IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | | |
|---|---|---|
| BRETT BENSON, RAYMOND SLEDGE, KENNETH PACHOLSKI, KATHRYN TYLER, and the ILLINOIS ASSOCATION OF FIREARMS RETAILERS, | ) ) ) ) | **FILED: July 6, 2010** |
| | ) ) | |
| Plaintiffs, | ) ) | |
| v. | ) ) | Civil Action No. |
| THE CITY OF CHICAGO and RICHARD M. DALEY, Mayor of the City of Chicago, | ) ) ) ) | |
| Defendants. | ) ) | |

## COMPLAINT FOR DECLARATORY JUDGMENT AND INJUNCTIVE RELIEF

Plaintiffs RAYMOND SLEDGE, BRETT BENSON, KATHRYN TYLER, KENNETH

PACHOLSKI, and the ILLINOIS ASSOCIATION OF FIREARMS RETAILERS, by and

through their attorneys, for their complaint against Defendants CITY OF CHICAGO and

RICHARD M. DALEY, Mayor, state as follows:

## INTRODUCTION

1.      This is an action to vindicate the federal constitutional rights of residents of

Chicago, Illinois, to keep and bear arms under the Second and Fourteenth Amendments to the

United States Constitution.

2.      The Supreme Court has unequivocally declared that the Second Amendment

"guarantee[s] the individual right to possess and carry" arms. *District of Columbia v. Heller*, 128

S. Ct. 2783, 2797 (2008). In particular, *Heller* struck down a ban on the possession of handguns,

1

"the most popular weapon chosen by Americans for self-defense in the home." *Id.* at 2818.  The City of Chicago ("the City") has long denied this fundamental right to its citizens, banning in 1982 all possession of handguns for any purpose whatsoever.  On June 28, 2010, in *McDonald v. City of Chicago*, 561 U.S. __, No. 08-1521, slip op. (2010) (attached as Ex. A), the Supreme Court made clear that, like other fundamental constitutional rights, the right to keep and bear arms is protected against infringement by state and local governments.  Accordingly, the City's total ban on handgun possession was patently unconstitutional.

3.      As the Supreme Court has noted, the City views the Second Amendment as "a second-class right," *id.* at 33 (plurality opinion), to be "singled out for … specially unfavorable []" treatment," *id.* at 31 (majority opinion), and thus the City promptly enacted an ordinance imposing a host of new restrictions that have the purpose and effect of preventing Plaintiffs and other law-abiding residents of Chicago from exercising their fundamental right to keep and carry firearms for self defense and other lawful purposes.

### PARTIES

4.      Plaintiff Brett Benson is a resident of Chicago and a citizen of the United States.

5.      Plaintiff Raymond Sledge is a resident of Chicago and a citizen of the United States.

6.      Plaintiff Kenneth Pacholski is a resident of Chicago and a citizen of the United States.

7.      Plaintiff Kathryn Tyler is a resident of Chicago and a citizen of the United States.

8.      The Illinois Association of Firearms Retailers ("ILAFR") is a non-profit entity organized under the law of Illinois and Section 501(c)(6) of the Internal Revenue Code to promote the interests of the firearms retail industry and the protection of Second Amendment

rights.  Its principal place of business is in Carbondale, Illinois.  Its members engage in the sale

of firearms, the operation of shooting ranges, and the operation of combined retail

operations/firing ranges in Illinois and several members would, if permitted, operate retail

establishments and shooting ranges in Chicago.

9.      Defendant City of Chicago is a political subdivision of the State of Illinois.

Defendant Richard M. Daley is the Mayor of Chicago, which is his principal place of business.

He is sued in his official capacity.  The City of Chicago, Mayor Daley, and their officers, agents,

and employees will sometimes hereafter be referred to as "Defendants."

## JURISDICTION

10.      Jurisdiction is founded on 28 U.S.C. § 1331 in that this action arises under the

Constitution of the United States, and under 28 U.S.C. § 1343(3), in that this action seeks to

redress the deprivation, under color of law, of rights secured by the United States Constitution.

