# Exhibit A

## Expert Rebuttal Report of Gary Kleck

### I.    Background and Qualifications

I am a Professor of Criminology and Criminal Justice at Florida State University.  I received my doctorate in Sociology from the University of Illinois in 1979, where I received the University of Illinois Foundation Fellowship in Sociology.  I am the David J. Bordua Professor of Criminology at Florida State University, where I have been on the faculty since 1978, and previously served as its Director of Graduate Studies.   My research has focused on the impact of firearms and gun control on violence, and I have been called "the dominant social scientist in the field of guns and crime" (Vizzard, 2000, p. 183).

I have published the most comprehensive reviews of evidence concerning guns and violence in the scholarly literature, which inform and serve as part of the basis of my opinions.  I am the author of Point Blank: Guns and Violence in America, which won the 1993 Michael J. Hindelang Award of the American Society of Criminology, awarded to the book of the previous several years which "made the most outstanding contribution to criminology."  More recently, I authored Targeting Guns (1997) and, with Don B. Kates, Jr., co-authored The Great American Gun Debate (1997) and Armed: New Perspectives on Gun Control (2001).

I have also published scholarly research in all of the leading professional journals in my field.  Specifically, my articles have been published in the American Sociological Review, American Journal of Sociology, Social Forces, Social Problems, Criminology, Journal of Criminal Law and Criminology, Law & Society Review, Journal of Research in Crime and Delinquency, Journal of Quantitative Criminology, Law & Contemporary Problems, Law and Human Behavior, Law & Policy Quarterly, Violence and Victims, Journal of the American Medical Association, and other scholarly journals.  My research and writings have addressed, among other topics, the impact of guns on homicide, suicide, crime, and gun accidents; the impact of gun control laws on homicide, suicide, crime, and gun accidents; the measurement of aggregate gun ownership levels; the defensive use of guns by crime victims; the carrying of firearms for self-protection; gun trafficking, and the use of gun trace data for exploring how criminals get guns; and methodological problems in research on guns and violence.  A list of my writings, including those authored in the previous 10 years, is included in my *curriculum vitae*, attached as Exhibit A to this report.

I have testified before Congress and state legislatures on gun control issues, and worked as a consultant to the National Research Council, National Academy of Sciences Panel on the Understanding and Prevention of Violence and as a member of the U.S. Sentencing Commission's Drugs-Violence Task Force.  I am a referee for over a dozen professional journals, and serve as a grants consultant to the National Science Foundation.

Finally, I teach doctoral students how to do research and evaluate the quality of research evidence, and have taught graduate courses on statistical techniques and survey research methodology.

I have not testified as an expert at trial or by deposition during the previous four years.  I am being compensated for my work at the rate of $350 per hour.

## II.      Materials Considered

In addition to the materials referenced in this report and, more generally, the studies of guns and violence that I have authored, which are listed in my *curriculum vitae*, I also considered and reviewed the materials listed in Exhibit B in writing this report.

## III.     Rebuttal of Expert Witnesses

This report rebuts the criminological claims made in the expert witness reports of Joseph J. Vince, Jr., Daniel W. Webster, and Philip J. Cook.

## A.      REPORT OF JOSEPH J. VINCE, JR.

My rebuttal is organized to follow the sequence of Mr. Vince's report, using his section divisions, starting with his education and experience and continuing to evaluate his substantive claims.

### Education and Experience

Mr. Vince has undoubted expertise in the enforcement of federal gun control laws, in connection with his employment with the federal Bureau of Alcohol, Tobacco, and Firearms. This expertise, however, has no relevance to the factual issues involved in this case. He has never done any research on the effects of firearms availability on crime, suicide, or gun accidents, or the impact of gun control laws or firearms storage practices on these forms of violence, and shows no evidence of being familiar with research done by others. He also has no training in research methods or statistics that would enable him to distinguish methodologically sound research from unsound, unreliable research on these topics. In general, he simply mentions his "experience" in law enforcement, and asks the reader to take on faith that this somehow enables him to judge the effects of key elements of Chicago gun law. By itself, experience in law enforcement cannot provide expertise on issues like the impact of restricting gun sales, the effects of requiring guns to be maintained in an inoperable condition, or the other factual issues at stake in this case. One cannot directly observe effects of gun control provisions, in connection with law enforcement experience or any other kind of personal experience, since one cannot directly observe, in the course of professional experience, crimes or other acts of violence <u>not</u> occurring. Likewise, knowledge of violence that does occur can tell us nothing, by itself, about whether the same or similar acts would have occurred in the absence of guns or gun control provisions. These effects can only be indirectly detected using scientific research methods, and Mr. Vince lacks the training and knowledge that would enable him to either conduct such research himself, or be able to judge the relative technical merits of research done by others. The arguments and evidence Mr. Vince cites are anecdotal (e.g., pp. 3-4 citations of individual incidents of violent crime) and unscientific, and can reveal nothing about the consequences of Chicago's restrictions on guns.

### Section A – Firearms-related Violence in Chicago

Mr. Vince asserts that firearms-related violence "is a systemic and epidemic problem in the City of Chicago" (p. 3). He does not explain what he means by "systemic" in this context, and I am not aware of any relevant commonly understood meaning. Use of the term "epidemic" to describe a problem commonly implies that the problem is spreading or becoming worse, but Vince proffers no evidence to indicate upward trends in gun violence; the anecdotes he derives

from scattered news stories about gun violence are just as compatible with declining rates as with increasing rates. Vince's poorly labeled Figure 9b (p. 5; the horizontal axis does not properly denote the year to which each pair of columns pertains) reports raw counts of murders, not rates, and even this material does not support Vince's implied claim that firearms violence is increasing in Chicago, since even raw counts of firearms homicides declined from period "2" (apparently 2001) to period 5 (apparently 2004), from period 7 (2006?) to period 8 (2007?), and most recently, from period 9 (2008?) to period 10 (2009?).

**Section B – Chicago's Firearm-Storage Restrictions and the Use of Firearms for Self-Defense.**

Mr. Vince asserts that Chicago's gun restrictions do "not prohibit (sic) individuals from effectively utilizing a firearm for self-defense." Of course the ordinance does not prohibit effective defensive gun use (DGU) (it is silent on the matter) – but I assume that Vince meant that the restrictions do not *prevent* people from effectively using guns effectively for self-defense, and will assess his claims in this light. Nothing presented by Vince in this section actually bears on whether some effective DGUs are prevented by the ordinance's ban on Chicago Firearms Permit (CFP) holders keeping more than one gun "assembled and operable" in their homes.

Vince cites the firearms handling and storage practices of law enforcement officers, but fails to note that none of his sources indicate that officers maintain their guns in a locked status while they are on-duty and thus at risk of being attacked. He notes that officers face more danger than the average civilian, but fails to note that civilians are no more able to anticipate attacks and other criminal threats than police officers. Not knowing when a threat will arise, civilians must have their guns ready for use much or all of the time, just as on-duty police officers keep their duty weapons operable, loaded, and ready for immediate use. Mr. Vince also reports that law enforcement agencies keep guns they have seized locked, and that many retail gun dealers keep their guns secured by trigger locks or other locking devices (pp. 6-8). Neither category of information is relevant to guns kept for defensive purposes, since law enforcement officers do not expect to use confiscated guns for self-protection (they have their own duty weapons for that purpose), nor do gun dealers expect to use any of their guns for sale in self-defense. Thus, these storage practices have no bearing on whether keeping guns locked or otherwise inoperable reduces their utility for self-defense.

Vince cites instances of various parties distributing gun locking devices or urging their use (pp. 8-10), but fails to cite any evidence bearing on what fraction of the recipients actually made regular use of the locking devices, whether their use prevented harmful gun discharges, or whether their use impaired DGU. The fact that those distributing the locks *hoped* to thereby prevent violence is not evidence that distribution actually had such effects.

Perhaps the closest Vince ever comes to presenting evidence bearing on whether some effective DGUs are prevented by the ordinance's ban on CFP holders keeping more than one gun "assembled and operable" in their homes is when he relates his visits to sporting goods stores and his informal tests of how long it takes to disengage trigger locks (p. 14). Even this material, however, can tell us nothing about whether some effective DGUs are prevented by the use of trigger locks, since the exercise was unscientific in that it did not simulate the most important elements of situations where a gun is likely to be used or needed for self-defense in the home. A

well-lighted sporting goods store does not simulate the conditions of darkness that prevail during many crimes, and darkness is surely related to how quickly a prospective defender can place a key in a lock or enter a combination. Likewise, the calm circumstances of Mr. Vince's informal exercise do not simulate the high stress and physiological arousal experienced by a victim during a crime. When a person's pulse rate and blood pressure are elevated and his or her hands are shaking, this surely affects the person's ability to disengage a locking device. In sum, none of the evidence Vince presents contradicts the hypothesis that requiring a gun to be secured by a locking device will sometimes prevent effective defensive use of the gun.

Mr. Vince also cites the opinions of store clerks as to the merits of various locking devices sold in their stores. He shows no awareness of the possibility that store employees might have a vested interest in overstating the virtues of the products they sell.

Vince asserts (p. 13) that law enforcement officers almost always carry only a single firearm. This is not quite true, since most officers patrol in vehicles, and it is commonplace for vehicles to also contain a shotgun, in addition to sidearms that officers keep on their persons. This is one form of gun carrying, albeit not carrying on the person. Further, many officers carry a small back-up gun on their person in addition to their standard service weapon. More specifically, the Chicago Police Department allows its uniformed sworn officers to carry "two exposed firearms" (Chicago Police Department 2007). Indeed, under some circumstances, if CPD officers elect to carry an auxiliary subcompact semiautomatic pistol, they generally *must* also carry another weapon (Chicago Police Department 2010). Leaving these issues aside, however, the fact that many officers usually carry only one gun on their person does not support Vince's claim that civilians gain no defensive benefit from having more than one operable gun per CHP holder in their home. Police officers usually do not need more than one operable gun because while on duty they always carry that one gun on their person, and thus it is always immediately available for use. It is a cumbersome, but required condition of police work that they always carry a gun. In contrast, civilians in their homes do not ordinarily carry their guns on their person as they move from room to room, nor do they sleep with a gun on their person. They can only use a gun for protection in their home if one is located near enough to them at the time a crime occurs that they can retrieve the gun in a timely fashion, and the gun is in a relatively operable ready condition, i.e. ready for use before a criminal attacks or otherwise victimizes the resident or another occupant. Thus, the fact that many police officers carry only one gun on their person is of no relevance to whether Chicago's limits on number of operable guns impair effective DGU.

Vince claims (p. 14) that since Chicago citizens may own as many additional guns (in addition to the one gun per permit holder kept operable) as they like, the safe storage requirements pertaining to these other guns (keeping them in an inoperable condition) does "not impair the effective utilization of that firearm for self-defense." This is a *non sequitur*. None of the evidence Vince cites or the arguments he offers justify the notion that a gun kept in an inoperable condition (unloaded and locked or disassembled) is just as usable for self-defense as one kept in an operable condition. This assertion appears to be nothing more than an unsupported personal opinion of Mr. Vince. It also ignores the legal fact that the instant a second gun is made operable in a Chicago home (i.e. is unlocked and loaded), it constitutes a violation of the Chicago gun ordinance and cannot be legally used for self-defense.

Mr. Vince nowhere offers any explanation of how Chicago's restriction on the number of operable guns could have violence-reduction benefits by limiting access to guns among those who would misuse the weapons, yet not also limit access among household members to guns for purposes of lawful self-defense.

**Section C – Oversight and Regulations of Gun Sores by the Bureau of Alcohol, Tobacco, Firearms and Explosives (ATF).**

On pp. 15-20, Vince addresses Chicago's ban on handgun sales, but somehow links it with ATF's supposed inability to provide sufficient regulation of gun stores. The idea seems to be that this inability is a good reason why gun sales ought to be banned altogether. There are two problems with this argument: (1) the premise that ATF lacks the resources and authority to regulate gun stores is false, and (2) there is no sound evidence that banning gun sales, for whatever reason, has the benefits that Vince claims for the measure.

Vince leans heavily on one source to justify his claim that ATF lacks the resources and authority to regulate gun stores – a 2004 report by the Office of Inspector General (OIG) of the Department of Justice (p. 18, and Exhibit 5). He mischaracterizes the findings of this report. The OIG did not conclude that ATF lacked the resources and authority to regulate gun stores or otherwise enforce federal gun laws, but rather that ATF did not make effective use of the resources and authority that they did possess. In any case, Vince's assertion that ATF is overwhelmed by the magnitude of their regulatory duties is not supported by relatively recent data. Vince cites parts of the OIG report that refer to 104,000 federal firearms licensees (FFLs), and only 4,581 FFL compliance inspections. These data, however, pertain to FY 2002. More recent data available on the ATF website indicate that in FY 2007, there were only about 60,000 FFLs (U.S. Bureau of Alcohol, Tobacco, Firearms and Explosives 2011), greatly reducing the regulatory burden on ATF. Further, earlier research by ATF indicated that only a tiny fraction of all FFLs actually sell a significant number of guns. Operation Snaphot, a survey of FFLs, revealed that 46% of them sold *no* guns in the preceding year, and another 34% sold between one and ten guns. Only 7% sold over 50 guns and thus could potentially be a source of significant numbers of guns flowing into illegal channels (U.S. Bureau of Alcohol, Tobacco, Firearms 1993). Since 7% of 60,000 FFLs is just 4,200 gun dealers, even if ATF could do no more compliance inspections than they did back in FY 2002, they would still be able to do one *every* year for *every* single FFL selling significant numbers of guns. The OIG report, however, concluded that ATF should in fact be able to do far more compliance inspections with existing resources, if they used them more wisely. And in fact, an ATF report states that in FY 2007 "ATF conducted approximately 10,000 compliance inspections" (U.S. Bureau of Alcohol, Tobacco, Firearms and Explosives 2008) – a number sufficient to inspect all "real" gun dealers (those annually selling more than 50 guns) *every* year, plus a sample of low-volume dealers. Thus, it is not true that ATF lacks the resources and authority to regulate gun stores, in Chicago or elsewhere, and this cannot be used to justify totally banning gun sales within the city of Chicago. Vince also implies that banning gun sales in Chicago will reduce gun possession among the city's criminals and thereby reduce firearms crime, but does not cite any research indicating that local sales bans have such effects. Existing evidence indicates that they do not (Kleck and Patterson 1993; Britt, Kleck, and Bordua 1996).

Vince notes that 1% of FFLs account for "the vast majority of crime guns" (p. 17) and implies that knowing the identity of these dealers should, if ATF did not suffer from an "enforcement gap," enable it to go after these dealers and thereby reduce the number of guns used by criminals. Contrary to Mr. Vince's interpretation, it is now well-established that this concentration of traced crime guns among relatively few FFLs is almost entirely attributable to (1) the fact that those dealers also account for a similarly large fraction of all gun sales, which leads to large numbers of these dealers' lawfully sold guns eventually being stolen and falling into criminal hands, even if the dealers' sales were all completely lawful and ethical, and to (2) the fact that some dealers do business in higher crime areas, which increases the fraction of their lawfully sold guns that are eventually stolen. Thus the citation of this concentration of traced crime guns is misleading and likely to lead a reader to believe in the unsupported notion that the tracing of large numbers of crime guns to a few dealers is due to FFL misconduct. "Bad" FFLs are of virtually no significance in supplying guns to criminals, directly or indirectly (see the summary of evidence in Kleck and Wang 2009).

**Recommendations**

Vince's report ends with a series of recommendations for changes in local policies and enforcement activities that have nothing to do with the challenged elements of Chicago's current gun ordinances, and nothing whatsoever to do with empirical evidence on which gun control policies reduce crime and violence. Mr. Vince does not cite any evidence that similar measures have proven effective elsewhere, or even that the measures logically follow from what is known about how criminals acquire guns. Instead the list of proposed measures appears to be little more than a series of policies that Mr. Vince personally favors.

**B.     REPORT OF DANIEL W. WEBSTER**

My rebuttal is organized to follow the sequence of Professor Webster's report, using his section divisions, and focusing on his substantive research-based sections, V to X. The full citations for studies that Webster relies on may be found in his report.

**Section V-A - Effects of Guns on Suicide**

Professor Webster confidently asserts that availability of firearms increases the risk of suicide, citing studies that purportedly demonstrate this effect (pp. 2-7). He explicitly links this discussion with "Chicago's limitation to a single operable firearm in the home" (p. 1), but it should first be noted that none of the studies he cites assess the effects of having more than one operable gun vs. having just one – the "household" studies (better known as case-control studies) assess the effects of having any guns, operable or otherwise, vs. having none. Indeed, Webster does not even offer an explanation of why multiple guns might raise suicide risks more than a single gun would. In light of the obvious fact that people who commit suicide by shooting themselves use only *one* gun, it is unclear why Webster thinks that having more than one would have any effect not produced by having just one. Since the current Chicago gun ordinance does not ban home possession of guns, but only restricts the number that may be kept in an "assembled and operable" condition, the entire body of evidence cited on guns and suicide has no relevance to whether this element of the ordinance could reduce suicides.

I will nevertheless evaluate the merits of Dr. Webster's general claims as to whether firearms possession affects suicide. Webster is highly selective as to which studies he chooses to

cite, excluding those that failed to support his conclusions. For example, in his section on "household studies" and suicide, he discusses just five case-control studies, all of which support his thesis that guns in the household cause a higher risk of a household member killing themselves. He even goes so far as to explicitly assert that "nearly all of the case-control studies have shown a positive relationship between gun ownership and suicides" (p. 3). The "weasel word" "nearly" renders his claim vague, since he does not state what fraction "nearly all" constitutes, or how many studies did not support his thesis. In fact, as the review summarized in my Table 1 shows, at least *six* out of 16 published case-control studies of suicides found no significant association between gun ownership and suicide:

> (1) Miller (1978) found no guns/suicide association whatsoever in his sample of elderly men.

> (2) Brent et al. (1988) found no significant guns/suicide association once suicidal intent was controlled.

> (3) Bukstein et al. (1993) found no significant guns/suicide association in a sample of adolescent substance abusers.

> (4) Brent et al. (1994) found no significant guns/suicide association in a sample of "affectively ill" adolescents.

> (5) Beautrais et al. (1996) found no significant guns/suicide association among 499 suicides (and 1,225 control subjects), using what at the time was the largest sample of suicides ever used to study this association.

> (6) Conwell (2002) found no significant guns/suicide association among females.

It is unlikely that most people would interpret Webster's claim that "nearly all" studies find a gun effect on suicide to be consistent with six out of 16 studies *not* supporting the thesis. It is easy enough to cherry-pick favorable findings in a controversial field, if there are a large enough studies, but this does not help readers understand the field.

As it happens, it would scarcely matter even if "nearly all" of the case-control studies really had found a positive guns/suicide association, since this body of research is far too weak to support any conclusions. The primary problem facing researchers trying to discover whether gun ownership actually causes an increased risk of suicide is to separate the effects of guns from the effects of other factors, called "confounders" or confounding variables, correlated with guns. In this context, a confounder is a factor that affects suicide risk, but also has a significant correlation with gun ownership. Unless the researcher measures and statistically controls for all the likely confounders, s/he will confuse the purported effects of gun ownership with the effects of the uncontrolled confounders. Unfortunately, as Table 1 indicates, the people who have done case-control studies on this topic have generally devoted little or no effort to controlling for likely confounders. Fourteen of the 16 studies controlled for no more than four confounders, and eight of them conducted analyses in which *no* confounders were controlled, giving the researchers no ability whatsoever to separate the effects of gun ownership from the effects of other factors that affect the likelihood of committing suicide and are associated with gun ownership. A partial list of likely confounders typically not controlled would include (1) alcoholism or heaving drinking, (2) illicit drug use, (3) urban vs. rural location, (4) residence in a

high crime neighborhood, (5) experience as a victim of crime (e.g. rape), (6) gang membership, (7) drug dealing, (8) perception of the world as a hostile place, (9) a personality that emphasizes self-reliance and consequently self-blame for problems, and (10) strength of suicidal intent.

To illustrate how important controlling for confounders is, consider the last confounder mentioned, suicidal intent (SI). No one disputes that having a stronger desire or motivation to kill one's self makes it more likely that the person will actually do so. A stronger SI, however, is also likely to induce some people to acquire a gun for the purpose of carrying out the suicide attempt. Even if possessing or using a gun did not actually influence whether a person attempted suicide or whether an attempt was fatal, one would still find higher gun ownership among those who killed themselves, i.e. one would find a positive guns/suicide association. Indeed, one would find an especially strong positive association between suicide and a *recent* gun purchase, a finding Webster himself notes (p. 5, in connection with the California "cohort study"). But this would be a noncausal "spurious" association between guns and suicide. Having a gun did not necessarily cause a higher risk of suicide; rather, having a stronger SI caused the higher risk of suicide, and also caused a higher likelihood of gun ownership, creating a noncausal association between gun ownership and suicide.

In Table 1, the strength of association between gun ownership and suicide is measured with an odds ratio (OR), which expresses how much higher or lower the odds of committing suicide are for persons with a gun in their household. For example, if OR=3.4, it means that the odds of a person committing suicide are 3.4 times higher if there is a gun in the household than if there is not, and the guns/suicide association is positive – suicide risk is higher for gun owners. On the other hand, if OR were 0.2, it would mean that the odds of suicide for persons with a household gun are only 0.2 or 20% of the odds for persons without a household gun, and the association is negative – suicide risk is lower for gun owners. An OR of 1 would represent no relationship in either direction – the odds of suicide are the same for persons with a gun and for a person without one.

The crude OR is the simple bivariate odds ratio, without any controls for confounding variables, and thus is not meaningful as a measure of the causal effect of gun ownership on suicide. The adjusted OR ("adj OR") is the odds ratio when controlling for other possible confounding variables. If the variables controlled truly are confounders, the adjusted OR generally gives a better picture of the causal effect of gun ownership on suicide. Finally, the numbers under p in Table 1 are levels of statistical significance. They represent the probability that the observed association could be entirely the product of random chance factors, such as which subjects happened to be selected for a study, rather than being reflective of an actual causal effect. Customarily, a p under .05 is considered acceptably significant. When the authors only reported that the association was nonsignificant, this is denoted in Table 1 with "n.s."

If an association is spurious, and thus *not* reflective of an actual causal effect, controlling for confounding variables will cause the odds ratio to weaken to the point where it is no longer significantly different from one, the value representing no association. We need not speculate what happens to the guns/suicide association once suicidal intent (SI) is controlled, because Brent and his colleagues (1988) measured SI and controlled for it while estimating the suicide/guns association. Before controlling for SI, there was a strong, significant association (crude odds ratio=4.5, p<.025). Once the researchers introduced a control for SI, the association

was no longer significantly different from one. The finding was later replicated in another analysis of a somewhat larger overlapping sample by the same group of researchers. When they introduced the control for SI, the guns/suicide association was halved, dropping from an odds ratio of 4.5 to 2.1 (Brent et al. 1991).

To take another example, *no* researchers have controlled for self-reliance/self-blame, yet this too could be a powerful confounder. Surveys have established that gun owners are more self-reliant than other people – for example people who believe they must rely on their own efforts to protect themselves and their families are more likely to own guns (Feagin 1970). Unfortunately, people who see themselves as master of their own fate are also more likely to hold themselves responsible for their troubles, rather than blaming other people – a disposition that could make suicide more likely. Thus, if self-blame is the dark side of self-reliance, it would both increase gun ownership and increase the risk of suicide, creating a spurious guns/suicide association. We have no direct empirical test of this hypothesis, however, since no researcher in this area has measured and controlled for self-blame/self-reliance.

All but the last two studies summarized in Table 1 controlled for four or fewer likely confounders. Most variables that were controlled were not likely confounders, either because the study did not present any evidence that they had a significant effect on suicide or because they have no known association with gun ownership. Controlling for such variables does not help isolate the effect of gun ownership on suicide. For example, Kellermann et al (1992) controlled for ten variables, but only six of these were significantly related to suicide risk, and of these six, only four have a documented significant association with gun ownership, and thus were actual confounders.

In sum, Webster's review of household (case-control) studies is highly selective, fails to acknowledge studies that contradict his conclusions, covers studies that are not relevant to any element of Chicago's gun ordinance, and relies on studies that are far too methodologically weak to sustain even the (irrelevant) conclusions that Webster draws.

Webster says virtually nothing about exactly *why* gun ownership would increase the risk of suicide, perhaps because he regards it as self-evident. He does not, for example, assert that gun possession makes people depressed or puts the idea of suicide into the minds of people previously disinclined to consider it. He does, however, at one point refer to firearm suicide as "the most lethal means of self-harm" (p. 5). He does not cite any evidence supporting this claim, or compare the fatality rates of suicide attempts by shooting with those of suicide attempts using other methods that are likely to be substituted if guns were not available. As it happens, shooting is no more lethal than the method most likely to be substituted, hanging.

Hanging is already the second-most common method of suicide after shooting, and is similarly lethal and thus likely to be perceived as a feasible substitute method by prospective suicide attempters who were seriously motivated enough to have put a loaded gun to their head and pull the trigger, were a gun available. It also uses materials (rope and a sturdy support) much more widely available that guns (Kleck 1997, Chapter 8). Table 2 reviews research comparing the fatality rates (completed [fatal] suicides / total suicide attempts) of suicide attempts by hanging and those by shooting. The research indicates that there is little or no difference in fatality rates between hanging attempts and shooting attempts. Indeed, some studies have even indicated that hanging attempts were slightly more likely to be fatal than

shooting attempts. The most recent and extensive data, covering the entire U.S. in recent years, indicates that shooting attempts are only 5.7% more likely to end in death than hanging attempts. This small a difference is not statistically reliable, since estimates of nonfatal suicide attempts – a component in the denominator of fatality rates - are very imprecise. For example, the last study shown in Table 2, covering the entire U.S., used estimates of nonfatal suicide attempts derived from injury reports from a probability sample of emergency rooms, and thus is subject to random sampling error. The 95% confidence interval for estimates of nonfatal suicide attempts for 2001-2007 was 10,193-18,632 for hanging attempts and 5,563-42,764 for shooting attempts, implying a range of fatality rates of 72.7 to 82.9% for hanging and 73.5 to 95.5% for shooting (CDCP 2011). Since these ranges overlap, this difference in fatality rates is not statistically significant. Further, it is possible that the only reason there is even this slight 5.7% difference in fatality rates between shooting and hanging attempts is because people who choose to use shooting as a suicide method were more intent on dying than persons who choose hanging. Thus, there may be no difference at all in the lethality of the methods themselves, as distinct from the "lethality" of their users' intentions. In sum, there is no sound foundation to expect that suicide attempts would become less lethal if restrictions on gun availability caused suicide attempters to substitute hanging as their method. And certainly there is no foundation for a claim that the purported greater lethality of shooting could raise the risk of suicide by a factor of 4.7, as one of Webster's cited studies concluded (see p. 3 re. the Kellermann et al. study). As Professor Philip Cook concluded regarding guns and suicide: "if a gun is not available for some reason, then there are always alternatives that are nearly as lethal, including hanging and jumping from a high place" (Cook 1991, p. 25).

