# Expert Report of Philip J. Cook

## I. Background and Qualifications

My current academic appointment is at Duke University, where I am ITT/Sanford Professor of Public Policy, Professor of Economics and Sociology, and Senior Associate Dean of the Sanford School of Public Policy. I began my research program on firearms violence in 1975, and since then have coauthored scholarly books and articles on a variety of related topics, including the economic costs of gun violence, the illicit markets for guns, the consequences of weapon choice in robbery and assault, the influence of gun availability on gun use in crime, the use of guns in self-defense, and the effectiveness of gun control regulations. I have served on expert panels for the National Academy of Sciences that dealt with violence prevention, "smart" guns, rampage shootings in schools, and injury control. I also served as Consultant to the Enforcement Division of the United States Department of Treasury (1999–2000), which at that time included the Bureau of Alcohol, Tobacco and Firearms ("ATF"). I was elected fellow of the American Society of Criminology in 2000, and elected Member of the Institute of Medicine of the National Academies in 2001. A full curriculum vitae is attached as Appendix A of this report.

I am being compensated at a rate of $300/hour for my time in rendering my opinion and testimony in this matter. I have testified as an expert in two other cases in the last four years: *Woolard v. Sheridan*, No. 10-CV-02068-JFM (D. Md.) and *Kachalsky v. Cacace*, No. 10-CV-5413 (S.D.N.Y.).

## II. Materials Reviewed

The opinions that I articulate in this report are based on my review of numerous studies published in scientific peer-reviewed journals and books, the Chicago firearms ordinance, and discovery materials from *Illinois Association of Firearms Retailers v. City of Chicago*, No. 10-CV-4184 (N.D. Ill.), made available to me. The material I used to formulate my opinions is listed in the attached Appendix B. I anticipate reviewing additional materials as they become relevant and available and reserve the right to amend my report, opinion, and testimony as necessary.

## III. Regulations at Issue and Summary of Opinions

I have been asked to opine on whether certain firearms-ordinance provisions enacted by the City of Chicago ("City") serve the goal of enhancing public safety. Those provisions fall into two categories: (1) the regulation of firearms sales and transfers within the City limits, and (2) the regulation of the public carriage of firearms outside of the home.

The specific ordinances at issue state with respect to firearms sales or transfers:

> *It shall be unlawful for any person to engage in the business of selling, or to sell, give away, or otherwise transfer, any . . . deadly weapon which can be carried or concealed on the person . . . without securing a weapons dealer license. . . . It*

*shall be unlawful for a person licensed under this chapter to engage in the
business of selling, or to sell, give away or otherwise transfer, any firearm[.]*
    *Chicago Ordinance 4-144-010.*

*[N]o firearm may be sold, acquired or otherwise transferred within the city,
except through inheritance of the firearm.*
    *Chicago Ordinance 8-20-100(a).*

In summary, these provisions bar sales and transfers of firearms (except through inheritance).
The logical implication is that a Chicago resident who wants to lawfully acquire a firearm must
leave the City to do so.

It is my opinion that this ban on the transfer of firearms within the City plausibly serves
to promote public safety, and in particular to reduce gun use in violence. This conclusion is
based on research findings that support the following conclusions:

A.     Gun violence is a serious public health and safety problem that has social and
economic consequences.

B.     The type of weapon used in an assault or robbery affects the likelihood that the
victim will be killed. In particular, with other things being equal, violent crimes
committed with firearms are far more likely to result in the death of the victim
than violent crimes committed with knives, blunt objects, or bare fists.

C.     Weapon choice by violent offenders is influenced by the prevalence and
availability of firearms in the community, and has a direct effect on the criminal
homicide rate. Other things equal, an increase in the prevalence and availability
of firearms is associated with an increase in the percentage of violent crimes
committed with firearms.

D.     It is plausible that legal restrictions on sales and other transfers of firearms, such
as those in the current Chicago ordinance, have the effect of reducing the
prevalence and availability of firearms to people who may be inclined to use them
in violent crime.

With respect to public carriage of firearms, the specific ordinances at issue state:

*It is unlawful for any person to carry or possess a handgun, except when in the
person's home.*
    *Chicago Ordinance 8-20-020(a).*

*It is unlawful for any person to carry or possess a long gun, except when in the
person's home or fixed place of business.*
    *Chicago Ordinance 8-20-030(a).*

In summary, the public carriage provisions limit possession of a handgun to the owner's home
and a long gun to the owner's home or fixed place of business. A licensed Chicago resident can
freely carry a weapon in his or her home, but is restricted from carrying that weapon elsewhere.

2

It is my opinion that this ban on public carriage serves to promote public safety, and in particular to reduce gun use in violence. This conclusion is based on research findings that support the following conclusions:

A.   Carrying firearms away from home contributes directly to the use of guns in violent crime and is associated with increases in violence and lethality.

B.   An *ex ante* permitting regime for carry is not sufficient to screen out all potential bad actors because many people who commit gun crimes do not, in fact, have a prior record that would disqualify them from carrying under typical prescreening regimes.

C.   A regime limiting public carriage facilitates enforcement efforts, particularly targeted patrol efforts to remove illegal guns from the street before they can be used in the commission of a crime.

D.   The best scientific evidence provides no reason to believe that loosening these public-carriage restrictions would have a deterrent effect on crime. Further, the frequency and utility of gun use in self-defense against criminal predation is unknown, but conclusions based on surveys are demonstrably suspect.

## IV.   Basic Findings Concerning Guns and Violence

Firearms are appreciably more lethal than other commonly available weapons. One way to reduce firearms use in violence, and the attendant social costs, is to reduce the availability of guns to criminals.

### A.   Gun violence is a serious public health and safety problem that has social and economic consequences.

#### 1.   A great many Americans die or are injured by gunfire.

Approximately one million Americans have died from gunshot wounds in homicides, accidents and suicides during the last three decades. In 2007, the most recent year for which the National Center for Health Statistics provides final tabulations on injury deaths, there were 31,224 firearms deaths, including 12,632 firearms homicides and 17,352 firearms suicides.[1] (These counts are similar to those in other years during the last decade.) As a point of reference, there were three gun deaths for every four traffic deaths.

Most homicides are committed with guns. Of the criminal homicides in 2007, 69 percent were by gunshot. It is also true that half of all suicides are committed with firearms.

Of course not all gunshot injuries are fatal. Emergency rooms treated 66,769 nonfatal gunshot injuries in 2009, including 44,466 nonfatal injuries from criminal assaults. And there

---

[1] Computed using statistics made available by the Centers for Disease Control and Prevention, online at http://webappa.cdc.gov/sasweb/ncipc/mortrate10_sy.html.

were a total of over 300,000 assaults and robberies in that year in which the perpetrator used a gun, in most cases to threaten the victim.[2]

The City of Chicago has more than its share of criminal homicides. According to police statistics, there were 436 homicides in 2010, of which 81 percent were by gun. The overall homicide rate was 16 per 100,000 residents, over three times the national average.

> 2. Homicide is not evenly distributed across the population, but highly concentrated among youthful minority males.

Focusing just on males age 15–34, homicide victimization rates in 2007 (consistent with earlier years) were 15 times as high for blacks as for whites. Homicide is the leading cause of death for blacks, and the second-leading cause of death for Hispanic males in this age group. For all men in this age range, most all (85 percent) homicides are committed with guns.

> 3. Firearms also pose a particular threat to public officials and law enforcement officers.

Fourteen of the 15 direct assaults against Presidents, Presidents-elect, and presidential candidates in United States history were perpetrated with firearms, including the five resulting in death.[3] (The one exception of the 15, a failed attack with a hand grenade against President George W. Bush, occurred overseas.) Of the 536 law enforcement officers who were feloniously killed between 2000 and 2009, 490 (91 percent) were assaulted with a firearm.[4]

> 4. The medical costs of gun violence are substantial, but constitute only a fraction of the overall social costs.

My colleagues and I conducted a detailed study of the medical costs of gun violence using a variety of medical-records data.[5] Our conclusion, published in the *Journal of the American Medical Association*, was that the average lifetime medical cost per nonfatal gunshot wound case in which the patient was hospitalized was about $35,500 in 1994 (a figure that would

---

[2] U.S. Department of Justice, Federal Bureau of Investigation, Criminal Justice Information Services Division, "Crime in the United States," Table 19 (2009) (Rate: Number of Crimes per 100,000 inhabitants), online at http://www2.fbi.gov/ucr/cius2009/data/table_19.html (accessed Jan. 17, 2011).

[3] Kaiser, F.M., "Direct Assaults Against Presidents, President-Elect, and Candidates," Congressional Research Service Report for Congress (Jan. 7, 2008), online at http://www.fas.org/sgp/crs/misc/RS20821.pdf (accessed Jan. 10, 2011).

[4] U.S. Department of Justice, Federal Bureau of Investigation, Criminal Justice Information Services Division, "Law Enforcement Officers Feloniously Killed," Table 27 (2009), online at http://www2.fbi.gov/ucr/killed/2009/data/table_27.html (accessed Aug. 26, 2011).

[5] Cook, P.J., B. Lawrence, J. Ludwig & T. Miller, "The Medical Costs of Gunshot Wounds," Journal of the American Medical Association, 282(5), 1999: 447–54.

be about $67,500 today due to medical-cost inflation). All told, gunshot injuries in 1994 associated with assault and homicide produced total lifetime medical costs of approximately $1.7 billion, of which over half was paid for from government funds.

The results from this study can be used to generate an estimate of the lifetime medical costs of treating gun assault and homicide victims in Chicago in 2010. In our study, there were 4.0 nonfatal injuries known to medical authorities for every fatal gun assault, of which 2.3 were admitted to the hospital and 1.7 were treated in the emergency department only. Assuming similar ratios in Chicago in 2010, we estimate that in addition to the 354 gun homicides recorded by the Chicago Police Department, there were over 1,400 nonfatal gun assaults treated in local hospitals, all together generating medical costs amounting to $63 million.

The medical costs are only a fraction of the total costs of firearms violence to the community. The threat of being shot causes private citizens and public institutions to undertake a variety of costly measures to reduce this risk, such as weapons screening to schools and public buildings, and, for people who have the means, moving to safer neighborhoods that may be less conveniently located. Furthermore, the threat of gun violence is in some neighborhoods an important disamenity, causing residents to be fearful and take special precautions to protect themselves and their children. That threat depresses property values and puts a drag on economic development.

Together with economist Jens Ludwig, I quantified the overall magnitude of these social costs. Much of the cost is subjective, but that makes it no less real. The accepted procedure in economics for estimating subjective costs is to conduct a contingent-valuation survey. In particular, we asked survey respondents a series of questions to ascertain whether they would be willing to vote for a program that would reduce gun violence by 30 percent in their community, which respondents were told would entail a specified increase in their taxes. Their answers implied a national total valuation of $24 billion for that partial reduction. We extrapolated from this valuation of a partial reduction to estimate an overall cost of firearms assault and homicide of $80 billion in 1995, which was approximately $1 million per gunshot wound.[6] We also noted the evidence that murder rates have a direct effect on the rate of population growth or decline, with each murder associated with a reduction of 70 residents. Jens Ludwig has testified about the implications of these findings for the City of Chicago, noting that the relatively high homicide rate in Chicago could account for the population decline in the City since 2000.[7]

---

[6] Ludwig, J. and P.J. Cook, "The Benefits of Reducing Gun Violence: Evidence from Contingent-Valuation Survey Data," Journal of Risk and Uncertainty, 22(3), 2001: 207–26.

[7] Ludwig, J., "The Social Costs of Handgun Violence," Testimony to the Chicago City Council, June 29, 2010, produced as CITY398–401.

**B.** **The type of weapon used by a perpetrator of violent crime is an important determinant of whether the victim is killed.**

1. <u>Guns are intrinsically more lethal than other commonly available weapons.</u>

Guns provide a means of inflicting a fatal wound quickly, from a distance, requiring relatively little personal risk, determination, involvement, or strength. Gun use in an assault increases the likelihood of death by making it easier to kill. As a result, while only a small fraction (5 percent) of criminal assaults are perpetrated with guns, over two-thirds of fatal assaults (murders and non-negligent homicides) are perpetrated with guns.

The goal of separating guns from criminal violence is somewhat distinct from the goal of reducing overall rates of criminal violence. A program or regulation that was effective in reducing gun use in violent crime would save lives (by reducing the case-fatality rate) even if there was no change in the overall rate of violence. Thus, the City has an interest in reducing gun use by criminals that goes beyond its interest in violent-crime prevention.

That the type of weapon used in a violent crime has an influence on the outcome of the crime is known as the "instrumentality effect."[8]

2. <u>Evidence for the "instrumentality" effect.</u>

In two seminal articles, Franklin Zimring provided systematic evidence that the weapon type used in an assault affects the likelihood the victim will be killed.[9] Zimring drew on crime data from Chicago to show that case-fatality rates in gun attacks are a multiple of those in knife attacks, despite the fact that the circumstances are generally quite similar. In serious attacks, he concluded, the difference between whether the victim lived or died was often a matter of chance rather than a difference in intent, and the chances of a fatality were higher with a gun than a knife.

Zimring found further confirmation in comparing the case-fatality rates among shootings involving guns of different caliber.[10] He demonstrated that victims were more likely to die in larger-caliber shootings, again suggesting that the intrinsic lethality of the weapon, and not just the assailant's intent, affected the outcome.

