# EXPERT REPORT OF JOSEPH J. VINCE, JR.

I have been asked to testify in the matter of *Illinois Association of Firearms Retailers, et al, v. City of Chicago, et al*, No. 10-cv-04184 (N.D. Ill). My proposed testimony is based on observations, research, and opinions drawn from (i) my training, study, and experience in law enforcement generally and firearms law enforcement in particular; (ii) a review of published studies and other materials relating to firearms security and safe use, and the diversion of guns to criminals; (iii) my training, study, and experience in working with the firearms industry on issues of firearms security and safe use; and (iv) testimony, photographs, and documents relating to firearms-related crimes, self-protection with firearms, and accidental and improper uses of firearms. This report constitutes the essential elements of my opinions in this matter, but I reserve the right to provide additional details or to amend my opinions as additional information becomes available.

I will testify that:

A. Firearms-related violence is a systemic and epidemic problem in the City of Chicago.
B. Chicago Ordinance 8-20-040 does not prohibit individuals from effectively utilizing a firearm for self-defense and provides other gun safety and security benefits. The use of firearm trigger locks, cables and other locking devices are an effective means of providing safety and security of firearms in the home as well as a deterrent to the unlawful use of firearms as a result of theft.
C. The Bureau of Alcohol, Tobacco, Firearms and Explosives (ATF) lacks the resources and statutory authority to provide sufficient oversight and regulation of gun stores.

## Education and Experience

For almost thirty years, I served as a special agent with the ATF. I began my law enforcement career as a deputy sheriff with the Trumbull County Sheriff's Office, Warren, Ohio, from 1969 to 1971. My tenure at ATF began in May 1971 as a special agent in the Detroit, Michigan, Division Office. I later worked as a special agent in Flint, Michigan, and as the Resident Agent in Charge in Omaha, Nebraska. During this period, I received awards for investigative work, including finalist for Special Agent of the Year, and received ATF's Gold Star Award for wounds received in the line of duty.

In 1983, I came to ATF Headquarters in Washington, D.C., first as Operations Officer in the Firearms Division, then as Special Agent In Charge of the Firearms Tracing Branch, and finally as Special Agent In Charge of the Intelligence Branch. By July 1995, I became Chief of the Firearms Enforcement Division at ATF headquarters. In this position, I was an originator and overseer of the Bureau's Youth Crime Gun Interdiction Initiative (YCGII), a Presidential gun crime-reduction program. From July 1997 through January 1999, I was Chief of the Crime Gun Analysis Branch at ATF's

offices in Falling Waters, West Virginia, where ATF maintains its crime-gun tracing information. During my tenure as chief, I worked to reduce gun crime violence and used crime-gun tracing to assist in those efforts. I worked closely with the firearms industry to prevent theft and the illegal diversion of firearms to criminals. During my tenure as Assistant Chief and Chief, Firearms Division and Chief, Crime Gun Analysis Branch, I worked with members of law enforcement and the firearms industry to research and publish safety and security practices for citizens and industry members.

During my career with ATF and now as a consultant, I have been intimately involved in all aspects of the firearms business - manufacturing, wholesaling and retailing. In my career I have visited numerous manufacturing facilities, audited federally licensed dealers, scrutinized safety and security procedures required of the firearms industry, examined State and local ordinances, and trained firearms industry personnel.

Presently, I am Director of Criminal Justice Programs at Mount St. Mary's University in Emmitsburg, Maryland, and President of Crime Gun Solutions LLC, a company devoted to assisting law enforcement in the collection, access, management, analysis, training, and dissemination of crime-gun information. I have served as a facilitator-instructor for, and am a current member of, the International Association of Chiefs of Police (IACP). My instruction to law enforcement officers included gun store security and prevention of firearms acquisition by criminals. I serve on the IACP's Firearms Committee, which examines firearms-related violent crime and makes recommendations to the IACP's Executive Committee and members internationally.

I received an M.A. in Criminal Justice from the University of Detroit in 1979, and a B.A. with a major in Criminal Justice from Youngstown (Ohio) State University in 1970. I have received several notable awards, including the Vice Presidential Hammer Award for innovations in Federal Firearms Enforcement in 1996. I was a finalist in 1997 for the Innovations in Government award presented by the Ford Foundation and the John F. Kennedy School of Government at Harvard University for work on a project titled "Disarming the Criminal." Upon retirement from ATF, I received the Albert Galatin Award, the Treasury Department's highest award for distinguished government service. I have authored numerous publications, including ATF Crime Gun Analysis Branch reports on the illegal firearms market, and have given numerous lectures, speeches, and presentations training law enforcement groups in the United States and abroad. My curriculum vita is attached as Exhibit 1.

I am sufficiently familiar with the pending action to submit to a deposition concerning the specific testimony, including any opinion and its basis, that I intend to give at trial. My hourly fee for providing deposition testimony is $350.00. My hourly fee for consulting with defendants' attorneys is $350.00 per hour.

I will note here that I am a strong proponent of citizens' rights to own firearms for the purpose of self-defense, hunting, and sport shooting. From 2005 until 2008, I was a founding Board Member of the American Hunters' and Shooters' Association, Inc. This organization was founded to protect the rights and privileges of gun owners, the

environment, and the heritage of hunting and shooting.  This organization strongly believes, as do I, that criminal acquisition and illegal use of firearms diminishes the reputation of true hunters and shooters as well as places our communities in danger.

## Substance of Anticipated Testimony

### A. Firearms-related violence is a systemic and epidemic problem in the City of Chicago.

Firearms violence is a widespread in the City of Chicago.  Headlines from local newspapers detail this horrific problem on a daily basis:

# At least 40 shot across city over weekend

June 21, 2010 1:52 PM|

At least 40 people were shot over the weekend across **Chicago**, with eight of them slain, according to police logs.

The toll covers a period from 8:43 p.m. Friday--after violent storms hit the city--to 6:39 this morning.

On Sunday, **Chicago** Police Superintendent Jody Weis acknowledged a high number shootings over the weekend and attributed more than half of them to the work of gangs.

## Teen wounded in West Side shooting

**July 29, 2011|Staff report**

A teen was found shot in the hand tonight on the West Side in the city's Douglas Park neighborhood, officials said.

The shooting happened about 10:40 p.m. on the 1200 block of South Albany Avenue, said Police News Affairs Officer Hector Alfaro.

## 4 critically injured in separate South Side shootings



(Eric Clark for the Chicago Tribune)
August 01, 2011|Staff report

Officials said that four people were critically wounded in three separate shootings.

In the first shooting, a man was shot and critically wounded in a shooting in the Park Manor neighborhood, authorities said.

### Robert Freeman, 13-Year-Old Boy, DEAD: Shot 22 Times While Riding Bike
By **Boyce Watkins, PhD** on Jul 30th 2010 8:59AM

Filed under: **News**, **Politics**
**Theresa Lumpkin** was, until Thursday, the Mother of 13-year-old **Robert Freeman Jr**. of Chicago. Her tenure as his parent ended when the young boy was shot and killed on the South Side of Chicago in what many believe to be a case of mistaken identity.

**Witnesses say, though, that the murder was deliberate, as the gunman shot the young boy multiple times.**

## Chicago's Schools, Police Work To Stem Violence

**David Schaper** and **Cheryl Corley**

March 21, 2011
*In Chicago, nearly 700 children were hit by gunfire last year — an average of almost two a day — and 66 of them died.*

Law enforcement statistics show the longstanding nature of the problem. The chart below of homicides committed with firearms in the past decade demonstrates the extent of firearm violence in the City of Chicago:



Murder Offenses by Weapon Types, 2000-2009[1]

### B. Chicago Ordinance 8-20-040 does not prohibit individuals from effectively utilizing a firearm for self-defense and provides other gun safety and security benefits.

I have been asked to examine section 8-20-040 of the Chicago firearms ordinance as to its effect on personal self-defense in the home.

Chicago Ordinance 8-20-040, Firearms kept or maintained in home, states as follows:

*Subject to section 8-20-050, every person who keeps a firearm in his home shall keep no more than one firearm in his home assembled and operable. If more than one person in the home has valid CFP and registration certificate, each person with a valid CFP and registration certificate is entitled to have one such firearm assembled and operable in*

---

[1] Chicago Police Department, City of Chicago, Illinois – Annual Reports,
https://portal.chicagopolice.org/portal/page/portal/ClearPath, August 5, 2011.

*the home. All other firearms kept or possessed by that person in his home shall be broken down in a nonfunctioning state or shall have a trigger lock or other mechanism, other than the firearm safety mechanism, designed to render the firearm temporarily inoperable.*

*The provisions of this section shall not apply to peace officers.*[2]

My partners and I in Crime Gun Solutions, LLC (CGS) have over 75 years combined of law enforcement experience in which firearms were a tool of the profession. We have been involved in years of personal training in the use of firearms as well as safety and security measures for their storage and tracking. As both Federal agents and as consultants to law enforcement, CGS partners have recommended security measures for retail dealers, the United States Army, and civilian residences. We have researched numerous best practices and interviewed burglars and thieves in order to make sound determinations of our recommendations.

I have been asked to specifically examine if the use of trigger locks, cable locks and the like (as enumerated in the Chicago Firearms Ordinance) further important safety benefits and whether they thwart self-defense protection by citizens in the home. I have specifically studied the issue of firearms kept and maintained in a home. The literature on this subject matter is extremely broad and extensive. In addition, we found literally a plethora of products that can be purchased by citizens to secure firearms that appear to conform to the provisions of the Chicago ordinance.

In examining the use of firearms in the home for defensive purposes, we first researched protocols and advice from the professionals that utilize a firearm on a daily basis as a tool of their profession: law enforcement officers and the military. As a society, we expect our law enforcement and military professionals to be extensively trained with the firearms they utilize. Both professions are trained in the operation of the weapons they use, safe handling practices and when it is appropriate to use the firearm. Just as important, they are trained in the use of a firearm under stressful life or death situations, and are mandated to receive constant remedial training. As our nation's first responders to violent situations, both law enforcement (Federal, State and local) and military agencies dictate that their personnel use firearm locking mechanisms of various types to secure their weapons when not in use. On military bases, personnel other than those having law enforcement duties are not armed and their weapons are unloaded, disassembled, and securely stored.

I examined common practices by law enforcement and the courts in dealing with firearms. Firearms that are seized by law enforcement agencies are normally stored with some type of locking mechanism to prevent inadvertent or accidental use. When firearms are transported for laboratory examination some type of locking mechanism is attached. Firearms that are brought to court as evidence are required to be unloaded and have an attached trigger or other type of lock to prevent inadvertent use or

---

[2] City of Chicago, Firearms Ordinance, 8-20-040 (added Coun. J. 7-2-10, p. 96234, §4).

accidental discharge. Prior to entering jails, law enforcement officers are mandated to unload their weapons or place them in a gun lock box to prevent unauthorized access and accidental discharges. Firearm policies not properly followed by personnel normally result in penalties from time-off without pay to potential firing. Citizens are strictly prohibited from bringing firearms into courthouses and officers of the court are stationed at entrances to these facilities with metal detectors to insure this prohibition. Both law enforcement agencies and courthouses across the United States have taken a proactive approach toward preventing unauthorized possession, accidental discharge and other misuse of firearms in their facilities.

These practices, similar to those found within the Chicago Firearms Ordinance, are followed by the nation's military and law enforcement agencies and, therefore, would be prudent practices for citizens.

Further, the firearms industry recognizes the safety benefits of proper firearms storage practices and recommends that owners follow them. During my tenure with ATF, my staff at the Firearms Division and I consulted with firearm industry members, law enforcement professionals, and firearm enthusiasts to develop a publication titled *Safety & Security Information for Federal Firearm Licensees: Steps for Reducing Your Vulnerability to Theft/Loss and Personal Injury*.[3] This publication is available to the general public and can be downloaded from the ATF website free of charge. The safety and security measures outlined in this publication (those devised with input from firearm professionals and aficionados) parallel provisions within the Chicago Ordinance. For example, this publication advises to:

- ***Keep display cases locked at all times.***
- ***Disable display firearms.*** *Use trigger locks or plastic ties to ensure that the firearms cannot be loaded or fired while being examined. In some situations, the best practice may be the removal of the firing pin. Another best practice to consider is placing display firearms in a safe at night, a protocol followed by most jewelry stores.*
- ***Keep ammunition stored separately from the firearms and out of the reach of customers.*** *This practice can help eliminate shoplifting of ammunition and help ensure that firearms remain unloaded while on display.*
- ***Recommend safe storage methods.*** *Federal law requires that firearms safety or locking devices be available for purchase and provided to anyone purchasing a firearm. We recommend that you advertise these to your customers for storing their firearms. Advise customers to take their firearms directly home rather than leave the firearms in their vehicle while taking care of other errands. Remind your customers that firearms should always be unloaded when being stored.*[4]

---

[3] Bureau of Alcohol, Tobacco, Firearms and Explosives, Department of Justice, Safety & Security Information for Federal Firearm Licensees, ATF P 3317.2, revised February 2010.

[4] Ibid.

Obviously, this publication was developed to encourage firearm dealers to institute measures in preventing incidences of theft and possible accidental injuries from happening in their establishments.  Law enforcement professionals and gun enthusiasts suggested the procedures in the publication because they found that these precautions worked.  The publication advises dealers to take the initiative to examine the stores' physical security and other security measures pertaining to preventing theft/loss or personal injury.  In doing so, dealers found that this was not only a prudent practice, but could lower their insurance costs.

My research found that some manufacturers supply trigger lock devices with the purchase of their firearms, some communities provide trigger lock devices free of charge to citizens, and even the National Shooting Sports Foundation (NSSF), a lobbying arm of the firearms industry, has a safety program utilizing trigger locking devices; they report that they have provided over 35 million gun locks and safety kits. This program was even funded through grant money supplied by the Federal government.  The following was found on the Internet describing the NSSF program[5] and is copied in its entirety as Exhibit 3:

**Safety Curriculum - Project ChildSafe -** *Putting A Lock On Safety In Your Home –*
*A nationwide program of the National Shooting Sports Foundation and its community partners to help ensure safe and responsible firearm ownership and storage.*

This firearm industry program recommends the following actions by citizens for proper safe security use and storage of firearms:
> It is the responsibility of the firearms owner to know how to properly handle any firearm you own and to know how to secure your firearm(s) in a safe manner at home.
> If a citizen for any reason feels uncomfortable with or unable to accept these responsibilities, the NSSF urges them not to own a firearm.
> Caution, nearly all firearms accidents in the home can be prevented simply by making sure that guns are kept unloaded and locked up, with ammunition secured in a separate location.
> Store firearms in a safe manner that provides barriers against unauthorized use.
> Use of a firearm for home defense requires the owner to have appropriate training and clear understanding of safe handling and storage of firearms.
> If you must have quick access to a loaded firearm in your home, you need to take special safety measures.  Keeping a gun to defend you family makes no sense if that same gun puts your family members or visitors to

---

[5] National Shooting Sports Foundation, Safety Curriculum, Project ChildSafe, http://www.projectchildsafe.org/curriculum.cfm, August 2, 2011.

your home at risk.  Many home firearm accidents occur when unauthorized individuals, visitors, discover loaded firearms that were carelessly left out in the open.

➢ If you choose to keep a firearm for home security, your objective should be to create a situation in which the firearm is readily available to you, yet inaccessible or inoperative to others.

➢ You must exercise full control and supervision over a loaded gun at all times.  This means the gun must be unloaded and placed in secure storage whenever you leave the gun in your home or elsewhere.  Secure ammunition separately.

➢ Your most important responsibility is ensuring that unsupervised children cannot encounter loaded firearms.

In order to promote this safety program, the NSSF teamed up with law enforcement agencies nationwide including those within the State of Illinois to dispense and tout the safety of gun locks and how they will save lives.  In the cited article below (see Exhibit 4 for the entirety), a NSSF spokesperson states that gunlocks are "simple but effective devices" and that "a trigger lock is better than nothing at all, but a cable lock is better than a trigger-lock, and a good gun safe is better than just about anything."[6]

## Area police to distribute 700 gun-locks through Project ChildSafe

By Gary Mays, The Journal-Standard

FREEPORT --
"A trigger-lock is better than nothing at all, but a cable lock is better than a trigger-lock," Still said, a fistful of gun-safety information in one hand and a plastic-wrapped gun lock in the other. "And a good gun safe is better than just about anything."

Still and his organization, Project ChildSafe, are betting the 698,000 cable gun locks they are distributing in Illinois will go a long way toward saving children's lives by preventing accidental gun deaths. Nationwide distribution of the gun locks is funded by a $50 million U.S. Dept. of Justice grant, enough to purchase up to 20 million of the devices.

Grim statistics illustrate the importance of securing guns, officials say. According to U.S. Centers for Disease Control data provided by kidsandguns.org, an online gun-safety group, an average of four children died every day from non-homicide firearm incidents from 1996 to 2001. During that same period, 1,530 children were killed in firearm accidents.

Guns are present in 40 percent of U.S. households with children. And in households with children and firearms, 40 percent had at least one unlocked firearm and 13 percent kept their unlocked firearm loaded or stored with ammunition, according to a 2001 RAND Corp. study.

---

[6] Gary Mays, Area police to distribute 700 gun-locks through Project ChildSafe, The Journal Standard, http://www.journalstandard.com/content/articles/2003/11/24/local_news/news32.jpg, November 24, 2003.

"Even though it is unloaded, it is your responsibility to make it safe," Snyders said. "You have got to lock them up."

It should be noted that our research has shown that one of the plaintiffs in this matter is an affiliate of the NSSF.

The Illinois Association of Firearms Retailers is the newest of state-specific organizations created to represent the rights and interests of its federally licensed firearms retailers. Heading the Illinois group as its first president is John Mann, owner of Mann & Son Sporting Goods in Pinckneyville, Ill. ILAFR was formed with the assistance of the National Association of Firearms Retailers (NAFR), the retailer division of NSSF. "NSSF, NAFR and each of the state retailer organizations are working together to protect the rights of retailers and give them a new form of representation at the state level," said Tom Larson, NSSF director of retail partnerships.[7]

The Chicago Firearms Ordinance closely follows the recommendations of the NSSF with regard to safe handling and storage of firearms.

On July 31, 2011 in order to research currently available trigger locks and other mechanisms, CGS Partner Gerald Nunziato and I traveled to Gander Mountain[8] and Dick's Sporting Goods in Niles, Ohio. These are two major retailer establishments dedicated to sporting activities, which include sales of firearms and firearm accessories. Both stores are major Midwest retailers who operate in the State of Illinois. Masterlock Brand trigger locks were among the locks we examined.

We entered each store as two private citizen customers wishing to garner information for safely securing our firearms and yet having the ability to quickly use them for self-defense. Located in each store we found every type of product outlined in the NSSF ChildSafe Program, *i.e.*, trigger locks, gun lock boxes, cable locks, and safes. Prices for these products ranged from slightly over $7 for trigger locks to over $400 for gun safes with extensive fire and heat resistance ratings. In both stores we approached clerks working in the firearms department for assistance who were very knowledgeable of the products and both stated they were avid hunters and owners of firearms. In each store, clerks demonstrated for us the use of trigger locks.

The clerk in Gander Mountain stated that he personally utilized trigger locks on his firearms and kept the key on his person at all times. He stated that he was comfortable with his ability to access a weapon, load it and use it for self-defense. When utilizing trigger locks both the manufacturers as well as this clerk recommend

---

[7] GunDogs.com, Firearms Retailers Form Association in Illinois, http://www.gundogsonline.com/Article/Firearms-Retailers-Form-Association-in-Illinois-Page1.htm, August 3, 2011.

[8] Note that Gander Mountain was one of the retailers that cooperated with ATF during my tenure as Firearms Division Chief in establishing exceptional safety and security measures with regard to firearms.

having the firearm unloaded before engaging the lock to prevent an accidental discharge. Both clerks felt that trigger lock devices were a deterrent from unauthorized access, especially that of minors, as well as from the average burglar. They stated that the average burglar attempting to pry the trigger lock from the firearm would most likely damage the firearm to the extent of making it inoperable and this was a plus for negating criminals from using stolen firearms.

During our visit in both stores we examined the storage practices employed by each establishment. In both Gander Mountain and Dick's Sporting Goods, we found that every firearm racked or in a display case had a trigger lock affixed. We inquired of both clerks why the companies employed the use of the trigger locks on every firearm displayed. The simple answer by each clerk was a resounding, "It works!" Each clerk advised that since instituting the trigger locks, they were not aware of any unauthorized accesses or thefts of weapons. Each clerk was a strong proponent of securing firearms in some manner.

Gander Mountain personnel worked with ATF to devise best safety and security practices for federally licensed firearms dealers. I can recall being told of an incident involving a young man who was intent on committing suicide with a firearm. The young man entered a Gander Mountain store, acquired ammunition, and smashed a handgun display case; but because a trigger lock was affixed to the firearm he could not further his death wish before being curtailed by clerks. This convinced Gander Mountain executives that trigger locks were an effective means of securing weapons from unintended uses and the procedure remains to this day. Simply stated, they found that trigger locks work.

I also examined the practices of other firearm industry entities that display firearms and want to prevent thefts, accidental discharges, and injuries or deaths:

**"The Shooting, Hunting, Outdoor Trade Show (SHOT Show) and Conference is the largest and most comprehensive trade show for all professionals involved with the shooting sports, hunting and law enforcement industries.** *It is the world's premier exposition of combined firearms, ammunition, law enforcement, cutlery, outdoor apparel, optics and related products and services. This is also an event that has a significant participation and presence of the National Rifle Association (NRA). The SHOT Show attracts buyers from all 50 states and more than 100 countries. The SHOT Show is owned and sponsored by the National Shooting Sports Foundation."*[9] *The rules employed by the SHOT Show concerning safe firearm practices are as follows:*

---

[9] The Shooting, Hunting, Outdoor Trade Show (SHOT Show) and Conference, http://shotshow.org/, August 3, 2011.

**Attendance Rules**

*Attendance at the SHOT Show is RESTRICTED to the shooting, hunting and outdoor trade and commercial buyers and sellers of military, law enforcement and tactical products and services ONLY. The show is not open to the public, and NO one under age 16 shall be admitted (including infants).*

_**NO**_ *personal firearms or ammunition allowed. Only firearms on display by exhibitors whose firing pins have been removed (and have been inspected by SHOT Show Safety Advisors) will be permitted on the show floor.*

*Attendees and their belongings may be searched at any time during the show. Attendees consent to such searches and waive any related claims that may arise. If an attendee refuses such searches, attendee may be denied entry or be removed from show premises without refund or other compensation."*[10]

Gun shows are another venue where firearms and ammunition are displayed, and such shows are held throughout the United States on a weekly basis. We have found that due to the number of accidental discharges resulting in deaths and injuries at gun shows and flea markets, strict rules requiring firearms to be unloaded and locked in some fashion are the norm. Because individuals wishing to sell firearms bring them to gun shows, all firearms are routinely inspected at a front desk where the firearm is inspected and a flex lock affixed to insure that it cannot be loaded or fired. The partners of CGS are very aware of the dangers that unlocked firearms have at these events because we have been retained to examine practices after a fatal incident occurred. For example, in one such case, a wife was shopping for a firearm as an anniversary gift for her husband at a flea market which had a portion of the floor designated for firearms. As she approached this section, another customer picked a firearm from a table, turned, and pointed the weapon in her direction. The firearm, which was supposed to be unloaded, discharged, striking the women in the heart and instantly killing her. Again, one must ask why industry members and others in the firearms business utilize locking mechanisms to secure firearms, and the only answer is that they work to prevent thefts, accidents and other unauthorized uses.

The plaintiffs in this action may argue that the use of trigger locks imposes a hardship on citizens from using a firearm for self-defense. I do not concur with this argument. First, under the Chicago Firearms Ordinance, citizens are permitted to have a fully loaded and operable firearm for every person in a household meeting the

---

[10] Ibid.

requirements of the statute. Citizens may choose to carry a loaded weapon from room to room, or place it anywhere in the residence.[11]

My opinion that being able to possess a single loaded firearm in the home provides sufficient protection for self-defense against an attack by an intruder is also based in part on my law enforcement experience and training.

Law enforcement officers face threats to their personal security much more frequently than the average citizen and are therefore much more likely to need to use a firearm as a defensive weapon when facing situations where their life or the life of another is in danger.[12] Even so, law enforcement officers almost always carry only a single firearm. And, even then, they are taught to have their weapon properly holstered, with the safety engaged, until it is required for use against a life-threatening situation. Officers and special agents are trained in utilizing that weapon and properly and safely re-loading the weapon if required. They do not need to have immediate access to multiple loaded and ready firearms to do their job. Only in the movies, on television or in novels do law enforcement officers hold and shoot multiple firearms at once. In addition, most shooting incidents involving police officers last for short durations and are at close quarters. Therefore, in the overwhelming number of incidents in which a citizen will need to use a firearm having a single conventional firearm should be more than sufficient to protect life and property.

At the same time, law enforcement agencies expend large sums of monies to purchase locking devices that will secure firearms when they are not being used. While law enforcement personnel may sometimes have multiple firearms present, the additional firearms are securely stored. In police vehicles, for instance, additional firearms other than the officer's side-arm are kept locked. Also, federal agents may need to use long guns when encountering certain dangerous arrests or raid situations; however, when the enforcement action is concluded, the long guns are unloaded and secured in the trunk of the vehicle until they can be stored in their offices. Law enforcement officers are always fearful of having criminals obtain and use police weapons against them. The repeated occurrence of criminals taking an officer's weapon from them and using it on the officer has been the bases for examination and perfection of training to prevent this tragedy. The configuration of holsters and other locking type devices to prevent easy access from unauthorized users of an officer's firearm has seen dramatic changes and improvements over time. The fact that law enforcement officers use safe storage devices and practices while simultaneously facing a more severe security threat than the average citizen is strong evidence that Chicago's requirements do not impose a hardship on using a firearm for self-defense in the home.

---

[11] If the resident has a minor in the house, then they must keep control of the loaded firearm at all times. *See* Chicago Firearms Ordinance, section 8-20-050.

[12] Such training includes stimulated stressful situations presented via computer simulation of actual events officers have encountered (shoot/don't shoot scenarios). This type of training is done during initial academy qualifications and is repeated every year.

I believe that having loaded firearms in various areas within a residence may even pose a greater threat to a citizen's ability to defend themselves. If an intruder were to illegally enter a residence and find a fully operable and loaded firearm in one area of the residence, this weapon could then be used against the home owner who is in another area of the residence. Preventing intruders and criminals from access to loaded firearms is the best protection from serious injury or death during a crime.[13]

Also, I have explored the precise amount of time and effort it takes for an individual to remove a trigger lock from a firearm, load the weapon and use it for self-defense. In this regard, at my direction, CGS partner Nunizato purchased a Remington Trigger Block and a Bellock Keyed Trigger Lock from Dick's Sporting Goods and conducted tests timing the unlocking of the trigger locks on an actual firearm ten times each with the key in his pocket. Mr. Nunziato determined the following:

|  | Bellock | Remington |
|---|---|---|
| Fastest | 2.79 seconds | 3.27 seconds |
| Slowest | 6.62 seconds | 8.66 seconds (dropped key) |
| Average | 4.303 seconds | 5.306 seconds |
| Median | 4.12 seconds | 4.505 seconds |

Even when dropping the key, it took under 10 seconds to unlock and make the firearm operable. This is within sufficient time to respond to the threat of a home intruder. A citizen who commits to learning how to properly use one of these devices and practices unlocking the device should be able to achieve similar times; indeed, these devices are designed and manufactured to be used by average citizens in home security situations.

Therefore, I must conclude that section 8-20-040 of the Chicago Firearms Ordinance does not impair citizens from effectively utilizing a firearm for self-defense. A citizen may keep one firearm loaded and fully operable at all times. The citizen may also own as many additional firearms as he or she wishes, and the safe storage requirements required as to those firearms do not impair the effective utilization of that firearm for self-defense, and are in accord with guidelines, practices, and recommendations of firearm experts, the United States Military, law enforcement agency experts, court safety rules, and the gun industry itself. The requirements are in the best interest of the public safety of all citizens.

---

. [13]T. Vinson, "Gun and Knife Attacks." Australian Journal of Forensic Science (1974); Glenn L. Pierce, *et al.*, Report to the U.S. Dep't of Treasury, Bureau of Alcohol, Tobacco and Firearms, Office of Enforcement, Washington, DC, *The Identification of Patterns in Firearms Trafficking: Implications for Focused Enforcement Strategies* (1995).

### C. *The Bureau of Alcohol, Tobacco, Firearms and Explosives (ATF) lacks the resources and statutory authority to provide oversight and regulation of existing gun stores.*

I have been asked to examine section 8-20-100 of the Chicago firearms ordinance and opine as to whether there are valid public safety reasons for barring the sale of firearms in Chicago.

Chicago Ordinance 8-20-100, Permissible sales and transfers of firearms and ammunition, states as follows:

> *(a) Except as authorized by subsection (e) and Section 8-84-075, no firearm may be sold, acquired or otherwise transferred within the city, except by inheritance.*[14]

We have been asked to comment on why it may not be in the best of interests for firearms to be sold within the Chicago City limits.

I believe that one such reason is that the federal government (acting through the ATF) is not able to properly inspect and monitor firearms stores. Without adequate oversight, firearms stores are a source of firearms entering the illegal market or otherwise falling into the hands of criminals.

Chicago's restriction on the sale or transfer of firearms can be seen as a preventative strategy. In the more than three decades that CGS partners have personally labored at, researched, and consulted with law enforcement agencies to reduce firearms-related violent crime, it has repeatedly become apparent that only those firearms policies that include a strong prevention element (along with intervention and enforcement) can truly have success in reducing firearms violence for all citizens. If community leaders and enforcement officials merely wait for violent crime to occur, they will be destined to investigate the trail of blood that firearms violence leaves in its wake. It would be utopian to believe that without the existence of laws and regulations aimed at prevention every citizen would take due diligence in the safe handling and use of dangerous items that can cause serious injury or death. An example of the importance of a preventative strategy is the government's mandating of safe practices involving automobiles. Those mandates have resulted in dramatic reductions in injuries and deaths over time through additions to automobile safety equipment and the mandatory use of seatbelts.[15] It should be noted that when automobile legislation and regulations were introduced, some individuals within the automobile industry and the driving public strenuously objected as an infringement on personal liberties. However, as we have experienced, the legal use of automobiles as a conveyance has not been adversely affected and lives have been saved. Automobile manufacturers who were the most

---

[14] City of Chicago, Firearms Ordinance, 8-20-100 (added Coun. J. 7-2-10, p. 96234, §4).

[15] National Highway Transportation and Safety Administration (NHTSA), NHTSA.gov.

ardently opposed to mandated safety equipment are now the same companies that currently advertise with pride that their products have garnered five-star safety ratings.[16]

Chicago's restriction on the sale of firearms is a type of preventative strategy that can reduce firearm-related violence. I know from my experience that when firearms sales are allowed to occur, firearms frequently fall into the hands of criminals or others who are not lawfully qualified to possess them. CGS partners have personally been involved in conducting audits of federally licensed firearms dealers ("FFLs"). These audits encompass a full range of governmental licensing functions associated with monitoring and regulating dealers in firearms, including: conducting store inventories, examining dealer records (including initial applications, renewals, and firearm transfer records), scrutinizing zoning ordinance compliance, surveying safety and security measures, and participating in training of dealers. Along with this, my years of experience in tracing and researching crime guns has made me well aware of corrupt or bad business practices of firearm dealers that result in large numbers of firearms entering the illegal market.

It is no secret that this is a problem that plagues Chicago. The number of weapons seized by the Chicago Police Department attests to this (see chart below).



Firearm Recoveries, 2000-2009 Note: Totals include firearms recovered during annual turn in events, 4,049 in 2006: 6,003 in 2007; 5,739 in 2008; and 1,621 in 2009.[17]

---

[16] Ibid.

[17] Chicago Police Department, City of Chicago, Illinois – Annual Reports, https://portal.chicagopolice.org/portal/page/portal/ClearPath, August 5, 2011.

Further, in 1998 the Chicago Police Department initiated an enforcement action "Operation Gunsmoke"[18] to stop the flow of guns from licensed dealers outside city limits to criminals within the city.  Having identified from the tracing of crime guns seized by the Chicago Police under the YCGII the specific dealers who were the suppliers of crime guns, police officers working in an undercover capacity depicting themselves as criminals or prohibited purchasers attempted to purchase firearms through flagrant 'straw purchases'.  Repeatedly, the officers had minimal difficulty acquiring guns with little regard from dealers for the purchaser's ineligibility and/or nefarious reason or purpose.

