**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

| | | |
|---|---|---|
| **ILLINOIS ASSOCIATION OF** | ) | |
| **FIREARMS RETAILERS, ET AL.,** | ) | |
| | ) | |
| **Plaintiffs,** | ) | |
| | ) | |
| **v.** | ) | **No. 10-CV-4184** |
| | ) | **Judge Edmond E. Chang** |
| **CITY OF CHICAGO, ET AL.,** | ) | **Magistrate Judge Geraldine Soat** |
| | ) | **Brown** |
| **Defendants.** | ) | |

**DEFENDANTS' MEMORANDUM IN SUPPORT OF THEIR MOTION FOR
<u>SUMMARY JUDGMENT</u>**

Michael A. Forti
Mardell Nereim
Andrew W. Worseck
William Macy Aguiar
Rebecca Alfert Hirsch
City of Chicago, Department of Law
Constitutional and Commercial Litigation Division
30 North LaSalle Street, Suite 1230
Chicago, Illinois 60602
(312) 744-9018 / 6975 / 7129 / 4216

Attorneys for Defendants

## TABLE OF CONTENTS

INTRODUCTION . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

ARGUMENT . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2

I.     Second Amendment Analysis Framework . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2

II.    The Restrictions On Carrying Firearms Outside The Home Are Constitutional . . . 3

      A.     The Second Amendment does not protect carrying outside one's home . . . . 5

           1.     The English understanding . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 5

           2.     The American understanding . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 7

                i.     Bans on carry . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 7

                ii.     Bans on discharge . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 8

      B.     Chicago's restrictions satisfy means-end scrutiny . . . . . . . . . . . . . . . . . . 10

           1.     Intermediate scrutiny applies . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 10

           2.     Intermediate scrutiny's requirements . . . . . . . . . . . . . . . . . . . . . . . . 12

           3.     The restriction on carrying outside the home satisfies
                  intermediate scrutiny . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 15

                i.     Reducing deaths from violent encounters involving a gun . . 16

                ii.     Reducing violence by gang members . . . . . . . . . . . . . . . . . . 18

                 iii.     Reducing accidental injury and death . . . . . . . . . . . . . . . . . 20

                 iv.     Reducing gun theft . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 21

           4.     The restriction on handguns in a fixed place of business satisfies
                  intermediate scrutiny . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 21

           5.     The restriction on firearms in the home of another satisfies
                  intermediate scrutiny . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 22

I

**III.**   **The Firearm Acquisition Regulations Are Constitutional** . . . . . . . . . . . . . . . . . . . . 23

    **A.**   **The regulations satisfy the undue burden standard** . . . . . . . . . . . . . . . . . . . 23

    **B.**   **The regulations satisfy intermediate scrutiny** . . . . . . . . . . . . . . . . . . . . . . . . 27

        **1.**   **Restricting criminals' access to licensed dealers** . . . . . . . . . . . . . . . 27

        **2.**   **Restricting gun acquisition in the illegal market** . . . . . . . . . . . . . . . 31

        **3.**   **Gun stores are dangerous and cannot be safely regulated** . . . . . . . . 33

**IV.**   **The Safe Storage Requirement Is Constitutional** . . . . . . . . . . . . . . . . . . . . . . . . . . . 37

    **A.**   **The regulation satisfies the undue burden standard** . . . . . . . . . . . . . . . . . . . 37

    **B.**   **The regulation satisfies intermediate scrutiny** . . . . . . . . . . . . . . . . . . . . . . . . 40

        **1.**   **Reducing gun acquisition by criminals** . . . . . . . . . . . . . . . . . . . . . . . . 40

        **2.**   **Reducing the risk of suicide, homicide, and accidental firearm death** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 41

        **3.**   **Reducing threats to first responders** . . . . . . . . . . . . . . . . . . . . . . . . . . 44

**CONCLUSION** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 45

# TABLE OF AUTHORITIES

## Cases

*Allied Structural Steel v. Spannaus*, 438 U.S. 234 (1978) ............................... 25

*Bullock v. Carter*, 405 U.S. 134 (1972) ............................................ 25

*City of Los Angeles v. Alameda Books, Inc.*, 535 U.S. 425 (2002) .................... 13, 14

*DiMa Corp. v. Town of Hallie*, 185 F.3d 823 (7th Cir. 2006) ........................... 14

*District of Columbia v. Heller*, 128 S.Ct. 2783 (2008) ............................ *passim*

*Dycus v. State*, 74 Tenn. 584 (1880) ............................................... 7

*Ezell v. City of Chicago*, 651 F.3d 684 (7th Cir. 2011) ................... 2, 3, 11, 23, 24, 25

*G.M. Enterprises, Inc. v. Town of St. Joseph*, 350 F.3d 631 (7th Cir. 2003) .......... 12, 13, 14

*McDonald v. Chicago*, 130 S.Ct. 3020 (2010) ................................... 2, 3, 13

*Moore v. Madigan*, __ F.Supp.2d __, 2012 WL 344760
(C.D. Ill. Feb. 3, 2012) ................................................. 5, 10, 11, 12, 21

*Nordyke v. King*, 644 F.3d 776 (9th Cir. 2011) ...................................... 25

*People v. Marin*, 342 Ill.App.3d 716 (1st Dist. 2003) .............................. 17, 21

*Planned Parenthood of Southeast Pennsylvania v. Casey*, 505 U.S. 833 (1992) ............ 25

*Robertson v. Baldwin*, 165 U.S. 275 (1897) ......................................... 10

*Sir John Knight's Case*, 87 Eng. Rep. 75 (K.B. 1686) ................................. 6

*State v. Cole*, 665 N.W.2d 328 (Wis. 2003) ......................................... 26

*State v. Dawson*, 159 S.E.2d 1 (N.C. 1968) ......................................... 26

*Trinen v. City of Denver*, 53 P.3d 754 (Colo. Ct. App. 2002) ......................... 26

*Turner Broadcasting System, Inc. v. FCC*, 520 U.S. 180, 211 (1997) ................. 12, 14

*United States v. Masciandaro*, 638 F.3d 458 (4th Cir. 2011) . . . . . 4, 5, 10, 11, 13, 14, 20, 21, 22

*United States v. Salerno*, 481 U.S. 739 (1987) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 12

*United States v. Skoien*, 614 F.3d 638 (7th Cir. 2010) . . . . . . . . . . . . . 4, 9, 10, 11, 12, 13, 16, 42

*United States v. Williams*, 616 F.3d 685 (7th Cir. 2010) . . . . . . . . . . . . . . . . . . . . . . . . . 3, 11, 13

*United States v. Yancey*, 621 F.3d 681 (7th Cir. 2010) . . . . . . . . . . . . . . . . . . . . . . 3, 9, 10, 11, 13

*Williams v. State*, 10 A.3d 1167 (Md. 2011) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 5

*Zablocki v. Redhail*, 434 U.S. 374 (1978) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 25

## Statutes and Ordinances

MCC 8-20-010 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4

MCC 8-20-020 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3, 4

MCC 8-20-030 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3, 4

MCC 8-20-040 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 37, 38

MCC 8-20-100 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 23

MCC 8-20-110 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 24

MCC 8-20-120 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 24

MCC 8-20-140 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4, 25

MCC 8-20-180 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4

Statute of Northampton (1328). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 5

1686 New Jersey Statute (ch. IX) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 7

1721 Pennsylvania Statute (ch. CCXLV, sec. IV) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 8

1746 Massachusetts Statute (ch. X) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 8

1751 Pennsylvania Statute (ch. CCCLXXXVIII) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 8

1782 Pennsylvania Statute (ch. DCCCCLVIII, sec. XLII) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 38

1783 Massachusetts Statute (sec. I) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 38

1783 Pennsylvania Statute (ch. MXX, sec. XLII) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 38

1784 New York Statute (ch. 28) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 38

1786 New York Statute (ch. 43) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 8

1786 Virginia Statute (ch. XXI) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 7

1792 North Carolina Statute (ch. III) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 7

1795 Massachusetts Statute (ch. XXV) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 7

1801 Massachusetts Statute (sec. I) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 38

1801 Tennessee Statute (ch. 22) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 7

1813 Spring Garden, Pennsylvania Ordinance (sec. V) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 9

1815 Northen Liberties, Pennsylvania Ordinance (sec. VIII) . . . . . . . . . . . . . . . . . . . . . . . . . . 9

1817 Moyamensing Township, Pennsylvania Ordinance (sec. II) . . . . . . . . . . . . . . . . . . . . . . . 9

1817 New Orleans, Louisiana Ordinance (art. 12) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 9

1820 Kennsington, Pennsylvania Ordinance (sec. VII) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 9

1821 Tennessee Statute (ch. 13) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 7

1837 Georgia Statute (sec. I) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 24

1851 Richmond, Virginia Ordinance (sec. IX) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 9

1859 Manchester, New Hampshire Ordinance (sec. 20) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 9

1861 Illinois Statute (sec. 78) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 9

1865 New Haven, Connecticut Ordinance (ch. IV) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 9

1868 Florida Statute (ch. VII, sec. 14) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 7

1869 Saint Joseph, Missouri Ordinance (sec. 17) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 9

1875 Wyoming Statute (ch. 52, sec. 1) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 8

1876 Dodge City, Kansas Ordinance (sec. XI) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 7, 8

1879 Tennessee Statute (ch. CLXXXVI, sec. 1) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 7

1879 Tennessee Statute (ch. XCVI, sec. 1) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 24

1881 Chicago, Illinois Ordinance (art. XX) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 9

1901 South Carolina Statute (No. 435, sec. 1) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 24

## Other Authorities

Chicago City Council Committee on Police and Fire Legislative Findings. . . . . . . . . . . . . . . . . 1

Proclamation of Richard II (Nov. 2, 1381) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 6

Proclamation of Elizabeth I (July 26, 1579) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 6

Proclamation of Elizabeth I (December 2, 1594) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 6

Robert Gardiner, The Compleat Constable 18 (3d ed. 1708) . . . . . . . . . . . . . . . . . . . . . . . . 6, 7

Blackstone, 4 *Commentaries on the Laws of England* (5th ed. 1773) . . . . . . . . . . . . . . . . . . . . . 6

Hawkins, 1 *A Treatise of the Pleas of the Crown* (T. Leach, ed. 1777) . . . . . . . . . . . . . . . . . 5, 6

Coke, 3 *Institutes of the Laws of England* (Brooke, ed. 1797) . . . . . . . . . . . . . . . . . . . . . . . . . 6

Patrick J. Charles, *Scribble Scrabble, The Second Amendment, and Historical Guideposts: A Short Reply to Lawrence Rosenthal and Joyce Lee Malcom*, 105 Nw. U. L. Rev. 227, 237 (2011) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 5

Cornell & DeDino, *A Well Regulated Right: The Early American Origins of Gun Control*, 73 Fordham L. Rev. 487 (2004) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 7

Courtwright, *The Cowboy Subculture*, in *Guns in America: A Reader* (Dizzard, *et al.*, ed. 1999) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 8

Winkler, *Scrutinizing the Second Amendment*, 105 Mich. L. Rev. 683 (2007) . . . . . . . . . . . . 26

Baltimore Gazette and Daily Advertiser, December 17, 1827 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 9

## INTRODUCTION

After multi-day hearings involving testimony from over 30 witnesses, including national firearms policy experts and Chicago Police Department ("CPD") leadership, Chicago passed the Responsible Gun Ownership Ordinance ("Ordinance") in July 2010. A:1.[1] Chicago found that gun violence is "the cause of significant social and economic costs to the City and our communities" and that Illinois' gun laws "are not sufficient to protect the City from the unique and heightened risk of firearm violence, especially handgun violence, endemic in densely populated urban areas." A:4.

