# EXHIBIT 1

**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

| | | |
|---|---|---|
| ILLINOIS ASSOCIATION OF | ) | |
| FIREARMS RETAILERS, ET AL., | ) | |
| | ) | |
| Plaintiffs, | ) | |
| | ) | |
| v. | ) | No. 10-CV-4184 |
| | ) | Judge Edmond E. Chang |
| CITY OF CHICAGO, ET AL., | ) | Magistrate Judge Geraldine Soat |
| | ) | Brown |
| Defendants. | ) | |

## DEFENDANTS' LOCAL RULE 56.1(a)(3) STATEMENT OF MATERIAL FACTS

Defendants City of Chicago (the "City") and Mayor Rahm Emanuel (collectively, "Defendants"), by their counsel, Stephen R. Patton, Corporation Counsel of the City of Chicago, hereby submit their Local Rule 56.1(a)(3) statement of material facts to which there is no genuine issue and which entitle Defendants to judgment as a matter of law.[1]

### PARTIES

1.      Plaintiff Kathryn Tyler ("Tyler") resides at 2620 West Jerome Street in Chicago with her husband, Plaintiff Kenneth Pacholski ("Pacholski"). Exhibit 1 (Deposition of Kathryn Tyler) at 5:1-2, 7:15-18, 14:24-15:5; Exhibit 2 (Deposition of Kenneth Pacholski) at 14:16-22, 15:4-20.  Plaintiff Michael Hall ("Hall") resides at 11254 South Bell Avenue in Chicago with his wife and two children, one of whom is under 17 years old.  Exhibit 3 (December 14, 2010 Deposition of Michael Hall) at 5:2-5, 20:22-21:15; Exhibit 4 (May 27, 2011 Deposition of

---

[1]  This statement includes both facts that are undisputed, and facts that Defendants anticipate Plaintiffs will dispute.  However, under the standards governing review of the particular claims presented in this case, these disputes would not preclude entry of judgment for Defendants. *See* Defendants' Memorandum in Support of Their Motion for Summary Judgment, at 12-15.  Defendants have included both the undisputed and the anticipated disputed facts in this single statement for the convenience of the Court.

Michael Hall) at 34:7-22.  Plaintiff Illinois Association of Firearms Retailers ("ILAFR") is an organization existing under the laws of Illinois and represents firearm retailers and the retail firearms industry in Illinois.  Exhibit 5 (Deposition of Whitney O'Daniel) at 21:13-18; Exhibit 6 (Plaintiffs' Second Amended Complaint), ¶ 4.  The City of Chicago is a municipal corporation existing under the laws of Illinois.  Rahm Emanuel is the Mayor of Chicago.

## JURISDICTION AND VENUE

2.      Plaintiffs' Second Amendment Complaint seeks redress for alleged violations of the Second and Fourteenth Amendments to the United States Constitution.  This court has jurisdiction over these claims pursuant to 28 U.S.C. §§ 1331 and 1343(a)(3).  Venue is proper under 28 U.S.C. § 1391(b) because Defendants reside in this district and a substantial part of the events giving rise to the Plaintiffs' claims occurred in this district.

## FIREARM VIOLENCE

3.      In 2010, there were:

    a.      436 reported murders in Chicago; 81% (353) were committed with a firearm.  Of those committed with a firearm, 348 (99%) were committed with a handgun.

    b.      14,271 reported robberies in Chicago; 38% (5,371) were committed with a firearm.  Of those committed with a firearm, 98% (5,275) were committed with a handgun.

    c.      5,060 reported aggravated assaults; 44% (2,216) were committed with a firearm. Of those committed with a firearm, 96% (2,123) were committed with a handgun.

d.     9,409 reported aggravated batteries; 20% (1,860) were committed with a firearm.  Of those committed with a firearm, 97% (1,812) were committed with a handgun.

Exhibit 7 (Affidavit of Timothy Lavery), ¶ 2.

4.     In 2009, Chicago had the second-highest murder and non-negligent manslaughter rate (16.1 per 100,000 residents) of the 10 U.S. cities with the largest population.  Exhibit 8 (Uniform Crime Reporting Statistics – 10 cities).  That rate was nearly double that of Los Angeles (8.1) and nearly triple that of New York City (5.6), the two cities with a higher population than Chicago.  *Id.*  It was also more than three times the national average (5.0).  Exhibit 9 (Uniform Crime Reporting Statistics – Nation).

5.     Joseph Gorman has been a sworn member of the Chicago Police Department ("CPD") for over 25 years and is the Commander of the CPD's Gang Investigations Unit.  Exhibit 10 (Affidavit of Joseph Gorman), ¶¶ 2-16, 31.  He testified that street gangs are a form of urban terrorism in Chicago and that gang violence spearheads violent crime in Chicago.  *Id.*, ¶ 30.  In 2010, 59% of Chicago murders were gang-involved, meaning that the murder was gang-related or that the victim and/or offender was a gang member.  Exhibit 11 (January - December 2010 Chicago Crime Summary) at 2.  Approximately 55-60% of Chicago shootings are gang-related.  Exhibit 10, ¶ 27.

6.     Chicago has at least 80 different street gangs, which operate in different neighborhoods throughout Chicago.  *Id.*, ¶ 19.  There are between 80,000 and 100,000 known members of those gangs.  *Id.*, ¶ 21.  That number does not include the many gang associates and affiliates who, while not members themselves, assist or facilitate criminal conduct by gang

3

members. *Id.* Most Chicago gangs are subdivided into factions. *Id.*, ¶ 19. There are over 300 different gang factions within Chicago. *Id.* Each gang, and even many gang factions, has its own name and symbols, a hierarchy, a geographic territory ("turf"), a code of conduct, and an organized, continuous course of criminal activity. *Id.*, ¶ 20. Gang members routinely use violence and intimidation to advance their criminal interests, and they rely heavily on the use of firearms. *Id.*, ¶ 25. Handguns, rather than long guns, are predominantly used by gang members because they are easily concealed and readily accessible. *Id.*

7.     Gang factions arose, in some part, from the demolition of Chicago public housing projects such as the Robert Taylor Homes by 2007 and Cabrini-Green by 2011. *Id.*, ¶ 19. Gangs based in those residences were forced to relocate, in many instances moving to neighborhoods where rival gangs had been long-established. *Id.* This relocation disrupted the structure and hierarchy of these gangs; groups of relocated gang members split off into their own factions and now often operate within a street or a block of another faction. *Id.* This destabilization of the gang structure in Chicago has fomented violent interactions not only between gangs, but also between factions of the same gang, as leaders try to expand or protect their turf. *Id.*

8.     A U.S. Department of Justice study of 22 cities indicates that Chicago and Los Angeles "have unusually high rates of gang membership" and "are outliers . . . with respect to gang activity." Exhibit 12 (Philip J. Cook, et al., Underground Gun Markets, The Economic Journal, 117 (2007)), at F573, F576. Around 20% of arrestees in these two cities reported membership in a gang at the time of their arrest, which is "about eight times the median value [in the study] and about twice as high as the rate reported in the next-highest city, Birmingham." *Id.* at F576. In addition, 45% of Chicago arrestees, and 34% of Los Angeles arrestees, reported

having been in a gang at some point; the next highest rate (Birmingham) was 20%. *Id.* at F577

(Table 4). Gangs have operated within Chicago for decades and are well-entrenched criminal

enterprises. Exhibit 10, ¶ 22. It is not uncommon for multiple generations of a family to be

members of the same gang. *Id.*

       9.     In 2007, there were 31,224 firearms deaths in the U.S., 12,632 of which were

homicides and 17,352 of which were suicides. Exhibit 13 (Declaration of Philip J. Cook),

Exhibit A thereto, at 3. Of the 536 law enforcement officers feloniously killed nationally

between 2000-2009, 490 (91%) were assaulted with a firearm. *Id.* at 4.

       10.    Dr. Philip J. Cook is the ITT/Sanford Professor of Public Policy, Professor of

Economics and Sociology, and Senior Associate Dean of the Sanford School of Public Policy at

Duke University. Exhibit 13, ¶ 1. He has studied firearm violence since 1975 and has published

scholarly books and articles on a number of related topics, including the economic costs of gun

violence, the illicit markets for guns, the consequences of weapon choice in robbery and assault,

the influence of gun availability on gun use in crime, the use of guns in self-defense, and the

effectiveness of gun control regulations. *Id.*, Exhibit A thereto, at 1. Dr. Gary Kleck, a

criminologist at Florida State University and Plaintiffs' proffered rebuttal expert, agrees that Dr.

Cook has "contributed consistently to the serious literature on gun control." Exhibit 14

(Deposition of Gary Kleck) at 19:24-20:3.

       11.    Dr. Cook estimates that, in the U.S. as a whole, the medical costs of gun violence

are approximately 2% of the total social cost of gun violence. Exhibit 13, Exhibit A thereto, at 5;

Exhibit 15 (Deposition of Philip J. Cook) at 43:16. These social costs entail "a variety of costly

measures" that residents take to reduce the risk of being shot, such as "moving to safer

neighborhoods that may be less conveniently located." Exhibit 13, Exhibit A thereto, at 5.

"Furthermore, the threat of gun violence is in some neighborhoods an important disamenity, causing residents to be fearful and take special precautions to protect themselves and their children. That threat depresses property values and puts a drag on economic development." *Id.*

12.     In J. Ludwig & P.J. Cook, *The Benefits of Reducing Gun Violence: Evidence from Contingent-Valuation Survey Data*, 22 Journal of Risk and Uncertainty 207-26 (2001), Dr. Cook and Dr. Jens Ludwig (currently the McCormick Foundation Professor of Social Service Administration, Law, and Public Policy at the University of Chicago) estimated that the total social cost of firearms assault and homicide was approximately $1 million per gunshot wound. Exhibit 13, Exhibit A thereto, at 5; Exhibit 16 (Jens Ludwig June 29, 2010 Written Testimony for Chicago City Council Committee on Police and Fire) at CITY 000400; Exhibit 17 (Ludwig & Cook Report). This study also found that "murder rates have a direct effect on the rate of population growth or decline, with each murder associated with a reduction of 70 residents." Exhibit 13, Exhibit A thereto, at 5. Testimony submitted by Dr. Ludwig during the City Council's hearings on Chicago's Responsible Gun Ownership Ordinance ("Ordinance") indicates that "if Chicago's homicide rate for the past 8 or 9 years had been more like New York City's, which has a homicide rate that is around one-third of [Chicago's], then Chicago's population would have actually *increased* by several hundred thousand residents, rather than declined." Exhibit 16 at CITY 000399. Dr. Ludwig's calculations also suggest that "eliminating gun involvement in crime in Chicago might increase total property values in the city by perhaps $30 billion or so, and increase property tax revenues by around $30 million per year." *Id.* Dr. Ludwig estimates that "the total social cost of gun violence for Chicago annually is around $2.5

6

billion, or $2,500 per year for each Chicago household." *Id.* at CITY 000400.

13.    Dr. Kleck testified that requiring "a factual basis" for "being certain" about a

proposition is an "unreasonable standard" in criminology. Exhibit 14 at 355:2-6. "You're never

certain about anything in science." *Id.* at 355:5-6. "Everything is uncertain in science." *Id.* at

356:19-25. The appropriate question is whether there is "a factual basis" for "drawing

conclusions one way or another." *Id.* at 355:6-7. Researchers must work with the data they have

and try to "draw rational and reasonable conclusions from the results, taking into account the fact

that there are certain unknowns." *Id.* at 460:6-14. "No study is perfect." *Id.* at 460:15-16.

"[Y]ou draw your conclusions on the best available evidence, not based on perfect evidence." *Id.*

at 353:7-8.

## RESTRICTION ON CARRYING OUTSIDE THE HOME

14.    No provision of the Ordinance has prevented or restrained Tyler, Pacholski, or

Hall from engaging in self defense in response to a threat. Exhibit 1 at 168:17-19; Exhibit 2 at

215:17-216:10; Exhibit 3 at 234:11-14. Dr. Cook opines that MCC 8-20-020(a) and -030(a), to

the extent that they "limit possession of a handgun to the owner's home and a long gun to the

owner's home or fixed place of business . . . serves to promote public safety, and in particular to

reduce gun use in violence." Exhibit 13, Exhibit A thereto, at 2-3.

15.    Dr. Cook opines that "whether the victim of an assault or robbery dies is not just a

reflection of the offender's intentions." *Id.*, Exhibit A thereto, at 7. For "[t]he bulk of people

who are shot and killed," the killing results from "a spontaneous encounter and not a sustained

clear intent to kill." Exhibit 15 at 188:11-15. "The type of weapon used in an assault or robbery

affects the likelihood that the victim will be killed." Exhibit 13, Exhibit A thereto, at 2. "In

particular, with other things being equal, violent crimes committed with firearms are far more likely to result in the death of the victim than violent crimes committed with knives, blunt objects, or bare fists." *Id.* "In other words, the likelihood that an assault or a robbery 'converts' to a homicide is much higher if a gun is involved." *Id.* at 10. This is known as the "instrumentality effect." *Id.* at 6. Dr. Kleck "tentatively" agrees that, if the user's intent to inflict lethality is controlled for, and all other things being equal, guns are more lethal than other weapons. Exhibit 14 at 388:12-16. "As a result, while only a small fraction (5 percent) of criminal assaults are perpetrated with guns, over two-thirds of fatal assaults (murders and non-negligible homicides) are perpetrated with guns." Exhibit 13, Exhibit A thereto, at 6.

16.     Dr. Cook bases this conclusion on "two seminal articles" by Franklin Zimring: *Is Gun Control Likely to Reduce Violent Killings?*, 35 University of Chicago L. Rev. 721 (1968) and *The Medium Is The Message: Firearm Caliber As A Determinant Of Death From Assault*, 1 Journal of Legal Studies 97 (1972). Exhibit 13, Exhibit A thereto, at 6; Exhibits 18 & 19 (Zimring Studies). Dr. Cook also relies on his own prior research: *The Technology of Personal Violence* in 14 Crime and Justice: An Annual Review of Research (M. Tonry ed. 1991); *Robbery Violence*, 78 Journal of Criminal Law & Criminology 366 (1987). Exhibit 13, Exhibit A thereto, at 6-7; Exhibits 20 & 21 (Cook Studies).

17.     Dr. Cook opines that "the incidence of gun carrying contributes directly to gun use in assault." Exhibit 13, Exhibit A thereto, at 13. Dr. Kleck agrees that Dr. Cook is "probably correct . . . that the prevalence of firearms has a positive effect on gun use" – i.e., the percent of violent crimes in which guns are used. Exhibit 14 at 414:8-24. Dr. Cook opines that "[i]f the fraction of assaults or robberies involving guns increases, then the death rate (*i.e.*, the criminal

8

homicide rate) will also increase." Exhibit 13, Exhibit A thereto, at 7. Dr. Cook's study of annual Uniform Crime Reports data for the 200 largest counties over 20 years "found that the homicide rate increased with the prevalence of gun ownership. On average, a 10 percent increase in the prevalence of gun ownership increased the homicide rate by about 2 percent." *Id.* at 10; Exhibit 22 (*The Social Costs of Gun Ownership*, 90 Journal of Public Economics 379 (2006)).

18. Dr. Cook opines that the City's restrictions on carrying firearms outside the home "are plausibly supported" by "the association between gun carrying and the increased lethality of crime." Exhibit 13, Exhibit A thereto, at 18. "Carrying firearms away from home contributes directly to the use of guns in violent crime and is associated with increases in violence and lethality." *Id.* at 3. "That is to say, where there is more gun carrying, we should expert more" firearms injuries and deaths. *Id.* at 13. "[E]ven if there was no change in the overall rate of violence" in Chicago, "[a] program or regulation that was effective in reducing gun use in violent crime would save lives (by reducing the case-fatality rate)." *Id.* at 6.

