# Exhibit 3

Michael Hall                                December 14, 2010

1

IN THE UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF ILLINOIS

EASTERN DIVISION


BRETT BENSON, KENNETH          )

PACHOLSKI, KATHRYN TYLER,       )

MICHAEL HALL, SR., RICK PERE    )

and the ILLINOIS ASSOCIATION    )

OF FIREARMS RETAILERS,          )

            Plaintiffs,      )   No. 10 CV 4184

    -vs-                       )

THE CITY OF CHICAGO, and        )

RICHARD M. DALEY, Mayor of      )

the City of Chicago,            )

            Defendants.      )


       The deposition of MICHAEL HALL, called

for examination, taken pursuant to the Federal

Rules of Civil Procedure of the United States

District Courts pertaining to the taking of

depositions, taken before THERESA A. VORKAPIC, a

Notary Public within and for the County of Kane,

State of Illinois, and a Certified Shorthand

Reporter, CSR No. 84-2589, of said state, at the



ESQUIRE
an Alexander Gallo Company

Toll Free: 800.708.8087
Facsimile: 312.673.8138

Suite 1200
311 West Monroe Street
Chicago, IL 60606
www.esquiresolutions.com

2

1    City of Chicago Law Department, Suite 1230, 30
2    North LaSalle Street, Chicago, Illinois, on
3    December 14, 2010, at approximately 9:59 a.m.
4    PRESENT:
5         COOPER & KIRK,
6         (1523 New Hampshire Avenue, N.W.,
7         Washington, D.C. 20036,
8         202-220-9642), by:
9         MR. JESSE PANUCCIO,
10        jpanuccio@cooperkirk.com,
11             appeared on behalf of Plaintiffs;
12        CITY OF CHICAGO, DEPARTMENT OF LAW,
13        (30 North LaSalle Street, Suite 1230,
14        Chicago, Illinois 60602-2580,
15        312-744-7129), by:
16        MR. ANDREW WORSECK,
17        aworseck@cityofchicago.org,
18             appeared on behalf of Defendants.
19
20   REPORTED BY:   THERESA A. VORKAPIC,
21                  C.S.R. Certificate No. 84-2589
22
23
24



ESQUIRE
an Alexander Gallo Company

Toll Free: 800.708.8087
Facsimile: 312.673.8138

Suite 1200
311 West Monroe Street
Chicago, IL 60606
www.esquiresolutions.com

Michael Hall                                     December 14, 2010

5

1        A.    No.

2        Q.    What is your residential address?

3        A.    112554 South Bell.

4        Q.    That is in Chicago?

5        A.    Yes.

6        Q.    How long have you lived there?

7        A.    Five years.

8        Q.    Prior to living at that address, where

9   did you live?

10       A.    10820 South Fairfield, Chicago.

11       Q.    How long have you lived in Chicago?

12       A.    Besides my military, all my life except

13  for four years in high school.

14       Q.    Do you have any other residences in

15  Chicago?

16       A.    No.

17       Q.    Do you have any other residences

18  anywhere?

19       A.    No.

20       Q.    What is your employment?

21       A.    Telecom consultant.

22       Q.    Do you have an employer?

23       A.    Yes.

24       Q.    Who is that?



ESQUIRE
an Alexander Gallo Company

Toll Free: 800.708.8087
Facsimile: 312.673.8138

Suite 1200
311 West Monroe Street
Chicago, IL 60606
www.esquiresolutions.com

Michael Hall                                    December 14, 2010

6

1        A.    Teletech.

2        Q.    Do they have a business address that

3    you work from?

4        A.    Pretty much everybody -- I have a home

5    office but, yes, there is a main office.

6        Q.    What is the address of that office?

7        A.    819 Sheridan Road, Highland Park.

8        Q.    Do you go to that office as part of

9    your employment?

10       A.    Rarely.  Occasionally.

11       Q.    How often would you say you go there?

12       A.    Good question.  Once a month maybe.

13       Q.    How far is that from your house?

14       A.    Approximately 40 miles.

15       Q.    You drive there?

16       A.    Typically.

17       Q.    If you don't drive, how else do you get

18   there?

19       A.    There is train service, but I typically

20   drive.

21       Q.    Is that the Metra?

22       A.    Uh-huh.

23       Q.    So aside from going to the Teletech

24   office about once a month, you generally work from



ESQUIRE
an Alexander Gallo Company

Toll Free: 800.708.8087
Facsimile: 312.673.8138

Suite 1200
311 West Monroe Street
Chicago, IL 60606
www.esquiresolutions.com

Michael Hall                              December 14, 2010

9

1        Q.    Over that five-year span, have you had

2   clients in the Chicagoland suburbs?

3        A.    Yes.

4        Q.    How many clients to your best knowledge

5   have you had to visit in the Chicagoland suburbs

6   over the past five years?

7        A.    Again, a guess, 30.

8        MR. PANUCCIO:  I'll just put an objection on

9   the record.  It calls for speculation.

10  BY MR. WORSECK:

11       Q.    In an average month, how often do you

12  travel to a client site whether it be in the City

13  of Chicago or a Chicago suburb?

14       A.    Roughly ten days a month.

15       Q.    Do you travel to those sites with the

16  starting point being your home?

17       A.    Yes.

18       Q.    How many days a month do you travel to

19  a client site in the suburbs from your home?

20       A.    I never stopped to think about it quite

21  honestly.

22       Q.    Sure.  Take a moment if you need to.

23       A.    Probably a little bit less maybe.  I

24  said ten and I have to be honest, I was thinking



ESQUIRE
an Alexander Gallo Company

Toll Free: 800.708.8087
Facsimile: 312.673.8138

Suite 1200
311 West Monroe Street
Chicago, IL 60606
www.esquiresolutions.com

Michael Hall                                December 14, 2010

10

1  of all total customer sites between City and

2  suburbs so probably minimum ten, five being

3  Chicago, five being suburb.

4       Q.    So is it fair to say that -- do you

5  work Monday through Friday or do you work weekends

6  as well?

7       A.    Yes to all of them.

8       Q.    So for the ten days a month that you

9  are not traveling to a client site either in the

10  city or the suburbs, are you working from home the

11  rest of the time?

12      A.    Yes, either from home or from the other

13  office which I'm rarely at.

14      Q.    The clients in the suburbs, how far

15  away are they from your home?

16      MR. PANUCCIO:  It's vague.  I suppose he

17  could give an average answer, but "clients" is

18  vague.

19  BY THE WITNESS:

20      A.    I don't know.  I never really paid much

21  attention.  I get in the car and go.  I'm trying

22  to think of where I've been recently.  I was out

23  in Rockford.  It depends on where business takes

24  us.  Most recently all of my work has been in



ESQUIRE
an Alexander Gallo Company

Toll Free: 800.708.8087
Facsimile: 312.673.8138

Suite 1200
311 West Monroe Street
Chicago, IL 60606
www.esquiresolutions.com

1  Chicago, but I would say it's pretty even in

2  general.   20 miles maybe, and this is just

3  guessing.

4  BY MR. WORSECK:

5      Q.    Sure.   Rockford is certainly further

6  than 20 miles.

7      A.    Well, but some of them aren't quite as

8  far.

9      Q.    Do you drive to those locations when

10 you need to go to them?

11     A.    Unless I'm coming downtown Chicago I'll

12 take the train.   Otherwise I drive.

13     Q.    But for any of the suburban clients

14 that you visit, you drive?

15     A.    Yes.   I drive.

16     Q.    Can you tell me what the last five or

17 ten suburbs are that you traveled to for work?

18     A.    Rockford.   I don't have any of my

19 billing sheets in front of me so I can't think.

20     Q.    The billing sheets would tell you where

21 you've been traveling for work?

22     A.    Yes, it would tell me where I've been

23 and what I've done and what dates.

24     MR. PANUCCIO:   Just answer to the extent you



ESQUIRE
an Alexander Gallo Company

Toll Free: 800.708.8087
Facsimile: 312.673.8138

Suite 1200
311 West Monroe Street
Chicago, IL 60606
www.esquiresolutions.com

Michael Hall                                    December 14, 2010

13

1    don't recall any other things recently in the
2    suburbs.  If I think of them, I'll certainly tell
3    you.
4         Q.    Sure.  Do you have any other jobs or
5    forms of employment?
6         A.    Yes.  I do.  Actually I'm a part-time
7    referee, basketball, IHSA.
8         Q.    How long have you been doing that?
9         A.    About nine years.
10        Q.    Do you need to travel for that outside
11   of the City?
12        A.    Yes.
13        Q.    How far from your house do you need to
14   travel for the referee duties?
15        A.    Not far.  Typically I don't take close
16   assignments to the south side.
17        Q.    South side suburbs?
18        A.    Both.  City and suburbs.
19        Q.    But to the extent you're going to the
20   suburbs, they are on the south side?
21        A.    Yes.
22        Q.    How frequently do you travel outside of
23   the City as part of your refereeing duties?
24        A.    How far you said?



ESQUIRE
an Alexander Gallo Company

Toll Free: 800.708.8087
Facsimile: 312.673.8138

Suite 1200
311 West Monroe Street
Chicago, IL 60606
www.esquiresolutions.com

Michael Hall                                    December 14, 2010

14

1      Q.     How frequently?

2      A.     It's seasonal, so once a week, maybe

3  once every two weeks.

4      Q.     And that's to a suburb?

5      A.     Uh-huh.

6      Q.     And do you drive?

7      A.     Yes.

8      Q.     What is the basketball season?

9      A.     Well, the girls' season is from

10  August to November and the boys' season is from

11  November to March, except for high school, both

12  boys and girls is November to March, grade school

13  I should clarify on the south side, different

14  areas of the City.

15     Q.     Could you tell me the last ten suburbs

16  you've traveled to for the refereeing duties?

17     A.     Oak Lawn.  I do a lot in Oak Lawn.

18  Gosh, I'm drawing a blank.  I'm sorry.

19     Q.     Are there any documents, like a

20  schedule or something, that would indicate where

21  you've been traveling?

22     A.     Just my calendar.

23     Q.     So about once a week during basketball

24  season, you travel to the suburbs as a referee?



ESQUIRE
an Alexander Gallo Company

Toll Free: 800.708.8087
Facsimile: 312.673.8138

Suite 1200
311 West Monroe Street
Chicago, IL 60606
www.esquiresolutions.com

Michael Hall                                    December 14, 2010

                                                              20

1        Q.      It was just shooting at targets?

2        A.      Targets that were stationary or opening

3    and closing.  They would open for a period of time

4    and close.

5        Q.      Did that shooting take place in an

6    indoor range or outdoor range or both?

7        A.      Outdoor.

8        Q.      Could you describe your educational

9    background?

10       A.      High school graduate with some college.

11       Q.      Where did you graduate from high

12   school?

13       A.      Richards High School, Oak Lawn,

14   Illinois.

15       Q.      Where did you take college courses?

16       A.      Moraine Valley Community College before

17   I was in the military.  After I was in the

18   military, University of Maryland.

19       Q.      Did you focus on any field of study

20   while taking courses?

21       A.      Just general classes.

22       Q.      You have a wife; is that correct?

23       A.      Correct.

24       Q.      She lives with you at your home



ESQUIRE
an Alexander Gallo Company

Toll Free: 800.708.8087
Facsimile: 312.673.8138

Suite 1200
311 West Monroe Street
Chicago, IL 60606
www.esquiresolutions.com

21

```
 1   address?
 2        A.     Yes.
 3        Q.     How many children do you have?
 4        A.     Five.
 5        Q.     Do any of them live with you at your
 6   home?
 7        A.     Yes.
 8        Q.     How many?
 9        A.     Three.  Two full time.  Right now one
10   more beginning tonight.
11        Q.     What are the ages of your children?
12        A.     27, 26, 23, 19 and 14.
13        Q.     Which ones are the two full-time
14   residents?
15        A.     The 23-year-old and the 14-year-old.
16        Q.     And the 19-year-old?
17        A.     Will be home tonight.
18        Q.     Do the 27 and 26-year-old children live
19   in Chicago or the Chicago area?
20        A.     One is a student down in Louisiana and
21   the other one lives in the suburbs.
22        Q.     What suburb?
23        A.     Darien.
24        Q.     Do you ever travel out to Darien to
```



ESQUIRE
an Alexander Gallo Company

Toll Free: 800.708.8087
Facsimile: 312.673.8138

Suite 1200
311 West Monroe Street
Chicago, IL 60606
www.esquiresolutions.com

Michael Hall                                    December 14, 2010
                                                              69

1        A.    Yes.

2        Q.    Do you know what was redacted?

3        A.    I do not.

4        Q.    Did you send this e-mail string to your

5   attorneys?

6        A.    Yes, I believe I did.

7        Q.    And then if you can look at Page 13 in

8   Exhibit 2, same question, do you know what was

9   redacted?

10       A.    I do not.

11       Q.    Did you send that to your attorneys?

12       A.    I believe I did.

13       Q.    How many firearms do you currently own?

14       A.    Three.

15       Q.    What are they?

16       A.    Nine millimeter handgun, a 12 gauge

17  shotgun and a 1022 long rifle.

18       Q.    Those are the only firearms that you

19  own?

20       A.    Yes.

21       Q.    How many of those are registered with

22  the City of Chicago?

23       A.    Two.

24       Q.    Which ones?



ESQUIRE
an Alexander Gallo Company

Toll Free: 800.708.8087
Facsimile: 312.673.8138

Suite 1200
311 West Monroe Street
Chicago, IL 60606
www.esquiresolutions.com

Michael Hall                                    December 14, 2010

1      A.    Nine millimeter handgun and the 12

2    gauge shotgun.

3      Q.    Do you keep the long rifle in the City

4    of Chicago?

5      MR. PANUCCIO:    I object and ask for a time

6    frame on that question.

7    BY MR. WORSECK:

8      Q.    Do you currently keep it in the City?

9      A.    No.

10      Q.    How long have you possessed each of

11    these weapons?

12      A.    12 gauge shotgun approximately 30

13    years, the nine millimeter handgun approximately

14    four years, the 1022 approximately three years.

15    That could be flip-flopped.  I don't know.  I

16    don't recall exact dates.

17      Q.    Under the old Chicago firearms

18    registration ordinance, did you register any of

19    these firearms?

20      MR. PANUCCIO:    I'm going to instruct the

21    witness not to answer pursuant to what I just put

22    on the record, the Fifth Amendment objection.

