# APPENDIX A

dJune 14, 2011

# PHILIP JACKSON COOK

ITT/Terry Sanford Professor of Public Policy Studies   Telephone: 919 613-7360
Professor of Economics and Sociology           FAX:  919 681-8288
Sanford School of Public Policy
Box 90245
Duke University                 E-mail: pcook@duke.edu
Durham, NC 27708

Education:

B.A. (with high distinction) University of Michigan, 1968
Ph.D. (Economics) University of California, Berkeley, 1973

Positions held:

| | |
|---|---|
| 2009- | Senior Associate Dean for Faculty, Sanford School of Public Policy |
| 2008-9 | Schelling Visiting Professor of Public Policy, University of Maryland |
| 2003 | Residency, Bellagio Study and Conference Center (September-October) |
| 2000 | Visiting Scholar, Kennedy School of Government, Harvard University |
| 1997-99 | Director, Sanford Institute of Public Policy; Chair, Department of Public Policy Studies |
| 1994- | ITT/Terry Sanford Professor of Public Policy Studies |
| 1992- | Professor of Public Policy Studies, Economics, & Sociology, Duke University |
| 1989-90 | Visiting Professor, Fuqua School of Business, Duke University |
| 1985-89 | Director, Institute of Policy Sciences and Public Affairs, Duke University and Chairman, Department of Public Policy Studies |
| 1984- | Professor of Public Policy and Economics, Duke University |
| 1979-84 | Associate Professor; 1973-79 Assistant Professor, Duke University |

| 1982 | Expert (part time) Office of Policy and Management Analysis, Criminal Division, U.S. Department of Justice |
| Fall 1980 | Visiting Scholar, Institute for Research in Social Science, University of North Carolina, Chapel Hill |

Fellowships and Academic Honors:

Raymond Vernon Memorial Prize for best paper in *JPAM,* 2008

Richard A. Stubbing Teacher Mentor Award, 2008

Member, Institute of Medicine, National Academy of Sciences, 2001-

*Who's Who in America 2001 and subsequent issues*

Fellow of the American Society of Criminology, 2000-

Vernon Prize for best paper in *Journal of Policy Analysis & Management* (v. 16), 1997

Research Associate, National Bureau of Economic Research 1996-

*Who's Who in Economics* 3rd edition (1996)

Kenneth J. Arrow Award (for best paper published in health economics), 1994

National Science Foundation Fellowship, 1968-1970

Special Career Fellowship (Ford Foundation), 1968-1972

National Merit Scholar, 1964-1968

Sims Award, Economics Department, University of Michigan, 1967

Phi Beta Kappa

<u>Publications</u>

A. Health and Safety Regulation

1. Books and Edited Volumes

PJ Cook and JW Vaupel, eds. <u>Law and Contemporary Problems</u>, Autumn 1976. Issue entitled "Valuing Lives: When and How Should Society Spend its Scarce Resources to Decrease Mortality"

<u>Law and Contemporary Problems</u>, Winter 1988. Editor for issue entitled "Vice."

PJ Cook and A Scharff <u>Recommendations Concerning Administration and Rate Structure for Excise Taxation in Romania</u> Distributed by Tax Advisory Program, US Treasury Department, August 1994.

<u>Paying the Tab: The Economics of Alcohol Policy</u> Princeton, NJ: Princeton University Press, 2007.
Chapters 10 and 12 serialized in <u>Milken Economic Review</u> 10(1) First Quarter, 2008)

2. Articles

PJ Cook and D Graham "The Demand for Insurance and Protection: The Case of Irreplaceable Commodities" <u>Quarterly Journal of Economics</u>, February 1977, 143-156. Reprinted in Georges Dionne and Scott Harrington (eds.) <u>Foundations of Insurance Economics</u> Kluwer Academic Press, 1991.

"The Value of Human Life in the Demand for Safety: Comment" <u>The American Economic Review</u>, September 1978, 710-711.

"Discussion" (on Martin Bailey's paper on Safety Decisions and Insurance) <u>American Economics Association Papers and Proceedings</u>, May 1978, 300.

"The Effect of Liquor Taxes on Drinking, Cirrhosis, and Auto Fatalities," in Mark Moore and Dean Gerstein, eds. <u>Alcohol and Public Policy: Beyond the Shadow of Prohibition</u>, National Academy of Sciences, 1981, 255-285; and in Richard Zeckhauser and Derek Leebaert, eds. <u>What Role for Government</u>? Duke University Press, 1983, 203-220.

PJ Cook and G Tauchen "The Effect of Liquor Taxes on Heavy Drinking" <u>Bell Journal of Economics</u>, Autumn 1982, 379-390.

"Alcohol Taxes as a Public Health Measure" <u>British Journal of Addiction</u>, September 1982, 245-250; and in Marcus Grant, Martin Plant, and Alan Williams, eds. <u>Economics and Alcohol</u>, Croom Helm Ltd., 1983.

PJ Cook and G Tauchen, "The Effect of Minimum Drinking Age Legislation on Youthful Auto Fatalities, 1970-77" Journal of Legal Studies 13, January 1984, 169-190. *reprinted in* The Economics of Health Behaviours, John H. Cawley and Donald S. Kenkel, eds., Cheltenham, UK: Edward Elgar Publishing Ltd., 2008.

"Increasing the Federal Alcohol Excise Tax" in Dean Gerstein, ed. Toward the Prevention of Alcohol Problems: Government, Business, and Community Action, National Academy Press, Washington, DC, 1984, 24-32.

"The Economics of Alcohol Consumption and Abuse" in Louis Jolyon West, ed. Alcoholism and Related Problems: Issues for the American Public, Prentice-Hall, 1984, 56-77.

"The Impact of Distilled Spirits Taxes on Consumption, Auto Fatalities and Cirrhosis Mortality" Control Issues in Alcohol Abuse Prevention: Strategies for States and Communities in Harold D. Holder, ed., Advances in Substance Abuse, Suppl: 1, Jai Press, Greenwich, CT, 1987, Pages 159-167.

"Comment" in John D. Graham (ed.) Preventing Automobile Injury: New Findings for Evaluation Research, Dover, MA: Auburn House Publishing Company, 1988, pp. 181-183.

DC Chapman, PJ Cook *et al.* "The Cultural Dimensions of Alcohol Policy Worldwide", Health Affairs, summer 1989, 48-62.

"The Social Costs of Drinking," in The Expert Meeting on the Negative Social Consequences of Alcohol Abuse Norewegian Ministry of Health and Social Affairs, Oslo, Norway, 1991.

PJ Cook and MJ Moore "Taxation of Alcoholic Beverages" in M. Hilton and G. Bloss, eds. Economic Research on the Prevention of Alcohol-Related Problems, NIAAA, NIH Publication No. 93-3513, 1993, 33-58.

PJ Cook and MJ Moore "Economic Perspectives on Reducing Alcohol-Related Violence" in Susan E. Martin, ed. Alcohol and Interpersonal Violence: Fostering Multidisciplinary Perspectives NIH Publication No. 93-3496, 1993, 193-212.

PJ Cook and MJ Moore "Violence Reduction through Restrictions on Alcohol Availability" Alcohol Health & Research World 17(2), 1993, 151-156.

PJ Cook and MJ Moore "Drinking and Schooling" Journal of Health Economics, 12, 1993, 411-429. *reprinted in* The Economics of Health Behaviours, John H. Cawley and Donald S. Kenkel, eds., Cheltenham, UK: Edward Elgar Publishing Ltd., 2008.

4

P.J. Cook and O-J Skog, "*Alcool, alcoolisme, alcoolisation*" by S. Ledermann" Alcohol Health & Research World 19(1), 1995, 30-32.

"Social Costs of Alcohol, Tobacco and Drug Abuse" and "Tax Laws, Alcohol" in J.H. Jaffe, ed. The Encyclopedia of Drugs and Alcohol, New York: Macmillan Publishing Co, 1996.

"Comment" in Brookings Papers on Economic Activity: Microeconomics, 1994 162-166.

PJ Cook and MJ Moore "This Tax's for You" National Tax Journal September 1994, pp. 559-573.

KE Warner, PJ Cook, *et al.* "Criteria for Determining an Optimal Cigarette Tax: the Economists' Perspective" Tobacco Control Winter 1995 4(4), 380-86.

PJ Cook, A Parnell, MJ Moore, D Pagnini. "The Effects of Short-Term Variation in Abortion Funding on Pregnancy Outcomes" Journal of Health Economics 1999 18(2), 241-258. *reprinted in* The Economics of Health Behaviours, John H. Cawley and Donald S. Kenkel, eds., Cheltenham, UK: Edward Elgar Publishing Ltd., 2008.

PJ Cook and MJ Moore, "Alcohol" in AJ Culyer and JP Newhouse, eds. Handbook of Health Economics Vol 1B (New York: North-Holland) 2000, 1629-1673.

PJ Cook and MJ Moore, "Environment and Persistence in Youthful Drinking Patterns" in J Gruber, ed. Risky Behavior Among Youths: An Economic Analysis (Chicago: University of Chicago Press), 2001, 375-437.

PJ Cook and MJ Moore, "The Economics of Alcohol Abuse and Alcohol-Control Policies" Health Affairs 21(2), March/April 2002: 120-133.

"Pricing and Taxation of Alcohol: What is the 'Right' Tax Rate? Comment on *Alcohol: No Ordinary Commodity*" Addiction, 98 (10), October 2003: 1356-7.

PJ Cook, J Ostermann, and FA Sloan "The Net Effect of an Alcohol Tax Increase on Death Rates in Middle Age" American Economic Review 95(2), May 2005: 278-281.

PJ Cook and P Reuter "When is Alcohol Just Another Drug" Addiction 102, June 2007: 1182-88.

PJ Cook and R Hutchinson "Smoke Signals: Adolescent Smoking and School Continuation" in Marina Bianchi (ed.) Advances in Austrian Economics Vol. 10, The Evolution of Consumption: Theories and Practices 2007: 157-188.

C Carpenter and PJ Cook "Cigarette Taxes and Youth Smoking: New Evidence from National, State, & Local Youth Risk Behavior Surveys" Journal of Health Economics

27(2), March 2008: 287-299.

"A Free Lunch" Journal of Drug Policy Analysis 1(1), article 2.
http://www.bepress.com/jdpa/vol1/iss1/art2

Comment on "Explaining change and stasis in alcohol consumption"
17:6 of Addiction Research & Theory Journal 17:6, December 2009.

"Leave the minimum drinking age to the states" in Natasha A. Frost, Joshua D. Freilich,
and Todd R. Clear (eds.) Contemporary Issues in Criminal Justice Policy Belmont, MA:
Wadsworth, 2009: 99-106.

FJ Chaloupka, PJ Cook, RM Peck, and JA Tauras "Enhancing compliance with tobacco
control policies" in Kathryn M. Neckerman, ed. Tobacco Policy New York: Columbia
University Press, forthcoming.

P.J. Cook and Maeve Gearing, "The minimum drinking age: 21 as an artifact" in Helene
R. White & David L. Rabiner (eds.) College Student Drinking and Drug Use: Multiple
Perspectives on a Complex Problem, Guilford Press 2011.

3. Editorial

"Increasing the Federal Excise Taxes on Alcoholic Beverages" Journal of Health
Economics 7(1), March 1988, 89-91.

B. Economics of State Lotteries

1. Book

CT Clotfelter and PJ Cook Selling Hope:  State Lotteries in America Harvard University
Press, 1989. Paperback edition, 1991.

2. Articles

CT Clotfelter and PJ Cook "Implicit Taxation in Lottery Finance" National Tax Journal,
December, 1987

CT Clotfelter and PJ Cook "Redefining 'Success' in the State Lottery Business" Journal of
Policy Analysis and Management 9(1), Winter 1990, 99-104.

CT Clotfelter and PJ Cook "On the Economics of State Lotteries" Journal of Economic
Perspectives, Fall, 1990, 105-120.
Reprinted (in shorter version) in The Conference Board Economic Times 2(4), April
1991. Reprinted (in revised version) in Samuel H. Baker and Catherine S. Elliott, eds.
Readings in Public Finance 2nd ed., Cincinnati: South-Western College Publishers, 1997,
457-472.

CT Clotfelter and PJ Cook "What Kind of Lottery for North Carolina?" <u>Popular Government</u> 56(4), Spring 1991, pp. 25-29.

CT Clotfelter and PJ Cook "Lotteries in the Real World", <u>Journal of Risk and Uncertainty</u> 4(3), July 1991, 227-232.

CT Clotfelter and PJ Cook "Lotteries", in Peter Newman, Murray Milgate, and John Eatwell, eds. <u>The New Palgrave Dictionary of Money and Finance</u> Macmillan Press, London, 1992.

PJ Cook and CT Clotfelter "The Peculiar Scale Economics of Lotto" <u>American Economic Review</u>, June 1993, 634-643.

CT Clotfelter and PJ Cook "The Gambler's Fallacy in Lottery Play", <u>Management Science</u>, December 1993.

CT Clotfelter, PJ Cook, J Edell, and M Moore, State Lotteries at the Turn of the Century: Report to the National Gambling Impact Study Commission. June 1, 1999.

CT Clotfelter and PJ Cook, "Ends and Means in State Lotteries: The Importance of a Good Cause" in Alan Wolfe and Erik C. Owens, eds. <u>Gambling: Mapping the American Moral Landscape</u> Waco: Baylor University Press, 2009, 11-38.

3. OpEd. Pieces (with Charles T. Clotfelter)

<u>New York Times</u>, August 20, 1987;
<u>The Atlanta Constitution</u>, February 12, 1989;
<u>The News and Observer</u> (Raleigh), May 27, 1990;
<u>Newsday</u>, July 24, 1990;
<u>San Diego Union</u>, April 1991.
<u>The News & Observer</u> (Raleigh), February 14, 1999
<u>The News & Observer</u> (Raleigh), March 1, 2007

C. Crime and Criminal Justice Policy

1. Monographs and Edited Volumes

<u>Robbery in the United States</u>, National Institute of Justice, September 1983.

PJ Cook and D Slawson <u>The Costs of Adjudicating Murder Cases in North Carolina</u> Administrative Office of the Courts, Raleigh, NC, 1993.

PJ Cook, J Ludwig, and J McCrary (eds.) <u>Controlling Crime: Strategies and Tradeoffs</u> Chicago: University of Chicago Press, 2011 (forthcoming).

2. Symposium editor

"Explaining the growth in the prison population" <u>Criminology and Public Policy</u> 8(1), February 2009.

3. Articles

"The Correctional Carrot: The Prospect of Reducing Recidivism through Improved Job Opportunities" <u>Policy Analysis</u>, January 1975, 11-54.
*Reprinted* in *The Economics of Crime,* edited by Isaac Ehrlich and Zhiquiang Liu Northampton, MA: Edward Elgar Publishing, Inc., 2006.

"Punishment and Crime: A Critique of Recent Findings on the Preventive Effects of Punishment" <u>Law and Contemporary Problems</u>, Winter 1977, 164-204; and in Ralph Andreano and John Siegfried, eds. <u>The Economics of Crime</u>, John Wiley, 1980, 137-180.

"The Clearance Rate as a Measure of Criminal Justice System Effectiveness" <u>Journal of Public Economics</u> 11, 1979, 135-142; and in Egon Bittner and Sheldon L. Messinger, eds. <u>Criminology Review Yearbook</u>, Volume 2, Sage Publications, 1980.

