# Exhibit 16



THE UNIVERSITY OF
CHICAGO

**Crime Lab**

55 East Monroe
30th Floor
Chicago, IL 60603
crimelab@uchicago.edu

Testimony
Chicago City Council
The Social Costs of Handgun Violence
June 29, 2010
Jens Ludwig, PhD
McCormick Foundation Professor of Social Service Administration, Law, and Public Policy
University of Chicago

Good morning and thank you for inviting me to testify about the costs of gun violence in the city of Chicago.

I would like to begin by discussing the role that guns play in contributing to gun violence:

- Guns make violent events more lethal compared to crimes that involve knives or other weapons.

- This means that in places where guns are more readily available, a higher percentage of assaults and robberies will result in the victim's death, and so those places will have relatively higher rates of homicide.

- The increased lethality of guns compared to other weapons is one reason why guns are involved in the vast majority of homicides, both nationally (67%) and in the city of Chicago specifically (80.6%).

- The vast majority of the time that a gun is used in homicide in Chicago (98% of the time to be exact), it is a handgun

The role that guns play in making violent crime more lethal imposes massive costs on the city of Chicago, which are widely shared among all of the city's residents but disproportionately so by the most economically vulnerable among us:

- Based on previous research that I have published with colleagues in the *Journal of the American Medical Association* (Cook, Lawrence, Ludwig and Miller, 1999) suggesting that the average medical costs per crime-related gunshot injury is around $45,000 (in inflation-adjusted 2010 dollars), combined with my estimate that there were around 2,060 assault-related gunshot injuries in Chicago in 2008,[1]

---

[1] I estimate the number of assault-related total gunshot injuries in the city of Chicago for 2008 as follows. Data from the Chicago Police Department indicate that there were 412 firearm homicides in Chicago in 2008. Previous research by my colleague Philip Cook of Duke University (Cook, 1985) suggests that around one of five assault-related gunshot injuries are fatal. These two numbers together imply that there were around 412*5 =2,060 total assault-related gunshot injuries in Chicago in 2008.

CITY 000398

implies that the medical costs associated with inter-personal gun violence in Chicago in 2008 were nearly $94 million—over half of which was paid for by government programs, that is, by taxpayers.[2]

- My previous research suggests that gun violence increases the costs of running our criminal justice system by at least $64 million each year.[3]

- Previous research has found that every homicide reduces a city's population by around 70 people. Data from the Census Bureau shows that from 2000 to 2008, the total population of Chicago declined from 2,896,016 to 2,853,114, a decline of nearly 50,000 people. To put this number into perspective, the total population of Hyde Park in 2000 was 29,920. My calculations suggest that if Chicago's homicide rate for the past 8 or 9 years had been more like New York City's, which has a homicide rate that is around one-third of ours, then Chicago's population would have actually *increased* by several hundred thousand residents, rather than declined.[4]

- Previous research by NYU economist Amy Ellen Schwartz and her colleagues show that the massive crime drop in New York over the 1990s contributed substantially to the growth in property values in that city. My calculations suggest that eliminating gun involvement in crime Chicago might increase total property values in the city by perhaps $30 billion or so, and increase property tax revenues by around $30 million per year.[5]

---

[2] My 1999 paper in JAMA notes that the lifetime total cost of fatal gunshot injuries in Maryland was $13,191, equal to $19,420 in 2010 dollars, while the total lifetime cost of non-fatal gunshot injuries was $35,367, equal to $52,067 when adjusted to 2010 dollars. The average medical costs are a weighted average of these two figures, where the weights are proportional to the share of total crime-related gunshot injuries that are fatal (20%) versus non-fatal (80%).

[3] To see how this figure is derived, consider the effects of an intervention that results in 100 fewer gunshot injuries. Previous studies suggest that, on average, every 100 assault-related gunshot injuries will lead to 20 deaths. To be conservative, assume that all of the 100gunshot injuries that are prevented are replaced by 100 non-gun injuries, of which around 7 will be fatal on average (see Cook and Leitzel, 1996). The savings to the criminal justice system from eliminating 100 gunshot injuries equals the difference between the criminal justice costs of the 13 "excess" homicide cases (13 times $243,960 = $3.2 million) and the costs of 13 non-fatal aggravated assaults (13 times $6,200 = $80,600). The criminal justice costs for gunshot injuries in Chicago then equal the costs per gunshot injury ($31,000) times the number of gunshot injuries, or 2,060, as noted above. See Cook and Ludwig (2000), p. 86-87, esp. footnote 5.

[4] Data from the CPD's 2008 homicide report indicates that the city experienced a total of (633+667+656+601+454+451+471+445+511) = 4,559 homicides from 2000 through 2008. If our homicide rate had been like New York's over this period (that is, about one-third the actual Chicago homicide rate), then we would have had around 3,009 fewer homicides, or about 3,009*70 = 210,600 more residents. Note that from 2000 to 2008 New York City did indeed have a population increase of several hundred thousand people (from 8,008,278 to 8,363,710, a 4.4 percent increase).

[5] Estimates from Amy Ellen Schwartz and colleagues (2003) suggest that a decline in violent crime rates of 50 percent would increase property values by 7-9 percent. My calculations suggest that about half of this effect comes from homicides, the vast majority of which as noted above are committed with guns. My guess of roughly half the effect comes from evidence from Cullen and Levitt (1996) that each part 1 offense reduces city population by 1 person, while each homicide (as they report in unpublished estimated discussed in Cook and Ludwig, 2000) reduces city population by 70 people. In Chicago in 2008 there were 35,797 part 1 violent crimes and 510 homicides, which implies that about half the population loss due to crime was due to homicides. I assume that the effect on property values is proportional to the effect on population out-migration. Data from the Cook County government reports

- My previous research with Duke Professor Philip J. Cook estimates that the total social costs per assault-related gunshot injury is on the order of around $1 million (Cook and Ludwig, 2000; Ludwig and Cook, 2001). This total social cost estimate includes the intangible costs of crime, such as the fear of losing a loved one to gun violence (which makes life almost unlivable in some of our city's most distressed and dangerous communities) as well as the costs that many people incur to reduce their risk of being shot, such as living far away from where they work. My estimates suggest that the total social cost of gun violence for Chicago annually is around $2.5 billion, or $2,500 per year for each Chicago household.

- A standard principle in economics is that the optimal tax on consumer goods should be equal to the net social costs that the good imposes on the rest of society. Based on the estimates for the social costs of crime that Philip Cook and I have calculated, together with our estimate for the effects of increased household gun ownership rates on an area's homicide rate, Cook and I estimate that the optimal licensing fee for a household to keep a gun would be around $600 per year (Cook and Ludwig, 2006)[6].

---

that total property value in the county is $656.5 billion, and that (very roughly) property tax revenues for governmental-type activities in 2008 were $619 million in 2008 http://www.cookcountygov.com/taxonomy/Finance/Documents/CAFR/cc_2008CAFR.pdf. Eliminating gun involvement in crime in Chicago would have the equivalent impact on property values (and hence taxes) as cutting the violent crime rate in half, and so would increase property tax collection by 7-9% of $619 million, or $43 to $56 million. Around 60 percent of Cook County's population lives in Chicago, so I assume the change in Chicago's property tax revues would be 60 percent of $43 to $56 million, or $26 to $34 million. My calculations imply that the total property value of Chicago would be approximated as 60% * $656.5 billion, or $394 billion, and so eliminating gun involvement in crime would lead to an increase in property values of 7-9% of that, or $28 to $35 billion.

[6] In other words, a licensing fee of $600 per year represents the net effect of one more household having a gun on the total volume of gun violence in the local area and the social costs per extra crime related gunshot injury.

# References

Chicago Police Department (2008) Murder Analysis Report

Cook, P. (1985) "The case of the missing victims: Gunshot wounds in the National Crime Survey." *Journal of Quantitative Criminology,* 1(1):91-102.

Cook, P. and J. A. Leitzel (1996) "Perversity, Futility, Jeopardy: An Economic Analysis of the Attack on Gun Control," *Law and Contemporary Problems,* 59 (1):1-28.

Cook, P. Lawrence, B., Ludwig, J. and R. Miller (1999) "The Medical Costs of Gunshot Injuries in the United States," *Journal of American Medical Association,* 282:447-454.

Cook, P. and J. Ludwig (2000) Gun Violence: The Real Costs. NY: Oxford University Press.

Cook, P. and J. Ludwig. (2006) "The Social Costs of Gun Ownership. *Journal of Public Economics. "* 90(1-2): 379-391

Cullen, J. B. and S. D. Levitt (1996) "Crime, Urban Flight, and the Consequences for Cities," NBER Working Papers 5737, National Bureau of Economic Research, Inc

Ludwig, J. and P. Cook (2001) "The Benefits of Reducing Gun Violence: Evidence from Contingent-Valuation Survey Data." *Journal of Risk and Uncertainty.* 22(3): 207-226

Schwartz, A. E., Susin, S. and I. Voicu (2003) "Has Falling Crime Driven New York City's Real Estate Boom?" *Journal of Housing Research* 14(1):101-135.

CITY 000401

# Exhibit 17

The Journal of Risk and Uncertainty, 22:3; 207–226, 2001
© 2001 Kluwer Academic Publishers. Manufactured in The Netherlands.

# The Benefits of Reducing Gun Violence:
# Evidence from Contingent-Valuation Survey Data*

JENS LUDWIG[1]                                    ludwigj@gunet.georgetown.edu
*Georgetown University and National Consortium on Violence Research*

PHILIP J. COOK                                     cook@pps.duke.edu
*Duke University, National Consortium on Violence Research,
and National Bureau of Economic Research*

## Abstract

This article presents an estimate of the benefits of reducing crime using the contingent-valuation (CV) method. We focus on gun violence, a crime of growing policy concern in America. Our data come from a national survey in which we ask respondents referendum-type questions that elicit their willingness-to-pay (WTP) to reduce gun violence by 30%. We estimate that the public's WTP to reduce gun assaults by 30% equals $24.5 billion, or around $1.2 million per injury. Our estimate implies a statistical value of life that is quite consistent with those derived from other methods.

**Keywords:** costs of crime, gun violence, contingent valuation

**JEL Classification:** K42, H43, J17

## 1. Introduction

Since the early 1970s, the United States have averaged nearly 14,500 gun homicides and perhaps another 70,000 non-fatal injuries from gun assaults.[1] Concern about gun

*Portions adapted from Cook and Ludwig, *Gun Violence: The Real Costs* (Oxford University Press, 2000). This article was supported by a grant from the Joyce Foundation and written in part while the first author was visiting scholar to the Northwestern University/University of Chicago Joint Center for Poverty Research. We are indebted to the Johns Hopkins Center for Gun Policy and Research and the National Opinion Research Center at the University of Chicago for the opportunity to make use of their annual gun survey. Thanks to Mark Cohen, Julie Cullen, Ted Gayer, Arlene Greenspan, Jay Hamilton, Steve Hargarten, David Hemenway, Joel Huber, Arthur Kellermann, Debby Leff, Steve Levitt, Will Manning, Ted Miller, John Mullahy, Terry Richmond, Seth Sanders, Bill Schwab, Kurt Schwabe, Kerry Smith, Tom Smith, Steve Teret, Daniel Webster, seminar participants at Duke University, the University of North Carolina at Chapel Hill, the American Society of Criminology, and the American Economic Association, as well as to W. Kip Viscusi and an anonymous referee for helpful comments. Thanks to Bruce Lawrence and Bob Malme for help with the calculations. Any errors of fact or interpretation are our own.

[1]Corresponding author: Jens Ludwig, Georgetown Public Policy Institute, 3600 N Street, NW, Suite 200, Washington, DC 20007.



EXHIBIT
Cook 4
LHD 9/28/11
PENGAD 800-631-6989

violence has prompted a substantial policy response. For example, in New York City, the elite Street Crimes Unit has employed aggressive stop-and-search tactics to reduce illegal gun carrying in high-crime neighborhoods (Bratton and Kohler, 1998). In St. Louis the police sought parental consent to search homes and seize illegal firearms kept by teens (Rosenfeld and Decker, 1996), while the Boston Gun Project targeted illegal gun trafficking and gang shootings (Kennedy, Piehl, and Braga, 1996; Piehl, Kennedy, and Braga, 1998). Richmond, Virginia's Project Exile threatens felons who use guns with prosecution and sentencing in federal court (Cook and Ludwig, 2000). And at the national level, policies ranging from background checks for gun-show sales to an outright ban on handguns are being actively considered.[2]

While some of these programs may be effective in reducing the risk of assault-related gunshot injuries to citizens (Blumstein and Rosenfeld, 1998; Blumstein and Wallman, 2000; Cook and Ludwig, 2000), each imposes some cost on society in the form of additional government expenditures and inconvenience to citizens. One of the central insights from the economics of crime is that information about the benefits and costs of crime reduction may be useful in deciding how to make these tradeoffs (Becker, 1968; Stigler, 1970; Rottenberg, 1970). Yet applying this insight to the case of gun violence requires some estimate for the benefits of reducing gun injuries.

The present article represents the first attempt to estimate the benefits of reducing crime using the contingent-valuation (CV) method. Our focus on gun violence in particular is motivated by the growing policy concern about this issue. We adopt the standard approach of public economics and define the benefit of a public good as what society is willing to pay (WTP) to achieve some change in the level of the good (Viscusi, 1992). The public good in question here is freedom from the *ex ante* risk of victimization. This *ex ante* approach is appropriate for the decision problem facing policymakers, who must decide whether to fund crime-control programs that will prevent injuries to victims whose identity is not yet known.

The estimates presented in the current article are obtained from a nationally representative CV survey of 1,204 adults conducted in 1998. The survey elicits respondents' WTP to finance a 30% reduction in gun violence through programs that target gun thefts and illegal gun dealers. Since such interventions should have little effect on the ability of most adults to own guns, the public good of interest is a marginal decrease in assault-related gunshot injury (hereafter "gun crime" or "gun violence") holding constant whatever benefits may be associated with widespread gun ownership. Responses to this CV question should in principle yield comprehensive estimates for the benefits of reductions in the risk of gunshot injury. Our results suggest that a 30% reduction in gun violence is worth $24.5 billion to the American public. Dividing this figure by the number of gunshot injuries in 1998 implies a WTP per injury equal to around $1.2 million.

Despite some limitations of the CV data used to derive our estimates, these findings are consistent with a number of reasonable benchmarks. First, we find that WTP is positively correlated with household income. Controlling for other background characteristics, WTP also increases with household size; since the reduction in risk the household experiences is related to the number of members, this finding suggests that the responses are driven at

least in part by the demand for specified reductions in the risk of gunshot injury. Second, Anderson (1999) finds that the average household currently spends around $1,800 per year in taxes and consumption expenditures to fund the criminal justice system and private protection measures. Thus, it does not seem implausible that the average household will spend an additional $240 per year to reduce the threat of gunshot injury by 30%, particularly since the fear of crime in America appears to be driven largely by the threat of *violent* crime (Zimring and Hawkins, 1997; Hamermesh, 1998; Cullen and Levitt, 1999).[3] Third, our estimates imply a value for one statistical life that is quite consistent with those derived in other contexts (Viscusi, 1992, 1993).

Compared with earlier research, our estimates provide a very different picture of both the magnitude and distribution of the costs of gun violence. Previous studies of the benefits of reducing gun violence have adopted an *ex post* approach that begins with a count of the annual number of gunshot injuries and then multiples this figure by some estimate of the cost per injury.[4] The primary limitation with this *ex post* method is that it does not fit the decision problem that faces policymakers, and ignores averting behaviors and other costs imposed even on those who are not victimized. Much of this research has been conducted within the public health "cost-of-illness" (COI) tradition, which is likely to understate the cost per injury by focusing only on medical treatment for gunshot injuries and other direct costs plus a measure of lost productivity (Max and Rice, 1993).[5] And in fact the leading COI study reports a cost per injury (equal to about $80,000 in 1998 dollars) that is far lower than our own estimate (Max and Rice, 1993).

More recent studies improve on the COI approach by adding measures for the value of life and health obtained from the workplace-risk or jury-award literatures (Miller and Cohen, 1996, 1997; Miller, Cohen, and Wiersema, 1996; Anderson, 1999), and generate estimates that are closer in magnitude to our own. But these studies like the COI literature adopt an *ex post* approach.

Our CV evidence suggests instead that the costs of gun violence are far more evenly distributed across the population than victimization statistics would suggest. Although gunshot injuries are concentrated disproportionately among low-income young men (Cook and Ludwig, 2000), as noted above the WTP to reduce gun violence is highest among middle-class parents. Although these households are at low personal risk of injury, their stake in reducing gun violence comes in part from the costly averting behaviors that they undertake in response to the threat of gunshot injury. For example, economists have found that decisions about whether to live in the city or suburb (Cullen and Levitt, 1999) and whether to work in the evening (Hamermesh, 1998) are affected by the risk of homicide victimization, most of which is accounted for by the risk of gun homicide. Cook and Ludwig (2000) show that the cost of administering the criminal justice system are increased by $2 billion or more each year because guns increase the likelihood that a robbery or fistfight results in a homicide. Gunshot injuries increase the net medical expenditures of public and private health insurance programs. And schools and other government agencies divert scarce resources to metal detectors and other security precautions designed largely to reduce the risk of gunshot injury.

The rest of the article is organized as follows. The second section reviews the willingness-to-pay (WTP) approach and discusses the application of this method to the

case of gunshot injuries. The third section describes our data and the fourth presents the empirical results. The fifth section discusses the implications of these findings.

## 2. The WTP approach

In this section we discuss the WTP approach within the context of gun violence, and then discuss different methods for estimating WTP.

### Defining WTP

Under the traditional benefit-cost framework of public economics, the benefits of a violence-reduction program consists of the sum of the values that citizens are WTP to fund some program or policy that reduces the risk of injury victimization. Previous research suggests that individual WTP to support a program to reduce gun violence may be motivated by four factors (Schelling, 1968):

- First, the individual may attach some value to the reduction in risk of being shot.
- Second, she may value the reduction in risk to other members of her household. Because we assume that individuals value the well-being of others in the household and because households pool income, we follow Manning et al. (1991) and treat households as the economic unit of interest.
- Third, she may derive some value from reducing the risk of others outside her household for whom she feels altruistic (Viscusi, Magat, and Forrest, 1998).
- Fourth, a reduction in the population risk of gunshot injury may have secondary benefits by improving her material quality of life. Part of this benefit comes from reductions in her own preventive expenditures (Berger, Blomquist, Kenkel and Tolley, 1994), while reductions in preventive behaviors by others may produce additional benefits. (For example, the overall quality of life in the community may improve from a reduction in gun violence, as a reduced threat of being caught in the cross fire engenders more socializing). Further, she may also receive some financial gain from reductions in the number of gunshot injuries to strangers through reductions in taxes or insurance premiums (Cook et al., 1999, Cook and Ludwig, 2000).

Total societal WTP is then defined as the sum of what each individual household is willing to pay.

### Measuring WTP

One way to measure societal WTP for programs that reduce health risks is to examine marketplace behavior. For example, a widely used approach is to examine the extra wage compensation that workers require in order to take risky jobs; these wage premiums

reflect the price of some health risk in the labor market (see, for example, Moore, and Viscusi, 1988a,b, 1990a,b; Viscusi and Moore, 1989). Another possibility is to examine variations in the prices of housing (Gayer, Hamilton, and Viscusi, 2000) or other consumer goods (Viscusi, 1993) related to health risks to estimate the value that people attach to risk reduction. In practice, identifying the independent effects of health risks on wages and prices is complicated by the possibility of other job or product attributes that may be correlated with these risks. Another complication stems from the choice of the appropriate risk measure that should be used. Most studies rely on some objective measure of the health risk facing consumers or workers, under the assumption that perceived and actual risks are closely related. This assumption is usually justified by noting that individuals have tangible incentives to gather information about the risks associated with particular consumer products or jobs.

