# Exhibit 20

*Philip J. Cook*

# The Technology of Personal Violence

**ABSTRACT**

Over 30,000 deaths each year result from gunshot wounds. Two decades of systematic research on weapons and personal violence indicate a pervasive influence of weapon type on the patterns and outcomes of violent encounters. The likelihood that an assault will result in death depends (among other things) on the lethality of the weapon. The evidence that weapon lethality affects the likelihood of death in suicide is somewhat weaker. Assailants' weapon choice depends on a number of factors, including the relative vulnerability of the intended victim and the general availability of firearms. National Crime Survey data indicate that guns are used only about 80,000 times each year in self-defense.

The core issues for researchers concerned with the technology of personal violence were identified two decades ago in *Firearms and Violence in American Life* (Newton and Zimring 1969), a report of the National Commission on the Causes and Prevention of Violence. The first issue is to establish the causal importance of weapon type in influencing the volume, patterns, and lethality of personal violence. The second is to measure the effects of gun availability on the propensity to use guns in crime and suicide, where "availability" refers both to the prevalence of gun ownership and to the legal regulations governing transfer and use. The third core issue is to analyze how the threat of criminal victimiza-

Philip J. Cook is professor of public policy and economics, Duke University. Michael Rand of the Bureau of Justice Statistics provided unpublished data. Arthur Kellermann, Gary Kleck, Jacqueline Cohen, Albert J. Reiss, Jr., and Jeffrey Roth offered extensive and very useful comments on an earlier draft. Duke University's Fuqua School of Business provided an office and secretarial support.

© 1991 by The University of Chicago. All rights reserved.
0192-3234/91/0014-0003$01.00

1



2        Philip J. Cook

tion influences the use of guns in self-defense, and to what effect. These were the central concerns of Newton and Zimring's seminal report, and they remain central today.

Obviously, these concerns are motivated by the ongoing debate over the proper regulation of guns. This policy context not only sets the agenda; it also tends to politicize scholarly interpretation and criticism of the results. In this context, it is too easy to lose sight of the fact that, at least in principle, research can be evaluated on the basis of its scientific merits independent of whether it seems more supportive of the "pro" or "anti" position on gun control. Furthermore, some of these issues are relevant to a basic scientific understanding of violence. This review aspires to apply the norms of science in evaluating research methods and results while taking note of the policy context.

There has been a shift in the emphasis of weapons research in the two decades since publication of *Firearms and Violence in American Life.* During the 1970s, the primary focus was on the criminal misuse of guns (Cook 1982; Wright, Rossi, and Daly 1983). But during the 1980s, the focus has broadened to include much greater attention to suicide and gun accidents. This shift is the result of the involvement of the public health research community as one aspect of its emerging concern with traumatic injury as a public health problem. Milestones in this new effort are the publication of *Injury in America: A Continuing Public Health Problem* by the Committee on Trauma Research of the National Research Council(1985) and the subsequent creation of a research program on intentional injury by the Centers for Disease Control (Mercy and Houk 1988).

The involvement of the public health community has a number of virtues besides generating increased scholarly attention to suicides and accidents. It also brings a new capacity to improve data collection on gunshot wounds and consideration of a variety of policy instruments for responding to this problem: improving emergency medical response to gunshot cases, encouraging physicians to advise their patients on how to prevent gun injuries in the home, and developing regulations on the design of guns to reduce accidental shootings. But even with the broader objectives dictated by the public health framework, the most important capacities for reducing gun violence continue to reside in the criminal justice system and government apparatus for regulating gun transfer, possession, and use.

My objective here is not to review the literature as much as to review

and supplement current knowledge concerning weapons and violence.[1] While there are a few international comparisons offered, the bulk of the essay is limited to research using data from the United States. Section I charts trends in personal violence during the last two decades; since the early 1970s, there has not been much variation in death rates from homicide and suicide although there are interesting trends in the use of guns in personal violence during this period and a remarkable surge in homicide among black youths since 1984. Section II assesses the evidence on "instrumentality," concluding that the deadliness of the weapon used in a robbery or assault has an important effect on whether the victim lives or dies. The type of weapon also influences the likelihood that a robbery or assault will be "successful." Section III explores one logical implication of these findings, namely, that criminals who are equipped with a gun will be empowered to commit robberies or assaults on people who could defend themselves against attacks with less potent weapons; a gun is indeed the "great equalizer." The likelihood that a gun will be used is closely related to its relative value given the vulnerability of the victim. Section IV then considers how the general availability of guns influences their use in personal violence. There is considerable geographic variation in the prevalence of gun ownership, and the prevalence of gun ownership is highly correlated with the fractions of homicides, robberies, and suicides committed with a gun. Evidence is sketchy on whether regulations governing the possession, transfer, and use of guns have any additional effect. Section V reviews the evidence on the demand for and usefulness of guns in self-defense against crime and reports new results on the relative frequency with which guns are used in defense against burglars. The final section outlines a research agenda that identifies projects that appear feasible (given sufficient funding) and important from a policy perspective.

Virtually every issue discussed in this essay has been debated by partisans in the "great American gun war," and almost any conclusions concerning the scientific evidence would be controversial. Nonetheless, a number of policy-relevant conclusions are offered in this essay, albeit with what I hope is an appropriate degree of scholarly caution. These conclusions are briefly summarized in the next few paragraphs.

---

[1] This essay is an update and extension of Cook (1983a). The earlier review includes a discussion of the market for guns, a topic that is not included here, but this essay includes several new topics, most important, suicide and self-defense.

4        Philip J. Cook

One familiar bumper sticker asserts, "Guns don't kill people: people kill people," meaning, perhaps, that it is the intent of the assailant rather than the type of weapon he uses that determines whether the victim lives or dies. But there is persuasive evidence that both intent and weapon matter. A policy that was successful in inducing a substitution of knives for guns in acts of interpersonal violence would save lives. It may be true that a resourceful person can always find a way to kill someone if he is determined to do so. But many homicides are not the result of a sustained, deliberate intent to kill but rather are etiologically indistinguishable from a larger set of assaults and robberies in which the victim does not die. The lethality of the weapon is a major independent determinant of the lethality of the attack. The importance of the weapon in this respect is perhaps the best-established finding relevant to the gun-control debate.

Another familiar bumper sticker reads, "When guns are outlawed, only outlaws will have guns." If this is not a tautology, then it expresses the belief that the violent criminals will always find a way to obtain guns, regardless of legal efforts to restrict availability. Undoubtedly, laws restricting gun possession, transfer, and carrying are difficult to enforce in the American context in which there are about 150 million firearms in private hands. However, it is notable that the tendency to use guns in crime differs widely among cities and is highly correlated with the local prevalence of gun ownership. A similar pattern holds in international comparisons. It is interesting that the prevalence of gun ownership does not appear to have much effect on the overall robbery rate; guns are simply substituted for other weapons when they are readily available. The consequence is not more robberies, but rather a higher death rate in those robberies that do occur. There is some evidence that assault is similar to robbery with respect to the effect of these weapons.

Are guns useful in self-defense? The answer is surely yes. Based on the best available evidence, the National Crime Survey (NCS), it appears that there are about 80,000 instances each year in which people attempt to defend themselves with guns against assault, robbery, rape, or burglary, and in most such cases they are successful. Unfortunately, guns are used far more often to perpetrate violent crimes—over 800,000 per year—than to defend against them. And guns acquired for self defense often end up being used to shoot family members, either accidentally or intentionally. One survey found that as many handgun owners reported being involved in a gun accident as reported using the

gun in self-defense. In considering the social costs and benefits of the widespread ownership of firearms, the assertion that it produces a general deterrent effect on predatory crime is worth considering. But the evidence on this issue is inconclusive.

The rules of engagement over gun-control policy have been rewritten during the 1980s with the involvement of the public health community. The focus and perspective of public health officials on mortality and morbidity has the effect of reordering the implicit priorities in gun violence; in particular, suicide, which accounts for a majority of gunshot deaths each year, becomes much more important in a public health framework than in a criminal justice framework. And there is some evidence for "instrumentality" in suicide. The availability of deadly weapons that are acceptable in some sense to the suicidal person arguably plays an independent causal role in whether the person dies of self-inflicted injury. If suicide becomes a central focus of the debate over gun control, then much is changed. Those at greatest risk for suicide are the demographic mirror image of homicide victims (except with respect to sex), so that the "gun problem" becomes an affliction of the middle class and middle aged in this perspective. And there exist policies that arguably would make it more difficult for a suicidal person to obtain a gun but would be irrelevant to curtailing criminal violence: one such policy is counseling family members about keeping guns away from suicidal people.

The overarching conclusion from this essay is that the widespread involvement of firearms in personal violence is not just an incidental detail but, rather, has an important influence on the patterns and lethality of this violence.

## I. Levels and Trends in Personal Violence

Over the last two decades, there has been little variation in death rates from intentional violence. Since 1970, the homicide rate per 100,000 has fluctuated within the range 8.1–10.6, while the suicide rate has varied between 11.6 and 13.3 per 100,000. The use of guns in homicide has declined in relative frequency since 1974, and increased in relative frequency for suicide, leaving the overall firearms fatality rate remarkably stable. Thus there seems to be little "news" in these trends. But no news in this case is bad news, at least in comparison with an earlier, more peaceful era.

The year President Kennedy was shot, the homicide rate was 4.6 per 100,000, about half the rate that has afflicted U.S. society during the

6    Philip J. Cook



FIG. 1.—Trends in suicide and homicide rates, 1970–87. Sources: National Center for Health Statistics (1970–86, 1987).

1970s and 1980s. Indeed, this assassination came at an important turning point in the history of personal violence. Homicide rates began increasing rapidly in 1964. The data in figure 1 depict what has happened since 1970. There was a peak in 1980 at 10.6 deaths per 100,000, a subsequent reduction of 23 percent through 1985, and some increase since then.

Guns have been the leading instrument of death throughout this period, but they have declined in relative importance since 1974. In that year, 70 percent of homicides were committed with guns; by 1983, the gun fraction had declined to 60 percent, where it has remained since then (figure 2).

Suicide rates also increased during the 1960s, though less dramatically than for homicides. The postwar peak occurred in 1977, at 13.3 per 100,000, and after a small decline, the suicide rate has been gradually increasing since 1983 (figure 1). The relative importance of guns as instruments of suicide has increased during the same period that guns were of declining importance in homicide; between 1970 and 1981, the percentage of guns in contrast to other weapons or means increased 10



FIG. 2.—Trends in gun use in suicide and homicide, 1970–87. Sources: National Center for Health Statistics (1970–86, 1987).

percentage points to 59, where it has remained since then.[2] The opposite trends in the gun fractions for homicide and suicide, depicted in figure 2, pose an interesting conundrum. Whether weapon choice is a matter of availability or personal preference, there is no obvious reason why guns should be selected increasingly often by suicidal people and less often by assailants.

Figure 3 depicts the trends in firearm fatality rates from homicide, suicide, and accident.[3] The peak rate for gun fatalities was 15.3 per 100,000, in 1974. By way of comparison, the fatality rate due to motor vehicle accidents in 1974 was 21.0. It is also illuminating to compare

[2] Table 1 demonstrates a very similar temporal pattern of weapon choice for homicides and suicides involving youths age fifteen to twenty-four. The main exception is the upward surge in gun use in homicide after 1984, unique to this age group.
[3] The "total" rate exceeds the sum of gun accident, suicide, and homicide rates because each year there are several hundred gun fatalities for which there is insufficient information to allow assignment to one of these categories by the National Center for Health Statistics.

## TABLE 1

Trends in Homicides, Suicides, and Gun Accidents, Rates per 100,000, among Victims Aged 15–24

| Year | Rate of Homicide | | | Rate of Suicide | | | Rate of Gun Accidents | Rate of Total Gun Deaths* |
|---|---|---|---|---|---|---|---|---|
| | Total Deaths | No. of Gun Deaths | Gun Deaths/Total (Percent) | Total Deaths | No. of Gun Deaths | Gun Deaths/Total (Percent) | | |
| 1970 | 11.7 | 8.3 | 71 | 8.8 | 4.2 | 47 | 2.0 | 14.5 |
| 1971 | 12.7 | 8.9 | 70 | 9.4 | 4.7 | 50 | 2.1 | 15.7 |
| 1972 | 13.5 | 9.7 | 72 | 10.2 | 5.7 | 56 | 2.2 | 17.6 |
| 1973 | 13.4 | 9.5 | 71 | 10.6 | 5.9 | 55 | 2.2 | 17.6 |
| 1974 | 14.2 | 10.2 | 72 | 10.9 | 6.5 | 59 | 2.1 | 18.8 |
| 1975 | 13.7 | 9.6 | 70 | 11.8 | 6.9 | 58 | 1.9 | 18.4 |
| 1976 | 12.4 | 8.5 | 69 | 11.7 | 6.6 | 57 | 1.6 | 16.7 |
| 1977 | 12.7 | 8.6 | 68 | 13.6 | 8.1 | 60 | 1.6 | 18.4 |
| 1978 | 13.2 | 9.0 | 69 | 12.4 | 7.4 | 60 | 1.4 | 17.9 |
| 1979 | 14.9 | 10.0 | 67 | 12.7 | 7.8 | 61 | 1.6 | 19.4 |
| 1980 | 15.6 | 10.5 | 67 | 12.3 | 7.7 | 62 | 1.7 | 19.9 |
| 1981 | 14.7 | 10.2 | 68 | 12.1 | 7.6 | 63 | 1.5 | 19.2 |
| 1982 | 13.7 | 8.9 | 65 | 12.1 | 7.6 | 62 | 1.3 | 17.8 |
| 1983 | 12.4 | 7.8 | 63 | 11.9 | 7.3 | 62 | 1.3 | 16.5 |
| 1984 | 11.9 | 7.8 | 65 | 12.8 | 7.7 | 60 | 1.2 | 16.6 |
| 1985 | 12.2 | 7.9 | 65 | 12.7 | 7.5 | 59 | 1.3 | 16.8 |
| 1986 | 14.2 | 9.5 | 67 | 13.1 | 7.9 | 60 | 1.1 | 18.6 |
| 1987 | 14.0 | 9.8 | 70 | 12.9 | 7.7 | 59 | 1.1 | 18.5 |

SOURCE.—National Center for Health Statistics (1970-86 from published sources, 1987 by telephone).

* Includes International Classification of Disease (ICD) codes E922 (accident with gun), E955 (gun suicide), E965 (gun homicide), and E985 (gun death, uncertain whether accidental or intentional). Deaths by legal intervention are excluded.

Technology of Personal Violence          9



FIG. 3.—Trends in gun fatality rates, 1970–87. Sources: National Center for Health Statistics (1970–86, 1987).

the gun fatality rates with wartime fatalities. The gun death counts from suicide, homicide, and accident have totaled over 30,000 for every year since 1972. In terms of Americans killed, a year of gun misuse in the United States is the equivalent of the Korean War; a year and one-half yields a Vietnam, while nine years adds up to World War II.

Special interest focuses on the youthful victims of homicides and suicides (figure 4). The age group fifteen to twenty-four has been the object of particular attention by demographers because in recent decades this group has experienced exceptionally high rates of death due to trauma, which has prevented them from sharing in the general decline in mortality rates (see table 1). Homicide rates for this age group have been 40–50 percent higher than the population average, with a still wider gap (to over 60 percent) emerging in 1986 and 1987. The suicide rate for youths was lower than the population average until 1977 and has been about at the average since then; this is noteworthy since generally the suicide rate increases with age.

10      Philip J. Cook



FIG. 4.—Trends in suicide and homicide rates, population age 15–24, 1970–87. Sources: National Center for Health Statistics (1970–86, 1987).

The fractions of youthful homicides and suicides involving guns have been close to the corresponding fractions for the population as a whole for most of the last two decades. But since 1984, there has been a sharp increase in the fraction of youth homicides involving guns at the same time that the overall youth homicide rate has been increasing. A closer look at these recent events indicates a divergence between blacks and whites: between 1984 and 1987, the number of black victims age fifteen to twenty-four increased 36 percent, while the number of white victims declined by 5 percent (figure 5). (This disparity widened still further in 1988.) An obvious hypothesis is that the vast increases in homicide rates for black youths, coupled with an increase in the fraction of these homicides involving guns, is a reflection of the increasing rates of violence related to the illicit drug trade during this period.[4]

---

[4] Recent trends in Washington, D.C., help document the lethal effects of the drug trade. According to the District of Columbia's Office of Criminal Justice Plans and



FIG. 5.—Trends in youthful male homicide rates by race, 1978–88. Sources: National Center for Health Statistics (1970–86, 1987); FBI (1989). The 1988 estimate presumes that the percentage increases in homicide rates for males in the specified age/race groups were equal to the percentage increases in the homicide rates for all people in the age/race groups.

For every person who is killed in a homicide, a suicide, or an accident there are several more who sustain a nonfatal injury. The number of such injuries is not tabulated or even estimated in any systematic fashion and must be guesstimated from rather sketchy evidence. The ap-

---

Analysis (1989), the number of homicide victims age eighteen to twenty-five increased from thirty-five in 1985 to sixty-five in 1987 and an annualized total of 110 during the first half of 1988. Most were black males. (While gender and race are not tabulated by age in the report, about three-quarters of all homicide victims in the District of Columbia were black males during this period. Indeed, there were only three white males killed during the first half of 1988 in the District of Columbia.) The Metropolitan Police Department classified most homicides by motive: the fraction classified as drug-related increased from 21 percent to 80 percent between 1985 and 1988. The homicide rate for black males age twenty to twenty-four was as high in 1980 as in 1988. But the earlier peak was coincident with a peak in the overall homicide rate, whereas the more recent pattern for young black males is unique to them.

proach used here is to multiply death counts (for 1987) by an estimate of the ratios of nonfatal injuries to deaths for each category. The estimates presented here are for gunshot wounds only (figure 6).

For assault, Cook (1985a) estimated a death rate of about 15 percent for gun assaults in which the victim was wounded; the data were special compilations from four law-enforcement agencies, with very similar results from each source. A death rate of 15 percent implies 5.7 nonfatal gunshot woundings for each fatality, or about 73,000 such cases in 1987.

The available data on suicide and accidents are much more sparse and unreliable. For lack of other sources, I requested and received a special tabulation from the Dallas Police Department some years ago, for the period November 1981–November 1982; the death rates in that sample were 76 percent for gun suicide attempts ($N = 144$), and just 2.6 percent for gun accidents ($N = 152$). If these rates are assumed valid for the nation as a whole in 1987, they imply 5,700 nonfatal injuries due to suicide attempts with a gun, and 60,800 nonfatal gun accidents. This last number has the greatest degree of uncertainty associated with it.

Combining assault, suicide, and accident, the total count of nonfatal gunshot woundings in 1987 is 139,000. This result is in line with an estimate generated by the Health Interview Survey (HIS) for 1971–72, of 155,000 nonfatal gunshot injuries for a twelve-month period (National Center for Health Statistics 1976). My approach yields an estimate of 163,000 injuries for 1971, which is well within the sampling error range of the HIS estimate. Wright, Rossi, and Daly (1983, p. 170) offer an estimate of 183,000 injuries in 1975, which is roughly consistent with mine when proper account is taken of changes in gun killings between 1975 and 1987.

If these estimates are in the right ball park, they suggest that nonfatal gunshot injuries outnumber fatal ones by a factor of four or five. Further, the relative importance of assaults, suicide attempts, and accidents is quite different in the case of nonfatal injuries than in the case of deaths; in particular, gun accidents form a much higher percentage of gunshot injuries than of deaths.

