## TABLE 2
### PERCENT DISTRIBUTION OF CRIMINAL HOMICIDES AND ROBBERIES BY VICTIM AND OFFENDER CHARACTERISTICS - 1981

| | ROBBERY | ROBBERY MURDER | NON FELONY HOMICIDE |
|---|---|---|---|
| **Victim Sex** | | | |
| Male | 63 | 85 | 78 |
| Female | 37 | 15 | 22 |
| **Victim Race** | | | |
| White | 73 | 64 | 50 |
| Black | 25 | 33 | 48 |
| Other | 3 | 2 | 2 |
| **Victim Age** | | | |
| Less than 20 | 27 | 6 | 12 |
| 20-34 | 40 | 34 | 49 |
| 35-49 | 15 | 21 | 24 |
| Over 49 | 18 | 39 | 15 |
| **Offender Sex** | | | |
| Male | 92 | 92 | 82 |
| Female | 4 | 2 | 17 |
| Both | 4 | 6 | 1 |
| (Unknown) | (0.9) | (36.3) | (7.7) |
| **Offender Race** | | | |
| White | 34 | 39 | 48 |
| Black | 56 | 58 | 50 |
| Other | 5 | 1 | 2 |
| Mixed | 4 | 2 | 0 |
| (Unknown) | (2.2) | (36.4) | (8.1) |
| **Offender Age** | | | |
| Less than 21 | 40 | 33 | 13 |
| 21 and over | 46 | 56 | 85 |
| Mixed | 14 | 11 | 2 |
| (Unknown) | (4.3) | (39.1) | (8.9) |

| Victim Race | White Off | Black Off | White Off | Black Off | White Off | Black Off |
|---|---|---|---|---|---|---|
| White | 94 | 61 | 92 | 49 | 95 | 7 |
| Black | 6 | 39 | 7 | 51 | 4 | 93 |

| Weapon Type | ROBBERY | ROBBERY MURDER | NON FELONY HOMICIDE |
|---|---|---|---|
| Gun | 17 | 65 | 65 |
| Knife or Other | 28 | 25 | 25 |
| Personal or Unknown | 56 | 11 | 10 |
| **Relationship** | | | |
| Relative | 15 | 2 | 30 |
| Acquaintance | | 26 | 58 |
| Stranger | 85 | 73 | 12 |
| (Unknown) | | (34.2) | (10.9) |
| N | | 2,091 | 11,599 |

Definitions:  "Unknown" entries are percent of all cases for which information on the stated attribute was unknown. Other entries in each column sum to 100 percent.
"Non Felony Homicide" includes all homicides not classified as felony related, suspected to be felony related, or unknown circumstances.
"Robbery" includes noncommercial, nonfatal cases with victims aged 12 or more.

Sources:  FBI Supplementary Homicide Reports, microfiles.
BJS *Criminal Victimization in the United States, 1981*

and the relationship, if any, between the victim and suspect. Cases that have some of the characteristics of robbery may be classified in the SHR system as "suspected felony type" or "unable to determine circumstances." Two recent studies evaluated homicide classification procedures in Chicago[20] and Baltimore.[21] Both studies concluded that while almost all cases officially recorded as robbery-related were correctly classified, a number of cases which were recorded in a different category were probably robbery-related.

Table 2 displays percentage distributions of robbery and robbery-murder cases over a number of dimensions, including the age, sex, and the role of the victim and the offender, the relationship, if any, between the victim and the offender, and the type of weapon used in the commission of the crime. By way of comparison, the distributions over the same dimensions are reported in the third column for "non-felony homicides," which are criminal homicides that did not occur in the context of a robbery or another felony. The first column of Table 2 presents the corresponding distributions of nonfatal robberies, calculated from published data in the 1981 National Crime Survey.[22] The NCS sample was drawn from a population that differs in certain respects from the population used for SHR data. The most important difference between NES and SHR data is that commercial robberies are not included in the NCS data. In the recent study of Chicago data, it was found that approximately 15% of the SHR's robbery-related murders occurred in the context of a commercial robbery.[23]

Although the data in Table 1 result from a multivariate analysis, the statistics in Table 2 are more primitive because each dimension is considered separately. Hence, there are possible problems in attribution introduced by collinearity among the dimensions. In any event, a comparison of distributions in columns 1 and 2 indicates that robbery murders differ from nonfatal robberies in ways similar to the differences reported in Table 1 between serious injury robberies and other robberies. In comparing robbery murder victims to robbery victims, a disproportionate number of robbery murder victims are over forty-nine years old (39% versus 18%), and are male (85% versus 63%). Robbery murder victims are more likely than robbery victims to be acquainted with or related to the perpetrator (26 % versus 15 %). This conclusion is supported by the sta-

[20] Zimring & Zuehl, *supra* note 14.

[21] Loftin, *supra* note 19.

[22] U.S. DEP'T. OF JUSTICE, BUREAU OF JUSTICE STATISTICS, CRIMINAL VICTIMIZATION IN THE UNITED STATES (1981).

[23] Zimring & Zuehl, *supra* note 14.

tistics on racial crossovers: for black offenders, robbery murder victims are more likely to be of the same race than are robbery victims (51% versus 39%).

The greatest difference between robbery murder and other types of robbery is the type of weapon used by the perpetrator. While 65% of all robbery murders are committed with a gun, guns are used in only 17% of all robberies. This result may be viewed as a logical extension of the weapons pattern shown in Table 1. Robbers using guns are relatively unlikely to attack their victims but are relatively likely to inflict serious injury; in other words, gun assaults are more serious than assaults with other weapons.

Comparison of robbery murders with other criminal homicide cases also yields interesting results. The third column of Table 2 reports the percentage distributions for "nonfelony homicides" in 1981. Nonfelony homicides include: all homicides not classified as felony-related, those homicides suspected to be felony-related, or homicides occurring in unknown circumstances. With respect to the demographic characteristics of the offender, robbery murders are much more similar to robberies than to other homicides. Robbers, regardless of whether they kill their victims, are more likely than nonfelony killers to be male, under twenty-one years of age, and nonwhite.

Generally speaking, there is a greater relational distance between victim and offender in robbery and robbery murder cases than in nonfelony homicides.[24] Figures in Table 2 reflect that in 85% of the robberies and 73% of the robbery murders, the victim and offender were strangers; however, only 12% of nonfelony murder cases shared this characteristic. Other statistics give further evidence of this relational distance. With respect to race, only 7% of nonfelony homicides involve black offenders and white victims; the corresponding percentages for robbery murder and nonfatal robbery are 49% and 61% respectively. White offenders, on the other hand, almost always choose whites as victims for all three types of crime. Finally, there is a greater age disparity between victim and offender in robberies and robbery murders than in nonfelony homicides.

In the dimension of weapon type, robbery murder is identical to nonfelony homicide and much different from robbery. Sixty-five percent of both types of killing are committed with guns, while guns were used in only 17% of the robberies.

In considering these statistical comparisons, it is important to

---

[24] *Id.*

keep in mind the imperfections of the data. The lack of data about commercial robberies bias the robbery statistics. For example, commercial robbery is more likely than non-commercial robbery to involve a gun.[25] Commercial robbery offenders tend to be older than non-commercial robbers.[26] Moreover, the robbery murder statistics may be distorted by the imprecision of police and FBI homicide classifications.[27] Finally, offender data for robbery murders and other homicides are incomplete because there are no suspects in some cases. These unknown offenders may have different characteristics than the typical known offenders. None of these problems, however, are severe enough to cast doubt on the basic pattern of findings. Furthermore, these data are the best available and have the virtue of being national in scope.

This description of robbery violence does not preempt the potential usefulness of intensive studies of single jurisdictions. In that context, there is a possibility of obtaining more data on the circumstances of the crime and the characteristics of offenders that are not readily observable, such as prior criminal record[28] and drug and alcohol involvement.[29]

In summary, the more interesting findings from the data in Table 2 are:

* Robbery and robbery murder are both typically committed by offenders who do not know their victims. Nonfelony homicides, on the other hand, are only rarely committed by strangers.
* Black offenders choose white victims in half of all robbery murders and in more than half of all robberies. In nonfelony homicides, however, such racial "crossover" is rare.
* The age of robbery murder victims is considerably older than that of either robbery or nonfelony homicide victims. Furthermore, the percentage of robbery murder victims who are male is higher than the corresponding percentages of either robbery or nonfelony homicides.
* The final significant difference between robbery and robbery murder is the distribution of weapons. Armed robbery is far more likely to result in death than is an un-armed robbery.

---

25 *See* Cook, *Reducing Injury and Death Rates in Robbery*, 6 POLICY ANALYSIS 21. (1980).
26 *Id.*
27 *See* Loftin, *supra* note 19; Zimring and Zuehl, *supra* note 14, at 4.
28 *See* P. COOK & D. NAGIN, DOES THE WEAPON MATTER? AN EVALUATION OF A WEAPONS-EMPHASIS POLICY IN THE PROSECUTION OF VIOLENT OFFENDERS (1979).
29 *See* Goldstein, *Homicide Related to Drug Traffic*, 62 BULL. N.Y. ACAD. MED. 509 (1986); Zimring & Zuehl, *supra* note 14.

## III.  MURDER AS A BY-PRODUCT OF ROBBERY

### A.  ALTERNATIVE SCENARIOS

The statistical evidence presented in Part II suggests that homicides classified as "robbery related" have much in common with nonfatal robberies. However, criminal law and criminal justice system operating procedures view robbery murder as being much more analagous to other murders than to other robberies. The police investigation of a robbery murder will be conducted by detectives from the homicide division and will be accorded much higher priority than a robbery. The crime will be recorded as a murder and not as a robbery for uniform crime reporting purposes. In the event of an arrest and subsequent prosecution, the primary charge will be murder. Within the criminal justice system, the robbery component of robbery murder is only relevant as an aggravating circumstance that may influence the degree of murder charged and the priority assigned the case by the prosecutor. In any event, the criminal justice system channels robbery murders on the same track as other murders and channels nonfatal robbery cases on a quite different track. Nevertheless, the potential influence of the criminal justice system on the robbery murder rate is not limited to its success in solving robbery murder cases, because effective robbery-specific policies may reduce robbery murder. These policies include the deterrence of gun use in robbery,[30] the education of potential victims concerning the safest way to behave if robbed,[31] and the reduction of the overall volume of robbery by increasing the likelihood that robbers will be caught, convicted, and punished.[32] However, robbery-specific policies will only be effective in reducing robbery murders if murder is in some sense the direct and probabilistic consequence of robbery. If each robbery has an intrinsic and positive probability of resulting in the victim's death, then robbery-specific policies could reduce robbery murder. On the other hand, if robbery murders are etiologically distinct from nonfatal robberies, then policies directed at the latter will have little or no effect on the former. Thus, understanding the causal link between robbery and robbery murder is useful in the search for policies to make robbery a less lethal crime.[33]

---

30  *See* Cook, *The Influence of Gun Availability on Violent Crime Patterns,* in CRIME AND JUSTICE: AN ANNUAL REVIEW OF RESEARCH 4 (M. Tonry & N. Morris eds. 1983).

31  *See* Cook, *The Relationship Between Victim Resistance and Injury in Noncommercial Robbery,* 15 J. LEG. STUD. 405 (1986).

32  *See* COOK, *supra* note 7, at 25.

33  This argument is developed further in Cook, *Reducing Injury and Death Rates in Robbery,* 6 POLICY ANALYSIS 21 (1980).

Possible connections between the robbery and the killing components of a robbery murder are illustrated by the following scenarios:

Scenario 1: Two gun-toting robbers enter a convenience store and order the clerk to lie on the floor. The clerk hesitates and then reaches under the counter. One of the robbers, afraid that the clerk is reaching for a gun, shoots and kills him.

Scenario 2: Three teenagers knock down an elderly woman and run off with her purse. In falling, she hits her head on the sidewalk and later dies from the concussion.

Scenario 3: Two hoodlums break into a room where a large heroin transaction is in progress, kill everyone there, and flee with the drugs and cash.

Scenario 4: Two acquaintances meet on the street and begin arguing about a ten dollar loan that one claims to have made to the other. The argument becomes violent. The "lender" stabs and kills the other. Then, as an afterthought, the lender takes the other's wallet as "compensation" for the loan.

The first two scenarios are meant to represent a class of robberies in which the robbers have the capability, but not the intent, to use lethal violence prior to initiating the robbery. The killing involved is, in effect, a probabilistic outcome of the underlying event. The number of such robbery murders will bear a close causal relationship to the number of such robberies that occur. In the last two scenarios, the murders would also most likely be classified by the police as "robbery related", but the relationship between the killing and the theft is quite different from the first two scenarios. In the third and fourth scenario, the assailants make a decision to use lethal violence that is unrelated to the immediate events of the robbery. A criminal justice system effort to deter robbery might, if successful, eliminate some of the robbery murders of the types illustrated by the first two scenarios. However, the other types of robbery are beyond the reach of a robbery-specific program.

Some robbery murders, therefore, are robberies that result in the victim's death as a result of a mistake, an escalation of violence induced by victim resistance, or some other factor inherent in the robbery process. In other robbery murders, the killing is a distinct event that occurs in conjunction with a robbery. Which sort of robbery murder predominates? Is robbery murder more closely related to robbery or to criminal homicide in its essential etiology? These are the questions that motivate the statistical inquiry which follows.

B.  INTERCITY DIFFERENCES IN ROBBERY AND MURDER RATES

If robbery murder is closely linked to robbery, then a close rela-

tionship between robbery rates and robbery murder rates, both over time and across jurisdictions, would be expected. As is apparent in the statistics in Table 2, there is indeed such a close relationship. The proper interpretation of this relationship requires a careful examination of the results.

### 1.   Data

Available data permitted calculation of robbery rates, robbery murder rates, and criminal homicide rates by weapon type in each of forty-three large United States cities between 1976 and 1983. Robbery data were taken from the FBI's unpublished "Return A" files. Homicide rates were computed from the FBI's Supplementary Homicide Report files, which are also unpublished. Population-based rates for each city were averaged over the four years of "Period 1," 1976-79, and of "Period 2," 1980-83. Combining data over a four-year period in this fashion was necessary to provide meaningful robbery murder rates for the smaller cities in the sample, some of which had fewer than ten robbery murders in any one year.

### 2.   Results

Table 2 indicates that the correlation between the robbery rate and the robbery murder rate is .81 for Period 1 and .80 for Period 2. Clearly, these two crime categories exhibit very similar geographic patterns, as would be expected if murder were a "by-product" of robbery. However, the fact that robbery murder is even more highly correlated with the overall homicide rate (net of robbery murders) calls this interpretation into question: this correlation is .83 in Period 1 and .87 in Period 2. Given this result, it appears that all three variables (robbery rate, robbery murder rate, overall homicide rate) are indicators of some underlying characteristic of these cities, which could be called "violence proneness." Cities with high robbery rates have high robbery murder rates and high rates of other types of homicide.

One method for sorting out the separate effects of somewhat collinear variables is a multivariate regression analysis. Table 3 presents the results of two sets of ordinary least squares regressions. In each case, the robbery murder rate per 100,000 is the dependent variable, computed for Period 1, for Period 2, and for the change between the two periods. The independent variables are computed for the corresponding periods.

From the results of Regression 2, it is apparent that the robbery rate and the net homicide rate make separate and distinguishable

*PHILIP J. COOK* [Vol. 78

## TABLE 3
### ROBBERY MURDERS PER 100,000, 43 CITIES ORDINARY LEAST SQUARES REGRESSION RESULTS

| | ESTIMATED COEFFICIENTS (ESTIMATED STANDARD ERRORS) | | |
| --- | --- | --- | --- |
| | Period 1 1976-79 | Period 2 1980-83 | Change Period 2 − Period 1 |
| **Regression 1** | | | |
| Constant | −.406 (.368) | −.012 (.364) | −.294 (.140) |
| Robberies/1000 | .498 (.057) | .363 (.043) | .305 (.058) |
| $R^2$ | .65 | .64 | .41 |
| **Regression 2** | | | |
| Constant | −1.136 (.293) | −.668 (.266) | −.259 (.146) |
| Robberies/1000 | .284 (.054) | .176 (.040) | .256 (.081) |
| Net Homicides/100,000 | .112 (.018) | .107 (.015) | .028 (.033) |
| $R^2$ | .82 | .83 | .42 |

Note: "Net Homicides" means total criminal homicides minus robbery murders.

Sources: Robbery data: FBI's Return A file for individual cities. Homicide date: FBI's Supplementary Homicide Reports files.

contributions in explaining the cross-section structure of robbery murder rates. Interestingly, when the same regression is run on the data for the changes in rates between the two periods, reported in the last column, the coefficient on the net homicide rate is small and statistically insignificant. Thus, the rate of change in the robbery murder rate is closely linked to the robbery rate, but not the net homicide rate, of the forty-three cities. These results suggest that the intertemporal relationship between robbery and robbery murder is not a reflection of the city "violence proneness" factor, as measured by the homicide rate, but rather indicates a direct causal link between the robbery rate and the robbery murder rate.

B. THE IMPORTANCE OF WEAPON TYPE

While it is natural to evaluate the seriousness of robbery by viewing its consequences to the victim, i.e., degree of injury and financial loss, the legal distinction is actually based on the robber's choice of weapon. In particular, armed robbery is subject to more severe punishment than unarmed, "strong-arm" robbery. A number of states have recently delineated a further distinction be-

Case: 1:10-cv-04184 Document #: 165-7 Filed: 03/12/12 Page 9 of 74 PageID #:3319

tween armed robbery and unarmed robbery.[34] A survey of 900 assistant prosecutors found that they perceived gun robbery as substantially more serious than robbery with a blunt object or with physical force.[35] One argument in favor of such weapons-based distinctions derives from the notion of "objective dangerousness": that the likelihood of serious injury or death in robbery is influenced *inter alia* by the type of weapon employed by the assailant. Hence, the seriousness of a robbery is associated with weapon type regardless of the outcome.[36] Gun robberies, therefore, are more dangerous than other armed robberies, and armed robberies are more dangerous than strong-arm robberies. If this hypothesis is correct, then effective policies to discourage the use of lethal weapons in robbery will reduce the fraction of robberies that result in serious injury or death.

In Part II, it was reported that a much higher fraction of robbery murders than robberies are committed with a gun. Table 4 presents the robbery murder/robbery ratios for each weapon category, using SHR data for large cities. The third row of this table demonstrates that the likelihood of death in a gun robbery (about 1

### TABLE 4
### ROBBERY MURDER—ROBBERY RATIOS FOR LARGE CITIES, BY WEAPON TYPE, 1977

|   |                                          | GUN    | KNIFE  | OTHER  | UNARMED |
|---|------------------------------------------|--------|--------|--------|---------|
| 1.| Ratios calculated from Return A Robbery Count | 0.70%  | 0.50%  | 0.19%  | 0.11%   |
| 2.| Robbery Reporting Rate                    | .590   | .260   | .231   | .208    |
| 3.| Corrected Ratios                          | 0.41%  | 0.13%  | 0.04%  | 0.02%   |

Notes:

Row 1: Each entry is the ratio of robbery murders committed with the stated weapon type (SHR data) to the number of robberies reported to the police (Return A data) for cities over 250,000 population, 1977. Ratios are stated in percent form.

Row 2: Each entry is the ratio of all U.S. robberies reported to the police. (*Crime in the United States, 1976*) to the number of robberies estimated from the National Crime Survey (*Criminal Victimization in the United States, 1976*), for the stated weapon type.

Row 3: Each entry is the product of corresponding entries in Rows 1 and 2. The implicit assumption here is that the national robbery reporting rates in 1976 were the same as urban robbery reporting rates in 1977.

---

[34] E. JONES & M. RAY, HANDGUN CONTROL: LEGISLATIVE AND ENFORCEMENT STRATEGIES (U.S. Dept. Justice, 1981).

[35] Roth, *Prosecutor Perceptions of Crime Seriousness*, 69 J. CRIM. L. & CRIMINOLOGY 232, 241 (1978).

[36] F. Zimring, *The Medium Is the Message: Firearm Calibre as a Determinant of Death From Assault*, 1 J. LEG. STUD. 97 (1972).

*PHILIP J. COOK*

in 250) is three times greater than the likelihood of death in knife robbery, which is, in turn, about three times greater than the corresponding likelihood of death in armed robbery involving other weapons. The likelihood of death in unarmed robbery, one in 5000, is the lowest.

In sum, the likelihood of death in robbery is linked to the lethality of the weapon, with "lethality" defined as the amount of effort and strength required to kill. One could hypothesize that the relatively high death rate in gun robbery is the direct consequence of the fact that a loaded gun provides the assailant with the means to kill quickly at a distance and without much skill, strength, or danger of a counterattack. A passing whim or even the accidental twitch of a trigger finger is sufficient. Thus, a gun is intrinsically more dangerous than other types of weapons.

Although this argument is certainly plausible, the ratios in Table 4 may exaggerate the differences due to weapon type. The robber's choice of weapon is correlated with other observable characteristics of the robbery such as the type of target and the age and number of robbers involved. The choice of weapon may also be associated with unobservable characteristics of the robbery, such as the assailant's intent. If the robber plans to kill the victim, then presumably he will try to equip himself with the most appropriate tool for that task. For most assailants, this tool would be some type of firearm.[37] Thus, armed robberies differ from other robberies; these differences, however, are not all based upon weapon type. Other dimensions of armed robbery may account for some part of the large differences in death rates shown in Table 4.

