# Exhibit 26

U.S. Department of Justice
Office of Justice Programs
*National Institute of Justice*

RESEARCH REPORT

# Reducing Gun Violence

## Evaluation of the Indianapolis Police Department's Directed Patrol Project

U.S. Department of Justice
Office of Justice Programs
810 Seventh Street N.W.
Washington, DC 20531

John Ashcroft
*Attorney General*

Deborah J. Daniels
*Assistant Attorney General*

Sarah V. Hart
*Director, National Institute of Justice*

Office of Justice Programs
World Wide Web Site
*http://www.ojp.usdoj.gov*

National Institute of Justice
World Wide Web Site
*http://www.ojp.usdoj.gov/nij*

# Reducing Gun Violence

## Evaluation of the Indianapolis Police Department's Directed Patrol Project

Edmund F. McGarrell
Steven Chermak
Alexander Weiss

Crime Control Policy Center
Hudson Institute

November 2002
NCJ 188740

**National Institute of Justice**

**Sarah V. Hart**
*Director*

Edmund F. McGarrell is director of the School of Criminal Justice at Michigan State University and adjunct fellow at the Hudson Institute. Steven Chermak is associate professor in the Department of Criminal Justice at Indiana University. Alexander Weiss is executive director of the Center for Public Safety and professor of management and strategy at the J.L. Kellogg Graduate School of Management at Northwestern University.

This research was sponsored by grant award number 95-IJ-CX-0019 from the National Institute of Justice, U.S. Department of Justice. Points of view or opinions expressed in this report are those of the authors and do not represent the official position of the National Institute of Justice or the U.S. Department of Justice. This document is not intended to create, does not create, and may not be relied on to create any rights, substantive or procedural, enforceable at law by any party in any matter civil or criminal.

*The National Institute of Justice is a component of the Office of Justice Programs, which also includes the Bureau of Justice Assistance, the Bureau of Justice Statistics, the Office of Juvenile Justice and Delinquency Prevention, and the Office for Victims of Crime.*

# Foreword

This Research Report is part of the National Institute of Justice's (NIJ's) Reducing Gun Violence publication series. Each report in the series describes the implementation and effects of an individual, NIJ-funded, local-level program designed to reduce firearm-related violence in a particular U.S. city. Some studies received cofunding from the U.S. Department of Justice's Office of Community Oriented Policing Services; one also received funding from the Centers for Disease Control and Prevention.

Each report in the series describes in detail the problem targeted; the program designed to address it; the problems confronted in designing, implementing, and evaluating the effort; and the strategies adopted in responding to any obstacles encountered. Both successes and failures are discussed, and recommendations are made for future programs.

While the series includes impact evaluation components, it primarily highlights implementation problems and issues that arose in designing, conducting, and assessing the respective programs.

The Research Reports should be of particular value to anyone interested in adopting a strategic, data-driven, problem-solving approach to reducing gun violence and other crime and disorder problems in communities.

The series reports on firearm violence reduction programs in Boston, Indianapolis, St. Louis, Los Angeles, Atlanta, and Detroit.

# Contents

Foreword . . . . . . . . . . iii

Introduction . . . . . . . . . . 1

Putting the Strategies in Place . . . . . . . . . . 5

Will the Community Support Aggressive Patrol Strategies? . . . . . . . 13

Implications for Further Research . . . . . . . . . . 17

Notes . . . . . . . . . . 21

Appendix: Additional Methods and Findings . . . . . . . . . . 25

# Introduction

During the mid-1990s, Indianapolis found itself in an unusual situation. The local economy was strong and the city's downtown was experiencing a vibrant renewal. But the city also was experiencing record-setting levels of homicide at a time when homicide was declining in many comparable cities.

Local officials took several steps to address homicide. For example, they used data to identify where and when homicides were occurring. To produce the data, the Indianapolis Police Department (IPD) created the Indianapolis Management Accountability Program, or IMAP, an adaptation of the New York City Police Department's computer comparison statistics (CompStat) program.

IPD then applied directed patrol tactics in two areas of the city that had high concentrations of violent crime. Directed patrol involves assigning officers to a particular area to proactively investigate suspicious activities and enforce existing gun, drug, traffic, and related laws. Officers assigned to directed patrol areas are freed from having to respond to calls for service.[1]

Directed patrol is thought to be most promising as a crime control tool when it is targeted toward high-crime locations and their hot spots.[2] Indianapolis selected the approach because research indicated it had been successful in Kansas City. (See "Findings From Kansas City.")

The most common approach in a directed patrol effort is traffic stops. The strategy generally includes increasing the number of police officers in a given location and the number of contacts with citizens. In theory, intense traffic enforcement should have a general deterrent effect because it increases the threat of detection and punishment of criminal activity.[3]

To the extent that directed patrol focuses on suspicious individuals in high-risk locations, it moves from a general deterrence strategy to a targeted or focused deterrence strategy. The Indianapolis study provided the opportunity to compare a general deterrence with a targeted deterrence strategy.

***Findings From Kansas City***

One of the most promising studies on the use of directed patrol to reduce violent crime is the Kansas City gun experiment conducted by Lawrence W. Sherman and his colleagues in the early 1990s.* Kansas City police officers, trained to search for illegal guns, increased traffic enforcement in a police beat with high levels of violent crime. Their efforts led to increased seizures of illegal firearms, which in turn were associated with a significant decrease in gun-related crime in the targeted area. The researchers found that the target beat experienced a 65-percent increase in firearm seizures and an approximately 50-percent decrease in the incidence of gun-related crime. A control beat experienced a slight decline in gun seizures and a small increase in gun-related crime.

---

* Sherman, L.W., J.W. Shaw, and D.P. Rogan, *The Kansas City Gun Experiment*, Research in Brief, Washington, DC: U.S. Department of Justice, National Institute of Justice, 1995, NCJ 150855; and Sherman, L.W., and D.P. Rogan, "The Effects of Gun Seizures on Gun Violence: 'Hot Spots' Patrol in Kansas City," *Justice Quarterly* 12 (1995): 673–693.

## *How Did Indianapolis Reduce Gun Crime?*[4]

IPD applied directed patrol tactics in two police districts in two different ways. Put in the simplest terms, the East District followed a general deterrence strategy whereby it assigned many police officers who stopped many people, issued many citations, and made 1 felony arrest for every 100 traffic stops. The North District, employing a targeted deterrence strategy, assigned fewer officers who stopped fewer people and issued fewer citations but made almost 3 times as many arrests for every 100 stops. Officers in the North District were more likely to stop and arrest felons because they focused on specific suspicious behavior and individuals. Homicide went down in both districts, but the North District also reduced gun crime overall—and they did so using fewer resources.

Directed patrol in the North target area reduced gun crime, homicide, aggravated assault with a gun, and armed robbery. In contrast, in the East target area it had no effect on gun-related crime, except for a possible effect on homicide. Why? The North District's targeted deterrence approach most likely sent a message of increased surveillance to those individuals most likely to commit violent gun-related crimes.[5]

The results of the Indianapolis directed patrol program are consistent with a growing body of research that shows that when police identify a specific problem and focus their attention on it, they can reduce crime and violence. As in the Kansas City gun intervention project, directed police patrol led to sizable reductions in gun crime. Additionally, it did not shift crime to surrounding areas or harm police-community relations.

The finding that the community generally accepted the program supports the idea that crime control benefits need not generate police-citizen conflict. However, the lack of impact in Indianapolis's East target area, which used a more general rather than a targeted deterrence model, and the potential strain that these types of police initiatives could have on police-community relations suggest the need for continued research on both the benefits and the potential costs of such strategies.

## About This Report

The evaluation of the Indianapolis directed patrol program examined several questions:

- Can directed police patrol reduce violent gun crime?

- Do different directed patrol strategies have different effects?

- Will the community support this type of aggressive traffic enforcement?

- Which aspects of the Indianapolis experiment work and what still remains unknown?

The following sections address these questions.

# Putting the Strategies in Place

The Indianapolis directed patrol experiment was a 90-day project initiated on July 15, 1997, in two districts:

- The North District's beats A51 and A52.
- The East District's beats B61 and B62.

Data from IPD's Indianapolis Management Accountability Program revealed that these four beats were consistently among those that exhibited the highest levels of violent crime, drug distribution, and property crime in the city. (See "Selecting the Target and Comparison Areas.")

The choice of strategies employed to implement directed patrol was left to the command staff of each district. Consequently, each district employed a slightly different strategy.

The East District used a broader general deterrence strategy that maximized the number of police vehicle stops, thereby creating a sense of significantly increased police presence. The strategy was based on the theory that offenders would be deterred by the increased patrols. Additionally, the police anticipated that the large number of vehicles would yield seizures of illegal weapons and drugs.

### *Selecting the Target and Comparison Areas*

To determine the extent to which directed patrol in the North and East target areas had an impact, researchers needed to select a comparison area that did not experience directed patrol.

Selecting comparison areas for evaluations can be problematic. No two areas are alike, and they are influenced by myriad demographic, economic, neighborhood, and police processes. In an ideal situation, the police beats with crime patterns most like those in the target areas would be selected. This process was impossible in Indianapolis, however, because the beats most like the target areas were contiguous to them. Researchers did not want to use contiguous beats as comparisons because they intended to examine crime effects in those surrounding areas.

#### *Demographics*

Consequently, two beats in the East District were selected as the most similar available choices (beats B41 and B42). The comparison area, however, is more

*Continued on page 6*

populous than both of the target areas and covers a significantly larger land area. The comparison area houses primarily black residents (86 percent) and thus is more comparable to the North target area, where most residents live in predominately black, low-income neighborhoods. The low-income neighborhoods in the East target area consist principally of white residents; 14 percent are black and a small but growing number are Latino.

Exhibit 1 presents basic data for the target and the comparison areas, and exhibit 2 presents Uniform Crime Reporting (UCR) Program Index offenses (1996) for the three areas as well as citywide.*

### *Crime Rate Comparisons*

The evaluation compared crime trends in the target areas with crime trends in the comparison area and citywide (minus crime in the target areas). The evaluators assumed that the citywide crime trend would provide the best estimate of what was likely to occur in the target areas absent the directed patrol project.

The homicide rate in the North target area was three times that of the city. Its robbery and aggravated assault rates were almost twice those of the city. Its property crime rate, however, was slightly lower than the city's rate.

