# Exhibit 31



# ARMED AND CONSIDERED DANGEROUS

## New Second Edition

## JAMES D. WRIGHT
## PETER H. ROSSI

with a new introduction by
James D. Wright and
Nicholas E. Libby

PLAINTIFF'S
EXHIBIT

tables

30

ARMED AND CONSIDERED DANGEROUS    WRIGHT & ROSSI



Transaction

# ARMED AND
# CONSIDERED
# DANGEROUS

# ARMED AND CONSIDERED DANGEROUS

## New Second Edition

## JAMES D. WRIGHT
## PETER H. ROSSI

with a new introduction by
James D. Wright and
Nicholas E. Libby



**AldineTransaction**
*A Division of Transaction Publishers*
New Brunswick (U.S.A.) and London (U.K.)

# Contents

Preface to the Expanded Edition                                      ix
   *James D. Wright*

Preface                                                             xxi

Acknowledgments                                                     xxv

Introduction to the Aldine/Transaction Edition                     xxix

1   **The Criminal Acquisition and Use of Firearms**

  Introduction                                               1
  Gun Crime as a Social Problem                              2
  Social Science Implications                                5
  Policymaking Considerations                                7
  An Overview of Prior Literature
    and Our Findings                                 8
  Characteristics of the Prisoner Sample                    12
  A Typology of Criminal Gun Use                            12
  Firearms Ownership and Use                                13
  Growing Up with Guns                                      14
  Why Do Criminals Carry Guns                               14
  Armed Victims                                             15
  What Felons Look For in Firearms                          15
  The Market for Criminals' Guns                            16
  "Gun Control" and Criminal Gun Use                        18
  Policy Implications                                       18

2   **The Felon Survey Methods, Procedures,**
   **Descriptive Data**

  Research Goals                                            21
  Survey Design and Method                                  23
  Selection of Research Sites                               23
  Choosing Respondents within Prisons                       26
  Field Operations                                          27
  Response Rates                                            28

v

New material this edition © 2008 by Transaction Publishers, New Brunswick, New Jersey. Originally published in 1986 by Aldine de Gruyter.

Preface to the Expanded Edition © 1994 by James D. Wright.
Copyright © 1986 by James D. Wright and Peter H. Rossi.

All rights reserved under International and Pan-American Copyright Conventions. No part of this book may be reproduced or transmitted in any form or by any means, electronic or mechanical, including photocopy, recording, or any information storage and retrieval system, without prior permission in writing from the publisher. All inquiries should be addressed to Aldine/Transaction, A Division of Transaction Publishers, Rutgers—The State University, 35 Berrue Circle, Piscataway, New Jersey 08854-8042. www.transactionpub.com

This book is printed on acid-free paper that meets the American National Standard for Permanence of Paper for Printed Library Materials.

Library of Congress Catalog Number: 2007046172.
ISBN: 978-0-202-36242-7
Printed in the United States of America

Library of Congress Cataloging-in-Publication Data

Wright, James D.
  Armed and considered dangerous / James D. Wright and Peter H. Rossi; with a new introduction by James D. Wright and Nicholas E. Libby. — New 2nd ed.
    p. cm.
  A reissue of the 1994 ed., with a new introduction.
  Includes bibliographical references and index.
  ISBN 978-0-202-36242-7
  1. Gun control--United States. 2. Firearms and crime--United States. I. Rossi, Peter H. (Peter Henry), 1921-2006. II. Title.

HV7436.W75 2008
363.4'50973--dc22
                   2007046172

vii

## Contents

Questionnaire Development and Disposition   28
Site Descriptions and Characteristics   29
Data Quality   32
Salient Sample Characteristics   38
Summary of Sample Characteristics   54

3   Varieties of Armed Criminals: A Descriptive Typology
Validation   59
Previous Criminal Histories   65

4   Patterns of Weapons Ownership and Use: On the Circumstances of Criminal Violence
Overall Patterns of Ownership and Use   79
Patterns of Weapons Use: The Conviction Offense   87
Patterns of Weapons Use: Other Offenses   94
The Correlates of "Habitual" Weapons Carrying   99
Additional Details on Weapons-Carrying Behavior   102
Summary of Principal Findings   108

5   Family, Friends, and Firearms: The Effects of Socialization on Felons' Weapons Behavior   111

6   Motivations to go Armed
The "Rationality" of Firearms use in Crime   125
Measuring Weapons-Carrying Motives   127
The Motivations of Nongun Users   131
Coherence in Motives   133
The Importance of Gun Carrying   135
Reasons for the "Most Recent" Firearms Acquisitions   136

vii

## Contents

7   Confronting the Armed Victim
Armed Victims as Risks to Criminals   142
Attitudinal Results   144
Armed Victim Confrontations: Experiential Results   154
Summary   158

8   The Criminal as a Firearms Consumer
What Felons Look For in a Handgun   162
What Felons Actually Carry   169
Consumer Sophistication   175
Summary   180

9   Patterns of Acquisition: Where and How Felons Obtain Guns
How and Where Do Felons Obtain Handguns?   182
Criminal Handguns versus Crime Handguns   186
Other Characteristics of the Criminal-Handgun Market   188
Where and How Do Felons Obtain Shoulder Weapons?   189
Summary   190

10   Patterns of Acquisition: Gun Theft
How Many Crime Guns are Stolen Guns?   193
Who Steals Guns?   197
How Many Guns Are Stolen?   198
Why Are Guns Stolen?   199
The Commerce in Stolen Firearms   202
Where are Guns Stolen?   205
The Optimal Gun Theft   206
Summary   207

viii

Contents

**11 Handgun Controls and Weapons Choice: The Substitution Issue**

Substitution Theory   209
Postrelease Gun Acquisition   210
Acquisition Under Conditions of Scarcity   215

**12 The Great American Gun War: Some Policy Implications of the Felon Study**

Introduction   225
The Nature of the Illicit Firearms Market   229
Crime Guns: Quality and Price   232
Why Criminals Carry and Use Guns   233
Substitution and Other Neutralizing Side Effects   237

Bibliography   239

Index   243

# Preface to the Expanded Edition

*Armed and Considered Dangerous* was originally published in 1986. Now a bit long in the tooth, the book is still regularly cited in scholarly, popular, and public policy discussions of guns and what to do about them. It was and (we believe) remains the most ambitious survey ever undertaken of the criminal acquisition, possession, and use of guns. Several of the findings have become "coin of the realm" in the gun control debate, cited frequently by persons who have long since forgotten where they came from or what their limitations are. Several other findings, including many that we regard as important, have been largely ignored. Still other findings have been superseded by better and more recent data or rendered anachronistic by intervening events.

Without doubt, the United States is among the most heavily armed private populations on earth. Half of all US households own at least one gun, and there are something on the order of 200 million firearms in circulation. As every student of comparative crime and homicide rates knows, we are also among the world's leaders in criminal violence. Whether these facts are causally related is hotly debated. To many, it seems obvious that rates of private gun ownership and rates of violence must be connected, but this apparently obvious connection has proven exceptionally difficult to document. *Armed and Considered Dangerous* began with the assumption that if there is an important connection here, it would necessarily have something to do with where, how, and why criminals obtain, carry and use guns.

Guns are involved in an enormous number of crimes in this country, hundreds of thousands of them annually; the number of times that guns are used to threaten, intimidate or harass people is uncounted but certainly large. In other countries with stricter gun laws and fewer privately possessed firearms, gun crime is rare. It is thus an easy conclusion that if we had fewer guns and stricter gun laws, we would also have less crime, violence, and intimidation. This is also the conclusion of scholars such as Anderson (1985), Zimring and Hawkins (1987), and many others. On the other hand, we know that most privately owned firearms are owned primarily for socially innocuous sport and recreational purposes such as hunting, target shooting, collecting, and the like, and we also know that many privately owned firearms are used in self-defense against crime, perhaps as often as a million times a year or more (Kleck, 1988a). Most of the 200 million or so guns in private possession in the US, in short, seem to have nothing to do with the

crime and violence issue now one way or the other; among the remainder, it is a plausible surmise that they are used as often to deter crime as to perpetuate it. Connections that seem "obvious" on the surface sometimes dissolve under closer scrutiny; detailed and systematic examinations of the evidence concerning guns, crime, and violence in the United States have called the "obvious" connections into some doubt (e.g., Wright, Rossi, and Daly, 1983; Kleck, 1991).

Our research program on guns and violence now spans nearly two decades and like everyone else who works in this area, we are regularly asked whether "gun control" is not the answer. The question fails in the first instance to recognize that "gun control" is an exceedingly nebulous concept. To say that one favors gun control, or opposes it, is to speak in ambiguities. In the present-day American political context, "stricter gun control" can mean anything from Federal registration of firearms to mandatory sentences for gun use in crime to outright bans on the manufacture, sale, or possession of certain types of firearms. One can control the manufacturers of firearms, the wholesalers, the retailers, or the purchasers; one can control the firearms themselves, or the ammunition they require, or the uses to which they are put. And one can likewise control their purchase, their carrying, or their mere possession. "Gun control" thus covers a very wide range of specific interventions. No thinking person could unilaterally favor or oppose everything that falls within that range.

Our first major "gun" study was a comprehensive and critical review of the extant literature on guns, crime, and violence (Wright, Rossi, and Daly, 1983). In doing that research, we learned that there are approximately 20,000 gun laws of various sorts already on the books in the United States. A few of these are Federal laws (such as the Gun Control Act of 1968), but most are state and local regulations. It is a misstatement to say, as pro-gun control advocates sometimes do, that the United States has "no meaningful gun control legislation." The problem, if indeed there is one, is not that laws do not exist but that the regulations in force vary enormously from one place to the next, or, in some cases, that the laws being carried on the books are not or cannot be enforced.

Much of the gun legislation now in force, whether enacted by Federal, state, or local statutes, falls into the category of reasonable social precaution, being neither more nor less stringent than measures taken to safeguard against abuses of other potentially life-threatening products, such as automobiles. It seems reasonable, for example, that people should be required to obtain a permit to carry a concealed weapon, as they are virtually everywhere in the United States. It is likewise reasonable that people not be allowed to own automatic weapons without special permission, and that felons, drug addicts, and other sociopaths be prevented from legally acquiring guns. Both these restrictions are in force everywhere in the United States, because they are elements of Federal law. Nearly all people, even

hard-core gun nuts, favor these sorts of obvious and reasonable precautions and related precautionary measures in the same vein.

Other common "gun control" laws seem innocuous or even reasonably precautious but prove on closer inspection to be largely symbolic non-responses to real issues. For example, about three-fourths of the American population live in jurisdictions where the registration of new firearms purchases is required. Apparently, many states and localities find this to be a useful precaution against something. But what exactly does registration of new purchases accomplish? Armed and Considered Dangerous showed that felons rarely obtain their guns from legitimate retail outlets, and that the few who do—about one in six—rarely bother to register their gun with authorities or attempt to obtain a permit, even when required to do so by law. (That criminals will generally be indifferent to our laws would seem to follow from the definitions of the terms, but it is a lesson that we have had to relearn time and time again.) Thus, few if any criminal firearms acquisitions would ever get registered in any conceivable gun registration program. The study also showed that many "crime guns"—somewhere between half and three-quarters of them—enter the illicit stream of firearms commerce through theft from legitimate owners. What advantage accrues to the police if, via a system of registration, the police are then able to trace a "crime gun" back to its original legal owner? It would be a useful study to investigate the number of crimes that police are aided in solving through systems of gun registration; the findings from Armed and Considered Dangerous would suggest that the number is small indeed.

Having learned that the criminal acquisition of guns involves informal and intrinsically difficult-to-regulate transfers that are entirely independent of laws concerning registration and permits, average gun owners often conclude (whether rightly or wrongly) that such measures must therefore be intended primarily to keep tabs on them, that registration is "just the first step" towards outright confiscation of all privately-held firearms, and that mandated registration of new gun purchases is thus an unwarranted "police state" intrusion on law-abiding citizens' constitutional rights. Reasoning in this vein often seems bizarre or even psychotic to proponents of registration or permit laws, but it is exactly this style of reasoning that accounts for the white-hot ferocity of the debate over guns in America today.

Many jurisdictions also require "waiting periods" or "cooling off" periods between application and actual possession of a new firearms purchase; the much-discussed Brady Bill,[1] now enacted as the Brady Law, imposes a national waiting period of five days. Since there are relatively few legitimate purposes to which a firearm might be put that would be thwarted if the user

[1]After James Brady, the presidential press secretary who was shot and permanently maimed in John Hinckley's attempted assassination of Ronald Reagan. Brady's wife, Sarah, is a leading figure in the National Coalition to Ban Handguns.

had to wait a few days, or even a few weeks, these waiting periods also seem like reasonable precautions. But again, what can they actually accomplish? Since very few criminals obtain guns through normal retail channels in the first place, it is obvious that they will not be affected by a national waiting period, one way or the other. If the intent of the waiting period is to allow the police sufficient time to run a background check on every potential gun purchaser, and thereby to enforce the prohibition against sales to persons with felony records, then the obvious effect will be to cause persons with felony records to obtain their firearms from other informal sources—as, indeed, five-sixths of them do anyway. Finally, if the intent is to provide time for homicidal intentions to cool, one must face up to the likelihood that most of the people in the gun shop trying to buy a gun today already own one or more firearms. (Most of the people who own guns own more than one of them; indeed, the average number owned among those owning any is more than three.) Judged solely against what seems reasonable or precautionary, waiting periods have much to recommend them. Judged against the evidence on gun ownership, possession, and acquisition by both felons and law-abiding citizens, the rationale for a national waiting period weakens.

Again, since it is now well-known that the "bad guys" do not generally obtain guns through normal retail channels, waiting periods enforced at the point of retail sale can only be aimed at thwarting the legitimate intentions of the "good guys." What conceivable crime-reduction benefit will a national five-day waiting period give us? And if the answer is "probably very little," then the minds of average gun owners are freed to speculate on the nefarious and conspiratorial intentions that may be harbored, consciously or not, by those who favor such a thing. The distinction between ill-considered and evil is quickly lost, and the debate over guns in America gets hotter still.

*Armed and Considered Dangerous* is a work of applied social research. The intention was to describe the criminal acquisition and use of firearms in as much detail as possible, not to test general hypotheses derived from criminological theory. (Historically, criminological theory has had very little to say about guns in any case.) We expected to be criticized for the atheoretical nature of the work but this anticipated criticism never materialized. Some found the work "exemplary" and "comprehensive" while others felt that it illustrated "the vices . . . of unreconstructed empiricism." Most of the reviews were fair and reasoned assessments of the book's weaknesses and strengths.[2]

One fairly common line of criticism was that we took the survey responses of convicted felons altogether too seriously, especially their answers to questions about encounters with armed victims and their responses to hypothetical questions about how they might respond to various "gun con-

[2]Reviews of the book include those by Domino, 1987; Burden, 1989; Bordua, 1987; Kessler, 1986; Kleck, 1988; Harding, 1988; Waddington, 1990; and Zimring, 1987.

trol" measures. Concerning the former: Data reported in Chapter 7 suggest that 63% of our respondents had encountered an armed victim at some time in their criminal careers, that a third (34%) had "been scared off, shot at, wounded or captured by an armed victim" at least once, and that 69% knew of other criminals who had been "scared off, shot at . . . &c" by armed victims. We of course acknowledged these responses to be "very imperfect evidence on the efficacy of private firearms as a defense against crime, but it is at least some evidence that armed citizens abort or prevent at least some crime" (p. 155). At the very least, we felt that the data supported a conclusion that felons are made nervous by the prospects of encountering an armed victim. Some critics felt, on the other hand, that the respondents were probably exaggerating the frequency of these encounters, presumably to construct a convenient rationale for their own felonious firearms behaviors. Part of the conventional wisdom of "gun control" advocates is that persons who arm themselves in self-defense in fact put themselves at a greater peril, and that the only reasonable posture in the face of an impending criminal victimization is capitulation to the offender's wishes. Our findings ran against the grain of these beliefs.

Subsequent to the appearance of *Armed and Considered Dangerous*, Kleck (1988a) published a paper presenting evidence on the actual deterrence of crime by armed private citizens. The paper knits together pertinent data and findings from a large number of sources, themselves very uneven in coverage and quality. As it turns out, there is not a lot of good information on these topics, and so Kleck's compilation is more in the nature of a reasoned synthesis than a definitive statement. Even as a first approximation, however, the results generally confirmed what our felons had told us. Excluding all police and military uses, and making conservative assumptions throughout, Kleck's finding was that private citizens use handguns to defend themselves 650,000 times a year. If allowance is made for the use of rifles and shotguns for the purpose, the number increases to about a million a year. By way of comparison, data from the *Uniform Crime Reports* and the *National Crime Survey* suggest an annual gun-crime tally of only about 800,000. "Thus, the best available evidence suggests that handguns may be used about as often for defensive purposes as for criminal purposes" (1988a:4). If Kleck's conclusions are even approximately correct, then there are surely sufficient numbers of armed victim-criminal encounters to render our survey results plausible. (More recent data assembled by Kleck suggests that the annual number of crimes thwarted or prevented by armed citizens may be closer to two million incidents.)

The survey also asked felons what they thought they would do if small, cheap handguns were banned, or indeed if handguns were banned altogether. It is obvious that the benefits of some commonly urged "gun control" measures turn rather decisively on what kinds of weapons felons might substitute in the face of such bans. Several early studies (e.g., Zimring,

1969; 1972) had argued that knives were the likely substitute weapon for handguns, and since knives are inherently less lethal, banning handguns (or certain classes of handguns) would eventuate in less death. Others (e.g., Kates, 1978) had argued in contrast that in the face of a handgun ban, criminals might substitute sawed off shoulder weapons, which, being intrinsically more lethal, might produce more, not fewer deaths. The findings from a number of "what if . . ." questions meant to explore this issue were profoundly distressing (Chapter 11). "In all cases, the fractions who said they would 'move down' to less lethal equipment are more than offset by the fraction who would move up—to bigger and more expensive handguns in some cases, to sawed-off shoulder weapons by others" (p. 223).

We accept the criticism that these "substitution" questions are entirely hypothetical and that they do not constitute the final word on the matter. Assuredly not! Still, the opinions of felons about what they might do or how they might react to various firearms bans is surely of some relevance to the debate, at least until someone undertakes the relevant policy experiments. One wonders what the reaction might have been had we found that almost all of these felons said they would just get out of the crime business altogether in the face of a handgun ban. Do the critics object to the questions we asked or rather to the answers we obtained?

Some subsequent research has taken these substitution findings at face value and explored their possible consequences. Kleck (1984) studied the circumstances in which homicides occur and concluded that shoulder weapons could indeed be substituted for handguns in anywhere from 54% to 80% of the cases. Lizotte (1986) showed that if the rates of substitution indicated in our survey data held, the murder rate could conceivably triple, a conclusion also advanced by Kates (1989). Of course, no one knows for sure just what felons might do in the face of a total handgun ban, but the results from Armed and Considered Dangerous suggest the possibility that the net result might not be an improvement in the human condition, a possibility that should not be lightly dismissed.

Non-American reviewers of the book felt that we had overlooked the "glaringly obvious" point that the sorts of criminal firearms use and abuse documented by the study flourish "in an environment in which guns are common." One even felt that the general thrust of the book revealed a "point of view that widespread gun ownership is an acceptable and desirable social phenomenon." When viewed from the more civilized (or certainly less violent) perspective of British or Dutch or Australian society, many of the findings of Armed and Considered Dangerous may indeed seem bizarre and frightening. And perhaps there is an overlooked, unarticulated, but quite damning indictment of contemporary American society lurking not so far beneath the surface of these pages, one that we failed to recognize but that non-American readers seized on rather quickly.

