34  The Felon Survey

alcohol use, and 83% are missing information on number of dependents. As an aside on general issues of data quality, it is worth a note that all these values greatly exceed the missing data rates in the survey responses. Whether truthful or not, whether accurate or misleading, at least the survey data are there, which clearly cannot be said for much of the official records data.

Since participation in the survey was voluntary (in Michigan and all other sites), it is certainly possible that respondents differed significantly from nonrespondents in ways that might imperil the generalizability of the research results. In Michigan, however, this was apparently not the case: Respondents and nonrespondents were nearly identical on every point where comparison is possible. (See Table 2.1.) All these data, of course, are derived from the official records, since we have no survey data on the nonrespondent group. The mean age of the respondents was 21.5 years and of the nonrespondents 21.1 years, clearly a trivial difference. About 64% of the Michigan respondents and 68% of the nonrespondents were black, another trivial difference. Nearly all men in each group (96 and 93%, respectively) were single at the point of last arrest; the average respondent had

TABLE 2.1. Characteristics of Respondents and Nonrespondents: Michigan

|  | Total sample (400)[a] | Respondents (261)[a] | Nonrespondents (139)[a] |
|---|---|---|---|
| Age[b] | | | |
| Mean | 21.3 | 21.5 | 21.1 |
| SD | 2.2 | 2.3 | 2.1 |
| Median | 21.0 | 21.0 | 21.0 |
| Race (in percentages) | | | |
| White | 32.7 | 34.1 | 30.2 |
| Black | 65.5 | 64.0 | 68.3 |
| Native American | 0.7 | 0.8 | 0.7 |
| Mexican | 1.0 | 1.1 | 0.7 |
| Marital status (in percentages) | | | |
| Married | 5.0 | 4.0 | 6.8 |
| Single | 95.0 | 96.0 | 93.2 |
| Percentage "not reported" or unknown | 4.4 | 4.6 | 4.3 |
| Education | | | |
| Mean | 9.7 | 9.8 | 9.5 |
| SD | 1.2 | 1.3 | 1.2 |
| Percentage distribution | | | |
| Ninth grade or less | 45.3 | 44.3 | 47.2 |
| Tenth–eleventh grade | 47.0 | 45.3 | 50.0 |
| High school (GED) | 7.0 | 9.4 | 2.8 |
| Any college | 0.7 | 1.0 | 0.0 |
| Percentage "not reported" or unknown | 25.5 | 26.4 | 23.7 |

(continued)

Data Quality  35

|  | Total sample (400)[a] | Respondents (261)[a] | Nonrespondents (139)[a] |
|---|---|---|---|
| Number of dependents | | | |
| Mean | 1.7 | 1.9 | 1.5 |
| SD | 1.5 | 1.7 | 1.0 |
| Median | 1.3 | 1.3 | 1.2 |
| Mode | 1.0 | 1.0 | 1.0 |
| Percentage "not reported" or unknown | 83.2 | 81.0 | 82.7 |
| Occupation (in percentages) | | | |
| Professional | — | — | — |
| Clerical | 0.5 | 0.8 | 0.0 |
| Service work | 2.8 | 3.5 | 1.4 |
| Farming/mining | 1.3 | 1.6 | 0.7 |
| Skilled trade | 1.8 | 1.9 | 1.4 |
| Unskilled | 39.0 | 39.4 | 38.1 |
| Structural | 2.3 | 2.7 | 1.4 |
| Student | 3.8 | 4.7 | 2.2 |
| None | 48.3 | 45.3 | 54.7 |
| Known drug use (in percentages) | | | |
| Episodic | 40.7 | 40.3 | 41.0 |
| Unknown | 59.2 | 59.0 | 59.9 |
| Known alcohol use (in percentages) | | | |
| Episodic | 23.5 | 23.4 | 23.7 |
| Unknown | 76.5 | 76.6 | 76.3 |
| Sentenced from Detroit | | | |
| Percentage from Detroit | 34.5 | 32.9 | 39.6 |

[a] Base number.
[b] Age was calculated by subtracting year of birth from 1982.

received 9.8 years of education and the average nonrespondent, 9.5 years. In terms of general social profile, in short, the responding and nonresponding groups were effectively identical. The same is true of the criminal profiles: The distribution of conviction offenses was very nearly identical, as was the fraction reporting a conviction offense in which a weapon was probably present (24 and 23%, respectively, for respondents and nonrespondents).

Another way to express the lack of differences between responders and nonresponders is to regress response status (0 = responder; 1 = nonresponder) on all the available variables. This regression (Table 2.2) produces 13 statistically insignificant coefficients and an overall $R^2$ (= .05) that is also statistically indistinguishable from zero. In Michigan, then, we can conclude with considerable confidence that respondents and nonrespondents did not differ with respect to any variable maintained in the official criminal justice records of that state. There is, in short, no evidence of self-selection bias, at least in this one site.

Comparisons between official and survey data among the 265 men for

TABLE 2.2. Regression of Response Status on Selected Official Prison Record Data: Michigan[a]

| Selected variable | b | S. E. | t |
|---|---|---|---|
| Age | −.0169 | (.0141) | .233 |
| Detroit[b] | .0840 | (.0677) | .216 |
| White[c] | −.0514 | (.0699) | .463 |
| Other ethnicity[c] | .0037 | (.2170) | .986 |
| Education[d] | −.0390 | (.0234) | .096 |
| Married[e] | .1977 | (.1327) | .138 |
| Years incarcerated | .00175 | (.0249) | .994 |
| Assault[f] | −.0298 | (.0809) | .713 |
| Breaking and entering[f] | .0244 | (.0701) | .728 |
| Rape/sex offense[f] | −.0827 | (.0776) | .287 |
| Robbery[f] | −.0609 | (.0689) | .377 |
| Larceny[f] | .0676 | (.0933) | .469 |
| Murder/manslaughter[f] | −.1403 | (.8230) | .089 |
| Intercept | 1.111 | (.3442) | .001 |
| $R^2$ = | .046 | $F = (1.036)$ | $p = .416$ |
| (N) = | (400) | | |

[a] Dependent variable is 0 for respondents and 1 for nonrespondents
[b] Deleted category: "all other sentencing counties."
[c] Deleted category: "black."
[d] Education in years.
[e] Deleted category: "single."
[f] Deleted category: "all other offenses."

whom we have both show an extremely high correspondence on most variables. The correlation between the two marital status variables is .84; between the two race variables, .85; and between the two age variables, .91. Since all these correlations are short of perfect, there is clearly some error in the data (either or both sets); the magnitude of these correlations, however, implies a generally high reliability in the self-reports of major demographic characteristics.

The intercorrelation of the two education variables is somewhat weaker: .50. Cross-tabular analysis suggests that much of the "error" in this case may reflect real changes—that is, having received some additional schooling since coming to prison (e.g., through a Graduate Equivalency Degree (GED) program of the sort found in the Michigan site and in most other state prisons). In any case, where there are disagreements between the survey measure of education and the "official" measure, the nature of the disagreement is more years of schooling reported in the survey than show in the official record; only 6 men (of 188 in this analysis, or 3%) reported fewer years of schooling in the survey than appear in the official record.

Analysis of the self-reported data on criminal activities is restricted to information about the conviction offense and is complicated by (1) multi-

ple conviction offenses (in both records) for much of the sample and (2) the inherently ambiguous meaning of many crime categories. In general, it can be assumed that the self-reported conviction offense is an account in colloquial language of what the felon actually did; the "official" conviction offense is a label from the wording of the crime of which the felon was convicted (or to which he pleaded guilty).

There are, thus, many legitimate reasons other than reporting error or bias that would cause the self-reported and "official" conviction offenses to disagree. Not every felon, to illustrate, would necessarily be sensitive to the distinction between burglary and robbery; he might report "robbery" as the conviction crime when the official charge was breaking and entering, or larceny, or theft. Plea bargaining might also produce some disparities: A man who is in prison because he stole a car would presumably report "auto theft" as the conviction offense, even if this charge had been plea-bargained down to a lesser offense during court proceedings. In like fashion, a man who had actually attempted a murder might report "attempted homicide" as the conviction crime even though the "official" record shows an aggravated assault.

