highest shown in the table and was more than twice the percentage registered for the total sample. The group's figure for aggravated assault was also distinctively higher than the average—22 versus 13% in the total sample; it, too, was among the highest values registered in the table. Thus, relative to the rest of the sample, the Improvisers consisted disproportionately of murderers and aggravated assaulters. It would therefore appear likely that our category of Improvisers contains a fair-sized proportion of so-called criminals of passion—men prone to arguments, scuffles, fights, and barroom brawls and apt to pick up anything at hand for the purpose of meting out physical punishment, frequently enough with devastating results. The image one obtains from the conviction offense data on these men is that their aggressive tendencies were on "short-fuses"; they do not appear to be hardened or calculating criminals. Consistent with this depiction, their robbery percentage was among the lowest recorded in the table.

## Knife Criminals

As among the Unarmed, the modal conviction offense among the Knife Criminals was burglary (24%), followed closely by robbery (22%), then aggravated assault (18%), rape (16%), and homicide (15%). The Knife Criminals, interestingly, were much more likely to be doing time on a rape charge than any of the other categories shown in the table.

## Firearms Criminals

As might be anticipated, the modal conviction offense among all four categories of firearms criminals was robbery, with percentages ranging from 37 to 50%. Among the One-Time Firearms Users, robbery was followed by homicide (21%), then aggravated assault (18%). In the remaining three categories, burglary was the next most frequently mentioned conviction offense, followed in turn by either aggravated assault or some kind of weapons charge. Note finally that the Handgun Predators and Shotgun Predators showed the highest average number of conviction offenses of any group in the table.

In the questionnaire, the series on conviction offense was followed by a short question sequence asking for some details about the incident, specifically, whether the offender had been armed with any kind of weapon when he committed the crime for which he was then doing time. These data are shown in Panel II of Table 3.1. In the total sample, just over one-half (54%) had been armed during their conviction offense, a figure that varied from 1% (of the Unarmed) to 82% (of the One-Timers). In general, the "armed at the time" question gave results one would expect: About four-fifths of the Handgun Predators, Shotgun Predators, One-Time Firearms Users, and

Knife Criminals had been armed during the conviction crime as had been 71% of the Sporadic Handgun Users and 62% of the Improvisers.

The remainder of the information contained in Table 3.1 can be summarized rather more quickly; all of it is consistent with expectation. Of the 43 Improvisers who had been armed during their conviction offense, for example, 79% had been armed with some sort of improvised weapon.[4] (A few were also armed with something else as well, those carrying multiple weapons amounting to 5% of the total.) Likewise, 88% of the Knife Criminals who had been armed during the conviction offense ($N = 96$) were in fact armed with a knife, although here, too, a few (6%) were also carrying other weapons. It is worth noting, of course, that a few of both the Improvisers and the Knife Criminals said they were carrying some sort of firearm during the conviction offense, which means, by rights, that they should have answered "yes" to both filter questions and subsequently to have been categorized as firearms criminals. The numbers involved are sufficiently small ($N<15$), however, that any analysis of these inconsistencies is pointless.

Data for the various categories of firearms offenders are equally straightforward: 94% of the One-Time Firearms Users had been armed with a firearm at the conviction offense; 73% of the Sporadic Handgun Users and 81% of the Handgun Predators had been armed with a handgun during the conviction offense; 63% of the Shotgun Predators had been armed with some kind of shoulder weapon (the remainder with handguns). As in previous cases, many of these men also had been armed with other weapons as well, the tendency to carry multiple weapons being by far the most pronounced among the Predator categories (37 and 53%, respectively, carrying more than one kind of weapon during the conviction crime).

## PREVIOUS CRIMINAL HISTORIES

We can anticipate that the weapons usage types will vary in the extent to which they have had previous contacts with the police, the courts, and the prisons. It is to be expected that the Handgun Predators will have had the longest records and will have committed more serious crimes than, say, the Unarmed Criminals.

The data on prior arrests, convictions, and incarcerations also proved to

[4]Since data on the conviction offense were employed in assigning men to categories only when there were missing data on the other, more direct, questions, it is clearly not necessary that every "armed criminal" identified in the typology have been armed during the conviction offense. Likewise, assignment to categories in most cases depends on the man's report of the weapon "most frequently used" in commiting crimes, which makes it logically possible that an improviser, say, could have carried a knife during the conviction offense, or, for that matter, that Handgun Predators could have been armed with knives rather than handguns during the conviction offense, etc.

be much as one would expect. (See Panel IV of Table 3.1.) The total sample averaged 10 prior arrests, 4 prior convictions, and 3 prior incarcerations. In each case, the averages for the Unarmed Criminals were substantially lower than the overall averages, and in general, the averages tend to increase as one moves to the more predatory categories of the typology. The only major exception to this pattern is that the One-Time Firearms Users tended to show fewer "priors" than the Knife Criminals, which, under the circumstances, is perhaps not surprising.[5]

Table 3.2 is based on a series of questions asking how often the prisoners had committed each of a series of specific crimes. The answers constitute approximate criminal histories. As was the case with the data on conviction offenses, the data on criminal histories came out much as one would anticipate. In the total sample, the most commonly committed crime was theft (listed as a crime they had done at least once by 80%), followed by burglary and assault (71% each), then robbery and drug dealing (52% each), then murder and rape (13 and 12%, respectively). Results of interest for each of the seven types of crime are as follows.

## Assault

The lowest assault percentage in the table (48%) was registered by the Unarmed Criminals, with percentages in all other categories ranging upward from 75%. "Pride of place" (here and, for all practical purposes, everywhere in the table) went to the two more predatory categories, with 91% in each category claiming at least one prior assault. Most of the men who had ever done an assault had only done one or "a few," the percentage who claim more than "a few" amounting to 28% of the total sample. The low figures on "how often?" were found in the Unarmed, Improviser, and One-Time Firearms categories (13–15% of each category having done more than a few assaults); the high figures, of course, were registered by the Predators.

Overall, some two-thirds of the assaults reported by our sample involved some kind of weapon: Among the Unarmed category, the figure was just under a one-third and increased in a generally predictable fashion up

[5]As shown later, the Knife Criminals were generally more active and more violent on all counts than the One-Time Firearms Users. As with the Improvisors, the One-Timers appear to contain a fair-sized number of "criminals of passion," men who have committed only one serious crime. On all scores, of course, the Unarmed Criminals appear to be mainly "soft-core" criminals. The Improvisers and One-Timers are, as noted, often "criminals of passion," the two categories differing, one imagines, mainly in whether there was a firearm available in the "moment of rage." The Knife Criminals and Sporadic Handgun Users constitute yet a third package—more violent than the Improvisors and One-Time Firearms Users, but by no means the hardest of the "hard core." The hard-core violent criminals in the sample are heavily concentrated in the two Predator categories.

| | Type | | | | | | | |
|---|---|---|---|---|---|---|---|---|
| | Total | Unarmed | Improviser | Knife | One-timer | Sporadic handgun | Handgun predator | Shoulder weapon |
| (N) = | (1874) | (725) | (79) | (134) | (257) | (257) | (321) | (101) |
| 1. Ever do assault? | | | | | | | | |
| Percentage "yes" | 71 | 48 | 90 | 88 | 75 | 83 | 91 | 91 |
| N "yes" | (1270) | (317) | (70) | (113) | (186) | (206) | (290) | (88) |
| If yes: How often? | | | | | | | | |
| Percentage more than "a few" | 28 | 14 | 13 | 25 | 15 | 28 | 54 | 44 |
| If yes: Ever use weapon? | | | | | | | | |
| Percentage "yes" | 67 | 32 | 63 | 76 | 73 | 70 | 88 | 85 |
| N "yes" | (817) | (94) | (43) | (84) | (131) | (141) | (251) | (73) |
| If armed: With what? (in percentage)[a] | | | | | | | | |
| Handgun | 52 | 20 | 2 | 10 | 58 | 56 | 78 | 61 |
| Shoulder weapon | 36 | 9 | 0 | 13 | 23 | 24 | 59 | 88 |
| Any knife | 67 | 38 | 19 | 99 | 37 | 70 | 83 | 88 |
| Any "other" | 92 | 73 | 116 | 81 | 45 | 87 | 120 | 111 |
| 2. Ever do burglary? | | | | | | | | |
| Percentage "yes" | 71 | 60 | 74 | 76 | 58 | 82 | 88 | 92 |
| N "yes" | (1261) | (407) | (57) | (95) | (137) | (205) | (274) | (86) |
| If yes: How often? | | | | | | | | |
| Percentage more than "a few" | 40 | 22 | 33 | 41 | 27 | 46 | 68 | 49 |
| If yes: Ever use weapon? | | | | | | | | |
| Percentage "yes" | 46 | 8 | 30 | 56 | 33 | 60 | 85 | 72 |
| N "yes" | (545) | (30) | (16) | (50) | (43) | (119) | (228) | (59) |
| If armed: With what? (in percentage)[a] | | | | | | | | |
| Handgun | 70 | 41 | 7 | 12 | 49 | 80 | 92 | 57 |
| Shoulder weapon | 14 | 7 | 6 | 4 | 9 | 7 | 16 | 44 |
| Any knife | 70 | 47 | 25 | 98 | 60 | 69 | 72 | 76 |
| Any "other" | 28 | 30 | 63 | 42 | 28 | 26 | 22 | 36 |
| 3. Ever deal drugs? | | | | | | | | |
| Percentage "yes" | 52 | 33 | 47 | 54 | 44 | 60 | 85 | 73 |
| N "yes" | (893) | (210) | (34) | (67) | (103) | (148) | (263) | (68) |

(continued)

**TABLE 3.2.** Criminal Histories by Type (*continued*)

| | Total | Unarmed | Improviser | Knife | One-timer | Sporadic handgun | Handgun predator | Shoulder weapon |
|---|---|---|---|---|---|---|---|---|
| (*N*)= | (1874) | (725) | (79) | (134) | (257) | (257) | (321) | (101) |
| If yes: How often? | | | | | | | | |
| Percentage more than "a few times" | 59 | 47 | 50 | 60 | 47 | 55 | 74 | 69 |
| If yes: Ever carry weapon? | | | | | | | | |
| Percentage "yes" | 62 | 21 | 34 | 62 | 46 | 69 | 92 | 85 |
| *N* "yes" | (532) | (41) | (11) | (40) | (46) | (99) | (240) | (55) |
| If armed: With what? (in percentage)[a] | | | | | | | | |
| Handgun | 88 | 81 | 54 | 28 | 85 | 96 | 100 | 78 |
| Shoulder weapon | 32 | 17 | 36 | 18 | 8 | 20 | 35 | 69 |
| Any knife | 54 | 44 | 55 | 95 | 48 | 46 | 51 | 65 |
| Any "other" | 20 | 10 | 45 | 33 | 15 | 12 | 21 | 29 |
| 4. Ever kill someone? | | | | | | | | |
| Percentage "yes" | 13 | 2 | 14 | 11 | 14 | 13 | 33 | 34 |
| *N* "yes" | (225) | (12) | (10) | (13) | (34) | (30) | (97) | (29) |
| If yes: How often? | | | | | | | | |
| Percentage more than "once" | 35 | 8 | 0 | 8 | 15 | 27 | 52 | 48 |
| If yes: With what? (in percentage)[a] | | | | | | | | |
| Handgun | 61 | 46 | 20 | 8 | 71 | 70 | 72 | 46 |
| Shoulder weapon | 50 | 33 | 0 | 38 | 32 | 27 | 59 | 93 |
| Any knife | 32 | 17 | 10 | 92 | 18 | 47 | 27 | 34 |
| Any "other" | 30 | 17 | 90 | 46 | 9 | 17 | 33 | 34 |
| 5. Ever do rape? | | | | | | | | |
| Percentage "yes" | 12 | 10 | 11 | 20 | 9 | 13 | 17 | 18 |
| *N* "yes" | (211) | (63) | (8) | (23) | (21) | (31) | (48) | (17) |
| If yes: How often? | | | | | | | | |
| Percentage more than "once" | 36 | 29 | 25 | 48 | 43 | 35 | 40 | 41 |
| If yes: Ever use weapon? | | | | | | | | |
| Percentage "yes" | 36 | 7 | 38 | 86 | 50 | 45 | 33 | 53 |
| *N* "yes" | (73) | (4) | (3) | (19) | (10) | (13) | (16) | (8) |
| *If armed: With what? (in percentage)*[a] | | | | | | | | |
| Handgun | 35 | —[b] | — | 5 | 40 | 33 | 75 | — |
| Shoulder weapon | 16 | — | — | 11 | 0 | 0 | 19 | — |
| Any knife | 66 | — | — | 116 | 60 | 54 | 50 | — |
| Any "other" | 23 | — | — | 16 | 20 | 15 | 6 | — |
| 6. Ever do robbery? | | | | | | | | |
| Percentage "yes" | 52 | 17 | 47 | 51 | 57 | 85 | 87 | 83 |
| *N* "yes" | (907) | (111) | (34) | (62) | (137) | (213) | (274) | (76) |
| If yes: How often? | | | | | | | | |
| Percentage more than "a few" | 23 | 6 | 0 | 10 | 4 | 7 | 53 | 41 |
| If yes: Ever use weapon? | | | | | | | | |
| Percentage "yes" | 87 | 26 | 78 | 82 | 93 | 96 | 98 | 97 |
| *N* "yes" | (767) | (25) | (25) | (49) | (125) | (202) | (268) | (73) |
| If armed: With what? (in percentage)[a] | | | | | | | | |
| Handgun | 79 | 36 | 4 | 19 | 74 | 94 | 97 | 60 |
| Shoulder weapon | 38 | 8 | 8 | 8 | 20 | 22 | 55 | 95 |
| Any knife | 37 | 16 | 8 | 92 | 18 | 32 | 41 | 45 |
| Any "other" | 18 | 36 | 88 | 22 | 6 | 8 | 19 | 32 |
| 7. Ever do theft? | | | | | | | | |
| Percentage "yes" | 80 | 68 | 85 | 83 | 72 | 95 | 96 | 95 |
| *N* "yes" | (1440) | (463) | (63) | (106) | (176) | (237) | (302) | (93) |
| If yes: How often? | | | | | | | | |
| Percentage more than "a few" | 48 | 31 | 44 | 39 | 30 | 49 | 84 | 66 |
| If yes: Ever carry weapon? | | | | | | | | |
| Percentage "yes" | 42 | 4 | 32 | 37 | 35 | 62 | 79 | 73 |
| *N* "yes" | (570) | (17) | (19) | (37) | (59) | (140) | (233) | (65) |
| If armed: With what? (in percentage)[a] | | | | | | | | |
| Handgun | 77 | 35 | 6 | 19 | 68 | 88 | 94 | 62 |
| Shoulder weapon | 31 | 0 | 11 | 3 | 20 | 16 | 39 | 78 |
| Any knife | 56 | 24 | 16 | 105 | 34 | 47 | 63 | 66 |
| Any "other" | 24 | 47 | 84 | 30 | 12 | 14 | 24 | 32 |

[a]Multiple responses are possible.
[b]*N* less than 10.

to the high figure, 88%, among Handgun Predators. Among the 725 Unarmed Criminals, there were 94 men (13%) who had committed at least one armed assault, an apparent inconsistency. However, a further check on the types of weapons employed by these 94 showed the distribution to be dominated by the "other weapon" category—beer bottles, two-by-fours, and other "weapons" that happened to be at hand. It would be debatable, therefore, whether these were truly "armed crimes" in the usual sense of the term.

Excepting the result for the Unarmed Criminals, the other data on weapons used in assault came out precisely as one would expect. Essentially, all of the Improvisers who had ever done an armed assault, for example, used some sort of improvised weapon for the purpose. (To be sure, here as in all cases, a few of them had assaulted with other weapons as well.) Likewise, virtually all of the Knife Criminals who had ever done an armed assault used a knife to do so; 78% of the Handgun Predators had ever done at least one handgun assault; and 88% of the Shotgun Predators had committed at least one shotgun assault. The choice of assault weapons, in other words, was highly consistent with the categories of our typology.

The use of multiple weapon types in committing assault bears a special emphasis, especially among the more predatory categories. Among the Handgun Predators who had ever done an armed assault (and 78% of them had), 78% had, as noted above, used a handgun in at least one of them. About three-fifths, however, had also committed assaults with shoulder weapons, some 83% with a knife, and all of them had done at least one assault with some "other" weapon. In this sense, the phrase, "Handgun Predator," is somewhat misleading: They turn out to be, in essence (here and everywhere else in the table), omnibus weapons abusers. The same, of course, can be said of the Shotgun Predators: Nearly 90% of those who had done any armed assault had done at least one with a shoulder weapon, but 61% had also committed a handgun asault, about 90% had also done at least one knife assault, and virtually all had committed at least one assault with some "other" weapon.[6]

[6]The question about ever having done an assault was followed by an extensive series asking for details. Among those who had ever done an assault (N = 1270), about 18% had done only one; the modal response to "how often?" was "a few times" (50%); about 3% of the sample had done "hundreds" of them. Just under one-quarter of the assaulters in the sample affirmed that at least one of their assaults had been directed against a family member; 57% affirmed that at least one had involved "friends or acquaintances." The typical victim, however, was a stranger; 81% of the assaulters in the sample reported at least one assault on someone they "didn't really know." These general patterns were roughly the same for the assaulters in each of our seven categories.

We also asked where these assaults occurred. The most common response was "out in public," mentioned by 66%, followed in order by "in a bar or tavern" (59%),

## Burglary

Burglary was a fairly common crime in all categories of the typology, the burglary percentages ranging from 60 (among the Unarmed) to 92% (among Shotgun Predators). Except for theft, burglary was the most common crime among the Unarmed Criminals. As always, the highest burglary percentages were registered by the Predators, some 90% of whom had done at least one burglary. They were also the more active burglars: 68% of the Handgun Predators who had ever done burglary had done more than "a few" of them and likewise for 49% of the Shotgun Predators—these being the two highest values shown in the table. Thus, relative to the others, the Predators were more likely to do burglaries and more likely to do lots of them; they were also the most likely, by far, to have been armed while doing them. It would thus appear that many of the burglaries these men committed may have been "burglaries" only accidentally; had anyone been around at the time, they might well have been robberies instead.

The weapons carried during burglaries were much as one would expect. Most armed burglars carried a handgun and a knife, but then, most armed burglars were Handgun Predators by our definition, and their pattern, therefore, dominates the results for the total sample. In general, burglars who went armed and carried the weapons they would be expected to carry given their placement within the categories of our typology.

## Drug Dealing

One-half the sample had dealt drugs at least once: The Unarmed were the least likely to have done so (33%), and the Handgun Predators were the most likely (85%), followed by the Shotgun Predators (73%). The Predators were also the most likely to have done so more than "a few times" and the most likely to have carried a weapon in the process. About 90% of the Predators who dealt in drugs did so armed, virtually always with one or another firearm.

"in school" (56%), "in somebody else's house or apartment" (46%), and in the respondent's own house or apartment (39%). In all cases, the Predators reported the highest values: Among the Predators who had done at least one assault, for example, over 70% reported at least one of them to have occurred in a bar or tavern. We also asked the assaulters in the sample whether they had ever "seriously hurt anybody" in the course of their assaults. In the total sample, only 18% answered "no." Well over 90% of the Predator assaulters claimed to have seriously hurt someone during one or more of their assaults. About 21% of the assaulters also affirmed that there was "a chance" that someone had died as a result of the assault(s), a figure that varies from 7% of the assaulters in the Unarmed category up to 39% of the assaulters in the Handgun Predator category.

## Criminal Homicide

Of the total sample, 13% claimed to have killed somebody at least once in their lives, a figure that varied from 2% of the Unarmed up to one-third of both predator categories. One-half the Predators who had ever killed someone claimed to have done so more than once, by far the highest percentage recorded. Most of the homicide perpetrators in the sample (61%) claimed to have used a handgun for the purpose, but one-half also claimed to have used a shoulder weapon at least once. As in previous cases, the choice of homicide weapons across categories was generally consistent with the typology.

The heavy concentration of homicide within the Predator categories warrants emphasis. By these men's own admission, there were 225 homicide offenders in our sample—men who had killed at least once. Of the 225, 56% were in one of the two Predator categories, and if the Sporadic Handgun Users were added, the figure would rise to about 70%. In the categories in question, homicide, which is often depicted as a unique sort of crime, appears to be merely one more aspect of a generally violent and criminal life.

The multiple homicide offenders in our sample (men who had killed more than once) were also heavily concentrated in the two predatory categories. All told, our sample contained 79 men who claimed to have committed murder more than once, and 81% of them were in these two classes.

## Rape

Rape was the only crime among the seven we asked about where the Predators did not lead the field. Overall, 12% of the sample had raped at least once, a figure that varied from 9 (among the One-Time Firearms Users) to 20% (among the Knife Criminals). The concentration of rapists in the knife category was remarked upon earlier in discussing conviction offenses. The rape percentages in the Predator categories were only slightly below that of the Knife Criminals—approximately 17–18%.

In the total sample, 36% of the men who had ever raped had done so more than once; among the Knife Criminal rapists, the figure was 48%, by far the highest value shown. About one-third of the rapes committed by the sample involved some sort of weapon; and again, the Knife Criminal rapists turned out to be a distinctive group, some 90% of them having used a weapon. The tendency of Handgun Predators not to use weapons while committing rape is perhaps a noteworthy finding (only one-third of them reported a weapons involvement), but the sample size at this point is too small to draw any firm conclusions.

## Robbery

One-half the sample had done at least one robbery; and of those who had done at least one, about one-quarter had done more than "a few." The Unarmed Criminals were the least likely to have committed robbery and Handgun Predators, the most likely. Predictably, the Predators were also the most active robbers, with 40–50% of them reporting more than "a few" robberies. Excepting the Unarmed, almost everyone in the sample who had committed robbery used a weapon for the purpose, with percentages ranging from 78 to 98%. The weapons used in committing robberies were as one would expect: Knife Criminals used improvised weapons (88%), the Knife Criminals used knives (92%), and the Firearms Criminals used firearms primarily but were also more likely than the other categegories to carry multiple robbery weapons.

## Theft

Theft was the most common of the seven crimes asked about; some four-fifths of the total sample had committed at least one theft. (The question asked whether the man had ever stolen something worth more than $50.) As in almost every other case, the Unarmed showed the lowest theft percentage, and the Predators showed the highest. The Predators were the least done most active thieves: In the total, about one-half the men who had ever done theft had done more than "a few," while among the Handgun Predators, the figure was 84%. Our Predators also carried weapons while doing thefts, much more so than any other category. In fact, as becomes increasingly obvious, the Predators tended to do every conceivable kind of crime and to be armed more or less constantly.

## "Total Criminality"

The detailed criminal history information just summarized is, at best, cumbersome to work with; it proves useful to combine all the information into a single "total criminality" index. The idea, basically, is to convert each man's past criminal activities into a single variable that can be more efficiently analyzed than the item-by-item results.

Obviously, such a variable has to take into account not only the kinds of crimes each man has done in his career, but their relative seriousness and frequency. Under this viewpoint, a man who has killed once is "more criminal" than a man who committed a single theft, and the man who has done two homicides is "more criminal" than the man who has done only one. An obvious approach is to weight each crime type asked about in the one. An obvious approach is to weight each crime type asked about in the criminal history section by its relative seriousness, multiply the relative se-

riousness by the frequency with which the crime was committed, then, finally, sum the resulting scores across crime types.

As discussed above, the criminal history questions asked about seven major crime types: assault, burglary, drug dealing, homicide, rape, robbery, and theft. Seriousness scores for each of these seven crime types were derived from recent work published by Wolfgang (1980)[7] in which a national sample of Americans was asked to rate the seriousness of a large number of different crimes. Wolfgang's scores were used to weight the frequencies recorded for each of the seven crime types. Table 3.3 shows the

[7] In the Wolfgang study, literally hundreds of "incidents" were included; in our data, questions dealt exclusively with broad categories of crime types. In order to assign seriousness scores to our crime types, we simply took every incident from the Wolfgang list that represented one of the types of crime, then averaged over the seriousness scores reported for all those incidents (see Table 3.3). To illustrate, there were 15 different "incidents" in the Wolfgang list that we determined to be "assaults," with seriousness scores ranging from 135 to 543. Since our question asks only about "assaults," with no further details, we can therefore derive an average "seriousness score" for the crime of assault by averaging the Wolfgang scores for the 15 assault incidents contained in his study. Table 3.3 records the results of this work: For each crime, it shows (1) the number of "incidents" on which the average for the crime type was based; (2) the minimum and maximum seriousness scores within the set of incidents; and (3) the calculated arithmetic average, the latter being the specific numerical weight we used in creating the Total Criminality Index. In general, the resulting averages are quite consistent with most other "crime seriousness" measures.

The next step was to convert the response options used in the criminal history section to numerical frequencies. With the exception of homicide, this conversion was as follows: If the man said he had never done the crime in question or if he simply did not answer the question, he was given a "0" for the frequency measure. If he responded "just once" or if he indicated in the initial question that he had done the crime but was missing data on how often, he was given a frequency score of "1." For the remaining response categories, the conversions were as follows: "a few times" = 5 times; "maybe ten or fifteen times" = 10 times; "dozens of times" = 25 times; and "hundreds of times" = 100 times. The response options for the homicide question were slightly different and were handled as follows: "no, never" or missing data = 0 times; "just once" or "yes" but no answer to the "how often?" question = 1 time; "a few times" = 5 times; and "many times" = 10 times.

The final step was to multiply the seriousness score for each crime type by the frequency with which the man had committed that crime type and then to sum the resulting scores over the seven crime types. Theoretically, the resulting sum can vary from 0 (the score a man would receive if he never committed any of the seven crimes in question) to 166,450 (the score a man would receive if he had done "hundreds" of every crime but homicide and "many" homicides.)

Empirically, 136 "zero" scores were observed, a plausible result since many of the men in the sample will have never committed any of the crimes asked about in the sequence; and the highest score observed for any single man was 129,299—some 78% of the maximum possible value. (Five men obtained scores over 100,000.) To avoid any further dealings with ludicrously large numbers, our final measure of total criminality is the score discussed above divided by 100.

