and likewise, under the right circumstances, even the largest of handguns can be readily concealed on one's person (e.g., in a shoulder holster beneath a sports coat).

As just noted, the assumed criminal preference for small, cheap handguns has largely been inferred from studies of confiscated weapons. In the well-known Bureau of Alcohol, Tobacco, and Firearms (BATF) Project Identification study (1976a), to illustrate, one-half the handguns in the sample were judged to be worth less than $50, 70% had barrel lengths of 3 inches or less, and 60% were .32 caliber or less; all told, 45% were deemed to be "Saturday Night Specials." Brill's (1977) analysis suggested a somewhat, but not dramatically, lower fraction of SNSs among the handguns used in crime. Of course, Project Identification's handgun prices were obtained in the early 1970s, and since that time inflation has raised the prices of all goods by as much as 125%; thus a handgun that sold for $50 then would now sell for over $100.

In all these studies, the question, "Compared to what?" is relevant and largely unanswered. Since no credible study has ever been done of the characteristics of handguns owned by legitimate handgun owners, we have no way of knowing whether the preference for small, cheap handguns among criminals is any more (or less) pronounced than the preferences that exist among the gun-owning population at large. This, of course, is equally problematic in the analyses reported in this chapter.

## WHAT FELONS LOOK FOR IN A HANDGUN

To assess the traits that felons look for in a handgun, every man in the sample (whether a gun owner or not) was given a list of handgun characteristics (e.g., "that it is cheap," "that it is big caliber") and was asked to state how important each characteristic "would be to you in looking for a suitable handgun." In all, 13 handgun traits were used for this analysis; each man was also asked to pick from the list the single most important factor he would look for in a handgun.

Initially, we deal with responses for the total sample; later, we consider handgun owners only, and still later, we consider the men who have used their handguns to commit crimes. Marginal frequencies for the 13 "how important" questions are shown in Table 8.1.

Judging first from the fraction rating each trait as "very important," the three most desirable handgun characteristics were accuracy (62% rating this as very important), untraceability (60%), and the quality of the construction (that it was a well-made gun, 58%). That it was "easy to shoot" was very important to 54%, that it was "easily concealed" was very important to 50%. "Easy to get" and "has a lot of firepower" were also relatively important (48 and 42%, respectively).

In contrast, the characteristics usually associated with criminal hand-

TABLE 8.1. What Felons Look For in a Handgun

| Trait | Very important | Somewhat important | A little important | Unimportant | (N) | Percentage "single most important" (N = 894) |
|---|---|---|---|---|---|---|
| Cheap | 21 | 21 | 20 | 37 | (1429) | 6 |
| Concealable | 50 | 25 | 12 | 13 | (1434) | 13 |
| Firepower | 42 | 25 | 14 | 18 | (1444) | 22 |
| Small caliber | 11 | 20 | 22 | 47 | (1382) | 3 |
| Large caliber | 30 | 23 | 15 | 31 | (1382) | 4 |
| Accurate | 62 | 21 | 8 | 9 | (1413) | 9 |
| Easy to shoot | 54 | 24 | 10 | 12 | (1427) | 2 |
| Scary-looking | 21 | 18 | 16 | 44 | (1421) | 5 |
| Well-made | 58 | 20 | 9 | 13 | (1431) | 17 |
| Untraceable | 60 | 12 | 9 | 19 | (1434) | 13 |
| Easy to get | 48 | 23 | 12 | 17 | (1423) | 4 |
| Ammunition cheap | 19 | 19 | 19 | 43 | (1394) | 1 |
| Ammunition easy to get | 45 | 26 | 11 | 18 | (1436) | 2 |

guns were not particularly important to these men: "That it is cheap" was very important to only 21%, "that it is small caliber," to only 11%. These data clearly do not suggest a strong preference for SNS-style handguns among these felons.

Results for the "single most important" question were generally similar: Based on these results, the ideal handgun from the felon's viewpoint was one that had a lot of firepower (22%), was well-made (17%), could not be traced (13%), and was easily concealed (13%). Price, in contrast, was the single most important factor to only 6%; small caliber, to only 3%. In both cases, the importance of concealability was apparent, but beyond that, the traits characteristic of heavier duty handguns seemed far more important to these men than did the traits of snubbies or the SNSs.

The 13 handgun traits asked about in the sequence can be grouped roughly into four categories. First are the traits that, for our purposes, define the SNS: cheapness and small caliber. Second are the traits that, for want of a better term, we will refer to as the "serious handgun" traits: accuracy, firepower, big caliber, well-made gun. Third are a set of three traits that would normally matter only to a felon who intended to use the handgun for criminal or illicit purposes—that it is concealable, intimidating, and cannot be traced—to which we will refer as the "criminal-use" traits.[1] Finally, there are four "convenience traits—easy to shoot, easy to get, ammunition is cheap, ammunition is easy to get—which might be of some

[1] To nonfelons, of course, some of these "criminal-use" traits, especially concealability, may be of value for reasons other than the use of the gun in crime. Police officers who are required to be armed even when off-duty, for example, would value concealability even though their purposes are noncriminal.

**TABLE 8.2. Intercorrelations among Desirable Handgun Characteristics**

|  | 1 | 2 | 3 | 4 | 5 | 6 | 7 | 8 | 9 | 10 | 11 | 12 | 13 |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| *SNS traits* | | | | | | | | | | | | | |
| 1. Cheap | — | | | | | | | | | | | | |
| 2. Small caliber | .34 | — | | | | | | | | | | | |
| *Serious-handgun traits* | | | | | | | | | | | | | |
| 3. Accurate | .09 | .08 | — | | | | | | | | | | |
| 4. High firepower | .11 | .07 | .50 | — | | | | | | | | | |
| 5. Large caliber | .07 | -.01 | .31 | .58 | — | | | | | | | | |
| 6. Well made | .03 | .11 | .59 | .57 | .45 | — | | | | | | | |
| *Criminal-use traits* | | | | | | | | | | | | | |
| 7. Concealable | .37 | .22 | .31 | .25 | .13 | .16 | — | | | | | | |
| 8. Scary | .27 | .21 | .04 | .24 | .26 | .07 | .25 | — | | | | | |
| 9. Untraceable | .17 | .17 | .28 | .29 | .20 | .27 | .46 | .24 | — | | | | |
| *Convenience traits* | | | | | | | | | | | | | |
| 10. Easy to shoot | .22 | .17 | .59 | .45 | .28 | .46 | .40 | .19 | .32 | — | | | |
| 11. Easy to get | .31 | .17 | .29 | .31 | .22 | .28 | .45 | .28 | .49 | .39 | — | | |
| 12. Cheap ammunition | .49 | .38 | .14 | .17 | .13 | .12 | .28 | .29 | .26 | .28 | .38 | — | |
| 13. Easy ammunition | .27 | .20 | .37 | .31 | .24 | .33 | .36 | .18 | .38 | .41 | .53 | .48 | — |

importance to a handgun consumer regardless of the intended use. Intercorrelations among the 13 items, grouped as indicated, are shown in Table 8.2.

One is struck, first, by the predominance of positive correlations; indeed, there is but one negative (and, as it happens, insignificant) correlation in the table, between big and small caliber.[2] The implication, of course, is that felons who looked for any one of the items in a handgun tended to look for each of the others as well, which, per se, is not an implausible result: The "ideal" crime handgun may well be one that is cheap and easy to obtain, accurate, well-made, easy to shoot, and on through the list of desiderata.

In general, the correlations among the variables within each of the four groupings were especially strong; all were positive, statistically significant, and varied in magnitude from .24 (scary and untraceable) to .59 (accurate and well-made). The two SNS traits (cheap and small caliber) correlated .34; both these traits also correlated rather strongly with concealability (.37 and .22, respectively) and with the two questions concerning ammunition.

[2]One would expect, of course, that big and small caliber would be strongly and negatively related; that is, felons who preferred large-caliber guns would be inclined not to favor small-caliber guns, and vice versa. The lack of a significant negative relationship may imply, therefore, that felons are not particularly knowledgeable about firearm characteristics, as other data presented later also show. It might also mean that felons are largely indifferent about caliber and therefore accord the same importance to both large and small calibers.

In general, the correlations of cheap and small caliber with all three of the criminal-use traits make it plain that at least some criminals did look for SNS-style handguns to use in crime; later, we use these items in an attempt to determine just who the criminal consumers of small, cheap handguns were.

The four "serious-handgun" characteristics were particularly strongly correlated with one another; the average correlation among the four was .50. All four traits were very weakly correlated with the SNS traits, as would be expected. On the other hand, the correlations of these four with the criminal use traits were unexpectedly strong, averaging .21. This finding also makes it plain that some criminals looked for heavy-duty equipment to use in their crimes; who these people were is, of course, also the object of a later analysis.

The three criminal use traits were correlated at .32, on the average, with one another, and tended to be positively (and rather strongly) correlated with all other traits reflected in the table. Much the same was also true of the four convenience traits, about which nothing further need be said.

Given these intercorrelations, it is possible to reduce the 13 traits to the four more general variables we have just discussed. Scaling consisted simply of summing responses to the component variables. To reduce all four variables to a common metric, the resulting sum was divided by the number of component items; each scaled variable therefore ranged from 1 (all component traits said to be "not at all important") to 4 (all component traits said to be "very important"). Distributions, means, standard deviations, and intercorrelations for the resulting variables are reported in Table 8.3.

The distributions on these variables suggest rather strongly that the "serious-handgun" traits taken as a whole were the most important factors fel-

**TABLE 8.3. Distributions, Means, Standard Deviations, and Intercorrelations among the Four Handgun Characteristic Variables (in Percentage)**

| Scale value | SNS traits | "Serious" | Criminal use | Convenience |
|---|---|---|---|---|
| 1–1.9 | 40 | 13 | 14 | 15 |
| 2–2.9 | 37 | 25 | 27 | 32 |
| 3–3.9 | 17 | 42 | 47 | 40 |
| 4 | 6 | 20 | 12 | 13 |
| $\bar{x} =$ | 2.1 | 3.0 | 2.8 | 2.8 |
| SD = | .91 | .88 | .85 | .83 |
| (N) = | (1356) | (1317) | (1374) | (1346) |

Correlations

|  | SNS | Serious | Criminal use | Convenience |
|---|---|---|---|---|
| SNS | — | | | |
| Serious | .09 | — | | |
| Criminal use | .39 | .35 | — | |
| Convenience | .47 | .48 | .58 | — |

166

ons looked for in a handgun. The mean on the "serious-handgun" factor was 3.0, clearly the highest of the four means; 62% of the sample scored 3 or higher on the "serious handgun" variable (somewhat or very important); relatively few men (about 13%) considered the "serious-handgun" traits to be generally unimportant.

Next in importance were the criminal-use and convenience traits, with means of 2.8 in both cases. By far the least important were the SNS traits: The mean for this variable was 2.1, and only 23% of the sample regarded these traits as very or somewhat important to look for in a handgun.

The substantive conclusion is reasonably obvious: The characteristics of SNSs were not high on the list of things felons looked for in their handguns; the serious-handgun traits were. With one exception, the intercorrelations among these four variables were positive and strong. The exception was, of course, a substantively trivial correlation of .09 between the SNS and serious handgun traits. The criminal-use and convenience traits were both correlated at about the same level with the SNS and serious-handgun traits, or in other words, the convenience and criminal-use traits were about equally important to men who preferred SNS-style handguns and to those who preferred the heavier duty equipment. We note finally that the strongest correlate of the criminal-use traits was the convenience traits ($r = .58$): men who valued a handgun for its suitability for use in crime also tended strongly to value guns that were easy to obtain and fire and for which ammunition was cheap and readily obtained.

There is, of course, no guarantee that felons, in fact, can translate their expressed preferences into actual ownership. Just as all consumers have some ideas about the kinds of goods they would like ideally to possess, but only limited ability to indulge those preferences, so, too, criminals may not always be able to obtain the kinds of weapons they desire. Later in this chapter, we inquire about the relationship between what the sample preferred and what they actually owned.

Table 8.4 shows the relationship between the "handgun-traits" preferences and the gun-ownership variables (ever own a gun? ever own a handgun?) The relationship to the armed criminals typology is also shown. Concerning the gun ownership typology, only three of the eight mean comparisons were statistically significant: Men who had never owned a gun tended to value the SNS traits more highly than men who had, and, likewise, the nonowners tended to value the serious-handgun traits less highly than the gun owners did. Finally, men who had owned a handgun valued the criminal-use traits more highly than gun owners who had not owned handguns.

Substantively, perhaps the most interesting result reported here is that the preference of felons for SNS-style handguns was concentrated disproportionately among felons who had never even owned a gun; among gun-

167

What Felons Look for in a Handgun

TABLE 8.4. Handgun-Characteristics Preference by Gun Ownership and Type

| | SNS | Serious | Criminal use | Convenience |
|---|---|---|---|---|
| *Ever Owned a Gun?* | | | | |
| No | 2.3ª | 2.7ª | 2.8 | 2.8 |
| Yes | 2.0 | 3.1 | 2.8 | 2.8 |
| *If yes: Own Handgun?* | | | | |
| No | 2.1 | 2.9 | 2.6ª | 2.8 |
| Yes | 2.0 | 3.1 | 2.8 | 2.8 |
| *Type* | | | | |
| Unarmed | 2.2 | 2.9 | 2.7 | 2.8 |
| Improviser | 2.1 | 3.1 | 2.8 | 2.7 |
| Knife | 2.2 | 3.0 | 2.8 | 3.0 |
| One-timer | 2.0 | 2.9 | 2.7 | 2.8 |
| Sporadic | 2.1 | 2.9 | 3.0 | 2.9 |
| Handgun predator | 1.9 | 3.3 | 2.9 | 2.9 |
| Shotgun predator | 1.9 | 3.2 | 2.9 | 2.8 |
| $F =$ | 4.54 | 7.32 | 5.03 | 1.79 |
| $p =$ | .000 | .000 | .000 | .097 |

ªThe difference between owners and nonowners is statistically significant.

owning felons, the importance of the SNS traits was even less than suggested in earlier analyses.

The relationship of the trait variables to the criminal typology proves instructive. The preference for SNS characteristics was generally highest among the nongun-using criminals, especially among the Unarmed and Knife Criminals, and lowest among the Predator categories. Likewise, preference for the serious-handgun traits was lowest among the nonusers and highest among the Predators, as was the preference for the criminal-use traits. (The relationship of the convenience factor to type was not statistically significant.)

We can now provide at least part of the answer to a question posed earlier, namely: What kinds of felons preferred small, cheap handguns? The preference for these handguns was highest among felons who had never owned a gun and never committed a crime with one. The obverse of this relationship can also be noted: Serious criminals preferred serious equipment.

We noted earlier that the men in this sample acquired their most recent handguns for a variety of reasons, among which self-protection and use in crime were clearly of considerable importance. Correlations between the various reasons for their most recent handgun acquisition and the four handgun characteristics variables are shown in Table 8.5. With only a few exceptions, these correlations were small and substantively insignificant. The exceptions, not surprisingly, involve the self-protection and crime variables: The clear implication is that felons looked for largely the same traits in a handgun

TABLE 8.5. Correlations of Handgun Characteristic Preferences with Motives for Acquiring Their Most Recent Handgun and with "Gun-Socialization" Variables

| | Handgun traits | | | |
|---|---|---|---|---|
| | SNS | Serious | Criminal use | Convenience |
| Motive for handgun acquisition | | | | |
| Hunting | .02 | .06 | −.08 | −.04 |
| Target shooting | .01 | .10 | −.08 | −.03 |
| Collection | −.03 | .16 | −.08 | −.02 |
| Protection | .00 | .19 | .10 | .10 |
| Just wanted one | .07 | .11 | .11 | .14 |
| Use in crime | .02 | .12 | .26 | .17 |
| Stole to sell | .17 | .04 | .15 | .12 |
| Needed to get someone | .11 | .12 | .06 | .08 |
| Socialization variables | | | | |
| Fathers | −.11 | .13 | −.08 | −.05 |
| Siblings | −.03 | .10 | .00 | .03 |
| Friends | −.07 | .19 | .06 | .03 |
| Male clan | −.06 | .14 | −.03 | −.00 |
| Experiences | −.13 | .13 | −.08 | −.04 |

whatever the intended use. Exceptions of some possible interest were as follows:

Men who had stolen their most recent handgun to sell for money showed a slight preference for SNS traits ($r=.17$). Perhaps, in their view, the smaller handguns were more readily portable, easier to get out of a house, and possibly, easier to sell. Men whose motive was that they needed a gun ("to get someone") also showed a slight preference for SNS traits ($r=.11$). These were the only two motives that correlated with the SNS preference.

"Serious-handgun" characteristics were relatively more important to men whose intended application was target shooting ($r=.10$), a gun collection ($r=.16$), self-protection ($r=.19$), and use in crime ($r=.12$). Clearly, none of these relationships was very strong; all were statistically significant.

As might be expected, the only strong correlate of the criminal-use traits was the criminal-use motive ($r=.26$). Men who had acquired their most recent handgun specifically to use in crime tended to value things such as intimidation value, concealability, and untraceability more than other felons valued them. The criminal-use trait was also weakly correlated with "Stole to sell" ($r=.15$). It is also worth a note that the convenience traits were also more strongly correlated with the criminal-use motive than with any of the other motives ($r=.17$).

A final point to emphasize is that the criminal-use motive was not significantly correlated with the SNS traits ($r=.02$). There were, it appears, a few felons who did prefer SNS-style handguns, but not those who intended to use their handgun for criminal purposes.

Table 8.5 also shows the correlations of the handgun-trait preferences with the "gun-socialization" variables that were analyzed in Chapter Five. All these correlations are weak. The only pattern of possible significance revealed in these data was that all five socialization variables were negatively correlated with the SNS traits and positively correlated with the serious-handgun traits: The greater a felon's early exposure to firearms, the less he valued SNS handguns and the more he valued the more serious equipment.

The final question in the "preference" sequence asked respondents how much they would be willing to pay "to get a handgun that was suitable in all other respects." Our intention in asking the question was to estimate the handgun price elasticity for the felon population. Unfortunately, the responses appear useless for the purpose. There is, first, a small group who volunteered that they would be willing to pay nothing, many adding the note that they would simply steal the gun they wanted. Among the remainder, the modal response was $100, and 70% indicated they would be willing to pay $150 or less. As it happens, the going street price for handguns is about $100 per copy (as best as we have been able to determine[3]), and it can be assumed that even imprisoned felons were aware of this fact. We infer from this that the responses to the "how much would you pay?" question meant only that felons were willing to pay the going rate; hence, no further analysis of this variable has been undertaken.

## WHAT FELONS ACTUALLY CARRY

The preceding describes the characteristics of the "ideal handgun" from the criminal viewpoint. It is a useful question whether the traits they preferred in a handgun were to be found among the handguns they actually owned. It is certainly possible that many felons, for whatever reason, found it difficult to lay hands on the preferred equipment and as a consequence owned something else instead. On the other hand, we have already seen

[3] Determining the going street price of black-market handguns is a chancy business at best. We asked graduate students whom we knew to be familiar with the sleazier side of life to ask around among their associates (small-time drug dealers, mainly) about the availability and price of stolen handguns. We also asked two of our policemen friends, one a city policeman, the other a state policeman, to confirm whether the reports we obtained were at least reasonable so far as they knew. The report: Stolen handguns can be had more or less anywhere in Massachusetts in any reasonable quantity at the rate of roughly $100 per handgun, findings that neither of our police friends disputed. High-quality handguns cannot be obtained at this rate but can be obtained at higher rates, if one is willing to spend the money. "Any reasonable quantity" apparently means in lots of 25 or less. These inquiries also found that anyone who deals in drugs, even small quantities of marijuana for a predominantly college market, also either deals in stolen guns or at least knows someone who does.

What Felons Actually Carry

TABLE 8.6. Characteristics of the Felons' Most Recent Handguns

| | Percentage in felon sample |
|---|---|
| Approximate retail value | |
| $50 or less | 11 |
| 51–100 | 20 |
| 101–150 | 19 |
| 151–200 | 18 |
| 201–300 | 17 |
| 301 + | 15 |
| (N) = | (922) |
| Manufacturer | |
| Smith and Wesson | 36 |
| Colt | 16 |
| Ruger | 5 |
| All other brands | 13 |
| "Don't know" brand | 30 |
| (N) = | (900) |
| Barrel length | |
| Short (3 inches or less) | 30 |
| Medium (4–6 inches) | 53 |
| Long (7 inches or more) | 17 |
| (N) = | (914) |

| | Felons (%) | U.S. handguns[a] |
|---|---|---|
| Caliber | | |
| .22 | 16 | 34 |
| .25 | 5 | 13 |
| .32 | 9 | 6 |
| .357 | 20 | 13 |
| .38 | 29 | 27 |
| .41 | 1 | — |
| .44 | 6 | 2 |
| .45 | 8 | 3 |
| 9 mm | 7 | 2 |
| (N) = | (940) | — |

[a] Source: Wright, Rossi, and Daly (1983: 43).

Many others would have been obtained at substantial discounts off the retail price through various gray- or black-market sources (fences, pawn shops, drug dealers, etc.) It should also be noted that these prices may or may not have been adjusted for the heavy inflationary trends of the past decade, and hence, if anything, may well underestimate the current prices of the equipment involved. As an indication of the approximate quality of the felon's equipment, however, these price (and manufacturers') data are probably not too misleading; to emphasize, they do not suggest much interest among the felon population in cheap, low-quality handguns.

Data on caliber and barrel length sustain the same conclusion. Fewer

The Criminal As a Firearms Consumer

that these men had owned handguns in fairly large numbers; we see in the following two chapters that many were also heavily involved in firearms thefts. The implication is that over any reasonable span of time, most of these men would have sooner or later come into possession of a handgun that was ideally suited to their preferences, which suggests that the correlation between preferred and actual handgun traits ought to be reasonably strong.

Each handgun owner in the sample was asked a series of questions about the most recent handgun he had owned: approximate retail value, manufacturer, caliber, and barrel length. Marginal frequencies for these four variables are shown in Table 8.6. For one (but only one) of these four variables, namely, caliber, comparable U.S. national data exist and these data are also shown.

The apparent preference for serious equipment suggested in the first section of this chapter is amply evident in the handguns these men actually owned. On the whole, these were relatively expensive handguns: Only about 11% were judged to be worth $50 or less, and just under one-third (31%) were judged to be worth $100 or less.[4] Most of these handguns (37%) fell into the $100–200 range; about one-third (32%) were worth more than $200. Consistent with the price data, about three-fifths of these handguns (57%) were manufactured by Smith and Wesson, Colt, or Ruger Arms, all three manufacturers of quality handguns.[5] (To be sure, a sizable fraction of the respondents, 30%, did not know the manufacturer of their most recent handgun.)

