| Method | Features | Comments |
|---|---|---|
| **Trigger Lock**  | Widely available, can effectively block trigger but does not prevent loading. | Caution: should never be used on a loaded gun because it can cause the gun to fire under certain circumstances; can't be used on lever-action firearms; keys and combinations must be kept away from children and other unauthorized persons. |
| **Cable Lock** | Widely available, can be used on most firearms, and can also be used to lock a gun to a solid object. | Be sure to install according to directions, not around trigger; keys, combinations must be kept away from children; cable can be cut. |
| **Lock Box (Mechanical & Electronic)** | Conceals and protects guns. | Provides secure storage for loaded or unloaded firearm, but in electronic models batteries will need replacement; depending on size, locked box can be stolen; keys and combinations must be kept away from children and other unauthorized persons. |
| **Gun Safes** | Most secure storage for multiple guns | Certain models are heavy, expensive; keys and combination must be kept away from children and other unauthorized persons. |
| **Disassembling** | Creates a condition where gun cannot be fired. | Not possible with all guns; requires knowledge of correct assembly and disassembly. |

procedures; don't
lose the parts.



**Project ChildSafe National Coordinator** • 203-
e-mail: **projectchildsafe@nssf.org**

National Shooting Sports Foundation, Inc
11 Mile Hill Road Newtown, CT 06470
203.426.1320 • FAX 203-426-1245

**EXHIBIT 4**

## Area police to distribute 700 gun-locks through Project ChildSafe

By Gary Mays, The Journal-Standard

FREEPORT -- Clyde Still - that's "Clyde like Bonnie and Still like whiskey" - stood in front of the Stephenson County Public Safety Building on Sunday afternoon, ready to make a delivery to Stephenson County Sheriff Dave Snyders.

And with the zeal of a tent-revival preacher, Still explained the importance of the 700 or so yellow and black gun locks he was delivering to the county, as Snyders busily stacked box after box of the simple but effective devices onto a wheeled cart.

It was the Albany, N.Y.-native's last stop of the day in the county, and the latest in a whirlwind tour of the Midwest in which he has spread his message of gun safety.

"A trigger-lock is better than nothing at all, but a cable lock is better than a trigger-lock," Still said, a fistful of gun-safety information in one hand and a plastic-wrapped gun lock in the other. "And a good gun safe is better than just about anything."

Still and his organization, Project ChildSafe, are betting the 698,000 cable gun locks they are distributing in Illinois will go a long way toward saving children's lives by preventing accidental gun deaths. Nationwide distribution of the gun locks is funded by a $50 million U.S. Dept. of Justice grant, enough to purchase up to 20 million of the devices.

The locks work when a gun owner threads the cable through a handgun or rifle, interfering with the weapon's action and rendering them inoperable. Each gun-lock comes with instructions for proper use and a set of two keys that fit into a padlock that secures the cable on both ends.

"I'll go all over the country before it is all over," said Still, whose truck is emblazoned with the Project ChildSafe logo and gun safety messages. "This is one of the most important things I will ever do."

In addition to the 700 locks that will be distributed by the Sheriff's Department, 200 will be available at Freeport Police headquarters. Another 200 will go to police in Lena and German Valley, said Snyders. Pearl City, Durand, Pecatonica, Warren, Stockton, Hanover, Polo and Jo Daviess County also are on the regional distribution list.

"This is timed pretty well," Snyders said, noting the delivery of the gun locks coincides with the advent of gun deer season, when hunters have their weapons out and visible to youngsters.

Snyders also received a stack of educational videotapes and a placard to place in the department's window, advertising the availability of the devices to area gun owners and hunters. Several models are available for different guns. Those interested in a free gun lock should contact their local police or sheriff's department.

Grim statistics illustrate the importance of securing guns, officials say. According to U.S. Centers for Disease Control data provided by kidsandguns.org, an online gun-safety group, an average of four children died every day from non-homicide firearm incidents from 1996 to 2001. During that same period, 1,530 children were killed in firearm accidents.

Guns are present in 40 percent of U.S. households with children. And in households with children and firearms, 40 percent had at least one unlocked firearm and 13 percent kept their unlocked firearm loaded or stored with ammunition, according to a 2001 RAND Corp. study.

That's why, according to Snyders, even antique guns on display or those kept out of children's reach need to be secured with a lock.

"Even though it is unloaded, it is your responsibility to make it safe," Snyders said. "You have got to lock them up."

But even Project ChildSafe acknowledges that no gun is ever totally secure. A warning inside the organization's brochure says, "This lock may be defeated by a determined individual using tools or other aggressive means and may not prevent intentional misuse of a firearm."

Copyright Â© 2003 The Journal-Standard
http://www.journalstandard.com/content/articles/2003/11/24/local_news/news32.jpg

**EXHIBIT 5**



**U.S. Department of Justice**
**Office of the Inspector General**
**Evaluation and Inspections Division**

# Inspections of Firearms Dealers by the Bureau of Alcohol, Tobacco, Firearms and Explosives

### Report Number I-2004-005

**July 2004**

# EXECUTIVE DIGEST

The Office of the Inspector General (OIG) assessed the effectiveness of the Bureau of Alcohol, Tobacco, Firearms and Explosives' (ATF) program for inspecting Federal Firearms Licensees (FFLs) to ensure that they are complying with federal firearms laws and regulations. We reviewed the frequency and quality of the ATF's different types of FFL inspections; how the ATF manages its Inspector resources; how the ATF selects FFLs for inspection; and the regulatory enforcement actions taken by the ATF against FFLs who violate federal firearms laws.

The Gun Control Act of 1968 (Act) established the ATF's FFL inspection program "for ensuring compliance with the record keeping requirements" of the Act.[1] ATF Inspectors conduct "application inspections" on applicants for FFLs and "compliance inspections" on existing license-holders. Application inspections are conducted to ensure that applicants are familiar with the Gun Control Act and other federal firearms laws.[2] Compliance inspections are conducted to ensure that FFLs are obeying these laws. Specifically, FFLs must account for all firearms that they have bought and sold, and report all multiple handgun sales and firearms thefts to the ATF. If the ATF finds violations, it is empowered to take adverse actions including issuing warning letters, directing FFLs to attend warning conferences, revoking the FFLs' licenses, and, potentially, referring the matter to ATF Special Agents for criminal enforcement. As of March 2004, the ATF had limited authority to suspend an FFL's license, and no authority to fine FFLs.

## RESULTS IN BRIEF

We found that the ATF's inspection program is not fully effective for ensuring that FFLs comply with federal firearms laws because inspections are infrequent and of inconsistent quality, and follow-up inspections and adverse actions have been sporadic. Specifically, the ATF does not conduct in-person inspections on all applicants before licensing them to sell guns, and ATF compliance inspections of active dealers, including large-scale retailers, are infrequent and vary in quality. Even when numerous or serious violations were found, the ATF did not uniformly take adverse actions, refer FFLs for investigation, or conduct timely follow-up inspections.

---

[1] The Gun Control Act of 1968, Public Law 90-618. Title 18 U.S.C. Chapter 44.

[2] The National Firearms Act, Title 26 U.S.C. Chapter 53; The Arms Export Control Act of 1976, Title 22 U.S.C. § 2778.

We also found wide variations in the ATF inspection program's productivity and implementation among the ATF Field Divisions that led us to conclude that inspection procedures should be streamlined and standardized. Although the ATF faces significant shortfalls in resources, it must ensure that available Inspector resources are used effectively and efficiently to ensure that FFLs comply with federal firearms laws. The ATF has begun to implement changes to improve the consistency with which it conducts follow-up inspections and takes adverse actions. However, our review concluded that the ATF still needs to implement consistent inspection procedures to identify and address problem FFLs.

## The ATF Does Not Conduct In-Person Application Inspections on All New FFLs to Verify Applicant Information and Ensure They Understand Firearms Laws

Application inspections are critical for ensuring compliance with federal firearms laws. These inspections enable the ATF to verify that applicants are eligible for federal firearms licenses and also provide the new dealers an opportunity to discuss issues related to firearms laws with ATF Inspectors. Further, if an FFL violates federal firearms laws after having received an application inspection, it is easier for the ATF to meet the legal standard of demonstrating that the violation was "willful."[3]

In fiscal year (FY) 2002, the ATF issued 7,977 licenses to new firearms businesses and 7,382 licenses to firearms collectors, and conducted 8,123 application inspections.[4] Upon examining the ATF's firearms license database, we found that most (95 percent) of the inspections were of businesses, not collectors, which indicated that the ATF inspected the preponderance of new firearms retailers in FY 2002. However, our interviews and survey of ATF Headquarters and Field Division personnel found that many of those application inspections consisted only of a telephone call rather than an in-person visit. ATF Headquarters and Field Division staff told us that telephonic application inspections were not as comprehensive as in-person inspections, but the ATF staff said that they did not have enough resources to conduct all

---

[3] In the context of the Gun Control Act, willfulness is the intentional disregard of, or indifference to, legal obligations. Repeat violations (especially where there was notification of prior violations) or large numbers of violations can demonstrate willfulness. Sometimes one egregious violation, such as selling a gun to a non-prohibited person when the FFL knows that the gun is actually for a prohibited person ("straw purchase"), can demonstrate willfulness.

[4] A collector's license enables individuals to make interstate sales and purchases of firearms classified by the ATF as curios and relics to facilitate a personal firearms collection. ATF officials told us that they do not place a high priority on inspecting new firearms collectors.

inspections in person. Subsequent to the initiation of this review, in an October 8, 2003, memorandum to ATF Field Divisions, the ATF Assistant Director for Firearms, Explosives, and Arson issued revised guidance for conducting application inspections. The memorandum stated that the ATF's goal is to inspect all new FFL applicants on-site to ensure that they understand federal firearms laws before issuing them a federal firearms license, beginning with applicants in 14 selected cities. Although the new guidance is a step in the right direction, the ATF still does not comprehensively inspect all new applicants in person.

## The ATF Does Not Regularly Conduct Compliance Inspections on Active FFLs, Including Large-Scale Retailers

We found that most FFLs are inspected infrequently or not at all. According to the former ATF Director, the agency's goal is to inspect each FFL at least once every three years to ensure that they are complying with federal firearms laws. However, due in part to resource shortfalls, the ATF is currently unable to achieve that goal. ATF workload data show that the ATF conducted 4,581 FFL compliance inspections in FY 2002, or about 4.5 percent of the approximately 104,000 FFLs nationwide. At that rate, it would take the ATF more than 22 years to inspect all FFLs.

Our review of the inspection history for 100 randomly selected FFLs also showed that the ATF did not conduct regular compliance inspections. Of the 100 FFLs, 23 had never been inspected; 22 had received only an application inspection; 29 had received at least one compliance inspection; and 26 FFLs had received only a license renewal inspection. Even for those FFLs that had been inspected, the records showed that many of the inspections occurred years ago. For example, one FFL cited in 1985 for selling a rifle to a minor and for numerous record-keeping violations had never been re-inspected.

## The ATF Does Not Identify and Inspect All FFLs that Exhibit Established Indicators of Potential Violations or Gun Trafficking

"Crime gun" trace data enables the ATF to identify FFLs that may be violating federal firearms laws or FFLs at which firearms trafficking may be occurring.[5] Although the ATF focuses its inspections on those FFLs that exhibit most severely the established indicators of trafficking

---

[5] The ATF defines a "crime gun" as any firearm that is "illegally possessed, used in a crime, or suspected by law enforcement officials" of having been used during the commission of a crime. The ATF National Tracing Center traces crime guns recovered by law enforcement agencies to determine where they were originally sold by an FFL.

U.S. Department of Justice                                                    iii
Office of the Inspector General
Evaluation and Inspections Division

(e.g., sales of many handguns to one person), it does not identify all FFLs that exhibit those indicators. Instead, the ATF manipulates the criteria it uses to target FFLs for inspections so that it only identifies as many such FFLs as it has the resources to inspect. Therefore, the ATF has not applied its established indicators of potential trafficking to objectively identify the full universe of potential traffickers.

In December 2003, the ATF began a special project to identify common characteristics of FFLs that pose a greater risk to public safety, so that the general level of compliance within the industry can be estimated and that compliance inspections can be better directed at those FFLs where it is most likely that violations may have occurred. Nonetheless, until the ATF objectively identifies the full universe of FFLs that exhibit established trafficking characteristics, it cannot identify the resources it needs to effectively address FFLs that are likely to be committing violations, or accurately report to the Attorney General, Congress, and the public on the scope of the potential trafficking problem at FFLs.

