action is formally categorized as a denial of a renewal request – not as a revocation. In FY 2001, the ATF denied 28 requests for renewal.[63]

During our review, ATF officials told us that, before May 2003, the decision on whether to take adverse action (<u>i.e.</u>, to revoke or deny renewal of an FFL's license) was left to the discretion of the Inspector, Area Supervisor, and the DIO of each of the 23 Field Divisions. However, in May 2003, subsequent to the initiation of our review, the ATF created guidelines for the Field Divisions to follow when determining whether or not to initiate an adverse action. When asked about the impact of these new guidelines, ATF personnel in the four Field Divisions we visited told us that they expected the guidelines to lead to an increase in the total number of license revocations. We found that after the ATF issued the adverse action guidelines, the number of FFL revocation hearings rose to 87 during FY 2003, and 59 Initial Notices of Revocation were issued and renewals denied during the first quarter of FY 2004 alone. As of March 2004, most of these cases have not been finalized.

<u>The process for revoking or denying renewal of a federal firearms license is not timely.</u> The ATF provided specific case tracking data for 50 closed denials and revocations completed in FY 2001 and FY 2002.[64] The processing of these 50 cases averaged 379 days from the date that the Inspector recommended revocation or denial to the date that the case was closed by the NLC. We determined that the length of denial and revocation proceedings was due, in part, to the number of ATF officials involved (see Figure 11 on page 42). At least five ATF officials participate in these proceedings and each official reviews and approves the FFL inspection case file seriatim. A formal ATF Notice of Revocation is issued only after all of the officials have approved the action. Because the ATF has limited suspension and fining authority, FFLs remain in business during the adjudication of renewal denials and revocations.

During our interviews, DIOs and some Area Supervisors stated that most delays in the eight-step process occurred at the Division

---

[63] ATF officials also told us that FFLs sometimes withdraw their renewal applications after being told that they may be denied. In FY 2001, 489 FFLs withdrew their applications, but ATF did not track how many withdrew after being told they would be denied versus withdrawals for other reasons.

[64] The ATF provided partial data for an additional 37 cases that we did not include because the data were inadequate to enable us to determine the case processing time. For example, for 33 cases the NLC did not have dates for when the initial Notice of Revocation or Denial was sent to the FFL.

Counsel level as the ATF waited for Division Counsel to draft a Notice of Revocation for the FFL. We were unable to evaluate that perception from the case tracking data that ATF could provide, because it did not include the dates that the cases were processed by individual Field Division offices. However, Assistant Chief Counsels and Division Counsels we interviewed acknowledged delays in denial and revocation proceedings, which they stated were due, in part, to their heavy caseloads. They also stated that the quality of the initial compliance inspection report was a factor, as not all cases they received adequately detailed that the FFL "knowingly and willfully" violated federal firearms laws. This caused further delay while the Division Counsels obtained clarifying information from the Inspectors to ensure that the cases met legal standards.

We also noted that in some cases delays occurred due to a lack of legal staff within the Field Divisions. Although in 1999 the ATF established a standard Field Division structure that would include two staff attorneys, two of the Field Divisions we visited (Washington, D.C. Field Division, Seattle Field Division) had no attorneys on staff. When those Field Divisions needed legal assistance, they obtained it directly from their regional Assistant Chief Counsel's Office. For example, at the Washington, D.C., Field Division, the DIO told us that he sent revocation and denial cases to the Assistant Chief Counsel's Office located in Philadelphia.[65] In one case, he said, it took four months to prepare an Initial Notice of Revocation for his signature.

---

[65] The Assistant Chief Counsel's Offices are located in San Francisco, Chicago, Dallas, Atlanta, and New York/Philadelphia. The northeast regional office is currently operating in Philadelphia due to the September 11, 2001, destruction of the ATF's New York offices, which were located at the World Trade Center.

## Figure 11: FFL Denial or Revocation Process

| |
|---|
| Compliance inspection reveals federal firearms violations. Inspector recommends revoking FFL's license. |

↓

| |
|---|
| Area Supervisor approves recommendation for revocation. |

↓

| |
|---|
| DIO approves recommendation for revocation. |

↓

| |
|---|
| Division Counsel writes initial Notice of Revocation for issuance to the FFL by DIO. FFL has 15 days to appeal revocation and request a hearing. |

↓

| |
|---|
| NLC officials assign Inspector to serve as Hearing Officer. |

↓

| |
|---|
| DIO schedules hearing to be attended by Hearing Officer, FFL, FFL's counsel, Inspector who conducted compliance inspection, and Division Counsel. |

↓

| |
|---|
| Hearing Officer issues report of findings and recommendations to DIO. |

↓

| |
|---|
| Division Counsel writes final Notice of Revocation for issuance by DIO. |

↓

| |
|---|
| FFL has 60 days to appeal revocation to U.S. District Court. |

↓

| |
|---|
| If an FFL files an appeal, Division Counsel, in consultation with an AUSA, submits Motion for Summary Judgment on behalf of the ATF. |

**Case Study: FFL Remains in Business More Than Two Years After Inspector Recommends Revoking License**

Based on an October 2001 compliance inspection, an ATF Inspector recommended revoking the license of a Georgia FFL operating as a pawnbroker. During the inspection, the Inspector determined, among other findings, that the FFL:

- Sold 51 firearms without first obtaining proper identification from the purchasers;
- Failed to complete a Report of Multiple Sale on three occasions;
- Transferred at least one firearm to an out-of-state resident; and
- "Aided and abetted a prohibited person in obtaining a firearm" on four occasions by transferring firearms to individuals other than those who had originally pawned the firearms to him without performing the proper background check.

The DIO issued an initial Notice of Revocation on May 6, 2002. The FFL appealed, and a hearing was scheduled for November 2002. The NLC rescheduled the hearing for February 2003 at the FFL's request. At that hearing, the FFL blamed the violations on human error as well as a computer program he used to maintain his records. The Hearing Officer's completed report, which included a recommendation to *approve* the FFL's license, was issued to the DIO on March 31, 2003. The DIO issued a final Notice of Revocation on June 13, 2003. The FFL waited until August 12, 2003 – the maximum allowable time – to appeal the DIO's decision to U.S. District Court, where the case remained as of March 2004. Both sides have until June 1, 2004 to file motions in the case, according to a December 2003 order. Throughout these proceedings, the FFL has remained in business.

*[U.S. District Court, Middle District of Georgia; Case #03-CV-267.]*

We also found indications of limited communication between Field Division staff and Division Counsels. For example, we were told that Inspectors, Area Supervisors, and DIOs, usually do not seek advice from Division Counsels on inspections of FFLs found to have violated federal firearms laws until they request a Notice of Revocation or Denial. Furthermore, Division Counsels told us that they are not routinely notified when Warning Conferences are scheduled between FFLs and DIOs. One Assistant Chief Counsel told us that he believes that the ATF would benefit if Division Counsels had the opportunity to participate in such proceedings in case, later on, a Notice of Revocation is issued to the FFL.

## New ATF Guidelines Begin to Address Inconsistent and Untimely Adverse Actions

In May 2003, the ATF took the initial steps toward standardizing adverse actions by issuing guidelines that were intended to ensure that Field Division personnel make more consistent and appropriate determinations on adverse actions (such as warning letters, warning conferences, and revocations) when FFLs are found to have violated federal firearms laws. The guidelines established standards for minimum adverse actions to be taken when violations are found. Although Field Divisions can deviate from the policy if they determine that the facts warrant another action, any deviation on inspections violations for which the standard action is revocation must be reviewed by Headquarters.

The guidelines specify that FFLs that commit minor non-repetitive, non-willful violations that do not affect the lawfulness of a gun transfer, such as minor omissions or format errors, should receive warning letters or reports of violations. FFLs committing more serious violations that do not rise to the level of revocation, such as failing to record an acquisition within a specified time frame or failing to report multiple sales, should receive warning conferences. When FFLs commit the most serious violations, such as having more than a threshold number of guns missing from their inventory, the Field Division should begin the process of revoking or denying the renewal of the FFL's license.

The guidelines also address some of the problems we noted with the ATF's past failure to follow-up and take action when violations were found. For example, they address the frequent failure to routinely re-inspect FFLs found to have committed serious violations by directing that all FFLs that receive warning letters or warning conferences must be

scheduled for a follow-up "recall" inspection in the following year. The guidelines also begin to address the lack of adverse actions taken against repeat violators by directing that adverse actions must escalate for repeat offenses. For example, an FFL that was issued a warning letter or directed to attend a warning conference for a violation cannot be given the same penalty if a subsequent inspection discovers further violations. Instead, the penalty must escalate to a warning conference (from a warning letter) or to revocation. The guidelines also establish a time frame for part of the adverse action process by directing DIOs to act on adverse action recommendations within 90 days after receiving the inspection report.

In addition to addressing the adverse action process, the guidelines also address part of the inspection process by requiring that follow-up inspections on FFLs that had unresolved inventory discrepancies include a full inventory, unless the DIO approves a statistical sample instead. Conducting a full inventory identifies all the guns that the FFL may have lost, and it brings the FFL's inventory records up-to-date. The FFL then formally reports any missing guns to the NTC as lost or stolen. The reporting of lost and stolen guns provides some benefit should one of those guns be recovered and traced, since it saves the NTC from contacting the manufacturer and dealer before the NTC knows that the gun was lost from a specific FFL's inventory. A full inventory may also identify more instances of violations to support potential adverse actions.

However, for the purpose of verifying that FFLs are complying with the requirement to maintain an accurate inventory, a policy of conducting full inventories in lieu of valid statistical samples may not be the most effective use of ATF resources. Conducting full inventories at larger gun dealers can be very time consuming. Moreover, once an inspection identifies discrepancies sufficient to document that an FFL's inventory system is deficient, completing a full inventory provides only incremental instances of missing guns. We would not disagree that there are cases, often related to an investigation, where a full inventory is desirable – cases like the Bull's Eye Shooter Supply.[66] However, maintaining an accurate inventory remains the responsibility of the FFL. Given the limited resources available to the ATF to conduct gun shop

---

[66] The Bull's Eye Shooter Supply in Washington State was the FFL that lost the Bushmaster sniper rifle used in a series of murders across the country in 2002 for which John Allen Muhammad and Lee Boyd Malvo were subsequently convicted. Subsequent inspections found that the store could not account for several hundred guns, including assault weapons.

inspections, restricting inventories to the minimum sample needed to provide a statistically valid check on the accuracy of the FFL's record-keeping system would reduce the length of inspections and enable the ATF to provide better coverage of FFLs.

## By Streamlining and Standardizing Inspections, the ATF Could Dramatically Improve the FFL Inspection Program

We found that there is a critical need for the ATF to improve the efficiency and effectiveness of the FFL inspection program and ensure that FFLs are inspected using consistent inspection procedures and sampling criteria regardless of their geographic location. With the May 2003 guidelines, the ATF began to improve the consistency and timeliness of adverse actions, as well as to address the critical need to re-inspect FFLs that committed violations. However, the current variability in the Field Divisions' inspection procedures must be addressed to ensure that adverse actions taken under the May 2003 guidelines treat FFLs consistently. Requiring defined adverse actions for specific numbers of violation instances in the absence of standardized inspection procedures and sampling criteria will result in dissimilar treatment of FFLs in different Field Divisions. As discussed previously, the ATF's guidance on conducting inspections does not ensure consistent examinations of FFLs' compliance with gun laws.

We observed several areas in which the inspection process could be improved through standardization, such as:

- Standardizing inventory procedures to conduct the minimum sample needed (based on the number of guns in the FFL's stock) to provide a statistically valid check on the effectiveness of the FFL's inventory management and record-keeping systems.

- Standardizing the review procedures for Forms 4473 to provide for the minimum sample needed to provide a statistically valid check (based on the number of guns sold by the FFL) on whether the FFL is completing the Forms as required.

- Standardizing and automating inspections paperwork and providing laptop computers to enable Inspectors to prepare inspection reports on-site. Currently ATF Inspectors must complete 11 worksheets containing 115 steps and totaling 23

pages while on-site. Application inspection paperwork comprises 32 steps for the inspection and 56 steps for an acknowledgement of laws. The Inspectors must then transcribe their handwritten notes from the worksheets into the ATF's N-Spect database upon returning to their Area Office.

- Extending the inspection cycle for FFLs with no significant violations. Under the May 2003 guidelines, FFLs found to have committed violations must be scheduled by the ATF Field Division for a follow-up inspection in the following year. Extending that approach, a model standardized inspection procedure could allow Field Divisions to extend the inspection cycle for FFLs that have no significant violations beyond three years, so that available resources can be directed toward noncompliant dealers.

- Establish guidance to ensure that Inspectors consistently look for known indications of firearms trafficking and, when found, report the findings to the ATF's Criminal Enforcement Division.

Improving the efficiency of the inspection process would also reduce the need for additional staff. Adopting a standardized inspection process designed to use the minimum review necessary to effectively gauge FFLs' adherence to gun laws will increase the efficiency of the FFL inspection program. This will reduce both the need for additional Inspector staffing and the burden that inspections place on FFLs. In an April 2003 report to Congress, the ATF Director stated that, to fully implement the ATF's mission to regulate and enforce federal firearms and explosives laws, the ATF would need 1,775 Inspectors, an increase of 1,277 Inspectors from current staffing levels.[67] Of the 1,775 Inspectors, 1,235 would be dedicated to conducting FFL compliance inspections in order to inspect all FFLs on a triennial basis. The Director based this figure, in part, on projections of FFL application and compliance inspections, as well as inspections initiated to support criminal investigations. Our review of FY 2002 ATF work hour data shows that it dedicated 628,117 staff hours (the equivalent of 302 staff years at 2,080 hours per year) to FFL inspections. The requested increase to 1,235 Inspectors would require 933 new Inspectors, and would more than

---

[67] *Inspector Staffing Requirement for the Bureau of Alcohol, Tobacco, Firearms and Explosives,* April 15, 2003.

quadruple the Inspector workforce dedicated to inspecting FFLs.[68]  In the Department's FY 2005 Budget Request, it recommended funding 126 new Inspector positions for the ATF.

