personal information) during FFL inspections and enter that data into the NTC database.

<u>A recent study indicated that some gun dealers are willing to sell guns to prohibited persons</u>.  The need to better identify the potential universe of dealers involved in gun trafficking and focus inspections on those dealers was highlighted in a 2003 study by the University of California, Los Angeles, School of Public Health.  That independent study found that up to 20 percent of gun dealers exhibited a willingness to help likely prohibited persons obtain guns through straw purchases.[56]  The study used an independent telephone survey to test whether randomly selected FFLs were willing to sell a handgun, regardless of the intended recipient of the firearm.  A total of 120 FFLs were surveyed.  Of those, 87.5 percent said that they would sell a handgun to someone when the caller stated that the handgun was for his or herself, and 72.5 percent said that they would sell a handgun to someone when the caller stated that the handgun was intended to be a gift, both situations in which the sale would be legal.  However, 52.5 percent also said that they would sell a handgun to the caller when told the gun was for a boyfriend or girlfriend "who needs it," a situation in which the FFL should have questioned the legality of the sale.

To address concerns that the FFLs may have been "playing along" with the interviewers, 20 additional calls were made after the initial study was completed.  In these calls, the interviewer opened with "My girl/boyfriend needs me to buy her/him a handgun because s/he isn't allowed to."  In 16 of the 20 calls, the dealers correctly informed the callers that they would not sell a firearm to them.  However, four agreed to sell a handgun, even though they appeared to recognize that the sale would be illegal.  Some even offered advice on avoiding the restrictions, stating for example:

1. "What you do with it is your business.  Legally you'd be responsible for it, you're more than welcome to buy one.  You can't transfer it to him—I assume he's been turned down";

2. "As long as you have no record, you can come down here and pick one up and put it in your name";

---

[56] Although federal law allows individuals to purchase a firearm as a legitimate gift, it is unlawful to knowingly transfer a firearm to an individual known to be prohibited from possessing a gun.  It also is unlawful for an FFL to knowingly participate in such a straw purchase.

3. "You can do whatever you want after you walk out the door"; and

4. Clerk: "She can't come in, pick one out and you buy it. That's against the law." Interviewer: "I'd come, just me." Clerk: "I'd have no problem with that." [57]

In December 2003 the ATF's Firearms Programs Division randomly selected 760 FFLs for compliance inspections to identify FFL business characteristics that could be used to more effectively target FFLs for compliance inspections. By analyzing FFL business characteristics, such as number of employees and types of firearms sold, the ATF plans on developing a "risk model" based on the types and levels of firearms violations found at the selected FFLs.[58] According to the ATF, the "risk model" will identify those FFLs most likely to be violating federal firearms laws. According to the Chief of the Firearms Programs Division, the ATF may, in the future, modify the FFL Renewal Application form to capture those factors identified by the risk model.

In sum, we disagree with the ATF's practice of limiting its identification of potential traffickers to the number that can be addressed within available resources. Unless the ATF identifies the full universe of FFLs exhibiting indications of firearms trafficking, it is unable to properly manage its range of enforcement activities, or inform the Attorney General, Congress, and the public of the scope of the potential trafficking problem at FFLs.

## ATF's Field Divisions Implement FFL Inspections Inconsistently

During our review of FFL inspection files, we found that the process and amount of time spent conducting application and compliance inspections varied greatly among the ATF Field Divisions. For the 8,123 application inspections and 4,581 compliance inspections conducted by the ATF in FY 2002, the application inspections took an average of 11.8 hours and the compliance inspections took an average of 35.3 hours each. However, we found considerable variation in the average inspection time among the ATF's 23 Field Divisions. Time and workload data from the ATF's N-Spect database showed that the average time that Field Divisions spent conducting each application inspection

---

[57] Buying a Handgun for Someone Else, *Injury Prevention* 2003; 9:147-150, with permission from the BMJ Publishing Group.

[58] We note that the Random Sample Compliance Inspection worksheets do not include information related to the FFLs' firearms tracing histories.

ranged from 6.2 hours in the Kansas City Field Division to 25.5 hours in the Miami Field Division. For compliance inspections, the average inspection length ranged from 24.5 hours per inspection in the Nashville Field Division to 90.0 hours in the Washington Field Division. According to ATF Headquarters officials, the variance was due to Inspectors' discretion in determining the appropriate amount of time to spend examining FFL records. ATF officials also told us that inspection times were affected by the number of inexperienced Inspectors in the Field Divisions.

Our review of the ATF's Inspector Handbook confirmed that Inspectors have the latitude to abbreviate significant portions of a compliance inspection.[59] According to the Inspector Handbook, Inspectors must complete 11 worksheets totaling 23 pages during an inspection. Although the Work Program and worksheets provide extensive direction for data collection, Inspectors are allowed to reduce specific inspection steps. For example:

- The worksheets give ATF Inspectors the discretion to either conduct a full inventory (i.e., a physical count) of the firearms in stock during a compliance inspection, or to sample the FFL's inventory to determine whether the number of "open" A&D Book entries matches the number of firearms at the FFL's place of business. The worksheet provides no guidance to ensure that a valid sample is taken, or how many discrepancies can be found before a full inventory is required.[60]

- The ATF inspection worksheet for examining Form 4473 sales records gives the Inspector the option to conduct a sample review and contains a space for the Inspector to explain the method used to determine how the sample was taken. In our discussions with Inspectors, we found that they did not use a statistical method for determining the number of Forms 4473 to examine. Instead, most Inspectors told us that they examined either a pre-determined number of Forms, or examined Forms

---

[59] The ATF also issues supplemental instructions annually to guide the conduct of the limited number of Focused Inspections directed by Headquarters. In FY 2003, Inspectors were to count all guns in stock and compare that number to the total number of entries in the FFL's A&D book for which the "disposition" column was blank. If those numbers matched, the Inspector was to conduct a limited inventory verification. If discrepancies were found, a full inventory verification was required.

[60] ATF Inspection Worksheet 2 – Inventory. The worksheet asks, "Full count of inventory taken?" and provides a space for the Inspector to answer Yes or No. The worksheet notes, "If no count was taken, state why in findings."

from a specific time frame. For example, in the Miami Field Division, Inspectors said that they were required by their Area Supervisor to review six months of Forms 4473, while Inspectors at the Seattle Field Division said that they were told by their Area Supervisor to examine one year's worth of records.

Our discussions with Inspectors during our site visits also confirmed that Inspectors vary in the depth of their reviews. For example, all 18 Inspectors we interviewed said that they review Forms 4473 as part of the inspection process, but 14 said that they only examine the forms to see if they were filled out properly – not for indications that a purchaser may be part of a firearms trafficking ring or acting as a straw purchaser for someone else (e.g., purchasing patterns, similarities in purchasers' addresses). These 14 Inspectors said that they do not review Forms 4473 for firearms trafficking indicators because it was not a required part of the ATF's inspection process.

Although our interviews and review of the ATF's Inspector Handbook confirmed that Inspectors and their supervisors have the discretion to vary the extent of inspections, we also analyzed ATF performance data to identify any other factors that could be causing the disparity between Field Divisions. Our

> **Case Study: Gun Dealer Avoided Restrictions on Sales To Prohibited Persons**
>
> In June 2002, an ATF inspection was conducted at an FFL in the Seattle Field Division based on information from Special Agents at another Field Division. The inspection found that the FFL had been illegally conducting business at Nevada gun shows in violation of the Gun Control Act. The FFL admitted to inspectors that he had illegally transferred 52 firearms at the gun shows, and that he altered his A&D Book to hide the sales. Furthermore, the FFL admitted to having worked with two out-of-state gun show dealers to allow for firearms sales to be conducted without NICS checks. The FFL told inspectors this was done "because [the FFL] needed the money for...family." As a result of the inspection, the ATF revoked the FFL's license.
>
> Source: ATF case files

analysis of ATF data regarding application inspections found that the average time spent conducting application inspections was clearly correlated to the Field Divisions' staffing levels and the number of FFLs located in the Divisions. ATF data showed that Field Division staffing ranged from a high of 35 Inspectors in the San Francisco Field Division to a low of 9 Inspectors in the Baltimore Field Division. The number of FFLs in each Field Division ranged from 8,194 FFLs in the Kansas City Field Division to 1,172 FFLs in the Miami Field Division. However, the ATF had not distributed its Inspector resources among the Field Divisions to match the distribution of FFLs, resulting in significant workload imbalances among the Field Divisions. As shown in Figure 6,

the Field Division that had higher numbers of FFLs to oversee with each Inspector spent less time conducting each application inspection.



