| APPENDIX III: ATF COMMENTS ON THE DRAFT REPORT |
|---|



**U.S. Department of Justice**

Bureau of Alcohol, Tobacco,
Firearms and Explosives

*Office of the Director*

JUN 2 9 2004 Washington, DC 20226

900000:CAA
8310

MEMORANDUM TO: Assistant Inspector General for Evaluation and Audits

FROM: Director

SUBJECT: Response to the Office of Inspector General's (OIG)
Draft Report: Review of the Inspections of Firearms Dealers
Performed by the Bureau of Alcohol, Tobacco, Firearms and
Explosives, Assignment Number A-2003-008

The Bureau of Alcohol, Tobacco, Firearms and Explosives (ATF) appreciates the
opportunity to respond to the recommendations in the OIG's above-cited draft report. In
addition to responding to the recommendations, we have provided responses to the
"Results of the Review" section of the draft report. Although we already have adopted
many of the recommendations, we welcome the constructive criticism of our programs.
The independent evaluation will help us to utilize our inspector resources even more
effectively and efficiently.

As you know, ATF's move to the Department of Justice (DOJ) established an agency
with a more focused mission of preventing the criminal misuse of firearms and
explosives. Thus, we have become a stronger, more effective law enforcement and
regulatory agency. Through ATF's inspection program and other regulatory activities,
we encourage and ensure compliance with the Federal firearms laws and regulations in
order to prevent the criminal diversion of firearms and ensure law enforcement's ability
to trace crime guns.

ATF knows that Federal Firearms Licensees (FFLs) with significant compliance
problems -- though a small percentage of the overall licensee population of
approximately 104,000 -- are a threat to public safety. Therefore, ATF is committed to
continuing to improve its inspection procedures to ensure that all FFLs comply with the
firearms laws and regulations, that firearms are not diverted from the legal to illegal
market, and that corrupt FFLs are put out of business.

U.S. Department of Justice
Office of the Inspector General
Evaluation and Inspections Division

66

-2-

Assistant Inspector General for Evaluation and Audits

Our responses to your recommendations are as follows:

**1. Develop a standard, streamlined inspection process that includes in-person inspections of all applicants; more efficient inventory and records reviews; automated inspection reporting; and consistent examination of indicators of firearms trafficking.**

ATF concurs with this recommendation. ATF recognizes that standardized inspection procedures are essential to ensure the most effective inspection techniques are used consistently throughout the country. Moreover, the procedures must be streamlined to ensure our inspector resources are used efficiently. This will enable ATF to ensure FFLs are complying with licensing requirements, which will help prevent the diversion of firearms to the illegal market. While ATF recognizes standard procedures are essential, allowing area supervisors and inspectors to exercise their professional judgment on how to efficiently and effectively conduct certain aspects of the inspection program also is critical to creating a strong regulatory program. ATF identified and began to address deficiencies within our inspection program prior to the initiation of the audit by the OIG. Based on the recommendations, ATF will undertake additional steps to improve our inspection programs.

**In-person inspections of all applicants**

ATF agrees that firearms application inspections are critical to ensuring compliance with the Federal firearms laws. ATF also agrees that inspections conducted in-person help to ensure a greater understanding of the Federal firearms laws and thus often result in a higher level of FFL compliance. Additionally, in-person inspections help establish an FFL's understanding of the Federal firearms laws at the time of license issuance, which enables ATF to more easily demonstrate "willfulness" if an FFL subsequently does violate the Federal firearms laws.

The Gun Control Act (GCA) requires ATF to process applications within 60-days. As noted in the draft report, historically we have not possessed the resources to inspect all applicants in-person within this timeframe. Because ATF agrees that firearms application inspections should be done in-person, prior to the issuance of this draft report, we revised guidance to our field divisions and now require the in-person inspection of all new applicants in 14 selected metropolitan areas. The application inspections in these 14 locations will be included in our Integrated Violence Reduction Strategy (IVRS) violent crime performance measures that are reported to Congress.

-3-

Assistant Inspector General for Evaluation and Audits

ATF also is taking steps to conduct in-person application inspections nationwide. New procedures issued in June 2004 generally require that an inspector must meet with an applicant in-person. An area supervisor does have discretion under this policy to decide whether an in-person inspection is an effective use of ATF resources. Although telephonic interviews are not ideal, sometimes they are necessary, such as when an FFL is located very far from the ATF field office. Under the June 2004 policy, if an FFL does not have an in-person application inspection, an in-person compliance inspection must be scheduled in the first year after issuance of the license.

Finally, ATF hopes that after studying the allocation of its inspector resources (which is discussed in detail later in this response) and streamlining its inspections (also discussed below), it will have the resources to conduct more in-person application inspections.

**More efficient inventory and records review**

ATF agrees with the OIG's recommendation that ATF should establish a more efficient inventory and record review process. ATF already has taken steps to achieve this goal. In June 2004, ATF issued a memorandum entitled, "Guidelines for Conducting Federal Firearms Licensee Compliance Inspections." The Guidelines set forth the following requirements for inspectors:

- **Period of Records Review**

The period of record review is to go back 1 year from the start of the inspection, or in the case of a recall inspection, from the date of the last inspection.

- **Inventory**

The Guidelines set out when complete inventory verifications must be performed. Complete inventory verification means that each firearm in inventory must be physically identified by serial number and matched to the corresponding bound book entry, and each open entry in the bound book must be accounted for.

- **Review of ATF Forms 4473s**

The Guidelines also establish the number of Forms 4473 that must be reviewed. If problems are identified with the Form 4473s selected for review, the number of forms reviewed is to be expanded. These firearms records will be reviewed for indications of firearms trafficking activity such as unreported multiple sales of handguns and straw purchases. Referrals to ATF agents will be made when indicators of firearms trafficking are present.

-4-

Assistant Inspector General for Evaluation and Audits

We believe judgmentally sampling Forms 4473, by first isolating weapons of choice, is better than random sampling all Forms 4473. The later approach would include reviewing purchases for types of weapons that are not used in crime, e.g., .22 caliber rifles. In addition, many FFLs do not have sufficient sales to conduct a valid random sample since the total sales volume is less than 200. In light of the OIG comments, we are reviewing random sampling as an inspection tool in order to determine if procedures could be developed for large FFLs. We are very familiar with this process and had used it extensively for alcohol and tobacco tax audits when this Bureau was part of the Treasury Department.

**Automated Inspection Reporting**

The draft report discusses the extensive paperwork inspectors must complete while at an FFL's premises, which later must be entered into ATF's N-Spect database. The draft report suggests that inspectors be given laptops to use during inspections so that they can streamline this process. ATF agrees using laptops would be a more efficient process, and in fact had issued laptops to all inspectors over 3 years ago. Every inspector has one today.

However, many FFLs are not comfortable with ATF inspectors using laptop computers during inspections. ATF is prohibited by law from creating a registry of firearms and firearm owners. When our inspectors use their laptop computers during an FFL inspection, many FFLs express concern that the computers are being used to create a national firearms registry, rather than being used to automate the inspection process. Inspectors are sensitive to these apprehensions and seek the approval of the FFL prior to using their ATF laptop during an inspection. Because ATF strives to have a cooperative relationship with FFLs, inspectors do not use laptop computers if an FFL does not want them to.

ATF is in the process of reevaluating all workplans and work papers to eliminate work steps and work papers that are not critical to the final report. This should reduce the need for inspectors to complete work papers manually and then reenter the data in N-Spect. Until new procedures are finalized, our inspectors will continue to enter their inspection information in N-SPECT in accordance with established guidelines so that the inspection results can be accurately monitored.

-5-

Assistant Inspector General for Evaluation and Audits

**Consistent examination of indicators of firearms trafficking.**

The draft report recommends that ATF establish guidance to ensure that inspectors consistently look for known indications of firearms trafficking and, when found, report the findings to ATF's criminal enforcement division. The draft report notes that ATF has taken steps to improve coordination between inspectors and special agents by creating a Special Intelligence Inspector (SII) position in each field division, although it states that as of November 2003 only 7 of the 23 positions had been filled.

ATF agrees this recommendation is essential to ensure we effectively prevent firearms trafficking. The June 2004 memorandum identified trafficking indicators and provided guidelines for referring cases with such indicators to special agents. ATF also is developing a Focused Inspection Work Plan that will concentrate on trafficking indicators. A group comprised of Directors of Industry Operations (DIO) is developing this plan and they will be given this draft report to assist them with the plan. The group is required to have their comments to ATF management by October 1, 2004. Currently, the idea is that for certain inspections, the work steps will be reduced to include only those activities essential to identifying illegal firearm purchases, traffickers, and corrupt FFLs. This will make inspections more efficient, which, will as the OIG suggests in its draft report, enable ATF inspectors to conduct more inspections.

In addition, ATF continually works to improve the coordination between inspectors and special agents. Currently, 10 SII positions have been filled and we are actively trying to fill the others. Furthermore, ATF has tasked a working group of upper management to analyze how unified operations of criminal and regulatory personnel can best be structured to achieve efficiency and meet the goals of our strategic plan.

**Other steps ATF is taking to standardize and streamline the inspection process.**

In addition, ATF currently is updating its Inspector Handbook to provide better guidance to inspectors on the conducting of inspections. As noted earlier, ATF is analyzing the entire report and work paper process and evaluating the use of a narrative report. This review will examine all facets of the inspection report, including the work program, work papers, gathering evidence of violations, applicability of statistical sampling, and a standard narrative report format. Through this reevaluation process, ATF will improve the effectiveness and efficiency of the inspection process.

2. **Conduct a pilot project to test the streamlined inspection procedures and establish appropriate time standards for conducting these inspections.**

ATF concurs with this recommendation.

-6-

Assistant Inspector General for Evaluation and Audits

As stated above, ATF is developing streamlined, standardized inspection procedures. We will conduct a pilot project of the procedures during FY-05 in several field divisions.

**3. Revise the staffing requirement report using the time standards to reflect the number of inspectors needed to conduct compliance inspections on a triennial basis, or an alternative schedule based on the FFL's compliance history.**

ATF concurs with this recommendation.

A working group of senior managers has been tasked with developing a workload model for field resources. At this time, a completion date has not been determined but a status report is due to the Assistant Director (Field Operations) in late June 2004. Presently, the managers are evaluating factors such as crime statistics, task forces, immediate and long term needs, and the FFL population, for inclusion in the workload model. The working group will be given a copy of this draft report. They will be asked to consider the shorter inspection times provided in the report, as well as an alternative inspection schedule based on an FFL's compliance history, in developing the model.

