# Exhibit 43

Journal of Urban Health: Bulletin of the New York Academy of Medicine, Vol. 87, No. 5
doi:10.1007/s11524-010-9489-6
© 2010 The Author(s). This article is published with open access at Springerlink.com

# Firearm Retailers' Willingness to Participate in an Illegal Gun Purchase

Garen Wintemute

**ABSTRACT** *Firearm-related violence is a significant public health and public safety problem for cities in the USA, and licensed firearm retailers are an important source of the guns used in that violence. Using a scripted telephone interview, we screened a sample of licensed retailers in California to assess their willingness to participate in the surrogate or "straw" purchase of a handgun; such purchases are illegal under federal law. Of 149 retailers who provided a response, 30 (20.1%) agreed to participate. In multivariate analysis, pawnbrokers were more likely to agree than were gun dealers (odds ratio 6.58, 95% confidence interval 1.99–21.71). Sales of handguns that were later subjected to ownership tracing (a proxy measure for a gun's use in crime) were not more frequent among retailers who agreed to participate than among others, and other findings were unexpected as well.*

**KEYWORDS** *Firearms, Handguns, Crime, Gun Policy, Violence*

## INTRODUCTION

Nearly 315,000 violent crimes, including an estimated 10,886 homicides, were committed with firearms in the United States in 2008.[1,2] Firearm violence is particularly a problem for America's major urban areas,[3] and federally licensed retailers are important sources of these guns.[4] Of persons incarcerated during the 1990s for gun crimes, 12% to 19% of those in state prisons[5] and 19% of those in federal prisons[6] purchased their guns personally from a gun dealer or pawnshop. An unknown but substantial number of others illegally use surrogate or "straw" purchasers to acquire guns from licensed retailers indirectly.[7] Licensed retailers who are themselves corrupt are linked to nearly half (48%) of guns that are trafficked—intentionally diverted into illegal commerce.[7]

### Linking Retailers to Crime Guns

Several methods are available to identify retailers who are frequent sources of crime guns. The most common relies on available data; it is to measure the number of guns a retailer sells that are later subjected to ownership traces by the Bureau of Alcohol, Tobacco, Firearms and Explosives (ATF).[8] Traces performed by ATF on guns recovered by police agencies worldwide, usually in connection with a crime. A completed trace begins with the gun's manufacture and ends with its first retail sale.

Wintemute is with the Violence Prevention Research Program, UC Davis Medical Center, Sacramento, CA, USA.

Correspondence: Garen Wintemute, MD, MPH, Violence Prevention Research Program, UC Davis Medical Center, 2315 Stockton Blvd, Sacramento, CA 95817, USA. (E-mail: gjwintemute@ucdavis.edu)
Electronic supplementary material The online version of this article (doi:10.1007/s11524-010-9489-6) contains supplementary material, which is available to authorized users.

In 1998, just 1,020 (1.2%) of 83,272 licensed retailers accounted for 57.4% of all traced guns.[9]

Importantly, the number of guns traced to a retailer is not simply a function of the number of guns that retailer sells. A minority of retailers is associated with *disproportionate*, not just frequent, sales of crime guns.[10,11] In a California study of retailers with at least 100 handgun sales per year, the 11.2% of retailers with disproportionate sales of crime guns accounted for 17.9% of all handguns sold by study subjects but 46.1% of handguns that were later used in violent or firearm-related crimes.[10,11] Several factors are associated with disproportionate sales of crime guns.[10,11] Most are characteristics of the retailers or of their clienteles, not of the communities in which the retailers are located. These findings have suggested a second available data strategy for identifying retailers who may be important sources of crime guns: determining the percentage of each retailer's proposed sales that are denied when criminal background checks show prospective purchasers to be prohibited persons.[10,11]

While available data may yield useful screening tools, they do not address the question of retailer intent. A key question remains: Do disproportionate sales of crime guns reflect purposeful behavior by the retailer, simple negligence, or circumstances beyond the retailer's control?

Several investigations have therefore assessed retailer behavior directly, either by passive monitoring or by observing the response to a predetermined stimulus, such as a proposed illegal gun purchase. A large study of gun shows demonstrated that straw purchases were to some extent concentrated at "hotspot" retailers and sometimes appeared to involve the full and knowledgeable participation of the retailer.[12] Working undercover, police officers or private investigators from several major cities have proposed sham straw purchases to selected retailers, already identified as important sources of crime guns, to determine their willingness to participate in illegal sales.[13,14] Investigators working for the city of New York recently screened retailers at seven gun shows and proposed sham straw purchases to those whose behavior suggested that they would be "vulnerable targets."[15] The positive predictive value of the screening process, the details of which were not published, was 94% (16/17).

Direct, on-site observation provides persuasive evidence but is not feasible on a large scale. Costs for the New York gun show study totaled at least $3,311 per gun seller screened and $30,000 per gun seller tested.[15,16] A much less expensive approach is to solicit participation in an illegal act, such as a straw purchase, by telephone. Sorenson and Vittes used this technique to assess 120 licensed gun retailers, selected from an Internet business directory, in 20 large cities across the country.[17] Of the 40 retailers who were told that "my girl/boyfriend needs me to buy her/him a handgun," 21 (52.5%) agreed to make the sale.

**The Current Study**

This study applies the Sorenson and Vittes technique, with some modifications, to a larger population of retailers about whom a great deal of additional information is available.[11] This information concerns sales of traced guns, gun sales overall, the nature of guns sold, attributes of the clientele, and characteristics of the specific place and larger community in which the retailer is located. Our primary hypothesis was that retailers who agreed to participate in a straw purchase would be more likely than others to be identifiable independently as important sources of traced crime guns. Based on our prior findings,[10,11] we also hypothesized that retailers who

agreed to participate would sell more guns than others did, would sell proportionately more inexpensive guns, would have a higher percentage of denied purchases, and would more likely be pawnbrokers and located in a central city or other urban environment.

## METHODS

### Study Design, Setting, and Subjects

This is a cross-sectional study. The 300 subjects, all federally licensed handgun retailers in California, were initially the topic of a case–control study of retailers with disproportionate sales of crime guns. The formation and characteristics of the study population have previously been described.[11] In brief, subjects were identified from among all retailers who sold handguns for at least one of the years 1998–2003 and averaged at least 50 handgun sales annually for their years in business during that period. Sixty retailers were associated with disproportionate sales of handguns that were later traced. "Disproportionate" was defined as having an actual number of traced handguns that exceeded the number predicted by aggregate data for all eligible retailers, by a margin that reached statistical significance ($p < 0.05$). The other 240 retailers were a random sample of the eligible non-cases, serving as controls.

### Variables and Data Collection

The California Department of Justice (CDOJ) provided records for handgun sales by licensed retailers and for proposed sales that CDOJ denied under laws prohibiting felons, violent misdemeanants, and certain others from purchasing firearms (in California, almost all transfers of firearms, including those between private parties, must be processed by a licensed retailer). ATF provided records for all gun traces initiated during the study period, regardless of the location of the requesting law enforcement agency. CDOJ and ATF records covered the years 1998–2003.

   Variables obtained from these data fell into three classes: relating to the retailer, to the retailer's clientele (including those whose purchases were denied), and to the general socioeconomic environment of the county in which the retailer was located.[10,11] A variable for urbanicity of the retailer's specific location was taken from site visits, which were conducted by the author during August–December 2004 (with few exceptions, other site visit variables had been shown not to be associated with disproportionate sales of crime guns).[11]

   Two female staff members were trained by the author as callers. A script involving a request for assistance with a questionable gun purchase (detailed below) was prepared following the model developed by Sorenson and Vittes[17] (personal communication, Sorenson SB, 2005), with minor modification. Responses to anticipated questions or remarks were drafted by the author and rehearsed by project staff. Callers were trained to interact with a wide variety of potential respondents. They then each contacted a random sample of 15 retailers who were not part of the study population for final simulation training. This also provided a pilot test for the script, which was revised as needed.

   Telephone calls were made during April–June, 2005. During this time callers were regularly debriefed by the author and senior program staff to address any unforeseen difficulties that had arisen.

   The script proceeded as follows: After verifying that the respondent was the subject retailer and still sold handguns, the caller said, "I need to buy a gun for my

boyfriend. He knows what he wants, but asked me to buy it for him. Can I do that?" To requests for more information, such as about the gun the boyfriend wanted or his eligibility to purchase for himself, the caller responded that she did not know. If asked whether the purchase was a gift, the caller responded that it was not; the boyfriend just wanted her to purchase it on his behalf. If asked further about financial details, the caller indicated that the purchase was to be for cash and with the boyfriend's money; the gun was for the boyfriend, but the caller was to be the purchaser. If the retailer's response was negative or equivocal, the caller followed up with "I'd really like to help him out" or "Is there some way to make this work?" If the response was positive, the caller asked "How do I do that?" or "What do I need to do?" and if the information had not already been provided, "Do I need to bring anything?"

Callers were given no information about the retailers they were contacting other than a name, telephone number, and address. Calls were not recorded. Immediately after concluding each call, callers completed a data form and made detailed notes. The data forms and notes were reviewed by the author as data collection was underway to screen for unanticipated problems.

In most cases, the retailer's final answer was a straightforward yes or no. There were ambiguous responses, however, of two types. Some retailers gave a nominally positive response to the caller's question when in fact they were recommending a purchase by the caller and a follow-up private party transfer to the boyfriend. In California, as these retailers explained, this would require a second purchase application to be completed by the boyfriend, a background check to verify his eligibility to own guns, and an additional fee. It seemed clear that their positive response was not endorsing an illegal straw purchase, but rather a legal retail sale followed by a legal secondary market transaction. These retailers were classified as having provided a qualified yes.

In other cases, the retailer's nominal response was negative but was accompanied by information, and in a few cases explicit coaching, on how the caller could complete a straw purchase. Still others, while saying no, indicated that this was because the caller had told them the nature of the transaction and that they would ignore the caller's intent if she were to come to the store. These respondents were classified as having provided a qualified no.

The callers' notes were also reviewed to identify cases in which retailers had specifically stated that the purchase as proposed was illegal or used any form of the phrase "straw purchase."

## Statistical Methods

As before,[10,11] we replaced each retailer's handgun sales volume with an estimate of gun-years of exposure to the risk of being traced during the study period for that retailer's handguns. Record-based variables for subsets of handgun sales were expressed as percentages of total gun-years of exposure. The frequency of gun tracing was expressed as traces per 1,000 gun-years of exposure.

Continuous variables were generally not normally distributed and were summarized using medians and interquartile ranges. Results for responding and nonresponding retailers were compared using the Mantel–Haenszel Chi-squared test for categorical variables and a two-sided Wilcoxon's rank sum test for continuous variables. Logistic regression with odds ratios (ORs) and 95% confidence intervals (CIs) was used to quantify relative risks for the outcome of interest. A multivariate model was generated by entering all variables with $p \leq 0.30$ in bivariate regression

with purposeful backward elimination until all remaining variables had $p \leq 0.10$. Because of the likelihood of endogeneity, variables specifying whether or not the retailer described the proposed sale as "illegal" or as a "straw" transaction were not included in the multivariate model. Interaction terms for all variable pairs in the reduced model were tested.

The main analysis was restricted to cases in which the retailer's response was unambiguously positive or negative. Sensitivity analyses were conducted by adding the qualified responses coded either according to their nominal intent or to their actual intent as inferred by us. The Hosmer–Lemeshow test was used to assess goodness of fit for multivariate models.

### Approval
The study was approved by the UC Davis Institutional Review Board.

### RESULTS

Of 300 retailers in the study population, 57 were not contacted because they were known from both administrative records and site visits to be out of business, were on military installations, or could not be located (Figure 1). Another 11 were found to be listings for additional licenses at a single business address. Of 232 retailers for whom contacts were attempted, 15 could not be reached, 61 no longer sold handguns, and 7 had no inventory at the time of the call, sold only at auction, or sold only to police personnel. Of the 151 retailers from whom no response was obtained, at least 114 (75.5%) were no longer in business or no longer selling handguns (Figure 1).

The 149 responding retailers and 151 others differed with regard to several variables that have previously been associated with disproportionate sales of traced guns (Tables 1 and 2 display principal findings; complete results are in Supplemental



**FIGURE 1.** Flow diagram showing exclusions and reasons for which retailers did not provide a response.

TABLE 1  Descriptive statistics for 149 retailers who provided a response and 151 others (categorical variables)

| Characteristics | Responders $N = 149$ | | Nonresponders $N = 151$ | | |
|---|---|---|---|---|---|
| | N | % | N | % | P |
| *Retailer characteristics* | | | | | |
| Licensed as pawnbroker | 24 | 16.1 | 40 | 26.5 | 0.028 |
| Nature of retailer's location: center city/urban (as compared to suburban, small town, or rural) | 32 | 21.5 | 46 | 30.5 | 0.077 |

Because the descriptive statistics differ, categorical variables and continuous variables are listed separately

Table 1 in the Electronic Supplementary Materials, available online). Some of these differences suggested a lower risk for responders; others suggested the opposite. Gun tracing rates did not differ between the two groups.

Of the 149 completed responses, 30 (20.1%) were positive, 104 (69.8%) were negative, 5 (3.4%) were qualified positive, 9 (6.0%) were qualified negative, and 1 could not be classified. Of the 30 positive responses, 14 included an explicit warning that the caller would be responsible for what her boyfriend did with the gun. Example responses are in Table 3.