11.      This action seeks relief pursuant to 28 U.S.C. §§ 2201 and 2202, and 42 U.S.C. §

1983.  Venue is proper in this district pursuant to 28 U.S.C. § 1391(b).

## BACKGROUND

12.      On June 28, 2010, the Supreme Court of the United States held in *McDonald v.*

*Chicago*, No. 08-1521 that the Second Amendment right to keep and bear arms restrains state

and local governments through incorporation in the Fourteenth Amendment.

13.      The Supreme Court remanded the case for the lower courts to apply the Second

Amendment to the challenged Chicago ordinance that effectively banned private ownership of

handguns within the city.  In anticipation that the ordinance challenged in *McDonald* would be

struck down, the City Council of Chicago, on July 2, 2010, amended the Municipal Code of

Chicago as it pertains to firearms ("the Ordinance") (a copy is attached as Ex. B).

14.    In his statements during the July 2, 2010 City Council meeting, Alderman Fioretti declared that the vindication of Second Amendment rights in *McDonald* "was not a good decision for law-abiding citizens."  Alderman Solis concurred, stating that "the decision made by the Supreme Court is not really in the best interests of our citizens."  Alderman Dixon denounced what she called the Court's "blatant … misreading of the law."  Another city council member likewise criticized the Justices of the Supreme Court, saying that "[w]e're here today because of their poor judgment … of how life is in large urban settings and cities like … Chicago.  I don't know how they can say we would be safer by allowing individuals, even if they are law-abiding citizens, to own and possess firearms in their homes."

15.    Alderman Lyle forecast that future generations would react to the Supreme Court's decision in *McDonald* with "shock and awe.  They will be amazed that in a country that is a leader of the free nations that we have such a reckless love affair with guns," and that Americans would actually spend time and money "litigating and discussing whether or not people have the right to carry many mass weapons of destruction. … They're going to wonder what madness overtook this country.  But that's where we find ourselves. … We find ourselves with a court that used to be occupied by literary legal giants, who now use this to take a slap at the leaders of the City of Chicago."

16.    Alderman Hairston complained about what he described as "the message the Supreme Court is sending.  I think that's the same message that the gang bangers are sending, that a life is not valuable.  That truly hurts my soul here.  I have to say it:  I think the Supreme Court is wrong.  Just like they've been wrong before."

17.    Alderman Mary Ann Smith echoed her fellows on the City Council, vowing to limit gun ownership with new legal restrictions and thanking "everyone who has worked to try

and create as restrictive a tool as possible." In describing the new Ordinance on July 1, 2010,
Chicago Corporation Counsel Mara Georges lauded the restrictions and concluded that "[w]e've
gone farther than anyone else ever has."

## THE NEW ORDINANCE

18.     Several of the provisions of the Ordinance infringe Plaintiffs' constitutional right
to keep and bear arms and are therefore challenged here.

19.     Pursuant to MCC § 8-20-110, no person may "carry or possess a firearm without
a [Chicago Firearm Permit]" ("CFP") and no person may obtain such a permit unless he is "21
years of age or older." A person 18 to 20 years of age may obtain a CFP only if (1) "the person
has the written consent of his parent or legal guardian" and (2) the parent or guardian is not
prohibited from having a CFP or an Illinois Firearm Owner' Identification Card ("FOID"). *Id.* at
§ 8-20-110(b)(1). Thus the Ordinance impermissibly burdens the exercise of the right to keep
and bear arms by all law-abiding adults under the age of 21 and effectively prohibits the exercise
of such rights by such individuals who do not have parents or guardians, or whose parents or
guardians refuse to give consent (for whatever reason or no reason), or whose parents or
guardians are ineligible for obtaining their own CFP or FOID.

20.     Section 4-144-010 states that it shall be unlawful for any person "to engage in the
business of selling, or to sell, give away or otherwise transfer, any firearm." Section 8-20-100
states that "no firearm may be sold, acquired or otherwise transferred within the city, except
through inheritance of a firearm." Thus, apart from bequests, the Ordinance imposes a total ban
on the sale or transfer of firearms within Chicago.