Webster's review of "ecological studies" (studies of macro-level aggregates like the populations of states or cities) (pp. 5-7) is likewise both highly selective and irrelevant to the Chicago gun ordinance. Chicago's gun ordinance does not prohibit gun ownership (though permit requirements continue pre-existing limits on gun possession by high-risk subsets like convicted felons). Consequently, studies of the impact of variation in overall gun ownership levels are not relevant to the ordinance.

In any case, Webster only cites "several" studies that assert that higher gun ownership rates cause higher suicide rates. He does not reveal how many studies did *not* support this hypothesis, or whether those studies that failed to support a guns/suicide association were technically sounder than the studies he cites. In fact, there are more studies that do *not* support the hypothesis, including some that are methodologically sounder than the ones he cites, than studies that do support it. For example, 10 of the 11 studies in this area published before 1996 found no significant effect of higher gun ownership rates on total suicide rates. The standard finding in the field is that gun rates have no effect on how many people kill themselves; rather they only affect how many of those who do kill themselves do so with guns. Thus, gun rates affect rates of *gun* suicide, but not the *total* suicide rate (Kleck 1997, Chapter 8, esp. p. 291).

Further, the handful of "ecological" studies that Webster does cite are conspicuously flawed. It is not possible to assess the impact of gun levels on suicide rates unless the analyst has a valid measure of gun prevalence, which usually has to be measured indirectly, with a "proxy" measure. Webster claims that the study by Miller et al. (2006) used a valid proxy for gun ownership (the percent of suicides committed with guns, or PSG), and cites a study (Azrael et al. 2004; see Webster's fn. 17) to support his claim that PSG was "a validated surrogate measure of

firearm ownership." Professor Webster apparently misread the Azrael article, since the authors clearly did not endorse the use of PSG for tracking changes in gun levels. Instead, Azrael et al. found that PSG (which they labeled FS/S, firearms suicides over total suicides) had a very weak correlation over time with survey measures of gun ownership, stating that "the intertemporal correlation between FS/S and gun prevalence…is quite weak" (p. 54) and reporting a correlation of r=0.21 ($r^2$=0.0441). This means that this proxy shares only 4% of its variation with gun prevalence as directly measured in surveys. PSG is therefore worthless for use in longitudinal studies like the panel study by Miller et al., which examined *changes over time* in gun ownership and suicide. Technically superior tests of the validity of PSG have likewise shown that there is no correlation over time between changes in PSG and changes in gun prevalence (Kleck 2004; Kovandzic, Schaffer, and Kleck 2008). Since Miller et al. did not have a valid measure of changes in gun prevalence over time, their findings can tell us nothing about what effects such changes may have on suicide rates. The same problem afflicts all other longitudinal studies of guns and violence that use PSG as the measure of gun prevalence.

Further, similar to the case-control studies, the ecological studies in this area do a notably poor job controlling for confounders – many of them do not control for any at all. Other studies control for some variables, but few of them are actually confounders. For example, the Miller et al. (2007) study cited in Webster's fn. 15 controlled for six variables, but when I reanalyzed their data I found that *none* of the six were confounders. Five of the six did not have any significant effect on suicide rates, and the one that did (rates of illicit drug use) was uncorrelated with gun prevalence. Thus, Miller et al. made an entirely arbitrary and inappropriate choice of confounders. They *seemed* to address the confounders problem but actually did nothing whatsoever to help isolate the effect of gun availability. By way of demonstrating how much the findings would change if a more appropriate selection of variables were controlled, I re-estimated the models but included just five other variables that *were* confounders. As a result, 69% of the guns/suicide association disappeared (Kleck 2007). Thus, the guns/suicide association is "fragile," meaning that it is highly unstable, subject to huge changes when the analysis is done slightly differently (in this case, using a different set of control variables).

The Miller et al. (2002) article that Webster cites in fn. 16 has the same problem – an arbitrary, unjustified selection of control variables. Only six variables were controlled, three of which were the same as in the authors' 2007 article, just discussed. Of the remaining three, only one, the divorce rate, is likely to be a confounder. Thus, the authors in this study did *almost* nothing to control confounding variables.

Indeed, all of the ecological studies of suicide rates cited in Webster's footnotes 15-20 suffer from the exact same problem – the analysts controlled for few variables, selected those few control variables arbitrarily, without regard to whether they actually affect suicide rates or are correlated with gun prevalence rates, and as a result controlled for few or no confounders. Thus, they fail to separate the effects of gun ownership rates from the effects of other variables that affect suicide rates. For example, it is well established that African-Americans are less likely to commit suicide than whites, and are also less likely to own guns. Thus, it is important to control for percent African-American in an ecological study of guns and suicide, since this variable reduces suicide rates but is also negatively correlated with gun prevalence. Failing to control for it biases the guns/suicide association positively, i.e. it artificially makes the estimated effect of gun prevalence seem more positive than it really is. The same observations apply to the

percent foreign born, since foreign born persons are both less likely to own guns and less likely to commit suicide. *None* of the studies cited by Webster controlled for percent African-American or percent foreign born, and thus all of their findings were biased – making the effect of gun prevalence look stronger than it really is.

Professor Webster then cites some scattered statistics on gun prevalence and suicide rates in just three states. This is a further step back from the state-level analyses cited in fn. 15-20, because those analyses at least incorporated information on the full set of all 50 states. Webster suggests that because these three states had discretionary purchase permit systems, their suicide rates were lower. He offers no evidence that these laws actually reduce gun availability, nor any theory as to how they could reduce suicide rates without reducing gun prevalence. In any case, the display of numbers in his Table 1 has no relevance to the present legal case, since the Chicago ordinance did not involve either the introduction of, or challenges to, a discretionary purchase permit system.

Webster also notes (p. 3) that the share of Chicago's suicides that were committed with guns was lower "when the city's handgun ban was in force" than in the U.S. as a whole or in other large metro areas. He likewise notes that Chicago's suicide rate was lower than in the rest of the U.S. in 2005 - an obvious attempt to suggest this low suicide rate was at least partially *caused by* the handgun ban. He fails to tell the reader that these facts also prevailed *before* Chicago's "handgun ban was in force" beginning in 1982. For example, Chicago's suicide rate in 1980 was 7.4 suicides per 100,000, while it was 11.8 in the U.S. as a whole. Likewise, the percent of suicides committed with guns in 1980 was 41.9 percent in Chicago, compared to 57.3 percent of suicides in the U.S. as a whole (analysis of Mortality Detail File data – U.S. Department of Health and Human Services 1984). It is obviously impossible for the effects of the city's gun laws to operate backwards in time, so other factors must have brought about the city's lower pre-1982 suicide rate and its lower gun share of suicides.

## Section V-B - Effects of Guns on Homicide

Pp. 7-11 of the Webster report concern homicides, and addresses the same categories of research addressed in the suicide section. The homicide section suffers from the same problems as the suicide section – the research reviewed is largely irrelevant to the factual issues at stake in this case, Webster is extremely selective about which studies he reviews, favoring those that find a positive guns/homicide association, and the studies he does stress are of very poor quality.

The "household studies" (case-control studies) of homicide that Webster reviews have the same previously discussed problems as the suicide case-control studies, especially the possibility of a spurious association. The same factors that put people at greater risk of being murdered also motivate many of them to acquire guns for self-protection. Thus, if murder victims are more likely to own guns than nonvictims, this cannot, by itself, be used to infer that gun ownership caused the higher risk of murder, since one would expect a positive association between gun possession and homicide victimization even if the former had no effect whatsoever on the latter. For example, being a street gang member or a drug dealer increases both the likelihood of being murdered and the likelihood of possessing a gun, so even if owning a gun had no effect on the probability of being murdered, one would still expect a positive association between gun ownership and homicide victimization.

The homicide studies, however, also have their own unique problems.  In suicide research, it is usually a reasonable assumption that if a person uses a gun to commit suicide, the gun belongs to either the suicidal person or to someone else in his or her household.  Thus, there is some reasonable connection between household gun ownership and suicide; although the suicide might well have occurred even without guns (e.g., hanging could be substituted), one can at least be fairly confident that a "household gun" was used to kill the decedent.  With homicide, this is not a reasonable assumption, and indeed it is nearly always wrong – murder victims are almost never killed with a gun belonging either to themselves or to some other member of their household (Kleck 2001a).  Even those who are killed in their own homes are typically killed by outsiders who bring their own guns with them.  Based largely on Kellermann's own data, revealed in a later study, less than two percent of homicides in the areas he studied were committed with a gun belonging to the victim or another member of the victim's household (Kleck 2001a, pp. 69-70).  Thus, if people with guns in their homes are more likely than those without guns to be murdered, there is no reason to infer from this fact that their household gun ownership somehow caused gun owners' elevated risk of being murdered – the household gun is simply not involved.  Webster appears to be unaware of this problem, and fails to note that *none* of the homicide studies on which he relies established that even a single one of the homicide victims studied had been killed with a household gun.

The more likely explanation of the guns/homicide association is that a variety of confounding factors increase the risk of homicide victimization, but also cause many of those exposed to these factors to acquire guns for self-protection.  Webster stresses the findings of Kellermann et al. (his fn. 24), but those authors perfectly exemplify the failure to control for important likely confounders.  As previously noted, drug dealers and members of street gangs are at extremely high risks of being murdered, and are also far more likely to possess guns – acquired largely for protection against those high risks (Kleck and Hogan 1999; Kleck 2001).  Thus, it is essential that researchers control for gang membership and for status as a drug dealer if they are to properly estimate the effect of gun ownership on homicide victimization.  Otherwise, the researcher will obtain a spurious (noncausal) positive association between guns and homicide.  Kellermann et al. did not control for either of these obvious confounders, nor did any of the other researchers cited by Webster (see studies cited in fn. 24-28).  More generally, researchers in this area also fail to control for numerous other confounders (Kleck and Hogan 1999).  Thus, Webster has no sound basis for interpreting the guns/homicide associations he cites as indicative of actual causal effects, rather than as spurious associations.

Webster notes (p. 8) the long average time interval between "the first family handgun purchase and any homicide death" and draws the *non sequitur* conclusion that it is therefore unlikely that the guns-homicide association "could be due to homicide risks prompting gun ownership."  This is illogical, for multiple reasons.  First, even though the family's *first* handgun may have been purchased many years before a family member was murdered, other handguns might have been acquired shortly before the homicide, in direct response to the factors that precipitated the killing.  Second, many of the same risk factors that placed family members at greater risk at the time of the homicide would also have prevailed years before, and thus could have motivated acquisition of a gun at that earlier time.  For example, people who are poor and who must live in a high-crime neighborhood today are very likely to have also lived in a low-income, high-crime neighborhood years earlier.  Thus, the fact that guns were acquired years

before a family member was killed does not mean that the gun acquisition was not prompted by exposure to homicide risk factors such as a high neighborhood crime rate or association with dangerous people.

Webster cites a study by Kleck and Hogan (1999) to the effect that gun ownership has a weak (OR=1.36) positive association with the risk of committing a homicide (p. 8), but fails to note a crucial qualifier that Kleck and Hogan were careful to state: "the failure to control confounding variables known to positively affect both violent behavior and gun acquisition, however, is probably at least partly responsible for the positive guns-homicide association. Therefore an association this weak could be entirely spurious" (p. 288).

In the single cohort study cited by Webster, in connection with a study by Wintemute (p. 8), Webster notes that the risk of being murdered was higher among handgun purchasers than among others, but fails to note that this is precisely what one would expect if handgun purchase did *not* increase homicide risk, since being exposed to a variety of risk factors (living in high crime neighborhoods, associating with dangerous people, drug dealing, etc.) other than gun ownership would increase the risk of being murdered but also motivate many people to purchase a handgun for self-protection. One would still expect a higher murder rate among gun purchasers, even if gun purchase did not *cause* any increase in risk.

Webster also fails to recognize patterns in Wintemute's findings that are inconsistent with the view that gun ownership causes an increased risk of being murdered. Webster notes that handgun purchase appeared to increase the risk of homicide for women but not for men. This is not consistent with the view that these associations reflect the effect of gun possession on homicide risk, since a genuine causal effect should be *weaker* for women than for men. Because women are smaller and physically weaker than men, guns are less necessary for killing women than for killing men, and consequently are much less likely to be used in the killing of women than of men (Kleck 1991, p. 204). Therefore, the availability of a gun should have *less* effect on the homicide risk of women than of men – exactly the opposite of the pattern observed in the Wintemute study. On the other hand, the pattern makes perfect sense if the gun/homicide is interpreted as spurious. When women purchase handguns, it is especially likely to be for purposes of self-defense, whereas men are more likely to purchase handguns for a variety of purposes, including recreational activities like hunting and target shooting, unrelated to self-defense (Kleck 1997, Chapter 3). Thus, among recent handgun purchasers, women are more likely than men to have been responding to factors raising their risk of homicide, and for this reason are more likely to be murdered after buying the handgun. In short, the guns-homicide associations observed in the Wintemute study are better interpreted as spurious associations than as evidence that handgun purchases increase the risk of homicide.

The "ecological" homicide studies discussed by Webster (pp. 9-11) have essentially the same problems that afflicted the "ecological" suicide studies – use of invalid measures of gun prevalence (such as the use in longitudinal studies of the proportion of suicides committed with a firearm) and a failure to control for confounding variables, but they also suffer from an additional problem - failing to properly address causal order. Homicide rates can affect gun ownership, as well as gun ownership possibly affecting homicide rates, so a positive guns/homicide association may merely indicate that higher murder rates cause more people to acquire guns for self-protection. And indeed, the best available evidence indicates that is exactly

what happens (Kleck and Patterson 1993; Kovandzic et al. 2008). None of the studies on which Webster relies applied any accepted research methods that can differentiate the effect of guns on homicide from the effect of homicide rates on gun rates. In particular, merely relating this year's homicide rate to the previous year's gun ownership rate does not solve the problem (Kleck 2009). One simple reason for this method's ineffectiveness is that it simply *assumes*, rather than demonstrating, that gun ownership has no immediate effect on homicide, and that gun possession begins to have an effect on homicide only after a year has passed – a patently implausible, and certainly unsupported, assumption.

Table 3 summarizes a considerably more complete and representative set of macro-level studies (referred to as "ecological studies" by Webster) of the effect of gun ownership rates on homicide rates. The table shows which studies met the minimal methodological criteria for properly estimating a gun effect: (1) using a valid measure of gun ownership levels, (2) controlling for a substantial number of possible confounding variables, and (3) using accepted procedures for establishing causal order (that is, distinguishing the effect of gun levels on homicide rates from the effect of homicide rates on gun ownership). A number of patterns are clearly evident. First, most of the research is of very poor quality, and *all* of the studies cited by Webster are of especially poor quality, failing to meet these minimal criteria. Second, there are only a few good quality studies, *none* of which were cited by Webster. While there were other studies that met two of the three conditions, the only studies that meet all three criteria are Kleck and Patterson (1993) and Kovandzic et al. (2008). Finally, and most significantly, these two studies found *no* significant positive effect of gun ownership levels on homicide rates. In sum, Webster's conclusions concerning "ecological" studies of homicide are the product of "cherry picking" studies that support his position, ignoring fatal flaws in those studies, and ignoring better quality studies that obtained findings contrary to those conclusions.

Methodological quality is of vital significance in this field, and Webster fails to use the most critical criteria of quality in deciding which studies can be relied upon to provide meaningful estimates of the effect of gun levels on homicide rates. Indeed, Webster devotes an entirely uncritical discussion (p. 11) to a study by Cook and Ludwig (2006) that I used as the chief example bad research in a paper titled "How Not to the Study the Effect of Gun Levels on Violence Rates" (Kleck 2009). I used this study as my exemplar of poor research because the authors failed on all three methodological criteria. This was a longitudinal study, but the authors used a measure of gun ownership known to be invalid for use in longitudinal studies (Kleck 2004; Kovandzic et al. 2008), they used an inappropriate method for addressing the causal order problem (relating the current homicide rate to the previous year's gun rate), and they explicitly controlled for only four control variables that were significantly related to homicide rates, while failing to control for important, well-known, and easily measured determinants of homicide rates such as the poverty rate, the divorce rate, the percent of the population born in the South, and the percent of the population in prison (see Kleck 2009 for details and discussion of other flaws). Webster shows no awareness of any of these fatal flaws.

## Section V-C - Effects of Guns on Unintentional Shootings

Once again, the research cited by Webster is largely irrelevant to the factual issues involved in this case, since he focuses on either (1) the effects of having a gun in the household, or, in the ecological studies, (2) the effects of higher gun ownership rates on rates of accidental

shootings. These studies are irrelevant because the Chicago handgun ordinance does not ban gun ownership (or handgun ownership) and thus does not prevent anyone from having a gun in their household. The research would be relevant only if it assessed the effects of limiting operable guns to one per permitted occupant, or the effects of a local sales ban, but these topics were not addressed in the cited studies.

The study cited by Webster that comes closest to being relevant is the Wiebe article cited on p. 12, but Webster inaccurately describes the only findings in that study that were somewhat relevant to the Chicago gun ordinance. Wiebe compared fatal gun accident (FGA) risks between households with guns and households without guns, but the findings from that comparison are irrelevant because the Chicago ordinance does not mandate that households be without guns. Wiebe, however, also compared (a) households with multiple guns with (b) households with just one gun, and with (c) households with no guns. (He did not, however, compare households with multiple guns kept in *operable* condition with households with a single gun kept in operable condition.) Webster only reports those findings in a later section (Section VI), separated from his main discussion of the Wiebe study, and then the discussion is misleading.

Wiebe's results indicated that there was no significant additional risk from having multiple firearms versus having only one firearm in the home. The relative risk (RR) was 3.9 for multiple firearms, indicating that the risk of an FGA was 3.9 times larger for persons living in a household with multiple guns than for persons living in a household with no guns (Table 3 in Wiebe, p. 714). The RR for persons in households with just one firearm, however, was a statistically indistinguishable 3.4. The 95% confidence interval (CI) for the multiple firearms RR was 2.0-7.8, meaning that one can be 95% confident that the RR is somewhere between 2.0 and 7.8 – a very wide range. Thus, this is a very imprecise estimate, subject to a large amount of random sampling error. The 95% CI for the single-firearm RR was 1.5-7.6, another very wide range, which largely overlaps the CI for the multiple-firearms RR. Webster concedes this, but does not make it clear that this means *there is no statistically reliable basis for concluding that persons in households with multiple guns are at even slightly higher risk of suffering an unintentional gunshot injury.* Even this finding, however, is not entirely relevant to the present legal case since Wiebe never made any comparisons of risk with regard to the number of guns kept in *operable* condition.

In any case, these RRs cannot be taken at face value as estimates of causal effects because Wiebe controlled for only one actual confounding variable. He controlled for three other predictors of FGA risk, but only two of them were significantly related to FGA risk at the .05 level (income was not). As with the suicide and homicide household studies, estimates of risk associated with gun ownership are not reliable unless researchers control for a substantial number of confounding variables. In particular, it is important to control for the subject's willingness to take risks, since this clearly will increase the likelihood of experiencing any kind of accident. There are indirect indications that handgun owners in particular are more likely to be risk takers. For example, handgun owners are more likely than other people to have an arrest record, indicating that they have committed crimes serious enough to merit arrest (Kleck 1991, p. 57). Since committing serious crimes is a highly risky activity, this is an indication of greater willingness of handgun owners to take risks. Supporting this, Waller and Whorton (1973) found that criminals are more likely than noncriminals to be involved in gun accidents.

This observation is important in interpreting Wiebe's pattern of findings regarding the purported effects of types of guns. Higher rates of death from FGA could reflect either (1) an actual causal effect (having a gun genuinely causes a higher risk of a FGA), or a (2) spurious, noncausal association attributable to the facts that (a) having a risk-prone personality is more common among gun owners, and that (b) taking risks causes an increased likelihood of experiencing an FGA. If the guns/FGA association reflected a causal effect, one would expect a stronger association of death from a fatal gun accident with *long gun* ownership than with handgun ownership, because (1) long guns are mechanically easier to accidentally discharge than handguns (due to a lighter trigger pull than with handguns and the frequent absence of an integral safety), and because (2) long guns are more lethal than handguns, so that an accidentally inflicted wound from a long gun is more likely than one inflicted with a handgun to result in the victim's death (due to the higher average muzzle velocity of rifle ammunition, the greater average length of rifle bullets, and the larger number of projectiles fired by shotguns) (Kleck 1991, Chapter 3). Wiebe, however, found that *handgun* ownership was more strongly related than long gun ownership to FGA risk, a pattern contrary to the hypothesis that the guns/FGA correlation is a due to a causal effect of gun ownership, but consistent with the view that it is a spurious association attributable at least partly to the greater tendency of some handgun owners to take risks, rather than any actual risk-increasing effects of owning guns.

Webster claims he could find only one ecological study (Miller at al. 2001, see Webster's fn. 43) of the relationship between firearm availability and rates of death due to unintentional shootings (p. 12), but this is incorrect. Kleck and Patterson (1993) conducted an ecological study of this very topic, finding no significant effect of gun ownership rates on the FGA rate (p. 270). Webster was clearly aware of this study, since he cites it in detail on p. 9 of his report. This is an unfortunate omission since the Kleck and Patterson study that Webster ignored was methodologically superior to the Miller et al. study that Webster discussed at length. Miller and his colleagues conducted a longitudinal study but used a measure of gun ownership levels that is known to be invalid for use in longitudinal studies (Kleck 2004), while Kleck and Patterson used a measure that was valid for use in their cross-sectional (non-longitudinal) analysis of large cities. Once again, Webster's review of research was selective, and unjustifiably excluded research with findings that contradicted his conclusions.

**Section VI – The Effect of Number of Household Firearms on Suicide, Homicide, and Gun Accidents.**

I have already addressed the "case-control" studies that claimed that household gun ownership increases the risk of suicide and homicide. Regarding the risk of gun accidents, the only study that Webster relied on was the Wiebe study already discussed in connection with Section V-C. The Wiebe study (whose findings were misleadingly described by Webster) found that there was no statistically significant difference in the risk of gun accidents between a household having multiple guns versus a household having only one gun. Likewise, the Cummings et al. study cited by Webster obtained the same findings with respect to the risk of homicide. Although Cummings et al. did not analyze data on number of guns owned, they measured the number of handguns purchased by family members at some time in the past. Since people frequently get rid of guns, this is not a good measure of the number of guns owned at any one time, but in any case the findings did not support Webster's conclusions. Cummings et al. found that there was no significant difference in homicide risk between households that had

purchased multiple handguns and those that had purchased just one. This is the actual meaning of Webster's somewhat obscure concession that "the confidence intervals of these point estimates overlap" (p. 12). The statement means that there was no statistically reliable difference in risk of homicide.

**Section VII – The Effects of "Safe" Storage on Suicide, Homicide and Unintentional Shootings**

The feature that is most conspicuous in Webster's discussion of "safe" storage is the absence of any discussion of how keeping guns locked away and unloaded affects their readiness for use in self-defense. Webster avoids acknowledging a logical inconsistency in advocacy for "safe storage" practices – the idea that securing guns would make them less available to household members intent on committing homicides or suicides, or likely to accidentally shoot someone, yet *not* make them less available to household members who need to use the guns for self-defense. He offers no evidence or argument in response to the complaint of gun owners that keeping guns in an inoperable condition makes those guns less ready for use in lawful self-defense (even if a single gun is allowed to be kept in an operable condition). This is a critical matter, since if keeping guns locked and unloaded substantially reduced the number of life-saving defensive uses of guns, but had little or no effect on harmful uses, it could hardly be reasonably argued that keeping guns locked and unloaded is "safe" storage.

Webster's discussion of research is irrelevant to the Chicago ordinance, and specifically its limits on the keeping of operable guns, since none of the studies he cites assessed the impact of having (a) one gun kept in operable condition versus (b) having *more than one* gun in operable condition. Instead, the studies, at best, compared (a) households with all guns locked up with (b) households with one or more guns kept in operable condition. That is, the studies attempted to assess the effect of having *any* guns in operable condition, not the effect of having one operable gun versus multiple operable guns (see studies cited in Webster's fn. 44-49). Since people who use guns to commit suicide or homicide only need to use one gun to do so, it is not at all obvious why it would make any difference whether there were multiple guns in operable condition or just one – one is all that is needed to commit suicide or homicide.

The case-control studies cited by Webster also cannot sustain the conclusion that keeping guns locked and unloaded reduces the risk of homicide, suicide, and unintentional shootings, since none of the studies made a serious effort to control for confounding variables, i.e. gun-correlated factors that affect the likelihood of people suffering these harms – as was previously documented in the preceding segments of this rebuttal report (see Table 1 with respect to suicide studies and Table 3 with respect to homicide studies).

Webster misleadingly hints (p. 13) that the National Rifle Association supports keeping all guns locked up and unloaded. In fact, the NRA specifically exempts guns kept for self-defense from this general recommendation: "A gun stored primarily for personal protection must be ready for immediate use. It may be kept loaded as long as local laws permit …" (National Rifle Association 1990, p. 37). Since self-defense is virtually the only reason a gun owner would want to keep a gun loaded and unlocked, this is a fairly consequential exemption, and to not mention it when describing the NRA's storage recommendations is seriously misleading.

Webster's review of research on Child Access Prevention (CAP) laws is grossly misleading, since the results of the best available research, including Webster's own work, indicate that the laws were a failure. They were intended to reduce gun accidents among young people by requiring that gun owners keep their guns secured in a way that prevented unauthorized youths (usually defined as persons under 15) from gaining access. Webster reports statistically significant reductions in FGAs with young victims following passage of CAP laws in Florida and California, but fails to mention that these were just two of *fifteen* states' CAP laws that were evaluated, and that the other 13 states showed no effects of the laws (see studies cited in fn. 50 and 51). If the underlying rationale for these laws was sound, all the laws, or at least a majority of them, should have reduced FGAs. Webster correctly notes that Florida, the first state to pass such a law, experienced a huge wave of publicity concerning the law and the topic of child-involved gun accidents, but fails to appreciate the significance of this fact: the drop in the rate of FGAs with young victims in Florida may have been due to the publicity and presumably heightened awareness of the potential for unauthorized access to guns among young people, not to the provisions of the CAP law. The fact that a drop in accidents occurred in Florida where there was huge publicity due to the uniqueness of the nation's first CAP law, but not in 13 other states, where CAP laws were passed with little fanfare, supports this interpretation. Webster suggests (p. 14) that beneficial effects occurred in Florida and California because these states defined some violations as felonies, but this is inconsistent with (a) the fact that Connecticut, which also provides for felony penalties, did not experience a significant decline in FGAs among young people (Hepburn et al. 2006, cited in fn. 51), (b) the enormous body of research indicating that more severe penalties for crime do not reduce crime any more than less severe penalties (Doob and Webster 2003), and (c) the fact that neither Webster nor anyone else known to me has established that felony penalties have *ever* actually been imposed for violation of CAP laws, in either Florida or California.