Research on the crime of robbery provides further confirmation for the instrumentality effect. About half of victims of non-commercial robbery included in the National Crime Victimization Survey ("NCVS") report being physically attacked by the robber (rather than just

---

[8] Cook, P.J., "The Technology of Personal Violence" in M. Tonry, ed., <u>Crime and Justice: An Annual Review of Research</u>, Vol. 14 (University of Chicago Press, 1991).

[9] Zimring, F.E., "Is gun control likely to reduce violent killings?" <u>University of Chicago Law Review</u>, 35, 1968: 21–37; Zimring, F.E., "The medium is the message: Firearm caliber as a determinant of death from assault," <u>Journal of Legal Studies</u>, 1, 1972: 97–124.

[10] Zimring (1972), *supra*.

threatened), and one-fifth require medical treatment. We know from other data sources that many robbery victims are killed. In 2005 the FBI classified 921 murders as robbery-related (6 percent of all murders), implying that on the order of 1 in 1,000 robberies resulted in death that year. Since the most serious potential outcome of a robbery is the victim's death, it is of considerable interest to know what distinguishes fatal robberies from the great majority in which the victim survives. One of my studies compared robbery murders (as documented by the FBI's Supplementary Homicide Reports) to nonfatal robberies, finding similar statistical patterns with respect to the characteristics of the offenders.[11] The most prominent *difference* between robbery and robbery murder is with respect to the types of weapons used. About two-thirds of robbery murders are committed with guns, while less than *one*-third of robberies involve guns. Gun robberies are three times more likely to result in the death of the victim than knife robberies, and knife robberies are three times more likely to result in death than robberies with other weapons.[12] A regression analysis of changes in robbery-murder rates in 43 cities found a close relationship between the robbery rate and the robbery murder rate, as if the latter were simply a probabilistic byproduct of the former. Every additional 1,000 gun robberies added 4 robbery murders to a city's total, while an additional 1,000 nongun robberies added just one murder.[13]

My conclusion is that whether the victim of an assault or robbery dies is not just a reflection of the offender's intentions. The type of weapon used by the offender in an assault or robbery has a causal effect on whether the victim lives or dies. If the weapon used is a firearm, the victim is much more likely to die than if the weapon is a knife or club. If the fraction of assaults or robberies involving guns increases, then the death rate (*i.e.*, the criminal homicide rate) will also increase.

> **C.** **Weapon choice by violent offenders is influenced by the prevalence and availability of firearms in the community, and has a direct effect on the criminal homicide rate.**

> 1. <u>Guns used in crime are obtained from a variety of sources.</u>

The likelihood that a gun will be used in a crime, and thereby render the crime more lethal than it otherwise would be, is closely linked to the general availability of guns, and especially handguns. Currently about one in three households nationwide are in possession of at least one firearm.[14] The prevalence of gun ownership differs widely across the counties and states, and is lower in Cook County, and still lower in the City of Chicago, than is true for the

---

[11] Cook, P.J., "Robbery Violence," <u>Journal of Criminal Law & Criminology</u>, 78(2), 1987: 366.

[12] *Id.*

[13] *Id.* at 373. *See also* Wells, W. and J. Horney, "Weapon effects and individual intent to do harm; influences on the escalation of violence," <u>Criminology</u>, 40(2), 2002: 265–96.

[14] This statistic is computed from the 2010 General Social Survey, conducted by National Opinion Research Center. *See* Violence Policy Center, "A Shrinking Minority: The Continuing Decline of Gun Ownership in America" (2011), online at http://www.vpc.org/studies/ownership.pdf (accessed Aug. 26, 2011).

United States as a whole.[15] The household prevalence of gun ownership affects their use in crime and suicide both directly—by providing members of gun-owning households with immediate access to guns—and indirectly—by making it easier to steal a gun or arrange a purchase or loan.

In particular, I conducted an analysis of residential burglary using data from the National Crime Victimization Survey and other sources, and found that the burglary rate and gun-theft rate increased in direct relation to the prevalence of firearm ownership in the county.[16] That connection is apparently due to the fact that guns are profitable "loot," so that burglaries in gun-rich areas are more profitable.

Data on the sources by which criminals obtain guns point to a variety of channels. Almost all firearms used in crime in the United States were first sold at retail by a federally licensed dealer.[17] In some cases the sale is directly to the individual who eventually uses the firearm in crime, or to a straw purchaser who is acting on the individual's behalf. In some of these sales, the dealer is complicit.

In most cases the firearm is not purchased directly by the ultimate perpetrator, but rather goes through a series of transactions first. In one nationwide study of guns that were confiscated by police and traced by the ATF's National Tracing Center, just 11 percent of the guns were confiscated from the individual who had first purchased them from a federally licensed firearm dealer ("FFL").[18] Typical transactions include informal transfers among family members, off-the-books sales or loans by acquaintances (including transfers within a criminal gang), sales by underground brokers or traffickers, and thefts, among other channels.

---

[15] The best indicator of the prevalence of gun ownership in a jurisdiction is the percentage of suicides in that jurisdiction that are committed with a gun. That indicator has been validated. *See, e.g.*, Azrael, D., P.J. Cook & M. Miller, "State and Local Prevalence of Firearms Ownership: Measurement, Structure, and Trends," Journal of Quantitative Criminology, 20(1), 2004: 43–62; Cook, P.J. and J. Ludwig, "The Social Costs of Gun Ownership" Journal of Public Economics, 90(1-2), 2006: 379–91. In 2005, the percentage of suicides involving guns was 52 percent nationwide, compared with 32 percent in Chicago and 39 percent in suburban Cook County. Children's Memorial Research Center, Illinois Violent Death Reporting System 1(1) (Aug. 2007).

[16] Cook, P.J. and J. Ludwig, "Guns and Burglary" in Ludwig, J. and P.J. Cook, Evaluating Gun Policy, 74–106 (Brookings Institution Press, 2003).

[17] Department of Treasury, Bureau of Alcohol, Tobacco & Firearms, "Following the Gun: Enforcing Federal Laws Against Firearms Traffickers" 3 (June 2000).

[18] Pierce, G.L., A.A. Braga, R.R. Hyatt & C.S. Koper, "Characteristics and dynamics of illegal firearms markets: implications for a supply-side enforcement strategy," Justice Quarterly, 21(2), 2004: 391–422. It should be noted that this statistic is based on a minority of guns submitted for tracing, since in a majority of cases the information on the identity of the possessor or of the first buyer were missing.

The nationwide 1997 Survey of Inmates in State Correctional Facilities, for example, asked inmates who had been in possession of a gun where they had obtained it. Of those who were serving their first prison sentence, less than 20 percent said they obtained their gun from a licensed dealer, but most obtained their guns in the local "informal" or "secondary" market: 40 percent got it from a friend or family member, 31 percent by theft or a transaction in the underground market, and 9 percent from other sources.[19]

> 2.    The prevalence of guns in a community influences weapon choice in violent crime.

My research has provided strong evidence that the prevalence of gun ownership is closely linked to the likelihood that robbers or assailants will use a gun as opposed to a knife or other weapon. In articles published in scientific journals, I and my coauthors have analyzed the effect of the prevalence of gun ownership on several crime-related outcomes. For instance, in an analysis of annual Uniform Crime Reports data for the 200 largest counties over 20 years, we found that an increase in the prevalence of gun ownership in a county was associated with an increase in the percentage of robberies committed with a gun.[20] While the prevalence of gun ownership is not the only determinant of the fractions of assaults and robberies in which the perpetrator uses a gun, it is my opinion that it is one important causal influence.

In a cross-section analysis of data from a survey of adolescent males, Jens Ludwig and I demonstrated that the prevalence of gun ownership has a strong positive relationship to the probability of gun carrying by adolescent males, after statistically controlling for other factors.[21] Thus an increase in gun prevalence is associated with an increase in gun carrying by this group. (We found that gun prevalence had no effect on the likelihood of carrying a knife or other type of weapon.)

A reasonable inference is that violence-prone people find it easier to access firearms when firearms ownership is relatively widespread. But it is often argued that widespread gun ownership also has socially beneficial effects as a deterrent to crime. My research has investigated this hypothesis, finding that the prevalence of ownership has little or no effect on rates of assault, robbery, or rape.[22]

---

[19] Harlow, C.W., "Firearm Use by Offenders," Bureau of Justice Statistics Special Report, Table 9 (rev. 2002).

[20] Cook, P.J., J. Ludwig, S. Venkatesh & A. Braga, "Underground Gun Markets," The Economic Journal, 117, 2007: F558–88. *See also* Cook, P.J., "The Effect of Gun Availability on Robbery and Robbery Murder: A Cross-Section Study of Fifty Cities," Policy Studies Review Annual, 3, 1979: 743–81.

[21] Cook, P.J., and J. Ludwig, "Does Gun Prevalence Affect Teen Gun Carrying After All?" Criminology, 42(1), 2004: 27–54.

[22] Cook, P.J., and J. Ludwig (2004), *supra*; Cook (1979), *supra*; Cook, P.J. and J. Ludwig, "The Social Costs of Gun Ownership," Journal of Public Economics, 90(1-2), 2006: 379–91

I conclude that an increase in gun ownership has on balance neither a deterrent effect on violent crime, nor does it augment violence rates. Thus the prevalence of firearms does not affect the *volume* of violence, but has a positive effect on gun use and hence the death rate in assault and robbery—the criminal homicide rate. (In other words, the likelihood that an assault or a robbery "converts" to a homicide is much higher if a gun is involved.) That prediction is confirmed in an analysis of data for the 200 largest counties mentioned above. In that study we found that the homicide rate increased with the prevalence of gun ownership. On average, a 10 percent increase in the prevalence of gun ownership increased the homicide rate by about 2 percent.[23]

## V.   Public-Safety Ends Served by the City's Regulation of Private and Dealer Firearms Transactions within the City Limits

### A.   The ban on private sales and transfers is a reasonable effort to preserve high transactions costs for guns in the underground market.

The current Chicago gun ordinance effectively bans the transfer of firearms within the City limits. As discussed above, the private transfer of guns in the informal, illegal market is the proximate source of most guns that end up being used in crime. In Chicago, the relatively low prevalence of gun ownership and the tradition of gun emphasis in policing have made guns quite scarce "on the street." Indeed, most criminals in Chicago currently lack a gun and have difficulty obtaining one. It is reasonable to suppose that the current transfer ban—which bans all forms of transfer (except for inheritance)—will help preserve that scarcity.

Direct evidence documenting the scarcity of guns to youths and criminals comes from a unique study conducted by the ethnographer Sudhir Venkatesh several years ago. His inquiry into the underground gun market in two neighborhoods of southside Chicago involved interviewing hundreds of gang members, robbers, prostitutes, drug dealers, and people active in the gun trade.[24] These interviews documented a widespread belief in the value of guns, coupled with surprising ignorance about how to go about obtaining one or the appropriate ammunition. Respondents who reported that they were successful in obtaining a gun reported paying prices that tended to be substantially higher than in the legal market, despite the questionable quality of the guns that were changing hands. The drug-dealing gangs did not deal in guns because they were concerned that it would lead to a police crackdown (and would put their main source of income, drug dealing, at risk). Some criminals, wanting a gun but not knowing how to obtain one, hired a broker who for a substantial fee ($30–$50) attempted to find one. The overall result from Venkatesh's ethnography, supplemented by more traditional belief that I and other coauthors analyzed for this project, is that the underground market in guns did not work smoothly. There were high transactions costs; due to the illegality of handgun possession and transfer, potential buyers and sellers had trouble finding each other or trusting each other. Inflated prices, long waits, and suspect quality were the norm. As a result, it is unusual for criminals in Chicago to be in possession of a gun. By rendering sales and transfers illegal, the

---

[23] Cook, P.J. and J. Ludwig (2006), *supra*.

[24] Cook, P.J., J. Ludwig, S. Venkatesh & A. Braga (2007), *supra*.

Chicago ordinance helps to maintain these transaction costs, which in turn, it is reasonable to suppose, depresses possession rates by criminals.

Another source of information provides further support for this conclusion. A survey of a large sample of arrestees, conducted by the U.S. Department of Justice in 1996 and 1997 in 22 cities, included a series of questions on guns. Of the 1,194 arrestees interviewed in Chicago, only 20.8 percent had ever owned a handgun. An additional 18 percent indicated that they would like to have one someday; about 70 percent of those reported that it would take them at least a week or that they would simply be unable to obtain one. (Although the samples are not directly comparable across cities, it is noteworthy that a larger percentage than in Chicago thought they could obtain one relatively quickly.)

### B.    The ban on dealers will help curtail another source of crime guns.

While most guns used in crime were not sold directly to the criminal by an FFL, some dealers do serve as a regular and disproportionate source of guns to crime. Nationwide in 1998, 1.2 percent of dealers accounted for 57 percent of all guns that were submitted by law enforcement agencies for tracing to the National Tracing Center of ATF.[25] An analysis of 1,470 investigation files from ATF found that corrupt FFLs accounted for nearly half of all guns that could be accounted for in these investigations.[26] Corrupt dealers may knowingly sell to purchasers who are disqualified because of a criminal record or other characteristic, or to a straw purchaser who is buying the gun with the clear intent of transferring it to someone who is disqualified.