One significant reason that dealers persist in operating this way is that, as shown by ATF information, media reports, and academic studies, Federal firearm laws are too weak and/or ineffective to adequately and timely police firearms transaction and shut down even the most flagrant suppliers of crime guns to criminals, terrorists, and minors by revoking their license.  As has been reported in sworn testimony by former ATF Director Stephen Higgins, it takes on average over six years for ATF to revoke a license from a federally licensed firearms dealer, even under the most egregious circumstances.[19]  I will note here that since 1998, Congress has further weakened the licensing revocation authority of ATF (under lobbying by the NSSF), so that even if a licensee is convicted of the most heinous felony crime or has incredibly poor business practices that allow criminals, terrorists, and minors to acquire firearms, the license can be passed to a relative or associate.  In other words, Al Capone could relinquish his firearm business and license to Frank Nitti.

For two decades, cities across the country have realized that the Federal government alone cannot do the job of keeping firearms from criminals and they must be responsible for their own public safety.  Repeatedly, studies have shown that the vast majority of crime guns acquired by and used by criminals have originated from less than 1% of federally licensed firearms dealers.[20]  Even armed with this knowledge of the identity of these dealers, ATF has not been able to curtail the flow of firearms to the criminal element in major cities across the United States.  Moreover, even when a city tries to step into the ATF's enforcement gap and take action on its own, those efforts fail to cure the problem.  For instance, New York identified suburban dealers supplying large numbers of guns that were used by criminals in the City and tried to bring to light the dealers' activities.  CGS was employed by the City of New York to assist in supporting this effort.  The City's program resulted in demonstrating through video and

---

[18] Chicago Police Department, City of Chicago, Illinois, Gunsmoke Files and Documents 004562-006830 and Documents City 6831-City7910.

[19] *NAACP v. Americans Arms, Inc., et al.*, Nos. 99-C-3999, 99-C- 7037 (E.D.N.Y.).

[20] Glenn L. Pierce, et al., Report to the U.S. Dep't of Treasury, Bureau of Alcohol, Tobacco and Firearms, Office of Enforcement, Washington, DC, The Identification of Patterns in Firearms Trafficking: Implications for Focused Enforcement Strategies (1995);  Bureau of Alcohol, Tobacco and Firearms, U.S. Dep't of the Treasury, *Youth Crime Gun Trace Analysis Reports: The Illegal Youth Firearms Markets in 17 Communities* (1997); Bureau of Alcohol, Tobacco and Firearms, U.S. Dep't of the Treasury, *Following the Gun: Enforcing Federal Laws Against Firearms Traffickers* (2000).

audio undercover tapes that dealers were not abiding by Federal law and/or regulation. Yet, none of the flagrant dealers involved in the enforcement action lost their federal firearm licenses.

My expert experience and direct knowledge is that the lack of proper inspection of gun dealers by ATF, as well as insufficient federal laws and ATF resources to properly monitor these businesses, results in criminals and other ineligible purchasers being able to easily acquire firearms from these businesses.

The Department of Justice, Office of Inspector General has verified this finding in their inspection report of July 2004.[21] (*See* Exhibit 5 for full report.) In the DOJ's Inspector General's Report they wrote:

> *RESULTS IN BRIEF*
> *"We found that the ATF's inspection program is not fully effective for ensuring that FFLs comply with federal firearms laws because inspections are infrequent and of inconsistent quality, and follow-up inspections and adverse actions have been sporadic. Specifically, the ATF does not conduct in-person inspections on all applicants before licensing them to sell guns, and ATF compliance inspections of active dealers, including large-scale retailers, are infrequent and vary in quality. Even when numerous or serious violations were found, the ATF did not uniformly take adverse actions, refer FFLs for investigation, or conduct timely follow-up inspections."*
>
> *"Although the ATF faces significant shortfalls in resources, it must ensure that available Inspector resources are used effectively and efficiently to ensure that FFLs comply with federal firearms laws."*
>
> *"The ATF Does Not Regularly Conduct Compliance Inspections on Active FFLs, Including Large-Scale Retailers"*
> *"We found that most FFLs are inspected infrequently or not at all. According to the former ATF Director, the agency's goal is to inspect each FFL at least once every three years to ensure that they are complying with federal firearms laws. However, due in part to resource shortfalls, the ATF is currently unable to achieve that goal. ATF workload data show that the ATF conducted 4,581 FFL compliance inspections in FY 2002, or about 4.5 percent of the approximately 104,000 FFLs nationwide. At that rate, it would take the ATF more than 22 years to inspect all FFLs."*
>
> *"Our review of FFL inspection files also found that even when FFL compliance inspections identify significant violations of federal firearms laws by the FFLs or by gun purchasers, these violations are not always reported to ATF Special Agents for investigation. We identified several cases in which indications of*

---

[21] U.S. Department of Justice, Office of the Inspector General, Inspections of Firearm Dealers by the Bureau of Alcohol, Tobacco, Firearms and Explosives, Report Number I-2004-005, July 2004, Washington, D.C.

*potential criminal violations, including gun trafficking, were identified but not referred for investigation."*

In order for the City of Chicago to appropriately license and regulate firearm dealers operating within the City limits the following steps, among others, would need to be taken:

a. Enact firearm licensing and regulatory authority legislation.
b. Establish a governmental entity to prepare regulations, enforce regulations, monitor and inspect dealers as well as refer criminal activity uncovered to the appropriate law enforcement authority.
c. Hire and train employees to main the governmental entity established.
d. Publicly disseminate regulations to citizens and dealers alike.
e. Provide training and publications to licensed firearm dealers.

Having been involved in crime-gun reduction research and enforcement efforts for decades, it is obvious to me that in order to provide the needed amount of public safety it would be necessary for the City of Chicago to enact their own licensing and monitoring bureaucracy of retail firearm dealers. This regime would need to be much more extensive and complex than that existing under federal law. The City of Chicago would need to establish procedures and policies for a governmental arm to enact regulations, and criteria governing all aspects of a firearms sales business (including building requirements, storage procedures, record-keeping requirements, sales practices), review license applications, issue licenses, and diligently monitor and inspect dealers, all in order to ensure that dealers were in complete compliance with the City's Ordinance. This would be an enormous undertaking for the City and would take months, perhaps years, to establish proper protocols and sufficiently train employees. There is also no guarantee that this scheme would be completely effective. In order to demonstrate the difficulty of this task, one need only examine some of the recommendations the Inspector General provided to ATF in the cited inspection report:

### RECOMMENDATIONS

*We recommend that the ATF:*

- *Develop a standard, streamlined inspection process that includes in-person inspections of all FFL applicants; more efficient inventory and records reviews; automated inspection reporting; and consistent examination of indicators of firearms trafficking.*
- *Conduct a pilot project to test the streamlined inspection procedures and establish appropriate time standards for conducting these inspections.*
- *Revise the staffing requirement report using the time standards to reflect the number of Inspectors needed to conduct compliance inspections on a triennial basis, or on an alternative schedule based on the FFL's compliance history.*
- *Direct the National Licensing Center to develop an adverse action tracking system to monitor the progress and timeliness of FFL denials and revocations from the time an Inspector makes a recommendation until the proceedings are finalized.*

- *Develop a model for more accurately identifying potential firearms trafficking through the analysis of an FFL's firearms sales volume and the number of firearms traced to the FFL."[22]*

If the DOJ Inspector General makes such extensive recommendations to an agency that has been issuing Federal firearm licenses, inspecting dealers, and enforcing Federal firearm laws since 1968, it is quite evident what an enormous task this will entail for the City of Chicago.

Dated: August 15, 2011

JOSEPH J. VINCE, Jr.
CRIME GUN SOLUTIONS LLC
2214 West Greenleaf Drive
Frederick, MD 21702

---

[22] Ibid.

**EXHIBIT 1**

**Joseph J. Vince, Jr.**
**2214 W. Greenleaf Drive**
**Frederick, MD 21702**
**(301) 631-2950 – info@crimegunsolutions.com**

***Education***     1979   M.A., *University of Detroit*, Detroit, MI
                              Criminal Justice

                   1970   B.A., *Youngstown State University*, Youngstown, OH
                              Major:   Criminal Justice
                              Minor:   History and Education

## Formal Managerial Training

| | | |
|---|---|---|
| January 1994 | *Senior Executive Service Candidate*, SES,  Washington, D.C. |
| March 1987 | *Leadership Development Program*, Center for Creative Leadership, Greensboro, NC |
| August 1981 | *Executive Development Seminar*, OPM, Kings Point, NY |
| February 1980 | *Supervision and Group Performance*, OPM, St. Louis, MO |

## Experience

| | | |
|---|---|---|
| January 1999-Present | President | Crime Gun Solutions, LLC |
| May 2002 – Present | Faculty | Professor, Mount St. Mary's University, Emmitsburg, MD |
| 2010 – Present | Member | Board Member, Frederick Community College, C.J. Dept. |
| January 2002-2004 | Member | State and Local L.E. Advisory Board to the U.S. Counterdrug Intelligence coordinating Group (CDX) U.S. Department of Justice |
| February 2001-2004 | Member | Government Intelligence Training Initiative |
| May 2005 – 2008 | Board of Dir. | American  Hunters  and  Shooters Association, Inc. |
| September 2001-Pres. | Director | The  Father Delaney Center for Public Safety Practices At Mount St. Mary's University |

**U.S. Bureau of Alcohol, Tobacco and Firearms**

| | | |
|---|---|---|
| July 1997-January 1999 | Chief | Crime Gun Analysis Branch, falling Waters, WV |
| July 1995-July 1997 | Chief | Firearms Enforcement Division, Headquarters, Washington, DC |
| July 1993-July 1995 | Deputy Chief | Firearms Enforcement Division, Headquarters, Washington, DC |
| March 1991-July 1993 | Special Agent In Charge | Division Office, Chicago, IL |
| October 1986-March 1991 | Assistant Special Agent In Charge | Team Supervisor, ATF Southeast National Response Team (NRT); Division Office, Miami, FL |
| January 1985-October 1986 | Special Agent In Charge | Intelligence Branch, Headquarters, Washington, DC |

| November 1983-January 1985 | Special Agent In Charge | Firearms Tracing Branch, Headquarters, Washington, DC |
| June 1983-November 1983 | Operations Officer | Firearms Division, Headquarters, Washington, DC |
| August 1979-June 1983 | Resident Agent In Charge | Division Office, Omaha, NE |
| October 1974-August 1979 | Criminal Investigator | Special Agent, Division Office, Flint, MI |
| May 1971-October 1974 | Criminal | Special Agent, Division Office, Detroit, MI |

**Other Law Enforcement Experience**

| June 1969-May 1971 | Deputy Sheriff | Trumbull County Sheriff's Office, Warren, OH |

## Awards

| 1997 | *Innovations In American Government Finalist* | Presented by the Ford Foundation and the John F. Kennedy School of Government at Harvard University |
| | | for work on the project "Disarming the Criminal" |
| 1996 | *Vice Presidential Hammer Award* | Three awards were presented for innovations in Federal Firearms Enforcement |
| 1997 | *ATF Gold Star Award* | Awarded for wounds received in action |

## Publications/Research

| 2004 | <u>*Evidence Collection Toolbox & Field Guide*</u> | Criminal Justice textbook and field guide Published by Jones and Bartlett 2005 |
| 1998 | <u>*Youth Crime Gun Interdiction Initiative*</u> | Crime Gun Analysis Reports of the Illegal Youth Firearms Markets in 27 Communities |
| 1997 | <u>*Youth Crime Gun Interdiction Initiative*</u> | Crime Gun Analysis Reports of the Illegal Youth Firearms Markets in 17 Communities |
| 1992 | <u>*Protecting America: The Effectiveness Of the Federal Armed Career Criminal Statutes*</u> | A Study by the Bureau of Alcohol, Tobacco and Firearms, United States Department of the Treasury |
| 1986 | <u>*The Encyclopedia of Police Science*</u> | Contributing Writer |
| 1983 | *"MERT – Response for the 80's"* | <u>Law Enforcement Periodical</u> |
| 1980 | *"Achievement Through Cooperation"* | <u>Nebraska Law Enforcement Magazine</u> |

Authored or managed numerous studies and reports for ATF, which were utilized by The White House, Congress, other law enforcement agencies for policy and strategic matters.

## Organizations

Member, International Association of Chiefs of Police

Member, International Association of Chiefs of Police, Firearms Committee Member and Consultant

Member, American Society of Law Enforcement Trainers

## Public Instruction

| Lectures, Speeches and Presentations | Numerous Law Enforcement Groups Academies/Universities Training Seminars (Both U.S. & Abroad) | In Reference to ATF's Mission, Findings and Accomplishments |
|---|---|---|

### *Media Appearances*

Quoted in newspapers as crime gun/law enforcement expert, to include:
- *New York Times, Wall Street Journal, Washington Post, Washington Times, USA Today,* and other national and international publications.

Radio and TV appearances commenting on crime and law enforcement issues, to include:
- *60 Minutes,* CNN, ABC, CBS, FOX, PBS as well as local television stations across the U.S.
  and internationally to include: Canada, Great Britain and Japan.

**EXHIBIT 2**

**MATERIALS RELIED UPON**
**ATF, Government Documents and Other Reports**

Glenn L. Pierce, *et al.*, Report to the U.S. Dep't of Treasury, Bureau of Alcohol, Tobacco and Firearms, Office of Enforcement, Washington, DC, *The Identification of Patterns in Firearms Trafficking: Implications for Focused Enforcement Strategies* (1995).

Bureau of Alcohol, Tobacco and Firearms, U.S. Dep't of the Treasury, *1996 Firearms Enforcement Report* (1996).

Bureau of Alcohol, Tobacco and Firearms, U.S. Dep't of the Treasury, *Youth Crime Gun Trace Analysis Reports: The Illegal Youth Firearms Markets in 17 Communities* (1997).

Bureau of Alcohol, Tobacco and Firearms, U.S. Dep't of the Treasury, *A Progress Report: Gun Dealer Licensing and Illegal Gun Trafficking* (1997).

U.S. Dep't of the Treasury, *Crime Guns Trace Analysis Reports: The Illegal Youth Firearms Market in 27 Communities* (1999).

Bureau of Alcohol, Tobacco and Firearms, U.S. Dep't of the Treasury, *Commerce in Firearms in the United States* (2000).

Bureau of Alcohol, Tobacco and Firearms, U.S. Dep't of the Treasury, *Following the Gun: Enforcing Federal Laws Against Firearms Traffickers* (2000).

Bureau of Alcohol, Tobacco and Firearms, Dep't of the Treasury, *Crime Gun Trace Reports* (1999) *National Report* (2000).

Feb. 4**,** 2000 ATF Press Release, *Treasury, ATF Release Firearms Report, Gun Trafficking Actions.*

U.S. Dep't of Justice, Gun Violence Reduction: National Integrated Firearms Violence Reduction Strategy (2001).

Bureau of Alcohol, Tobacco, Firearms and Explosives, Department of Justice, Safety & Security Information for Federal Firearm Licensees, ATF P 3317.2, revised February 2010.

2001-02 - Firearms Commerce in the United States, Bureau of Alcohol, Tobacco and Firearms, U.S. Dept of the Treasury, Washington, D.C.

FFL Newsletter, (Bureau of Alcohol, Tobacco and Firearms, U.S. Dep't of the Treasury, Washington, D.C.) Vol. 2, 1989.

FFL Newsletter, (Bureau of Alcohol, Tobacco and Firearms, U.S. Dep't of the Treasury, Washington, D.C.) Vol. I, 1992, Aug 1996 FFL Newsletter; Aug 1997 FFL Newsletter;

Aug 1998 FFL Newsletter; December 2002 FFL Newsletter; August 2004 FFL Newsletter; February 2005 FFL Newsletter; August 2005 FFL Newsletter; March 2006 FFL Newsletter; November 2008 FFL Newsletter.

Americans for Gun Safety, *Selling Crime* (2004), Washington, D.C.

Don't Lie for the Other Guy video and materials, National Shooting Sports Foundation, 2002, Hartford, Conn.

The Gun Control Act of 1968, Public Law 90-618, Title 18, U. S. Code, Chapter 44.

Bureau of Alcohol, Tobacco and Firearms, Washington, D.C., Federal Firearms Regulations Reference Guide, ATF P 5300.4.

Bureau of Alcohol, Tobacco and Firearms, Washington, D.C., State Laws and Published Ordinances – Firearms, ATF P 5300.5.

National Shooting Sports Foundation, Safety Curriculum, Project ChildSafe, http://www.projectchildsafe.org/curriculum.cfm**,** August 2, 2011.

Gary Mays, Area police to distribute 700 gun-locks through Project ChildSafe, The Journal Standard, http://www.journalstandard.com/content/articles/2003/11/24/local_news/news32.jpg, November 24, 2003.

The Shooting, Hunting, Outdoor Trade Show (SHOT Show) and Conference, http://shotshow.org/**,** August 3, 2011.

*NAACP v. Americans Arms, Inc., et al.*, Nos. 99-C-3999, 99-C- 7037 (E.D.N.Y.).

Chicago Police Department, City of Chicago, Illinois, Gunsmoke Files and Documents 004562-006830 and Documents City 6831-City7910.

Chicago Police Department, City of Chicago, Illinois – Annual Reports, https://portal.chicagopolice.org/portal/page/portal/ClearPath, August 5, 2011.

Cook, Philip J. and Mark H. Moore. 1995. "Gun Control." In Crime, edited by James Q. Wilson, and John Petersilia; San Francisco: Institute for Contemporary Studies.

U.S. Department of Justice, Office of the Inspector General, Inspections of Firearm Dealers by the Bureau of Alcohol, Tobacco, Firearms and Explosives, Report Number I-2004-005, July 2004, Washington, D.C.

State of Illinois Constitution, http://www.ilga.gov/commission/lrb/conmain.html.

T. Vinson. "Gun and Knife Attacks." Australian Journal of Forensic Science (1974).

Zimring, Franklin E. and Gordon Hawkins, 1987. The Citizen's Guide to Gun Control. New York: MacMillan Publishing Co.

Zimring, F. E., 1972. "The Medium is the Message: Firearm Calibre as a Determinant of Death from Assault." Journal of Legal Studies.

**EXHIBIT 3**

# Safety Curriculum

**Project ChildSafe**
*Putting A Lock On Safety In Your Home*



*A nationwide program of the National Shooting Sports Foundation and its community partners to help ensure safe and responsible firearm ownership and storage.*

As a firearms owner, it is your responsibility to know how to properly handle any firearm you own and also to know how to secure your firearm(s) in a safe manner in your home. Project ChildSafe has been created to help you accomplish these very important safety goals.

**If for any reason you feel uncomfortable with or are unable to accept these responsibilities, we strongly urge you not to own a firearm.**

## Handling Firearms in a Safe Manner



Firearms safety begins with understanding and carefully following all the rules of safe gun handling.

Before handling any firearm, you should be familiar with the following safety procedures:

- Be sure you know how the firearm operates. Not all firearms are the same. Know how to safely open and close the action of the firearm and know how to safely remove any ammunition from the gun or from the gun's magazine. The manufacturer's name and location are on every gun. Write them for free safety and operating instructions.
- Always keep a gun pointed in a safe direction, even when

**Where to get a free safety kit**



**A firearms safety message from Doug Koenig, World Champion Marksman**



**A firearms safety message from Travis Tritt, country music celebrity.**

**Watch a safety video**

**Access NSSF Safety Materials**

**Message to Firearms Retailers on "Child Safety Lock Act"**

handling an unloaded gun. A "safe direction" means that the gun is pointed so that even if it were to fire it would not result in injury.

- Never assume that a firearm is unloaded. Whenever you pick up a gun, the first thing you should do is to point it in a safe direction and make *sure* it is unloaded. Open the action and look into the chamber(s), which should be clear of ammunition. If the gun has a magazine, carefully remove it *before* opening the action. Then open the action to be sure the chamber is clear of ammunition. 

- Always keep your finger off the trigger, even when handling an unloaded gun. When handling a gun, rest your finger outside the trigger guard or along the side of the gun. The only time you should touch the trigger is when you are at a shooting range or other safe shooting location and you are actually ready to fire.

**Remember, nearly all firearms accidents in the home can be prevented simply by making sure that guns are kept unloaded and locked up, with ammunition secured in a separate location.**

## Storing Firearms in a Safe Manner

As a firearms owner, you must make absolutely sure that guns in your home are stored so that they are not accessible to children or other unauthorized persons. Hiding a gun in a closet, drawer or similar location is *not* safe storage. Children are extremely curious and might find a gun in your home that you thought was safely hidden or inaccessible.

As with most all areas of home safety, your objective as a firearm owner is to put in place a series of simple precautions (multiple safeguards) that together help create a secure environment for firearms in the home. Each of these precautions is designed to prove an additional barrier against unauthorized use.

**Key guidelines for safe storage include:**



- Unloaded firearms should be stored in a locked cabinet, safe, gun vault or storage case. Be sure to place a locked storage case in a location inaccessible to children.
- Unloaded firearms can also be secured with a gun locking device that renders the firearm inoperable. A gun lock should be used as an additional safety precaution and not as a substitute for lock storage. If firearms are disassembled, parts should be securely stored in separate locations.
- Store ammunition in a locked location separate from firearms.
- Always re-check firearms carefully and completely to confirm that they are "still" unloaded when you remove them from storage. Accidents could occur if a family member has loaned or borrowed a gun and then carelessly returned it to storage while it was still loaded.

## Firearms Kept for Home Security



The decision to maintain a firearm in the home for self-protection is a serious, personal matter. Unlike passive safety devices, such as alarm systems, firearms used for home protection require significantly more involvement by the owner. Any added safety benefit that may be derived from a firearm depends in large measure on the owner's commitment to appropriate training and a clear understanding of safe handling and storage rules. Are your security concerns realistic and consistent with local crime rates? Do other adults in your household support the decision to maintain a gun in the house? If they will have access to the firearm, will they join you in a firearms training and safety program? What precautions will be practiced to safeguard children? Do risk factors such as drug and alcohol abuse exist within your household?

In addition, issues such as individual temperament, reaction to emergency situations, and specific family circumstances should also enter in the decision.

If you must have quick access to a loaded firearm in your home, you need to take special safety measures. Keeping a gun to defend your family makes no sense if that same gun puts your family members or visitors to your home at risk. Many home firearms accidents occur when unauthorized individuals, often visitors, discover loaded firearms that were carelessly left out in the open.

If you choose to keep a firearm for home security, your objective should be to create a situation in which the firearm is readily available to you, yet inaccessible or inoperative to others. Special lockable cases that can be quickly opened only by authorized individuals are options to consider.

You must exercise full control and supervision over a loaded gun at all times. This means the gun must be unloaded and placed in secure storage whenever you leave the gun in your home or elsewhere. Secure ammunition separately.

Your most important responsibility is ensuring that unsupervised children cannot encounter loaded firearms. The precautions you take must be completely effective. Anything less invites tragedy and is a serious violation of your responsibility as a gun owner.

**A Message for Your Children**

Young people are naturally curious about firearms and, as a result, may be tempted to "play" with a firearm they find. Make sure young people in your home are aware of and understand the safety guidelines described below.

1. Don't go looking for guns in your house or a friend's house. Don't let other kids look for guns in your house.
2. If you find a gun in your house, or anywhere else, STOP! Leave it alone. Don't touch it. Don't let anyone else touch it. Leave the area and be sure to tell an adult at once.
3. Even if a gun looks like a toy, don't touch it. Some real guns may look like toy guns, so don't take a chance. Leave the area and immediately tell an adult.

## REMEMBER: IF YOU FIND A GUN, DON'T PICK IT UP. JUST LEAVE IT ALONE, AND GO TELL AN ADULT RIGHT AWAY!

**Options for Securely Storing Firearms**

| Method | Features | Comments |
|---|---|---|
| **Trigger Lock**  | Widely available, can effectively block trigger but does not prevent loading. | Caution: should never be used on a loaded gun because it can cause the gun to fire under certain circumstances; can't be used on lever-action firearms; keys and combinations must be kept away from children and other unauthorized persons. |
| **Cable Lock**  | Widely available, can be used on most firearms, and can also be used to lock a gun to a solid object. | Be sure to install according to directions, not around trigger; keys, combinations must be kept away from children; cable can be cut. |
| **Lock Box (Mechanical & Electronic)**  | Conceals and protects guns. | Provides secure storage for loaded or unloaded firearm, but in electronic models batteries will need replacement; depending on size, locked box can be stolen; keys and combinations must be kept away from children and other unauthorized persons. |
| **Gun Safes**  | Most secure storage for multiple guns | Certain models are heavy, expensive; keys and combination must be kept away from children and other unauthorized persons. |
| **Disassembling**  | Creates a condition where gun cannot be fired. | Not possible with all guns; requires knowledge of correct assembly and disassembly |

procedures; don't lose the parts.

Project ChildSafe National Coordinator • 203-270-2
e-mail: projectchildsafe@nssf.org

National Shooting Sports Foundation, Inc.
11 Mile Hill Road Newtown, CT 06470
203.426.1320 • FAX 203-426-1245

**EXHIBIT 4**

## Area police to distribute 700 gun-locks through Project ChildSafe

By Gary Mays, The Journal-Standard

FREEPORT -- Clyde Still - that's "Clyde like Bonnie and Still like whiskey" - stood in front of the Stephenson County Public Safety Building on Sunday afternoon, ready to make a delivery to Stephenson County Sheriff Dave Snyders.

And with the zeal of a tent-revival preacher, Still explained the importance of the 700 or so yellow and black gun locks he was delivering to the county, as Snyders busily stacked box after box of the simple but effective devices onto a wheeled cart.

It was the Albany, N.Y.-native's last stop of the day in the county, and the latest in a whirlwind tour of the Midwest in which he has spread his message of gun safety.

"A trigger-lock is better than nothing at all, but a cable lock is better than a trigger-lock," Still said, a fistful of gun-safety information in one hand and a plastic-wrapped gun lock in the other. "And a good gun safe is better than just about anything."

Still and his organization, Project ChildSafe, are betting the 698,000 cable gun locks they are distributing in Illinois will go a long way toward saving children's lives by preventing accidental gun deaths. Nationwide distribution of the gun locks is funded by a $50 million U.S. Dept. of Justice grant, enough to purchase up to 20 million of the devices.

The locks work when a gun owner threads the cable through a handgun or rifle, interfering with the weapon's action and rendering them inoperable. Each gun-lock comes with instructions for proper use and a set of two keys that fit into a padlock that secures the cable on both ends.

"I'll go all over the country before it is all over," said Still, whose truck is emblazoned with the Project ChildSafe logo and gun safety messages. "This is one of the most important things I will ever do."

In addition to the 700 locks that will be distributed by the Sheriff's Department, 200 will be available at Freeport Police headquarters. Another 200 will go to police in Lena and German Valley, said Snyders. Pearl City, Durand, Pecatonica, Warren, Stockton, Hanover, Polo and Jo Daviess County also are on the regional distribution list.

"This is timed pretty well," Snyders said, noting the delivery of the gun locks coincides with the advent of gun deer season, when hunters have their weapons out and visible to youngsters.

Snyders also received a stack of educational videotapes and a placard to place in the department's window, advertising the availability of the devices to area gun owners and hunters. Several models are available for different guns. Those interested in a free gun lock should contact their local police or sheriff's department.

Grim statistics illustrate the importance of securing guns, officials say. According to U.S. Centers for Disease Control data provided by kidsandguns.org, an online gun-safety group, an average of four children died every day from non-homicide firearm incidents from 1996 to 2001. During that same period, 1,530 children were killed in firearm accidents.

Guns are present in 40 percent of U.S. households with children. And in households with children and firearms, 40 percent had at least one unlocked firearm and 13 percent kept their unlocked firearm loaded or stored with ammunition, according to a 2001 RAND Corp. study.

That's why, according to Snyders, even antique guns on display or those kept out of children's reach need to be secured with a lock.

"Even though it is unloaded, it is your responsibility to make it safe," Snyders said. "You have got to lock them up."

But even Project ChildSafe acknowledges that no gun is ever totally secure. A warning inside the organization's brochure says, "This lock may be defeated by a determined individual using tools or other aggressive means and may not prevent intentional misuse of a firearm."

Copyright Â© 2003 The Journal-Standard
http://www.journalstandard.com/content/articles/2003/11/24/local_news/news32.jpg

**EXHIBIT 5**



**U.S. Department of Justice**
**Office of the Inspector General**
**Evaluation and Inspections Division**

# Inspections of Firearms Dealers by the Bureau of Alcohol, Tobacco, Firearms and Explosives

## Report Number I-2004-005

**July 2004**

# EXECUTIVE DIGEST

The Office of the Inspector General (OIG) assessed the effectiveness of the Bureau of Alcohol, Tobacco, Firearms and Explosives' (ATF) program for inspecting Federal Firearms Licensees (FFLs) to ensure that they are complying with federal firearms laws and regulations. We reviewed the frequency and quality of the ATF's different types of FFL inspections; how the ATF manages its Inspector resources; how the ATF selects FFLs for inspection; and the regulatory enforcement actions taken by the ATF against FFLs who violate federal firearms laws.

The Gun Control Act of 1968 (Act) established the ATF's FFL inspection program "for ensuring compliance with the record keeping requirements" of the Act.[1] ATF Inspectors conduct "application inspections" on applicants for FFLs and "compliance inspections" on existing license-holders. Application inspections are conducted to ensure that applicants are familiar with the Gun Control Act and other federal firearms laws.[2] Compliance inspections are conducted to ensure that FFLs are obeying these laws. Specifically, FFLs must account for all firearms that they have bought and sold, and report all multiple handgun sales and firearms thefts to the ATF. If the ATF finds violations, it is empowered to take adverse actions including issuing warning letters, directing FFLs to attend warning conferences, revoking the FFLs' licenses, and, potentially, referring the matter to ATF Special Agents for criminal enforcement. As of March 2004, the ATF had limited authority to suspend an FFL's license, and no authority to fine FFLs.

## RESULTS IN BRIEF

We found that the ATF's inspection program is not fully effective for ensuring that FFLs comply with federal firearms laws because inspections are infrequent and of inconsistent quality, and follow-up inspections and adverse actions have been sporadic. Specifically, the ATF does not conduct in-person inspections on all applicants before licensing them to sell guns, and ATF compliance inspections of active dealers, including large-scale retailers, are infrequent and vary in quality. Even when numerous or serious violations were found, the ATF did not uniformly take adverse actions, refer FFLs for investigation, or conduct timely follow-up inspections.

---

[1] The Gun Control Act of 1968, Public Law 90-618. Title 18 U.S.C. Chapter 44.

[2] The National Firearms Act, Title 26 U.S.C. Chapter 53; The Arms Export Control Act of 1976, Title 22 U.S.C. § 2778.

---

U.S. Department of Justice                                                                    i
Office of the Inspector General
Evaluation and Inspections Division

We also found wide variations in the ATF inspection program's productivity and implementation among the ATF Field Divisions that led us to conclude that inspection procedures should be streamlined and standardized. Although the ATF faces significant shortfalls in resources, it must ensure that available Inspector resources are used effectively and efficiently to ensure that FFLs comply with federal firearms laws. The ATF has begun to implement changes to improve the consistency with which it conducts follow-up inspections and takes adverse actions. However, our review concluded that the ATF still needs to implement consistent inspection procedures to identify and address problem FFLs.

**The ATF Does Not Conduct In-Person Application Inspections on All New FFLs to Verify Applicant Information and Ensure They Understand Firearms Laws**

Application inspections are critical for ensuring compliance with federal firearms laws. These inspections enable the ATF to verify that applicants are eligible for federal firearms licenses and also provide the new dealers an opportunity to discuss issues related to firearms laws with ATF Inspectors. Further, if an FFL violates federal firearms laws after having received an application inspection, it is easier for the ATF to meet the legal standard of demonstrating that the violation was "willful."[3]

In fiscal year (FY) 2002, the ATF issued 7,977 licenses to new firearms businesses and 7,382 licenses to firearms collectors, and conducted 8,123 application inspections.[4] Upon examining the ATF's firearms license database, we found that most (95 percent) of the inspections were of businesses, not collectors, which indicated that the ATF inspected the preponderance of new firearms retailers in FY 2002. However, our interviews and survey of ATF Headquarters and Field Division personnel found that many of those application inspections consisted only of a telephone call rather than an in-person visit. ATF Headquarters and Field Division staff told us that telephonic application inspections were not as comprehensive as in-person inspections, but the ATF staff said that they did not have enough resources to conduct all

---

[3] In the context of the Gun Control Act, willfulness is the intentional disregard of, or indifference to, legal obligations. Repeat violations (especially where there was notification of prior violations) or large numbers of violations can demonstrate willfulness. Sometimes one egregious violation, such as selling a gun to a non-prohibited person when the FFL knows that the gun is actually for a prohibited person ("straw purchase"), can demonstrate willfulness.