Chicago faces a singular gun violence epidemic. Most of this is spawned by street gangs, which pervade Chicago to a degree unique in the nation. This calls for regulations that other jurisdictions may see no need to adopt. But that does not make them any less valid under the Second Amendment. Indeed, these public safety regulations fall comfortably within a regulatory zone that States and cities have always enjoyed, and that *District of Columbia v. Heller*, 128 S.Ct. 2783 (2008) countenanced.

Chicago's regulations do not burden protected conduct. Even if they did, they are easily justified. The deferential review that applies does not require Chicago to prove that its regulations work, or that their bases are beyond dispute. Chicago need only make a threshold showing of logic and data, although Chicago goes much farther and submits a rich evidentiary record rooted in expert testimony, empirical research, and police experience. Even if disputed by Plaintiffs, this showing is sufficient under the governing law to entitle Chicago to judgment.

---

[1] The legislative materials and historical statutes and proclamations cited herein are attached as an appendix to this brief.

1

## ARGUMENT

**I. Second Amendment Analysis Framework.**

*Heller* established that the Second Amendment's core is the use of arms "in defense of hearth and home." 128 S.Ct. at 2821. It is not a right to keep and carry firearms "in any manner whatsoever" and "for whatever purpose." *Id.* at 2816. Nor does the Amendment "cast doubt" on various "longstanding" restrictions, which are "presumptively lawful." *Id.* at 2816-17 & n.26. "[E]xamples" of valid restrictions are laws prohibiting carrying concealed weapons or carrying in "sensitive places such as schools and government buildings," and laws "imposing conditions and qualifications on the commercial sale of arms" or "regulating the storage of firearms to prevent accidents." *Id.* at 2816-17 & n.26, 2820. And in finding the Amendment incorporated against state and local governments, the Court "repeat[ed] those assurances." *McDonald v. Chicago*, 130 S.Ct. 3020, 3047 (2010) (plurality opinion).

Second Amendment claims entail a two-step inquiry: First, the court determines whether the regulated activity is covered by the Amendment at all – that is, whether it is within the Amendment's "scope." *Ezell v. City of Chicago*, 651 F.3d 684, 701 (7th Cir. 2011). This "requires a textual and historical inquiry" into the amendment's "original meaning" – that is, "how the Amendment was understood at the time of ratification." *Id.* at 700, 701. "The Constitution was written to be understood by the voters" and "[c]onstitutional rights are enshrined with the scope they were understood to have when the people adopted them." *Heller*, 128 S.Ct. at 2788, 2821.[2] If the activity falls outside the scope, "the analysis can stop there; the

---

[2] Citing *McDonald*, *Ezell* stated that, when a state or local law is at issue, the scope question "depends on how the right was understood when the Fourteenth Amendment was ratified" in 1868 rather than when the Second Amendment was ratified in 1791. 651 F.3d at 702,

regulated activity is categorically unprotected, and the law is not subject to further Second Amendment review." *Ezell*, 651 F.3d at 703.

If the scope covers the activity, a second inquiry is necessary: Whether the regulation satisfies means-end scrutiny. This requires "select[ion of] an appropriate standard of review." *Id.* at 706. *Heller* did not establish a standard, although it rejected rational basis. *See* 128 S.Ct. at 2817 n.27. The Seventh Circuit has since established that there is no one-size-fits-all approach, and that the standard in a given case depends on a sliding scale: "a severe burden" on the core Second Amendment right of armed self-defense "will require an extremely strong public-interest justification and a close fit between the government's means and its end." *Ezell*, 651 F.3d at 708. On the other hand, "laws restricting activity lying closer to the margins" of the right, "laws that merely regulate rather than restrict," and "modest burdens" on the right "may be more easily justified. How much more easily depends on the relative severity of the burden and its proximity to the core of the right." *Id. See also United States v. Yancey*, 621 F.3d 681, 683 (7th Cir. 2010) (per curiam) (applying intermediate scrutiny but "reserv[ing] the question whether a different kind of firearm regulation might require a different approach"); *United States v. Williams*, 616 F.3d 685, 692 (7th Cir. 2010) (applying intermediate scrutiny "without determining that it would be the precise test applicable to all challenges to gun restrictions").

**II.      The City's Restrictions on Carrying Firearms Outside the Home Are Constitutional.**

In Counts I & V, Plaintiffs challenge MCC 8-20-020 & -030 to the extent that they prohibit carrying operable handguns outside one's "home" and operable long guns outside one's

---

703. But *McDonald* rejected the argument that the Fourteenth Amendment applies a different version of the Bill of Rights to the States, and "h[e]ld" that it incorporates "the Second Amendment right recognized in *Heller*." *Id.* at 3046-47, 3050.

"home" or "fixed place of business."[3] "Home" is defined in MCC 8-20-010 as "the inside of a person's dwelling unit which is traditionally used for living purposes, including the basement and attic;" it excludes "(i) any garage, including an attached garage, on the lot; (ii) any space outside the dwelling unit, including any stairs, porches, back, side or front yard space, or common areas; or (iii) any dormitory, hotel, or group living, as that term is defined in section 17-17-0102-A." Plaintiffs do not advance a right to carry firearms anywhere outside the home, but only in those places that are currently permitted under Illinois law. *See* Jan. 18, 2012 Order; Dkt. No. 114, at 2. Plaintiffs seek to carry firearms "anywhere on one's own land," to keep a handgun at one's "fixed place of business," and to carry firearms "on the land of another person as an invitee with that person's permission." Dkt. No. 114 at 5-6.

These claims push the Second Amendment beyond the bounds marked in *Heller*, which carefully limited its holding to the home. This alone is reason to reject them. *Heller* "warns readers not to treat [it] as containing broader holdings than the Court set out to establish," *United States v. Skoien*, 614 F.3d 638, 640 (7th Cir. 2010) (*en banc*), and "[o]n the question of *Heller*'s applicability outside the home environment, we think it prudent to await direction from the Court itself." *United States v. Masciandaro*, 638 F.3d 458, 475 (4th Cir. 2011). The Supreme Court could very well find that the risk of firearms "would rise exponentially as one moved the right from the home," and "[i]f ever there was an occasion for restraint, this would seem to be it." *Id.* at 476. Extension of the Second Amendment to invalidate critical public safety laws

---

[3] These provisions permit firearms outside of one's home or business so long as they are "lawful[ly] transport[ed]," which, under MCC 8-20-010, means that they are "(i) broken down in a nonfunctioning state; (ii) not immediately accessible; and (iii) unloaded and in a firearm case." *See* MCC 8-20-020(b)(17), -030(b)(1). Plaintiffs also challenge MCC 8-20-140(a), & -180(c) to the extent that they replicate the restrictions of -020 and -030.

"circumscribe[s] the scope of popular governance . . . and encourage[s] litigation in contexts we cannot foresee." *Id*. at 475. For these reasons, myriad courts have declined to extend the Second Amendment outside the home, including – just last month – a federal court hearing a challenge to Illinois' bans on carrying in public. *See Moore v. Madigan*, __ F.Supp.2d __, 2012 WL 344760 at *7 (C.D. Ill. Feb. 3, 2012) (citing cases). *See also Williams v. State*, 10 A.3d 1167, 1177 (Md. 2011) (citing cases).

Should the Court choose to reach the merits, Chicago still prevails. The Second Amendment does not protect gun carrying in any of the challenged areas because its historical scope is limited to one's home. And even if some form of protection extends beyond the home, Chicago's restrictions are justified under means-end scrutiny.

**A.    The Second Amendment does not protect carrying outside one's home.**

**1.    The English understanding.**

English treatment of the arms right is instructive because the Second Amendment "was not intended to lay down a novel principle, but rather codified a right inherited from our English ancestors." *Heller*, 128 S.Ct. at 2801-02. *See also id*. at 2797. And for at least 400 years prior to America's founding, the English right did not include the carrying of firearms outside the home. The 1328 Statute of Northampton provided that, subject to exceptions for the king's servants and ministers, "no man great nor small" shall "be so hardy . . . to go nor ride armed by night nor by day, in fairs, markets, nor in the presence of the justices or other ministers, nor in no part elsewhere." A:33. *See also* Charles, *Scribble Scrabble, The Second Amendment, and Historical Guideposts: A Short Reply to Lawrence Rosenthal and Joyce Lee Malcom*, 105 Nw. U. L. Rev. 227, 237 (2011). While the Statute permitted one to defend himself "in his own

house" because "a man's house is as his castle," it did not allow one "to excuse the wearing [of] such armor in publick," even "by alledging [sic] that such a one threatened him, and that he wears it for the safety of his person from assault." Hawkins, *A Treatise of the Pleas of the Crown*, Bk. 1, ch. 63, § 8 (T. Leach, ed. 1777). *See also* 3 Coke, *Institutes of the Laws of England* 161-62 (Brooke, ed. 1797) (Statute does not excuse going armed in "safeguard of his life," even when another "menaced him" earlier in the week). Indeed, going armed in public was "a great offense at the common law" and the Statute "is but an affirmance of that law." *Sir John Knight's Case*, 87 Eng. Rep. 75 (K.B. 1686). And Blackstone, who "constituted the preeminent authority on English law for the founding generation," *Heller*, 128 S.Ct. at 2798, affirmed that, just as "every Athenian was finable who walked about the city in armour," so too the Statute prohibited "going armed with dangerous or unusual weapons." Blackstone, 4 *Commentaries on the Laws of England* 148-49 (5th ed. 1773). It was "a crime against the public peace, by terrifying the good people of the land." *Id.* at 148.

The Statute's restrictions were especially critical in towns and cities. For instance, in 1381, Richard II ordered that "to make provision for the peace in [London] . . . no stranger or privy person, save those deputed to keep the peace, shall go armed [in London] after they shall come to their lodgings." A:35. In 1579, Elizabeth I directed enforcement of a prohibition on carrying "Dagges, Pistolles" and other firearms "in Shires, Townes, and other publick places," as they are "in time of peace only mete for thieves, robbers, and murderers" and caused "disorder growne so great." A:36. In 1594, she declared that the public carrying of pistols was "to the terror of all people professing to travel and live peaceably." A:38. And by the turn of the 18th century, urban constables could arrest persons who "wear or carry any Daggers, Guns or Pistols

6

Charged." A:44.