19. A high pulse rate and shaking hands during a crime "would" affect "the accuracy with which the [victim] can wield the gun or use the gun," it "might" affect the shooter's judgment, and it "possibl[y]" could lead to the accidental shooting of a person who does not actually present a threat. Exhibit 14 at 114:3-17. Tyler testified that when an attacker is confronting you, "your adrenalin is flowing," and that "I don't know what I'd do." Exhibit 1 at 119:17-20. It is possible that she would shoot "the first person that I think is threatening me." *Id.* at 120:18-121:1.

20. A study of gunshot victims in Philadelphia who possessed a firearm at the time of getting shot reported that "gun possession by urban adults was associated with a significantly

increased risk of being shot in an assault." Exhibit 23 (C. Branas, et al., *Investigating the Link Between Gun Possession and Gun Assault*, 99 American Journal of Public Health 1-7 (2009)) at 4. It found that persons in possession of a gun were 4.46 times more likely to be shot in an assault than those not in possession. *Id.* It concluded that "[o]n average, guns did not protect those who possessed them from being shot in an assault." *Id.* at 6.

21. Currently, CPD is able to arrest and prosecute gang members (or other criminals) when those members are detected carrying or possessing firearms in the spaces outside of a home, because that activity is unlawful in Chicago. Exhibit 24 (Declaration of Eugene Williams), ¶ 11; *see also* Exhibit 10, ¶ 34. Eugene Williams, Acting Chief of Patrol for the CPD, testified that this is an important tool that CPD uses to combat the gang problem in Chicago. Exhibit 24, ¶ 11; *see also* Exhibit 10, ¶¶ 34-35. It allows CPD to take gang members, and/or their firearms, "off the street" before they commit a violent act with the firearm. Exhibit 24, ¶ 11; *see also* Exhibit 10, ¶ 34. "The existence of a regulation prohibiting [gun carrying] allows police officers to intervene and remove the weapon before it can be used in the commission of a crime." Exhibit 13, Exhibit A thereto, at 14. Dr. Kleck agrees that "if you could arrest people for simply having a gun, it is easier to prevent people from using the gun criminally than having to wait until after they commit the crime." Exhibit 14 at 445:23-446:4.

22. The value of this tool is magnified when combined with targeted policing efforts (where CPD focuses resources on areas of high gang activity), because it creates a disincentive for gang members to carry or possess firearms. Exhibit 24, ¶ 11; *see also* Exhibit 10, ¶ 34. Targeted policing entails "a large volume of police contacts with suspicious individuals who are stopped for questioning and frisked if there is reason to believe that they are carrying a weapon."

Exhibit 13, Exhibit A thereto, at 14. The CPD has "a tradition" of "targeted enforcement directed at confiscating guns that are being carried illegally," in an "effort to reduce gun misuse." Exhibit 15 at 181:5-12; Exhibit 13, Exhibit A thereto, at 14. This "high priority" is known to residents of Chicago neighborhoods with high gang activity. Exhibit 15 at 182:3-21. Consequently, when CPD officers are frequently patrolling a gang area or neighborhood, gang members know that they stand a higher chance of being detected (and arrested) if they have a firearm outside of a home. Exhibit 24, ¶ 11; *see also* Exhibit 10, ¶ 34. Chief Williams testified that, as a result, the gang member will be less likely to carry or possess the gun outside the home, which benefits both public and officer safety by removing a key driver of the crime problem in Chicago – namely, a gun in the hand of a gang member in public. Exhibit 24, ¶ 11; *see also* Exhibit 10, ¶ 33.

23. Dr. Cook opines that this "enhanced probability that if you're armed in public that you'll end up being detected and arrested . . . reduces the incentive to carry a gun by creating a deterrent." Exhibit 15 at 161:9-15. Dr. Cook testified that it is "plausible" that Chicago's ban on carrying outside the home, coupled with police enforcement targeted at illegal carrying, has reduced the misuse of guns outside the home, given that "large sections of the active criminal community . . . do not have a gun and do not carry a gun." *Id.* at 182:23-183:14. Dr. Cook opines that "[t]argeted patrol against illicit gun carrying has been shown to be effective," citing J. Cohen & J. Ludwig, *Policing Crime Guns* in Evaluating Gun Policy: Effects on Crime and Violence 217-250 (J. Ludwig & P.J. Cook eds. 2003) and E.F. McGarrell, et al., *Reducing Gun Violence: Evaluation of the Indianapolis Police Department's Directed Patrol Project*, National Institutes of Justice (2002). Exhibit 13, Exhibit A thereto, at 14; Exhibits 25 & 26 (studies)..

24.     *Policing Crime Guns* studied targeted patrols in Pittsburgh that were undertaken in certain areas of the city on certain days ("on days") but not on others ("off days").  Exhibit 25 at 219.  The patrols involved police contacts with citizens "initiated mainly through traffic stops and 'stop-and-talk' activities with pedestrians in public areas."  *Id.* at 221.  "When warranted for reasons of officer safety (usually because of suspicious actions or demeanor), these stops sometimes moved to the types of pat-downs on the outside of clothing to check for weapons that are allowed" as *Terry* stops.  *Id.*  The study "suggest[s] that Pittsburgh's targeted policing program against illegal gun carrying may have reduced shots fired by 34 percent and gunshot injuries by as much as 71 percent in the targeted areas."  *Id.* at 238.  The study reported that since the "number of actual arrests and guns confiscated as a result of these patrols was fairly modest . . . [t]hese reductions are likely to occur because of deterred gun carrying or criminal behavior."  *Id.* at 220.

25.     *Reducing Gun Violence* evaluated an Indianapolis policing strategy of focusing on "specific suspicious behavior and individuals" in a particular area.  Exhibit 26 at 2.  It "reduced gun crime, homicide, aggravated assault with a gun, and armed robbery."  *Id.*  "[T]otal gun crimes declined 29 percent" and "aggravated assaults with a gun and armed robberies declined 40 percent" in the area.  *Id.* at 10.

26.     "Targeted patrol against guns has been a prominent feature of New York City policing for the last two decades, a period during which that city has enjoyed an unprecedented reduction in violent crime."  Exhibit 13, Exhibit A thereto, at 14.  Further, Dr. Cook's 2007 study of disadvantaged neighborhoods and criminal access to guns in Chicago ("2007 Chicago Study") found that  "[p]olice pressure against guns . . .  does discourage participation in the gun trade in

12

Chicago." Exhibit 12 at F570.

27.     Dr. Cook opines that if "stop-and-frisk tactics (or other targeted patrol tactics) became unavailable for any reason (including because the legal basis for conducting them was eliminated through the striking down of strict carrying restrictions), then the reductions of gun misuse resulting from these tactics would be lost," and there "would be more guns on the street." Exhibit 13, Exhibit A thereto, at 15; Exhibit 15 at 184:23-185:3.   Many Chicago gang members and affiliates may not have a recorded criminal history that would disqualify them from receiving a gun permit.  Exhibit 24, ¶ 10.  Chief Williams testified that if it became legal to possess guns in the spaces outside a home, CPD would not be able to arrest CFP-holding gang members or their acquaintances for possessing guns in these spaces, and they would be more likely to do so. *Id*., ¶¶ 10-11; *see also* Exhibit 10, ¶¶ 33-34.  And because, many times, firearms possession is the only crime being committed during an encounter between police and a gang member, there would be no other basis for an arrest.  Exhibit 24, ¶ 11; Exhibit 10, ¶ 34.  Instead, rather than being able to arrest the gang member before a violent firearm act occurs, law enforcement will have to wait until after the gang member actually commits a violent act with the gun.  Exhibit 24, ¶ 11; Exhibit 10, ¶¶ 34-35.

28.     Further, "by providing an independent basis for arrest and prosecution, the illegality of firearms outside the home allows CPD to take gang members off the street without disclosing evidence of larger criminal gang activity in which that gang member is involved (or the sources of that evidence, such as confidential informants) that the CPD may be currently investigating.  If this basis did not exist, CPD would have to make a choice between letting the armed gang member remain free or risk compromising a larger investigation."  Exhibit 10, ¶ 35.

13

29.     "An *ex ante* permitting regime for carry is not sufficient to screen out all potential

bad actors because many people who commit gun crimes do not, in fact, have a prior record that

would disqualify them from carrying under typical prescreening regimes."  Exhibit 13, Exhibit A

thereto, at 3.  "[A] majority of criminal homicides and other serious crimes committed are

committed by individuals who have not been convicted of a felony."  *Id.* at 16.  A study of

Illinois data published by Dr. Cook in *Criminal Records of Homicide Offenders*, 294 Journal of

the American Medical Association 598-601 (2005), found that "just 43 percent of adults arrested

for criminal homicide . . . had a felony conviction on their record."  *Id.*; Exhibit 27 (Cook study).

Dr. Kleck agrees that under a permitting system, "some criminals will be able to carry guns" and

"some people who have permits will commit crimes with those guns."  Exhibit 14, at 446:5-11.

Data complied by the Violence Policy Center indicates that between May 2007 and August 2011,

concealed-carry permit holders killed 370 people (net of justifiable homicide killings).  Exhibit

13, Exhibit A thereto, at 17.

30.     Dr. Cook opines that "if it could be established by a witness" that the "nominally

private spaces . . . outside of the main dwelling structure of a residence such as yards or porches .

. . were no different than public spaces in terms of the ability of people in those spaces to inflict

public gun violence or be the victim of public gun violence, then [his] opinions on the carry

regulations set out in [his] report would apply equally to those private spaces.  If a bullet fired

from one space into the other would not respect the nominal change in ownership status, there is

no reason to expect that outcomes which are true 'on the street' would not hold true just off of

it."  *Id*. at 15.

31.     The Tyler/Pacholski home lies between Jerome Street to the south and an alley to

14

the north; the front of the home faces Jerome Street and the rear faces the alley. Exhibit 2 at 120:4-9; Exhibit 1 at 57:4-9 and Exhibit 6 thereto. The front of the property line extends to a sidewalk that runs parallel to Jerome Street, and the rear property line extends to the alley. Exhibit 2 at 120:23-121:20; Exhibit 1 at 57:7-10. The parcel contains a detached two-and-a-half car garage behind the house; the garage opens into the alley. Exhibit 2 at 122:10-19; Exhibit 1 at 51:24, 54:19-55:5, and Exhibit 6 thereto. The garage is used to store cars and other items; it is not used for residential purposes. Exhibit 1 at 57:15-58:5; Exhibit 2 at 125:7-15. The garage is 5 to 6 feet away from the neighboring residential parcels on either side of the Tyler/Pacholski parcel. Exhibit 1 at 60:7-22, and Exhibit 6 thereto. The parcel has a back yard which extends all the way to the alley on either side of the garage. *Id.* The backyard is "very accessible" to the alley. Exhibit 1 at 78:6-11. A fence with three gates encloses the back yard, but there is no fence in the front yard. Exhibit 1 at 64:17-24. The home has three porches: a second-storey balcony that is accessible from the bedroom; a two foot by three foot exterior landing attached to the house's rear door; and a two foot by four foot slab attached to the house's front door. Exhibit 1 at 61:3-62:21. The porch outside the front door is 30 feet from the Jerome Street sidewalk. Exhibit 2 at 129:20-130:11.

32.     Hall's home is on a corner, 90 by 100 foot parcel on the northwest corner of West 113th Street and Bell Avenue. Exhibit 3 at 94:9-11; Exhibit 28 (PLMH 000017). Immediately west of the home is a driveway leading into West 113th Street. Exhibit 3 at 97:4-15, 105:3-10, and Exhibit 4 thereto. The parcel has a detached two-car garage, which is used to store various items, such as tools, bikes, and toys. Exhibit 3 at 94:15-16, 99:21-100:1. No cars are kept in the garage, nor does anyone live there. *Id.* at 100:2-9. The garage is about 18 inches from the

15

western neighbor's property line, and between 12 and 18 inches from the northern neighbor's property line. *Id.* at 105:11-21. There is an 8 by 20 feet porch on the east side of the home, which faces Bell Avenue. *Id.* at 97:16-23, 101:21-102:1, Exhibit 4 thereto. It is about 15 feet from the sidewalk that runs parallel to Bell Avenue, and 20 feet from the sidewalk that runs parallel to West 113th Street. *Id.* at 103:5-8, 104:23-105:2, Exhibit 4 thereto. There is also a side porch on the south side of the house that is 15 feet from the sidewalk that runs parallel to West 113th Street. *Id.* at 104:12-22. The property also contains a 3 and a half to four foot high fence. *Id.* at 106:16-23. A baseball diamond belonging to Morgan Park Academy, a K-12 school, lies to the east of his home on the western side of Bell Avenue. *Id.* at 105:22-106:10.

33.     The dimensions and layouts of the Tyler/Pacholski and Hall residential parcels are typical of those commonly found in Chicago. Exhibit 24, ¶¶ 5,6. In a typical Chicago neighborhood, "the lots are 25 by 125 [feet] and people live very closely to each other." Exhibit 29 (Deposition of Vance Henry) at 11:19-12:3. Much of the space on a typical residential parcel is taken up by the residential building containing the dwelling unit(s), for instance, a home or a condominium building. Exhibit 24, ¶ 4. Thus, spaces outside this structure, such as porches, stairways, yards, or common areas, are typically a short distance away from the public way (i.e., adjacent streets, sidewalks, or alleys). *Id.* An even shorter distance typically separates these spaces from neighboring parcels. *Id.* Yards, driveways, and garages in particular typically directly abut sidewalks, streets, alleys, and/or neighboring parcels. *Id.*

34.     Chief Williams testified that "given these compact dimensions, private spaces outside the home, such porches, yards, stairs, garages, and common areas, are essentially 'public' when it comes to committing firearms violence. The shootings, gunshot injuries, and

intimidation that can occur in these places are virtually identical to those that can take place in purely public areas." *Id.*, ¶ 7. Chief Williams testified that a person with a gun on his porch, in his yard, or on his staircase can use the firearm to intimidate or shoot a person on the sidewalk, or in neighboring yard, in virtually the same way that he could if he were standing on the sidewalk or neighboring yard itself. *Id.* The person on the sidewalk or neighboring yard can see the possessor's gun, can hear threatening speech by the possessor, and can be targeted and shot by the possessor. *Id.* These risks befall not only members of the public, but law enforcement officers as well. *Id.*, ¶ 6; Exhibit 30 (Deposition of Dana Alexander) at 33:8-20.