23    BY MR. WORSECK:

24      Q.    If you can look again at Exhibit 2,



ESQUIRE
an Alexander Gallo Company

Toll Free: 800.708.8087
Facsimile: 312.673.8138

Suite 1200
311 West Monroe Street
Chicago, IL 60606
www.esquiresolutions.com

71

1    Pages 3 and 4, is it fair to say that these are

2    the registration certificates that you received

3    for the 12 gauge and the nine millimeter

4    respectively?

5         A.    Yes.

6         Q.     The nine millimeter and the 12 gauge,

7    you keep those at your residence?  Is that

8    correct?

9         MR. PANUCCIO:  Objection to the time frame.

10   That's current?

11   BY MR. WORSECK:

12        Q.     Currently.  Do you currently keep those

13   at your residence?

14        A.     Yes.

15        Q.     Where do you keep the long rifle

16   currently?

17        MR. PANUCCIO:  You can answer to the extent

18   it will not implicate your Fifth Amendment

19   privilege.

20   BY THE WITNESS:

21        A.     I would like to say it's outside the

22   City.

23   BY MR. WORSECK:

24        Q.     Where outside the City?



ESQUIRE
an Alexander Gallo Company

Toll Free: 800.708.8087
Facsimile: 312.673.8138

Suite 1200
311 West Monroe Street
Chicago, IL 60606
www.esquiresolutions.com

Michael Hall                                    December 14, 2010

1        Q.      And you bought that about 30 years ago?

2        A.      Yes.

3        Q.      How did you get to Chuck's Gun Shop to

4   buy that weapon?

5        A.      I believe either I drove or my

6   brother-in-law drove.  I don't recall.

7        Q.      Why did you decide to go to Chuck's to

8   buy the weapon?

9        A.      I think my brother-in-law was a past

10  customer.

11       Q.      Did you shop around at that time?  Did

12  you go to various stores or did you just go to

13  Chuck's and decide to buy a weapon that they had

14  there that day?

15       A.      No.  I planned on buying a hunting trip

16  that I was going on back then and it was suggested

17  by my brother let's go by in guy, he has got

18  deals.  So it was recommended to be a good deal.

19       Q.      How far away from your home is Chuck's?

20       A.      Gosh, I don't know.  As the crow flies

21  probably about ten miles I'm speculating, but you

22  have to go around the freeway so it's roughly ten

23  miles I'll say.

24       Q.      How long does it take you to get to



ESQUIRE
an Alexander Gallo Company

Toll Free: 800.708.8087
Facsimile: 312.673.8138

Suite 1200
311 West Monroe Street
Chicago, IL 60606
www.esquiresolutions.com

Michael Hall                                    December 14, 2010

74

1    Chuck's today, to drive there?

2        A.    About 25 minutes maybe.

3        Q.    Do you remember how much you paid for

4    the shotgun?

5        A.    Oh, God, no.  I'd have to throw a

6    guess.  I think -- I could be totally wrong, it

7    was about $200.

8        Q.    The nine millimeter, how did you

9    acquire that weapon?

10       A.    I bought it.

11       Q.    Where?

12       A.    Chuck's Gun Shop.

13       Q.    How did you get there?

14       A.    I drove.

15       Q.    How long did it take?

16       A.    Approximately 25 minutes.

17       Q.    How much did you pay?

18       A.    I don't remember.  I want to say 450

19   roughly.  I could be off.  There is a receipt in

20   here, isn't there?

21       Q.    I believe so.

22       MR. PANUCCIO:  16 maybe, maybe 17 -- I'm

23   sorry, last two in the packet, 116 and 117.

24       MR. WORSECK:  Oh, I see.



ESQUIRE
an Alexander Gallo Company

Toll Free: 800.708.8087
Facsimile: 312.673.8138

Suite 1200
311 West Monroe Street
Chicago, IL 60606
www.esquiresolutions.com

Michael Hall                                    December 14, 2010

                                                                76

1  model at Chuck's?

2       A.    I liked it.

3       Q.    Had you ever shot that model before?

4       A.    That particular model I've shot in nine

5  millimeters before.  I might have.  I've shot a

6  got of guns.  It's a beretta style which I've shot

7  but that particular Stoeger, I don't recall.

8       Q.    Were you able to finalize that purchase

9  all in one visit at Chuck's or did you have to go

10  out there more than once?

11      A.    I went out there more than once.

12      Q.    How many times did you go to Chuck's?

13      A.    I've been to Chuck's many times.

14      Q.    Let me ask it this way.

15            When you decided you wanted to buy the

16  nine millimeter that you ended up buying, did you

17  walk out with it that day or did you have to come

18  back?

19      A.    No.  I did not walk out with it that

20  day.

21      Q.    Why can you not walk out with it that

22  day?

23      A.    There is a law you can't walk out with

24  a gun the day you buy it.



ESQUIRE
an Alexander Gallo Company

Toll Free: 800.708.8087
Facsimile: 312.673.8138

Suite 1200
311 West Monroe Street
Chicago, IL 60606
www.esquiresolutions.com

Michael Hall                                    December 14, 2010

                                                              80

1    weapon at that point in time, a nine millimeter?

2        A.    The same reason I bought a new Ping

3    putter, I guess, sport, protection, both.

4        Q.    When did you first bring the nine

5    millimeter to your Chicago residence?

6        MR. PANUCCIO:   I'm going to instruct the

7    witness not to answer pursuant to the Fifth

8    Amendment privilege.

9    BY MR. WORSECK:

10       Q.    The long rifle, how did you acquire

11   that?

12       A.    I bought it.

13       Q.    Where?

14       A.    Chuck's Gun Shop.

15       Q.    Actually can we look back at document

16   116 in Exhibit 2?   What is this document?

17       A.    116?

18       Q.    Yes.

19       MR. PANUCCIO:   For the record, the witness

20   was looking at 16.

21       THE WITNESS:   I'm sorry.

22   BY THE WITNESS:

23       A.    What is this document?

24   BY MR. WORSECK:



ESQUIRE
an Alexander Gallo Company

Toll Free: 800.708.8087
Facsimile: 312.673.8138

Suite 1200
311 West Monroe Street
Chicago, IL 60606
www.esquiresolutions.com

82

1      Q.     That was the date that the money was
2  paid for the weapon?
3      A.     I have to assume so.
4      Q.     And you're saying that that was not the
5  date that the --
6      A.     I didn't say that.  I said I have to
7  assume it's the date if it was dated correctly it
8  would have been the date.
9      Q.     And that date is not the date that the
10 weapon left the store?
11     A.     Oh, no.
12     Q.     If you could look at the next page,
13 Page 117.
14     A.     Again, I don't recall a lot of these
15 dates so I don't want to be held to any of these
16 dates as being concrete, but go ahead.
17     Q.     Actually let's go back to 116.  Just
18 slightly below the middle of the page there is a
19 box for expiration date.
20     A.     Okay.  I see it.
21     Q.     August 1, 2010.
22     A.     Yes.
23     Q.     What is that date if you know?
24     A.     I have no idea.



ESQUIRE
an Alexander Gallo Company

Toll Free: 800.708.8087
Facsimile: 312.673.8138

Suite 1200
311 West Monroe Street
Chicago, IL 60606
www.esquiresolutions.com

94

1    walked in and threatened me or my family.

2        Q.     Any other examples?

3        A.     These are just all examples.  I'm

4    giving you one or two of many, many situations

5    that could occur.  I could go on and on.  I

6    suppose we could draw all kinds of conclusions on

7    what could happen, scenarios of what could happen

8    and has hand in my neighborhood.

9        Q.     Can you describe the layout of your

10   residential property?

11       A.     It's a corner house.  I've been there

12   for five years and the first two months I was

13   there my property was burglarized which forced me

14   to put up a fence around my property.  It's a

15   hundred foot by a hundred foot lot.  I have a

16   detached two-car garage.  I have a front porch and

17   I have a yard on two sides.

18       MR. WORSECK:  Can you mark this as Exhibit 4,

19   please.

20               (WHEREUPON, a certain document

21                was marked Hall Deposition

22                Exhibit No. 4, for

23                identification, as of 12/14/2010.)

24               (WHEREUPON, the document was



ESQUIRE
an Alexander Gallo Company

Toll Free: 800.708.8087
Facsimile: 312.673.8138

Suite 1200
311 West Monroe Street
Chicago, IL 60606
www.esquiresolutions.com

1    indicated your detached two-car garage is; is that

2    correct?

3         A.    Yes.

4         Q.    To the left of your house, is that the

5    driveway?

6         A.    The cement one, yes.

7         Q.    It looks like there might be --

8         A.    Asphalt next to it.

9         Q.    So immediately left of the house is a

10   cement driveway which is your driveway?

11        A.    Yes.

12        Q.    And then immediately left of that is an

13   asphalt driveway which is your neighbor's

14   driveway?

15        A.    Correct.

16        Q.    You mentioned a front porch.  Could you

17   draw an outline around the front porch?

18        A.    (Indicating).

19        Q.    For the record, you have drawn an

20   outlined around the right most portion of the

21   residence that sort of is the right most jutting

22   out piece of the residence; is that correct?

23        A.    Correct.

24        MR. PANUCCIO:  On the record, I've already



ESQUIRE
an Alexander Gallo Company

Toll Free: 800.708.8087
Facsimile: 312.673.8138

Suite 1200
311 West Monroe Street
Chicago, IL 60606
www.esquiresolutions.com

Michael Hall                                    December 14, 2010

                                                              99

1        A.     Main overhead door and aside door.  The
2    side door is basically inoperable, though.
3        Q.     It's broken?
4        A.     There's actually a freezer in front of
5    it.
6        Q.     What side of the garage is that side
7    door on?
8        A.     East.
9        Q.     So would be on the side of the garage
10   closest to South Bell Avenue?
11       A.     Correct.
12       MR. PANUCCIO:  For the record, this map
13   doesn't have a compass on it.
14       MR. WORSECK:  No.
15       MR. PANUCCIO:  Let the record reflect that
16   Mr. Hall has provided us with a drawing of the
17   compass.
18   BY MR. WORSECK:
19       Q.     And the top of the photo is north?
20       A.     Correct.
21       Q.     What is the garage used for, what
22   purposes?
23       A.     Bikes, tricycles, tools, motorcycle,
24   garden tools, regular work tools, a freezer, a



ESQUIRE
an Alexander Gallo Company

Toll Free: 800.708.8087
Facsimile: 312.673.8138

Suite 1200
311 West Monroe Street
Chicago, IL 60606
www.esquiresolutions.com

Michael Hall                                    December 14, 2010

100

1   work bench, and just a lot of kids toys.

2       Q.    Do you store your automobiles in the

3   garage?

4       A.    No.

5       Q.    Does anyone reside in the garage?

6       A.    I do on some occasions.

7       Q.    That would be the dog house, wouldn't

8   it?

9       A.    Nobody resides in the garage.

10      Q.    How often are you or a family member in

11  the garage?

12      A.    Daily.

13      Q.    For how long a period of time on

14  average would you say someone from your family is

15  in the garage?

16      A.    Total amount of time, half hour a day,

17  hour a day.  I'm in there more than anybody else.

18      Q.    The only functional door is the

19  overhead door, correct?

20      A.    Correct.  The side door can be

21  functional if I moved some stuff around.

22      Q.    Do both of those doors have locks?

23      A.    No.

24      Q.    Do either of them have locks?



ESQUIRE
an Alexander Gallo Company

Toll Free: 800.708.8087
Facsimile: 312.673.8138

Suite 1200
311 West Monroe Street
Chicago, IL 60606
www.esquiresolutions.com

Michael Hall                                    December 14, 2010

                                                                101

1        A.      Yes.  The side door does.  It has a
2    remote, but it's broken right now.
3        Q.      Is it routinely left open or closed?
4        A.      No, closed.
5        Q.      So right now you just manually need to
6    lift it up?
7        A.      Right now until I get it fixed, yes.
8        Q.      When you are in there for any length of
9    time working on your work bench or doing whatever
10   your doing in there, do you close the overhead
11   door behind you as a matter of routine practice?
12       A.      No.
13       Q.      So generally when your in the garage
14   doing something, you leave the garage open?
15       A.      It depends on what I'm doing.  If I'm
16   storing something in the rafters I close it, if I
17   am going in there for a tool, I leave it up
18   because I'm running around.
19       Q.      Can you describe the layout of your
20   front porch?
21       A.      Sure.  It's attached -- the front porch
22   is actually underneath the second floor is
23   actually a family room above the porch and below
24   it is a porch roughly eight feet, it's got windows



ESQUIRE
an Alexander Gallo Company

Toll Free: 800.708.8087
Facsimile: 312.673.8138

Suite 1200
311 West Monroe Street
Chicago, IL 60606
www.esquiresolutions.com

Michael Hall                                December 14, 2010

1    around it, 8 feet by 20 feet.

2          Q.     So it's a enclosed porch?

3          A.     Pretty much, yes.

4          Q.     Are those windows just screen windows

5    or are all-weather windows?

6          A.     It's a hundred-year-old house.  I would

7    hardly say all weather windows, but they are thin,

8    they are screened, mostly screened, and then you

9    could slide the old window down.

10         Q.     Is there a door that leads into the

11   front porch from the outside?

12         A.     Yes.

13         Q.     Is there a door that leads from the

14   front porch into the house?

15         A.     Yes.

16         Q.     Do both of those doors have locks?

17         A.     Yes.

18         Q.     What do you and your family members use

19   the front porch for?

20         A.     Storage.  No.  Sitting in the summer,

21   it's three season, reading.

22         Q.     Does anyone reside in the front porch

23   in the same way they would reside, for instance,

24   in a bedroom?



ESQUIRE
an Alexander Gallo Company

Toll Free: 800.708.8087
Facsimile: 312.673.8138

Suite 1200
311 West Monroe Street
Chicago, IL 60606
www.esquiresolutions.com

Michael Hall                                December 14, 2010

1        A.    No.

2        Q.    How often are you or a family member

3   using your front porch on average?

4        A.    Daily.

5        Q.    How close is your front porch to the

6   two sidewalks?

7        A.    Approximately 15 feet from the Bell

8   sidewalk because it actually turns.  You can't see

9   with the tree line, it curves in.  If you want I

10  can draw that, too.  It kind of goes like that

11  (indicating).

12       Q.    Okay.  Could you just initial that

13  line, please.

14       A.    (Indicating).

15  MR. PANUCCIO:  I was going to suggest maybe

16  we use a different color pen or something, but it

17  might be all right.