"The Implications of Deterrence and Incapacitation Research for Policy Evaluation" in Cleon Foust and Robert Webster, eds. <u>An Anatomy of Criminal Justice</u>, D.C. Health, Lexington, 1980, 55-77.

"Research in Criminal Deterrence: Laying the Groundwork for the Second Decade" in Norval Morris and Michael Tonry, eds. <u>Crime and Justice: An Annual Review of Research, Volume 2</u>, University of Chicago, 1980, 211-268.

"Costs of Crime" in Sanford H. Kadish, ed. <u>Encyclopedia of Crime and Justice</u>, Macmillan Publishing Company, 1983.

"The Use of Criminal Statutes to Regulate Product Safety: Comment on Wheeler" <u>Journal of Legal Studies</u>, August 1984, 619-622.

PJ Cook and G Zarkin "Crime and the Business Cycle" <u>Journal of Legal Studies</u>, January 1985.

JQ Wilson and PJ Cook "Unemployment and Crime--What is the Connection?" <u>The Public Interest</u>, 79, Spring, 1985, 3-8.

PJ Cook and G Zarkin "Homicide and Economic Conditions" <u>Journal of Quantitative Criminology</u>, March 1986, Vol. 2, No. 1.

"The Demand and Supply of Criminal Opportunities" in Michael Tonry and Norval Morris, eds. <u>Crime and Justice: An Annual Review of Research</u>, Vol. 7, University of Chicago Press, 1986, 1-28.

"Criminal Incapacitation Effects Considered in an Adaptive Choice Framework" in Derek Cornish and Ron Clarke, eds. <u>The Reasoning Criminal</u>, New York: Springer-Verlag, 1986, 202-216.

PJ Cook and JH Laub "The (Surprising) Stability of Youth Crime Rates" <u>Journal of Quantitative Criminology</u> 2 (3) September 1986, 265-278.

"The Economics of Criminal Sanctions" in Martin L. Friedland (ed.) <u>Sanctions and Rewards in the Legal System</u>, University of Toronto Press, 1987.

PJ Cook and JH Laub "Trends in Child Abuse and Juvenile Delinquency" in Francis X. Hartman, ed. <u>From Children to Citizens: The Role of the Juvenile Court</u>, Springer-Verlag, New York, 1987, Vol. II, Chapter 7, pp.109-127.

"Notes on an Accounting Scheme for a Juvenile Correctional System" in Francis X. Hartman (ed.) <u>From Children to Citizens: The Role of the Juvenile Court</u>, Springer-Verlag, New York, 1987, Vol. II, Chapter 19, pp. 362-370.

PJ Cook and J Laub, "The Unprecedented Epidemic in Youth Violence" in Michael Tonry and Mark H. Moore eds., <u>Youth Violence</u> University of Chicago Press, 1998, 101-138.

PJ Cook, "The Epidemic of Youth Gun Violence" <u>Perspectives on Crime and Violence: 1997-1998 Lecture Series</u> (Washington, DC: National Institute of Justice), 1998, 107-125.

"Forward" to BC Welsh, DP Farrington, and LW Sherman (eds.) <u>Costs and Benefits of Preventing Crime</u> (Boulder, CO; Westview Press) 2001.

PJ Cook and JH Laub, "After the Epidemic: Recent Trends in Youth Violence in the United States" in Michael Tonry ed. <u>Crime and Justice: A Review of Research</u> Chicago, University of Chicago Press, 2002: 117-153.

"Meeting the Demand for Expert Advice on Drug Policy" <u>Criminology and Public Policy</u> 2(3), July 2003: 565-570.

"Comment" on "Catching Cheating Teachers" in William G. Gale and Janet Rothenberg Pack, eds., <u>Brookings-Wharton Papers on Urban Affairs 2003</u> Washington, DC: Brookings Institution Press, 2003: 210-215.

PJ Cook and N Khmilevska, "Cross-National Patterns in Crime Rates" in Michael Tonry and David P. Farrington, eds. Crime and Punishment in Western Countries, 1980-1999 Chicago: University of Chicago Press, 2005: 331-345.

PJ Cook and J Ludwig "Assigning Youths to Minimize Total Harm" in Kenneth A. Dodge, Thomas J. Dishion, and Jennifer E. Lansford (eds.) Deviant Peer Influences in Programs for Youth: Problems and Solutions The Guilford Press, 2006: 67-89.

"Symposium on Deterrence: Editorial Introduction" Criminology & Public Policy 5(3), August     2006: 413-416.

"Crime" in Robert P. Inman, ed. MAKING CITIES WORK: Prospects and Policies for Urban America  Princeton University Press, 2009: 297-327.

"Robbery" in Michael Tonry (ed.) Handbook on Crime and Justice  Oxford University Press, 2009.

Crime Control in the City:  A Research-Based Briefing on Public and Private Measures Cityscape: A Journal of Policy Development and Research 11(1), March, 2009: 53-80.

Potential Savings from Abolition of the Death Penalty in North Carolina  American Law and Economics Review 10, 2009: doi: 10.1093/aler/ahp022.

PJ Cook, DC Gottfredson, and C Na  "School crime control and prevention" in Michael Tonry, ed. Crime and Justice  University of Chicago Press, 2010.

"Property crime – yes; violence – no: Comment on Lauritsen and Heimer" Criminology & Public Policy 9(4), November 2010: 693-697.

"Comment" on "What do economists know about crime?" in R. DiTella, S. Edwards, and E. Schargrodsky The Economics of Crime: Lessons for & from Latin America  Chicago: University of Chicago Press, 2010: 302-304.

PJ Cook and J MacDonald  "Public safety through private action: An economic assessment of BIDs" The Economic Journal 121, May, 2011: 445-462.

"Co-Production in deterring crime," Criminology & Public Policy 10(1), Feb, 2011:103-8.

P.J. Cook and J. Ludwig, "Economical Crime Control," in Controlling Crime: Strategies and Tradeoffs, edited by P.J. Cook, J. Ludwig, and J. McCrary (2011), University of Chicago Press

P.J. Cook and J. MacDonald, "The role of private action in controlling crime," in Controlling Crime: Strategies and Tradeoffs, edited by P.J. Cook, J. Ludwig, and J. McCrary, University of Chicago Press, Chicago, forthcoming 2011.

P.J. Cook & J. Ludwig, "The Economist's guide to crime busting" The Wilson Quarterly (Winter, 2011), pp. 62-66.

D. Gottfredson, P.J. Cook, and C. Na, "School-based crime prevention", in The Oxford Handbook of Crime Prevention, edited by Brandon C. Walsh and David P. Farrington (2011), Oxford University Press

D. Weapons and Violent Crime
1. Monographs and Edited Volumes

PJ Cook and D Nagin Does the Weapon Matter? An Evaluation of a Weapon - Emphasis Policy in the Prosecution of Violent Offenders Institute of Law and Social Research, Washington, DC, 1979.

Annals of the American Academy of Political and Social Science, May 1981. Issue entitled "Gun Control" (special editor).

PJ Cook and J Ludwig Guns in America: Results of a Comprehensive National Survey on Firearms Ownership and Use Washington, D.C.: The Police Foundation, 1997.

Law and Contemporary Problems (special editor) "Kids, Guns, and Public Policy" 59(1): Winter 1996.

PJ Cook and J Ludwig Gun Violence: The Real Costs New York: Oxford University Press, 2000.

J Ludwig and PJ Cook (eds.) Evaluating Gun Policy: Effects on Crime and Violence Washington, DC: Brookings Institution Press, 2003.

2. Articles

"A Strategic Choice Analysis of Robbery" in Wesley Skogan (ed.) Sample Surveys of the Victims of Crimes, Ballinger, 1976, 173-187.

"Causal Linkages between Gun Control Ordinances and Crime: A Conceptualization and Review of the Literature" Hearings on the Treasury Department's proposed gun regulations, before the Subcommittee on Crime, Committee on the Judiciary, U.S. House of Representatives, 95th Congress, 2nd Session, Appendix 4, May 4 and 18, 1978.

"The Effect of Gun Availability on Robbery and Robbery Murder: A Cross-Section Study of Fifty Cities" Policy Studies Review Annual, Volume 3, Sage Publications, 1979, pp. 743-781. Also published in Hearings; see above.

"Reducing Injury and Death Rates in Robbery" Policy Analysis, 6(1) Winter 1980, 21-45.

PJ Cook and J Blose "State Programs for Screening Handgun Buyers" Annals of the American Academy of Political and Social Science, May 1981, 80-91. Reprinted in M. Gittell, ed. State Politics and the New Federalism ( NY: Longman, 1986).

"The Effect of Gun Availability on Violent Crime Patterns," Annals of the American Academy of Political and Social Science, May 1981; and in Federal Regulation of Firearms (A Report prepared by Congressional Research Service for the U.S. Senate Judiciary Committee) USGPO, May 1982; and in Neil Alan Weiner, Margaret A. Zahn and Rita J.Sagi, eds., Violence: Patterns, Causes, Public Policy (San Diego: Harcourt Brace Jovanovich, 1990).

PJ Cook and K Hawley "North Carolina's Pistol Permit Law: An Evaluation" Popular Government, May 1981, 1-6.

"Guns and Crime: the Power of Long Division" Journal of Policy Analysis and Management, Fall 1981, 120-125.

"The 'Saturday Night Special': An Assessment of Alternative Definitions from a Policy Perspective" Journal of Criminal Law and Criminology 72:4, Winter 1981, 1735-1745.

"The Role of Firearms in Violent Crime" in Marvin E. Wolfgang and Neil A. Weiner, eds. Criminal Violence (Sage Publications, 1982), 236-289; also titled "The Influence of Gun Availability on Violent Crime Patterns" in Norval Morris and Michael Tonry, eds. Crime and Justice: An Annual Review of Research, Volume 4, University of Chicago Press, 1983, 49-90.

"The Case of the Missing Victims: Gunshot Woundings in the National Crime Survey" Journal of Quantitative Criminology, March 1985, 91-102.

"Is Robbery Becoming More Violent? An Analysis of Robbery Murder Trends Since 1968" Journal of Criminal Law and Criminology, 76 (2), Summer 1985, 480-489.

"The Relationship Between Victim Resistance and Injury in Noncommercial Robbery" Journal of Legal Studies, XV (1), June 1986, 405-416.

"Robbery Violence" Journal of Criminal Law & Criminology, 78(2), 1987, 357-376. Reprinted in Robert Hornsby and Richard Hobbs (eds.) Gun Violence Ashgate Publishing Ltd. Forthcoming.

"The Technology of Personal Violence" in Michael Tonry, ed. Crime and Justice: An Annual Review of Research Vol. 14, University of Chicago Press, 1991.

Reprinted (in part) in Lee Nisbet (ed.) The Gun Control Debate: You Decide 2nd ed. (Chicago: Prometheus Books, 2001).

"Notes on the Availability and Prevalence of Firearms" American Journal of Preventive Medicine 9(3,supp), 1993.

PJ Cook and MH Moore "Gun Control" in James Q. Wilson and Joan Petersilia, eds. Crime (San Francisco: ICS Press, 1995), 267-294.

PJ Cook, S Molliconi, and T Cole "Regulating Gun Markets" Journal of Criminal Law & Criminology 86(1), 1995, 59-92.

PJ Cook and T Cole "Editorial: Strategic Thinking About Gun Markets and Violence" Journal of the American Medical Association 275(22), June 12, 1996, 1765-7.

PJ Cook and J Leitzel "Perversity, Futility, Jeopardy: An Economic Analysis of the Attack on Gun Control" Law and Contemporary Problems 59(1): Winter 1996: 91-118.

PJ Cook, J Ludwig, and D Hemenway, "The Gun Debate's New Mythical Number: *How Many Defensive Uses Per Year*" Journal of Policy Analysis and Management 16(3) Summer 1997, 463-9.

PJ Cook and J Leitzel, "Gun Control" New Palgrave Dictionary of Economics and Law, 1998.

J Ludwig, PJ Cook, and TW Smith, "The Gender Gap in Reporting Household Gun Ownership" American Journal of Public Health, v. 88, no. 11, Nov. 1998: 1715-1718.

PJ Cook and MH Moore, "Guns, Gun Control, and Homicide: A Review of Research and Public Policy" in M. Dwayne Smith and Margaret A. Zahn, eds., Homicide: A Sourcebook of Social Research Sage Publications, 1998, 277-296. Also in M. Dwayne Smith and Margaret A. Zahn, eds., Studying and Preventing Homicide: Issues and Challenges, Sage Publications, 1998, 246-273.

PJ Cook and J Ludwig, "Defensive Gun Uses: New Evidence from a National Survey" Journal of Quantitative Criminology 14(2), 1998: 111-131 .

SP Teret, DW Webster, JS Vernick, TW Smith, D Leff, GJ Wintemute, PJ Cook, DF Hawkins, AL Kellermann, SB Sorenson, S DeFrancesco, "Support for New Policies to Regulate Firearms: Results of two national surveys" New England Journal of Medicine 339, Sept. 17, 1998: 813-818.

AL Kellermann and PJ Cook, "Armed and Dangerous: Guns in American Homes" in MA Bellesiles, ed., Lethal Imagination: Violence and Brutality in American History New York University Press, 1999, 425-440.

PJ Cook, B Lawrence, J Ludwig, and T Miller, "The Medical Costs of Gunshot Wounds" Journal of the American Medical Association 282(5), August 4, 1999, 447-454.

J Ludwig and PJ Cook, "Homicide and Suicide Rates Associated with Implementation of the Brady Handgun Violence Prevention Act" Journal of the American Medical Association 284(5), August 2, 2000: 585-591.

J Ludwig and PJ Cook, "The Benefits of Reducing Gun Violence: Evidence from Contingent-Valuation Survey Data" Journal of Risk and Uncertainty 22(3), 2001: 207-226.

PJ Cook, MH Moore, and A Braga, "Gun Control" in James Q. Wilson and Joan Petersilia, eds. Crime: Public Policies For Crime Control, ICS Press, Oakland CA., 2002: 291-329.

PJ Cook and A Braga, "Comprehensive Firearms Tracing: Strategic and Investigative Uses of New Data on Firearms Markets" Arizona Law Review 43(2) 2001:277-309. Reprinted with minor changes as "New Law Enforcement Uses for Comprehensive Firearms Trace Data" in Bernard E Harcourt (ed.) Guns, Crime, and Punishment New York: NYU Press, 2003: 163-187.

PJ Cook and JA Leitzel, "'Smart' Guns: A Technological Fix for Regulating the Secondary Gun Market" Contemporary Economic Problems 20(1) January 2002: 38-49.

PJ Cook and J Ludwig, "The Costs of Gun Violence Against Children" The Future of Children 12(2), Summer/Fall 2002: 87-99.

PJ Cook and J Ludwig, "Litigation as Regulation: Firearms" WK Viscusi, ed. Regulation Through Litigation Washington, DC: Brookings Institution Press, 2002: 67-93
AA Braga, PJ Cook, DM Kennedy, and MH Moore "The Illegal Supply of Firearms" in Michael Tonry ed. Crime and Justice: A Review of Research Chicago, University of Chicago Press, 2002: 229-262.

PJ Cook and J Ludwig, "The Effects of Gun Prevalence on Burglary: Deterrence vs Inducement" in J Ludwig and PJ Cook (eds.) Evaluating Gun Policy Washington, DC: Brookings Institution Press, 2003: 74-118.

PJ Cook and J Ludwig, "Pragmatic Gun Policy" in J Ludwig and PJ Cook (eds.) Evaluating Gun Policy Washington, DC: Brookings Institution Press, 2003: 1-37.