When market behavior cannot be directly examined to estimate societal WTP for a public good, the preferred method, known as "contingent-valuation (CV)," is to survey a representative group of respondents about how much they would be willing to pay. A 1992 panel sponsored by the National Oceanic and Atmospheric Administration (NOAA) outlined the key components of a CV study that would maximize the likelihood of producing reliable results (Arrow et al., 1993), which include the use of referendum formats that ask respondents to vote on a hypothetical government program. The referendum format is deemed preferable to open-ended questions because citizens have experience in casting such votes, and because the referendum format minimizes incentives to free ride (Mitchell and Carson, 1989).

Whether even high-quality CV studies produce reliable estimates of WTP remains the topic of ongoing debate. One concern is that individuals will have limited information about the nature of the risk that is being asked about. This issue should not pose a major problem for our CV study because individuals already make decisions about where to live and when to work in response to the threat of gun violence (Hamermesh, 1998; Cullen and Levitt, 1999), decisions that provide people with incentives to gather information about these risks on their own.

Another concern stems from the tendency of survey respondents to present themselves favorably to interviewers (Sudman and Bradburn, 1974), which produces social desirability bias or yea-saying. A related concern is the possibility that CV responses are motivated more by the respondent's desire to "purchase moral satisfaction" rather than support the provision of a defined quantity of some public good (Kahneman and Knetsch, 1992). Both problems may manifest themselves in what is known as the "embedding effect," where the respondent's WTP is independent of the quantity of the public good that is being provided.

Perhaps the primary concern that most economists have about CV research is that respondents have no incentive to take the questions seriously since they relate to hypothetical rather than actual market behavior. what Kenkel, Berger, and Blomquist (1994) call "hypothetical bias." The use of referendum-type CV questions is one attempt to address this concern by increasing the realism of the survey exercise.

The empirical evidence on the existence of embedding effects is somewhat mixed (see, for example, Desvousges et al., 1993; Balson et al., 1990; Beattie et al., 1998; Hammitt

and Graham, 1999). Some evidence against hypothetical bias comes from experimental designs that compare reported with actual WTP, and from comparisons of CV responses with estimated travel times to use parks and other public goods or to wage premiums associated with health risks (Brookshire et al., 1982; Viscusi and O'Conner, 1984; Brookshire and Coursey, 1987; Smith, 1992; Hanemann, 1994), though several studies do find some discrepancies between hypothetical and actual behavior (Hausman, 1993; Diamond and Hausman, 1994; Johannesson et al., 1999). More generally, CV responses are typically consistent (at least broadly) with economic theory, in the sense that WTP increases with income and decreases with the availability of substitute goods (Tolley and Fabian, 1988; Kenkel, Berger, and Blomquist, 1994).

In sum, while most economists agree that WTP is the conceptually appropriate measure for valuing improvements to health and safety, most also agree that none of the available methods for measuring WTP are entirely satisfactory. Wage-risk tradeoffs cannot be used to value the benefits of reducing gun violence in part because of limited data on the risks of gunshot injury across occupations. Wage-risk tradeoffs will also fail to capture the value that workers place on reductions in the averting behaviors that they undertake in their private lives, or the value of reductions in risks to family, friends, and others in the community. In contrast the contingent-valuation method will produce WTP measures that are (at least in principle) complete. Despite the ongoing debates about contingent valuation there are, as Hammitt and Graham (1999, p. 58) note, "few good alternatives."

## 3. CV survey data

The 1998 National Gun Policy Survey (NGPS) is a nationally representative telephone survey of 1,204 American adults conducted during the Fall of 1998 by the National Opinion Research Center (NORC) at the University of Chicago. Interviews were conducted with one adult per sampled household, with the adult chosen randomly via the most-recent-birthday method. The response rate for the NGPS was 61% (see Kuby, Imhof, and Shin, 1999).

After a series of questions asking about their attitudes towards government and various current or proposed gun regulations, respondents are asked the following questions: "Suppose that you were asked to vote for or against a new program in your state to reduce gun thefts and illegal gun dealers. This program would make it more difficult for criminals and delinquents to obtain guns. It would reduce gun injuries by about 30%, but taxes would have to be increased to pay for it. If it would cost you an extra [$50/$100/$200] in annual taxes would you vote for or against this new program?" The amount of the tax increase that the respondent is asked about, either $50, $100 or $200, is randomly determined by the survey software. Respondents are then asked a follow-up where the dollar amount asked about in the initial referendum question is either doubled or halved, depending on whether the respondent's initial answer was positive or negative, respectively.

The intervention specified in the CV scenario should have no effect on hunting or defensive gun uses, and previous research suggests that gun availability within an area

increases the lethality but not the volume of violent crime (Cook, 1979, 1981, 1983). Thus the implicit counterfactual scenario that respondents are asked to "buy" in the NORC survey is a 30% reduction in gun crime, an equivalent increase in the number of non-gun crimes, and no change in the number if defensive gun uses. It is possible that respondents ignore the possibility of a countervailing increase in non-gun crimes when formulating their WTP responses, which will lead them to overstate the value of moving from the *status quo* to the counterfactual that we have in mind. Yet the degree of bias is likely to be modest, given the evidence cited above that Americans appear to be far more worried about serious injuries than other criminal victimizations.

As noted earlier, we assume that respondents are reporting on the total dollar value that their *household* would be willing to pay to fund this program, rather than reporting strictly on the value that they themselves would pay. Our assumption is conservative in that if respondents are in fact reporting on personal rather than household WTP, our estimates will understate total societal WTP to fund the hypothetical reduction in gun crime.[6]

## 4. Empirical results

We begin by presenting a non-parametric estimate for WTP to reduce gun violence by 30%. This estimate does not impose any assumptions on the population distribution of WTP, and suggests a WTP equal to $21.8 billion. We then present a more elaborate set of maximum-likelihood estimates that are derived under alternative assumptions about the distribution of WTP. Our preferred estimates suggest a societal WTP of $24.5 billion, equal to around $1.2 million per gunshot injury avoided.

*Non-parametric estimates*

Table 1 presents the descriptive statistics from the NGPS data. The proportion of respondents who vote to support the violence-reduction program decreases as the amount required to fund the program increases, ranging from 76% at a cost of $50 more in annual taxes to 38% at a cost of $400. Figure 1 provides a graphical representation of the cumulative distribution function implied by these descriptive statistics.

If we integrate under the area shown in Figure 1 and multiply by the total number of households in the US—equal to 102.5 million in 1998 (US Bureau of the Census, 1999a)—we obtain an estimated total WTP of $21.8 billion to reduce assault-related gunshot injuries by 30% (Table 2). In these calculations we assign a WTP of $0 to those respondents who answer no to both the first and follow-up CV questions, under the assumption that each individual's WTP to reduce gunshot injuries must be non-negative.[7] Although some people may object to the specific *mechanism* used to reduce gun injuries, presumably few people would be willing to pay to see more Americans shot, and in any case it is not clear that such preference should be given standing in benefit-cost analysis. In order to convert this estimate into WTP per gunshot injury avoided,

*Table 1.* Descriptive statistics from the 1998 NGPS

| | How vote on program to reduce gunshot injuries by 30% but cost $50 more per year in income taxes? | How vote on program to reduce gunshot injuries by 30% but cost $100 more per year in income taxes? | How vote on program to reduce gunshot injuries by 30% but cost $200 more per year in income taxes? |
|---|---|---|---|
| % Vote in favor of program (N) | 75.8 (400) | 68.5 (400) | 63.6 (404) |
| % Vote in favor of program on follow-up Q (N) | | | |
| Amount asked about on follow-up Q | | | |
| $25 | 23.3 (95) | | |
| $50 | | 24.2 (112) | |
| $100 | 67.2 (290) | | 27.9 (133) |
| $200 | | 59.4 (268) | |
| $400 | | | 59.4 (253) |

*Source:* Authors' calculations from 1998 NGPS; descriptive statistics are calculated using the 1998 NGPS sampling weights. Figures are in 1998 dollars.

we can divide total WTP by the estimated annual incidence of assault-related gunshot woundings—around 68,900 in 1998[8]—multiplied by 30%. This suggests WTP per injury equal to around $1.1 million.

*Parametric estimates*

The non-parametric estimate understates societal WTP because it does not interpolate the underlying distribution between the CV bid values or extrapolate beyond the highest value used in the survey. The non-parametric approach is also limited in that it only uses a fraction of the information available with the CV data. In this section we develop refined estimates that use maximum-likelihood methods to estimate societal WTP under a number of different assumptions.

Our empirical strategy is based on the framework outlined by Cameron and James (1987) and Cameron (1988). Let $Y_i$ equal the (unobserved) WTP value that respondent (i) has in mind when answering the first and second referendum questions in the NGPS. The respondent will answer in the affirmative to the first referendum question ($I_{1i} = 1$) if the "price" of the program in the form of higher taxes ($t_{1i}$) is not greater than the respondent's WTP ($Y_i \geq t_{1i}$). Similarly, the respondent will support the program in the follow-up CV question ($I_{2i} = 1$) if the new price $t_2$ is less than WTP ($Y_i \geq t_{2i}$), where $t_{2i}$ is equal to double $t_{1i}$ if $I_{1i} = 1$ and half of $t_{1i}$ if $I_{1i} = 0$. We initially assume that $Y_i$ is log-normally distributed (equation 1), which constrains WTP to be positive.

$$\log Y_i = \beta + u_i, \quad u_i \sim N(0, \sigma^2) \tag{1}$$



*Figure 1.* Demand for 30% reduction in gun violence.

From this setup we can estimate household WTP using the "interval-data" or "double-bounded" model from Hanemann, Loomis, and Kanninen (1991). The probabilities for the four possible joint outcomes for the first ($I_{1i}$) and second ($I_{2i}$) referendum questions are given in equations (2)–(5) (recall that $t_{2i} = 2t_{1i}$ if $I_{1i} = 1$, and $t_{2i} = 0.5t_{1i}$ if $I_{1i} = 0$).

$$P[I_{1i} = 1, I_{2i} = 1] = P[Y_i \geq t_{2i} > t_{1i}] = P[Y_i \geq t_{2i}]$$
$$= P[u_{1i}/\sigma \geq (\log t_{2i} - \beta)/\sigma]$$
$$= 1 - F[(\log t_{2i} - \beta)/\sigma] \qquad (2)$$

*Table 2.* Nonparametric estimates for mean WTP from NGPS

| Frequency distribution of maximum WTP to reduce gun assaults by 30% implied by descriptive statistics in Table 1 | (% households) |
|---|---|
| $ 0 | 18.6 |
| 25 | 5.6 |
| 50 | 7.3 |
| 100 | 4.9 |
| 200 | 25.8 |
| 400 | 37.8 |
| Implied mean WTP per household | $212.7 |
| Implied aggregate WTP[a] | $21.8 billion |

Notes: Estimates calculated from (weighted) descriptive statistics for NGPS shown in Table 1. Results reported in 1998 dollars.
[a]Obtained by multiplying mean WTP per household by number of households in the United States in 1998, which is equal to 102.5 million (US Bureau of the Census, 1999a,b).

216 LUDWIG AND COOK

$$P[I_{1i} = 0, I_{2i} = 0] = P[Y_i < t_{2i} < t_{1i}] = P[Y_i < t_{2i}]$$
$$= P[u_{1i}/\sigma < (\log t_{2i} - \beta)/\sigma]$$
$$= F[(\log t_{2i} - \beta)/\sigma] \tag{3}$$

$$P[I_{1i} = 1, I_{2i} = 0] = P[t_{1i} \leq Y_i < t_{2i}] = P[Y_i < t_{2i}] - P[Y_i < t_{1i}]$$
$$= F[(\log t_{2i} - \beta)/\sigma] - F[(\log t_{1i} - \beta)/\sigma] \tag{4}$$

$$P[I_{1i} = 0, I_{2i} = 1] = P[t_{2i} \leq Y_i < t_{1i}] = P[Y_i < t_{1i}] - P[Y_i < t_{2i}]$$
$$= F[(\log t_{1i} - \beta)/\sigma] - F[(\log t_{2i} - \beta)/\sigma] \tag{5}$$

We obtain estimates for the parameters of this model by applying maximum-likelihood estimation (MLE) to the log-likelihood function in equation (6).

$$\ln L = \sum_i (I_{1i})(I_{2i})\{1 - F[(\log t_{2i} - \beta)/\sigma]\}$$
$$+ (1 - I_{1i})(1 - I_{2i})\{F[(\log t_{2i} - \beta)/\sigma]\}$$
$$+ (I_{1i})(1 - I_{2i})\{F[(\log t_{2i} - \beta)/\sigma] - F[(\log t_{1i} - \beta)/\sigma]\}$$
$$+ (1 - I_{1i})(I_{2i})\{F[(\log t_{1i} - \beta)/\sigma] - F[(\log t_{2i} - \beta)/\sigma]\} \tag{6}$$

The coefficient estimate for the variables $t_{1i}$ and $t_{2i}$ is an estimate for $1/\sigma$, which in turn allows us to identify an estimate $b$ for the parameter $\beta$. Calculating the standard errors for mean and median household WTP is complicated by the fact that our estimate for $b$ is really the ratio of two estimates—the estimated value for $\beta/\sigma$ divided by an estimate for $1/\sigma$. Our method for calculating standard errors is provided in the technical appendix. If $w_i$ represents the NGPS sampling weight for household (i), which equals the number of households in the population that each sampled household represents, then estimated societal WTP is given by equation (7). While $b$ provides an unbiased estimate for the expected value of log WTP, for a log-normal variable the mean of WTP itself will be given by $\exp(b) \times \exp(0.5\sigma^2)$ as in equation (7) (Manning, 1998).

$$\text{Societal WTP} = \sum_i w_i \times \exp(b) \times \exp(0.5\sigma^2) \tag{7}$$

In Figure 2, we compare the cumulative distribution function for WTP implied by the parametric estimates presented in Table 3 with the non-parametric function from Figure 1. The MLE estimates imply mean and median household WTP equal to $203 and aggregate WTP equal to $20.8 billion, or around $1 million per injury (Table 4). The parametric estimate does not exceed the non-parametric figure as might be expected because the former uses data from both the first and second CV questions, while the latter is based largely on responses to the first CV question.

We further refine our parametric estimates by calculating mean household WTP conditional on a vector of household characteristics $X_i$ that may affect the risk of gunshot

THE BENEFITS OF REDUCING GUN VIOLENCE                                    217



*Figure 2.* Demand for 30% reduction in gun violence.

Table 3. Coefficient estimates from MLE estimates. from NGPS contingent valuation referendum data

| Variable | Without household covariates | With household covariates |
|---|---|---|
| Intercept | 3.078 (0.155)** | 3.096 (0.220)** |
| Bid value (1/σ) | 0.600 (0.030)** | 0.634 (0.033)** |
| *Race* | | |
| African-American | | −0.046 (0.131) |
| Hispanic | | −0.129 (0.155) |
| Other Race | | −0.213 (0.213) |
| *Region* | | |
| Northeast | | 0.057 (0.119) |
| Midwest | | −0.156 (0.100) |
| West | | −0.155 (0.116) |
| *HH composition* | | |
| # Children < 6 in HH | | 0.229 (0.064)** |
| # Children 6–17 in HH | | 0.115 (0.041)** |
| # Adults in HH | | −0.027 (0.057) |
| *Family income* | | |
| $20–39,999 | | 0.214 (0.121)* |
| $40–59,999 | | 0.438 (0.135)** |
| $60,000 plus | | 0.449 (0.133)** |
| Income missing | | 0.081 (0.141) |
| Gun in home | | −0.201 (0.088)** |
| N | 1,145 | 1,110 |
| Log likelihood | −804.57 | −759.3 |

Notes: Author calculations from applying maximum likelihood estimation to equation (3) for the 1997 gun survey data and equation (11) for the 1998 gun survey data, under the assumption that WTP is normally distributed. Figures are in 1998 dollars.
*Statistically significant at the 10% level.
**Statistically significant at the 5% level.

injury, attitudes towards risk, or ability to pay. In our empirical analysis the vector of household variables includes income, household composition (the number of children under 6 or 6–17, and the number of adults), household gun ownership, and race.[9]

As seen in Table 3, income has a strong positive effect on support for the violence program. We also find that households with guns have lower WTP than other households to support gun-violence reduction, consistent with previous findings that gun owners are less supportive of gun control than non-owners (Teret et al., 1998). Table 3 also provides some support for the assumption that respondents are reporting on household (rather than individual) WTP, since WTP has a strong correlation with the number of children in the home.

Including the household covariates serves to increase our estimated mean WTP per household from $203 to $239 (Table 4). Total WTP to reduce gun violence by 30% equals $24.5 billion, or around $1.2 million per injury. We use household-level covariates because we interpret the CV responses as reflections of household (rather than individual) WTP. If different individuals within the home would report different WTP values, then our estimates should still be unbiased (since adults are randomly selected from households) but may be inefficient.[10]

*Sensitivity analyses*

We find that our estimates are fairly robust to assumptions about the distribution of WTP. Re-estimating equation (7) with covariates under the assumption that WTP has a log-logistic (rather than log-normal) distribution produces an estimated mean WTP of $206. Using a normal distribution, which allows WTP to be negative, produces an estimate of $213.

One concern with these CV data is the possibility that responses to the follow-up CV question are influenced by the initial question. As Cameron and Quiggin (1994) note,

*Table 4.* Maximum likelihood estimates for WTP to reduce gun assaults by 30%, from NGPS data

| | Without covariates | With covariates[a] |
|---|---|---|
| Estimated WTP to reduce GSW by 30% | | |
| Mean | $203 | $239 |
| (95% confidence interval) | (185–220) | (103–375) |
| Median | $203 | $204 |
| (95% confidence interval) | (185–220) | (68–340) |
| *Estimated societal WTP for program to reduce gun assaults by 30%[b]* | $20.8 billion | $24.5 billion |
| *Estimated societal WTP for each gun assault avoided* | $1.0 million | $1.2 million |

Notes: Figures are in 1998 dollars.
[a]Covariates included in model are household income, household composition (the number of children under 6 or 6–17, and the number of adults), household gun ownership status, and race.
[b]Obtained by multiplying mean WTP per household by number of households in the United States in 1998, which is equal to 102.5 million (U.S. Bureau of the Census, 1999a,b).

respondents may become more certain about their response to the second rather than first question because they have had more time to reflect on the public good in question. Alternatively, respondents may believe that the first question provides information about the actual average cost of the public good, and may then react negatively to the second question that asks the respondent to pay "more than it costs." The descriptive statistics presented in Table 1 provides some evidence to support this second effect. For example, Table 1 shows that 69% of respondents who are asked about a $100 tax increase in the first question will pay this much to support the program, though only 51% of those who are asked about a $50 increase in the first question will support a $100 tax increase (76% × 67%).

To address the possibility that the respondent is sensitized by the first CV question, and thus that the first and second questions produce draws from slightly different WTP distributions, we follow Cameron and Quiggin (1994) and re-estimate WTP using a bivariate probit model. The bivariate probit model allows for different means for the first and second WTP values ($\beta_1 \neq \beta_2$), as well as separate error processes that have different variances ($\sigma_1^2 \neq \sigma_2^2$) and are only imperfectly correlated ($[\text{Corr}|u_{1i}, u_{2i}] = \rho < 1$). Although the bivariate probit model affords greater flexibility than the MLE model given by equation (6), this strategy comes at the cost of less precise estimates (Alberini, 1995) and makes interpretation of the results somewhat complicated. Relative to our preferred WTP estimate of $239 in Table 4, the bivariate-probit estimate for the first referendum response is 30% higher and for the second response is 13% lower. Both of these are within the 95% confidence interval for the estimate in Table 4.