## II. Instrumentality

Only a fraction of those who are shot, stabbed, cut, or bludgeoned in criminal assaults die of their wounds. That fraction is much higher for gunshot wounds than for wounds inflicted with other common



FIG. 6.—Fatalities and injuries from gunshot wounds, 1987. Source: National Center for Health Statistics (1987).

weapons. One interpretation of this weapon-specific difference in case fatality rates comes from Zimring (1968, 1972), who suggested that the death or survival of the victim of personal violence is largely a matter of chance, and that that chance depends in part on the lethality of the weapon used to inflict injury. This "weapon instrumentality effect," which ascribes causal importance to the type of weapon, is a fundamental tenet of gun-control advocates, and is, hence, one of the key points of debate in both the politics and the social science of this issue.

There is no question that case fatality rates for assaults, robberies, and other violent encounters are much higher when the assailant uses a gun than a knife, club, or bare hands; the controversy has focused on the interpretation of this finding. Marvin Wolfgang (1958, p. 83) states in his seminal study of homicide in Philadelphia that "it is the contention of this observer that few homicides due to shooting could be avoided merely if a firearm were not immediately present, and that the

offender would select some other weapon to achieve the same destructive goal." Wolfgang believed that the choice of weapon by an assailant was an indication of his lethal intent, and that the relatively high case fatality rates for gun assaults simply reflected the relative prevalence of would-be killers among the gun users. Zimring's quite different conclusion was supported by his analysis of gun and knife assaults in Chicago; he found that gun assaults in his sample were five times as likely to result in death as knife assaults, despite the apparent similarity between gun and knife assaults in other observable respects. "These figures support the inference that if knives were substituted for guns, the homicide rate would drop significantly" (Zimring 1968, p. 728).

The debate over the weapon instrumentality effect can be clarified by a thought experiment. Imagine that it was possible to intervene just before the first blow was struck in a violent encounter, replacing the assailant's weapon with another that is less lethal, and then observe the outcome. In particular, Zimring's question was whether the death rate would be reduced in cases where a loaded gun was replaced with a knife. His affirmative answer is supported by his argument that many gun homicides are committed by people who have no clear intention to kill. If the assailant's intent were ambiguous or unsustained, then the fatality rate would fall because killing with a knife ordinarily requires greater strength and more sustained effort than killing with a gun. Indeed, despite his conclusion quoted above, Wolfgang suggested one mechanism for this possibility: "The offender's physical repugnance to engaging in direct physical assault by cutting or stabbing his adversary, may mean that in the absence of a firearm no homicide occurs" (Wolfgang 1958, p. 79). In other cases the assailant may cease the attack after inflicting a wound or two, simply because the violent urge that prompted the attack is satisfied. Rarely does the assailant administer the coup de grace that would ensure the victim's death. In Zimring's gun sample, only 16 percent of nonfatal cases and 19 percent of fatal cases involved more than one gunshot wound (1968, p. 737).

Wright, Rossi, and Daly (1983) provide the most prominent critique of Zimring's work on instrumentality. They focus on Zimring's conclusion that a large fraction of killers attack their victims with no clear intention of killing them and, in that respect, are similar to other assailants whose victims survive. Wright, Rossi, and Daly agree that *some* killers lack clear homicidal intent but do not accept Zimring's evidence as establishing that ambiguous intent characterizes a *large percentage* of homicidal attacks (Wright, Rossi, and Daly 1983, p. 192) and is hence

so prevalent as to account for the large observed differences in weapon-specific case fatality rates.

The evidence in question is of three sorts. First, Zimring (1968) notes that homicides in Chicago in 1967 typically involved relatives or acquaintances caught up in altercations in which the assailant or victim had been drinking—circumstances that he asserts tend to be associated with ambiguous intent (p. 722). Second, he demonstrates that homicide cases are similar to serious assault cases with respect to the demographic characteristics of killers and victims, with greatly disproportionate involvement of males and blacks (p. 724). In that respect, then, fatal and nonfatal cases are similar, suggesting (says Zimring) that they may also be similar with respect to the assailants' state of mind. Third, he reports the results of a detailed study of the wounds inflicted in gun and knife attacks, concluding that despite the lower death rate in knife attacks, a greater percentage of knife than gun attacks appear to be "in earnest," based on the location and number of wounds inflicted (pp. 730–35). Zimring (1968) analyzed Chicago Police Department assault records for the period November 9–December 6, 1967. During this period there were 366 serious knife attacks, of which eight were fatal, and 247 serious gun attacks, of which thirty-four were fatal. He analyzed the number and location of wounds resulting from each of these attacks as a basis for judging the seriousness and intent of the assailant.

Wright, Rossi, and Daly's response to this evidence is that it is insufficient to offer persuasive support for Zimring's conclusion regarding ambiguous intent. However, Wright, Rossi, and Daly are impressed by Zimring's data on the seriousness of many nonfatal knife attacks, concluding that this evidence "does at least suggest that a substantial portion of knife attacks are indeed 'in earnest,' and this constitutes the strongest evidence yet encountered that the motives of gun and knife attackers may be similar" (Wright, Rossi, and Daly 1983, p. 200). The implication is that if these "earnest" knife attackers had used guns, a higher percentage of victims would have died; that is, Wright, Rossi, and Daly appear to accept the validity and importance of the weapon instrumentality effect while remaining unconvinced that Zimring's explanation for this effect (ambiguous intent) is correct.

Zimring buttressed the conclusions from his first study, which compared knife and gun attacks, with a later (1972) study comparing attacks with large- and small-caliber guns. The basic data for the caliber comparison came from an analysis of fatal and nonfatal firearm attacks

reported to the Chicago Police between March 5 and July 22, 1970. In all, 1,115 gun attacks resulting in 156 fatalities were reported. For the purpose of comparing death rates by caliber, Zimring excluded from this sample all robberies and also all attacks with shotguns and large-caliber rifles and also excluded a number of cases (most of which were not fatal) in which the caliber of the gun was not known to police. The actual number of cases available for detailed study is not clear from Zimring's report.

He found that the fatality rate increased with caliber, as predicted by the weapon instrumentality effect. The alternative explanation takes the same form as in the case of guns versus knives: that assailants who use larger-caliber weapons tend to have more deadly intent, and that the fatality rate differential between large- and small-caliber guns reflects this difference in intent rather than the lethality of the weapon. This alternative explanation receives some support from the fact that shooters using a .38 or higher-caliber weapon were more likely to inflict multiple wounds than those using a .22-caliber weapon (26 percent vs. 11 percent) (Zimring 1972, p. 104). But the caliber-related differences in the death rate are large even when the number and location of wounds are controlled for. In any event, Wright, Rossi, and Daly (1983), despite their generally critical review of Zimring's work, are convinced by it that weapon lethality does have an independent causal effect on the probability of death: "One apparently certain implication of Zimring's result is that the substitution of higher-caliber for lower-caliber handguns would almost certainly cause the rate of handgun deaths to increase" (Wright, Rossi, and Daly 1983, p. 203).

While Zimring's work focused on weapon-specific case fatality rates for assaults, it is also of interest to observe how the weapon instrumentality effect fares in the context of other violent felonies. Homicides committed during the commission of a felony such as robbery, rape, or burglary account for about 20 percent of all criminal homicides, of which half are robberies (Cook 1985b). My studies of robbery violence offer support for the instrumentality effect in that context (Cook 1979, 1980a, 1987). Robbery is generally defined as theft or attempted theft by force or the threat of violence, including muggings and holdups. The overall robbery fatality rate is about one in 750 (Cook 1987), much lower than for serious assaults (where the rate is roughly one in 100).[5]

---

[5] The estimated number of aggravated assaults in 1987, based on the National Crime Survey, is 1.5 million (Bureau of Justice Statistics 1989a). There were about 20,000

But as in the case of assault, robbery fatality rates differ widely, depending on the type of weapon used. The fatality rate is four per thousand for gun robberies, which is about three times higher than for knife robberies and ten times higher than for robberies involving other weapons. Demonstrating that all or part of this difference in weapon-specific fatality rates is due to the weapon itself requires a statistical method for controlling for other factors that influence the probability that a robbery will result in the death of a victim.

One approach that I developed for testing weapon instrumentality in robbery was quite different from Zimring's. I reasoned that if the type of weapon had an independent causal effect on the probability of death, then a city's robbery murder rate should be more sensitive to variations in its gun robbery rate than to its nongun robbery rate. This prediction was confirmed in my study of changes in robbery and robbery murder in forty-three cities for the period 1976–83 (Cook 1987, p. 373). On the average, an additional 1,000 gun robberies produced an additional 4.8 murders, whereas an additional 1,000 nongun robberies added only 1.4 additional murders. These results are estimates of regression coefficients, where the dependent variable is the change in the robbery murder rate between two four-year periods (1976–79 and 1980–83), and the independent variables are the corresponding changes in the nongun robbery rate and the gun robbery rate. The purpose of studying intertemporal changes rather than working with a simple cross-sectional analysis is to obviate the need to develop a statistical explanation for the large permanent differences among cities with respect to robbery rates and gun usage in robbery. It is certainly possible that one or more of these differences among cities might affect both robbery rates and the robbery murder rate, thus creating a spurious association between the two. While in principle these "third cause" variables could be controlled for in a multiple regression format, in practice the correct choice of a specification for the regression is not obvious and adds a great deal of uncertainty to the estimates.

Of course, using change data does not eliminate the possibility that there is some third cause operating on both the changes in robbery rates and the changes in robbery murder rates. It is conceivable that the violent criminals in some cities became more vicious from one period to

---

criminal homicides in that year, of which about 20 percent were in felony circumstances (Federal Bureau of Investigation 1988). The remaining homicides would have been classified as aggravated assaults if the victims had survived.

the next and for that reason were more likely to use guns in robbery and to kill their robbery victims. One crude check on this possibility is to control for changes in the city's homicide rate (other than robbery murders), since viciousness would presumably spill over into other encounters if it were a general phenomenon. In any event, when I included a homicide change variable in the regression specification, it was statistically insignificant and had essentially no effect on other coefficient estimates. So I am quite confident in my causal interpretation of the results: that robbery murder is a direct, though fairly rare, result of robbery, that a change in the robbery rate will (other things equal) cause a corresponding change in the robbery murder rate, and that an increase in gun robberies has a larger effect on robbery murder than a similar increase in nongun robberies. It appears that, at this level of aggregation, murder can be viewed as a byproduct of robbery, the likelihood of which depends to an important degree on the type of weapon.

In sum, the weapons-specific differences in fatality rates in assault as well as for robbery have been clearly established; more lethal weapons are associated with higher fatality rates. Further, there is persuasive evidence that these differences in fatality rates are, in large part, the direct consequence of the differential lethality of the weapons, rather than simply a statistical artifact of some other causal process (such as differences in intent that influence both weapon choice and outcome). However, the various mechanisms that are responsible for the instrumentality effect have not been completely analyzed or documented.

The mechanism suggested by Zimring is that in a large percentage of violent attacks the assailant's intent is ambiguous. His data and those of others make clear that for every killing there are several other nonfatal attacks for which there was a real chance that the assailant's actions would cause death; for example, for everyone in his (1972) sample who died from a single gunshot wound in the chest, there were 1.8 others who suffered a single gunshot wound in the chest and survived. Surely the element of chance is important here, and in an unsustained attack, the lethality of the first blow will be a major determinant of the chance of death. But there are other mechanisms that may also be important in instrumentality.

In mechanism suggested by Zimring, the key attribute of a gun is that it can kill without sustained effort; relatively small amounts of energy and time are sufficient. But another quality of firearms may also be relevant; it empowers someone to attack a stronger victim and kill

him or her, which may be physically impossible with a less powerful weapon. Surely the power of a gun to overcome or forestall resistance helps explain why all successful presidential assassinations and over 90 percent of murders of police officers have been committed with a gun (Federal Bureau of Investigation 1979). Various other patterns of weapon use, discussed in Section III below, offer further support for the "power" explanation of instrumentality.

Whatever the mix of mechanisms that account for it, the instrumentality effect is not a complete explanation for observed weapons-specific differences in fatality rates. The death rate for assault may vary for reasons unrelated to weapon choice. For example, Swersey (1980) documented a large increase in the homicide rate in Harlem between 1968 and 1973 which was accompanied by a more than doubling of the fraction of gun attacks resulting in death; Swersey concluded that much of the change was due to an increase in intentional killings resulting from disputes involving narcotics activities. But the type of weapon, while not the sole determinant of the probability that a violent encounter will result in death, is one of the important determinants of this probability.

## A. Other Instrumentality Effects

The effect of weapon type on the likelihood of death in a violent encounter is of paramount concern, but it is by no means the only weapon instrumentality effect. The type of weapon also influences the likelihood and severity of injury and the likelihood that the assailant will succeed in whatever purpose motivated the attack. As noted by Kleck and McElrath (1989), "The ultimate goal behind an act of violence is not necessarily the victim's death or injury, but rather may be money, sexual gratification, respect, attention, or the humiliation and domination of the victim." Their analysis of National Crime Survey data on assaults by strangers found that half of these cases were mere threats without any attack; in only about half of those cases where the assailant did attack was the victim injured. The type of weapon affects the likelihood of physical attack and injury in an assault, as well as the likelihood of "success."

Most of the previous research on this issue has focused on robbery. The principal role of a weapon in robbery is to aid the robber in coercing the victim (by force or threat) to part with his valuables. If the threat is sufficiently convincing, physical force is not necessary. For this reason, it is hardly surprising that the use of force is closely related

to the weapon type in robbery, being very common in unarmed rob-
bery and relatively rare in gun robbery. Using National Crime Panel
data for twenty-six cities, I found that the likelihood of physical attack
in a noncommercial robbery committed by one or more adult males
differed with the type of weapon used as follows: gun, 22.1 percent;
knife, 39.4 percent; other weapon, 60.4 percent; and strong-arm, 73.5
percent (Cook 1980a). As an immediate consequence, the likelihood of
injury is less in a gun robbery than for robberies with other weapons
(Conklin 1972; Cook 1976; Skogan 1978); indeed, the pattern of injury
across the four weapon categories is exactly the reverse of the pattern of
fatality rates. But if we confine our attention to injuries serious enough
to require hospitalization, then this pattern largely disappears; when
other factors are held constant (via a multivariate statistical analysis)
gun and knife robberies are about equally likely to result in serious
injury.[6] Thus more lethal weapons are less likely to be used to inflict
injury, but when they are, the injury tends to be more serious. That is
why the likelihood of death is much higher in gun robberies than in
knife robberies, as noted above.

Kleck and McElrath (1989) report a similar analysis for assaults by
strangers reported to the National Crime Survey during the years
1979–85. They found that the presence of a gun or knife reduces the
likelihood that there will be any sort of physical attack during the
assault; if there are lethal weapons present, it is more likely that the
assault will terminate with a threat. Given that there is an attack during
the assault by a stranger, it is less likely that the victim will sustain
injury if the attack is perpetrated with a gun than with a knife, presum-
ably because attack with a gun includes the possibility of shooting at
but missing the victim, a possibility that has no analog for other types
of weapons. If there is an injury, the probability that it will result in the
death of the victim is much higher in the case of gunshot wounds than
knife wounds.[7]

The inverse relation between weapon lethality and use of force is
compatible with the notion that violence plays a tactical role in rob-

---

[6] "Serious injury" is defined here as "hospitalized overnight" (Cook 1987, p. 361).
Robberies committed with clubs and other weapons (besides guns and knives) have the
highest probability of serious injury.
[7] The authors were able to estimate "likelihood of death" equations by merging NCS
data on nonfatal assaults with supplementary homicide report data. Kleck and McElrath
(1989) do not replicate for assaults the analysis of robbery data reported in Cook (1986);
that is, they do not estimate the effect of weapon type on the probability that the victim
will sustain a serious injury given that there was an assault.

bery—that it is employed when the robber believes it is needed to overcome or forestall victim resistance, and that this need is less likely to arise when the robber uses a gun. (See Cook [1980*a*] for a complete discussion of this issue. Not all violence in robbery is tactical.) Thus, the type of weapon is an important determinant of the nature of the interaction between robber and victim.

The type of weapon is also important in determining whether a robbery is completed successfully. The powerful threat produced by the display of a gun generally ensures compliance. According to National Crime Survey data for 1987, success rates in noncommercial robbery ranged from 70 percent for gun cases down to 55 percent for knife robberies and 49 percent for robberies with clubs and other weapons (Bureau of Justice Statistics 1989*a*, p. 64). Furthermore, the value of items taken in completed robberies is over twice as high in gun robberies as for other armed robberies (Cook 1976).

## B. Handgun versus Long Gun

Comparisons of fatality and injury rates across different categories of weapons conceal the potentially important diversity within each category. The "knife" category includes everything from scissors and penknives to large hunting knives, while "gun" incorporates homemade "zip" guns, assault rifles, and everything in between. Laws regulating the transfer and use of firearms incorporate certain distinctions among different types of firearm. For example, current federal law bans the transfer of automatic rifles and sawed-off shotguns and bans the importation of small cheap handguns commonly known as "Saturday Night Specials." State laws tend to regulate handguns more stringently than long guns (Cook and Blose 1981). If these legal distinctions affect the mix of guns used in assault and robbery, then they may thereby influence the fatality rate in these crimes.

Zimring's (1972) most persuasive demonstration of the instrumentality effect in assault used the finding that wounds made by larger-caliber bullets are more likely to result in death than were otherwise comparable wounds made by smaller-caliber bullets. Other characteristics of a bullet are also important in determining the lethality of a wound, including its shape and velocity. In particular, while tissue damage inflicted by a low-velocity bullet is primarily limited to the track of the bullet through the body, high-velocity bullets injure tissue distant from the bullet track, because of the large temporary cavity formed by the shock wave (Fackler 1988; Hollerman 1988).

Rifles are more deadly than handguns in part because of the difference in the velocity of the bullet. For example, a .22-caliber bullet fired from a rifle will travel at a muzzle velocity of about 1,700 feet per second, compared with a velocity of 950 feet per second for a bullet from the same cartridge fired from a handgun (Hollerman 1988, p. 238). The difference in velocity is the direct result of the difference in barrel length; a longer barrel provides a longer time for the force of the gunpowder explosion to accelerate the bullet. A corollary is that bullets fired from snub-nosed handguns have lower muzzle velocity than bullets fired from handguns with standard barrels.

Shotguns add a new dimension to the analysis of the intrinsic lethality of firearms since a single shotshell contains a number of projectiles. According to one expert, shotgun wounds are most commonly caused by a one-ounce load of no. 6 birdshot containing 225 pellets, fired from a twelve-gauge shotgun (Hollerman 1988, p. 241). The spread of the shot pattern and the trauma inflicted by multiple wounds enhance the case fatality rate for shotgun wounds.

Given a choice, one would prefer being shot at by someone using a handgun than a rifle or shotgun. This conclusion follows both from the wound ballistics information summarized above and because long guns are more accurate and easier to aim than handguns. A number of authors have considered the possible implications for the regulation of guns (Benenson and Kates 1979; Wright, Rossi, and Daly 1983; Kleck 1984a), concluding that a policy that regulates handguns more stringently than long guns may have the perverse effect of increasing the death rate from gun assaults. For example, if the only effect of a handgun prohibition were that shooters would use sawed-off shotguns instead, then there is no question that the result of the prohibition would be to increase the homicide rate. However, if the principal effect of the prohibition were to reduce the rate of gun assault, with only a relatively few cases in which another type of firearm was substituted for the handgun, then the homicide rate would fall. Note that "substitution" in this case is not a simple phenomenon; the elimination of handguns would presumably have some effect on all of the following: the rate of robberies and other potentially violent confrontations, the weapons deployed in these confrontations, the likelihood that if a gun were deployed it would be fired, the likelihood that if fired it would hit the intended victim, and finally, the likelihood that the wound would be fatal. There is no precise information on any of the links of this chain, and the net effect on the homicide rate is in doubt.