Strong evidence that gun robberies are nonetheless intrinsically more dangerous than other types of robberies is presented in Table 5. The equations estimated in this table are identical to those used in Table 3, except that the robbery rate is replaced with two variables: the gun robbery rate, and the nongun robbery rate. Looking at the results of change data in Regression 2, we see that a one unit increase in the gun robbery rate is associated with a 0.432 percentage point increase in the robbery murder rate. This percentage point increase represents approximately five times the effect of a one unit increase in the nongun robbery rate. As noted above, a change in the net homicide rate has little or no influence on the robbery murder rate.

Thus, the robbery murder rate is much more sensitive to

---

[37] A more thorough discussion of the interaction between intent and weapon type is presented in Cook, *supra* note 30.

### TABLE 5
ROBBERY MURDERS PER 100,000, 43 CITIES ORDINARY LEAST
SQUARES REGRESSION RESULTS

| | ESTIMATED COEFFICIENTS (ESTIMATED STANDARD ERRORS) | | |
|---|---|---|---|
| | Period 1 1976-79 | Period 2 1980-83 | Change Period 2 − Period 1 |
| Regression 1 | | | |
| Constant | −.524 (.275) | −.048 (.308) | −.175 (.159) |
| Gun Robberies/1000 | 1.043 (.103) | .884 (.130) | .479 (.128) |
| Non Gun Robberies/1000 | .153 (.073) | .050 (.083) | .141 (.122) |
| $R^2$ | .81 | .75 | .44 |
| Regression 2 | | | |
| Constant | −.928 (.287) | −.603 (.276) | −.132 (.165) |
| Gun Robberies/1000 | .666 (.159) | .320 (.160) | .432 (.137) |
| Non Gun Robberies/1000 | .173 (.067) | .123 (.069) | .081 (.137) |
| Net Homicides/100,000 | .070 (.024) | .095 (.020) | .031 (.032) |
| $R^2$ | .84 | .84 | .45 |

Note: "Net Homicides" means total criminal homicides minus robbery murders.

Sources: Robbery data: FBI's Return A file for individual cities. Homicide data: FBI's Supplementary Homicide Reports files.

changes in a city's gun robbery rate than to its nongun robbery rate. A reduction in the gun robbery rate yields a greater reduction in robbery murder than a corresponding reduction in nongun robbery. While this evidence is based on "natural" variations in crime data for forty-three cities, it is reasonable to infer that explicit policies which are successful in reducing gun use in robbery will also reduce the robbery murder rate.

#### C. SUMMARY

Homicides classified as "robbery-related" may result from a number of different motivational patterns. In some cases, the victim is killed by accident in response to the victim's resistance or as a result of a momentary vicious impulse. In such cases, it is reasonable to view the killing as a by-product of the robbery. Effective policies to reduce the robbery rate would also be effective in reducing such robbery-related killings.

Not all robbery-related murders have this "Russian roulette" character. In some cases, the murder is a planned part of the robbery; in others, the assailant's primary motive is to kill the victim, and the robbery is a secondary concern. The volume of such cases will be less closely linked to the overall volume of robberies.

The evidence presented above strongly indicates the empirical importance of the first sort of robbery murder. In forty-three cities, the change in the robbery murder rate between two four-year periods was highly correlated with the contemporaneous change in the robbery rate. Although it is possible that some "third cause" accounts for this correlation, this appears unlikely. A contemporaneous change in the overall level of lethal violence in these cities can be ruled out as a "third cause." Such a change would be reflected in the net criminal homicide rate. However, when that variable was included in the regression on change data, it had essentially no effect on the results. Thus, robbery murder rate patterns suggest that killings were an intrinsic by-product of robbery. If this conclusion is valid, then policies affecting robbery rates will also affect robbery murder rates.

Different types of robberies are characterized by different probabilities of generating this "by-product." The age of the victim, the time of day, the victim-offender relationship, and other factors, may influence the likelihood that the robbery victim will be killed. One factor that is of special interest due to its importance in the criminal law is the type of weapon used by the robber. It is expected that gun robberies would be intrinsically dangerous due to the relative ease with which a gun robber can kill his victim. The percentage of gun robberies that result in murder is three times higher than the percentage of murders resulting from knife robberies.[38] This ratio is higher with respect to other weapon types. Regression results on the robbery murder rates for forty-three cities demonstrates that the use of a gun has a direct causal effect on the likelihood of the victim's death.[39] In these regressions, a change in the gun robbery rate is estimated to have a five times greater effect on the murder rate than would a similar change in the nongun robbery rate.[40]

## IV. Concluding Thoughts on Policy

Violence and the possibility of injury make robbery a serious

---

[38] *See supra* 371, Table 4.

[39] *See supra* 373, Table 5.

[40] *See supra* 371.

crime. The criminal justice system can respond to this violence both directly and indirectly. The direct response is to punish robberies that result in serious injury or death more harshly and to give higher priority to the investigation and prosecution of such robberies than to those in which the victims are not injured. The indirect response is to give high priority to convicting and punishing robbers who commit relatively dangerous robberies, whether or not they injure their victims.

The criminal justice system obviously places a high priority on robbery murder cases. The felony murder rule and capital punishment statutes facilitate prosecution and the imposition of severe punishment for these cases. The threat of severe punishment resulting from this direct response to robbery violence may have some general deterrent value. Surprisingly, however, the high priority given to robbery killings does not necessarily carry over to serious injury cases. Some jurisdictions do not appear to distinguish between robbery defendants in injury cases and robbery defendants in otherwise similar cases in which the victim was not injured.[41]

The indirect criminal justice system response to robbery violence is reflected in the distinction between armed and unarmed robbery. This distinction plays an important role in prosecution and sentencing. A further distinction between gun robberies and other armed robberies appears justified by wide variations in the fatality rate among different weapon categories. More persuasive evidence of the objective dangerousness of gun robberies is found in the regression results of Part III, which demonstrate the close link between variations in the gun robbery rate and the robbery murder rate.

Gun robberies can be deterred by means other than more severe sentencing. For example, since gun robberies are concentrated on commercial targets, programs to discourage commercial robbery, such as installing automatic cameras[42] and instituting exact change policies,[43] are, in effect, anti-gun robbery programs. A quite different approach is to discourage the use of guns in robberies by reducing the general availability of guns or by instituting stringent

---

[41] *See* COOK & NAGIN, *supra* note 28; P. Rossi, E. Weber-Burdin & H. Chen, *Effects of Weapons Use on Felony Case Disposition: An Analysis of Evidence from the Los Angeles PROMIS System* (1981)(unpublished manuscript).

[42] D. WHITCOMB, SEATTLE—FOCUS ON ROBBERY—THE HIDDEN CAMERAS PROJECT (Law enforcement Assistance Administration—National Institute of Law Enforcement and Criminal Justice, 1979).

[43] Chaiken, Lawless & Stevenson, *The Impact of Police Activity on Subway Crime*, 3 J. URBAN ANALYSIS 173, 186-189 (1974).

enforcement of anti-carrying ordinances.[44] The evidence in Part III suggests that a reduction in the gun robbery rate achieved by these or other means will reduce the robbery murder rate.

Since criminal justice system resources are scarce, it is necessary to consider the likely consequences if increased priority for gun robbery cases comes at the cost of reduced priority to other types of robbery. There has been considerable speculation about the net social benefit of engineering a reduction in the fraction of armed robberies committed with guns, while leaving the overall armed robbery rate unchanged.[45] Based on the evidence in Parts II and III, it appears that robbery killings would decline, serious injuries would remain more or less constant, and minor injuries would increase.

The type of weapon used by the robber is not the only correlate of robbery violence. A number of others were identified in Part II, the most important of which is the age of the victim. The probabilities that a victim over age fifty will be attacked, injured, or killed during a robbery are much higher than for other age groups. The explanation for these results is not immediately obvious but deserves consideration in formulating criminal justice system policy.

Therefore, using the best and most extensive data available with national scope, some important patterns in robbery violence have been documented. Injury and death rates differ widely depending on the circumstances and the characteristics of the victims and offenders. However, robberies resulting in serious injury or death are not primarily the result of a distinct causal process. Rather, it appears that robbery violence is a probabilistic by-product of robbery encounters. Thus, it is logically possible to reduce the robbery murder rate indirectly by policies directed at nonfatal robbery. This indirect approach will be most effective in reducing deaths if it is directed at categories of robbery that are most dangerous, such as gun robberies.

---

44 *See* Cook, *supra* note 30.
45 *See* Cook, *supra* note 33, at 44-45; Skogan, *supra* note 15, at 72.

# Exhibit 22



Journal of Public Economics 90 (2006) 379–391



www.elsevier.com/locate/econbase

# The social costs of gun ownership

Philip J. Cook[a,*], Jens Ludwig[b]

[a]*Duke University and NBER, United States*
[b]*Georgetown University and NBER, United States*

Received 17 August 2004; received in revised form 18 February 2005; accepted 18 February 2005
Available online 31 May 2005

## Abstract

This paper provides new estimates of the effect of household gun prevalence on homicide rates, and infers the marginal external cost of handgun ownership. The estimates utilize a superior proxy for gun prevalence, the percentage of suicides committed with a gun, which we validate. Using county- and state-level panels for 20 years, we estimate the elasticity of homicide with respect to gun prevalence as between +0.1 and +0.3. All of the effect of gun prevalence is on gun homicide rates. Under certain reasonable assumptions, the average annual marginal social cost of household gun ownership is in the range $100 to $1800.
© 2005 Elsevier B.V. All rights reserved.

*Jel classifications:* H21; I18; K42
*Keywords:* Regulation; Social costs; Evaluation methods; Externalities; Gun violence

## 1. Introduction

Like many other private decisions about health and safety, such as getting vaccinated, purchasing LoJack (Ayres and Levitt, 1998), or driving a sport utility vehicle (Gayer, 2004), private gun ownership may impose externalities. Widespread gun ownership in a community could provide a general deterrent to criminal predation, lowering the risk to owners and non-owners alike. But widespread gun ownership could also lead to increased

---

* Corresponding author.
*E-mail address:* pcook@duke.edu (P.J. Cook).

0047-2727/$ - see front matter © 2005 Elsevier B.V. All rights reserved.
doi:10.1016/j.jpubeco.2005.02.003

*P.J. Cook, J. Ludwig / Journal of Public Economics 90 (2006) 379–391*

risks of various sorts, including the possibility that guns will be misused by the owners or transferred to dangerous people through theft or unregulated sale. Whether the social costs of gun ownership are positive or negative is arguably the most fundamental question for the regulation of firearms in the United States.

Previous research has produced conflicting conclusions. One prominent estimate for the effects of gun prevalence on homicide is by John Lott (2000), who relates state-level estimates of gun ownership rates from voter exit polls in 1988 and 1996 to state crime rates, conditioning on several socioeconomic variables in a cross-section analysis. His estimate of the elasticity of homicide with respect to state gun ownership rates is extraordinarily large, equal to $-3.3$.[1]

Mark Duggan (2001) identifies the relationship between guns and crime using over-time variation in panels of states and also counties. Duggan's elasticity estimate, $+0.2$, is of the opposite sign from Lott's and an order of magnitude smaller. There is some question about the validity of his proxy for gun prevalence, the subscription rate to *Guns and Ammo* magazine.

In this paper we follow Duggan's lead in using panel regression methods to estimate the effect of gun prevalence on homicide rates, but with a different and well-validated proxy variable. Our results suggest that the social cost of an additional household acquiring a handgun depends on the rate of violence and the existing prevalence of guns, but under a wide range of assumptions is greater than $100 per year.

## 2. FSS as a proxy for gun prevalence

Since most states lack any sort of registration or licensing system that would generate administrative data on firearms ownership, household surveys provide the only direct source of information on this matter. But survey data are not always available or reliable for sub-national units, so analysts have employed a variety of proxy variables. Two independent inquiries have recently identified one such proxy as superior to all others for the purpose of estimating the cross-section structure of gun prevalence across large geographic entities (Azrael et al., 2004; Kleck, 2004). That proxy is the fraction of suicides committed with a firearm (FSS).

Our use of FSS is primarily to estimate variation over time rather than in the cross-section. To validate this use requires consistent estimates of gun prevalence over time, preferably at a sub-national level. The "gold standard" for national surveys of gun ownership is the General Social Survey (GSS). We ran panel regressions of GSS-based estimates of gun prevalence against two proxies, FSS and the subscription rate to *Guns and Ammo*, the proxy used by Duggan (2001). The estimated coefficients of our GSS

---

[1] Lott conditions on region but not state dummies in his regressions, so his estimates will be identified primarily by cross-sectional variation in gun ownership rates (Azrael et al., 2004). A more fundamental problem is that there are serious problems with his voter exit poll data, which suggest that from 1988 to 1996 gun ownership rates increased for the U.S. as a whole from 27.4 to 37.0% (p. 36). Yet the best source of national data on gun ownership trends – the General Social Survey – indicates that individual gun ownership trends were essentially flat during this period (Kleck, 1997, pp. 98–99).

measures on FSS are in every case significantly positive, and are especially strong when year fixed effects are omitted, while the subscription rate to *Guns and Ammo* performs less well and in some cases yields a negative coefficient estimate.[2]

## 3. Data

The estimates presented below are based on panel data for 200 counties that had the largest population in 1990,[3] or a subset of those counties, for the period 1980 to 1999. We also present estimates based on state-level panel data. The 200 largest counties accounted for 74% of all homicides in the United States in 1990.[4]

Suicide and homicide counts are taken from Vital Statistics Program mortality data, based on reports of coroners and medical examiners and compiled by the National Center for Health Statistics. Data on robbery, burglary, and other types of crime besides homicide are from the FBI's Uniform Crime Reports.

Finally, we control for other changes over time in county socio-demographic characteristics that could affect both crime and gun prevalence. Such data are available at the county level only from the decennial Census, from which we interpolate data for the inter-Censal years. Covariates include the prevalence of blacks, households headed by a female, urban residents, and residents living in the same house 5 years ago.

## 4. Empirical strategy

The basic empirical approach here is to estimate the relationship between gun prevalence and homicide by exploiting the substantial across-area differences in trends in gun ownership over a 20-year period. Our baseline estimates are generated from model (1), which relates the natural log of jurisdiction (i)'s homicide rate (or, alternatively, the gun- or non-gun homicide rate) in year $t$ against FSS, the proxy for the jurisdiction's gun ownership rate, in year $(t-1)$. FSS is lagged by one period out of concern for reverse causation – gun ownership may be consequence as well as cause of a county's crime rate – although the lag can also be justified for substantive reasons: the thefts and secondary-

---

[2] The GSS is conducted by the National Opinion Research Center most years from 1972 to 1993 and biennially since 1994 (Davis and Smith, 1998), and is capable of providing representative samples at the national or census region or even division level. Our panel dataset for this validation exercise is defined over the nine Census divisions and the 14 years in which GSS fielded gun questions between 1980 and 1998. In these regressions, we condition on fixed effects for Census division in all model specifications. We define "prevalence" in the GSS data for either handguns or all guns, and for either households or individuals. For additional details, see Cook and Ludwig (2004b).

[3] Kelly (2000) used this sample of counties in studying the determinants of crime rates. The 5 counties of New York City are combined in our analysis due to data limitations. Oklahoma City was dropped in 1995 due to the large homicide count associated with the bombing of the federal building there.

[4] Also of some interest is what fraction of all guns in the U.S. is found in the top 200 counties. While we cannot perform this calculation with our FSS proxy, which is not available for all counties, we find that 43% of all *Guns and Ammo* subscriptions in the U.S. are in the 200 largest counties.

market transfers that move guns from households to use by criminals will ordinarily take some time. To further control for the possibility of reverse causation, we condition on the natural log of the area's burglary and robbery rates, which are the kinds of crimes that seem likely to motivate the acquisition of a firearm for self-defense. These crime variables also are a good reflection of criminogenic factors in the community that influence homicide rates (Blumstein, 2000). To account for other county or state characteristics that affect homicide, the regression model includes year and county/state fixed effects, as well as the logs of the socio-demographic variables. The regression estimates are weighted by each county or state's population to account for heteroskedasticity in the error term.

$$\log Y_{it} = \beta_0 + \beta_1 \log FSS_{it-1} + \beta_2 X_{it} + d_i + d_t + \varepsilon_{it}. \tag{1}$$

Another concern is serial correlation in the error structure, given that FSS changes only slowly over time within counties and that other unmeasured determinants of county crime rates may also have jurisdiction-specific trends.[5] We address this problem by calculating Huber–White standard errors that are robust to an arbitrary autocorrelation pattern in the errors over time within counties. Bertrand et al. (2004) show that this approach works better than more parametric strategies in panels with a short time dimension.

A final concern in estimating Eq. (1) is that the proxy for gun prevalence, FSS, is subject to measurement error of two types. First, because it is only a proxy, the correlation between FSS and the "true" prevalence is presumably less than one. Judging the quality of the proxy in that sense is difficult, given that there are no error-free measures of the criterion variable. In particular, survey-based estimates are subject to sampling error and reporting error. Based on an analysis of national GSS estimates over time, the hypothesis that FSS *is* a "perfect" proxy cannot be rejected, but that is not the same thing as demonstrating that it is perfect in fact.[6]

Second, and probably more important, is that the reliability of FSS will depend on the number of suicides used to compute it. For the 21 years of data on 200 large counties, the 10th and 90th percentiles have 27 and 142 suicides respectively, with a median of 52 and a mean of 196. If the choice of weapon in suicide follows a binomial process, then a jurisdiction with 50 suicides a year would generate an observed FSS that is subject to a standard error of 7 percentage points. The effect of this measurement error will be to bias the coefficient estimate of FSS toward zero. We address this problem in a variety of ways below, including re-calculating our estimates with state-level data. While the state data have the advantage of reducing measurement error in FSS, one drawback is that county-

---

[5] Testing for the presence of serial correlation in fixed-effects models is complicated in applications where the time dimension is fairly short compared to the number of observational units. Following Solon (1984), we test for serial correlation by first-differencing the data, and then keep the residuals from a regression of the log change in homicides against the log change in FSS and year effects. A regression of these residuals against their 1-year lag yields a coefficient of −0.4, close to the value of −0.5 characteristic of an error structure that is serially uncorrelated. Additional tests indicate that serial correlation is a somewhat greater problem with the state-level data.

[6] The correlation between national household handgun prevalence and FSS over 18 waves of the GSS is 0.635, very close to the mean of a large number of correlations generated from a simulation based on the assumption that FSS is exact and the GSS estimates are unbiased but subject to normal sampling error. That mean is 0.664.

P.J. Cook, J. Ludwig / Journal of Public Economics 90 (2006) 379–391 383

Table 1
Descriptive statistics for county data

|  | Full sample (largest 200) | Bottom quartile 1980 FSS | Top quartile 1980 FSS |
|---|---|---|---|
| *Full period (1980–1999)* |  |  |  |
| FSS | 49.9 | 34.6 | 66.9 |
| Homicide rate | 11.0 | 10.9 | 14.4 |
| Gun homicide rate | 7.3 | 6.9 | 10.1 |
| %Urban | 92.6 | 94.7 | 91.8 |
| %Percent black | 14.0 | 13.5 | 19.5 |
| %Female household head | 18.0 | 20.1 | 18.5 |
| # Suicides | 195.8 | 192.5 | 120.0 |
| *FSS in selected years* |  |  |  |
| 1980 | 48.0 | 29.2 | 73.3 |
| 1990 | 52.8 | 37.2 | 69.1 |
| 1999 | 48.0 | 34.9 | 59.8 |

Source: Mortality—National Center for Health Statistics, Vital Statistics, Mortality; Crime—Federal Bureau of Investigation, Uniform Crime Reports; Demographics—US Census Bureau, 1980, 1990 and 2000 Censuses.

level gun prevalence may be more relevant for local gun availability in the used or "secondary" gun market (Cook et al., 1995).[7]

## 5. Results

Table 1 presents descriptive statistics for the full panel assembled from annual data for the 200 largest counties for the years 1980–1999 (all calculations are weighted by county population). Over the entire sample period, the average homicide rate is 11 per 100,000 residents, with half of all suicides having been committed with a firearm.

Table 1 also provides some sense for the variation in gun ownership that identifies the panel data estimates shown below. The second and third columns of Table 1 present data for the top and bottom quartiles for our 200 counties ranked according to their gun ownership rates at the start of our panel, in 1980. The (disproportionately Southern) counties where guns are most common in 1980 experience a persistent and pronounced reduction in household gun ownership rates during the 20 years of our panel, as reflected by the nearly 20% decline in FSS over this period. At the same time, counties where guns were least common in 1980 (disproportionately in the Northeast and Midwest regions) experienced an increase in FSS of 20% from 1980 to 1999.