The East target area's homicide rate was between the rates of the North target area and the city. It had a particularly high rate of robbery, and its rate of aggravated assault was nearly twice that of the city. Its rate of property crime was higher than the rates in the city and the North target area.

The North and East target areas are quite dense, which reduces their population-based rates of crime. Both areas, however, have extremely high rates of violent crime for their size. Although the comparison area had a higher violent crime rate than the city, its rate was considerably lower than those of the target areas.

---

* Indianapolis is part of a consolidated city-county governmental structure. The police department's jurisdiction consists of the center city. The population in 1990 was 377,723. The crime data and the population base refer to the police department's jurisdiction. The figures differ from those reported in the Uniform Crime Reporting Program, which include the consolidated city-county jurisdiction (population approximately 760,000).

**Exhibit 1** Characteristics of Target and Comparison Areas

| Characteristic | North Target Area | East Target Area | Comparison Area |
|---|---|---|---|
| Population | 16,612 | 14,645 | 19,305 |
| Square miles | 2.79 | 1.69 | 4.74 |
| Person-weeks | 215,956 | 190,385 | 250,965 |
| Square mile-weeks | 36.27 | 21.97 | 61.62 |
| Gun crimes (July 15 to October 15, 1996) | 75 | 42 | 49 |

Note: Person-weeks are calculated by population × weeks. Square mile-weeks are calculated by square miles × weeks.

**Exhibit 2** Level of Crime for Uniform Crime Reporting Program Index Offenses, 1996

| Activity | Citywide | North Target | East Target | Comparison Area |
|---|---|---|---|---|
| | **Number of Offenses** | | | |
| Murder | 114 | 15 | 7 | 9 |
| Robbery | 2,600 | 194 | 229 | 122 |
| Aggravated assault | 4,280 | 330 | 301 | 281 |
| Rape | 424 | 23 | 25 | 23 |
| **Total violent** | 7,418 | 562 | 562 | 435 |
| Burglary | 7,797 | 303 | 564 | 337 |
| Larceny | 16,842 | 633 | 796 | 469 |
| Motor vehicle theft | 5,860 | 295 | 269 | 350 |
| **Total property** | 30,499 | 1,231 | 1,629 | 1,156 |
| **Total Index** | 37,917 | 1,793 | 2,191 | 1,591 |
| | **Rate per 1,000 Residents** | | | |
| | Citywide | North Target | East Target | Comparison Area |
| Murder | 0.3 | 0.9 | 0.5 | 0.5 |
| Robbery | 6.8 | 11.7 | 15.6 | 6.3 |
| Aggravated assault | 11.3 | 19.9 | 20.6 | 14.5 |
| Rape | 1.1 | 1.4 | 1.7 | 1.2 |
| **Total violent** | 19.6 | 33.8 | 38.4 | 22.5 |
| Burglary | 20.6 | 18.2 | 38.5 | 17.5 |
| Larceny | 44.6 | 38.1 | 54.4 | 24.3 |
| Motor vehicle theft | 15.5 | 17.8 | 18.4 | 18.1 |
| **Total property** | 80.7 | 74.1 | 111.2 | 59.9 |
| **Total Index** | 100.4 | 107.9 | 149.6 | 82.4 |
| | **Rate per Square Mile** | | | |
| | Citywide | North Target | East Target | Comparison Area |
| Murder | 1.2 | 5.4 | 4.1 | 1.9 |
| Robbery | 27.6 | 69.5 | 135.5 | 25.7 |
| Aggravated assault | 45.4 | 118.3 | 178.1 | 59.3 |
| Rape | 4.5 | 8.2 | 14.8 | 4.8 |
| **Total violent** | 78.6 | 201.4 | 332.5 | 91.8 |
| Burglary | 82.6 | 108.6 | 333.7 | 71.1 |
| Larceny | 178.5 | 226.9 | 471.0 | 98.9 |
| Motor vehicle theft | 62.1 | 105.7 | 159.2 | 73.8 |
| **Total property** | 323.2 | 441.2 | 963.9 | 243.9 |
| **Total Index** | 401.9 | 642.6 | 1,296.4 | 335.6 |

Note: Numbers may not add up due to rounding.

The North District followed a more targeted deterrence approach. This selective approach to vehicle and pedestrian stops sought to maximize seizures of illegal weapons and drugs through more thorough, focused investigation. Resources were targeted toward individuals suspected of being involved in illegal activities.

## Activity Data

In their effort to increase the visibility of the police and thus deter crime, the East target area used nearly 1,000 more officer hours than the North target area (see exhibit 3). East District police officers made more arrests, issued more warning tickets and traffic citations,[6] and seized more drugs.

But the North District's more selective, focused approach resulted in the detection of more serious criminal activity during each stop. As a result, North District officers made twice as many total arrests per vehicle stop. They were three times as likely to uncover an illegal firearm during a traffic stop and discovered three times as many total guns per stop.[7] (See exhibit 4.) As part of the strategy to target offenders and investigate suspicious behavior, North District officers also made 126 probation checks during proactive checks of probationers at their residences.

**Exhibit 3** Directed Patrol Activity Data

| | Total Activities | | |
|---|---|---|---|
| **Activity** | Total | North Target Area | East Target Area |
| Officer hours | 4,879.8 | 1,975 | 2,904.8 |
| Traffic citations | 1,638 | 698 | 940 |
| Warning tickets | 2,837 | 510 | 2,327 |
| Combined tickets | 4,475 | 1,208 | 3,267 |
| Vehicle stops | 5,253 | 1,417 | 3,836 |
| **Total arrests** | 992 | 434 | 558 |
| Drug seizures | 61 | 18 | 43 |
| Illegal gun seizures | 25 | 12 | 13 |
| Legal guns discovered | 81 | 43 | 38 |
| **Total guns** | 106 | 55 | 51 |

Exhibit 4 Comparison of Activity for Vehicle Stops

| Activity | North Target per 100 Stops | East Target per 100 Stops |
|---|---|---|
| **Total vehicle stops** | 1,417 | 3,836 |
| Felony arrests | 2.9 | 1.1 |
| Total arrests | 30.6 | 14.5 |
| Illegal gun seizures | 0.9 | 0.3 |
| Total guns | 3.9 | 1.3 |
| Warning tickets | 36.0 | 60.7 |
| Citations | 49.2 | 24.5 |
| Probation contacts* | 8.9 | 0.0 |

* Probation checks were based on addresses of probationers residing in the target beats rather than on routine vehicle stops.

## *Illegal Firearms Seized*

Although the North District officers found more guns per vehicle stop, the total number of illegal firearms seized in the two target areas was similar. As exhibit 5 shows, 42 firearms were seized in the North target area and 45 were seized in the East target area during the 90-day directed patrol period in 1997. This compared with 39 and 30, respectively, during the same 90-day period in 1996. This represented a modest increase (7.7 percent) over 1996 levels in the North District and a sizable increase (50 percent) in the East District. In the comparison area, the number of seizures declined 40 percent from 1996 to 1997.

## *Observational Data*

Trained observers rode with participating officers for 100 hours and observed 104 contacts between officers and citizens. According to the observers, East District officers were more likely to base their contact on a traffic law violation. In the North District, officers concentrated their efforts and contacts on suspicious persons or situations. Yet, when North District officers did make a traffic stop, they were more likely to issue a citation. In the North District, 26 percent of contacts resulted in traffic citations; in the East District, 9 percent of contacts resulted in citations. Contacts in both target areas lasted about 15 minutes.

**Exhibit 5** Firearms Seized in Target and Comparison Areas During 90-Day Period in 1996 and 1997

| Guns Seized* | North Target | East Target | Comparison Area |
|---|---|---|---|
| 1996 (before directed patrol) | 39 | 30 | 45 |
| 1997 (during directed patrol) | 42 | 45 | 27 |
| % change | +7.7 | +50.0 | –40.0 |

Note: Data are for the period from July 15 through October 15.
* Includes guns seized by directed patrol officers and regular duty officers.

## *Differences in Firearm-Related Crimes*[8]

Although homicide declined in both North and East target areas (and the declines were significant when contrasted with the citywide trend), other gun-related offenses declined in the North target area but increased in the East target area (see exhibit 6). For example, aggravated assaults with a gun and armed robberies declined 40 percent in the North target area. These were statistically significant decreases compared with both the comparison area and the citywide trend. Similarly, total gun crimes declined 29 percent in the North target area. In contrast, aggravated assaults with a gun increased 58 percent and armed robberies increased 16 percent in the East target area. Although the increases in the East District were smaller than the increases observed in the comparison area, they contrast significantly with the decreases in the North target area.

Thus, other than for homicide, it appears that the positive effects on firearm-related crimes were confined to the North target area, where officers were more selective in who they stopped. Furthermore, decreases in robbery and aggravated assault rates in the North District were primarily due to the decline in firearm-related assaults and robberies.

**Exhibit 6** Change in Firearm-Related Crime for 90-Day Period in 1996 and 1997

| | North Target | East Target | Total Target Area | Comparison Area | Citywide |
|---|---|---|---|---|---|
| **Homicide** | | | | | |
| 1996 (before directed patrol) | 7 | 4 | 11 | 3 | 17 |
| 1997 (during directed patrol) | 1 | 0 | 1 | 3 | 26 |
| % change | NA*† | NA*‡ | NA*† | NA* | +52.9 |
| **Aggravated assault—gun** | | | | | |
| 1996 (before directed patrol) | 40 | 19 | 59 | 22 | 333 |
| 1997 (during directed patrol) | 24 | 30 | 54 | 48 | 402 |
| % change | –40.0≠ | +57.9 | –8.5∫ | +118.2 | +20.7 |
| **Armed robbery** | | | | | |
| 1996 (before directed patrol) | 31 | 31 | 62 | 13 | 356 |
| 1997 (during directed patrol) | 19 | 36 | 55 | 21 | 338 |
| % change | –38.7# | +16.1 | –11.3 | +61.5 | –5.0 |
| **Gun crimes** | | | | | |
| 1996 (before directed patrol) | 75 | 42 | 117 | 49 | NA |
| 1997 (during directed patrol) | 53 | 57 | 110 | 53 | NA |
| % change | –29.3 | +35.7 | –6.0 | +8.2 | NA |

Note: Data are for the period from July 15 to October 15. The homicide and armed robbery categories include some incidents that involved a weapon that was not a firearm.
* Percent change not calculated due to small total study population.
† Comparison to citywide trend significant at ≤ .05.
‡ Comparison to citywide trend significant at ≤ .10.
∫ Comparison to citywide trend significant at ≤ .05; to comparison beats significant at ≤ .10.
≠ Comparison to both citywide trend and comparison beats significant at ≤ .05.
# Comparison to comparison beats significant at ≤ .10.