Whether the widespread ownership of firearms in this country is "accept-

able" or even "desirable," it is surely a fact of American life. As we have already mentioned, half the households in the United States possess one or more firearms and the total number of guns in circulation is on the order of 200 million (Wright, 1990; Howe, 1988). Given the deep attachment that Americans evidently have to their guns, the vast number already "out there" in private hands, and the Constitutionally guaranteed right to keep and bear arms, one is entitled to wonder whether there is anything that can plausibly be done to reduce the general availability of guns or the number of them in circulation. It is obvious, of course, that if there were no guns in America, no crimes would be committed with guns. But this conclusion is nothing more than a correct deduction from a contrary-to-fact premise. The more interesting question is whether anything can be done to reduce the amount of death and violence in a society where hundreds of millions of guns are already in circulation and will doubtlessly remain so. And if the answer to that question turns out to be no, then so be it. As C. Wright Mills said, "First, one tries to get it straight, to make an adequate statement. If it is gloomy, too bad. If it leads to hope, fine."

Some societies might well be able to reduce their violence problems by severely restricting or even prohibiting private firearms ownership among the general population. The "policy space" for "gun control" in the United States is not nearly that broad. Here, the effort has almost always been to find some way to thwart the criminal acquisition and use of firearms while at the same time protecting the legitimate ownership rights of average, law-abiding gun owners—rights that seem given in our history and culture, if not by the Second Amendment. Armed and Considered Dangerous makes it doubtful that this quest will ever be successful, and this for two reasons: First, the data make clear (as if there were any reasonable doubt on the point) that criminals are highly-motivated firearms consumers (Chapter 6). To men of the sort studied in this book, a gun often spells the difference between life and death, and if people decide that their ability to survive depends on being adequately armed, then surely they will find some way, legal or otherwise, to arm themselves. Thus, so long as firearms are available to anyone for any reason at any price, highly motivated criminals will be armed. Secondly, our data on gun theft (Chapter 10) suggest that half to three-quarters of the guns used by criminals are stolen. The high volume of gun theft tends to erode the distinction between the "good guys" and the "bad guys" in that any gun that can be legitimately owned by a law-abiding gun owner can be stolen from that owner and make its way into criminal hands.

With a few exceptions, the themes and analyses of Armed and Considered Dangerous seem (to us at least) to have held up pretty well, and so we have not revised or rewritten anything for this edition. The study is based exclusively on adult felons and therefore does not directly address the emerging national concern over juvenile crime and violence. A recent repli-

cation focussed on incarcerated *juvenile* offenders, however, shows the same general patterns (Sheley, Wright and Smith, 1992). As with adults, juvenile offenders also obtain their guns through informal, off-the-record sources, own and carry them mainly for self-protection, come from social and familial backgrounds where gun ownership is common, prefer high-quality, high-firepower firearms, and in most other ways mirror the acquisition and use patterns of adult felons.

Much of today's "gun control" debate concerns assault weapons and related "military-style" equipment.[3] Nothing much was being said about these kinds of guns in the early 1980s, and so *Armed and Considered Dangerous* makes no mention of them. Among juvenile offenders in the replication study, however, it is noteworthy that the revolver remained the most commonly owned weapon, as it was among the adult felons; 72 percent of the juveniles had owned a revolver at some time in their lives, and 58 percent had owned one at the time of their current incarceration. These guns generally were not small, cheap pistols; the most common calibers among the most recently owned revolvers of the juvenile offender sample were the .38 and the .357. Next in popularity was the semi-automatic pistol, typically chambered for 9 mm or .45 caliber rounds. Two-thirds of the sample had owned such a gun at some time; 55 percent owned one at the time of their incarceration. Shotguns, whether sawed-off or unaltered, had been owned by about 60 percent of the juvenile inmates. More than half the sample (51 percent) possessed a sawed-off shotgun at the time of their incarceration. Finally, nearly half of the respondents had owned a military-style rifle; 35 percent had owned one at the time they went to prison. For those interested in the debate over military-style guns, Kleck's discussion of "Assault Rifles and Assault Weapons" (1991:70–82) is definitely worth attention.

*Armed and Considered Dangerous* has been used (and abused) in the policy arena at least as much as it has been cited in the scholarly literature. The initial release of the book was accompanied by a large number of articles and editorials in newspapers all over the United States. Findings from the book have been cited in Congressional, state, and local debates over gun control, on television programs and radio talk shows, and by the Director of the National Institute of Justice and the Attorney General of the United States.

In general, the book was more enthusiastically received in pro-gun circles than among pro-control advocates. Pro-control enthusiasts were quick to dismiss the survey results as unreliable; one of the most prominent of them stated on national television that it would be foolish to let the opinions of convicted felons dictate the firearms policies of the nation. On the other side, the NRA ran a large and highly laudatory two-page article on the study

[3]As of this writing, of course, the Congress has passed a law banning the sale of about 20 categories of assault weapons, following the lead of a number of states that enacted similar prohibitions in the early 1990s.

in the 31 August 1985 issue of *Monitor* (Blackman, 1985), gleefully pointing out that most of our findings confirmed what the NRA had been saying for years.

In retrospect, the most widely cited of the study's findings in policy debates were those concerning where and how criminals obtain guns. The research showed that criminals almost always obtain guns through private swaps, trades, and purchases with family members, friends, and street sources, or through theft from private residences. The unavoidable conclusion from this finding is that restrictions imposed at the point of retail sale will necessarily miss the large majority of criminal firearms transactions. As such, the rationale for such restrictions wanes.

These findings have proved especially pertinent to the on-going debate about the wisdom of a national waiting period. In most renditions, the rationale for a waiting period is to provide the police with sufficient time to conduct a background check and thereby to enforce the provision in the Gun Control Act of 1968 that prohibits transfer of a firearm to persons with a felony conviction. There is a widespread suspicion in pro-control circles that many gun dealers are very lax in enforcing this provision; a waiting period and mandatory background check would therefore prevent convicted felons from just walking into a gun shop and buying whatever firearms they wanted. Whether gun dealers are lax or not, *Armed and Considered Dangerous* discovered that five criminal firearms transactions out of six do not involve a customary retail transaction with a legitimate firearms dealer. Those who oppose a waiting period cite this finding with relish because it shows that very few of these transactions would be affected one way or the other; interestingly enough, at least one supporter of the Brady Bill also favorably cited the finding on the grounds that one out of six is better than nothing. Our findings in regard to felon encounters with armed victims have also been widely mentioned in various policy debates, especially by pro-gun advocates who, for obvious reasons, find it useful to tout the self-defensive efficacy of private firearms.

When we were doing the research for *Armed and Considered Dangerous*, and for many years prior to that, much concern was being expressed in policy circles over the small, cheap handguns known as Saturday Night Specials, and so these firearms figured prominently in the analysis. Today, of course, the concern is with automatic pistols, assault rifles, and assorted other military-style equipment (about which, incidentally, *Armed and Considered Dangerous* has very little to say).

The focus on small, light handguns was typically justified on two grounds; first, these guns have no legitimate sport or recreational use, and secondly, they are the preferred firearm in crime. Thus, we could just ban them altogether and in so doing, we would directly reduce the number of crime guns available and not step on anyone's legitimate ownership rights. The idea that the Saturday Night Special was the "preferred" gun among the

criminal population turned out to be wrong (Kleck, 1986a,b). *Armed and Considered Dangerous* showed, overwhelmingly, that serious criminals both prefer to carry and actually carry relatively large, big-bore, well-made handguns. Indeed, not more than about one in seven of these guys' handguns would qualify as small and cheap. Most of our respondents wanted to be at least as well armed as their most likely adversaries, the police, and most succeeded in so doing. Most serious felons apparently view the Saturday Night Special with contempt.

*Armed and Considered Dangerous* illustrates the role that applied social research can play in the process of policy formation. Matters of public policy often involve deeply-held values and are therefore not usually decidable by research, and matters of gun policy are certainly no exception. But applied research *can* serve as a prism of fact through which the enthusiasms of ideology or advocacy can be refracted.

Many applied researchers are dismayed by how frequently research results seem to be ignored in the ongoing policy debate; that was not the fate of *Armed and Considered Dangerous*, whose findings have been widely and prominently cited in nearly every policy discussion of the gun issue. At the same time, it is doubtful that many minds have actually been changed by anything contained in the book. Those who opposed "stricter gun control" before we did the book still oppose it; those in favor of "stricter gun control" are still in favor. The latest research findings, after all, are but one of many inputs into the democratic policy-making process, and by no means the most important. There are, in addition, normative, economic, political, ethical, pragmatic, and ideological inputs that must be accommodated, and in the process of accommodation, the influence of research is often obscured to the point where it can no longer be recognized. It should not be inferred from this that the research has been ignored, but rather that research results are only one voice in the cacophony of the process.

Applied research of the sort represented by *Armed and Considered Dangerous* is often pretty good in describing a problem and pretty bad in suggesting viable solutions. Most of the policy implications that can be fairly drawn from the book are negative in character: this won't work for this reason, that won't work for that reason, and so on. When we are asked, as we often are, "Okay, then what *will* work?" we usually mutter something about poverty, the drug problem, or the inadequate resources of the criminal justice system, and otherwise have little to say. Our muteness is not a personal failing. The question, rather, asks more of the data than the data were ever intended to provide.

One review of *Armed and Considered Dangerous* called it "a must for those interested in firearms, crime, or policy research" and concluded, "the gun control debate will never be the same again." Grateful though we are for this last comment, it is assuredly wrong. In the "Great American Gun War" (as Bruce-Briggs has described it), as in most other areas of public

policy, relatively little turns on factual matters that could be resolved through research; most of what is at issue turns on values, ideologies, and world views that are remarkably impervious to disconfirmation by anything. No one who believes deeply that gun controls would make this a better world—or that they wouldn't—will be persuaded otherwise by any of the research we or anyone else has done. Regardless of the state of scientific knowledge, the fact is that the gun control debate will never be any different.

*Armed and Considered Dangerous* is a book about the "bad guys" and their guns. Unfortunately, for every "bad guy" who owns and abuses a firearm, there are a hundred or more average citizens who own guns for sport, for recreation, for self-protection, and for other reasons generally regarded as appropriate and legitimate. There are vast differences between the average gun owner and the average gun-abusing felon, but the analyses reported here do not suggest any obvious way to translate these differences into workable, efficacious gun control policies.

James D. Wright

## REFERENCES

Anderson, Jervis. 1985. *Guns in American Life.* New York: Random House.

Blackman, Paul. 1985. "The Armed Criminal in America." *NRA Monitor* 12, 16 (31 August):4–5.

Bordua, David. 1987. Review of *Armed and Considered Dangerous* in *Contemporary Sociology* 16, 5 (September):697–698.

Bruce-Briggs, Barry. 19766. "The Great American Gun War." *The Public Interest* 45:37–62.

Burden, Tom. 1989. Review of *Armed and Considered Dangerous* in *Review of Sociology* 6, 2:65–68.

Domino, Joseph. 1987. Review of *Armed and Considered Dangerous* in *Deviant Behavior.*

Harding, Richard. 1988. Review of *Armed and Considered Dangerous* in *Australian and New Zealand Journal of Criminology*: pp. 186–187.

Howe, Walter J. 1988. "Firearms Production by US Manufacturers, 1973–1985." *Shooting Industry* (Shot Show Issue):101–112.

Kates, Don B. 1978. *Restricting Handguns: The Liberal Skeptics Speak Out.* Croton-on-Hudson, NY: North River Press.

Kates, Don B. 1984. *Firearms and Violence: Issues of Public Policy.* Cambridge, MA: Ballinger Publishing Co.

Kates, Don B. 1989. "Firearms and Violence: Old Premises and Current Evidence." Pp. 197–215 in T. R. Gurr (ed), *Violence in America.* Newbury Park, CA: Sage Publications.

Kessler, Raymond, 1986. Review of *Armed and Considered Dangerous* in *The Journal of Criminal Law and Criminology* 77, 2 (Summer):504–506.

## Preface

The study reported in this volume is part of a larger research program on criminal violence being undertaken by the Social and Demographic Research Institute of the University of Massachusetts. The focus here is on the acquisition, carrying, and use of guns (and other weapons) in the commission of criminal acts. Data consist of questionnaires administered to nearly 2000 convicted felons serving time in state prisons all around the country. While many other large surveys of the prison population have been done, none have focused so exclusively or exhaustively on the firearms aspect of the crime problem.

The design and contents of this survey evolved out of a comprehensive review of the extant literature on "weapons, crime, and violence in America" (Wright, Rossi, and Daly, 1983). Although vast reams have been written on these topics, many important questions have not been thoroughly researched, and some of the most important have barely been researched at all. In the latter category we would include the question of how, where, and why criminals acquire, carry, and use firearms. Indeed, prior to the study whose results are reported here, nearly everything that was known about these topics was based on samples of firearms confiscated by the police in the course of criminal investigations, an approach known to be fraught with problems.

Information obtained from convicted felons in self-administered questionnaires is also fraught with problems that we are happy to acknowledge. We do not believe that these survey data constitute the final word on any of the topics discussed in this volume. The states where this survey was conducted were chosen mainly because of their willingness to cooperate and, therefore, do not constitute a probability sample of states; the prisons within states were also selected mainly for their willingness to cooperate and therefore do not constitute a probability sample of prisons; finally, since participation in the survey was voluntary, specific respondents were also self-selected and therefore do not constitute a probability sample of convicted felons. The data we have assembled are national in scope and, we hope, in implications, but in no sense are they "nationally generalizable" in the strict statistical sense of the word.

Sampling issues aside, there are also formidable problems of measurement in a survey of this sort. There is obviously no guarantee that prisoners answered our questions truthfully or completely; indeed, given their strong

xxi

## Preface to Expanded Edition

Kleck, Gary. 1984. "Handgun-Only Gun Control: A Policy Disaster in the Making." Pp. 186–194 in Kates, *Firearms and Violence* (1984).

Kleck, Gary. 1986a. "Policy Lessons from Recent Gun Control Research." *Law and Contemporary Problems* 49, 1 (Winter):35–62.

Kleck, Gary. 1986b. "Evidence that 'Saturday Night Specials' Not Very Important for Crime." *Sociology and Social Research* 70, 4 (July):303–307.

Kleck, Gary. 1988a. "Crime Control through the Private Use of Armed Force." *Social Problems* 35, 1 (February):1–21.

Kleck, Gary. 1988b. Review of *Armed and Considered Dangerous* in *Social Forces* 66, 4 (June):1139–1140.

Kleck, Gary. 1991. *Point Blank: Guns and Violence in America.* Hawthorne, NY: Aldine.

Lizotte, Alan J. 1986. "The Costs of Using Gun Control to Reduce Homicide." *Bulletin of the New York Academy of Medicine* 62:539ff.

Sheley, Joseph F., James D. Wright, and M. Dwayne Smith. 1992. *Firearms, Violence and Inner-City Youth: A Report of Research Findings.* Final Report to the National Institute of Justice and the Office of Juvenile Justice and Delinquency Prevention, Washington, DC (March).

Waddington, P. A. J. 1990. Review of *Armed and Considered Dangerous* in *Howard Journal of Criminal Justice* 29, 7 (February):57–58.

Wright, James D. 1990. "Guns and Crime." Chapter 21 (pp. 441–457) in Joseph F. Sheley (ed), *Criminology: A Contemporary Handbook.* Belmont, CA: Wadsworth Publishing Co.

Wright, James D., Peter H. Rossi, and Kathleen Daly. 1983. *Under the Gun: Weapons, Crime, and Violence in America.* Hawthorne, NY: Aldine.

Zimring, Franklin E. 1968. "Is Gun Control Likely to Reduce Violent Killings?" *The University of Chicago Law Review* 35:721–737.

Zimring, Franklin E. 1972. "The Medium is the Message: Firearm Caliber as a Determinant of Death from Assault." *Journal of Legal Studies* 1, 1 (January):97–123.

Zimring, Franklin E. 1987. Review of *Armed and Considered Dangerous* in *American Journal of Sociology* 93, 1 (July):224–226.

Zimring, Franklin E., and Gordon Hawkins. 1987. *The Citizen's Guide to Gun Control.* New York: Macmillan.

xx

felonious inclinations, there is ample reason to be skeptical of everything they have to say. Already in prison, they run no additional risk in reporting honestly on their backgrounds, behaviors, and criminal histories; but at the same time, there is very little positive motivation for them to report the truth either. In the few cases where we could inquire about the correspondence between what was reported in the questionnaire and what was known about the felon through his criminal justice records, the correspondence was comfortingly close (see Chapter Two), but there is no guarantee that this convenient pattern generalizes throughout the data.

Finally, it bears emphasis (here and throughout the volume) that a sample of convicted felons doing time in state prisons is *not*, by any means, a representative sample of the criminal population at large. Juvenile offenders are rarely sent to the kinds of facilities where we conducted this study and they are therefore grossly underrepresented in our data. Likewise, first-time adult offenders are rarely imprisoned and are also underrepresented here. In general, the kinds of men we studied are older, more hardened, more violent, and have longer criminal records than the population of criminals at large would be. Their firearms behavior may, therefore, not be indicative of the firearms behaviors of the larger criminal population. All the findings reported here must be interpreted with this fact very much in mind.

Because this study grew out of a very detailed and comprehensive review of the literature on guns, crime, and violence, our review of pertinent literature here is rather cursory; reference is usually made to the literature review rather than to the primary sources. We have, however, made an effort to cite the most important studies that have appeared in the literature since our earlier review was completed. The relative brevity of our reference list results not from academic solipsism but from a desire to avoid redundant labor.

Our purpose in undertaking this study was primarily to *describe* the weapons behavior of the felon population, not to test specific hypotheses or theories of crime, and most assuredly not to evaluate the relative wisdom of this or that approach to "gun control." We have, of course, addressed both theoretical issues and policy implications whenever it seemed appropriate to do so; but this was in all cases subsidiary to our more fundamental descriptive task. We therefore plead guilty in advance to the (inevitable) charge that this work is largely atheoretical. But, on the other hand, where is the criminological theory that says anything at all about the role of firearms in the lives and activities of the criminal population?

This study was originally funded in the Spring of 1981; data collection began in earnest the following August and continued through December. A preliminary research report (running well in excess of six hundred pages) was submitted to the study sponsor in the Spring of 1984, whereupon we were informed that the National Institute of Justice could no longer publish such massive reports and that a 100-page version would be more suitable for

their needs. This much-condensed version of the study results was subsequently published by the Institute (Wright and Rossi, 1985); the present volume, in turn, is a much revised (and somewhat abridged) version of the initial research report.

The initial research report contained two appendixes, both of which have been omitted from this volume. The first was simply a reproduction of the study questionnaire (the questionnaire itself ran to 75 pages). Since the present volume does not contain a copy of the questionnaire, we have made every effort to give exact question wordings in the tables or in the associated text. Readers seeking more information about the exact study contents and formats can obtain a copy of the study codebook (and a copy of the data themselves) from the Interuniversity Consortium for Political and Social Research (PO Box 1248, Ann Arbor, MI 48106), where the data and documentation have been archived.

The second appendix was a long, detailed, and rather tedious blow-by-blow description of how the sample was sorted into the categories of the "Armed Criminals" typology that is introduced in Chapter Three. For nearly 90% of the sample, this sorting-out was completely straightforward (as described in the chapter), but for the remaining tenth, it was not. The detailed description of how this tenth was handled is available directly from us upon request.

*James D. Wright*
*Peter H. Rossi*

## Acknowledgments

A research project such as the one reported here only succeeds if it enjoys the cooperation and assistance of any number of people who, through obligation or courtesy, make themselves and their expertise available to the research staff. Whether this project has in fact succeeded is for readers, not us, to decide; such failings as it may contain, however, are not for lack of the enthusiastic cooperation and capable assistance of the following individuals, for whose contributions we are most grateful:

Our first and largest debt is to the National Institute of Justice, who provided the funds to undertake this research and who has supported the Social and Demographic Research Institute's violent crime research program for the past seven years. Officials at NIJ who have been involved in varying degrees with the project include the Institute Director, James K. Stewart, and the Associate Director, Robert Burkhardt; Fred Heinzelmann, Director of the Institute's Community Crime Prevention Division; and Dr. Lois Mock, who served as project monitor for the study.