Of course, discrepancies might also result from systematic exaggeration or denial on the part of the prisoners; they might conceivably claim to have done crimes that they in fact had not done to make themselves appear "bad" to the field staff, or they might deny committing crimes that they had actually committed to make themselves appear "good." We admit both of these as real possibilities that cannot be tested in the data.

The preceding points in mind, it is perhaps remarkable that the conviction offense data are as consistent as they are. The measure of consistency employed in this analysis is the proportion of cases in which the official and survey data agree on the conviction offense. To illustrate, a man who told us he was in prison for rape is considered a "consistent case" if there is at least one "official" conviction offense that is a rape, no matter what other conviction offenses are also present in the official record. The man is also considered a consistent case if he does not give rape as a conviction offense and there is no rape charge to be found within the official record. Obviously, given the simplicity of the response format provided in the survey for the conviction offense question, and the complexity of the criminal codes from which the official conviction offenses are derived, one has to be reasonably charitable in deciding what amounts to a "consistency" and what does not. (Our category of "aggravated assault," for instance, would encompass several dozen specific criminal code charges.)

All told, the 261 Michigan felons for whom we have survey data had 459 official conviction offenses in their records. "Consistency rates" by type of crime are as follows: robbery, 79%; burglary or breaking and entering, 82%; larceny, 84%; assault, 84%; rape, 90%; auto theft, 92%; murder 92%.

All of these, obviously, are large proportions of consistent responses and reflect a comforting degree of convergence between the official and self-reported data. In general, if a man told us he was in prison for a certain crime, we would find the same crime listed as one of the official conviction offenses; and alternatively, if he gave no indication of being in prison for a certain crime, we would find no evidence of that crime among the listed conviction offenses. As indicated, this pattern was observed in some 79–92% of the cases, depending on the crime type.

The (relatively few) inconsistent cases reveal an interesting pattern that merits some comment. Overwhelmingly, these inconsistencies result from prisoners reporting conviction offenses to us that did not appear in the official record (versus offenses appearing in the record that were not reported in the questionnaire). This pattern characterized between 60 and 90% of the inconsistencies that we observed. We believe that in most of these cases, the discrepancy results from the difference between crime as an actual behavior and crime as an official charge: The "inconsistency" is between what the felon actually did (and is now in prison for) and the official charge under which he was sentenced. Which of these is the "truer" or "more correct" record is entirely a matter of judgment and the purposes to which the information is to be put.

The principal conclusions to be derived from the foregoing limited analysis of data quality are straightforward: In the one site where we were in a position to inquire, we found no systematic differences between respondents and nonrespondents (no selection bias); likewise, for the few variables where a comparison was possible, the agreement between self-reported and official data was acceptably close (no obvious reporting bias). It is not certain by any means that these patterns would generalize to sites other than Michigan; in fairness, Michigan was undoubtedly one of our more successful sites, most of all in regard to the response rate. And likewise, there is no guarantee that the general pattern of consistency that we find on a few variables (those that can be compared to the official record) would also be observed on all the variables contained within the questionnaire. Accurate reporting of, say, age or conviction offense does not necessarily imply equally accurate reporting of criminal histories, drug abuse, gun ownership and use, or other potentially sensitive topics. To the extent that the topic can be investigated, however, we find no reason to suspect the overall quality of the survey data. Most of the patterns revealed in this analysis are in accord with those reported by Marquis (1981).

## SALIENT SAMPLE CHARACTERISTICS

### Comparisons with U.S. State-Prison Population

The general profile of the state-prison population in America is reasonably well-known: In the aggregate, prisoners tend to be young males from

socioeconomically disadvantaged backgrounds. In these regards, our sample is not exceptional. More than two-thirds of the sample (69%) were under age 30, just about one-half (50%) were white, fewer than two-fifths (39%) had completed as much as 12 years of schooling, and, when employed, most tended to have held down jobs that were close to the bottom in wages and skill levels.

Selected sociodemographic characteristics of the total U.S. state-prison population are given in the *1981 Sourcebook of Criminal Justice Statistics* (Flanagan, van Alstyne, and Gottfredson, 1981: 485–486). Table 2.3 compares our sample to the data contained in this source for all variables where direct comparisons are possible.

The sample closely resembles the total of U.S. state-prison population on most variables. The most serious "disparity" that surfaces concerns age: In the total state-prison population, the percentage of men under 30 years is 63%, whereas in the sample, it was 69% (mean age = 27.8 years). This anomaly results almost entirely from the inclusion of the Michigan State Reformatory in the sample, a facility restricted mainly to young men ages 16–24.[4]

Most of the other differences shown are in the direction one would expect given the age difference just discussed. For example, our sample was somewhat more likely to have seen military service (28%) than U.S. state prisoners as a whole (24%); they were also less likely to be married, widowed, or divorced, and more likely never to have been married. The sample's conviction crimes showed the same tendency, showing fewer murders (possibly because murderers draw long sentences and may have been ineligible for our sample for that reason) but more auto thefts and drug crimes than the overall state-prisoner population. Again, however, the differences are generally quite minor, amounting to only a few percentage points in most cases.

One final "disparity" of note concerns race: While the percentage of whites in the sample was almost exactly the same as that shown for the U.S. total, the percentage of blacks was about 7–8 points "too low," and correspondingly, the percentage of "others" was about 7 points "too high." The explanation for the slightly skewed racial composition of the sample is fairly straightforward: Most of the excess "all others" were Native Americans, and their disproportionate presence in the sample resulted from Minnesota, Oklahoma, and Missouri having been among the 10 states where we interviewed, all three states having quite large Native American populations. A second and less important factor is that in one of our sites (and, to a much lesser extent, in a second site), access to the survey room was under the *de facto* control of the Aryan Brotherhood, a white prison gang.

---

[4] With the Michigan cases excluded, the percentage of the remaining sample under age 30 was 64% (mean age = 28.9 years), virtually identical to the age distribution shown in the table for all state inmates.

Salient Sample Characteristics

and in both these sites, the reluctance of black inmates to appear for the interview was quite obvious.

The major message to be found in Table 2.3 is that our sample closely resembles the total United States state-prisoner population on most of the standard background variables, the major exceptions being that the sample is somewhat younger and contains fewer blacks (both differences resulting from local peculiarities in the sites available to us for the research).

Marriage and Family Status

As shown in Table 2.3, most (63%) of the prisoners in the sample had never been married; among the roughly two-fifths who had been married at one or another time, nearly one-half experienced a marital breakup, through divorce, separation, or death. At the time of the survey, the married proportion of the sample was just under one-fifth.[5] Considering that the median age of the sample was 26.0 years, it is apparent that these men "lagged behind" their age peers in the general population, a substantial majority of whom would currently be married. Similar findings have been reported by Rossi, Berk, and Lenihan (1980) for prisoners in Georgia and Texas.

Although fewer than two-fifths of the sample had ever been married, and fewer than one-fifth were actually married at the point of incarceration, over three-fifths (62%) claimed to have fathered a child, a rather high level of fertility considering their ages and marital status.

Families of Origin

The men in the sample tended to have come from rather large families, a characteristic which they share with other persons of low socioeconomic origins. A mere 2% claimed to have had no brothers or sisters, and the median number of siblings reported was 5.0. On average, then, the men in the sample were 1 of 6 children in their family of origin; about 14% were 1 of 10 or more children. The size of the family of origin for the sample was thus about twice the average for all U.S. families.

The siblings of our sample are of some interest (Table 2.4). Over one-half the sample (54%) reported having a brother or sister who was arrested at one or another time; nearly two-fifths (39%) had brothers or sisters who also served prison or jail sentences. Also of considerable interest: One-half the respondents (52%) reported having siblings who owned rifles or shotguns, and nearly as many (44%) reported siblings who owned handguns.

[5] About one-quarter of the sample was "living with a girlfriend" prior to their incarceration, but if one adds the cohabitors to the marrieds, the total proportion of the sample with a regular, monogamous relationship prior to incarceration remains less than one-half.