Previous Criminal Histories

TABLE 3.3. Derived "Seriousness Scores" for Seven Types of Crime[a]

| Crime | Number of incidents | Minimum seriousness | Maximum seriousness | Average seriousness |
|---|---|---|---|---|
| Burglary | 14 | 61 | 212 | 125 |
| Theft | 15 | 38 | 239 | 128 |
| Robbery | 22 | 112 | 460 | 249 |
| Assault | 15 | 135 | 543 | 271 |
| Drug dealing | 15 | 187 | 452 | 304 |
| Rape | 4 | 369 | 657 | 508 |
| Murder | 5 | 611 | 946 | 795 |

[a]See Fn. 7 for details on the entries in this table.

TABLE 3.4. "Total Criminality" by Type

| | $\bar{X}$ | SD | Sum | Percentage of total sum |
|---|---|---|---|---|
| Unarmed | 61 | 113 | 44,011 | 17 |
| Improvisers | 101 | 140 | 8,005 | 3 |
| Knife criminals | 109 | 129 | 14,560 | 6 |
| One-timer | 84 | 136 | 21,677 | 8 |
| Sporadic | 151 | 158 | 38,773 | 15 |
| Handgun predators | 332 | 232 | 106,453 | 41 |
| Shotgun predators | 265 | 269 | 26,807 | 10 |
| Total | 139 | 190 | 260,286 | 100 |

seriousness scores that were used in weighting the crimes committed by the men in the sample.

Table 3.4 shows the means and standard deviations of the resulting Total Criminality Index, first for the total sample then separately for each of the seven categories of the typology. The numbers do not have any intuitively obvious meaning except that the higher the Total Criminality Index, the more serious and more frequent was the total set of crimes admitted by the felon.

The overall sample mean was 139. As would be expected, the lowest category mean was found for the Unarmed Criminals (mean = 61), followed, interestingly, by the One-Time Firearms Users (mean = 84). Judging from the "total criminality" result, these two categories contained mostly "soft-core" felons—men who had committed fewer crimes and less serious crimes than the others.

The Improvisers (mean = 101) and the Knife Criminals (mean = 109) formed a second distinctive cluster—clearly more criminal overall than the Unarmed and the One-Timers, but well below the remaining categories.

Then, about midway between this last set of categories and the truly high-rate felons, one finds the Sporadic Handgun Users (mean = 151).

Finally, there are the Predators, whose scores were sharply higher than the scores obtained in any of the other categories. Among the Shotgun Predators, the mean = 265, and among the Handgun Predators, who are clearly the most active and most violent of them all, the mean = 332. As was apparent in the item-by-item results, the men we have labeled Predators were clearly omnibus felons—men who, one imagines, committed more or less any crime they had the opportunity to commit.

As shown in the third column of the table, the sum of the "total criminality" index over the entire sample was about 260,000. The percentage of this total sum accounted for by each of the seven categories is shown in the fourth column. The Unarmed Criminals amounted to about 39% of the total sample but accounted for only 17% of the total crime this sample has committed. The Predators (handgun and shotgun combined), in contrast, amounted to about 22% of the sample and yet accounted for 51% of the total crime. If one adds the Sporadics in, we are dealing with just over one-third of the total sample and just under two-thirds of the total crime. Thus, when we talk about "controlling crime" in the United States today, we are talking largely about controlling the behavior of these men.

The distinctiveness of the Predators can be seen in yet another way. In the well-known RAND study of criminal careers (Chaiken and Chaiken, 1982), a category of criminal was isolated and given the label "violent predator"—obviously quite similar to our Predator categories. The RAND category was defined by the crimes of assault, robbery, and drug dealing. Response categories to the relevant questions in our study were very different from those employed in the RAND survey, making it impossible to duplicate the RAND typology exactly. However, we can locate the subset of our sample that had done more than "a few" robberies, more than "a few" assaults, and more than "a few" drug deals. As it happens, there were 90 men in our sample who had done more than "a few" of all three types of crime, of whom 84 fell into one of the two Predator categories. (Three of the remaining six were Sporadic Handgun Users by our definition; none of the other categories had more than one apiece.) Among these 90, incidentally, the average score on the Total Criminality Index was 573, and thus, these 90 men alone (representing only 5% of the sample) accounted for nearly 20% of the total crime committed by the sample. It is, we think, fairly obvious that RAND's "violent predators" and our Handgun and Shotgun Predators are, in the main, the same kinds of people.

It is also clear from the materials presented in this chapter that the Predators were not criminal "specialists" in any sense of the word. They were, instead, what we can refer to as omnibus felons—men prone to commit virtually any kind of crime available in the environment for them to commit. Thus, excepting rape, they were the most likely to have done each of

the crimes we asked about, the most likely to have done each of them more than a few times, and the most likely to have been armed when they did it. Clearly, these men were criminal "opportunists," the hardest of the hard-core, the so-called career criminals who contribute so disproportionally to the American crime problem.

# 4

## PATTERNS OF WEAPONS OWNERSHIP AND USE: ON THE CIRCUMSTANCES OF CRIMINAL VIOLENCE

Americans use firearms in many ways in the pursuit of a variety of ends. In this respect, felons resemble other Americans, although their mix of purposes tends to be markedly different from that of their fellow citizens. As we see in this chapter, many felons use guns in legitimate as well as illegitimate applications. Although many of the prisoners we interviewed had used guns in their crimes, many gun-owning felons had not. And even those who had used guns in their crimes also used them for other purposes as well. In short, firearms ownership and use are not all "of a piece" even among the criminal population.

It also proves useful to look closely at how weapons are actually used in crimes. In some cases, weapons are used instrumentally, to intimidate prospective victims; in others, weapons may be present "just in case," to be used only if circumstances appear to demand it. The actual patterns of criminal gun use prove to be complicated and diverse. Understanding them will lead, one hopes, to better ideas about how to cope with the policy issues involved.

### OVERALL PATTERNS OF OWNERSHIP AND USE

To obtain a proper perspective on prisoners' use of firearms, we begin by describing the general patterns of firearms ownership and use among the overall sample, as background to the more extended discussion of criminal aspects of gun ownership and use that follows. Relevant data are shown in Table 4.1. As indicated, three-quarters of the men in the sample had owned one or more firearms at some time in their lives. This amounts to just over 1300 men, the subsample on which all the rest of this section is based. A little more than one-half (57%) owned a gun at the time of their last arrest.[1]

[1] It is worth a note that nearly one-half of the men in the sample who did not own a gun at the time they were last arrested but were armed, nonetheless, during that offense, were armed with some sort of firearm. Clearly, one does not need actually to own a gun in order to carry a gun during one's crimes: In many cases, these firearms would have been borrowed from friends and associates or stolen during the crime, etc.

79

TABLE 4.1. General Ownership and Use of Firearms: Total Sample
(in Percentages)

1. Have you personally ever owned or possessed any kind of gun?
No       25
Yes      75
  (N)    (1732)

2. [If yes] About how many firearms, altogether, have you ever owned or possessed?
1   (1)*      15
2-3 (2.5)     27
4-5 (4.5)     15
6-10 (8)      10
11+ (13)      33
  (N)=        (1123)
  Mean =      6.6 guns

3. [If yes to (1)] Ever owned a handgun?
No       13
Yes      87
  (N)=   (1184)

4. [If yes to (1)]: Did you own a gun when you were last arrested?
No       43
Yes      57
  (N)=   (1169)

What kind was it?

|         | Yes | (N)= |
|---------|-----|------|
| Handgun | 78  | (659) |
| Rifle   | 34  | (658) |
| Shotgun | 44  | (660) |

5. [If yes to (3)]: How many handguns have you ever owned?
1   (1)*      17
2-3 (2.5)     28
4-5 (4.5)     14
6-10 (8)      13
11+ (13)      29
  (N)=        (951)
  Mean =      6.2 handguns

6. [If yes to (1)]: Ever owned a rifle?
No       24
Yes      76
  (N)=   (1176)

A shotgun?
No       23
Yes      77
  (N)=   (1170)

7. [If yes to (1)]: Did you ever register any of your guns with the police or authorities?
No       75
Yes      25
  (N)=   (1164)

(continued)

Did you ever apply for a permit to purchase or carry?
No       85
Yes      15
  (N) =  (1166)

8. [If yes to (1)]: When you had a gun, did you usually keep it loaded or unloaded?
Loaded     61
Unloaded   39
  (N) =    (1172)

9. [If yes to (1)]: Did you ever get a gun specifically for use in crimes?
No       72
Yes      28
  (N)=   (1169)

10. [If yes to (1)]: Except during military service, did you ever threaten to shoot someone with any of your guns?
No, never         51
Yes, one time     15
Yes, a few times  27
Yes, many times   6
  (N)=            (1152)

11. [If yes to (1)]: Except during military service, have you ever actually fired a gun at somebody?
No, never         50
Yes, one time     21
Yes, a few times  23
Yes, many times   6
  (N)=            (1146)

12. [If yes to (1)]: Which of the following best describes the situation(s) in which you fired a gun at somebody?

|                               | Yes | (N)= |
|-------------------------------|-----|------|
| During a gang fight           | 32  | (563) |
| During a family fight         | 8   | (562) |
| In a bar or tavern            | 27  | (563) |
| To protect myself             | 66  | (563) |
| Someone breaking into my home | 14  | (561) |
| While committing a crime      | 39  | (561) |
| While leaving scene of a crime| 29  | (561) |
| During a drug deal            | 29  | (561) |
| Shootout with police          | 17  | (559) |
| On my job                     | 6   | (556) |

13. [If yes to (13)]: Did you ever actually wound a person by shooting them with a gun?
No                31
Yes, once         37
Yes, a few times  27
Yes, many times   5
  (N)=            (557)

14. [If yes to (13)]: Were you trying to wound them (or kill them) or was it an accident?
Trying       80
Accidental   20
  (N)=       (372)

(continued)

82    Patterns of Weapons Ownership and Use

TABLE 4.1. General Ownership and Use of Firearms: Total Sample (in Percentages) (continued)

15. [If yes to (1)]: Before you came to this prison, about how often would you say you fired your gun?

| | |
|---|---|
| Never | 10 |
| Once a year | 8 |
| A few times a year | 25 |
| About once a month | 8 |
| A few times a month | 18 |
| About every week | 13 |
| More than once a week | 18 |
| (N)= | (1099) |

16. [If "once a year" or more to (15)]: Which of the following best describes the situation in which you usually fired your gun?

| | |
|---|---|
| In self-defense | 14 |
| While hunting | 17 |
| Target shooting | 35 |
| At a gun club, range | 3 |
| Multiple "legal" response | 19 |
| During a crime | 11 |
| (N)= | (974) |

*The numbers in parentheses show the category midpoints used to calculate the reported averages.

It is difficult to compare this level of gun ownership with existing data on the general American population. National household surveys have been the major source of data on civilian gun ownership and have consistently shown that about one-half of all households own at least one firearm (Wright, Rossi, and Daly, 1983). Unfortunately, these surveys typically ask about guns in possession of households at the *time of the interview*. In contrast, our prisoners were interviewed as *individuals* and asked whether they had ever owned a firearm *at any time* in their lives. It is certainly conceivable that a national survey of adult men that asked about gun ownership over entire lifetimes would also find some three-quarters responding yes.

A possibly more appropriate comparison with the American population in general can be made by considering the proportion of prisoners who claimed to have personally owned a firearm at the time of their arrest (57%). Since 1980, the National Opinion Research Center's General Social Surveys have included an approximately comparable question on individual (versus household) gun ownership. According to Gary Kleck (personal communication), these data show a rate of gun ownership of 23% among black males age 18–39, and a rate of 49% among white males in the same age categories. (To emphasize, these figures are for *personal*, not household, ownership.) If we weight these ownership figures according to the racial distribution of the prisoners in the sample, we get a predicted rate of gun ownership among our felons of 37%, versus the observed rate of 57%.

Overall Patterns of Ownership and Use    83

Based on these comparisons, we would conclude that felons are substantially more likely to own guns than their counterparts in the civilian population. (Even this comparison is, of course, imprecise. A more precise comparison would require further adjustments for city size, social class or income, and possibly other factors. These data, in short, suggest a higher than average rate of gun ownership among felons, but the result is by no means definitive.)

There are some ways, however, in which prisoners were inarguably different from the general civilian population. Of those who owned a gun at the point of last arrest, most (78%) owned a handgun, some 34% owned a rifle, and 44% owned a shotgun. Handgun ownership thus appears to be proportionally more widespread among prisoners than among the general population, in which perhaps one-half the households who own any guns own handguns.

In addition, prisoners appear to have owned larger numbers of guns than their civilian counterparts (although this, too, is by no means certain). Men in the sample who had ever owned guns tended to have owned them in what appears to be fairly large numbers. Indeed, the modal number of guns of all types ever owned was "more than 10," and the average (mean) number ever owned among those having owned at least one was 6.6 firearms. This can be loosely contrasted with the average number of guns owned among all U.S. families owning at least one gun, which is about 3.2 firearms (Wright, Rossi, and Daly, 1983: 40). This comparison is only a rough one because the data from national surveys pertain to ownership at the time of the survey and not over the entire lifetime of the household. Nevertheless, it suggests that gun-owning criminals tend to own guns in rather large numbers.[2]

Gun-owning criminals were also much more likely ever to have owned handguns than gun-owning families at large. Available data suggest that about one-quarter of all U.S. families, and thus about one-half of all gun-owning families, possess at least one handgun (Wright, Rossi, and Daly, 1983: Chs. 2–5); among the men in our sample who had ever owned any firearm, 87% had owned at least one handgun.

[2] Our question asks each man how many guns he has ever owned; the survey estimate of 3.2 firearms per gun-owning U.S. household is based on a question about the number of guns presently owned. It is certainly conceivable, and perhaps even rather likely, that the average number of guns ever owned among U.S. families owning at least one of them is on the order of 6 or 7 guns (or possibly more), in which case the average number ever owned among the men in our sample would be about average for gun-owning households. So far as we know, however, no national survey has ever asked gun-owning families about the number of firearms they have ever owned, so no precise comparison between our results and comparable national results is possible. The only safe conclusion would be that gun-owning felons tend to own guns at a rate at least as high as the rate among all U.S. gun owners in general.

As with firearms in general, these men also tended to have owned handguns in large numbers; again, the modal response to the "how many handguns" question was "more than 10" and the mean number owned among those ever owning at least 1 was 6.2 handguns. More than three-quarters of those ever owning any firearm had also owned at least 1 shotgun and a similar proportion had owned at least 1 rifle. The general picture that emerges here is that our prisoners were a heavily armed group; their tendency, clearly, was to have owned all types of firearms and to have owned fairly large numbers of them.[3]

By definition, our prisoners were not law-abiding citizens. Hence, there was little reason to anticipate that their weapons ownership would be "within the law." In at least some of the states in our sample, gun-registration laws were in effect. But few of the prisoners had ever registered their guns with authorities or applied for purchase or ownership permits. Men who had ever owned a gun were asked whether they had ever registered any of their guns with police or other authorities and also whether they had ever applied for a permit to purchase or carry their guns. The strong majority response was "no" in both cases (75% had never registered a gun, and 85% had never applied for a permit to purchase or carry). In general, the tendency not to have done these things was about the same in every state, regardless of state laws mandating one or the other of these measures.

Most of the gun owners in the sample (61%) made it a practice to keep their gun(s) loaded at all times; how this compares with normal practice among legitimate gun owners is unknown. In any event, being armed also meant keeping their guns "at the ready."

Of course, the crucial way in which felons differed from other gun owners is that many of them had used their guns in the commission of crimes. Although only 28% of the gun owners in the felon sample said that they had ever acquired a gun specifically for use in crime, it may be assumed that this proportion is much higher than in the general civilian population(!) But this finding also has another and somewhat more interesting implication: Since at least one half of the men in the sample had committed at least one gun crime at some point in their lives, it follows directly that many of the firearms that are ultimately used in crime are not acquired specifically for that purpose.

Whatever the reasons for acquisition, however, we saw in the previous

[3] Again, the comparisons reported in the text are hardly exact. A more exact comparison would be between the rate of handgun ownership observed in our sample and the rate of handgun ownership among a sample of predominantly central city men of equivalent age, background, and social circumstance. So far as we know, the appropriate data for such a comparison have never been published. So here, too, we are left with the impression that the rate of handgun ownership among the gun owners in our sample is higher than the norm, but we are unable to confirm this impression.

chapter that many of these men had used their guns to commit crimes. Indeed, many had used them in ways that directly threatened bodily harm to other persons: Almost one-half (49%) of the gun owners admitted to having threatened to shoot someone with one of their guns at some time. Apparently, these were not idle threats either: One-half of the sample also claimed to have actually fired their guns at human targets at some time. A cross-tabulation of these two items showed that among those who had ever threatened to shoot someone, 75% actually did.

Men who indicated that they had actually fired a gun at somebody (military service excluded) were asked about the circumstances in which this took place. The most common response by far, mentioned by 66%, was "to protect myself."[4] What this response actually means is far from clear: It doubtlessly covers diverse circumstances ranging from those in which the felon himself acted with some degree of aggression to those in which he was attacked without provocation by someone else. A robber who fires his weapon at the police in order to prevent his own arrest has most assuredly "protected" himself but certainly not in the usual sense. (On the self-protection theme, see also Chapters 6 and 7.)

The next most common circumstance for firing a gun at somebody was "while committing a crime" (noted by 39%), followed by "during a gang fight" (32%), while leaving the scene of a crime (29%), during a drug deal (29%), and "in a bar or tavern" (27%). All other possibilities were noted by 20% or less.

Men who indicated that they had fired at someone were asked whether they had managed to inflict a wound in the process; most (69%) had. And of those who managed to inflict a wound, 80% said they had intended to do so; accidental woundings were indicated in only 20% of the relevant cases.

In short, although the typical gun-owning criminal in our sample claimed not to have acquired his weapons for the primary purpose of committing crimes with them, he nevertheless managed in many cases to do so, even to the point of threatening or committing felonious assaults. Given the evident lifestyles of the men in this sample and the likely etiology of the as-

[4] In contrast, available survey data suggest that the proportion of the entire U.S. adult population that has ever actually fired a gun in self-defense is on the order of 2–6% (Wright, Rossi, and Daly, 1983: 148). Since this is a result for the total adult population, the appropriate comparison figure from our survey is the proportion of population, the appropriate comparison figure from our survey is the proportion of our sample who has ever owned a gun (75%) times the proportion of those who have ever fired one at somebody (50%) times the proportion "to protect myself" (66%), or about 25% of the total sample. (More directly, we have 373 men in the sample who say they have fired a gun at somebody "to protect myself," and this amounts to just 20% of the total sample, all missing data included.) Thus, firing a gun at somebody "in self-defense" is at least 4 times more common, and perhaps as much as 10–12 times more common, among our sample than among the adult population at large.

## PATTERNS OF WEAPONS USE: THE CONVICTION OFFENSE

As indicated in the previous chapter, we asked for considerable details concerning the weapons these men carried during their conviction offense; results from these questions are discussed in this section. As background, we begin with some of the circumstances of the conviction crime itself. According to their own reports (see Chapter 2), about 39% of the men in the sample were unemployed or looking for work at the time of their conviction crime; almost one-half (49%) were either "broke" or "short on money"; and substantially more than one-half (57%) were either drunk, high on drugs, or both. Only about one-quarter were "worried about getting caught."

Although 61% of our sample had committed at least one armed crime at some point in their criminal careers, only 54% were actually armed during the crime for which they were then in prison. This 54% amounts to 810 men who admitted to carrying a weapon during their conviction offense, the subsample on which most of the following analysis is based.

Men who were either drunk or high on drugs during their conviction crime (N = 840) were slightly more likely to also have been armed during that crime (57%) than those who were neither high nor drunk (N = 669; 50% were armed). On the other hand, among those who were armed during the conviction offense, the pharmacologically impaired were less likely than the others to have been armed with a firearm (67 versus 78%). Further analyses revealed no interesting or significant differences in the uses of the firearm in the conviction crime according to whether the felon was or was not drunk or high on drugs.

Differences in the tendency to have been armed during the conviction offense across the categories of our Armed Criminals typology were discussed briefly in Chapter Three (see Table 3.2). The fraction armed during the conviction crime varied from a low of about three-fifths among the Improvisers to a high of about four-fifths in the more predatory groups.

As we document later, the truly predatory felons in our sample were distinguished from other felons by their habit of carrying a weapon more or less all the time. Clearly, a man who is constantly armed will be armed, by definition, during any offense he commits. The rather higher proportions armed during the conviction crime among the more predatory groups is not, therefore, an indication that they were more likely to have been committing (at the time) a crime for which some weapon was needed, but rather a result of their tendency to have carried weapons on a regular basis, whether they were planning to do crimes or not (see below, "Additional Details on Weapons Carrying Behavior").

Whether a felon was armed during the conviction crime, of course, did depend to some extent on the kind of crime committed. Data on the proportions armed according to conviction offense are shown in Table 4.2.

---

saults involved, the distinction between aggression and self-protection is obviously muddled.

Finally, we asked our gun owners how often they fired their guns. One-tenth responded "never," and another one-third said only once or a few times a year. On the other hand, the majority (57%) fired their gun(s) once a month or more, on the average; and almost one-fifth fired them several times a week. It would be useful to compare these results with comparable data on legitimate firearms owners, but the relevant data do not exist. Our informal impression is that these men tend to have fired their guns at something more than the average rate, but this is only a conjecture.[5]

It would be wrong to infer from the above results that all or even most of these firings involved some sort of criminal activity. Much if not most of the gun firing that these men did would qualify as sporting or recreational. Indeed, the most common situation in which their guns were fired was "target shooting, plinking" (35%), hunting (17%), or a combination of target shooting and hunting (19%). Adding "at a gun club or shooting range" to the above three responses, sporting and recreational usage accounted for nearly three-quarters of the gun firing in this sample. The remaining one-quarter was divided nearly equally between firing "in self-defense" (14%) and firing during the course of a crime (11%). Like other men of similar age and circumstances, these men clearly used firearms rather frequently in sport and recreational applications; unlike other men, they also sometimes used them for illicit criminal purposes as well, and it is to this latter usage that we now turn attention.

[5] Newton and Zimring (1969: 5) report that there were about 4.4 billion rounds of ammunition manufactured in 1967. In the same year, there were about 80–100 million firearms in private hands in the United States. Simple division therefore suggests about 50 rounds fired per weapon per year on the average. This may be a high estimate, since a lot of the manufactured ammunition (exact percentage unknown) would have gone to military or police use. On the other hand, it may be a low estimate since it would include neither surplus military ammunition nor hand-loaded ammunition. In any case, it would not be uncommon to go through 40 or 50 rounds in a single plinking or target-shooting session. Given these numbers, it is therefore conceivable that the "typical" private firearm is taken out and actually fired no more than about once or twice a year on the average. It is also likely that the actual distribution of gun-firings is sharply bimodal, with a large fraction of the total number of guns never being fired and another fraction being fired quite regularly. All this, to emphasize, is sheer speculation.

The rate at which our felons said they fired their guns may seem implausibly high, particularly given results reported later concerning the kinds of guns these men tend to own (typically, large caliber, well-made weapons) and the price of ammunition for these firearms. Unfortunately, we did not probe for much detail on this point. As noted below in the text, the most common circumstance for firing a gun was "target shooting." This would presumably include, in addition to the usual things, such practices as firing at road signs from cars or motorcycles and other similar firearms practices that would tend to drive the average rate of firing upward.

effects of plea bargaining) among at least some small share of the sample. (On the other hand, the armed ''simple assaulters'' amount in total to only 30 men.)

The handgun was, by far, the weapon of choice among those armed during the conviction offense. All told, 60% of these men (N = 796) were armed with a handgun at the time. About 15% were armed with sawed-off equipment; 11% were armed with regular (not sawed-off) shoulder weapons. About 40% carried a knife during the conviction offense; another 16% were armed with some other weapon (e.g., straight razor, brass knuckles, explosives, martial arts weapons).

As is obvious from the total of the percentages reported above, the carrying of multiple weapons during the conviction offense was a fairly common practice. Of the 789 men who answered all the questions about the kinds of weapons carried during the conviction crime, 25% reported carrying more than one weapon, a handgun and a knife being the most common combination. (Almost 10% reported carrying three or more weapons during the conviction offense.) As would be expected, the tendency to carry multiple weapons was especially pronounced among the Predator groups, among whom 43% were armed with more than one weapon during their conviction crime. (Among the Sporadics, the figure was about 20%; and in the other categories of the typology, on the order of 10% or less.)

Given this pattern of multiple-weapons carrying, there is some ambiguity in sorting the sample out into firearms and non-firearms criminals. If, however, we give precedence to the carrying of a firearm (as in the development of the typology), then about three-quarters (72%) of the men who were armed during the conviction offense were armed with a firearm of one sort or another (even if they were also armed with something else), and the remaining one-quarter (28%) were armed with other items from the conviction offense sequence is shown in Table 4.3.

Men who had been armed with a firearm during the conviction offense were asked whether the gun was actually fired during the crime. Surprisingly, nearly two-fifths (39%) responded ''yes,'' which suggests (among other things) a notable readiness to use the weapon(s) being carried. Details on the actual firing of guns during the conviction offense are discussed later. Of course, these gun firings during the conviction crime may be one of the reasons why these felons appear in our sample in the first place, since the noise of firing might have raised probability of being apprehended, and the act of firing, the probability of being convicted and sent to prison. (The result, in other words, may not generalize to the population of armed crime incidents.)