It would, of course, be mistaken to think that the prices noted above were what these men actually had paid for their handguns. The question asked for their opinion on what these guns would have been worth on the retail market, not what they actually had paid. Many of the high-priced handguns reported here would no doubt have been stolen, if not by the respondent then by the source from whom the respondent obtained the gun.

[4] Rather than take these "retail worth" estimates at face value, we compared brand-for-brand the prices these men stated with the prices listed in Gun Digest in every case where the felon gave us enough information about the handgun to make the comparison. In general, the convergence between their estimates and the Gun Digest prices was striking. These men had an exceptionally good idea of what their equipment was worth, no matter how they obtained it.

[5] As Brill (1977) has pointed out, it is very difficult to obtain manufacturing data from the U.S. small-arms industry, and so we have not attempted a brand-for-brand comparison with total production figures. It is well-known, however, that Smith and Wesson and Colt are the two leading handgun manufacturers (the General Motors and Ford of the industry, as it were), and these are, as we have just pointed out, also the two manufacturers whose products show up most frequently among the handguns owned by our sample. This provides at least one fragment of evidence suggesting that the criminal-handgun arsenal is probably not much different from the arsenal of the handgun-owning public in general.

about their most recent handguns and what has been inferred about criminals' handguns from the confiscation data. In the Project Identification study noted earlier, to illustrate, one-half the handguns in the sample were judged to be worth less than $50; two-thirds of the handguns in our sample were said to be worth $100 or more, a disparity that can be easily accounted for by the intervening inflationary process. However, other characteristics showed very large disparities: Some 70% of the Project Identification handguns had 3-inch or smaller barrels versus 30% of the handguns in our sample; 60% of the Project Identification handguns were small caliber versus 30% in our data. More generally, our data show a much heavier predominance of serious equipment among the handguns of felons than has been suggested in any of the confiscation studies, including Brill's (1977). How can this disparity be explained?

TABLE 8.7. Barrel Length by Caliber of Criminal Handguns

| Caliber | Barrel length | | |
|---|---|---|---|
| | Short | Medium | Long |
| .32 or less | 47 | 22 | 18 |
| .357 or higher | 53 | 78 | 82 |
| (N)= | (264) | (475) | (148) |

One possibility, of course, is that our data are misleading and the confiscation data are correct. It is conceivable, for example, that the felons in our sample exaggerated the size, caliber, and worth of their handguns, perhaps to impart a "macho" image to the field team. It is also possible that the states available to us for study have biased our results; for example, 7 of the 10 states in the study are either clearly or at least arguably southern or western states, and perhaps felons in these states carried bigger handguns than felons in other areas of the country.

Then too, all our data relate to the most recent handguns these felons had acquired; assuming multiple handguns in their arsenals, they actually might not have carried, day to day, these "most recent" handguns but rather other, smaller handguns that had been acquired at some earlier time. (It does seems likely that a felon who owned several handguns would tend to carry the smaller of them, all else equal.)

Finally, our sample of imprisoned felons cannot pretend to be a probability sample of all criminals, being biased toward persons with longer and more violent careers in crime. If one-time, less violent, and/or juvenile offenders used smaller and different armaments from our more "serious" criminals, which also does not seem unlikely, then the Project Identification findings may well be accurate as a depiction of the "typical" crime handgun.

It is also possible that our data are correct and that the confiscation data

than one-third (30%) of the sample's most recent handguns had barrel lengths of 3 inches or less; most (53%) were standard-sized handguns of the sort normally carried, say, by policemen (4–6-inch barrels); a considerable number (17%) were large handguns of the "Dirty Harry" type (7-inch or longer barrels).

The data on caliber are especially informative, because roughly comparable data for nonfelon handguns exist. We stress that this comparison is not precise. Data shown in the table for "U.S. Handguns" represent the calibers of all handguns manufactured in the United States in 1973–1974. Imported handguns, therefore, are not included. Still, relative to admittedly imprecise data on the calibers of handguns in general, the handguns carried by felons were disproportionately large, not small, caliber.

The differences are fairly substantial. More than one-third (34%) of all handguns manufactured in the United States in 1973–1974 were of the .22 caliber variety. In contrast, only about one-sixth (53%) of the felons' most recent handguns were .22s. All told, just over one-half (53%) of all handguns qualify as small caliber weapons (.32 caliber or less); fewer than one-third of the felons (30%) owned handguns of these calibers. Relative to the totals shown, felons were considerably more likely to carry .357s (20 versus 13% in the total), .44s (6 versus 2%), .45s (8 versus 3%), and 9 mm firearms (7 versus 2%).[a] As in all other analyses reported in this chapter, the felon's preference for serious equipment is again obvious.

Neither barrel length nor caliber per se is sufficient to isolate the true SNSs in this sample of handguns. Some short-barrel weapons are chambered in large calibers; some small caliber weapons are not short-barreled. The cross-tabulation of caliber by barrel length is shown in Table 8.7. In general, the relationship is as one would anticipate: The longer the barrel, the larger the caliber. Still, it is worth a note that over one-half of the short-barreled handguns were chambered in large calibers. If, following Project Identification, we define an SNS as being both short-barreled and small caliber, then 125 of the most recent handguns owned by these men were SNSs, which amounts to 14%. This, moreover, is certainly an overestimate of the true percentage, since at least some of the short, small-caliber weapons would not have been especially cheap.

There is, in short, a serious disparity between what these men told us

[a]The prevalence of 9 mm handguns in these data is worth a special note. We have remarked elsewhere on the apparent growing popularity of the 9 mm semiautomatic among the police (Wright, Rossi, and Daly, 1983: Ch. 4); judging from the data discussed in the text, this weapon is also enjoying an increase in popularity among felons as well. (In any case, very few 9 mm weapons are reported in Brill's [1977] analysis.) Judging from other characteristics of these weapons, we infer that most of them are manufactured by Browning, and that they are the 13-round autoloader that has been referred to as "the handweapon of choice among terrorists world-wide."

are biased toward small, cheap, low-caliber weapons. There are, we think, at least a few possible reasons why this might be the case.

First, as Brill (1977) has pointed out, the confiscation studies are typically based on all the handguns that come into the possession of the police. This includes not only handguns actually used in crime, but also handguns that police find and ones that they confiscate on simple carrying charges. Indeed, according to Brill, as many as 40% of the handguns in the Project Identification study were confiscated on illegal possession or carrying charges. The prevalence of light, inexpensive handguns in the confiscation samples may tell us, therefore, as much about the arsenal of the guncarrying American public at large as about the equipment preferences of felons.

Of course, the felons in our sample are also not necessarily representative of all felons, tending, as we have pointed out earlier, to have long records of previous offenses and incarcerations. Experienced criminals such as these may have different preferences in handguns from amateurs, and the confiscation samples may reflect more the arsenals of the latter. Indeed, the relative preference of Unarmed and Knife Criminals for SNS-type guns tends to support this interpretation.

Another possibility exists. Many of the handguns that appear in the confiscation samples are handguns found by the police at the scene of a crime. We think it conceivable that the tendency for a criminal to simply drop his handgun at the scene (as he makes his escape) might vary as a function of the quality of the weapon. To illustrate, a burglar carrying a handgun worth, say, $50 might not want to run the risk of being apprehended with the weapon in his possession, since this might result in a more serious charge. In contrast, a burglar carrying a handgun worth several hundreds of dollars might well be loathe to leave it behind, regardless of the increased risk. In short, we think felons might be more inclined to drop a cheap gun than to drop a quality sidearm. If so, this would also tend to bias the confiscation samples toward smaller and lower quality handguns.

Clearly, we have no way to judge the relative credibility of the various possibilities outlined above. Realistically, all the possibilities mentioned are probably operating to some unknown degree—both those that bias our data and those that bias the confiscation data. Lacking better information than presently in hand, we have no choice but to stick to the obvious substantive conclusion suggested by our results: The men we interviewed in these 10 prisons tended both to prefer and to own higher quality handguns than previous studies of criminal handguns led us to expect.

The zero-order correlations between the characteristics these men said they preferred in a handgun and the characteristics of the most recent handguns they actually owned were in the right direction but were not very strong. The SNS traits preference was negatively correlated with the approximate retail value of the felon's most recent handgun ($r = -.16$), with

caliber (recoded so that .22s, .25s, and .32s are small caliber and everything else is large, $r = -.09$), and with barrel length ($r = -.07$); and in contrast, the "serious handgun" preference was positively correlated with value ($r = .23$), with caliber ($r = .22$), and barrel length ($r = .17$).

One reason why these correlations are not higher, of course, is that many of these "most recent" handguns had been stolen by the felon. As we see in Chapter Ten, felons stole handguns because they were there to steal, not because they were looking specifically for a firearm; for any given stolen handgun, then, one would expect no more than a random "fit" between desiderata and actual characteristics. If one omits handguns stolen by the felon himself from the analysis, then the correlations between preferred and actual handgun characteristics go up: absent the stolen handguns, the SNS traits preference was negatively correlated with retail value ($-.22$), caliber ($-.11$), and barrel length ($-.13$); and likewise, the "serious-handgun" preference was positively correlated with value (.27), caliber (.24), and barrel length (.21). Although these correlations are still rather modest, the general tendency is clear enough: The criminals in our sample tended actually to own what they preferred to own, which for the most part meant fairly heavy-duty handguns.

How the handguns carried by our felons compare with the total handgun arsenal of the American gun-owning population is largely unknown; except for the limited data on caliber, the appropriate information to make the comparison simply does not exist (so far as we know). We suspect, however, that the criminal arsenal and the total arsenal differ rather little, if only because the criminal arsenal consists, in major part, of handguns stolen from legitimate (or quasi-legitimate) gun owners (see Chapter Ten).

Judging from various fragmentary sources of data (cf. Wright, Rossi, and Daly, 1983), the most commonly owned handgun in the United States today is a Smith and Wesson .38 revolver equipped with a 4-inch barrel; this, as it happens, is also the sidearm of issue in roughly 90% of all U.S. police departments, and it was also the most frequent handgun reported by the men in our sample. One possible implication is that the equipment data reviewed in this section tell us as much about the handgun arsenal in general as they do about the handguns used specifically in criminal applications.

## CONSUMER SOPHISTICATION

How knowledgeable were our felons about firearms? About firearms laws? Were they relatively ignorant consumers who knew only that they liked guns and liked to own and carry them? Or did they qualify as reasonably sophisticated firearms consumers?

To get some sense of their consumer sophistication, the survey protocol included a 7-item true–false "gun-knowledge" test and an 8-item true-false

TABLE 8.8. Knowledge of Guns and Gun Laws

| Knowledge | Percentage correct | |
| --- | --- | --- |
| | Felons (N = 1732) | Male students (N = 96) |
| Guns | | |
| 1. A pistol and a revolver are two words for the same thing (False) | 26 | 69 |
| 2. A magnum [handgun] will fire a more powerful bullet (True) | 85 | 75 |
| 3. Most handgun cartridges contain about 300 grains of powder (False) | 22 | 17 |
| 4. A double-action revolver has to be cocked before you can fire it (False) | 28 | 26 |
| 5. A long barrel is more accurate than a short barrel (True) | 67 | 79 |
| 6. Police carry .38 revolvers (True) | 69 | 74 |
| 7. The price of a new Colt Python is about $150 (False) | 22 | 21 |
| | (N = 1657) | (N = 96) |
| Gun-law | | |
| 1. It is illegal for a felon to buy a gun (True) | 82 | 54 |
| 2. Federal laws ban [handgun] ownership except by police (False) | 77 | 94 |
| 3. An alcoholic or addict can buy a gun if he has no record (False) | 13 | 3 |
| 4. You have to be 25 to legally buy a handgun (False) | 63 | 72 |
| 5. It is illegal to mail handguns across state lines (True) | 50 | 45 |
| 6. It is illegal to trade for a handgun unless it is reported to the police (False) | 18 | 16 |
| 7. Gun dealers are required to get a Federal license (True) | 82 | 81 |
| 8. The major agency that enforces Federal gun laws is the FBI (False) | 25 | 21 |
| Gun-knowledge scores | | |
| $\bar{X}$ = | 3.2 | 3.6 |
| SD = | 1.5 | 1.6 |
| Percentage of 5 or more correct = | 20 | 28 |
| (N) = | (1732) | (96) |
| Gun-law scores | | |
| $\bar{X}$ = | 4.1 | 3.9 |
| SD = | 1.5 | 1.4 |
| Percentage of 5 or more correct = | 43 | 33 |
| (N) = | (1657) | (96) |

test dealing with federal firearms laws. The results for these 15 items are shown in Table 8.8. In order to provide some comparative data, the same 15 items were also included in a survey administered to an undergraduate class at the University of Massachusetts in spring, 1984; results for the male respondents in this survey are also shown in the table. In both cases, "don't know" was treated as an incorrect response. In the felon sample, men who simply skipped the entire sequence were omitted from the analysis.

Concerning first the felons' knowledge of guns, the only fair conclusion is that they appear well-informed on some things but seriously uninformed about others; the same was true of the male college students as well.

Male college students, but not felons, recognized the distinction between a pistol and a revolver (all revolvers are also pistols, but not all pistols are revolvers); 69% of the students, but only 26% of the felons, correctly answered this question. In contrast, felons were slightly more likely (85%) than male college students (75%) to know that one difference between a magnum and a regular handgun is that the magnum will fire a more powerful cartridge.

In the remaining five cases, the differences between the two samples were effectively trivial. Both felons and male college students knew, for example, that a long-barreled handgun is more accurate, all else equal, than a short-barreled one; likewise, both groups knew that most U.S. policeman carry .38 caliber revolvers.

Things that most people in both groups did not seem to understand are that (1) a double-action revolver does not have to be cocked to be fired; (2) handgun cartridges do not contain 300 grains of powder (the lead in a standard police .38 cartridge only weighs 158 grains; the powder load would weigh from 20 to 30 grains; a 300-grain powder load would cause most handguns to explode on firing); and (3) the price of a new Colt Python is about $600, not about $150.

Whether these results represent a high or a low degree of consumer sophistication, we cannot say. All that can be said with confidence is that the average felon in our sample appeared to know about as much (or as little) about guns as the average male student in our class. Clearly, the comparison is complicated in any case by the much lower educational attainment of the felons.

Concerning knowledge of federal firearms laws, much the same conclusion holds. Felons were much more likely (82%) than male college students (54%) to know that it is illegal for a convicted felon to buy a gun; college students, in contrast, were more likely than felons to know that federal laws do not prohibit handgun ownership among all except the police (94 versus 77%). Clear majorities in both groups also knew that one does not have to be 25 years old to legally purchase a handgun (the stipulated age in the federal Gun Control Act of 1968 is 21: 63% of the felons and 72% of the students correctly answered this question); and that gun dealers are

TABLE 8.9. Relationship of Gun and Gun-Law Knowledgeability to Other Variables of Interest

| | Gun knowledge | | | Law knowledge | | |
|---|---|---|---|---|---|---|
| | X̄ | SD | (N) | X̄ | SD | (N) |
| **By gun ownership** | | | | | | |
| **Ever own gun?** | | | | | | |
| No | 2.3 | 1.4 | (409) | 3.5 | 1.6 | (383) |
| Yes | 3.5 | 1.4 | (1277) | 3.5 | 1.4 | (1234) |
| **Ever own handgun?** | | | | | | |
| No | 3.1 | 1.4 | (151) | 4.1 | 1.3 | (150) |
| Yes | 3.6 | 1.4 | (1010) | 4.3 | 1.5 | (1009) |
| **By type** | | | | | | |
| Unarmed | 2.8 | 1.5 | (667) | 3.9 | 1.5 | (627) |
| Improviser | 2.9 | 1.6 | (76) | 4.2 | 1.5 | (71) |
| Knife user | 3.1 | 1.5 | (122) | 4.1 | 1.5 | (123) |
| One-timer | 3.1 | 1.5 | (241) | 4.1 | 1.6 | (231) |
| Sporadic | 3.4 | 1.5 | (239) | 4.4 | 1.4 | (231) |
| Handgun predator | 3.9 | 1.4 | (297) | 4.3 | 1.5 | (287) |
| Shotgun predator | 3.5 | 1.7 | (90) | 4.2 | 1.4 | (87) |

| | Correlation coefficients | |
|---|---|---|
| | Gun knowledge | Law knowledge |
| Gun knowledge | — | .40 |
| **Traits preferences** | | |
| SNS | -.20 | -.08 |
| Serious handgun | .25 | .19 |
| Criminal use | .00 | .06 |
| Convenience | -.03 | .05 |
| **Gun-ownership variables** | | |
| N guns owned | .29 | .17 |
| N handguns owned | .27 | .10 |
| **Socialization variables** | | |
| Father | .29 | .19 |
| Siblings | .18 | .15 |
| Friends | .20 | .09 |
| Male clan | .21 | .12 |
| Experiences | .31 | .24 |
| Age when first fired | -.26 | -.17 |
| Age when first obtained | -.19 | -.11 |

Predators knew more about guns (but not about gun laws) than any other single group. In the same vein, the Unarmed Criminals were less knowledgeable on both scores than any other group. Relative to their peers, the Predators, therefore, turned out to be the most sophisticated firearms consumers of the lot.

Concerning the correlations between knowledge and the "trait-preference" variables discussed earlier in this chapter, the pattern is quite simple: As knowledgeability increased, the preference for "serious-handgun" traits increased, and the preference for SNS-style traits declined. The more

required to get a federal license (82 and 81% correct, respectively). Just about one-half of both groups (50 and 45%, respectively) knew that it is illegal to mail handguns across state lines.

Points on which both groups were about equally misinformed included: First the major agency that enforces federal firearms laws is, of course, the Bureau of Alcohol, Tobacco, and Firearms, not the FBI. Second, federal law does not make it illegal for people to trade guns among themselves, whether the trade is reported to the police or not. (To be sure, some local jurisdictions do have restrictions of this general sort.) Third, alcoholics and drug addicts are prohibited from firearms purchases, according to the Gun Control Act of 1968.

Overall scores (number correct) for both groups on both "tests" are reported at the bottom of the table. Concerning knowledgeability about guns, the mean score for the felons was 3.2 (out of a possible 7) and for male college students, 3.6; concerning gun laws, the means were 4.1 and 3.9, respectively (out of a possible 8). Male college students, it appears, were slightly better informed than felons about guns per se; felons, in contrast, were slightly better informed than students about firearms laws. These differences were, of course, relatively modest; the scores on both "tests" for both groups were not much better than one would expect on chance alone.

For both felons and college students, of course, there was substantial variability around the mean scores, and it is interesting to ask just who the more knowledgeable felons were. Pertinent data are shown in Table 8.9.

We can note first that the two "test" scores were, themselves, positively correlated at .40; men who were knowledgeable about guns tended also to be knowledgeable about gun laws. Given this and the fact that the patterns shown elsewhere in the table were quite similar for both variables, we can speak of "knowledgeability" in general and not discuss the two sets of results separately.

By and large, the patterns shown here were much as one would expect. Felons who had owned guns were substantially more knowledgeable than felons who had not; gun-owning felons who had owned handguns were the most knowledgeable of all. Knowledgeability also increased with the number of guns and the number of handguns ever owned. In the same vein, both measures of knowledgeability were positively (and, at times, rather strongly) correlated with all the socialization variables discussed in Chapter Five; both measures were negatively correlated with the age at which the felon first fired a gun and first obtained a gun of his own. The general pattern, therefore, was straightforward: The younger a felon was when first exposed to guns, the more exposure to guns he has received, and the more guns he has ever owned,—the greater his knowledge of guns and gun laws. Experience, again, proves to be a capable teacher.

The breakdown according to categories of the armed criminals typology also shows that men who had used guns to commit crimes were generally more knowledgeable than men who had not. Interestingly, the Handgun

a criminal knew about guns (and gun laws), the more he preferred serious firearms equipment. In contrast, the preference for small, cheap handguns was concentrated among men who knew relatively little about guns.

## SUMMARY

The principal conclusions of the analyses reported in this chapter can be summarized as follows:

1. In contrast to much speculation and the general run of results from studies of confiscated weapons, the felons in our sample neither preferred to own, nor did they actually own, small, cheap, low-quality handguns. The strong preference, rather, was for large, well-made guns.

2. The preference for large, well-made handguns was especially strong among felons who had owned guns and who had used guns to commit crimes; the preference for small, cheap handguns was concentrated among felons who neither owned guns nor used them in crime. Serious criminals preferred serious equipment.

3. Not more than about 15% of the most recent handguns possessed by this sample qualified as SNSs, even with an inclusive definition of the term.

4. As best as can be judged with the limited data available, the handgun arsenal of our sample was little different from the total arsenal of handguns possessed by the gun-owning public at large, with the possible exception that 'large-caliber handguns were overrepresented among the sample.

5. Felons, in general, were not highly informed about either guns or gun laws; rather, they appeared to be about as knowledgeable on both topics as a nonrandom sample of male college students in the northeast. Overall, felons who had owned guns and who used guns to commit crimes were more knowledgeable than their opposite numbers.

Since most college students do not own guns, and most felons do, one would perhaps expect felons to be notably better informed about firearms than male college students, which, as we have seen, is not the case. None of the material reviewed here suggests that the average felon is an especially knowledgeable firearms consumer. One might therefore inquire as to the source of their apparent preference for the larger, better made, higher quality handguns. One plausible (indeed, rather likely) interpretation of all the material presented in this chapter is that the average felon wishes to be at least as well-armed as the average policeman, their most likely adversaries in a genuine shootout. Judging from the characteristics of their most recent handguns, it would also appear that most gun-using felons, especially the more predatory among them, have succeeded in this goal.

# 9

# PATTERNS OF ACQUISITION: WHERE AND HOW FELONS OBTAIN GUNS

Where and how felons obtain their firearms have obvious implications for the design of sensible firearms-control regulations. Many existing regulations, including some of those embodied in the Gun Control Act of 1968 and in the laws of many states, attempt to interdict the criminal acquisition of guns primarily at the point of retail sale. Under the provisions of the Gun Control Act, federally licensed gun dealers are forbidden to sell firearms to persons with a felony record.[1] In some jurisdictions, this only means that the prospective purchaser must sign a statement saying that he does not have a criminal record; in other jurisdictions, applications are forwarded to the local police for a criminal-records check.

State and local jurisdictions can, and frequently do, impose additional restrictions, for example, bans on sales to certain groups, required "waiting periods," required reporting of all firearms transfers, whether they involve a retail sale or not, registration of guns, permits to purchase, own, or carry guns. These many Federal, state, and local regulations, however, only will have an impact on the subset of criminal-firearms transfers that involve sources likely to be concerned about the legality of the transaction. The fraction of firearms transfers to felons that do involve such sources is, therefore, a relevant (and largely unresearched) issue.