## Implementation of FFL Inspections by Field Divisions Is Inconsistent

The conduct of FFL inspections varied greatly among the ATF Field Divisions. The average time that each of the 23 ATF Field Divisions spent conducting each application inspection in FY 2002 ranged from 6.2 hours per inspection to as much as 25.5 hours per inspection. The average time spent to conduct each compliance inspection ranged from 24.5 hours to as much as 90 hours per inspection. ATF Headquarters officials stated that the variance in average inspection times among the 23 Field Divisions occurred because of the discretion that Inspectors have in conducting compliance inspections and because some Field Divisions had more inexperienced Inspectors on staff, which reduced productivity.

We reviewed the ATF's guidance for inspections and found that it does allow Inspectors great latitude to modify significant portions of the inspections. For example:

- To determine whether an FFL's record-keeping system is accurate, ATF Inspectors may either conduct a full inventory during a compliance inspection or sample the FFL's inventory. The ATF inventory worksheet used during inspections provides no guidance to ensure that a minimum valid sample is taken.

- The ATF worksheet for examining sales records does not specify how many records to review. Our interviews with Inspectors in Field Divisions found varying approaches. For example, in the Miami Field Division, Inspectors said that they reviewed six months of records, while Inspectors at the Seattle Field Division said that they examined the records for one year. The Inspectors also examined the records differently. Of the 18 Inspectors we interviewed, 14 said that they only examine the forms to see if they were properly filled out, while 4 indicated that they also look for indications that a purchaser may be part of a firearms trafficking ring or acting as a straw purchaser for someone else.

We also examined the numbers of inexperienced Inspectors on staff and compared the percentage of inexperienced staff to the average inspection times for each Field Division, but we found no correlation. Rather, our review of application inspection data found that average inspection times were related to disparities in staffing levels and the number of FFLs located in the Divisions. Field Division Inspector staff ranged from a high of 35 Inspectors to a low of 9 Inspectors. Likewise, the number of FFLs in each Field Division ranged from 1,172 to 8,194. However, the ATF had not distributed its Inspector resources among the Field Divisions to match the distribution of FFLs, resulting in significant workload imbalances. As a result, the average time that each Field Division spent on application inspections decreased as the number of FFLs per available Inspector increased.

We also examined several performance indicators to see if the inspection variations had an impact on outcomes, such as violations found and criminal referrals. We found little correlation between the amount of time that Field Divisions spent inspecting and the number of adverse actions (such as revoking an FFL's license) that the Field Divisions took or the number of times the Field Divisions identified and referred suspected criminal activity for investigation. We also found significant variances in productivity among the ATF Field Divisions' inspections. For example, our analysis of the ATF's FY 2002 workload and performance data found:

- The number of inspections conducted per Inspector each year ranged from 12.7 (Miami Field Division) to 46.5 (Kansas City Field Division).

- The percentage of the inspections conducted by Field Divisions that identified violations varied from just 4.5 percent (Kansas City Field Division) to 41.5 percent (Dallas Field Division).

U.S. Department of Justice                                                                              v
Office of the Inspector General
Evaluation and Inspections Division

- On compliance inspections in which violations were discovered, the average number of violation instances found ranged from 15.9 (Nashville Field Division) to 178.2 (Chicago Field Division).

- The average time that the Field Divisions took to find each violation instance ranged from 47 minutes per violation instance (Dallas Field Division) to over 7 hours per violation instance (Los Angeles Field Division).

Our review of FFL inspection files also found that even when FFL compliance inspections identify significant violations of federal firearms laws by the FFLs or by gun purchasers, these violations are not always reported to ATF Special Agents for investigation. We identified several cases in which indications of potential criminal violations, including gun trafficking, were identified but not referred for investigation. The FFLs were subsequently investigated after the illegal activity was discovered through other means. For example, one FFL was inspected in October 2002, and during that compliance inspection the Inspector found 40 firearms not entered into the FFL's inventory records, missing sales records, and sales to out-of-state residents – all strong indicators of gun trafficking. However, the Inspector did not report the findings through ATF management channels to ATF Special Agents for investigation. Subsequent to the inspection, information from a confidential informant led to an investigation, and in December 2003, ATF Special Agents arrested the dealer for firearms trafficking.

## The ATF Acts Infrequently to Revoke Federal Firearms Licenses, and the Process is Not Timely

In FY 2002, 1,934 of the inspections that the ATF conducted uncovered violations. Inspectors found an average of almost 70 violations on each of these 1,934 inspections. In FY 2003, the ATF found violations on 1,812 inspections, with an average of over 80 violations each. However, the ATF issued only 30 Notices of Revocation in FY 2002 and 54 Notices of Revocation in FY 2003. In addition to initiating few revocation actions, the process for revoking the licenses of FFLs that violated federal firearms laws, or clearing the FFL, is lengthy.[6] The ATF provided us with case-tracking data for 50 closed denial and revocation cases completed in FY 2001 and FY 2002. We determined that the

---

[6] Notices of Revocation are not final. Of the 30 Notices in FY 2002, 25 FFLs requested a hearing and 3 of those avoided revocation. (FY 2003 data was unavailable.) The ATF also can effectively revoke an FFL's license by denying his or her request for license renewal, and in FY 2001, the ATF denied 28 requests for renewal.

U.S. Department of Justice        vi
Office of the Inspector General
Evaluation and Inspections Division

processing of these 50 cases averaged 379 days from the date that the Inspector recommended revocation to the date that the case was closed.

According to ATF officials, the lengthy duration of revocation proceedings was due to the number of ATF officials involved in the eight-step process (e.g., Area Supervisors, Directors of Industry Operations (DIOs), Division Counsels, and Hearing Officers) and delayed support from ATF lawyers. The ATF's case tracking data did not include internal tracking dates, but Assistant Chief Counsels and Division Counsels we interviewed acknowledged delays in denial and revocation proceedings. They stated that the delays were due, in part, to their heavy caseloads and a need for better documentation of violations from ATF Inspectors. We also noted that, in some cases, delays occurred due to a lack of legal staff within the Field Division. Some Field Divisions without staff lawyers were required to obtain support directly from their regional Assistant Chief Counsel's Office.[7]

In May 2003, subsequent to the initiation of our review, the ATF issued guidelines to ensure more consistent and timely initiation and processing of adverse actions. We found that, after the ATF issued the guidelines, the number of FFL revocation hearings rose from 25 in FY 2002 to 87 in FY 2003. The ATF also denied FFL requests to renew their licenses or issued Notices of Revocation 59 times during the first quarter of FY 2004. Most of these cases had yet to be finalized as of March 2004.

The May 2003 guidelines begin to address the problems that we noted with the ATF's past failure to consistently follow up and take action when violations are found. Specifically, the policy directs that all FFLs that were issued warning letters or that were directed to attend warning conferences must be scheduled for a follow-up "recall" inspection in the following year, and that adverse actions are to escalate for repeat offenses. The policy also establishes a time frame for part of the adverse action process by directing Field Divisions to act on recommendations for adverse action within 90 days after receiving the inspection report.

---

[7] The ATF has five Assistant Chief Counsel Offices, located in San Francisco, Chicago, Dallas, Atlanta, and New York/Philadelphia. The northeast regional office is currently operating in Philadelphia due to the September 11, 2001, destruction of the ATF's New York offices, which were located at the World Trade Center.

## FFL Inspections Must Be Streamlined and Standardized

With the May 2003 guidelines, the ATF began to improve the consistency and timeliness of adverse actions (including warning letters, warning conferences, and revocation), but the ATF needs to further improve the consistency and quality of FFL inspections. The current variability in the Field Divisions' inspection implementation must be addressed to ensure that FFLs subject to adverse actions are treated consistently. Requiring specific adverse actions for specific numbers of violations in the absence of standardized inspection procedures and sampling criteria will result in dissimilar treatment of FFLs in different Field Divisions. As discussed previously, the ATF's guidance on conducting inspections does not ensure consistent examinations of FFLs' compliance with gun laws.

Areas in which the inspection process could be improved include: standardizing procedures to require reviews of firearms inventories and sales records to establish a statistically valid sample needed to verify the effectiveness of the FFL's inventory management and record-keeping systems; standardizing and automating inspections paperwork and providing laptop computers to enable Inspectors to prepare reports on-site; extending the inspection cycle for FFLs with no significant violations so that limited resources can be directed toward noncompliant dealers; and establishing guidance to ensure that Inspectors consistently identify and report indications of firearms trafficking for investigation.

Improving the efficiency of the inspection process through standardization also could reduce the need for additional staff and the time spent at FFLs. In an April 2003 report to Congress, the former ATF Director stated that to fully implement the ATF's mission to enforce federal firearms laws, the ATF would need 1,235 Inspectors dedicated to conducting FFL inspections.[8] That projection appears to include an assumed 27 percent increase in the average length of inspections over the historical average of 49.4 hours that we identified.[9] If the staffing requirement was calculated using the ATF's actual historical inspection average of about 50 hours, the ATF would need a total of only 984 Inspectors to accomplish firearms inspections on a triennial basis. Moreover, rather than increasing inspection times, our analysis shows

---

[8] On March 24, 2004, the current Acting ATF Director reiterated the report's figures in testimony before the House Committee on Appropriations, Subcommittee on Commerce, Justice, and State, the Judiciary, and Related Agencies.

[9] This average includes both application and compliance inspections, as well as all other time (e.g., leave, training, etc.) that must be considered when projecting staffing needs.

---

that implementing a streamlined yet statistically valid inspection regimen could reduce the average inspection time and the ATF could therefore reduce the number of additional Inspectors needed to accomplish FFL compliance inspections every three years. For example, by reducing the average inspection time to 40 hours, the ATF would reduce the number of Inspectors needed to conduct FFL compliance inspections on a triennial basis from 1,235 to 788 Inspectors.

Increasing the efficiency of the inspection process also is needed because the demand on ATF Inspectors to perform duties related to explosives is increasing. In November 2002, the Safe Explosives Act imposed new requirements that increased the number of explosives licensees and directed the ATF to conduct on-site inspections of explosives licensees at least once every three years. The additional explosives workload already has reduced the ATF's ability to inspect FFLs. Our review of inspections data for the first five months of FY 2004 found a precipitous decrease in the number of compliance inspections. From October 2003 through February 2004, the ATF completed just 1,113 FFL compliance inspections. At that pace, the ATF would complete fewer than 2,700 FFL compliance inspections during FY 2004 – less than half the number that the agency reported that it completed in FY 2003 and less than 2.6 percent of the FFL population.

## The ATF Does Not Consistently Report Inspection Performance

In response to our requests for inspections and workload data, the ATF queried its N-Spect, Federal Licensing System (FLS), and Standard Time and Attendance System (STATS) electronic databases.[10] During our examination of the performance and productivity of the ATF's FFL inspections program, we identified significant discrepancies between the systems with regard to the number and type of inspections conducted and the hours spent conducting the inspections. Further, we found that data contained in the N-Spect database contained significant errors. For example, while preparing responses to our data requests, ATF officials determined that several hundred inspections entered as compliance inspections were actually application inspections. In addition, the data in the systems differed significantly from the data the ATF included in published reports. We discussed these inconsistencies with ATF Headquarters officials, and they gave two reasons for the inconsistencies. They stated that there were differences in how the queries of the N-Spect electronic database were constructed by different ATF analysts, and that

---

[10] N-Spect tracks direct time related to FFL inspections, FLS tracks information related to FFL licensees, and the STATS timekeeping system tracks direct and indirect hours for payroll purposes.

Field Division staff did not use the correct project codes because the codes are "confusing."

To improve the future tracking of inspection data, in October 2003 the ATF implemented a new version of N-Spect that requires Field Division staff to use pull-down menus that are inspection-specific (e.g., "Application Inspection"). Although the enhancements to the N-Spect database will increase the reliability of the data in the system, the ATF must nonetheless adopt a standard approach for querying the N-Spect electronic database to ensure that requests for the same data will elicit comparable results. If the ATF does not adopt a standard method for querying and extracting historical data, it cannot consistently report accurate performance data.

## New Restriction on Retention of Gun Purchaser Data Will Reduce the ATF's Ability to Detect Fraudulent Background Checks

Prior to selling a gun, an FFL must determine if the potential purchaser is prohibited from owning a gun by querying the Federal Bureau of Investigation's (FBI) National Instant Criminal Background Check System (NICS) directly through the FBI or through a designated state agency. For each query, the FBI's NICS currently retains for 90 days whether or not the sale was approved and information on the purchaser. However, beginning in July 2004 all purchaser information on NICS queries that do not result in a denial will no longer be kept for 90 days, but will be destroyed within 24 hours of the official NICS response to the FFL.[11] To comply with this requirement, the FBI has stated that it intends to expunge purchaser information for approved sales from NICS records overnight. For these approved sales, the FBI will retain for 90 days only the NICS Transaction Number (NTN), the license number of the FFL that contacted NICS, and the date that the NICS query was made. After 90 days, the FBI will retain only the NTN and the date that the number was issued.