We examined the ATF's calculations and question whether it needs as many Inspectors as stated.  The ATF projection was calculated using an overall average inspection time of 62.7 hours per inspection (Table 4, on the next page).  However, according to the ATF's FY 2002 data, the overall average inspection time was only 49.4 hours (628,117 inspection hours divided by 12,704 total inspections).  The ATF request therefore appears to include an assumed 27 percent increase in the average length of inspections.

Calculating the staffing requirement using the ATF's actual historical inspection average of about 50 hours per inspection indicates that the ATF should need a total of only 984 Inspectors (682 new Inspectors) to accomplish inspections on a triennial basis.  Moreover, as previously discussed, our analysis found wide variations in inspection implementation and productivity among the ATF Field Divisions.  By standardizing and streamlining its inspection process the ATF could reduce the average inspection time from the current 49.4 hours, which would further reduce the number of additional Inspectors that needed to accomplish FFL compliance inspections on a triennial basis.[69]  For example, by reducing the overall average inspection time to 40 hours per inspection, the ATF should be able to implement a triennial FFL compliance inspection program with 788 Inspectors (Table 4).

Increasing the efficiency of the inspection process also is needed because the demands on ATF Inspectors to perform duties related to explosives licensees are increasing.  Immediately after the terrorist

---

[68] FY 2002 work hour data was the latest available during our review.  The work hours used in this section do not match the work hours discussed previously because they include not only time spent directly conducting inspections, but all time in an Inspector's work year, such as leave, training, sick days.  This additional time must be considered when calculating staffing requirements.

[69] We noted that the ATF was exploring other ways to reduce the demands on Inspectors, including a December 2003 proposal to hire former Inspectors to serve as Hearing Officers and a Flexiplace Pilot Program.  The Flexiplace Pilot reduced the requirement for 23 Inspectors from 15 Field Divisions to work from ATF Area Offices, allowing more inspections of geographically remote FFLs.  An August 2003 Headquarters review of the program concluded that it improved the performance of the Inspectors who participated.  As of January 2004, the ATF had not expanded the program.

| Table 4: ATF STAFFING REQUEST CALCULATIONS | | | | |
|---|---|---|---|---|
| Activity | Number of Inspections | Hours per Inspection* | Total Hours | Inspector FTE @ 2080 Hours |
| Non-YCGII FFL Compliance Inspections | 22,889 | 66 | 1,510,674 | 726.3 |
| YCGII FFL Compliance Inspections | 11,444 | 80 | 915,520 | 440.2 |
| Support Criminal Investigations | 631 | 73 | 46,063 | 22.1 |
| Firearms Applications | 6,000 | 16 | 96,000 | 46.2 |
| **Total** | **40,964** | **62.7** | **2,568,257** | **1234.7** |

- ATF staffing calculations include indirect time

| OIG RECALCULATION: ATF STAFFING AT 50 HOURS PER INSPECTION | | | | |
|---|---|---|---|---|
| Non-YCGII FFL Compliance Inspections | 22,889 | 51.5 | 1,178,784 | 566.7 |
| YCGII FFL Compliance Inspections | 11,444 | 63.5 | 726,752 | 349.4 |
| Support Criminal Investigations | 631 | 73 | 46,063 | 22.1 |
| Firearms Applications | 6,000 | 16 | 96,000 | 46.2 |
| **Total** | **40,964** | **50** | **2,047,599** | **984.4** |

| OIG RECALCULATION: ATF STAFFING AT 40 HOURS PER INSPECTION | | | | |
|---|---|---|---|---|
| Non-YCGII FFL Compliance Inspections | 22,889 | 40 | 915,560 | 440.2 |
| YCGII FFL Compliance Inspections | 11,444 | 50.8 | 581,360 | 279.5 |
| Support Criminal Investigations | 631 | 73 | 46,063 | 22.1 |
| Firearms Applications | 6,000 | 16 | 96,000 | 46.2 |
| **Total** | **40,964** | **40** | **1,638,983** | **788** |

attacks of September 11, 2001, the ATF initiated a policy of investigating all incidents of theft or loss of explosives materials, and conducting compliance inspections on all explosives license holders within 50 miles of major metropolitan areas. This meant that the ATF had to inspect 7,459 of 9,400 explosives license holders. In November 2002, the Safe Explosives Act (SEA) imposed new licensing requirements that increased the number of explosives licensees, and mandated that the ATF conduct on-site inspections of explosives licensees and permit holders at least once every three years.

The additional explosives work is already reducing ATF's ability to inspect FFLs. The Chief of Staff of the ATF's Firearms, Explosives and Arson Directorate confirmed that Inspector resources have been diverted to explosives work by Area Supervisors to meet the SEA's inspection requirements. As a result, she said, the ATF plans to re-examine Inspectors' firearms work because ATF Headquarters officials are "worried" that FFLs are not being inspected. Our review of preliminary data for FY 2004 inspections work confirmed these concerns.

Preliminary data for early FY 2004 indicated that there has been a precipitous decrease in the number of FFL inspections. Through the first five months of FY 2004, the ATF completed 1,113 FFL compliance inspections. At that pace, the agency will complete less than 2,700 FFL compliance inspections during FY 2004. That is less than half the number that the agency reported that it completed in FY 2003, and less than 2.6 percent of the FFL population. For example, the Kansas City Field Division, which oversees the most FFLs of any Field Division (with 8,194 FFLs) completed only 21 FFL compliance inspections in the first five months of FY 2004.

   Reducing the time spent at FFLs' places of business. The time that ATF Inspectors spend on-site at FFLs cannot be calculated definitively. Although the ATF's inspection hour tracking system shows that the ATF spent a total of 257,723 hours conducting FFL inspections in FY 2002, it does not allow the time spent on travel and other inspection related actions performed away from FFL locations to be segregated from the total inspection hours. Nonetheless, any increase in inspection efficiency would reduce the overall time spent conducting reviews on-site at the FFLs, and minimize any potential interruption of the FFLs' business operations.

## ATF Does Not Consistently Report Inspection Performance

   In response to our requests for inspections and workload data (such as the number of compliance and application inspections conducted and the Inspector work hours associated with completing these inspections during FY 2002), the ATF queried its N-Spect, FLS, and Standard Time and Attendance System (STATS) electronic databases. N-Spect tracks direct time related to FFL inspections, FLS tracks information related to FFL licensees, and the STATS timekeeping system tracks direct and indirect hours for payroll purposes. During our examination of the performance and productivity of the ATF's FFL inspections program, we identified significant discrepancies between the systems with regard to the number and type of inspections conducted and the hours spent conducting the inspections. In addition, the data in the systems regarding the number of inspections done differed significantly from what the ATF included in published reports. Finally, data contained in the N-Spect database contained significant errors: after extracting data to respond to our requests, ATF officials determined that several hundred inspections entered as compliance inspections were actually application inspections.

Table 5 contains examples of inconsistent data related to the ATF's FY 2002 ATF's FFL inspections program that the ATF provided to OIG and reported publicly.

| Table 5: Inconsistent N-Spect Totals of FY 2002 FFL Inspection Activities | | |
|---|---|---|
| **Data Source** | **FY 2002 Totals** | **Inspection Type** |
| N-Spect data provided to the OIG in May 2003 | **12,522** | Total Inspections (the ATF claimed data could not be broken down by inspection type) |
| Revised N-Spect data provided to the OIG in February 2004 | 7,665 | Application Inspections |
| | 5,039 | Compliance Inspections |
| | **12,704** | Total Inspections |
| Revised N-Spect data adjusted to correct miscoded inspections provided to the OIG Team on May 20, 2004 | 8,123 | Application Inspections |
| | 4,581 | Compliance Inspections |
| | **12,704** | Total Inspections |
| FLS Licensee Inspection Data | 4,722 | FY 2002 new licensees with "inspection date" indicating that an application inspection was conducted |
| *ATF Snapshot 2003* | "Approximately 6,000" | Compliance Inspections |
| *ATF Performance and Accountability Report 2002* | "Eleven percent" of all FFLs were inspected.<br><br>*11% of 104,300 FFLs is equivalent to 11,473 inspections* | Total Inspections |

In addition to FY 2002 data discrepancies, current data from ATF's N-Spect database shows that the ATF conducted 5,729 application inspections and 4,035 compliance inspections in FY 2001, as well as 8,043 application inspections and 5,887 compliance inspections in FY 2003. Previously, the ATF had published reports and provided draft reports to the OIG indicating that it conducted more inspections: 5,497 application inspections and 5,016 compliance inspections in FY 2001 and 8,422 application inspections and 6,481 compliance inspections in FY 2003.

U.S. Department of Justice
Office of the Inspector General
Evaluation and Inspections Division

We discussed these substantial inconsistencies with ATF Headquarters officials. They explained that the inconsistencies were due to differences in how the queries of the N-Spect electronic database were constructed by different ATF analysts. For instance, according to the ATF Deputy Assistant Director for Field Operations, the ATF report on FY 2002 activities (*ATF Snapshot 2003*) reported a higher number of inspections completed because it aggregated all Inspector activities to determine the number of compliance inspections conducted by ATF Inspectors, and included limited purpose inspections as well as activities unrelated to FFL compliance inspections. Another reason for the discrepancies related to the project codes used to identify types of inspections. According to ATF Headquarters officials, Area Supervisors do not always use the correct project codes when assigning inspections because the codes are "confusing." For our review, ATF Headquarters officials had to query an N-Spect "Special Instructions" data field for "firearms application inspection" and "firearms compliance inspection" rather than the appropriate project code in order to more accurately determine inspection totals.

The ATF has taken steps to ensure that inspection totals are accurately measured. In October 2003, the ATF released a new version of N-Spect that requires Area Supervisors to use pull-down menus that are inspection-specific (e.g., "Application Inspection"). Moreover, although the enhancements to the N-Spect database will increase the reliability of the data in the system, the ATF must adopt a standard approach for querying the N-Spect electronic database and ensure that queries are stored for future use so that subsequent requests for the same data will elicit comparable results. If the ATF does not adopt a standard method for querying and extracting historical data, it cannot consistently report accurate performance data.

## New Restriction on Retention of Gun Purchaser Data will Hinder the ATF's Ability to Detect Fraudulent Background Checks

As discussed in the Background section, prior to transferring a firearm to an unlicensed individual, an FFL must complete a check of the National Instant Criminal Background Check System (NICS) to determine if the potential purchaser is prohibited from owning a gun. For each query, the NICS currently collects information on whether or not the purchase was allowed to proceed, and retains information on the potential purchaser for 90 days. The FBI assigns each query a unique NICS Transaction Number (NTN), which FFLs are required to enter onto the corresponding Form 4473.

For the majority of dealers, NICS is a valuable tool that enables them to quickly determine whether a potential customer is prohibited from purchasing a firearm. However, some gun dealers could attempt to hide transfers to prohibited persons by falsifying NICS information. To deter fraud and detect FFLs that may be providing false information to pass a NICS check in order to facilitate a sale to a prohibited person, during FFL compliance inspections ATF Inspectors verify that the information submitted to NICS matches the information on the Form 4473. The Inspectors copy information on selected Forms 4473 from the past 90 days and check with the FBI to ensure that the information on the Form 4473 matches the information that the FFL provided at the time of the sale. If discrepancies are found, it may indicate than an FFL submitted false information to NICS in order to receive an NTN associated with a background check for a non-prohibited person. The ATF reported that it has not found any NICS violations involving the falsification of purchaser information through the Forms 4473 review.[70]

However, the ability of ATF Inspectors to conduct this Form 4473 review was affected when the FY 2004 appropriations act reduced the time that the FBI can retain information submitted by FFLs during the NICS check.[71] Beginning in July 2004, all purchaser information (e.g., name, address, date of birth) on NICS queries for which firearms sales are approved will no longer be kept for 90 days; it must be destroyed within 24 hours of the official NICS response to the FFL.[72] For approved sales, the FBI can retain for 90 days the NTN, the license number of the FFL that contacted NICS, and the date that the NICS query was made.

---

[70] *Gun Control: Potential Effects of Next-Day Destruction of NICS Background Check Records*, General Accounting Office, Report GAO-02-653, July 2002, 16-18. ATF Headquarters officials said, however, that they believe FFLs are aware of the ATF's procedures for inspecting Forms 4473 and are thereby deterred from supplying NICS with false purchaser information. The officials noted that the vast majority of discrepancies identified during FFL inspections occur because of clerical errors made by FFLs or Inspectors, such as FFL errors in recording purchaser information onto Forms 4473 or Inspector errors in copying information onto worksheets.

[71] The Fiscal Year 2004 Consolidated Appropriations Bill (Public Law 108-199) states that DOJ cannot retain "identifying information" related to sales of firearms to non-prohibited persons for more than 24 hours. All information related to calls for which potential sales are *denied* by NICS will still be retained indefinitely.

[72] As of March 2004, NICS officials plan on purging purchaser information every night, at midnight (EST). Therefore, purchaser information related to a firearm bought at 5 p.m. will be purged seven hours later.

---

U.S. Department of Justice
Office of the Inspector General
Evaluation and Inspections Division

After 90 days, the FBI may retain only the NTN and the date that the number was issued.

In 2002, ATF Headquarters officials suggested that the ATF's FFL compliance inspections program would not be affected by a "Next Day Destruction" provision.[73] Instead of submitting information copied from Forms 4473 to NICS, ATF Headquarters officials said that Inspectors could "recheck" the eligibility of purchasers by requesting that the FBI rerun selected NICS checks taken from FFL records during compliance inspections. However, while resubmitting Form 4473 information to NICS will determine whether the purchaser would be approved *on the date of the recheck*, it does not enable the ATF to effectively detect that the FFL supplied inaccurate information to NICS. There are reasons other than FFL fraud for a prior approved purchase to fail during a recheck. For instance, the purchaser may have become ineligible only since the sale, or the FBI NICS operator on the original query may have transposed letters or numbers resulting in an erroneous approval. Given these and other possible explanations, the lack of information in NICS will make it much more difficult for the ATF to prove that FFLs supplied false information initially.