**Figure 6: Comparison of Length of Application Inspections to FFLs per Inspector**

Source: ATF workload and performance data

    We also examined the ATF's explanation that compliance inspection times were affected by the number of inexperienced Inspectors assigned to each Field Division.[61] As explained by ATF officials, inexperienced Inspectors receive on-the-job training from more experienced Inspectors. During that time, they observe or are observed by the experienced Inspector. Since inexperienced Inspectors are not fully productive, the average inspection time for Field Divisions with more inexperienced Inspectors could be higher. However, as shown in Figure 7, we found there was no correlation between the average time that a Field Division took to conduct compliance inspections and the percentage of inexperienced Inspectors among the Field Division's staff.

---

[61] Trainee Inspectors start at grade 5 on the General Schedule (GS). During their first two years, while at the GS-5 and GS-7 levels, trainees accompany senior Inspectors to observe and assist.



Figure 7: Impact of Inexperienced Inspectors on Average Compliance Inspection Hours

Source:  ATF workload and performance data

We also examined several performance indicators to see if the differing inspection times were related to outcomes, such as violations found and criminal referrals.  As shown in Figure 8, we found that Field Divisions with longer average compliance inspection times found more instances of violations on each inspection.  However, it was unclear whether the longer inspection times resulted from the need to document more violations, or if the greater number of violation instances found resulted from longer inspections.



Figure 8: Comparison of Average Hours and Average Violation Instances for Compliance Inspections

Source: ATF workload and performance data

To examine whether the variation in average inspection times was due to some Field Divisions taking more time to document noncompliance by FFLs in order to pursue adverse actions, we analyzed whether Field Divisions that took longer to conduct compliance inspections in FY 2002 also took more adverse actions. We found that Field Divisions that had longer average inspection times took slightly fewer adverse actions than Field Divisions that took less time to conduct inspections. Figure 9 shows the average inspection time and number of adverse actions taken for each ATF Field Division.



**Figure 9: Comparison of Average Compliance Inspection Time to Adverse Actions, FY 2002**

Source: ATF workload and performance data

Our analysis of the ATF Field Divisions' inspection efforts and outcomes also uncovered significant variances in inspection productivity. For example, our analysis of the ATF's FY 2002 workload and performance data found such variances as:

- The number of inspections conducted per Inspector each year ranged from 12.7 (Miami Field Division) to 46.5 (Kansas City Field Division).

- The percentage of the inspections conducted by each Field Division that identified violations varied from 4.5 percent (Kansas City Field Division) to 41.5 percent (Dallas Field Division).

- On inspections where violations were discovered, the average number of instances of violations found on each inspection ranged from 15.9 (Nashville Field Division) to 178.2 (Chicago Field Division).

- The average time that Field Divisions took to find each violation ranged from 47 minutes per violation (Dallas Field Division) to over 7 hours per violation (Los Angeles Field Division).

Inspection hours, violations, and adverse actions taken in FY 2002 are summarized by Field Division in Table 2, on the next page.

The variability in FFL inspections between ATF Field Divisions indicates that inspections are not being conducted according to standardized inspection procedures. Moreover, the excessive variability allowed inefficient and ineffective operations to persist. The ATF's failure to use the limited available Inspector resources efficiently also reduced its capability to carry out regular inspections of all FFLs, which, in turn, reduced the effectiveness of the ATF's FFL inspection program for ensuring FFLs comply with federal firearms laws. Further, the lack of standardization resulted in inconsistent treatment of FFLs in Field Divisions.

We believe that a standardized inspection approach is needed to ensure that FFLs in all Field Divisions are inspected using consistent inspection procedures and sampling criteria. Adopting a standardized inspection process designed to use the minimum review necessary to effectively gauge FFLs adherence to gun laws also would increase the efficiency of the FFL inspection program, and better enable the ATF to provide uniform, regular inspection coverage of the FFL population. An increase in inspection efficiency also would reduce the overall time that Inspectors spend at the FFLs' place of business.

## Table 2 - Inspector Hours, Productivity, Violation Instances Found, and Adverse Actions Taken, FY 2002

| Field Division | Inspectors | FFLs per Inspector | FFLs Within Field Division | Total Inspector Hours (N-Spect Data) | Application Inspections | Compliance Inspections | Inspections per Inspector | Average Hours per Application Inspection | Average Hours per Compliance Inspection | Inspections with Violations | % of Inspections Finding Violations | Violations Instances Found | Violation Instances per Inspection | Inspection Hours to Find Each Violation Instance | Warning Letters | Warning Conferences | Revocations |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Atlanta | 20 | 145 | 2,892 | 8,925 | 300 | 86 | 19 | 9.5 | 70.6 | 57 | 15% | 7549 | 132.4 | 1.18 | 8 | 5 | 1 |
| Baltimore | 9 | 203 | 1,823 | 6,306 | 131 | 107 | 26 | 15.7 | 39.7 | 52 | 22% | 6665 | 128.2 | 0.95 | 3 | 4 | 1 |
| Boston | 17 | 352 | 5,977 | 7,998 | 271 | 106 | 22 | 13.2 | 41.8 | 34 | 9% | 2345 | 69.0 | 3.41 | 2 | 0 | 0 |
| Charlotte | 18 | 239 | 4,295 | 13,326 | 417 | 208 | 35 | 11.5 | 40.9 | 114 | 18% | 8801 | 78.1 | 1.50 | 27 | 6 | 1 |
| Chicago | 23 | 157 | 3,601 | 9,429 | 315 | 151 | 20 | 16.0 | 29.0 | 34 | 7% | 6058 | 178.2 | 1.56 | 8 | 1 | 4 |
| Columbus | 34 | 191 | 6,496 | 17,212 | 472 | 268 | 22 | 11.3 | 44.4 | 140 | 19% | 9517 | 68.0 | 1.81 | 14 | 0 | 3 |
| Dallas | 30 | 186 | 5,581 | 15,951 | 249 | 255 | 17 | 14.7 | 48.2 | 209 | 41% | 20239 | 96.8 | 0.79 | 40 | 21 | 5 |
| Detroit | 18 | 235 | 4,237 | 11,410 | 362 | 228 | 33 | 11.0 | 32.5 | 109 | 18% | 9051 | 83.0 | 1.26 | 8 | 8 | 0 |
| Houston | 16 | 251 | 4,019 | 7,013 | 277 | 169 | 28 | 9.5 | 25.9 | 52 | 12% | 2457 | 47.3 | 2.85 | 6 | 2 | 0 |
| Kansas City | 18 | 455 | 8,194 | 7,889 | 737 | 100 | 47 | 6.2 | 32.9 | 38 | 5% | 3650 | 96.1 | 2.16 | 10 | 5 | 1 |
| Los Angeles | 24 | 116 | 2,790 | 7,040 | 176 | 136 | 13 | 15.6 | 31.6 | 28 | 9% | 995 | 35.5 | 7.07 | 2 | 0 | 0 |
| Louisville | 25 | 131 | 3,287 | 17,629 | 373 | 320 | 28 | 13.9 | 38.9 | 131 | 19% | 8634 | 65.9 | 2.04 | 34 | 11 | 1 |
| Miami | 15 | 78 | 1,172 | 6,679 | 157 | 33 | 13 | 25.5 | 81.0 | 11 | 6% | 1315 | 119.5 | 5.08 | 0 | 0 | 1 |
| Nashville | 23 | 192 | 4,408 | 16,881 | 275 | 565 | 37 | 11.2 | 24.4 | 222 | 26% | 3537 | 15.9 | 4.77 | 62 | 15 | 7 |
| New Orleans | 21 | 225 | 4,724 | 15,912 | 483 | 385 | 41 | 12.4 | 25.8 | 170 | 20% | 11017 | 64.8 | 1.44 | 20 | 14 | 3 |
| New York | 33 | 116 | 3,838 | 15,660 | 359 | 375 | 22 | 14.8 | 27.6 | 84 | 11% | 4477 | 53.3 | 3.50 | 2 | 1 | 1 |
| Philadelphia | 27 | 193 | 5,207 | 11,013 | 434 | 62 | 18 | 14.1 | 79.0 | 23 | 5% | 2082 | 90.5 | 5.29 | 2 | 3 | 1 |
| Phoenix | 15 | 423 | 6,341 | 7,449 | 373 | 144 | 34 | 9.3 | 27.7 | 46 | 9% | 1384 | 30.1 | 5.38 | 2 | 0 | 0 |
| San Francisco | 35 | 109 | 3,815 | 17,099 | 359 | 387 | 21 | 14.7 | 30.5 | 125 | 17% | 8005 | 64.0 | 2.14 | 16 | 0 | 0 |
| Seattle | 21 | 309 | 6,498 | 7,577 | 538 | 85 | 30 | 7.0 | 44.6 | 31 | 5% | 4261 | 137.5 | 1.78 | 4 | 2 | 1 |
| St.Paul | 17 | 453 | 7,709 | 10,780 | 451 | 172 | 37 | 10.1 | 36.2 | 97 | 16% | 4565 | 47.1 | 2.36 | 9 | 5 | 2 |
| Tampa | 22 | 150 | 3,297 | 10,718 | 399 | 185 | 27 | 12.6 | 30.7 | 90 | 15% | 5055 | 56.2 | 2.12 | 5 | 0 | 0 |
| Washington | 17 | 176 | 2,995 | 7,828 | 215 | 54 | 16 | 13.8 | 90.0 | 37 | 14% | 3073 | 83.1 | 2.55 | 4 | 3 | 0 |
| | 498 | | 103,196 | 257,723 | 8,123 | 4,581 | | 11.8 | 35.3 | 1,934 | | 134,832 | 69.7 | 1.9 | 288 | 109 | 30 |

Note: FFL and Inspector data are as of 08/01/03, other data are totals for FY 2002.