Once the new workload model is finalized, ATF will evaluate the staffing levels at each of our field offices to ensure they operate effectively and efficiently to meet our mission. At that time, we will determine if voluntary reassignments are necessary.

**4. Develop alternatives for better aligning inspector resources with the distribution of FFLs, such as by redrawing field division boundaries, realigning personnel, or other methods.**

ATF concurs with this recommendation.

The draft report found ATF has not distributed its inspector resources among the field divisions to match the distribution of FFLs, resulting in workload imbalances among the field divisions. ATF agrees that to most effectively conduct FFL inspections, inspector resources must be matched to the FFL population.

ATF inspectors, presently and historically, have responsibilities beyond inspecting FFLs. The division of ATF into the Tax and Trade Bureau (TTB) and the Bureau of Alcohol, Tobacco, Firearms and Explosives, as well as the passage of the Safe Explosives Act, caused ATF's regulatory landscape to be redrawn. There is no longer a need for inspectors to focus on alcohol and tobacco issues, but they now have more extensive

-7-

Assistant Inspector General for Evaluation and Audits

explosives responsibilities. Moreover, with the creation of TTB, ATF experienced a 25 percent reduction in inspectors nationwide, which is much higher than ATF originally anticipated. These factors have created some of the current imbalances between the numbers of inspectors and FFLs amongst the field divisions.

As stated in response to recommendation number 3, ATF is creating a new workload model for inspector staffing. Once it is finalized, we will determine if we need to reassign inspectors to better align inspector resources with the distribution of FFLs.

At this time, ATF is not planning to modify the existing structure of 23 field divisions. However, we are consolidating our DIO positions so that they accurately correspond to FFL and explosives inspection workloads and inspector resources.

Further, ATF has contracted with an academic researcher to assess and provide recommendations to improve ATF's firearms-related strategic plan and generate performance measures to help us maximize our existing resources.

Finally, ATF is taking steps to help us better target which FFLs to inspect. This will allow us to use our inspector resources more efficiently. Our plan is to use accepted statistical sampling concepts to assign FFL inspections as part of a random sample compliance model. We currently are gathering information regarding the factors that should be employed to analyze the FFL population. Once that information is collected, analyzed, and validated, it will be applied to the FFL population to generate inspection assignments using a viable risk model.

5. **Update the inspection tracking system to accurately segregate and report on inspector time spent preparing for the inspections, in travel, on site at FFLs, and conducting other administrative duties.**

ATF does not concur with this recommendation.

ATF is committed to monitoring the time inspectors spend on various assignments, so that we can ensure inspectors are operating efficiently and can work to align inspector resources with regulatory needs across the country. However, ATF does not believe it is necessary to categorize inspector work time by function (e.g., travel time v. preparation time) to achieve this goal.

-8-

Assistant Inspector General for Evaluation and Audits

Rather, ATF's case management system, N-FOCIS, uses project codes that categorize by "commodity" activity, e.g., firearms, which allows us to properly capture all administrative costs associated with ATF's mission. N-FOCIS has recently undergone system upgrades that allow us to track an inspector's activity using detailed profile codes.

Using these codes, ATF can differentiate between types of firearms inspections, application versus compliance, and within these, the types of specific inspections. For example, compliance has many subcategories including random sample, focused, etc. These system improvements enable ATF to gather data to compare inspections and related travel, to non-inspection work time. The changes provide for better categorization of inspector workloads. Although the purpose of N-FOCIS is to facilitate the tracking of commodity activities, firearms versus explosives versus alcohol and tobacco, and not capture timekeeping activities, N-FOCIS does segregate and capture general assignments that are completed by field personnel. Therefore, it provides us with an accurate picture of the time spent by field personnel on assignments.

**6. Prepare quarterly reports on the productivity and results achieved by each field division.**

ATF concurs with this recommendation.

ATF agrees it is essential to monitor the productivity of the field divisions so that we can ensure our resources are being used as efficiently and effectively as possible. We also must monitor the results of inspections to provide us with information on where trafficking problems may exist.

In order to address this issue, ATF recently created the position of Deputy Assistant Director (Field Operations – Industry Operations) to help manage ATF's regulatory enforcement efforts, including recent initiatives mentioned in the draft report and in this response. One of the first projects the Deputy Assistant Director undertook was creating a quarterly report detailing productivity and results achieved by each field division. The first report, covering the 1st and 2nd quarters of the current fiscal year, was issued in May 2004. This report provides data on how many total inspections have been completed, including how many focused and random sampling inspections, along with the remaining workload projections of each field division for this fiscal year.

The quarterly report will ensure that each field division is working on mandated Headquarters projects and demonstrate whether they are successfully completing the projects. Additionally, the reports will make ATF management aware of the constraints

-9-

Assistant Inspector General for Evaluation and Audits

that the field divisions are operating under. If targets are not met, steps can be taken to address the underlying problem. The reports also will show where potential trafficking problems may exist.

Furthermore, ATF recently has established the Case Management Branch (CMB) within our Field Operations Directorate to track and evaluate industry operations and criminal enforcement activities, conduct case comparisons, and make recommendations to management when needed. The CMB works closely with the field offices and the Deputy Assistant Director (Field Operations - Industry Operations) to ensure data integrity and workload priorities are being met.

**7. Direct the National Licensing Center to develop an adverse action tracking system to monitor the progress and timeliness of FFL denials and revocations from the time an inspector makes a recommendation until the proceedings are finalized.**

We concur with this recommendation.

A tracking system will help ATF ensure FFL denials and revocations proceed as efficiently as possible, which is essential to ensuring FFLs who violate the Federal firearms laws do not remain in the business of selling firearms.

The Division Chief, Firearms and Explosives Services, has been given the responsibility of developing and monitoring an improved adverse action tracking system for denials and revocations of licenses. Currently, the tracking system only covers FFLs who, having been issued a notice of revocation or denial, have requested a hearing. The system will be expanded to include all cases where a notice of revocation or denial is issued. (Please note, it would not be useful for an inspector recommendation to initiate the tracking system, because until a supervisor approves the denial or revocation action, no notice will be issued.) Moreover, under the new system, an e-copy of the tracking report will be forwarded to all Division Counsel on a monthly basis. Division Counsel previously have not been notified, on a regular basis, of the status of adverse action cases. Keeping counsel timely apprised of how many adverse actions are in their division, as well as how long they have been pending, will enable counsel to address any workload concerns.

Further, under the new system, we will provide an e-copy of the tracking report to all DIOs on a monthly basis. This will enable DIOs to be aware of any delays caused by either their staff or the FFL which impact on the progress of the adverse action.

Finally, additional data fields will be incorporated into the revised tracking system to more accurately reflect the progress of adverse actions.

-10-

Assistant Inspector General for Evaluation and Audits

**8.  Continue coordinating with the Department of Justice, Office of Legislative Affairs, to gain the authority to suspend or impose civil penalties on FFLs that violate Federal firearms laws.**

ATF concurs with this recommendation.

ATF will continue to work with the Department of Justice's Office of Legislative Affairs on this matter.  Specifically, ATF will discuss the benefits of having regulatory options other than revocation, such as license suspension, the authority to issue civil penalties for minor violations, and the authority to resolve disputes short of litigation through offers in compromise.

We would like to clarify one misstatement in the draft report.  The draft report states ATF has no authority to fine FFLs.  ATF actually has authority to fine FFLs in one limited situation:  if an FFL does not conduct a required National Instant Criminal Background System (NICS) check and the person would have been prohibited from possessing or receiving a firearm, the FFL may be fined not more than $5,000.

**9.  To improve the comprehensiveness of crime gun tracing by law enforcement agencies:**

**a.  Coordinate with the Office of Justice Programs to determine the feasibility of using discretionary grant funding to support crime gun tracing.**

ATF concurs with this recommendation.

A discussion will be held with other DOJ entities to determine the feasibility of using discretionary grant funding to support local police departments who want to trace all crime guns.  We will initiate such discussions soon.

**b.  Develop a model for more accurately identifying potential firearms trafficking through the analysis of an FFL's firearms sales volume and the number of firearms traced to the FFL.**

ATF conditionally concurs with this recommendation.

ATF continually works to better identify FFLs who may be a source of trafficked firearms so that it can focus its inspection and enforcement efforts on these dealers. However, ATF presently cannot capture the ratio of firearm sales to firearms traced for all FFLs.  This is because ATF does not have access to real time firearms retail sales data for all FFLs.  NICS data does not represent the complete sales picture.  Purchasers may

-11-

Assistant Inspector General for Evaluation and Audits

and often do acquire more than one firearm on a single NICS check. Moreover, purchasers who possess State-issued firearms permits that qualify as an exception for a NICS check obtain firearms without the check. In addition, it can be difficult for ATF to get data from States who serve as Points of Contact for NICS. Since not all FFLs are inspected annually, we cannot get this information from FFL inspections. Further, since not all law enforcement entities trace crime guns, our tracing data is not comprehensive.

However, since October 2000, ATF has obtained information on firearms dispositions from FFLs on their applications for license renewal. The data reported covers the 3-year period of the previous license. It may be possible to compare this data with trace data sorted by FFL. In theory, those FFLs with the highest ratio of traces, in the past 3 years, to reported dispositions could then be identified and scheduled for compliance inspection. While the data periods of any such effort would not be consistent across FFLs and the results might not be easily developed, ATF will attempt to come up with such a ratio analysis, perhaps on a pilot basis. If the project is successful, we will adopt it as an additional indicator of FFLs to inspect.

Moreover, since 2000, ATF has invested significant resources to using firearm trace information to target which FFLs should be inspected using factors other than the ratio of guns traced to gun sales. ATF believes these efforts have been effective.

Results of the Review:

As stated previously, we would like to comment on the findings of the draft report.

**The ATF does not conduct in-person application inspections on all new FFLs to verify applicant information and ensure that they understand firearms laws.**

ATF agrees that firearms application inspections are critical to ensuring compliance with the Federal firearms laws and that inspections conducted in-person help to ensure a greater understanding of the Federal firearms laws and thus often achieve a higher level of FFL compliance. Additionally, in-person inspections help establish an FFL's understanding of the Federal firearms laws at the time of license issuance, which enables ATF to more easily demonstrate "willfulness" if an FFL subsequently does violate the Federal firearms laws.