Bivariate regression results are in Tables 4 and 5. Calls made by one staff member were less likely to return a positive response than were calls made by the other (OR 0.26, 95% CI 0.11–0.62). Pawnbrokers were more likely than other retailers to respond positively (OR 3.50, 95% CI 1.35–9.10); those who described the purchase as illegal or as a "straw" transaction were less so. There was no association between a positive response and the frequency with which a retailer's guns were traced, with the percentage of sales that were denied because the purchasers were ineligible, or with most other characteristics of the retailer, the retailer's clientele, or the retailer's community. Given the strong caller effect, bivariate regressions for all other variables were repeated with the caller variable

TABLE 2  Descriptive statistics for 149 retailers who provided a response and 151 others (continuous variables)

| Variable | Responders $N = 149$ | | Nonresponders $N = 151$ | | |
|---|---|---|---|---|---|
| | Median | IQR | Median | IQR | P |
| *Retailer characteristics* | | | | | |
| Gun-years of exposure (×1,000) | 2.5 | 1.3–6.1 | 1.2 | 0.8–2.2 | <0.0001 |
| Traced guns per 1,000 gun-years | 1.3 | 0.5–2.7 | 1.5 | 0.4–3.6 | 0.27 |
| Gun-years from sales of multiple guns (%)[a] | 6.4 | 4.0–9.6 | 9.1 | 5.5–14.6 | 0.0001 |
| *Clientele characteristics* | | | | | |
| Denials, % of (sales+denials) | 1.9 | 1.3–2.4 | 1.7 | 0.8–2.5 | 0.062 |

Because the descriptive statistics differ, categorical variables and continuous variables are listed separately
*IQR* interquartile range, *CI* confidence interval
[a]Sales of more than one handgun in a single transaction (which became illegal in California in 2000)

**TABLE 3  Examples of retailer responses to the question, "I need to buy a gun for my boyfriend. He knows what he wants, but asked me to buy it for him. Can I do that?"**

*Responses coded as "No"*
The gentleman said I could pay for the gun, but I could save $30 by not paying the registration fee twice. I could buy it and register it in my name and pay the $30, if it was a gift for my boyfriend or something. Then my boyfriend would need to register it in his name and pay registration fees again. I asked him if I could buy it and give it to my boyfriend. He said "Nooooooooo, that is an illegal purchase of a handgun." He said that is a federal crime and there is a question on the federal document asking if I was going to be in possession of the gun. And if I answer that wrong, that is perjury and I will have the Feds involved.
"No, that's not legal. If he wants to come in and buy it, he has to take a handgun safety certificate test, he has to be over 21, and we have to do a background check on him. I wouldn't sell you a gun if it's for your boyfriend. It's a straw sale. That's a felony. You can pay for it but he has to do the background check."
"You can purchase it for him but he has to do the registration. If you purchased it and put it in your name and it was used in a crime or it was stolen, it would be found in your name. You don't want to do that. If they found it at a crime scene, it would be traced back to you. I followed up with 'So I can't help him out?' and he responded, 'You can purchase it for him but he has to do the registration.'"
*Responses coded as "Yes"*
He said "yeah" I could do it and asked if I had handgun safety training in the State of California. He said I had to take a $25 state test that is 30 questions long. Then I need to bring a utility bill that is 3 months old with my address on it. He said I could do what I asked, but I needed to study for the test first because I could take it, then I could buy the gun and do all of the paperwork.
The man asked if I "needed" to buy it for him. I told him my boyfriend wanted me to. He said "Oh, I get it" and laughed a little and said yes, I could. I asked what I needed to bring with me and he asked if I was a California resident. He said I needed my driver's license and my registration with the same address as my license, or a utility bill with my current address. He stated if they didn't have the gun I needed, they would order it and take care of me.
He said yes I could and told me to "say it is for you, though." He said, "you don't want to...you know." He said I needed to take an exam. He stated it sounded like I never bought a gun before. He said it's 50 cents for a handbook to study. It's a 30 question test that is $25 and lasts for 5 years, if I want to buy any more guns. Then I need proof of residency like a phone bill or utility bill. He said after the gun is paid in full, then my 10 day waiting period starts.
*"Yes," including a warning*
The gentleman said I could buy the gun, but if anything happens to it, I am responsible. He said I could register it in my name, but if my boyfriend does something with it, it will come back to me. He also said I could pay for it and do the background check on me and my boyfriend can register it and it would cost him $75. He said he just wanted to make clear to me that if I register it and give it to my boyfriend and we break up, I am still responsible. He said if I had it stolen or lost it, to report it. He said you could still do it, but it's up to you.
The gentleman said the gun would be in my name and asked if I knew this. He said if I wanted to come in and do all of the stuff in my name and my boyfriend goes out and shoots somebody and I am willing to take the rap for it, then I could. After telling him that was fine, he said he really wasn't supposed to know what I was doing with the gun after I left. He said I needed to bring a valid ID and the money when I come down.
*"Yes," describing purchase as illegal or as a straw transaction*
The gentleman said he could sell me a handgun. He said my boyfriend would need to come down and do the paperwork. He said if he did sell me the gun, it is called a straw "purpose" and he and I could both go to jail. He said now if I came in and bought it, whatever I did after I left was of no concern to him. He stated again he could sell me one.

*Responses coded as "Qualified Yes"[a]*

He said yes, but I first needed [a Handgun Safety Card], which is $25 and 30 questions. He said then I needed to do a background check that is an additional $25 on top of the price of the gun. I will then have to wait 10 days before I can pick up the gun. I asked if at that point I could pick it up and give it to my boyfriend. He said "yes, but the right way." He said I needed to transfer it into my boyfriend's name, which costs an additional $45, and then my boyfriend will need to pay and take the HSC test and the same for the background check. He said California states it needs to be in my boyfriend's name.

*Responses coded as "Qualified No"[b]*

The gentleman said "technically no." He said there is a thing called a Straw Purchase Bylaw and because I told him my intent, I cannot buy a gun in my name and give it to my boyfriend. For all the man knew, my boyfriend could be a felon and not supposed to have the gun. I can come in and get a gift certificate that my boyfriend can use. Or I can buy the gun and my boyfriend can come in and register for it. I then followed up with, "I couldn't do it?" He said if I didn't tell them and I just came down and bought it and gave it to him, they wouldn't know.

"Yeah, if you're buying it for yourself, as long as you pass the background check through the DOJ, fill out the paperwork, and register it in your name. But no, you can't buy one for him. He has to buy it and register it in his name. If for whatever reason he can't pass a background check, I didn't hear that. In the future, if you are calling around and want to buy it for him, I would keep that mum."

[a]A nominal "yes" response that appeared to be an endorsement for a sale to the caller followed by a legal private party sale to her boyfriend
[b]A nominal "no" response accompanied by information on how the caller could complete a straw purchase

added. The results were unchanged (Supplemental Table 2 in the Electronic Supplementary Materials, available online).

In a reduced multivariate model (Table 6), strong effects remained for the caller, the retailer's status as a pawnbroker, and the retailer's location in a center city or urban area. Terms for interactions between each pair of variables in the reduced model were not significant.

Results for the sensitivity analyses, in which the qualified responses were added and coded according to either their nominal or inferred actual intent, were very similar to those for the main analysis (data not shown).

## DISCUSSION

Twenty percent of the licensed firearm retailers in our study population agreed to assist a potential handgun buyer with a transaction that had many attributes of an illegal surrogate or "straw" purchase. Others, while saying no, offered the buyer concrete assistance in completing a purchase they appeared to understand was against the law. In multivariate analysis, pawnbrokers were more than six times as likely as gun dealers to give a positive response.

High as it is, our "yes" rate is much lower than the 52.5% found by Sorenson and Vittes.[17] Differences in study populations may account for much of this. Our sample was drawn from all retailers exceeding a modest threshold sales volume in a state that regulates and polices gun commerce to a degree that is perhaps unique. In their study, retailers were drawn from an Internet business directory, which may cause high-volume retailers to be overrepresented, and were located throughout the country.

**TABLE 4   Descriptive statistics and results of bivariate regressions (categorical variables)**

| Characteristic | Said "Yes" N=30 | | Said "No" N=104 | | OR | 95% CI | | P |
|---|---|---|---|---|---|---|---|---|
| | N | % | N | % | | | | |
| *Variables intrinsic to telephone call* | | | | | | | | |
| Call made by staff member #1 | 9 | 30.0 | 65 | 62.5 | 0.26 | 0.11 | 0.62 | 0.002 |
| Retailer described purchase as "illegal" | 3 | 10.0 | 53 | 51.0 | 0.11 | 0.03 | 0.37 | 0.0005 |
| Retailer described purchase as "straw" | 2 | 6.7 | 30 | 28.9 | 0.18 | 0.04 | 0.79 | 0.023 |
| *Retailer characteristics* | | | | | | | | |
| Licensed as pawnbroker | 10 | 33.3 | 13 | 12.5 | 3.50 | 1.35 | 9.10 | 0.01 |
| In or <25 mi from city with comprehensive tracing | 11 | 36.7 | 44 | 42.3 | 0.79 | 0.34 | 1.83 | 0.58 |
| Nature of retailer's location: center city/urban (as compared to suburban, small town, or rural) | 2 | 6.7 | 24 | 23.1 | 0.24 | 0.05 | 1.07 | 0.062 |

Variables are grouped by the entity they describe: the telephone call itself, the retailer, the retailer's clientele, or the county in which the retailer is located. Because the descriptive statistics differ, categorical variables and continuous variables are listed separately

*OR* odds ratio, *CI* confidence interval

Many of our findings were unexpected. First was the ambiguity of the purchase request as presented. An unexpectedly high number of retailers understood the transaction to be a gift, even though the script was designed to make it clear that this was not the case. Following Sorenson and Vittes,[17] we had purposely not scripted a completely transparent request for assistance with a straw purchase, believing that this would not be realistic.

Second was the lack of association between a positive response and previously identified risk factors for disproportionate sales of traced crime guns.[8,10,11] One possible explanation is simply that there is no association between a retailer's propensity to engage in illegal activity and that retailer's risk for selling guns that are used in crime. This fails a basic test of plausibility. Another is that at least some of those risk factors have been wrongly identified and that no association between them and propensity to engage in illegal activity (or risk for selling crime guns) should be expected. This is also unlikely, at least as a comprehensive explanation, since those risk factors have been identified in repeated studies on different populations using different methods.[8,10,11,18,19]

However, the use of gun tracing data to gauge retailers' willingness to engage in unlawful activity, or even to measure their sales of guns that are later used in crime, has been questioned before.[20,21] It is clear that not all crime guns are recovered by law enforcement agencies, that not all recovered guns are traced, and that selection bias may arise at each of these points.[22] The impact of this will be less in states such as California, where many cities trace all recovered guns, than elsewhere.[23]

**TABLE 5  Descriptive statistics and results of bivariate regressions (continuous variables)**

| Variable | Said "Yes" N = 30 | | Said "No" N = 104 | | OR | 95% CI | | P |
|---|---|---|---|---|---|---|---|---|
| | Median | IQR | Median | IQR | | | | |
| *Retailer characteristics* | | | | | | | | |
| Gun-years of exposure (× 1,000) | 1.8 | 1.0–2.8 | 2.8 | 1.5–8.7 | 0.90 | 0.81 | 1.00 | 0.063 |
| Traced guns per 1,000 gun-years | 0.9 | 0.0–2.6 | 1.3 | 0.6–3.1 | 0.94 | 0.79 | 1.13 | 0.51 |
| Gun-years from sales of inexpensive handguns (%)[a] | 1.5 | 0.5–8.2 | 1.1 | 0.3–5.0 | 1.01 | 0.97 | 1.06 | 0.56 |
| Gun-years from sales at gun shows (%) | 0.2 | 0.0–0.7 | 0.1 | 0.0–0.5 | 0.99 | 0.95 | 1.03 | 0.63 |
| Gun-years from sales of multiple guns (%)[b] | 6.4 | 4.0–9.9 | 6.5 | 4.1–9.8 | 1.00 | 0.93 | 1.07 | 0.90 |
| Median time from sale to recovery (years)[c] | 1.5 | 1.0–1.8 | 1.1 | 0.8–1.8 | 1.45 | 0.83 | 2.54 | 0.20 |
| *Clientele characteristics* | | | | | | | | |
| Gun-years from police sales (%)[d] | 6.0 | 3.8–8.4 | 6.6 | 4.9–9.8 | 1.01 | 0.94 | 1.09 | 0.80 |
| Denials, % of (sales+denials) | 1.9 | 1.2–2.6 | 1.9 | 1.4–2.3 | 1.18 | 0.83 | 1.67 | 0.37 |
| Median age of purchasers (years) | 42.5 | 40–45 | 43 | 40–45 | 1.01 | 0.91 | 1.11 | 0.90 |
| Male purchasers (%) | 93.1 | 89.5–93.8 | 92.9 | 90.8–94.3 | 0.95 | 0.83 | 1.09 | 0.47 |
| *County characteristics*[e] | | | | | | | | |
| Federal firearm licensees per 100,000 persons | 8.4 | 4.5–20.4 | 6.6 | 4.2–15.0 | 1.02 | 0.99 | 1.06 | 0.21 |
| Homicide per 100,000 persons | 4.6 | 3.2–8.5 | 5.6 | 3.0–9.5 | 0.95 | 0.84 | 1.08 | 0.44 |
| Rape per 100,000 persons | 29.0 | 20.9–34.0 | 29.0 | 27.8–34.0 | 0.98 | 0.94 | 1.03 | 0.44 |
| Robbery per 100,000 persons (×10) | 9.9 | 6.7–20.0 | 12.4 | 8.7–26.5 | 0.98 | 0.93 | 1.02 | 0.25 |

| | | | | | | | | |
|---|---|---|---|---|---|---|---|---|
| Aggravated assault per 100,000 persons (×10) | 34.2 | 23.4–51.7 | 36.2 | 31.1–53.9 | 0.98 | 0.96 | 1.01 | 0.22 |
| Felony weapons offenses per 100,000 persons[f] | 46.2 | 44.5–67.7 | 46.2 | 44.9–63.2 | 1.01 | 0.99 | 1.03 | 0.55 |
| Misdemeanor weapons offenses per 100,000 persons[g] | 14.4 | 12.0–23.9 | 12.6 | 11.2–19.2 | 1.02 | 0.97 | 1.07 | 0.45 |
| Black population (%) | 3.8 | 1.6–9.1 | 5.7 | 2.1–9.8 | 0.96 | 0.86 | 1.06 | 0.40 |
| Latino population (%) | 30.8 | 19.0–44.6 | 31.7 | 18.4–44.6 | 1.00 | 0.97 | 1.03 | 0.84 |
| Males ages 20–29, as % of males ages 40–44 | 187 | 165–208 | 188.5 | 170.5–208.0 | 1.00 | 0.99 | 1.01 | 0.99 |
| Unemployed persons (% of persons ages ≥16) | 4.9 | 3.6–5.2 | 5.0 | 3.6–5.2 | 0.93 | 0.69 | 1.25 | 0.61 |
| Households headed by single females (%) | 11.9 | 10.9–14.7 | 13.4 | 11.5–14.7 | 1.00 | 0.82 | 1.21 | 0.95 |
| Median household income (×$1,000) | 42.2 | 34.7–55.9 | 42.2 | 40.1–47.1 | 1.00 | 0.96 | 1.04 | 0.96 |
| Households per 10,000 persons (×100) | 32.9 | 32.8–36.3 | 32.9 | 32.5–36.3 | 1.03 | 0.91 | 1.17 | 0.64 |