21.     Section 8-20-110 prohibits possession of a firearm without a Chicago Firearms
Permit, and Section 8-20-120 states that no person can obtain such a permit without "an affidavit

5

signed by a firearm instructor certified by the State of Illinois … attesting that the applicant has completed a firearm and safety training course, which, at a minimum, provides one hour of range training." Yet Section 8-20-280 states that "[s]hooting galleries, firearm ranges, or any other place where firearms are discharged are prohibited." Thus, the Ordinance dictates that there can be no place in Chicago where one can obtain the firearms training that the Ordinance itself mandates for legal possession of a firearm. This provision impermissibly burdens the right to keep and bear arms of all residents of Chicago and effectively denies that right entirely for individuals who lack the means to travel to a jurisdiction where firearms training is available.

22.    Section 8-24-10 states that "no person shall fire or discharge any firearm within the city, except in lawful self-defense or defense of another" or for delimited hunting purposes. Although on its face this purports to preserve the right to use a firearm in self-defense, by proscribing the discharge of a gun for training or practice purposes, the Ordinance dictates that the residents of Chicago cannot obtain the firearms training that the Ordinance itself requires in Chicago and that is otherwise desired by Plaintiffs and other gun owners to achieve and maintain proficiency in the operation and use of their firearms. This provision impermissibly burdens the right to keep and bear arms of all residents of Chicago and effectively denies that right entirely for individuals who lack the means to travel to a jurisdiction where firearms training is available.

23.    Section 8-20-040 prohibits the possession of more than one "assembled and operable" firearm within the home, even by someone who is fully licensed to possess a firearm by the Ordinance. Any other firearms owned by that person must be disassembled or otherwise rendered "inoperable." If there is more than one person in the home with a CFP and a registration certificate, each such person is allowed only one gun in an operable condition.

6

24.     Section 8-20-140 prohibits possession of a firearm without a "firearm registration certificate," and Section 8-20-170(b) declares that such a certificate may not be issued for "an unsafe handgun." An "unsafe handgun" is defined as "any handgun that is listed on the superintendent [of the department of police's] roster of unsafe handguns because, in the determination of the superintendent, the handgun is unsafe due to its size, ability to be concealed, detectability, quality of manufacturing, quality of materials, ballistic accuracy, weight, reliability, caliber, or other factors which makes the design or operation of the handgun otherwise inappropriate for lawful use." MCC § 8-20-010.

25.     Although the Ordinance furthers the pretense that Section 8-20-170(b) is a safety regulation by including in the superintendent's determination such factors as "reliability" and "quality of manufacturing," in truth the law gives that official unfettered discretionary power to proscribe ownership of any—or all—handguns as "unsafe." Indeed, several of the factors that the Ordinance lists as potentially leading to ban on a particular model of handgun as "unsafe" are parameters that would in any reasonable determination count as *virtues* for a self-defense weapon. A small, light handgun, of small caliber, is easier to handle and wield—especially for the elderly, the infirm, and for women—yet the Ordinance provides that "size," "weight," and "caliber" may be used to ban a handgun as "unsafe."

26.     Moreover, under Section 8-20-170(b), Plaintiffs and other residents of Chicago face continuing uncertainty as to whether handguns they own will, without opportunity for public notice or comment, suddenly be placed on the "unsafe handguns" list.

27.     Section 8-20-060(a) outlaws the possession of—and legally defines as contraband—any "laser sight accessory." This proscription is facially at war with the Ordinance's supposed purpose of promoting the safety of Chicago's residents. A laser aiming

device substantially enhances the user's prospects for hitting the target—such as an attacker in one's home—and banning such devices therefore impairs the ability to exercise, safely and effectively, the right to armed self-defense.  Moreover, laser aiming devices limit collateral consequences of missed shots and may end a confrontation with a "laser stop," rather than a discharge, further adding to their public safety benefits.

28.     Section 8-20-020 renders it "unlawful for any person to carry or possess a handgun, except when in the person's home."  Section 8-20-030 renders it "unlawful for any person to carry or possess a long gun, except when in the person's home or fixed place of business."  Section 8-20-140(a) renders it "unlawful for any person to carry or possess a firearm without a firearm registration certificate," and Section 8-20-180(c) states that "[a] registration certificate shall only be valid for the address on the registration certificate," and "[e]xcept in the lawful transportation of a firearm, a person shall not carry or possess any firearm at any location other than that authorized by the registration certificate."  Thus the Ordinance imposes a total ban in Chicago on possessing or carrying a firearm outside one's home for personal protection, except in one's fixed place of business where long guns, but not handguns, are permitted.  For example, if an elderly widow lives in an unsafe neighborhood and asks her son to spend the night because she has recently received harassing phone calls, the son may not bring his registered firearm with him to his mother's home as an aid to the defense of himself and his mother. Similarly, if a resident of Chicago owns his own business, such as a convenience store, in a dangerous neighborhood, the resident may not carry his firearm each day from his home to his business for purposes of self-protection.  Nor may he possess a handgun at his place of business, even if he is disabled or otherwise incapable of operating a long gun.