Setting aside the historically unique (and nonreproducible) experience of Florida as the first state to have a CAP law, California is the only state to experience significant declines in youth FGAs following passage of a CAP, of 15 state laws evaluated. Finding a single seemingly supportive finding out of 15 findings is about what one would expect to occur as a result of random chance alone even if CAP laws had no effect. That is, if 15 bodies of meaningless numbers were randomly generated by a computer, and one set of numbers was arbitrarily labeled the "FGA rate" and another one "CAP status," one would expect to find a statistically "significant" association between the two in one of those bodies of data, by random chance alone, merely because one had searched for the association so many times.

**Section VIII – Effects on Guns on Burglary**

Webster asserts (p. 14) that "firearm availability within homes increases the risk of home burglaries." The sole basis for this claim is a single study by Cook and Ludwig (2003; see Webster's fn. 52). While Cook and Ludwig did indeed draw this conclusion, their methods cannot actually sustain it, and some of their findings directly contradict it. It is common for researchers to find a significant positive association between gun rates and crime rates, but the best-supported explanation for this statistical pattern is that higher crime rates motivate many people to acquire guns for self-protection, not that higher gun rates cause higher crime rates (Kleck 1984; Kleck and Patterson 1993; Southwick 1997; Southwick 1999; Kovandzic et al. 2008). The only studies that find a supposed positive effect of gun rates on crime rates are,

*without exception*, those that failed to use appropriate methods to distinguish the effect of guns on crime rates from the effect of crime rates on guns (see Table 3 with regard to homicide). The study by Cook and Ludwig is no exception, as they too failed to use appropriate methods to resolve this causal order problem. One of their analyses (pp. 88-91) simply ignores the issue, effectively assuming that burglary rates have no immediate effect on gun ownership rates. They used an ineffective method for determining causal order, merely relating burglary rates in a given year to gun prevalence in the previous year. In any case, what Webster does not share with the readers is that this analysis found *no* significant effect of gun ownership levels on burglary rates (Table 3-4, p. 92), contrary to the Cook and Ludwig's (and Webster's) claim that higher gun ownership rates cause higher burglary rates by increasing the average "take" in burglaries, and thereby boosting the incentive to commit burglaries.

In another analysis (pp. 91-93), Cook and Ludwig attempted to apply instrumental variables analysis to their data, a potentially effective method for dealing with simultaneous two-way relationships. This method, however, does not work unless the analysts use one or more relevant and valid "instrumental" variables. In this case, the authors needed to measure a variable that affects gun ownership but does not affect burglary rates. Cook and Ludwig used the percent of the population living in rural areas in this role, claiming (probably correctly) that it has a significant positive effect on gun ownership rates, but also assuming (incorrectly) that it has *no* effect on burglary rates (p. 91). There is a wealth of evidence indicating that burglary rates are lower in rural areas than in metropolitan areas (e.g., U.S. FBI 2010), so percent rural is an invalid instrumental variable because it cannot be assumed that rural conditions have no effect on burglary rates. As a consequence, the models of burglary rates estimated by Cook and Ludwig were "underidentified," a statistical condition under which estimates are meaningless (see Kovandzic et al. 2008 for a technical explanation). Rather than the observed positive guns/burglary associations reflecting an effect of gun availability on burglary rates, it is more likely that the association merely reflected the well-established fact that higher crime rates motivate many people to acquire guns for protection (Kleck 1997).

In addition to being unsupported by the empirical evidence, the argument that higher gun rates increase burglary rates by increasing the "incentives" for committing burglary is highly implausible on logical and theoretical grounds. Guns claim only about two percent of the dollar value of stolen property in the U.S., an amount too small to even be perceptible to the average burglar (U.S. FBI 2010). Further, the argument contradicts simple economic theory. The higher the gun ownership rate, the fewer nonowners there are, and thus the fewer willing customers there will be for stolen guns, and the lower the price those customers would be willing to pay. If everyone already has all the guns they want, why would they take the risks associated with buying a stolen gun? In sum, as the gun ownership rate goes up, the opportunity for stealing may go up, but the need for stolen guns and their prices go down, and thus the incentive for burglars to steal them goes down.

Webster is also very selective in reporting the findings of this study, failing to report those that supported the hypothesis that gun ownership rates do *not* increase burglary. For example, when Cook and Ludwig applied instrumental variables analysis to data from the National Crime Victimization Survey on whether individuals had been burglarized, they found *no* significant effect of gun ownership rates in a person's area on whether they were burglarized, contrary to the authors' incentive theory (Table 3-7 and accompanying text, p. 101).

Webster does briefly cite another similar finding, but misstates its relevance to the issues addressed by Cook and Ludwig, who claimed that higher gun rates caused more burglary. In fact, their analysis focusing just on burglary while a resident was at home ("hot burglaries") found that such burglaries were *less* likely for people who lived in areas with higher gun ownership rates, though the bivariate association was not quite statistically significant (t=1.60, 1-tailed significance = .0548; see top row of Table 3-8 and accompanying text, pp. 102-103). Estimates based on procedures controlling for other variables likewise produced gun effects that were negative but nonsignificant. These findings clearly contradicted the Cook/Ludwig hypothesis, but all Webster could perceive in the results is a supposed failure to find a significant negative deterrent effect of higher gun ownership rates.

The results, however, are probably irrelevant to whether guns deter criminals from committing burglaries, since it is unclear whether deterrent effects of guns, even if they exist, should be higher in areas with higher gun ownership rates. There is no evidence that criminals are aware of such differences across areas or time periods (Kleck 2001c). Instead, what criminals *are* aware of is the fact many Americans own guns. Thus, they may frequently be deterred by considering the general fact of widespread gun ownership, but are no more deterred from crime in areas or time periods with high gun ownership rate than in areas or time periods with low rates.

On the other hand, while the Cook-Ludwig tests were irrelevant to whether guns deter burglary, they are relevant to their hypothesis that higher gun rates increase burglary rates. Their findings indicate that the hypothesis is wrong, since people living in areas with more guns are *less* likely (albeit not significantly so) to be burglarized.

Webster briefly address the issue of gun theft (p. 15), and correctly notes that there are a large number of guns stolen each year – at least 500,000. He misunderstands, however, the significance of this fact and its relevance to the Chicago ordinance. It is precisely because there are so many gun thefts that criminals who want a gun can already obtain one, either by stealing one themselves or buying a stolen gun from others. Under current conditions, gun ownership among criminals is already "saturated" – everyone who wants one has one. Even Chicago's officials concede this state of affairs, stating that it is easy for the city's criminals to get guns despite the current gun ordinance. For example, Carol Brown, Chief of Policy for the Chicago Mayor's Office agreed that "it's fairly easy for criminals in the City of Chicago to obtain a gun illegally if they want to" (Brown 2011, p. 34), while Sgt. Kevin Johnson of the Chicago Police Department's Chicago Anti-Gun Enforcement (CAGE) team stated in his deposition that it is "not difficult at all" for a Chicago criminal to get a handgun (Johnson 2011, p. 87). Consistent with these assessments, interviews with arrestees in 1997 indicated that even when the far stricter pre-*McDonald* gun controls were in force, Chicago criminals paid less for guns in the illegal market than their retail prices – a state of affairs that would not prevail if guns were scarce or hard to obtain. The average price paid by Chicago criminals for a handgun was just $190, even though a conservative estimate of the average retail price of handguns recovered from criminals in the city was $237 (Kleck and Wang 2009, pp. 1248-1251). If it was already easy for criminals to get guns under the older, much stricter gun controls, it is implausible that the less strict post-*McDonald* controls have made it harder. Chicago's officials are correct – it is already easy for criminals to get guns, even with the current gun ordinance in force. When there is already an oversupply of guns available to criminals, marginal reductions in gun thefts would at best reduce

this oversupply, not prevent criminals from obtaining a gun. In any case, there is no evidence of even a modest effect on the gun theft rate of the city's limits on the number of operable guns allowed in households. In this light, there is no logical reason to believe that the city's existing ordinance reduces the number of criminals with guns.

## Section IX – The Defensive Value of Guns

In section IX of his report (pp. 15-16), Webster cites one study, as if it bears on the issue of whether "increasing the number of operable firearms in homes makes occupants safer," but the study actually did not even address the number of operable guns in homes or whether their use makes their owners safer. Oddly enough, Webster seems to concede the irrelevance of the study he cites, at the end of Section IX (p. 16: "No prior study …."), raising the question "why discuss this study?" This one cited study (Kleck and Gertz 1995) merely estimated the number of times Americans used guns for self-defense, either in their homes or elsewhere, but did not address the issue of numbers of guns kept in homes, whether they were kept in an operable status, or whether having the guns made their possessors safer.

Webster appears to believe that legitimate doubt has been cast on the estimates of the frequency of defensive gun uses (DGUs) generated by Kleck and Gertz, citing other, poorer quality surveys done by Hemenway et al. (cited fn. 57). As in the rest of his report, he reviews only a small and unrepresentative subset of the relevant studies. A considerably more complete and representative review of survey estimates of DGU frequency is shown in Table 4. The full body of studies strongly supports the conclusion that Americans use guns for self-defense an enormous number of times each year. Many of the early surveys were not very useful because they did not ask the DGU question of everyone in the sample, so estimates of DGUs in the entire population could not be computed (e.g., the Cambridge Reports, Time/CNN, and Gallup 1991 and 1993 surveys). Among more recent surveys, however, results have consistently indicated a million or more DGUs per year – excepting the two survey done by Hemenway and his colleagues. Thus, Webster has selectively cited the only two recent surveys generating estimates under one million.

Webster failed to recognize, however, that even the poor quality surveys done by Hemenway implied huge estimates of DGU frequency (Table 4). More specifically, those estimates, like the DGU estimates generated by every other national survey, are larger than the highest estimates of the number of *crimes* committed by offenders using guns (about 550,000 in 1992, for example – Kleck and Gertz 1995) . In short, defensive uses of guns by crime victims are more common than offensive uses by criminals – a conclusion supported even by the deviant findings of the surveys done by Hemenway on which Webster selectively relied (for details on why these were poor quality surveys, see Kleck 2001b, pp. 227-229).

Webster also appears to believe that estimates of DGU frequency in the Kleck and Gertz survey were somehow cast in doubt by the fact that their survey supposedly indicated that there were over 200,000 assailants wounded in DGUs, while other evidence from hospital emergency rooms indicates fewer than 100,000 *treated* for gunshot wounds (GSWs). It should first be noted that Webster has failed to take account of random sampling error in the survey-based GSW estimates. The percent of defensive gun users who believed that they wounded their adversary (7%) was based on just 194 sample cases of DGUs, so the 95% confidence interval estimate of this percentage is 3.41-10.59%. Thus, as few as 3.41% of the estimated 2.5 million defensive

gun users in 1992 would claim, if asked, that they had wounded their adversary, or as few as 85,250 defensive woundings. Thus, simple random sampling error, present in all survey estimates, is sufficient all by itself to explain the supposed discrepancy between the Kleck-Gertz estimates and emergency room data on GSWs.

There is, however, no actual discrepancy, since Webster made an erroneous apples-and-oranges comparison. The number of persons *treated* for GSWs is only a subset, and probably a fairly small subset, of the *total* wounded. Most gunshot wound victims are criminals. Because medical personnel are legally required to report treatment of GSWs to police, this means that wounded criminals who seek professional medical care of their injuries can expect to be subjected to a police interrogation as to how they came to be wounded. Those wounded by victims while attempting a crime would be understandably reluctant to reveal this to police and thereby risk a prison term for the crime. Since most gunshot wounds are survivable without professional medical treatment, many criminals choose not to seek such treatment, instead self-treating or seeking treatment from associates (Kleck 1997, pp. 3-5 and sources cited therein). Consequently the lower number of professionally *treated* gunshot victims implies nothing about whether survey DGU estimates of *total* gunshot victims are too high. In short, the GSW estimates implied in the Kleck-Gertz survey were perfectly compatible with the emergency room data on the number of GSWs medically treated that were cited by Webster.

Webster also claims that the Kleck-Gertz estimate of DGU frequency is inconsistent with a DGU estimate based on the National Crime Victimization Survey (NCVS). There is in fact no such estimate, since the NCVS has *never* directly asked even a single respondent about DGU. Instead, the NCVS only asks a general open-ended question about self-protective strategies that a victim might have employed during a crime incident. Thus, no one is asked specifically about DGU – respondents are merely given the opportunity to volunteer the information that they used a gun for self-protection. This is not an effective way to elicit reports of DGUs. Since the NCVS is a nonanonymous survey (the identity of respondents is known to surveyors) conducted by the federal government on behalf of the Justice Department, it is not surprising that few respondents volunteer the information that they threatened or attacked another person with a deadly weapon (Kleck 2001b). In sharp contrast, Webster does not mention that *every other survey* (at least 18 national surveys) indicates far more DGUs than the NCVS supposedly implies – most indicating over a million annual DGUs (Table 4). Thus, it is the NCVS "estimate" that is deviant, not the Kleck-Gertz estimate.

Most problematic of all, Webster completely ignores the well-known and sophisticated body of research that actually does bear on the question of whether guns make their owners safer – research on the effectiveness of actual defensive uses of guns by crime victims. It is understandable that Webster does not mention this body of research, since it unanimously indicates that victims who use guns for self-protection are less likely to be injured or lose property, compared to either victims who did not to resist, or to those who adopted other self-protective strategies.

The most authoritative information on the effectiveness of DGU comes from analyses of crime incidents reported in the NCVS. Respondents in this survey are asked if they have been victims of a crime in the previous six months, and if they say they have, they are asked about what actions they took to protect themselves during the incident. They are also asked whether

they were injured or whether they lost property, along with many other questions about a host of other factors that might affect the outcome of crimes.

Findings from these analyses have unanimously indicated that, even after controlling for many possible confounding variables, crime victims who used guns to protect themselves were found to be *less* likely to suffer injure after taking their self-protective actions, and *less* likely to lose property, than victims who did not resist at all, victims who resisted by force but not with a gun, or victims who resisted in nonforceful ways. Of special importance, gun-using victims were less likely to suffer *serious* injury (more serious than just cuts or bruises) than victims using any other self-protection strategy. The effectiveness of DGU is all the more impressive in light of the fact that gun users were typically facing more dangerous circumstances than victims using other defensive strategies – gun users were more likely to be outnumbered, already injured before using the gun, and to be facing armed offenders (Kleck 1988; Kleck and DeLone 1993; Southwick 2000; Kleck 2001c; Tark and Kleck 2004). Some early studies indicated that some gun-using victims were injured, supposedly as a result of using their guns, but after the NCVS was modified to establish whether injury occurred before or after protective actions were taken, it was found that nearly all injuries to gun-using victims had occurred *before* they used their guns (Kleck 2001c). Thus, gun use could not have provoked offenders into hurting the victims. In short, defensive gun use is not only extremely frequent in the U.S., but it is also effective in making crime victims safer. Webster created the contrary impression simply by excluding any mention of the relevant research.

The relevance of the DGU effectiveness research to the present case is straightforward. Limiting the number of operable guns in Chicago homes is likely to reduce the number of occasions when residents can get to their guns in time to use them against criminals, and these defensive uses would, based on this body of research, generally reduce the victim's chances of being killed, raped, otherwise injured, or of losing property. Thus, the restrictions are likely to reduce the number of beneficial uses of guns by crime victims in their homes.

## Section X – The Likely Effects of Chicago's Limitation on Number of Operable Guns in the Home

In this brief section, Webster draws conclusions that seem to come out of nowhere, having no logical connection with any of the research previously discussed, and even directly contradicting it. He belatedly addresses the relevant issue of the difference in effects between having one operable gun in the home versus multiple operable guns, but then falsely claims that the research he reviewed supports the existence of an effect of having multiple operable guns in the home: "there also appears to be a dose-response relationship in which risks increase with the number of guns kept in the home" (p. 16). He does not state which specific studies support such a relationship, but in fact only two studies that he reviewed even addressed the difference between having one gun vs. having multiple guns, and they did *not* support Webster's conclusion. As previously noted, Wiebe found no significant difference in the risk of a fatal gun accident between persons in households with a single gun and those in households with multiple guns, and this one study did not address the number of *operable* guns. Likewise, the Cummings et al. study found no significant difference in the risk of homicide between having purchased multiple handguns and having purchased only one.

## C.      REPORT OF PHILIP J. COOK

My response to Professor Cook's report is confined to his Sections IV to VI (pp. 3-18), which include his claims as to what research has to say about the links among guns, violence, and gun control.  My response follows the same sequence of sections that Cook used.

### SECTION IV-A – Consequences of Gun Violence

In Section IV-A, Professor Cook recites a series of statistics about the frequency of gun violence, but does not establish or provide any reasons to believe that the number of homicides, suicides, injuries, or crimes would be any lower if fewer guns were available.  On that point, he is very selective as to which of his own research findings he includes in his report.  He does not, for example, mention that he, like dozens of other researchers, has found the criminal offenders who possess guns while committing a crime are *less* likely to attack and injure their victims (Kleck 1991, pp. 161-162 and the sources cited therein).  Specifically, Cook found that robbers with guns were less likely than other robbers to injure their victims (Cook and Nagin 1979).  This repeatedly confirmed, though surprising, finding implies that injuries would increase if gun-armed robbers had instead been without guns.

Cook notes that the homicide rate in Chicago is far above the national average, but does not mention in this context that gun ownership in Chicago is far *below* the national average (Cook et al. 2007).  Regardless of whether one believes that gun ownership by prospective crime victims prevents crime, this pair of facts certainly does not support Cook's later claim that higher gun levels cause higher homicide rates, and thus that lower gun rates should produce lower homicide rates.

Cook reports enormous estimates of the "cost of gun violence" (pp. 4-5), but none of the data he cites in any way establishes that the costs of violence would be any lower if the violence were instead committed with knives or other weapons.  Cook's "costs of gun violence" are not really gun-specific - they largely reflect the costs of violence in general, rather the costs of gun violence in particular.  Nothing in this section can be legitimately construed to establish that the costs of violence in the U.S. or in Chicago would be even slightly lower if guns were less common.

The total cost figures are also dubious because the vast majority of these supposed costs are intangible costs that are not easily measured, and indeed may not be measurable at all.  Cook estimated these intangible costs using a "contingent-valuation survey," which he claims is "the accepted procedure in economics for estimating subjective costs" (p. 5).   The contingent valuation (CV) method has most often been used to assess the cost of environmental damage.  A blue-ribbon panel chaired by Nobel laureate Kenneth Arrow assessed the CV method, and how CV studies should best be done.   The concluding chapter of the collection of papers based on the panel's proceedings had this to say: "the basic conclusion of all the papers is that CV should be discarded as a public policy tool for determining economic damages to the environment" (Hausman 1993, p. 467).  This extremely negative assessment was based on the fact the CV method produces estimates that are illogical, internally inconsistent, and wildly inconsistent across studies.  Thus, Cook's CV-based estimates of the mostly intangible "cost of gun violence" cannot be regarded as credible.

Further, Cook is conspicuously one-sided as to which intangible costs and benefits he chooses to measure. He has acknowledged in his deposition that carry permit holders are motivated by a desire for security and self-protection, but also frankly acknowledges that he has never made any effort to quantify the value of the subjective feelings of safety and security produced by ownership or carrying of firearms (Cook 2011, p. 166), and thus has done nothing to quantify the *loss* in felt sense of security that would arise from gun restrictions, including bans on gun carriage and limits on the number of operable guns allowed in homes.

**Section IV-B – Lethality of Guns Used in Crime**

In section IV-B, Cook asserts that "guns are intrinsically more lethal than other commonly available weapons" (p. 6). Although this might to be true to some extent, Cook overstates the difference, and overstates the degree of support for this assertion. He has previously acknowledged that an attacker's intent to kill also affects the likelihood that he will inflict a fatal wound, that "the assailant's choice of weapon is a good indicator of his intent in assault offenses," and that "the assailant who is determined to kill the victim probably will use a gun, if one is available" (Cook 1982, p. 248). Consequently, by Cook's own logic, the attackers who use guns are also likely to be more lethal in their *intentions*, a factor that has its own independent effect of whether the victim is killed. This means that one cannot judge the lethality of weapons unless one somehow also measures and controls for the lethality of the attacker's intentions, since the two will be highly correlated. None of the studies that Cook cites to support his claim that guns are "more intrinsically lethal" measured or controlled for attacker lethality, and thus none can establish to what degree the higher fatality rate of gun attacks is due to the weapon's lethality rather than the attacker's more lethal intentions (Kleck 1991, pp. 163-170). Therefore, his claims about weapon lethality have no sound scientific foundation.

**Section IV-C – Criminal Weapon Choice and Gun Prevalence**

In section IV-C-1, p. 8. Cook claims that higher gun ownership rates cause higher burglary rates, relying for support entirely on a book chapter he co-authored with Jens Ludwig. Unfortunately, Professor Cook misreports the results of his own study. While Cook and Ludwig did indeed draw this *conclusion*, their methods cannot actually sustain it, and many of their findings directly contradicted it. The authors speculated that gun ownership rates could boost burglary rates by increasing the average "take" in burglaries, and thereby increasing the incentive to commit burglaries.

It is common for researchers to find a significant positive association between gun rates and crime rates, but the best-supported explanation for this statistical pattern is that higher crime rates motivate many people to acquire guns for self-protection, *not* that higher gun rates cause higher crime rates (Kleck 1984; Kleck and Patterson 1993; Southwick 1997; Southwick 1999; Kovandzic et al. 2008). Unless researchers use appropriate methods to establish which is cause and which is effect, they risk misinterpreting (a) the effect of crime on gun acquisition for self-protection with (b) the effect of guns on crime. The only studies that find a supposed crime-increasing effect of gun rates are, *without exception*, those that failed to use scientifically acceptable methods to resolve this causal order issue. This is documented in Table 3, summarizing studies on the impact of gun levels on homicide rates.

The burglary study by Cook and Ludwig was no exception, as they too failed to use appropriate methods to resolve this causal order problem. Thus, there is no methodologically sound basis for interpreting the positive burglary/guns association as reflecting the effect of gun rates on burglary rates. One of the authors' state-level analyses (their pp. 88-91) simply ignored the issue, by effectively assuming that burglary rates have *no* immediate effect on gun ownership rates. The unstated assumption underlying this analysis was that if burglaries motivated any people to get guns for protection, this would only happen after at least a one year delay – a highly implausible assumption. They used an unsuitable and professionally unacceptable method for determining causal order, merely relating burglary rates in a given year (the dependent variable or effect) to gun prevalence in the previous year (the independent variable or purported cause). They did not cite any textbook or other authority that this is an acceptable method for resolving causal order, because there are no supporting authorities. In any case, this analysis found *no* significant effect of gun ownership levels on burglary rates (their Table 3-4, p. 92), contrary to Cook's claim that higher gun ownership rates cause higher burglary rates. Cook does not mention this unsupportive finding in his expert witness report.

In another state-level analysis (pp. 91-93), Cook and Ludwig attempted to apply instrumental variables analysis to their data, a potentially effective method for dealing with simultaneous two-way relationships. This method, however, does not work unless the researchers include one or more relevant and valid "instrumental" variables (Wooldridge 2009, Chapter 15). In this case, the needed instrumental variable was a variable that affects gun ownership but does not directly affect burglary rates. Cook and Ludwig used the percent of the population living in rural areas in this role, claiming (probably correctly) that it has a significant positive effect on state gun ownership rates, but also assuming (incorrectly) that it has *no* effect on state burglary rates (p. 91). There is a wealth of evidence indicating that burglary rates are much lower in rural areas than in metropolitan areas (e.g., U.S. FBI 2010), so percent rural is an invalid instrumental variable because it cannot be assumed that rural conditions have no effect on burglary rates. As a consequence, the models of burglary rates estimated by Cook and Ludwig were "underidentified," a statistical condition under which estimates are meaningless (see Wooldridge 2009, Chapter 15; Kovandzic et al. 2008 for a technical explanation). In sum, Cook and Ludwig did nothing that was methodologically appropriate to address the causal order issue, and thus had no sound basis that concluding from this analysis that higher gun ownership rates cause higher burglary rates. Rather than the observed positive guns/burglary associations reflecting an effect of gun availability on burglary rates, it is more likely that the association merely reflected the well-established fact that higher crime rates motivate many people to acquire guns for protection, i.e. that higher crime rates cause higher gun rates (Kleck 1997, pp. 75-81; Kleck et al. 2011).

Cook also fails to mention still other unsupportive findings of this study, findings that indicated that gun ownership rates do *not* increase burglary. When Cook and Ludwig applied instrumental variables analysis to individual-level data from the National Crime Victimization Survey on whether the households in which the individuals lived had been burglarized, they found *no* significant effect of the gun ownership rates in an individual's area on whether they were burglarized, contrary to the authors' incentive theory (see their Table 3-7 and accompanying text, p. 101).

Likewise, in yet another individual-level analysis using the NCVS data, Cook and Ludwig focused their analysis just on burglaries committed while a resident was at home ("hot burglaries"), and found that such burglaries were *less* likely for people who lived in areas with higher gun ownership rates, though the bivariate association was not quite statistically significant (1-tailed significance = .0548; see top row of Table 3-8 and accompanying text, pp. 102-103). Estimates based on procedures controlling for other variables likewise produced estimated gun effects that were *negative,* though nonsignificant. These findings also contradicted the Cook/Ludwig hypothesis that more guns cause higher burglary rates.

In sum, Cook's characterization of the findings of this study can, at best, be described as highly selective, at worst misleading. His own research did not support the claim that higher gun ownership rates cause higher burglary rates.

In addition to being unsupported by the empirical evidence, the argument that higher gun rates increase burglary rates by increasing the "incentives" for committing burglary is dubious on both commonsensical and theoretical grounds. First, guns claim less than one percent of the dollar value of stolen property in the U.S., an amount so small that it is not likely to not even be perceptible to the average burglar (U.S. FBI 2010, Table 24). Second, the Cook/Ludwig argument contradicts simple economic theory. The higher the gun ownership rate, the fewer nonowners there are, and thus the fewer people there are who want a gun but do not already have one. Thus, there are fewer customers for stolen guns, that is, is less demand. Where almost everyone who wants a gun already has one, it is harder for a gun thief to find buyers, and the prices customers are willing to pay will be lower. In sum, as the gun ownership rate goes up, the opportunity for stealing may go up, but the need for stolen guns, and thus the prices at which they can be sold goes down. Consequently, the incentive for burglars to steal them for purposes of sale goes *down*, not up. It might be thought that a major part of the incentive for burglars to steal guns would also be so that they could keep the guns for their own use, rather than selling them for profit. Research on gun theft, however, indicates that criminals who steal guns usually already possessed guns, and therefore usually do not keep the guns for their own use (Wright and Rossi 1986, Chapter 10).

In Section IV=C-1, p. 7 Cook discusses how criminals get guns, but relies on a source of information that is not relevant to this question (his fn. 17 source, *Following the Gun*). He relies on this source to describe how criminals typically get guns, but fails to note that the set of crime guns covered in this study was not a representative sample of all crime guns, but rather was only a tiny and unrepresentative set of guns associated with criminal investigations conducted by the Bureau of Alcohol, Tobacco and Firearms (ATF). As the principle federal agency charged with enforcing federal gun laws and regulating the gun industry, ATF investigates the "diversion" of guns from legal to illegal channels, especially from licensed dealers to criminals. The agency does not routinely investigate burglaries of private residences, private transfers between friends and family members, or other common sources of crime guns. Instead, it narrowly focuses its enforcement efforts on those channels of gun movement that it is charged with regulating and that it is capable of effectively investigating. Consequently, data concerning the guns that ATF comes across in the course of its investigations cannot legitimately be considered to be in any way representative of all crime guns or even those recovered by police.