Some years ago the City of Chicago ran a sting operation on suburban FFLs to investigate their willingness to sell guns in spite of a professed illegal motive or obvious intention to act as a straw purchaser. Several dealers were willing to make the sale nonetheless, and even provided advice to those acting as customers about how to make an illegal purchase.[27]

---

[25] Wintemute, G.J., P.J. Cook & M.A. Wright, "Risk factors among handgun retailers for frequent and disproportionate sales of guns used in violent and firearm related crimes." Injury Prevention, 11, 200:357–63.

[26] Braga, A.A., P.J. Cook, D.M. Kennedy & M.H. Moore, "The illegal supply of firearms," in Tonry, M., ed., Crime and Justice: A Review of Research 336 (University of Chicago Press, 2002).

[27] Daley, R., "Good riddance to public enemy No. 1," *Chicago Tribune* Dec. 13, 1998; Daley, R., "Gun industry floods Chicago with illegal weapons city and county charge in landmark $433 million lawsuit," Mayor's Press Release Nov. 12, 1998; Meier, B, "Local governments attack gun industry with civil lawsuits," *New York Times* Aug. 14, 1999. *See also* "Gunsmoke" files, produced as CITY4562–6830.

Similarly, a systematic study of FFLs in California documented the willingness of clerks to sell to "customers" who posed as being in clear violation of the law.[28]

One reason why FFLs may become scofflaws is that the main regulatory agency, ATF, provides little oversight and is rarely able to revoke a license. A report by the Inspector General of the U.S. Department of Justice concluded this: "We found that the ATF's inspection program is not fully effective for ensuring that FFLs comply with federal firearms laws because inspections are infrequent and of inconsistent quality, and follow-up inspections and adverse actions have been sporadic."[29] In particular, "ATF conducted 4,581 FFL compliance inspections in FY 2002, or about 4.5 percent of the approximately 104,000 FFLs nationwide. At that rate, it would take the ATF more than 22 years to inspect all FFLs."[30]

In addition, some guns may be stolen from gun dealers or are the subject of unregulated, undocumented transfers. A more recent report on ATF inspections (in a letter from Assistant Attorney General Ronald Weich to U.S. Congressman Mike Quigley dated October 21, 2010) found that in FY2009, 6.5 percent of FFLs had guns missing from inventory, amounting to over 28,000 guns lost to thefts or undocumented transfers in total.

The Chicago gun ordinance does not allow FFLs to operate within the City limits. Of course, it is legal for a qualified Chicago resident to buy a gun from a gun store outside the city. But the fact that there are no FFLs within city limits makes illegal transactions from an FFL somewhat more difficult for youths and criminals. In the study of Chicago gun markets mentioned above, we found that it was rare for guns used in Chicago crimes to be purchased directly from an FFL in the suburbs. Among the guns taken by law enforcement agencies and submitted for tracing, only 12 percent were confiscated within 3 years of the initial purchase and were originally purchased in Cook County.[31] A partial explanation for why active criminals do not acquire guns at suburban FFLs was provided by one of Sudhir Venkatesh's sources, who indicated that people like him rarely left their own neighborhood. This suggests that were FFLs free to operate in the City, these criminals would be more likely to acquire guns from an FFL.

## VI.    Public-Safety Ends Served by the City's Regulation of Public Carriage of Firearms

The City ordinance bans public carriage of firearms by private citizens. Since most violent crimes are committed away from the residence of the perpetrator, carrying is the usual

---

[28] Sorenson, S. and K. Vittes, "Buying a handgun for someone else: firearm dealer willingness to sell," Injury Prevention 9, 2003:147–50. *See also* Wintemute, G., "Firearm retailers' willingness to participate in an illegal gun purchase," Journal of Urban Health, 87(5), 2010: 865–78.

[29] U.S. Department of Justice, Office of the Inspector General, Evaluations and Inspections Division, "Inspections of Firearms Dealers by the Bureau of Alcohol, Tobacco, Firearms and Explosives," Report No. I-2004-005 ii (Jul. 2004).

[30] *Id.* at iii.

[31] Cook, P.J., J. Ludwig, S. Venkatesh & A. Braga (2007), *supra.*

precursor to gun crime. A ban on carrying, coupled with police enforcement targeted on illegal carrying, will plausibly reduce the misuse of guns outside the home.

    **A.    Carrying firearms away from home contributes directly to the use of guns by perpetrators of violent crime.**

Most gun robberies and other gun assaults are committed away from the offender's place of residence. For an offender to use his or her own gun in a crime logically requires that the offender has transported the gun to the location of the criminal assault. For that reason the state has a legitimate interest in the regulation of whether and how guns are carried in public, and by whom.

To develop this point, I consulted tabulations provided by the Chicago Police Department ("CPD"). First, almost all firearms used in crime in Chicago are handguns. The obvious advantage of handguns for criminal use is that they are small, and easy to carry and conceal. In 2010, police records indicate that over 98 percent of all robberies with firearms involved handguns. Similarly, a CPD analysis of firearms used in homicides in 2008 found that 98 percent were handguns.[32] The preponderance of handguns among guns used in crime is by no means limited to Chicago. National crime statistics demonstrate that handguns are used in the great majority of gun crimes—far out of proportion to their relative importance in the stock of guns in private hands.[33]

Of Chicago robberies with a handgun in 2010, 68 percent occurred in a location identified as an alley, street, public park, sidewalk, or public parking lot or garage. Most of the other robberies with a handgun were directed against commercial locations. Only 10 percent occurred at residential locations. For homicides with guns, only 18 percent occurred at residential locations (including yards, hallways, and garages).

The evidence cited in Part IV.C above, concerning the prevalence of gun ownership, is also relevant to establishing the connection between the incidence of gun carrying and the incidence of gun assault. My studies have documented the close positive relationship between the prevalence of gun ownership and the incidence of gun carrying by young men, as well as the positive effect of gun prevalence on the percentage of assaults and robberies involving a gun. These findings provide general support for and are consistent with the conclusion that the incidence of gun carrying contributes directly to gun use in assault (and the resulting increased lethality of such crimes). That is to say, where there is more gun carrying, we should expect more of the harms outlined in Part IV.A.

---

[32] Chicago Police Department, "2008 Murder Analysis in Chicago," (2009), online at https://portal.chicagopolice.org/portal/page/portal/ClearPath/News/Statistical%20Reports/Murde r%20Reports/2008%20Murder%20Reports/MA08.pdf (accessed Aug. 26, 2011).

[33] Zimring, F.E. and G. Hawkins, <u>Crime is not the Problem: Lethal Violence in America</u>, Chs. 1, 3 & 7 (Oxford University Press, 1997).

**B.      The violence-reduction effects of restrictions on public carriage may depend on enforcement efforts, and in particular by targeted patrol efforts to remove illegal guns from the street.**

Regulations alone will not dissuade all criminals from carrying guns in public to commit crimes. The existence of a regulation prohibiting this behavior, however, allows police officers to intervene and remove the weapon before it can be used in the commission of a crime. In many cities, police departments have adopted targeted patrols against illegal gun carrying in an effort to reduce gun misuse. The Chicago Police Department's emphasis of "getting guns off the street" dates back to the 1950s.[34] In recent years, targeted patrol has been one tactic used by the CPD as part of Project Safe Neighborhoods.[35]

Targeted patrol against illicit gun carrying has been shown to be effective. For example, in 1998, the Pittsburgh Police Department instituted a Firearm Suppression Patrol against illegal carrying. This program involved expansion of patrol activities during high-crime periods of the week, in two high-crime areas of the city. A careful analysis found that the program, which increased the number of stops of suspicious vehicles and pedestrians, had the effect of reducing gun misuse, including "shots fired" calls and gunshot injuries.[36] Similarly, an experimental intervention in two areas of Indianapolis provided some evidence that directed patrol that was clearly targeted on illicit gun carrying (as implemented in one of the areas) reduced rates of gun violence.[37]

Targeted patrol against guns has been a prominent feature of New York City policing for the last two decades, a period during which that city has enjoyed an unprecedented reduction in violent crime. Targeted patrol includes a large volume of police contacts with suspicious individuals who are stopped for questioning and frisked if there is reason to believe that they are carrying a weapon. (In 2006, there were over a half million such encounters recorded by the New York City Police Department.)[38] Since policing resources and tactics changed in other ways as well in New York City, analysts have found it difficult to identify the precise contribution of targeted patrol to the crime drop.

It has been argued that stringent regulation of firearms carrying helps establish the legal basis for stop-and-frisk tactics. "When applicable law bans the possession or carrying of

---

[34] Cook, P.J., J. Ludwig, S. Venkatesh & A. Braga (2007), *supra*, at F606.

[35] Papachristos, A.V., T.L. Meares & J. Fagan, "Attention Felons: Evaluating Project Safe Neighborhoods in Chicago," Journal of Empirical Legal Studies, 4(2), 2007: 223–72.

[36] Cohen, J. and J. Ludwig, "Policing crime guns" in Ludwig, J. and P.J. Cook, Evaluating Gun Policy, 217–50 (Brookings Institution Press, 2003).

[37] McGarrell, E.F., S. Chermak & A. Weiss, "Reducing Gun Violence: Evaluation of the Indianapolis Police Department's Directed Patrol Project," National Institute of Justice (2002).

[38] Rosenthal, L., "Second Amendment plumbing after *Heller*: Of standards of scrutiny, incorporation, well-regulated militias, and criminal street gangs," Urban Lawyer, 41(1), 2009: 1.

firearms, whenever an officer reasonably suspects that an individual is illegally carrying a firearm—such as a suspicious bulge in a waistband—a stop-and-frisk is considered constitutionally reasonable."[39] I am not an expert on the relevant legal doctrine and hence not in a position to pass judgment on the technical legal validity of this argument, but I can say that if such stop-and-frisk tactics (or other targeted patrol tactics) became unavailable for any reason (including because the legal basis for conducting them was eliminated through the striking down of strict carrying restrictions), then the reductions of gun misuse resulting from these tactics would be lost.

### C. There is no reason to expect a different public carriage regime immediately outside of the home.

Up to this point, neither I nor the literature has drawn a distinction between the harms and necessity of regulating the carriage of firearms in traditional public places (such as streets, schools and malls) and potentially privately owned spaces immediately outside of the main dwelling structure of a residence such as yards or porches. I am not personally familiar with the geographic layout of Chicago or a typical neighborhood or private property, but if it could be established by a witness who was familiar with these facts that these nominally private spaces were no different than public spaces in terms of the ability of people in those spaces to inflict public gun violence or be the victim of public gun violence, then my opinions on the carry regulations set out in this report would apply equally to those private spaces. If a bullet fired from one space into the other would not respect the nominal change in ownership status, there is no reason to expect that outcomes which are true "on the street" would not hold true just off of it.

### D. A regime of licensing applicants who lack a serious criminal record to carry firearms would allow a large percentage of dangerous people to carry legally.

It should be noted that the State of Illinois bans carrying firearms in public places within city limits. The ban applies to carrying either concealed or openly, and specifies only limited exceptions, such as carrying a gun that has been broken down for transportation purposes.[40] Even if the City repealed its ban on carrying, state regulations would continue to apply.[41] In consideration of the possibility that both the City and State bans might be repealed, it is of interest to consider the consequences of a licensing arrangement.

All but three states currently either ban carrying a concealed firearm or restrict carrying to those who have obtained a license or permit for that purpose. In 33 states the statute requires the relevant authority to issue a license to any applicant who meets certain minimum requirements and pays the required fee; both the requirements and the fee differ among these

---

[39] *Id.* at 38.

[40] 720 ILCS 5/24-1(a)(10).

[41] One difference may be that the Illinois statute allows carriage of a firearm into a friend's residence. The expert report of Daniel Webster in this matter is relevant to judging the risks of introducing a gun, or an additional gun, into a home, even if permission is granted by a member of the household.

"shall issue" states. In other states the issuing authority has some discretion in responding to an application. These "may issue" states generally require that the applicant, in addition to meeting minimum requirements and paying a fee, demonstrate a justifiable need to carry a concealed weapon.

In "shall-issue" states where authorities are required to issue concealed-carry permits to all applicants who meet certain minimum conditions, the list of conditions typically includes a minimum age provision (usually 21) and incorporates the list of provisions of the federal Gun Control Act that limit lawful possession. Among other things, those provisions ban possession by those with a prior felony conviction, a misdemeanor conviction for domestic violence (or restraining order), an involuntary commitment for mental illness, or a current felony indictment. Of those provisions, a felony conviction is most prominent—it is relatively well-documented in computerized databases that are available to law enforcement authorities, and has been the most common reason for denying a firearms transfer following a federally mandated background check. Overall, 62 percent of the federal denials of a gun transfer have been due to a finding of a felony conviction.[42]

It is sometimes alleged that most gun crimes are committed by active criminals who can be readily identified as such. For that reason, it is claimed that issuing concealed-carry permits to applicants who are not identified as criminals from public records poses no risk to the public safety. But this claim is false. In particular, the evidence indicates that a majority of criminal homicides and other serious crimes committed are committed by individuals who have not been convicted of a felony.

One of the first systematic studies of this subject was conducted using data from Illinois. In that study, we found that just 43 percent of adults arrested for criminal homicide during the 1990s had a felony conviction on their record.[43] Thus, most adults who are arrested for felony homicide would not have been barred from obtaining a firearm prior to that arrest, if the only requirements for obtaining that card were a lack of prior felony conviction and minimum age. (In fact there are several other disqualifying conditions, but these are either less common than felony conviction or cannot be reliably checked by authorities from existing databases.)