[4] A collector's license enables individuals to make interstate sales and purchases of firearms classified by the ATF as curios and relics to facilitate a personal firearms collection. ATF officials told us that they do not place a high priority on inspecting new firearms collectors.

U.S. Department of Justice                                                   ii
Office of the Inspector General
Evaluation and Inspections Division

inspections in person. Subsequent to the initiation of this review, in an October 8, 2003, memorandum to ATF Field Divisions, the ATF Assistant Director for Firearms, Explosives, and Arson issued revised guidance for conducting application inspections. The memorandum stated that the ATF's goal is to inspect all new FFL applicants on-site to ensure that they understand federal firearms laws before issuing them a federal firearms license, beginning with applicants in 14 selected cities. Although the new guidance is a step in the right direction, the ATF still does not comprehensively inspect all new applicants in person.

**The ATF Does Not Regularly Conduct Compliance Inspections on Active FFLs, Including Large-Scale Retailers**

We found that most FFLs are inspected infrequently or not at all. According to the former ATF Director, the agency's goal is to inspect each FFL at least once every three years to ensure that they are complying with federal firearms laws. However, due in part to resource shortfalls, the ATF is currently unable to achieve that goal. ATF workload data show that the ATF conducted 4,581 FFL compliance inspections in FY 2002, or about 4.5 percent of the approximately 104,000 FFLs nationwide. At that rate, it would take the ATF more than 22 years to inspect all FFLs.

Our review of the inspection history for 100 randomly selected FFLs also showed that the ATF did not conduct regular compliance inspections. Of the 100 FFLs, 23 had never been inspected; 22 had received only an application inspection; 29 had received at least one compliance inspection; and 26 FFLs had received only a license renewal inspection. Even for those FFLs that had been inspected, the records showed that many of the inspections occurred years ago. For example, one FFL cited in 1985 for selling a rifle to a minor and for numerous record-keeping violations had never been re-inspected.

**The ATF Does Not Identify and Inspect All FFLs that Exhibit Established Indicators of Potential Violations or Gun Trafficking**

"Crime gun" trace data enables the ATF to identify FFLs that may be violating federal firearms laws or FFLs at which firearms trafficking may be occurring.[5] Although the ATF focuses its inspections on those FFLs that exhibit most severely the established indicators of trafficking

---

[5] The ATF defines a "crime gun" as any firearm that is "illegally possessed, used in a crime, or suspected by law enforcement officials" of having been used during the commission of a crime. The ATF National Tracing Center traces crime guns recovered by law enforcement agencies to determine where they were originally sold by an FFL.

U.S. Department of Justice            iii
Office of the Inspector General
Evaluation and Inspections Division

(e.g., sales of many handguns to one person), it does not identify all FFLs that exhibit those indicators. Instead, the ATF manipulates the criteria it uses to target FFLs for inspections so that it only identifies as many such FFLs as it has the resources to inspect. Therefore, the ATF has not applied its established indicators of potential trafficking to objectively identify the full universe of potential traffickers.

In December 2003, the ATF began a special project to identify common characteristics of FFLs that pose a greater risk to public safety, so that the general level of compliance within the industry can be estimated and that compliance inspections can be better directed at those FFLs where it is most likely that violations may have occurred. Nonetheless, until the ATF objectively identifies the full universe of FFLs that exhibit established trafficking characteristics, it cannot identify the resources it needs to effectively address FFLs that are likely to be committing violations, or accurately report to the Attorney General, Congress, and the public on the scope of the potential trafficking problem at FFLs.

## Implementation of FFL Inspections by Field Divisions Is Inconsistent

The conduct of FFL inspections varied greatly among the ATF Field Divisions. The average time that each of the 23 ATF Field Divisions spent conducting each application inspection in FY 2002 ranged from 6.2 hours per inspection to as much as 25.5 hours per inspection. The average time spent to conduct each compliance inspection ranged from 24.5 hours to as much as 90 hours per inspection. ATF Headquarters officials stated that the variance in average inspection times among the 23 Field Divisions occurred because of the discretion that Inspectors have in conducting compliance inspections and because some Field Divisions had more inexperienced Inspectors on staff, which reduced productivity.

We reviewed the ATF's guidance for inspections and found that it does allow Inspectors great latitude to modify significant portions of the inspections. For example:

- To determine whether an FFL's record-keeping system is accurate, ATF Inspectors may either conduct a full inventory during a compliance inspection or sample the FFL's inventory. The ATF inventory worksheet used during inspections provides no guidance to ensure that a minimum valid sample is taken.

U.S. Department of Justice                                                                  iv
Office of the Inspector General
Evaluation and Inspections Division

- The ATF worksheet for examining sales records does not specify how many records to review. Our interviews with Inspectors in Field Divisions found varying approaches. For example, in the Miami Field Division, Inspectors said that they reviewed six months of records, while Inspectors at the Seattle Field Division said that they examined the records for one year. The Inspectors also examined the records differently. Of the 18 Inspectors we interviewed, 14 said that they only examine the forms to see if they were properly filled out, while 4 indicated that they also look for indications that a purchaser may be part of a firearms trafficking ring or acting as a straw purchaser for someone else.

We also examined the numbers of inexperienced Inspectors on staff and compared the percentage of inexperienced staff to the average inspection times for each Field Division, but we found no correlation. Rather, our review of application inspection data found that average inspection times were related to disparities in staffing levels and the number of FFLs located in the Divisions. Field Division Inspector staff ranged from a high of 35 Inspectors to a low of 9 Inspectors. Likewise, the number of FFLs in each Field Division ranged from 1,172 to 8,194. However, the ATF had not distributed its Inspector resources among the Field Divisions to match the distribution of FFLs, resulting in significant workload imbalances. As a result, the average time that each Field Division spent on application inspections decreased as the number of FFLs per available Inspector increased.

We also examined several performance indicators to see if the inspection variations had an impact on outcomes, such as violations found and criminal referrals. We found little correlation between the amount of time that Field Divisions spent inspecting and the number of adverse actions (such as revoking an FFL's license) that the Field Divisions took or the number of times the Field Divisions identified and referred suspected criminal activity for investigation. We also found significant variances in productivity among the ATF Field Divisions' inspections. For example, our analysis of the ATF's FY 2002 workload and performance data found:

- The number of inspections conducted per Inspector each year ranged from 12.7 (Miami Field Division) to 46.5 (Kansas City Field Division).

- The percentage of the inspections conducted by Field Divisions that identified violations varied from just 4.5 percent (Kansas City Field Division) to 41.5 percent (Dallas Field Division).

U.S. Department of Justice                                                            v
Office of the Inspector General
Evaluation and Inspections Division

- On compliance inspections in which violations were discovered, the average number of violation instances found ranged from 15.9 (Nashville Field Division) to 178.2 (Chicago Field Division).

- The average time that the Field Divisions took to find each violation instance ranged from 47 minutes per violation instance (Dallas Field Division) to over 7 hours per violation instance (Los Angeles Field Division).

Our review of FFL inspection files also found that even when FFL compliance inspections identify significant violations of federal firearms laws by the FFLs or by gun purchasers, these violations are not always reported to ATF Special Agents for investigation. We identified several cases in which indications of potential criminal violations, including gun trafficking, were identified but not referred for investigation. The FFLs were subsequently investigated after the illegal activity was discovered through other means. For example, one FFL was inspected in October 2002, and during that compliance inspection the Inspector found 40 firearms not entered into the FFL's inventory records, missing sales records, and sales to out-of-state residents – all strong indicators of gun trafficking. However, the Inspector did not report the findings through ATF management channels to ATF Special Agents for investigation. Subsequent to the inspection, information from a confidential informant led to an investigation, and in December 2003, ATF Special Agents arrested the dealer for firearms trafficking.

**The ATF Acts Infrequently to Revoke Federal Firearms Licenses, and the Process is Not Timely**

In FY 2002, 1,934 of the inspections that the ATF conducted uncovered violations. Inspectors found an average of almost 70 violations on each of these 1,934 inspections. In FY 2003, the ATF found violations on 1,812 inspections, with an average of over 80 violations each. However, the ATF issued only 30 Notices of Revocation in FY 2002 and 54 Notices of Revocation in FY 2003. In addition to initiating few revocation actions, the process for revoking the licenses of FFLs that violated federal firearms laws, or clearing the FFL, is lengthy.[6] The ATF provided us with case-tracking data for 50 closed denial and revocation cases completed in FY 2001 and FY 2002. We determined that the

---

[6] Notices of Revocation are not final. Of the 30 Notices in FY 2002, 25 FFLs requested a hearing and 3 of those avoided revocation. (FY 2003 data was unavailable.) The ATF also can effectively revoke an FFL's license by denying his or her request for license renewal, and in FY 2001, the ATF denied 28 requests for renewal.

U.S. Department of Justice                                          vi
Office of the Inspector General
Evaluation and Inspections Division

processing of these 50 cases averaged 379 days from the date that the Inspector recommended revocation to the date that the case was closed.

According to ATF officials, the lengthy duration of revocation proceedings was due to the number of ATF officials involved in the eight-step process (e.g., Area Supervisors, Directors of Industry Operations (DIOs), Division Counsels, and Hearing Officers) and delayed support from ATF lawyers. The ATF's case tracking data did not include internal tracking dates, but Assistant Chief Counsels and Division Counsels we interviewed acknowledged delays in denial and revocation proceedings. They stated that the delays were due, in part, to their heavy caseloads and a need for better documentation of violations from ATF Inspectors. We also noted that, in some cases, delays occurred due to a lack of legal staff within the Field Division. Some Field Divisions without staff lawyers were required to obtain support directly from their regional Assistant Chief Counsel's Office.[7]

In May 2003, subsequent to the initiation of our review, the ATF issued guidelines to ensure more consistent and timely initiation and processing of adverse actions. We found that, after the ATF issued the guidelines, the number of FFL revocation hearings rose from 25 in FY 2002 to 87 in FY 2003. The ATF also denied FFL requests to renew their licenses or issued Notices of Revocation 59 times during the first quarter of FY 2004. Most of these cases had yet to be finalized as of March 2004.

The May 2003 guidelines begin to address the problems that we noted with the ATF's past failure to consistently follow up and take action when violations are found. Specifically, the policy directs that all FFLs that were issued warning letters or that were directed to attend warning conferences must be scheduled for a follow-up "recall" inspection in the following year, and that adverse actions are to escalate for repeat offenses. The policy also establishes a time frame for part of the adverse action process by directing Field Divisions to act on recommendations for adverse action within 90 days after receiving the inspection report.

---

[7] The ATF has five Assistant Chief Counsel Offices, located in San Francisco, Chicago, Dallas, Atlanta, and New York/Philadelphia. The northeast regional office is currently operating in Philadelphia due to the September 11, 2001, destruction of the ATF's New York offices, which were located at the World Trade Center.

U.S. Department of Justice          vii
Office of the Inspector General
Evaluation and Inspections Division

**FFL Inspections Must Be Streamlined and Standardized**

With the May 2003 guidelines, the ATF began to improve the consistency and timeliness of adverse actions (including warning letters, warning conferences, and revocation), but the ATF needs to further improve the consistency and quality of FFL inspections. The current variability in the Field Divisions' inspection implementation must be addressed to ensure that FFLs subject to adverse actions are treated consistently. Requiring specific adverse actions for specific numbers of violations in the absence of standardized inspection procedures and sampling criteria will result in dissimilar treatment of FFLs in different Field Divisions. As discussed previously, the ATF's guidance on conducting inspections does not ensure consistent examinations of FFLs' compliance with gun laws.

Areas in which the inspection process could be improved include: standardizing procedures to require reviews of firearms inventories and sales records to establish a statistically valid sample needed to verify the effectiveness of the FFL's inventory management and record-keeping systems; standardizing and automating inspections paperwork and providing laptop computers to enable Inspectors to prepare reports on-site; extending the inspection cycle for FFLs with no significant violations so that limited resources can be directed toward noncompliant dealers; and establishing guidance to ensure that Inspectors consistently identify and report indications of firearms trafficking for investigation.

Improving the efficiency of the inspection process through standardization also could reduce the need for additional staff and the time spent at FFLs. In an April 2003 report to Congress, the former ATF Director stated that to fully implement the ATF's mission to enforce federal firearms laws, the ATF would need 1,235 Inspectors dedicated to conducting FFL inspections.[8] That projection appears to include an assumed 27 percent increase in the average length of inspections over the historical average of 49.4 hours that we identified.[9] If the staffing requirement was calculated using the ATF's actual historical inspection average of about 50 hours, the ATF would need a total of only 984 Inspectors to accomplish firearms inspections on a triennial basis. Moreover, rather than increasing inspection times, our analysis shows

---

[8] On March 24, 2004, the current Acting ATF Director reiterated the report's figures in testimony before the House Committee on Appropriations, Subcommittee on Commerce, Justice, and State, the Judiciary, and Related Agencies.

[9] This average includes both application and compliance inspections, as well as all other time (e.g., leave, training, etc.) that must be considered when projecting staffing needs.

U.S. Department of Justice                                    viii
Office of the Inspector General
Evaluation and Inspections Division

that implementing a streamlined yet statistically valid inspection regimen could reduce the average inspection time and the ATF could therefore reduce the number of additional Inspectors needed to accomplish FFL compliance inspections every three years. For example, by reducing the average inspection time to 40 hours, the ATF would reduce the number of Inspectors needed to conduct FFL compliance inspections on a triennial basis from 1,235 to 788 Inspectors.

Increasing the efficiency of the inspection process also is needed because the demand on ATF Inspectors to perform duties related to explosives is increasing. In November 2002, the Safe Explosives Act imposed new requirements that increased the number of explosives licensees and directed the ATF to conduct on-site inspections of explosives licensees at least once every three years. The additional explosives workload already has reduced the ATF's ability to inspect FFLs. Our review of inspections data for the first five months of FY 2004 found a precipitous decrease in the number of compliance inspections. From October 2003 through February 2004, the ATF completed just 1,113 FFL compliance inspections. At that pace, the ATF would complete fewer than 2,700 FFL compliance inspections during FY 2004 – less than half the number that the agency reported that it completed in FY 2003 and less than 2.6 percent of the FFL population.

**The ATF Does Not Consistently Report Inspection Performance**

In response to our requests for inspections and workload data, the ATF queried its N-Spect, Federal Licensing System (FLS), and Standard Time and Attendance System (STATS) electronic databases.[10] During our examination of the performance and productivity of the ATF's FFL inspections program, we identified significant discrepancies between the systems with regard to the number and type of inspections conducted and the hours spent conducting the inspections. Further, we found that data contained in the N-Spect database contained significant errors. For example, while preparing responses to our data requests, ATF officials determined that several hundred inspections entered as compliance inspections were actually application inspections. In addition, the data in the systems differed significantly from the data the ATF included in published reports. We discussed these inconsistencies with ATF Headquarters officials, and they gave two reasons for the inconsistencies. They stated that there were differences in how the queries of the N-Spect electronic database were constructed by different ATF analysts, and that

---

[10] N-Spect tracks direct time related to FFL inspections, FLS tracks information related to FFL licensees, and the STATS timekeeping system tracks direct and indirect hours for payroll purposes.

Field Division staff did not use the correct project codes because the codes are "confusing."

To improve the future tracking of inspection data, in October 2003 the ATF implemented a new version of N-Spect that requires Field Division staff to use pull-down menus that are inspection-specific (e.g., "Application Inspection"). Although the enhancements to the N-Spect database will increase the reliability of the data in the system, the ATF must nonetheless adopt a standard approach for querying the N-Spect electronic database to ensure that requests for the same data will elicit comparable results. If the ATF does not adopt a standard method for querying and extracting historical data, it cannot consistently report accurate performance data.

**New Restriction on Retention of Gun Purchaser Data Will Reduce the ATF's Ability to Detect Fraudulent Background Checks**

Prior to selling a gun, an FFL must determine if the potential purchaser is prohibited from owning a gun by querying the Federal Bureau of Investigation's (FBI) National Instant Criminal Background Check System (NICS) directly through the FBI or through a designated state agency. For each query, the FBI's NICS currently retains for 90 days whether or not the sale was approved and information on the purchaser. However, beginning in July 2004 all purchaser information on NICS queries that do not result in a denial will no longer be kept for 90 days, but will be destroyed within 24 hours of the official NICS response to the FFL.[11] To comply with this requirement, the FBI has stated that it intends to expunge purchaser information for approved sales from NICS records overnight. For these approved sales, the FBI will retain for 90 days only the NICS Transaction Number (NTN), the license number of the FFL that contacted NICS, and the date that the NICS query was made. After 90 days, the FBI will retain only the NTN and the date that the number was issued.

For most FFLs, NICS is a valuable tool that enables them to quickly determine whether a potential customer is prohibited from buying firearms. However, a small number of corrupt gun dealers may attempt to hide transfers to prohibited persons by falsifying NICS information, such as by listing the prohibited buyer on the sales record but calling in to the FBI the name of a person with a clean record.

---

[11] The Fiscal Year 2004 Consolidated Appropriations Bill (Public Law 108-199) states that the Department of Justice cannot retain "identifying information" related to sales of firearms to non-prohibited persons for more than 24 hours. However, all information related to calls for which potential sales are *denied* by NICS will be retained indefinitely.

U.S. Department of Justice        x
Office of the Inspector General
Evaluation and Inspections Division

Currently, the ATF rechecks recent sales records with NICS to verify the information that the FFLs submitted. The ATF reported that it has not found any NICS violations involving the falsification of purchaser information through these reviews, but officials said the checks serve as a deterrent. However, the reduced retention period for approved purchaser and FFL information will limit the ATF's ability to detect certain fraudulent NICS checks through FFL inspections, since the ATF will no longer be able to verify the information that the dealers submitted by rechecking sales records at the FFL.

## CONCLUSIONS

Our review found the ATF's FFL inspection program is too limited and inconsistent to ensure that FFLs comply with federal firearms laws. In FY 2002, the ATF inspected only 4.5 percent of the approximately 104,000 FFLs to ensure they were complying with federal firearms laws. Although we recognize that the ATF's resources are limited, we concluded that the ATF's lack of standardized inspection procedures results in inconsistent inspections of FFLs and significant variation in the implementation of the inspection program by Field Divisions. The most recent performance data available show that ATF's Field Divisions took from 24.5 hours to as much as 90 hours per compliance inspection. Further, we found little or no correlation between longer inspection times and outcomes such as criminal referrals and adverse actions taken. We concluded that the ATF needs a more standardized and efficient inspection regimen.

Because the ATF does not conduct regular inspections of all FFLs, it cannot effectively monitor the overall level of FFL compliance with federal firearms laws. In December 2003, the ATF directed Field Divisions to conduct Random Sample Compliance Inspections. Using data from those inspections, the ATF planned to "be able to project the overall level of compliance by" gun dealers, pawnbrokers, and collectors.[12] While the project to estimate the overall level of compliance with laws is needed to assess the challenge facing the ATF, it cannot take the place of regular compliance inspections for deterring and identifying noncompliance with gun laws.

To ensure that all FFLs are treated consistently, and that the FFL inspection program is as efficient as possible to maximize the number of inspections conducted annually, a national ATF policy should require

---

[12] Memorandum, Assistant Director for Firearms, Explosives, and Arson to All Special Agents In Charge, December 8, 2003. ATF officials told us that the memorandum was not distributed to the Field Divisions until January 2004.

U.S. Department of Justice          xi
Office of the Inspector General
Evaluation and Inspections Division

that inspections be conducted in a uniform manner, that inspections procedures are limited to the steps needed to accomplish a valid review, and that violations are processed in a uniform and appropriate manner. A consistent and timely inspection process is essential for identifying and addressing scofflaw dealers and for reducing the availability of illegal firearms to criminals.

## RECOMMENDATIONS

We recommend that the ATF:

1. Develop a standard, streamlined inspection process that includes in-person inspections of all FFL applicants; more efficient inventory and records reviews; automated inspection reporting; and consistent examination of indicators of firearms trafficking.

2. Conduct a pilot project to test the streamlined inspection procedures and establish appropriate time standards for conducting these inspections.

3. Revise the staffing requirement report using the time standards to reflect the number of Inspectors needed to conduct compliance inspections on a triennial basis, or on an alternative schedule based on the FFL's compliance history.

4. Develop alternatives for better aligning Inspector resources with the distribution of FFLs, such as by redrawing Field Division boundaries, realigning personnel, or other methods.

5. Update the inspection tracking system to accurately segregate and report on Inspector time spent preparing for inspections, in travel, on-site at FFLs, and conducting other administrative duties.

6. Prepare quarterly reports on the productivity and results achieved by each Field Division.

7. Direct the National Licensing Center to develop an adverse action tracking system to monitor the progress and timeliness of FFL denials and revocations from the time an Inspector makes a recommendation until the proceedings are finalized.

U.S. Department of Justice                                         xii
Office of the Inspector General
Evaluation and Inspections Division

8. Continue coordinating with the Department of Justice, Office of Legislative Affairs, to gain the authority to suspend or impose civil penalties on FFLs that violate federal firearms laws.

9. To improve the comprehensiveness of crime gun tracing by law enforcement agencies:

    a. Coordinate with the Office of Justice Programs to determine the feasibility of using discretionary grant funding to support crime gun tracing.

    b. Develop a model for more accurately identifying potential firearms trafficking through the analysis of an FFL's firearms sales volume and the number of firearms traced to the FFL.

U.S. Department of Justice                                                    xiii
Office of the Inspector General
Evaluation and Inspections Division

---

## TABLE OF CONTENTS

---

**Background**.................................................................................. 1

**Purpose, Scope and Methodology** ...................................................... 14

**Results of the Review**...................................................................... 17

    The ATF Does Not Conduct In-Person Application Inspections on
All New FFLs ...................................................................... 17

    The ATF Does Not Regularly Conduct Compliance Inspections
on Active FFLs, Including Large-Scale Retailers ................................. 20

    ATF Does Not Identify and Inspect All FFLs That Exhibited Indicators
of Potential Violations or Gun Trafficking........................................... 23

    Gun Tracing Has Significant Shortcomings That Limit Its Use for
Identifying FFLs That Should Be Inspected ....................................... 24

    ATF's Field Divisions Implement FFL Inspections Inconsistently......... 28

    Suspected Criminal Violations Are Not Always Referred
for Investigation .................................................................. 37

    ATF Acts Infrequently to Revoke Federal Firearms Licenses
and the Process is Not Timely ............................................. 39

    New ATF Guidelines Begins to Address Inconsistent and
Untimely Adverse Actions ................................................. 43

    By Streamlining and Standardizing Inspections, the ATF Could
Dramatically Improve the FFL Inspection Program ............................ 45

    ATF Does Not Consistently Report Inspection Performance ................ 49

    New Restriction on Retention of Gun Purchaser Data Will Hinder
the ATF's Ability to Detect Fraudulent Background Checks................ 51

**Conclusions** ................................................................ 54

**Recommendations** ........................................................ 56

---

U.S. Department of Justice
Office of the Inspector General
Evaluation and Inspections Division

**Appendix I: ATF Form 4473** ............................................................ 58

**Appendix II: Area Supervisor Survey** ............................................... 60

**Appendix III: ATF Comments on the Draft Report** ......................... 66

**Appendix IV: OIG Analysis of the ATF's Comments** ................ ....... 85

---

# BACKGROUND

---

The Bureau of Alcohol, Tobacco, Firearms and Explosives (ATF) enforces federal firearms laws and regulations, including issuing licenses and overseeing Federal Firearms Licensees (FFLs) and most explosives licensees and permittees. The ATF enforces federal firearms laws, in part, by conducting regulatory inspections of FFLs. These inspections examine whether FFLs are keeping proper records and are taking proper steps to avoid selling firearms to prohibited persons (see inset).

## FFL Licensing and Operational Requirements

To obtain a license for making or selling firearms, applicants must be at least 21 years old and not prohibited from possessing firearms. Applicants are required to notify the chief officer of their local law enforcement agency (LEA) that they intend to apply for a license, and must submit a photograph and a full set of fingerprints with their applications, as well as a statement certifying that their business is in compliance with all state and local laws (including zoning laws). Application examiners at the ATF National Licensing Center (NLC) in Atlanta, Georgia, determine the eligibility of applicants for Federal Firearms Licenses.[13] Fees for federal firearms dealer licenses are $200 for the first three years and $90 for each three-year renewal period.

> **Individuals Prohibited From Purchasing Firearms**
>
> Individuals prohibited by federal law from possessing a firearm include anyone who:
> 1. has been convicted of a crime punishable by more than one year in prison;
> 2. is a fugitive from justice;
> 3. unlawfully uses controlled substances;
> 4. has been adjudicated as mentally defective;
> 5. is an illegal alien, or an alien admitted to the United States under a nonimmigrant visa;
> 6. has been dishonorably discharged from the Armed Forces;
> 7. has renounced his or her American citizenship;
> 8. is a subject of a court order that restrains the person from harassing, stalking, or threatening an intimate partner; or
> 9. has been convicted of a misdemeanor crime of domestic violence.
>
> Individuals under indictment for a crime punishable by more than one year of prison are prohibited from receiving a firearm, but may lawfully possess a firearm they obtained before being indicted.
>
> Source: Title 18 U.S.C. Chapter 44

---

[13] The NLC maintains the Federal Licensing System (FLS) database and is the official repository of firearms and explosives inspection reports. Certain information from inspection reports is captured in the FLS, including dates of inspections and past regulatory enforcement actions taken against FFLs. The NLC also oversees the ATF's Hearing Officer program for conducting adverse action hearings involving FFLs.

---

As of December 2003, there were approximately 104,300 FFLs in the United States, including approximately 65,700 retailers.[14]

Each year, FFLs conduct more than 8.5 million firearms sales.[15] To reduce the availability of firearms to criminals, FFLs are required to verify that potential customers are not prohibited from possessing a firearm and to verify that customers are residents of the state in which the FFL is located. FFLs must verify the identity of potential customers by examining a government-issued identification document, such as a driver's license, and have the customer complete a Form 4473, Firearms Transaction Record, which captures data related to the purchaser and firearm(s) purchased (see Appendix I). The FFLs also contact the Federal Bureau of Investigation (FBI) or a statewide LEA to request that the National Instant Criminal Background Check System (NICS) be queried to confirm that the potential customers are not prohibited from purchasing firearms.[16] Most NICS queries result in an immediate response to the FFL regarding purchaser eligibility. In cases where an immediate response is not given, FFLs are allowed to complete the transaction after three business days if NICS is unable to complete the check within that time. If the purchaser is later determined to be prohibited from possessing a gun, the ATF seeks to remove the gun from the purchaser's possession.[17]

Federal law requires that FFLs maintain completed Forms 4473, as well as a log of all firearms that they have acquired and sold, known as an Acquisition and Disposition Book (A&D Book). The A&D Book must

---

[14] Firearms retailers are issued either Type 1 (storefront retailer) or Type 2 (pawnshop) federal firearms licenses. Other types of FFLs include manufacturers and importers of firearms or ammunition, ammunition dealers, and collectors of curios or relics. Largely as a result of increases in license fees and the ATF's requirement that all FFLs comply with state and local zoning laws, the FFL population has decreased from a high of more than 286,000 in March 2000.

[15] "Federal Bureau of Investigation National Instant Criminal Background Check System 2001/2002 Operational Report," FBI Publication, May 2003.

[16] The Brady Handgun Violence Prevention Act, Public Law 103-159, Title 18 U.S.C. § 922(s). The NICS, operated by the FBI, was created to facilitate the required background checks. FFLs can also query NICS via the Internet, through the FBI's NICS E-Check system.

[17] ATF Special Agents attempt to remove the firearm from the prohibited person's possession by informing the purchaser of his or her "prohibited status" and offering options for them to surrender the firearm. Options include returning the firearm to the FFL that sold it, transferring the firearm to a non-prohibited third party, or surrendering the firearm to an LEA.

---

contain information including a description of the firearm, the name and address of the person from whom the firearm was acquired and, once sold, the name and address of the purchaser and the date the gun was sold.[18] FFLs also are required to report sales of multiple handguns to the same purchaser.[19] Combined, these record-keeping requirements are intended to deter the illegal transfer of firearms to prohibited persons.

The records kept by FFLs also enable the ATF to trace firearms recovered by LEAs to learn when those firearms were purchased and by whom. According to the ATF, less than 5 percent of firearms are used in violent crimes by the person who originally purchased the gun from an FFL. Guns used in violent crime are generally acquired through a secondary market of traffickers and "straw purchasers" (individuals that buy firearms for prohibited individuals).[20] Nonetheless, tracing is a significant investigative tool because it can provide investigators leads to the subsequent purchaser(s) of the firearm.

**The ATF's FFL Inspection Program**

The ATF's FFL inspection program uses a cadre of Inspectors to verify that FFLs are complying with federal firearms laws and that tracing data provided by FFLs are accurate and timely. The Inspectors do not have the authority to arrest individuals, do not carry firearms, and do not conduct criminal or undercover investigations. Before the enactment of the Homeland Security Act of 2002, the ATF had 567 Inspectors.[21] As directed by the Homeland Security Act, in February 2003 the tax and regulatory responsibilities of the ATF were split, and most regulatory functions were transferred from the Department of the

---

[18] If a firearm is obtained from another FFL, the FFL receiving the firearm can enter the other licensee's FFL number instead of the name and address of the previous owner. Sales must be recorded in the A&D Book within seven days from the time the Form 4473 is completed.

[19] According to Title 18 U.S.C. § 923(g), an FFL must submit a "Report of Multiple Sale or Other Disposition of Pistols and Revolvers," to the ATF if an individual purchases more than one handgun within a period of five consecutive business days.

[20] An unlicensed individual may sell a firearm to an unlicensed resident of his or her State, if the buyer is not prohibited by law from receiving or possessing a firearm, or to a licensee in any State (Title 18 U.S.C. § 922).

[21] Testimony of ATF Director Bradley Buckles to the Senate Committee on the Judiciary, June 11, 2002.

---

Treasury to the Department of Justice.[22]  The new title of the agency within the Department of Justice became the Bureau of Alcohol, Tobacco, Firearms and Explosives.  As of August 2003, the ATF had 498 Inspectors.  Of the 498 Inspectors, approximately 420 were assigned to Industry Operations groups located throughout the ATF's 23 Field Divisions.  The remaining Inspectors were assigned to the ATF Headquarters and various management positions.

A typical ATF Field Division structure included a Special Agent In Charge to oversee the operations of the office, a Director of Industry Operations (DIO), and two or three Area Offices, which were managed by an Area Supervisor.  Most Field Divisions also had at least one Senior Operations Inspector to assist with large-scale FFL inspections (Figure 1).



**Figure 1: Field Division Organization Chart**

Source:  ATF Field Operations Directorate.

To implement the FFL inspection program, ATF Inspectors conduct four different types of inspections:

- *Application inspections* verify that an applicant for a federal firearms license is eligible for a license and agrees to follow federal laws related to buying and selling firearms.  These inspections may be conducted either over the telephone or in-person.  The Inspectors interview the individual applying for the license and,

[22] The Act created the Alcohol and Tobacco Tax and Trade Bureau (TTB) within the Department of the Treasury to administer and enforce existing federal laws and tax code provisions related to alcohol and tobacco products.  According to the ATF, about 60 Inspectors and 19 attorneys accepted positions at the TTB.  As a result of a Memorandum of Agreement between the ATF and the TTB, an additional 40 Inspectors were detailed from the ATF to the TTB for seven months, from March through September 2003.

during in-person inspections, also interview store employees. According to ATF Headquarters officials, the ATF focuses on conducting application inspections on new businesses and generally does not inspect new collectors. [23]

- *Compliance inspections* examine whether an FFL is complying with federal firearms laws, including ensuring that Forms 4473 (Firearms Transaction Record) and A&D Books are maintained accurately. Except in very limited circumstances, the ATF is prohibited by law from inspecting an FFL more than once a year.[24]

- *Renewal inspections* verify the accuracy of renewal application information and determine if an FFL's license should be renewed. The ATF categorizes all renewal inspections as compliance inspections for performance measurement purposes, although they are generally less rigorous than other compliance inspections.

- *Limited purpose inspections* are narrowly scoped inspections conducted for a specific purpose. For example, an Inspector may visit a store to review and approve an FFL's new inventory software or to examine Forms 4473 for a particular firearm used in a crime. The ATF categorizes all limited purpose inspections as compliance inspections for performance measurement purposes.

According to the ATF's published reports and draft reports provided to the OIG, Inspectors conducted 5,497 application inspections during fiscal year FY 2001, 7,229 application inspections in FY 2002, and 8,422 application inspections in FY 2003. The ATF has also reported that Inspectors conducted 5,016 compliance inspections in FY 2001, 5,802 compliance inspections in FY 2002, and 6,481 compliance inspections in FY 2003 (Figure 2). [25]

---

[23] A collector's license enables individuals to make interstate sales and purchases of firearms classified by the ATF as curios and relics to facilitate a personal firearms collection.