2. **The American understanding.**

i. **Bans on carry.**

The English conception of the arms right was widely understood and adopted in America. States and cities continued to restrict carrying firearms outside the home in a wide variety of contexts.

As early as 1686, New Jersey prohibited "wear[]ing any pocket pistol" and other various weapons in response to the "great abuses" and "great fear and quarrels" that carrying caused. A:48-49. And Massachusetts, North Carolina, Virginia, and Tennessee expressly adopted variants of the Statute of Northhampton. A:50-57. Similar laws continued throughout the 19th-century, both before and after ratification of the Fourteenth Amendment. For instance, an 1821 Tennessee law penalized "carrying a dirk, sword-cane, spanish stiletto, belt or pocket pistols, either public or private." A:57. An 1868 Florida statute criminalized persons who "have about or on their person any dirk, pistol, or other arm or weapon, except a common pocket knife." A:61. An 1879 Tennessee statute banned "carry[ing] publicly or privately . . . any kind of pistol" except military pistols. A:64. This ban applied even "upon one's own farm or premises, or in fact in any place." *Dycus v. State*, 74 Tenn. 584 (1880). *See also* Cornell & DeDino, *A Well Regulated Right: The Early American Origins of Gun Control*, 73 Fordham L. Rev. 487, 512-16 (2004).

Even in the absence of a state-wide ban, the unique problems of urban crime could necessitate bans in cities. In responding to violence fomented by the western cattle drives, Dodge City, Kansas banned the carrying, "concealed, or otherwise," of pistols and other dangerous

7

weapons in 1876.  A:69.  A year earlier, Wyoming banned carrying "concealed or openly, any fire arm or other deadly weapon, within the limits of any city, town or village."  A:72.  Indeed, by the 1870s, most Western cattle towns required cowboys to "'check' their guns when they entered town, typically by exchanging them for a metal token at one of the major entry points or leaving them at the livery stable."  Courtwright, *The Cowboy Subculture*, in *Guns in America: A Reader* 96 (Dizzard, *et al.*, ed. 1999).

### ii.  Bans on discharge.

Also commonplace were bans on the discharge of firearms in cities when outside the home.  By banning discharge, these laws effectively prevented firearms from being used, including for self-defense.  They are further historical evidence that the "central component" of the Second Amendment – the use of firearms for self defense – was not understood to exist out of doors.  And if the purpose for carrying a firearm is not constitutionally protected, there is no constitutional reason to protect the carrying itself.

By 1721, it was illegal to "fire any gun or other firearms" in Philadelphia, "without . . . special license," as "much mischief may happen by shooting guns . . . within the city."  A:75-76.  Thirty years later Pennsylvania expanded this ban to "any county town, or . . . any other town or borough . . . already built and settled, or hereafter to be built and settled."  A:78-79.  By 1746 it was illegal in Boston to "discharge any Gun or Pistol" except during approved training, since "the Lives and Limbs of many Persons have been lost, and other have been in great Danger . . . by the indiscreet firing of Guns."  A:81.  A 1786 law banning discharge in New York City streets, lanes, and alleys also extended to "any . . . garden or other inclosure or from any house, or in any other place where persons frequently walk."  A:83-84.

8

Local discharge bans persisted throughout the 19th century. A 1817 New Orleans ban prohibited discharge "in any street, court-yard, lot, walk or public way." A:87. This extended to discharges "from the door or window of any house or other building, or near any house or other inhabited part of the said city or suburbs, on any account whatever." *Id*. 1817, the township of Moyamensing, PA, empowered watchmen to arrest "persons discharging or firing off any hand gun, pistol or other fire-arms . . . within the regulated parts of the township in the night time." A:90. The aim was to "aid [the night watchmen] in preventing burglaries, robberies and other outrages and disorders." *Id*. Other cities and towns banned discharge without special license or unless for military purposes: Spring Garden, PA (1813); Northen Liberties, PA (1815); Kennsington, PA (1820); Baltimore (1827); Richmond (1851); Manchester (1859); New Haven (1865); St. Joseph, MO (1869). A:90-102. In 1861, Illinois banned discharge in Chicago without permission from the mayor or common council, and by 1881, Chicago had banned discharge completely. A:104,106.

It does not matter whether these laws precisely track Chicago's current restrictions. Chicago "need not mirror limits that were on the books in 1791," *Skoien*, 614 F.3d at 641, and the Seventh Circuit has "rejected the notion that only exclusions in existence at the time of the Second Amendment's ratification are permitted." *Yancey*, 621 F.3d at 683. This sensibly recognizes that different times demand different measures, and that a historical analogue may not exist simply because there was no need for it in the past. *See Yancey*, 621 F. 3d at 685 (absence of historical prohibitions on possession by mentally ill may be due to fact that, in the founding era, "lunatics" could simply be "lock[ed] up"). Indeed, many of *Heller*'s "presumptively lawful" restrictions did not exist in 1791. *See Skoien*, 614 F.3d at 640-41. The ratifiers intended to

9

"leav[e] to the people's elected representatives" the "filling in of details" of how best to respond to the "armed mayhem" fomented by firearms in future generations. *Id.* at 640, 642. Chicago's restrictions are merely "the latest incarnation of the states' unbroken history" of banning firearms outside the home. *Yancey*, 621 F.3d at 684. Accordingly, because carrying firearms outside the home enjoys no Second Amendment protection, Plaintiffs' challenge fails at the outset.

      **B.**      **Chicago's restrictions satisfy means-end scrutiny**.

            **1.**      **Intermediate scrutiny applies.**

Even if carrying outside the home were protected, Chicago's restrictions would still pass muster. Under *Ezell*'s sliding scale approach, intermediate scrutiny is the appropriate standard for these claims, for two reasons.

First, carrying outside the home is not a "core" right. *See Moore*, 2012 WL 344760, at *10. A centuries-old tradition of banning the conduct would not exist if it were. Nor would *Heller* have ventured that restrictions on outside carry are "presumptively lawful," or that concealed carry bans were upheld by "the majority of 19th-century courts to consider the question." *Heller*, 128 S.Ct. at 2816-17 & n.26. *See also, e.g., Robertson v. Baldwin*, 165 U.S. 275, 281-82 (1897) (right to keep and bear arms "is not infringed by laws prohibiting the carrying of concealed weapons"). It is in "the home" – not outside – where the need for self-defense "is most acute." *Heller*, 128 S.Ct. at 2817. Outside the confined privacy of the home, police patrol is more pronounced, *see Masciandaro*, 638 F.3d at 474, and it is easier to flee. Indeed, there is no evidence that lack of a gun has ever prevented Plaintiffs from defending themselves or fleeing when outside their homes. Research indicates that carrying a gun actually increases one's risk of

10

being shot by more than a factor of 4.  SOF:20.[4]

Second, even if carrying outside the home is core, S*koien*, *Williams*, and *Yancey* show that intermediate scrutiny applies to a ban on core conduct in the face of special threats.  In those cases, the risk was possession by particularly dangerous persons.  *See Yancey*, 621 F.3d 681 (users of controlled substances); *Williams*, 616 F.3d 685 (7th Cir. 2010) (felons); *Skoien*, 614 F.3d 638 (domestic violence misdemeanants).  Here, it is shooting guns in the crowded neighborhoods of Chicago.  Indeed, "as we move outside the home, firearm rights have always been more limited, because public safety interests often outweigh individual interests in self-defense," and this "longstanding out-of-the-home/in-the-home distinction bears directly on the level of scrutiny applicable." *Masciandaro*, 638 F.3d at 470.  *See also id.* at 465 (applying intermediate scrutiny to ban on loaded guns in vehicles in national park, even where defendant "is frequently forced to sleep in his car"); *Ezell*, 651 F.3d at 714 (Rovner, J., concurring) ("public safety was a paramount value to our ancestors, a value that, in some circumstances, trumped the Second Amendment right to discharge a firearm in a particular place"); *Moore*, 2012 WL 344760, at *13 (applying intermediate scrutiny to Illinois ban on carrying operable firearms in public).  Anything more exacting than intermediate scrutiny would "foreclose an extraordinary number of regulatory measures, thus handcuffing lawmakers' ability to 'prevent armed mayhem' in public places and depriving them of a 'variety of tools for combating that problem.'" *Masciandaro*, 638 F.3d at 471 (quoting *Skoien* and *Heller*).

---

[4]  References to paragraph numbers of Defendants Local Rule 56.1(a)(3) Statement of Material Facts are denoted as "SOF:__".

11

### 2.    Intermediate scrutiny's requirements.

Regulations are valid under Second Amendment intermediate scrutiny so long as they are "substantially related to an important government objective." *Skoien*, 614 F.3d at 641.  Chicago easily meets this test.  The Ordinance's purpose is "protecting the public from the potentially deadly consequences of gun violence," A:4, and "no one doubts" that "preventing armed mayhem" is "an important governmental objective." *Skoien*, 614 F.3d at 642.  This interest is, in fact, "compelling." *United States v. Salerno*, 481 U.S. 739, 750 (1987).  As any Chicagoan knows, the scourge of firearm violence in Chicago exacts a terrible human toll and destroys communities.  In 2010, firearms were used in 353 murders, 5,3571 robberies, 2,216 aggravated assaults, and 1,860 aggravated batteries.  SOF:3.  Dr. Jens Ludwig of the University of Chicago estimates that the total annual social cost of Chicago gun violence is about $2.5 billion, or $2,500 per household, and that it depresses total property values by around $30 billion and property tax revenues by $30 million per year.  SOF:12.

Chicago is afforded a wide berth in showing that its restrictions are substantially related to stemming this tide.  For one, Chicago need not prove that they actually work.  "*Heller* did not suggest that [a regulation] would be effective only if the statute's benefits are first established by admissible evidence," and there is no requirement of "proof, satisfactory to a court," that a regulation is "vital to the public safety." *Skoien*, 614 F.3d at 641.  *See also Moore*, 2012 WL 344760, at *13 (not necessary to show that carry ban "truly" reduces risk of gun violence); *Turner Broadcasting System, Inc. v. FCC*, 520 U.S. 180, 211 (1997) (government not required to prove that it is correct "as an objective matter"); *G.M. Enterprises, Inc. v. Town of St. Joseph*, 350 F.3d 631, 640 (7th Cir. 2003) (city need not prove "undeniably" that regulation would

succeed).

Rather, a substantial relationship can be shown with nothing more than "logic and data." *Skoien*, 614 F.3d at 642. Indeed, in upholding bans on core conduct, *Skoien*, *Williams*, and *Yancey* relied on data compilations and studies that had neither been found reliable nor probative by a court, nor even subjected to adversarial testing. *See Skoien*, 614 F.3d at 642-644; *Williams*, 616 F.3d at 692-93; *Yancey*, 621 F.3d at 686. *See also Skoien* at 652 (Sykes, J., dissenting) (*en banc* majority's approach "deprives Skoien of the opportunity to review the outcome-determinative evidence, let alone subject it to normal adversarial testing"); *G.M. Enterprises*, 350 F.3d at 640 (it is "completely unfounded" to require that materials relied upon by a city be "of sufficient methodological rigor to be admissible under *Daubert*").