35.     Further, Chief Williams testified that escalation of disputes can happen in these areas in just the same way that an encounter between two people on a sidewalk or on opposite sides of the street when guns are present. Exhibit 24, ¶ 7. And even if the gun is not initially used to intimidate or shoot, a firearm possessed in these spaces outside the home will embolden the possessor to be more aggressive than he or she otherwise would. *Id.* This can cause otherwise conventional disputes or arguments between neighbors or neighborhood residents to escalate into serious confrontations where the gun would be used to intimidate or shoot. *Id.*

36.     Chief Williams also testified that these same interactions and misuses can take place in the common areas inside residential buildings, such as elevators, hallways, stairwells, and lobbies. *Id.*, ¶ 8. In fact, they could be magnified in these areas because they are not private. *Id.* For instance, unlike a homeowner who can control who and how many people are allowed onto his property, any number of people living in a high-rise residential building could congregate in hallways and lobbies. *Id.*

37.     Chief Williams testified that requiring guns to be kept within the confines of the

17

home reduces these risks. *Id.,* ¶ 9. Before a gun can be misused outside the home, it must first be taken outside the home. *Id.* In the case of a dispute, in the time it takes for a resident to go back inside the home to retrieve a gun before bringing it outside, the resident may "cool down" and decide against getting the firearm and/or to call the police. *Id.* Similarly, the other disputant may flee the scene or call the police. *Id.* Further, the walls and roof of a home makes it much more secure than the spaces outside the home. *Id.* They can stop a mis-directed bullet from exiting the home and hitting innocent victims outside. *Id.* These benefits are lost when firearms are taken outside the home. *Id.* In the dense neighborhoods of Chicago, a mis-directed bullet fired from outside the home stands a much greater risk of injuring an innocent bystander on a nearby sidewalk or parcel. *Id.*

38.     Illegal gang activity in Chicago occurs not only in public places (such as streets, playgrounds, alleys), but also in spaces such as yards, porches, hallways, and stairwells on private property. Exhibit 10, ¶¶ 24, 32. Chief Williams further testified that gang members seeking to protect their turf or criminal operations (such as narcotics dealing or other vice activities) would be especially prone to engage in the these abuses discussed above. Exhibit 24, ¶ 20; *see also* Exhibit 10, ¶ 25. Gang members (as well as non-gang members) have done so when in the private spaces outside a home in the past. Exhibit 24, ¶ 10; Exhibit 10, ¶ 32. In Chief Williams's opinion, they would be more prone to do so if it became legal for them to possess guns in those spaces. Exhibit 24, ¶ 10; *see also* Exhibit 10, ¶ 33. Qualified members would therefore be free to possess firearms in places like a lobby or stairwell of a residential high-rise, or on the porch or in the front yard of a three-flat. Exhibit 24, ¶ 10; Exhibit 10, ¶ 33. From those spaces they could easily use guns to oversee drug dealing taking nearby, or just feet away on a

18

sidewalk or street corner.  Exhibit 24, ¶ 10; Exhibit 10, ¶ 33.  From those spaces, they could also easily use guns to intimidate or shoot at rival gang members or other people viewed as threats, or other members of the public that they merely wished to intimidate.  Exhibit 24, ¶ 10; Exhibit 10, ¶ 33.

39.     Dr. Cook's 2007 Chicago Study reported that "[j]ust showing rather than actually firing guns is usually sufficient" for the possessor to be taken seriously or intimidate.  Exhibit 12 at F563.  It found that even for older gang members and professional criminals regularly engaged in crime, "gun use was typically limited to simply brandishing the weapon."  *Id.*  Simply drawing a gun on a person can be enough to "make the person change their mind about what their intentions are."  Exhibit 1 at 118:24-119:4.  Dr. Cook's study further reported that sometimes it is not even necessary to explicitly show the gun, as "it's all about the bulge."  Exhibit 12 at F563.

40.     Chief Williams testified that even if the gun is not overtly used to intimidate or shoot, it will embolden the gang member to be more aggressive, which will lead to more violent gang altercations.  Exhibit 24, ¶ 10; *see also* Exhibit 10, ¶ 33.  Similarly, this increased gun possession would provide an incentive to rival gang members to carry guns, even if it remained illegal for them to do so, in order to protect themselves.  Exhibit 24, ¶ 10.  Research published in J. Wright & P. Rossi, *Armed and Considered Dangerous* (new 2nd ed. 2008) found that 62% of criminals who carried guns said that the chance their victim might be armed was a "very" or "somewhat important" factor in their decision to carry a gun.  Exhibit 31 (Wright & Rossi study) at 150.  Chief Williams testified that this proliferation of guns will further inflame the violent crime problem in Chicago.  Exhibit 24, ¶ 10.

41.     People possessing firearms in the spaces outside their home are more prone to

having the firearm stolen from them. *Id.*, ¶ 12. These areas are generally less secure than the home, and are easier for criminals to access. *Id.* This includes garages, which are generally less-secure than the home and are the target of break-ins or other crime to a greater degree than homes. *Id.*; Exhibit 1 at 84:14-21. In 2010, Chicago Police Officer Thor Soderberg was accosted in the parking lot of a CPD station and his firearm was wrestled away from him and used to shoot and kill him. Exhibit 24, ¶ 12. Chief Williams testified that "[i]f criminals are willing to take firearms from CPD officers on CPD grounds, they would not hesitate to take guns from private residents on the residents' private property." *Id.*

## RESTRICTION ON HANDGUNS IN FIXED PLACE OF BUSINESS

42.     Tyler is the only Plaintiff identified as having a "desire to possess a handgun for armed self-defense at her place of business." Exhibit 6, ¶ 31. Tyler is a veterinarian and part owner of Uptown Animal Hospital, a clinic located at 5545 North Clark Street in Chicago that is amidst a pedestrian shopping district. Exhibit 1 at 5:16-18; 6:9-14, 134:1-10. The clinic is on the first floor of a building that contains two other business, one of which is a coffee shop. *Id.* at 131:7-16. The clinic can be accessed from the outside by three different doorways: One in the front that is accessed through a small vestibule that is accessed from the sidewalk, one in the back, and one that is accessed via a common interior hallway in the building that leads to the coffee shop. *Id.* at 138:5-139:11; Exhibit 32 at PLKPKT 000038. The front, "main," doorway is unlocked during business hours. *Id.* at 145:20-22. The clinic has an alarm system. *Id.* at 139:20-22.

43.     There are relatively more accidents with short guns than with long guns in the United States. Exhibit 14 at 320:6-11. "[T]he only kind of gun that can result in a fatal gun

accident is a loaded one," and "[h]andguns are much more likely to be kept loaded [than long guns] and thus at risk of a gun accident." *Id.* at 320:15-321:1. Long guns "often" are loaded only when they are "being used for recreational purposes and so on." *Id.* at 320:22-24. Compared to long guns, handguns are generally less accurate and more prone to accidental discharge. Exhibit 24, ¶ 14. Like the spaces outside a person's home, a place of business is generally less secure than a home. *Id.* There is generally more foot traffic in a place of business than in a home, and a place of business is generally open to members of the public and/or to other employees, all of whom cannot be controlled by the person wishing to possess a handgun there. *Id.* Chief Williams testified that, consequently, allowing handguns to be maintained in a person's fixed place of business increases the risk of hitting an innocent bystander when the gun is discharged. *Id.*

44. Compared to long guns, handguns are much more likely to be used in a crime in Chicago. *Id.*; Exhibit 7, ¶ 2. Chief Williams testified that "because a handgun is concealable, a person possessing a handgun in the workplace would be more likely to use it as a tool of intimidation or other crime in the workplace." Exhibit 24, ¶ 14.

## REGULATION OF FIREARMS SALES AND TRANSFERS

45. Chicago's restriction on gun sales and transfers does not prevent Plaintiffs from acquiring firearms; they have purchased firearms outside of Chicago, including in the Chicago suburbs. Exhibit 1 at 150:23-151:1; Exhibit 3 at 208:8-14; Exhibit 2 at 94:20-95:9. Within 6 miles of Chicago, there are six stores that sell firearms to the public; within 25 miles, there are 29 stores; within 50 miles, there are 46 stores. Exhibit 33 (June 3, 2011 Stipulation); Exhibit 34 (Map of Chicago Area Gun Stores). Chuck's Guns ("Chuck's") is a retail gun store located at

14310 South Indiana in Riverdale, Illinois, approximately 7 blocks from the Chicago border.

Exhibit 35 (Deposition of John Riggio) at 10:5-10. Approximately 53% of Chuck's customers

who purchase firearms are Chicago residents. *Id.* at 16:18-24, 26:6-9. Illinois Gun Works is

retail gun store located at 7229 West Grand Avenue in Elmwood Park, approximately 500 feet

from the Chicago border. Exhibit 36 (Deposition of Henry Rush) at 9:15-20. Dr. Kleck asserts

that a law-abiding, low income Chicago resident wanting a gun for self-defense would have to

spend 30 minutes driving, or 2 hours taking public transportation (and perhaps more time

learning how to take public transportation), to a suburban gun store. Exhibit 14 at 434:25-435:8.

46. "[G]uns are fairly durable [and] they last for a long time." *Id*. at 168:18-20. "In

all likelihood" a law-abiding civilian needs to go to a gun store to get a gun for self defense only

"once," if the store has the kind of gun the person wants. *Id.* at 435:9-15. Tyler's firearms have

never needed maintenance or repairs, and she has never taken a firearm to a store for that

purpose. Exhibit 1 at 162:14-19. Hall has never needed to take a firearm to a dealer for

maintenance or repair. Exhibit 3 at 220:7-9, 221:17-21.

47. Since 2005, Tyler has visited gun stores in the Chicago suburbs at least 14 times.

She has visited Maxon Shooter's Supply ("Maxon's") in Des Plaines, Illinois, a 45 minute drive,

three or four times. Exhibit 1 at 153:5-17. She has visited Bass Pro Shops ("Bass") in Gurnee,

Illinois, an hour drive, five or six times. *Id.* at 158:5-15. She has visited Dick's Sporting Goods

("Dick's") in Niles, Illinois, "just" a 20 minute drive, five times. *Id.* at 159:18-160:2. She has

visited The Adventure Store ("Adventure") in Waukegan, Illinois one time. *Id.* at 160:3-6.

48. Pacholski has been to Maxon's "numerous" times and goes up to 10 times a year.

Exhibit 2 at 193:22-194:5. He drives to Dick's 8 to 10 times a year. *Id.* at 199:1-10. He goes to

Bass three or four times a year. *Id.* at 110:12-16. He visits GAT Guns in Dundee, Illinois once a year. *Id.* at 197:23-198:4. He has also visited Adventure. *Id.* at 199:23-200:6. Pacholski has purchased firearms in Wisconsin; Waukegan, Illinois; Oak Lawn, Illinois; Rosemont, Illinois; Champaign/Urbana, Illinois; Gurnee, Illinois. *Id.* at 77:16-19, 83:14-84:18, 94:20-95:2, 98:3-19, 104:2-12, 105:21-106:4.

49.     Hall has bought three firearms from Chuck's. Exhibit 3 at 72:20-24, 74:8-16, 80:10-14; Exhibit 28 at PLMH 0000116-117. Chuck's is about a 25 minute drive from Hall's home, and he has visited it at least 10 times since 2005. Exhibit 3 at 73:24-74:2, 76:12-13, 210:15-17. Since 2005, Hall has visited gun stores in the Chicago suburbs at least 24 times. He visited Sporting Arms & Supply in Posen, Illinois, a 45 minute drive, one time; Cabela's in Hammond, Indiana, a 30 minute drive, ten times; Cabela's in Hoffman Estates, Illinois, a 90 minute drive, two times; Bass, a 90 minute drive, one or two times; Dick's Sporting Goods in Highland, Indiana, a 40 minute drive, one time; and various Walmart locations in Illinois, ten to twenty times. *Id.* at 211:16-214:21, 215:23-216:8, 229:8-230:1.

50.     Tyler lives "right on the City limits" and "pop[s] into Evanston quite frequently." Exhibit 1 at 151:5-13. She also goes to the suburbs one or twice a month for dinner or shopping. *Id.* at 151:14-16. Pacholski drives three times a week to Gary, Indiana, a 50 minute drive from his home, for work at his aircraft hangar. Exhibit 2 at 28:18-29:7. Once a month, Hall drives 40 miles to his employer's office in Highland Park. Exhibit 3 at 6:2-16. He drives to client locations in the suburbs 5 times month. *Id.* at 9:18-10:3, 11:9-15. Hall also travels to the suburbs once every two weeks during basketball season to referee. *Id.* at 13:4-7,13:22-14:7.

51.     Dr. Cook opines that "it is plausible that legal restrictions on sales and other

transfers of firearms, such as those in the current Chicago ordinance, have the effect of reducing the prevalence and availability of firearms to people who may be inclined to use them in violent crime." Exhibit 13, Exhibit A thereto, at 2.

52.     "[T]he private transfer of guns in the informal, illegal market is the proximate source of most guns that end up being used in crime." *Id*. at 10.  While "[a]lmost all firearms used in crime in the United States were first sold at retail by a federally licensed dealer . . . in most cases [of crime] the firearm is not purchased directly by the ultimate perpetrator, but rather goes through a series of transactions first." *Id*. at 8.  A nationwide study of traced guns found that "just 11 percent" were confiscated from the individual who had first purchased them from a federally licensed firearm dealer ("FFL").  *Id*.  ATF data indicates that for the 3,054 Chicago crime gun traces in 2000 in which both the possessor and purchaser could be identified, the possessor purchased the gun directly from an FFL only 2.8% of the time.  Exhibit 37 (July 2002 ATF Crime Gun Trace Reports - Chicago) at 8.

53.     The 2007 Chicago Study found that the underground gun market in Chicago "[does] not work smoothly."  Exhibit 13, Exhibit A thereto, at 10.  The study found that the market is "characterized by substantial transaction costs, by which we mean large mark-ups over legal prices, substantial search times, uncertainty about product quality, and the physical risk associated with the exchange."  Exhibit 12 at F561.  The study reported that these transaction costs "stand in contrast to conventional wisdom in the sociology and criminology literatures, which in the context of the US has emphasized the ease with which criminals can access guns in the informal market, as well as the inelasticity of demand by criminals."  *Id.* at F580.

54.     The study examined Chicago's Grand Boulevard/Washington Park neighborhood,

"a large contiguous swatch of poor and working-class neighbourhoods in the South Side of Chicago" whose homicide rate is about 75% higher than that of Chicago as a whole and whose residents "are much more disadvantaged than other residents of Chicago or the US as a whole" according to education, employment, and poverty statistics. *Id.* at F562, F563. This area is of "particular interest given that gun crime in America is disproportionately concentrated in large cities and within these cities occurs disproportionately in highly disadvantaged neighborhoods." *Id.* at F562.

55. The study found that those who were able to obtain a gun "reported paying prices that tended to be substantially higher than in the legal market, despite the questionable quality of the guns that were changing hands." Exhibit 13, Exhibit A thereto, at 10. Three manufacturers' guns frequently turn up as Chicago crime guns, and while most pistols from these manufacturers listed in excellent condition are offered on websites for between $50 - $100, guns from these manufacturers sell in the Chicago underground market for between $150 - $400. Exhibit 12 at F564. In addition, local brokers who facilitate exchanges in the underground Chicago market were found to typically charge $30 to $50 per transaction, "a large percentage of the sales price." *Id*. at F565. Further, Commander Gorman testified that guns sold in the underground Chicago market often sell above retail, and that guns have been sold to undercover CPD officers in sting operations for between $100 to $200 above the retail price. Exhibit 10, ¶ 29.

56. The study further found that, "[s]ince gun transactions are illegal in Chicago, communication between potential buyers and sellers is made difficult." Exhibit 12 at F581. "The illegality of the gun market in Chicago creates information problems in matching prospective buyers and sellers. Neither side of the market can take advantage of the well-

developed infrastructure for legal advertising. In addition the illegality of the market means that participants do not have recourse to the courts to enforce transactions." *Id.* at F568. The study reported that "[e]ven local gun brokers report that a large share of their transaction attempts fall – around 30-40%. Reasons included the inability to get a gun from a supplier; the customer and broker could not agree on the location for the transaction; and the broker either did not trust the customer's intentions or thought he or she was an undercover police officer." *Id.* at F565. The study reported that "reliable 'connections' appear to be scarce," and "executing transactions with strangers is surely a risky business." *Id.* at F566.