18  MR. WORSECK:  Yeah, I think that's fine.

19  BY MR. WORSECK:

20       Q.    Just for the record, you've drawn sort

21  of a curved line to the right of your house

22  starting from the north and curving down to the

23  southwest and terminating roughly directly below

24  the front porch?



ESQUIRE
an Alexander Gallo Company

Toll Free: 800.708.8087
Facsimile: 312.673.8138

Suite 1200
311 West Monroe Street
Chicago, IL 60606
www.esquiresolutions.com

Michael Hall                                    December 14, 2010

104

1      A.    Uh-huh.  I'm drawing pictures of the
2  sidewalk.
3      Q.    You've drawn some further lines to
4  further illustrate the sidewalk patterns around
5  your home front?
6      A.    Uh-huh, yes.
7      Q.    And, again, how far -- how close is
8  your front porch to the sidewalk to the east of
9  it?
10     A.    Approximately 15 feet.
11     Q.    And to the sidewalk to the south of it?
12     A.    I want to clarify something.  There's
13 also aside porch here, too.  I'm drawing a picture
14 of the side porch and it's about another 15 feet
15 from the side porch to the walk.
16     Q.    And for the record, you've drawn
17 another rectangle around the southernmost jut of
18 the house?
19     A.    Yes.
20     Q.    So the side porch is about 15 feet from
21 the south sidewalk?
22     A.    Correct.
23     Q.    How far from the south sidewalk is the
24 front porch?



ESQUIRE
an Alexander Gallo Company

Toll Free: 800.708.8087
Facsimile: 312.673.8138

Suite 1200
311 West Monroe Street
Chicago, IL 60606
www.esquiresolutions.com

Michael Hall                           December 14, 2010
                                                      105

1        A.     Approximately 20 feet from this corner
2    to here (indicating).
3        Q.     From the map is it fair to say that
4    your driveway is directly adjacent to your
5    neighbor's driveway, that neighbor being your
6    immediately westward neighbor?
7        A.     Correct.
8        Q.     And your driveway also is adjacent to
9    the street, 113th Street?
10       A.     Yes.
11       Q.     How close to your neighbor's property
12   line is your garage?
13       A.     I've got two neighbors, the north or --
14       Q.     Let's talk about the west neighbor
15   first?
16       A.     How close is my garage to his garage?
17       Q.     To his property?
18       A.     About a foot and a half.
19       Q.     How close is your garage to your
20   northern neighbor's property?
21       A.     About a foot, foot and a half.
22       Q.     What is to the east of your home on the
23   other side of South Bell Street?
24       A.     A baseball diamond.



ESQUIRE
an Alexander Gallo Company

Toll Free: 800.708.8087
Facsimile: 312.673.8138

Suite 1200
311 West Monroe Street
Chicago, IL 60606
www.esquiresolutions.com

1          Q.      Is that a freestanding diamond or is
2     that associated with a school?
3          A.      It's associated with a school.
4          Q.      What school is there?
5          A.      Morgan Park Academy.
6          Q.      Is that a high school or a primary
7     school?
8          A.      Both.
9          Q.      K through 12?
10         A.      Yes.
11         Q.      Do you have an alarm system for your
12    home?
13         A.      No.
14         Q.      For your garage?
15         A.      No.
16         Q.      You mention there is a fence around
17    your property?
18         A.      Correct.
19         Q.      What is it made of?
20         A.      PVC.
21         Q.      How high is it?
22         A.      Four feet.  It goes down from three and
23    a half to four and kind of switches around.
24         Q.      Does that entirely encompass your



ESQUIRE
an Alexander Gallo Company

Toll Free: 800.708.8087
Facsimile: 312.673.8138

Suite 1200
311 West Monroe Street
Chicago, IL 60606
www.esquiresolutions.com

Michael Hall                                    December 14, 2010

159

1   the gun to defend my family.  At that point, it

2   would be a little faster to get a broomstick.

3        Q.    Does anything in the ordinance prevent

4   you from carrying around on your person from room

5   to room a fully assembled and operable and loaded

6   firearm?

7        A.    Not that I am aware of.

8        Q.    Do you do that?

9        MR. PANUCCIO:  I'm going to object to the

10  extent -- the witness has testified he is not

11  aware of a requirement, but there might be such a

12  requirement and this question would then call for

13  an admission as to whether he's violating that

14  requirement, so I would invoke the Fifth

15  Amendment.

16       MR. WORSECK:  Are you instructing the witness

17  based on a guess that there might be a requirement

18  or based on --

19       MR. PANUCCIO:  I'll need time to review the

20  ordinance.

21       MR. WORSECK:  I will happy to let you make

22  the invocations, but not if we are speculating on

23  potential criminal liability under provisions that

24  don't even exist.



ESQUIRE
an Alexander Gallo Company

Toll Free: 800.708.8087
Facsimile: 312.673.8138

Suite 1200
311 West Monroe Street
Chicago, IL 60606
www.esquiresolutions.com

201

1    firearms on your person on the sidewalk, on the
2    street, at the park, in the shopping mall?
3        MR. PANUCCIO:  Objection.  Compound question.
4    BY MR. WORSECK:
5        Q.    Generally speaking, you're seeking the
6    right to carry firearms on your person when you go
7    out in public?
8        A.    I believe a person has a right.
9        Q.    And that's something you're seeking in
10   the case?
11       A.    Yes.
12       Q.    In you won your lawsuit and you were
13   able to do that, would you would you carry the
14   firearm.  Would you carry it concealed or would
15   you carry it in the open?
16       A.    Assuming I followed the law, I would
17   carry it concealed.
18       Q.    Why would you carry it concealed versus
19   in the open?
20       A.    Umm, I believe in privacy and not
21   everybody has to know that I have a weapon on me.
22   I don't want to look intimidating.
23       Q.    Are there any other factors that
24   influence that decision?



ESQUIRE
an Alexander Gallo Company

Toll Free: 800.708.8087
Facsimile: 312.673.8138

Suite 1200
311 West Monroe Street
Chicago, IL 60606
www.esquiresolutions.com

1  with another friend that happens to be a Chicago

2  police officer and he said with all the stuff you

3  have to go through you're better off spend the

4  money and go get one new because it's not worth

5  going through all that and I said you're probably

6  right and I took a pass.  So that in essence was a

7  burden.

8      Q.    My question was does the ban prevent

9  you from acquiring firearms for self defense

10 purposes?

11     A.    No.

12     Q.    You can go to the suburbs and buy

13 weapons for self defense purposes, right?

14     A.    Yes.

15     Q.    Go to Exhibit 1, the discovery

16 responses, turn to Page 24 which is interrogatory

17 6.  Actually that runs on for a few pages and take

18 your time to read it through but I'd like to jump

19 to the end when you're ready on Page 26 the last

20 paragraph which talks about you.  In the last

21 paragraph in the response to interrogatory No. 6

22 which is on Page 26, it lists various firearms

23 dealers and/or ranges that you have visited over

24 the past five years, are there any ranges or



ESQUIRE
an Alexander Gallo Company

Toll Free: 800.708.8087
Facsimile: 312.673.8138

Suite 1200
311 West Monroe Street
Chicago, IL 60606
www.esquiresolutions.com

Michael Hall                                    December 14, 2010

211

1    that trip?

2         A.    Yes, more than likely.

3         Q.    The other nine times that you've gone

4    to Chuck's in the past five years were to buy

5    something or other or to look at inventory?

6         A.    Yes.

7         Q.    Within that set of nine visits, you on

8    three occasions purchased weapons?

9         A.    Correct.

10        Q.    I am going?

11   MR. PANUCCIO:   I am going to object to the

12   recharacterizing the testimony the witness.   The

13   witness testified to approximate numbers rather

14   than definitely nine visits.

15   BY MR. WORSECK:

16        Q.    Sporting Arms & Supply which is the

17   next entity in your answer, how many times have

18   you visited that location in the past five years?

19        A.    Once.

20        Q.    And that was the occasion we've already

21   talked about in connection with getting your CFP

22   training?

23        A.    Yes.

24        Q.    Cabela's in Hammond, how many times



ESQUIRE
an Alexander Gallo Company

Toll Free: 800.708.8087
Facsimile: 312.673.8138

Suite 1200
311 West Monroe Street
Chicago, IL 60606
www.esquiresolutions.com

Michael Hall                                    December 14, 2010

212

1   over the past five years have you visited that

2   location?

3        A.    It's only been open about three years I

4   think.  I don't know.  Probably a good ten

5   roughly.

6        Q.    For what purposes did you visit that

7   location and I'm looking to distinguish between

8   using a shooting range if they have one, buying

9   weapons, or otherwise browsing merchandise or

10  buying accessories?

11       A.    Browsing, buying accessories.

12       Q.    Do they have a range at that site?

13       A.    They have a bow range.  I don't think

14  they have a gun rake.

15       Q.    Have you purchased any weapons from

16  Cabela's in Hammond?

17       A.    No.

18       Q.    But you have purchased other firearms

19  accessories, ammunition and other accessories?

20       A.    Uh-huh, accessories, correct.

21       Q.    The Cabela's in Hoffman Estates?

22       A.    Uh-huh.

23       Q.    How many times have you visited that

24  location over the past five years?



ESQUIRE
an Alexander Gallo Company

Toll Free: 800.708.8087
Facsimile: 312.673.8138

Suite 1200
311 West Monroe Street
Chicago, IL 60606
www.esquiresolutions.com

Michael Hall                                    December 14, 2010

213

1        A.    Twice maybe.

2        Q.    What was the purpose of those visits?

3        A.    Browsing.

4        Q.    Going back to the in ham Cabela's in

5   Hammond, Indiana, how do you get out there how?

6        A.    Drive.

7        Q.    The Cabela's in Hoffman Estates, how do

8   you get there?

9        A.    Drive.

10       Q.    The Bass Pro Shops in Gurnee, how many

11  times have you been there in the past five years?

12       A.    Twice maybe, once or twice.

13       Q.    And the purpose of those visits?

14       A.    Browse.

15       Q.    Did you purchase any firearms?

16       A.    No.

17       Q.    Did you purchase any ammunition?

18       A.    I don't recall, no.

19       Q.    I didn't ask that question as to the

20  Cabela's in off man estates so let me ask you

21  that.  The Cabela's in Hoffman Estates, have you

22  bought any firearms or ammunition?

23       A.    No firearms.  I might have bought

24  ammunition.



ESQUIRE
an Alexander Gallo Company

Toll Free: 800.708.8087
Facsimile: 312.673.8138

Suite 1200
311 West Monroe Street
Chicago, IL 60606
www.esquiresolutions.com

Michael Hall                                    December 14, 2010

214

1        Q.      The Dick's sporting goods, the response
2    here says that's in Highland, Illinois but is it
3    possible that's in Indiana?
4        A.      It's in Indiana.
5        Q.      How many times have you visited that
6    over the past five years?
7        A.      Once.
8        Q.      What was the purpose?
9        A.      Accessory.
10       Q.      Did you buy any firearms or ammunition?
11       A.      I bought a part to a shotgun.
12       Q.      The WalMarts in Illinois, how many of
13   those have you visited in the past five years?
14       A.      How many wall parts WalMarts in the
15   past five years.
16       Q.      For firearm related purchases?
17       A.      Ten to 20.
18       Q.      Ten to 20 visits or different
19   locations?
20       A.      Visits and different locations.  Mostly
21   for accessories.
22       Q.      Have you purchased any firearms or
23   ammunition from Illinois WalMarts?
24       A.      I might have.  Yeah, I think I have.



ESQUIRE
an Alexander Gallo Company

Toll Free: 800.708.8087
Facsimile: 312.673.8138

Suite 1200
311 West Monroe Street
Chicago, IL 60606
www.esquiresolutions.com

Michael Hall                                    December 14, 2010

215

1      Q.      Firearms?

2      A.      No, no firearms.  Just accessories.

3      Q.      Accessories?

4      A.      Yep.

5      Q.      The WalMarts in South Dakota, how many

6  visits have you made to those?

7      A.      South Dakota, it's really a guy and the

8  Cabela's that we go to every year.  Not so much

9  the WalMart.

10     Q.      So there is a Cabela's in South Dakota?

11     A.      It's the annual pilgrimage to the

12  Cabela's in Mitchell.

13     Q.      That an essentially large one or

14  attractive --

15     A.      It's a thing that our group has got

16  accustomed to doing.

17     Q.      Where in South Dakota is that?

18     A.      Mitchell.

19     Q.      You do that every year?

20     A.      Yes.

21     Q.      How do you get there?

22     A.      Drive.

23     Q.      I don't know if I asked this for the

24  Cabela's in Hammond and Hoffman Estates, how do



ESQUIRE
an Alexander Gallo Company

Toll Free: 800.708.8087
Facsimile: 312.673.8138

Suite 1200
311 West Monroe Street
Chicago, IL 60606
www.esquiresolutions.com

Michael Hall                                    December 14, 2010

216

1    you get out there?

2         A.    You did ask me this.  Drive.

3         Q.    And the Bass Pro Shops?

4         A.    Drive.

5         Q.    And Dick's Sporting Goods?

6         A.    Drive.

7         Q.    And the WalMarts?

8         A.    Drive.

9         Q.    So you've gone to the South Dakota

10   Cabela's annually over the past five years?

11        A.    Uh-huh.

12        Q.    And the Buffalo range that you

13   mentioned, do you know where that's located in

14   Illinois?

15        A.    I want to say Matoon?  Does that sound

16   right.

17        Q.    I know there is a Matoon.  I don't know

18   if that's where the range is?

19        A.    I believe that's where it's at.

20        Q.    How many times have you been there over

21   the past five years?

22        A.    Once.

23        Q.    And you drove there?

24        A.    Yes.



ESQUIRE
an Alexander Gallo Company

Toll Free: 800.708.8087
Facsimile: 312.673.8138

Suite 1200
311 West Monroe Street
Chicago, IL 60606
www.esquiresolutions.com

220

1    part and changed it out.

2                Is that considered maintenance?

3        Q.    I'm thinking more of your gun doesn't

4    work, something is clogged, something is broken,

5    you need to take it to a gunsmith?

6        A.    No.

7        Q.    Have you ever had to take a firearm to

8    a gunsmith for repairs?

9        A.    No.

10       Q.    Out of the locations we've just

11   discussed that are in Illinois, do you have a

12   favorite?

13       A.    Not really.

14       Q.    Is there any reason you may go to one

15   versus another Illinois location?