PJ Cook and J Ludwig, "The Effects of the Brady Act on Gun Violence" in BE Harcourt (ed.) Guns, Crime, and Punishment in America New York: NYU Press, 2003: 283-298. reprinted in Steven D. Levitt and Thomas J. Miles (eds.) Economics of the Criminal Law Edward Elgar Publishing, 2007.

PJ Cook and Jens Ludwig "Fact-Free Gun Policy" <u>University of Pennsylvania Law Review</u> 151(4), April 2003: 1329-1340.

D Azrael, PJ Cook, and M Miller "State and Local Prevalence of Firearms Ownership: Measurement, Structure, and Trends" <u>Journal of Quantitative Criminology</u> 20(1) March 2004: 43-62.

PJ Cook and J Ludwig "Does Gun Prevalence Affect Teen Gun Carrying After All?" <u>Criminology</u> 42(1) February 2004: 27-54.

"Youths' Involvement with Guns: Motivation vs. Availability" <u>Archives of Pediatrics & Adolescent Medicine</u> July, 2004: 705.

PJ Cook and J Ludwig "Principles for Effective Gun Policy" <u>Fordham Law Review</u> 73(2), November, 2004: 589-613.

PJ Cook, J Ludwig, and A Braga "Criminal Records of Homicide Offenders" <u>Journal of the American Medical Association</u> 294(5), August 3, 2005: 598-601.

GJ Wintemute, PJ Cook, and M Wright "Risk Factors among Handgun Retailers for Frequent and Disproportionate Sales of Guns Used in Violent and Firearm-Related Crimes" <u>Injury Prevention</u> December, 2005: 357-363.

PJ Cook and J Ludwig "The Social Costs of Gun Ownership" <u>Journal of Public Economics</u> 90(1-2), January 2006: 379-391.

PJ Cook and SB Sorenson "The Gender Gap Among Teen Survey Respondents: Why are Boys more Likely to Report a Gun in the Home than Girls?" <u>Journal of Quantitative Criminology</u> 22(1) March, 2006: 61-76.

PJ Cook and J Ludwig "Aiming for evidence-based gun policy" <u>Journal of Policy Analysis and Management</u> 25(3), Summer 2006: 691-735.

"Use and Control of Firearms" <u>Encyclopedia of Law & Society</u>, Sage Publications, Inc., 2007.

PJ Cook, J Ludwig, SA Venkatesh, and AA Braga "Underground Gun Markets" <u>The Economic Journal,</u> 117 (524) November, 2007: 588-618.

SB Sorenson and PJ Cook "'We've Got a Gun?': Comparing Reports of Adolescents and their Parents about Household Firearms" <u>Journal of Community Psychology</u> 36(1), January 2008: 1-19.

PJ Cook and J Ludwig "Firearms Violence" in Michael Tonry (ed.) <u>Oxford Handbook on</u>

Crime and Public Policy Oxford University Press, 2009.

"Robbery" in Michael Tonry (ed.) Oxford Handbook on Crime and Public Policy Oxford University Press, 2009.

PJ Cook, J Ludwig, and AM Samaha "Gun Control After *Heller*: Threats and Sideshows from a Social Welfare Perspective" UCLA Law Review 56(5), June 2009: 1041-1093.

PJ Cook, W Cukier, and K Krause "The Illicit Firearms Trade in North America" Criminology and Criminal Justice 9(3) 2009: 265-286.

PJ Cook, J Ludwig, and AM Samaha "Gun Control After *Heller*: Litigating against Regulation" in Daniel Kessler, ed., Regulation versus Litigation Chicago: University of Chicago Press, 103-135.

PJ Cook, A Braga, and MH Moore "Gun Control" Crime and Public Policy New York: Oxford University Press, 2010: 257-292.

"Post-*Heller* Strategies to Reduce Gun Violence" Journal of Catholic Social Thought 8(1) Winter, 2011: 93-110.

3. OpEd Pieces

"Making Handguns Harder to Hide, The Christian Science Monitor, May 29, 1981.

PJ Cook and J Ludwig "Has the Brady Act Been Successful?" The Charlotte Observer August 15, 2000.

PJ Cook and J Ludwig "Toward Smarter Gun Laws" The Christian Science Monitor Feb. 6, 2001.

PJ Cook and J Ludwig "Protecting the Public in Presidential Style" News & Observer June 10, 2001.

PJ Cook and J Ludwig "What did the sniper case teach us? Lessons in Gun Control" News & Observer Nov. 3, 2002, 25A.

PJ Cook and J Ludwig "Will wider availability of guns improve public safety? No" CQ Researcher Oct. 31, 2008.

E. Income Distribution

1. Book

RH Frank and PJ Cook The Winner-Take-All Society (New York: The Free Press, 1995).

Named a "Notable Book of the Year, 1995" by the *New York Times Book Review;* named one of the ten Best Business Books of 1995 by *Business Week*; given The Critics' Choice Award 1995-96 by the *San Francisco Review of Books.* Paperback edition (Penguin Books, 1996). Named "One of Ten best books of the year, 1996" by *The China Times.* Portuguese, Korean, Chinese, and Japanese editions.

RH Frank and PJ Cook  "Preface to the new edition" The Winner-Take-All Society (London: Virgin Books, Random House, 2010).

2. Article

PJ Cook and RH Frank "The Growing Concentration of Top Students at Elite Schools" in Charles T. Clotfelter and Michael Rothschild, eds. Studies of Supply and Demand in Higher Education (Chicago: University of Chicago Press, 1993).

PJ Cook and RH Frank "The Economic Payoff of Attending an Ivy-League Institution" in Richard Delgado and Jean Stefancic, eds., Critical White Studies: Looking Behind the Mirror Temple University Press, 1997.

RH Frank and PJ Cook "The winner-take-all society" in William Darity, ed., The International Encyclopedia of the Social Sciences, 2nd ed. Gale, 2007.

3. OpEd and Magazine Articles (with Robert Frank)
*USA Today*, October 9, 1995, p. 13A
*Washington Post*, November 12, 1995
*Washington Monthly*, December 1995
*Chronicle of Higher Education*, January 5, 1996

F. Other topics

"A 'One Line' Proof of the Slutsky Equation" The American Economic Review, March 1972, 139.

PJ Cook and Robert H. Frank "The Effect of Unemployment Dispersion on the Rate of Wage Inflation" Journal of Monetary Economics 1, 1975, 241-249.

PJ Cook and JW Vaupel "What Policy Analysts Do:  Three Research Styles" Journal of Policy Analysis and Management, 4 (3) Spring, 1985, 427-8.

PJ Cook and J Ludwig "Weighing the Burden of 'Acting White'; Are there Race Differences in Attitudes Towards Education?" Journal of Policy Analysis and Management 16(2), Spring 1997, 256-278.  (Winner of the Vernon Prize for best paper in Volume 16)

. . .

PJ Cook and Jens Ludwig "The Burden of 'Acting White:' Do Black Adolescents Disparage Academic Achievement?" in Christopher Jencks and Meredith Phillips (eds.) The Black-White Test Score Gap Brookings Institution Press, Washington DC, 1998: 375-400.   Reprinted in Minority status, Oppositional Culture and Academic Engagement John U. Ogbu, Ed.  New York: RoutledgeFarmer, forthcoming.

PJ Cook, R MacCoun, C Muschkin, and J Vigdor "The Negative Impacts of Starting Middle School in Sixth Grade" Journal of Policy Analysis and Management Winter 2008, 104-121.  (winner of the Raymond Vernon Memorial Prize, 2008)

"Acting White" in William Darity, ed. International Encyclopedia of the Social Sciences, 2nd ed. Gale, 2007.

R MacCoun, PJ Cook, C Muschkin, and J Vigdor "Distinguishing Spurious and Real Peer Effects: Evidence from Artificial Societies, Small-Group Experiments, and Real Schoolyards"  Review of Law and Economics  4(3), 2008: 695-714.

E H-W Kim and PJ Cook, The continuing importance of children in relieving elder poverty: evidence from Korea Ageing & Society 2011, forthcoming.

## Book reviews

Of Jack P. Gibbs, Crime, Punishment, and Deterrence in Contemporary Psychology 21:5, 1976.

Of Kenneth Dolbeare (ed.) Public Policy Evaluation in Policy Analysis, Fall 1977, 604-606.

Of David T. Stanley, Prisoners Among Us in Policy Analysis, Winter 1978, 139-141.

Of John Heineke, Economic Models of Criminal Behavior in Southern Economic Journal, April 1980, 1255-1257 (with Anne Witte).

Of Laurence Ross, Deterring the Drinking Driver in Journal of Health Politics, Policy, and Law, Winter 1983, 958-961; and in Popular Government, Winter 1983, 37-38.

Of Robert H. Frank, Choosing the Right Pond:  Human Behavior and the Quest for Status in Journal of Policy Analysis and Management, Fall 1986.

Of Michael D. Laurence, John R. Snortum, and Franklin Zimring. eds., Social Control of the Drinking Driver, in Science, July 29, 1988.

Of Michael Tonry and Norval Morris, eds., Drugs and Crime in Journal of Policy Analysis and Management 10(3), Summer 1991.

Of Mark A.R. Kleiman, <u>Against Excess: Drug Policy for Results</u>; and Franklin E. Zimring and Gordon Hawkins, <u>The Search for Rational Drug Control Policy</u> in <u>Journal of Policy Analysis and Management</u> 11(4), Fall 1992.

Of H. Laurence Ross, <u>Confronting Drunk Driving: Social Policy for Saving Lives</u> in <u>Journal of Health Politics, Policy and Law</u> 18(1) Spring 1993, 235-237.

Of Willard Manning et al, <u>The Costs of Poor Health Habits</u> in <u>Policy Currents</u> 2(4), Nov. 1992.

Of Gary Kleck, <u>Point Blank: Guns and Violence in America</u> in <u>New England Journal of Medicine</u> February 3, 1994.

Of Robert L. Rabin and Stephen D. Sugarman, eds., <u>Smoking Policy: Law Politics and Culture</u> in <u>Science</u> 262, December 10, 1993.

Of Trudy Ann Karlson and Stephen W. Hargarten, <u>Reducing Firearm Injury and Death: A public health sourcebook on guns</u> in <u>New England Journal of Medicine</u>, February 5, 1998.

Of Tyler Cowen, <u>What Price Fame?</u> in <u>Journal of Economic Literature</u> September 2001, 933-935.

Of Felix Gutzwiller and Thomas Steffen, <u>Cost-Benefit Analysis of Heroin Maintenance Treatment</u> in <u>Addiction</u> 2001, v. 96, 1071-2.

Of Robert J. MacCoun and Peter Reuter <u>Drug War Heresies</u> in <u>Journal of Policy Analysis and Management</u> v. 21(2), Spring 2002, 303-306.

Of James B. Jacobs <u>Can Gun Control Work?</u> in <u>Journal of Policy Analysis and Management</u> 23(1), Winter 2004, 198-201.

Of S. Selvanathan and E.A. Selvanathan <u>The Demand for Alcohol, Tobacco, and Marijuana: International Evidence</u> in <u>Addiction</u> 102, 2007: 830.

Of Harold Winter <u>The Economics of Crime: An introduction to rational crime analysis</u> in <u>Journal of Economic Literature</u> v. 47: Sept. 2009.

<u>Unpublished monographs</u>

"The Effect of Legitimate Opportunities on the Probability of Parolee Recidivism," Institute of Policy Sciences and Public Affairs, Duke University, 1973.

"Citizen Cooperation with the Criminal Justice System," Institute of Policy Sciences and Public Affairs, Duke University, 1976.

"A Summary of State Legal Codes Governing Juvenile Delinquency Proceedings" (with Joseph Austin and Richard Levi), Institute of Policy Sciences and Public Affairs, Duke University, 1977.

"Life, Liberty, and the Pursuit of Self Hazardous Behavior" (with James Vaupel), Institute of Policy Sciences and Public Affairs, Duke University, 1978.

"Regulating Handgun Transfers: Current State and Federal Procedures, and an Assessment of the Feasibility and Cost of the Proposed Procedures in the Handgun Crime Control Act of 1979" (with James Blose), Institute of Policy Sciences and Public Affairs, Duke University, 1980.

<u>Public and Invited Lectures</u>

PJ Cook, San Francisco: MacArthur Foundation Group on Juvenile Justice, 28 February 2003.

PJ Cook, University of Virginia Law School, 11 March 2003.

PJ Cook, University of Virginia Medical Center, 12 March 2003.

PJ Cook, University of Pennsylvania Symposium on Gun Policy, 24 April 2003.

P.J. Cook, Washington, DC: National Institute of Justice, 28 July 2003.

PJ Cook, Washington DC: Robert Wood Johnson Foundation Investigator Award Conference, 9 October 2003.

PJ Cook, UNC-CH Public Health School, 20 October 2003.

P.J.Cook, University of Delaware, 23 October 2003.

The Social Costs of Gun Ownership, Cambridge, MA, March 26, 2004.

Effective gun policy, Fordham Law School, April 13, 2004.

Effective gun policy, Columbia University Law School, April 14, 2004.

The Homicide Epidemic, Emory University Sociology Department, October 28, 2004.

Hochbaum Lecture, UNC School of Public Health, Chapel Hill, April 10, 2006.

European Economic Assn, Vienna, Austria, August 25, 2006.

Symposium honoring Thomas Schelling, University of Maryland, College Park, September 29, 2006.

Robert Wood Johnson Foundation Investigators Award, San Diego, October 6, 2006.

Davis Lectureship, University of Chicago Center for Health Administration Studies, December 6, 2006.

2007 Crime & Population Dynamics Summer Workshop, Aspen Wye River Center, June 04, 2007.

Paying the Tab: The case for higher alcohol taxes, Johns Hopkins University Institute for Policy Studies, February 14, 2008.

Alcohol and Tobacco Taxes as Public Health Measures, Washington DC: American Medical Assn President's Forum, March 31, 2008.

Paying the Tab: The case for raising the alcohol excise tax, Rutgers University School of Social Work, April 23, 2008.

Cost-Benefit Analysis of Crime, Washington DC, June 25, 2008.

The New Second Amendment, Virginia Tech Department of Economics, October 13, 2008.

Paying the Tab: The case for higher alcohol taxes, Bloomberg School of Public Health, Johns Hopkins University, December 03, 2008.

Sussmilch Lecture: Estimating the effects of alcohol taxation on mortality, Max Planck Institute for Demographic Research, Rostock, Germany, December 16, 2008.

Paying the Tab, University of Maryland, February 13, 2009.

Lessons from Alcohol Control Research, San Diego, California, February 20, 2009.

Paying the Tab, University of Maryland Baltimore County, March 04, 2009.

Benefits of Crime Reduction, National Academy of Sciences, March 05, 2009.

School Crime, University of Maryland, March 09, 2009.

Post-Heller Strategies to Reduce Gun Violence, Villanova University, March 24, 2009.

Gun control after Heller, Emory University Department of Economics, December 04, 2009.

Private inputs into crime control, Economics Department, University of Virginia, February 04, 2010.

Private inputs into public safety, Royal Economic Society Annual Conference, Surrey, March 30, 2010.

The case for and against preserving a minimum drinking age of 21, Duke University, May 19, 2010.

The Scientific and Intuitive Case for Higher Alcohol Taxes, Helsinki, Finland, September 22, 2010.

Public safety through private action, Bonn, Germany, October 09, 2010.

Public safety through private action, Harvard Law and Economics Workshop, February 08, 2011.

Public safety through private action, University of Oregon Department of Economics, March 05, 2011.