Another concern that commonly arises with CV studies is that of "protest zeroes," defined as cases in which the respondent rejects the hypothetical market scenario even though her true WTP exceeds the stated "price" of the referendum (Mitchell and Carson, 1989). The proper definition of protest zeroes is complicted in our application. Fairly uncontroversial is the case of tax protestors—those respondents who object to financing the program out of tax revenues, but who would be willing to pay the stated amount to achieve a 30% reduction in gun violence if the program were financed by some other means. One possibility is to identify as tax protesters the 24% of respondents who "strongly agree" with the survey question that "taxes are too high." When we re-estimate our model without these respondents in the sample—which is the preferred method for dealing with protesters (Freeman, 1993)—our estimate is only 13% higher than the $239 figure reported in Table 4.

More complicated are cases where the respondent objects to the mechanism for reducing gun violence, rather than the mechanism for financing the program. The NGPS asks about programs that target the illegal use or transmission of firearms, which in turn should reduce gun violence holding the overall crime rate constant. Respondents who object to these interventions should *only* be counted as protest zeroes if alternative interventions exist that could plausibly reduce gun crime without reducing the overall crime rate.

In any case, when we exclude "intervention-protesters," defined as those who "strongly disagree" that "the government should do everything it can to keep handguns out of the hands of criminals, even if it means that it will be harder for law-abiding citizens to

purchase handguns," the result is only a 7% increase in WTP compared with Table 4. Another way to assess the problem of "intervention-protestors" is to estimate WTP for those households that own guns, which turns out to be only slightly lower than the estimate for all households ($211 versus $239 per household).

## 5. Discussion

This article estimates the demand for reductions in crime using CV methods. Our estimates suggest that a 30% reduction in gun violence is worth $24.5 billion to the American public in 1998 dollars, around $1.2 million per injury. These findings are generally quite robust to our decisions about the estimation procedure—even the descriptive statistics imply a societal WTP of $21.8 billion.

The most fundamental issue is whether NGPS respondents take the CV questions seriously and provide thoughtful answers, and, if so, whether these responses reflect underlying preferences about a given quantity of violence reduction rather than social desirability bias, moral satisfaction or some other motivation. CV responses that are motivated by something other than the public's demand for a public good may be insensitive to the quantity of the public good that is offered (the embedding effect), and thus not useful for benefit-cost analysis.

Some evidence that respondents devote at least some thought to answering the CV questions comes from the positive correlation of WTP with family income, consistent with economic theory, and negative correlation with household gun ownership, consistent with previous research that gun owners are less supportive of government efforts to reduce gun violence (Teret et al., 1998).

Our crude test for an embedding effect with the NGPS data suggests that WTP is in fact sensitive to the amount of risk reduction provided. Table 4 shows that WTP increases with the number of children in the home, which in turn is related to the total amount of risk reduction that the households gains from a violence-reduction program. Since these findings could be explained by taste or other differences between households with and without children, we re-estimated our models using only those households with children. We find that each additional child in the home under the age of 6 increases the respondent's WTP by 50%, and each additional child between 6 and 17 increases WTP by 25%. Although these findings provide some evidence against an embedding effect, for some reason additional adults within the home do not appear to increase household WTP.

Our estimates are based on CV questions that are limited in length and level of detail by the constraints of telephone survey methods, and are thus necessarily imperfect. The CV questions used in the gun survey described here can be criticized for excluding important information about the hypothetical interventions that respondents are asked to support, a problem that plagues all CV studies to some degree. In particular, the NGPS questions do not specify the baseline risk to the respondent, although there is substantial heterogeneity in the risk of gunshot injury within the population. This problem may be mitigated somewhat if, as we have suggested earlier, individuals already have incentives

to obtain information about their risk of gunshot injury as part of their decisions about where to work and live.

A related concern is that respondents to these CV questions may overstate the baseline risk of gunshot injury as a result of the rash of school shootings that have occurred during the past several years. Although we have no way to directly assess this problem, it is useful to note that the CV survey was conducted during the Fall of 1998, several months before the most heavily publicized school shooting in Littleton, Colorado. Prior to the survey, the most recent school shooting that received substantial national attention occurred in March, 1998 in Jonesboro, Arkansas.

Despite the limitations of these CV survey data, some support for the credibility of our findings comes from their consistency with other benchmarks. As noted above, our estimates for what households are willing to pay to reduce gun crime by 30% seems reasonable compared to what households currently pay in taxes and private expenditures to protect themselves against crime. Our estimates for society's WTP to reduce gun violence are also remarkably consistent with previous estimates from wage-risk tradeoffs. Deriving a value of statistical life from our CV results is complicated somewhat by the fact that our question reflects WTP for both fatal and nonfatal gunshot injuries. If we start with the extreme assumption that WTP is driven entirely by concern about fatal gunshot injuries, then our preferred estimate of $1.2 million per gunshot injury avoided implies a value per statistical life equal to around $6.8 million. But presumably part of WTP to reduce gun injuries is motivated by concern about non-fatal gunshot injuries. If we assume that non-fatal gunshot injuries are twice as undesirable as the average workplace injury, our estimates imply a value per statistical life of around $5.4 million.[11] By way of comparison, studies of wage-risk tradeoffs produce estimates for the value of life (also in 1998 dollars) between $3.7 and $8.6 million (Viscusi, 1993).

We would expect societal WTP to be far smaller if citizens were concerned only about reducing the risk of gun injury to themselves and members of their families. The reason is that gunshot injuries in the United States are highly concentrated among a group of people who on average are far less risk averse than are members of the general population. Two-thirds of all firearm homicides in 1996 were to males between the ages of 15 and 39 (CDC, 1999), and three-quarters of gun homicide victims under 21 in Boston in 1990–94 had criminal records (Kennedy, Piehl, and Braga, 1996). Levitt and Venkatesh (2000) studied the records documenting the opportunities and violence-victimization risks for members of a crack-dealing street gang. Comparing the risk to the reward suggests that they placed a value on a statistical life of just $55,000 on average. Our WTP estimates thus suggest that the benefits from reducing gun violence in America are substantial, and accrue primarily to citizens at low personal risk of injury through reductions in risk to friends, family and others for whom they feel altruistic, lower tax bills, or improvements to the overall quality of community life.

Finally, it is important to note that our CV estimates are for *marginal* reductions in the prevalence of gun violence, and can provide only limited information about the benefits of eliminating gun violence altogether. Simply multiplying our estimates for the value of a 30% reduction in gun violence by 3.33 may either understate or overstate the value of a 100% reduction. This simple extrapolation may produce a number that is

too low if some forms of averting behavior only respond to the complete elimination of gunshot injuries. On the other hand, this extrapolation could produce a number that is too high if the technology of reducing gunshot injuries is different from that of complete elimination. Although marginal reductions in gun violence are possible without much affecting hunting or defensive gun use, the complete elimination of gun violence is unlikely to be attainable without at least some effect on whatever benefits arise from guns. Of course, with more than 200 million guns already in circulation (Cook and Ludwig, 1996), ending gun violence altogether in America is an unrealistic objective for public policy in any case.

## Appendix

### A. Calculating standard errors for mean and median WTP

The usual standard error formula for a linear predictor evaluated at some value of the regressors $x_0$ is given by equation (A1)

$$SE(x_0'\mathbf{b}) = (x_0 V x_0')^{1/2} \tag{A1}$$

Estimation of the log likelihood given in equation (7) is simplified somewhat because $b$ is a scalar rather than a vector, so $V$ is also a scalar equal to the variance of $b$, $x_0 = 1$, and equation (A1) simplifies to (A2)

$$SE(b) = (V)^{1/2} \tag{A2}$$

The complication in our case comes from the fact that $b$ is actually the ratio of two estimates $b'/s'$, where $b'$ is an estimate for $(\beta/\sigma)$ and $s'$ is an estimate for $(1/\sigma)$. In this case the variance for $b = b'/s'$ can be approximated by the formula given in equation (A3) (Yates, 1981, p. 190)

$$V = \text{Var}(b) = \text{Var}(b'/s') \approx (b'/s')^2 \left[ (\text{Var}(b'))/(b')^2 + (\text{Var}(s'))/(s')^2 \right] \tag{A3}$$

The final complication is that (A3) gives us the variance for the estimated mean of the natural log of $Y$ (WTP), while ultimately we are interested in the variance of predicted mean of the untransformed WTP. With $E[\ln Y] = b$ and $\text{Var}(E[\ln Y]) = V$ then the variance of $E[Y]$ is given by equation (A4) (Maddala, 1977, p. 33).

$$\text{Var}(E[Y]) = \exp(2b + V) * (e^V - 1) \tag{A4}$$

THE BENEFITS OF REDUCING GUN VIOLENCE                                   223

## Notes

1. Unpublished figures from the Vital Statistics for fatal gun homicides from 1972 onward were provided to us by James Mercy of the Centers for Disease Control and Prevention. Estimates for the number of non-fatal assault-related gunshot injuries come from applying the case-fatality ratios reported in Cook and Ludwig (2000).

2. See for example Fox Butterfield, "Small-Print Provisions of Gun Bill Please Federal Officials Best," *New York Times*, May 22, 1999, and "Handguns: Who Will Stand Up?" Editorial, *Washington Post*, April 28, 1999.

3. Unpublished calculations kindly provided to us by Julie Cullen and Steve Levitt show that each additional homicide reduces a city's population by 70 residents, far larger than the 1-resident reduction caused by each additional non-fatal violent or property crime.

4. Only a handful of studies have adopted an *ex ante* approach to evaluating the benefits of reducing crime. All of these studies rely on hedonic-pricing methods to relate crime rates and housing prices (Thaler, 1978; Hellman and Naroff, 1978; Rizzo, 1979). These estimates rely on data from a single city, may confound the price effects of crime with other factors, and are incomplete. None of these studies focuses on gun violence specifically.

5. The COI approach defines lost productivity as foregone earnings plus the lost value of household work; all other forms of non-market production are excluded. See Kenkel (1994) for a detailed review of the COI approach.

6. One implication of this assumption is that our analysis should convert the NGPS sampling weights from person weights into household weights. The NGPS respondent weights calculated by NORC equal one divided by the probability of the household's selection into the sample. The weights are then divided by the adult's probability of selection from within the household, equal to (1/A) where A is the number of adults in the home. To convert these into household weights we multiply by (1/A).

7. The estimate in Table 2 for the proportion of households who would pay $400 per year is derived by multiplying the proportion of household who say they would pay $200 to fund the program in the first CV question (63.6% from the last column of Table 1) by the proportion who answer yes to the follow-up CV question. To derive the share of households whose WTP is $200 we multiply those who say yes to an initial bid value of $100 by the fraction who say no to the follow-up question. The estimates in Table 2 for WTP of $0 and $25 are derived using an analogous procedure for those who say no to an initial bid value of $50. The estimated proportion of households whose WTP is $50 in Table 2 comes from subtracting the share of households whose WTP is $0 or $25 (Table 2) from the proportion of households who say no to an initial bid value of $100 (Table 1). The figure for the $100 WTP level in Table 2 comes from subtracting the share of household whose WTP is $200 or $400 from the share who say yes to an initial bid value of $100.

8. Data from the Vital Statistics census of deaths suggest that there were 12,102 firearm homicides in 1998 (NCHS, 2000). To calculate the total number of assault-related firearm injuries we multiply the number of gun homicides by the estimated ratio of total to fatal assault-related gun injuries for 1997 (5.69) from Cook and Ludwig (2000).

9. Since only 2.2% of all marriages were inter-racial in 1992, the last year for which such data are available (US Bureau of the Census, 1999b), we infer "household race" from the respondent's race. The household gun ownership measure will slightly understate the true prevalence of gun ownership across households because some married women either do not know about or are unwilling to report on guns owned by their spouses (Ludwig, Cook, and Smith, 1998).

10. To explore this possibility, we re-estimated our preferred MLE model after restricting the sample to married respondents and including an indicator for the respondent's gender. While the coefficient estimate for an indicator variable for husbands is negative and statistically significant, inclusion of this variable serves to reduce estimated mean WTP by less than 7% compared with the results obtained when the variable is excluded.

11. This comes from multiplying twice the highest estimate for workplace injuries reported in Viscusi (1993), around $300,000 in 1998 dollars, by the number of nonfatal gun injuries for every fatality (4.69), and subtracting this figure ($1.4 million) from the estimated value of 5.69 gunshot injuries ($6.8 million).

## References

Alberini, Anna. (1995). "Efficiency vs Bias of Willingness-to-Pay Estimates: Bivariate and Interval-Data Models," *Journal of Environmental Economics and Management* 29. 169–180.

Anderson, David. A. (1999). "The Aggregate Burden of Crime," *Journal of Law and Economics* 42(2), 611–642.

Arrow, Kenneth et al. (1993). "Report of the NOAA Panel on Contingent Valuation." *Federal Register*, Washington, DC, January 15.

Balason, W. E. et al. (1990). "Development and Design of a Contingent Valuation Survey for Measuring the Public's Value for Visibility Improvements at the Grand Canyon National Park." Working Paper.

Beattie, Jane, Judith Covey, Paul Dolan, Lorraine Hopkins, Michael Jones-Lee, Graham Loomes, Nick Pidgeon, Angela Robinson, and Anne Spencer. (1998). "On the Contingent-Valuation of Safety and the Safety of Contingent Valuation: Part 1—Caveat Investigator," *Journal of Risk and Uncertainty* 17. 5–25.

Becker, Gary. (1968). "Crime and Punishment: An Economic Approach." *Journal of Political Economy* 76(2), 169–217.

Berger, Mark, Glenn Blomquist, Donald Kenkel, and George Tolley. (1994). "Framework for Valuing Health Risks." In George Tolley, Donald Kenkel, and Robert Fabian (eds.), *Valuing Health for Policy: An Economic Approach*. Chicago: University of Chicago Press.

Blumstein, Alfred and Richard Rosenfeld. (1998). "Explaining Recent Trends in U.S. Homicide Rates," *Journal of Criminal Law and Criminology* 88(4), 1175–1216.

Blumstein, Alfred and Joel Wallman. (2000) *The Crime Drop in America*. Cambridge: Cambridge University Press.

Bratton, William and Peter Knobler. (1998). *Turnaround: How America's Top Cop Reversed the Crime Epidemic*. New York: Random House.

Brookshire, David S. and Don L. Coursey. (1987). "Measuring the Value of a Public Good: An Empirical Comparison of Elicitation Procedures," *American Economic Review* 77(4), 554–566.

Brookshire, David S., Mark A. Thayer, William D. Schulze, and Ralph C. d'Arge. (1982). "Valuing Public Goods: A Comparison of Survey and Hedonic Approaches," *American Economic Review* 72(1), 165–177.

Cameron, Trudy Ann. (1998). "A New Paradigm for Valuing Non-Market Goods Using Referendum Data: Maximum Likelihood Estimation by Censored Logistic Regression." *Journal of Environmental Economics and Management* 15, 355–379.

Cameron, Trudy Ann and Michelle D. James. (1987). "Efficient Estimation Methods for 'Closed Ended' Contingent Valuation Surveys," *Review of Economics and Statistics* 69, 269–276.

Cameron, Trudy Ann and John Quiggin. (1994). "Estimation Using Contingent Valuation Data from a 'Dichotomous Choice with Follow-Up' Questionnaire," *Journal of Environmental Economics and Management* 27, 218–234.

Cook, Philip J. (1979). "The Effect of Gun Availability on Robbery and Robbery Murder: A Cross-Section Study of Fifty Cities," *Policy Studies Review Annual* 3, 743–781.

Cook, Philip J. (1981). "The Effect of Gun Availability on Violent Crime Patterns," *Annals of the American Academy of Political and Social Science* 455. 63–79.

Cook, Philip J. (1983). "The Influence of Gun Availability on Violent Crime Patterns." In Norval Morris and Michael Tonry (eds.), *Crime and Justice: An Annual Review of Research*, Vol. 1. Chicago: University of Chicago Press

Cook, Philip J. and Jens Ludwig. (1996). *Guns in America: Results of a Comprehensive Survey of Gun Ownership and Use*. Washington, DC: Police Foundation.

Cook, Philip J., Bruce Lawrence, Jens Ludwig and Ted R. Miller. (1999). "The Medical Costs of Gunshot Injuries in the United States," *Journal of the American Medical Association* 282(5). 447–454.

Cook, Philip J. and Jens Ludwig. (2000). *Gun Violence: The Real Costs*. New York: Oxford University Press.

Cullen, Julie Berry and Steven D. Levitt. (1999). "Crime, Urban Flight, and the Consequences for Cities," *Review of Economics and Statistics* 81(2), 159–169.

Desvousges, William H. et al. (1993). "Measuring Natural Resource Damages with Contingent Valuation: Tests of Validity and Reliability." In Jerry A. Hausman (ed.), *Contingent Valuation: A Critical Assessment*. Amsterdam: North Holland.

Diamond, Peter A. and Jerry A. Hausman. (1994). "Contingent Valuation: Is Some Number Better than No Number?" *Journal of Economic Perspectives* 8(4), 45–64.

Freeman, Myrick A. (1993). *The Measurement of Environmental and Resource Values: Theory and Methods.* Washington, DC: Resources for the Future.

Gayer, Ted, James T. Hamilton, and W. Kip Viscusi. (2000). "Private Values of Risk Tradeoffs at Superfund Sites: Housing Market Evidence on Learning about Risk," *Review of Economics and Statistics* 82(3), 439–451.

Hamermesh, Daniel S. (1998). "Crime and the Timing of Work." National Bureau of Economic Research Working Paper No. 6613.

Hammit, James K. and John D. Graham. (1999). "Willingness to Pay for Health Protection: Inadequate Sensitivity to Probability?" *Journal of Risk and Uncertainty* 8, 33–62.

Hanemann, Michael. (1994). "Valuing the Environment Through Contingent Valuation." *Journal of Economic Perspectives* 8(4), 19–43.

Hanemann, Michael, John Loomis and Barbara Kanninen. (1991). "Statistical Efficiency of Double-Bounded Dichotomous Choice Contingent Valuation." *American Journal of Agricultural Economics* 73(4), 1255–1263.

Hausman, Jerry A. (1993). *Contingent Valuation: A Critical Assessment.* Amsterdam: North Holland.

Hellman, Daryl A. and Joel L. Naroff. (1979). "The Impact of Crime on Urban Residential Property Values," *Urban Studies* 16, 105–112.

Johannesson, Magnus, Glenn C. Blomquist, Karen Blumenschein, Per-Olov Johansson, Bengt Liljas, and Richard M. O'Conor. (1999). "Calibrating Hypothetical Willingness to Pay Responses," *Journal of Risk and Uncertainty* 8, 21–32.

Kahneman, Daniel and Jack L. Knetsch. (1992). "Valuing Public Goods: The Purchase of Moral Satisfaction." *Journal of Environmental Economics and Management* 22, 57–70.

Kenel, Donald. (1994). "Cost of Illness Approach." In George Tolley, Donald Kenkel, and Robert Fabian (eds.). *Valuing Health for Policy: An Economic Approach.* Chicago: University of Chicago Press.

Kenkel, Donald, Mark Berger, and Glenn Blomquist. (1994). "Contingent Valuation of Health." In George Tolley, Donald Kenkel, and Robert Fabian (eds.). *Valuing Health for Policy: An Economic Approach.* Chicago: University of Chicago Press.

Kennedy, David M., Anne M. Piehl, and Anthony A. Braga. (1996). "Youth Violence in Boston: Gun Markets, Serious Youth Offenders and a Use-Reduction Strategy." *Law and Contemporary Problems* 59(1), 147–196.