Case: 1:10-cv-04184 Document #: 165-6 Filed: 03/12/12 Page 24 of 80 PageID #:3254

Those who favor more stringent regulation of handguns are impressed by the greatly disproportionate involvement of such guns in violent crime. There are more than twice as many long guns in private hands as handguns. Yet handguns were used in over 80 percent of the gun homicides in 1988 (Federal Bureau of Investigation 1989, p. 12) and over 90 percent of the noncommercial gun robberies in 1987 (Bureau of Justice Statistics 1989a, p. 64); among handgun crimes, most involve weapons with barrels that are shorter than the average of those in circulation (Cook 1981a). One consequence of the disproportionate use of handguns in crime is a rather high probability that a privately owned handgun has been or will be used in crime; by one estimate, a representative group of 100 handguns sold new in 1977 were, over the course of their lifetimes, involved in crime at the rate of .33 (one crime per three guns) (Cook 1981b).[8] This number is still higher for snub-nosed handguns. This relatively high rate of crime involvement, an order of magnitude higher for handguns than for long guns, suggests that handguns are especially well suited to criminal use and that the criminal use of guns would decline if handguns were somehow eliminated.

Kleck (1984a) has laid out a useful road map for estimating the effects of a handgun prohibition. If we knew the relative death rates for handgun wounds and long gun wounds resulting from criminal assault under current conditions of gun availability, then it would be possible to make at least a rough estimate of the effect of substitution on the homicide rate. Unfortunately, this information is not available. The overall death rate from gunshot wounds in assault is about one in seven (Cook 1985a), which can be viewed as an average of the long gun and handgun ratios. But data on gunshot wounds do not usually distinguish between long guns and handguns, so separate fatality rates cannot be calculated. Indirect methods employed by Kleck (1984a) suggest that the death rate for gunshot wounds inflicted by long guns may be three or four times as high as for wounds inflicted by handguns; the validity of these methods is not known due to the lack of direct evidence on this matter. The best evidence that is available is provided by Kleck him-

---

[8] This estimate is the ratio of crimes committed with handguns in 1977 (estimated from National Crime Survey data) to the number of new handguns sold in that year. This method of estimating the *lifetime* crime involvement of the 1977 cohort of new handguns is valid under the assumption that handgun sales and handgun crime rates are constant over time. It underestimates handgun crime involvement if crime increases after 1977 or if the 1977 cohort of new handguns turns out to be small relative to subsequent cohorts.

24 ·        Philip J. Cook

self, in a subsequent study (Kleck and McElrath 1989). He and his coauthor created a unique data set by combining the NCS reports of injuries resulting from stranger assaults with supplementary homicide reports of homicides by strangers for the year 1982. Based on these combined data, they estimated the effects of different weapon types on the likelihood of death, controlling for some other variables. Their estimates imply that the likelihood of death in handgun assaults is virtually identical to the likelihood of death in assaults with other guns.[9] They do not comment on this result, but the apparent implication is that other guns are no more lethal in practice than handguns.

One interesting aspect of the controversy concerning the possible effects of regulating some guns more stringently than others is that all parties to the debate seem to have accepted the validity of the weapon instrumentality effect. Thus there is a consensus among the researchers in this area that the type of weapon matters, not just as a signal of the intent or personality of the assailant, but as a distinct causal factor. Whether a shooting victim lives or dies depends in part on the length of the gun barrel and the size of the bullet.

## C. Suicide

As with homicide, about 60 percent of suicides are committed with guns. And, as in the case of criminal attacks, there is evidence that the instrument chosen by suicide attempters affects whether the attempt proves fatal or not (Clarke and Lester 1989). Case fatality rates are much higher for gun attempts than for those involving other means that are frequently employed, such as drugs and razors; for example, Dallas Police Department data indicate a fatality rate of 76 percent for gun suicide attempts, compared with just 4 percent for all other means combined (table 2). In another study (Card 1974), it was found that 92 percent of suicide attempts by firearms were successful, compared with 78 percent for carbon monoxide, 9 percent for other gases, 78 percent for hanging, 67 percent for drowning, 23 percent for poisoning, and 4 percent for cutting. This impressive difference does not, of course, prove the instrumentality claim. It can be argued that the choice of weapon in a suicide attempt reflects the seriousness of purpose of the attempter and makes no independent contribution to the outcome. The

---

[9] In fact, in their probit estimate, the coefficient estimate for "handgun" is slightly higher than for "other gun," but the difference is small. It should be noted that Kleck and McElrath (1989), in constructing their data set, are forced, due to insufficient information, to omit over half of the homicides by strangers.

## TABLE 2
### Suicide Attempts and Fatality Rates,
### Dallas, November 1981–November 1982

| | Suicide Attempts | | | Fatality Rates (Percent) |
| Means | Total | Unsuccessful | Successful | |
|---|---|---|---|---|
| Firearms | 144 | 35 | 109 | 76 |
| Other means: | 857 | 823 | 34 | 4 |
|   Hanging | 14 | 5 | 9 | 64 |
|   Drugs | 652 | 643 | 9 | 1 |
|   Cutting | 132 | 127 | 5 | 4 |
|   All other | 59 | 48 | 11 | 19 |
|     Overall | 1,001 | 858 | 143 | 14 |

SOURCE.—Special unpublished tabulation, Dallas Police Department (1983).

debate over instrumentality in suicide proceeds parallel to the debate over instrumentality in homicide.

The case for suicide instrumentality is weaker than for homicide. First, while Zimring's claim is plausible that a large fraction of the shooters in homicide cases have no clear intent to kill, a similar assertion for gun suicides is far less plausible. Surely someone who purposefully points a gun at a vital area and pulls the trigger expects to die. Further, if a gun is not available for some reason, then there are always alternatives that are nearly as lethal, including hanging and jumping from a high place (Card 1974). And while homicides are usually the result of transitory altercations or confrontations, we know that many suicides result from a chronic condition such as pathological depression or a terminal painful disease. In such cases, there is time to contemplate alternative means and select one that will succeed. It is noteworthy in this regard that Japan and some European countries have far higher suicide rates than the United States despite the fact that private ownership of guns is relatively rare in those countries and gun suicides make up only a small fraction of the total. Kates (1990, p. 42) tabulated suicide rates for various years in the mid-1980s. The U.S. rate was 12.2 per 100,000, compared with Japan (20.3), West Germany (20.4), France (21.8), Austria (26.9), Denmark (28.7), and Rumania (66.2).

Nevertheless, there is some evidence that the instrumentality effect is important in suicide. That some other countries have higher suicide

rates despite the relatively rare use of guns does not undercut this conclusion. The argument here is *not* that the availability of lethal means is the *sole* determinant of suicide rates but, rather, that the availability of lethal means influences the extent to which suicidal impulses are translated into complete suicides. Depriving a suicidal person of a lethal and attractive means of self-destruction may well save his life. One telling case in point is the drop in British suicide rates during the 1960s. During that decade, the carbon monoxide (CO) was gradually eliminated from domestic gas. Before this changeover began, almost half the suicides in England and Wales were by CO; by 1970, the CO death rate had dropped to about one-sixth its level in 1962 (Kreitman 1976; Clarke and Mayhew 1988). During this period, there was very little change in the rate of suicide by all other means. As a result, the overall suicide rate fell by one-third during this period, suggesting that few of the people who would have killed themselves in 1970, had CO still been a component of their domestic gas, actually did so. However, the British experience has not been replicated in several other countries that eliminated CO from domestic gas at about the same time; in the Netherlands, for example, suicide by other means increased by more than enough to compensate for the reduction in CO deaths (Clark and Mayhew 1988; Sloan et al. 1990, p. 371).

The lessons from the coal gas story are not conclusive, but do encourage a closer look at the etiology of suicide. Kreitman (1976, p. 92) asks how the removal of a single agent of self-destruction could have a large effect on the suicide rate: "There is no shortage of exits from this life; it would seem that anyone bent on self-destruction must eventually succeed, yet it is also quite possible, given the ambivalence (or multivalence) of many suicides, that a failed attempt serves as a catharsis leading to profound psychological change. For others it may be that the scenario of suicide specifies the use of a particular method, and that if this is not available actual suicide is then less likely. Virtually nothing is known about such questions." His first suggestion receives support from Richard Seiden (1977), who followed up on over 700 people who were stopped from jumping off the Golden Gate or San Francisco Bay Bridges (both high enough to ensure a high probability of death). Only 4 percent had subsequently killed themselves. He asserts that "we know very well that suicidal people are typically very ambivalent . . . and that the risk period is transient, often directly related to acute stress situations" (Seiden 1977, p. 275).

Kreitman's second point, that the "scenario of suicide" may specify a

particular weapon, is very important to the instrumentality argument. While lethal means are readily at hand even in the absence of a gun, some suicidal people may reject hanging, jumping, and drowning as too painful and uncertain, while not knowing enough about drugs to take that exit successfully. Boor (1981), notes the cultural specificity of suicide means, and concludes that a major determinant of suicide rates is the availability of a culturally accepted method of committing the act. For example, the majority of suicides in Sri Lanka are committed by ingesting pesticides (Berger 1988), but the availability of pesticides is not a suicide risk in the United States. But while there is some evidence that, if deprived of their favored means of death, some suicidal people may choose to live (e.g., Clarke and Mayhew 1988), this evidence is far from conclusive.

A recent study of risk factors in adolescent suicide is directly relevant to the issue of gun instrumentality and confirms (albeit for a small local sample) that suicidal youths are more likely to kill themselves if there is a gun in their home than otherwise (Brent et al. 1988). The authors conclude that "clinicians who work with suicidal adolescents should strongly advocate the removal of firearms from the home environment" (p. 587). This conclusion seems very reasonable, even in the absence of a definitive experiment. Sloan et al. (1990) used an entirely different method to reach a similar conclusion about youthful suicide: in their comparison of suicide rates in King County (Seattle) and Vancouver for the years 1985–87, they found that King County, with a much higher prevalence of gun ownership, had a 37 percent higher rate of suicide for youths age fifteen to twenty-four; King County had a much higher gun suicide rate for this group and a slightly lower nongun rate. However, the apparent importance of gun availability in influencing the overall suicide rate is limited to youths; for older people, the suicide rate was actually somewhat higher in Vancouver than in King County. It should be noted, in any event, that this comparison between two jurisdictions is not a reliable basis for making generalizations.

From what little is known of the suicide process, it appears plausible that there is an instrumentality effect, and in particular in the United States, where guns are the favored means, that depriving suicidal people of guns would save some lives. But the evidence available at this point is not strong and includes findings that contradict the instrumentality hypothesis. Nevertheless, if I had a deeply depressed teenage son or daughter, I would take care that there were no loaded guns in the house.

28      Philip J. Cook

## D. Conclusion

The discussion on instrumentality begins with the undeniable observation that death rates in assault, robbery, and parasuicide differ widely depending on the "instrument" used. The more lethal the weapon, the higher the fraction of injuries that prove fatal. The difficult question is how to interpret this empirical pattern. If the type of weapon in a violent encounter were chosen at random, then the significance of the observed pattern would be clear: the type of weapon has a direct influence on the outcome. But in practice, the choice of weapon in an assault or suicide attempt is not strictly random; to some extent it is a signal of intent, and other things equal, those with more deadly intent are more likely to kill. The debate over instrumentality, over whether the weapon "matters," is a debate over whether systematic differences in intent are sufficient to account for the large observed differences in weapon-specific death rates. While the evidence is mixed for suicide, it is more clear cut in assaultive crimes that the weapon does indeed matter.

This conclusion follows from close scrutiny of samples of assaults and from analysis of patterns in aggregate data. And it comports with common sense. The type of weapon matters in personal violence just as it does in warfare. If violent people did not have access to guns, there would still be as much violence in the United States as there is now, or more, but it would be much less deadly.

## III.  Patterns of Gun Use in Personal Violence

Firearms were used in 61 percent of the homicides, 33 percent of the robberies, and 21 percent of the aggravated assaults reported to the police in 1988 (Federal Bureau of Investigation 1989). These percentages have varied over time and differ across jurisdictions for reasons that are explored in subsequent sections. This section focuses on the patterns of gun use across the different circumstances in which these crimes occur. What characteristics of the assailant, the victim, and the immediate environment of the criminal act influence the likelihood that a gun is employed, rather than another type of weapon?

A gun has a number of characteristics that make it superior to other readily available weapons for use in violent crime: even in the hands of a weak and unskilled assailant, a gun can be used to kill. The killing can be accomplished from a distance without much risk of effective counterattack by the victim, and the killing can be completed quickly, without sustained effort, and in a relatively impersonal fashion. Fur-

thermore, because everyone knows that a gun has these attributes, the mere display of a gun communicates a highly effective threat. In most circumstances, a gun maximizes the probability of success for a would-be robber or murderer.

Evidence that criminals who use guns are influenced by tactical considerations such as these comes from a survey of prisoners by James Wright and Peter Rossi (1986). They persuaded 1,874 convicted male felons in ten states to fill out questionnaires concerning their criminal histories and their use of weapons. This sample, it should be noted, is a sample of convenience, rather than a representative sample of all male prisoners, and no clear inferences can be drawn from the quantitative results. In the absence of other data, however, the Wright-Rossi survey is useful in providing a general qualitative impression. Respondents who had used guns in some of their crimes (almost all of whom admitted to committing robberies, among other crimes) cited a number of motives for this choice of weaponry. A majority indicated that each of the following reasons, related to their ability to forestall or overcome victim resistance and get away unscathed, was "very important" or "somewhat important": "chance victim would be armed," "prepared for anything," "ready to defend myself," "easier to do crime," "might need gun to escape," "need gun to do crime," "people don't mess with you." The *most* cited reason for using a gun was "don't have to hurt victim."

Given all these advantages, the obvious question is why only a minority of violent crimes are committed with a gun. Wright and Rossi asked felons in their sample who used weapons other than guns "why not carry a gun?" The most frequent reasons were "just asking for trouble," "get a stiffer sentence," "never needed a gun for my crimes." Lack of familiarity was important for a large minority of respondents, who checked "never owned a gun" or "don't like guns." One third of respondents checked "against the law for me to own a gun" as an important reason. Twenty-one percent of this group checked "too much trouble to get one." Thus, the respondents who used weapons other than guns were generally concerned about the legal consequences and other trouble resulting from carrying a gun to use in crime. Tastes, familiarity, and legal restrictions on ownership also played a role in their decisions. Availability is cited as an important consideration by only a few of the respondents, but that by no means "proves" that availability is generally unimportant. The respondents may have had a tendency to exaggerate their competence in obtaining whatever weapon they wanted. Further, the Wright-Rossi sample gives a highly distorted

representation of the population of violent criminals; all respondents were prisoners, and prisoners tend to be older and perhaps more sophisticated about crime than the population of active criminals on the outside.

A variety of evidence gives clear indication that the decision about whether to go armed with a gun is closely linked to decisions about what crimes to commit and the likely success or failure of these crimes. The tool determines the task, and the task determines the tool. These links are clearly illustrated by the patterns of gun use in robbery, murder, and assault.

### A. Robbery

The robber's essential task is to overcome the victim's natural tendency to resist parting with his or her valuables. A variety of techniques for accomplishing this task are used in robbery, including actual attack (as in muggings or yokings) and the threatening display of a weapon such as a gun, knife, or club. The objective is to gain the victim's compliance quickly or render him helpless, thereby preventing the victim from striking back, escaping, or summoning help. The amount of what could be called "power" (capability of generating lethal force) the robber needs to achieve a high probability of reaching these objectives depends on the characteristics of the robbery target (the victim) and, in particular, on the vulnerability of the target. The most vulnerable targets are people who are young, elderly, otherwise physically weak or disabled (e.g., by alcohol), or alone and without ready means of escape. The least vulnerable targets are commercial places, especially where there are several customers and clerks and possibly even armed guards—a bank being one extreme example.

A gun is the most effective tool for enhancing the robber's power. Unlike other common weapons, a gun gives a robber the capacity to threaten deadly harm from a distance, thus allowing him to maintain a buffer zone between himself and the victim and to control several victims simultaneously. A gun serves to preempt any rational victim's inclination to flee or resist. Skogan (1978) documented the effectiveness of a gun in forestalling victim resistance in his analysis of a national sample of victim-reported robberies: only 8 percent of gun robbery victims resisted physically in noncommercial robberies, compared with about 15 percent of victims in noncommercial robberies involving other weapons. Other types of resistance (arguing, screaming, fleeing) were

also less common in gun robbery than in robbery involving other weapons.

It seems reasonable to assume, from the robber's viewpoint, that the value of employing a gun tends to be inversely related to the vulnerability of the target. A gun will cause a greater increase in the likelihood of success against well-defended targets than against more vulnerable targets. A strong-arm technique will be adequate against an elderly woman walking alone on the street—a gun would be redundant with such a victim—but a gun is virtually a requirement for a successful liquor store robbery. Skogan (1978) provides evidence supporting his claim: he finds little relation between robbery success rates and weapon type for personal robbery but a very strong relation for commercial robbery. He reports that success rates in commercial robbery were 94 percent with a gun, 65 percent with a knife, and 48 percent with other weapons.

In economic terms, we can characterize robbery as a production process (Cook 1979, pp. 752–53) with weapons, robbers, and a target as "inputs." The "output" of the production process can be defined as the probability of success. This probability increases with the number and skill of the robbers, the vulnerability of the target, and the lethality of the weapons. For a given robber and target characteristics, the "marginal product" of a gun can be defined as the increase in probability of success if the robber or robbers substitute a gun for, say, a knife. The evidence presented above suggests that the marginal product of a gun is small against vulnerable targets and relatively large against well-defended targets. We can go one step further and define the "value of a gun's marginal product" as its marginal product (increase in success probability) multiplied by the amount of loot if the robbery is successful. Since, for obvious reasons, targets with greater potential loot tend to be better defended against robbery, the value of the gun's marginal product is even more strongly related to target vulnerability than is its marginal product. It makes good economic sense, then, for gun use in robbery to be closely related to target vulnerability. Cook (1980a) demonstrates that this is indeed the case, on the basis of tabulating results of more than 12,000 robbery reports taken from victim survey data gathered in twenty-six large cities. These results are reproduced in table 3.

From the table (part A) we see that 55 percent of gun robberies committed by adults, but only 13 percent of other adult armed robberies, involve commercial targets. Those relatively few gun robberies

## TABLE 3

### Distribution of Robberies by Location and Victim Characteristics

#### A. Distribution of All Robberies across Locations by Adults (Percent)

| Type | Gun | Knife or Other Weapon | Unarmed |
|------|-----|----------------------|---------|
| Commercial | 55.1 | 13.3 | 19.1 |
| Residence | 6.4 | 10.4 | 8.5 |
| Street, vehicle, etc. | 38.5 | 76.3 | 72.4 |

#### B. Distribution of Street Robberies by Victim Characteristics (Percent)

| Victim | Gun | Knife or Other Weapon | Unarmed |
|--------|-----|----------------------|---------|
| Male victim aged 16–54 | 59.8 | 53.8 | 41.1 |
| Two or more victims | 10.5 | 5.8 | 3.7 |
| All others (young, elderly, and/or female victims) | 29.7 | 40.4 | 55.2 |

SOURCE.—Adapted from Cook (1980a), p. 43. The distributions are calculated from National Crime Panel victimization survey data of twenty-six cities.

NOTE.—Percentages sum to 100. All incidents involved at least one male robber age eighteen or over. Entries in the table reflect survey sampling weights.

that were committed against people on the street are concentrated on relatively invulnerable targets—groups of two or more victims, or prime-age males—while street robbery with other weapons was most likely to involve women, children, and elderly victims (part B). Skogan (1978) provides further detail for commercial robberies, reporting that the likelihood that a gun is present in such robberies is only 44 percent for commercial places that have only one employee but 68 percent for commercial places with two or more employees.