The source of this convergence remains something of a mystery (Azrael et al., 2004). If whatever drove this convergence between high- and low-gun ownership areas was orthogonal to the determinants of homicide trends, then a difference-in-differences

---

[7] On the other hand, a potential advantage of the state-level data comes from the possibility that people cross county lines to obtain firearms. This may not be a very severe problem, at least for youth, who account for a disproportionate share of all gun crime. When Cook and Ludwig (2004a) regress an indicator for youth gun carrying against FSS the relationship is much stronger when FSS is measured at the county than at the state level.

estimate of the effect of FSS on homicide ($Y$) would be unbiased. In particular, expression (2) is an estimate of the elasticity of $Y$ with respect to FSS, where $\Delta$ indicates the difference between 1999 and 1980, and the subscripts $Q1$ and $Q4$ refer to "top quartile" and "bottom quartile" respectively.

$$\left(\Delta \ln Y_{Q1} - \Delta \ln Y_{Q4}\right) / \left(\Delta \ln FSS_{Q1} - \Delta \ln FSS_{Q4}\right). \tag{2}$$

The elasticity of homicide with respect to FSS estimated in this fashion is $+0.18$. A similar calculation for gun homicides yields an elasticity with respect to gun ownership rates of $+0.35$. These simple estimates turn out to be quite compatible with those derived from the panel regression analysis that uses all of the variation across counties over time.

### 5.1. Panel regression findings

The first column of Table 2 presents the results for our most parsimonious model, which includes county and year fixed effects but no other covariates. The estimated elasticity of homicide with respect to the lagged value of log FSS equals $+0.100$ ($p < 0.05$). The final three columns of Table 2 show that this point estimate is not sensitive to controlling for several sets of influential covariates.

Table 3 reports results for a number of alternative specifications, in each case for three dependent variables: the logs of the homicide rate, the gun homicide rate, and the non-gun homicide rate. If the predominant causal mechanism linking gun prevalence to homicide is that increased prevalence induces substitution of guns for other weapons in assaults, with a consequent increase in lethality, then only the gun homicide rate will increase in response to an increase in FSS. Table 3 generally supports this prediction.

The results are robust to a variety of modifications to our basic estimation approach. In the second row, additional county-level characteristics are added –percentages of resident

Table 2
Baseline results, county-level data, 1980–1999

| | Ln(Hom) | Ln(Hom) | Ln(Hom) | Ln(Hom) |
|---|---|---|---|---|
| Ln FSS ($t-1$) | 0.100** (0.044) | 0.107*** (0.037) | 0.085* (0.044) | 0.086** (0.038) |
| Ln Rob ($t$) | | 0.139*** (0.043) | | 0.149*** (0.042) |
| Ln Burg ($t$) | | 0.258*** (0.068) | | 0.226*** (0.072) |
| Ln percent black ($t$) | | | 0.233 (0.166) | 0.278* (0.164) |
| Ln %Urb ($t$) | | | −0.389** (0.161) | −0.537*** (0.157) |
| Ln %same house 5 years ago | | | −10.209*** (0.430) | −0.690 (0.419) |
| Ln %female headed house | | | 0.790* (0.460) | −0.303 (0.413) |
| Year fixed effects? | Yes | Yes | Yes | Yes |
| County fixed effects? | Yes | Yes | Yes | Yes |
| $R^2$ | 0.915 | 0.921 | 0.918 | 0.923 |
| $N$ | 3822 | 3822 | 3822 | 3822 |

Parentheses contain standard errors adjusted for serial correlation (see text). Estimates utilize county population as weight. Analytic sample consists of annual observations for 200 largest counties in U.S. over the period 1980–1999.

   * Significantly different from zero at the 10% level.
  ** Significantly different from zero at the 5% level.
 *** Significantly different from zero at the 1% level.

*P.J. Cook, J. Ludwig / Journal of Public Economics 90 (2006) 379–391*

385

Table 3
Sensitivity analysis

|  | Ln(Homicide) | Ln(Gun Homicide) | Ln(Non-gun Homicide) |
|---|---|---|---|
| *Alternative specifications* | | | |
| Baseline model, final column, Table 2 | 0.086** (0.038) | 0.173*** (0.049) | −0.033 (0.040) |
| 2 Additional covariates (age, poverty, immigrants) | 0.086** (0.036) | 0.173*** (0.043) | −0.020 (0.040) |
| 3 Baseline model, unweighted | 0.051 (0.043) | 0.167*** (0.043) | −0.061 (0.042) |
| 4 Add census division/year fixed effects | 0.068* (0.035) | 0.162*** (0.044) | −0.047 (0.038) |
| 5 Condition on lag dependent variable | 0.061* (0.033) | 0.108** (0.046) | −0.032 (0.040) |
| *Alternative samples* | | | |
| 6 Average FSS over 2 years | 0.148** (0.059) | 0.317*** (0.089) | −0.054 (0.061) |
| 7 Limit sample to largest 100 counties | 0.131*** (0.047) | 0.207*** (0.066) | 0.026 (0.051) |
| 8 Limit sample to largest 50 counties | 0.223*** (0.076) | 0.252** (0.101) | 0.114 (0.078) |
| 9 State-level data, baseline model | 0.407*** (0.142) | 0.562*** (0.180) | 0.106 (0.130) |
| 10 State data, add division/year fixed effects | 0.335*** (0.114) | 0.534*** (0.167) | −0.066 (0.099) |
| 11 State data, condition on lag dependent variable | 0.208** (0.081) | 0.272** (0.110) | 0.103 (0.116) |

Unless otherwise noted, analytic sample consists of 200 largest counties in US using data from 1980 to 1999. Each cell in table presents the coefficient estimate and standard error for the log of FSS ($t - 1$) (except for row 6), with the robbery rate, burglary rate, indicators for missing values for robbery and burglary, and percent black as covariates. Parentheses contain standard errors adjusted for serial correlation (see text). Estimates utilize county population (rows 1–8) or state population (rows 9–11) as weights.
  * Statistically significant at 10%.
  ** Statistically significant at 5%.
  *** Statistically significant at 1%.

population living in poverty, born outside of the U.S., and in different age groupings — which have almost no effect on the point estimates for FSS. Re-calculating the estimates without weighting by county population produces an elasticity estimate for homicide with respect to guns that is about two-thirds as large as the weighted estimate (row 3). We prefer the weighted estimates because they provide a heteroskedasticity correction. Finally, the results reported in rows 4 and 5 demonstrate that the results hold up quite well to the inclusion of separate year fixed effects for each of the nine Census divisions, or to inclusion of the lagged dependent variable.[8]

The second panel of Table 3 reports the results of several efforts to deal with the fact that our measure of gun prevalence, FSS, is subject to error, primarily due to the relatively small number of suicides in some counties. To increase the "sample" of suicides, we average FSS over 2 years (row 6), limit the analysis to the largest 100 or largest 50 counties (rows 7 and 8), and utilize state-level data (rows 9, 10, and 11). The results suggest that the reduction in measurement error, as expected, tends to increase the point

---

[8] When we condition on county-specific linear trends (or state trends with the state data), the point estimates for FSS are generally about half as large as in Table 3. These estimates are statistically significant in the state data but not quite significant in the county data, with p-values on the order of $p \approx 0.2$.

Table 4
Specification checks for county and state results, 1980–1999

| Outcome | 200 Largest county data | State data |
|---|---|---|
| Ln(UCR murder) | 0.073* (0.043) | 0.645*** (0.200) |
| Ln(UCR rape) | −0.012 (0.048) | −0.201 (0.382) |
| Ln(UCR aggravated asslt) | −0.040 (0.038) | 0.275 (0.168) |
| Ln(UCR larceny) | 0.004 (0.015) | 0.096 (0.074) |
| Ln(UCR MV theft) | 0.041 (0.038) | 0.046 (0.189) |
| Ln(Fatality rate from falls) | N/A | 0.058 (0.158) |
| Ln(MV crash fatality rate) | N/A | 0.081 (0.068) |

Each cell presents the coefficient and standard error (adjusted for serial correlation) for a separate regression of the outcome measure described in the first column against the log of lagged FSS, controlling for the log of the robbery and burglary rates as well as the other covariates described in the final column of Table 4. The county-level regressions condition on county and year fixed effects and weight by county population, using a sample of the 200 largest counties in the U.S.; the state-level regressions condition on year and state fixed effects, as well as weight by state population.

    * Statistically significant at 10%.
    *** Statistically significant at 1%.

estimates by a factor of from 1.5 to 3 or 4 times our baseline specification. County-level estimates that adjust for measurement error using the approach suggested by Griliches and Hausman (1986), based on a comparison of the within- and first-difference estimators, are also generally about 3 or 4 times those from the baseline model.[9]

A final way to test for the possibility of bias from unmeasured variables is to determine whether FSS predicts outcomes that logically have little relationship to gun prevalence, in the spirit of Altonji et al. (2000, 2002). Table 4 reports the results of estimating the baseline model (final column, Table 2) on rates of other types of crime from the UCR, and on the fatality rate from falls and from motor-vehicle accidents. The estimated coefficients on FSS are not significantly different from zero in any of these regressions.[10,11]

Finally, Table 5 provides suggestive evidence that gun prevalence leads to elevated rates of homicide through the transfer of guns from "legal" to "illegal" owners, rather than through increased gun misuse by otherwise legal owners. In this exercise, we

---

[9] When we recalculate our estimates with the state-level data using a weighted average of the three gun proxies that are available to us (FSS, gun prevalence from the GSS, and Guns and Ammo subscription rates, where the weights are calculated using factor analysis as in Fryer et al., 2005), the point estimates are about 1.3 times those from our baseline model.

[10] Another implication from Table 4 is that the results are not sensitive to measuring homicides using data from the UCR rather than our preferred source, the Vital Statistics. Note that Duggan (2001) also finds evidence that gun prevalence as proxied by Guns and Ammo subscription rates are not systematically related to other types of crime besides homicide.

[11] We also calculated our estimates using just the long-term variation in gun ownership rates and homicide from the early 80s to the late 90s. This long-difference approach circumvents the problem of modeling the sharp increase and fall of the homicide rate during our sample period. We estimate a long-difference model that shows the changes in log homicides (or log gun or non-gun homicides) from 1980 to 1999, regressed against the change in log FSS over the same period, conditioning on the log changes in the other explanatory variables included in our baseline model. This long-difference estimator yields an elasticity of homicide with respect to gun prevalence of +.3, which is even larger when we pool data from multiple years to correct for measurement error.

*P.J. Cook, J. Ludwig / Journal of Public Economics 90 (2006) 379–391*                                      387

Table 5
Effects of gun ownership on Youth Homicides, State Data, 1980–1999

|  | Ln(Hom 15–19) | Ln(Gun hom 15–19) | Ln(Nongun 15–19) |
|---|---|---|---|
| *State data* | | | |
| Ln(State FSS) | 0.593** (0.194) | 0.458* (0.205) | −0.053 (0.373) |

Each cell presents a coefficient and standard error (adjusted for serial correlation) from a separate regression. Each regression controls for the log of the state's burglary and robbery rate and percent black, log state alcohol consumption per capita, and year and state fixed effects. Estimates are calculated using state populations as weights.
  * Statistically significant at 10%.
  ** Statistically significant at 5%.

focus on homicide rates to victims 15 to 19, a relatively high percentage of whom are killed in gang- and felony-related attacks by youthful criminals—with guns that are typically obtained from the secondary market (Cook and Ludwig, 2004a). That this market is closely tied to the prevalence of gun ownership is suggested by the large coefficient on FSS.[12]

# 6. Social costs

In sum, gun prevalence is positively associated with overall homicide rates but not systematically related to assault or other types of crime. Together, these results suggest that an increase in gun prevalence causes an *intensification* of criminal violence—a shift toward greater lethality, and hence greater harm to the community. Of course, gun ownership also confers benefits to the owners and possibly other members of the household. The benefits are associated with the various private uses of guns—gun sports, collecting, protection of self and household against people and varmints. But if our estimates are correct, the net external effects appear to be negative.

The magnitude of these net external costs is suggested by the elasticity estimates of homicide with respect to FSS. The baseline model applied to county-level data yields an elasticity of +0.09 or +0.10, although our various attempts to correct for measurement error typically suggest estimates on the order of +0.3 or more. All of these have the feature that the effect on overall homicide is due to changes in gun use, with the possibility of some substitution away from other types of weapon.

These elasticity estimates with respect to FSS also serve as estimated elasticities with respect to the household prevalence of gun ownership, if FSS is proportional to prevalence. Based on cross-section data, FSS does not appear to be strictly proportional—the best-fit line between FSS and survey-based gun ownership rates is linear with a significantly negative intercept (Azrael et al., 2004). But proportionality is

---

[12] Note that all of the estimates presented here assume that the elasticity of homicide with respect to guns is constant across counties. When we test this assumption by including interactions between FSS and indicators for whether the county's value of FSS in 1980 is in the top or bottom quartile, these interactions are not statistically significant.

a defensible assumption for time-series data: a regression of national handgun prevalence rates (from GSS data) on FSS yields an intercept with a $t$-statistic of only $-1$. In what follows, we treat the elasticity with respect to FSS as equal to the elasticity with respect to the prevalence of gun ownership.

The positive elasticity estimates imply that an increase in the prevalence of gun ownership has positive marginal social cost. It is relevant to translate the elasticity into a ratio: the annual change in the homicide count associated with a change in the number of households with guns. That ratio is related to the elasticity by this formula:

$$\text{Ratio of changes in homicides to gun−owning households} = [e \times h \times n]/g \quad (3)$$

where $e$ = elasticity of homicide rate to prevalence of guns; $h$ = homicide rate per capita; $g$ = household prevalence of gun ownership; $n$ = number of people per household.

This ratio is proportional to the marginal social cost of an additional gun homicide. The formula implies that the marginal social cost of acquiring a gun increases with the homicide rate. For a given homicide rate, the marginal social cost is lower for high-prevalence jurisdictions than low-prevalence—an implication of the log–log specification.

It is important to distinguish between gun types. While handguns make up only about one-third of the private inventory of guns, they account for 80% of all gun homicides and a still-higher percentage of gun robberies. Handguns are also used in most gun suicides. Hence the social costs of handgun ownership are much higher than ownership of rifles and shotguns. Unfortunately, it is difficult to distinguish between the prevalence of long-gun ownership and handgun ownership in aggregate data, since they are very highly correlated across jurisdictions. There is some divergence over time, as overall gun ownership has had a strong downward trend that is not so evident for handgun ownership. FSS is a better proxy over time for handgun ownership.

If the marginal social cost of gun prevalence is entirely attributable to handguns, then the relevant national average is about 20%. Using that value, together with a homicide rate of 10/100,000 (which is close to the average for the 200 counties), an elasticity of +0.10, and 2 people per household, then the formula indicates one additional homicide per year for every 10,000 additional handgun-owning households. In a county with 10% prevalence and a baseline homicide rate of 20, there are 4.0 additional homicides per year for every additional 10,000 handguns; if the baseline homicide rate is 5, and handgun prevalence 30%, just 0.3 homicides are engendered. If the true elasticity is closer to +0.3 instead of +0.1, then the predicted changes in homicides should be tripled.

Two additional questions relevant to calculating marginal social cost cannot be resolved satisfactorily from our results: which margin, and what geographic unit?

## 6.1. Which margin?

Most households that own one gun own several.[13] FSS is a valid proxy for the prevalence of gun ownership, but much of the "action" is at the intensive margin. With

---

[13] About three-quarters of all guns are owned by the one-third of gun-owning households that own at least four (Cook and Ludwig, 1996).

*P.J. Cook, J. Ludwig / Journal of Public Economics 90 (2006) 379–391*          389

respect to providing the right attribution of marginal social cost, it is important to determine whether the acquisition of the nth gun by a gun-owning household has the same cost on average as the acquisition of the first gun. Of course it is only the latter acquisition that will change prevalence.

### 6.2. What geographic unit?

While our focus has been on county-level ownership, we note that guns often travel across county lines. For that reason, household gun ownership in nearby counties may affect gun availability to local criminals. If true, then "gun prevalence in nearby counties" is a variable that belongs in the homicide regressions, since it is substantively relevant and quite possibly correlated with within-county prevalence. We experimented with specifications that included rest-of-state FSS in addition to the usual within-county FSS, but the results were not very sensible. At this point, it is necessary to be guided by other sorts of evidence regarding the importance of diffuse sources of guns outside of the immediate county. If there are few frictions in the flow of guns to criminals within a state, then our state-level estimates are a better basis for imputing the social costs than the county-level estimates.

Translated into the policy domain, the answers to these questions should influence the nature of regulation adopted in response to the cost argument, and also the geographic scope of the regulatory system. If the number of households with guns, as opposed to the number of guns, is the main concern, then a licensing system may be the preferred form of regulation.[14]

What would be the optimal license fee per household? Answering this question requires monetizing the social costs of the additional homicides that appear to be generated by widespread gun prevalence. One possibility would be to assign each homicide the value per statistical life that has been estimated in previous research, a range of $3 to $9 million (Viscusi, 1998), which come primarily from studies of workplace wage-risk tradeoffs. But even the lower end of this range may overstate the dollar value required to compensate the average homicide victim for a relatively higher risk of death, given that (as noted above) such a large proportion of homicide victims are engaged in criminal activity that entails a high risk of death. For example, a study of the wage premium paid to gang members engaged in selling drugs suggests a value per statistical life on the order of $8000 to $127,000 (Levitt and Venkatesh, 2000).

Suppose that given local conditions with respect to violence and gun ownership, we estimate a ratio of 10,000 handgun-owning households per annual homicide (approximately what holds at the national average for gun prevalence and homicide with an elasticity of homicide to gun prevalence of +0.1) Given a conservative value of life, $1 million, then the appropriate license fee for a household would be $100 per year. That license fee would increase with the homicide rate, and in some jurisdictions, such as Washington, DC, would become so high that as to be the practical equivalent of a ban on ownership (a ban on handgun acquisition is currently in place in Washington, Chicago, and some other cities). Of course, this calculation ignores the problem of compliance.

---

[14] If it is the number of guns that matters, as opposed to the number of households, then an annual tax per gun could be assessed. But our estimates are not directly relevant to estimating the appropriate fee in that case.

*P.J. Cook, J. Ludwig / Journal of Public Economics 90 (2006) 379–391*

This calculation will understate the optimal license fee per gun-owning household if our assumption about the average value per statistical life for homicide victims is too low, or if, as seems likely, gun violence imposes costs on society that are not well captured by any study of the value per statistical life.

Contingent valuation estimates intended to capture the complete social costs of gun violence indicate a value of around $1 million per assault-related gunshot injury (Cook and Ludwig, 2000; Ludwig and Cook, 2001). On average one in six assault-related gunshot injuries results in death (Cook, 1985; Cook and Ludwig, 2000). Under the assumption that this case-fatality rate is stable across time and space, then at the national averages for gun prevalence and homicide our baseline estimate of a guns/homicide elasticity of $+0.10$ implies that each additional 10,000 gun-owning households leads to around 6 additional crime-related gunshot injuries. If these contingent valuation estimates are approximately correct, the optimal license fee per gun-owning household would be on the order of $600. If the true elasticity of homicide with respect to gun prevalence is on the order of $+0.30$ rather than $+0.10$, as suggested by some of our estimates that are based on modifications intended to reduce measurement error, the optimal license fee may be as high as $1800 per household.[15]

## Acknowledgements

The research reported here was supported by a grant from the Joyce Foundation, and was conducted in part while the authors were residents at the Rockefeller Foundation's Bellagio Study and Conference Center. Thanks to Mark Duggan for sharing his data on gun magazine subscriptions, to Bob Malme, Dmitri Mirovitski, Joe Peters and Eric Younger for excellent research assistance, and to seminar participants at the NBER Health Spring 2004 meetings, and to David Hemenway, for helpful comments. All opinions and any errors are our own.

## References

Altonji, J.G., Elder, T.E., Taber, C.R., 2000. Selection on observed and unobserved variables: assessing the effectiveness of catholic schools. NBER Working Paper, vol. 7831. National Bureau of Economic Research, Cambridge, MA.

Altonji, J.G., Elder, T.E., Taber, C.R., 2002. An evaluation of instrumental variable strategies for estimating the effects of Catholic schools. NBER Working Paper, vol. 9358. National Bureau of Economic Research, Cambridge, MA.

Ayres, I., Levitt, S., 1998. Measuring positive externalities from unobservable victim precaution: an empirical analysis of LoJack. Quarterly Journal of Economics 113 (1), 43–77.

Azrael, D., Cook, P.J., Miller, M., 2004. State and local prevalence of firearms ownership: measurement, structure and trends. Journal of Quantitative Criminology 20 (1), 43–62.

---

[15] Note that all of these calculations ignore any additional costs that may arise from increased gun prevalence in the form of additional gun accidents or suicides (for estimates of the relationship between gun prevalence and suicide, see Duggan, 2003).

Bertrand, M., Duflo, E., Mullainathan, S., 2004. How much should we trust differences-in-differences? Quarterly Journal of Economics 119 (1), 249–275.

Blumstein, A., 2000. Disaggregating the violence trends. In: Blumstein, A., Wallman, J. (Eds.), The Crime Drop in America. Cambridge University Press, New York, pp. 13–44.

Cook, P.J., 1985. The case of the missing victims: gunshot woundings in the National Crime Victimization Survey. Journal of Quantitative Criminology 1 (1), 91–102.

Cook, P.J., Ludwig, J., 1996. Guns in America: Results of A Comprehensive Survey of Gun Ownership and Use. Police Foundation, Washington, DC.