# Will the Community Support Aggressive Patrol Strategies?

Increasing the number of police officers on patrol, especially in a city's most disenfranchised neighborhoods, may increase citizens' feelings of safety and communication between the police and the community. But police managers also need to consider the possible adverse consequences of implementing aggressive patrol strategies. If citizens criticize the police and view the frequent stops as harassment, then any reduction in crime will be accomplished only with significant costs. Citizen support for the police may decrease, public criticism may increase, and racial tensions may intensify. These consequences, if they occur, would adversely affect any department's community policing program.

To learn how citizens perceive aggressive patrol strategies and investigate how an intense police presence affects citizens' opinions, researchers examined whether citizen perceptions of crime, fear, and disorder changed after the directed patrol program was implemented. Researchers also explored the community's awareness and acceptance of the program. Did the community support the aggressive effort, or did directed patrol increase the community's concerns about racial profiling and disparity in how the police treat people? Surveys were administered in both the target and comparison areas before and after directed patrol was conducted.[9] The findings: The community was aware of the program and supported it.

## *Awareness of and Support for Directed Patrol*

Approximately two-thirds of citizens were aware of IPD's patrol strategies to remove guns and drugs from the streets (see note 9). Little change was found in the levels of awareness in the test and comparison samples. This suggests a general awareness of the strategies rather than an increased awareness as a result of the directed patrol experiment.

Before the directed patrol intervention, approximately 71 percent of the citizens in the sample supported "intense patrol" and increased police visibility. This figure increased to 76 percent following the program. Residents of the

East target area accounted for most of the increase. No change in support was found among North target or comparison area residents.

In the North District, the level of support from blacks was almost unchanged (from a mean score of 4.58 before the program to 4.62 after the program).[10] Whites in the North District were slightly less supportive, but their support increased more from the preprogram to the postprogram survey (4.09 to 4.25). In the East District, whites were slightly more supportive than blacks.

Whites in the North target area prior to directed patrol were the least supportive. Women were more supportive of directed patrol than were men, although the differences were not pronounced. No statistically significant changes in opinion by race or gender followed the directed patrol experiment. Thus, the effort neither built nor harmed public support.

## Attitudes Toward the Police

Citizens also were asked about their general support for the police department. The high level of support for IPD prior to directed patrol did not change after the experiment ended. Whites expressed slightly more positive attitudes toward the police, although no statistically significant changes were found by race or sex in the postintervention survey.[11]

## Minimizing Police-Citizen Conflict

Despite the large number of contacts between police and citizens, citations issued, and arrests made, IPD officials said that no reported citizen complaints were tied to the directed patrol initiative. IPD took several steps to prevent conflict from this aggressive police strategy. First, the deputy chief of each district attended community meetings and spoke with neighborhood leaders before directed patrol was implemented. The deputy chiefs explained the project and its goals and stated that the department would not implement the project if the community objected. Assured of neighborhood leaders' support, the deputy chiefs asked them to explain the project to residents and to solicit community support.

Second, the department provided adequate supervision for the project. A captain in each district was assigned to the project. A team of sergeants directly supervised the officers, often arriving on the scene of traffic stops and investigations. Furthermore, the captains and sergeants emphasized that the project had to be implemented in a way that was respectful of the citizens with whom officers had contact.

The citizen survey results suggest that IPD was successful in implementing the project in a fashion that did not generate police-citizen conflict.[12] The survey approach is unlikely, however, to tap into the perceptions of the most disenfranchised members of the community because they are unlikely to participate in a telephone survey. No evidence of such criticism exists, but it remains a possible effect of directed patrol efforts.

## *Impact on Perceptions of Crime, Quality of Life, and Fear*

Although the changes were not dramatic, declines were seen in both the North and East target areas in the percentage of respondents indicating that neighborhood crime had increased. At the same time, a slight, although not significant, increase was seen in the comparison area. Drug and gun crimes were the highest rated crime problems in the target neighborhoods. Statistically significant declines were noted in the percentage of citizens in both target areas who labeled drugs as a "major problem" following directed patrol. Modest, although not statistically significant, declines also were observed for gun crime. No changes were observed in the comparison area.

North target area residents were less likely to rate their neighborhood negatively following directed patrol. Both North and East target area residents were less likely to claim that the neighborhood was a "worse place." Beyond this, however, no significant changes in perceptions of the neighborhood or fear of crime were noted.

# Implications for Further Research

The results of this study indicate that directed patrol, using a **targeted** rather than a **broad** general deterrence strategy, can have a significant effect on violent crime. This finding is supported by the overall effect on homicide, the effect on firearm-related crime in the North target area (which used a targeted deterrence strategy), and the consistency with earlier findings in the Kansas City project. The less positive results on crime in the East target area, which used a broader general deterrence strategy, illustrate the greater effectiveness of a more focused deterrence approach.

Consequently, more needs to be learned about the effects of directed patrol strategies on crime. The Kansas City results show that removing illegal weapons from a high-crime neighborhood may be a key strategy in reducing firearm-related crime. The contrast between the North and East Districts, however, suggests that merely removing illegal firearms may not be the primary causal agent. Rather, a targeted deterrence approach that increases surveillance of suspicious individuals in high-risk neighborhoods may be the key ingredient to reducing gun crime and violence. More research is needed on the crime reduction effects of targeted versus more general deterrence approaches. Multiple-site, multiple-method tests of directed patrol interventions could be helpful in understanding the impact on different types of crime.[13]

## *Further Research on Directed Patrol and Police-Minority Community Relations*

More needs to be learned about how to implement directed patrol projects while maintaining positive relationships with the community. Consistent findings emerge from Kansas City and Indianapolis about the impact these projects had on citizen perceptions of the police. Both the Kansas City target area and the North target area in Indianapolis were in predominantly black neighborhoods, involved aggressive patrol strategies, and received support from residents. The effort also was supported in the predominantly white neighborhoods in the East target area. Given the history of police-citizen relationships in the black community, it is striking to find high levels of support by blacks for an aggressive police strategy that can lead to significantly higher levels of vehicle stops by the police.

In their 1988 article, Sampson and Cohen quoted Lawrence W. Sherman:[14]

> Done properly, proactive strategies need not abuse minority rights or constitutional due process nor hinder community relations. But the difficulties of implementing such strategies are substantial, and great care is required at implementation. (Sherman, 1986: 379)

IPD district chiefs took the time to meet with neighborhood leaders and community groups to explain the initiative and secure their support before implementation. In addition, directed patrol supervisors emphasized the need to treat citizens with respect and explain to citizens why they were being stopped. Observations by trained observers suggested that officers' actions were consistent with these instructions. Beyond these points, however, more needs to be learned about the training and tactics that can be used to ensure that this type of aggressive strategy is positively received by the community. This point is given weight in the recent research reported by Paternoster and colleagues.[15] Although they looked specifically at arrests in spouse assault cases, researchers found that suspects' perception of the fairness of police treatment had long-term impacts on subsequent violence.

## Turning Research Into Practice

Indianapolis's experience with directed patrol establishes the value of using research methods and data analysis to help solve crime problems. The study demonstrates the need to distinguish between two similar but distinct strategies that had very different levels of effectiveness in addressing gun-related violence.

The directed patrol experience helped Indianapolis officials understand the importance of linking research and practice. After the directed patrol experiment, it became more commonplace for officials to use research to enhance the success of strategic initiatives. One such initiative is a broad, multiagency problem-solving effort aimed at addressing homicide and gun violence. The initiative, known as the Indianapolis Violence Reduction Partnership (IVRP), includes local, State, and Federal criminal justice agencies; community leaders; service providers; and a research team. Researchers help IVRP pinpoint problems, develop a strategy, monitor how the strategy is working, interpret new data, and continually adjust the strategy as needed.

Analyses to date indicate that the IVRP approach resulted in significant reductions in homicide in Indianapolis during 1999.[16]

The link between research and practice also has produced promising results elsewhere. Boston's Operation Ceasefire, a communitywide collaboration, reduced youth homicide by more than 60 percent.[17] Other cities, including Indianapolis through IVRP, are adopting Boston's problem-solving model in the Strategic Approaches to Community Safety Initiative sponsored by the National Institute of Justice. The Boston and Indianapolis experiences, coupled with other promising interventions, suggest that serious crime problems can be productively addressed through these partnerships between criminal justice practitioners and researchers.[18]

# Notes

1. Cordner, G.W., "The Effects of Directed Patrol: A National Quasi-Experiment in Pontiac," in *Contemporary Issues in Law Enforcement,* ed. J. Fyfe, Beverly Hills, CA: Sage Publications, 1981.

2. Sherman, L.W., D. Gottfredson, D. MacKenzie, J. Eck, P. Reuter, and S. Bushway, *Preventing Crime: What Works, What Doesn't, What's Promising,* Washington, DC: U.S. Department of Justice, National Institute of Justice, 1997, NCJ 165366.

3. Support for the deterrent effect of increasing the number of police and the contacts between police and citizens in high-crime areas is provided by Marvel, T.B., and C.E. Moody, "Specification Problems, Police Levels and Crime Rates," *Criminology* 34 (1996): 609–646; Wilson, J.Q., and B. Boland, "The Effect of the Police on Crime," *Law and Society Review* 12 (1978): 367–390; Sampson, R.J., and J. Cohen, "Deterrent Effects of the Police on Crime: A Replication and Theoretical Extension," *Law and Society Review* 22 (1988): 163–189; Press, S.J., *Some Effects of an Increase in Police Manpower in the 20th Precinct of New York City,* New York: New York City Rand Institute, 1971; and Schnelle, J.F., R.E. Kirchner, Jr., J.D. Casey, P.H. Uselton, Jr., and M.P. McNees, "Patrol Evaluation Research: A Multiple-Baseline Analysis of Saturation Police Patrolling During Day and Night Hours," *Journal of Applied Behavior Analysis* 10 (1977): 33–40.