We note a special gratitude to Dr. Mock for her patience in seeing the project through to completion, her assistance in winning the initial grant, her many valuable suggestions as the research proceeded, and her detailed and helpful comments on earlier drafts.

We are also grateful for the time and advice of the scholars and practitioners who constituted the project's Advisory Committee: Mr. Al Andrews, Chief of Police of Peoria, Illinois; Dr. Marcia Chaiken of the National Institute for Sentencing Alternatives; Dr. Phillip Cook of Duke University; Dr. Mark Moore of Harvard University; and Mr. William Wilkie of the National Institute of Corrections. The members of the Advisory Committee met formally to review the project pretest results and to brainstorm over the contents of the questionnaire; most of them were also pestered by mail or phone periodically throughout the study for advice and counsel.

Mr. Wilkie is owed a special note of thanks for his assistance in arranging our access to the state prison systems where we eventually interviewed. A day on the phone in behalf of a research project not of his own making saved us what would have otherwise been several months of work.

The project was also blessed with an extraordinarily resourceful and talented field team who traveled to prisons all over the United States gathering the data on which this study is based. For services dramatically in excess of the rate of pay—for countless hours in coach class, endless nights in

Case: 1:10-cv-04184 Document #: 166-2 Filed: 03/12/12 Page 17 of 43 PageID #:3469

Minnesota Corrections Facility at Lino Lake; and at the Lino Lakes facility, Mr. William McGrath, Ms. Delores Redfield, Ms. Toby Larson, and Officer Pat Clemens.

In Oklahoma: Mr. Larry R. Meachum, Director, and Mr. Clifton Sandel, Supervisor of Planning and Research, Oklahoma Department of Corrections; Mr. Larry Fields, Warden, Joe Harp Correctional Center; and at the Center, Mr. Larry Thornton, Medical Director; Mr. Sam Preston, Programs Director; and Officers Stephen D. Moore, Terry W. Ragsdale, Jerome L. Carson, Keith Hall, and John Y. Brown.

In Florida: Mr. Louis L. Wainwright, Secretary, Dr. John H. Dale, Jr., Chief, Bureau of Planning, Research, and Statistics, and Mr. Bob Kriegner, Florida Department of Corrections; Superintendent Raymond D. Massey and Mr. Paul V. Gunning, Assistant Superintendent for Operations, Union Correctional Institution; and at the Institution, Colonel Jackson, Major Tomlinson, Lieutenant Rayburn, and Sergeant Newman of the Security Staff; Mr. Cunningham, Chief of Classification; Mr. J. L. Pitcher, Business Manager; Mr. Chuck Davis, Director of the educational unit; and Officer Robbie Watson.

In Georgia: Mr. David C. Evans, Commissioner, Mr. Ben Wyckoff, Director of Research and Evaluation, and Ms. Meg Updycke, Office of Public Affairs, Georgia Department of Corrections; Mr. Bob Francis, Warden, Georgia Diagnostic and Classification Center; and at the Center, Mr. Parrish, Assistant Superintendent for Security, Mr. David Fields, Assistant Superintendent for Operations, and Mr. Steve Phillips, Assistant Superintendent for Care and Treatment; Mr. Dave Cawthon; and Officers Wesley Baker and Tommy Lee Williamson.

In Nevada: Mr. Vernon Housewright, Director, Nevada Department of Prisons; Mr. George Sumner, Superintendent, Nevada State Prison; and at the Prison, Counsellor Robin Bates and Lt. Roger Belleville.

In Arizona: Mr. Ellis MacDougall, Director, Mr. Jerry Thompson, Deputy Director, and Mr. Bob Anderson, Head of Research, Arizona Department of Corrections; Mr. Don Wawrzaszek, Chief Administrator, Arizona State Prison; Mr. Bob Goldsmith, Warden, and Mr. Al Grijalva, Assistant Warden, Central Unit; and at the Unit, Major Herndon, Chief of Security, and Officers Becky Blanco, Myron B. Fristad, Gary E. Peterson, Rickey Garrett, and John A. Nielson.

In Maryland: Mr. John P. Galley, Commissioner, and Mr. Bruce Stout, Executive Assistant, Maryland Division of Correction; Mr. Marlin Bachnell, Warden, Maryland Correctional Training Center; and at the Center, Mr. Terrie Chavis, Assistant Superintendent for Treatment, and his assistant, Mr. Bernard Burnes; Mr. Brewer, Security Officer; Lt. Nelson Baker; and Officers John Mills, Charles Turner, and Daniel Sirbaugh.

In Massachusets: Mr. Michael V. Fair, Commissioner, Mr. Dennis Humphrey, Associate Commissioner, and Mr. Frank Carney, Director of Re-

Holiday Inns, fifteen- and sixteen-hour working days, and infinite patience (and good research judgment) in the face of wary administrators and hostile inmates—we thank Jeff Segal, Joe Pereira, and Tommy Joyner.

Additional thanks are owed Mr. Pereira for having undertaken the data quality analysis reported in the text and for assisting in the translation of the Spanish version of the questionnaire; and also to Mr. Segal, who undertook the data analyses and first drafts of the material on stolen firearms.

Data entry, analysis, and management were under the general direction of SADRI's Director of Software Development and Data Base Management, Ms. Eleanor Weber-Burdin, whose talents on the computer are exceeded only by her commitment to the people and projects of "the shop." Her assistant, Ms. Marianne Geronimo, provided supervision of the data entry staff and much assistance to the principal investigators in the data analysis. Special thanks to both of them for yet another job well done.

Gratitude is also owed the several undergraduate and graduate students at the University of Massachusetts who entered the data from the raw questionnaire onto the computer quickly and with remarkably few errors: Rachael Angeline, Matthew Archibald, Denise Furlong, Michael Hanrahan, Amy Kopel, Lisa Lorant, Mary Ellen Madaio, and Aida Rodriguez. Ms. Rodriguez also assisted in preparing the Spanish version of the questionnaire.

Our presence in the ten research sites, and therefore our ability to gather the project data, was only possible because of the cooperation and assistance of each state's corrections administration—from the State Commissioner of Corrections down to and including the security staff who were assigned to watch over the field team while we were in the site. None of the following people had any obligation to render, or stood to profit from, the help which was, nonetheless, freely given:

In Michigan: Mr. Perry M. Johnson, Director, Michigan Department of Corrections; Mr. William Kime, Deputy Director of Research; Mr. Robert Richardson, Chief of Research in the Program Bureau; Warden John Jabe and Deputy Warden Gach, Michigan Reformatory; Mr. Jabe's Administrative Assistant, Mr. Joe Cross; Mr. Robert Heriford; and Officers Bernard Clark, Richard Signs, Don Gostenell, and Bradley Harris.

In Missouri: Dr. Lee Roy Black, Director, Department of Corrections and Human Resources; Mr. Dale Riley, Acting Director, Division of Adult Institutions; Mr. Gerard Frey, Superintendent, and Mr. Don Cabana, Assistant Superintendent, Missouri Eastern Correctional Center; and at the Center, Ms. Micki Andrews.

In Minnesota: Mr. Jack G. Young, Commissioner, Mr. Orville Pung, Deputy Commissioner, and Mr. Gerry Strathman, Research Director, Minnesota Department of Corrections; Mr. Frank Wood, Superintendent, and Mr. Dennis Benson, Residential Program Manager, Minnesota Corrections Facility at Oak Park Heights; at the Oak Park Heights facility, Lt. Lou Stender, Mr. David Crist, and Mr. Rick Hillengass; Mr. James Hulbert, Superintendent,

search, Massachusetts Department of Correction; Superintendent Terence Holbrook and Deputy Superintendent Michael Maloney, Massachusetts Correctional Institution at Norfolk; and at the Institution, Mr. Carlos Geromini, Principal of the Education Unit, and Officer James Butler.

The next-to-final draft of the survey questionnaire was pretested on 18 men serving sentences in the Berkshire County House of Corrections, a county jail in Western Massachusetts. We are grateful to Sheriff Carmen C. Massimiano and Officer Paul Therrien of the Pittsfield Police Department for arranging our access to the pretest site.

Over the course of this project, SADRI was well-served by an able and cheerful secretarial pool consisting at various times of Ms. Cindy Coffman, Mr. Ken Forfia, Ms. Jeanne Reinle, Ms. Kathy Moore, and Ms. Jane Karp, all of whom contributed to the production of this manuscript or to one (or more) of its several predecessors.

Previous drafts of the study report (or its component parts) profited immensely from the careful reading and critical commentary of Dr. Lois Mock, Dr. Phillip Cook, Dr. Paul Blackman, Mr. Mark Benenson, Dr. Gary Kleck, Dr. Marcia Chaiken, Dr. Alan Lizotte, Mr. Don Kates, Dr. Colin Loftin, several of our colleagues at the University of Massachusetts, numerous participants at various meetings and symposia where preliminary findings were presented, and others who have asked not to be identified. We are grateful indeed to these people for having prevented many factual errors and interpretive excesses from seeing the light of print.

Finally, we express our gratitude to the nearly 2000 prisoners all over the United States who agreed to participate in this study and complete a survey questionnaire.

Despite the considerable assistance just acknowledged, none of the persons and institutions identified above, nor the National Institute of Justice, nor the United States government, bears any responsibility whatsoever for any of the findings, interpretations, conclusions, or implications expressed in this volume, all of which remain our own.

# Introduction to the Aldine Transaction Edition

*Plus ça change, plus c'est la meme chose!*

One returns to the work of two decades past with a certain trepidation. *Armed and Considered Dangerous*, by James D. Wright and Peter H. Rossi, was first published in 1986. A second edition, sporting a new preface but otherwise unchanged, was issued in 1994. It was an easy and comfortable conclusion then that "with a few exceptions, the themes and analyses of *Armed and Considered Dangerous (ACD)* seem to have held up pretty well." But what about the years since? Has enough of the original survived unscathed to justify Transaction Publishers' decision to reissue the volume some twenty-two years after it first appeared in print? Can data that are now old enough to vote still have anything useful to say about the criminal acquisition and use of firearms in Twenty-first-century America?

Evidently, yes. Despite its advanced age, *Armed and Considered Dangerous* is still cited in the scholarly literature on guns and crime with gratifying regularity and many of the book's findings are now so widely accepted and repeated that their origins have been forgotten. As recently as 2005, the book was described as "the only available survey of the attitudes of (imprisoned) felons" concerning guns and related topics (Hahn et al., 2005).

## THE CRIMINAL GUN MARKET

Major replications of the book's findings concerning firearms acquisitions by imprisoned offenders were carried out by the U.S. Department of Justice in 1991 and 1997 (Bureau of Justice Statistics, 2002). Unlike the *ACD* survey, which sampled only males inmates incarcerated in state prisons, the BJS studies added federal prisoners to the sampling frame and sampled both male and female inmates. The sample sizes were also an order of magnitude larger (about 2,000 in *ACD* versus nearly 20,000 in the BJS surveys). A final important difference is that the *ACD* questionnaire was largely self-administered whereas the BJS surveys were based on computer-assisted personal interviews.

Methodological differences aside, the findings from the BJS surveys tend to hew pretty closely to those we reported in 1986 everywhere

a reasonably close comparison is possible. The BJS surveys found that 15% of state prison inmates and 13% of federal prison inmates carried handguns when committing the crime that landed them in prison, while only 2% carried a military-style weapon. The criminal preference for conventional handguns over so-called "assault weapons" is again confirmed. Furthermore, roughly 30% of the state prison population and 35% of federal prisoners convicted of violent offenses possessed firearms at the time of their conviction.

Perhaps the most widely cited finding from ACD was that criminals rarely obtained guns through conventional retail channels. (Thus, by implication, controls imposed at the point of retail sale would miss the large majority of criminal firearms transactions.) In the 1997 survey of state inmates, among those who possessed a gun at the time of their arrest, "fewer than 2% bought their firearm at a flea market or gun show, about 12% from a retail store or pawnshop, and 80% from family, friends, a street buy, or an illegal source" (BJS, 2002:1). Compare to ACD (p. 185): "One out of six of the men in this sample acquired his most recent handgun through means and sources likely to be concerned about the legality of the transaction; five out of six did not." ACD showed, and every subsequent study has confirmed, that "the illicit firearms market . . . [is] . . . clearly and heavily dominated by informal, off-the-record transactions, either with family and friends or with various gray- and black-market sources" (p. 190).

The BJS findings are of particular interest because in the decades since ACD was published, a lot of legislation and commentary has focused on so-called "military style assault weapons" and on the illegal criminal acquisition of firearms at gun shows and flea markets. Handgun Control, Inc. has lobbied for years to "Close the Gun Show Loophole," both houses of Congress have passed legislation attempting to control firearms sales at gun shows, and at least one overly-exuberant legislator (Denver Congresswoman Diana DeGette) has averred that "70 percent of guns used in crimes come from gun shows" (Kopel, 2000). No study ever done, and certainly none with any sort of methodological credibility, has ever found that more than 2 or 3% of criminals' guns are obtained at gun shows. Flea markets have also been singled out for some legislative attention but are, the data show, equally irrelevant.

Somewhat more significantly perhaps, Title XI of the Federal Violent Crime Control Act of 1994 banned the manufacture and importation of a certain class of guns defined by the act as "assault weapons." As many pro-gun writers pointed out (at the time and since), these firearms were categorized as "assault weapons" in the legislation by certain identifying cosmetic and ergonomic features that gave them a military or pseudo-military appearance but that generally would not affect their

lethality or suitability for criminal purposes. The act also banned what were called "high capacity" magazines (generally, clips holding more than 15 rounds). Studies done before and since the 1994 legislation, including the BJS surveys, showed very little criminal interest in or use of these so-called "assault weapons," whose size and appearance made them difficult to conceal and therefore useless for many criminal purposes (see, e.g., Kleck, 1997). To some fanfare but with no apparent effect, the "assault weapons ban" was allowed to expire on September 13th, 2004 (the "sunset" date included in the original legislation).

## CRIME, CRIME RATES, AND GUNS

Rates of crime in general and violent crime in particular continued to trend upward from the publication of ACD through to about 1994 and then, somewhat inexplicably, began a ten-year downward slide that has only recently reversed. No one has produced the definitive account of why the crime and violent crime rates dropped, but the decline was precipitous and nearly universal (Rosenfeld, 2005; Blumstein and Wallman, 2000). Most observers agree that the generally good economy of the mid-to-late 90s was a contributing factor, although the relationship between crime and the economy is not straightforward. Changing demography might also have been a factor and so too changing police and law enforcement practices, a topic we take up again later. But the most important factor seems to have been the slackening demand for crack cocaine in the early 90s and the consequent decline in crack-related violence. Of course, the reasons for the drop-off in crack usage are also not well-understood and so this is not an entirely satisfactory explanation, but for whatever reason, as the original crack generation grew older, stopped using, or died off, their generational "replacements" preferred marijuana and alcohol. "Following a lag of a year or two, rates of gun violence also began to fall off" (Rosenfeld, 2004: 87). This seems to be a particularly compelling explanation for the decline in youth violence. (Likewise, a resurgence these past few years of heroin and crack usage and the emergence of a virtual epidemic of crystal methamphetamine addiction seem largely to blame for the recent reversal of the declining crime rates.)

For our purposes, the important lesson in all this is that the availability and use of hard-core drugs seems far more consequential for the overall crime and violent crime rates than anything having to do with the availability of guns, which probably did not slacken significantly even as crime rates were plummeting.

That said, guns are still involved in an enormous number of crimes and acts of violence in this country. A few years ago, the BJS compiled

## FIREARMS BEHAVIORS AND CRIMINOLOGICAL THEORY

The number of criminals who are themselves victims of crime, including homicides, drives home the important theoretical point that, as we put it in ACD, "these men inhabit a violent and generally hostile world . . . these men came to possess and carry [guns] as much to aid in surviving life on the streets as to use in committing crime" (p. 139). The original book was criticized by some reviewers as largely descriptive and atheoretical, as indeed it was. As we stated in the Preface to the second edition, "historically, criminological theory has had very little to say about guns in any case.' Some recent theoretical developments in the field, particularly in the areas of rational choice theory and lifestyles/ routine activities theory, have put the study of felons and their firearms on a somewhat more developed theoretical basis.

Routine activities theory was originally developed by Cohen and Felson (1979) and argues that the opportunity to commit crime arises in the juxtaposition in space and time of a motivated offender, a suitable target, and the absence of capable guardians. Lifestyles and routine activities thus modulate the risk of criminal victimization: how people spend their time, the hours of the day when they are out and about, how they dress, what defensive measures they take, who they spend time with, etc. all impact upon their suitability as a target and the presence or absence of guardians.

In a broader context, ACD drew attention to guns and gun carrying as part and parcel of the routine activities of the criminal class. A myriad of factors affect the decision for the "bad guys" to carry firearms routinely—including a fear or history of victimization, involvement with delinquent peer groups, exposure to violence, and a generally deviant or criminal lifestyle. Indeed, we took pains to argue that the critical "decision" in the criminal use of guns was not the decision to acquire one or even to use one in a particular offense, but rather the decision to carry a gun on a routine basis—this surely in response to an environment perceived as dangerous and hostile, where a gun becomes a useful "hedge" in a violent and threatening world. Once a firearm is being carried routinely, it is then always "available" for use in crime.

This set of findings, incidentally, has been cited as one justification for a police emphasis on the detection and intervention of illegal gun carrying in crime "hot spot" areas, e.g., the Kansas City Gun Experiment in the early 90s, Project Safe Neighborhoods implemented in Chicago and a number of other U.S. cities, Project Exile in Richmond, and a number of others. See Koper (2003) for a review article on this topic.

At its core, routine activities theory posits an element of rationality in criminal behavior. Judging the perspective from the viewpoint of

a report on firearm injury and death for the years 1993 through 1997 (BJS, 2000). In that span, the nation suffered ~180,000 firearm-related fatalities and more than 400,000 nonfatal firearm injuries. Thus, the annual firearms toll continues to amount to about 36,000 deaths and perhaps 80,000 non-fatal injuries. Deaths by gun suicide continue to outnumber homicidal deaths, with fatal firearms accidents a very distant third. Of the nonfatal injuries, 62% occurred during the course of an assault. Of the lethal incidents involving firearms, more than half were suicides, 44% were the result of a homicide, and 1 or 2 percent were accidental.

In more recent years, 1993 to 2001, the BJS (2003) has estimated that 70% of homicide victims are killed with a firearm. Furthermore, 27% of robberies and 8% of assaults involved offenders armed with a gun. It has also been found that firearm usage is exceptionally high in crime-precipitated homicides, defined as cases where the victim was killed while engaging in illegal behavior such as predatory crimes, vice crimes, or drug dealing (Copes et al., 2002). In an analysis of Chicago homicides, Copes and colleagues found that about 64% of all crime-precipitated homicides involved a firearm. By type, 77% of the homicides committed in connection with predatory crime involved firearms, versus 49% of the homicides connected to vice crimes and 89% of murders connected to drug transactions. Rosenfeld (1991) also found that firearms were used in ~90% of drug-related homicides.

ACD described predatory gun criminals as relatively young non-white men from troubled backgrounds and generally violent neighborhoods—a description that has been confirmed in any number of subsequent studies, which consistently show that most perpetrators of homicide and other gun crimes are male and younger than 30 (Stell, 2004). Furthermore, 70-80% of firearms offenders have criminal records with an average of four major felony arrests prior to the commission of a homicide.

Regarding homicide victimization, Dobrin and Bursk (2003) found that victims of homicide are more likely to be criminals themselves than non-victims and that criminal offending increases the chance of becoming a homicide victim. In virtually all studies, prior offending increases the odds of being a homicide victim (Dobrin, 2001; Dobrin et al., 2005). Faria (2005) analyzed FBI data and found that ~75% of violent crimes in any locality are committed by the 6% of criminals who are the most active repeat offenders (and incidentally, that less than 0.2% of crimes committed with firearms are committed by citizens licensed to carry a concealed weapon). Put simply, criminal activity involving firearms is disproportionately committed by and against a small subset of the population (Cook et al., 2005).

offenders, it depicts most crimes as being opportunistic in nature and most criminals as cost-benefit calculators making judgments about the suitability of targets (willingness and ability to resist, amount of cash being carried, ease of victimization) and about the presence or absence of capable guardians. So while criminals may not be "rational" in the sense that they plan ahead, scout out targets, undertake surveillance, or plot likely routes of escape in case they are detected, they still make rational decisions about criminal opportunities that present themselves. This is why muggings do not typically occur on SWAT team training grounds and why police evidence rooms are rarely burglarized!