TABLE 2.3. Comparisons between Prisoner Sample and Known Characteristics of Total U.S. State-Prisoner Population (%)[a]

| Characteristic | Sample | U.S. state-prison inmates |
|---|---|---|
| Age | | |
| Younger than 30 | 68.8 | 63.0 |
| 30 and older | 31.2 | 37.0 |
| Race | | |
| White[b] | 49.9 | 49.6 |
| Black | 40.3 | 47.8 |
| All other | 9.8 | 2.5 |
| Hispanic | 7.2 | 9.4 |
| Education | | |
| Fewer than 12 years | 61.2 | 58.0 |
| 12 or more years | 38.8 | 42.0 |
| Military service | 28.5 | 23.8 |
| Marital status[c] | | |
| Married | 19.8 | 24.0 |
| Widowed | 1.6 | 3.0 |
| Divorced | 10.0 | 17.0 |
| Separated | 5.8 | 8.0 |
| Never married | 37.4 | 48.0 |
| Living with girlfriend | 25.3 | — |
| Conviction offense[d] | | |
| Murder | 9.3 | 15.1 |
| Manslaughter | 2.0 | 4.4 |
| Sexual assault | 6.7 | 6.9 |
| Robbery | 23.1 | 27.7 |
| Assault | 12.7 | 7.1 |
| Burglary | 19.4 | 20.1 |
| Larceny, theft | 8.0 | 5.3 |
| Auto theft | 5.1 | 2.1 |
| Forgery, fraud | 4.4 | 4.9 |
| Drug dealing, sales | 9.4 | 6.3 |

[a] The source for information on "All State Inmates" is the 1981 Sourcebook of Criminal Justice Statistics, pp. 485–486 (Flanagan et al., 1981).

[b] Includes persons of Hispanic origin. Hispanics shown separately below.

[c] Marital status is not shown in the 1981 Sourcebook. Data given in this panel are from the 1977 Sourcebook, p. 616.

[d] The comparison of conviction offenses is not precise. Data reported in the Sourcebook are constrained to sum to 100%, whereas the sample could give multiple responses for their conviction offense. The percentage distributions shown here were constructed as follows: (1) The Sourcebook gives a final residual "all other" category which contained 10% of the cases. This one-tenth was dropped and the distribution recomputed. (2) For the 10 crimes shown in the Sourcebook presentation, the percentage of the sample responding "yes" to that crime as their conviction offense was computed; these percentages were then summed (they added up to 130%) and finally divided through by that sum to constrain the final distribution to add up to 100%.

TABLE 2.4. Siblings of the Prisoners (in Percentages)[a]

| Number of siblings | Percentage of prisoners |
|---|---|
| 0 | 2.3 |
| 1 | 6.1 |
| 2 | 11.7 |
| 3 | 11.6 |
| 4 | 12.0 |
| 5 | 11.9 |
| 6 | 8.3 |
| 7 | 7.7 |
| 8 | 7.0 |
| 9 | 6.2 |
| 10 or more | 13.7 |
| Yes only[a] | 1.4 |
| (N) = | (1823) |

| Has any of them ever . . . | Yes | No | (N)[b] |
|---|---|---|---|
| Committed a serious crime? | 37.3 | 62.7 | (1660) |
| Been arrested? | 53.5 | 46.5 | (1671) |
| Served time? | 39.1 | 60.9 | (1674) |
| Beaten up someone? | 22.5 | 77.5 | (1568) |
| Owned a shoulder weapon? | 51.5 | 48.5 | (1574) |
| Owned a handgun? | 43.9 | 56.1 | (1541) |
| Shown you how to shoot? | 18.2 | 81.8 | (1696) |

[a]Respondent indicated he had at least one sibling but gave no answer to "how many."
[b]Missing data omitted item by item.

About one-fifth of the sample (18%) had a brother or sister who showed them how to shoot a gun. (Effects of early exposure to guns on the sample's own firearms behavior are analyzed in Chapter Five.)

Most (about 84%) of the sample grew up in a home with the father (or, at minimum, a "man of the house") present. Those with a father or father-figure present in the home during the formative years (ages 10–16) were asked a series of questions about that person (Table 2.5).

As is apparent from the table, many of the fathers of the men in the sample themselves lived "outside the law." About one-quarter of the fathers were reported as having been arrested at some point in their lives; just under one-fifth (18%) had served prison time. Interestingly, only 13% of the respondents reported that their fathers ever committed a serious crime, about one-half the number who reported their fathers as having been arrested. Clearly, the prisoners' fathers had relatively frequent contacts with the law. Overall, 28% of the sample with a father present in the home (N = 1584) responded "yes" to one or more of these three questions.

---

TABLE 2.5. The Fathers (or Father-Substitutes) of the Prisoners (in Percentages)

|  | Yes | No | (N)[a] |
|---|---|---|---|
| Was there a father or "man of the house" when R was 10–16 years old? | 84.5 | 15.5 | (1874) |
| If yes: Did he ever . . . |  |  |  |
| Commit a serious crime? | 12.7 | 87.3 | (1420) |
| Get arrested? | 24.5 | 75.5 | (1459) |
| Serve time? | 18.5 | 81.5 | (1500) |
| Beat up or try to kill someone? | 23.8 | 76.2 | (1420) |
| Beat you up? | 26.7 | 73.3 | (1582) |
| Beat up your mother? | 31.2 | 68.8 | (1535) |
| Beat up your brothers/sisters? | 22.6 | 77.4 | (1569) |
| Own a rifle or shotgun? | 69.6 | 30.4 | (1509) |
| Own a handgun? | 56.8 | 43.2 | (1471) |
| Carry a handgun outside home? | 36.3 | 63.7 | (1431) |
| Show you how to shoot a gun? | 47.7 | 52.3 | (1575) |
| Give you a gun of your own? | 45.5 | 54.5 | (1460) |

[a]Missing data omitted item by item.

Many of the fathers also had violent tendencies. Over one-quarter of the sample reported having been beaten up by their fathers; nearly one-third, that their fathers had beaten up their mothers; and so on. Overall, about one-half (48%) of the sample with a father present responded "yes" to one or more of the four questions about their father's violence. One must take care not to exaggerate these results: It bears emphasis that one-half the men in the sample did not have a violent father (by these standards), and more than two-thirds did not have a criminal father. Still, it is also clear that many of these men were raised in an environment where brutality and crime were very much a part of the ordinary routines of life.

### Early Experiences with Guns

It is equally clear that many were raised in homes with firearms present. About 70% of the fathers were reported as having owned a shoulder weapon; well over one-half (57%), as having owned a handgun; more than one-third (35%), as having carried his handgun with him outside the home. Among those with a father present and with nonmissing data on both relevant questions (N = 1441), 75% answered "yes" to either the rifle/shotgun or the handgun question, or both. Since only about one-half of all U.S. households possess a firearm of any sort (Wright, Rossi, and Daly, 1983: Ch. 5), it is therefore fairly obvious that the sample originates disproportionately in social groups in which gun ownership is higher than average.