Another question in the sequence asked whether the felon brought his weapon(s) with him to the scene of the crime or whether the weapon(s) had been acquired at the scene. Indirectly, these findings address, to some

TABLE 4.2. Percentages Armed during Conviction Offense, by Conviction Offense (in Percentages)

| Crime | Armed with a weapon | | (N = 100%) |
| --- | --- | --- | --- |
| | Yes | No | |
| Arson | 42 | 58 | (19) |
| Simple assault | 58 | 42 | (52) |
| Aggravated assault, ADW | 85 | 15 | (212) |
| Auto theft | 50 | 50 | (105) |
| Burglary, B + E | 41 | 59 | (369) |
| Counterfeiting | 50 | 50 | (8) |
| Drug possession | 45 | 55 | (101) |
| Drug dealing | 43 | 57 | (80) |
| Forgery | 25 | 75 | (67) |
| Fraud, swindle | 42 | 58 | (12) |
| Kidnapping | 64 | 36 | (66) |
| Homicide | 78 | 22 | (192) |
| Manslaughter | 83 | 17 | (41) |
| Possession stolen property | 52 | 48 | (73) |
| Rape | 42 | 58 | (122) |
| Other sex offense | 21 | 79 | (82) |
| Robbery | 78 | 22 | (478) |
| Theft, larceny | 52 | 48 | (155) |
| Weapons charge | 83 | 17 | (174) |

Much of the information contained in the table is almost redundant: We should not be surprised to learn, for example, that 83% of the men in the sample doing time on a weapons charge were armed with a weapon while they committed that offense! (Indeed, what may be surprising is that 17% claimed that they were not armed, a reflection, possibly, of errors in reporting either their conviction charges or their weapons carrying.) The reported percentages for aggravated assault (85%), manslaughter and homicide (83 and 78%, respectively), and robbery (78%) are also to be expected given that so many of these crimes involve the use of weapons.

Table 4.2 also shows, however, a great deal of weapons carrying in crimes that do not necessarily require weapons to complete successfully, for example, auto theft (50% armed at the time), drug possession or sales (43-45% armed at the time), theft (52% armed), receipt of stolen property (52% armed), or burglary (41% armed).

The pattern shown for burglary is of special note and is indicative of the tendency of many of these men to have carried weapons at all times; this result suggests that perhaps two-fifths of all burglaries would have had high probabilities of turning into robberies if anyone had been at home at the time to confront the intruder. It is also worth mentioning that 58% of the men doing time on simple assault had in fact been armed when the assault in question occurred, suggesting a degree of self-restraint (or, possibly, the

TABLE 4.3. Weapons Use in Conviction Offenses (in Percentages)

| | During conviction offense, felon was armed with: | |
| --- | --- | --- |
| | Firearm (N = 580) | Something else (N = 230) |
| 1. Was the gun actually fired during the crime? | | |
| No | 61 | — |
| Yes | 39 | — |
| 2. Did you bring your weapon with you... or get it at the scene? | | |
| Brought it with me | 79 | 66 |
| Got it at scene | 12 | 23 |
| Both | 9 | 11 |
| 3. Did you actually use your weapon . . . in committing the crime or did you just have it with you . . . ? | | |
| Actually used it | 24 | 42 |
| Just had it | 76 | 58 |
| If "actually used it:" How did you use the weapon? | | |
| 4. To scare victim: | 69 | 44 |
| (N) = | (407) | (118) |
| 5. To injure victim: | 16 | 26 |
| (N) = | (407) | (117) |
| 6. To kill victim: | 18 | 16 |
| (N) = | (404) | (117) |
| 7. To get away: | 26 | 18 |
| (N) = | (407) | (116) |
| 8. To protect myself: | 38 | 32 |
| (N) = | (406) | (117) |
| 9. Did you plan to use the weapon in the way you did, or was it something that just happened . . . ? | | |
| Planned to use | 44 | 26 |
| Just happened | 56 | 74 |
| (N) = | (346) | (103) |

extent, the so-called "crime of passion" scenario, the idea that much criminal violence occurs in a "moment of rage," making use of whatever weapons are available at the time. Somewhat in contrast to this scenario, the large majority of both types of felons brought their weapons with them: The majorities amounted to 79% of those who were armed with a firearm during the conviction crime and 66% of those who were armed with some-

thing else. Thus, most armed crime (whether it involves firearms or other types of weaponry) apparently involves at least some degree of premeditation—enough advance thought, at least, to bring one's weapons along. Note also that acquiring "other weapons" at the scene was somewhat more common than acquiring a firearm at the scene; and that in about one-tenth of the cases, the felon both brought weapons to the scene and acquired them while there. [6]

(To be sure, it is possible that the degree of premeditation involved in bringing one's weapon along again raised the probability of conviction, incarceration, and subsequently an appearance in our sample. The true "crime of passion" may as a consequence be underrepresented in these data.)

To have carried a weapon during the conviction offense is not necessarily the same as actually using the weapon to commit the offense. We asked the sample whether they had actually used their weapon in committing the crime or whether they just had it with them. Majorities of both types reported that they actually used the weapon in some way, but the majority was considerably larger (76%) among those armed with a gun than among those armed with "other" weapons (58%). Judging from these results, some three-quarters of the men who committed crimes while armed with a gun actually used the gun in some fashion in the course of that crime.

Felons who indicated that they had in fact used the weapon in some way were then asked, "How did you use the weapon?" "To scare the victim" was by far the most common usage among both types, mentioned by 69% of those armed with a gun and 44% of those armed with other weapons. A principal motive for the use of weapons in crime, and especially for the use of guns in crime, is apparently to intimidate the victim into quick and ready capitulation to the offender's demands. "To protect myself" was the next most frequent response in both categories, noted by 38 and 32%, respectively. The ambiguity of this response was already remarked upon above.

The use of weapons to injure or kill the victim was predictably much less common than the use of weapons for purposes of intimidation; still, 18% of those armed with a gun and 16% of those armed with something else said they used the weapon to kill the victim during their conviction offense. (Lest these figures seem unreasonably high, recall that about 15% of the total sample were doing time on a homicide or manslaughter charge.) Interestingly, the use of the weapon to *injure* the victim was somewhat more frequent among those armed with something else (26%) than among those

[6] For example, a burglar armed with a knife (say, for purposes of jimmying a window) who, in the course of a burglary, stole a gun from a residence would have brought one weapon with him to the scene (the knife) and would have acquired another weapon at the scene. An armed drug dealer who, in one particular trade, exchanged drugs for guns would also have brought weapons to the scene and acquired additional ones at the scene. The pattern, in short, is not inconceivable.

armed with a gun (16%). This pattern is consistent with findings reported by Cook (1980), namely, that in robberies at least, the overall injury rate is higher among nongun robberies than among gun robberies (presumably because people who are being robbed at gun point are less likely to resist).

The final question in the sequence asked those who had used their weapon in some way to commit the crime whether they had planned to use the weapon or whether it "just happened." Advance planning for the use of the weapon was the minority report in both cases. Still, among those armed with a gun, some 44% indicated that they had planned to use the gun in the way that they did. (Among the "something else" group, the figure was 26%.)

TABLE 4.4. Firing Guns in Crime Situations as a Function of Planned Use of the Weapon (in Percentages)[a]

| Was the gun actually fired? | Did you plan to use the weapon in the way that you did? | | (Row ns) |
| --- | --- | --- | --- |
| | Yes | No | |
| No | 72 | 30 | (171) |
| Yes | 28 | 70 | (182) |
| (N)= | (157) | (196) | |

[a]Table is based only on the subsample who were armed with a gun at the conviction offense and who actually used the gun in committing that offense.

All told, there were 156 men in the sample who were armed with a gun during the conviction offense, who also used the gun in some way in committing that offense, and who, finally, indicated that they had planned on using the gun in the way that they did. As one might anticipate, most of these 156 men (73%, to be precise) were in prison on a robbery charge. Some 27% were in on a weapons charge, 22% on an aggravated assault or "assault with a deadly weapon" charge, 15% on a burglary charge, and 10% on a homicide charge. (Given the total of these percentages, many of these men were clearly in prison on more than one charge, a robbery charge and a weapons violation being the most common combination.) Also unsurprisingly, 57% of them fell into the two predatory categories of our typology.

Interestingly, among those who were armed with a gun during the conviction offense and who actually used the gun in committing the offense, the tendency to have fired the weapon was much lower among those who planned on using the gun than among those who did not (Table 4.4). Among those who had planned on using the weapon, 28% reported firing the

weapon during the crime; among those who had not "planned on using the weapon in the way that you did," 70% report having fired the weapon. Percentaging in the other direction, only 24% of those who reported having fired their gun during the conviction offense also reported having planned to use the weapon in that way.

The strong implication of these findings is that most firings of guns in criminal situations are unplanned. The "plan," to the extent that there was one, was presumably to intimidate the victim and to use the weapon to that end. The actual firing of the weapon was, one senses, a rather unwanted by-product of a situation that "goes sour" for whatever reason: The victim resisted rather than capitulated, the police arrived at the scene, or the offender encountered some difficulty in effectuating his escape. Whatever the reason, however, the finding is reasonably clear: Most of the men who actually fired guns in criminal situations claimed to have had no prior intention of so doing.

On the other hand, 39% of the men in the sample who were armed with a gun during the conviction offense reported firing it during that offense (Table 4.2), so despite the apparent lack of prior intentions, these men clearly had few compunctions about firing when the situation appeared to demand it.

Needless to say, this interpretation of criminal gun use is largely a view from the perspective of the criminal (is based, that is, on what these criminals told us) and may therefore suffer to some extent from the latter's attempt to present his gun use in as sympathetic a fashion as possible. It is, after all, a fine semantic point to claim that carrying a gun "just in case" is not the same as planning for the use of the weapon.

There were, as it happens, 44 men in the sample who were armed with a gun during the conviction crime, who actually fired the gun during the incident, and who said that they had in fact planned to use the gun in the way that they did. Eighteen of these men (41%) were in prison on aggravated assault or "assault with a deadly weapon" charges, 12 of them (27%) were in on a homicide charge, and 21 (48%) were in for armed robbery. (Many were also doing time on a variety of lesser offenses, and, again, several were in on multiple charges, such as robbery with aggravated assault, etc.)

As would be expected, how the gun was in fact used in a crime situation varied rather sharply depending on whether or not it was fired (Table 4.5). By far the most common use in the case of unfired weapons was to intimidate the victim (89%); in contrast, the most common use in the case of fired weapons was "to protect myself" (48%). Injury to the victim was predicably much more common in cases when the gun was fired (26%) than when it was not (9%), as was the victim's death (36 versus 3%).

The consequences for the offender also appear to have varied rather sharply depending on whether the weapon was fired or not. Among those

94  Patterns of Weapons Ownership and Use

TABLE 4.5. How Guns Are Used in Crimes, Depending on Whether or Not They Were Fired: Conviction Offenses (in Percentages)[a]

| "How did you use the weapon?" | Was gun fired? | |
|---|---|---|
| | No | Yes |
| To scare victim | 89 | 45 |
| (N)= | (218) | (184) |
| To injure victim | 9 | 26 |
| (N)= | (218) | (184) |
| To kill victim | 3 | 36 |
| (N)= | (217) | (182) |
| To get away | 26 | 28 |
| (N)= | (218) | (184) |
| To protect myself | 31 | 48 |
| (N)= | (217) | (184) |

[a]Table is based on those who were armed with a gun at the conviction offense and who used the gun to commit the offense.

armed with a gun during the conviction offense and who used their weapon in some way to commit the offense; the men who actually fired the weapon were much more likely to be doing time on aggravated assault charges than those who did not fire (32 versus 13%); and likewise for homicide (40 versus 3%) and manslaughter (10 versus 1%). In contrast, the men who did not fire were more likely to be in on a robbery charge (66 versus 37% of those who did fire). Interestingly, being in on a weapon's charge was slightly more common among those who did not fire (25%) than among those who did (18%).

## PATTERNS OF WEAPONS USE: OTHER OFFENSES

We have already indicated that the conviction crime is, for most of these men, only the most recent in a fairly long series of criminal activities. Not all of the hard-core gun criminals in our sample were, in fact, armed during the conviction offense; indeed, one in five of the two Predator groups was not carrying a weapon at the time he was last arrested (one among many reasons, incidentally, why the conviction offense per se is a rather misleading indicator of the true nature of a person's criminal career).

Many of the questions asked about the conviction offense were also asked about the more general use of weapons in committing crime; results from these "more general" questions are analyzed in the present section. This discussion adds some useful details to the portrait of criminal weapons involvement and also provides an opportunity to replicate and refine some of the patterns that have already emerged. Data are shown in Table 4.6. These results are based on the series of questions following the initial

TABLE 4.6. Weapons Use in Crimes Other Than the Conviction Offense (in Percentages)

| | Gun criminals (N = 871) | Armed—not with a gun—criminals (N = 177) |
|---|---|---|
| 1. What kinds of gun(s) have you ever used to commit crimes? | | |
| Handgun | 90 | — |
| Sawed-off shotgun | 27 | — |
| Regular shotgun | 16 | — |
| Sawed-off rifle | 7 | — |
| Regular rifle | 10 | — |
| Zipgun (homemade) | 3 | — |
| All other | 4 | — |
| 2. What kind of weapons have you ever used to commit crimes? | | |
| Pocket knife | — | 34 |
| Switchblade | — | 13 |
| Buck knife | — | 38 |
| Hunting knife | — | 24 |
| Club | — | 34 |
| All other | — | 56 |
| 3. About how often were you armed . . . when you committed your crimes? | | |
| Only once | 26 | 38 |
| A few times | 34 | 33 |
| Many times | 14 | 6 |
| Most of the time | 16 | 11 |
| All of the time | 10 | 11 |
| (N)= | (819) | (141) |
| 4. What kind of [weapon] have you used most frequently in committing crimes? | | |
| Handgun | 85 | — |
| Sawed-off shotgun | 9 | — |
| Regular shotgun | 3 | — |
| All other guns | 3 | — |
| Pocket knife | — | 23 |
| Buck knife | — | 24 |
| Club | — | 14 |
| All other non-gun | — | 40 |
| (N)= | (797) | (118) |
| 5. When you committed crimes, did you have just a gun or did you usually carry other weapons as well? | | |
| Just a gun | 56 | — |
| Other weapons | 44 | — |
| (N)= | (794) | |
| What other kinds of weapons did you usually carry? | | |
| Pocket knife | 37 | — |
| Switchblade | 24 | — |

(continued)

Patterns of Weapons Use: Other Offenses

filter questions, which asked whether the felon had ever committed armed crimes and, if "yes," whether he had committed crimes armed with a gun. For present purposes, these questions isolate two groups of interest (call them "Gun Criminals" and "Armed—Not with a Gun—Criminals," respectively) whose weapons behavior is compared throughout this section.

As in the conviction offense data, handguns are by far the preferred weapon among gun criminals. Among the men in the sample who had ever committed a gun crime, 90% had used a handgun for at least one of them; 85% stated that the handgun was the weapon they used most frequently. Next in popularity was the justly infamous sawed-off shotgun, indicated as a crime weapon by 27% of the gun criminals and as the most frequent crime weapon by 9%. Percentages having used other kinds of firearms at least once in committing crime were 16% for unmodified shotguns, 10% for un-modified rifles, and 7% for sawed-off rifles. A variety of "other" firearms were also indicated in the open-ended follow-up, including BB guns, gas-operated pistols, and automatic weapons of various sorts.

Since the sum of the percentages shown in the table totals well over 100% (157%, to be precise), it is obvious that many of the gun criminals had used several types of firearms. (Most of the Shotgun Predators, for example, had also used handguns in one or another of their crimes.)

A small majority of the gun criminals (56%) said that they carried only a gun when they committed their crimes; a large minority (44%) carried a gun when they committed their crimes; a large minority (44%) carried other weapons as well, typically, one or another kind of knife. Buck and pocket knives were especially popular back-up weapons among this group, indicated by 45 and 37%, respectively. As might be expected, the carrying of multiple weapons was especially common among the Predators: 56% of the Handgun Predators and 69% of the Shotgun Predators indicated that they had carried multiple weapons versus 34% of the Sporadics and 28% of the One-Time Firearms Users.

Men who had committed armed crime, but not with a gun, used mainly knives and a motley assortment of other weaponry. Among this group (N=177), 38% had used a buck knife at least once and 24% indicated the buck knife as the weapon used most frequently. Next in popularity were the pocket knives (34% having used one at least once, 23% indicating it as the most frequently used weapon) and clubs (34 and 14%, respectively). "Other" weapons used by these men included switchblades, hunting and butcher knives, brass knuckles, straight razors, mace, pieces of chain, mar-tial arts weapons, baseball bats, etc.

Both groups of armed criminals were asked how often they were armed when they did their crimes. The most substantial difference between the two groups was the percentage responding, "only once." Among the gun criminals, 26% claimed to have been armed only once (these, of course, are the One-Timers in our typology); among the armed—not with a gun—group, the corresponding percentage is 38%. About one-third of both groups

TABLE 4.6. Weapons Use in Crimes Other Than the Conviction Offense (in Percentages) (continued)

| | Gun criminals (N = 871) | Armed—not with a gun—criminals (N = 177) |
|---|---|---|
| Buck knife | 45 | — |
| Hunting knife | 23 | — |
| Club | 18 | — |
| Martial arts | 19 | — |
| Butcher knife | 10 | — |
| Brass knuckles | 10 | — |
| Straight razor | 13 | — |
| Chain | 11 | — |
| (N) = | (348) | — |
| 6. Some men . . . tell us that they [carried a weapon] pretty much all the time. . . . Others tell us they [carried a weapon] only in certain situations. . . . Others only [carried a weapon] when they were planning to do a crime. Which of these are you most like? | | |
| Carried all the time | 30 | 34 |
| Carried in situations | 51 | 53 |
| Only carried when planning crime | 19 | 13 |
| (N) = | (788) | (131) |
| [If "only in certain situations"] In what kinds of situations would you tend to carry [a weapon]? | | |
| When doing a drug deal | 47 | 30 |
| Out drinking or raising hell | 23 | 29 |
| Going to strange part of city | 50 | 46 |
| At night | 34 | 41 |
| With others who were carrying | 34 | 23 |
| I thought I might need to protect myself | 83 | 84 |
| All other | — | — |
| (N approx) = | (402) | (70) |
| 7. Did you ever actually use your [weapon] . . . in committing a crime? Circle all that apply. | | |
| To scare victim | 70 | 48 |
| To injure victim | 20 | 22 |
| To kill victim | 16 | 8 |
| To protect myself | 50 | 44 |
| To get away | 35 | 25 |
| All other | 2 | 10 |
| (N approx) = | (793) | (145) |
| 8. In all the crimes you have ever committed while armed with a gun, have you ever fired the gun? | | |
| No | 43 | — |
| Yes | 57 | — |
| (N) = | (796) | — |

said they were armed "a few times." To have been armed "many times," "most of the time," or "all of the time" was characteristic of 40% of the gun criminals and 28% of the other group.

The next question in the sequence was intended to explore the issue of habitual carrying of weapons. The question read as follows:

Some of the men we have talked to tell us they were in the habit of carrying a [weapon] with them pretty much all the time, even on days when they were not planning to do any crimes. Other men tell us that they were in the habit of carrying a [weapon] only in certain situations—for example, when they were going out drinking—again, whether they planned to do a crime or not. Still others tell us that they carried a [weapon] when they were planning to do a crime. Which of these are you most like?

Responses were very similar for both groups. The majority response in both cases was to have carried weapons "only in certain situations," the pattern for 51% of the gun criminals and 53% of the others. The next most frequent response was to have carried a weapon all the time, the pattern for about one-third of both groups. The least common pattern in both cases was to have carried a weapon only when planning a crime, indicated by 19% of the gun criminals and 13% of the others. It would appear, therefore, that most of the weapons that are used in crimes, be they firearms or other weapons, are not carried specifically for that purpose; carrying a weapon specifically for the purpose of using it in crimes was characteristic of fewer than one fifth of the armed criminals in our sample.

In by far the largest majority of cases, then, weapons were available for use in crimes either because of a tendency to carry weapons all the time or through a practice of carrying weapons in particular situations. The follow-up questions concerning these "situations" were quite revealing. The most common by far was "whenever I thought I might need to protect myself," mentioned by 83–84% of both groups.

As we see in a later chapter, self-protection figures prominently as a claimed motive in the weapons behavior of these men. Given the lifestyles involved, this is no doubt a genuine motive in some cases; in other cases, it is no more than a self-serving rationalization, if for no other reason than that men like these who carry guns routinely to "defend themselves" against the endemic violence of their environment contribute to the hostility of the environment by the very act.

Other situations in which these men would tend to carry weapons include: when doing a drug deal (mentioned by 47% of the relevant gun criminals and 30% of the others),[7] when going to a strange part of the city

[7]This pattern is consistent with related data reported in Chapter Three: Among the men in the sample who ever dealt drugs (N = 865), some 62% said that they "usually carried a weapon" when dealing.

(mentioned by 50 and 46%, respectively), "at night" (34 and 41%), when they were with others who were carrying weapons (34 and 23%), etc. Most of these "situations" are clearly variations on the self-defense theme.

We further note: A man who tends to carry a weapon whenever he thinks he might need to protect himself, or whenever he is going to a strange part of the city, or whenever it is dark out, etc., clearly tends to carry his weapon(s) on a pretty regular basis, if not quite "all the time." These points in mind, we appear to be dealing, in reality, with only two types of weapons-carrying behavior—habitual carrying for general purposes and premeditated carrying for the specific purpose of committing crimes. And it is the former pattern that predominated, quite heavily, among the armed criminals in our sample.

## THE CORRELATES OF "HABITUAL" WEAPONS CARRYING

The above notwithstanding, the tendency to carry a gun more or less all the time is a sufficiently distinctive (and dangerous) pattern of behavior to inquire about its correlates. For this purpose, we focus only on the gun criminals (N = 786) simply because that is of greatest interest. To facilitate the analysis, we have also recoded the responses to the "carrying" question so that the men who said they carried "all the time" were assigned a 1 and all others (who answered the question) were assigned a 0. The resulting variable was then correlated with a large number of other variables, with results as follows:

First, the tendency to carry a gun "all the time" was strongly correlated with two additional questions from much later in the survey that also dealt with carrying behavior ($r$'s = .55 and .56). These questions are discussed in more detail later. For now, we merely note that there was considerable internal consistency in the responses.

Aside from the additional items on carrying behavior, the strongest correlates of the tendency to carry a gun "all the time" were whether the felon's family, friends, and associates owned and/or carried firearms. First, the carrying question correlated at .09 with whether the felon's father owned a gun, at .12 with whether his father owned a handgun, and at .17 with whether the father himself carried a handgun with him outside the home. None of these relationships is especially striking, but all are statistically significant. Likewise, the carrying question correlated at −.17 with the felon's age when he first fired a gun (the younger a man was when he first fired a gun, the more likely he was to carry a gun "all the time"). In part, then, the tendency to carry "all the time" is apparently a result of early familial socialization into firearms ownership and use (see also Chapter Five).

More striking, by far, were the effects of gun ownership and carrying among the felon's associates and friends—"the people you hung around with before you came to this prison." One item asked how many of these

TABLE 4.7. Carrying Behavior by Criminal Type (in Percentages)

| | Type | | | |
|---|---|---|---|---|
| Carried a gun | One-timer | Sporadic | Handgun predator | Shotgun predator |
| All the time | 13 | 14 | 51 | 40 |
| Only in certain situations | 64 | 57 | 39 | 49 |
| Only when planning a crime | 22 | 29 | 10 | 11 |
| (N) = | (179) | (235) | (292) | (82) |

people themselves owned a gun; responses correlated .20 with the tendency for the felon himself to carry "all the time." Another item asked how many of the felon's associates owned a handgun; responses to this item correlated .24 with the felon's own carrying. Still another item asked, "about how many of them . . . made a habit of carrying a handgun with them outside their home?" This item correlated .32 with the felon's own carrying behavior, and this was the single strongest correlate (other than the two mentioned earlier) revealed in this analysis.

(A parallel three-item series was asked about "the men in your family—your father, brothers, uncles, and so on." These three items correlated with the felon's carrying behavior at .13, .20, and .26, respectively—all statistically significant.)

This analysis clearly suggests that the single most important reason why a felon might decide to carry a gun more or less all the time was that his associates with other men who carry guns routinely. While familial socialization is clearly a factor, peer-group influences appear to be even more important. Such influences might operate in either or both of two ways: First, a felon's peers may influence his weapons-carrying behavior in much the same way that peers often influence one's choice of clothing; peers, that is, may define the "in" things to do. Second, armed peers may constitute a threat to safety; unarmed members of armed groups may be very vulnerable to bullying and coercion. In addition, it should be kept in mind that friends and associates are chosen. The correlation between friends' and felons' carrying behaviors may only imply that these men elected to "hang out" with others who carried guns.

The tendency to carry "all the time" was also correlated with other aspects of weapons behavior. The carrying question, for example, correlated .24 with the number of guns ever owned and .30 with the number of handguns ever owned. Thus, the more guns a felon had owned, the more likely he was to carry one "all the time." Felons who carried "all the time" were also more likely to keep their gun(s) loaded ($r=.22$) than others, and they tended to fire their guns more often ($r=.29$). They were also more likely to have threatened to shoot someone ($r=.25$), and to have actually shot someone ($r=.30$) than those who carried less regularly. Finally, and predictably, the men who carried a gun "all the time" tended to be high-rate criminals; the carrying question correlated at .29 with our Index of Total Criminality.

The tendency to carry "all the time" was especially pronounced among the Predators (Table 4.7). Among gun criminals in general, recall, about 30% said they carried a gun more or less all the time; among the Shotgun Predators, the figure rose to 40%, and among the Handgun Predators, to just over 50%. The Predators, interestingly, were the least likely, by far, to carry only when they were planning to do a crime; this pattern, rather, was more characteristic of those who had committed just one or

only a few gun crimes. Thus, as we indicated earlier, the Predators stand out from other groups because of their routine and habitual carrying of firearms.

The final items shown in Table 4.6 relate to the actual use of weapons in committing crimes. The general patterns revealed there are quite similar to those discussed in connection with the conviction offense. By far the most common usage of guns in committing crime was intimidation of the victim, mentioned by 70% of the gun criminals. Among those armed—not with a gun, intimidation of the victim was also the most common use, but the proportion was decidedly lower (48%). The percentage difference suggests, reasonably, that felons intent on intimidating their victims preferentially chose firearms as the means.