Relatively little is known about the mechanisms through which firearms circulate in either the licit or illicit markets. It has long been suspected that many felons obtain their guns through theft, a suspicion that is confirmed in this chapter and analyzed in detail in the next. It is also commonly as-

[1] The Omnibus Crime Control and Safe Streets Act prohibits all firearms possession by persons with a felony record, so any transfer of a firearm to a felon is an illegal act, whether it involves a normal retail outlet or not. Many states have additional laws to the same effect. We focus in this chapter on acquisitions through retail channels not because these acquisitions are somehow "more illegal" or more reprehensible than acquisitions through other sources but because governments at least have a passing chance to enforce regulations that impinge at the point of retail sale. Enforcing regulations that attempt to govern informal transfers between private parties is a much more difficult task although, given the data reported in this chapter, no less an essential one.

TABLE 9.1. Where and How Felons Obtain Guns: Marginal Frequencies (in Percentages)

| Handguns | |
|---|---|
| 1. How did you get your most recent handgun? | |
| Stole | 32 |
| Rent/borrow | 9 |
| Trade | 7 |
| Cash purchase | 43 |
| Gift | 8 |
| (N)= | (970) |
| 2. Where did you get it? | |
| Friend | 40 |
| Gun shop | 11 |
| Pawnshop | 6 |
| Family | 4 |
| Fence | 5 |
| Street | 14 |
| Drug dealer | 3 |
| Black market | 3 |
| Hardware/department store | 4 |
| All other | 9 |
| (N)= | (943) |
| 3. Was it new or used? | |
| Used | 62 |
| New | 33 |
| Don't know | 5 |
| (N)= | (980) |
| 4. Did you get it in or out of state? | |
| In state | 77 |
| Out-of-state | 23 |
| (N)= | (968) |
| 5. Once you decided to get it, how long did it take? | |
| Few hours | 60 |
| Day | 12 |
| Few weeks | 18 |
| Week | 4 |
| Few weeks | 3 |
| Month or more | 3 |
| (N)= | (934) |
| Shoulder weapons | |
| 1. How did you get most recent rifle or shotgun? | |
| Stole | 23 |
| Rent/borrow | 6 |
| Trade | 7 |
| Cash purchase | 42 |
| Gift | 22 |
| (N)= | (951) |
| 2. Where did you get it? | |
| Friend | 33 |
| Gun shop | 17 |
| Pawnshop | 4 |
| | (continued) |

Patterns of Acquisition: Obtaining Guns

sumed, but has never been thoroughly researched, that many felons exploit informal, black market, and other relatively hard-to-regulate sources of supply. This too is confirmed in the analyses reported below.

Burr's (1977) study of Florida felons represents, so far as we know, the only previous attempt to explore patterns of criminal gun acquisition by direct questioning of a felon sample. Data were gathered on the sources from which 176 criminal handguns were obtained. Just over one-third were acquired through private party transactions (purchases or swaps between private individuals), and about one-quarter were obtained through theft. Another one-quarter were obtained through a retail dealer; a few were obtained as gifts (5%), through pawn shops (2%), or simply had been borrowed (4%). Taking "retail dealer" and "pawn shop" as customary retail transactions where there might be some concern with legality and the remainder as informal, off-the-record transactions, the latter predominate in these data by about three to one (74 to 26%).

Burr also surveyed a sample of nonfelon gun owners and asked where they obtained their handguns. Their responses differed in degree, but not in kind, from the felons' responses. Of the 433 legitimate handguns in this analysis, 43% were purchased from a retail dealer and 6% were bought from a pawn shop; thus, only about one-half of the legitimate handguns were acquired through customary retail channels. Another 16% were bought from a private party, 15% were received as gifts, and 7% were acquired through informal swaps and trades, the remainder having been acquired in a variety of oddlot ways. Nationally representative results from a 1978 survey of gun owners show largely identical patterns (see Wright, Rossi, and Daly, 1983: 118–119). Thus, it appears that informal mechanisms of circulation are quite important in both the licit and illicit firearms markets, but especially in the latter.

Our questionnaire obtained fairly comprehensive information as to where and how our felons had acquired their guns. Since our respondents tended to have owned guns in fairly large numbers, it was impractical to ask where and how they had procured every gun they had ever owned. Thus, all our questions refer specifically to their most recent firearms acquisitions; a separate series of questions asked about the most recent handgun and about the most recent shoulder weapon. Marginal frequencies for all the variables employed in this analysis are shown in Table 9.1. Absent any reason or evidence to suggest otherwise, we assume that patterns of acquisition for these "most recent" guns were typical of all the firearms transactions these men undertook.

## HOW AND WHERE DO FELONS OBTAIN HANDGUNS?

Each man in the study was asked whether he had ever owned a handgun; 1032 said "yes." This amounts to 55% of the total sample and to 79% of those who had ever owned any kind of gun. Each of these handgun owners

**TABLE 9.1.** Where and How Felons Obtain Guns: Marginal Frequencies (in Percentages) *(continued)*

| | |
|---|---|
| Family | 22 |
| Fence | 3 |
| Street | 5 |
| Drug dealer. | 2 |
| Black market | 2 |
| Hardware/department Store | 11 |
| All other | 2 |
| (N)= | (718) |

were asked where and how his most recent handgun had been procured.

Concerning "how," outright cash purchase was the most common means of acquiring a handgun, indicated by about 43%. The only other fairly common means of acquisition was theft, indicated by 32%. Small but roughly equal proportions obtained their most recent handgun as gifts (8%), by borrowing (8%), or through trades (7%).

The most surprising of these results is the relatively high fraction of handguns procured via theft, which appears to be a much more important source of supply for criminal firearms than has been suggested in previous studies. Indeed, previous studies based on traces of firearms confiscated by police routinely have suggested that about one-fifth of the firearms used in crime are stolen weapons; as indicated earlier, Burr's results suggested that about one-quarter of them were. Here we learn, in contrast, that one-third of our sample had obtained their most recent handgun through theft. Moreover, this proportion is only a lower boundary to the fraction of stolen guns among the firearms used by this sample, since many of the weapons obtained through purchase, trade, etc., were likely also stolen (if not by the felon, then by the person from whom he acquired the weapon). The entire matter of stolen guns is sufficiently important that the next chapter is devoted exclusively to it; as such, no more need be said on the topic here.

Concerning where felons obtained handguns, the most important source was clearly friends, mentioned by 40%. "Off-the-street" was a distant second, mentioned by 14%, followed by gun shops, which were mentioned by 11%. Others sources of at least some importance included pawnshops (6%), fences (5%), and family members and drug dealers (4% each). Combining categories in obvious ways, we find that friends and family were by far the most common source for the felons' most recent handguns (44%), followed by various informal gray- and black-market sources (fences, drug dealers, off-the-street, etc., with 26%), followed finally by customary retail outlets (gun shops, pawn shops, hardware and department stores, with 21%).[2] The remaining 10% were acquired from a variety of other sources.

The cross-tabulation of the "where" and "how" questions is shown in

[2] The term, "gray- and black-market sources," is used in a very loose way. It includes fences, drug dealers, and "off the street," as well as the response, "black

Table 9.2. We note first that friends and family were the predominant source of supply whatever the means of acquisition, including theft. Indeed, among those who had obtained their most recent handgun by stealing (N = 297), 31% reported stealing from friends or family members. Another 30% reported stealing from a gray- or black-market source (fence, drug dealer, etc.). About one-tenth of the thefts were directly from retail outlets, and the remaining 29% were from "other sources" (in this case, overwhelmingly, from homes and apartments). Much additional detail on the theft of firearms is reported in the following chapter.

Concerning outright cash purchases, family and friends were again the predominant source of supply (38%), followed by customary retail outlets (35%). The black market also received a sizable share of the cash purchase market, in this case 26%.

**TABLE 9.2.** Means by Sources of Handgun Acquisitions (in Percentages)

| Sources | Purchase | Theft | Means[c] | | |
|---|---|---|---|---|---|
| | | | Rent/borrow | Trade | Gift |
| Family/friends | 38 | 31 | 85 | 54 | 79 |
| Gray/black market[a] | 26 | 30 | 10 | 41 | 15 |
| Retail outlet[b] | 35 | 10 | 2 | 3 | 5 |
| All other | 1 | 29 | 3 | 2 | 1 |
| (N)= | (415) | (297) | (82) | (70) | (75) |

[a] Fence, off-the-street, drug dealer, or black market.
[b] Gun shop, pawnshop, hardware or department store.
[c] Each column totals 100%.

Table 9.2 thus contains an answer to the question posed at the onset of this chapter, namely, what fraction of felons' handgun acquisitions involved a straightforward transaction (cash purchase) with a conventional retail outlet? As it happens, this describes 147 of the 939 men represented in the table, or 16%. One out of six of the men in this sample acquired his most recent handgun through means and sources likely to be concerned about the legality of the transaction; five out of six did not. Clearly, regulations imposed at the point of retail sale miss the overwhelming majority of all criminal handgun transactions.

The remainder of Table 9.2 can be summarized very quickly: Borrowing a handgun or receiving one as a gift almost always involved family and friends; swaps and trades were about equally likely to involve family and friends (54%) and black-market sources (41%). Other sources of supply in these cases were generally unimportant.

market." We do not wish to imply that these "gray- and black-market sources" amount to organized enterprises, much less that they are organized enterprises specializing in firearms transactions.

TABLE 9.3. Means and Sources of Handgun Acquisition, by Type (in Percentages)

| How obtained | Unarmed | Improviser | Knife | One-timer | Sporadic | Handgun predator | Shotgun predator |
|---|---|---|---|---|---|---|---|
| Theft | 18 | 42 | 18 | 22 | 40 | 42 | 48 |
| Rent/borrow | 3 | 8 | 4 | 15 | 13 | 8 | 6 |
| Trade | 11 | — | 11 | 6 | 6 | 8 | 4 |
| Purchase | 58 | 46 | 48 | 50 | 34 | 36 | 33 |
| Gift | 10 | 4 | 18 | 8 | 7 | 6 | 9 |
| (N)= | (207) | (26) | (44) | (163) | (199) | (262) | (69) |
| Where obtained | | | | | | | |
| Family/friends | 38 | 42 | 50 | 53 | 41 | 48 | 33 |
| Black market | 23 | 12 | 20 | 17 | 36 | 26 | 37 |
| Normal retail | 32 | 31 | 20 | 23 | 13 | 12 | 21 |
| All other | 7 | 15 | 10 | 7 | 11 | 13 | 9 |
| (N)= | (200) | (26) | (44) | (160) | (160) | (255) | (67) |
| Percentage purchasing most recent handgun from normal retail outlet | 30 | 23 | 18 | 21 | 7 | 7 | 10 |

[a]All columns total 100%.

As one might anticipate, there were fairly sizable differences in the means and sources of handgun acquisitions across the categories of our typology; these data are shown in Table 9.3. In the less predatory categories, cash purchase was clearly the most common means of acquisition, and in the more predatory categories, it was theft. One-timers and Sporadics were noticeably more likely to have borrowed (or rented) their most recent handguns than were the other types; knife criminals were noticeably more likely to have received their handguns as gifts.

Concerning sources: Family and friends were the major suppliers in all cases but one; among Shotgun Predators, black-market sources were slightly more common. Normal retail outlets were exploited by about one-third of the Unarmed Criminals and the Improvisers, and by about one-fifth or fewer of everyone else. Fractions who obtained their most recent handgun through cash purchase from a normal retail outlet varied from 30% of the Unarmed Criminals to 7% of the Handgun predators. Thus, felons in general avoided usual retail outlets, and the more predatory felons were especially likely to do so.

## CRIMINAL HANDGUNS VERSUS CRIME HANDGUNS

The obvious presence of sizable numbers of handgun owners in all categories of the 'typology presents a convenient occasion in which to stress

once again that not all of the handguns acquired by these men were, in fact, crime guns; what we have said so far pertains to the acquisition of guns by criminals in general, and not specifically the acquisition of guns to use in crime. We can provide, however, at least some data on this latter topic as well.

Men who indicated that they owned a handgun were asked about the reasons why they had acquired it. One of the options was, "to use in my crimes." (These data were analyzed, of course, in detail in an earlier chapter.) As it happens, just over one-half the men who answered this question sequence said that use in crime was not at all important; 20% indicated that it was "somewhat important," and 29% said that it was very important. The cross-tabulation of this item with the questions on where and how handguns were obtained is shown in Table 9.4.

For fairly obvious reasons, the patterns in Table 9.4 are very similar to those observed in Table 9.3. Handguns acquired by felons for reasons other than use in crime tended to be outright cash purchases (50%), typically from family and friends (45%); handguns acquired specifically to use in crime tended instead to be stolen. All told, about 20% of the "noncriminal" acquisitions involved cash purchase from a usual retail outlet versus about 7% of the acquisitions where use in crime was somewhat or very important. Thus, our essential point remains: More predatory criminals, acquiring a handgun specifically for use in crime, heavily exploited informal, off-the-record means and sources and rarely went through customary retail channels.

TABLE 9.4. Means and Sources of Handgun Acquisition by Motives for Obtaining a Handgun (in Percentages)

| | "To use in crime"[a] | | |
|---|---|---|---|
| | Very important | Somewhat important | Not important |
| How obtained | | | |
| Theft | 43 | 49 | 24 |
| Rent/borrow | 14 | 9 | 6 |
| Trade | 6 | 6 | 9 |
| Purchase | 32 | 29 | 50 |
| Gift | 5 | 8 | 11 |
| (N)= | (208) | (146) | (374) |
| Where obtained | | | |
| Family/friends | 43 | 49 | 45 |
| Black market | 32 | 27 | 22 |
| Normal retail | 12 | 12 | 24 |
| All other | 13 | 13 | 9 |
| (N)= | (204) | (142) | (359) |
| Percentage purchasing from normal retail outlet | 7 | 7 | 20 |

[a]Each column totals 100%.

The illicit-firearms market was also predominantly a local market: More than three-quarters of the sample (77%) reported that they had procured their most recent handgun in-state. In general, there were no important differences in this fraction according to type, or according to the motive for acquisition, or by state.[4]

We also asked these men how long it took them to actually get their most recent handgun once they had decided to do so; overwhelmingly, the answer was "almost immediately."[5] About 60% obtained it within a few hours, and about three-quarters of them within the day. Only about one-tenth reported that it took more than a few days. Clearly, these men encountered not much more difficulty in acquiring a handgun than they would encounter in making any sort of usual retail purchase, their criminal records and felonious leanings notwithstanding.

## WHERE AND HOW DO FELONS OBTAIN SHOULDER WEAPONS?

Men in our sample were also asked whether they had ever owned a rifle or a shotgun; 1023 said yes.[6] This amounts to 55% of the total sample and to 78% of those who ever owning any kind of firearm. Parallel questions about means and sources of shoulder-weapon acquisition were also asked; marginal results are shown in Table 9.1.

The patterns differed, but only modestly, from what has already been observed in the case of handguns, and so these data can be summarized quickly. Again, outright cash purchase was the most common method of acquisition (42%), followed by theft (23%), followed, interestingly, by gifts (22%). Clearly, felons were more likely to receive shoulder weapons as gifts

[4] The confiscation studies usually report much larger fractions of out-of-state handguns than are reported in the text, especially for states with relatively strict gun control laws. Our result addresses only where the felon obtained his most recent handgun and says nothing about where that handgun was first sold at retail. It is certainly possible that many of the "in-state" acquisitions reported by the sample involved handguns originating in other states.

[5] Phil Cook (private communication) points out that many of these men would have presumably "decided" to obtain their most recent handgun the moment they were offered one on the street or found one in the dresser drawer of the home they were burglarizing. In these cases, clearly, the "how long did it take" question is without meaning.

[6] It is worth noting that the Gun Control Act of 1968 imposes the same restriction on shoulder-weapon sales to felons as on handgun sales. All these restrictions, incidentally, are for persons with felony convictions. Although every man in our sample had had at least one felony conviction when we interviewed him, he need not have had a felony conviction when he was last arrested and sentenced to prison (i.e., his conviction offense might have been his first-ever felony conviction). We lack adequate detail in our criminal-history questions to sort out those for whom the conviction offense was the first felony.

One plausible reading of these data is that the GCA of 1968 and related state and local regulations have been quite successful in preventing routine, over-the-counter firearms acquisitions by felons, since, quite apparently, few of the felons in our sample acquired their most recent handgun in this way. It would be pertinent to know in this connection whether the patterns observed here were also typical modes of gun acquisition by felons before 1968, but no earlier study of sufficient detail exists.

On the other hand, it is possible that the modes of acquisition just described long predate the 1968 legislation, and moreover, that they are characteristic of many of the consumer transactions that felons undertake, not just their firearms acquisitions. It would be pertinent to know in this connection how the felons' most recent automobiles or television sets had been obtained, that is, how many were stolen, how many acquired used from friends and family, and so on. Unfortunately, these questions were not included in the survey.

It is also of some interest to inquire about the criminal records of the (relatively) small (N = 147) subset of the sample who did acquire their most recent handgun through a normal retail transaction. As it happens, these men averaged seven prior arrests, three prior convictions, and two prior imprisonments. All of these averages were less than the corresponding values for men whose most recent handgun was obtained in other ways, but they amount to fairly lengthy criminal records nonetheless. (We cannot determine from our data how many of these previous convictions were for felonies.) It therefore appears that at least some men with lengthy criminal records nonetheless successfully obtain handguns through conventional over-the-counter transactions.[3]

## OTHER CHARACTERISTICS OF THE CRIMINAL-HANDGUN MARKET

Table 9.1 contains some additional descriptive details about the nature of the criminal-handgun market. Given what has already been said, it comes as no surprise to learn that the market was dominated by used versus new equipment: Among those who answered the question, nearly two-thirds (65%) reported that their most recent handgun was used when they obtained it. Used guns were somewhat more prominent when use in crime was a major or secondary motive for the acquisition than when it was not; new handguns were reported disproportionately by the Unarmed relative to the more predatory groups.

[3] This, of course, does not imply that the men in question themselves simply walked into a gun shop and bought themselves a gun, in direct defiance of the Gun Control Act of 1968. In many cases, these purchases would have been made in the felon's behalf by friends or associates with "clean" records, which is, to be sure, still quite illegal. Although we asked these men where and how they had obtained their most recent guns, we did not ask who, exactly, had obtained them.

Case: 1:10-cv-04184 Document #: 166-5 Filed: 03/12/12 Page 15 of 44 PageID #:3574

tained one almost immediately. Not more than about one in six did so through means and sources that were likely to be concerned about the legality (or perhaps even the advisability) of the transaction. Restrictions on firearms acquisitions by felons at the point of retail sales simply miss the largest share of these transactions and are apparently ineffectual in preventing the remainder.

Shutting off the supply of guns to criminals means, of necessity, shutting off the informal circulation of guns among the friends and associates of these men and, of course, stemming the supply obtained through theft. Both are problematic: It is already illegal to transfer a firearm to a convicted felon (see Footnote 1), yet many of the friends and associates of these men apparently do it just the same. Legislation has not done the trick; perhaps sentencing would work better. (One might consider, for example, stiff penalties for firearms transfers to felons whenever these were detected and, in the same framework, stiff penalties for the crime of gun theft.)

Of the many sources of firearms exploited by these men, theft is perhaps the most difficult to contain. No matter how we attempt to interdict the criminal acquisition of handguns, any handgun that can be legitimately owned for any reason can subsequently be stolen from its legitimate owner and turn up in the hands of a felon. As we have seen, about one-third of the handgun owners in our sample themselves stole their most recent handgun; as we see in the next chapter, many of the handguns obtained through other means were either definitely or probably stolen by other parties. The extensive commerce in stolen firearms among criminals tends to erode beyond all recognition the distinction between the licit and illicit markets; it is thus to the specific topic of gun theft that we now turn.

---

than they were to receive handguns. Borrowing and trading were again fairly minor methods, reported by 6–7% each.

As in the case of handguns, friends were the predominant source of shoulder weapons (33%), followed by family members (22%), followed by gun shops (17%). Conventional retail outlets were clearly more important in the shoulder-weapon market than in the handgun market; in contrast, gray- or black-market sources were less important. Overall, 55% of these men obtained their most recent shoulder weapon from family and friends, 31% from a customary retail outlet, 12% from a gray- or black-market source, and the remaining 2% from a variety of other outlets.

The cross-tabulation of the shoulder weapon "where" and "how" questions is shown in Table 9.5. Outright cash purchase of shoulder weapons

TABLE 9.5. Means by Sources of Shoulder-Weapon Acquisitions (in Percentages)

| Sources | Means[a] | | | Gift |
|---|---|---|---|---|
| | Purchase | Rent/borrow | Trade | |
| Family/friends | 34 | 78 | 59 | 88 |
| Gray/black market | 14 | 14 | 30 | 8 |
| Retail outlet | 51 | 2 | 8 | 2 |
| All other | 1 | 5 | 3 | 2 |
| (N) = | (396) | (58) | (63) | (200) |

[a] Columns total 100%.

tended to involve customary retail outlets (51%) or family and friends (34%); borrowing long guns and receiving them as gifts were overwhelmingly from family and friends; trading was primarily with family and friends (59%) but sometimes with gray- or black-market outlets as well (30%). (Men who had stolen their most recent shoulder weapon were not asked from whom it had been stolen.) The major differences between the criminal-handgun and shoulder-weapons markets were that (1) customary retail outlets were a more important source of shoulder weapons than handguns, and (2) gifts were a much more important source of shoulder weapons than handguns. Otherwise, the two markets appeared to be rather similar.

## SUMMARY

The illicit firearms market as exploited by the men in our sample was clearly and heavily dominated by informal, off-the-record transactions, either with family and friends or with various gray- and black-market sources. Cash purchase was the principal mode of acquisition, followed by theft. The market was primarily in used guns and was largely an in-state, not out-of-state, market. Once felons decided they wanted (or needed) a handgun, they ob-

# 10

## PATTERNS OF ACQUISITION: GUN THEFT

A major source of the firearms used by our felon sample was theft, the means by which 32% of our sample acquired their most recent handguns. Stolen guns pose a serious criminal justice problem: A stolen firearm is, by definition, in "the wrong hands" but under the best of circumstances can only be traced back to the last legal owner if the gun is subsequently used in a crime. As we saw in Chapter Eight, untraceability is an important characteristic that felons look for in handguns, and stolen guns fit that definition very well. Even when other sources of supply are available, it is easy to see that there might be a preference among criminals for stolen equipment.

Our survey included a fairly extensive series of questions on the theft of firearms, results from which are presented in this chapter. Marginal frequencies for the relevant items are shown in Table 10.1.

That theft of guns represents a major source of the firearms used by criminals has long been suspected, and yet, surprisingly little previous research on the topic has been reported. Indeed, there are no more than a handful of studies (so far as we can determine) that have even considered the issue, and only two that have explored the topic in some detail. The first of these is the offender survey conducted in Florida by Burr (1977); the second is Brill's *Firearms Abuse* (1977). Where possible, results from both these studies are compared to our own results throughout this chapter.