For most FFLs, NICS is a valuable tool that enables them to quickly determine whether a potential customer is prohibited from buying firearms. However, a small number of corrupt gun dealers may attempt to hide transfers to prohibited persons by falsifying NICS information, such as by listing the prohibited buyer on the sales record but calling in to the FBI the name of a person with a clean record.

---

[11] The Fiscal Year 2004 Consolidated Appropriations Bill (Public Law 108-199) states that the Department of Justice cannot retain "identifying information" related to sales of firearms to non-prohibited persons for more than 24 hours. However, all information related to calls for which potential sales are *denied* by NICS will be retained indefinitely.

U.S. Department of Justice                                          x
Office of the Inspector General
Evaluation and Inspections Division

Currently, the ATF rechecks recent sales records with NICS to verify the information that the FFLs submitted. The ATF reported that it has not found any NICS violations involving the falsification of purchaser information through these reviews, but officials said the checks serve as a deterrent. However, the reduced retention period for approved purchaser and FFL information will limit the ATF's ability to detect certain fraudulent NICS checks through FFL inspections, since the ATF will no longer be able to verify the information that the dealers submitted by rechecking sales records at the FFL.

## CONCLUSIONS

Our review found the ATF's FFL inspection program is too limited and inconsistent to ensure that FFLs comply with federal firearms laws. In FY 2002, the ATF inspected only 4.5 percent of the approximately 104,000 FFLs to ensure they were complying with federal firearms laws. Although we recognize that the ATF's resources are limited, we concluded that the ATF's lack of standardized inspection procedures results in inconsistent inspections of FFLs and significant variation in the implementation of the inspection program by Field Divisions. The most recent performance data available show that ATF's Field Divisions took from 24.5 hours to as much as 90 hours per compliance inspection. Further, we found little or no correlation between longer inspection times and outcomes such as criminal referrals and adverse actions taken. We concluded that the ATF needs a more standardized and efficient inspection regimen.

Because the ATF does not conduct regular inspections of all FFLs, it cannot effectively monitor the overall level of FFL compliance with federal firearms laws. In December 2003, the ATF directed Field Divisions to conduct Random Sample Compliance Inspections. Using data from those inspections, the ATF planned to "be able to project the overall level of compliance by" gun dealers, pawnbrokers, and collectors.[12] While the project to estimate the overall level of compliance with laws is needed to assess the challenge facing the ATF, it cannot take the place of regular compliance inspections for deterring and identifying noncompliance with gun laws.

To ensure that all FFLs are treated consistently, and that the FFL inspection program is as efficient as possible to maximize the number of inspections conducted annually, a national ATF policy should require

---

[12] Memorandum, Assistant Director for Firearms, Explosives, and Arson to All Special Agents In Charge, December 8, 2003. ATF officials told us that the memorandum was not distributed to the Field Divisions until January 2004.

U.S. Department of Justice                                                                 xi
Office of the Inspector General
Evaluation and Inspections Division

that inspections be conducted in a uniform manner, that inspections procedures are limited to the steps needed to accomplish a valid review, and that violations are processed in a uniform and appropriate manner. A consistent and timely inspection process is essential for identifying and addressing scofflaw dealers and for reducing the availability of illegal firearms to criminals.

## RECOMMENDATIONS

We recommend that the ATF:

1. Develop a standard, streamlined inspection process that includes in-person inspections of all FFL applicants; more efficient inventory and records reviews; automated inspection reporting; and consistent examination of indicators of firearms trafficking.

2. Conduct a pilot project to test the streamlined inspection procedures and establish appropriate time standards for conducting these inspections.

3. Revise the staffing requirement report using the time standards to reflect the number of Inspectors needed to conduct compliance inspections on a triennial basis, or on an alternative schedule based on the FFL's compliance history.

4. Develop alternatives for better aligning Inspector resources with the distribution of FFLs, such as by redrawing Field Division boundaries, realigning personnel, or other methods.

5. Update the inspection tracking system to accurately segregate and report on Inspector time spent preparing for inspections, in travel, on-site at FFLs, and conducting other administrative duties.

6. Prepare quarterly reports on the productivity and results achieved by each Field Division.

7. Direct the National Licensing Center to develop an adverse action tracking system to monitor the progress and timeliness of FFL denials and revocations from the time an Inspector makes a recommendation until the proceedings are finalized.

8. Continue coordinating with the Department of Justice, Office of Legislative Affairs, to gain the authority to suspend or impose civil penalties on FFLs that violate federal firearms laws.

9. To improve the comprehensiveness of crime gun tracing by law enforcement agencies:

   a. Coordinate with the Office of Justice Programs to determine the feasibility of using discretionary grant funding to support crime gun tracing.

   b. Develop a model for more accurately identifying potential firearms trafficking through the analysis of an FFL's firearms sales volume and the number of firearms traced to the FFL.

# TABLE OF CONTENTS

**Background** ............................................................. 1

**Purpose, Scope and Methodology** ..................................... 14

**Results of the Review** ................................................ 17

The ATF Does Not Conduct In-Person Application Inspections on
All New FFLs .......................................................... 17

The ATF Does Not Regularly Conduct Compliance Inspections
on Active FFLs, Including Large-Scale Retailers ...................... 20

ATF Does Not Identify and Inspect All FFLs That Exhibited Indicators
of Potential Violations or Gun Trafficking ........................... 23

Gun Tracing Has Significant Shortcomings That Limit Its Use for
Identifying FFLs That Should Be Inspected ............................ 24

ATF's Field Divisions Implement FFL Inspections Inconsistently ........ 28

Suspected Criminal Violations Are Not Always Referred
for Investigation .................................................... 37

ATF Acts Infrequently to Revoke Federal Firearms Licenses
and the Process is Not Timely ........................................ 39

New ATF Guidelines Begins to Address Inconsistent and
Untimely Adverse Actions ............................................. 43

By Streamlining and Standardizing Inspections, the ATF Could
Dramatically Improve the FFL Inspection Program ...................... 45

ATF Does Not Consistently Report Inspection Performance .............. 49

New Restriction on Retention of Gun Purchaser Data Will Hinder
the ATF's Ability to Detect Fraudulent Background Checks ............. 51

**Conclusions** ......................................................... 54

**Recommendations** ..................................................... 56

U.S. Department of Justice
Office of the Inspector General
Evaluation and Inspections Division

**Appendix I:  ATF Form 4473** ............................................................... 58

**Appendix II:  Area Supervisor Survey** ............................................... 60

**Appendix III:  ATF Comments on the Draft Report**......................... 66

**Appendix IV: OIG Analysis of the ATF's Comments**................. ....... 85

# BACKGROUND

The Bureau of Alcohol, Tobacco, Firearms and Explosives (ATF) enforces federal firearms laws and regulations, including issuing licenses and overseeing Federal Firearms Licensees (FFLs) and most explosives licensees and permittees. The ATF enforces federal firearms laws, in part, by conducting regulatory inspections of FFLs. These inspections examine whether FFLs are keeping proper records and are taking proper steps to avoid selling firearms to prohibited persons (see inset).

## FFL Licensing and Operational Requirements

To obtain a license for making or selling firearms, applicants must be at least 21 years old and not prohibited from possessing firearms. Applicants are required to notify the chief officer of their local law enforcement agency (LEA) that they intend to apply for a license, and must submit a photograph and a full set of fingerprints with their applications, as well as a statement certifying that their business is in compliance with all state and local laws (including zoning laws). Application examiners at the ATF National Licensing Center (NLC) in Atlanta, Georgia, determine the eligibility of applicants for Federal Firearms Licenses.[13] Fees for federal firearms dealer licenses are $200 for the first three years and $90 for each three-year renewal period.

> **Individuals Prohibited From Purchasing Firearms**
>
> Individuals prohibited by federal law from possessing a firearm include anyone who:
> 1. has been convicted of a crime punishable by more than one year in prison;
> 2. is a fugitive from justice;
> 3. unlawfully uses controlled substances;
> 4. has been adjudicated as mentally defective;
> 5. is an illegal alien, or an alien admitted to the United States under a nonimmigrant visa;
> 6. has been dishonorably discharged from the Armed Forces;
> 7. has renounced his or her American citizenship;
> 8. is a subject of a court order that restrains the person from harassing, stalking, or threatening an intimate partner; or
> 9. has been convicted of a misdemeanor crime of domestic violence.
>
> Individuals under indictment for a crime punishable by more than one year of prison are prohibited from receiving a firearm, but may lawfully possess a firearm they obtained before being indicted.
>
> Source: Title 18 U.S.C. Chapter 44

---

[13] The NLC maintains the Federal Licensing System (FLS) database and is the official repository of firearms and explosives inspection reports. Certain information from inspection reports is captured in the FLS, including dates of inspections and past regulatory enforcement actions taken against FFLs. The NLC also oversees the ATF's Hearing Officer program for conducting adverse action hearings involving FFLs.

---

U.S. Department of Justice
Office of the Inspector General
Evaluation and Inspections Division

As of December 2003, there were approximately 104,300 FFLs in the United States, including approximately 65,700 retailers.[14]

Each year, FFLs conduct more than 8.5 million firearms sales.[15] To reduce the availability of firearms to criminals, FFLs are required to verify that potential customers are not prohibited from possessing a firearm and to verify that customers are residents of the state in which the FFL is located. FFLs must verify the identity of potential customers by examining a government-issued identification document, such as a driver's license, and have the customer complete a Form 4473, Firearms Transaction Record, which captures data related to the purchaser and firearm(s) purchased (see Appendix I). The FFLs also contact the Federal Bureau of Investigation (FBI) or a statewide LEA to request that the National Instant Criminal Background Check System (NICS) be queried to confirm that the potential customers are not prohibited from purchasing firearms.[16] Most NICS queries result in an immediate response to the FFL regarding purchaser eligibility. In cases where an immediate response is not given, FFLs are allowed to complete the transaction after three business days if NICS is unable to complete the check within that time. If the purchaser is later determined to be prohibited from possessing a gun, the ATF seeks to remove the gun from the purchaser's possession.[17]

Federal law requires that FFLs maintain completed Forms 4473, as well as a log of all firearms that they have acquired and sold, known as an Acquisition and Disposition Book (A&D Book). The A&D Book must

---

[14] Firearms retailers are issued either Type 1 (storefront retailer) or Type 2 (pawnshop) federal firearms licenses. Other types of FFLs include manufacturers and importers of firearms or ammunition, ammunition dealers, and collectors of curios or relics. Largely as a result of increases in license fees and the ATF's requirement that all FFLs comply with state and local zoning laws, the FFL population has decreased from a high of more than 286,000 in March 2000.

[15] "Federal Bureau of Investigation National Instant Criminal Background Check System 2001/2002 Operational Report," FBI Publication, May 2003.

[16] The Brady Handgun Violence Prevention Act, Public Law 103-159, Title 18 U.S.C. § 922(s). The NICS, operated by the FBI, was created to facilitate the required background checks. FFLs can also query NICS via the Internet, through the FBI's NICS E-Check system.

[17] ATF Special Agents attempt to remove the firearm from the prohibited person's possession by informing the purchaser of his or her "prohibited status" and offering options for them to surrender the firearm. Options include returning the firearm to the FFL that sold it, transferring the firearm to a non-prohibited third party, or surrendering the firearm to an LEA.

---

contain information including a description of the firearm, the name and address of the person from whom the firearm was acquired and, once sold, the name and address of the purchaser and the date the gun was sold.[18] FFLs also are required to report sales of multiple handguns to the same purchaser.[19] Combined, these record-keeping requirements are intended to deter the illegal transfer of firearms to prohibited persons.

The records kept by FFLs also enable the ATF to trace firearms recovered by LEAs to learn when those firearms were purchased and by whom. According to the ATF, less than 5 percent of firearms are used in violent crimes by the person who originally purchased the gun from an FFL. Guns used in violent crime are generally acquired through a secondary market of traffickers and "straw purchasers" (individuals that buy firearms for prohibited individuals).[20] Nonetheless, tracing is a significant investigative tool because it can provide investigators leads to the subsequent purchaser(s) of the firearm.

### The ATF's FFL Inspection Program

The ATF's FFL inspection program uses a cadre of Inspectors to verify that FFLs are complying with federal firearms laws and that tracing data provided by FFLs are accurate and timely. The Inspectors do not have the authority to arrest individuals, do not carry firearms, and do not conduct criminal or undercover investigations. Before the enactment of the Homeland Security Act of 2002, the ATF had 567 Inspectors.[21] As directed by the Homeland Security Act, in February 2003 the tax and regulatory responsibilities of the ATF were split, and most regulatory functions were transferred from the Department of the

---

[18] If a firearm is obtained from another FFL, the FFL receiving the firearm can enter the other licensee's FFL number instead of the name and address of the previous owner. Sales must be recorded in the A&D Book within seven days from the time the Form 4473 is completed.