Moreover, the shortened retention time will make it much easier for corrupt FFLs to avoid detection. We identified at least two potential ways that the new restriction would make it easier for corrupt FFLs to falsify the NICS check to hide a knowing transfer of a gun to a prohibited person.

- An FFL may enter correct information from the prohibited person on the Form 4473, but relay information for a person with a known "clean" record to the FBI for the NICS check. After July 2004, the ATF will have only 24 hours to detect this by cross-checking purchaser information in the FFL's records with NICS records.

- An FFL may falsify the date of the sale. Three factors make this tactic even safer for corrupt FFLs with only a 24-hour retention time – the fact that blank Forms 4473 are not serially numbered, A&D books are kept sequentially by the date that the FFL receives the guns (so disposition dates are not expected to be sequential), and after 90 days the NICS will retain only the

---

[73] *Gun Control: Potential Effects of Next-Day Destruction of NICS Background Check Records.* General Accounting Office, Report GAO-02-653, July 2002.

U.S. Department of Justice
Office of the Inspector General
Evaluation and Inspections Division

53

issue date for NTNs on approved transfers. To safely backdate a sale, a corrupt FFL needs only a good NTN that was issued to another FFL on a known date over 90 days before.[74] As long as the date on the Form 4473 and the "disposition date" in the A&D book match the date that the NTN was issued – and the dealer does not make the mistake of "selling" a gun on a date before it was received – the fraud will be exceedingly difficult to detect.

Given the new restriction on retaining NICS data, after July 2004 an ATF Inspector arriving on-site could only check the information on Forms 4473 filled out by the FFL that day. Therefore, the likelihood of encountering a falsified NICS check would be remote.

## CONCLUSIONS

We concluded that the ATF's FFL inspection program did not consistently ensure that FFLs comply with federal firearms laws. The lack of standardized inspection procedures resulted in inconsistent inspections of FFLs and significant variation in the implementation of the inspection program by Field Divisions. Our review of N-Spect performance data found that ATF's Field Divisions took an average of 35.3 hours to conduct FFL inspections to detect noncompliance with federal firearms laws, and one Division took only 24.5 hours on average to conduct its compliance inspections. We found no operational reasons why some Field Divisions averaged much longer, up to 90 hours, to conduct compliance inspections. In fact, we found little or no correlation between inspection times and enforcement activities, such as referrals of suspected criminal activity and adverse actions taken. Further, our finding that the Field Divisions varied significantly in such productivity measures as number of inspections finding violations and number of inspections done by each Inspector argues strongly for implementation of a more standardized and efficient inspection regimen.

Because the ATF does not conduct regular inspections of FFLs and lacks adequate resources to meet agency goals, it cannot effectively monitor the overall level of FFL compliance with federal firearms laws. In

---

[74] Using an NTN from another FFL limits the possibility that the fraud may be detected through the chance discovery of the same NTN twice in the FFL's records. Because NICS will delete which FFL an NTN was issued to, and FFLs are inspected independently, even where one individual holds multiple FFLs for different business locations, it will be very unlikely that such reuse of NTNs will be discovered.

December 2003, the ATF initiated a program to conduct special Random Sample Compliance Inspections to develop a risk model for the FFL inspection program. Using data from those inspections, the ATF planned to "be able to project the overall level of compliance by" gun dealers, pawnbrokers, and collectors.[75] While the project to estimate the overall level of compliance with laws is needed to estimate the challenges facing the ATF, it does not take the place of regular compliance inspections for deterring and identifying noncompliance with gun laws.

To ensure that all FFLs are treated consistently, and that the FFL inspection program is as efficient as possible, the ATF needs to implement a policy to ensure that inspections are conducted in a uniform manner, that inspections procedures are limited to the minimum steps needed to accomplish a valid review, and that violations are processed in a uniform and appropriate manner. A consistent and timely inspection process is essential for identifying and addressing scofflaw dealers and reducing the availability of illegal firearms to criminals.

---

[75] Memorandum, Assistant Director for Firearms, Explosives, and Arson to All Special Agents In Charge, December 8, 2003. ATF officials told us that the memorandum was not distributed to the Field Divisions until January 2004.

# RECOMMENDATIONS

We recommend that the ATF:

1. Develop a standard, streamlined inspection process that includes in-person inspections of all FFL applicants; more efficient inventory and records reviews; automated inspection reporting; and consistent examination of indicators of firearms trafficking.

2. Conduct a pilot project to test the streamlined inspection procedures and establish appropriate time standards for conducting these inspections.

3. Revise the staffing requirement report using the time standards to reflect the number of Inspectors needed to conduct compliance inspections on a triennial basis, or on an alternative schedule based on the FFL's compliance history.

4. Develop alternatives for better aligning Inspector resources with the distribution of FFLs, such as by redrawing Field Division boundaries, realigning personnel, or other methods.

5. Update the inspection tracking system to accurately segregate and report on Inspector time spent preparing for inspections, in travel, on-site at FFLs, and conducting other administrative duties.

6. Prepare quarterly reports on the productivity and results achieved by each Field Division.

7. Direct the National Licensing Center to develop an adverse action tracking system to monitor the progress and timeliness of FFL denials and revocations from the time an Inspector makes a recommendation until the proceedings are finalized.

8. Continue coordinating with the Department of Justice, Office of Legislative Affairs, to gain the authority to suspend or impose civil penalties on FFLs that violate federal firearms laws.

9. To improve the comprehensiveness of crime gun tracing by law enforcement agencies:

   a. Coordinate with the Office of Justice Programs to determine the feasibility of using discretionary grant funding to support crime gun tracing.

   b. Develop a model for more accurately identifying potential firearms trafficking through the analysis of an FFL's firearms sales volume and the number of firearms traced to the FFL.

## Appendix I: ATF Form 4473 (Page 1)

OMB NO. 1512-0129

**DEPARTMENT OF THE TREASURY**
**BUREAU OF ALCOHOL, TOBACCO AND FIREARMS**
**FIREARMS TRANSACTION RECORD PART I - OVER-THE-COUNTER**

Transferor's Transaction Serial Number

WARNING: You may not receive a firearm if prohibited by Federal or State Law. The information you provide will be used to determine whether you are prohibited under law from receiving a firearm.
Prepare in original only. All entries must be in ink. Read the Important Notices, Instructions and Definitions on this form.

### Section A - Must Be Completed Personally By Transferee (Buyer)

| 1. Transferee's Full Name (Last, First, Middle) | 2. Residence Address (No., Street, City, County, State, ZIP Code; cannot be a post office box) |
|---|---|

| 3. Place of Birth (City, State or foreign country) | 4. Height ____ Weight ____ | 5. ☐ Male ☐ Female | 6. Birth Date Month ____ Day ____ Year ____ | 7. Social Security Number (Optional, but will help prevent misidentification.) |
|---|---|---|---|---|

8. Race (Ethnicity) (Check one or more boxes)

☐ American Indian or Alaska Native    ☐ Black or African American    ☐ Native Hawaiian or Other Pacific Islander

☐ Hispanic or Latino    ☐ Asian    ☐ White

9. What is your State of residence (if any)? _____ (See Definition 5. If you are not a citizen of the United States, you have a State of residence only if you have resided in a State for at least 90 days prior to the date of this sale.)

10. What is your country of citizenship? (List more than one, if applicable.) _____

11. If you are not a citizen of the United States, what is your INS-issued alien number or admission number? _____

### Certification Of Transferee

12. Answer questions 12a through 12l by writing "yes" or "no" in the boxes to the right of the questions.

| | |
|---|---|
| a. Are you the actual buyer of the firearm(s) listed on this form? Warning: You are not the actual buyer if you are acquiring the firearm(s) on behalf of another person. If you are not the actual buyer, the dealer cannot transfer the firearm(s) to you. (See Important Notice 1 for actual buyer definition and examples.) | |
| b. Are you under indictment or information in any court for a felony, or any other crime, for which the judge could imprison you for more than one year? (An information is a formal accusation of a crime by a prosecutor. See Definition 3.) | |
| c. Have you been convicted in any court of a felony, or any other crime, for which the judge could have imprisoned you for more than one year, even if you received a shorter sentence including probation? (See Important Notice 6, Exception 1.) | |
| d. Are you a fugitive from justice? | |
| e. Are you an unlawful user of, or addicted to, marijuana, or any depressant, stimulant, or narcotic drug, or any other controlled substance? | |
| f. Have you ever been adjudicated mentally defective (which includes having been adjudicated incompetent to manage your own affairs) or have you ever been committed to a mental institution? | |
| g. Have you been discharged from the Armed Forces under dishonorable conditions? | |
| h. Are you subject to a court order restraining you from harassing, stalking, or threatening your child or an intimate partner or child of such partner? (See Important Notice 7.) | |
| i. Have you been convicted in any court of a misdemeanor crime of domestic violence? (See Important Notice 6, Exception 1 and Definition 4.) | |
| j. Have you ever renounced your United States citizenship? | |
| k. Are you an alien illegally in the United States? | |
| l. Are you a nonimmigrant alien? (See Definition 6.) | |

13. If you are a nonimmigrant alien, do you fall within any of the exceptions set forth in Important Notice 6, Exception 2?

Yes ☐    No ☐    Not applicable ☐    (If "yes," the licensee must complete question 18c.)

I certify that the above answers are true and correct. I understand that answering "yes" to question 12a when I am not the actual buyer of the firearm is a crime punishable as a felony. I understand that answering "yes" to any of the questions 12b through 12k is prohibited from purchasing or receiving a firearm. I understand that a person who answers "yes" to question 12l is prohibited from purchasing or receiving a firearm, unless the person also answers "yes" to question 13. I also understand that making any false oral or written statement, or the exhibiting any false or misrepresented identification with respect to this transaction, is a crime punishable as a felony. I further understand that the repetitive purchase of firearms for the purpose of resale for livelihood and profit without a Federal firearms license is a violation of law. (See Important Notice 8.)

| 14. Transferee's Signature | 15. Date |
|---|---|

ATF F 4473 (5300.9) PART I (10-2001) PREVIOUS EDITIONS ARE OBSOLETE

## Appendix I: ATF Form 4473 (Page 2)

**Section B - Must Be Completed By Transferor (Seller)**

16. Type of firearm(s) to be transferred:

☐ Handgun   ☐ Long Gun   ☐ Both

17. Location of sale if at a gun show. *(See Instruction to Transferor 13.)*

_____ (city, state)

18a. Type of Identification *(e.g., driver's license or other valid government-issued photo identification):* _____

Number on Identification: _____

Expiration Date of Identification *(if any)* _____   *(See Instruction to Transferor 1.)*

18b. **Aliens only:** Types and dates of additional required identification *(e.g., utility bills or lease agreements. See Instruction to Transferor 2.)*

18c. **Nonimmigrant aliens only:** Type of documentation showing an exception to the nonimmigrant alien prohibition *(e.g., hunting license/permit, waiver. See Instruction to Transferor 3.)*

**Question 19, 20, or 21 Must Be Completed Prior To The Transfer Of The Firearm(s)** *(See Instructions to Transferor 5-7.)*

19a. The transferee's identifying information in Section A of this form was transmitted to NICS or the appropriate state agency on _____ *(Date).*

19b. The NICS or state transaction number *(if provided)* was: _____

19c. The response initially provided by NICS or the appropriate state agency was:

☐ Proceed   ☐ Denied   ☐ Delayed

19d. If initial NICS or state response was "Delayed," the following response was received from NICS or the appropriate state agency on: _____ *(Date)*

☐ Proceed   ☐ Denied   ☐ No resolution was provided within 3 business days.

19e. The name and Brady identification number of the NICS examiner *(if provided)* _____ / _____ *(optional)*
*(name)* *(number)*

20. ☐ No NICS check was required because the transfer involved only NFA firearm(s). *(See Instruction to Transferor 7.)*

21. ☐ No NICS check was required because the buyer has a valid permit which qualifies as an exemption to NICS *(See Instruction to Transferor 7.)*

State Permit Type: _____   Date of Issuance: _____

Expiration Date *(if any):* _____   Permit Number: _____

**Section C**

If the transfer of the firearm(s) takes place on a different day from the date that the transferee signed Section A, the transferee must complete Section C immediately prior to the transfer of the firearm(s). *(See Instruction to Transferor 3 & Instruction to Transferor 8.)*

**I certify that the answers I provided to the questions in Section A of this form are still true and correct.**

22. Transferee's Signature

23. Date

**Section D**

| 24. Manufacturer and/or Importer | 25. Model | 26. Serial Number | 27. Type *(pistol, revolver, rifle, shotgun, etc.)* | 28. Caliber or Gauge |
|---|---|---|---|---|
|  |  |  |  |  |
|  |  |  |  |  |
|  |  |  |  |  |

**Complete ATF F 3310.4 For Multiple Purchases Of Handguns** *(See Instruction to Transferor 11.)*

29. Trade/corporate name and address of transferor *(Hand stamp may be used.)*

30. Federal Firearms License Number *(Hand stamp may be used.)*

On the basis of (1) the statements in Section A; (2) my verification of identity noted in question 18a and my verification again at the time of transfer *(if the transfer does not occur on the same day the verification was noted in question 18a)*; and (3) the information in the current State Laws and Published Ordinances, it is my belief that it is not unlawful for me to sell, deliver, transport, or otherwise dispose of the firearm(s) listed on this form to the person identified in Section A.