U.S. Department of Justice
Office of the Inspector General
Evaluation and Inspections Division

36

## Suspected Criminal Violations Are Not Always Referred for Investigation

In addition to documenting regulatory violations, the FFL inspection program also identifies indications of potential criminal activity. Paradoxically, we found that Field Divisions that took longer to conduct inspections made slightly fewer referrals of suspected criminal activity (Figure 10). To analyze this result, we examined the total number of inspections completed by each Field Division and found that Field Divisions that took longer to conduct inspections completed fewer inspections. Further, the data showed that the number of inspections completed was correlated to the number of referrals made, and that taking longer to conduct an inspection made it no more likely that suspected criminal activity would be found and referred. Therefore, Field Divisions that took longer to conduct inspections completed fewer inspections and made fewer criminal referrals.



Figure 10: Comparison of Average Compliance Inspection Time to Criminal Referrals, FY 2002

Source: ATF Field Management Staff and ATF Firearms Programs Division

U.S. Department of Justice
Office of the Inspector General
Evaluation and Inspections Division

37

In addition, we found evidence that the coordination between ATF Inspectors and ATF Special Agents could be improved. During our review, we determined that even when FFL compliance inspections identify significant violations of federal firearms laws by the FFLs or by gun purchasers, the violations are often not reported to ATF Special Agents for investigation. In our interviews, 12 of 18 Inspectors said that they rarely refer information gathered during FFL inspections to Special Agents because they did not believe that Special Agents would follow-up on the information. The other six Inspectors told us that they made one or two referrals per year to Special Agents.

We identified several cases where indications of potential criminal violations by FFLs, including gun trafficking, were identified but not referred for investigation. These FFLs were subsequently investigated after the illegal activity was discovered through other means. For example, Inspectors conducted compliance inspections in March 2000 and October 2002 on an FFL located in the southern United States. The 2000 inspection was based, in part, on information from a state LEA. During the 2002 compliance inspection, the Inspector found 40 firearms not entered into the FFL's A&D Book, several missing Forms 4473, and sales to out-of-state residents – all strong indicators of gun trafficking. Despite these findings, the FFL was not reported to Special Agents for investigation. Then, subsequent to the inspections, information from a confidential informant led to an investigation of this FFL. In December 2003, ATF Special Agents arrested the FFL for trafficking firearms.

Further, the latest data available indicate that investigations are not frequently initiated as a result of information provided by ATF Inspectors. In FY 2002 and FY 2003 respectively, Inspectors made 951 and 823 referrals of potential criminal activity identified during compliance inspections, an average of two per field-level Inspector. According to the ATF's *Following the Gun* report, published in 2000, of the 1,530 firearms trafficking investigations conducted from July 1996 to December 1998, just 43 - less than 3 percent - were initiated based on information found during inspections (see Table 3 on next page). Our survey of 45 Area Supervisors also found that few inspections result from information referred to Inspectors by ATF Special Agents. Most Area Supervisors (71.1 percent) said that they assigned five or fewer inspections each year based on information from Special Agents.

In December 2002, the ATF attempted to improve coordination between Inspectors and Special Agents by creating 23 Special Intelligence Inspector (SII) positions (one in each Field Division). The SIIs

are responsible for collecting and disseminating information gathered by Inspectors and Special Agents between the two groups. As of November 2003, only 7 of the 23 authorized SII positions had been filled. Although ATF Headquarters officials said that they plan to fill the positions, as of March 2004 no deadline had been set.

| Table 3: Reasons Cited for ATF Firearms Trafficking Investigations (July 1996 to December 1998) | | |
|---|---|---|
| Reason | Times Cited | Percent of Investigations* |
| Referral from state, local, or federal agency | 409 | 26.7% |
| Confidential informant | 352 | 23.0% |
| Crime gun tracing analysis | 296 | 19.3% |
| Review of multiple sales forms | 205 | 13.4% |
| FFL reported suspicious activity. | 139 | 9.1% |
| Developed from another ATF investigation | 127 | 8.3% |
| FFL reports burglary/theft/robbery to ATF | 115 | 7.5% |
| ATF initiated investigation of suspicious activity (e.g., gun show task force, etc.) | 81 | 5.3% |
| **ATF inspection of FFL** | **43** | **2.8%** |
| Tip by citizen or anonymous source | 37 | 2.4% |
| Other | 9 | 0.6% |

\* Some of the 1,530 investigations cited more than one reason. Therefore, the "Percent of Investigations" exceeds 100 percent.

Source: "Following the Gun," ATF Publication (June 2000).

## The ATF Acts Infrequently to Revoke Federal Firearms Licenses, and the Process is Not Timely

We found that the ATF rarely revokes federal firearms licenses. In FY 2002, the 1,934 FFL inspections that found violations found an average of almost 70 violations each (for a total of 134,832 violations). In FY 2003, the 1,812 inspections that found violations found an average of over 80 violations each (for a total of 149,396 violations). However, in those years, the ATF issued Initial Notices of Revocation to only 30 and 54 FFLs, respectively.[62] In addition to issuing a Notice of Revocation after a compliance inspection, the ATF also can effectively revoke an FFL's license by denying its request for license renewal. If an FFL's license expires during the course of revocation proceedings, the ATF's

---

[62] Notices of Revocation are not final. Of the 30 Notices in FY 2002, 25 FFLs requested a hearing and 3 of those avoided revocation. (The FY 2003 data was unavailable as of March 2004.)

action is formally categorized as a denial of a renewal request – not as a revocation. In FY 2001, the ATF denied 28 requests for renewal.[63]

During our review, ATF officials told us that, before May 2003, the decision on whether to take adverse action (i.e., to revoke or deny renewal of an FFL's license) was left to the discretion of the Inspector, Area Supervisor, and the DIO of each of the 23 Field Divisions. However, in May 2003, subsequent to the initiation of our review, the ATF created guidelines for the Field Divisions to follow when determining whether or not to initiate an adverse action. When asked about the impact of these new guidelines, ATF personnel in the four Field Divisions we visited told us that they expected the guidelines to lead to an increase in the total number of license revocations. We found that after the ATF issued the adverse action guidelines, the number of FFL revocation hearings rose to 87 during FY 2003, and 59 Initial Notices of Revocation were issued and renewals denied during the first quarter of FY 2004 alone. As of March 2004, most of these cases have not been finalized.

The process for revoking or denying renewal of a federal firearms license is not timely. The ATF provided specific case tracking data for 50 closed denials and revocations completed in FY 2001 and FY 2002.[64] The processing of these 50 cases averaged 379 days from the date that the Inspector recommended revocation or denial to the date that the case was closed by the NLC. We determined that the length of denial and revocation proceedings was due, in part, to the number of ATF officials involved (see Figure 11 on page 42). At least five ATF officials participate in these proceedings and each official reviews and approves the FFL inspection case file seriatim. A formal ATF Notice of Revocation is issued only after all of the officials have approved the action. Because the ATF has limited suspension and fining authority, FFLs remain in business during the adjudication of renewal denials and revocations.

During our interviews, DIOs and some Area Supervisors stated that most delays in the eight-step process occurred at the Division

---

[63] ATF officials also told us that FFLs sometimes withdraw their renewal applications after being told that they may be denied. In FY 2001, 489 FFLs withdrew their applications, but ATF did not track how many withdrew after being told they would be denied versus withdrawals for other reasons.

[64] The ATF provided partial data for an additional 37 cases that we did not include because the data were inadequate to enable us to determine the case processing time. For example, for 33 cases the NLC did not have dates for when the initial Notice of Revocation or Denial was sent to the FFL.

Counsel level as the ATF waited for Division Counsel to draft a Notice of Revocation for the FFL. We were unable to evaluate that perception from the case tracking data that ATF could provide, because it did not include the dates that the cases were processed by individual Field Division offices. However, Assistant Chief Counsels and Division Counsels we interviewed acknowledged delays in denial and revocation proceedings, which they stated were due, in part, to their heavy caseloads. They also stated that the quality of the initial compliance inspection report was a factor, as not all cases they received adequately detailed that the FFL "knowingly and willfully" violated federal firearms laws. This caused further delay while the Division Counsels obtained clarifying information from the Inspectors to ensure that the cases met legal standards.