Because ATF agrees that firearms application inspections should be done in-person, prior to the issuance of this report, we revised guidance to our field divisions requiring the in-person inspection of all new applicants in 14 selected metropolitan areas. ATF also is

-12-

Assistant Inspector General for Evaluation and Audits

taking steps to conduct in-person application inspections nationwide. New procedures issued in June 2004 generally require that an inspector must meet with an applicant in-person. An area supervisor does have discretion under this policy to decide whether an in-person interview is an effective use of ATF resources. Under the June 2004 policy, if an FFL does not have an in-person application inspection, an in-person compliance inspection must be scheduled in the first year after issuance of the license.

**The ATF does not regularly conduct compliance inspections on active FFLs, including large-scale retailers.**

ATF recognizes it cannot conduct annual compliance inspections of all FFLs because of the large population of licensees (104,000) and the small number of inspectors (420). Therefore, ATF works to most effectively utilize its inspector resources. For example, it focuses on licensees with a history of non-compliance and licensees with indicators of firearms trafficking, as well as carrying out its random sample inspection program. As stated elsewhere in this report, ATF is undertaking new efforts to effectively target FFLs for inspection, streamline the inspection process to allow for more inspections overall, and deploy its inspector resources more efficiently. Moreover, ATF has been working to ensure only FFLs who are engaged in the business of dealing in firearms, as required by the Gun Control Act, are licensed so that regulatory resources are not wasted on persons who do not merit firearms licenses.

Finally, the fact that an FFL is large does not exclude it from being selected for inspection. In fact, inspections of many large FFLs are mandated under ATF's Focused Inspection Program, because they have large numbers of firearm traces or trafficking indicators.

**The ATF does not identify and inspect all FFLs that exhibited indicators of potential violations or gun trafficking.**

ATF does identify all FFLs that exhibit indicators of potential violations or gun trafficking based on trace data available. However, we limit inspection requirements based upon our available inspector resources. We direct our resources to those FFLs that appear most problematic. The initiatives discussed throughout this response should enable ATF to inspect more of these FFLs in the future. For example, as discussed above, ATF is presently undertaking the use of accepted statistical sampling concepts to assign FFL inspections. ATF is gathering information regarding the factors that should be employed to analyze the FFL population. Once those factors are collected, analyzed

-13-

Assistant Inspector General for Evaluation and Audits

and validated, they will be applied to the FFL population to generate inspection assignments using a viable risk model. Similarly, the new work plan focusing on trafficking should both highlight trafficking problems and enable more efficient inspections which will allow for more inspections.

**Gun tracing has significant shortcomings that limit its use for identifying FFLs that should be inspected.**

ATF's National Tracing Center (NTC), the only organization of its kind in the United States, provides 24-hour assistance to Federal, State, local, and foreign law enforcement agencies in their fight against violent crime involving firearms. The draft report states that it was established in 1994. However, ATF has traced crime guns since Federal law first required FFLs to maintain their records. 1994 simply was the year the NTC moved to its present site in Martinsburg, West Virginia.

ATF's NTC plays a critical role both in assisting other law enforcement entities and in targeting ATF's enforcement and regulatory resources. While ATF agrees there currently are some problems with using tracing statistics to identify FFLs to inspect, ATF is taking steps to address these problems. Moreover, after taking potential biases created by these problems into account, ATF does make extensive use of trace data in targeting FFLs to inspect.

One current limitation with trace data is that not all law enforcement agencies conduct comprehensive tracing as is the case in Youth Crime Gun Interdiction Initiative cities. Increased use of tracing in areas where it is not currently conducted would help identify FFLs to inspect. As stated in response to recommendation 9, ATF will work to encourage more localities to do comprehensive tracing.

Another weakness of trace data raised in the draft report is that most used guns cannot be traced because absent any State regulation, there is no requirement to document transfers between individuals. ATF's "Demand Letter" program identifies dealers who may have a large number of traces associated with the secondhand sales of firearms. By collecting limited used gun information from these FFLs, ATF is able to trace any second hand guns sold by these dealers.

The third weakness discussed in the draft report is the lack of a ratio of guns traced to sales volume. Once again, ATF is taking steps to address this problem. As discussed in response to recommendation 9, efforts will be made to identify the relationship between sales volume and traced firearms.

-14-

Assistant Inspector General for Evaluation and Audits

While these weaknesses do exist, ATF believes it currently uses its trace data effectively to target FFLs for inspections. For example, ATF's "Focused Inspection" and "Demand Letter" programs use this data and have achieved beneficial results.

The draft report concludes that traces originating in particular cities are associated with dealers in and around those cities. However, there are many cities with firearms sourced on a regional and national basis. Therefore, it is not especially useful to compare, as the draft report does, the number of traces submitted by law enforcement in a field division and the number of inspections in that field division. ATF's Focused Inspection and Demand Programs capture FFLs with trafficking indicators no matter where the firearms are used in crime. FFLs are routinely identified for inspection if they meet the criteria for having a certain number of short time-to-crime traces, no matter where the law enforcement agencies that requested the traces were located. (This was the basis for increased enforcement activity regarding FFLs in Mississippi who were identified through guns recovered in Chicago).

Moreover, ATF often relies on field offices to be aware of the trace histories of the local dealer population to focus their inspection efforts. The draft report reflected that field offices were making such efforts. Further, field offices increasingly have been asking the NTC for FFL trace histories, showing they are trying to better target their inspection efforts.

Field Office FFL History Requests:

| FY01 | FY02 | FY03 |
|------|-------|-------|
| 1,197 | 1,639 | 2,205 |

**ATF field divisions implement FFL inspections inconsistently.**

ATF has been working on standardizing and streamlining the present procedures for conducting firearms inspections since before the initiation of the OIG audit. The new guidelines issued in June 2004 establish clear guidance for how inspections are to be conducted. We are confident they will make inspections more consistent across field divisions.

**Suspected criminal violations are not always referred for investigation.**

The June 2004 guidelines remind inspectors that information referrals should be made when trafficking indicators are present. Moreover, as discussed in response to recommendation 1, ATF is working to better coordinate its regulatory and enforcement personnel.

-15-

Assistant Inspector General for Evaluation and Audits

**The ATF acts infrequently to revoke Federal firearms licenses, and the process is not timely. New ATF policy begins to address inconsistent and untimely adverse actions.**

ATF appreciates the draft report's recognition of the recent changes to ATF's adverse action policy to improve consistency, efficiency, and ensure FFLs who willfully violate the GCA receive a revocation or denial notice when appropriate. While ATF recognized the need to make changes in our adverse action procedure, we disagree with the draft report's suggestion that ATF previously acted improperly by infrequently revoking Federal firearms licenses.

In reviewing the number inspections conducted in the field and the number of adverse actions taken as a result of those inspections, the draft report noted the discrepancy between average inspection time and the number of adverse actions taken by the field divisions. The report fails to note the critical components that comprise the decision to take adverse action against an FFL. The report should reflect that not all violations can (or should) result in an adverse action against an FFL. The legal standard is "willfulness." Many violations noted by an inspector may be so inadvertent that they cannot satisfy the legal standard of "willfulness."

In addition, some willful violations may not warrant revocation/denial if there are mitigating circumstances. In such cases, the violation is noted but no formal action is taken against the FFL. Rather, the FFL is educated about better methods and procedures to avoid such errors in the future. Hence, the fact that inspectors have taken a great deal of time inspecting and documenting violations by an FFL, but have failed to take formal legal action against the FFL, cannot be construed, by itself, as inappropriate. ATF works diligently to promote voluntary compliance, protect the public, and deny and revoke licenses when appropriate.

This finding and the accompanying narrative make it appear that ATF is allowing some FFLs whose licenses should be revoked to remain in business. However, when ATF specifically asked if the OIG had found a single case of ATF not taking action where warranted, the OIG staff replied no. ATF believes it appropriately undertakes revocation and denial actions when evidence of willful violations support such action.

In addition, the draft report does not reflect the fact that many FFLs withdraw renewal applications when they are put on notice that their application likely will be denied and surrender their license when told it likely will be revoked.

-16-

Assistant Inspector General for Evaluation and Audits

Finally, while we are working to better track adverse actions as discussed in response to recommendation 7, revocation and denial proceedings often are slow for reasons beyond ATF's control. The legal process for denial/revocation has time constraints that bind ATF, but not the FFL. For example, FFLs often ask for and receive extensions of time to respond to notices, making the process lengthy.

**By streamlining and standardizing inspections, the ATF could dramatically improve the FFL inspection program.**

ATF identified and began to address deficiencies within our inspection program prior to the initiation of the OIG audit. ATF issued guidelines to streamline and standardize compliance inspections in June 2004 that were effective immediately. ATF's Field Operations and Enforcement Programs and Services Directorates will be monitoring inspection field activities closely.

**ATF does not consistently report inspection performance.**

ATF recognizes that inspection performance data must be closely scrutinized. This concern was discussed at great length with the Audit Team during the OIG audit. ATF is committed to ensuring integrity of our performance indicators.

As discussed in response to recommendation 5, modifications and upgrades have been made to N-FOCIS to streamline the way it captures activity by commodity. These modifications and improvements will help to ensure that data runs accurately reflect field activity and remain constant over the course of time. Additionally, ATF's Office of Strategic Intelligence is generating quarterly reports for the program offices so that field activity can be monitored regularly.

**New restrictions on retention of gun purchaser data will hinder the ATF's ability to detect fraudulent background checks.**

Although ATF will no longer be able to have NICS verify information from ATF Forms 4473 for transferees who received proceed responses from NICS, this will not hinder our ability to ensure FFLs do not abuse the NICS system. We are developing a procedure that will allow inspectors to obtain "Individual FFL Audit Logs" from the FBI prior to inspections. These logs will contain certain data that will be utilized during inspections to corroborate the veracity of information provided to, and received from, NICS. This includes all information for denied transactions and data such as the date NICS was contacted, the NICS Transaction Number (NTN), and the response provided, for a 60 day time period for proceed transactions. ATF inspectors will also have the ability to conduct NICS rechecks to ensure FFLs did not provide NICS with false information. The draft

-17-

Assistant Inspector General for Evaluation and Audits

report incorrectly suggests that the rechecks only can tell if the purchaser should have been approved at the time of the recheck because the FBI will be told the date of the original check, it can disregard any changes to the purchaser's status since that date. ATF also uses a tool called the NTN validator to ensure FFLs are not creating false NTNs when no NICS check was completed. Thus, as stated above, the new restrictions will not impede our regulatory and enforcement efforts.