Variables are grouped by the entity they describe: the telephone call itself, the retailer, the retailer's clientele, or the county in which the retailer is located. Because the descriptive statistics differ, categorical variables and continuous variables are listed separately

IQR interquartile range, OR odds ratio, CI confidence interval

[a]Handguns manufactured by seven companies—Bryco Arms/Jennings Firearms, Davis Industries, High Point Firearms, Lorcin Engineering, Phoenix Arms, Raven Arms, Sundance Industries—whose handguns all had suggested retail prices of approximately $150 or less; almost no such handguns were manufactured by other companies during the study period

[b]Sales of more than one handgun in a single transaction (which became illegal in California in 2000)

[c]The time between the dates of a gun's sale and its recovery by police, in years

[d]Sales to police agencies or individuals who were exempt, due to police employment, from California's required basic firearms safety course

[e]For the county in which the retailer is located

[f]An arrest rate. Examples: unlawful possession of a weapon on the person, in a vehicle, or in a public place (charged as a felony), unlawful possession of weapon in public building, possession of short-barreled shotgun or rifle, possession of firearm by felon, carrying firearm with intent to commit felony, obliterating firearm serial number

[g]An arrest rate. Examples: unlawful possession of a weapon on the person, in a vehicle, or in a public place (charged as a misdemeanor), possession of weapon with intent to assault, knowingly filing false firearm purchase application, selling firearms without a license, possession of unregistered assault weapon, sale of ammunition to a minor

**TABLE 6  Reduced regression model**

| Characteristic | OR | 95% CI | | P |
|---|---|---|---|---|
| *Variables intrinsic to telephone call* | | | | |
| Call made by staff member #1 | 0.23 | 0.09 | 0.59 | 0.002 |
| *Retailer characteristics* | | | | |
| Licensed as pawnbroker | 6.58 | 1.99 | 21.71 | 0.002 |
| Nature of retailer's location: center city/urban (as compared to suburban, small town, or rural) | 0.10 | 0.02 | 0.57 | 0.01 |

Hosmer–Lemeshow goodness of fit test, $P = 0.35$

The nature of our responding retailers may provide a partial explanation. The risk factor data were gathered for 1998–2003, and the interviews were conducted in 2005. Three-fourths of the nonresponders had gone out of business or were no longer selling handguns. In California, where retailers must also have state licenses, where the state Department of Justice has its own retailer inspection program and where enforcement is generally more active than elsewhere, it is possible that many of our nonresponders had been put out of business through enforcement action. If so, our unexpected findings may result in part from survival bias.

We believe the most important explanation is the ambiguity of the question we posed to retailers. By not portraying the nature of the purchase more explicitly, we may have created a screening test that was highly sensitive, but not specific enough. This is particularly important since sales of traced crime guns generally, and disproportionate sales of those guns in particular, are concentrated among a very small percentage of licensed retailers.[8–11] Sorenson and Vittes conducted a sensitivity analysis in which 20 retailers were told, "My girl/boyfriend needs me to buy her/him a handgun because s/he isn't allowed to."[17] Four retailers said yes to this unambiguous request for assistance in committing a felony, and their specific verbal responses were similar to those observed in this study.

Our findings are subject to several limitations. Precisely because of the unusual nature of gun commerce in California, generalizability is limited. Second, because our population was originally created for a case–control study of retailers with disproportionate sales of crime guns, such retailers are overrepresented. We anticipated that this might affect the frequency of our outcome of interest (though, as shown in Tables 4 and 5, this did not appear to occur), but it should not affect relative risk estimates.

Last is the strong association between saying "yes" and the staff member who placed the call. We deliberately had all calls placed by women in order to avoid a possible gender bias on the part of respondents and also because of the finding that women may figure disproportionately among straw purchasers.[7] Callers adhered closely to the script, both in text and in tone. The caller with the higher proportion of "No" responses was a few years younger and had a significantly higher voice, and respondents may have been influenced by her perceived youth. The effect appeared to be independent of those for other variables, but more attention to elimination of factors that may give rise to an interviewer effect will be necessary in future studies.

These limitations notwithstanding, screening by telephone appears to hold promise as a cost-effective technique for cities impacted by gun violence and others to identify firearm retailers who may be willing to engage in suspect and illegal sales. Future studies will be needed to refine and validate this technique.

## ACKNOWLEDGMENTS

Support for this project was provided by grants from The Joyce Foundation, The California Wellness Foundation, and The Eli and Edythe L. Broad Foundation.

**OPEN ACCESS** This article is distributed under the terms of the Creative Commons Attribution Noncommercial License which permits any noncommercial use, distribution, and reproduction in any medium, provided the original author and source are credited.

## REFERENCES

1. Rand MR. *Criminal Victimization, 2008*. Washington: Bureau of Justice Statistics; 2009. NCJ 227777.
2. Federal Bureau of Investigation. *Crime in the United States, 2008*. Washington: Federal Bureau of Investigation; 2009.
3. Webster DW, Vernick JS, Bulzacchelli MT. Effects of state-level firearm seller accountability policies on firearm trafficking. *J Urban Health*. 2009; 86: 525–537.
4. Braga AA, Cook PJ, Kennedy DM, Moore MH. The illegal supply of firearms. In: Tonry M, ed. *Crime and Justice: A Review of Research*, vol. 29. Chicago: The University of Chicago Press, Chicago and London; 2002: 319–352.
5. Harlow CW. *Firearm Use by Offenders*. Washington: Bureau of Justice Statistics; 2001. NCJ 189369.
6. Scalia J. *Federal Firearm Offenders, 1992–98*. Washington: Bureau of Justice Statistics; 2000. NCJ 180795.
7. Bureau of Alcohol, Tobacco and Firearms. *Following the Gun: Enforcing Federal Laws Against Firearms Traffickers*. Washington: Bureau of Alcohol, Tobacco and Firearms; 2000.
8. Pierce GL, Braga AA, Hyatt RRJ, Koper CS. Characteristics and dynamics of illegal firearms markets: implications for a supply-side enforcement strategy. *Justice Q*. 2004; 21: 391–422.
9. Bureau of Alcohol, Tobacco and Firearms. *Commerce in Firearms in the United States*. Washington: Bureau of Alcohol, Tobacco and Firearms; 2000.
10. Wintemute GJ, Cook P, Wright MA. Risk factors among handgun retailers for frequent and disproportionate sales of guns used in violent and firearm related crimes. *Inj Prev*. 2005; 11: 357–363.
11. Wintemute GJ. Disproportionate sales of crime guns among licensed handgun retailers in the United States: a case-control study. *Inj Prev*. 2009; 15: 291–299.
12. Wintemute GJ. *Inside Gun Shows: What Goes on When Everybody Thinks Nobody's Watching*. Sacramento: Violence Prevention Research Program; 2009.
13. Plaintiff's complaint. City of Chicago and County of Cook vs. Beretta USA Corp. et al. Circuit Court of Cook County. 1998.
14. City of New York v A-1 Jewelry & Pawn, et al. 501 F. Supp. 2d 369 (EDNY). United States District Court. 2007.
15. City of New York. *Gun Show Undercover: Report on Illegal Sales at Gun Shows*. New York: City of New York; October, 2009.
16. Lisberg A. Mayor Bloomberg's gun sales investigation costs city $1.5 M. *New York Daily News*. http://www.nydailynews.com/news/2009/12/20/2009-12-20_gun_sales_probe_cost_15m.html. Accessed December 20, 2009.
17. Sorenson SB, Vittes K. Buying a handgun for someone else: firearm dealer willingness to sell. *Inj Prev*. 2003; 9: 147–150.

18. Wright MA, Wintemute GJ, Webster DW. Factors affecting a recently purchased handgun's risk for use in crime under circumstances that suggest gun trafficking. *J Urban Health.* 2010; 87(3): 352–364.
19. Koper CS. *Crime Gun Risk Factors: Buyer, Seller, Firearm, and Transaction Characteristics Associated with Gun Trafficking and Criminal Gun Use.* Philadelphia: Jerry Lee Center of Criminology; 2007.
20. Kleck G. ATF gun trace data and the role of organized gun trafficking in supplying guns to criminals. *St Louis U Law Rev.* 1999; 18: 23–45.
21. Blackman PH. *The Limitations of ATF Firearms Tracing Data for Policymaking and Homicide Research. Proceedings of the Homicide Research Working Group Meetings, 1997 and 1998.* Washington: National Institute of Justice; 1999.
22. Cook PJ, Braga AA. Comprehensive firearms tracing: strategic and investigative uses of new data on firearms markets. *Ariz Law Rev.* 2001; 43: 277–309.
23. Wintemute GJ, Romero MP, Wright MA, Grassel KM. The life cycle of crime guns: a description based on guns recovered from young people in California. *Ann Emerg Med.* 2004; 43: 733–742.

# Exhibit 44







# Following the Gun:

## Enforcing Federal Laws Against Firearms Traffickers



**June 2000**

**Department of the Treasury**
**Bureau of Alcohol, Tobacco & Firearms**







# Following the Gun:

## Enforcing Federal Laws Against Firearms Traffickers



**June 2000**

**Department of the Treasury
Bureau of Alcohol, Tobacco & Firearms**

# FOREWORD BY THE DIRECTOR

Virtually every crime gun in the United States starts off as a legal firearm. Unlike narcotics or other contraband, the criminals' supply of guns does not begin in clandestine factories or with illegal smuggling. Crime guns, at least initially, start out in the legal market, identified by a serial number and required documentation. This means that virtually every crime gun leaves some paper trail. Historically, the Bureau of Alcohol, Tobacco and Firearms (ATF) has pursued cases against both armed offenders and firearms traffickers. Until recently, however, we did not have the tools to develop a systematic approach to understanding and addressing the sources of firearms used in crime. In 1996, we intensified our efforts to address the illegal supply of crime guns by using the crime gun recovered by law enforcement officials to identify and target the illegal suppliers. To assess this strategy, we have conducted a review of our trafficking investigations and their disposition by prosecutors and courts.

Studies such as this one are essential to ATF. The last decade has brought our investigators and inspectors an enormous increase in investigative information. The National Tracing Center (NTC) now has over 1,000,000 traces of firearms recovered by law enforcement officials in our firearms trafficking information system. The National Integrated Ballistics Information Network (NIBIN), operated by ATF with the Federal Bureau of Investigation (FBI), now contains 500,000 ballistics images. The National Instant Check System (NICS), launched by the FBI and ATF in 1998, has resulted in ATF receiving over 130,000 reports of prohibited persons attempting to buy firearms from FFLs. Our files contain facts from thousands of investigations and debriefings of arrested persons in possession of firearms used in crime.

This huge advance in investigative information and in tools to access it enables ATF and our State and local partners to identify many more criminals individually, and to analyze and respond to specific local crime patterns. With greater knowledge of the gun criminal, we can target our resources more effectively and better explain our cases to the communities we serve. At the same time, this wealth of criminal investigative information brings with it the management challenges of creating the best investigative and strategic uses, sharing information with other Federal, State, and local authorities, protecting citizen privacy, and fully informing Congress and the public.

The case analysis presented here will help us develop the most effective possible enforcement strategies. This report demonstrates the effectiveness of State and local law enforcement agencies and prosecutors joining ATF in "following the crime gun" to the gun's illegal supplier, and targeting that supplier and others in the chain of illegal transfers. It may be the gun of the drug dealer, the violent gang member, the repeat felon, parolee or probationer, the domestic violence offender, the juvenile, or any other person prohibited from possessing a firearm. Gun traffickers are often criminals in other respects, and trafficking investigations provide another means to prevent them from harming the community.

This report is strong evidence of the support ATF receives from the U.S. Attorneys and other prosecuting attorneys on a daily basis. Our review would not have been possible without the assistance from valuable academic partners and the Bureau of Justice Statistics, as well as support from the Department of the Treasury. We also want to thank the many State and local law enforcement agencies who directly participated in the vast majority of investigations described in this report. Every member of the study team joins me in expressing our gratitude.