8

29.    As contemporaneous statements from City officials attest, the Mayor and City Council designed the Ordinance to evade the Supreme Court's vindication of Second-Amendment rights in *McDonald*, to be as "restrictive a tool as possible" for suppressing gun ownership, and to go "farther than anyone else ever has" in restricting the exercise of the right to keep and bear arms.

30.    Violation of the Ordinance is punishable by fines up to $10,000 and incarceration for up to six months.  Each day that such violation exists constitutes a separate offense.  MCC § 8-20-300(a) & (b).

31.    Defendant Daley is responsible for enforcing the Ordinance through agencies under his direction.

## THE IMPACT OF THE ORDINANCE ON THE PLAINTIFFS

32.    Plaintiff Brett Benson is a 37-year-old resident of Chicago.  He is married and has three young children.  He is a trader on the Chicago Mercantile Exchange.  He owns a farm in central Illinois about two hours from Chicago.

33.    Mr. Benson desires to keep more than one operable handgun and long gun in his home for the protection of his family and property, but the Ordinance prohibits him from doing so.

34.    But for the Ordinance, Mr. Benson would on occasion carry a handgun for self-defense when outside his home, as that term is defined in the Ordinance.  He would, for example, sometimes carry a gun in his vehicle, both for self-defense and for the purpose of transporting it between his farm and his home.

35.     To purchase a gun under the current legal regime, Mr. Benson must travel outside the city at least twenty miles from his home.  He would buy firearms within the city if sales of these items were permitted by the law.

36.     Plaintiff Raymond Sledge is a 53-year-old resident of Chicago.  He has been employed for the last sixteen years as a teaching assistant at a public elementary school in Chicago.

37.     Although he owns his own house, his current legal residence is his mother's house a few blocks away, in the south side neighborhood of Greater Grand Crossing.  He moved in with his mother several years ago to take care of her after his father passed away.  They share their Chicago home with Mr. Sledge's brother; Raymond Sledge assists in his brother's care, including taking him for kidney dialysis every week.

38.     The Sledge home is located just a few blocks from a high-crime area, and Mr. Sledge often has to travel through that part of town.  According to the City Council representative for the area, Alderman Lyle, the neighborhood has a shortage of commercial establishments, and residents complain of high crime and poor city services.  Since June 18, 2010, the following crimes have been reported within an eight-block radius of the Sledge home: battery, aggravated assault with a handgun, aggravated assault with a knife, and aggravated vehicular hijacking.

39.     Both Mr. Sledge's house and that of his mother have been burglarized; in each instance the burglars broke into the garage and stole property.  But a garage (attached or unattached) is expressly excluded from the statutory definition of one's "home," MCC § 8-20-010, and therefore the Ordinance would criminalize use of a firearm to defend one's life, family, and property in one's own garage.

40.     Mr. Sledge grew up hunting with his father and owns two long guns that he is allowed to have within the city limits because they were grandfathered in the early 1980s when the law preceding the current Ordinance was enacted.  He also owns several handguns but has been barred from keeping them in his residence by the statute that was challenged in *McDonald*.

41.     Mr. Sledge would keep those handguns in his residence in Chicago if the law permitted.

42.     Plaintiff Sledge also wants to be able to carry his handgun outside his home in order to defend himself, but he is prevented from doing so by the Ordinance.

43.     Plaintiff Sledge believes that private citizens should be trained in responsible handling of their firearms and should practice with them to maintain proficiency.  But he cannot practice or train with his firearms in Chicago because the Ordinance bans firing ranges and the discharge of firearms within city limits.  Nor can he purchase firearms within Chicago—again he must leave the city to do so.  He currently uses the firing range at a gun shop outside Chicago city limits some twenty minutes from his residence, but would use a closer facility if it existed within the city.