Likewise, the share of crime guns linked with ATF investigations that moved through a particular channel cannot legitimately be regarded as providing even an approximate estimate of the share of crime guns that moved through that channel on the way to criminals' possession. ATF even explicitly acknowledged this, cautioning readers that their investigations "do not necessarily reflect typical criminal diversions of firearms" (U.S. ATF 2000, p. 53). Professor Cook apparently did not understand the significance of this caveat, since it means that the data presented in his report cannot be used to draw conclusions about the typical ways that firearms get into criminals' possession.

Likewise, Cook draws conclusions about "typical transactions" involving guns ending up in criminals' hands that were based on data pertaining only to a sample of guns that law enforcement agencies chose to submit for tracing by ATF and that ATF was able to successfully trace. Such samples are not randomly chosen samples of crime guns, and cannot legitimately be regarded as representative of either all crime guns or even of crime guns that were recovered by police. Rather than describing crime guns and the ways they typically get into criminal possession, samples of traced guns reflect police preferences as to which crime guns they choose to submit for tracing and which ones are easier for ATF to trace (Kleck 1999). Thus, they are not merely unrepresentative of crime guns, but systematically distort the picture of typical gun diversions, for example, by exaggerating the share of guns that moved through more easily traced channels, such as purchases of newer guns (Kleck and Wang 2009). As the Congressional Research Service concluded, "the firearms selected for tracing do not constitute a random sample and cannot be considered representative of the larger universe of all firearms used by criminals, or of any subset of the universe" (U.S. Congressional Research Service 1992, p. 65). Likewise, Cook relies on trace data to draw conclusions about the paths that guns take when they are diverted from legal channels to criminal possession (p. 8, sources cited in his fn. 17 and 18), but trace data cannot legitimately be used for this purpose. As a National Academy of Sciences panel flatly stated, "trace data cannot show whether a firearm has been illegally diverted from legitimate firearms commerce" (National Academy of Sciences 2004, p. 40).

At the end of Section IV-C-2, p. 10, Cook claims that higher gun ownership rates cause higher rates of criminal homicide, an assertion that is erroneous for two reasons. First, his argument leading to this conclusion is logically fallacious, in that his premises, even if accepted, do not logically lead to his conclusion. Second, the empirical evidence that directly bears on this question, which was completely ignored by Prof. Cook, directly contradicts his assertion. Competently conducted research on the effect of gun ownership rates on homicide rates has found either *no* significant effect (Kleck and Patterson 1993), or a modest *negativ*e (homicide-reducing) effect (Kovandzic et al. 2008).

Consider first Cook's flawed logic. He begins with two premises: (1) the prevalence of firearms has a positive effect on gun use (by which Cook meant the percent of violent crimes in which guns are used), and (2) gun use affects the death rate in assault and robbery. From these two premises, he concludes that the prevalence of firearms therefore has a positive effect on the criminal homicide rate (p. 10). The first premise is probably correct, while the second one is more dubious, but even if both were correct, they would not logically lead to Cook's conclusion. The inference is fallacious for at least two reasons. First, it ignores the possibility that a higher prevalence of guns among prospective victims makes crimes more dangerous for offenders, and can deter some prospective offenders from attempting to assault or rob victims in the first place.

This deterrent effect would reduce the overall number of attempted assaults and robberies. Thus, even if a higher fraction of victims did die (a higher "death rate" in Cook's terms) as a result of a higher gun prevalence, the number of deaths could still go down because the number of assaults and robberies to which this purportedly elevated death rate applied went down.

Second, Cook's reasoning is fallacious because he ignores the effects of more assault and robbery victims actually using guns for self-protection during the criminal attempts. Offender gun use might increase the fraction of injuries inflicted by the offender that were fatal, but it is also now well-established that victim defensive use of guns during criminal attempts *reduces* the probability of the offender injuring the victim (Kleck 1988; Kleck and DeLone 1993; Southwick 2000; Kleck 2001c; Tark and Kleck 2004) - a point Cook does not deny. Thus, increased gun prevalence among crime victims would tend to reduce the number of victims injured, so that even if increased gun prevalence among offenders did increase the *fraction* of wounded victims who died, this fraction would apply to a smaller number of victims who were wounded. Consequently, it is impossible to tell, from Cook's premises, whether increased gun prevalence would, on net, increase or decrease the criminal homicide rate.

The actual net effect of gun prevalence on the homicide rate can therefore only be established empirically, i.e. through systematic observations of the covariation of the two phenomena in the real world. Cook does not review the huge body of empirical research directly bearing on this issue, perhaps because so much of it indicates that his claims are wrong. Table 3 presents a systematic review of every published study in the English language of which I am aware addressing the effect on gun ownership rates on homicide rates. The results of this heterogeneous set of 39 studies have been decidedly mixed, with 22 studies finding a significant positive association between gun levels and homicide rates, 16 failing to find such an association, and one with both supportive and unsupportive findings. There are nevertheless clear patterns in this body of research. The earlier, more technically primitive studies tended to find a purported effect of gun rates on homicide rates, but as the methodological quality of research improved, such findings became less common. It is essential that one make careful distinctions between good and bad quality research if one wants to make sense of the full body of research.

Table 3 provides information concerning the chief methodological flaws that characterized each study, and makes it clear that few studies can be considered even minimally satisfactory, in that nearly all studies made at least one of the three most consequential errors. *All* studies whose authors purported to have found a significant positive effect of gun ownership on homicide rates made at least one (and usually more) of three fatal errors: (1) they used an invalid measure of gun ownership (in which case the observed associations did not even pertain to actual gun ownership levels), (2) they failed to control for a significant number of possible confounding variables (in which case the observed associations were likely to be "spurious," noncausal associations), or (3) they failed to properly address causal order (in which case, observed positive guns/homicide associations could reflect the effects of homicide rates on gun levels, rather than the reverse).

Conversely, *no* methodologically competent studies have found that gun ownership levels have a significant positive effect on total homicide rates. The only two studies that avoided all three of these critical flaws both found that gun ownership levels do *not* have a

significant positive effect on total homicide rates (Kleck and Patterson 1993; Kovandzic et al. 2008). The pattern could not be clearer – poor quality research sometimes (about half the time) suggests that the prevalence of gun ownership increases the homicide rate, while good quality research indicates that it does not.

To support his claim that higher gun rates cause higher homicide rates, Cook relies on just one study, which he conducted with Jens Ludwig (Cook and Ludwig 2006, cited in Cook's fn. 23). This study is so technically flawed that I used it as an exemplar of poor research in this area, in an expository article I published a few years ago, titled "How Not to Study the Effect of Gun Levels on Violence Rates" (Kleck 2009). Lest it be thought this is an unduly harsh assessment, it should be noted that Cook and Ludwig managed to make *all three* fatal errors: (1) they used a measure of gun levels that is invalid for judging changes in gun ownership levels (their's was a longitudinal study), (2) they did not use any methodologically approved or effective method for addressing causal order, and (3) they did not explicitly control for a substantial number of confounding variables, instead controlling only for a limited and arbitrarily selected set of variables, half of which turned out to be unrelated to homicide rates (Kleck 2009). This crude study therefore cannot be relied upon to provide a meaningful estimate of the effect of gun rates on homicide rates.

Cook's discussion in this section is also conspicuous for its lack of attention paid to an issue of central significance to Chicago's stricter gun control measures – whose gun possession contributes to violence? If criminal use of guns were confined to a small subset of the population, while beneficial, violence-reducing uses occurred among a larger segment of the population, would it be wise public policy to discourage gun possession among both groups equally? Would it be wise to ban gun sales or gun carrying to everyone, not just those in well-defined high risk groups, such as convicted criminals? Gun laws in most states routinely distinguish between two kinds of resident adults – those with a criminal conviction on their record and those without. The distinction is presumably based on the simple premise that gun possession by some people is a significant risk to public safety, while gun possession by others is not. Cook makes no distinction between criminal gun possession and noncriminal gun possession.

There is sound reason to believe that gun possession among noncriminal crime victims is beneficial, since methodologically competent research has established that actual defensive use of guns by crime victims reduces the likelihood that the crime will result in injury or property loss to the victim (Kleck 1988; Kleck and DeLone 1993; Southwick 2000; Wang and Kleck 2004). Thus, there are good reasons to expect that noncriminal gun possession reduces the number of people injured or killed in crimes. There are also violence-increasing effects of gun possession among criminals (Kleck 1997, Chapter 7). This combination of effects may account for why the best available research has not found a net violence-elevating effect of gun ownership rates (Table 3) – violence-decreasing effects of noncriminal gun ownership cancel out violence-increasing effects of criminal gun ownership. If this is true, it means that restricting guns equally among both criminals and noncriminals – such as banning gun sales to all prospective buyers or completely banning gun carriage - is unwise policy, since it would reduce beneficial gun uses by noncriminals, while only reducing harmful uses by criminals to the extent that criminals obeyed or were otherwise affected by the restrictions.

**Section V-A – Purported Public Safety Rationales for Chicago's Sales Ban**

In Section V-A, p. 10, Cook claims that Chicago's gun control efforts have made guns scarce for youth and criminals, supporting this claim by asserting that guns purchased "on the street" by criminals and youth in Chicago are (a) expensive, and (b) take a long time to acquire. He relies entirely on a study he conducted with colleagues (cited in his fn. 24), based mostly on interviews with criminals in a single high-crime Chicago neighborhood. The authors of this study claimed that there was a "substantial" price markup in the underground gun market. Their own interviews, however, actually indicated that even among the more naïve, less well-connected youth in this area (among whom prices should be relatively high), prices actually paid for handguns were almost exactly the same as their retail prices in stores. The authors reported that prices paid "on the street" for handguns ranged from $250 to $400. Assuming that the average price paid by these youth was around the midpoint between $250 and $400, we can tentatively guess that the average was somewhere around $325 (the authors did not report an average). As it happens, this is virtually identical to the average *retail* price of handguns confiscated from criminals in that same area, which was about $316 according to the authors' own data (Cook et al. 2007, p. F564, F586). Ignoring uncertainty about the exact average price paid in the illegal market, the authors' figures imply an average markup of just three percent over the average retail price of $316. By no stretch of the imagination could a markup of three percent be accurately described as "substantial." Indeed, it is far less than the 15 percent markup over cost that legal gun retailers typically charge (Cook et al. 1995, p. 71). Thus, even in a low gun ownership city with very restrictive gun laws, among more naïve young gun buyers lacking extensive criminal connections, criminals were not paying prices substantially over retail. Although prices for used guns sold by licensed retailers would not be as high as the new-gun retail prices used by Cook et al. (2007, p. F 586), the differences in prices charged by gun dealers between new guns and relatively newer used guns is slight, and Cook himself has asserted that most crime guns are relatively new (Cook and Braga 2001).

These data, however, pertained only to an unrepresentative sample of one small segment of the population in just one unrepresentative neighborhood of Chicago. Cook and his colleagues also reported considerably more generalizable city-wide data on prices paid by Chicago arrestees who were interviewed in 1996-97, as part of the U.S. Justice Department's Drug Use Forecasting program. This more systematic body of data indicated that the median price paid for handguns by Chicago criminals was just $150 (Cook et al. 2007, p. F573), *less than half* the average new-gun retail price of the guns confiscated from Chicago criminals of $331 (computed from data in their Table A4, p. F586). That is, Chicago criminals were able to buy guns "on the street" at bargain prices, well *below* what a person would pay in a gun store for the same guns.

In short, the authors' evidence consistently contradicted Cook's claims that criminals pay high prices for "street guns," and do even support a claim that criminals pay amounts even slightly over retail prices. Even in Chicago, where handgun sales had been banned for the fifteen years preceding the Cook et al. study (and where gun ownership was quite low even before the ban), the prices paid by criminals by the time of Cook's study were generally at or below retail prices. In sum, Cook's own data on prices paid for guns by Chicago's criminals directly contradict his claim that guns are scarce for criminals or hard to get.

Cook also cited data from the survey of Chicago arrestees done by the Justice Department in 1996-1997 (p. 11), and claimed that these data indicate that the city's criminals take a long time to acquire handguns, implying that it was hard for criminals to get them. In fact, this survey did not ask *any* criminals how long it had taken them to actually acquire their handguns, since the relevant question was asked only of arrestees who had never owned a handgun, and thus *had never actually obtained one*. That is, Cook relied for his conclusions as to acquisition time entirely on the *guesses* of arrestees who had no personal experience whatsoever with how long it takes to obtain a handgun in Chicago. Cook has presented no other type of evidence, either in his expert witness report or in any publication, that Chicago's gun enforcement efforts have made it hard for criminals in the city to obtain handguns. Thus, he has no reliable evidence that indicates that Chicago criminals take a long time to get guns.

In sum, the price data indicate that Chicago criminals can easily get handguns at bargain prices, well below retail price, while Cook's evidence on how long it takes criminals to get guns do not provide any reliable information on the topic. Thus, Cook has no reliable foundation for his claim the Chicago's gun enforcement efforts (or any other forces) have made it hard for the city's criminals and youth to get guns.

## Section V-B – The Effect of Banning Gun Dealers

In Section V-B, on p. 11 Cook hints that corrupt licensed gun dealers account for a large share of guns that get into criminal hands, and that this therefore justifies Chicago's ban on local handgun sales. He misleadingly cites two bits of supposedly relevant information to suggest that corrupt dealers are important in supplying criminals' guns. First, he notes that a small share of licensed dealers account for most of the crime guns traced by ATF. He did not make explicit why this is relevant, but when read in context, it is clear that he was hinting that all, most, or at least a large share, of these dealers with high "trace counts" had many crime guns traced back to them because they were corrupt or "scofflaw" dealers who knowingly or negligently sold guns to criminals, gun traffickers or straw purchasers working for traffickers. In fact, the large share of traced crime guns is known to be attributable to either of two factors that have nothing to do with dealer misconduct. First, a small share of licensed dealers account for most of lawful gun sales. Higher sales volume means that a larger number of a given dealer's lawfully sold guns will eventually be stolen, usually in residential burglaries, and traced by ATF. In short, the disproportionately large share of crime guns being traced back to a given dealer is a reflection of the dealer's larger share of sales volume, i.e. business success, not dealer misconduct. Second, some dealers do business in areas with higher crime rates, and thus higher rates of residential burglary and gun theft. This means that no matter how closely they follow laws and ethical practices in selling guns, a higher fraction of their lawfully sold guns will eventually be stolen. To date, there is no research whatsoever that indicates that, once one accounts for sales volume and local crime rates, dealer misconduct is responsible for any nonnegligible part of the disproportionate share of traced crime guns for which a few dealers account (Kleck and Wang 2009). Consequently, this pattern does not support Cook's belief that corrupt licensed dealers are a significant part of the problem of guns getting into criminals' hands.

The second fact cited by Cook to support this claim is an ATF report indicating that "corrupt FFLs [federal firearms licensees] accounted for nearly half of all guns" involved in 1,470 ATF investigations. There appears to be no point to Cook citing this fact except to suggest

that corrupt FFLs account for a large share of crime guns. The report in fact supports no such assertion. The figures cited by Cook merely reflect where ATF focused its investigative efforts. Since ATF is charged with regulating FFLs, but can do little about transfers of guns from private parties (friends, family) and criminals, or about gun thefts resulting from residential burglaries, their investigations generally focus on the few FFLs who do engage in misconduct. Regardless of how rare "scofflaw" gun dealers are, and how few guns they supply to criminals, such dealers will claim a large share of the guns *linked with ATF investigations* simply because FFLs are where ATF directs a large share of their investigative efforts. In fact, corrupt ("scofflaw") FFLs are extremely rare, and are unimportant as sources of crime guns (Kleck and Wang 2009).

Cook cites (p. 11) the cases of "several" FFLs in the suburbs of Chicago who were found, as a result of police "sting" operations, to be willing to make illegal gun sales. Since citing "several" anecdotal cases cannot support a claim that such misconduct is common among FFLs, the relevance of these cases to Chicago's ban on local handgun sales is unclear. There is no doubt that every occupation has at least a few unethical practitioners, but this is not usually considered a justification for entirely banning the practice of that occupation. On the other hand, if Cook was suggesting that a complete ban on sales was the only way that occasional misconduct could be prevented, that is obviously a *non sequitur.* Indeed, the fact that police investigations were able to successfully identify the few corrupt FFLs operating in the Chicago area could be regarded as evidence that sales bans are *not* necessary and that ordinary regulation and law enforcement activities can effectively regulate gun commerce in Chicago.

Cook falsely claims that (a) "ATF provides little oversight of FFLs" and (b) is rarely *able* to revoke a dealer license (p. 12), in an attempt to suggest that the agency would be unable to effectively regulate gun commerce in Chicago if its sales ban were repealed. Cook cites a 2004 report (his fn. 29) to support the former claim, but this report merely criticized how ATF uses its resources – it did not conclude that ATF provides "little oversight" over FFLs. In any case, this report, which was based on data no more recent than 2002), is outdated. Partly in response to this report, ATF substantially increased its inspections of FFL premises after the period covered by the report, and the number of FFLs has greatly declined since 2002, allowing far more ATF oversight per FFL. More recent data available on the ATF website indicate that by FY 2007, there were only about 60,000 FFLs, compared to 104,000 in 2002 (U.S. Bureau of Alcohol, Tobacco, Firearms and Explosives 2011), greatly reducing the regulatory burden on ATF. Further, earlier research by ATF indicated that only a tiny fraction of FFLs actually sell a significant number of guns. Operation Snapshot, a survey of FFLs, revealed that 46 percent of them sold *no* guns in the preceding year, and another 34 percent sold between one and ten guns. Only 7 percent sold over 50 guns and thus could potentially be a source of significant numbers of guns flowing into illegal channels (U.S. Bureau of Alcohol, Tobacco, Firearms 1993). Applying this 7 percent figure to the 2007 number of FFLs, there were actually only about 4,200 gun dealers selling any significant number of guns. In FY 2007 "ATF conducted approximately 10,000 compliance inspections" (U.S. Bureau of Alcohol, Tobacco, Firearms and Explosives 2008) – a number sufficient to inspect all "real" gun dealers (those annually selling more than 50 guns) *every* year, plus a sample of low-volume dealers. Thus, it is not true that ATF lacks the resources and authority to regulate gun stores, in Chicago or elsewhere, and a claim to this effect cannot be used to justify totally banning gun sales within the city of Chicago.

As to Cook's claims about dealer license revocations, there is no evidence whatsoever that ATF is rarely *able* to revoke licenses; instead, the evidence merely indicates that ATF, for whatever reasons, rarely *does* so. All the extant evidence of which I am aware is consistent with the view that few FFLs' licenses are revoked because few engage in misconduct serious enough (that is, more serious than sloppy record-keeping) to merit license revocation (Kleck and Wang 2009). Indeed, ATF itself has never even claimed that a large share of FFLs engage in any serious misconduct. Critics sometimes note how long it takes for FFL to revoke licenses, suggesting that these delays somehow make it impossible to revoke licenses, but such delays should only result in time lags in revocations (e.g., proceedings initiated in 2008 might not result in revocation until 2010), but should not prevent revocations from occurring at all (Kleck and Wang 2009). In sum, ATF is currently well able to regulate licensed gun dealers in the U.S., and Cook offers no reason why it would not be able to do likewise in Chicago if gun sales were permitted within the city limits.

Cook nevertheless argues that banning gun sales in Chicago can make it "more difficult" (to an unstated degree) for criminals and youths in Chicago to obtain guns, despite the fact that gun dealers continue to legally operate in the suburbs just outside the city. He claims that the Chicago criminals he studied rarely obtained guns from these stores because they "rarely left their own neighborhood" (p. 12). Of course, if Cook's assertion is true of low-income Chicago residents in general, he should have noted that the city's ban on gun sales places an especially significant burden on law-abiding low-income residents who want a gun for purposes of lawful self-defense.

In any case, Cook fails to acknowledge the fact that the sales ban must also increase the trouble for getting a gun at least as much for law-abiding residents of Chicago as for criminals, and fails to take account of the harm that comes from crime victims not being able to defend themselves with guns. Every single study of the effectiveness of crime victims' use of gun for protection during crimes has found such use to be effective in reducing both injury (especially serious injury) and property loss (Kleck 1988; Kleck and DeLone 1993; Southwick 2000; Kleck 2001c; Tark and Kleck 2004). Thus, any reduction in gun possession among crime victims would increase the fraction of crimes resulting in injury or property loss.

Cook concedes that 12 percent of traced Chicago crime guns were purchased within Cook County (p. 11), but does not seem to recognize that this supports the view that many of Chicago's criminals did indeed evade the city's old gun sales ban by buying guns in suburban Cook County gun stores, and presumably would evade the new sales ban as well. He offers no reason why this will not continue to be so in the future if the new gun sales ban continues in force.

## Section VI – Purported Public Safety Rationales for Chicago's Carriage Ban

Cook's Section VI-A addresses effects of gun carriage away from offenders' homes. This discussion is conspicuous primarily for its one-sidedness, focusing only on the effects of gun carriage by offenders, and ignoring the effects of carriage by crime victims and prospective victims. Chicago's ban on gun carriage applies to all civilian residents, criminals and noncriminals alike, and thus would presumably discourage carriage by *both* offenders and victims. Indeed, given that offenders are not permitted to possess firearms in Chicago (a law not challenged in this suit), the ban on carriage can be expected to have little incremental effect on

their behavior.  Indeed, convicted felons are, by definition, law-breakers so it is safe to assume that rates of compliance with the carriage ban will be even higher among noncriminal victims than among criminal offenders.  Thus, discussion of the likely effects of the ban on *non*criminal victims and prospective victims would have been even more relevant to any balanced assessment of the ban's likely impact.

The best available evidence indicates that instances of gun carriage by members of the general public for purposes of self-defense that do *not* involve  the commission of gun crimes are far more common than instances of carriage in which a violent gun crime was committed (the only kind of incident Cook chose to focus on).  In a survey of a nationally representative sample of U.S. adults, results indicated that, in 1993, 7.1 million adults carried a gun on their person for self-defense, 12.4 million carried guns for self-protection in a vehicle, and 4.0 million did both.  Since those who carried on their person did so an average of 138 days per year, while those who carried in their vehicles did so an average of 146 days, the total number of person-days of defensive carriage was 1.8 to 2.8 *billion*, depending on how much overlap there was between these two kinds of defensive carrying.  In comparison, the annual number of crimes committed by offenders using guns, even in peak crime years, is well under a million (Kleck 1997), so even if all of them involved gun carriage (i.e. we ignored all gun crimes committed in or near the offender's home), the number of harmful instances of gun carriage are far less than a *tenth of one percent* of the number of instances of gun carriage for defensive purposes (Kleck and Gertz 1998, p. 208).

Further, the National Self-Defense Survey indicated that 63 percent of defensive gun uses occur in locations other than the defender's home, and thus presumably required carriage away from home (Kleck and Gertz 1995, p. 185).  That survey indicated that in 1993 there were about 2.5 million defensive gun uses (p. 184), so about 1.6 million defensive gun uses required carriage of the gun to the scene.  This number likewise dwarfs the number of crimes committed by offenders who used guns and who carried the guns away from home.  In combination with the unanimous research finding that defensive gun use reduces the likelihood of injury or property loss (sources are cited elsewhere in this report), this means there are enormous numbers of injury-reducing defensive uses of guns involving gun carriage, all of them ignored by Cook.

This is why it was singularly one-sided for Cook to conclude (p. 13) that "where there is more gun carrying, we should expect more of the harms outlined in Part IV.A [i.e., gun crimes]." It would have been more informative for Cook to also conclude that where there is more gun carrying by crime victims, there are more injury-preventing defensive uses of guns by crime victims in public places.  Conversely, less carrying by prospective crime victims, due to Chicago's gun carriage ban, will mean fewer injury-preventing defensive gun uses by victims, and thus a larger share of crime incidents resulting in injury.

Cook's Section VI-B discussion of targeted law enforcement patrol activities is entirely unrelated to the issues in this case, including the ban on carrying guns in public places.  If Chicago allowed gun carrying with a city-issued permit (and Illinois repealed its ban on gun carriage), instead of completely banning gun carriage, police would not in any way be impaired in their efforts to suppress gun carrying by criminals.  They would still have the legal authority to stop and frisk, upon reasonable suspicion, any persons believed to be unlawfully carrying firearms, and would still retain the authority to seize any unlawfully possessed firearms they

found.  We can be certain of this because this is precisely the situation that prevails elsewhere in the U.S., where police have no difficulty arresting suspects for unlicensed gun carriage, even though at least 40 states allow relatively easy access to carry permits.  Carrying a gun in a public place without a license, in a jurisdiction that requires a permit for carrying, is just as much a crime as carrying a gun in a jurisdiction that completely forbids gun carriage.  Indeed, the targeted patrol efforts that Cook believes were effective, in Pittsburgh and Indianapolis (see Cook's fn. 36, 37) were carried out in states that did not ban carriage as Chicago does, but that merely require a permit.  He seems unaware if his assessment of these efforts is correct, it shows that you do *not* need a complete Chicago-style ban on carriage to carry out effective targeted patrol programs.

In section VI-D, Cook  describes Illinois' carry laws as if they were squarely in the national mainstream, when in fact they are restrictive to a unique degree.  The way Cook phrases it is: "All but three states currently either ban carrying a concealed firearm or restrict carry to those who have obtained a license or permit for that purpose" (p. 15).  That eccentric phrasing conceals more than it reveals, since it conceals the fact that Illinois is the *only* state that bans concealed carriage of guns.  Most of the states that Cook lumps in with Illinois, i.e. that require a permit or license, issue such permits on a relatively lenient "shall issue" basis – that is, virtually any noncriminal adult resident who follows the application procedures is issued the permit.  Only eight states have restrictive carry permit systems in which it is difficult for noncriminal adult residents to get a permit (National Rifle Association 2011; Brady Campaign 2011), and thus have gun carriage laws even remotely as restrictive as those of Illinois.

Cook concedes that he has no evidence for claims in section VI-C (p. 15), so I have no comments, other than to point out that once again Cook ignores the issue of defensive gun use (DGU), in this case DGU linked with gun carriage or possession in places immediately outside homes.  Banning gun carriage in such places would discourage lawful and justified defensive uses of guns in those places, and as noted elsewhere, defensive gun use by crime victims is effective in preventing injury or property loss (Kleck 1988; Kleck and DeLone 1993; Southwick 2000; Kleck 2001c; Tark and Kleck 2004).  Significantly, this is a point that Cook never disputes.