These statistics demonstrate that most adults who are arrested for felony homicide would not have been barred from obtaining a permit to carry a concealed firearm prior to that arrest, if the only requirements for obtaining a permit were a lack of prior felony conviction (and minimum age). In other words, if the goal is to protect the public against dangerous criminal acts in public with firearm, then it is not enough to just *ex ante* screen out those with felony

---

[42] U.S. Department of Justice, Federal Bureau of Investigation, Criminal Justice Information Services Division, "Operations 2010," National Instant Criminal Background Check System (NICS), online at http://www.fbi.gov/about-us/cjis/nics/reports/2010-operations-report/2010-operations-report-pdf (accessed Aug. 22, 2011).

[43] Cook, P.J., J. Ludwig & A.A. Braga, "Criminal records of homicide offenders," Journal of the American Medical Association, 294(5), 2005: 598–601.

convictions, through a licensing or permitting regime. That group constitutes only a minority of future arrestees for serious crimes, including felony homicide.

Various investigations have sought to document the frequency with which concealed-carry permit holders are arrested and convicted of serious crimes. Since May 2007, the Violence Policy Center has tabulated from news reports the number of individuals killed by people with concealed-carry permits (net of justifiable self-defense killings), uncovering a total of 370 by August 2011.[44]

**E.** **The best scientific evidence provides no reason to believe that loosening these public-carriage restrictions would have a deterrent or preventive effect on crime.**

One potential counterargument to restrictive public carriage regimes is that loosening restrictions would have a deterrent effect on crime by allowing "law abiding" citizens to carry guns for self defense. This theory posits that criminals knowing that they themselves are at risk of a lethal outcome will be deterred from committing crime. I find no scientific evidence for this theory. Further, there is reason to doubt survey-based estimates of the utility of carrying a firearm for self-defense.

In 1997, economists John Lott and David Mustard published an article evaluating the effects of the adoption of so-called "right to carry" ("RTC") or "shall issue" laws in 10 states. This article found that violent crime rates were reduced by the adoption of these laws, while property crime rates were possibly increased. This article, and Lott's subsequent book, *More Guns, Less Crime*, initiated a wide-ranging academic debate about the effects of RTC laws on crime rates. Because the research results appeared to be having a considerable influence on policy, the National Research Council assembled a group of distinguished scholars who had not participated in the academic debate on RTC laws or on gun regulations generally, and tasked them with assessing this research. This panel of experts issued a report in 2005. One conclusion of this report, endorsed by 17 of the 18 panel members, was that the evidence on the effectiveness of RTC laws was too weak and inconsistent to support any conclusion about their effectiveness.[45]

With the passage of time more data have become available and further studies conducted. A recent analysis, using data from 1977 through 2006, found that the estimates of the effects of RTC laws change depending on the details of how the analysis is conducted, and that the "bottom line" issue of whether RTC laws tend to reduce—or increase—rates of violence cannot be determined with confidence using commonly accepted research methods.[46]

---

[44] Violence Policy Center, "Concealed Carry Killers," online at http://www.vpc.org/ccwkillers.htm (accessed Aug. 26, 2011).

[45] National Research Council, Firearms and Violence: A Critical Review (National Academies Press, 2005).

[46] Ayres, I. and J.J. Donohue, "More guns less crime fails again: The latest evidence from 1977-2006," Econ Journal Watch, 6(2), 2009: 218–38.

I conclude on the basis of the extensive research on this issue that quantitative evaluation methods do not provide a reliable basis for determining whether RTC laws increase or reduce crime and violence—or indeed, whether there truly is a consistent effect one way or another. As a result, I conclude that the City restrictions on public carriage of firearms are in no sense contra-indicated by the evidence on public safety. On the other hand, the restrictions are plausibly supported by the preceding discussions in this report, including the association between gun carrying and the increased lethality of crime.

Furthermore, I note that prominent claims have been made that guns are used millions of times each year by private citizens in self-defense against criminal predation, including in public places.[47] These claims are based not on police records, but rather on responses to one-time surveys (typically by telephone) of a sample of adults. Such estimates are an order of magnitude higher than those generated by the large ongoing federal survey of crime victimization (National Criminal Victimization Survey), and far higher than would be logically compatible with other sources of data on crime and violence, including the number of cases treated for gunshot wounds.[48] A technical problem called "telescoping" with these one-time surveys may explain part of the upward bias.[49] But close study of the survey reports of defensive gun use suggest that many of these reports are about events that simply did not happen, as suggested by inconsistencies in the alleged facts.[50]

In one study a panel of criminal-court judges reviewed reported defensive gun uses from a survey and found that these reports are frequently of actions that are not legitimate self-defense, but rather criminal assault. The authors make this observation, with which I agree: "Regular citizens with guns, who are sometimes tired, angry, drunk or afraid, and who are not trained in dispute resolution or on when it is proper to use a firearm, have many opportunities for inappropriate gun use. People engage in innumerable annoying and somewhat hostile interactions with others in the course of a lifetime."[51]

Finally, in judging the utility of widespread gun carrying, it is worth noting the results of two surveys that "gun use against adults to threaten and intimidate is far more common than self defense gun use by them, and that most self reported self defense gun uses are probably illegal, and may be against the interests of society."[52]

---

[47] Kleck, G. and M. Gertz, "Armed resistance to crime: the prevalence and nature of self-defense with a gun," Journal of Criminal Law and Criminology, 273, 1995: 1749–54.

[48] Cook, P.J. and J. Ludwig, "Defensive gun uses: New evidence from a national survey," Journal of Quantitative Criminology, 14(2), 1998: 111–31.

[49] Id.; Hemenway, D., D. Azrael, M Miller, "Gun use in the United States: results from two national surveys," Injury Prevention, 6, 2000: 263–67.

[50] Cook, P.J. and J. Ludwig (1998), supra.

[51] Hemenway, D., D. Azrael, M Miller (2000), supra, at 266.

[52] Id. at 267.

**August 26, 2011**

Philip J. Cook

_____

**Philip J. Cook**

# APPENDIX A

dJune 14, 2011

# PHILIP JACKSON COOK

ITT/Terry Sanford Professor of Public Policy Studies    Telephone: 919 613-7360
Professor of Economics and Sociology        FAX:   919 681-8288
Sanford School of Public Policy
Box 90245
Duke University          E-mail: pcook@duke.edu
Durham, NC 27708

Education:

> B.A. (with high distinction) University of Michigan, 1968
> Ph.D. (Economics) University of California, Berkeley, 1973

Positions held:

| | |
|---|---|
| 2009- | Senior Associate Dean for Faculty, Sanford School of Public Policy |
| 2008-9 | Schelling Visiting Professor of Public Policy, University of Maryland |
| 2003 | Residency, Bellagio Study and Conference Center (September-October) |
| 2000 | Visiting Scholar, Kennedy School of Government, Harvard University |
| 1997-99 | Director, Sanford Institute of Public Policy; Chair, Department of Public Policy Studies |
| 1994- | ITT/Terry Sanford Professor of Public Policy Studies |
| 1992- | Professor of Public Policy Studies, Economics, & Sociology, Duke University |
| 1989-90 | Visiting Professor, Fuqua School of Business, Duke University |
| 1985-89 | Director, Institute of Policy Sciences and Public Affairs, Duke University and Chairman, Department of Public Policy Studies |
| 1984- | Professor of Public Policy and Economics, Duke University |
| 1979-84 | Associate Professor; 1973-79 Assistant Professor, Duke University |

| 1982 | Expert (part time) Office of Policy and Management Analysis, Criminal Division, U.S. Department of Justice |
|---|---|
| Fall 1980 | Visiting Scholar, Institute for Research in Social Science, University of North Carolina, Chapel Hill |

Fellowships and Academic Honors:
Raymond Vernon Memorial Prize for best paper in *JPAM*, 2008
Richard A. Stubbing Teacher Mentor Award, 2008
Member, Institute of Medicine, National Academy of Sciences, 2001-
*Who's Who in America 2001and subsequent issues*
Fellow of the American Society of Criminology, 2000-
Vernon Prize for best paper in *Journal of Policy Analysis & Management* (v. 16), 1997
Research Associate, National Bureau of Economic Research 1996-
*Who's Who in Economics* 3rd edition (1996)
Kenneth J. Arrow Award (for best paper published in health economics), 1994
National Science Foundation Fellowship, 1968-1970
Special Career Fellowship (Ford Foundation), 1968-1972
National Merit Scholar, 1964-1968
Sims Award, Economics Department, University of Michigan, 1967
Phi Beta Kappa

Publications

A. Health and Safety Regulation

1. Books and Edited Volumes

PJ Cook and JW Vaupel, eds. Law and Contemporary Problems, Autumn 1976. Issue entitled "Valuing Lives: When and How Should Society Spend its Scarce Resources to Decrease Mortality"

Law and Contemporary Problems, Winter 1988. Editor for issue entitled "Vice."

PJ Cook and A Scharff Recommendations Concerning Administration and Rate Structure for Excise Taxation in Romania Distributed by Tax Advisory Program, US Treasury Department, August 1994.

Paying the Tab: The Economics of Alcohol Policy Princeton, NJ: Princeton University Press, 2007.
Chapters 10 and 12 serialized in Milken Economic Review 10(1) First Quarter, 2008)

2. Articles

PJ Cook and D Graham "The Demand for Insurance and Protection: The Case of Irreplaceable Commodities" Quarterly Journal of Economics, February 1977, 143-156. Reprinted in Georges Dionne and Scott Harrington (eds.) Foundations of Insurance Economics Kluwer Academic Press, 1991.

"The Value of Human Life in the Demand for Safety: Comment" The American Economic Review, September 1978, 710-711.

"Discussion" (on Martin Bailey's paper on Safety Decisions and Insurance) American Economics Association Papers and Proceedings, May 1978, 300.

"The Effect of Liquor Taxes on Drinking, Cirrhosis, and Auto Fatalities," in Mark Moore and Dean Gerstein, eds. Alcohol and Public Policy: Beyond the Shadow of Prohibition, National Academy of Sciences, 1981, 255-285; and in Richard Zeckhauser and Derek Leebaert, eds. What Role for Government? Duke University Press, 1983, 203-220.

PJ Cook and G Tauchen "The Effect of Liquor Taxes on Heavy Drinking" Bell Journal of Economics, Autumn 1982, 379-390.

"Alcohol Taxes as a Public Health Measure" British Journal of Addiction, September 1982, 245-250; and in Marcus Grant, Martin Plant, and Alan Williams, eds. Economics and Alcohol, Croom Helm Ltd., 1983.

PJ Cook and G Tauchen, "The Effect of Minimum Drinking Age Legislation on Youthful Auto Fatalities, 1970-77" Journal of Legal Studies 13, January 1984, 169-190. *reprinted in* The Economics of Health Behaviours, John H. Cawley and Donald S. Kenkel, eds., Cheltenham, UK: Edward Elgar Publishing Ltd., 2008.

"Increasing the Federal Alcohol Excise Tax" in Dean Gerstein, ed. Toward the Prevention of Alcohol Problems: Government, Business, and Community Action, National Academy Press, Washington, DC, 1984, 24-32.

"The Economics of Alcohol Consumption and Abuse" in Louis Jolyon West, ed. Alcoholism and Related Problems: Issues for the American Public, Prentice-Hall, 1984, 56-77.

"The Impact of Distilled Spirits Taxes on Consumption, Auto Fatalities and Cirrhosis Mortality" Control Issues in Alcohol Abuse Prevention: Strategies for States and Communities in Harold D. Holder, ed., Advances in Substance Abuse, Suppl: 1, Jai Press, Greenwich, CT, 1987, Pages 159-167.

"Comment" in John D. Graham (ed.) Preventing Automobile Injury: New Findings for Evaluation Research, Dover, MA: Auburn House Publishing Company, 1988, pp. 181-183.

DC Chapman, PJ Cook *et al.* "The Cultural Dimensions of Alcohol Policy Worldwide", Health Affairs, summer 1989, 48-62.

"The Social Costs of Drinking," in The Expert Meeting on the Negative Social Consequences of Alcohol Abuse Norewegian Ministry of Health and Social Affairs, Oslo, Norway, 1991.

PJ Cook and MJ Moore "Taxation of Alcoholic Beverages" in M. Hilton and G. Bloss, eds. Economic Research on the Prevention of Alcohol-Related Problems, NIAAA, NIH Publication No. 93-3513, 1993, 33-58.

PJ Cook and MJ Moore "Economic Perspectives on Reducing Alcohol-Related Violence" in Susan E. Martin, ed. Alcohol and Interpersonal Violence: Fostering Multidisciplinary Perspectives NIH Publication No. 93-3496, 1993, 193-212.

PJ Cook and MJ Moore "Violence Reduction through Restrictions on Alcohol Availability" Alcohol Health & Research World 17(2), 1993, 151-156.

PJ Cook and MJ Moore "Drinking and Schooling" Journal of Health Economics, 12, 1993, 411-429. *reprinted in* The Economics of Health Behaviours, John H. Cawley and Donald S. Kenkel, eds., Cheltenham, UK: Edward Elgar Publishing Ltd., 2008.

P.J. Cook and O-J Skog, *"Alcool, alcoolisme, alcoolisation"* by S. Ledermann" Alcohol Health & Research World 19(1), 1995, 30-32.

"Social Costs of Alcohol, Tobacco and Drug Abuse" and  "Tax Laws, Alcohol" in J.H. Jaffe, ed. The Encyclopedia of Drugs and Alcohol, New York: Macmillan Publishing Co, 1996.