[24] Firearms Owners Protection Act of 1986, Public Law 99-308, Title 18 U.S.C. Chapter 44.

[25] As described in the results section of this report, inspection data in the ATF's inspection tracking database do not support these published numbers. According to the inspections database, ATF Inspectors conducted 5,729 application inspections and 4,035 compliance inspections in FY 2001; 8,123 application inspections and (cont.)



Source: *Firearms in Commerce in the United States 2001/2002, ATF 2003 Performance and Accountability Report,* ATF Firearms Programs Division.

## The ATF's Regulatory Enforcement Actions

When the ATF finds that an FFL has violated the Gun Control Act or its implementing regulations, it may take one of several actions.[26]  For minor infractions (e.g., missing ZIP code on a Form 4473), the FFL may be given a Report of Violations, which notifies the FFL of violations that should be corrected.  For more serious infractions, the FFL may be sent a

---

4,581 compliance inspections in FY 2002; and 8,043 application inspections and 5,887 compliance inspections in FY 2003, rather than the previously reported totals.

[26]  In the context of the Gun Control Act, willfulness is the intentional disregard of, or plain indifference to, legal obligations (Title 18 U.S.C. § 924).  It can be demonstrated through repeat violations (especially where there was notification of prior violations) or large numbers of violations.  Sometimes one egregious violation, such as a straw sale to a prohibited person, can demonstrate willfulness (ATF B 5370.1 p.2).

warning letter, or it may be directed to attend a warning conference. At a warning conference, an FFL is notified that it must correct its practices or lose its license. For severe or repeat violations deemed willful, the ATF may revoke or deny renewal of the FFL's license.

The revocation process begins when an ATF Inspector recommends revocation because of severe or repeated violations. If the Area Supervisor approves the Inspector's recommendation, the inspection report and supporting documentation are submitted to the DIO. After consulting with the Division Counsel, the DIO can issue an Initial Notice of Revocation. If an Initial Notice of Revocation is issued, the FFL has 15 days to appeal the proposed revocation and request a hearing. Revocation hearings are conducted in the field by ATF Inspectors who are specially trained to act as Hearing Officers. As of September 1, 2003, 23 Inspectors served as Hearing Officers as a collateral duty to their regular tasks and 11 additional Inspectors had completed training to become Hearing Officers. Hearing Officers are assigned from Field Divisions other than the Divisions proposing the revocation. At the hearing, the Hearing Officer examines the facts and hears testimony from the ATF and the FFL. After the hearing, the Hearing Officer prepares a report of findings and recommendations for the DIO.

> **FFL Education Efforts**
>
> In addition to regulatory enforcement, the ATF educates FFLs and others on federal firearms laws through seminars and programs. In FY 2002, the ATF conducted 183 "commodity seminars" for FFLs, LEAs, and the public. At many of these seminars, the ATF supplied FFLs with the "Don't Lie For the Other Guy" packet prepared by the National Shooting Sports Foundation. The packet includes a poster, pamphlet, and a videotape to help FFLs identify firearms traffickers. As of October 2003, approximately 23,000 FFLs had received the packet.

After receiving the Hearing Officer's report, the DIO can allow the FFL to retain his license, or issue a Final Notice of Revocation. If a Final Notice of Revocation is issued, the FFL has 60 days to appeal the revocation to U.S. District Court. If the FFL appeals, the ATF routinely submits a Motion for Summary Judgment asking the Court to uphold the agency's determination.

In FY 2002, Inspectors conducted 25 revocation hearings. Of those, 22 resulted in the revocation of the FFL's license. The number of revocation hearings increased to 87 during FY 2003.[27]

Other than issuing warning letters, holding warning conferences, and revoking licenses, the ATF has few enforcement options. As of

---

[27] As of March 1, 2004, most of these cases were still pending.

March 2004, the ATF had very limited authority to impose fines and suspend an FFL's license.[28] This limited authority can occur only under a specific circumstance where an FFL failed to conduct a NICS check and, had the check been conducted, it would have discovered that the customer was a prohibited person. As an alternative to revoking licenses, as of March 2004 the ATF's General Counsel was seeking, through the Department of Justice Office of Legislative Affairs, the authority to suspend or fine FFLs who violate firearms laws.

**The ATF Firearms Tracing Program**

In 1994, the ATF consolidated its tracing activities at the National Tracing Center (NTC) in Falling Waters, West Virginia. The NTC traces the purchase histories of "crime guns" recovered by federal, state, local, and international LEAs.[29] The ATF defines a "crime gun" as any firearm that is "illegally possessed, used in a crime, or suspected by law enforcement officials" of having been used during the commission of a crime. Crime gun tracing data can identify potential firearms trafficking and unlawful business practices by FFLs. The ATF has the following tracing-based indicators of firearms trafficking:

- <u>Short Time-to-Crime</u>. The recovery of a crime gun within 2 to 3 years after its initial purchase is considered a short time-to-crime and a significant trafficking indicator. According to the ATF, about one-third of crime guns were recovered within 3 years of their first retail purchase. The short time from retail sale to use in a crime "suggests illegal diversion or criminal intent associated with the retail purchase from the FFL."[30]

- <u>Multiple Sales of Handguns</u>. According to the ATF, 20 percent of all handguns traced in 2000 had been originally purchased as part of a multiple handgun sale. FFLs are required to report multiple handgun sales to the NTC.

---

[28] Title 18 U.S.C. § 922 states "the Attorney General may, after notice and opportunity for a hearing, suspend for not more than 6 months or revoke any license issued to the licensee under Section 923, and may impose on the licensee a civil fine of not more than $5,000."

[29] International trace requests are received directly from foreign law enforcement agencies via fax or through electronic transmission from ATF Country Attaché offices in Colombia, Mexico, and Canada. From January 1, 2003, to March 31, 2003, NTC traced 8,108 firearms for foreign governments.

[30] "Crime Gun Trace Reports (2000)," ATF, July 2002.

In requesting a trace of a crime gun, an LEA supplies the ATF with information including the make, model, serial number, and other identifying characteristics of the gun and the circumstances of its recovery.[31] Using that information, an ATF analyst contacts the manufacturer of the firearm to determine which FFL purchased the gun. The analyst then contacts the FFL identified by the manufacturer to obtain information on the retail purchaser from the appropriate Form 4473 and A&D Book entry. FFLs are required by law to respond to firearms trace requests from the ATF within 24 hours.[32] According to the NTC Director, the NTC performed 232,272 firearms traces in FY 2001, 240,651 firearms traces in FY 2002, and 280,947 firearms traces in FY 2003.[33] The NTC defines a successful trace as one in which the initial retail purchaser of the crime gun is identified. According to the NTC Director, 50 to 60 percent of traces requested in FY 2003 succeeded.

Trace data can be categorized to identify those guns that are most often used in crime. For example, in 2000 the Smith & Wesson .38 caliber revolver was the most frequently traced firearm recovered by LEAs.[34] Using trace information, the NTC offers several analytical products to LEAs, such as:

- statistical analyses to identify indicators of firearms trafficking;

- data on potential violations of regulations, such as unreported multiple sales of handguns, stolen firearms, and firearms with obliterated serial numbers; and

---

[31] Each firearm made in or imported to the United States must possess a serial number "which may not be readily removed, obliterated, or altered" and must be unique to each firearms manufacturer or importer.

[32] Title 18 U.S.C. § 923(g)(7).

[33] The Youth Crime Gun Interdiction Initiative (YCGII) program, currently operating in 60 cities, is the ATF's major initiative to encourage LEAs to trace recovered firearms. The program has been successful at increasing the number of firearms trace requests submitted to the ATF by LEAs participating in the program. To join the YCGII program, LEAs must sign a Memorandum of Understanding (MOU) with the ATF in which the LEAs agree to make comprehensive firearms tracing a "primary goal and objective" of their agencies. The ATF funds FFL inspections in these cities through YCGII appropriations.

[34] "Crime Gun Trace Reports (2000)," ATF, July 2002.

- data on firearms transaction records received from FFLs that have ceased business operations.[35]

Demand Letter Programs.  Because some FFLs either ignored trace data requests or were unable to provide NTC analysts with purchaser information from Forms 4473 and their A&D Books, the ATF initiated the Demand Letter I Program in February 2000.  The Demand Letter I Program covers FFLs deemed "Uncooperative" by NTC officials because they failed to provide the ATF with purchaser information.  FFLs deemed "Uncooperative" are required to submit all Forms 4473 for the previous three years and to continue to submit these Forms on a monthly basis until the ATF determines that they are cooperating.  Forty-one FFLs were originally placed in this category.  As of April 2004, no FFLs were designated as uncooperative.

Also in February 2000, the ATF initiated the Demand Letter II Program to address FFLs with frequent short time-to-crime traces.  The Demand Letter II Program requires FFLs with 15 or more traces of guns within 3 years of initial purchase to submit information quarterly on previously owned firearms acquired from non-FFLs.  Originally, 430 FFLs were placed in this category.[36]  As of April 2004, 271 FFLs were in this category.  The actual "Demand Letter" sent to FFLs states that if the FFLs do not respond to the NTC's requests for firearms tracing information, the FFLs' licenses could be revoked.  The NTC forwards lists of FFLs subjected to either Demand Letter program to ATF Field Divisions on an annual basis.

Firearms Trafficking Analysis.  The ATF's Crime Gun Analysis Branch (CGAB), co-located with the NTC in West Virginia, analyzes data from crime gun traces, multiple sales, and firearms thefts, and provides firearms trafficking analysis to Inspectors, Special Agents, and LEAs.  The CGAB uses crime gun data maintained by the NTC to focus on specific U.S. geographic areas in which firearms trace patterns indicate firearms trafficking.[37]  For example, CGAB analyzes tracing data to determine the geographic areas where crime guns were recovered, a

---

[35]  By law, FFLs are required to provide their firearms transaction records to NTC when they go out of business (Title 18 U.S.C. § 923(g)(4)).  The NTC is the only federal repository for this data.

[36]  Originally, FFLs with ten or more short time-to-crime traces were included in this category.

[37]  The CGAB is a unit of the Intelligence Programs Division, which is under the Office of Strategic Intelligence and Information.

process known as geo-mapping. This information is shared with LEAs, to enable them to better focus their law enforcement activities.

The CGAB also develops numerous statistical and informational products. For example, "master queries" of all crime guns traced nationwide (grouped by county) can be used to identify FFLs that should be inspected. The "NTC Weekly Queries of FTS Data," disseminated to all users of the CGAB's electronic database, shows "firearms trafficking indicators," such as firearms purchased as part of a multiple sale. The CGAB also develops investigative leads that are researched and forwarded to the appropriate ATF Field Division, and it provides information and support to promote the tracing of all recovered crime guns by LEAs across the United States. Finally, the CGAB monitors and forwards to ATF agents information on theft reports, firearms traces, and multiple sale transactions from FFLs that are under investigation.

In FY 2002, CGAB provided firearms tracing data for 1,639 FFLs and completed 46 geo-mapping projects for ATF Field Divisions (see Figure 3 on page 13). The CGAB also researched and forwarded 138 referrals to ATF Field Divisions for potential investigations based on accumulated firearms tracing data, and was given authority over ATF's program to "raise" obliterated serial numbers on recovered firearms.[38]

Regional Crime Gun Centers. In 1996, the ATF began to establish Regional Crime Gun Centers (RCGC) in cities in which gun violence presented a significant public risk and high amounts of crime guns were recovered. Before the establishment of the RCGCs, the NTC's ability to provide crime gun analysis for these areas and the rest of the country was, according to the NTC Director, "limited" compared to the micro-analysis conducted at RCGCs. The NTC now oversees RCGCs in Chicago, Los Angeles, New York, and Washington, D.C.[39] The RCGCs are organizationally part of the local ATF Field Division and serve as a liaison and local analysis unit for crime gun tracing for local LEAs.

Disclaimer on the use of firearms tracing data: Section 630 of the Fiscal Year 2004 Consolidated Appropriations Act mandates that the ATF and all federal government agencies which use trace data in a report clearly state the shortcomings of trace data, as follows:

---

[38] "CGAB Performance Indicators," FY 2002.

[39] We visited RCGCs in Chicago and Los Angeles during our fieldwork. At a third field site, in Miami, ATF personnel told us that the Miami Field Division is establishing a "gun intelligence center" similar to a RCGC.

Firearm traces are designed to assist law enforcement authorities in conducting investigations by tracking the sale and possession of specific firearms. Law enforcement agencies may request firearms traces for any reason, and those reasons are not necessarily reported to the federal government. Not all firearms used in crime are traced and not all firearms traced are used in crime. Firearms selected for tracing are not chosen for purposes of determining which types, makes or models of firearms are used for illicit purposes. The firearms selected do not constitute a random sample and should not be considered representative of the larger universe of all firearms used by criminals, or any subset of that universe. Firearms are normally traced to the first retail seller, and sources reported for firearms traced do not necessarily represent the sources or methods by which firearms in general are acquired for use in crime.

## Figure 3: Sample ATF Gun Recovery Geo-Map



Source: ATF Southern California Regional Crime Gun Center.

## PURPOSE, SCOPE, AND METHODOLOGY

### Purpose

The Office of the Inspector General (OIG) conducted this review to assess the effectiveness of the ATF's program for inspecting FFLs and to examine how this program assists in enforcing federal firearms laws.

### Scope

The scope of this review included examining histories for firearms retailers categorized either as Type 1 or Type 2 dealers. We did not review inspection histories of FFLs issued other license types, such as those issued licenses for producing or importing firearms and ammunition, or collectors of curios or relics. We also reviewed inspection histories for FFLs whose licenses were revoked or are in the process of being revoked. Inspection histories included application information, inspection worksheets, and Inspector reports, as well as reports and memoranda related to any regulatory action taken by the ATF against the FFL. However, we reviewed the impact of all license types on inspection activities, including workload and inspection outcomes.

The ATF provided us with access to the two electronic information systems containing licensee information, inspection information, and reports – the Federal Licensing System (FLS) and N-Spect. To assist in our assessment of how ATF officials target which FFLs to inspect, the ATF also provided us with access to two electronic information systems containing information on firearms tracing – the Firearms Tracing System (FTS), and Online LEAD.

### Methodology

<u>Interviews</u>. We conducted in-person and telephone interviews with personnel from ATF Headquarters, ATF Field Divisions, United States Attorneys' Offices, law enforcement agencies (LEAs), firearms retailers, and advocacy groups. Specifically, we interviewed individuals from ATF's Firearms, Explosives and Arson Directorate, Field Operations Directorate; Office of Inspections; Office of the Chief Counsel; and National Tracing Center. We spoke with Assistant United States Attorneys (AUSAs) assigned to prosecute firearms-related offenses and to Project Safe Neighborhood Coordinators, who are the AUSAs who coordinate most firearms-related prosecutions. We spoke with law enforcement officials assigned to firearms-related cases, and to those

responsible for submitting crime gun trace requests. We spoke with a statistician who has worked with National Tracing Center data. We also interviewed a California Department of Justice official responsible for overseeing that state's firearms licensee inspections program.[40]

We spoke with three firearms retailers; representatives from Taurus International, a firearms manufacturer; and a representative from the National Association of Firearms Retailers. We also interviewed officials from two advocacy groups – the National Rifle Association and the Brady Center to Prevent Gun Violence.

Field Site Visits. As part of our fieldwork, we interviewed personnel and reviewed FFL inspection files at four of the ATF's 23 Field Division offices – Miami, Chicago, Los Angeles, and Seattle.[41] We chose these sites based on their geographic location, size, local crime trends, and distribution of firearms inspection work. While at these locations, we also interviewed local law enforcement officials and AUSAs to discuss criminal prosecutions of FFLs and related issues. We reviewed 100 randomly selected inspection files to determine when the FFL was issued a license to sell firearms, the frequency of ATF inspections, the extent and intensity of those inspections, violations detected during those inspections, and actions by ATF against the FFL.[42] We also reviewed FFL files for which the ATF revoked or was in the process of revoking the FFL's license. We also observed one FFL compliance inspection.

Data. We relied on ATF electronic databases for information on FFLs, inspections, Inspector work hours, and firearms tracing data, but we noted discrepancies in the data, as detailed in the results section of this report. After discussing the data discrepancies with ATF Headquarters officials, we concluded that the N-Spect data were the most accurate information for examining the numbers of inspections conducted and the direct work hours expended for compliance and applications inspections. However, the Standard Time and Attendance System (STATS) database was the only data source available that included all staff time. We therefore used this database to analyze

---

[40] California, which issues its own state firearms licenses, is one of the few states with its own licensee inspection program.

[41] We also visited the Field Division in Washington, D.C., to test our methodology and data collection instruments.

[42] We used Microsoft Excel to generate random numbers associated with FFL numbers for the Field Divisions we visited. We used FLS to generate these FFL numbers based on our inspection criteria.

---

staffing requirements.[43]  We also examined the N-Spect data to determine whether the variances affected our findings and confirmed that the variances in inspection productivity and implementation remained regardless of which data run we used.  We used FLS to determine FFL licensing histories and N-Spect to analyze Inspector assignments and reports.  We used information from the STATS and N-Spect to examine Inspector workload.  We used FTS to determine trace histories of firearms sold by FFLs, and Online LEAD to review potential firearms trafficking patterns.

We also collected and analyzed prosecution data from the Executive Office for United States Attorneys; ATF budget requests from FY 2002 through FY 2005; internal ATF memoranda; ATF annual and periodic reports; transcripts of congressional testimony by ATF officials; judicial decisions; General Accounting Office reports on NICS; a Congressional Research Service report on the potential of terrorist access to firearms; a University of California, Los Angeles, study; and Department of the Treasury Office of the Inspector General reports on the ATF's FFL and explosives inspection programs.  Finally, we reviewed the laws and regulations applicable to the ATF's oversight of FFLs.

Area Supervisor Survey.  We conducted an e-mail survey of Area Supervisors – those ATF personnel who assign FFL inspections and approve inspection reports – to determine their views on ATF's FFL inspection program, "crime gun" tracing, and Inspector resources (see Appendix II).  Forty-five of 50 Area Supervisors replied by e-mail or fax, a response rate of 90 percent.

---

[43] We also used the STATS data for examining staffing needs, since that was the data that the ATF relied on to prepare the *Inspector Staffing Requirements for the Bureau of Alcohol, Tobacco, Firearms and Explosives* report for the Justice Management Division and Congress.

## RESULTS OF THE REVIEW

**The ATF's FFL inspection program is not as effective as it should be for ensuring public safety by quickly identifying and revoking the licenses of FFLs that violate federal firearms laws. The ATF does not inspect all applicants in person before licensing them to become firearms dealers, compliance inspections of FFLs (including large-scale retailers) were infrequent, and we found wide variations in productivity and program implementation among the ATF's Field Divisions. Moreover, the ATF does not identify and conduct compliance inspections on all FFLs that exhibit indicators of gun trafficking. Finally, even when numerous or serious violations were found, the ATF did not consistently take adverse actions, refer FFLs for investigation, or conduct timely follow-up inspections. We concluded that the ATF should streamline and standardize its FFL inspection procedures to improve the effectiveness of the FFL inspection program for ensuring that FFLs comply with federal firearms laws.**

## The ATF Does Not Conduct In-Person Application Inspections on All New FFLs to Verify Applicant Information and Ensure That They Understand Firearms Laws

According to ATF Field Operations Directorate officials, application inspections are critical for ensuring compliance with federal firearms laws.[44] Application inspections not only enable the ATF to better ensure that the applicant is eligible for a federal firearms license, but also provide the new dealer an opportunity to ask ATF Inspectors questions and discuss with them issues related to firearms laws. Further, the ATF officials said that if an FFL violates federal firearms laws after having received an application inspection, it is easier for the ATF to meet the legal standard of demonstrating that the violations were "willful" in order to take adverse action.

---

[44] When an individual applies for a license to become a firearms dealer, the ATF has 60 days after the completed application is received by the NLC to either issue a license or deny the application (Title 18 U.S.C. § 923(d)(2)).

According to the ATF's N-Spect database, which tracks inspections activity, the ATF conducted 8,123 application inspections in fiscal year (FY) 2002. According to the ATF's FLS database, which tracks all firearms licenses issued by the NLC, there were 15,359 newly licensed FFLs in FY 2002.[45] Of that number, 7,977 were licenses issued for firearms businesses and 7,382 were issued to firearms collectors. By examining the "inspection date" field included in the FLS record for each FFL, we found that most (95 percent) of the FFLs that were inspected were businesses, not collectors.[46] Therefore, the data available to us indicates that in FY 2002 the ATF inspected the preponderance of new firearms retailers.

However, our interviews and survey of ATF Headquarters and Field Division personnel found that many of those application inspections consisted only of a telephone call rather than an in-person visit. Ten of the 45 Area Supervisors we surveyed (22 percent) said that, because of limited Inspector resources, they directed Inspectors to perform at least some application inspections by telephone. One Area Supervisor stated that he assigned telephone application inspections because some applicants were located as far as 400 miles from his Area Office. He said that, in those cases, he tries to schedule an in-person compliance inspection for the following year, but cannot guarantee that it will occur.

ATF Headquarters officials, DIOs, Area Supervisors, and Inspectors told us that application inspections conducted by telephone are not as comprehensive as in-person inspections. For example, one important action Inspectors take during in-person inspections is to interview individuals who will work for the FFL. When application inspections are conducted by telephone, the Inspectors do not routinely interview store employees.

Subsequent to the initiation of this review, in an October 8, 2003, memorandum to ATF Field Divisions, the ATF Assistant Director for Firearms, Explosives, and Arson issued new guidance on application inspections. The new guidance stated that the ATF's goal is to inspect all

---

[45]   This includes all FFLs, including holders of the Type 3 collector license. A collector's license enables individuals to make interstate sales and purchases of firearms classified by the ATF as curios and relics to facilitate a personal firearms collection. ATF officials told us that they do not place a high priority on inspecting new firearms collectors.

[46]   The inspection date field was blank in 70 percent of the records, because no inspection was done, the inspection report had not been forwarded by the Field Division, or the report information had not been entered by the NLC. However, of the 4,722 records that had inspection dates, 4,493 (95 percent) were businesses.

new FFL applicants to ensure that they understand federal firearms laws before issuing them a federal firearms license. The memorandum established as an initial milestone that "Inspectors should ensure that <u>all new applicants</u> receive onsite inspections" at 14 select cities (emphasis in original).[47]

After receiving a draft of this report, the ATF attempted to more precisely determine the number of inspections conducted by telephone. Although in 2002 the N-Spect system did not capture the method by which an inspection was conducted, ATF's Field Management Staff attempted to estimate the number of application inspections conducted by telephone by querying the database to identify application inspections with words such as "telephone" or "phone" in a "Special Instructions" data field. The results of that query indicated that about 4 percent of application inspection records had such remarks. However, because there was no direction to the field to ensure consistent entry of inspection methods, and because words such as "telephone" could be entered for reasons other than to specify the inspection method, we found these results unreliable.

Although the new goal established in the October 8, 2003, memorandum is a step in the right direction, the ATF still does not comprehensively inspect all new applicants in person. Therefore, it cannot verify the accuracy of the information that each applicant provided to the NLC to become an FFL. Further, foregoing an in-person inspection means that the applicants' opportunity to ask questions of ATF Inspectors is limited. While FFLs should understand and follow the law, ATF personnel said that if an FFL fails to comply with federal firearms laws, the lack of an application inspection makes it harder for the ATF to meet the legal standard of proving that the violation was "willful" in order to take adverse action.

---

[47] After receiving a draft of this report, the ATF attempted to more precisely determine the number of inspections conducted by telephone. Although in 2002 the N-Spect system did not capture the method by which an inspection was conducted, ATF's Field Management Staff attempted to estimate the number of application inspections conducted by telephone by querying the database to identify application inspections with words such as "telephone" or "phone" in a "Special Instructions" data field. The results of that query indicated that about 4 percent of application inspection records had such remarks. However, because there was no direction to the field to ensure consistent entry of inspection methods, and because words such as "telephone" could be entered for reasons other than to specify the inspection method, we found these results unreliable.

**The ATF Does Not Regularly Conduct Compliance Inspections on Active FFLs, Including Large-Scale Retailers**

According to the ATF Director, for the ATF to ensure compliance with federal firearms laws, FFLs should receive a compliance inspection at least once every three years. However, the ATF is currently unable to even begin to meet that goal. We found that most FFLs are inspected infrequently or not at all. ATF workload data show that the ATF conducted 4,581 FFL compliance inspections in FY 2002, or about 4.5 percent of the approximately 104,000 FFLs nationwide.[48] At that rate, it would take the ATF more than 22 years to inspect all FFLs.

We reviewed inspection history files for a sample of 100 FFLs that had been in business for an average of 11.2 years, and verified that they did not receive regular compliance inspections (Figure 4).[49] Specifically:

- In 23 cases, the records showed that the ATF had never conducted a full compliance, application, or renewal inspection on the FFL.[50] On average, the FFLs that had never been inspected had been selling firearms for 8.6 years.

- In 22 cases, the ATF had conducted an application inspection, but had conducted no further inspections of the FFL. On average, these FFLs had been selling firearms for 5.1 years.

- In 29 cases, the ATF had conducted at least one compliance inspection on the FFL. Among those 29 cases were 9 cases in which the ATF conducted additional follow-up compliance inspections, including 2 in which the ATF later conducted a third compliance inspection. These compliance inspections occurred, on average, about once every 9.2 years. On average, the FFLs had been selling firearms for 14.8 years.

- In 26 cases, the ATF had never conducted a compliance inspection at the FFL, but had conducted at least one renewal

---

[48] For the purposes of our review, we relied upon FY 2002 data for ATF Inspector workload activities.

[49] Due to limitations in the NLC database of FFL information, we could only determine dates for when the ATF issued a federal firearms license for 87 of the FFLs in our sample. The "average time in business" was calculated using these FFLs' records.

[50] At some of these FFLs, limited purpose inspections had been conducted, but no full compliance, application, or renewal inspections were conducted.

inspection. These renewal inspections occurred, on average, about once every 6.9 years. On average, these FFLs had been selling firearms for 15.1 years.



**Figure 4: FFL Inspection File Review Analysis**

- 23% ■ No record of inspection
- 22% ■ Application inspection only
- 29% □ At least one compliance inspection
- 26% □ At least one renewal inspection, but no compliance inspection

Source: ATF inspection history files

Large-scale retailers sell a higher volume of guns than small dealers. Despite the potential for large numbers of improper sales, we found that large-scale retailers also are not inspected on a routine basis. Our sample showed that the ATF conducted compliance inspections on large-scale national and regional chain retailers such as Wal-Mart, Sports Authority, or Big 5 (a sporting goods chain with 293 stores throughout 10 western states) with about the same infrequency as small dealers. The five Area Supervisors we interviewed told us that they avoid selecting large FFLs for compliance inspections because the large volume of records makes the inspections more difficult and time-consuming.

The nine large-scale retailers in our sample were inspected about once every 9.9 years, versus once every 9.2 years for the overall sample.[51]

Further, we found that the 9 large-scale retailers included in our sample were only slightly more likely to have been subjected to a compliance inspection than the average FFL, with 33 percent (3 of 9) having received at least one compliance inspection, versus 29 percent of FFLs overall.[52]  Of the nine large-scale retailers we reviewed:

- One had not been inspected since receiving its license in 1985.

- Four had received only an application inspection.

- One had received a renewal inspection in 1995, the first since receiving a firearms license in 1973, and had not been inspected since 1995.

- Three had received at least one compliance inspection, including:

    o A sporting goods retailer that was last inspected in 1986. According to the inspection report on the 1986 limited purpose inspection the Inspector spent only four hours at the store, a very short amount of time for an inspection.

    o A retailer cited in 1977 for selling ammunition to a minor and for having inventory discrepancies.   In 1985, during the FFL's next inspection, the FFL was cited for selling a rifle to a minor and for numerous Form 4473 violations.  The FFL had not been inspected since 1985.

    o A retailer cited in 2000 for at least one unreported multiple handgun sale and, on seven occasions, not certifying the residency of aliens who purchased firearms.  No follow-up inspection had been done.

---

[51]  Other FFLs in our sample that received compliance inspections included gun shops, pawnshops, gunsmiths, movie industry members, and small-scale FFLs operating out of their homes.

[52] We concluded that more large-scale retailers had been inspected at least once despite having less frequent inspections because they averaged a longer time in business than other retailers in our sample.

Because the ATF does not conduct regular inspections of FFLs, the ATF cannot effectively monitor the overall level of FFL compliance with federal firearms laws and regulations. In December 2003, the ATF initiated a program to conduct special Random Sample Compliance Inspections to develop a risk model for the FFL inspection program. Using data from those inspections, the ATF planned to "be able to project the overall level of compliance by" gun dealers, pawnbrokers, and collectors.[53] While the project to estimate the overall level of compliance with laws is needed to identify the challenges facing the ATF, it cannot take the place of regular compliance inspections for deterring and identifying noncompliance with gun laws.

**The ATF Does Not Identify and Inspect All FFLs That Exhibited Indicators of Potential Violations or Gun Trafficking**

The ATF has not identified all FFLs that exhibit characteristics of violations or firearms trafficking in order to properly manage its range of enforcement activities, as well as to inform the Attorney General, Congress, and the public of the scope of the potential trafficking problem at FFLs. Gun dealers are selected for compliance inspections either by ATF Headquarters (under the Focused Inspection, Demand Letter, or other programs) or by the 23 ATF Field Divisions. Under the Focused Inspection Program, the ATF Firearms Programs Division selects FFLs for mandatory compliance inspections by the Field Divisions. The Chief of the Firearms Program Division told us that the ATF and the NTC generally applied two principal criteria to select the FFLs: data on sales practices by FFLs, such as volume and multiple handgun sales; and time-to-crime for guns traced to that FFL.[54] In FY 2002, ATF Headquarters assigned Focused Inspections on about 350 FFLs, or about 16 per Field Division.

Although the ATF's criteria for selecting FFLs for Focused Inspections targeted those FFLs that most significantly exhibited the established indicators of trafficking (i.e., multiple sales and short time-to-crime), the ATF did not identify or inspect all FFLs that exhibited

---

[53] Memorandum, Assistant Director for Firearms, Explosives, and Arson, to All Special Agents In Charge, December 8, 2003. ATF officials told us that the memorandum was distributed to the Field Divisions in January 2004.

[54] In October 2003, the ATF established new criteria for selecting FFLs for future Focused Inspections: 1) FFLs sent a Demand Letter in FY 2002 or FY 2003; 2) FFLs in cities with a high crime rate and multiple sales meeting certain criteria during calendar years 2001 and 2002; 3) FFLs in high-crime cities that have not been inspected in the previous 10 years; and 4) FFLs that have had a firearm traced to them within the first year of the issuance of their license.

indicators of trafficking. Instead, the NTC Director told us that the ATF established a numerical goal for Focused Inspections based on the resources available, and then changed the criteria to limit the number of FFLs identified to that number (350 in FY 2002). Therefore, the number of FFLs that exhibited indicators of trafficking and therefore should have been inspected was more than the 350 identified.

**Gun Tracing Has Significant Shortcomings That Limit Its Use For Identifying FFLs That Should Be Inspected**

Our review found that the crime gun trace data relied upon by the ATF to target inspections has significant limitations that reduce its effectiveness for identifying FFLs likely to be involved in firearms trafficking. Along with other information, firearms trace data can assist the ATF in identifying those FFLs that may be violating federal firearms laws and should be inspected. Although a trace does not in itself prove that an FFL is involved in gun trafficking, a high number of short time-to-crime sales and other patterns can indicate that an inspection is warranted. In FYs 2001, 2002, and 2003, LEAs submitted an average of a quarter million trace requests to the ATF each year. Table 1 shows the trace requests submitted by the 60 YCGII cities and other LEAs.

| Table 1: Trace Requests Submitted to the ATF | | | |
|---|---|---|---|
| Fiscal Year | Total Firearms Trace Requests | Non-YCGII trace requests | YCGII trace requests |
| 2001 | 232,272 | 133,962  (58%) | 98,310  (42%) |
| 2002 | 240,651 | 144,300  (60%) | 96,351  (40%) |
| 2003 | 280,947 | *(not available)* | *(not available)* |

Source: National Tracing Center

As an indicator of whether the ATF overall used that data to direct its resources at FFLs that should be inspected, we examined whether the Field Divisions that had more gun traces in FY 2001 conducted more compliance inspections in FY 2002. The ATF was unable to provide data on traces *to* FFLs in each Field Division, but was able to provide us with the number of traces *submitted* by LEAs in each Field Division. ATF data shows that the preponderance of crime guns are recovered in the same geographic area in which they were originally sold by an FFL. Therefore, although we recognized limitations in the data, we expected that, if trace data were being used to target inspections at those FFLs that exhibited indicators of firearms trafficking, then higher numbers of trace requests would lead to more inspections in a Field Division. However, we found

little correlation between the number of traces and the number of compliance inspections conducted the next year (Figure 5). This result indicated that the ATF overall did not focus its resources to conduct more inspections in those Field Divisions that had more crime guns traced.