Nor must Chicago's logic or data perfectly match the regulation. If the Second Amendment "leaves [cities] a variety of tools for combating" gun violence, *Heller*, 128 S.Ct. at 2822, "by no means eliminates" the ability of cities "to devise solutions to social problems that suit local needs and values," *McDonald*, 130 S.Ct. at 3046, and allows that "state and local experimentation with reasonable firearms regulations will continue," *id.*, Chicago must have leeway to adopt policies that may be novel or extend beyond current research findings or other evidence. Indeed, "[a] municipality considering an innovative solution may not have data that could demonstrate the efficacy of its proposal because the solution would, by definition, not have been implemented previously." *City of Los Angeles v. Alameda Books, Inc.*, 535 U.S. 425, 439-40 (2002) (plurality opinion). As the Fourth Circuit remarked: "This is serious business. We do not wish to be even minutely responsible for some unspeakably tragic act of mayhem because in the peace of our judicial chambers we miscalculated as to Second Amendment rights."

13

*Masciandaro*, 638 F.3d at 475. *See also Alameda Books*, 535 U.S. at 451 (Kennedy, J., concurring) ("The Los Angeles City Council knows the streets of Los Angeles better than we do.") (citations omitted).

Because Chicago need not prove the efficacy of its restrictions or support them with admissible evidence that has been subjected to adversarial testing, summary judgment in its favor "is appropriate" even if the evidence is disputed or Plaintiffs proffer evidence, even expert testimony, "support[ing] a contrary conclusion." *Turner Broadcasting*, 520 U.S. at 210-11. The court is "simply to determine whether the [applicable standard] is satisfied," and it can be met even when one can "draw[] two inconsistent conclusions from the evidence." *Id.* at 211. For instance, in *DiMa Corp. v. Town of Hallie*, 185 F.3d 823 (7th Cir. 1999), the plaintiff's expert evidence was "irrelevant" on summary judgment, because the court's task was not to "discover the objective truth," but only to ensure that there was "some evidence" supporting the town's conclusions. *Id.* at 831. The plaintiff's evidence "merely contradict[ed]" other evidence that the town "could have reasonably relied upon." *Id.* And in *G.M. Enterprises*, the court affirmed summary judgment for the Town even though the plaintiff's evidence "arguably undermin[ed] the Town's inference of the correlation of adult entertainment and adverse secondary effects, including a study that questions the methodology employed in the numerous studies relied upon by the [Town]." 350 F.3d at 639.

Even Plaintiffs' proffered rebuttal expert, Dr. Gary Kleck, acknowledges that empirical consensus is illusive in the realm of firearms policy. He believes that requiring "a factual basis" for "being certain" about a proposition is an "unreasonable standard" – "[y]ou're never certain about anything in science." SOF:13. The appropriate question is whether there is "a factual

14

basis" for "drawing conclusions one way or another." *Id*. Researchers must work with the data they have and try to "draw rational and reasonable conclusions from the results, taking into account the fact that there are certain unknowns." *Id*. "No study is perfect." *Id*. "[Y]ou draw your conclusions on the best available evidence, not based on perfect evidence." *Id*.

### 3. The restriction on carrying outside the home satisfies intermediate scrutiny.

The density of Chicago neighborhoods means that the nominally private spaces outside the home are effectively "public" when it comes to firearm violence. SOF:30,34. A typical Chicago residential lot is only 25 by 125 feet, with much of it taken up by the home itself. SOF:33. Consequently, the distance between a yard, porch, garage, or staircase and a neighboring parcel, street, or sidewalk is typically very short, if there is any space at all. *Id*. Indeed, the Tyler/Pacholski porch is only 30 feet from the sidewalk in front of their house; their front yard has no fence; their detached garage is only 5 to 6 feet from their neighbors' property; and their backyard, even though it has a fence, is "very accessible" from the rear alley. SOF:31. Likewise, Hall's porches are only 15 feet from the sidewalks; his yard is enclosed only by a 3.5 foot high fence; his detached garage is no more than 18 inches from his neighbors' property; and a baseball field and school are on the other side of the street. SOF:32.

Eugene Williams, Acting Chief of Patrol for the CPD testified that, in such tight quarters, "private" firearms violence is no different from that found on the street. SOF:34,35. A porch mere feet away from the sidewalk is just as good a spot to shoot at or intimidate people on the sidewalk as the sidewalk itself, *id.*, and bullets ignore property lines. Common areas inside residential buildings, such as elevators, hallways, stairwells, and lobbies, are even worse,

15

because, by definition, they are not private. SOF:36. While a homeowner can control access to her property, any number of residents living in an apartment building can congregate within arms-reach in hallways and lobbies. *Id*. Chicago's carry restrictions combat firearms violence in these areas in four ways.

### i.      Reducing deaths from violent encounters involving a gun.

When guns are taken outside the home, encounters turn deadly – a proposition amply supported by the expert opinion of Dr. Philip Cook of Duke University, who has studied firearms violence for over 30 years and who, as even Dr. Kleck acknowledges, "has contributed consistently to the serious literature on gun control." SOF:10. As Dr. Cook explains, whether a victim dies in an encounter turns not only on an attacker's intent, but also on whether a gun is used. SOF:15. Research by Franklin Zimring shows that "violent crimes with firearms are far more likely to result in the death of the victim than violent crimes committed with knives, blunt objects, or bare fists." SOF:15,16. Indeed, *Skoien* endorsed Dr. Zimring's work as showing that "guns are about five times more deadly than knives." 614 F.3d at 642. This is known as the "instrumentality effect." SOF:15. And it means that "[i]f the fraction of assaults or robberies involving guns increases, then the death rate (*i.e.*, the criminal homicide rate) will also increase." SOF:17. Dr. Cook therefore concludes that "where there is more gun carrying, we should expect more" firearms injuries and deaths. SOF:18.

Banning carry outside the home addresses this head-on. By reducing the number of times a gun will be present during an encounter, it reduces the number of encounters resulting in death. For one, law-abiding residents will not carry a gun outside if it is illegal. This is critical because even if a resident lacks criminal design at the outset, a gun brought into the yard or onto

16

the porch emboldens him to be aggressive, which can cause common neighborhood disputes to spiral into deadly gunplay. SOF:35. *See also People v. Marin*, 342 Ill.App.3d 716, 727-728 (1st Dist. 2003) (operable gun outside the home "creates a volatile situation vulnerable to spontaneous lethal aggression" and the "escalation of minor public altercations into gun battles"). And if the law-abiding resident should decide to break the law by going inside and getting a gun, the time that takes may allow him to "cool down" or call the police, and the other disputant can flee or call the police. SOF:37.

Even more important, and as Dr. Cook opines, the ban "reduces the incentive" for criminals and gang members to carry by creating an effective deterrent. SOF:23. The CPD employs targeted patrol tactics, which focus police resources in high-crime neighborhoods and emphasize stopping suspicious individuals for questioning and frisking if there is reason to believe they are carrying a weapon. SOF:22. The CPD also places a "high priority" on confiscating illegally-carried guns, and this priority is known to residents. *Id*. Dr. Cook opines that these two features of CPD policing make it less likely for criminals to carry, because they know they stand a higher chance of being detected (and arrested) if they do. SOF:23. He relies on a 2003 study of targeted policing in Pittsburgh, which found a 34% drop in shots fired and a 71% drop in gunshot injuries. SOF:23,24. The study concluded that the reductions "likely" occurred "because of deterred gun carrying or criminal behavior." SOF:24. And a 2002 study of Indianapolis found a 29% decline in total gun crimes and a 40% decline in aggravated assaults with a gun and armed robberies. SOF:25. Dr. Cook also observes that New York City enjoyed an "unprecedented reduction in violent crime" over the past two decades, a period during which targeted policing against guns "has been a prominent feature." SOF:26. Dr. Cook's study of gun

17

possession and use by Chicago criminals and gangs – *Underground Gun Markets*, 117 The

Economic Journal, F558-F588 (2007) ("2007 Chicago Study") – also found that "[p]olice

pressure against guns . . . does discourage participation in the gun trade" because it "has the

effect of jeopardising gang profits from the more lucrative drug trade." *Id.*

### ii.    Reducing violence by gang members.

Chicago's restrictions also reduce gun violence by allowing CPD to arrest and prosecute

gang members for the mere act of carrying. SOF:21. Chief Williams testified that this is a

critical tool for combating Chicago's gang problem, because it allows CPD to take gang

members or their firearms "off the street" before they commit a firearm crime. *Id.*[5] Dr. Kleck

agrees that "if you [can] arrest people for simply having a gun, it is easier to prevent people from

using the gun criminally than having to wait until after they commit the crime." *Id.* Since, many

times, gun carrying is the only crime being committed by a gang member, there would be no

other basis for removing a gun-carrying gang member if carrying were legal. SOF:27.

This would be a disaster. Gang members would be immunized from arrest and could

freely tote guns in lobbies or stairwells of a residential high-rise, or on the porch or front yard of

a residential low-rise. SOF:38. All the while, CPD would be forced to stand back and await the

outbreak of gun violence. SOF:21. The mere carrying alone will be enough to intimidate

residents and protect drug-dealing and other gang activity. As Dr. Cook's 2007 Chicago Study

found, "[j]ust showing rather than actually firing guns is usually sufficient" to be taken seriously.

SOF:39. Among older gang members and professional criminals, "gun use was typically limited

---

[5] Also, in situations involving a larger, ongoing criminal investigation, the carry ban
allows CPD to arrest gang members without having to disclose information that could
compromise the investigation. SOF:28.

to simply brandishing the weapon." *Id*. It is not even necessary to show or flash the gun, as "it's all about the bulge." *Id*. And once gang members can lawfully bring guns outside of their homes, rivals will be more likely to carry guns to protect themselves, even if it remains illegal for them to do so. SOF:40. Indeed, one study found that 62% of criminals who carried guns said that the chance their victim might be armed was a "very" or "somewhat important" factor in their decision to carry a gun. *Id*. Chief Williams testified that this proliferation will inflame violent crime in Chicago. *Id*.

It must be remembered that many gang members and affiliates lack recorded criminal histories that would prevent them from being able to lawfully carry guns. SOF:27,29. Dr. Kleck agrees that even under a permitting system, "some criminals will be able to carry guns" and "some people who have permits will commit crimes with those guns." SOF:29. In fact, a majority of criminal homicides and other serious crimes are committed by individuals who have no felony conviction on their record; in Illinois, only 43% of adults arrested for homicide do. *Id*. Dr. Cook thus concludes that if targeted policing and the ability to arrest for carrying "became unavailable for any reason (including because the legal basis for conducting them was eliminated through the striking down of strict carrying restrictions), then the reductions of gun misuse resulting from these tactics would be lost" and there "would be more guns on the street." SOF:27.