57. Dr. Cook testified that guns are "quite scarce 'on the street'" in Chicago, that "most criminals in Chicago currently lack a gun and have difficulty obtaining one," and that "it is unusual for criminals in Chicago to be in possession of a gun." Exhibit 13, Exhibit A thereto, at 10; Exhibit 15 at 173:3-22. U.S. Department of Justice data discussing the 2007 Chicago Study indicates that only 21% of Chicago arrestees said they had ever owned a handgun. Exhibit 13, Exhibit A thereto, at 11; Exhibit 12 at F573. The study reported that of 17 regular thieves interviewed, only one said that they could find a gun in less than a week. Exhibit 12 at F566. The study further reported that the U.S. Department of Justice data indicates that, of Chicago arrestees who never owned a gun but indicated that they might want one someday, about 70% reported that it would take them at least a week or that they would simply be unable to obtain one. *Id.* at F574; Exhibit 13, Exhibit A thereto, at 11. This number was roughly 60% for arrestees surveyed in other cities. Exhibit 12 at F574. That same data indicated that the percentage of Chicago arrestees who reported owning a gun (21%) "is much lower than" the mean and median values for other surveyed cities (31% and 33% respectively). *Id.* This data is

26

evidence that "Chicago was not an easy place for thieves and other criminals to obtain guns;" in fact, relative to other cities, "it was one of the most difficult." Exhibit 15 at 146:19-147:5.

58.     Dr. Cook concludes that "[b]y rendering sales and transfers illegal, the Chicago ordinance helps to maintain these transaction costs, which in turn, it is reasonable to suppose, depresses possession rates by criminals" and "help[s] preserve" the scarcity of guns in the illegal Chicago market. Exhibit 13, Exhibit A thereto, at 10, 11.

59.     Joseph J. Vince, Jr. is currently the Director of Criminal Justice Programs at Mount St. Mary's University in Emmitsburg, MD. Exhibit 38 (Declaration of Joseph J. Vince, Jr.), Exhibit A thereto, at 2. He is also President of Crime Gun Solutions LLC ("CGS"), a company that assists law enforcement in the collection, access, management, analysis, training, and dissemination of crime-gun information. *Id.* He is also a member of the International Association of Chiefs of Police ("IACP") and serves on the IACP's Firearms Committee, which examines firearms-related violent crime and makes recommendations to the IACP's Executive Committee. *Id.* He previously worked as a special agent at the ATF for 28 years. *Id.* at 1. His tenure at ATF included the following positions: field agent in Detroit investigating crimes concerning the firearms industry and federal firearms laws; resident agent in charge of the Omaha office; operations officer in the Firearm Division at ATF headquarters in Washington, D.C.; special agent in charge of the Firearm Tracing Branch; special agent in charge of the Intelligence Branch; chief of the Firearm Enforcement Division; and chief of the Crime Gun Analysis Branch. *Id.* at 2; Exhibit 39 (Deposition of Joseph Vince, Jr.) at 12:11-13:9. In his career, Mr. Vince has visited firearms manufacturing facilities, audited FFLs, scrutinized firearms industry safety and security procedures, and trained firearms industry personnel. Exhibit 38, Exhibit A

27

thereto, at 2. Audits of FFLs included conducting store inventories, examining dealer records (including license applications, license renewals, and firearm transfer records), and surveying safety and security measures. *Id.* at 16.

60. Mr. Vince opines that "when firearms sales are allowed to occur, firearms frequently fall into the hands of criminals or others who are not lawfully qualified to possess them." *Id.* A New York City investigation demonstrated that suburban dealers supplying large numbers of crime guns to New York did not follow federal laws and regulations. *Id.* at 17-18. Further, in 1998, the CPD initiated "Operation Gunsmoke" to investigate the sales practices of suburban Chicago gun dealers who sold guns later identified as crime guns in Chicago. *Id.* at 17. Undercover officers posed as criminals or unqualified purchasers, and, "[r]epeatedly, [they] had minimal difficulty acquiring guns with little regard from dealers for the purchaser's ineligibility and/or nefarious reason or purpose." *Id.* "Several dealers were willing to make the sale nonetheless and even provided advice to those acting as customers about how to make an illegal purchase." Exhibit 13, Exhibit A thereto, at 11.

61. For example, B&H Sports, Ltd., in Oak Lawn, Illinois ("B&H") sold guns to buyers even though the buyers lacked a FOID card and stated that they were otherwise ineligible to get one. Exhibit 40 ("Operation Gunsmoke" documents) at CITY 006321-23, 6342-44. To complete the transaction, B&H fraudulently completed an ATF Form 4473, indicating that another individual was the purchaser of the firearm, even though B&H knew that another who could not legally buy the firearm was the actual purchaser. *Id.* at CITY 006342-44. B&H also sold a gun in violation of the waiting period required by 720 ILCS 5/24-3(g). *Id.* at CITY 006348-53, 006262-66.

62.     Undercover officers also visited Midwest Sporting Goods in Lyons, Illinois, Suburban Sporting Goods in Melrose Park, Illinois, Chicago Ridge Gun Shop & Range, Inc. in Chicago Ridge, Illinois, and Chuck's Gun Shop and Pistol Range in Riverdale, Illinois. Although the undercover officer purchasing the firearm made it clear that the firearm was for another person, these stores still made the sale without determining whether the actual purchaser had a FOID card and was otherwise qualified to possess the firearm.  *Id.* at CITY 005459-62, 005212-14, 006070-72, 005027-29.

63.     On other occasions, store clerks would advise undercover agents seeking to purchase multiple firearms to stagger their purchases over a number of days so that the clerk would not have to notify the ATF of the sale of multiple firearms.  *Id.* at CITY 005870-71, 005862-64, 005874-76, 005301-05.

64.     Suburban Sporting Goods sold a gun after the purchaser examined the serial numbers on numerous firearms asked the clerk if they could withstand "a little metal work."  *Id.* at CITY 005164-67.  He purchased a .380 caliber semi-automatic pistol, informing the clerk that it was the one with which he could work.  *Id.* at CITY 005166.

65.     A 2004 report by the U.S. Department of Justice's Office of the Inspector General ("DOJ Report") indicated that, for FFLs discovered to have violated federal law in 2002, the average number of violations per FFL was almost 70, and FFLs in the ATF's Chicago Field Division had the highest average number of violations – 178.2 per FFL.  Exhibit 41 (U.S. Department of Justice, Office of the Inspector General, *Inspections of Firearms Dealers by the Bureau of Alcohol, Tobacco, Firearms and Explosives*, Report No. I-2004-005 (July 2004)) at vi.

66.     A study of handgun dealers in the 20 largest U.S. cities having more than 10

29

dealers reported that "more than half were willing to sell a handgun even when it would be illegal to do so." Exhibit 42 (S.B. Sorenson & K.A. Vittles, *Buying a handgun for someone else: firearms dealer willingness to sell*, 9 Injury Prevention 147 (2003)) at 148-149. It found that 53% of dealers were willing to sell when the purchaser indicated that the gun was for another person (his or her boyfriend/girlfriend) who "needs" it. *Id.* at 148. Even when the purchaser expressly indicated that the purchase was one prohibited by law – *i.e.*, by saying "[m]y girl/boyfriend needs me to buy her/him a handgun because s/he isn't allowed to" – 4 out of 20 dealers agreed to the sale. *Id.* at 149-150. The DOJ Report cited this study as "highlight[ing] . . . the need to better identify the potential universe of dealers involved in gun trafficking." Exhibit 41 at 27.

67.     A study of California handgun dealers that averaged at least 50 handgun sales annually reported that 20% of dealers "agreed to assist a potential handgun buyer with a transaction that had many attributes of an illegal surrogate or 'straw' purchase. Others, while saying no, offered the buyer concrete assistance in completing a purchase they appeared to understand was against the law." Exhibit 43 (G. Wintemute*, Firearm Retailers' Willingness to Participate in an Illegal Gun Purchase*, 87(5) Journal of Urban Health 865-78 (2010)) at 872. The study observed that this percentage is less than the 53% found in the Sorensen & Vittles study described in Paragraph 66, *supra*, but stated that California "regulates and polices gun commerce to a degree that is perhaps unique," noting that, in California, retailers must have state licenses, the state has its own retailer inspection program, and "enforcement is generally more active than elsewhere." *Id.* at 872, 876.

68.     The ATF has concluded that, "[c]learly, FFLs' access to large numbers of firearms

makes them a particular threat to public safety when they fail to comply with the law." Exhibit 44 (June 2000 ATF Following the Gun: Enforcing Federal Laws Against Firearms Traffickers)), at ix, x. A 2000 ATF examination of 1,530 firearms trafficking investigations between July 1996 through December 1998 ("2000 ATF Report") found that "[a]lthough corrupt FFLs are relatively rare, they are associated with the diversion of large volumes of firearms." Exhibit 44 at 10, 28. Another ATF report found that in 2000, "[i]n all jurisdictions, many traceable crime guns were first purchased from a small number of Federally licensed gun dealers." Exhibit 45 (July 2002 ATF Crime Gun Trace Report - National) at 46. In general, less than 1% of firearms dealers contribute 60% of crime guns. Exhibit 39 at 55:15-19.

69.     In 2000, 936 FFLs were identified through a gun trace as having sold a gun that was recovered in Chicago as a crime gun. Exhibit 37 at 17. 1.3% of those FFLs – 12 out of 936 – accounted for 41% of the traces (1,111 of 2,723), an average of 93 traces per FFL. *Id.* 3.3% – 31 out of 936 – accounted for 51% of the traces (1,386 of 2,723), an average of 45 traces per FFL. *Id.* In 2000, 10 FFLs accounted for 70% of traceable crime guns in Indianapolis; 5 FFLs accounted for 65% of traceable crime guns in Gary; 4 FFLs accounted for 53% of traceable crime guns in Milwaukee. Exhibit 45 at 46.

70.     The 2000 ATF Report found that "[t]he most frequent type of trafficking channel identified . . . is straw purchasing from [FFLs]. Nearly 50 percent of the ATF investigations involved firearms being trafficked by straw purchasers either directly or indirectly." Exhibit 44 at 10. A straw purchaser is "[a] person illegally purchasing a firearm from a [FFL] for another person, including for unlicensed sellers, criminal users, juveniles, and other prohibited possessors. Straw purchasers may be friends, associates, relatives, or members of the same

31

gang." Exhibit 45 at A-6.

71.     The 2000 ATF Report also documented trafficking by FFLs directly. It noted that

"[l]icensed dealers, including pawnbrokers, have access to a large volume of firearms, so a

corrupt licensed dealer can illegally divert large numbers of firearms. Although FFL traffickers

were involved in the smallest proportion of ATF trafficking investigations, under 10 percent,

FFL traffickers were associated with by far the highest mean number of illegally diverted

firearms per investigation, over 350, and the largest total number of illegally diverted firearms, as

compared to the other trafficking channels." *Id*. at ix, 12. The report found that 25,741 diverted

firearms were trafficked by straw purchasers, and 40,365 were trafficked by licensed dealers. *Id*.

at 13. Of the 133 investigations involving illegal diversion from an FFL, 26 percent (35 of 133)

involved the FFL's transfer of firearms to prohibited persons, such as felons and juveniles, 24

percent (32 of 133) involved straw purchasing, and 19 percent (25 of 133) involved FFLs making

false entries in their acquisition and disposition record book. *Id.* at 28, 29.

72.     Sergeant Kevin Johnson of the CPD's Chicago Anti-Gun Enforcement ("CAGE")

Team, whose primary purpose is to investigate illegal firearms trafficking in Chicago, testified

that gun stores create an opportunity for guns to be stolen. Exhibit 47 (Deposition of Kevin

Johnson) at 11:13-15, 93:5-10. In January 2012, 195 handguns were stolen from Maxon's in Des

Plaines, Illinois. Exhibit 10, ¶ 39. In December 2011, 33 firearms were stolen from Deb's Gun

Range in Hammond, IN. Exhibit 48 (ATF News Release). In February 2011, 26 firearms were

stolen in a break-in at Freddie Bear Sports, a Tinley Park, IL gun store. Exhibit 47 at 92:24-93:4;

Exhibit 49 (Tinley Park police reports) at CITY 004921. A couple of years ago, Chuck's was the

victim of an attempted break-in. Exhibit 35 at 10:5-10, 25:18-21. Illinois Gun Works has been

the victim of a break-in. Exhibit 36 at 18:12-18. From 1998-1999, firearms were stolen from at least 9 dealers in Cook County. Exhibit 50 (Illinois - State, Local, ATF Report) at 18.

73.     In February 2012, more than 80 firearms were stolen from an Ohio gun store. Exhibit 51 (ATF and DOJ news releases). In December 2011, 43 firearms were stolen from a Roanoke, VA gun store. *Id.* In November 2011, 90 firearms were stolen from a Pennsylvania gun store. *Id.* In November 2011, a total of 17 firearms were stolen from two Lincoln, Nebraska gun stores. Exhibit 52 (August 2011 Sacramento Bee article). In August 2011, 22 firearms were stolen from a Henderson, Nevada gun store. Exhibit 51. In July 2011, 19 firearms were stolen from a gun store in Raleigh, North Carolina. *Id.* In July 2011, 27 firearms were stolen from the Fort Irwin Army Post in Fort Irwin, California. *Id.* In April 2011, firearms were stolen from a Kentucky gun store. *Id.* March 2011, 12 firearms were stolen from a Florida gun store, the second time in 18 months the store had been burglarized. *Id.* In February 2011, 15 firearms were stolen from a Michigan gun store. *Id.* In December 2010, 73 firearms were stolen from a North Carolina gun store. *Id.* In August 2010, 58 firearms were stolen from an Ohio gun store. *Id.* In March 2010, 20 firearms were stolen from a Wisconsin gun store. *Id.*

74.     William Campion, a member of Plaintiff ILAFR and the owner and operator of Camco Sales and Service, a gun dealership, does not store firearms in his shop because the potential for burglary of the firearms presents a "safety concern." Exhibit 53 (Deposition of William Campion) at 7:13-22, 33:8-17, 35:2-6, 50:21-51:5, 67:22-68:12.

75.     In May 2010, at least 21 firearms were stolen from the Harvey, Illinois police department's shooing range. Exhibit 54 (Deposition of Eugene Williams) at 56:21-24; Exhibit 55 (Chicago Tribune article). Chief Williams testified that if criminals are willing to steal guns

from a police department facility, they would be willing to steal guns from a civilian gun store. Exhibit 54 at 57:1-11.

76.     Chief Williams testified that the kinds of intimidation, escalation, and deadly gun use that has taken place in public in Chicago could take place in the parking lots or other gathering spaces around gun stores located in Chicago.  *Id*. at 55:2-19. Commander Gorman testified that if gun stores were allowed in Chicago "patrons coming from gun stores would be targeted for theft and/or violent crime by gang members seeking to obtain a firearm. In addition to increasing violent crime in Chicago, it would increase the availability of guns for sale on the illegal market and would do so more quickly."  Exhibit 10, ¶ 41.

77.     Dr. Cook testified that "the fact that there are no FFLs within city limits [in Chicago] makes illegal transactions from an FFL somewhat more difficult for youths and criminals."  Exhibit 13, Exhibit A thereto, at 12.  Just like now, it was the case at the time of the 2007 Chicago Study that a Chicago resident "seeking to buy a firearm of any sort must travel outside of city limits."  Exhibit 12 at F561.  The study noted that "any Chicago resident can identify the location of numerous licensed suburban gun dealers with a quick search of the local phone directory or the Internet."  *Id.* at F566.  The study reported, however, that guns recently purchased (i.e., within three years) at suburban Cook County dealers accounted for only 11% of confiscated crime guns.  *Id.* at F566-67.