16       A.    Distance.

17       Q.    Anything else?

18       A.    Price.   That's about it.

19       Q.    We talked earlier about comfort level

20   with a dealer.

21               Is that still a factor?

22       A.    Uh-huh.  If I am buying a firearm,

23   yeah, not accessories.

24       Q.    Accessories it's less important to have



ESQUIRE
an Alexander Gallo Company

Toll Free: 800.708.8087
Facsimile: 312.673.8138

Suite 1200
311 West Monroe Street
Chicago, IL 60606
www.esquiresolutions.com

Michael Hall                                December 14, 2010

229

1    Chuck's doesn't give you any kind of document.
2    The only one I have is the one from the
3    certification.
4         Q.    Aside from how long does it take you to
5    drive to Chuck's?  When you go out there for
6    whatever purpose, how long does that usually take?
7         A.    About 25 minutes.
8         Q.    We have talked about how it took about
9    45 minutes to get to Sporting Arms & Supply for
10   the CFP training?
11        A.    Because of the trains yes that one
12   particular day.
13        Q.    That was just due to the train schedule
14   on that day?
15        A.    Yes.
16        Q.    The Cabela's in Hammond, Indiana, how
17   long does that take you to get to?
18        A.    Half hour.
19        Q.    Cabela's in Hoffman Estates?
20        A.    About an hour and a half.
21        Q.    The Bass Pro Shops in Gurnee?
22        A.    Hour and a half.
23        Q.    Dick's sporting goods in Highland,
24   Indiana?



# ESQUIRE
an Alexander Gallo Company

Toll Free: 800.708.8087
Facsimile: 312.673.8138

Suite 1200
311 West Monroe Street
Chicago, IL 60606
www.esquiresolutions.com

```
 1        A.     About 40 minutes.
 2        Q.     The WalMarts in Illinois that you go
 3   to?
 4        A.     Two hours.
 5        Q.     Is it just one WalMart location that
 6   you go to?
 7        A.     The one I'm thinking of it's out by
 8   LaSalle, Peru.
 9        Q.     We talked about the Buffalo range.
10   Aside from the amount of time it takes to get to
11   these locations and whatever you might have to pay
12   for gas, are there any other expenses or costs
13   associated with visiting these various
14   enterprises?
15        A.     The expense of the range.  You have to
16   pay a range fee.
17        Q.     I'm thinking more just in terms of
18   getting there?
19        A.     No.
20        Q.     Do you know whether there are any
21   shooting ranges or gun dealers that we haven't
22   talked about that you haven't visited that where
23   the same general radius from your home as these
24   locations that you have visited are?
```



ESQUIRE
an Alexander Gallo Company

Toll Free: 800.708.8087
Facsimile: 312.673.8138

Suite 1200
311 West Monroe Street
Chicago, IL 60606
www.esquiresolutions.com

Michael Hall                                    December 14, 2010

234

1        MR. WORSECK:  Could you read it back, please.
2                     (WHEREUPON, the record was
3                      read by the reporter.)
4   BY THE WITNESS:
5        A.    No.
6   BY MR. WORSECK:
7        Q.    Did any City official or agent ever
8   enforce of the provisions of the prior ordinance
9   against you?
10       A.    No.
11       Q.    Has the current gun ordinance
12  restricted or retrained you from exercising self
13  defense in response to a threat?
14       A.    No.
15       Q.    Did the prior gun ordinance ever
16  restrict or restrain you from exercising self
17  defense in response to a threat?
18       A.    Could I ask for clarification what you
19  mean by self defense?  And what's a threat.
20       Q.    Did it keep you from exercising self
21  defense as you thought it necessary to exercise in
22  the face of what you perceived as being a threat?
23       A.    I almost have to say yes.
24       Q.    Can you explain?



ESQUIRE
an Alexander Gallo Company

Toll Free: 800.708.8087
Facsimile: 312.673.8138

Suite 1200
311 West Monroe Street
Chicago, IL 60606
www.esquiresolutions.com

Michael Hall                                    December 14, 2010

261

1      STATE OF ILLINOIS   )

2                          )  SS:

3      COUNTY OF K A N E   )

4                I, THERESA A. VORKAPIC, a Notary Public

5      within and for the County of Kane, State of

6      Illinois, and a Certified Shorthand Reporter, CSR

7      No. 84-2589, of said state, do hereby certify:

8                That previous to the commencement of

9      the examination of the witness, the witness was

10     duly sworn to testify the whole truth concerning

11     the matters herein;

12               That the foregoing deposition

13     transcript was reported stenographically by me,

14     was thereafter reduced to typewriting under my

15     personal direction and constitutes a true record

16     of the testimony given and the proceedings had;

17               That the said deposition was taken

18     before me at the time and place specified;

19               That I am not a relative or employee or

20     attorney or counsel, nor a relative or employee of

21     such attorney or counsel for any of the parties

22     hereto, nor interested directly or indirectly in

23     the outcome of this action.

24               IN WITNESS WHEREOF, I do hereunto set



ESQUIRE
an Alexander Gallo Company

Toll Free: 800.708.8087
Facsimile: 312.673.8138

Suite 1200
311 West Monroe Street
Chicago, IL 60606
www.esquiresolutions.com

Michael Hall                                    December 14, 2010

262

1   my hand of office at Chicago, Illinois, this 15th

2   day of December, 2010.

3

4                        *Theresa A Vorkapic*

5                   Theresa A. Vorkapic

6                   Notary Public, Kane County,

7                   Illinois.

8                   My commission expires 10/17/11.

9

10

11  C.S.R. Certificate No. 84-2589.

12

13

14

15

16

17

18

19

20

21

22

23

24



ESQUIRE
an Alexander Gallo Company

Toll Free: 800.708.8087
Facsimile: 312.673.8138

Suite 1200
311 West Monroe Street
Chicago, IL 60606
www.esquiresolutions.com



# Exhibit 4

1

IN THE UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF ILLINOIS

EASTERN DIVISION

ILLINOIS ASSOCIATION OF      )

FIREARMS RETAILERS,  KENNETH )

PACHOLSKI, KATHRYN TYLER,   )

and MICHAEL HALL,          )

            Plaintiffs,   )

   -vs-              )  No. 10 CV 4184

THE CITY OF CHICAGO and    )

RICHARD M. DALEY, Mayor    )

of the City of Chicago,   )

           Defendants.   )

    The deposition of MICHAEL HALL, called for
examination, taken pursuant to the Federal Rules of
Civil Procedure of the United States District
Courts pertaining to the taking of depositions,
taken before GAIL LIVIGNI, CSR No. 84-1965, a
Notary Public within and for the County of Will,
State of Illinois, and a Certified Shorthand
Reporter of said state, at Suite 1230, 30 North
LaSalle Street, Chicago, Illinois, on the 27th day
of May, A.D. 2011, commencing at 9:00 o'clock a.m.



ESQUIRE
an Alexander Gallo Company

Toll Free: 800.708.8087
Facsimile: 312.673.8138

Suite 1200
311 West Monroe Street
Chicago, IL 60606
www.esquiresolutions.com

Michael Hall                                           May 27, 2011

                                                              2

 1    PRESENT:

 2         COOPER & KIRK, PLLC,

 3         (1523 New Hampshire Avenue, N.W.,

 4         Washington, D.C., 20036,

 5         (202) 220-9600), by:

 6    MR. DAVID H. THOMPSON,

 7              appeared on behalf of the Plaintiffs,

 8

 9         CORPORATION COUNSEL, CITY OF CHICAGO,

10         (30 North LaSalle Street, Suite 1640,

11         Chicago, Illinois 60602,

12         (312) 744-6079), by:

13    MR. ANDREW WORSECK,

14              appeared on behalf of the Defendants.

15

16

17

18

19

20

21

22

23    REPORTED BY:   GAIL LIVIGNI, CSR

24              CSR No. 84-1965.




ESQUIRE
an Alexander Gallo Company

Toll Free: 800.708.8087
Facsimile: 312.673.8138

Suite 1200
311 West Monroe Street
Chicago, IL 60606
www.esquiresolutions.com

9

1    except now the term isn't even tied to the statute,

2    it could be any legal definition, so I have the

3    same objections that it calls for a legal

4    conclusion.

5    BY MR. WORSECK:

6        Q.    And you can answer the question.

7        MR. THOMPSON:   You can answer the question if

8    you're comfortable giving a legal opinion.

9        MR. WORSECK:   No, I'm not asking for a legal

10   opinion.

11       MR. THOMPSON:   I think you are.

12   BY THE WITNESS:

13       A.    I believe this is a -- I'm not an expert

14   in locking devices for weapons.   I can tell you

15   that both guns were inoperable and both guns'

16   triggers cannot be fired with the locking devices

17   that I had on them.   I don't know what the

18   definition you referred to as trigger lock, I don't

19   even know if that's a term, but I can tell you both

20   weapons could not fire, the trigger cannot be

21   pulled with the devices I had on those weapons.

22       MR. THOMPSON:   And we're now -- we want to let

23   you set the stage as to what he owned.   Now we're

24   into -- we're beyond.   You know, we're very close



ESQUIRE
an Alexander Gallo Company

Toll Free: 800.708.8087
Facsimile: 312.673.8138

Suite 1200
311 West Monroe Street
Chicago, IL 60606
www.esquiresolutions.com

Michael Hall                                    May 27, 2011

13

1        Q.      It did not prohibit you from touching
2    the trigger?
3        A.      That's correct.
4        Q.      Subsequent to your December, 2010
5    deposition, you acquired additional locking
6    devices, correct?
7        A.      Correct.
8        Q.      How many devices?
9        A.      Two.
10       Q.      What devices?
11       A.      To the best of my recollection, one was
12   made by Master Lock.  It is a combination type
13   device that was brought to my attention by you in
14   our last deposition.
15           The other one is a lock that was made
16   either by or for Remington shotguns, and it
17   surrounds the -- I forget the model, RTL06, I think
18   it is -- I could be wrong, something like
19   that -- and it's just an additional locking device
20   for the shotgun.
21       MR. WORSECK:   Could you mark this as 1,
22   please?
23
24



ESQUIRE
an Alexander Gallo Company

Toll Free: 800.708.8087
Facsimile: 312.673.8138

Suite 1200
311 West Monroe Street
Chicago, IL 60606
www.esquiresolutions.com

Michael Hall                                    May 27, 2011

7

1    BY MR. WORSECK:

2         Q.    So, Mr. Hall, could you just state, as

3    of the date of your December, 2010 deposition, what

4    locking devices you had for the firearms that you

5    had?

6         A.    First of all, I'd like to correct you.

7    I'm not unclear on locking devices.  I was clear on

8    locking devices and I'm clear on what I had before

9    I obtained new ones.

10         The locking device on the 9-millimter,

11    as was before in December and still until I had to

12    swap them out, was the cable device that goes into

13    a lock provided by Stroger, the manufacturer of the

14    gun, that renders the weapon inoperable.  The

15    9-millimeter was locked with the manufacturer's

16    supplied cable lock.

17         And my terminology is very -- I'm using

18    the term cable lock, but it's a locking device that

19    renders the weapon inoperable.  The 12-gauge is a

20    Ruger manufactured for weapons locking device, it's

21    a padlock that went between the firing chamber and

22    where the barrel would normally be set on a shotgun

23    to render the weapon inoperable.

24         Q.    Okay.  And based on your understanding



ESQUIRE
an Alexander Gallo Company

Toll Free: 800.708.8087
Facsimile: 312.673.8138

Suite 1200
311 West Monroe Street
Chicago, IL 60606
www.esquiresolutions.com

1       A.      That's correct.  When you say Remington,

2   you mean the Regal model RTL06?

3       Q.      Right.

4       A.      Yes.

5       Q.      I'm calling it the Remington lock

6   because that's what you called it.

7       A.      That's fair.

8       Q.      Why don't we call it going forward the

9   Regal lock.

10      A.      Okay.

11      Q.      When did you acquire the Master Lock

12  lock?

13      A.      I don't recall the exact date, but based

14  on this document that I provided, it's

15  February 13th, 2011.

16      Q.      And when did you acquire the Regal lock?

17      A.      According to this document here, it's

18  February 14th.  I believe it to be accurate.

19      Q.      Those are the dates that you acquired

20  the locks?

21      A.      When you say acquired, you mean I had in

22  hand?

23      Q.      Let me ask it this way.  Those are the

24  dates that you purchased the locks?



ESQUIRE
an Alexander Gallo Company

Toll Free: 800.708.8087
Facsimile: 312.673.8138

Suite 1200
311 West Monroe Street
Chicago, IL 60606
www.esquiresolutions.com

Michael Hall                                    May 27, 2011

17

1       A.      Correct.

2       Q.      How long did it take you to receive the

3  locks?

4       A.      I don't recall.  It was very quick, a

5  couple days.  That's the best of my recollection.

6       Q.      The usual number of days it takes to

7  have something shipped?

8       A.      Sure.

9       Q.      When did you start looking into getting

10 these locks?

11      A.      Well, I have to be honest with you, the

12 locks I had on there previous were manufacturer

13 supplied locks, and I felt them sufficient, and it

14 was you that brought it to my attention at the last

15 deposition, you mentioned the term combination

16 tumbler, and I said I had heard of them; and after

17 our deposition, I did some digging, and I found

18 one, and I was interested in it, and I saw it was

19 relatively inexpensive, and I bought it.

20      Q.      And what was the reason you started

21 looking at the Regal lock?

22      A.      Well, you know, I was on the mindset of

23 locks.  The lock I had on the shotgun was a

24 metallic lock and it was sitting on a metallic



ESQUIRE
an Alexander Gallo Company

Toll Free: 800.708.8087
Facsimile: 312.673.8138

Suite 1200
311 West Monroe Street
Chicago, IL 60606
www.esquiresolutions.com

Michael Hall                                    May 27, 2011

1    barrel insert.  Typically, you know, if you like to

2    take care of yourself, you don't like metal on

3    metal, and I thought it would be interesting to

4    take a look at what this other lock would do.

5    Curiosity I think more than anything just trying to

6    find something that would not be so much metal on

7    metal as the other lock was.

8         Q.    The Regal lock -- let me ask it this

9    way.  How does the Regal lock lock?  Is it via a

10   combination or a key?

11        A.    It is a key lock.

12        Q.    When did you start looking into these

13   locks specifically?  I understand you're saying

14   that some of the issues that came up in your first

15   deposition might have sparked your interest, but

16   when specifically following that deposition did you

17   start to look into these locks?