Crime and the Business Cycle, Andrew Young School of Policy Studies, Georgia State University, March 10, 2011.

Public safety through private action, Vanderbilt Law and Economics Program, April 25, 2011.

Alcohol and Violence, Washington DC, April 28, 2011.

Lessons from an (un)controlled experiment, Jerry Lee Symposium on Criminology and Public Policy, May 03, 2011.

<u>Conferences</u>

Unraveling the Urban Enigma, Wharton School, University of Pennsylvania, May 04, 2007.

Boisi Center Conference on Gambling and the American Moral Landscape, Boston College, October 25, 2007.

<u>Selected Research grants</u>

Principal investigator, "Evaluating Policy Options to Increase Citizen Cooperation in Urban Law Enforcement," A Durham Observatory Project, 1975.

Principal investigator, "The Processing of Gun Crimes in D.C. District Court," Institute of Law and Social Research, 1977.

Principal investigator, "Empirical Studies of Robbery and Handgun Control," U.S. Department of Justice.

Principal investigator, "Evaluating Alternative Policy Strategies for Controlling the Distribution of Handguns" (with Mark Moore), Ford Foundation, 1977-79.

Principal investigator, "A Review of the Major Gun Regulation Proposals," Center for the Study and Prevention of Handgun Violence, 1979-80.

Principal investigator, "A Review of Robbery Literature," National Institute of Justice, 1981.

Principal investigator, "Robbery Violence," National Institute of Justice, 1983-85.

Principal investigator, "Vice," The Chicago Resource Center, 1987

Principal investigator, "Costs of the Death Penalty in North Carolina," NC Administrative Office of the Courts, 1991-93.

Principal investigator, "Causes and Effects of Youthful Drinking," National Institute on Alcohol Abuse and Alcoholism, 1992-1994.

Principal investigator, "Markets for Stolen Guns," Harry Frank Guggenheim Foundation, 1993-4.

Principal investigator, "The Costs of Gunshot Wounds," The Joyce Foundation, 1997-99.

Principal investigator, "Community Gun Prevalence and Crime," The Joyce Foundation, 2000-2003.

Investigator Award In Health Policy Research, Robert Wood Johnson Foundation, 2003-4.

Principal Investigator, "evaluations of two programs in Milwaukee designed to reduce serious criminal violence" Joyce Foundation, 2007-2008.

Principal Investigator, "Fiscal Costs of Capital Punishment in NC" Z. Smith Reynolds Foundation, 2007-2008.

Principal Investigator, "An Experimental Evaluation of the Milwaukee Prisoner Re-entry Program" Smith Richardson Foundation, 2008-2011.

Co-Investigator, "Preventing truancy in urban schools through provision of social services by truancy officers: A Goal 3 randomized efficacy trial"   US Department of Education/IES: 2010 – 2014.

## Service and Administrative Activities at Duke University

Director of Undergraduate Studies, Institute of Policy Sciences and Public Affairs, 1974-75, 1992.

Director of Graduate Studies, Institute of Policy Sciences and Public Affairs, 1977-79, 1984, and 1994-95.

Chairman, Graduate Curriculum Committee, Institute of Policy Sciences and Public Affairs, 1977-79.

Member, Undergraduate Faculty Council of Arts and Sciences, 1977-78, 1991-93.

Author of an evaluation of undergraduate admission policy, commissioned by the Undergraduate Faculty Council, 1978.

Member, Academic Council, Duke University, 1978-79, 1982-84, 1993-95, 1998-2000 Elected to the Executive Committee of the Academic Council, 1982-83.

Associate Director, Institute of Policy Sciences and Public Affairs, 1979-1985, 2005-.

Pre-Major Advisor, 1981-85.

Member, UFCAS Committee on Admissions, 1984-86.

Member, University Committee on Undergraduate Admissions and Financial Aid, 1986 - 87.

Author of a special report on predicting yields from undergraduate admissions, 1987.

Member, Dean White's Ad Hoc Committee on Undergraduate Internships, 1987.

Member, President's Administrative Oversight Committee, 1987-90.

Chairman, Public Policy Studies Committee on Appointments and Promotion, 1990-93.

Chair, Provost's committee to review Dean Earl Dowell for reappointment, 1992.

Member, Arts and Sciences Committee on Planning and Priorities, 1993-95. Chair, 1994-95.

Member, Dean Search Committee, Fuqua School of Business, 1994.

Chair, PPS Diversity Committee, 1994-95.

Member, Executive Committee of the Graduate School, 1995-96

Member, steering committee, Child and Family Policy initiative, 1999

Member, Dean's Search Committee, Duke Law School, 1999

Member, Planning Committee, Institute for Genome Sciences and Policy, 1999

Chair, Arts & Sciences Council Task Force on the Budget, 2001-2

## Public and Professional Service

Chairman, Weapons and Violent Crime Workshop, NILECJ, LEAA, U.S. Department of Justice, February 1978.

Presenter, N.C. Governor's Crime Commission, June and September, 1979.

Panel member, National Research Council Study of Alternative Policies Affecting the Prevention of Alcohol Abuse and Alcoholism, 1978-1981.

Member, N.C. Governor's Task Force on Drunken Driving, 1982.

Member, Ad Hoc Workshop on the Future of Criminal Justice Research, U.S. Department of Justice and National Research Council, March 1982.

Testified on alternative gun-control policies before the U.S. Senate Criminal Law Subcommittee, March 4, 1982.

Testified on alcohol tax policy before the Social Security Advisory Council, May 25, 1982.

Participant, Sixty-Sixth American Assembly (Public Policy on Alcohol Problems), Harriman, NY, April 26-29, 1984.

Member, Executive Session on the Juvenile Justice System, Harvard University, 1984-85.

Member, Policy Council of the American Society of Criminology, 1985-86, and 1990-91.

Invited participant, Conference on the Cigarette Excise Tax sponsored by the Harvard Institute for the Study of Smoking Behavior, Washington, DC, April 17, 1985.

Member, "Crime and Violence" working group of the NAS Committee on Basic Research, 1985.

Member, Research Advisory Committee of the U.S. Sentencing Commission, 1986-91 (Chair, 1986).

Associate, Canadian Institute of Advanced Research, 1986.

Member, Board of Advisors, Public Policy Program, College of William & Mary, 1987-1992.

Member, National Academy of Sciences Committee on Law and Justice, 1987-1993.

Treasurer, Association of Public Policy Analysis and Management, 1987-1994.

Testified on the use of alcohol taxation as a public-health measure before the U.S. Senate Committee on Governmental Affairs, September 27, 1988.

Member, Workshop on Health Economics, National Institute of Alcohol Abuse and Alcoholism, September 1988.

Member, National Research Council's Panel on the Understanding and Control of Violent Behavior, 1988-91.

Member, Advisory Board to the Injury Prevention Research Center, University of North Carolina, 1990-.

Witness, "Problems and Prospects for a N.C. Lottery" North Carolina Economic Future Commission, December 5, 1990.

Invited participant, CDC's Forum on Youth Violence in Minority Communities, Atlanta, December 10-12, 1990.

Member, President's Advisory Board of the H. John Heinz III School of Public Policy and Management, Carnegie Mellon University, 1992-96 and subsequently (including 2007).

Consultant, Tax Advisory Program, US Department of Treasury, 1994-95.

Steering Committee, National Consortium on Violence Research, 1995-1997.

Member, Center for Gun Policy Research, Johns Hopkins University, 1995-.

Invited participant, White House Leadership Conference on Youth, Drug Use, and Violence, March 7, 1996.

Invited speaker, U.S. Senate Democratic Policy Council, Wilmington, DE, April 26, 1996.

Member, National Academy of Sciences (IOM) Committee on Injury Prevention and Control, 1997-8.

Member, Advisory Committee to the Harvard Injury Control Research Center, 1998-.

Consultant, US Department of Treasury, Enforcement Division, 1999-2000.

Member, National Academy of Sciences (NRC) Case Studies of School Violence Committee, 2001-2002.

Member, Division Committee for the Behavioral and Social Sciences and Education, National Research Council, 2001-2004.

Member, "Committee to Develop a Strategy to Prevent and Reduce Underage Drinking", Institute of Medicine 2002-3.

Member, Panel on Assessing the Feasibility, Accuracy, and Technical Capability of a National Ballistics Database, The National Academies 2004-5.

Member, *Crime and Justice* editorial board, 2007-1010.

Member, National Research Council Workshop on Understanding Crime Trends, 2007-8

Co-Director, NBER Economics of Crime Working Group, 2007-

Vice Chair, National Research Council Committee on Law and Justice, 2006-2010.

Vice President, Association of Public Policy and Management, 2008-2009 (two years).

Panel member, International Benchmarking Review of UK Sociology: 2009-2010. http://www.esrcsocietytoday.ac.uk/ESRCInfoCentre/Support/Evaluation/ibr/IBR_Sociology.aspx

Member, International Scientific Advisory Board, Netherlands Institute for the Study of Crime and Law Enforcement (NSCR), 2010-.

Member, National Research Council Committee on Deterrence and the Death Penalty, August 2010 – November 2011.

## Refereeing

Associate editor, <u>Law and Contemporary Problems</u>, 1974-78.

Editorial consultant, <u>Journal of Criminal Law and Criminology</u>, 1982-.

Member, Editorial Board, <u>Journal of Policy Analysis and Management</u>, 1986- 2002.

Associate Editor, <u>Criminology</u>, 1987-91.

Editorial board, <u>Criminology & Public Policy</u>  2010-

Occasional refereeing: American Economic Review, Journal of Political Economy, Journal of Public Economics, Economic Inquiry, Journal of Legal Studies, Journal of Law and Economics, New England Journal of Medicine, Journal of the American Medical Association, Criminology and other professional journals.

# APPENDIX B

## MATERIALS REVIEWED

In addition to the materials specifically referenced in the footnotes to my report and my own articles referenced in my *curriculum vitae* attached as Appendix A, I reviewed and considered the following in forming my opinion:

1. Chicago City Ordinance, Ch. 4-144

2. Chicago City Ordinance, Ch. 8-20

3. Illinois Firearm Owners Identification Card Act, 430 ILCS 65/0.01, *et seq.*

4. Second Amended Complaint in *Illinois Association of Firearms Retailers, et al. v. City of Chicago*, No. 10-CV-4184 (N.D. Ill. Jan. 12, 2011)

5. Deposition of Kevin Johnson in *Illinois Association of Firearms Retailers, et al. v. City of Chicago*, No. 10-CV-4184 (N.D. Ill. Apr. 19, 2011)

6. Plaintiffs' Response to City's Document Request No. 16 in *Illinois Association of Firearms Retailers, et al. v. City of Chicago*, No. 10-CV-4184 (N.D. Ill. Mar. 10 & Apr. 29, 2011)

7. Prepared Testimony before Chicago City Council produced in *Illinois Association of Firearms Retailers, et al. v. City of Chicago*, No. 10-CV-4184 (N.D. Ill.) as CITY395–409

8. CPD Crime Data produced in *Illinois Association of Firearms Retailers, et al. v. City of Chicago*, No. 10-CV-4184 (N.D. Ill.) as CITY1376–470 (Reported Incidents by Offense Type, Location, Description, and Year)

9. CPD Crime Data produced in *Illinois Association of Firearms Retailers, et al. v. City of Chicago*, No. 10-CV-4184 (N.D. Ill.) as CITY1471 (# of Reported Crime Incidents Where Offense Was Home Invasion + A Firearm-Related Offense)

10. CPD Crime Data produced in *Illinois Association of Firearms Retailers, et al. v. City of Chicago*, No. 10-CV-4184 (N.D. Ill.) as CITY1472 (# of Firearms Turned in by Citizens at Annual "Gun Turn-In" Events in City of Chicago)

11. CPD Data produced in *Illinois Association of Firearms Retailers, et al. v. City of Chicago*, No. 10-CV-4184 (N.D. Ill.) as CITY1473 (Civilian Registered Firearms)

12. CPD Crime Data produced in *Illinois Association of Firearms Retailers, et al. v. City of Chicago*, No. 10-CV-4184 (N.D. Ill.) as CITY1474–502 (# of Crime Victims by Offense Type and Age)

13. CPD Crime Data produced in *Illinois Association of Firearms Retailers, et al. v. City of Chicago*, No. 10-CV-4184 (N.D. Ill.) as CITY1503–12 (# of Crime Victims by Offense Type and Gender)

14. Operation "Gunsmoke" Files produced in *Illinois Association of Firearms Retailers, et al. v. City of Chicago*, No. 10-CV-4184 (N.D. Ill.) as CITY4562–6830

15. Documents produced in *Illinois Association of Firearms Retailers, et al. v. City of Chicago*, No. 10-CV-4184 (N.D. Ill.) as CITY6831–7910

16. Report by Daniel W. Webster, ScD, MPH on the Justification for Chicago's Limit of One Operable Firearm in the Home produced in *Illinois Association of Firearms Retailers, et al. v. City of Chicago*, No. 10-CV-4184 (N.D. Ill.)

17. Chicago Police Department, Annual Reports, Online at https://portal.chicagopolice.org/portal/page/portal/ClearPath/News/Statistical%20Reports/Annual%20Reports

18. Chicago Police Department, Murder Reports, Online at https://portal.chicagopolice.org/portal/page/portal/ClearPath/News/Statistical%20Reports/Murder%20Reports

19. Rosenthal, L., "Second Amendment after *Heller*: Of Standards of Scrutiny, Incorporation, Well-Regulated Militias, and Criminal Street Gangs," Urban Lawyer, 41, 2009: 1

20. Wiebe, D.J., *et al.*, "Homicide and Geographic Access to Gun Dealers in the United States," BMC Public Health, 9, 1999: 199

21. Mayor's Against Illegal Guns, "The Movement of Illegal Guns in America: The Link Between Gun Laws and Interstate Gun Trafficking" (Dec. 2008)

22. Department of Justice, Bureau of Alcohol, Tobacco, Firearms and Explosives, Office of Strategic Information and Intelligence, "2009 Illinois Trace Data" (2010)

23. Americans for Gun Safety Foundation, "Selling Crime: A Handful of Gun Stores Fuel Criminals" (Jan. 2004)

24. U.S. Department of Justice, Office of the Inspector General, Evaluations and Inspections Division, "Inspections of Firearms Dealers by the Bureau of Alcohol, Tobacco, Firearms and Explosives," Report No. I-2004-005 (Jul. 2004)

25. Department of the Treasury, Bureau of Alcohol, Tobacco and Firearms, "Following the Gun: Enforcing Federal Laws Against Firearms Traffickers" (Jun. 2000)

26. United States Department of Justice, Bureau of Alcohol, Tobacco, Firearms and Explosives, "Shot Show—January 2011: Inspection Findings" (2011)

27. Legal Community Against Gun Violence, "Illinois: Summary of State Firearms Laws: Sales and Transfers," online at http://www.lcav.org/states/illinois.asp#SalesTransfers

28. Children's Memorial Research Center. Illinois Violent Death Reporting System 1(1) (Aug. 2007)

# Exhibit 14

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

CASE NO. 10-CV-4184
Judge Edmond E. Chang

ILLINOIS ASSOCIATION OF
FIREARMS RETAILERS, KENNETH
PACHOLSKI, KATHRYN TYLER, and
MICHAEL HALL,
        Plaintiffs,

vs.

THE CITY OF CHICAGO and
RICHARD M. DALEY, Mayor of the
City of Chicago,

        Defendants.