Kuby, Alma M., Laurie Imhof, and Hee-Choon Shin. (1999). *Fall 1998 National Gun Policy Survey: Methodology Report.* Chicago: National Opinion Research Center.

Levitt, Steven D. and Sudhir Alladi Venkatesh. (2000). "An Economic Analysis of a Drug-Selling Gang's Finances." *Quarterly Journal of Economics* 115(3), 755–790.

Ludwig, Jens, Philip J. Cook, and Tom W. Smith. (1998). "The Gender Gap in Reporting Household Gun Ownership." *American Journal of Public Health* 88(11), 1715–1718.

Maddala, G. S. (1977). *Econometrics.* New York: McGraw-Hill.

Manning, Willard G., Emmett B. Keeler, Joseph P. Newhouse, Elizabeth M. Sloss, and Jeffrey Wasserman. (1991). *The Costs of Poor Health Habits.* Cambridge, MA: Harvard.

Manning, Willard G. (1998). "The Logged Dependent Variable, Heteroscedasticity, and the Retransformation Problem." *Journal of Health Economics* 17, 283–295.

Max, Wendy and Dorothy P. Rice. (1993). "Shooting In the Dark: Estimating the Cost of Firearm Injuries." *Health Affairs* 171–185.

Miller, Ted R. and Mark A. Cohen. (1996). "Costs." In Rao R. Ivatury and C. Gene Cayten (eds.). *The Textbook of Penetrating Trauma.* Baltimore, MD: Williams & Wilkins.

Miller, Ted R. and Mark A. Cohen. (1997). "Costs of Gunshot and Cut/Stab Wounds in the United States, With Some Canadian Comparisons." *Accident Analysis and Prevention* 29(3), 329–341.

Miller, Ted R., Mark A. Cohen, and Brian Wiersema. (1996). *Victim Costs and Consequences: A New Look (NCJ 155282).* Washington, DC: National Institute of Justice.

Mitchell, Robert Cameron and Richard T. Carson. (1989). *Using Surveys to Value Public Goods: The Contingent Valuation Method.* Washington, DC: Resources for the Future.

Moore, Michael J. and W. Kip Viscusi. (1988a). "Doubling the Estimated Value of Life: Results Using New Occupational Fatality Data," *Journal of Policy Analysis and Management* 7(3), 476–490.

Moore, Michael J. and W. Kip Viscusi. (1988b). "The Quantity-Adjusted Value of Life," *Economic Inquiry* 26(3), 369–388.

Moore, Michael J. and W. Kip Viscusi. (1990a). "Discounting Environmental Health Risks: New Evidence and Policy Implications," *Journal of Environmental Economics and Management* 18(2), S51–S62.

Moore, Michael J. and W. Kip Viscusi. (1990b). "Models for Estimating Discount Rates for Long-Term Health Risks Using Labor Market Data," *Journal of Risk and Uncertainty* 3(4), 381–402.

National Center for Health Statistics. (2000). *National Vital Statistics Reports.* Vol. 48, No. 11, July 24, 2000. Hyattsville, MD: National Center for Health Statistics.

Piehl, Anne M., David M. Kennedy, and Anthony A. Braga. (1998). "Problem Solving and Youth Violence: An Evaluation of the Boston Gun Project." Harvard University, Working Paper.

Rizzo, Mario J. (1979). "The Costs of Crime to Victims: An Empirical Analysis," *Journal of Legal Studies* 8, 177–205.

Rosenfeld, Richard and Scott H. Decker. (1996). "Consent to Search and Sieze: Evaluating an Innovative Youth Firearm Suppression Program," *Law and Contemporary Problems* 59(1), 197–220.

Rottenberg, Simon. (1970). "The Social Cost of Crime and Crime Prevention." In Barbara McLennan (ed.), *Crime in Urban Society.* Cambridge, MA: University Press.

Schelling, Thomas C. (1968). "The Life You Save May Be Your Own." In Samuel B. Chase (ed.), *Problems in Public Expenditure and Analysis.* Washington, DC: Brookings Institution.

Smith, V. Kerry. (1992). "Arbitrary Values, Good Causes, and Premature Verdicts," *Journal of Environmental Economics and Management* 22, 71–89.

Stigler, George J. (1970). "The Optimum Enforcement of Laws," *Journal of Political Economy* 78, 526–536.

Sudman, Seymour and Norman Bradburn. (1974). *Response Effects In Surveys: A Review and Synthesis.* Chicago: Aldine.

Teret, Stephen P., Daniel W. Webster, Jon S. Vernick et al. (1998). "Support for New Policies to Regulate Firearms: Results of Two National Surveys," *New England Journal of Medicine* 339(12), 813–818.

Thaler, Richard. (1978). "A Note on the Value of Crime Control: Evidence from the Property Market," *Journal of Urban Economics* 5, 137–145.

Tolley, George and Robert Fabian. (1988). *The Economic Value of Visibility.* Mount Pleasant, MO: Blackstone.

US Bureau of the Census. (1999a). *Statistical Abstract of the United States: 1999,* 119th ed., Washington, DC: Government Printing Office.

US Bureau of the Census. (1999b). <http://www.census.gov/population/socdemo>>(downloaded on February 22, 1999).

Viscusi, W. Kip. (1992). *Fatal Tradeoffs: Public and Private Responsibilities for Risk,* New York: Oxford University Press.

Viscusi, W. Kip. (1993). "The Value of Risks to Life and Health," *Journal of Economic Literature* 31(4), 1912–1946.

Viscusi, W. Kip and Charles O'Connor. (1984). "Adaptive Responses to Chemical Labeling: Are Workers Bayesian Decision Makers?" *American Economic Review* 74(5), 942–956.

Viscusi, W. Kip, Wesley A. Magat, and Anne Forrest. (1988). "Altruistic and Private Valuations of Risk Reduction," *Journal of Policy Analysis and Management* 7(2), 227–245.

Viscusi, W. Kip and Michael J. Moore. (1989). "Rates of Time Preference and Valuations of the Duration of Life," *Journal of Public Economics* 38, 297–317.

Yates, F. (1981). *Sampling Methods for Censuses and Surveys,* 4th edition Revised and Enlarged. London: Charles Giffin & Co.

Zimring, Franklin E. and Gordon Hawkins. (1997). *Crime Is Not the Problem: Lethal Violence in America.* New York: Oxford University Press.

# Exhibit 18

# Is Gun Control Likely To Reduce Violent Killings?

## Frank Zimring

One of the major arguments for the elimination of firearms, and derivatively for gun control laws, is that such measures would reduce the number of criminal homicides.[1] It has been argued, however, that eliminating guns would have no such effect because if somebody wants to kill, he will find a weapon to achieve "his destructive goal"; there is, it is said, more than one way to skin a cat.[2] This paper is an attempt to bring this phase of the gun control debate closer to a resolution, through analysis of data from the Police Department of the City of Chicago on reported criminal homicides and serious, but not fatal, criminal assaults during 1965, 1966, and 1967.

### HOMICIDE AND THE INTENTION TO KILL

If all homicides resulted from such a single-minded intention to kill as gangland killings, laws prohibiting firearms would not have a substan-

---

Frank Zimring is Assistant Professor of Law, The University of Chicago, and Research Associate, Center for Studies in Criminal Justice. This study was supported by the Center for Studies in Criminal Justice at the University of Chicago. The study would not have been possible without the cooperation of the Homicide-Sex Division of the Chicago Police Department, and particularly Commander Francis Flanagan and Detective P. D. Conway. The author wishes to thank Professor Hans Zeisel, of the University of Chicago Law School, for his monumental assistance in the preparation of this note, and Fred Axley, a second-year student at the University of Chicago Law School, for his diligent research assistance.

1 "It would be fairly easy to reduce the number of murders. Rational and effective laws would cut homicide sharply." Norval Morris, quoted in LOOK, Sept. 19, 1967, at 32.

2 "More than the availability of a shooting weapon is involved in homicide. Pistols and revolvers are not difficult to purchase . . . in Philadelphia. . . . The type of weapon used appears to be, in part, the culmination of assault intentions or events and is only superficially related to causality. To measure quantitatively the effect of the presence of firearms on the homicide rate would require knowing the number and type of homicides that would not have occurred had not the offender—or, in some cases, the victim—possessed a gun. Research would require determination of the number of shootings that would have been stabbings, beatings, or some other method of inflicting death had no gun been available. It is the contention of this observer that few homicides due to shootings could be avoided merely if a firearm were not immediately present, and that the offender would select some other weapon to achieve the same destructive goal. Probably only in those cases where a felon kills a police officer, or vice versa, would homicide be avoided in the absence of a firearm." M. WOLFGANG, PATTERNS IN CRIMINAL HOMICIDE 82-83 (1958).

EXHIBIT
[handwritten] ook
6
EAD 9/28/11
PENGAD 800-631-6989

tial effect on homicide. Even assuming such assassins would be unable to obtain guns—a doubtful supposition—they would resort to other weapons on the order of dynamite to achieve their intention. But not all homicides are so unambiguously motivated. The question is: Do a significant proportion of homicides result from a less deliberate and determined intention? If this question may be answered in the affirmative, and if the probable substitute for firearms in these situations is less likely to lead to death, then the elimination of guns would reduce the number of homicides.

The hypothesis is more easily stated than proved. For obvious reasons, there are no precise data on the intention of an attacker toward his victim—whether he wished to wound or injure, with some apprehension of the risk of death or some desire to kill, or whether he single-mindedly intended to kill at any cost. Either of these mental states would be consistent with a finding of murder if homicide results. But the more ambiguous intention might well lead to the termination of an attack before lethal consequences ensue. The barroom fight ends when one of the two participants has been stabbed, shot, or beaten into submission.[8] At that point the issue has been decided. Similarly, the violent domestic dispute may end decisively without fatal consequences.

A series of statistics for the city of Chicago throws light on the degree to which homicides result from an ambiguous, rather than a single-minded, intention to kill. The first table corncerns the relationship between attacker and victim in homicide cases:

### TABLE 1
#### RELATIONSHIP BETWEEN HOMICIDE VICTIM AND ATTACKER: CHICAGO, 1967

| Relationship | % |
|---|---|
| Friends and acquaintances | 41 |
| Spouse or lover | 20 |
| Other family | 7 |
| Neighbors | 3 |
| Business | 3 |
| No relationship | 22 |
| Undetermined | 4 |
| Total | 100 |
| Number of cases | 554 |

More than two-thirds of all killings involved spouses, lovers, friends, or tavern guests as victim and attacker.

Closely related to data on relationship are statistics about the motive of the attack:

---

8 For statistics on non-fatal serious assaults, see Tables 7, 8, and 9 *infra*. See also WOLFGANG, *supra* note 2, at 86, for a discussion of the quality of intention in homicides by beating in Philadelphia.

### TABLE 2
#### Motives of Homicide as Established by Police: Chicago, 1967

| Motives | % |
|---|---|
| *Altercations:* | |
| General Domestic | 17 |
| Money | 9 |
| Liquor | 7 |
| Sex | 2 |
| Triangle | 6 |
| Racial | 1 |
| Children | 2 |
| Other | 38 |
| | — |
| | 82 |
| | |
| *Teen Gang Disputes:* | 3 |
| *Robbery:* | |
| Strong Arm | 3 |
| Armed | 9 |
| *Other Motive:* | 3 |
| | — |
| Total | 100 |
| Number of cases | 551 |

82% of the homicides in Chicago in 1967 occurred as a result of altercations—domestic, money, liquor, etc.—precisely the situations where the intention is more apt to be ambiguous rather than single-minded.

Third, a comparison of victims of homicide with victims of serious assaults, with respect to their race and sex, shows:

Victims of homicides and victims of serious assaults are distributed quite similarly by race and sex among the population and differ substantially in these characteristics from the Chicago population as a whole. (See Table 3.)

Next, it should be noted that only 30% of the victims of fatal gunshot attacks in 1967 were wounded by more than one shot. While data are not available on the number of shots fired, it may be readily assumed that the majority of the 70% of single wound homicides occurred in situations where the attacker did not exhaust the multiple shot capacity of his firearm.[4]

Finally, in 54% of the situations which led to homicide in 1967, the police noted that the offender or the victim or both had been drinking prior to the homicidal attack. This figure probably does not include a number of situations in which the police officer was unable to determine whether intoxicants were involved.

---

4 When one offender kills more than one victim, this inference may not hold. Nine cases where the police noted the weapon was exhausted were found in the 1967 records. More may have gone without notation.

TABLE 3

HOMICIDE AND SERIOUS ASSAULT VICTIMS AND CHICAGO POPULATION BY RACE AND SEX

| | Homicide Victims 1967 % | Serious Assault Victims of Gun and Knife Attacks 5th Period, 1968 % | Chicago Population 1960[1] % |
|---|---|---|---|
| *White* | | | |
| Male | 15 | 15 | 37 |
| Female | 7 | 4 | 39 |
| *Negro* | | | |
| Male | 59 | 61 | 11 |
| Female | 12 | 15 | 12 |
| *Other* | | | |
| Male | 6 | 5 | —[2] |
| Female | 1 | 1 | —[2] |
| Total | 100% | 100% | 100% |
| Number | 553 | 480 | 3,540,100 |

[1] More recent data on Chicago population by both race and sex are not available. Non-whites are estimated to have comprised 30% of the city's population in April 1968, as compared with 24% in 1960. Hospital Planning Council for Metropolitan Chicago, Chicago Regional Hospital Study: Population Estimates for Municipalities and Counties in the Chicago Consolidated Area, 1967 and 1968, Table 2 (mimeo. July 1968).

[2] Less than 0.5%.

It may be inferred from these data that many homicides are related to variable states of intention and that a significant proportion do not result from an attack committed with the single-minded intention to kill. The next question that must be asked in order to determine whether elimination of firearms would result in a lower homicide rate, is whether firearms as a class are more dangerous in the normal assault situation than the most dangerous probable substitute weapon. If they are not, then their elimination would not reduce the homicide rate, which is a function of the dangerousness of the weapons used multiplied by the number of serious attacks. Before an answer may be sought from the data, it is necessary to define "dangerousness" of a weapon in a manner that permits empirical study.

## DEFINING DANGEROUSNESS

To say that weapon A is more dangerous than weapon B might mean either that weapon A can facilitate the implementation of intentions to attack in situations where weapon B cannot, or that consummated attacks with weapon A are more dangerous than consummated attacks with weapon B, or both. Certainly, the capacity of a particular weapon

*Effects of Gun Control*

to make a homicidal attack possible—its range—is an element of any definition of weapon dangerousness.[5] But no available experience statistics indicate how many attacks with weapon A would not have been attacks at all if weapon B and not weapon A were available.

We do know (1) that firearms as a class have a greater range for carrying intention into act than any other frequently used assault mechanism, and (2) that most homicides involve individuals who are acquainted with one another and take place in "inside" locations such as homes, taverns, and common passageways.[6] The prior acquaintance of victim and offender and the location of most homicidal attacks suggest that it is correct to assume that weapon range is a critical factor in attack situations in only a comparatively small number of cases.[7] Nonetheless, to the limited extent that range has any bearing on the dangerousness of weapons in attack, guns must be considered more dangerous than alternative weapons in common usage. Where range is important, as in the killing of police, the absence of firearms may have preventive effects beyond the scope of this study.

### The Most Dangerous Probable Substitute Weapon

In order to assess the impact of effective gun control on homicide fairly, the dangerousness of firearms in attack situations should be judged against the dangerousness of the most dangerous weapon which probably *would be*—as opposed to *could be*—used in assault situations were firearms not available.

There are a number of dangerous instrumentalities widely available to most of the population. Knives, other cutting instruments, automobiles, and blunt instruments of all kinds are freely available. Hands and feet, potentially lethal instruments in their own right, are a part of man's standard equipment. Some, but not all, poisons are available in various forms. Many flammable and explosive substances are within the average citizen's reach. Thus, weapon availability is a threshold which excludes only a few of the more exotic or technically sophisticated means of destruction. A far more important screening question is whether a particular form of attack instrumentality is available in the perceptual sense—likely to enter the thoughts and physical reach of an individual who is contemplating attack.

---

5 Range is of particular importance in political killings and in killing armed individuals. Thus, factors affecting range would concededly affect the rate of police officers killed. *See* WOLFGANG, *supra* note 2, at 83.

6 In 1967, over 2/3 of Chicago homicides took place in inside locations. *See also* HOMICIDE SECTION, AGGRAVATED ASSAULT SECTION, REVIEW UNIT, CHICAGO POLICE DEP'T., MURDER ANALYSIS—1966. For statistics on relationship, see Table 1 *supra*.

7 *See* WOLFGANG, *supra* note 2, at 83.

A rough estimate of the perceived availability of instrumentalities as murder weapons can be obtained by analyzing the type of weapons actually used in homicides reported to the police:

*Homicide by Weapon: Chicago, 1966*[8]

|  | % |
|---|---|
| Firearms | 52 |
| Knives | 30 |
| Other weapons | 8 |
| No weapon | 10 |
| Not known | 1 |
|  | 100% |

Total number:  510

It is true, of course, that some attack instruments may be underreported because it is difficult to discover that they have caused a death (*e.g.*, some forms of poison) or because death caused by the instrumentality is not normally suspected as intentionally caused whether or not intention was actually present (*e.g.*, automobiles). Poison is not even listed as a cause of death in Chicago homicide in 1966. An automobile is listed as accounting for one suspected intentional death. The great disproportion between knife and bodily attacks and other instrumentalities does not allow for the serious competition of automobiles and poison.

Thus, unless the people who make homicidal attacks with firearms are radically different from those who make homicidal attacks with other weapons known to the police, the absence of guns would produce a great many more knife attacks and a substantially greater number of attacks using hands or feet as potentially homicidal weapons.

There are two separate kinds of evidence suggesting that guns and knives are used by the same sorts of people:

As table 4 shows, in general, the same kinds of altercations produce gun and knife killings.

As table 5 shows, firearms and knives are used by whites and Negroes in about the same proportions.

Although knives result in three times as many homicides as attacks with the hands or feet, it is not necessarily true that knife attacks are more physically dangerous than all kinds of attacks with hands or feet. Some forms of attack involving the hands or feet, such as strangulation, might conceivably result in death in a greater proportion of attacks in earnest than some forms of knife attack. But comparison of the propor-

---

8 MURDER ANALYSIS—1966, *supra* note 6. 1967 homicides by weapon show the same pattern: guns 57%, knives 25%, hands or feet 10%, other 8%, total number 553.

*Effects of Gun Control*

### TABLE 4
POLICE-NOMINATED MOTIVE OF HOMICIDES BY WEAPON: CHICAGO, 1966

|  | % Shot | % Stabbed | % Other |
|---|---|---|---|
| *Altercations:* |  |  |  |
| General Domestic | 21 | 25 | 23 |
| Money | 6 | 7 | 2 |
| Liquor | 2 | 8 | 4 |
| Sex | 1 | 3 | 2 |
| Gambling | 2 | 1 | 0 |
| Triangle | 5 | 5 | 3 |
| Theft (alleged) | — | — | 2 |
| Children | 2 | 1 | 1 |
| Other | 41 | 30 | 28 |
|  | 80 | 80 | 65 |
| *Robbery:* |  |  |  |
| Strong Arm | — | — | 10 |
| Armed | 9 | 9 | 4 |
| *Burglary:* | — | — | — |
| *Sex:* |  |  |  |
| Perversion | 2 | 3 | 5 |
| Assault of Woman | — | 4 | 7 |
| *Wanton Use of Weapons:* | 2 | — | 1 |
| *Undetermined:* | 6 | 4 | 4 |
| *Gangland Type:* |  |  |  |
| Organized | 1 | — | — |
| Crim. of Victim |  |  |  |
| Burglar | — | — | — |
| Undetermined | — | — | 1 |
| *Other:* |  |  |  |
| Mercy Killing | — | — | 1 |
| Mental Disorder | — | — | 2 |
|  | 100% | 100% | 100% |
| Number | 265 | 152 | 93 |

### TABLE 5
HOMICIDE WEAPON USED BY RACE AND SEX OF OFFENDER: CHICAGO, 1967

|  | Male | | Female | |
|---|---|---|---|---|
|  | Negro | White | Negro | White |
| Guns | 60 | 59 | 40 | 50 |
| Knives | 21 | 16 | 54 | 33 |
| No weapon | 12 | 17 | 1 | 0 |
| Other | 8 | 8 | 4 | 17 |
| Total | 100% | 100% | 100% | 100% |
| Number of Offenders | 330 | 71 | 72 | 12 |

tions of killings does indicate one of two things: (1) if attacks using the hands or feet are very much more common than the homicide statistics indicate, they are physically very much less dangerous than knife attacks, or (2) if attacks using the hands or feet are physically more dangerous than knife attacks, they are very much less used and therefore less available in the perceptual sense.