What is the causal process that produces these patterns in gun robbery? There are two plausible explanations, both compatible with the evidence presented above: robbers who aspire to well-defended, lucrative targets equip themselves with a gun in order to increase their chance of success; or robbers who happen to have a gun are more tempted to rob lucrative, well-defended targets than robbers who lack this tool. In short, the question is whether the weapon is chosen to suit the task, or rather that the available weapon helps define the task. There is doubtless some truth in both explanations. The first explana-

tion suggests that the observed relation between gun use and target choice is the result of differences between the kinds of people who rob lucrative targets and those who commit relatively petty street robberies—a difference reminiscent of Conklin's (1972) distinction between "professionals" and "opportunists." Victim survey data suggest that gun robbers as a group have more of the earmarks of professionalism than other armed robbers: besides the fact that they make bigger "scores," gun robbers are older, less likely to rob acquaintances, and less likely to work in groups of three or more (Cook 1976; Skogan 1978). Cook and Nagin (1979, p. 25) demonstrated that the factors that determine a robber's choice of weapon have some tendency to persist: a cohort of adult men arrested for gun robbery in the District of Columbia showed a greater propensity to use guns in subsequent robberies than did the corresponding cohort of nongun robbery arrestees.

It seems reasonable to hypothesize, then, that robbers who engage in planning and who seek out big scores will take pains to equip themselves with the appropriate weapon—usually some type of firearm. The extent to which other, less professional robbers use guns, and hence the kinds of targets they choose, may be more sensitive to the extent to which such people have access to guns and are in the habit of carrying them, for whatever reason. Increased availability of guns may then result in some target switching by this group—substitution of more lucrative, better-defended targets for more vulnerable targets. Increased gun availability may also result in weapon substitution for a given type of target, implying an increase in the fraction of street robberies committed with a gun; that is, guns will be put to less valuable uses as they become "cheaper."

## B. Murder

The qualities of a gun that make it the most effective robbery weapon, particularly against well-defended targets, are also of value to a killer. A decision to kill is easier and safer to implement with a gun than with other commonly available weapons—there is less danger of effective victim resistance during the attack, and the killing can be accomplished more quickly and impersonally, with less sustained effort than is usually required with a knife or blunt object. As in the case of robbery, a gun has greatest value against relatively invulnerable victims, and the vulnerability of the victim appears to be an important factor in determining the probability that a gun will be used as the murder weapon.

The least vulnerable victims are those who are guarded or armed. All presidential assassinations in U.S. history were committed with handguns or rifles. Almost all law-enforcement officers who have been murdered in recent years were shot: in 1978, ninety-one of ninety-three murdered officers were killed by guns (Federal Bureau of Investigation 1979, p. 309).

Physical size and strength are also components of vulnerability. For the period 1976–87, 67.5 percent of male homicide victims were shot, compared with only 50.6 percent of female homicide victims (Kellermann and Mercy 1990). The age pattern is strikingly regular: about 70 percent of victims aged twenty to twenty-four are shot, but this percentage drops off rapidly for younger and older—that is, more vulnerable—victims (Cook 1982).

Vulnerability is, of course, a relative matter. We would expect that the lethality of the murder weapons would be directly related to the difference in physical strength between the victim and killer, other things equal. This hypothesis can be investigated using the Federal Bureau of Investigation data coded from the supplementary homicide reports submitted by police departments. These data include the demographic characteristics of the victim and (where known) the offender, as well as the murder weapon, immediate circumstances, and apparent motive of the crime. Some patterns in these data offer support to the relative vulnerability hypothesis. First, women tend to use more lethal weapons than men to kill their spouses and intimate acquaintances: 99 percent of the women, but only 81 percent of the men, used a gun or knife during the years 1976–87 (Kellermann and Mercy 1990). The gun fractions alone are 70 percent and 66 percent—not a large difference, but one that is in the predicted direction. This result is especially notable since women typically have less experience than men in handling guns and are less likely to think of any guns kept in the home as their personal property.

Table 4 focuses on killings resulting from arguments and brawls in which both the killer and the victim were males. The gun fraction increases with the age of the killer and is inversely related to the age of the victim: the highest gun fraction (87 percent) involves elderly killers and youthful victims; the lowest gun fraction (48 percent) involves youthful killers and elderly victims. Since age is highly correlated with strength and robustness, these results offer strong support for the relative vulnerability hypothesis.

TABLE 4

Percent of Gun Use in Murders and Nonnegligent Homicides
Resulting from Arguments or Brawls, Male Victim
and Male Offender

| | Offender Age | | |
| Victim Age | 18–39 | 40–59 | 60+ |
|---|---|---|---|
| 18–39 | 68.0 (91,906) | 79.6 (368) | 87.2 (47) |
| 40–59 | 54.5 (398) | 64.1 (245) | 66.7 (57) |
| 60+ | 48.3 (58) | 49.2 (61) | 63.3 (30) |

SOURCE.—Federal Bureau of Investigation Supplementary Homicide Reports, fifty
cities, 1976 and 1977 combined (unpublished microdata files). Reprinted from Cook
(1982).

NOTE.—The sample size is in parentheses. Cases in which the age of the killer is not
known are excluded.

Why are less vulnerable murder victims more likely to be shot than
relatively vulnerable victims? A natural interpretation of this result is
that intended victims who are physically strong or armed in some
fashion are better able to defend themselves against homicidal assault
than more vulnerable victims—unless the assailant uses a gun, the great
equalizer. The "vulnerability pattern" can then be explained as result-
ing from some combination of three mechanisms: first, homicidal at-
tacks are more likely to fail against strong victims than weak ones, and
the difference in the likelihood of failure is greater for nongun attacks
than attacks with a gun; second, the likelihood that an individual will
act on a homicidal impulse depends in part on the perceived probability
of success—the intended victim's ability to defend himself or herself
acts as a deterrent to would-be killers, but this deterrent is much
weaker if the killer has a gun; and, third, in the case of a planned
murder, the killer will have the opportunity to equip himself with a tool
that is adequate to the task. Against well-defended victims, the tool
chosen will almost certainly be a gun, if one can be obtained without
too much difficulty.

Each of these mechanisms is compatible with the prediction that a
reduction in gun availability will cause a reduction in murder, a reduc-
tion that will be concentrated on killings that involve a victim who is
physically stronger than the killer.

36          Philip J. Cook

## C. Assault

For a large percentage of violent crimes, it is in the assailant's interest to take care to *avoid* killing the victim. Robbery murder, for example, is a capital crime in many jurisdictions—even if the killing is an "accident" or a spontaneous reaction to victim resistance. Conklin (1972, p. 111) interviewed several robbery convicts who used an unloaded gun for fear that otherwise they might end up shooting their victims, and the same concern was reflected in some of the responses from Wright and Rossi's (1986) sample of prisoners. In other violent confrontations, such as fights between family members, this same concern may deter the combatants from reaching for a gun—even when there is one readily available. A loaded gun is not an appropriate weapon when the assailant's intent is to hurt, but not kill, the victim.

Some unknown fraction of assault cases is similar to robbery in that the assailant's objective is to coerce the victim's compliance—the assailant wants the victim to stop attacking him (physically or verbally) or stop dancing with his girlfriend or get off his favorite bar stool or turn down the stereo. Moreover, as in the case of robbery, the probability of a physical attack in such cases may be less if the assailant has a gun than otherwise, because the victim will be less inclined to ignore or resist a threat enforced by the display of a gun. (It may also be true that the assailant would be more hesitant to use a gun than another weapon to make good his threat.) In general support of these ideas, evidence from the National Crime Survey indicates that assaults with a gun are less likely to involve attack or injury than are assaults with other weapons (Kleck and McElrath 1989).

## D. Conclusion

Consideration of the tactical concerns of criminals helps make sense of a number of patterns in weapon use in violent crime. A robber equipped with a gun can stage a successful robbery against a target that might effectively resist an assailant using a less powerful weapon. A woman who decides to kill a man who is larger and stronger than she will have a hard time of it with a knife, but a gun would do the job. Guns are most likely to be used where they have greatest value compared to other, less lethal weapons. This conclusion inspires an obvious question: if guns became more scarce, would there be relatively less violent crime of the sort for which guns are most valuable? In the case of robbery, for example, would there be a reduction in the victimization rate for commercial places? If so, would criminals substitute other

targets or other types of crime for commercial robbery? These questions cannot be answered from the available literature but are relevant in assessing the policy-relevant effects from a change in gun availability. The research agenda offered in the concluding section includes specific recommendations for further work in this area.

## IV. Availability

About one-half of the households in the United States possess at least one firearm, and the total number of firearms in private hands is on the order of 150 million. Nevertheless, guns are a scarce commodity, costly to obtain and to use. For a criminal, the costs may include not only the purchase price but also the various legal risks of obtaining, possessing, and using the gun in crime. These costs help explain why guns are not used in a higher proportion of violent crimes, as discussed in the previous section. For example, gun robberies tend to be considerably more lucrative than others, yet less than one-third of all robberies are committed with a gun.

Advocates of gun-control measures seek to make guns more scarce, especially to criminals and criminal use. "Gun control" generally encompasses three basic strategies (Zimring 1990): deprive dangerous people (convicted felons, mental patients) of guns; restrict high-risk uses (carrying concealed); and forbid commerce in certain kinds of firearms (machine guns, Saturday Night Specials). Evidence on the effectiveness of such measures in reducing the misuse of guns is sketchy. There have been only a few evaluations of specific ordinances, and these are reviewed below; more work has been done on how gun availability, defined generically, affects the prevalence of gun misuse.

The most obvious indicator of "availability" is the prevalence of ownership, which is the topic of the next section. Subsequent sections describe several operational definitions of "gun availability" and review empirical studies of the relation between availability measures and the incidence of suicide and violent crimes.

### A. Recent Trends and Patterns in Gun Ownership

The number of firearms in private hands has been estimated both from survey data and from data on manufactures and imports. The most thorough study of this matter is by Wright, Rossi, and Daly (1983), who estimate that there were 100–140 million firearms in 1978, of which 30–40 million were handguns. Since then there have been 52 million firearms manufactured or imported into the United States for

sale to households, businesses, and law-enforcement agencies (Bureau of Alcohol, Tobacco and Firearms 1989). Of the 52 million new guns, there were 6.6 million recorded exports (Bureau of Alcohol, Tobacco and Firearms 1989) and possibly millions more of illegal export. Further, some portion of the stock of guns existing in 1978 has been discarded, rendered useless by breakage and rust, or confiscated by authorities, so some of the new guns are "replacements" for older guns. If the stock in existence in 1978 depreciated by just 1 percent per year, then the total stock as of 1988 was 150 million give or take 20 million. (This estimate accepts the 100–140 million range for 1978 as correct and ignores illegal imports and exports since then.) While the trend probably continues upward, it is notable that fewer new guns were sold in the United States during the decade ending in 1988 than during the preceding decade.

The 1989 Gallup poll estimated 47 percent of households possessed a gun, a result that affirms one of the remarkable constants in American life: the fraction of American households owning a gun has remained at about one-half for at least the last three decades (Bureau of Justice Statistics 1989b, p. 232). There has, however, been a substantial increase in the fraction of households that own a handgun, from 13 percent in 1959 to about 24 percent in 1978 and thereafter; thus in recent years, about half of the gun-owning households own a handgun. Most gun-owning households have several guns, with an average of three as of 1978 (based on a poll of voters conducted by Decision Making Information, Inc. that year; see Wright 1981). Only one in six gun-owning households is limited to handguns; three-quarters of those who own a handgun also own a rifle or shotgun. These statistics are relevant to the question of how many guns are in private hands; between 1978 and 1988, the number of households increased by 12 million, while the fraction of households owning a gun remained roughly constant. These data support the conclusion that the total stock of guns in private hands has increased, but whether it has increased in proportion to the number of households depends on whether there has been any change in the average number of guns per gun-owning household during this period.[10]

The incidence of firearms ownership is not uniform across society.

[10] Gary Kleck (1990), in a personal communication, notes that data from a December 1989 poll imply that the average respondent who said there was at least one gun in the household had an average of 4.4 guns, considerably higher than the three-per-household estimate from a 1978 poll mentioned above.

The General Social Surveys conducted by the National Opinion Research Center have included an item about gun ownership since 1973; they consistently find that the fraction of households owning a gun increases with income, decreases with city size, is substantially higher for whites than blacks, and is highest in the South and lowest in the Northeast (Wright and Marston 1975; Bureau of Justice Statistics 1989b). An analysis of regional patterns of ownership for residents of large cities, using National Opinion Research Center polls taken in the mid-1970s, found a range for gun ownership from 10 percent for residents of large cities in New England and the Mid Atlantic up to 50 percent for the East South Central region (Louisville, Kentucky; Memphis and Nashville, Tennessee; Birmingham, Alabama). The South Atlantic, Mountain, and West South Central regions all had ownership rates of 40 percent or higher (Cook 1979).

### B. The Costs of Obtaining a Gun

The density of gun ownership is one dimension of gun availability since gun owners obviously have more ready access to guns than do other people. The term "gun availability" also refers to the cost and difficulty of acquiring a gun. The purchase price of a new gun will differ widely depending on its characteristics. The trend in the average prices of new guns has followed the overall trend in consumer prices since 1960 (Cook 1982). Since about half of all gun transfers involve used guns (Blose and Cook 1980), it would also be relevant to assess price trends in that market. In the absence of any useful data on this subject, it seems safe to assume that prices in the second-hand market exhibit the same trend as prices in the market for new guns, as is true for autos and other consumer durables.

In addition to the purchase price, the cost of obtaining a gun may be increased by federal and state laws that regulate firearms commerce. What is required in this respect differs from state to state and sometimes also differs among jurisdictions within a state.

### C. Regulations Governing Transfers and Possession

The Gun Control Act of 1968 established the framework for the current system of controls on gun transfers. All shipments of firearms are limited to federally licensed dealers who are required to obey all applicable state and local ordinances. This act also stipulates several categories of people who are denied the right to receive or possess a gun, including illegal aliens, convicted felons and those under indict-

40      Philip J. Cook

ment, and people who have at some time been involuntarily committed to a mental institution. People with a history of "substance abuse" are also proscribed from possessing a gun. Dealers are not allowed to sell handguns to people younger than twenty-one, or to sell long guns to those younger than eighteen, although there is no federal prohibition of gun possession by youths. Under the Gun Control Act, the various prohibitions are implemented by a requirement that the buyer sign a form stating that he does not fall into any of the proscribed categories.

The Gun Control Act imposed a national ban on mail-order purchases of firearms except by licensed dealers. There are also some restrictions on sales to people from out of state. The intended effect of these regulations was to insulate the states from each other so that the stringent regulations on firearms commerce adopted in some states would not be undercut by the greater availability of guns in other states.[11]

A number of states have adopted significant restrictions on commerce in firearms, especially handguns. Twenty-one states, including about two-thirds of the population, currently require that handgun buyers obtain a permit or license (or at least send an application to the police) before taking possession of the gun (Bureau of Justice Statistics 1989b, p. 169). Local jurisdictions in several other states have regulations of this sort in place. All but a few state transfer-control systems are "permissive," in the sense that most people are legally entitled to obtain a gun. In a few jurisdictions, however, it is very difficult to obtain a handgun legally. For example, Washington, D.C., stipulates that only law-enforcement officers and security guards are entitled to obtain a handgun (Jones 1981).

The effect of a permissive transfer-control system is to increase the effective cost of a legally purchased handgun by imposing a permit fee and a waiting period and by requiring applicants to do some paperwork and submit to a criminal-record check. These requirements may discourage some people from purchasing handguns and motivate others to evade the transfer regulations by purchasing from friends or other sources that lack a dealer's license. Of course, purchase from a nondealer may be costly and inconvenient in other ways.

---

[11] The McClure-Volkmer Amendments of 1986 eased the restriction on out-of-state purchases of long guns. Such purchases are now legal so long as they comply with the regulations of both the buyer's state of residence and the state in which the sale occurs.

### D. Evading Regulations on Gun Transfers

Interstate differences in the stringency of transfer regulations pro-
duce a vigorous illegal commerce in guns moving across state lines
(Bureau of Alcohol, Tobacco and Firearms 1976; Moore 1981). Even in
jurisdictions that lack stringent regulations, there is an active market in
stolen guns and off-the-book transfers. From their survey of prisoners,
Wright and Rossi (1986, p. 185) report that few respondents acquired
their guns by purchasing them from a licensed dealer. Of those who
had owned a handgun, one-third reported having stolen their most
recent one. For others, "family and friends" were the most common
source of guns purchased, traded for, or borrowed. Many of the guns
obtained from these sources had been stolen by someone else. These
findings are suggestive although, as noted above, the Wright-Rossi
study is based on a sample of convenience that is not representative of
the population of active criminals.

It seems reasonable to conclude that gun availability to criminals has
much to do with the ease of stealing a gun or obtaining one on the black
market or from an acquaintance. Given these sources, the difficulty of
obtaining a gun is presumably closely related to the density of gun
ownership. For example, the fraction of burglaries that result in the
theft of guns increases with the fraction of households that own guns
(Moore 1981), so the black market for stolen guns will be more active in
cities where gun ownership is prevalent. Further, criminals will find it
easier (and perhaps cheaper) to buy or borrow a gun from an acquain-
tance in cities with high rates of gun ownership. Thus, the costs of
obtaining a gun for those who are not inclined to buy from a dealer will
depend on the general prevalence of gun ownership.

### E. Carrying Guns in Public

Since most violent crimes occur away from the assailant's home,
mere possession of a gun is not enough to guarantee that it is available
for use when the occasion arises. Hence, the propensity to go armed in
public is an important aspect of gun availability. Presumably, the prev-
alence of going armed is highly correlated with the prevalence of own-
ership across cities, but it may also be influenced by the vigor with
which anticarrying laws are enforced and by other factors.

State and local legislation tends to make a sharp distinction between
keeping a gun in one's home or business and carrying a gun in public.
All but a few states either ban concealed weapons entirely or require a

special license for carrying concealed weapons. One national survey found that 7 percent of respondents carried a handgun outside of their homes for protection (Wright 1981).

### F. Measuring Gun Availability

The preceding discussion developed the notion of gun availability in terms of the prevalence of ownership, the costs of obtaining a gun, and the propensity to go armed in public. These three dimensions of availability are closely related, but it would be useful to distinguish among them in measuring the effects of gun availability on violent crime and suicide. Unfortunately, none of these dimensions can be measured directly from existing data. Instead, researchers make use of indicators that have some logical relation to availability, and are arguably correlated with one or more of the relevant dimensions of availability. But the interpretation of empirical studies of this sort is inevitably somewhat uncertain.

1. *Gun Use in Homicide as an Availability Measure.* Perhaps the most commonly used measure of gun availability is the fraction of criminal homicides committed with a gun. A number of authors have related this gun fraction to the homicide rate across jurisdictions or over time in a single jurisdiction. A positive correlation is interpreted as evidence that increased gun availability causes increases in the murder rate.