Cook, P.J., Ludwig, J., 2000. Gun Violence: The Real Costs. Oxford University Press, New York.

Cook, P.J., Ludwig, J., 2004a. Does gun prevalence affect teen gun carrying after all? Criminology 42 (1), 27–54.

Cook, P.J., Ludwig, J., 2004b. The social costs of gun ownership. NBER Working Paper, vol. 10736. National Bureau of Economic Research, Cambridge, MA.

Cook, P.J., Molliconi, S., Cole, T.B., 1995. Regulating gun markets. Journal of Criminal Law and Criminology 86 (1), 59–92.

Davis, J.A., Smith, T.W., 1998. General social surveys, 1972–1998 (machine-readable data file)/Principal Investigator J.A. Davis; Director and Co-Principal Investigator, T.W. Smith; Sponsored by National Science Foundation–NORC ed.—National Opinion Research Center, Chicago (producer); The Roper Center for Public Opinion Research, University of Connecticut, Storrs, CT (distributor).

Duggan, M., 2001. More guns, more crime. Journal of Political Economy 109 (5), 1086–1114.

Duggan, M., 2003. Guns and suicide. In: Ludwig, J., Cook, P.J. (Eds.), Evaluating Gun Policy. Brookings Institution Press, Washington, DC, pp. 41–73.

Fryer, R., Heaton, P.S., Levitt, S.D., Murphy, K.M., 2005. Measuring the impact of crack cocaine. Working paper, Department of Economics, University of Chicago.

Gayer, T., 2004. The fatality risks of sport-utility vehicles, vans and pickup trucks relative to cars. Journal of Risk and Uncertainty 28 (2), 103–133.

Griliches, Z., Hausman, J., 1986. Errors in variables in panel data. Journal of Econometrics 31, 93–118.

Kelly, M., 2000. Inequality and crime. Review of Economics and Statistics 82 (4), 530–539.

Kleck, G., 1997. Targeting Guns: Firearms and Their Control. Aldine de Gruyter, New York.

Kleck, G., 2004. Measures of gun ownership levels for macro-level crime and violence research. Journal of Research in Crime and Delinquency 41 (1), 3–36.

Levitt, S., Venkatesh, S., 2000. An economic analysis of a drug-selling gang's finances. Quarterly Journal of Economics 115, 755–789.

Lott, J.R., 2000. More Guns, Less Crime, 2nd ed. University of Chicago Press, Chicago.

Ludwig, J., Cook, P.J., 2001. The benefits of reducing gun violence: evidence from contingent-valuation survey data. Journal of Risk and Uncertainty 22 (3), 207–226.

Solon, G., 1984. Estimating autocorrelations in fixed-effects models. National Bureau of Economic Research Working Paper, No. 32. National Bureau of Economic Research, Cambridge, MA.

Viscusi, W.K., 1998. Rational Risk Policy. Oxford University Press, New York.

# Exhibit 23

# Investigating the Link Between Gun Possession and Gun Assault

| Charles C. Branas, PhD, Therese S. Richmond, PhD, CRNP, Dennis P. Culhane, PhD, Thomas R. Ten Have, PhD, MPH, and Douglas J. Wiebe, PhD

Among a long list of issues facing the American public, guns are third only to gay marriage and abortion in terms of people who report that they are "not willing to listen to the other side." In concert with this cultural rift, scholarly discussion over guns has been similarly contentious.[1] Although scholars and the public agree that the roughly 100 000 shootings each year in the United States are a clear threat to health, uncertainty remains as to whether civilians armed with guns are, on average, protecting or endangering themselves from such shootings.[2–4]

Several case–control studies have explored the relationship between homicide and having a gun in the home,[5,6] purchasing a gun,[7,8] or owning a gun.[9] These prior studies were not designed to determine the risk or protection that possession of a gun might create for an individual at the time of a shooting and have only considered fatal outcomes. This led a recent National Research Council committee to conclude that, although the observed associations in these case–control studies may be of interest, they do little to reveal the impact of guns on homicide or the utility of guns for self-defense.[3,10]

However, the recent National Research Council committee also concluded that additional individual-level studies of the association between gun ownership and violence were the most important priority for the future.[3] With this in mind, we conducted a population-based case–control study in Philadelphia to investigate the relationship between being injured with a gun in an assault and an individual's possession of a gun at the time. We included both fatal and nonfatal outcomes and accounted for a variety of individual and situational confounders also measured at the time of assault.

## METHODS

We applied a case–control study design to determine the association between being injured with a gun in an assault and an individual's possession of a gun at the time. To determine this in the most generalizable way, we chose our target population to be residents

*Objectives.* We investigated the possible relationship between being shot in an assault and possession of a gun at the time.

*Methods.* We enrolled 677 case participants that had been shot in an assault and 684 population-based control participants within Philadelphia from 2003 to 2006. We adjusted odds ratios for confounding variables.

*Results.* After adjustment, individuals in possession of a gun were 4.46 ($P<.05$) times more likely to be shot in an assault than those not in possession. Among gun assaults where the victim had at least some chance to resist, this adjusted odds ratio increased to 5.45 ($P<.05$).

*Conclusions.* On average, guns did not protect those who possessed them from being shot in an assault. Although successful defensive gun uses occur each year, the probability of success may be low for civilian gun users in urban areas. Such users should reconsider their possession of guns or, at least, understand that regular possession necessitates careful safety countermeasures. (*Am J Public Health.* 2009;99:XXX–XXX. doi:10.2105/AJPH.2008.143099)

of Philadelphia, Pennsylvania, prompting the use of population-based control participants. We considered trial, cohort, and matched cohort designs but for various reasons (ethical considerations, prohibitively long implementation time, limited generalizability, and so on.) these were not pursued.

We assumed that the resident population of Philadelphia risked being shot in an assault at any location and at any time of day or night. This is an acceptable assumption because guns are mobile, potentially concealable items and the bullets they fire can pass through obstacles and travel long distances.[11–14] Any member of the general population has the potential to be exposed to guns and the bullets they discharge regardless of where they are or what they are doing. As such, we reasonably chose not to exclude participants as immune from hypothetically becoming cases because they were, for instance, asleep at home during the night or at work in an office building during the day. Instead we measured and controlled for time-based situational characteristics that might have changed, but did not eliminate, the possibility of being shot in an assault.

### Participant Identification and Matching

Gunshot assault cases caused by powder charge firearms were identified as they occurred, from October 15, 2003, to April 16,

2006. The final 6 months of this period were limited to only fatal cases. We excluded self-inflicted, unintentional, and police-related shootings (an officer shooting someone or being shot), and gun injuries of undetermined intent. We excluded individuals younger than 21 years because it was not legal for them to possess a firearm in Philadelphia and, as such, the relationship we sought to investigate was functionally different enough to prompt separate study of this age group. We excluded individuals who were not residents of Philadelphia as they were outside our target population and individuals not described as Black or White as they were a very small percentage of shootings (<2%). Even after these exclusions, the study only needed a subset of the remaining shootings to test its hypotheses. A random number was thus assigned to these remaining shootings, as they presented, to enroll a representative one third of them.

Data coordinators at the Philadelphia Police Department identified and enrolled new shooting case participants as they occurred by reviewing an electronic incident tracking system and interviewing police officers, detectives, and medical examiners. Basic data for eligible case participants were wirelessly sent to the University of Pennsylvania where study leaders forwarded them to a survey research firm for recruitment of a matched control participant.

| RESEARCH AND PRACTICE |

More detailed information for each enrolled case was later filled in with additional data from state and local police, medical examiner, emergency medical services, and hospital data sources.[15]

We pair-matched case participants to control participants on the date and time (within 30-minute intervals; i.e., 10:30 pm, 11:00 pm) of each shooting. This was done because the factors we planned to analyze, including gun possession, were often short-lived making the time of the shooting most etiologically relevant.[16] This also helped to control for a great many unmeasurable confounders related to time. We also matched our control participants to case participants on the basis of age group (aged 21–24 years, 25–39 years, 40–64 years, and 65 years and older), gender, and race (Black or White). We pair-matched on these variables to avoid extremely sparse data in certain subgroups given a priori knowledge that exceedingly different age, race, and gender distributions existed among assaultive shootings relative to the general population of Philadelphia.[17] We did not pair-match case participants and control participants on location. On the basis of early power calculations, we matched 1 control participant to each shooting case.

Control participants were in Philadelphia at the time their matched case was shot. The median number of days between the time a shooting occurred and the time a control participant interview was completed was 2 days. More than three quarters of all control participant interviews were completed within 4 days of their matched shooting. Control participants were interviewed as rapidly as possible to minimize recall bias.

Control participants were sampled from all of Philadelphia via random-digit dialing.[10,18] In the interest of time, multiple interviewers may have simultaneously begun and then completed control participant interviews. This resulted in 7 case participants that had more than 1 control participant. These few additional control participants were retained in final analyses. We also tested for the possibility of unequal sampling by using an inverse probability of selection weight defined as the number of eligible control participants divided by the number of phone lines in a household. These weighted models generated only very small differences (<5%) in our results.

We took several steps to maximize participation and avoid selection biases caused by nonresponse.[15,10,19–21] According to standard formulae, the cooperation rate for our control participant survey was calculated to be 74.4% and the response rate 56.0%.[22] These rates exceeded those of other surveys conducted at about the same time[23] and were high enough to produce a reasonably representative sample of our target population.[24,25] Our control participants were statistically similar to the general population of Philadelphia in terms of marital status, retirement, education, general health status, and smoking status within the age, gender, and race categories specified earlier.[26] Our control participants were, however, significantly more unemployed than the general population.

## Conceptual Framework and Variables

We conceptually separated confounding variables in the association between victim gun possession and gun assault into individual and situational characteristics, both of which feed the eventual victim–offender interaction that results in gun assault (Figure 1).[27–29]

Case subsets included fatal gun assaults and gun assaults in which the victim had at least some chance to resist the threat posed by an offender, based on circumstance data and written accounts from police, paramedics, and medical examiners. Case participants with at least some chance to resist were typically either 2-sided, mutual combat situations precipitated by a prior argument or 1-sided attacks where a victim was face-to-face with an offender who had targeted him or her for money, drugs, or property. Case participants with at least some chance to resist were in contrast to those that happened very suddenly, involved substantial distances, had no face-to-face contact, and

had physical barriers between victim and shooter (e.g., an otherwise uninvolved victim shot in his living room from a gun fired during a fight down the street).[30–33] Each case's chance-to-resist status was assigned after being independently rated by 2 individuals (initial $\kappa = 0.64$ indicating substantial agreement[34]) who then reconciled differential ratings.

For case participants, gun possession at the time of the shooting was determined by police observations at crime scenes and police interviews with victims and witnesses, as well as confiscation and recovery of guns by police investigators. We coded case participants as in possession if 1 or more guns were determined to have been with them and readily available at the time of the shooting. We coded control participants as in possession if they reported any guns in a holster they were wearing, in a pocket or waistband, in a nearby vehicle, or in another place, quickly available and ready to fire at the time of their matched case's shooting. We determined gun possession status for 96.8% of case participants and 99.6% of control participants. We imputed missing data by using multiple imputation by chained equations.[35,36]

We collected participants' locations as street intersection or blockface points. We collected environmental factors as centroid and population-weighted centroid points of blocks, block groups, and tracts.[37] We assigned study participants cumulative, inverse distance-weighted measures of each environmental factor on the basis of the points where they were located and the point locations and magnitudes of the factors surrounding them. The higher the measure, the greater the clustering and magnitude of factors around a participant's location.[15,38]



**FIGURE 1—Conceptual framework showing the relationships between victim gun possession, gun assault, and other important characteristics.**

| RESEARCH AND PRACTICE |

## Statistical Analyses

We modeled gun possession as the focal independent variable with the outcome of gun assault and other confounding variables by using conditional logistic regression.[39] We excluded excessively collinear confounders to keep variance inflation factors less than 10.[40]

We adjusted all regression models for yearly age (to control for residual variability within age groups that remained after matching[17]) and numerous other potential individual and situational confounders based on previous work and theory (Table 1).[5–8,27,32,33,41–48] We defined workers at high probability of being assaulted based on their profession (e.g., their job involved handling of cash) as being at high risk.[46] We

calculated reduced regression models with confounders that, when added to the model of gun possession and yearly age, changed the matched odds ratio by more than 15%.[49,50] We also calculated full regression models with all confounders that were not excessively collinear regardless of how much they changed the matched odds ratio. Robust sandwich estimators of variance were specified.[51] Regression model residuals were not statistically significant for spatial autocorrelation.[52,53]

We performed sensitivity analyses to assess the potential impact of misclassification bias on our analyses of gun possession and gun assault. To do this we purposely miscoded the gun possession status of case participants and

control participants by specifying that a randomly selected 1%, 3%, 5%, and 10% of them had their guns go undetected and then reran our regression models to determine the effect on our original odds ratio. We repeated this procedure 100 times for each percentage combination of miscoded case participants and control participants and averaged the results to produce a mean biased odds ratio and standard error. The 2 misclassification biases upon which we most concentrated were case participants without guns recoded to having guns (e.g., to test the bias of a shooting victim or others on-scene disposing of their guns before police arrived) and control participants without guns recoded to having guns (e.g., to

**TABLE 1—Comparison of Case and Control Participants, by Situational and Individual Characteristics: Philadelphia, PA, 2003–2006**

| | All Gun Assaults | | Fatal Gun Assaults | | Gun Assaults Where Victim Had at Least Some Chance to Resist | |
|---|---|---|---|---|---|---|
| | Case Participants (n = 677) | Control Participants (n = 684) | Case Participants (n = 163) | Control Participants (n = 166) | Case Participants (n = 446) | Control Participants (n = 451) |
| **Situational characteristics** | | | | | | |
| Gun possession, % | 5.92 | 7.16 | 8.80 | 7.85 | 8.28 | 7.37 |
| Alcohol involvement, % | 26.34 | 13.82** | 24.55 | 14.20** | 28.94 | 13.58** |
| Illicit drug involvement, % | 11.27 | 7.51** | 23.38 | 4.75** | 9.00 | 8.85 |
| Being outdoors, % | 83.13 | 9.05** | 70.77 | 9.24** | 82.21 | 9.65** |
| Others present, mean no. of people | 3.12 | 2.91 | 3.29 | 2.90 | 3.36 | 2.95 |
| Surrounding area | | | | | | |
| Blacks, mean 1000 people per mile | 26.04 | 20.19** | 24.44 | 20.62** | 25.81 | 19.56** |
| Hispanics, mean 1000 people per mile | 4.50 | 2.68** | 4.21 | 2.89* | 4.65 | 2.68** |
| Unemployment, mean 1000 people per mile | 2.44 | 1.98** | 2.29 | 2.02** | 2.43 | 1.96** |
| Income, mean million dollars per mile | 594.90 | 652.79** | 577.11 | 632.32 | 586.65 | 660.26** |
| Alcohol outlets, mean number per mile | 79.87 | 82.12 | 73.05 | 82.42 | 78.48 | 84.28 |
| Illicit drug trafficking, mean arrests per mile | 953.21 | 563.60** | 809.94 | 634.19* | 958.58 | 551.69** |
| **Individual characteristics** | | | | | | |
| Age, mean, y | 30.56 | 32.65** | 31.99 | 34.12** | 30.88 | 32.84** |
| Black, % | 87.89 | 87.87 | 87.69 | 87.31 | 85.56 | 85.31 |
| Male, % | 91.88 | 91.67 | 91.38 | 91.54 | 94.40 | 94.25 |
| Hispanic, % | 7.15 | 3.51** | 7.63 | 4.23 | 8.12 | 3.82** |
| Occupation | | | | | | |
| Professional, % | 33.00 | 29.93 | 28.68 | 30.82 | 34.70 | 30.43 |
| Working class, % | 31.34 | 46.70 | 30.77 | 41.39 | 30.49 | 46.40 |
| Not working, % | 35.66 | 23.38 | 40.55 | 27.79 | 34.81 | 23.17 |
| High-risk occupation,[a] % | 24.34 | 11.40** | 13.78 | 10.45 | 27.21 | 10.99** |
| Education, mean, y | 11.59 | 12.73** | 11.66 | 12.68** | 11.59 | 12.76** |
| Prior arrests, y | 53.12 | 37.06** | 54.58 | 35.95** | 52.80 | 37.17** |

[a]High-risk occupations were those in which workers had a high probability of being assaulted (e.g., their job involved handling of cash).[46]
*$P \leq .05$; **$P \leq .01$.

[Q1]

test the bias of having been in possession of a gun but not admitting it to an interviewer. The levels of misclassification we tested were based on prior work[54–56] and our own data that indicated less than 1% of our control participants were not "very sure" of their gun possession status. Statistical tests were 2-tailed and significance was indicated by $P$ values less than .05 throughout our analyses.

## RESULTS

Over the study period, our research team was notified of 3485 shootings of all types occurring in Philadelphia. This translated into an average of 4.77 (standard deviation [SD]=2.82) shootings per day, with a maximum of 21 shootings in a single day and an average of 9 days a year that were free from shootings. From among all these shootings, 3202 (91.88%) were assaults, 167 were self-inflicted (4.79%), 60 were unintentional (1.72%), 54 were legal interventions (1.55%), and 2 were of undetermined intent (0.06%). When we considered only assaults, an average of 4.39 (SD=2.70) individuals were shot per day in Philadelphia with a maximum of 20 in a single day and an average of 13 days a year in which no individuals were shot.

From among all 3202 individuals who had been shot in an assault, we excluded those aged younger than 21 years or of unknown age (29.83%), non-Philadelphia residents (4.34%), individuals not described as being Black or White (1.62%), and police officers that had been shot (0.09%). From the remaining group of 2073 participants, we randomly selected and enrolled 677 individuals (32.66%). We also concurrently identified and enrolled an age-, race-, and gender-matched group of 684 control participants.

Case participants and control participants showed no statistically significant differences in age group, race, and gender distributions, or in the times of day, days of the week, and months of the year when their data were collected. Case participants and control participants were thus successfully matched on age category, race, gender, and time.

However, compared with control participants, shooting case participants were significantly more often Hispanic, more frequently working in high-risk occupations[1,2], less educated, and

had a greater frequency of prior arrest. At the time of shooting, case participants were also significantly more often involved with alcohol and drugs, outdoors, and closer to areas where more Blacks, Hispanics, and unemployed individuals resided. Case participants were also more likely to be located in areas with less income and more illicit drug trafficking (Table 1).

### Association Between Gun Possession and Gun Assault

After we adjusted for confounding factors, individuals who were in possession of a gun were 4.46 (95% confidence interval [CI]=1.16, 17.04) times more likely to be shot in an assault than those not in possession. Individuals who were in possession of a gun were 4.23 (95% CI=1.19, 15.13) times more likely to be fatally shot in an assault. In assaults where the victim had at least some chance to resist, individuals who were in possession of a gun were 5.45 (95% CI=1.01, 29.92) times more likely to be shot.

When we only considered independent variables that most strongly affected our models, smaller but correspondingly significant adjusted odds ratios were noted. In these reduced models, individuals who were in possession of a gun were 2.55 (95% CI=1.00, 6.58) times more likely to be shot in an assault than those not in possession. Individuals who were in possession of a gun were also 3.54 (95% CI=1.18, 10.58) times more likely to be fatally shot in an assault. In assaults where the victim had at least some chance to resist, individuals who were in possession of a gun were 2.92 (95% CI=1.01, 8.42) times more likely to be shot (Table 2).

Sensitivity analyses produced no odds ratio estimates less than 1.00. If we assumed that both case participants and control participants had 5% of their guns go undetected, the observed odds ratio of 4.46 (significant) would have been reduced to 2.23 (nonsignificant). Similarly, among gun assaults where the victim had a reasonable chance to resist, 5% underdetection of guns among both case participants and control participants would have reduced the observed odds ratio of 5.45 (significant) to 3.12 (nonsignificant; Table 3).

## DISCUSSION

After we adjusted for numerous confounding factors, gun possession by urban adults was associated with a significantly increased risk of being shot in an assault. On average, guns did not seem to protect those who possessed them from being shot in an assault. Although successful defensive gun uses can and do occur,[33,57] the findings of this study do not support the perception that such successes are likely.

A few plausible mechanisms can be posited by which possession of a gun increases an individual's risk of gun assault. A gun may falsely empower its possessor to overreact, instigating and losing otherwise tractable conflicts with similarly armed persons. Along the same lines, individuals who are in possession of a gun may increase their risk of gun assault by entering dangerous environments that they would have normally avoided.[58–60] Alternatively, an individual may bring a gun to an otherwise gun-free conflict only to have that gun wrested away and turned on them.

**TABLE 2—Regression Results Showing the Association Between Gun Possession and Gun Assault: Philadelphia, PA, 2003–2006**

| | Total Participants (Cases and Controls), No. | Full Models, AOR (95% CI) | Reduced Models, AOR (95% CI) |
|---|---|---|---|
| All gun assaults | 1361 | 4.46 (1.16, 17.04)* | 2.55 (1.00, 6.58)* |
| Fatal gun assaults | 329 | 4.23 (1.19, 15.13)* | 3.54 (1.18, 10.58)* |
| Gun assaults where victim had at least some chance to resist | 897 | 5.45 (1.01, 29.92)* | 2.92 (1.01, 8.42)* |

*Notes.* AOR = adjusted odds ratio; CI = confidence interval. The full models adjusted for all characteristics listed in Table 1; reduced models adjusted for age, illicit drug involvement, being outdoors, and unemployment.
*$P \leq .05$.