4. The full technical report, including the time-series analysis discussed in the appendix, "Additional Methods and Findings," was submitted to the National Institute of Justice in 2000: McGarrell, E.F., S. Chermak, and A. Weiss, "Reducing Firearms Violence Through Directed Police Patrol: Final Report on the Evaluation of the Indianapolis Police Department's Directed Patrol Project." See also McGarrell, E.F., S. Chermak, A. Weiss, and J. Wilson, "Reducing Firearms Violence Through Directed Police Patrol," *Criminology & Public Policy* 1 (1) (November 2001): 119–148.

5. The targeted deterrence strategy was also evident in the Kansas City gun experiment. (Sherman, L.W., J.W. Shaw, and D.P. Rogan, *The Kansas City Gun Experiment,* Research in Brief, Washington, DC: U.S. Department of Justice, National Institute of Justice, 1995, NCJ 150855; and Sherman, L.W., and D.P. Rogan, "The Effects of Gun Seizures on Gun Violence: 'Hot Spots' Patrol in Kansas City," *Justice Quarterly* 12 (1995): 673–693.)

Similar targeted deterrence strategies were successful in San Diego and Boston. The San Diego field interrogation was intended to send a deterrence message to high-risk individuals in high-risk locations (Boydstun, J., *San Diego Field Interrogation: Final Report*, Washington, DC: Police Foundation, 1975). In Boston's Operation Ceasefire meetings, the threat of punishment was directly communicated to individuals believed to be at greatest risk for involvement in firearm-related violence (Kennedy, D.M., "Pulling Levers: Getting Deterrence Right," *National Institute of Justice Journal* 236 (July 1998): 2–8). See also Sherman, L.W., "Policing for Crime Prevention," in *Preventing Crime*, by Sherman, Gottfredson, MacKenzie, Eck, Reuter, and Bushway (see note 2).

6. North and East District officers issued 1,638 traffic citations and 2,837 warning tickets. Officers said that warning tickets often were issued for minor infractions because issuing expensive tickets to low-income residents frustrates their efforts to cultivate positive community relations. Citations were issued for more serious infractions and repeat violations. The directed patrol experiment in Indianapolis resulted in 84 felony arrests, 654 misdemeanor arrests, and 254 warrant arrests, for a total of 992 arrests.

7. Directed patrol officers seized 25 illegal firearms; an additional 81 legally possessed weapons were discovered. (Additional firearms were seized in the target areas by officers on routine patrol. Exhibits 4 and 5 reflect the total firearms seized.) Thus, officers uncovered more than three legally possessed weapons for every one illegally possessed weapon. Some officers joked that people who were stopped were more likely to have a gun permit than a driver's license.

8. Exhibit 6 reports the results of statistical significance tests conducted using the general linear model analysis of variance approach. The variance is partitioned into period effects, area effects, and effects due to the interaction of area and period. The interaction effect is of interest because it allows the study to contrast the trend in the target areas with the trend in the comparison area and in the city as a whole. When the target areas experience a decline in crime, the method tests whether the decline is greater than would be expected by chance given the trend in the comparison area.

Similarly, when the target areas experience no change or an increase, the method allows the study to test whether it is significantly different from the trend in the comparison area.

9. The surveys were conducted using a randomly selected panel design. The sample size of the preintervention panel was 420. The net response rate was 58.2 percent (302 of the 722 people approached refused to participate). The response rates in the North (59.7 percent) and East (66.5 percent) target areas were higher than in the comparison area (49.6 percent). The sample size of the panel following the directed patrol experiment was 282 (67 percent of the original sample). Attrition was evenly distributed throughout the two target areas and the comparison area and the demographic patterns were consistent in both the presamples and postsamples. Additional information on the survey is available in Chermak, S., and E.F. McGarrell, "Citizens' Perceptions of Aggressive Traffic Enforcement Strategies," *Justice Quarterly* 18 (2001): 365–391.

10. Support for the program was measured on a five-point Likert scale from "no support" to "strongly support."

11. A small decline occurred in the number of North District residents who strongly agreed that police were professional and courteous. This was not found in the East District, but it was observed in the comparison area. Thus, it does not seem to be the product of directed patrol. The decline most likely is the result of the highly publicized trial of four IPD officers who were involved in a confrontation with two citizens while the officers were off duty. The trial occurred during the directed patrol experiment. This appeared to affect attitudes of black citizens, who are the majority of citizens in the North District and comparison area.

12. See also Shaw, J.W., "Community Policing Against Guns: Public Opinion of the Kansas City Gun Experiment," *Justice Quarterly* 12 (1995): 695–710.

13. Sherman, Gottfredson, MacKenzie, Eck, Reuter, and Bushway, *Preventing Crime* (see note 2); and Sherman, L.W., "Cooling the Hot Spots of Homicide: A Plan for Action," in *What Can the Federal Government Do to Decrease Crime and Revitalize Communities?* Research Forum, Washington, DC: U.S. Department of Justice, National Institute of Justice and Executive Office for Weed and Seed, 1998, NCJ 172210.

14. Sampson and Cohen, "Deterrent Effects of the Police on Crime" (see note 3).

15. Paternoster, R., R. Bachman, R. Brame, and L.W. Sherman, "Do Fair Procedures Matter? The Effect of Procedural Justice on Spouse Assault," *Law and Society Review* 31 (1997): 163–204.

16. Coleman, V., W.C. Holton, Jr., K. Olson, S.C. Robinson, and J. Stewart, "Using Knowledge and Teamwork To Reduce Crime," *National Institute of Justice Journal* 241 (October 1999): 16–23; and McGarrell, E.F., and S. Chermak, "Problem Solving to Reduce Gang and Drug-Related Violence in Indianapolis," in *Gangs, Youth Violence, and Community Policing,* edited by S. Decker, Belmont, CA: Wadsworth, forthcoming.

17. See Kennedy, D.M., A.A. Braga, A.M. Piehl, and E.J. Waring, *The Boston Gun Project's Operation Ceasefire,* Reducing Gun Violence Series, Washington, DC: U.S. Department of Justice, National Institute of Justice, 2001, NCJ 188741.

18. The data-driven problem-solving model is a key component of the U.S. Department of Justice's Project Safe Neighborhoods (visit the Project Safe Neighborhoods Web site at *http://www.psn.gov*).

# Appendix: Additional Methods and Findings

To further test the potential impact on violent crime, three ARIMA (auto-regressive integrated moving average) models were used to compare the North and East target areas, the comparison area, and the city (minus the target areas). The outcome measure was the number of homicides, aggravated assaults with a gun, and armed robberies. The data were compiled from the first week in 1995 through January 12, 1998—a 132-week preintervention period, a 13-week intervention period, and a 13-week postintervention period.

The first model compared the three periods. A significant effect was found for the North target area, which had approximately two fewer violent crimes on average during the intervention. The comparison area witnessed an increase of slightly more than one violent crime per week on average during the intervention period. Neither the East target area nor the net city-wide trend showed significant changes during the intervention period.

The second model compared the intervention period with the preintervention period. An effect of reduced violent crimes was found in the North target area during the intervention period. The comparison area witnessed an increase, whereas neither the East target area nor the city trend saw a change.

The third model compared the intervention period with the postintervention period. This tested the effect of removing the intervention. No significant changes were found when the intervention was removed. This suggests that the intervention effect in the North target area remained even after the directed patrol project ended. This model should be interpreted cautiously, however, because of the small number of observations (26 weeks).

It appears unlikely that the findings from the East target area were due either to a long-term suppression effect or a rebound from unusually low levels of violent crime.

To determine whether evidence of a residual deterrence effect existed, researchers compared the trend in crime for the 90-day period following the termination of directed patrol (October 16, 1997, to January 15, 1998) with

the same period in the previous year. The findings from this analysis are mixed. Although homicides continued to decline in the North target area, they increased in the East target area. Aggravated assault with a gun declined 30 and 49 percent in the North and East target areas, respectively; declines also occurred in the comparison area and citywide, although they were of a smaller magnitude than in the target areas. The differences between the target areas and the comparison area were not statistically significant. Armed robberies declined 15 percent in the North target area, similar to the citywide trend. Both the East target area and the comparison area witnessed increases in armed robbery. Thus, the most promising results are for aggravated assault with a gun. Both target areas experienced fairly large decreases, although the lack of statistical significance when contrasted with the comparison area suggests that these results reflect the citywide trend rather than the residual deterrent effect of directed patrol. The findings for other offenses did not reveal any consistent evidence of residual deterrence.

# About the National Institute of Justice

NIJ is the research, development, and evaluation agency of the U.S. Department of Justice and is solely dedicated to researching crime control and justice issues. NIJ provides objective, independent, nonpartisan, evidence-based knowledge and tools to meet the challenges of crime and justice, particularly at the State and local levels. NIJ's principal authorities are derived from the Omnibus Crime Control and Safe Streets Act of 1968, as amended (42 U.S.C. §§ 3721–3723).

The NIJ Director is appointed by the President and confirmed by the Senate. The NIJ Director establishes the Institute's objectives, guided by the priorities of the Office of Justice Programs, the U.S. Department of Justice, and the needs of the field. The Institute actively solicits the views of criminal justice and other professionals and researchers to inform its search for the knowledge and tools to guide policy and practice.

## NIJ's Mission

NIJ's mission is to advance scientific research, development, and evaluation to enhance the administration of justice and public safety.

## NIJ's Strategic Goals and Program Areas

NIJ has seven strategic goals grouped into three categories:

Creating relevant knowledge and tools:

1. Partner with State and local practitioners and policymakers to identify social science research and technology needs.
2. Create scientific, relevant, and reliable knowledge—with a particular emphasis on violent crime, drugs and crime, cost-effectiveness, and community-based efforts—to enhance the administration of justice and public safety.
3. Develop affordable and effective tools and technologies to enhance the administration of justice and public safety.

Dissemination:

4. Disseminate relevant knowledge and information to practitioners and policymakers in an understandable, timely, and concise manner.
5. Act as an honest broker to identify the information, tools, and technologies that respond to the needs of stakeholders.

Agency management:

6. Practice fairness and openness in the research and development process.
7. Ensure professionalism, excellence, accountability, cost-effectiveness, and integrity in the management and conduct of NIJ activities and programs.