Rational choice theory (e.g., McCarthy, 2002) also depicts offender decisions to own and carry firearms as rational behavior. Criminals typically do not live in the safest areas nor do they lead calm, safe, sheltered lives. To the contrary, their living conditions and behavior regularly put them in circumstances where access to a firearm is highly beneficial. As one respondent in the pre-testing for ACD put it, "You can't never will never be the only guy on the street who ain't got him a piece." When people all around are armed, gun carrying becomes an extremely rational act.

In a sequence asking ACD respondents why they carried a gun, the single most common answer among the gun-carriers was "if you carry a gun your victim doesn't put up a fight and that way you don't have to hurt them" (mentioned as "very important" by 57%). Remarkably, the "bad guys" turn out to carry guns as a means of avoiding, not perpetrating, violence. Other not-uncommon life situations that might rationalize the routine carrying of guns would be harassment by armed others, engaging armed victims, or having an encounter with police.

Rational choice theory counsels the analyst to take individual utilities and disutilities into consideration and to depict any given behavior as the outcome of a more or less explicit cost-benefit analysis. Although factors ranging from pharmacological impairment to uncontrollable rage might intercede to pervert the cost-benefit logic, rational choice theory still tells us that offenders carry firearms because they believe that the possible utilitarian uses of guns and the peace of mind granted by having quick access to one outweigh any potential costs.

## FIREARMS LAWS AND THE REDUCTION OF GUN VIOLENCE

A commonplace line of argument in unsophisticated debates about "gun control" is that compared to other countries, the U.S. has pretty relaxed firearms laws, lots and lots of guns, and more gun violence than most other countries. All this, of course, is true. What is less obvious is

the frequent conclusion, namely, that lax laws and ready gun availability is why we suffer so much gun violence.

The Task Force on Community Preventive Services is a fifteen-member non-federal task force supported by the Centers for Disease Control and Prevention (CDC) that is charged with identifying threats to public health and summarizing what is known about how to minimize those threats. One topic of concern to the task force is violence, and one question raised about violence is whether stricter firearms laws would reduce it. A convenient summary of the task force's conclusions in this matter is the paper by Hahn and 8 co-authors that appeared in the American Journal of Preventive Medicine in 2005.

In the sequel to ACD focused on juvenile offenders, we pointed out that since most of the methods through which criminals acquire guns and virtually everything they ever do with those guns are already against the law, one is entitled to wonder whether new laws, stricter laws, or more aggressive enforcement of existing laws will make much of a difference (Sheley and Wright, 1995). Hahn and his colleagues reviewed dozens of studies (the paper's bibliography contains 121 entries) about the violence reduction effects of bans on specific firearms or ammunition, restrictions on gun acquisition, waiting periods, gun registration, gun licensing, "shall issues" statutes that make it easier for law-abiding citizens to acquire permits to carry concealed weapons, child access prevention laws (e.g., laws that require child-proof storage of guns), and zero-tolerance approaches to guns in schools. Across all available studies and multiple indicators of violence, the task force concluded that "the evidence is insufficient to determine whether the degree or intensity of firearms regulation is associated with increased (or decreased) violence" (2005:59).

Of course, "absence of evidence is not evidence of absence" and the task force rightly concludes that much of the evaluation literature in this area is a methodological shambles. So here as always, more and better research is needed. But the inability of existing studies to detect the presumed violence-reductive effects of more and stricter gun laws also implies that even if such effects exist, they cannot be very strong; otherwise, virtually any design would be able to detect them. As intimated time and again throughout ACD, those who seek to reduce the level of violence in America by putting further and more onerous restrictions on the rights of the general public to own firearms are probably barking up the wrong tree.

Perhaps the most wellknown, or possibly infamous, firearms law to have been passed since ACD was published was the so-called Brady Act, which mandated a federal five-day waiting period for gun acquisition and a mandatory criminal background check. (The law has since been sunsetted and replaced with the FBI's National Instant Criminal

Background Check system, itself controversial.) Numerous evaluations of Brady and like legislative initiatives repeatedly showed them to have no effect in reducing firearms violence (Moorhouse and Wanner, 2006; McGarrell, 2005; Stell, 2004; Levit, 2004; Lott and Whitley, 2001; Brezina and Wright, 2000; Ludwig and Cook, 2000; The Urban Institute, 1997). As ACD showed, the large majority of criminal firearms transactions do not involve conventional over-the-counter retail transactions, a finding that was later extended to juvenile transactions as well (Sheley and Wright, 1995). That being the case, restrictions imposed at the point of retail sale cannot possibly have much of an effect.

More generally, efforts to control violence by controlling the supply of firearms have been generally unsuccessful, at least partly because the vast number of guns already in circulation (several hundreds of millions in the U.S. alone) implies that actual reductions in the available supply are almost impossible to achieve (Brezina and Wright, 2000). Guns already in circulation represent a virtually inexhaustible source of supply to the informal market in firearms, not infrequently through theft of guns from private residences. And, of course, there are always corrupt "legitimate" dealers engaged in illegal firearms trafficking to supplement the supply of pre-owned guns.

## LAW ENFORCEMENT STRATEGIES AND THE REDUCTION OF GUN VIOLENCE

Because of the above and a long string of similar considerations, more recent efforts to control violence have looked to law enforcement rather than new legislation (Ludwig, 2005) as the potential solution. Within recent years, numerous cities have initiated "gun emphasis" programs, directing law enforcement to target gun possession and carrying by persons with previous felony convictions. Conceptually, these approaches ask whether more aggressive enforcement of existing laws might not achieve the violence reduction that "new" gun control measures have not.

In general, there is little to no evidence that the number of guns legitimately owned by private citizens in a city or other locality has a discernible effect on crime in general or gun crime in particular (Stolzenberg and D'Alessio, 2000). There is some reason to believe, on the other hand, that reducing the use of firearms in crime would reduce the rate of firearm-related injuries and fatalities (Varano et al., 2004; Weaver et al., 2004). Some research has also shown that there is a positive relationship between illegal firearms availability and violent crime in general as well as gun crime, including gun crimes committed by juveniles. Thus, "gun enforcement" programs are strongly oriented towards the obtaining, carrying and use of guns by proscribed classes

of persons (specifically, those with felony records), not towards general firearms ownership and use by the law-abiding population.

Among the "gun enforcement" programs launched in the U.S. in the past several years would be included Operation Ceasefire in Boston and Los Angeles, Project Exile in Richmond, and New York's Compstat—each of which has stimulated a substantial evaluation literature. Others, like the St. Louis Consent-to-Search Program, Indianapolis Police Department's Directed Patrol Project, and Atlanta's Project PACT, have received less academic attention. While each program has its nuances, they share common thematic elements. For example, each program focuses on identifying "hot spots" of criminal gun activity and directing intervention efforts to those specific areas. Most of these programs also have community outreach and partnership components in their logic models in addition to interagency cooperation efforts spanning local, state, and federal levels. A common element is what is called the "pulling levers" strategy, which is comprised essentially of "throwing the book" at perpetrators of violence through increased focus and cooperation from law enforcement officials, prosecutors, and the courts. The general theory of "pulling levers" is that one can deter violent behavior by chronic gang offenders by "reaching out directly to gangs, setting clear standards for their behavior, and backing up that message by 'pulling every lever' legally available when those standards are violated" (Kennedy, 1998). Often times, researchers have been involved in the design and implementation of these programs in order to generate the most plausible possible evaluations of their effects.

Although theoretically promising, the evidence is mixed on whether any of these programs were effective in curbing gun violence. Braga et al. (2001) and Braga and Pierce (2005) found significant reductions in firearm violence for Boston's Operation Ceasefire, but a re-analysis by Rosenfeld and his colleagues (2005) did not confirm the positive findings. Fagin et al. (1998) found that Compstat had a salutary effect on violent crime, but again, Rosenfeld and colleagues (2005) disputed the result. Ironically, Rosenfeld et al. (2005) found strong support for the violence-reductive effects of Project Exile in Richmond but the analysis by Raphael and Ludwig (2003) did not. Despite some claims of success, the efficacy of Operation Ceasefire in Los Angeles and Atlanta's Project PACT is questionable (Tita et al., 2005; Kellermann et al., 2006). The Indianapolis "Directed Patrol Project" was found to be a fairly cost-effective deterrent to firearm crime (McGarrell, Chermak, and Weiss, 2002) and the St. Louis Consent-to-Search program started out achieving a fairly high level of success, although the effect dwindled after policy changes altered the nature of the program (Decker and Rosenfeld, 2004). The National Institute of Justice published annual reviews of the state of the evidence on these gun enforcement strategies from 2001 to 2006, and

Case: 1:10-cv-04184 Document #: 166-2 Filed: 03/12/12 Page 22 of 43 PageID #:3474

the best that can be said is that some programs seem to have been at least marginally effective in some years under some conditions, whereas others were not. It is hard to come to an omnibus conclusion in the face of these contradictory results. One obvious problem is that it is difficult to control exogenous factors—generally declining crime and violent crime rates in most cities from the mid-90s forward to about 2004, local employment trends, demographic changes, characteristics, uncontrolled differences in policing strategies, the local economic and political environment (Rosenfeld et al., 2005; Raphael and Ludwig, 2003)—in these kinds of evaluation studies.

The Bureau of Alcohol, Tobacco and Firearms (ATF) has also developed gun strategies to assist local law enforcement in their violence reduction efforts. One notable initiative is ATF's Youth Crime Gun Interdiction Initiative (YCGII), devoted specifically to identifying characteristics of guns used in youth violence. In addition, YCGII is aimed at calculating the time-to-crime of guns used in crime (meaning the elapsed time between first retail sale of a firearm and its use in a crime) determining what types of guns are used in criminal offenses, and identifying transaction histories of traced firearms. All of this information is found in the Bureau's Crime GunTrace Reports database. YCGII also investigates geographical patterns of trafficking in crime guns and provides investigative support and direction for local law enforcement agencies who also participate in the program (ATF, 2000).

Based on various reviews and evaluations, several things can be said regarding the efficacy of gun enforcement programs. First, problem-oriented policing (i.e., in this instance focusing manpower and resources heavily on a particular problem such as gun crime by youth) seems to show some potential. Also, programs with specialized directed-patrol techniques (i.e., targeted to "hot spots") appear to be more effective than those with more general patrol policies. Inter-agency cooperation across city, state, and federal jurisdictions is clearly integral to gun enforcement programs. Further, "pulling levers" only works when prosecutors, probation officers, and health and building inspectors as well as the local police are "on board" with the strategy. From a law enforcement perspective, the lesson is apparently that reactive policing (where officers simply respond to calls for service) will not suffice.

It is also apparent that gun enforcement strategies work best when they are coupled with community partnerships, when there are direct efforts to gather support for the program and increase public awareness of the program's reasons and goals, and when realistic and meaningful alternatives for those involved in violent activity are provided. As in so many other areas of police practice, just "getting tough" rarely produces much benefit. Unfortunately, when violent crime spikes, most people want immediate action via any means necessary, and things like com-

munity partnerships, community involvement, or "community policing" take a back seat, even in the face of evidence that partnerships with the inner-city community may do more to reduce firearms violence and gang activity in the long run.

## KIDS AND GUNS

One active line of research whose origins can be traced directly to ACD is firearms acquisition and use by juveniles, both juvenile offenders and "regular" high school students. A great deal of the concern about this topic results from a number of well-publicized school shootings—Columbine, Paducah, Ft. Gibson, Santee, Granite Hills, and many others. After each of these incidents, parents, teachers, and the media always ask insistently, "Where did those kids get their guns?" And the answer is always the same: Dad's gun case, Uncle Bill's bedside table, the school drug dealer. Never mind that far more young people are shot to death in their own homes by their own parents in an average year than perish in school ground shootings (Brezina and Wright, 2000).[1]

The follow-up study to ACD was the Sheley and Wright study of incarcerated juveniles, itself followed by a large sample survey of high school students (Sheley and Wright, 1995, 1998; Wright and Sheley, 1993). Some of the findings from these and other kids-and-guns studies were alarming. In the 1995 Youth Risk Behavior Survey, 7.6% of all students surveyed reported carrying a gun to school. Sheley and Wright (1998) found that 29% of 10th and 11th grade students from 53 high schools had possessed a gun within the past year, 4% carried a gun every now and then, and 2% carried a firearm most or all of the time. Reports of regular gun carrying generally range from 0.2% to 5% in various nationally representative samples (Kleck, 1997; Sickmund et al., 1997; Mercy and Rosenberg, 1998) depending on locality and operational definitions of "gun carrying."

Regarding gun availability and the presence of firearms in the lives of students, 50% reported that they would have "little" or "no" trouble obtaining a gun, 14% reported weapons carrying by friends, 13% had attended social events where shots were fired, and 23% had friends who experienced gun-related victimizations (Sheley and Wright, 1998). Other student surveys report similar results (e.g., Bjerregard and Lizotte, 1995; Callahan and Rivara, 1992). Guns are commonly owned consumer goods and are present in about 40% of all U.S. households. The shock expressed about where and how "mere children" can lay hands on serious armament, as in the many school shootings alluded to earlier, is wholly disingenuous.

Why do juveniles carry firearms? Rountree (2000) found that family and peer based socialization was an important factor in the decision

to carry a gun to school. Involvement in criminal or deviant lifestyles was also important (as it is for adults). Rountree and colleagues (2006) tested the hypothesis that juveniles carry guns based on their fear of victimization. They found that fear, risk, and history of victimization did not predict weapons carrying, although weapons carrying did predict subsequent fear and risk of victimization, actually being victimized, and offending. Lizotte and colleagues (2001) found that gun carrying was associated with the ownership of guns by peers for "protection," being involved in gang-related activity, and selling drugs. Webster, Gainer, and Champion (1993) similarly found that gun carrying was related to having an arrest history, a greater exposure to violence, being threatened, initiating fights, and having attitudes supportive of shooting someone else.

For many youth, as for adults, concealability is the primary issue, particularly when guns are being carried in public places (schools, retail areas, and the like). What, then, to make of the recurrent concern, expressed more or less continually for the past two decades, about kids carrying and using so-called assault weapons? Although some studies, including our own, suggest that 20-30% of juvenile offenders might have some sort of access to these kinds of guns (Knox et al., 1994; Sheley and Wright, 1993) most of the guns used by juveniles to commit crimes and subsequently confiscated by the police are conventional side arms (pistols and revolvers), not "military-style" equipment (Ruddell and Mays, 2003). (In fact, most of the guns in the Ruddell-Mays study were relatively unsophisticated, including a number of .22 and .25 caliber firearms, other cheap, junky handguns, and even pellet guns.) There was also no evidence in this study to suggest a trend towards bigger-caliber weapons, contrary to a common speculation and some other evidence (e.g., Adibe et al., 2004). Koper (1995) goes so far as to suggest that the possession, carrying, and use of "military-style" weapons by some juveniles may simply be considered more "trendy" than the old stand-bys.

How do juvenile offenders (and kids in general) acquire guns? Largely through the same methods and outlets as adult offenders, i.e., via informal purchases, swaps, and trades in the so-called secondary gun market. Braga and Kennedy (2001) found, based on firearms trace information obtained through the ATF, that most firearms that are acquired by juvenile offenders, used in crime and subsequently confiscated by the police had been stolen somewhere in the chain of commerce from first to final possessor. These authors also note the diversion of some firearms from retail outlets through so-called "straw purchases" and some more or less organized trafficking of second-hand firearms to juveniles, points of concern that also surfaced in our earlier studies (Sheley and Wright, 1993).

## ILLEGAL METHODS OF GUN ACQUISITION BY JUVENILE AND ADULT OFFENDERS

The Gun Control Act of 1968 made it illegal for juveniles[2] and persons with felony convictions to purchase guns through regulated retail outlets, and yet a great deal of research and even casual observation shows definitively that these provisions have not halted or even seriously complicated the acquisition of guns of all sorts by these proscribed classes. Just how does that happen?

A large part of the answer, as we have already intimated, lies in the vast arsenal of firearms already in circulation in private hands. The private gun supply exceeds 200 million weapons, with one or more of them possessed in about 40% of all U.S. households (Brezina and Wright, 2000; Wright, 1995). With that many guns to be found in that many households, it cannot be very hard to lay hands on one. And, of course, it is not.

In the first instance, those legally ineligible to obtain firearms from retail sources (juveniles, felons, and fugitives) can walk into (nearly) every second home or break into retail outlets and steal all the guns they want. Therefore, theft is one common mechanism by which the proscribed classes acquire guns (ATF, 2000). Another is the so-called "straw purchase," where someone who is legally eligible to buy a gun does so then gives or sells it to someone who is not. ATF (2000) estimates suggest that straw purchases might account for as many as 46% of the firearms used by juveniles, confiscated by police, and subsequently traced. These secondary markets, including straw purchasers and private citizens who sell their firearms without a Federal Firearms License (FFL), are obvious and frequently used avenues for proscribed classes to obtain guns. Within these secondary markets, buyers and sellers avoid the inconveniences of criminal records checks, sales records, waiting periods, and the like, although one study suggests that buyers often pay premiums three to five times higher than legal market prices (Urban Institute, 1997). ATF (2000) reports that 89% of crime guns seized by the police and traced through their system were not purchased directly by the offender from a licensed gun dealer, which is about the same figure reported in ACD (about 1 in 6). Interestingly, somewhere between 30 and 40% of the guns owned by ordinary private citizens were also acquired in secondary market transactions (Cook and Ludwig, 1996), so it is not just the "bad guys" who buy and sell through these methods.

In recounting the ways in which juveniles and felons obtain guns, we should not overlook unscrupulous licensed gun dealers as a possible source. Clearly, licensed dealers who fail to comply with the law and divert firearms to felons, fugitives, or juveniles contribute to the illicit firearms market. These corrupt dealers are particularly threatening to

public safety because they have access to large quantities of firearms (Siegel, 1999). The Urban Institute study (1997) reports anecdotally that these unscrupulous dealers "cover" their illicit commerce by reporting the guns as lost, missing, or stolen in the mandatory ATF paperwork.

ATF itself reports (2000) that apparently corrupt dealers were involved in only 10% of their investigations but were responsible for nearly half of the total number of firearms traced. The average number of guns trafficked by unscrupulous dealers was over 350 per dealer. As suggested by the Urban Institute, the shenanigans of these enterprising capitalists include making false entries in their records, selling firearms "off the books," knowingly selling to convicted felons, conducting illegal out-of-state sales, and selling illegal weapons such as automatic weapons, grenades, and sawed-off shotguns (ATF, 2000).

Pierce and colleagues (2004) are the most recent investigators to update and extend the ACD findings, in this case using data from gun traces rather than interviews with felons. Consistent with the preferences expressed by our felons, handguns are the most frequently traced type of firearm within the United States by a pretty wide margin. Semiautomatic pistols constitute about 46% of all trace requests with conventional revolvers making up the majority, also consistent with the ACD findings. They also found that only about 11% of traced crime guns were in the possession of the original buyer, which reproduces the ATF (2000) finding as well as the results from ACD. The authors also report that most traced crime guns were obtained by the offender from secondary markets, specifically from friends and family members.

*Plus ça change, plus c'est la meme chose!*

James D. Wright and Nicholas E. Libby
Department of Sociology
University of Central Florida

## Notes

1. Since 2000, the number of youth ages 5-18 murdered annually has averaged ~1500. Of these, an average of 17 have been homicides at schools. About two-thirds of youth murders are committed by parents. See data at http://nces.ed.gov/programs/crimeindicators/table_01_1.asp

2. "Juvenile" means under 18 for the purchase of rifles and shotguns and under 21 for the purchase of handguns.