44                                                    The Felon Survey

## The Timing of Significant Life Events

Some appreciation of the childhood and adolescent experiences of the prisoners in the sample can be gleaned from Table 2.6, where data are reported from a series of questions asking about the ages at which certain significant experiences occurred. To give a sense of the life chronologies involved, the events in the table are arranged from youngest to oldest mean ages of occurrence.[6]

The questionnaire asked about 18 significant life events. In the average life of our respondents, the first of the 18 to have occurred was firing a gun, which happened on average early in the thirteenth year. During the same year, the average respondent also had sex with a woman for the first time; about midway through the fourteenth year, the average respondent got drunk for the first time. Prior to his sixteenth birthday, he had also stolen something worth more than $50, acquired his first shoulder weapon, and smoked marijuana for the first time. The average respondent, in other words, was

TABLE 2.6. The Timing of Significant Life Events

|  | Mean | SD | Median | (N)[a] | Percentage "never" | Percentage missing |
|---|---|---|---|---|---|---|
| Current age | 27.8 | 8.1 | 26.0 | (1834) | — | 2.1 |
| Age when respondent first |  |  |  |  |  |  |
| Fired a gun | 13.2 | 4.4 | 13.0 | (1677) | 8.6 | 1.9 |
| Had sex | 13.7 | 2.9 | 13.8 | (1821) | 1.0 | 1.9 |
| Got drunk | 14.5 | 3.5 | 14.4 | (1679) | 8.5 | 1.9 |
| Stole $50+ | 15.1 | 4.6 | 14.7 | (1463) | 19.1 | 2.8 |
| Got long gun | 15.1 | 4.6 | 14.8 | (1233) | 31.0 | 3.2 |
| Smoked pot | 15.8 | 5.6 | 14.7 | (1544) | 15.0 | 2.7 |
| Had full-time job | 16.4 | 2.6 | 16.2 | (1729) | 6.0 | 1.7 |
| Got arrested | 16.6 | 5.7 | 15.8 | (1841) | 0.9 | 0.9 |
| Lived on own | 16.8 | 3.1 | 16.7 | (1687) | 8.5 | 1.5 |
| Did hard drugs | 17.1 | 4.5 | 16.4 | (1113) | 36.7 | 3.9 |
| Sawed-off gun | 17.8 | 4.1 | 16.8 | (372) | 74.3 | 5.8 |
| Got hand gun | 18.1 | 5.6 | 17.1 | (1154) | 34.7 | 3.7 |
| Hurt someone | 18.8 | 7.0 | 17.2 | (937) | 46.1 | 3.9 |
| Did felony | 19.0 | 6.8 | 17.6 | (1791) | — | 4.4 |
| Convicted | 19.2 | 6.4 | 17.8 | (1831) | 1.2 | 1.2 |
| Sent to prison | 19.2 | 6.4 | 17.8 | (1830) | 1.2 | 1.2 |
| Did armed crime | 19.8 | 7.0 | 17.9 | (1110) | 36.8 | 4.0 |
| Did handgun crime | 19.8 | 7.1 | 18.0 | (819) | 51.2 | 5.1 |

[a] Sample size for which mean, SD, and median have been computed.

[6] The arrangement of the results in Table 2.6 from lowest to highest mean ages is a presentational convenience to facilitate discussion of the data and should not be interpreted as an invariant causal sequence. Note in particular that the standard deviations around the averages are relatively large.

Salient Sample Characteristics                                                45

"into" sex, drugs, guns, and crime before he was even legally eligible to drive in most states.

During the sixteenth year, the average respondent "came of age," that is, obtained his first full-time job, moved out of the parental household, and experienced his first arrest. On average, our respondents were first arrested at age 16.6 years and were living on their own by age 16.8 years. At this point in the experience of a "normal" teenage male, life's biggest worry might well be acne or whom to invite to the high school prom. In contrast, the people in our sample were already working fulltime jobs, paying their own bills, and getting into trouble with the law.

Early in the seventeenth year, our average respondent had also begun experimenting with hard drugs; as we discuss in more detail later, about one-third (31%, N = 1659) were destined eventually to become drug addicts, and roughly another one-third (30%, N = 1665), to become alcoholics.

Between the eighteenth and twentieth birthdays, the life of our average respondent went from bad to worse: He obtained his first handgun, on average, at age 18.1 years, seriously hurt or tried to kill someone at age 18.8 years, committed his first felony at age 19.0 years, was first convicted and sent to prison or some other correctional facility at age 19.2 years, and committed his first armed crime at age 19.8 years. On the average, our respondents first went to prison at about the same time many "normal" late adolescent males would otherwise be starting college.

The life histories of the sample during its 20s can be summarized rather more quickly: Most of early adulthood was spent in prison. On average, 8.3 years transpired between the first imprisonment and the time of our study. The average respondent spent 5.0 of those years behind bars, typically not all of it in a single stretch: Indeed, the average respondent in the study had been arrested 9.9 times, convicted 4.3 times, and imprisoned 3.1 times by the time we interviewed him. Since, as noted earlier, the average age at first arrest was 16.6 years, and that at first imprisonment, 19.2 years, it is fairly obvious that most of the late teens and 20s of the sample were spent either getting into trouble with the law or serving time for having done so.

Some comments on the Percentage "Never" column of Table 2.6 are also in order. (To avoid confusion, we note that the averages reported in the table and discussed above in the text were computed with the "nevers" and the missing data omitted.) Of the 18 items included in this analysis, only 2 showed a majority giving the "never" response. About three-quarters of our sample (75% of those answering the question) said they had never sawed off a rifle or shotgun; thus, about one in four had, and among that one in four, the average age when it was first done was 17.8 years. (The survey contains considerable detail on sawing off shoulder weapons that is analyzed in Chapter Eleven.) Also, just over one-half the sample (51%) said they had never "committed a crime while armed with a handgun"; thus,

just under one-half had (average age at the first handgun crime = 19.8 years).

Some other items of potential interest: only about one-fifth of the sample (19%) had never committed a theft; just under one-third (31%) had never owned a rifle or shotgun; just over one-third (35%) had never owned a handgun; about seven-eighths (85%) had at least tried marijuana; nearly two-thirds (63%) had also tried hard drugs; just under one-half (46%) claimed never to have "seriously hurt or tried to kill somebody"; barely more than one-third (36%) claimed never to have committed a crime armed with any weapon.

The life history of a "typical" felon is often discussed in terms of what might be called "retarded development," especially in regard to late adolescence and early adulthood. At a time in life when most young males are completing their schooling, getting married, starting a family, and launching themselves into adult careers, the "typical" felon is spending most of his time in prison. Since prison provides few or no opportunities to start a family or to accumulate seniority and experience in a "real world" job, the typical felon's life-cycle development is, accordingly, retarded, and as such, at age 30, he tends to resemble more a 20 year old in terms of educational attainment, marital status, and employment history. This pattern is frequently cited as at least part of the explanation for the adjustment difficulties faced by many felons subsequent to their release from prison. As is clear from the above account (and from other materials presented later in this chapter), our sample also showed these same general tendencies.

There is, however, another aspect of the patterning of life events that has not received so much attention, one that might be called "accelerated development" in the early adolescent years. Stated simply, our felons started doing "adult" things—having sex, getting drunk, doing drugs, leaving home—much earlier, we suspect, than "normal" teenage males. Thus, while many of these men resembled 20 year olds at age 30, many also resembled 20 year olds at age 14 or 15. It is as though they rushed very quickly into the stage of "late adolescence" and then managed to remain at more or less the same stage well into their early middle age.

### Education, Employment, Income

The lack of education and limited employment histories of the felon population have been described in many prior studies and are certainly evident in this sample as well. Details are shown in Table 2.7. On the whole, the prisoners sampled were poorly educated, with the modal respondent having dropped out of high school in the tenth or eleventh grade. About 16% had graduated from high school, and an additional 23% had some education beyond high school. For most, "education beyond high school" consisted of 1 or 2 years of college; only 3% of the sample had actually attained a college degree.

About two-fifths (39%) of the sample were unemployed at the time they were last arrested. Of those unemployed at arrest, about two-thirds had held at least some sort of job in the previous year; thus, about 12% of the sample were unemployed for the entire year prior to arrest. Roughly 70% of those unemployed at the time of arrest said they were also looking for work.