The second most frequent use in both cases was for "self-protection," mentioned by 50% of the gun criminals and by 44% of the armed—not with a gun—group. "To get away" was third (noted by 35 and 25% of the two groups), followed by "to injure the victim" and "to kill the victim," respectively. One gun criminal in six in this sample said he had used a gun to kill a victim in the course of a crime; the same was true of about one-tenth of the armed—not with a gun—group. Finally, we note that a sizable majority (57%) of the gun criminals reported having fired a gun at least once in the course of a crime.

As was the case in the conviction offense data, how a gun was used in crime depended to some extent on whether or not it was fired. Relevant data are shown in Table 4.8. First, the incidence of the use of guns to intimidate victims was about the same whether the felon ever actually fired the gun (74%) or not (68%). Clearly, the purpose of intimidation is amply served in most cases by the mere presence of a firearm; one normally does not need to fire a round or two to get a potential victim's attention.

In all other cases, however, there were fairly sizable differences in the pattern of use according to whether the gun was (ever) fired. To illustrate, the use of a gun to injure the victim was about 8 times more common if the gun were fired (32%) than if not (4%), and the use of a gun to kill the

victim, about 10 times more common (25 versus 2%). About one gun criminal in four in this sample who said he had actually fired a gun in a crime situation reported having killed a victim at least once.

Judging from the data on conviction offense, most of these firings—and, as a consequence, most of the ensuing victim deaths—were probably not planned in advance but rather resulted from unforeseen circumstances arising in the event. Consistent with this interpretation, we note further that men who had fired their gun(s) in a crime situation were much likelier to report having used their weapon for self-protection (63%) than those who had never fired (32%) and likewise for the use of the weapon "to get away" (47 versus 18%).

TABLE 4.8. How Guns Are Used in Crimes, Depending on Whether or Not They Were Fired: Crimes in General (in Percentages)

| | Have you ever fired a gun during a crime? | |
|---|---|---|
| How did you use the gun? | No (N = 344) | Yes (N = 452) |
| To scare victim | 74 | 68 |
| To injure victim | 4 | 32 |
| To kill victim | 2 | 25 |
| To protect myself | 32 | 63 |
| To get away | 18 | 47 |
| All other | 2 | 2 |
| None of the above | 9 | 1 |

Finally, note that one-tenth of the gun criminals who never fired their gun also reported never having used the weapon in any of the manners asked about in the question (versus 1% of those who had fired). These, presumably, were men who carried firearms in the course of their crimes but never encountered a situation where it was necessary to use them. At the same time, however, 96% of the gun criminals in the sample (which, by present definition, means having committed at least one crime armed with a gun) had actually used a gun to commit a crime in some way. Carrying a gun but never actually using it to commit a crime was an apparently rare behavior.

## ADDITIONAL DETAILS ON WEAPONS-CARRYING BEHAVIOR

Data presented in the previous section are based entirely on the men in the sample who have at some time in their careers committed at least one armed crime. There are some men in the sample, however, who, despite having owned guns, have never committed a crime with one (and, to be

sure, a few who, despite having never owned a gun, have nonetheless committed gun crimes). The questionnaire included several items on carrying behavior and related matters that were asked of all the gun-owning felons in the sample, whether they had ever committed armed crimes or not; results from these items are discussed in the present section.

Table 4.9 shows, as an entry point to this discussion, the relationship between having owned guns and having committed crimes with them. We have already remarked that about three-quarters of this sample had owned one or more guns at one or another time; the remaining one-quarter had never owned any guns. Table 4.9 confirms that it is not necessary ever to have owned a gun in order to have committed a crime with one; indeed, 18% of the nonowners by their own admission had committed at least one gun crime in their lives. An additional 13% of the nonowners had com-

TABLE 4.9. The Commission of Armed Crime as a Function of Gun Ownership (in Percentages)

| | Felon has committed | | | |
|---|---|---|---|---|
| | No armed crime | Armed—not with gun | Gun crime | (N = 100%) |
| 1. Have you ever owned a gun? | | | | |
| No | 69 | 13 | 18 | (403) |
| Yes | 32 | 9 | 59 | (1273) |
| 2. If yes: How many? | | | | |
| 1 | 47 | 13 | 40 | (157) |
| 2–3 | 41 | 10 | 49 | (302) |
| 4–5 | 31 | 11 | 58 | (158) |
| 6–10 | 24 | 4 | 72 | (113) |
| 10+ | 17 | 4 | 79 | (368) |

mitted armed crimes but not with guns, and the strong majority of the nonowners (69%) had never committed any armed crime. Clearly, the rate at which armed crimes were committed was much lower among felons who did not own guns than among the gun owners.

The pattern among felons who had ever owned a gun was, of course, sharply different. Among the gun-owning felons, 59% had committed at least one gun crime. On the other hand, nearly one-third (32%) of the gun-owners in this sample had never committed any armed crime at all, whether with a gun or with some other weapon. It is, therefore, clearly not the case that every felon who had ever owned a gun also used his gun to commit crime; about one-third of the group showed at least some restraint in this matter.

The tendency to have committed gun crime increased with the number of guns ever owned. Among those who had owned just one gun, 40% had

TABLE 4.10. Additional Details on Weapons Carrying, by Type: Gun Owners Only (in Percentages)

| Type | Total | Unarmed | Improviser | Knife | One-timer | Sporadic handgun | Handgun predator | Shotgun predator |
|---|---|---|---|---|---|---|---|---|
| **1. Ever own gun?** | | | | | | | | |
| Yes | 76 | 58 | 64 | 72 | 82 | 93 | 95 | 69 |
| (N) = | (1732) | (649) | (199) | (73) | (124) | (238) | (300) | (90) |
| **2. Ever own handgun?** | | | | | | | | |
| Yes | 87 | 69 | 78 | 70 | 92 | 100 | 100 | 93 |
| (N) = | (1184) | (330) | (37) | (70) | (189) | (213) | (269) | (76) |
| **3. If yes: Ever carry handgun outside home?** | | | | | | | | |
| Never | 19 | 52 | 52 | 45 | 21 | 6 | 1 | 5 |
| A few times | 33 | 30 | 52 | 32 | 49 | 54 | 11 | 31 |
| Many times | 28 | 12 | 8 | 8 | 20 | 34 | 45 | 32 |
| All the time | 19 | 9 | 8 | 7 | 10 | 6 | 44 | 32 |
| (N) = | (936) | (201) | (25) | (44) | (152) | (192) | (254) | (65) |
| **4. Did you carry on your person or somewhere else?** [If yes to (3)] | | | | | | | | |
| On person | 82 | 76 | 75 | 76 | 66 | 82 | 92 | 86 |
| Elsewhere | 18 | 24 | 25 | 24 | 34 | 18 | 8 | 14 |
| (N) = | (768) | (106) | (20) | (25) | (121) | (180) | (252) | (64) |
| **5. If on person: Where?** | | | | | | | | |
| In pocket | 18 | 15 | 7 | 5 | 26 | 24 | 15 | 15 |
| In belt | 46 | 36 | 33 | 42 | 48 | 52 | 47 | 44 |
| Shoe or boot | 2 | 4 | 14 | 10 | 2 | 1 | 2 | 4 |
| Hip holster | 10 | 14 | 27 | 21 | 8 | 9 | 10 | 4 |
| Leg holster | 2 | 4 | — | 1 | 2 | 1 | 2 | 4 |
| Shoulder holster | 21 | 27 | 33 | 16 | 12 | 16 | 23 | 30 |
| All other | 1 | 5 | 15 | 19 | 2 | 5 | 2 | — |
| (N) = | (622) | (78) | (15) | (19) | (80) | (146) | (230) | (54) |

*(continued)*

105

---

committed at least one gun crime, a fraction from the gun-owning subset through and including the "10 or more guns" category, where 79% had committed at least one gun crime. Thus, the more guns a felon had owned, the more likely he was to have committed a crime with one of them.

What distinguishes gun-owning felons who use their guns to commit crime from gun-owning felons who do not? As it happens, a key factor implicated in this difference appears to be the gun-carrying tendencies: gun-owning felons who used their guns to commit crimes were, for the most part, those who actually carried their firearms on a more or less regular basis. Relevant data are presented in Table 4.10.

To avoid confusion, data in Table 4.10 are derived from the gun-owning subset of the overall sample, whether the felon ever used a gun to commit a crime or not. Since there are good-sized numbers of gun owners in all categories of our typology, results are shown separately for each type of criminal, as well as for the total sample. Note further: The typology is itself only an expanded version of the three-category variable shown in Table 4.9, the rightmost four categories in Table 4.10 representing, of course, those who had committed at least one gun crime in the course of their criminal careers.

The first two panels of the table show gun-ownership tendencies among the various categories of the typology. Most of the men in all categories had owned at least one gun in their lives, with majorities ranging from 58% of the Unarmed Criminals up to 95% of the Handgun Predators. Large majorities of the gun owners in each category had also owned at least one handgun; here, the majorities ranged from 69% of the Unarmed Criminals to 100% of the Sporadics and Handgun Predators. It is, therefore, of some importance to note that the majority of the men throughout our typology had at some time possessed the instruments necessary to commit gun crimes. Despite this, some of these men, for whatever reason, chose not to do so—a small glimmer of hope, perhaps, in an otherwise generally dismal portrait.

All the handgun owners in the sample were asked if they ever carried their handguns with them outside the home—"for protection or self-defense, or to use in committing crimes." Overall, 19% of the handgun owners said, "Never," and another one-third said that they had done so only "a few times." Thus, a small majority of the handgun owners in this sample (52%) were not in the habit of carrying their handgun(s) on a regular or routine basis. Among the Unarmed and the Armed—Not-with-a-Gun—group of handgun owners, this was true of some 77–84%. Even among the One-Timers and the Sporadics, some 60–70% did not carry their handguns on any regular basis. Only among the Predator groups do we find a strong majority pattern of routine handgun carrying: Among the Handgun Predators, about 90% carried their handgun "many times" or all the time; among

handgun-owning Shotgun Predators, this was true of 64%. Nearly one-half (44%) of the Handgun Predators carried their handgun "all the time."[8]

Men who reported ever carrying their handgun with them outside the home were asked whether they tended to carry their weapon on their person or somewhere else. To carry on one's person was the strong majority tendency in all groups, with the size of the majority ranging from 75 to 92%. A follow-up for those who carried on their person asked about where and how the weapon was carried. Differences across types were generally minor. Shoved into a belt or waistband was the modal response, given by 46%. A shoulder holster was the next most popular means of carrying, mentioned by 21%, and this was followed by sticking the gun in one's pocket, noted by 18%. Other means of carrying were mentioned by 10% or fewer.

Men who indicated that they carried a handgun with them outside the home were also asked where they kept the weapon when they were not carrying it. Again, differences across types of criminals were generally modest. "Hidden away" was the modal response in the overall sample (54%), followed by "in a drawer" (34%), "in the bedside table" (24%), and "under the pillow" (17%). (Note that the various possibilities given in the question sequence are not mutually exclusive and, thus, that multiple responses were rather common.) In general, keeping the handgun in the bedside table or under one's pillow was more common among the Predators than among any of the other groups. When these men told us that they carried a gun "all the time," we can apparently take the response quite literally. Even while sleeping, many of them kept their handgun within easy reach.

One additional question on carrying behavior was asked of all gun owners in the sample (not just the handgun owners, as in item 3 from the table). Results are shown in Panel 7 and are consistent with all other gun-carrying data so far reviewed. The tendency to carry "most" or "all" of the time characterized a very small fraction of all groups except the Predators (some 12–24% depending on type), whereas among the Predators, it was the clear majority tendency. Note finally (Panel 8) that Predators were much more likely than gun-carrying respondents in other groups to carry on their person as opposed to "in the car," this latter being the majority tendency

[8]Comparable data on carrying practices among handgun owners in general is, at best, thin. One survey (discussed in Wright, Rossi, and Daly, 1983: 142) found that 7% of all U.S. adults, or about 29% of all handgun owners, said "yes" to the question, "Do you ever carry that handgun or pistol outside of the house with you for protection, or not?" Thus, among handgun owners in general, the practice is fairly widespread. On the other hand, only 19% of the handgun owners in the felon sample responded "never" to the handgun-carrying question, so about 80% of them carry their handgun outside the home at least now and again. To the extent that these data are at least crudely comparable, the clear indication is that gun-owning felons carry handguns outside the home much more frequently than handgun owners do in general.

TABLE 4.10. Additional Details on Weapons Carrying, by Type: Gun Owners Only (in Percentages) (continued)

| | Type | | | | | | | |
|---|---|---|---|---|---|---|---|---|
| | Shotgun predator | Handgun predator | Sporadic handgun | One-timer | Knife | Improviser | Unarmed | Total |
| **6. [if yes to (3)]: When not carrying, where did you keep it?** | | | | | | | | |
| In gun cabinet | 9 | 14 | 7 | 13 | 30 | 10 | 24 | 15 |
| In drawer | 46 | 37 | 30 | 33 | 39 | 30 | 31 | 34 |
| Bedside table | 31 | 29 | 20 | 22 | 32 | 17 | 24 | 24 |
| Under pillow | 26 | 28 | 16 | 14 | 7 | 14 | 17 | 17 |
| Hidden away | 47 | 57 | 63 | 48 | 65 | 41 | 51 | 54 |
| In garage | 3 | 4 | 9 | 3 | 4 | 3 | 2 | 4 |
| All other | 8 | 13 | 6 | 12 | 12 | 21 | 8 | 11 |
| [N (approx)] = | (66) | (257) | (195) | (158) | (44) | (29) | (214) | (963) |
| **7. All gun owners: How often did you carry a firearm?** | | | | | | | | |
| Never | 11 | 2 | 8 | 23 | 45 | 31 | 46 | 23 |
| 1–2 times | 11 | 2 | 12 | 27 | 12 | 29 | 15 | 14 |
| From time to time | 27 | 24 | 51 | 31 | 30 | 26 | 27 | 31 |
| Most of the time | 27 | 44 | 18 | 11 | 9 | 6 | 8 | 20 |
| All of the time | 24 | 29 | 9 | 7 | 9 | 5 | 4 | 12 |
| (N) = | (71) | (250) | (194) | (176) | (66) | (35) | (302) | (1094) |
| **8. [If yes to (7)]: Carry on person or in car?** | | | | | | | | |
| On person | 81 | 82 | 68 | 42 | 38 | 46 | 65 | 60 |
| In car | 19 | 18 | 32 | 58 | 62 | 54 | 35 | 40 |
| (N) = | (58) | (244) | (180) | (135) | (37) | (24) | (166) | (844) |

## SUMMARY OF PRINCIPAL FINDINGS

The results reported in this chapter sustain the following conclusions concerning patterns of weapons ownership and use among convicted felons:

1. Felons as a lot tended to own guns frequently and in large numbers. They also tended in the majority to keep their guns loaded at all times, and they appeared to fire their guns rather frequently. As in the population at large, most of these firings were in sport and recreational applications of one sort or another, but many of the gun-owning felons in our sample had also fired guns at other people, often (they say) to protect themselves.

2. More than one-half the sample was pharmacologically impaired during the conviction crime; those so impaired were slightly more likely to have been armed than those who were not, but the difference was slight.

3. The Firearms Predators were, of course, more likely to have been armed, and armed with a gun, during the conviction crime than were any of the other categories in our typology, a consequence, as we have seen, of the habitual carrying of firearms among these men.

4. Among the men armed during their conviction crime, most (72%) were armed with a firearm, a handgun being by far the most common weapon. More generally, as is obvious in all other sources of data, the handgun was by far the preferred crime firearm, indicated as the most frequently used weapon by 85% of the gun criminals in our sample.

5. The carrying of multiple types of weapons was fairly common practice, especially among the more predatory criminals.

6. Despite the obvious preference for handguns among gun criminals, good-sized fractions have also used other kinds of firearms in committing crime, including some 27% (of the gun criminals) who have used a sawed-off shotgun at least once.

7. Most of the men who carried a weapon during their conviction crime used the weapon in some way in the course of the crime, most frequently to intimidate the victim. More generally, intimidation of the victim was the most common use to which criminal weapons were put (whether there are firearms or other kinds of weapons), followed by self-protection. Nearly all the men who had ever committed a crime armed with a gun actually used a gun in the course of a crime; carrying but never using a gun was extremely uncommon.

8. Although nearly two-fifths of the men in our sample who were armed

with a gun during the conviction offense reported that the gun was actually fired during the incident, very few of those who fired their gun planned in advance to do so. Men who carried guns during crimes clearly planned on using them—for intimidation, if nothing else—but very few appear to have planned on actually firing them. In general, it seems obvious that the average criminal would prefer not to fire his gun during a crime, since this could only increase his chances of apprehension and conviction.

9. The consequences to the victim were more serious if a gun were fired in the course of an incident than if the gun were merely present but not fired; and likewise for the offender. Men who were armed with a gun during the conviction offense and who actually fired the gun during the incident were convicted on more serious charges than the men who were armed with a gun but who did not fire it.

10. Among the armed—not with a gun—criminals, knives were the weapons of choice. In general, these men carried their weapons less frequently than gun criminals did.

11. Most (57%) of the gun criminals in our sample said they had actually fired their gun(s) at least once in the course of a crime. Predictably, the use of a gun to injure or kill the victim was much higher if the gun had been fired if not.

12. Roughly 30% of the armed criminals in the sample (whether armed with a gun or with other weapons) made a habit of carrying a weapon more or less all the time. About 50% carried a weapon only in certain situations—mainly, whenever they felt they might need to protect themselves. Carrying a weapon for the specific purpose of committing crimes with it was fairly uncommon, characteristic of no more than about one-fifth of the sample. Most of the weapons used to commit crimes, in short, were apparently not carried specifically for that purpose.

13. The key distinguishing feature of the men who carried a gun more or less all the time—other than their essentially predatory nature—was that they associated with other men who made a practice of carrying firearms. (Virtually identical results are also reported in Chapter Five.) We think this pattern reflects, in part, peer pressures to "go along" with the predominant practices of one's group, but also, in part, a genuine survival motive: Given the nature of the environment these men inhabited, it would have been rather foolish to have been the only man in the crowd without a gun. In considering the significance of the carrying behavior reported here, we do well to keep in mind that "self-defense" in context means, for the most part, defense against others much like oneself.

14. In general, the gun owners in this sample committed armed crime at a much higher rate than the nonowners. Still, about 40% of the gun owners had never committed a gun crime. The more guns a felon had owned, the more likely he was to have committed at least one gun crime.

15. Most of the handgun owners in this sample did not routinely carry

in four of the five non-Predator groups. These men, clearly, were not content just to have a firearm available in the general vicinity (as were most of the other gun-carrying men in the sample). Their preference was to have a gun immediately at hand.

a handgun with them outside the home; the routine carrying of handguns was strongly concentrated among the Predators and was, indeed, a distinguishing characteristic of the group. Men who carried a handgun typically did so simply by shoving one into their belt; use of a shoulder holster, however, was relatively common.

16. Most predatory criminals were armed with a gun most or all of the time. Even when they slept, they tended to keep their weapons nearby. Judging from the general run of results reported in this chapter, a handgun was their most, and perhaps only, trustworthy companion.

# 5

## FAMILY, FRIENDS, AND FIREARMS: THE EFFECTS OF SOCIALIZATION ON FELONS' WEAPONS BEHAVIOR

It has been widely reported in the literature that the single best predictor of adult firearms ownership in a "normal" (that is, noncriminal) population is whether one's father had owned a gun. (Relevant studies of the topic are reviewed in Wright, Rossi, and Daly, 1983: Ch. 6.) This result is interpreted to mean simply that fathers teach their children—especially male offspring—about guns, expose them to guns, indoctrinate them, as it were, into what is frequently called "The Gun Culture." Later, as adults, these people acquire and use their own firearms, a predictable result of their early learning and experiences. It is a pertinent and, so far as we know, unresearched question whether the ownership and use of firearms among felons is similarly influenced by the effects of early socialization, the topic of this chapter.

Recapitulating what was learned in Chapter Four, most (75%) of the men in our sample had owned at least one gun at one time or another, and slightly more than one-half (57%) owned a gun at the time of arrest. Over 90% of the sample had fired a gun at some time; the average age at which they first did so was 13. Likewise, the average man in our sample obtained his own rifle or shotgun at age 15 and his first handgun at age 18. Clearly, most of these men were exposed to firearms at a relatively early age and have owned and used guns throughout their lives, no doubt for a variety of purposes. We stress that in many of these respects, felons are likely little different from many, perhaps most, American adult men.

The survey asked about firearms ownership and carrying practices among four groups of potential "socialization agents": fathers, siblings, "the people you hung around with before you came to this prison" (hereafter, simply "friends"), and "the men in your family" (fathers, brothers, uncles, cousins). We also asked about seven "socialization experiences" that many men encounter in their youth (here taken to mean prior to age 14). Marginal frequencies for these items are shown in Table 5.1.

As indicated in Chapter Two, about 70% of the fathers of the men in the sample are reported to have owned a rifle or shotgun; more than one-half owned a handgun; a cross-tabulation of the two items shows that 75% had

III

the men in the class, 43% reported that their fathers owned a gun (versus 75% of the felons), and 23% reported that their fathers owned a handgun (versus 57% of the felons). Thus, relative to a nonrandom sample of male college students in the northeast, felons are much more likely to have come from gun-owning backgrounds. On the other hand, 48% of the male students reported that their fathers had taught them how to shoot guns, the same percentage as observed among the felons.² The rituals of male socialization, it would appear, are much the same for youth everywhere.

Just over one-half of the felons' siblings were reported to have owned shoulder weapons; about 44% were reported to have owned a handgun. In contrast, less than one-quarter of the male college student sample had siblings who owned any kind of gun. About one-fifth of the felons were taught how to shoot a gun by their sibling(s).

Perhaps the most significant data shown in Table 5.1 concern patterns of ownership among the felons' friends. A mere 12% of the sample reported that none of their friends owned a gun; more than two-fifths reported that most or all of them did. Figures for handgun ownership among the felons' friends were similar although somewhat lower. About 20% reported that most or all of their friends carried handguns. (None of these items was included in the college student survey.)

Finally, concerning the "men in your family," some 36% reported that most or all of them owned a gun (compared to about one-tenth of the male college students); 20% reported that none of them owned a gun (versus 24% of the male college students). Fewer than one-third (29%) of the felons reported that none of the men in the family owned a handgun; about one-quarter reported that most or all of them did.

To provide additional details about gun socialization, the survey asked about various experiences the felons might have had when they were younger; all of these items were also asked of the college students. Results for both samples are shown in Table 5.2.

Consistent with the results for the "taught how to shoot" question, just under one-half of the felons (and the male college students) reported that

---

in the American Experience." The "sample" is clearly not "representative" of anything, and the data are cited here for illustrative purposes only. That said, it is worth a note that the reported rate of gun and handgun ownership among the families of these students is respectably close to the known national figures. Initially, this even seems somewhat anomalous since rates of gun ownership are generally lower in New England than in the nation at large. On the other hand, given the subject matter of the course, it is plausible that children from gun-owning backgrounds are proportionally more likely to have enrolled.

²It will be noted that the percentage of students who were taught how to shoot guns by their fathers slightly exceeds the percentage who owned guns. Assuming reliable reports, this suggests that even some fathers who do not own guns feel compelled to make arrangements for their sons' introduction to the shooting sports.

---

**TABLE 5.1.** Measures of Socialization to Firearms Usage (in Percentages)

| | Yes | No | | | (N) |
|---|---|---|---|---|---|
| **Fathers** | | | | | |
| 1. Did father own a rifle or shotgun? | 70 | 30 | | | (1509) |
| 2. Did father own a handgun? | 57 | 43 | | | (1471) |
| 3. Did father carry a handgun? | 36 | 64 | | | (1431) |
| 4. Did father show respondent how to shoot? | 48 | 52 | | | (1575) |
| 5. Did father give respondent a gun? | 46 | 54 | | | (1460) |
| **Siblings** | | | | | |
| 1. Sibs own a rifle or shotgun? | 52 | 48 | | | (1574) |
| 2. Sibs own a handgun? | 44 | 56 | | | (1541) |
| 3. Sibs teach respondent how to shoot? | 18 | 82 | | | (1696) |
| **Associates** | None | Some | Most | All | (N) |
| 1. How many friends owned a gun? | 12 | 48 | 29 | 12 | (1710) |
| 2. How many owned a handgun? | 18 | 51 | 23 | 8 | (1704) |
| 3. How many carried a handgun? | 37 | 46 | 13 | 5 | (1712) |
| **Men in family** | None | Some | Most | All | (N) |
| 1. How many owned a gun? | 20 | 45 | 20 | 16 | (1712) |
| 2. How many owned a handgun? | 29 | 48 | 15 | 8 | (1694) |
| 3. How many carried a handgun? | 64 | 31 | 4 | 2 | (1693) |
| **Experiences** | Yes | No | | | (N) |
| When you were a kid, did you ever: | | | | | |
| 1. Go out shooting with father? | 48 | 52 | | | (1647) |
| 2. Go to camp and shoot? | 14 | 86 | | | (1635) |
| 3. Go shooting at a range? | 19 | 81 | | | (1630) |
| 4. Go hunting? | 58 | 42 | | | (1631) |
| 5. Join Boy Scouts? | 38 | 62 | | | (1615) |
| 6. Play with toy guns? | 78 | 22 | | | (1633) |
| 7. Take apart a gun? | 36 | 64 | | | (1625) |

fathers who owned some sort of firearm. Among handgun-owning fathers, about three-fifths carried handguns outside the home. Likewise, about one-half the fathers (48%) showed their son(s) how to shoot guns, and roughly the same proportion (46%) gave their son(s) firearms as gifts.