## HOW MANY CRIME GUNS ARE STOLEN GUNS?

Estimates of the percentage of stolen guns among the firearms used in crime vary widely. The lowest estimate that appears in the literature is 6%, this figure having been derived from the well-known Project Identification study of confiscated weapons. The opinion of Brill and most other observers is that this is almost certainly an underestimate, quite probably a severe one. The follow-up study, Project 300, is also based on a sample of confiscated guns but results in a more credible estimate of 22%. Brill's best estimate is about 19–20% (1977: 103); this too is based on a sample of confiscations. Studies of police-confiscated weapons thus appear to converge on roughly 20% as the fraction of stolen guns among crime guns.

193

## How Many Crime Guns Are Stolen Guns?

**TABLE 10.1. Marginal Frequencies For Items on Gun Theft (in Percentages)**

(Total Sample) During any of the crimes you ever committed during your life, did you ever steal a gun?

| | |
|---|---|
| No | 53 |
| Yes | 47 |
| (N)= | (1678) |

(Asked of those who ever stole a gun): About how many guns would you say you have stolen in your life?

| | |
|---|---|
| 1 | 13 |
| A few | 43 |
| 10 or 15 | 17 |
| Dozens | 17 |
| Hundreds | 9 |
| Thousands | 2 |
| (N)= | (775) |

Have you ever gone out specifically looking for a gun to steal, or did you just steal guns when you came across them?

| | |
|---|---|
| I have looked specifically for a gun to steal | 24 |
| I stole guns when I came across them | 76 |
| (N)= | (766) |

When you stole a firearm, was it usually because you wanted it for yourself, or was it usually because you intended to sell or trade it to somebody else?

| | |
|---|---|
| Usually to keep for myself | 31 |
| Usually to sell or trade | 70 |
| (N)= | (765) |

Of all the guns you have ever stolen, did you ever keep one for your own personal use?

| | |
|---|---|
| No | 32 |
| Yes | 68 |
| (N)= | (774) |

(Asked of those who ever kept a stolen gun): Why did you keep the gun(s)?

| | Yes | No | (N) |
|---|---|---|---|
| I didn't know what else to do with it | 7 | 93 | (515) |
| It was a nice piece | 68 | 32 | (520) |
| I did not have a gun then | 37 | 64 | (513) |
| A stolen gun could never be traced to me | 34 | 67 | (517) |
| I collect guns | 19 | 81 | (513) |
| I couldn't find anyone else to sell it to | 12 | 88 | (509) |

(Asked of those who ever stole a stolen gun): Have you ever sold or traded a stolen gun to somebody?

| | |
|---|---|
| No, never | 11 |
| Yes, one time | 14 |
| Yes, a few times | 41 |
| Yes, many times | 32 |
| (Inferred Yes—answered follow-up) | 3 |
| (N)= | (774) |

(Asked of those who sold or traded a stolen gun): Which of the following best describes who you have sold or traded stolen guns to?

| | Yes | No | (N) |
|---|---|---|---|
| To a friend | 66 | 34 | (677) |
| To another member of my family | 12 | 88 | (676) |
| To a pawnshop | 21 | 79 | (670) |
| To a fence | 49 | 51 | (673) |
| To a gun dealer | 21 | 79 | (674) |
| To a stranger on the street | 25 | 76 | (674) |
| To people I was in debt to | 20 | 80 | (677) |
| To my drug dealer | 31 | 69 | (672) |

(Asked of all respondents): Suppose you decided you really needed a handgun for some reason, and that the only way to get one was to steal one. Which of the following best describes where you think you would go to steal a handgun if you really needed it?

| | Yes | No | (N) |
|---|---|---|---|
| Directly off a person | 10 | 90 | (1599) |
| From a home or apartment | 58 | 42 | (1602) |
| Out of a car | 31 | 69 | (1600) |
| From a policeman | 8 | 92 | (1595) |
| From a store | 28 | 72 | (1602) |
| From a manufacturer | 11 | 89 | (1593) |
| Off a truck during shipment | 13 | 87 | (1592) |

(continued)

There are, to be sure, a wide range of technical difficulties encountered in making inferences from these confiscation samples; Brill (1977) provides a complete description of them. Perhaps the most serious problem is that in order for a confiscated gun to show up in these analyses as a stolen gun, the theft must have been reported to the police, complete with a correct serial number and description of the firearm. No one knows for sure what fraction of stolen guns is ever reported to the police; certainly, the fraction is less than 100% and may be much less than 100%. Indeed, a gun owner would have good reason not to report a theft if there was a possibility that the gun was not possessed legally by that owner. Given the complexity of gun laws in this country and the wide variability in them from place to place, nearly any gun owner might have some concerns on this score. In addition, many gun owners may not have sufficient information about the stolen weapon—especially its serial number—to provide the police with a usable report. For these reasons, many have assumed that a large share of the gun thefts simply go unreported. If so, then all estimates of the fraction of stolen guns among the guns used in crime that are based on traces of police confiscations would have to be taken as lower boundary estimates.

Another approach to the problem is to ask felons themselves whether they stole their gun(s), as, indeed, we have done in our study. So far as we know, the only previous survey of felons to include such a question is Burr's. Among the 176 handguns owned among Burr's sample of felons, 23% were

listed as stolen firearms by the felons themselves, roughly in the same range as the estimates based on confiscation samples.

Somewhat in contrast to these findings, all the handgun owners in our sample were asked, "Which of the following best describes how you got [your most recent] handgun?" Results were reported in the previous chapter: About one-third (32%) said that they personally had stolen it, a somewhat higher figure than reported in previous studies.

This, moreover, is obviously an underestimate of the true fraction of stolen guns among the guns used in crime, since a stolen gun need not have been stolen by the felon himself; many of these men, knowingly or unknowingly, will have bought, traded for, or otherwise obtained a handgun that had been stolen by someone else.

To tap what can be called the secondary market in stolen guns, all the handgun owners in the sample were asked, "To the best of your knowledge, was [your most recent handgun] a stolen weapon?" Men who had personally stolen the gun were instructed to circle "definitely stolen" in response to this question, but not all of them did. (Many, in fact, simply skipped the question.) If we treat every handgun that was reported to have been personally stolen as a "definitely" stolen weapon, then, all told, 46% of the most recent handguns possessed by this sample were *"definitely stolen,"* and another 24% were *"probably stolen." Thus, at least four-tenths, and possibly as many as seventh-tenths, of the most recent handguns owned by this sample were stolen weapons.* These data suggest, unmistakably, that stolen handguns are a much more important source of supply to the criminal population than has been suggested in previous studies.

To be sure, these estimates strictly apply only to the felons' most recent handguns; whether they generalize to all the handguns these felons ever owned is, therefore, an open question. Still, we see no reason why these "most recent" transactions would have been atypical of the total population of firearms transactions in which these men have engaged, so we are inclined to take these results as indicative and generalizable. If so, then it is clear beyond question that stolen guns are heavily involved among the firearms used in crime.

Although our estimates of the percentage of stolen guns among crime guns differ considerably from previous ones, the differences are not irreconcilably large. For example, Brill's most extensively studied confiscation sample was a New York City sample of 144 handguns submitted for tracing to the Bureau of Alcohol, Tobacco, and Firearms (BATF). New York City, of course, has very strict controls over the private ownership of handguns; this notwithstanding, the New York City police have guessed that there are 2,000,000 unlicensed and therefore illegally possessed handguns in the city.[1]

[1] This is almost certainly a high estimate. If handguns were owned in New York City at the average rate of handgun ownership for the nation, and if, as we have estimated elsewhere, there are about 40 million handguns presently in private hands,

Moreover, New York City has extraordinarily high burglary and robbery rates. From these facts, one can infer that criminals in New York City commonly encounter unregistered and illegally possessed handguns whose theft is not likely to be reported to the police; many of the guns that are stolen in New York City, in other words, would never show up in an ATF search as stolen weapons because their theft would never have been reported.

Clearly, no one knows for sure the rate at which stolen handguns are reported to the police in New York City. If two-thirds are and the remaining one-third are not, then a simple correction of Brill's best estimate (of 20%) would raise it to about 30%. If only one-third of the gun thefts are reported, the same correction would raise Brill's estimate to about 60%, or in roughly the same range as our upper estimate. Whether there is any genuine "discrepancy" between our results and Brill's appears, therefore, to turn entirely on the rate at which handgun thefts are reported to the New York City police; plausible (although admittedly untested) assumptions about this rate narrow the differences between the estimates considerably.

As to Burr's estimate, it is clear that the fraction of his felons who themselves stole their (most recent) handgun (about 23%) is similar to the fraction of our felons who did so (about 32%); the critical point is that this fraction is a clear underestimate of the true fraction of stolen guns among crime guns, since, as we have seen, many of the stolen handguns possessed by our felons (or by felons in general) were not stolen directly by them but were acquired through purchases and trades with other parties. Taking this secondary market in stolen guns into account approximately doubles the estimated percentage of stolen guns among the firearms used in crime.

## WHO STEALS GUNS?

Corroborating evidence on the extent of firearms theft among the sample was obtained in the criminal-history section of the survey. All respondents were asked, "During any of the crimes you ever committed in your life, did you ever steal a gun?" Of those who responded (N=1678), 47% resaid "yes," among those who had ever stolen a gun (N=790), 86% reported having stolen more than one of them.

The tendency to have ever stolen a gun was related, although not perfectly, to the tendency to have used guns to commit crimes (Table 10.2). About one quarter of the Unarmed Criminals reported having stolen at least one gun; of this one-quarter, one-third reported having stolen more than one gun; this one-quarter, one-third reported having stolen more than 10 guns. Among the Improvisers, 45% had stolen a gun; among the Knife

then the total number of New York City handguns would be about 1.2 million at the most. The true number is probably even lower since, in general, gun ownership tends to be lowest in large cities, especially in the Northeast (Wright, Rossi, and Daly, 1983: Ch. 6). Realistically, the total number of unregistered handguns in New York City is probably on the order of several hundreds of thousands, not 2 million.

Criminals, 34%; and among the One-Timers, 35%. Thus, among the less predatory felon categories, fractions ranging from about one-quarter to about one half had stolen at least one firearm.

The remaining categories stand in sharp contrast; among the Sporadics and Predators, it was the rare man who had not stolen a firearm sometime in his life. Indeed, in these categories, the fraction who had ever stolen guns runs from 70 to 80%. These, moreover, tend to be high-rate thieves: Among the Sporadics and Predators who had stolen at least one gun (N = 472), a mere 5% had stolen only one. As with virtually all other forms of criminality examined in this analysis, then, gun theft is heavily concentrated among the more predatory groups of criminals.

TABLE 10.2. Gun Theft by Type

| Type | Percentage reporting ever stolen | $\bar{X}$ stolen/thief | SD | (N) | Total guns |
|---|---|---|---|---|---|
| Unarmed | 26 | 32 | 136 | (160) | 5063 |
| Improviser | 45 | 13 | 24 | (31) | 407 |
| Knife user | 34 | 30 | 155 | (41) | 1228 |
| One-timer | 35 | 47 | 193 | (78) | 3624 |
| Sporadic handgunner | 70 | 29 | 134 | (164) | 4768 |
| Handgun predator | 81 | 44 | 239 | (144) | 11,223 |
| Shotgun predator | 75 | 61 | 177 | (62) | 3801 |
| Entire population | 47 | 39 | 147 | (775) | 30,114 |

HOW MANY GUNS ARE STOLEN?

Men who reported having stolen a gun at some time in their careers were then asked how many guns they had ever stolen. Response categories were just one, a few, 10–15, dozens, hundreds, or thousands. Taking "a few" to mean 5 and "dozens" to mean 25, and using the lower limits to all the other categories, we estimate that the gun thieves in our sample had stolen some 30,000 guns in their careers, an average of about 39 stolen weapons per man. This average, of course, is greatly inflated by the small number of men who report thousands of thefts; the median value would be substantially lower.[2] Still, it is clear that at least some of these men had stolen guns in very large numbers.

[2] "Admittedly, "thousands" of gun thefts seems a bit unlikely. The question asks, however, for the number of guns ever stolen, not the number of separate thefts. One hijacking of a truck in shipment or one heist from a manufacturer's warehouse would be adequate to produce 1000 stolen guns. As we report later, men who said they had stolen large numbers of guns were also more likely than others to report thefts from potential high-volume sources (see the section on "professional" gun thieves.)

About 13% of the sample of gun thieves reported having stolen a single gun, most of them in the less predatory categories. These "one-time" thieves accounted for less than 1% of the total number of guns stolen. Of vastly greater concern are the 85 men—11% of the gun thieves—who reported stealing hundreds or thousands of guns; these men accounted for nearly 80% of the total volume of stolen guns reported by our respondents. About three-quarters of these "high-rate" gun thieves were from the two Predator categories. The Predators contribute disproportionately to every aspect of the crime problem, the gun-theft aspect clearly included. It is worth mentioning, however, that 13% of the high-rate gun thieves were Unarmed Criminals, men who had apparently stolen large numbers of guns but had never actually used guns in committing their crimes.

WHY ARE GUNS STOLEN?

The presence of a relatively large group of Unarmed Criminals among the high-rate gun thieves illustrates an important point about gun theft, namely, that the motivation to steal a weapon need not simply be that the felon wants (or needs) a gun for his own personal use. To the contrary, one may assume that many guns are stolen for the same reason that many television sets or stereos are stolen, that is, to fence for cash or otherwise dispose of in the gray or black markets. Indeed, given the evident high demand, potential quick turnover, and easy portability, one can readily imagine that firearms (particularly handguns) are probably among the more desirable things to encounter in burglarizing a residence or a store, even if the thief has no personal use for the weapon.

As we have just seen, guns were stolen by felons who did not use guns as well as by the gun users. The nonusing categories amounted to one-third of the gun thieves and accounted for about one-fifth of the total volume; of the gun thieves, in other words, the nonusers stole guns at a lower rate than on the average, in other words, the nonusers stole guns with alarming frequency.

That the motivation to steal guns was a mixture of personal and commercial concerns was apparent in the responses to some of the follow-up questions. All the gun thieves were asked, "Have you ever gone out specifically looking for a gun to steal, or did you just steal guns when you came across them?" More than three-quarters (76%) of the gun thieves stole guns when they came across them; thus, going out looking specifically for guns when they came across them was a relatively rare behavior. Likewise, we asked, "When a gun to steal, was it usually because you wanted it for yourself, or you stole a firearm, was it usually because you intended to sell or trade it to somebody else?" More than two-thirds (70%) of the gun thieves "usually" stole guns to sell or trade to someone else. Clearly, most gun thefts were "opportunity" crimes; Guns were stolen mainly because they were there to steal, not because the

felon had decided he needed a gun and that theft was the most convenient or cheapest way to obtain it.

To be sure, a minority of the gun thefts were rather more purposive in character; Table 10.3 shows that these "more purposive" gun thieves were concentrated among the Predator categories. More than one-third of the Handgun Predators (34%), and two-fifths of the Shotgun Predators (41%), reported having looked specifically for a gun to steal—higher percentages than obtained in any of the other categories. The Handgun Predators were also the likeliest, by far, to steal guns to keep for themselves (45 versus 30% in the total sample of gun thieves). Still, even in the Predator categories, opportunity theft was the rule: Looking specifically to steal a gun for one's own personal use was the minority tendency in every category.

TABLE 10.3. Intention and Motive in Gun Thefts (in Percentages)

| | Percentage who | | Percentage who stole | |
|---|---|---|---|---|
| Type | Looked for guns to steal | Stole guns when they came across them | For myself | To sell |
| Unarmed | 12 | 88 | 16 | 84 |
| Improviser | 10 | 90 | 16 | 84 |
| Knife user | 12 | 88 | 20 | 81 |
| One-timer | 15 | 85 | 37 | 64 |
| Sporadic handgunner | 24 | 77 | 29 | 71 |
| Handgun predator | 34 | 66 | 45 | 55 |
| Shotgun predator | 41 | 59 | 23 | 77 |
| Entire population | 24 | 76 | 31 | 70 |

The cross-tabulation of these two questions isolated an interesting subgroup, namely, 100 men who reported that they looked specifically for guns to steal, and that they usually stole guns to sell or trade to others. In some sense, these are men who appeared to specialize in gun theft, and so some additional analysis of them is in order.

First, these 100 "professional" gun thieves stole guns in larger than average numbers: Their average number of guns ever stolen was 84, or more than twice the average for all gun thieves. Relative to the others, they were also distinctively more likely to steal from high-quantity sources. Among the total sample of gun thieves, for example, 8% said they had stolen guns directly from a manufacturer; among the 100 "professionals," this was true of 15%. They were also more likely to steal from a shipment (29 versus 16% in the total) and from stores (50 versus 37%). They were also more likely than the others to have stolen a gun from a policeman or "directly off a person." However, gun theft during housebreaks was no more common among the "professionals" than among the total sample.

The "professionals" also differed in how they disposed of the guns they stole. Most sold to fences (64 versus 49% in the total sample of gun thieves); a surprisingly large number sold stolen firearms to gun dealers (32 versus 21% in the total sample). Perhaps the term "gun dealer" was interpreted by many to include persons who traded primarily on the black and gray markets, as well as licensed retailers and wholesalers. Many of them (27%) said they had used stolen guns to settle their debts; nearly two-fifths (of the "professionals" versus 31% of all gun thieves) had also sold stolen guns to their drug dealer.

There was a definite connection between drug abuse and "professional" gun theft as we have defined it here. Relative to the total sample, the "professional" gun thieves were heavy drug abusers and high-rate drug dealers; more than one-half of them (53 versus 27% of the total sample)

TABLE 10.4. Retention of Stolen Guns (in Percentages)

| Type | Those who usually stole for self (%) | Those ever keeping stolen gun (%) |
|---|---|---|
| Unarmed criminal | 16 | 33 |
| Improviser | 16 | 48 |
| Knife user | 20 | 34 |
| One-timer | 37 | 60 |
| Sporadic handgunner | 29 | 81 |
| Handgun predator | 45 | 90 |
| Shotgun predator | 23 | 81 |
| Entire population | 31 | 68 |

had made dozens or hundreds of drug deals. They were also more likely than the average man in the sample to have been armed during the conviction offense (about two-thirds versus just over one-half of all respondents); relative to other armed criminals, they showed a preference for sawed-off shotguns (21 versus 13% among the total armed-criminals sample).

We indicated earlier that most of the gun thieves in the sample stole guns because they were there to steal, and that the predominant motive in doing so was to sell or trade the gun to another party. Yet another follow-up question asked, "Of all the guns you have ever stolen, did you ever keep one for your own personal use?" Although less than one-third of the gun thieves usually stole guns for themselves, fully two-thirds had kept at least one for their own personal use, at some time, for some reason. Predictably, the tendency to have kept at least one stolen gun for personal use increased regularly as one moves to the more predatory categories of the typology, reaching a peak among the Handgun Predators, of whom 90% had kept a stolen gun for their personal use (Table 10.4).

Men who indicated that they had kept a gun for personal use were asked why. The most frequent answer, given by 68%, was that "it was a nice

piece," presumably a nicer piece than the one they were then carrying. Theft, it appears, serves as a mechanism of technological upgrading among the criminal population. The next most frequent reason for keeping a stolen gun, mentioned by 37%, was that "I did not have a gun then." Roughly one-third mentioned that "a stolen gun could never be traced to me"; predictably, this response was especially common among the more serious gun abusers. Other reasons for keeping stolen guns were all cited less frequently, for example, "I collect guns" (mentioned by 20%), or "I couldn't find anyone to sell it to" (12%).

The results just summarized illustrate an important point about the crime of gun theft, namely, that while large fractions of our sample report having stolen guns and report theft as the means by which they obtained their most recent handgun, the need to obtain a gun for one's own personal use was only rarely the principal motivation in stealing them. Recall: just under one-half the sample had ever stolen any firearm; of this one-half, about two-thirds had kept at least one stolen gun for their own use; among this latter group (which comprise about one-third of the total sample), only 37% gave as the reason for keeping the gun that they did not have a gun at that time. In other words, most of the men who reported stealing weapons did not need to steal guns in order to arm themselves; virtually every man in the sample who armed himself through theft would also have had other means that could be exploited for the purpose. It therefore does not follow from the high volume of gun theft among this sample, or from the apparently major role of stolen guns in supplying the criminal market, that a drastic reduction of gun theft would result in fewer armed criminals. For most, or so it appears, the theft of guns is a redundancy, not the necessary prerequisite for arming oneself.

## THE COMMERCE IN STOLEN FIREARMS

All who reported the theft of a gun were asked if they had ever sold or traded a stolen gun; 90% had. Of these, 16% had done so "just once," 47% had done so "a few times," and 37% had done so "many times." "A few times" was the modal response among all categories except the Predators; among the Predators, "many times" was the most common response. About 95% of the Predators (both groups) had sold or traded a stolen gun at least once in their careers.

Men who reported having sold or traded at least one stolen firearm were queried about their customers in these transactions. The most frequent sale was "to a friend," mentioned by about two-thirds overall. This, in fact, was the modal response in all categories, with percentages ranging from 53% of the Unarmed to 73% among the Handgun Predators.

Next to friends, black-market sales predominated, especially to fences (49%) and drug dealers (31%). Sales "to a stranger on the street" were also fairly common, having been mentioned by 25%. Other frequently mentioned outlets included pawnshops (21%), "gun dealers" (21%), "people I was in debt to" (20%), and family members (12%). Three men volunteered the information that they had sold stolen guns to policemen.

The pattern of commerce revealed in these responses is, of course, very similar to the pattern of acquisition noted in the previous chapter. Felons with stolen guns to sell tended to sell them to the same sources that other felons exploited to acquire guns. Some of these men, clearly, were suppliers to the stolen-gun market, and others were consumers in the market; realistically, most of these men were probably both suppliers and consumers at various times.

It is also of some significance that the 693 men who entered the "who did you sell to?" question sequence gave a total of 1670 answers, for an average of 2.4 channels of distribution per man. More than one-third of these channels involved close associates (friends, family, creditors); another one-third involved criminal enterprises (fences and drug dealers). Roughly one-sixth of the commerce in stolen guns involved legitimate or quasi-legitimate businesses (gun shops, pawn shops). Most of the remainder was sold on the street. Of course, not all stolen guns entered these channels of distribution; as noted earlier, about two-thirds had kept at least one gun for their own use.

Perhaps the most important point to emphasize in all this is the extent to which the market in stolen guns is apparently integrated into the more general criminal markets in stolen goods and in drugs. A striking example of this integration was supplied by one of our southern respondents who described the role of stolen guns in the drug operation with which he worked. In this operation, drug dealers would obtain as many guns as possible from their clients—namely, from drug users who had stolen guns in burglaries and who sought to trade them with the dealers for drugs or cash. In these trades, guns with retail values often in the hundreds of dollars were obtained for drugs whose cost to the dealer was perhaps $10 or $20. Once enough guns had been obtained, they would be loaded for shipment to South America, where guns are in high demand to satisfy the armament needs of the "cocaine cowboys" (private armies in the service of the large Colombian and Bolivian drug operators). The shipment cost, of course, is nil, since the planes would be going to South America anyway to run drugs back to the states.