[19] According to Title 18 U.S.C. § 923(g), an FFL must submit a "Report of Multiple Sale or Other Disposition of Pistols and Revolvers," to the ATF if an individual purchases more than one handgun within a period of five consecutive business days.

[20] An unlicensed individual may sell a firearm to an unlicensed resident of his or her State, if the buyer is not prohibited by law from receiving or possessing a firearm, or to a licensee in any State (Title 18 U.S.C. § 922).

[21] Testimony of ATF Director Bradley Buckles to the Senate Committee on the Judiciary, June 11, 2002.

---

Treasury to the Department of Justice.[22]  The new title of the agency within the Department of Justice became the Bureau of Alcohol, Tobacco, Firearms and Explosives.  As of August 2003, the ATF had 498 Inspectors.  Of the 498 Inspectors, approximately 420 were assigned to Industry Operations groups located throughout the ATF's 23 Field Divisions.  The remaining Inspectors were assigned to the ATF Headquarters and various management positions.

A typical ATF Field Division structure included a Special Agent In Charge to oversee the operations of the office, a Director of Industry Operations (DIO), and two or three Area Offices, which were managed by an Area Supervisor.  Most Field Divisions also had at least one Senior Operations Inspector to assist with large-scale FFL inspections (Figure 1).



**Figure 1: Field Division Organization Chart**

Source:  ATF Field Operations Directorate.

To implement the FFL inspection program, ATF Inspectors conduct four different types of inspections:

- *Application inspections* verify that an applicant for a federal firearms license is eligible for a license and agrees to follow federal laws related to buying and selling firearms.  These inspections may be conducted either over the telephone or in-person.  The Inspectors interview the individual applying for the license and,

---

[22]  The Act created the Alcohol and Tobacco Tax and Trade Bureau (TTB) within the Department of the Treasury to administer and enforce existing federal laws and tax code provisions related to alcohol and tobacco products.  According to the ATF, about 60 Inspectors and 19 attorneys accepted positions at the TTB.  As a result of a Memorandum of Agreement between the ATF and the TTB, an additional 40 Inspectors were detailed from the ATF to the TTB for seven months, from March through September 2003.

during in-person inspections, also interview store employees. According to ATF Headquarters officials, the ATF focuses on conducting application inspections on new businesses and generally does not inspect new collectors. [23]

- *Compliance inspections* examine whether an FFL is complying with federal firearms laws, including ensuring that Forms 4473 (Firearms Transaction Record) and A&D Books are maintained accurately. Except in very limited circumstances, the ATF is prohibited by law from inspecting an FFL more than once a year.[24]

- *Renewal inspections* verify the accuracy of renewal application information and determine if an FFL's license should be renewed. The ATF categorizes all renewal inspections as compliance inspections for performance measurement purposes, although they are generally less rigorous than other compliance inspections.

- *Limited purpose inspections* are narrowly scoped inspections conducted for a specific purpose. For example, an Inspector may visit a store to review and approve an FFL's new inventory software or to examine Forms 4473 for a particular firearm used in a crime. The ATF categorizes all limited purpose inspections as compliance inspections for performance measurement purposes.

According to the ATF's published reports and draft reports provided to the OIG, Inspectors conducted 5,497 application inspections during fiscal year FY 2001, 7,229 application inspections in FY 2002, and 8,422 application inspections in FY 2003. The ATF has also reported that Inspectors conducted 5,016 compliance inspections in FY 2001, 5,802 compliance inspections in FY 2002, and 6,481 compliance inspections in FY 2003 (Figure 2). [25]

---

[23] A collector's license enables individuals to make interstate sales and purchases of firearms classified by the ATF as curios and relics to facilitate a personal firearms collection.

[24] Firearms Owners Protection Act of 1986, Public Law 99-308, Title 18 U.S.C. Chapter 44.

[25] As described in the results section of this report, inspection data in the ATF's inspection tracking database do not support these published numbers. According to the inspections database, ATF Inspectors conducted 5,729 application inspections and 4,035 compliance inspections in FY 2001; 8,123 application inspections and (cont.)

U.S. Department of Justice          5
Office of the Inspector General
Evaluation and Inspections Division



Source: *Firearms in Commerce in the United States 2001/2002, ATF 2003 Performance and Accountability Report,* ATF Firearms Programs Division.

## The ATF's Regulatory Enforcement Actions

When the ATF finds that an FFL has violated the Gun Control Act or its implementing regulations, it may take one of several actions.[26]  For minor infractions (<u>e.g.</u>, missing ZIP code on a Form 4473), the FFL may be given a Report of Violations, which notifies the FFL of violations that should be corrected.  For more serious infractions, the FFL may be sent a

4,581 compliance inspections in FY 2002; and 8,043 application inspections and 5,887 compliance inspections in FY 2003, rather than the previously reported totals.

[26]  In the context of the Gun Control Act, willfulness is the intentional disregard of, or plain indifference to, legal obligations (Title 18 U.S.C. § 924).  It can be demonstrated through repeat violations (especially where there was notification of prior violations) or large numbers of violations.  Sometimes one egregious violation, such as a straw sale to a prohibited person, can demonstrate willfulness (ATF B 5370.1 p.2).

warning letter, or it may be directed to attend a warning conference. At a warning conference, an FFL is notified that it must correct its practices or lose its license. For severe or repeat violations deemed willful, the ATF may revoke or deny renewal of the FFL's license.

The revocation process begins when an ATF Inspector recommends revocation because of severe or repeated violations. If the Area Supervisor approves the Inspector's recommendation, the inspection report and supporting documentation are submitted to the DIO. After consulting with the Division Counsel, the DIO can issue an Initial Notice of Revocation. If an Initial Notice of Revocation is issued, the FFL has 15 days to appeal the proposed revocation and request a hearing. Revocation hearings are conducted in the field by ATF Inspectors who are specially trained to act as Hearing Officers. As of September 1, 2003, 23 Inspectors served as Hearing Officers as a collateral duty to their regular tasks and 11 additional Inspectors had completed training to become Hearing Officers. Hearing Officers are assigned from Field Divisions other than the Divisions proposing the revocation. At the hearing, the Hearing Officer examines the facts and hears testimony from the ATF and the FFL. After the hearing, the Hearing Officer prepares a report of findings and recommendations for the DIO.

> **FFL Education Efforts**
>
> In addition to regulatory enforcement, the ATF educates FFLs and others on federal firearms laws through seminars and programs. In FY 2002, the ATF conducted 183 "commodity seminars" for FFLs, LEAs, and the public. At many of these seminars, the ATF supplied FFLs with the "Don't Lie For the Other Guy" packet prepared by the National Shooting Sports Foundation. The packet includes a poster, pamphlet, and a videotape to help FFLs identify firearms traffickers. As of October 2003, approximately 23,000 FFLs had received the packet.

After receiving the Hearing Officer's report, the DIO can allow the FFL to retain his license, or issue a Final Notice of Revocation. If a Final Notice of Revocation is issued, the FFL has 60 days to appeal the revocation to U.S. District Court. If the FFL appeals, the ATF routinely submits a Motion for Summary Judgment asking the Court to uphold the agency's determination.

In FY 2002, Inspectors conducted 25 revocation hearings. Of those, 22 resulted in the revocation of the FFL's license. The number of revocation hearings increased to 87 during FY 2003.[27]

Other than issuing warning letters, holding warning conferences, and revoking licenses, the ATF has few enforcement options. As of

---

[27] As of March 1, 2004, most of these cases were still pending.

March 2004, the ATF had very limited authority to impose fines and suspend an FFL's license.[28] This limited authority can occur only under a specific circumstance where an FFL failed to conduct a NICS check and, had the check been conducted, it would have discovered that the customer was a prohibited person. As an alternative to revoking licenses, as of March 2004 the ATF's General Counsel was seeking, through the Department of Justice Office of Legislative Affairs, the authority to suspend or fine FFLs who violate firearms laws.

## The ATF Firearms Tracing Program

In 1994, the ATF consolidated its tracing activities at the National Tracing Center (NTC) in Falling Waters, West Virginia. The NTC traces the purchase histories of "crime guns" recovered by federal, state, local, and international LEAs.[29] The ATF defines a "crime gun" as any firearm that is "illegally possessed, used in a crime, or suspected by law enforcement officials" of having been used during the commission of a crime. Crime gun tracing data can identify potential firearms trafficking and unlawful business practices by FFLs. The ATF has the following tracing-based indicators of firearms trafficking:

- Short Time-to-Crime. The recovery of a crime gun within 2 to 3 years after its initial purchase is considered a short time-to-crime and a significant trafficking indicator. According to the ATF, about one-third of crime guns were recovered within 3 years of their first retail purchase. The short time from retail sale to use in a crime "suggests illegal diversion or criminal intent associated with the retail purchase from the FFL."[30]

- Multiple Sales of Handguns. According to the ATF, 20 percent of all handguns traced in 2000 had been originally purchased as part of a multiple handgun sale. FFLs are required to report multiple handgun sales to the NTC.

---

[28] Title 18 U.S.C. § 922 states "the Attorney General may, after notice and opportunity for a hearing, suspend for not more than 6 months or revoke any license issued to the licensee under Section 923, and may impose on the licensee a civil fine of not more than $5,000."

[29] International trace requests are received directly from foreign law enforcement agencies via fax or through electronic transmission from ATF Country Attaché offices in Colombia, Mexico, and Canada. From January 1, 2003, to March 31, 2003, NTC traced 8,108 firearms for foreign governments.

[30] "Crime Gun Trace Reports (2000)," ATF, July 2002.

In requesting a trace of a crime gun, an LEA supplies the ATF with information including the make, model, serial number, and other identifying characteristics of the gun and the circumstances of its recovery.[31] Using that information, an ATF analyst contacts the manufacturer of the firearm to determine which FFL purchased the gun. The analyst then contacts the FFL identified by the manufacturer to obtain information on the retail purchaser from the appropriate Form 4473 and A&D Book entry. FFLs are required by law to respond to firearms trace requests from the ATF within 24 hours.[32] According to the NTC Director, the NTC performed 232,272 firearms traces in FY 2001, 240,651 firearms traces in FY 2002, and 280,947 firearms traces in FY 2003.[33] The NTC defines a successful trace as one in which the initial retail purchaser of the crime gun is identified. According to the NTC Director, 50 to 60 percent of traces requested in FY 2003 succeeded.

Trace data can be categorized to identify those guns that are most often used in crime. For example, in 2000 the Smith & Wesson .38 caliber revolver was the most frequently traced firearm recovered by LEAs.[34] Using trace information, the NTC offers several analytical products to LEAs, such as:

- statistical analyses to identify indicators of firearms trafficking;

- data on potential violations of regulations, such as unreported multiple sales of handguns, stolen firearms, and firearms with obliterated serial numbers; and

---

[31] Each firearm made in or imported to the United States must possess a serial number "which may not be readily removed, obliterated, or altered" and must be unique to each firearms manufacturer or importer.

[32] Title 18 U.S.C. § 923(g)(7).

[33] The Youth Crime Gun Interdiction Initiative (YCGII) program, currently operating in 60 cities, is the ATF's major initiative to encourage LEAs to trace recovered firearms. The program has been successful at increasing the number of firearms trace requests submitted to the ATF by LEAs participating in the program. To join the YCGII program, LEAs must sign a Memorandum of Understanding (MOU) with the ATF in which the LEAs agree to make comprehensive firearms tracing a "primary goal and objective" of their agencies. The ATF funds FFL inspections in these cities through YCGII appropriations.

[34] "Crime Gun Trace Reports (2000)," ATF, July 2002.

---

- data on firearms transaction records received from FFLs that have ceased business operations.[35]

Demand Letter Programs. Because some FFLs either ignored trace data requests or were unable to provide NTC analysts with purchaser information from Forms 4473 and their A&D Books, the ATF initiated the Demand Letter I Program in February 2000. The Demand Letter I Program covers FFLs deemed "Uncooperative" by NTC officials because they failed to provide the ATF with purchaser information. FFLs deemed "Uncooperative" are required to submit all Forms 4473 for the previous three years and to continue to submit these Forms on a monthly basis until the ATF determines that they are cooperating. Forty-one FFLs were originally placed in this category. As of April 2004, no FFLs were designated as uncooperative.

Also in February 2000, the ATF initiated the Demand Letter II Program to address FFLs with frequent short time-to-crime traces. The Demand Letter II Program requires FFLs with 15 or more traces of guns within 3 years of initial purchase to submit information quarterly on previously owned firearms acquired from non-FFLs. Originally, 430 FFLs were placed in this category.[36] As of April 2004, 271 FFLs were in this category. The actual "Demand Letter" sent to FFLs states that if the FFLs do not respond to the NTC's requests for firearms tracing information, the FFLs' licenses could be revoked. The NTC forwards lists of FFLs subjected to either Demand Letter program to ATF Field Divisions on an annual basis.