**The Person Actually Transferring The Firearm(s) Must Complete Questions 31-34.**

| 31. Transferor's Name *(Please print.)* | 32. Transferor's Signature | 33. Transferor's Title | 34. Date Transfer is completed |
|---|---|---|---|
|  |  |  |  |

*U.S. Government Printing Office: 2002 — 783-779

ATF F 4473 (5300.9) PART I (10-2001)

**Appendix II: Area Supervisor Survey**



# U.S. Department of Justice
### Office of the Inspector General
### Area Supervisor Survey

**Purpose:** *This survey is being conducted by the U.S. Department of Justice, Office of the Inspector General (OIG). The OIG is evaluating the effectiveness of the Federal Firearms Licensee (FFL) inspection programs implemented by the Bureau of Alcohol, Tobacco, Firearms and Explosives (ATF).*

**Note:** *Please be advised that any information collected from this survey will not be attributed to individual Area Supervisors.*

**Directions:** *This survey should take approximately 10 minutes to complete. Click on the gray areas to complete your responses. Please complete and return to the OIG via email or fax by October 24, 2003. The fax number is provided at the end of the survey. If you have any questions concerning this survey, please call OIG Inspector                , at            .*

### Please return your completed survey by October 24, 2003.

Name:

Field Division:

Telephone Number:

Inspector Staffing
**Please limit your responses to your Group and Satellite Office staff only – not to the entire Field Division.**

1.    How many Inspectors are currently assigned to your Group?

2. In your opinion, is your Group staffed so that your Inspectors can adequately inspect the Federal Firearms Licensees and explosives permitees in your Area?

☐ Yes    ☐ No

**[If Yes, please skip to Question 4.]**

3. How many <u>additional</u> Inspectors would need to be assigned to your Group so that your Inspectors could adequately inspect the Federal Firearms Licensees and explosives permitees in your Area?

4. How many of your Inspectors also serve as Adverse Action Hearing Officers, if any?

5. How many Special Operations Inspectors are assigned to your Group, if any?

Federal Firearms Licensees
**Please limit your answers in this section to your Group, as well as any Satellite Offices assigned to your group.**

6. On average, how many <u>new</u> FFL applications are processed for your Area Office each month by the National Licensing Center?

7. How many new FFL applicant inspections do you assign to your staff?

☐ All    ☐ Some (As Needed)    ☐ None

**[If None, skip to Question 9]**

8. How are new FFL applicant inspections conducted?

☐ By Phone   ☐ In Person      ☐ Both

9. To the best of your knowledge, how many FFL inspection assignments in your Group were pre-determined by ATF Headquarters, in fiscal year 2003?

10. How many inspections pre-determined by ATF Headquarters do you plan to assign in fiscal year 2004?

11. Are any of these 2004 inspections carry-overs from 2003?

☐ Yes.      ☐ No.

12. To the best of your knowledge, how many FFL inspection assignments in your Group were pre-determined by the National Tracing Center, in fiscal year 2003? Please specify, according to inspection type.

Focused Inspections.

Demand Letter Inspections.

Other NTC-assigned Inspections.

13. How many inspections pre-determined by the National Tracing Center do you plan to assign in fiscal year 2004?

14. Are any of these 2004 inspections carry-overs from 2003?

☐ Yes.      ☐ No.

15.     To the best of your knowledge, how many FFL inspection assignments in your Group were based on information referred from ATF Special Agents, in fiscal year 2003?

☐ None     ☐ 1 to 5     ☐ 6 to 10     ☐ 10+

Explosives Permittees
**Please limit your answers in this section to your Group, as well as any Satellite Offices assigned to your group.**

16.     How many explosives inspections do you plan to assign in fiscal year 2004?

17.     What impact has the Safe Explosives Act had on your Group's ability to inspect FFLs? (Please describe.)

Federal Firearms Licensee Inspections
**Please limit your answers in this section to your Group, as well as any Satellite Offices assigned to your Group.**

18.     On average, how many work hours should a New Application Inspection take an Inspector to complete, including travel time and writing the report?

            Hours.

19.     Please rate the effectiveness of the National Tracing Center data in determining which FFLs should be inspected in your area.

☐ *Very Effective*
☐ *Somewhat Effective*
☐ *Somewhat Ineffective*
☐ *Very Ineffective*
☐ *Not Applicable*

---

20. Why is the National Tracing Center data effective or ineffective in determining which FFLs should be inspected in your area, and how might this be improved? (Please describe.)

21. Please rate the effectiveness to which the list of mandatory inspections, provided by ATF Headquarters, adequately and fully identify those FFLs that should be inspected, based on indications that the FFL is violating Federal firearms laws?

☐ *Very Effective*
☐ *Somewhat Effective*
☐ *Somewhat Ineffective*
☐ *Very Ineffective*
☐ *Not Applicable*

22. Why is the ATF Headquarters data effective or ineffective in determining which FFLs should be inspected in your area, and how might this be improved? (Please describe.)

23. If enacted in your Group, please rate the effectiveness of the Flexiplace Program, as it would relate to your Inspectors conducting FFL inspections? (Flexiplace is a program under which employees are permitted to perform all or a portion of their duties at a Flexiplace work telecommuting center.)

☐ *Very Effective*
☐ *Somewhat Effective*
☐ *Somewhat Ineffective*
☐ *Very Ineffective*
☐ *Not Applicable*

**Submitting this survey**
You may submit this survey by email or fax.
**Please return by October 24, 2003.**

***Email:*** To email this survey:
1. Save your completed survey as a <u>new</u> MS-Word document.
2. Hit 'reply' to the original OIG email.
3. Attach survey to 'reply' email before sending.

*Fax:*     To fax this survey, please print out your completed survey and fax it to: (xxx) xxx-xxxx.  (Surveys completed by hand will also be accepted.) Please address your fax cover sheet to: Office of the Inspector General, Attention: Inspector xxxxxxxxxxxxxxxxxxxxxxxx.

## APPENDIX III: ATF COMMENTS ON THE DRAFT REPORT



**U.S. Department of Justice**

Bureau of Alcohol, Tobacco,
Firearms and Explosives

*Office of the Director*

JUN 2 9 2004 Washington, DC 20226

900000:CAA
8310

MEMORANDUM TO: Assistant Inspector General for Evaluation and Audits

FROM: Director

SUBJECT: Response to the Office of Inspector General's (OIG)
Draft Report: Review of the Inspections of Firearms Dealers
Performed by the Bureau of Alcohol, Tobacco, Firearms and
Explosives, Assignment Number A-2003-008

The Bureau of Alcohol, Tobacco, Firearms and Explosives (ATF) appreciates the
opportunity to respond to the recommendations in the OIG's above-cited draft report. In
addition to responding to the recommendations, we have provided responses to the
"Results of the Review" section of the draft report. Although we already have adopted
many of the recommendations, we welcome the constructive criticism of our programs.
The independent evaluation will help us to utilize our inspector resources even more
effectively and efficiently.

As you know, ATF's move to the Department of Justice (DOJ) established an agency
with a more focused mission of preventing the criminal misuse of firearms and
explosives. Thus, we have become a stronger, more effective law enforcement and
regulatory agency. Through ATF's inspection program and other regulatory activities,
we encourage and ensure compliance with the Federal firearms laws and regulations in
order to prevent the criminal diversion of firearms and ensure law enforcement's ability
to trace crime guns.

ATF knows that Federal Firearms Licensees (FFLs) with significant compliance
problems -- though a small percentage of the overall licensee population of
approximately 104,000 -- are a threat to public safety. Therefore, ATF is committed to
continuing to improve its inspection procedures to ensure that all FFLs comply with the
firearms laws and regulations, that firearms are not diverted from the legal to illegal
market, and that corrupt FFLs are put out of business.

-2-

Assistant Inspector General for Evaluation and Audits

Our responses to your recommendations are as follows:

**1. Develop a standard, streamlined inspection process that includes in-person inspections of all applicants; more efficient inventory and records reviews; automated inspection reporting; and consistent examination of indicators of firearms trafficking.**

ATF concurs with this recommendation. ATF recognizes that standardized inspection procedures are essential to ensure the most effective inspection techniques are used consistently throughout the country. Moreover, the procedures must be streamlined to ensure our inspector resources are used efficiently. This will enable ATF to ensure FFLs are complying with licensing requirements, which will help prevent the diversion of firearms to the illegal market. While ATF recognizes standard procedures are essential, allowing area supervisors and inspectors to exercise their professional judgment on how to efficiently and effectively conduct certain aspects of the inspection program also is critical to creating a strong regulatory program. ATF identified and began to address deficiencies within our inspection program prior to the initiation of the audit by the OIG. Based on the recommendations, ATF will undertake additional steps to improve our inspection programs.

**In-person inspections of all applicants**

ATF agrees that firearms application inspections are critical to ensuring compliance with the Federal firearms laws. ATF also agrees that inspections conducted in-person help to ensure a greater understanding of the Federal firearms laws and thus often result in a higher level of FFL compliance. Additionally, in-person inspections help establish an FFL's understanding of the Federal firearms laws at the time of license issuance, which enables ATF to more easily demonstrate "willfulness" if an FFL subsequently does violate the Federal firearms laws.

The Gun Control Act (GCA) requires ATF to process applications within 60-days. As noted in the draft report, historically we have not possessed the resources to inspect all applicants in-person within this timeframe. Because ATF agrees that firearms application inspections should be done in-person, prior to the issuance of this draft report, we revised guidance to our field divisions and now require the in-person inspection of all new applicants in 14 selected metropolitan areas. The application inspections in these 14 locations will be included in our Integrated Violence Reduction Strategy (IVRS) violent crime performance measures that are reported to Congress.

-3-

Assistant Inspector General for Evaluation and Audits

ATF also is taking steps to conduct in-person application inspections nationwide. New procedures issued in June 2004 generally require that an inspector must meet with an applicant in-person. An area supervisor does have discretion under this policy to decide whether an in-person inspection is an effective use of ATF resources. Although telephonic interviews are not ideal, sometimes they are necessary, such as when an FFL is located very far from the ATF field office. Under the June 2004 policy, if an FFL does not have an in-person application inspection, an in-person compliance inspection must be scheduled in the first year after issuance of the license.

Finally, ATF hopes that after studying the allocation of its inspector resources (which is discussed in detail later in this response) and streamlining its inspections (also discussed below), it will have the resources to conduct more in-person application inspections.

**More efficient inventory and records review**

ATF agrees with the OIG's recommendation that ATF should establish a more efficient inventory and record review process. ATF already has taken steps to achieve this goal. In June 2004, ATF issued a memorandum entitled, "Guidelines for Conducting Federal Firearms Licensee Compliance Inspections." The Guidelines set forth the following requirements for inspectors:

- **Period of Records Review**

The period of record review is to go back 1 year from the start of the inspection, or in the case of a recall inspection, from the date of the last inspection.

- **Inventory**

The Guidelines set out when complete inventory verifications must be performed. Complete inventory verification means that each firearm in inventory must be physically identified by serial number and matched to the corresponding bound book entry, and each open entry in the bound book must be accounted for.

- **Review of ATF Forms 4473s**

The Guidelines also establish the number of Forms 4473 that must be reviewed. If problems are identified with the Form 4473s selected for review, the number of forms reviewed is to be expanded. These firearms records will be reviewed for indications of firearms trafficking activity such as unreported multiple sales of handguns and straw purchases. Referrals to ATF agents will be made when indicators of firearms trafficking are present.

-4-

Assistant Inspector General for Evaluation and Audits

We believe judgmentally sampling Forms 4473, by first isolating weapons of choice, is better than random sampling all Forms 4473. The later approach would include reviewing purchases for types of weapons that are not used in crime, e.g., .22 caliber rifles. In addition, many FFLs do not have sufficient sales to conduct a valid random sample since the total sales volume is less than 200. In light of the OIG comments, we are reviewing random sampling as an inspection tool in order to determine if procedures could be developed for large FFLs. We are very familiar with this process and had used it extensively for alcohol and tobacco tax audits when this Bureau was part of the Treasury Department.

**Automated Inspection Reporting**

The draft report discusses the extensive paperwork inspectors must complete while at an FFL's premises, which later must be entered into ATF's N-Spect database. The draft report suggests that inspectors be given laptops to use during inspections so that they can streamline this process. ATF agrees using laptops would be a more efficient process, and in fact had issued laptops to all inspectors over 3 years ago. Every inspector has one today.

However, many FFLs are not comfortable with ATF inspectors using laptop computers during inspections. ATF is prohibited by law from creating a registry of firearms and firearm owners. When our inspectors use their laptop computers during an FFL inspection, many FFLs express concern that the computers are being used to create a national firearms registry, rather than being used to automate the inspection process. Inspectors are sensitive to these apprehensions and seek the approval of the FFL prior to using their ATF laptop during an inspection. Because ATF strives to have a cooperative relationship with FFLs, inspectors do not use laptop computers if an FFL does not want them to.

ATF is in the process of reevaluating all workplans and work papers to eliminate work steps and work papers that are not critical to the final report. This should reduce the need for inspectors to complete work papers manually and then reenter the data in N-Spect. Until new procedures are finalized, our inspectors will continue to enter their inspection information in N-SPECT in accordance with established guidelines so that the inspection results can be accurately monitored.

-5-

Assistant Inspector General for Evaluation and Audits

**Consistent examination of indicators of firearms trafficking.**

The draft report recommends that ATF establish guidance to ensure that inspectors consistently look for known indications of firearms trafficking and, when found, report the findings to ATF's criminal enforcement division. The draft report notes that ATF has taken steps to improve coordination between inspectors and special agents by creating a Special Intelligence Inspector (SII) position in each field division, although it states that as of November 2003 only 7 of the 23 positions had been filled.

ATF agrees this recommendation is essential to ensure we effectively prevent firearms trafficking. The June 2004 memorandum identified trafficking indicators and provided guidelines for referring cases with such indicators to special agents. ATF also is developing a Focused Inspection Work Plan that will concentrate on trafficking indicators. A group comprised of Directors of Industry Operations (DIO) is developing this plan and they will be given this draft report to assist them with the plan. The group is required to have their comments to ATF management by October 1, 2004. Currently, the idea is that for certain inspections, the work steps will be reduced to include only those activities essential to identifying illegal firearm purchases, traffickers, and corrupt FFLs. This will make inspections more efficient, which, will as the OIG suggests in its draft report, enable ATF inspectors to conduct more inspections.

In addition, ATF continually works to improve the coordination between inspectors and special agents. Currently, 10 SII positions have been filled and we are actively trying to fill the others. Furthermore, ATF has tasked a working group of upper management to analyze how unified operations of criminal and regulatory personnel can best be structured to achieve efficiency and meet the goals of our strategic plan.