We also noted that in some cases delays occurred due to a lack of legal staff within the Field Divisions. Although in 1999 the ATF established a standard Field Division structure that would include two staff attorneys, two of the Field Divisions we visited (Washington, D.C. Field Division, Seattle Field Division) had no attorneys on staff. When those Field Divisions needed legal assistance, they obtained it directly from their regional Assistant Chief Counsel's Office. For example, at the Washington, D.C., Field Division, the DIO told us that he sent revocation and denial cases to the Assistant Chief Counsel's Office located in Philadelphia.[65] In one case, he said, it took four months to prepare an Initial Notice of Revocation for his signature.

---

[65] The Assistant Chief Counsel's Offices are located in San Francisco, Chicago, Dallas, Atlanta, and New York/Philadelphia. The northeast regional office is currently operating in Philadelphia due to the September 11, 2001, destruction of the ATF's New York offices, which were located at the World Trade Center.



## Figure 11: FFL Denial or Revocation Process

Compliance inspection reveals federal firearms violations. Inspector recommends revoking FFL's license.

↓

Area Supervisor approves recommendation for revocation.

↓

DIO approves recommendation for revocation.

↓

Division Counsel writes initial Notice of Revocation for issuance to the FFL by DIO. FFL has 15 days to appeal revocation and request a hearing.

↓

NLC officials assign Inspector to serve as Hearing Officer.

↓

DIO schedules hearing to be attended by Hearing Officer, FFL, FFL's counsel, Inspector who conducted compliance inspection, and Division Counsel.

↓

Hearing Officer issues report of findings and recommendations to DIO.

↓

Division Counsel writes final Notice of Revocation for issuance by DIO.

↓

FFL has 60 days to appeal revocation to U.S. District Court.

↓

If an FFL files an appeal, Division Counsel, in consultation with an AUSA, submits Motion for Summary Judgment on behalf of the ATF.

**Case Study: FFL Remains in Business More Than Two Years After Inspector Recommends Revoking License**

Based on an October 2001 compliance inspection, an ATF Inspector recommended revoking the license of a Georgia FFL operating as a pawnbroker. During the inspection, the Inspector determined, among other findings, that the FFL:

- Sold 51 firearms without first obtaining proper identification from the purchasers;
- Failed to complete a Report of Multiple Sale on three occasions;
- Transferred at least one firearm to an out-of-state resident; and
- "Aided and abetted a prohibited person in obtaining a firearm" on four occasions by transferring firearms to individuals other than those who had originally pawned the firearms to him without performing the proper background check.

The DIO issued an initial Notice of Revocation on May 6, 2002. The FFL appealed, and a hearing was scheduled for November 2002. The NLC rescheduled the hearing for February 2003 at the FFL's request. At that hearing, the FFL blamed the violations on human error as well as a computer program he used to maintain his records. The Hearing Officer's completed report, which included a recommendation to *approve* the FFL's license, was issued to the DIO on March 31, 2003. The DIO issued a final Notice of Revocation on June 13, 2003. The FFL waited until August 12, 2003 – the maximum allowable time – to appeal the DIO's decision to U.S. District Court, where the case remained as of March 2004. Both sides have until June 1, 2004 to file motions in the case, according to a December 2003 order. Throughout these proceedings, the FFL has remained in business.

*[U.S. District Court, Middle District of Georgia; Case #03-CV-267.]*

We also found indications of limited communication between Field Division staff and Division Counsels. For example, we were told that Inspectors, Area Supervisors, and DIOs, usually do not seek advice from Division Counsels on inspections of FFLs found to have violated federal firearms laws until they request a Notice of Revocation or Denial. Furthermore, Division Counsels told us that they are not routinely notified when Warning Conferences are scheduled between FFLs and DIOs. One Assistant Chief Counsel told us that he believes that the ATF would benefit if Division Counsels had the opportunity to participate in such proceedings in case, later on, a Notice of Revocation is issued to the FFL.

## New ATF Guidelines Begin to Address Inconsistent and Untimely Adverse Actions

In May 2003, the ATF took the initial steps toward standardizing adverse actions by issuing guidelines that were intended to ensure that Field Division personnel make more consistent and appropriate determinations on adverse actions (such as warning letters, warning conferences, and revocations) when FFLs are found to have violated federal firearms laws. The guidelines established standards for minimum adverse actions to be taken when violations are found. Although Field Divisions can deviate from the policy if they determine that the facts warrant another action, any deviation on inspections violations for which the standard action is revocation must be reviewed by Headquarters.

The guidelines specify that FFLs that commit minor non-repetitive, non-willful violations that do not affect the lawfulness of a gun transfer, such as minor omissions or format errors, should receive warning letters or reports of violations. FFLs committing more serious violations that do not rise to the level of revocation, such as failing to record an acquisition within a specified time frame or failing to report multiple sales, should receive warning conferences. When FFLs commit the most serious violations, such as having more than a threshold number of guns missing from their inventory, the Field Division should begin the process of revoking or denying the renewal of the FFL's license.

The guidelines also address some of the problems we noted with the ATF's past failure to follow-up and take action when violations were found. For example, they address the frequent failure to routinely re-inspect FFLs found to have committed serious violations by directing that all FFLs that receive warning letters or warning conferences must be

scheduled for a follow-up "recall" inspection in the following year. The guidelines also begin to address the lack of adverse actions taken against repeat violators by directing that adverse actions must escalate for repeat offenses. For example, an FFL that was issued a warning letter or directed to attend a warning conference for a violation cannot be given the same penalty if a subsequent inspection discovers further violations. Instead, the penalty must escalate to a warning conference (from a warning letter) or to revocation. The guidelines also establish a time frame for part of the adverse action process by directing DIOs to act on adverse action recommendations within 90 days after receiving the inspection report.

In addition to addressing the adverse action process, the guidelines also address part of the inspection process by requiring that follow-up inspections on FFLs that had unresolved inventory discrepancies include a full inventory, unless the DIO approves a statistical sample instead. Conducting a full inventory identifies all the guns that the FFL may have lost, and it brings the FFL's inventory records up-to-date. The FFL then formally reports any missing guns to the NTC as lost or stolen. The reporting of lost and stolen guns provides some benefit should one of those guns be recovered and traced, since it saves the NTC from contacting the manufacturer and dealer before the NTC knows that the gun was lost from a specific FFL's inventory. A full inventory may also identify more instances of violations to support potential adverse actions.

However, for the purpose of verifying that FFLs are complying with the requirement to maintain an accurate inventory, a policy of conducting full inventories in lieu of valid statistical samples may not be the most effective use of ATF resources. Conducting full inventories at larger gun dealers can be very time consuming. Moreover, once an inspection identifies discrepancies sufficient to document that an FFL's inventory system is deficient, completing a full inventory provides only incremental instances of missing guns. We would not disagree that there are cases, often related to an investigation, where a full inventory is desirable – cases like the Bull's Eye Shooter Supply.[66] However, maintaining an accurate inventory remains the responsibility of the FFL. Given the limited resources available to the ATF to conduct gun shop

---

[66] The Bull's Eye Shooter Supply in Washington State was the FFL that lost the Bushmaster sniper rifle used in a series of murders across the country in 2002 for which John Allen Muhammad and Lee Boyd Malvo were subsequently convicted. Subsequent inspections found that the store could not account for several hundred guns, including assault weapons.

inspections, restricting inventories to the minimum sample needed to provide a statistically valid check on the accuracy of the FFL's record-keeping system would reduce the length of inspections and enable the ATF to provide better coverage of FFLs.

## By Streamlining and Standardizing Inspections, the ATF Could Dramatically Improve the FFL Inspection Program

We found that there is a critical need for the ATF to improve the efficiency and effectiveness of the FFL inspection program and ensure that FFLs are inspected using consistent inspection procedures and sampling criteria regardless of their geographic location. With the May 2003 guidelines, the ATF began to improve the consistency and timeliness of adverse actions, as well as to address the critical need to re-inspect FFLs that committed violations. However, the current variability in the Field Divisions' inspection procedures must be addressed to ensure that adverse actions taken under the May 2003 guidelines treat FFLs consistently. Requiring defined adverse actions for specific numbers of violation instances in the absence of standardized inspection procedures and sampling criteria will result in dissimilar treatment of FFLs in different Field Divisions. As discussed previously, the ATF's guidance on conducting inspections does not ensure consistent examinations of FFLs' compliance with gun laws.

We observed several areas in which the inspection process could be improved through standardization, such as:

- Standardizing inventory procedures to conduct the minimum sample needed (based on the number of guns in the FFL's stock) to provide a statistically valid check on the effectiveness of the FFL's inventory management and record-keeping systems.

- Standardizing the review procedures for Forms 4473 to provide for the minimum sample needed to provide a statistically valid check (based on the number of guns sold by the FFL) on whether the FFL is completing the Forms as required.