**In conclusion, we wanted to provide a summary of significant steps ATF has or will take to address the recommendations and findings of the OIG draft report:**

- Revised guidance to the field to require in-person inspections of all FFL applicants in 14 metropolitan areas

- Issued new procedures in June 2004 generally requiring all FFL application inspections to be conducted in-person. If an application inspection is not conducted in-person, an in-person compliance inspection must be scheduled in the first year after the license is issued

- Issued "Guidelines for Conducting Federal Firearms Licensee Compliance Inspections" in June 2004. This publication sets out guidelines for the period of records review, when complete inventory verifications must be performed, and establishes the number of Forms 4473 to be reviewed. It also gives guidance on referring potential trafficking cases to ATF agents.

- Developing a Focused Inspection Work Plan that concentrates on trafficking indicators. A draft of this streamlined inspection program is due to ATF management on October 1, 2004.

- Created a working group of upper management to determine how to best structure unified operations of criminal and regulatory personnel.

- Undertaking a complete review of the firearms report writing procedures including the work program, work papers, how to gather evidence of violations, applicability of statistical sampling, and creating a standard narrative report format.

- Conducting a pilot project of its new streamlined and standardized inspection procedures in several field divisions during FY-05.

-18-

Assistant Inspector General for Evaluations and Audits

- Developing a workload model for field resources. The working group will be given a copy of the draft report to consider in conducting their analysis. A status report is due in June 2004. ATF will shift inspector resources if the results of the study show this would be beneficial.

- Consolidating Director of Industry Operations positions to better align with workload and inspector distribution.

- Working with an academic researcher to improve our firearm-related strategic plan and generate performance measures to help us maximize our existing resources.

- Using accepted statistical sampling concepts to assign FFL inspections. We are currently gathering the information necessary for this analysis.

- Upgraded our N-FOCIS system to enable us to better track inspector work time on various assignments.

- Created the position of Deputy Assistant Director (Field Operations – Industry Operations) to help manage ATF's regulatory enforcement efforts. Also created the Case Management Branch within our Field Operations Directorate to monitor industry operations.

- Issued first quarterly report in May on the productivity and results achieved by each field division.

- Revised our adverse action procedures to improve consistency, efficiency, and ensure denials/revocations are issued where warranted.

- Creating a new adverse action tracking system that will include all FFLs who receive a notice of denial or revocation. Field counsel and DIOs will receive e-copies of the report on a monthly basis. The report will have more details than the existing report.

- Coordinate with DOJ to gain suspension, fine, and offers in compromise authority.

- Work with DOJ to determine the feasibility of using discretionary grant funding to support local police departments who want to trace all crime guns.

-19-

Assistant Inspector General for Evaluation and Audits

- Attempt to develop a ratio of guns traced to sales volume to use in a pilot program for inspecting FFLs.

Again, we appreciate the opportunity to respond to the draft report and look forward to continuing our efforts to address the issues it raised. If you have any questions regarding this response, please contact, Carol Campbell Audit Liaison, Office of Inspection, at (202) 927-8276.

Carl J. Truscott

# APPENDIX IV: OIG ANALYSIS OF THE ATF'S COMMENTS

On June 4, 2004, the Office of the Inspector General (OIG) sent copies of a draft of this report to the Bureau of Alcohol, Tobacco, Firearms and Explosives (ATF) with a request for written comments. The ATF responded to us in a memorandum dated June 29, 2004.

The ATF fully concurred with seven of our nine recommendations. The ATF did not concur with our recommendation on updating its inspection tracking system to more accurately segregate and report on all Inspector time spent on inspections. Instead, the ATF offered an alternative solution for updating N-SPECT, explaining that an update to the overall system, N-FOCIS, would accomplish what we recommended. The ATF also conditionally concurred with the recommendation on developing a model to more accurately identify potential firearms trafficking, although it suggested that implementing the recommendation would be difficult. The ATF also provided general comments on the findings contained in the draft report. Our analysis of the ATF's comments on the recommendations and findings in the draft report follows.

## THE ATF'S RESPONSE TO RECOMMENDATIONS

**Recommendation 1:** **Develop a standard, streamlined inspection process that includes in-person inspections of all Federal Firearms Licensee (FFL) applicants; more efficient inventory and records reviews; automated inspection reporting; and consistent examination of indicators of firearms trafficking.**

**Status:** Resolved – Open

**Summary of the ATF's Response:** The ATF concurred with our recommendation and stated that it is taking a series of steps to implement it, including:

- In-person application inspections are now required in 14 metropolitan areas, and ATF also is increasing the number of in-person application inspections conducted nationwide.

- A memorandum titled "Guidelines for Conducting Federal Firearms Licensee Compliance Inspections" was issued in June 2004 to clarify a number of inspection process issues such as the methods for verifying FFL inventories, record review periods, and ATF Form 4473 reviews.

- The ATF is reevaluating all work plans and workpapers to eliminate tasks that are not critical to a final inspection report.

- An ATF working group is developing a work plan for Focused Compliance Inspections. The working group's initial milestone is to provide comments to ATF management by October 1, 2004.

- The Inspector Handbook is being updated to provide better guidance to Inspectors on conducting inspections.

In response to our recommendation that the ATF automate its inspection procedures, the ATF stated that Inspectors have laptop computers at their disposal, but that many FFLs object to the use of these computers during inspections. The ATF stated that these FFLs are concerned that the laptop computers might be used to create a registry of firearms and firearms owners, something the ATF is prohibited by law from doing.

**The OIG's Analysis:** The ATF's proposed actions are responsive to the recommendation. By October 31, 2004, please provide copies of or status reports on the following:

- The "Guidelines for Conducting Federal Firearms Licensee Compliance Inspections," June 2004,

- The names of the 14 metropolitan locales that now require in-person application inspections,

- The new inspection reporting procedures that are under development,

- The Focused Inspection Work Plan that is under development, and

- The updated Inspector Handbook.

The ATF's comment on the use of laptops is not responsive to the recommendation to automate inspection reporting. We are not persuaded that FFLs should be allowed to determine how the ATF conducts its inspections. The fear ascribed to some FFLs is groundless. Creating an effective national firearms registry would require information on all gun sales by all FFLs – a logistical impossibility for the ATF. The ATF's current practice of taking handwritten notes while onsite at an FFL and later transcribing the information into a computer is no more or less likely to facilitate the hypothetical national firearms registry than is entering inspection information directly into a computer while onsite. Rather, we believe that educating FFLs on the implausibility of their concern, as well as the potential benefits of quicker inspections and more accurate inspection records for the FFL, could help overcome such objections. Therefore, we request that the ATF reconsider this response and also identify steps to improve the automation of the inspection process.

**Recommendation 2:** **Conduct a pilot project to test the streamlined inspection procedures and establish appropriate time standards for conducting these inspections.**

> **Status:** Resolved – Open

> **Summary of the ATF's Response:** The ATF concurred with this recommendation and stated that it was developing streamlined, standardized inspection procedures, which it planned to test in several divisions in a pilot project during Fiscal Year 2005.

> **The OIG's Analysis:** The ATF's proposed action is responsive to the recommendation. By October 31, 2004, please provide us with the streamlined inspection procedures that will be used in the pilot project, as well as the planned start and completion dates, and locations, for the pilot project.

**Recommendation 3:** **Revise the staffing requirement report using the time standards to reflect the number of Inspectors needed to conduct compliance inspections on a triennial basis or on an alternative schedule based on the FFL's compliance history.**

> **Status:** Resolved – Open

**Summary of the ATF's Response:**  The ATF concurred with our recommendation and stated that it created a working group to develop a workload model.  A completion date for the effort has not yet been established, but a status report from the working group was due by late June 2004 to the Assistant Director (Field Operations).  Further, in its response to Recommendation 4, the ATF stated that it has contracted with an academic researcher to develop recommendations to improve performance measures to help the ATF maximize its existing resources.

**The OIG's Analysis:**  The ATF's proposed action is responsive to the recommendation.  By October 31, 2004, please provide us with copies of the status reports submitted by the working group, the schedule for the completion of the workload model, any revised staffing requirement reports, and copies of the recommendations of the academic researcher for improving the utilization of existing resources.

**Recommendation 4:  Develop alternatives for better aligning Inspector resources with the distribution of FFLs, such as by redrawing Field Division boundaries, realigning personnel, or other methods.**

**Status:**  Resolved – Open

**Summary of the ATF's Response:**  The ATF responded that the rationale for how Inspectors were allocated to its Field Divisions was based on its former alcohol and tobacco oversight responsibilities (which are now assigned to the Department of the Treasury), as well as its explosives inspections activities.  The ATF recently began consolidating its Director of Industry Operations (DIO) positions so that they are better aligned with its FFL and explosives inspection workload.  Also, using the new workload model for Inspector staffing developed in response to Recommendation 3, the ATF will evaluate the need to reassign Inspectors to better align resources with the distribution of FFLs and explosives licensees.

**The OIG's Analysis:**  The ATF's proposed action is responsive to the recommendation.  By October 31, 2004, please provide us with a schedule for completing the assessment of the alignment of Inspector resources with the FFL population and any analyses of the current and planned distribution of resources.

---

**Recommendation 5:** **Update the inspection tracking system to accurately segregate and report on Inspector time spent preparing for inspections, in travel, onsite at FFLs, and conducting other administrative duties.**

**Status:** Unresolved – Open

**Summary of the ATF's Response:** The ATF did not concur with the recommendation, stating that because it "does not believe it is necessary to categorize Inspector work time by function (e.g., travel time v. preparation time)" to ensure that Inspectors are operating efficiently. The ATF stated that it believes its current case management system, N-FOCIS, uses project codes to accurately account for "all administrative costs associated with ATF's mission." The ATF stated that it has upgraded its N-FOCIS system [which includes the N-Spect FFL inspection database] to segregate inspection activities by type (i.e., application inspections versus compliance inspections) to "provide for better categorization of inspector workloads."

**The OIG Analysis:** The ATF's comments and alternative actions are not responsive to the recommendation to update the tracking system to segregate and report on Inspector time. From the description of the recent upgrades to the N-FOCIS system provided by the ATF, it appears that the ATF will be better able to track data on each *type of inspection* and how it was conducted. However, from the information provided, it appears that the ATF will still be unable to quantify Inspector time spent onsite, in travel, and accomplishing other administrative and non-inspection related activities.

However, a system that does not track all categories of Inspector time is inadequate for ensuring that activities are conducted efficiently. In our review, we found that only 41 percent of ATF Inspectors' firearms-related work time is spent directly on inspection activities (including traveling to and from the FFL's place of business). Fifty-nine percent of the Inspectors' time was spent on activities not directly related to inspections, such as training, answering telephone inquiries from FFLs, or other administrative tasks. Implementing a tracking system that can measure the time spent on all of these activities – not just data related to the specific type of inspection assignment – is essential to developing and implementing an effective workload model and to

---

redistributing resources to match the workload, actions which the ATF stated in its response to Recommendations 3 and 4 that it plans to undertake in FY 2005.