Bradley A. Buckles

# Table of Contents

FOREWORD .................................................................................................. iii

EXECUTIVE SUMMARY ............................................................................. ix

1. INTRODUCTION ....................................................................................... 1

2. FIREARMS TRAFFICKERS AND FIREARMS TRAFFICKING LAWS ................. 3
   2-1. Firearms trafficking and diversion ......................................................... 3
       Diversion and stolen firearms .............................................................. 3
       Types of trafficking ............................................................................. 3
   2-2. Laws prohibiting trafficking in firearms ................................................. 4
       Prohibitions on firearms acquisition ..................................................... 4
       Regulation of firearms disposition ........................................................ 4
   2-3. Regulatory and criminal enforcement ..................................................... 4
   2-4. Trafficking charges and penalties ........................................................... 5

3. REVIEW OF FIREARMS TRAFFICKING INVESTIGATIONS (July 1996 - December 1998) ....... 7
   3-1. Initiation of Firearms Trafficking Investigations ..................................... 8
   3-2. Traffickers and Trafficking Channels ..................................................... 10
       Firearms trafficking channels identified in ATF investigations ................ 10
       Volume of firearms diverted, by trafficking channel .............................. 12
       Federally licensed dealers conspiring with other traffickers ................... 14
       Federally licensed dealers' impact on the volume of illegal supply .......... 15
       The business premises of licensed dealers in trafficking investigations ... 16
       Gun shows and the diversion of firearms ............................................. 17
       Straw purchasers and the diversion of firearms .................................... 18
       The involvement of juveniles and youth in ATF trafficking investigations ... 19

   3-3. Firearms Misuse, Felons, and Trafficking Investigations .......................... 20
       Trafficked firearms subsequently recovered in crime ............................ 20
       The involvement of felons in firearms trafficking ................................... 22

   3-4. Characteristics of the Investigations ..................................................... 23
       Interstate and intrastate destinations of trafficked firearms ................... 23
       Number of firearms trafficked in ATF investigations ............................. 24
       New, secondhand, and stolen firearms ................................................. 25

   3.5 Characteristics of Case Dispositions ..................................................... 26
       Violations reported in ATF trafficking investigations ............................. 26
       Violations in ATF trafficking investigations involving FFLs .................... 28
       National Firearms Act violations .......................................................... 30
       Recommendations for prosecution ....................................................... 31
       Status of investigations recommended for prosecution .......................... 32
       Federal charges against defendants recommended for prosecution in trafficking
           investigations ............................................................................... 33
       Geographic distribution of Federal prosecutions ................................... 34
       Disposition of defendants recommended for prosecution ....................... 35

4. EXAMPLES OF GUN TRAFFICKERS AND THEIR SENTENCES ....................................... **37**

    Residential FFL trafficker ................................................................................... 37
    Gun store trafficker ............................................................................................ 37
    FFL and Interstate trafficker ............................................................................ 37
    Straw Purchasers/Interstate traffickers ........................................................... 37
    Straw Purchaser/Intrastate trafficker .............................................................. 38
    Traffickers in firearms stolen from gun store dealer ........................................ 38
    Traffickers in firearms stolen from residences ................................................. 38
    Traffickers in firearms stolen from common carrier ........................................ 38
    Straw purchasers and international traffickers ................................................. 39
    Licensed and unlicensed dealers trafficking at gun shows ................................ 39

5. ENFORCEMENT LESSONS LEARNED FROM FIREARMS TRAFFICKING
   INVESTIGATIONS .................................................................................................... **41**
   5-1. Channels of Illegal Supply ............................................................................ 41
   5-2. Impact of Enforcement ................................................................................. 42
   5-3. Enforcement Issues ....................................................................................... 43
   5-4. Investigative Partnerships and Resources .................................................... 44

## LIST OF TABLES

Table 1.   Initiation of ATF Firearms Trafficking Investigations ........................................ 9
Table 2.   Sources of Firearms Trafficking Identified in ATF Investigations ................................. 11
Table 3.   Volume of Firearms Diverted, by Trafficking Channel ...................................... 13
Table 4.   Other Trafficking Channels Involved in FFL Trafficking Investigations ...................... 14
Table 5.   The Influence of FFL Traffickers on the Number of Firearms Trafficked by Straw
            Purchasers, Unlicensed Sellers, and at Gun Shows .................................... 15
Table 6.   Business Premises of a 20 Percent Random Sample of FFLs Involved in
            Trafficking Investigations ....................................................................... 16
Table 7.   Relationships Between Straw Purchaser and Trafficker ..................................... 18
Table 8.   The Role of Youth and Juveniles in Trafficking Investigations ......................... 19
Table 9.   Known Criminal Uses of Trafficked Firearms .................................................. 21
Table 10.  Firearms Traffickers and Felons Identified in Trafficking Investigations .................... 22
Table 11.  Interstate, Intrastate, and International Trafficking in ATF Investigations ................. 23
Table 12.  Number of Firearms Involved in ATF Trafficking Investigations ....................... 24
Table 13.  New, Secondhand, and Stolen Firearms in ATF Trafficking Investigations ................ 25
Table 14.  Violations in ATF Trafficking Investigations .................................................... 27
Table 15.  Violations in ATF Trafficking Investigations Involving FFLs ............................ 29
Table 16.  Weapons Associated with NFA Violations in ATF Trafficking Investigations ............. 30
Table 17.  ATF Trafficking Investigations Recommended for Prosecution ....................... 31
Table 18.  Status of Trafficking Investigations Accepted for Prosecution ......................... 32
Table 19.  ATF Description of Charges Against Defendants in Trafficking Investigations
            Recommended for Federal Prosecution .................................................. 33
Table 20.  States in which ATF Recommended Federal Prosecution of Defendants in
            Trafficking Investigations ....................................................................... 34
Table 21.  Disposition of Defendants in Trafficking Investigations Accepted for Prosecution ...... 35

APPENDICES

A: Statutes Relating to Firearms Trafficking ................................................................................. 47

B: Methodology .................................................................................................................................. 52

    Use of surveys ................................................................................................................................ 53

    What these data represent ........................................................................................................... 53

   Survey Forms .................................................................................................................................. 55

# EXECUTIVE SUMMARY

Many criminals obtain their guns from the illegal market supplied by a variety of sources: unlicensed sellers who buy guns with the purpose of reselling them; fences; corrupt Federal firearms licensees (FFLs); and straw purchasers who buy guns for other unlicensed sellers, criminal users, and juveniles. It is the responsibility of the Bureau of Alcohol, Tobacco and Firearms (ATF), often working together with State and local law enforcement agencies, to investigate this criminal trafficking in firearms, arrest the perpetrators, and refer them to U.S. Attorneys for prosecution.

To report on the problem and the Federal enforcement response to it, ATF documented and analyzed the criminal investigations involving firearms traffickers that it initiated from July 1996 through December 1998, from commencement of the investigation to sentencing by a court. This review builds on an earlier examination of the illegal acquisition of firearms by youth and juveniles, prepared in response to a request by Congress.[1] The information for both reports derived from surveys of the ATF special agents responsible for the investigations.[2]

The analysis documents an aggressive, productive effort that led to the prosecution, conviction, and sentencing of hundreds of firearms traffickers during this period. It also suggests that this effort could be rendered still more effective with continued improvements in investigative techniques and enforcement tools.

## The investigations and the trafficked firearms

*Trafficking and armed offender investigations.* ATF initiated 1,530 firearms trafficking investigations during the period July 1996 through December 1998, which comprised only a portion of ATF's firearms investigations. Most ATF firearms investigations were initiated specifically to target offenders who committed acts of armed violence or were considered potentially violent — armed career criminals, armed narcotics traffickers, and felons in possession of firearms — as part of locally designed strategic efforts to reduce drug trafficking and violent gang activity, and violent crime generally. ATF trafficking investigations complement these enforcement strategies by reducing the illegal availability of firearms to such armed violent offenders as well as to juveniles, and by identifying and arresting other violent criminals through investigations of firearms trafficking activity.

*Removing guns from the streets.* The targets of the ATF trafficking investigations during this period diverted a total of 84,128 firearms from legal to illegal commerce. ATF estimates that agents seized a quarter of these firearms in connection with the investigations themselves, removing them from the illegal market. The remainder of the trafficked firearms were documented during the criminal investigation or later recovered in crimes. Trafficked firearms may continue to be recovered by law enforcement officials and traced long after traffickers are arrested and incarcerated.

*How ATF initiates trafficking investigations.* Most of the trafficking investigations were initiated based on traditional case methods, such as referrals from other agencies and information provided by confidential informants. One in every five investigations, however, was triggered by information provided by Federal firearms licensees through tips or mandatory reporting to ATF concerning lost or stolen firearms.

---

[1] *Performance Report* for the Senate and House Committee on Appropriations, Youth Crime Gun Interdiction Initiative, Department of the Treasury, Bureau of Alcohol, Tobacco and Firearms, February 1999.

[2] The survey was designed by Dr. Anthony A. Braga, of the John F. Kennedy School of Government, Harvard University, who also prepared the tables in this report, in consultation with ATF. For a full description of the methodology, see Appendix B.

*Role of firearms tracing.* Almost 30 percent of the investigations (448 of 1,530) were initiated through the innovative investigative methods of information analysis – analysis of firearms trace data, multiple firearms sales records, or both. After initiation of the investigations, tracing was used as an investigative tool to gain information on recovered crime guns in 60 percent of the investigations (918 of 1,530). These findings show that crime gun trace analysis and on-line Project LEAD, the National Tracing Center's firearms trafficking information system, are being widely used to increase ATF's productivity in the development of firearms trafficking investigations. Almost 60 percent of the investigations involved secondhand guns, which are very difficult to trace because unlicensed sellers are not required to keep any transfer records, and there is no effective way to track a gun beyond the first retail sale. Investigative use of firearms and ballistics trace information by Federal, State, and local law enforcement to identify traffickers and armed offenders is a developing capability that should be strengthened.

## Traffickers and armed criminals

*Traffickers supply criminals and juveniles with guns.* Traffickers move guns onto the streets and into the hands of criminals. Over half of the trafficking investigations involved firearms known to have been subsequently involved in additional criminal investigations, including investigations of homicide and robbery, assault, felon in possession of firearms, and illegal gun possession. Juveniles were involved in about 14 percent of the investigations (209) as possessors, thieves and robbers, and traffickers. The number of crime guns linked to particular traffickers by ATF in investigations or through firearms and ballistics tracing is likely to understate significantly the role of trafficked firearms in violent crime. Investigative resources for trafficking cases are limited, and firearms and ballistics tracing are not yet fully developed and available to law enforcement agencies.

*Trafficking investigations lead to armed violent felons.* When law enforcement follows the gun used by the criminal to its illegal supplier, the investigation often leads to another violent criminal. Convicted felons play a significant role in firearms trafficking. About 23 percent of the investigations included violations involving convicted felons buying, selling, or possessing firearms. A quarter (669) of the traffickers identified in the investigations were convicted felons. About 45 percent of the trafficking investigations involved convicted felons in various roles, including trafficking and receiving trafficked firearms.

## Traffickers and trafficking channels

*Different types of traffickers and trafficking channels.* Firearms traffickers are using a variety of channels to divert firearms, and investigations usually involve multiple trafficking channels, such as a corrupt FFL and a straw purchaser, or theft and unlicensed dealing.

*Corrupt FFLs as major traffickers.* Although FFLs were involved in under 10 percent of the trafficking investigations, they were associated with the largest number of diverted firearms – over 40,000 guns, nearly half of the total number of trafficked firearms documented during the two-year period. The mean number of trafficked guns involved in any case in which an FFL figured was over 350. When an FFL was acting as the sole trafficker in the investigation, or working with an unlicensed dealer, the mean number of guns per investigation rose to over 550. Clearly, FFLs' access to large numbers of firearms makes them a particular threat to public safety when they fail to comply with the law. Investigations focused on retail gun stores, pawnshops, and residential FFLs. The 133 investigations of FFLs revealed a variety of violations, including failure to keep required records, transfers to prohibited persons, offenses involving National Firearms Act weapons, making false entries in record books, and conducting illegal out-of-state transfers.

*Gun shows.* Gun shows were a major trafficking channel, involving the second highest number of trafficked guns per investigation (more than 130), and associated with approximately 26,000 illegally diverted firearms. The investigations involved both licensed and unlicensed sellers at gun shows.

*Straw purchasers.* Straw purchasing was the most common channel in trafficking investigations. Almost half of all the trafficking investigations involved straw purchasers. Therefore, although the average number of firearms trafficked per straw purchase investigation was relatively small, 37 firearms, there were nearly 26,000 firearms associated with these investigations.

*Unlicensed sellers.* Unlicensed sellers were a focus of about a fifth of the trafficking investigations, and involved an average of about 75 guns per investigation and almost 23,000 guns. Unlicensed sellers range from individuals who knowingly sell guns to criminals from their personal collections to interstate gun runners buying guns to sell to gangs and drug organizations.

*Firearms theft.* Firearms theft is an important source of trafficked firearms. Firearms stolen from FFLs, residences, and common carriers were involved in over a quarter of the trafficking investigations. Investigations involving firearms stolen from residences and federally licensed firearms dealers were associated with over 9,000 trafficked firearms. There were a handful of investigations involving thefts of firearms from common carriers, but such thefts may involve a large number of firearms. ATF is proposing a regulation that would require FFLs to report guns missing in shipment.

## Productive partnerships between ATF, U.S. Attorneys, and State and local authorities

*Successful prosecutions.* Over 1,000 of ATF's trafficking investigations were referred to prosecutors. Prosecutors accepted 90 percent of ATF's trafficking case referrals, involving more than 1,700 defendants. At the time of the survey, over 60 percent of the defendants were fully adjudicated. Over 1,000 traffickers — 97 percent of those adjudicated — were found guilty and sentenced in Federal, State, and local courts. Over three-quarters received sentences of incarceration up to life in prison; most of the remainder received probation. Altogether, as a result of these investigations, 812 defendants were sentenced in Federal court to a cumulative 7,420 years in prison, with an average sentence of about nine years.