44.     Plaintiffs Kenneth Pacholski and Kathryn Tyler are a married couple and residents of Chicago.  Mr. Pacholski is self-employed in the aircraft restoration business.  Dr. Tyler is a veterinarian and the owner of her own animal clinic.

45.     Mr. Pacholski and Dr. Tyler own firearms but, because of the prior ban, kept them outside the city limits.  They desire to keep more than one operable handgun each in their home, but are precluded from doing so under the Ordinance.

46.     Dr. Tyler, on occasion, has a desire to possess a handgun for armed self-defense at her place of business.  Dr. Tyler would much prefer to use a handgun rather than a long gun

11

for such purposes, both because a handgun is easier to use and because transporting a long gun is much less practicable.  For example, in the past, the emergency alarm at her business has activated in the middle of the night and she has had to proceed alone to address the situation. She would carry a handgun for personal self-defense in such circumstances were she not precluded from doing so under the Ordinance.

47.     To purchase a gun under the current legal regime, or to practice with and receive training for their firearms at a range, Mr. Pacholski and Dr. Tyler must travel outside the city. They would buy firearms within the city if sales of these items were permitted by the law; they would also practice at ranges within the city if such ranges were permitted to operate under the law.

48.     Plaintiff ILAFR has members who desire to sell firearms and to operate shooting ranges inside Chicago city limits for patronage by law-abiding residents—including law-abiding adults 18 to 21 years of age—and would do so but for the Ordinance.

49.     Under the Ordinance, Plaintiffs Sledge, Benson, Pacholski, and Tyler face arrest, prosecution, and incarceration should they possess firearms in their homes or carry them outside their homes in violation of the Ordinance.  The members of Plaintiff ILAFR face arrest, prosecution, and incarceration if they sell firearms or operate a shooting range in violation of the Ordinance.

## COUNT I

### (U.S. CONST., AMENDS. II AND XIV, 42 U.S.C. § 1983)

50.     The preceding paragraphs are incorporated herein.

51.     The Ordinance outlaws some uses of firearms for self-defense within one's home. *See* MCC §§ 8-20-020, -030   The statutory definition of "home" expressly excludes "(i) any

garage, including an attached garage, on the lot; (ii) any space outside the dwelling unit, including any stairs, porches, back, side or front yard space, or common areas." MCC § 8-20-010.

52.     Thus the Ordinance outlaws the exercise of the right to bear arms in self-defense even when one is in one's own garage, on one's own back porch, or on the steps leading up to one's front door.

53.     These provisions infringe upon, and impose an impermissible burden upon, the Plaintiffs' right to keep and bear arms under the Second and Fourteenth Amendment.

## COUNT II

### (U.S. CONST., AMENDS. II AND XIV, 42 U.S.C. § 1983)

54.     The previous paragraphs are incorporated herein.

55.     Section 8-20-110 of the Ordinance provides that no person may "carry or possess a firearm without a CFP" and that no person may obtain such a permit unless he or she is "21 years of age or older."  A person 18 to 20 years of age may obtain a CFP only if (1) "the person has the written consent of his parent or legal guardian" and (2) the parent or guardian is not prohibited from having a CFP or an Illinois Firearm Owner' Identification Card ("FOID").

56.     This provision directly restricts the ability of members of Plaintiff ILAFR to sell firearms to law-abiding adult residents of Chicago or to sell them time on shooting ranges if they are under the age of 21.

57.     This provision infringes upon, and imposes an impermissible burden upon, the rights of law-abiding adults under the age of 21 to keep and bear arms under the Second and Fourteenth Amendments.

13

58.     This provision further violates the Constitution by denying adult citizens between the ages of 18 and 21 the equal protection of the laws.

## COUNT III

### (U.S. CONST., AMENDS. II AND XIV, 42 U.S.C. § 1983)

59.     The previous paragraphs are incorporated herein.

60.     Section 4-144-010 states that it shall be unlawful for any person "to engage in the business of selling, or to sell, give away or otherwise transfer, any firearm."  Section 8-20-100 states that "no firearm may be sold, acquired or otherwise transferred within the city, except through inheritance of a firearm."