In Section VI-D, Cook claims that "it is sometimes alleged that most gun crimes are committed by active criminals *who can be readily identified as such*" (p. 16, emphasis added), but does not cite any specific persons or organizations that make such a claim.  I am not aware of any significant participants in the gun control debate who make such a claim.  Rather, the claim that is typically made is that most gun crimes, and indeed most serious violent crimes regardless of weapon use, are committed by persons who have repeatedly committed crimes in the past – regardless of whether or not they can be readily identified as such in official records.  It is the their status as law breakers that is important because it bears on the claim that the kinds of people who commit violent crimes are also likely to ignore gun control laws.  For those making this claim, the relevant fact is that these are people prone to break laws, not that they are readily identifiable as such.  Thus, Cook is knocking down a straw-man version of his opponents' arguments.

He then goes on to claim that certain unstated parties assert that "issuing carry permits to persons not identified as criminals from public records pose no risk" (p. 16).  I am not aware of

any responsible party who has asserted there is *no* risk whatsoever from issuing permits to such persons, and Cook does not cite any. A more reasonable argument that is not a mere straw man is that this risk is quite small relative to the benefits of genuinely noncriminal persons having the legal right to carry guns in public places and therefore being in a position to use them defensively.

Cook cites a body of largely irrelevant research that establishes the obvious fact that not all criminals are recorded in public databases as persons who have been convicted of a crime, or specifically convicted of a felony (p. 16). What he does *not* cite is any evidence showing that any significant fraction of persons who are issued carry permits ever commit violent gun crimes as a result of possessing permits. This is presumably because there is no such evidence; in any case, I am not aware of any. Instead, the evidence indicates that criminal gun violence among carry permit holders is virtually nonexistent. Data are available from Florida that cover the longest documented period of time in which a lenient "shall-issue" carry law was in operation, from 1987 to 2011. Florida issued 2,047,928 concealed weapon licenses between October 1, 1987 (when their new "shall issue" carry law went into effect) and August 31, 2011, and still had 853,272 active licenses as of the latter date. Yet, over this entire 24-year period, the state revoked a grand total of just *168* licenses due to licensees committing a crime in which a firearm was utilized – an average of just seven per year (Florida Department of Agriculture and Consumer Services, 2011), in a state in which there were 113,641 violent crimes known to the police in 2009 (U.S. FBI 2010). In short, carry permit holders do not contribute more than a negligible share of violent crimes. Cook's concern was that, if Illinois and Chicago lifted their carry bans, many violent people would be issued carry permits, and as a result commit violent crimes. Based on extensive actual experience with a "shall issue" carry permit system, however, this concern has proven to be unwarranted. Those criminals without an officially recorded criminal conviction might be *eligible* to get a carry permit if they applied for one, but actual experience indicates that hardly any do, perhaps because they do not want to be officially identified by authorities as a gun possessor, or maybe just because they just do not care that much about conforming with the law.

Nevertheless, in Section VI-D, on p. 17, Cook cites a report on an advocacy group's website that claims that 370 homicides had been committed by concealed carry permit holders (his fn. 44). I have previously reviewed in detail an earlier version of this report concerning a subset of 50 homicides that occurred in the May 2007 to April 2009 period (Violence Policy Center [VPC] 2009). The VPC authors clearly implied that possession of a carry permit somehow contributed to these homicides or made their possessors more dangerous to the public, but did not make explicit the logic underlying this assertion, or explain exactly how carry permit holding contributed to the violence. Likewise, Cook does not explicitly state the relevance of the VPC claims to the Chicago case or Chicago's ban on carriage – he just allows unwary readers to infer that granting carry permits somehow contributed to the occurrence of these homicides.

In fact, most of the homicides identified by VPC do not support an argument that possession of a carry permit makes criminal homicides more likely. Most conspicuously illustrative, one of the killings cited by VPC did not even involve use of a gun, but rather was committed by strangling (see p. 11, regarding the 3-5-09 Florida case). The VPC authors did not explain how having the legal authority to carry a gun in public places could contribute to a murder committed by strangling.

Other homicides cited in the VPC report did at least involve use of a gun, but were committed on the killer's property - that is, a place where gun possession does not require a carry permit (e.g., Pennsylvania case that occurred on 11-19-08, p. 6). A person without a carry permit is just as entitled to possess a gun on his own property as a person with such a permit, so the killer's possession of a carry permit could not have made his possession of a gun in the time and place of the killing any more likely or contributed to the commission of the homicide.

In other VPC-cited killings the gun was carried to the crime scene in the killer's vehicle, in a state where such carrying did not require a carry permit for gun possession in a vehicle to be lawful – again, possession of a carry permit was irrelevant to whether the killer possessed a gun at the time of the killing. For example, the very first case cited in the VPC report (VPC 2009, p. 3 - homicide committed on 8-5-08) involved a killer who possessed a gun at the time of the shooting by virtue of carrying it to the scene in his vehicle, in Florida, a state that does not require a permit for carrying a gun in one's vehicle (Bird 2000). Thus, in these kinds of homicides, the fact that the killer happened to be a carry permit holder was irrelevant to whether he possessed a gun at the time of the killing.

Other killings cited by VPC did involve guns, and did occur in places where a carry permit would be required for lawful possession, or involved a killer who travelled to the homicide location through public spaces that would require a carry permit for gun possession to be legal, but nevertheless were killings where possession of a carry permit was almost certainly irrelevant to the commission of the crime. Many of the homicides cited by VPC were either premeditated murders, or were the by-product of other very serious planned crimes such as rape or robbery. To argue that being a carry permit holder somehow contributed to these sorts of killings requires one to envision people who were willing to plan to take another person's life (risking the death penalty), or to plan to commit a rape or robbery (risking a long prison sentence), yet were *not* willing to violate laws forbidding carrying guns in public places without a carry permit – a crime commonly punished with a sentence of probation (Kleck 1991).

The sort of homicide scenario that *would* support an argument that increasing the number of legally authorized gun carriers would increase criminal violence would be one that (a) involved unpremeditated violence, (b) was committed with a gun, and (c) occurred in a location away from the killer's home and thus required carrying a gun through public spaces. In such cases, one could at least plausibly argue that possession of a carry permit encouraged gun carrying in public without any prior intention of committing a criminal act with the gun, but that once the gun was made available in a situation where the carrier was motivated to commit an unplanned act of violence, use of the gun made it more likely the criminal act would result in the victim's death.

Of the 50 homicides covered in this report, however, only five killings fit this description (see the three Florida homicides committed on 2-29-08, February 2008, and 1-7-08; the Ohio killing committed on 8-6-07, and the South Carolina case committed on 5-10-07 – pp. 13-15, 19, 22). The rest of the cases involved planned violent felonies, or occurred in or near the offender's home, or were committed with a gun that was available to the offender because it had been carried to the scene in the killer's motor vehicle (plus the case committed by strangling). In sum, perhaps five of the 50 criminal homicides were committed by carry permit holders in

circumstances where possession of a carry permit *may* have contributed to the occurrence of the killing.

In Section VI-E, p. 17, Cook subtly alters the issue relevant to whether Chicago's ban on gun carriage would reduce crime rates, or perhaps homicide rates, below what they would be without the ban. He does not assert that he believes the ban will have this beneficial effect; instead he merely asserts that extant research is somehow not good enough to "provide a reliable basis for determining whether RTC ["Right-to-Carry"] laws increase or reduce crime and violence" (p. 18). A more straightforward way to rephrase Cook's assessment would be to say that there is no sound basis for believing that stricter controls over gun carriage, such as Illinois-style bans or near approximations like restrictive licensing systems, reduce crime or violence. That is, Cook's own carefully worded assessment implies that there is no sound scientific basis, in the large body of quantitative studies of carry law impact, for believing that Chicago's ban on gun carriage reduces crime or violence. This does not prevent him from nevertheless asserting that the city's carry ban is "plausibly supported" by the "preceding discussions" of his own research – presumably referring to the Section IV-B-2 (p. 10) discussion that was logically fallacious and empirically unsupported.

More importantly, Cook fails to address any of the intended effects of "shall issue" laws. They were not intended to reduce crime rates, but rather were intended to allow more law-abiding citizens to carry guns in public places and thereby make them available for self-protection in such places. Cook does not deny that the laws have such effects, nor deny that Chicago's carry ban reduces defensive gun uses by noncriminals in public places. Instead, he is merely silent on the issue.

Finally, in Section VI-E, on p. 18 of his report, Cook belatedly reaches the central issue underlying debates over gun controls, including Chicago's regulations – defensive use of guns and possible deterrent effects of gun ownership. His discussion of these topics is consistently misleading, superficial, and inaccurate. For example, he misunderstands the key methodological issues surrounding survey-based estimates of defensive gun use (DGU) frequency, and totally ignores the issue of the effectiveness of victim DGU.

Cook begins by hinting that there is something wrong about estimating the frequency of crime-related experiences with surveys: "these claims [of large numbers of DGUs] are based not on police records, but rather on responses to one-time surveys (typically by telephone) of a sample of adults." He hints but does not explicitly say that police-based counts of DGUs would be more reliable. This is not surprising, since no expert in the field has ever claimed that police-based counts of crime-related events are more complete than survey-based counts.

Cook then makes two patently false claims. First, he claims that the National Crime Victimization Survey (NCVS) provides an estimate of DGU frequency, and that private surveys yield DGU estimates that are not credible because they are "an order of magnitude higher" than these supposed NCVS estimates. In fact, the NCVS has never directly asked a single respondent whether they had a DGU experience, and thus cannot provide a meaningful estimate of the prevalence of such experiences. Instead, NCVS respondents can only report DGUs if they volunteer reports of such experiences in response to an open-ended question pertaining to self-protective actions in general (Kleck 2001b).

Second, Cook claims that the DGU estimates from private surveys are "far higher than would be logically compatible with other sources of data on crime and violence" (p. 18). This too is indisputably false, and is not supported by the source that Cook cites (Cook and Ludwig [1998], cited in his fn. 48). Reporting results from the National Survey of the Private Ownership of Firearms (NSPOF), Cook and Ludwig claimed to have established conflicts between their defensive gun use estimates and crime estimates drawn from other sources, concluding that the defensive gun use results must be erroneous because they implied (1) numbers of defensive gun uses that would claim implausibly large fractions of all crimes of a given type, and (2) implausibly large numbers of defensive woundings of criminals compared to other sources of data on the frequency of woundings (Cook and Ludwig 1998). Their reasoning was fallacious because it relied on the indisputably false premise that we can somehow know the true *total* number of crimes in a given category (e.g., the total number of sexual assaults or the total number of robberies), and know the true total number of gunshot woundings, whether medically treated or not. No responsible scholar claims that we know these things, and even Cook and Ludwig never dared to explicitly claim that we do. Yet without such knowledge, it is plainly impossible to assert that the number of survey-reported DGUs linked with a given type of crime was implausibly large compared to the total number of crimes of that type.

Cook and Ludwig also cited data on the number of people treated in emergency rooms for nonfatal gunshot wounds and asserted that their own survey's estimates of criminals wounded during defensive gun uses were implausibly high in comparison. In reality, the two sets of numbers are perfectly consistent. Cook and Ludwig effectively ignored the fact that the wounding figures they cited were only estimates of the frequency of gunshot woundings *treated in hospital emergency departments*, not the total number of gunshot woundings, treated or untreated. It is highly unlikely that most criminals wounded by gun-wielding victims seek professional medical treatment (as distinct from self-treatment or treatment by family or friends), since medical personnel are required by law to report gunshot wounds to the police (Lee et al. 1991). Because most gunshot woundings are survivable with no more sophisticated medical care than what can be administered by the average lay person, most wounded criminals can afford to choose self-treatment over professional treatment at a hospital (see Kleck 1997, pp. 1-5 and the medical sources cited therein). And wounded criminals have extremely strong legal reasons to do so, since seeking professional medical treatment would often be tantamount to surrendering to police for the crime in which they had been wounded, if the victim had reported it to the police. Cook and Ludwig disputed the claim that most such criminals would not seek emergency room treatment, but not by citing contrary evidence or pointing to some logical flaw in the evidence or arguments supporting this assertion. Instead, they simply issued the rather imperious pronouncement that "we find that possibility rather unlikely." They offered no further rationale for this remarkable assessment.

Cook and Ludwig claimed that the estimated numbers of defensive gun uses connected with particular types of crimes were inconsistent with the total number of crimes of that type, with or without defensive gun uses. For example, they claimed to have shown that the estimated number of defensive gun uses linked with rapes actually exceeded the *total* number of rapes, as estimated by the NCVS. This turned out to be incorrect, but the claim was irrelevant anyway, since we do not know the total number of rapes, from the NCVS or another other source. Alternate sources of information indicate that only a minority of all crime incidents get reported

to the NCVS, and thus it is far from complete in its estimates of crime frequency (Loftin and MacKenzie 1990). Therefore, no matter how large the estimated number of defensive gun uses are in the gun surveys, they could still be a plausibly small share of all crime incidents, including both those effectively covered by the NCVS and those not covered. Consequently, comparing defensive gun use estimates with NCVS estimates of crime, or with hospital-based estimates of medically treated gunshot woundings, can tell us nothing about whether defensive gun use estimates are plausible.

To give Cook and Ludwig's argument its strongest chance to appear credible, consider rape, the only crime category for which, according to those authors, the estimated number of crimes with a defensive gun use supposedly exceeded the total number of such crimes as estimated by the NCVS. The NSPOF results, according to Cook and Ludwig, implied 322,000 rapes and attempted rapes in which the victim used a gun defensively, while the NCVS for the same year indicated a total of only 316,000 rapes and attempted rapes, with or without defensive gun use. The number of rape-linked DGUs, however, exceeded the rape total only because Cook and Ludwig made a careless mistake. The NSPOF defensive gun use estimates actually pertained to defensive gun uses linked with "rape, attempted rape, *other sexual assault*" (emphasis added), while the supposedly corresponding number from the NCVS used by Cook and Ludwig (316,000) pertained only to "Rape/Attempted rape" - even though the NCVS also provides estimates for the separate category of "Sexual Assault." When the correct figures from properly corresponding categories are used, the NCVS figure is actually 432,750 rapes, attempted rapes, and sexual assaults, and thus the NSPOF estimate of 322,000 defensive gun uses linked with such crimes did not even come close to exceeding the NCVS estimate of the total number of such crimes. Therefore, Cook and Ludwig's only instance of a defensive gun use estimate that was supposed to be impossible (as distinct from subjectively "implausible") turned out to be the product of their own error.

Nevertheless, even correcting for this mistake, the rape defensive gun use estimate still looks implausibly high at first glance. Cook and Ludwig, however, also reported that their 95 percent confidence interval estimate (which reflects the possible effects of random error in selecting survey respondents) of rape-linked DGUs was 12,000 to 632,000 (Cook and Ludwig 1998, p. 123). Using the lower limit of this extremely imprecise estimate (12,000), the NSPOF estimate of rape-linked DGUs was not even mildly implausible compared with the NCVS estimate of 432,750 rapes, attempted rapes, and sexual assaults, since it implies that guns were used by victims in less than three percent of total rapes and sexual assaults. Therefore, even the appearance of "implausibility" could be the product of nothing more than random sampling error, which in turn was due to the NSPOF's relatively small sample size.

In any case, the Kleck-Gertz NSDS, which had twice the sample size of the Cook-Ludwig NSPOF and thus considerably more precise defensive gun use estimates, implied only 209,089 defensive gun uses linked with rapes or sexual assaults (Kleck and Gertz 1995). This is less than half the NCVS estimate of "total" crimes in this category. In no crime category were NSDS estimates of defensive gun uses even half the number of NCVS-estimated offenses in the corresponding category.

But, again to give Cook and Ludwig's argument every chance of appearing reasonable, ignore their invalid comparison, ignore sampling error due to an inadequate sample size, and

consider just their point estimate of 322,000 rape-linked defensive gun uses. The biggest problem still remains: the NCVS estimate of rape frequency is not complete or exhaustive, and the true total number of rapes is almost certainly far higher. Indeed, rape estimates derived from the present NCVS are themselves two and a half times the size of those derived from earlier versions of the same survey (U.S. Bureau of Justice Statistics 1996, p. 152). If the true number of rapes is actually far higher than the NCVS estimate of 316,000, there is nothing even mildly implausible about an estimate of 322,000 rapes, attempted rapes, and sexual assaults with DGU.

Reviewing the results of surveys specially designed to study rape, Loftin and MacKenzie (1990) found that the total number of rapes could be as much as *thirty-three* times as high as NCVS-based estimates. Thus, instead of there being only 316,000 total rapes per year, there could actually have been anywhere from 316,000 on up to a possible (albeit unlikely) 10.4 million rapes. In sum, there turns out to be no logical foundation whatsoever for the claim that 322,000 rape-linked defensive gun uses is implausibly high in comparison with the total number of rapes.

Cook's discussion of possible flaws in survey estimates of DGU frequency is conspicuously one-sided, in that he mentions only flaws that would make the estimates too high. For example, he alludes to the problem of forward telescoping (p. 18), without acknowledging that this is known to have only a slight effect on survey estimates and that its effects is completely counterbalanced by memory failure, which reduces the estimates (Kleck and Gertz 1995, pp. 171-172 and sources cited therein). Cook likewise mentions nothing about the well-established reluctance of survey respondents to admit to criminal behaviors, such as the unlicensed gun carrying that often accompanies DGUs in public places. If lacking a carry permit, a survey respondent who had used a gun defensively in a public place cannot report it to the surveyors without confessing to the crime of unlawful carriage.

Cook's exclusive and lop-sided emphasis on alleged sources of overestimation is in sharp contrast to more mainstream scholars' assessments of survey estimates of crime-related experiences, which are overwhelmingly concerned with flaws that make estimates of the frequency of these experiences too *low* (for overviews, see Cantor and Lynch 2000; Thornberry and Krohn 2000). There is no precedent of any kind for a survey of the general U.S. adult population to yield an overestimate of any crime-related phenomenon. If Cook's extraordinary claims about DGU estimates were correct, it would be the first instance in the history of survey research that a survey of the general adult population overstated the frequency of any crime-related experience (Kleck 2001b).

Leaving aside Cook's persistently one-sided speculations about possible survey flaws that might make DGU estimates too high, the actual empirical evidence has consistently and repeatedly indicated the DGU by crime victims is extremely common, and in particular is more common than criminal uses of guns by offenders (Kleck 2001b). Table 4 displays the full set of results that Cook's report omits, summarizing decades of empirical research on the frequency of DGU. Whether surveys were conducted or sponsored by scholars, federal government agencies like the Centers for Disease Control, pro-gun organizations like the National Rifle Association, or news outlets with antigun editorial polices (the *Washington Post*, *Time* magazine), the results always indicate huge numbers of DGUs – numbers that exceed the highest estimates of the number of crimes committed by gun-using offenders.

Cook claims that evidence concerning many alleged DGUs reported in surveys "suggests" that many of the reports "are about events that simply did not happen," citing his own article (Cook and Ludwig 1998) in support (p. 18). In fact, this article did not contain any information that showed that even one of the reported DGUs did not occur. This claim was nothing more than an unsupported speculation by the authors, based on the sort of minor inconsistencies that inevitably pop up in detailed accounts of complex but genuine events (a detailed analysis of these authors' claims concerning inconsistencies can be found in Kleck 2001b, pp. 250-252). As far as anyone can tell, all the reports of DGUs in the survey in question pertained to events that actually did happen.

Cook also cites a study (Hemenway et al. 2000, cited in Cook's fn. 51) that purported to have established that many alleged DGUs were actually criminal assaults. These assessments were, however, nothing more than guesswork by a small number of criminal courts judges, based on the fragmentary information with which the authors provided them. The willingness of judges to assess violent acts as defensive in nature varies radically across different areas of the country, with judges in some Northeastern parts of the nation being almost entirely unwilling to assess any homicides as justifiable, while judges elsewhere assess over twenty percent of homicides to be justifiable (Kleck 1991, pp. 111-114, 147). The authors of this study did not identify any of the judges, explain how they were chosen, or even say where they served as judges.

Finally, Cook hints (p. 18) that criminal uses of guns are more numerous than defensive uses, citing a pair of surveys done by Hemenway and his colleagues. These authors asked their respondents: "In the past five years, have you used a gun to protect yourself from a person or people?" The phrase "protect yourself" excludes defensive uses on behalf of others, artificially limiting the defensive use experiences that qualified for further inquiry. The authors appropriately excluded on-duty gun uses involving police, security guard, or military duties, but apparently also excluded off-duty uses as well.

Unfortunately, the resulting DGU estimates were tainted by the fact that this question had been preceded by the question "In the past five years, has anyone displayed or brought out a gun in a hostile manner, even if this event did not take place as part of commission of a crime?" This oddly worded question did not make it clear whether the respondent was being asked about defensive uses or offensive uses, since a person making genuinely defensive use of a gun certainly would be using the gun in a manner that was "hostile" to the criminal attempting to victimize them. In fact, the curious phrasing even obscures whether the respondent was being asked about something that they did, or something that was done to them.

As the authors acknowledged (Azrael and Hemenway, 2000, p. 290), an unknown share of the positive responses to this earlier, ambiguous question may have reflected defensive gun uses by the respondent, or experiences in which other people used guns defensively against the respondent. As a result, some defenders who answered "yes" to the ambiguous first "hostile manner" question might have thought it was unnecessary to answer affirmatively to the self-protection question, believing that they had already reported the relevant DGU. This would cause the DGU estimate to be too low, and indeed the estimate based on this survey was lower than those obtained in any other post-1991 survey (Table 4). When these authors conducted a second survey (Hemenway et al. 2000) in which this problem was partially fixed, the share

reporting a DGU jumped by 58 percent (compare the "Hemenway 1999" survey with the "Azrael and Hemenway" survey in Table 4), supporting the suspicion that the authors' procedures in the first survey had caused DGU frequency to be radically understated.

Professor Cook mentions none of this in his report, and ignores the results of all the other surveys shown in Table 4. Thus, his conclusions are based on a small, unrepresentative sample of the relevant research, on two surveys that were especially flawed and that yielded DGU estimates that deviated radically from those obtained in other, more methodologically sound studies. Since he relies on unreliable estimates of DGU frequency, he has no sound evidentiary foundation for drawing conclusions about the relative frequency of aggressive/criminal gun uses and defensive uses.

In any case, technically superior research directly contradicts Professor Cook's conclusions on this point. The best available estimates of criminal uses of guns are based on the NCVS and these were indicate that there were about 554,000 gun crimes in 1992, and generally smaller in other, less violent years. As indicated in Table 4, estimates of annual defensive uses of guns by crime victims are mostly in the one to three million range, varying depending on what year the data pertain to, and what subset of DGUs were being estimated (e.g., those involving any type of gun or just those involving handguns? all uses regardless of location, or only uses outside the home?). Regardless of these variations, however, the full body of evidence consistently indicates more defensive uses of guns by crime victims that criminal uses by offenders – directly contradicting Professor Cook's highly selective reading of the relevant research.

Cook's discussion in his final section also completely ignores the issue of crimes deterred by gun ownership and carrying. Actual defensive use of guns by victims during the commission of a crime serves to improve the victim's chances of coming out of the incident unscathed, but guns may also prevent prospective offenders from even attempting crimes in the first place. One cannot directly count up crimes that did *not* occur because would-be offenders feared running into armed victims, any more than one can count the number of murders not committed because would-be killers feared legal punishment. Nevertheless, there is a wealth of evidence suggesting that widespread ownership, carrying, and defensive use of guns by potential and actual crime victims has a deterrent effect on crime. Crime rates have been observed to go down after widely publicized instances of defensive gun use, after highly publicized programs in which civilians were trained in the safe use of firearms, and even after a town required home gun ownership. It has also been found that burglars in the U.S. are far less likely to commit burglaries of occupied homes than burglars in nations with lower gun ownership rates. More directly, surveys of incarcerated criminals indicate that they fear confronting armed victims and have personally refrained from committing crimes because they believed the victim was or might be armed (evidence summarized in Kleck 2001c, pp. 318-330).

In one survey of prison inmates in ten states, among felons who reported ever committing a violent crime or a burglary, 42 percent said they had run into a victim who was armed with a gun, 38 percent reported they had been scared off, shot at, wounded, or captured by an armed victim (these were combined in the original survey question), and 43 percent said they had at some time in their lives decided not to commit a crime because they knew or believed the victim was carrying a gun. Thus, 90 percent (38/42=.90) of the prisoners who had encountered an armed

victim had been scared off, shot, wounded or captured at least once by such a victim. Concerning the felons' attitudes toward armed victims, 56 percent agreed with the statement that "most criminals are more worried about meeting an armed victim than they are about running into the police," 58 percent agreed that "a store owner who is known to keep a gun on the premises is not going to get robbed very often," and 52 percent agreed that "a criminal is not going to mess around with a victim he knows is armed with a gun." (Wright and Rossi 1986, discussed in Kleck 2001c).

In sum, many criminals may be deterred altogether from even attempting crimes, and the number of deterred crimes, though not directly countable, could be enormous. Indeed, it is worth noting that it is a logical possibility that the number of crimes deterred by victim gun possession could easily exceed the number of crimes that actually occur. Cook, however, does not address even the possibility of such deterrence occurring, or the possibility that Chicago's restrictions on gun ownership and carriage could reduce it.

# References

Azrael, Deborah, Philip J. Cook and Matthew Miller (2004) "State and Local Prevalence of Firearms Ownership Measurement, Structure and Trends" *Journal of Quantitative Criminology* 20(1) 43-62.

Azrael, Deborah, and David Hemenway. 2000. " 'In the safety of your own home.' " *Social Science & Medicine* 50:285-291

Bailey, James E., Arthur L. Kellermann, Grant Somes, Joyce G. Banton, Frederick P. Rivara, and Norman P. Rushforth. 1997. "risk factors for violent death of women in the home." *Archives of Internal Medicine* 157:777-782.

Beautrais, Annette L., Peter R. Joyce, and Roger T. Mulder. 1996. "Access to firearms and the risk of suicide." *Australian and New Zealand Journal of Psychiatry* 30:741-748.

Bird, Chris. 2000. *The Concealed Handgun Manual.* San Antonio, TX: Privateer.

Bordua, David J. 1986. "Firearms ownership and violent crime: a comparison of Illinois counties." Pp. 156-88 in *The Social Ecology of Crime*, edited by James M. Byrne and Robert J. Sampson. N.Y.: Springer-Verlag.

Brady Campaign. 2011. Website page describing state gun laws, at http://www.bradycampaign.org/xshare/stateleg/scorecard/2010/2010_scoring_system.pdf

Brearley, H.C. 1932. *Homicide in the United States*. Chapel Hill: University of North Carolina Press.

Brent, David A., Joshua A. Perper, Charles E. Goldstein, David J. Kolko, Marjorie J. Allan, Christopher J. Allman, and Janice P. Zelenak. 1988. "Risk factors for adolescent suicide." *Archives of General Psychiatry* 45:581-588.

Brent, David A., Joshua A. Perper, Christopher J. Allman, Grace M. Moritz, Mary E. Wartella, and Janice P. Zelenak. 1991. "The presence and accessibility of firearms in the homes of adolescent suicides." *Journal of the American Medical Association* 266:2989-2995.

Brent, David A., Joshua A. Perper, Grace Moritz, and Marianne Baugher. 1993a. "Suicides in adolescents with no apparent psychopathology." *Journal of the American Academy of Child and Adolescent Psychiatry* 32:494-500.