"Comment" in Brookings Papers on Economic Activity: Microeconomics, 1994 162-166.

PJ Cook and MJ Moore "This Tax's for You" National Tax Journal September 1994, pp. 559-573.

KE Warner, PJ Cook, *et al.* "Criteria for Determining an Optimal Cigarette Tax: the Economists' Perspective" Tobacco Control Winter 1995 4(4), 380-86.

PJ Cook, A Parnell, MJ Moore, D Pagnini. "The Effects of Short-Term Variation in Abortion Funding on Pregnancy Outcomes" Journal of Health Economics 1999 18(2), 241-258. *reprinted in* The Economics of Health Behaviours,  John H. Cawley and Donald S. Kenkel, eds., Cheltenham, UK: Edward Elgar Publishing Ltd., 2008.

PJ Cook and MJ Moore, "Alcohol" in AJ Culyer and JP Newhouse, eds. Handbook of Health Economics Vol 1B (New York: North-Holland) 2000, 1629-1673.

PJ Cook and MJ Moore, "Environment and Persistence in Youthful Drinking Patterns" in J Gruber, ed. Risky Behavior Among Youths: An Economic Analysis (Chicago: University of Chicago Press), 2001, 375-437.

PJ Cook and MJ Moore, "The Economics of Alcohol Abuse and Alcohol-Control Policies" Health Affairs 21(2), March/April 2002: 120-133.

"Pricing and Taxation of Alcohol: What is the 'Right' Tax Rate?  Comment on *Alcohol: No Ordinary Commodity*" Addiction, 98 (10), October 2003: 1356-7.

PJ Cook, J Ostermann, and FA Sloan "The Net Effect of an Alcohol Tax Increase on Death Rates in Middle Age" American Economic Review 95(2), May 2005: 278-281.

PJ Cook and P Reuter "When is Alcohol Just Another Drug" Addiction 102, June 2007: 1182-88.

PJ Cook and R Hutchinson "Smoke Signals: Adolescent Smoking and School Continuation" in Marina Bianchi (ed.) Advances in Austrian Economics Vol. 10, The Evolution of Consumption: Theories and Practices  2007: 157-188.

C Carpenter and PJ Cook "Cigarette Taxes and Youth Smoking: New Evidence from National, State, & Local Youth Risk Behavior Surveys" Journal of Health Economics

27(2), March 2008: 287-299.

"A Free Lunch" Journal of Drug Policy Analysis 1(1), article 2.
http://www.bepress.com/jdpa/vol1/iss1/art2

Comment on "Explaining change and stasis in alcohol consumption"
17:6 of Addiction Research & Theory Journal 17:6, December 2009.

"Leave the minimum drinking age to the states" in Natasha A. Frost, Joshua D. Freilich, and Todd R. Clear (eds.) Contemporary Issues in Criminal Justice Policy Belmont, MA: Wadsworth, 2009: 99-106.

FJ Chaloupka, PJ Cook, RM Peck, and JA Tauras "Enhancing compliance with tobacco control policies" in Kathryn M. Neckerman, ed. Tobacco Policy New York: Columbia University Press, forthcoming.

P.J. Cook and Maeve Gearing, "The minimum drinking age: 21 as an artifact" in Helene R. White & David L. Rabiner (eds.) College Student Drinking and Drug Use: Multiple Perspectives on a Complex Problem, Guilford Press 2011.

3. Editorial

"Increasing the Federal Excise Taxes on Alcoholic Beverages" Journal of Health Economics 7(1), March 1988, 89-91.

B. Economics of State Lotteries

1. Book

CT Clotfelter and PJ Cook Selling Hope: State Lotteries in America Harvard University Press, 1989. Paperback edition, 1991.

2. Articles

CT Clotfelter and PJ Cook "Implicit Taxation in Lottery Finance" National Tax Journal, December, 1987

CT Clotfelter and PJ Cook "Redefining 'Success' in the State Lottery Business" Journal of Policy Analysis and Management 9(1), Winter 1990, 99-104.

CT Clotfelter and PJ Cook "On the Economics of State Lotteries" Journal of Economic Perspectives, Fall, 1990, 105-120.
Reprinted (in shorter version) in The Conference Board Economic Times 2(4), April 1991. Reprinted (in revised version) in Samuel H. Baker and Catherine S. Elliott, eds. Readings in Public Finance 2nd ed., Cincinnati: South-Western College Publishers, 1997, 457-472.

CT Clotfelter and PJ Cook "What Kind of Lottery for North Carolina?" Popular Government 56(4), Spring 1991, pp. 25-29.

CT Clotfelter and PJ Cook "Lotteries in the Real World", Journal of Risk and Uncertainty 4(3), July 1991, 227-232.

CT Clotfelter and PJ Cook "Lotteries", in Peter Newman, Murray Milgate, and John Eatwell, eds. The New Palgrave Dictionary of Money and Finance Macmillan Press, London, 1992.

PJ Cook and CT Clotfelter "The Peculiar Scale Economics of Lotto" American Economic Review, June 1993, 634-643.

CT Clotfelter and PJ Cook "The Gambler's Fallacy in Lottery Play", Management Science, December 1993.

CT Clotfelter, PJ Cook, J Edell, and M Moore, State Lotteries at the Turn of the Century: Report to the National Gambling Impact Study Commission. June 1, 1999.

CT Clotfelter and PJ Cook, "Ends and Means in State Lotteries: The Importance of a Good Cause" in Alan Wolfe and Erik C. Owens, eds. Gambling: Mapping the American Moral Landscape Waco: Baylor University Press, 2009, 11-38.

3. OpEd. Pieces (with Charles T. Clotfelter)

New York Times, August 20, 1987;
The Atlanta Constitution, February 12, 1989;
The News and Observer (Raleigh), May 27, 1990;
Newsday, July 24, 1990;
San Diego Union, April 1991.
The News & Observer (Raleigh), February 14, 1999
The News & Observer (Raleigh), March 1, 2007

C. Crime and Criminal Justice Policy

1. Monographs and Edited Volumes

Robbery in the United States, National Institute of Justice, September 1983.

PJ Cook and D Slawson The Costs of Adjudicating Murder Cases in North Carolina Administrative Office of the Courts, Raleigh, NC, 1993.

PJ Cook, J Ludwig, and J McCrary (eds.) Controlling Crime: Strategies and Tradeoffs Chicago: University of Chicago Press, 2011 (forthcoming).

2. Symposium editor

"Explaining the growth in the prison population" <u>Criminology and Public Policy</u> 8(1), February 2009.

3. Articles

"The Correctional Carrot: The Prospect of Reducing Recidivism through Improved Job Opportunities" <u>Policy Analysis</u>, January 1975, 11-54.
*Reprinted* in *The Economics of Crime,* edited by Isaac Ehrlich and Zhiquiang Liu Northampton, MA: Edward Elgar Publishing, Inc., 2006.

"Punishment and Crime: A Critique of Recent Findings on the Preventive Effects of Punishment" <u>Law and Contemporary Problems</u>, Winter 1977, 164-204; and in Ralph Andreano and John Siegfried, eds. <u>The Economics of Crime</u>, John Wiley, 1980, 137-180.

"The Clearance Rate as a Measure of Criminal Justice System Effectiveness" <u>Journal of Public Economics</u> 11, 1979, 135-142; and in Egon Bittner and Sheldon L. Messinger, eds. <u>Criminology Review Yearbook</u>, Volume 2, Sage Publications, 1980.

"The Implications of Deterrence and Incapacitation Research for Policy Evaluation" in Cleon Foust and Robert Webster, eds. <u>An Anatomy of Criminal Justice</u>, D.C. Health, Lexington, 1980, 55-77.

"Research in Criminal Deterrence: Laying the Groundwork for the Second Decade" in Norval Morris and Michael Tonry, eds. <u>Crime and Justice: An Annual Review of Research, Volume 2</u>, University of Chicago, 1980, 211-268.

"Costs of Crime" in Sanford H. Kadish, ed. <u>Encyclopedia of Crime and Justice,</u> Macmillan Publishing Company, 1983.

"The Use of Criminal Statutes to Regulate Product Safety: Comment on Wheeler" <u>Journal of Legal Studies</u>, August 1984, 619-622.

PJ Cook and G Zarkin "Crime and the Business Cycle" <u>Journal of Legal Studies</u>, January 1985.

JQ Wilson and PJ Cook "Unemployment and Crime--What is the Connection?" <u>The Public Interest</u>, 79, Spring, 1985, 3-8.

PJ Cook and G Zarkin "Homicide and Economic Conditions" <u>Journal of Quantitative Criminology</u>, March 1986, Vol. 2, No. 1.

"The Demand and Supply of Criminal Opportunities" in Michael Tonry and Norval Morris, eds. Crime and Justice: An Annual Review of Research, Vol. 7, University of Chicago Press, 1986, 1-28.

"Criminal Incapacitation Effects Considered in an Adaptive Choice Framework" in Derek Cornish and Ron Clarke, eds. The Reasoning Criminal, New York: Springer-Verlag, 1986, 202-216.

PJ Cook and JH Laub "The (Surprising) Stability of Youth Crime Rates" Journal of Quantitative Criminology 2 (3) September 1986, 265-278.

"The Economics of Criminal Sanctions" in Martin L. Friedland (ed.) Sanctions and Rewards in the Legal System, University of Toronto Press, 1987.

PJ Cook and JH Laub "Trends in Child Abuse and Juvenile Delinquency" in Francis X. Hartman, ed. From Children to Citizens: The Role of the Juvenile Court, Springer-Verlag, New York, 1987, Vol. II, Chapter 7, pp.109-127.

"Notes on an Accounting Scheme for a Juvenile Correctional System" in Francis X. Hartman (ed.) From Children to Citizens: The Role of the Juvenile Court, Springer-Verlag, New York, 1987, Vol. II, Chapter 19, pp. 362-370.

PJ Cook and J Laub, "The Unprecedented Epidemic in Youth Violence" in Michael Tonry and Mark H. Moore eds., Youth Violence University of Chicago Press, 1998, 101-138.

PJ Cook, "The Epidemic of Youth Gun Violence" Perspectives on Crime and Violence: 1997-1998 Lecture Series (Washington, DC: National Institute of Justice), 1998, 107-125.

"Forward" to BC Welsh, DP Farrington, and LW Sherman (eds.) Costs and Benefits of Preventing Crime (Boulder, CO; Westview Press) 2001.

PJ Cook and JH Laub, "After the Epidemic: Recent Trends in Youth Violence in the United States" in Michael Tonry ed. Crime and Justice: A Review of Research Chicago, University of Chicago Press, 2002: 117-153.

"Meeting the Demand for Expert Advice on Drug Policy" Criminology and Public Policy 2(3), July 2003: 565-570.

"Comment" on "Catching Cheating Teachers" in William G. Gale and Janet Rothenberg Pack, eds., Brookings-Wharton Papers on Urban Affairs 2003 Washington, DC: Brookings Institution Press, 2003: 210-215.

PJ Cook and N Khmilevska, "Cross-National Patterns in Crime Rates" in Michael Tonry and David P. Farrington, eds. Crime and Punishment in Western Countries, 1980-1999 Chicago: University of Chicago Press, 2005: 331-345.

PJ Cook and J Ludwig "Assigning Youths to Minimize Total Harm" in Kenneth A. Dodge, Thomas J. Dishion, and Jennifer E. Lansford (eds.) Deviant Peer Influences in Programs for Youth: Problems and Solutions The Guilford Press, 2006: 67-89.

"Symposium on Deterrence: Editorial Introduction" Criminology & Public Policy 5(3), August    2006: 413-416.

"Crime" in Robert P. Inman, ed. MAKING CITIES WORK: Prospects and Policies for Urban America  Princeton University Press, 2009: 297-327.

"Robbery" in Michael Tonry (ed.) Handbook on Crime and Justice  Oxford University Press, 2009.

Crime Control in the City:  A Research-Based Briefing on Public and Private Measures Cityscape: A Journal of Policy Development and Research 11(1), March, 2009: 53-80.

Potential Savings from Abolition of the Death Penalty in North Carolina  American Law and Economics Review 10, 2009: doi: 10.1093/aler/ahp022.

PJ Cook, DC Gottfredson, and C Na  "School crime control and prevention" in Michael Tonry, ed. Crime and Justice  University of Chicago Press, 2010.

"Property crime – yes; violence – no: Comment on Lauritsen and Heimer" Criminology & Public Policy 9(4), November 2010: 693-697.

"Comment" on "What do economists know about crime?" in R. DiTella, S. Edwards, and E. Schargrodsky The Economics of Crime: Lessons for & from Latin America  Chicago: University of Chicago Press, 2010: 302-304.

PJ Cook and J MacDonald  "Public safety through private action: An economic assessment of BIDs" The Economic Journal 121, May, 2011: 445-462.

"Co-Production in deterring crime," Criminology & Public Policy 10(1), Feb, 2011:103-8.

P.J. Cook and J. Ludwig, "Economical Crime Control," in Controlling Crime: Strategies and Tradeoffs, edited by P.J. Cook, J. Ludwig, and J. McCrary (2011), University of Chicago Press

P.J. Cook and J. MacDonald, "The role of private action in controlling crime," in Controlling Crime: Strategies and Tradeoffs, edited by P.J. Cook, J. Ludwig, and J. McCrary, University of Chicago Press, Chicago, forthcoming 2011.