**Figure 5: Comparison of Trace Requests to Inspections**

Note: The ATF could not dissagregate trace data for the Miami and Tampa Field Divisions.

Source: National Tracing Center and Firearms Programs Division Data

Although the ATF does not appear to be systematically conducting more inspections in Field Divisions with more gun traces, the Field Divisions may still use tracing data to select FFLs for those inspections that are not directed by Headquarters. For example, Area Supervisors, who determine FFL inspection assignments for their Area Offices, told us that they use trace data such as time-to-crime of two years or less, firearms with obliterated serial numbers, and multiple sales of handguns to target inspections.

<u>There are limitations to more extensive use of trace data to target inspections</u>. In response to our survey and in interviews, ATF

Inspectors, Area Supervisors, and NTC management explained that tracing data is not fully useful for identifying potential problem FFLs. There are three limitations that reduce the utility of tracing data for targeting inspections. First, all LEAs do not trace all crime guns. Consequently, trace data are skewed toward dealers located in and around cities that participate in the YCGII program. As shown in Table 1 on page 24, about 40 percent of trace requests originate from the 60 YCGII cities, even though only about 15.5 percent of the U.S. population lives in those cities.[55] Therefore, FFLs located in areas where the LEAs do not comprehensively trace crime guns are less likely to have guns traced to them. A Deputy Assistant Director told us that, because of this data limitation, at least three firearms "trafficking corridors" (i.e., routes along which guns from an area with lax firearms laws are illegally transported to an area with stringent firearms laws) are not picked up by tracing data.

Second, because trace data are not controlled for dealer sales volume, an elevated number of traces is not always evidence that an FFL is involved in firearms trafficking. Large-scale FFLs may have more guns traced to them simply because they sell more guns than smaller FFLs. As described to us by ATF Inspectors, a hypothetical FFL selling 40 guns a year of which 8 are subsequently traced as crime guns would be a much greater concern than a dealer selling 2,000 guns of which 15 are subsequently traced. However, the ATF's current database does not include sales volume, and therefore the ATF cannot easily use trace data to identify FFLs that have a high number of traces *for their sales volume*. Consequently, the smaller dealer in the example above would be less likely to be identified for inspection through tracing, despite the fact that 20 percent of the guns it sold became crime guns.

Third, tracing follows a particular firearm's trail from the manufacturer, through the FFL, to the initial purchaser of the firearm. As an Area Supervisor stated, a firearm may have been purchased later by another FFL (such as a pawnshop), "possibly two or three times, before it is actually involved in a crime and traced. The subsequent FFLs do not appear in the trace report."

Although correcting all of the above limitations would be difficult, more LEAs could be induced to comprehensively trace firearms if such tracing were made a condition of relevant Department of Justice grants. The ATF also could collect sales volume information (but not any

---

[55] "Population Estimates for Cities and Towns," U.S. Census Bureau. Population data was current as of July 1, 2002.

personal information) during FFL inspections and enter that data into the NTC database.

　　<u>A recent study indicated that some gun dealers are willing to sell guns to prohibited persons</u>.  The need to better identify the potential universe of dealers involved in gun trafficking and focus inspections on those dealers was highlighted in a 2003 study by the University of California, Los Angeles, School of Public Health.  That independent study found that up to 20 percent of gun dealers exhibited a willingness to help likely prohibited persons obtain guns through straw purchases.[56]  The study used an independent telephone survey to test whether randomly selected FFLs were willing to sell a handgun, regardless of the intended recipient of the firearm.  A total of 120 FFLs were surveyed.  Of those, 87.5 percent said that they would sell a handgun to someone when the caller stated that the handgun was for his or herself, and 72.5 percent said that they would sell a handgun to someone when the caller stated that the handgun was intended to be a gift, both situations in which the sale would be legal.  However, 52.5 percent also said that they would sell a handgun to the caller when told the gun was for a boyfriend or girlfriend "who needs it," a situation in which the FFL should have questioned the legality of the sale.

　　To address concerns that the FFLs may have been "playing along" with the interviewers, 20 additional calls were made after the initial study was completed.  In these calls, the interviewer opened with "My girl/boyfriend needs me to buy her/him a handgun because s/he isn't allowed to."  In 16 of the 20 calls, the dealers correctly informed the callers that they would not sell a firearm to them.  However, four agreed to sell a handgun, even though they appeared to recognize that the sale would be illegal.  Some even offered advice on avoiding the restrictions, stating for example:

1. "What you do with it is your business.  Legally you'd be responsible for it, you're more than welcome to buy one. You can't transfer it to him—I assume he's been turned down";

2. "As long as you have no record, you can come down here and pick one up and put it in your name";

---

[56] Although federal law allows individuals to purchase a firearm as a legitimate gift, it is unlawful to knowingly transfer a firearm to an individual known to be prohibited from possessing a gun.  It also is unlawful for an FFL to knowingly participate in such a straw purchase.

3. "You can do whatever you want after you walk out the door"; and

4. Clerk: "She can't come in, pick one out and you buy it. That's against the law." Interviewer: "I'd come, just me." Clerk: "I'd have no problem with that."[57]

In December 2003 the ATF's Firearms Programs Division randomly selected 760 FFLs for compliance inspections to identify FFL business characteristics that could be used to more effectively target FFLs for compliance inspections. By analyzing FFL business characteristics, such as number of employees and types of firearms sold, the ATF plans on developing a "risk model" based on the types and levels of firearms violations found at the selected FFLs.[58] According to the ATF, the "risk model" will identify those FFLs most likely to be violating federal firearms laws. According to the Chief of the Firearms Programs Division, the ATF may, in the future, modify the FFL Renewal Application form to capture those factors identified by the risk model.

In sum, we disagree with the ATF's practice of limiting its identification of potential traffickers to the number that can be addressed within available resources. Unless the ATF identifies the full universe of FFLs exhibiting indications of firearms trafficking, it is unable to properly manage its range of enforcement activities, or inform the Attorney General, Congress, and the public of the scope of the potential trafficking problem at FFLs.

## ATF's Field Divisions Implement FFL Inspections Inconsistently

During our review of FFL inspection files, we found that the process and amount of time spent conducting application and compliance inspections varied greatly among the ATF Field Divisions. For the 8,123 application inspections and 4,581 compliance inspections conducted by the ATF in FY 2002, the application inspections took an average of 11.8 hours and the compliance inspections took an average of 35.3 hours each. However, we found considerable variation in the average inspection time among the ATF's 23 Field Divisions. Time and workload data from the ATF's N-Spect database showed that the average time that Field Divisions spent conducting each application inspection

---

[57] Buying a Handgun for Someone Else, *Injury Prevention* 2003; 9:147-150, with permission from the BMJ Publishing Group.

[58] We note that the Random Sample Compliance Inspection worksheets do not include information related to the FFLs' firearms tracing histories.

ranged from 6.2 hours in the Kansas City Field Division to 25.5 hours in the Miami Field Division. For compliance inspections, the average inspection length ranged from 24.5 hours per inspection in the Nashville Field Division to 90.0 hours in the Washington Field Division. According to ATF Headquarters officials, the variance was due to Inspectors' discretion in determining the appropriate amount of time to spend examining FFL records. ATF officials also told us that inspection times were affected by the number of inexperienced Inspectors in the Field Divisions.

Our review of the ATF's Inspector Handbook confirmed that Inspectors have the latitude to abbreviate significant portions of a compliance inspection.[59] According to the Inspector Handbook, Inspectors must complete 11 worksheets totaling 23 pages during an inspection. Although the Work Program and worksheets provide extensive direction for data collection, Inspectors are allowed to reduce specific inspection steps. For example:

- The worksheets give ATF Inspectors the discretion to either conduct a full inventory (i.e., a physical count) of the firearms in stock during a compliance inspection, or to sample the FFL's inventory to determine whether the number of "open" A&D Book entries matches the number of firearms at the FFL's place of business. The worksheet provides no guidance to ensure that a valid sample is taken, or how many discrepancies can be found before a full inventory is required.[60]

- The ATF inspection worksheet for examining Form 4473 sales records gives the Inspector the option to conduct a sample review and contains a space for the Inspector to explain the method used to determine how the sample was taken. In our discussions with Inspectors, we found that they did not use a statistical method for determining the number of Forms 4473 to examine. Instead, most Inspectors told us that they examined either a pre-determined number of Forms, or examined Forms

---

[59] The ATF also issues supplemental instructions annually to guide the conduct of the limited number of Focused Inspections directed by Headquarters. In FY 2003, Inspectors were to count all guns in stock and compare that number to the total number of entries in the FFL's A&D book for which the "disposition" column was blank. If those numbers matched, the Inspector was to conduct a limited inventory verification. If discrepancies were found, a full inventory verification was required.

[60] ATF Inspection Worksheet 2 – Inventory. The worksheet asks, "Full count of inventory taken?" and provides a space for the Inspector to answer Yes or No. The worksheet notes, "If no count was taken, state why in findings."

from a specific time frame. For example, in the Miami Field Division, Inspectors said that they were required by their Area Supervisor to review six months of Forms 4473, while Inspectors at the Seattle Field Division said that they were told by their Area Supervisor to examine one year's worth of records.

Our discussions with Inspectors during our site visits also confirmed that Inspectors vary in the depth of their reviews. For example, all 18 Inspectors we interviewed said that they review Forms 4473 as part of the inspection process, but 14 said that they only examine the forms to see if they were filled out properly – not for indications that a purchaser may be part of a firearms trafficking ring or acting as a straw purchaser for someone else (e.g., purchasing patterns, similarities in purchasers' addresses). These 14 Inspectors said that they do not review Forms 4473 for firearms trafficking indicators because it was not a required part of the ATF's inspection process.

> **Case Study: Gun Dealer Avoided Restrictions on Sales To Prohibited Persons**
>
> In June 2002, an ATF inspection was conducted at an FFL in the Seattle Field Division based on information from Special Agents at another Field Division. The inspection found that the FFL had been illegally conducting business at Nevada gun shows in violation of the Gun Control Act. The FFL admitted to inspectors that he had illegally transferred 52 firearms at the gun shows, and that he altered his A&D Book to hide the sales. Furthermore, the FFL admitted to having worked with two out-of-state gun show dealers to allow for firearms sales to be conducted without NICS checks. The FFL told inspectors this was done "because [the FFL] needed the money for...family." As a result of the inspection, the ATF revoked the FFL's license.
>
> Source: ATF case files

Although our interviews and review of the ATF's Inspector Handbook confirmed that Inspectors and their supervisors have the discretion to vary the extent of inspections, we also analyzed ATF performance data to identify any other factors that could be causing the disparity between Field Divisions. Our analysis of ATF data regarding application inspections found that the average time spent conducting application inspections was clearly correlated to the Field Divisions' staffing levels and the number of FFLs located in the Divisions. ATF data showed that Field Division staffing ranged from a high of 35 Inspectors in the San Francisco Field Division to a low of 9 Inspectors in the Baltimore Field Division. The number of FFLs in each Field Division ranged from 8,194 FFLs in the Kansas City Field Division to 1,172 FFLs in the Miami Field Division. However, the ATF had not distributed its Inspector resources among the Field Divisions to match the distribution of FFLs, resulting in significant workload imbalances among the Field Divisions. As shown in Figure 6,

the Field Division that had higher numbers of FFLs to oversee with each Inspector spent less time conducting each application inspection.



Source: ATF workload and performance data

We also examined the ATF's explanation that compliance inspection times were affected by the number of inexperienced Inspectors assigned to each Field Division.[61] As explained by ATF officials, inexperienced Inspectors receive on-the-job training from more experienced Inspectors. During that time, they observe or are observed by the experienced Inspector. Since inexperienced Inspectors are not fully productive, the average inspection time for Field Divisions with more inexperienced Inspectors could be higher. However, as shown in Figure 7, we found there was no correlation between the average time that a Field Division took to conduct compliance inspections and the percentage of inexperienced Inspectors among the Field Division's staff.

---

[61] Trainee Inspectors start at grade 5 on the General Schedule (GS). During their first two years, while at the GS-5 and GS-7 levels, trainees accompany senior Inspectors to observe and assist.



Source: ATF workload and performance data

We also examined several performance indicators to see if the differing inspection times were related to outcomes, such as violations found and criminal referrals. As shown in Figure 8, we found that Field Divisions with longer average compliance inspection times found more instances of violations on each inspection. However, it was unclear whether the longer inspection times resulted from the need to document more violations, or if the greater number of violation instances found resulted from longer inspections.



Source: ATF workload and performance data

To examine whether the variation in average inspection times was due to some Field Divisions taking more time to document noncompliance by FFLs in order to pursue adverse actions, we analyzed whether Field Divisions that took longer to conduct compliance inspections in FY 2002 also took more adverse actions. We found that Field Divisions that had longer average inspection times took slightly fewer adverse actions than Field Divisions that took less time to conduct inspections. Figure 9 shows the average inspection time and number of adverse actions taken for each ATF Field Division.



Figure 9: Comparison of Average Compliance Inspection Time to Adverse Actions, FY 2002

Source: ATF workload and performance data

Our analysis of the ATF Field Divisions' inspection efforts and outcomes also uncovered significant variances in inspection productivity. For example, our analysis of the ATF's FY 2002 workload and performance data found such variances as:

- The number of inspections conducted per Inspector each year ranged from 12.7 (Miami Field Division) to 46.5 (Kansas City Field Division).

- The percentage of the inspections conducted by each Field Division that identified violations varied from 4.5 percent (Kansas City Field Division) to 41.5 percent (Dallas Field Division).

- On inspections where violations were discovered, the average number of instances of violations found on each inspection ranged from 15.9 (Nashville Field Division) to 178.2 (Chicago Field Division).

- The average time that Field Divisions took to find each violation ranged from 47 minutes per violation (Dallas Field Division) to over 7 hours per violation (Los Angeles Field Division).

Inspection hours, violations, and adverse actions taken in FY 2002 are summarized by Field Division in Table 2, on the next page.

The variability in FFL inspections between ATF Field Divisions indicates that inspections are not being conducted according to standardized inspection procedures. Moreover, the excessive variability allowed inefficient and ineffective operations to persist. The ATF's failure to use the limited available Inspector resources efficiently also reduced its capability to carry out regular inspections of all FFLs, which, in turn, reduced the effectiveness of the ATF's FFL inspection program for ensuring FFLs comply with federal firearms laws. Further, the lack of standardization resulted in inconsistent treatment of FFLs in Field Divisions.

We believe that a standardized inspection approach is needed to ensure that FFLs in all Field Divisions are inspected using consistent inspection procedures and sampling criteria. Adopting a standardized inspection process designed to use the minimum review necessary to effectively gauge FFLs adherence to gun laws also would increase the efficiency of the FFL inspection program, and better enable the ATF to provide uniform, regular inspection coverage of the FFL population. An increase in inspection efficiency also would reduce the overall time that Inspectors spend at the FFLs' place of business.

## Table 2 - Inspector Hours, Productivity, Violation Instances Found, and Adverse Actions Taken, FY 2002

| Field Division | Inspectors | FFLs per Inspector | FFLs Within Field Division | Total Inspector Hours (N-Spect Data) | Application Inspections | Compliance Inspections | Inspections per Inspector | Average Hours per Application Inspection | Average Hours per Compliance Inspection | Inspections with Violations | % of Inspections Finding Violations | Violations Instances Found | Violation Instances per Inspection | Inspection Hours to Find Each Violation Instance | Warning Letters | Warning Conferences | Revocations |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Atlanta | 20 | 145 | 2,892 | 8,925 | 300 | 86 | 19 | 9.5 | 70.6 | 57 | 15% | 7549 | 132.4 | 1.18 | 8 | 5 | 1 |
| Baltimore | 9 | 203 | 1,823 | 6,306 | 131 | 107 | 26 | 15.7 | 39.7 | 52 | 22% | 6665 | 128.2 | 0.95 | 3 | 4 | 0 |
| Boston | 17 | 352 | 5,977 | 7,998 | 106 | 106 | 22 | 13.2 | 41.8 | 34 | 9% | 2345 | 69.0 | 3.41 | 2 | 2 | 0 |
| Charlotte | 18 | 239 | 4,295 | 13,326 | 417 | 208 | 35 | 11.5 | 40.9 | 114 | 18% | 8901 | 78.1 | 1.50 | 27 | 6 | 1 |
| Chicago | 23 | 157 | 3,601 | 9,429 | 315 | 151 | 20 | 16.0 | 29.0 | 34 | 7% | 6058 | 178.2 | 1.56 | 8 | 7 | 4 |
| Columbus | 34 | 191 | 6,496 | 17,212 | 472 | 268 | 22 | 11.3 | 44.4 | 140 | 19% | 9517 | 68.0 | 1.81 | 14 | 4 | 3 |
| Dallas | 30 | 186 | 5,581 | 15,951 | 249 | 255 | 17 | 14.7 | 48.2 | 209 | 41% | 20239 | 96.8 | 0.79 | 40 | 21 | 5 |
| Detroit | 18 | 235 | 4,237 | 11,410 | 362 | 228 | 33 | 11.0 | 32.5 | 109 | 18% | 9051 | 83.0 | 1.26 | 8 | 4 | 0 |
| Houston | 16 | 251 | 4,019 | 7,013 | 277 | 169 | 28 | 9.5 | 25.9 | 52 | 12% | 2457 | 47.3 | 2.85 | 6 | 0 | 0 |
| Kansas City | 18 | 455 | 8,194 | 7,889 | 737 | 100 | 47 | 6.2 | 32.9 | 38 | 5% | 3650 | 96.1 | 2.16 | 10 | 5 | 1 |
| Los Angeles | 24 | 116 | 2,790 | 7,040 | 176 | 136 | 13 | 15.6 | 31.6 | 28 | 9% | 995 | 35.5 | 7.07 | 2 | 0 | 0 |
| Louisville | 25 | 131 | 3,287 | 17,629 | 373 | 320 | 28 | 13.9 | 38.9 | 131 | 19% | 8634 | 65.9 | 2.04 | 34 | 11 | 1 |
| Miami | 15 | 78 | 1,172 | 6,679 | 157 | 33 | 13 | 25.5 | 81.0 | 11 | 6% | 1315 | 119.5 | 5.08 | 1 | 0 | 1 |
| Nashville | 23 | 192 | 4,408 | 16,881 | 275 | 565 | 37 | 11.2 | 24.4 | 222 | 26% | 3537 | 15.9 | 4.77 | 62 | 15 | 7 |
| New Orleans | 21 | 225 | 4,724 | 15,912 | 483 | 385 | 41 | 12.4 | 25.8 | 170 | 20% | 11017 | 64.8 | 1.44 | 20 | 14 | 3 |
| New York | 33 | 116 | 3,838 | 15,660 | 359 | 375 | 22 | 14.8 | 27.6 | 84 | 11% | 4477 | 53.3 | 3.50 | 2 | 0 | 0 |
| Philadelphia | 27 | 193 | 5,207 | 11,013 | 434 | 62 | 18 | 14.1 | 79.0 | 23 | 5% | 2082 | 90.5 | 5.29 | 2 | 3 | 1 |
| Phoenix | 15 | 423 | 6,341 | 7,449 | 373 | 144 | 34 | 9.3 | 27.7 | 46 | 9% | 1384 | 30.1 | 5.38 | 2 | 0 | 0 |
| San Francisco | 35 | 109 | 3,815 | 17,099 | 359 | 387 | 21 | 14.7 | 30.5 | 125 | 17% | 8005 | 64.0 | 2.14 | 16 | 0 | 0 |
| Seattle | 21 | 309 | 6,498 | 7,577 | 538 | 85 | 30 | 7.0 | 44.6 | 31 | 5% | 4261 | 137.5 | 1.78 | 4 | 2 | 1 |
| St.Paul | 17 | 453 | 7,709 | 10,780 | 451 | 172 | 37 | 10.1 | 36.2 | 97 | 16% | 4565 | 47.1 | 2.36 | 9 | 4 | 2 |
| Tampa | 22 | 150 | 3,297 | 10,718 | 399 | 185 | 27 | 12.6 | 30.7 | 90 | 15% | 5055 | 56.2 | 2.12 | 5 | 0 | 0 |
| Washington | 17 | 176 | 2,995 | 7,828 | 215 | 54 | 16 | 13.8 | 90.0 | 37 | 14% | 3073 | 83.1 | 2.55 | 4 | 3 | 0 |
| | 498 | | 103,196 | 257,723 | 8,123 | 4,581 | | 11.8 | 35.3 | 1,934 | | 134,832 | 69.7 | 1.9 | 288 | 109 | 30 |

Note: FFL and Inspector data are as of 08/01/03, other data are totals for FY 2002.

U.S. Department of Justice
Office of the Inspector General
Evaluation and Inspections Division

**Suspected Criminal Violations Are Not Always Referred for Investigation**

In addition to documenting regulatory violations, the FFL inspection program also identifies indications of potential criminal activity. Paradoxically, we found that Field Divisions that took longer to conduct inspections made slightly fewer referrals of suspected criminal activity (Figure 10). To analyze this result, we examined the total number of inspections completed by each Field Division and found that Field Divisions that took longer to conduct inspections completed fewer inspections. Further, the data showed that the number of inspections completed was correlated to the number of referrals made, and that taking longer to conduct an inspection made it no more likely that suspected criminal activity would be found and referred. Therefore, Field Divisions that took longer to conduct inspections completed fewer inspections and made fewer criminal referrals.



**Figure 10: Comparison of Average Compliance Inspection Time to Criminal Referrals, FY 2002**

Source: ATF Field Management Staff and ATF Firearms Programs Division

In addition, we found evidence that the coordination between ATF Inspectors and ATF Special Agents could be improved. During our review, we determined that even when FFL compliance inspections identify significant violations of federal firearms laws by the FFLs or by gun purchasers, the violations are often not reported to ATF Special Agents for investigation. In our interviews, 12 of 18 Inspectors said that they rarely refer information gathered during FFL inspections to Special Agents because they did not believe that Special Agents would follow-up on the information. The other six Inspectors told us that they made one or two referrals per year to Special Agents.

We identified several cases where indications of potential criminal violations by FFLs, including gun trafficking, were identified but not referred for investigation. These FFLs were subsequently investigated after the illegal activity was discovered through other means. For example, Inspectors conducted compliance inspections in March 2000 and October 2002 on an FFL located in the southern United States. The 2000 inspection was based, in part, on information from a state LEA. During the 2002 compliance inspection, the Inspector found 40 firearms not entered into the FFL's A&D Book, several missing Forms 4473, and sales to out-of-state residents – all strong indicators of gun trafficking. Despite these findings, the FFL was not reported to Special Agents for investigation. Then, subsequent to the inspections, information from a confidential informant led to an investigation of this FFL. In December 2003, ATF Special Agents arrested the FFL for trafficking firearms.

Further, the latest data available indicate that investigations are not frequently initiated as a result of information provided by ATF Inspectors. In FY 2002 and FY 2003 respectively, Inspectors made 951 and 823 referrals of potential criminal activity identified during compliance inspections, an average of two per field-level Inspector. According to the ATF's *Following the Gun* report, published in 2000, of the 1,530 firearms trafficking investigations conducted from July 1996 to December 1998, just 43 - less than 3 percent - were initiated based on information found during inspections (see Table 3 on next page). Our survey of 45 Area Supervisors also found that few inspections result from information referred to Inspectors by ATF Special Agents. Most Area Supervisors (71.1 percent) said that they assigned five or fewer inspections each year based on information from Special Agents.

In December 2002, the ATF attempted to improve coordination between Inspectors and Special Agents by creating 23 Special Intelligence Inspector (SII) positions (one in each Field Division). The SIIs

are responsible for collecting and disseminating information gathered by Inspectors and Special Agents between the two groups. As of November 2003, only 7 of the 23 authorized SII positions had been filled. Although ATF Headquarters officials said that they plan to fill the positions, as of March 2004 no deadline had been set.

| Table 3: Reasons Cited for ATF Firearms Trafficking Investigations (July 1996 to December 1998) | | |
|---|---|---|
| **Reason** | **Times Cited** | **Percent of Investigations*** |
| Referral from state, local, or federal agency | 409 | 26.7% |
| Confidential informant | 352 | 23.0% |
| Crime gun tracing analysis | 296 | 19.3% |
| Review of multiple sales forms | 205 | 13.4% |
| FFL reported suspicious activity | 139 | 9.1% |
| Developed from another ATF investigation | 127 | 8.3% |
| FFL reports burglary/theft/robbery to ATF | 115 | 7.5% |
| ATF initiated investigation of suspicious activity (e.g., gun show task force, etc.) | 81 | 5.3% |
| → **ATF inspection of FFL** | **43** | **2.8%** |
| Tip by citizen or anonymous source | 37 | 2.4% |
| Other | 9 | 0.6% |

\* Some of the 1,530 investigations cited more than one reason. Therefore, the "Percent of Investigations" exceeds 100 percent.

Source: "Following the Gun," ATF Publication (June 2000).

## The ATF Acts Infrequently to Revoke Federal Firearms Licenses, and the Process is Not Timely

We found that the ATF rarely revokes federal firearms licenses. In FY 2002, the 1,934 FFL inspections that found violations found an average of almost 70 violations each (for a total of 134,832 violations). In FY 2003, the 1,812 inspections that found violations found an average of over 80 violations each (for a total of 149,396 violations). However, in those years, the ATF issued Initial Notices of Revocation to only 30 and 54 FFLs, respectively.[62] In addition to issuing a Notice of Revocation after a compliance inspection, the ATF also can effectively revoke an FFL's license by denying its request for license renewal. If an FFL's license expires during the course of revocation proceedings, the ATF's

---

[62] Notices of Revocation are not final. Of the 30 Notices in FY 2002, 25 FFLs requested a hearing and 3 of those avoided revocation. (The FY 2003 data was unavailable as of March 2004.)

action is formally categorized as a denial of a renewal request – not as a revocation. In FY 2001, the ATF denied 28 requests for renewal.[63]

During our review, ATF officials told us that, before May 2003, the decision on whether to take adverse action (i.e., to revoke or deny renewal of an FFL's license) was left to the discretion of the Inspector, Area Supervisor, and the DIO of each of the 23 Field Divisions. However, in May 2003, subsequent to the initiation of our review, the ATF created guidelines for the Field Divisions to follow when determining whether or not to initiate an adverse action. When asked about the impact of these new guidelines, ATF personnel in the four Field Divisions we visited told us that they expected the guidelines to lead to an increase in the total number of license revocations. We found that after the ATF issued the adverse action guidelines, the number of FFL revocation hearings rose to 87 during FY 2003, and 59 Initial Notices of Revocation were issued and renewals denied during the first quarter of FY 2004 alone. As of March 2004, most of these cases have not been finalized.

The process for revoking or denying renewal of a federal firearms license is not timely. The ATF provided specific case tracking data for 50 closed denials and revocations completed in FY 2001 and FY 2002.[64] The processing of these 50 cases averaged 379 days from the date that the Inspector recommended revocation or denial to the date that the case was closed by the NLC. We determined that the length of denial and revocation proceedings was due, in part, to the number of ATF officials involved (see Figure 11 on page 42). At least five ATF officials participate in these proceedings and each official reviews and approves the FFL inspection case file seriatim. A formal ATF Notice of Revocation is issued only after all of the officials have approved the action. Because the ATF has limited suspension and fining authority, FFLs remain in business during the adjudication of renewal denials and revocations.

During our interviews, DIOs and some Area Supervisors stated that most delays in the eight-step process occurred at the Division

---

[63] ATF officials also told us that FFLs sometimes withdraw their renewal applications after being told that they may be denied. In FY 2001, 489 FFLs withdrew their applications, but ATF did not track how many withdrew after being told they would be denied versus withdrawals for other reasons.

[64] The ATF provided partial data for an additional 37 cases that we did not include because the data were inadequate to enable us to determine the case processing time. For example, for 33 cases the NLC did not have dates for when the initial Notice of Revocation or Denial was sent to the FFL.

Counsel level as the ATF waited for Division Counsel to draft a Notice of Revocation for the FFL.  We were unable to evaluate that perception from the case tracking data that ATF could provide, because it did not include the dates that the cases were processed by individual Field Division offices.  However, Assistant Chief Counsels and Division Counsels we interviewed acknowledged delays in denial and revocation proceedings, which they stated were due, in part, to their heavy caseloads.  They also stated that the quality of the initial compliance inspection report was a factor, as not all cases they received adequately detailed that the FFL "knowingly and willfully" violated federal firearms laws.  This caused further delay while the Division Counsels obtained clarifying information from the Inspectors to ensure that the cases met legal standards.

We also noted that in some cases delays occurred due to a lack of legal staff within the Field Divisions.  Although in 1999 the ATF established a standard Field Division structure that would include two staff attorneys, two of the Field Divisions we visited (Washington, D.C. Field Division, Seattle Field Division) had no attorneys on staff.  When those Field Divisions needed legal assistance, they obtained it directly from their regional Assistant Chief Counsel's Office.  For example, at the Washington, D.C., Field Division, the DIO told us that he sent revocation and denial cases to the Assistant Chief Counsel's Office located in Philadelphia.[65]  In one case, he said, it took four months to prepare an Initial Notice of Revocation for his signature.

---

[65]  The Assistant Chief Counsel's Offices are located in San Francisco, Chicago, Dallas, Atlanta, and New York/Philadelphia.  The northeast regional office is currently operating in Philadelphia due to the September 11, 2001, destruction of the ATF's New York offices, which were located at the World Trade Center.

## Figure 11: FFL Denial or Revocation Process

Compliance inspection reveals federal firearms violations. Inspector recommends revoking FFL's license.

↓

Area Supervisor approves recommendation for revocation.

↓

DIO approves recommendation for revocation.

↓

Division Counsel writes initial Notice of Revocation for issuance to the FFL by DIO. FFL has 15 days to appeal revocation and request a hearing.

↓

NLC officials assign Inspector to serve as Hearing Officer.

↓

DIO schedules hearing to be attended by Hearing Officer, FFL, FFL's counsel, Inspector who conducted compliance inspection, and Division Counsel.

↓

Hearing Officer issues report of findings and recommendations to DIO.

↓

Division Counsel writes final Notice of Revocation for issuance by DIO.

↓

FFL has 60 days to appeal revocation to U.S. District Court.

↓

If an FFL files an appeal, Division Counsel, in consultation with an AUSA, submits Motion for Summary Judgment on behalf of the ATF.

---

**Case Study: FFL Remains in Business More Than Two Years After Inspector Recommends Revoking License**

Based on an October 2001 compliance inspection, an ATF Inspector recommended revoking the license of a Georgia FFL operating as a pawnbroker. During the inspection, the Inspector determined, among other findings, that the FFL:

- Sold 51 firearms without first obtaining proper identification from the purchasers;
- Failed to complete a Report of Multiple Sale on three occasions;
- Transferred at least one firearm to an out-of-state resident; and
- "Aided and abetted a prohibited person in obtaining a firearm" on four occasions by transferring firearms to individuals other than those who had originally pawned the firearms to him without performing the proper background check.

The DIO issued an initial Notice of Revocation on May 6, 2002. The FFL appealed, and a hearing was scheduled for November 2002. The NLC rescheduled the hearing for February 2003 at the FFL's request. At that hearing, the FFL blamed the violations on human error as well as a computer program he used to maintain his records. The Hearing Officer's completed report, which included a recommendation to *approve* the FFL's license, was issued to the DIO on March 31, 2003. The DIO issued a final Notice of Revocation on June 13, 2003. The FFL waited until August 12, 2003 – the maximum allowable time – to appeal the DIO's decision to U.S. District Court, where the case remained as of March 2004. Both sides have until June 1, 2004 to file motions in the case, according to a December 2003 order. Throughout these proceedings, the FFL has remained in business.

*[U.S. District Court, Middle District of Georgia; Case #03-CV-267.]*

---

We also found indications of limited communication between Field Division staff and Division Counsels. For example, we were told that Inspectors, Area Supervisors, and DIOs, usually do not seek advice from Division Counsels on inspections of FFLs found to have violated federal firearms laws until they request a Notice of Revocation or Denial. Furthermore, Division Counsels told us that they are not routinely notified when Warning Conferences are scheduled between FFLs and DIOs. One Assistant Chief Counsel told us that he believes that the ATF would benefit if Division Counsels had the opportunity to participate in such proceedings in case, later on, a Notice of Revocation is issued to the FFL.