Other jurisdictions may have little need for these tools, but Chicago needs every one it can get because its singular gang epidemic spearheads violent crime in the city. SOF:4. In 2010, 59% of Chicago murders were gang-related or the victim or offender was a gang member. SOF:5. Approximately 55-60% of all Chicago shootings are gang-related. *Id*. A Department of

19

Justice study of over 20 U.S. cities found that Chicago and Los Angeles "have unusually high rates of gang membership" and "are outliers . . . with respect to gang activity." SOF:8. Their levels of gang membership are about 8 times the median value in the study and about twice as high as the next highest city. *Id*. Forty-five percent of Chicago arrestees, and 34% of Los Angeles arrestees, reported having been in a gang at some point; the next highest rate (Birmingham) was 20%. *Id*. Gangs have been entrenched for decades; membership commonly spans multiple generations of a single family, and there are at least 80 gangs, and between 80,000 and 100,000 known members, throughout Chicago. SOF:6,8. Most gangs are divided into factions – there are over 300 – and even factions of the same gang go to war. SOF:6,7. And uniquely local events can drive Chicago's gang problem. For instance, recent demolition of the Robert Taylor Homes and Cabrini-Green public housing projects dispersed gang members into rivals' turf and caused a breakdown of the traditional gang hierarchy. SOF:7. This disruption and instability has increased gang violence as gangs and factions try to protect or expand their turf. *Id*.

### iii. Reducing accidental injury and death.

Even if a carrier has the best intentions, there are no walls or ceilings to protect innocents from stray gunfire once a gun is taken outside. SOF:37. During a crime, the victim experiences elevated stress and physiological arousal, such as a high pulse rate and shaking hands. This affects the victim's accuracy, and can affect their judgment, which can lead to accidentally shooting someone who is not a threat. *Id*. Tyler testified that "your adrenalin is flowing" during an attack, and that she might shoot "the first person that I think is threatening me." *Id*. *See also Masciandaro*, 638 F.3d at 473 (gun can be shot "accidentally" or "before a potential victim has

the opportunity to flee"); *Moore*, 2012 WL 344760, at *14 (carrier can be "mistaken about his need for self-defense or just a poor shot"). "One may reasonably conclude that prohibiting" operable firearms outside the home "will make it more difficult for individuals to discharge firearms in public and will thereby diminish the public's risk of injuries and death by gunfire." *Moore*, 2012 WL 344760, at *14. Indeed, the danger to "police officers and the general public" is "inherent." *Marin*, 342 Ill.App.3d at 724.

### iv. Reducing gun theft.

Chicago also restricts carry because guns outside the home are more likely to be stolen. SOF:41. These areas, including garages (which are targeted for theft more than homes), are generally less secure than the home and easier for criminals to access. *Id.* Just two years ago, a firearm was wrestled away from CPD Officer Thor Soderberg in a CPD parking lot and used to kill him. *Id.* Chief Williams testified that "[i]f criminals are willing to take firearms from CPD officers on CPD grounds, they would not hesitate to take guns from private residents on the residents' private property." *Id.*

### 4. The restriction on handguns in a fixed place of business satisfies intermediate scrutiny.

Prohibiting operable handguns in a fixed place of business is also substantially related to preventing firearms violence. Three factors combine to make the workplace an especially dangerous place for handguns in Chicago. First, almost all firearm crime in Chicago stems from handguns. SOF:3,6. In 2010, handguns were used in 99% of murders, 97% of aggravated batteries, 96% of aggravated assaults, and 98% of robberies involving a gun. SOF:3. Second, handguns are generally less accurate and more prone to accidental discharge than long guns.

21

SOF:43. Third, the workplace is generally more volatile than a home: It has more foot traffic, and is open to the public or other employees, all of whom cannot be controlled. *Id*. Indeed, Tyler's veterinarian clinic is located at 5545 North Clark Street, amidst a busy pedestrian shopping district. SOF:42. It is in a building that has two other businesses, including a coffee shop; it can be accessed through three different doors; and the main doorway is unlocked during business hours. *Id*. Consequently, allowing handguns in the workplace would increase the risk of hitting an innocent bystander. SOF:43. And because handguns are concealable and the tool of choice for gun crime in Chicago, they are more likely to be used to intimidate or harm a coworker or a visitor than a long gun. SOF:44. Prohibiting handguns in the workplace reduces the risk of firearm accidents and crime in areas "where large numbers of people, including children, congregate." *Masciandaro*, 638 F.3d at 473.

> **5. The restriction on firearms in the home of another satisfies intermediate scrutiny.**

Increasing the number of unsecured firearms in any home presents numerous risks, including for firearm accidents and thefts. These risks are more fully discussed in Section IV.B. below, which discusses Chicago's safe storage regulations. These risks also, as Dr. Cook opines, justify prohibiting a guest from taking operable guns into another's home, "even if permission is granted by a member of the household." SOF:137. Further, a guest with a gun presents its own problems. Because the guest cannot be controlled by the owner, the owner cannot ensure that the gun will be used properly. SOF:138. Chief Williams testified that the risk of intimidation, escalation, or accidental discharge would only increase as the number of armed guests increased – for instance, at a house party with multiple guests drinking alcohol, or at a meeting of CFP-

22

holding gang members. *Id*. Finally, allowing a guest to bring a gun would allow the host to evade the CFP requirement by claiming that firearms in his home belong to his CFP-holding guest. SOF:139. This would permit any number of dangerous people otherwise disqualified from firearms possession, including domestic violence abusers and gang leaders, to legally have firearms in their home that they could readily abuse.

## III. The Firearm Acquisition Regulations Are Constitutional.

In Count II, Plaintiffs challenge MCC 8-20-100, which provides in relevant part that "no firearm may be sold, acquired or otherwise transferred within the city, except through inheritance," and MCC 4-144-010, which states that a holder of a Chicago weapons dealer license may not sell or transfer firearms. They also challenge, in Count VI, Chicago's Zoning Code to the extent it prohibits gun stores.

Under *Ezell*'s sliding scale, the undue burden standard is best suited to this claim, and Chicago easily satisfies it. And even if the Court applies intermediate scrutiny, the regulations pass muster.

### A. The regulations satisfy the undue burden standard.

The undue burden standard should be applied for two reasons. *First*, Chicago's regulations are not a ban on protected conduct. While the right to possess firearms in the home for self-defense "implies a corresponding right to acquire" them, *Ezell*, 651 F.3d at 704, Chicago does not ban acquisition. Chicago merely regulates the place where acquisition may occur, requiring that it take place outside Chicago. This is – at most – a burden; the regulations have not prevented any Plaintiff from acquiring firearms. SOF:45.

The regulations would amount to a ban only if the implied right to acquire included an

implied right to acquire in one's home municipality. That expansion finds no footing in the Amendment's text, which speaks only to keeping and bearing arms. Nor is it necessary to effectuate the Amendment's central value of armed self-defense. Where a gun is purchased has nothing to do with its utility for defense. Guns are mass-produced, fungible consumer products distributed throughout the country, and a Smith & Wesson is the same whether purchased in Chicago or Schaumburg. And state bans of the sale of even popular and common arms stretch back nearly 200 years. These laws necessarily required a resident wishing to purchase a designated gun leave the jurisdiction. For instance, an 1837 Georgia law made it illegal for "any merchant . . . or any other person . . . to sell, or offer to sell . . . pistols" (except "horseman's pistols"). A:109. An 1879 Tennessee statute banned the sale of "belt or pocket pistols, or revolvers, or any other kind of pistols, except army or navy pistol[s]." A:112-113. And a 1901 South Carolina law banned the sale of pistols less than 20 inches in length and 3 pounds in weight — *i.e.*, handguns. A:115. Surely all of these are reasons why "nothing in [*Heller*] should be taken to cast doubt on . . . laws imposing conditions and qualifications on the commercial sales of arms." 128 S.Ct. at 2817.

Second, unlike in *Ezell*, this case does not involve a Chicago Firearm Permit ("CFP") pre-condition that Chicago prohibits residents from fulfilling within its borders. *See Ezell*, 651 F.3d at 712 (Rovner, J., concurring) (problem posed by banning shooting ranges while simultaneously requiring training could be cured by "drop[ping] the requirement for one hour of live-range training"). None of the CFP provisions require a resident to do anything with respect to firearm acquisition. *See* MCC 8-20-110, -120. Indeed, a resident can obtain and hold a CFP without ever owning a gun. The Ordinance's only requirement concerning gun acquisition comes *after*

24

the gun is possessed: The resident must register it within 5 days. MCC 8-20-140(d).

For these reasons, it is inappropriate to use the intermediate scrutiny applied in *Skoien*, *Williams*, and *Yancey* to complete bans on firearm possession, nor the "more rigorous showing" applied in *Ezell* to the "serious encroachment" at issue there. *Ezell*, 651 F.3d at 708. Rather, the court should select a standard that permits the City to "more easily justif[y]" the regulation. *Id.* at 709. That is the "undue burden" standard. In articulating this test in *Planned Parenthood of Southeast Pennsylvania v. Casey*, 505 U.S. 833 (1992), the Court recognized that "not every law which makes a right more difficult to exercise is, *ipso facto*, an infringement of that right." *Id.* at 881. Legislation is valid so long as it does not "place a substantial obstacle in the path" of a person seeking to exercise a constitutional right. *Id.* at 878. *See also id.* at 874 ("The fact that a law which serves a valid purpose, one not designed to strike at the right itself, has the incidental effect of making it more difficult or more expensive to procure an abortion cannot be enough to invalidate it.").

While *Ezell* declined to adopt this standard for the law at issue there, it did not hold that the standard could never apply to a Second Amendment claim. The Supreme Court has applied it in a variety of other contexts,[6] and should do so here. *See also Nordyke v. King*, 644 F.3d 776, 788 (9th Cir. 2011) ("regulations of gun sales do not substantially burden Second Amendment rights merely because they make it more difficult to obtain a gun"), *rehearing en banc granted*, __ F.3d __, 2011 WL 5928130 (Nov. 28, 2011). It is effectively the standard that states have long used when applying the Second Amendment analogues in their own constitutions. *See*

---

[6] *See Zablocki v. Redhail*, 434 U.S. 374, 386-87 (1978) (right to marry); *Allied Structural Steel v. Spannaus*, 438 U.S. 234, 244 (1978) (contracts clause); *Bullock v. Carter*, 405 U.S. 134, 143 (1972) (voting rights).

Winkler, *Scrutinizing the Second Amendment*, 105 Mich. L. Rev. 683, 716-17 (2007). This state approach focuses, like the undue burden test, on how much the regulation burdens exercise of the right and whether it leaves open reasonable alternatives. *See id.* at 716. The key limitation is that the right "must not be allowed to become illusory," *State v. Cole*, 665 N.W.2d 328, 338 (Wis. 2003), rendered "nugatory," *Trinen v. City of Denver*, 53 P.3d 754, 757 (Colo. Ct. App. 2002), or effectively destroyed, *State v. Dawson*, 159 S.E.2d 1, 11 (N.C. 1968). The approach recognizes that firearms regulation "requires highly complex socio-economic considerations" and "multi-factor judgments" that "courts are not institutionally equipped to make." Winkler, at 715. Federal courts, which have only recently begun to evaluate regulation of the arms right, "should not lightly disregard this wealth of experience" developed by the states. *Id.* at 715, 716-17.