78.     Dr. Cook testified that "[a] partial explanation for why active criminals do not acquire guns at suburban FFLs" is that, as found in the study, they rarely leave their own neighborhood.  Exhibit 13, Exhibit A thereto, at 12.  The 2007 Chicago Study reported that the studied neighborhoods "are notorious for having among the city's most powerful street gangs,"

and that the residents "are very parochial, perhaps because gang turf increases the risks of travel[]ing to other areas." Exhibit 12 at F566, F572. In fact, Dr. Kleck recognizes that being a gang member is "an obstacle" to a person leaving their neighborhood. Exhibit 14 at 436:7-12. Other things being equal, an individual who does not have a gang affiliation "probably would have an easier time . . . crossing through other neighborhoods" than one who does. *Id.* at 436:2-6. Commander Gorman testified that a gang member traveling to a suburban gun store involves "great risk because it involves crossing gang and gang faction boundaries both in Chicago and its suburbs (because Chicago-based gangs also operate in many surrounding suburbs)." Exhibit 10, ¶ 38. He testified that therefore "trips by gang members to suburban gun stores require significant planning and forethought" and that "the risks of making such a trip, and the preparation needed to alleviate those risks, cause some gang members, particularly those acting alone, sporadically, or in a small group, to forego making a trip to a suburban store." *Id.*

79. Dr. Cook opines that "were FFLs free to operate in the City, these criminals would be more likely to acquire guns from an FFL." Exhibit 13, Exhibit A thereto, at 12. Commander Gorman testified that allowing gun stores in Chicago "would therefore increase the likelihood that a gang member will acquire a firearm or that stolen firearms will enter the illegal gun market" because "[a] gang member needing to travel only a few blocks or miles, all while in Chicago, would have less risk to visit a gun store compared to having to travel to a suburban store, and would need less time to prepare." Exhibit 10, ¶ 38.

80. The DOJ Report observed that "the preponderance of crime guns are recovered in the same geographic area in which they were originally sold by an FFL." Exhibit 41 at 24. FFLs operating in a high-crime area "expos[e] that neighborhood to more gun crime than might be true

35

for a rural dealer." Exhibit 15 at 221:18-23. Dr. Kleck testified that because "Chicago is a high

crime area," "if there were FFLs in [Chicago] . . . a larger fraction of guns sold by [Chicago

FFLs] would make it into the illegal market than for . . . FFLs that were not located in a high

crime area." Exhibit 14 at 163:10-19.

81. A study of California handgun dealers that averaged at least 50 handgun sales

annually reported that a dealer's location in an urban setting is a risk factor "strongly associated

with handgun retailers' risk of disproportionate sales of guns that are later used in crimes."

Exhibit 56 (G. Wintemute, *Disproportionate sales of crime guns among licensed handgun*

*retailers in the United States: a case-control study*, 15 Injury Prevention 291-299 (2009)) at 296-

97. The study reported an odds ratio over 5 for dealers located in an urban setting. *Id.* at 297.

82. A 2009 study of a county's per capita rate of licensed firearm dealers and its rate

of firearm homicide found that "the relation between FFLs and gun homicide was found to vary

significantly by urbanization" and that "in major cities, a disproportionately high prevalence of

FFLs was associated with significantly higher gun homicide rates." Exhibit 57 (D. Wiebe et al.,

*Homicide and geographic access to gun dealers in the United States*, BMC Public Health 9:199

(2009)) at CITY 000592. It found that "major cities having the most FFLs per capita also have

the highest rates of gun homicide." *Id.* at CITY 000593. The study observed that "[i]n major

city areas with higher crime rates, there will be greater criminal demand for guns and, hence, a

larger illegal market for guns. It thus seems more likely that a weapon sold in a major city, as

compared to one sold in another county type, will end up in the hands of a criminal user through

theft, straw purchase, gun trafficking, or some other kind of transaction in the secondhand

market." *Id.* at CITY 000595.

83.     A 2007 study, sponsored by the United States Department of Justice, studied crime guns sold by Maryland dealers and recovered in Baltimore and Washington, D.C.  Exhibit 58 (Christopher Koper, *Crime Gun Risk Factors: Buyer, Seller, Firearm, and Transaction Characteristics Associated with Gun Trafficking and Criminal Gun Use*, Report to the National Institute of Justice, U.S. Department of Justice (2007)).  It found the following:

- A dealer's distance to a city was the "primary characteristic of importance" as to whether a dealer is likely to sell a gun recovered as a crime gun in the city.  *Id.* at 82.

- Guns sold by dealers operating within 5 miles of either city were over twice as likely to be recovered as were guns sold by dealers operating further than 20 miles from both cities, and this risk declined as a dealer's distance from both cities increased.  *Id.* at 72.

- As to Baltimore specifically, "proximity to Baltimore stood out as the most powerful predictor" of whether a gun sold from a dealer would be recovered as a crime gun in Baltimore.  Sales made by dealers in or within 5 miles of the city were about 2.6 times as likely to be recovered as were guns sold by dealers located more than 20 miles from the city.  Risk levels were also substantially elevated, ranging from 1.5 times to 2 times more likely, for other dealers operating within 20 miles of the city.  *Id.* at 74 & Table 46.

- As to Washington, D.C. specifically, a dealer's proximity to the city was an "important" factor as to whether a gun it sold was recovered as a crime gun. Relative to dealers operating more than 20 miles from the city, risk levels were nearly 2.5 times higher for dealers within 10 miles of the city and about 1.7 times higher for dealers located 11-15 miles from the city.  *Id.* at 77 & Table 47.

- Dealers located within 20 miles of Baltimore sold 90% of the Maryland guns recovered in Baltimore; dealers located within 20 miles of D.C. sold 75% of the Maryland guns recovered in D.C.  *Id.* at 5.

84.     The ATF conducts compliance inspections to examine whether an FFL is complying with federal firearms laws.   Exhibit 59 (William J. Krouse, *The Bureau of Alcohol, Tobacco, Firearms and Explosives (ATF): Budget and Operations for FY 2011*, Congressional Research Service (June 6, 2011)) at 5.  FFLs are required by federal law to verify that customers

are not prohibited from possessing a firearm and to verify that customers are residents of the state in which the FFL is located.  Exhibit 41 at 2.  FFLs also are prohibited from knowingly transferring a firearm to an individual known to be prohibited from possessing a gun.  *Id.* at 27 n.56.  FFLs must verify the identity of potential customers by examining a government-issued identification document, such as a driver's license, and have the customer complete a Form 4473, Firearms Transaction Record, which captures data related to the purchaser and firearm(s) purchased.  *Id.* at 2.  FFLs are also required to request a query of the National Instant Criminal Background Check System (NICS) to confirm that the potential customers are not prohibited from purchasing firearms.  *Id.*  Federal law requires that FFLs maintain completed Forms 4473, as well as a log of all firearms that they have acquired and sold, known as an Acquisition and Disposition Book (A&D Book).  *Id.*  The A&D Book must contain information including a description of the firearm, the name and address of the person from whom the firearm was acquired and, once sold, the name and address of the purchaser and the date the gun was sold.  *Id.* at 2-3.

85.     Combined, these record-keeping requirements are intended to deter the illegal transfer of firearms to prohibited persons.  *Id.* at 3.  The records kept by FFLs enable the ATF to trace firearms recovered by law enforcement agencies to learn when those firearms were purchased and by whom.  *Id.*  Inspection of the records also allows the ATF to uncover evidence of corrupt FFLs transferring firearms "off the books," straw purchases, and other patterns of suspicious behavior.  Exhibit 59 at 12.

86.     A report by the U.S. Department of Justice's Office of the Inspector General ("OIG") "assessed the effectiveness of [ATF's] program for inspecting [FFLs] to ensure that they

38

are complying with federal firearms laws and regulations." Exhibit 41 at i. The DOJ Report

concluded that "the ATF's inspection program is not fully effective for ensuring that FFLs

comply with federal firearms laws because inspections are infrequent and of inconsistent quality,

and follow-up inspections and adverse actions have been sporadic." *Id.* Among other numerous

detailed findings, the Report noted that:

• The ATF faces significant shortfalls in resources. *Id.* at ii.

• While the ATF's goal is to inspect each FFL at least once every three years, "most FFLs are inspected infrequently or not at all." In FY 2002, the ATF inspected only 4.5% of the approximately 104,000 FFLs for compliance with federal firearms laws. "At that rate, it would take the ATF more than 22 years to inspect all FFLs." *Id.* at iii. *See also id.* at xi.

• A sample of 100 FFLs that had been in business for an average of 11.2 years revealed that: in 23 cases, the ATF had never conducted a full compliance, application, or renewal inspection; in 22 cases, the ATF had conducted an application inspection but no further inspection even though these FFLs had been active for an average of 5.1 years; in 29 cases, while the ATF had conducted at least one compliance inspection on the FFL, the inspections occurred on average once every 9.2 years and the FFLs had been active for an average of 14.8 years; in 26 cases, the ATF had never conducted a compliance inspection but had conducted at least one renewal inspection, which occurred, on average, once every 6.9 years. *Id.* at 20-21.

• Even though "[l]arge-scale retailers sell a higher volume of guns than small dealers" and present "the potential for large numbers of improper sales," such retailers "are not inspected on a routine basis. *Id.* at 21. ATF supervisors indicated that "they avoid se lecting large FFLs for compliance inspections because the large volume of records makes the inspections more difficult and time-consuming." *Id.* The nine-large scale dealers in the DOJ's sample were inspected roughly once every 9.9 years. *Id.* at 22. Five of those nine had never received a compliance inspection. *Id.*

• Even though ATF "focuses its inspections on those FFLs that exhibit most severely the established indicators of trafficking . . . it does not identify all FFLs that exhibit those indicators. Instead, the ATF manipulates the criteria it uses to target FFLs for inspection so that it only identifies as many such FFLs as it has the resources to inspect." *Id.* at iii-iv. *See also id.* at 23-24.

• "[T]he ATF overall did not focus its resources to conduct more inspections in those Field Divisions that had more crime guns traced" and there was "little correlation between the number of traces and the number of compliance inspections conducted the next year." *Id.*

at 25.  In 2001, of the ATF's 21 Field Divisions for which it had discernable data, the Chicago Field Division had the highest number of trace requests in 2001; however, in 2002, it had only the 11th highest number of compliance inspections.  *Id.*

- "The lack of standardized inspection procedures resulted in inconsistent inspections of FFLs and significant variation in the implementation of the inspection program by Field Divisions."  *Id.* at 54.  Compliance inspections averaged 24.5 hours in one Field Division and up to 90 hours in other Field Divisions, yet the report "found no operational reasons" for this discrepancy.  *Id.*  In fact, the report "found little or no correlation between inspection times and enforcement activities, such as referrals of suspected criminal activity and adverse actions taken."  *Id.*

- 14 of 18 Inspectors interviewed by the OIG indicated that they "only examine [Form 4473s] to see if they were filled out properly – not for indications that a purchaser may be part of a firearms trafficking ring or acting as a straw purchaser for someone else (*e.g.*, purchasing patterns, similarities in purchasers' addresses)."  *Id.* at 30.

- Of the 1,530 firearms trafficking investigations conducted by the ATF from July 1996 to December 1998, just 43 - less than 3% – were initiated based on information found during ATF inspections of an FFL.  *Id.* at 38.

- "Even when numerous or serious violations were found, the ATF did not uniformly take adverse actions, refer FFLs for investigation, or conduct timely follow-up inspections."  *Id.* at i.

- In 2002, even though violations were found in 1,934 inspections, and such inspections found an average of almost 70 violations each, the ATF issued only 30 notice of license revocation.  *Id.* at vi, 39.

- "[T]he process for revoking the licenses of FFLs that violated federal firearms laws, or clearing the FFL, is lengthy."  *Id.* at vi.

- "Because the ATF does not conduct regular inspections of FFLs and lacks adequate resources to meet agency goals, it cannot effectively monitor the overall level of FFL compliance with federal firearms laws."  *Id.* at 54.

87.     In FY 2002, the year reviewed in the DOJ Report, the ATF had 5,143

appropriated permanent positions.  Exhibit 59 at 7.  In FY 2010, ATF had 5,206 appropriated

permanent positions.  *Id.*  In FY 2002, ATF had an appropriated overall budget of $854,747,000.

*Id.*  In FY 2010, the ATF had an appropriated overall budget of $1.158 billion.  *Id.* at 5, 7.

40

88.     ATF conducted the following number of compliance inspections from FY 2007 to FY 2010:

| Year | Total Number of FFLs | FFLs Inspected | % of FFLs Inspected |
|---|---|---|---|
| FY 2010: | 118,487 | 10,538 | 8.9 |
| FY 2009: | 115,101 | 11,375 | 9.9 |
| FY 2008: | 111,600 | 11,169 | 10.0 |
| FY 2007: | 109,000 | 10,106 | 9.3 |

Exhibit 60 (ATF Fact Sheet, Facts and Figures (FY 2010)) at 2; Exhibit 61 (ATF, Firearms Commerce in the United States 2011) at 27; Exhibit 59 at 12-13.

89.     As to the subset of Type 1 FFLs (retail dealers in firearms) and Type 2 FFLs (retail dealers in firearms who also receive firearms in pawn), ATF conducted the following numbers of compliance inspections in the following years:

| Year | Total Number of FFLs | FFLs Inspected | % of FFLs Inspected |
|---|---|---|---|
| FY 2009 | 54,184 | 11,375 | 21.0 |
| FY 2008 | 54,948 | 11,170 | 20.3 |

Exhibit 62 (October 21, 2010 letter from Ronald Weich, Assistant Attorney General, U.S. Department of Justice to the Honorable Mike Quigley, U.S. House of Representatives) at 1.

90.     Of these dealers inspected in FY 2009:

•     29% (3,260 dealers) had violated federal law and regulations; and

•     7% (745 dealers) had a total of 28,325 guns missing from inventory (after reconciliation), for an average of 38 guns per dealer.

*Id.*

91.     Of the 10,538 FFL compliance inspections conducted by ATF in FY 2010, 35%

41

resulted in a report of violations, a warning letter, a warning conference, license revocation, denial of license renewal, or the surrender of the license. Exhibit 60.

92. For crimes committed between 1996 and 2000, Chuck's Guns in Riverdale, Illinois, had the highest number of crime guns traced to it – 2,370 – of any FFL in the U.S. Exhibit 63 (*Selling Crime: High Crime Gun Stores Fuel Criminals*, Americans For Gun Safety (Jan. 2004)) at 9. The next highest number traced to an Illinois dealer for that period was 738. *Id.* at 23. Chuck's Guns was not inspected by the ATF during that period. *Id.* Between 2003 and 2011, Chuck's was audited by the ATF only two times, with the second audit occurring approximately three years ago. Exhibit 35 at 33:24-34:11. Camco Sales and Service has never been investigated or inspected by the ATF. Exhibit 53 at 48:14-19.