18        A.    I can't recall, Drew.  Probably the day

19   I bought them is my best guess.  You know, I did

20   visit Cabella's about a week prior to purchasing it

21   in Indiana, and I asked the clerk about them, they

22   did not have them in stock.  That sparked my

23   interest.  A couple days later I went online, I

24   found these ones I purchased, this first one, this



ESQUIRE
an Alexander Gallo Company

Toll Free: 800.708.8087
Facsimile: 312.673.8138

Suite 1200
311 West Monroe Street
Chicago, IL 60606
www.esquiresolutions.com

26

1   lock back on the handgun, what reasons would

2   motivate that decision?

3        MR. THOMPSON:  Objection, calls for

4   speculation.  You may answer.

5   BY THE WITNESS:

6        A.     You know, when you purchase things and

7   you got accessories, such as a new car, and you

8   have accessories with it, you'd like to think that

9   the accessories stay with the car.  If you misplace

10  one of the accessories, you feel like it may not be

11  complete.

12        I just like to make sure that, within

13  that case, I had the complete set of parts for that

14  particular handgun.  That would be the only reason,

15  I would want to make sure it's there with it.

16  Whether it's locked or not I think is immaterial

17  because it was already locked.

18        Q.     Then let's talk about the shotgun.  As

19  of December, 2010, you had a Ruger manufactured

20  padlock on that weapon?

21        A.     Correct.

22        Q.     After your deposition, you go out, you

23  get the Regal lock for that weapon, you take off

24  the Ruger lock, you apply the Regal lock.  At some



ESQUIRE
an Alexander Gallo Company

Toll Free: 800.708.8087
Facsimile: 312.673.8138

Suite 1200
311 West Monroe Street
Chicago, IL 60606
www.esquiresolutions.com

Michael Hall                                      May 27, 2011

27

1    point after that, you decide that you want to

2    reapply the Ruger lock but you can't find the key

3    for that one either, and so you don't reapply the

4    Ruger lock, is that a fair summary?

5        A.    I was not intending to reapply the Ruger

6    lock.  My intent is not to replace the Ruger lock.

7    I didn't care for the locking effect, it was metal

8    on metal.  I didn't care for that locking effect

9    that the gun had to be completely broken down in

10   order to apply that lock.

11       Q.    So can you describe for me the

12   differences between the old Ruger lock and the new

13   Regal lock with respect to how much they require

14   the gun to be broken down?

15       A.    The new lock does not require the gun to

16   be broken down.  Now, this is -- I want to answer

17   this question with respect and knowledge that

18   everybody here knows that the shotgun is broken

19   down, it remains broken down.

20             With the new lock, the shotgun does not

21   have to be broken down.  It could be applied with

22   the gun assembled and calibrated; whereas the old

23   one, it would have to be -- you have to take the

24   lock off, assemble it and calibrate, and possibly



ESQUIRE
an Alexander Gallo Company

Toll Free: 800.708.8087
Facsimile: 312.673.8138

Suite 1200
311 West Monroe Street
Chicago, IL 60606
www.esquiresolutions.com

Michael Hall                                    May 27, 2011

28

1    even incite the shotgun because of the way it

2    was -- you know, you broke it down, put it back

3    together.  With, again, the new lock, it could be

4    put away for the season with the lock on there and

5    ready to go and calibrated for the next time you

6    use it.

7        Q.    So the new Regal lock -- let me ask you

8    this question.  Can you describe how the Regal lock

9    affixes to the weapon?

10       A.    It encompasses the trigger guard, and

11   it's a key lock.

12       Q.    Is it fair to describe it as sort of a

13   clam shell device?

14       A.    I suppose you could call it that.  I'm

15   not familiar with the term in regards to guards,

16   but, yes, I think I know what you're saying where

17   the two halves come together, sure.

18       Q.    If we can just look at page 126 of

19   Exhibit 1, is it fair to say that the lock is

20   comprised of basically two pieces, each of which,

21   you know, roughly is shaped to the dimensions of

22   the trigger part of the gun.  One piece affixes to

23   one side of the trigger, the other piece affixes to

24   the other side, they lock together, they prevent



ESQUIRE
an Alexander Gallo Company

Toll Free: 800.708.8087
Facsimile: 312.673.8138

Suite 1200
311 West Monroe Street
Chicago, IL 60606
www.esquiresolutions.com

29

1  anyone from handling the trigger with their
2  fingers?
3       A.    That's an incorrect statement in that
4  the term trigger is not in part of the -- it
5  doesn't encompass -- it encompasses the trigger,
6  but it's the trigger guard that it attaches to.
7       Q.    So it attaches to the trigger guard?
8       A.    Guard, it surrounds the trigger guard.
9       Q.    The shape of the two pieces is roughly
10 the same as the trigger guard?
11      A.    No, it's elongated past on both sides.
12      Q.    Okay.  But basically when they are
13 affixed, they enclose the trigger guard and the
14 trigger?
15      A.    Correct.
16      Q.    So that one's fingers or hand cannot
17 handle the trigger?
18      A.    That's correct.
19      Q.    And they otherwise do not require any
20 breaking down or other alterations to the weapon?
21      A.    I believe that is correct, to the best
22 of my knowledge.
23      Q.    Now, if I understood you correctly, you
24 said that even though you have the Regal lock on



ESQUIRE
an Alexander Gallo Company

Toll Free: 800.708.8087
Facsimile: 312.673.8138

Suite 1200
311 West Monroe Street
Chicago, IL 60606
www.esquiresolutions.com

Michael Hall                                    May 27, 2011

1    was staying in compliance, I would keep it

2    assembled for the sake that it would be ready to go

3    for the next time I would need to use it.

4        Q.    So your understanding of the Ordinance

5    is the only reason why you break down your shotgun

6    aside from breaking it down momentarily to clean

7    it?

8        A.    That's correct.  I would think so.  I

9    never gave it too much thought, but, yes, that's a

10   fair statement.

11       Q.    And I don't think we covered this, but

12   could you describe for me how the Master Lock

13   works, what it does, what it locks on the handgun?

14       A.    It's a combination tumbler as you

15   described it in the last deposition.  It has

16   three -- very similar to what we're all familiar

17   with -- I don't think what you call it, little

18   spiral combinations on there, you enter three

19   digits which are preset to what you want, and once

20   you enter the correct combination, you left the

21   latch which then takes the two halves and pulls

22   them apart.

23       Q.    And the Master Lock works in basically

24   the same way as the Regal lock in that it's two



ESQUIRE
an Alexander Gallo Company

Toll Free: 800.708.8087
Facsimile: 312.673.8138

Suite 1200
311 West Monroe Street
Chicago, IL 60606
www.esquiresolutions.com

Michael Hall                                    May 27, 2011

32

1   pieces that are roughly shaped to the same
2   dimensions as the trigger guard, and one piece is
3   affixed to one side of the guard, the other piece
4   is affixed to the other, they come together, they
5   lock, and they prevent a person's hand or fingers
6   from handling the trigger?
7       A.   Yes.   It's a universal device.   It's,
8   actually, a rough fit.   It has little rubber
9   fingers that conform with the gun it's applied to
10  because it is universal.   So I wouldn't say it's a
11  fit, as you say, but it can conform to the trigger
12  guard, to around the trigger guard, yes.
13      Q.   Now, do you keep your handgun broken
14  down?
15      A.   No.
16      Q.   Why don't you keep the handgun broken
17  down?
18      A.   For safety of my family and myself.
19      Q.   What do you mean by that?
20      A.   I like to keep it assembled for safety
21  purposes.
22      Q.   Why do you keep a trigger lock on it?
23      A.   To stay in compliance with the City
24  Ordinance.



ESQUIRE
an Alexander Gallo Company

Toll Free: 800.708.8087
Facsimile: 312.673.8138

Suite 1200
311 West Monroe Street
Chicago, IL 60606
www.esquiresolutions.com

Michael Hall                                        May 27, 2011

                                                              34

1    BY THE WITNESS:

2        A.    I believe that it's to make sure -- I

3    may be overkill, but to keep myself from being in

4    any kind of legal trouble with the City, when it's

5    not on my person, I will keep a lock on it.

6    BY MR. WORSECK:

7        Q.    And I don't want to rehash old grounds,

8    but since you brought it up, I just want to clarify

9    for purposes of today's record that you still have

10   minors living with you in your home?

11       A.    Yes.

12       Q.    And is that one minor?

13       A.    Correct -- well, excuse me, could you

14   define minor?

15       MR. THOMPSON:  Just say the age of your

16   children who are living at home.

17   BY THE WITNESS:

18       A.    I have two children at home, one is 19

19   and one is 15.

20   BY MR. WORSECK:

21       Q.    15 was the second?

22       A.    Yes.

23       Q.    Based on your understanding of the

24   Ordinance, if it did not require you to have a



ESQUIRE
an Alexander Gallo Company

Toll Free: 800.708.8087
Facsimile: 312.673.8138

Suite 1200
311 West Monroe Street
Chicago, IL 60606
www.esquiresolutions.com

36

1   because I can't find a definition for the term

2   trigger lock.

3        MR. THOMPSON:   Can we agree that, for purposes

4   of this transcript, that trigger lock -- we'll try

5   not to use that term, but if we do, we mean or

6   similar locking mechanism?

7        MR. WORSECK:   Well, we've been talking about

8   two devices that, based on the witness's testimony,

9   work by denying access to the trigger and they

10  lock.

11       MR. THOMPSON:   The problem is the Ordinance

12  says trigger lock and references a key.   Obviously,

13  the combination isn't a key device, and so

14  that's -- the Ordinance is, you know, injecting

15  some potential confusion here.

16       MR. WORSECK:   Let me just ask a few questions

17  then to go back over this.

18  BY MR. WORSECK:

19       Q.     It's your understanding of the Ordinance

20  that you need to have something like the Master

21  Lock combination lock on your handgun?

22       A.     It's my understanding of the Ordinance

23  that the locks that we place on our weapons have to

24  render the weapon inoperable, and I feel I was in



ESQUIRE
an Alexander Gallo Company

Toll Free: 800.708.8087
Facsimile: 312.673.8138

Suite 1200
311 West Monroe Street
Chicago, IL 60606
www.esquiresolutions.com

                                                              37

1  compliance.

2      Q.     Okay.   That's why you have the Master

3  Lock combination lock on your handgun and that's

4  why you have the Regal key lock on your shotgun?

5      A.     And I'd like to take it one step

6  further --

7      Q.     Can you just answer that question then?

8      A.     Yes.

9      MR. THOMPSON:   Yes, just answer the questions.

10  BY MR. WORSECK:

11     Q.     Okay.   I think we're fine then.   I'd

12  like to direct your attention to page 125 of

13  Exhibit 1, and is it fair to say that this is one

14  of the pages in the Master Lock documentation that

15  came along with the Master Lock lock?

16     A.     Yes.

17     Q.     And if I can direct you to the heading

18  that says "Firearm Safety Tips" about right in the

19  middle of the page, do you see that?

20     A.     Yes.

21     Q.     If you look at safety tip No. 3 which

22  reads, "store firearms unloaded under lock and

23  key," do you see that?

24     A.     Yes.



ESQUIRE
an Alexander Gallo Company

Toll Free: 800.708.8087
Facsimile: 312.673.8138

Suite 1200
311 West Monroe Street
Chicago, IL 60606
www.esquiresolutions.com

Michael Hall                                    May 27, 2011

47

1    BY THE WITNESS:

2        A.    I don't have much experience.  You're

3    asking for an expert opinion, and I don't have that

4    much expertise in unlocking and locking devices

5    that render a weapon inoperable.

6    BY MR. WORSECK:

7        Q.    You have a key lock on your shotgun,

8    correct?

9        A.    Yes.

10       Q.    How long does it take you to unlock the

11   key lock on your shotgun?

12       A.    The reason I'm smiling here is because

13   I've never -- I put it on and I've never unlocked

14   it.  Since I put it on, it's been on there.

15       Q.    You've never once tried to unlock the

16   key lock on your shotgun?

17       A.    No.  To the best of my recollection, I

18   do not recall unlocking it.

19       Q.    So you have no idea how long it takes

20   you?

21       A.    I don't even know if it works.

22       Q.    You have no idea how long it takes you?

23       A.    I don't.  Assuming I find the key.

24       Q.    So you have lost the key --



ESQUIRE
an Alexander Gallo Company

Toll Free: 800.708.8087
Facsimile: 312.673.8138

Suite 1200
311 West Monroe Street
Chicago, IL 60606
www.esquiresolutions.com

1      A.    No, I haven't lost the key to the Regal.

2      Q.    Just so the record is clear, you lost

3  the key to your old shotgun lock, but you now have

4  the Regal lock on the trigger, it works by use of a

5  key, you have that key, you just have never

6  unlocked that lock with the key?

7      A.    To the best of my recollection, I don't

8  recall unlocking it.  I put it on there, it's snug,

9  I put it away.  I don't recall unlocking it or

10 playing with that one at all.

11     Q.    Have you ever unlocked the Master Lock

12 combination lock on your handgun?

13     A.    Yes.

14     Q.    How many times?

15     A.    Three or four.

16     Q.    For what purposes?

17     A.    To make sure it functioned and curiosity

18 pretty much to see how it worked.

19     Q.    How long did it take you to unlock the

20 Master Lock combination lock in those instances?

21     A.    From taking it out of the case?

22     Q.    No, just from you have the gun in your

23 hand, you are now going to start moving the wheels

24 into proper alignment.



ESQUIRE
an Alexander Gallo Company

Toll Free: 800.708.8087
Facsimile: 312.673.8138

Suite 1200
311 West Monroe Street
Chicago, IL 60606
www.esquiresolutions.com

Michael Hall                                              May 27, 2011

                                                                    50

1    threats and it was a leisurely Sunday afternoon, I

2    could probably pin down some kind of time frame,

3    but it's still vague.

4         Q.    I'm not asking you to speculate about

5    hypotheticals.  I'm asking you did you do anything

6    to try to find out whether there were other locking

7    devices you could use on your handgun that took

8    less than 40 to 50 seconds to unlock?

9         A.    I never went to research any kind of

10   lock based on how long it would take me and if I

11   could be faster than the combination lock that I

12   recently purchased.

13        Q.    Why not?

14        A.    Why not?  Why didn't I research it?  I

15   never thought too much about it.  You know, after

16   you and I talked about the combination tumbler, I

17   decided that may be quicker.  I didn't know.  I had

18   no experience with it.  I tried it.  There is pros

19   and cons of having it, and I let it be at that.