Volume 1
Page 1 - 327

---

VIDEOTAPED
DEPOSITION OF:       GARY KLECK

TAKEN AT INSTANCE OF:    The Defendants

DATE:            October 28, 2011

TIME:            Commenced at  9:03 a.m.
                   Concluded at 12:11 a.m.

LOCATION:        200 North Monroe Street
                   Tallahassee, Florida

REPORTED BY:      L. DANIELLE FREEZE
                   Certified Realtime Reporter
                   Lfreeze37@comcast.net

ACCURATE STENOTYPE REPORTERS, INC.
2894 REMINGTON GREEN LANE
TALLAHASSEE, FL  32308  850.878.2221
asreporters@nettally.com



ESQUIRE
an Alexander Gallo Company

Toll Free: 800.708.8087
Facsimile: 312.704.4950

Suite 1200
311 West Monroe Street
Chicago, IL 60606
www.esquiresolutions.com

Gary Kleck                                      October 28, 2011

                                                              2

1    APPEARANCES:

2

3              REPRESENTING PLAINTIFFS:

4

           CHARLES J. COOPER, ESQUIRE
5          ccooper@cooperkirk.com
           COOPER & KIRK
6          1523 New Hampshire Ave., N.W.
           Washington, D.C.  20036
7          202.220.9660

8

9              REPRESENTING DEFENDANTS:

10

           CRAIG WOODS, ESQUIRE
11         cwoods@mayerbrown.com
           RANJIT J. HAKIM, ESQUIRE
12         rhakim@mayerbrown.com
           MAYER BROWN LLP
13         71 South Wacker Drive
           Chicago, IL  60606-4637
14         312.701.8758

15

16

17

18             ALSO PRESENT:

19         Barbara Kirkland-Graves, Videographer

20

21

22

23

24

25



ESQUIRE
an Alexander Gallo Company

Toll Free: 800.708.8087
Facsimile: 312.704.4950

Suite 1200
311 West Monroe Street
Chicago, IL 60606
www.esquiresolutions.com

26

1    don't?

2        A     Correct.

3        Q     Okay.  What about the Journal of Political

4    Economy; are you familiar with that?

5        A     Yes, I would -- I should have mentioned that.

6    That would also definitely be a leading journal in the

7    field of economics.

8        Q     What about leading journals in the field of

9    public health?

10        A     American Journal of Public Health.

11        Q     Are there any other leading journals that you

12    would consider -- well, strike that.

13            Would you consider the Journal of the

14    American Medical Association to be a leading

15    peer-reviewed journal, scholarly journal in the United

16    States?

17        A     In the medical field, yes.

18        Q     In the medical field.

19            What about the New England Journal of

20    Medicine, the same in the medical --

21        A     The same.

22        Q     Okay.  Have you ever been awarded any grants

23    for your research on firearms and violence?

24        A     No.

25        Q     Any of the work that you've done, has it been



ESQUIRE
an Alexander Gallo Company

Toll Free: 800.708.8087
Facsimile: 312.704.4950

Suite 1200
311 West Monroe Street
Chicago, IL 60606
www.esquiresolutions.com

Gary Kleck                                        October 28, 2011

1       A       Yes.

2       Q       Currently?

3       A       Yes.

4       Q       How long have you owned guns?

5       A       Since the early 1980s.

6       Q       And do you typically carry a weapon on your

7   person?

8       A       No.

9       Q       Now, in Florida, if I'm right, there's a right

10  to carry a concealed carry; is that correct?

11      A       Yes.

12      Q       Do you have a permit for a concealed carry?

13      A       No.

14      Q       Do you need a permit for a concealed carry in

15  Florida?

16      A       Yes.  And -- if you were going to carry on the

17  person.

18      Q       How do you store -- how many weapons do you

19  have?

20      A       Two.

21      Q       Are they both handguns?

22      A       Yes.

23      Q       And how do you store them at home?

24      A       I keep them stored with a trigger lock on each

25  one.



ESQUIRE
an Alexander Gallo Company

Toll Free: 800.708.8087
Facsimile: 312.704.4950

Suite 1200
311 West Monroe Street
Chicago, IL 60606
www.esquiresolutions.com

Gary Kleck                                          October 28, 2011

36

1       Q      Do you have a -- a gun safe in your house?

2       A      No.

3       Q      Do you consider a trigger lock to be a safe

4    method of storing those guns?

5       A      Yes.

6       Q      In your home, do you typically have a gun in --

7    loaded at all times?

8       A      Yes.

9       Q      Do you have a trigger lock on the gun when it

10   is loaded?

11      A      Yes.

12      Q      Why do you do that?

13      A      At this point, there's probably not much

14   rational reason because my kids are out of the house.

15   But at the time I had kids, my primary concern was that

16   the kids not get ahold of a loaded gun.  Now it's a

17   matter of habit, I guess.

18      Q      Have you ever discharged those weapons before?

19      A      Yes.

20      Q      Have you gone through training at all?

21      A      I've never gone through any formal training.

22      Q      Have you ever used your gun in a defensive

23   manner?  Have you ever discharged your gun in a defensive

24   manner before?

25      A      No.



ESQUIRE
an Alexander Gallo Company

Toll Free: 800.708.8087
Facsimile: 312.704.4950

Suite 1200
311 West Monroe Street
Chicago, IL 60606
www.esquiresolutions.com

Gary Kleck                                          October 28, 2011

104

1       Q     Does that mean it's your position that when

2   someone is permitted to do something, that they typically

3   do or many people do take advantage of that?

4       A     It would be a combination of being allowed to

5   do that by departmental regulations, plus having a strong

6   motive to do so.

7       Q     But you don't know how many officers actually

8   take advantage of that; correct?

9       A     No, I do not.

10      Q     I assume since you use trigger locks on your

11  gun, that you would agree that they do have a safety

12  benefit?

13      A     Yes.

14      Q     And that's pretty much undisputed?

15      A     No, I -- I'd say almost any assertion you make

16  in the gun area has been disputed by somebody.  It's not

17  disputed by me but...

18      Q     Okay.  So, for instance, Mr. Vince references

19  that confiscated guns are secured with safety locks;

20  right?

21      A     Are you asking did he say that?

22      Q     Something -- he said that guns that are

23  confiscated in crimes are secured with some kind of

24  safety lock or trigger lock to prevent --

25      A     I think he did say something like that, yes.



ESQUIRE
an Alexander Gallo Company

Toll Free: 800.708.8087
Facsimile: 312.704.4950

Suite 1200
311 West Monroe Street
Chicago, IL 60606
www.esquiresolutions.com

Gary Kleck                                           October 28, 2011

1      Q    And do you know why that is?

2      A    No, I -- I don't know what the motives of

3   police departments that do that are.  I could guess, but

4   I -- I don't have any documentary evidence on it.

5      Q    I mean, you would -- what -- what would be your

6   guess; it would be for safety purposes, to prevent

7   unauthorized use?

8      A    It -- it -- yes, it provides some assurance

9   against somebody firing the guns who didn't have a -- a

10  key to the lock.  That certainly would be part of it.

11     Q    And is that a similar reason to why retailers

12  put safety locks on guns that they have on display?

13     A    Very likely.

14     Q    And that's because they -- they actually do

15  prevent unauthorized use; correct?

16     A    It's because they make a -- they seem a

17  sensible step to take in order to prevent unauthorized

18  use.

19     Q    Now, do you know -- you're familiar with the

20  organization NSSF?

21     A    Yes.

22     Q    What is that?

23     A    It's a -- it's a foundation advancing the

24  interests of the gun industry, National Shooting Sports

25  Foundation, I think is what that stands for.



ESQUIRE
an Alexander Gallo Company

Toll Free: 800.708.8087
Facsimile: 312.704.4950

Suite 1200
311 West Monroe Street
Chicago, IL 60606
www.esquiresolutions.com

Gary Kleck                                    October 28, 2011

108

1    gun buy a second gun or a third gun?

2        A    Yes.

3        Q    Are you aware of any person or entity in the

4    gun industry who asserts that the use of a trigger lock

5    or other safety mechanism impairs defensive gun use?

6        A    I'm not aware one way or another on that issue.

7        Q    And the same would be true for anyone outside

8    the gun industry?

9        A    Well, actually, could you ask the original

10   question again?

11       Q    Sure.  We'll have her read it back.

12            Two questions ago.

13            (The record was read by the reporter.)

14       A    In that case, the answer to your last question

15   would be yes --

16   BY MR. WOODS:

17       Q    Who --

18       A    -- for persons outside of the gun industry,

19   undoubtedly, there have been many people who have

20   asserted this.

21       Q    And who are -- do you know who they are?

22       A    I wouldn't be able to identify individuals,

23   only it would be a commonplace assertion.

24       Q    Okay.

25       A    Virtually anything that secures the gun,



ESQUIRE
an Alexander Gallo Company

Toll Free: 800.708.8087
Facsimile: 312.704.4950

Suite 1200
311 West Monroe Street
Chicago, IL 60606
www.esquiresolutions.com

1    somebody has argued that it impairs its usefulness for

2    self-defense.

3         Q    Are you taking the position that the use of

4    trigger locks does impair the ability to use that gun in

5    self-defense?

6         A    Yes.

7         Q    Do trigger locks deter theft at all?

8         A    We don't know for sure.  It seems reasonable

9    that it does that.  It depends on the extent to which

10   thieves are aware of how hard it is to get a trigger lock

11   off of a gun you've stolen.

12        Q    Is it hard to get a trigger lock off a gun

13   you've stolen?

14        A    Yes, very hard.

15        Q    And how do you know that?

16        A    Just because I'm familiar with the

17   construction.  It's really hard steel.  It's curved.  You

18   can't easily get a hacksaw blade on it.  There's no angle

19   by which you can cut it so as to remove it.

20             So, in fact, I've never even heard of a

21   criminal successfully getting a trigger lock off.

22        Q    That was going to be my next question.

23             Okay.  So just common sense would tell you

24   that a trigger lock would deter theft?

25        A    Probably.  Again, with the qualifier to the



ESQUIRE
an Alexander Gallo Company

Toll Free: 800.708.8087
Facsimile: 312.704.4950

Suite 1200
311 West Monroe Street
Chicago, IL 60606
www.esquiresolutions.com

Gary Kleck                                          October 28, 2011

1      A     If the criminal was concealing, was holding his

2    hand in front of it, no, you wouldn't.  So it's small

3    enough that a person who was thinking in those terms

4    could easily conceal it.

5      Q     Are you aware of any study indicating that

6    trigger locks do not prevent accidental or impulsive

7    discharge?

8      A     No, I'm not aware of any study of that sort.

9      Q     Are you aware of any study that demonstrates

10   the use of a trigger lock prevents effective defensive

11   gun use?

12     A     No, I don't think the -- the topic has ever

13   been studied.

14     Q     Now, if you go to page 4 again, in your expert

15   report, the last sentence of the first paragraph on the

16   page there, it says:  In sum, the half paragraph, the

17   carryover paragraph:  In sum, do you see that?

18     A     Yes.

19     Q     In sum, none of the evidence Vince presents

20   contradicts the hypothesis that requiring a gun to be

21   secured by a locking device will sometimes prevent

22   effective defensive gun use.

23           You agree that that's just a hypothesis?

24     A     Well, I wouldn't say just a hypothesis.  It's a

25   highly plausible hypothesis.  Some hypotheses have more



ESQUIRE
an Alexander Gallo Company

Toll Free: 800.708.8087
Facsimile: 312.704.4950

Suite 1200
311 West Monroe Street
Chicago, IL 60606
www.esquiresolutions.com

Gary Kleck                                    October 28, 2011

112

1   plausibility than others.

2          And in this case, I'm relying on the

3   commonsensical notion that you can't have a way of

4   securing a gun that secures unauthorized use, which

5   doesn't also make it harder to have authorized use of

6   the gun.

7          None of the locking devices, none of the

8   devices for securing guns, that I'm aware of, can

9   effectively prevent unauthorized access without, at

10  least, to some degree impairing authorized access.

11     Q    But you would agree that even under the

12  assumption that it does impair authorized access, it

13  impairs unauthorized access a lot more than it impairs

14  authorized access; correct?

15     A    Correct.

16     Q    And that hypothesis has never been tested in

17  any scientific manner; correct?

18     A    No, not that I can think of right now.

19     Q    But you -- you still believe that that

20  conclusion --

21     A    Yes.

22     Q    Yeah, I was not quite done.

23     A    Sorry.

24     Q    You still believe that the conclusion that

25  requiring a gun to be secured by a locking device will



ESQUIRE
an Alexander Gallo Company

Toll Free: 800.708.8087
Facsimile: 312.704.4950

Suite 1200
311 West Monroe Street
Chicago, IL 60606
www.esquiresolutions.com

Gary Kleck                                    October 28, 2011

113

1    sometimes prevent effective defensive gun use of the gun

2    is a scientifically reliable conclusion, even though

3    there's been no study to substantiate it; is that your

4    opinion?

5         A    No, I didn't say anything about it being

6    scientifically reliable.  I'm relying on common sense

7    here.

8         Q    Okay.  But it hasn't been scientifically

9    established; you just think as a matter of common sense,

10   it makes sense?

11        A    That's correct.

12        Q    Now, in the sentence before that, it says:

13             When a person's pulse rate and blood pressure

14   are elevated and his hands are shaking, this surely

15   affects the person's ability to disengage a locking

16   device.

17             Now, is your basis for that sentence just

18   common sense as well?

19        A    Yes.

20        Q    No study that has established that; correct?

21        A    Correct.

22        Q    Have you ever tried to remove a locking device

23   under those kind of conditions --

24        A    No.

25        Q    -- when your pulse rate was high or blood



ESQUIRE
an Alexander Gallo Company

Toll Free: 800.708.8087
Facsimile: 312.704.4950

Suite 1200
311 West Monroe Street
Chicago, IL 60606
www.esquiresolutions.com

Gary Kleck                                    October 28, 2011

114

1    pressure was high?

2        A    No.

3        Q    Would the presence of a high pulse rate and

4    blood pressure and hand shaking also affect the judgment

5    of the person who is trying to unlock the locking device?

6        A    It might.

7        Q    Would it affect the accuracy with which the

8    person can wield the gun or use the gun?

9        A    Yes.

10       Q    Could it also lead to inappropriate misuse of

11   the gun, the fact that the person's pulse rate and blood

12   pressure are high, his hands are shaking, and he's

13   obviously very excited?

14       A    What kind of misuse are you talking about?

15       Q    Let's say accidental shooting of a person who

16   doesn't actually present a threat to the person.

17       A    It's possible.

18       Q    Okay.  Are you aware of any study or evidence

19   that indicates that there is a defensive benefit to

20   having more than one operable gun per Chicago firearms

21   permit holder in the home?

22       A    To my knowledge, no one has ever studied that

23   subject.

24       Q    And so we can't assess the scientific validity

25   of that statement; correct?



ESQUIRE
an Alexander Gallo Company

Toll Free: 800.708.8087
Facsimile: 312.704.4950

Suite 1200
311 West Monroe Street
Chicago, IL 60606
www.esquiresolutions.com

1     Q    Are you aware of anyone else who has performed

2  tests to see how fast trigger locks can be removed from

3  guns other than what you've seen in Mr. Vince's report?

4     A    I can't recall any specific instances, no.

5  Very likely they have been done.  It's kind of an obvious

6  topic, but I can't recall any specific instances and

7  certainly didn't rely on any in my opinions.

8     Q    Now, if you go to the bottom of page 3 and it's

9  carryover to page 4 of your report, Exhibit 1.  It says:

10 A well-lighted sporting goods store does not simulate the

11 conditions of darkness that prevail during many crimes.