Strangulation is very rare in Chicago. There were six such reported fatalities in 1966: most homicides by hand or foot attack were attributable to beatings. Since beatings are common in attack situations, it is more probable that knives are physically more dangerous. In either case, since we are talking about the predominant probable substitute for gun attacks, the balance would seem to favor the use of knife attacks. The use of beatings would lead to even stronger differences than those noted.

### FATALITY RATES FROM GUN AND KNIFE ATTACKS

Chicago police records include data which permit useful comparison between serious knife and gun attacks and between knife and gun killings. (See Table 6.) For 1967, these data show:

> 2.3 times as many serious knife attacks were reported to the police as gun attacks.
> Knives accounted for less than half the number of homicides that guns did.
> *The rate of knife deaths per 100 reported knife attacks was less than 1/5 the rate of gun deaths per 100 reported gun attacks.*

These figures support the inference that if knives were substituted for guns, the homicide rate would drop significantly.

### TABLE 6

NUMBER OF NON-FATAL ATTACKS AND HOMICIDES WITH KNIVES AND FIREARMS RECORDED BY POLICE: CHICAGO, 1965-67

|  | Non-Fatal Attacks | Homicides |
|---|---|---|
| *1965* | | |
| Knives | 5,285 | 104 |
| Firearms | 1,298 | 195 |
| *1966* | | |
| Knives | 5,230 | 152 |
| Firearms | 1,873 | 265 |
| *1967* | | |
| Knives | 5,612 | 135 |
| Firearms | 2,412 | 317 |
| *Total* | | |
| Knives | 16,127 | 391 |
| Firearms | 5,583 | 777 |

*Effects of Gun Control*

The figures, though not the inference, are subject to qualification, however. Not all gun or knife attacks are called to the attention of the police. That attacks reported to the police are not a complete census of weapon attacks in the population would not, by itself, disturb the validity of inferences made from comparisons of police statistics. But if a plausible argument can be made that the police statistics are not a reliable *index* of attack rates in the total population, and if the factors which undermine the use of police statistics as an index could be expected to overstate the proportion of knife relative to gun attacks reported, the validity of inferences from police attack statistics could be questioned.

Two plausible reasons why attacks with one weapon could be more often reported than attacks using a second weapon may be noted. First, the more serious a victim perceives an attack to be, the more likely it is that he will report the attack to the police. Attacks with weapons which are considered more serious will be reported to the police proportionately more often than weapons considered less serious. It must be stated that we do not here deal with the fine distinctions that people may make regarding the lethal potential of various weapons. Thus, if individuals considered both knife and gun attacks to be very serious, the marginal differences in their opinions regarding the two weapons could not be expected to produce significant reporting differentials. Second, to the extent that aggressive patrol, investigation, police pressure on victims to promote disclosure, or a patrolman's decision to report an attack may affect police records, the police perception of weapon dangerousness will influence the proportional relationships found in police statistics. A series of interviews of Chicago police officials at various levels indicates that the unanimous feeling of concerned police officers is that gunshot attacks are more dangerous than knife attacks. To the extent that police and victim perceptions distort police statistics, therefore, they apparently result in underestimation rather than overestimation of the ratio of knife attacks to gun attacks in Chicago.

To rebut the inference that substituting knife attacks for gun attacks would reduce the homicide rate, it can also be argued that because a knife is viewed as a less serious weapon than a gun, a lower proportion of knife attacks represent attacks in earnest. The statistics clarify the form such an argument would have to take. First, it can be noted that the use of attacks reported to the police as a standard to construct attack proportions has already screened out a certain number of attacks which are not considered terribly serious, because it is plausible that attacks perceived of as being more serious are more often reported. Second, in order to equalize the number of deaths per 100 attacks in earnest with each weapon, the "non-earnest knife attack" hypothesis must explain

over 75% of the total number of reported knife assaults even if it is assumed that *every* firearm attack reported to the police in 1966 represents an attack in earnest. To the extent that less than all firearm attacks are considered in earnest, an even greater proportion of knife attacks must be discounted. On its face, this seems implausible. The demographic similarity between knife attack victims and homicide victims is an additional indication that the two statistics may be two products of closely similar forms of attack, in essence a continuum rather than two discrete behaviors. Given the magnitude of the difference between reported knife and gun assaults, and the substantial probability that reporting biases underestimate the proportional impact of knife assaults if they have any influence at all, the non-earnest hypothesis seems an incomplete explanation of the different assault/killing ratios noted in Chicago.

### THE ATTACK STUDY

To obtain a more accurate impression of the character of knife and firearm attacks reflected in Chicago police records, police assault records for the period November 9-December 6, 1967 were analyzed in detail. The ratio of knife attacks to gun attacks was somewhat lower during this period than in any of the larger periods which have been the basic focus of analysis. Still, the number of knife attacks was substantially greater than the number of firearm attacks. And the ratio of gun killings to knife killings rose even more dramatically in this period than the ratio of gun attacks to knife attacks. There were 34 deaths attributable to firearms during this police period and eight deaths attributable to stabbings. The rate of knife deaths per 100 reported knife assaults was less than one-sixth of the rate of gun deaths per 100 reported gun assaults during this police period. This relationship is consistent with the overall one to five statistic found in the earlier large period comparisons.

One way of estimating the seriousness of an attack is to determine where the attacker sought to wound his victim. It may be assumed that actual wound location is a generally reliable indicator of the intended target, particularly for knives. It is highly unlikely that a great number of individuals intending superficial wounds to a non-vital area of the victim's body would by mistake stab him in the back, chest, neck or abdomen. Indeed, to the extent that "mistakes" produce a patterned difference between intended and actual location of wounds, the bias would probably understate rather than overstate the seriousness of a large group of attacks.

Table 7 sets forth the most serious area of the body where a wound was sustained in a knife or gun attack. It shows:

70 knife wounds per 100 knife attacks occurred in areas that are associated with serious attacks—chest, abdomen, head and face, back, and neck—while only 56 gunshot wounds per 100 firearm attacks occurred in these areas.

Knife attacks resulting in wounds to non-vital areas—thighs and extremities—occurred no more frequently per 100 attacks than similar gun wounds. A smaller number of knife wounds to legs and thighs per 100 attacks is balanced against a larger number of knife wounds to arms, hands, and wrists per 100 attacks. Of every 100 reported firearm attacks, 12 resulted in no wound, while there was only one reported knife attack during the period which resulted in no wound.

TABLE 7

NON-FATAL AND FATAL KNIFE AND GUN ATTACKS BY LOCATION OF MOST SERIOUS WOUND: CHICAGO, NOVEMBER 9–DECEMBER 6, 1967

| Location of most serious wound | Non-Fatal Attacks | | Fatal Attacks | | Total | |
|---|---|---|---|---|---|---|
| | Knife % | Gun % | Knife % | Gun % | Knife % | Gun % |
| *Serious* | | | | | | |
| Chest | 15 | 13 | 50 | 44 | 15 | 17 |
| Abdomen | 17 | 12 | — | 18 | 17 | 13 |
| Head | 15 | 11 | 38 | 32 | 16 | 14 |
| Back | 10 | 3 | 13 | 3 | 10 | 3 |
| Neck | 4 | 1 | — | — | 4 | 1 |
| Shoulders | 8 | 8 | — | 3 | 8 | 7 |
| Total | 69 | 48 | 100 | 100 | 70 | 56 |
| *Non-Serious* | | | | | | |
| Legs | 7 | 28 | — | — | 7 | 24 |
| Arms | 24 | 10 | — | — | 23 | 9 |
| Missed | — | 14 | — | — | — | 12 |
| Total | 31 | 52 | — | — | 30 | 45 |
| *Total* | 100% | 100% | 100% | 100% | 100% | 100% |
| *Number* | 358 | 213 | 8 | 34 | 366 | 247 |

These data appear to support three inferences, each of which will be discussed in turn.

1. *Not all gun attacks can be per se considered attacks in earnest.* About 56% of the reported firearm attacks, including all of the fatal attacks noted during the sample police period, produced wounds in the chest, abdomen, head area, and the back and shoulders. It is, of course, true that many of the gun wounds in locations like the back or chest were not the kinds of wounds which led to fatalities. However, since we are using wound location as an index of the *intended* seriousness of an

attack, and wound seriousness is an indication of outcome rather than intention, it is probably safe to assume that a substantial proportion of those gun attacks with dangerous area wounds could qualify as attacks in earnest, since they generated the risk of fatal consequences.

It can be argued, however, that since the relationship between the intended locale of an attack and the actual locale of the wounding is not complete, many of the firearm attacks that have been coded as misses, or attacks culminating in a wound no more serious than an arm, hand, hip, leg, or foot wound, were actually much more seriously intended. A proponent of this position would point out that when a police report indicates that a man firing a gunshot has missed, as it does in a substantial number of cases, there is no information on what area of the body the gunshot wound has missed, and therefore no inference may be drawn about the seriousness of the attack. The normal attack capacity of a firearm, however, is substantially more than one shot. If an individual does not wound a victim as seriously as he intended on the first try, he may try again. Since Table 7 only codes wounds by *location of the most serious wound area of a particular attack*, attacks coded in less serious areas are attacks in which the assailant *did not* try again, or at least had no greater success. If attacks resulting in multiple wounds are presumptively considered serious and added to those resulting in actual wounds to serious areas, the total is less than 58% of all gun attacks. (See Table 8.) Adding shotgun attacks not already included still leaves the total at roughly 60%. It is doubtful, therefore, that *all* gun attacks are accompanied by even ambiguous intentions to kill.

2. *A substantial proportion of the knife attacks reported to police appear to be attacks in earnest.* The data show that a far greater number of knife attacks resulted in wounds to serious than to non-serious locations. If the 29 multiple knife wounds in non-serious locations are added to the knife wounds in serious areas, the total is approximately 77%. (See Table 8.) While it is doubtless true that not all attacks resulting in serious area wounds were in earnest, it may also be presumed that some of the attacks resulting in non-serious wounds to the arms represent attacks in earnest partially thwarted by the victim's defensive use of his arms. In any event, it is difficult to argue that only an insignificant proportion of knife attacks are made in earnest.

3. *There is no evidence that attacks in earnest are much more common with guns than with knives.* Adding multiple wounds in non-serious locations to all serious wound locations makes possible a very rough estimate of the proportion of attacks which are in earnest for guns and knives. As indicated above, these figures are approximately 60% and 77%, respectively. Obviously, these are only rough estimates. Their

*Effects of Gun Control*

TABLE 8

KNIFE AND GUN ATTACKS RESULTING IN MULTIPLE WOUNDS:
CHICAGO, NOVEMBER 9–DECEMBER 6, 1967

|  | Knife | Gun[1] |
|---|---|---|
| *Serious Area* | | |
| Number of Multiple Wound Attacks | 117 | 19 |
| % of— | | |
| Non-Fatal Attacks | 46% | 16% |
| Fatal Attacks | 50% | 19% |
| *Non-Serious Area* | | |
| Number of Multiple Wound Attacks | 29 | 5 |
| % of— | | |
| Non-Fatal Attacks | 26% | 5% |
| Fatal Attacks | — | — |

1 Does not include shotgun attacks resulting in multiple, non-serious area wounds.

trend, however, may be usefully compared with police estimates of the gravity of the most serious wound sustained by the victim. Since the gravity of the wound may reflect a number of factors independent of the attacker's intention, the use of these police data should be secondary, to safeguard against any unwarranted inferences from the wound location data.

The police classify knife wounds as "slash" and "puncture" wounds. Slash wounds involve a shallower penetration than puncture wounds. Some gun wounds are classified by the police as "grazing," less serious wounds. The police estimates (see Table 9) indicate:

34% of the serious area knife wounds were slash wounds; 25% involved only one serious area slash wound. If this latter group is excluded, 59% of the knife attacks resulted in puncture wounds to serious areas or multiple knife wounds.

9% of the serious area firearm wounds were grazings. Excluding these leaves 56% of all firearm attacks resulting in serious area or multiple gunshot or shotgun wounds.

Excluding slash and graze wounds from attacks in earnest is not necessarily the best method of arriving at final figures. While slash and graze wounds where there was only one serious area wound may have resulted from less ominous attack intentions than penetrating wounds, the dangerousness of the area where the wound was sustained militates against this interpretation. Nevertheless, the exclusion results in a conservative estimate of the proportions of knife and gun attacks which are in earnest.

These statistics support two complementary propositions: (1) a roughly equal proportion of knife and gun attacks are of the kind which may not have been attacks in earnest, and (2) a roughly equal proportion of police reported knife and gun attacks are of the kind that suggest the

## TABLE 9

POLICE-NOTED EXTENT OF WOUND BY WEAPON AND AREA OF WOUND: NON-FATAL ATTACKS,
CHICAGO, NOVEMBER 9-DECEMBER 6, 1967

| | | Serious Area | |
|---|---|---|---|
| *Knife*[1] | | *Gun*[2] | |
| Puncture | 66 | Wound | 92 |
| Slash | 34 | Graze | 9 |
| | 100% | | 100% |
| Number of Cases | 247 | | 106 |

| | | Non-Serious Area | |
|---|---|---|---|
| *Knife* | | *Gun* | |
| Puncture | 70 | Wound | 99 |
| Slash | 30 | Graze | 1 |
| | 100% | | 100% |
| Number of Cases | 110 | | 81 |

[1] Does not include one "menaced."
[2] Does not include 29 "missed."

attack was probably seriously intended. If the area of wounding is taken as an index of seriousness, a greater number of knife wounds than gun wounds are presumptively in earnest, and a lesser number of knife wounds than gun wounds are of the kind where the location of the attack creates some doubt about the earnestness of the attack. If the presence or absence of multiple shooting or stabbing is examined, nothing about the data suggests that the average knife attack is any less seriously intended than the average gun attack. Indeed, multiple knife attacks are more common per 100 reported attacks than multiple gun attacks. Finally, if all single knife slash wounds are removed from the class of presumptively serious attacks, this still leaves roughly equal proportions of presumptively serious attacks, with the gun figure slightly higher than the knife figure. If all single *and* multiple knife slash wounds are removed from the class of presumptively serious attacks, a rather radical use of the data, a gap of less than 10% opens between knife attacks considered presumptively serious and gun attacks considered presumptively serious.

The implications of these data on the basic question posed about weapon dangerousness can best be set into perspective by taking the most negative interpretation of the attack statistics and tracing its implications. If it is assumed that only those wounds inflicted by knives in serious area locations that resulted in police reported punctures can be presumptively considered attacks in earnest, but that every gunshot attack reported is an attack in earnest or worse, the death rate per 100

attacks in earnest by guns would still be two and one-half times that of the death rate per 100 attacks in earnest by knives. Certainly, more reasonable use of these data would involve a substantially smaller number of asymmetrical assumptions. If the comparison is between knife puncture wounds in serious areas and gun wounds in serious areas, guns exhibit a death rate five times greater than knives.

Thus, when the data on the character of assaults are discussed in light of assault rates by weapon in Chicago and death rates by weapon in Chicago, a difference in attack intentions by weapon great enough to explain the differential death rates experienced is highly unlikely.

CONCLUSION

The beginning of the present exercise is found in a crude but suggestive set of ratios: the rate of homicide per 100 police reported attacks is about five times as great for firearms as for knives, the next most dangerous weapon available in Chicago's homicide experience. Since a very substantial part of Chicago's homicide rate appears to be attributable to ambiguously motivated deadly attacks, it seems clear that the deadliness of a particular weapon in an attack situation is a significant determinant of the homicide rate. If this is true, then the killing per 100 attack ratio cited above is a conclusive demonstration that the absence of firearms would depress the otherwise expectable homicide rate, unless the disproportionate number of killings per police reported attack could be explained by a plausible rival hypothesis.

We have sought an explanation which would comport with the reality of homicide in Chicago and still explain the disproportionate killing per attack ratios noted in official statistics. The biases built into the way attacks are reported could only work to understate rather than overstate the disproportionate dangerousness of firearm attacks. The remaining rival hypothesis was then phrased in the form of the prediction that the vast majority of all police reported knife attacks were non-earnest in nature and all of the police reported gun attacks were of the kind that were likely to produce ambiguously motivated homicides or worse. In fact, an investigation of patterns of knife and gun wounding has suggested that a roughly equal proportion of both knife and gun attacks appear to be of a class likely to produce the ambiguously motivated homicide. The negative conclusion available from these data has already been stated: It is highly unlikely that the attack in earnest hypothesis which seeks to differentiate knife and gun attacks could, in the light of our study of wound location, completely explain the difference in kill ratios previously noted. But what of an affirmative conclusion?

It might be thought that the five to one kill ratio relationship between knives and guns, when combined with the apparent similarity of attack in earnest ratios, could lead to a prediction that the absence of firearms in Chicago's population would reduce Chicago's homicide experience by four-fifths of the present gun-attributable total, or by some other finite amount. Unfortunately, this is not the case. First, while a substantial proportion of all homicides can be thought to be ambiguously motivated, we cannot make that assumption about all homicides, and we cannot conclusively isolate the proportion of homicide experience which is attributable to this kind of attack. Since the single-minded attack with intent to kill surely results in death more often per 100 attacks than an ambiguously motivated attack in earnest, we cannot confidently exclude the number of single-minded killings which constitute a part of reported homicides. However, there are some interesting data which might bear on the proportion of single-minded killings. The proportion of multiple woundings is only slightly higher in fatal gun attacks than in non-fatal, serious gun attacks. Further, multiple wound figures in homicides for all of 1967 account for only 30% of the gunshot killing totals. This would tend to limit the number of "kill at any cost" cases which might exaggerate the impression of firearm dangerousness in the attack statistics.

Second, it is not unlikely that the apparent similarity between knife and gun attack figures does conceal some disproportion between the attack in earnest ratios noted in knife versus gun attacks. The only unlikely conclusion is that weapon dangerousness does not affect the gross expectable homicide rate. The precise extent of that effect is a matter for conjecture. On their face, the data suggest that the effect of firearm elimination would itself be quite substantial. But that phrase is a hedge, and the method of this inquiry is non-experimental. The words "quite substantial" are as far as the data will take us.

A final note should be taken of the initial assumption of this enterprise: that a degree of continuity exists between homicide and non-fatal but serious assaults with deadly weapons. The similarities between serious attacks reported by police and homicides are compelling. Both events fall with disproportionate impact on the Negro community, and upon a disproportionately high number of male victims. Since relationship is a confirmed element of a great many such attacks, both phenomena can be attributed to a similarly skewed group of attackers.[9] The attack data do not reveal substantial differences between fatal attacks using particular weapon forms and serious area, non-fatal attacks involving the same weapon. During the sample period:

---

[9] *See* Wolfgang, *supra* note 2, table 22, at 379; Murder Analysis—1966, *supra* note 6.