Brearley (1932), in perhaps the first study of this sort, analyzed a cross-sectional sample of states using this measure of availability. Fisher (1976) analyzed time series data for Detroit for the period 1926–68 while I sketched out a similar analysis for the United States as a whole (Cook 1982). Etzioni and Remp (1973) assessed cross-national patterns of homicide rates and gun involvement; Curtis (1974, pp. 103–13) did a more thorough analysis along the same lines. Each of these studies finds strong positive correlations, with the partial exception of Curtis. But none of these studies is particularly persuasive evidence of a direct causal link between availability and homicide; the gun fraction in homicide is a fairly primitive indicator of gun availability,[12] and there

---

[12] The gun fraction in homicide reflects other factors besides the general availability of guns. Within a particular city or region, some people will have greater access to guns or more motivation for using guns than others, and so the observed gun fraction in that locality will depend on who is doing the killing. For example, a city such as Washington, with a relatively low prevalence of gun ownership, can exhibit a high gun fraction in homicides during a year when most of the killings are by well-equipped gangsters. This measure of gun availability could, in principle, be refined by adjusting the crude gun fraction for circumstances and motives. In my work (Cook 1979), I took a step in that direction by excluding felony-type homicides in the calculation of the gun fraction.

are other plausible explanations for the observed correlations (Cook 1982, p. 266). There may, for example, be some "third cause" variable, such as a "culture of violence," that influences both the prevalence of guns and the rate of homicidal attacks.

The gun fraction in homicide is not the only available proxy for gun availability. Measurement theory suggests that we can obtain a more reliable indicator for this underlying trait by combining two or more proxy variables. One possibility in this regard is to average the gun fraction in homicide with the gun fraction in suicide (Cook 1979, 1985c). The latter also reflects the choices of a sample of people (suicides), and those choices reflect the ease of obtaining a gun, among other things (Clarke and Lester 1989). And the "sample" reflected in suicide statistics is quite different from the sample reflected in homicide statistics. In particular, the demographics of suicide and homicide are quite different, and in some ways are virtually mirror images. For example, the homicide death rate peaks in the third decade and drops sharply thereafter, while the suicide death rate tends to increase throughout the normal age span. The homicide rate for blacks is over six times as high as for whites, while the white suicide rate is almost double that of blacks. Most suicides occur at home, while most homicides occur away from home. Despite these differences and others, the use of guns in homicide and suicide exhibits a similar geographic pattern. For 1973 and 1974 data combined, the gun fractions for suicide and assaultive homicide were highly correlated across fifty large cities ($r = .82$), suggesting an environmental determinant of gun use. The validity of this interpretation was supported by comparing the regional pattern in this index with the regional pattern of urban gun ownership across eight regions (as measured by the National Opinion Research Center's [NORC] General Social Survey); the index proved compatible with the survey results.[13]

This index was then used as a measure of gun availability in a regression analysis of robbery rates. Controlling for other variables important

[13] The procedure for validating the index was as follows: Data for residents of large cities (over 250,000) were obtained from the National Opinion Research Center's General Social Survey files for 1973, 1974, and 1976. The results for the three years were combined to generate more reliable estimates. For each of the nine census regions, these data were used to estimate the prevalence of gun ownership among residents of large cities. Two of the regions (New England and the Middle Atlantic) were combined to increase sample size. The resulting estimates of gun prevalence in the remaining eight regions were compared with the corresponding values of the index for these regions. The correlation between the two was .94.

in explaining intercity differences in robbery,[14] the principal results were as follows: a 10 percent reduction in the prevalence of gun ownership in a city is associated with about a 5 percent reduction in the gun robbery rate and a 4 percent reduction in the robbery murder rate but has no discernible effect on the overall robbery rate. These results suggest that gun density influences the choice of weapon in robbery and its lethality but not the overall volume of robbery.

These estimates do not allow for the possibility that the prevalence of gun ownership is influenced in some way by the robbery rate. While it is true that a small fraction of guns are acquired for self-defense purposes (Kleck 1988; Smith and Uchida 1988), most of these are purchased by households that have acquired other guns for sporting purposes; three-quarters of those who own a handgun also own a rifle or shotgun (Wright 1981). The overall geographic pattern of gun ownership appears to have much more to do with regional culture than with the objective threat of crime.

While the geographic patterns of gun use in homicide and suicide are very similar, the same is not true for temporal patterns in gun use. As noted earlier, there has been a mild downward trend in gun use in homicide since 1975, while the trend in suicide has been toward somewhat greater use of guns (see also Cook 1985c).

2. *Survey Data.*    Since there have been a number of national surveys that include items on gun ownership, an obvious question arises as to why the results cannot be used to measure geographic patterns of availability. The problem is that the national samples are too small to produce reliable estimates of ownership rates for cities or states. Markush and Bartolucci (1984) employed NORC survey data to estimate gun prevalence for each of nine regions; they increased the sample size and hence reliability of the estimates by combining data from four surveys. Their study was limited to suicide; across the nine regions, the suicide and gun ownership rates were highly correlated ($r = .81$). Unfortunately, with such a small sample, they are unable to take account of other factors besides gun availability that may also influence suicide rates, so the proper interpretation of their result is not clear (see also Lester 1988).

---

[14] The control variables include the following characteristics of the cities: percent of the population that are youthful black males; population per square mile; fraction of the standard metropolitan statistical area in the city; fraction of the population in relative poverty; number of Uniform Crime Report crimes per policeman; number of retail stores per capita; and an indicator for those cities in states with relatively stringent gun-control regulations.

Case: 1:10-cv-04184 Document #: 165-6 Filed: 03/12/12 Page 46 of 80 PageID #:3276

The 1989 International Crime Survey (van Dijk, Mayhew, and Kilias 1990) surveyed households in fourteen countries, and for the first time makes possible a valid international comparison of gun ownership and violent crime patterns. Killias (1990) looked at a subsample of eleven countries for which there were data on homicide by weapon type: for what it is worth, the correlation between the gun fraction in homicide and the prevalence of gun ownership is $r = .72$.[15]

3. *Manufacturing, Import, and Sales Data.* Newton and Zimring (1969) assembled a historical series on gun manufacture and import as a basis for estimating the current private stocks of handguns and long guns. These data are flawed by the facts (acknowledged by Newton and Zimring) that imports are not measured accurately, and data are lacking on exports, breakage, confiscation, and other removals from the stock. Nonetheless, this series has been used as a measure of gun availability by several researchers.

Four studies have analyzed the effect of the stock of guns, as estimated by the Newton-Zimring method, on temporal movements in the national homicide rate (Phillips, Votey, and Howell 1976; Kleck 1979, 1984b; Magaddino and Medoff 1984). All use multivariate statistical methods to control for some of the other variables that influence homicide rates, and all but Kleck (1984b) conclude from their analysis that the stock of guns has a positive effect on the homicide rate. The difficulty with this type of analysis, in addition to the flaws in the measure of gun availability, is the uncertainty concerning the proper specification of the statistical model; the social process that generates year-to-year changes in the homicide rate is poorly understood, and the estimates of how the gun stock affects homicide are sensitive to what assumptions are made about other factors. (It should be noted that specification uncertainty is also a problem in cross-sectional studies such as reported in Cook 1979.)

### G. Comparisons without Explicit Measures of Availability

There is a tradition in debates over gun control to compare homicide rates across countries that are known to differ widely with respect to the private ownership of guns (Bruce-Briggs 1976). It is not necessary

---

[15] For these eleven countries, the percent of households possessing a firearm is as follows: Australia, 20.1; Belgium, 16.8; Canada, 30.8; England and Wales, 4.7; Federal Republic of Germany, 9.2; Finland, 25.5; France, 24.7; Netherlands, 2.0; Norway, 31.2; Switzerland, 32.6; and United States, 48.9. France is excluded from the correlation due to lack of homicide data.

to have a precise measure of availability to be sure that guns are much scarcer in Japan than in the United States. The problem with such comparisons is that countries that differ widely with respect to availability also differ with respect to various other factors that influence rates of personal violence. Japan, where few individuals own a gun, has a very low homicide rate and a high suicide rate by American standards. Kates (1990, p. 42) indicates that Japan's suicide rate was 20.3 per 100,000, compared to a U.S. rate of 12.2 in 1982; Japan's homicide rate was 0.9 per 100,000, compared with a rate of 7.6 in the United States. All we can safely conclude from this comparison is that guns are not the only thing that matters in personal violence.

A recent study by Sloan et al. (1988) claims to have solved the problem of finding two jurisdictions that are quite different with respect to gun availability but alike in other respects relevant to personal violence. Seattle and Vancouver share a common geography, climate, and history and are remarkably similar in terms of demographic and socioeconomic characteristics. But guns are more widely owned and more easily obtained in Seattle than in Vancouver, as indicated by differences in laws governing ownership, the number of gun permits issued, and the fractions of homicides and suicides committed with a gun. The two cities have similar rates of aggravated assault, but more of Seattle's assaults were committed with a gun. The homicide rate in Seattle averaged 11.3 per 100,000 (1980–86), compared with 6.9 for Vancouver; all the difference was in the rate of gun homicide. These results are intriguing, but there must remain some doubt about their proper interpretation.

In one view, the Seattle-Vancouver comparison should be considered a sort of natural controlled experiment, in which the people living in the two cities are two samples that have been "drawn" at random from the same population and assigned to either the Seattle "treatment" (more guns) or the Vancouver "treatment" (fewer guns). The probability statements in the article by Sloan and his associates only make sense in the context of a model such as this. There is certainly reason to doubt this model; the two "samples" are obviously not the result of random assignment (e.g., they differ substantially with respect to the ethnic composition of the nonwhite populations), and the two "treatments" differ in more ways than gun availability.

A quite different view of the Seattle-Vancouver comparison is that the relevant unit of observation is the city, rather than the individuals who make up the city populations. And in that perspective, the sample

size here is just two. The fundamental finding is that the city with more guns also has a higher homicide rate, and that finding is compatible with the generalization that gun availability has a direct causal effect on the homicide rate. But with a sample of two, this conclusion is not persuasive. Quantifying the uncertainty in this case is difficult, and requires some careful thought about the appropriate model in which to view the two-city comparison.

## H. Conclusions concerning Gun Availability Studies

Assessing the effects of gun availability on personal violence is made difficult by problems in defining and measuring availability as well as by the usual problems in interpreting results generated from nonexperimental data (Cook 1980b). It is clear from this work that the geographic differences in gun ownership are highly correlated with the fractions of homicides, suicides, assaults, and robberies involving guns. One explanation for this relation is that the weapon choices of violent and suicidal people are influenced by the ease of obtaining a gun.

Given the weapon instrumentality effect, greater use of guns in assaults and robberies is likely to increase the death rates from these types of violence. If an increase in gun availability produces an increase in the fraction of violent acts committed with a gun, then the end result will be more deaths. This conclusion is plausible and supported by a number of the studies reviewed above but difficult to document persuasively in the absence of a natural experiment. The case-control approach represented in the comparison of Vancouver and Seattle seems promising, though it is difficult, in practice, to identify suitable pairs of jurisdictions, and one pair is not enough. An alternative approach to assessing the effect of gun availability on personal violence is to evaluate the effects of legal interventions designed to reduce availability. Such evaluations are of particular interest because they are directly relevant to policy.

## I. Evaluating Gun-Control Ordinances

Commerce in and use of firearms are subject to a variety of regulations; these regulations differ widely among states, and the effects of these regulations are mediated by the effort devoted to their enforcement. Research evaluating the effects of these ordinances has taken one of two approaches. Some studies employ a multivariate analysis in which one or more of the independent variables is an index of state regulatory stringency. A second approach focuses on the impact of the

48 · Philip J. Cook

implementation of a new ordinance or a change in enforcement policy in a single jurisdiction.

1. *Cross-sectional Studies.* Several cross-sectional studies that attempt to measure the effectiveness of gun-control ordinances in reducing personal violence are noteworthy (Geisel, Ross, and Wettick 1969; Murray 1975; Medoff and Magaddino 1983; Magaddino and Medoff 1984). Each used cross-sectional data on the fifty states and reported regression results relating various measures of personal violence rates to a number of independent variables—including one or more indicators of the stringency of state gun-control legislation. Geisel, Ross, and Wettick reported that greater stringency, as measured by the index they devised, was associated with lower rates of suicide and homicide by gun. Medoff and Magaddino limited their analysis to suicide rates and reported that states requiring waiting times for handgun transfers had lower suicide rates than others, after controlling for relevant characteristics of the state population. Two other studies (Murray 1975; Magaddino and Medoff 1984), however, reported results that provide no support for the hypothesis that more stringent state gun-control laws are efficacious in reducing violent death rates.

All of these studies are problematic for several reasons (Cook 1982; Wright, Rossi, and Daly 1983). As with any statistical analysis of nonexperimental data, the results are sensitive to the specification of the model to be estimated. There are many plausible variables that may influence interstate variation in rates of personal violence, and the decision about which of these variables to include in the analysis is subject to a large and unquantifiable degree of uncertainty. Nevertheless, it is methodologically unacceptable simply to ignore the problem of multiple causation, as do Lester and Murrell (1982) in their study of the effect of gun-control ordinances on suicide rates. Further, none of the studies summarized above has even attempted to measure gun availability, even though most of the gun-control regulations influence rates of personal violence, if at all, by reducing the availability of guns. For example, if North Carolina and Connecticut have similar licensing systems for handguns and enforce them with equal vigor, gun availability will still remain far higher in North Carolina since a much higher percentage of households already own guns in that state. And finally, these studies code gun-control ordinances without regard to the vigor with which they are enforced and offenders are punished. In sum, it appears that the intrinsic difficulties with this approach virtually ensure

against generating reliable, persuasive results that will be a useful guide to state legislators.

    2. *Measuring the Impact of New Regulations.*    The prognosis for evaluations of the impact of new regulations is more hopeful. Three major statutes have been subjected to systematic evaluation: the federal Gun Control Act of 1968 (GCA), the Bartley-Fox Amendment (Massachusetts), and the Firearms Control Act (District of Columbia). These three statutes represent three distinct strategies for reducing gun availability and hence personal violence involving guns.

    As noted above, a major purpose of the GCA was to stop mail-order sales of guns to private individuals, and otherwise to interdict the interstate traffic in firearms. Zimring (1975, p. 176) observes that "if the Gun Control Act and its enforcement has led to a reduction in interstate firearms traffic, this reduction should be evident in New York City and Boston, the principal cities in the two most restrictive handgun-licensing states in the United States, because out-of-state handguns are a higher proportion of total handguns in these cities than in other metropolitan areas." Zimring finds that the trends in such variables as handgun homicides, firearm assaults, and the percentage of total homicides involving handguns provide no support for the hypothesis that the GCA reduced gun availability in New York City and Boston. All these variables trend upward during 1966–73, and these trends are not discernibly different from corresponding trends in Philadelphia or from the overall rates for large cities. Based on these findings and evidence from gun-tracing studies, Zimring concludes that the GCA had failed to diminish handgun migration or lethal violence.[16] Magaddino and Medoff (1984) employed a much different statistical approach but reached essentially the same conclusions concerning the GCA.

    One explanation for this apparent failure is the lack of enforcement effort on the part of the Bureau of Alcohol, Tobacco and Firearms—the federal agency responsible for interdicting illegal interstate movements of firearms. This explanation received partial support from Operation D.C., in which the Bureau of Alcohol, Tobacco and Firearms enforcement staff in the District of Columbia was increased from seven to between thirty-five and fifty special agents for the first six months of

---

[16] However, the Gun Control Act (GCA) may have enhanced the capacity of the police to trace the ownership record of weapons used in crime.

1970. The gun murder rate dropped significantly during this period and rebounded thereafter, while the nongun murder rate remained roughly constant. The result is supportive of the claim that gun availability is sensitive to interdiction efforts and, further, that gun availability influences the gun murder rate and the overall murder rate.

Massachusetts's Bartley-Fox Amendment has received more scholarly scrutiny than any other piece of gun-related legislation. The amendment took effect on April 1, 1975, and established a minimum sentence of one year for an initial violation of Massachusetts's legal requirements for carrying a gun away from home or office. The amendment did not eliminate the possibility of charge bargaining in the prosecution of such cases but did effectively tie the hands of the sentencing judge. This mandatory sentence provision received tremendous publicity at the time it was implemented. The immediate impact was clear-cut: thousands of gun owners applied for licenses to carry (required to carry a handgun legally), and most gun owners obtained a firearms identification card required of all gun owners and sufficient for carrying a long gun legally. Indeed, 100,000 firearms identification cards were issued in April 1975—more than had been issued in all of 1973 and 1974 combined (Beha 1977).

James Beha's early analysis of the effect of this amendment found that the police and courts were making a conscientious effort to implement the spirit of the new law. It had little effect on the court processing of robberies and murders, but it did increase the likelihood of prison time for defendants accused of assault with a firearm. Most important, cases in which illegal carrying was the most serious charge had an increased chance of resulting in a prison term. Some indication was found (from interviews with law-enforcement officers and a few criminals in Boston) that the propensity of the "streetwise" to go armed had been reduced by the threat of the law (Beha 1977).

Pierce and Bowers (1979, 1981) assessed the impact of Bartley-Fox on violent crime through 1977. They constructed annual time series on a number of violent-crime measures for Massachusetts, Boston, and several comparison groups. They concluded that the short-term impact was to reduce the fractions of assaults and robberies involving guns and to reduce the criminal homicide rate. They noted that the effect on gun assault began one month prior to the effective date of the law, suggesting that offenders, at least initially, were responding to the publicity that accompanied the new law rather than to the actual imposition of severe sanctions that it engendered.

An alternative approach to evaluating Bartley-Fox was used by Deutsch and Alt (1977). They employed a stochastic modeling technique, applied to monthly time-series data on armed robbery, homicide, and gun assault in Boston (January 1966–October 1975). They found significant reductions in armed robbery and gun assault, but not homicide, during the first six months following implementation of Bartley-Fox. In a follow-up study of the same three violent-crime measures, utilizing thirty months of postintervention data, Deutsch (1979) found large reductions in all three series, which he attributed to the new law. It should be noted, however, that the rest of the country was also experiencing reductions in violent-crime rates during this period.

The District of Columbia implemented the strictest gun-control ordinance in the nation in February 1977. This ordinance, the Firearms Control Act, banned the acquisition or transfer of a handgun by any District resident, with the exception of law-enforcement officers and a few others. The only residents who could legally possess a handgun were those who acquired and registered them before the ordinance went into effect. To acquire handguns in the District, residents must steal them or make illegal purchases in the black market or in the neighboring states.

In contrast to Bartley-Fox, the crime-related effects of the Firearms Control Act would be likely to increase over time and to be quite small for the first few months or even years. This lack of a temporally concentrated impact increases the difficulty of evaluating this ordinance. The first evaluation that was attempted (U.S. Conference of Mayors 1980) compared average crime rates for a three-year period subsequent to implementation with corresponding rates for 1974–76. Rates of gun robbery, assault, and homicide were all lower in the postimplementation period. Jones (1981) extended this analysis in several respects. He found a reduction in the fraction of assaults and robberies committed with a gun following implementation. Further, he found a change in the distribution of criminal homicides across circumstances, with felony-type homicides becoming more important relative to homicides involving family members and arguments with acquaintances. This last finding is interesting given the enormous increase in homicides in the District of Columbia since 1985 (District of Columbia 1989). The doubling of this rate between 1985 and 1988 has been the result of drug-related conflicts, rather than increased prevalence of the altercations among family and friends. Homicides for which drug trafficking or use

was a direct cause increased from twenty-one for all of 1985 to ninety-five for just the first six months of 1988, while the annual rate of other types of homicides was about the same (District of Columbia 1989). The fraction of homicides in which guns were used increased from 65 percent to 70 percent during this period. It is perhaps not surprising that the District's restrictions on handgun transfers have proven ineffective in stopping the tide of drug-related lethal violence.

## V. Self-Defense

That one-half of American households own guns is primarily a reflection of the widespread involvement in hunting and target shooting. But for one-fifth of those who own a gun and two-fifths of handgun owners, the most important reason is self-defense at home (Wright, Rossi, and Daly 1983, p. 96). The concern reflected in this defensive demand for guns is quite reasonable, given the burglary statistics. During the period 1979–87, there was an annual average of one million residential burglaries in which a household member was present, yielding a household victimization rate of over 1 percent.[17] Thirty-four percent of these burglaries of occupied dwellings resulted in an assault, robbery, or rape. Thus the need to take precautions against intruders is real, and a gun seems to offer an inexpensive means of self-defense against intruders who are neither discouraged by locks nor deterred by the presence of someone in the home.