TABLE 3—Sensitivity Analyses Showing the Effects of Simulated Misclassification Because of Undetected Gun Possession: Philadelphia, PA, 2003–2006

| % of Control Participants Without Guns Randomly Recoded to Having Guns[a] | % of Case Participants Without Guns Randomly Recoded to Having Guns[b] | | | | |
|---|---|---|---|---|---|
| | 0% | 1% | 3% | 5% | 10% |
| All gun assaults | | | | | |
| 0% | 4.46* | 4.80* | 5.45* | 6.22* | 8.25** |
| 1% | 3.66 | 3.83 | 4.51* | 5.07* | 6.91** |
| 3% | 2.49 | 2.69 | 3.11 | 3.51 | 4.81* |
| 5% | 1.86 | 2.01 | 2.37 | 2.23 | 3.07* |
| 10% | 1.03 | 1.14 | 1.32 | 1.26 | 1.78 |
| Fatal gun assaults | | | | | |
| 0% | 4.23* | 4.76* | 5.48* | 6.30* | 8.36** |
| 1% | 3.62 | 3.87* | 4.44* | 5.28* | 7.21* |
| 3% | 2.52 | 2.85 | 3.35 | 3.84 | 4.45* |
| 5% | 1.89 | 2.29 | 2.54 | 2.87 | 4.01 |
| 10% | 1.03 | 1.31 | 1.53 | 1.74 | 2.31 |
| Gun assaults where victim had at least some chance to resist | | | | | |
| 0% | 5.45* | 4.78* | 5.66* | 6.27* | 8.34** |
| 1% | 3.59 | 4.75 | 5.48 | 6.24* | 8.73* |
| 3% | 2.46 | 3.25 | 3.82 | 4.34 | 6.00* |
| 5% | 1.86 | 2.53 | 2.80 | 3.12 | 4.36 |
| 10% | 1.03 | 1.42 | 1.66 | 1.83 | 2.48 |

[a]For instance, to compensate for control participants who failed to disclose their gun possession.
[b]For instance, to compensate for case participants who discarded their guns after they were shot.
*$P \le .05$; **$P \le .01$; base adjusted odds ratio is adjusted odds ratios from full models with 0% of case and 0% of control participants recoded.

Situations in which the victim had at least some chance to resist may have generated gun assault risks when one considers that many of these events were 2-sided situations in which both parties were ready and mutually willing to fight on the basis of a prior argument.[29,30] Because both victim and offender had some sense of each other's capabilities prior to the event they may have had more time to prepare for their ensuing conflict.[61] More preparation may have increased the likelihood that both individuals were armed with guns and that at least 1 or both were shot.

Although less prevalent, 1-sided situations in which a victim had at least some chance to resist an unprovoked attack may have also generated gun assault risks for victims who possessed guns.[29] In these situations, victim and offender were often interacting for the first time and the element of surprise afforded the offender likely limited the victim's ability to quickly produce a gun and defuse or dominate their advantaged opponent. If the victim did produce a gun, doing so may have simply exacerbated an already volatile situation and gotten them shot in the process.

In contrast, when victims had little to no chance to resist, they were almost always confronted with events that happened very suddenly, involved substantial distances, had no face-to-face contact, and had physical barriers between them and the shooter (e.g., bystander or drive-by shootings). These victims likely had no meaningful opportunity to use a gun if they had one in their possession.

## Prior Case–Control Studies

We endeavored to improve upon prior case–control studies that have explored the relationship between homicide and exposure to guns.[5–9] Although gun homicides are important to prevent, the ability to produce a more general conclusion about the risk of gun assault, not simply the risk of being murdered with a gun,

was of greater importance to public health and safety. This prompted us to enroll all shootings, regardless of their survival, as one improvement to our case–control study.

A second improvement was our use of an incidence density sampling framework to select control participants. This allowed us to make a judgment about the risk associated with gun possession proximal to the shooting event itself. Prior case–control work has involved less proximal gun exposure measures — owning,[9] purchasing,[7,8] or having a gun in the home.[5,6] These measures leave open to question the actual risk that a gun may pose for an individual concurrent with the time they were shot. That is, someone may have a gun in their home, may have purchased a gun, or may own a gun, but without knowledge of whether that gun was in their possession at the time they were shot, the possibility that they have been misclassified as being exposed to a gun when in fact they were not is a potential bias.[43,62,63] This bias erodes the ability to speculate on plausible causal mechanisms other than to say that general access to a gun, over some amount of space or time, is a risk factor.

Finally, as this was a case–control study, we had the advantage of being able to statistically adjust for numerous confounders of the relationship between gun possession and gun assault. These confounders included important individual-level factors that did not change with time such as having a high-risk occupation, limited education, or an arrest record. Other confounders that we included were situational factors that could have influenced the relationship under study—substance abuse, being outside, having others present, and being in neighborhood surroundings that were impoverished or busy with illicit drug trafficking. Although these situational confounders were potentially short-lived (e.g., a participant may have metabolized the drugs or alcohol they consumed, moved to another location, or left the company of others) this was less important given the incidence–density sampling and the fact that case and control participants were essentially matched on time.

## Study Limitations

A number of study limitations deserve discussion. Our control population was more unemployed than the target population of

| RESEARCH AND PRACTICE |

Philadelphians that it was to intended to represent. Although we did account for employment status in our regression models and our control population was found to be representative of Philadelphians for 5 out of 6 indicators, having a preponderance of unemployment among our control participants may mildly erode our study's generalizability. It is also worth noting that our findings are possibly not generalizable to nonurban areas whose gun injury risks can be significantly different than those of urban centers like Philadelphia.[64]

Certain other variables that may have confounded the association between gun possession and assault were also beyond the scope of our data collection system and, therefore, were not included in our analyses. For instance, any prior or regular training with guns was a potentially important confounding variable that we did not measure and whose inclusion could have affected our findings (although the inclusion of other confounding variables possibly related to training may account for some of this unmeasured confounding).

We also did not account for the potential of reverse causation between gun possession and gun assault. Although our long list of confounders may have served to reduce some of the problems posed by reverse causation,[65] future case-control studies of guns and assault should consider instrumental variables techniques to explore the effects of reverse causation. It is worth noting, however, that the probability of success with these techniques is low.[66]

Finally, our results could have been affected by misclassification of gun possession status. Because of prior discussion[63] and likely levels of misclassification,[54–56] we concentrated on undetected gun possession. The ensuing sensitivity analyses demonstrated odds ratio estimates that increased and decreased in statistical significance but that did not drop below 1.00, even when challenged with high levels of misclassification. Thus, even after simulating high levels of misclassification bias, a net protective effect of gun possession was not evident.

## Conclusions

On average, guns did not protect those who possessed them from being shot in an assault. Although successful defensive gun uses are possible and do occur each year,[33,57] the probability of success may be low for civilian gun

users in urban areas. Such users should rethink their possession of guns or, at least, understand that regular possession necessitates careful safety countermeasures. Suggestions to the contrary, especially for urban residents who may see gun possession as a surefire defense against a dangerous environment,[61,67] should be discussed and thoughtfully reconsidered. ∎

## About the Authors

Charles C. Branas and Douglas J. Wiebe are with the Department of Biostatistics and Epidemiology, Firearm and Injury Center at Penn, University of Pennsylvania School of Medicine, Philadelphia. Therese S. Richmond is with the Division of Biobehavioral and Health Sciences, Firearm and Injury Center at Penn, and University of Pennsylvania School of Nursing, Philadelphia. Dennis P. Culhane is with the Cartographic Modeling Laboratory, University of Pennsylvania School of Social Policy and Practice, Philadelphia. Thomas R. Ten Have is with the Department of Biostatistics and Epidemiology, University of Pennsylvania School of Medicine, Philadelphia.

Correspondence should be sent to Charles C. Branas, PhD, Department of Biostatistics and Epidemiology, University of Pennsylvania School of Medicine, Room 936 Blockley Hall, 423 Guardian Dr, Philadelphia, PA 19104-6021 (e-mail: cbranas@upenn.edu). Reprints can be ordered at http://www.ajph.org by clicking the "Reprints/Eprints" link.

This article was accepted February 7, 2009.

## Contributors

C.C. Branas originated the study idea, oversaw the implementation of the study, and analyzed the data. T.S. Richmond and D.P. Culhane advised the study's implementation and analyses. T.R. Ten Have and D.J. Wiebe advised the study's implementation and analyzed the data. All authors wrote this article.

## Acknowledgments

This study was funded by the National Institutes of Health, National Institute on Alcohol Abuse and Alcoholism (grant R01AA013119).

The authors are also indebted to numerous dedicated individuals at the Philadelphia Police, Public Health, Fire, and Revenue Departments as well as DataStat Inc, who collaborated in this work.

## Human Participant Protection

The study was approved by both the University of Pennsylvania and the Philadelphia Department of Public Health institutional review boards. A federal certificate of confidentiality was also provided by the National Institutes of Health.

## References

1. Branas CC. A review of: suing the gun industry: a battle at the crossroads of gun control and mass torts. J Leg Med. 2006;27(1):103–108.

2. Centers for Disease Control and Prevention. Web-based Injury Statistics Query and Reporting System: 2000-2001. Available at: http://www.cdc.gov/ncipc/wisqars. Accessed March 1, 2009.

3. Wellford CF, Pepper JV, Petrie CV. Firearms and Violence: A Critical Review. Washington, DC: National Academies Press; 2005:6.

4. Vizzard W. Shots in the Dark. The Policy, Politics, and Symbolism of Gun Control. New York, NY: Rowman and Littlefield; 2000.

5. Wiebe DJ. Homicide and suicide risks associated with firearms in the home: a national case-control study. Ann Emerg Med. 2003;41:771–782.

6. Kellermann AL, Rivara FP, Rushforth NB, et al. Gun ownership as a risk factor for homicide in the home. N Engl J Med. 1993;329:1084–1091.

7. Grassel KM, Wintemute GJ, Wright MA, Romero MP. Association between handgun purchase and mortality from firearm injury. Inj Prev. 2003;9:48–52.

8. Cummings P, Koepsell T, Grossman D, Savarino J, Thompson R. The association between the purchase of a handgun and homicide or suicide. Am J Public Health. 1997;87:974–978.

9. Kleck G, Hogan M. National case-control study of homicide offending and gun ownership. Soc Probl. 1999;46(2):275–293.

10. Weiner J, Wiebe DJ, Richmond TS, et al. Reducing firearm violence: a research agenda. Inj Prev. 2007;13:80–84.

11. Poole C. Critical appraisal of the exposure-potential restriction rule. Am J Epidemiol. 1987;125:179–183.

12. Poole C. Exposure opportunity in case-control studies. Am J Epidemiol. 1986;123:352–358.

13. Poole C. Controls who experienced hypothetical causal intermediates should not be excluded from case-control studies. Am J Epidemiol. 1999;150:547–551.

14. Richmond TS, Branas CC, Cheney RA, Schwab CW. The case for enhanced data collection of gun type. J Trauma. 2004;57:1356–1360.

15. Branas C, Richmond T, Culhane D, Wiebe D. Novel linkage of individual and geographic data to study firearm violence. Homicide Stud. 2008;12(3):298–320.

16. Roberts I. Methodologic issues in injury control studies. Inj Prev. 1995;1:45–48.

17. Rothman KJ, Greenland S. Case-control studies. In: Rothman KJ, Greenland S, eds. Modern Epidemiology. 2nd ed. Philadelphia, PA: Lippincott Williams & Wilkins; 1998:93–114.

18. Waksberg J. Sampling methods for random digit dialing. J Am Stat Assoc. 1978;73:40–46.

19. Koepsell TD, McGuire V, Longstreth WT Jr, Nelson LM, van Belle G. Randomized trial of leaving messages on telephone answering machines for control recruitment in an epidemiologic study. Am J Epidemiol. 1996;144:704–706.

20. Harlow BL, Crea EC, East MA, Oleson B, Fraer CJ, Cramer DW. Telephone answering machines: the influence of leaving messages on telephone interviewing response rates. Epidemiology. 1993;4:380–383.

21. Herzog A, Rodgers W. The use of survey methods in research on older Americans. In: Woolson R, ed. The Epidemiologic Study of the Elderly. New York, NY: Oxford University Press; 1992.

22. Daves R. Standard Definitions: Final Dispositions of Case Codes and Outcome Rates for Surveys. 4th ed. Lenexa, KS: The American Association for Public Opinion Research; 2006.

| RESEARCH AND PRACTICE |

23. Galea S, Tracy M. Participation rates in epidemiologic studies. *Ann Epidemiol.* 2007;17:643–653.

24. Keeter S, Kennedy C, Dimock M, Best J, Craighill P. Gauging the impact of growing nonresponse on estimates from a national RDD telephone survey. *Public Opin Q.* 2006;70:759–779.

25. Groves R. Nonresponse rates and nonresponse bias in household surveys. *Public Opin Q.* 2006;70:646–675.

26. Southeastern Pennsylvania Household Health Survey. Adult Respondent File, 2002, 2004, 2006. Philadelphia, PA: Public Health Management Corporation; 2006.

27. Ziegenhagen E, Brosnan D. Victim responses to robbery and crime control policy. *Criminology.* 1985; 23:675–695.

28. Felson R, Steadman H. Situational factors in disputes leading to criminal violence. *Criminology.* 1983; 21:59–74.

29. Wells W. The nature and circumstances of defensive gun use: a content analysis of interpersonal conflict situations involving criminal offenders. *Justice Q.* 2002;19:127–157.

30. Denton JF, Fabricius WV. Reality check: using newspapers, police reports, and court records to assess defensive gun use. *Inj Prev.* 2004;10:96–98.

31. Wolfgang M. A tribute to a view I have opposed. *J Crim Law Criminol.* 1995;86(1):188–192.

32. Kleck G, DeLone M. Victim resistance and offender weapon effects in robbery. *J Quant Criminol.* 1993;9(1): 55–81.

33. Kleck G, Gertz M. Armed resistance to crime: the prevalence and nature of self-defense with a gun. *J Crim Law Criminol.* 1995;86(1):150–187.

34. Koepsell TD, Weiss NS. *Epidemiologic Methods: Studying the Occurrence of Illness.* New York, NY: Oxford University Press; 2003:200.

35. van Buuren S, Boshuizen HC, Knook DL. Multiple imputation of missing blood pressure covariates in survival analysis. *Stat Med.* 1999;18:681–694.

36. Rubin D. *Multiple Imputation for Nonresponse in Surveys.* New York, NY: Wiley; 1987.

37. Xie D, Raghunathan TE, Lepkowski JM. Estimation of the proportion of overweight individuals in small areas - a robust extension of the Fay-Herriot model. *Stat Med.* 2007;26:2699–2715.

38. Branas CC, Elliott MR, Richmond TS, Culhane DP, Wiebe DJ. Alcohol consumption, alcohol outlets, and the risk of being assaulted with a gun. *Alcohol Clin Exp Res.* 2009;33:906–915.

39. Breslow NE. Statistics in epidemiology: the case-control study. *J Am Stat Assoc.* 1996;91(433):14–28.

40. Fox J. *Regression Diagnostics: An Introduction. Sage University Paper Series on Quantitative Applications in the Social Sciences.* Newbury Park, CA: Sage; 1991:7–79.

41. Nelson DE, Grant-Worley JA, Powell K, Mercy J, Holtzman D. Population estimates of household firearm storage practices and firearm carrying in Oregon. *JAMA.* 1996;275:1744–1749.

42. Kleck G, Gertz M. Carrying guns for protection: results from the National Self-Defense Survey. *J Res Crime Delinq.* 1998;35(2):193–224.

43. Kleck G. What are the risks and benefits of keeping a gun in the home? *JAMA.* 1998;280:473–475.

44. Decker S, Caldwell A. *Illegal Firearms: Access and Use by Arrestees.* Washington, DC: US Department of Justice, Office of Justice Programs, National Institute of Justice; 1997. Report ID NCJ 163496.

45. Dahlberg LL, Ikeda RM, Kresnow MJ. Guns in the home and risk of a violent death in the home: findings from a national study. *Am J Epidemiol.* 2004;160: 929–936.

46. Islam SS, Edla SR, Mujuru P, Doyle EJ. Ducatman AM. Risk factors for physical assault. State-managed workers' compensation experience. *Am J Prev Med.* 2003;25:31–37.

47. Warner BD, Wilson Coomer B. Neighborhood drug arrest rates: are they a meaningful indicator of drug activity? A research note. *J Res Crime Delinq.* 2003;40(2): 123–138.

48. Kleck G, McElrath K. The effects of weaponry on human violence. *Soc Forces.* 1991;69(3):669–692.

49. Mickey RM, Greenland S. The impact of confounder selection criteria on effect estimation. *Am J Epidemiol.* 1989;129:125–137.

50. Kleinbaum DG. Epidemiologic methods: the "art" in the state of the art. *J Clin Epidemiol.* 2002;55: 1196–1200.

51. White H. A heteroscedasticity-consistent covariance matrix estimator and a direct test for heteroscedasticity. *Econometrica.* 1980;48:817–838.

52. Getis A. Spatial statistics. In: Longley P, Goodchild M, Maguire D, Rhind D, eds. *Geographical Information Systems Volume 1 Principles and Technical Issues.* 2nd ed. Chichester, England: John Wiley and Sons; 2000:239–251.

53. Gruenewald PJ, Remer L. Changes in outlet densities affect violence rates. *Alcohol Clin Exp Res.* 2006; 30:1184–1193.

54. Smith T. A seeded sample of concealed-carry permit holders. *J Quant Criminol.* 2003;19:441–445.

55. Rafferty AP, Thrush JC, Smith PK, McGee HB. Validity of a household gun question in a telephone survey. *Public Health Rep.* 1995;110:282–288.

56. Kellermann AL, Rivara FP, Banton J, et al. Validating survey responses to questions about gun ownership among owners of registered handguns. *Am J Epidemiol.* 1990;131:1080–1084.

57. Hemenway D. The myth of millions of annual self-defense gun uses: a case study of survey overestimates of rare events. *Chance.* 1997;10(3):6–10.

58. Thompson DC, Thompson RS, Rivara FP, Adams J, Hillman M. Risk compensation theory should be subject to systematic reviews of the scientific evidence. *Inj Prev.* 2001;7(2):86–88.

59. Peltzman S. The effects of automobile safety regulation. *J Polit Econ.* 1975;83:677–725.

60. Wilkinson DL, Fagan J. Role of firearms in violence scripts: the dynamics of gun events among adolescent males. *Law Contemp Probl.* 1996;59(1):55–89.

61. Wilkinson DL. *Guns, Violence, and Identity Among African American and Latino Youth.* New York, NY: LFB Scholarly Publishing LLC; 2003.

62. Ikeda RM, Dahlberg LL, Kresnow MJ, Sacks JJ, Mercy JA. Studying "exposure" to firearms: household ownership v access. *Inj Prev.* 2003;9(1):53–57.

63. Cummings P, Koepsell TD. Does owning a firearm increase or decrease the risk of death? *JAMA.* 1998; 280:471–473.

64. Branas CC, Nance ML, Elliott MR, Richmond TS, Schwab CW. Urban-rural shifts in intentional firearm death: different causes, same results. *Am J Public Health.* 2004;94:1750–1755.

65. Brookhart MA, Wang PS, Solomon DH, Schneeweiss S. Evaluating short-term drug effects using physician-specific prescribing preference as an instrumental variable. *Epidemiology.* 2006;17:268–275.

66. Staiger D, Stock J. Instrumental variables regression with weak instruments. *Econometrica.* 1997;65: 557–586.

67. Anderson E. *Code of the Street: Decency, Violence, and the Moral Life of the Inner City.* New York, NY: W.W. Norton; 1999.

# Exhibit 24

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

ILLINOIS ASSOCIATION OF          )
FIREARMS RETAILERS, ET AL.,      )
                                 )
        Plaintiffs,              )
                                 )
    v.                           )        No. 10-CV-4184
                                 )        Judge Edmond E. Chang
CITY OF CHICAGO, ET AL.,         )        Magistrate Judge Geraldine Soat
                                 )          Brown
        Defendants.              )


## DECLARATION OF EUGENE WILLIAMS

I, Eugene Williams, do solemnly affirm and declare under penalty of perjury that the following facts are true and correct to the best of my knowledge and belief and that they are based on my personal knowledge or understanding.

1.      I have served as a sworn member of the Chicago Police Department ("CPD") since 1980. I am currently the Acting Chief of Patrol for the CPD. In this position, I supervise the operations of all 25 police Districts in the city and oversee the deployment of all patrol police officers in the city. Each District has a Commander, who reports to me. The Districts are grouped into 5 Areas, and each Area is headed by a Deputy Chief. These Deputy Chiefs also report to me. I also supervise the CPD's Special Functions Division, which has its own Chief and two Commanders, all of whom report to me. All told, there are over 7,000 sworn officers who are under my supervision either directly or indirectly.