## NIJ's Structure

NIJ has three operating units. The Office of Research and Evaluation manages social science research and evaluation and crime mapping research. The Office of Science and Technology manages technology research and development, standards development, and technology assistance to State and local law enforcement and corrections agencies. The Office of Development and Communications manages field tests of model programs, international research, and knowledge dissemination programs. NIJ is a component of the Office of Justice Programs, which also includes the Bureau of Justice Assistance, the Bureau of Justice Statistics, the Office of Juvenile Justice and Delinquency Prevention, and the Office for Victims of Crime.

To find out more about the National Institute of Justice, please contact:

National Criminal Justice Reference Service
P.O. Box 6000
Rockville, MD 20849–6000
800–851–3420
e-mail: *askncjrs@ncjrs.org*

To obtain an electronic version of this document, access the NIJ Web site
(*http://www.ojp.usdoj.gov/nij*).

If you have questions, call or e-mail NCJRS.

**U.S. Department of Justice**

Office of Justice Programs

*National Institute of Justice*

*Washington, DC 20531*

Official Business

Penalty for Private Use $300

PRESORTED STANDARD
POSTAGE & FEES PAID
DOJ/NIJ
PERMIT NO. G-91

# Exhibit 27

# Criminal Records of Homicide Offenders

Philip J. Cook, PhD
Jens Ludwig, PhD
Anthony A. Braga, PhD

**Context** Homicide prevention strategies can be either targeted toward high-risk groups or addressed to the population at large. One high-risk group of particular interest is adults with a criminal record. But the prevalence of a criminal record among homicide offenders has not been reliably quantified, nor has the prevalence of criminal record in the general population.

**Objective** To determine what portion of the homicide problem would be addressed by interventions linked to arrest or conviction.

**Design, Setting, and Participants** A case-control analysis was performed using a comprehensive data set of all arrests and felony convictions in Illinois for 1990-2001. Cases were defined as Illinois residents aged 18 to 64 years who were arrested for homicide in 2001. Controls were all other Illinois residents aged 18 to 64 years in 2001. Illinois criminal and juvenile record information for cases and controls was compiled for 1990-2000. Five definitions of previous record were considered (arrest, arrest for a violent crime, 5 or more arrests with at least 1 for a violent crime, felony conviction, and violent-felony conviction), each measured for 1990-2000 and for 1996-2000.

**Main Outcome Measure** The population-attributable risk: the portion of homicide offenses that would be eliminated by a hypothetical intervention that reduced the offending risk of individuals with a record to the offending risk of those who lack a record.

**Results** For 1990-2000, 42.6% of 884 cases had at least 1 felony conviction compared with 3.9% of nearly 7.9 million controls, for a population-attributable risk of 40.3% (95% CI, 37.0%-43.8%); among cases, 71.6% had experienced any arrest from 1990-2000 compared with 18.2% of controls, for a population-attributable risk of 65.3% (95% CI, 61.6%-68.8%). For 1996-2000, the population-attributable risk among individuals with a felony conviction or any arrest was 31.0% (95% CI, 27.9%-34.2%) and 58.5% (95% CI, 54.9%-62.1%), respectively.

**Conclusions** Interventions after arrest or conviction, such as supervised release, imprisonment, correctional programs, or bans on firearm possession, are targeted toward a group that has relatively high incidence of lethal violence, but they leave a large portion of the problem untouched.

*JAMA. 2005;294:598-601* www.jama.com

Homicide is a serious public health problem in the United States, with 17 638 victims in 2002.[1] Programs to prevent homicide can be distinguished by whether they are addressed to the general public or are targeted toward individuals who are considered high risk because of their previous criminal involvement. For example, federal gun laws incorporate both approaches; there are general provisions, such as the near prohibition on the private possession of fully automatic weapons, and targeted provisions, such as the ban on possession of any firearm by convicted felons and domestic violence offenders. Similarly, the criminal law poses a general threat of punishment to any adult contemplating criminal violence but targets individuals with convictions for more severe sentences. Other criminal justice interventions are highly targeted, affecting only individuals who are actually arrested or convicted: mandated drug programs and other rehabilitation-oriented programs, incarceration, parole and probation supervision, and so forth.

Although the criminology literature includes a number of studies of the criminal histories of select groups of homicide offenders,[2-7] previous studies have typically dealt with special subsets of homicide offenders, provided few specifics on criminal record, and lacked comparable information for the general population. As a result, this literature offers little guidance on the relative scope of targeted vs general prevention strategies in addressing the homicide problem. Specifically, how much would the homicide rate be reduced by a hypothetical intervention that eliminated the excess risk of homicide offending among people with a criminal record, defined, for example, by felony conviction within the previous decade? To answer this question, we conducted a case-control study comparing the prevalence of criminal histories among homicide offenders to the prevalence of criminal histories among the general population.

**For editorial comment see p 623.**

**Author Affiliations:** Department of Public Policy Studies, Duke University, Durham, NC (Dr Cook); Georgetown University, Washington, DC (Dr Ludwig); and the John F. Kennedy School of Government, Harvard University, Cambridge, Mass (Dr Braga).
**Corresponding Author:** Philip J. Cook, PhD, Sanford Institute of Public Policy, Duke University, Durham, NC 27708-0245 (pcook@duke.edu).

 ©2005 American Medical Association. All rights reserved.

Downloaded from jama.ama-assn.org by guest on September 22, 2011

Case: 1:10-cv-04184 Document #: 166-1 Filed: 03/12/12 Page 40 of 62 PageID #:3430

## METHODS

The data include all arrests of juveniles and adults in Illinois from 1990-2001. They were extracted from the Illinois State Police mainframe computer by a special program written by the Illinois Criminal Justice Information Authority and are stored at the Chapin Hall Center for Children, University of Chicago. The specific data files used in our analysis are described in more detail elsewhere.[8]

Every "arrest event" included in these data files was assigned a unique identification number. Every arrestee was also assigned a unique identification number by the Illinois State Police that was the basis for compiling an individual's complete arrest and conviction record over time. (The identity of arrestees is routinely confirmed by the police by use of fingerprint data.) Details on the arrest event included information on the date of arrest and the criminal charges initially filed against the arrestee. A separate data file compiled from reports from the state's prosecuting attorney's offices lists additions or deletions to the criminal charges filed against arrestees for each arrest event. Another data file reported separately by the court clerks provided information on court hearings and dispositions and was the basis for determining convictions.

All individuals arrested for murder or manslaughter in Illinois in 2001 were identified in the arrest data files for that year and linked to their arrests and convictions in Illinois for 1990-2000. We defined the cases as just those homicide arrestees who were Illinois residents aged 18 to 64 years. Of the 1032 individuals arrested for homicide in 2001, we excluded 32 who were out-of-state residents, 110 who were younger than 18 years, and 6 who were older than 64 years. Arrestees younger than 18 years were excluded because they are too young to have a criminal history that can be meaningfully compared with those who are older.

The data on court dispositions are somewhat less complete than the data on arrests. To deal with this problem of missing data, we generated 2 sets of estimates of the prevalence of felony convictions (and convictions for violent felonies) that bracket the true prevalence; the low estimate assumed no conviction in cases in which the data were unclear, and the high estimate assumed a conviction in these cases. Disposition was unclear in this sense in 56 046 instances, 22.6% of the known felony convictions. For the sake of brevity, and because in practice it made little difference in the pattern of results, we report only the high estimates.

We computed the prevalence of an arrest record for the controls (the Illinois resident population aged 18 to 64 years in 2001 who were not arrested for homicide in that year) by counting all individuals who were arrested at least once in Illinois from 1990-2000 and who were between 18 and 64 years on April 15, 2001, and dividing by the state population in this age range. We also computed the prevalence of arrest from 1996-2000. Similarly, we computed the prevalence of other types of criminal record for 1990-2000 and 1996-2000: arrest for a violent crime (including homicide, rape, robbery, and assault); 5 or more arrests, including a violent crime arrest; felony conviction; and felony conviction for a violent crime.

The Illinois population for 2001 for residents aged 18 to 64 years was estimated from 2 sources. The noninstitutionalized population was estimated from the US Census Bureau's American Community Survey for 2001.[9] The institutionalized population is not included in the American Community Survey. We estimated it from the Census Bureau's public use microfile data for 2000[10] on the assumption that the institutionalized population did not change in size or composition between 2000 and 2001.

The prevalence of a record among cases (homicide arrestees) and controls (the population at large) were compared, and attributable risks were computed.[11] (The population-attributable risk is the proportion of homicides that would be eliminated if the homicide risk of those with a record dropped to the rate of those without a record.) We used SAS software, version 9.1 (SAS Institute Inc, Cary, NC).

**Table.** Attributable Risks of Homicide

| | No. of Cases (n = 884) | Proportion of Population | Proportion of Cases | Population-Attributable Risk (95% CI) |
|---|---|---|---|---|
| Criminal record during 1990-2000 | | | | |
| Arrest | 633 | 0.182 | 0.716 | 0.653 (0.616-0.688) |
| Violent arrest | 327 | 0.078 | 0.370 | 0.317 (0.283-0.352) |
| ≥5 Arrests, ≥1 violent | 258 | 0.028 | 0.292 | 0.272 (0.242-0.304) |
| Felony conviction | 377 | 0.039 | 0.426 | 0.403 (0.370-0.438) |
| Violent-felony conviction | 82 | 0.009 | 0.093 | 0.085 (0.067-0.106) |
| Criminal record during 1996-2000 | | | | |
| Arrest | 559 | 0.113 | 0.632 | 0.585 (0.549-0.621) |
| Violent arrest | 228 | 0.042 | 0.258 | 0.225 (0.197-0.257) |
| ≥5 Arrests, ≥1 violent | 157 | 0.011 | 0.178 | 0.169 (0.144-0.195) |
| Felony conviction | 287 | 0.021 | 0.325 | 0.310 (0.279-0.342) |
| Violent-felony conviction | 55 | 0.004 | 0.062 | 0.058 (0.045-0.077) |

Abbreviation: CI, confidence interval.

## RESULTS

There were 884 cases and 7 879 478 controls. From 1990-2000, 42.6% of cases and 3.9% of controls had at least 1 felony conviction, implying a population-attributable risk of 40.3% (95% CI, 37.0%-43.8%) (TABLE). For every definition of record, the population-attributable risk is less when record is defined on the 5-year interval 1996-2000 than on the 11-year interval 1990-2000. It differs widely across the 5 definitions of record, depending mostly on the prevalence of that record among cases. For example, for records defined on the interval 1996-2000, the

©2005 American Medical Association. All rights reserved.