## REFERENCES

Adibe, O.O., Caruso, R.P., and Swan, K.G. 2004. "Gunshot wounds: Bullet caliber is increasing, 1998-2003." *American Surgeon*, 70:322-325.

Bjerregaard, B., and Lizotte, A.J. 1995. "Gun ownership and gang membership." *Journal of Criminal Law and Criminology*, 86:37-58.

Blumstein, A., and Wallman, J. 2000. *The Crime Drop in America*. New York: Cambridge University Press.

Braga, A.A., Kennedy, D.M., Piehl, A.M., and Waring, E.J. 2001. *Reducing Gun Violence: The Boston Gun Project's Operation Ceasefire–Research Report*. Washington, DC: National Institute of Justice.

Braga, A.A., and Kennedy, D.M. 2001. "The illicit acquisition of firearms by youth and juveniles." *Journal of Criminal Justice*, 29:379-388.

Braga, A.A., and Pierce, G. 2005. "Disrupting illegal firearms markets in Boston: The effects of Operation Ceasefire on the supply of new handguns to criminals." *Criminology & Public Policy*, 4:717-748.

Brezina, T., and Wright, J.D. 2000. "Going armed in the school zone." *Forum for Applied Research and Public Policy*, 15:82-86.

Bureau of Alcohol, Tobacco, and Firearms. 2000. *Following the Gun: Enforcing Federal Laws Against Firearms Traffickers*. Department of the Treasury.

Bureau of Alcohol, Tobacco, and Firearms. 2000. *Crime Gun Trace Reports*. Department of the Treasury.

Bureau of Justice Statistics. 1996. *Firearm Injury from Crime*. US Department of Justice.

Bureau of Justice Statistics. 2000. *Firearm Injury and Death from Crime, 1993-97*. US Department of Justice.

Bureau of Justice Statistics. 2002. *Firearm Use by Offenders*. US Department of Justice.

Bureau of Justice Statistics. 2003. *Weapon Use and Violent Crime*. US Department of Justice.

Callahan, C.M., and Rivera, F.P. 1992. "Urban high school youth and handguns." *Journal of the American Medical Association*, 267:3038-3042.

Cohen, L. and Felson, M. 1979. "Social change and crime rate trends: A routine activity approach." *American Sociological Review*, 44:588-608.

Cook, P. and Ludwig, J. 1996. *Guns in America: Results of a Comprehensive Survey of Gun Ownership and Use*. Washington: Police Foundation.

Cook, P., Ludwig, J., and Braga, A. 2005. "Homicide offending and prior criminal record. *Journal of the American Medical Association*, 294: 598-601.

Copes, H., Kerley, K.R., and Carroll, A. 2002. "Killed in the act: A descriptive analysis of crime-precipitated homicide." *Homicide Studies*, 6:240-257.

Decker, S.H., and Rosenfeld, R. 2004. *Reducing Gun Violence: The St. Louis Consent-to-Search Program–Research Report*. Washington, DC: National Institute of Justice.

Dobrin, A. 2001. "The risk of offending on homicide victimization: A case control study." *Journal of Research in Crime and Delinquency*, 38: 154-173.

Dobrin, A., and Bursik, J. 2003. The risk of offending on homicide victimization: A public health concern. *American Journal of Health Behavior*, 27:603-612.

Dobrin, A., Lee, D., and Price, J. 2005. "Neighborhood structure differences between homicide victims and non-victims." *Journal of Criminal Justice*, 33:137-143.

Fagin, J., Zimring, F., and Kim, J. 1998. "Declining homicide in New York City: A tale of two trends." *Journal of Criminal Law and Criminology*, 88:1277-1323.

Faria, M. 2005. "Gun violence is not a public health crisis." In Egendorf, L. (Ed.) *Guns and Violence* (39-53). Detroit: Thomson Gale.

Hahn, R.A., Bilukha, O., Crosby, A., Fullilove, M.T., Liberman, A., Moscicki, E., Snyder, S., Tuma, F., and Briss, P.A. 2005. "Firearms laws and the reduction of violence: A systematic review." *American Journal of Preventative Medicine*, 28:40-71.

Kellermann, A.L., Fuqua-Whitley, D., and Parramore, C.S. 2006. *Reducing Gun Violence: Community Problem Solving in Atlanta–Research Report*. Washington, DC: National Institute of Justice.

Kennedy, D. 1998. "Pulling levers: Getting deterrence right." *National Institute of Justice Journal* 236:2–8.

Kleck, G. 1997. *Targeting guns: Firearms and their control*. Hawthorne, N.Y.: Aldine de Gruyter.

Knox, G.W., Houston, J.G., Laskey, J.A., McCurrie, T.F., Tromanhauser, E.D., and Laske, D.L. 1994. *Gangs and Guns*. Chicago: National Gang Crime Research Center.

Kopel, David, 2000. "The facts about gun shows." The Cato Institute. Available at: http://www.cato.org/dailys/01-10-00.html.

Koper, C.S. 1995. *Gun Lethality and Homicide: Gun Types Used by Criminals and the Lethality of Gun Violence in Kansas City, Missouri, 1985-1993*. Ann Arbor, MI: University Microforms Inc.

Koper, C.S. 2003. "Police strategies for reducing illegal possession and carrying of firearms: A systematic review protocol prepared for the Campbell Collaboration." Jerry Lee Center of Criminology, University of Pennsylvania. Available online at: http://www.sas.upenn.edu/jerrylee/research/ccjg_guns.pdf.

Levitt, S.D. 2004. "Understanding why crime fell in the 1990s: Four factors that explain the decline and six that do not." *Journal of Economic Perspectives*, 18:163–190.

Lizotte, A., Bonsell, T., McDowall, D., Thornberry, T., and Krohn, M. 2001. "Carrying guns and involvement in crime." In Silverman, R., Thornberry, T., Cohen, B., and Krisberg, B. [Eds.] *Crime and Justice at the Millennium: Essays by and in Honor of Marvin E. Wolfgang*. Norvell: Kluwer Academic.

Lott, J.R., and Whitley, J.E. 2001. "Safestorage gun laws: Accidental deaths, suicides, and crime." *Journal of Law and Economics*, XLIV:659–689.

Ludwig, J., and Cook, P. 2000. "Homicide and suicide rates associated with implementation of the Brady Handgun Violence Prevention Act." *Journal of the American Medical Association*, 284:585–591.

Ludwig, J. 2005. "Better gun enforcement, less crime." *Criminology and Public Policy*, 4:677–716.

McCarthy, B. 2002. "New economics of sociological criminology." *Annual Review of Sociology*, 28:417–442.

McGarrell, E.F., Chermak, S., and Weiss, A. 2002. *Reducing Gun Violence: Evaluation of the Indianapolis Police Department's Directed Patrol Project–Research Report*. Washington, DC: National Institute of Justice.

McGarrell, E. 2005. Gun control does not reduce gun violence. In Egendorf, L. (Ed.) *Guns and Violence* (88–92). Detroit: Thomson gale.

Mercy, J.A., and Rosenberg, M.L. 1998. "Preventing firearm violence in and around schools." In Elliott, D.S., Hamburg, B.A., and Williams, K.R. (Eds.) *Violence in American Schools*. Cambridge: Cambridge University Press.

Moorhouse, J., and Wanner, B. 2006. "Does gun control reduce crime or does crime increase gun control?" *Cato Journal*, 26, 103-124.

Pierce, G.L, Braga, A.A., Hyatt, R.R, and Koper, C.S. 2004. "Characteristics and dynamics of illegal firearms markets: Implications for a supply-side enforcement strategy." *Justice Quarterly*, 21:391–422.

Raphael, S., and Ludwig, J. 2003. "Prison sentence enhancements: The case of project exile." In Ludwig, J., and Cook, P. [Eds.] *Evaluating Gun Policy: Effects on Crime and Violence*. Washington, D.C.: Brookings Institution.

Rosenfeld, R. 1991. *Anatomy of the Drug Related Homicide*. St. Louis: University of Missouri at St. Louis.

Rosenfeld, R. 2004. "The case of the unsolved crime decline." *Scientific American*, 290: 70–77.

Rosenfeld, R. 2005. "Firearms research and the crime drop." *Criminology and Public Policy*, 4:799–806.

Rosenfeld, R., Fornango, R., and Baumer, E. 2005. "Did Ceasefire, Compstat, and Exile reduce homicide?" *Criminology & Public Policy* 4:419–450.

Rountree, P.W. 2000. "Weapons at school: Are the predictors generalizable across context?" *Sociological Spectrum*, 20:291–324.

Ruddell, R., and Mays, G.L. 2003. "Examining the arsenal of juvenile gunslingers: Trends and policy implications." *Crime and Delinquency*, 49: 231–252.

Sheley, J., and Wright, J.D. 1993. *Gun acquisition and possession in selected juvenile samples–Research in brief*. Washington, DC: National Institute of Justice.

Sheley, J., and Wright, J.D. 1995. *In the Line of Fire: Youth, Guns, and Violence in Urban America*. New York: Aldine de Gruyter.

Sheley, J., and Wright, J.D. 1998. *High school youths, weapons and violence: A national survey–Research in brief*. Washington, DC: National Institute of Justice.

Sickmund, M., Snyder, H.N., and Poe-Yamagata, Eileen. 1997. *Juvenile Offenders and Victims: 1997 Update on Violence*. Washington, DC: Office of Juvenile Justice and Delinquency Prevention.

Siegel, B.J. 1999. City lawsuits against the gun industry: A roadmap for reforming gun industry misconduct. *Saint Louis University Public Law Review*, 18:247–290.

Stell, L. 2004. The production of criminal violence in America: is strict gun control the solution? *Journal of Law, Medicine, & Ethics*, 32:38–46.

Stolzenberg, L., and D'Alessio, S.J. 2000. "Gun availability and violent crime: New evidence from the National Incident-Based Reporting System." *Social Forces*, 78:1461–1482.

The Urban Institute. 1997. *Impact Evaluation of the Public Safety and Recreational Firearms Use Protection Act of 1994–Final Report*. Washington, DC: The Urban Institute.

Tita, G.E., Riley, K.J, Ridgeway, G., and Greenwood, P.W. 2005. *Reducing Gun Violence: Operation Ceasefire in Los Angeles–Research Report*. Washington, DC: National Institute of Justice.

Varano, S., McCluskey, J., Patchin, J., and Bynum, T. 2004. Exploring the drugs-homicide connection. *Journal of Contemporary Criminal Justice*, 20:369–392.

Weaver, G.S., Wittekind, J.E.C., Huff-Corzine, L., Corzine, J., Petee, T.A., and Jarvis, J.P. 2004. "Violent encounters: A criminal event analysis of lethal and nonlethal outcomes." *Journal of Contemporary Criminal Justice*, 20:348–368.

Webster, D.W., Gainer, P.S., and Champion, H.R. 1993. "Weapon carrying among inner-city junior high school students: Defensive behavior vs. aggressive delinquency." *American Journal of Public Health*, 83: 1604–1608.

Wright, J.D. 1995. "Ten essential observations on guns in America." *Society* (March/April):63–68.

Wright, J.D., and Sheley, J.F. 1993. "Motivations for gun possession and carrying among serious juvenile offenders." *Behavioral Sciences and the Law* 11:375–388.

# 1

# THE CRIMINAL ACQUISITION AND USE OF FIREARMS

## INTRODUCTION

How and why criminals acquire, carry, and use firearms are the central topics of this volume. Almost all of the information presented here was obtained from a survey of men serving sentences for felony offenses in 11 state prisons scattered throughout the country. However uncertain one may be about their reliability as sources, convicted criminals are about the only source of empirical information on this topic that can be tapped at reasonable cost. (We also show later that convicted felons are not totally unreliable informants.)

The research effort that generated our data was supported by a grant from the National Institute of Justice.[1] There are many compelling reasons to devote public funds and scholarly effort to obtaining empirical information on the criminal acquisition and use of firearms. The first and most compelling reason is that by any standard, the level of damage to persons and property through the criminal use of firearms is unacceptably high in the United States. Crime is a major social problem, and violent crime, where firearms play a critical role, is an especially troublesome aspect of the problem.

Second, the question of how social order is maintained is at the very heart of social science concerns. Crime constitutes one of the major forms of social disorder, one to whose understanding social scientists have devoted much attention. In addition, the possession of firearms is so widespread among Americans that an adequate interpretation of American culture requires some understanding of how guns fit into the larger society. The devotion of many Americans to the ownership and use of firearms clearly

[1] NIJ Grant #82-NIJ-CX-0001 (James D. Wright, Principal Investigator, and Peter H. Rossi, Co-Principal Investigator). A highly abbreviated version of the materials reported in this volume is contained in Wright and Rossi, *The Armed Criminal in America* (Washington, D.C.: The National Institute of Justice, 1985). The survey data themselves are available through the Inter-University Consortium for Political and Social Research (PO Box 1248, Ann Arbor, Michigan 48106).

conditions, perhaps strongly, the actions that can be taken to reduce the criminal use of guns.[2]

Third, there is a clear policy interest in understanding how firearms, crime, and American culture are related. Effective social policy aimed at reducing crime, in general, and gun-related crime, in particular, depends on a sound understanding of these relationships and the limits they set on various policy initiatives.

These three sets of concerns form the background of this monograph in the sense that they constitute the origins of the research effort whose results are described in the following chapters. These three concerns also represent our major goals. If this volume advances our understanding of the social order, or helps to reveal the structural foundations of social order, or illuminates ways that policy might reduce gun crime, then the aspirations that fueled its writing will have been fulfilled.

## GUN CRIME AS A SOCIAL PROBLEM

Violent crime that threatens or abuses the physical safety of its victims lies at the heart of the crime problem in America today. In turn, the use of firearms to commit crime constitutes a major portion of the violent crime problem. Each year, approximately 30,000 American citizens die through the suicidal, homicidal, or accidental abuse of guns; several hundreds of thousands are injured (intentionally or accidentally); hundreds of thousands more are victimized by gun crimes (Wright, Rossi, and Daly, 1983). Crime of all sorts impacts on a major portion of the nation's households: Victimization surveys show that one out of five households is victimized by crime annually (Rossi, 1983). Although violent crime per se constitutes only about one-tenth of all crime, the remainder being property crimes in which firearms ostensibly played no role, it contributes considerably more than its share to the fear of crime and to the public's sense of crime as a serious problem. Indeed, it can be argued that violent crime is *the* crime problem and that its reduction should be a matter of the highest priority on the law enforcement and criminal justice policy agendas of the Nation.

The line between "violent" and "nonviolent" crimes is clear in some instances but hazy and indistinct in others. Homicide, manslaughter, assault, and robbery are, by definition, clearly violent crimes in which physical harm is either inflicted or threatened. But a burglary, ordinarily a non-violent crime, can easily become violent if the burglar (or his victim) is carrying a gun. Similarly, a minor argument that would otherwise be no

[2] Research on the general phenomenon of gun ownership in American society is reviewed in Wright, Rossi, and Daly (1983). Also useful in this connection is Tonso (1982). Surveys dating to 1959 have consistently shown that about one-half of all U.S. households possesses a firearm.

more serious than a disturbance of the peace can be transformed into an aggravated assault if one of the parties attempts to emphasize his or her views by brandishing or using a weapon.

In a very real sense, most felonies either are or have the potential to become violent crimes. All that is needed is the inclination and means to inflict physical harm on a victim. And while it is obviously possible to in-flict a great deal of harm with almost any object, it is both easier and po-tentially more damaging with firearms than with other weapons. Moreover, guns can be used at a distance, thus keeping the perpetrator safely beyond the reach of the victim; they are easily concealed about the person so that potential victims may be unaware of the danger they are about to confront; perhaps of greatest significance, guns are very intimidating weapons that make for compliant victims and easy pickings.

The main dimensions of the social problem of gun crime are often said to be the obvious consequences of these characteristics of firearms. Gun crimes cause more physical damage to victims; guns make crimes easier to commit, thereby increasing the crime rate; guns make it possible to un-dertake larger scale crimes, thereby increasing the overall social cost. Clearly, or so it is argued, if guns could somehow be abolished, both the scale of our crime problem and the physical damages associated with crime would decrease.

*Or would they?*

One of the principal lessons of this volume is that the connection be-tween guns and crime, while seemingly obvious and clear, is actually quite complex and rife with potentially counterbalancing interactions. It is, for example, true that many crimes are committed with guns, but it does not follow that if there were no guns (or fewer guns), there would be no (or less) crime. Guns may only increase the efficiency of the criminal and have no consequence for his rate of criminal activity. A gunless society might still have as much crime; indeed, if criminals compensated for decreased efficiency with an increase in the number of crimes committed, a newly gunless society might find its crime rate going up, *not down.*

Likewise, it is certain that guns are used by criminals to inflict physical harm upon their victims. But again, it does not follow that fewer guns in criminal hands would mean less physical harm. Indeed, according to some researchers, the use of guns in crime actually *lowers* the level of harm since victims are less inclined to resist—and thereby less likely to be injured—when confronted with a gun.

In the same vein, guns enable larger scale crimes, for instance, they make possible the robbing of banks. But it does not follow that the elimination of these larger scale crimes would, *ipso facto,* reduce the overall social cost. Cook (1976) has stressed that criminals carry guns in part because guns allow them to "hit" more lucrative targets; in the absence of such oppor-tunities, they may decide to rob less lucrative (and less resistant) targets in-

stead— the young, the old, and the infirm. And it is not at all clear that a reduction in bank robberies won at the cost of an increased rate of robbery against, for example, the elderly represents a genuine reduction in the social cost of crime.

Another extremely important and often underappreciated dimension of the gun crime problem is that gun ownership and use are so widespread among the American population. There are approximately 120–140 million firearms in private hands in the United States. Sample surveys show that about one-half of all American households possess at least one firearm, and that about one in three or four possess a handgun (see Wright, Rossi, and Daly, 1983). It is also clear that only a very small fraction of these privately owned firearms are ever involved in crime or interpersonal violence, the vast bulk of them being owned and used more or less exclusively for sport and recreational purposes, or for self-protection.

This pattern of widespread firearms possession and use places strong constraints on social policies aimed at the control of criminal weapons abuse. At one extreme, a policy aimed at removing all weapons from private hands is rendered completely unthinkable: Firearms are as American as automobiles and apple pie. At the other extreme, any policy that facilitates easy access to firearms among legitimate gun owners also makes firearms readily available for criminal use as well. Of course, neither of these extremes is currently at issue. Rather, current controversies center around policies advanced as either necessary to control gun crime, despite any inconvenience to the legitimate gun owner, or as directed solely at the criminal or negligent use of guns. The same policies are, in turn, opposed as being either unacceptably restrictive, based on the constitutionally guaranteed "right to keep and bear arms," or as symbolic but largely ineffectual barriers to criminal gun abuse.

Although the formation and adoption of social policies are not guided exclusively by empirical knowledge of the problem in question (nor should they be), policies based on inaccurate or incomplete knowledge are bound to be of limited effectiveness. Hence, the role of scientific knowledge in the formation of social policy is primarily that of showing the characteristics of the problem to which policy must be attentive. For example, a policy that calls for the registration of all handguns in the United States must reckon with the fact that there are 30–50 million handguns already in private hands. Legislation that seeks to prohibit the ownership of handguns by convicted felons must come to grips with the unfortunate fact that there is no easy way to enforce such laws.

Clearly, the findings presented in this volume are relevant to policy concerns. How felons obtain their guns and why they use them in crime bear directly on strategies designed to intervene in the processes that lead to firearms abuse. Not that the "fit" between findings and criminal justice policy is a perfect one: The facts presented here are consistent with a variety of

policy initiatives. But these findings also show, at least to our satisfaction, that some of the more commonly proposed policy strategies could well prove ineffective or even strongly counterproductive, possibilities that policymakers will ignore only at considerable peril.