Among those with a job at any time during the year prior to imprisonment, weekly take home pay averaged $226; about two-thirds were taking home $200 per week or less. Most of the men in the sample (54%) felt that they needed more money than they were making "to make ends meet."[7]

TABLE 2.7. Education, Employment, Income

| | Percentage |
|---|---|
| *Educational attainment* | |
| No schooling | 0.4 |
| 6 or fewer years | 3.6 |
| 7–9 years | 24.6 |
| 10–11 years | 32.7 |
| High school graduate | 16.0 |
| Technical school | 6.2 |
| Some college | 13.7 |
| College graduate | 2.8 |
| (N)= | (1842) |
| *Number of dependents* | |
| 0 | 12.9 |
| 1 | 19.9 |
| 2 | 18.0 |
| 3 | 19.4 |
| 4 | 14.0 |
| 5 | 6.5 |
| 6 | 3.5 |
| 7 | 3.0 |
| 8 or more | 2.8 |
| Mean response | 2.67 |
| (N)= | (1831) |
| *Employed at last arrest?* | |
| Yes | 58.5 |
| No | 38.6 |
| (N)= | (1820) |

(continued)

[7] By Bureau of Labor Statistics conventions, a person who is unemployed and not looking for work is not "unemployed," but rather is "out of the labor force." To compare the unemployment figures given in the text with official unemployment figures, this factor must be taken into account. Of those without a job at the time of arrest (39% of the total), 70% were in fact looking for work (at least, so they said); the fraction unemployed is thus $(.39) \times (.70) = .273$. The denominator of the unemployment rate in this sample is the proportion employed (.61) plus those unemployed (.273) = .883. We get the estimated unemployment rate for the sample by dividing: $(.273)/(.883) = .31$, or 31%, approximately four times the national unemployment rate (7.6%) in 1981. (We are grateful to Gary Kleck for these calculations.)

The Felon Survey

**TABLE 2.7.** Education, Employment, Income (*continued*)

| | Percentage |
|---|---|
| *If no: Employed during previous year?* | |
| Yes | 68.1 |
| No | 31.9 |
| (N)= | (698) |
| *Combined employment data* | |
| Employed when arrested | 61.1 |
| Unemployed at arrest, but employed during previous year | 26.5 |
| Never employed in entire year | 12.4 |
| (N)= | (1794) |
| *"At the time you were arrested . . . , were you . . ."* | |
| *Unemployed?* | |
| Yes | 35.7 |
| No | 64.3 |
| (N)= | (1601) |
| *Looking for work?* | |
| Yes | 25.3 |
| No | 74.7 |
| *Weekly take-home pay* | |
| $100 or less | 9.5 |
| $101–150 | 28.2 |
| $151–200 | 27.3 |
| $201–250 | 12.7 |
| $251–300 | 7.8 |
| $301–400 | 7.3 |
| $401 or more | 7.3 |
| (N)= | (1486) |
| Mean response = | $226 |
| *Was it enough money?* | |
| More than enough | 20.6 |
| Just enough | 25.2 |
| Needed a little more | 31.6 |
| Needed a lot more | 22.5 |
| (N)= | (1451) |
| *If R "needed more": How much more?* | |
| Mean response | $175 |
| SD | $205 |
| (N)= | (804) |

Among those needing more, the average additional income they felt they needed was rather substantial—$175. Presumably, some share of the criminal activities of these men is a function of this apparent "income deficit."

In summary, the education, employment, and income profile of the sample is consistent with the well-known characteristics of the felon population in the United States: On the whole, they are uneducated, unemployed or underemployed, and rather poorly paid.

Salient Sample Characteristics

### Juvenile Criminality

Recent studies have strongly suggested that, like diabetes, "early onset" is the fatal form of the criminal disease. That is, high-rate adult criminals usually share the common characteristic of having committed fairly serious and fairly frequent crimes while they were still juveniles.

Our survey obtained several items of information about the juvenile criminality of the sample; see Table 2.8. On the average, as we have already noted, the men in this sample commenced their criminal careers about midway in their teens: By age 15, the average felon had already committed a nontrivial theft, by age 16.5, had already been arrested, and by age 19, had committed his first "pretty serious" crime (listed as "did felony" in Table 2.7).

A follow-up to this latter question asked what the felon's first "pretty serious" crime had been; responses appear in the top panel of Table 2.8. Burglary and robbery were by far the most common "entry" crimes, mentioned by 22 and 20%, respectively. Theft and automobile theft were also

**Table 2.8.** Juvenile Criminality (in Percentage)

1. "What kind of crime was your first pretty serious crime?"

| | Percentage |
|---|---|
| Burglary | 22 |
| Robbery | 20 |
| Theft, larceny | 11 |
| Auto theft | 10 |
| Assault | 10 |
| Drug related | 5 |
| Homicide | 6 |
| All others | 16 |
| (N) = | (1707) |

2. "How often did you do crimes before age 18?" (in percentage)

| | Never | Once | A few | 10–15 | Dozens/ hundreds | (N) |
|---|---|---|---|---|---|---|
| Assault (.73)[a] | 53 | 9 | 24 | 6 | 8 | (1749) |
| Burglary (.78) | 41 | 8 | 24 | 8 | 18 | (1746) |
| Drug related (.75) | 62 | 2 | 13 | 4 | 18 | (1738) |
| Murder (.61) | 92 | 5 | 2 | — | 1 | (1702) |
| Rape (.60) | 94 | 4 | 2 | — | — | (1697) |
| Robbery (.68) | 67 | 7 | 15 | 4 | 7 | (1727) |
| Armed robbery (.70) | 73 | 6 | 11 | 3 | 7 | (1710) |
| Theft (.66) | 35 | 9 | 25 | 9 | 22 | (1758) |

[a]Correlation with corresponding question about adult criminality.

rather frequent, mentioned by 11 and 10%. About one-tenth entered their criminal career with an assault; some 6% entered with a homicide.

Regardless of the response to the "first serious crime" question, each felon was given a list of common crimes and asked how frequently he had committed each crime "before you were 18 years old." Here too, economic crimes lead the list. About two-thirds (65%) had committed at least one nontrivial theft before age 18, about three-fifths had committed at least one burglary, and one-third had committed at least one robbery. Also, just under one-half (47%) had committed at least one assault. Early involvement with drugs is also indicated in these results: about two-fifths had done drug dealing or sales before age 18. The only crimes which large majorities had not done before age 18 are therefore murder and rape (92 and 94% "never," respectively). It is perhaps of some additional interest that only 18% of the men who answered the juvenile crime sequence responded "never" to all eight questions. Thus, more than four-fifths of the men in the sample had committed at least one of these crimes prior to their eighteenth birthday.

Having done any of these crimes once and only once before age 18 is rather uncommon, with the exception of murder and rape. Most of the men who had ever committed these crimes, in short, had done so at least "a few" times. High-rate juvenile criminals clearly tend to "specialize" in theft, burglaries, and drug deals: 22, 18, and 18%, respectively, had done dozens or even hundreds of these kinds of crimes before age 18.

### Drug Abuse

We indicated earlier that the men in this sample began experimenting with drugs (including alcohol) at a relatively early age: By age 14.5, the average man in the sample had gotten drunk at least once, by age 16 he had at least tried marijuana, and by age 17, he had also at least tried hard drugs. For many, these early drug experiences were only the opening events in a life-long history of chemical dependence and substance abuse. Data on the drug usage and abusage of the sample are shown in Table 2.9.

About one-third of the sample (29%) had been alcoholics by their own admission; likewise, about one-third (31%) had been drug addicts, and an equivalent portion (29%) had been admitted to a drug or alcohol rehabilitation program at some time. The cross-tabulation of the "alcoholic?" and "drug addict?" questions reveals that 54% (N = 1649) claimed never to have been either; 14% had been both. If we take self-admitted dependency on either alcohol or drugs (or both) as the definition of "serious" drug abuse, then 46% of the felon sample would qualify.

Many of the men who did not admit to outright drug addiction did admit to a heavy pattern of drug use. Each man in the sample was presented with a list of 11 commonly used illicit drugs and asked how frequently he

had used each of them before coming to prison. Majorities ranging from 51 to 81% claimed never to have used barbiturates (51% "never"), psychedelics (59% "never"), opium (62% "never"), PCP (63% "never"), heroin (66% "never"), and methadone (81% "never"). In the remaining five cases, however, the majority had used the drug at least once.

Unsurprisingly, alcohol and marijuana were the most commonly used drugs among this sample, by far. A mere 7% of the sample claimed never to have used alcohol; 27% used alcohol "almost all of the time." The corresponding percentages for marijuana were 16 and 31%. Hashish, amphetamines, and cocaine are also frequently used, with about one-tenth in all three cases claiming to have used the drug almost all of the time.