Unfortunately, comparable questions have not been asked of a sample of legitimate gun-owning adults, and so it is uncertain whether these figures are relatively high, relatively low, or about the same as one would observe in a sample of "normals." To provide at least some comparative data, several of these items were also administered to a large undergraduate class at the University of Massachusetts in the spring of 1984.¹ Among

¹Survey questionnaires were distributed on the second day of class to 167 students (96 men and 71 women) enrolled in a course on "Guns, Crime, and Violence

they "went out shooting guns with their father" when they were young (before they were 14 years old). This, interestingly, was the only question of the seven on which results from the felon and student samples converged; in all other cases, the two groups differed, often by a considerable margin. Male college students, for example, were more likely to have played with toy guns (93%) than felons (78%), were more likely to have joined the Boy Scouts than felons (55 versus 38%), were more likely to have gone to a summer camp where guns were used for recreation (32 versus 14%), and were more likely to have gone shooting at a gun club or pistol range (28 versus 19%). In contrast, the felons were more likely than male college students to have gone hunting as children (58 versus 34%) and were also more likely to have taken a gun apart to "see how it works" (36 versus 23%). (One difference between students and felons is that students played with toy guns and felons with real ones!) Note that college students tend to exceed the felons in activities that require funds, reflecting the greater affluence of their families.

**TABLE 5.2.** "Gun Socialization" Experiences of Felons Compared with a Sample of College Students (in Percentages)

| | Felons | Male students ($N=96$) | Female students ($N=70$) |
|---|---|---|---|
| 1. Ever go shooting with father? | 48 | 46 | 11 |
| 2. Shoot at summer camp? | 14 | 32 | 16 |
| 3. Shoot at range or club? | 19 | 28 | 13 |
| 4. Go hunting? | 58 | 34 | 6 |
| 5. Join Boy/Girl Scouts? | 38 | 55 | 51 |
| 6. Play with toy guns? | 78 | 93 | 60 |
| 7. Take apart a gun? | 36 | 23 | 11 |

These "socialization" experiences tend to be associated with each other in patterned ways as shown in Table 5.3, where the correlations among pairs of variables are reported. One is struck, first, by the overwhelming predominance of positive coefficients. In addition, all but a handful are statistically significant. Substantively, this pattern of positive and relatively high correlations implies that socialization is patterned and cumulative. Men in the sample who were exposed to any one of the socialization agents and experiences shown in the table were more likely to have been exposed to all the others as well.

Intercorrelations among the variables representing each of the five socialization "domains" (four "agent" domains and one "experience" domain) are indicated by boldface numbers. With the partial exception of the experience domain, correlations (indicated in boldface) are especially strong. To illustrate, the average correlation among the five variables representing

**TABLE 5.3.** Intercorrelations among the Socialization "Agents" and "Experiences" Variables

| | | Variable[a] 1 | 2 | 3 | 4 | 5 | 6 | 7 | 8 | 9 | 10 | 11 | 12 | 13 | 14 | 15 | 16 | 17 | 18 | 19 | 20 | 21 |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Father own gun | 1 | | | | | | | | | | | | | | | | | | | | | |
| Father own handgun[b] | 2 | **48**[c] | | | | | | | | | | | | | | | | | | | | |
| Father carry HG | 3 | **35** | **62** | | | | | | | | | | | | | | | | | | | |
| Father teach shoot | 4 | **51** | **30** | **26** | | | | | | | | | | | | | | | | | | |
| Father give gun | 5 | **31** | **20** | **20** | 52 | | | | | | | | | | | | | | | | | |
| Sib own gun | 6 | 31 | 16 | 21 | 31 | 25 | | | | | | | | | | | | | | | | |
| Sib own HG | 7 | 18 | 27 | 28 | 13 | 14 | **63** | | | | | | | | | | | | | | | |
| Sib teach shoot | 8 | 14 | 10 | 14 | 21 | 13 | **37** | **37** | | | | | | | | | | | | | | |
| Friends own gun | 9 | 22 | 17 | 18 | 21 | 23 | 22 | 21 | 12 | | | | | | | | | | | | | |
| Friends own HG | 10 | 14 | 21 | 23 | 11 | 17 | 14 | 24 | 09 | **76** | | | | | | | | | | | | |
| Friends carry HG | 11 | 11 | 16 | 25 | 08 | 13 | 12 | 22 | 07 | **55** | **66** | | | | | | | | | | | |
| Others own gun | 12 | 39 | 21 | 29 | 42 | 31 | 36 | 30 | 24 | 37 | 27 | 19 | | | | | | | | | | |
| Others own HG | 13 | 32 | 45 | 41 | 30 | 23 | 27 | 36 | 20 | 33 | 38 | 31 | **70** | | | | | | | | | |
| Others carry HG | 14 | 18 | 30 | 45 | 18 | 19 | 20 | 31 | 16 | 27 | 34 | 44 | **39** | **53** | | | | | | | | |
| Go out shooting | 15 | 39 | 20 | 17 | 59 | 48 | 30 | 13 | 23 | 20 | 09 | 04 | 37 | 25 | 12 | | | | | | | |
| Camp | 16 | 07 | 08 | 08 | 13 | 14 | 07 | 08 | 03 | 09 | 13 | 13 | 08 | 13 | 17 | **14** | | | | | | |
| Club or range | 17 | 16 | 12 | 12 | 25 | 25 | 11 | 06 | 08 | 14 | 10 | 05 | 19 | 17 | 11 | **33** | **34** | | | | | |
| Hunting | 18 | 34 | 13 | 10 | 45 | 36 | 29 | 14 | 22 | 19 | 09 | 05 | 31 | 19 | 09 | **60** | **12** | **27** | | | | |
| Boy Scouts | 19 | −01 | 02 | 03 | 07 | 02 | −02 | −04 | −03 | 04 | 05 | 00 | 03 | 02 | 05 | **04** | **17** | **15** | **04** | | | |
| Toy guns | 20 | 02 | 04 | 03 | −02 | −03 | 00 | 02 | −04 | 03 | 02 | 00 | 01 | −01 | −01 | **06** | **07** | **06** | **05** | **22** | | |
| Took apart | 21 | 21 | 15 | 15 | 26 | 30 | 19 | 18 | 16 | 23 | 21 | 16 | 21 | 18 | 16 | **37** | **23** | **33** | **36** | **06** | **09** | |

[a]Decimals omitted.
[b]Hereafter Hg.
[c]Numbers in boldface indicate intercorrelations among variables representing each of the five socializations "domains (four "agent" domains and one "experience" domain).

the fathers was .38; among the sibling variables, .46; among the friends' variables, .66; and among the "men in the family" variables, .54. Concerning the experience variables, the correlations are substantially weaker (averaging only .20) but still modestly high by customary standards.

Substantively, the generally strong positive "intradomain" correlations provide additional evidence for the social nature of firearms ownership and use. Fathers owning shoulder weapons also tended to own handguns ($r = .48$), to carry handguns (.35), to teach their sons how to shoot (.51), and to give guns as gifts to their sons (.31). In degrees, the same coherent tendencies were observed in each of the other agent domains. The behaviors represented by these variables, in short, are not random with respect to one another but rather tend to form a fairly tight "package." Much the same would presumably be true of normal firearms owners as well.

These findings, as well as similar findings based on studies of noncriminal gun owners, are consistent with the idea of an "American Gun Culture," more precisely, a culture composed of persons and families whose ownership and use of firearms are derivative of a shared set of values transmitted through parental socialization. This, of course, is not to say that the average gun-owning criminal in our sample is no different from the average deer hunter, trap shooter, or gun collector. It is to say that the average gun-owning criminal, like the average legitimate gun owner, was raised around guns and introduced early in life to their use. It may well be that there are multiple "gun cultures" [as Lizotte and Bordua (1980) and Lizotte, Bordua, and White (1981) have suggested], some of which strongly disapprove of the illegal (or quasi-legal) uses of guns and some of which do not. In any case, gun ownership in the population at large and among our sample of prisoners displays unmistakable cultural aspects.

The intercorrelations among the variables in each domain are sufficiently strong to justify the construction of scales, each measuring the strength of the relevant sources of gun socialization. Scaling was straightforward: In the cases of measuring the influence of fathers, siblings, and experiences, the scaled variables are simply a count of the number of "yes" answers to the relevant questions. Thus, the Father-Influence Scale ranges from 0 to 5, the Sibling-Influence Scale ranges from 0 to 3, and the Experience Scale ranges from 0 to 7.

Since questions concerning friends and "men in the family" employed four-choice response options, construction of the Peer-Influence Scale and Male-Clan-Influence Scale had to proceed differently. In these cases, the responses to the three relevant questions were again simply summed, so the resulting scaled variables both range from 3 (a "none of them" response to all three questions) to 12 (an "all of them" response to all three questions). Frequencies and intercorrelations for the resulting variables are shown in Table 5.4.

We note first that the missing data rates for the scaled variables are rel-

**TABLE 5.4.** Frequencies and Intercorrelations for Influence Scales ($N = 1874$)

| | Scale value | Relative frequency | Adjusted frequency |
|---|---|---|---|
| *Father-Influence Scale* | 0 | 12 | 19 |
| | 1 | 7 | 11 |
| | 2 | 9 | 14 |
| | 3 | 13 | 21 |
| | 4 | 11 | 18 |
| | 5 | 12 | 18 |
| | Missing | 36 | — |
| *Sibling-Influence Scale* | 0 | 34 | 43 |
| | 1 | 14 | 17 |
| | 2 | 21 | 26 |
| | 3 | 12 | 15 |
| | Missing | 20 | — |
| *Peer-Influence Scale* | 3 | 10 | 11 |
| | 4 | 5 | 5 |
| | 5 | 14 | 16 |
| | 6 | 26 | 28 |
| | 7 | 9 | 10 |
| | 8 | 11 | 12 |
| | 9 | 9 | 10 |
| | 10 | 3 | 4 |
| | 11 | 1 | 2 |
| | 12 | 3 | 3 |
| | Missing | 9 | — |
| *Male-Clan-Influence Scale* | 3 | 16 | 18 |
| | 4 | 9 | 10 |
| | 5 | 20 | 22 |
| *Male-Clan Influence Scale (continued)* | 6 | 18 | 22 |
| | 7 | 10 | 20 |
| | 8 | 7 | 10 |
| | 9 | 5 | 8 |
| | 10 | 3 | 6 |
| | 11 | 1 | 4 |
| | 12 | 2 | 1 |
| | Missing | 10 | 2 |
| | | | — |
| *Experiences Scale* | 0 | 4 | 5 |
| | 1 | 17 | 20 |
| | 2 | 18 | 22 |
| | 3 | 15 | 17 |
| | 4 | 14 | 17 |
| | 5 | 9 | 10 |
| | 6 | 5 | 6 |
| | 7 | 2 | 3 |
| | Missing | 15 | — |

| *Intercorrelations*[a] | Father | Sibling | Peers | Male Clan |
|---|---|---|---|---|
| Sibling | .36 | — | | |
| Peer | .27 | .24 | — | |
| Male clan | .54 | .39 | .42 | — |
| Experiences | .46 | .25 | .20 | .30 |

[a]Missing data deleted pairwise. Ns for each cell vary from 1040 to 1662. All coefficients are significant at .001 or beyond.

atively high, ranging from 9% missing on the "friends" variable. The high rate for fathers, of course, only reflects a point noted in Chapter Two, that many of these men grew up in fatherless environments. Also, some of them had no brothers or sisters, which accounts for part of the 20% missing data for siblings. Finally, the seven experience questions appeared toward the end of a very long questionnaire; most of the missing data on this variable results from men simply not answering these questions.

Perhaps the most important substantive point to make about the frequency distributions concerns the relatively low percentages found in the low-end categories of each scale. More than 80% of the men who answered all the fathers' questions, for example, reported that their fathers either owned a gun, carried a gun, taught their sons how to shoot, or gave their sons firearms as gifts; thus, some four-fifths of the men with fathers appear to have received at least some firearms exposure from that source. Likewise, some 95% of the sample (who answered all the pertinent questions) had at least one (or more) of the seven firearms experiences.

Results for the "Peer-Influence Scale" bear a special note. Recall that these questions referred to "the men you hung around with before you came to this prison." About 90% of the sample reported that at least some of these men either owned or carried firearms. As we see later, the firearms practices of a felon's associates were particularly relevant in accounting for his own criminal firearms use.

It is an interesting question just how many of the men in the sample were exposed to none of the agents or experiences recorded in the table; or in other words, how many men fell at the de facto zero point on all five scales. As it happens, this is true of only 7 of the men in the sample. Ignoring the "experience" domain, the number of men at the de facto zero point on all four agents' variables is 28. In short, virtually all of these men had at least some exposure to firearms early in their lives.

Intercorrelations among the five scaled variables are all moderate to high (ranging from .20 to .54), positive in sign, and statistically significant, as, indeed, one would expect given the results in Table 5.3. We thus emphasize again: Men exposed to firearms in any of these contexts are likely to have been exposed in them all.

The scaled variables provide convenient and efficient ways to assess the effects of early socialization on the sample's own firearms behavior. For this purpose, we have selected 16 items of possible interest, grouped loosely into four topical areas, as follows:

*Age:* How old the felon was when he (1) first fired a gun, (2) first obtained his own shoulder weapon, (3) first obtained his own handgun, (4) committed his first armed crime, and (5) committed his first handgun crime.

*Gun Ownership in General:* Has the felon ever owned a gun, ever owned a

TABLE 5.5. Correlations between Felon's Firearms Behavior and Influence Scales[a]

| Firearms behaviors | Father | Sibling | Influence scales | | |
|---|---|---|---|---|---|
| | | | Peers | Male clan | Experiences |
| Age[b]: | | | | | |
| At first firing | -.36 | -.23 | -.19 | -.26 | -.39 |
| At first gun | -.38 | -.14 | -.20 | -.23 | -.31 |
| At first handgun | -.18 | -.06 | -.25 | -.11 | -.08 |
| At first armed crime | -.01 | -.01 | -.14 | -.01 | .02 |
| At first handgun crime | -.07 | -.00 | -.15 | -.04 | -.00 |
| Gun ownership[c]: | | | | | |
| Ever own gun? | .35 | .30 | .30 | .27 | .28 |
| If yes: How many? | .25 | .24 | .36 | .26 | .22 |
| If yes: Own handgun? | .02 | .09 | .25 | .12 | -.03 |
| How many? | .18 | .22 | .39 | .20 | .16 |
| How often fire? | .14 | .11 | .21 | .15 | .12 |
| Criminal gun use: | | | | | |
| Armed at conviction | .08 | .07 | .22 | .12 | .06 |
| How often armed with gun?[d] | .20 | .18 | .33 | .17 | .14 |
| Trouble to get one? | .11 | .11 | .20 | .11 | .16 |
| Predator?[e] | .18 | .18 | .34 | .17 | .12 |
| Unarmed | -.11 | -.14 | -.28 | -.14 | -.11 |
| Carrying practices: | | | | | |
| Carry handguns? | .11 | .06 | .28 | .14 | .03 |
| Carry firearms? | .15 | .15 | .40 | .19 | .04 |

[a]Missing data deleted pairwise.

[b]"Never" is treated as missing data for this analysis.

[c]"Ever own" was asked of everyone. Remaining questions were asked only of those who had ever owned.

[d]Asked of gun criminals only.

[e]Type is represented here by two dummy variables, one for Predators and one for Unarmed Criminals.

handgun? How many guns and handguns has he ever owned? How often did he fire his guns before he came to prison?

*Criminal Gun Use:* Was the felon armed at the conviction offense? How often was he armed with a gun when he committed crimes? How much trouble will it be for him to obtain a handgun upon release? Is he a Predator or not?

*Carrying Practices:* Two questions on how often the felon carried a firearm with him outside the home.

Zero-order correlations among the variables just discussed and the five scaled socialization variables are shown in Table 5.5. With only a few exceptions, the patterns are much as one would expect: The higher the felon's prior exposure to the agents and experiences of firearms socialization, the more pronounced his own firearms' behavior tends to be. (Since any coefficient greater than approximately .05 is statistically significant for this

TABLE 5.6. Multiple Regression of Selected Firearms Behavior on the Five Influence Scales

|  |  | Influence scales | | | | |
| Dependent variables |  | Father | Sibling | Peers | Male clan | Experiences | $R^2$ |
| --- | --- | --- | --- | --- | --- | --- | --- |
| Age[a] |  |  |  |  |  |  |  |
| Age at first firing | b = | -.46 | -.27 | -.12 | -.06 | -.67 | .20 |
|  | SE = | .09 | .12 | .06 | .07 | .08 |  |
| Age at first armed crime | b = | -.09 | .04 | -.56 | .19 | .17 | .03 |
|  | SE = | .19 | .26 | .13 | .16 | .17 | — |
| Ownership |  |  |  |  |  |  |  |
| Ever own a gun? | b = | .05 | .06 | .04 | .00 | .03 | .21 |
|  | SE = | .01 | .01 | .01 | .00 | .01 |  |
| Number owned | b = | .08 | .19 | .23 | .03 | .10 | .17 |
|  | SE = | .04 | .05 | .03 | .03 | .04 |  |
| Own a handgun? | b = | -.01 | .02 | .04 | .01 | -.02 | .07 |
|  | SE = | .01 | .01 | .01 | .01 | .01 | — |
| Crime |  |  |  |  |  |  |  |
| Armed at conviction? | b = | .00 | .01 | .05 | .01 | .00 | .05 |
|  | SE = | .01 | .02 | .01 | .01 | .01 |  |
| How often armed? | b = | .08 | .09 | .18 | -.03 | .02 | .13 |
|  | SE = | .04 | .05 | .03 | .03 | .03 | — |
| Carrying |  |  |  |  |  |  |  |
| How often carry? | b = | .05 | .07 | -.01 | -.01 | -.06 | .17 |
|  | SE = | .03 | .05 | .03 | .03 | .03 |  |

[a,b] Unstandardized partial regression coefficient; SE, standard error of the estimate.

sample size, we will adopt a more rigorous standard than customary and only consider coefficients whose absolute magnitude is at least .10).

Considering first the "how old were you when . . ." questions, we note that the correlation coefficients are predominantly negative, as would be expected. In general, the higher the degree of exposure, the younger a felon was when he first "got into" guns. The age at which he first fired a gun is correlated -.36 with the Father's-Influence Scale, -.39 with the Experiences-Influence Scale, and somewhat more weakly (but still negatively) with the other three scales. The age at which the felon acquired his first firearm follows a very similar pattern. In short, fathers and the experiences sons share with their fathers seem to be the predominant influences on firing and acquiring a gun for the first time.

In the remaining three cases, however, the pattern shifts somewhat; the age at which a felon acquired his first handgun, committed his first armed crime, and committed his first handgun crime were all more strongly correlated with the Peer-Influence Scale than with any of the other four, a pattern that recurs elsewhere in the table.

All five Influence scales were moderately to strongly correlated (.27 to .35) with whether the felon had ever owned a gun; among those who had ever owned at least one, all five variables were likewise moderately to strongly correlated (.22 to .36) with the total number of guns the felon had owned. Among those ever owning a gun, however, the tendency to have owned a handgun was strongly correlated only with the Peer-Influence Scale (r = .25) and was essentially uncorrelated with the other four variables. Friends also appeared to exert a greater influence on the number of handguns ever owned and on the rate at which a felon fired his guns than any of the other socialization agents. Considering the number of handguns owned, for example, the effect of the Peer-Influence Scale was about twice that of any other.

In regard to criminal gun use and carrying practices, the general drift of the findings can be quickly summarized: Firearms ownership and carrying among the felon's friends were by far the most important factors. For example, the tendency to have been armed at the conviction offense is correlated at .22 with the Peer-Influence Scale and essentially uncorrelated with all other scales. Among those who have committed at least one gun crime, the frequency with which they were armed with a gun during their crimes was correlated .33 with the Peer-Influence Scale, by far the strongest effect of the five. Likewise, the effects of the Peer-Influence Scale on the felon's carrying practices were more than twice as great as the effects of any other variable. We note finally: Whether the felon is categorized as a Predator is correlated at .34 with the Peer-Influence Scale but much more weakly correlated with all other variables; the correlation of the Peer-Influence Scale with the Unarmed category is -.28, again the strongest effect of the five.

Since all five socialization variables are rather strongly intercorrelated (Table 5.4), the zero-order analyses just reported may be potentially misleading. Selected results for a multivariate analysis of these same variables are shown in Table 5.6.

Table 5.6 reports regression coefficients and standard errors for 8 separate regression equations. Dependent variables are a representative selection of the 16 firearms behaviors discussed above; independent variables are the five influence scales.

These analyses tend to confirm the conclusions advanced on the basis of the zero-order results. Legitimate aspects of firearms behavior tended to be related to all the influence scales (Male Clan being the consistent exception) and especially to the Father Influence and Experiences Scales. Clearly illicit aspects of a felon's firearms behavior tended to be related only to the Peer-Influence Scale.

The pattern can be illustrated with two examples. The tendency ever to have owned a gun was significantly related to every socialization variable except the Male-Clan-Influence Scale. Fathers and siblings apparently exerted the strongest effects. The tendency to have been armed at the conviction offense was significantly related to none of the influence scales except

the Peer-Influence Scale. The results for the carrying variable were, in essence, identical.

In short, we witness in these data a rather intriguing pattern. When considering the more normal or legitimate aspects of firearms behavior (whether the felon ever owned a gun, how many he has owned, how old he was when he first fired or acquired one, etc.), fathers appeared to be the predominant influence (reinforced, to be sure, by all the other agents of socialization as well). When considering the seamier or clearly criminal aspects of firearms behavior, however, the influence of fathers (and other family agents) paled considerably, and the effects of one's peer group came to dominate. (A very similar run of results was also reported in some of the analyses of Chapter Four.)

We infer from this pattern that much of the material presented in this chapter, while of interest, is not especially relevant to the clearly criminal acquisition and use of firearms. It is of some interest to learn, for example, that one-half the felons in this sample were taken out by their fathers and taught how to shoot guns, and that, on the average, they were about 13 years old at the time. We suspect, however, that similar questions asked of a national sample of legitimate firearms owners would produce nearly identical results. What we witness in these data is probably not unique in any sense to the early childhood experiences of felons but rather are fairly common experiences for young males generally in our society. Although hazardous, the comparisons with data from a sampling of male college students are generally consistent with this impression.

Judging from the data reported in this chapter, especially that shown in Tables 5.5 and 5.6, the critical variable affecting criminal uses and abuses of firearms is the prevalence of guns among the felon's peer group—the number of his friends and associates who owned or carried firearms. The "friends" variable was correlated consistently, and at times quite strongly, with all the criminal gun use questions; without exception, it was the strongest correlate (of those examined in this analysis).

The key turning point in the lives of most of these men, we suggest, was not the occasion in their early adolescence when their fathers took them out to teach them how to fire guns. Rather, it was the day they realized that many of the people they hung around with were carrying guns themselves. Some adolescent males, of course, would respond to this information by finding new people to hang around with. This, for example, could well describe some (perhaps many) of the college students we surveyed. Others would respond by obtaining a gun themselves, and these, it appears, were often the ones who ended up in prison.

In the best of circumstances, adolescence can be a much-troubled period in a young man's life; and the men in our sample clearly did not grow up "in the best of circumstances." Most of the men in this sample, as we noted in an earlier chapter, had gotten drunk, tried drugs, and committed

at least one fairly serious crime before their sixteenth birthday. Nearly two-thirds reported having been expelled from school; more than one-quarter reported having been beaten by their fathers. Although our study contains no direct questions on such matters, it is easy enough to imagine that the respect and friendship of others in their social environments was, at best, a sometime thing.

Under the circumstances, it is understandable that they might turn to peers for companionship (delinquent gangs are rarely choosy about whom they admit, so long as geography and race are in order) and to firearms for a measure of power and respect. One can also easily imagine an addiction to the ensuing sense of control every bit as intoxicating in its way as heroin or alcohol are in theirs. Student athletes wear their "letter sweaters" to signify their accomplishments and win the admiration and respect of others. Not insignificantly, the same sweaters signify victory in aggressive, even if ritualized, encounters with other young men. In fundamental symbolic respects, this strikes us as not entirely different from the possession and routine carrying of guns among the "tough kids"—the drop-outs or expellees who, at age 16, are already out of school, on their own, prowling the streets.

# 6

# MOTIVATIONS TO GO ARMED

Why do felons acquire and carry weapons? The answer to this question may appear to be obvious, but it is not. For the commission of some crimes, to be sure, a weapon is a great convenience, if not an absolute necessity: Armed robbery is one example and willful, premeditated homicide another. And yet, as we have seen, many of the men in the sample carried weapons during burglaries and thefts, where the need for a weapon is much less obvious; further, many were in the habit of carrying even on days when they were not planning to do any crimes (Chapter Four).

Furthermore, weapons carrying is not without some potential costs; in many jurisdictions, the involvement of a weapon in a crime would eventuate in a stiffer sentence (e.g., Cook and Nagin, 1979), either through mandatory sentence enhancement laws or through the normal sentencing practices of the courts, so there is at least some inducement not to carry. Finally, carrying a weapon in the course of one's daily affairs, especially a firearm, is at least a modest inconvenience, if not a considerable encumbrance.[1] Since the prevalence of weapons carrying among felons is clearly greater than one would expect on the basis of their instrumental use in crime alone, the question why felons bother to carry weapons is not at all a trivial one.

## THE "RATIONALITY" OF FIREARMS USE IN CRIME

Some previous discussions of why criminals carry guns have tended to depict the behavior mainly as the carrying of the "tools of the trade," in short, a view of the felon as a rational economic actor. Cook's (1976) "strategic choice analysis" of robbery, for example, suggests that robbers carry guns (versus other weapons or no weapons) because it allows them to rob more lucrative targets and thus to maximize their take. Others suggest that it is more a matter of convenience: A gun is a very intimidating weapon,

[1] One reader of a previous draft pointed out that once a person becomes accustomed to it, a small handgun in the pocket is no more an encumbrance than a thick wallet or full key chain; indeed, after carrying a gun for many years (to be sure, in a holster), some policemen apparently feel uncomfortable without it.

and it is just easier to commit crimes (less resistance from the victim, for example) if one is armed with a gun than if not.