In South America, guns would be traded at high premium for cocaine or other drugs. In adequate quantity, handguns are said to be worth roughly $200–300 each in Bolivia, with even higher prices obtaining elsewhere. In Bogota, to cite an illustration, a kilo of pure cocaine sells for roughly $6000 and could therefore be acquired in exchange for 20 or 30 guns; that same kilo of cocaine would bring perhaps $50,000 in Miami even if sold in bulk, and considerably more than $50,000 if broken down into smaller quan-

tities for street sale. The 20 or 30 guns necessary to broker the deal in Bogota would rarely represent an out-of-pocket expense of more than several hundred dollars (say, 30 stolen guns obtained at the price of $20 worth of drugs each, or $600 in real costs). Over the entire cycle, from initial acquisition of the guns to the street sale of drugs obtained in South America in exchange for guns, one's investment multiplies several hundred times.

As we reported earlier, about 46% of the sample's most recent handguns were definitely stolen (including the ones stolen directly by the felons themselves), and an additional 24% were "probably stolen." A cross-tabulation of this question with the questions on where and how their most recent handguns were obtained gives some additional sense of the commerce in stolen guns. For this purpose, we ignore the direct thefts and focus on the handguns acquired through other means. To illustrate, 70 men reported that they had either rented or borrowed their most recent handgun; of these, 39 (56%) were rated as "probably" or "definitely" stolen. Of the 349 handguns "bought for cash," 52 were "definitely stolen" and 101 were "probably stolen." Thus, about 44% of the cash purchases made by these men involved stolen guns. Even among the 112 guns received in trades or as gifts, 51% were considered likely to have been stolen. Overall, of the 531 handguns our respondents obtained other than through a personal theft, 259 (49%) were judged either definitely or probably stolen. In short, stolen firearms circulated freely through all the mechanisms of exchange exploited by these men.

Percentaging in the other direction: 276 of the most recent handguns owned by the sample are, in their words, "definitely stolen." Only about two-thirds of these (69%) were stolen directly by the felons themselves. About one-fifth of them (18%) were purchased for cash, 5% were borrowed or rented, 4% were received in trades, and another 4% received as gifts. Most of these transactions predictably involved family, friends, and black-market sources, but roughly one in five apparently involved a legitimate or quasi-legitimate business.

It is also worth a note that the category, "probably not stolen," is also somewhat ambiguous and would no doubt include at least a few stolen guns as well. Transactions involving these "probably not stolen" firearms were, to say the least, a little irregular: Only 57% of the "probably not stolen" were purchased for cash versus 73% of the "definitely not stolen" guns; moreover, about one-third of the "probably not stolen" handguns were obtained from irregular sources: fences, black-market hustlers, drug dealers, or "off-the-street."

In sum, a direct theft is only one among several ways that felons come to possess stolen guns; apparently, at least one-third of the stolen guns they possessed were acquired through secondary sources. The commerce in stolen firearms seems to be quite extensive and thoroughly integrated with the criminal markets in drugs and other stolen property.

## WHERE ARE GUNS STOLEN?

The preceding notwithstanding, the principal source of stolen guns to our sample was direct thefts that they, personally, had committed; moreover, direct theft is the ultimate source (obviously) of all the stolen firearms that circulate in the illicit-firearms market. Men who told us they had stolen at least one gun in their careers were asked about the sources from which these guns had been stolen. These data show that about one-half the thefts involved street crimes, residential burglaries, or other crimes against strangers, and that about one-third of them involved friends or family of the respondent. In roughly 1 theft in 10, the victim was an ostensibly legitimate firearms outlet—gun shop, pawn shop, department store, or, in a few cases, the military. The remaining thefts, about 7% of the total, involved illicit sources: fences, drug dealers, and black-market operators.

We asked the gun thieves not only about the sources but also about the locations of their gun thefts. The modal response was "from a home or apartment," mentioned by 84%. In other words, 84% of the men who had ever stolen at least one gun had stolen a gun directly from a private residence. This fraction varied little across the categories of the typology.

About one-half the gun thieves (51%) indicated that they had stolen a gun "from a car"; this was especially common among the Handgun Predators. The next most common response was "from a store," mentioned by about one-third of all gun thieves and by one-half the two Predator groups. Stealing a gun "directly off a person" was admitted by 27%; most of these thefts involved the serious gun abusers (Sporadics and Predators).

"Off a truck during shipment" was mentioned by 15%; 14% claim to have stolen a gun directly from a policeman. In both cases, the Predators showed the highest percentages of all groups. About 8% of the thieves reported having stolen from manufacturers; again, the Predators led the list.

In terms of the number of thefts, then, most involved residences and vehicles, although thefts from commercial establishments, shippers, and manufacturers also seem alarmingly common. In terms of the total number of guns stolen, however, it is possible that theft from residences is less important and theft from these other sources more important. The heist of one semitrailer full of guns might well net more equipment than hundreds or even thousands of residential burglaries. Unfortunately, we did not ask the sample just how many guns they had ever stolen from each of the sources, so we can only speculate that thefts from stores, shippers and manufacturers account for a large share of the total volume. Still, the frequency with which these men reported thefts against potential high-volume sources argues in favor of additional research on this aspect of the gun-theft problem.

Brill has reached a similar conclusion on the basis of his confiscation samples. Because of the extremely small sample sizes, Brill concludes that his analysis "cannot be read as evidence than nonindividual thefts (thefts

TABLE 10.5. Respondent's Theft Experiences and Hypothetical Optimal Theft (in Percentages)

| Source | Respondents who ever stole from each source (%) | Those who would steal from each source (%) |
| --- | --- | --- |
| Directly from a person | 27 | 10 |
| From a home/apartment | 84 | 58 |
| Out of a car | 51 | 31 |
| From a policeman | 15 | 8 |
| From a store | 37 | 28 |
| From a manufacturer | 8 | 11 |
| Off a truck shipment | 16 | 13 |
| Other | | |
| Relative | 0.3 | 0.7 |
| Friend | 0.1 | 0.4 |
| Military | 0.5 | 0.2 |
| Work | 0.4 | 0.1 |
| I'd buy it | NAª | 4.1 |
| Don't know | NAª | 0.4 |
| Other | 2.8 | 3.6 |

ªNA = not applicable.

from manufacturers, distributors, dealers, or transporters) constitute the majority of firearms thefts, but it does indicate that these non-individual thefts may be a serious problem" (197: 110). Interestingly, officials at BATF disputed this conclusion, claiming that the nonindividual thefts would probably "equal less than 1%" of all stolen firearms. Our results tend to favor Brill's position; at minimum, it is clear that thefts from potential high-volume sources were committed quite frequently by the felons in this sample.

THE OPTIMAL GUN THEFT

Every man in the sample, whether he had ever stolen guns or not, was asked to imagine the following hypothetical situation: "Suppose you decided you really needed a handgun for some reason and the only way to get one was to steal it." They were then asked how they would go about it. The results, shown in Table 10.5, are quite similar to the behavioral reports already discussed: The rank ordering of places from which they would go to steal a gun is effectively identical to the ordering of places from which they had in fact stolen guns. "From a home or apartment" leads the list and was noted by 58%, followed by "out of a car" (31%), and "from a store" (28%), with all remaining responses being much less frequent.

Of some interest is the number of volunteered responses we obtained with the question, many of them quite detailed, for example: "Follow a man with a business for a few days and find out where he keeps it, then

get it at night," or "Hide in store clothing rack with wire cutter and get one that way." Respondents frequently commented during debriefing that the police were always a good source, since they always carry at least one handgun and frequently two or three. In the total sample, interestingly, 8% mentioned "from a policeman" as the place they would go to steal a handgun; among the Handgun Predators, this response was offered by 14%.

SUMMARY

The principal conclusions to be drawn from data presented in this chapter are as follows:

1. Our best estimate of the fraction of stolen guns among the firearms used in crime is substantially higher than estimates reported in other studies. One-third of the sample's most recent handguns were personally stolen by the felons themselves; an additional 14% were reported as "definitely stolen" weapons and another 24% as "probably stolen." Overall, then, at least four-tenths, and possibly as much as seven-tenths, of the most recent handguns possessed by this sample were stolen guns.

2. About one-half of the felons in the sample had stolen at least one gun in their careers; men who had stolen at least one tended to have stolen fairly large numbers of them. Most guns were stolen simply because they were there to steal; usually, the point in stealing a gun was to sell or trade it for cash, drugs, or other goods. Gun theft, in short, was predominantly an opportunity crime. Still, two-thirds of those who had ever stolen a gun had kept at least one of them for their own personal use, usually because "it was a nice piece."

3. Gun theft was fairly common among all groups of criminals, even among those who did not use guns to commit their crimes, but it was most common among the more serious gun abusers.

4. We estimate that our sample had stolen a total of roughly 30,000 guns overall. About 80% of the total volume was accounted for by roughly one-tenth of the thieves who stole guns in very large numbers (in the hundreds or thousands). Relative to the total sample, the high-rate gun thieves tended to be drug dealers and users.

5. Stolen firearms circulated widely and freely through all the mechanisms of gun commerce exploited by these men. Nearly one-half the cash purchases of handguns involved stolen weapons.

6. Most gun thefts involved private residences or automobiles, but a good sized fraction of them involved potential high-volume sources such as dealers, shippers, and manufacturers. We cannot estimate the fraction of the total number of stolen guns that originated in these high-volume thefts, but the frequency with which high-volume sources were targeted in thefts suggests that the fraction is probably substantial.

# 11

## HANDGUN CONTROLS AND WEAPONS CHOICE: THE SUBSTITUTION ISSUE

In any substantive area, current patterns of human behavior provide important guides to social policy, providing descriptive information on the nature of the problem in question that should be taken into account in whatever policy may be constructed. But current patterns of behavior are an incomplete guide to what might occur if policies were changed. Human behavior is adaptive, and adaptations occur as well to changes in social policy. In the current case, our survey has provided descriptive information on how felons have used guns in the past and possibly some guides about how they might use guns in the future, assuming that social policies concerning guns remain much the same.

What might happen, however, were gun control policies to change in dramatic ways? Is there anything our survey can tell us about the likely outcomes resulting from efforts to reduce the access of criminals to firearms? In particular, suppose that some sort of effective controls were enacted that substantially reduced the ability of criminals to obtained handguns or certain kinds of handguns. What might happen in that event?

### SUBSTITUTION THEORY

Key issues are the extent to which criminals can find effective and efficient substitutes for firearms and how such substitutes might affect both crime rates and the total social costs of crime. The arguments that have been advanced run the full range of optimism. For example, in 1968, Zimring published an argument to the effect that gun controls that effectively reduced the availability of firearms to criminals would reduce violent killings. The key premises in his argument were that in the absence of firearms, most of the assaults and attacks now perpetrated with firearms would instead be perpetrated with knives, and that knives are intrinsically less lethal than firearms. The conclusion is that if there were fewer guns, there would be fewer criminal killings—not because criminals would somehow become less violence-prone but simply because the means of violence available to them would be markedly less effective.

209

For the moment, we will not consider whether the goal of a substantial reduction in the number of available handguns can be accomplished without some considerable social cost. Assuming that this goal can be achieved, there are serious questions that raise doubts about Zimring's arguments. To begin, it is not clear that less lethal weapons such as knives would always be substituted for handguns; some (such as Kates, 1978, and Kleck, 1983; 1984a) argue that the more lethal sawed-off shotgun would be substituted instead, at least in some cases. It is thus possible that the ''no handguns'' condition would leave us with the same violent-crime problem we now face, or possibly even a worse one, if the fraction substituting sawed-off shotguns rather than knives were substantially large.

Still another possibility, clearly the most desirable, is that in the absence of handguns, criminals would simply go unarmed. It has been argued, for example, that the handgun provides the psychic ''strength'' necessary to commit crimes, that it supplies the needed ''courage.'' Absent handguns, it is possible that many felons, therefore, simply would get out of the crime business altogether and stop carrying weapons of any sort. This, clearly, would constitute an improvement.

In short, there are several possible criminal adaptations to a world in which handguns are more difficult or impossible to obtain. Data from our survey may not definitively point out which ways may be followed, but the information may help at least to sharpen the question.

## POSTRELEASE GUN ACQUISITION

Of course, no one knows for sure just what criminals would do if we could somehow attain a ''no handguns'' condition or some close variant [i.e., no cheap handguns, no Saturday Night Special (SNS) handguns]. The possibility that a nontrivial fraction would substitute more lethal weapons instead is, however, sufficiently important that an extended inquiry into the matter is in order. Although the felons in our sample may not be the best or most reliable source of information on what might happen under certain future circumstances, their views on these issues are certainly of some relevance.

Under the provisions of existing federal law, it is already illegal for a convicted felon to acquire a firearm. It is of some interest and pertinent to the concerns of this chapter to see how the likely postrelease firearms behavior of our sample would be constrained by this fact.

Interestingly, most (73%) of the men in our sample were aware of this restriction (see Chapter Eight). This notwithstanding, most of them did not anticipate much trouble in acquiring a handgun once released from prison. First, as in polls of the general public, most of the men in our sample (82%) agreed that ''gun laws affect only law-abiding citizens; criminals will al-

ways to get guns.'' In like fashion, most (88%) also agreed that ''a criminal who wants a handgun is going to get one, no matter how much it costs.'' A more direct question sequence posed the following hypothetical situation: ''Suppose now that you have been released from this prison and you have decided that you need to get a handgun for some reason. Let's also suppose you don't already have one. How much trouble do you think it would be for you to get a handgun after you get out of this prison?'' Follow-up questions asked for details—how much would it cost, how long would it take, where would you go to get it, etc. Results are shown in Table 11.1.

Overall, the modal response for the ''how much trouble'' question was ''no trouble at all,'' the answer given by 59%. Another 16% affirmed that it would be ''only a little trouble.'' Thus, three-quarters of the sample believed they could obtain handguns with little or no trouble subsequent to their release from prison. This, of course, was the result for the total sample. Men who were experienced in using firearms to commit crime anticipated even less difficulties: Among the Predators, for example, more than four-fifths thought they could arm themselves with little or no trouble, and much the same held for the Sporadic Handgun Users as well.

Whether these are realistic judgments or not is certainly an open question, but at the moment, we have no evidence to suggest that they are not. Clearly, many of these men, especially the firearms abusers, had acquired firearms in the past, and given an average of three prior incarcerations, many would have at some previous point been exactly in the situation in question. Therefore, it is likely that these data represent reports of past experience as much as judgments of future possibilities. For this reason, we are inclined to accept them as accurate.

A follow-up question asked how much each man felt he would have to pay to get the handgun he wanted. Many responded ''nothing'' at this point, adding that they would steal one. Among those who stated a specific dollar price, the modal response was $100, and the overall sample mean response = $114. Acquiring a handgun subsequent to release was neither especially troublesome nor especially expensive, at least as these men saw it. (It is important to bear in mind that given the handgun-acquisition practices of these felons, the prices are not those of the legitimate market but of the gray or black market.)

[1]In a 1978 poll conducted by Patrick Caddell (Cambridge Reports, Inc., 1978), 78% agreed that ''gun control laws affect only law abiding citizens, criminals will always be able to find guns'', a virtually identical result to that obtained among the prisoners. Likewise, a DMI poll (Decision-Making Information, 1978) found 85-90% agreeing that ''registration of handguns'' will not prevent criminals from acquiring or using them for illegal purposes.'' (Findings from both polls are discussed at some length in Wright, 1981.) Consensus on the point is thus virtually unanimous among felons and the general population alike.

**TABLE 11.1.** Acquiring Handguns after Release from Prison, by Type

| | Total | Unarmed | Improviser | Knife | One-timer | Sporadic | Handgun predator | Shotgun predator |
|---|---|---|---|---|---|---|---|---|
| 1. How much trouble do you think it would be for you to get a handgun when you get out of this prison? (in percentages) | | | | | | | | |
| A lot of trouble | 15 | 23 | 21 | 13 | 15 | 6 | 5 | 9 |
| Some trouble | 10 | 12 | 11 | 11 | 9 | 12 | 6 | 7 |
| Only a little trouble | 16 | 14 | 16 | 20 | 13 | 24 | 15 | 14 |
| No trouble at all | 59 | 51 | 51 | 56 | 62 | 58 | 74 | 70 |
| (N) = | (1621) | (606) | (70) | (119) | (216) | (234) | (290) | (86) |
| 2. About how much do you think you would have to pay . . . ? (in dollars) | | | | | | | | |
| X̄ | 114 | 112 | 166 | 130 | 131 | 100 | 104 | 102 |
| SD | 150 | 118 | 321 | 142 | 239 | 92 | 112 | 123 |
| (N) = | (1393) | (481) | (53) | (100) | (186) | (217) | (278) | (78) |
| 3. About how long do you think it would take . . . ? (in percentages) | | | | | | | | |
| Few hours | 42 | 35 | 36 | 31 | 48 | 45 | 53 | 54 |
| Day | 16 | 13 | 19 | 16 | 12 | 19 | 19 | 18 |
| Few days | 21 | 23 | 19 | 22 | 23 | 19 | 19 | 16 |
| Week | 6 | 6 | 6 | 13 | 6 | 6 | 3 | 4 |
| Few weeks | 6 | 7 | 11 | 8 | 5 | 8 | 3 | 4 |
| Month or more | 9 | 16 | 8 | 10 | 6 | 3 | 3 | 5 |
| (N) = | (1527) | (539) | (62) | (115) | (202) | (235) | (291) | (83) |
| 4. How would you go about trying to get one . . . ? (in percentages) | | | | | | | | |
| Steal | 11 | 10 | 8 | 14 | 7 | 12 | 13 | 16 |
| Rent | 1 | 1 | 0 | 0 | 1 | 1 | 1 | 4 |
| Borrow | 21 | 18 | 26 | 18 | 19 | 23 | 27 | 20 |
| Trade something | 6 | 8 | 5 | 3 | 6 | 5 | 6 | 6 |
| Buy one for cash | 61 | 63 | 61 | 66 | 67 | 59 | 54 | 54 |
| (N) = | (1521) | (544) | (62) | (114) | (204) | (230) | (286) | (81) |
| 5. Where would you try to get one? Percentage yes for | | | | | | | | |
| Friend | 58 | 45 | 59 | 60 | 53 | 68 | 75 | 73 |
| Gun shop | 16 | 20 | 12 | 19 | 19 | 10 | 13 | 9 |
| Pawnshop | 19 | 21 | 17 | 31 | 18 | 15 | 16 | 17 |
| Family member | 15 | 15 | 15 | 16 | 13 | 13 | 19 | 14 |
| Fence | 35 | 28 | 39 | 36 | 30 | 41 | 43 | 51 |
| On the street | 42 | 37 | 33 | 47 | 39 | 50 | 45 | 53 |
| My drug dealer | 20 | 11 | 21 | 17 | 13 | 25 | 34 | 33 |
| Black market | 31 | 22 | 27 | 39 | 28 | 36 | 41 | 43 |
| Hardware/department store | 8 | 10 | 8 | 11 | 9 | 5 | 7 | 4 |
| Mail order | 5 | 6 | 8 | 8 | 4 | 2 | 2 | 5 |

212

213

We also asked how long they thought it would take. The modal response was "a few hours." Nearly 80% of the sample said they could get a handgun in a few days or less; among the Predators, the figure rose to about 90%. Over one-half the Predators said they could arm themselves in a few hours.

The final questions in the sequence asked how and where they would go about trying to obtain a handgun. About three-fifths figured they would simply buy one for cash, another one-fifth thought they would just borrow one, and one-tenth said they would go out and steal one. These patterns were essentially identical across the categories of the typology.

As to where they would go to obtain a handgun, informal sources predominated. Most said they would have attempted to get one from a friend, and this was especially the case for the Predators. In the total sample, the next most likely sources, in order, were "on-the-street" (42%), from a fence (35%), on the black market (31%), "my drug dealer" (20%), a pawnshop (19%), a gun shop (16%), from a family member (15%), from a hardware or department store (8%), and from a mail-order outlet (5%).

It is worth noting that where these men said they would go to get a handgun on release was very similar to where their most recent firearms, in fact, had been obtained (see Chapter Nine); again, the data seem to reflect prior experiences as much as hypothetical possibilities. As in the case of the actual acquisitions, the Predators were especially likely to exploit informal sources. About three-quarters of the Predators, for example, would go to a friend, about one-half would try a fence, the street market, and/or the black market, and about one-third would try their drug dealer. All other possibilities were mentioned by less than 20% of these men. Not more than about one in five of the Predators would have attempted to obtain a handgun from a source likely to be concerned about the legality of the transaction, and even here, one imagines that these "sources" would be mainly back-ups to exploit if the more customary (more frequently mentioned) sources somehow failed to work out.

Summarizing briefly, most of the men in this sample—and especially the more predatory sorts—believed they could acquire a handgun after their release from prison in a matter of a few hours or, at most, a few days, that it would be little or no trouble to do so, and that the out-of-pocket cost for so doing would be on the order of $100. And clearly, many of them had well-articulated plans as to how they would go about it. One man, discussing this question sequence with the field staff, pointed out that he would first have to go to a hardware store and buy a knife (presumably, with his gate money); this would take perhaps a half-hour. Then, knife in hand, he would have to find an open gas station—where, he explained, one will almost always find a handgun on the premises. He would then use the knife to rob the gas station of its handgun: the total elapsed time, he figured,

would be perhaps 1 hour, and the total expense would be the price of the knife, let us say, $10. "You see," he added, "no problem!"[2]

## ACQUISITION UNDER CONDITIONS OF SCARCITY

The above, of course, pertains to the handgun situation as it now exists. That situation includes, as its most salient features, lots and lots of readily available handguns and at least some (however fitful) efforts to regulate the acquisition of handguns by convicted felons. It is apparent from the above that the weapons behavior of our sample is far more strongly dictated by the ready availability of handguns than by current efforts at control.

The study also explored some alternatives to the existing arrangements, each relevant in one or another way to at least some proposed solutions to the problem of handgun violence. Again, all these questions are highly and unavoidably hypothetical, and one may properly wonder just how many of such situations these men would in fact do what they said they would do if such situations existed. Still, given the nature of this sample, their responses even to hypothetical possibilities are of more than passing interest.[3] Data are shown in Table 11.2.

One much-discussed policy option is to "tax the bottom out" of the handgun market. This proposal is rooted in the belief (but see Chapter Eight) that cheap handguns are overrepresented among the handguns used to commit crimes.[4] Obviously, most of the men in our sample believed that they could get the handgun they wanted for roughly $100. According to Cook (1976), the average "take" in a handgun robbery was roughly $160, some three times the average take in a nongun robbery. (A correction for

[2] One reader of an earlier draft objected at this point, arguing that if it were really that easy, all these men should be rich, since all they would need to do is steal the gun money. If there were as many rich people to rob in this world as there are gun owners to steal guns form, and if the average rich person took no greater precautions with his or her wealth than the average gun owner appears to take with his tions with his or her weapon, we would most certainly agree.