Firearms Trafficking Analysis. The ATF's Crime Gun Analysis Branch (CGAB), co-located with the NTC in West Virginia, analyzes data from crime gun traces, multiple sales, and firearms thefts, and provides firearms trafficking analysis to Inspectors, Special Agents, and LEAs. The CGAB uses crime gun data maintained by the NTC to focus on specific U.S. geographic areas in which firearms trace patterns indicate firearms trafficking.[37] For example, CGAB analyzes tracing data to determine the geographic areas where crime guns were recovered, a

---

[35] By law, FFLs are required to provide their firearms transaction records to NTC when they go out of business (Title 18 U.S.C. § 923(g)(4)). The NTC is the only federal repository for this data.

[36] Originally, FFLs with ten or more short time-to-crime traces were included in this category.

[37] The CGAB is a unit of the Intelligence Programs Division, which is under the Office of Strategic Intelligence and Information.

process known as geo-mapping. This information is shared with LEAs, to enable them to better focus their law enforcement activities.

The CGAB also develops numerous statistical and informational products. For example, "master queries" of all crime guns traced nationwide (grouped by county) can be used to identify FFLs that should be inspected. The "NTC Weekly Queries of FTS Data," disseminated to all users of the CGAB's electronic database, shows "firearms trafficking indicators," such as firearms purchased as part of a multiple sale. The CGAB also develops investigative leads that are researched and forwarded to the appropriate ATF Field Division, and it provides information and support to promote the tracing of all recovered crime guns by LEAs across the United States. Finally, the CGAB monitors and forwards to ATF agents information on theft reports, firearms traces, and multiple sale transactions from FFLs that are under investigation.

In FY 2002, CGAB provided firearms tracing data for 1,639 FFLs and completed 46 geo-mapping projects for ATF Field Divisions (see Figure 3 on page 13). The CGAB also researched and forwarded 138 referrals to ATF Field Divisions for potential investigations based on accumulated firearms tracing data, and was given authority over ATF's program to "raise" obliterated serial numbers on recovered firearms.[38]

Regional Crime Gun Centers. In 1996, the ATF began to establish Regional Crime Gun Centers (RCGC) in cities in which gun violence presented a significant public risk and high amounts of crime guns were recovered. Before the establishment of the RCGCs, the NTC's ability to provide crime gun analysis for these areas and the rest of the country was, according to the NTC Director, "limited" compared to the micro-analysis conducted at RCGCs. The NTC now oversees RCGCs in Chicago, Los Angeles, New York, and Washington, D.C.[39] The RCGCs are organizationally part of the local ATF Field Division and serve as a liaison and local analysis unit for crime gun tracing for local LEAs.

Disclaimer on the use of firearms tracing data: Section 630 of the Fiscal Year 2004 Consolidated Appropriations Act mandates that the ATF and all federal government agencies which use trace data in a report clearly state the shortcomings of trace data, as follows:

---

[38] "CGAB Performance Indicators," FY 2002.

[39] We visited RCGCs in Chicago and Los Angeles during our fieldwork. At a third field site, in Miami, ATF personnel told us that the Miami Field Division is establishing a "gun intelligence center" similar to a RCGC.

---

Firearm traces are designed to assist law enforcement authorities in conducting investigations by tracking the sale and possession of specific firearms. Law enforcement agencies may request firearms traces for any reason, and those reasons are not necessarily reported to the federal government. Not all firearms used in crime are traced and not all firearms traced are used in crime. Firearms selected for tracing are not chosen for purposes of determining which types, makes or models of firearms are used for illicit purposes. The firearms selected do not constitute a random sample and should not be considered representative of the larger universe of all firearms used by criminals, or any subset of that universe. Firearms are normally traced to the first retail seller, and sources reported for firearms traced do not necessarily represent the sources or methods by which firearms in general are acquired for use in crime.

**Figure 3: Sample ATF Gun Recovery Geo-Map**



Source: ATF Southern California Regional Crime Gun Center.

## PURPOSE, SCOPE, AND METHODOLOGY

### Purpose

The Office of the Inspector General (OIG) conducted this review to assess the effectiveness of the ATF's program for inspecting FFLs and to examine how this program assists in enforcing federal firearms laws.

### Scope

The scope of this review included examining histories for firearms retailers categorized either as Type 1 or Type 2 dealers. We did not review inspection histories of FFLs issued other license types, such as those issued licenses for producing or importing firearms and ammunition, or collectors of curios or relics. We also reviewed inspection histories for FFLs whose licenses were revoked or are in the process of being revoked. Inspection histories included application information, inspection worksheets, and Inspector reports, as well as reports and memoranda related to any regulatory action taken by the ATF against the FFL. However, we reviewed the impact of all license types on inspection activities, including workload and inspection outcomes.

The ATF provided us with access to the two electronic information systems containing licensee information, inspection information, and reports – the Federal Licensing System (FLS) and N-Spect. To assist in our assessment of how ATF officials target which FFLs to inspect, the ATF also provided us with access to two electronic information systems containing information on firearms tracing – the Firearms Tracing System (FTS), and Online LEAD.

### Methodology

Interviews. We conducted in-person and telephone interviews with personnel from ATF Headquarters, ATF Field Divisions, United States Attorneys' Offices, law enforcement agencies (LEAs), firearms retailers, and advocacy groups. Specifically, we interviewed individuals from ATF's Firearms, Explosives and Arson Directorate, Field Operations Directorate; Office of Inspections; Office of the Chief Counsel; and National Tracing Center. We spoke with Assistant United States Attorneys (AUSAs) assigned to prosecute firearms-related offenses and to Project Safe Neighborhood Coordinators, who are the AUSAs who coordinate most firearms-related prosecutions. We spoke with law enforcement officials assigned to firearms-related cases, and to those

U.S. Department of Justice                                    14
Office of the Inspector General
Evaluation and Inspections Division

responsible for submitting crime gun trace requests. We spoke with a statistician who has worked with National Tracing Center data. We also interviewed a California Department of Justice official responsible for overseeing that state's firearms licensee inspections program.[40]

We spoke with three firearms retailers; representatives from Taurus International, a firearms manufacturer; and a representative from the National Association of Firearms Retailers. We also interviewed officials from two advocacy groups – the National Rifle Association and the Brady Center to Prevent Gun Violence.

Field Site Visits. As part of our fieldwork, we interviewed personnel and reviewed FFL inspection files at four of the ATF's 23 Field Division offices – Miami, Chicago, Los Angeles, and Seattle.[41] We chose these sites based on their geographic location, size, local crime trends, and distribution of firearms inspection work. While at these locations, we also interviewed local law enforcement officials and AUSAs to discuss criminal prosecutions of FFLs and related issues. We reviewed 100 randomly selected inspection files to determine when the FFL was issued a license to sell firearms, the frequency of ATF inspections, the extent and intensity of those inspections, violations detected during those inspections, and actions by ATF against the FFL.[42] We also reviewed FFL files for which the ATF revoked or was in the process of revoking the FFL's license. We also observed one FFL compliance inspection.

Data. We relied on ATF electronic databases for information on FFLs, inspections, Inspector work hours, and firearms tracing data, but we noted discrepancies in the data, as detailed in the results section of this report. After discussing the data discrepancies with ATF Headquarters officials, we concluded that the N-Spect data were the most accurate information for examining the numbers of inspections conducted and the direct work hours expended for compliance and applications inspections. However, the Standard Time and Attendance System (STATS) database was the only data source available that included all staff time. We therefore used this database to analyze

---

[40] California, which issues its own state firearms licenses, is one of the few states with its own licensee inspection program.

[41] We also visited the Field Division in Washington, D.C., to test our methodology and data collection instruments.

[42] We used Microsoft Excel to generate random numbers associated with FFL numbers for the Field Divisions we visited. We used FLS to generate these FFL numbers based on our inspection criteria.

staffing requirements.[43]  We also examined the N-Spect data to
determine whether the variances affected our findings and confirmed
that the variances in inspection productivity and implementation
remained regardless of which data run we used.  We used FLS to
determine FFL licensing histories and N-Spect to analyze Inspector
assignments and reports.  We used information from the STATS and
N-Spect to examine Inspector workload.  We used FTS to determine trace
histories of firearms sold by FFLs, and Online LEAD to review potential
firearms trafficking patterns.

We also collected and analyzed prosecution data from the
Executive Office for United States Attorneys; ATF budget requests from
FY 2002 through FY 2005; internal ATF memoranda; ATF annual and
periodic reports; transcripts of congressional testimony by ATF officials;
judicial decisions; General Accounting Office reports on NICS; a
Congressional Research Service report on the potential of terrorist access
to firearms; a University of California, Los Angeles, study; and
Department of the Treasury Office of the Inspector General reports on the
ATF's FFL and explosives inspection programs.  Finally, we reviewed the
laws and regulations applicable to the ATF's oversight of FFLs.

<u>Area Supervisor Survey</u>.  We conducted an e-mail survey of Area
Supervisors – those ATF personnel who assign FFL inspections and
approve inspection reports – to determine their views on ATF's FFL
inspection program, "crime gun" tracing, and Inspector resources (see
Appendix II).  Forty-five of 50 Area Supervisors replied by e-mail or fax, a
response rate of 90 percent.

---

[43] We also used the STATS data for examining staffing needs, since that was the
data that the ATF relied on to prepare the *Inspector Staffing Requirements for the Bureau
of Alcohol, Tobacco, Firearms and Explosives* report for the Justice Management Division
and Congress.

## RESULTS OF THE REVIEW

The ATF's FFL inspection program is not as effective as it should be for ensuring public safety by quickly identifying and revoking the licenses of FFLs that violate federal firearms laws. The ATF does not inspect all applicants in person before licensing them to become firearms dealers, compliance inspections of FFLs (including large-scale retailers) were infrequent, and we found wide variations in productivity and program implementation among the ATF's Field Divisions. Moreover, the ATF does not identify and conduct compliance inspections on all FFLs that exhibit indicators of gun trafficking. Finally, even when numerous or serious violations were found, the ATF did not consistently take adverse actions, refer FFLs for investigation, or conduct timely follow-up inspections. We concluded that the ATF should streamline and standardize its FFL inspection procedures to improve the effectiveness of the FFL inspection program for ensuring that FFLs comply with federal firearms laws.

## The ATF Does Not Conduct In-Person Application Inspections on All New FFLs to Verify Applicant Information and Ensure That They Understand Firearms Laws

According to ATF Field Operations Directorate officials, application inspections are critical for ensuring compliance with federal firearms laws.[44] Application inspections not only enable the ATF to better ensure that the applicant is eligible for a federal firearms license, but also provide the new dealer an opportunity to ask ATF Inspectors questions and discuss with them issues related to firearms laws. Further, the ATF officials said that if an FFL violates federal firearms laws after having received an application inspection, it is easier for the ATF to meet the legal standard of demonstrating that the violations were "willful" in order to take adverse action.

---

[44] When an individual applies for a license to become a firearms dealer, the ATF has 60 days after the completed application is received by the NLC to either issue a license or deny the application (Title 18 U.S.C. § 923(d)(2)).

According to the ATF's N-Spect database, which tracks inspections activity, the ATF conducted 8,123 application inspections in fiscal year (FY) 2002. According to the ATF's FLS database, which tracks all firearms licenses issued by the NLC, there were 15,359 newly licensed FFLs in FY 2002.[45] Of that number, 7,977 were licenses issued for firearms businesses and 7,382 were issued to firearms collectors. By examining the "inspection date" field included in the FLS record for each FFL, we found that most (95 percent) of the FFLs that were inspected were businesses, not collectors.[46] Therefore, the data available to us indicates that in FY 2002 the ATF inspected the preponderance of new firearms retailers.

However, our interviews and survey of ATF Headquarters and Field Division personnel found that many of those application inspections consisted only of a telephone call rather than an in-person visit. Ten of the 45 Area Supervisors we surveyed (22 percent) said that, because of limited Inspector resources, they directed Inspectors to perform at least some application inspections by telephone. One Area Supervisor stated that he assigned telephone application inspections because some applicants were located as far as 400 miles from his Area Office. He said that, in those cases, he tries to schedule an in-person compliance inspection for the following year, but cannot guarantee that it will occur.

ATF Headquarters officials, DIOs, Area Supervisors, and Inspectors told us that application inspections conducted by telephone are not as comprehensive as in-person inspections. For example, one important action Inspectors take during in-person inspections is to interview individuals who will work for the FFL. When application inspections are conducted by telephone, the Inspectors do not routinely interview store employees.