**Other steps ATF is taking to standardize and streamline the inspection process.**

In addition, ATF currently is updating its Inspector Handbook to provide better guidance to inspectors on the conducting of inspections. As noted earlier, ATF is analyzing the entire report and work paper process and evaluating the use of a narrative report. This review will examine all facets of the inspection report, including the work program, work papers, gathering evidence of violations, applicability of statistical sampling, and a standard narrative report format. Through this reevaluation process, ATF will improve the effectiveness and efficiency of the inspection process.

**2. Conduct a pilot project to test the streamlined inspection procedures and establish appropriate time standards for conducting these inspections.**

ATF concurs with this recommendation.

-6-

Assistant Inspector General for Evaluation and Audits

As stated above, ATF is developing streamlined, standardized inspection procedures. We will conduct a pilot project of the procedures during FY-05 in several field divisions.

**3. Revise the staffing requirement report using the time standards to reflect the number of inspectors needed to conduct compliance inspections on a triennial basis, or an alternative schedule based on the FFL's compliance history.**

ATF concurs with this recommendation.

A working group of senior managers has been tasked with developing a workload model for field resources. At this time, a completion date has not been determined but a status report is due to the Assistant Director (Field Operations) in late June 2004. Presently, the managers are evaluating factors such as crime statistics, task forces, immediate and long term needs, and the FFL population, for inclusion in the workload model. The working group will be given a copy of this draft report. They will be asked to consider the shorter inspection times provided in the report, as well as an alternative inspection schedule based on an FFL's compliance history, in developing the model.

Once the new workload model is finalized, ATF will evaluate the staffing levels at each of our field offices to ensure they operate effectively and efficiently to meet our mission. At that time, we will determine if voluntary reassignments are necessary.

**4. Develop alternatives for better aligning inspector resources with the distribution of FFLs, such as by redrawing field division boundaries, realigning personnel, or other methods.**

ATF concurs with this recommendation.

The draft report found ATF has not distributed its inspector resources among the field divisions to match the distribution of FFLs, resulting in workload imbalances among the field divisions. ATF agrees that to most effectively conduct FFL inspections, inspector resources must be matched to the FFL population.

ATF inspectors, presently and historically, have responsibilities beyond inspecting FFLs. The division of ATF into the Tax and Trade Bureau (TTB) and the Bureau of Alcohol, Tobacco, Firearms and Explosives, as well as the passage of the Safe Explosives Act, caused ATF's regulatory landscape to be redrawn. There is no longer a need for inspectors to focus on alcohol and tobacco issues, but they now have more extensive

-7-

Assistant Inspector General for Evaluation and Audits

explosives responsibilities. Moreover, with the creation of TTB, ATF experienced a 25 percent reduction in inspectors nationwide, which is much higher than ATF originally anticipated. These factors have created some of the current imbalances between the numbers of inspectors and FFLs amongst the field divisions.

As stated in response to recommendation number 3, ATF is creating a new workload model for inspector staffing. Once it is finalized, we will determine if we need to reassign inspectors to better align inspector resources with the distribution of FFLs.

At this time, ATF is not planning to modify the existing structure of 23 field divisions. However, we are consolidating our DIO positions so that they accurately correspond to FFL and explosives inspection workloads and inspector resources.

Further, ATF has contracted with an academic researcher to assess and provide recommendations to improve ATF's firearms-related strategic plan and generate performance measures to help us maximize our existing resources.

Finally, ATF is taking steps to help us better target which FFLs to inspect. This will allow us to use our inspector resources more efficiently. Our plan is to use accepted statistical sampling concepts to assign FFL inspections as part of a random sample compliance model. We currently are gathering information regarding the factors that should be employed to analyze the FFL population. Once that information is collected, analyzed, and validated, it will be applied to the FFL population to generate inspection assignments using a viable risk model.

5. Update the inspection tracking system to accurately segregate and report on inspector time spent preparing for the inspections, in travel, on site at FFLs, and conducting other administrative duties.

ATF does not concur with this recommendation.

ATF is committed to monitoring the time inspectors spend on various assignments, so that we can ensure inspectors are operating efficiently and can work to align inspector resources with regulatory needs across the country. However, ATF does not believe it is necessary to categorize inspector work time by function (e.g., travel time v. preparation time) to achieve this goal.

-8-

Assistant Inspector General for Evaluation and Audits

Rather, ATF's case management system, N-FOCIS, uses project codes that categorize by "commodity" activity, e.g., firearms, which allows us to properly capture all administrative costs associated with ATF's mission. N-FOCIS has recently undergone system upgrades that allow us to track an inspector's activity using detailed profile codes.

Using these codes, ATF can differentiate between types of firearms inspections, application versus compliance, and within these, the types of specific inspections. For example, compliance has many subcategories including random sample, focused, etc. These system improvements enable ATF to gather data to compare inspections and related travel, to non-inspection work time. The changes provide for better categorization of inspector workloads. Although the purpose of N-FOCIS is to facilitate the tracking of commodity activities, firearms versus explosives versus alcohol and tobacco, and not capture timekeeping activities, N-FOCIS does segregate and capture general assignments that are completed by field personnel. Therefore, it provides us with an accurate picture of the time spent by field personnel on assignments.

**6. Prepare quarterly reports on the productivity and results achieved by each field division.**

ATF concurs with this recommendation.

ATF agrees it is essential to monitor the productivity of the field divisions so that we can ensure our resources are being used as efficiently and effectively as possible. We also must monitor the results of inspections to provide us with information on where trafficking problems may exist.

In order to address this issue, ATF recently created the position of Deputy Assistant Director (Field Operations – Industry Operations) to help manage ATF's regulatory enforcement efforts, including recent initiatives mentioned in the draft report and in this response. One of the first projects the Deputy Assistant Director undertook was creating a quarterly report detailing productivity and results achieved by each field division. The first report, covering the 1st and 2nd quarters of the current fiscal year, was issued in May 2004. This report provides data on how many total inspections have been completed, including how many focused and random sampling inspections, along with the remaining workload projections of each field division for this fiscal year.

The quarterly report will ensure that each field division is working on mandated Headquarters projects and demonstrate whether they are successfully completing the projects. Additionally, the reports will make ATF management aware of the constraints

-9-

Assistant Inspector General for Evaluation and Audits

that the field divisions are operating under. If targets are not met, steps can be taken to address the underlying problem. The reports also will show where potential trafficking problems may exist.

Furthermore, ATF recently has established the Case Management Branch (CMB) within our Field Operations Directorate to track and evaluate industry operations and criminal enforcement activities, conduct case comparisons, and make recommendations to management when needed. The CMB works closely with the field offices and the Deputy Assistant Director (Field Operations - Industry Operations) to ensure data integrity and workload priorities are being met.

**7. Direct the National Licensing Center to develop an adverse action tracking system to monitor the progress and timeliness of FFL denials and revocations from the time an inspector makes a recommendation until the proceedings are finalized.**

We concur with this recommendation.

A tracking system will help ATF ensure FFL denials and revocations proceed as efficiently as possible, which is essential to ensuring FFLs who violate the Federal firearms laws do not remain in the business of selling firearms.

The Division Chief, Firearms and Explosives Services, has been given the responsibility of developing and monitoring an improved adverse action tracking system for denials and revocations of licenses. Currently, the tracking system only covers FFLs who, having been issued a notice of revocation or denial, have requested a hearing. The system will be expanded to include all cases where a notice of revocation or denial is issued. (Please note, it would not be useful for an inspector recommendation to initiate the tracking system, because until a supervisor approves the denial or revocation action, no notice will be issued.) Moreover, under the new system, an e-copy of the tracking report will be forwarded to all Division Counsel on a monthly basis. Division Counsel previously have not been notified, on a regular basis, of the status of adverse action cases. Keeping counsel timely apprised of how many adverse actions are in their division, as well as how long they have been pending, will enable counsel to address any workload concerns.

Further, under the new system, we will provide an e-copy of the tracking report to all DIOs on a monthly basis. This will enable DIOs to be aware of any delays caused by either their staff or the FFL which impact on the progress of the adverse action.

Finally, additional data fields will be incorporated into the revised tracking system to more accurately reflect the progress of adverse actions.

-10-

Assistant Inspector General for Evaluation and Audits

**8. Continue coordinating with the Department of Justice, Office of Legislative Affairs, to gain the authority to suspend or impose civil penalties on FFLs that violate Federal firearms laws.**

ATF concurs with this recommendation.

ATF will continue to work with the Department of Justice's Office of Legislative Affairs on this matter. Specifically, ATF will discuss the benefits of having regulatory options other than revocation, such as license suspension, the authority to issue civil penalties for minor violations, and the authority to resolve disputes short of litigation through offers in compromise.

We would like to clarify one misstatement in the draft report. The draft report states ATF has no authority to fine FFLs. ATF actually has authority to fine FFLs in one limited situation: if an FFL does not conduct a required National Instant Criminal Background System (NICS) check and the person would have been prohibited from possessing or receiving a firearm, the FFL may be fined not more than $5,000.

**9. To improve the comprehensiveness of crime gun tracing by law enforcement agencies:**

**a. Coordinate with the Office of Justice Programs to determine the feasibility of using discretionary grant funding to support crime gun tracing.**

ATF concurs with this recommendation.

A discussion will be held with other DOJ entities to determine the feasibility of using discretionary grant funding to support local police departments who want to trace all crime guns. We will initiate such discussions soon.

**b. Develop a model for more accurately identifying potential firearms trafficking through the analysis of an FFL's firearms sales volume and the number of firearms traced to the FFL.**

ATF conditionally concurs with this recommendation.

ATF continually works to better identify FFLs who may be a source of trafficked firearms so that it can focus its inspection and enforcement efforts on these dealers. However, ATF presently cannot capture the ratio of firearm sales to firearms traced for all FFLs. This is because ATF does not have access to real time firearms retail sales data for all FFLs. NICS data does not represent the complete sales picture. Purchasers may

-11-

Assistant Inspector General for Evaluation and Audits

and often do acquire more than one firearm on a single NICS check. Moreover, purchasers who possess State-issued firearms permits that qualify as an exception for a NICS check obtain firearms without the check. In addition, it can be difficult for ATF to get data from States who serve as Points of Contact for NICS. Since not all FFLs are inspected annually, we cannot get this information from FFL inspections. Further, since not all law enforcement entities trace crime guns, our tracing data is not comprehensive.

However, since October 2000, ATF has obtained information on firearms dispositions from FFLs on their applications for license renewal. The data reported covers the 3-year period of the previous license. It may be possible to compare this data with trace data sorted by FFL. In theory, those FFLs with the highest ratio of traces, in the past 3 years, to reported dispositions could then be identified and scheduled for compliance inspection. While the data periods of any such effort would not be consistent across FFLs and the results might not be easily developed, ATF will attempt to come up with such a ratio analysis, perhaps on a pilot basis. If the project is successful, we will adopt it as an additional indicator of FFLs to inspect.

Moreover, since 2000, ATF has invested significant resources to using firearm trace information to target which FFLs should be inspected using factors other than the ratio of guns traced to gun sales. ATF believes these efforts have been effective.

**Results of the Review:**

As stated previously, we would like to comment on the findings of the draft report.

**The ATF does not conduct in-person application inspections on all new FFLs to verify applicant information and ensure that they understand firearms laws.**

ATF agrees that firearms application inspections are critical to ensuring compliance with the Federal firearms laws and that inspections conducted in-person help to ensure a greater understanding of the Federal firearms laws and thus often achieve a higher level of FFL compliance. Additionally, in-person inspections help establish an FFL's understanding of the Federal firearms laws at the time of license issuance, which enables ATF to more easily demonstrate "willfulness" if an FFL subsequently does violate the Federal firearms laws.

Because ATF agrees that firearms application inspections should be done in-person, prior to the issuance of this report, we revised guidance to our field divisions requiring the in-person inspection of all new applicants in 14 selected metropolitan areas. ATF also is

-12-

Assistant Inspector General for Evaluation and Audits

taking steps to conduct in-person application inspections nationwide. New procedures issued in June 2004 generally require that an inspector must meet with an applicant in-person. An area supervisor does have discretion under this policy to decide whether an in-person interview is an effective use of ATF resources. Under the June 2004 policy, if an FFL does not have an in-person application inspection, an in-person compliance inspection must be scheduled in the first year after issuance of the license.

**The ATF does not regularly conduct compliance inspections on active FFLs, including large-scale retailers.**

ATF recognizes it cannot conduct annual compliance inspections of all FFLs because of the large population of licensees (104,000) and the small number of inspectors (420). Therefore, ATF works to most effectively utilize its inspector resources. For example, it focuses on licensees with a history of non-compliance and licensees with indicators of firearms trafficking, as well as carrying out its random sample inspection program. As stated elsewhere in this report, ATF is undertaking new efforts to effectively target FFLs for inspection, streamline the inspection process to allow for more inspections overall, and deploy its inspector resources more efficiently. Moreover, ATF has been working to ensure only FFLs who are engaged in the business of dealing in firearms, as required by the Gun Control Act, are licensed so that regulatory resources are not wasted on persons who do not merit firearms licenses.

Finally, the fact that an FFL is large does not exclude it from being selected for inspection. In fact, inspections of many large FFLs are mandated under ATF's Focused Inspection Program, because they have large numbers of firearm traces or trafficking indicators.

**The ATF does not identify and inspect all FFLs that exhibited indicators of potential violations or gun trafficking.**

ATF does identify all FFLs that exhibit indicators of potential violations or gun trafficking based on trace data available. However, we limit inspection requirements based upon our available inspector resources. We direct our resources to those FFLs that appear most problematic. The initiatives discussed throughout this response should enable ATF to inspect more of these FFLs in the future. For example, as discussed above, ATF is presently undertaking the use of accepted statistical sampling concepts to assign FFL inspections. ATF is gathering information regarding the factors that should be employed to analyze the FFL population. Once those factors are collected, analyzed

-13-

Assistant Inspector General for Evaluation and Audits

and validated, they will be applied to the FFL population to generate inspection assignments using a viable risk model. Similarly, the new work plan focusing on trafficking should both highlight trafficking problems and enable more efficient inspections which will allow for more inspections.