- Standardizing and automating inspections paperwork and providing laptop computers to enable Inspectors to prepare inspection reports on-site. Currently ATF Inspectors must complete 11 worksheets containing 115 steps and totaling 23

pages while on-site. Application inspection paperwork comprises 32 steps for the inspection and 56 steps for an acknowledgement of laws. The Inspectors must then transcribe their handwritten notes from the worksheets into the ATF's N-Spect database upon returning to their Area Office.

- Extending the inspection cycle for FFLs with no significant violations. Under the May 2003 guidelines, FFLs found to have committed violations must be scheduled by the ATF Field Division for a follow-up inspection in the following year. Extending that approach, a model standardized inspection procedure could allow Field Divisions to extend the inspection cycle for FFLs that have no significant violations beyond three years, so that available resources can be directed toward noncompliant dealers.

- Establish guidance to ensure that Inspectors consistently look for known indications of firearms trafficking and, when found, report the findings to the ATF's Criminal Enforcement Division.

Improving the efficiency of the inspection process would also reduce the need for additional staff. Adopting a standardized inspection process designed to use the minimum review necessary to effectively gauge FFLs' adherence to gun laws will increase the efficiency of the FFL inspection program. This will reduce both the need for additional Inspector staffing and the burden that inspections place on FFLs. In an April 2003 report to Congress, the ATF Director stated that, to fully implement the ATF's mission to regulate and enforce federal firearms and explosives laws, the ATF would need 1,775 Inspectors, an increase of 1,277 Inspectors from current staffing levels.[67] Of the 1,775 Inspectors, 1,235 would be dedicated to conducting FFL compliance inspections in order to inspect all FFLs on a triennial basis. The Director based this figure, in part, on projections of FFL application and compliance inspections, as well as inspections initiated to support criminal investigations. Our review of FY 2002 ATF work hour data shows that it dedicated 628,117 staff hours (the equivalent of 302 staff years at 2,080 hours per year) to FFL inspections. The requested increase to 1,235 Inspectors would require 933 new Inspectors, and would more than

---

[67] *Inspector Staffing Requirement for the Bureau of Alcohol, Tobacco, Firearms and Explosives,* April 15, 2003.

quadruple the Inspector workforce dedicated to inspecting FFLs.[68]  In the Department's FY 2005 Budget Request, it recommended funding 126 new Inspector positions for the ATF.

We examined the ATF's calculations and question whether it needs as many Inspectors as stated.  The ATF projection was calculated using an overall average inspection time of 62.7 hours per inspection (Table 4, on the next page).  However, according to the ATF's FY 2002 data, the overall average inspection time was only 49.4 hours (628,117 inspection hours divided by 12,704 total inspections).  The ATF request therefore appears to include an assumed 27 percent increase in the average length of inspections.

Calculating the staffing requirement using the ATF's actual historical inspection average of about 50 hours per inspection indicates that the ATF should need a total of only 984 Inspectors (682 new Inspectors) to accomplish inspections on a triennial basis.  Moreover, as previously discussed, our analysis found wide variations in inspection implementation and productivity among the ATF Field Divisions.  By standardizing and streamlining its inspection process the ATF could reduce the average inspection time from the current 49.4 hours, which would further reduce the number of additional Inspectors that needed to accomplish FFL compliance inspections on a triennial basis.[69]  For example, by reducing the overall average inspection time to 40 hours per inspection, the ATF should be able to implement a triennial FFL compliance inspection program with 788 Inspectors (Table 4).

Increasing the efficiency of the inspection process also is needed because the demands on ATF Inspectors to perform duties related to explosives licensees are increasing.  Immediately after the terrorist

---

[68]  FY 2002 work hour data was the latest available during our review.  The work hours used in this section do not match the work hours discussed previously because they include not only time spent directly conducting inspections, but all time in an Inspector's work year, such as leave, training, sick days.  This additional time must be considered when calculating staffing requirements.

[69]  We noted that the ATF was exploring other ways to reduce the demands on Inspectors, including a December 2003 proposal to hire former Inspectors to serve as Hearing Officers and a Flexiplace Pilot Program.  The Flexiplace Pilot reduced the requirement for 23 Inspectors from 15 Field Divisions to work from ATF Area Offices, allowing more inspections of geographically remote FFLs.  An August 2003 Headquarters review of the program concluded that it improved the performance of the Inspectors who participated.  As of January 2004, the ATF had not expanded the program.

| Table 4: ATF STAFFING REQUEST CALCULATIONS | | | | |
|---|---|---|---|---|
| Activity | Number of Inspections | Hours per Inspection* | Total Hours | Inspector FTE @ 2080 Hours |
| Non-YCGII FFL Compliance Inspections | 22,889 | 66 | 1,510,674 | 726.3 |
| YCGII FFL Compliance Inspections | 11,444 | 80 | 915,520 | 440.2 |
| Support Criminal Investigations | 631 | 73 | 46,063 | 22.1 |
| Firearms Applications | 6,000 | 16 | 96,000 | 46.2 |
| **Total** | **40,964** | **62.7** | **2,568,257** | **1234.7** |

- ATF staffing calculations include indirect time

| OIG RECALCULATION: ATF STAFFING AT 50 HOURS PER INSPECTION | | | | |
|---|---|---|---|---|
| Non-YCGII FFL Compliance Inspections | 22,889 | 51.5 | 1,178,784 | 566.7 |
| YCGII FFL Compliance Inspections | 11,444 | 63.5 | 726,752 | 349.4 |
| Support Criminal Investigations | 631 | 73 | 46,063 | 22.1 |
| Firearms Applications | 6,000 | 16 | 96,000 | 46.2 |
| **Total** | **40,964** | **50** | **2,047,599** | **984.4** |

| OIG RECALCULATION: ATF STAFFING AT 40 HOURS PER INSPECTION | | | | |
|---|---|---|---|---|
| Non-YCGII FFL Compliance Inspections | 22,889 | 40 | 915,560 | 440.2 |
| YCGII FFL Compliance Inspections | 11,444 | 50.8 | 581,360 | 279.5 |
| Support Criminal Investigations | 631 | 73 | 46,063 | 22.1 |
| Firearms Applications | 6,000 | 16 | 96,000 | 46.2 |
| **Total** | **40,964** | **40** | **1,638,983** | **788** |

attacks of September 11, 2001, the ATF initiated a policy of investigating all incidents of theft or loss of explosives materials, and conducting compliance inspections on all explosives license holders within 50 miles of major metropolitan areas. This meant that the ATF had to inspect 7,459 of 9,400 explosives license holders. In November 2002, the Safe Explosives Act (SEA) imposed new licensing requirements that increased the number of explosives licensees, and mandated that the ATF conduct on-site inspections of explosives licensees and permit holders at least once every three years.

The additional explosives work is already reducing ATF's ability to inspect FFLs. The Chief of Staff of the ATF's Firearms, Explosives and Arson Directorate confirmed that Inspector resources have been diverted to explosives work by Area Supervisors to meet the SEA's inspection requirements. As a result, she said, the ATF plans to re-examine Inspectors' firearms work because ATF Headquarters officials are "worried" that FFLs are not being inspected. Our review of preliminary data for FY 2004 inspections work confirmed these concerns.

Preliminary data for early FY 2004 indicated that there has been a precipitous decrease in the number of FFL inspections. Through the first five months of FY 2004, the ATF completed 1,113 FFL compliance inspections. At that pace, the agency will complete less than 2,700 FFL compliance inspections during FY 2004. That is less than half the number that the agency reported that it completed in FY 2003, and less than 2.6 percent of the FFL population. For example, the Kansas City Field Division, which oversees the most FFLs of any Field Division (with 8,194 FFLs) completed only 21 FFL compliance inspections in the first five months of FY 2004.

<u>Reducing the time spent at FFLs' places of business</u>. The time that ATF Inspectors spend on-site at FFLs cannot be calculated definitively. Although the ATF's inspection hour tracking system shows that the ATF spent a total of 257,723 hours conducting FFL inspections in FY 2002, it does not allow the time spent on travel and other inspection related actions performed away from FFL locations to be segregated from the total inspection hours. Nonetheless, any increase in inspection efficiency would reduce the overall time spent conducting reviews on-site at the FFLs, and minimize any potential interruption of the FFLs' business operations.

## ATF Does Not Consistently Report Inspection Performance

In response to our requests for inspections and workload data (such as the number of compliance and application inspections conducted and the Inspector work hours associated with completing these inspections during FY 2002), the ATF queried its N-Spect, FLS, and Standard Time and Attendance System (STATS) electronic databases. N-Spect tracks direct time related to FFL inspections, FLS tracks information related to FFL licensees, and the STATS timekeeping system tracks direct and indirect hours for payroll purposes. During our examination of the performance and productivity of the ATF's FFL inspections program, we identified significant discrepancies between the systems with regard to the number and type of inspections conducted and the hours spent conducting the inspections. In addition, the data in the systems regarding the number of inspections done differed significantly from what the ATF included in published reports. Finally, data contained in the N-Spect database contained significant errors: after extracting data to respond to our requests, ATF officials determined that several hundred inspections entered as compliance inspections were actually application inspections.