To develop a workload model for aligning Inspector resources with regulatory needs, the ATF must be able to segregate and analyze all Inspector time, not just time spent directly on conducting inspections. If the ATF does not categorize and measure Inspector work time by function, it will be difficult to establish appropriate performance goals, account for the variability among its divisions, or accurately report its productivity.

Please reconsider this response and provide us by August 3, 2004, whether the ATF will create a plan for updating the inspection tracking system to accurately segregate and report on all Inspector time or, in the alternative, how the ATF plans to develop a comprehensive workload model without such information.

**Recommendation 6: Prepare quarterly reports on the productivity and results achieved by each Field Division.**

**Status:** Resolved – Open

**Summary of the ATF's Response:** The ATF stated that to address this recommendation, it created the position of Assistant Director (Field Operations) to better manage the ATF's regulatory enforcement efforts in the field. One of the first tasks of the Assistant Director was the creation of a quarterly reporting system on inspection productivity and results by each Field Division. The ATF also established the Case Management Branch within the Field Operations Directorate for tracking and evaluating industry operations and criminal enforcement activities, conducting case comparisons, and making appropriate recommendations.

**The OIG's Analysis:** The ATF's proposed action is responsive to the recommendation. By October 31, 2004, please provide us with copies of the quarterly reports, as well as any annual compendium or other productivity analyses for FY 2004.

**Recommendation 7**: **Direct the National Licensing Center to develop an adverse action tracking system to monitor the progress and timeliness of FFL denials and revocations from the time an Inspector makes a recommendation until the proceedings are finalized.**

**Status:** Resolved – Open

**Summary of the ATF's Response:** The ATF concurred with this recommendation and tasked the Division Chief, Firearms and Explosives Services, with developing and monitoring an improved adverse action tracking system for denials and revocations of licenses. The ATF also intends to route an electronic version of monthly tracking reports to all Division Counsels and DIOs to better advise them of how many adverse actions are pending in their divisions and how long each case is taking to resolve. The ATF also plans to expand the tracking system to incorporate more indicators of case progress.

**The OIG's Analysis:** The ATF's proposed action is responsive to the recommendation. By August 3, 2004, please provide us with a copy of the functional description of the planned adverse action tracking system and a copy of the master schedule for the development and implementation of the system.

**Recommendation 8**: **Continue coordinating with the Department of Justice, Office of Legislative Affairs, to gain the authority to suspend or impose civil penalties on FFLs that violate federal firearms laws.**

**Status:** Resolved – Open

**Summary of the ATF's Response:** The ATF has indicated that it will continue to work with the Department of Justice's Office of Legislative Affairs on obtaining regulatory options such as license suspensions and the authority to issue civil penalties in lieu of license revocation. The ATF also clarified that it can impose fines in one limited circumstance, when an FFL fails to conduct a National Instant Criminal Background Check System (NICS) check and that NICS check would have resulted in a denial of the sale.

**The OIG's Analysis:** The OIG considers this recommendation resolved. By October 31, 2004, please provide us

with updates as to how the ATF is coordinating with the Office of Legislative Affairs. We made two minor changes in the report to make it clearer that the ATF has no general fining authority but can impose a fine in the limited circumstance described above.

**Recommendation 9: To improve the comprehensiveness of crime gun tracing by law enforcement agencies:**

**a. Coordinate with the Office of Justice Programs to determine the feasibility of using discretionary grant funding to support crime gun tracing.**

**Status:** Resolved – Open

**Summary of the ATF's Response:** The ATF's stated that it concurred with the recommendation and planned to initiate discussions with other Department entities on the feasibility of using discretionary grant funding to support local police departments that want to trace crime guns.

**The OIG's Analysis:** The ATF's proposed action is responsive to the recommendation. By October 31, 2004, please provide us with the dates of meetings held or planned and copies of minutes or other documentation of the topics discussed and the decisions made at the meetings.

**b. Develop a model for more accurately identifying potential firearms trafficking through the analysis of an FFL's firearms sales volume and the number of firearms traced to the FFL.**

**Status:** Resolved – Open

**Summary of the ATF's Response:** The ATF conditionally concurred with this recommendation, but stated that retail sales volumes are not captured for each FFL dealer on a yearly basis. Further, the ATF stated that the number of NICS checks submitted by each FFL is not a reliable indicator of sales because purchasers can acquire more than one firearm on a single NICS check and certain limited types of sales are exempt from a NICS check. However, the ATF proposed incorporating the sales data reported by FFL dealers applying to renew their licenses as a method to identify for inspection those FFLs with the highest ratios of traces to reported sales over a 3-year period.

**The OIG's Analysis:** The ATF's proposed action is responsive to the recommendation. However, our review found that the ATF's current compliance inspection procedures do not include steps to verify the renewal data submitted by the FFLs. We accept the ATF's proposed action, but request that the ATF modify its proposal to include adding steps to compliance inspections to verify the renewal data against actual FFL Acquisition and Disposition Book sales totals. By October 31, 2004, please provide us with the implementation plan for comparing FFL trace data and reported sales volume.

## ATF COMMENTS ON REPORT FINDINGS

In addition to addressing the recommendations, the ATF remarked on the draft report's findings. In this section, we summarize the ATF's comments and provide our analysis of its planned actions.

**FINDING: The ATF does not conduct in-person application inspections on all new FFLs to verify applicant information and ensure that they understand firearms laws.**

**The ATF's Comment:** The ATF agreed that in-person application inspections are critical for ensuring that licensees understand and obey federal firearms laws. The ATF stated that it is taking steps to conduct in-person application inspections nationwide and noted that under its June 2004 policy, all applicants who do not receive an in-person application inspection must be scheduled for an in-person compliance inspection during the first year after they are issued a federal firearms license.

**The OIG's Analysis:** We agree with the ATF's comments and planned course of action.

FINDING: The ATF does not regularly conduct compliance inspections on active FFLs, including large-scale retailers.

**The ATF's Comment:** The ATF stated that it cannot conduct annual compliance inspections of all FFLs due to the large number of licensees (more than 104,000) and the small number of Inspectors (420). Instead, the ATF stated that it works to focus its compliance inspections [Focused Inspection Program] on those FFLs with a history of non-compliance and those FFLs with

business practices that indicate signs of potential firearms trafficking. The ATF stated that many large-scale FFLs fall into one of these categories, thereby requiring that they be inspected. According to the ATF, "the fact that an FFL is large does not exclude it from being selected for inspection."

**The OIG's Analysis:** We agree with the ATF's statement that it cannot conduct annual compliance inspections on all FFLs with its current resources, and we did not suggest that the ATF attempt to do so in the report. To the contrary, we accepted the ATF's stated goal of conducting a compliance inspection on every FFL at least once every three years. With additional staffing and better utilization of its existing personnel, we believe that goal is attainable. In regard to the ATF's statement that large-scale FFLs are often inspected under its Focused Inspection Program and are not exempt from inspection, we note that although the ATF described these inspections as "mandatory," our interviews with DIOs found otherwise. Two DIOs described these inspections as "priorities," but stated that they do not complete all assigned Focused Inspections, including those of large-scale FFLs, because of competing demands. Further, the report did not state that large FFLs were exempt from inspection, but showed that they were statistically treated about the same as all other FFLs with respect to infrequent inspections.

**FINDING: The ATF does not identify and inspect all FFLs that exhibited indicators of potential violations or gun trafficking.**

**The ATF's Comment:** The ATF disagreed with our finding and stated that it "does identify all FFLs that exhibit indicators of potential violations or gun trafficking based on trace data available." However, the acknowledged that it "limit[s] inspection requirements based on our available Inspector resources." The ATF also stated that it plans to analyze other factors that should be utilized to determine which FFLs should be inspected.

**The OIG's Analysis:** During our inspection, we did not find that the ATF ever compiled a list of *all* FFLs that exhibited trafficking indicators (e.g., multiple traces, short time-to-crime traces). Instead, in describing how FFLs are identified for Focused Inspections, staff of the National Tracing Center (NTC) stated that they manipulated the query parameters by limiting the FFLs identified to a pre-selected number. That pre-selected number

(350 in FY 2002) was based on the projected availability of Inspector resources. The ATF made no attempt to determine an unacceptable level of trafficking indicators for FFLs and then identify all FFLs that exceeded that level without regard to whether all of the FFLs could be inspected with existing resources. Therefore, we maintain our finding that the ATF has not identified all FFLs that exhibited indicators of potential violations or of firearm trafficking.

**FINDING: Gun tracing has significant shortcomings that limit its use for identifying FFLs that should be inspected.**

**The ATF's Comment:** The ATF agreed that gun tracing has "weaknesses" and stated that it plans to address shortcomings identified in our report by implementing Recommendation 9. The ATF disagreed with our comparison of traces submitted by law enforcement agencies within a Field Division to the number of inspections conducted in that Field Division and stated that the comparison is "not especially useful." The ATF stated that crime gun tracing patterns vary by region. The ATF also clarified that the NTC was moved to Martinsburg, West Virginia, in 1994 but stated that the ATF had conducted tracing before the NTC relocated.

**The OIG's Analysis:** We believe that our comparison of trace data to inspections is useful. We do not agree with the ATF's argument that the existence of national trafficking patterns negates the use of data on traces submitted in each Division to analyze the ATF's resource management.[76] The ATF argues that the fact that more traces were submitted in a Division would not necessarily mean that more inspections should be conducted in that Division because the traced guns may have originally been sold by FFLs in other Divisions. Therefore, any inspections would have occurred in those Divisions, not in the Divisions where the traces were submitted.

However, the ATF's own analysis of crime gun recoveries (contained in its report *Crime Gun Trace Reports 2000*) found that 48 percent of crime guns were recovered within 25 miles of where they were originally sold. In contrast, national trafficking patterns

---

[76] The ATF was unable to provide us with consolidated data on the number of guns traced to FFLs in each Division, and instead provided the number of traces submitted by law enforcement agencies, by Field Division.

(i.e., guns recovered more than 250 miles from where they were purchased) accounted for more than 30 percent of crime guns traced in only 9 cities (including cities that ban handguns, such as New York City, Washington, D.C., and Chicago). Those data indicate that the preponderance of guns recovered in a Division was of local origin. Therefore, we concluded that data on trace submissions could be used to approximate the distribution of crime gun traced to FFLs in the ATF's Field Divisions.