*State and local law enforcement role.* More than 33,000 offenders were convicted of felony firearms-related offenses in State and local courts in 1996.[3] State or local law enforcement agencies participated in 68 percent (1,037 of 1,530) of the ATF trafficking investigations. Although only about 3 percent of ATF's case referrals and about 10 percent of the defendants referred were to State and local prosecutors, about 70 percent of ATF's investigations involved intrastate trafficking and about 10 percent involved guns stolen from residences. This suggests that where there are applicable laws, State and local law enforcement play an important role in curbing the illegal market in firearms.

*Enforcement challenges.* Investigators and prosecutors face challenges building successful cases against firearms traffickers. Prosecutors accepted over 60 percent of trafficking cases referred by ATF that involved straw purchasers and dealing by unlicensed sellers, but in the majority of cases proceeded with other charges, not related on their face to firearms trafficking. Also notable is that although FFLs are associated with the largest volume of trafficked firearms, many FFL violations are misdemeanors rather than felonies, presenting a dilemma for prosecutors who

---

[3] Jodi M. Brown, Patrick A. Langan, and David J. Levin, *Felony Sentences in State Courts*, 1996. Bureau of Justice Statistics (1999).

understandably give priority to crimes with greater penalties. Similarly, sentencing guidelines do not provide for increased penalties for trafficking crimes involving truly large scale trafficking — more than 50 firearms. The most important conclusion to be drawn from this case review is that prosecutors are finding ways to prosecute criminal traffickers despite these issues. Law enforcement authorities, however, must in effect build a double case against many firearms traffickers, identifying non-trafficking conduct that can be the basis for a strong criminal case.

Gun traffickers play a critical and deadly role in the chain of violence. They are a principal source of firearms for criminals. Although some guns are bought legally and used in crime, the many thousands of guns that traffickers supply illegally, without a Brady background check or an FFL transfer record that enables tracing, are firearms that are likely to be associated with other crimes. While the success of the firearms trafficking enforcement effort is to be measured by a reduction in gun violence, it is clear that enforcing Federal laws against firearms traffickers has a deservedly high priority.

# 1. INTRODUCTION

When the Gun Control Act of 1968 (GCA) was enacted, Congress declared that its primary purpose was to "keep firearms out of the hands of those not legally entitled to possess them . . . and to assist law enforcement authorities in the States and their subdivisions in combating . . . crime in the United States." Many criminals obtain their guns from the illegal market supplied by a variety of sources: unlicensed sellers who buy guns with the purpose of reselling them; fences; corrupt Federal firearms licensees (FFLs); and straw purchasers who buy guns for other unlicensed sellers, criminals, and juveniles.[4] It is the responsibility of the Bureau of Alcohol, Tobacco and Firearms (ATF), often working together with State and local law enforcement agencies, to investigate this criminal trafficking, arrest the perpetrators, and refer them to U.S. Attorneys for prosecution.

ATF has pursued cases against firearms traffickers throughout its history. Starting in 1996, through the Youth Crime Gun Interdiction Initiative and related enforcement and training programs, ATF increased its efforts to work with State and local law enforcement agencies to expand the tracing of guns recovered by police, and to make discovery of the source of the crime gun, and criminal prosecution of the illegal supplier of firearms, a routine aspect of the investigation and prosecution of armed criminals and juveniles.

This report documents ATF criminal investigations involving firearms traffickers that were initiated from July 1996 through December 1998. The report begins by explaining how the nation's firearms laws prohibit illegal transfers of firearms. It then presents an analysis of more than 1,500 ATF firearms trafficking investigations as reported in a survey of ATF field agents. The report also analyzes the agents' reports of the disposition of the cases — the violations referred by ATF, the charges filed and verdicts won by U.S. Attorneys and State and local prosecutors, and the sentences imposed by courts. Finally, the report discusses lessons learned from these investigations and conclusions about the further development of an integrated firearms enforcement strategy against armed criminals and the illegal suppliers who fuel their gun violence.

During the period of review, trafficking investigations comprised only a portion of ATF's firearms investigations. Most ATF firearms investigations specifically targeted violent offenders — armed career criminals, armed narcotics traffickers, and felons in possession of firearms — as part of locally designed strategic efforts to reduce drug trafficking and violent gang activity, and violent crime generally. The gun trafficker, however, also plays a critical role in the chain of violence. Whether a single straw purchaser buying a TEC-9 at a gun show for a high school student, a corrupt licensed dealer selling a silencer to a felon who fails a Brady check, or a gun runner funneling guns to an urban gang, these are violators who demand the full enforcement attention of ATF and our State and local partners. In addition to being traffickers, these violators are also often themselves violent offenders. ATF issues this report to assess and strengthen our efforts, to broaden public understanding, and to support other law enforcement authorities in their efforts to confront the illegal trafficker in guns.

---

[4] Under current law, a "straw purchase" occurs when the actual buyer of a firearm uses another person, the "straw purchaser," to execute the paperwork necessary to purchase a firearm from an FFL. The "straw purchaser" violates the GCA by making a false statement with respect to information required to be kept in the FFL's records.

# 2. FIREARMS TRAFFICKING AND FIREARMS TRAFFICKING LAWS

The Gun Control Act has a dual framework for keeping firearms out of the wrong hands – prohibiting certain people from possessing guns and regulating the sale of guns. A variety of provisions of the GCA are used to investigate and prosecute firearms traffickers. Unlike criminal misuse of guns, however, firearms trafficking charges can be hard to prove. This has often made cases against firearms traffickers more complicated and challenging than other kinds of gun cases.

## 2-1. Firearms Trafficking and Diversion

Because initially all crime guns start off as legally owned firearms, the term "firearms trafficking" refers to the illegal diversion of legally owned firearms from lawful commerce into unlawful commerce, often for profit. The term "trafficking" has a different meaning in the firearms context than in the context of drug trafficking, where it usually refers to the illegal manufacture, transportation, and smuggling of large quantities of illicit drugs.

### Diversion and Stolen Firearms

ATF uses the term "diversion," in addition to "trafficking." "Diversion" is a broader term than "trafficking," and encompasses any movement of firearms from the legal to the illegal marketplace through an illegal method or for an illegal purpose. For example, a criminal who steals a firearm from a licensee for his own personal use is participating in the illegal diversion of a firearm, but he is not a trafficker. Thus, while the theft of firearms may involve a criminal stealing one or more firearms for his own use, or may involve subsequent trafficking, addressing stolen firearms is an important part of a firearms trafficking strategy because theft constitutes one means of the illegal supply of firearms. In this report, "trafficking" and "diversion" are used synonymously, even though, strictly speaking, diversion is a broader term. Investigations involving gun theft are included in the report only when they also involve trafficking in stolen guns.

### Types of Trafficking

Firearms trafficking includes:

- Trafficking in *new* firearms, interstate and intrastate, including by federally licensed firearms dealers, large scale straw purchasers or straw purchasing rings, or small scale straw purchasers, from gun stores, gun shows, or other premises;

- Trafficking in *secondhand* firearms, interstate and intrastate, including by licensed firearms dealers, including pawnbrokers, large scale straw purchasers or straw purchasing rings; small scale straw purchasers, unlicensed sellers, including at gun shows, flea markets, or through newspaper ads, gun magazines, the Internet, and personal associations; and bartering and trading within criminal networks.

- Trafficking in new and secondhand *stolen* firearms, involving guns stolen from federally licensed dealers, including pawnbrokers, manufacturers, wholesalers, and importers, theft from common carriers, home invasions, and vehicle theft.

Firearms theft is often associated with trafficking. ATF investigates thefts from Federal firearms licensees who are required to report thefts or losses to ATF. ATF also investigates thefts from common carriers, some of which voluntarily report thefts to ATF. State and local law enforcement officials may involve ATF when there is a wave of local burglaries apparently for the purpose of obtaining firearms that may then be trafficked. Federal law does not require individual firearms owners to report the theft or loss of a firearm, though owners may report losses to local authorities and/or the FBI in order to assist law enforcement and facilitate the return of the stolen property should it be recovered.

## 2-2. Laws Prohibiting Trafficking in Firearms

One of the primary purposes of the Gun Control Act of 1968 (GCA) was to provide support to State and local law enforcement officials in their fight against violent crime and to assist them in enforcing their own firearms laws. Prior to enactment of the GCA, differences among State laws made it difficult for State and local officials to enforce their laws. Unrestricted mail-order sales of firearms and the ability of persons to acquire firearms in other less restrictive States prevented many States from effectively enforcing their laws. The GCA remedied this situation by providing a Federal scheme that channels interstate commerce in firearms through Federally licensed dealers, who are required to transfer firearms in accordance with State and local law. The interstate controls of the GCA also generally require Federal firearms licensees to transfer firearms only to residents of the State where their premises are located and restrict unlicensed persons to acquiring firearms within their State of residence. Licensees, however, may transfer long guns to non-residents if they meet in person with the purchaser and the sale complies with the applicable State laws for both buyer and seller.

The GCA also imposes a number of restrictions on persons who acquire or attempt to acquire firearms as well as restrictions on persons who dispose of firearms.

### Prohibitions on Firearms Acquisition

The GCA makes it unlawful for certain "prohibited persons," such as convicted felons, fugitives, persons adjudicated mentally ill, and certain domestic violence offenders to possess firearms.[5] With limited exceptions, it is unlawful for anyone under the age of 18 to possess a handgun. Persons who acquire firearms from FFLs must certify their eligibility to purchase firearms, and it is illegal to provide false information in purchasing a firearm. A person purchasing a firearm from an FFL may only acquire a firearm for himself or herself unless he or she is purchasing a firearm for someone else as a gift.

### Regulation of Firearms Disposition

Sales regulation is aimed at preserving a State's authority to control commerce in firearms within its borders, as well as to help restrict supply to persons prohibited by Federal law from buying firearms. The GCA requires individuals who are engaged in the business of dealing in firearms to obtain a Federal firearms license. A condition of the Federal license is that the licensee also obeys State and local requirements governing gun sales. The GCA's "interstate controls" make it unlawful for unlicensed individuals to sell any firearms across State lines, or for Federal firearms licensees to deliver handguns to residents of another State. An FFL may not sell a handgun to anyone under the age of 21, or a long gun to anyone under the age of 18. Since 1994, the Brady Act has required FFLs to conduct background checks to determine whether a purchaser is prohibited. FFLs are required to maintain records of the acquisition and disposition of firearms, report multiple handgun sales, report lost or stolen firearms to ATF, and provide transaction records for firearms traces initiated by law enforcement.[6]

## 2-3. Regulatory and Criminal Enforcement

ATF's firearms trafficking efforts include both regulatory and criminal enforcement of these requirements. Regulatory enforcement aims to ensure FFL compliance with the GCA rules

---

[5]  18 U.S.C. § 922.

[6]  Federal law does not require all sellers of guns to obtain a Federal firearms license. In fact, the GCA specifically provides that a person who makes "occasional sales, exchanges, or purchases of firearms for the enhancement of a personal collection or for a hobby, or who sells all or part of his personal collection of firearms" is not required to obtain a firearms license 18 U.S.C. § 922 (a) (21) (c). Unlicensed sellers are prohibited from knowingly selling a firearm to a person prohibited by law from possessing a firearm. However, they are not required to conduct Brady background checks to determine if their buyer is a prohibited person, nor are they required to maintain records that permit the firearm to be traced if it is recovered by law enforcement officials in connection with a crime.

governing the conduct of the firearms business, and focuses its inspection efforts on FFLs associated with indicators of trafficking. FFLs that violate the rules may be subject to revocation of their license, as well as to criminal prosecution. Regulatory enforcement is described in a recent ATF report.[7]

## 2-4. Trafficking Charges and Penalties

No section of the GCA is specifically devoted to punishing the diversion of firearms from lawful to unlawful channels. There are a variety of firearms violations that may be charged in a case involving trafficking. Certain GCA violations, however, are more relevant than others to building cases against traffickers. The charging decision often involves an assessment of the full scope of conduct, the penalties attached to particular charges, and possible defenses at trial.

The two most straightforward trafficking offenses are engaging in the business of dealing in firearms without a license, *see* 18 U.S.C. § 922(a)(1)(A), and traveling into another State to acquire a firearm in furtherance of an intent to violate section 922(a)(1)(A), *see* 18 U.S.C. § 924(n). There are many trafficking cases, however, in which neither of these statutes will be cited, primarily for two reasons. First, cases brought against unlicensed dealers under section 922(a)(1)(A) present prosecution challenges because of the statutory definition of "engaged in the business" in the 1986 amendments to the GCA.[8] Second, ATF firearms trace information indicates that most firearms traffickers acquire firearms in the State in which they are selling them. In such cases, section 924 (n) is not applicable.

When these two offenses are not available, alternative charges are brought. These charges may not, at first glance, appear relevant to firearms trafficking. Depending on the facts of the case, a defendant who was engaged in trafficking may be charged with one or more of the following violations:

- The serial numbers on firearms are often obliterated to make it impossible to trace the firearms. This happens in conjunction with stolen firearms, and it is also an indicator of firearms trafficking. *If it can be established that the defendant knowingly possessed firearms with obliterated serial numbers, and the firearm has at any time been shipped or transported in interstate commerce, then the defendant may be charged with violating 18 U.S.C. § 922(k).*

- Firearms traffickers often present false identification documents to Federal firearms licensees when obtaining firearms. This ensures that the firearms cannot be traced back to the trafficker and circumvents the required Brady background check. In addition, traffickers often use "straw purchasers" to falsely represent to the licensee that they are the actual purchasers of the firearm. *If it can be established that the trafficker or "straw purchaser" lied to the licensee about a material fact, or presented a false identification document in connection with the purchase of the firearm, the trafficker or "straw purchaser" may be charged with violating 18 U.S.C. § 922(a)(6) or aiding and abetting such a violation.* Straw purchasing itself, that is, the practice of buying firearms from an unlicensed dealer on behalf of someone else, is not unlawful.