61.     These provisions thus impose a total ban on the sale or transfer of firearms within Chicago, and thereby infringe upon, and impose an impermissible burden upon, the Plaintiffs' right to keep and bear arms under the Second and Fourteenth Amendments.

62.     These provisions prohibit members of Plaintiff ILAFR from selling firearms within Chicago and infringe upon, and impose an impermissible burden upon, the rights all adult law-abiding residents of Chicago.

## COUNT IV

### (U.S. CONST., AMENDS. II AND XIV, 42 U.S.C. § 1983)

63.     The previous paragraphs are incorporated herein.

64.     Section 8-20-110 prohibits possession of a firearm without a CFP and Section 8-20-120 states that no person can obtain a CFP without "an affidavit signed by a firearm instructor certified by the State of Illinois … attesting that the applicant has completed a firearm and safety training course, which, at a minimum, provides one hour of range training."

65.     Yet Section 8-20-280 states that "[s]hooting galleries, firearm ranges, or any other place where firearms are discharged are prohibited."  The Ordinance thus dictates that there can be no place in Chicago where one can obtain the firearms training that the Ordinance itself mandates for legal possession of a firearm.

66.     Section 8-24-010 further provides that "no person shall fire or discharge any firearm within the city, except in lawful self-defense or defense of another" or for very limited hunting purposes.  By proscribing the discharge of a gun for training or practice purposes, the Ordinance in fact precludes citizens from engaging in the training that the Ordinance itself mandates as a prerequisite to legal gun ownership.

67.     These provisions infringe upon, and impose an impermissible burden upon, Plaintiffs' right to keep and bear arms under the Second and Fourteenth Amendments.

68.     These provisions prohibit members of Plaintiff ILAFR from operating shooting ranges within Chicago and infringe upon, and impose an impermissible burden upon, the rights of all adult, law-abiding residents of Chicago.

## COUNT V

### (U.S. CONST., AMENDS. II AND XIV, 42 U.S.C. § 1983)

69.     The previous paragraphs are incorporated herein.

70.     Section 8-20-040 prohibits the possession of more than one "assembled and operable" firearm within the home by someone who is fully licensed under the Ordinance to possess a firearm.  Any other firearms owned by that person must be disassembled or otherwise rendered "inoperable."  If there is more than one person in the home with a CFP and a registration certificate, each such person is allowed only one gun in an operable condition.

15

71.     The Ordinance thus bars a licensed gun owner from keeping more than one operable firearm in the home for self-defense, either to have a firearm available in more than one room of the dwelling in case of emergency, or to have a firearm available to more than one adult member of the family.  In the event of a home invasion, all family members would be dependent upon the ability of a single person in a single location to obtain immediate access to a single operable weapon.

72.     These provisions infringe upon, and impose an impermissible burden upon, the Plaintiffs' right to keep and bear arms under the Second and Fourteenth Amendments.

### COUNT VI

### (U.S. CONST., AMENDS. II AND XIV, 42 U.S.C. § 1983)

73.     The previous paragraphs are incorporated herein.

74.     Section 8-20-140 prohibits possession of a firearm without a "firearm registration certificate," and Section 8-20-170(b) declares that no such certificate may be issued for "an unsafe handgun."  An "unsafe handgun" is defined in the Ordinance as "any handgun that is listed on the superintendent [of department of police's] roster of unsafe handguns because, in the determination of the superintendent, the handgun is unsafe due to its size, ability to be concealed, detectability, quality of manufacturing, quality of materials, ballistic accuracy, weight, reliability, caliber, or other factors which makes the design or operation of the handgun otherwise inappropriate for lawful use."  MCC § 8-20-010.

75.     The unbridled discretion that the Ordinance confers upon Chicago's law enforcement authorities thus violates the Second Amendment and the Fourteenth Amendment's guarantee of Due Process of Law.

## COUNT VII

### (U.S. CONST., AMENDS. II AND XIV, 42 U.S.C. § 1983)

76.     The preceding paragraphs are incorporated herein.

77.     Section 8-20-060(a) outlaws the possession of—and legally defines as contraband—any "laser sight accessory."

78.     This provision undermines, rather than promotes, the Ordinance's supposed goal of promoting firearms safety, and in any event it infringes upon, and imposes an impermissible burden upon, the right to keep and bear arms guaranteed by the Second and Fourteenth Amendments.