Brent, David A., Joshua A. Perper, Grace Moritz, Marianne Baugher, Joy Schweers, and Claudia Roth. 1993b. "Firearms and adolescent suicide: a community case-control study." *American Journal of Diseases of Children* 147:1066-1071.

Brent, David A., Joshua A. Perper, Grace Moritz, Marianne Baugher, Joy Schweers, and Claudia Roth. 1994. "Suicide in affectively ill adolescents: a case-control study." *Journal of Affective Disorders* 31:193-202.

Brill, Steven. 1977. *Firearm Abuse: A Research and Policy Report*. Washington, D.C.: Police Foundation.

Britt, Chester, Gary Kleck, and David J. Bordua. "A reassessment of the D.C. gun law: some cautionary notes on the use of interrupted time series designs for policy impact assessment." Law & Society Review 30(2):361-380.

Brown, Carol. 2011. Deposition of Carol Brown in Illinois Association of Firearms Retailers, et al, v. City of Chicago, et al, No. 10-cv-04184.

Bukstein, O. G., David A. Brent, Joshua A. Perper, Grace Moritz, Marianne Baugher, Joy Schweers, Claudia Roth, and L. Balach. 1993. "Risk factors for completed suicide among adolescents with a lifetime history of substance abuse: a case-control study." *Acta*

*Psychiatrica Scandanavia* 88:403-408.

Cantor, David, and James P. Lynch. 2000. "Self-report surveys as measures of crime and criminal victimization." Pp. 58-138 in *Criminal Justice 2000*, Volume 4. Available online at https://www.ncjrs.gov/criminal_justice2000/vol_4/04c.pdf

Card, Josefina Jayme. 1974. "Lethality of suicidal methods and suicide risk: two distinct concepts." Omega 5:37-45.

Centers for Disease Control and Prevention (CDCP). 2009. "National suicide statistics at a glance: Case fatality rate among persons ages 10 years and older, by mechanism, United States, 2002-2006." Downloaded 10-12-2009 from CDCP website at http://www.cdc.gov/violenceprevention/suicide/statistics/case_fatality.html.

Centers for Disease Control and Prevention (CDCP). 2011. Nonfatal injury estimates obtained via the WISQARS function, at http://webappa.cdc.gov/sasweb/ncipc/nfirates2001.html.

Chicago Police Department. 2007. Uniform and Property U04-02, Department Approved Weapons and Ammunition (effective July 24, 2007).

Chicago Police Department 2010. Uniform and Property U04-02-04, Department Approved Auxiliary Subcompact Semiautomatic Pistols and Ammunition (effective April 16, 2010).

Conwell, Yeates, Kenneth Connor, and Christopher Cox. 2002. "Access to firearms and risk for suicide in middle-aged and older adults." *American Journal of Geriatric Psychiatry* 10:407-416.

Cook, Philip J. 1979. "The effect of gun availability on robbery and robbery murder." Pp. 43-81 in *Policy Studies Review Annual*, edited by Robert Haveman and B. Bruce Zellner. Beverly Hills: Sage.

Cook, Philip J. 1982. "The role of firearms in violent crime." Pp.236-91 in *Criminal Violence*, edited by Marvin E. Wolfgang and Neil Alan Weiner. Beverly Hills: Sage.

Cook, Philip J. 1991. "Technology of Personal Violence." *Crime and Justice* 14:1-71.

Cook, Philip J. 2011. Deposition of Philip J. Cook in Illinois Association of Firearms Retailers, et al, v. City of Chicago, et al, No. 10-cv-04184.

Cook, Philip J., and Daniel Nagin. 1979. *Does the Weapon Matter?* Washington, D.C.: INSLAW.

Cook, Philip J., Stephanie Molliconi, and Thomas B. Cole. 1995. "Regulating gun markets." *Journal of Criminal Law and Criminology* 86(1):59-92.

Cook, Philip J., and Jens Ludwig. 1997. *Guns in America*. Report to the Police Foundation. Washington, D.C.: Police Foundation.

Cook, Philip J., and Anthony Braga. 2001. "Comprehensive firearm tracing: strategic and investigative users of new data on firearms markets." *Arizona Law Review* 43:277-309.

Cook, Philip J., and Jens Ludwig. 2006. "The social costs of guns." *Journal of Public Economics* 90 (1-2):379-391.

Cook, Philip J., Jens Ludwig, Sudhir Venkatesh, and Anthony A. Braga. 2007. "Underground gun markets." *The Economic Journal* 117:F558-F588.

Cummings, Peter, David C. Grossman, and Robert S. Thompson. 1997. "The association between the purchase of a handgun and homicide or suicide." *American Journal of Public Health* 87:974-978.

Dahlberg, Linda L., Robin M. Ikeda, and Marcie-jo Kresnow. 2004. "Guns in the home and risk of a violent death in the home." *American Journal of Epidemiology* 160:929-936.

Doob, Anthony, and Cheryl Webster. 2003. Sentence severity and crime: Accepting the null

hypothesis. In *Crime and Justice*, eds. Michael Tonry, Chicago: University of Chicago Press.

Duggan, Mark. 2001. "More guns, more crime." *Journal of Political Economy* 109:1086-1114.

Elnour, A. A., and J. Harrison. 2008. "Lethality of suicide methods." *Injury Prevention* 14:39-45.

Feagin, Joe R. 1970. "Home defense and the police: Black and white perspectives." *American Behavioral Scientist* 13:797-814.

Fisher, Joseph C. 1976. "Homicide in Detroit: the role of firearms." *Criminology* 14:387-400.

Florida Department of Agriculture and Consumer Services. 2011. Division of Licensing website at http://licgweb.doacs.state.fl.us/stats/cw_monthly.pdf, accessed 9-10-11.

Hausman, Jerry A. (ed.). 1993. *Contingent Valuation*. Amsterdam: North-Holland.

Hemenway, David, and Matthew Miller. 2000. "Firearm availability and homicide rates across 26 high-income countries." *Journal of Trauma* 49:985-988.

Hoskins, Anthony W. 2001. "Armed Americans." *Justice Quarterly* 18:569-592.

Johnson, Kevin. 2011. Deposition of Kevin Johnson in Illinois Association of Firearms Retailers, et al, v. City of Chicago, et al, No. 10-cv-04184.

Kellermann, Arthur L., Frederick P. Rivara, Grant Somes, Donald T. Reay, Jerry Francisco, Joyce Gillentine Banton, Janice Prodzinski, Corinne Fligner, and Bela B. Hackman. 1992. "Suicide in the home in relation to gun ownership." *New England Journal of Medicine* 327:467-472.

Killias, Martin. 1993. "Gun ownership, suicide, and homicide: an international perspective." Pp. 289-303 in *Understanding Crime: Experiences of Crime and Crime Control*, edited by Anna del Frate, Uglijesa Zvekic, and Jan J. M. van Dijk. Rome: UNICRI.

Killias, Martin, John van Kesteren, and Martin Rindlisbacher. 2001. "Guns, violent crime, and suicide in 21 countries." *Canadian Journal of Criminology* 43:429-448.

Kleck, Gary. 1979. "Capital punishment, gun ownership, and homicide." *American Journal of Sociology* 84:882-910.

_____. 1984. "The relationship between gun ownership levels and rates of violence in the United States." Pp. 99-135 in *Firearms and Violence: Issues of Public Policy*, edited by Don B. Kates, Jr. Cambridge, Mass.: Ballinger.

_____. 1988. "Crime control through the private use of armed force." Social Problems 35:1-21.

_____. 1991. *Point Blank: Guns and Violence in America.* Hawthorne, NY: Aldine de Gruyter.

_____. 1997. *Targeting Guns: Firearms and their Control.* Hawthorne, NY: Aldine de Gruyter.

_____. 1999. "BATF gun trace data and the role of organized gun trafficking in supplying guns to criminals." *St. Louis University Public Law Review* 18(1):23-45.

_____. 2001a. "Can owning a gun really triple the owner's chances of being murdered?" *Homicide Studies* 5:64-77.

_____. 2001b. "The frequency of defensive gun use." Chapter 6 in *Armed*, edited by Gary Kleck and Don B. Kates. Buffalo, NY: Prometheus.

_____. 2001c. "The nature and effectiveness of owning, carrying, and using guns for self-protection." Chapter 7 in *Armed*, edited by Gary Kleck and Don B. Kates. Buffalo, NY: Prometheus.

_____. 2004a. "Measures of gun ownership levels for macro-level crime and violence research." *Journal of Research in Crime and Delinquency* 41(1):3-36.

_____. 2004b. "The Great American Gun Debate: What Research Has to Say." Pp. 470-

487 in *The Criminal Justice System*, 9th Edition, edited by George F. Cole, Marc G. Gertz, and Amy Bunger. Belmont, CA: Wadsworth/Thompson Learning (2004).

_____. 2007. "Fragile Findings on the Guns-Suicide Link." Unpublished paper.

_____. 2009. "How not to study the effect of gun levels on violence rates." Journal on Firearms and Public Policy 21:65-93.

Kleck, Gary, and Miriam DeLone. 1993. "Victim resistance and offender weapon effects in robbery." *Journal of Quantitative Criminology* 9:55-82.

Kleck, Gary, and Marc Gertz. 1995. "Armed resistance to crime: the prevalence and nature of self-defense with a gun." Journal of Criminal Law and Criminology 86:150-187.

Kleck, Gary, and Marc Gertz. 1998. "Carrying guns for protection." *Journal of Research in Crime and Delinquency* 35:193-224.

Kleck, Gary, and Michael Hogan. 1999. "A national case-control study of homicide offending and gun ownership." *Social Problems* 46(2):275-293.

Kleck, Gary, and E. Britt Patterson. 1993. "The impact of gun control and gun ownership levels on violence rates." *Journal of Quantitative Criminology* 9:249-288.

Kleck, Gary, and Shun-Yung Wang. 2009. "The myth of big-time gun trafficking." *UCLA Law Review* 56(5):1233-1294.

Kleck, Gary, Tomislav Kovandzic, Mark Saber, and Will Hauser. 2011. "The effect of perceived risk and victimization on plans to purchase a gun for self-protection." *Journal of Criminal Justice* 39(4):312-319.

Kovandzic, Tomislav, Mark Schaffer, and Gary Kleck. 2008. "Estimating the causal effect of gun prevalence on homicide rates." Discussion paper available at <http://ftp.iza.org/dp3589.pdf> .

Kung, Hsiang-Ching, Jane L. Pearson, and Xinhua Liu. 2003. "Risk factors for male and female suicide decedents ages 15-64 in the United States." *Social Psychiatry and Psychiatric Epidemiology* 38:419-426.

Lee, Roberta K., Richard J. Waxweiler, James G. Dobbins, and Terri Taschetag. 1991. "Incidence rates of firearm injuries in Galveston, Texas, 1979-1981." *American Journal of Epidemiology* 134:511-521.

Lester, David. 1988. "Firearm availability and the incidence of suicide and homicide." *Acta Psychiatrica Belgium* 88:387-393.

_____. 1990. "Relationship between firearm availability and primary and secondary murder." *Psychological Reports* 67:490.

_____. 1996. "Gun ownership and rates of homicide and  suicide." *European Journal of Psychiatry* 10:83-85.

Loftin, Colin, and Ellen J. MacKenzie. 1990. "Building national estimates of violent victimization." Paper presented at the National Research Council Symposium on the Understanding and Control of Violent Behavior, Destin, Florida, April 1-6, 1990.

Lott, John R., Jr. 2000. *More Guns, Less Crime*. 2nd edition. Chicago: University of Chicago Press.

Magaddino, Joseph P., and Marshall H. Medoff. 1984. "An empirical analysis of federal and state firearm controls." Pp. 225-58 in *Firearms and Violence*, edited by Don B. Kates, Jr. Cambridge: Ballinger.

McDowall, David. 1991. "Firearm availability and homicide rates in Detroit, 1951-1986." *Social Forces* 69:1085-1099.

McDowall, David, and Colin Loftin. 1983. "Collective security and the demand for handguns." *American Journal of Sociology* 88:1146-1161.

Miller, Marv. 1978. "Geriatric suicide." *The Gerontologist* 18:488-495.

Miller, Matthew, Deborah Azrael, and David Hemenway. 2002. "Firearm availability and unintentional firearm deaths, suicide, and homicide among 5-14 year olds." *Journal of Trauma Injury, Infection, and Critical Care* 52:267-275.

Miller, Matthew, Deborah Azrael, and David Hemenway. 2004. "The epidemiology of case fatality rates for suicide in the Northeast." *Annals of Emergency Medicine* 43(6):723-730.

Miller, Matthew, David Hemenway, and Deborah Azrael. 2007. "State-level homicide victimization rates in the US in relation to survey measures of household firearm ownership, 2001-2003." *Social Science & Medicine* 64:656-664.

Moody, Carlisle E. and Thomas B. Marvell (2005) "Guns and crime" *Southern Economic Journal*, 71: 720-36.

Moody, Carlisle E. 2009. "Firearms and homicide." Unpublished paper presented at the Critical Issues Symposium, Economics of Crime, Florida State University, Tallahassee, Florida, March 28, 2009.

Murray, Douglas R. 1975. "Handguns, gun control laws and firearm violence." *Social Problems* 23:81-92.

National Academy of Sciences. 2005. *Firearms and Violence.* National Research Council report, edited by Charles F. Wellford, John V. Pepper, and Carol V. Petrie. Washington, D.C.: National Academies Press.

National Rifle Association. 1990. *Home Firearm Safety*. Pamphlet. Washington, D.C.: National Rifle Association.

National Rifle Association. Institute for Legislative Action website at http://www.nraila.org/Issues/FactSheets/Read.aspx?ID=18, accessed 9-10-11.

Newton, George D., and Franklin Zimring. 1969. *Firearms and Violence in American Life*. A Staff Report to the National Commission on the Causes and Prevention of Violence. Washington, D.C.: U.S. Government Printing Office.

Phillips, Llad, Harold L. Votey, and John Howell. 1976. "Handguns and homicide." *Journal of Legal Studies* 5:463-78.

Seitz, Stephen T. 1972. "Firearms, homicides, and gun control effectiveness." *Law and Society Review* 6:595-614.

Sayer, Geoffrey, Gavin Stewart, Jennifer Chipps. 1996. "Suicide attempt in NSW: associated mortality and morbidity." *New South Wales Public Health Bulletin* 7(6):55-59, 63.

Shah, Seema, Richard E. Hoffman, Lane Wake, and Willaim M. Marine. 2000. "Adolescent suicide and household access to firearms in Colorado." *Journal of Adolescent Health* 26:157-163.

Shenassa, E. D., S. N. Catlin, and S. L. Buka. 2003. "Lethality of firearms relative to other suicide methods." *Journal of Epidemiology and Community Health* 57:120-124.

Shneidman, Edwin S., and Norman L. Farberow. 1961. "Statistical comparisons between attempted and committed suicides." Pp. 19-47 in *The Cry for Help*, edited by Norman L. Farberow and Edwin S. Shneidman. N.Y.: McGraw-Hill.

Sorenson, Susan B, and Richard A. Berk. 2001. "Handgun sales, beer sales, and youth homicide, California, 1972-1993." *Journal of Public Health Policy* 22:183-197.

Southwick, Lawrence, Jr. 1997. "Do guns cause crime? Does crime cause guns?: a Granger test." *Atlantic Economic Journal* 25:256-273.

_____. 1999. "Guns and justifiable homicide: deterrence and defense." *Saint Louis University Public Law Review* 18:217-246.

_____. 2000. "Self-defense with guns: the consequences." *Journal of Criminal Justice* 28:351-370.

Spicer, Rebecca S., and Ted R. Miller. 2000. "Suicide acts in 8 states." *American Journal of Public Health* 90(12):1885-1891.

Tark, Jongyeon, and Gary Kleck. 2004. "Resisting crime." *Criminology* 42:861-909.

Thornberry, Terrence, and Marvin Krohn. 2000. "The self-report method for measuring delinquency and crime." Pp. 33-83 in *Criminal Justice 2000,* Volume 4. Available online at https://www.ncjrs.gov/criminal_justice2000/vol_4/04b.pdf.

U.S. Bureau of Alcohol, Tobacco, Firearms. 1993. *Operation Snapshot: Final Report.* Report dated July 12, 1993. Washington, D.C.: U.S. Department of the Treasury.

U.S. Bureau of Alcohol, Tobacco, Firearms and Explosives (ATF). "Fact Sheet: FFL Compliance Inspections." Report dated June 2008. Downloaded 8-17-11 form the ATF website at http://www.atf.gov/publications/factsheets/factsheet-ffl-compliance.html.

_____. 2011. "ATF Snapshot 2008." Downloaded 8-17-11 from the ATF website at http://www.atf.gov/publications/general/snapshots/atf-snapshot-2008.html.

U.S. Bureau of Justice Statistics 1996. *Criminal Victimization in the United States, 1993.* Washington, D.C.: U.S. Government Printing Office.

U.S. Congressional Research Service. 1992. *'Assault Weapons': Military-style Semi-automatic Firearms Facts and Issues.* Report 92-434 GOV. Washington, D.C. Library of Congress.

U.S. Dept. of Health and Human Services, National Center for Health Statistics. 1986. MORTALITY DETAIL FILE, 1980: [UNITED STATES] [Computer file]. Hyattsville, MD: U.S. Dept. of Health and Human Services, National Center for Health Statistics [producer]. Ann Arbor, MI: Inter-university Consortium for Political and Social Research [distributor], 1986.

U.S. Federal Bureau of Investigation. 2010. *Crime in the United States, 2009.* Available at FBI website at http://www2.fbi.gov/ucr/cius2009/index.html.

Violence Policy Center. 2009. *Law Enforcement and Private Citizens Killed by Concealed Handgun Permit Holders: An Analysis of News Reports, May 2007 to April 2009.* Washington, D.C.: Violence Policy Center.

Vizzard, William J. 2000. *Shots in the Dark: The Policy, Politics, and Symbolism of Gun Control.* NY: Rowman and Littlefield.

Waller, Julian A., and Elbert B. Whorton. 1973. "Unintentional shootings, highway crashes and acts of violence." *Accident Analysis and Prevention* 5:351-6.

Weibe, Douglas J. 2003. "Homicide and suicide risks associated with firearms in the home." *Annals of Emergency Medicine* 41:771-782.

Wooldridge, Jeffrey M. 2009. *Introductory Econometrics*, 4th edition. Mason, OH: South-Western.

Wright, James D., and Peter H. Rossi. 1986. *Armed and Considered Dangerous.* NY: Aldine.

**Table 1. Case-Control Studies of Access to Firearms and Suicide**

| Study | Sample/Dataset | n | Suicides[a] | Total | Signif[b] | Number of Likely Confounders[c] | Crude OR | p | Adj OR | p |
|---|---|---|---|---|---|---|---|---|---|---|
| Miller 1978 | Elderly white males | 60 | 30 | 0 | 0 | 0 | 1.0 | n.s. | - | - |
| Brent et al. 1988[d] | W. PA adolescents (A) | 65 | 27 | 3 | 3 | 2 (age, suicidal intent) | 2.7 | <.025 | *n.s.* | *>.025* |
| | W. PA adolescents (B) | 83 | 27 | 2 | 2 | 1 (age) | - | - | 3.4 | <.025 |
| Brent et al. 1991[d] | W. PA adolescents (A) | 94 | 47 | 2 | 2 | 1 (suicidal intent) | 4.5 | .001 | 2.1 | <.0001 |
| | W. PA adolescents (B) | 94 | 47 | 1 | 1 | 0 | 4.2 | .001 | 2.2 | .001 |
| Kellermann et al 1992 | In-home suicides, 3 urban counties | 720 | 360 | 10 | 6 | 4 (sex, age, race, lives alone) | 3.2 | <.025 | 4.8 | <.025 |
| Brent et al. 1993a | W. PA adolescents | 45 | 7 | 0 | 0 | 0 | - | .04 | - | - |
| Brent et al. 1993b | W. PA adolescents | 134 | 67 | 3 | 3 | 0 | 3.3 | .004 | 4.4 | <.025 |
| Bukstein et al. 1993 | W. PA adolescents, substance abusers | 35 | 23 | 0 | 0 | 0 | Any guns: | | - | *n.s.* |
| | | | | | | | Handguns: | | - | <.001 |
| | | | | | | | Long guns: | | - | *n.s.* |
| Brent et al. 1994 | W. PA adolescents, affectively ill | 86 | 63 | 0 | 0 | 0 | - | .0001 | *n.s.* | *>.025* |
| Beautrais et al. 1996 | Canterbury NZ adults | 1225 | 499 | 0 | 0 | 0 | 1.4 | >.05 | - | - |
| | | | | | | Males only: | 0.93 | >.90 | *1.00* | *>.90* |
| Cummings et al. 1997 | WA handgun purchasers | 2109 | 353 | 4 | 0 | 3 (age, sex, Zip code) | - | | 1.9 | <.025 |
| Bailey et al. 1997 | Female subsample of Kellermann | 240 | 120 | 3 | 3 | 1 (living alone) | - | - | 4.6 | <.025 |
| Shah et al. 2000 | CO adolescents | 44 | 26 | 3 | 2 | 0 | 2.60 | <.05 | 3.91 | <.05 |
| Conwell et al. 2002 | Rochester area NY, age 50+ | 172 | 86 | 3 | 0 | 3 (age, sex, race) Males: | 4.17 | .0006 | 4.30 | .004 |
| | | | | | | Females: | 0.50 | .32 | *1.02* | *.985* |

| Kung et al. 2003 | 1993 Mortality Followback | 9855 | 1463 | 5 | 5 | 1 (race) | Males: | 2.59 | <.025 | 6.05 | <.025 |
| | | | | | | | Females: | 2.71 | <.025 | 6.99 | <.025 |
| Weibe 2003 | 1993 Mortality Followback | 3918 | 1959 | 8 | 5 | 8 (age, sex, race, region, marital status, income, live alone, pop. size) | | 3.32 | - | 3.44 | <.025 |
| Dahlberg et al. 2004 | 1993 Mortality Followback | 1584 | 1049 | 13 | 1 | 6 (age, sex, race, education, marital status, region) | Males: | 10.4 | <.025 | | |
| | | | | | | | Females: | *2.3* | =.025 | | |

Notes:
a. Unweighted number of completed suicide victims in multivariate analysis. Sample size (n) includes cases (suicides) and controls.
b. Number of control variables documented as being significantly associated with suicide at .05 (1-tailed) level. If no significance levels were shown for control variables, they were classified as nonsignificant.
c. A likely confounder is a variable that affects suicide and is also significantly correlated with gun ownership.
d. The analyses labeled A involved a comparison of completers (cases) with attempters (controls), while those labeled B involved a comparison of suicide completers (cases) with psychiatric inpatients (controls).

Abbreviations: Crude OR = bivariate odds ratio (no controls for other variables), adj OR = adjusted (multivariate) odds ratio, p = 2-tailed significance

**Major Patterns Evident in the Review**:
- At least six studies have found no significant association between gun ownership and suicide:
    (1) Miller (1978) found no guns/suicide association whatsoever in his sample of
      elderly men.
    (2) Brent et al. (1988) found no significant guns/suicide association once suicidal intent was controlled.
    (3) Bukstein et al. (1993) found no significant guns/suicide association in a sample of adolescent substance abusers.
    (4) Brent et al. (1994) found no significant guns/suicide association in a sample of "affectively ill" adolescents.
    (5) Beautrais et al. (1996) found no significant guns/suicide association among 499 suicides and controls, using what at the time was the largest sample of suicides ever used to study this association.
    (6) Conwell (2002) found no significant guns/suicide association among females.
Thus, claims that "nearly all" case-control studies have found significantly higher risks of suicides among gun owners are extremely misleading.

- All but the last two studies controlled for four or fewer likely confounders. Most variables that were controlled were not likely confounders, either because they showed no significant effect on suicide or because they have no known association with gun ownership. Controlling for such variables does not help isolate the effect of gun ownership on suicide. For example, Kellermann et al (1992) controlled for ten variables, but only six of these were significantly related to suicide risk, and of these six, only four have a documented significant association with gun ownership. Likewise, mental illness (otherwise undifferentiated) is not a confounder.

- None of the studies were specifically designed to assess the effect of gun ownership on suicide, so authors could control only for variables that happened to be included in datasets created for other purposes.

- Only Brent et al. (1988) and Brent et al. (1991) controlled for suicidal intent, and one of these studies (Brent et al. [1988]) found *no* significant association between gun ownership and suicide, while the other found that controlling for suicidal intent halved the guns/suicide association (compare adjusted OR with crude OR).

- None of these studies controlled for the subject's predilection for self-reliance and self-blame, and none controlled for a perception of the world as a hostile, unsupportive place. Both variables are known to be associated with gun ownership and are likely to affect suicide.

- Most of the pre-1996 case-control studies are based on very small samples, with correspondingly unstable results.

- All of the last three studies are based on various subsets of the exact same body of data, the 1993 Mortality Followback study, and thus should not be considered as independent studies showing a significant guns-suicide association. Any flaws in the underlying dataset could distort the findings of all three studies in similar ways. Likewise, the Bailey et al. (1997) study is based entirely on a subset of the sample used in Kellermann et al. (1992) study, while all five of the Brent studies and the Bukstein et al. study are all based on varying subsets of the same very small sample of 67 Western Pennsylvania adolescent suicides, compared with varying sets of control subjects. Thus, what might appear to some readers to be 11 bodies of data supporting a guns-suicide association are actually just three independent bodies of data, repeatedly reanalyzed. Discussions of these studies that do not make this point explicit can therefore give a highly misleading impression of how much support there is for this association.

- Although not shown in the table, all but one of the studies that separately assessed the guns-suicide association for handguns and for long guns, found the association to be stronger for handgun ownership. Since long guns are much more lethal than handguns, and just as easily used for suicide, this pattern makes no sense if the associations are interpreted as estimates of

causal effects of gun ownership/access on suicide.  They do, however, make sense if the associations are interpreted as spurious, noncausal associations.  Handgun ownership is associated with a variety of pathologies that could increase suicide risk, such as crime victimization, crime offending, and heavy drinking.

**Table 2. Relative Lethality of Shooting and Hanging as Methods of Suicide**

| Study | Area | Years | % Attempts Fatal Hanging | % Attempts Fatal Shooting | Ratio, fatality rates, Shooting/Hanging |
|---|---|---|---|---|---|
| Schneidman & Farberow (1961) | Los Angeles County | 1957 | 78.7 | 77.1 | 0.979 |
| Card (1974) | Allegheny County, PA | 1969-70 | 77.5 | 91.6 | 1.181 |
| Sayer et al. (1996) | New South Wales, Australia | 1991-1993 | 82 | 75 | 0.915 |
| Spicer and Miller[a] (2000) | 8 U.S. states | 1989-1997 | 61.4 | 82.5 | 1.344 |
|  |  |  | 85.5 | 89.2 | 1.043 |
| Shenassa et al. (2003) | Illinois | 1990-1997 | 90 | 96 | 1.067 |
| Miller et al. (2004) | 7 NE U.S. states | 1996-2000 | 82.4 | 90.8 | 1.102 |
| Elnour & Harrison (2008) | Australia | 1993-2003 | 83.4 | 90.4 | 1.083 |
| CDCP (2009) | U.S. | 2002-2006 | 79.2 | 83.7 | 1.057 |

Note:

a.  The figures in the upper row for this study are based on the full sample of nonfatal suicide attempts recorded in hospital discharge records (concerning persons admitted to hospitals, then discharged) and emergency department (ED) records (concerning persons with no injuries serious enough to merit admission to the hospital).  The figures in the lower row are confined to only nonfatal suicide attempts recorded in hospital discharge records, thereby excluding the less serious cases commonly found in ED records.