P.J. Cook & J. Ludwig, "The Economist's guide to crime busting" The Wilson Quarterly (Winter, 2011), pp. 62-66.

D. Gottfredson, P.J. Cook, and C. Na, "School-based crime prevention", in The Oxford Handbook of Crime Prevention, edited by Brandon C. Walsh and David P. Farrington (2011), Oxford University Press

D. Weapons and Violent Crime
  1. Monographs and Edited Volumes

PJ Cook and D Nagin Does the Weapon Matter?  An Evaluation of a Weapon - Emphasis Policy in the Prosecution of Violent Offenders Institute of Law and Social Research, Washington, DC, 1979.

Annals of the American Academy of Political and Social Science, May 1981.  Issue entitled "Gun Control" (special editor).

PJ Cook and J Ludwig Guns in America: Results of a Comprehensive National Survey on Firearms Ownership and Use Washington, D.C.: The Police Foundation, 1997.

Law and Contemporary Problems (special editor) "Kids, Guns, and Public Policy" 59(1): Winter 1996.

PJ Cook and J Ludwig Gun Violence: The Real Costs New York: Oxford University Press, 2000.

J Ludwig and PJ Cook (eds.) Evaluating Gun Policy: Effects on Crime and Violence Washington, DC: Brookings Institution Press, 2003.

  2. Articles

"A Strategic Choice Analysis of Robbery" in Wesley Skogan (ed.) Sample Surveys of the Victims of Crimes, Ballinger, 1976, 173-187.

"Causal Linkages between Gun Control Ordinances and Crime: A Conceptualization and Review of the Literature" Hearings on the Treasury Department's proposed gun regulations, before the Subcommittee on Crime, Committee on the Judiciary, U.S. House of Representatives, 95th Congress, 2nd Session, Appendix 4, May 4 and 18, 1978.

"The Effect of Gun Availability on Robbery and Robbery Murder:  A Cross-Section Study of Fifty Cities" Policy Studies Review Annual, Volume 3, Sage Publications, 1979, pp. 743-781.  Also published in Hearings; see above.

"Reducing Injury and Death Rates in Robbery" Policy Analysis, 6(1) Winter 1980, 21-45.

PJ Cook and J Blose "State Programs for Screening Handgun Buyers" Annals of the American Academy of Political and Social Science, May 1981, 80-91. Reprinted in M. Gittell, ed. State Politics and the New Federalism ( NY: Longman, 1986).

"The Effect of Gun Availability on Violent Crime Patterns," Annals of the American Academy of Political and Social Science, May 1981; and in Federal Regulation of Firearms (A Report prepared by Congressional Research Service for the U.S. Senate Judiciary Committee) USGPO, May 1982; and in Neil Alan Weiner, Margaret A. Zahn and Rita J.Sagi, eds., Violence: Patterns, Causes, Public Policy (San Diego: Harcourt Brace Jovanovich, 1990).

PJ Cook and K Hawley "North Carolina's Pistol Permit Law: An Evaluation" Popular Government, May 1981, 1-6.

"Guns and Crime: the Power of Long Division" Journal of Policy Analysis and Management, Fall 1981, 120-125.

"The 'Saturday Night Special': An Assessment of Alternative Definitions from a Policy Perspective" Journal of Criminal Law and Criminology 72:4, Winter 1981, 1735-1745.

"The Role of Firearms in Violent Crime" in Marvin E. Wolfgang and Neil A. Weiner, eds. Criminal Violence (Sage Publications, 1982), 236-289; also titled "The Influence of Gun Availability on Violent Crime Patterns" in Norval Morris and Michael Tonry, eds. Crime and Justice: An Annual Review of Research, Volume 4, University of Chicago Press, 1983, 49-90.

"The Case of the Missing Victims: Gunshot Woundings in the National Crime Survey" Journal of Quantitative Criminology, March 1985, 91-102.

"Is Robbery Becoming More Violent? An Analysis of Robbery Murder Trends Since 1968" Journal of Criminal Law and Criminology, 76 (2), Summer 1985, 480-489.

"The Relationship Between Victim Resistance and Injury in Noncommercial Robbery" Journal of Legal Studies, XV (1), June 1986, 405-416.

"Robbery Violence" Journal of Criminal Law & Criminology, 78(2), 1987, 357-376. Reprinted in Robert Hornsby and Richard Hobbs (eds.) Gun Violence Ashgate Publishing Ltd. Forthcoming.

"The Technology of Personal Violence" in Michael Tonry, ed. Crime and Justice: An Annual Review of Research Vol. 14, University of Chicago Press, 1991.

Reprinted (in part) in Lee Nisbet (ed.) <u>The Gun Control Debate: You Decide</u> 2nd ed. (Chicago: Prometheus Books, 2001).

"Notes on the Availability and Prevalence of Firearms" <u>American Journal of Preventive Medicine</u> 9(3,supp), 1993.

PJ Cook and MH Moore "Gun Control" in James Q. Wilson and Joan Petersilia, eds. <u>Crime</u> (San Francisco: ICS Press, 1995), 267-294.

PJ Cook, S Molliconi, and T Cole "Regulating Gun Markets" <u>Journal of Criminal Law & Criminology</u> 86(1), 1995, 59-92.

PJ Cook and T Cole "Editorial: Strategic Thinking About Gun Markets and Violence" <u>Journal of the American Medical Association</u> 275(22), June 12, 1996, 1765-7.

PJ Cook and J Leitzel "Perversity, Futility, Jeopardy: An Economic Analysis of the Attack on Gun Control" <u>Law and Contemporary Problems</u> 59(1): Winter 1996: 91-118.

PJ Cook, J Ludwig, and D Hemenway, "The Gun Debate's New Mythical Number: *How* Many Defensive Uses Per Year" <u>Journal of Policy Analysis and Management</u> 16(3) Summer 1997, 463-9.

PJ Cook and J Leitzel, "Gun Control" <u>New Palgrave Dictionary of Economics and Law</u>, 1998.

J Ludwig, PJ Cook, and TW Smith, "The Gender Gap in Reporting Household Gun Ownership" <u>American Journal of Public Health</u>, v. 88, no. 11, Nov. 1998: 1715-1718.

PJ Cook and MH Moore, "Guns, Gun Control, and Homicide: A Review of Research and Public Policy" in M. Dwayne Smith and Margaret A. Zahn, eds., <u>Homicide: A Sourcebook of Social Research</u> Sage Publications, 1998, 277-296. Also in M. Dwayne Smith and Margaret A. Zahn, eds., <u>Studying and Preventing Homicide: Issues and Challenges</u>, Sage Publications, 1998, 246-273.

PJ Cook and J Ludwig, "Defensive Gun Uses: New Evidence from a National Survey" <u>Journal of Quantitative Criminology</u> 14(2), 1998: 111-131 .

SP Teret, DW Webster, JS Vernick, TW Smith, D Leff, GJ Wintemute, PJ Cook, DF Hawkins, AL Kellermann, SB Sorenson, S DeFrancesco, "Support for New Policies to Regulate Firearms: Results of two national surveys" <u>New England Journal of Medicine</u> 339, Sept. 17, 1998: 813-818.

AL Kellermann and PJ Cook, "Armed and Dangerous: Guns in American Homes" in MA Bellesiles, ed., <u>Lethal Imagination: Violence and Brutality in American History</u> New York University Press, 1999, 425-440.

PJ Cook, B Lawrence, J Ludwig, and T Miller, "The Medical Costs of Gunshot Wounds" Journal of the American Medical Association 282(5), August 4, 1999, 447-454.

J Ludwig and PJ Cook, "Homicide and Suicide Rates Associated with Implementation of the Brady Handgun Violence Prevention Act" Journal of the American Medical Association  284(5), August 2, 2000: 585-591.

J Ludwig and PJ Cook, "The Benefits of Reducing Gun Violence: Evidence from Contingent-Valuation Survey Data" Journal of Risk and Uncertainty 22(3), 2001: 207-226.

PJ Cook, MH Moore, and A Braga, "Gun Control" in James Q. Wilson and Joan Petersilia, eds. Crime: Public Policies For Crime Control, ICS Press, Oakland CA., 2002: 291-329.

PJ Cook and A Braga, "Comprehensive Firearms Tracing: Strategic and Investigative Uses of New Data on Firearms Markets" Arizona Law Review 43(2) 2001:277-309. Reprinted with minor changes as "New Law Enforcement Uses for Comprehensive Firearms Trace Data" in Bernard E Harcourt (ed.) Guns, Crime, and Punishment New York: NYU Press, 2003: 163-187.

PJ Cook and JA Leitzel, "'Smart' Guns: A Technological Fix for Regulating the Secondary Gun Market" Contemporary Economic Problems 20(1) January 2002: 38-49.

PJ Cook and J Ludwig, "The Costs of Gun Violence Against Children" The Future of Children  12(2), Summer/Fall 2002: 87-99.

PJ Cook and J Ludwig, "Litigation as Regulation: Firearms" WK Viscusi, ed. Regulation Through Litigation Washington, DC: Brookings Institution Press, 2002: 67-93
AA Braga, PJ Cook, DM Kennedy, and MH Moore "The Illegal Supply of Firearms" in Michael Tonry ed. Crime and Justice: A Review of Research Chicago, University of Chicago Press, 2002: 229-262.

PJ Cook and J Ludwig, "The Effects of Gun Prevalence on Burglary: Deterrence vs Inducement" in J Ludwig and PJ Cook (eds.) Evaluating Gun Policy Washington, DC: Brookings Institution Press, 2003: 74-118.

PJ Cook and J Ludwig, "Pragmatic Gun Policy" in J Ludwig and PJ Cook (eds.) Evaluating Gun Policy Washington, DC: Brookings Institution Press, 2003: 1-37.

PJ Cook and J Ludwig, "The Effects of the Brady Act on Gun Violence" in BE Harcourt (ed.) Guns, Crime, and Punishment in America New York: NYU Press, 2003: 283-298. reprinted in Steven D. Levitt and Thomas J. Miles (eds.) Economics of the Criminal Law  Edward Elgar Publishing, 2007.

PJ Cook and Jens Ludwig "Fact-Free Gun Policy" University of Pennsylvania Law Review 151(4), April 2003: 1329-1340.

D Azrael, PJ Cook, and M Miller "State and Local Prevalence of Firearms Ownership: Measurement, Structure, and Trends" Journal of Quantitative Criminology 20(1) March 2004: 43-62.

PJ Cook and J Ludwig "Does Gun Prevalence Affect Teen Gun Carrying After All?" Criminology 42(1) February 2004: 27-54.

"Youths' Involvement with Guns: Motivation vs. Availability" Archives of Pediatrics & Adolescent Medicine July, 2004: 705.

PJ Cook and J Ludwig "Principles for Effective Gun Policy" Fordham Law Review 73(2), November, 2004: 589-613.

PJ Cook, J Ludwig, and A Braga "Criminal Records of Homicide Offenders" Journal of the American Medical Association 294(5), August 3, 2005: 598-601.

GJ Wintemute, PJ Cook, and M Wright "Risk Factors among Handgun Retailers for Frequent and Disproportionate Sales of Guns Used in Violent and Firearm-Related Crimes" Injury Prevention December, 2005: 357-363.

PJ Cook and J Ludwig "The Social Costs of Gun Ownership" Journal of Public Economics 90(1-2), January 2006: 379-391.

PJ Cook and SB Sorenson "The Gender Gap Among Teen Survey Respondents: Why are Boys more Likely to Report a Gun in the Home than Girls?" Journal of Quantitative Criminology 22(1) March, 2006: 61-76.

PJ Cook and J Ludwig "Aiming for evidence-based gun policy" Journal of Policy Analysis and Management 25(3), Summer 2006: 691-735.

"Use and Control of Firearms" Encyclopedia of Law & Society, Sage Publications, Inc., 2007.

PJ Cook, J Ludwig, SA Venkatesh, and AA Braga "Underground Gun Markets" The Economic Journal, 117 (524) November, 2007: 588-618.

SB Sorenson and PJ Cook "'We've Got a Gun?': Comparing Reports of Adolescents and their Parents about Household Firearms" Journal of Community Psychology 36(1), January 2008: 1-19.

PJ Cook and J Ludwig "Firearms Violence" in Michael Tonry (ed.) Oxford Handbook on

_Crime and Public Policy_ Oxford University Press, 2009.

"Robbery" in Michael Tonry (ed.) _Oxford Handbook on Crime and Public Policy_ Oxford University Press, 2009.

PJ Cook, J Ludwig, and AM Samaha "Gun Control After _Heller_: Threats and Sideshows from a Social Welfare Perspective" _UCLA Law Review_ 56(5), June 2009: 1041-1093.

PJ Cook, W Cukier, and K Krause "The Illicit Firearms Trade in North America" _Criminology and Criminal Justice_ 9(3) 2009: 265-286.

PJ Cook, J Ludwig, and AM Samaha "Gun Control After _Heller_: Litigating against Regulation" in Daniel Kessler, ed., _Regulation versus Litigation_ Chicago: University of Chicago Press, 103-135.

PJ Cook, A Braga, and MH Moore "Gun Control" _Crime and Public Policy_ New York: Oxford University Press, 2010: 257-292.

"Post-_Heller_ Strategies to Reduce Gun Violence" _Journal of Catholic Social Thought_ 8(1) Winter, 2011: 93-110.

3. OpEd Pieces

"Making Handguns Harder to Hide, _The Christian Science Monitor_, May 29, 1981.