**New ATF Guidelines Begin to Address Inconsistent and Untimely Adverse Actions**

In May 2003, the ATF took the initial steps toward standardizing adverse actions by issuing guidelines that were intended to ensure that Field Division personnel make more consistent and appropriate determinations on adverse actions (such as warning letters, warning conferences, and revocations) when FFLs are found to have violated federal firearms laws. The guidelines established standards for minimum adverse actions to be taken when violations are found. Although Field Divisions can deviate from the policy if they determine that the facts warrant another action, any deviation on inspections violations for which the standard action is revocation must be reviewed by Headquarters.

The guidelines specify that FFLs that commit minor non-repetitive, non-willful violations that do not affect the lawfulness of a gun transfer, such as minor omissions or format errors, should receive warning letters or reports of violations. FFLs committing more serious violations that do not rise to the level of revocation, such as failing to record an acquisition within a specified time frame or failing to report multiple sales, should receive warning conferences. When FFLs commit the most serious violations, such as having more than a threshold number of guns missing from their inventory, the Field Division should begin the process of revoking or denying the renewal of the FFL's license.

The guidelines also address some of the problems we noted with the ATF's past failure to follow-up and take action when violations were found. For example, they address the frequent failure to routinely re-inspect FFLs found to have committed serious violations by directing that all FFLs that receive warning letters or warning conferences must be

scheduled for a follow-up "recall" inspection in the following year. The guidelines also begin to address the lack of adverse actions taken against repeat violators by directing that adverse actions must escalate for repeat offenses. For example, an FFL that was issued a warning letter or directed to attend a warning conference for a violation cannot be given the same penalty if a subsequent inspection discovers further violations. Instead, the penalty must escalate to a warning conference (from a warning letter) or to revocation. The guidelines also establish a time frame for part of the adverse action process by directing DIOs to act on adverse action recommendations within 90 days after receiving the inspection report.

In addition to addressing the adverse action process, the guidelines also address part of the inspection process by requiring that follow-up inspections on FFLs that had unresolved inventory discrepancies include a full inventory, unless the DIO approves a statistical sample instead. Conducting a full inventory identifies all the guns that the FFL may have lost, and it brings the FFL's inventory records up-to-date. The FFL then formally reports any missing guns to the NTC as lost or stolen. The reporting of lost and stolen guns provides some benefit should one of those guns be recovered and traced, since it saves the NTC from contacting the manufacturer and dealer before the NTC knows that the gun was lost from a specific FFL's inventory. A full inventory may also identify more instances of violations to support potential adverse actions.

However, for the purpose of verifying that FFLs are complying with the requirement to maintain an accurate inventory, a policy of conducting full inventories in lieu of valid statistical samples may not be the most effective use of ATF resources. Conducting full inventories at larger gun dealers can be very time consuming. Moreover, once an inspection identifies discrepancies sufficient to document that an FFL's inventory system is deficient, completing a full inventory provides only incremental instances of missing guns. We would not disagree that there are cases, often related to an investigation, where a full inventory is desirable – cases like the Bull's Eye Shooter Supply.[66] However, maintaining an accurate inventory remains the responsibility of the FFL. Given the limited resources available to the ATF to conduct gun shop

---

[66] The Bull's Eye Shooter Supply in Washington State was the FFL that lost the Bushmaster sniper rifle used in a series of murders across the country in 2002 for which John Allen Muhammad and Lee Boyd Malvo were subsequently convicted. Subsequent inspections found that the store could not account for several hundred guns, including assault weapons.

inspections, restricting inventories to the minimum sample needed to provide a statistically valid check on the accuracy of the FFL's record-keeping system would reduce the length of inspections and enable the ATF to provide better coverage of FFLs.

**By Streamlining and Standardizing Inspections, the ATF Could Dramatically Improve the FFL Inspection Program**

We found that there is a critical need for the ATF to improve the efficiency and effectiveness of the FFL inspection program and ensure that FFLs are inspected using consistent inspection procedures and sampling criteria regardless of their geographic location. With the May 2003 guidelines, the ATF began to improve the consistency and timeliness of adverse actions, as well as to address the critical need to re-inspect FFLs that committed violations. However, the current variability in the Field Divisions' inspection procedures must be addressed to ensure that adverse actions taken under the May 2003 guidelines treat FFLs consistently. Requiring defined adverse actions for specific numbers of violation instances in the absence of standardized inspection procedures and sampling criteria will result in dissimilar treatment of FFLs in different Field Divisions. As discussed previously, the ATF's guidance on conducting inspections does not ensure consistent examinations of FFLs' compliance with gun laws.

We observed several areas in which the inspection process could be improved through standardization, such as:

- Standardizing inventory procedures to conduct the minimum sample needed (based on the number of guns in the FFL's stock) to provide a statistically valid check on the effectiveness of the FFL's inventory management and record-keeping systems.

- Standardizing the review procedures for Forms 4473 to provide for the minimum sample needed to provide a statistically valid check (based on the number of guns sold by the FFL) on whether the FFL is completing the Forms as required.

- Standardizing and automating inspections paperwork and providing laptop computers to enable Inspectors to prepare inspection reports on-site. Currently ATF Inspectors must complete 11 worksheets containing 115 steps and totaling 23

pages while on-site. Application inspection paperwork comprises 32 steps for the inspection and 56 steps for an acknowledgement of laws. The Inspectors must then transcribe their handwritten notes from the worksheets into the ATF's N-Spect database upon returning to their Area Office.

- Extending the inspection cycle for FFLs with no significant violations. Under the May 2003 guidelines, FFLs found to have committed violations must be scheduled by the ATF Field Division for a follow-up inspection in the following year. Extending that approach, a model standardized inspection procedure could allow Field Divisions to extend the inspection cycle for FFLs that have no significant violations beyond three years, so that available resources can be directed toward noncompliant dealers.

- Establish guidance to ensure that Inspectors consistently look for known indications of firearms trafficking and, when found, report the findings to the ATF's Criminal Enforcement Division.

   Improving the efficiency of the inspection process would also reduce the need for additional staff. Adopting a standardized inspection process designed to use the minimum review necessary to effectively gauge FFLs' adherence to gun laws will increase the efficiency of the FFL inspection program. This will reduce both the need for additional Inspector staffing and the burden that inspections place on FFLs. In an April 2003 report to Congress, the ATF Director stated that, to fully implement the ATF's mission to regulate and enforce federal firearms and explosives laws, the ATF would need 1,775 Inspectors, an increase of 1,277 Inspectors from current staffing levels.[67] Of the 1,775 Inspectors, 1,235 would be dedicated to conducting FFL compliance inspections in order to inspect all FFLs on a triennial basis. The Director based this figure, in part, on projections of FFL application and compliance inspections, as well as inspections initiated to support criminal investigations. Our review of FY 2002 ATF work hour data shows that it dedicated 628,117 staff hours (the equivalent of 302 staff years at 2,080 hours per year) to FFL inspections. The requested increase to 1,235 Inspectors would require 933 new Inspectors, and would more than

---

[67] *Inspector Staffing Requirement for the Bureau of Alcohol, Tobacco, Firearms and Explosives,* April 15, 2003.

quadruple the Inspector workforce dedicated to inspecting FFLs.[68]  In the Department's FY 2005 Budget Request, it recommended funding 126 new Inspector positions for the ATF.

We examined the ATF's calculations and question whether it needs as many Inspectors as stated.  The ATF projection was calculated using an overall average inspection time of 62.7 hours per inspection (Table 4, on the next page).  However, according to the ATF's FY 2002 data, the overall average inspection time was only 49.4 hours (628,117 inspection hours divided by 12,704 total inspections).  The ATF request therefore appears to include an assumed 27 percent increase in the average length of inspections.

Calculating the staffing requirement using the ATF's actual historical inspection average of about 50 hours per inspection indicates that the ATF should need a total of only 984 Inspectors (682 new Inspectors) to accomplish inspections on a triennial basis.  Moreover, as previously discussed, our analysis found wide variations in inspection implementation and productivity among the ATF Field Divisions.  By standardizing and streamlining its inspection process the ATF could reduce the average inspection time from the current 49.4 hours, which would further reduce the number of additional Inspectors that needed to accomplish FFL compliance inspections on a triennial basis.[69]  For example, by reducing the overall average inspection time to 40 hours per inspection, the ATF should be able to implement a triennial FFL compliance inspection program with 788 Inspectors (Table 4).

Increasing the efficiency of the inspection process also is needed because the demands on ATF Inspectors to perform duties related to explosives licensees are increasing.  Immediately after the terrorist

---

[68]  FY 2002 work hour data was the latest available during our review.  The work hours used in this section do not match the work hours discussed previously because they include not only time spent directly conducting inspections, but all time in an Inspector's work year, such as leave, training, sick days.  This additional time must be considered when calculating staffing requirements.

[69]  We noted that the ATF was exploring other ways to reduce the demands on Inspectors, including a December 2003 proposal to hire former Inspectors to serve as Hearing Officers and a Flexiplace Pilot Program.  The Flexiplace Pilot reduced the requirement for 23 Inspectors from 15 Field Divisions to work from ATF Area Offices, allowing more inspections of geographically remote FFLs.  An August 2003 Headquarters review of the program concluded that it improved the performance of the Inspectors who participated.  As of January 2004, the ATF had not expanded the program.

| Table 4: ATF STAFFING REQUEST CALCULATIONS | | | | |
|---|---|---|---|---|
| Activity | Number of Inspections | Hours per Inspection* | Total Hours | Inspector FTE @ 2080 Hours |
| Non-YCGII FFL Compliance Inspections | 22,889 | 66 | 1,510,674 | 726.3 |
| YCGII FFL Compliance Inspections | 11,444 | 80 | 915,520 | 440.2 |
| Support Criminal Investigations | 631 | 73 | 46,063 | 22.1 |
| Firearms Applications | 6,000 | 16 | 96,000 | 46.2 |
| **Total** | **40,964** | **62.7** | **2,568,257** | **1234.7** |

- ATF staffing calculations include indirect time

| OIG RECALCULATION: ATF STAFFING AT 50 HOURS PER INSPECTION | | | | |
|---|---|---|---|---|
| Non-YCGII FFL Compliance Inspections | 22,889 | 51.5 | 1,178,784 | 566.7 |
| YCGII FFL Compliance Inspections | 11,444 | 63.5 | 726,752 | 349.4 |
| Support Criminal Investigations | 631 | 73 | 46,063 | 22.1 |
| Firearms Applications | 6,000 | 16 | 96,000 | 46.2 |
| **Total** | **40,964** | **50** | **2,047,599** | **984.4** |

| OIG RECALCULATION: ATF STAFFING AT 40 HOURS PER INSPECTION | | | | |
|---|---|---|---|---|
| Non-YCGII FFL Compliance Inspections | 22,889 | 40 | 915,560 | 440.2 |
| YCGII FFL Compliance Inspections | 11,444 | 50.8 | 581,360 | 279.5 |
| Support Criminal Investigations | 631 | 73 | 46,063 | 22.1 |
| Firearms Applications | 6,000 | 16 | 96,000 | 46.2 |
| **Total** | **40,964** | **40** | **1,638,983** | **788** |

attacks of September 11, 2001, the ATF initiated a policy of investigating all incidents of theft or loss of explosives materials, and conducting compliance inspections on all explosives license holders within 50 miles of major metropolitan areas. This meant that the ATF had to inspect 7,459 of 9,400 explosives license holders. In November 2002, the Safe Explosives Act (SEA) imposed new licensing requirements that increased the number of explosives licensees, and mandated that the ATF conduct on-site inspections of explosives licensees and permit holders at least once every three years.

The additional explosives work is already reducing ATF's ability to inspect FFLs. The Chief of Staff of the ATF's Firearms, Explosives and Arson Directorate confirmed that Inspector resources have been diverted to explosives work by Area Supervisors to meet the SEA's inspection requirements. As a result, she said, the ATF plans to re-examine Inspectors' firearms work because ATF Headquarters officials are "worried" that FFLs are not being inspected. Our review of preliminary data for FY 2004 inspections work confirmed these concerns.

Preliminary data for early FY 2004 indicated that there has been a precipitous decrease in the number of FFL inspections. Through the first five months of FY 2004, the ATF completed 1,113 FFL compliance inspections. At that pace, the agency will complete less than 2,700 FFL compliance inspections during FY 2004. That is less than half the number that the agency reported that it completed in FY 2003, and less than 2.6 percent of the FFL population. For example, the Kansas City Field Division, which oversees the most FFLs of any Field Division (with 8,194 FFLs) completed only 21 FFL compliance inspections in the first five months of FY 2004.

<u>Reducing the time spent at FFLs' places of business</u>. The time that ATF Inspectors spend on-site at FFLs cannot be calculated definitively. Although the ATF's inspection hour tracking system shows that the ATF spent a total of 257,723 hours conducting FFL inspections in FY 2002, it does not allow the time spent on travel and other inspection related actions performed away from FFL locations to be segregated from the total inspection hours. Nonetheless, any increase in inspection efficiency would reduce the overall time spent conducting reviews on-site at the FFLs, and minimize any potential interruption of the FFLs' business operations.

**ATF Does Not Consistently Report Inspection Performance**

In response to our requests for inspections and workload data (such as the number of compliance and application inspections conducted and the Inspector work hours associated with completing these inspections during FY 2002), the ATF queried its N-Spect, FLS, and Standard Time and Attendance System (STATS) electronic databases. N-Spect tracks direct time related to FFL inspections, FLS tracks information related to FFL licensees, and the STATS timekeeping system tracks direct and indirect hours for payroll purposes. During our examination of the performance and productivity of the ATF's FFL inspections program, we identified significant discrepancies between the systems with regard to the number and type of inspections conducted and the hours spent conducting the inspections. In addition, the data in the systems regarding the number of inspections done differed significantly from what the ATF included in published reports. Finally, data contained in the N-Spect database contained significant errors: after extracting data to respond to our requests, ATF officials determined that several hundred inspections entered as compliance inspections were actually application inspections.

Table 5 contains examples of inconsistent data related to the ATF's FY 2002 ATF's FFL inspections program that the ATF provided to OIG and reported publicly.

| Table 5: Inconsistent N-Spect Totals of FY 2002 FFL Inspection Activities | | |
|---|---|---|
| **Data Source** | **FY 2002 Totals** | **Inspection Type** |
| N-Spect data provided to the OIG in May 2003 | **12,522** | Total Inspections (the ATF claimed data could not be broken down by inspection type) |
| Revised N-Spect data provided to the OIG in February 2004 | 7,665 | Application Inspections |
| | 5,039 | Compliance Inspections |
| | **12,704** | Total Inspections |
| Revised N-Spect data adjusted to correct miscoded inspections provided to the OIG Team on May 20, 2004 | 8,123 | Application Inspections |
| | 4,581 | Compliance Inspections |
| | **12,704** | Total Inspections |
| FLS Licensee Inspection Data | 4,722 | FY 2002 new licensees with "inspection date" indicating that an application inspection was conducted |
| *ATF Snapshot 2003* | "Approximately 6,000" | Compliance Inspections |
| *ATF Performance and Accountability Report 2002* | "Eleven percent" of all FFLs were inspected.<br><br>*11% of 104,300 FFLs is equivalent to 11,473 inspections* | Total Inspections |

In addition to FY 2002 data discrepancies, current data from ATF's N-Spect database shows that the ATF conducted 5,729 application inspections and 4,035 compliance inspections in FY 2001, as well as 8,043 application inspections and 5,887 compliance inspections in FY 2003. Previously, the ATF had published reports and provided draft reports to the OIG indicating that it conducted more inspections: 5,497 application inspections and 5,016 compliance inspections in FY 2001 and 8,422 application inspections and 6,481 compliance inspections in FY 2003.

We discussed these substantial inconsistencies with ATF Headquarters officials. They explained that the inconsistencies were due to differences in how the queries of the N-Spect electronic database were constructed by different ATF analysts. For instance, according to the ATF Deputy Assistant Director for Field Operations, the ATF report on FY 2002 activities (*ATF Snapshot 2003*) reported a higher number of inspections completed because it aggregated all Inspector activities to determine the number of compliance inspections conducted by ATF Inspectors, and included limited purpose inspections as well as activities unrelated to FFL compliance inspections. Another reason for the discrepancies related to the project codes used to identify types of inspections. According to ATF Headquarters officials, Area Supervisors do not always use the correct project codes when assigning inspections because the codes are "confusing." For our review, ATF Headquarters officials had to query an N-Spect "Special Instructions" data field for "firearms application inspection" and "firearms compliance inspection" rather than the appropriate project code in order to more accurately determine inspection totals.

The ATF has taken steps to ensure that inspection totals are accurately measured. In October 2003, the ATF released a new version of N-Spect that requires Area Supervisors to use pull-down menus that are inspection-specific (e.g., "Application Inspection"). Moreover, although the enhancements to the N-Spect database will increase the reliability of the data in the system, the ATF must adopt a standard approach for querying the N-Spect electronic database and ensure that queries are stored for future use so that subsequent requests for the same data will elicit comparable results. If the ATF does not adopt a standard method for querying and extracting historical data, it cannot consistently report accurate performance data.

## New Restriction on Retention of Gun Purchaser Data will Hinder the ATF's Ability to Detect Fraudulent Background Checks

As discussed in the Background section, prior to transferring a firearm to an unlicensed individual, an FFL must complete a check of the National Instant Criminal Background Check System (NICS) to determine if the potential purchaser is prohibited from owning a gun. For each query, the NICS currently collects information on whether or not the purchase was allowed to proceed, and retains information on the potential purchaser for 90 days. The FBI assigns each query a unique NICS Transaction Number (NTN), which FFLs are required to enter onto the corresponding Form 4473.

For the majority of dealers, NICS is a valuable tool that enables them to quickly determine whether a potential customer is prohibited from purchasing a firearm. However, some gun dealers could attempt to hide transfers to prohibited persons by falsifying NICS information. To deter fraud and detect FFLs that may be providing false information to pass a NICS check in order to facilitate a sale to a prohibited person, during FFL compliance inspections ATF Inspectors verify that the information submitted to NICS matches the information on the Form 4473. The Inspectors copy information on selected Forms 4473 from the past 90 days and check with the FBI to ensure that the information on the Form 4473 matches the information that the FFL provided at the time of the sale. If discrepancies are found, it may indicate than an FFL submitted false information to NICS in order to receive an NTN associated with a background check for a non-prohibited person. The ATF reported that it has not found any NICS violations involving the falsification of purchaser information through the Forms 4473 review.[70]

However, the ability of ATF Inspectors to conduct this Form 4473 review was affected when the FY 2004 appropriations act reduced the time that the FBI can retain information submitted by FFLs during the NICS check.[71] Beginning in July 2004, all purchaser information (e.g., name, address, date of birth) on NICS queries for which firearms sales are approved will no longer be kept for 90 days; it must be destroyed within 24 hours of the official NICS response to the FFL.[72] For approved sales, the FBI can retain for 90 days the NTN, the license number of the FFL that contacted NICS, and the date that the NICS query was made.

---

[70] *Gun Control: Potential Effects of Next-Day Destruction of NICS Background Check Records*, General Accounting Office, Report GAO-02-653, July 2002, 16-18. ATF Headquarters officials said, however, that they believe FFLs are aware of the ATF's procedures for inspecting Forms 4473 and are thereby deterred from supplying NICS with false purchaser information. The officials noted that the vast majority of discrepancies identified during FFL inspections occur because of clerical errors made by FFLs or Inspectors, such as FFL errors in recording purchaser information onto Forms 4473 or Inspector errors in copying information onto worksheets.

[71] The Fiscal Year 2004 Consolidated Appropriations Bill (Public Law 108-199) states that DOJ cannot retain "identifying information" related to sales of firearms to non-prohibited persons for more than 24 hours. All information related to calls for which potential sales are *denied* by NICS will still be retained indefinitely.

[72] As of March 2004, NICS officials plan on purging purchaser information every night, at midnight (EST). Therefore, purchaser information related to a firearm bought at 5 p.m. will be purged seven hours later.

After 90 days, the FBI may retain only the NTN and the date that the number was issued.

In 2002, ATF Headquarters officials suggested that the ATF's FFL compliance inspections program would not be affected by a "Next Day Destruction" provision.[73] Instead of submitting information copied from Forms 4473 to NICS, ATF Headquarters officials said that Inspectors could "recheck" the eligibility of purchasers by requesting that the FBI rerun selected NICS checks taken from FFL records during compliance inspections. However, while resubmitting Form 4473 information to NICS will determine whether the purchaser would be approved *on the date of the recheck*, it does not enable the ATF to effectively detect that the FFL supplied inaccurate information to NICS. There are reasons other than FFL fraud for a prior approved purchase to fail during a recheck. For instance, the purchaser may have become ineligible only since the sale, or the FBI NICS operator on the original query may have transposed letters or numbers resulting in an erroneous approval. Given these and other possible explanations, the lack of information in NICS will make it much more difficult for the ATF to prove that FFLs supplied false information initially.

Moreover, the shortened retention time will make it much easier for corrupt FFLs to avoid detection. We identified at least two potential ways that the new restriction would make it easier for corrupt FFLs to falsify the NICS check to hide a knowing transfer of a gun to a prohibited person.

- An FFL may enter correct information from the prohibited person on the Form 4473, but relay information for a person with a known "clean" record to the FBI for the NICS check. After July 2004, the ATF will have only 24 hours to detect this by cross-checking purchaser information in the FFL's records with NICS records.

- An FFL may falsify the date of the sale. Three factors make this tactic even safer for corrupt FFLs with only a 24-hour retention time – the fact that blank Forms 4473 are not serially numbered, A&D books are kept sequentially by the date that the FFL receives the guns (so disposition dates are not expected to be sequential), and after 90 days the NICS will retain only the

---

[73] *Gun Control: Potential Effects of Next-Day Destruction of NICS Background Check Records.* General Accounting Office, Report GAO-02-653, July 2002.

issue date for NTNs on approved transfers. To safely backdate a sale, a corrupt FFL needs only a good NTN that was issued to another FFL on a known date over 90 days before.[74] As long as the date on the Form 4473 and the "disposition date" in the A&D book match the date that the NTN was issued – and the dealer does not make the mistake of "selling" a gun on a date before it was received – the fraud will be exceedingly difficult to detect.

Given the new restriction on retaining NICS data, after July 2004 an ATF Inspector arriving on-site could only check the information on Forms 4473 filled out by the FFL that day. Therefore, the likelihood of encountering a falsified NICS check would be remote.

## CONCLUSIONS

We concluded that the ATF's FFL inspection program did not consistently ensure that FFLs comply with federal firearms laws. The lack of standardized inspection procedures resulted in inconsistent inspections of FFLs and significant variation in the implementation of the inspection program by Field Divisions. Our review of N-Spect performance data found that ATF's Field Divisions took an average of 35.3 hours to conduct FFL inspections to detect noncompliance with federal firearms laws, and one Division took only 24.5 hours on average to conduct its compliance inspections. We found no operational reasons why some Field Divisions averaged much longer, up to 90 hours, to conduct compliance inspections. In fact, we found little or no correlation between inspection times and enforcement activities, such as referrals of suspected criminal activity and adverse actions taken. Further, our finding that the Field Divisions varied significantly in such productivity measures as number of inspections finding violations and number of inspections done by each Inspector argues strongly for implementation of a more standardized and efficient inspection regimen.

Because the ATF does not conduct regular inspections of FFLs and lacks adequate resources to meet agency goals, it cannot effectively monitor the overall level of FFL compliance with federal firearms laws. In

---

[74] Using an NTN from another FFL limits the possibility that the fraud may be detected through the chance discovery of the same NTN twice in the FFL's records. Because NICS will delete which FFL an NTN was issued to, and FFLs are inspected independently, even where one individual holds multiple FFLs for different business locations, it will be very unlikely that such reuse of NTNs will be discovered.

December 2003, the ATF initiated a program to conduct special Random Sample Compliance Inspections to develop a risk model for the FFL inspection program. Using data from those inspections, the ATF planned to "be able to project the overall level of compliance by" gun dealers, pawnbrokers, and collectors.[75] While the project to estimate the overall level of compliance with laws is needed to estimate the challenges facing the ATF, it does not take the place of regular compliance inspections for deterring and identifying noncompliance with gun laws.

To ensure that all FFLs are treated consistently, and that the FFL inspection program is as efficient as possible, the ATF needs to implement a policy to ensure that inspections are conducted in a uniform manner, that inspections procedures are limited to the minimum steps needed to accomplish a valid review, and that violations are processed in a uniform and appropriate manner. A consistent and timely inspection process is essential for identifying and addressing scofflaw dealers and reducing the availability of illegal firearms to criminals.

---

[75] Memorandum, Assistant Director for Firearms, Explosives, and Arson to All Special Agents In Charge, December 8, 2003. ATF officials told us that the memorandum was not distributed to the Field Divisions until January 2004.

## RECOMMENDATIONS

We recommend that the ATF:

1. Develop a standard, streamlined inspection process that includes in-person inspections of all FFL applicants; more efficient inventory and records reviews; automated inspection reporting; and consistent examination of indicators of firearms trafficking.

2. Conduct a pilot project to test the streamlined inspection procedures and establish appropriate time standards for conducting these inspections.

3. Revise the staffing requirement report using the time standards to reflect the number of Inspectors needed to conduct compliance inspections on a triennial basis, or on an alternative schedule based on the FFL's compliance history.

4. Develop alternatives for better aligning Inspector resources with the distribution of FFLs, such as by redrawing Field Division boundaries, realigning personnel, or other methods.

5. Update the inspection tracking system to accurately segregate and report on Inspector time spent preparing for inspections, in travel, on-site at FFLs, and conducting other administrative duties.

6. Prepare quarterly reports on the productivity and results achieved by each Field Division.

7. Direct the National Licensing Center to develop an adverse action tracking system to monitor the progress and timeliness of FFL denials and revocations from the time an Inspector makes a recommendation until the proceedings are finalized.

8. Continue coordinating with the Department of Justice, Office of Legislative Affairs, to gain the authority to suspend or impose civil penalties on FFLs that violate federal firearms laws.

9. To improve the comprehensiveness of crime gun tracing by law enforcement agencies:

   a. Coordinate with the Office of Justice Programs to determine the feasibility of using discretionary grant funding to support crime gun tracing.

   b. Develop a model for more accurately identifying potential firearms trafficking through the analysis of an FFL's firearms sales volume and the number of firearms traced to the FFL.

**Appendix I: ATF Form 4473 (Page 1)**

OMB NO. 1512-0129

**DEPARTMENT OF THE TREASURY**
**BUREAU OF ALCOHOL, TOBACCO AND FIREARMS**
**FIREARMS TRANSACTION RECORD PART I - OVER-THE-COUNTER**

Transferor's Transaction Serial Number

**WARNING:** You may not receive a firearm if prohibited by Federal or State Law. The information you provide will be used to determine whether you are prohibited under law from receiving a firearm.
Prepare in original only. All entries must be in ink. Read the Important Notices, Instructions and Definitions on this form.

**Section A - Must Be Completed Personally By Transferee (Buyer)**

1. Transferee's Full Name (Last, First, Middle)

2. Residence Address (No., Street, City, County, State, ZIP Code; cannot be a post office box)

3. Place of Birth (City, State or foreign country)

4. Height _____ Weight _____

5. ☐ Male ☐ Female

6. Birth Date  Month _____ Day _____ Year _____

7. Social Security Number (Optional, but will help prevent misidentification.)

8. Race (Ethnicity) (Check one or more boxes)

☐ American Indian or Alaska Native   ☐ Black or African American   ☐ Native Hawaiian or Other Pacific Islander

☐ Hispanic or Latino   ☐ Asian   ☐ White

9. What is your State of residence (if any)? _____ (See Definition 5. If you are not a citizen of the United States, you have a State of residence only if you have resided in a State for at least 90 days prior to the date of this sale.)

10. What is your country of citizenship? (List more than one, if applicable.) _____

11. If you are not a citizen of the United States, what is your INS-issued alien number or admission number? _____

**Certification Of Transferee**

12. Answer questions 12a through 12l by writing "yes" or "no" in the boxes to the right of the questions.

a. Are you the actual buyer of the firearm(s) listed on this form? **Warning: You are not the actual buyer if you are acquiring the firearm(s) on behalf of another person. If you are not the actual buyer, the dealer cannot transfer the firearm(s) to you.** (See Important Notice 1 for actual buyer definition and examples.)

b. Are you under indictment or information in any court for a felony, or any other crime, for which the judge could imprison you for more than one year? (An information is a formal accusation of a crime by a prosecutor. See Definition 3.)

c. Have you been convicted in any court of a felony, or any other crime, for which the judge could have imprisoned you for more than one year, even if you received a shorter sentence including probation? (See Important Notice 6, Exception 1.)

d. Are you a fugitive from justice?

e. Are you an unlawful user of, or addicted to, marijuana, or any depressant, stimulant, or narcotic drug, or any other controlled substance?

f. Have you ever been adjudicated mentally defective (which includes having been adjudicated incompetent to manage your own affairs) or have you ever been committed to a mental institution?

g. Have you been discharged from the Armed Forces under **dishonorable** conditions?

h. Are you subject to a court order restraining you from harassing, stalking, or threatening your child or an intimate partner or child of such partner? (See Important Notice 7.)

i. Have you been convicted in any court of a misdemeanor crime of domestic violence? (See Important Notice 6, Exception 1 and Definition 4.)

j. Have you ever renounced your United States citizenship?

k. Are you an alien **illegally** in the United States?

l. Are you a nonimmigrant alien? (See Definition 6.)

13. If you are a nonimmigrant alien, do you fall within any of the exceptions set forth in Important Notice 6, Exception 2?

Yes ☐   No ☐   Not applicable ☐   (If "yes," the licensee must complete question 18c.)

I certify that the above answers are true and correct. I understand that answering "yes" to question 12a when I am not the actual buyer of the firearm is a crime punishable as a felony. I understand that a person who answers "yes" to any of the questions 12b through 12k is prohibited from purchasing or receiving a firearm. I understand that a person who answers "yes" to question 12l is prohibited from purchasing or receiving a firearm, unless the person also answers "yes" to question 13. I also understand that making any false oral or written statement, or exhibiting any false or misrepresented identification with respect to this transaction, is a crime punishable as a felony. I further understand that the repetitive purchase of firearms for the purpose of resale for livelihood and profit without a Federal firearms license is a violation of law. (See Important Notice 8.)

14. Transferee's Signature

15. Date

ATF F 4473 (5300.9) **PART I** (10-2001) PREVIOUS EDITIONS ARE OBSOLETE

## Appendix I: ATF Form 4473 (Page 2)

| Section B - Must Be Completed By Transferor (Seller) |
|---|

16. Type of firearm(s) to be transferred:

☐ Handgun   ☐ Long Gun   ☐ Both

17. Location of sale if at a gun show.  *(See Instruction to Transferor 13.)*

_____ *(city, state)*

18a. Type of Identification  *(e.g., driver's license or other valid government- issued photo identification.):* _____

Number on Identification: _____

Expiration Date of Identification  *(if any)* _____.  *(See Instruction to Transferor 1.)*

18b. **Aliens only:**  Types and dates of additional required identification *(e.g., utility bills or lease agreements.  See Instruction to Transferor 2.)*

18c. **Nonimmigrant aliens only:**  Type of documentation showing an exception to the nonimmigrant alien prohibition *(e.g., hunting license/permit; waiver.  See Instruction to Transferor 3.)*

| Question 19, 20, or 21 Must Be Completed Prior To The Transfer Of The Firearm(s)  *(See Instructions to Transferor 5-7.)* |
|---|

19a. The transferee's identifying information in Section A of this form was transmitted to NICS or the appropriate state agency on _____ *(Date).*

19b. The NICS or state transaction number *(if provided)* was: _____

19c. The reponse initially provided by NICS or the appropriate state agency was:

☐ Proceed   ☐ Denied   ☐ Delayed

19d. If initial NICS or state response was *"Delayed,"* the following response was received from NICS or the appropriate state agency on _____
_____ *(Date)*

☐ Proceed   ☐ Denied   ☐ No resolution was provided within 3 business days.