Chicago's acquisition regulations easily satisfy the undue burden standard. There is no evidence that they present any obstacle, much less a substantial one, to anyone's ability to acquire a gun. Such a claim would be frivolous: There are 6 stores within 6 miles of Chicago, 29 stores within 25 miles, and 46 stores within 50 miles. SOF:45. At least two are a stone's throw away: Illinois Gun Works at 7229 West Grand in Elmwood Park is roughly 500 feet from Chicago's border, and Chuck's Guns at 14310 South Indiana in Riverdale, Illinois is 7 blocks away. *Id.* Pacholski visits area stores up to 24 times a year. SOF:48. Tyler has been to area stores at least 14 times since 2005, including Dick's Sporting Goods in Niles, Illinois, which is "just" a 20 minute drive from her home. SOF:47. Hall has visited area stores at least 34 times since 2005, including Chuck's Guns, where he has bought all of his firearms, and which is a 25-minute drive from his home. SOF:49. And Plaintiffs frequently travel to the suburbs for other reasons, such as work and recreation. SOF:50.

26

Dr. Kleck posits that a law-abiding, low-income Chicago resident would have to spend 30 minutes driving, or around two hours taking public transportation. SOF:45. There is no evidence that it actually takes this long, but, even if it did, the burden would be *de minimis*. Dr. Kleck explained that, "[i]n all likelihood," a law-abiding resident needs to visit a store only "once" if the store has the kind of gun the person wants. SOF:46. Because "guns are fairly durable [and] they last for a long time," there is little, if any, need for subsequent visits to replace or repair a gun. *Id*. Indeed, Tyler and Hall have never needed to take a gun for maintenance. *Id*.

### B. The regulations satisfy intermediate scrutiny.

If a more rigorous review is warranted, it should be *Skoien* intermediate scrutiny. As discussed above, the *Ezell* standard is not appropriate, and the Seventh Circuit has applied *Skoien* scrutiny to even complete bans on the core right to guns in the home for self-defense when exercise of the right poses serious danger. That is the case here: Criminals and gang members would find it far easier to get guns if sales and transactions were legal in Chicago. Chicago's regulations are substantially related to combating this, in three ways discussed below.

### 1. Restricting criminals' access to licensed dealers.

Gun dealers are the point sources from which "[a]lmost all" crime guns originate. SOF:52. Joseph Vince's expert observation is that when stores are allowed to operate, guns "frequently fall into the hands of criminals or others who are not lawfully qualified to possess them." SOF:60. Mr. Vince is uniquely qualified to offer this condemnation, as he previously led the ATF's Firearm Tracing Branch, its Intelligence Branch, its Crime Gun Analysis Branch, and its Firearm Enforcement Division during a 28-year ATF career. SOF:59. And empirical research affirms the point. A 2003 study of handgun dealers in 20 cities found that more than half were

27

willing to make an illegal sale, and 20% were willing even when the buyer expressly indicated the sale was illegal.  SOF:66.  A 2004 report by the U.S. Department of Justice's Office of the Inspector General ("DOJ Report"), which reviewed the ATF's oversight of federally licensed firearms dealers ("FFLs"), cited this study as "highlight[ing] . . . the need to better identify the potential universe of dealers involved in gun trafficking."  *Id.*  And even though California independently licenses and inspects dealers and "regulates and polices gun commerce to a degree that is perhaps unique," a 2010 study of California handgun dealers averaging 50 handgun sales annually found that 20% still "agreed to assist a potential handgun buyer with a transaction that had many attributes of an illegal surrogate or 'straw' purchase."  SOF:67.[7]  Other dealers, even while declining the sale, "offered the buyer concrete assistance in completing a purchase they appeared to understand was against the law."  *Id.*

Chicago has its own first-hand experience with unscrupulous dealers.  In 1998, CPD initiated Operation Gunsmoke, where undercover officers posed as criminals or unqualified purchasers and tried to buy guns from numerous suburban stores near Chicago.  SOF:60.  Mr. Vince observes that "[r]epeatedly, [the officers] had minimal difficulty acquiring guns with little regard from dealers for the purchaser's ineligibility and/or nefarious reason."  *Id.*  Several dealers even provided advice on how to make an illegal purchase.  *Id.*  For example, B&H Sports, Ltd., in Oak Lawn, Illinois sold guns to purchasers lacking an Illinois Firearm Owner Identification card, even when they told the staff that they were ineligible to get one.  SOF:61.  To make the sale, the staff fraudulently completed paperwork stating that somebody else was the purchaser.

---

[7] Straw purchasing is an illegal purchase for another person, such as a criminal, juvenile, or other prohibited possessor, and is the most common form of illegal gun trafficking.  SOF:70.

*Id.* And clerks at multiple stores advised purchasers seeking multiple firearms to stagger their purchases over a number of days so that the store would not have to notify the ATF of a multiple sale. SOF:63. *See also* SOF:62,64.

Since dealers are not permitted in Chicago, a Chicago criminal wanting a gun from a dealer must travel to the suburbs. For criminals, this is not as easy as it sounds, and the geography makes a difference. Even though "any Chicago resident can identify the location of numerous licensed suburban gun dealers with a quick search of the local phone directory or the Internet," guns recently purchased (*i.e.*, purchased within the last three years) from suburban Cook County dealers account for only 11% of confiscated crime guns. SOF:77. Dr. Cook opines, based on the 2007 Chicago Study, that one reason for this is that Chicago criminals rarely leave their own neighborhood. SOF:78. He found that Chicago's high-crime neighborhoods "are notorious for having among the city's most powerful street gangs," and that residents "are very parochial, perhaps because gang turf increases the risks of travel[]ing to other areas." *Id.* Indeed, Dr. Kleck agreed that being a gang member is "an obstacle" to leaving one's neighborhood and that a non-gang member "probably would have an easier time" crossing through other neighborhoods. *Id.* Joseph Gorman, the Commander of the CPD's Gang Investigations Unit, testified that traveling to a suburban gun store is dangerous for a gang member because it involves crossing gang and faction boundaries, both in Chicago and in the suburbs. *Id.* The danger of crossing gang turf causes some gang members, especially those operating alone, sporadically, or in a small group, to forgo the trip. *Id.*

Studies of other jurisdictions also document the link between store geography and criminal gun use. A 2007 study, sponsored by the Department of Justice, of crime guns sold by

Maryland dealers and recovered in Baltimore and Washington, D.C., found that a dealer's distance to a city was the "primary characteristic of importance" for whether a dealer is likely to sell a crime gun recovered in the city. SOF:83. Guns sold by dealers within 5 miles of either city were over twice as likely to be recovered than guns sold by dealers operating more than 20 miles away, and this risk declined as a dealer's distance increased. *Id*. In Baltimore, a store's proximity "stood out as the most powerful predictor;" sales by dealers within 5 miles were about 2.6 times as likely to be recovered than guns sold by dealers located more than 20 miles away. *Id*. Risk levels were also substantially elevated, ranging from 1.5 times to 2 times more likely, for dealers operating within 20 miles. *Id*. As to Washington, D.C., dealer proximity was an "important" factor; compared to dealers more than 20 miles away, risk levels were nearly 2.5 times higher for dealers within 10 miles and about 1.7 times higher for dealers within 11-15 miles. *Id*.

In addition, a 2009 study found that "major cities having the most FFLs per capita also have the highest rates of gun homicide." SOF:82. The study observed that "[i]n major city areas with higher crime rates, there will be greater criminal demand for guns and, hence, a larger illegal market for guns. It thus seems more likely that a weapon sold in a major city, as compared to one sold in another county type, will end up in the hands of a criminal user through theft, straw purchase, gun trafficking, or some other kind of transaction in the secondhand market." *Id*. Dr. Kleck agrees that if there were FFLs in Chicago, "a larger fraction of guns sold by [Chicago FFLs] would make it into the illegal market" than for "FFLs that were not located in a high crime area." SOF:80. And a 2009 study of California handgun dealers averaging at least 50 handgun sales annually reported that a dealer's urban location is a risk factor "strongly associated" with

the dealer's "risk of disproportionate sales of guns that are later used in crimes." SOF:81. It reported that the odds of an urban dealer selling a crime gun were more than 5 times higher than those in other areas. *Id*.

Dr. Cook concludes that the absence of FFLs in Chicago "makes illegal transactions from an FFL somewhat more difficult for youths and criminals," and that criminals "would be more likely to acquire guns from an FFL" were they allowed in Chicago. SOF:77,79. Indeed, nationwide, 11% of confiscated guns are taken from the person who bought it at an FFL, but that number is only 2.8% in Chicago. SOF:52. That is, Chicago crime guns are 75% less likely to have been bought directly from an FFL than the national average.

### 2.      Restricting gun acquisition in the illegal market.

Criminals unwilling to leave Chicago are forced to deal in the underground Chicago market if they want to try at getting a gun. This is a significant boon to public safety because, as the 2007 Chicago Study reveals, that market "[does] not work smoothly." SOF:53. It has "substantial transaction costs" – *i.e.*, "large mark-ups over legal prices, substantial search times, uncertainty about product quality, and the physical risk associated with the exchange." *Id*. Dr. Cook concludes that "[b]y rendering sales and transfers illegal, the [Ordinance] helps to maintain these transaction costs, which, in turn, it is reasonable to suppose, depresses possession rates by criminals" and "help[s] preserve" the scarcity of guns in the illegal Chicago market. SOF:58. These essential roadblocks to criminal acquisition would be lost if Chicago were forced to allow gun transactions.

The study found that prices are "substantially higher than in the legal market, despite the questionable quality of the guns." SOF:55. For instance, guns in excellent condition from three

31

popular makers list on websites for $50-$100, but sell in the illegal Chicago market for $150-400. *Id*. Guns purchased in CPD stings are also frequently sold for $100-$200 over the retail price. *Id*. Further, the study found that banning sales makes gun deals a "risky business" and communication between buyer and seller "difficult." SOF:56. Neither party can take advantage of the "well-developed infrastructure for legal advertising," nor can they enforce transactions in court. *Id*. Local "brokers" report that between 30-40% of transactions fail, including because a gun could not be obtained from a supplier, or because the broker did not trust the buyer or thought he or she was an undercover officer. *Id*.