93. Mr. Vince opines that the ATF "lacks the resources and statutory authority to provide sufficient oversight and regulation of gun stores. Exhibit 38, Exhibit A thereto, at 1. Mr. Vince testified that the federal firearms laws governing dealers "have been gutted" and "weakened" to the point that they "are not effective." Exhibit 39 at 168:20-169:2. "Except in very limited circumstances, the ATF is prohibited by law from inspecting an FFL more than once a year." Exhibit 41 at 5. Morever, the ATF routinely provides advanced notice of an inspection to an FFL. Exhibit 38, ¶ 8. Dr. Kleck testified that this "make[s] it harder" for the ATF to detect illegal activity by an FFL. Exhibit 14 at 155:23-156:11. Mr. Vince opines that "the lack of proper inspection of gun dealers by ATF, as well as insufficient federal laws and ATF resources to properly monitor these businesses, results in criminals and other ineligible purchasers being able to easily acquire firearms from these businesses." Exhibit 38, Exhibit A thereto, at 18.

94. Further, Dr. Cook indicates that the ATF "provides little oversight and is rarely

able to revoke a license." Exhibit 13, Exhibit A thereto, at 12. "[I]t takes on average over six years for ATF to revoke a license from [an FFL], even under the most egregious circumstances." Exhibit 38, Exhibit A thereto, at 17. In addition, even where an FFL is convicted of a serious felony or has poor business practices that allow criminals, terrorists, or minors to acquire firearms, the license can be passed to a relative or associate. *Id.*

95.     Dr. Kleck has "no basis for disagreeing or agreeing" that the ATF "is not properly using its resources to monitor FFLs." Exhibit 14 at 166:10-20. He "ha[sn't] independently studied the use of resources by ATF other than the fact that I know how many compliance inspections they do relative to the number of FFLs." *Id.* at 166:23-167:1. He has never studied the effectiveness of the ATF's inspection procedures. *Id.* at 156:12-15.

96.     Even with tracing data indicating that the majority of crime guns originate from less than 1% of FFLs, the ATF "has not been able to curtail the flow of firearms to [criminals] in major cities." Exhibit 38, Exhibit A thereto, at 17. The DOJ Report recommendations for enhancing regulation of FFLs include:

- Develop a standard, streamlined inspection process that includes in-person inspections of all FFL applicants; more efficient inventory and records reviews; automated inspection reporting; and consistent examination of indicators of firearms trafficking.

- Conduct a pilot program to test the streamlined inspection procedures and establish appropriate time standards for conducting these inspections.

- Update the inspection tracking system to accurately segregate and report on Inspector time spent preparing for inspections, in travel, on-site at FFLs, and conducting other administrative duties.

- Direct the National Licensing Center to develop an adverse action tracking system to monitor the progress and timeliness of FFL denials and revocations from the time an Inspector makes a recommendation until the proceedings are finalized.

43

Exhibit 41 at 56.

## SAFE STORAGE REGULATIONS

97.     Under MCC 8-20-040, every qualified Chicago resident is permitted to have a fully loaded and operable firearm in the home, to place it anywhere in the home, and to carry it anywhere in the home, including from room to room.  Exhibit 1 at 86:13-14; 98:11-15; Exhibit 2 at 174:19-175:18; Exhibit 3 at 159:3-7; Exhibit 38, Exhibit A thereto, at 12-13.  This allows the resident to have a firearm ready for self-defense at all times within the home.  Exhibit 14 at 123:17-20.

98.     Jody Weis, then-Superintendent of the CPD, testified at the City Council hearings on the Ordinance that "[o]ne operable firearm is all a person should need for self-defense.  This rule does not burden the right to self defense."  Exhibit 64 (June 29, 2010 Chicago City Council hearing transcript) at 71.  Mr. Vince opines that MCC 8-20-040  "does not prohibit individuals from effectively utilizing a firearm for self defense."  Exhibit 38, Exhibit A thereto, at 1, 13.  Mr. Vince bases this opinion in part on his law enforcement experience and training.  *Id.* at 13.  Mr. Vince indicates that even though "[l]aw enforcement officers face threats to their personal security much more frequently than the average citizen and are therefore much more likely to need to use a firearm as a defensive weapon," they "almost always carry only a single firearm" and "do not need to have immediate access to multiple loaded and ready firearms to do their job."  *Id.*

99.     Dr. Kleck is not aware of "any study or evidence that indicates that there is a defensive benefit to having more than one operable gun per Chicago firearms permit holder in the home."  Exhibit 14 at 114:18-23.

100.    Dr. Daniel W. Webster is a professor at the Johns Hopkins Bloomberg School of Public Health and has studied gun-related injuries and violence for the past 22 years, serving as Co-Director of the Johns Hopkins Center for Gun Policy for the past 10 years. Exhibit 65 (Declaration of Daniel Webster), Exhibit A thereto, at 1. He teaches graduate courses in violence prevention and research and evaluation methods, and serves on the steering committee of a National Institutes of Health-funded pre- and post-doctoral training program in violence prevention research. *Id.* He has published 62 articles in scientific, peer-reviewed journals. *Id.* Dr. Webster opines that "no research [ ] supports the notion that increasing the number of operable firearms in homes makes occupants safer." *Id.* at 15.

101.    Tyler is "perfectly willing to carry [her gun] around" in her house on her person and has no safety concerns with doing so. Exhibit 1 at 86:13-14, 98:11-15, 101:16-20. She doesn't carry it around in her house because she doesn't have a holster, but she thinks that its "not a bad idea" to get a holster and carry it from room to room. *Id.* at 87:16-88:1, 96:13-22. She does not have "any reason to think that [she is] less able to defend [herself] by carrying around a weapon on [her] person versus storing weapons around the house." *Id.* at 110:14-18.

102.    Dr. Kleck owns two handguns and uses a trigger lock on both. Exhibit 14 at 35:18-25.

103.    Pacholski keeps 18 guns in his home: thirteen rifles, three shotguns, one revolver, and one semiautomatic pistol. Exhibit 2 at 63:7-22; 64:23-65:6. It is "not a problem" for Pacholski to keep his guns secured, "even with a trigger lock." *Id.* at 155:24-156:3. Pacholski has Franzen trigger locks, which prevent the firearm from being shot, on all of his firearms. *Id.* at 165:20-23, 168:16-169:4; Exhibit 66 (Plaintiffs' Response to Interrogatory 2 of City's 3rd Set

of Interrogatories) at 9.

104.     The Franzen lock contains two halves that cover each side of the trigger guard, lock together (thereby preventing access to the trigger), and offer a "[q]uick, easy release." Exhibit 32 at PLKTKP 000057.  All of Pacholski's trigger locks use the same key, which he carries on his person.  Exhibit 2 at 138:2-13; 139:8-10;140:23-24.   With the key present, Pacholski can unlock the locks in 8 to 10 seconds.  *Id.* at 139:3-7, 142:18-22.  When it comes to using a firearm for self-defense, Pacholski believes that time is "not really of the essence as much as you got to have your head together and kind of make sure you are doing the right thing." *Id.* at 171:20-24.  Pacholski's only basis for believing that this 8 to 10 seconds impacts the use of a firearm for self defense is "stories [he] heard" when receiving firearms training.  *Id.* at 171:6-11.

105.     Hall keeps two firearms in his home:  a 9 millimeter handgun, and 12 gauge shotgun.  Exhibit 3 at 69:13-70:9; 71:6-14.  He uses a Master Lock 94 Resettable Combination firearm lock ("Master Lock") on the handgun, and a Regal Model RETL06 firearm lock ("Regal") on the shotgun.  Exhibit 4 at 13:8-20; 16:1-17:5; and Exhibit 1 thereto, at PLMH 000120, 125, 126.  Both locks consist of two halves that cover either side of the trigger guard/trigger and lock together, thereby preventing access to the trigger.  Exhibit 4 at 28:18-29:18, 31:11-32:1; and Exhibit 1 thereto, at PLMH 000120, 125, 126.  The Master Lock is a combination lock; it has three numeric dials that must be set to the proper combination in order to open the lock.  Exhibit 4 at 31:11-22; and Exhibit 1 thereto, at PLMH 000120, 125.  The Regal requires use of a separate key.  Exhibit 4 at 18:8-11; and Exhibit 1 thereto, at PLMH 000126.  Both locks render the firearm inoperable and can be affixed without having to break down the gun.  Exhibit 4 at 27:20-28:6, 31:11-32:15, 36:19-37:8.  Hall has also secured the handgun with a

46

cable lock supplied by Stroger, the gun's manufacturer, which ran through the open slide of the firearm; and secured the shotgun with a keyed padlock supplied by Ruger, the gun's manufacturer, which contained a 4 inch steel loop that ran through the weapon's chamber when the barrel was removed.  Exhibit 4 at 7:10-23; 17:11-13; 26:18-21; Exhibit 66 at 9.  Both devices rendered the weapons inoperable.  Exhibit 4 at 7:17-23; 9:13-21.

106.    Hall does not have "much experience" or "much expertise" in unlocking devices that render firearms inoperable.  *Id*. at 47:2-5.  He has never unlocked the Regal and has no idea how long it takes to unlock.  *Id.* at 47:7-23.  He has unlocked the Master Lock three or four times; he believes that, each time, it took about 40 or 50 second to move the tumblers into the correct combination to unlock the lock.  *Id.* at 48:11-49:3.  Hall has not timed himself unlocking the device, nor has he practiced it.  *Id.* at 66:14-67:7.  Prior to buying the Master Lock, Hall did not find out how long it would take to unlock.  *Id.* at 52:4-7.  Hall has never tried to see whether other locks are available that would require less time to unlock.  *Id.* at 50:4-12, 55:19-56:24.

107.    Tyler owns one firearm, a Makarov 9mm handgun.  Exhibit 1 at 41:6-13.  She keeps it in a locked safe that is attached to her bed in her bedroom.  *Id.* at 42:1-3.  The gun is stored with its ammunition clip inside it, but no round is chambered.  *Id.* at 72:7-17.  It takes five seconds to open the safe, and another 2 or 3 seconds to chamber a round and make the gun fully ready for use.  *Id.* at 73:20-74:11.

108.    Tyler has no experience in using firearms that have trigger locks; she has never handled such a firearm, nor does she know how long it takes to unlock a trigger lock.  *Id.* at 98:21-99:7; 99:22-100:4, 111:5-8.  Nor has she ever tried to figure out how long it would take her to unlock a trigger lock.  *Id.* at 110:19-23.  She is not familiar with other devices that could

be used to render a firearm temporarily inoperable under MCC 8-20-040. *Id.* at 105:18-106:13.

109.    Mr. Vince's colleague, Gerald Nunziato ("Nunziato"), tested how long it takes to unlock two different types of trigger locks – a Bellock Keyed Trigger Lock and a Remington Trigger Block – purchased at Dick's Sporting Goods. Exhibit 38 , Exhibit A thereto, at 14. Mr. Nunziato was approximately 65 years old at the time and, having been retired from the ATF for approximately 10 years, was "rusty" in the handling of firearms. Exhibit 39 at 134:5-11. His test results include the time it takes to load the firearm after removing the lock. *Id*. at 136:5-14. The average time it took to unlock the Bellock lock and load the weapon was 4.30 seconds; the fastest was 2.79 seconds and the slowest was 6.62 seconds. Exhibit 38, Exhibit A thereto, at 14. The average time it took to unlock the Remington lock and load and weapon was 5.30 seconds; the fastest was 3.27 seconds and the slowest was 8.66 seconds, during which the key was dropped. *Id.*

110.    Nunziato conducted the same test on trigger lock make and models used by Hall and Pacholski. Exhibit 38, ¶ 6. On a revolver, the average time to unlock the Franzen and load the weapon was 6.3 seconds; the fastest was 4.5 seconds and the slowest was 8.6 seconds. *Id.*, Exhibit B thereto. On a semi-automatic pistol, the average time to unlock the Franzen and load the weapon was 4.3 seconds; the fastest was 2.9 seconds and the slowest was 6.3 seconds. *Id.* On a revolver, the average time to unlock the Master Lock and load the weapon was 7.4 seconds; the fastest was 5.34 seconds and the slowest was 9.6 seconds. *Id.* On a semi-automatic pistol, the average time to unlock the Master Lock and load the weapon was 4.8 seconds; the fastest was 3.8 seconds and the slowest was 6.0 seconds. *Id.*

111.    Mr. Vince opines that MCC 8-20-040's safe storage requirements "do not impair

48

the effective utilization of that firearm for self-defense." *Id.*, Exhibit A thereto, at 14. Gun

locking devices "are designed and manufactured to be used by average citizens in home security

situations." *Id.* Mr. Vince opines that 10 seconds or less is "sufficient time to respond to the

threat of a home intruder" and that a citizen who learns how to properly use the locks should be

able to achieve times similar to those of Nunziato. *Id.*

112. MCC 8-20-040's safe storage requirements are "in accord" with the practices of

the United States Military and law enforcement. *Id.* at 14. Despite the extensive training they

receive in using firearms, and their role as first responders to violent situations, both law

enforcement and military personnel are required to lock and secure their weapons when not in

use. *Id.* at 6. On military bases, aside from military law enforcement personnel, soldiers'

firearms, when not in use, are generally secured via unloading, disassemblage, and secure

storage, even though soldiers are highly-trained individuals who use firearms as a tool of the

trade. *Id.* at 6; Exhibit 39 at 85:1-86:10. While law enforcement personnel may sometimes have

multiple firearms present while on duty, the additional firearms are securely stored by, for

instance, keeping them locked in police vehicles. Exhibit 38, Exhibit A thereto, at 13. Mr.

Vince testified that law enforcement's following of these practices while operating in the face of

"a more severe security threat than the average citizen is strong evidence that Chicago's

requirements do not impose a hardship on using a firearm for self-defense in the home." *Id.*

113. Dr. Kleck's opinion that locking devices will "sometimes" prevent effective

defensive gun use is a "hypothesis" that he bases on "common sense" and not his expertise in

criminology. Exhibit 14 at 112:16-113:11,128:23-129:3. The proposition "hasn't been

scientifically established," he has no scientific evidence supporting it, and it has never been

tested in any scientific manner. *Id.* at 112:16-113:11, 131:16-22. He did not rely upon any tests of how long it takes to remove a trigger lock. *Id.* at 119:1-7. He is not aware of any study demonstrating that trigger locks prevent effective defensive gun use. *Id.* at 111:9-13. He is not aware of any study showing that keeping one operable firearm in a home but trigger locking a second, third, or fourth firearm reduces a person's ability to effectively resist crime versus not securing the additional firearms with a trigger lock. *Id.* at 345:17-24. He is not aware of anyone in the gun industry who asserts that trigger locks or other safety mechanisms impair defensive gun use. *Id.* at 108:3-6.

114.    Dr. Kleck does not know and has never tried to determine how often "the fact that you have a trigger lock will make a difference about whether you could use a gun defensively," or at what point during a home intrusion or attack the owner will not have enough time to disengage a trigger lock in order to use a gun defensively.  *Id.* at 140:20-141:18.

115.    Dr. Kleck asserts that an owner's ability to disengage a locking device is affected when their pulse rate and blood pressure are elevated, and their hands are shaking, but he bases this belief only on "common sense." *Id*. at 113:12-19. No study has established this, and Dr. Kleck himself has never tried to remove a locking device under such conditions. *Id.* at 113:20-114:2. Dr. Kleck is not aware of any study that has examined the effect of darkness on retrieving a gun to use in self-defense. *Id.* at 120:16-19. While Dr. Kleck believes that training can reduce the physiological impairments from stress on being able to disengage a locking device on a gun, he has not "see[n] the need" to undertake such training. *Id.* at 120:20-121:5.

116.    Dr. Webster is not aware of research indicating that requirements like those in MCC 8-20-040 reduce the ability of a person to effectively use a firearm for self-defense in the

home.  Exhibit 65, Exhibit A thereto, at 16.