20        Q.    Do you think the amount of time it takes

21   to unlock a locking device on a gun is an important

22   consideration for a homeowner who wants to use that

23   weapon for self-defense?

24        MR. THOMPSON:  Objection.  Now we're beyond



ESQUIRE
an Alexander Gallo Company

Toll Free: 800.708.8087
Facsimile: 312.673.8138

Suite 1200
311 West Monroe Street
Chicago, IL 60606
www.esquiresolutions.com

52

1  case where you needed to use the weapon for

2  self-defense in your home?

3         A.    That was under consideration, yes.

4         Q.    Prior to buying the Master Lock, did you

5  find out how long it would take to unlock that

6  lock?

7         A.    I did not.

8         Q.    Nor did you look at other locking

9  devices to see if they took less time to unlock?

10        A.    Well, I was already somewhat familiar

11 with a key locking device which was on there, and I

12 knew that there was some benefits as well as some

13 downsides to having that, so I opted to try the

14 other scenario, and I've since found that there is

15 some disadvantages to that as well which I did not

16 know prior to having it.

17        Q.    So, again, I'm trying to understand why

18 you -- the factors that went into your decision to

19 buy the Master Lock for your handgun, and you've

20 said that you think it's important to be able to

21 use a gun quickly for self-defense when you need

22 it.

23        A.    Uh-huh.

24        Q.    Nonetheless, you did not -- prior to



ESQUIRE
an Alexander Gallo Company

Toll Free: 800.708.8087
Facsimile: 312.673.8138

Suite 1200
311 West Monroe Street
Chicago, IL 60606
www.esquiresolutions.com

Michael Hall                                    May 27, 2011

1    the way or found any approximately how long it

2    takes an average human being to unlock this lock on

3    any particular model, make of weapon.

4         Q.     And my question is when did you make

5    that inquiry?  You said you haven't found anything.

6    When did you start looking for stuff?

7         A.     Well, to the best of my recollection,

8    Drew, it was the day I bought it or possibly even

9    the day before, prior to purchasing it, I looked to

10   see how it operated.

11              Now, I doubt very seriously, but I could

12   be wrong, that Master Lock is going to have a list

13   of all the gun manufacturers and models made in the

14   world and have kind of a chart that says

15   approximately how long it will take to remove this

16   particular model lock off the particular model and

17   make of weapon that the homeowner might decide to

18   have.

19        Q.     And following your acquisition of the

20   Master Lock handgun lock and your use of it and

21   your unlocking of it a few times, as you mentioned,

22   and your finding out how long it takes you to

23   unlock it, you have not tried to see if there are

24   any other locks you could use on your handgun that



ESQUIRE
an Alexander Gallo Company

Toll Free: 800.708.8087
Facsimile: 312.673.8138

Suite 1200
311 West Monroe Street
Chicago, IL 60606
www.esquiresolutions.com

Michael Hall                                    May 27, 2011

56

1    would take less time than the Master Lock takes to

2    unlock?

3         A.    I don't recall seeing any other kind of

4    tumbler lock.

5         Q.    I'm not talking about tumbler locks

6    exclusively.  I am talking about any locking

7    device; key lock, tumbler lock, cable lock,

8    something else.

9         A.    As I said in previous testimony, there

10   are advantages and disadvantages that I found

11   having both.

12        Q.    Sir, I appreciate your answers, but one

13   of the reasons why we're having this record is

14   because you're not answering the questions I'm

15   asking, so I have to ask them again.  So I'd ask

16   that you answer the question that I asked.

17        A.    Could you repeat it?

18   MR. WORSECK:   Could you read it back, please?

19              (WHEREUPON, the record was read

20               as requested.)

21   BY MR. WORSECK:

22        Q.    But it's a yes or no question.

23        A.    And I believe I answered it.  The answer

24   would be no.



ESQUIRE
an Alexander Gallo Company

Toll Free: 800.708.8087
Facsimile: 312.673.8138

Suite 1200
311 West Monroe Street
Chicago, IL 60606
www.esquiresolutions.com

Michael Hall                                    May 27, 2011

66

1   case?

2        A.     Correct.

3        Q.     You would still need to remove the gun

4   from the case?

5        A.     Correct.

6        Q.     You would still need to notice that the

7   slide was open?

8        A.     Correct.

9        Q.     You would still notice that there were

10  no rounds in the weapon unless you had kept it

11  loaded?

12       A.     Correct.  Thank you for clarifying that,

13  yes.

14       Q.     So the only steps of this list of steps

15  that we've been talking about that you would need

16  to take in a self-defense context, by virtue of a

17  locking device being on the weapon, would be

18  recalling the combination, turning the weapon to

19  the side of the lock where the combination wheels

20  are facing you, spinning the wheels to the proper

21  combination setting, swinging the latch on the

22  locking device, and pulling the pieces of the

23  device apart?

24       A.     Yes.



ESQUIRE
an Alexander Gallo Company

Toll Free: 800.708.8087
Facsimile: 312.673.8138

Suite 1200
311 West Monroe Street
Chicago, IL 60606
www.esquiresolutions.com

Michael Hall                                          May 27, 2011

67

1       Q.      And it's your testimony that those five

2    steps take between 40 and 50 seconds?

3       A.      I'm speculating that it would take 40 to

4    50 seconds knowing myself, you know, and how

5    I -- knowing how I would probably do it, I have not

6    timed myself or practiced this, that's

7    approximately correct.

8       Q.      Is it fair to say that, until you find

9    the key for your Regal shotgun lock, that you

10   cannot use that shotgun?

11      A.      I have a key to the Regal shotgun.  It's

12   the old locks I don't have the keys for.

13      Q.      Oh, you're correct.  So then let me ask

14   this.  What steps do you need to take as to your

15   shotgun in a lab setting in order to unlock the

16   locking device?

17      A.      Could I ask you to be more specific in

18   terms of is it broken down or assembled because,

19   like I said in earlier testimony, there are

20   times -- currently it's broken down, but with the

21   new lock, it can be assembled with the lock on

22   there.

23      Q.      Well, since it's broken down, why don't

24   we walk through the way you actually keep it right



ESQUIRE
an Alexander Gallo Company

Toll Free: 800.708.8087
Facsimile: 312.673.8138

Suite 1200
311 West Monroe Street
Chicago, IL 60606
www.esquiresolutions.com

Michael Hall                                        May 27, 2011

78

1   STATE OF ILLINOIS    )
2                        )  SS:
3   COUNTY OF W I L L    )
4            I, GAIL LIVIGNI, CSR No. 84-1965, a
5   Notary Public within and for the County of Will,
6   State of Illinois, and a Certified Shorthand
7   Reporter of said state, do hereby certify:
8            That previous to the commencement of the
9   examination of the witness, the witness was duly
10  sworn to testify the whole truth concerning the
11  matters herein;
12           That the foregoing deposition transcript
13  was reported stenographically by me, was thereafter
14  reduced to typewriting under my personal direction
15  and constitutes a true record of the testimony
16  given and the proceedings had;
17           That the said deposition was taken
18  before me at the time and place specified;
19           That I am not a relative or employee or
20  attorney or counsel, nor a relative or employee of
21  such attorney or counsel for any of the parties
22  hereto, nor interested directly or indirectly in
23  the outcome of this action.
24           IN WITNESS WHEREOF, I do hereunto set my



ESQUIRE
an Alexander Gallo Company

Toll Free: 800.708.8087
Facsimile: 312.673.8138

Suite 1200
311 West Monroe Street
Chicago, IL 60606
www.esquiresolutions.com

Michael Hall                                    May 27, 2011

79

1   hand of office at Chicago, Illinois, this 8th day

2   of June, 2011.

3

4

5

6

7              Notary Public, Will County, Illinois.

8              My commission expires 9/17/2011

9

10  GAIL LIVIGNI, CSR No. 84-1965

11

12

13

14

15

16

17

18

19

20

21

22

23

24


ESQUIRE
an Alexander Gallo Company

Toll Free: 800.708.8087
Facsimile: 312.673.8138

Suite 1200
311 West Monroe Street
Chicago, IL 60606
www.esquiresolutions.com

# Exhibit 5

WHITNEY O'DANIEL                                    March 22, 2011

1

IN THE UNITED STATES DISTRICT COURT

FOR THE NORTHERN DISTRICT OF ILLINOIS

EASTERN DIVISION


ILLINOIS ASSOCIATION OF FIREARMS)

RETAILERS, KENNETH PACHOLSKI,    )

KATHRYN TYLER, and MICHAEL HALL,)

      Plaintiffs,              )

      vs.                      ) Case No. 10 CV 4184

THE CITY OF CHICAGO and          )Judge Edmond E. Chang

RICHARD M. DALEY, Mayor of the  )Mag. Judge Geraldine

City of Chicago,                 )   Soat Brown

      Defendants.              )


      The 30(b)(6) deposition of ILAFR by

WHITNEY O'DANIEL, called for examination, taken pursuant

to the Federal Rules of Civil Procedure of the United

States District Courts pertaining to the taking of

depositions, taken before LAURA KIENLEN, CSR No.

84-4153, a Notary Public within and for the County of

Cook, State of Illinois, and a Certified Shorthand

Reporter of said state, at Suite 1240, 30 North LaSalle

Street, Chicago, Illinois, on the 22nd day of March,

A.D. 2011, at 9:30 a.m.



# ESQUIRE
an Alexander Gallo Company

Toll Free: 800.708.8087
Facsimile: 312.673.8138

Suite 1200
311 West Monroe Street
Chicago, IL 60606
www.esquiresolutions.com

1      A.    Oh, sorry.

2      Q.    And when did you leave SIU?

3      A.    1996.

4      Q.    Have you ever operated as a firearms' dealer

5 or a retailer?

6      A.    No, never.

7      Q.    Do you have any experience in the retail side

8 of the firearms' business?

9      A.    No.

10     Q.    You never worked in a gun store or anything

11 like that?

12     A.    No.

13     Q.    Could you describe for me in your own words

14 what the ILAFR is?

15     A.    Yeah.   The Illinois Association of Firearms

16 Retailers is an organization designed and structured to

17 represent fire -- all the firearm retailers in the state

18 of Illinois, to allow them to have representation as

19 necessary so that their markets for retail sales can go

20 forward without too much hassle, basically.   You know,

21 obviously represent them in Springfield in a lobby

22 scenario, and make sure that the markets continue to be

23 open for them, and where there needs to be new --

24 pursue -- there are obstacles to existing markets



ESQUIRE
an Alexander Gallo Company

Toll Free: 800.708.8087
Facsimile: 312.673.8138

Suite 1200
311 West Monroe Street
Chicago, IL 60606
www.esquiresolutions.com

WHITNEY O'DANIEL

March 22, 2011

60

1    otherwise opposed anything that ILAFR has wanted to do

2    in Illinois?

3         A.    No.

4         Q.    And how would you describe the National

5    Shooting Sports Foundation?  What does it do?  Why does

6    it exist?

7         A.    The National Shooting Sports Foundation is

8    represented -- represents the firearm industry as a

9    whole.  They put on what's called a shot show, shooting,

10   hunting, outdoor trade.  I think it was here in Chicago

11   at one time back in the '70s or something.  And it's an

12   annual meeting or a convention that brings all the

13   firearm retailers and outdoor retailers and

14   manufacturers together, and they have booths and

15   displays and products and that kind of thing.  So that's

16   what they do.

17        Q.    Does the ILAFR -- strike that.

18              Has the ILAFR ever dealt with the NRA in

19   connection with activities that the ILAFR has undertaken

20   or has wanted to undertake in Illinois?

21        A.    No, absolutely not.

22        Q.    Has the NRA ever objected to or otherwise

23   expressed its opposition or displeasure with any

24   activity or initiative that the ILAFR has undertaken or



ESQUIRE

an Alexander Gallo Company

Toll Free: 800.708.8087
Facsimile: 312.673.8138

Suite 1200
311 West Monroe Street
Chicago, IL 60606
www.esquiresolutions.com

WHITNEY O'DANIEL                                      March 22, 2011

                                                              156

1    STATE OF ILLINOIS   )

2                        ) SS:

3    COUNTY OF C O O K   )

4              I, LAURA KIENLEN, a Notary Public within

5    and for the County of Cook, State of Illinois, and a

6    Certified Shorthand Reporter of said state, do hereby

7    certify:

8              That previous to the commencement of the

9    examination of the witness, the witness was duly sworn

10   to testify to the whole truth concerning the matters

11   herein;

12             That the foregoing deposition transcript was

13   reported stenographically by me, was thereafter reduced

14   to typewriting under my personal direction and

15   constitutes a true record of the testimony given and the

16   proceedings had;

17             That the said deposition was taken before

18   me at the time and place specified;

19             That I am not a relative or employee or

20   attorney or counsel, nor a relative or employee of such

21   attorney or counsel for any of the parties hereto, nor

22   interested directly or indirectly in the outcome of this

23   action.

24             IN WITNESS WHEREOF, I do hereunto set my



ESQUIRE
an Alexander Gallo Company

Toll Free: 800.708.8087
Facsimile: 312.673.8138

Suite 1200
311 West Monroe Street
Chicago, IL 60606
www.esquiresolutions.com

WHITNEY O'DANIEL                                          March 22, 2011

157

1   hand of office at Chicago, Illinois, this 26th day of
2   March, 2011.

3
4
5
6                              Notary Public
7                          Cook County, Illinois
8                      My commission expires 10/05/11.
9
10
                              OFFICIAL SEAL
11                            LAURA KIENLEN
                      Notary Public - State of Illinois
12               My Commission Expires Oct 05, 2011
13
14
15   CSR Certificate No. 84-4153.
16
17
18
19
20
21
22
23
24



ESQUIRE
an Alexander Gallo Company

Toll Free: 800.708.8087
Facsimile: 312.673.8138

Suite 1200
311 West Monroe Street
Chicago, IL 60606
www.esquiresolutions.com

# Exhibit 6

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

ILLINOIS ASSOCIATION OF FIREARMS )
RETAILERS, KENNETH PACHOLSKI, )
KATHRYN TYLER, and MICHAEL HALL, )
                                       )       **FILED: January 27, 2011**
    **Plaintiffs,**               )
                                         )
**v.**                                      )       **Civil Action No. 10-cv-04184**
                                         )       **Judge Edmond E. Chang**
**THE CITY OF CHICAGO and**      )
**RICHARD M. DALEY, Mayor of the**   )
**City of Chicago,**                    )
                                         )
    **Defendants.**             )

## SECOND AMENDED COMPLAINT
## FOR DECLARATORY JUDGMENT AND INJUNCTIVE RELIEF

Plaintiffs ILLINOIS ASSOCIATION OF FIREARMS RETAILERS, KENNETH

PACHOLSKI, KATHRYN TYLER, and MICHAEL HALL, by and through their attorneys, for

their complaint against Defendants CITY OF CHICAGO and RICHARD M. DALEY, Mayor,

state as follows:

## INTRODUCTION

    1.    This is an action to vindicate the federal constitutional rights of residents of

Chicago, Illinois, to keep and bear arms under the Second and Fourteenth Amendments to the

United States Constitution.