12 A couple of questions about that part of the sentence.

13         One is, is it your understanding that

14 Mr. Vince conducted his test in a well-lighted sporting

15 goods store?

16    A    Yes.

17    Q    Do you know -- your second statement there was

18 that:  Conditions of darkness prevail during many crimes?

19    A    Yes.

20    Q    What's your basis for saying that?

21    A    We have data on the times that crimes occur.

22         And, of course, you can infer the lack of

23 sunlight as one source of light from the times.  So

24 lots of crimes are committed at night and, therefore,

25 there's no sunlight.  We can also infer it from the



ESQUIRE
an Alexander Gallo Company

Toll Free: 800.708.8087
Facsimile: 312.704.4950

Suite 1200
311 West Monroe Street
Chicago, IL 60606
www.esquiresolutions.com

1   fact that lots of crimes are committed while victims

2   are sleeping and people ordinarily would sleep under

3   conditions of darkness.

4        Q    But it could also be light inside the home --

5        A    Might.

6        Q    -- because people have lights in their homes;

7   correct?

8        A    Might be.

9        Q    You would agree with me that darkness could

10  also affect how quickly someone could retrieve a gun from

11  a biometric safe too?

12       A    Yes.

13       Q    And it could also affect how long it takes to

14  retrieve a gun from a hiding place in the home?

15       A    Yes.

16       Q    Do you know of any study that has looked at the

17  effect of darkness on retrieving a gun to use in

18  self-defense?

19       A    No.

20       Q    Can training reduce the physiological

21  impairments from the stress that you mention here, the

22  effects they have on the ability to disengage a locking

23  device?

24       A    I think it could.

25       Q    Do -- have you engaged in any training to try



ESQUIRE
an Alexander Gallo Company

Toll Free: 800.708.8087
Facsimile: 312.704.4950

Suite 1200
311 West Monroe Street
Chicago, IL 60606
www.esquiresolutions.com

Gary Kleck                                    October 28, 2011

121

1    to maximize your ability to remove a trigger lock quickly

2    on your guns?

3        A    No.

4        Q    Is there any reason why you haven't?

5        A    Didn't see the need.

6        Q    You agree that an unauthorized user can't use a

7    trigger-locked gun; correct?

8        A    It's virtually impossible.

9        Q    Unless they have the key on themselves or -- or

10   they know the combination.

11       A    Now, are you -- you're asking about

12   unauthorized users?

13       Q    Yes.

14       A    Okay.  Or unless they went to -- went to

15   extraordinary efforts to remove the lock forcibly.  I

16   mean, I can envision using an acetylene torch, for

17   example, not that I know of any real world instances,

18   but, you know, it's hypothetically possible.

19       Q    You would agree that there's a difference in

20   the amount of training that officers receive, law

21   enforcement officers receive, in firearms handling; is

22   that correct?

23       A    Yes.  Well, difference between them and

24   civilians you're asking about?

25       Q    Yes.



ESQUIRE
an Alexander Gallo Company

Toll Free: 800.708.8087
Facsimile: 312.704.4950

Suite 1200
311 West Monroe Street
Chicago, IL 60606
www.esquiresolutions.com

Gary Kleck                                              October 28, 2011

123

1  of, you know, some knowledge of the mental intentions of

2  the offender, neither a civilian nor a police officer

3  would be able to anticipate the attack or threat.

4        Q    It depends on the circumstance as to whether

5  the civilian is able to anticipate or not; correct?

6        A    Yes.  There -- there might be other cues that

7  would tip off either a civilian or a police officer that

8  an attack is imminent.

9        Q    This statement isn't based on any study,

10  though; it's based on your just logic and reasoning?

11        A    Yes.

12        Q    Now, you say in the next sentence:  Not knowing

13  when a threat will arise, civilians must have their guns

14  ready for use much or all the time just as on-duty police

15  officers keep their duty weapons operable, loaded, and

16  ready for immediate use.

17             Chicago gun ordinances allows someone to

18  have -- allows a Chicago permit holder to have a gun

19  ready for use at all times; correct?

20        A    That's correct.

21        Q    So let's go now to page 4 of your report, and I

22  want to ask you about paragraph -- 2nd full paragraph,

23  again, the bottom, towards the bottom.

24        A    (Views document.)

25        Q    Where it says -- well, the sentence starts:



**ESQUIRE**
an Alexander Gallo Company

Toll Free: 800.708.8087
Facsimile: 312.704.4950

Suite 1200
311 West Monroe Street
Chicago, IL 60606
www.esquiresolutions.com

Gary Kleck                                    October 28, 2011

1   well, and personal experience, that it does take some

2   time to disengage a trigger lock.

3        Q    But you can't tell me, you can't define timely

4   fashion in terms of seconds or minutes; correct?

5        A    Again, I think I said something to the effect

6   that I think it takes about five seconds from the time

7   you have the key to the time it's disengaged.  So that

8   would be my guess as to that portion of the time.

9            And then there would be some additional time,

10  which I don't have any strong opinion on to retrieve

11  the key if it wasn't kept with the gun.  And so, yes, I

12  mean, retrieving the trigger lock certainly does take

13  additional time.  I mean, sorry, not retrieving; I mean

14  disengaging.

15       Q    This is just based on your common sense?

16       A    Well, if you want to call it that and personal

17  experience and it's sort of a logical condition for

18  disengaging --

19       Q    Yeah, so maybe --

20       A    -- that it has to take some time.

21       Q    So maybe I should ask the question a different

22  way.

23            This opinion that you're offering is not

24  based on your expertise in criminology; correct?

25       A    No.



ESQUIRE
an Alexander Gallo Company

Toll Free: 800.708.8087
Facsimile: 312.704.4950

Suite 1200
311 West Monroe Street
Chicago, IL 60606
www.esquiresolutions.com

Gary Kleck                                              October 28, 2011

129

1      Q      It's an expertise that all of us have, common

2  sense; right?

3      A      Yes.  I'd like to think so.

4      Q      Yeah, sometimes you never know.

5             So if you go now to the bottom of page 4.

6      A      (Views document.)

7             Okay.

8      Q      The last sentence there, it says:  It also

9  ignores the legal fact that the instant a second gun is

10  made operable in a Chicago home (i.e. is unlocked and

11  loaded), it constitutes a violation of the Chicago gun

12  ordinance and cannot be legally used for self-defense.

13             What's your basis for giving that legal

14  opinion?

15      A      Well, I shouldn't have given the -- the le --

16  that -- stated that as a legal opinion.  The last clause

17  is kind of a legal assessment.  And the first part of it

18  is just based on my reading of the ordinance.

19             But the ordinance actually directly addresses

20  whether the gun is kept operable, but I don't think it

21  then goes into what happens if you used it in

22  self-defense.  So that was my nonexpert legal opinion

23  in that last clause, the part that reads:  Cannot be

24  legally used for self-defense.

25      Q      So that opinion is outside your expertise in



**ESQUIRE**
an Alexander Gallo Company

Toll Free: 800.708.8087
Facsimile: 312.704.4950

Suite 1200
311 West Monroe Street
Chicago, IL 60606
www.esquiresolutions.com

Gary Kleck                                    October 28, 2011

131

1     Q     So in order to assess that, you would have to

2  perform scientific studies to determine whether there is

3  an effect, a deterrent effect of gun possession on the

4  crime rate?

5     A     Yes.

6     Q     So let's turn now to page 3, the second-to-last

7  paragraph, it says:  Vince cites instances of various

8  parties distributing gun-locking devices or urging their

9  use, but fails to cite any evidence bearing on what

10 fraction of the recipients actually made regular use of

11 the locking devices, whether their use prevented harmful

12 gun discharges, or whether their use impaired DGU.

13        Do you know what fraction of people who

14 obtain locking devices actually use them?

15    A     No.

16    Q     Do you have any evidence that a locking device

17 has ever prevented any defensive gun use ever?

18    A     I -- I probably heard anecdotes to that effect,

19 but I wouldn't be able to cite any as I sit here.

20    Q     Certainly no scientific evidence in that

21 regard?

22    A     No.

23        MR. WOODS:  How much time do we have on this

24 tape?

25        THE VIDEOGRAPHER:  Nine minutes.



ESQUIRE
an Alexander Gallo Company

Toll Free: 800.708.8087
Facsimile: 312.704.4950

Suite 1200
311 West Monroe Street
Chicago, IL 60606
www.esquiresolutions.com

Gary Kleck                                          October 28, 2011

1          (Exhibit No. 4 was marked for

2     identification.)

3   BY MR. WOODS:

4     Q    And, Dr. Kleck, I'm handing you what has been

5   marked as Exhibit No. 4.  Can you identify this, please.

6     A    Yes, it is a chapter of a book that I wrote

7   called the Nature and Effectiveness of Owning, Carrying,

8   and Using Guns for Self-Protection.

9     Q    These are your words in this text that have

10  been provided?

11    A    Yes.

12    Q    Can you turn over to page 308?

13    A    (Views document.)

14    Q    If you look down at the third paragraph where

15  it says given.

16          Given that most gun criminals acquire their

17  guns directly or indirectly as a result of theft,

18  probably the strongest rationale for keeping guns

19  stored in a secure manner of some sort is to reduce gun

20  theft and thereby reduce acquisition of guns by

21  criminals.

22          You agree with that statement today?

23    A    Yes.

24    Q    All right.

25          MR. WOODS:  Why don't we go ahead and take a



**ESQUIRE**
an Alexander Gallo Company

Toll Free: 800.708.8087
Facsimile: 312.704.4950

Suite 1200
311 West Monroe Street
Chicago, IL 60606
www.esquiresolutions.com

1    that applied to discussions before the deposition

2    started, but I had forgotten what the stipulation

3    actually said, so I'm fine with your

4    understanding.

5        MR. COOPER:   Okay.   Let's proceed on those

6    grounds, then.

7    BY MR. WOODS:

8        Q    All right.   I wanted to go back to one point

9    about the impairment of defensive gun use associated with

10   gun trig -- trigger locks.

11       You would certainly agree with me that there

12   is some scenario where if you're in your home and

13   you're assaulted -- someone assaults you with a gun and

14   wakes you up immediately out of sleep and has a gun to

15   your head, it's not going to matter whether you --

16   your -- the guns you have in your house have trigger

17   locks or not, you aren't going to be able to use them

18   defensively regardless?

19       A    There certainly are some scenarios like that.

20       Q    And then on the other end of the spectrum, if

21   you are in your home and you hear someone breaking and

22   entering your home and but -- but you are on the third

23   floor and you have a gun right next to you, you have

24   plenty of time to disable a trigger lock in order to use

25   that gun to defend yourself.   That's certainly a



ESQUIRE
an Alexander Gallo Company

Toll Free: 800.708.8087
Facsimile: 312.704.4950

Suite 1200
311 West Monroe Street
Chicago, IL 60606
www.esquiresolutions.com

1    plausible scenario too; correct?

2       A    Yes.

3       Q    And your point is that somewhere between those

4    two time periods where you have a lot of time and when

5    you have zero time, there's going to be a time where the

6    fact that you have a trigger lock will make a difference

7    about whether you could use a gun defensively or not;

8    correct?

9       A    Yes.

10      Q    And you don't know exactly what that time is;

11    right?

12      A    No.

13      Q    And you don't know how often that scenario

14    might occur; correct?

15      A    Correct.

16      Q    And you haven't done anything to try to

17    determine either of those two points; correct?

18      A    No, I have not.

19      Q    And your basis that there exists such a time is

20    just based on common sense; correct?

21      A    Well, I'd call it logic because there has to be

22    intermediate points between having lots of time and

23    having little time. I mean, that's -- that's logic.

24    It's not exact -- I wouldn't call it common sense. It's

25    not a matter of common understandings among people.



ESQUIRE
an Alexander Gallo Company

Toll Free: 800.708.8087
Facsimile: 312.704.4950

Suite 1200
311 West Monroe Street
Chicago, IL 60606
www.esquiresolutions.com

155

1       A     -- the 1993 figure on the percent of FFLs who

2   are that kind of dealer and the 2007 number of FFLs.

3       Q     Now, one of the things that happened between

4   1993 and today is that the fees for being an FFL went up;

5   do you think that would disproportionately affect FFLs

6   that had -- that sold few guns?

7       A     It could.

8       Q     So that would mean that the percentage of FFLs

9   that sold more than 50 guns would go up relatively?

10      A     It could.  But that would be a percentage.  It

11  wouldn't necessarily imply that the raw number of real

12  dealers that had to be inspected had gone up.  We'd just

13  be --

14      Q     We don't know what the real number of FFLs

15  today that sell more than 50 guns is?

16      A     Well, to complete my answer, it -- we'd only

17  know that the percentage who are selling 50 or more would

18  have gone up because the number not doing that had gone

19  down, not because the number who had sold 50 or more guns

20  went up.  And, thus, there's no foundation at all for the

21  belief that ATF's burden of regulating real gun dealers

22  has gone up.

23      Q     Does the ATF have to give notice to an FFL

24  before it conducts an inspection?

25      A     I don't know.



ESQUIRE
an Alexander Gallo Company

Toll Free: 800.708.8087
Facsimile: 312.704.4950

Suite 1200
311 West Monroe Street
Chicago, IL 60606
www.esquiresolutions.com

Gary Kleck                                      October 28, 2011

156

1      Q    Have you looked at that issue now or in the

2    past?

3      A    No, I might have read something about it, but I

4    haven't looked at it in the sense of researching it

5    myself.

6      Q    If that is true, do you think that would have

7    an effect on the ability of ATF to properly detect any

8    illegal activity in FFLs?

9      A    Yes.

10     Q    What effect would it have?

11     A    I think it would make it harder.

12     Q    And I think you answered this before, but you

13   haven't ever studied the effectiveness of ATF inspection

14   procedures?

15     A    No.

16     Q    Now, you mention at the bottom of page 5, I'll

17   just read the last two sentences:  Vince also implies

18   that banning gun sales in Chicago will reduce gun

19   possession among the city's criminals and thereby reduce

20   firearms crime, but does not cite any research indicating

21   that local sales bans have such effect.  And then you

22   say:  Existing evidence indicates that they do not.  And

23   you cite two papers; correct?

24     A    Yes.

25     Q    And these are both studies that you conducted?



ESQUIRE
an Alexander Gallo Company

Toll Free: 800.708.8087
Facsimile: 312.704.4950

Suite 1200
311 West Monroe Street
Chicago, IL 60606
www.esquiresolutions.com

163

1   criminals' hands?

2        A    I believe that a majority of them get into

3   criminals' hands directly or indirectly as a result of

4   theft, most commonly residential burglary.

5        Q    And you think that bad apple, so -- so-called

6   bad apple or illegal transactions from FFLs are not a

7   majority of the path for getting guns into criminals'

8   hands?

9        A    Yes, that's correct.

10       Q    Correct?  We agreed before that Chicago is a

11  high crime area?

12       A    Yes.

13       Q    So if there were FFLs in the city of Chicago,

14  you would agree with me that a larger fraction of guns

15  sold by those FFLs would make it into the illegal market

16  than for, say, FFLs that were not located in a high crime

17  area; correct?

18       A    Other things being equal, yes, I think that's

19  correct.

20       Q    What is the mechanism by which some fixed

21  percentage of guns sold by FFLs get into the hands of

22  criminals, is it -- is it all theft?