46% of the non-fatal knife attacks resulting in wounds to serious areas, and 50% of the fatal knife attacks, involved multiple wounds.

16% of the non-fatal serious area firearm attacks, and 19% of the fatal shootings, resulted in multiple wounds. (See Table 8.)

Perhaps these data are telling us it would be advisable to shift the focus of concentration from the species of homicide to the genus of deadly attack. The portion of the population subject to this threat is as skewed as the homicide statistics indicate, but the problem is larger. In the final years of this decade, a further study of this culture of violence is an obligation to its survivors.

# Exhibit 19

# THE MEDIUM IS THE MESSAGE: FIREARM CALIBER AS A DETERMINANT OF DEATH FROM ASSAULT

### FRANKLIN E. ZIMRING*

$T$HIS is the second report of a research project on violent assault in Chicago. The first, a study of fatal and nonfatal assaults with knives and guns, produced evidence to support three conclusions:

(1) Most homicide is not the result of a single-minded intention to kill at any cost.

(2) Many nonfatal attacks with knives and guns are apparently indistinguishable in motive, intent and dangerousness from many fatal attacks. Indeed, the overlap between fatal and nonfatal assaults with knives and guns is much more impressive than any differences that were noted.

(3) Weapon dangerousness, independent of any other factors, has a substantial impact on the death rate from attack.[1]

This paper first reports on an attempt to carry the earlier research one step further by comparing low-caliber with high-caliber firearms attacks, and then suggests some ways in which the data developed in the two studies of

* Associate Professor of Law and Associate Director of the Center for Studies in Criminal Justice, University of Chicago. Jerald Kessler, now a third-year student at the University of Chicago Law School, performed with diligence and creativity as a research assistant on this project. Steven Harris, a second-year student at the Law School, conducted a helpful survey of the literature on intent in violent attack. The Chicago Police Department, in particular Mr. Michael Spiotto, provided access to the department files on reported fatal and nonfatal attacks that were used in this study.

[1] Franklin E. Zimring, Is Gun Control Likely To Reduce Violent Killings?, 35 U. Chi. L. Rev. 721-24, 730-37 (1968). A third report, Homicide in Chicago, 1965-70, grows out of the same research project, a study of violent attack in Chicago supported by the Center for Studies in Criminal Justice at the University of Chicago. Other data on the issue of weapon dangerousness are developed in George D. Newton and Franklin E. Zimring, Firearms and Violence in American Life (Staff Report (7) to the Nat'l Comm'n on the Causes and Prevention of Violence 1969). See, e.g., id. at 44 and 177-79 (relationship between relative degree of gun use and extent to which guns are more lethal than knives), 46-47 (death rates from gun vs. nongun armed robbery), 69-74 (effect of increase in gun ownership and use on death from assault in Detroit), 76-77 (relationship between relative gun use in robbery and assault in major cities).

97



fatal and nonfatal attacks might interest criminologists and criminal law scholars.

## I.  THE STUDY

### A.  *Plan and Basic Data*

The previous study found that the rate of killings per hundred police-reported attacks was five times as high with guns as with knives.[2] This and other data indicated that most killings are coincident with a state of mind ambiguous enough so that the dangerousness of the weapon used will have a significant influence on the chances that death will result.[3] A second conclusion, flowing from the first, was that a shift from knives to guns or from guns to knives would have a significant impact on the death rate from violent attack.

If large-caliber firearms have a greater destructive potential than small-caliber firearms, and there is every reason to believe they do, the comparison of the death rates from large-caliber and from small-caliber attacks provides one opportunity to confirm the earlier finding that weapon dangerousness had a significant impact on the death rate from assaults. If a difference in physical dangerousness does not result in a significant difference in the death rate from assault, this would be evidence that an actor's intentions rather than the mechanism he uses is the primary determinant of the death rate from violent assault. On the other hand, if, as is the case, attacks with different types of firearms have significantly different death rates, this lends important support to the theory that effective weapon controls can influence the homicide rate. Indeed, from a methodological standpoint, a firearm caliber comparison is not only an important support to the gun-versus-knife study alluded to earlier but an improvement on it because two kinds of gun attacks are easier to compare with respect to such data as the number of wounds and the location of wounds than knife and gun attacks.

The basic data for the caliber comparison come from an analysis of fatal and nonfatal firearm attacks reported to the Chicago Police between March 5 and July 22, 1970. In all, 1115 gun attacks resulting in 156 fatalities were reported to the police. In general profile, these firearm attacks present a picture of deadly attack in Chicago similar to that developed in the earlier study. Again, spontaneous fights and domestic and romantic altercations formed the principal backdrop to deadly attacks,[4] and again nonfatal and fatal attacks were more notable for similarities in pattern than for any differences.

[2] Franklin E. Zimring, *supra* note 1, at 728.

[3] *Id.* at 722-24, 737.

[4] *Id.* at 721-25, especially tables 1-4.

Table 1 compares fatal and nonfatal gun attacks with respect to the race and sex of victim, and race and sex of offender.

TABLE 1

PERCENTAGE DISTRIBUTION OF HOMICIDE AND ASSAULT VICTIMS, OFFENDERS AND CHICAGO POPULATION

|  |  | Victims | | Offenders | | Chicago population (1970 census) |
|---|---|---|---|---|---|---|
|  |  | Fatal | Nonfatal | Fatal | Nonfatal |  |
| White |  |  |  |  |  |  |
|  | Male | 17 | 11 | 7 | 8 | 32 |
|  | Female | 2 | 1 | 2 | 1 | 35 |
| Black |  |  |  |  |  |  |
|  | Male | 61 | 71 | 79 | 77 | 15 |
|  | Female | 13 | 13 | 7 | 9 | 18 |
| Hispanic |  |  |  |  |  |  |
|  | Male | 5 | 4 | 6 | 6 | 2 |
|  | Female | 3 | 1 | 0 | 0 | 2 |
|  |  | 100% (156) | 100% (932) | 100% (135) | 100% (815) | 100% (3,366,957) |

[1] Less than .5%.
[a] Not available—included in "white."
*Source:* Compiled from Chicago Police Dep't Offense Reports.

The distribution by race and sex of victims of fatal gun assaults is quite similar to the distribution of victims of nonfatal gun assaults, and very different from the distribution of the population. The implication is that these two classes of attack are part of a single larger class. This also seems to be a plausible inference from the race and sex data on offenders in Table 1, where again wounders and killers are similar to each other and different from the general population.

Table 2 compares the incidents leading up to the attack for fatal versus nonfatal attacks, in all categories except robbery, which will be separately considered.

Table 2, like the data on the distribution of attacks by race and sex, supports the theory that there is a great deal of continuity between fatal and nonfatal gun attacks because, generally, the same type of circumstances lead to woundings and death. In this comparison, however, there are differences as well as similarities. Domestic and romantic arguments account for a quarter of all killings but only one out of every ten nonfatal attacks, while "teen gang" offenders account for 17 per cent of all nonfatal attacks but only 11 per cent of fatalities. These differences may seem to suggest that domestic attacks are more deadly than others. But it would be incorrect to draw such an inference. Domestic fights that kill must come to the attention of the police. Nonfatal

100                 THE JOURNAL OF LEGAL STUDIES

TABLE 2
GUN ATTACKS BY CIRCUMSTANCES

|  | % Fatal attacks | % Nonfatal attacks |
|---|---|---|
| Domestic/Romantic arguments | 25% | 11% |
| Other fights | 35% | 26% |
| Teen-gang offenders | 11% | 17% |
| Felony relation (other than robbery) | 1% | 5% |
| Other and unknown | 28% | 41% |
|  | 100% | 100% |
|  | (113) | (809) |

*Source:* Compiled from Chicago Police Dep't Offense Reports.

attacks, particularly if the injury is not very severe, may not be reported to the police; and such attacks, when they occur within the family, are more apt to go unreported than other such attacks because of the close relationship between the victim and offender.[5]

Table 3 sets out the distribution of gun attacks by circumstances leading to the attack for the different gun caliber categories that will be the basis for comparison in this study.

TABLE 3
GUN ATTACKS BY CALIBER BY CIRCUMSTANCES

|  | .22 | .25 and .32 | .38 |
|---|---|---|---|
| Domestic/Romantic altercations | 23% | 23% | 27% |
| Other fights | 39% | 37% | 34% |
| Teen-gang offender | 15% | 8% | 14% |
| Felony relation (other than robbery) | 2% | 5% | 5% |
| Other | 21% | 27% | 20% |
|  | 100% | 100% | 100% |
|  | (155) | (126) | (109) |

*Source:* Compiled from Chicago Police Dep't Offense Reports.

The data reported in Table 3 point clearly to the conclusion that the circumstances leading to attacks with different caliber guns are remarkably similar.

[5] One recent study found that only 22% of assaults where the offender was a relative of the victim were reported, compared to 72% of all other assaults. While a much higher percentage of gun assaults would tend to be reported, the "family" effect might still be great. See Anthony Turner, The San Jose Methods Test of Known Crime Victims (unpublished from U.S. Law Enforcement Assistance Admin. Statistics Div. 1971).

Other findings from this sample, consistent with the 1968 study,[6] include the relatively small number of gun killings that involve more than one wound (38 per cent in this sample) and the similarity in the number and location of wounds between many nonfatal gun attacks and most gun homicides.

## B. Weapon-Caliber Effects

In order to obtain data on weapon-caliber effects, two minor problems and one major problem in the data had to be overcome. A minor problem was that certain types of weapons, most notably shotguns, cannot be easily compared with other types of firearm. Our solution to this problem was to exclude shot-gun attacks (12 per cent of all attacks) and large-caliber rifle attacks (less than one per cent of attacks). A second problem was that information was not available, for the entire period covered by the rest of the study, on robberies that result in nonfatal rather than fatal wounds. To deal with this problem, data on fatal robberies (19 per cent of all fatalities) were excluded from the main study and separately analyzed.[7]

These exclusions left us with a sample of 932 cases, the great majority of them attacks made with handguns.[8] Table 4 reveals the major problem associated with drawing inferences in this group of cases about the effects of weapon

---

[6] See Franklin E. Zimring, *supra* note 1, at 731 (table 7), 734.

[7] The problem with robbery-assault statistics is that, typically, if a victim lives, the incident is reported as a robbery and stored in a different section of the police department. Data were available, however, on fatal robberies during the four police periods, and the distribution by caliber is somewhat different from that noted in other offenses.

| | Robbery killings (%) | Nonrobbery killings (%) |
|---|---|---|
| .22 | 11 | 24 |
| .25 & .32 | 26 | 26 |
| .38 and > .38 | 62 | 51 |
| | 100%(27) | 100%(109) |

At the same time, a greater number of robbery killings involved multiple wounds, as shown below.

| | Robbery killings | All other killings |
|---|---|---|
| Single wound | 48 | 62 |
| Multiple wound | 52 | 38 |
| | 100%(27) | 100%(109) |

These data may suggest more deadly intention in robbery or a greater necessity for force growing out of victim resistance in robbery. The answer to whether a profound caliber effect exists awaits data on nonfatal robbery shootings.

[8] All .22-caliber attacks were included even if there was a police notation that a rifle was involved.

THE JOURNAL OF LEGAL STUDIES

TABLE 4

|  | Fatal attacks | Nonfatal attacks |
|---|---|---|
| Caliber known | 94% | 37% |
| Caliber not known | 6% | 63% |
|  | 100% | 100% |
|  | (116) | (797) |

*Source:* Chicago Police Dep't Offense Reports.

caliber on death rates: the substantial number of cases in which weapon caliber is not known. The reason why caliber is known in far fewer aggravated assaults than homicides is doubtless that less police effort is devoted to nonfatal attacks; just as among nonfatal attacks, the more serious the wound the more likely that caliber is known.[9]

An analysis of particular types of firearm attacks, however, provides evidence that the sample of attacks for which caliber is known is an acceptably representative sample of all firearm attacks by caliber. Attacks that result from domestic altercations will involve both a victim and offender apt to be familiar with household firearms, as well as a readily available suspect, and thus promise a much higher percentage of cases in which firearm caliber is known. Thus, firearm caliber was determined in 92 per cent of the 65 domestic altercation cases compared to 40 per cent of all other types of cases. Table 5 compares the distribution of attacks by caliber when caliber is known for

TABLE 5

|  | Small caliber | | Large caliber | | |
|---|---|---|---|---|---|
|  | .22 | .25 | .32 | .38 | > .38 |
| Domestic attacks (92% Caliber known) | 33% | 16% | 19% | 29% | 3% |
| Other attacks (40% Caliber known) | 38% | 12% | 15% | 29% | 5% |

*Source:* Compiled from Chicago Police Dep't Offense Reports.

domestic altercations and all other altercations. In spite of the great differences in the percentage of attacks in which caliber is known, the percentage distribution by caliber is remarkably similar.[10]

[9] Comparing the percentage of nonfatal attacks in the sample where caliber is known for single-shot attacks to various parts of the body, we come up with these results:

| Head and chest | 44% |
|---|---|
| Abdomen, back and neck | 38% |
| Shoulder, arm and leg | 31% |

[10] The death rate difference by caliber is just as pronounced in domestic disputes; see Table 8, *infra.*

With that preliminary question discussed, it is possible to proceed to an analysis of death rates from firearm attacks by caliber. The simplest way of making this comparison is to compare the death rate per 100 police-reported firearms attacks for each of the four major firearm calibers. But the simple method of comparison overstates the independent effects of weapon caliber, because a greater number of large-caliber handgun attacks result in multiple wounds than do small-caliber guns. Table 6 takes a slightly more complicated route by presenting, for all attacks in which firearm caliber was identified, the percentage of single-wound attacks to each of three regions of the body that result in death, and a similar comparison for attacks that involve multiple wounds.

**TABLE 6**
PERCENTAGE OF KNOWN CALIBER ATTACKS THAT RESULT IN DEATH

| | Single wound | | | | |
|---|---|---|---|---|---|
| | .22 | .25 | .32 | .38 | > .38 |
| Head and chest | 36% (34) | 70% (10) | 67% (12) | 76% (29) | 83% (6) |
| Abdomen, back, neck | 35% (26) | 29% (7) | 10% (10) | 38% (13) | — |
| Shoulder, arm, leg | 0% (55) | 5% (22) | 0% (17) | 0% (27) | 0% (4) |
| | Multiple wound | | | | |
| | .22 | .25 | .32 | .38 | > .38 |
| Head and chest | 36% (14) | 33% (6) | 46% (13) | 77% (26) | 100% (2) |
| Abdomen, back, neck | 0% (5) | 50% (2) | 33% (6) | 33% (6) | — |
| Shoulder, arm, leg | 0% (2) | 0% (1) | — | 0% (7) | — |

*Source:* Compiled from Chicago Police Dep't Offense Reports.

Table 6 overstates the probability that a wound with a particular caliber firearm to a particular area will result in fatality, because nonfatal attacks for which the caliber is unknown have been excluded and inclusion of these attacks would reduce the fatality percentage considerably across the board. However, by adding information about the number and location of wounds in attacks in which the police did not identify weapon caliber, the data presented in Table 6 can be converted into an estimate of the different death rates expectable per 100 police-reported attacks made with various types of gun to different areas of the body. Table 7 attempts this estimate by distributing unknown-caliber nonfatal attacks by caliber in the pattern found in nonfatal

assaults where caliber was known. The seven fatal assaults with unknown caliber were ignored.[11]

### TABLE 7
#### Estimated Death Rate from Gun Attacks by Wound Location, Number of Wounds, and Gun Caliber

| | Single wound | | | | |
|---|---|---|---|---|---|
| | .22 | .25 | .32 | .38 | > .38 |
| Head and chest | 16% (69) | 50% (14) | 44% (18) | 55% (40) | 63% (8) |
| Abdomen, back, neck | 17% (52) | 13% (15) | 4% (24) | 20% (25) | 25% (4) |
| Shoulder, arm, leg | 0% (170) | 2% (71) | 0% (52) | 0% (83) | 0% (11) |
| Total | 7% (291) | 10% (100) | 10% (94) | 18% (148) | 27% (23) |
| | Multiple wound | | | | |
| | .22 | .25 | .32 | .38 | > .38 |
| Head and chest | 28% (19) | 25% (4) | 35% (17) | 68% (25) | 100% (2) |
| Abdomen, back, neck | 0% (11) | 33% (3) | 18% (11) | 18% (11) | — |
| Shoulder, arm, leg | 0% (6) | 0% (3) | — | 0% (22) | — |
| Total | 14% (36) | 20% (10) | 29% (28) | 40% (58) | 100% (2) |

*Source:* Compiled from Chicago Police Dep't Offense Reports.

Table 7 reveals three discrete influences on the fatality rate from firearm attacks. The first is the location of the most serious wound inflicted by a

[11] There are three ways in which the estimate could have been made. All three involve using information available about the number and location of wounds and estimating the distribution of attacks by caliber. One method would assume the distribution of all known attacks to be the pattern to be found in all unknown attacks. This assumes no bias by caliber in the sample of known-caliber attacks. A second method would assume that the pattern of domestic assaults by caliber was the same as all other assaults and would allocate all unknown-caliber attacks in each wound location by caliber so that the total percentage for each caliber was the same as that caliber's share of domestic disputes. This method was rejected because of the likelihood that it would understate the number of .22-caliber attacks. Only 11% of all domestic killings were .22 killings, suggesting that the percentage of .22 assaults was higher in nondomestic attacks than in domestic attacks. The third method would distribute the unknown-caliber attacks to reflect the distribution of nonfatal attacks by caliber when caliber is known. Thus, if .22-caliber attacks are 30% of total attacks and 35% of nonfatal attacks, the first method would assume that 30% of all unknown-caliber attacks were .22, while the third method would assume that 35% were .22 attacks. Since caliber is an influence on whether or not death results, and since whether death results is an influence on whether caliber is determined, the third method seems superior to the second.

particular attack. A simple rule of thumb would be that, independent of caliber and number of wounds, attacks that result in wounds to the head and chest are three times as deadly as gun attacks that result in wounds only to the abdomen, neck, or back. Attacks in which the most serious wound is to the shoulder, arm, or leg are rarely fatal.

A second relationship that emerges from considering Table 7 is that the number of wounds inflicted in a firearm attack has predictive value as to the death rate. The death rate for multiple-wound attacks where the most serious wound was to the head or chest is higher than the rate for single wounds to the head or chest, and clearly is much higher than if the offender had stopped after his first wound, which may have hit a less dangerous area. With respect to both the location of the wound and the number of wounds inflicted, it is difficult to judge how many of the effects noted are independent of the intention of the attacker and how many reflect a tendency of individuals with more homicidal intentions to wound more often and shoot to more vital areas of the body.

The third major predictive relationship that can be noted is that of weapon caliber. The two most widely used weapon calibers, .22 and .38, present the most meaningful contrast. Examination of Table 7 shows a much greater fatality rate from .38 caliber attacks resulting in more than one wound and from single-wound .38 caliber attacks to the head and chest region. Because these areas account for most fatalities, the overall result is that .38 caliber attacks are more than twice as deadly as .22 caliber attacks. Among the less commonly used weapons, .25 and .32 caliber firearms are more likely to kill than .22's by a considerable margin and less likely to kill than .38 caliber attacks. No significant differences between the two intermediate calibers emerge from the present data. The few attacks made with weapons greater than .38 caliber exhibit the highest of all fatality rates, but the number of attacks with such weapons is too small to justify a conclusion that such weapons are significantly more dangerous than the .38.

Because some of the estimates are based on a small number of known attacks—notably those dealing with intermediate-caliber and larger-than-.38 caliber weapons, and with most multiple-wound attacks—Table 7 is merely a first approximation of the relative deadliness of attacks by caliber, wound location and number of wounds. But with respect to .22 and .38 caliber attacks, particularly single-wound attacks, the numbers are large and the contrast is striking.