A number of studies have questioned whether a gun, in fact, offers much protection against burglars since most people who are burglarized while at home do not attempt to defend themselves with a gun even when there is one available. The larger issue is whether the presence of a gun in the home poses a risk to household members that outweighs whatever protection it may confer; a handgun obtained for self-protection may end up causing accidental injury or suicide (Kellermann and Reay 1986). There may, however, be a public benefit to the widespread ownership of guns, particularly in deterring burglary of occupied dwellings. And the use of guns for self-protection away from home raises the same issues; people who go armed in public may have a better chance to defend themselves against robbery and assault while at the same time increasing the rates of accidental shootings and other

---

[17] An unpublished tabulation provided the author by the U.S. Bureau of Justice Statistics estimated that, during the period 1979–87, there were 9.042 million burglaries in which a household member was present.

forms of misuse. Indeed, it is entirely reasonable that private gun own-ership has mixed effects on personal violence and crime. This section documents these effects and reviews the evidence on their importance.

### A. The Demand for Guns for Self-Protection

The qualities of a gun that make it effective in fending off assailants and intruders are the same as those that make it an effective tool in personal crimes of violence. A gun greatly enhances most people's capacity to intimidate or incapacitate an assailant. The defensive de-mand for guns extends even to those who routinely engage in violent crime; a majority of the gun-using felons who responded to Wright and Rossi's survey cited self-defense as an important reason for their prac-tice of carrying a gun (Wright and Rossi 1986, p. 128).

As a means of defense against crime, guns supplement alarms, guard dogs, and "target-hardening" measures (door locks, window grilles, safes), both in residences and retail shops. A 1968 survey of small businesses found that the demand for guns and other protection devices increased with the threat of victimization. Businesses in the ghetto were more likely to have a gun than were those located in other areas of the central city, which, in turn, were more likely to have a gun than were businesses located in the suburbs (Kakalik and Wildhorn 1972). This pattern of gun ownership is not found among households since most people buy guns to hunt rather than for defending their homes; thus, urban households are less likely to own a gun than rural households. However, there is evidence that the propensity to obtain a gun specifically for self-protection is influenced by the threat of criminal victimization. Smith and Uchida (1988) demonstrate this result with data from a survey of three urban areas conducted in 1977. For the overall sample of 9,021 respondents, 14.3 percent reported that they or another member of their household had purchased a "gun or other weapon" for protection of home and family. The authors' multivariate analysis of these responses demonstrated that defensive weapon acqui-sition was more likely if a household member had been victimized in the last year, or if the respondent perceived an increase in his neighbor-hood's crime rate in the last year. They also found a strong negative association between weapon acquisition and the respondent's rating of police services. The authors conclude that obtaining a weapon for pro-tection is a response to perceived vulnerability to crime. This result is surely credible though not definitive; the data do not allow them to

54        Philip J. Cook

distinguish between guns and other weapons and do not include any
objective indicator of neighborhood crime rates.

### B. Use of Guns for Self-Protection

If guns are obtained in part for self-protection, how often are they
actually used for that purpose? Attempts to answer this question have
relied primarily on survey data since there are no official records that
are directly relevant.

Gary Kleck (1988) reviewed a number of surveys and other sources
in an attempt to demonstrate the value of guns in defending against
crime. He noted in particular the results of the 1981 Hart poll of
registered voters; 4 percent of respondents said they or members of
their household had used a handgun in the previous five years for self-
protection or for protection of property at home, work, or elsewhere.
(Respondents were instructed to limit their report to uses against peo-
ple, as opposed to animals, and to exclude military and police-work
uses.) On the assumption that respondents define "household" the same
way as the Census Bureau, Kleck concludes that there were 3.2 million
households (4 percent of 80 million) in which someone used a handgun
to threaten or shoot at another person in an effort to defend life or
property. Unfortunately, there are no details provided in the Hart poll
concerning the distribution of circumstances for these events, nor any
data on defensive uses of long guns. Kleck overcomes the latter problem
by multiplying the incidence of handgun uses by a factor of 1.57. His
justification is based on a poll conducted in 1978, which inquired
whether guns in the home were owned primarily for self-defense. He
concludes from the responses that there are 21 million handguns and 12
million long guns kept for self-defense, or .57 long guns for every
handgun. He then assumes that long guns are used for self-defense in
this same ratio (Kleck 1988, p. 4). He concludes that guns are used in
self-defense about one million times each year.

The National Crime Survey (NCS) provides much more specific
data on the use of guns in self-defense against personal violence. Na-
tional Crime Survey data for 1979–85 yield an estimate of 386,000
instances in which victims of assault and robbery defended themselves
with a gun (Kleck 1988). This implies an annual average of 55,000
defensive uses of firearms in crimes of violence, which is less than 6
percent of Kleck's estimate of the overall frequency of self-defense uses.
The logical implication, if one believes Kleck's estimate, is that there
are about 950,000 other "defensive" uses of guns that do not involve

violent crimes. But Kleck comes to a different conclusion. He uses California survey data as a basis for arguing that most of the defensive uses of guns *do* involve crimes of personal violence, occurring primarily at home. His explanation for the seemingly gross inconsistency among his various statistics is that the NCS respondents underreport assaults occurring at home. The undercount would have to be vast indeed for this to be an adequate explanation, but perhaps it is: conceivably, respondents are so reticent about reporting domestic violence incidents to NCS interviewers that the NCS estimate misses all but 1 or 2 percent of them.[18]

Alternatively, or in addition, the Hart poll may be in error. The Hart poll on which Kleck's estimate is based requires respondents to recall events from years earlier and, in particular, to distinguish between those that occurred within five years and those that occurred earlier. Experiments conducted in the course of designing the National Crime Survey demonstrated that respondents made systematic errors in placing their personal victimization experiences in time; if asked to report victimizations occurring within the previous twelve months, they would tend to "telescope" in important experiences that had occurred outside of that time frame, while forgetting to mention other victimizations that occurred within the time frame (Penick and Owens 1976; Skogan 1981). The Hart poll asked respondents to deal with a time frame of five years, rather than one, and the question concerned experiences for any member of the "household," rather than just personal experience. Given these difficulties, it is likely that some of the respondents who gave a positive response were remembering events that, in fact, had occurred more than five years earlier or events that occurred to family members who were not members of the "household" as that term would be defined by the Bureau of the Census. In short, there are severe methodological problems with the Hart poll as a basis for estimating the prevalence of gun use in self-defense.

The National Crime Survey is a much larger and more sophisticated effort, based on questionnaires that have been devised and refined through a program of extensive testing to produce a reliable basis for

---

[18] The National Crime Survey (NCS) has encountered severe problems in counting repetitive crimes (known as "series incidents") and excludes them from its published estimates (Skogan 1990). This problem combined with the underreporting engendered by special sensitivities with domestic violence produces a considerable bias in estimates of household assaults (Bureau of Justice Statistics 1984). Presumably the Hart poll would suffer from the same problems.

estimating the volume of crime. Still, Kleck is correct in pointing out that the NCS data miss a large fraction of domestic assaults and the defensive uses of guns that may occur in that context. My conclusion is to accept the NCS-based estimate of 50,000 defensive uses per year against rape, robbery, and assault with the proviso that this figure excludes almost all defensive uses against members of the same household. The NCS data probably also miss most of the instances in which guns are used by criminals and others who are unlikely to cooperate with the National Crime Survey interviewers (Cook 1985a). Of course, there is no reason to believe that the Hart poll would do any better in this respect.

The National Crime Survey also offers some information on the frequency of gun use in protecting property. In particular, newly available results on burglaries provide the first direct measure of self-defense measures taken against burglars of occupied dwellings. Data from the National Crime Survey for the nine-year period 1979–87 were pooled to provide reliable estimates. Special tabulations were provided in personal correspondence to me from Michael Rand of the Bureau of Justice Statistics. During this period, there was an average of 6.8 million residential burglaries a year, of which in 1.0 million cases (14.7 percent), there was someone at home at the time. In about one-half of these burglaries (52.6 percent), some self-defense action was taken. Of greatest interest here is the use of weapons in self-defense: only 3.1 percent of occupants used a gun to defend against the intruder, while 2.0 percent used a knife or other weapon. Thus, there are about 32,000 instances each year in which someone uses a gun to scare off or defend against an intruder. In other words, a gun is used once in every 220 burglaries, or once in every thirty burglaries of an occupied residence.[19]

Given these results, it is possible to estimate the total number of defensive gun uses against burglary and violent crime. Of the 32,000 annual uses against burglary, about 9,000 involved violent crimes as well. Avoiding double counting, the total National Crime Survey–based estimate of gun uses against predatory crime is about 80,000 per year.

[19] About half (54 percent) of burglaries against an occupied dwelling are perpetrated by a relative or acquaintance of the victim. But only one-third of the instances of defensive gun use against intruders involve relatives or acquaintances. When a stranger burglarizes an occupied dwelling, the likelihood the victim will use a gun in self-defense is about 4.6 percent.

## C. Success and Failure in Self-Defense Efforts

The statistical record suggests that people who use a weapon to defend against robberies, assaults, and burglaries are generally successful in foiling the crime and avoiding injury. In the case of burglary, the National Crime Survey sample for 1979–87 of burglaries of occupied residences indicate that gun defense is associated with a relatively low rate of successful theft (14 percent of gun-defense cases versus 33 percent overall). If we restrict the sample to those cases in which theft was actually attempted (41 percent of the total), there remains a large difference in success rates: 80 percent of all such attempts were successful in burglaries of occupied residences, but when the victim used a gun in self-defense, only 48 percent of attempts were successful. (The estimated theft success rate is only 46 percent when the victim defended himself or herself with a knife or other weapon.)

Robbery statistics also suggest the effectiveness of using a gun or other weapon in self-defense. Kleck's (1988) analysis of National Crime Survey data for the period 1979–85 found that the likelihood that a robbery would be completed successfully when the victim resisted with a gun was only 31 percent, the same as the rate for robberies where knives or other weapons were used to resist. (The overall rate of successful completion was 65 percent.) However, it was relatively rare for guns to be used to defend against robbery. Defense with guns occurred in only 1.2 percent of incidents, and knives or other weapons were used in another 2.3 percent of incidents. Proportionately, few victims have a gun handy when they are robbed, and most of those who do are surely not in a position to use it effectively. A skilled robber takes control of the victim quickly through violence or threats (Conklin 1972). Thus, the sample of robberies in which the victim uses a gun in self-defense is surely unrepresentative of the universe of robberies in a number of dimensions, including the competence of the robbers and the types of weapon they use. For that reason, the National Crime Survey tabulations are not a reliable guide to the costs and benefits of using a gun in self-defense in any specific robbery circumstances (Cook 1986).[20]

## D. Injury to Victims

There is always a danger that victim resistance will provoke an assailant to greater violence and result in more serious injury to the victim

[20] Victims are much less likely to resist gun robbers than those with other weapons.

than if no resistance had been made. It is interesting that National Crime Survey data (Kleck 1988) suggest that physical attack and injury are much less likely to occur in robberies and assaults in which the victim is able to deploy a gun than in other circumstances. But that difference, in the absence of information on the sequence of events in the violent encounter, is subject to several interpretations (Cook 1986). It could be that resistance with a gun forestalls attack, or, alternatively, that an attack prevents the victim from deploying his gun. While both explanations may be valid, the latter is surely more important. In the usual sequence of events, the robber's attack on the victim *initiates* the encounter, as in a mugging or yoking. Thus instead of concluding that "gun resisters are unlikely to be attacked," it is more accurate to conclude that "victims who are attacked are unlikely to have the opportunity to deploy their gun."

The sparse National Crime Survey data on this subject say nothing at all about the likelihood that the victim will be killed since homicide is not a logical possibility in victim survey data. Police files on robbery murder do offer some information on the importance of resistance, however. I collected data from police files in Dade County, Florida, and Atlanta, Georgia, for several years in the mid-1970s (Cook 1980*a*). Out of thirty robbery murders in Dade County, there were just three in which the victim offered forceful resistance. In twenty-six robbery murders in Atlanta, there was evidence of forceful resistance in two cases, including one that involved a gun: a police officer was shot when he interrupted a robbery and attempted to draw his weapon (Cook and Nagin 1979, p. 33). It appears, then, that robbery murder is rarely the result of escalation of violence stemming from the victim's use of force.

In sum, while using a gun to resist a robber may sometimes result in serious injury or death to the victim, that result is not common. Only about 1 percent of victims of noncommercial robbery resist with a gun, and in those instances the resistance effort is usually successful. Of course, resisting with a gun is only possible if the robber fails to take immediate control of the situation and only prudent if the robber lacks a gun himself.

### E. Deterrence and Other General Effects

While relatively few victims of burglary and personal violence attempt to defend themselves with guns, the possibility of encountering an armed victim poses a definite risk to predatory criminals. That risk

may influence a number of crime-related decisions, including the kinds of crimes to commit, the selection of targets, the modus operandi, and even the decision of when to retire. The widespread availability of guns surely does have some influence on such decisions and, hence, on the overall volume and pattern of predatory crime. The pertinent question is whether these effects are large or small.

Wright and Rossi's (1986) survey of prisoners found a large minority with relevant personal experience. Overall, two-fifths said there had been one or more times in their life when they "decided not to do a crime because [they] knew or believed that the victim was carrying a gun" (p. 155). One-third had been "scared off, shot at, wounded, or captured by an armed victim." Wright and Rossi point out that there is an ambiguity in these results concerning the nature of the armed victim; no doubt some were law-abiding citizens, but others would be criminal associates of the respondent whom they fought or attempted to rob (p. 159). On the broader issue of deterrence, Wright and Rossi asked their respondents what felons worry about when contemplating criminal activity: "might get shot at by victim" was a frequent worry for 34 percent of the respondents, the same fraction as those whose concern was "might get shot at by police" (Wright and Rossi, p. 148). (By comparison, half of the respondents indicated that they worried about being caught.) These results, while based on a sample that is not representative of violent criminals, are at least suggestive that the threat of effective victim resistance is relevant in understanding criminal behavior.

The objective threat that armed victims pose to predatory criminals is difficult to measure. Wright and Rossi's (1986) data do not allow an estimate of the fraction who had been shot during the course of a crime. National Crime Survey data on self-defense do not include an item on whether the assailant was injured. Police departments file supplementary homicide reports with the Federal Bureau of Investigation that include cases of "civilian justifiable homicide"—instances in which a civilian killed a criminal in the act of committing a felony—but it is not always possible to determine the circumstances in which these homicides occur. One attempt to use these data focused on robbery (Cook 1979). I tabulated all such killings that occurred during robberies, 1973–74, in nineteen cities. The death rate per 100,000 exposures ranged from about four, for cities in the Northeast and Pacific regions, to a high of forty-eight for Atlanta. Assuming that the death

rate from justifiable shootings in robberies is about 10 percent,[21] then an order-of-magnitude estimate for the risk a robber faces in a city with high gun ownership is 0.2 percent. This relative frequency is an average of commercial and noncommercial robberies; the former may be the more risky, given the presence of security guards in some cases. In any event, a probability on the order of 0.2 percent seems so low as to be readily ignored in a robber's calculations, yet for a robbery "career" of 100 robberies, the implication is an 18 percent probability of being shot at least once.

Do high rates of gun ownership have a deterrent effect on robbery? A multivariate analysis of city robbery rates, reported above, found that there was no statistically discernible effect of gun prevalence on the robbery rate (Cook 1979). Of course, "no effect" may be the net result of a negative deterrent effect and a positive effect stemming from the greater ease of robbers obtaining guns for use in crime.

There is a smattering of evidence on the likelihood that a residential burglar will be shot. The most often cited is Newton and Zimring's (1969, p. 63) order-of-magnitude estimate of 0.2 percent, based on a single city during a period when there were just seven justifiable homicides in burglaries. In any event, there is no evidence that higher gun ownership rates deter burglary. Indeed, I found that burglary rates tend to increase with gun ownership across large cities, other things equal (Cook 1983*b*). Presumably, this is the result of the greater average payoff to burglary in cities where guns are likely to be part of the loot.[22]

A number of authors have suggested that the threat of being shot by an occupant has the effect of deterring burglary of occupied dwellings (Kates 1983; Wright and Rossi 1986). In support of this proposition, Kleck (1988) observes that the occupancy rate for burglaries in the United States is far lower than in three countries for which the relevant burglary data exist (Canada, Great Britain, and the Netherlands) and where gun ownership is less prevalent.

---

[21] The "deterrence" explanation is speculative and should not be taken seriously until it is possible to rule out other explanations. As reported above, in the United States, it appears that burglary of occupied dwellings is a much different phenomenon than burglary of unoccupied dwellings. Half the former cases involve relatives or acquaintances, and, in most cases, their objective is something other than theft by stealth. Given this characterization, it is easy to believe that international differences in the relative frequency of burglary of occupied dwellings reflect societal differences.

[22] Alternatively, it could reflect the reverse causal process, in the sense that the demand for guns may be enhanced by a high burglary rate. However, as noted above, gun-ownership patterns are largely determined by the demand for use in hunting and other sports, rather than for use in self-defense.

There are two well-known instances in which a jurisdiction has implemented a policy of encouraging citizens to use guns in self-defense against crime. In both cases, short-term changes in crime statistics have been interpreted as evidence that the intervention had a large deterrent effect. Yet this interpretation of the data is open to serious doubt.

The first such intervention was in Orlando, Florida, where the police trained 6,000 women in the safe use of firearms between October 1966 and March 1967. The program was highly publicized as an anti-rape intervention. According to Kleck and Bordua (1983), the rape rate in Orlando dropped 88 percent from 1966 to 1967 and did not return to its former level until 1972. During that same period, the rape rate in the rest of Florida nearly doubled. But Green (1987) questioned the reliability of the Orlando Police Department's crime records as a basis for evaluating the effects of the gun training program. He pointed out that the recorded rape rate in Orlando fluctuated widely throughout the 1960s and actually dropped to zero in 1963. The pattern that is interpreted as a deterrent effect by Bordua and Kleck may be an artifact of poor data.

The second intervention was in Kennesaw, Georgia; in March 1982, the town council passed an ordinance requiring every household in the city to keep a firearm in their home. The law was enacted to make a public statement rather than to change behavior; there was no penalty for violation, and it exempted those who objected to firearms. Nevertheless, the burglary rate dropped sharply immediately following adoption of this ordinance, and it has continued to be touted as evidence of the crime-deterrent value of a well-armed citizenry (Kleck 1988; Kates 1989).

An analysis of the Kennesaw burglary data over the period from 1976 to 1986 suggests a different conclusion (McDowall, Wiersema, and Loftin 1989). They demonstrate that the burglary rate fluctuated widely from year to year (as one would expect in such a small city) but that there is no evidence that the gun ordinance produced a downward shift in the trend. They make a persuasive case that the ordinance had no effect on burglary rates in Kennesaw.

## F. Conclusion

Despite the fact that there is a gun in half of American households, it is relatively rare for victims of burglary and crimes of violence to use them in self-defense. The National Crime Survey data suggest about 55,000 uses in robbery and assault each year, with an additional 25,000

uses against burglary. The National Crime Survey underestimates the volume of domestic violence, hence, underestimates the frequency with which guns are used to defend against family members. For other circumstances, however, the National Crime Survey estimates are a reasonable approximation of reality.