2.      My prior positions in CPD have included the following: patrol officer (4th District), tactical team officer (4th District), homicide detective (Area 2), uniformed sergeant (4th

District), tactical team sergeant (4th District), narcotics section sergeant, watch commander (3rd & 15th Districts), and narcotics section lieutenant. I have also served as Commander of the Narcotics Section, Commander of the 15th District, Assistant Deputy Superintendent, and Deputy Chief of Patrol for Area 2. During my career, I have worked in Chicago neighborhoods and communities that are disproportionately exposed to, and impacted by, firearms violence and drug and gang activity on the street level.

3. Through my over 31 years of experience in CPD, I have become familiar with common layouts of residential and commercial real estate parcels and buildings in Chicago, including single-family homes and multi-unit dwellings such as residential low-rises and high-rises.

4. In Chicago, much of the space on a typical residential lot is taken up by the residential building, such as a home or a condominium building. As result, private spaces outside this building, such as porches, stairways, yards, or common areas, are typically a short distance away from the public way, such as streets, sidewalks, or alleys. An even shorter distance typically separates these spaces from neighboring lots. Yards, driveways, and garages in particular are usually right next to sidewalks, streets, alleys, and/or neighboring parcels.

5. It is my understanding that the record reveals the following facts regarding the dimensions of the residential parcels belonging to Plaintiffs Michael Hall, Kathryn Tyler, and Kenneth Pacholski:

a. *Michael Hall.* Mr. Hall's residential parcel is at 11254 South Bell Avenue, and lies on the northwest corner of West 113th Street and Bell Avenue. It has a driveway leading into West 113th Street, and the driveway runs along side the property of one of his neighbors.

2

The parcel contains a detached two-car garage, which is about 18 inches from his western neighbor's property line, and between 12 and 18 inches from his northern neighbor's property line. The yard extends to sidewalks on the east and south sides of the home. The south side of the home, which faces West 113th Street, has a porch that is 15 feet from the south sidewalk.

b.      *Kathryn Tyler & Kenneth Pacholski*. The Tyler/Pacholski residential lot is at 2620 West Jerome Street. The front yard extends to a sidewalk that runs parallel to Jerome Street, and the rear of the lot extends to an alley behind the home. The parcel contains a detached two-and-a-half car garage behind the home, and the garage opens into the alley. The parcel has a back yard which lies between the house and the garage, although parts of the back yard extend all the way to the alley. The home has two porches on the ground level: a two foot by three foot exterior landing outside the home's back door, and a two foot by four foot slab outside the front door. The porch outside the front door is 30 feet from the sidewalk.

6.      In my experience, these general dimensions and layouts are fairly common in Chicago. Given these compact dimensions, private spaces outside the home, such porches, yards, stairs, garages, and common areas, are essentially "public" when it comes to committing firearms violence. The shootings, gunshot injuries, and intimidation that can occur in these places are virtually identical to those that can take place in purely public areas. For instance, a person with a gun on his porch, in his yard, or on his staircase can use the firearm to intimidate or shoot a person on the sidewalk, or in neighboring yard, in virtually the same way that he could if he were standing on the sidewalk or neighboring yard itself. The person on the sidewalk or neighboring yard can see the possessor's gun, can hear threatening speech by the possessor, and can be targeted and shot by the possessor. These risks befall not only members of the public, but

3

law enforcement and other first responders as well.

7.      Further, escalation of disputes can happen in these areas in just the same way that an encounter between two people on a sidewalk or on opposite sides of the street when guns are present. And even if the gun is not initially used to intimidate or shoot, a firearm possessed in these spaces outside the home will embolden the possessor to be more aggressive than he or she otherwise would. This can cause otherwise conventional disputes or arguments between neighbors or neighborhood residents to escalate into serious confrontations where the gun would be used to intimidate or shoot.

8.      These same interactions and misuses can take place in the common areas inside residential buildings, such as elevators, hallways, stairwells, and lobbies. In fact, they could be magnified in these areas because they are not private. For instance, unlike a homeowner who can control who and how many people are allowed onto his property, any number of people living in a high-rise residential building could congregate in hallways and lobbies.

9.      Requiring guns to be kept within the confines of the home reduces these risks. Before a gun can be misused outside the home, it must first be taken outside the home. In the case of a dispute, in the time it takes for a resident to go back inside the home to retrieve a gun before bringing it outside, the resident may "cool down" and decide against getting the firearm and/or to call the police. Similarly, the other individual may flee the scene or call the police. Further, although gun injuries and accidents can occur within a home, the walls and roof of a home can stop a mis-directed bullet from exiting the home and hitting innocent victims outside. These benefits are lost when firearms are taken outside the home. In the dense neighborhoods of Chicago, a mis-directed bullet fired from outside the home stands a much greater risk of injuring

an innocent bystander on a nearby sidewalk or parcel.

10.     Gang members seeking to protect their turf or criminal operations (such as narcotics dealing or other vice activities) would be especially prone to engage in the abuses and misuses outlined in paragraphs 6-8 above. In my experience, gang members (as well as non-gang members) have done so when in the private spaces outside a home in the past. In my opinion, they would be more prone to do so if it became legal for them to possess guns in those spaces. Many gang members and affiliates may not have a recorded criminal record that would disqualify them from receiving a gun permit. Qualified members would therefore be free to possess firearms in places like a lobby or stairwell of a residential high-rise, or on the porch or in the front yard of a three-flat. From those spaces they could easily use guns to oversee drug dealing taking place nearby, or just feet away on a sidewalk or street corner. From those spaces, they could also easily use guns to intimidate or shoot at rival gang members, other people viewed as threats, or even innocent residents. And even if the gun is not overtly used to intimidate or shoot, it will embolden the gang member to be more aggressive, which will lead to more violent gang altercations. Similarly, this increased gun possession would provide an incentive to rival gang members to carry guns, even if it remained illegal for them to do so, in order to protect themselves. This proliferation of guns will further inflame the violent crime problem in Chicago.

11.     Currently, law enforcement is able to arrest and prosecute gang members (or other criminals) when they are detected carrying or possessing guns in the spaces outside home, because that activity is unlawful in Chicago. This is an important tool that CPD uses to combat the gang problem in Chicago. It allows CPD to take gang members, and/or their guns, "off the street" before they commit a violent act with a gun. The value of this tool is magnified when

5

combined with targeted policing efforts (where CPD focuses resources on areas of high gang

activity), because it creates a disincentive for gang members (or other criminals) to carry or

possess firearms. When CPD officers are frequently patrolling a gang area or high-crime

neighborhood, gang members and criminals know that they stand a higher risk of being detected

(and arrested) if they have a gun outside a home. Consequently, they will be less likely to carry

outside the home, which benefits both public and officer safety by preventing a main risk factor

for violent crime in Chicago – namely, a gun in the hand of gang member or criminal in public.

If it became legal to possess guns in the private spaces outside a home, this critical tool would be

lost; CPD would not be able to arrest qualified gang members or their acquaintances for

possessing guns in these spaces. Gang members or acquaintances would therefore be emboldened

to carry guns in these spaces. And because, many times, gun possession is the only crime being

committed during an encounter between the police and a gang member, there would be no other

basis for arresting the individual. Instead, rather than being able to arrest the gang member

before a violent firearm act occurs, law enforcement will have to wait until after the gang

member actually commits a violent act with the gun.

     12.    People possessing firearms in the private spaces outside their home are more

likely prone to have the firearm stolen from them. These areas are generally less secure than the

home, and are easier for criminals to access. This includes garages, which are generally less-

secure than the home and are the target of break-ins or other crime to a greater degree than

homes. Indeed, in 2010, Chicago Police Officer Thor Soderberg was accosted in the parking lot

of a CPD station and his firearm was wrestled away from him and used to shoot and kill him. If

criminals are willing to take firearms from CPD officers on CPD grounds, they would not

6

hesitate to take guns from private residents on the residents' private property.

13.     Allowing a guest to take firearms to the home of another person (a host), even with the host's knowledge and consent, presents various threats to public safety. First, it introduces at least one additional unsecured firearm to that home, which presents the same risks (such as those for gun homicides or accidents) that arise from increasing the number of unsecured guns in any home. Second, the guest cannot be controlled by the host and may use the gun improperly despite the host's wishes. These risks would increase as the number of armed guests increased. For instance, a house party where multiple guests have guns and are drinking, or a congregation of armed gang members in a single home (say, a drug house), would present serious risks of intimidation, escalation, and potential discharge. Third, it would allow a host who does not qualify for a Chicago Firearm Permit to evade that requirement. The host could simply claim that guns in his home belong to his guest, and these firearms could be misused by the host.

14.     Allowing handguns to be kept or carried in a person's fixed place of business presents various threats to public safety. First, like the spaces outside a person's home, a place of business is generally less secure than a home. A workplace is generally open to members of the public and/or to other employees, all of whom cannot be controlled by the person wishing to possess a handgun there. Also, there is generally more foot traffic in a place of business than in a home. Further, compared to long guns, handguns are generally less accurate and more prone to unintentional discharge. Thus, there is an increased chance of hitting an innocent bystander when handguns are discharged in a place of business. Second, compared to long guns, handguns are much more likely to be used in a crime in Chicago. Relatedly, because a handgun is

concealable, a person possessing a handgun in the workplace would be more likely to use it as a tool of intimidation or other crime in the workplace than a long gun.

Dated: _____, 2012          FURTHER THE DECLARANT SAYETH NOT.


_____
          Eugene Williams

concealable, a person possessing a handgun in the workplace would be more likely to use it as a tool of intimidation or other crime in the workplace than a long gun.

Dated: _01 March_ 2012          FURTHER THE DECLARANT SAYETH NOT.

_Eugene Williams_
Eugene Williams

8

# Exhibit 25

# Evaluating
# Gun Policy

BROOKINGS METRO SERIES



**BROOKINGS METRO SERIES**

The Center on Urban and Metropolitan Policy at the Brookings Institution is integrating research and practical experience into a policy agenda for cities and metropolitan areas. By bringing fresh analyses and policy ideas to the public debate, the center hopes to inform key decisionmakers and civic leaders in ways that will spur meaningful change in our nation's communities.

As part of this effort, the Center on Urban and Metropolitan Policy has established the Brookings Metro Series to introduce new perspectives and policy thinking on current issues and attempt to lay the foundation for longer-term policy reforms. The series will examine traditional urban issues, such as neighborhood assets and central city competitiveness, as well as larger metropolitan concerns, such as regional growth, development, and employment patterns. The Metro Series will consist of concise studies and collections of essays designed to appeal to a broad audience. While these studies are formally reviewed, some will not be verified like other research publications. As with all publications, the judgments, conclusions, and recommendations presented in the studies are solely those of the authors and should not be attributed to the trustees, officers, or other staff members of the Institution.

The Brookings Metro Series

*Edgeless Cities: Exploring the Elusive Metropolis*
Robert E. Lang

*Growth and Convergence in Metropolitan America*
Janet Rothenberg Pack

*Laws of the Landscape: How Policies Shape Cities in Europe and America*
Pietro S. Nivola

*Low-Income Homeownership: Examining the Unexamined Goal*
Nicolas P. Retsinas and Eric S. Belsky, editors

*Redefining Urban and Suburban America: Evidence from Census 2000*
Bruce Katz and Robert E. Lang, editors

*Reflections on Regionalism*
Bruce J. Katz, editor

*Savings for the Poor: The Hidden Benefits of Electronic Banking*
Michael A. Stegman

# Evaluating Gun Policy

*Effects on Crime and Violence*

Jens Ludwig
Philip J. Cook
*editors*

BROOKINGS INSTITUTION PRESS
*Washington, D.C.*

*Copyright © 2003*
THE BROOKINGS INSTITUTION
1775 Massachusetts Avenue, N.W.
Washington, D.C. 20036
*www.brookings.edu*

All rights reserved

*Library of Congress Cataloging-in-Publication data*

Evaluating gun policy: effects on crime and violence / Jens Ludwig and
Philip J. Cook, editors.
    p.    cm.
Includes bibliographical references and index.
   ISBN 0-8157-5312-8 (cloth : alk. paper)—
   ISBN 0-8157-5311-X (pbk. : alk. paper)
   1. Gun control—United States. 2. Violent crimes—United States.
I. Ludwig, Jens. II. Cook, Philip J., 1946–

HV7436 .E9 2003
364.15'0973—dc21                             2002014696


9 8 7 6 5 4 3 2 1


The paper used in this publication meets minimum requirements of the
American National Standard for Information Sciences—Permanence of Paper
for Printed Library Materials: ANSI Z39.48-1992.

Typeset in Adobe Garamond

Composition by Circle Graphics
Columbia, Md.

Printed by R. R. Donnelley
Harrisonburg, Virginia

JACQUELINE COHEN
JENS LUDWIG

# 6 | *Policing Crime Guns*

Between 1985 and 1991 the homicide rate in the United States increased by nearly 25 percent, from 7.9 to 9.8 per 100,000 residents. Almost all of this increase was accounted for by additional gun homicides committed against and by young males.[1] Although the homicide rate has declined substantially during the 1990s, homicide in the United States is still dominated by young people and firearms and remains much more frequent than in other developed nations.[2] Policymakers who are concerned about America's problem with lethal violence must ask: how can we prevent young men from shooting one another?

One increasingly popular answer is to increase the risks of carrying guns illegally through stepped-up police enforcement. Under these "directed patrol"

The police enforcement efforts evaluated were undertaken by the Bureau of Police in Pittsburgh, Pa. Both the implementation and evaluation were supported with funds from the Alfred P. Sloan Foundation. This project builds on earlier work funded by National Institute of Justice awards NIJ-95-IJ-CX-0005 and NIJ 95-IJ-CX-0075. The authors thank the City of Pittsburgh Bureaus of Police and City Information Systems for their cooperation in this effort, especially the efforts of the Firearms Tracking Unit in managing the police intervention. Invaluable data were provided with assistance from Deborah Friedman at the Allegheny County Injury Surveillance System (ACISS) and Wilpen Gorr of Carnegie Mellon University. Thanks to Jeffrey Fagan, Lawrence Sherman, and participants in the Brookings conference on gun policy for helpful comments.

1. Cook and Laub (1998); Blumstein (2000).
2. Blumstein and Wallman (2000).

 Copyright 2003, The Brookings Institution

programs, high-crime areas are targeted for additional police resources that focus on illegally carried firearms. The hope is that targeted patrols will deter high-risk people from carrying or misusing guns in public places, consistent with evidence that criminals seem to be deterred by the threat of punishment in other contexts.[3] Such patrols may also reduce illegal gun carrying through an "incapacitation effect" by taking illegal guns or those who carry them off the street. The aim of successful targeted policing programs is to reduce illegal gun carrying in public places, a proximate cause of many lethal and nonlethal gun assaults, while avoiding many of the practical and political difficulties of regulating private gun ownership.[4]

Whether targeted policing against illegal guns reduces gun violence in practice remains unclear. To date the evidence in support of such efforts comes largely from the widely cited Kansas City Gun Experiment, which assigned additional police resources to more vigorously pursue illegal guns in one high-crime neighborhood of the city but not in another. While the "treatment" neighborhood experienced a 65 percent increase in the number of guns seized by the police and a 49 percent reduction in gun crimes, neither outcome measure showed much change over this period in the "control" area.[5]

Although the findings from Kansas City are suggestive, the program is not an "experiment" as scientists use the term since there is no guarantee that the two neighborhoods *would have* had similar crime rates had the policing intervention *not* been launched. Some support for this concern comes from the fact that gun crimes were more common in the "control" neighborhood for extended periods even before the new policing program was initiated.[6]

Indianapolis implemented a similar targeted policing program in 1997. One area of the city was targeted for stepped-up vehicle stops for minor violations, while in another area police focused on stopping the most suspicious people within these communities. The results are somewhat puzzling: the number of gun seizures increased by around half with vehicle stops but changed very little with person stops, yet the latter area experienced a decline in gun crimes both in absolute terms and in comparison to other parts of the city.[7] Because of this discrepancy in impact, there is growing interest in the distinction between interventions targeted at "people" rather than simply "places," although it is also possible that the results in the targeted area are spurious. Despite the popular

3. Nagin (1998); Levitt (2001).
4. James Q. Wilson. "Just Take Away Their Guns," *New York Times Magazine,* March 20, 1994, sec. 6, p. 47; Sherman (2000).
5. Sherman and Rogan (1995); Sherman, Shaw and Rogan (1995).
6. Sherman, Shaw and Rogan (1995).
7. McGarrell and others (2001).

Copyright 2003, The Brookings Institution

support for these police patrols and their increased use by urban police departments, reliable evidence on their effectiveness remains limited at best.[8]

In this chapter we present new evidence on the effects of police programs against illegal gun carrying that draws on data from Pittsburgh, Pennsylvania. As with all nonexperimental policy evaluations, identifying causal program effects is difficult. However, several features of Pittsburgh's 1998 policing program offer a unique opportunity to isolate the impact of the police patrols from the effects of other confounding factors that cause crime rates to vary across areas and over time.

The Pittsburgh police department stepped up police patrols in some areas but not others of the city, which enables us to compare trends in crime rates between the treatment and control areas before and after the police patrols were launched. Yet this type of across-area over-time comparisons is not without limitations: a standard concern is that crime rates in the treatment communities may simply follow a different trajectory over time from those of the control areas, and so differences in trends once the patrols are implemented in the target neighborhoods may not reflect the effects of the new policing intervention.

The unique aspect of Pittsburgh's program is that the police patrols were launched on some days of the week (Wednesday through Saturday, hereafter "on days") but not others (Sunday to Tuesday, "off days") within the treatment (or target) communities. We compare trends between the treatment and control neighborhoods in the periods before and after the policing program is launched, focusing on gun misuse during the on days. If the policing program has an effect, we would expect a greater decline during the on days of the week in the treatment than control communities, and this decline should be larger than the difference in trends across neighborhoods observed during the off days. To the extent that unmeasured confounding variables cause the treatment neighborhoods to have different trends from the control areas during every day of the week, this approach controls for these omitted factors by comparing across-area trends during on versus off days. This strategy thus isolates the causal effects of those factors unique to the target neighborhoods following the launch of the police patrols during the days when these patrols are active—factors such as the police patrols themselves.[9]

8. Survey data indicate that these targeted policing programs enjoyed widespread support from both black and white residents in Indianapolis and Kansas City. Shaw (1995); Chermak, McGarrell, and Weiss (2001); McGarrell, Chernak, and Weiss (1999).

Previous studies have also generated suggestive findings that community policing and focused problem-solving interventions may reduce gun crime. Dunworth (2000); Kennedy and others (2001), although these studies are susceptible to the same confounding problems as those with the Kansas City evaluation.

9. Gruber (1994); Joyce and Kaestner (1996); Ludwig (1998).

Copyright 2003, The Brookings Institution

In our judgment the Pittsburgh program provides at least suggestive evidence that targeted patrols against illegally carried guns may reduce gun crime. Our analysis suggests the policing program may have reduced shots fired by perhaps as much as 34 percent, and hospital-treated assault gunshot injuries declined by 71 percent during on days in program-treated areas. These reductions are likely to occur because of deterred gun carrying or criminal behavior rather than incapacitation since the number of actual arrests and guns confiscated as a result of the patrols was fairly modest. There is also no evidence of spillover or displacement that affect gun crime levels in untreated areas or during off days.

Given the high costs that gun violence imposes on society—about $1 million per gunshot injury[10]—the fairly modest program cost of under $35,000 in overtime expenditures is small in comparison to the potential benefits to Pittsburgh residents, which may be as large as $25 million. Perhaps more important, the policing program in Pittsburgh was implemented in a way that was sensitive to concerns about individual liberty and police-community relations. No citizen complaints were filed against the police department as a result of the new program.

## Policing in Pittsburgh

Pittsburgh shares many characteristics with other American cities that make the policing program evaluated in this chapter of national interest. While public attention has focused on the dramatic increase in gun violence starting in the mid-1980s in large cities such as New York, Los Angeles, and Chicago, similar increases were observed in the early 1990s in more modestly sized cities such as Pittsburgh.[11] The increase was driven largely by gun homicides committed against and by young African American males.[12] Given the substantial residential segregation by race in Pittsburgh and most other American cities, the concentration of criminal gun violence among young black males leads to geographic concentration of gun homicides as well.[13]

This concentration suggests the opportunity for an intervention that narrowly targets resources on an identifiable law enforcement target—illegal gun carrying by youth in high-risk neighborhoods. Like other "directed patrol" efforts, Pittsburgh's *firearm suppression patrol* (FSP) program assigned more police resources

10. Cook and Ludwig (2000); Ludwig and Cook (2001).
11. Blumstein (2000).
12. Cook and Laub (1998); Blumstein (2000).
13. Glaeser and Vigdor (2001).

Copyright 2003, The Brookings Institution

to selected high-crime areas. These patrols were relieved from responding to cit-izen requests for service (911 calls) in order to work pro-actively to search for illegally carried guns.[14]

Police contacts were initiated mainly through traffic stops and "stop-and-talk" activities with pedestrians in public areas. Carrying open alcohol contain-ers in public and traffic violations were frequent reasons for initiating contact. When warranted for reasons of officer safety (usually because of suspicious ac-tions or demeanor), these stops sometimes moved to the types of pat-downs on the outside of clothing to check for weapons that are allowed under the Supreme Court's 1968 decision in *Terry* v. *Ohio*.[15] When there was reasonable suspicion of criminal activity, the contact might escalate to more intrusive searches inside pockets, under coats, and in waistbands as part of an arrest.