Downloaded from jama.ama-assn.org by guest on September 22, 2011

Case: 1:10-cv-04184 Document #: 166-1 Filed: 03/12/12 Page 41 of 62 PageID #:3431

population-attributable risk is 58.5% for arrest (95% CI, 54.9%-62.1%), 31.0% for felony conviction (95% CI, 27.9%-34.2%), and 5.8% for violent-felony conviction (95% CI, 4.5%-7.7%).

## COMMENT

These estimates of population-attributable risk are useful in assessing conflicting perspectives in the literature about the importance of general as opposed to targeted prevention strategies for homicide.

Some observers have characterized most homicide offenders as ordinary citizens who kill in a moment of rage or sudden impulse when provoked by acquaintances or relatives.[12-15] This perspective seems to be supported by Federal Bureau of Investigation data indicating that about half of all homicides are committed by an acquaintance or relative of the victim, more than a quarter of all female victims are killed by boyfriends or husbands, and arguments precipitate about a third of all homicides.[16] This type of evidence has been offered in support of increased controls on firearms commerce, possession, and use in the general population to forestall lethal attacks by generally nonviolent citizens.[12-15]

In contrast, there is a large body of research evidence documenting the previous criminal justice system involvement of a majority of homicide offenders.[3,6,7,17-20] Most domestic homicides are preceded by a history of assaults,[20,21] and "acquaintance" homicides often turn out to be killings among rival gang members, drug dealers, or organized crime figures.[22,23] This evidence supports an intervention strategy targeted toward serious offenders.

Our findings provide some support to both perspectives. Homicide offending in Illinois is certainly concentrated among individuals with a criminal record. The prevalence of a serious criminal record among homicide offenders is far higher than for the general population. Nonetheless, a large part of the homicide problem lies beyond the reach of any preventive treatment that is limited to individuals who have been arrested or convicted. For example, just 32.5% of homicide arrestees have been convicted of a felony in the previous 5 years. An intervention that reduced the homicide risk of felons to that of the general population would reduce the homicide rate by just 31.0%. Such findings indicate the potential importance of general prevention strategies. Of course, whether any prevention program is worthwhile depends on its effectiveness in influencing behavior of the target population and on its cost.

There are several limitations to our study, stemming from the nature of the data. First, the identification of homicide offending with homicide arrest leads to 2 types of misclassification. An unknown fraction of homicide arrestees in Illinois in 2001 was not factually guilty, and hence some individuals are incorrectly classified as "cases." And some proportion of killers in 2001 were not arrested for homicide in that year so that a relatively small number of "controls" are in fact killers. Some indication of the magnitude of the latter problem is given by the fact that 60.2% of Midwest-region homicides were cleared by arrest in 2001.[24] For our purposes, the main concern is that individuals who were arrested in 2001 were not strictly representative of the population of killers with respect to record.

Second, we have no information on arrests or convictions occurring in other states. That omission is not necessarily relevant to assessing the opportunities available to Illinois state agencies to prevent lethal violence through interventions in the lives of individuals arrested or convicted. But an out-of-state record may be relevant to sentencing options and to federal law governing firearms possession. (In federal law, any conviction for domestic violence and any conviction for a felony bar an individual from obtaining or possessing a firearm.[25])

Third, our method for estimating the prevalence of an Illinois criminal record among Illinois residents in 2001 has a positive bias of unknown magnitude. We tabulated the number of individuals who were arrested or convicted in Illinois during a specified period and divided by the resident population in 2001. Yet not all individuals arrested in Illinois during the given period were living there in 2001; there was attrition because of death and relocation out of state. This problem does not apply to the cases, because all of them are identified as individuals. Thus, homicide arrest in Illinois is somewhat more concentrated among individuals with an Illinois criminal record than indicated by our statistics. As a logical matter, this bias should be smaller for record defined for the 5-year period (1996-2000) than for the 11-year period (1990-2000).

Finally, we have limited our analysis to the record of arrests and convictions. There are other opportunities for official intervention in the lives of dangerous people, including civil restraining orders and court-ordered hospitalization for certain kinds of mental illness.[26,27]

## CONCLUSION

Interventions after arrest or conviction, such as mandatory drug treatment, supervised release, imprisonment, correctional programs, or bans on firearm possession, are targeted toward a group that has relatively high incidence of lethal violence, but they leave a large portion of the problem untouched. Broader prevention strategies, including general deterrence and the regulation of markets for "criminogenic" commodities (firearms, alcohol, and drugs), may also be warranted as part of a comprehensive strategy.

**Author Contributions:** Drs Cook and Ludwig had full access to all of the data in the study and take responsibility for the integrity of the data and the accuracy of the data analysis.
*Study concept and design:* Cook, Ludwig, Braga.
*Acquisition of data:* Ludwig.
*Analysis and interpretation of data:* Cook, Ludwig, Braga.
*Drafting of the manuscript:* Cook, Ludwig, Braga.
*Critical revision of the manuscript for important intellectual content:* Cook, Ludwig, Braga.
*Statistical analysis:* Cook, Ludwig.
*Administrative, technical, or material support:* Ludwig, Braga.
*Study supervision:* Ludwig.
**Financial Disclosures:** None reported.

©2005 American Medical Association. All rights reserved.

Downloaded from jama.ama-assn.org by guest on September 22, 2011

**REFERENCES**

1. *WISQARS Injury Mortality Reports, 1999-2002.* Centers for Disease Control and Prevention. Atlanta, Ga: Centers for Disease Control and Prevention; 2005.
2. Wolfgang ME. *Patterns of Criminal Homicide.* Philadelphia: University of Pennsylvania Press; 1958.
3. Kleck G, Bordua D. The factual foundation of certain key assumptions of gun control. *Law Policy Q.* 1983;5:271-298.
4. Straus M. Domestic violence and homicide antecedents. *Bull N Y Acad Med.* 1986;62:446-465.
5. Braga AA. Serious youth gun offenders and the epidemic of youth violence in Boston. *J Quant Criminol.* 2003;19:33-54.
6. McGarrell EF, Chermak S. Problem solving to reduce gang and drug-related violence in Indianapolis. In: Decker SH, ed. *Policing Gangs and Youth Violence.* Belmont, Calif: Wadsworth; 2003:77-101.
7. Tita G, Riley J, Greenwood P. From Boston to Boyle Heights: the process and prospects of a "pulling levers" strategy in a Los Angeles barrio. In: Decker SH, ed. *Policing Gangs and Youth Violence.* Belmont, Calif: Wadsworth; 2003: 102-130.
8. Chapin Hall Center for Children. *Illinois State Police Arrests Database, Codebook Version 1.* Chicago, Ill: Chapin Hall Center for Children at the University of Chicago; 2003.
9. US Bureau of the Census. *American Community Survey: 2001.* Washington, DC: US Bureau of the Census; 2001.
10. US Bureau of the Census. *Public-Use Microdata Samples: Census 2000.* Washington, DC: US Bureau of the Census; 2000.
11. Leung H, Kupper L. Comparison of confidence intervals for attributable risk. *Biometrics.* 1981;37:293-302.
12. Zimring FE, Hawkins G. *Crime Is Not the Problem: Lethal Violence in America.* New York, NY: Oxford University Press; 1997.
13. Christoffel KK. Toward reducing pediatric injuries from firearms: charting a legislative and regulatory course. *Pediatrics.* 1991;88:294-305.
14. Webster DW, Chaulk CP, Teret SP, Wintemute GJ. Reducing firearms injuries. *Issues Sci Technol.* 1991;7:73-79.
15. Conklin B, Seiden R. Gun deaths: biting the bullet on effective control. *Public Aff Rep.* 1981;22:1-7.
16. Spitzer RJ. *The Politics of Gun Control.* 2nd ed. New York, NY: Chatham House; 1998.
17. Dowd MD, Knapp J, Fitzmaurice L. Pediatric firearm injuries, Kansas City 1992: a population-based study. *Pediatrics.* 1994;94:867-873.
18. Kennedy DM, Piehl AM, Braga AA. Gun buybacks: where do we stand and where do we go? In: Plotkin M, ed. *Under Fire: Gun Buyback, Exchanges, and Amnesty Programs.* Washington, DC: Police Executive Research Forum; 1996:141-174.
19. Lane R. *Murder in America: A History.* Columbus: Ohio State University Press; 1997.
20. Mercy JA, Saltzman L. Fatal violence among spouses in the United States. *Am J Public Health.* 1989;79:595-599.
21. Campbell JC, Webster DW, Koziol-McLain J, Block C, Campbell D, Curry MA. Risk factors for femicide in abusive relationships: results from a multisite case control study. *Am J Public Health.* 2003;93:1089-1097.
22. Braga AA, Piehl AM, Kennedy DM. Youth homicide in Boston: an assessment of supplementary homicide reports. *Homicide Studies J.* 1999;3:277-299.
23. Kates DB, Schaffer H, Lattimer JK, et al. Guns and public health: epidemic of violence or pandemic of propaganda. *Tenn Law Rev.* 1995;62:513-596.
24. Bureau of Justice Statistics. *Sourcebook for Criminal Justice Statistics.* Washington, DC: Bureau of Justice Statistics, US Dept of Justice; 2002.
25. Vernick JS, Hepburn LM. State and federal gun laws: trends for 1970-99. In: Ludwig J, Cook PJ, eds. *Evaluating Gun Policy.* Washington, DC: Brookings Institution Press; 2003:345-402.
26. Myers WC, Scott K. Psychotic and conduct disorder symptoms in juvenile murderers. *Homicide Stud.* 1998;2:160-175.
27. Langford L, Isaac N, Kabat S. Homicides related to intimate partner violence in Massachusetts. *Homicide Studies J.* 1998;2:353-377.