## SOCIAL SCIENCE IMPLICATIONS

All the social sciences address themselves to an understanding of crime and more general patterns of human behavior that contravene societal values and norms. Economists are inclined to regard crime as a matter of rational choice in which the benefits and costs of crime are weighed, at least implicitly, by all. Psychologists may see crime as a generalized response of persons who are imperfectly socialized to patterns of conformity or as aggression born of frustration. Sociologists have paid primary attention to the links between socioeconomic status and crime, noting that both victims and offenders are drawn disproportionately from the lower strata of the society.

Although firearms do not figure prominently in any criminological theories, any investigation of the role of firearms in crime per force must take into account what the social sciences have had to say about criminal behavior. Correspondingly, what we learn about the role of firearms in crime casts light on the nature of that activity and, hence, contributes to the scientific understanding of crime.

There are several theoretical frameworks in the social sciences that are relevant to the criminal use of firearms. Microeconomic theories of crime are perhaps most directly applicable. (For examples of this general approach, see Anderson, Harris, and Miller, 1983; Becker, 1968; Cook, 1976; Fleisher, 1966.) In barest outline, the microeconomic framework conceptualizes crime as the outcome of decisions constantly being made by persons faced with the choice between committing crime and pursuing legitimate ways to obtain resources. In such decisions, the individual weighs the benefits against the costs and acts accordingly. The role of firearms in such decisions is presumably to alter both the anticipated benefits and the anticipated costs. Thus, using a firearm to commit a robbery enhances the probability of success: A potential victim is not likely to put up much resistance when faced with an armed robber. The use of firearms in crime might also alter the costs, since some jurisdictions explicitly enhance sentences for the use of firearms in crime. From the microeconomic viewpoint, the decision to commit gun crime is clearly instrumental. Although this approach does not state whether the anticipated benefits of gun use exceed the incurred additional costs, it does direct the researcher to include measures of benefits and costs in studying the motivations of armed criminals. Our research, accordingly, measures the benefits and costs of the instrumental use of firearms in crime.

The microeconomic framework is most useful in studying criminal activity that is directed toward economic gain. It is less useful in understanding crimes that do not have obvious economic payoffs. For example, assaults that are unaccompanied by attempts at economic gain are difficult to interpret within the microeconomic framework. Clearly, some benefits are presumably gained from assaulting someone in the course of a dispute, but it is difficult to envisage the measurement of such benefits in metrics that would make them commensurate with the costs of engaging in alternative approaches to settling disputes.[3]

Deterrence theory, a variant of the microeconomic approach, is also relevant (see, for example, Zimring and Hawkins, 1973). Deterrence theory directs attention to the cost side of crime commission and particularly to the punishments meted out by the criminal justice system. According to this theory, crimes generally are deterred (thwarted, prevented) to the extent that the expected punishment for crimes is certain, quick, and harsh. Of course, to some extent deterrence theory is irrelevant to understanding convicted felons of the sort studied here, these being persons who clearly were *not* deterred from committing the crimes for which they were incarcerated. Nonetheless, this theoretical framework also points to investigating the role played by anticipated punishments in the decision to commit crimes and, for gun crimes in particular, the role played by explicit legislative provisions or informal sentencing practices that threaten gun criminals with enhanced sanctions.

Sociologists tend to pay attention to the microsocial contexts of criminal activity, viewing crime as both a *learned* activity acquired in the social milieu surrounding the individual and a *social* activity supported by that milieu. [Notable examples of this approach include Miller, 1958; Suttles, 1968; and, of course, the entire "Chicago School" of criminological thought as produced in the 1920s and 1930s (e.g., Thrasher, 1927).] Here, the role played by families and peers of criminals is critical. As far as the general American population is concerned, social research has shown that the best predictor of gun ownership among adults is having grown up in a family where guns were owned and used (see, Caetano, 1979; Lizotte and Bordua, 1980; Marks and Stokes, 1976). In such environments, males are instructed in the use of guns and perhaps even given guns as gifts at an early age. Using guns *in crime* likewise may be regarded as learned behavior reinforced in friendship groups in which peers are themselves armed and use guns in crime. This viewpoint directs the researcher to inquire into patterns of gun possession and use among family, friends, and acquaintances of gun criminals. As detailed in Chapter Five, we gave considerable attention to such issues in this study.

[3]The so-called crimes of passion are, virtually by definition, those that cannot be described in simple cost-benefit terms, unless expiation or catharsis is included among the presumed benefits.

There are, to be sure, many social science theories of crime that, in our view, contribute little or nothing to the understanding of *gun crime*. We include in this category the so-called *social control theories* (theories stressing the restraining effects of firm and consistent disciplinary regimens within households and schools as the key to crime prevention), *conflict theories* (theories that depict crime as the inevitable consequence of social inequalities or as inherent in the structure of capitalist societies), and *labeling theories* (theories that explain deviant behavior as the outcome of the social affixing of deviant labels). Each of these theories may well contribute to an understanding of crime in a broad sense, but none of them seems directly pertinent to the study of gun crimes or gun criminals.

It should be noted, finally, that theories of crime were mainly useful in alerting us to the kinds of information we should attempt to obtain from the felons we studied. No specific hypotheses were formulated on the basis of these theories, although, as the reader will note, many of our more important observations on gun crime and gun criminals were suggested by these theoretical orientations.

## POLICYMAKING CONSIDERATIONS

Perhaps the most important influence on the design of this research was a desire to make contributions to the formation of policies that might alleviate the problem of gun crime in America. As indicated above, our conception of the proper role of research in policymaking is a rather modest one. We do not believe that policy should be dictated by research, but rather that research should make its contribution by providing data that policymakers can use in deciding among various alternatives. As such, our principal goal in this volume is to describe the gun crime problem in policy-relevant terms.

To be relevant to policy formation, research has to be designed around the existing "policy space," that is, around those policy alternatives that are either actively being considered or at least lie within the range of the politically acceptable. Using this rule, it would make relatively little sense to consider such (currently) unacceptable policies as (at the one extreme) forced confiscation of all firearms in private hands or (at the other extreme) policies that would require all adults to acquire and carry guns.[4]

[4]Although these options may appear at first glance to be way beyond the existing American "policy space," both have in fact made appearances in the recent past. A recent ordinance passed in Morton Grove, Illinois, has outlawed the possession of handguns within the town; an outright ban on handguns is also a principal aim of the National Coalition to Ban Handguns; the new gun legislation enacted in Washington D.C. in 1975 (see Jones, 1981) also amounts, for all practical purposes, to a ban on handgun ownership within the District. At the opposite extreme, the city fathers of Kennesaw, Georgia, in apparent response to the Morton Grove ordinance, have passed a law *requiring* every (noncriminal) head of household to keep a gun, this for the common defense of the community.

Most existing approaches to the control of criminal gun use can be seen as variations on one of two basic strategies: (1) attempts to interdict the acquisition of handguns (and other firearms) by persons with criminal backgrounds or tendencies; and, (2) attempts to deter criminals from using handguns by raising the costs of doing so. Correspondingly, our research focuses heavily on the empirical questions relevant to these two strategies.

Interdicting the acquisition of handguns by criminals requires some knowledge of how criminals typically obtain guns. It would make a considerable difference in the policies to be considered and adopted if criminals were found to obtain most of their handguns from registered firearms dealers and obtained guns in other ways only rarely or with great difficulty. Under such circumstances, policy efforts might profitably be directed at regulating registered firearms dealers and their transactions, as, indeed, we currently attempt to do under provisions of the Gun Control Act of 1968. On the other hand, if criminals were found to be only minimally connected to the legitimate retail market, then interdiction becomes more difficult, our likely success depending critically on the actual means of acquisition employed.

The second mode of attack on the gun crime problem is to provide strong incentives for criminals not to use guns in committing their crimes. In this connection, several empirical questions arise: What motivates criminals to carry and use guns? Are guns used instrumentally to increase the efficiency of crime? Are guns carried for other reasons and used more or less incidentally in crimes? If the former, increasing penalties for gun crimes might deter some criminals from criminal gun abuse. If the latter, then the reduction of gun crime may have to take other directions.

## AN OVERVIEW OF PRIOR LITERATURE AND OUR FINDINGS

The study reported in this volume evolved from our earlier review of the existing scholarly literature on weapons, crime, and violence in the United States (Wright, Rossi, and Daly, 1983). Given the seriousness of the gun crime problem and a long-standing tradition of criminological research, we expected to discover a rich array of information on topics such as how and why criminals acquire, carry, and use firearms. This, however, proved not to be the case. "Remarkably, no nationally representative data [on these topics] are available" (Wright, Rossi, and Daly, 1983: 16).

Most of what has been learned to date about the uses of firearms in crimes has been based either on samples of confiscated weapons or on surveys of crime victims. Neither of these is an entirely adequate source of data for the purpose. The confiscation studies encounter formidable methodological and interpretative problems that render them of dubious utility (see, e.g., Brill, 1977, or Wright, Rossi, and Daly, 1983: Ch. 9, for extensive discussions). And clearly, the victims of crime possess relatively little information

about the more general motives, habits, or tendencies of their assailants. Aside from a well-demonstrated criminal preference for handguns rather than shoulder arms, not much has been learned from either of these sources about the "hows" and "whys" of criminal firearms abuse.

Our literature review did uncover one study that took an entirely different approach to the problem. Burr (1977) attempted to study these issues through direct surveys of incarcerated offenders. Although the survey results were intriguing, they were based on a rather small sample, restricted to a single state (Florida), and covered a very narrow range of topics. The study reported in this volume is largely an effort to extend Burr's approach to a larger sample drawn from a number of states, covering a much wider set of issues.

Burr's findings have been reviewed in some detail elsewhere (Wright, Rossi, and Daly, 1983: 183–187); similarities and differences between his results and ours are noted consistently throughout this volume. Where pertinent, we also compare and contrast our findings with those reported from the confiscation and victimization studies.

Since the completion of our earlier literature review, a number of new studies have appeared that we have drawn on either in the design of the data collection effort or in the interpretation of our results.

We note first in this connection the continuing research effort directed toward evaluating the effects of gun laws on the incidence of violent crime. By far the most heavily studied of these laws is the Massachusetts Bartley–Fox Amendment, which provides a mandatory 1-year prison sentence for unlicensed carrying of firearms (see, for example, Beha, 1977; Deutsch and Alt, 1977; Pierce and Bowers, 1981). The Detroit mandatory sentence enhancement law (Loftin and MacDowell, 1981), the Washington, D.C. gun law (Jones, 1981), and the federal Gun Control Act of 1968 (Magaddino and Medoff, 1984) have also received recent attention. And there is a continuing effort to examine state firearms laws as a possible explanation of state-to-state differences in crime rates (e.g., Geisel, Roll, and Wettick, 1969; Murray, 1975; and most recently DeZee, 1983).

The principal generalization to be made from these evaluation studies is that guns laws have at best modest effects, and at worst no effects, on the incidence of criminal violence. In a phrase, "gun laws do not appear to affect gun crimes" (DeZee, 1983: 374). Far more intriguing (to us, in any case) than the finding itself is DeZee's interpretation of the finding: "[T]he possible reason for such ineffectiveness is not necessarily the nature of the solutions (laws) but rather the misunderstanding of the problem (gun violence) by policy implementers" (1983: 367). What is being claimed here is that we do not yet know enough about why and how criminals acquire and use guns to design effective policies to make them stop it. Clearly, existant legislation is based on inadequate models of criminal firearms acquisition and use; otherwise, it would presumably be more effective than it

demonstrably is. Exploring the inadequacies of these models is a leading goal of this volume.

We have also profited from on-going research on the so-called "career criminal," particularly the recent RAND study of "Criminal Careers" (Chaiken and Chaiken, 1982) which is also based on a large survey of incarcerated felons. These studies have shown (1) that juvenile criminality is a strong predictor of adult criminality (i.e., that crime can be considered as a "career"); (2) that a small fraction of the criminal population commits a large fraction of the total crime; and (3) that criminals, particularly the high-rate criminals (RAND's "violent predators"), rarely specialize in one particular crime type (they are, rather, opportunists who commit many kinds of crime, depending on the opportunities presented to them). All of these findings are replicated in the present study; as such, comparisons between our and RAND's findings are noted throughout the volume.

The archetypical predatory armed crime is, of course, robbery, and in this regard we call attention to the recent series of studies by Cook (1981, 1982, 1983, 1984, 1985), which are nearly encyclopedic in their coverage. Cook's description of the apparently wanton and needless slaughter of defenseless robbery victims first suggested to us the need to consider weapons ownership and use among criminals as something perhaps more fundamental than a simple desire for criminal efficiency or quick intimidation of the victim.[5]

We have conceived this study, loosely, as an analysis of the illicit firearms market, a market like any other in that it consists of transactions between suppliers and consumers. For a more general "market analysis" of handguns, see Balkin and MacDonald (1984). Based on the results of Burr's survey and the confiscation studies, we had prior reason to expect that stolen handguns would figure prominently in the criminal firearms market (as, indeed, they do (Chapter Ten)); Moore (1981) has provided a useful, if rather speculative, account of the nature of the problem of gun theft. Moore also hypothesizes that the licit and illicit firearms markets will be largely indistinguishable in fundamental ways, a point confirmed in several of the following analyses.

A long- and hotly debated issue in the area of firearms and crime concerns the protective efficacy of private gun ownership. Here the issue is whether armed citizens represent any deterrent to the commission of crim-

[5]That much of the violence associated with armed robbery appears wanton and needless is clearly not proof that this violence serves no instrumental purpose; it only raises the possibility that at least some robbers may be motivated by factors other than a desire for simple and quick intimidation of the victim. There has been a concern for several years now that robberies are becoming "more violent," i.e., more likely to involve what appears to be gratuitous harm to the victim. In fact, according to Cook (1984), robbery-connected violence has been declining since about 1981.

inal acts. The assumption that they do not has long been an article of faith in the conventional wisdom about guns and gun control; considerable evidence that they do has recently been published by Kleck and Bordua (1983, 1984). There is evidence, for example, that the odds to a felon of confronting an armed victim are approximately as great as the odds of being apprehended, convicted, and sentenced for the crime; there is also evidence (from FBI data on justifiable homicides) that a felon is at least as likely to be shot to death by a civilian as he is to be slain by the police. These and other findings raise the question of how felons themselves assess the various risks they face in going about their criminal activities and of the felons' own experiences with and feelings about encounters with armed victims, topics considered in some detail later in this volume (see especially Chapter Seven).

Other research by Kleck (1984a) has also raised a question of particular policy interest, namely, the kinds of weapons criminals would substitute for handguns in the face of various partial or total handgun bans. This is of particular interest because much of the gun control legislation currently being urged on legislative bodies stipulates a ban on all handguns or on certain classes of handguns (e.g., small, cheap ones); handgun bans, whether partial or total, are, in short, apparently viable policy options in the current environment.

All would agree, as Kleck (1984) points out, that in the complete absence of handguns, some criminals would shift "downward" to less lethal weapons (for example, knives and clubs) and that some criminals would shift "upward" to more lethal weapons (for example, shoulder arms, appropriately modified, if need be, to make them concealable). Kleck further points out that the net effect on the death rate from crime that would result from a total handgun ban would therefore strictly depend on two variables: the "relative deadliness" of the substitute weapon and the "substitution fraction"—the fraction of criminals currently using handguns that would substitute some other weapon instead (Kleck, 1984). The relative deadliness of rifles and shotguns versus handguns is on the order of three or four to one (shoulder arms, that is, are some three or four times more lethal than handguns, on the average). What remains largely unknown is the substitution fraction. In order to explore likely values of this fraction under different hypothetical conditions, we asked a number of questions in the survey on how felons thought they might respond to various partial or total handgun bans; results from these questions are discussed in Chapter Eleven.

Although the studies cited above have contributed important information to the study of firearms violence, major gaps in our knowledge clearly remain. In order to fill those gaps dealing specifically with the acquisition and use of guns by criminals, we designed and conducted a survey of prisoners who had been incarcerated for felony offenses and were serving time in a sample of state prisons all around the country. We questioned them about their acquisition and use of guns in the period of time before their

imprisonment. Self-administered questionnaires were filled out by 1874 felons in state prisons in Michigan, Missouri, Oklahoma, Minnesota, Nevada, Arizona, Florida, Georgia, Maryland, and Massachusetts. The procedures by which these states were chosen are discussed in Chapter Two.

Eligibility criteria for participation in the survey were fairly minimal: We interviewed only men who were in prison on a felony conviction and who had been sentenced to their current term on or after 1 January 1979. We did not attempt to restrict the sample only to men who had committed crimes with guns, on the grounds that it was important to have a group of unarmed criminals to serve as a comparison group. About two-fifths of the final sample claimed never to have committed any crime armed with any weapons; the remainder had.

## CHARACTERISTICS OF THE PRISONER SAMPLE

The sample obtained for this study closely resembles the state prisoner population in the United States as a whole (Chapter Two), being predominantly young, poorly educated, and disproportionately nonwhite. The men in this sample also tend to have grown up around guns and to have owned and used guns for most of their lives. About three-quarters report that their fathers owned guns; about one-half report that they were taught how to shoot guns by their fathers. The average man in the sample first fired a gun at age 13.

## A TYPOLOGY OF CRIMINAL GUN USE

The felons in the sample evidenced wide variability in their prior criminal weapons behavior (Chapter Three). About 40% of the sample claimed never to have committed any crime armed with any kind of weapons; these men constitute the Unarmed Criminals who are used for comparison purposes throughout the analysis. Another one-tenth had committed armed crime, some of them rather frequently, but never with a gun; based on the customary weapon of choice, this one-tenth is further divided into Knife Criminals (7% of the sample) and Improvisors (4%).

The remaining half of the sample had committed at least one gun crime; these are the Gun Criminals who are further divided into four groups, depending on the weapon most frequently (handgun versus shoulder weapon) and the frequency of use. The One-Timers are men who had committed one but only one gun crime; they represent about 28% of the Gun Criminals and 14% of the total sample. Sporadics are men who had committed "a few" gun crimes; there are just about as many of them as there are One-Timers. The remainder, 44% of the Gun Criminals and 22% of the total sample, had committed more (and often much more) than a few gun crimes; these men are the truly predatory felons and are classified as

Handgun Predators (17% of the total sample) or Shotgun Predators (5% of the total sample), depending on the type of firearm they said they used most frequently in committing their crimes. The foregoing seven-category typology is used for descriptive purposes throughout the analysis.

As one would expect, there were sharp differences across these seven groups in their patterns of criminality. The modal conviction offense for the Unarmed Criminals was burglary; for the Improvisors, homicide (by a small margin); for the Knife Criminals, burglary; and among all categories of Gun Criminals, robbery. With the exception of rape, the Predators were in fact the most likely to have committed each and every crime we asked about and to have committed them at a higher than average rate. Calculations reported in Chapter Three suggest that the Predators, representing only about 20% of the sample, account for nearly one-half of the total criminal violence perpetrated by the men in this sample.

## FIREARMS OWNERSHIP AND USE

Three-quarters of the men in the sample reported having owned at least one gun in their lives; more than three-quarters of the gun owners had owned handguns (Chapter Four). Since only one-half of the sample had ever committed a gun crime, it is clear that not every gun-owning felon commits crimes with his guns. Still, the tendency ever to have committed a gun crime was higher among felons who had owned guns than among those who had not; and among the gun-owning felons, the tendency to have committed a gun crime increased with the number of guns ever owned.

Felons who had ever owned guns appear to have owned them in fairly large numbers, although the absence of appropriate comparative data makes this an uncertain conclusion. They are also much more likely than gun owners in general to have owned handguns. They tended in the majority to keep their guns loaded at all times and to fire them, in our opinion, at a rather high rate.

Most of the men who were armed during their conviction crime reported having used their weapon in some way in the course of the crime, most frequently to intimidate the victim. Nearly two-fifths of those armed with a gun during the conviction crime reported that the gun was fired during the incident. Most of these firings were said to be unplanned.

Most (57%) of the Gun Criminals in the sample also said they had fired a gun at least once in the course of a crime at some point in their criminal careers.