As noted above, at minimum, some 46% of the sample was substance dependent. An upper boundary to the true fraction of drug abusers in the sample can be obtained by defining "serious drug abuse" to mean using any one of the 11 drugs listed in Table 2.9 "many times" or "almost all of the time." As it happens, only 26% of the total sample claimed not to have used any of these drugs many times or all the time; as a percentage of the

TABLE 2.9. Drug Use and Abuse (in Percentages)

| Have you ever: | Yes | No | (N) |
|---|---|---|---|
| Been an alcoholic? | 29 | 71 | 1665 |
| Been addicted to drugs? | 31 | 69 | 1659 |
| Been admitted to rehab? | 29 | 71 | 1661 |

| Before prison, how often did you take: | Never | Once | A few times | Many times | Almost all the time | (N) |
|---|---|---|---|---|---|---|
| Alcohol | 7 | 2 | 23 | 41 | 27 | (1659) |
| Marijuana | 16 | 3 | 20 | 30 | 31 | (1648) |
| Heroin | 66 | 6 | 14 | 9 | 5 | (1614) |
| Methadone | 81 | 3 | 8 | 5 | 2 | (1593) |
| Psychedelics | 59 | 4 | 18 | 14 | 5 | (1624) |
| Hashish | 41 | 4 | 24 | 24 | 8 | (1626) |
| Opium | 62 | 6 | 19 | 10 | 3 | (1608) |
| Barbiturates | 51 | 4 | 24 | 15 | 6 | (1615) |
| Amphetamines | 45 | 3 | 22 | 20 | 9 | (1614) |
| Cocaine | 44 | 6 | 23 | 19 | 9 | (1622) |
| PCP | 63 | 9 | 17 | 7 | 3 | (1587) |

| How often did you take drugs? | |
|---|---|
| About every day | 39 |
| About every weekend | 12 |
| From time to time | 17 |
| Never | 38 |
| (N) = | (1598) |

(continued)

TABLE 2.9. Drug Use and Abuse (in Percentages) *(continued)*

| | | | |
|---|---|---|---|
| Ever commit crimes because you needed money for drugs or alcohol? | | | |
| No | | 65 | |
| Once | | 5 | |
| A few times | | 27 | |
| Many times | | 22 | |
| (N) = | | (1514) | |

| | Mean | SD | (N) |
|---|---|---|---|
| Heroin users only: average weekly heroin costs: | $55 | $98 | (192) |
| Alcohol users only: average weekly alcohol costs: | $13 | $70 | (1297) |
| Users of other drugs: average weekly drug costs: | $27 | $83 | (900) |

Total sample: weekly drug costs

| Amount spent | Percentage |
|---|---|
| $0 | 11 |
| $1–49 | 35 |
| $50–99 | 16 |
| $100–199 | 15 |
| $200–299 | 7 |
| $300+ | 15 |
| (N) = | (1432) |

During conviction crime, were you:

| | Yes | No | (N) |
|---|---|---|---|
| Drunk? | 41% | 59% | (1605) |
| High on drugs? | 37 | 63 | (1596) |
| Either or both? | 57 | 43 | (1562) |

---

subsample who answered at least one of the drug questions, the figure is 16%. Rephrased, somewhere between three-quarters and five-sixths of the sample used one or more of the 11 drugs either frequently or regularly. As a convenient rule of thumb, then, we can conclude that about one-half the felon sample had been substance-dependent and an additional one-quarter had been serious drug abusers. Nearly one-half the sample (46%) claimed to have used three or more of the drugs on the list many times or most of the time.[8]

[8] The drug use patterns discussed in the text are very close to those reported in the RAND survey. Among the RAND respondents, 83% were found to be serious drug users (Chaiken and Chaiken, 1982: 16), compared to about 84% in our sample. This source also remarks that the pattern of drug abuse extends back into adolescence; "indeed, their use of drugs and their criminal careers usually being at about the same time" (1982: 16). The authors add an important caveat, however,

The relationships between use and addiction are much as one would expect. Among those who said they used alcohol "almost all of the time" (N = 445), 68% had also been alcoholics; among those who used heroin "many times" or "almost all the time" (N = 216), 90% had also been drug addicts.

We also asked each man in the sample how often he usually took drugs. Some 22%, the true abstainers, said "never," and 27% said they only took drugs from time to time. A small group, 12%, used drugs only on the weekends; and the remainder, nearly two-fifths, used drugs just about every day. Slightly more than one-third (35%) confessed to having committed at least one property crime because they needed drug money; 13% had done so many times.

The tendency to have committed crimes to obtain drug money is positively and significantly correlated with all 11 usage questions, with the correlation coefficients ranging from .21 to .41. As would be expected, the strongest correlation is for heroin use (.41), followed by methadone use (.38) and barbiturate use (.36).

To get some sense of the financial burdens imposed by these drug-use patterns, we asked the drug users in the sample how much they had been spending for drugs "in the average week." Heroin users in the sample (N = 192) were averaging about $55 a week on heroin, but with a high variation around that average; alcohol users (N = 1297) were averaging about $13 a week on alcohol; users of all other drugs (N = 900) were averaging about $27 per week for drugs of various sorts. To avoid confusion, users who said they were not spending anything for their drugs are omitted from these calculations. (Many heavy heroin users, for example, are also heroin dealers and cover their own habit through sales to others; the out-of-pocket heroin cost for these men is therefore effectively zero.)

Not all men in the sample answered the questions about drug costs; this battery appeared near the end of the questionnaire. Many who did answer gave a nonnumeric response (e.g., "a lot," "not much," "all the money I had"). Excluding both these sources of missing data, there are 1432 men who gave complete numerical information on their drug expenses. Of these, only 11% were spending nothing in the average week for either drugs or alcohol; an additional 35% incurred only modest drug costs ($1–49). The remainder, some 54% of the sample, were spending at least $50 a week on drugs; 37% were spending $100 a week or more. Using the average weekly take-home pay reported earlier ($226) as the standard, about one-third of the sample were spending one-half this amount for drugs, and about one-fifth (19%) were spending at least this amount or more. Among the rel-

---

one that bears repeating here: "This does not indicate that drug use caused them to become criminals. Rather, drug use appears to be just another element of the criminal life-style they have adopted."

atively serious drug users in the sample, in short, drugs would have doubtlessly been the single largest item in their weekly budget.

Finally, we asked each man in the sample if he had been drunk or high on drugs when he committed the crime for which he was now in prison. Surprising no one, most had been: 41% said they were drunk, 37% said they were high; 57% had been either drunk or high (or both); 18% had been drunk and high. If the conviction crimes of these men represent a reasonable sample of all the crimes that are committed, then the average crime involves a perpetrator who is pharmacologically impaired when the offense is committed.

## SUMMARY OF SAMPLE CHARACTERISTICS

First, the characteristics of the men in this sample are respectably close to the known characteristics of the U.S. state-prisoner population on almost all variables where a direct comparison is possible; most of the exceptions to this pattern result from specific site peculiarities (e.g., age and race). Like felons in general, the men in our sample are best typified as young males from socially marginal backgrounds.

Second, most of the men in the sample were exposed to, or experimenting with, drugs, guns, and crime on or before their sixteenth birthday. Many had fathers who were either violent, or criminal, or both. The general pattern of life cycle development for these men is to have begun doing "adult" things rather early in life. The late teens of these men were mostly spent getting into relatively serious trouble with the law; most spent the largest share of their 20s in prison.

Third, socioeconomically, the average man in the sample left school in the tenth or eleventh grade and had an uncertain employment history thereafter. Rates of unemployment among the sample were some four times the national average. The average (employed) man in the sample was, at the point of last arrest, taking home $226 a week to support himself, one or two other people, and, in most cases, a fairly high level of drug consumption as well.

Fourth, most of the felons in the sample grew up around guns and had owned and used guns for most of their lives. About three-quarters had gun-owning fathers; about one-half had gun-owning siblings; some 90% had fired a gun at some time.