On the other hand, some of the analyses so far presented point as much to habit as to rational calculation as an important, if not predominant, motive. In Chapter Four, for example, we found that about 30% of the weapons users in the sample carried weapons almost all of the time, whether planning a crime or not; weapons also enhanced some felons' sense of security, these being the additional 50% who carried weapons in "certain situations," mainly, whenever they felt the need for self-protection. Only about one armed felon in five said that he had carried only when he had been planning to do a crime. From these findings alone, one can safely infer that the crime-facilitative aspects of a weapon did not represent the only, or (perhaps) even the major, motive for carrying one, that habit or fear were of at least equivalent importance.

Of course, a "habit" is not necessarily nonrational or irrational behavior. In everyday life, many of our "habits" consist of patterns of behavior that are the product of long-standing decisions that have proved so useful we no longer subject them to close scrutiny. For example, many Americans habitually wear watches, putting them on in the morning without giving a thought to whether or not wearing a watch on the day in question "makes sense." Through experience, we know that whatever our scheduled activities may be, there are likely to be many occasions when knowing the time would be desirable. Similarly, the habitual carrying of weapons may also make sense in the pursuit of a criminal career in hostile and threatening surroundings. Opportunities to commit crimes may occur, and other predators may attempt to make one a victim.

We reported in Chapter Four that only about 30% of the gun owners in the sample had ever acquired a firearm specifically for use in crime; thus, the large majority (70%) had not. The firearms actually used by these men to commit crimes must have been originally acquired, therefore, for other reasons, possibly a mixture of reasons in which criminal use did not explicitly dominate. What these "other reasons" might have been is in part the topic of this chapter.

It would, of course, be mistaken to formulate the issue as one of "rational calculation" or "crime facilitation" versus habit, fear, or "self-defense," since in important ways these are false oppositions. A felon who carried a gun mainly because of possible encounters with armed victims (and many did, as we see later) could be said to carry out of fear, out of a sensed need for self-defense, or as a means of more efficiently robbing potentially armed victims. In the abstract, these seem like entirely separate classes of motives, but in reality they are not.

The last point requires some emphasis. In discussing the weapons motivations of "the criminal class," it is misleading to look at strictly criminal behaviors as divorced from the broader day-to-day style of life that char-

acterizes the criminal population. As we have stressed earlier, many of the men in our sample were not calculating, "rational" criminals but rather strict opportunists whose "strategic choice," when they made one, was to commit some crime that was suddenly there for them to commit. It is not as though they get out of bed on certain days, decide that this is a day on which they will commit crimes, and arm themselves accordingly. They get out of bed knowing that theirs is a violent and uncertain existence, that today may be a day when they are assaulted in a bar, hassled by others on the street, confronted by an armed victim or by the police, or presented with an opportunity to commit a crime. Our point is that a firearm is a useful hedge against all the above contingencies. When we say that crime-facilitation, self-protection, fear, and habit are interrelated motives for the firearms behavior of the felons in our sample, what we mean to imply is that all of these are ever-present realities in the day-to-day existence of these men and thus that the decision to arm oneself must derive from some "mix" of what otherwise appear to be distinctive and clearly separable motivations.

## MEASURING WEAPONS-CARRYING MOTIVES

Most of the information we have on the motivations to acquire and carry weapons was obtained by directing questions to respondents according to their special circumstances. Men who indicated early in the questionnaire that they had never committed an armed crime were skipped to a set of questions asking, in essence, Why not? Men who had committed crimes with guns were likewise skipped to a sequence asking about their motives for carrying firearms; men who had committed armed crimes, but not with guns, were asked two sequences: why they carried the weapons they carried, and why they chose not to carry a gun. Marginal frequencies for all four of these question sequences are shown in Table 6.1.

It must be stressed in advance that all the data reported here should be treated with some skepticism, in that people are not always the best witnesses about their own motives. As we saw in Chapter Five, for example, having grown up around guns is no doubt an important part of the explanation of the firearms behavior of the felons in the sample, and yet it is likely that socialization factors would rarely be mentioned if people were asked, point blank, "Why do you own a gun?" People, in short, are not always aware of all the relevant reasons for their behavior and need not always be honest in reporting them even when they are aware.

Then too, as we hasten to add, certain "response-set" tendencies may also be at work. On the one hand, it might be easier to say, for example, that "I needed a gun to protect myself" than to say, "I wanted the gun to threaten my friends, if they should try to push me around." Alternatively, some readers of earlier versions of this material suggested that the more

likely effect would be in the opposite direction, the hypothesis being that felons would stress (or fabricate) tougher, more aggressive reasons so as to project an image of self as fundamentally "bad." Our hope, of course, is that these represent offsetting tendencies. In any case, it is clear that the reasons felons themselves gave for why they owned and carried weapons constitute interesting and useful information but do not provide the final word on the matter.

The lead-in to the "motivations" questions read as follows: "There are many different reasons why a person might decide to carry a [GUN or WEAPON] while doing a crime. Following is a list of some of these reasons." For each reason listed, the respondent was asked to state how important that reason was in his own decision to carry a gun (or weapon). Response options were "very," "somewhat," "a little," or "not at all important." Frequencies reported in Table 6.1 are arranged in rank order (most to least important reason), based in all cases on the percentage that cited each reason as "very important."

We focus first on the responses of the Gun Criminals (men who have committed at least one gun crime). As these men told it, the single most important reason why they decided to carry a gun while doing crime was, "if you carry a gun your victim doesn't put up a fight, and that way you don't have to hurt them" ("very important" to 57%, and the most commonly mentioned motive of the 14 listed, by a fairly substantial margin).[2]

[2]This result is consistent with a suggestion once made by Phil Cook that many robbers carry guns as a means of avoiding, not perpetrating, violence. It is not con-

TABLE 6.1. Motivations to Go Armed: Marginal Results (in Percentages)

| | Importance | | | | $\bar{x}$ | (N) |
|---|---|---|---|---|---|---|
| | Very | Somewhat | A little | Not at all | | |
| **Gun criminals: Why did you carry a gun?** | | | | | | |
| 1. Don't have to hurt victim | 57 | 15 | 7 | 21 | 3.1 | (721) |
| 2. Chance victim would be armed | 50 | 12 | 13 | 25 | 2.9 | (712) |
| 3. Prepared for anything | 48 | 20 | 11 | 20 | 3.0 | (709) |
| 4. Ready to defend myself | 44 | 14 | 13 | 29 | 2.7 | (698) |
| 5. Easier to do crime | 42 | 17 | 12 | 29 | 2.7 | (696) |
| 6. Might need gun to escape | 40 | 15 | 12 | 33 | 2.6 | (695) |
| 7. Need gun to do crime | 39 | 13 | 12 | 37 | 2.5 | (698) |
| 8. Felt better with gun | 34 | 20 | 17 | 29 | 2.6 | (706) |
| 9. People don't mess with you | 30 | 21 | 14 | 36 | 2.4 | (686) |
| 10. Easy to hurt someone | 27 | 13 | 13 | 47 | 2.2 | (686) |
| 11. Gun is "tool of trade" | 25 | 16 | 16 | 43 | 2.2 | (690) |
| 12. Police have guns | 20 | 10 | 12 | 58 | 1.9 | (688) |
| 13. Friends carried guns | 13 | 11 | 14 | 61 | 1.8 | (702) |
| 14. Made me feel like a man | 4 | 4 | 12 | 80 | 1.3 | (674) |
| **Armed-not-with-a-gun: Why did you carry a weapon?** | | | | | | |
| 1. Don't have to hurt victim | 39 | 8 | 13 | 39 | 2.5 | (133) |
| 2. Feel better with a weapon | 33 | 12 | 9 | 46 | 2.3 | (133) |
| 3. Ready to defend myself | 30 | 13 | 13 | 45 | 2.3 | (135) |
| 4. Easier to do crime | 29 | 12 | 10 | 48 | 2.2 | (133) |
| 5. Chance victim would be armed | 27 | 12 | 8 | 53 | 2.1 | (135) |
| 6. Prepared for anything | 24 | 14 | 12 | 50 | 2.1 | (132) |
| 7. Easy to hurt someone | 24 | 6 | 10 | 60 | 1.9 | (135) |
| 8. People don't mess with you | 20 | 11 | 17 | 52 | 2.0 | (133) |
| 9. Might need weapon to escape | 18 | 11 | 10 | 61 | 1.9 | (133) |
| 10. Friends carried weapon | 17 | 11 | 11 | 59 | 1.9 | (138) |
| 11. Weapon's "tool of trade" | 16 | 8 | 9 | 68 | 1.7 | (133) |
| 12. Need weapon to do crime | 11 | 8 | 10 | 71 | 1.6 | (132) |
| 13. Police have weapons | 10 | 5 | 13 | 72 | 1.5 | (135) |
| 14. Made me feel like a man | 5 | 6 | 7 | 82 | 1.4 | (130) |
| **Armed-not-with-a-gun: Why not carry a gun?** | | | | | | |
| 1. Just asking for trouble | 56 | 13 | 6 | 25 | 3.0 | (143) |
| 2. Get a stiffer sentence | 54 | 15 | 6 | 25 | 3.0 | (138) |
| 3. Never needed gun for my crimes | 54 | 13 | 9 | 24 | 3.0 | (138) |
| 4. Somebody would get hurt | 49 | 9 | 9 | 35 | 2.7 | (140) |
| 5. Wouldn't feel right | 42 | 9 | 13 | 37 | 2.5 | (137) |
| 6. Never thought about it | 38 | 6 | 16 | 40 | 2.4 | (139) |
| 7. Wouldn't trust myself | 36 | 7 | 7 | 50 | 2.3 | (135) |
| 8. Never owned a gun | 35 | 7 | 12 | 46 | 2.3 | (137) |
| 9. Don't like guns | 30 | 8 | 11 | 50 | 2.3 | (135) |
| 10. Against the law for me to own gun | 25 | 7 | 13 | 56 | 2.0 | (137) |
| 11. Too much trouble to get one | 16 | 5 | 7 | 72 | 1.6 | (134) |
| 12. Costs too much | 11 | 6 | 11 | 72 | 1.6 | (138) |
| 13. Wouldn't know how to use one | 11 | 4 | 8 | 76 | 1.5 | (132) |
| **The unarmed: Why not carry a weapon?** | | | | | | |
| 1. Just asking for trouble | 69 | 12 | 5 | 14 | 3.3 | (553) |
| 2. Get a stiffer sentence | 67 | 12 | 6 | 15 | 3.3 | (535) |
| 3. Never needed gun for my crimes | 61 | 7 | 6 | 26 | 3.0 | (523) |
| 4. Somebody would get hurt | 60 | 11 | 7 | 22 | 3.1 | (531) |
| 5. Easier to do crime | 53 | 9 | 7 | 31 | 2.8 | (528) |
| 6. Never thought about it | 52 | 9 | 10 | 28 | 2.9 | (537) |
| 7. Wouldn't feel right | 51 | 8 | 8 | 33 | 2.8 | (513) |
| 8. Against the law | 46 | 11 | 8 | 34 | 2.7 | (517) |
| 9. Don't like weapons | 38 | 6 | 6 | 36 | 2.7 | (506) |
| 10. Never owned a weapon | 34 | 8 | 8 | 50 | 2.3 | (502) |
| 11. Wouldn't trust myself | 14 | 8 | 7 | 73 | 1.7 | (495) |
| 12. Wouldn't know how to use one | 14 | 6 | 7 | 73 | 1.6 | (499) |
| 13. Too expensive | 12 | 7 | 7 | 73 | 1.6 | (516) |

(continued)

Per se, this is not a particularly surprising result: We saw in Chapter Four that intimidation of the victim was, by far, the most common use to which crime weapons were put; we now learn that it was also the single most important motive for carrying a gun during crime. Confronted by a gun-wielding felon, the typical victim is, one presumes, less likely to resist, no doubt a highly desirable outcome from the felon's point of view. One pre-dominant motive to go armed was clearly to minimize the "hassles" from victims that a felon might otherwise encounter and, hence, to maximize the chances that the crime would be successfully completed.

In much the same vein, the second most important reason cited for the decision to carry a gun was, "There's always a chance my victim would be armed" ("very important" to 50%). It is of considerable interest that both the first and second most important motives relate to victims; one-half the men who had committed gun crimes said that one "very important" reason to carry a gun during crime was the prospect that the intended victim would be armed. The role that actual or potential encounters with armed victims played in the firearms behavior of this sample is of sufficient interest that we have devoted the next chapter exclusively to this topic. It bears notice in this context that felons are not above preying upon their fellow criminals as victims in their crimes; hence, the probabilities that victims might be armed are not trivial.

Intimidation of the victim and defense against an armed victim are the only motives of the 14 that were said to be very important by one-half or more of the sample. Other motives of nearly equal weight included, "when you have a gun, you are prepared for anything that might happen" ("very important" to 48%), and "a guy like me has to be ready to defend him-self" (44%). Self-preservation was clearly the common theme in both these responses; Carrying a gun was seen, apparently, as a useful hedge against the uncertainties that accompany a life of crime.

That "it is easier to do crime if you are armed with a gun" was the fifth (but only the fifth) most commonly cited motive and was rated as "very important" by 42%. This plus the first-place result make it clear that the increased ease with which crime can be committed if armed with a gun was one important motive for carrying one; the other results also suggest, however, that self-preservation was a motive of equivalent or greater im-portance. Of course, the line between self-preservation and efficiency in accomplishing crimes is blurred, especially if one considers that success in a crime most likely includes coming away from the incident without phys-ical harm or apprehension.

sistent, however, with the argument just reviewed in the text, that these felons would exercise every opportunity to let the researchers know just how "bad" they were. "And that way you don't have to hurt them . . ." strikes us as an almost sissified response, hardly the sort of thing that a Richard Pryor-like "we bad" felon would be inclined to confess to. Among the Gun Criminals, however, it was the most fre-quently given response.

The twin motifs of self-preservation and efficiency recur throughout the results. "I felt I might need a gun to escape" was very important to 40%; "you need a gun to do the kind of crime I did," to 39%. Some men "just felt better when I had a gun with me" (34% "very important"). That "peo-ple just don't mess with you if you are carrying a gun" was very important to 30%. Motives of apparently minimal importance included "a lot of the people I hung around with carried guns" (but see the previous chapter), and "carrying a gun made me feel more like a man."

Data on the motivations of the gun criminals in the sample therefore support the conclusion that they carried guns both to facilitate the com-mission of crimes and for their own self-protection. We emphasize again that these are not entirely different motives. A resistant victim not only complicates the commission of the crime but also might imperil the well-being of the offender; being able to effectuate one's escape could be scored as either an "efficiency" motive or a "self-preservation" motive; and so on through the list. The important point to be made from these results is not that one or the other of these was the single most important motive for a felon to carry a gun, but rather that guns were important because they al-lowed for the commission of crimes with minimum trouble from victims and maximum security for the felon. Whether or not this mixture of mo-tives amounts to some postulated syndrome of "economic rationality" is more a semantic problem than an empirical one. To be sure, many of the factors mentioned as important by these men went well beyond the ra-tional calculations of a profit-maximizing "businessman," relating, instead, to survival in an uncertain and inherently dangerous lifestyle. At the same time, a man who has decided to maximize his chances of survival has ob-viously made a quite rational decision.

## THE MOTIVATIONS OF NONGUN USERS

Results for the Armed-Not-with-a-Gun Criminals were similar in some respects but quite different in others. We note first that all the possible mo-tives for carrying were generally less important to the men who carry weapons other than firearms than to the gun criminals. To illustrate, the mean response for the first-place finisher among the Armed-Not-with-a-Gun group was 2.5 (39% "very important"). Among the Gun Criminals, there were six motives with higher mean scores. From this pattern (which is quite general throughout the table) one can safely infer that the reasons why gun criminals carried guns were generally more strongly held than were the reasons why the men who carried other weapons carried the weapons they did. The motives for carrying guns, in other words, were more sharply crys-tallized—more fervently held, as it were—than the motives for carrying other weapons.

As among the Gun Criminals, the most important reason for carrying a weapon among the Armed-Not-with-a-Gun group was so that the victim

would not put up a fight. Indeed, the two groups were agreed on four of the top five motives. Men who carried weapons other than guns, that is, appeared to do so for pretty much the same reasons that gun-carrying felons carried firearms—a combination of efficiency and protection. The difference was mainly that these reasons were less strongly held among the nongun group than among the gun group. One possible interpretation of this difference is that guns are simply better devices both for efficiency in the commission of crime and for general protection against victims and a hostile environment; men to whom these factors were very important might have preferentially chosen to carry guns. Another possible reason may have to do with the types of crimes committed by nongun criminals, crimes in which firearms may not provide an important edge or advantage (e.g., rape).

The Armed-Not-with-a-Gun criminals were also asked why they had opted not to carry firearms; the Unarmed Criminals were asked why they had opted not to carry any weapons. Remarkably, there was virtually perfect agreement between the two groups through the first six reasons on the list. In both cases, the most important reason for not carrying was that "the guy who carries [a gun or a weapon] is just asking for trouble" (very important to 56% of the Armed-Not-with-a-Gun and to 69% of the Unarmed), followed by "you get a stiffer sentence if you get caught with a [gun or a weapon]" (very important to 54 and 67%, respectively). The other four top finishers in both groups were: "I never needed a [gun or a weapon] for the kinds of crime I did" (54 and 61% "very important"); "if you carry a [gun or a weapon], somebody's going to get hurt" (49 and 60% very important; respectively); "I just wouldn't feel right carrying [a gun or weapon]" (42 and 53%); and "I just never thought about carrying a [gun or weapon]" (38 and 52%).

Despite the high rank-order agreement on the reasons not to carry, we note again that all the cited reasons were less important, on the average, to the Armed-Not-with-a-Gun Criminals than to the Unarmed Criminals. The highest mean score among the former group was 3.0 and among the latter 3.3; and again, this pattern was quite general throughout all relevant comparisons. Interestingly, then, it appears that the Armed-Not-with-a-Gun criminals carried weapons for much the same reasons that the Gun Criminals carried guns, but they chose not to carry guns for much the same reasons that the Unarmed opted not to carry anything. Their motives, in short, were apparently mixed: Like the Gun Criminals, they sensed the need to be armed; like the Unarmed, they agreed that carrying a gun was "just asking for trouble." As a compromise among competing motives, they carried other weapons instead.

Some of the item-specific results warrant more extended comment. First, the strong showing of "you get a stiffer sentence if . . ." should be acknowledged. As noted in the opening of this chapter, a weapons involvement would have eventuated in a stiffer sentence in many jurisdictions; the

perception of the sample on this point is probably accurate. It is impossible to say for sure just how many of the Unarmed or the Armed-Not-with-a-Gun criminals would have been Gun Criminals were it not for this fact; but presumably some, perhaps many, would have been. The sentencing provisions for weapons involvement, in short, do not represent a perfect deterrent since many Gun Criminals appear in our sample (and therefore have clearly not been deterred); but they do appear to represent at least some deterrent to some men who might have otherwise carried guns.

On the other hand, that it was "against the law" for most of these men to own a firearm appears to have been a minimal deterrent, especially for the Armed-Not-with-a-Gun group, among whom this finished tenth as a reason not to carry guns. This suggests (as an admittedly remote but interesting inference) that more might be gained in this area through sentencing practices than through legislative action: The provisions of new firearms legislation are things these men would find easy enough to ignore; sentencing practices in which stiffer penalties are given to those who use guns in crime, in contrast, clearly are not.

Finally, it is of some relevance to note that the decision not to carry a weapon had little, if anything, to do with availability, knowledge, or price. The least important of all factors asked about was, "A good [gun or weapon] just costs too much money"; this factor was said to be not at all important by about three-quarters of both relevant groups. "It is too much trouble to get a [gun or weapon]" and "I wouldn't know how to use [a gun or weapon] if I had one" were also not at all important to the large majority. As noted previously, a substantial majority of the Unarmed Criminals in the sample, in fact, had owned guns. That these men did not use guns to commit crimes is not, therefore, the result of inadequate knowledge about or exposure to them.

Interestingly, there were some apparent commonalities in the reasoning of men who carried weapons and those who did not. The major reason cited by noncarriers for the decision not to carry was that to carry a weapon (be it a gun or some other weapon) was to "ask for trouble." The major reason cited by carriers for the decision to carry was that if you had a weapon, the victim did not put up a fight. In both cases, avoiding unwanted trouble was clearly a principal motive. Where the two groups differed was in what kind of trouble they wanted to avoid—hassles from uncooperative victims, on the one hand, trouble with the law (or longer sentences), on the other.

## COHERENCE IN MOTIVES

Table 6.2 shows the intercorrelations among the 14 "motivations" questions for the Gun Criminals portion of the sample. Remarkably, all the coefficients are positive; all are statistically significant; most are respect-

## 134 · Motivations to Go Armed

TABLE 6.2. Intercorrelations among the Motives to Go Armed

|  | Gun criminals only | | | | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
|  | 1 | 2 | 3 | 4 | 5 | 6 | 7 | 8 | 9 | 10 | 11 | 12 | 13 | 14 |
| 1. Friends carried | — | | | | | | | | | | | | | |
| 2. Victim could be armed | 18* | — | | | | | | | | | | | | |
| 3. Defend myself | 31 | 39 | — | | | | | | | | | | | |
| 4. No victim hassles | 10 | 41 | 21 | — | | | | | | | | | | |
| 5. Felt better | 28 | 25 | 41 | 23 | — | | | | | | | | | |
| 6. Easier to do crime | 13 | 41 | 21 | 46 | 37 | — | | | | | | | | |
| 7. Felt like a man | 26 | 11 | 18 | 09 | 27 | 17 | — | | | | | | | |
| 8. Police have guns | 26 | 28 | 36 | 17 | 22 | 27 | 23 | — | | | | | | |
| 9. Need to escape | 16 | 45 | 36 | 35 | 29 | 37 | 15 | 33 | — | | | | | |
| 10. Easy to hurt | 22 | 26 | 24 | 15 | 27 | 33 | 16 | 29 | 31 | — | | | | |
| 11. Tool of trade | 23 | 30 | 38 | 25 | 32 | 38 | 15 | 40 | 29 | 35 | — | | | |
| 12. Need to do crime | 08 | 33 | 21 | 28 | 22 | 40 | 09 | 22 | 30 | 30 | 39 | — | | |
| 13. Prepared for anything | 19 | 39 | 37 | 28 | 33 | 35 | 11 | 26 | 41 | 40 | 46 | 44 | — | |
| 14. People don't mess | 19 | 21 | 22 | 30 | 32 | 19 | 18 | 21 | 20 | 25 | 35 | 38 | — | |

*Missing data deleted pairwise; decimal points omitted.

able in magnitude; and quite a few are substantial (.30 or higher). What this implies, of course, is that men who found any of these factors important tended to see each of the others as important as well, which might have been a major reason why they were Gun Criminals in the first place. Stated in somewhat different terms, most men who were able to cite any reason to carry a gun would often be able to cite numerous reasons. Presumably, the more reasons a man has for carrying a firearm, the more difficult it would be to persuade him to stop it, and in this sense, the uniformly positive coefficients reported in the table are not encouraging.

Little need be said about the coefficients themselves. As noted previously, the single most important reason given for carrying a gun was that the victim would be less likely to resist. This factor was strongly correlated with ''there's always a chance the victim would be armed'' (r = .41), ''it is easier to do crime when you are armed with a gun'' (r = .46), and ''I felt I might need a gun to escape'' (r = .35). These correlations nicely illustrate the similarity between the efficiency and self-preservation motives; phrased otherwise, self-preservation is, itself, part of the meaning of efficiency and vice versa.

The single largest coefficient reported in the table (r = .46) was between ''when you have a gun, you are prepared for anything that might happen'' and ''for a guy like me, a gun is just a tool of the trade.'' We note this result simply because it too illustrates the relationship between the efficiency and survival motives. All else equal, the ''tool of the trade'' response would suggest a very pragmatic orientation, to wit, that the gun is just a piece of equipment necessary to get the work done. And yet, this response

## Importance of Gun Carrying · 135

was strongly correlated with all the ''survival'' responses. From this one infers that to these men, the gun was a ''tool of the trade'' not just in the sense that it facilitated getting the work done but also in the important sense that a truly useful ''tool'' is one that prepares its users for any eventuality they could reasonably expect to encounter as they went about their daily affairs.

### THE IMPORTANCE OF GUN CARRYING

The uniformly positive coefficients reported in Table 6.2 suggest that a useful measure of the ''seriousness'' of gun carrying among the men in the sample can be constructed simply by summing the number of ''very important'' responses over the 14 offered options. This, in essence, is a count of the number of ''good reasons'' a felon gave for why he carried a gun. Table 6.3 reports the means on this measure by type, as well as the mean responses on each of the 14 motivation items.

Over the total gun criminals sample, the average number of ''very important'' reasons was 3.6; in other words, the average gun criminal had 3 or 4 very important reasons why he carried a gun. This average varied sharply across the categories of the typology, from 1.6 ''very important'' reasons among the One-Timers to 5.2 ''very important'' reasons among the Handgun Predators. In general, as the frequency of gun use in crime increased, the number of important reasons for carrying a gun also increased. The higher rate criminals in our sample evidenced a much greater seriousness of purpose in their gun-carrying behaviors than the others.

TABLE 6.3. The Motivation to Go Armed, by Type

|  | One-timers | Sporadics | Handgun predators | Shotgun predators |
|---|---|---|---|---|
| 1. Friends carried | 1.4 | 1.6 | 2.0 | 2.1 |
| 2. Victim could be armed | 2.1 | 2.8 | 3.3 | 3.1 |
| 3. Defend myself | 2.1 | 2.5 | 3.2 | 2.9 |
| 4. No victim hassles | 2.5 | 3.2 | 3.3 | 3.1 |
| 5. Felt better | 1.9 | 2.6 | 3.0 | 2.5 |
| 6. Easier to do crime | 1.9 | 2.7 | 3.1 | 3.0 |
| 7. Felt like man | 1.2 | 1.3 | 1.4 | 1.3 |
| 8. Police have guns | 1.5 | 1.7 | 2.3 | 2.4 |
| 9. Need to escape | 1.9 | 2.4 | 3.1 | 2.9 |
| 10. Easy to hurt | 1.7 | 2.0 | 2.5 | 2.5 |
| 11. Tool of trade | 1.5 | 1.9 | 2.8 | 2.7 |
| 12. Need to do crime | 2.1 | 2.4 | 2.9 | 2.5 |
| 13. Prepared for anything | 2.3 | 2.8 | 3.4 | 3.2 |
| 14. People don't mess | 2.1 | 2.4 | 2.6 | 2.7 |
| X ''Very important''[a] | 1.6 | 3.2 | 5.2 | 4.0 |

[a]Average number of reasons rated as ''very important.'' See text for details.