[3] In interpreting the ensuing data, the differences between our sample of prisoners and the total population of street criminals should especially be kept in mind. Our felons, to emphasize, are older, more violent, and with longer criminal careers than the average street criminal would be; in a word, they are more hardened. How these men might respond to some of the options considered, for that reason, is not necessarily indicative of how criminals in general would respond.

[4] Data reported in Chapter Eight do not suggest a predominance of "cheapies" among this sample's most recent handguns; attitudinal data played by gun theft in the is much of a concern. Considering the dominant role played by gun theft in the illicit firearms market (Chapter Ten), it is hard to imagine that price would be a concern to the felon market unless the price rose to such a level that ordinary citizens stopped buying handguns for felons to steal.

TABLE 11.2. Weapons Choices under Various Handgun Control Policies by Type (in Percentages)

| | Total | Unarmed | Improviser | Knife | One-timer | Sporadic | Handgun predator | Shotgun predator |
|---|---|---|---|---|---|---|---|---|
| **1. Suppose the cheapest handgun you could find cost more than you could possibly afford to pay for it. What would you do then?** | | | | | | | | |
| Steal a handgun | 20 | 11 | 12 | 22 | 16 | 26 | 36 | 19 |
| Saw off a shoulder gun | 11 | 7 | 7 | 12 | 10 | 8 | 13 | 35 |
| Borrow a handgun | 25 | 17 | 23 | 17 | 27 | 36 | 34 | 29 |
| Carry a knife or club | 8 | 5 | 15 | 21 | 6 | 7 | 6 | 9 |
| Not carry any weapon | 36 | 60 | 42 | 28 | 38 | 22 | 10 | 11 |
| (N) = | (1538) | (563) | (65) | (112) | (207) | (230) | (276) | (85) |
| **2. "Let's suppose that the handgun you really wanted was a small, cheap, low-caliber little handgun, but that there just weren't any of them around for you to get. If you thought you wanted a handgun but found you just couldn't get one, what do you think you would do instead?"** | | | | | | | | |
| Get bigger, more expensive | 45 | 30 | 34 | 32 | 47 | 63 | 68 | 38 |
| Saw off shoulder weapon | 12 | 7 | 9 | 6 | 6 | 18 | 45 | 45 |
| Carry knife or club | 10 | 9 | 19 | 10 | 36 | 10 | 8 | 8 |
| Not carry | 33 | 57 | 40 | 24 | 35 | 18 | 9 | 6 |
| (N) = | (1495) | (539) | (67) | (110) | (204) | (218) | (272) | (85) |
| **3. "Some people say that if there were no handguns at all, criminals would carry knives or clubs instead. Other people say that if there were no handguns, criminals would carry rifles and shotguns that had been sawed off so you could hide them. Which of these comes closest to your own beliefs?"** | | | | | | | | |
| Carry knives or clubs | 64 | 12 | 7 | 4 | 7 | 5 | 2 | 1 |
| Carry sawed-off | 21 | 59 | 43 | 53 | 66 | 67 | 75 | 82 |
| Carry knives and sawed-off | 8 | 12 | 7 | 11 | 11 | 11 | 7 | 8 |
| Not carry | 7 | 10 | 25 | 32 | 39 | 17 | 10 | 10 |
| (N) = | (1644) | (611) | (74) | (119) | (229) | (236) | (288) | (87) |
| **4. "And how about you personally . . . If you wanted to carry a handgun but you just couldn't get your hands on one, which of the following do you think you would do?"** | | | | | | | | |
| Carry knife or club | 24 | 18 | 32 | 50 | 26 | 26 | 20 | 14 |
| Carry sawed-off | 40 | 22 | 27 | 31 | 33 | 51 | 72 | 74 |
| Not carry | 37 | 60 | 41 | 19 | 41 | 23 | 8 | 12 |
| (N) = | (1636) | (607) | (71) | (119) | (228) | (233) | (290) | (88) |

216   217

inflation would raise this figure by quite a bit.) Given these values, it is clearly cost-effective for the would-be robber to buy a handgun at prevailing prices; it is, after all, a rare business venture where one's entire capital outlay can be recouped in the first "transaction." But what, then, might happen if the cheapest handgun available in the market cost more than the typical felon could possibly afford to pay? Would the cost-effectiveness equation then not tip sharply away from obtaining a handgun?

Panel 1 of Table 11.2 shows the responses of the sample to the pricing strategy. In the aggregate, the modal response was not to carry any weapon, mentioned by 36%, seemingly an optimistic finding. Note, however, that this response was heavily concentrated among the less predatory categories, especially among the Unarmed Criminals (60% of whom said they would not carry any weapon under this condition). That those who did not carry firearms in any case said they would continue not carrying in the face of the pricing strategy is hardly surprising. Among the Predators, the number who said they would not carry any weapon in the face of the pricing strategy was on the order of 10%, and for the Sporadics, on the order of 20%. Thus, while at least some of these men would apparently be affected by exceptionally high handgun prices, 80–90% of them clearly would not be.

A few men in all categories said they would respond to the pricing option by carrying knives or clubs—these represented about 8% of the total sample, some 15% of the Improvisers, 21% of the Knife Criminals, and less than 10% of everyone else. The simple expedient of borrowing the handgun one needed was mentioned by 25% of the total sample and by approximately one-third of the three most predatory groups. Among the Sporadics, in fact, borrowing the necessary weapon was the modal response, followed by stealing one (26%), and simply not carrying anything (22%).

Among the Handgun Predators, the pattern was somewhat different: Most (36%) would steal the handgun they wanted, about the same proportion (34%) would respond by either stealing or borrowing the handgun they wanted. Among the Shotgun Predators, sawing off a shoulder weapon was the modal response to the pricing strategy (given by 35%), followed in turn by borrowing a handgun (29%), then stealing one (19%). Given the above patterns, it is clear that most of these men thought they could readily evade the pricing strategy.

The result for the Handgun Predators is informative. If the cheapest handgun around cost more than they could possibly afford to pay, some 70% would respond by either stealing or borrowing the handgun they wanted. Call this "lateral substitution" (i.e., the "substitute" weapon in these cases is for all practical purposes the same weapon that would have been carrying otherwise). Of the remainder, approximately one-half would substitute something less lethal (i.e., a knife, club, or no weapon at all); and the other one-half would substitute something more lethal—a sawed-off

shotgun. The net result, if these responses are credible, would not constitute any obvious improvement.

The answers given in response to the pricing question, moreover, are not unrealistic, in our opinion. As we saw in earlier chapters, most of our sample, especially the more predatory ones, associated with other men who also owned and carried firearms, so the possibility of borrowing a handgun would usually be open to them. (To be sure, not everybody can borrow; there have to be some owners around to borrow from.) Open, too, would be the option to steal a gun, as we saw in Chapter Ten. We have more to say later in this chapter about the final possibility, sawing off a shoulder weapon, but it, too, turns out to be a real option. Whether these men can actually be counted on to act as they said they would act is not known, but there is a certain consistency between these reports and what they told us elsewhere in the questionnaire.

A proposal similar in many ways to the pricing strategy is a ban on the SNS, the small, cheap, low-caliber little handgun. We saw in Chapter Eight that the characteristics of the SNS are not especially high on the list of things these men looked for in a handgun; indeed, accuracy, quality, and firepower were more important desiderata. Still, a fair amount of the crime that is committed with handguns is committed with cheap handguns, and it is an interesting and policy-relevant question to ask what might happen if no inexpensive handguns were around.

Panel 2 of Table 11.2 shows the response of the sample to the "ban SNSs" strategy. Overall, the modal response was to obtain a bigger and more expensive handgun, mentioned by 45%. Among the handgun Predators, this option was chosen by 68%, among the Sporadics, by 63%, and among the One-Timers, by 47%. The next most frequent response in the aggregate was not to carry any weapon, mentioned by one-third, but again, this response was heavily concentrated in the less predatory categories (especially the Unarmed Criminals, among whom it was chosen by 57%). Among the Predators, the option not to carry in the face of the SNS ban was chosen by less than 10%. About one-fifth of the Handgun Predators said they would shift to sawed-off weapons.

Zimring (1972) has analyzed death from handgun assaults as a function of caliber. As the caliber increases, so does the death rate. Since more expensive handguns tend to be larger caliber weapons and since they are typically designed to handle hotter ammunition loads, one may presume that the rate of death would also increase with the quality of the weapon as well. Thus, the possible shift to "bigger, more expensive handguns" in the face of a SNS ban, as reported by our sample, would probably be a shift from less lethal to more lethal firearms. The effect of such a ban on the Handgun Predators (they say) would be, in essence, to shift about 85% of them to more lethal weapons (either bigger handguns or sawed-off shotguns) and to shift the remaining 15% to less

lethal weapons (or to no weapons at all). The same was true of the Shotgun Predators. Among the Sporadics, about three-quarters would shift in the more lethal direction. One possible consequence of a SNS ban, one that left all the heavier duty equipment still on the market, is that the rate of death from criminal violence could well increase, perhaps rather dramatically.

A final possibility explored in the survey was a complete ban on all handguns. Responses of the sample to this option are shown in Panels 3 and 4. In the aggregate, the modal response (given by 40%) was to carry a sawed-off weapon, followed by not carrying anything (37%), with the knife or club option being the least popular (24%). As before, the option not to carry was mentioned most often by men who did not carry in any case— by 60% of the Unarmed Criminals, by 41% of the Improvisers, and, interestingly, by 41% of the One-Timers as well. Among the Sporadics, just about one-half would "move up" to sawed-off equipment, about one-quarter would carry knives or clubs, and about one-quarter would go unarmed.

Among Predators, of course, the result was even worse. Three-quarters of them said they would carry sawed-off shoulder weapons if there were not any handguns around for them to carry instead. If the truly vicious assaults are as concentrated among our Predator categories as our earlier results suggested them to be (see Chapter Three), and if these men can be taken at their word, then the apparent consequence of a complete ban on handguns would be stark increase in the rate of death from violent criminal assault.

There is at least some reason to take these men seriously when they say they would substitute a sawed-off rifle or shotgun under the various specified conditions. Many of the men who said that this is what they would do also said that they, in fact, had sawed off rifles and shotguns in the past (see Table 11.3). First, most of the men in the sample agreed with the hypothetical possibility that "if a criminal wants a handgun but can't get one, he can always saw off a rifle or a shotgun." Agreement with this sentiment ran from 80 to 90%. Again hypothetically, most of the men in the sample thought it would be "easy" (39%) or "very easy" (32%) for them to saw off a shoulder weapon, and in the Predator categories, the fraction thinking it would be easy or very easy ran upward to about 90%. We also asked, "Have you personally ever sawed off a rifle or shotgun?" Overall, 29% of the sample had, a fraction that varied from 9% of the Unarmed Criminals up to about 70% in the two Predator categories.

Perhaps more directly to the point, 50% of the men in the sample who said they would carry a sawed-off weapon in the face of a complete handgun ban also said they, themselves, actually had sawed off a weapon at some point in their lives. This was the aggregate result across all seven categories. Among the Handgun Predators specifically, 77% of those who said

TABLE 11.3. Data on Sawing Off Shotguns, by Type (in Percentages)

| | Total | Unarmed | Improviser | Knife | One-timer | Sporadic | Handgun predator | Shotgun predator |
|---|---|---|---|---|---|---|---|---|
| **1. If a criminal wants a handgun but can't get one, he can always saw off a rifle or shotgun.** | | | | | | | | |
| Agree | 82 | 82 | 80 | 84 | 82 | 79 | 86 | 88 |
| Disagree | 18 | 18 | 20 | 16 | 18 | 21 | 14 | 12 |
| (N) = | (1651) | (624) | (71) | (118) | (228) | (237) | (287) | (86) |
| **2. Do you think it would be hard or easy for you to saw off a shotgun or rifle so you could conceal it?** | | | | | | | | |
| Very easy | 32 | 27 | 36 | 28 | 30 | 24 | 45 | 54 |
| Easy | 39 | 34 | 30 | 46 | 42 | 46 | 42 | 35 |
| Hard | 16 | 19 | 23 | 18 | 11 | 22 | 11 | 7 |
| Very hard | 12 | 20 | 11 | 8 | 17 | 8 | 2 | 4 |
| (N) = | (1505) | (543) | (62) | (113) | (207) | (226) | (278) | (82) |
| **3. Have you personally ever sawed off a rifle or shotgun?** | | | | | | | | |
| No | 71 | 91 | 76 | 86 | 74 | 70 | 31 | 28 |
| Yes | 29 | 9 | 24 | 14 | 26 | 30 | 69 | 72 |
| (N) = | (1638) | (919) | (70) | (120) | (223) | (234) | (286) | (89) |

(continued)

they would carry sawed-off equipment also said they had sawed off a rifle or shotgun at some time.

Men who indicated that they had sawed off a rifle or shotgun were asked a few follow-up questions. About 70% of those who had ever sawed off shotguns had done so more than once; among the Predators, this was true of about 85%. On average, the men who had ever done so had been about 18 years old at the time. Among those who had ever done so, 56% reported that they had used a sawed-off weapon at least once in committing a crime, a percentage that varied in a remarkably linear manner from 6% of the Unarmed Criminals to 75% of the Handgun Predators and 92% of the Shotgun Predators.

In short, here as in the previous options discussed earlier, there is a certain consistency between what these men said they would do and what they said they, in fact, had done at other times in their lives. Unquestionably, some of the responses obtained in this question sequence have to be discounted as bravado; others, also unquestionably, are genuine.

How much, then, is bravado, and how much genuine? Although we have no data that provide a definitive answer, our feeling is that most of the responses to these questions should be taken quite seriously. The argument that these responses are "bravado"—presentations of the felon's self in the nastiest, most brutal light possible, perhaps to impress our field team—assumes implicitly that these men are short on opportunities to express their essential meanness and thus resort to fabricating "nasty" answers to survey questions. What these men seem to be saying (this, in any case, is our interpretation) is that their predatory designs on other human beings will not be thwarted for lack of the appropriate instruments. To summarily dismiss this message on the grounds that the responses of felons to survey questionnaires cannot be taken too literally is, in our opinion, unwise.

In summary, evidence assembled in this chapter is not consistent with the argument that the likely substitute weapons that would be used in the face of various partial or total handgun bans are less lethal than the weapons felons currently carry. In all cases, the fractions who said they would "move down" to less lethal equipment are more than offset by the fractions who would move up—to bigger and more expensive handguns in some cases, to sawed-off shoulder weapons in others. None of the options considered here produces a net shift in a less lethal direction.

TABLE 11.3. Data on Sawing Off Shotguns, by Type (in Percentages) (continued)

| | Total | Unarmed | Improviser | Knife | One-timer | Sporadic | Handgun predator | Shotgun predator |
|---|---|---|---|---|---|---|---|---|
| **4. If yes to 3: About how many?** | | | | | | | | |
| Just one | 30 | 58 | 35 | 69 | 55 | 30 | 16 | 14 |
| A few | 43 | 32 | 35 | 31 | 29 | 51 | 50 | 40 |
| 5 or 10 | 17 | 8 | 9 | 0 | 11 | 14 | 21 | 25 |
| More than 10 | 10 | 2 | 12 | 0 | 5 | 9 | 14 | 21 |
| (N=) | (476) | (57) | (17) | (16) | (56) | (71) | (196) | (63) |
| **5. If yes to 3: Did you ever use a sawed-off rifle or shotgun to actually commit a crime?** | | | | | | | | |
| No | 44 | 94 | 88 | 82 | 68 | 49 | 25 | 8 |
| Yes | 56 | 6 | 12 | 18 | 32 | 51 | 75 | 92 |
| (N=) | (474) | (53) | (17) | (17) | (57) | (71) | (196) | (63) |
| **6. If yes to 3: About how old were you when you first sawed off a rifle or a shotgun?** | | | | | | | | |
| $\bar{X} =$ | 17.8 | 19.6 | 15.8 | 19.4 | 20.2 | 17.5 | 17.3 | 16.7 |
| $SD =$ | 4.1 | 4.7 | 3.3 | 4.3 | 5.8 | 3.4 | 3.5 | 4.0 |
| (N=) | (373) | (32) | (13) | (11) | (41) | (56) | (166) | (53) |

# 12

## "THE GREAT AMERICAN GUN WAR": SOME POLICY IMPLICATIONS OF THE FELON STUDY

### INTRODUCTION

In an oft-quoted article published in 1976, Bruce-Biggs (1976) characterized the perennial debate in American political life over what to do about firearms as "The Great American Gun War," suggesting, correctly in this case, a rather more rancorous and hotly contested arena of public policy than one normally might expect to encounter. There may be some issues in American politics where feelings run more strongly (abortion being one, nuclear power perhaps another), but not many; few issues evoke such passion or have had a longer run on the political playbill than what to do about crime and the guns with which crimes are committed.

A session of the Congress seldom passes without at least a few new "gun control" measures being introduced, be they amendments to existing regulations or proposals for entirely new policies. Almost invariably, these initiatives are warmly received in some quarters and bitterly denounced in others. What seems to one group a reasonable method of reducing criminals' access to guns seems to another an unconscionable infringement upon the legitimate rights of the American gun-owning public.

It is worth stressing at the outset of a discussion of the policy implications of our results that the key issues in "The Great American Gun War" rarely turn on matters of empirical fact. As Bruce-Biggs correctly observed, the policy debate concerns styles of life and corresponding value systems as much as it concerns the equipment of crime and how to control it. In some segments of American society, guns of all sorts are loathesome objects utterly devoid of redeeming social value; in other segments, guns and the activities that guns make possible are an integral and highly valued aspect of day-to-day existence. Neither segment will be dissuaded from its views by the results of empirical research, no matter how sound or well-conducted.

Although there is no love lost among the contestants in this particular public policy arena, there is at least some agreement among all contending groups that one policy goal should be to reduce significantly the use of

of the gun-wielding felon but not the lives of legitimate firearms users, at least not unduly.

Unfortunately, it is hard to target any social policy with a high degree of accuracy: serious definitional questions arise, particularly at the margins. To illustrate, the United States Olympic pistol shooting team represents an obviously legitimate body of handgun owners whose right to own and use handguns can be taken as given; likewise, an urban street thug with a lengthy criminal record and overt sociopathic tendencies is obviously a person who has long since foregone any claim to legitimate handgun ownership. At the extremes, the categories of legitimate and illegitimate are easy to recognize. But what of the adolescents who may someday grow up to become either Olympic shooters if all goes well or street thugs if all does not? Or of young men in urban slums who today may feel they need a gun to defend against the thugs but who tomorrow might be thugs themselves? What, for that matter, of the outwardly placid and upstanding citizen who buys a shotgun to hunt quail but who, in an alcohol-induced fit of psychotic anger, barricades himself in his house and kills everything in sight?

Unacceptably adverse consequences to noncriminal gun owners represent the single greatest barrier to the design of effective policy in the "gun crime" area. A stiff tax on handguns imposed at the point of production would no doubt raise the price of handguns enough to drive some criminals out of the handgun market, but it would also drive millions of noncriminals out of the market as well. The cheap, low-quality handgun that is not available for use in crime is also not available to impoverished families in high-crime neighborhoods who feel (correctly or otherwise) that they need a gun to defend against the predation rampant on their streets. A jurisdiction that requires a week-long waiting period to obtain a handgun while the police run the appropriate criminal records check will come across an occasional criminal attempting to obtain a handgun through customary channels and enormous numbers of other people for whom both the waiting period and the records check were altogether immaterial.

Aside from the spill-over of effects onto the noncriminal population, there is also the problem of unintended effects on the target (criminal) population. A policy designed to prevent the transfer of firearms to felons through customary retail channels (such as the Gun Control Act of 1968) might only result in an increase in the rate of gun thefts by felons from nonfelon owners or an increased level of activity in the informal nonretail market. As we saw in the previous chapter, a policy intended to prevent criminals from carrying small, cheap handguns might cause them to carry big, expensive, and more lethal handguns instead.

The intended effect of virtually every piece of "gun-crime" legislation enacted in the twentieth century has been along one or the other of the

firearms in crimes of all sorts. No one denies that the American crime rate is unacceptably high or that the use of firearms to commit crimes is a pressing national problem. The issues that are at the heart of contention are whether and how this goal can best be reached.

Broadly speaking, the methods available to achieve the agreed-upon goal fall into two categories: (1) reducing the ability of criminals to obtain firearms in the first place; and/or (2) reducing the criminals' use of guns in committing crime once guns have been obtained. Clearly, the issues are closely related: if we could accomplish (1), (2) would then be moot. Hence, the second issue is only an issue because of the presumption that complete success at preventing criminals from obtaining firearms will probably not be possible.

Both available methods are rife with considerable complexity, even ambiguity. It is easy to agree, for example, that one goal of policy should be to "keep guns out of the hands of criminals." Indeed, other than the criminals themselves, it is hard to imagine anyone who would not agree. But this presumes that criminals can somehow be easily identified before the fact, a task that has occupied criminologists for a century with little notable success. It is, of course, very easy to identify criminals after they have committed crimes and have been convicted and sentenced for them; thus, after the fact, it is always easy to say that "that man should not have been allowed to own a gun." Identifying the people who "should not be allowed to own a gun" before they have acquired one and inflicted harm on others is an immeasurably more difficult and perhaps intractable problem.

It is of some interest that partisans on both sides of the gun debate, or some of them at least, both recognize and accept the fact just noted (namely, that criminals are hard to identify in advance of their actually committing crimes). One side infers from this that the appropriate strategy, therefore, is to keep guns (or at least handguns or certain kinds of handguns) out of everybody's hands, which would assure (assuming a 100% success rate) that they were being kept from criminal hands in the process. The other side infers that the appropriate strategy, therefore, is to forego any effort to interdict before the fact and simply punish abuses as they occur. In the interpretation, in other words, the same fact subtends two entirely different implications. It should be noted that this area of social policy is no different in this respect from others: The same empirical facts can be accommodated within a variety of widely differing policies.

Other complications are introduced by the unintended side consequences of policies that are or may be enacted. The best of all imaginable firearms policies enacted to reduce gun crime would clearly be ones that somehow impacted only on criminals and on no others. Furthermore, such policies would be ones that had only the intended effect on the target population and no other effects. The ideal policy, in short, complicates the life

lines suggested earlier: to prevent criminals from obtaining guns or to prevent them from using guns once obtained. And yet, the number of armed criminals and the amount of armed crime has tended to increase, not abate. What has happened is not what was intended. We do not mean to suggest that gun-control legislation has caused crime, in some way, to increase, only that the hoped-for reduction in armed crime has not occurred.

One final and long-standing complication, of course, has been the well-known Second Amendment to the Constitution of the United States and the apparent ambiguity about what rights it grants to whom. In the current epoch of nuclear weaponry, for example, what meaning should be construed for the phrase, "an armed militia?" Does the "right to keep and bear arms" include the right to target practice? To own a gun for self-defense? To keep loaded firearms in the home with children present? Surely, in a democratic society, every right comes with certain corollary obligations. But what, then, are the obligations that come with the right "to keep and bear arms?"