Subsequent to the initiation of this review, in an October 8, 2003, memorandum to ATF Field Divisions, the ATF Assistant Director for Firearms, Explosives, and Arson issued new guidance on application inspections. The new guidance stated that the ATF's goal is to inspect all

---

[45] This includes all FFLs, including holders of the Type 3 collector license. A collector's license enables individuals to make interstate sales and purchases of firearms classified by the ATF as curios and relics to facilitate a personal firearms collection. ATF officials told us that they do not place a high priority on inspecting new firearms collectors.

[46] The inspection date field was blank in 70 percent of the records, because no inspection was done, the inspection report had not been forwarded by the Field Division, or the report information had not been entered by the NLC. However, of the 4,722 records that had inspection dates, 4,493 (95 percent) were businesses.

new FFL applicants to ensure that they understand federal firearms laws before issuing them a federal firearms license. The memorandum established as an initial milestone that "Inspectors should ensure that <u>all new applicants</u> receive onsite inspections" at 14 select cities (emphasis in original).[47]

After receiving a draft of this report, the ATF attempted to more precisely determine the number of inspections conducted by telephone. Although in 2002 the N-Spect system did not capture the method by which an inspection was conducted, ATF's Field Management Staff attempted to estimate the number of application inspections conducted by telephone by querying the database to identify application inspections with words such as "telephone" or "phone" in a "Special Instructions" data field. The results of that query indicated that about 4 percent of application inspection records had such remarks. However, because there was no direction to the field to ensure consistent entry of inspection methods, and because words such as "telephone" could be entered for reasons other than to specify the inspection method, we found these results unreliable.

Although the new goal established in the October 8, 2003, memorandum is a step in the right direction, the ATF still does not comprehensively inspect all new applicants in person. Therefore, it cannot verify the accuracy of the information that each applicant provided to the NLC to become an FFL. Further, foregoing an in-person inspection means that the applicants' opportunity to ask questions of ATF Inspectors is limited. While FFLs should understand and follow the law, ATF personnel said that if an FFL fails to comply with federal firearms laws, the lack of an application inspection makes it harder for the ATF to meet the legal standard of proving that the violation was "willful" in order to take adverse action.

---

[47] After receiving a draft of this report, the ATF attempted to more precisely determine the number of inspections conducted by telephone. Although in 2002 the N-Spect system did not capture the method by which an inspection was conducted, ATF's Field Management Staff attempted to estimate the number of application inspections conducted by telephone by querying the database to identify application inspections with words such as "telephone" or "phone" in a "Special Instructions" data field. The results of that query indicated that about 4 percent of application inspection records had such remarks. However, because there was no direction to the field to ensure consistent entry of inspection methods, and because words such as "telephone" could be entered for reasons other than to specify the inspection method, we found these results unreliable.

**The ATF Does Not Regularly Conduct Compliance Inspections on Active FFLs, Including Large-Scale Retailers**

According to the ATF Director, for the ATF to ensure compliance with federal firearms laws, FFLs should receive a compliance inspection at least once every three years. However, the ATF is currently unable to even begin to meet that goal. We found that most FFLs are inspected infrequently or not at all. ATF workload data show that the ATF conducted 4,581 FFL compliance inspections in FY 2002, or about 4.5 percent of the approximately 104,000 FFLs nationwide.[48] At that rate, it would take the ATF more than 22 years to inspect all FFLs.

We reviewed inspection history files for a sample of 100 FFLs that had been in business for an average of 11.2 years, and verified that they did not receive regular compliance inspections (Figure 4).[49] Specifically:

- In 23 cases, the records showed that the ATF had never conducted a full compliance, application, or renewal inspection on the FFL.[50] On average, the FFLs that had never been inspected had been selling firearms for 8.6 years.

- In 22 cases, the ATF had conducted an application inspection, but had conducted no further inspections of the FFL. On average, these FFLs had been selling firearms for 5.1 years.

- In 29 cases, the ATF had conducted at least one compliance inspection on the FFL. Among those 29 cases were 9 cases in which the ATF conducted additional follow-up compliance inspections, including 2 in which the ATF later conducted a third compliance inspection. These compliance inspections occurred, on average, about once every 9.2 years. On average, the FFLs had been selling firearms for 14.8 years.

- In 26 cases, the ATF had never conducted a compliance inspection at the FFL, but had conducted at least one renewal

---

[48] For the purposes of our review, we relied upon FY 2002 data for ATF Inspector workload activities.

[49] Due to limitations in the NLC database of FFL information, we could only determine dates for when the ATF issued a federal firearms license for 87 of the FFLs in our sample. The "average time in business" was calculated using these FFLs' records.

[50] At some of these FFLs, limited purpose inspections had been conducted, but no full compliance, application, or renewal inspections were conducted.

inspection. These renewal inspections occurred, on average, about once every 6.9 years. On average, these FFLs had been selling firearms for 15.1 years.



**Figure 4: FFL Inspection File Review Analysis**

- ☒ No record of inspection
- ■ Application inspection only
- ☐ At least one compliance inspection
- ☐ At least one renewal inspection, but no compliance inspection

Source: ATF inspection history files

Large-scale retailers sell a higher volume of guns than small dealers. Despite the potential for large numbers of improper sales, we found that large-scale retailers also are not inspected on a routine basis. Our sample showed that the ATF conducted compliance inspections on large-scale national and regional chain retailers such as Wal-Mart, Sports Authority, or Big 5 (a sporting goods chain with 293 stores throughout 10 western states) with about the same infrequency as small dealers. The five Area Supervisors we interviewed told us that they avoid selecting large FFLs for compliance inspections because the large volume of records makes the inspections more difficult and time-consuming.

The nine large-scale retailers in our sample were inspected about once every 9.9 years, versus once every 9.2 years for the overall sample.[51]

Further, we found that the 9 large-scale retailers included in our sample were only slightly more likely to have been subjected to a compliance inspection than the average FFL, with 33 percent (3 of 9) having received at least one compliance inspection, versus 29 percent of FFLs overall.[52]  Of the nine large-scale retailers we reviewed:

- One had not been inspected since receiving its license in 1985.

- Four had received only an application inspection.

- One had received a renewal inspection in 1995, the first since receiving a firearms license in 1973, and had not been inspected since 1995.

- Three had received at least one compliance inspection, including:

  o A sporting goods retailer that was last inspected in 1986. According to the inspection report on the 1986 limited purpose inspection the Inspector spent only four hours at the store, a very short amount of time for an inspection.

  o A retailer cited in 1977 for selling ammunition to a minor and for having inventory discrepancies.  In 1985, during the FFL's next inspection, the FFL was cited for selling a rifle to a minor and for numerous Form 4473 violations.  The FFL had not been inspected since 1985.

  o A retailer cited in 2000 for at least one unreported multiple handgun sale and, on seven occasions, not certifying the residency of aliens who purchased firearms.  No follow-up inspection had been done.

---

[51] Other FFLs in our sample that received compliance inspections included gun shops, pawnshops, gunsmiths, movie industry members, and small-scale FFLs operating out of their homes.

[52] We concluded that more large-scale retailers had been inspected at least once despite having less frequent inspections because they averaged a longer time in business than other retailers in our sample.

Because the ATF does not conduct regular inspections of FFLs, the ATF cannot effectively monitor the overall level of FFL compliance with federal firearms laws and regulations. In December 2003, the ATF initiated a program to conduct special Random Sample Compliance Inspections to develop a risk model for the FFL inspection program. Using data from those inspections, the ATF planned to "be able to project the overall level of compliance by" gun dealers, pawnbrokers, and collectors.[53] While the project to estimate the overall level of compliance with laws is needed to identify the challenges facing the ATF, it cannot take the place of regular compliance inspections for deterring and identifying noncompliance with gun laws.

## The ATF Does Not Identify and Inspect All FFLs That Exhibited Indicators of Potential Violations or Gun Trafficking

The ATF has not identified all FFLs that exhibit characteristics of violations or firearms trafficking in order to properly manage its range of enforcement activities, as well as to inform the Attorney General, Congress, and the public of the scope of the potential trafficking problem at FFLs. Gun dealers are selected for compliance inspections either by ATF Headquarters (under the Focused Inspection, Demand Letter, or other programs) or by the 23 ATF Field Divisions. Under the Focused Inspection Program, the ATF Firearms Programs Division selects FFLs for mandatory compliance inspections by the Field Divisions. The Chief of the Firearms Program Division told us that the ATF and the NTC generally applied two principal criteria to select the FFLs: data on sales practices by FFLs, such as volume and multiple handgun sales; and time-to-crime for guns traced to that FFL.[54] In FY 2002, ATF Headquarters assigned Focused Inspections on about 350 FFLs, or about 16 per Field Division.

Although the ATF's criteria for selecting FFLs for Focused Inspections targeted those FFLs that most significantly exhibited the established indicators of trafficking (i.e., multiple sales and short time-to-crime), the ATF did not identify or inspect all FFLs that exhibited

---

[53] Memorandum, Assistant Director for Firearms, Explosives, and Arson, to All Special Agents In Charge, December 8, 2003. ATF officials told us that the memorandum was distributed to the Field Divisions in January 2004.

[54] In October 2003, the ATF established new criteria for selecting FFLs for future Focused Inspections: 1) FFLs sent a Demand Letter in FY 2002 or FY 2003; 2) FFLs in cities with a high crime rate and multiple sales meeting certain criteria during calendar years 2001 and 2002; 3) FFLs in high-crime cities that have not been inspected in the previous 10 years; and 4) FFLs that have had a firearm traced to them within the first year of the issuance of their license.

U.S. Department of Justice                                              23
Office of the Inspector General
Evaluation and Inspections Division

indicators of trafficking. Instead, the NTC Director told us that the ATF established a numerical goal for Focused Inspections based on the resources available, and then changed the criteria to limit the number of FFLs identified to that number (350 in FY 2002). Therefore, the number of FFLs that exhibited indicators of trafficking and therefore should have been inspected was more than the 350 identified.

## Gun Tracing Has Significant Shortcomings That Limit Its Use For Identifying FFLs That Should Be Inspected

Our review found that the crime gun trace data relied upon by the ATF to target inspections has significant limitations that reduce its effectiveness for identifying FFLs likely to be involved in firearms trafficking. Along with other information, firearms trace data can assist the ATF in identifying those FFLs that may be violating federal firearms laws and should be inspected. Although a trace does not in itself prove that an FFL is involved in gun trafficking, a high number of short time-to-crime sales and other patterns can indicate that an inspection is warranted. In FYs 2001, 2002, and 2003, LEAs submitted an average of a quarter million trace requests to the ATF each year. Table 1 shows the trace requests submitted by the 60 YCGII cities and other LEAs.

| Table 1: Trace Requests Submitted to the ATF | | | |
|---|---|---|---|
| Fiscal Year | Total Firearms Trace Requests | Non-YCGII trace requests | YCGII trace requests |
| 2001 | 232,272 | 133,962  (58%) | 98,310  (42%) |
| 2002 | 240,651 | 144,300  (60%) | 96,351  (40%) |
| 2003 | 280,947 | *(not available)* | *(not available)* |

Source:  National Tracing Center

As an indicator of whether the ATF overall used that data to direct its resources at FFLs that should be inspected, we examined whether the Field Divisions that had more gun traces in FY 2001 conducted more compliance inspections in FY 2002. The ATF was unable to provide data on traces *to* FFLs in each Field Division, but was able to provide us with the number of traces *submitted* by LEAs in each Field Division. ATF data shows that the preponderance of crime guns are recovered in the same geographic area in which they were originally sold by an FFL. Therefore, although we recognized limitations in the data, we expected that, if trace data were being used to target inspections at those FFLs that exhibited indicators of firearms trafficking, then higher numbers of trace requests would lead to more inspections in a Field Division. However, we found

little correlation between the number of traces and the number of compliance inspections conducted the next year (Figure 5). This result indicated that the ATF overall did not focus its resources to conduct more inspections in those Field Divisions that had more crime guns traced.



**Figure 5: Comparison of Trace Requests to Inspections**

Note: The ATF could not disaggregate trace data for the Miami and Tampa Field Divisions.

Source: National Tracing Center and Firearms Programs Division Data

    Although the ATF does not appear to be systematically conducting more inspections in Field Divisions with more gun traces, the Field Divisions may still use tracing data to select FFLs for those inspections that are not directed by Headquarters. For example, Area Supervisors, who determine FFL inspection assignments for their Area Offices, told us that they use trace data such as time-to-crime of two years or less, firearms with obliterated serial numbers, and multiple sales of handguns to target inspections.