**Gun tracing has significant shortcomings that limit its use for identifying FFLs that should be inspected.**

ATF's National Tracing Center (NTC), the only organization of its kind in the United States, provides 24-hour assistance to Federal, State, local, and foreign law enforcement agencies in their fight against violent crime involving firearms. The draft report states that it was established in 1994. However, ATF has traced crime guns since Federal law first required FFLs to maintain their records. 1994 simply was the year the NTC moved to its present site in Martinsburg, West Virginia.

ATF's NTC plays a critical role both in assisting other law enforcement entities and in targeting ATF's enforcement and regulatory resources. While ATF agrees there currently are some problems with using tracing statistics to identify FFLs to inspect, ATF is taking steps to address these problems. Moreover, after taking potential biases created by these problems into account, ATF does make extensive use of trace data in targeting FFLs to inspect.

One current limitation with trace data is that not all law enforcement agencies conduct comprehensive tracing as is the case in Youth Crime Gun Interdiction Initiative cities. Increased use of tracing in areas where it is not currently conducted would help identify FFLs to inspect. As stated in response to recommendation 9, ATF will work to encourage more localities to do comprehensive tracing.

Another weakness of trace data raised in the draft report is that most used guns cannot be traced because absent any State regulation, there is no requirement to document transfers between individuals. ATF's "Demand Letter" program identifies dealers who may have a large number of traces associated with the secondhand sales of firearms. By collecting limited used gun information from these FFLs, ATF is able to trace any second hand guns sold by these dealers.

The third weakness discussed in the draft report is the lack of a ratio of guns traced to sales volume. Once again, ATF is taking steps to address this problem. As discussed in response to recommendation 9, efforts will be made to identify the relationship between sales volume and traced firearms.

-14-

Assistant Inspector General for Evaluation and Audits

While these weaknesses do exist, ATF believes it currently uses its trace data effectively to target FFLs for inspections. For example, ATF's "Focused Inspection" and "Demand Letter" programs use this data and have achieved beneficial results.

The draft report concludes that traces originating in particular cities are associated with dealers in and around those cities. However, there are many cities with firearms sourced on a regional and national basis. Therefore, it is not especially useful to compare, as the draft report does, the number of traces submitted by law enforcement in a field division and the number of inspections in that field division. ATF's Focused Inspection and Demand Programs capture FFLs with trafficking indicators no matter where the firearms are used in crime. FFLs are routinely identified for inspection if they meet the criteria for having a certain number of short time-to-crime traces, no matter where the law enforcement agencies that requested the traces were located. (This was the basis for increased enforcement activity regarding FFLs in Mississippi who were identified through guns recovered in Chicago).

Moreover, ATF often relies on field offices to be aware of the trace histories of the local dealer population to focus their inspection efforts. The draft report reflected that field offices were making such efforts. Further, field offices increasingly have been asking the NTC for FFL trace histories, showing they are trying to better target their inspection efforts.

Field Office FFL History Requests:

| FY01 | FY02 | FY03 |
|------|------|------|
| 1,197 | 1,639 | 2,205 |

**ATF field divisions implement FFL inspections inconsistently.**

ATF has been working on standardizing and streamlining the present procedures for conducting firearms inspections since before the initiation of the OIG audit. The new guidelines issued in June 2004 establish clear guidance for how inspections are to be conducted. We are confident they will make inspections more consistent across field divisions.

**Suspected criminal violations are not always referred for investigation.**

The June 2004 guidelines remind inspectors that information referrals should be made when trafficking indicators are present. Moreover, as discussed in response to recommendation 1, ATF is working to better coordinate its regulatory and enforcement personnel.

-15-

Assistant Inspector General for Evaluation and Audits

**The ATF acts infrequently to revoke Federal firearms licenses, and the process is not timely. New ATF policy begins to address inconsistent and untimely adverse actions.**

ATF appreciates the draft report's recognition of the recent changes to ATF's adverse action policy to improve consistency, efficiency, and ensure FFLs who willfully violate the GCA receive a revocation or denial notice when appropriate. While ATF recognized the need to make changes in our adverse action procedure, we disagree with the draft report's suggestion that ATF previously acted improperly by infrequently revoking Federal firearms licenses.

In reviewing the number inspections conducted in the field and the number of adverse actions taken as a result of those inspections, the draft report noted the discrepancy between average inspection time and the number of adverse actions taken by the field divisions. The report fails to note the critical components that comprise the decision to take adverse action against an FFL. The report should reflect that not all violations can (or should) result in an adverse action against an FFL. The legal standard is "willfulness." Many violations noted by an inspector may be so inadvertent that they cannot satisfy the legal standard of "willfulness."

In addition, some willful violations may not warrant revocation/denial if there are mitigating circumstances. In such cases, the violation is noted but no formal action is taken against the FFL. Rather, the FFL is educated about better methods and procedures to avoid such errors in the future. Hence, the fact that inspectors have taken a great deal of time inspecting and documenting violations by an FFL, but have failed to take formal legal action against the FFL, cannot be construed, by itself, as inappropriate. ATF works diligently to promote voluntary compliance, protect the public, and deny and revoke licenses when appropriate.

This finding and the accompanying narrative make it appear that ATF is allowing some FFLs whose licenses should be revoked to remain in business. However, when ATF specifically asked if the OIG had found a single case of ATF not taking action where warranted, the OIG staff replied no. ATF believes it appropriately undertakes revocation and denial actions when evidence of willful violations support such action.

In addition, the draft report does not reflect the fact that many FFLs withdraw renewal applications when they are put on notice that their application likely will be denied and surrender their license when told it likely will be revoked.

-16-

Assistant Inspector General for Evaluation and Audits

Finally, while we are working to better track adverse actions as discussed in response to recommendation 7, revocation and denial proceedings often are slow for reasons beyond ATF's control. The legal process for denial/revocation has time constraints that bind ATF, but not the FFL. For example, FFLs often ask for and receive extensions of time to respond to notices, making the process lengthy.

**By streamlining and standardizing inspections, the ATF could dramatically improve the FFL inspection program.**

ATF identified and began to address deficiencies within our inspection program prior to the initiation of the OIG audit. ATF issued guidelines to streamline and standardize compliance inspections in June 2004 that were effective immediately. ATF's Field Operations and Enforcement Programs and Services Directorates will be monitoring inspection field activities closely.

**ATF does not consistently report inspection performance.**

ATF recognizes that inspection performance data must be closely scrutinized. This concern was discussed at great length with the Audit Team during the OIG audit. ATF is committed to ensuring integrity of our performance indicators.

As discussed in response to recommendation 5, modifications and upgrades have been made to N-FOCIS to streamline the way it captures activity by commodity. These modifications and improvements will help to ensure that data runs accurately reflect field activity and remain constant over the course of time. Additionally, ATF's Office of Strategic Intelligence is generating quarterly reports for the program offices so that field activity can be monitored regularly.

**New restrictions on retention of gun purchaser data will hinder the ATF's ability to detect fraudulent background checks.**

Although ATF will no longer be able to have NICS verify information from ATF Forms 4473 for transferees who received proceed responses from NICS, this will not hinder our ability to ensure FFLs do not abuse the NICS system. We are developing a procedure that will allow inspectors to obtain "Individual FFL Audit Logs" from the FBI prior to inspections. These logs will contain certain data that will be utilized during inspections to corroborate the veracity of information provided to, and received from, NICS. This includes all information for denied transactions and data such as the date NICS was contacted, the NICS Transaction Number (NTN), and the response provided, for a 60 day time period for proceed transactions. ATF inspectors will also have the ability to conduct NICS rechecks to ensure FFLs did not provide NICS with false information. The draft

-17-

Assistant Inspector General for Evaluation and Audits

report incorrectly suggests that the rechecks only can tell if the purchaser should have been approved at the time of the recheck because the FBI will be told the date of the original check, it can disregard any changes to the purchaser's status since that date. ATF also uses a tool called the NTN validator to ensure FFLs are not creating false NTNs when no NICS check was completed. Thus, as stated above, the new restrictions will not impede our regulatory and enforcement efforts.

**In conclusion, we wanted to provide a summary of significant steps ATF has or will take to address the recommendations and findings of the OIG draft report:**

- Revised guidance to the field to require in-person inspections of all FFL applicants in 14 metropolitan areas

- Issued new procedures in June 2004 generally requiring all FFL application inspections to be conducted in-person. If an application inspection is not conducted in-person, an in-person compliance inspection must be scheduled in the first year after the license is issued

- Issued "Guidelines for Conducting Federal Firearms Licensee Compliance Inspections" in June 2004. This publication sets out guidelines for the period of records review, when complete inventory verifications must be performed, and establishes the number of Forms 4473 to be reviewed. It also gives guidance on referring potential trafficking cases to ATF agents.

- Developing a Focused Inspection Work Plan that concentrates on trafficking indicators. A draft of this streamlined inspection program is due to ATF management on October 1, 2004.

- Created a working group of upper management to determine how to best structure unified operations of criminal and regulatory personnel.

- Undertaking a complete review of the firearms report writing procedures including the work program, work papers, how to gather evidence of violations, applicability of statistical sampling, and creating a standard narrative report format.

- Conducting a pilot project of its new streamlined and standardized inspection procedures in several field divisions during FY-05.

-18-

Assistant Inspector General for Evaluations and Audits

- Developing a workload model for field resources. The working group will be given a copy of the draft report to consider in conducting their analysis. A status report is due in June 2004. ATF will shift inspector resources if the results of the study show this would be beneficial.

- Consolidating Director of Industry Operations positions to better align with workload and inspector distribution.

- Working with an academic researcher to improve our firearm-related strategic plan and generate performance measures to help us maximize our existing resources.

- Using accepted statistical sampling concepts to assign FFL inspections. We are currently gathering the information necessary for this analysis.

- Upgraded our N-FOCIS system to enable us to better track inspector work time on various assignments.

- Created the position of Deputy Assistant Director (Field Operations – Industry Operations) to help manage ATF's regulatory enforcement efforts. Also created the Case Management Branch within our Field Operations Directorate to monitor industry operations.

- Issued first quarterly report in May on the productivity and results achieved by each field division.

- Revised our adverse action procedures to improve consistency, efficiency, and ensure denials/revocations are issued where warranted.

- Creating a new adverse action tracking system that will include all FFLs who receive a notice of denial or revocation. Field counsel and DIOs will receive e-copies of the report on a monthly basis. The report will have more details than the existing report.

- Coordinate with DOJ to gain suspension, fine, and offers in compromise authority.

- Work with DOJ to determine the feasibility of using discretionary grant funding to support local police departments who want to trace all crime guns.

-19-

Assistant Inspector General for Evaluation and Audits

- Attempt to develop a ratio of guns traced to sales volume to use in a pilot program for inspecting FFLs.

Again, we appreciate the opportunity to respond to the draft report and look forward to continuing our efforts to address the issues it raised. If you have any questions regarding this response, please contact, Carol Campbell Audit Liaison, Office of Inspection, at (202) 927-8276.

Carl J. Truscott

# APPENDIX IV: OIG ANALYSIS OF THE ATF'S COMMENTS

On June 4, 2004, the Office of the Inspector General (OIG) sent copies of a draft of this report to the Bureau of Alcohol, Tobacco, Firearms and Explosives (ATF) with a request for written comments. The ATF responded to us in a memorandum dated June 29, 2004.

The ATF fully concurred with seven of our nine recommendations. The ATF did not concur with our recommendation on updating its inspection tracking system to more accurately segregate and report on all Inspector time spent on inspections. Instead, the ATF offered an alternative solution for updating N-SPECT, explaining that an update to the overall system, N-FOCIS, would accomplish what we recommended. The ATF also conditionally concurred with the recommendation on developing a model to more accurately identify potential firearms trafficking, although it suggested that implementing the recommendation would be difficult. The ATF also provided general comments on the findings contained in the draft report. Our analysis of the ATF's comments on the recommendations and findings in the draft report follows.

## THE ATF'S RESPONSE TO RECOMMENDATIONS

**Recommendation 1:** **Develop a standard, streamlined inspection process that includes in-person inspections of all Federal Firearms Licensee (FFL) applicants; more efficient inventory and records reviews; automated inspection reporting; and consistent examination of indicators of firearms trafficking.**

**Status:** Resolved – Open

**Summary of the ATF's Response:** The ATF concurred with our recommendation and stated that it is taking a series of steps to implement it, including:

- In-person application inspections are now required in 14 metropolitan areas, and ATF also is increasing the number of in-person application inspections conducted nationwide.

- A memorandum titled "Guidelines for Conducting Federal Firearms Licensee Compliance Inspections" was issued in June 2004 to clarify a number of inspection process issues such as the methods for verifying FFL inventories, record review periods, and ATF Form 4473 reviews.

- The ATF is reevaluating all work plans and workpapers to eliminate tasks that are not critical to a final inspection report.

- An ATF working group is developing a work plan for Focused Compliance Inspections. The working group's initial milestone is to provide comments to ATF management by October 1, 2004.

- The Inspector Handbook is being updated to provide better guidance to Inspectors on conducting inspections.

In response to our recommendation that the ATF automate its inspection procedures, the ATF stated that Inspectors have laptop computers at their disposal, but that many FFLs object to the use of these computers during inspections. The ATF stated that these FFLs are concerned that the laptop computers might be used to create a registry of firearms and firearms owners, something the ATF is prohibited by law from doing.

**The OIG's Analysis:** The ATF's proposed actions are responsive to the recommendation. By October 31, 2004, please provide copies of or status reports on the following:

- The "Guidelines for Conducting Federal Firearms Licensee Compliance Inspections," June 2004,

- The names of the 14 metropolitan locales that now require in-person application inspections,

- The new inspection reporting procedures that are under development,

- The Focused Inspection Work Plan that is under development, and

- The updated Inspector Handbook.