Table 5 contains examples of inconsistent data related to the ATF's FY 2002 ATF's FFL inspections program that the ATF provided to OIG and reported publicly.

| Table 5: Inconsistent N-Spect Totals of FY 2002 FFL Inspection Activities | | |
|---|---|---|
| **Data Source** | **FY 2002 Totals** | **Inspection Type** |
| N-Spect data provided to the OIG in May 2003 | **12,522** | Total Inspections (the ATF claimed data could not be broken down by inspection type) |
| Revised N-Spect data provided to the OIG in February 2004 | 7,665 | Application Inspections |
| | 5,039 | Compliance Inspections |
| | **12,704** | Total Inspections |
| Revised N-Spect data adjusted to correct miscoded inspections provided to the OIG Team on May 20, 2004 | 8,123 | Application Inspections |
| | 4,581 | Compliance Inspections |
| | **12,704** | Total Inspections |
| FLS Licensee Inspection Data | 4,722 | FY 2002 new licensees with "inspection date" indicating that an application inspection was conducted |
| *ATF Snapshot 2003* | "Approximately 6,000" | Compliance Inspections |
| *ATF Performance and Accountability Report 2002* | "Eleven percent" of all FFLs were inspected. *11% of 104,300 FFLs is equivalent to 11,473 inspections* | Total Inspections |

In addition to FY 2002 data discrepancies, current data from ATF's N-Spect database shows that the ATF conducted 5,729 application inspections and 4,035 compliance inspections in FY 2001, as well as 8,043 application inspections and 5,887 compliance inspections in FY 2003. Previously, the ATF had published reports and provided draft reports to the OIG indicating that it conducted more inspections: 5,497 application inspections and 5,016 compliance inspections in FY 2001 and 8,422 application inspections and 6,481 compliance inspections in FY 2003.

We discussed these substantial inconsistencies with ATF Headquarters officials. They explained that the inconsistencies were due to differences in how the queries of the N-Spect electronic database were constructed by different ATF analysts. For instance, according to the ATF Deputy Assistant Director for Field Operations, the ATF report on FY 2002 activities (*ATF Snapshot 2003*) reported a higher number of inspections completed because it aggregated all Inspector activities to determine the number of compliance inspections conducted by ATF Inspectors, and included limited purpose inspections as well as activities unrelated to FFL compliance inspections. Another reason for the discrepancies related to the project codes used to identify types of inspections. According to ATF Headquarters officials, Area Supervisors do not always use the correct project codes when assigning inspections because the codes are "confusing." For our review, ATF Headquarters officials had to query an N-Spect "Special Instructions" data field for "firearms application inspection" and "firearms compliance inspection" rather than the appropriate project code in order to more accurately determine inspection totals.

The ATF has taken steps to ensure that inspection totals are accurately measured. In October 2003, the ATF released a new version of N-Spect that requires Area Supervisors to use pull-down menus that are inspection-specific (e.g., "Application Inspection"). Moreover, although the enhancements to the N-Spect database will increase the reliability of the data in the system, the ATF must adopt a standard approach for querying the N-Spect electronic database and ensure that queries are stored for future use so that subsequent requests for the same data will elicit comparable results. If the ATF does not adopt a standard method for querying and extracting historical data, it cannot consistently report accurate performance data.

## New Restriction on Retention of Gun Purchaser Data will Hinder the ATF's Ability to Detect Fraudulent Background Checks

As discussed in the Background section, prior to transferring a firearm to an unlicensed individual, an FFL must complete a check of the National Instant Criminal Background Check System (NICS) to determine if the potential purchaser is prohibited from owning a gun. For each query, the NICS currently collects information on whether or not the purchase was allowed to proceed, and retains information on the potential purchaser for 90 days. The FBI assigns each query a unique NICS Transaction Number (NTN), which FFLs are required to enter onto the corresponding Form 4473.

For the majority of dealers, NICS is a valuable tool that enables them to quickly determine whether a potential customer is prohibited from purchasing a firearm. However, some gun dealers could attempt to hide transfers to prohibited persons by falsifying NICS information. To deter fraud and detect FFLs that may be providing false information to pass a NICS check in order to facilitate a sale to a prohibited person, during FFL compliance inspections ATF Inspectors verify that the information submitted to NICS matches the information on the Form 4473. The Inspectors copy information on selected Forms 4473 from the past 90 days and check with the FBI to ensure that the information on the Form 4473 matches the information that the FFL provided at the time of the sale. If discrepancies are found, it may indicate than an FFL submitted false information to NICS in order to receive an NTN associated with a background check for a non-prohibited person. The ATF reported that it has not found any NICS violations involving the falsification of purchaser information through the Forms 4473 review.[70]

However, the ability of ATF Inspectors to conduct this Form 4473 review was affected when the FY 2004 appropriations act reduced the time that the FBI can retain information submitted by FFLs during the NICS check.[71] Beginning in July 2004, all purchaser information (e.g., name, address, date of birth) on NICS queries for which firearms sales are approved will no longer be kept for 90 days; it must be destroyed within 24 hours of the official NICS response to the FFL.[72] For approved sales, the FBI can retain for 90 days the NTN, the license number of the FFL that contacted NICS, and the date that the NICS query was made.

---

[70] *Gun Control: Potential Effects of Next-Day Destruction of NICS Background Check Records*, General Accounting Office, Report GAO-02-653, July 2002, 16-18. ATF Headquarters officials said, however, that they believe FFLs are aware of the ATF's procedures for inspecting Forms 4473 and are thereby deterred from supplying NICS with false purchaser information. The officials noted that the vast majority of discrepancies identified during FFL inspections occur because of clerical errors made by FFLs or Inspectors, such as FFL errors in recording purchaser information onto Forms 4473 or Inspector errors in copying information onto worksheets.

[71] The Fiscal Year 2004 Consolidated Appropriations Bill (Public Law 108-199) states that DOJ cannot retain "identifying information" related to sales of firearms to non-prohibited persons for more than 24 hours. All information related to calls for which potential sales are *denied* by NICS will still be retained indefinitely.

[72] As of March 2004, NICS officials plan on purging purchaser information every night, at midnight (EST). Therefore, purchaser information related to a firearm bought at 5 p.m. will be purged seven hours later.

After 90 days, the FBI may retain only the NTN and the date that the number was issued.

In 2002, ATF Headquarters officials suggested that the ATF's FFL compliance inspections program would not be affected by a "Next Day Destruction" provision.[73] Instead of submitting information copied from Forms 4473 to NICS, ATF Headquarters officials said that Inspectors could "recheck" the eligibility of purchasers by requesting that the FBI rerun selected NICS checks taken from FFL records during compliance inspections. However, while resubmitting Form 4473 information to NICS will determine whether the purchaser would be approved *on the date of the recheck*, it does not enable the ATF to effectively detect that the FFL supplied inaccurate information to NICS. There are reasons other than FFL fraud for a prior approved purchase to fail during a recheck. For instance, the purchaser may have become ineligible only since the sale, or the FBI NICS operator on the original query may have transposed letters or numbers resulting in an erroneous approval. Given these and other possible explanations, the lack of information in NICS will make it much more difficult for the ATF to prove that FFLs supplied false information initially.

Moreover, the shortened retention time will make it much easier for corrupt FFLs to avoid detection. We identified at least two potential ways that the new restriction would make it easier for corrupt FFLs to falsify the NICS check to hide a knowing transfer of a gun to a prohibited person.

- An FFL may enter correct information from the prohibited person on the Form 4473, but relay information for a person with a known "clean" record to the FBI for the NICS check. After July 2004, the ATF will have only 24 hours to detect this by cross-checking purchaser information in the FFL's records with NICS records.

- An FFL may falsify the date of the sale. Three factors make this tactic even safer for corrupt FFLs with only a 24-hour retention time – the fact that blank Forms 4473 are not serially numbered, A&D books are kept sequentially by the date that the FFL receives the guns (so disposition dates are not expected to be sequential), and after 90 days the NICS will retain only the

---

[73] *Gun Control: Potential Effects of Next-Day Destruction of NICS Background Check Records.* General Accounting Office, Report GAO-02-653, July 2002.

issue date for NTNs on approved transfers. To safely backdate a sale, a corrupt FFL needs only a good NTN that was issued to another FFL on a known date over 90 days before.[74] As long as the date on the Form 4473 and the "disposition date" in the A&D book match the date that the NTN was issued – and the dealer does not make the mistake of "selling" a gun on a date before it was received – the fraud will be exceedingly difficult to detect.

Given the new restriction on retaining NICS data, after July 2004 an ATF Inspector arriving on-site could only check the information on Forms 4473 filled out by the FFL that day. Therefore, the likelihood of encountering a falsified NICS check would be remote.