Comparing the number of trace requests to the number of inspections conducted in each Division shows whether, on a national level, trace data were used to direct resources toward inspecting FFLs in Divisions where more crime guns originated. Our analysis showed little or no ATF-wide correlation between the number of crime guns submitted to the ATF for tracing in a Field Division and the number of compliance inspections conducted in that Field Division. The lack of any correlation on a national level indicates that the ATF is not managing its resources to conduct more inspections in Divisions where more crime guns originated.

The ATF also stated that some Field Divisions use trace data to target inspections within the Division. We agree that this is a positive use of trace data, and we note in the report that the Divisions can and are using the data internally. However, the internal use of trace data by Divisions does not negate our primary finding that there is little or no correlation between the number of traces and the number of inspections ATF-wide. Likewise, the ATF's statement that some localities have few local guns traced (which we found was due to restrictions on handgun sales in the locality) does not negate our primary finding.

Regarding the ATF's comments on the NTC move to Martinsburg, we clarified that the ATF's gun tracing program operations were consolidated, not established, in 1994.

**FINDING: ATF Field Divisions implement inspections inconsistently.**

**The ATF's Comment:** The ATF stated that it has been working on standardizing and streamlining the present procedures for conducting inspections.

**The OIG's Analysis:** Although the ATF did not explicitly state whether it agrees with our finding, the ATF's planned course of action will address the problems we reported with varying inspection implementation by ATF Field Divisions and will lead to more consistent inspections across the agency.

**FINDING: Suspected criminal violations are not always referred for investigation.**

**The ATF's Comment:** The ATF stated that its June 2004 policy reminds Inspectors to initiate referrals to ATF Special Agents when inspections reveal potential trafficking indicators.

**The OIG's Analysis:** If followed, we agree that the ATF's new policy will address our finding and lead to more consistent referrals of suspected trafficking.

**FINDING: The ATF acts infrequently to revoke federal firearms licenses, and the process is not timely. New ATF policy begins to address inconsistent and untimely adverse actions.**

**The ATF's Comment:** The ATF disagreed with our finding that, prior to its new policy, the ATF acted "improperly" by infrequently revoking federal firearms licenses and noted that we did not find a specific case in which the ATF should have taken such action against an FFL. The ATF stated that our report "fails to note the critical components that comprise the decision to take adverse action against an FFL." The ATF stated that the report should note that not all violations of federal firearms laws warrant revocation of the FFL's license. Further, the ATF stated that the legal standard is "willfulness," and many violations "may be so inadvertent that they cannot satisfy the legal standard." In addition, the ATF noted that many applicants and licensees withdraw their requests for a federal firearms license rather than face revocation.

**The OIG's Analysis:** We did not identify any FFLs that the ATF allowed to stay in business when revocation was warranted because, as our report made clear, we did not re-inspect any FFLs during our review. Instead, we examined the ATF's overall processes.

Our report did not state that the ATF acted "improperly" by failing to revoke FFL licenses in the past. However, the ATF's own actions indicate that its past practices were inadequate. In our review, we found that 11 of the ATF's 23 Field Divisions took no revocation actions in FY 2002. Those 11 Field Divisions conducted a total of 1,936 compliance inspections that found 51,314 violation instances. To accept the ATF's logic would mean that those Field Divisions initiated no revocations because, despite the 51,314 violations – which ATF Inspectors spent more than 108,000 hours to find and document – the ATF found no case that indicated a pattern of willful disregard for federal firearms laws. If that were correct, we would question such an expenditure of resources to find and document minor infractions. We would also question the ATF's process for selecting FFLs to inspect in those Field Divisions, since it failed to make effective use of established indicators of trafficking to identify those FFLs among the 46,775 FFLs located in these Field Divisions that were likely to be willfully violating federal firearms laws. We believe such FFLs existed in those 11 Field Divisions. [During our review, we also noted news reports of corrupt FFLs being arrested in Miami, Los Angeles, and Phoenix.]

The ATF's argument that, in the past, it always properly revoked the licenses of FFLs that were willfully violating federal firearms laws is also contradicted by the substantial rise in revocations since the ATF issued revised adverse action guidelines. In the first quarter of FY 2004, the ATF issued Initial Notices of Revocation or denied renewal to 59 FFLs. If that rate continues, the ATF will revoke the licenses of almost eight times as many FFLs in FY 2004 as it did in FY 2002. Given the above, we do not find persuasive the ATF's argument that in the past it revoked the licenses of all FFLs that violated federal firearms laws.

**FINDING: By streamlining and standardizing inspections, the ATF could dramatically improve the FFL inspection program.**

**The ATF's Comment:** The ATF stated that it began addressing "deficiencies" in its inspection program prior to the initiation of our review and stated that it will closely monitor its Inspectors to ensure that they are following the June 2004 guidelines, which address deficiencies that the ATF identified as well as those we identified in our report.

---

**The OIG's Analysis:** We believe that the ATF's June 2004 guidelines and the planned actions described in its response to our recommendations will be effective for responding to the need we identified for the ATF to improve the FFL inspection program.

**FINDING: The ATF does not consistently report inspection performance.**

**The ATF's Comment:** The ATF stated that it is committed to ensuring the integrity of its performance indicators and stated that modifications and upgrades to its electronic databases will help ensure consistent reporting of inspection performance.

**The OIG's Analysis:** We believe that the ATF's planned course of action will lead to more accurate and consistent reporting of its inspection activities.

**FINDING: New restrictions on retention of gun purchaser data will hinder the ATF's ability to detect fraudulent background checks.**

**The ATF's Comment:** The ATF stated that a new restriction placed on data maintained by NICS does not hinder the ATF's ability to "ensure FFLs do not abuse the NICS system." The ATF stated that it is developing a procedure to allow Inspectors to obtain 90 days of FFL-specific NICS information from the Federal Bureau of Investigation (FBI), which oversees NICS, prior to inspecting FFLs. The ATF stated that this information gives Inspectors the "ability to conduct NICS rechecks to ensure FFLs did not provide NICS with false information."

**The OIG's Analysis:** On the basis of the information provided by the ATF, we continue to believe that the new restriction on NICS information will reduce the ATF's ability to detect fraudulent NICS checks through an examination of FFL records. Even if ATF Inspectors are supplied with 90 days of FFL-specific NICS data from the FBI, all purchaser information on approved sales will be deleted within 24 hours. Therefore, the ATF can only *assume* that the purchaser information that was originally submitted to NICS was the same as the information that the Inspector submits for the recheck. If the recheck finds that a sale was allowed to a prohibited person, the ATF will have no way of determining from the FFLs' records whether the approval was due to an incorrect response from the NICS operator (i.e., the result of FBI error) or if it occurred because the FFL supplied incorrect purchaser information to NICS.

Moreover, the ATF will have no way of determining the cause of an incorrect NICS response once 90 days have elapsed because, after that time, the FBI also deletes the remaining FFL-specific information associated with approved NICS transaction numbers. We agree that conducting a recheck could potentially identify that a prohibited person obtained a gun. However, we continue to believe that the new NICS restriction will hinder the ability of the ATF to detect fraudulent NICS background checks by examining FFL records during compliance inspections.

# Exhibit 42

ORIGINAL ARTICLE

# Buying a handgun for someone else: firearm dealer willingness to sell

S B Sorenson, K A Vittes

. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .

*Injury Prevention* 2003;9:147–150

See end of article for
authors' affiliations
. . . . . . . . . . . . . . . . . . . .

Correspondence to:
Professor Susan B
Sorenson, UCLA School of
Public Health, 650 C E
Young Drive South, Los
Angeles, CA
90095–1772, USA;
sorenson@ucla.edu
. . . . . . . . . . . . . . . . . . . .

**Objective:** To examine firearm dealer willingness to sell when a handgun is being purchased for another person. US law requires a background check of the purchaser but not the end user of a firearm.

**Subjects and methods:** A total of 120 handgun dealers (six from each of the 20 largest US cities with 10 or more dealers) participated in telephone interviews. Dealers within each city were randomly assigned to a male or female interviewer and then randomly assigned to one of three purchase conditions—when the consumer said that the handgun was for him/herself, a gift for a girl/boyfriend, or for a girl/boyfriend "because s/he needs it".

**Results:** Most dealers were willing to sell a handgun regardless of the end user (self: 87.5%; gift: 70.8%; "need": 52.5%). Multivariate analyses indicate that dealers in the Midwest, South, and West were more willing to sell than those in the Northeast (adjusted odds ratio (AOR) = 21.30, 18.74, and 8.93, respectively) and that willingness to sell is lower when the sale would be illegal, that is, under the "need" condition (AOR = 0.20).

**Conclusions and implications:** Dealers are in a position to exercise judgment when a customer is explicit about buying a firearm for someone else. Some appeared willing to ignore or sidestep relevant information even when told that the end user was prohibited from purchasing a firearm him/herself. In the absence of federal handgun registration, which would track ownership changes, resources with which to conduct compliance checks (for example, as are conducted to identify retailers who sell tobacco or alcohol to under-age persons) seem warranted.

In the US, efforts to reduce firearm related morbidity and mortality include keeping guns out of the hands of certain people (for example, felons, those adjudicated mentally ill). Regulating the actions of all people who purchase guns in the US (over four million domestically produced guns were sold in the US in 1999[1]) is extremely difficult. Regulating firearm dealers is one such effort to assert control over who is able to obtain a firearm. A federal firearms license (FFL) is required of anyone who is "regularly involved in the business of selling firearms at wholesale or retail"[2]; there were 104 840 FFLs in the US in 2001.[1] FFLs, which are subject to federal oversight, are the point of purchase of most (60%–70%) guns each year.[3]

One focus of recent firearm policy debate is whether and how to require firearm manufacturers to take responsibility for the distribution of their products. More than 30 US cities and counties have filed lawsuits, many on this basis, against firearm manufacturers trying to hold them accountable for firearm violence. As noted in some of the legal cases, it is believed that many gun dealers facilitate—sometimes willingly and sometimes passively—the movement of guns from the legal to the illegal market.[4] The primary observation is that, despite laws and regulations, individual dealers are able to exercise a fair amount of judgment in their sales of firearms. To our knowledge, published peer reviewed literature on firearm dealer sales behavior is virtually non-existent.