- Criminals often steal firearms for the purpose of trafficking them. *If it can be established that the firearms were stolen, and that the defendant transported the*

---

[7]  *Commerce in Firearms in the United States*, Department of the Treasury, Bureau of Alcohol, Tobacco and Firearms, February 2000.

[8]  The term "engaged in the business" means . . . "as applied to a dealer in firearms, . . . a person who devotes time, attention, and labor to dealing in firearms as a regular course of trade or business with the principal objective of livelihood and profit through the repetitive purchase and resale of firearms, but such term shall not include a person who makes occasional sales, exchanges, or purchases of firearms for the enhancement of a personal collection or for a hobby, or who sells all or part of his personal collection of firearms. . . ." 18 U.S.C. § 921(a)(21)(C).

*firearms in interstate commerce knowing or having reasonable cause to believe that they were stolen, the defendant may be charged with violating 18 U.S.C. § 922(i). If it can be established that the defendant stole the firearms from a licensee and the firearm has been shipped in interstate or foreign commerce, the defendant may be charged with violating 18 U.S.C. § 922(u).*

- Many traffickers distribute firearms to criminals and gang members knowing that the recipients intend to use the firearms for criminal purposes. *If it can be established that the defendant transferred the firearm, knowing that the firearm will be used in a crime of violence or a drug trafficking crime, the defendant may be charged with violating 18 U.S.C. § 924(h).*

- Traffickers may distribute handguns to juvenile gang members and other individuals under the age of 18. *If it can be established that the defendant transferred a handgun to an individual knowing or having reasonable cause to believe that the transferee was under the age of 18, and none of the statutory exemptions apply, the defendant may be charged with violating 18 U.S.C. § 922(x)(1).*[9]

- Certain "corrupt" dealers cooperate with traffickers by knowingly maintaining false records of acquisition and disposition, or failing to keep required records. *If it can be established that a firearms licensee knowingly made a false statement in required records, the licensee may be charged with violating 18 U.S.C. § 924(a)(1)(A).*

- *A person who illegally traffics in certain weapons covered by the National Firearms Act (NFA), such as machine guns, short barrel shotguns, short barrel rifles, and silencers, can be prosecuted for violations of the NFA, 26 U.S.C. Chapter 53.*

- Finally, in some cases the individual suspected of trafficking is also a felon. While it may be difficult to prove that the defendant was engaged in the business of dealing in firearms, the evidence clearly establishes that he was a felon in possession of firearms. *If it can be established that the defendant possessed firearms after being convicted of a crime punishable by a term exceeding one year, the defendant may be charged with violating 18 U.S.C. § 922(g)(1). If it can be established that any person transferred a firearm to a prohibited person knowing or having reasonable cause to believe that the person was prohibited then the transferor may be charged with violating 18 U.S.C. 922(d). If the defendant had been convicted of three prior violent felonies or serious drug offenses, however, the defendant may receive an enhanced 15 year sentence under the Armed Career Criminal Act. 18 U.S.C. § 924(e).*

These examples are not exhaustive. Rather they illustrate the principle that not all trafficking cases involve criminal statutes readily identified as penalizing "trafficking" or involving "trafficking" charges. Although these charges are not uniquely "trafficking" charges, they are the statutory tools that investigators and prosecutors most often use in trying to punish and deter firearms traffickers. In ATF's view, even though the perpetrator may not be charged with "trafficking in firearms," as there is no such specific criminal violation, the goal is to get illegal traffickers off the street and prevent others from emerging, by prosecuting them to the fullest extent possible under the Federal firearms laws.

One of the conclusions drawn from the case review presented here is that persons who traffick in firearms are often not being prosecuted for that conduct; rather, they are instead being prosecuted for other related conduct.

---

[9] Exceptions from the transfer and possession prohibitions of § 922 (x) are provided for the following temporary transfers, if the juvenile has prior written consent from a parent and the consent is in the juvenile's possession at all times: (1) employment; (2) ranching or farming; (3) target practice; (4) hunting; and (5) firearms safety instruction. Permanent transfers of handguns to juveniles are also authorized under the statute for juveniles who are members of the Armed Forces.

# 3. REVIEW OF FIREARMS TRAFFICKING INVESTIGATIONS

## July 1996 - December 1998

The case review presented in this report originated in a Congressional request for information about ATF's enforcement activities. Specifically, the House and Senate Committees on Appropriations requested ATF to report on trafficking investigations by February 1999 in connection with funding for ATF's Youth Crime Gun Interdiction Initiative (YCGII), the component of ATF's firearms enforcement programs focused on illegal acquisition, possession, and use of guns by youth and juveniles.[10]

In response, ATF Headquarters requested all ATF Special Agents in Charge to provide information on all firearms trafficking investigations in their respective areas between July 1996 (the commencement date of YCGII) and December 1998 (the end of the last calendar year before February 1999). A survey was sent to each Field Division requesting information for each investigation (see Appendix B).

The 23 ATF Field Divisions submitted a total of 1,530 reports on investigations, including ongoing investigations and perfected cases referred for prosecution. Information on 648 investigations involving youth and juveniles were reviewed and provided the basis for a report to Congress on the performance of YCGII in February 1999.[11] In this report, ATF and an outside researcher review all 1,530 investigations, using the survey forms submitted.[12]

This report also reviews the disposition of cases referred by ATF for prosecution. To develop disposition information, ATF in December 1999 sent supplementary surveys for the 1,530 submitted investigations to the 23 ATF Field Divisions (see Appendix B). All surveys were returned to ATF Headquarters by March 15, 2000 for analysis by ATF personnel and outside researchers. Case disposition information was reviewed by outside researchers working with the Bureau of Justice Statistics, which has statutory authority for collecting and maintaining Federal case disposition information.[13]

The case review is presented in five sections: initiation of firearms trafficking investigations; traffickers and trafficking channels; firearms misuse, felons, and trafficking investigations; characteristics of the investigations; and characteristics of case dispositions.

---

[10] The Statement of Managers accompanying the 1998 Conference Report stated that: "the conferees believe that the proposed increase in funding must be supported by evidence of a significant reduction in youth crime, gun trafficking, and gun availability. The conferees would like to see additional evidence linking the Youth Crime Gun Interdiction Initiative (YCGII) to a corresponding decrease in gun trafficking among youths and minors. Therefore, the conferees direct ATF to report no later than February 1, 1999 on the performance of YCGII." Conference Report to Accompany H.R. 4328, October 19, 1998.

[11] See *Youth Crime Gun Interdiction Initiative: Performance Report.* Report to the Senate and House Committees on Appropriations Pursuant to Conference Report 105-825, October 1998. Department of the Treasury, Bureau of Alcohol, Tobacco, and Firearms, 1999.

[12] Dr. Anthony A. Braga of the John F. Kennedy School of Government, Harvard University.

[13] Dr. Anthony A. Braga of the John F. Kennedy School of Government, Harvard University and Dr. Joel Garner of the Joint Centers for Justice Studies, Sheperdstown, West Virginia.

## 3-1. Initiation of Firearms Trafficking Investigations

*Traditional methods.*  ATF firearms trafficking investigations were most frequently initiated after a referral from other law enforcement agencies or through information provided by confidential informants.

*FFL cooperation.*  In about nine percent of the investigations, Federal firearms licensees (FFLs) reported suspicious activity to ATF, such as suspected straw purchasing or the use of false identification to obtain firearms.  Almost eight percent of the investigations were initiated by FFLs reporting burglaries, thefts, and robberies to ATF.  ATF maintains a database on firearms that FFLs report as stolen or missing; this information is used to initiate investigations and in connection with regulatory compliance inspections.

*Innovative use of information resources: tracing and multiple sales forms.*  Although many investigations were initiated via traditional law enforcement leads, many others were initiated through the use of crime gun trace information and multiple sales information.[14]  Nearly 20 percent of the investigations were initiated through trace analysis after the recovery of crime guns, and slightly more than 13 percent of the investigations were initiated after reviewing multiple firearms sales records.  Almost 30 percent of all ATF firearms trafficking investigations between July 1996 and December 1998 were initiated either through the analysis of trace data, multiple firearms sales records, or both (448 of 1,530).  Beyond the initiation of investigations, tracing was used as an investigative tool to gain information on recovered crime guns in 60 percent of the investigations.[15]

These findings show that crime gun trace analysis and Project LEAD, the National Tracing Center's firearms trafficking information system, are being widely used to increase ATF's productivity in the development of firearms trafficking investigations.  With Project LEAD available on-line to ATF field offices and State and local task forces working with ATF field offices since November 1999, and assuming continuing increased participation in tracing by State and local law enforcement agencies, trace and multiple sales information can be expected to grow in importance as a source of leads to traffickers.  In addition, as law enforcement officials develop the ability to connect spent cartridges and bullets to firearms through the National Integrated Ballistics Information Network (NIBIN), the ability to identify illegal sources of firearms will continue to grow.

---

[14] 18 U.S.C. § 923 (g) (3) (B).  In November 1998, the National Tracing Center began entering multiple sales information into Project LEAD, ATF's firearms trafficking information system, making it available for trafficking investigations.

[15] Information obtained from the Supplemental Survey.

**Table 1.  Initiation of ATF Firearms Trafficking Investigations**

| Reason | Number of investigations | Percent |
|---|---|---|
| Referral from another State, local, or Federal agency | 409 | 26.7 |
| Confidential informant | 352 | 23.0 |
| Trace analysis after firearms recovery | 296 | 19.4 |
| Review of multiple sales forms | 205 | 13.4 |
| FFL reported suspicious activity | 139 | 9.1 |
| Developed from another ATF investigation | 127 | 8.3 |
| FFL reports burglary/ theft / robbery to ATF | 115 | 7.5 |
| ATF initiated investigation of suspicious activity (e.g. gun show task force, interstate theft task force, etc.) | 81 | 5.3 |
| ATF Regulatory inspection of FFL records | 43 | 2.8 |
| Tip by concerned citizen or anonymous source | 37 | 2.4 |
| Other | 9 | 0.6 |

Number of investigations included = 1,530

Note:  Sum may exceed 100 percent since investigations may be included in more than one category.

## 3-2. Traffickers and Trafficking Channels

For law enforcement agencies in any community, a key challenge is to identify the sources of illegal supply of firearms, the types of traffickers, and the predominant types of trafficking channels. For instance, if criminals in a particular community are obtaining firearms through theft from lawful firearms owners, law enforcement and community public safety strategies must focus on reducing theft.[16] To the extent that the illegal market in firearms is supplied by transactions at FFLs in new and secondhand firearms, whether pawnbrokers, other retail dealers, or residential licensees, an enforcement response to these sources is required.

The records of purchase denials under the Brady Act show that prohibited persons, including some violent felons, do seek to acquire guns from FFLs.[17] This review confirms that retail transactions in new and secondhand firearms with FFLs and unlicensed sellers supply the illegal market, and also that stolen firearms are trafficked by unlicensed dealers.

### Firearms Trafficking Channels Identified in ATF Investigations

*Retail transactions: straw purchasing, unlicensed sellers, and corrupt FFLs.* The most frequent type of trafficking channel identified in ATF investigations is straw purchasing from federally licensed firearms dealers. Nearly 50 percent of the ATF investigations involved firearms being trafficked by straw purchasers either directly or indirectly. The investigations also involve trafficking by unlicensed sellers (more than 20 percent); by federally licensed dealers (just under 9 percent); and diversion from gun shows and flea markets by FFLs or unlicensed sellers (about 14 percent).

*Theft as a source of trafficked firearms.* Firearms stolen from FFLs, residences, and common carriers were involved in 26 percent of the trafficking investigations. ATF's trafficking investigations show that firearms may be stolen and subsequently trafficked from a variety of sources, including FFL dealers, pawnbrokers, residences, and common carriers. These stolen firearms may be sold subsequently by individuals and groups specializing in firearms trafficking or by those fencing a variety of stolen goods.[18]

---

[16] See e.g. James D. Wright, 1995, "Ten Essential Observations on Guns in America," *Society* March/April: 63 – 68; Philip J. Cook, Stephanie Molliconi, and Thomas B. Cole, 1995, "Regulating Gun Markets," *Journal of Criminal Law and Criminology* 86: 59-92; James D. Wright and Peter H. Rossi, 1994, *Armed and Considered Dangerous: A Survey of Felons and Their Firearms,* Expanded Edition, New York: Aldine De Gruyter; Bureau of Justice Statistics. 1993. "Survey of State Prison Inmates, 1991" Washington, DC: US Department of Justice; Joseph F. Sheley and James D. Wright. 1993. "Gun Acquisition and Possession in Selected Juvenile Samples." *Research in Brief.* Washington, DC: US Department of Justice.

[17] Since the passage of the Brady Act, more than 500,000 prohibited persons have been prevented from buying firearms from FFLs.