## COUNT VIII

### (U.S. CONST., AMENDS. II AND XIV, 42 U.S.C. § 1983)

79.     The preceding paragraphs are incorporated herein.

80.     Section 8-20-020 makes it "unlawful for any person to carry or possess a handgun, except when in the person's home."  Section 8-20-030 makes it "unlawful for any person to carry or possess a long gun, except when in the person's home or fixed place of business."  Section 8-20-140(a) renders it "unlawful for any person to carry or possess a firearm without a firearm registration certificate," and Section 8-20-180(c) states that "[a] registration certificate shall only be valid for the address on the registration certificate," and "[e]xcept in the lawful transportation of a firearm, a person shall not carry or possess any firearm at any location other than that authorized by the registration certificate."

81.     Thus the Ordinance imposes a complete and total ban in Chicago on possessing or carrying a firearm outside one's home for personal protection—except in one's fixed place of business, where long guns, but not handguns, are permitted—and thereby infringes upon, and

17

imposes an impermissible burden upon, the Plaintiffs' rights under the Second and Fourteenth Amendments.

WHEREFORE, Plaintiffs pray that the Court:

A.     Enter a declaratory judgment that MCC §§ 4-144-010, 8-20-010 (to the extent it defines "home" and "unsafe handgun"), 8-20-020, 8-20-030, 8-20-040, 8-20-060, 8-20-100, 8-20-110(b)(1), 8-20-170(b), 8-20-180(c), 8-20-280 , and 8-24-010 are null and void because such provisions infringe Plaintiffs' constitutional rights under the Second and Fourteenth Amendments.

B.     Issue injunctive relief prohibiting Defendants and their agents from enforcing MCC §§ 4-144-010, 8-20-010 (to the extent it defines "home" and "unsafe handgun"), 8-20-020, 8-20-030, 8-20-040, 8-20-060, 8-20-100, 8-20-110(b)(1), 8-20-170(b), 8-20-180(c), 8-20-280 , and 8-24-010.

C.     Award Plaintiffs costs and attorneys' fees pursuant to 42 U.S.C. § 1988.

D.     Grant such other relief as may be proper.


Respectfully submitted,


Charles J. Cooper*
David H. Thompson*
Jesse Panuccio*
COOPER & KIRK, PLLC
1523 New Hampshire Ave., NW
Washington, D.C.  20036
Tel: (202) 220-9600
Fax: (202) 220-9601
Email: ccooper@cooperkirk.com

Brian S. Koukoutchos*

s/ Stephen Kolodziej
Stephen Kolodziej
Atty. ID# 6216375
BRENNER FORD MONROE & SCOTT LTD.
33 N. Dearborn St., Suite 300
Chicago, IL  60602
Tel: (312) 781-1970
Fax: (312)781-9202
Email: skolodziej@brennerlawfirm.com

*Designated Local Counsel*

28 Eagle Trace
Mandeville, LA  70471
Tel: (985) 626-5052
bkoukoutchos@gmail.com

*Application for admission *pro hac vice* forthcoming.

*Counsel for Plaintiffs*

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF ILLINOIS**
**EASTERN DIVISION**

| | | |
|---|---|---|
| **BRETT BENSON, RAYMOND SLEDGE,** | ) | |
| **KENNETH PACHOLSKI, KATHRYN TYLER,** | ) | |
| **and the ILLINOIS ASSOCATION OF** | ) | |
| **FIREARMS RETAILERS,** | ) | **FILED: July 6, 2010** |
| | ) | |
| | ) | |
| **Plaintiffs,** | ) | |
| | ) | |
| **v.** | ) | **Civil Action No.** |
| | ) | |
| **THE CITY OF CHICAGO and** | ) | |
| **RICHARD M. DALEY, Mayor of the** | ) | |
| **City of Chicago,** | ) | |
| | ) | |
| **Defendants.** | ) | |

## L.R. 3.2 Notification of Affiliates

Pursuant to Local Rule 3.2 of the United States District Court for the Northern District of Illinois, Plaintiff Illinois Association of Firearms Retailers, a nonprofit corporation, hereby states that it has no publicly held affiliates.

s/ Stephen A. Kolodziej

Stephen A. Kolodziej
Local Counsel for Plaintiffs