**Table 3.  Macro-Level Studies of the Impact of Gun Levels on Homicide Rates[a]**

| Study | Sample | Measure of Gun Levels[b] | Homicide Rates[c] | Valid Gun Measure? | Number of Control Variables[d] | Causal Order?[e] | Results[f] |
|---|---|---|---|---|---|---|---|
| Brearley (1932) | 2 states | PGH | THR | No | 0 | No | Yes |
| Newton and Zimring (1969) | 4 years, Detroit | NPP | THR | No | 0 | No | Yes |
| Seitz (1972) | 50 states | GHR, FGA | THR | No | 1 | No | Yes |
| Fisher (1976) | 9 years, Detroit | NPP, GRR, PGH | THR | No | 0 | (No) | Yes |
| Phillips et al., (1976) | 18 years, U.S. | PROD | THR | No | 1 | No | Yes |
| Brill (1977) | 11 cities | PGC | THR | No | 0 | No | Yes |
| Kleck (1979) | 27 years, U.S. | PROD | THR | No | 6 | (No) | Yes |
| Cook (1979) | 50 cities | PGH, PSG | RMR | Yes | 4 | No | Yes |
| Kleck (1984) | 32 years, U.S. | PROD | THR | No | 5 | (No) | No |
| Maggadino and Medoff (1984) | 31 years, U.S. | PROD | THR | No | 6 | (No) | No |
| Bordua (1986) | 102 counties | GLR, SIR | THR | Yes | 0-4 | No | No |
|  | 9 regions |  | GHR | Yes | 0-4 | No | No |
| Lester (1988) | 9 regions | SGR | THR | Yes | 0 | No | Yes |
| Lester (1990) | 48 states | PSG | THR | Yes | 0 | No | Yes/No |
| McDowall (1991) | 36 years, Detroit | PSG, PGR | THR | No | 3 | (No) | Yes |
| Killias (1993) | 16 nations | SGR | THR | Yes | 0 | No | Yes |
|  |  |  | GHR | Yes | 0 | No | Yes |
| Kleck and Patterson (1993) | 170 cities | 5-item factor including PSG[h] | THR, GHR | Yes | 4-6 | Yes | No |
| Lester (1996) | 12 nations | PGH, PSG | THR, GHR | Yes | 0 | No | Yes |
| Southwick (1997) | 48 years, U.S. | PROD | THR | No | 0 | (No) | No |
| Southwick (1999) | 34 years, U.S. | HGS | THR | No | 0-2 | No | No |
| Hemenway and Miller (2000) | 26 nations | PGH, PSG | THR | Yes | 0 | No | Yes |
| Lott (2000) | 2 years, 15 states[g] | SGR | THR | Yes | 5 | No | No |
| Duggan (2001) | 19 years, 50 states | GMR | THR | No | 0 | No | Yes |
| Hoskin (2001) | 36 nations | PSG | THR | No | 2 | (No) | Yes |

Table 3 (continued)

| Study | Sample | Measure of Gun Levels[b] | Homicide Rates[c] | Valid Gun Measure? | # Control Variables[d] | Causal Order?[e] | Results[f] |
|---|---|---|---|---|---|---|---|
| Killias et al. (2001) | 21 nations | SGR | THR, GHR | Yes | 0 | No | No |
| Sorenson and Berk (2001) | 22 years, California | HGS | THR | No | 0-3 | (No) | Yes |
| Miller et al. (2002) | 10 years, 50 states | PSG, PHG | THR | No | 0-3 | No | Yes |
|  | 10 years, 9 regions | SGR | THR | Yes | 0-3 | No | No |
| Azrael et al. (2004) | 49 states | PSG | THR | Yes | 1 | No | Yes |
| Moody and Marvell (2005) | 17 years, c. 29 states | PSG | THR | No | 6-10 | (No) | No |
| Cook and Ludwig (2006) | 20 years, 50 states | PSG | THR, GHR, NHR | No | 4 | (No) | Yes |
|  | 20 years, 200 counties | PSG | THR, GHR, NHR | No | 4 | (No) | Yes |
| Miller et al. (2007) | 50 states | SGR | THR, GHR, NHR | Yes | 5-6 | No | Yes |
| Kovandzic et al. (2008) | 1,456 counties | PSG | GHR, NHR | Yes | 18 | Yes | No |
| Moody (2009) | 27 years, 50 states | PSG | THR | No | 3 | (No) | No |
|  | U.S., 59 years | PROD | THR | No | 0 | (No) | No |

Notes:
a. Table includes only studies where the dependent variable was a homicide rate, as opposed to the fraction of homicides committed with guns, and where gun ownership levels were actually measured, rather than assumed. Studies that examined only gun violence rates (e.g. only gun homicides) were excluded (e.g., Murray 1975). The full citations for these studies can be found in Kleck (2009).
b. Measures of Gun Level: CCW = concealed carry permits rate; FGA = Fatal gun accident rate; GLR = Gun owners license rate; GMR = Gun magazine subscription rates; GRR = Gun registrations rate; GUNSTOL = % of the dollar value of stolen property due to guns; HGS = handgun sales (retail); HLR = Hunting license rate; NPP = Number of handgun purchase permits; PGA = % aggravated assaults committed with guns; PGC = % homicides, aggravated assaults and robberies (combined together) committed with guns; PCS = same as PGC, but with suicides lumped in as well; PGH = % homicides committed with guns; PGR = % robberies committed with guns; PSG = % suicides committed with guns; PROD= Guns produced minus exports plus imports, U.S.; SGR = Survey measure, % households with gun(s); SHR = Survey measure, % households with handgun(s); SIR = Survey measure, % individuals with gun(s) Only survey measures and PSG, when used in a cross-sectional study, were classified as valid measures of gun levels.
c. Homicide Rates: THR = Total homicide rate; GHR = Gun homicide rate; NHR = nongun homicide rate; RMR = Robbery murder rate.

d. Number of significant control variables in the most complete crime rate equations, excluding "fixed effects" variables (dummy variables denoting area or time period) and lagged dependent variables.

e. Did research use technically sound methods to establish the causal order between gun levels and homicide rates? (No) means researchers took steps to address the issue, but used ineffective methods such as merely lagging the gun variable, or used models that were probably underidentified.

f. Yes=Study found significant positive association between gun levels and violence; No=Study did not find such a link.

g. Panel design, two waves.

h. Five-item factor composed of PSG, PGH, PGR, PGA, and the percent of dollar value of stolen property due to stolen guns.

***General Pattern:*** No methodologically competent studies have found that general population gun ownership levels have a significant positive effect on total homicide rates. Conversely, *all* studies that purport to have found such an effect made at least one of three fundamental errors – (1) using an invalid measure of gun ownership, (2) failing to control for a significant number of possible confounding variables, or (3) failing to properly address causal order.

**Table 4. National Surveys of Defensive Gun Use in the U.S.[a]**

| Survey: | Cambridge Reports | DMIa | DMIb | Hart | Time/CNN | Mauser |
|---|---|---|---|---|---|---|
| Time of Interviews: | April-May 1978 | May-June 1978 | December 1978 | October 1981 | December 1989 | March-April 1990 |
| Sample Size: | 1,500 | 1,500 | 1,010 | 1,228 | 605 | 344 |
| Population covered: | Adults | Registered voters | Registered voters | Registered voters | "Firearm owners" | Residents |
| Gun Type Covered: | Handguns | All guns | All guns | Handguns | All guns | All guns |
| Recall Period: | Ever | Ever | Ever | 5 years | Ever | 5 years |
| Excluded Uses No Against Animals? | No | Yes | Yes | No | Yes | |
| Excluded Military, Police Uses? | No | Yes | Yes | Yes | Yes | Yes |
| Defensive question asked of: | Protection hgun owners | All | All | All | Gun owners | All |
| Defensive question refers to: | R | Household | Household | Household | R | Household |
| Unadjusted % Adults with DGU[b] | 3 | 15 | 7 | 4 | 9 | 3.79 |
| Adj. % with DGU | 0.45 | 2.22 | 1.14 | 2.01 | 4.50 | 1.5 |
| Implied number of DGUs[d] | 0.7 m | 1.7 m | 0.9 m | 1.7 m | 2.6 m | 1.4 m |

Table 4. National Surveys of Defensive Gun Use in the U.S. (continued)

| Survey: | Gallup | Kleck & Gertz | Gallup | L.A. Times | Tarrance | CDC |
|---|---|---|---|---|---|---|
| Time of Interviews: | May 1991 | Feb.-April 1993 | December 1993 | April 1994 | May 1994 | April-Sept. 1994 |
| Sample Size: | 1,002 | 4,997 | 1,014 | 1,682 | 1,000 | 5,238 |
| Population covered: | Adults | Adults | Adults | Adults | Adults | Adults |
| Gun Type Covered: | All guns | All guns | All guns | All guns | All guns | All guns |
| Recall Period: | Ever | 1 year | Ever | Ever | 5 years | 1 year |
| Excluded UsesNo Against Animals? | Yes | No | No | Yes | Yes | |
| Excluded Military, Police Uses? | No | Yes | Yes | Yes | Yes | Yes |
| Defensive question asked of: | Rs in handgun households | All | Gun owners | All | All | Rs in gun-owning households |
| Defensive question refers to: | R | R | R | R | R | R |
| Unadjusted % Adults with DGU[b] | 8 | 1.326 | 11 | 8[c] | 1 | 2.0 |
| Adj. % with DGU | 1.20 | 1.326 | 1.63 | 3.18 | 0.36 | 2.0 |
| Implied number of DGUs | 0.6 m | 2.5 m | 0.9 m | 6.1 m | 0.7 m | 3.0 m[d] |

Table 4.  National Surveys of Defensive Gun Use in the U.S. (continued)

| Survey: | NSPOF | Hemenway & Azrael | Hearst | Hemenway | Gallup | Washington Post |
|---|---|---|---|---|---|---|
| Time of Interviews: | Nov-Dec 1994 | May-June 1996 | August 1997 | Spring 1999 | May 2000 | June 2000 |
| Sample Size: | 2,568 | 1,906 | 2,016 | 2,474 | 1,031 | 1,068 |
| Population covered: | Adults | Adults | Adults | Adults | Adults | Adults |
| Gun Type Covered: | All guns | All guns | All guns | All guns | All guns | All guns |
| Recall Period: | 1 year | 5 years | Ever | 5 years | Ever | Ever |
| Excluded Uses Against Animals? | Yes | No | Yes | No | No | |
| Excluded Military, Police Uses? | Yes | Yes | No | Yes | No | No |
| Defensive question asked of: | All | All | All | All | All | All |
| Defensive question refers to: | R | R | R | R | R | R |
| Unadjusted % Adults with DGU[b] | 1.44 | 0.73 | 5 | 1.15 | 7 | 8 |
| Adj. % with DGU | 1.44 | 0.29 | 0.60 | 0.46 | 0.84 | 0.96 |
| Implied number of DGUs | 2.8 m | 0.6 m | 1.2 m | 0.9 m | 1.8 m | 2.0 m |

Abbreviations:
DMI = Decision Making Information; R = respondent; Hgun = handgun; m = million; DGU = defensive gun use; CDC = Centers for Disease Control and Prevention; NSPOF = National Survey of the Private Ownership of Firearms

Notes:
a. Table covers surveys of probability samples of the general U.S. population that directly asked Rs about DGU. It excludes the survey reported in McDowall et al. (2000), which was instead based on samples of "commercial lists of likely gun owners" (p. 8), and the NCVS, which never asks Rs specifically about DGU.
b. This percentage is the share of persons or households who reported a DGU for whatever recall period was used, for whatever subset of gun types or circumstances that happened to be specified in the survey's original question. Thus, these figures are generally not even minimally comparable across surveys.
c. This survey inquired only about DGUs outside the home.
d. Implied DGUs is for DGUs in connection with all types of crimes, projected from the survey's estimate for burglary-linked DGUs only.

Sources: Kleck (2001b); details on most of the surveys can be found in the Roper Center's iPoll Databank online database.

Adjustments Applied to Estimated Percent with DGU:
To make estimates from different surveys more meaningful and comparable, they were adjusted so as to produce standardized estimates of the share of U.S. adults who used any kind of gun defensively against a human (rather than an animal) in the preceding 12 months, not including uses in connection with military, police, or security guard duties. For each deviation from this standard, the following adjustments were applied:

| *Deviation from Standard* | *Adjustment – multiply by*: |
|---|---|
| 1. Use of 5 year recall period rather than 1 year | 0.40 |
| 2. Use of "ever" lifetime recall period rather than 1 year | 0.1628 |
| 3. Failure to exclude uses against animals | 0.90984 |
| 4. Failure to exclude uses linked with police, military, etc. | 125/155 |
| 5. Estimate covered only handguns | 100/79.7 |
| 6. Estimate covered only uses in the home | 100/37.3 |
| 7. Estimate covered only uses linked with burglary | 100/33.8 |

The rationales for adjustments 1-3 can be found in Kleck (2001b).  Adjustment 4 was based on the finding in McDowall et al. (2000) that when Rs were not instructed to exclude incidents linked with military, police, or security guard duty, 30 of the 155 Rs who initially reported a DGU were found, after further questioning, to be reporting these kinds of duty-related experiences. Adjustments 5-7 are based on the findings in Kleck and Gertz (1995) that 79.7% of DGUs involved handguns, that 37.3% of DGUs occurred in the user's home, and that 33.8% of DGUs were linked with burglaries.

September 30, 2011

Gary Kleck

# EXHIBIT A

CURRICULUM VITAE

GARY KLECK

(Updated July 28, 2011)

PERSONAL

Place of Birth:          Lombard, Illinois

Date of Birth:          March 2, 1951

Address:                College of Criminology and Criminal Justice
                        306 Hecht House
                        The Florida State University
                        Tallahassee, Florida 32306-1127

Telephone Numbers:      Office:        (850) 644-7651
                        Office FAX:    (850) 644-9614
                        Home:          (850) 894-1628

e-mail Address:         gkleck@fsu.edu


CURRENT POSITION

   David J. Bordua Professor of Criminology, Florida State University

COURTESY APPOINTMENT

   Professor, College of Law, Florida State University

PROFESSIONAL MEMBERSHIPS

   American Society of Criminology

   Academy of Criminal Justice Sciences

EDUCATION

   A.B.      1973 - University of Illinois, with High Honors and with Distinction in
             Sociology

   A.M.      1975 - University of Illinois at Urbana, in Sociology

   Ph.D.     1979 - University of Illinois at Urbana, in Sociology

ACADEMIC HONORS

> National Merit Scholar, 1969
>
> Freshman James Scholar, University of Illinois, 1969
>
> Graduated from University of Illinois with High Honors and with Distinction in Sociology, 1973
>
> University of Illinois Foundation Fellowship in Sociology, 1975-76
>
> 1993 Winner of the Michael J. Hindelang Award of the American Society of Criminology, for the book that made "the most outstanding contribution to criminology"  (for <u>Point Blank: Guns and Violence in America</u>).

TEACHING POSITIONS

| | |
|---|---|
| Fall, 1991 to present | Professor, College of Criminology and Criminal Justice, Florida State University |
| Fall, 1984 to Spring, 1991 | Associate Professor, School of Criminology, Florida State University. |
| Fall, 1979 to Spring, 1984 | Assistant Professor, School of  Criminology, Florida State University. |
| Fall, 1978 to Spring, 1979 | Instructor, School of Criminology, Florida State University. |

COURSES TAUGHT

> Criminology, Applied Statistics, Regression, Introduction to Research Methods, Law Enforcement, Research Methods in Criminology, Gun Control, Violence Theory Seminar, Crime Control, Assessing Evidence, Survey Research.

DISSERTATION

> <u>Homicide, Capital Punishment, and Gun Ownership:  An Aggregate Analysis of U.S. Homicide Trends from 1947 to1976</u>.  Department of Sociology, University of Illinois, Urbana.  1979.

PUBLICATIONS (sole author unless otherwise noted)

BOOKS

1991, <u>Point Blank: Guns and Violence in America</u>.  Hawthorne, N.Y.: Aldine de Gruyter.
2005        Winner of the 1993 Michael J. Hindelang award of the American Society of
            Criminology.   Republished in 2005 in paperback by Transaction Publishers.

            Reviewed in <u>Contemporary Sociology</u>, <u>American Journal of Sociology</u>,
            <u>Social Forces</u>, <u>Journal of Criminal Law and Criminology</u>, <u>The
            Criminologist</u>, <u>The Public Interest</u>, <u>Criminal Law Forum</u>, <u>Social
            Science Review</u>, <u>Criminal Justice Abstracts</u>, <u>Crime, Criminal Justice and
            Law Enforcement</u>, <u>Newsletter of Public Policy Currents</u>, <u>Commonweal</u>,
            <u>Choice</u>, and others.

1997 <u>Targeting Guns: Firearms and their Control</u>. Hawthorne, N.Y.: Aldine de Gruyter.

1997 <u>The Great American Gun Debate: Essays on Firearms and Violence</u> (with Don B.
            Kates, Jr.).  San Francisco: Pacific Research Institute for Public Policy.

2001 (with Don B. Kates) <u>Armed: New Perspectives on Gun Control</u>.  N.Y.:
            Prometheus Books.

            Selected to <u>Choice: Current Reviews for Academic Libraries</u>' 39th annual
            "Outstanding Academic Title List," awarded for "excellence in scholarship and
            presentation, the significance of their contribution to their field, and their value as
            an important treatment of their topic."

RESEARCH MONOGRAPH

1979 Bordua, David J., Alan J. Lizotte, and Gary Kleck. <u>Patterns of Firearms
            Ownership, Use and Regulation in Illinois</u>.  A Report to the Illinois Law Enforce-
            ment Commission, Springfield, Illinois.

ARTICLES IN PEER-REVIEWED JOURNALS

1979 "Capital punishment, gun ownership, and homicide."  <u>American Journal of
            Sociology</u> 84(4):882-910.

1981 "Racial discrimination in criminal sentencing: A critical evaluation of the
            evidence with additional evidence on the death penalty." <u>American Sociological
            Review</u> 46(6):783-804.

1982 "On the use of self-report data to determine the class distribution of criminal

behavior." <u>American Sociological Review</u> 47(3):427-33.

1983    (with David Bordua) "The factual foundation for certain key assumptions of gun control." <u>Law and Policy Quarterly</u> 5(3):271-298.

1985     "Life support for ailing hypotheses:  modes of summarizing the evidence on racial discrimination in criminal sentencing."  <u>Law and Human Behavior</u> 9(3):271-285.

1986     "Policy lessons from recent gun control research." <u>Law and Contemporary Problems</u> 49(1):35-62.

1986    "Evidence that 'Saturday Night Specials' not very important for crime." <u>Sociology</u> and Social Research 70(4):303-307.

1987     "American's foreign wars and the legitimation of domestic violence." <u>Sociological Inquiry</u> 57(3):237-250.

1988    "Crime control through the private use of armed force." <u>Social Problems</u> 35(1):1-21.

1988    "Miscounting suicides." <u>Suicide and Life-Threatening Behavior</u> 18(3):219-236.

1990    (with Susan Sayles) "Rape and resistance." <u>Social Problems</u> 37(2):149-162.

1991    (with Karen McElrath) "The effects of weaponry on human violence." <u>Social Forces</u> 69(3):669-92.

1993    (with Miriam DeLone) "Victim resistance and offender weapon effects in robbery." <u>Journal of Quantitative Criminology</u> 9(1):55-82.

1993    (with E. Britt Patterson)  "The impact of gun control and gun ownership levels on violence rates."  <u>Journal of Quantitative Criminology</u> 9(3):249-287.

1993    "Bad data and the 'Evil Empire': interpreting poll data on gun control." <u>Violence and Victims</u> 8(4):367-376.

1995    "Guns and violence: an interpretive review of the field." <u>Social Pathology</u> 1(1):12-47.

1995    "Using speculation to meet evidence." <u>Journal of Quantitative Criminology</u> 11(4):411-424.

1995    (with Marc Gertz) "Armed resistance to crime: the prevalence and nature of self-defense with a gun."  <u>Journal of Criminal Law & Criminology</u> 86(1):150-187.

1996    "Crime, culture conflict and sources of support for gun control: a multi-level application of the General Social Surveys." <u>American Behavioral Scientist</u> 39(4):387-404.

1996    (with Chester Britt III and David J. Bordua) "A reassessment of the D.C. gun law: some cautionary notes on the use of interrupted time series designs for policy impact assessment." <u>Law & Society Review</u> 30(2):361-380.

1996    (with Chester Britt III and David J. Bordua) "Avoidance and misunderstanding." <u>Law & Society Review</u> 30(2):393-397.

1997     (with Marc Gertz) "The illegitimacy of one-sided speculation: getting the defensive gun use estimate down."  <u>Journal of Criminal Law and Criminology</u> 87(4):1446-1461.

1997    Tomislav Kovandzic and Marc Gertz) "Defensive gun use: vengeful vigilante imagery vs. reality: results from the National Self-Defense Survey." <u>Journal of Criminal Justice</u> 26(3):251-258.

1998    (with Marc Gertz) "Carrying guns for protection: results from the National Self-Defense Survey." <u>Journal of Research in Crime and Delinquency</u> 35(2):193-224.

1998    "What are the risks and benefits of keeping a gun in the home?"  <u>Journal of the American Medical Association</u> 280(5):473-475.

1998    (with Charles Crawford and Ted Chiricos) "Race, racial threat, and sentencing of habitual offenders." <u>Criminology</u> 36(3):481-511.

1999    (with Michael Hogan) "A national case-control study of homicide offending and gun ownership." <u>Social Problems</u> 46(2):275-293.

1999    "BATF gun trace data and the role of organized gun trafficking in supplying guns to criminals."  <u>St. Louis University Public Law Review</u> 18(1):23-45.

2001    "Can owning a gun really triple the owner's chances of being murdered?" <u>Homicide Studies</u> 5:64-77.

2002    (with Theodore Chiricos) "Unemployment and property crime: a target-specific assessment of  opportunity and motivation as mediating factors." <u>Criminology</u> 40(3):649-680.

2004    "Measures of gun ownership levels for macro-level crime and violence research." Journal of Research in Crime and Delinquency 41(1):3-36.

2004    (with Jongyeon Tark) "Resisting crime: the effects of victim action on the outcomes of crimes." Criminology 42(4):861-909.

2005    (with Brion Sever, Spencer Li, and Marc Gertz) "The missing link in general deterrence research." Criminology 43(3):623-660.

2006    (with Jongyeon Tark and Jon J. Bellows) "What methods are most frequently used in research in criminology and criminal justice?" Journal of Criminal Justice 34(2):147-152.

2007    "Are police officers more likely to kill African-American suspects?" Psychological Reports 100(1):31-34.

2007    (with Shun-Yung Wang and Jongyeon Tark) "Article productivity among the faculty of criminology and criminal justice doctoral programs, 2000-2005." Journal of Criminal Justice Education 18(3):385-405.

2008    (with Jongyeon Tark, Laura Bedard, and Dominique Roe-Sepowitz) "Crime victimization and divorce." International Review of Victimology 15(1):1-17.

2009    "The worst possible case for gun control: mass shootings in schools." American Behavioral Scientist 52(10):1447-1464.

2009    (with Shun-Yung Wang) "The myth of big-time gun trafficking." UCLA Law Review 56(5):1233-1294.

2009    (with Tomislav Kovandzic) "City-level characteristics and individual handgun ownership: effects of collective security and homicide." Journal of Contemporary Criminal Justice 25(1):45-66.

2009    (with Marc Gertz and Jason Bratton) "Why do people support gun control?" Journal of Criminal Justice 37(5):496-504.

2010    (with James C. Barnes) "Article productivity among the faculty of criminology and criminal justice doctoral programs, 2005-2009." Journal of Criminal Justice Education 22(1):43-66.

2011    (with Tomislav Kovandzic, Mark Saber, and Will Hauser. "The effect of perceived risk and victimization on plans to purchase a gun for self-protection." Journal of Criminal Justice 39(4):312-319.

2011    (with James C. Barnes)  "Deterrence and macro-level perceptions of punishment risks: is there a "collective wisdom?"  <u>Crime and Delinquency</u> (forthcoming, c. November 2011).

2011    (with James C. Barnes)  "Do more police generate more crime deterrence?"  <u>Crime and Delinquency</u> (forthcoming).

## OTHER PUBLISHED ARTICLES

1992    "Assault weapons aren't the problem."  <u>New York Times</u> September 1, 1992, p. A15.  Invited Op-Ed page article.

1993    "The incidence of violence among young people." <u>The Public Perspective</u> 4:3-6. Invited article.

1994    "Guns and self-protection."  <u>Journal of the Medical Association of Georgia</u> 83:42. Invited editorial.

1997    "Using speculation to meet evidence: reply to Alba and Messner."  <u>Journal on Firearms and Public Policy</u> 9:

1998    "Has the gun deterrence hypothesis been discredited?"  <u>Journal on Firearms and Public Policy</u> 10:65-75.

1999    "There are no lessons to be learned from Littleton."  <u>Criminal Justice Ethics</u> 18(1):2, 61-63.  Invited commentary.

1999    "Risks and benefits of gun ownership - reply."  <u>Journal of the American Medical Association</u> 282(2):136-136.

1999    "The misfire that wounded Colt's."  <u>New York Times</u> October 23, 1999.  Invited Op-Ed page article.

1999    "Degrading scientific standards to get the defensive gun use estimate down." <u>Journal on Firearms and Public Policy</u> 11:77-137.

2000    "Guns aren't ready to be smart."  <u>New York Times</u> March 11, 2000.  Invited Op-Ed page article.

2000    (with Chester Britt III and David J. Bordua) "The emperor has no clothes: Using interrupted time series designs to evaluate social policy impact."  <u>Journal on Firearms and Public Policy</u> 12:197-247.

2001    "School lesson: armed self-defense works."  <u>Wall Street Journal</u> March 27, 2001.

8

Invited opinion article.

2001    "Impossible policy evaluations and impossible conclusions: a comment on Koper
        and Roth."  Journal of Quantitative Criminology 17(1):75-80.

2001    "Absolutist politics in a moderate package: prohibitionist intentions of the gun
        control movement."  Journal on Firearms and Public Policy 13:1-43.

2002    "Research agenda on guns, violence, and gun control."  Journal on Firearms and
        Public Policy 14:51-72.

2006    "Off target."  New York Sun January 5, 2006.  Invited opinion article.

2009    "How not to study the effect of gun levels on violence rates."  Journal on
Firearms
        and Public Policy 21:65-93.