PJ Cook and J Ludwig "Has the Brady Act Been Successful?" _The Charlotte Observer_ August 15, 2000.

PJ Cook and J Ludwig "Toward Smarter Gun Laws" _The Christian Science Monitor_ Feb. 6, 2001.

PJ Cook and J Ludwig "Protecting the Public in Presidential Style" _News & Observer_ June 10, 2001.

PJ Cook and J Ludwig "What did the sniper case teach us?  Lessons in Gun Control" _News & Observer_ Nov. 3, 2002, 25A.

PJ Cook and J Ludwig "Will wider availability of guns improve public safety?  No" _CQ Researcher_ Oct. 31, 2008.

E. Income Distribution

1. Book

RH Frank and PJ Cook _The Winner-Take-All Society_ (New York: The Free Press, 1995).

Named a "Notable Book of the Year, 1995" by the *New York Times Book Review;* named one of the ten Best Business Books of 1995 by *Business Week*; given The Critics' Choice Award 1995-96 by the *San Francisco Review of Books*. Paperback edition (Penguin Books, 1996). Named "One of Ten best books of the year, 1996" by *The China Times*. Portuguese, Korean, Chinese, and Japanese editions.

RH Frank and PJ Cook "Preface to the new edition" The Winner-Take-All Society (London: Virgin Books, Random House, 2010).

## 2. Article

PJ Cook and RH Frank "The Growing Concentration of Top Students at Elite Schools" in Charles T. Clotfelter and Michael Rothschild, eds. Studies of Supply and Demand in Higher Education (Chicago: University of Chicago Press, 1993).

PJ Cook and RH Frank "The Economic Payoff of Attending an Ivy-League Institution" in Richard Delgado and Jean Stefancic, eds., Critical White Studies: Looking Behind the Mirror Temple University Press, 1997.

RH Frank and PJ Cook "The winner-take-all society" in William Darity, ed., The International Encyclopedia of the Social Sciences, 2nd ed. Gale, 2007.

## 3. OpEd and Magazine Articles (with Robert Frank)
*USA Today*, October 9, 1995, p. 13A
*Washington Post*, November 12, 1995
*Washington Monthly*, December 1995
*Chronicle of Higher Education*, January 5, 1996

## F. Other topics

"A 'One Line' Proof of the Slutsky Equation" The American Economic Review, March 1972, 139.

PJ Cook and Robert H. Frank "The Effect of Unemployment Dispersion on the Rate of Wage Inflation" Journal of Monetary Economics 1, 1975, 241-249.

PJ Cook and JW Vaupel "What Policy Analysts Do: Three Research Styles" Journal of Policy Analysis and Management, 4 (3) Spring, 1985, 427-8.

PJ Cook and J Ludwig "Weighing the Burden of 'Acting White'; Are there Race Differences in Attitudes Towards Education?" Journal of Policy Analysis and Management 16(2), Spring 1997, 256-278. (Winner of the Vernon Prize for best paper in Volume 16)

PJ Cook and Jens Ludwig "The Burden of 'Acting White:' Do Black Adolescents Disparage Academic Achievement?" in Christopher Jencks and Meredith Phillips (eds.) The Black-White Test Score Gap Brookings Institution Press, Washington DC, 1998: 375-400.  Reprinted in Minority status, Oppositional Culture and Academic Engagement John U. Ogbu, Ed.  New York: RoutledgeFarmer, forthcoming.

PJ Cook, R MacCoun, C Muschkin, and J Vigdor "The Negative Impacts of Starting Middle School in Sixth Grade" Journal of Policy Analysis and Management Winter 2008, 104-121.  (winner of the Raymond Vernon Memorial Prize, 2008)

"Acting White" in William Darity, ed. International Encyclopedia of the Social Sciences, 2nd ed. Gale, 2007.

R MacCoun, PJ Cook, C Muschkin, and J Vigdor "Distinguishing Spurious and Real Peer Effects: Evidence from Artificial Societies, Small-Group Experiments, and Real Schoolyards" Review of Law and Economics 4(3), 2008: 695-714.

E H-W Kim and PJ Cook, The continuing importance of children in relieving elder poverty: evidence from Korea Ageing & Society 2011, forthcoming.

Book reviews

Of Jack P. Gibbs, Crime, Punishment, and Deterrence in Contemporary Psychology 21:5, 1976.

Of Kenneth Dolbeare (ed.) Public Policy Evaluation in Policy Analysis, Fall 1977, 604-606.

Of David T. Stanley, Prisoners Among Us in Policy Analysis, Winter 1978, 139-141.

Of John Heineke, Economic Models of Criminal Behavior in Southern Economic Journal, April 1980, 1255-1257 (with Anne Witte).

Of Laurence Ross, Deterring the Drinking Driver in Journal of Health Politics, Policy, and Law, Winter 1983, 958-961; and in Popular Government, Winter 1983, 37-38.

Of Robert H. Frank, Choosing the Right Pond:  Human Behavior and the Quest for Status in Journal of Policy Analysis and Management, Fall 1986.

Of Michael D. Laurence, John R. Snortum, and Franklin Zimring. eds., Social Control of the Drinking Driver, in Science, July 29, 1988.

Of Michael Tonry and Norval Morris, eds., Drugs and Crime in Journal of Policy Analysis and Management 10(3), Summer 1991.

Of Mark A.R. Kleiman, <u>Against Excess: Drug Policy for Results;</u> and Franklin E. Zimring and Gordon Hawkins, <u>The Search for Rational Drug Control Policy</u> in <u>Journal of Policy Analysis and Management</u> 11(4), Fall 1992.

Of H. Laurence Ross, <u>Confronting Drunk Driving: Social Policy for Saving Lives</u> in <u>Journal of Health Politics, Policy and Law</u> 18(1) Spring 1993, 235-237.

Of Willard Manning et al, <u>The Costs of Poor Health Habits</u> in <u>Policy Currents</u> 2(4), Nov. 1992.

Of Gary Kleck, <u>Point Blank: Guns and Violence in America</u> in <u>New England Journal of Medicine</u> February 3, 1994.

Of Robert L. Rabin and Stephen D. Sugarman, eds., <u>Smoking Policy: Law Politics and Culture</u> in <u>Science</u> 262, December 10, 1993.

Of Trudy Ann Karlson and Stephen W. Hargarten, <u>Reducing Firearm Injury and Death: A public health sourcebook on guns</u> in <u>New England Journal of Medicine</u>, February 5, 1998.

Of Tyler Cowen, <u>What Price Fame?</u> in <u>Journal of Economic Literature</u> September 2001, 933-935.

Of Felix Gutzwiller and Thomas Steffen, <u>Cost-Benefit Analysis of Heroin Maintenance Treatment</u> in <u>Addiction</u> 2001, v. 96, 1071-2.

Of Robert J. MacCoun and Peter Reuter <u>Drug War Heresies</u> in <u>Journal of Policy Analysis and Management</u> v. 21(2), Spring 2002, 303-306.

Of James B. Jacobs <u>Can Gun Control Work?</u> in <u>Journal of Policy Analysis and Management</u> 23(1), Winter 2004, 198-201.

Of S. Selvanathan and E.A. Selvanathan <u>The Demand for Alcohol, Tobacco, and Marijuana: International Evidence</u> in <u>Addiction</u> 102, 2007: 830.

Of Harold Winter <u>The Economics of Crime: An introduction to rational crime analysis</u> in <u>Journal of Economic Literature</u> v. 47: Sept. 2009.

Unpublished monographs

"The Effect of Legitimate Opportunities on the Probability of Parolee Recidivism," Institute of Policy Sciences and Public Affairs, Duke University, 1973.

"Citizen Cooperation with the Criminal Justice System," Institute of Policy Sciences and Public Affairs, Duke University, 1976.

"A Summary of State Legal Codes Governing Juvenile Delinquency Proceedings" (with Joseph Austin and Richard Levi), Institute of Policy Sciences and Public Affairs, Duke University, 1977.

"Life, Liberty, and the Pursuit of Self Hazardous Behavior" (with James Vaupel), Institute of Policy Sciences and Public Affairs, Duke University, 1978.

"Regulating Handgun Transfers: Current State and Federal Procedures, and an Assessment of the Feasibility and Cost of the Proposed Procedures in the Handgun Crime Control Act of 1979" (with James Blose), Institute of Policy Sciences and Public Affairs, Duke University, 1980.

<u>Public and Invited Lectures</u>

PJ Cook, San Francisco: MacArthur Foundation Group on Juvenile Justice, 28 February 2003.

PJ Cook, University of Virginia Law School, 11 March 2003.

PJ Cook, University of Virginia Medical Center, 12 March 2003.

PJ Cook, University of Pennsylvania Symposium on Gun Policy, 24 April 2003.

P.J. Cook, Washington, DC: National Institute of Justice, 28 July 2003.

PJ Cook, Washington DC: Robert Wood Johnson Foundation Investigator Award Conference, 9 October 2003.

PJ Cook, UNC-CH Public Health School, 20 October 2003.

P.J.Cook, University of Delaware, 23 October 2003.

The Social Costs of Gun Ownership, Cambridge, MA, March 26, 2004.

Effective gun policy, Fordham Law School, April 13, 2004.

Effective gun policy, Columbia University Law School, April 14, 2004.

The Homicide Epidemic, Emory University Sociology Department, October 28, 2004.

Hochbaum Lecture, UNC School of Public Health, Chapel Hill, April 10, 2006.

European Economic Assn, Vienna, Austria, August 25, 2006.

Symposium honoring Thomas Schelling, University of Maryland, College Park, September 29, 2006.

Robert Wood Johnson Foundation Investigators Award, San Diego, October 6, 2006.

Davis Lectureship, University of Chicago Center for Health Administration Studies, December 6, 2006.

2007 Crime & Population Dynamics Summer Workshop, Aspen Wye River Center, June 04, 2007.

Paying the Tab: The case for higher alcohol taxes, Johns Hopkins University Institute for Policy Studies, February 14, 2008.

Alcohol and Tobacco Taxes as Public Health Measures, Washington DC: American Medical Assn President's Forum, March 31, 2008.

Paying the Tab: The case for raising the alcohol excise tax, Rutgers University School of Social Work, April 23, 2008.

Cost-Benefit Analysis of Crime, Washington DC, June 25, 2008.

The New Second Amendment, Virginia Tech Department of Economics, October 13, 2008.

Paying the Tab: The case for higher alcohol taxes, Bloomberg School of Public Health, Johns Hopkins University, December 03, 2008.

Sussmilch Lecture: Estimating the effects of alcohol taxation on mortality, Max Planck Institute for Demographic Research, Rostock, Germany, December 16, 2008.

Paying the Tab, University of Maryland, February 13, 2009.

Lessons from Alcohol Control Research, San Diego, California, February 20, 2009.

Paying the Tab, University of Maryland Baltimore County, March 04, 2009.

Benefits of Crime Reduction, National Academy of Sciences, March 05, 2009.

School Crime, University of Maryland, March 09, 2009.

Post-Heller Strategies to Reduce Gun Violence, Villanova University, March 24, 2009.

Gun control after Heller, Emory University Department of Economics, December 04, 2009.

Private inputs into crime control, Economics Department, University of Virginia, February 04, 2010.

Private inputs into public safety, Royal Economic Society Annual Conference, Surrey, March 30, 2010.

The case for and against preserving a minimum drinking age of 21, Duke University, May 19, 2010.

The Scientific and Intuitive Case for Higher Alcohol Taxes, Helsinki, Finland, September 22, 2010.

Public safety through private action, Bonn, Germany, October 09, 2010.

Public safety through private action, Harvard Law and Economics Workshop, February 08, 2011.

Public safety through private action, University of Oregon Department of Economics, March 05, 2011.

Crime and the Business Cycle, Andrew Young School of Policy Studies, Georgia State University, March 10, 2011.

Public safety through private action, Vanderbilt Law and Economics Program, April 25, 2011.

Alcohol and Violence, Washington DC, April 28, 2011.

Lessons from an (un)controlled experiment, Jerry Lee Symposium on Criminology and Public Policy, May 03, 2011.

Conferences

Unraveling the Urban Enigma, Wharton School, University of Pennsylvania, May 04, 2007.

Boisi Center Conference on Gambling and the American Moral Landscape, Boston College, October 25, 2007.

<u>Selected Research grants</u>

Principal investigator, "Evaluating Policy Options to Increase Citizen Cooperation in Urban Law Enforcement," A Durham Observatory Project, 1975.

Principal investigator, "The Processing of Gun Crimes in D.C. District Court," Institute of Law and Social Research, 1977.

Principal investigator, "Empirical Studies of Robbery and Handgun Control," U.S. Department of Justice.

Principal investigator, "Evaluating Alternative Policy Strategies for Controlling the Distribution of Handguns" (with Mark Moore), Ford Foundation, 1977-79.

Principal investigator, "A Review of the Major Gun Regulation Proposals," Center for the Study and Prevention of Handgun Violence, 1979-80.

Principal investigator, "A Review of Robbery Literature," National Institute of Justice, 1981.

Principal investigator, "Robbery Violence," National Institute of Justice, 1983-85.

Principal investigator, "Vice," The Chicago Resource Center, 1987

Principal investigator, "Costs of the Death Penalty in North Carolina," NC Administrative Office of the Courts, 1991-93.

Principal investigator, "Causes and Effects of Youthful Drinking," National Institute on Alcohol Abuse and Alcoholism, 1992-1994.