19e. The name and Brady identification number of the NICS examiner *(if provided)* _____ / _____ *(optional)*
*(name)*        *(number)*

20. ☐ No NICS check was required because the transfer involved only NFA firearm(s).  *(See Instruction to Transferor 7.)*

21. ☐ No NICS check was required because the buyer has a valid permit which qualifies as an exemption to NICS *(See Instruction to Transferor 7.)*

State Permit Type: _____   Date of Issuance: _____

Expiration Date *(if any):* _____   Permit Number: _____

| Section C |
|---|

If the transfer of the firearm(s) takes place on a different day from the date that the transferee signed Section A, the transferee must complete Section C immediately prior to the transfer of the firearm(s).  *(See Instruction to Transferee 3 & Instruction to Transferor 8.)*

**I certify that the answers I provided to the questions in Section A of this form are still true and correct.**

| 22. Transferee's Signature | 23. Date |
|---|---|
| | |

| Section D | | | | |
|---|---|---|---|---|
| 24. Manufacturer and/or Importer | 25. Model | 26. Serial Number | 27. Type *(pistol, revolver, rifle, shotgun, etc.)* | 28. Caliber or Gauge |
| | | | | |
| | | | | |

| Complete ATF F 3310.4 For Multiple Purchases Of Handguns  *(See Instruction to Transferor 11.)* |
|---|

29. Trade/corporate name and address of transferor  *(Hand stamp may be used.)*

30. Federal Firearms License Number  *(Hand stamp may be used.)*

On the basis of (1) the statements in Section A; (2) my verification of identity noted in question 18a and my verification again at the time of transfer *(if the transfer does not occur on the same day the verification was noted in question 18a);* and (3) the information in the current State Laws and Published Ordinances, it is my belief that it is not unlawful for me to sell, deliver, transport, or otherwise dispose of the firearm(s) listed on this form to the person identified in Section A.

| The Person Actually Transferring The Firearm(s) Must Complete Questions 31-34. |
|---|

| 31. Transferor's Name  *(Please print.)* | 32. Transferor's Signature | 33. Transferor's Title | 34. Date Transfer is completed |
|---|---|---|---|

*U.S. Government Printing Office: 2002 — 783-779

ATF F 4473 (5300.9) PART I  (10-2001)

**Appendix II: Area Supervisor Survey**



# U.S. Department of Justice
### Office of the Inspector General
### Area Supervisor Survey

**Purpose:** *This survey is being conducted by the U.S. Department of Justice, Office of the Inspector General (OIG). The OIG is evaluating the effectiveness of the Federal Firearms Licensee (FFL) inspection programs implemented by the Bureau of Alcohol, Tobacco, Firearms and Explosives (ATF).*

**Note:** *Please be advised that any information collected from this survey will not be attributed to individual Area Supervisors.*

**Directions:** *This survey should take approximately 10 minutes to complete. Click on the gray areas to complete your responses. Please complete and return to the OIG via email or fax by October 24, 2003. The fax number is provided at the end of the survey. If you have any questions concerning this survey, please call OIG Inspector                  , at                  .*

***Please return your completed survey by October 24, 2003.***

---

Name:

Field Division:

Telephone Number:

---

Inspector Staffing
**Please limit your responses to your Group and Satellite Office staff only – not to the entire Field Division.**

1.    How many Inspectors are currently assigned to your Group?

---

2.   In your opinion, is your Group staffed so that your Inspectors can adequately inspect the Federal Firearms Licensees and explosives permitees in your Area?

☐ Yes        ☐ No

**[If Yes, please skip to Question 4.]**

3.   How many <u>additional</u> Inspectors would need to be assigned to your Group so that your Inspectors could adequately inspect the Federal Firearms Licensees and explosives permitees in your Area?

4.   How many of your Inspectors also serve as Adverse Action Hearing Officers, if any?

5.   How many Special Operations Inspectors are assigned to your Group, if any?

Federal Firearms Licensees
    **Please limit your answers in this section to your Group, as well as any Satellite Offices assigned to your group.**

6.   On average, how many <u>new</u> FFL applications are processed for your Area Office each month by the National Licensing Center?

7.   How many new FFL applicant inspections do you assign to your staff?

☐ All        ☐ Some (As Needed)        ☐ None

**[If None, skip to Question 9]**

8.   How are new FFL applicant inspections conducted?

☐ By Phone   ☐ In Person       ☐ Both

9.   To the best of your knowledge, how many FFL inspection assignments in your Group were pre-determined by ATF Headquarters, in fiscal year 2003?

10.  How many inspections pre-determined by ATF Headquarters do you plan to assign in fiscal year 2004?

11.  Are any of these 2004 inspections carry-overs from 2003?

☐ Yes.       ☐ No.

12.  To the best of your knowledge, how many FFL inspection assignments in your Group were pre-determined by the National Tracing Center, in fiscal year 2003? Please specify, according to inspection type.

Focused Inspections.

Demand Letter Inspections.

Other NTC-assigned Inspections.

13.  How many inspections pre-determined by the National Tracing Center do you plan to assign in fiscal year 2004?

14.  Are any of these 2004 inspections carry-overs from 2003?

☐ Yes.       ☐ No.

15. To the best of your knowledge, how many FFL inspection assignments in your Group were based on information referred from ATF Special Agents, in fiscal year 2003?

☐ None  ☐ 1 to 5  ☐ 6 to 10  ☐ 10+

Explosives Permittees
**Please limit your answers in this section to your Group, as well as any Satellite Offices assigned to your group.**

16. How many explosives inspections do you plan to assign in fiscal year 2004?

17. What impact has the Safe Explosives Act had on your Group's ability to inspect FFLs? (Please describe.)

Federal Firearms Licensee Inspections
**Please limit your answers in this section to your Group, as well as any Satellite Offices assigned to your Group.**

18. On average, how many work hours should a New Application Inspection take an Inspector to complete, including travel time and writing the report?

Hours.

19. Please rate the effectiveness of the National Tracing Center data in determining which FFLs should be inspected in your area.

☐ *Very Effective*
☐ *Somewhat Effective*
☐ *Somewhat Ineffective*
☐ *Very Ineffective*
☐ *Not Applicable*

20.   Why is the National Tracing Center data effective or ineffective in determining which FFLs should be inspected in your area, and how might this be improved? (Please describe.)

21.   Please rate the effectiveness to which the list of mandatory inspections, provided by ATF Headquarters, adequately and fully identify those FFLs that should be inspected, based on indications that the FFL is violating Federal firearms laws?

☐ *Very Effective*
☐ *Somewhat Effective*
☐ *Somewhat Ineffective*
☐ *Very Ineffective*
☐ *Not Applicable*

22.   Why is the ATF Headquarters data effective or ineffective in determining which FFLs should be inspected in your area, and how might this be improved? (Please describe.)

23.   If enacted in your Group, please rate the effectiveness of the Flexiplace Program, as it would relate to your Inspectors conducting FFL inspections? (Flexiplace is a program under which employees are permitted to perform all or a portion of their duties at a Flexiplace work telecommuting center.)

☐ *Very Effective*
☐ *Somewhat Effective*
☐ *Somewhat Ineffective*
☐ *Very Ineffective*
☐ *Not Applicable*

---

**Submitting this survey**
You may submit this survey by email or fax.
**Please return by October 24, 2003.**

***Email:***   To email this survey:
1. Save your completed survey as a <u>new</u> MS-Word document.
2. Hit 'reply' to the original OIG email.
3. Attach survey to 'reply' email before sending.

---

***Fax:***      To fax this survey, please print out your completed survey and fax it to: (xxx) xxx-xxxx.  (Surveys completed by hand will also be accepted.) Please address your fax cover sheet to: Office of the Inspector General, Attention: Inspector xxxxxxxxxxxxxxxxxxxxxxxx.

**APPENDIX III: ATF COMMENTS ON THE DRAFT REPORT**



**U.S. Department of Justice**

Bureau of Alcohol, Tobacco,
Firearms and Explosives

*Office of the Director*

JUN 2 9 2004  Washington, DC 20226

900000:CAA
8310

MEMORANDUM TO: Assistant Inspector General for Evaluation and Audits

FROM: Director

SUBJECT: Response to the Office of Inspector General's (OIG)
Draft Report: Review of the Inspections of Firearms Dealers
Performed by the Bureau of Alcohol, Tobacco, Firearms and
Explosives, <u>Assignment Number A-2003-008</u>

The Bureau of Alcohol, Tobacco, Firearms and Explosives (ATF) appreciates the
opportunity to respond to the recommendations in the OIG's above-cited draft report. In
addition to responding to the recommendations, we have provided responses to the
"Results of the Review" section of the draft report. Although we already have adopted
many of the recommendations, we welcome the constructive criticism of our programs.
The independent evaluation will help us to utilize our inspector resources even more
effectively and efficiently.

As you know, ATF's move to the Department of Justice (DOJ) established an agency
with a more focused mission of preventing the criminal misuse of firearms and
explosives. Thus, we have become a stronger, more effective law enforcement and
regulatory agency. Through ATF's inspection program and other regulatory activities,
we encourage and ensure compliance with the Federal firearms laws and regulations in
order to prevent the criminal diversion of firearms and ensure law enforcement's ability
to trace crime guns.

ATF knows that Federal Firearms Licensees (FFLs) with significant compliance
problems -- though a small percentage of the overall licensee population of
approximately 104,000 – are a threat to public safety. Therefore, ATF is committed to
continuing to improve its inspection procedures to ensure that all FFLs comply with the
firearms laws and regulations, that firearms are not diverted from the legal to illegal
market, and that corrupt FFLs are put out of business.

-2-

Assistant Inspector General for Evaluation and Audits

Our responses to your recommendations are as follows:

**1. Develop a standard, streamlined inspection process that includes in-person inspections of all applicants; more efficient inventory and records reviews; automated inspection reporting; and consistent examination of indicators of firearms trafficking.**

ATF concurs with this recommendation. ATF recognizes that standardized inspection procedures are essential to ensure the most effective inspection techniques are used consistently throughout the country. Moreover, the procedures must be streamlined to ensure our inspector resources are used efficiently. This will enable ATF to ensure FFLs are complying with licensing requirements, which will help prevent the diversion of firearms to the illegal market. While ATF recognizes standard procedures are essential, allowing area supervisors and inspectors to exercise their professional judgment on how to efficiently and effectively conduct certain aspects of the inspection program also is critical to creating a strong regulatory program. ATF identified and began to address deficiencies within our inspection program prior to the initiation of the audit by the OIG. Based on the recommendations, ATF will undertake additional steps to improve our inspection programs.

**In-person inspections of all applicants**

ATF agrees that firearms application inspections are critical to ensuring compliance with the Federal firearms laws. ATF also agrees that inspections conducted in-person help to ensure a greater understanding of the Federal firearms laws and thus often result in a higher level of FFL compliance. Additionally, in-person inspections help establish an FFL's understanding of the Federal firearms laws at the time of license issuance, which enables ATF to more easily demonstrate "willfulness" if an FFL subsequently does violate the Federal firearms laws.

The Gun Control Act (GCA) requires ATF to process applications within 60-days. As noted in the draft report, historically we have not possessed the resources to inspect all applicants in-person within this timeframe. Because ATF agrees that firearms application inspections should be done in-person, prior to the issuance of this draft report, we revised guidance to our field divisions and now require the in-person inspection of all new applicants in 14 selected metropolitan areas. The application inspections in these 14 locations will be included in our Integrated Violence Reduction Strategy (IVRS) violent crime performance measures that are reported to Congress.

-3-

Assistant Inspector General for Evaluation and Audits

ATF also is taking steps to conduct in-person application inspections nationwide. New procedures issued in June 2004 generally require that an inspector must meet with an applicant in-person. An area supervisor does have discretion under this policy to decide whether an in-person inspection is an effective use of ATF resources. Although telephonic interviews are not ideal, sometimes they are necessary, such as when an FFL is located very far from the ATF field office. Under the June 2004 policy, if an FFL does not have an in-person application inspection, an in-person compliance inspection must be scheduled in the first year after issuance of the license.

Finally, ATF hopes that after studying the allocation of its inspector resources (which is discussed in detail later in this response) and streamlining its inspections (also discussed below), it will have the resources to conduct more in-person application inspections.

### More efficient inventory and records review

ATF agrees with the OIG's recommendation that ATF should establish a more efficient inventory and record review process. ATF already has taken steps to achieve this goal. In June 2004, ATF issued a memorandum entitled, "Guidelines for Conducting Federal Firearms Licensee Compliance Inspections." The Guidelines set forth the following requirements for inspectors:

- **Period of Records Review**

  The period of record review is to go back 1 year from the start of the inspection, or in the case of a recall inspection, from the date of the last inspection.

- **Inventory**

  The Guidelines set out when complete inventory verifications must be performed. Complete inventory verification means that each firearm in inventory must be physically identified by serial number and matched to the corresponding bound book entry, and each open entry in the bound book must be accounted for.

- **Review of ATF Forms 4473s**

  The Guidelines also establish the number of Forms 4473 that must be reviewed. If problems are identified with the Form 4473s selected for review, the number of forms reviewed is to be expanded. These firearms records will be reviewed for indications of firearms trafficking activity such as unreported multiple sales of handguns and straw purchases. Referrals to ATF agents will be made when indicators of firearms trafficking are present.

-4-

Assistant Inspector General for Evaluation and Audits

We believe judgmentally sampling Forms 4473, by first isolating weapons of choice, is better than random sampling all Forms 4473. The later approach would include reviewing purchases for types of weapons that are not used in crime, e.g., .22 caliber rifles. In addition, many FFLs do not have sufficient sales to conduct a valid random sample since the total sales volume is less than 200. In light of the OIG comments, we are reviewing random sampling as an inspection tool in order to determine if procedures could be developed for large FFLs. We are very familiar with this process and had used it extensively for alcohol and tobacco tax audits when this Bureau was part of the Treasury Department.

## Automated Inspection Reporting

The draft report discusses the extensive paperwork inspectors must complete while at an FFL's premises, which later must be entered into ATF's N-Spect database. The draft report suggests that inspectors be given laptops to use during inspections so that they can streamline this process. ATF agrees using laptops would be a more efficient process, and in fact had issued laptops to all inspectors over 3 years ago. Every inspector has one today.

However, many FFLs are not comfortable with ATF inspectors using laptop computers during inspections. ATF is prohibited by law from creating a registry of firearms and firearm owners. When our inspectors use their laptop computers during an FFL inspection, many FFLs express concern that the computers are being used to create a national firearms registry, rather than being used to automate the inspection process. Inspectors are sensitive to these apprehensions and seek the approval of the FFL prior to using their ATF laptop during an inspection. Because ATF strives to have a cooperative relationship with FFLs, inspectors do not use laptop computers if an FFL does not want them to.

ATF is in the process of reevaluating all workplans and work papers to eliminate work steps and work papers that are not critical to the final report. This should reduce the need for inspectors to complete work papers manually and then reenter the data in N-Spect. Until new procedures are finalized, our inspectors will continue to enter their inspection information in N-SPECT in accordance with established guidelines so that the inspection results can be accurately monitored.

-5-

Assistant Inspector General for Evaluation and Audits

**Consistent examination of indicators of firearms trafficking.**

The draft report recommends that ATF establish guidance to ensure that inspectors consistently look for known indications of firearms trafficking and, when found, report the findings to ATF's criminal enforcement division.  The draft report notes that ATF has taken steps to improve coordination between inspectors and special agents by creating a Special Intelligence Inspector (SII) position in each field division, although it states that as of November 2003 only 7 of the 23 positions had been filled.

ATF agrees this recommendation is essential to ensure we effectively prevent firearms trafficking.  The June 2004 memorandum identified trafficking indicators and provided guidelines for referring cases with such indicators to special agents.  ATF also is developing a Focused Inspection Work Plan that will concentrate on trafficking indicators.  A group comprised of Directors of Industry Operations (DIO) is developing this plan and they will be given this draft report to assist them with the plan.  The group is required to have their comments to ATF management by October 1, 2004.  Currently, the idea is that for certain inspections, the work steps will be reduced to include only those activities essential to identifying illegal firearm purchases, traffickers, and corrupt FFLs. This will make inspections more efficient, which, will as the OIG suggests in its draft report, enable ATF inspectors to conduct more inspections.

In addition, ATF continually works to improve the coordination between inspectors and special agents.  Currently, 10 SII positions have been filled and we are actively trying to fill the others.  Furthermore, ATF has tasked a working group of upper management to analyze how unified operations of criminal and regulatory personnel can best be structured to achieve efficiency and meet the goals of our strategic plan.

**Other steps ATF is taking to standardize and streamline the inspection process.**

In addition, ATF currently is updating its Inspector Handbook to provide better guidance to inspectors on the conducting of inspections.  As noted earlier, ATF is analyzing the entire report and work paper process and evaluating the use of a narrative report.  This review will examine all facets of the inspection report, including the work program, work papers, gathering evidence of violations, applicability of statistical sampling, and a standard narrative report format.  Through this reevaluation process, ATF will improve the effectiveness and efficiency of the inspection process.

**2.  Conduct a pilot project to test the streamlined inspection procedures and establish appropriate time standards for conducting these inspections.**

ATF concurs with this recommendation.

-6-

Assistant Inspector General for Evaluation and Audits

As stated above, ATF is developing streamlined, standardized inspection procedures. We will conduct a pilot project of the procedures during FY-05 in several field divisions.

**3. Revise the staffing requirement report using the time standards to reflect the number of inspectors needed to conduct compliance inspections on a triennial basis, or an alternative schedule based on the FFL's compliance history.**

ATF concurs with this recommendation.

A working group of senior managers has been tasked with developing a workload model for field resources. At this time, a completion date has not been determined but a status report is due to the Assistant Director (Field Operations) in late June 2004. Presently, the managers are evaluating factors such as crime statistics, task forces, immediate and long term needs, and the FFL population, for inclusion in the workload model. The working group will be given a copy of this draft report. They will be asked to consider the shorter inspection times provided in the report, as well as an alternative inspection schedule based on an FFL's compliance history, in developing the model.

Once the new workload model is finalized, ATF will evaluate the staffing levels at each of our field offices to ensure they operate effectively and efficiently to meet our mission. At that time, we will determine if voluntary reassignments are necessary.

**4. Develop alternatives for better aligning inspector resources with the distribution of FFLs, such as by redrawing field division boundaries, realigning personnel, or other methods.**

ATF concurs with this recommendation.

The draft report found ATF has not distributed its inspector resources among the field divisions to match the distribution of FFLs, resulting in workload imbalances among the field divisions. ATF agrees that to most effectively conduct FFL inspections, inspector resources must be matched to the FFL population.

ATF inspectors, presently and historically, have responsibilities beyond inspecting FFLs. The division of ATF into the Tax and Trade Bureau (TTB) and the Bureau of Alcohol, Tobacco, Firearms and Explosives, as well as the passage of the Safe Explosives Act, caused ATF's regulatory landscape to be redrawn. There is no longer a need for inspectors to focus on alcohol and tobacco issues, but they now have more extensive

-7-

Assistant Inspector General for Evaluation and Audits

explosives responsibilities. Moreover, with the creation of TTB, ATF experienced a 25 percent reduction in inspectors nationwide, which is much higher than ATF originally anticipated. These factors have created some of the current imbalances between the numbers of inspectors and FFLs amongst the field divisions.

As stated in response to recommendation number 3, ATF is creating a new workload model for inspector staffing. Once it is finalized, we will determine if we need to reassign inspectors to better align inspector resources with the distribution of FFLs.

At this time, ATF is not planning to modify the existing structure of 23 field divisions. However, we are consolidating our DIO positions so that they accurately correspond to FFL and explosives inspection workloads and inspector resources.

Further, ATF has contracted with an academic researcher to assess and provide recommendations to improve ATF's firearms-related strategic plan and generate performance measures to help us maximize our existing resources.

Finally, ATF is taking steps to help us better target which FFLs to inspect. This will allow us to use our inspector resources more efficiently. Our plan is to use accepted statistical sampling concepts to assign FFL inspections as part of a random sample compliance model. We currently are gathering information regarding the factors that should be employed to analyze the FFL population. Once that information is collected, analyzed, and validated, it will be applied to the FFL population to generate inspection assignments using a viable risk model.

**5. Update the inspection tracking system to accurately segregate and report on inspector time spent preparing for the inspections, in travel, on site at FFLs, and conducting other administrative duties.**

ATF does not concur with this recommendation.

ATF is committed to monitoring the time inspectors spend on various assignments, so that we can ensure inspectors are operating efficiently and can work to align inspector resources with regulatory needs across the country. However, ATF does not believe it is necessary to categorize inspector work time by function (e.g., travel time v. preparation time) to achieve this goal.

-8-

Assistant Inspector General for Evaluation and Audits

Rather, ATF's case management system, N-FOCIS, uses project codes that categorize by "commodity" activity, e.g., firearms, which allows us to properly capture all administrative costs associated with ATF's mission. N-FOCIS has recently undergone system upgrades that allow us to track an inspector's activity using detailed profile codes.

Using these codes, ATF can differentiate between types of firearms inspections, application versus compliance, and within these, the types of specific inspections. For example, compliance has many subcategories including random sample, focused, etc. These system improvements enable ATF to gather data to compare inspections and related travel, to non-inspection work time. The changes provide for better categorization of inspector workloads. Although the purpose of N-FOCIS is to facilitate the tracking of commodity activities, firearms versus explosives versus alcohol and tobacco, and not capture timekeeping activities, N-FOCIS does segregate and capture general assignments that are completed by field personnel. Therefore, it provides us with an accurate picture of the time spent by field personnel on assignments.

**6. Prepare quarterly reports on the productivity and results achieved by each field division.**

ATF concurs with this recommendation.

ATF agrees it is essential to monitor the productivity of the field divisions so that we can ensure our resources are being used as efficiently and effectively as possible. We also must monitor the results of inspections to provide us with information on where trafficking problems may exist.

In order to address this issue, ATF recently created the position of Deputy Assistant Director (Field Operations – Industry Operations) to help manage ATF's regulatory enforcement efforts, including recent initiatives mentioned in the draft report and in this response. One of the first projects the Deputy Assistant Director undertook was creating a quarterly report detailing productivity and results achieved by each field division. The first report, covering the 1st and 2nd quarters of the current fiscal year, was issued in May 2004. This report provides data on how many total inspections have been completed, including how many focused and random sampling inspections, along with the remaining workload projections of each field division for this fiscal year.

The quarterly report will ensure that each field division is working on mandated Headquarters projects and demonstrate whether they are successfully completing the projects. Additionally, the reports will make ATF management aware of the constraints

-9-

Assistant Inspector General for Evaluation and Audits

that the field divisions are operating under.  If targets are not met, steps can be taken to address the underlying problem.  The reports also will show where potential trafficking problems may exist.

Furthermore, ATF recently has established the Case Management Branch (CMB) within our Field Operations Directorate to track and evaluate industry operations and criminal enforcement activities, conduct case comparisons, and make recommendations to management when needed.  The CMB works closely with the field offices and the Deputy Assistant Director (Field Operations - Industry Operations) to ensure data integrity and workload priorities are being met.

**7.  Direct the National Licensing Center to develop an adverse action tracking system to monitor the progress and timeliness of FFL denials and revocations from the time an inspector makes a recommendation until the proceedings are finalized.**

We concur with this recommendation.

A tracking system will help ATF ensure FFL denials and revocations proceed as efficiently as possible, which is essential to ensuring FFLs who violate the Federal firearms laws do not remain in the business of selling firearms.

The Division Chief, Firearms and Explosives Services, has been given the responsibility of developing and monitoring an improved adverse action tracking system for denials and revocations of licenses.  Currently, the tracking system only covers FFLs who, having been issued a notice of revocation or denial, have requested a hearing.  The system will be expanded to include all cases where a notice of revocation or denial is issued.  (Please note, it would not be useful for an inspector recommendation to initiate the tracking system, because until a supervisor approves the denial or revocation action, no notice will be issued.)  Moreover, under the new system, an e-copy of the tracking report will be forwarded to all Division Counsel on a monthly basis.  Division Counsel previously have not been notified, on a regular basis, of the status of adverse action cases.  Keeping counsel timely apprised of how many adverse actions are in their division, as well as how long they have been pending, will enable counsel to address any workload concerns.

Further, under the new system, we will provide an e-copy of the tracking report to all DIOs on a monthly basis.  This will enable DIOs to be aware of any delays caused by either their staff or the FFL which impact on the progress of the adverse action.

Finally, additional data fields will be incorporated into the revised tracking system to more accurately reflect the progress of adverse actions.

-10-

Assistant Inspector General for Evaluation and Audits

**8. Continue coordinating with the Department of Justice, Office of Legislative Affairs, to gain the authority to suspend or impose civil penalties on FFLs that violate Federal firearms laws.**

ATF concurs with this recommendation.

ATF will continue to work with the Department of Justice's Office of Legislative Affairs on this matter. Specifically, ATF will discuss the benefits of having regulatory options other than revocation, such as license suspension, the authority to issue civil penalties for minor violations, and the authority to resolve disputes short of litigation through offers in compromise.

We would like to clarify one misstatement in the draft report. The draft report states ATF has no authority to fine FFLs. ATF actually has authority to fine FFLs in one limited situation: if an FFL does not conduct a required National Instant Criminal Background System (NICS) check and the person would have been prohibited from possessing or receiving a firearm, the FFL may be fined not more than $5,000.

**9. To improve the comprehensiveness of crime gun tracing by law enforcement agencies:**

**a. Coordinate with the Office of Justice Programs to determine the feasibility of using discretionary grant funding to support crime gun tracing.**

ATF concurs with this recommendation.

A discussion will be held with other DOJ entities to determine the feasibility of using discretionary grant funding to support local police departments who want to trace all crime guns. We will initiate such discussions soon.

**b. Develop a model for more accurately identifying potential firearms trafficking through the analysis of an FFL's firearms sales volume and the number of firearms traced to the FFL.**

ATF conditionally concurs with this recommendation.

ATF continually works to better identify FFLs who may be a source of trafficked firearms so that it can focus its inspection and enforcement efforts on these dealers. However, ATF presently cannot capture the ratio of firearm sales to firearms traced for all FFLs. This is because ATF does not have access to real time firearms retail sales data for all FFLs. NICS data does not represent the complete sales picture. Purchasers may

-11-

Assistant Inspector General for Evaluation and Audits

and often do acquire more than one firearm on a single NICS check. Moreover, purchasers who possess State-issued firearms permits that qualify as an exception for a NICS check obtain firearms without the check. In addition, it can be difficult for ATF to get data from States who serve as Points of Contact for NICS. Since not all FFLs are inspected annually, we cannot get this information from FFL inspections. Further, since not all law enforcement entities trace crime guns, our tracing data is not comprehensive.

However, since October 2000, ATF has obtained information on firearms dispositions from FFLs on their applications for license renewal. The data reported covers the 3-year period of the previous license. It may be possible to compare this data with trace data sorted by FFL. In theory, those FFLs with the highest ratio of traces, in the past 3 years, to reported dispositions could then be identified and scheduled for compliance inspection. While the data periods of any such effort would not be consistent across FFLs and the results might not be easily developed, ATF will attempt to come up with such a ratio analysis, perhaps on a pilot basis. If the project is successful, we will adopt it as an additional indicator of FFLs to inspect.

Moreover, since 2000, ATF has invested significant resources to using firearm trace information to target which FFLs should be inspected using factors other than the ratio of guns traced to gun sales. ATF believes these efforts have been effective.

**Results of the Review:**

As stated previously, we would like to comment on the findings of the draft report.

**The ATF does not conduct in-person application inspections on all new FFLs to verify applicant information and ensure that they understand firearms laws.**

ATF agrees that firearms application inspections are critical to ensuring compliance with the Federal firearms laws and that inspections conducted in-person help to ensure a greater understanding of the Federal firearms laws and thus often achieve a higher level of FFL compliance. Additionally, in-person inspections help establish an FFL's understanding of the Federal firearms laws at the time of license issuance, which enables ATF to more easily demonstrate "willfulness" if an FFL subsequently does violate the Federal firearms laws.

Because ATF agrees that firearms application inspections should be done in-person, prior to the issuance of this report, we revised guidance to our field divisions requiring the in-person inspection of all new applicants in 14 selected metropolitan areas. ATF also is

-12-

Assistant Inspector General for Evaluation and Audits

taking steps to conduct in-person application inspections nationwide. New procedures issued in June 2004 generally require that an inspector must meet with an applicant in-person. An area supervisor does have discretion under this policy to decide whether an in-person interview is an effective use of ATF resources. Under the June 2004 policy, if an FFL does not have an in-person application inspection, an in-person compliance inspection must be scheduled in the first year after issuance of the license.

**The ATF does not regularly conduct compliance inspections on active FFLs, including large-scale retailers.**

ATF recognizes it cannot conduct annual compliance inspections of all FFLs because of the large population of licensees (104,000) and the small number of inspectors (420). Therefore, ATF works to most effectively utilize its inspector resources. For example, it focuses on licensees with a history of non-compliance and licensees with indicators of firearms trafficking, as well as carrying out its random sample inspection program. As stated elsewhere in this report, ATF is undertaking new efforts to effectively target FFLs for inspection, streamline the inspection process to allow for more inspections overall, and deploy its inspector resources more efficiently. Moreover, ATF has been working to ensure only FFLs who are engaged in the business of dealing in firearms, as required by the Gun Control Act, are licensed so that regulatory resources are not wasted on persons who do not merit firearms licenses.

Finally, the fact that an FFL is large does not exclude it from being selected for inspection. In fact, inspections of many large FFLs are mandated under ATF's Focused Inspection Program, because they have large numbers of firearm traces or trafficking indicators.

**The ATF does not identify and inspect all FFLs that exhibited indicators of potential violations or gun trafficking.**

ATF does identify all FFLs that exhibit indicators of potential violations or gun trafficking based on trace data available. However, we limit inspection requirements based upon our available inspector resources. We direct our resources to those FFLs that appear most problematic. The initiatives discussed throughout this response should enable ATF to inspect more of these FFLs in the future. For example, as discussed above, ATF is presently undertaking the use of accepted statistical sampling concepts to assign FFL inspections. ATF is gathering information regarding the factors that should be employed to analyze the FFL population. Once those factors are collected, analyzed

-13-

Assistant Inspector General for Evaluation and Audits

and validated, they will be applied to the FFL population to generate inspection assignments using a viable risk model. Similarly, the new work plan focusing on trafficking should both highlight trafficking problems and enable more efficient inspections which will allow for more inspections.

**Gun tracing has significant shortcomings that limit its use for identifying FFLs that should be inspected.**

ATF's National Tracing Center (NTC), the only organization of its kind in the United States, provides 24-hour assistance to Federal, State, local, and foreign law enforcement agencies in their fight against violent crime involving firearms. The draft report states that it was established in 1994. However, ATF has traced crime guns since Federal law first required FFLs to maintain their records. 1994 simply was the year the NTC moved to its present site in Martinsburg, West Virginia.

ATF's NTC plays a critical role both in assisting other law enforcement entities and in targeting ATF's enforcement and regulatory resources. While ATF agrees there currently are some problems with using tracing statistics to identify FFLs to inspect, ATF is taking steps to address these problems. Moreover, after taking potential biases created by these problems into account, ATF does make extensive use of trace data in targeting FFLs to inspect.

One current limitation with trace data is that not all law enforcement agencies conduct comprehensive tracing as is the case in Youth Crime Gun Interdiction Initiative cities. Increased use of tracing in areas where it is not currently conducted would help identify FFLs to inspect. As stated in response to recommendation 9, ATF will work to encourage more localities to do comprehensive tracing.

Another weakness of trace data raised in the draft report is that most used guns cannot be traced because absent any State regulation, there is no requirement to document transfers between individuals. ATF's "Demand Letter" program identifies dealers who may have a large number of traces associated with the secondhand sales of firearms. By collecting limited used gun information from these FFLs, ATF is able to trace any second hand guns sold by these dealers.

The third weakness discussed in the draft report is the lack of a ratio of guns traced to sales volume. Once again, ATF is taking steps to address this problem. As discussed in response to recommendation 9, efforts will be made to identify the relationship between sales volume and traced firearms.

-14-

Assistant Inspector General for Evaluation and Audits

While these weaknesses do exist, ATF believes it currently uses its trace data effectively to target FFLs for inspections. For example, ATF's "Focused Inspection" and "Demand Letter" programs use this data and have achieved beneficial results.

The draft report concludes that traces originating in particular cities are associated with dealers in and around those cities. However, there are many cities with firearms sourced on a regional and national basis. Therefore, it is not especially useful to compare, as the draft report does, the number of traces submitted by law enforcement in a field division and the number of inspections in that field division. ATF's Focused Inspection and Demand Programs capture FFLs with trafficking indicators no matter where the firearms are used in crime. FFLs are routinely identified for inspection if they meet the criteria for having a certain number of short time-to-crime traces, no matter where the law enforcement agencies that requested the traces were located. (This was the basis for increased enforcement activity regarding FFLs in Mississippi who were identified through guns recovered in Chicago).

Moreover, ATF often relies on field offices to be aware of the trace histories of the local dealer population to focus their inspection efforts. The draft report reflected that field offices were making such efforts. Further, field offices increasingly have been asking the NTC for FFL trace histories, showing they are trying to better target their inspection efforts.

Field Office FFL History Requests:

| FY01 | FY02 | FY03 |
|------|------|------|
| *1,197* | *1,639* | *2,205* |

**ATF field divisions implement FFL inspections inconsistently.**

ATF has been working on standardizing and streamlining the present procedures for conducting firearms inspections since before the initiation of the OIG audit. The new guidelines issued in June 2004 establish clear guidance for how inspections are to be conducted. We are confident they will make inspections more consistent across field divisions.