The study reported that these transaction costs "stand in contrast to conventional wisdom in the sociology and criminology literatures, which . . . has emphasized the ease with which criminals can access guns in the informal market, as well as the inelasticity of demand by criminals." SOF:53. Indeed, Dr. Cook observes that guns are "quite scarce on the street in Chicago," that "most" Chicago criminals "currently lack a gun and have difficulty obtaining one," and that it is "one of the most difficult" cities for criminals to get guns. SOF:57. Only one out of 17 regular Chicago thieves said he could find a gun in less than a week. *Id*. And Department of Justice data indicates that only 21% of Chicago arrestees had ever owned a handgun. *Id*. This figure is "much lower" than the mean and median values for other cities (31% and 33% respectively). *Id*. Further, while 60% of arrestees in other cities who had never owned a gun but might want one said it would take them at least a week or that they would simply be unable to get one, that number was 70% in Chicago. *Id*. In short, the idea that Chicago criminals can easily evade a sale ban and acquire guns elsewhere is simply not true. Gun possession by criminals would surely increase if guns could be lawfully sold and traded in Chicago.

### 3. Gun stores are dangerous and cannot be safely regulated.

Eliminating gun stores from Chicago not only makes it harder for criminals to access

them, it also saves Chicago from having to host a chronically-diseased regime that is

fundamentally broken. Even if many dealers are law-abiding, a flood of crime guns can spring

from a single bad apple. ATF reports that a corrupt FFL is "a particular threat to public safety"

when it fails to comply with the law, because, due to its "access to large numbers of firearms," it

"can illegally divert large numbers of firearms." SOF:68,71. Indeed, when dealers violate the

law, they do so with abandon. The DOJ Report found that FFLs who violated federal law

averaged 70 violations apiece; FFLs in ATF's Chicago Field Division had the highest average:

178.2 violations per FFL. SOF:65. And the results can be catastrophic: In general, less than 1%

of dealers contribute 60% of crime guns. SOF:68. ATF analysis of Chicago crime guns found

that only 1.3% of dealers – 12 of 936 – accounted for 41% of crime guns, for an average of 93

traces per FFL. SOF:69. This pattern is frightfully consistent throughout the region: 10 FFLs

accounted for 70% of crime guns in Indianapolis, 5 FFLs accounted for 65% in Gary, and 4 FFLs

accounted for 53% in Milwaukee. *Id*. In addition, a 2000 ATF study of trafficking

investigations found that, even though FFL traffickers were involved in less than 10% of the

investigations, they "were associated with by far the highest mean number of illegally diverted

firearms per investigation, over 350, and the largest total number of illegally diverted firearms, as

compared to other trafficking channels." SOF:71.

Besides selling crime guns, a gun store is a cache just waiting to be raided. In just the

past year, 195 handguns were stolen from a Des Plaines store, 33 guns were stolen from a

Hammond, Indiana store, and 26 were stolen from a Tinley Park store. SOF:72. From 1998-

1999, guns were stolen from at least 9 Cook County dealers. *Id.* Thieves have also tried or

succeeded in stealing guns from Chuck's Guns and Illinois Gun Works. *Id.* And between March

2010 and February 2012, there were at least 13 thefts from other gun stores in the nation.

SOF:73. William Campion, a gun dealer and member of Plaintiff ILAFR, does not store firearms

in his shop because the burglary risk presents a "safety concern." SOF:74. Criminals will even

hit government installations: In July 2011, 27 firearms were stolen from an army post in Fort

Irwin, California, and in May 2010, at least 21 guns were stolen from the Harvey, Illinois police

department. SOF:73,75. Patrons of a Chicago gun store would also be targeted for theft and/or

violent crime by gang members seeking a gun. SOF:76.

The havoc wrought by gun stores is only compounded by the failure of ATF - the

principle federal agency charged with policing gun dealers – to curtail it. Federal law imposes a

series of requirements on FFLs that are intended to deter sales to prohibited persons, help law

enforcement trace recovered guns, and detect corruption. SOF:84,85. Among other things, FFLs

are required to verify that customers are eligible and to conduct a background check. SOF:84.

They are prohibited from knowingly transferring a gun to a prohibited buyer, and must complete

and maintain a "Form 4473," which captures data relating to the purchaser and the firearm. *Id.*

They are also required to log all firearms acquired and sold. *Id.*

On paper, ATF is to inspect FFLs to verify compliance with these (and other)

requirements. *Id.* In reality, and as Mr. Vince opines, ATF "lacks the resources and statutory

authority to provide sufficient oversight and regulation of gun stores." SOF:93. The Department

of Justice concurs. The DOJ Report assessed ATF's FY2002 compliance inspections and

concluded that ATF "cannot effectively monitor the overall level of FFL compliance with federal

34

firearms laws" because it "does not conduct regular inspections" and "lacks adequate resources to meet agency goals." SOF:86.

Among a slew of detailed adverse findings, *id.*, the DOJ Report found that ATF inspected only 4.5% of FFLs. *Id.* It also found that although large-scale dealers sell more guns than small dealers and "present the potential for large numbers of improper sales," large retailers "are not inspected on a routine basis." *Id.* The nine large-scale dealers in the DOJ's sample were inspected on average only once every 9.9 years, and five had never received a compliance inspection. *Id.* Further, even though ATF's Chicago field office had the highest number of crime gun trace requests in 2001, it had only the 11th-highest number of compliance inspections. *Id.* This was hardly the first time that ATF had neglected Chicagoland: Chuck's Guns was not inspected between 1996 and 2000 even though it had the highest number of crime guns traced to it – 2,370 – of any FFL in the nation during that period, and even though the next highest number of traces to an Illinois dealer was 738. SOF:92.

Even more distressing, the DOJ Report found that ATF "manipulates the criteria it uses to target FFLs for inspection so that it only identifies as many such FFLs as it has the resources to inspect." SOF:86. ATF avoided inspecting large retailers "because the large volume of records makes the inspections more difficult and time-consuming." *Id.* Fourteen of eighteen inspectors examined Form 4473s only "to see if they were filled out properly – not for indications that a purchaser may be part of a firearms trafficking ring or acting as a straw purchaser for someone else." *Id.* And when ATF did manage to do an inspection, it was essentially pointless: "Even when numerous or serious violations were found," ATF "did not uniformly take adverse actions, refer FFLs for investigation, or conduct timely follow-up inspections." *Id.* Even though

35

violations were found in 1,934 inspections, ATF attempted to revoke only 30 licenses, and the revocation process was "lengthy." *Id.*

Little has changed since the DOJ Report. ATF's staffing has remained constant, and while the percentage of FFLs inspected annually has increased from 4.5%, it has stalled at 10%. SOF:87,88. Even as to those FFLs that are retail dealers, ATF only inspects one in five a year. SOF:89. Since 2002, ATF has audited Chuck's Guns only twice. SOF:92. And ATF's authority remains virtually toothless. In most instances, ATF cannot inspect an FFL more than once a year. SOF:93. *See also* 18 U.S.C. § 923(g)(1)(B)(ii)(I). It usually sends notice before doing so, which "make[s] it harder" to uncover illegal activity. SOF:93. ATF is rarely able to revoke a license, and, even under the most egregious circumstances, the average revocation takes 6 years. SOF:94. And if an FFL is convicted of a felony or discovered to have poor practices, the license can simply be passed to a relative or associate. *Id.*

As Mr. Vince concludes, federal law governing dealers has been "gutted" and "weakened" to the point of ineffectiveness. SOF:93. Dr. Kleck, for his part, has "no basis for disagreeing" that the ATF "is not properly using its resources." SOF:95. With the odds of being inspected remaining low, it comes as no surprise that FFL violations remain rampant. In FY2009, 29% of inspected dealers violated federal law, and 7% had a total of 28,325 missing firearms. SOF:90.

Even with tracing data indicating that most crime guns come from a small fraction of FFLs, the ATF has not be able to curtail the flow of guns to criminals in major cities. SOF:96. Whether this is because the ATF is derelict or because gun stores are inherently incurable, the Second Amendment does not require that Chicago allow this plague to operate within its borders.

36

Chicago should not be saddled with the cost and burden of trying to bring an industry to heel when even the expert federal agency with a billion-dollar budget, SOF:87, cannot do the job.

## IV. The Safe Storage Requirement Is Constitutional.

Count IV challenges MCC 8-20-040's requirement that each CFP holder "keep no more than one firearm in his home assembled and operable" and that "[a]ll other firearms kept or possessed by that person in his home shall be broken down in a nonfunctioning state or shall have a trigger lock or other mechanism, other than the firearm safety mechanism, designed to render the firearm temporarily inoperable." This provision should be reviewed using the undue burden standard, because it regulates, rather than restricts, armed self-defense in the home. It also is amply justified under intermediate scrutiny.

### A. The regulations satisfy the undue burden standard.

Chicago's regulation permits residents to keep a fully loaded, operable firearm ready at all times, which can be carried from room to room. SOF:97,101. As former CPD Superintendent Jody Weis testified at hearings on the Ordinance, "[o]ne operable firearm is all a person should need for self-defense." SOF:98. Indeed, law enforcement officers almost always carry a single firearm even though they more frequently face danger than the average citizen. *Id*. And Dr. Kleck is not aware of "any study or evidence that indicates that there is a defensive benefit to having more than one operable gun per [CFP] holder in the home." SOF:99. *See also* SOF:100 (opinion of Dr. Daniel Webster of Johns Hopkins University).

Since one operable firearm is sufficient for self-defense, even if MCC 8-20-040 allowed nothing more, it would not impose a substantial obstacle to armed self-defense in the home. The

regulation could be sustained based on this allowance alone.[8]  But MCC 8-20-040 in fact allows

much more:  An owner may keep as many guns as he wants in as many rooms as he wants, so

long as they are generally stored in compliance with its requirements.[9]  And allowing for *more*

firearms cannot make an already-valid scheme suddenly unconstitutionally restrictive.

Even if viewed in isolation, it is clear that the storage regulations are constitutional.  First,

they do not implicate protected conduct.  The Amendment does not protect the keeping of

firearms "in any manner whatsoever," *Heller*, 128 S.Ct. at 2816, "[n]or . . . does [*Heller's*]

analysis suggest the invalidity of laws regulating the storage of firearms to prevent accidents."