117.    The price of trigger locks offered by two major firearms retailers operating in the

Midwest (Gander Mountain and Dick's Sporting Goods) is slightly over $7.  Exhibit 38, Exhibit

A thereto, at 10.  Hall found the two trigger locks he currently uses by doing a Google search

online, and he purchased them online.  Exhibit 4 at 18:23-19:24.  He purchased the Master Lock

for $14.99, which was "relatively inexpensive."  *Id.*  at 17:18-19; 19:1; 20:1-7.  He purchased the

Regal lock for $10.50.  *Id.* at 20:1-7.  Pacholski purchased a 12-pack of Franzen trigger locks for

$69.99, plus $15.32 postage and tax, via the website of a gun store.  Exhibit 32 at PLKTKP

000056.

118.    Dr. Kleck asserts that "probably the strongest rationale for keeping guns stored in

a secure manner of some sort is to reduce gun theft and thereby reduce acquisition of guns by

criminals" since "most gun criminals acquire their guns directly or indirectly as a result of theft."

Exhibit 14 at 132:16-23.  Over 500,000 guns are stolen each year in the United States.  Exhibit

12 at F561.  The average U.S. gun owner owns between 6 and 7 guns, many of which are not

locked up.  Exhibit 65, Exhibit A thereto, at 15.  Dr. Kleck asserts that it is "reasonable" to

believe that trigger locks deter gun theft, because it is "very hard" to remove a trigger lock from a

stolen gun; he has never heard of a criminal who has successfully done so.  Exhibit 14 at 109:7-

21.

119.    In prior research, Dr. Cook performed multiple analyses on multiple data sets and

found that "residential burglary rates tend to increase with community gun prevalence."  Exhibit

67 (P. Cook and J. Ludwig, *Guns and Burglary*, in Evaluating Gun Policy 74-107 (J. Ludwig &

P. J. Cook, ed. 2003)) at 76.  The authors employed statistical tools to address the potential of

reverse causation – i.e., that high burglary rates induce homeowners to acquire guns for protection, rather than an increase in gun ownership causing higher burglary rates. *Id.* The authors' "preferred explanation" for why an increase in gun prevalence would lead to a higher burglary rate is that "guns are valuable loot because they are portable and readily sold or fenced." *Id.* at 98. Dr. Webster opines that MCC 8-20-040 "will minimize the number guns available to criminals" because it "decrease[s] the number of operable guns in the home and the potential value of such guns to would-be thieves." Exhibit 65, Exhibit A thereto, at 15.

120.    Chief Williams testified that MCC 8-20-040 "reduc[es] the ability of a burglar or intruder to use a gun they might come across in the course of breaking into a house against the home owner." Exhibit 54 at 49:19-24. Tyler believes that "[y]ou just don't leave firearms laying around in your house" because "that's not responsible," as someone could steal the gun, use it against the owner, or accidentally discharge it. Exhibit 1 at 89:22-90:12. Tyler generally keeps her gun in her safe because it prevents unauthorized users from accessing it. *Id.* at 85:15-19.

121.    One of the purposes served by MCC 8-20-040 is "reducing the number of firearms accidents or suicides or domestic violence shootings that would occur in the home by reducing the number of operable firearms that could be misused in those sorts of situations." Exhibit 54 at 50:6-12.

122.    Dr. Webster opines that the availability of firearms in the home increases the risks for suicide, homicide, and deaths from unintentional shootings, and that these risks increase as the number of firearms kept in the home increases, a phenomenon known as a "dose-response relationship." Exhibit 65, Exhibit A thereto, §§ V, VI. In forming his opinion, Dr. Webster relied upon more than 30 studies. *Id.*, Exhibit A thereto. Some of those studies found a

relationship between the number of firearms in the home and an increased risk of suicide, homicide, and/or unintentional death:

a.      P. Cummings, et al., *The Association between the Purchase of a Handgun and Homicide or Suicide*, 87 American Journal of Public Health 974-978 (1997).  Exhibit 68.  This study found that "[t]he association between handgun purchase and suicide tended to become stronger as the number of handguns purchased increased," and reported an adjusted relative risk of 1.6 for one family purchase, 1.8 for two family purchases, and 2.7 for three or more family purchases.  *Id.* at 976.  It further found that "[t]here was a stronger association between handgun purchase and death by homicide as the number of handguns purchased increased," and reported an adjusted relative risk of 1.1 for one family purchase, 2.1 for two family purchases, and 6.2 for three or more family purchases.  *Id.*  Dr. Kleck testified that this study has "some relevance" to MCC 8-20-040 and was published in a "leading journal" in the field of public health."  Exhibit 14 at 26:8-10, 171:7-10.

b.      D. Wiebe, *Firearms in US homes as a risk factor for unintentional gunshot fatality*, 35 Accident Analysis and Prevention 711-716 (2003).  Exhibit 69.  This study found that "the magnitude of the association" between gun availability and unintentional gunshot fatality "increased with the availability of multiple guns."  *Id.* at 713.  Compared to homes where no guns were present, the relative risk of death in a home with one gun was 3.4, and was 3.9 in a home with multiple guns.  *Id.*  The study states that "[h]aving multiple guns appeared to compound the hazard, as did having handguns in particular."  *Id.* at 714.  Dr. Kleck asserts that while not "perfectly relevant," this study is the "closest to being relevant" to MCC 8-20-040.  Exhibit 14 at 315:4-13.

c.      D. Brent, et al., *Firearms and Adolescent Suicide: A Community Case- Control Study*, 147 American Journal of Diseases of Children 1066-1071 (1993). Exhibit 70. This study reported that "the more guns in the home, the more likely suicide by firearms was to occur." *Id*. at 1068. Of suicide victims who used a firearm, 18.8% of those with no guns in the home committed suicide, 75% of those with one gun in the home committed suicide, and 91.2% of those with more than one gun committed suicide. *Id.* at 1068. It found that "[t]he odds of suicide with *more than one* handgun in the home were greatly increased relative to having *just one* handgun in the home," based on an estimated odds ratio of 17.1. *Id.*

123.     Dr. Webster also relied on studies and other data demonstrating an association between the availability of any firearm in the home and suicide, homicide, and unintentional death. Exhibit 65, Exhibit A thereto, § V. He opines that "if a variable is associated with an outcome, it is often the case that more of the variable will be associated with more of the outcome." *Id.* at 12. The studies differed in their design (*e.g.*, case control study, cohort study, ecological study), samples, populations, or analytic methods. *Id.* at 3-12. The studies relied upon by Dr. Webster include the following:

a.      A. Kellerman, et al., *Suicide in the Home in Relation to Gun Ownership*, 327 New England Journal of Medicine 467-472 (1992). Exhibit 71. This case control study found an adjusted odds ratio of 4.8 for suicides in a home with one or more firearms compared to a home with no firearms, and concluded that its results "offer strong evidence that the ready availability of guns increases the risk of suicide in the home." *Id.* at 470.

b.      P. Cummings, et al., *The Association between the Purchase of a Handgun and Homicide or Suicide*, 87 American Journal of Public Health 974-978 (1997). Exhibit 68. This

case control study found that, for members of households where a family member had legally purchased a handgun from a licensed dealer, the risk of suicide involving a firearm was 3.1 times higher, and the risk of homicide involving a firearm was 2.2 times higher, than for members of households with no purchase. *Id.* at 975-76. Further, the study found that the median interval between the first handgun purchase by the victim or any family member and any suicide with a gun was 10.7 years. *Id.* at 976. Dr. Webster opines that this indicates "that, in most instances, the suicide victim did not purchase a gun in order to complete a plan to commit suicide but rather used a firearm that had been purchased years ago, sometimes by individuals other than the one who committed suicide." Exhibit 65, Exhibit A thereto, at 4. Further, the study found that the median interval between the first family handgun purchase and any homicide death was 11.3 years and that "[t]he relative risk of death by homicide associated with family handgun purchase bore no statistically significant relationship to time since purchase." Exhibit 68 at 976. Dr. Webster opines that this indicates that "it seems unlikely" that the risk of being a homicide victim is what "prompt[ed] gun ownership." Exhibit 65, Exhibit A thereto, at 8.

     c.     D. Wiebe, *Homicide and Suicide Risks Associated With Firearms in the Home: A National Case-Control Study*, 41 Annals of Emergency Medicine 771-782 (2003). Exhibit 72. This case control study found that, "[c]ompared with persons living in a home with no firearms, the adjusted [odds ratio] for suicide was 3.44 . . . for persons living in a home where a gun was present." *Id.* at 776. It also concluded that "[h]aving a gun in the home was a strong risk factor for gun-related suicide," reporting an adjusted odds ratio of 16.89. *Id.* at 777. "The increased risk of suicide connected to guns in the home was exclusive to suicides committed with a firearm." Exhibit 65, Exhibit A thereto, at 4.

d.      G. Wintemute, et al., *Mortality among recent purchasers of handguns*, 341 New England Journal of Medicine 1583-89 (1999).  Exhibit 73.  This cohort study found that "handgun purchasers, as compared with the general adult population during the same period, were at substantially greater risk for suicide in the first year after a handgun purchase (standardized mortality ratio, 4.31), and the increase was attributable entirely to the substantial excess mortality from suicide by firearm (standardized mortality ratio, 7.12)." *Id.* at 1585.  A standardized mortality ratio is the ratio of the number of deaths among handgun purchasers to the number of deaths expected in the general population based on age and sex-specific death rates. Exhibit 65, Exhibit A thereto, at 5.  In the 6-year period following the purchase, the risk for suicide (standardized mortality ratio, 2.16) and suicide by firearm (standardized mortality ratio, 3.50) remained elevated.  Exhibit 73 at 1586.

e.      M. Miller, et al., *The association between changes in household firearm ownership and rates of suicide in the United States*, 12 Injury Prevention 178-182 (2006). Exhibit 74.  This longitudinal ecological study found that "changes in household firearm ownership over time were associated with significant changes in rates of suicides for men, women, and children." *Id.* at 181.  Each 10% decline in firearm prevalence was accompanied by "significant declines in suicide by firearm and suicide overall: firearm suicide rates dropped by 4.2% . . . and total suicide rates by 2.5%." *Id.* at 180.  Further, "[t]he relation between changes in household firearm ownership and overall rates of suicide is due to the association of firearm ownership and suicide by firearms (that is, changes in non-firearm suicide are not related to changes in firearm ownership)." *Id.* at 181.

f.      A. Kellerman, et al., *Gun Ownership as a Risk Factor for Homicide in the Home*,

329 New England Journal of Medicine 1084-1091 (1993). Exhibit 75. This case control study found that "the presence of one or more firearms in the home was strongly associated with an increased risk of homicide in the home," reporting an adjusted odds ratio of 2.7, and that "[g]un ownership was most strongly associated with homicide at the hands of a family member or intimate acquaintance," reporting an adjusted odds ratio of 7.8. *Id.* at 1087. The study further noted that "[n]ot surprisingly, the link between gun ownership and homicide was due entirely to a strong association between gun ownership and homicide by firearms." *Id.*

g. J. Campbell, et al., *Risk Factors for Femicide in Abusive Relationships: Results From A Multisite Case Control Study*, 93 American Journal of Public Health 1089-1097 (2003). Exhibit 76. This case control study found that gun availability "had substantial independent effects that increased homicide risks" at the hands of an intimate partner, with at least a 5-fold increase in risk. *Id.* at 1092.

h. M. Miller, et al., *State-level homicide victimization rates in the US in relation to survey measures of household firearm ownership, 2001-2003*, 64 Social Science & Medicine 656-664 (2007). Exhibit 77. This ecological study of state-wide firearm ownership and homicide data found that "[s]tates with higher rates of household firearm ownership had significantly higher homicide victimization rates in multivariate analyses. The association between firearm prevalence and homicide victimization in our study was driven by gun-related homicide victimization rates; non-gun-related victimization rates were not significantly associated with rates of firearm ownershp." *Id.* at 660-61. The study found that "each one-percentage point difference in household firearm ownership was associated with a 3.3% difference in firearm homicide victimization . . . and a 2.2% difference in the rate of homicide

57

victimization." *Id.* at 659.

i.      M. Miller, et al., *Firearm Availability and Unintentional Firearm Deaths, Suicide, and Homicide among 5-14 Year Olds,* 52 Journal of Trauma, Injury, Infection, and Critical Care 267-275 (2002). Exhibit 78. This ecological study of state-wide data found "a positive and statistically significant association between gun availability and state-level rates of unintentional firearm deaths, homicides, firearm homicides, suicides, and firearm suicides among children. The increased rate of homicide and suicide in states with high gun levels was accounted for by significantly elevated firearm (but not nonfirearm) suicide and homicide rates." *Id.* at 271. Further, in comparing data from the five states with the highest estimated gun availability levels (Louisiana, Alabama, Mississippi, Arkansas, and West Virginia) with the five states with the lowest (Hawaii, Massachusetts, Rhode Island, New Jersey, and Delaware), the study concluded that children in the high-gun states "were 16 times as likely to die from unintentional firearm injury, 7 times as likely to die from firearm suicide, 3 times as likely to die from firearm homicide and, overall, twice as likely to die from suicide and homicide." *Id.*

j.      M. Miller, et al., *Firearm Availability and Suicide, Homicide, and Unintentional Firearm Deaths Among Women*, 79 Journal of Urban Health 26-38 (2002). Exhibit 79. This study found "positive and statistically significant associations between gun availability and state-level rates of suicide, homicide, and unintentional firearm death among adult women. The increased rate of suicide in states with high gun levels was accounted for by elevated firearm suicide rates . . . [and] [t]he increased rate of homicide in states with high gun levels was accounted for primarily by significantly elevated firearm homicide rates." *Id.* at 29-32. Further, in comparing data from the five states with the highest estimated gun availability to the five with

the lowest, the study found that women living in the high gun states "were 1.5 times as likely to die from suicide, 2.7 times as likely to die from homicide, and 11.2 times as likely to die from an unintentional firearm injury." *Id.* at 33-34. Dr. Webster opines that, since women and children are rarely the ones who bring a firearm into the home, "positive associations between gun availability and homicide risks are unlikely to be due to individuals being motivated by their own risk of homicide to acquire a gun." Exhibit 65, Exhibit A thereto, at 9.

k.     D. McDowall, *Firearm Availability and Homicide Rates in Detroit, 1951-1986*, 69 Social Forces 1085-1101 (1991). Exhibit 80. This study of changes in gun availability and homicide rates in Detroit from 1951 to 1986 estimated that each 1% increase in gun availability was associated with an increase of more than 1% in homicides per 100,000 residents. *Id.* at 1090. It found that if the gun ownership rate (i.e., the gun density index) from 1964 is applied to 1986, and "all other explanatory variables were held at their 1986 levels," the homicide rate predicted for 1986 would be 21.4 per 100,000 residents, rather than the rate of 56.4 that was actually observed. *Id.* at 1091. The study reported that "[t]his is only 38% of the actual rate for 1986 and represents a difference of 379 lives." *Id.*

l.     M. Duggan, *More Guns, More Crime*, 109 Journal of Political Economy 1086-1114 (2001). Exhibit 81. This study of state and county-level data found that "changes in homicide and gun ownership are significantly positively related" and that its findings suggest "that an increase in the number of guns leads to a substantial increase in the number of homicides." *Id.* at 1088. It reported that its findings suggest that "a 10 percent increase in the rate of gun ownership is associated with approximately a 2 percent increase in the homicide rate." *Id.* at 1096.

m.      P. Cook, et al., *The social costs of gun ownership*, 90 Journal of Public Economics 379-391 (2006).  Exhibit 22.

n.      D. Wiebe, *Firearms in US homes as a risk factor for unintentional gunshot fatality*, 35 Accident Analysis and Prevention 711-716 (2003).  Exhibit 69.  This case control study found that "the relative risk of death by an unintentional shooting, comparing subjects living in homes with and without at least one gun, was 3.7."  *Id.* at 713.

o.      Data from Massachusetts, New Jersey, and New York indicates that they have rates of gun prevalence (12.6%, 12.3%, and 18.0%, respectively) lower than the national average (31.7%).  Exhibit 65, Exhibit A thereto, at 6-7.  The data also indicate that their suicide rates (7.3, 8.35, and 7.73, respectively) are between 37% and 45% lower than the national average rate (13.15).  *Id.*  Dr. Webster opines that because these states allow for discretionary denials of gun purchase permits and have "some of the most stringent nondiscretionary requirements for issuing permits to purchase firearms," this data "is consistent" with the thesis that policies that reduce the prevalence of firearms in homes lead to fewer suicides.  *Id.* at 6.  Further, data from these states indicates that, in large metropolitan counties, the homicide rates for non-Hispanic whites (1.9, 2.5, and 2.2, respectively) and for African Americans (22.0, 27.7, and 16.0, respectively) are lower than the national average (3.3 and 28.5, respectively).  *Id.* at 10.