    2.    The Supreme Court has unequivocally declared that the Second Amendment

"guarantee[s] the individual right to possess and carry" arms. *District of Columbia v. Heller*, 128

S. Ct. 2783, 2797 (2008). In particular, *Heller* struck down a ban on the possession of handguns,

1

"the most popular weapon chosen by Americans for self-defense in the home." *Id.* at 2818. The City of Chicago ("the City") has long denied this fundamental right to its citizens, banning, as of 1982, all possession of handguns for any purpose whatsoever. In *McDonald v. City of Chicago,* 130 S. Ct. 3020 (2010), the Supreme Court made clear that, like other fundamental constitutional rights, the right to keep and bear arms is protected against infringement by state and local governments. Because of the Supreme Court's ruling, the City recognized that its total ban on handgun possession was patently unconstitutional and, therefore, promptly amended its firearms ordinance.

3.    As the Supreme Court has noted, however, the City views the Second Amendment as "a second-class right," *id.* at 3044 (plurality opinion), to be "singled out for ... specially unfavorable [] treatment," *id.* at 3043 (majority opinion). Thus, the City enacted a host of new restrictions that have the purpose and effect of preventing Plaintiffs and other law-abiding residents of Chicago from exercising their fundamental right to keep and bear firearms for self-defense and other lawful purposes.

## PARTIES

4.    The Illinois Association of Firearms Retailers ("ILAFR") is a non-profit entity organized under the laws of the State of Illinois and Section 501(c)(6) of the Internal Revenue Code to promote the interests of the firearms retail industry and the protection of Second Amendment rights. Its principal place of business is in Carbondale, Illinois. Its members engage in the sale of firearms, the operation of shooting ranges, and the operation of combined retail operations/firing ranges in Illinois.

5.    Plaintiff Kenneth Pacholski is a resident of Chicago and a citizen of the United States.

2

6. Plaintiff Kathryn Tyler is a resident of Chicago and a citizen of the United States.

7. Plaintiff Michael Hall is a resident of Chicago and a citizen of the United States.

8. Defendant City of Chicago is a political subdivision of the State of Illinois.

9. Defendant Richard M. Daley is the Mayor of Chicago, which is his principal place of business, and he is sued in his official capacity.

10. The City of Chicago, Mayor Daley, and their officers, agents, and employees will sometimes hereafter be referred to as "Defendants."

## JURISDICTION

11. This action seeks relief pursuant to 28 U.S.C. §§ 2201 and 2202, and 42 U.S.C. §§ 1983 and 1988. Therefore, jurisdiction is founded on 28 U.S.C. § 1331 in that this action arises under the Constitution and laws of the United States, and under 28 U.S.C. § 1343(3), in that this action seeks to redress the deprivation, under color of law, of rights secured by the United States Constitution.

12. Venue is proper in this district pursuant to 28 U.S.C. § 1391(b).

## BACKGROUND

13. On June 28, 2010, the Supreme Court of the United States held in *McDonald v. Chicago*, 130 S. Ct. 3020 (2010), that the Second Amendment right to keep and bear arms restrains state and local governments through incorporation in the Fourteenth Amendment.

14. The Supreme Court remanded the case for the lower courts to apply the Second Amendment to the challenged Chicago ordinance that effectively banned private ownership of handguns within the city. In anticipation that the ordinance challenged in *McDonald* would be struck down, the City Council of Chicago, on July 2, 2010, amended the Municipal Code of Chicago as it pertains to firearms ("the Ordinance") (a copy is attached as Ex. A).

3

15. In his statements during the July 2, 2010 City Council meeting, Alderman Fioretti declared that the vindication of Second Amendment rights in *McDonald* "was not a good decision for law-abiding citizens." Alderman Solis concurred, stating that "the decision made by the Supreme Court is not really in the best interests of our citizens." Alderman Dixon denounced what she called the Court's "blatant … misreading of the law." Another Alderman likewise criticized the Justices of the Supreme Court, saying that "[w]e're here today because of their poor judgment … of how life is in large urban settings and cities like … Chicago. I don't know how they can say we would be safer by allowing individuals, even if they are law-abiding citizens, to own and possess firearms in their homes."

16. Alderman Lyle forecast that future generations would react to the Supreme Court's decision in *McDonald* with "shock and awe. And they are going to be amazed that in a country that [holds] itself to be a leader of the free nations that we have such a reckless love affair with guns…. They're going to wonder what madness overtook this country. And that's where we find ourselves. … We find ourselves with a Court that…used to be occupied by just literary legal giants, who now [use] this opportunity to write [an] opinion and take a slap at the leaders of the City of Chicago."

17. Alderman Hairston complained about what he described as "the message the Supreme Court is sending. I think that's the same message that the gang bangers are sending, that a life is not valuable. That truly hurts my soul here. I have to say it: I think the Supreme Court is wrong."

18. Alderman Mary Ann Smith echoed her fellows on the City Council, vowing to limit gun ownership with new legal restrictions and thanking "everyone who has worked to try and create as restrictive a tool as possible." In describing the new Ordinance on July 1, 2010,

4

Chicago Corporation Counsel Mara Georges lauded its bans and restrictions and concluded that "[w]e've gone farther than anyone else ever has."

19.    In findings issued in support of the Ordinance, the City Council Committee on Police & Fire specifically stated that it was "essential" to "limit[] the number of handguns in circulation."

## THE NEW FIREARMS ORDINANCE

20.    Several of the provisions of the Ordinance infringe Plaintiffs' constitutional right to keep and bear arms and are therefore challenged here.

21.    Section 4-144-010 states that it shall be unlawful for any person "to engage in the business of selling, or to sell, give away or otherwise transfer, any … deadly weapon which can be carried or concealed on the person … without securing a weapons dealer license." The Section further states that "[i]t shall be unlawful for any person" possessing a weapons dealer license" "to engage in the business of selling, or to sell, give away or otherwise transfer, any firearm." Section 8-20-100 states that "no firearm may be sold, acquired or otherwise transferred within the city, except through inheritance of the firearm." Thus, apart from bequests, the Ordinance imposes a total ban on the sale or transfer of firearms within Chicago.

22.    Section 8-20-110 prohibits possession of a firearm without a Chicago Firearms Permit, and Section 8-20-120 states that no person can obtain such a permit without "an affidavit signed by a firearm instructor certified by the State of Illinois … attesting that the applicant has completed a firearm safety and training course, which, at a minimum, provides one hour of range training." Yet Section 8-20-280 states that "[s]hooting galleries, firearm ranges, or any other place where firearms are discharged are prohibited." Thus, the Ordinance dictates that there can

be no place in Chicago where one can obtain the firearms training that the Ordinance itself mandates for legal possession of a firearm.

23. Section 8-24-010 states that "[n]o person shall fire or discharge any firearm within the city, except in the lawful self-defense or defense of another" or for delimited hunting purposes. Although on its face this purports to preserve the right to use a firearm in self-defense, by proscribing the discharge of a gun for training or practice purposes, the Ordinance dictates that the residents of Chicago cannot obtain in Chicago the firearms training that the Ordinance itself requires and that is otherwise desired by Plaintiffs and other gun owners to achieve and maintain proficiency in the use of their firearms.

24. Section 8-20-040 prohibits the possession of more than one "assembled and operable" firearm within the home, even by someone who is fully licensed to possess a firearm by the Ordinance. Any other firearms owned by that person must be disassembled or otherwise rendered "inoperable." If there two or more persons in the home with CFPs and registration certificates, each such person is allowed only one gun in an operable condition. The Ordinance thus bars a licensed gun owner from keeping more than one operable firearm in the home for self-defense, either to have a firearm available in more than one room of the dwelling in case of emergency, or to have a firearm available to more than one adult member of the family. In the event of a home invasion, all family members would be dependent upon the ability of a single person in a single location to obtain immediate access to a single operable weapon.

25. Section 8-20-020 renders it "unlawful for any person to carry or possess a handgun, except when in the person's home." Section 8-20-030 renders it "unlawful for any person to carry or possess a long gun, except when in the person's home or fixed place of business." The term "home" is sharply limited, defined to exclude "any garage, including an attached garage, on

6

the lot" and "any space outside the dwelling unit, including any stairs, porches, back, side or front yard space, or common areas." MCC § 8-20-010. Section 8-20-140(a) renders it "unlawful for any person to carry or possess a firearm without a firearm registration certificate," and Section 8-20-180(c) states that "[a] registration certificate shall only be valid for the address on the registration certificate," and "[e]xcept in the lawful transportation of a firearm, a person shall not carry or possess any firearm at any location other than that authorized by the registration certificate." "Lawful transportation" means transportation by a person who has a FOID card, a CFP, and a firearm registration certificate, and whose firearm is "(i) broken down in a nonfunctioning state; (ii) not immediately accessible; and (iii) unloaded and in a firearm case." MCC § 8-20-010. The Ordinance thus imposes a total ban in Chicago on possessing or carrying a firearm for personal protection outside one's "home" (as narrowly defined by the Ordinance), except in one's fixed place of business where long guns, but not handguns, are permitted.

26.    As contemporaneous statements from City officials attest, the Mayor and City Council designed the Ordinance to negate the Supreme Court's vindication of Second-Amendment rights in *McDonald*, to be as "restrictive a tool as possible" for suppressing gun ownership, and to go "farther than anyone else ever has" in restricting the exercise of the right to keep and bear arms.

27.    Violation of the Ordinance is punishable by fines up to $10,000 and incarceration for up to six months. Each day that such violation exists constitutes a separate offense. MCC § 8-20-300(a) & (b).

28.    Defendant Daley is responsible for enforcing the Ordinance through agencies and officers under his direction. Mayor Daley appoints and supervises most municipal officers in Chicago, including (i) the Director of the Department of Administrative Hearings, which has

7

authority to adjudicate enforcement of the Ordinance, and (ii) the Superintendent of Police, who has the authority to arrest Chicago residents for violations of the Ordinance and to make further rules and regulations under the Ordinance. MCC §§ 2-4-010, 2-4-020, 2-14-010, 2-14-190, 2-84-040, 8-26-090. Mayor Daley supervises the conduct of all municipal officers and has general authority to enforce (or to designate the officer who enforces) the Ordinance. MCC § 2-4-030. Mayor Daley signs all firearms licenses and permits under the Ordinance, MCC §§ 2-4-040, 8-20-110, 8-20-140, and supervises the Superintendent of Police, who transmits all denials of firearms licenses under the Ordinance, MCC § 8-20-200.

### THE IMPACT OF THE FIREARMS ORDINANCE ON THE PLAINTIFFS

29.    Plaintiff Kenneth Pacholski is a 52 year-old male.  Plaintiff Kathryn Tyler is a 53 year-old female.  They are a married couple and are residents of Chicago.  Mr. Pacholski is self-employed in the aircraft-restoration business.  Dr. Tyler is a veterinarian and the owner of her own animal clinic.

30.    Mr. Pacholski and Dr. Tyler desire to keep, or be able to legally operate—and would keep or legally operate—more than one operable handgun each in their home, but are precluded from doing so under the Ordinance.

31.    Dr. Tyler, on occasion, has a desire to possess a handgun for armed self-defense at her place of business.  Dr. Tyler would much prefer to use a handgun rather than a long gun for such purposes, both because a handgun is easier to use and because transporting a long gun is much less practicable.  For example, in the past, the emergency alarm at her business has activated in the middle of the night and she has had to proceed alone to address the situation. She would carry a handgun for personal self-defense in such circumstances were she not precluded from doing so under the Ordinance.

8

32. To purchase a gun under the current legal regime, or to practice with and receive training for their firearms at a range, Mr. Pacholski and Dr. Tyler must travel outside the city. They would buy firearms within the city if sales of these items were permitted by the law; they would also practice at ranges within the city if such ranges were permitted to operate under the law.

33. Plaintiff Michael Hall is a 52-year-old male, and a resident of Chicago. He is married and has five children. He is employed in the telecommunications industry.

34. Mr. Hall is a former Fleet Marine Corps Corpsman and during his military service he repeatedly received an "expert" rating in firearms marksmanship.

35. Mr. Hall often works from his home office. He desires to keep or operate—and, but for the Ordinance, would keep or operate—more than one operable handgun in his home, so that he can have a ready means of self- and family-defense in both his bedroom and his home office.

36. Mr. Hall desires to be able to—and, but for the Ordinance, would—keep and bear arms for purposes of self-defense on all parts of his property, including the curtilage of his home. For example, in two separate incidents, Mr. Hall's truck and his wife's minivan have been burglarized while parked in the driveway of his home. The Ordinance, however, prohibits Mr. Hall from bearing arms in the driveway of his home.

37. Mr. Hall would shop for and purchase firearms and firearms accessories within the city if sales of these items were not prohibited by the Ordinance.

38. Mr. Hall would practice with a firearm at firearms ranges within Chicago if such ranges were permitted to operate under the law.

39. Mr. Hall desires to transport firearms between his home and western Illinois, Iowa, and South Dakota, where he travels for hunting and target-shooting purposes.

40.    Plaintiff ILAFR has members who desire to sell firearms and to operate shooting ranges inside Chicago city limits for patronage by law-abiding residents and would do so but for the Ordinance.  ILAFR brings this action on behalf of its members, whose activities as firearms vendors, shooting-range operators, and firearms trainers, are part of the constitutionally protected activities that Mr. Pacholski, Dr. Tyler, Mr. Hall, and other law-abiding Chicago residents would engage in but for the Ordinance.

41.    The Ordinance's total ban on firearms sales and firearms ranges prevents members of ILAFR from doing business in the City of Chicago, and thereby prevents them from engaging in a business (the sale of firearms and the operation of a firiearms range) that is part of the constitutionally protected activities that Mr. Pacholski, Dr. Tyler, Mr. Hall, and other residents of the City of Chicago would engage in but for the Ordinance.