23       A    Could you please repeat the question?

24       Q    Yeah.  You say in your point 1 that there's a

25  certain fraction of guns that FFLs sell that's going to



ESQUIRE
an Alexander Gallo Company

Toll Free: 800.708.8087
Facsimile: 312.704.4950

Suite 1200
311 West Monroe Street
Chicago, IL 60606
www.esquiresolutions.com

166

1      A     No.

2      Q     So just because an FFL has not had their

3   license revoked doesn't necessarily mean that they are

4   not engaging in illegal activity?

5      A     Not necessarily.  But the difference is you

6   would rarely have traffic enforcement efforts focusing on

7   individual drivers, whereas you often have that with

8   suspect FFLs.  So you'd have a much higher probability of

9   detection of their violations.

10     Q     But we have already seen from the OIG report

11  that FFLs that -- that ATF, just to use your assumptions,

12  is not properly using its resources to monitor FFLs;

13  correct?

14     A     Is that my view, that they're not doing that?

15  Is that what you are asking?

16     Q     That was certainly your view of the OIG;

17  correct?

18     A     Yeah, yes.

19     Q     And you disagree with that?

20     A     I have no basis for disagreeing or agreeing.  I

21  have no independent knowledge of that.

22     Q     You haven't studied that?

23     A     No, I haven't independently studied the use of

24  resources by ATF other than the fact that I know how many

25  compliance inspections they do relative to the number of



ESQUIRE
an Alexander Gallo Company

Toll Free: 800.708.8087
Facsimile: 312.704.4950

Suite 1200
311 West Monroe Street
Chicago, IL 60606
www.esquiresolutions.com

Gary Kleck                                    October 28, 2011

167

1    FFLs.

2         Q    A crime gun that is stolen from a lawful

3    purchaser from an FFL or a crime gun that was obtained

4    illegally from an FFL, they're not any more or less

5    dangerous than the other; correct?

6         A    The gun itself, no, but depending on who

7    acquired it, obviously, by definition, a person who

8    acquired the gun as a result of theft is a criminal.  So

9    the gun is more likely to be used for some dangerous

10   purpose for that reason.

11        Q    Right.  And I was suggesting that the

12   alternative to that person who acquired the gun from

13   stealing it from someone's home was someone who acquired

14   the gun from illegally obtaining it via an FFL.  They are

15   also a criminal; correct?

16        A    Illegally obtaining it?

17        Q    Yes.

18        A    Well, yeah.  What do you mean by -- you know,

19   like what kind of transaction are you talking about?

20        Q    I'm talking about either stealing it from

21   the -- from the -- straight from the FFL or reaching some

22   agreement with the FFL owner to sell the gun to that

23   person, even though they wouldn't qualify under the

24   federal law to get that gun.

25        A    Yeah, under the theft scenario, again,



ESQUIRE
an Alexander Gallo Company

Toll Free: 800.708.8087
Facsimile: 312.704.4950

Suite 1200
311 West Monroe Street
Chicago, IL 60606
www.esquiresolutions.com

Gary Kleck                                          October 28, 2011

171

1    relevant to the Chicago gun ordinance, the research has

2    to involve precisely the conditions of the Chicago gun

3    ordinance, that being one operable weapon versus the rest

4    in storage, in particular?

5         A    Yes, in order to be strongly relevant, it would

6    certainly have to pertain to number of operable guns.

7         Q    Is there any relevance to studies, such as the

8    Cummings study, to -- can -- can you infer anything from

9    the Cummings study that may be relevant to the Chicago --

10        A    Yes, there's some relevance.

11             It doesn't -- it's not quite on point with

12   respect to the Chicago ordinance because that concerns

13   number of operable guns.  But there's an underlying

14   premise of the Chicago ordinance, which is that the

15   number of guns presumably has an effect, but it's going

16   to be most pronounced with operable guns.

17        Q    And could you make at least an argument that if

18   a gun is not operable, that is, at least, similar in

19   effect to not having the gun at all in the home?

20        A    For some purposes, yes, like for -- for

21   purposes that require quick access, yes.

22        Q    Now, would that be true in terms of suicides?

23        A    Rarely.

24        Q    Well, you're -- you're familiar that -- or

25   you're aware that many suicides are -- are done very



ESQUIRE
an Alexander Gallo Company

Toll Free: 800.708.8087
Facsimile: 312.704.4950

Suite 1200
311 West Monroe Street
Chicago, IL 60606
www.esquiresolutions.com

1        Q    Well, you questioned that value of .06.

2        A    No, I said I didn't know one way or another

3    whether it was accurate.

4        Q    Okay.  We can put that exhibit aside.

5             And I want to return you to page 7 of your

6    report or actually ask you to turn over to page 7.

7        A    (Views document.)

8        Q    And you state that -- let me see if I can find

9    the sentence in here.  I'm going to direct you to the

10   last sentence of the first half paragraph there before at

11   least the indent, where it says:  In fact, as the review

12   summarized in my Table 1 shows, at least six out of 16

13   published case-control studies of suicides found no

14   significant association between gun ownership and

15   suicide; do you see that?

16       A    Yes.

17       Q    So ten case control studies did find a

18   significant association between gun ownership and

19   suicide?

20       A    Yes.

21       Q    And of the six -- and you list the six here on

22   this page that did not find a statistical significant

23   increased association between gun ownership and suicide;

24   right?

25       A    Yes.



ESQUIRE
an Alexander Gallo Company

Toll Free: 800.708.8087
Facsimile: 312.704.4950

Suite 1200
311 West Monroe Street
Chicago, IL 60606
www.esquiresolutions.com

1    basically for females, the association is zero.  It's

2    essentially nothing.  And then it's 1.02 odds ratio.  And

3    then for males, it's positive significant association.

4    But I was referring to the female --

5         Q    Okay.

6         A    -- sample in that statement No. 6.

7         Q    So actually Conwell did show a statistically

8    significant increased risk associated with gun ownership

9    for males; right?

10        A    Right.  But it's one that really doesn't make

11   sense if it's interpreted as a causal effect of gun

12   ownership because there's no reason why females would be

13   impervious to the effect of guns.

14             They might have a lower level of gun

15   ownership; but given gun ownership, the effect should

16   be the same.  So it suggests you are really seeing the

17   effect of a confounder that's correlated with gun

18   ownership.

19        Q    Well, couldn't it just be that because there

20   are less females that have guns that you just don't have

21   enough power to see the effect with respect to females,

22   but you can see with respect to males?

23        A    It -- it might have an effect on the power, but

24   it's not going to affect the size of -- the size of the

25   association.  And that's what I'm contrasting here, the



Toll Free: 800.708.8087
Facsimile: 312.704.4950

Suite 1200
311 West Monroe Street
Chicago, IL 60606
www.esquiresolutions.com

ESQUIRE
an Alexander Gallo Company

Gary Kleck                                    October 28, 2011
                                                           315

1   gun owners were correctly identifying themselves as gun

2   owners and whether non-gun owners were correctly

3   identifying themselves as non-gun owners.

4        Q    Now, one of your criticisms here, the reason

5   it's not perfectly relevant is he didn't look just at

6   operable guns; he just looked at number of guns; right?

7        A    Yes, that's correct.

8        Q    But that doesn't make the study completely

9   irrelevant?

10       A    No, it does not.  That's why I said it comes

11  closest to being relevant.  It's certainly closer to

12  being relevant than studies that made no distinction

13  between numbers of guns.

14       Q    So at the top of page 16, where you say:  These

15  studies are irrelevant because the Chicago handgun

16  ordinance does not ban gun ownership (or handgun

17  ownership) -- okay -- and thus does not prevent anyone

18  from having a gun in their household -- you're talking

19  about other studies, I apologize.  Strike that.

20            At the bottom of page 16, you say that:

21  Committing serious crime is a highly risky activity and

22  that this is a -- this is an indication of greater

23  willingness of handgun owners to take risks?

24       A    Yes, since a component of handgun owners would

25  be those who commit crimes with handguns.



ESQUIRE
an Alexander Gallo Company

Toll Free: 800.708.8087
Facsimile: 312.704.4950

Suite 1200
311 West Monroe Street
Chicago, IL 60606
www.esquiresolutions.com

Gary Kleck                                    October 28, 2011

322

1    that either.

2        Q    But you had mentioned that, for instance,

3    storage practices affect this question significantly,

4    fatal gun accidents, because as you said, long guns

5    typically aren't kept loaded, but handguns are kept

6    loaded; and that's why they are involved in so many more

7    accidents?

8        A    They -- they are kept -- they are more likely

9    to be kept loaded than long guns, yes, that's true.  But

10   they are not more likely to be involved in accidents

11   relative to long guns if you control for whether they are

12   kept loaded or not.  They're actually less likely to

13   result in a fatal gun accident, loaded handguns compared

14   to compared to loaded long guns.

15       Q    And guns with trigger locks are much less

16   likely to be involved in accidents than guns without

17   trigger locks; correct?

18       A    Yes, they're virtually not involved in

19   accidents at all if there's trigger lock on them.

20            MR. WOODS:  Can we take a short break?

21            MR. COOPER:  That might be a good idea.

22            THE VIDEOGRAPHER:  Are we off the record?

23            MR. WOODS:  Yes.

24            (Brief recess was taken.)

25            (The proceedings adjourned at 6:09 p.m.)



ESQUIRE
an Alexander Gallo Company

Toll Free: 800.708.8087
Facsimile: 312.704.4950

Suite 1200
311 West Monroe Street
Chicago, IL 60606
www.esquiresolutions.com

Gary Kleck                                          October 28, 2011

324

1                    CERTIFICATE OF REPORTER

2

3

4       STATE OF FLORIDA        )

5       COUNTY OF LEON          )

6

7              I, LISA D. FREEZE, RPR, NOTARY PUBLIC,

8       certify that the foregoing proceedings were taken

9       before me at the time and place therein designated;

10      that my shorthand notes were thereafter translated

11      under my supervision; and the foregoing pages numbered

12      1 through 322  are a true and correct record of the

13      aforesaid proceedings.

14

15             I further certify that I am not a relative,

16      employee, attorney or counsel of any of the parties,

17      nor am I a relative or employee of any of the parties'

18      attorney or counsel connected with the action, nor am I

19      financially interested in the action.

20             DATED this 10th day of November, 2011.

21             _____

22             LISA D. FREEZE, RPR, CRR
               Notary Public
23             1-800-934-9090
               850-878-2221

24

25



ESQUIRE
an Alexander Gallo Company

Toll Free: 800.708.8087
Facsimile: 312.704.4950

Suite 1200
311 West Monroe Street
Chicago, IL 60606
www.esquiresolutions.com

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

CASE NO. 10-CV-4184
Judge Edmond E. Chang

ILLINOIS ASSOCIATION OF
FIREARMS RETAILERS, KENNETH
PACHOLSKI, KATHRYN TYLER, and
MICHAEL HALL,
      Plaintiffs,

vs.                                    Volume 2
                                       Page 328 - 474

THE CITY OF CHICAGO and
RICHARD M. DALEY, Mayor of the
City of Chicago,

      Defendants.

_____

CONT'D
VIDEOTAPED
DEPOSITION OF:          GARY KLECK


TAKEN AT INSTANCE OF:   The Defendants


DATE:                   October 29, 2011


TIME:                   Commenced at  8:17 a.m.
                        Concluded at 11:50 a.m.


LOCATION:               200 North Monroe Street
                        Tallahassee, Florida


REPORTED BY:            L. DANIELLE FREEZE
                        Certified Realtime Reporter
                        Lfreeze37@comcast.net

ACCURATE STENOTYPE REPORTERS,  INC.
2894 REMINGTON GREEN LANE
TALLAHASSEE, FL  32308    850.878.2221
asreporters@nettally.com



ESQUIRE
an Alexander Gallo Company

Toll Free: 800.708.8087
Facsimile: 312.704.4950

Suite 1200
311 West Monroe Street
Chicago, IL 60606
www.esquiresolutions.com

APPEARANCES:


        REPRESENTING PLAINTIFFS:


        CHARLES J. COOPER, ESQUIRE
        ccooper@cooperkirk.com
        COOPER & KIRK
        1523 New Hampshire Ave., N.W.
        Washington, D.C.  20036
        202.220.9660


        REPRESENTING DEFENDANTS:


        CRAIG WOODS, ESQUIRE
        cwoods@mayerbrown.com
        RANJIT J. HAKIM, ESQUIRE
        rhakim@mayerbrown.com
        MAYER BROWN LLP
        71 South Wacker Drive
        Chicago, IL  60606-4637
        312.701.8758


        ALSO PRESENT:

        Barbara Kirkland-Graves, Videographer



ESQUIRE
an Alexander Gallo Company

Toll Free: 800.708.8087
Facsimile: 312.704.4950

Suite 1200
311 West Monroe Street
Chicago, IL 60606
www.esquiresolutions.com

Gary Kleck                                      October 29, 2011

345

1          Yes.

2     Q    And they say the phrase "ready for use" needs

3  some explanation.  A gun kept in the home for protection

4  is essentially always in use and may be kept loaded if

5  special care is taken; correct?

6     A    Correct.

7     Q    That's what they say.

8          And then they say:  The gun must be stored in

9  a secure place, inaccessible to unauthorized users,

10 children or adults, and in accordance with local laws;

11 correct?

12    A    Correct.

13    Q    So he's talking about guns that are ready for

14 use.  They must be stored in a secure place inaccessible

15 to unauthorized users; correct?

16    A    Correct.

17    Q    Now, Dr. Kleck, you don't have a study that

18 says that trigger locking the second, third or fourth

19 weapon in a home but keeping one operable will reduce a

20 person's ability to effectively resist crime versus not

21 having a requirement that the second, third and fourth

22 gun be secured with trigger locks; correct?

23    A    That's correct.  To my knowledge, that's never

24 been studied.

25    Q    All right.  I want to talk to you a little bit



ESQUIRE
an Alexander Gallo Company

Toll Free: 800.708.8087
Facsimile: 312.704.4950

Suite 1200
311 West Monroe Street
Chicago, IL 60606
www.esquiresolutions.com

Gary Kleck                                    October 29, 2011

436

1      A     That is what he's asserting.

2      Q     Right.  Do you think an individual who did not

3   have a gang affiliation would have an easier time

4   crossing through other neighborhoods?

5      A     Other things being equal, yes, probably he

6   would have an easier time.

7      Q     People with gang affiliations would be less

8   likely to leave their neighborhood for fear of being

9   killed; right?

10     A     That would be a non sequitur, but that one

11  factor, the fact that they are gang members, would be an

12  obstacle.

13     Q     Would someone looking to arrange multiple

14  weapons purchases, not getting guns for just self-defense

15  but trafficking guns, for instance, would they face more

16  of a burden having to go to the suburbs to get those guns

17  than someone, a law abiding citizen, who only needs to go

18  once to get a gun for self-defense?

19     A     So you're talking about traffickers.

20           So I -- I -- is the premise that this is a

21  trafficker who is located in the middle of Chicago,

22  then?

23     Q     Yes.

24     A     Oh, okay.  And so the comparison is with the

25  trafficker getting multiple guns versus someone getting



ESQUIRE
an Alexander Gallo Company

Toll Free: 800.708.8087
Facsimile: 312.704.4950

Suite 1200
311 West Monroe Street
Chicago, IL 60606
www.esquiresolutions.com

Gary Kleck                                            October 29, 2011

471

1          CERTIFICATE OF REPORTER

2

3    STATE OF FLORIDA      )

4    COUNTY OF LEON        )

5

6          I, LISA D. FREEZE, RPR, NOTARY PUBLIC,

7    certify that the foregoing proceedings were taken

8    before me at the time and place therein designated;

9    that my shorthand notes were thereafter translated

10   under my supervision; and the foregoing pages numbered

11   328 through 469  are a true and correct record of the

12   aforesaid proceedings.