There is a further way of estimating the magnitude of weapon caliber effects on deadly attacks: projecting the impact of caliber effects on Chicago's homicide experience. Using the data developed in Table 7, we can approximate the total potential impact of caliber effects on the death rate from gun attacks.

FIGURE 1

CALIBER EFFECTS ON FATALITIES FROM GUN ASSAULT

| | | |
|---|---|---|
| Number of fatalities if all attacks were with .38 | 177 (+62%) | +62% |
| Actual number of fatalities from gun attacks | 109 | |
| Number of fatalities if all attacks were with .22 | 57 (—48%) | —48% |

## C. Alternatives to the Instrumentality Interpretation

One alternative to concluding that there is a substantial instrumentality effect tied to weapon caliber is the possibility that caliber differences either mask or express differences in intention sufficient to explain a two-to-one difference in death rate. At the outset, it is difficult to understand how much range in intention is possible when we are comparing single-shot wounds to the head or chest with one type of firearm as against single-shot wounds to the head or chest with another type of firearm. But to the extent that such comparison allows for differences in intention, some data are available to suggest that the differences are not great. For one thing, the number of individuals who can choose between small- and large-caliber weapons at the time of an attack, thereby expressing differential intent by opting for a high- or low-caliber weapon, is small.[12] The number of handgun owners who own more than one such weapon is estimated at slightly fewer than one out of five, and there is no firm evidence available on whether persons apt to be involved in deadly attacks are multiple handgun owners more often than the average.[13]

It can be argued, however, that there is a differential expression of personality involved in choosing large- versus small-caliber handguns that reaches back to the time of purchase when caliber decision is made and therefore is not affected by the fact that most handgun owners own only one. According to this view, there are ".38-caliber people" and they are somewhat more deadly than ".22-caliber people," independent of the difference in the dangerousness of their weapons. The difference in the number of multiple-wound attacks between .22-caliber weapons and the higher-caliber weapons leaves

[12] This assumes, of course, that most gun attacks are not sufficiently premeditated so that persons can run out and purchase weapons with suitable calibers for their particular purposes. See pp. 98-100, *supra*, and Franklin E. Zimring, *supra* note 1.

[13] Of those individuals who report handgun ownership, 83% report owning one such gun. See George P. Newton and Franklin E. Zimring, *supra* note 1, at 176. A study of prison inmates in Texas and Louisiana reports high lifetime handgun ownership. Study by C. M. Friel, Sam Houston State College (unpublished, 1970). The study, however, does not indicate whether multiple ownership is common or turnover high. Nor do the data distinguish between inmates who have committed crimes of violence and other inmates.

some room for this kind of argument, but not much; and the larger number of .22 single-shot attacks is explainable, in part, by the fact that some .22-caliber rifles have only a one-shot capacity, and .22-caliber rifles may form a significant sprinkling in the attacks noted.[14] Yet the differences in proportion of multiple-wound attacks by caliber do suggest some difference in intent correlated with caliber. In sum, there is no basis for rejecting out of hand the notion that differential intention or personality may play some role in gross intercaliber differences in death rate—but there is also no reason to suppose that personality effects can create a two-to-one difference in death rate after controlling for the number and location of wounds.

One method of further assessing the relative importance of caliber selection would be to see whether the intercaliber death rate differences hold up in domestic disputes, which are particularly interesting because they involve the most substantial probability that the actor is using a gun for a different purpose from that which motivated gun purchase. Yet Table 8 shows the same order of death rate difference by caliber for domestic attacks that Table 7 showed for all attacks.

TABLE 8

DEATH RATES BY CALIBER, NUMBER OF WOUNDS AND LOCATION IN DOMESTIC ATTACKS

| | Single wound | | | |
|---|---|---|---|---|
| | .22 | .25 & .32 | .38 | > .38 |
| Head and chest | 0% | 100% | 67% | 50% |
| Abdomen, back and neck | 0% | 0% | 50% | — |
| Total vital areas | 0%(8) | 33%(6) | 57%(7) | (2) |
| | Multiple wound | | | |
| | .22 | .25 & .32 | .38 | > .38 |
| Head and chest | 40% | 60% | 75% | — |
| Abdomen, back and neck | 0% | 0% | 100% | — |
| Total vital areas | 29%(7) | 50%(6) | 78%(9) | |

*Source:* Compiled from Chicago Police Dep't Offense Reports.

Another interesting comparison is obtained by analyzing separately the outcome of shooting episodes involving female offenders, on the ground that the female offender is least likely to have selected her own weapon and most likely to have acquired someone else's weapon under circumstances that leave little room for suggesting that she chose a particular caliber in line with either a personality trait or short-range intention. Table 9 presents data on attacks by females, and tells the same story as its predecessors.

[14] See note 8 *supra.*

TABLE 9

DEATH RATES FROM ATTACKS TO VITAL AREAS BY FEMALE ASSAILANTS

|  | Single wound | | | |
|---|---|---|---|---|
|  | .22 | .25 & .32 | .38 | > .38 |
| Head and chest | 0% | 50% | 50% | 50% |
| Abdomen, back and neck | 0% | 25% | 100% | — |
| Total vital areas | 0%(9) | 33%(6) | 67%(3) | 50%(2) |
|  | Multiple wound | | | |
|  | .22 | .25 & .32 | .38 | > .38 |
| Head and chest | 33% | 50% | 67% | — |
| Abdomen, back and neck | 0% | 100% | — | — |
| Total vital areas | 20%(5) | 67%(3) | 67%(3) |  |

*Source:* Compiled from Chicago Police Dep't Offense Reports.

These small sample checks are consistent with the argument presented above: there are intriguing differences at the margin between high-caliber and low-caliber handgun attacks. But the major differences in death rates appear to be instrumentality effects.

## II. SOME IMPLICATIONS OF THE WEAPONS STUDIES

The narrow purpose of the present study was to investigate further the question of weapon effects in violent assault. It confirms the earlier conclusion that the instrument used in an attack has a strong impact on chances of fatality. A corollary is that weapon controls, to the extent effective, could save many lives in Chicago. A broader aim of this series of studies was to seek meaningful knowledge about deadly assault in our major cities. And, with two detailed studies of attack in Chicago and a number of collateral inquiries completed,[15] the time seems ripe to discuss what, if anything, these data might teach us about understanding and preventing violent killings. In what follows, some observations are grouped under three rubrics:

A.  The character of intent in violent assault.
B.  The exportability of Chicago-based data to other areas.
C.  The implications of the data for criminal law scholarship and reform.

### A.  *The Character of Intent in Violent Assault*

Professor Megargee, one of many scholars who have addressed the social implications of violent activity, emphasizes both the importance and the frustrations of focusing on the role of intent in deadly assault when he says:

The second issue confronting those who would define violence is the question of

[15] See George P. Newton and Franklin E. Zimring, *supra* note 1, at ch. 7.

intentionality. Intentionality by its very nature is something that cannot be observed. Our insights into human behavior have shown that there is no hard and fast line between what is intended and what is not intended.[16]

Lacking that hard and fast line, Megargee continues:

Typologies of violence offered by behavioral scientists have focused more on the motivation of the violent person than on the actual act.[17]

He goes on to suggest:

This focus recognizes that the difference between murder and aggravated assault often depends on whether a bullet chances to hit a muscle or an artery or on whether a physician is nearby to treat the victim.[18]

At this point I am moved to disagree, not with Megargee's good sense, but with his generous treatment of his colleagues. In fact, sociological students of homicide, perhaps gulled by their legal colleagues, have at times assumed that homicide is a separate, autonomous category of intentional human behavior. A classic example of this kind of assumption can be found in Wolfgang's *Patterns of Criminal Homicide*:

It is the contention of this observer that few homicides due to shootings could be avoided merely if a firearm were not immediately present, and that the offender would select some other weapon to achieve the same destructive goal. Probably only in those cases where a felon kills a police officer, or vice versa, would homicide be avoided in the absence of a firearm.[19]

Wolfgang's remarks should not be taken out of context. Elsewhere in his study there is a suggestion that something other than differences in intent might distinguish criminal killing from less destructive acts of violent attack. For example, he observes that the means used by Irish immigrants to attack, principally by brass knuckles and fists, may help to explain the low death rate from those attacks.[20]

Other studies of criminal homicide tend to be even easier in assuming a distinctive intentional component to homicidal impulse. David Abrahamsen devotes chapter 10 of his book, *The Psychology of Crime*, to "the personality of the murderer." His discussion, which is in terms of the offender's "wish to

[16] Edwin I. Megargee, A Critical Review of Theories of Violence, in Donald Mulvihill, Melvin Tumin, and Lynn Curtis, Crimes of Violence 1039 (Staff Report (13) to the Nat'l Comm'n on the Causes and Prevention of Violence 1969).

[17] *Id.* at 1043.

[18] *Ibid.*

[19] Marvin Wolfgang, Patterns of Criminal Homicide 83 (1958).

[20] *Id.* at 80.

kill" and "the force which compels a person to commit homicide,"[21] may be the consequence of implicitly assuming that homicidal force is an autonomous mechanism of human expression and homicidal result its usual product.

We also find in the sociological literature studies of the cultural and psychological backgrounds to violent behavior that serve as a counterweight to the implicit assumptions in homicide studies. Nine years after *Patterns in Criminal Homicide*, Wolfgang and Ferracuti speak in terms of the subculture of violence rather than the subculture of homicide.[22] Hans Toch, in his *Violent Men*,[23] seems implicitly to assume a great deal of continuity between fatal and nonfatal violent episodes, yet Toch never addresses the question whether homicide and less drastic forms of violence are either similar or different; rather, he discusses violence as a generic behavioral category.

This is not to say that those who are skeptical about the autonomy of homicide as a pattern of human behavior have lacked evidence for their skepticism. Pittman and Handy noted, in 1964, that a

comparison of findings concerning acts of homicide and aggravated assault indicates that the pattern for the two crimes is quite similar. Both acts, of course, are reflections of population subgroupings which tend to externalize their aggression when confronted with conflict situations.[24]

Until recently, however, what Professor Megargee calls the "question of intentionality" has been far from the central focus of sociological concern in the study of violence. In general, it has been a question addressed parenthetically by the otherwise employed social scientist.

The knife-versus-gun and gun-caliber studies support three related propositions about the role of intent in violent assault. The first is that there is a good deal of overlap between the structure, intention and motivational background of most serious but nonfatal attacks and most homicides in Chicago. Given the prior findings on the demographic similarity, with respect to victims and offenders, of homicide and aggravated assault, this should come as no surprise. But the conclusion is, in a special way, inescapable in the present data: for example, whatever else may separate fatal from nonfatal firearm attacks, the element of chance must play an important role, because all attacks to the head and trunk can cause death (but less than a majority do) and more than 60 per cent of all lethal attacks are single-wound shootings. The overlap

---

[21] David Abrahamsen, The Psychology of Crime 185 (1960).

[22] Marvin Wolfgang and Franco Ferracuti, The Subculture of Violence (1967).

[23] Hans Toch, Violent Men (1969).

[24] David J. Pittman and William Handy, Patterns in Criminal Aggravated Assault, 55 J. Crim. L., Criminology & Police Science 462, 470 (1964).

I speak of is a physical reality, not simply the fact that the same sort of people engage in both behaviors. Nor is it merely the finding that some assailants and some killers appear to be acting in the same way. Rather, it is a strong suggestion that most people who attack with guns act in ways that are distinguishable only on the basis of result.

Discussion of the overlap between fatal and nonfatal attacks leads to the second major inference that can be drawn from the two studies under discussion: that most violent attacks with deadly weapons, whether fatal or nonfatal, are pursued with ambiguous intentions as to whether the victim should die. Most of the attacks we have studied that resulted in wounds to the head or trunk of a victim were inflicted under circumstances consistent with assuming that the offender considered death as one of the likely consequences of his actions. The same can almost certainly be said for a number of attacks that resulted in wounding to less vital body areas, although a precise estimate of the proportion of woundings to extremities that involved appreciation of the risk of death is unobtainable. Even if the risk of death was realized, it is still the case that this result was not diligently pursued in the majority of deadly attacks. In 62 per cent of all fatal firearm attacks, and 72 per cent of all nonfatal firearm attacks, the offender did not inflict more than one wound, in spite of his ordinary ability to do so. To some extent these statistics may be telling us that the initial intention, in both fatal and nonfatal gun assaults, is to achieve, by wounding, an objective other than death, but to achieve that objective whether or not death occurs.

There are suggestions in the prior literature that the ambiguously motivated deadly assault may play a role in homicide statistics. With respect to homicide by beating, Wolfgang says:

Many of these . . . appear to have been the result of fighting with no intention on the part of the offender to kill.[25]

What is missing in the literature is a study of data bearing on intention with respect to both fatal and nonfatal attacks. Without such data it would be impossible, regardless of what intuitive power might have been brought to bear on the question, to make statements about most killings or most nonfatal woundings unless the circumstances of an attack pointed unambiguously to the fact that death was or was not intended with some energy.[26] If, as I have suggested, most attacks that kill—as well as most attacks that do not kill—are

[25] Marvin Wolfgang, *supra* note 19, at 86.
[26] But see David Abrahamsen, *supra* note 21, at 185:
A murderer is so completely dominated by his inner forces that apparently no means is too foul for achieving his goal, as seen in the following case.

intended ambiguously, this is a difficult conclusion to reach without comparing fatal and nonfatal attacks in some detail. And that comparison is a relatively recent arrival in the sociological literature on violence.

One final possibility should be discussed. While there is evidence that the objective of a serious attack is ambiguous at the outset and remains so throughout its course, there is also some indication that the desired result of an attack may very well change during its enactment. The act of firing a gun alters the emotional context of the situation in a number of ways that can change the attacker's objectives:

—Firing a shot that finds its mark can be an emotional release, and this release can make an individual who might have sought or at least ignored the possibility of his victim's death more inclined to end his attack.

—Firing a shot and inflicting a wound also alter the immediate conflict situation that leads to an attack, and if the wound is serious or stunning, the threat of attack or counterattack by the victim may be abated.

—At the same time, inflicting a wound has transferred the consequences of assault from the realm of fantasy to that of palpable and unpleasant reality; if the reality of deadly attack does not square with its fantasy significance, or involves emotional costs greater than the attacker contemplated, the attack may be aborted, even if it was originally pursued with lethal intent.

### B.  *The Limits of Instrumentality Explanations*

The present study maintains an extremely narrow focus: attacks with one type of weapon (guns) in one city over a four month period. One natural issue early in the sequence of any discussion of these data is the extent to which the significant instrumentality effect found here can be expected to occur with other types of weapons and in other locations. Our tentative answer on this issue is the following hypothesis:

The significance of weapon dangerousness on the death rate will rise or fall with the proportion of ambiguously motivated attacks with deadly weapons.

This hypothesis comes, rather unmysteriously, from the interrelation discussed earlier between the large number of ambiguously motivated deadly attacks and the extensive instrumentality effects in such attacks. Because the hypothesis is phrased in terms of differential intentions, some more tangible form of prediction will be necessary before it can be tested through the use of comparative criminal statistics.

The hypothesis speaks only to the relative differences one might observe in different settings. It does not suggest that there is any city where increases or decreases in the use of guns will not affect the death rate from assault. But

the theory highlights two apparent ironies. The first is that as the rate of ambiguously motivated attacks with guns increases, the rate of gun deaths per 100,000 persons will increase but the death rate per 100 gun assaults, if anything, should decrease somewhat.[27] The second apparent irony is that gun controls are most needed in precisely those situations where guns have the greatest popularity in attacks—and thus where control will be hardest to achieve. This is not to say that the need for firearms control is meaningfully correlated with ownership and use of firearms alone. Rather, the combination of widespread gun ownership, particularly handgun ownership, *and* the propensity to use these weapons is the explosive compound.

### C. *Criminal Law for a Subculture of Violence*

The task of relating data from these studies to issues in substantive criminal law is an open-ended one. At this point it is more appropriate to raise most of the following points as plausible interpretations than to peddle them as established truths.

1. *The Calculation of Dangerousness in Deadly Assault.* On some matters, however, the data appear to speak with more than equivocal authority. The first of these is that empirical studies such as that reported above give the rough outline of a new basis for judging the seriousness of criminal acts of violence—that basis is the objective dangerousness of particular types of behavior. The reader may ask, has not dangerousness always been an important element in the definition and grading of criminal offenses? The answer to this question is that, with respect to deadly attacks, the law has approached the issue of dangerousness indirectly and, as it turns out, incompletely.

Most penal codes now grade violent offenses with a view to a mixture of two factors: the actor's subjective intention and the actual result of an attack. In Illinois, for example, a person is guilty of murder if his intent can be characterized as either intent to kill or to do great bodily harm, or knowledge that his acts create a strong probability of death or great bodily harm, and the result is the death of his victim. If his victim lives, an individual is guilty of attempted murder if he intends to kill.[28] If he knows that such acts create a strong probability of death or great bodily harm but does not have a specific intent to kill, the individual is guilty only of aggravated battery if his victim lives.[29]

----

[27] In fact, comparisons among different American cities show little, if anything, in the way of a patterned difference. See George P. Newton and Franklin E. Zimring, *supra* note 1, at 177. The British death rate per 100 reported gun attacks is, however, a good deal higher than that experienced in most American jurisdictions. See Gt. Brit., Home Office, The Use of Firearms in England and Wales (unpublished, 1967).

[28] Ill. Rev. Stat., ch. 38, § 8-4 (1969).

[29] Aggravated battery requires "intentionally or knowingly" causing "great bodily

The important questions in differentiating among murder, attempted murder, and aggravated battery are thus:

(1) did the actor intend to kill?
(2) did death result?

The result of an attack is an incomplete gauge of dangerousness if any element of fortuity determines result, and this seems to be the case. Indeed, one reading of Table 7 in this study and parallel tables in the knife-gun study would characterize homicide in Chicago as a lethal lottery with many times as many players as ultimate losers. The attacker's intent is also an incomplete measure of dangerousness if factors other than intent determine result. This study has shown that another factor, the "instrumentality effect," is an important determinant of the result of an assault.

A third basic question can be asked and answered: In the generality of cases, how likely is it that conduct such as that engaged in by the offender will lead to death? This question is, in practice, answerable by the cautious use of data on violent attacks, although later on I will argue that the present sequence of studies casts some doubt on whether the same can be said for discriminations based on the difference between intention to kill and intention to inflict great bodily harm in most cases of attacks with deadly weapons.

The significance of "objective dangerousness" is subject to some qualifications. First, the present data are clearly deficient as complete measures of objective dangerousness. Data on the distance between attacker and victim are missing from the two studies under discussion. They are important because data on wound location appear too late in the scenario of violence for before-the-fact dangerousness to be clearly determined. We know only where the attacker hit, not where he aimed. Yet even these data, as displayed in Table 7, screen out much more fortuity than traditional tests of intent and result.

A second qualification in using before-the-fact calculations of dangerousness is that any rational penal system can make only a limited number of distinctions in the formal grading of violent attacks. Result and intent are still viable distinctions, though in varying degree. Forty-three degrees of violent assault are too many, even for Jeremy Bentham. Some four or five mixtures of result, intent and dangerousness seem the largest number that the penal law can digest. So the question of whether high velocity .38-caliber bullets kill more often than their low velocity .38-caliber cousins can hardly be expected to differentiate offenses. One suspects that, in the task of grading offenses of violence, the law will be hard put to digest effectively even the great difference in death rates between .22 and .38 caliber guns, although this

---

harm." Ill. Rev. Stat., ch. 38, § 12.4 (1969). Attempted murder requires an attack "with intent to commit" the offense of murder. See *id.* at § 8-4.

is not clear. Certainly, however, the law can act on the four- or five-to-one difference between death rates in gun and knife attacks.