When guns are used in self-defense, the result is usually favorable; the victim is able to foil the robbery or assault attempt. There is little evidence that the use of a gun in self-defense tends to escalate violence, although it surely happens in some cases. Of course, an assailant who has obtained the upper hand quickly enough can forestall effective resistance, and the data reflect that fact.

The threat of a burglar or robber being shot by a civilian during the commission of a crime is small, on the average, though higher in more heavily armed jurisdictions than elsewhere. While predatory criminals are aware of this danger and surely adopt precautions in some cases, it is not true that jurisdictions with high gun ownership have lower robbery or burglary rates than others. The two famous quasi-experiments in Kennesaw and Orlando may have produced some deterrent effects, but the data are such as to vitiate confidence in this conclusion.

Finally, it is important to comment on the several studies (including Newton and Zimring 1969; Yeager 1976; Rushforth et al. 1977; Kellermann and Reay 1986) that demonstrate that guns kept in the home are far more likely to kill a family member or friend than an intruder. This is a strange comparison, in a way, since the defensive purpose of keeping a gun is not to kill intruders but to scare them off (Silver and Kates 1979). Wright (1984) has suggested that a more relevant comparison is between the likelihood of a gun accident and the likelihood of having occasion to use a gun in self-defense; based on one national survey, these appear to be approximately equal, on the average. But that comparison ignores the fact that a gun in the house may increase the risk that a household member will commit suicide. Thus the objective benefit of gun ownership is measured by the likelihood of using the gun to defend successfully against burglary and assault, whether or not the perpetrator is shot in the process. The cost of gun ownership is the risk of an accidental shooting, or, more problematically, of suicide. There is an asymmetry here: no cost is incurred unless there is injury, but the beneficial use of the gun does not require that anyone be injured.

Undoubtedly, anyone who is contemplating obtaining a gun should consider the risks, whose magnitude depends on how carefully a

weapon is stored and handled, whether any family members are
suicidal, and other factors. These risks can be compared to a realistic
assessment of the benefit, that there is some small chance of being able
to use the gun in self-defense if there were an intruder who could not
otherwise be scared off. The upshot of this calculation will depend on
the circumstances. Finally, the public benefit of having a heavily armed
citizenry remains to be demonstrated.

## VI. Directions for Future Research

Research on weapons and violence has provided some answers or par-
tial answers to questions relevant to evaluating alternative gun-control
strategies. At the same time, this research has demonstrated that the
"technology" of personal violence is an important piece of the etio-
logical puzzle. Further research in a number of areas would enhance
our scientific understanding of personal violence and inform the policy
debate on how best to combat this pressing problem. Below is a menu
of promising and feasible projects.

### A. *Data Collection*

There remains considerable uncertainty concerning the number of
firearms in private households. This uncertainty could be greatly re-
duced by a carefully designed national survey that included items on
whether there were any guns in the house, and if so, how many and of
what sort. Other items of interest include information on how these
guns are stored and used, who within the household has access to them,
and how the guns were obtained.

There is a lack of information on the use of guns in self-defense. The
National Crime Survey currently includes items that provide informa-
tion on self-defense in violent confrontations and against burglars, but
no information on other uses such as scaring trespassers away from
private property. There is also need for better data on justifiable
homicides than are currently available from the Federal Bureau of In-
vestigation's supplementary homicide reports (Kleck 1988).

We need reliable estimates of the number of gunshot woundings in
accidents, assaults, and suicide attempts, including detailed informa-
tion on the type of gun. Without such data, it is not possible to develop
a clear picture of the relative costs of gun misuse in different circum-
stances. The data that are currently routinely available, which are
limited to fatal shootings, may tend to understate the importance of

64        Philip J. Cook

accidents (fatal or otherwise) relative to criminal or self-inflicted shoot-ings. If this is true, then policy interventions directed specifically at reducing the accident rate are undervalued.

Finally, it is worth considering an expanded program of data collection on homicide and suicide, perhaps using the Fatal Accident Reporting System (FARS) as a model.[23] FARS is maintained by the National Highway Traffic Safety Administration, which collects detailed crash information from police records. Suicide and homicide data could be collected separately, or FARS could be expanded into a traumatic death reporting system; in either case, data elements would include information on the weapons that caused death, together with demographic characteristics, immediate circumstances, blood alcohol content of the participants, and so forth.

## B. Measuring Gun Availability

Gun "availability" has been viewed by some researchers as virtually synonymous with the prevalence of gun ownership. It would be of great interest to evaluate this assumption by analyzing how violent people obtain their guns in a sample of jurisdictions that differ with respect to prevalence of ownership. Potential sources of information on this issue include traces of confiscated crime guns, police investigations of fences, drug dealers, and other black market operators, and interviews of the sort conducted by Wright and Rossi (1986), but with a broader and more representative sample.

In addition to this effort to develop better qualitative understanding of gun availability, it would be useful to conduct evaluations of various indicators of gun availability as a basis for studying the effect of availability on crime patterns. The most commonly used indicator, the percentage of homicides that are committed with a gun, is flawed by its sensitivity to differences in the composition of homicide over time and across jurisdictions.

The promising new effort to collect internationally comparable data on crime and the prevalence of gun ownership should be encouraged and broadened to include suicide. Casual international comparisons have long been a part of the rhetoric for and against gun-control measures, and it would be of value to be able to make these comparisons more systematically.

---

[23] Arthur Kellermann (1990) suggested this approach in a personal communication.

Case: 1:10-cv-04184 Document #: 165-6 Filed: 03/12/12 Page 66 of 80 PageID #:3296

## C. Methodology

The research on guns and crime that has received the most scholarly attention in recent memory is the comparison of homicide rates in Seattle and Vancouver, conducted by Sloan, Kellermann, and others (1988). There is an interesting methodological question about this type of comparison, relating to the degree of uncertainty that attaches to the results. Should this be viewed as a controlled laboratory experiment in which the two cities are identical in every relevant respect except gun availability? Or should this single comparison be viewed as an interesting anecdote that must be confirmed by results from many other pairs of cities before the result is well established in a statistical sense? I favor the second view but would welcome a careful analysis of the methodological issues here.

## D. Evaluations of Policy Changes

Evaluations of the effects of changes in policies affecting gun availability and use offer the most direct evidence on the question of what generally can be accomplished through such measures. Of course, the consequences of any particular intervention will be influenced by the immediate context and the effort devoted to implementation, so there will always be a question about what generalizations can safely be drawn. But that simply argues for doing as many evaluations as possible and not resting strong conclusions on single cases.

Systematic evaluation of a policy change in one jurisdiction is relevant to predicting the consequences of a similar change proposed for another jurisdiction. In some cases it may also serve as a test of general propositions concerning guns and violence. A case in point is the Bartley-Fox Amendment in Massachusetts. Several studies found that its threat of severe punishment for carrying a gun illegally reduced illegal carrying and some types of violent crime, including homicide, although the nongun assault rate appears to have increased. In addition to providing information about the effects of this particular ordinance, this pattern of results is powerful evidence in support of the instrumentality effect.

These recommendations for research directions are not intended to exhaust the list of interesting possibilities but, rather, to suggest that there is much useful work that remains to be done. Indeed, even after two decades of systematic research on weapons and personal violence and results indicating the powerful and pervasive influence of weapon

type on the patterns and outcomes of violent encounters, this area of research has yet to realize its great potential. Criminologists who set out to understand personal violence rarely devote much attention to weapons questions; they are apparently perceived as a distinct topic, which has not yet been "mainstreamed" into etiological research. Public health researchers appear to be moving more quickly in this respect, and guns have been established in the public health literature as a widely acknowledged environmental risk factor.

The type of weapon is more than an incidental detail of a violent encounter, and the general availability of guns in a community cannot be ignored when seeking to understand patterns of interpersonal violence and suicide. That is the bottom line and the basis for encouraging more research in this area.

## REFERENCES

Beha, James A., III. 1977. "'And Nobody Can Get You Out': The Impact of a Mandatory Prison Sentence for the Illegal Carrying of a Firearm on the Use of Firearms and the Administration of Criminal Justice in Boston." *Boston University Law Review* 57:96–146, 289–33.

Benenson, Mark, and Don B. Kates, Jr. 1979. "Handgun Prohibition and Homicide: A Plausible Theory Meets the Intractible Facts." In *Restricting Handguns: The Liberal Skeptics Speak Out*, edited by Don B. Kates, Jr. Croton-on-Hudson, N.Y.: North River.

Berger, Lawrence R. 1988. "Suicides and Pesticides in Sri Lanka." *American Journal of Public Health* 78:826–28.

Blose, James, and Philip J. Cook. 1980. "Regulating Handgun Transfers: Current State and Federal Procedures, and an Assessment of the Feasibility and Costs of the Proposed Procedures in the Handgun Crime Control Act of 1979." Working paper. Durham, N.C.: Duke University, Institute of Policy Sciences.

Boor, M. 1981. "Methods of Suicide and Implications for Suicide Prevention." *Journal of Clinical Psychology* 37:70–75.

Brearly, Harrington C. 1932. *Homicide in the U.S.* Chapel Hill: University of North Carolina Press.

Brent, David A., Joshua A. Perper, Charles E. Goldstein, David J. Kolko, Marjorie J. Allan, Christopher J. Allman, and Janice P. Zelenak. 1988. "Risk Factors for Adolescent Suicide." *Archives of General Psychiatry* 45:581–88.

Bruce-Briggs, B. 1976. "The Great American Gun War." *Public Interest* 45:1–26.

Bureau of Alcohol, Tobacco and Firearms. 1976. *Project Identification: A Study of Handguns Used in Crime*. Washington, D.C.: U.S. Department of the Treasury.

———. 1989. "Ready Reference Statistics." Mimeographed. Washington, D.C.: U.S. Department of the Treasury.

Bureau of Justice Statistics. 1984. *Family Violence.* Bureau of Justice Statistics Special Report. Washington, D.C.: U.S. Bureau of Justice Statistics.

———. 1989a. *Criminal Victimization in the United States, 1987.* Washington, D.C.: U.S. Bureau of Justice Statistics.

———. 1989b. *Sourcebook of Criminal Justice Statistics—1988.* Washington, D.C.: U.S. Bureau of Justice Statistics.

Card, J. J. 1974. "Lethality of Suicidal Methods and Suicide Risk: Two Distinct Concepts." *Omega* 5:37–45.

Clarke, Ronald V., and David Lester. 1989. *Suicide: Closing the Exits.* New York: Springer-Verlag.

Clarke, Ronald V., and Pat Mayhew. 1988. "The British Gas Suicide Story and Its Criminological Implications." In *Crime and Justice: A Review of Research*, vol. 10, edited by Michael Tonry and Norval Morris. Chicago: University of Chicago Press.

Committee on Trauma Research, National Research Council. 1985. *Injury in America: A Continuing Public Health Problem.* Washington, D.C.: National Academy Press.

Conklin, John E. 1972. *Robbery and the Criminal Justice System.* Philadelphia: Lippincott.

Cook, Philip J. 1976. "A Strategic Choice Analysis of Robbery." In *Sample Surveys of the Victims of Crimes*, edited by Wesley Skogan. Cambridge, Mass.: Ballinger.

———. 1979. "The Effect of Gun Availability on Robbery and Robbery Murder: A Cross Section Study of Fifty Cities." In *Policy Studies Review Annual*, vol. 3, edited by Robert H. Haveman and B. Bruce Zellner. Beverly Hills, Calif.: Sage.

———. 1980a. "Reducing Injury and Death Rates in Robbery." *Policy Analysis* 6(1):21–45.

———. 1980b. "Research in Criminal Deterrence: Laying the Groundwork for the Second Decade." In *Crime and Justice: An Annual Review of Research*, vol. 2, edited by Norval Morris and Michael Tonry. Chicago: University of Chicago Press.

———. 1981a. "The 'Saturday Night Special': An Assessment of Alternative Definitions from a Policy Perspective." *Journal of Criminal Law and Criminology* 72:1735–45.

———. 1981b. "Guns and Crime: The Perils of Long Division." *Journal of Policy Analysis and Management* 1:120–25.

———. 1982. "The Role of Firearms in Violent Crime: An Interpretive Review of the Literature, with Some New Findings and Suggestions for Future Research." In *Criminal Violence*, edited by Marvin Wolfgang and Neil Weiner. Beverly Hills, Calif.: Sage.

———. 1983a. "The Influence of Gun Availability on Violent Crime Pat-

terns." In *Crime and Justice: An Annual Review of Research*, vol. 4, edited by Michael Tonry and Norval Morris. Chicago: University of Chicago Press.

———. 1983*b*. "Does Gun Ownership Deter Burglary?" Mimeographed. Durham, N.C.: Duke University, Institute of Policy Sciences.

———. 1985*a*. "The Case of the Missing Victims: Gunshot Woundings in the National Crime Survey." *Journal of Quantitative Criminology* 1:91–102.

———. 1985*b*. "Is Robbery Becoming More Violent? An Analysis of Robbery Murder Trends since 1968." *Journal of Criminal Law and Criminology* 76:480–89.

———. 1985*c*. "Report on a City-specific Gun Prevalence Index." Mimeographed. Durham, N.C.: Duke University, Institute of Policy Sciences.

———. 1986. "The Relationship between Victim Resistance and Injury in Noncommercial Robbery." *Journal of Legal Studies* 15:405–16.

———. 1987. "Robbery Violence." *Journal of Criminal Law and Criminology* 78:357–76.

Cook, Philip J., and James Blose. 1981. "State Programs for Screening Handgun Buyers." *Annals of the American Academy of Political and Social Science* 455:80–91.

Cook, Philip J., and Daniel Nagin. 1979. *Does the Weapon Matter?* Washington, D.C.: Institute for Law and Social Research.

Curtis, Lynn A. 1974. *Criminal Violence*. Lexington, Mass.: Lexington.

Dallas Police Department. 1983. Personal communication with author.

Deutsch, Stuart Jay. 1979. "Lies, Damn Lies, and Statistics: A Rejoinder to the Comment by Hay and McCleary." *Evaluation Quarterly* 3:315–28.

Deutsch, Stuart Jay, and Francis B. Alt. 1977. "The Effect of Massachusetts' Gun Control Law on Gun-related Crimes in the City of Boston." *Evaluation Quarterly* 1:543–68.

District of Columbia. 1989. *Homicide in the District of Columbia*. Washington, D.C.: Office of Criminal Justice Plans and Analysis.

Etzioni, Amitai, and Richard Remp. 1973. *Technological Shortcuts to Social Change*. New York: Russell Sage.

Fackler, Martin L. 1988. "Wound Ballistics: A Review of Common Misconceptions." *Journal of the American Medical Association* 259(18):2730–36.

Federal Bureau of Investigation. 1979. *Crime in the United States, 1978*. Washington, D.C.: U.S. Government Printing Office.

———. 1988. *Crime in the United States, 1987*. Washington, D.C.: U.S. Government Printing Office.

———. 1989. *Crime in the United States, 1988*. Washington, D.C.: U.S. Government Printing Office.

Fisher, Joseph. 1976. "Homicide in Detroit: The Role of Firearms." *Criminology* 13:387–400.

Geisel, Martin S., Richard Ross, and R. Stanton Wettick, Jr. 1969. "The Effectiveness of State and Local Regulation of Handguns: A Statistical Analysis." *Duke Law Journal* 4:647–76.

Green, Gary S. 1987. "Citizen Gun Ownership and Criminal Deterrence: Theory, Research, and Policy." *Criminology* 25:63–82.

Hollerman, Jeremy J. 1988. "Gunshot Wounds." *American Family Physician* 37(5):231–46.

Jones, Edward D., III. 1981. "The District of Columbia's 'Firearms Control Regulations Act of 1975': The Toughest Handgun Control Law in the United States—or Is It?" *Annals of the American Academy of Political and Social Science* 455:138–49.

Kakalik, James S., and Sorrell Wildhorn. 1972. *The Private Security Industry— Its Nature and Extent.* Santa Monica, Calif.: RAND.

Kates, Don B., Jr. 1983. "Handgun Prohibition and the Original Meaning of the Second Amendment." *Michigan Law Review* 82:204–73.

————. 1989. "Firearms and Violence: Old Premises and Current Evidence." In *Violence in America: The History of Crime,* edited by Ted Robert Gurr. Newbury Park, Calif.: Sage.

————. 1990. *Guns, Murders, and the Constitution: A Realistic Assessment of Gun Control.* San Francisco: Pacific Research Institute.

Kellermann, Arthur L. 1990. Personal communication with author.

Kellermann, Arthur L., and James A. Mercy. 1990. "Sex, Lies and Safety: Should Women Buy Handguns for Self Defense?" Unpublished manuscript. Memphis: University of Tennessee, Department of Medicine.

Kellermann, Arthur L., and Donald T. Reay. 1986. "Protection or Peril? An Analysis of Firearm-related Deaths in the Home." *New England Journal of Medicine* 314:1557–60.

Killias, Martin. 1990. "Gun Ownership and Violent Crime: The Swiss Experience in International Perspective." *Security Journal* 1(3):169–74.

Kleck, Gary. 1979. "Capital Punishment, Gun Ownership, and Homicide." *American Journal of Sociology* 84:882–910.

————. 1984a. "Handgun-only Control: A Policy Disaster in the Making." In *Firearms and Violence: Issues of Public Policy,* edited by Don B. Kates, Jr. Cambridge, Mass.: Ballinger.

————. 1984b. "The Relationship between Gun Ownership Levels and Rates of Violence in the United States." In *Firearms and Violence: Issues of Public Policy,* edited by Don B. Kates, Jr. Cambridge, Mass.: Ballinger.

————. 1988. "Crime Control through the Private Use of Armed Force." *Social Problems* 35:1–22.

————. 1990. Personal communication with author.

Kleck, Gary, and David J. Bordua. 1983. "The Factual Foundation for Certain Key Assumptions of Gun Control." *Law and Policy Quarterly* 5:271–98.

Kleck, Gary, and Karen McElrath. 1989. "The Effects of Weaponry on Human Violence." Mimeographed. Tallahassee: Florida State University, School of Criminology.

Kreitman, Norman. 1976. "The Coal Gas Story: United Kingdom Suicide Rates, 1960–71." *British Journal of Preventive Social Medicine* 30:86–93.

Lester, David. 1988. "Research Note: Gun Control, Gun Ownership, and Suicide Prevention." *Suicide and Life-Threatening Behavior* 18(2):176–80.

Lester, David, and Mary E. Murrell. 1982. "The Prevention Effect of Strict Gun Control Laws on Suicide and Homicide." *Suicide and Life-Threatening Behavior* 12(3):131–40.

McDowall, David, Brian Wiersema, and Colin Loftin. 1989. "Did Mandatory Firearm Ownership in Kennesaw Prevent Burglaries?" Working paper. College Park: University of Maryland, Institute of Criminal Justice and Criminology.

Magaddino, Joseph P., and Marshall H. Medoff. 1984. "An Empirical Analysis of Federal and State Firearm Control Laws." In *Firearms and Violence: Issues of Public Policy*, edited by Don B. Kates, Jr. Cambridge, Mass.: Ballinger.

Markush, R. E., and A. A. Bartolucci. 1984. "Firearms and Suicide in the United States." *American Journal of Public Health* 74:123–27.

Medoff, Marshall H., and Joseph P. Magaddino. 1983. "Suicides and Firearm Control Laws." *Evaluation Review* 7(3):357–72.

Mercy, J. A., and V. N. Houk. 1988. "Firearm Injuries: A Call for Science." *New England Journal of Medicine* 319:1283–85.

Moore, Mark. 1981. "Keeping Handguns from Criminal Offenders." *Annals of the American Academy of Political and Social Science* 455:92–109.

Murray, Douglas R. 1975. "Handguns, Gun Control Laws, and Firearms Violence." *Social Problems* 23:81–93.