The Pittsburgh policing initiative was constructed with concerns about individual rights and police-community relations in mind. Not long before the intervention was fielded, the Pittsburgh police department entered into a consent decree with the Department of Justice in response to complaints about abuse of force, most notably several police shootings of civilian residents. As part of the consent decree, the police department issued new regulations governing police contacts with citizens. Included were explicit guidelines on when officers could engage in "*Terry*" pat-down safety frisks and specific reporting require-ments of the circumstances that precipitated more intrusive searches of persons or vehicles and seizures of guns or other property. Notably, officers had to artic-ulate the basis for their suspicion about criminal activity by the person(s) being searched. Participating officers were specially selected by police command staff based on their demonstrated capacities in pursuing a proactive style of law enforcement tempered by a professional attitude and demeanor in citizen encounters.

The goal of the Pittsburgh policing program was to focus resources on those neighborhoods most in need. In Pittsburgh, as in many other cities, youth homi-cides (victims 12 to 24 years old) and citizen reports to police about shots fired are highly concentrated in a relatively small number of neighborhoods; how-ever, unlike other cities, these high-crime neighborhoods are not contiguous in Pittsburgh. The city of Pittsburgh includes three distinct areas separated by rivers. The highest-crime neighborhoods are in police administrative zone 1 on the

---

14. The Pittsburgh initiative was part of a larger effort funded by the Alfred P. Sloan Foundation that involved collaboration between university research teams and police in the cities of Pittsburgh, Pa., and Rochester, N.Y. Police in each city were encouraged to design their own strategies for addressing street-level gun violence. The results reported relate to the effort by police in Pittsburgh.

15. *Terry* v. *Ohio* (392 U.S. 1, 1968).

Copyright 2003, The Brookings Institution

north side of the rivers and zone 5 in the eastern end of the city between the rivers. These two zones are the target areas for the FSPs.

Each of the target zones is a fairly large geographic area filled with neighborhoods that have different populations and problems with gun violence. The two zones each include about thirty-five census tracts and fifteen neighborhoods, spread out over nearly ten square miles each and home to 55,000 and 80,000 residents, respectively. In around a third of the tracts in zone 1 and a fifth of those in zone 5, fewer than 5 percent of the residents are African American. However, each zone also contains seven tracts in which more than half of all residents are black. Amid the high-crime neighborhoods in the target zones are many census tracts that experienced no youth homicides at all in the recent peak year, 1993.

Under the FSP program one additional patrol team was assigned to both zones 1 and 5, consisting of four officers and a sergeant (all in uniform) traveling in three vehicles—usually two marked patrol cars and one unmarked car. The teams in each zone worked four-hour shifts from 8 p.m. to midnight twice weekly for fourteen weeks from July 19 to October 24, 1998. These patrols were focused on the high-crime evenings of Wednesday through Saturday nights. Specific patrol days were designated to ensure a mix of different days covered in each zone. The most common pattern (found in half the weeks) was alternating days, either Wednesday and Friday or Thursday and Saturday, in individual zones. During this period, fifty-one special patrol details were fielded across the two zones involving nearly 1,000 officer-hours (including the sergeants' time).

With the assistance of maps and reports of recent shots-fired activity, patrol teams identified and targeted "high-risk places at high-risk times," looking for opportunities to initiate citizen contacts for the purpose of soliciting information and investigating suspicious activity associated with illegal carrying and use of guns.[16] The earlier Indianapolis program pursued a place-based strategy in one part of the city, which focused on maximizing the number of traffic stops, and a person-based strategy in another area, which focused on stopping only the most suspicious people within the target areas. Pittsburgh's program falls somewhere between these two models—the program used pedestrian and traffic stops and included some focus on suspicious people, but stops were not limited to this group.

Implementation of this strategy in Pittsburgh differed slightly between the two treatment areas. In zone 5 the three police vehicles typically traveled together as a unit, while in zone 1 the vehicles patrolled individually. Despite the greater dispersion of police patrols in zone 1, the number of police contacts recorded was

16. Sherman (2001).

Copyright 2003, The Brookings Institution

greater in zone 5—perhaps because of this area's higher initial crime level. Compared with zone 1, table 6-1 shows that zone 5 experienced around twice as many vehicle stops (27 versus 12), person contacts (118 versus 57), arrests (12 versus 6), and confiscated guns (5 versus 2).

Given the size of these target zones the "dosage" of the intervention may seem low in absolute terms—just four-hour patrol details twice weekly in each targeted patrol zone, covering under 5 percent of all available hours weekly. However, the patrols covered more than 15 percent of high-risk times from 7 p.m. to 1 a.m. daily and 30 percent of high-risk times on high-risk days (Wednesday to Saturday) weekly. Moreover, the three-vehicle, five-officer teams represented a large increment to customary patrol resources in the target police zones. Police vehicles increased by 20 percent and patrol officers by 25 percent in target zone 5, the city's highest crime zone. The increases were even larger in the other target (zone 1), with a 35 percent increase in vehicles and a 50 percent increase in officers.

## Data

Our goal is to focus on outcome measures that capture illegal gun carrying and criminal misuse in Pittsburgh. Gun homicides are an obvious choice, although such events are too rare to be useful given our research design. More frequent events such as gun robberies or assaults provide another possibility, although previous research suggests that standard police incident reports are often unreliable about whether a gun was involved in these types of criminal events.[17] As a result our emphasis is on measures of citizen reports to the police of shots fired and on gunshot injuries treated in hospital emergency departments.

Data on shots fired come from Pittsburgh's 911 Emergency Operations Center and include information about the date, time, and address of the reported incident. These data allow us to identify whether the events occurred in the treatment or control zones during the periods that the policing program was in effect, which we define as 8 p.m. to midnight on those days the firearm suppression patrols were deployed in target areas (Wednesday through Saturday evenings).

Because discharging a firearm within the city limits of Pittsburgh is against the law, our measure of shots fired captures an event that is itself technically a "gun crime." But more important, we expect shots fired to be strongly related to the prevalence with which guns are carried in public spaces by high-risk people who are willing to use them, even if only to show off.

17. McGarrell and others (2001).

Copyright 2003, The Brookings Institution

Table 6-1. *Enforcement Activities during Firearm Suppression Patrols*

| Activities | Zone 1 | Zone 5 | Total |
|---|---|---|---|
| Person contacts | 57 | 118 | 175 |
| With pat down/search | 13 | 21 | 34 |
| No pat down | 44 | 97 | 141 |
| Vehicle stops | 12 | 27 | 39 |
| Stolen vehicle recovered | 1 | 3 | 4 |
| Citations | 4 | 21 | 25 |
| Vehicle | 3 | 11 | 14 |
| Open container/alcohol | 1 | 7 | 8 |
| Disorderly/noise/nuisance | 0 | 3 | 3 |
| Warnings/other[a] | 17 | 37 | 54 |
| Search/seize | 2 | 5 | 7 |
| Gun and no other contraband | 1 | 1 | 2 |
| Gun and other contraband | 1 | 0 | 1 |
| Other contraband alone | 0 | 4 | 4 |
| Nothing found | 11 | 17 | 28 |
| Arrests | 6 | 12 | 18 |
| With gun | 1 | 2 | 3 |
| No gun | 5 | 10 | 15 |
| Guns confiscated | 2 | 5 | 7 |
| General activities with no contacts | | | |
| Pursuit—no contact[b] | 17 | 24 | 41 |
| Patrol—no contact[c] | 171 | 46 | 217 |
| Assist nonfirearm suppression unit | 32 | 30 | 62 |
| Nonfirearm suppression activities[d] | 3 | 3 | 6 |
| 911 calls (total) | 55 | 50 | 105 |
| Person shot | 0 | 2 | 2 |
| Shots fired | 13 | 21 | 34 |
| Person(s) with gun[e] | 16 | 8 | 24 |
| Stolen gun | 0 | 0 | 0 |

a. "Other" includes warnings without citations and requests that individuals "move along."

b. Combination "viewed only" and "pursuit—no contact" used for actors who fled or dispersed on police arrival.

c. "Patrol—no contact" also includes a few instances of stationary surveillance of an area and tactical foot patrols.

d. "Non-FSU activities" include supervision of officers and investigation of possible stolen car parked on street.

e. "Person(s) with gun" includes armed robbery calls.

Copyright 2003, The Brookings Institution

One complication is that because shots fired can often be detected over a wide area, duplicate calls for the same incident may occur. We attempt to address this problem by eliminating duplicate calls that shared the same event number in the Emergency Operations Center system or calls that reported shots fired within five minutes and 2,000 feet of one another. We also eliminated reports that lacked information about the exact location of the event, since without this address information we would be unable to identify duplicate calls for the same event. Taken together these criteria eliminate 27 percent of the 9,884 original shots-fired reports in our sample.[18] Of course our procedure will not eliminate duplicate calls that are reported by residents who live more than 2,000 feet apart.

Another complication is the difficulty in pinpointing the exact location of shots-fired incidents, especially in urban neighborhoods where gunfire is common enough to make residents alert for similar sounds. Although we do not have any direct measure of this problem, gun suppression officers responding to shots-fired calls were unable to verify an actual incident in three out of four calls. In these cases witnesses or callers could not be located at or near the scene, and police could not locate physical evidence (such as shell casings or bullet holes) of shots being fired. The lack of verification does not mean that a gun was not fired, since witnesses or callers may not bother to meet with the police if they believe the danger has passed or if the police report to the scene with some delay. Finding shell casings on the street may be difficult if the event occurs at night and witnesses are lacking or uncertain about the exact location of the shooting, or even impossible when a revolver is used (since these guns do not automatically expel the shell casing after firing).

While there necessarily remains some uncertainty about the shots-fired data, we nevertheless believe that this measure is associated with gun carrying and misuse. Support comes from the fact that the frequency of shots-fired calls and youth homicides are highly correlated in both the cross section across Pittsburgh census tracts and over time for the city of Pittsburgh as a whole.

Gunshot injuries treated in hospitals serve as a complementary outcome measure, one that is not subject to the same potential reporting problems as shots fired and which provides a more direct indicator of gun violence. Data came

---

18. Of the 9,884 original shots-fired calls, 238 are eliminated because they are exact duplicate records (that is, they have the same event number, address, and time), 986 are eliminated because we do not have exact address information on the event, and 1,419 are eliminated because these reports are within five minutes in time and 2,000 feet in distance from another call, leaving us with a total of 7,241 shots-fired calls in our final analysis. There do not seem to be any substantial differences across Pittsburgh police zones in the fraction of the original shots-fired calls that are eliminated under these criteria.

Copyright 2003, The Brookings Institution

from the injury surveillance system developed by the Allegheny County Health Department in cooperation with the Harvard Injury Control Research Center, which collects and analyzes data on gunshot injuries treated in four trauma centers at area hospitals. Together, data from these trauma centers capture more than 90 percent of gunshot injuries treated in hospitals in the Pittsburgh area.[19]

These data include information about the demographic attributes of the victims, the nature of the injury, and the circumstances of the event (assault, self-inflicted, or accidental). We focus on gunshot injuries from assaults since these events should be most sensitive to the policing intervention, although we also explore the sensitivity of our findings to different subsets of gunshot injuries. For privacy reasons the data do not include individual identifying information such as the victim's exact street address. However, we do have the victim's zip code of residence, which allows us to locate victims among the large police zones used in this project. Of the 1,125 gunshot injury reports in our sample, we lose only thirty-five cases because of missing information on the victim's zip code.

How well does zip code information on the victim's address capture criminal events that occur within the same police beat? Analysis of the 328 homicides that occurred in Pittsburgh from 1990 to 1995 suggests that the use of residence zip code data performs fairly well: in 81 percent of cases the victim lives within the same police zone in which the murder occurred. The offender lives within the same police zone in which the murder takes place in 69 percent of homicides.

## Methods

In the absence of random assignment of Pittsburgh's policing program across neighborhoods, the challenge is to isolate the causal effects of the intervention from those of other factors that drive variation in crime rates across communities over time. As with any nonexperimental study there necessarily remains some question about whether this analysis has successfully identified the program's effects. Nevertheless, some unique features of Pittsburgh's policing program, including the fact that the gun patrols were implemented on some days of the week but not others within targeted neighborhoods, help us eliminate various competing explanations for the crime changes observed within the target areas.

Our research design, as well as some commonly used alternatives, can be illustrated by using table 6-2. Policymakers and reporters often judge the success

---

19. For more information about these data, see www.hsph.harvard.edu/hicrc/nviss. In principle, perpetrators who are shot by victims or police during the commission of a crime may avoid medical treatment for fear of being arrested, but we suspect that such cases are rare in practice. See Azrael and others, chapter 10, in this volume.

Copyright 2003, The Brookings Institution

Table 6-2. *Research Design for Pittsburgh Policing Evaluation*

| | Preperiod (6 weeks before) | Postperiod (14 weeks during) | Estimated differences |
|---|---|---|---|
| *Part A: Comparing overall averages* | | | |
| Target zones | A | B | (B − A) |
| Control zones | C | D | (D − C) |
| DD | | | (B − A) − (D − C) |
| *Part B: Exploiting within-week variation in patrol activity* | | | |
| Target zones | | | |
| Wednesday–Saturday | E | F | (F − E) |
| Sunday–Tuesday | G | H | (H − G) |
| $DD_T$ | | | (F − E) − (H − G) |
| Control zones | | | |
| Wednesday–Saturday | I | J | (J − I) |
| Sunday–Tuesday | K | L | (L − K) |
| $DD_C$ | | | (J − I) − (L − K) |
| DDD = $DD_T$ − $DD_C$ | | | [(F − E) − (H − G)] − [(J − I) − (L − K)] |

Note: Estimates of program effects rely on various differences that compare outcomes in different subsets of the data. DD is a difference-in-differences, and DDD is a difference-in-difference-in-differences.

of programs such as the Pittsburgh FSPs by examining whether crime rates or other outcomes decline within the jurisdiction once the program is put into place. In terms of table 6-2, this type of estimate would come from comparing the average number of gunshot injuries or shots fired per day in the treatment zones (1 and 5) during the fourteen weeks of the program from July 19 to October 24, 1998, represented by the letter B in the top part of table 6-2, with what is observed during the six-week preprogram period from June 7 to July 18, given by letter A in table 6-2.[20] The obvious problem with this before-after approach is that crime rates change over time in a generally cyclical fashion at the local, state, and national levels—often dramatically—for reasons that remain poorly understood.[21]

An alternative approach with its own limitations comes from comparing the average number of gunshot injuries or shots fired in the treatment zones during the postprogram period (letter B in table 6-2) with the control zones over the same time frame (letter D in table 6-2). The primary limitation with this cross-sectional comparison is that the treatment zones have persistently higher crime

20. We initially define a six-week period as "pre-program" to keep this time frame within the high-crime summer months, although we also explore the sensitivity of our findings to different definitions.
21. Blumstein and Wallman (2000).

Copyright 2003, The Brookings Institution

rates than the control zones, even before the Pittsburgh FSP program is enacted. Criminologists often try to address this problem by using multivariate regression to control for observable differences across areas in population and other local-area characteristics. But if, as seems likely, the zones systematically differ in ways that we cannot readily measure, we will inappropriately attribute differences in crime among them to the effects of the policing program rather than to the un-measured factors.

To address these "omitted-variables" problems, a third alternative is to focus on comparing how outcomes change in the treatment and control areas from the six-week "preprogram" period (June 7 to July 18, 1998) versus the fourteen-week postprogram period. This so-called difference-in-differences (DD) estimate comes from comparing the change (or difference) in outcomes in the treatment zones (given by B − A in the top panel of table 6-2) with the change in the control zones (D − C). The estimate of program impact in this case [DD = (B − A) minus (D − C)] is unbiased if the unmeasured differences between the treatment and control zones in Pittsburgh remain fixed over the sample period.

However, if there are unmeasured variables that change over time in ways that would cause the treatment and control areas to experience different *trends* in shots fired or gunshot injuries, the DD estimate will yield biased estimates for the program's impact. For example, large and small cities follow different crime trajectories over time in the United States.[22] Attempts to evaluate the effects of big city interventions by comparing their crime trends with those in small cities are likely to confound the effects of the programs of interest with those of whatever other factors lead to divergent crime experiences over time by city size.

One important check on the reliability of the DD estimation approach is to examine whether treatment and control areas follow similar trends *before* the intervention is enacted.[23] In any case, while the DD estimate improves on both the standard before-after and cross-section research designs just discussed, the approach remains vulnerable to bias introduced by time-varying omitted variables that affect crime trends as well as levels in the treatment and control neighborhoods.

In our evaluation we attempt to account for unmeasured, time-varying variables that may cause treatment and control areas to have different trends by exploiting the fact that the patrols are implemented on only selected days of the week (Wednesday through Saturday evenings). As a result observations for the off days (Sunday through Tuesdays) in the treatment areas can serve as an addi-

22. Blumstein (2000).
23. Bassi (1984); Heckman and Hotz (1989); Smith and Todd (forthcoming).

Copyright 2003, The Brookings Institution

tional "control group" for measuring the program impact on gun crime in the on days. Put differently, to the extent that unmeasured variables cause the treatment and control areas to have different crime trends throughout the week, comparing on days with off days within the treatment areas should control for these confounding trends and help isolate the effects of the new police patrols.

This *difference-in-difference-in-differences* (DDD) estimate can be described more formally with the notation outlined in the bottom panel of table 6-2.[24] The difference (F − E) represents how shots fired or gunshot injuries change from the pre- to postprogram period on Wednesdays through Saturdays in the treatment zones of Pittsburgh. As already noted, our focus on changes in this analysis helps overcome the fact that some neighborhoods have persistently higher crime rates year after year compared with other areas. To account for the possibility that factors specific to the treatment zones may drive crime changes over time, we compare changes in the treatment areas during the on days (F − E) with changes on the off days (H − G), or [$DD_T$ = (F − E) − (H − G)].

Of course the high-crime evenings of Wednesday through Saturday may simply follow different crime trends than the lower-crime evenings of Sunday through Tuesday throughout the city of Pittsburgh as a whole. To account for this possibility, we compare the relative change over time in the treatment areas for Wednesday through Saturday versus Sunday through Tuesday [$DD_T$ = (F − E) − (H − G)], with the within-week change over the same period that is observed in the control areas [$DD_C$ = (J − I) − (L − K)]. The DDD estimate in this case is given by [(F − E) − (H − G)] − [(J − I) − (L − K)]. This research design helps isolate the effects of those factors specific to the treatment zones during the on days of the postprogram period—factors such as the new FSPs introduced by the Pittsburgh police.

Our estimate for the effects of the Pittsburgh policing program can be derived from a simple regression framework as shown in equation 1. Let $Y_{it}$ represent the number of either shots fired or gunshot injuries on day *(t)* within neighborhood *(i)* in Pittsburgh. The explanatory variables in the regression consist of a series of simple dichotomous indicators where *Treat$_i$* is equal to one if the neighborhood is in the treatment zones (1 and 5) and equal to zero otherwise, *Post$_t$* is equal to one if the day falls within the fourteen-week period that the policing program is in effect and equal to zero for the six-week preprogram period, and *Day$_t$* equals one if the observation is for a Wednesday, Thursday, Friday, or Saturday, the on days of the week when the police patrols may be operating.

24. This research design has also been applied to study the effects of Medicaid benefits for maternity and pediatric care on abortion (Joyce and Kaestner, 1996), mandated maternity benefits on child bearing (Gruber, 1994), permissive gun-carrying laws (Ludwig, 1998), and the Richmond, Virginia, Project Exile program. See Raphael and Ludwig, chapter 7 in this volume.

Copyright 2003, The Brookings Institution

$$Y_{it} = b_0 + b_1 Treat_i + b_2 Post_t + b_3 Day_t + b_4 (Treat_i) \times (Post_t)$$

$$(1) \qquad + b_5 (Day_t) \times (Post_t) + b_6 (Treat_i) \times (Day_t)$$

$$+ b_7 (Treat_i) \times (Day_t) \times (Post_t) + e_{it}$$

The DDD estimate in this case is given by the coefficient $b_7$. In our analysis we present robust standard errors that are adjusted to account for heteroskedasticity as well as nonindependence of observations drawn from the same neighborhood.[25] Only omitted covariates that vary on a daily basis have potential for affecting model estimation. More enduring factors that are typically thought to affect crime, such as demographic and economic variables, will not influence program impacts estimated on a daily basis. Furthermore, the differencing strategy of the DDD research design should account for most of the potentially confounding factors that vary over time across neighborhoods.[26]

## Results

Our central finding is that the Pittsburgh FSPs appear to substantially reduce citizen reports of shots fired and gunshot injuries in the target neighborhoods. While we find some evidence of a "phantom effect" for shots fired in 1997, the year before the police patrols are put into place, the findings for gunshot injuries generally hold up to a variety of specification checks.