**©2005 American Medical Association. All rights reserved.**

Downloaded from jama.ama-assn.org by guest on September 22, 2011

# Exhibit 28



PLAT OF SURVEY
N
SCALE: 1"=20'
CORNER OF GARAGE 1.06 E. & 1.73 S.
CORNER OF ADJACENT GARAGE 1.87 W.
CORNER OF ADJACENT GARAGE 1.37 W.
FRAME GARAGE
100.70
2 STORY STONE RESIDENCE
91.00
S. BELL AVENUE
113TH STREET
PROFESSIONAL LAND SURVEYOR CORPORATION NO. 116 STATE OF ILLINOIS
PREFERRED SURVEY, INC.
7845 W. 79TH STREET, BRIDGEVIEW, IL 60455
Phone 708-458-7845 / Fax 708-458-7855

PLMH 000017

# Chuck's Gun Shop & Pistol Range

14310 S. INDIANA • RIVERDALE, IL 60827
(708) 849-4455

DATE ______ TIME ______
N 679248

PICK UP DATE Tuesday
AFTER 12:03 PM

DATE ______ TIME ______
SOLD BY 08
DEL. BY ______

ALL SALES FINAL — **NO REFUNDS OR EXCHANGES**

INV. DATE 5.8.07.  4473 # 6301

| | | | |
|---|---|---|---|
| DATE OF SALE 6.23.07. | ☒ NEW ☐ USED | MAKE AND/OR IMPORTER Ruger | MODEL [illegible] FINISH Blue |
| TIME OF SALE 12.02 P.M | 1 ☐ REVOLVER 2 ☒ AUTO/PISTOL 3 ☐ DERR 4 ☐ SHOT GUN | 5 ☐ RIFLE 6 ☐ PISTOL GRIP SHOTGUN | |
| DATE OF DELIVERY | CALIBER/GAUGE 9mm | BARREL LENGTH 4" | SERIAL NUMBER 76429 07A 006291 |
| TIME OF DELIVERY | POLICE DEPT. / SECURITY COMPANY | | STAR |

NAME, ADDRESS AND ZIP CODE OF PURCHASER
Michael J Hall 11254 S Bell Av Chi IL 60643

HOME DEFENSE ☐ TARGET SHOOTING ☐ SECURITY ☐ HUNTING ☐ COLLECTOR ☒

| | | | | |
|---|---|---|---|---|
| S.S. # REDACTED | | HOME PHONE [illegible]-3777 | | D.O.B. [illegible] |
| COLOR HAIR Gry | COLOR EYES Brn | HEIGHT 6'0" | WEIGHT 180 | SEX Male |
| F.O.I. # 56140023 | | DRIV. LIC. # OR STATE ID # [illegible]400 5505 8043 | | |
| EXPIRATION DATE 8.1.10 | | OCCUPATION/EMPLOYER I.T. Consultant | | |

TRADE IN IF ANY — DESCRIBE
☒ NONE
MFG ______
IMPORTER ______
SER. # ______
MDL ______ CAL ______
______ AUTO ______ REV
MFG ______
IMPORTER ______
SER. # ______
MDL ______ CAL ______
______ AUTO ______ REV

| | |
|---|---|
| [illegible] | $ 499.50 |
| Tx | $ 38.39 |
| Total | $ 535.37 |
| | $ |
| Paid Tue Visa | |
| | $ |
| | $ |
| | $ |
| | $ |
| | $ |

READ AND SIGN REVERSE SIDE
RECEIVED BY [illegible]
[illegible]-101 1/06

PLMH 000116

**Chuck's Gun Shop & Pistol Range**
14310 S. INDIANA • RIVERDALE, IL 60827
(708) 849-4455

A 0425-08
DATE ______ TIME ______
N ______
DATE ______ TIME ______
SOLD BY ___
DEL. BY ___

PICK UP DATE ______
AFTER ______

ALL SALES FINAL — **NO REFUNDS OR EXCHANGES**

INV. DATE 10-5-07 · X 4473 # 6747

| DATE OF SALE 10-3-07 | ☒ NEW ☐ USED | MAKE AND/OR IMPORTER Ruger | MODEL 10/22 FINISH Blue |
|---|---|---|---|
| TIME OF SALE 4:01 PM | 1 ☐ REVOLVER 2 ☐ AUTO/PISTOL | 3 ☐ DERR. 4 ☐ SHOT GUN | 5 ☒ RIFLE 6 ☐ PISTOL GRIP SHOTGUN |
| DATE OF DELIVERY 10-06-07 | CALIBER/GAUGE 22 LR | BARREL LENGTH 18 1/2" | SERIAL NUMBER 350-41620. |
| TIME OF DELIVERY 4:55 PM | POLICE SECURITY | DEPT. COMPANY | STAR |

NAME, ADDRESS AND ZIP CODE OF PURCHASER
Michael J Hall 11354 S. Bell Chicago, IL 60643

HOME DEFENSE ☐ TARGET SHOOTING ☐ SECURITY ☐ HUNTING ☒ COLLECTOR ☐

| S.S. # REDACTED | | HOME PHONE 773 913-3777 | | D.O.B. 02-12-58 |
|---|---|---|---|---|
| COLOR HAIR Grey | COLOR EYES Brown | HEIGHT 6-00 | WEIGHT 180 | SEX Male |
| F.O.I. # 56140093 | | DRIV. LIC. # OR STATE ID # H400-5505-8043 | | |
| EXPIRATION DATE 5-01-2010 | | OCCUPATION/EMPLOYER Consultant | | |

TRADE IN IF ANY — DESCRIBE
☒ NONE
MFG ______
IMPORTER ______
SER. # ______
MDL ______ CAL ______
______ AUTO ______ REV
MFG ______
IMPORTER ______
SER. # ______
MDL ______ CAL ______
______ AUTO ______ REV

| | |
|---|---|
| Gun | $ 204.00 |
| Tax | $ 15.81 |
| Total | $ 219.81 |
| Dep | $ 80.00 Visa |
| Bal | $ 139.81 |
| PAID | $ PFull Cash |
| | $ |
| | $ |
| | $ |
| | $ |

READ AND SIGN REVERSE SIDE
X [signature]
RECEIVED BY
X
INV. - 101 1/06

**Master Lock**®

**94 RESETTABLE COMBINATION GUN LOCK**

WARNING!
Do Not Use On A Loaded Gun!
Attempts to use on a loaded gun may result in an accidental discharge!

**READ BEFORE USE!**

## ⚠ WARNING!

**DO NOT USE THIS LOCK ON A LOADED GUN! Attempts to use on a loaded gun may result in an accidental discharge. A loaded gun must *always* be regarded as dangerous. If the lock becomes damaged in any way do not attempt to use on your firearm – refer to guarantee information for replacement.**

*Before attempting to use, carefully read all of the following instructions along with the firearms safety tips.*

**IMPORTANT:** We do not guarantee that this product will lock all firearms. It will block access to many guns when properly attached. Some lever action rifles, firearms without trigger guard surrounding the triggers, guns with extra light or extra wide triggers or guns with trigger shoes or extensions may not be able to be effectively locked with this gun lock. NO GUN LOCK CAN OFFER COMPLETE PROTECTION AGAINST THE ACCIDENTAL OR INTENTIONAL MISUSE OF FIREARMS. Keep guns unloaded and out of children's reach. Master Lock Company is not responsible for incidental or consequential damages.

## Instructions for Use

1. To open lock, set dials to combination (combination is pre-set to 0-0-0 by factory). With dials set to combination, move release lever to open, or up, position. Pull apart the two sides of the gun lock. MAKE SURE GUN IS UNLOADED AND NOT COCKED.

2. Move release lever back down to locked position and scramble combination dials. Insert front lock unit with ratchet post through trigger guard, behind trigger if possible.

3. Insert rear unit, with outside edges of both units matching. Note that self-adjusting pins usually permit lock to be installed in more than one position.

4. After determining best locking position, press the two units together. Make certain lock is tight and cannot be moved after it is installed. If it can be, press units tighter together until immovable.

1.

2.

3.
FRONT UNIT
RATCHET POST
REAR UNIT

4.

**PLMH 000120**

*– INSTRUCTIONS FOR USE CONTINUED ON OTHER SIDE –*



■ While the preceding illustrations (see other side, no. 3) show the preferred and most usual method of using this gun lock, a more effective fit on some guns may be achieved by positioning the lock differently. The ultimate goal is to cover the trigger area as firmly and completely as possible; with the large number of different gun styles available, other lock positions may be more effective.

## How to Reset Combination

1. Open the lock by pulling apart the two sides of the lock and completely removing from the gun.
2. Push the lever into the down position.
3. With dials set to the current combination, use a pen point or similar narrow object, press the reset button on the left side of the lock in toward the center of the lock.
4. Continue to apply pressure to the reset button, and set the dials to your personalized combination.
5. Release the reset button. New combination is now set.

## Firearm Safety Tips

1. All firearms should always be assumed to be loaded and should be handled as such.
2. Keep firearms pointed in a safe direction at all times, even when unloaded.
3. Store firearms unloaded under lock and key.
4. Store ammunition separately under lock and key.
5. Never store firearms in a place accessible to children.
6. Teach children basic principles of firearm safety. When encountering a gun:
   *– DON'T TOUCH IT!*
   *– TELL AN ADULT!*

*Laws concerning firearm ownership, storage and handling vary among states and local jurisdictions. Learn and comply with your state and local laws and those of any jurisdiction to which you plan to transport or use firearms.*

## Limited Lifetime Warranty

If this product fails due to a defect in materials or workmanship at any time during the life of the product, Master Lock Company will replace it free of charge. Simply contact Master Lock at www.masterlock.com for replacement information and complete warranty. This warranty does not cover products which have been abused, altered, damaged, misused, cut or worn. TO THE EXTENT PERMITTED BY LAW, MASTER LOCK COMPANY DISCLAIMS ALL OTHER IMPLIED OR EXPRESS WARRANTIES INCLUDING ALL WARRANTIES OF MERCHANTABILITY AND/OR FITNESS FOR A PARTICULAR PURPOSE.

LIMITATION OF LIABILITY: This warranty is your sole remedy and MASTER LOCK COMPANY shall not be liable for any damages, whether direct, indirect, incidental, special, consequential, exemplary, or otherwise, including lost revenues and lost profits, arising out of any theory of recovery, including statutory, contract or tort. In no event will MASTER LOCK COMPANY's entire liability exceed the purchase price of this product. Some states and provinces do not allow the exclusion or limitation of incidental or consequential damages so the above limitations or exclusions may not apply to you. This limited warranty gives you specific legal rights, and you may also have other rights which vary from state to state and province to province.

**94DSPT**

©1999-2010
**Master Lock Company, LLC**
Milwaukee, Wisconsin 53210 U.S.A.
Marcas Registradas

**PLMH 000125**

112164

# Regal Model RTL06 Trigger Lock

**Designed to fit Remington firearm models: 1100, 1187, 870, 552, 572, 7400, 7600, and others.**

This is a California-approved firearms safety device that meets the requirements of California Penal Code Section 12088 and the regulations issued thereunder.