Evidence on carrying behavior shows that about 30% of the Gun Criminals made it a practice to carry a gun more or less all the time. Another 50% carried in "certain situations," namely, whenever they felt that they might need to protect themselves. One in five carried only when they intended to commit a crime. Thus, most of the weapons that are used to

commit crimes are not carried exclusively for that purpose. The best predictor of the tendency to carry more or less all the time is associating with others who carried guns.

## GROWING UP WITH GUNS

Prisoners in our sample became acquainted with firearms early in their lives (Chapter Five). As among gun owners in general, early socialization appears to be a relevant factor, at least insofar as the clearly legitimate aspects of weapons behavior are concerned (e.g., ever owning a gun, numbers of guns owned). Men raised by gun owning fathers, in other words, were distinctively more likely to have owned guns themselves than men whose fathers did not own guns.

In contrast, the clearly illegitimate aspects of weapons ownership (e.g., whether armed with a gun during the conviction offense, the tendency to carry on a regular basis) were only weakly predicted by parental socialization and were much more strongly predicted by peer influences and, in particular, by the number of friends who themselves owned and carried guns.

## WHY DO CRIMINALS CARRY GUNS?

Why do felons bother to carry guns in the first place? What, in short, is "the motivation to go armed" (Chapter Six)? Our data suggest that the possibility of using one's gun to commit a crime is not the only motive for carrying one. Most Gun Criminals appear to have acquired and carried guns also for their own self-protection in what is clearly a hostile and violent environment.

To illustrate, a principal reason for acquiring one's most recent handgun was self-protection in 58% of the cases; "to use in my crimes," in only 28% of the cases. In general, self-protection motives were even more important to the Predators than to other Gun Criminals. In short, as with the carrying patterns discussed earlier, most of the guns that are actually used in crimes are not exclusively acquired for criminal purposes but for self-defense as well. (Of course, the line between self-defense and instrumental use in crime is blurred when a criminal claims that his purpose in carrying a gun is to "protect" himself from his victims and the police, which was frequently the case.)

All the Gun Criminals were given a list of reasons why they might carry a gun and were asked how important each reason was to them. As it happens, every reason listed was stated to be more important by the Predators than by the other groups, which suggests that they are considerably more serious about their gun carrying than other felons are. Among the Predators, the single most important reason to carry a gun was that "when you have a gun, you are prepared for anything that might happen."

Evidence from several lines of analysis converges, therefore, on the conclusion that predatory felons acquire and carry guns as much to protect themselves against the uncertainties of an unfriendly environment as to prey upon the larger population. The potential criminal applications of firearms share importance with these other, more defensive purposes.

## ARMED VICTIMS

Among the reasons given for why one might carry a gun during crime was that "there's always a chance my victim would be armed." This was cited as a very important reason by 50% of the Gun Criminals. Chapter Seven explores evidence from the survey on felons' attitudes about and experiences with armed-victim encounters. The attitudinal results show clearly that these felons were made nervous by the prospect of such encounters. Four-fifths agreed that "a smart criminal always tries to find out if his victim is armed," and three-fifths agreed that "most criminals are more worried about meeting an armed victim than they are about running into the police."

The experiential data also show that armed victim encounters were fairly frequent among these men. About two-fifths of the sample reported at least one armed-victim encounter at some time in their careers; just over one-third said that they had personally been "scared off, shot at, wounded, or captured by an armed victim." About two-fifths reported having decided at least once in their lives not to commit a crime because they had reason to suspect that the intended victim was armed. This result makes it clear that at least some crimes are prevented by gun-wielding victims.

One must, of course, be cautious in interpreting the above results. Many of these men's "victims" are in all likelihood other men much like themselves. The armed-victim encounters reported by this sample may well be confrontations between two men with equally felonious histories and motives as between hard-core perpetrators and total innocents.

## WHAT FELONS LOOK FOR IN FIREARMS

What do felons look for in a handgun? What characteristics are important to them? What kinds of handguns do they actually own and carry? The often-assumed criminal preference for small, cheap handguns is not confirmed in our data (Chapter Eight). When asked what kinds of traits would be important to them in a handgun, accuracy, untraceability, and quality of construction were much more frequent responses than price, low caliber, and so on. In general, the characteristics of the so-called "Saturday Night Special" did not emerge as being particularly important to these men; the preference, in contrast, seems to have been for well-made, large-caliber handguns.

Analysis of the preference questions according to criminal type revealed a rather interesting and straightforward pattern: The preference for small, cheap handguns was concentrated among felons who did not use guns in committing crimes; the preference for large, well-made handguns was likewise strongest in the more predatory categories of the typology. Preference for the bigger and better made handguns was also stronger among gun owners than among nonowners. The principal generalization to surface in this analysis is that serious criminals prefer serious equipment.

Evidence on the most recent handguns actually owned by the sample tends to confirm the results from the preference questions. On the average, these "most recent" handguns were relatively expensive (two-thirds worth $100 or more), large barreled (70% with barrel lengths of 4 inches or more), and large caliber (70% larger than .32 caliber). Not more than about 15% of them would qualify as Saturday Night Specials, even with a somewhat inclusive definition of the term, and likewise, not more than one-third would qualify as "snubbies" (barrel length of 3 inches or less). In general, criminals both prefer to carry, and actually carry, bigger and better handguns than has been suggested in most previous studies.

## THE MARKET FOR CRIMINALS' GUNS

Where and how do criminals obtain their guns (Chapter Nine)? As others have suggested, informal, off-the-record sources predominate in the illicit-handgun market. The principal mode of acquisition for the most recent handguns owned by our sample was outright cash purchase, typically from friends or family members; following cash purchase was theft. About 43% of the sample's most recent handguns were bought for cash; just under one-third were stolen directly by the felons themselves. Gifts (8%), borrowing (8%), and swaps and trades (7%) were also of some importance.

All told, 40% of the sample's most recent handguns were obtained from friends. "Off the street" was a distant second, mentioned by 14%, followed by gun shops (11%), pawnshops (6%), fences (5%), family members (4%), and drug dealers (4%). Combining categories in obvious ways, friends and family were the most important source of supply (44%), followed by various gray and black market sources (26%), followed, finally, by customary retail outlets (21%), with the remaining one-tenth acquired from a variety of odd-lot sources.

The cross-tabulation of the "where" and "how" questions revealed that friends and family were the most common source of supply whatever the means of acquisition, including theft. Indeed, 31% of the directly stolen handguns were reported to have been stolen from friends or family members. Another 30% of them were stolen from various gray- and black-market sources; about one-tenth were stolen directly from retail outlets; the re-

mainder (29%) were stolen from the homes, apartments, and automobiles of strangers.

The Gun Control Act of 1968 attempts to interdict the criminal acquisition of guns at the point of retail exchange through the provision that forbids the sale of guns to persons with a felony conviction. It is, therefore, of some interest to inquire about the fraction of our sample's most recent handguns that were obtained via outright cash purchase from a customary retail outlet. As it happens, that fraction is 16%. About one criminal handgun in six is obtained through methods and sources likely to be concerned about the legality of the transaction; about five in six are not. The illicit firearms market is heavily dominated by informal, off-the-record transactions.

Perhaps the most surprising of our results concerning the methods and sources of handgun acquisition is the fraction (32%) that were obtained through direct theft by the criminal himself (Chapter Ten). In addition, one must consider that many of the other handgun transactions these men undertook (i.e., a swap with a friend, a cash purchase from one's drug dealer) would have also involved stolen guns. To tap what we refer to as the secondary market in stolen guns, we asked all the handgun owners who said they had obtained their most recent handgun in some way other than by a direct theft whether, to the best of their knowledge, the gun was stolen or not. If we add the handguns reported as "definitely stolen" to those that had been directly stolen by the felons themselves, the fraction of stolen guns among this sample's most recent handguns increases to 46%; and if we include the guns reported as "probably stolen," it increases to 70%. Thus, stolen firearms are a much more important source of supply to the illicit gun market than has been suggested in previous studies.

Stealing firearms was by no means uncommon among the prisoners in the sample. Just under one-half had stolen at least one gun at some time; men who had stolen any guns tended to have done so in fairly large numbers. Gun theft was quite common in all categories of the typology, even among criminals who themselves did not use guns in committing their crimes, but theft was more frequent among the Predators than other groups. A few gun thieves reported having looked specifically for guns to steal; most, however, stole guns whenever they came across them. Typically, the point in stealing a gun was apparently the same as stealing television sets or other items—namely, to fence or swap for cash, drugs, or other goods. Gun theft, in other words, is predominantly an opportunity crime much like any other theft. Still, most of the men who had ever stolen a gun also reported having kept at least one stolen gun for their own use at some time. When asked the reason for this, the most common answer was that "it was a nice piece."

Stolen firearms appear to circulate widely and freely through all the mechanisms of exchange exploited by these men. About one-half the cash

purchases involved stolen guns, as did the majority of transactions involving fences, drug dealers, etc. Given the importance of untraceability (Chapter Eight), it is obvious that stolen firearms, especially stolen handguns, are highly desirable commodities among the criminal population and represent a major source of the criminal handgun supply.

## "GUN CONTROL" AND CRIMINAL GUN USE

Chapter Eleven raises the question of how felons might respond to various handgun control measures. Every man in this sample has at least one felony conviction and is therefore legally prohibited from acquiring a handgun upon release; interestingly, about three-quarters of the sample were aware of this provision in the Gun Control Act of 1968. This aside, three-quarters also reported that it would be little or no trouble for them to obtain a handgun once they were released from prison, that they could arm themselves in a matter of a few hours or, at most, a few days, and that the out-of-pocket cost to do so would be approximately $100. Since the sample averages three prior imprisonments, one may assume that many of these men will have been in the same situation in question at some prior time; we suspect, therefore, that these data reflect prior experience as much as judgments about future possibilities.

We also asked the sample hypothetical questions concerning their likely response to various kinds of handgun control measures that might be enacted in the future (e.g., a "pricing strategy" that greatly increased the cost of the cheapest handguns available, a ban on small, cheap handguns, and a complete ban on all handguns). Without belaboring the details, the majority of the Gun Criminals in the sample said they would circumvent the first option by borrowing or stealing an appropriate gun, the second by obtaining bigger and more expensive handguns, and the third by carrying sawed-off shotguns and rifles. If these responses can be taken at face value (admittedly a big "if"), then all the options considered in the question sequence would appear to produce a net shift toward more lethal rather than less lethal equipment.

## POLICY IMPLICATIONS

The concluding chapter considers the policy implications of the study results. As is often the case in research of this sort, the data are very useful in describing the problem in great detail and rather less useful in suggesting appropriate solutions. What to do about the problem of gun crime is a topic that has been considered by intelligent people for decades, and no one has yet conjured up a completely effective and workable solution, at least not one that was also politically acceptable. It may well be that no effective and workable solution exists, or that all potentially workable solutions are

politically unacceptable for one or another reason. The "policy implications" considered in the final chapter are thus descriptions of the constraints within which any firearms control policy will have to operate more than they are specific legislative recommendations.

Still, five potentially important policy implications are suggested by our results.

First, because criminals acquire and use guns as much for self-protection in a social world where many of their associates go armed as they do for instrumental uses in committing crimes, viable social policies have to address the issue of reducing the violence and routine carrying of guns that appear to be endemic to many impoverished urban neighborhoods. The reduction of crime in such neighborhoods has to be as much in the center of law enforcement concern as protecting middle-class citizens from the incursions of violent criminals. That criminals prey upon each other and upon others of similar background and circumstance as much as (or more than) they prey on the suburban middle class should not be a matter of indifference to criminal-justice policy.

Second, a major source of supply to the illicit firearms market is via theft from persons who own and use firearms legally. Cutting down on the theft of firearms ought to be, therefore, a second goal of social policy. Whether this means better security measures for gun-owning households, more mandatory reporting of stolen guns by their owners, or special insurance provisions cannot be decided by our sample. In all probability, given the frequency of gun theft as reported by our sample, all of these ultimately may prove necessary.

Third, gun control measures that attempt to interdict the retail sale of weapons to criminals through legitimate channels miss perhaps as many as five-sixths of the criminal firearms transactions. Customary retail outlets appear to have almost no role in an illicit market dominated by informal purchase, swaps, and trades. In addition to interdiction at the point of retail sale, methods must be found that successfully interdict the much larger and more important informal market as well.

Fourth, sentence-enhancement policies that would punish more heavily crimes in which guns are used appear to be largely irrelevant to the more predatory gun users, for whom guns are useful in a variety of ways, not the least being their own survival. These men are apparently insensitive to punishment deterrence in any event and often own and carry guns because they fear the prospects of life without them. Mandatory penalties for criminal gun use may well be advisable for other reasons, but they are not likely to have much effect on the firearms practices of truly predatory felons.

Finally, some of the more frequently discussed "gun control" measures, such as a ban on small, cheap handguns, may well prove to have counterproductive consequences. Most observers would agree that many of these

20        Criminal Acquisition and Use of Firearms

measures would probably result in at least some felons switching to more, rather than less, lethal firearms, but the precise fraction who actually would do so has been a matter of considerable dispute. So that the findings from our study are not mistaken, let us stress that this fraction is still not known. The fraction of the felons in our sample who *said* that this was what they would do, however, was well more than one-half.

# 2

# THE FELON SURVEY: METHODS, PROCEDURES, DESCRIPTIVE DATA

## RESEARCH GOALS

Any attempt to control the acquisition of guns by criminals, much less control their use, has to be based on accurate knowledge of the extent of gun usage among that population and of how guns are typically acquired by criminals. Our review of the existing literature (Wright, Rossi, and Daly, 1983) has shown that relatively little was known about why and how criminals acquire, carry, and use guns (and other weapons). Knowledge of the topic had been derived mostly from samples of weapons confiscated by the police, an approach with acknowledged limitations (Brill, 1977).

Ideally, a study of how criminals obtain and use their weapons should be based on a sample of persons currently active in crime. For quite obvious reasons, this direct approach is impractical since it is impossible to identify with certainty who might currently be a criminal. Rather, it is necessary to approach the problem somewhat indirectly, for example, by studies of persons known to have criminal pasts.

Our literature review uncovered a promising study by Burr (1977), who had obtained some very intriguing data on felons and their firearms by interviewing a sample of prisoners. Burr found that they were quite willing to talk about their previous criminal careers and about their acquisition and use of guns. However, since Burr's sample was based on Florida felons only, his findings were of limited generality.

The study reported in this volume extends Burr's method to a nationwide sample of state-prison inmates. Although convicted felons are to some unknown degree a selected group of criminals, a strong case can be made on several grounds that a study based on a large sample of prisoners might produce much interesting and policy-relevant information on the criminal use and abuse of guns.

First, state prisoners are accessible for study at relatively low cost. Second, although first offenders often are not imprisoned, and as a consequence would be seriously underrepresented in any sample of prisoners, repeat offenders (those most likely to be imprisoned) apparently constitute

serious offenses. Moreover, prisoners may have been less skillful (or careful) in committing their crimes and hence more likely to have been imprisoned. In addition, prisoners' responses are of unknown and suspect validity. Finally, prisoners may be less responsive to the risks encountered in a criminal career since, obviously, they were not deterred by the risks of imprisonment. Hence, prisoners probably overrepresent the "hard-core" persistent criminals. All the findings reported in this volume should be interpreted in light of the above facts.

## SURVEY DESIGN AND METHOD

The data presented in this volume consist of answers to self-administered questionnaires filled out by a sample of 1982 inmates who were serving time in state prisons. The prisons were selected from 10 states, a "sample" that was designed to provide a range across the major regions of the United States.

Fully aware of both the inherent limitations described above and the absence of a better approach that was also practical, work began on the project in December 1981. The first 6 months were spent in negotiations for access to a set of prisons and in developing a pretest draft of the survey protocol. A draft questionnaire was pretested in June 1982 in a county jail in Massachusetts. Data collection started in August 1982 and continued through January 1983.

## SELECTION OF RESEARCH SITES

Since prisoners are located in clusters (i.e. prisons), an efficient and relatively inexpensive sampling strategy, cluster sampling, can be employed to obtain a sample of prisoners. "Site selection" was therefore a two-stage process: first, choosing states, and second, choosing specific prisons within states.

The number of sites to be included in the study was constrained by the project budget; assuming some 200 cases per site, available resources allowed for a total of 8 to 12 sites. In the end, data were collected in 11 prisons in 10 states: Two prisons in Minnesota were included and one prison each in Michigan, Missouri, Oklahoma, Nevada, Arizona, Florida, Georgia, Maryland, and Massachusetts.

Initially, we proposed to select states on the basis of two state characteristics that we anticipated might be relevant to the weapons behavior of the felon population: (1) the density of private gun ownership in the state and (2) the stringency of state firearms regulations. The rather strong and well-known correlation of both these factors with region, however, suggested that our purposes would be adequately served if the ultimate sample of states had a reasonable geographical spread, as, indeed, it does.

the source of much criminal behavior and often of its more serious forms (Chaiken and Chaiken, 1982). Hence, the crimes committed by men most likely to be found in prison constitute a considerable portion of the overall crime problem. Third, men who are already in prison for their crimes would not be at any further peril in cooperating with the researchers and could therefore be expected to provide reasonably truthful information. Fourth, prisons are an obvious place to find criminal gun abusers in large numbers. Finally, although juveniles by definition are excluded from such a study, many felons have long careers of crime extending back into their adolescence and perhaps even earlier. Hence, juvenile crime can be included in part by considering the crime careers of current prisoners. Such, in any case, were the principal rationales for the use of inmates of state prisons as sources of information for this study.

There are also some fairly serious limitations that derive from this decision. No sample of prisoners, for example, will contain any criminals who consistently, by luck or talent, evade apprehension and imprisonment. Of course, no one knows how large this group is, nor how much of the total crime problem is generated by their criminal activities. The prevailing opinion among criminologists is that most reasonably active criminals spend time in prison sooner or later.

A second and probably more serious limitation is the substantial underrepresentation of juveniles, who are heavy contributors to crime rates. Since many juvenile criminals may never persist in their criminality into adulthood, the juvenile careers of those who do may be unrepresentative. A consequence is that this study has relatively little to say about the firearms behavior of men who have yet to reach the age of majority, except in the form of recall information from those whose criminality persisted into their adult years.

Third, there is the serious issue of the validity of prisoners' answers to questions concerning their criminal activities. Although there may not be much motivation for prisoners to distort their accounts of their criminal careers, neither is there much motivation for truthfulness. Previous research on this issue, however, has reported that comparisons between information given by the prisoners and information in their official records show little evidence of systematic distortion (e.g., Marquis, 1981).

Finally, first offenders are often not sent to prison, even if convicted, and are clearly underrepresented in any prison sample. It is conceivable, perhaps even likely, that their patterns of firearms use are quite different from those who have longer records.

In sum, any sample of incarcerated felons probably differs from the total population of criminals in the following ways: State prisoners are probably older and have longer and more sustained involvements in criminality and in the criminal justice system. They are also more likely to have been more violent in their crime than criminals in general and to have committed more

Other than regional spread, the primary constraint on the selection of states was the willingness of a state's prison system to cooperate in the research. We were counselled by members of the Advisory Committee that some states would flatly refuse to cooperate, that others would be at best highly suspicious, and that other states had a prior record of enthusiastic cooperation in research of this general sort. We chose states to approach accordingly. In the end, every state that we approached agreed to participate, but we only approached states where we had reason to believe that this would be the outcome.

Our initial hope was to obtain access to the main maximum security facility in each of the selected states, on the grounds that hard-core gun-using felons would be housed primarily in such institutions. In fact, in almost every case, the decision as to which prison we were allowed to study was made by state corrections officials. In most states, we were not granted access to the main maximum-security prison, often because the safety of the field team could not be assured. Ultimately, four maximum-security prisons, three medium- to maximum-security prisons, and three medium-security prisons were included. Except for Minnesota, we interviewed in only one prison per state; in Minnesota, we interviewed in two facilities and have combined these data in all subsequent analyses. In general, men housed in less than maximum-security facilities have shorter records and fewer previous arrests; for the most part, these men are further from "hard-core" status than the men housed in stricter facilities.