Fifth, the average felon in this sample commenced his criminal career as a juvenile. About 80% had committed at least one felony before the age of 18; many had committed large numbers of them, property crimes being by far the most common. As reported in previous studies, juvenile criminality is a strong predictor of adult criminal activity.

Sixth, about one-half the felons in the sample were (or had been) either alcoholics or drug addicts, or both, at some point. An additional one-quarter

appear to have been rather heavy drug users, if not addicts. The modal usage pattern was to have used drugs nearly every day. Over one-half the sample was spending more than $50 a week on drugs or alcohol at the time of their last arrest; about two-fifths were spending $100 per week or more.

Seventh, the patterns of criminal activity among this sample are not all "of a piece." Between one-third and two-fifths, for example, said they had never committed an armed crime; the remainder had. And likewise, about one-half said they had never committed a handgun crime; the remainder had. Not all the criminals in this sample, in short, are armed criminals; and not all of the armed criminals are armed with guns. These points suggest the need for a typology of criminals to be employed in subsequent analyses based on patterns of weapons use, and this, as it happens, is the topic of the next chapter.

# 3

## VARIETIES OF ARMED CRIMINALS: A DESCRIPTIVE TYPOLOGY

Although compared to the general male population, the men in our sample appear to be quite homogeneous in their socioeconomic backgrounds, they did vary considerably among themselves in the kinds and amounts of their criminal activities and, most importantly for purposes of this volume, in their patterns of weapons use. For instance, so far as we can tell, many of the men in the sample had never committed any kind of crime armed with any kind of weapon. These, in fact, constitute the modal type. Some had used weapons from time to time but never on a sustained or regular basis. And, by their own admission, some, of course, had done literally hundreds, or even thousands, of armed crimes. Even among those who have used weapons regularly, there are differences in the kind of weapons carried and the uses to which they are customarily put.

These differences in mind, the present chapter develops a basic and simple typology of criminal-weapons users, one that proves useful in sorting the sample into relatively homogeneous categories based on patterns of criminal-weapons use. This typology figures prominently in all subsequent analyses reported in this volume.

The weapons usage typology was constructed using information from the questionnaire about (1) the type of weapon most commonly carried or used in the commission of crimes (no weapon, a knife or a club, a handgun, etc.), and (2) for the subset of firearms users specifically, the frequency of criminal weapons use.

The typology was developed using information on weapons use from the questionnaire, classifying men in the sample into one category or another based on evidence derived from questions that obtained information on the use of weapons in the crimes they had committed.[1]

---

[1] Assignment of men to categories of the typology was completely straightforward in approximately 90% of the cases. These assignments were based on (1) the initial filter questions reproduced in the following paragraph of the text; (2) a question asking about the type of weapon used most frequently in committing crime; and (3) for the subset of Gun Criminals, a question asking about the frequency of gun use. Information from elsewhere in the questionnaire was used for purposes of

57

The essential division into gun criminals versus those who did not use guns in their crimes was accomplished through the answers to two questions, as follows:

1. "Thinking now about all the crimes you have ever done in your life, . . . have you ever used a weapon to commit a crime or had any kind of weapon with you while you were committing a crime?
2. [If "yes"] Still thinking about all the crimes you have ever done, . . . have you ever used a gun to commit a crime or ever had a gun with you while you were committing a crime?"

As can be seen, these two questions sort the sample initially into three groups: (1) the unarmed criminals, those who answered "no" to the first question; (2) the armed-but-not-with-a-gun criminals, those who answered "yes" to the first question but "no" to the second; and (3) the gun criminals, those who answered "yes" to both questions.

Of course, there is some ambiguity in the responses to these questions. First, not everyone answered both these questions, and in these cases ($N = 105$), we have made use of other relevant information in the questionnaires.

Second, the question sequence clearly gives precedence to gun crime. To illustrate, a man who had done, let us say, hundreds of armed robberies with a butcher knife and one armed robbery with a handgun would, if he followed instructions correctly, be counted here as a "gun criminal." (We discuss later in this chapter the other kinds of weapons used by men in each of the various categories.) In the same vein, many of these men were accustomed to carrying several weapons, a knife and a handgun being the most common combination. In these cases, clearly, the typology again gives precedence to the handgun (or more generally, firearms) use. Given that our central concern in this study was criminal gun usage, this pattern of precedence was justifiable.

Finally, there were some inconsistencies in the responses given to this question that became apparent when other information provided in the questionnaire was taken into account. In particular, some of the men who claimed never to have used weapons in their crimes indicated elsewhere in the questionnaires that they had indeed used weapons of one or another sort. To the extent possible, these inconsistencies were resolved, usually in favor of gun usage.

The information contained in the initial two questions was supplemented with information on the specific types of weapons used and on the

---

frequency with which armed crimes had been committed. The end result was the following typology:

*Unarmed Criminals:* ($N = 725$ or 39%)
Prisoners for whom we could find no positive evidence anywhere in the questionnaire that they had ever used any weapons of any sort in committing their crimes.

*Improvisers:* ($N = 79$ or 4%)
Men who had used weapons, but not guns or knives, in their crimes, usually a variety of ready-to-hand weapons.

*Knife Criminals:* ($N = 134$ or 7%)
Men who used predominately knives and never firearms in committing their crimes.

*One-Time Firearms Users:* ($N = 257$ or 14%)
Men who had committed one and only one gun crime (whatever the type of gun they used).

*Sporadic Handgun Users:* ($N = 257$ or 14%)
Men who have used a handgun "a few times" in committing crimes but never a shoulder weapon.

*Handgun Predators:* ($N = 321$ or 17%)
Men who have used handguns "many," "most," or "all" of the time in committing their crimes.

*Shotgun Predators:* ($N = 101$ or 5%)
Men who claimed shoulder weapons as their most frequently used weapons and who committed more than one crime with such weapons. Since most of these persons used sawed-off shotguns, we use the term *Shotgun Predators* for them. It should be noted, however, that a few of them used other types of shoulder weapons instead.

## VALIDATION

Men in the sample had numerous opportunities to tell us about their past weapons use, and only a subset of these items has been used specifically in constructing the typology of armed criminals.[2] It is therefore possible to get some sense of the validity of the typology by analyzing its relationships to some of these other questions.

We stress in advance that there are inherent ambiguities in the concept of *armed crime*. To carry a weapon as one is committing a crime is clearly a different matter from using that weapon in some way in the course of the crime. A man who is burglarizing a house and who, incidentally, also happens to have a pocket knife along with him is clearly committing a crime while armed with a weapon but is only arguably committing an armed crime.

---

assignment only when the felon failed to answer one or more of the above three sequences. Comprehensive details on the assignment of these men to the categories of the typology are available from the authors on request (c/o Social and Demographic Research Institute, Machmer Hall W-35, University of Massachusetts, Amherst, MA 01003).

[2] To be sure, depending on the pattern of missing data to the various component items, virtually all of the information available on some of these men was employed in placing them in the typology. All told, however, 89% of the sample had nonmissing data on all relevant component items; and thus, various of the other pieces of information about weapons use contained within the questionnaire were employed in only 11% of the cases.

Other ambiguities also exist. Burglars, for example, might carry buck or sheath knives with them in the course of their burglaries to use as jimmying tools—to pry open windows and doors, to pick locks, etc. In this case, again, it is clear that these men are committing crimes while armed with a weapon and equally clear that they are using the weapon in order to complete the crime successfully. Would we want to say, however, that they are doing armed crime?

Or consider the case of drug dealers. Many dealers, apparently, go about their business heavily armed: Police often find in the glove compartments or trunks of their cars an imposing arsenal of weaponry, "just in case." Imagine, then, the dealer who has made literally hundreds of deals, was heavily armed in each and every one of those deals, but never encountered a situation where the use of any of the weapons was necessary. Again, that crimes were committed while the perpetrator was armed is obvious. Was it, however, an armed crime?