The item-by-item results showed a remarkably consistent pattern: Every reason for carrying a gun was more important to the Predators than to either the One-Timers or the Sporadics. The data reveal no exceptions to this pattern.

Among the Predators (both types), the single most important reason for carrying a gun was, "When you have a gun, you are prepared for anything that might happen." Among the Handgun Predators, this was followed by the two "victims'" responses and then by self-defense. Other items with mean scores (among Handgun Predators) of 3.0 or higher included the need to escape, that it was easier to do crime when armed with a gun, and that "I just felt better...." In general, the patterns for the Shotgun Predators were very similar. Relative to responses in the total gun criminals sample, then, these results suggest that the crime facilitative (or "efficiency") factors were somewhat less important and the survival factors somewhat more important to the Predators than to the other groups. This, of course, is an inference from the rank order of responses; in absolute terms, to emphasize, every reason for carrying was more important to the Predators than to the other groups.

## REASONS FOR THE "MOST RECENT" FIREARMS ACQUISITIONS

Additional evidence on motivations was obtained from all the gun owners in the sample (not just the Gun Criminals) in connection with questions about the reasons why they acquired their most recent firearm(s). These data are shown in Table 6.4.

Concerning the most recent handgun acquisitions, the predominant motive by far was self-protection: 58% of the handgun owners in the sample cited this as a "very important" reason why the most recent handgun was obtained. No other reason even comes close: The next highest "very important" percentage was for "target shooting" (31%). Thus, most felons who acquired a handgun did so, they said, for their own self-defense.

Remarkably, "to use in my crimes" was cited as a "very important" reason by only 28% of the sample; the proportion citing self-protection was more than twice as large. As suggested earlier, acquiring a handgun specifically for its use in crime was relatively uncommon among the felons in this sample.

Given that the themes of efficiency and self-protection are clearly related, one infers that most of the handguns that were actually used in crime were acquired for "self-protection" (as seen by the felons) but that the protection involved was "defense" against the risks stemming from a life of crime. Apparently, felons view weapons as general tools that serve a variety of purposes, in which "self-protection" serves as an important symbolic rubric.

Sport and recreational applications (hunting, target shooting, gun collec-

TABLE 6.4. Reasons Why Felons' Most Recent Firearms Were Obtained (in Percentages)

| | Not important | Somewhat important | Very important | (N) |
|---|---|---|---|---|
| Most recent handgun | | | | |
| Hunting | 54 | 20 | 26 | (736) |
| Target shooting | 38 | 31 | 31 | (746) |
| Gun collection | 56 | 19 | 25 | (718) |
| Protection | 16 | 26 | 58 | (819) |
| Just wanted one | 38 | 36 | 26 | (772) |
| To use in crimes | 52 | 20 | 28 | (737) |
| Stole to sell | 65 | 18 | 17 | (715) |
| Needed to get someone | 80 | 10 | 10 | (688) |
| Most recent shoulder weapon | | | | |
| Hunting | 23 | 14 | 64 | (844) |
| Target shooting | 30 | 30 | 40 | (778) |
| Gun collection | 56 | 19 | 26 | (741) |
| Protection | 44 | 25 | 31 | (779) |
| Just wanted one | 43 | 33 | 23 | (765) |
| To use in crimes | 70 | 13 | 17 | (736) |
| Stole to sell | 73 | 13 | 14 | (726) |
| Needed to get someone | 87 | 6 | 7 | (694) |

tions) were mentioned as important reasons by roughly one-quarter of the handgun owners in the sample; specific criminal applications (stole a handgun to sell; needed a handgun to get somebody) were cited less frequently (10–20%), except, of course, general use in crime, which was noted by 28%. Judging from these data, a felon was as likely to acquire a handgun for some sport or recreational purpose as he was to acquire one for a specific criminal use. Many, no doubt, had both purposes in mind, just as a salesman might buy a car for both pleasure and business applications.

Concerning the most recent rifle or shotgun acquisition, sport and recreational uses dominated the results. Hunting was cited as very important by 64%, and target shooting by 40%. Following in third place was self-protection, very important to 31%. Specific criminal applications were less commonly cited: Still, 17%—nearly one in five—mentioned "to use in my crimes" as a very important reason for their most recent acquisition.[3]

[3] The careful reader will notice that "I stole to sell . . ." was cited about equally often in connection with both the most recent handgun and shoulder-weapon acquisition. Chapter 10 discusses the matter of gun theft in some detail; gun theft, like other theft, is mainly an opportunity crime. What the result in Table 6.4 means, we suspect, is that felons in general stole guns whenever they came across them. Since shoulder weapons are more common than handguns in the private arsenal of the U.S. population, one would expect felons to come across shoulder weapons rather more frequently. Still, a shoulder weapon would be more difficult to steal than a

both intriguing and somewhat counterintuitive. Relatively few men in this sample said they had ever acquired a gun specifically to use in crime; relatively few cited such uses as a primary reason why their handguns had been obtained. Likewise, relatively few men were in the habit of carrying just when they were planning to do crime, and again, the crime-facilitative aspects of firearms, while unquestionably important, certainly did not dominate the reasons given for why they carried guns. The real or potential criminal applications of firearms, in most analyses, seem not to have been the dominant factor in the firearms behavior of these men. Of course, the key to the meaning of this finding is that self-protection has at least two referents: (1) protection against other predators in a hostile environment; and (2) protection against the risks involved in the commission of crimes.

Self-protection was clearly an important motive in both the acquisition and carrying of guns. "When you have a gun, you are prepared for anything that might happen." Men in the sample who carried guns with them outside the home did so either all the time or whenever they felt the need to protect themselves; survival factors figured quite prominently in the motivations analyzed in this chapter; self-protection as an acknowledged motive appeared to be about twice as important as use in crime as a reason for their most recent handgun acquisitions, although self-protection also clearly includes protection in the context of the commission of crimes. All the evidence we have assembled, therefore, points to the same conclusion, namely, that gun criminals carried guns at least as much to protect themselves against the uncertainties of their environment as to prey upon the larger population.

That these men inhabit a violent and generally hostile world is easy to demonstrate. Over 70% of them had been involved in assaults; over 50% had gotten into bar fights; about 40% had been stabbed with a knife; 52% reported having been shot at with a gun; 34% said they had been "scared off, shot at, wounded or captured" by a victim who was armed with a gun (see the following chapter). That they felt some need to protect themselves is hardly surprising. Violence, clearly, was very much an integral part of the daily lives of these men—and this was as true on days when they were not committing crimes as on the days when they were. In this framework for existence, such as it is, a gun was perceived, no doubt, as a very useful hedge against an uncertain and fearful future, an "equalizer" that these men came to possess and carry as much to aid in surviving life on the streets as to use in committing crime.

TABLE 6.5. Reasons Why Felons' Most Recent Handguns Were Obtained, by Type

| Reason | Unarmed | Improviser | Knife | One-timer | Sporadic | Handgun predator | Shotgun predator |
|---|---|---|---|---|---|---|---|
| Hunting | 2.0 | 1.8 | 1.9 | 1.8 | 1.5 | 1.5 | 1.7 |
| Target shooting | 2.2 | 2.4 | 2.2 | 2.0 | 1.8 | 1.7 | 1.8 |
| Collecting | 1.8 | 1.8 | 2.0 | 1.7 | 1.5 | 1.7 | 1.8 |
| Self-protection | 2.2 | 2.1 | 2.3 | 2.4 | 2.5 | 2.6 | 2.3 |
| Just wanted one | 1.9 | 1.8 | 1.6 | 1.8 | 1.9 | 2.0 | 2.2 |
| Use in crimes | 1.1 | 1.1 | 1.4 | 1.4 | 1.9 | 2.3 | 2.2 |
| Stole to sell | 1.4 | 1.3 | 1.5 | 1.4 | 1.7 | 1.6 | 1.6 |
| Get someone | 1.1 | 1.2 | 1.5 | 1.2 | 1.2 | 1.5 | 1.6 |
| (N)[b] | (167) | (21) | (37) | (134) | (172) | (231) | (57) |

The type columns are grouped under the heading Type[a].

[a] Responses are very important (=3), somewhat important (=2), and not important (=1).

[b] Missing data deleted item by item. Ns shown are the largest Ns in the table.

Felons who owned handguns but did not use them to commit crimes tended predominantly to have been sport and recreational owners (Table 6.5). Among the Unarmed Criminals, for example, "target shooting" was, on the average, as important as self-protection as a reason for acquiring the most recent handgun, and the same was more or less equally true of Improvisors and Knife Criminals as well. In all three cases, to be sure, self-protection was as important as (or, in one case, slightly more important than) any of the sport and recreational reasons. On the other hand, it was only among the nongun criminals where sport and recreational motives competed favorably with the other reasons listed.

Self-protection was a relatively important motive in all seven groups; means varied from 2.1 to 2.6 (out of a possible maximum of 3). Among the four groups of Gun Criminals, self-protection was the single most important motive in every case. Even among Handgun Predators, self-protection was more important than any of the specific criminal use applications; the mean response among Handgun Predators on "self-protection" was 2.6 versus 2.3 on "to use in my crimes." In short, even the more predatory criminals acquired handguns primarily, as they saw it, for their own self-protection and only secondarily to use in crime. (At the same time, use in crime was clearly more important to the Predators than to any of the other groups.)

The overall pattern revealed in this and previous analyses is, therefore,

handgun, and the black market demand for firearms, is one presumes, predominantly a demand for handguns. If felons made a practice of stealing every (or nearly every) handgun they came across in the course of their burglaries but only the occasional (say, every third or fourth) shoulder weapon, it would largely account for the pattern being discussed.

# 7

# CONFRONTING THE ARMED VICTIM

Many private citizens claim to own guns for protection against crime, a finding that has been confirmed in a number of national surveys (see Wright, Rossi, and Daly, 1983: Ch. 7, for a review of relevant studies). Whether the people who own guns for such reasons are in fact any safer from crime is a matter of considerable and often rancorous dispute. Some believe that guns represent a potent and efficacious defense against crime; others believe that the "typical" American gun owner is less likely to capture a criminal in the act than to shoot himself in the foot (or perhaps, to shoot a loved one in a moment of rage).

Which of these is the correct view cannot be resolved, of course, through a survey of prisoners, and our point in this chapter, therefore, is not to come to some conclusions about whether people "should" or "should not" own guns to protect themselves from crime. What our data can tell us, however, is how often these prisoners had encountered armed victims and how they reacted to those encounters. About one-half of the prisoners claimed that defense against an armed victim was an important reason for acquiring and using guns (Chapter Six). Apparently, felons believe that armed victims are of sufficient concern to justify owning and using firearms. In addition, we asked the felons a number of direct questions about encountering an armed victim, findings from which are reported in this chapter. We cover two main topics: First, we consider evidence from the survey on whether an encounter with an armed victim is something about which felons worried in the course of committing crimes; and second, how frequently armed victims were encountered during the felons' criminal careers.

One piece of information that we do not provide (not having thought at the time to ask the appropriate questions) is just who the armed victims were that these men reported confronting. One potent and oft-exploited image of the armed victim is that of the hard-bitten, law-abiding home owner valiantly defending self and family from the incursions of the predatory criminal class. This, for example, is the image one obtains from "The Armed Citizen" column in the NRA's *American Rifleman*, where news accounts of these kinds of incidents are collected and printed. Such incidents doubtlessly occur, perhaps with considerable frequency. National survey data suggest that some 2–6% of all U.S. adults have at some time actually fired

a gun in their own self-defense (Wright, Rossi, and Daly, 1983: Ch 7); a 1981 survey by Peter Hart found that 9% of all handgun-owning households had used the handgun for defense in the previous five years.

On the other hand, one must also keep in mind in reviewing the materials presented in this chapter that felons often prey on others much like themselves, and that in many of these encounters, the issue of who is victim and who is perpetrator is decidedly ambiguous. An illustration: We report later that about one-third of our sample obtained its most recent handgun through direct theft by the felon himself. About 31% of these thefts were reported to have been thefts from the felons' own friends and family members, and another 30% were thefts from fences, drug dealers, and other black-market sources. Only about 29% of them involved thefts from the cars, homes, and apartments of total strangers.

That the predatory felons in this sample hung around with others who owned and carried guns has already been reported; that they tend to have preyed on the people they associated with (or others in their immediate environment) is suggested by the gun theft data just reviewed and is confirmed in detail by the many criminal victimization surveys (e.g., Hindelang, Gottfredson, and Garofalo, 1978). Given these points, one has to expect that the rate at which these men confronted armed victims would be rather high, which, indeed, it is. To emphasize, many of the confrontations reported by these men (precise percentage unknown) would have involved their own friends and associates, that is, others of like background, circumstance, and (perhaps) felonious inclinations.[1]

## ARMED VICTIMS AS RISKS TO CRIMINALS

Generally speaking, a criminal poised at the edge of a decision to commit a crime faces a range of possible risks and benefits. The benefits consist

[1]The point, that criminals tend to prey upon others much like themselves, is illustrated by some of the commonplace findings in criminological research. For example, it has been widely reported that most homicides and homicidal assaults involve persons who are known to one another from the event—family members, friends, acquaintances, and so on (see, e.g., Curtis, 1974; Zimring, 1968). Less than one-half of all household burglaries (where characteristics of the offender are known) are committed by strangers (Bureau of Justice Statistics, 1985); about one-half are committed by relatives and acquaintances of the victim. Concerning the crime of robbery, "most robbers . . . typically operate close to home," that is, in their own or adjacent neighborhoods (Cook, 1983: 19). A related finding pertinent to this discussion is that "there is a tendency for robbers to choose victims who are similar to themselves in terms of demographic characteristics" (Cook, 1982: 30). In most of the major categories of crime, in short, the odds are good that the victim is a relative, acquaintance, or reasonably nearby neighbor of the offender. The rate at which offenders would expect to encounter armed victims is therefore a function of the rate of gun owning and carrying among felons' relatives, acquaintances, and neighbors, which, as we have already noted, is apparently rather high.

of the potential economic or other gains, however conceived, from the contemplated crime; the costs include the possibility of being caught and imprisoned, of being shot at in the course of the crime, either by the police or by the victim, the likelihood of social disapproval, etc. Each cost (and each benefit) can be described in two parameters: (1) the value (positive or negative) of the anticipated outcome and (2) the probability that the outcome will be achieved. The expected benefit (or cost) of the behavior is the value of the outcome times its probability. In standard utility theory, one commits the act in question if and only if the expected benefits exceed the expected costs.

In principle, a crime-control measure based on utility theory operates on the decisions faced by potential criminals by changing the value of the expected costs of crime—either through affecting the probabilities of a cost being incurred by a criminal (e.g., by increasing the chances that one will be caught), or through changing the values associated with the outcome (e.g., by increasing the sentence meted out to those who are caught), or, of course, both. In theory, either of these should have equivalent effects, since a cost is to be reckoned as a simple multiplicative function of its associated probabilities and values.

Empirically, it has been shown (Anderson, Harris, and Miller, 1983) that a normal, noncriminal population is, in fact, more responsive to changes in the probabilities than to changes in the values, or in other words, that normal people are more sensitive to the certainty of punishment than to the severity of punishment. Whether this is also true of the "deterrence calculus" of a felon population has not been thoroughly studied.

Whether "The Armed Citizen" functions to deter, prevent, or thwart crime therefore appears to turn on two questions: First, what is the probability that a felon will encounter an armed victim in the course of his criminal affairs? Second, what are the potential costs of these encounters?

The probability of encountering a victim who possesses a firearm is by no means trivial, as it happens. National surveys conducted periodically since 1959 have routinely found that one-half the households in the United States possess at least one firearm (Wright, Rossi, and Daly, 1983: Ch. 5). All else equal, then, a burglar would expect to find at least one gun in every second home. This, of course, is not to say that one-half of all households are fully prepared to thwart a crime with a gun: The weapons may be inaccessible, no ammunition may be present, there may be no one home to use the gun, etc. Still, with one-half of all households possessing at least one gun, the prospect of encountering an armed victim who is at the time prepared to use his or her weapon is clearly greater than zero. We also emphasize again that criminals often prey upon each other: Those who would venture, say, to rob their own drug dealers can expect that the dealers would be armed and have their weapons ready to hand.

There are no firm estimates of the proportion of the American popula-

tion who routinely carry handguns or the proportion of businesses whose managers and proprietors keep guns handy on the premises. All evidence suggests that these proportions are small, but nonzero, and in some environments may actually be quite large. In any event, it is not just the burglar who faces the possibility of encountering an armed would-be victim but also those who commit other crimes as well.

The potential costs of encountering an armed victim vary all the way from being forced to abandon the intended crime and running away through being captured and turned over to the criminal justice system to being shot and physically harmed or killed. It is conceivable that would-be victims might be even more likely to fire their weapons than the police would be (when discovering a crime in progress), and if so, then the potential cost of encountering an armed victim may exceed the potential cost of, say, running into the police.

The possibility of greater damage from armed victims is offset by the possibility that victims might not have their guns handy, might not want to use their guns if they had them at hand, or for some other reason might not want to risk escalating an encounter into a full-scale shootout.

Whatever the true probabilities and costs, the prospects of an armed-victim encounter no doubt contribute to the general uncertainty of a life of crime. In the usual run of things, a criminal would seldom know for sure whether the intended victim were armed or what kinds of behaviors to expect even if the victim were armed. All he would know for sure is that there is some possibility the victim is carrying (or possesses) a gun and some possibility that the gun will be used against him. How large these probabilities are is unknown, but they are clearly larger than zero, and in the case of some classes of would-be victims, especially other criminals, store owners, banks, currency exchanges, etc., are likely to be quite high.

There is, in short, good reason to expect that felons would be made nervous by the possibility of running into an armed victim: Since there are so many armed potential victims "out there," the probability of such an encounter is relatively high and the possible consequences, potentially dreadful. On this basis, one may assume that criminals are no more anxious to encounter armed victims than victims are to encounter armed criminals.

## ATTITUDINAL RESULTS

Fear of imprisonment is not a significant barrier to participation in crime because many felons do not expect to get caught in any case.[2] Our sample

---

[2]More correctly, hard-core predatory felons committed to a career in crime are rarely dissuaded from their commitment by the fear of imprisonment. Many do not expect to be caught; others are not bothered by the thought of prison even if they are caught. These points aside, it is also obvious that the fear of imprisonment is

was asked, in reference to their conviction offense, "At the time you committed that crime, were you worried about getting caught?" Over three-quarters (76%) were not. Results shown later suggest that our sample was not entirely indifferent to the prospect of apprehension and imprisonment, but these outcomes were so clearly unlikely to occur as the result of any one crime that they were not a cause for worry. Given the customary clearance and incarceration rates for crimes known to the police in most jurisdictions, it is also clear that the felons were not making unrealistic judgments. Objectively, the odds are very good that a felon will not be charged with any one crime that he has committed and even less that he would be sent to prison for that crime. This is a useful finding for our present discussion only because it sets a comparative context: It gives an initial idea of how worried our felons were about the prospect of getting caught, something that we can compare later with their anxieties about encountering armed victims.

We asked the sample a series of agree–disagree questions, each concerning the matter of armed victims in one or another way. Results from these items are shown in Table 7.1. There is a very consistent pattern to the results; in all cases, the majority opinion was that felons are made nervous by the prospect of an encounter with an armed victim.

The first item in the sequence asked men to agree or disagree that "a criminal is not going to mess around with a victim he knows is armed with a gun." About three-fifths of the sample (56%) agreed. Another item read, "A smart criminal always tries to find out if his potential victim is armed." More than four-fifths (81%) agreed with that. Yet another item read, "Most criminals are more worried about meeting an armed victim than they are about running into the police." About three-fifths (57%) also agreed with that. There were also two direct questions on whether guns thwart crimes: One reads, "One reason burglars avoid houses when people are at home is that they fear being shot during the crime." Three-quarters of the sample (74%) agreed. (Of course, there are other reasons for avoiding occupied homes, such as fear of being reported to the police, about which we did not ask.) The other reads, "A store owner who is known to keep a gun on the premises is not going to get robbed very often." About three-fifths (58%) again agreed. The possibility that one's intended victim is armed was evidently a concern to most of these men: The strong majority agreed that it is wise to find out in advance if one's potential victims are armed and to avoid them if they are.

How easy it is for felons to find out whether a potential victim is armed is not revealed in these answers. Some would-be victims are almost certainly armed (e.g., banks, currency exchanges, other criminals such as drug

---

one factor that prevents millions and millions of people from committing crimes— these being ordinary, law-abiding citizens.

**TABLE 7.1.** Attitudes toward Encountering Armed Victims: Total Sample (in Percentages)

| | Strongly agree | Agree | Disagree | Strongly disagree | (N) |
|---|---|---|---|---|---|
| 1. A criminal is not going to mess around with a victim he knows is armed with a gun. | 25 | 31 | 35 | 9 | (1646) |
| 2. One reason burglars avoid houses when people are at home is that they fear being shot. | 35 | 39 | 20 | 7 | (1628) |
| 3. Most criminals are more worried about meeting an armed victim than they are about running into the police. | 21 | 36 | 32 | 10 | (1615) |
| 4. A smart criminal always tries to find out if his potential victim is armed. | 30 | 51 | 15 | 4 | (1608) |
| 5. A store owner who is known to keep a gun on the premises is not going to get robbed very often. | 18 | 40 | 32 | 9 | (1645) |
| 6. Committing crime against an armed victim is an exciting challenge. | 10 | 14 | 34 | 42 | (1604) |

dealers). Other would-be victims, while not certain to be armed, may nonetheless have a high probability (e.g., residents of neighborhoods that have reputations for high levels of gun ownership or associates and friends who the felon knows to carry guns on a regular basis). Still others would have very low probabilities of being armed (e.g., elderly women going shopping, children). In each of these cases, whatever prior expectations may be, there is undoubtedly an element of uncertainty that increases with lack of knowledge about the specific would-be victim.

One final question in the sequence was designed to explore the "other side" of this issue, namely, the possibility that "committing crime against an armed victim is an exciting challenge." For about three-quarters of the men in this sample, it was not.

A few of these findings warrant additional comment. For example, it has long been noted that most burglaries occur when the homes in question are unoccupied. (Estimates of the proportion unoccupied during burglary vary from about 75% to more than 90%.) This fact has been used (by Yaeger, Alviani, and Loving, 1976) to argue against the advisability of keeping a firearm "for protection" in one's home; in most burglary cases, at least, the odds are excellent that no one will be home to use it. We now learn that the possibility of being shot during the crime is one of the reasons bur-

glars avoid occupied residences in the first place. (This, in any case, is the predominant view of three-quarters of our sample.)

The result reported in Table 7.1 is for the total sample, not all of whom had ever done burglaries. We thought it possible that the burglars in the sample might have had a different opinion, but agreement with the item ran to about 75% among almost all groups, whether they had ever done a burglary or not. (Only in the highest-rate group, those who had done "hundreds" of burglaries, did the level of agreement fall off, in this case to 57%.) Burglars and nonburglars alike, therefore, agreed that one reason burglars avoid occupied residences is the fear of being shot. There was also a fair-sized majority agreement that one would normally avoid stores that are known to keep a gun on the premises, too. Finally, more than one-half the sample also agreed that criminals are more fearful of being shot by their victims than by the police, and later results show that these men were themselves about equally fearful of these two prospects.

In sum, the prospect of being shot by the victim is clearly something the men in this sample worried about. This concern, it appears, is not unrealistic; one study has reported that in any given year, more criminals are shot to death in "justifiable homicides" by ordinary civilians than are killed by the police (Kleck, 1983).

We also call attention to the overwhelming majority who agreed that "a smart criminal always tries to find out if his victim is armed." Apparently, many of the felons in our sample took this advice to heart. Data reported later show that about two-fifths of these men (39%) had at some time in their lives decided not to do a crime because they "knew or believed that the victim was carrying a gun." Nearly one-tenth of the sample (8%) had had this experience "many times." Clearly, the fact or prospect of an armed victim encounter prevented at least some of the crimes these men would otherwise have committed.

Finally, it is worth emphasizing that while three-quarters of our felons did not agree that "committing crime against an armed victim is an exciting challenge," the remaining one-quarter did, about one-tenth of them "strongly." Some, in short, were apparently not at all nervous about the prospect of an armed victim; to the contrary, the prospect seemed to excite them. Who, then, are they? The answer, at least in part, is that they are the more predatory felons. Among the nonpredatory categories of our typology, agreement to the statement ran to about 20%, and among the Predators, to about 40%. For a substantial minority of the Predators, in other words, the thrill of confrontation with an armed victim appears to be part of the positive motivation to commit crime.

All the preceding items deal with criminals in general; we also asked each man about the kinds of things he personally thought about "when you were getting ready to do a crime" (Table 7.2). The three things most often on a felon's mind when getting ready to commit crime were, it ap-

TABLE 7.2. What Felons Worry about When Contemplating Criminal Activity: Total Sample (in Percentages)

|  | Regularly | Often | Seldom | Never | (N) |
|---|---|---|---|---|---|
| Might get caught | 34 | 20 | 28 | 18 | (1584) |
| Might get shot at by police | 20 | 14 | 25 | 40 | (1534) |
| Might get shot at by victim | 19 | 15 | 27 | 39 | (1521) |
| Might have to go to prison | 30 | 20 | 24 | 25 | (1555) |
| Your friends might look down on you | 14 | 11 | 19 | 56 | (1535) |
| Family might look down on you | 30 | 18 | 17 | 35 | (1557) |
| Might hurt or kill someone | 20 | 12 | 18 | 51 | (1554) |

pears, the possibility of getting caught (cited as something one thought about "regularly" or "often" by 54%), the possibility of going to prison (50%), and the possibility that "your family might look down on you" (48%). Just over one-third thought regularly or often about the possibility of getting shot by the police; an identical percentage thought regularly or often about getting shot by one's victim. The possibility of hurting or killing someone was also thought about regularly or often by roughly one-third. That one's friends "might look down on you" was a concern to only about one-quarter.