The last few pages are not intended to create despair, and much less to enumerate exhaustively all of the complications that are inherent in this particular public-policy area. Our point, rather, is to illustrate that the issues involved go well beyond anything that can be learned from data supplied by a sample of state prisoners. Much, in fact, goes well beyond what could be learned from any study; and many relevant empirical questions cannot be answered with data on prisoners alone.

This study, of course, was not designed to answer all the relevant empirical questions, only to provide baseline information about the acquisition, ownership, and use of guns among a criminal population, information that could be useful in discussing the appropriate policy issues. Although seldom in an explicit fashion, all policies and policy recommendations make assumptions about the "facts" concerning the area of human behavior in question. Clearly, the chances of successful policy are higher the more accurate these assumptions turn out to be. A policy based on the assumption that criminals prefer small, cheap handguns can hardly be successful if in fact they do not. Our point in undertaking this study, in short, was to test some common assumptions and provide useful descriptive data, assuredly not to evaluate the wisdom of one or another "gun-control" measure.

Research of the sort reported in this volume is often very good in describing the nature of a problem and rather poor in suggesting adequate solutions. This study is no exception: We have tried to obtain reasonably accurate readings on certain facets of the criminal acquisition and use of guns, but by themselves, the findings of the research do not immediately suggest any effective solutions. "Policy implications" are just that: implications that derive from one particular interpretation of a set of research findings, certainly not policy conclusions or recommendations whose wisdom is self-evident now that the findings are in hand. Policymaking is the rightful domain of policymakers: Our intention is that policymaking be in-

formed, but not overly constrained, by the results and interpretations we have reported.

In order to prevent criminals from obtaining guns, we need to know where and how their guns are obtained; to prevent them from carrying guns and using them in crime, we need to know why they carry and how they use them, or in short, the roles that firearms play in the lifestyles of the felon population. Most of the policy implications of this study derive from the information we have assembled on these topics.

## THE NATURE OF THE ILLICIT FIREARMS MARKET

Firearms manufacturers are, of course, the ultimate source of virtually all the guns that are ever used for any purpose, since the home manufacture of firearms is apparently rare. This obvious fact means that guns come into the hands of criminals by means of a system of distribution that connects manufacturers and criminals through a chain of transfers. The early links in this chain ordinarily involve firearms wholesalers and retailers, a fact that tempts policymakers to consider using these intermediaries as points to detect potential firearms abusers and thereby to prevent firearms from falling into improper hands. The ultimate efficacy of such an approach depends to a considerable extent on the length of the chain of transfers and the location of retail outlets within the chain.

The findings from our study cast some light on the nature of the transfer chain: We cannot reconstruct the complete chain from manufacturer to criminal consumer, but we have considerable detail on the last link in the chain, the transfer of a firearm into criminal hands. From the viewpoint of policy, two features of these data stand out, and these are discussed in the next sections.

### Deterring the Acquisition of Firearms

Legitimate firearms retailers play a minor and unimportant role as direct sources of the criminal handgun supply. Not more than about one in six of the most recent handguns acquired by our sample was obtained through a customary retail transaction involving a licensed firearms dealer; the market into which criminals are tied, rather, is dominated by informal, off the record, transactions, mostly involving friends and associates, family members, and various black-market sources. The means of acquisition from these informal sources include cash purchase, swaps and trades, borrowing and renting, and often theft. (Indeed, our impression is that the verbs, "borrow," "take," "steal," and "rent" were blurred and indistinct in the vocabularies of our respondents.) Whatever the verbal ambiguities, however, it is clear that our sample was enmeshed in a largely informal market in firearms that served as the immediate source of their supply.

The implication of this result is probably not that we should simply give up on our efforts to interdict criminal acquisition of handguns at the point of retail sale. To so argue would be equivalent to arguing that we should stop the airport metal searches because they only rarely detect a weapons-carrying passenger. Restrictions at the point of retail sale, that is, may serve a useful preventive function; at minimum, the acquisition of a firearm by a felon should be somewhat more complicated than just walking into a gun shop and buying one. The implication, rather, concerns the ultimate effect of such efforts, which is not to prevent the acquisition of guns by criminals but rather to force them out of the retail market and into other, less formal channels of distribution.

One tempting way to intervene between the manufacturer and the criminal end-user is to raise the price of weapons entering the market, perhaps by taxing handguns heavily. Eventually, a sharp rise in handgun prices would be reflected on the gray and black markets as well as in the retail stores. Our data do not allow any calculations of how high prices on the legitimate market would have to go to affect those on the gray and black markets, but we suspect that a dollar increase on the former most likely means considerably less on the latter. Furthermore, it is not at all clear how price-elastic the criminal demand for handguns is; price increases may affect criminal gun acquisition only once they reach very high levels.

Moreover, although exceptionally high prices might drive some criminals out of the handgun market altogether, it would also increase the attractiveness of gun theft and, therefore, might draw some criminals into the market, as procurers of stolen handguns. Furthermore, there would also be a large price burden placed on literally millions of legitimate handgun users, some of whom might then be tempted to become buyers on the gray and black markets.

The further implication of our results, of course, is that if we do intend seriously to complicate the acquisition of guns by felons, then methods must be found for intervening in the informal firearms market. As we have already noted, the transfer of a firearm to a felon, whether formal or informal, is already illegal, so legislation to make it illegal is clearly not the answer. By their very nature, such transactions are difficult or impossible to detect, so "stricter enforcement" of existing laws is also probably chimerical. One might require, as a matter of federal policy, that every firearms transaction be reported to the cognizant authorities and the appropriate criminal records check undertaken; but one quickly senses that this measure would have virtually no effect on the criminal users we are trying to interdict and a considerable effect on legitimate users among whom a large informal market also exists.

There is, in short, some reason to doubt whether any politically acceptable, implementable, effective, and Constitutional method of intervening in the informal market can be found; the implication of our results is not a

method by which this could be done but rather the information that it must be done if we are to prevent or even seriously hamper the acquisition of firearms by criminals.

## The Role of Gun Theft

Our study also confirms beyond serious doubt the important role that gun theft plays in connecting the criminal market to its firearms supply. One-half the men in this sample had stolen at least one gun at some time in their lives; many had stolen more than one; a few had stolen guns in extremely large numbers. At least 40%, and perhaps as much as 70%, of the most recent handguns owned by this sample were stolen weapons.

We indicated earlier that the ideal "gun-crime" policy is one that impacts directly on the illicit user but leaves the legitimate user pretty much alone. This presupposes a sharp distinction between the licit and illicit markets, a distinction that is made tenuous by the apparently heavy volume of gun theft. To leave the legitimate user "pretty much alone" at least implies a guarantee of the right to acquire firearms under some set of prescribed conditions; and yet, all else equal, any gun that can be legitimately possessed by a legal and law-abiding owner can be stolen from its owner and subsequently fall into criminal hands.

Again, our data suggest little by way of a method through which the gun theft problem could be attacked. In terms of the total number of thefts, thefts from homes and apartments are clearly the most numerous, which suggests, as one approach, that legitimate gun owners be made more aware of the problem and the strategies available to them to prevent theft of their weapons. Police chiefs who are empowered to issue permits to own or purchase firearms might be one point at which this information could be imparted; information booklets produced by the manufacturers for inclusion with shipped weapons would be another.

Legitimate gun owners might also be induced to exercise greater caution in storing their weapons in relatively theft-resistant ways—for example, by tax credits or insurance discounts similar to those given for energy conservation measures or the installation of home fire detectors.

Finally, some jurisdictions have begun to consider the liability of a legitimate owner whose gun is stolen and subsequently used to commit a crime. Our data do not speak to the advisability or likely consequences of such measures, but certainly, as we have already said, the right to own guns must be accompanied by certain corollary responsibilities, and perhaps these responsibilities include all reasonable precaution in storing one's weapons in relatively theft-proof ways. (To be sure, one would still want to insist that the liability of the thief greatly exceeded the liability of his victim.)

Although house and apartment break-ins appear to account for the largest number of thefts, they may not account for the largest number of stolen

weapons that enter the illicit market. A distressingly large number of our respondents also reported having stolen guns from potential high-volume sources: manufacturers, shippers, wholesalers, retailers, and even military establishments. Our impression is that security measures in these quarters are already pretty tight, but perhaps they could be increased even further.

The "scale" problem is pertinent in this case: One successful hijacking of a truck during shipment could well net as many total firearms as would be netted in a few thousand household thefts; consequently, the prevention of one hijacking is as useful to society as a whole as the prevention of a few thousand household thefts. All else equal, then, resources might be directed disproportionally to preventing thefts from high-volume sources. Unfortunately, our data do not show that high-volume sources account for more of the total volume than housebreaks, only that they may; this, therefore, is an area that requires further research before the policy implication is obvious.

At minimum, of course, society as a whole could increase the penalty for the crime of gun theft, perhaps by making gun theft a felony whatever the other circumstances of the crime. In most jurisdictions at present, the theft of a gun from a household or store is considered to be a no more serious crime than the theft of any other object of equivalent value.

Whatever the methods one might imagine, however, the nature of the task that society confronts is made reasonably clear by our results: If we are to make headway in preventing the acquisition of guns by criminals, we must find some way to intervene in the informal gun market, a market that, under present conditions, is supplied in substantial part by firearms obtained through theft.

## CRIME GUNS: QUALITY AND PRICE

Many "gun crime" proposals that have surfaced in recent years have been targeted to particular classes of firearms: to handguns in general or, somewhat more commonly, to certain restricted classes of handguns, particularly those of the small, cheap, low-quality variety: the "snubbies" or the so-called "Saturday Night Specials." The rationale for such proposals is twofold: (1) legitimate owners have little or no need for such firearms and (2) illegitimate owners do.

To assess the nature of the criminal demand for these kinds of handguns, we asked for considerable information both on the characteristics our sample preferred in a handgun and on the characteristics of the most recent handgun they had actually possessed. Neither of these sources of information represents perfect data on the nature of the criminal handgun demand: The "preferred-characteristics" questions may tell us more about our sample's fantasies concerning the "perfect" handgun than about the true nature of their demand; the characteristics of the most recent handgun may

or may not generalize to the typical handgun that felons own, carry, and use to commit crimes. Still, neither source of data suggests much interest among felons in small, cheap handguns; such interest as we observed was concentrated primarily among felons who had never used firearms to commit crimes. The criminals in our sample both preferred to own, and actually owned, relatively large, well-made weapons.

The average price paid by our felons for their most recent handguns was not especially high, falling in the $100–150 range; still, the average quality was well beyond the level of the "cheapies." The most common among the recent handguns was a Smith and Wesson .38 equipped with a 4-inch barrel; no more than about 15% of the most recent handguns would qualify as SNSs. A comparison between the average dollar cost and the average apparent quality suggests that prices in the informal, gray, and black markets are heavily discounted, in all likelihood because of the predominance of stolen weapons in these markets.

Whatever the price paid or the mode of acquisition, however, one result is clear: The more a felon used his guns in crime, the higher the quality of the equipment he possessed. Among the truly predatory criminals in the sample, the small, cheap handgun was not the weapon of choice.

Given the rate of gun theft reported by the sample, it is also of no surprise that price was not a very important consideration. Our interpretation of a question on how much they would be willing to pay for a suitable handgun is that felons are willing to pay the going rate. For what it is worth, far more interest was shown in matters such as accuracy, firepower, untraceability, and quality of construction than in price.

The implication of these findings is that the strategy of purging the market of small, cheap weapons may simply be irrelevant, most of all to predatory felons who are more likely to use their guns to commit crimes. In addition, the apparent price insensitivity argues against a policy that stresses raising the price of guns to keep them from criminal hands. Either or both of these strategies may well prove advisable for other reasons; it is possible, for example, that small, cheap handguns are much more important to first offenders, juveniles, or other classes of criminals who are on average younger, less hardened, and less violent than the men in our sample. So far as the sorts of men who end up doing time in state prisons are concerned, however, it is fairly clear that they do not have much interest in small, cheap firearms in the first place.

## WHY CRIMINALS CARRY AND USE GUNS

As long as you got a lot of fire power, you're all right. There was a rule with me that I always have a gun at all times, 'cause sometimes you'd be out in the street and the opportunity just present itself where you see a lot of money. Then you want to be armed. (. . .) So I had the gun always on me to take advantage

of opportunities—and to protect myself. A gun is like a part of me. I could wake up in the morning, and before I get out of the bed to go into the bathroom, I strap my shoulder holster over my shoulder. I never would go out of the house without it.

The preceding is not a quotation from one of our respondents, although it certainly might have been. It is, rather, a passage from John Allen's *Assault with a Deadly Weapon: The Autobiography of a Street Criminal* (Allen, 1977: 179–180). John Allen is typical of the predatory felons in our sample in many ways: He is urban, black, and uneducated, commenced his life of crime in his early teens, acquired his first firearm at age 13 by stealing it from his grandfather, was a heroin addict on several occasions and a heavy abuser of drugs, had a lengthy criminal record as both a juvenile and an adult, spent much of his life in prison, was prone to fits of violent rage, and seldom passed by an opportunity to commit a crime, be it armed robbery, car theft, drug dealing, pimping, housebreaking, or whatever. His motives for owning and carrying guns, as expressed in the above passage, are also typical of the motives expressed by our sample: When armed, one is prepared "for anything that might happen"—an opportunity to commit a crime or a need to defend oneself against the assaults or predations of others. His behavior in regard to the weapon is also perhaps typical: As his comment concerning the morning regimen indicates, carrying a gun was an habitual part of his daily routine.

The possession and carrying of handguns (and other weapons: John Allen also kept a sawed-off shotgun at hand for truly serious work) by felons is part and parcel of their day-to-day existence, no more unusual in their circles than the carrying of wallets or purses would be in others. The motivation to do so goes well beyond the instrumental use of guns in committing crimes, although as Allen's testimony and our data make clear, this is assuredly one important motive. Survival in an uncertain but hostile and violent world is, with equal assurance, another.

Most of the gun-owning felons in our sample grew up around guns, were introduced to guns at an early age, and had owned and used guns ever since. Most also hung around with other men who owned and carried guns. In such circles, a handgun is at least an acceptable article of attire, if not a *de rigueur* requirement. Not to suggest that these handguns are strictly ornamental: Our felons tended in the majority to keep their guns loaded at all times and to fire them at a fairly regular rate, often enough at other people. One-half the men in our sample claimed to have fired a gun at someone at some time; one-half also claimed to have been fired upon.

It is, therefore, no surprise that one of their major acknowledged motives for acquiring and carrying guns was for the purpose of self-protection. In an environment where crime and violence are pervasive, and where many of one's friends and associates routinely carry guns, there is plenty to "pro-

tect" oneself against. "Self-protection," in this context at least, must be interpreted with some caution, of course. Part of it no doubt implies protection against being preyed upon or continually hassled by others who are better armed; another part, perhaps the larger part, means protection against armed innocents, against the police, against the prospects of apprehension during a crime, etc. The "insurance" that many of these men seek in carrying a gun is only the insurance that they will always be the perpetrator and not the victim of the sorts of crimes they so regularly commit.

A third of our sample (of Gun Criminals), like John Allen, make it a practice to carry a gun more or less all the time; one-half carried whenever the circumstances seemed to suggest it: when doing a drug deal, when going out at night, when they were with other men who were carrying guns, or more generally, whenever their ability to defend themselves might be at issue. Only one in five of the Gun Criminals in our sample carried just when they intended to commit a crime.

Since it follows directly from this finding that most of the guns used to commit crime are not carried specifically for the purpose, the implication is that the decision to carry is the critical decision point, not the decision to use the gun in a crime. This is to suggest only that the decision to carry guns regularly by men prone to criminal acts is causally prior to the actual uses of these weapons on victims and, therefore, may represent the theoretically most effective point of intervention.

How one might intervene in the decision to carry, however, is a rather depressing question to contemplate. Unlicensed carrying of concealed weapons is already illegal everywhere. Stricter enforcement of the relevant laws prohibiting concealed carrying of weapons—for example, by periodic shakedowns of people on the streets or in the bars—is a theoretical possibility that raises obvious Constitutional issues; such dragnets would also net large numbers of otherwise legitimate people who are carrying a weapon out of fear. The largest handguns, and even some sawed-off shoulder weapons, can be carried more or less unobtrusively; the smaller the weapon, the more true this becomes. A patrol officer might have some suspicions about a particular person, but anything short of open display might fail the criterion of probable cause.

If one accepts the idea that self-protection in a hostile and dangerous world is a principal motive for the ownership and carrying of guns among felons, then it follows that relevant policies to discourage the practice are those that would reduce the hostility and danger endemic to the social worlds inhabited by these men, that is, poor, urban neighborhoods in the main. As is well known, these neighborhoods produce not only most of the perpetrators but also most of the victims of crime; crime, violence, and routine handgun carrying are distinguishing features of urban slum existence. Unfortunately, there are few issues in law enforcement that seem more intractable than that of substantially reducing violent crime in high crime areas:

It is not at all clear just how such a goal might be attained, nor is it clear that communities would support the effort by paying the added taxes that would be required.

Outright neglect is, of course, one possibility, one that, in fact, has been followed in at least some of our major cities from time to time. Here, the strategy is for the police to withdraw in force, hoping to contain the crime problem within certain boundaries. (Some have also charged, perhaps with reason, that a second hope is that the criminals within the boundaries will kill or maim each other in sufficient numbers that the rest of us could walk our own streets in peace.) "Containment" has not proven to be a very effective strategy, however; crime has a habit of spilling over into the more affluent (and politically powerful) communities. A humane society should also not be indifferent to the victimization by crime of those who can least afford it and who are also victimized by many of society's other institutions and practices as well.

We conclude that a viable policy designed to reduce the criminal use of guns will have to find means of reducing the violence that is characteristic of many urban neighborhoods. We recognize the circularity of this reasoning: What we are suggesting is that the way to get criminals to stop carrying guns is to get criminals to stop carrying guns! Our point, however, is not entirely tautological: What we are suggesting is that the reduction of crime in high-crime neighborhoods has to be as much in the center of law enforcement concern as protecting middle-class citizens from the incursions of predatory criminals.

One might also simply give up dealing with the causes of gun carrying among felons and deal directly with the behavior itself, for example, through policies designed to encourage criminals to leave their weapons at home when they "go to work." Here, the effort would be concentrated on making the carrying and use of guns as difficult and as costly to the felon as possible.

One strategy presently in use in many jurisdictions, one that also enjoys overwhelming popular support (Wright, Rossi, and Daly, 1983: Ch. 12) is to provide enhanced (mandatory "add-on") penalties for the use of a gun (or other weapon) in committing crime (or, as in the Massachusetts case, a mandatory penalty for unlicensed carrying, whatever the actual usage or intent).

How successful this tactic has been in reducing the use of guns in crime has yet to be assessed definitively. Often, or so it appears, judges working with mandatory add-ons reduce the sentence for the main charge by an equivalent number of years, so that the total penalty remains much the same. Moreover, the add-on is often a small fraction of the main charge: A typical sentence for an armed robbery (assuming a lengthy prior record) might be 10–30 years; a 1- or 2-year mandatory sentence enhancement might

not alter the sentence enough to make any difference in the subjective calculations of the criminal. Ultimately, increased sentencing runs up against prison overcrowding as the limiting condition: It does no good to add additional years to a felon's sentence when the state corrections system has no prison space for him in any case. The overcrowding situation is such that many prisons now find every reason for early release (e.g., time off for good behavior, lenient parole) simply to make sufficient room for the "new arrivals" from the courts.

Another problem in using mandatory add-ons for felonious gun use as a deterrent to the practice of carrying weapons is that most criminals do not expect to be caught in any case; what might happen to them once they are caught, therefore, cannot be much of a concern. (It should be added, nonetheless, that many of the non-gun criminals in our sample mentioned the prospect of a stiffer sentence when caught with a weapon as a very important reason not to carry one.)

A final problem in deterring the routine carrying of guns (whether through sentencing or through other measures), at least among the more predatory men in our sample, is that many of the crimes these men commit are directed toward victims who may be armed themselves. John Allen notes: "During the times when I was down, though, I would mainly rob the other dealers to get the drugs or the scratch I needed to buy my drugs" (1977: 176). Why an addict would rob his own dealer (or fellow dealers) is not hard to fathom: They have the drugs, and they carry a lot of money. But to do so unarmed would be the height of folly, since the dealer being robbed doubtlessly will be armed himself. [In discussing one robbery of a fellow dealer, Allen notes, "This was a way we often got weapons—we'd take people's guns when we robbed them" (p. 177).]

More generally, the presence of firearms among a felon's associates and potential victims is probably a much greater threat to his well-being than the prospect of an extra 1 or 2 years in prison. It would be sensible, therefore, to run the risk of an enhanced prison term by carrying a firearm oneself. In this sense, the predatory gun-wielding felon must be considered to be largely indifferent to deterrence through after-the-fact punishments; relative to what might happen if he needed a gun but did not have one, most after-the-fact punishments would pale to relative insignificance.

## SUBSTITUTION AND OTHER NEUTRALIZING SIDE EFFECTS

Data presented in the previous chapter raise the possibility that some of the more commonly advocated "gun-crime" policies could well prove to have negative and unwanted side consequences. Bans on certain kinds of weapons, assuming a reasonable success rate, will cause some criminals not to commit the crimes they would have committed otherwise and will

cause other criminals to commit the same crimes but armed with different weapons. The relative sizes of these two groups is a pertinent issue; so, too, is the question what these "different weapons" would be.

All the data we have presented on this issue are conjectural, and so their implications are even "iffier" than usual. Still, the large majority of the more predatory felons in our sample told us they would respond to various partial or total handgun bans with either lateral or upward substitution—the weapons they said they would carry under these hypothetical conditions were either just as lethal as, or more lethal than, the weapons they would have otherwise carried in any case. One may properly quarrel with some of the details, doubt the practicalities, or debate the probity and realism of these responses, but the major message comes through clearly: The felonious activities of these men will not suffer for lack of the appropriate armament; their intent, so far as we can tell, would be to find substitutes that may be somewhat inconvenient but nevertheless highly effective.

Given our results, we think it likely that the major effects of partial or total handgun bans would fall more on the shoulders of the ordinary gun-owning public than on the felonious gun abuser of the sort studied here. The people most likely to be deterred from acquiring a handgun by exceptionally high prices or by the nonavailability of certain kinds of handguns are not felons intent on arming themselves for criminal purposes (who can, if all else fails, steal the handgun they want), but rather poor people who have decided they need a gun to protect themselves against the felons but who find that the cheapest gun in the market costs more than they can afford to pay. Given the materials presented in Chapter Seven on confrontations with armed victims, it is therefore also possible that one sole consequence of such measures would be some loss in the crime-thwarting effects of civilian firearms ownership.