    <u>There are limitations to more extensive use of trace data to target inspections.</u> In response to our survey and in interviews, ATF

U.S. Department of Justice                25
Office of the Inspector General
Evaluation and Inspections Division

Inspectors, Area Supervisors, and NTC management explained that tracing data is not fully useful for identifying potential problem FFLs. There are three limitations that reduce the utility of tracing data for targeting inspections. First, all LEAs do not trace all crime guns. Consequently, trace data are skewed toward dealers located in and around cities that participate in the YCGII program. As shown in Table 1 on page 24, about 40 percent of trace requests originate from the 60 YCGII cities, even though only about 15.5 percent of the U.S. population lives in those cities.[55] Therefore, FFLs located in areas where the LEAs do not comprehensively trace crime guns are less likely to have guns traced to them. A Deputy Assistant Director told us that, because of this data limitation, at least three firearms "trafficking corridors" (i.e., routes along which guns from an area with lax firearms laws are illegally transported to an area with stringent firearms laws) are not picked up by tracing data.

Second, because trace data are not controlled for dealer sales volume, an elevated number of traces is not always evidence that an FFL is involved in firearms trafficking. Large-scale FFLs may have more guns traced to them simply because they sell more guns than smaller FFLs. As described to us by ATF Inspectors, a hypothetical FFL selling 40 guns a year of which 8 are subsequently traced as crime guns would be a much greater concern than a dealer selling 2,000 guns of which 15 are subsequently traced. However, the ATF's current database does not include sales volume, and therefore the ATF cannot easily use trace data to identify FFLs that have a high number of traces *for their sales volume*. Consequently, the smaller dealer in the example above would be less likely to be identified for inspection through tracing, despite the fact that 20 percent of the guns it sold became crime guns.

Third, tracing follows a particular firearm's trail from the manufacturer, through the FFL, to the initial purchaser of the firearm. As an Area Supervisor stated, a firearm may have been purchased later by another FFL (such as a pawnshop), "possibly two or three times, before it is actually involved in a crime and traced. The subsequent FFLs do not appear in the trace report."

Although correcting all of the above limitations would be difficult, more LEAs could be induced to comprehensively trace firearms if such tracing were made a condition of relevant Department of Justice grants. The ATF also could collect sales volume information (but not any

---

[55] "Population Estimates for Cities and Towns," U.S. Census Bureau. Population data was current as of July 1, 2002.

personal information) during FFL inspections and enter that data into the NTC database.

<u>A recent study indicated that some gun dealers are willing to sell guns to prohibited persons</u>. The need to better identify the potential universe of dealers involved in gun trafficking and focus inspections on those dealers was highlighted in a 2003 study by the University of California, Los Angeles, School of Public Health. That independent study found that up to 20 percent of gun dealers exhibited a willingness to help likely prohibited persons obtain guns through straw purchases.[56] The study used an independent telephone survey to test whether randomly selected FFLs were willing to sell a handgun, regardless of the intended recipient of the firearm. A total of 120 FFLs were surveyed. Of those, 87.5 percent said that they would sell a handgun to someone when the caller stated that the handgun was for his or herself, and 72.5 percent said that they would sell a handgun to someone when the caller stated that the handgun was intended to be a gift, both situations in which the sale would be legal. However, 52.5 percent also said that they would sell a handgun to the caller when told the gun was for a boyfriend or girlfriend "who needs it," a situation in which the FFL should have questioned the legality of the sale.

To address concerns that the FFLs may have been "playing along" with the interviewers, 20 additional calls were made after the initial study was completed. In these calls, the interviewer opened with "My girl/boyfriend needs me to buy her/him a handgun because s/he isn't allowed to." In 16 of the 20 calls, the dealers correctly informed the callers that they would not sell a firearm to them. However, four agreed to sell a handgun, even though they appeared to recognize that the sale would be illegal. Some even offered advice on avoiding the restrictions, stating for example:

1. "What you do with it is your business. Legally you'd be responsible for it, you're more than welcome to buy one. You can't transfer it to him—I assume he's been turned down";

2. "As long as you have no record, you can come down here and pick one up and put it in your name";

---

[56] Although federal law allows individuals to purchase a firearm as a legitimate gift, it is unlawful to knowingly transfer a firearm to an individual known to be prohibited from possessing a gun. It also is unlawful for an FFL to knowingly participate in such a straw purchase.

3. "You can do whatever you want after you walk out the door"; and

4. Clerk: "She can't come in, pick one out and you buy it. That's against the law." Interviewer: "I'd come, just me." Clerk: "I'd have no problem with that." [57]

In December 2003 the ATF's Firearms Programs Division randomly selected 760 FFLs for compliance inspections to identify FFL business characteristics that could be used to more effectively target FFLs for compliance inspections. By analyzing FFL business characteristics, such as number of employees and types of firearms sold, the ATF plans on developing a "risk model" based on the types and levels of firearms violations found at the selected FFLs.[58] According to the ATF, the "risk model" will identify those FFLs most likely to be violating federal firearms laws. According to the Chief of the Firearms Programs Division, the ATF may, in the future, modify the FFL Renewal Application form to capture those factors identified by the risk model.

In sum, we disagree with the ATF's practice of limiting its identification of potential traffickers to the number that can be addressed within available resources. Unless the ATF identifies the full universe of FFLs exhibiting indications of firearms trafficking, it is unable to properly manage its range of enforcement activities, or inform the Attorney General, Congress, and the public of the scope of the potential trafficking problem at FFLs.

## ATF's Field Divisions Implement FFL Inspections Inconsistently

During our review of FFL inspection files, we found that the process and amount of time spent conducting application and compliance inspections varied greatly among the ATF Field Divisions. For the 8,123 application inspections and 4,581 compliance inspections conducted by the ATF in FY 2002, the application inspections took an average of 11.8 hours and the compliance inspections took an average of 35.3 hours each. However, we found considerable variation in the average inspection time among the ATF's 23 Field Divisions. Time and workload data from the ATF's N-Spect database showed that the average time that Field Divisions spent conducting each application inspection

[57] Buying a Handgun for Someone Else, *Injury Prevention* 2003; 9:147-150, with permission from the BMJ Publishing Group.

[58] We note that the Random Sample Compliance Inspection worksheets do not include information related to the FFLs' firearms tracing histories.

ranged from 6.2 hours in the Kansas City Field Division to 25.5 hours in the Miami Field Division. For compliance inspections, the average inspection length ranged from 24.5 hours per inspection in the Nashville Field Division to 90.0 hours in the Washington Field Division. According to ATF Headquarters officials, the variance was due to Inspectors' discretion in determining the appropriate amount of time to spend examining FFL records. ATF officials also told us that inspection times were affected by the number of inexperienced Inspectors in the Field Divisions.

Our review of the ATF's Inspector Handbook confirmed that Inspectors have the latitude to abbreviate significant portions of a compliance inspection.[59] According to the Inspector Handbook, Inspectors must complete 11 worksheets totaling 23 pages during an inspection. Although the Work Program and worksheets provide extensive direction for data collection, Inspectors are allowed to reduce specific inspection steps. For example:

- The worksheets give ATF Inspectors the discretion to either conduct a full inventory (i.e., a physical count) of the firearms in stock during a compliance inspection, or to sample the FFL's inventory to determine whether the number of "open" A&D Book entries matches the number of firearms at the FFL's place of business. The worksheet provides no guidance to ensure that a valid sample is taken, or how many discrepancies can be found before a full inventory is required.[60]

- The ATF inspection worksheet for examining Form 4473 sales records gives the Inspector the option to conduct a sample review and contains a space for the Inspector to explain the method used to determine how the sample was taken. In our discussions with Inspectors, we found that they did not use a statistical method for determining the number of Forms 4473 to examine. Instead, most Inspectors told us that they examined either a pre-determined number of Forms, or examined Forms

---

[59] The ATF also issues supplemental instructions annually to guide the conduct of the limited number of Focused Inspections directed by Headquarters. In FY 2003, Inspectors were to count all guns in stock and compare that number to the total number of entries in the FFL's A&D book for which the "disposition" column was blank. If those numbers matched, the Inspector was to conduct a limited inventory verification. If discrepancies were found, a full inventory verification was required.

[60] ATF Inspection Worksheet 2 – Inventory. The worksheet asks, "Full count of inventory taken?" and provides a space for the Inspector to answer Yes or No. The worksheet notes, "If no count was taken, state why in findings."

---

from a specific time frame. For example, in the Miami Field Division, Inspectors said that they were required by their Area Supervisor to review six months of Forms 4473, while Inspectors at the Seattle Field Division said that they were told by their Area Supervisor to examine one year's worth of records.

Our discussions with Inspectors during our site visits also confirmed that Inspectors vary in the depth of their reviews. For example, all 18 Inspectors we interviewed said that they review Forms 4473 as part of the inspection process, but 14 said that they only examine the forms to see if they were filled out properly – not for indications that a purchaser may be part of a firearms trafficking ring or acting as a straw purchaser for someone else (e.g., purchasing patterns, similarities in purchasers' addresses). These 14 Inspectors said that they do not review Forms 4473 for firearms trafficking indicators because it was not a required part of the ATF's inspection process.

> **Case Study: Gun Dealer Avoided Restrictions on Sales To Prohibited Persons**
>
> In June 2002, an ATF inspection was conducted at an FFL in the Seattle Field Division based on information from Special Agents at another Field Division. The inspection found that the FFL had been illegally conducting business at Nevada gun shows in violation of the Gun Control Act. The FFL admitted to inspectors that he had illegally transferred 52 firearms at the gun shows, and that he altered his A&D Book to hide the sales. Furthermore, the FFL admitted to having worked with two out-of-state gun show dealers to allow for firearms sales to be conducted without NICS checks. The FFL told inspectors this was done "because [the FFL] needed the money for...family." As a result of the inspection, the ATF revoked the FFL's license.
>
> Source: ATF case files

Although our interviews and review of the ATF's Inspector Handbook confirmed that Inspectors and their supervisors have the discretion to vary the extent of inspections, we also analyzed ATF performance data to identify any other factors that could be causing the disparity between Field Divisions. Our analysis of ATF data regarding application inspections found that the average time spent conducting application inspections was clearly correlated to the Field Divisions' staffing levels and the number of FFLs located in the Divisions. ATF data showed that Field Division staffing ranged from a high of 35 Inspectors in the San Francisco Field Division to a low of 9 Inspectors in the Baltimore Field Division. The number of FFLs in each Field Division ranged from 8,194 FFLs in the Kansas City Field Division to 1,172 FFLs in the Miami Field Division. However, the ATF had not distributed its Inspector resources among the Field Divisions to match the distribution of FFLs, resulting in significant workload imbalances among the Field Divisions. As shown in Figure 6,

the Field Division that had higher numbers of FFLs to oversee with each Inspector spent less time conducting each application inspection.



**Figure 6: Comparison of Length of Application Inspections to FFLs per Inspector**

Source: ATF workload and performance data

   We also examined the ATF's explanation that compliance inspection times were affected by the number of inexperienced Inspectors assigned to each Field Division.[61] As explained by ATF officials, inexperienced Inspectors receive on-the-job training from more experienced Inspectors. During that time, they observe or are observed by the experienced Inspector. Since inexperienced Inspectors are not fully productive, the average inspection time for Field Divisions with more inexperienced Inspectors could be higher. However, as shown in Figure 7, we found there was no correlation between the average time that a Field Division took to conduct compliance inspections and the percentage of inexperienced Inspectors among the Field Division's staff.

---

[61] Trainee Inspectors start at grade 5 on the General Schedule (GS). During their first two years, while at the GS-5 and GS-7 levels, trainees accompany senior Inspectors to observe and assist.



Figure 7: Impact of Inexperienced Inspectors on Average Compliance Inspection Hours

Source: ATF workload and performance data

We also examined several performance indicators to see if the differing inspection times were related to outcomes, such as violations found and criminal referrals. As shown in Figure 8, we found that Field Divisions with longer average compliance inspection times found more instances of violations on each inspection. However, it was unclear whether the longer inspection times resulted from the need to document more violations, or if the greater number of violation instances found resulted from longer inspections.



Figure 8: Comparison of Average Hours and Average Violation Instances for Compliance Inspections

Source: ATF workload and performance data

To examine whether the variation in average inspection times was due to some Field Divisions taking more time to document noncompliance by FFLs in order to pursue adverse actions, we analyzed whether Field Divisions that took longer to conduct compliance inspections in FY 2002 also took more adverse actions. We found that Field Divisions that had longer average inspection times took slightly fewer adverse actions than Field Divisions that took less time to conduct inspections. Figure 9 shows the average inspection time and number of adverse actions taken for each ATF Field Division.



Figure 9: Comparison of Average Compliance Inspection Time to Adverse Actions, FY 2002

Source: ATF workload and performance data

Our analysis of the ATF Field Divisions' inspection efforts and outcomes also uncovered significant variances in inspection productivity. For example, our analysis of the ATF's FY 2002 workload and performance data found such variances as:

- The number of inspections conducted per Inspector each year ranged from 12.7 (Miami Field Division) to 46.5 (Kansas City Field Division).