The ATF's comment on the use of laptops is not responsive to the recommendation to automate inspection reporting. We are not persuaded that FFLs should be allowed to determine how the ATF conducts its inspections. The fear ascribed to some FFLs is groundless. Creating an effective national firearms registry would require information on all gun sales by all FFLs – a logistical impossibility for the ATF. The ATF's current practice of taking handwritten notes while onsite at an FFL and later transcribing the information into a computer is no more or less likely to facilitate the hypothetical national firearms registry than is entering inspection information directly into a computer while onsite. Rather, we believe that educating FFLs on the implausibility of their concern, as well as the potential benefits of quicker inspections and more accurate inspection records for the FFL, could help overcome such objections. Therefore, we request that the ATF reconsider this response and also identify steps to improve the automation of the inspection process.

**Recommendation 2**: **Conduct a pilot project to test the streamlined inspection procedures and establish appropriate time standards for conducting these inspections.**

> **Status:** Resolved – Open

> **Summary of the ATF's Response:** The ATF concurred with this recommendation and stated that it was developing streamlined, standardized inspection procedures, which it planned to test in several divisions in a pilot project during Fiscal Year 2005.

> **The OIG's Analysis:** The ATF's proposed action is responsive to the recommendation. By October 31, 2004, please provide us with the streamlined inspection procedures that will be used in the pilot project, as well as the planned start and completion dates, and locations, for the pilot project.

**Recommendation 3**: **Revise the staffing requirement report using the time standards to reflect the number of Inspectors needed to conduct compliance inspections on a triennial basis or on an alternative schedule based on the FFL's compliance history.**

> **Status:** Resolved – Open

**Summary of the ATF's Response:** The ATF concurred with our recommendation and stated that it created a working group to develop a workload model. A completion date for the effort has not yet been established, but a status report from the working group was due by late June 2004 to the Assistant Director (Field Operations). Further, in its response to Recommendation 4, the ATF stated that it has contracted with an academic researcher to develop recommendations to improve performance measures to help the ATF maximize its existing resources.

**The OIG's Analysis:** The ATF's proposed action is responsive to the recommendation. By October 31, 2004, please provide us with copies of the status reports submitted by the working group, the schedule for the completion of the workload model, any revised staffing requirement reports, and copies of the recommendations of the academic researcher for improving the utilization of existing resources.

**Recommendation 4:** **Develop alternatives for better aligning Inspector resources with the distribution of FFLs, such as by redrawing Field Division boundaries, realigning personnel, or other methods.**

**Status:** Resolved – Open

**Summary of the ATF's Response:** The ATF responded that the rationale for how Inspectors were allocated to its Field Divisions was based on its former alcohol and tobacco oversight responsibilities (which are now assigned to the Department of the Treasury), as well as its explosives inspections activities. The ATF recently began consolidating its Director of Industry Operations (DIO) positions so that they are better aligned with its FFL and explosives inspection workload. Also, using the new workload model for Inspector staffing developed in response to Recommendation 3, the ATF will evaluate the need to reassign Inspectors to better align resources with the distribution of FFLs and explosives licensees.

**The OIG's Analysis:** The ATF's proposed action is responsive to the recommendation. By October 31, 2004, please provide us with a schedule for completing the assessment of the alignment of Inspector resources with the FFL population and any analyses of the current and planned distribution of resources.

**Recommendation 5:** **Update the inspection tracking system to accurately segregate and report on Inspector time spent preparing for inspections, in travel, onsite at FFLs, and conducting other administrative duties.**

**Status:** Unresolved – Open

**Summary of the ATF's Response:** The ATF did not concur with the recommendation, stating that because it "does not believe it is necessary to categorize Inspector work time by function (e.g., travel time v. preparation time)" to ensure that Inspectors are operating efficiently. The ATF stated that it believes its current case management system, N-FOCIS, uses project codes to accurately account for "all administrative costs associated with ATF's mission." The ATF stated that it has upgraded its N-FOCIS system [which includes the N-Spect FFL inspection database] to segregate inspection activities by type (i.e., application inspections versus compliance inspections) to "provide for better categorization of inspector workloads."

**The OIG Analysis:** The ATF's comments and alternative actions are not responsive to the recommendation to update the tracking system to segregate and report on Inspector time. From the description of the recent upgrades to the N-FOCIS system provided by the ATF, it appears that the ATF will be better able to track data on each *type of inspection* and how it was conducted. However, from the information provided, it appears that the ATF will still be unable to quantify Inspector time spent onsite, in travel, and accomplishing other administrative and non-inspection related activities.

However, a system that does not track all categories of Inspector time is inadequate for ensuring that activities are conducted efficiently. In our review, we found that only 41 percent of ATF Inspectors' firearms-related work time is spent directly on inspection activities (including traveling to and from the FFL's place of business). Fifty-nine percent of the Inspectors' time was spent on activities not directly related to inspections, such as training, answering telephone inquiries from FFLs, or other administrative tasks. Implementing a tracking system that can measure the time spent on all of these activities – not just data related to the specific type of inspection assignment – is essential to developing and implementing an effective workload model and to

redistributing resources to match the workload, actions which the ATF stated in its response to Recommendations 3 and 4 that it plans to undertake in FY 2005.

To develop a workload model for aligning Inspector resources with regulatory needs, the ATF must be able to segregate and analyze all Inspector time, not just time spent directly on conducting inspections. If the ATF does not categorize and measure Inspector work time by function, it will be difficult to establish appropriate performance goals, account for the variability among its divisions, or accurately report its productivity.

Please reconsider this response and provide us by August 3, 2004, whether the ATF will create a plan for updating the inspection tracking system to accurately segregate and report on all Inspector time or, in the alternative, how the ATF plans to develop a comprehensive workload model without such information.

**Recommendation 6**: **Prepare quarterly reports on the productivity and results achieved by each Field Division.**

**Status:** Resolved – Open

**Summary of the ATF's Response:** The ATF stated that to address this recommendation, it created the position of Assistant Director (Field Operations) to better manage the ATF's regulatory enforcement efforts in the field. One of the first tasks of the Assistant Director was the creation of a quarterly reporting system on inspection productivity and results by each Field Division. The ATF also established the Case Management Branch within the Field Operations Directorate for tracking and evaluating industry operations and criminal enforcement activities, conducting case comparisons, and making appropriate recommendations.

**The OIG's Analysis:** The ATF's proposed action is responsive to the recommendation. By October 31, 2004, please provide us with copies of the quarterly reports, as well as any annual compendium or other productivity analyses for FY 2004.

**Recommendation 7:** **Direct the National Licensing Center to develop an adverse action tracking system to monitor the progress and timeliness of FFL denials and revocations from the time an Inspector makes a recommendation until the proceedings are finalized.**

> **Status:** Resolved – Open

> **Summary of the ATF's Response:** The ATF concurred with this recommendation and tasked the Division Chief, Firearms and Explosives Services, with developing and monitoring an improved adverse action tracking system for denials and revocations of licenses. The ATF also intends to route an electronic version of monthly tracking reports to all Division Counsels and DIOs to better advise them of how many adverse actions are pending in their divisions and how long each case is taking to resolve. The ATF also plans to expand the tracking system to incorporate more indicators of case progress.

> **The OIG's Analysis:** The ATF's proposed action is responsive to the recommendation. By August 3, 2004, please provide us with a copy of the functional description of the planned adverse action tracking system and a copy of the master schedule for the development and implementation of the system.

**Recommendation 8:** **Continue coordinating with the Department of Justice, Office of Legislative Affairs, to gain the authority to suspend or impose civil penalties on FFLs that violate federal firearms laws.**

> **Status:** Resolved – Open

> **Summary of the ATF's Response:** The ATF has indicated that it will continue to work with the Department of Justice's Office of Legislative Affairs on obtaining regulatory options such as license suspensions and the authority to issue civil penalties in lieu of license revocation. The ATF also clarified that it can impose fines in one limited circumstance, when an FFL fails to conduct a National Instant Criminal Background Check System (NICS) check and that NICS check would have resulted in a denial of the sale.

> **The OIG's Analysis:** The OIG considers this recommendation resolved. By October 31, 2004, please provide us

---

U.S. Department of Justice
Office of the Inspector General
Evaluation and Inspections Division

with updates as to how the ATF is coordinating with the Office of Legislative Affairs. We made two minor changes in the report to make it clearer that the ATF has no general fining authority but can impose a fine in the limited circumstance described above.

**Recommendation 9: To improve the comprehensiveness of crime gun tracing by law enforcement agencies:**

**a. Coordinate with the Office of Justice Programs to determine the feasibility of using discretionary grant funding to support crime gun tracing.**

**Status:** Resolved – Open

**Summary of the ATF's Response:** The ATF's stated that it concurred with the recommendation and planned to initiate discussions with other Department entities on the feasibility of using discretionary grant funding to support local police departments that want to trace crime guns.

**The OIG's Analysis:** The ATF's proposed action is responsive to the recommendation. By October 31, 2004, please provide us with the dates of meetings held or planned and copies of minutes or other documentation of the topics discussed and the decisions made at the meetings.

**b. Develop a model for more accurately identifying potential firearms trafficking through the analysis of an FFL's firearms sales volume and the number of firearms traced to the FFL.**

**Status:** Resolved – Open

**Summary of the ATF's Response:** The ATF conditionally concurred with this recommendation, but stated that retail sales volumes are not captured for each FFL dealer on a yearly basis. Further, the ATF stated that the number of NICS checks submitted by each FFL is not a reliable indicator of sales because purchasers can acquire more than one firearm on a single NICS check and certain limited types of sales are exempt from a NICS check. However, the ATF proposed incorporating the sales data reported by FFL dealers applying to renew their licenses as a method to identify for inspection those FFLs with the highest ratios of traces to reported sales over a 3-year period.

**The OIG's Analysis:** The ATF's proposed action is responsive to the recommendation. However, our review found that the ATF's current compliance inspection procedures do not include steps to verify the renewal data submitted by the FFLs. We accept the ATF's proposed action, but request that the ATF modify its proposal to include adding steps to compliance inspections to verify the renewal data against actual FFL Acquisition and Disposition Book sales totals. By October 31, 2004, please provide us with the implementation plan for comparing FFL trace data and reported sales volume.

## ATF COMMENTS ON REPORT FINDINGS

In addition to addressing the recommendations, the ATF remarked on the draft report's findings. In this section, we summarize the ATF's comments and provide our analysis of its planned actions.

**FINDING: The ATF does not conduct in-person application inspections on all new FFLs to verify applicant information and ensure that they understand firearms laws.**

**The ATF's Comment:** The ATF agreed that in-person application inspections are critical for ensuring that licensees understand and obey federal firearms laws. The ATF stated that it is taking steps to conduct in-person application inspections nationwide and noted that under its June 2004 policy, all applicants who do not receive an in-person application inspection must be scheduled for an in-person compliance inspection during the first year after they are issued a federal firearms license.

**The OIG's Analysis:** We agree with the ATF's comments and planned course of action.

FINDING: The ATF does not regularly conduct compliance inspections on active FFLs, including large-scale retailers.

**The ATF's Comment:** The ATF stated that it cannot conduct annual compliance inspections of all FFLs due to the large number of licensees (more than 104,000) and the small number of Inspectors (420). Instead, the ATF stated that it works to focus its compliance inspections [Focused Inspection Program] on those FFLs with a history of non-compliance and those FFLs with

business practices that indicate signs of potential firearms trafficking. The ATF stated that many large-scale FFLs fall into one of these categories, thereby requiring that they be inspected. According to the ATF, "the fact that an FFL is large does not exclude it from being selected for inspection."

**The OIG's Analysis:** We agree with the ATF's statement that it cannot conduct annual compliance inspections on all FFLs with its current resources, and we did not suggest that the ATF attempt to do so in the report. To the contrary, we accepted the ATF's stated goal of conducting a compliance inspection on every FFL at least once every three years. With additional staffing and better utilization of its existing personnel, we believe that goal is attainable. In regard to the ATF's statement that large-scale FFLs are often inspected under its Focused Inspection Program and are not exempt from inspection, we note that although the ATF described these inspections as "mandatory," our interviews with DIOs found otherwise. Two DIOs described these inspections as "priorities," but stated that they do not complete all assigned Focused Inspections, including those of large-scale FFLs, because of competing demands. Further, the report did not state that large FFLs were exempt from inspection, but showed that they were statistically treated about the same as all other FFLs with respect to infrequent inspections.

**FINDING: The ATF does not identify and inspect all FFLs that exhibited indicators of potential violations or gun trafficking.**

**The ATF's Comment:** The ATF disagreed with our finding and stated that it "does identify all FFLs that exhibit indicators of potential violations or gun trafficking based on trace data available." However, the acknowledged that it "limit[s] inspection requirements based on our available Inspector resources." The ATF also stated that it plans to analyze other factors that should be utilized to determine which FFLs should be inspected.

**The OIG's Analysis:** During our inspection, we did not find that the ATF ever compiled a list of *all* FFLs that exhibited trafficking indicators (e.g., multiple traces, short time-to-crime traces). Instead, in describing how FFLs are identified for Focused Inspections, staff of the National Tracing Center (NTC) stated that they manipulated the query parameters by limiting the FFLs identified to a pre-selected number. That pre-selected number

(350 in FY 2002) was based on the projected availability of Inspector resources. The ATF made no attempt to determine an unacceptable level of trafficking indicators for FFLs and then identify all FFLs that exceeded that level without regard to whether all of the FFLs could be inspected with existing resources. Therefore, we maintain our finding that the ATF has not identified all FFLs that exhibited indicators of potential violations or of firearm trafficking.

**FINDING: Gun tracing has significant shortcomings that limit its use for identifying FFLs that should be inspected.**

 **The ATF's Comment:** The ATF agreed that gun tracing has "weaknesses" and stated that it plans to address shortcomings identified in our report by implementing Recommendation 9. The ATF disagreed with our comparison of traces submitted by law enforcement agencies within a Field Division to the number of inspections conducted in that Field Division and stated that the comparison is "not especially useful." The ATF stated that crime gun tracing patterns vary by region. The ATF also clarified that the NTC was moved to Martinsburg, West Virginia, in 1994 but stated that the ATF had conducted tracing before the NTC relocated.