## CONCLUSIONS

We concluded that the ATF's FFL inspection program did not consistently ensure that FFLs comply with federal firearms laws. The lack of standardized inspection procedures resulted in inconsistent inspections of FFLs and significant variation in the implementation of the inspection program by Field Divisions. Our review of N-Spect performance data found that ATF's Field Divisions took an average of 35.3 hours to conduct FFL inspections to detect noncompliance with federal firearms laws, and one Division took only 24.5 hours on average to conduct its compliance inspections. We found no operational reasons why some Field Divisions averaged much longer, up to 90 hours, to conduct compliance inspections. In fact, we found little or no correlation between inspection times and enforcement activities, such as referrals of suspected criminal activity and adverse actions taken. Further, our finding that the Field Divisions varied significantly in such productivity measures as number of inspections finding violations and number of inspections done by each Inspector argues strongly for implementation of a more standardized and efficient inspection regimen.

Because the ATF does not conduct regular inspections of FFLs and lacks adequate resources to meet agency goals, it cannot effectively monitor the overall level of FFL compliance with federal firearms laws. In

---

[74] Using an NTN from another FFL limits the possibility that the fraud may be detected through the chance discovery of the same NTN twice in the FFL's records. Because NICS will delete which FFL an NTN was issued to, and FFLs are inspected independently, even where one individual holds multiple FFLs for different business locations, it will be very unlikely that such reuse of NTNs will be discovered.

December 2003, the ATF initiated a program to conduct special Random Sample Compliance Inspections to develop a risk model for the FFL inspection program.  Using data from those inspections, the ATF planned to "be able to project the overall level of compliance by" gun dealers, pawnbrokers, and collectors.[75]  While the project to estimate the overall level of compliance with laws is needed to estimate the challenges facing the ATF, it does not take the place of regular compliance inspections for deterring and identifying noncompliance with gun laws.

To ensure that all FFLs are treated consistently, and that the FFL inspection program is as efficient as possible, the ATF needs to implement a policy to ensure that inspections are conducted in a uniform manner, that inspections procedures are limited to the minimum steps needed to accomplish a valid review, and that violations are processed in a uniform and appropriate manner.  A consistent and timely inspection process is essential for identifying and addressing scofflaw dealers and reducing the availability of illegal firearms to criminals.

---

[75] Memorandum, Assistant Director for Firearms, Explosives, and Arson to All Special Agents In Charge, December 8, 2003.  ATF officials told us that the memorandum was not distributed to the Field Divisions until January 2004.

## RECOMMENDATIONS

We recommend that the ATF:

1. Develop a standard, streamlined inspection process that includes in-person inspections of all FFL applicants; more efficient inventory and records reviews; automated inspection reporting; and consistent examination of indicators of firearms trafficking.

2. Conduct a pilot project to test the streamlined inspection procedures and establish appropriate time standards for conducting these inspections.

3. Revise the staffing requirement report using the time standards to reflect the number of Inspectors needed to conduct compliance inspections on a triennial basis, or on an alternative schedule based on the FFL's compliance history.

4. Develop alternatives for better aligning Inspector resources with the distribution of FFLs, such as by redrawing Field Division boundaries, realigning personnel, or other methods.

5. Update the inspection tracking system to accurately segregate and report on Inspector time spent preparing for inspections, in travel, on-site at FFLs, and conducting other administrative duties.

6. Prepare quarterly reports on the productivity and results achieved by each Field Division.

7. Direct the National Licensing Center to develop an adverse action tracking system to monitor the progress and timeliness of FFL denials and revocations from the time an Inspector makes a recommendation until the proceedings are finalized.

8. Continue coordinating with the Department of Justice, Office of Legislative Affairs, to gain the authority to suspend or impose civil penalties on FFLs that violate federal firearms laws.

9. To improve the comprehensiveness of crime gun tracing by law enforcement agencies:

    a. Coordinate with the Office of Justice Programs to determine the feasibility of using discretionary grant funding to support crime gun tracing.

    b. Develop a model for more accurately identifying potential firearms trafficking through the analysis of an FFL's firearms sales volume and the number of firearms traced to the FFL.

## Appendix I: ATF Form 4473 (Page 1)

OMB NO. 1512-0129

**DEPARTMENT OF THE TREASURY**
BUREAU OF ALCOHOL, TOBACCO AND FIREARMS
**FIREARMS TRANSACTION RECORD PART I - OVER-THE-COUNTER**

Transferor's Transaction Serial Number

WARNING: You may not receive a firearm if prohibited by Federal or State Law. The information you provide will be used to determine whether you are prohibited under law from receiving a firearm.

Prepare in original only. All entries must be in ink. Read the Important Notices, Instructions and Definitions on this form.

**Section A - Must Be Completed Personally By Transferee (Buyer)**

| | |
|---|---|
| 1. Transferee's Full Name (Last, First, Middle) | 2. Residence Address (No., Street, City, County, State, ZIP Code; cannot be a post office box) |

| 3. Place of Birth (City, State or foreign country) | 4. Height ____ Weight ____ | 5. ☐ Male ☐ Female | 6. Birth Date  Month ____ Day ____ Year ____ | 7. Social Security Number (Optional, but will help prevent misidentification.) |
|---|---|---|---|---|

8. Race (Ethnicity) (Check one or more boxes)

☐ American Indian or Alaska Native    ☐ Black or African American    ☐ Native Hawaiian or Other Pacific Islander

☐ Hispanic or Latino    ☐ Asian    ☐ White

9. What is your State of residence (if any)? _____ (See Definition 5. If you are not a citizen of the United States, you have a State of residence only if you have resided in a State for at least 90 days prior to the date of this sale.)

10. What is your country of citizenship? (List more than one, if applicable.) _____

11. If you are not a citizen of the United States, what is your INS-issued alien number or admission number? _____

**Certification Of Transferee**

12. Answer questions 12a through 12l by writing "yes" or "no" in the boxes to the right of the questions.

| | | |
|---|---|---|
| a. | Are you the actual buyer of the firearm(s) listed on this form? Warning: You are not the actual buyer if you are acquiring the firearm(s) on behalf of another person. If you are not the actual buyer, the dealer cannot transfer the firearm(s) to you. (See Important Notice 1 for actual buyer definition and examples.) | |
| b. | Are you under indictment or information in any court for a felony, or any other crime, for which the judge could imprison you for more than one year? (An information is a formal accusation of a crime by a prosecutor. See Definition 3.) | |
| c. | Have you been convicted in any court of a felony, or any other crime, for which the judge could have imprisoned you for more than one year, even if you received a shorter sentence including probation? (See Important Notice 6, Exception 1.) | |
| d. | Are you a fugitive from justice? | |
| e. | Are you an unlawful user of, or addicted to, marijuana, or any depressant, stimulant, or narcotic drug, or any other controlled substance? | |
| f. | Have you ever been adjudicated mentally defective (which includes having been adjudicated incompetent to manage your own affairs) or have you ever been committed to a mental institution? | |
| g. | Have you been discharged from the Armed Forces under dishonorable conditions? | |
| h. | Are you subject to a court order restraining you from harassing, stalking, or threatening your child or an intimate partner or child of such partner? (See Important Notice 7.) | |
| i. | Have you been convicted in any court of a misdemeanor crime of domestic violence? (See Important Notice 6, Exception 1 and Definition 4.) | |
| j. | Have you ever renounced your United States citizenship? | |
| k. | Are you an alien illegally in the United States? | |
| l. | Are you a nonimmigrant alien? (See Definition 6.) | |

13. If you are a nonimmigrant alien, do you fall within any of the exceptions set forth in Important Notice 6, Exception 2?

Yes ☐    No ☐    Not applicable ☐    (If "yes," the licensee must complete question 18c.)

I certify that the above answers are true and correct. I understand that answering "yes" to question 12a when I am not the actual buyer of the firearm is a crime punishable as a felony. I understand that a person who answers "yes" to any of the questions 12b. through 12k is prohibited from purchasing or receiving a firearm. I understand that a person who answers "yes" to question 12l is prohibited from purchasing or receiving a firearm, unless the person also answers "yes" to question 13. I also understand that making any false oral or written statement, or exhibiting any false or misrepresented identification with respect to this transaction, is a crime punishable as a felony. I further understand that the repetitive purchase of firearms for the purpose of resale for livelihood and profit without a Federal firearms license is a violation of law. (See Important Notice 8.)

| 14. Transferee's Signature | 15. Date |
|---|---|

ATF F 4473 (5300.9) PART I (10-2001) PREVIOUS EDITIONS ARE OBSOLETE

## Appendix I: ATF Form 4473 (Page 2)

**Section B - Must Be Completed By Transferor (Seller)**

16. Type of firearm(s) to be transferred:

☐ Handgun   ☐ Long Gun   ☐ Both

17. Location of sale if at a gun show. *(See Instruction to Transferor 13.)*

_____ (city, state)

18a. Type of Identification *(e.g., driver's license or other valid government- issued photo identification):* _____

Number on Identification: _____

Expiration Date of Identification *(if any)* _____ *(See Instruction to Transferor 1.)*

18b. **Aliens only:** Types and dates of additional required identification *(e.g., utility bills or lease agreements. See Instruction to Transferor 2.)*

18c. **Nonimmigrant aliens only:** Type of documentation showing an exception to the nonimmigrant alien prohibition *(e.g., hunting license/permit, waiver. See Instruction to Transferor 3.)*

**Question 19, 20, or 21 Must Be Completed Prior To The Transfer Of The Firearm(s)** *(See Instructions to Transferor 5-7.)*

19a. The transferee's identifying information in Section A of this form was transmitted to NICS or the appropriate state agency on _____ *(Date).*

19b. The NICS or state transaction number *(if provided)* was: _____

19c. The reponse initially provided by NICS or the appropriate state agency was:

☐ Proceed   ☐ Denied   ☐ Delayed

19d. If initial NICS or state response was "Delayed," the following response was received from NICS or the appropriate state agency on _____ *(Date)*

☐ Proceed   ☐ Denied   ☐ No resolution was provided within 3 business days.