In the present study, we focus on firearm dealers and their willingness to sell a handgun in a situation where a "straw purchase". A straw purchase is defined as when a person who is authorized to purchase a firearm buys one for someone who is not so authorized[5] (for example, a felon[6]) or when the purchaser conceals "the identity of the true intended receiver of the firearm(s)" (Department of the Treasury, Bureau of Alcohol, Tobacco, and Firearms; glossary[7]). Under federal law, a person may not knowingly purchase a firearm for a person who is prohibited from doing so him/herself, and dealers are

prohibited from selling or delivering "any firearm to any person in any state where the purchase or possession by such person of such firearm would be in violation of any state law or any published ordinance . . .".[8]

We focus on handguns rather than shotguns or rifles because handguns are used disproportionately in crime and suicide.[7 9 10] We also examine the role of purchaser gender. Women are not common purchasers of firearms; only 8% of women (compared with 35% of men) have ever purchased a handgun.[11] A widely held belief among law enforcement is that when a woman buys a handgun, she is buying it on behalf of her boyfriend or husband; available data support this assumption.[12] And, friends and family are the primary persons who are asked to and who do purchase guns for firearm traffickers, incarcerated offenders, and high school students.[13–15] In addition, recent research suggests that female gender is the single largest correlate of multiple purchase handguns, guns that may be more likely than others to be used in crime.[16] We, therefore, examine whether the intended user affects firearm dealer willingness to sell.

## METHODS

Six handgun dealers from each of the 20 largest cities in the US that had 10 or more dealers participated in the research. (A power analysis was conducted before data collection to determine the number needed to detect meaningful differences.) A list of US cities, ranked by size, was used to identify potential cities.[17] We identified dealers listed in an internet business directory under the keywords of "guns", "gun dealers", and "firearms".

Cities with fewer than 10 dealers listed were eliminated and replaced with the next largest city. Six firearm dealers were randomly selected from the listings for each city. Additional dealers were randomly selected when necessary (for example,

when a dealer did not sell handguns). Dealers were grouped by region of the country into Northeast (Baltimore, New York City, Philadelphia), South (Memphis, Nashville, Jacksonville, Oklahoma City, Houston, Dallas, San Antonio, El Paso, Austin, Fort Worth), Midwest (Cleveland, Indianapolis), and West (Denver, Seattle, Phoenix, Los Angeles, San Diego). Population sizes ranged from over eight million (New York City) to about one half million (Oklahoma City).

Dealers within each city were randomly assigned to one of two interviewers, one male and one female. Interviewers called the sampled firearm dealers posing as potential handgun purchasers. Interviewers followed a predetermined script that began with "Hi, do you sell handguns?" If not, the dealer was thanked and the call was terminated. If the dealer said yes, the interview continued with one of three a priori randomly assigned conditions, specifically: (1) "I'm looking to buy a handgun for myself," (2)"I'm looking to buy a handgun for my girl/boyfriend for her/his birthday," or (3) the intentionally ambiguous situation of "My girl/boyfriend needs me to buy her/him a handgun". The interviewer continued with "I've never done this before. What do I need to know?" The script and answers to anticipated questions (for example, "How much do you want to spend?") were pilot tested with 10 gun dealers across the US who were not from the sampled cities. Each pilot call was observed by the other interviewer and an attempt was made to standardize tone, style, and other speech patterns.

The callers took notes during all interviews and completed a brief questionnaire immediately after each call. Participation rate was 100%. Clerks who answered the phone were not made aware that they were participating in a study.

Attempts to persuade can reasonably be expected to be used by potential purchasers, therefore, when a clerk was unwilling to sell a handgun to the caller, the interviewers were instructed to gently attempt to persuade him or her (for example, "Is there any way I can do this—is there any way we can work it out?"). Five of the 28 conversion attempts were successful; we classified the converted cases (n = 5) as willing to sell. Ten clerks gave a response that could not be classified as a clear yes or no which was recorded as a "might" or "maybe". Given that an equivocal response is not a likely outcome in an in-person transaction, we adopted a conservative approach and required an affirmative response for inclusion in the "willing to sell" category; when a dealer indicated that s/he "might" sell, it was coded as a "no".

Frequencies and Fisher's exact tests were calculated to examine differences related to the manipulated variables, that is, interviewer gender and sales condition. Multivariate logistic regressions that took into consideration study variables (that is, interviewer gender and sales condition) and geographic region were used to predict dealer willingness to sell. Likelihood ratio tests were used to determine whether adding geographic region to the regression significantly improved the fit of the model. We also conducted descriptive and multivariate logistic regression analyses examining the role of the legality of the sale.

Under federal law, licensed firearm dealers may legally sell a firearm to any person who is not a prohibited purchaser (for example, a convicted felon) including guns that will be given as a gift.[7 18] In most cases, however, a licensed dealer may not knowingly sell a firearm to someone who the dealer knows is not the intended possessor, independent of the intended possessor's eligibility.[19] To determine whether it is legal under state laws for a dealer to sell a handgun when purchased as a gift, we contacted nine law enforcement agencies in seven different states. Responses ranged from the openly unsure (for example, "That's a tricky question right there") to the tentative (for example, "I'm pretty sure it's legal") to the accusatory ("I've been on the job 12 years and never had a person ask the law if they weren't going to do something illegal"), to the incorrect (for example, "Federal law says no for handguns"). Given this inconsistent information, we sought the assistance of two attorneys, a former Assistant United States Attorney and an attorney specializing in firearm policy. They reviewed relevant federal and state statutes[18 20] and judged whether it was legal for the dealer to sell a handgun under each condition in the specific state. The independent evaluators differed only on whether the gift condition was illegal in Indiana. Data were analyzed with Indiana classified each way; substantive findings were the same. To facilitate presentation of the findings, results are presented with Indiana classified as allowing gift sales.

The research was reviewed and approved by UCLA's Internal Review Board.

## RESULTS

### Willingness to sell

Most (70.8%) dealers indicated that they were willing to sell a handgun to the caller regardless of the stated end user of the gun. Willingness to sell differed by sales condition (p = 0.003). As shown in table 1, dealers were willing to sell a handgun 87.5% of the time when the caller stated that the handgun was for him/herself. (Dealer refusal to sell under this condition occurred when the interviewers, when asked, revealed that they did not meet residency or license requirements for the purchase.) When the caller stated that the handgun would be a gift, 72.5% of the dealers indicated they would sell the gun. One half (52.5%) indicated they would sell a handgun to the caller when told it was for a girl/boyfriend "who needs it".

Dealers were equally willing to sell a handgun to male and female callers (70.0% v 71.7%). (When "maybe" was included as a category, male callers were more likely to be given an outright "no" (28.3% v 13.3%), whereas females were more likely to be told that she "might" be able to get the gun (15.0% v 1.7%).) Although the proportion of dealers who were willing to sell a handgun when it was for the girl/boyfriend was identical (62.5%) for the interviewers, the proportion differed according to the rationale provided: a higher proportion were willing to sell to the male than the female interviewer when the gun would be a gift (80.0% v 65.0%) but a lower proportion were willing to sell to him than her when it was for a girl/boyfriend who needs it (45.0% v 60.0%).

A finding that emerged from the data, not postulated a priori, is that of geographic region. Dealers in the Northeast were

### Table 1  Dealer willingness (%) to sell a handgun

| | Randomly assigned handgun purchase condition | | | |
| | | For girl/boyfriend | | |
| | For self (n=40) | As gift (n=40) | Because s/he needs it (n=40) | Total (n=120) |
|---|---|---|---|---|
| Interviewer gender | | | | |
| Male (n=60) | 85.0 | 80.0 | 45.0 | 70.0 |
| Female (n=60) | 90.0 | 65.0 | 60.0 | 71.7 |
| Total (n=120) | 87.5 | 72.5 | 52.5 | 70.8 |

Note: cell percents are shown. Statistical tests are reported in the text.

substantially less likely to agree to sell than dealers in other regions of the country (27.8% v 78.4%; p = 0.001), and those in the South were more likely than those elsewhere to agree to sell a handgun (81.7% v 60.0%; p = 0.015).

### Handgun dealers and the law

Selling a handgun would be illegal under the "need" condition (n = 40), yet one half (52.5%) of the dealers were willing to do so. If the sale was legal, 80.0% were willing to do so. The legality of the sale was related to dealer willingness to sell (p = 0.003). Some dealers appeared to be aware of, but willing to work around, limitations placed by the law, as evidenced by the following exchanges: Interviewer: "Is there a problem with me buying it for my girlfriend?" Dealer: "As long as we don't know about it. It's personal business". Or, "First thing, don't ever tell anyone you're buying a gun for someone else because it's against the law". In several cases, dealers suggested that the caller contact another specific dealer, indicating that they may be aware of someone who might be willing to sell under these circumstances.

### Multivariate analyses

Multivariate logistic regressions were used to assess the independent effect of the type of sale, caller gender, and geographic region. The first regression tests the role of interviewer gender and type of sale (see table 2, model I). Dealers were less likely (adjusted odds ratio (AOR) = 0.38) to say that they would sell a handgun intended to be a gift than for personal use. Although this finding is substantively important, it is not of statistical significance (p = 0.11). Dealers were less willing (AOR = 0.16; p = 0.001) to sell a handgun if the caller indicated it was a purchase intended for a girl/boyfriend because s/he "needs it".

Adding geographic region to the regression (see model II) improved the fit of the model substantially (p = 0.001) and the added variables were statistically significant. Dealers in the Midwest, South, and West were more willing than those in the Northeast to sell regardless of the recipient of the handgun or the gender of the caller (AOR = 21.30, p = 0.003; AOR = 18.74, p = 0.000; AOR = 8.93, p = 0.004, respectively). "Need" remained significant (AOR = 0.09, p = 0.001).

All "need" sales were illegal; the others were legal. Replacing sale type with sale legality in models I and II resulted in an AOR of 0.28 (95% confidence interval (CI) 0.12 to 0.63) for illegal sales; the AOR for interviewer gender remained the same. When region was added to the regression, the AOR for interviewer gender and each region did not change substantially. Illegal sales remained statistically significant (AOR = 0.20, 95% CI 0.08 to 0.53).

### DISCUSSION

Firearm dealers who sell handguns are generally willing to sell to a potential customer regardless of whether the gun is for his or her own use or for use by another person. Gender of the purchaser was generally not relevant. Dealers in the Midwest, South, and West were more likely than those in the Northeast to be willing to sell a handgun regardless of interviewer gender and sales condition. Although dealers were less willing to make a sale when it would be illegal, more than half were willing to sell a handgun even when it would be illegal to do so.