[18] Two studies conducted in New York suggested that firearms trafficking was an important source of guns for criminals. A review of a 1973 analysis of stolen firearms by the New York City Police Department showed that, beyond residential burglaries, firearms are stolen from a variety of sources, including burglaries and robberies of manufacturers, licensed dealers, and during shipping, that stolen firearms are sometimes subsequently trafficked by thieves, and that stolen firearms are rapidly recovered in crime after theft. Steven Brill, 1977, *Firearms Abuse: A Research and Policy Report,* Washington, D.C.: Police Foundation. About 40 percent of 22 stolen firearms examined by Brill were recovered in crime within six months after the theft; Brill rightly cautions against over-interpreting these data due to small sample size. A 1992 examination of illegal trafficking of firearms into New York City noted that straw purchasers and corrupt federally licensed dealers illegally divert firearms to criminal consumers. Jeremy Travis and William Smarrito. 1992, "A Modest Proposal to End Gun Running in America," *Fordham Urban Law Journal* 19: 795 – 811.

---

*Regional variations.* Regional variations in the trafficking channels in ATF investigations suggest that the illegal market in guns may operate differently in different areas of the country. For instance, straw purchasing was involved in almost two thirds of ATF's trafficking investigations in its Northeast region, but closer to a quarter of its trafficking investigations in its Southwest and Western regions.[19] However, without additional information, it is not possible to know whether regional differences reflect differences in investigative practice, in the illegal market, or both.

### Table 2. Sources of Firearms Trafficking Identified in ATF Investigations

| Source | Number of investigations | Percent |
|---|---|---|
| Firearms trafficked by straw purchaser or straw purchasing ring | 709 | 46.3 |
| Trafficking in firearms by unlicensed sellers* | 314 | 20.5 |
| Trafficking in firearms at gun shows and flea markets | 212 | 13.9 |
| Trafficking in firearms stolen from FFL | 209 | 13.7 |
| Trafficking in firearms stolen from residence | 158 | 10.3 |
| Firearms trafficked by licensed dealer, including pawnbroker | 133 | 8.7 |
| Street criminals buying and selling firearms from unknown sources** | 95 | 6.2 |
| Trafficking in firearms stolen from common carrier | 31 | 2.0 |
| Unlicensed manufacture of common firearms or NFA weapons | 16 | 1.0 |
| Other sources (e.g. selling firearms over Internet, illegal pawning) | 18 | 1.1 |

Number of investigations included = 1,530

Note: Sum may exceed 100 percent since investigations may be included in more than one category.

\* As distinct from straw purchasers and other traffickers.

\*\* These were investigations in the early stages where trafficking channels were not yet fully clear.

---

[19] The Northeast region consisted of trafficking investigations submitted by the Boston, New York, Philadelphia, Baltimore, and Washington, D.C. Field Divisions. The Southeast region consisted of trafficking investigations submitted by the Charlotte, Miami, Tampa, Atlanta, Nashville, and New Orleans Field Divisions. The Central region consisted of trafficking investigations submitted by the Chicago, Columbus, Detroit, Kansas City, Louisville, and St. Paul Field Divisions. The Southwest region consisted of trafficking investigations submitted by the Phoenix, Dallas, and Houston Field Divisions. The Western region consisted of trafficking investigations submitted by the Los Angeles, San Francisco, and Seattle Field Divisions.

## Volume of Firearms Diverted, By Trafficking Channel

The types of trafficking channels differ in the mean number of guns per investigation and the overall number of guns associated with them.

*Trafficking by corrupt FFLs.* Licensed dealers, including pawnbrokers, have access to a large volume of firearms, so a corrupt licensed dealer can illegally divert large numbers of firearms. Although FFL traffickers were involved in the smallest proportion of ATF trafficking investigations, under 10 percent, FFL traffickers were associated with by far the highest mean number of illegally diverted firearms per investigation, over 350, and the largest total number of illegally diverted firearms, as compared to the other trafficking channels.

*Gun shows.* Investigations involving gun shows involved the second highest number of trafficked guns per investigation, over 130, and were associated with over 26,000 illegally diverted firearms.

*Straw purchasers and unlicensed sellers.* Straw purchasing rings and small scale straw purchasers averaged about half as many illegally diverted firearms per investigation (37) as unlicensed dealers (75), but the two types of trafficking channels were associated with a similar number of trafficked firearms overall, over 20,000.

*Stolen firearms.* Investigations involving firearms stolen from residences and FFLs were associated with the smallest mean number of guns per investigation. Because of the small number of investigations involving thefts of firearms from common carriers, this trafficking channel yielded the smallest total number of firearms, although it averaged a substantial number of illegally diverted firearms per investigation.[20]

---

[20] Common carriers are not required to report thefts to ATF, so relatively few such investigations are initiated. However, ATF will soon propose a regulation that would require FFLs to report firearms lost in shipment.

### Table 3. Volume of Firearms Diverted, By Trafficking Channel

| Source | Number of investigations | Number of firearms | Average number of firearms per invest.* | Number of firearms in more than half the investigations** |
|---|---|---|---|---|
| Firearms trafficked by straw purchaser or straw purchasing ring | 695 | 25,741 | 37.0 | 14 |
| Trafficking in firearms by unlicensed sellers*** | 301 | 22,508 | 74.8 | 10 |
| Trafficking in firearms at gun shows and flea markets | 198 | 25,862 | 130.6 | 40 |
| Trafficking in firearms stolen from FFLs | 209 | 6,084 | 29.1 | 18 |
| Trafficking in firearms stolen from residence | 154 | 3,306 | 21.5 | 7 |
| Firearms trafficked by licensed dealer, including pawnbroker | 114 | 40,365 | 354.1 | 42 |
| Trafficking in firearms stolen from common carrier | 31 | 2,062 | 66.5 | 16 |

Number of investigations included = 1,470

Number of firearms included = 84,128

Note: Sum may exceed 100 percent since investigations may be included in more than one category. Excludes 60 investigations with an unknown number of trafficked firearms.

   * Averages were calculated using the mean.

  ** This measure used the median.

 *** As distinct from straw purchasers and other traffickers.

**Federally Licensed Dealers Conspiring With Other Traffickers**

In most firearms trafficking investigations, ATF agents uncovered only one pathway through which guns were diverted or trafficked (80.8 percent, 1,237 of 1,530). Firearms trafficking investigations involving FFLs often involve a mixture of channels, including gun shows (31 percent), straw purchasers (28 percent), and unlicensed sellers (12 percent).

### Table 4. Other Trafficking Channels Involved in FFL Trafficking Investigations

| Trafficking channels | Number | Percent |
|---|---|---|
| Number of investigations involving FFLs | 133 | 100.0 |
|     FFL trafficking alone | 48 | 36.1 |
|     Multiple channels | 85 | 63.0 |
| | | |
| Multiple channels (may be more than one) | | |
|     Trafficking in firearms at gun shows and flea markets | 41 | 30.8 |
|     Firearms trafficked by straw purchaser or straw purchasing ring | 37 | 27.8 |
|     Trafficking in firearms by unlicensed sellers* | 16 | 12.0 |
|     Trafficking in firearms stolen from residence | 6 | 4.5 |
|     Trafficking in firearms stolen from FFLs | 3 | 2.3 |

Note: Sum may exceed 100 percent since investigations may be included in more than one category.

* As distinct from straw purchasers and other traffickers.

## Federally Licensed Dealers' Impact on the Volume of Illegal Supply

Licensed firearms dealers' access to large volumes of firearms can influence the number of firearms illegally diverted in investigations involving gun shows, straw purchasers, and unlicensed sellers. An unlicensed dealer conspiring with a corrupt FFL, for example, may be able to divert larger numbers of firearms to prohibited persons than an unlicensed seller acting alone. When corrupt FFLs act in conjunction with other types of traffickers, the average number of guns diverted per investigation increases dramatically when compared to investigations of gun shows, straw purchasers, and unlicensed sellers that do not involve conspiracy with a corrupt FFL.

**Table 5. The Influence of FFL Traffickers on the Number of Firearms Trafficked by Straw Purchasers, Unlicensed Sellers, and at Gun Shows**

| Source | No FFL involvement | | FFL involvement | |
|---|---|---|---|---|
| | Number of investigations | Average number of firearms per investigation* | Number of investigations | Average number of firearms per investigation* |
| Firearms trafficked by straw purchaser or straw purchasing ring | 659 | 32.8 | 36 | 114.8 |
| Trafficking in firearms by unlicensed sellers** | 285 | 46.6 | 16 | 576.6 |
| Trafficking in firearms at gun shows and flea markets | 161 | 87.9 | 37 | 316.5 |
| Firearms trafficked by licensed dealer, including pawnbroker; no other trafficking channels | —— | —— | 48 | 562.6 |

Number of investigations included = 1,470.

Note: Sum may exceed 100 percent since investigations may be included in more than one category. Excludes 60 cases with an unknown number of trafficked firearms.

 \* Averages were calculated using the mean.
\*\* As distinct from straw purchasers and other traffickers.

**The Business Premises of Licensed Dealers in Trafficking Investigations**

Enforcement information provides some insight into the relative roles of various elements of the licensed dealer population. A 1998 random sample of FFLs identified 69 percent of licensees as retail gun dealers and 10 percent as pawnbrokers. The remaining 21 percent were collectors of curios and relics, manufacturers of firearms and ammunition, and importers. Of the retail dealers and pawnbrokers, 44 percent operated from commercial premises (a quarter of these were gun shops or sporting goods and hardware outlets, while the rest were businesses not normally associated with a gun business, such as funeral homes and auto parts stores), and 56 percent from residential premises, down from 74 percent in 1992.[21]

A 20 percent sample (26 of 133) of FFL trafficking investigations under review here were randomly selected to examine the type of business premises maintained by the FFLs under investigation.

Slightly more than 38 percent were retail dealers and exactly the same number were pawn shops; 23 percent were "kitchen table" or residential dealers. Half of the licensed dealers who maintained a gun store business premises also sold firearms at gun shows. One third of the residential dealers and 20 percent of pawnbrokers also sold firearms at gun shows.

Because of the relatively small sample of cases examined, this table shows the variety of business premises of licensed dealers engaged in trafficking, but cannot be used as a basis for strong inferences about the relative importance of one type of business premise relative to another in firearms trafficking investigations.

**Table 6.  Business Premises of a 20 Percent Random Sample of FFLs Involved in Trafficking Investigations**

| FFL business premises | Number of investigations | Percent of all investigations | Percent of category selling at gun shows |
|---|---|---|---|
| Total | 26 | 100.0 | 35.0 |
| Gun store business premises | 10 | 38.5 | 50.0 |
| Pawn shop business premises | 10 | 38.5 | 20.0 |
| Residential business premises | 6 | 23.0 | 33.3 |

Note:  Since this is a 20 percent sample, it may not be representative of all FFLs.

---

[21] *Commerce in Firearms in the United States*, February 2000, Department of the Treasury, Bureau of Alcohol, Tobacco and Firearms.

## Gun Shows and the Diversion of Firearms

Gun shows are a special case of the retail sale of firearms. Unlike at other venues, both federally licensed dealers and unlicensed sellers sell guns at gun shows. While federally licensed firearms dealers perform background checks, unlicensed sellers are not required to do so. Gun shows are also places where buyers can choose to buy from the primary (firearms sold by FFLs) or secondary (firearms resold by unlicensed sellers) firearms markets. Secondhand firearms are far more difficult than new guns for law enforcement officials to trace to the most recent seller. This is because secondhand firearms likely have left the hands of FFLs, who are required to keep records, into the hands of unlicensed persons who are not required to keep records. Even if the secondhand guns are resold to an FFL, they are untraceable, because the trace will effectively end at the last sale in the unbroken chain of licensed sellers. The access to anonymous sales and large numbers of secondhand firearms makes gun shows attractive to criminals.

In the ATF trafficking investigations reviewed here, gun shows were associated with the diversion of approximately 26,000 firearms. Trafficking of firearms at and through gun shows was more prevalent in the trafficking investigations submitted by the Southwest (22 percent) and Western (21 percent) regions when compared to trafficking investigations submitted by the Central (15 percent), Southeast (12 percent), and Northeast (8 percent) regions of the United States.

A prior review of ATF gun show investigations shows that prohibited persons, such as convicted felons and juveniles, do personally buy firearms at gun shows and gun shows are sources of firearms that are trafficked to such prohibited persons. The gun show review found that firearms were diverted at and through gun shows by straw purchasers, unregulated private sellers, and licensed dealers.[22] Felons were associated with selling or purchasing firearms in 46 percent of the gun show investigations.[23] Firearms that were illegally diverted at or through gun shows were recovered in subsequent crimes, including homicide and robbery, in more than a third of the gun show investigations.[24]

---

[22] *Gun Shows: Brady Checks and Crime Gun Traces*, Department of the Treasury and Department of Justice, January 1999: Table 3.

[23] *Gun Shows: Brady Checks and Crime Gun Traces*, Department of the Treasury and Department of Justice, January 1999: Table 3.

[24] *Gun Shows: Brady Checks and Crime Gun Traces*, Department of the Treasury and Department of Justice, January 1999: Table 4.

### Straw Purchasers and the Diversion of Firearms

Investigations involving straw purchasers averaged 37 firearms per investigation, but because of the large number of investigations involving straw purchasing (695, 46 percent of all the trafficking investigations), this trafficking channel was associated with nearly 26,000 illegally diverted firearms. The 550 investigations involving straw purchasers without any additional trafficking channels averaged 26 illegally diverted firearms per investigation, and a total of just over 14,000 illegally diverted firearms. Although the average number of firearms trafficked per investigation is relatively small when compared to other trafficking channels, illegally diverted firearms associated with straw purchasers represent nearly a third of the illegally diverted firearms in all ATF investigations initiated between July 1996 and August 1998. Thus, despite the relatively small numbers per investigation, straw purchasers represent a significant overall crime and public safety problem.