2011    "Mass killings aren't the real gun roblem --- how to tailor gun-control
        measures to common crimes, not aberrant catastrophes."  Wall Street Journal
        January 15, 2011.  Invited opinion article.

2011    "The myth of big-time gun trafficking."  Wall Street Journal May 21, 2011.
        Invited opinion article.

BOOK CHAPTERS

1984    (with David Bordua)  "The assumptions of gun control."  Pp. 23-48 in
        Don B. Kates, Jr. (ed.) Firearms and Violence: Issues of Regulation. Cambridge,
        Mass.: Ballinger.

        (Also appeared in Federal Regulation of Firearms, report prepared by the
        Congressional Research Service, Library of Congress, for the Committee on
        the Judiciary, United States Senate, 1982).

1984    "The relationship between gun ownership levels and rates of violence in the U.S."
        Pp. 99-135 in Kates, above.

1984    "Handgun-only gun control: a policy disaster in the making."  Pp. 167-199 in
        Kates, above.

1996    "Racial discrimination in criminal sentencing."  Pp. 339-344 in Crime and
        Society, Volume III – Readings: Criminal Justice, edited by George Bridges,
        Robert D. Crutchfield, and Joseph G. Weis.  Thousand Oaks, Calif.: Pine
        Forge Press.

1996    "Gun buy-back programs: nothing succeeds like failure."  Pp. 29-53 in <u>Under Fire:</u>
<u>Gun Buy-Backs, Exchanges and Amnesty Programs</u>, edited by Martha R. Plotkin.
Washington, D.C.: Police Executive Research Forum.

2000    "Firearms and crime."  Pp. 230-234 in the <u>Encyclopedia of Criminology and
Deviant Behavior</u>, edited by Clifton D. Bryant.  Philadelphia: Taylor
& Francis, Inc.

2001    (with Leroy Gould and Marc Gertz) "Crime as social interaction."  Pp. 101-114 in
<u>What is Crime?: Controversy over the Nature of Crime and What to Do About It</u>,
edited by Stuart Henry and Mark M. Lanier.  Lanham, Md.: Rowman and
Littlefield.

2003    "Constricted rationality and the limits of general deterrence."  Chapter 13 in
<u>Punishment and Social Control: Enlarged Second Edition</u>, edited by Thomas G.
Blomberg.  New York: Aldine de Gruyter.

2004    "The great American gun debate: what research has to say."  Pp. 470-487 in <u>The
Criminal Justice System: Politics and Policies</u>, 9th edition, edited by George F.
Cole, Marc Gertz, and Amy Bunger.  Belmont, CA: Wadsworth-Thomson

2009    "Guns and crime." Invited chapter.  Pp. 85-92 in <u>21st Century Criminology: A
Reference Handbook</u>, edited by J. Mitchell Miller. Thousand Oaks, CA: Sage.

2011    Kovandzic, Tomislav, Mark E. Schaffer, and Gary Kleck. "Gun Prevalence,
Homicide Rates and Causality: A GMM Approach to Endogeneity Bias."
Chapter               to appear in <u>The Sage Handbook of Criminological Research Methods</u>,
edited by
David Gadd, Susanne Karstedt, and  Steven F. Messner.

## BOOK REVIEWS

1978    Review of <u>Murder in Space City: A Cultural Analysis of Houston Homicide
Patterns,</u> by Henry Lundsgaarde.  <u>Contemporary Sociology</u> 7:291-293.

1984    Review of <u>Under the Gun</u>, by James Wright et al. <u>Contemporary Sociology</u>
13:294-296.

1984    Review of <u>Social Control</u>, ed. by Jack Gibbs.  <u>Social Forces</u> 63: 579-581.

1988     Review of <u>Armed and Considered Dangerous</u>, by James Wright and Peter Rossi,
<u>Social Forces</u> 66:1139-1140.

1988 Review of <u>The Citizen's Guide to Gun Control</u>, by Franklin Zimring and Gordon Hawkins, <u>Contemporary Sociology</u> 17:363-364.

1989 Review of <u>Sociological Justice</u>, by Donald Black, <u>Contemporary Sociology</u> 19:261-3.

1991 Review of <u>Equal Justice and the Death Penalty</u>, by David C. Baldus, George G. Woodworth, and Charles A. Pulaski, Jr. <u>Contemporary Sociology</u> 20:598-9.

1999 Review of <u>Crime is Not the Problem</u>, by Franklin E. Zimring and Gordon Hawkins. <u>American Journal of Sociology</u> 104(5):1543-1544.

2001 Review of <u>Gun Violence: the Real Costs</u>, by Philip J. Cook and Jens Ludwig. <u>Criminal Law Bulletin</u> 37(5):544-547.

2010 Review of <u>Homicide and Gun Control: The Brady Handgun Violence Prevention Act and Homicide Rates</u>, by J. D. Monroe. <u>Criminal Justice Review</u> 35(1):118-120.


LETTERS PUBLISHED IN SCHOLARLY JOURNALS

1987 "Accidental firearm fatalities." <u>American Journal of Public Health</u> 77:513.

1992 "Suicide in the home in relation to gun ownership." <u>The New England Journal of Medicine</u> 327:1878.

1993 "Gun ownership and crime." <u>Canadian Medical Association Journal</u> 149:1773-1774.

1999 "Risks and benefits of gun ownership." <u>Journal of the American Medical Association</u> 282:136.

2000 (with Thomas Marvell) "Impact of the Brady Act on homicide and suicide rates."

   <u>Journal of the American Medical Association</u> 284:2718-2719.

2001 "Violence, drugs, guns (and Switzerland)." <u>Scientific American</u> 284(2):12.

2002 "Doubts about undercounts of gun accident deaths." <u>Injury Prevention Online</u> (September 19, 2002). Published online at <u>http://ip.bmjjournals.com/cgi/eletters</u> /8/3/252.

2005    "Firearms, violence, and self-protection."  <u>Science</u> 309:1674. September 9, 2005.

UNPUBLISHED REPORT

1987    <u>Violence, Fear, and Guns at Florida State University: A Report to the President's Committee on Student Safety and Welfare</u>. Reports results of campus crime victimization survey and review of campus police statistics on gun violence (32 pages).

RESEARCH FUNDING

1994    "The Impact of Drug Enforcement on Urban Drug Use Levels and Crime Rates." $9,500 awarded by the U.S. Sentencing Commission.

1997    "Testing a Fundamental Assumption of Deterrence-Based Crime Control Policy." $80,590 awarded by the Charles E. Culpeper Foundation to study the link between
        actual and perceived punishment levels.

PRESENTED PAPERS

1976    "Firearms, homicide, and the death penalty:  a simultaneous equations analysis." Presented at the annual meetings of the Illinois Sociological Association, Chicago.

1979    "The assumptions of gun control."  Presented at the Annual Meetings of the American Sociological Association, New York City.

1980    "Handgun-only gun control:  A policy disaster in the making."  Presented at the Annual Meetings of the American Society of Criminology, Washington, D.C.

1981    "Life support for ailing hypotheses:  Modes of summarizing the evidence on racial
        discrimination."  Presented at the Annual Meetings of the American Society of Criminology, Toronto.

1984    "Policy lessons from recent gun control research."  Presented at the Duke University Law School Conference on Gun Control.

1985    "Policy lessons from recent gun control research." Presented at the Annual Meetings of the American Society of Criminology, San Diego.

1986    "Miscounting suicides."  Presented at the Annual Meetings of the American Sociological Association, Chicago.

1987    (with Theodore G. Chiricos, Michael Hays, and Laura Myers) "Unemployment and crime: a comparison of motivation and opportunity effects."  Annual meetings of the American Society of Criminology, Montreal.

1988    "Suicide, guns and gun control."  Presented at the Annual Meetings of the Popular Culture Association, New Orleans.

1988    (with Susan Sayles)  "Rape and resistance."  Presented at the Annual Meetings of the American Society of Criminology, Chicago, Ill.

1989    (with Karen McElrath)  "The impact of weaponry on human violence."  Presented

        at the Annual Meetings of the American Sociological Association, San Francisco.

1989    (with Britt Patterson)  "The impact of gun control and gun ownership levels on city violence rates."  Presented at the Annual Meetings of the American Society

of

        Criminology, Reno.

1990    "Guns and violence: a summary of the field."  Presented at the Annual Meetings of the American Political Science Association, Washington, D.C.

1991    "Interrupted time series designs: time for a re-evaluation."  Presented at the Annual Meetings of the American Society of Criminology, New Orleans.

1993    (with Chester Britt III and David J. Bordua) "The emperor has no clothes: Using interrupted time series designs to evaluate social policy impact." Presented at the Annual Meetings of the American Society of Criminology, Phoenix.

1992    "Crime, culture conflict and support for gun laws: a multi-level application of the General Social Surveys."  Presented at the Annual Meetings of the American Society of Criminology, Phoenix.

1994    (with Marc Gertz) "Armed resistance to crime: the prevalence and nature of self-defense with a gun."   Presented at the Annual Meetings of the American Society of Criminology, Miami.

1995    (with Tom Jordan) "The impact of drug enforcement and penalty levels on urban drug use levels and crime rates."  Presented at the Annual Meetings of the American Society of Criminology, Boston.

1996    (with Michael Hogan) "A national case-control study of homicide offending and gun ownership." Presented at the Annual Meetings of the American Society of

13

Criminology, Chicago.

1997    "Evaluating the Brady Act and increasing the utility of BATF tracing data."
        Presented at the annual meetings of the Homicide Research Working Group,
        Shepherdstown, West Virginia.

1997    "Crime, collective security, and gun ownership: a multi-level application of the
        General Social Surveys."  Presented at the Annual Meetings of the American
        Society of Criminology, San Diego.

1998    (with Brion Sever and Marc Gertz) "Testing a fundamental assumption of
        deterrence-based crime control policy."  Presented at the Annual Meetings of the
        American Society of Criminology, Washington, D.C.

1998    "Measuring macro-level gun ownership levels." Presented at the Annual Meetings
        of the American Society of Criminology, Washington, D.C.

1999    "Can owning a gun really triple the owner's chances of being murdered?"
        Presented at the Annual Meetings of the American Society of Criminology,
        Toronto.

2000    "Absolutist politics in a moderate package: prohibitionist intentions of the gun
        control movement."  Presented at the Annual Meetings of the American Society
        of Criminology, San Francisco.

2001    (with Tomislav V. Kovandzic) "The impact of gun laws and gun levels on crime
        rates."  Presented at the Annual Meetings of the American Society of
        Criminology, Atlanta.

2001    "Measures of gun ownership levels for macro-level violence research."  Presented
        at the Annual Meetings of the American Society of Criminology, Atlanta.

2001    "The effects of gun ownership levels and gun control laws on urban crime rates."
        Presented at the Annual Meetings of the American Society of Criminology,
        Chicago.

2003    (with Tomislav V. Kovandzic) "The effect of gun levels on violence rates
        depends on who has them." Presented at the Annual Meetings of the American
        Society of Criminology, Denver.

2003    (with KyuBeom Choi) "Filling in the gap in the causal link of deterrence."
        Presented at the Annual Meetings of the American Society of
        Criminology, Denver.

2004    (with Tomislav Kovandzic) "Do violent crime rates and police strength levels in the community influence whether individuals own guns?" Presented at the Annual Meetings of the American Society of Criminology, Nashville.

2004    (with Jongyeon Tark) "Resisting crime: the effects of victim action on the outcomes of crime." Presented at the Annual Meetings of the American Society of Criminology, Nashville.

2004    (with Jongyeon Tark) "The impact of self-protection on rape completion and injury." Presented at the Annual Meetings of the American Society of Criminology, Nashville.

2004    (with Kyubeom Choi) "The perceptual gap phenomenon and deterrence as psychological coercion." Presented at the Annual Meetings of the American Society of Criminology, Nashville.

2005    (with Jongyeon Tark) "Who resists crime?" Presented at the Annual Meetings of the American Society of Criminology, Toronto.

2005    (with Jongyeon Tark and Laura Bedard) "Crime and marriage." Presented at the Annual Meetings of the American Society of Criminology, Toronto.

2006    (with Shun-Yang Kevin Wang)"Organized gun trafficking, 'crime guns,' and crime rates." Presented at the Annual Meetings of the American Society of Criminology, Los Angeles.

2006    "Are police officers more likely to kill black suspects?" Presented at the Annual Meetings of the American Society of Criminology, Los Angeles.

2007    (with Shun-Yang Kevin Wang) "The myth of big-time gun trafficking." Presented at the Annual Meetings of the American Society of Criminology, Atlanta.

2007    (with Marc Gertz and Jason Bratton) "Why do people support gun control?" Presented at the Annual Meetings of the American Society of Criminology, Atlanta.

2008    (with J.C. Barnes) "Deterrence and macro-level perceptions of punishment risks: Is there a "collective wisdom?" Presented at the Annual Meetings of the American Society of Criminology, St. Louis.

2009    "The myth of big-time gun trafficking." Presented at UCLA Law Review Symposium, "The Second Amendment and the Right to Bear Arms After DC v. Heller." January 23, 2009, Los Angeles.

2009    (with Shun-Yung Wang) "Employment and crime and delinquency of working youth: A longitudinal study of youth employment."  Presented at the Annual Meetings of the American Society of Criminology, November 6, 2009, Philadelphia, PA.

2009    (with J. C. Barnes)  "Do more police generate more deterrence?"  Presented at the Annual Meetings of the American Society of Criminology, November 4, 2009, Philadelphia, PA.

2010    (with J. C. Barnes) "Article productivity among the faculty of criminology and criminal justice doctoral programs, 2005-2009."  Presented at the annual Meetings of the American Society of Criminology, November 18, 2010, San Francisco, CA.

2010    (with Will Hauser) "Fear of crime and gun ownership."  Presented at the annual Meetings of the American Society of Criminology, November 18, 2010, San Francisco, CA.

2010    "Errors in survey estimates of defensive gun use frequency: results from national Internet survey experiments."  Presented at the annual Meetings of the American Society of Criminology, November 19, 2010, San Francisco, CA.

2010    (with Mark Faber and Tomislav Kovandzic)  "Perceived risk, criminal victimization, and prospective gun ownership."  Presented at the annual Meetings of the American Society of Criminology, November 19, 2010, San Francisco, CA.

CHAIR

1983    Chair, session on Race and Crime.  Annual meetings of the American Society of Criminology, Denver.

1989    Co-chair (with Merry Morash), roundtable session on problems in analyzing the National Crime Surveys.  Annual meetings of the American Society of Criminology, Reno.

1993    Chair, session on Interrupted Time Series Designs. Annual meetings of the American Society of Criminology, New Orleans.

1993    Chair, session on Guns, Gun Control, and Violence. Annual meetings of the American Society of Criminology, Phoenix.

1994    Chair, session on International Drug Enforcement. Annual meetings of the American Society of Criminology, Boston.

1999    Chair, Author-Meets-Critics session, More Guns, Less Crime. Annual meetings of the American Society of Criminology, Toronto.

2000    Chair, session on Defensive Weapon and Gun Use. Annual Meetings of the American Society of Criminology, San Francisco.

2002    Chair, session on the Causes of Gun Crime. Annual meetings of the American Society of Criminology, Chicago.

2004    Chair, session on Protecting the Victim. Annual meetings of the American Society of Criminology, Nashville.

DISCUSSANT

1981    Session on Gun Control Legislation, Annual Meetings of the American Society of Criminology, Washington, D.C.

1984    Session on Criminal Sentencing, Annual Meetings of the American Society of Criminology, Cincinnati.

1986    Session on Sentencing, Annual Meetings of the American Society of Criminology, Atlanta.

1988    Session on Gun Ownership and Self-protection, Annual Meetings of the Popular Culture Association, Montreal.

1991    Session on Gun Control, Annual Meetings of the American Statistical Association, Atlanta, Ga.

1995    Session on International Drug Enforcement, Annual Meetings of the American Society of Criminology, Boston.

2000    Session on Defensive Weapon and Gun Use, Annual Meetings of the American Society of Criminology, San Francisco.

2004    Author-Meets-Critic session on Guns, Violence, and Identity Among African-American and Latino Youth, by Deanna Wilkinson. Annual meetings of the American Society of Criminology, Nashville.

2007    Session on Deterrence and Perceptions, University of Maryland 2007 Crime & Population Dynamics Summer Workshop, Aspen Wye River Center, Queenstown.
        MD, June 4, 2007.

2011    Session on Guns and Crime, at the DeVoe Moore Center Symposium On
        The Economics of Crime, March 26-28, 2009.


PROFESSIONAL SERVICE

Editorial consultant -
          American Sociological Review
          American Journal of Sociology
          Social Forces
          Social Problems
          Law and Society Review
          Journal of Research in Crime and Delinquency
          Social Science Research
          Criminology
          Journal of Quantitative Criminology
          Justice Quarterly
          Journal of Criminal Justice
          Violence and Victims
          Violence Against Women
          Journal of the American Medical Association
          New England Journal of Medicine
          American Journal of Public Health
          Journal of Homicide Studies

Grants consultant, National Science Foundation, Sociology Program.

Member, Gene LeCarte Student Paper Committee, American Society of Criminology,
1990.

Area Chair, Methods Area, American Society of Criminology, annual meetings in Miami,
November, 1994.

Division Chair, Guns Division, American Society of Criminology, annual meetings in
Washington, D.C., November, 1998.

Dissertation evaluator, University of Capetown, Union of South Africa, 1998.

Division Chair, Guns Division, American Society of Criminology, annual meetings in
Washington, D.C., November, 1999.

Member of Academy of Criminal Justice Sciences selection committee for Editor of
Justice Quarterly, 2007.

UNIVERSITY SERVICE

Member, Master's Comprehensive Examination Committee, School of Criminology, 1979-1982.

Faculty Advisor, Lambda Alpha Epsilon (FSU chapter of American Criminal Justice Association), 1980-1988.

Faculty Senate Member, 1984-1992.

Carried out campus crime survey for President's Committee on Student Safety and Welfare, 1986.

Member, Strategic Planning and Budgeting Review Committee for Institute for Science and Public Affairs, and Departments of Physics and Economics, 1986.

Chair, Committee on Ph.D. Comprehensive Examination in Research Methods, School of Criminology, Summer,1986.

Member, Committee on Ph.D. Comprehensive Examination in Research Methods, School of Criminology, Summer, 1986 to present.

Chair, Committee on Graduate Assistantships, School of Criminology, Spring, 1987.

Chair, Ad Hoc Committee on Computers, School of Criminology, Fall, 1987.

Member, Recruitment Committee, School of Criminology, Spring, 1988; Spring, 1989; and 1989-90 academic year.

Member, Faculty Senate Committee on Computer-Related Curriculum, Spring, 1988 to Fall, 1989.

Chair, Ad Hoc Committee on Merit Salary Distribution, School of Criminology, Spring, 1988.

Chair, Ad Hoc Committee on Enrollment Strains, Spring, 1989.

Member, Graduate Handbook Committee, School of Criminology, Spring, 1990.

Member, Internal Advisement Committee, School of Criminology Spring, 1990.

University Commencement Marshall, 1990 to 1993.

Member, School of Criminology and Criminal Justice Teaching Incentive Program award

committee.

Chair, Faculty Recruitment Committee, School of Criminology and Criminal Justice, 1994-1995.

Chair, Committee on Ph.D. Comprehensive Examination in Research Methods, School of Criminology and Criminal Justice, 1994-1995.

Member, University Computer and Information Resources  Committee, 1995-1998.

Member, University Fellowship Committee, 1995 to present.

Member, University Library Committee, 1996 to 1999.

Chair, Electronic Access Subcommittee, University Library Committee, 1998 to 1999.

Member, Ad Hoc Committee on Merit Salary Increase Allocation, School of Criminology and Criminal Justice, 1998-1999.

Member, Academic Committee, School of Criminology and Criminal Justice, 2000-present.

Member, Recruiting Committee, School of Criminology and Criminal Justice, 2000-2001.

Member, Promotion and Tenure Committee, School of Criminology and Criminal Justice, 2000-present.

Chair, Committee on Ph.D. Comprehensive Examination in Research Methods, School of Criminology and Criminal Justice, 2000-2002.

Chair, Promotion and Tenure Committee, School of Criminology and Criminal Justice, 2001-2002.

Faculty Adviser, School of Criminology and Criminal Justice Graduate Student Association, 2001-present.

Member, ad hoc committee on survey research, School of Criminology and Criminal Justice, 2002.

Coordinator of Parts 2 and 4 of the School of Criminology and Criminal Justice Unit Review, 2002.

Chair, Academic Committee, School of Criminology and Criminal Justice, 2002-2003.

Director, Honors Programs, School of Criminology and Criminal Justice, 2002-present.

Member, University Promotion and Tenure Committee, Fall, 2003 to present.

Member of University Graduate Policy Committee, Fall 2003 to present.

Director of Graduate Studies, School (later College) of Criminology and Criminal Justice, April 2004 to present.

Chair, Promotion and Tenure Committee, College of Criminology and Criminal Justice, 2005-2006

## PUBLIC SERVICE

Television, radio, newspaper, magazine, and Internet interviews concerning gun control, racial bias in sentencing, crime statistics, and the death penalty.  Interviews and other kinds of news media contacts include Newsweek, Time, U.S. News and World Report, New York Times, Washington Post, Chicago Tribune, Los Angeles Times, USA Today, Boston Globe, Wall Street Journal, Kansas City Star, Philadelphia Inquirer, Philadelphia News, Atlanta Constitution, Atlanta Journal, Arizona Republican, San Antonio Express-News, Dallas Morning News, Miami Herald, Tampa Tribune, Jacksonville Times-Union, Womens' Day,    Harper's Bazaar, Playboy, CBS-TV (60 Minutes; Street Stories) ABC-TV (World News Tonight; Nightline), NBC-TV (Nightly News), Cable News Network, Canadian Broadcasting Company, National Public Radio, Huffington Post, PolitiFact.com, and many others.

Resource person, Subcommittee on Crime and Justice, (Florida House) Speaker's Advisory Committee on the Future,  February 6-7, 1986, Florida State Capitol.

Testimony before the U.S. Congress, House Select Committee on Children, Youth and Families, June 15, 1989.

Discussant, National Research Council/National Academy of Sciences Symposium on the Understanding and Control of Violent Behavior, April 1-4, 1990, Destin, Florida.

Colloquium on manipulation of statistics relevant to public policy, Statistics Department, Florida State University, October, 1992.

Speech to faculty, students, and alumni at Silver Anniversary of Northeastern University College of  Criminal Justice, May 15, 1993.

Speech to faculty and students at Department of Sociology, University of New Mexico,

October, 1993.

Speech on the impact of gun control laws, annual meetings of the Justice Research and Statistics Association, October, 1993, Albuquerque, New Mexico.

Testimony before the Hawaii House Judiciary Committee, Honolulu, Hawaii, March 12, 1994.

Briefing of the National Executive Institute, FBI Academy,       Quantico, Virginia, March 18, 1994.

Delivered the annual Nettler Lecture at the University of Alberta, Edmonton, Canada, March 21, 1994.

Member, Drugs-Violence Task Force, U.S. Sentencing  Commission, 1994-1996.

Testimony before the Pennsylvania Senate Select Committee to Investigate the Use of Automatic and Semiautomatic Firearms, Pittsburgh, Pennsylvania, August 16, 1994.

Delivered lectures in the annual Provost's Lecture Series, Bloomsburg University, Bloomsburg, Pa., September 19, 1994.

Briefing of the National Executive Institute, FBI Academy,       Quantico, Virginia, June 29, 1995.

Speech to personnel in research branches of crime-related State of Florida agencies, Research and Statistics Conference, sponsored by the Office of the State Courts Administrator, October 19, 1995.

Speech to the Third Annual Legislative Workshop, sponsored by the James Madison Institute and the Foundation for Florida's Future, February 5, 1998.

Speech at the Florida Department of Law Enforcement on the state's criminal justice research agenda, December, 1998.

Briefing on news media coverage of guns and violence issues, to the Criminal Justice Journalists organization, at the American Society of Criminology annual meetings in Washington, D.C., November 12, 1998.

Briefing on gun control strategies to the Rand Corporation conference on "Effective Strategies for Reducing Gun Violence,"  Santa Monica, Calif., January 21, 2000.

Speech on deterrence to the faculty of the Florida State University School of Law,

February 10, 2000.

Invited address on links between guns and violence to the National Research Council Committee on Improving Research Information and Data on Firearms, November 15-16, 2001, Irvine, California.

Invited address on research on guns and self-defense to the National Research Council Committee on Improving Research Information and Data on Firearms, January 15-16, 2001, Washington, D.C.

Invited address on gun control, Northern Illinois University, April 19, 2002.

Invited address to the faculty of the School of Public Health, University of Alabama, Birmingham, 2004.

Invited address to the faculty of the School of Public Health, University of Pennsylvania, March 5, 2004.

Member of Justice Quarterly Editor Selection Committee, Academy of Criminal Justice Sciences, Spring 2007

Testified before the Gubernatorial Task Force for University Campus Safety, Tallahassee, Florida, May 3, 2007.

OTHER ITEMS
Listed in:
Marquis Who's Who, 2009
Marquis Who's Who in the South and Southwest, 25th edition
Who's Who of Emerging Leaders in America, 1st edition
Contemporary Authors
Directory of American Scholars, 10th edition, 2002
Writer's Directory, 20th edition, 2004.

Participant in First National Workshop on the National Crime Survey, College Park, Maryland, July, 1987, co-sponsored by the Bureau of Justice Statistics and the American Statistical Association.

Participant in Second National Workshop on the National Crime Survey, Washington, D.C., July, 1988.

Participant, Seton Hall Law School Conference on Gun Control, March 3, 1989.

Debater in Intelligence Squared program, on the proposition "Guns Reduce Crime." Rockefeller University, New York City, October 28, 2008. Podcast distributed

23

through National Public Radio.  Further details are available at
 http://www.intelligencesquaredus.org/Event.aspx?Event=36.

Subject of cover story, "America Armed," in <u>Florida State University Research in Review</u>, Winter/Spring 2009.

Grants reviewer, Social Sciences and Humanities Research Council of Canada, 2010.

# EXHIBIT B

## MATERIALS REVIEWED

In addition to the materials referenced in my report and, more generally, the studies of guns and violence that I have authored, which are listed in my *curriculum vitae*, I also considered and reviewed the following materials in writing my report:

1. Second Amended Complaint, *Illinois Association of Firearms Retailers v. City of Chicago*, No. 10-CV-4184 (N.D. Ill.) (Doc. No. 80).

2. City of Chicago Ordinance of July 2, 2010.

3. Expert Report of Joseph J. Vince, Jr., *Illinois Association of Firearms Retailers v. City of Chicago*, No. 10-CV-4184 (N.D. Ill.).

4. Report by Daniel W. Webster, ScD, MPH on the Justification for Chicago's Limit on One Operable Firearm in the Home, *Illinois Association of Firearms Retailers v. City of Chicago*, No. 10-CV-4184 (N.D. Ill.).

5. Expert Report of Philip J. Cook, *Illinois Association of Firearms Retailers v. City of Chicago*, No. 10-CV-4184 (N.D. Ill.).