Principal investigator, "Markets for Stolen Guns," Harry Frank Guggenheim Foundation, 1993-4.

Principal investigator, "The Costs of Gunshot Wounds," The Joyce Foundation, 1997-99.

Principal investigator, "Community Gun Prevalence and Crime," The Joyce Foundation, 2000-2003.

Investigator Award In Health Policy Research, Robert Wood Johnson Foundation, 2003-4.

Principal Investigator, "evaluations of two programs in Milwaukee designed to reduce serious criminal violence" Joyce Foundation, 2007-2008.

Principal Investigator, "Fiscal Costs of Capital Punishment in NC" Z. Smith Reynolds Foundation, 2007-2008.

Principal Investigator, "An Experimental Evaluation of the Milwaukee Prisoner Re-entry Program" Smith Richardson Foundation, 2008-2011.

Co-Investigator, "Preventing truancy in urban schools through provision of social services by truancy officers: A Goal 3 randomized efficacy trial" US Department of Education/IES: 2010 – 2014.

Service and Administrative Activities at Duke University

> Director of Undergraduate Studies, Institute of Policy Sciences and Public Affairs, 1974-75, 1992.

> Director of Graduate Studies, Institute of Policy Sciences and Public Affairs, 1977-79, 1984, and 1994-95.

> Chairman, Graduate Curriculum Committee, Institute of Policy Sciences and Public Affairs, 1977-79.

> Member, Undergraduate Faculty Council of Arts and Sciences, 1977-78, 1991-93.

> Author of an evaluation of undergraduate admission policy, commissioned by the Undergraduate Faculty Council, 1978.

> Member, Academic Council, Duke University, 1978-79, 1982-84, 1993-95, 1998-2000 Elected to the Executive Committee of the Academic Council, 1982-83.

> Associate Director, Institute of Policy Sciences and Public Affairs, 1979-1985, 2005-.

> Pre-Major Advisor, 1981-85.

> Member, UFCAS Committee on Admissions, 1984-86.

> Member, University Committee on Undergraduate Admissions and Financial Aid, 1986 - 87.

> Author of a special report on predicting yields from undergraduate admissions, 1987.

> Member, Dean White's Ad Hoc Committee on Undergraduate Internships, 1987.

> Member, President's Administrative Oversight Committee, 1987-90.

> Chairman, Public Policy Studies Committee on Appointments and Promotion, 1990-93.

> Chair, Provost's committee to review Dean Earl Dowell for reappointment, 1992.

> Member, Arts and Sciences Committee on Planning and Priorities, 1993-95. Chair, 1994-95.

> Member, Dean Search Committee, Fuqua School of Business, 1994.

> Chair, PPS Diversity Committee, 1994-95.

Member, Executive Committee of the Graduate School, 1995-96

Member, steering committee, Child and Family Policy initiative, 1999

Member, Dean's Search Committee, Duke Law School, 1999

Member, Planning Committee, Institute for Genome Sciences and Policy, 1999

Chair, Arts & Sciences Council Task Force on the Budget, 2001-2

## Public and Professional Service

Chairman, Weapons and Violent Crime Workshop, NILECJ, LEAA, U.S. Department of Justice, February 1978.

Presenter, N.C. Governor's Crime Commission, June and September, 1979.

Panel member, National Research Council Study of Alternative Policies Affecting the Prevention of Alcohol Abuse and Alcoholism, 1978-1981.

Member, N.C. Governor's Task Force on Drunken Driving, 1982.

Member, Ad Hoc Workshop on the Future of Criminal Justice Research, U.S. Department of Justice and National Research Council, March 1982.

Testified on alternative gun-control policies before the U.S. Senate Criminal Law Subcommittee, March 4, 1982.

Testified on alcohol tax policy before the Social Security Advisory Council, May 25, 1982.

Participant, Sixty-Sixth American Assembly (Public Policy on Alcohol Problems), Harriman, NY, April 26-29, 1984.

Member, Executive Session on the Juvenile Justice System, Harvard University, 1984-85.

Member, Policy Council of the American Society of Criminology, 1985-86, and 1990-91.

Invited participant, Conference on the Cigarette Excise Tax sponsored by the Harvard Institute for the Study of Smoking Behavior, Washington, DC, April 17, 1985.

Member, "Crime and Violence" working group of the NAS Committee on Basic Research, 1985.

Member, Research Advisory Committee of the U.S. Sentencing Commission, 1986-91 (Chair, 1986).

Associate, Canadian Institute of Advanced Research, 1986.

Member, Board of Advisors, Public Policy Program, College of William & Mary, 1987-1992.

Member, National Academy of Sciences Committee on Law and Justice, 1987-1993.

Treasurer, Association of Public Policy Analysis and Management, 1987-1994.

Testified on the use of alcohol taxation as a public-health measure before the U.S. Senate Committee on Governmental Affairs, September 27, 1988.

Member, Workshop on Health Economics, National Institute of Alcohol Abuse and Alcoholism, September 1988.

Member, National Research Council's Panel on the Understanding and Control of Violent Behavior, 1988-91.

Member, Advisory Board to the Injury Prevention Research Center, University of North Carolina, 1990-.

Witness, "Problems and Prospects for a N.C. Lottery" North Carolina Economic Future Commission, December 5, 1990.

Invited participant, CDC's Forum on Youth Violence in Minority Communities, Atlanta, December 10-12, 1990.

Member, President's Advisory Board of the H. John Heinz III School of Public Policy and Management, Carnegie Mellon University, 1992-96 and subsequently (including 2007).

Consultant, Tax Advisory Program, US Department of Treasury, 1994-95.

Steering Committee, National Consortium on Violence Research, 1995-1997.

Member, Center for Gun Policy Research, Johns Hopkins University, 1995-.

Invited participant, White House Leadership Conference on Youth, Drug Use, and Violence, March 7, 1996.

Invited speaker, U.S. Senate Democratic Policy Council, Wilmington, DE, April 26, 1996.

Member, National Academy of Sciences (IOM) Committee on Injury Prevention and Control, 1997-8.

Member, Advisory Committee to the Harvard Injury Control Research Center, 1998-.

Consultant, US Department of Treasury, Enforcement Division, 1999-2000.

Member, National Academy of Sciences (NRC) Case Studies of School Violence Committee, 2001-2002.

Member, Division Committee for the Behavioral and Social Sciences and Education, National Research Council, 2001-2004.

Member, "Committee to Develop a Strategy to Prevent and Reduce Underage Drinking", Institute of Medicine 2002-3.

Member, Panel on Assessing the Feasibility, Accuracy, and Technical Capability of a National Ballistics Database, The National Academies 2004-5.

Member, *Crime and Justice* editorial board, 2007-1010.

Member, National Research Council Workshop on Understanding Crime Trends, 2007-8

Co-Director, NBER Economics of Crime Working Group, 2007-

Vice Chair, National Research Council Committee on Law and Justice, 2006-2010.

Vice President, Association of Public Policy and Management, 2008-2009 (two years).

Panel member, International Benchmarking Review of UK Sociology: 2009-2010. http://www.esrcsocietytoday.ac.uk/ESRCInfoCentre/Support/Evaluation/ibr/IBR_Sociology.aspx

Member, International Scientific Advisory Board, Netherlands Institute for the Study of Crime and Law Enforcement (NSCR), 2010-.

Member, National Research Council Committee on Deterrence and the Death Penalty, August 2010 – November 2011.

Refereeing

Associate editor, Law and Contemporary Problems, 1974-78.

Editorial consultant, <u>Journal of Criminal Law and Criminology</u>, 1982-.

Member, Editorial Board, <u>Journal of Policy Analysis and Management</u>, 1986- 2002.

Associate Editor, <u>Criminology</u>, 1987-91.

Editorial board, <u>Criminology & Public Policy</u>  2010-

Occasional refereeing: American Economic Review, Journal of Political Economy, Journal of Public Economics, Economic Inquiry, Journal of Legal Studies, Journal of Law and Economics, New England Journal of Medicine, Journal of the American Medical Association, Criminology and other professional journals.

# APPENDIX B

## MATERIALS REVIEWED

In addition to the materials specifically referenced in the footnotes to my report and my own articles referenced in my *curriculum vitae* attached as Appendix A, I reviewed and considered the following in forming my opinion:

1.  Chicago City Ordinance, Ch. 4-144

2.  Chicago City Ordinance, Ch. 8-20

3.  Illinois Firearm Owners Identification Card Act, 430 ILCS 65/0.01, *et seq.*

4.  Second Amended Complaint in *Illinois Association of Firearms Retailers, et al. v. City of Chicago*, No. 10-CV-4184 (N.D. Ill. Jan. 12, 2011)

5.  Deposition of Kevin Johnson in *Illinois Association of Firearms Retailers, et al. v. City of Chicago*, No. 10-CV-4184 (N.D. Ill. Apr. 19, 2011)

6.  Plaintiffs' Response to City's Document Request No. 16 in *Illinois Association of Firearms Retailers, et al. v. City of Chicago*, No. 10-CV-4184 (N.D. Ill. Mar. 10 & Apr. 29, 2011)

7.  Prepared Testimony before Chicago City Council produced in *Illinois Association of Firearms Retailers, et al. v. City of Chicago*, No. 10-CV-4184 (N.D. Ill.) as CITY395–409

8.  CPD Crime Data produced in *Illinois Association of Firearms Retailers, et al. v. City of Chicago*, No. 10-CV-4184 (N.D. Ill.) as CITY1376–470 (Reported Incidents by Offense Type, Location, Description, and Year)

9.  CPD Crime Data produced in *Illinois Association of Firearms Retailers, et al. v. City of Chicago*, No. 10-CV-4184 (N.D. Ill.) as CITY1471 (# of Reported Crime Incidents Where Offense Was Home Invasion + A Firearm-Related Offense)

10. CPD Crime Data produced in *Illinois Association of Firearms Retailers, et al. v. City of Chicago*, No. 10-CV-4184 (N.D. Ill.) as CITY1472 (# of Firearms Turned in by Citizens at Annual "Gun Turn-In" Events in City of Chicago)

11. CPD Data produced in *Illinois Association of Firearms Retailers, et al. v. City of Chicago*, No. 10-CV-4184 (N.D. Ill.) as CITY1473 (Civilian Registered Firearms)

12. CPD Crime Data produced in *Illinois Association of Firearms Retailers, et al. v. City of Chicago*, No. 10-CV-4184 (N.D. Ill.) as CITY1474–502 (# of Crime Victims by Offense Type and Age)

13. CPD Crime Data produced in *Illinois Association of Firearms Retailers, et al. v. City of Chicago*, No. 10-CV-4184 (N.D. Ill.) as CITY1503–12 (# of Crime Victims by Offense Type and Gender)

14. Operation "Gunsmoke" Files produced in *Illinois Association of Firearms Retailers, et al. v. City of Chicago*, No. 10-CV-4184 (N.D. Ill.) as CITY4562–6830

15. Documents produced in *Illinois Association of Firearms Retailers, et al. v. City of Chicago*, No. 10-CV-4184 (N.D. Ill.) as CITY6831–7910

16. Report by Daniel W. Webster, ScD, MPH on the Justification for Chicago's Limit of One Operable Firearm in the Home produced in *Illinois Association of Firearms Retailers, et al. v. City of Chicago*, No. 10-CV-4184 (N.D. Ill.)

17. Chicago Police Department, Annual Reports, Online at https://portal.chicagopolice.org/portal/page/portal/ClearPath/News/Statistical%20Reports/Annual%20Reports

18. Chicago Police Department, Murder Reports, Online at https://portal.chicagopolice.org/portal/page/portal/ClearPath/News/Statistical%20Reports/Murder%20Reports

19. Rosenthal, L., "Second Amendment after *Heller*: Of Standards of Scrutiny, Incorporation, Well-Regulated Militias, and Criminal Street Gangs," Urban Lawyer, 41, 2009: 1

20. Wiebe, D.J., *et al.*, "Homicide and Geographic Access to Gun Dealers in the United States," BMC Public Health, 9, 1999: 199

21. Mayor's Against Illegal Guns, "The Movement of Illegal Guns in America: The Link Between Gun Laws and Interstate Gun Trafficking" (Dec. 2008)

22. Department of Justice, Bureau of Alcohol, Tobacco, Firearms and Explosives, Office of Strategic Information and Intelligence, "2009 Illinois Trace Data" (2010)

23. Americans for Gun Safety Foundation, "Selling Crime: A Handful of Gun Stores Fuel Criminals" (Jan. 2004)

24. U.S. Department of Justice, Office of the Inspector General, Evaluations and Inspections Division, "Inspections of Firearms Dealers by the Bureau of Alcohol, Tobacco, Firearms and Explosives," Report No. I-2004-005 (Jul. 2004)

25. Department of the Treasury, Bureau of Alcohol, Tobacco and Firearms, "Following the Gun: Enforcing Federal Laws Against Firearms Traffickers" (Jun. 2000)

26.    United States Department of Justice, Bureau of Alcohol, Tobacco, Firearms and Explosives, "Shot Show—January 2011: Inspection Findings" (2011)

27.    Legal Community Against Gun Violence, "Illinois: Summary of State Firearms Laws: Sales and Transfers," online at http://www.lcav.org/states/illinois.asp#SalesTransfers

28.    Children's Memorial Research Center.  Illinois Violent Death Reporting System 1(1) (Aug. 2007)