**Suspected criminal violations are not always referred for investigation.**

The June 2004 guidelines remind inspectors that information referrals should be made when trafficking indicators are present. Moreover, as discussed in response to recommendation 1, ATF is working to better coordinate its regulatory and enforcement personnel.

-15-

Assistant Inspector General for Evaluation and Audits

**The ATF acts infrequently to revoke Federal firearms licenses, and the process is not timely. New ATF policy begins to address inconsistent and untimely adverse actions.**

ATF appreciates the draft report's recognition of the recent changes to ATF's adverse action policy to improve consistency, efficiency, and ensure FFLs who willfully violate the GCA receive a revocation or denial notice when appropriate. While ATF recognized the need to make changes in our adverse action procedure, we disagree with the draft report's suggestion that ATF previously acted improperly by infrequently revoking Federal firearms licenses.

In reviewing the number inspections conducted in the field and the number of adverse actions taken as a result of those inspections, the draft report noted the discrepancy between average inspection time and the number of adverse actions taken by the field divisions. The report fails to note the critical components that comprise the decision to take adverse action against an FFL. The report should reflect that not all violations can (or should) result in an adverse action against an FFL. The legal standard is "willfulness." Many violations noted by an inspector may be so inadvertent that they cannot satisfy the legal standard of "willfulness."

In addition, some willful violations may not warrant revocation/denial if there are mitigating circumstances. In such cases, the violation is noted but no formal action is taken against the FFL. Rather, the FFL is educated about better methods and procedures to avoid such errors in the future. Hence, the fact that inspectors have taken a great deal of time inspecting and documenting violations by an FFL, but have failed to take formal legal action against the FFL, cannot be construed, by itself, as inappropriate. ATF works diligently to promote voluntary compliance, protect the public, and deny and revoke licenses when appropriate.

This finding and the accompanying narrative make it appear that ATF is allowing some FFLs whose licenses should be revoked to remain in business. However, when ATF specifically asked if the OIG had found a single case of ATF not taking action where warranted, the OIG staff replied no. ATF believes it appropriately undertakes revocation and denial actions when evidence of willful violations support such action.

In addition, the draft report does not reflect the fact that many FFLs withdraw renewal applications when they are put on notice that their application likely will be denied and surrender their license when told it likely will be revoked.

-16-

Assistant Inspector General for Evaluation and Audits

Finally, while we are working to better track adverse actions as discussed in response to recommendation 7, revocation and denial proceedings often are slow for reasons beyond ATF's control. The legal process for denial/revocation has time constraints that bind ATF, but not the FFL. For example, FFLs often ask for and receive extensions of time to respond to notices, making the process lengthy.

**By streamlining and standardizing inspections, the ATF could dramatically improve the FFL inspection program.**

ATF identified and began to address deficiencies within our inspection program prior to the initiation of the OIG audit. ATF issued guidelines to streamline and standardize compliance inspections in June 2004 that were effective immediately. ATF's Field Operations and Enforcement Programs and Services Directorates will be monitoring inspection field activities closely.

**ATF does not consistently report inspection performance.**

ATF recognizes that inspection performance data must be closely scrutinized. This concern was discussed at great length with the Audit Team during the OIG audit. ATF is committed to ensuring integrity of our performance indicators.

As discussed in response to recommendation 5, modifications and upgrades have been made to N-FOCIS to streamline the way it captures activity by commodity. These modifications and improvements will help to ensure that data runs accurately reflect field activity and remain constant over the course of time. Additionally, ATF's Office of Strategic Intelligence is generating quarterly reports for the program offices so that field activity can be monitored regularly.

**New restrictions on retention of gun purchaser data will hinder the ATF's ability to detect fraudulent background checks.**

Although ATF will no longer be able to have NICS verify information from ATF Forms 4473 for transferees who received proceed responses from NICS, this will not hinder our ability to ensure FFLs do not abuse the NICS system. We are developing a procedure that will allow inspectors to obtain "Individual FFL Audit Logs" from the FBI prior to inspections. These logs will contain certain data that will be utilized during inspections to corroborate the veracity of information provided to, and received from, NICS. This includes all information for denied transactions and data such as the date NICS was contacted, the NICS Transaction Number (NTN), and the response provided, for a 60 day time period for proceed transactions. ATF inspectors will also have the ability to conduct NICS rechecks to ensure FFLs did not provide NICS with false information. The draft

-17-

Assistant Inspector General for Evaluation and Audits

report incorrectly suggests that the rechecks only can tell if the purchaser should have been approved at the time of the recheck because the FBI will be told the date of the original check, it can disregard any changes to the purchaser's status since that date. ATF also uses a tool called the NTN validator to ensure FFLs are not creating false NTNs when no NICS check was completed. Thus, as stated above, the new restrictions will not impede our regulatory and enforcement efforts.

**In conclusion, we wanted to provide a summary of significant steps ATF has or will take to address the recommendations and findings of the OIG draft report:**

- Revised guidance to the field to require in-person inspections of all FFL applicants in 14 metropolitan areas

- Issued new procedures in June 2004 generally requiring all FFL application inspections to be conducted in-person. If an application inspection is not conducted in-person, an in-person compliance inspection must be scheduled in the first year after the license is issued

- Issued "Guidelines for Conducting Federal Firearms Licensee Compliance Inspections" in June 2004. This publication sets out guidelines for the period of records review, when complete inventory verifications must be performed, and establishes the number of Forms 4473 to be reviewed. It also gives guidance on referring potential trafficking cases to ATF agents.

- Developing a Focused Inspection Work Plan that concentrates on trafficking indicators. A draft of this streamlined inspection program is due to ATF management on October 1, 2004.

- Created a working group of upper management to determine how to best structure unified operations of criminal and regulatory personnel.

- Undertaking a complete review of the firearms report writing procedures including the work program, work papers, how to gather evidence of violations, applicability of statistical sampling, and creating a standard narrative report format.

- Conducting a pilot project of its new streamlined and standardized inspection procedures in several field divisions during FY-05.

-18-

Assistant Inspector General for Evaluations and Audits

- Developing a workload model for field resources. The working group will be given a copy of the draft report to consider in conducting their analysis. A status report is due in June 2004. ATF will shift inspector resources if the results of the study show this would be beneficial.

- Consolidating Director of Industry Operations positions to better align with workload and inspector distribution.

- Working with an academic researcher to improve our firearm-related strategic plan and generate performance measures to help us maximize our existing resources.

- Using accepted statistical sampling concepts to assign FFL inspections. We are currently gathering the information necessary for this analysis.

- Upgraded our N-FOCIS system to enable us to better track inspector work time on various assignments.

- Created the position of Deputy Assistant Director (Field Operations – Industry Operations) to help manage ATF's regulatory enforcement efforts. Also created the Case Management Branch within our Field Operations Directorate to monitor industry operations.

- Issued first quarterly report in May on the productivity and results achieved by each field division.

- Revised our adverse action procedures to improve consistency, efficiency, and ensure denials/revocations are issued where warranted.

- Creating a new adverse action tracking system that will include all FFLs who receive a notice of denial or revocation. Field counsel and DIOs will receive e-copies of the report on a monthly basis. The report will have more details than the existing report.

- Coordinate with DOJ to gain suspension, fine, and offers in compromise authority.

- Work with DOJ to determine the feasibility of using discretionary grant funding to support local police departments who want to trace all crime guns.

-19-

Assistant Inspector General for Evaluation and Audits

- Attempt to develop a ratio of guns traced to sales volume to use in a pilot program for inspecting FFLs.

Again, we appreciate the opportunity to respond to the draft report and look forward to continuing our efforts to address the issues it raised.  If you have any questions regarding this response, please contact, Carol Campbell Audit Liaison, Office of Inspection, at (202) 927-8276.

Carl J. Truscott

# APPENDIX IV: OIG ANALYSIS OF THE ATF'S COMMENTS

On June 4, 2004, the Office of the Inspector General (OIG) sent copies of a draft of this report to the Bureau of Alcohol, Tobacco, Firearms and Explosives (ATF) with a request for written comments. The ATF responded to us in a memorandum dated June 29, 2004.

The ATF fully concurred with seven of our nine recommendations. The ATF did not concur with our recommendation on updating its inspection tracking system to more accurately segregate and report on all Inspector time spent on inspections. Instead, the ATF offered an alternative solution for updating N-SPECT, explaining that an update to the overall system, N-FOCIS, would accomplish what we recommended. The ATF also conditionally concurred with the recommendation on developing a model to more accurately identify potential firearms trafficking, although it suggested that implementing the recommendation would be difficult. The ATF also provided general comments on the findings contained in the draft report. Our analysis of the ATF's comments on the recommendations and findings in the draft report follows.

## THE ATF'S RESPONSE TO RECOMMENDATIONS

**<u>Recommendation 1</u>: Develop a standard, streamlined inspection process that includes in-person inspections of all Federal Firearms Licensee (FFL) applicants; more efficient inventory and records reviews; automated inspection reporting; and consistent examination of indicators of firearms trafficking.**

**Status:** Resolved – Open

**Summary of the ATF's Response:** The ATF concurred with our recommendation and stated that it is taking a series of steps to implement it, including:

- In-person application inspections are now required in 14 metropolitan areas, and ATF also is increasing the number of in-person application inspections conducted nationwide.

- A memorandum titled "Guidelines for Conducting Federal Firearms Licensee Compliance Inspections" was issued in June 2004 to clarify a number of inspection process issues such as the methods for verifying FFL inventories, record review periods, and ATF Form 4473 reviews.

- The ATF is reevaluating all work plans and workpapers to eliminate tasks that are not critical to a final inspection report.

- An ATF working group is developing a work plan for Focused Compliance Inspections. The working group's initial milestone is to provide comments to ATF management by October 1, 2004.

- The Inspector Handbook is being updated to provide better guidance to Inspectors on conducting inspections.

In response to our recommendation that the ATF automate its inspection procedures, the ATF stated that Inspectors have laptop computers at their disposal, but that many FFLs object to the use of these computers during inspections. The ATF stated that these FFLs are concerned that the laptop computers might be used to create a registry of firearms and firearms owners, something the ATF is prohibited by law from doing.

**The OIG's Analysis:** The ATF's proposed actions are responsive to the recommendation. By October 31, 2004, please provide copies of or status reports on the following:

- The "Guidelines for Conducting Federal Firearms Licensee Compliance Inspections," June 2004,

- The names of the 14 metropolitan locales that now require in-person application inspections,

- The new inspection reporting procedures that are under development,

- The Focused Inspection Work Plan that is under development, and

- The updated Inspector Handbook.

The ATF's comment on the use of laptops is not responsive to the recommendation to automate inspection reporting. We are not persuaded that FFLs should be allowed to determine how the ATF conducts its inspections. The fear ascribed to some FFLs is groundless. Creating an effective national firearms registry would require information on all gun sales by all FFLs – a logistical impossibility for the ATF. The ATF's current practice of taking handwritten notes while onsite at an FFL and later transcribing the information into a computer is no more or less likely to facilitate the hypothetical national firearms registry than is entering inspection information directly into a computer while onsite. Rather, we believe that educating FFLs on the implausibility of their concern, as well as the potential benefits of quicker inspections and more accurate inspection records for the FFL, could help overcome such objections. Therefore, we request that the ATF reconsider this response and also identify steps to improve the automation of the inspection process.

**Recommendation 2**:  **Conduct a pilot project to test the streamlined inspection procedures and establish appropriate time standards for conducting these inspections.**

> **Status:**  Resolved – Open
>
> **Summary of the ATF's Response:**  The ATF concurred with this recommendation and stated that it was developing streamlined, standardized inspection procedures, which it planned to test in several divisions in a pilot project during Fiscal Year 2005.
>
> **The OIG's Analysis:**  The ATF's proposed action is responsive to the recommendation. By October 31, 2004, please provide us with the streamlined inspection procedures that will be used in the pilot project, as well as the planned start and completion dates, and locations, for the pilot project.

**Recommendation 3**:  **Revise the staffing requirement report using the time standards to reflect the number of Inspectors needed to conduct compliance inspections on a triennial basis or on an alternative schedule based on the FFL's compliance history.**

> **Status:**  Resolved – Open

**Summary of the ATF's Response:** The ATF concurred with our recommendation and stated that it created a working group to develop a workload model. A completion date for the effort has not yet been established, but a status report from the working group was due by late June 2004 to the Assistant Director (Field Operations). Further, in its response to Recommendation 4, the ATF stated that it has contracted with an academic researcher to develop recommendations to improve performance measures to help the ATF maximize its existing resources.

**The OIG's Analysis:** The ATF's proposed action is responsive to the recommendation. By October 31, 2004, please provide us with copies of the status reports submitted by the working group, the schedule for the completion of the workload model, any revised staffing requirement reports, and copies of the recommendations of the academic researcher for improving the utilization of existing resources.

**Recommendation 4: Develop alternatives for better aligning Inspector resources with the distribution of FFLs, such as by redrawing Field Division boundaries, realigning personnel, or other methods.**

**Status:** Resolved – Open

**Summary of the ATF's Response:** The ATF responded that the rationale for how Inspectors were allocated to its Field Divisions was based on its former alcohol and tobacco oversight responsibilities (which are now assigned to the Department of the Treasury), as well as its explosives inspections activities. The ATF recently began consolidating its Director of Industry Operations (DIO) positions so that they are better aligned with its FFL and explosives inspection workload. Also, using the new workload model for Inspector staffing developed in response to Recommendation 3, the ATF will evaluate the need to reassign Inspectors to better align resources with the distribution of FFLs and explosives licensees.

**The OIG's Analysis:** The ATF's proposed action is responsive to the recommendation. By October 31, 2004, please provide us with a schedule for completing the assessment of the alignment of Inspector resources with the FFL population and any analyses of the current and planned distribution of resources.

**Recommendation 5:  Update the inspection tracking system to accurately segregate and report on Inspector time spent preparing for inspections, in travel, onsite at FFLs, and conducting other administrative duties.**

**Status:**  Unresolved – Open

**Summary of the ATF's Response:**  The ATF did not concur with the recommendation, stating that because it "does not believe it is necessary to categorize Inspector work time by function (e.g., travel time v.  preparation time)" to ensure that Inspectors are operating efficiently.  The ATF stated that it believes its current case management system, N-FOCIS, uses project codes to accurately account for "all administrative costs associated with ATF's mission."  The ATF stated that it has upgraded its N-FOCIS system [which includes the N-Spect FFL inspection database] to segregate inspection activities by type (i.e., application inspections versus compliance inspections) to "provide for better categorization of inspector workloads."

**The OIG Analysis:**  The ATF's comments and alternative actions are not responsive to the recommendation to update the tracking system to segregate and report on Inspector time.  From the description of the recent upgrades to the N-FOCIS system provided by the ATF, it appears that the ATF will be better able to track data on each *type of inspection* and how it was conducted.  However, from the information provided, it appears that the ATF will still be unable to quantify Inspector time spent onsite, in travel, and accomplishing other administrative and non-inspection related activities.

However, a system that does not track all categories of Inspector time is inadequate for ensuring that activities are conducted efficiently.  In our review, we found that only 41 percent of ATF Inspectors' firearms-related work time is spent directly on inspection activities (including traveling to and from the FFL's place of business).  Fifty-nine percent of the Inspectors' time was spent on activities not directly related to inspections, such as training, answering telephone inquiries from FFLs, or other administrative tasks.  Implementing a tracking system that can measure the time spent on all of these activities – not just data related to the specific type of inspection assignment – is essential to developing and implementing an effective workload model and to

redistributing resources to match the workload, actions which the ATF stated in its response to Recommendations 3 and 4 that it plans to undertake in FY 2005.

To develop a workload model for aligning Inspector resources with regulatory needs, the ATF must be able to segregate and analyze all Inspector time, not just time spent directly on conducting inspections. If the ATF does not categorize and measure Inspector work time by function, it will be difficult to establish appropriate performance goals, account for the variability among its divisions, or accurately report its productivity.

Please reconsider this response and provide us by August 3, 2004, whether the ATF will create a plan for updating the inspection tracking system to accurately segregate and report on all Inspector time or, in the alternative, how the ATF plans to develop a comprehensive workload model without such information.

## Recommendation 6:  Prepare quarterly reports on the productivity and results achieved by each Field Division.

**Status:**  Resolved – Open

**Summary of the ATF's Response:**  The ATF stated that to address this recommendation, it created the position of Assistant Director (Field Operations) to better manage the ATF's regulatory enforcement efforts in the field. One of the first tasks of the Assistant Director was the creation of a quarterly reporting system on inspection productivity and results by each Field Division. The ATF also established the Case Management Branch within the Field Operations Directorate for tracking and evaluating industry operations and criminal enforcement activities, conducting case comparisons, and making appropriate recommendations.

**The OIG's Analysis:**  The ATF's proposed action is responsive to the recommendation. By October 31, 2004, please provide us with copies of the quarterly reports, as well as any annual compendium or other productivity analyses for FY 2004.

**Recommendation 7**:  **Direct the National Licensing Center to develop an adverse action tracking system to monitor the progress and timeliness of FFL denials and revocations from the time an Inspector makes a recommendation until the proceedings are finalized.**

**Status:**  Resolved – Open

**Summary of the ATF's Response:**  The ATF concurred with this recommendation and tasked the Division Chief, Firearms and Explosives Services, with developing and monitoring an improved adverse action tracking system for denials and revocations of licenses.  The ATF also intends to route an electronic version of monthly tracking reports to all Division Counsels and DIOs to better advise them of how many adverse actions are pending in their divisions and how long each case is taking to resolve.  The ATF also plans to expand the tracking system to incorporate more indicators of case progress.

**The OIG's Analysis:**  The ATF's proposed action is responsive to the recommendation.  By August 3, 2004, please provide us with a copy of the functional description of the planned adverse action tracking system and a copy of the master schedule for the development and implementation of the system.

**Recommendation 8**:  **Continue coordinating with the Department of Justice, Office of Legislative Affairs, to gain the authority to suspend or impose civil penalties on FFLs that violate federal firearms laws.**

**Status:**  Resolved – Open

**Summary of the ATF's Response:**  The ATF has indicated that it will continue to work with the Department of Justice's Office of Legislative Affairs on obtaining regulatory options such as license suspensions and the authority to issue civil penalties in lieu of license revocation.  The ATF also clarified that it can impose fines in one limited circumstance, when an FFL fails to conduct a National Instant Criminal Background Check System (NICS) check and that NICS check would have resulted in a denial of the sale.

**The OIG's Analysis:**  The OIG considers this recommendation resolved.  By October 31, 2004, please provide us

with updates as to how the ATF is coordinating with the Office of Legislative Affairs. We made two minor changes in the report to make it clearer that the ATF has no general fining authority but can impose a fine in the limited circumstance described above.

**Recommendation 9**: **To improve the comprehensiveness of crime gun tracing by law enforcement agencies:**

**a. Coordinate with the Office of Justice Programs to determine the feasibility of using discretionary grant funding to support crime gun tracing.**

**Status:** Resolved – Open

**Summary of the ATF's Response:** The ATF's stated that it concurred with the recommendation and planned to initiate discussions with other Department entities on the feasibility of using discretionary grant funding to support local police departments that want to trace crime guns.

**The OIG's Analysis:** The ATF's proposed action is responsive to the recommendation. By October 31, 2004, please provide us with the dates of meetings held or planned and copies of minutes or other documentation of the topics discussed and the decisions made at the meetings.

**b. Develop a model for more accurately identifying potential firearms trafficking through the analysis of an FFL's firearms sales volume and the number of firearms traced to the FFL.**

**Status:** Resolved – Open

**Summary of the ATF's Response:** The ATF conditionally concurred with this recommendation, but stated that retail sales volumes are not captured for each FFL dealer on a yearly basis. Further, the ATF stated that the number of NICS checks submitted by each FFL is not a reliable indicator of sales because purchasers can acquire more than one firearm on a single NICS check and certain limited types of sales are exempt from a NICS check. However, the ATF proposed incorporating the sales data reported by FFL dealers applying to renew their licenses as a method to identify for inspection those FFLs with the highest ratios of traces to reported sales over a 3-year period.

**The OIG's Analysis:** The ATF's proposed action is responsive to the recommendation. However, our review found that the ATF's current compliance inspection procedures do not include steps to verify the renewal data submitted by the FFLs. We accept the ATF's proposed action, but request that the ATF modify its proposal to include adding steps to compliance inspections to verify the renewal data against actual FFL Acquisition and Disposition Book sales totals. By October 31, 2004, please provide us with the implementation plan for comparing FFL trace data and reported sales volume.

### ATF COMMENTS ON REPORT FINDINGS

In addition to addressing the recommendations, the ATF remarked on the draft report's findings. In this section, we summarize the ATF's comments and provide our analysis of its planned actions.

**FINDING: The ATF does not conduct in-person application inspections on all new FFLs to verify applicant information and ensure that they understand firearms laws.**

**The ATF's Comment:** The ATF agreed that in-person application inspections are critical for ensuring that licensees understand and obey federal firearms laws. The ATF stated that it is taking steps to conduct in-person application inspections nationwide and noted that under its June 2004 policy, all applicants who do not receive an in-person application inspection must be scheduled for an in-person compliance inspection during the first year after they are issued a federal firearms license.

**The OIG's Analysis:** We agree with the ATF's comments and planned course of action.

FINDING: The ATF does not regularly conduct compliance inspections on active FFLs, including large-scale retailers.

**The ATF's Comment:** The ATF stated that it cannot conduct annual compliance inspections of all FFLs due to the large number of licensees (more than 104,000) and the small number of Inspectors (420). Instead, the ATF stated that it works to focus its compliance inspections [Focused Inspection Program] on those FFLs with a history of non-compliance and those FFLs with

business practices that indicate signs of potential firearms trafficking. The ATF stated that many large-scale FFLs fall into one of these categories, thereby requiring that they be inspected. According to the ATF, "the fact that an FFL is large does not exclude it from being selected for inspection."

**The OIG's Analysis:** We agree with the ATF's statement that it cannot conduct annual compliance inspections on all FFLs with its current resources, and we did not suggest that the ATF attempt to do so in the report. To the contrary, we accepted the ATF's stated goal of conducting a compliance inspection on every FFL at least once every three years. With additional staffing and better utilization of its existing personnel, we believe that goal is attainable. In regard to the ATF's statement that large-scale FFLs are often inspected under its Focused Inspection Program and are not exempt from inspection, we note that although the ATF described these inspections as "mandatory," our interviews with DIOs found otherwise. Two DIOs described these inspections as "priorities," but stated that they do not complete all assigned Focused Inspections, including those of large-scale FFLs, because of competing demands. Further, the report did not state that large FFLs were exempt from inspection, but showed that they were statistically treated about the same as all other FFLs with respect to infrequent inspections.

**FINDING: The ATF does not identify and inspect all FFLs that exhibited indicators of potential violations or gun trafficking.**

**The ATF's Comment:** The ATF disagreed with our finding and stated that it "does identify all FFLs that exhibit indicators of potential violations or gun trafficking based on trace data available." However, the acknowledged that it "limit[s] inspection requirements based on our available Inspector resources." The ATF also stated that it plans to analyze other factors that should be utilized to determine which FFLs should be inspected.

**The OIG's Analysis:** During our inspection, we did not find that the ATF ever compiled a list of *all* FFLs that exhibited trafficking indicators (e.g., multiple traces, short time-to-crime traces). Instead, in describing how FFLs are identified for Focused Inspections, staff of the National Tracing Center (NTC) stated that they manipulated the query parameters by limiting the FFLs identified to a pre-selected number. That pre-selected number

(350 in FY 2002) was based on the projected availability of Inspector resources. The ATF made no attempt to determine an unacceptable level of trafficking indicators for FFLs and then identify all FFLs that exceeded that level without regard to whether all of the FFLs could be inspected with existing resources. Therefore, we maintain our finding that the ATF has not identified all FFLs that exhibited indicators of potential violations or of firearm trafficking.

**FINDING: Gun tracing has significant shortcomings that limit its use for identifying FFLs that should be inspected.**

**The ATF's Comment:** The ATF agreed that gun tracing has "weaknesses" and stated that it plans to address shortcomings identified in our report by implementing Recommendation 9. The ATF disagreed with our comparison of traces submitted by law enforcement agencies within a Field Division to the number of inspections conducted in that Field Division and stated that the comparison is "not especially useful." The ATF stated that crime gun tracing patterns vary by region. The ATF also clarified that the NTC was moved to Martinsburg, West Virginia, in 1994 but stated that the ATF had conducted tracing before the NTC relocated.

**The OIG's Analysis:** We believe that our comparison of trace data to inspections is useful. We do not agree with the ATF's argument that the existence of national trafficking patterns negates the use of data on traces submitted in each Division to analyze the ATF's resource management.[76] The ATF argues that the fact that more traces were submitted in a Division would not necessarily mean that more inspections should be conducted in that Division because the traced guns may have originally been sold by FFLs in other Divisions. Therefore, any inspections would have occurred in those Divisions, not in the Divisions where the traces were submitted.

However, the ATF's own analysis of crime gun recoveries (contained in its report *Crime Gun Trace Reports 2000*) found that 48 percent of crime guns were recovered within 25 miles of where they were originally sold. In contrast, national trafficking patterns

---

[76] The ATF was unable to provide us with consolidated data on the number of guns traced to FFLs in each Division, and instead provided the number of traces submitted by law enforcement agencies, by Field Division.

(i.e., guns recovered more than 250 miles from where they were purchased) accounted for more than 30 percent of crime guns traced in only 9 cities (including cities that ban handguns, such as New York City, Washington, D.C., and Chicago). Those data indicate that the preponderance of guns recovered in a Division was of local origin. Therefore, we concluded that data on trace submissions could be used to approximate the distribution of crime gun traced to FFLs in the ATF's Field Divisions.

Comparing the number of trace requests to the number of inspections conducted in each Division shows whether, on a national level, trace data were used to direct resources toward inspecting FFLs in Divisions where more crime guns originated. Our analysis showed little or no ATF-wide correlation between the number of crime guns submitted to the ATF for tracing in a Field Division and the number of compliance inspections conducted in that Field Division. The lack of any correlation on a national level indicates that the ATF is not managing its resources to conduct more inspections in Divisions where more crime guns originated.

The ATF also stated that some Field Divisions use trace data to target inspections within the Division. We agree that this is a positive use of trace data, and we note in the report that the Divisions can and are using the data internally. However, the internal use of trace data by Divisions does not negate our primary finding that there is little or no correlation between the number of traces and the number of inspections ATF-wide. Likewise, the ATF's statement that some localities have few local guns traced (which we found was due to restrictions on handgun sales in the locality) does not negate our primary finding.

Regarding the ATF's comments on the NTC move to Martinsburg, we clarified that the ATF's gun tracing program operations were consolidated, not established, in 1994.

**FINDING: ATF Field Divisions implement inspections inconsistently.**

**The ATF's Comment:** The ATF stated that it has been working on standardizing and streamlining the present procedures for conducting inspections.

**The OIG's Analysis:** Although the ATF did not explicitly state whether it agrees with our finding, the ATF's planned course of action will address the problems we reported with varying inspection implementation by ATF Field Divisions and will lead to more consistent inspections across the agency.

**FINDING: Suspected criminal violations are not always referred for investigation.**

**The ATF's Comment:** The ATF stated that its June 2004 policy reminds Inspectors to initiate referrals to ATF Special Agents when inspections reveal potential trafficking indicators.

**The OIG's Analysis:** If followed, we agree that the ATF's new policy will address our finding and lead to more consistent referrals of suspected trafficking.

**FINDING: The ATF acts infrequently to revoke federal firearms licenses, and the process is not timely. New ATF policy begins to address inconsistent and untimely adverse actions.**

**The ATF's Comment:** The ATF disagreed with our finding that, prior to its new policy, the ATF acted "improperly" by infrequently revoking federal firearms licenses and noted that we did not find a specific case in which the ATF should have taken such action against an FFL. The ATF stated that our report "fails to note the critical components that comprise the decision to take adverse action against an FFL." The ATF stated that the report should note that not all violations of federal firearms laws warrant revocation of the FFL's license. Further, the ATF stated that the legal standard is "willfulness," and many violations "may be so inadvertent that they cannot satisfy the legal standard." In addition, the ATF noted that many applicants and licensees withdraw their requests for a federal firearms license rather than face revocation.

**The OIG's Analysis:** We did not identify any FFLs that the ATF allowed to stay in business when revocation was warranted because, as our report made clear, we did not re-inspect any FFLs during our review. Instead, we examined the ATF's overall processes.

Our report did not state that the ATF acted "improperly" by failing to revoke FFL licenses in the past. However, the ATF's own actions indicate that its past practices were inadequate. In our review, we found that 11 of the ATF's 23 Field Divisions took no revocation actions in FY 2002. Those 11 Field Divisions conducted a total of 1,936 compliance inspections that found 51,314 violation instances. To accept the ATF's logic would mean that those Field Divisions initiated no revocations because, despite the 51,314 violations – which ATF Inspectors spent more than 108,000 hours to find and document – the ATF found no case that indicated a pattern of willful disregard for federal firearms laws. If that were correct, we would question such an expenditure of resources to find and document minor infractions. We would also question the ATF's process for selecting FFLs to inspect in those Field Divisions, since it failed to make effective use of established indicators of trafficking to identify those FFLs among the 46,775 FFLs located in these Field Divisions that were likely to be willfully violating federal firearms laws. We believe such FFLs existed in those 11 Field Divisions. [During our review, we also noted news reports of corrupt FFLs being arrested in Miami, Los Angeles, and Phoenix.]

The ATF's argument that, in the past, it always properly revoked the licenses of FFLs that were willfully violating federal firearms laws is also contradicted by the substantial rise in revocations since the ATF issued revised adverse action guidelines. In the first quarter of FY 2004, the ATF issued Initial Notices of Revocation or denied renewal to 59 FFLs. If that rate continues, the ATF will revoke the licenses of almost eight times as many FFLs in FY 2004 as it did in FY 2002. Given the above, we do not find persuasive the ATF's argument that in the past it revoked the licenses of all FFLs that violated federal firearms laws.

**FINDING: By streamlining and standardizing inspections, the ATF could dramatically improve the FFL inspection program.**

**The ATF's Comment:** The ATF stated that it began addressing "deficiencies" in its inspection program prior to the initiation of our review and stated that it will closely monitor its Inspectors to ensure that they are following the June 2004 guidelines, which address deficiencies that the ATF identified as well as those we identified in our report.

**The OIG's Analysis:** We believe that the ATF's June 2004 guidelines and the planned actions described in its response to our recommendations will be effective for responding to the need we identified for the ATF to improve the FFL inspection program.

**FINDING:  The ATF does not consistently report inspection performance.**

**The ATF's Comment:**  The ATF stated that it is committed to ensuring the integrity of its performance indicators and stated that modifications and upgrades to its electronic databases will help ensure consistent reporting of inspection performance.

**The OIG's Analysis:**  We believe that the ATF's planned course of action will lead to more accurate and consistent reporting of its inspection activities.

**FINDING:  New restrictions on retention of gun purchaser data will hinder the ATF's ability to detect fraudulent background checks.**

**The ATF's Comment:**  The ATF stated that a new restriction placed on data maintained by NICS does not hinder the ATF's ability to "ensure FFLs do not abuse the NICS system."  The ATF stated that it is developing a procedure to allow Inspectors to obtain 90 days of FFL-specific NICS information from the Federal Bureau of Investigation (FBI), which oversees NICS, prior to inspecting FFLs.  The ATF stated that this information gives Inspectors the "ability to conduct NICS rechecks to ensure FFLs did not provide NICS with false information."

**The OIG's Analysis:**  On the basis of the information provided by the ATF, we continue to believe that the new restriction on NICS information will reduce the ATF's ability to detect fraudulent NICS checks through an examination of FFL records.  Even if ATF Inspectors are supplied with 90 days of FFL-specific NICS data from the FBI, all purchaser information on approved sales will be deleted within 24 hours.  Therefore, the ATF can only *assume* that the purchaser information that was originally submitted to NICS was the same as the information that the Inspector submits for the recheck.  If the recheck finds that a sale was allowed to a prohibited person, the ATF will have no way of determining from the FFLs' records whether the approval was due to an incorrect response from the NICS operator (i.e., the result of FBI error) or if it occurred because the FFL supplied incorrect purchaser information to NICS.

Moreover, the ATF will have no way of determining the cause of an incorrect NICS response once 90 days have elapsed because, after that time, the FBI also deletes the remaining FFL-specific information associated with approved NICS transaction numbers. We agree that conducting a recheck could potentially identify that a prohibited person obtained a gun. However, we continue to believe that the new NICS restriction will hinder the ability of the ATF to detect fraudulent NICS background checks by examining FFL records during compliance inspections.