*Id.* at 2820.  This is no doubt due, in part, to their historical pedigree.  A 1783 Massachusetts

statute penalized the home possession of firearms "loaded with, or having gun-powder in the

same" in Boston.  A:116-117.  Other contemporaneous laws required home gunpowder to be

stored in certain ways or places, such as in "stone jugs or tin cannisters" (1784 New York),

"brass, copper or tin tunnels, and no otherwise," (1801 Massachusetts), or "in the highest story of

the house . . . unless it be at least fifty yards from any dwelling-house" (1782 and 1783

Pennsylvania).  A:119-131.  Because gunpowder is "a necessary component of an operational

firearm," these laws "prevented a homeowner from keeping in his home a gun that he could

---

[8]  The problem with the law invalidated in *Heller* was that it required all home firearms to be inoperable "at all times" – including when needed for self-defense.  *Heller*, 128 S.Ct. at 2818. That amounted to a ban:  The District "ma[de] it impossible for citizens to use [firearms] for the core lawful purpose of self-defense" in the home.  *Id.*

[9]  These firearms could be rendered operable in case of emergency even if the owner had an operable gun elsewhere in the home.  720 ILCS 5/24-10 provides:  "It is an affirmative defense to a violation of a municipal ordinance that prohibits, regulates, or restricts the private ownership of firearms if the individual who is charged with the violation used the firearm in an act of self-defense or defense of another as defined in Sections 7-1 and 7-2 of this Code when on his or her land or in his or her abode or fixed place of business."

immediately pick up and use against an intruder." *Heller*, 128 S.Ct. at 2849 (Breyer, J., dissenting). Even if they permitted a owner to temporarily load a gun when necessary for self-defense, the owner "would have had to get the gunpowder and load it into the gun, an operation that would have taken a fair amount of time to perform." *Id.*

Second, even if the Second Amendment's protections did extend to the storage of additional firearms, Chicago's storage requirements do not, in operation, present a substantial obstacle to defensive gun use. Trigger locks are one of the ways additional firearms can comply with MCC 8-20-040. That they pose no burden to quick gun use is shown by Pacholski and Hall's decision to use trigger locks on *all* of their guns – even the one gun they are free to keep in a fully operable and ready state. SOF:103,105.[10] These trigger locks contain two halves that cover each side of the trigger guard and lock together, thereby preventing access to the trigger. SOF:104. They can be affixed to the gun without having to break it down. SOF:104,105. Pacholski's trigger locks offer a "[q]uick, easy release," and he testified that it is "not a problem" to keep his guns secured, "even with a trigger lock." SOF:103,104. He added that during an attack, time is "not really of the essence as much as you got to have your head together and kind of make sure you are doing the right thing." SOF:104. It takes Pacholski between 8-10 seconds to unlock his locks, which are all key locks. *Id.* And time trials conducted on locks used by Pacholski and Hall found that it took no longer than 6.3 seconds to unlock the lock and load a semiautomatic pistol (and the average times were less). SOF:109,110.

Mr. Vince's expert opinion, based on his experience in law enforcement and in advising the firearms industry on safe storage devices, is that MCC 8-20-040 "do[es] not impair the

---

[10] Tyler has only one firearm, SOF:107, and thus is not subject to MCC 8-20-040.

effective utilization of [a] firearm for self-defense," that 10 seconds or less is "sufficient time to respond to the threat of a home intruder," and that a resident who learns how to use trigger locks should be able to achieve times similar to those of the time trials. SOF:111. As he observes, gun locking devices "are designed and manufactured to be used by average citizens in home security situations." *Id*.

Plaintiffs have no evidence that could overcome this. Dr. Kleck lacks any scientific evidence, and, indeed, uses trigger locks on both of his handguns. SOF:102,113,115. And while Hall testified that it took him 40 to 50 seconds to unlock the combination lock on his handgun, he lacks "much experience" or "much expertise" in unlocking firearm devices, he has unlocked the combination lock only three or four times, and he did not time himself or practice. SOF:106. In any event, even if Hall's speed with the combination lock never improves, there is no requirement that he use that kind of lock. He is free to use other locks, such as the key lock that he uses on his shotgun or any number of other quickly-accessible locks. *See* SOF:109,110.

### B. The regulations satisfy intermediate scrutiny.

Chicago's safe storage regulations are substantially related to preventing firearms violence in many different ways, each of which is sufficient to sustain them.

#### 1. Reducing gun acquisition by criminals.

As with gun sales, Chicago has a compelling interest in attacking another source of criminal gun acquisition: residential theft. Gun theft is pervasive. Over 500,000 guns are stolen each year in the U.S., and the average U.S. gun owner has between 6 and 7 guns, many of which are not locked up. SOF:118. A 2003 study by Dr. Cook found that residential burglary rates rise along with gun prevalence. SOF:119. His preferred explanation is that "guns are valuable loot

because they are portable and readily sold or fenced." *Id*.

MCC 8-20-040 is substantially related to reducing gun theft because, as Dr. Webster opines, it "decreases the number of operable firearms in the home and the potential value of such guns to would-be thieves." *Id*. Indeed, Dr. Kleck himself asserts that since "most gun criminals acquire their guns directly or indirectly as a result of theft," this is "probably the strongest rationale for keeping guns stored in a secure manner of some sort." SOF:118. He explained that it is "reasonable" to believe that trigger locks deter gun theft, because it is "very hard" to remove a trigger lock from a stolen gun; he has never heard of a criminal who has successfully done so. *Id*. The requirements also prevent the gun from being used against the home owner. SOF:120. As Tyler explained, leaving firearms "laying around in your house" is simply "not responsible" because they could be stolen, used against the owner, or accidentally discharged. *Id*.

### 2. Reducing the risk of suicide, homicide, and accidental firearm death.

MCC 8-20-040 also reduces the number of gun suicides, homicides, and accidents by reducing the number of guns that could be misused for those purposes. SOF:121,123. Dr. Kleck agrees that trigger locks "have a safety benefit," are a "sensible step to take in order to prevent unauthorized use." SOF:125. He also agrees that "guns with trigger locks are much less likely to be involved in accidents than guns without trigger locks;" indeed, they are "virtually not involved in accidents at all" and it is "virtually impossible" for an unauthorized user to use a trigger-locked gun. *Id*.

These benefits are also backed by scientific research. Dr. Webster's report cites a number of studies – including his own research published in the Journal of the American Medical Association – that, in his expert opinion, show that guns in the home increase the risk of suicide,

41

homicide, and unintentional shootings; that this risk increases as the number of guns increases; and that safe storage reduces these risks. SOF:122,123,126. Dr. Webster opines that MCC 8-20-040 provides a safety benefit even though it allows one guns to be unsecured, because any additional gun would still be unusable to "household members when they become distraught, suicidal, angry, or otherwise lose control of their emotions." SOF:127.

The studies relied upon by Dr. Webster used a variety of methodological designs and examined different populations. SOF:122,123,126. Chicago need not address all of them here,[11] for the Seventh Circuit has already found two of them determinative in the course of sustaining even a complete ban on home possession under intermediate scrutiny: Kellerman, et al., *Gun Ownership as a Risk Factor for Homicide in the Home*, 329 New England Journal of Medicine 1084-1091 (1993) and Wiebe, *Homicide and Suicide Risks Associated With Firearms in the Home: A National Case-Control Study*, 41 Annals of Emergency Medicine 771-782 (2003). *See Skoien*, 614 F.3d at 643-44. And Dr. Kleck agrees that at least two others are relevant: Wiebe, *Firearms in US homes as a risk factor for unintentional gunshot fatality*, 35 Accident Analysis and Prevention 711-716 (2003) and Cummings, et al., *The Association between the Purchase of a Handgun and Homicide or Suicide*, 87 American Journal of Public Health 974-978 (1997). Dr. Kleck contends that the former, while not "perfectly relevant," is the "closest to being relevant," and that the latter has "some relevance" and was published in a "leading journal" in the field of public health. SOF:122(a),(b).

Finally, industry and law enforcement practice affirm the effectiveness of safe storage in

---

[11] Dr. Webster's report discusses over 30 of these studies. Eighteen of them, as well as additional data relied upon by Dr. Webster, are summarized at SOF:122,123,126.

reducing injury.  Indeed, the parent organization of Plaintiff ILAFR – the National Shooting

Sports Foundation ("NSSF") – concedes it.  SOF:130.  The NSSF is the largest trade group

representing the firearms industry as a whole, with a membership of more than 6,000

manufacturers, distributors, retailers, ranges, and other organizations.  *Id.*  NSSF guidelines state

in part that:

> "[N]early all firearms accidents in the home can be prevented simply by making sure that
> guns are kept unloaded and locked up."

> Firearms owners "must make absolutely sure that guns in your home are stored so that
> they are not accessible to . . . unauthorized persons.  Hiding a gun in a closet, drawer or
> similar location is *not* safe storage."

> Even as to a firearm owned "for home security," the "objective should be to create a
> situation in which the firearm is readily available to [the owner], yet inaccessible or
> inoperative to others."

*Id.*  The NSSF also has distributed 35 million safety kits containing free gun locking devices.

SOF:131.  And the NSSF mandates that only disabled firearms are allowed at its trade show,

even though the show is closed to the public and open only to industry members.  SOF:132.  That

is, even among like company, the gun professionals require themselves to secure their guns.

The NRA also advises that home firearms "must be stored in a secure place, inaccessible

to unauthorized users (children or adults) and in accordance with local laws."  SOF:129.  It

stresses that "there is one general rule that *must* be applied under all conditions:  Store guns so

they are not accessible to untrained or unauthorized persons."  *Id.*

As to law enforcement, the International Association of Chiefs of Police recommends

"[m]andating safe storage of firearms by private citizens."  SOF:128.  And ATF guidelines,

developed with the firearms industry, counsel FFLs to "[d]isable display firearms" by using

43

"trigger locks or plastic ties to ensure that the firearms cannot be loaded or fired while being examined," and to "[r]ecommend safe storage methods," including locking devices, to customers. *Id*. The guidelines further recommend that FFLs should "[s]how only one firearm at a time to a customer. If the customer requests to handle another firearm, secure the first firearm before displaying another." *Id*.

### 3. Reducing threats to first responders.

"Responding to a domestic disturbance call is among an officer's most risky duties," *Skoien*, 614 F.3d at 644, and Chicago first responders have been harmed by guns kept in homes when fielding emergency calls. SOF:134. MCC 8-20-040 addresses this problem by reducing the number of operable firearms that could be used against a police officer or paramedic, especially by a distraught or upset family member or acquaintance. *Id*.

Firearms in the home present a special obstacle for paramedics. "Scene safety" is the paramedic's paramount concern when trying to save a life. SOF:135. But a scene is not considered safe when a gun is present: Even if not being used at the moment, the gun is a threat to the paramedic because he does not know how it will be used. *Id*. And, unlike the police, Chicago paramedics are not trained to secure loose firearms. SOF:136. An unsecured firearm at the scene therefore prevents the paramedic from rendering care, and the paramedic will refrain until the police secure the scene. *Id*. Scene safety (and, consequently, the speed with which a paramedic can tend to a victim) is enhanced by requiring firearms to be secured before the paramedic even arrives.

## CONCLUSION

WHEREFORE, for the foregoing reasons, and those stated in Chicago's Motion for

Summary Judgment, Chicago respectfully requests that the Court enter judgment in favor of

Chicago and against Plaintiffs on all claims.


Dated: March 2, 2012                                    Respectfully submitted,

                                                        STEPHEN R. PATTON
                                                        CORPORATION COUNSEL
                                                        CITY OF CHICAGO


                                            BY:     /s/ Andrew Worseck
                                                    One of Its Attorneys


Michael A. Forti
Mardell Nereim
Andrew W. Worseck
William M. Aguiar
Rebecca Alfert Hirsch
Constitutional & Commercial Litigation Division
30 North LaSalle Street, Suite 1230
Chicago, IL 60602
(312) 744-9010

45