124.    The majority of firearm-related deaths that occur in U.S. homes are suicides.  *Id.* at 2-3.  Even within the most urban counties in the U.S., suicides account for more than one third of all firearm-related deaths.  *Id.* at 3.  10 of the 16 published case control studies of firearm ownership and suicide "found a significant relationship between gun ownership and suicide."  Exhibit 14 at 188:17-20.  An additional one of those 16 studies – Conwell (2002) – found a

statistically significant increased risk associated with gun ownership for males. *Id.* at 192:7-10.

125.    Dr. Kleck owns two handguns, uses a trigger lock on both, and considers trigger locks to be a safe method of storing those guns. *Id.* at 35:18-25, 36:3-5. He agrees that trigger locks "have a safety benefit," are a "sensible step to take in order to prevent unauthorized use," and provide "some assurance against somebody firing the guns who didn't have a key to the lock." *Id.* at 104:10-13, 105:5-10, 105:14-18. He agrees that "guns with trigger locks are much less likely to be involved in accidents than guns without trigger locks;" indeed, they are "virtually not involved in accidents at all" and it is "virtually impossible" for an unauthorized user to use a trigger-locked gun. *Id.* at 121:6-8, 322:15-19. Even under the assumption that the devices impair authorized access for defensive use, they impair unauthorized access "a lot more" than they impair authorized access. *Id.* at 112:11-15.

126.    Dr. Webster opines that the safe storage of firearms reduces the risks of suicide, homicide, and deaths from unintentional shootings associated with keeping firearms in the home. Exhibit 65, Exhibit A thereto, §§ VII, X. The sources relied upon by Dr. Webster in forming this opinion include:

a.    A. Kellerman, et al., *Suicide in the Home in Relation to Gun Ownership*, 327 New England Journal of Medicine 467-472 (1992). Exhibit 71. This study concluded that "[h]omes with handguns and homes where firearms were not locked up or were kept loaded were even more likely to be the scene of a suicide than homes where firearms were kept securely stored." *Id.* at 470. The study reported, as compared to a home with no firearms, the following adjusted odds ratios: 2.4 for suicide by firearm where all guns were kept locked up; 5.6 where any gun was kept unlocked; 3.3 where all guns were kept unloaded; and 9.2 where any gun was kept

loaded. *Id.* at 471. Dr. Webster opines that these figures "clearly show a progression of increasing risk with increasing ease of access." Exhibit 65, Exhibit A thereto, at 13.

b.  D. Grossman, et al., *Gun Storage Practices and Risk of Youth Suicide and Unintentional Firearm Injuries*, 293 Journal of the American Medical Association 707-714 (2005). Exhibit 82. This case control study concluded that "[s]afe storage practices, including keeping firearms . . . secured with an extrinsic safety device, were shown to be protective for unintentional firearm shootings and suicide attempts among adolescents and children." *Id.* at 712. It further concluded that: "case guns" (those guns used in a suicide attempt or unintentional injury) "were less likely to be stored locked" than control guns (those guns that had not been used in a suicide attempt or unintentional injury), reporting an odds ratio of .27; "[r]elative to firearms that were unlocked and loaded, those stored locked and unloaded were less likely to be involved in a shooting," reporting an odds ratio of .16; and that "[h]aving only the ammunition accessible (with the reference firearm locked) was associated with a reduced risk of a case shooting event . . . relative to having both the gun and ammunition unlocked," reporting an odds ratio of .34. *Id.* at 711. This study "indicate[s] that the risk of self-inflicted and unintentional firearm injuries was about 70 percent lower in gun-owning homes that stored their firearms locked up and unloaded compared with homes where guns were not stored locked up and unloaded. The relationship between gun storage practices and firearm deaths to adolescents was similar for suicide and unintentional shootings." Exhibit 65, Exhibit A thereto, at 13.

c.  M. Miller, et al., *Firearm storage practices and rates of unintentional firearm deaths in the United States*, 37 Accident Analysis and Prevention 661-667 (2005). Exhibit 83. This state-level analysis found that, on average, a 1% increase in the proportion of households

that store firearms loaded is associated with a 4% increase in the rate of unintentional firearm deaths, and that this increase "appears to reside largely and significantly in those households in which at least one of the loaded firearms is also unlocked: the unintentional firearm death rate was 6% higher in states where an additional 1-percentage point of gun owning households stored firearms loaded and unlocked, compared to households in which all firearms were unloaded." *Id.* at 665. The study also compared the 6 states with the highest percentage of people living in homes with loaded firearms with the 10 states with the lowest percentage of people living in such homes. *Id.* Even though the 6 states had a smaller overall population, and a smaller number of people living in homes with loaded firearms, the 6 states had approximately twice as many unintentional firearm deaths than the 10 states. *Id.* Dr. Webster opines that, from this study, one "can infer . . . that generally in areas with safer storage practices of firearms, you will see lower risk and rates for unintentional firearm deaths." Exhibit 84 (Deposition of Daniel Webster) at 201:4-14.

d.    D. Webster, et al., *Association Between Youth-Focused Firearm Laws and Youth Suicides*, 292 Journal of the American Medical Association 594-601 (2004). Exhibit 85. This study of states that have safe storage laws intended to keep firearms from youth ("Child Access Prevention" laws) found that the laws were associated with an 8.3% reduction in suicide rates for persons aged 14 to 17 years. *Id.* at 596. It found that "[a]s would be expected if these reductions were attributable to reduced access to firearms, the reductions were specific to suicides committed with firearms and to the age group principally targeted by [the] laws." *Id.* at 599. Dr. Webster opines that this reduction is "significant." Exhibit 65, Exhibit A thereto, at 14.

e.    P. Cummings, et al., *State Gun Safe Storage Laws and Child Mortality Due to*

*Firearms*, 278 Journal of the American Medical Association 1084-1086 (1997). Exhibit 86. This study of states that have safe storage laws intended to keep firearms from youth found that "unintentional firearm-related deaths among children younger than 15 years were 23% . . . lower than expected in these states." *Id.* at 1085.

127. Dr. Webster opines that although MCC 8-20-040 allows each holder of a Chicago Firearm Permit to keep an operable firearm in their home at all times, the ordinance "should lead to reduced availability of operable firearms to household members when they become distraught, suicidal, angry, or otherwise lose control of their emotions and, thus, lead to fewer tragic deaths." Exhibit 65, Exhibit A thereto, at 16.

128. The International Association of Chiefs of Police recommends "[m]andating safe storage of firearms by private citizens." Exhibit 87 (2007 Taking a Stand Report) at 7. ATF guidelines recommend that FFLs "[d]isable display firearms" by using "trigger locks or plastic ties to ensure that the firearms cannot be loaded or fired while being examined," and that FFLs "[r]ecommend safe storage methods," including locking devices, to customers. Exhibit 38, Exhibit A thereto, at 7; Exhibit 88 (ATF Publication 3317.2, revised Feb. 2, 2010) at 12, 14. Those guidelines further recommend that FFLs should "[s]how only one firearm at a time to a customer. If the customer requests to handle another firearm, secure the first firearm before displaying another." *Id*. at 12. These recommendations are designed to prevent firearm theft and accidental discharge in gun stores, as well as the use of a retailer's firearm by a customer to rob the retailer. Exhibit 38, Exhibit A thereto, at 8; Exhibit 39 at 108:20-109:16. They were developed by Mr. Vince's staff at the ATF through consultation with firearms industry members. Exhibit 38, Exhibit A thereto, at 7. They were selected because they were found to work. *Id.* at

8. Mr. Vince testified that the reason firearms retailers use locking devices is also "applicable to your home" – i.e., "you want to make sure your visitors are safe there and you want to make sure that visitors don't inadvertently get ahold of a firearm." Exhibit 39 at 93:3-7. Mr. Vince testified that the owner "can't be assured that [a visitor] going to the bathroom . . . inadvertently seeing something won't pick it up and use it." *Id*. at 110:13-16.

129. An NRA publication entitled "Home Firearm Safety" states that a firearm kept in the home "must be stored in a secure place, inaccessible to unauthorized users (children or adults) and in accordance with local laws." Exhibit 14 at 345:8-12; and Exhibit 17 thereto, at 4. It further states that "there is one general rule that *must* be applied under all conditions: Store guns so they are not accessible to untrained or unauthorized persons." Exhibit 14, Exhibit 17 thereto, at 37 (emphasis in original).

130. The National Shooting Sports Foundation ("NSSF") is the largest trade group representing the firearms industry as a whole, with a membership of more than 6,000 firearms manufacturers, distributors, firearms retailers, shooting ranges, sportsmen's organizations and publishers. Exhibit 89 (NSSF webpages); Exhibit 5 at 60:4-9. Plaintiff ILAFR is the Illinois affiliate of the NSSF. Exhibit 89; Exhibit 38, Exhibit A thereto, at 10. NSSF guidelines state in part that

- "[N]early all firearms accidents in the home can be prevented simply by making sure that guns are kept unloaded and locked up."

- Firearms owners "must make absolutely sure that guns in your home are stored so that they are not accessible to . . . unauthorized persons. Hiding a gun in a closet, drawer or similar location is *not* safe storage."

- "If you must have quick access to a loaded firearm in your home, you need to take special safety measures. Keeping a gun to defend your family makes no sense if that same gun puts your family members or visitors to your home at risk."

65

- Even as to a firearm owned "for home security," the "objective should be to create a situation in which the firearm is readily available to [the owner], yet inaccessible or inoperative to others."

Exhibit 38, Exhibit A thereto, at 31-33 (emphasis in original).

131.    The NSSF guidelines further references trigger and cable locks as "options for securely storing firearms." *Id.* at 33-34. NSSF has distributed 35 million safety kits containing free gun locking devices. Exhibit 89.

132.    The NSSF owns and sponsors the Shooting, Hunting, Outdoor Trade Show, the largest and most comprehensive trade show for law enforcement, hunting, and shooting sports professionals. Exhibit 38, Exhibit A thereto, at 11. The show is not open to the public or persons under 16 years of age. *Id.* at 12; Exhibit 89. Access is restricted to members of the shooting, hunting, and outdoor trades and commercial buyers and sellers of military, law enforcement and tactical products and services. Exhibit 89. No personal firearms are permitted at the show, and only firearms whose firing pins have been removed are permitted on the show floor for display. *Id.* In addition, persons wishing to sell guns at gun shows are required to have a locking device affixed to the guns in order to ensure that they cannot be loaded or fired. Exhibit 38, Exhibit A thereto, at 12.

133.    The manufacturer's documentation that came with Hall's Master Lock states in part, under the heading "Firearm Safety Tips," "Store firearms unloaded under lock and key" and "Store ammunition separately under lock and key." Exhibit 28 at PLMH 000125. The manufacturer's documentation that came with Hall's Regal lock states "Store firearms and ammunition separately and securely." *Id.* at PLMH 000126.

134.    Another purpose of MCC § 8-20-040 is "reducing the number of firearms in that

66

home that [may] be misused as against a first responder," which is achieved by "reducing the number of operable weapons that would be in the home." Exhibit 54 at 51:1-12, 59:2-8. In the course of responding to emergency calls at Chicago residences, Chicago police officers have been harmed by guns possessed by people in those residences. *Id.* at 51:13-17, 52:10-13.

135. The "paramount" concern of Chicago Fire Department paramedics when responding to an emergency call is "scene safety." Exhibit 90 (Deposition of Marc Levison) at 15:2-11. A scene is considered safe for a paramedic to render emergency care when either Chicago police officers have secured the scene or when the paramedic does not perceive a threat. *Id.* at 15:13-19. A scene is not considered safe when a firearm is present (other than a firearm possessed by a police officer), as the firearm presents a threat to the paramedic and the paramedic does not know how it will be used. *Id.* at 17:14-16, 28:6-14, 29:22-30:2, 38:22-39:5.

136. A firearm at the scene thereby impedes and prevents CFD paramedics from delivering emergency care. *Id.* at 42:24-43:5, 45:20-46:8. If paramedics know that a firearm is present, they "stand back and stage out" – i.e., refrain from rendering care – until the police secure the scene. *Id.* at 45:20-46:8. CFD paramedics are not responsible for securing the safety of a scene and are not trained to secure a firearm found at the scene; that is the responsibility of the CPD. *Id.* at 22:6-12, 42:17-23. If the firearm is secured in the home, it does not present a threat to scene safety; scene safety is enhanced by reducing the number of operable firearms at the scene. *Id.* at 30:3-10, 42:12-16.

## RESTRICTION ON FIREARMS IN THE HOME OF ANOTHER

137. Dr. Cook opines that Dr. Webster's expert testimony regarding the risks from increasing the number of unsecured firearms in the home "is relevant to judging the risks of

introducing a gun, or an additional gun, into a home, even if permission is granted by a member of the household." Exhibit 13, Exhibit A thereto, at 15. Allowing a CFP holder (i.e., a guest) to take firearms to home of another person (i.e., a host) introduces at least one additional unsecured firearm to that house, and thereby presents the same risks that arise from increasing the number of unsecured firearms in any home. Exhibit 24, ¶ 13.

138.    Further, the guest cannot be controlled by the host and may use the firearm unlawfully despite the host's wishes. *Id.* These risks would only increase as the number of armed guests increased. *Id.* For instance, a house party where multiple guests are armed with firearms and drinking, or a congregation of armed CFP-holding gang members in a single home (say, a drug house), would present serious risks of intimidation, escalation, and potential discharge. *Id.*

139.    In addition, it would allow a host who does not qualify for a CFP to effectively evade the CFP requirement. *Id.* The host could simply claim that firearms in his or her home (or in the spaces outside the home) belong to his or her CFP-holding guest, and these firearms would be at risk of misuse by the host. *Id.*

Date: March 2, 2012

Respectfully submitted,

STEPHEN R. PATTON,
Corporation Counsel for the City of Chicago

By:    /s/ Andrew Worseck
          Assistant Corporation Counsel

Michael A. Forti
Mardell Nereim
Andrew W. Worseck
William Macy Aguiar
Rebecca Alfert Hirsch
City of Chicago, Department of Law
Constitutional and Commercial Litigation Division
30 North LaSalle Street, Suite 1230
Chicago, Illinois 60602
(312) 744-9018 / 6975  / 7129 / 4216

Attorneys for Defendants