42.    Under the Ordinance, Plaintiffs Pacholski, Tyler, and Hall face arrest, prosecution, and incarceration should they possess, carry, or transfer firearms in violation of the Ordinance. Members of ILAFR face arrest, prosecution, and incarceration if they sell or transfer firearms or operate a shooting range in violation of the Ordinance.

## THE CHICAGO ZONING ORDINANCE

43.    The development and use of land within the City of Chicago is governed, *inter alia*, by the City's Zoning Ordinance, Title 17 of the Municipal Code of Chicago.  "The provisions of th[e] Zoning Ordinance are cumulative and pose limitations and requirements in addition to all other applicable laws and ordinances." MCC § 17-1-1200.

44.    It is a violation of the Zoning Ordinance to "us[e] land or buildings in any way not consistent with [its] requirements." MCC § 17-16-0201. The Zoning Ordinance divides the city into various districts (e.g., business, commercial, manufacturing, and downtown), and for each of

10

these districts sets out a number of "permitted uses," which "are permitted by right in the subject zoning district." MCC §§ 17-3-0202, 17-4-0202, 17-5-0202.

45. The Zoning Ordinance specifies that "Retail Sales, General" is a permitted use in all business, commercial, and manufacturing districts and in some downtown districts. MCC §§ 17-3-0207, 17-4-0207, 17-5-0207.

46. The Zoning Ordinance specifies that "Sports and Recreation, Participant – Indoor" is a permitted use in all business and commercial districts and in some downtown districts. MCC §§ 17-3-0207, 17-4-0207.

47. The Zoning Ordinance defines the permitted use of "Retail Sales, General" as "[b]usinesses involved in the sale, lease or rent of new or used products or merchandise to the general public." MCC § 17-17-0104-Y.

48. The Zoning Ordinance defines the permitted use of "Sports and Recreation, Participant" as: "Provision of sports or recreation primarily by and for participants.... The following are participant sports and recreation use types (for either general or personal use): ... Participant sport and recreation uses conducted within an enclosed building, other than arcades and entertainment cabarets." MCC § 17-17-0104-Z(3).

49. Despite the fact that shooting ranges appear to fit well within the definition of the permitted use of "Sports and Recreation, Participant," the City's Commissioner of Zoning has maintained under oath that shooting ranges are currently "prohibited" and "banned" under the Zoning Ordinance.

## COUNT I

### (U.S. CONST., AMENDS. II AND XIV, 42 U.S.C. § 1983)

50. The preceding paragraphs are incorporated herein.

11

51.    The Ordinance outlaws use of firearms for self-defense within the curtilage of one's own home. *See* MCC §§ 8-20-020, -030   The statutory definition of "home" expressly excludes "(i) any garage, including an attached garage, on the lot; (ii) any space outside the dwelling unit, including any stairs, porches, back, side or front yard space, or common areas." MCC § 8-20-010.

52.    Thus the Ordinance outlaws the exercise of the right to bear arms in self-defense even when one is in one's own garage, on one's own back porch, or on the steps leading up to one's front door.

53.    These provisions infringe upon, and impose an impermissible burden upon, Mr. Pacholski's, Dr. Tyler's, and Mr. Hall's right to keep and bear arms under the Second and Fourteenth Amendment.

## COUNT II

### (U.S. CONST., AMENDS. II AND XIV, 42 U.S.C. § 1983)

54.    The previous paragraphs are incorporated herein.

55.    Section 4-144-010 states that it shall be unlawful for any person "to engage in the business of selling, or to sell, give away or otherwise transfer, any firearm." Section 8-20-100 states that "no firearm may be sold, acquired or otherwise transferred within the city, except through inheritance of a firearm."

56.    These provisions thus impose a total ban on the sale or transfer of firearms within Chicago, and thereby infringe upon, and impose an impermissible burden upon, Mr. Pacholski's, Dr. Tyler's, and Mr. Hall's right to keep and bear arms under the Second and Fourteenth Amendments.

57.     The fear of enforcement and/or prosecution that is placed upon firearms retailers

desiring to market and sell firearms inside the City of Chicago—such as members of ILAFR—

limits Chicago residents' access to ability to purchase firearms.  Accordingly, the Ordinance's

total ban on the sale or transfer of firearms within Chicago infringes upon, and imposes an

impermissible burden upon, the right to keep and bear arms of all adult law-abiding residents of

Chicago.

**COUNT III**

**(U.S. CONST., AMENDS. II AND XIV, 42 U.S.C. § 1983)**

58.     The previous paragraphs are incorporated herein.

59.     Section 8-20-110 prohibits possession of a firearm without a CFP, and Section 8-

20-120 states that no person can obtain a CFP without "an affidavit signed by a firearm instructor

certified by the State of Illinois … attesting that the applicant has completed a firearm safety and

training course, which, at a minimum, provides one hour of range training."

60.     Yet Section 8-20-280 states that "[s]hooting galleries, firearm ranges, or any other

place where firearms are discharged are prohibited."  The Ordinance thus dictates that there can

be no place in Chicago where one can obtain the firearms training that the Ordinance itself

mandates for legal possession of a firearm.

61.     Section 8-24-010 further provides that "[n]o person shall fire or discharge any

firearm within the city, except in the lawful self-defense or defense of another" or for very

limited hunting purposes.  By proscribing the discharge of a gun for training or practice

purposes, the Ordinance in fact precludes citizens from engaging anywhere in Chicago in the

training that the Ordinance itself mandates as a prerequisite to legal gun ownership.

62.    These provisions infringe upon, and impose an impermissible burden upon, Mr. Pacholski's, Dr. Tyler's, and Mr. Hall's right to keep and bear arms under the Second and Fourteenth Amendments.

63.    The fear of enforcement and/or prosecution that is placed upon persons and entities desiring to engage in live firearms instruction and/or operate a firing range inside the City of Chicago—such as members of ILAFR—limits Chicago residents' ability to train with their firearms.  Accordingly, the Ordinance's total ban on firing ranges within Chicago infringes upon, and imposes an impermissible burden upon, the right to keep and bear arms of all adult law-abiding residents of Chicago.

## COUNT IV

### (U.S. CONST., AMENDS. II AND XIV, 42 U.S.C. § 1983)

64.    The previous paragraphs are incorporated herein.

65.    Section 8-20-040 prohibits the possession of more than one "assembled and operable" firearm within the home by someone who is fully licensed under the Ordinance to possess a firearm.  Any other firearms owned by that person must be disassembled or otherwise rendered "inoperable."  If there is more than one person in the home with a CFP and a registration certificate, each such person is allowed only one gun in an operable condition.

66.    These provisions infringe upon, and impose an impermissible burden upon, Mr. Pacholski's, Dr. Tyler's, and Mr. Hall's right to keep and bear arms under the Second and Fourteenth Amendments.

14

## COUNT V

### (U.S. CONST., AMENDS. II AND XIV, 42 U.S.C. § 1983)

67.    The preceding paragraphs are incorporated herein.

68.    Section 8-20-020 makes it "unlawful for any person to carry or possess a handgun, except when in the person's home." Section 8-20-030 makes it "unlawful for any person to carry or possess a long gun, except when in the person's home or fixed place of business." Section 8-20-140(a) renders it "unlawful for any person to carry or possess a firearm without a firearm registration certificate," and Section 8-20-180(c) states that "[a] registration certificate shall only be valid for the address on the registration certificate," and "[e]xcept in the lawful transportation of a firearm, a person shall not carry or possess any firearm at any location other than that authorized by the registration certificate." "Lawful transportation" means transportation by a person who has a FOID card, a CFP, and a firearm registration certificate, and whose firearm is "(i) broken down in a nonfunctioning state; (ii) not immediately accessible; and (iii) unloaded and in a firearm case." § 8-20-010.

69.    Thus the Ordinance imposes a complete and total ban in Chicago on possessing or carrying a firearm outside one's "home" (as narrowly defined by the Ordinance) for personal protection—except in one's fixed place of business, where long guns, but not handguns, are permitted—and thereby infringes upon, and imposes an impermissible burden upon, Mr. Pacholski's, Dr. Tyler's, and Mr. Hall's rights under the Second and Fourteenth Amendments.

## COUNT VI

### (U.S. CONST., AMENDS. II AND XIV, 42 U.S.C. § 1983)

70.    The preceding paragraphs are incorporated herein.

15

71.    It is a violation of the City of Chicago's Zoning Ordinance, Title 17 of the Municipal Code of Chicago, to "us[e] land or buildings in any way not consistent with [its] requirements." MCC § 17-16-0201.

72.    The City of Chicago's Zoning Administrator and Commissioner of the Department of Zoning and Land Use Planning has stated under oath that the Zoning Ordinance prohibits and bans the construction and/or operation of shooting ranges in Chicago.

73.    To the extent the Zoning Ordinance bans the construction or operation of a firearms retail business or a shooting range it infringes, and imposes an impermissible burden, upon Mr. Pacholski's, Dr. Tyler's, and Mr. Hall's right to keep and bear arms under the Second and Fourteenth Amendments.

74.    To the extent the Zoning Ordinance bans the construction or operation of a firearms retail business or a shooting range by those desiring to open such businesses—such as members of ILAFR—it limits Chicago residents' access to ability to purchase and train with firearms, and thus infringes upon, and imposes an impermissible burden upon, the right to keep and bear arms of all adult law-abiding residents of Chicago.


WHEREFORE, Plaintiffs pray that the Court:

A.    Enter a declaratory judgment that MCC §§ 4-144-010, 8-20-010 (to the extent it defines "home" and "lawful transportation"), 8-20-020, 8-20-030, 8-20-040, 8-20-100, 8-20-180(c), 8-20-280 , and 8-24-010 are null and void to the extent and because such provisions infringe Plaintiffs' constitutional rights, and the rights of all law-abiding adult residents of Chicago, under the Second and Fourteenth Amendments.

B.    Enter a declaratory judgment that to the extent the City of Chicago Zoning

16

Ordinance, Title 17 of the Chicago Municipal Code, bans the operation and/or construction of firearms retail businesses or shooting ranges, it is null and void to the extent and because such provision infringe Plaintiffs' constitutional rights, and the rights of all law-abiding adult residents of Chicago, under the Second and Fourteenth Amendments.

C.      Issue injunctive relief prohibiting Defendants and their agents from enforcing MCC §§ 4-144-010, 8-20-010 (to the extent it defines "home" and "lawful transportation"), 8-20-020, 8-20-030, 8-20-040 , 8-20-100, 8-20-180(c), 8-20-280, and 8-24-010 to the extent such provisions infringe Plaintiffs' constitutional rights, and the rights of all law-abiding adult residents of Chicago, under the Second and Fourteenth Amendments.

D.      Issue injunctive relief prohibiting Defendants and their agents from enforcing the City of Chicago Zoning Ordinance, Title 17 of the Chicago Municipal Code, to the extent such provisions infringe Plaintiffs' constitutional rights, and the rights of all law-abiding adult residents of Chicago, under the Second and Fourteenth Amendments.

E.      Award Plaintiffs costs and attorneys' fees pursuant to 42 U.S.C. § 1988.

F.      Grant such other relief as may be proper.


                                                Respectfully submitted,


Stephen Kolodziej                               s/ Charles J. Cooper
Atty. ID# 6216375                               Charles J. Cooper*
BRENNER FORD MONROE & SCOTT LTD.                David H. Thompson*
33 N. Dearborn St., Suite 300                   Jesse Panuccio*
Chicago, IL 60602                               COOPER & KIRK, PLLC
Tel: (312) 781-1970                             1523 New Hampshire Ave., NW
Fax: (312)781-9202                              Washington, D.C. 20036
Email: skolodziej@brennerlawfirm.com            Tel: (202) 220-9600
                                                Fax: (202) 220-9601

17

*Designated Local Counsel*

Email: ccooper@cooperkirk.com

Brian S. Koukoutchos*
28 Eagle Trace
Mandeville, LA 70471
Tel: (985) 626-5052
bkoukoutchos@gmail.com

*Admitted *pro hac vice*.

*Counsel for Plaintiffs*

18

# IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ILLINOIS
### EASTERN DIVISION

| | | |
|---|---|---|
| ILLINOIS ASSOCIATION OF FIREARMS RETAILERS, KENNETH PACHOLSKI, KATHRYN TYLER, and MICHAEL HALL, | ) ) ) ) | |
| Plaintiffs, | ) ) | **FILED: January 27, 2011** |
| v. | ) ) ) | **Civil Action No. 10-cv-04184** **Judge Edmond E. Chang** |
| THE CITY OF CHICAGO and RICHARD M. DALEY, Mayor of the City of Chicago, | ) ) ) ) | |
| Defendants. | ) | |

## L.R. 3.2 Notification of Affiliates

Pursuant to Local Rule 3.2 of the United States District Court for the Northern District of Illinois, Plaintiff Illinois Association of Firearms Retailers, a nonprofit corporation, hereby states that it has no publicly held affiliates.

Stephen Kolodziej
Atty. ID# 6216375
BRENNER FORD MONROE & SCOTT LTD.
33 N. Dearborn St., Suite 300
Chicago, IL 60602
Tel: (312) 781-1970
Fax: (312)781-9202
Email: skolodziej@brennerlawfirm.com

*Designated Local Counsel*

s/ Charles J. Cooper
Charles J. Cooper*
David H. Thompson*
Jesse Panuccio*
COOPER & KIRK, PLLC
1523 New Hampshire Ave., NW
Washington, D.C. 20036
Tel: (202) 220-9600
Fax: (202) 220-9601
Email: ccooper@cooperkirk.com

Brian S. Koukoutchos*
28 Eagle Trace
Mandeville, LA 70471
Tel: (985) 626-5052
bkoukoutchos@gmail.com

*Admitted *pro hac vice*.
*Counsel for Plaintiffs*

1

## CERTIFICATE OF SERVICE

I, Charles J. Cooper, hereby certify that on this 9th day of February, 2011, I caused a

copy of the foregoing to be served by electronic filing on:

Michael A. Forti
Andrew W. Worseck
Mardell Nereim
Rebecca Alfert Hirsch
William Macy Aguiar
City of Chicago, Department of Law
Constitutional and Commercial Litigation Division
30 N. LaSalle St., Suite 1230
Chicago, IL 60602

s/ Charles J. Cooper
Charles J. Cooper