13

14         I further certify that I am not a relative,

15   employee, attorney or counsel of any of the parties,

16   nor am I a relative or employee of any of the parties'

17   attorney or counsel connected with the action, nor am I

18   financially interested in the action.

19         DATED this 11th day of November, 2011.

20                         _____

21                         LISA D. FREEZE, RPR, CRR
                            Notary Public
22                          1-800-934-9090
                            850-878-2221
23

24

25



ESQUIRE
an Alexander Gallo Company

Toll Free: 800.708.8087
Facsimile: 312.704.4950

Suite 1200
311 West Monroe Street
Chicago, IL 60606
www.esquiresolutions.com

# Exhibit 15

Page 1

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION
CIVIL ACTION NO.: 10-CV-04184

X - - - - - - - - - - - - - - - - - - - - - X

ILLINOIS ASSOCIATION OF FIREARMS RETAILERS,      :

KENNETH PACHOLSKI, KATHRYN TYLER AND             :

MICHAEL HALL,                                    :

                 Plaintiffs,            :

    vs.                                          :

THE CITY OF CHICAGO AND RAHM EMANUEL,            :

MAYOR OF THE CITY OF CHICAGO,                    :

                Defendants.            :

X - - - - - - - - - - - - - - - - - - - - - X

Durham, North Carolina

Wednesday, September 28, 2011

Videotaped Deposition of PHILIP J. COOK, Ph.D.,
a witness herein, called for examination by counsel
for the Plaintiffs in the above-entitled matter,
pursuant to notice, the witness being duly sworn by
Lisa A. DeGroat, RPR and Notary Public in and for
the State of North Carolina, taken at the law office
of Thomas, Ferguson & Mullins, L.L.P., 119 East Main
Street, Durham, North Carolina, at 8:07 a.m., on
Wednesday, September 28, 2011, and the proceedings
being taken down by Stenotype by Lisa A. DeGroat,
and transcribed under her direction.

Page 2

```
 1    APPEARANCES:

 2

 3       On behalf of the Plaintiffs:

 4            DAVID H. THOMPSON, ESQ.

 5            Cooper & Kirk, P.L.L.C.

 6            1523 New Hampshire Avenue, NW

 7            Washington, D.C.  20036

 8            (202) 220-9600

 9            dthompson@cooperkirk.com

10

11       On behalf of the Defendants:

12            CRAIG A. WOODS, ESQ.

13            Mayer Brown, L.L.P.

14            71 South Wacker Drive

15            Chicago, Illinois  60606

16            (312) 701-8536

17            cwoods@mayerbrown.com

18              -and-

19            RANJIT J. HAKIM, ESQ.

20            Mayer Brown, L.L.P.

21            71 South Wacker Drive

22            Chicago, Illinois  60606

23            (312) 701-8758

24            rhakim@mayerbrown.com

25
```

COMPRESSED COPY

Page 3

1    APPEARANCES (Continued):

2

3       On behalf of the Defendants:

4            ANDREW WORSECK, ESQ.

5            Department of Law

6            Constitutional and Commercial Litigation

7            Suite 1230

8            30 North LaSalle Street

9            Chicago, Illinois   60602

10           (312) 744-7129

11           aworseck@cityofchicago.com

12

13

14

15

16

17   THE VIDEOGRAPHER:

18           MR. CARL J. REHL

19

20

21

22

23

24

25

Page 43

1          THE WITNESS:  Yeah, my understanding was

2     that the -- which may be imperfect -- is that the

3     city ordinance at the time on carriage would have

4     been similar to the state law.

5          BY MR. THOMPSON:

6          Q.    And so that would be a ban on carriage by

7     ordinary citizens in public?

8          A.    By people who were not deputy sheriffs

9     or in some other fashion, and -- and the --

10     the -- the ban would be qualified by saying that

11     under some circumstances you could carry a gun

12     that -- that was locked up.

13          Q.    If it was disassembled and inoperable?

14          A.    I believe that's right, but this is not

15     an area that I am expert.  So --

16          Q.    Okay.  Now, let's go to the next paragraph,

17     where you say, "The medical costs are only a

18     fraction of the total cost of firearms violence to

19     the community."

20               Do you have an estimate as to what fraction

21     they are to the overall cost?

22          A.    For the United States as a whole our

23     estimate was that the medical costs were

24     approximately two percent of the total social

25     cost of gun violence.

1    to reproduce the ethnographic study for other

2    cities that had more relaxed regulations on guns

3    or less stringent regulations.

4              But we were able to do comparisons using

5    other kinds of data.  And, in particular, we

6    were using the data that were being generated by

7    surveys in a number of cities through the drug

8    use forecasting program at that time, where

9    samples of people arrested were interviewed

10   about a variety of subjects, including their

11   relationship to guns.  And we had access to

12   those data and were able to analyze them.

13      Q.   Okay.  But my question was:  What

14   difference did you find that the government

15   Chicago's regulations made?

16           MR. WOODS:  I'm going to object to the form

17   of the question; assumes facts and vague and

18   ambiguous.

19           THE WITNESS:  We were able to demonstrate

20   that Chicago had one of the lowest gun ownership

21   rates by people arrested and one of the higher --

22   highest rates of people who said that they -- that

23   as arrestees, who said that they would like to

24   obtain a gun, but that it would take them a long

25   time to do so, and they didn't know how.

1    perfect match.

2              And, in particular, the arrestees in

3    New York City and Chicago were below the line,

4    so to speak.  So that they were less likely to

5    own a gun than you would expect, given the gun

6    ownership rate in -- in the city.

7              Now, we can only say, well, that perhaps

8    that is because of the policing in those areas,

9    and the fact that in both New York and Chicago

10   there is a long tradition of gun-oriented

11   policing, which reduces the incentive to carry a

12   gun by creating a deterrent, by creating an

13   enhanced probability that if you're armed in

14   public that you'll end up being detected and

15   arrested, something that would not be true in a

16   city that did not have that kind of targeted

17   policing and stop -- stop-and-frisk policies.

18        Q.   Okay.  So I understand that.

19             Any other important causal influences on

20   the fraction of assaults and robberies in which the

21   perpetrator uses a gun?

22        A.   I would say that if you're talking about

23   police-recorded statistics, that it also is

24   going to be influenced by the police practice in

25   recording, especially assaults.

```
 1    Chicago, and because my indicator does not

 2    distinguish between lawful and unlawful.

 3         Q.    All right.  Now, let's look at Roman V --

 4         A.    Okay.

 5         Q.    -- in your report, page ten.  Okay.  Now,

 6    you say in the second sentence, quote, "In Chicago

 7    the relatively low prevalence of gun ownership and

 8    the tradition of gun emphasis in policing have made

 9    guns quite scarce on the street," close quote.

10         What's your basis for making that

11    statement?

12         A.    That basis is the ethnographic research

13    that was reported in underground gun markets --

14         Q.    And what --

15         A.    -- together with the survey data

16    reported in that same article taken from samples

17    of arrestees.

18         Q.    And what do you mean by, "on the street"?

19         A.    I meant for the youths and criminals and

20    gang members that Sudhir Venkotesh was

21    interviewing together with -- in the case of the

22    arrestees and another group of criminals.

23         Q.    Do you have an opinion as to roughly how

24    many guns are on the street of Chicago?

25         MR. WOODS:  Well, I'll object on vagueness
```

Page 181

1    of guns outside of the home"?

2         A.    That means the use of guns to illegally

3    threaten another person for the purposes of

4    robbery, rape, assault or to actually shoot.

5         Q.    Over the last ten years has the Chicago

6    Police Department engaged in police enforcement

7    targeted on illegal carrying?

8         A.    It has, and in -- I think that you can

9    go back further than that.  There is a tradition

10   in the Chicago Police Department of targeted

11   enforcement directed at confiscating guns that

12   are being carried illegally.

13        Q.    When did they start that?

14        A.    Well, I interviewed one source, who was

15   in a position to know, who said that perhaps in

16   the 1950's.

17        Q.    Okay.  Who was your source?

18        A.    The source is cited in the underground

19   gun market paper, where we mention it.  I

20   could --

21        Q.    It's all right.  We'll check.

22        A.    Yeah.

23        Q.    Okay.  Now, what steps have been taken by

24   the Chicago Police Department to engage in

25   enforcement targeted on illegal carrying?

1        MR. WOODS:  I'm going to object on

2   foundation grounds.  If he knows.

3        THE WITNESS:  So the steps are to

4   provide -- I don't know whether incentives are the

5   right way to put it, but that the police leadership

6   has adopted a view that confiscating guns is a high

7   priority, that stopping carrying and -- and illegal

8   possession of guns is a high priority.

9        And that the patrolmen know that and are

10  especially eager to -- to confront people they think

11  might be carrying a gun, whether it's in a car or on

12  their person, and to confiscate the gun.

13        And that this shows up not only in special

14  programs, like Operation Cease Fire that was going

15  on for awhile, but also just as a routine matter.

16  And what Sudhir Venkotesh found in his neighborhood

17  was that the -- his respondents, his sources that he

18  was talking to, knew about this.  And the gang

19  members knew about it and the other criminals

20  realized that the police put a very high priority on

21  getting guns off the street.

22        BY MR. THOMPSON:

23   Q.   Has Chicago's ban on carrying, coupled with

24  police enforcement targeted on illegal carrying, in

25  fact, reduced the misuse of guns outside of the home

COMPRESSED COPY

Page 183

1    in Chicago?

2         A.    So I think the answer is that it's

3    plausible that it has, and I cannot tell you

4    that I have direct evidence that proves that

5    point or that supports that point.

6         Q.    What's your indirect evidence?

7         A.    The indirect evidence is that the -- the

8    fact that for large sections of the active

9    criminal community, if you call it that, do not

10   have a gun and do not carry a gun.  So that that

11   was what he was finding out and what is evident

12   from the surveys of arrestees, compared with

13   other cities, that there's a fairly low gun

14   ownership rate.

15        Q.    How do you --

16        A.    That the other side of this is that

17   Chicago has a high murder rate, and the murders

18   they do have are to a very large extent

19   committed by -- with guns.  So it clearly is not

20   completely effective, far from it.

21            But what -- what I think is likely to be

22   the explanation is that there's another

23   tradition in Chicago, which is large,

24   well-organized criminal gangs, more so than in

25   other cities, except perhaps Los Angeles and a

Page 184

1    couple of other places, which engage on a

2    routine matter in high levels of deadly

3    violence.

4         So I think Chicago starts with a couple

5    of strikes against it, because of the gangs, but

6    that things would be worse if there was an open

7    market in guns.

8    Q.   Well, in the absence of a ban on carriage,

9    how would you expect Chicago's murder rate to differ

10   from the current level?

11   A.   So if public carrying were accepted,

12   then -- and resulted in -- in more public

13   carrying, that I can talk about the -- some of

14   the consequences that are associated with that.

15   Q.   Well, my question is:  How much would you

16   expect the Chicago murder rate to go up or down?

17   A.   I --

18        MR. WOODS:  I'm going to object on the

19   grounds of incomplete hypothetical.

20        Go ahead.

21        THE WITNESS:  I wish I could quantify the

22   answer, and I certainly am not in a position to do

23   that.  I think that if there was widespread legal

24   carriage in public that it would quite possibly make

25   the current police tactics more problematic and more

Page 185

1    difficult to execute, and that there would be more

2    guns on the street that would be available that

3    could be stolen.

4          Who knows? I mean there's a variety of

5    consequences. It might escalate kind of routine

6    confrontations that people have and induce still

7    further gun carrying, and -- and so forth. We

8    could -- we could spell it out.

9          The net effect of all of that is,

10   unfortunately, it's something that has not -- is not

11   something we can study right now or draw an

12   empirical conclusion to.

13         BY MR. THOMPSON:

14   Q.   Well, why can't you?

15   A.   Well, we haven't tried it, but the --

16   the -- the problem is that even in the case

17   where we have something that looks like a good

18   basis for exploring the effect of more

19   permissive carrying laws, that is the -- the

20   spread of the right to carry laws to something

21   like 33 states in the country, even there it has

22   turned out to be very difficult to determine

23   statistically what effect they have had on the

24   amount of violence or the homicide rate or other

25   kinds of crime, for that matter.

1    clear and sustained intent, coupled with the

2    capability of killing, that the chances increase,

3    and so that there is --

4                    BY MR. THOMPSON:

5         Q.    I'm sorry.   "There is" --

6         A.    There is certainly some cases where

7    there is a sustained attack with a coup de grace

8    shot to the head at the end of it or something

9    of that sort that have a very high probability

10   of resulting in death.

11               Those cases are unusual.   The bulk of

12   people who are shot and killed, there's only one

13   wound, or they -- in some other way it's clear

14   that -- that there was a spontaneous encounter

15   and not a sustained clear intent to kill.

16        Q.    Would you agree that an assailant's choice

17   of weapon is an indicator of his intent to inflict

18   harm?

19               MR. WOODS:   Objection; overbroad,

20   incomplete hypothetical, vague and ambiguous.

21               THE WITNESS:   I think that the assailant's

22   choice of weapon is most often an indicator of the

23   weapons he has immediately available, because such a

24   large percentage of the robberies and assaults

25   are -- occur spontaneously out in public, rather

Page 221

1      Q.    And it's a disproportionate share.

2      A.    Yeah.

3      Q.    And what I'm suggesting is if you wanted to

4   look at that scientifically to determine whether

5   that FFL really was a bad actor, wouldn't you want

6   to try to hold constant for the variables that are

7   highly correlated with crime rates among its

8   customer base to see, you know, what is the race,

9   ethnicity, poverty level, urbanization of its

10  customer base?

11          MR. WOODS:  Objection to the form of the

12  question.  It's also compound.

13          THE WITNESS:  Yeah, I mean I think that we

14  would need to have a conversation about that, about

15  what the goal is.  Presumably the goal is not simply

16  to find fault with certain FFLs, but, rather, it is

17  to reduce the flow of guns to criminals.

18          And so that if you have FFLs operating in

19  high crime areas of town, it's quite reasonable that

20  you would hold them to a different standard, just

21  because they are exposing that neighborhood to more

22  gun crime than might be true for a rural dealer

23  somewhere that didn't have the same kind of flow.

24          The other thing is that, you know, if

25  you're going to investigate dealers, you want to

Page 248

1                    CERTIFICATE OF REPORTER

2      STATE OF NORTH CAROLINA    )

3      COUNTY OF PERSON           )

4           I, LISA A. DeGROAT, the officer before whom

5      the foregoing deposition was taken, do hereby

6      certify that the witness whose testimony appears in

7      the foregoing deposition was duly sworn by me; that

8      the testimony of said witness was taken by me to the

9      best of my ability and thereafter reduced to

10     typewriting under my direction; that I am neither

11     counsel for, related to, nor employed by any of the

12     parties to the action in which this deposition was

13     taken; and further, that I am not a relative or

14     employee of any attorney or counsel employed by the

15     parties hereto, nor financially or otherwise

16     interested in the outcome of the action.

17           This, the 30th day of September, 2011.

18

19     _____

20     LISA A. DeGROAT

21     Registered Professional Reporter

22     Notary Public in and for

23     County of Person

24     State of North Carolina

25     Notary Public Number 19952760001

BRYANT COURT REPORTING SERVICES, INC.   (919)387-5853