The second qualification advanced goes a long way toward canceling out the first—if only a limited number of "dangerousness" distinctions can be recognized, then the margin of error from present data is relatively insignificant since the task is the rough grouping of attacks by dangerousness. Particularly if wound location is taken into account only in cases where the attacker had a better-than-usual opportunity to control results, the law's incapacity for fine distinctions diminishes concern with the crudeness of present data.

The third qualification that must be considered is not so easily pushed into the lower rank of present concern. It is one thing to suggest that considerations of objective dangerousness can be integrated into the grading of violent assault and quite another to argue that distinctions based on objective dangerousness, if so integrated, will lead to a substantial saving of lives. If the law could be structured and communicated so that the threat of more severe sanctions would lead people to shoot once rather than twice, use small-caliber rather than large-caliber guns, or, best of all, resort to knives instead of guns, the effect would be a substantial social policy benefit, but there is less reason to hope for a substantial increment of deterrence in this area than in almost any other area of social concern. At the point of attack, the average violent offender seems relatively immune to the threat of criminal sanctions. Unlike many crimes, gun and knife attacks generate a substantial probability that the offender will be arrested[30] and a relatively high risk of being punished,[31] because, with the exception of random or robbery-related attacks, the offender is usually easy to identify. Furthermore, almost all of the people who participate in shootings and stabbings are running a substantial risk of killing the object of their attack and thus are already in jeopardy of the law's most severe sanction. At the same time, these attacks typically occur in a context of substantial emotional arousal.

We thus cannot expect every distinction the law wishes to draw to have a substantial influence on the behavior of attackers. For this reason, a strategy of weapons control that focuses on making mechanisms unavailable at the time they may be used in attacks promises a good deal more loss prevention than a gradation of punishment based on the degree of objective dangerousness.[32] Yet it is not impossible, if the law focuses on one or two central distinctions—the difference between guns and other weapons seems to be a likely

[30] See Federal Bureau of Investigation, Uniform Crime Reports 8-10 (1969).
[31] See Charles Tittle, Crime Rates and Legal Sanctions, 16 Soc. Probs. 409 (1969).
[32] See George P. Newton and Franklin E. Zimring, *supra* note 1, at chs. 12, 17.

116 THE JOURNAL OF LEGAL STUDIES

candidate—that messages conveyed by the grading of offenses might affect attacker behavior at the margins.

But if this kind of process is what we seek, the number of distinctions should be kept small if the message is to be effectively conveyed. And in noting the possibility of some indirect effect of grading on social learning, no basis exists for doubting the initial statement—the prospects for marginal deterrence are far from bright.

There are reasons other than deterrence for considering the objective dangerousness of an attack in making decisions about how seriously an attacker, or a class of attackers, should be punished. To the extent that retributive considerations influence the punishment decision, there is reason for supposing that, as a matter of justice, more dangerous attacks should be punished somewhat more seriously than less dangerous attacks, and that one dimension of the equality of treatment that the law should seek is that attacks of relatively equal dangerousness should, all other things held constant, be treated similarly.

The point I am trying to make is too simple to justify an excursion into the philosophy of punishment. One measure of social dangerousness is the likelihood that a given act, in the generality of cases, will generate loss of life. Therefore, one criterion under a retributive theory of punishment should be the likelihood that a violent event will lead to death. A corollary is that data on objective dangerousness give the retributivist a new index of judging the justness of punishment. Focusing on how many wounds an attacker inflicts, and what kind of instrument he uses, provides an index of probable result less fortuitous than a test that concentrates on result alone.

Yet I am far from confident that a retributivist would feel completely comfortable making judgments about the just degree of punishment from objective dangerousness.[33] Modern arguments for equality in punishment have emphasized the guilty mind in making claims about equal culpability. The data in the present study make a point that, in large measure, runs against this current. Many of the factors that would be taken into account in judging objective dangerousness are independent of apparent differences in the quality of an attacker's intention. One of H. L. A. Hart's many difficulties with the unequal treatment of attempted and completed crimes is precisely that focusing on result tends to treat those of equal mental culpability in unequal ways.[34] Yet the same can be said of calculations based on objective dangerousness.

[33] Indeed, I am far from sure, in the present array of philosophical positions, of the definition of a "retributivist." Cf. H. L. A. Hart, Punishment and Responsibility; Essays in the Philosophy of Law 231 (1968):

. . . At least in the broader modern use of the term "retribution," there are many different answers to each of these questions, which may be styled "retributive" and have often earned the title of "retributive" for the theory of which they form part, even if the theory also contains reformative or deterrent elements normally contrasted with retribution.

[34] See id. at 129-30.

My purpose here is to raise the issue rather than resolve it. My own tentative conclusion is that it is at least possible that objective dangerousness could play an important role in a retributivist scale of punishment decisions. In so urging, I point out that we are discussing the use of data on dangerousness only after intent to do harm has been established. I make no implicit claim as to the justice of punishing behavior in the absence of culpable mental states.

Apart from deterrence and retribution, there is an argument to be made that objective dangerousness can help us in dealing with the basic economic problems of law enforcement. Data on the objective dangerousness of different forms of behavior can help in the allocation of scarce penal, prosecutorial, and preventive resources by drawing attention to problems of maximum severity. It is commonly argued, for example, that the addictive, debilitating and criminogenic qualities of heroin make this substance a more appropriate candidate for substantial law enforcement efforts than other drugs. Data on the death rates from attacks can be used in a similar way to focus on the most important problems in the area of violent assaults. Yet the extent to which an attack is likely to kill is something apart from the extent to which that form of attack is a social problem. If one form of attack has a death rate of 50 per 100 attacks but there are only 100 such attacks in the United States, data on the high death rate do not show that the problem presented by that form of attack is more serious than the problems presented by much more common attacks with lower death rates.

Indeed, one conclusion that can be drawn from the sequence of studies here reported is that the intention to wound with an extremely deadly weapon is, in the United States, a more serious problem than unambiguously lethal attacks. There are, I think, perspectives that the present study can bring to the economic problems of deciding whether and how the criminal law should attempt to affect human behavior. But these perspectives come less from a consideration of grading different forms of deadly attack than they do from the broader view of the criminal law as an instrument of loss prevention, for example in the area of weapons control.

I do not want to leave the impression that considerations of objective dangerousness are wholly novel in criminal law. The treatment of objective dangerousness in modern criminal codes varies from situation to situation. Behavior that is dangerous only because it increases the chances that serious but unintended consequences will occur is routinely made criminal. Drunk driving is one offense that seems to fit comfortably into this category. And even those who stress the necessity of intent to do wrong for a proper finding of criminal liability would find awareness of the fact that the actor was driving under the influence of alcohol to be sufficient *mens rea* (guilty intent) to convict, even when the actor was unaware of any risk that his conduct would lead to further harm. In addition, many penal codes make killings resulting from gross negligence seriously punished offenses.

It may be the case, however, that criminal codes are more apt to base decisions on criminal liability on the objective dangerousness of behavior when the penalty is low than when the penalty is high. There are striking exceptions to this, such as the felony murder rule, which is alive and apparently flourishing in most jurisdictions, so the more precise point may be that criminal law deals in objective dangerousness in those crimes that do not require that an individual intend or knowingly risk certain consequences. Where the law requires intent, knowledge, or recklessness with respect to death as a threshold for liability, as in the case of non-felony murder, it is suddenly unconcerned with variations in the objective dangerousness of conduct. The origin of the cleavage between intent and dangerousness is unclear. Perhaps there is an implicit assumption that when men can be said either to know or to intend that a result will follow from their conduct, their conduct will almost inevitably produce such a result. Since intent to kill, in most jurisdictions, may be inferred from the act of shooting another with a firearm in an area from which mortal wounds often result,[85] the presumption that *mens rea* sufficient to constitute murder inevitably produces a lethal result is incorrect.[86]

[85] See, *e.g.*, People v. Sheppard, 402 Ill. 411, 84 N.E.2d 377 (1949) (one wound—attempted murder, even though the wound was not to an area where death normally results).

[86] In part, the modern emphasis on *mens rea* is a reaction against the theory of "objective liability," a reading of the common law argued by Oliver Wendell Holmes, Jr. It is, I think, appropriate to distinguish that theory from the approach I am suggesting. Holmes described the operation of the "objective theory" of liability in the law of murder in The Common Law 56-57 (1881):

For it is to be remembered that the object of the law is to prevent human life being endangered or taken; and that, although it so far considers blameworthiness and punishing as not to hold a man responsible for consequences which no one, or only some exceptional specialist, could have foreseen, still the reason for this limitation is simply to make a rule which is not too hard for the average member of the community. As the purpose is to compel men to abstain from dangerous conduct and not merely to restrain them from evil inclinations, the law requires them at their peril to know the teaching of common experience, just as it requires them to know the law. Subject to these explanations, it may be said that the test of murder is the degree of danger to life attending the act under the known circumstances of the case.

When Holmes speaks of "the known circumstances of the case," he is referring to circumstances known to the generality of men rather than to the particular accused. He is thus, at least implicitly, not only assuming the culpability of acts that convey a high degree of objective dangerousness, but also maintaining that dangerous acts which unintentionally result in death are as culpable as dangerous acts intended to cause death.

Yet the data reported in this paper on objective dangerousness suggest that if the number of wounds an individual inflicts is any measure of his intention, attacks intended to kill have a higher death rate than more ambiguously motivated attacks, so that there is some basis in fact for differentially judging the two kinds of attack even if the likelihood of death is the only basis for judging the seriousness of attack. A proponent of the Holmesian position might respond that insofar as objective data such as the number of wounds inflicted or even choice of weapons can be taken as indices of intent, the grading of criminal homicide could proceed by placing distinctions on these objective

2. *Applying the Dangerousness Standard: the Problem of the One-Shot Killing.* One question raised by the short duration of most fatal and nonfatal assaults is whether the law should allow for a change of heart on the part of offenders and punish single-wound attacks less severely than those carried further. In the criminal law of attempt, an offender's change of heart is usually significant only if it occurs before a criminal result has been achieved.[37] Were objective dangerousness one of the standards that fed into the grading of deadly assault, more lenient treatment of single-wound attacks might be justifiable on the ground that these attacks are less likely to kill than multiple-wound attacks with the same weapons. The question is most problematical when an attack is terminated after a single shot or stabbing and yet the victim dies. Assume that we know little more about intent in such a case than the facts set forth in the previous sentence. The argument for a reduction in the grade of the offense is based on treating the assault that kills in approximately the same way as an equally dangerous but nonfatal attack with the same weapon. To the extent that deterrence seems realistic, the argument is buttressed by the prospects of persuading an individual to pursue leniency by abandoning an attack before it reaches the point of maximum dangerousness; yet death has occurred, and thus we have less reason to suppose that the attacker would allow his victim to live than is the case with the nonfatal single-wound attack. Moreover, the actual social loss is greater: whatever the value in dealing with the chance of death as an abstraction, one must also deal with the fact of death as a reality.

I do not state the issue intending to answer it, because accepting that objective dangerousness is relevant to the grading of deadly assault does not compel a particular answer to the question. Objective dangerousness is only one of many grading principles that can correctly be applied. The usefulness of viewing attacks in terms of objective dangerousness is not that such a view

manifestations rather than on the subjective nature of intent. I am not unsympathetic to this view, but feel that it is not an accurate representation of what Holmes himself would do with the data. My suspicion is that any attack with a deadly weapon would, if death ensues, result in the Holmesian classification of murder. The "objective test" device then becomes one of generating liability for the highest grade of offense rather than making distinctions between types of attack. Fewer than 1 per cent of all robberies result in homicide, and fewer than 1 in 10 robbery attacks kill. Fewer than 10 per cent of attacks with deadly weapons lead to a lethal conclusion. In either case, if "the test of murder is the degree of danger to life attending the act under the known circumstances of the case," any lethal conclusion equals murder. This approach does not make distinctions in deadly attacks; it obliterates them. To apply Holmes to the cases we have been examining, all of the knife and gun attacks to an area that could cause death would be murder when death was the result. Either it follows that all such nonfatal attacks are attempted murder or the Holmesian emphasis on "objective liability" really makes punishment more dependent on fortuity than almost any other test that could be applied to this class of cases.

[37] See Model Penal Code § 5.01(4), Renunciation of Criminal Purpose (as Defense to Attempt) (Prop. Off. Draft, 1962).

120          THE JOURNAL OF LEGAL STUDIES

answers the question whether a single-wound assault should be treated more leniently but that such a perspective raises that question in a new light.

3. *Toward a Unification of the Criminal Law of Violence.* Another issue to which the present data speak with some persuasive power is whether there is reason to shift from the traditionally separate criminal law consideration of homicide and other offenses of violence to a system that considers the basic category of behavior—that of violent attack—as an important unifying principle.

To be sure, some of the evidence one can marshal for the proposition that there is undue separation in the criminal law's treatment of violence under the present system is impressionistic, even literary. Yet a small literary excursion may be worthwhile. For example, the deadly assaults we have been examining are governed by the provisions of the Illinois Criminal Code of 1961,[38] by many standards one of the most modern and most thoroughly rationalized of penal codes. Homicide, including murder, voluntary manslaughter, involuntary manslaughter, and concealing the death of a bastard is dealt with in Article 9 of that Code. Article 12 of the Code, entitled "bodily harm," defines the offenses most commonly associated with nonfatal serious assault: assault, aggravated assault, battery, aggravated battery and others. The chapters on homicide and bodily harm are separated by provisions defining offenses such as kidnapping, rape, incest, bigamy, prostitution, pimping and obscenity.[39] One is moved to suggest that this separation is neither accidental nor without significance.

Scholars and draftsmen, both ancient and modern, have tended to consider the law of homicide separately and exhaustively. In the early years of this century, Oscar Warren published a five volume treatise on the law of homicide.[40] The reported law on the subject of homicide is enormous. This is easy to explain. Murder presents a combination of ultimates, the ultimate offense against human security and the ultimate punishment vested in temporal authority. Particularly in jurisdictions where that punishment is death, one can understand a defendant's motives for producing a high volume of lengthy appeals. At the same time, the lawyer is drawn to homicide by the considerable human instinct, when faced with a choice, to watch the table where the players are betting with $100 chips. For these and other reasons, when the great intellects of criminal law scholarship are faced with the possibility of writing a rationale of homicide or one of embezzlement, the choice becomes an obvious one.

The importance of homicide as a social and intellectual problem does not

---

[38] Ill. Rev. Stat., ch. 38, art. 1–42 (1969).

[39] Ill. Rev. Stat., ch. 38, §§ 10–1, 11–1, 11–11, 11–12, 11–14, 11–19, 11–20 (1969).

[40] Oscar Leroy Warren, On Homicide (1914).

explain why concern about the law of homicide should not have broadened to a consideration of the great variety of violent threats to human life. In part, one can suggest that the criminal law's emphasis on the quality of an actor's intention has helped maintain this separation. As suggested above, it may have been assumed that a man not only intends the natural and probable consequences of his acts, but intends these consequences to the exclusion of all others, and that in all but a few situations this unambiguous intent will lead to the consequences intended.

How has "homicidal isolationism" handicapped the development of effective criminal law theory? The fast answer is that data and perspectives on objective dangerousness as an index of the significance of conduct are not obtained until nonfatal and fatal attacks with similar weapons and in similar situations are subjected to the unified approach. But the deeper point is the danger of inconsistency and injustice that separation may risk. Real differences in dangerousness are not recognized; artificial distinctions are maintained.

4. *Discriminating Intent in Deadly Attack.* No area of the criminal law is more notorious for fine and often artificial distinctions between mental states accompanying acts than the law of homicide. Most of this notoriety attaches to the device of distinguishing degrees of culpability for murder by asking whether "premeditation" accompanied the intention to kill.[41] While premeditation may have started out as the clearly distinct concept of "lying in wait," as the concept grew the distinction between premeditated and unpremeditated intentional killings became progressively metaphysical.[42] Distinguishing between killings "with malice" and killings "without malice," if that distinction rests on anything other than the simple intention to kill, is also a task best left to word-magicians or judges and juries trying to conform results in homicide cases to personal instincts about rough justice.

While the concept of premeditation has received the bad press it deserves in academic writings,[43] most modern writers do express faith in some *mens rea* distinctions in grading criminal assault. The most popular distinction is between intent to kill, or knowledge that acts will kill, on the one hand, and dangerous acts that seek merely to inflict nonfatal results and are reckless or negligent with respect to fatal consequences. The distinction is an important

---

[41] See Edwin R. Keedy, History of the Pennsylvania Statute Creating Degrees of Murder, 97 U. Pa. L. Rev. 759 (1949).

[42] See *id.* at 773-77.

[43] See Benjamin N. Cardozo, What Medicine Can Do for Law, in Law and Literature and Other Essays and Addresses 70, 100 (1931):

What we have is merely a privilege offered to the jury to find the lesser degree . . . . I have no objection to giving them this dispensing power, but it should be given to them directly and not in a mystifying cloud of words.

one in the Illinois Criminal Code, for example, because a nonfatal attack with intent to kill is attempted murder, while an attack with any lesser intent is aggravated battery.

But to say that this distinction is important does not mean that it is viable in all cases. There were several hundred cases in one four-month period in Chicago in which an individual wounded another with a firearm in an area where such a wound could prove fatal and three out of four times he only wounded his victim once. Are all of these attacks committed, at the time of the first firing of the weapon, with "intent to kill"? What further data can discriminate attacks intended to kill in this category from other attacks? If we could crawl inside the minds of particular offenders, and if their own emotions were something other than ambiguous about what results were desired, we might obtain some more precise answers and some more precise distinctions. But the combination of the limitations of modern science and those imposed by modern criminal procedure makes this further step into the offender's mind unlikely, and in the circumstances it is not entirely unfortunate. In judging these serious attacks one either operates with a set of almost conclusive presumptions about intent, or one leaves the question of intention to kill versus intention merely to inflict great bodily harm to the discretion of the trier of fact. A presumption of attempted murder in all firearm and knife attacks would represent a smart comeback for the theory of objective liability, and would in a short time double the number of adult prison inmates in Illinois. Requiring additional evidence for an inference of lethal intent would widen the gap in punishment between similar fatal and nonfatal attacks. The outcome of leaving the determination of crime to the discretion of the trier of fact is more difficult to predict, but is hardly a utopian solution.

In the city of Chicago, then, the distinction between intent to kill and other mental states has some utility in extreme cases, but there are no firm guidelines to provide for the majority of serious assaults.

### III. CONCLUSION

If the weapon-caliber study proves useful to criminal law scholars, it will do so because it injects information about the reality of deadly attacks into an area where such data are rarely deployed. The study appears to say that intent to kill is rarely a helpful way to distinguish among a large number of nonfatal attacks with deadly weapons, and that the criminal law of violence may be artificially separated into fatal and nonfatal containers that hold the same behavioral brew.

As is usually the case, the critical points are easier to make than the constructive ones and enjoy a higher level of confidence. It is by no means clear that focusing on objective dangerousness as one of many factors differentiat-

ing criminal acts of violence will affect the behavior of potential offenders. It is also inadvisable to assume that considerations of objective dangerousness should be of controlling importance in the definition of offenses. Such considerations are relevant, but other standards, such as result and intention, are also relevant. For that reason the preceding discussion raises a good many more questions than it answers.

One implication of the present exercise may, indeed, be that there can be no such thing as a single "model" penal code. If variations in penal law have any effect at all on behavior, then the proper distinctions in the criminal law of violence should be designed to maximize preventive effects. Different patterns of violence may call for different types of distinctions. And even if the criminal law is whistling in the dark, there is a case to be made, based on consistency and fairness, that distinctions between grades of criminal offenses of violence should parallel the lines of demarcation in the reality of violence.