National Center for Health Statistics. 1970–86. *Vital Statistics of the United States*, vol. IIA: *Mortality*. Washington, D.C.: U.S. Government Printing Office.

———. 1976. *Persons Injured and Disability Days by Detailed Type and Class of Accident, United States, 1971–1972*. Vital and Health Statistics Series no. 10/105. Washington, D.C.: U.S. Government Printing Office.

———. 1987. Personal communication with author.

Newton, George D., Jr., and Franklin E. Zimring. 1969. *Firearms and Violence in American Life*. Washington, D.C.: U.S. Government Printing Office.

Penick, Bettye K., and Maurice E. B. Owens III. 1976. *Surveying Crime*. Washington, D.C.: National Academy of Sciences.

Phillips, Llad, Harold L. Votey, Jr., and John Howell. 1976. "Handguns and Homicide: Minimizing Losses and the Costs of Control." *Journal of Legal Studies* 5:463–78.

Pierce, Glenn L., and William J. Bowers. 1979. "The Impact of the Bartley-Fox Gun Law on Crime in Massachusetts." Unpublished manuscript. Boston: Northeastern University, Center for Applied Social Research.

———. 1981. "The Bartley-Fox Gun Law's Short-Term Impact on Crime in Boston." *Annals of the American Academy of Political and Social Science* 455:120–37.

Rushforth, N. B., A. B. Ford, C. S. Hirsh, N. M. Rushforth, and L. Adelson. 1977. "Violent Death in a Metropolitan County: Changing Patterns in Homicide (1958–74)." *New England Journal of Medicine* 297:531–38.

Seiden, Richard. 1977. "Suicide Prevention: A Public Health/Public Policy Approach." *Omega* 8:267–76.

Silver, Carol Ruth, and Don B. Kates, Jr. 1979. "Self-Defense, Handgun Ownership, and the Independence of Women in a Violent, Sexist Society." In *Restricting Handguns: The Liberals Skeptics Speak Out*, edited by Don B. Kates, Jr. Croton-on-Hudson, N.Y.: North River.

Skogan, Wesley G. 1978. "Weapon Use in Robbery: Patterns and Policy Implications." Unpublished manuscript. Evanston, Ill.: Northwestern University, Center for Urban Affairs.

———. 1981. *Issues in the Measurement of Victimization*. Washington, D.C.: U.S. Department of Justice, Bureau of Justice Statistics.

———. 1990. "The National Crime Survey Redesign." *Public Opinion Quarterly* 54:256–72.

Sloan, J. H., A. L. Kellermann, D. T. Reay, J. A. Ferris, T. Koepsell, F. P. Rivara, C. Rice, L. Gray, and J. LoGerfo. 1988. "Handgun Regulations, Crimes, Assaults, and Homicide. A Tale of Two Cities." *New England Journal of Medicine* 319:1256–62.

Sloan, J. H., F. P. Rivara, D. T. Reay, J. A. Ferris, and A. L. Kellermann. 1990. "Firearm Regulations and Community Suicide Rates: A Comparison of Two Metropolitan Areas." *New England Journal of Medicine* (forthcoming).

Smith, Douglas A., and Craig D. Uchida. 1988. "The Social Organization of Self-Help: A Study of Defensive Weapon Ownership." *American Sociological Review* 53(1):94–102.

Swersey, Arthur J. 1980. "A Greater Intent to Kill: The Changing Pattern of Homicide in Harlem and New York City." Unpublished manuscript. New Haven, Conn.: Yale School of Organization and Management.

U.S. Conference of Mayors. 1980. "The Analysis of the Firearms Control Act of 1975: Handgun Control in the District of Columbia." Mimeographed. Washington, D.C.: U.S. Conference of Mayors.

van Dijk, Jan J. M., Pat Mayhew, and Martin Killias. 1990. *Experiences of Crime across the World: Key Findings from the 1989 International Crime Survey*. Boston: Dordrecht.

Wolfgang, Marvin E. 1958. *Patterns in Criminal Homicide*. Philadelphia: University of Pennsylvania Press.

Wright, James D. 1981. "Public Opinion and Gun Control: A Comparison of Results from Two Recent National Surveys." *Annals of the American Academy of Political and Social Science* 455:24–39.

———. 1984. "The Ownership of Firearms for Reasons of Self-Defense." In *Firearms and Violence: Issues of Public Policy*, edited by Don B. Kates, Jr. Cambridge, Mass.: Ballinger.

Wright, James D., and Linda L. Marston. 1975. "The Ownership of the Means of Destruction: Weapons in the United States." *Social Problems* 23:81–107.

Wright, James D., and Peter H. Rossi. 1986. *The Armed Criminal in America: A Survey of Incarcerated Felons*. Hawthorne, N.Y.: Aldine.

Wright, James D., Peter H. Rossi, and Kathleen Daly. 1983. *Under the Gun: Weapons, Crime, and Violence in America*. Hawthorne, N.Y.: Aldine.

Yeager, Matthew G. 1976. *How Well Does the Handgun Protect You and Your Family?* Washington, D.C.: U.S. Conference of Mayors.

Zimring, Franklin E. 1968. "Is Gun Control Likely to Reduce Violent Killings?" *University of Chicago Law Review* 35:721–37.

———. 1972. "The Medium Is the Message: Firearm Calibre as a Determinant of Death from Assault." *Journal of Legal Studies* 1:97–124.

———. 1975. "Firearms and Federal Law: The Gun Control Act of 1968." *Journal of Legal Studies* 4:133–98.

———. 1990. "Firearms, Violence, and Public Policy." *Scientific American* (forthcoming).

# Exhibit 21

0091-4169/87/7802-357
THE JOURNAL OF CRIMINAL LAW & CRIMINOLOGY
Copyright © 1987 by Northwestern University, School of Law

Vol. 78, No. 2
Printed in U.S.A.

# ROBBERY VIOLENCE*

## PHILIP J. COOK**

### I. INTRODUCTION

Robbery is both a property crime and a crime of violence. The definition of robbery delineates the relationship between these two dimensions: theft or attempted theft by force or the threat of violence. Victim losses from robbery-related theft are usually quite small; victim survey results indicate that only 15% of noncommercial robberies in 1983 resulted in a theft of more than $250.[1] The violence element of robbery makes it a serious crime. In all, approximately 30% of the victims of noncommercial robbery are injured, and about one-third of these injuries require treatment at a hospital.[2] More importantly, approximately 2000 robbery victims are murdered each year.[3]

Robbery is particularly fear-inspiring, as it usually involves an unprovoked surprise attack by strangers on an innocent victim. This fear has serious consequences. James Q. Wilson and Barbara Boland note that "[i]t is mostly fear of robbery that induces many citizens to stay home at night and to avoid the streets, thereby diminishing the sense of community and increasing the freedom with which crimes may be committed on the streets."[4]

This Article will provide a description of the patterns of robbery violence, including demographic characteristics of robbers and their victims as well as their relationship to each other, the type of weapon used, and the location of the crime. This description is

---

* This research was supported by a grant from the National Institute of Justice. Lois Mock was extremely helpful as both project monitor and critic throughout the life of the project. David Hintz supplied able assistance in computer programming.

** Professor of Public Policy Studies and Economics, Duke University. Ph.D., University of California, Berkeley, 1973; B.A., University of Michigan, 1968.

[1] U.S. DEP'T. OF JUSTICE, BUREAU OF JUSTICE STATISTICS, CRIMINAL VICTIMIZATION IN THE UNITED STATES, 7 (1983).

[2] Id.

[3] U.S. DEP'T. OF JUSTICE, FED. BUREAU OF INVESTIGATION, CRIME IN THE UNITED STATES, 12 (1981-85).

[4] Wilson & Boland, Crime, in THE URBAN PREDICAMENT 179, 183 (W. Gorham & N. Glazer eds. 1976).



EXHIBIT 8
Cook
CAD 9/8/11

drawn from data sets compiled by the Federal Bureau of Investigation and the Bureau of Justice Statistics. The statistics are national in scope and include thousands of observations on both robberies and robbery murders. The findings demonstrate that robbery homicides are more similar to other robberies than other homicides. The weapon type data provide an important exception to this generalization: although guns predominate in all types of homicide, they are relatively rare in nonfatal robberies.

This Article will develop evidence regarding the causal relationship between robbery and robbery murder. If robbery murder is an intrinsic by-product of robbery, then it follows that effective programs to reduce the robbery rate will also reduce the robbery murder rate. Alternatively, if robbery murders constitute an etiologically distinct group of events, then there will be no correlation between the rates of robbery and robbery murder, and, consequently, policies directed at one will have little effect on the other. The evidence strongly favors the "intrinsic by-product" characterization of robbery murder because variations in the robbery rate are closely linked to variations in the robbery murder rate. Finally, some types of robbery are much more likely to result in death than others. It is estimated that a reduction in gun robberies would save approximately five times as many lives as would a similar reduction in non-gun robberies.[5]

Part Two of this Article presents a description of robbery violence patterns. This description includes a multivariate analysis of nonfatal violence estimated from National Crime Survey (NCS) micro data files[6], as well as a three-way comparison between robbery, robbery murder, and other homicides. Part Three of this Article explores the relationship between the intertemporal changes in city-specific robbery rates and the corresponding robbery murder rates of 43 large American cities. Finally, this Article discusses the relevance of these findings to several policy questions, such as the appropriate sanctions for such crimes and methods of deterrence.

## II. Patterns of Robbery Violence

Some robberies have much more serious consequences for the victims than others. Of the 1.5 million robbery attempts perpetrated each year,[7] the vast majority result in little or no loss of prop-

---

[5] *See infra* p.371.

[6] U.S. Dep't. Justice, Bureau of Justice Statistics (1979).

[7] Cook, Robbery in the United States: An Analysis of Recent Trends and Patterns 3 (1983).

erty or physical injury. However, one in every 750 robbery victims is killed, and one in every forty is seriously injured.[8]

Developing a comprehensive description of robbery violence patterns is hampered by a lack of data. The Uniform Crime Reports data on robbery lack much detail. In particular, these reports do not contain information regarding the prevalence of injury to the robbery victims. The National Crime Survey (NCS) data include much more detail information about each of the robberies reported by survey respondents. These data also provides estimates of non-fatal injury patterns.[9] The NCS data, however, include no information about robberies committed against commercial targets, which constitute 20% of all robberies, and exclude information about robbery murders. This information is compiled by the FBI from Supplementary Homicide Reports submitted by state and local jurisdictions.[10]

The first description of robbery violence patterns presented below is compiled from NCS data and is, therefore, limited to non-fatal, non-commercial robberies. The second section utilizes Supplementary Homicide Reports data to characterize robbery murder and to compare it with robbery and other types of criminal homicide.

A.   NON-FATAL INJURIES

Data for this description were taken from NCS files for the years 1973 to 1979 and include all cases reported to NCS interviewers which involved at least one male robber, age 18 or older.[11] Robberies committed by younger teenagers were excluded to avoid dilution of the sample by a large number of relatively trivial events such as extortion of lunch money from school children.

Table 1 reports the results of this multivariate probit analysis. The independent variables were selected from those available in the NCS records on the basis of previous findings and common sense. With one exception, these variables are binary, and they indicate the presence or absence of some characteristic, such as the presence of three or more robbers at the time of the incident or the fact that the victim was black. The only variable that is not binary is the median

---

[8] *Id.* at 6. *See also* Cook, *Is Robbery Becoming More Violent? An Analysis of Robbery Murder Trends Since 1968*, 76 J. CRIM. L. & CRIMINOLOGY 480 (1983).

[9] For an introduction to the NCS, see Sparks, *Surveys of Victimization—an Optimistic Assessment*, in CRIME AND JUSTICE: AN ANNUAL REVIEW OF RESEARCH 1 (M. Tonry & N. Morris eds. 1981).

[10] *See* U.S. DEP'T. OF JUSTICE, FED. BUREAU OF INVESTIGATION, UNIFORM CRIME REPORTING HANDBOOK (1980).

[11] This data set was provided to the author by Wesley Skogan, Professor of Political Science, Northwestern University.

income of the neighborhood in which the victim lives. This variable
was drawn from 1970 census data and is measured in thousands of
dollars. The estimated probability of violence in a robbery incident
with specified characteristics can be calculated by summing the con-
stant and the coefficient estimates associated with each of the appli-
cable characteristics and converting the resulting Z-score to a
probability by use of a table of the standard normal distribution.

Three definitions of "violence" are represented by the probit
analysis reported in table 1. The most serious cases of violence re-
sult in victim hospitalization for treatment of his wounds. This type
of violence is rare and occurs in only 2.6% of the cases included in
the NCS sample.[12] The second definition of "violence" is "hospital
treatment." This category comprises 10% of all cases and includes
victims admitted to a hospital as well as victims treated in an emer-
gency room and released. The third and broadest definition of "vi-
olence" is "victim attacked," which includes 51% of all cases.[13]

Each of the estimated coefficients in the last three columns of
Table 1 represents a measure of the partial effect of the indicated
characteristic of the robbery incident on the likelihood of violence,
controlling for the influence of all the other characteristics listed.
These estimated coefficients provide insight into the robbery pro-
cess. Some of the patterns that emerge have been discussed in
other literature.[14] Of considerable interest is the relationship be-
tween injury prevalence and weapon type. Although there is a di-
rect link between weapon lethality and the likelihood of death in
robbery, a number of studies have found that the likelihood of vic-
tim injury is related inversely to the lethality of the weapon.[15] This
surprising pattern in victim injury can be attributed to the weapons-
related difference in robbery technique. Non-armed robberies and
robberies with clubs, known as "muggings" or "yokings", usually
are initiated by an attack. Robberies with more lethal weapons,
known as "hold-ups," usually are initiated with the threat and/or

---

[12] A recent study found that gunshot victims in assault and robbery cases were se-
verely underrepresented in the NCS sample. *See* Cook, *The Case of the Missing Victims:
Gunshot Woundings in the National Crime Survey*, 1 J. QUANT. CRIMINOLOGY 91 (1985).

[13] The phrase "victim attacked" is derived from a question in the National Crime
Survey which reads: "Did person[s] hit you, knock you down, or actually attack you in
any way?" The violence may be appropriately characterized as "victim attacked" if the
victim responds affirmatively to this question.

[14] *See, e.g.*, J. CONKLIN, ROBBERY AND THE CRIMINAL JUSTICE SYSTEM (1972); Cook, *A
Strategic Choice Analysis of Robbery*, in SAMPLE SURVEYS OF THE VICTIMS OF CRIME 173 (W.
Skogan ed. 1976); Zimring & Zuehl, *Victim Injury and Death in Urban Robbery: A Chicago
Study*, 15 J. LEGAL STUD. 1 (1986).

[15] *See* note 11 and accompanying text, Skogan, *Weapon Use in Robbery*, in VIOLENT
CRIME: HISTORICAL AND CONTEMPORARY ISSUES (J. Inciardi & A. Pottieger eds. 1978).

## TABLE 1
### CORRELATES OF USE OF VIOLENCE IN NONCOMMERCIAL ROBBERY

| Robber Characteristics | Relative Frequency (%) | PROBIT ANALYSIS OF COMPLETE SAMPLE ESTIMATED COEFFICIENTS | | |
|---|---|---|---|---|
| | | Victim Attacked | Hospital Treatment | Hospitalized Overnight |
| 1.  3 or more robbers | 22 | .36** | .22** | .03 |
| 2.  Black | 55 | −.01 | .02 | .01 |
| 3.  Stranger to victim | 74 | −.09 | −.27** | −.22* |
| 4.  Weapon type ("unarmed" category omitted) | | | | |
|   a.  gun | 22 | −1.14** | −.14 | .35** |
|   b.  knife | 19 | −.76** | .13 | .30* |
|   c.  other | 11 | −.18** | .69** | .62** |
|   d.  unknown | 11 | −.45** | −.51** | −.01 |
| **Victim Characteristics** | | | | |
| 5.  2 or more victims | 8 | −.27** | −.34** | −.29 |
| 6.  Black | 21 | .05 | .25** | .23* |
| 7.  Age ("12-17" category omitted) | | | | |
|   a.  18-24 | 33 | .10 | .26** | .42* |
|   b.  25-54 | 40 | .02 | .30** | .36* |
|   c.  55+ | 14 | .17* | .55** | .87** |
| 8.  Male | 67 | −.17** | .09 | .22* |
| 9.  Median income of neighborhood | — | −.018** | −.009 | omitted |
| 10.  Location ("outdoor" category omitted) | | | | |
|   a.  Home | 14 | .01 | .05 | −.21 |
|   b.  Other indoor | 16 | −.11 | −.07 | −.15 |
| 11.  Nighttime | 63 | .23** | .23** | .18 |
| 12.  Constant | | .59** | −1.68** | −2.75** |
| Sample Counts | | 1337/2608 | 260/2608 | 76/2875 |

  * Coefficient exceeds standard error by factor of 1.65 - 1.96.
 ** Coefficient exceeds standard error by factor of 1.96 or more.
  Sample:  All cases included in the National Crime Survey, 1973-1979, involving at least one male robber age 18 or more.

the display of the weapon. This choice of technique in both cases reflects the robber's objective of overcoming the victim's willingness to part with his or her valuables. The mere threat of injury is sufficient if made credible by the display of a gun or a knife.

If a robbery victim is attacked, the seriousness of injury is determined in part by the weapon employed in the attack. Thus, we expect to find greater weapon-related disparities in minor injury rates than in serious injury rates. In addition, as will be discussed below, the likelihood of *fatal* injury is highest in robberies involving the use of the most lethal weapons, reversing the weapons-related pattern for minor injury.

A second important correlate of robbery violence is the age of the victim. Older victims, age fifty-five or above, are more likely than others to be attacked, to seek hospital treatment, and to be hospitalized overnight. Data presented in Table 2 indicate that older victims are also much more likely to be killed in a robbery. This pattern may reflect the relative vulnerability of older victims rather than a systematic difference in the nature of the robbers' assaults.

Third, robberies by strangers appear less likely to cause serious injury than robberies by acquaintances. This finding may be the result of a survey reporting bias.[16] One may also speculate that robberies by acquaintances involve nonpecuniary motives conducive to violence such as a desire to avenge a drug rip-off.

Unfortunately, robbery murders cannot be incorporated into this data set. The analysis of robbery murder patterns presented in the next section, however, does include some of the same variables. These patterns are similar to those patterns for serious injuries discussed in Table 1.

### B.  ROBBERY MURDER

The FBI's Uniform Crime Reports statistics for 1981 indicate that 22,516 criminal homicides were committed in that year.[17] Information on "circumstances/motives" was available for 20,053 of these homicides, of which 2,086 classified as "robbery-related."[18] This latter statistic is based on information submitted by local police departments known as Supplementary Homicide Reports (SHR). The SHR provide detailed information on each criminal homicide occurring in the department's jurisdiction. The SHR are the only routinely available source of information concerning a number of characteristics of robbery related homicides. These data are neither completely reliable nor accurate.[19]

The SHR circumstance codes include a "robbery" category to be used for murders that occur "in conjunction with" a robbery. Most homicide investigators determine whether the motive of the crime was robbery-based by means of circumstantial evidence, such as whether the victim's wallet is missing, the location of the killing,

---

[16] *See* Sparks, *supra* note 9 (respondents are less likely to report a crime committed against them by a relative or acquaintance than by a stranger, other things being equal).

[17] U.S. DEP'T. OF JUSTICE, FED. BUREAU OF INVESTIGATION, CRIME IN THE UNITED STATES, 1981 7 (1982).

[18] *Id.* at 12.

[19] Loftin, *The Validity of Robbery-Murder Classifications in Baltimore*, 1(3) VIOLENCE AND VICTIMS 191 (1986).