### Shots Fired

Table 6-3 shows our key findings for the average number of shots-fired reports per day in Pittsburgh neighborhoods. In the top panel of table 6-3 is the widely used difference-in-difference estimate, which compares the pre- to postprogram change in shots fired per day averaged across all days of the week in the treatment and control areas. These calculations show that the number of shots-fired reports declined in the treatment zones of the city by $-.066$ during the four-hour

25. Estimation uses STATA (version 7) software to perform OLS regressions with the "robust cluster" options to allow for an arbitrary variance-covariance error structure.

26. Consistent with this expectation, the results are unchanged when the estimating equation includes fixed effects for each of the police zones individually, measures of time and time squared to capture citywide crime trends, or indicators for weeks when school was in session or weekend nights (Friday and Saturday).

Copyright 2003, The Brookings Institution

Table 6-3. *Impact Estimates for Shots Fired (daily averages per police zone)*

| | Preperiod (6 weeks before) | Postperiod (14 weeks during) | Estimated differences |
|---|---|---|---|
| *Part A: Standard difference-in-difference estimate* | | | |
| Treatment zones | .750 | .684 | −.066 |
| Control zones | .274 | .327 | .053 |
| DD | | | −.119 (.152) |
| *Part B: Exploiting within-week variation in patrol activity* | | | |
| Treatment zones | | | |
| Wednesday–Saturday | .979 | .670 | −.310 |
| Sunday–Tuesday | .444 | .702 | .258 |
| $DD_T$ | | | −.567 (.088)** |
| Control zones | | | |
| Wednesday–Saturday | .323 | .281 | −.042 |
| Sunday–Tuesday | .208 | .387 | .179 |
| $DD_C$ | | | −.220 (.120)* |
| DDD | | | −.347 (.133)** |

Note: Results come from estimating daily average shots fired during the four hours from 8 p.m. to midnight in each of Pittsburgh's six police zones. Standard errors in parentheses are adjusted to account for heteroskedasticity in the error variance across different zones, and nonindependence of observations drawn from the same police zone. Asterisks identify statistically significant reductions in one-tail z tests.
*Significant at 5 percent level.
**Significant at 1 percent level.

treatment window from 8 p.m. to midnight (hereafter "per day" for these shots-fired results), while this figure increased in the control areas by +.053. The DD difference in simple trends is thus equal to −.119, which implies a greater decline in the treatment than control neighborhoods, but one that is not statistically significant.

More compelling evidence of a program impact arises when we exploit variation across days of the week in the timing of the patrols, as seen in the bottom panel of table 6-3. Once the policing program was implemented, the number of shots fired declined by −.310 per day during the on days in the treatment zones. However, the number of shots fired increased by +.258 in the same treatment neighborhoods during the off days. The gap between the on and off days is a decline of $DD_T = −.567$ shots-fired calls. In the control neighborhoods that did not receive the policing program, the gap in shots fired between the high- and low-crime days of the week declined more modestly, $DD_C = −.220$. The difference-in-difference-in-differences estimate is thus DDD = −.567 − (−.220) = −.347, statistically significant at the 1 percent level using a one-tailed test for a reduction in shots fired. The estimate implies that the policing program

Copyright 2003, The Brookings Institution

has reduced shots fired during the on days in the treatment areas by around 34 percent.[27]

The bottom panel of table 6-3 also offers suggestive evidence that the control neighborhoods may provide a reasonable estimate for the counterfactual outcome of what would have happened in the target neighborhoods in the absence of the policing program. This can be seen by focusing on the changes over time in shots fired during the off days (Sunday–Tuesday), which are similar in the treatment and control neighborhoods (+.258 versus +.179). The similarity in shots-fired trends during the off days across areas also suggests that the policing program may reduce gun carrying and misuse primarily through a deterrent effect rather than an incapacitation effect arising from arrests that take high-risk people and guns off the street. The latter would presumably manifest itself by a reduction during the off days in target neighborhoods as well, but such a carry-over effect did not occur. The results are also consistent with the idea that any displacement of gun violence from on to off days within the target areas may be only modest.

As seen in the top panel of table 6-4 the results are broadly robust to variations in the choice of comparison groups. Increasing the length of the preprogram period from five to fourteen weeks does not materially change the results. Partitioning the postprogram period in half reveals stronger reductions in shots fired during the second half after the patrols were in effect for at least seven weeks. Finally, control zone 2 is distinctive. It comes closest to the target areas in initial crime rates and contains the downtown business district (characterized by a small residential population and little activity on most nights) as well as the city's oldest historically black neighborhood. Removing zone 2, with its unique population and structural characteristics, increases the magnitude of effects in the target zones.

One way to test for bias from omitted variables is to examine whether our procedure leads to statistically significant differences in trends between treatment and control neighborhoods in 1997, the year before the program is launched, and in 1999, the year after the program was in effect. That is, we calculate the DDD estimate using the same calendar days that define the pre- and postprogram periods and on and off days for nonprogram years. Since no gun-suppression patrols were actually launched in the treatment neighborhoods in the on days of

27. We define the proportional magnitude of the treatment effect by comparing our DDD estimate for the program's impact (−.347) with our estimate for the average number of shots fired each day that would have been observed during the "on" days in the treatment neighborhoods if the program were not in effect. This counterfactual outcome is equal to the rate that is observed during this period (.670) plus the estimated treatment effect (.347), so the proportional reduction equals .347/(.670 + .347) = 34 percent.

Copyright 2003, The Brookings Institution

Table 6-4. *Robustness Checks for Estimated Program Effects on Shots Fired (daily averages per zone)*

| | DDD (difference-in-difference-in-differences) | | | |
| | Target zone 1 | | Target zone 5 | |
| Estimating data | Beta | (se) | Beta | (se) |
|---|---|---|---|---|
| *1998 program estimates* | | | | |
| 6 weeks preprogram versus 14 weeks during program | −0.435** | (0.117) | −0.260** | (0.117) |
| 14 weeks preprogram versus 14 weeks during program | −0.481** | (0.083) | −0.165** | (0.083) |
| 6 weeks preprogram versus first 7 weeks during program | −0.329* | (0.213) | −0.172 | (0.213) |
| 6 weeks preprogram versus second 7 weeks during program | −0.540** | (0.080) | −0.348** | (0.080) |
| 5 weeks preprogram versus 14 weeks during program | −0.378** | (0.090) | −0.034 | (0.090) |
| Target zones versus control zones 3, 4, and 6 | −0.504** | (0.132) | −0.329** | (0.132) |
| *Nonprogram years* | | | | |
| 1997 data, 6 weeks preprogram versus 14 weeks during program | −0.030 | (0.102) | −1.117** | (0.102) |
| 1997 data, 14 weeks preprogram versus 14 weeks during program | −0.266** | (0.107) | −0.915** | (0.107) |
| 1999 data, 6 weeks preprogram versus 14 weeks during program | 0.098 | (0.180) | 0.061 | (0.180) |
| 1999 data, 14 weeks preprogram versus 14 weeks during program | 0.104 | (0.103) | 0.027 | (0.103) |

Note: Unless noted otherwise, all contrasts are between each target zone (1 or 5) and all control zones (2, 3, 4, and 6) in the six-week preprogram and fourteen-week postprogram periods. Estimates come from comparing changes over time in the daily average number of shots fired during the four hours from 8 p.m. to midnight in treatment versus control police zones (table 6-2). Standard errors in parentheses are adjusted to account for heteroskedasticity in the error variance across different zones and non-independence of observations drawn from the same police zone. Asterisks identify statistically significant reductions in one-tail z tests.

*Significant at 10 percent level.
**Significant at 5 percent level.

Copyright 2003, The Brookings Institution

1997 and 1999, we expect no statistically significant differences to arise with the DDD approach. Of course the 1999 test is perhaps not as clean as that for 1997, given the possibility of "residual deterrence" of criminals even after the patrols have ended, but in any case evidence of a null effect in 1999 would provide useful evidence on the validity of our research design.

As seen in the bottom panel of table 6-4, while we find no statistically significant evidence of a phantom program "effect" in 1999 for either of the two treatment zones (1 and 5), we do find signs of a phantom effect in 1997, the year before the police patrols were launched. When we use a six-week preprogram period for 1997, the contrast between treatment zone 5 and the controls is statistically significant. Alternative definitions, ranging from five- to fourteen-week preprogram periods, yield statistically significant phantom effects in both zones 1 and 5. These findings make us cautious about interpreting the differences in shots fired between the treatment and control zones in 1998 as signs of the patrol program's effects. However, the results for gunshot injuries presented in the next section are more robust to our various specification checks.

## Gunshot Injuries

The results for assault-related gunshot injuries show an even more pronounced program impact during the program year (1998) and little consistent evidence of statistically significant program effects during the years before and after the program is in effect. Gun assault injuries declined significantly in both of the target zones by roughly the same proportional amount, although the decline is only statistically significant over a variety of conditions in the higher-crime zone 5.

The top panel of table 6-5 shows that the standard difference-in-difference estimate that relies on average gunshot injuries per day (averaged across all days of the week) suggests that the program has reduced such injuries by −.073 per day. The bottom panel of table 6-5 shows that refining the simple difference-in-difference calculation to focus on the days on which the patrols were in operation (Wednesday through Saturday) increases the magnitude of program impact to $(-.161 - .007) = -.168$ fewer assault-related gunshot injuries on patrol days in the target zones.[28] The simple pre- and post-trends are much more similar during the off days (.103 and .050). While the difference in trends during the on days equals −.168, the difference in trends for the off days is only about one-third as large and represents an increase of $.053 = (.103 - .050)$. Exploiting this within-week variation in patrol implementation more formally yields a DDD estimate equal to −.222 (p<.10), a reduction in assault gunshot injuries

28. Daily rates refer to the average number of gunshot injuries during a full twenty-four-hour day.

Copyright 2003, The Brookings Institution

Table 6-5. *Impact Estimates for Assault Gunshot Injuries*
*(daily averages per police zone)*

| | Preperiod (6 weeks before) | Postperiod (14 weeks during) | Estimated differences |
|---|---|---|---|
| **Part A: Standard difference-in-difference estimate** | | | |
| Treatment zones | .155 | .107 | −.048 |
| Control zones | .054 | .079 | .026 |
| DD | | | −.073 (.022)** |
| **Part B: Exploiting within-week variation in patrol activity** | | | |
| Treatment zones | | | |
| Wednesday–Saturday | .250 | .089 | −.161 |
| Sunday–Tuesday | .028 | .131 | .103 |
| $DD_T$ | | | −.264 (.208)* |
| Control zones | | | |
| Wednesday–Saturday | .073 | .080 | .007 |
| Sunday–Tuesday | .028 | .077 | .050 |
| $DD_C$ | | | −.042 (.042) |
| $DDD = DD_T - DD_C$ | | | −.222 (.165)* |

Note: Results come from estimating daily average gunshot injuries from assaults in each of Pittsburgh's six police zones. Standard errors in parentheses are adjusted to account for heteroskedasticity in the error variance across different zones and nonindependence of observations drawn from the same police zone. Asterisks identify statistically significant reductions in one-tail z tests.
*Significant at 10 percent level.
**Significant at 5 percent level.

of 71 percent (.222/(.222 + .089)) from the expected level on patrol days in the target zones.

Table 6-6 shows that the results are generally not sensitive to how we define the pre- or postprogram periods. The estimated program impact on assault-related gunshot injuries in zone 5 is always statistically significant and of about the same magnitude when we partition the postprogram period in half, and whether we define the preprogram period using the five weeks before the patrols go into effect, the fourteen weeks before the patrols are launched, or any interval in between. The estimated impact in zone 1 is also statistically significant but only for longer preprogram periods (eleven weeks or more). Statistically significant proportional changes in assault gunshot injuries are approximately similar in magnitude across the two zones, ranging from 59 to 77 percent in zone 1 compared with 60 to 72 percent in zone 5.[29]

29. In shorter preprogram periods the proportional reductions are in the same range in zone 5 but are smaller in zone 1.

Copyright 2003, The Brookings Institution

Table 6-6.  *Robustness Checks for Estimated Program Effects on Assault Gunshot Injuries*

| | DDD (difference-in-difference-in-differences) | | | |
| | Target zone 1 | | Target zone 5 | |
| Estimating data | Beta | (se) | Beta | (se) |
|---|---|---|---|---|
| *1998 program estimates* | | | | |
| 6 weeks preprogram versus 14 weeks during program | −0.015 | (0.041) | −0.428** | (0.041) |
| 14 weeks preprogram versus 14 weeks during program | −0.058** | (0.026) | −0.243** | (0.026) |
| All gunshot injuries (all causes) | −0.058 | (0.052) | −0.542** | (0.052) |
| All gunshot injuries (youth only) | −0.061 | (0.077) | −0.319** | (0.077) |
| Accidental gunshot injuries | −0.047** | (0.028) | −0.039* | (0.028) |
| 6 weeks preprogram versus first 7 weeks postprogram | −0.036 | (0.029) | −0.378** | (0.029) |
| 6 weeks preprogram versus second 7 weeks postprogram | 0.006 | (0.065) | −0.479** | (0.065) |
| 5 weeks preprogram versus 14 weeks postprogram | 0.042 | (0.032) | −0.348** | (0.032) |
| Target zone versus control zones 3, 4, and 6 | −0.021 | (0.055) | −0.434** | (0.055) |
| *Nonprogram years* | | | | |
| 1997 data, 6 weeks preprogram versus 14 weeks postprogram | −0.050 | (0.051) | −0.052 | (0.051) |
| 1997 data, 14 weeks preprogram versus 14 weeks postprogram | 0.028 | (0.051) | −0.037 | (0.051) |
| 1999 data, 6 weeks preprogram versus 14 weeks postprogram | 0.029 | (0.016) | −0.118** | (0.016) |
| 1999 data, 14 weeks preprogram versus 14 weeks postprogram | 0.031 | (0.010) | 0.007 | (0.010) |

Note:  Unless otherwise noted, all contrasts are between each target zone (1 or 5) and all control zones (2, 3, 4, and 6) in the six-week preprogram and fourteen-week postprogram periods. Estimates come from comparing changes over time in the daily average number of gunshot injuries in treatment versus control police zones (table 6-2). Standard errors in parentheses are adjusted to account for heteroskedasticity in the error variance across different zones and nonindependence of observations drawn from the same police zone. Asterisks identify statistically significant reductions in one-tail z tests.

*Significant at 10 percent level.

**Significant at 5 percent level.

Copyright 2003, The Brookings Institution

The pattern of large and significant effects in zone 5 and insignificant effects in zone 1 persists when we vary the subset of gunshot injuries. Zone 5 experiences significant declines in accidental gunshot injuries, the combination of all gunshot injuries, and gunshot injuries involving youthful victims (under age 25). In zone 1, the effects are smaller in magnitude and only reach statistical significance for accidental gunshot injuries.[30]

The results are similar when we use a generalized least squares (GLS) approach that corrects for serial correlation in the error structure of our regression model, or when we use models that weight each observation by the zone's population.[31] We also obtain similar findings when we reduce some of the day-to-day variation in gunshot injuries by using a panel data set that averages gunshot injuries for each zone within a week over the on days and over the off days. In this case each zone contributes only two observations per week to the panel data (one each for the on and off sets of days), rather than seven daily observations per zone per week as in our baseline estimates.

There is also suggestive evidence that our estimates for gunshot injuries are not driven by unmeasured confounding factors, shown in table 6-6. We replicate the DDD calculation using the same calendar days, neighborhoods, and days of the week but now using assault gunshot-injury data for 1997, when the program was not in effect. As with our analysis of the program year of 1998, we examine the sensitivity of our estimates to how we define the preprogram period, ranging from five to fourteen weeks. For the twenty total DDD estimates that we calculate for the preprogram year of 1997 (each of the two treatment zones individually against the control areas, using ten possible definitions of the preprogram period for each comparison), two are statistically significant at the 10 percent level. We obtain a similar fraction of statistically significant comparisons for 1999. While each point estimate is of course not a truly independent trial, we are not alarmed that two of the twenty comparisons are significant at the 10 percent level in 1997 and 1999. By way of comparison, during the program year of 1998 fully fourteen of the twenty possible comparisons are statistically significant at the 5 percent level.

---

30. The declines in accidental gunshot injuries are not likely to result from the policing program since there is evidence of even larger declines in both target zones during 1997, and in zone 1 during 1999, which further motivates our focus on the assault-related gunshot injuries that better reflect the type of violent behavior targeted by the police patrols.

31. We estimate GLS models that assume that the error terms for periods $(t-1)$ and $(t)$ are correlated but error terms more than one period apart are not (a first-order autoregressive process). The results are the same whether we assume that the serial correlation between error terms is the same or differs across police zones. In both cases the point estimate for the effect of the policing intervention increases in relation to the standard error and improves the significance level from .09 to .01.

Copyright 2003, The Brookings Institution

Moreover, in 1998, after the fourteen-week patrol period is over, we observe a statistically significant increase in assault gunshot injuries in zone 5 equal to around one-quarter of the decline observed during the program period. This bounce back is consistent with what we might expect from the cessation of a program that has a causal effect on gun carrying or crime and generates some residual deterrence. The bounce back is observed soon after the patrol program terminates (within two weeks), which suggests that at least some subset of people at high risk of carrying and misusing guns is reasonably well informed about the local police environment. In any case, there is no similar bounce back over the same calendar period in the treatment areas in 1997 and 1999.

## Discussion

Our estimates suggest that Pittsburgh's targeted policing program against illegal gun carrying may have reduced shots fired by 34 percent and gunshot injuries by as much as 71 percent in the targeted areas. Our evaluation pays careful attention to the problem of unmeasured, time-varying factors that may introduce bias into estimates of the policing program's impact. Although we cannot definitively rule out the possibility of omitted-variables bias with our analysis, the fact that the combined pattern of changes in gunshot injuries during the program period in 1998 is qualitatively different from what is observed in 1997 or 1999 is at least consistent with the idea that the FSPs had some effect on illegal gun carrying or misuse.

The relatively modest number of guns confiscated and arrests made as a result of Pittsburgh's directed patrols (table 6-1) suggest that incapacitation of illegal guns or their owners is unlikely to drive the large reductions that accompanied the policing program. Moreover, if the patrols reduce shots fired or assault gunshot injuries primarily through an incapacitation effect, by taking illegal guns and those who carry them off the street, we might expect the effects to carry over to the days of the week when the patrols were not in effect. This type of carryover does not appear to occur. Instead, the similarity in off-day trends between the treatment and control zones provides at least suggestive evidence of a deterrent effect that is specific to the treatment zones during the on days when the program is in effect and only reduces illegal gun carrying and misuse during those times. The absence of significant trends upward in the control areas during the program period also seems to rule out spatial displacement, where gun-carrying offenders shift their activities from the treatment to control neighborhoods.

Finally, one important policy question is whether the targeting of the police resources on illegal gun carrying in high-crime areas is an important part of the

Copyright 2003, The Brookings Institution

program's effects, or whether simply adding more resources to routine patrol activity would achieve similar ends. Unfortunately, the Pittsburgh data do not enable us to definitively rule out either possibility. Previous research by economist Steven Levitt suggests that a 10 percent increase in the number of police reduces violent crime by around 10 percent (that is, an elasticity of violent crime with respect to police officers of around −1.0), even if the additional police resources are deployed in standard ways.[32] Our findings suggest an elasticity of gunshot injuries with respect to additional targeted police officers on the order of −1.4.[33] However, given the standard errors around both sets of estimates we cannot confidently conclude that targeting the additional police resources in Pittsburgh to focus on illegal guns enhanced the overall impact of these expenditures on criminal behavior.

However, because the Pittsburgh program targets police resources on the most costly violent crimes—those that involve firearms—the targeting seems to enhance the cost effectiveness of the additional police resources.[34] Although blanket increases in police resources may yield from $1 to $5 in benefits to society for each extra dollar that is spent, the more targeted FSPs in Pittsburgh may generate even more substantial net benefits.[35] We estimate that the costs of the additional patrols in Pittsburgh are modest—something less than $35,000 in overtime expenditures during the fourteen-week program period. In contrast the costs of gun violence to society are substantial, about $1 million per gunshot injury.[36] If the estimates presented in this chapter are correct, then the investment of $35,000 or so in targeted antigun police patrols may yield benefits of as much as $25 million.[37] Equally important, Pittsburgh's experience suggests that targeted patrols against illegal guns can be implemented in a way that addresses community concerns about intrusive policing.

---

32. Levitt (1997).

33. This comes from comparing the 71 percent decline in assault-related gunshot injuries to the 50 percent increase in the number of police officers allocated to zone 5 during the "on days" of the Pittsburgh firearm suppression patrols.

34. Levitt (1997, p. 285) reports an average cost per violent crime of about $70,000 (in 1998 dollars), while the costs per assault-related gunshot injury are about $1 million. Cook and Ludwig (2000); Ludwig and Cook (2001). Of course this comparison is not perfect since the class of violent crimes includes those that do not involve injury to the victim, but the average cost per violent crime seems to be driven in large part by homicides that mostly involve firearms.

35. Levitt (1997).

36. Cook and Ludwig (2000); Ludwig and Cook (2001).

37. The estimates in table 6-4 imply a reduction in the average daily number of gunshot injuries per zone equal to 0.222, which, when multiplied by four patrol days a week over fourteen program weeks, implies a total decline of around twenty-five gunshot injuries.

Copyright 2003, The Brookings Institution