## WARNING!

THIS LOCK MAY BE CUT OR DEFEATED BY A DETERMINED INDIVIDUAL AND MAY NOT PREVENT INTENTIONAL MISUSE OF A FIREARM.

- **Read the Owner's Manual supplied with your firearm, including the Ten Commandments of Gun Safety, before operating the firearm and before installing the Trigger Lock.**
- **Store firearms and ammunition separately and securely.**
- **Keep firearms and ammunition out of the reach of children.**

## Installation Instructions

1. Engage the firearm's safety mechanism in the "ON" or "SAFE" position. See Firearm's Owner's Manual.
2. Unload all ammunition from the firearm in a safe manner. See Firearm's Owner's Manual.
3. Visually inspect chamber and magazine to confirm that the firearm is completely unloaded.
4. Leave action open for easy chamber inspection.
5. To open the Trigger Lock, insert the key into the lock plug and turn counter clockwise to "UNLOCK".
6. Pull the two sides of the lock a part.
7. Once the Trigger Lock is open make sure the key is kept in the "UNLOCK" position.
8. Insert the left side of the Trigger Lock (the side with lock plug and pins) through the shooter's left side of the trigger guard making sure the trigger block is behind the trigger. (See Photos 1 and 2).
9. Insert the right side of the Trigger Lock (the side with slot) into the shooter's right side of the trigger guard, matching the pins on the left side with holes on the right side and slot with back of the lock. (See Photo 3).
10. Press both sides of the Trigger Lock (left and right) together and hold together.
11. Inspect the Trigger Lock for a tight and secure fit. Turn the key clockwise to "LOCK" (See Photo 4). Pull on Trigger Lock halves to make sure they are secure.
12. Store the key in a separate and secure location away from the firearm.
13. **To Unlock:** Insert the key into the Trigger Lock key plug and turn counter clockwise to "UNLOCK". Pull the two sides of the lock apart and remove from the firearm.

Photo 1

Photo 2

Photo 3

Photo 4

**Notice**: Regal Industrial Sales does not guarantee that this product will fit all firearms. Regal Industrial Sales is not liable for incidental or consequential damages.

Regal Industrial Sales Model RTL06

Regal Industrial Sales, PO Box 355, 711 Rowley Road, Victor, New York 14564
888-908-6411 or 585-398-1290

# Exhibit 29

IN THE UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF ILLINOIS

EASTERN DIVISION

ILLINOIS ASSOCIATION OF       )

FIREARMS RETAILERS,        )

KENNETH PACHOLSKI,         )

KATHRYN TYLER, and         )

MICHAEL HALL,            )

      Plaintiffs,   )

  vs.            )   No. 10 CV 04184

THE CITY OF CHICAGO,        )

      Defendant.    )

The deposition of VANCE HENRY, called for

examination pursuant to the Rules of Civil

Procedure for the United States District Courts

pertaining to the taking of depositions, taken

before Johnetta Stafford Taylor, a notary public

within and for the County of Cook and State of

Illinois, at 33 North Dearborn Street, Chicago,

Illinois, on May 24, 2011, at the hour of

10:00 o'clock a.m.


Johnetta Stafford Taylor

License No:  084-001583

APPEARANCES:

COOPER & KIRK, by
MR. PETER A. PATTERSON,
1523 New Hampshire Avenue, N.W.
Washington, D.C. 20036
(202) 470-5580
Representing the Plaintiff;

HON. MARA GEORGES,
Corporation Counsel, by
MR. ANDREW WORSECK,
Assistant Corporation Counsel
Department of Law
30 North LaSalle Street
Suite 1230
Chicago, Illinois 60602
(312) 744-7129
Representing the Defendant.

that ban serve, if you know?

MR. WORSECK: Objection. Vague. And objection to the extent it calls for the witness to testify as to the City Council's policy goals.

But if the witness can otherwise testify as to governmental interests or purposes served, then he can answer.

MR. PATTERSON: The premise of all my questions about interest is your view about what --

THE WITNESS: Uh-huh.

MR. PATTERSON: -- not the City Council's view or anyone else's view, but just what your view is about the policies or governmental interests that are served by various provisions of the ordinance with respect to the policies.

THE WITNESS: Got it.

MR. PATTERSON: With that understanding, I would like to repeat my question about what interests are served by the provision banning carriage of firearms outside of homes.

THE WITNESS: You know, we live in a major metropolitan city, and particularly a city that

has -- it's very dense. In fact, a typical city neighborhood, the lots are 25 by 125 and people live very closely to each other. And I think that the focus of that provision is to make sure that just because of how close people live in proximity together in our neighborhoods, no one is adversely impacted by irresponsible gun ownership and use and possession.

As I stated in the case prior, that little girl would not have been shot if her brother hadn't had access to guns. And we've had other situations where, you know, people have been impacted.

MR. PATTERSON: Uh-huh.

THE WITNESS: Because of how dense our neighborhoods are. And for someone to have a gun and be able to come out on their porch or -- you know, I think that there's intimidation.

As a CAPS leader, we've had incidents where our CAPS people, our community policing volunteers have been intimidated because of the real reality of gang violence.

MR. PATTERSON: Okay.

THE WITNESS: And so I think that's in

STATE OF ILLINOIS )
) SS:
COUNTY OF C O O K )

I, JOHNETTA STAFFORD TAYLOR, a notary public within and for the County of Cook County and State of Illinois, do hereby certify that heretofore, to-wit, on May 24, 2011 personally appeared before me, at 33 North Dearborn Street, Chicago, Illinois, VANCE HENRY, in a cause now pending and undetermined in the U.S. District Court, Northern District of Illinois, Eastern Division, wherein ILLINOIS ASSOCIATION OF FIREARMS RETAILERS, KENNETH PACHOLSKI, KATHRYN TYLER, and MICHAEL HALL are the Plaintiffs, and THE CITY OF CHICAGO is the Defendant.

I further certify that the said witness was first duly sworn to testify the truth, the whole truth and nothing but the truth in the cause aforesaid; that the testimony then given by said witness was reported stenographically by me in the presence of the said witness, and afterwards reduced to typewriting by Computer-Aided Transcription, and the foregoing is a true and correct transcript of the testimony so given by

said witness as aforesaid.

I further certify that the signature to the foregoing deposition was reserved by counsel for the respective parties.

I further certify that the taking of this deposition was pursuant to Notice, and that there were present at the deposition the attorneys hereinbefore mentioned.

I further certify that I am not counsel for nor in any way related to the parties to this suit, nor am I in any way interested in the outcome thereof.

IN TESTIMONY WHEREOF: I have hereunto set my hand and affixed my notarial seal this 15th day of June, 2011.

NOTARY PUBLIC, COOK COUNTY, ILLINOIS

# Exhibit 30

IN THE UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

ILLINOIS ASSOCIATION OF )
FIREARMS RETAILERS, )
KENNETH PACHOLSKI, )
KATHRYN TYLER, and )
MICHAEL HALL, )
Plaintiffs, )
vs. ) No. 10 CV 04184
THE CITY OF CHICAGO, )
Defendant. )

The deposition of DANA ALEXANDER, called for examination pursuant to the Rules of Civil Procedure for the United States District Courts pertaining to the taking of depositions, taken before Johnetta Stafford Taylor, a notary public within and for the County of Cook and State of Illinois, at 33 North Dearborn Street, Chicago, Illinois, on May 26, 2011, at the hour of 11:00 o'clock a.m.

Johnetta Stafford Taylor
License No: 084-001583

APPEARANCES:

COOPER & KIRK, PLLC, by
MR. DAVID HENRY THOMPSON,
1523 New Hampshire Avenue, N.W.
Washington, D.C. 20036
(202) 470-5580
Representing the Plaintiffs;

HON. MARA GEORGES,
Corporation Counsel, by
MR. WILLIAM MACY AGUIAR,
30 North LaSalle Street, Suite 1230
Chicago, Illinois 60602
(312) 744-7216
Representing the Defendant.

MR. AGUIAR: Objection to the form and relevancy of the question.

You may answer.

THE WITNESS: Can you repeat the question, please.

MR. THOMPSON: Sure.

BY MR. THOMPSON:

Q. Given that there are criminals in the City of Chicago illegally possessing and carrying firearms, why shouldn't law abiding, properly trained citizens be allowed to carry a firearm in the City of Chicago?

MR. AGUIAR: Objection to the form and the relevancy.

You may answer.

THE WITNESS: My personal opinion with that is, I believe that it would create more of a safety hazard, you know, for law enforcement officers as they encounter citizens if we have citizens out there that are armed.

BY MR. THOMPSON:

Q. Do you have any basis for that concern? Any specific examples or evidence you can point to of someone lawfully possessing a firearm,

STATE OF ILLINOIS )

) SS:

COUNTY OF C O O K )

I, JOHNETTA STAFFORD TAYLOR, a notary public within and for the County of Cook County and State of Illinois, do hereby certify that heretofore, to-wit, on May 26, 2011 personally appeared before me, at 33 North Dearborn Street, Suite 300, Chicago, Illinois, DANA ALEXANDER, in a cause now pending and undetermined in the U.S. District Court, Northern District of Illinois, Eastern Division wherein ILLINOIS ASSOCIATION OF FIREARMS RETAILERS, KENNETH PACHOLSKI, KATHRYN TYLER, and MICHAEL HALL are the Plaintiffs, and THE CITY OF CHICAGO is the Defendant.

I further certify that the said witness was first duly sworn to testify the truth, the whole truth and nothing but the truth in the cause aforesaid; that the testimony then given by said witness was reported stenographically by me in the presence of the said witness, and afterwards reduced to typewriting by Computer-Aided Transcription, and the foregoing is a true and correct transcript of the testimony so given by

said witness as aforesaid.

I further certify that the signature to the foregoing deposition was reserved by counsel for the respective parties.

I further certify that the taking of this deposition was pursuant to Notice, and that there were present at the deposition the attorneys hereinbefore mentioned.

I further certify that I am not counsel for nor in any way related to the parties to this suit, nor am I in any way interested in the outcome thereof.

IN TESTIMONY WHEREOF: I have hereunto set my hand and affixed my notarial seal this 16th day of June, 2011.

NOTARY PUBLIC, COOK COUNTY, ILLINOIS