It is also worth noting that, despite the security classifications, prison systems in many states now make it a practice to move their men around rather frequently, such that at any one time, the population in any facility is a reasonably good "mix" of the total. These points notwithstanding, there are some strong differences across sites in the proportions of "hard-core" felons in the samples, the proportions being generally higher in maximum-security facilities than elsewhere.[1]

[1] Having interviewed in only one prison per state, prison differences and state differences are perfectly confounded in these data, which further implies that these data are not well suited for the examination of the effects of state-level variables (e.g., stringency of gun laws) on criminal firearms behavior. Observed differences across states, in other words, might result from the effects of state-level variables, but they might result only from the unique characteristics of prisoners who happen to have been housed in the facility where we interviewed.

Had we interviewed in "equivalent" prisons in each state, this problem would not exist (at least not to the same degree), but in fact there are very large differences across the 10 states in the kinds of prisons where we interviewed (see below, "Site Descriptions and Characteristics"). As a consequence, we do not know whether the differences between, say, Arizona felons and Missouri felons reflect a difference between Arizona and Missouri or whether they only reflect that our Arizona respondents were housed in a maximum-security facility whereas the Missouri respondents were not.

The general procedures followed for gaining access to the prisons were very similar in all 10 states. Negotiations commenced with the state Commissioner of Corrections and were often referred thereafter to a Deputy Commissioner. Some states had elaborate "application" procedures (e.g., requiring that a proposal be submitted, that assurances of anonymity be made); others were run on a much more informal basis. In all cases, the outcome of our negotiations at the Commissioner's level was permission to negotiate directly with the warden or superintendent of whatever prison the Commissioner (or his Deputy) had decided we could enter.

In the prisons themselves, we were often referred by the warden to an assistant or deputy to hammer out the actual details of our visit. All officials at the prison were given a brief description of the study and its purposes. We agreed, of course, to abide by any restrictions the prison officials saw fit to impose. Much initial anxiety disappeared when we made it clear that we were studying prisoners, not prisons, and that we were more than willing to "bend" our preferred procedures to accommodate local site preferences and needs.

Every prison imposed at least some restrictions on which men we could interview. In most cases, this meant we could not question men in protective custody, in disciplinary confinement, in psychiatric wards, or on death row. We made no effort in any prison to dissuade local officials from these constraints. Each prison also had set procedures by which the inducements to respondents would be dispensed, and these too were accepted without complaint in every case.

In the preliminary negotiations with local prison officials, we made it clear that the project was autonomous and required little extra work on the prison's part. We required (1) official permission to enter the prison and conduct interviews, and (2) a room (or rooms) to set up the survey operation. In exchange, we agreed to pay the overtime salaries of two guards for each day we were at the site, who assisted us in transporting prisoners and who provided security for the field staff. This, in essence, was a small "chit" that the warden or superintendent could use to reward his favorite security personnel with a little overtime work. As a further inducement, we also volunteered a $200 donation to the prison library fund. All the wardens with whom we negotiated seemed pleased with this "package."

Given the above discussion, it is clear that the 10 states included in this analysis do not constitute a probability sample of states, and that the 11 prisons where we interviewed do not constitute a probability sample of the correctional institutions. However, it must be stated that the nature of the sample does not necessarily invalidate our findings. A probability sample of prisoners and of prisons would certainly give greater plausibility to our findings, but there are ample indications in the findings themselves that the prisoners studied are not atypical of the population of convicted felons in the United States as a whole.

## CHOOSING RESPONDENTS WITHIN PRISONS

Once having gained access to a particular prison, we next faced the task of sampling felons within prisons and inducing them to participate in the study. Since felons are overwhelmingly male, and few prisons are "co-ed," we decided to interview male prisoners only. Misdemeanants were also excluded; only men with a felony conviction were eligible. Finally, on the reasoning that a man in the twenty-fifth year of a life sentence would have little to tell us about the illicit firearms market of today, we restricted the study to felons who had been out "on the street" recently enough to possess useful, current information; operationally, this meant a restriction to men who began their current prison term on or after 1 January 1979.

We did not impose any restrictions based on conviction offenses; we did not seek a sample composed exclusively of gun criminals. Indeed, recent research on criminal careers showed how difficult it would be to construct an adequate measure of being a "gun criminal" since so many criminals commit a wide variety of crimes, only a portion of which would be reflected in their official record (Chaiken and Chaiken, 1982). Also, given the project aims, we felt it was as important to understand why some criminals did not use guns as to understand why others did, and so we were concerned with obtaining adequate numbers of both groups for the final sample. On this point, at least, we were quite successful: about one-half the final sample had done at least one gun crime, about two-fifths had never committed any armed crime, and the remaining one-tenth had committed armed crimes but never with a gun (see Chapter Three). This distribution, incidentally, is quite consistent with what we had originally expected, based on results obtained in the RAND "Criminal Careers" survey.

Given the above restrictions, the selection of actual respondents was straightforward. We attempted, in preliminary negotiations with prison officials, to get a crude estimate of the likely number of men in the site who would meet our eligibility criteria. If this number were fewer than about 400 eligibles, we interviewed every man in the prison who agreed to participate. If the likely number of eligibles were greater than about 400, we obtained a current prisoner census and drew a simple random sample. In the end, it proved necessary to use a random sample in only three sites; in the remaining seven sites, every willing participant was included.

In most sites where every eligible felon could participate, notification of the study was made through public sources (e.g., announcements on bulletin boards and in prison newsletters). In sites where only a sample was eligible, each man in the sample was sent a personalized advance letter inviting his participation. In both cases, the notification contained a brief description of the project, assurances of confidentiality and anonymity, and an offer of a carton of cigarettes (or the cash equivalent) as an incentive for participating. In most sites, this was a more than ample inducement.

## FIELD OPERATIONS

Personal interviews were originally proposed for this data collection but were rejected in favor of self-administered questionnaires for a variety of reasons. Self-administration would provide for greater anonymity and would be substantially less intrusive at the site than face-to-face interviewing would have been. Self-administered questionnaires were also considerably less expensive; personal interviews with samples of the contemplated size would have required being at each site for periods of 10 days to 2 weeks each; with group administration of the sort finally employed, we were not in any site for more than 4 days. Further, our pretest results showed clearly that prisoners could readily "handle" even a fairly complicated self-administered questionnaire.

Field visits at each site varied from 2 to 4 days. The sampled prisoners were given questionnaires to fill out in groups that ranged from 10 to more than 100 men but that averaged about 30 each. A Spanish-language version of the questionnaire was available for Spanish-dominant respondents; functional illiterates were given the protocol as an oral interview. Every man signed a "written consent form" prior to starting the actual questionnaire.[2]

Survey sessions averaged about 2 hours each. One or more members of the field staff were present in the survey room at all times to answer questions or clarify instructions. Virtually all the survey sessions went smoothly. As reported by others who have surveyed prisoners, most respondents appeared to look on the protocol as a "test" and made an obvious effort to complete it accurately and well. For many of our respondents, the questionnaire was the longest single piece of text (75 pages) they had ever read. Frequently, men showed up at the survey room carrying their own pencils, "just in case." Questions about words, meanings, and instructions were fairly common. With the occasional surly exception, most respondents appeared eager and cooperative—even grateful in many cases for the carton of cigarettes and the break from prison routine.

The field staff consisted of three men: one white, one black, and one Hispanic. All three had considerable prior experience dealing with prisoners or those in conflict with the law.

Local security for the staff was supplied by prison guards being paid from project funds. Guards were seldom in the survey room itself, but were present just outside the door. No genuine security problems were encountered in any site, although as a condition of access at one site, the field staff signed an agreement that in the event they were taken hostage, prison officials were not obligated to negotiate for their release.

[2]The contents of the survey questionnaire are contained within the codebook for the data that is available through the ICPSR; see Chapter 1, note 1.

## RESPONSE RATES

Given the sampling and selection procedures followed, precise response rates for the survey are difficult to calculate. There is, first, considerable ambiguity about the actual number of persons eligible to participate. In most sites, in fact, we obtained no more than rough estimates of the total number of eligibles present. More precise estimates were impossible to obtain because of the frequency with which prisoners are moved around among prisons. Often, men who were otherwise eligible were disallowed as respondents by the prison officials for one or another reason (e.g., protective or disciplinary custody).

Still, despite the ambiguities, it is clear that the response rate was remarkably good in some sites and very poor in others. In one site where a precise response rate could be calculated, we achieved the cooperation of 96%; in another, only 22%. In general, however, the response rates were respectable: Across the eight sites where a reasonable estimate of the response rate could be made, we interviewed two-thirds or more of the eligible respondents in five; in three sites, the response rate exceeded 80%.

Response rates across sites were, as one might expect, highly sensitive to the incentives offered for participation. In one state where we were not allowed to offer inmates any inducement for participation, our response rate was 24%. In another, inducements were allowed, but virtually all the men in this site worked in a prison factory, made a respectable wage, and were allowed to carry cash with them inside the prison, so a carton of cigarettes was substantially less meaningful there than elsewhere. In this site, the response rate was 40%. In sites where we were allowed to implement our preferred inducement scheme and where there were no peculiar local problems, the response rates were usually quite good, ranging upward from about 70%.

## QUESTIONNAIRE DEVELOPMENT AND DISPOSITION

The study questionnaire was drafted and redrafted through roughly six iterations and was then pretested on about 20 men serving time in a county jail in western Massachusetts. The then-current draft and the pretest results were discussed in detail at a subsequent meeting of the project advisory committee. Based on these discussions and the pretest experience, a final draft was prepared.

The final survey protocol ran to 75 pages and contained a large number of dependent questions (i.e., questions to be answered by only some respondents, depending on answers to previous questions). Our concerns that felons might have trouble coping with the resulting skip patterns were allayed considerably by the pretest results. In fact, failure to follow the skip logic correctly was quite rare in the full sample as well. Our explanation

for the (to us) surprising success rate in following the skip patterns is that men in prison are accustomed to following precise instructions and doing exactly what they are told.

As indicated previously, a total of 1982 questionnaires were ultimately administered, of which 108 were discarded for one or another reason. Most of the discards were duplicate questionnaires turned in by men who had managed to attend two (or more) of the survey sessions; larcenous tendencies run deep. Other cases were discarded if only a small portion of the total questionnaire had been completed or if the questionnaire contained obviously frivolous (and usually rather hostile) responses.

The remaining 1874 usable questionnaires constitute the data for this project. Of these, 54 (3%) were administered as oral interviews. Another sizable fraction (129 cases, 7% of the usable total) are partial "break-offs" (i.e., the respondent simply quits partway through the questionnaire, providing some but not all the desired information). Finally, there are 292 additional questionnaires (16% of the usable total) that, in the coders' judgments, contain "a lot" of missing data. These, of course, are not break-offs but rather are questionnaires with substantial amounts of intermittently missing information (e.g., entire interior sections left blank). One result is that rates of missing data for any particular question in the survey run upward of about 10%.

## SITE DESCRIPTIONS AND CHARACTERISTICS

### Michigan

The Michigan site was a high-medium-security facility housing predominantly youthful offenders (ages 16–24). The prison census showed 943 eligible felons; a sample of 404 was drawn. Of these, 74 had become ineligible by the time we arrived: Some men in the initial sample had since been transferred elsewhere, others had been paroled or had completed their sentence, still others had been locked up in disciplinary segregation, leaving a net eligible sample of 330, of whom 265 showed up for the survey and completed a usable questionnaire (response rate = 80%).

### Missouri

The Missouri site was a medium-security, "cottage plan" facility housing a total population of 628, the only obvious "Country Club" prison in our sample. Officials at the prison estimated that about 125 of these were old-timers who would not meet our cut-off date; another 30–45 were unavailable to us for various administrative reasons. Survey sessions averaged about 25 men each; however, the men housed here had free movement around the compound, and so many showed up for the survey session twice.

All told, there were 450–500 eligibles at the site; 435 questionnaires were filled out. However, 73 of these proved fraudulent or otherwise unusable, leaving a net of 362 at this site.

## Oklahoma

The Oklahoma site was a new, medium-security facility that included a factory and a large psychiatric unit, housing a total of 610 men. Of these, 174 were administratively ineligible, leaving a total of 436 men. Of these, prison officials determined that 323 met our date cutoff and were eligible for participation. The names of these 323 were posted on bulletin boards; no other advance communication with the sample was allowed at this time. Further, no incentives of any kind were permitted. Survey sessions were held in the visiting room. Because of the posting procedure, it appeared that relatively few of the eligibles even knew of the survey; other than relief of boredom, there was no incentive for those who knew about it to participate. Only 78 completed questionnaires were obtained at this site, 24% of the eligible total.

## Minnesota

Interviews were conducted in two Minnesota prisons. The first was a medium-security, industrial program where all inmates are required to work in the prison factory; because of this, they are relatively well paid and have minimal free time available. Thus, our incentive was generally ineffective in this site. The total population at the site was 205 men; 136 of these were eligible to participate, but only 44 actually did. All 44 were run in a single session. The second Minnesota site was a new maximum security facility housing only about 100 men: 67 eligibles were identified, of whom 29 actually participated. Over the two Minnesota sites, the response rate was therefore only about 40%.

## Florida

The Florida site was a large "camp" compound designated as high-medium, housing about 2600 men. A sample of 430 men was drawn from the prison census; of these, 40 were administratively ineligible, leaving a net sample of 390, of whom 260 (67%) actually completed questionnaires.

## Georgia

The Georgia sample was interviewed at a recently constructed maximum-security intake and classification center; men are held in this center (for about 4 weeks on the average) pending security classifications and permanent assignment to an institution. The total prison census count was about

1600, all obviously meeting the date cut-off. However, the project had access only to the "exiting" cohort, which numbered about 400 men from whom volunteers were solicited by "our" guards. Men were interviewed in groups of about 35 in a prison classroom; 301 questionnaires were completed, of which 293 were usable. There was more discernible nervousness about confidentiality in this site than in any other, apparently because volunteers feared that their answers would influence their security classification and assignment; some also expressed the belief (clearly mistaken) that noncooperation with the survey might also influence their assignment. Literacy was also a more serious problem here than in any of the other sites.

## Nevada

The Nevada site was a maximum-security state prison housing a total of 540 men, of whom 390 met the date cut-off. Of these, 166 were "locked down" (disciplinary segregation) and administratively unavailable, leaving a net sample of 224, of whom 215 completed questionnaires. Sessions of about 25 men each were run in a large room in an abandoned wing of the prison; prison guards were in the survey room during the sessions.

## Arizona

This site was the maximum-security section of the state prison, housing 922 men. Of these, 330 were administratively ineligible, and 165 failed to meet the date cut-off, leaving a net sample of 427 men. Only 96 completed questionnaires (94 usables) were obtained. Two factors apparently contributed to the low response rate. First, our project had been preceded a few weeks earlier by another research project, the inmate response to which had been extremely negative. Second, the project did not enjoy the cooperation of a tough, suspicious prison gang whose manifest hostility toward us made it very difficult to persuade the residents to participate.

## Maryland

The Maryland site was a medium-security, vocational-training facility housing mainly younger prisoners (16–25) and first offenders. A sample of 406 was drawn from the census list of 1639; of the 406 sampled felons, 135 were unavailable for interviewing. This left a net sample of 271, from whom 212 completed questionnaires were obtained.

## Massachusetts

The Massachusetts site was a high-medium facility used to house inmates from the maximum-security prison as they approached their release dates. Based on discussions with local officials, we anticipated as many as

500 eligibles in this site. An advance letter announcing the project was sent to every resident; volunteers were required by the prison officials to sign up for their sessions. Only 89 volunteers ever signed up, and of these, only 48 appeared for their survey session. An evening "recruiting session" proved fruitless. Based on oral debriefings with the few men who did show up, we learned that many residents in this facility believed that results from a prior survey had been used in certain security classification decisions, and as such, they were not willing to cooperate with our project.[3]

## DATA QUALITY

Concerns about data quality arise easily when dealing with self-administered questionnaires and a sample of this general sort. What confidence can one have that felons report honestly and reliably on their criminal activities? That they have made no systematic effort simply to bamboozle a research project to which they are, at best, indifferent? In short, what reason do we have to believe anything that these men have told us about themselves and their criminal pasts?

The definitive study of the quality of prisoner self-report data is Marquis (1981), a data quality analysis of the RAND "Criminal Careers" survey. In this study, data quality was assessed by comparing prisoners' self-reports with information contained in official criminal justice records. Since the format and procedures of the RAND survey were very similar to those followed in our survey, it is reasonable to assume that Marquis' findings generalize. Summarizing briefly, Marquis found:

1. There is no evidence that prisoners attempt to deny salient aspects of their criminal past. Indeed, numbers of prior arrests and convictions reported in the survey generally exceeded the numbers that appeared in a man's official criminal justice record.
2. Comparisons of self-reported conviction-offense data with official records showed that "on a general level, the data are close to unbiased" (Marquis, 1981: 32). Moderate biases were found on some items, but in general, reliability of the self-report data was "moderately high."

[3] The security classifications given in the above discussion are the "official" ones that appear in the American Correctional Association's 1982 Directory. In fact, there are considerable state to state differences in what phrases such as "medium" or "maximum" security actually mean, and in this sense, the official designations can be misleading. Based on actual security provisions inside the walls, the judgment of the field staff is that we ended up interviewing in four clearly "maximum-security" facilities: Michigan, Florida, Nevada, and Arizona. Three additional sites are best considered "medium-to-maximum-security" facilities: Minnesota, Maryland, and Massachusetts. Security provisions in these sites were clearly less restrictive than in the four sites already noted but much more restrictive than those that obtained in the remaining three sites—Missouri, Oklahoma, and Georgia, all three of which are best considered as "medium-security" facilities, whatever their formal designations.

3. Discrepancies between survey and official data were not well predicted by verbal ability, memory, or demographic characteristics, which is to say that reporting errors were, in essence, randomly distributed over the survey population.

Comparisons between "official" and survey data, of course, are not comparisons between "true" and "measured" values but are rather comparisons between two measured values, both subject to error. In general, data base management procedures within the criminal justice system leave much to be desired (e.g., Weber-Burdin, Rossi, Wright, and Daly, 1981; Rossi, Berk, and Lenihan, 1980); as such, there is no guarantee that the official data are somehow "truer" or less error-prone than the self-reported data are. This point in mind, one is necessarily much more impressed by the convergence between official and survey data reported in Marquis' study than by the occasional discrepancy.

Following Marquis, we have undertaken some limited comparisons between official and survey data. It is perhaps a pertinent comment that most of the prison systems involved in our study were not in a position to supply machine-readable data on our sample without extraordinary, expensive, and time-consuming efforts. Indeed, in the end, we negotiated in details with only two sites for release of official data, and obtained these data only for one site, Michigan. This is not to imply that other states do not keep the appropriate records, only that the records are kept in ways that do not facilitate research use. Even the Michigan data, as we see shortly, are not ideally suited for the use to which we have put them.

In Michigan, we drew an initial sample of 404 men, from whom 265 usable cases were obtained. We received from the Data Processing Division at the Michigan Department of Corrections a computer tape with complete criminal record data for 400 of the original 404 cases. (Four men had either died or left the prison system by the time our tape request was processed.) These circumstances therefore allow for two types of comparisons relevant to our present concerns: (1) We can compare the 265 men from the original sample who completed a usable questionnaire with the 135 who did not; this tells us whether and how respondents differ from nonrespondents and is therefore a measure of self-selection bias; and (2) we can compare survey data with official data for the 265 men for whom we have both, a direct measure of the reliability of the self-reported information.

The "official" data on the Michigan inmates are rather limited in scope, consisting of birth date, marital status, number of dependents, education, race, occupation, drug use, alcohol use, and some details on conviction offenses. Rates of missing data are distressingly high on many of the variables: Birth date, race, occupation, and marital status are present for nearly all men, but 26% of the cases are missing information on educational level, 59% are missing information on drug use, 76% are missing information on