The very notion of armed crime, in short, is intrinsically ambiguous. As becomes apparent in later chapters, many of the men in our sample carried weapons with them as a matter of course, often for their own "protection." Given an average of nearly 10 prior arrests and more than 4 prior convictions, it is also clear that many of the men in the sample had an active criminal life as well. These points in mind, it should be clear that virtually any crime many of these men ever committed was an armed crime in the sense that they were armed when they committed it.

These inherent ambiguities in the concept of armed crime were anticipated during the development of the questionnaire; our hope was to deal with them by being very explicit and all-inclusive in the relevant questions. To illustrate, the initial question (reproduced above) is worded in the broadest possible terms. The idea was to begin with the broadest possible conception of armed crime and then to refine the concept on the basis of later questions; thus, the question was intended to include the case of a weapon possessed but not used and likewise to include every crime the man ever committed, whether he was apprehended for it or not. Whether it was actually interpreted by all respondents in precisely the way it was intended, however, is very much an open issue.[3]

---

[3] Our field workers reported more queries from respondents about these two filter questions than about any other set of items in the questionnaire. In many cases, a respondent would indicate that he had possessed a weapon in one of his crimes but did not actually use it and then would ask just where in the questionnaire he was supposed to go. In some cases, the respondent would answer the question as it was literally intended, skip to the appropriate section of the questionnaire, and then get confused because most of the questions he encountered there seemed irrelevant to his situation. That the concept of armed crime was much more ambiguous than we initially thought it was going to be was obvious once we had completed data collection at the first site.

---

## Validation

We begin our investigation of the utility of the typology by considering the conviction offenses reported by the sample. Conviction offenses were ascertained by presenting respondents with a list of 19 crime types (and a residual "Other" category) and asking them to indicate which of these crimes they were "now serving a sentence for." Multiple responses were obviously possible and, in fact, quite common; indeed, over the total sample, the mean number of conviction offenses reported was 1.51. The cross-tabulation of the conviction offense data and the armed criminals typology is shown below in Table 3.1.

One would not anticipate that the weapons usage typology will be completely predictive of the conviction offenses of the sample. But if the typology is valid, the relationships should be at least moderately strong.

In the total sample (first column of the table), the most frequent conviction offense was robbery (mentioned by 30%), followed by burglary (25%), aggravated assault (assault with a deadly weapon) (13%), and homicide (12%), with all other categories chosen by 10% or fewer. These patterns varied, at times sharply, across the categories of the typology, almost always in the manner one would expect. The firearms criminals (all four types), for example, were substantially more likely than the others to be doing time on a robbery charge. Likewise, the Handgun Predators and Shotgun Predators were about twice as likely to be in on a weapons charge as was the case for the total sample (22 versus 10%). Other findings of note are as follows.

### The Unarmed Criminals

The modal conviction offense among the Unarmed Criminals was burglary and breaking and entering, mentioned by 28%, followed in order by robbery (14%), theft (10%), and rape (10%). The robbery percentage for the group was the lowest shown in the table, and they were also much less likely than any other group to be doing time for aggravated assault. Interestingly, about 6% were in for homicide or manslaughter. The latter notwithstanding, the conviction-offense data for the group were broadly consistent with the patterns one would expect given their weapons behavior. Also of some interest, they reported the fewest average number of conviction offenses (mean = 1.21 offenses). These and other data presented later confirm, as one would guess, that Unarmed Criminals were generally among the least violent and least criminally active men in the sample.

### The Improvisers

The Improvisers turned out to be quite a distinctive group. First, unlike any other group, the modal conviction offense for the Improvisers was homicide, mentioned by 28%. Indeed, their homicide percentage was the

**TABLE 3.1.** Self-Reported Conviction Offenses by Gun-Usage Type (in Percentages)

| | | Gun-usage type | | | | | | |
|---|---|---|---|---|---|---|---|---|
| | Total | Unarmed | Improviser | Knife | One-timer | Sporadic handgun | Handgun predator | Shoulder weapon |
| Conviction offense[a] | | | | | | | | |
| (N) = | (1874) | (725) | (79) | (134) | (257) | (257) | (321) | (101) |
| Arson | 1 | 1 | 3 | 4 | 0 | 1 | 1 | 2 |
| Simple assault | 4 | 4 | 4 | 6 | 3 | 2 | 5 | 5 |
| ADW | 13 | 5 | 22 | 18 | 18 | 13 | 16 | 27 |
| Auto theft | 7 | 9 | 3 | 7 | 9 | 9 | 9 | 11 |
| Burglary | 25 | 28 | 25 | 24 | 12 | 27 | 26 | 28 |
| Counterfeiting | 1 | 1 | 0 | 2 | 0 | 0 | 0 | 1 |
| Drug possession | 7 | 9 | 6 | 4 | 2 | 3 | 12 | 6 |
| Drug sales | 6 | 7 | 3 | 4 | 5 | 4 | 9 | 9 |
| Forgery | 5 | 6 | 1 | 3 | 3 | 3 | 4 | 4 |
| Fraud | 1 | 1 | 1 | 0 | 2 | 0 | 1 | 4 |
| Kidnapping | 4 | 3 | 5 | 5 | 5 | 3 | 5 | 9 |
| Homicide | 12 | 6 | 28 | 15 | 21 | 9 | 14 | 13 |
| Manslaughter | 3 | 2 | 1 | 5 | 6 | 2 | 2 | 3 |
| Stolen property | 5 | 4 | 5 | 7 | 16 | 7 | 8 | 8 |
| Rape | 9 | 10 | 7 | 3 | 9 | 7 | 8 | 4 |
| Other sex crime | 6 | 8 | 3 | 5 | 9 | 4 | 4 | 5 |
| Robbery | 30 | 14 | 25 | 22 | 37 | 50 | 44 | 40 |
| Theft | 10 | 10 | 12 | 9 | 7 | 9 | 14 | 16 |
| Weapons charge | 10 | 3 | 3 | 6 | 13 | 11 | 17 | 23 |
| X Number of conviction offenses | 1.51 | 1.21 | 1.47 | 1.57 | 1.48 | 1.61 | 1.99 | 2.01 |

| | Total | Unarmed | Improviser | Knife | One-timer | Sporadic handgun | Handgun predator | Shoulder weapon |
|---|---|---|---|---|---|---|---|---|
| Armed at time | | | | | | | | |
| Percentage yes | 54 | 1 | 62 | 79 | 82 | 71 | 80 | 81 |
| (N) = | (1509) | (470) | (69) | (122) | (232) | (231) | (299) | (86) |
| If armed, with what?[b] (in percentage)[b] | | | | | | | | |
| (N) = | (810) | (9) | (43) | (96) | (191) | (165) | (239) | (70) |
| Handgun | 59 | — | 9 | 3 | 70 | 73 | 18 | 34 |
| Any shoulder weapon | 25 | — | 0 | 5 | 24 | 17 | 24 | 63 |
| Any knife | 41 | — | 9 | 88 | 16 | 23 | 34 | 51 |
| Any "other" | 22 | — | 79 | 7 | 3 | 9 | 13 | 23 |
| X Number of weapons mentioned | 1.4 | — | 0.6 | 1.2 | 1.2 | 1.2 | 1.8 | 2.4 |
| Percentage carrying two or more weapons | 23 | — | 5 | 6 | 12 | 19 | 37 | 53 |
| Other | | | | | | | | |
| X Prior arrests | 9.9 | 6.7 | 8.9 | 9.7 | 7.5 | 12.3 | 16.4 | 14.4 |
| (N) = | (1680) | (650) | (72) | (126) | (229) | (231) | (293) | (79) |
| X Prior convictions | 4.3 | 3.3 | 4.4 | 4.7 | 3.2 | 5.0 | 6.4 | 4.8 |
| (N) = | (1748) | (672) | (75) | (126) | (238) | (244) | (305) | (88) |
| X Prior incarcerations | 3.1 | 2.6 | 3.5 | 3.7 | 2.7 | 3.4 | 3.8 | 3.8 |
| (N) = | (1719) | (665) | (74) | (125) | (230) | (240) | (300) | (85) |

[a] Missing data omitted item by item.
[b] Multiple responses are possible.

62 / 63