Initially, there would appear to be some inconsistency between these responses and a result reported earlier, namely, that only about one-quarter of the sample was worried about getting caught during its conviction offense. On the other hand, to think about something, even regularly, is not the same thing as being worried about it. The possibility of being caught during a crime is, one presumes, ever present; it was, accordingly, "on the minds" one-half the sample more or less regularly. Whether this is something to worry about, however, depends on how much one disvalues getting caught (or if caught, going to prison). Our sample, recall, averaged some 10 prior arrests and 3 prior imprisonments; this notwithstanding, they still led active criminal lives. Clearly, these men might well have thought about the consequences of their actions, but they do not appear to have been especially worried about them.[3]

[3] For the record, there is a clear correlation between being worried about getting caught during the conviction offense and thinking about getting caught in general. Among those who said they were worried about getting caught during their conviction offense (N = 354), 47% thought "regularly" and 22% "often" about getting caught when they did crime; only 7% "never" thought about it. Among those who were not worried (N = 1028), only 29% said they thought about getting caught "regularly." Another 19% thought about it "often"; 22% never thought about it.

Percentaging the table in the other direction: There are 460 men in the sample who "regularly" thought about getting caught when they were doing crimes. Of these, just over one-third (36%) were worried about getting caught during the con-

As already noted, just over one-third thought regularly or often about being shot by the police; an identical percentage thought regularly or often about being shot by the victim. Utter indifference to these possibilities ("never" thinking about them) was indicated by about two-fifths in each case. The overall judgment of the sample reported earlier—that most criminals are more worried about being shot by their victims than by the police (with which 57% agreed)—therefore may be an example of a familiar pattern of imputing to groups certain motives that one is less likely to admit about oneself. Judging from these results, it appears that most of our sample was at least as worried about the one as they were about the other, still a noteworthy result.

It is of some interest to ask, Which felons thought most about being shot by their victim in the course of a crime? A major factor appears to be having had the experience of encountering an armed victim at some prior time. We asked the sample in a later question series whether they, personally, had ever "run into a victim who was armed with a gun." Results from this and several closely related questions are discussed more fully later. Among those who had never had the experience (N = 919), 48% said they "never" thought about being shot by their victim; among those who had (N = 553), only 23% "never" thought about it. Likewise, 45% of those who had at some time confronted an armed victim thought about being shot by their victim regularly or often; among the remainder, the comparable figure was 28%. Here as in many other instances, experience appears to be a capable teacher.

The survey contains some additional information on the relative importance of armed victims and the police in the minds of felons, namely, the questions on the "motivation to go armed" that were discussed in the previous chapter. Findings from that chapter relevant to the present discussion are shown in Table 7.3, which compares the relative importance of "there's always a chance my victim would be armed" with "the police have guns (or weapons), so criminals have to carry them too." These, to be sure, are not precisely parallel questions, and so the comparison of responses is somewhat hazardous. Still, in both cases, the armed victim appears to have been a much stronger motivating factor than the armed policeman.[4]

viction offense. This is consistent with the point made in the text, namely, that thinking about and worrying about getting caught are two different phenomena.

As it happens, those who were worried about getting caught during the conviction offense were also more likely to think regularly about being shot at by the police (24 versus 19% of the remainder), about going to prison (38 versus 27%), about the possibility that friends (19 versus 11%) and family (40 versus 26%) might "look down on you," etc.

[4] Of course, police do not automatically shoot anyone who is either a suspect or is seen in the process of committing a felony. The main menace of police to felons may be the latter's starting the criminal justice processing by making a felony arrest.

**TABLE 7.3.** Armed Victims and Police as Motivations to Carry Weapons (in Percentages)

| | Importance | | | | |
|---|---|---|---|---|---|
| | Very | Somewhat | A little | None | (N) |
| *Gun criminals* | | | | | |
| There's always a chance my victim would be armed. | 50 | 12 | 13 | 25 | (712) |
| The police have guns, so criminals have to carry them too. | 20 | 10 | 12 | 58 | (688) |
| *Armed, not-with-a-gun criminals* | | | | | |
| There's always a chance my victim would be armed. | 27 | 12 | 8 | 53 | (135) |
| The police have weapons, so criminals have to carry them too. | 10 | 5 | 13 | 72 | (135) |

Among the Gun Criminals, as we emphasized earlier, 50% indicated that the possibility of an armed victim was "very important" to them; only one-quarter stated that this was not important at all. The comparable figures for the item concerning police were 20 and 58%, respectively. Among criminals who were armed but not with a gun, 27% said that the possibility of an armed victim was "very important" to them, and 53% said that it was not important at all; here, the comparable figures for the item on police were 10 and 72%, respectively. In both cases, then, the possibility of confronting an armed victim appears to have been a more important motivator in the felon's decision to carry a weapon than the fact that the police have guns. The general picture that emerges from Table 7.3 is, therefore, much the same as has emerged in the other data so far presented. Beyond all doubt, criminals clearly worry about confronting an armed victim.

In order to get a better sense of who seemed to worry about "The Armed Citizen" and who did not, we created a simple summated index from five of the six items shown in Table 7.1.[5] The average scores on the index var-

ied significantly across the 10 states included in the study. The high value (most concern about armed victims) was registered in Georgia, followed by Maryland and Arizona; the low value was registered in Massachusetts, then Minnesota. The state means are positively correlated ($r = .51$, $p = .07$, $N = 10$ states) with a measure of the density of gun ownership within the state derived from Cook (1979). On the average, in other words, the highest concern about confronting an armed victim was registered by felons from states with the greatest relative number of privately owned firearms.

The effects of personal-level characteristics on the index of "concern about an armed victim" are shown in the multiple regression analysis reported in Table 7.4. With only a few exceptions, none of the observed effects is particularly striking, and the overall $R^2$ ($= .07$) is, at best, modest. Still, some of the patterns revealed here are intriguing.

None of the social background variables is strongly related to the tendency to have worried about armed victims. There is a weak tendency for concern to increase with the number of dependents and a somewhat stronger tendency for concern to increase with age. Also, veterans appear to be less concerned than nonveterans. Finally, there is a slight tendency for concern to decline with increasing weight; bigger men, in short, worry less about armed victims than smaller men. We emphasize, however, that none of these effects achieves customary levels of statistical significance; only one, the effect for age, even comes close.

Criminal background variables show somewhat stronger effects. Our "Index of Total Criminality" (see Chapter Three) has a statistically significant and negative effect on concern about an armed victim; so, too, does the number of prior arrests. Thus, more experienced (or higher rate) criminals worry less about armed victims than the less-experienced (or lower rate) felons. Of course, the direction of influence here is ambiguous: More experienced felons might have believed that they had the skills to cope with armed victims, but it may also have been the case that the more foolhardy (or courageous?) were more likely to engage in a great deal of crime.

The categories of the Armed Criminals typology were entered into the regression as a set of dummy variables, with the Unarmed serving as the omitted category. None of the coefficients is significant, although there is a clear tendency for all of them to be negative. In general, in other words, the Unarmed tended to worry most about encountering armed victims (but only slightly).

The survey contained one question about doing crime with partners versus doing crimes alone and another question about the tendency of felons to plan crimes in advance. We expected that felons who spent the most time planning their crimes would worry less about armed victims, and that

---

[5]Correlational analysis revealed that the item concerning "an exciting challenge" was not related to any of the other five items in the table; accordingly, it was omitted from the index. The other five items were all moderately and positively correlated with one another, the correlation coefficients ranging from about .17 to about .38. To create the index, responses were scored as follows: strongly agree = 4; agree = 3; do not know and no answer = 2; disagree = 1; strongly disagree = 0. Summing over the five items, the possible scores thus range from 0 (strongly disagree with all five items, the lowest possible degree of concern) to 20 (strongly agree with all five items, the highest possible degree of concern). Empirically, only 7 "0" scores were observed; there were 60 observations in the top category of the index. The overall mean = 12.1 (standard deviation = 3.8), or two scale points above the midpoint. This is only a restatement of results that are obvious in Table 7.1, namely, that a majority of the sample was concerned over the prospect of encountering an armed victim.

## Page 152

TABLE 7.4. Regression of "Concern about an Armed Victim" on Selected Felon Characteristics[a]

| Independent variables | b | SE | p |
|---|---|---|---|
| Education of respondent | -.03 | .08 | NS[b] |
| Number of dependents | .08 | .06 | .16 |
| Race (1 = white) | -.12 | .23 | NS |
| Marital Status (1 = married) | .13 | .28 | NS |
| In service (1 = yes) | -.34 | .25 | .18 |
| Age (in years) | .03 | .02 | .09 |
| Weight at arrest (divided by 10) | -.05 | .04 | .20 |
| Total criminality (divided by 10) | -.02 | .01 | .01 |
| Improvisers | .14 | .53 | NS |
| Knife criminals | -.15 | .42 | NS |
| One-timers | -.38 | .33 | NS |
| Sporadics | -.12 | .35 | NS |
| Predators | -.05 | .36 | NS |
| Number of prior arrests (divided by 10) | -.02 | .01 | .01 |
| Do crime with partners[c] | -.03 | .11 | NS |
| Plan crimes[c] | .08 | .15 | NS |
| Substance abuse index[c] | .08 | .05 | .12 |
| Age at first felony | .01 | .02 | NS |
| Ever own gun? | -.27 | .27 | NS |
| Ever shot at? | -.21 | .23 | NS |
| Current crime: Worried about getting caught? | .42 | .24 | .08 |
| Think about getting shot by victim? | .39 | .09 | .00 |
| Ever scared off by armed victim? | .10 | .27 | NS |
| Friends scared off by armed victim? | .41 | .11 | .00 |
| Ever run into armed victim? | -.73 | .28 | .01 |
| Gun-knowledge test[c] | .13 | .08 | .10 |
| Word-knowledge test[c] | -.18 | .05 | .00 |
| Intercept | 11.4 | .83 | .00 |

F = 3.39
p = .000
R² = .07

[a]Dependent variable is "Index of concern about armed victims."
[b]NS, Not significant.
[c]See text for details on how these variables were measured.

felons who worked with others would also worry less. Contrary to these expectations, neither of these variables is significantly related to the index of concern. Likewise, the felon's age at the point of his first serious crime also has no significant effect.

Another composite variable included in this analysis is an index of substance abuse—a simple count of the number of drugs (including alcohol) that the felon said he took "many times" or "most of the time." (See Chapter Two for details and Table Two for marginals on the relevant questions.) This index has a modest

## Page 153

positive effect on the index of concern: Heavy drug users, in other words, tended to be more concerned about armed-victim encounters than the lighter users.

Two of the other "attitudinal" questions discussed earlier in this chapter show significant effects on the index of concern. Persons who were worried about getting caught during their conviction offense were also more likely to worry about confronting an armed victim. Likewise, the more often a felon thought about "being shot at by your victim" during his crimes, the more concern he evidenced over the possibility. Unsurprisingly, this latter is the strongest effect shown in the table.

There is no significant effect of having ever owned a gun on the index of concern; likewise, felons who had ever been shot at with a gun were no more concerned than those who had not. On the other hand, our "Gun-Knowledge" Index (a seven-item true-false test concerning guns; see Chapter 8) shows a moderately strong positive effect on concern about armed victims. The more knowledgeable a felon was about guns, the more concerned he was about encountering a victim who had one.

The regression contains three "experiential" variables that measure the felon's prior experiences in encountering armed victims. All three are analyzed later. One asks, "Did you personally ever run into a victim who was armed with a gun?" Those who had were significantly less concerned about armed victims than those who had not; this, too, is among the strongest effects revealed in this analysis. Another question asks, "Have you ever been scared off, shot at, wounded, or captured by an armed victim?" The effect of this experience is positive on the index of concern, but it is not statistically significant. Finally, we asked, "Have any of the criminals you have known personally every been scared off, shot at, wounded, captured, or killed by an armed victim?" Response options were none, only one, a few, and many; the effect of this variable on concern is positive and statistically significant.

The general pattern revealed here is thus quite interesting. Felons who had themselves experienced a confrontation with an armed victim were significantly less concerned about the possibility, perhaps because they knew from their own experience that one can survive such an experience. Felons whose friends had had the experience, on the other hand, were significantly more concerned.

The final variable included in this analysis is the felon's score on a 10-word vocabulary test, which is negatively and significantly related to the index of concern. As the word-knowledge score increases, concern about armed victims declines. It is unclear to us why this should be the case.

In summary, most felons appear to have experienced some anxieties in thinking about encounters with armed victims; on most relevant questions, the majorities were quite substantial; a consistent pattern is that most criminals were at least as worried about confronting an armed victim as they

**TABLE 7.5. Confronting the Armed Victim: Experiential Results**

1. Thinking now about all the crimes you ever committed. . . did you personally ever run into a victim who was armed with a gun?

| | |
|---|---|
| No | 63 |
| Yes | 37 |
| | 100% |

(N)=(1667)

2. Have you ever been scared off, shot at, wounded, or captured by an armed victim?

| | |
|---|---|
| No | 66 |
| Yes | 34 |
| | 100% |

(N)=(1673)

3. Was there ever a time in your life when you decided not to do a crime because you knew or believed that the victim was carrying a gun?

| | |
|---|---|
| No, never | 61 |
| Yes, just once | 10 |
| Yes, a few times | 22 |
| Yes, many times | 8 |
| | 101% |

(N)=(1627)

4. Think now about other criminals you have known in your life, . . . have any of the criminals you have known personally ever been scared off, shot at, wounded, captured, or killed by an armed victim?

| | |
|---|---|
| No, none | 31 |
| Yes, but only one | 10 |
| Yes, a few | 48 |
| Yes, many | 11 |
| | 100% |

(N)=(1627)

one-third of the men who had ever encountered an armed victim said they had never been deterred by one. But it also implies, second, that at least some of these encounters do result in a thwarted crime. Two-thirds of the men who had ever encountered an armed victim said they had also been deterred or thwarted by an armed victim at least once. This is, to be sure, very imperfect evidence on the efficacy of private firearms as a defense against crime, but it is at least some evidence that armed citizens abort or prevent at least some crime. That 40% of the sample had at some time decided not to do a crime because the intended victim was carrying a gun is additional evidence favoring the same point.

We can only speculate about the circumstances under which a felon might find out that a potential victim had a weapon. Except in the few states where open gun toting is legal and customary, it would normally be rather difficult to determine whether a potential victim was armed, unless the victim was a policeman or an armed guard, or was carrying his or her weapon in

---

were about confronting the police. Generally speaking, felons from states with proportionally more gun owners worried proportionally more about "armed victim" encounters than did felons in other states. Felons who worried most about such things tended to be older and with more dependents, less criminally active, more likely to be substance abusers, more knowledgeable about guns, less verbally sophisticated, more likely to have known other criminals who had encountered an armed victim, but less likely to have had the experience themselves. We close with the emphasis that most of the individual-level effects summarized above are quite weak—they represent modest patterns, not sharp lines of differentiation.

## ARMED VICTIM CONFRONTATIONS: EXPERIENTIAL RESULTS

To worry about confronting an armed victim is one thing; to actually have had the experience is something else again. In the previous section, we examined briefly the role of experience in creating these concerns; here, we analyze the experiences directly. Our measures of encountering an armed victim are contained in a four-item sequence; questions and marginal results are shown in Table 7.5.

Most of these results have been noted earlier and therefore require only a passing comment. Just under two-fifths of the sample (37%) had at some time in their careers run into a victim who was armed with a gun. A slightly smaller percentage (34%) said they had been "scared off, shot at, wounded, or captured by an armed victim," and about two-thirds (69%) had at least one acquaintance who had had this experience. (One-tenth knew "many" criminals who had been thwarted by an armed victim.) As noted earlier, about two-fifths of the sample (40%) had at some time decided not to do a crime because they knew or believed that their intended victim was armed.

A cross-tabulation of the first two items shown reveals that encountering an armed victim is not the same thing as being thwarted by one. About 37% of the sample had run into an armed victim, but a slightly smaller percentage, 34%, said they had been scared off, shot at, or otherwise opposed forcefully by one. The correlation between these two experiences is strong ($r=.52$) but short of perfect. As it happens, there were 1049 men in the sample who said they had never "run into a victim who was armed with a gun," and of these, some 15% said they had been scared off, shot at, etc. This appears to be an inconsistency but may in fact not be. "Run into" might be interpreted to imply a direct face-to-face encounter, and clearly, one could be "scared off," or even "shot at," by a gun-wielding victim and never confront that victim face-to-face.

There were, likewise, 609 men in the sample who had encountered an armed victim. Of these, just two-thirds said they had also been scared off, shot at, etc.; the remaining one-third had not been. This implies, first, that not all encounters with an armed victim eventuate in a thwarted crime;

some outrageously obvious way. It would, in short, be quite difficult to know whether the victims of ordinary street crimes, muggings, robberies, etc., were armed or not. So also with burglaries of strange homes in strange neighborhoods. It may also be difficult to make such judgments about stores and gas stations, although specific store and gas station owners may develop appropriate reputations.

Thus, knowledge about a victim's armament is probably highest and most accurate when the victims are one's friends and neighbors or persons with whom one has frequent dealings. Hence, a felon might well decide not to rob his drug dealer when he knows that his drug dealer carries a weapon all the time, might decide not to hijack the loot from a fellow thief when the thief is an associate known to be armed, etc. Indeed, it could be argued that the process that results in these men saying they have been thwarted in at least one crime by an armed victim is, in fact, the opposite side of the self-protection theme about which the prisoners made much as a motive for their own acquisition and carrying of guns.

Our point here is simply that it is not at all clear that these men were saying when they told us that they had decided at least once not to do a crime because they knew or suspected that the intended victim was armed. This might involve a street robbery that was not committed because of a suspicious bulge under the victim's jacket, or it might involve a burglary thwarted in progress because the home owner opened fire, or it might involve nothing more than a general tendency to avoid victimizing other thugs in the immediate environment whom these felons knew to be armed. In all probability, it involves all of these possibilities and more, but the relative proportions are undetermined in these data.

The four items in Table 7.5 are fairly strongly correlated one with the other; the correlation coefficients range from .27 to .52. Substantively, this implies that those who had run into an armed victim were also likely to have been deterred or thwarted by one and to have had friends and acquaintances who had had similar experiences. The correlations among the items are strong enough to justify combining them into a simple summated index of armed victim encounters, consisting of a count of experiences such that the index varies from 0 (for respondents who had none of the four experiences described) to four (those who had all four). The mean on the "Encounter Index" = 1.8 (standard deviation = 1.4). Of the sample, 21% answered "no" to all four questions, which means that about 80% of the sample had had at least some experience with an armed victim—either directly or vicariously, through the experiences of friends and acquaintances.

Table 7.6 shows means on the "Encounter Index" separately for each of the categories of our Armed Criminals typology. The table makes an important point, namely, that the more crime one has committed, the higher the odds on encountering an armed victim. The least likely ever to have had such an encounter were the Unarmed Criminals (mean = 1.18); the most

likely, by far, were the Predators, especially the Handgun Predators, among whom the average = 2.73. The probability of an encounter with an armed victim, in other words, appears to be directly proportional to the rate at which crimes were committed. Consistent with this latter point, the correlation between the Encounter Index and our Index of Total Criminality is .31.

TABLE 7.6. The "Encounter Index" by Criminal Type

|  | $\bar{x}$ | SD |
|---|---|---|
| Unarmed | 1.18 | 1.2 |
| Improvisers | 1.61 | 1.3 |
| Knife criminals | 1.58 | 1.3 |
| One-timers | 1.63 | 1.2 |
| Sporadics | 2.24 | 1.3 |
| Handgun predators | 2.73 | 1.1 |
| Shotgun predators | 2.53 | 1.2 |
| $F = 63.4$ |  |  |
| $p = .000$ |  |  |

Table 7.7 shows the regression of the "Encounter Index" on selected background characteristics. These results are clearly dominated by the criminal history variables; the more crime one had committed, the higher the probability of having encountered armed victims. Neither Improvisers nor Knife Criminals were significantly more likely (than the Unarmed, the omitted category) to have had such encounters, but the coefficients for the other three types are all positive, correctly ordered, and statistically significant.

Holding constant the number of assaults, burglaries, drug deals, and robberies the felon had ever committed, the coefficient for the "Total Criminality" Index turns negative; but the coefficients for each of the crime-type variables are positive and statistically significant: The more crimes (of each type) one committed, the higher the probability of an armed victim encounter. In the same vein, the coefficient for age is positive and significant (older felons were more likely to have had these encounters); the coefficient for age at first felony is negative and significant (the older one was when starting in one's criminal career, the less likely one is to have encountered armed victims). Whites were significantly less likely than non-whites to have had these encounters. Finally, armed-victim encounters were more common among the serious drug abusers than others.

The multiple $R^2$ for the equation = .30; experience with armed victims is clearly more structured than concern about it. As is obvious in the above results, the structure in question is driven by an apparently simple probability process. Each crime a felon commits exposes him to some risk of en-

TABLE 7.7. Regression of the "Encounter Index" on Selected Background Variables [a]

| Independent variables | b | SE | p |
|---|---|---|---|
| Improviser | .11 | .16 | NS |
| Knife criminal | -.02 | .13 | NS |
| One-time gun user | .27 | .10 | .01 |
| Sporadic gun user | .46 | .11 | .00 |
| Predators | .70 | .11 | .00 |
| Total criminality (divided by 10) | -.01 | .00 | .00 |
| N assaults | .17 | .03 | .00 |
| N drug deals | .05 | .03 | .05 |
| N burglaries | .14 | .03 | .05 |
| N robberies | .13 | .03 | .00 |
| N arrests (divided by 100) | .03 | .03 | NS |
| Age | .02 | .00 | .00 |
| Age at first felony | -.03 | .01 | .00 |
| Race (white = 1) | -.26 | .07 | .00 |
| Word-knowledge test | -.01 | .01 | NS |
| Drug-abuse index | .03 | .02 | .05 |
| Intercept | 1.16 | .16 | .00 |

$F = 37.2$
$p = .00$
$R^2 = .30$

[a] Dependent variable is "index of encounters with armed victims."

countering an armed victim; the greater the number of "exposures," the higher the probability of having come across a victim who is armed with a gun.

## SUMMARY

The principal conclusions to be derived from the analyses reported in this chapter are as follows:

1. The felons in this survey were clearly concerned about encounters with armed victims. Most felons agreed that "a smart criminal always tries to find out if his victim is armed" and with a series of other items expressing the same general sentiment.

2. In general, encounters with armed victims seemed to be about as worrisome to these men as encounters with the police.

3. Most felons apparently thought about, but did not worry about, the prospect of being caught during their crimes.

4. Felons who had no prior encounters with armed victims, expressed more concern about such encounters than felons who had not; felons in

states with higher rates of private gun ownership also expressed more concern; the more predatory felons expressed less concern.

5. Confrontations with armed victims were a fairly frequent occurrence for these men. About two-fifths had run into an armed victim at least once; about one-third had been scared off, shot at, wounded, or captured by one; about two-fifths had decided at least once in their lives not to commit a crime because they knew or suspected that the victim was armed; about 80% had had at least some experience with an armed victim, either directly or vicariously, through the experiences of their associates.

6. The more crimes a felon had ever committed, the greater were his chances of encountering an armed victim. Perforce, then, predatory felons had had more of these encounters than any of the other felon groups.

7. The principal ambiguity in these results is that we do not know who the armed victims were. Some would have been law-abiding citizens defending themselves against crime; others would have been friends and associates of the felons who, in different circumstances, as easily could have been the perpetrator as the victim. Nothing in our data speaks to the relative frequencies in this regard.

# 8

## THE CRIMINAL AS A FIREARMS CONSUMER

We have presented an abundance of evidence that, when out of prison, felons were relatively heavy consumers of firearms. Three-quarters of the sample had owned at least 1 gun, and among those who had owned at least 1, the average number ever owned was on the order of 6, with a sizable fraction claiming to have owned more than 10. As heavy consumers, one might expect felons to have relatively sophisticated demands; on the other hand, their heavy consumption may only mean that they were wasteful consumers, destroying firearms through misuse, losing them through carelessness, trading guns frequently among their associates, perhaps heedless in general of the specific characteristics of weapons and interested only in a few attributes of particular concern to them.

This chapter addresses itself to the quality of criminal firearms consumption: what felons look for in their firearms, what characteristics are important to them, whether they qualify as reasonably sophisticated firearms consumers, etc.

It is often assumed that criminals prefer small, cheap handguns, the so-called Saturday Night Special (SNS), or, the currently more fashionable phrase, the "snubbies," the light-weight, short-barreled, typically smaller caliber weapons that are easily and cheaply obtained, readily concealable, and serve the purpose of intimidation as well as any other. Whether the characteristics just enumerated are among the traits felons look for in their handguns is therefore a primary concern of the ensuing analysis.

That criminals prefer concealable equipment above all else has been inferred from the high fraction of crime guns that are handguns, from the predominance of relatively small handguns among crime handguns, and from the fact that shoulder weapons involved in crimes are often modified to make them more concealable (see Wright, Rossi, and Daly, 1983: Ch. 9, for a review of the pertinent literature). Most of these findings are based on analyses of weapons confiscated by the police in the course of criminal investigations (e.g., Bureau of Alcohol, Tobacco, and Firearms, 1976a, 1976b; Brill, 1977; National Bureau of Standards, 1977).

On the other hand, a concealable handgun, per se, need not be cheap or, for that matter, particularly small. The handgun market contains some quite elegant and quite expensive equipment no larger than a man's hand;