Perhaps the most telling implication of our data on weapons substitution is not in the substance of the results but in the more general lesson that any social policy can have consequences that no one foresaw, intended, or wanted—consequences that, under the right conditions, worsen rather than improve the problem being addressed. Anticipating these untoward side consequences, and avoiding them, requires above all else a detailed empirical understanding of the nature of the problem; "solutions" that are implemented 'before the problem is reasonably well understood rarely solve anything.

Clearly, this study has not "solved" the problem of gun crime in American society; indeed, it has not even exemplified what the solution would look like. But it has provided some information about the nature of the problem itself, information that we hope others will use to formulate workable solutions to the problem of gun crime, thereby improving the collective existence of us all.

# BIBLIOGRAPHY

Allen, John
1977    Assault with a Deadly Weapon: The Autobiography of a Street Criminal. New York: McGraw Hill.

Anderson, Andy B., Anthony R. Harris, and JoAnn Miller
1983    "Models of deterrence theory." Social Science Research 12(3) (September): 236–262.

Balkin, Steven, and John MacDonald
1984    "A market analysis for handguns and gun control issues." In Firearms and Violence: Issues of Public Policy, ed. Don B. Kates, Cambridge, MA: Ballinger.

Becker, Gary S.
1968    "Crime and punishment: An economic approach." Journal of Political Economy 76: 169–217.

Beha, James A.
1977    "'And Nobody Can Get You Out': The impact of a mandatory prison sentence for the illegal carrying of a firearm on the use of firearms and on the administration of criminal justice in Boston." Parts I and II. Boston University Law Review 57:1 (January), 96–146; and 57:2 (March), 289–333.

Brill, Steven
1977    Firearms Abuse. Washington D.C.: The Police Foundation.

Bruce-Biggs, B.
1976    "The great American gun war." The Public Interest 45: 37–62.

Bureau of Alcohol, Tobacco, and Firearms
1976a   Project Identification: A Study of Handguns Used in Crime. Washington, D.C.: Bureau of Alcohol, Tobacco, and Firearms.
1976b   Project 300. Washington, D.C.: Bureau of Alcohol, Tobacco, and Firearms.

Bureau of Justice Statistics
1985    Bulletin: Household Burglary (Washington, DC: U.S. Department of Justice), January.

Burr, D. E. S.
1977    Handgun Regulation. Orlando, FL: Florida Bureau of Criminal Justice Planning and Assistance.

Caddell, Patrick
1978    An Analysis of Public Attitudes Toward Handgun Control. Cambridge, Mass., Cambridge Reports, Inc.

Caetano, Donald F.
1979    "The domestic arms race." Journal of Communication 29:2 (Spring): 39–46.

240   Bibliography

Cambridge Reports, Inc.
1978   An Analysis of Public Attitudes Toward Handgun Control. Cambridge, MA: Cambridge Reports, Inc.

Chaiken, Jan M., and Marcia R. Chaiken
1982   Varieties of Criminal Behavior. Santa Monica, CA: The RAND Corporation.

Cook, Philip J.
1976   "A strategic choice analysis of robbery." In Sample Surveys of the Victims of Crime, ed. Wesley Skogan. Cambridge, MA: Ballinger, pp. 173–187.
1979   "The effect of gun availability on robbery and robbery murder: A cross-sectional study of fifty cities." In Policy Studies Review Annual, eds. Robert Haveman and Bruce Zellner. Beverly Hills, CA: Sage, pp. 743–781.
1980   "Reducing injury and death rates in robbery." Policy Analysis 6(1) (Winter): 21–45.
1981   "The role of firearms in violent crimes: An interpretative review of the literature. . . ." Duke University: Institute of Policy Sciences and Public Affairs. P. 91 (mimeo'd).
1982   "Research on robbery: An analysis of existing literature and an assessment of future research needs." Washington, D.C.: National Institute of Justice. P. 65.
1983   "Robbery in the United States: An analysis of recent trends and patterns." Duke University: Institute of Policy Sciences and Public Affairs. Pp. 49 (mimeo'd).
1984   "Is robbery becoming more violent? An analysis of robbery murder trends since 1968." Duke University: Institute of Policy Sciences and Public Affairs.
1985   "The etiology of robbery violence." Paper presented at the meetings of the American Society of Criminology, San Diego.

Cook, Philip J., and Daniel Nagin
1979   Does the Weapon Matter? Washington, D.C.: Institute for Law and Social Research.

Curtis, Lynn A.
1974   Criminal Violence. Lexington, Mass.: D. C. Heath.

Decision-Making Information, Inc.
1978   Attitudes of the American Electorate Toward Gun Control. Santa Ana, CA: DMI, Inc.

Deutsch, Stephen J., and Francis B. Alt
1977   "The effect of Massachusetts' gun control law on gun-related crimes in the city of Boston." Evaluation Quarterly 1 (March): 543–568.

DeZee, Matthew R.
1983   "Gun control legislation: Impact and ideology." Law and Policy Quarterly 5(3) (July): 367–379.

Flanagan, Timothy J., David J. van Alstyne, and Michael R. Gottfredson
1981   Sourcebook of Criminal Justice Statistics. Washington, D.C.: U.S. Government Printing Office.

Fleisher, B.
1966   The Economics of Delinquency. Chicago: Quadrangle Books.

Ceisel, Martin S., Richard Roll, and R. Stanton Wetick
1969   "The effectiveness of state and local regulation of handguns: A statistical analysis." Duke University Law Journal 4 (August): 647–676.

Hindelang, Michael, Michael Gottfredson, and James Garofalo
1978   Victims of Personal Crime: An Empirical Foundation for a Theory of Personal Victimization. Cambridge, MA: Ballinger.

Bibliography   241

Inciardi, James A. (ed.)
1981   The Drugs-Crime Connection. Beverly Hills, CA: Sage.

Jones, Edward D.
1981   "The District of Columbia's 'Firearms Control Regulations Act of 1975': The toughest handgun control law in the United States—Or is it?" Annals of the American Academy of Political and Social Science 455 (May): 138–149.

Kates, Don B.
1978   "Some remarks on the prohibition of handguns." St. Louis University Law Journal 23(11), 11–34.
1984   Firearms and Violence: Issues of Public Policy. Cambridge, MA: Ballinger.

Kleck, Gary
1983   "Policy lessons from recent gun control research." To appear in Law and Contemporary Problems.
1984a   "Handgun control only: A policy disaster in the making." In Firearms and Violence: Issues of Public Policy, ed. Don B. Kates. Cambridge, Mass.: Ballinger, pp. 167–199.
1984b   "The relationship between gun ownership levels and rates of violence in the United States." In Firearms and Violence: Issues and Public Policy, ed. Don B. Kates. Cambridge, Mass.: Ballinger, pp. 99–132.

Kleck, Gary, and David J. Bordua
1983   "The factual foundation for certain key assumptions of gun control." Law and Policy Quarterly 5:3 (July), pp. 271–298.
1984   "The assumptions of gun control." In Firearms and Violence: Issues of Public Policy, ed. Don B. Kates. Cambridge, Mass.: Ballinger, pp. 23–48.

Lizotte, Alan J., and David Bordua
1980   "Firearms ownership for sport and protection: Two divergent models." American Sociological Review 45(2) (April): 229–244.

Lizotte, Alan J., David Bordua, and Carolyn White
1981   "Firearms ownership for sport and protection: Two not so divergent models." American Sociological Review 46(4) (August): 499–503.

Loftin, Colin, and David McDowall
1981   "One with a gun gets you two': Mandatory sentencing and firearms violence in Detroit." The Annals of the American Academy of Political and Social Science 455 (May): 150–167.

Magadino, Joseph P., and Marshall H. Medoff
1984   "An empirical analysis of federal and state firearm control laws." In Firearms and Violence: Issues of Public Policy, ed. Don B. Kates. Cambridge, MA: Ballinger, pp. 225–258.

Marks, Alan, and C. Shannon Stokes
1976   "Socialization, firearms, and suicide." Social Problems 23(5) (June): 622–629.

Marquis, Kent H.
1981   Quality of Prisoner Self Reports: Arrest and Conviction Response Errors. Santa Monica, CA: The RAND Corporation.

Miller, Walter B.
1958   "Lower class culture as a generating milieu of gang delinquency." Journal of Social Issues 14: 5–19.

Moore, Mark
1981   "Keeping handguns from criminal offenders." The Annals of the American Academy of Political and Social Science 455 (May), 92–109.

Bibliography

Murray, Douglas
1975   "Handguns, gun control laws and firearms violence." *Social Problems* 23(1) (October): 81–93.

National Bureau of Standards
1977   LEAA Police Equipment Survey of 1972. Vol. VI: Body Armor and Confiscated Weapons. Washington, D.C.: U.S. Department of Commerce.

Newton, George D., and Franklin E. Zimring
1969   *Firearms and Violence in American Life.* Washington, D.C.: U.S. Government Printing Office.

Pierce, Glenn L., and William J. Bowers
1981   "The Bartley-Fox gun law's short term impact on crime in Boston." *The Annals of the American Academy of Political and Social Science* 455 (May): 120–137.

Rossi, Peter H.
1983   "On crime and criminal justice." Chancellor's Lecture: University of Massachusetts, Amherst.

Rossi, Peter H., Richard A. Berk, and Kenneth Lenihan
1980   *Money, Work, and Crime.* New York: Academic Press.

Suttles, Gerald
1968   *The Social Order of the Slum.* Chicago: University of Chicago Press.

Thrasher, Frederick M.
1927   *The Gang.* Chicago: University of Chicago Press.

Tonso, William R.
1982   *Gun and Society: The Social and Existential Roots of the American Attachment to Firearms.* Washington, D.C.: University Press of America.

Weber-Burdin, Eleanor, Peter Rossi, James Wright, and Kathleen Daly
1981   *Weapons Policies: A Survey of Police Department Practices Concerning Weapons and Related Issues.* Amherst, MA: Social and Demographic Research Institute (mimeo'd).

Wolfgang, Marvin
1980   *National Survey of Crime Severity.* University of Pennsylvania: Center for Studies in Criminology and Criminal Law.

Wright, James D.
1981   "Public opinion and gun control: A comparison of results from two recent national surveys." *The Annals of the American Academy of Political and Social Science* 455 (May): 24–39.

Wright, James D., and Peter H. Rossi
1985   *The Armed Criminal in America: A Survey of Incarcerated Felons.* Washington, D.C.: U.S. Government Printing Office.

Wright, James D., Peter H. Rossi, and Kathleen Daly
1983   *Under the Gun: Weapons, Crime, and Violence in America.* Hawthorne, N.Y.: Aldine.

Yeager, Matthew G., Joseph D. Alviani, and Nancy Loving
1976   *How Well Does the Handgun Protect You and Your Family?* Washington, D.C.: U.S. Conference of Mayors.

Zimring, Franklin E.
1968   "Is gun control likely to reduce violent killings?" *The University of Chicago Law Review* 35: 721–737.
1972   "The medium is the message: Firearm caliber as a determinant of death from assault." *Journal of Legal Studies* 1(1): 97–123.

Zimring, Franklin E., and G. Hawkins
1973   *Deterrence: The Legal Threat in Crime Control.* Chicago: University of Chicago Press.

## INDEX

A

Allen, John, 234, 235, 237
Alt, Francis B., 9
Alviani, Joseph D., 146
American Correctional Association, 32
*American Rifleman,* 141
Anderson, Andy B., 5, 143
Armed crime, ambiguous nature of, 59–60
"Armed criminals" typology, 12–13, 57–77
   definition of types, 59
   validation of, 59–77
Armed victims of crime, 141–159
   as a reason to carry guns, 15, 129–130
   as a risk to criminals, 142–144
   encounters with, by felons, 15, 154–158
   attitudes about, among felons, 144–154

B

Background characteristics, of the felon sample
   age, 39
   drug use, 50–54
   early experiences with guns, 43
   education, 39, 46–47
   employment, 46–49
   income, 46–49
   juvenile criminality, 49–50
   life cycle developments, 44–46
   marriage, family characteristics, 41–43
   race, 39
Balkin, Steven, 10
Bartley-Fox Amendment (Massachusetts), 9
BATF. See Bureau of Alcohol, Tobacco, and Firearms
Becker, Gary S., 5
Beha, James A., 9
Berk, Richard A., 33, 41
Bordua, David J., 6, 11, 116
Bowers, William J., 9
Brill, Steven, 8, 21, 161, 162, 170, 172, 173, 174, 193, 195, 196, 205–206
Bruce-Biggs, Barry, 225
Bureau of Alcohol, Tobacco, and Firearms (BATF), 161, 162, 178, 196–197, 206
Bureau of Justice Statistics, 142
Burr, D. E. S., 9, 10, 21, 182, 193, 195, 197

C

Caddell, Patrick, 211
Caetano, Donald F., 6
Cambridge Reports, Incorporated, 211
"Career criminals," 10

Chaiken, Jan M., 10, 22, 26, 52–53, 76
Chaiken, Marcia R., 10, 22, 26, 52–53, 76
"Chicago School." See Crime
Confiscation studies, 8–9, 10, 161–162, 173–174, 193–195
Conflict theory. See Crime
Cook, Philip, J., 3, 5, 10, 92, 125, 129, 142, 151, 189, 215
Conviction offenses of the sample, 13, 61–65
  by categories of the "armed criminals" typology, 13, 61–65
Crime
  as a social problem, 1, 2–4
  juvenile crime, 10, 49–50
  theories of, 5–7
  "Chicago School," 6
  conflict theories, 7
  deterrence theory, 6
  labeling theory, 7
  microeconomic theories, 5–6
  social control theories, 7
  victimization by, 2
  violent vs. nonviolent, 2
Criminal histories of the sample, 65–73
  assault, 66, 70
  burglary, 71
  by categories of the "armed criminals" typology, 65–73
  drug dealing, 71
  homicide, 72
  rape, 72
  robbery, 73
  theft, 73
Curtis, Lynn A., 142

D

Daly, Kathleen, 2, 4, 8, 9, 21, 33, 43, 82, 83, 85, 107, 111, 141, 142, 143, 161, 172, 175, 182, 197, 236

Data quality
  this survey, 32–38
  RAND survey, 32–33
Decision-Making Information, 211
Deterrence theory, 6; see also Crime
Deutsch, Stephen Jay, 9
DeZee, Matthew R., 9
Drug use, 50–54

F

Felon survey; see also Background characteristics
  data quality, 32–38
  field operations, 27
  limitations of, 22–23
  methods of, 21–32
  response rates, 28
  sample characteristics, 38–55
    comparison with U.S. state prison population, 38–41
    sampling, 23–26
    site selection, 23–27
Fleisher, B., 5

G

Garófalo, James, 142
Geisel, Martin S., 9
Gottfredson, Michael, 39, 142
Gun acquisitions among felons, 16–17, 181–191
  Burr's study, 182
  importance of informal market, 190–191
  informal transactions, 185–186
  methods of, by type of criminal, 186
  retail transactions, 184
  shoulder weapons, 189–190
  theft. See "Gun Theft"
  upon release from prison, 210–215
  use in crime as a motive for, 186–187

Gun carrying
  among felons, 13–14
  correlates of, 99–102
  frequency of, 98–99, 104–107
  importance of peer influences, 99–100
  methods of, 107–108
  motivations to carry among felons, 14–15, 125–139
  rationality of, 125–127
Gun Control Act of 1968, 8, 9, 17, 18, 181, 188, 189, 227
"Gun Culture," 111, 116
Gun Digest, 170
Gun firing, among felons, 85–86
Gun knowledge, among felons, 175–180
Gun laws
  evaluation studies of, 9–10
  felon knowledge about, 176–179
  responses of felons to changes in, 18, 209–223
  ban on all handguns, 220–221
  ban on SNS's, 219–220
  increased prices, 215–219
Gun ownership
  among adults in general, 4
  among associates of felons, 112–113
  among categories of "armed criminals" typology, 104–108
  among fathers of felons, 111–113
  among felons, 13–14, 79–86, 111
  compared with U.S. adults, 82–83
  as a defense against crime, 10–11
  effects of socialization on. See Socialization to firearms use
  types and characteristics of guns owned, 15–16, 169–175
Gun preferences of felons, 15–16, 161–175
  by type of criminal, 16, 166–167
Gun theft, 10, 16–18, 19, 193–207

as a reason for gun ownership, 137
characteristics of
  gun thefts, 205–206
  gun thieves, 197–198
  commerce in stolen guns, 202–205
  fraction of crime guns that are stolen guns, 17, 193–197
  fraction of gun thefts reported to police, 195, 197
  motives for, 199–202
  number of guns stolen (by this sample), 198–199
  relationship to drug abuse, 201, 203–204
  secondary market in, 196–197
Gun use among felons
  as function of gun ownership, 102–103
  as means of victim intimidation, 91–92
  in conviction offenses, 87–94
  in other offenses, 94–99
  on victims, 91–92

H

Harris, Anthony R., 5, 143
Hart, Peter, 142
Hawkins, G., 6
Hindelang, Michael, 142

I

Inter-University Consortium for Political and Social Research, 1

J

Jones, Edward D., 7, 9
Juvenile criminality, 49–50

K

Kates, Don B., 210
Kennesaw (Georgia), 7
Kleck, Gary, 11, 47, 82, 147, 210

**L**

Labeling theory. See Crime
Lenihan, Kenneth, 33, 41
Lizotte, Alan J., 6, 116
Loftin, Colin, 9
Loving, Nancy, 146

**M**

MacDonald, John, 10
McDowall, David, 9
Magaddino, Joseph P., 9
Marks, Alan, 6
Marquis, Kent H., 22, 32–33, 38
Medoff, Marshall H., 9
Microeconomics theories. See Crime
Miller, Joann, 5, 143
Miller, Walter B., 6
Moore, Mark, 10
Morton Grove (Illinois), 7
Motivations to own and carry guns,
    125–139
  by type of criminal, 135–136
  fear vs. efficiency as motive, 126–
    127
  measures of, 127–129
  rationality of, 125–127
  role of armed victim encounters,
    154–158
Murray, Douglas, 9

**N**

Nagin, Daniel, 125
National Bureau of Standards, 161
National Coalition to Ban Hand-
    guns, 7
National Institute of Justice, 1
National Rifle Association, 141
Newton, George D., 86

**O**

Omnibus Crime Control and Safe
    Streets Act, 181

**P**

Pierce, Glenn L., 9
Policy implications, 7–8, 18–20,
    225–238
  of criminal handgun preferences,
    232–233
  of data on weapons substitution,
    237–238
  of gun theft, 231–232
  of motives to own and carry guns,
    233–237
  of nature of the illicit gun market,
    229–231
Pryor, Richard, 130

**R**

Response rates, 28
Roll, Richard, 9
Rossi, Peter H., 1, 2, 4, 8, 9, 21, 33,
    41, 43, 82, 83, 85, 107, 111,
    141, 142, 143, 161, 172, 175,
    182, 197, 236

**S**

Saturday Night Specials (SNSs), 15,
    16, 210, 219–220, 232–233
  as "weapon of choice" among
    criminals, 161–169
  proportion among guns of crimi-
    nals, 172, 180
Sawed-off shotguns
  As a response to handgun con-
    trols, 220–223
  extent and frequency of, 220–223
Self-protection, as a motive to carry
    guns among felons, 14, 136–
    139
Sites of study
  characteristics of, 29–32
  choice of, 23–27
SNS. See Saturday Night Specials
"Snubbies," 16, 161

Social control theories. See Crime
Socialization to firearms use
  among criminals, 14, 43, 111–123
  among people in general, 6
  effects on felons' firearms behav-
    ior, 118–122
  importance of peers vs. family, 122
  measures of, 116–117
Sourcebook of Criminal Justice Sta-
    tistics, 39, 40
Stokes, C. Shannon, 6
Student survey, 112–114, 176–177
"Substitution issue," 10, 209–223
  theories of, 209–210
Suttles, Gerald, 6

**T**

Thrasher, Frederick M., 6
Tonso, William R., 2
"Total criminality," 73–77
Typology of "armed criminals," 12–
    13, 57–77

**V**

Victimization surveys, 8–9
Victims of crime, armed. See Armed
    victims of crime
"Violent predators," 10, 76–77
  comparison with handgun and
    shotgun predators, 76–77

**W**

Weber-Burdin, Eleanor, 33
Wettick, R. Stanton, 9
White, Carolyn, 116
Wolfgang, Marvin, 74
Wright, James D., 1, 2, 4, 8, 9, 21,
    33, 43, 82, 83, 85, 107, 111,
    141, 142, 143, 161, 172, 175,
    182, 197, 211, 236

**XYZ**

Yeager, Matthew G., 146
Zimring, Franklin E., 6, 86, 142, 209,
    210, 219

Criminology
Sociology
Psychology

# ARMED AND CONSIDERED DANGEROUS
## New Second Edition
## James D. Wright and Peter H. Rossi

With a new introduction by James D. Wright and Nicholas E. Libby

*Armed and Considered Dangerous* is a book about "bad guys" and their guns. But Wright and Rossi contend that for every suspected criminal who owns and abuses a firearm, a hundred or more average citizens own guns for sport, for recreation, for self-protection, and for other reasons generally regarded as appropriate or legitimate. *Armed and Considered Dangerous* is the most ambitious survey ever undertaken of criminal acquisition, possession, and use of guns.

There are vast differences between the average gun owner and the average gun-abusing felon, but the analyses reported here do not suggest any obvious way to translate these differences into gun control policies. Most policy implications drawn from the book are negative in character. When experts are asked, "Okay, then what will work?" they usually fall back on the old warhorses of poverty, the drug problem, or the inadequate resources of the criminal justice system, and otherwise have little to say. This is not a failure of social science. It simply asks more of the data than the data were ever intended to provide.

Several of Wright and Rossi's findings have become "coin of the realm" in the gun control debate, cited frequently by persons who have long since forgotten where the data came from or what their limitations are. Several other findings, including many that are important, have been largely ignored. Still other findings have been superseded by better and more recent data or rendered anachronistic by intervening events. With the inclusion of a new introduction detailing recent statistics and updated information this new edition of *Armed and Considered Dangerous* is a rich source of information for all interested in learning about weapon behavior and ownership in America.

### About the Authors

*James D. Wright* is professor of sociology at the University of Central Florida. His current research interests include violence, urban poverty and inequality, health and the homeless population, and the "divorce reform" movement.

*Peter H. Rossi* (1921-2006) was professor of sociology at the University of Massachusetts, Amherst, Director of the Social and Demographic Research Institute, and Past President of the American Sociological Association.

*Nicholas E. Libby* is managing editor of *Homicide Studies* and a PhD student in sociology at the University of Central Florida.



ISBN: 0-202-36242-6
EAN
9 780202 362427

ISBN: 978-0-202-36242-7

**AldineTransaction**
*A Division of Transaction Publishers*
**www.transactionpub.com**

Library of Congress: 2007046172
Printed in the U.S.A.
Cover design by Jaime Saranczak