- The percentage of the inspections conducted by each Field Division that identified violations varied from 4.5 percent (Kansas City Field Division) to 41.5 percent (Dallas Field Division).

- On inspections where violations were discovered, the average number of instances of violations found on each inspection ranged from 15.9 (Nashville Field Division) to 178.2 (Chicago Field Division).

- The average time that Field Divisions took to find each violation ranged from 47 minutes per violation (Dallas Field Division) to over 7 hours per violation (Los Angeles Field Division).

Inspection hours, violations, and adverse actions taken in FY 2002 are summarized by Field Division in Table 2, on the next page.

The variability in FFL inspections between ATF Field Divisions indicates that inspections are not being conducted according to standardized inspection procedures. Moreover, the excessive variability allowed inefficient and ineffective operations to persist. The ATF's failure to use the limited available Inspector resources efficiently also reduced its capability to carry out regular inspections of all FFLs, which, in turn, reduced the effectiveness of the ATF's FFL inspection program for ensuring FFLs comply with federal firearms laws. Further, the lack of standardization resulted in inconsistent treatment of FFLs in Field Divisions.

We believe that a standardized inspection approach is needed to ensure that FFLs in all Field Divisions are inspected using consistent inspection procedures and sampling criteria. Adopting a standardized inspection process designed to use the minimum review necessary to effectively gauge FFLs adherence to gun laws also would increase the efficiency of the FFL inspection program, and better enable the ATF to provide uniform, regular inspection coverage of the FFL population. An increase in inspection efficiency also would reduce the overall time that Inspectors spend at the FFLs' place of business.

## Table 2 - Inspector Hours, Productivity, Violation Instances Found, and Adverse Actions Taken, FY 2002

| Field Division | Inspectors | FFLs per Inspector | FFLs Within Field Division | Total Inspector Hours (Non-Speed Data) | Application Inspections | Compliance Inspections | Inspections per Inspector | Average Hours per Application Inspection | Average Hours per Compliance Inspection | Inspections with Violations | % of Inspections Finding Violations | Violations Instances Found | Violation Instances per Inspection | Inspection Hours to Find Each Violation Instance | Warning Letters | Warning Conferences | Revocations |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Atlanta | 20 | 145 | 2,892 | 8,925 | 300 | 86 | 19 | 9.5 | 70.6 | 57 | 15% | 7549 | 132.4 | 1.18 | 8 | 5 | 1 |
| Baltimore | 9 | 203 | 1,823 | 6,306 | 131 | 107 | 26 | 15.7 | 39.7 | 52 | 22% | 6665 | 128.2 | 0.95 | 3 | 4 | 0 |
| Boston | 17 | 352 | 5,977 | 7,998 | 271 | 106 | 22 | 13.2 | 41.8 | 34 | 9% | 2345 | 69.0 | 3.41 | 2 | 0 | 0 |
| Charlotte | 18 | 239 | 4,295 | 13,326 | 417 | 208 | 35 | 11.5 | 40.9 | 114 | 18% | 8901 | 78.1 | 1.50 | 27 | 6 | 1 |
| Chicago | 23 | 157 | 3,601 | 9,429 | 315 | 151 | 20 | 16.0 | 29.0 | 34 | 7% | 6058 | 178.2 | 1.56 | 8 | 7 | 4 |
| Columbus | 34 | 191 | 6,496 | 17,212 | 472 | 268 | 22 | 11.3 | 44.4 | 140 | 19% | 9517 | 68.0 | 1.81 | 14 | 0 | 3 |
| Dallas | 30 | 186 | 5,581 | 15,951 | 249 | 255 | 17 | 14.7 | 48.2 | 209 | 41% | 20239 | 96.8 | 0.79 | 40 | 21 | 5 |
| Detroit | 18 | 235 | 4,237 | 11,410 | 362 | 228 | 33 | 11.0 | 32.5 | 109 | 18% | 9051 | 83.0 | 1.26 | 8 | 4 | 0 |
| Houston | 16 | 251 | 4,019 | 7,013 | 277 | 169 | 28 | 9.5 | 25.9 | 52 | 12% | 2457 | 47.3 | 2.85 | 6 | 2 | 0 |
| Kansas City | 18 | 455 | 8,194 | 7,889 | 737 | 100 | 47 | 6.2 | 32.9 | 38 | 5% | 3650 | 96.1 | 2.16 | 10 | 5 | 1 |
| Los Angeles | 24 | 116 | 2,790 | 7,040 | 176 | 136 | 13 | 15.6 | 31.6 | 28 | 9% | 995 | 35.5 | 7.07 | 2 | 1 | 0 |
| Louisville | 25 | 131 | 3,287 | 17,629 | 373 | 320 | 28 | 13.9 | 38.9 | 131 | 19% | 8634 | 65.9 | 2.04 | 34 | 11 | 1 |
| Miami | 15 | 78 | 1,172 | 6,679 | 157 | 33 | 13 | 25.5 | 81.0 | 11 | 6% | 1315 | 119.5 | 5.08 | 0 | 0 | 0 |
| Nashville | 23 | 192 | 4,408 | 16,881 | 275 | 565 | 37 | 11.2 | 24.4 | 222 | 26% | 3537 | 15.9 | 4.77 | 62 | 15 | 7 |
| New Orleans | 21 | 225 | 4,724 | 15,912 | 483 | 385 | 41 | 12.4 | 25.8 | 170 | 20% | 11017 | 64.8 | 1.44 | 20 | 14 | 3 |
| New York | 33 | 116 | 3,838 | 15,660 | 359 | 375 | 22 | 14.8 | 27.6 | 84 | 11% | 4477 | 53.3 | 3.50 | 2 | 1 | 1 |
| Philadelphia | 27 | 193 | 5,207 | 11,013 | 434 | 62 | 18 | 14.1 | 79.0 | 23 | 5% | 2082 | 90.5 | 5.29 | 2 | 3 | 1 |
| Phoenix | 15 | 423 | 6,341 | 7,449 | 373 | 144 | 34 | 9.3 | 27.7 | 46 | 9% | 1384 | 30.1 | 5.38 | 0 | 0 | 0 |
| San Francisco | 35 | 109 | 3,811 | 17,099 | 359 | 387 | 21 | 14.7 | 30.5 | 125 | 17% | 8005 | 64.0 | 2.14 | 16 | 0 | 0 |
| Seattle | 21 | 309 | 6,498 | 7,577 | 538 | 85 | 30 | 7.0 | 44.6 | 31 | 5% | 4261 | 137.5 | 1.78 | 4 | 2 | 1 |
| St.Paul | 17 | 453 | 7,709 | 10,780 | 451 | 172 | 37 | 10.1 | 36.2 | 97 | 16% | 4565 | 47.1 | 2.36 | 9 | 4 | 2 |
| Tampa | 22 | 150 | 3,297 | 10,718 | 399 | 185 | 27 | 12.6 | 30.7 | 90 | 15% | 5055 | 56.2 | 2.12 | 5 | 0 | 0 |
| Washington | 17 | 176 | 2,995 | 7,828 | 215 | 54 | 16 | 13.8 | 90.0 | 37 | 14% | 3073 | 83.1 | 2.55 | 4 | 3 | 0 |
| | 498 | | 103,196 | 257,723 | 8,123 | 4,581 | | 11.8 | 35.3 | 1,934 | | 134,832 | 69.7 | 1.9 | 288 | 109 | 30 |

Note: FFL and Inspector data are as of 08/01/03, other data are totals for FY 2002.

U.S. Department of Justice
Office of the Inspector General
Evaluation and Inspections Division

## Suspected Criminal Violations Are Not Always Referred for Investigation

In addition to documenting regulatory violations, the FFL inspection program also identifies indications of potential criminal activity. Paradoxically, we found that Field Divisions that took longer to conduct inspections made slightly fewer referrals of suspected criminal activity (Figure 10). To analyze this result, we examined the total number of inspections completed by each Field Division and found that Field Divisions that took longer to conduct inspections completed fewer inspections. Further, the data showed that the number of inspections completed was correlated to the number of referrals made, and that taking longer to conduct an inspection made it no more likely that suspected criminal activity would be found and referred. Therefore, Field Divisions that took longer to conduct inspections completed fewer inspections and made fewer criminal referrals.



**Figure 10: Comparison of Average Compliance Inspection Time to Criminal Referrals, FY 2002**

Source: ATF Field Management Staff and ATF Firearms Programs Division

U.S. Department of Justice
Office of the Inspector General
Evaluation and Inspections Division

In addition, we found evidence that the coordination between ATF Inspectors and ATF Special Agents could be improved. During our review, we determined that even when FFL compliance inspections identify significant violations of federal firearms laws by the FFLs or by gun purchasers, the violations are often not reported to ATF Special Agents for investigation. In our interviews, 12 of 18 Inspectors said that they rarely refer information gathered during FFL inspections to Special Agents because they did not believe that Special Agents would follow-up on the information. The other six Inspectors told us that they made one or two referrals per year to Special Agents.

We identified several cases where indications of potential criminal violations by FFLs, including gun trafficking, were identified but not referred for investigation. These FFLs were subsequently investigated after the illegal activity was discovered through other means. For example, Inspectors conducted compliance inspections in March 2000 and October 2002 on an FFL located in the southern United States. The 2000 inspection was based, in part, on information from a state LEA. During the 2002 compliance inspection, the Inspector found 40 firearms not entered into the FFL's A&D Book, several missing Forms 4473, and sales to out-of-state residents – all strong indicators of gun trafficking. Despite these findings, the FFL was not reported to Special Agents for investigation. Then, subsequent to the inspections, information from a confidential informant led to an investigation of this FFL. In December 2003, ATF Special Agents arrested the FFL for trafficking firearms.

Further, the latest data available indicate that investigations are not frequently initiated as a result of information provided by ATF Inspectors. In FY 2002 and FY 2003 respectively, Inspectors made 951 and 823 referrals of potential criminal activity identified during compliance inspections, an average of two per field-level Inspector. According to the ATF's *Following the Gun* report, published in 2000, of the 1,530 firearms trafficking investigations conducted from July 1996 to December 1998, just 43 - less than 3 percent - were initiated based on information found during inspections (see Table 3 on next page). Our survey of 45 Area Supervisors also found that few inspections result from information referred to Inspectors by ATF Special Agents. Most Area Supervisors (71.1 percent) said that they assigned five or fewer inspections each year based on information from Special Agents.

In December 2002, the ATF attempted to improve coordination between Inspectors and Special Agents by creating 23 Special Intelligence Inspector (SII) positions (one in each Field Division). The SIIs

are responsible for collecting and disseminating information gathered by Inspectors and Special Agents between the two groups. As of November 2003, only 7 of the 23 authorized SII positions had been filled. Although ATF Headquarters officials said that they plan to fill the positions, as of March 2004 no deadline had been set.

| Table 3: Reasons Cited for ATF Firearms Trafficking Investigations (July 1996 to December 1998) | | |
|---|---|---|
| **Reason** | **Times Cited** | **Percent of Investigations*** |
| Referral from state, local, or federal agency | 409 | 26.7% |
| Confidential informant | 352 | 23.0% |
| Crime gun tracing analysis | 296 | 19.3% |
| Review of multiple sales forms | 205 | 13.4% |
| FFL reported suspicious activity | 139 | 9.1% |
| Developed from another ATF investigation | 127 | 8.3% |
| FFL reports burglary/theft/robbery to ATF | 115 | 7.5% |
| ATF initiated investigation of suspicious activity (e.g., gun show task force, etc.) | 81 | 5.3% |
| **ATF inspection of FFL** | **43** | **2.8%** |
| Tip by citizen or anonymous source | 37 | 2.4% |
| Other | 9 | 0.6% |

\* Some of the 1,530 investigations cited more than one reason. Therefore, the "Percent of Investigations" exceeds 100 percent.

Source: "Following the Gun," ATF Publication (June 2000).

## The ATF Acts Infrequently to Revoke Federal Firearms Licenses, and the Process is Not Timely

We found that the ATF rarely revokes federal firearms licenses. In FY 2002, the 1,934 FFL inspections that found violations found an average of almost 70 violations each (for a total of 134,832 violations). In FY 2003, the 1,812 inspections that found violations found an average of over 80 violations each (for a total of 149,396 violations). However, in those years, the ATF issued Initial Notices of Revocation to only 30 and 54 FFLs, respectively.[62] In addition to issuing a Notice of Revocation after a compliance inspection, the ATF also can effectively revoke an FFL's license by denying its request for license renewal. If an FFL's license expires during the course of revocation proceedings, the ATF's

---

[62] Notices of Revocation are not final. Of the 30 Notices in FY 2002, 25 FFLs requested a hearing and 3 of those avoided revocation. (The FY 2003 data was unavailable as of March 2004.)