 **The OIG's Analysis:** We believe that our comparison of trace data to inspections is useful. We do not agree with the ATF's argument that the existence of national trafficking patterns negates the use of data on traces submitted in each Division to analyze the ATF's resource management.[76] The ATF argues that the fact that more traces were submitted in a Division would not necessarily mean that more inspections should be conducted in that Division because the traced guns may have originally been sold by FFLs in other Divisions. Therefore, any inspections would have occurred in those Divisions, not in the Divisions where the traces were submitted.

 However, the ATF's own analysis of crime gun recoveries (contained in its report *Crime Gun Trace Reports 2000*) found that 48 percent of crime guns were recovered within 25 miles of where they were originally sold. In contrast, national trafficking patterns

---

[76] The ATF was unable to provide us with consolidated data on the number of guns traced to FFLs in each Division, and instead provided the number of traces submitted by law enforcement agencies, by Field Division.

(i.e., guns recovered more than 250 miles from where they were purchased) accounted for more than 30 percent of crime guns traced in only 9 cities (including cities that ban handguns, such as New York City, Washington, D.C., and Chicago). Those data indicate that the preponderance of guns recovered in a Division was of local origin. Therefore, we concluded that data on trace submissions could be used to approximate the distribution of crime gun traced to FFLs in the ATF's Field Divisions.

Comparing the number of trace requests to the number of inspections conducted in each Division shows whether, on a national level, trace data were used to direct resources toward inspecting FFLs in Divisions where more crime guns originated. Our analysis showed little or no ATF-wide correlation between the number of crime guns submitted to the ATF for tracing in a Field Division and the number of compliance inspections conducted in that Field Division. The lack of any correlation on a national level indicates that the ATF is not managing its resources to conduct more inspections in Divisions where more crime guns originated.

The ATF also stated that some Field Divisions use trace data to target inspections within the Division. We agree that this is a positive use of trace data, and we note in the report that the Divisions can and are using the data internally. However, the internal use of trace data by Divisions does not negate our primary finding that there is little or no correlation between the number of traces and the number of inspections ATF-wide. Likewise, the ATF's statement that some localities have few local guns traced (which we found was due to restrictions on handgun sales in the locality) does not negate our primary finding.

Regarding the ATF's comments on the NTC move to Martinsburg, we clarified that the ATF's gun tracing program operations were consolidated, not established, in 1994.

**FINDING: ATF Field Divisions implement inspections inconsistently.**

**The ATF's Comment:** The ATF stated that it has been working on standardizing and streamlining the present procedures for conducting inspections.

**The OIG's Analysis:** Although the ATF did not explicitly state whether it agrees with our finding, the ATF's planned course of action will address the problems we reported with varying inspection implementation by ATF Field Divisions and will lead to more consistent inspections across the agency.

**FINDING: Suspected criminal violations are not always referred for investigation.**

**The ATF's Comment:** The ATF stated that its June 2004 policy reminds Inspectors to initiate referrals to ATF Special Agents when inspections reveal potential trafficking indicators.

**The OIG's Analysis:** If followed, we agree that the ATF's new policy will address our finding and lead to more consistent referrals of suspected trafficking.

**FINDING: The ATF acts infrequently to revoke federal firearms licenses, and the process is not timely. New ATF policy begins to address inconsistent and untimely adverse actions.**

**The ATF's Comment:** The ATF disagreed with our finding that, prior to its new policy, the ATF acted "improperly" by infrequently revoking federal firearms licenses and noted that we did not find a specific case in which the ATF should have taken such action against an FFL. The ATF stated that our report "fails to note the critical components that comprise the decision to take adverse action against an FFL." The ATF stated that the report should note that not all violations of federal firearms laws warrant revocation of the FFL's license. Further, the ATF stated that the legal standard is "willfulness," and many violations "may be so inadvertent that they cannot satisfy the legal standard." In addition, the ATF noted that many applicants and licensees withdraw their requests for a federal firearms license rather than face revocation.

**The OIG's Analysis:** We did not identify any FFLs that the ATF allowed to stay in business when revocation was warranted because, as our report made clear, we did not re-inspect any FFLs during our review. Instead, we examined the ATF's overall processes.

Our report did not state that the ATF acted "improperly" by failing to revoke FFL licenses in the past. However, the ATF's own actions indicate that its past practices were inadequate. In our review, we found that 11 of the ATF's 23 Field Divisions took no revocation actions in FY 2002. Those 11 Field Divisions conducted a total of 1,936 compliance inspections that found 51,314 violation instances. To accept the ATF's logic would mean that those Field Divisions initiated no revocations because, despite the 51,314 violations – which ATF Inspectors spent more than 108,000 hours to find and document – the ATF found no case that indicated a pattern of willful disregard for federal firearms laws. If that were correct, we would question such an expenditure of resources to find and document minor infractions. We would also question the ATF's process for selecting FFLs to inspect in those Field Divisions, since it failed to make effective use of established indicators of trafficking to identify those FFLs among the 46,775 FFLs located in these Field Divisions that were likely to be willfully violating federal firearms laws. We believe such FFLs existed in those 11 Field Divisions. [During our review, we also noted news reports of corrupt FFLs being arrested in Miami, Los Angeles, and Phoenix.]

The ATF's argument that, in the past, it always properly revoked the licenses of FFLs that were willfully violating federal firearms laws is also contradicted by the substantial rise in revocations since the ATF issued revised adverse action guidelines. In the first quarter of FY 2004, the ATF issued Initial Notices of Revocation or denied renewal to 59 FFLs. If that rate continues, the ATF will revoke the licenses of almost eight times as many FFLs in FY 2004 as it did in FY 2002. Given the above, we do not find persuasive the ATF's argument that in the past it revoked the licenses of all FFLs that violated federal firearms laws.

**FINDING: By streamlining and standardizing inspections, the ATF could dramatically improve the FFL inspection program.**

**The ATF's Comment:** The ATF stated that it began addressing "deficiencies" in its inspection program prior to the initiation of our review and stated that it will closely monitor its Inspectors to ensure that they are following the June 2004 guidelines, which address deficiencies that the ATF identified as well as those we identified in our report.

**The OIG's Analysis:** We believe that the ATF's June 2004 guidelines and the planned actions described in its response to our recommendations will be effective for responding to the need we identified for the ATF to improve the FFL inspection program.

**FINDING: The ATF does not consistently report inspection performance.**

**The ATF's Comment:** The ATF stated that it is committed to ensuring the integrity of its performance indicators and stated that modifications and upgrades to its electronic databases will help ensure consistent reporting of inspection performance.

**The OIG's Analysis:** We believe that the ATF's planned course of action will lead to more accurate and consistent reporting of its inspection activities.

**FINDING: New restrictions on retention of gun purchaser data will hinder the ATF's ability to detect fraudulent background checks.**

**The ATF's Comment:** The ATF stated that a new restriction placed on data maintained by NICS does not hinder the ATF's ability to "ensure FFLs do not abuse the NICS system." The ATF stated that it is developing a procedure to allow Inspectors to obtain 90 days of FFL-specific NICS information from the Federal Bureau of Investigation (FBI), which oversees NICS, prior to inspecting FFLs. The ATF stated that this information gives Inspectors the "ability to conduct NICS rechecks to ensure FFLs did not provide NICS with false information."

**The OIG's Analysis:** On the basis of the information provided by the ATF, we continue to believe that the new restriction on NICS information will reduce the ATF's ability to detect fraudulent NICS checks through an examination of FFL records. Even if ATF Inspectors are supplied with 90 days of FFL-specific NICS data from the FBI, all purchaser information on approved sales will be deleted within 24 hours. Therefore, the ATF can only *assume* that the purchaser information that was originally submitted to NICS was the same as the information that the Inspector submits for the recheck. If the recheck finds that a sale was allowed to a prohibited person, the ATF will have no way of determining from the FFLs' records whether the approval was due to an incorrect response from the NICS operator (i.e., the result of FBI error) or if it occurred because the FFL supplied incorrect purchaser information to NICS.

Moreover, the ATF will have no way of determining the cause of an incorrect NICS response once 90 days have elapsed because, after that time, the FBI also deletes the remaining FFL-specific information associated with approved NICS transaction numbers. We agree that conducting a recheck could potentially identify that a prohibited person obtained a gun. However, we continue to believe that the new NICS restriction will hinder the ability of the ATF to detect fraudulent NICS background checks by examining FFL records during compliance inspections.

# EXHIBIT B

**Hakim, Ranjit J.**

| | |
|---|---|
| **From:** | Joseph Vince [jvincecgs@msn.com] |
| **Sent:** | Thursday, September 15, 2011 7:40 AM |
| **To:** | Hakim, Ranjit J. |
| **Subject:** | Trigger Lock Testing |

Ranjit;

This serves to inform you that, at my direction, CGS partner Nunziato conducted an additional time test of unlocking a trigger lock from a firearm and loading the firearm. On September 8, 2011, he conducted the testing of a Franzen Key Trigger Lock and a Masterlock Combination Trigger Lock on a revolver and a semi-automatic pistol. The results were similar to the previous test in that he was able to unlock and load the firearms within seconds having the fastest time for the revolver of 4.5 and 5.34 seconds respectively with the slowest at 8.6 and 9.6 respectively and for the semi-automatic pistol the fastest at 4.5 and 5.34 seconds and the slowest at 8.6 seconds and 9.6 seconds for an average of 6.3 and 7.4 respectively. I have discussed the testing with Mr. Nunziato and we both agree that with practice the time for disengaging the lock and loading would be even lower.

Should you have any questions or require additional information, please contact me at the telephone numbers provided below.

Regards,

Joe

Joseph J. Vince, Jr.
President
Crime Gun Solutions, LLC
2214 West Greenleaf Drive
Frederick, Maryland 21702
Phone: (301) 631-2950
FAX: (301) 631-2950
Cell: (301) 639-1398
E-mail: JVinceCGS@msn.com

## Hakim, Ranjit J.

| | |
|---|---|
| **From:** | Hakim, Ranjit J. |
| **Sent:** | Thursday, September 15, 2011 9:09 AM |
| **To:** | dthompson@cooperkirk.com; ppatterson@cooperkirk.com |
| **Cc:** | Hakim, Ranjit J.; Woods, Craig A.; Andrew Worseck |
| **Subject:** | Vince deposition |
| **Attachments:** | Trigger Lock Testing |

David and Pete,

Looking forward to seeing you tomorrow. Joe mentioned an additional trigger lock test that he performed after completing his report. It is of the same nature as the trigger lock test on page 14 of his report, but involves different brand trigger locks. The additional test is summarized in the attached email.

Ranjit

**Ranjit Hakim** | Mayer Brown LLP
71 S. Wacker | Chicago, IL 60606
312.701.8758 | 312.706.9124(f)
rhakim@mayerbrown.com

## Hakim, Ranjit J.

| | |
|---|---|
| **From:** | Joseph Vince [jvincecgs@msn.com] |
| **Sent:** | Monday, September 19, 2011 4:01 PM |
| **To:** | Hakim, Ranjit J. |
| **Subject:** | Trigger Lock Testing |

Ranjit;

I noticed that there were inadverent errors in the email I forwarded last week concerning the trigger lock test conducted by CGS Paertner Gerald Nunziato. The correct reporting should be as follows:

This serves to inform you that, at my direction, CGS partner Nunziato conducted an additional time test of unlocking a trigger lock from a firearm and loading the firearm. On September 8, 2011, he conducted the testing of a Franzen Key Trigger Lock and a Masterlock Combination Trigger Lock on a revolver and a semi-automatic pistol. The results were similar to the previous test in that he was able to unlock and load the firearms within seconds having the fastest time for the revolver of 4.5 and 5.34 seconds respectively with the slowest at 8.6 and 9.6 respectively for an average of 6.3 and 7.4 respectively With regard to the semi-automatic pistol, the fastest time was 2.9 and 3.8 seconds and the slowest was 6.3 seconds and 6.0 seconds for an average of 4.3 and 4.8 respectively. I have discussed the testing with Mr. Nunziato and we both agree that with practice the time for disengaging the lock and loading would be even lower.

Should you have any questions or require additional information, please contact me at the telephone numbers provided below.

Regards,

Joe

Joseph J. Vince, Jr.
President
Crime Gun Solutions, LLC
2214 West Greenleaf Drive
Frederick, Maryland 21702
Phone: (301) 631-2950
FAX: (301) 631-2950
Cell: (301) 639-1398
E-mail: JVinceCGS@msn.com

## Hakim, Ranjit J.

| | |
|---|---|
| **From:** | Hakim, Ranjit J. |
| **Sent:** | Thursday, September 22, 2011 3:05 PM |
| **To:** | David Thompson |
| **Cc:** | Woods, Craig A.; 'Andrew Worseck'; Hakim, Ranjit J.; Pete Patterson |
| **Subject:** | RE: Vince deposition |
| **Attachments:** | Trigger Lock Testing |

David,

Good to see you yesterday. After reviewing Joe Vince's September 15, 2011 email that I forwarded to you previously, Joe identified an error in the numbers he reported for his additional test. His email correcting that error is attached.

Ranjit

---

**From:** Hakim, Ranjit J.
**Sent:** Thursday, September 15, 2011 9:09 AM
**To:** dthompson@cooperkirk.com; ppatterson@cooperkirk.com
**Cc:** Hakim, Ranjit J.; Woods, Craig A.; Andrew Worseck
**Subject:** Vince deposition

David and Pete,

Looking forward to seeing you tomorrow. Joe mentioned an additional trigger lock test that he performed after completing his report. It is of the same nature as the trigger lock test on page 14 of his report, but involves different brand trigger locks. The additional test is summarized in the attached email.

Ranjit

**Ranjit Hakim** | Mayer Brown LLP
71 S. Wacker | Chicago, IL 60606
312.701.8758 | 312.706.9124(f)
rhakim@mayerbrown.com