19e. The name and Brady identification number of the NICS examiner *(if provided)* _____ / _____ *(optional)*
(name)          (number)

20. ☐ No NICS check was required because the transfer involved only NFA firearm(s). *(See Instruction to Transferor 7.)*

21. ☐ No NICS check was required because the buyer has a valid permit which qualifies as an exemption to NICS *(See Instruction to Transferor 7.)*

State Permit Type: _____   Date of Issuance: _____

Expiration Date *(if any):* _____   Permit Number: _____

**Section C**

If the transfer of the firearm(s) takes place on a different day from the date that the transferee signed Section A, the transferee must complete Section C immediately prior to the transfer of the firearm(s). *(See Instruction to Transferee 3 & Instruction to Transferor 8.)*

**I certify that the answers I provided to the questions in Section A of this form are still true and correct.**

22. Transferee's Signature _____   23. Date _____

**Section D**

| 24. Manufacturer and/or Importer | 25. Model | 26. Serial Number | 27. Type *(pistol, revolver, rifle, shotgun, etc.)* | 28. Caliber or Gauge |
|---|---|---|---|---|
|  |  |  |  |  |
|  |  |  |  |  |
|  |  |  |  |  |

**Complete ATF F 3310.4 For Multiple Purchases Of Handguns** *(See Instruction to Transferor 11.)*

29. Trade/corporate name and address of transferor *(Hand stamp may be used.)*

30. Federal Firearms License Number *(Hand stamp may be used.)*

On the basis of (1) the statements in Section A; (2) my verification of identity noted in question 18a and my verification again at the time of transfer *(if the transfer does not occur on the same day the verification was noted in question 18a);* and (3) the information in the current State Laws and Published Ordinances, it is my belief that it is not unlawful for me to sell, deliver, transport, or otherwise dispose of the firearm(s) listed on this form to the person identified in Section A.

**The Person Actually Transferring The Firearm(s) Must Complete Questions 31-34.**

| 31. Transferor's Name *(Please print.)* | 32. Transferor's Signature | 33. Transferor's Title | 34. Date Transfer is completed |
|---|---|---|---|
|  |  |  |  |

*U.S. Government Printing Office: 2002 — 783-776

ATF F 4473 (5300.9) PART I (10-2001)

**Appendix II: Area Supervisor Survey**



## U.S. Department of Justice
### Office of the Inspector General
### Area Supervisor Survey

*Purpose:* This survey is being conducted by the U.S. Department of Justice, Office of the Inspector General (OIG). The OIG is evaluating the effectiveness of the Federal Firearms Licensee (FFL) inspection programs implemented by the Bureau of Alcohol, Tobacco, Firearms and Explosives (ATF).

*Note:* Please be advised that any information collected from this survey will not be attributed to individual Area Supervisors.

*Directions:* This survey should take approximately 10 minutes to complete. Click on the gray areas to complete your responses. Please complete and return to the OIG via email or fax by October 24, 2003. The fax number is provided at the end of the survey. If you have any questions concerning this survey, please call OIG Inspector          , at          .

**Please return your completed survey by October 24, 2003.**

---

Name:

Field Division:

Telephone Number:

---

Inspector Staffing
**Please limit your responses to your Group and Satellite Office staff only – not to the entire Field Division.**

1.     How many Inspectors are currently assigned to your Group?

---

2.   In your opinion, is your Group staffed so that your Inspectors can adequately inspect the Federal Firearms Licensees and explosives permitees in your Area?

☐ Yes          ☐ No

**[If Yes, please skip to Question 4.]**

3.   How many <u>additional</u> Inspectors would need to be assigned to your Group so that your Inspectors could adequately inspect the Federal Firearms Licensees and explosives permitees in your Area?

4.   How many of your Inspectors also serve as Adverse Action Hearing Officers, if any?

5.   How many Special Operations Inspectors are assigned to your Group, if any?

Federal Firearms Licensees
**Please limit your answers in this section to your Group, as well as any Satellite Offices assigned to your group.**

6.   On average, how many <u>new</u> FFL applications are processed for your Area Office each month by the National Licensing Center?

7.   How many new FFL applicant inspections do you assign to your staff?

☐ All          ☐ Some (As Needed)          ☐ None

**[If None, skip to Question 9]**

8.  How are new FFL applicant inspections conducted?

    ☐ By Phone    ☐ In Person    ☐ Both

9.  To the best of your knowledge, how many FFL inspection assignments in your Group were pre-determined by ATF Headquarters, in fiscal year 2003?

10. How many inspections pre-determined by ATF Headquarters do you plan to assign in fiscal year 2004?

11. Are any of these 2004 inspections carry-overs from 2003?

    ☐ Yes.    ☐ No.

12. To the best of your knowledge, how many FFL inspection assignments in your Group were pre-determined by the National Tracing Center, in fiscal year 2003? Please specify, according to inspection type.

    Focused Inspections.

    Demand Letter Inspections.

    Other NTC-assigned Inspections.

13. How many inspections pre-determined by the National Tracing Center do you plan to assign in fiscal year 2004?

14. Are any of these 2004 inspections carry-overs from 2003?

    ☐ Yes.    ☐ No.

15. To the best of your knowledge, how many FFL inspection assignments in your Group were based on information referred from ATF Special Agents, in fiscal year 2003?

   ☐ None   ☐ 1 to 5   ☐ 6 to 10   ☐ 10+

Explosives Permittees
**Please limit your answers in this section to your Group, as well as any Satellite Offices assigned to your group.**

16. How many explosives inspections do you plan to assign in fiscal year 2004?

17. What impact has the Safe Explosives Act had on your Group's ability to inspect FFLs? (Please describe.)

Federal Firearms Licensee Inspections
**Please limit your answers in this section to your Group, as well as any Satellite Offices assigned to your Group.**

18. On average, how many work hours should a New Application Inspection take an Inspector to complete, including travel time and writing the report?

   Hours.

19. Please rate the effectiveness of the National Tracing Center data in determining which FFLs should be inspected in your area.

   ☐ *Very Effective*
   ☐ *Somewhat Effective*
   ☐ *Somewhat Ineffective*
   ☐ *Very Ineffective*
   ☐ *Not Applicable*

---

U.S. Department of Justice
Office of the Inspector General
Evaluation and Inspections Division

20.   Why is the National Tracing Center data effective or ineffective
in determining which FFLs should be inspected in your area,
and how might this be improved? (Please describe.)

21.   Please rate the effectiveness to which the list of mandatory
inspections, provided by ATF Headquarters, adequately and
fully identify those FFLs that should be inspected, based on
indications that the FFL is violating Federal firearms laws?

☐ *Very Effective*
☐ *Somewhat Effective*
☐ *Somewhat Ineffective*
☐ *Very Ineffective*
☐ *Not Applicable*

22.   Why is the ATF Headquarters data effective or ineffective in
determining which FFLs should be inspected in your area, and
how might this be improved? (Please describe.)

23.   If enacted in your Group, please rate the effectiveness of the
Flexiplace Program, as it would relate to your Inspectors
conducting FFL inspections? (Flexiplace is a program under
which employees are permitted to perform all or a portion of
their duties at a Flexiplace work telecommuting center.)

☐ *Very Effective*
☐ *Somewhat Effective*
☐ *Somewhat Ineffective*
☐ *Very Ineffective*
☐ *Not Applicable*

**Submitting this survey**
You may submit this survey by email or fax.
**Please return by October 24, 2003.**

*Email:*   To email this survey:
1. Save your completed survey as a new MS-Word document.
2. Hit 'reply' to the original OIG email.
3. Attach survey to 'reply' email before sending.

***Fax:*** To fax this survey, please print out your completed survey and fax it to: (xxx) xxx-xxxx.  (Surveys completed by hand will also be accepted.) Please address your fax cover sheet to: Office of the Inspector General, Attention: Inspector xxxxxxxxxxxxxxxxxxxxxxxx.