This is, to our knowledge, the first study in the peer reviewed literature on factors that might influence firearm dealers' willingness to sell a handgun. The strengths of the study include its design (for example, see Campbell and Stanley[21]). The population included all dealers listed in the yellow pages of an internet directory, an easily accessed source of information for many persons wishing to purchase a firearm. Participating dealers were selected from large US cities in states that contain over half (53%) of the US population[22] and 35.5% of the FFLs (federal firearm licensees) in the US.[1]

Several matters warrant comment when interpreting the findings. First, dealers' stated intent may not correspond to their actual behavior. Although not necessarily a usual business practice, some dealers may say that they would sell a handgun while on the telephone but not do so if the potential customer was on-site. Alternatively, some dealers might resist persuasion attempts on the telephone but might yield to in-person pressure. Second, employees likely vary in their knowledge of and compliance with firearms laws such that if an interviewer had spoken with a different clerk at the same retailer, s/he might have received a different answer. Although personnel training may vary across and within stores, one "bad" clerk can implicate the entire dealership. Third, the effect of price on willingness to sell is not clear. If asked how much they were willing to spend, interviewers stated "about $300". Handguns are available for less and for substantially more. Perhaps dealer behavior would differ depending upon the amount of money a customer was willing to spend. Fourth, the effect of dealer location (that is, rural or urban) is unknown because the sample included only urban dealers. Fifth, the effect of state level regulation of firearm dealers is not examined in this study. Sixth, we did not attempt to ascertain whether the participating dealers held FFLs. One could assume that, if listed in a telephone directory, the dealer is "regularly involved in the business of selling firearms at wholesale or retail" and should have an FFL.[2] It was not possible, however, to ascertain this information without arousing undue suspicion. And, finally, although only two or three dealers seemed to be suspicious of the interviewers, skeptics may wonder whether the dealers were simply "playing along" with the caller.

To address the latter concern, we made 20 additional calls after the study was complete. A dealer was randomly chosen from each city and randomly assigned to each interviewer. The interviewer opened with "My girl/boyfriend needs me to buy

| Table 2 | Dealer likelihood of selling a handgun | | | | |
|---|---|---|---|---|---|
| | | Model I | | Model II | |
| | | AOR | 95% CI | AOR | 95% CI |
| Study condition: | | | | | |
| Sale type | | | | | |
| Gift (v for self) | | 0.38 | 0.12 to 1.21 | 0.28 | 0.07 to 1.09 |
| Need | | 0.16 | 0.05 to 0.49 | 0.09 | 0.02 to 0.36 |
| Interviewer gender | | | | | |
| Female (v male) | | 1.09 | 0.48 to 2.51 | 1.12 | 0.44 to 2.82 |
| Geographic region | | | | | |
| Midwest (v Northeast) | | | | 21.30 | 2.82 to 161.17 |
| South | | | | 18.74 | 2.05 to 38.9 |
| West | | | | 8.93 | 4.54 to 77.36 |

AOR, adjusted odds ratio; CI, confidence interval.
Note: each regression took into account the variables that are listed.

**Key points**

- A primary focus of both criminal justice and public health efforts has been keeping guns out of the hands of those who should not have them.
- The US government has allocated the primary responsibility to firearm dealers for monitoring that guns are not sold to persons who are prohibited by law from buying one.
- An experimental study of handgun dealers in the 20 largest cities in the US found that dealers generally are willing to sell to a potential customer regardless of whether the gun is for his or her own use or for use by another person.
- Although dealers were less willing to make a sale when the sale would be illegal, more than half were willing to sell a handgun even when it would be illegal to do so.

her/him a handgun because s/he isn't allowed to". That is, the caller was explicit about wanting to buy a gun for a prohibited purchaser. In 16 of the 20 calls, the dealer responded with an unequivocal "no" and commented about such a purchase being clearly illegal, a straw purchase, etc. Each of the four who agreed to sell a handgun appeared to recognize that the sale would be illegal. They said: (1) "As long as you have no record, you can come down here and pick one up and put it in your name"; (2) "You can do whatever you want after you walk out the door"; (3) "What you do with it is your business. Legally you'd be responsible for it, you're more than welcome to buy one. You can't transfer it to him—I assume he's been turned down"; and (4) "She can't come in, pick one out and you buy it. That's against the law". Interviewer: "I'd come, just me". Clerk: "I'd have no problem with that". These comments suggest that, even when expressly prohibited by law, dealer judgment enters into their sales.

**Implications for prevention**

Buying a handgun for another person may be a generous act intended to improve the recipient's ability to protect him/ herself. It also can provide legal cover for the recipient of the firearm because s/he is not subject to a background check or other regulatory mechanisms. Background checks are far from perfect,[23] but they are the primary means for screening those seeking to buy a firearm. It might be worth considering whether to prohibit purchasing or selling guns as gifts or, more generally, to prohibit purchasing or selling a firearm for someone else. Individuals are already prohibited from purchasing a firearm for a felon or other unauthorized purchaser; not allowing any firearm purchase on behalf of another would be useful when the purchaser or dealer is unaware of the recipient's relevant background. Alternatively, it might be worth considering changing the law to require a background check of the recipient of the firearm as well as the purchaser.

Regulating gun transfers (for example, requiring transfers between private parties to go through an FFL), as some states already do, is another potentially promising method to decrease gun injuries and fatalities.[24] Such approaches necessitate consideration given that current law enables people to break, with relative ease, the link between a firearm and the individual who uses it. If firearms were registered, transfer of ownership could be tracked more easily, and options and considerations such as those listed in the previous paragraph would be less relevant.

Educating retailers and enforcing existing laws are two other ways to reduce illegal sales. Decoy operations in which law enforcement agents impersonate a customer could help identify errant dealers. Such approaches have been used in cigarette and alcohol sales to minors.

Recent data indicate that 57.4% of crime guns can be traced to 1.2% of FFLs,[7] and sales volume, although an obvious cov-

ariate, appears not to be a determining factor.[25] Likewise, in the aforementioned General Accounting Office investigation, almost all FFLs adhered to federal and state firearm purchase laws.[23] Our findings differ. About half of the dealers were willing to sell a handgun when such a sale would be illegal. In addition, a few dealers seemed to be aware that such action would be illegal in that they indicated that they would be willing to skirt, if not openly violate, the law or they referred a potential customer to another retailer who may be so inclined.

. . . . . . . . . . . . . . . . . . . .

**Authors' affiliations**

**S B Sorenson, K A Vittes**, UCLA School of Public Health, Los Angeles, California

**REFERENCES**

1 **Department of the Treasury**, Bureau of Alcohol, Tobacco, and Firearms. *Firearms commerce in the United States 2001/2002.* Washington, DC: US Department of the Treasury, Bureau of Alcohol, Tobacco, and Firearms, 2002.
2 **18 USC § 921(a)(11)}**
3 **Cook PJ**, Ludwig J. *Guns in America: results of a comprehensive national survey on firearms ownership and use.* Washington, DC: Police Foundation, 1997.
4 **Vernick JS**, Teret SP. New courtroom strategies regarding firearms: tort litigation against firearm manufacturers and constitutional challenges to gun laws. *Houston Law Review* 1999;**36**:1713–54.
5 **Gun Control Act of 1968.** 18 USC § 922 (b)(2).
6 **Veen J**, Dunbar S, Reuland M, et al. *The BJA firearms trafficking program: demonstrating effective strategies to control violent crime.* Police Executive Research Forum. Series: BJA Bulletin, 1997.
7 **Department of the Treasury**, Bureau of Alcohol, Tobacco, and Firearms. *Following the gun: enforcing federal laws against firearms traffickers.* Washington, DC: Department of the Treasury, Bureau of Alcohol, Tobacco, and Firearms, 2000.
8 **Gun Control Act of 1968.** 18 USC § 922 (d) and (g).
9 **Zawitz MW**. *Guns used in crime: firearms, crime and criminal justice: selected findings.* Washington, DC: National Institute of Justice, 1995 [publication number NCJ-148201].
10 **Wintemute GJ**, Teret SP, Kraus JF, et al. The choice of weapons in firearm suicides. *Am J Public Health* 1988;**78**:824–6.
11 **National Opinion Research Center.** *National gun policy survey 1998.* Chicago: University of Chicago, 1999.
12 **Wachtel J.** Sources of crime guns in Los Angeles, California. *Policing: An International Journal of Police Strategies and Management* 1998;**21**:220–39.
13 **Wright JD**, Rossi PH. *Armed and considered dangerous: a survey of felons and their firearms.* Expanded edition. New York: Aldine de Gruyter, 1994.
14 **Beck A**, Gilliard D, Greenfeld L, et al. *Survey of prison inmates, 1991.* Washington, DC: National Institute of Justice, 1993 [publication number NCJ-136949].
15 **Sheley JF**, Wright JD. *Gun acquisition and possession in selected juvenile samples: research in brief.* Washington, DC: National Institute of Justice, 1993 [publication number NCJ-145326].
16 **Wright MA**, Wintemute GJ, Romero MP. A case-control study of multiple purchase handguns: characteristics that predict their use in crime. Presented at the APHA annual convention, November 10–13, 2002, Philadelphia, PA.
17 **Bureau of the Census.** *1990 Census of population: population of the 100 largest urban places.* Washington, DC: Bureau of the Census: table 22.
18 **Department of the Treasury**, Bureau of Alcohol, Tobacco, and Firearms. *Federal firearms regulations reference guide.* Washington, DC: Department of the Treasury, Bureau of Alcohol, Tobacco, and Firearms, 2000.
19 **Department of the Treasury**, Bureau of Alcohol, Tobacco, and Firearms. *General information.* Available at: http://www.atf.treas.gov/ pub/fire-explo_pub/geninfo.htm.
20 **Department of the Treasury**, Bureau of Alcohol, Tobacco, and Firearms. *State laws and published ordinances—firearms.* 22nd Ed. Washington, DC: Department of the Treasury, Department of the Treasury, Bureau of Alcohol, Tobacco, and Firearms, 2000.
21 **Campbell DT**, Stanley JC. *Experimental and quasi-experimental designs for research.* Boston: Houghton Mifflin, 1963.
22 **US Census Bureau.** *Ranking tables for states: population in 2000 and population change from 1990 to 2000.* Available from URL: http://www.census.gov/population/cen2000/phc-t3/tab03.pdf.
23 **General Accounting Office.** *Firearms purchased from federal firearm licensees using bogus identification.* Washington, DC: US General Accounting Office, 2001.
24 **Cook PJ**, Molliconi S, Cole T. Regulating gun markets. *J Crim Law Criminol* 1995;**86**:59–92.
25 **Wintemute GJ.** Relationship between illegal use of handguns and handgun sales volume. *JAMA* 2000;**284**:566–7.