Straw purchasers may be the instruments of criminals or traffickers who obtain the straw purchaser's services, or they may be unlicensed dealers who set out to use their non-prohibited status to traffick to other persons for a profit. In other words, the straw purchaser may also be the trafficker. In 25 percent of the investigations (387 of 1,530), the straw purchasers were working for traffickers, and in 19 percent of the investigations (292) the straw purchasers were the traffickers.[25] Straw purchasers were often friends (45 percent), relatives (23 percent), and spouses or girlfriends (18 percent) of the firearms traffickers. Almost 28 percent of the investigations involved a business relationship where the trafficker paid the straw purchaser money or drugs to buy firearms. Five percent of the investigations involved a straw purchaser who was a member of the same street gang as the trafficker.

### Table 7. Relationships Between Straw Purchaser and Trafficker

| Relationship to trafficker | Number of investigations | Percent |
|---|---|---|
| Friend | 173 | 44.7 |
| Business (paid with money or drugs to buy firearms) | 107 | 27.6 |
| Relative | 89 | 23.0 |
| Intimate (spouse or girlfriend) | 68 | 17.6 |
| Member of same gang | 21 | 5.4 |

Number of investigations included = 387

Note: Sum may exceed 100 percent since investigations may be included in more than one category.

---

[25] Table 10, Firearms Traffickers and Felons Identified in Trafficking Investigations.

### The Involvement of Juveniles and Youth in ATF Trafficking Investigations

Youth (ages 18 – 24) and juveniles (ages 17 and under) were involved in 42 percent of the ATF firearms trafficking investigations (648 of 1,530) during this period. ATF published an analysis of these investigations in the Youth Crime Gun Interdiction *Performance Report* in February 1999.

Juveniles were primarily involved in the trafficking investigations as possessors of firearms, but they were also involved in the illegal diversion of firearms as firearms traffickers, thieves or robbers, and straw purchasers of firearms.[26] A quarter of the youth and juvenile investiga-

tions involved juveniles obtaining firearms through thievery or robbery, and nearly a fifth of these investigations involved juveniles as gun traffickers.[27]

Youth were nearly twice as likely as juveniles to be involved as traffickers, and because of age restrictions on the purchase of firearms, about ten times as likely to be involved as straw purchasers as juveniles.[28] It has been shown that of crime guns recovered and traced by law enforcement officials in 27 cities, more were possessed by 19 year olds than any other age group; crime guns recovered from 18 year olds ranked second.[29]

*Table 8: The Role of Youth and Juveniles in Trafficking Investigations*

| Role of Youth | Number of investigations | Percent |
|---|---|---|
| Possessor | 337 | 53.9 |
| Trafficker | 236 | 37.8 |
| Straw purchaser | 149 | 23.8 |
| Thief /robber of firearms | 122 | 19.5 |

Number of investigations involving at least one youth = 625

| Role of Juveniles | Number of investigations | Percent |
|---|---|---|
| Possessor | 155 | 74.2 |
| Thief /robber of firearms | 53 | 25.3 |
| Trafficker | 40 | 19.1 |
| Straw purchaser | 4 | 1.9 |

Number of investigations involving at least one juvenile = 209

---

[26] *Performance Report* for the Senate and House Committee on Appropriations, Youth Crime Gun Interdiction Initiative, Department of the Treasury, Bureau of Alcohol, Tobacco and Firearms, February 1999. pg. 6.

[27] *Performance Report* for the Senate and House Committee on Appropriations, Youth Crime Gun Interdiction Initiative, Department of the Treasury, Bureau of Alcohol, Tobacco and Firearms, February 1999: Appendix, Table 1.

[28] *Performance Report* for the Senate and House Committee on Appropriations, Youth Crime Gun Interdiction Initiative, Department of the Treasury, Bureau of Alcohol, Tobacco and Firearms, February 1999: Appendix, Table 1.

[29] *Gun Crime in the Age Group 18-20*, the Department of the Treasury and the Department of Justice, June 1999.

## 3-3. Firearms Misuse, Felons, and Trafficking Investigations

Persons prohibited from possessing firearms, including felons, are obtaining guns from the illegal market. While a case review does not measure the full extent of the use of trafficked firearms by prohibited persons or in subsequent crimes, ATF's trafficking investigations show that trafficked firearms are diverted to prohibited persons and are subsequently used in serious crimes, and that some felons are heavily involved in firearms trafficking. Thus, investigations that "follow the crime gun" to its illegal source are not only an effective strategy to disrupt and reduce firearms trafficking in a community, they also are an effective means to apprehend felons, armed career criminals, and narcotics traffickers who possess and misuse firearms.

### Trafficked Firearms Subsequently Recovered in Crime

Half of the trafficking investigations involved at least one firearm recovered in crime. More than 14 percent of the trafficking investigations were associated with juvenile possession cases; about 17 percent were associated with homicide and robbery cases, respectively; about 25 percent of the investigations were associated with assault cases; more than 40 percent involved firearms associated with felon in possession cases; and more than 50 percent of these investigations involved firearms associated with illegal possession cases.

### Table 9.  Known Criminal Uses of Trafficked Firearms

50.4% of the investigations (771 of 1,530) had at least one diverted firearm recovered in a crime.

| Crime | Number of cases with at least one firearm recovered in a crime | Percent |
|---|---|---|
| Criminal possession (not felon in possession) | 390 | 50.6 |
| Felon in possession | 311 | 40.3 |
| Drug offense | 212 | 27.5 |
| Assault | 194 | 25.2 |
| Homicide | 134 | 17.4 |
| Robbery | 127 | 16.5 |
| Property crime | 116 | 15.0 |
| Juvenile possession | 109 | 14.1 |
| Sexual assault/ rape | 15 | 1.9 |
| Other crime | 42 | 5.4 |

Number of investigations included = 771

Note:  Sum may exceed 100 percent since investigations may be included in more than one
category.

### The Involvement of Felons in Firearms Trafficking

This review shows that convicted felons are heavily involved in firearms trafficking. Felons were involved in 45 percent (690 of 1,530) of the ATF firearms trafficking investigations in various roles. One third of the thieves and robbers involved in these investigations had at least one prior felony conviction, as did nine percent of straw purchasers working for traffickers, and 24 percent of straw purchasers who were the sole trafficker, five percent of the FFL traffickers, and more than a third of other firearms traffickers, such as unlicensed dealers.

Altogether, there were 2,670 traffickers identified by ATF agents, of whom 25 percent (669) were convicted felons. Felons may be identified as straw purchasers for a number of reasons: an FFL may have a felon as an employee; a felon may be buying from an unlicensed seller who does not conduct Brady checks; a felon may have stolen identity papers; and before the permanent provisions of the Brady Act took effect in November 1998, no criminal history checks were conducted for the purchase of long guns.

**Table 10. Firearms Traffickers and Felons Identified in Trafficking Investigations**

| Role | Total number of traffickers | Number of traffickers with felony convictions | Percent of traffickers with felony convictions |
|---|---|---|---|
| Firearms thief/ robber | 616 | 205 | 33.3 |
| Straw purchaser working for trafficker | 610 | 53 | 8.9 |
| Trafficker is the straw purchaser | 338 | 79 | 23.3 |
| FFL trafficker* | 131 | 7 | 5.3 |
| Former FFL | 25 | 0 | 0.0 |
| Other trafficker | 950 | 325 | 34.2 |
| Total | 2,670 | 669 | 25.0 |

Number of investigations included = 1,530

\* May include employees of FFL.

## 3-4. Characteristics of the Investigations

Most ATF trafficking investigations, 68 percent (1,037 of 1,530), involved the cooperation of State and/or local law enforcement agencies. Table 11 shows that about 70 percent of the investigations involved intrastate trafficking, suggesting that where there are applicable State firearms laws, State and local law enforcement have an important role to play in curbing the illegal market in firearms. Table 12 shows that most, but not all, gun trafficking investigations involve relatively small numbers of firearms. Table 13 highlights the relative roles of new, secondhand, and stolen firearms in trafficking investigations. The chain of ownership and status of a firearm can affect law enforcement's ability to identify its illegal supplier. Because of limited recordkeeping and reporting requirements applicable to stolen and secondhand firearms, the illegal sources of new crime guns are much easier to investigate.

### Interstate and Intrastate Destinations of Trafficked Firearms

ATF trace analysis reports have documented that the State in which a community is located is generally the largest single source of its traced crime guns.[30] The reports also show that some jurisdictions act as "source" areas (e.g. Florida and Georgia) of crime guns for other "market" areas (e.g. New York and Boston).[31] The review of investigations shows that firearms traffickers engage in intrastate trafficking, interstate trafficking, and international trafficking. Intrastate firearms trafficking was involved in 70 percent of the investigations, while slightly less than half of the investigations involved interstate firearms trafficking. Twenty percent of the investigations involved firearms being trafficked both interstate and intrastate. Firearms were trafficked internationally in about 11 percent of the investigations.

*Table 11. Interstate, Intrastate, and International Trafficking in ATF Investigations*

| Destination of trafficked firearms | Number | Percent |
|---|---|---|
| Intrastate | 1,072 | 70.1 |
| Interstate | 678 | 44.3 |
| International (export) | 170 | 11.1 |
| Unknown | 53 | 3.5 |
| Mutually exclusive categories: | | |
| Total | 1,530 | 100.0 |
| Intrastate only | 696 | 45.5 |
| Interstate and intrastate | 312 | 20.4 |
| Interstate only | 299 | 19.5 |
| International only | 87 | 5.7 |
| Interstate, intrastate, and international | 47 | 3.1 |
| Intrastate and international | 19 | 1.2 |
| Interstate and international | 17 | 1.1 |
| Unknown | 53 | 3.5 |

[30] *Youth Crime Gun Interdiction Initiative Trace Analysis Reports, 27 Communities*, Department of the Treasury, Bureau of Alcohol, Tobacco and Firearms, February 1999.

[31] *Youth Crime Gun Interdiction Initiative Trace Analysis Reports, 27 Communities*, Department of the Treasury, Bureau of Alcohol, Tobacco and Firearms, February 1999.

**Number of Firearms Trafficked in ATF Investigations**

Firearms trafficking mainly involves relatively smaller numbers; 43 percent of the investigations involved 10 firearms or less. Trafficking in large numbers of firearms, however, does occur; the two largest numbers of firearms reported in connection with a single investigation were 10,000 and 11,000, respectively.

*Table 12.  Number of Firearms Involved in ATF Trafficking Investigations*

| Range | Number of investigtions | Percent |
|---|---|---|
| Total number of investigations | 1,530 | 100.0 |
| Less than 5 | 354 | 23.1 |
| 5 – 10 | 308 | 20.1 |
| 11 – 20 | 279 | 18.2 |
| 21 – 50 | 286 | 18.7 |
| 51 – 100 | 139 | 9.1 |
| 101 – 250 | 67 | 4.4 |
| 251 or greater | 37 | 2.4 |
| Unknown | 60 | 3.9 |

## New, Secondhand, and Stolen Firearms

ATF's trace analysis in 27 cities suggests that up to 43 percent of traced firearms are new guns that have moved rapidly from the shelf of an FFL to recovery by law enforcement in three years or less, and, therefore, may have been trafficked.[32] The mere rapid movement of a firearm does not confirm that trafficking has occurred, because a gun may have been purchased by the criminal user or stolen by the criminal user from an FFL or from the person who bought the firearm. ATF, therefore, treats rapid time-to-crime as a trafficking indicator to be investigated with other information.

Focusing exclusively on new guns likely underestimates the true extent of gun trafficking. A National Tracing Center trace usually ends after the first retail sale. Following the trail of the gun further often requires a substantial commitment of investigative effort by the tracing law enforcement agency, a commitment that is often not feasible. ATF's trace analysis reports estimated that between 57 and 71 percent of all traceable crime guns in 27 cities were recovered more than three years after the first retail sale. While a trace of a crime gun may reveal that it was first sold at retail ten years before its recovery in crime, it is nevertheless possible that it was trafficked. The firearm during this time period could be resold to and by FFLs, or by unlicensed sellers on the secondary market, as "used" or "secondhand," and subsequently trafficked.

This review shows that investigations involved the trafficking of new, secondhand, and stolen firearms. Thus, while trace analysis alone cannot shed light on the percentage of older crime guns that are trafficked, ATF investigative experience suggests that trafficking in secondhand firearms is indeed a significant crime and public safety problem. While new firearms figured more prominently, new and secondhand guns were trafficked together in about one third of the investigations.

As documented in Table 3, firearms are stolen from a variety of sources. Depending on the type of theft involved, stolen firearms may range from new to quite old. For example, a burglary of a licensed dealer may yield a cache of new and secondhand firearms while a residential burglary or series of home invasions may yield only older firearms. Both new and secondhand firearms were stolen and subsequently trafficked, with secondhand firearms figuring more prominently among stolen, trafficked firearms.

### Table 13. New, Secondhand, and Stolen Firearms in ATF Trafficking Investigations

| Type of firearm | Number of investigations | Percent |
|---|---|---|
| New firearms | 1,120 | 73.2 |
| Secondhand firearms | 899 | 58.8 |
| Stolen guns | 381 | 24.9 |
| Unknown | 27 | 1.8 |
| Stolen firearms: | | |
|     Involves at least one new firearm | 223 | 58.5 |
|     Involves at least one secondhand firearm | 304 | 79.8 |
| Mutually exclusive categories for new and secondhand firearms: | | |
|     Total | 1,530 | 100.0 |
|     New firearms only | 604 | 39.5 |
|     New and secondhand firearms | 516 | 33.7 |
|     Secondhand firearms only | 383 | 25.0 |
|     Unknown | 27 | 1.8 |

Note: Sum may exceed 100 percent since investigations may be included in more than one category.

---

[32] *Youth Crime Gun Interdiction Initiative Trace Analysis Reports, 27 Communities,* Department of the Treasury, Bureau of Alcohol, Tobacco and Firearms, February 1999. pg. A-3.