## 3-5. Characteristics of Case Dispositions

An examination of the characteristics of case dispositions shows two things: first, that ATF is vigorously enforcing laws against firearms traffickers with the support of Federal and State prosecutors; and second, that persons who traffick in firearms are often not being prosecuted for that conduct, rather they are being prosecuted for other related conduct.

### Violations Reported in ATF Trafficking Investigations

*Illegal buying and selling.* ATF investigations uncovered a wide variety of apparent trafficking violations. ATF agents reported an average of two firearms violations per trafficking investigation and 36 percent of trafficking investigations were reported to have three or more firearms violations. Most were "selling" violations such as dealing without a license, or "buying" violations, such as straw purchasing, but violations involving firearms theft were also important.

*Felons as traffickers.* Felons play a significant role in firearms trafficking. About 23 percent of the investigations included violations involving convicted felons buying, selling, or possessing firearms.

*Obliteration of serial numbers.* About six percent of the investigations had violations involving serial number obliteration. Serial number obliteration is a clear indicator of firearms

trafficking, since the intentional obliteration of a serial number is intended to make it difficult for law enforcement officials to trace the firearm through a licensed seller to the first retail buyer. Other ATF analysis confirms that the obliteration of serial numbers is a significant problem; for eight cities with complete crime gun trace information, an average of 11.4 percent of traced handguns had obliterated serial numbers.[33]

*Violations by FFLs.* A review of the violations associated with the 133 investigations of licensed dealers revealed a variety of violations, including failure to keep required records (49 percent), transfers to prohibited persons (26 percent), making false entries in record books (19 percent), conducting illegal out-of-state transfers (16 percent), and obliterating serial numbers (8 percent).

---

[33] *Youth Crime Gun Interdiction Initiative Trace Analysis Reports, 27 Communities,* Department of the Treasury, Bureau of Alcohol, Tobacco and Firearms, February 1999. pg 13.

**Table 14. Violations in ATF Trafficking Investigations\***

| Violation | Number of investigations with violation | Percent |
|---|---|---|
| Straw purchasing | 638 | 41.7 |
| Dealing without a license | 486 | 31.8 |
| Purchase/ possession/ sales by felon | 350 | 22.9 |
| Possession/ receiving/ trafficking stolen firearms | 270 | 17.6 |
| Non-licensee engaging in interstate firearms trafficking | 244 | 15.9 |
| Possession/ manufacture/ trafficking of NFA weapons | 234 | 15.3 |
| Burglary/ theft/ robbery of FFL/ common carrier/ manufacturer | 205 | 13.5 |
| Providing false information to acquire firearms | 199 | 13.0 |
| Trafficking - unspecified | 135 | 8.8 |
| International firearms trafficking | 105 | 6.9 |
| Obliterating or altering serial numbers | 96 | 6.3 |
| Sales to prohibited persons, including felons | 89 | 5.8 |
| Purchase/ possession/ sales by prohibited persons\*\* | 79 | 5.2 |
| FFL failure to keep required records | 66 | 4.3 |
| Use of firearm during violent crime or drug trafficking | 42 | 2.7 |
| FFL transfer to prohibited persons | 39 | 2.5 |
| FFL making false entries in records | 26 | 1.7 |
| FFL conducts illegal out-of-state transfer | 26 | 1.7 |
| Trading firearms for drugs | 26 | 1.7 |
| Providing firearm to be used in violent/ drug crime | 20 | 1.3 |
| Trafficking/ possession by illegal alien | 15 | 1.0 |
| Providing firearms to juveniles | 13 | 0.8 |
| Non-licensee trafficking to felons | 12 | 0.8 |
| Transfer/ receive firearms through interstate commerce w/intent to commit felony | 12 | 0.8 |
| Armed career criminal | 11 | 0.7 |
| Failure to notify common carrier of firearms shipment | 11 | 0.7 |
| Possession/ manufacture/ transfer of illegal assault weapon | 8 | 0.5 |
| Other FFL violations (selling away from premises, failure to report multiple sales, failure to conduct Brady check, using false info to acquire FFL) | 7 | 0.5 |
| Possession/ manufacture of unregistered firearms | 7 | 0.5 |
| Unspecified violation(s) | 8 | 0.5 |

Number of investigations included = 1,530

Note: Sum may exceed 100 percent since investigations may be included in more than one category.

 \* Violations were observed but not necessarily presented as charges for prosecution.

\*\* As distinct from felons; includes juveniles, illegal aliens, and other prohibited persons.

### Violations in ATF Trafficking Investigations Involving FFLs

There were 133 ATF investigations (8.7 percent of 1,530) that involved the illegal diversion of firearms by a federally licensed firearms dealer (FFL). A variety of FFL violations were revealed in these investigations. Nearly half (48.9 percent, 65 of 133) of the licensed dealer investigations involved the failure to keep required records by an FFL. Slightly more than a quarter of the ATF investigations (26.3 percent, 35 of 133) involved FFLs transferring firearms to prohibited persons such as felons and juveniles. FFLs made false entries in their acquisition and disposition record book in almost a fifth of the ATF investigations (18.8 percent, 25 of 133) and conducted illegal out-of-state transfers of firearms in about 16 percent of the ATF investigations (15.8 percent, 21 of 133). ATF investigations involving corrupt FFLs were associated with many other types of firearms offenses including NFA violations (24.8 percent, 33 of 133), straw purchasing (24.1 percent, 32 of 133), and dealing without a license (18.8 percent, 25 of 133). Although corrupt FFLs are relatively rare, they are associated with the diversion of large volumes of firearms. While some violations committed by FFLs are felony offenses, two common FFL violations — failure to keep required records and making false entries in records — are misdemeanor offenses.

*FOLLOWING THE GUN: ENFORCING FEDERAL LAWS AGAINST FIREARMS TRAFFICKERS*     29

### Table 15: Violations in ATF Trafficking Investigations Involving FFLs*

| Violation | Number | Percent |
|---|---|---|
| FFL failure to keep required records | 65 | 48.9 |
| FFL transfer to prohibited persons | 35 | 26.3 |
| Possession/ manufacture/ trafficking of NFA weapons | 33 | 24.8 |
| Straw purchasing | 32 | 24.1 |
| Dealing without a license | 25 | 18.8 |
| FFL making false entries in records | 25 | 18.8 |
| FFL conducts illegal out-of-state transfer | 21 | 15.8 |
| Purchase/ possession / sales by felon | 16 | 12.0 |
| Trafficking - unspecified | 14 | 10.5 |
| International firearms trafficking | 13 | 9.8 |
| Sales to prohibited persons | 13 | 8.8 |
| Providing false information to acquire firearms | 11 | 8.3 |
| Obliterating or altering serial numbers | 10 | 7.5 |
| Possession/ receiving/ trafficking stolen firearms | 9 | 6.8 |
| Other FFL violations (selling away from premises, failure to report multiple sales, failure to conduct Brady check, using false info to acquire FFL) | 7 | 5.3 |
| Non-licensee engaging in interstate firearms trafficking | 6 | 4.6 |
| Trading guns for drugs | 4 | 3.0 |
| Receipt/ possession/ sales by prohibited persons | 3 | 2.3 |
| Use of firearm during violent crime or drug trafficking | 3 | 2.3 |
| Burglary/ theft/ robbery of FFL/ common carrier/ manufacturer | 2 | 1.6 |
| Providing firearm to be used in violent/ drug crime | 2 | 1.5 |
| Possession/ manufacture/ transfer of illegal assault weapon | 2 | 1.5 |
| Trafficking/ possession by illegal alien providing firearms to juveniles | 1 | 0.8 |
| Transfer/ receive firearms through interstate commerce w/intent to commit felony | 1 | 0.8 |
| Failure to notify common carrier of firearms shipment | 1 | 0.8 |
| Possession/ manufacture of unregistered firearms | 1 | 0.8 |
| Unspecified violation(s) | 2 | 1.5 |

Number of investigations involving FFLs = 133

Note: Sum may exceed 100 percent since investigations may be included in more than one category.

* Violations were observed but not necessarily presented as charges for prosecution.

### National Firearms Act Violations

The National Firearms Act (NFA) regulates the manufacture, importation, transfer, and possession of specific types of firearms and other weapons that are considered particularly dangerous. Of the trafficking investigations, 15 percent involved NFA violations. Of these, 45 percent involved machine guns, 35 percent involved sawed-off shotguns and/or short-barrel firearms, 23 percent involved silencers, and about 17 percent involved firearms converted to fully automatic.

**Table 16. Weapons Associated with NFA Violations in ATF Trafficking Investigations**

| NFA weapon | Number of investigations with at least one | Percent |
|---|---|---|
| Machine guns | 105 | 44.9 |
| Sawed-off shotguns/ short-barrel rifles & shotguns | 82 | 35.0 |
| Silencers | 54 | 23.1 |
| Converted guns | 40 | 17.1 |
| Conversion kits/ parts | 21 | 9.0 |
| Other explosives (e.g. blasting caps) | 18 | 7.7 |
| Grenades/ Grenade launchers | 12 | 5.1 |

Number of investigations involving NFA violations = 234  (15.3 percent of 1530)

Note:  Sum may exceed 100 percent since investigations may be included in more than one category.  However, "converted guns" have not been included in the "machine gun" count.

## Recommendations for Prosecution

Of the investigations initiated from July 1996 through December 1998, ATF agents recommended almost three-fourths of the firearms investigations for prosecution (1,090 of 1,530). Nearly 90 percent (962) of these 1,090 investigations were recommended to a U.S. Attorney's Office for prosecution, while slightly less than ten percent (101) were recommended to a State or local prosecutor for prosecution. Almost three percent (27) had some defendants in the case recommended to the U.S. Attorney's Office for prosecution and other defendants recommended to a State or local prosecutor for prosecution.

A variety of reasons were given by the ATF agents to explain why investigations (440) were not recommended for prosecution at the time of the supplementary survey. In less than 30 percent of the investigations not recommended for prosecution (121), the ATF agent stated that there was no potential for charges to be made against the defendant(s) in the case. Slightly less than 18 percent of the investigations (78) were not recommended for prosecution by ATF agents because there was insufficient evidence for prosecution at the time of the supplemental survey. Nearly 18 percent of the investigations not recommended for prosecution (77) were described as active ongoing investigations.

### *Table 17. ATF Trafficking Investigations Recommended for Prosecution*

| | Number of investigations | Percent |
|---|---|---|
| Investigations, total | 1,530 | 100.0 |
| Not recommended for prosecution | 440 | 28.7 |
| Recommended for prosecution | 1,090 | 71.3 |
| Recommended | | 100.0 |
|     to the U.S. Attorney's Office | 962 | 88.2 |
|     to State/ local prosecutor | 101 | 9.3 |
|     to both | 27 | 2.5 |
| **Reason for not recommending** | **Number of investigations** | **Percent of 440** |
| Total | 440 | 100.0 |
| No potential for charges | 121 | 27.5 |
| Insufficient evidence/ unable to substantiate violation | 78 | 17.8 |
| Investigation is still ongoing | 77 | 17.5 |
| Case was closed by ATF Field Division | 34 | 7.7 |
| Defendant(s) charged and prosecuted for other crimes before firearms trafficking investigation was developed | 27 | 6.1 |
| Investigation was transferred to another jurisdiction | 16 | 3.6 |
| Charges are forthcoming | 9 | 2.0 |
| Suspects were given a warning for violations without prosecution | 8 | 1.8 |
| Investigation was consolidated with another investigation | 6 | 1.4 |
| Confidential informant broke/ lost contact with defendant(s) | 5 | 1.1 |
| Investigation didn't progress because confidential informant was unreliable | 4 | 0.9 |
| No criminal intent by defendant(s) was found | 4 | 0.9 |
| Other reasons | 23 | 5.2 |
| Unspecified reasons | 28 | 6.3 |

**Status of Investigations Recommended for Prosecution**

Ninety percent of the investigations (975 of 1,090) recommended for prosecution were accepted for prosecution; only 10 percent (115) were declined. Table 18 presents the status of the cases accepted for prosecution at the time of the supplementary survey. More than 57 percent of the investigations were fully adjudicated, while an additional five percent had some defendants fully adjudicated and other defendants not fully adjudicated. Thirty-six percent of the cases were not yet fully adjudicated and only two percent were on appeal.

**Table 18. Status of Trafficking Investigations Accepted for Prosecution**

| Status | Number | Percent |
|---|---|---|
| Total | 975 | 100.0 |
| Fully adjudicated | 558 | 57.2 |
| Not fully adjudicated | 351 | 36.0 |
| Some defendants adjudicated, some not | 46 | 4.7 |
| Case is on appeal | 20 | 2.1 |

### Federal Charges Against Defendants Recommended for Prosecution in Trafficking Investigations

There were 1,787 defendants in the 1,090 fire-arms trafficking investigations recommended for prosecution by ATF agents. Almost 90 percent of these defendants faced Federal charges (1,593).

*Trafficking-related charges.* Some of the defendants were charged with offenses related on their face to firearms trafficking: 28 percent were charged with making false statements to acquire firearms, and about 18 percent were charged with dealing in firearms without a license. Nearly 28 percent of the defendants were charged with conspiracy to violate Federal laws and another eight percent were charged with aiding and abetting violations.

*Other charges.* Other defendants were charged with offenses not necessarily related on their face to firearms trafficking or firearms crime generally. Fully one quarter of the defendants were charged with being a convicted felon in possession of a firearm; another six percent were charged with other prohibited person violations. Over 27 percent were charged with conspiracy and over 12 percent with narcotics violations.

**Table 19. ATF Description of Charges Against Defendants in Trafficking Investigations Recommended for Federal Prosecution**

| Charge category | Number of defendants | Percent |
|---|---|---|
| Conspiracy to violate Federal law | 441 | 27.7 |
| Making false statements to acquire firearms | 439 | 27.6 |
| Convicted felon in possession of firearm (includes Armed Career Criminal) | 408 | 25.6 |
| Dealing in firearms without a license | 290 | 18.2 |
| Theft of firearms/ Possession of stolen firearms/ Sale of stolen firearms | 238 | 15.9 |
| Illegal possession/ Transfer / Manufacture of NFA weapons | 216 | 13.5 |
| Narcotics violations | 192 | 12.1 |
| Aiding and Abetting in the violation of Federal law | 122 | 7.7 |
| User of a firearm during a drug crime | 100 | 6.3 |
| Possession of firearm by prohibited person (juvenile, drug user, illegal alien, restraining order, under indictment) | 95 | 6.0 |
| Interstate firearms trafficking | 92 | 5.8 |
| Sale of firearms to out-of-state resident | 69 | 4.3 |
| Possession/ shipping/ transporting a firearm with obliterated serial numbers | 63 | 4.0 |
| Failure to maintain ledger/ falsifying paperwork/ sale of firearms in violation of Brady law/ sale of firearms without noting purchaser's name, age, etc. | 50 | 3.1 |
| Selling firearms to convicted felon | 35 | 2.2 |
| Transfer of firearm to prohibited person (juvenile, illegal alien, restraining order, under indictment) | 33 | 2.0 |
| International firearms trafficking | 28 | 1.8 |
| Transfer of a firearm to be used in a violent crime | 19 | 1.2 |
| Other/ unspecified Federal violation | 101 | 6.3 |

Number of defendants in the investigations recommended for prosecution = 1,593
Note: Since defendants can be charged with more than one type of crime, these categories are not mutually exclusive.

**Geographic Distribution of Federal Prosecutions**

Trafficking defendants were recommended for prosecution to U.S. Attorney's Offices in Federal courts covering 48 States, the District of Columbia, and Puerto Rico.

**Table 20. States in which ATF Recommended Federal Prosecution of Defendants in Trafficking Investigations**

| State | Number | Percent | State | Number | Percent |
|-------|--------|---------|-------|--------|---------|
| Alabama | 7 | 0.4 | North Carolina | 91 | 6.5 |
| Alaska | 4 | 0.3 | North Dakota | 16 | 1.0 |
| Arkansas | 5 | 0.3 | Nebraska | 8 | 0.5 |
| Arizona | 21 | 1.3 | New Hampshire | 11 | 0.7 |
| California | 54 | 3.4 | New Jersey | 17 | 1.1 |
| Colorado | 19 | 1.2 | New Mexico | 12 | 0.9 |
| Connecticut | 8 | 0.5 | Nevada | 10 | 0.6 |
| DC | 16 | 1.1 | New York | 134 | 9.4 |
| Delaware | 17 | 1.1 | Ohio | 37 | 2.3 |
| Florida | 97 | 6.1 | Oklahoma | 24 | 1.5 |
| Georgia | 98 | 6.2 | Oregon | 21 | 1.3 |
| Hawaii | 2 | 0.1 | Pennsylvania | 143 | 9.0 |
| Iowa | 7 | 0.4 | Rhode Island | 13 | 0.8 |
| Illinois | 24 | 1.5 | South Dakota | 9 | 0.6 |
| Indiana | 53 | 3.3 | Tennessee | 23 | 1.4 |
| Kansas | 6 | 0.4 | Texas | 124 | 8.9 |
| Kentucky | 23 | 1.4 | Utah | 2 | 0.1 |
| Louisiana | 23 | 1.4 | Virginia | 101 | 6.3 |
| Massachusetts | 43 | 2.7 | Vermont | 12 | 0.8 |
| Maryland | 24 | 1.5 | Washington | 29 | 1.8 |
| Maine | 17 | 1.1 | Wisconsin | 33 | 2.1 |
| Michigan | 25 | 1.6 | West Virginia | 27 | 1.7 |
| Minnesota | 4 | 0.3 | Wyoming | 2 | 0.1 |
| Missouri | 26 | 1.6 | | | |
| Mississippi | 13 | 0.8 | Unspecified State | 5 | 0.3 |
| Montana | 1 | 0.1 | | | |
| | | | Puerto Rico | 3 | 0.2 |

Number of defendants = 1,593

## Disposition of Defendants Recommended for Prosecution

*Adjudication.* Nearly 61 percent of the defendants recommended for prosecution were fully adjudicated at the time of the supplemental survey (1,083 of 1,787). Only 3 percent of the 1,083 fully adjudicated defendants were found not guilty or were dismissed. The ATF agents knew the sentencing outcome for all but slightly more than seven percent of the sentenced defendants at the time of the survey (77 of 1,048).

*Incarceration and fine.* Nearly 78 percent of these defendants (812) received a term of incarceration. Slightly more than 7 percent of the incarcerated defendants also received a fine (60 of 812). The fines ranged from $50 to $40,000.

*Term of incarceration.* Of the 812 incarcerated defendants, 9 percent received a term that was more than 10 years with some receiving life imprisonment; 26 percent received a term that was more than four years but no more than 10 years; 26 percent received a term that was more than two years but no more than four years; 22 percent received a term that was more than one year but no more than two years, and 17 percent received a term of one year or less. The average sentence imposed on those incarcerated was about nine years of imprisonment, resulting in a total of 7,420 years in prison.

*Probation.* About 15 percent of the defendants who were sentenced received a term of probation (155 of 1,048). Of the 155 defendants who received probation, 23 percent received a term of more than four years but less than eight years, almost 33 percent received a term of more than two years but no more than four years; nearly 30 percent received a term that was more than one year but no more than two years; and nearly 13 percent received a term of one year or less.

**Table 21. Disposition of Defendants in Trafficking Investigations Accepted for Prosecution**

| Status | Number of defendants | Percent |
|---|---|---|
| Accepted for prosecution | 1,787 | 100.0 |
|     Not fully adjudicated | 704 | 39.4 |
|     Fully adjudicated | 1,083 | 60.6 |
| Of those fully adjudicated | 1,083 | 100.0 |
|     Guilty | 1,048 | 96.7 |
|     Not guilty or dismissed | 35 | 3.2 |
| Disposition, total | 1,048 | 100.0 |
|     Incarceration | 812 | 77.5 |
|     Probation | 155 | 14.8 |
|     Home confinement (w/o probation period) | 4 | 0.4 |
|     Unknown sentence | 77 | 7.3 |
| Sentence length | | |
|     Incarcerated, total | 812 | 100.0 |
|         12 months or less | 138 | 17.0 |
|         13 – 24 months | 176 | 21.7 |
|         25 – 48 months | 207 | 25.5 |
|         49 – 120 months | 210 | 25.9 |
|         121 months – Life | 75 | 9.2 |
|         Unknown length | 6 | 0.8 |
|     Fine in addition to incarceration | 60 | 7.4 |
|     Probation, total | 155 | 100.0 |
|         12 months or less | 20 | 12.9 |
|         13 – 24 months | 46 | 29.7 |
|         25 – 48 months | 51 | 32.9 |
|         49 – 96 months | 36 | 23.2 |
|         Unknown length | 2 | 1.3 |
|     Fine in addition to probation | 16 | 10.3 |
|     Home confinement in addition to probation | 19 | 12.3 |

# 4. EXAMPLES OF GUN TRAFFICKERS AND THEIR SENTENCES

## Residential FFL Trafficker

From August 1993 to March 1996, an FFL in Kansas City, Missouri, illegally sold 1,357 firearms, many from his van, over 200 of which were recovered at crime scenes in Kansas City. The firearms were primarily Lorcin and Bryco handguns. The FFL was charged with making sales in violation of State law; recordkeeping violations, and sale to a convicted felon. He entered a guilty plea on May 16, 1996, in the Western District of Missouri (Kansas City) and was sentenced on September 26, 1996, to 71 months' incarceration. This sentence was an upward departure; the sentencing guidelines called for a range of 37 to 46 months.

## Gun Store Trafficker

Through Project LEAD, an investigation was initiated in July 1997, when two firearms, recovered in the Bronx, New York, were traced to an FFL in Suffolk County, New York. The investigation revealed that the FFL received a total of 207 firearms from a wholesaler that were then sold as part of an intrastate firearms trafficking operation. Thus far, five firearms have been recovered from crime scenes: four in New York City and one in Maryland. According to the FFL, the guns' serial numbers were removed by a co-conspirator in the Bronx, which accounted for the lack of additional known recovered firearms. In July, 1999, the FFL pled guilty to Criminal Sale of a Firearm, 2nd degree, a class "C" felony, in Suffolk County Court. On that same date, he was sentenced to 42 to 84 months in State prison.

## FFL and Interstate Trafficker

This investigation began in March 1996 when a firearm recovered from a Washington, DC youth, charged with illegal possession of a firearm, was traced by the Washington, DC Metropolitan Police Department, after the ATF

National Laboratory successfully raised the serial number. The paper trail led to a gun dealer in Missouri and later to a Nashville, Tennessee, gun trafficker who sold 200-300 guns on the streets of the Nation's capital. To date, 138 semiautomatic firearms originally sold by the Missouri Federal firearms licensee have been recovered in crimes in the Washington, DC. area ranging from nine murders to kidnapping, robbery, attempted murder, armed assault, drugs, and burglary. One of those firearms was used by a gang member to fatally wound a patient being transported to the hospital for treatment of wounds inflicted minutes earlier by the same gunman. On June 2, 1997, the Nashville gun trafficker pled guilty to Federal firearms trafficking charges. On August 22, 1997, he was sentenced to 60 months' imprisonment and 3 years' supervised release by the United States District Court in Nashville, Tennessee. During sentencing, the Federal judge referred to the defendant as a "dealer in death."

## Straw Purchasers/Interstate Traffickers

This investigation was initiated in January 1998 by the ATF/ New York Police Department firearms trafficking task force. Between September 1997 and January 1998, two traffickers transported approximately 90 firearms from Georgia to New York. On February 5, 1998, members of the task force, accompanied by special agents from the Savannah, Georgia, field office, conducted surveillance on the subjects as they transported 11 firearms from Augusta, Georgia, to New York City. The two suspects were charged with illegally transporting firearms interstate and unlicensed dealing in firearms and conspiracy. One was sentenced on December 18, 1998, to 18 months' incarceration, and the other was sentenced on July 24, 1998 to 6 months' home detention and 5 years' probation.

## Straw Purchaser/Intrastate Trafficker

This investigation was initiated in June of 1997 by ATF in Atlanta, Georgia. During a 9-month period, a straw purchaser had purchased more than 62 firearms in the Atlanta metropolitan area. These firearms were purchased for a defendant, who in turn sold the firearms on the streets of Atlanta. The straw purchaser was convicted and sentenced to 24 months to be served in boot camp. She testified in court that she had provided more than 200 firearms to the other trafficker. On June 5, 1998, the other trafficker pled guilty to violations of unlicensed dealing in firearms and possession of a firearm by a prohibited person, and was sentenced to 105 months in Federal prison.

## Traffickers in Firearms Stolen From Gun Store Dealer

On November 17, 1996, more than 100 firearms were stolen from a pawn shop in Nashville, Tennessee. On November 18, 1996, two suspects were arrested when an Ohio State Police Highway Patrol Officer stopped their vehicle and recovered more than 73 of the firearms, as well as several other weapons. One suspect later pled guilty to possession of the stolen firearms.

Several of the remaining firearms that were trafficked by the suspects were recovered in separate incidents: In March 1997, an ATF investigation into the murder of a nightclub owner in Detroit, Michigan, resulted in the recovery of a Llama semiautomatic pistol that had been obtained by the victim. Subsequently, an associate of the murder victim surrendered another firearm, a Sturm Ruger 9mm semiautomatic pistol. Another of the pawn shop firearms (a Glock Model 26 9mm semiautomatic pistol) was recovered at the scene of a quadruple homicide in Nashville, Tennessee, on July 26, 1997.

On September 4, 1997, one of the two possessors of the stolen firearms received a pretrial diversion, later dismissed, by pleading to pos-session of stolen firearms. The other possessor was sentenced to 57 months in prison and 3 years' supervised probation for violation of possession of stolen firearms and previously convicted felon in possession.

## Traffickers in Firearms Stolen From Residences

The defendants were a group of young men who committed first commercial, then residential burglaries. The defendents stole entire gun safes out of homes and then cut them open inside a mini-storage unit they had rented. The suspects became increasingly bolder and more violent, ultimately committing a home invasion in which the female victim was tied up and her house robbed. Several stolen firearms were recovered during the ATF investigation, which involved approximately 200 firearms. Agents executed numerous search warrants which resulted in the recovery of several stolen firearms. Because of the fact that serial numbers were not available on most of the firearms reported as stolen from the residential burglaries, it is not known whether they have been recovered or not. The investigation revealed that the defendants traded these stolen firearms for narcotics or sold them for cash to unknown individuals. All defendants prosecuted were convicted or pled guilty and received a range of prison sentences from 33 to 300 months; two defendants were required to pay restitution of over $1 million.

## Traffickers in Firearms Stolen From Common Carrier

On August 19, 1996, ATF special agents in Wilmington, Delaware, arrested a defendant for receipt of a large quantity of firearms stolen by another defendant, who had been arrested for the theft of 390 Llama firearms from an interstate shipment. Interviews with the thief yielded information regarding the identity and role of the recipient of the guns, who was subsequently arrested. (A third principal was

arrested on August 14 for storing two cartons of the firearms.) On January 8, 1997, the recipient pled guilty to violation of possession of stolen firearms. He was sentenced to 33 months' incarceration on April 16, 1997. The thief was sentenced to 15 months' incarceration and 5 years' probation on January 20, 1998.

## Straw Purchasers and International Traffickers

In 1996, ATF initiated an investigation following a seizure by the Colombian National Police of 17 MAK-90 firearms from a group of guerillas. The firearms were traced to several individuals in the Miami area, who had purchased 103 firearms from different licensed dealers and trafficked them to Colombia. Two suspects charged with making false statements were both sentenced to one year in prison, followed by deportation.

## Licensed and Unlicensed Dealers Trafficking at Gun Shows

In 1996, ATF initiated an investigation of an unlicensed firearms dealer and convicted felon who was using straw purchasers to acquire large numbers of firearms for subsequent sale to nonresidents. The primary suspect offered to sell agents an unlimited number of firearms, including fully automatic weapons and silencers.

Agents determined that the primary suspect had illegally trafficked more than 1,000 firearms during the past several years. Some of the firearms involved in this investigation were purchased at gun shows. One of the firearms was recovered from the scene of a shootout in Guadalajara in which two Mexican military officials were killed by drug traffickers. In 1997, another firearm was recovered during the search of the apartment of a former Mexican drug czar following his arrest for drug-related activities. Also under investigation were two federally licensed dealers suspected of selling stolen firearms, allowing individuals to straw purchase guns from them, and transferring firearms "off-the-book." Many of these transactions involved Mexican nationals.

In March 1998, the primary suspect was convicted of possession of an unregistered NFA firearm and sentenced to 78 months in prison, and an additional suspect, who was involved with straw purchasing firearms, was sentenced to 3 years' probation. In February and April 1998, the two licensed dealers were sentenced to 4 and 3 years' probation, respectively.

# 5. ENFORCEMENT LESSONS LEARNED FROM FIREARMS TRAFFICKING INVESTIGATIONS

ATF's review of trafficking investigations permits ATF to identify some of the important channels through which criminals are obtaining firearms, and provide insights into how they work. It also demonstrates that law enforcement can be successful in uncovering the illegal sources of firearms in a community and in holding gun traffickers accountable for their crimes. There are, however, challenges in enforcing the Federal firearms laws against gun traffickers.

## 5-1. Channels of Illegal Supply

ATF's review of recent trafficking investigations clearly demonstrates that many firearms are diverted from legal commerce through a variety of illegal channels that law enforcement agencies can target effectively to reduce criminal and juvenile access to firearms.

*Trafficking by corrupt FFLs.* Although FFL traffickers were involved in the smallest proportion of ATF trafficking investigations, under 10 percent, cases involving FFL traffickers were associated with the largest total number of illegally diverted firearms, over 40,000, as compared to the other trafficking channels.[34] All investigations involving FFL traffickers were associated with by far the highest average number of guns per investigation, over 350. But this number rose to over 560 guns in investigations of FFLs acting alone, and to over 575 guns when FFLs conspired with unlicensed sellers. Trafficking cases involved retail firearms dealers, pawnbrokers, and residential FFLs.

*Gun shows and flea markets.* Gun shows and flea markets are a major venue for illegal trafficking. About 14 percent of the investigations involved gun shows and flea markets. These investigations involved an average of 130 guns, the second highest number of trafficked guns per investigation, and were associated with approximately 26,000 illegally diverted

firearms. Gun show investigations involved both FFL traffickers and unlicensed dealers.

*Straw purchasers.* Straw purchasing rings and small scale straw purchasers comprised nearly 50 percent of the trafficking investigations, by far the largest number of trafficking investigations, and although the average number of guns per investigation was under 40, they accounted for nearly 26,000 trafficked firearms, about the same number of firearms as gun show investigations. Straw purchasers may be friends, paid associates, relatives, intimates, or members of the same gang.

*Trafficking by unlicensed sellers.* Unlicensed sellers (not associated with gun shows and not straw purchasers) were the focus of about 20 percent of the investigations, involving over 22,000 trafficked firearms, and about 75 guns per investigation.

*Trafficking in stolen firearms.* Survey evidence indicates there are at least 500,000 firearms stolen annually from residences.[35] It is, therefore, not surprising that some of these firearms are circulating in the illegal market, as are guns stolen from FFLs and common carriers. Trafficking investigations involving firearms stolen from residences, FFLs, and common carriers combined made up about a quarter of the trafficking investigations, and were associated with over 11,000 trafficked firearms. Because of the small number of investigations involving

---

[34] Firearms may be trafficked along multiple channels; therefore, an investigation may be included in more than one of the categories described.

[35] Philip J. Cook and Jens Ludwig, *Guns In America,* Police Foundation, 1996.

thefts of firearms from common carriers, about 2 percent of the investigations, this trafficking channel yielded the smallest total number of firearms, although it averaged a substantial number of illegally diverted firearms per investigation, over 66.

*Regional variations.* Regional variations in the trafficking channels in ATF investigations suggest that the illegal market in guns may operate differently in different areas of the country. For instance, straw purchasing was involved in almost two thirds of ATF's trafficking investigations in its Northeast region, but closer to a quarter of its trafficking investigations in its Southwest and Western regions. Without additional information, it is not possible to know whether regional differences reflect differences in investigative practices, the illegal market, or both. ATF trace analysis also reveals differences in crime gun patterns among different cities.[36]

## 5-2. Impact of Enforcement

*Convicted felons as traffickers.* Although primarily aimed at the illegal supplier, about 45 percent of the trafficking investigations involved convicted felons in various roles. About 23 percent of the investigations included violations involving convicted felons buying, selling, or possessing firearms. Altogether, a quarter (669) of the traffickers identified in the investigations were convicted felons. A key finding of this report is that trafficking investigations lead to the apprehension of armed violent criminals, who are also important suppliers of the illegal market in guns.

*Reducing criminal access to guns.* These "criminals behind the criminal" were collectively responsible for the trafficking of over 84,000 firearms. Half of the trafficking investigations involved guns known to be used in other types of crime, including felony possession, drug offenses, homicide, assault, and robbery. ATF estimates that trafficking investigations result in the actual seizure of about a quarter of the firearms ultimately shown to be trafficked by the targets. By arresting firearms traffickers, the number of firearms easily available to violent offenders can be reduced.

*Enforcement successes.* The Gun Control Act proscribes and penalizes illegal trafficking. ATF, supported by prosecutors, is enforcing the laws aggressively. ATF recommended almost three-fourths of the trafficking investigations for prosecution, nearly 90 percent to a U.S. Attorney, and the remainder to State and local prosecutors. Of these, 90 percent (over 1,700 defendants) were accepted for prosecution. Of the over 60 percent of the defendants who were fully adjudicated at the time of the survey, only 3 percent were found not guilty or dismissed. Over three-quarters of the defendants found guilty were sentenced to terms of incarceration, from sentences ranging from 12 months or less to life in prison. Altogether, as a result of these investigations, 828 defendants were sentenced to a cumulative 7,420 years in prison.

*Necessity of regulatory enforcement.* The major role played by FFLs as traffickers supplying the illegal market — from gun stores, pawnbrokers, gun shows, and residences, alone and in combination with straw purchasers and unlicensed sellers — confirms the need for a focused regulatory inspection and enforcement program based on trafficking and related indicators of potential illegal activity. Such a program has been initiated by ATF, and has been described in a report on regulatory enforcement published earlier this year by ATF.[37]

---

[36] *Crime Gun Trace Analysis Reports: The Illegal Youth Firearms Markets in 27 Communities,* Youth Crime Gun Interdiction Initiative, Department of the Treasury, Bureau of Alcohol, Tobacco and Firearms, February 1999.

[37] *Commerce in Firearms in the United States,* February 2000, Department of the Treasury, Bureau of Alcohol, Tobacco and Firearms.

## 5-3. Enforcement Issues

Systematic review of ATF's investigative experience led to some startling findings. While ATF agents and their State and local partners are successfully identifying firearms traffickers, U.S. Attorneys are accepting a high percentage of the cases, and juries are bringing in guilty verdicts, persons who traffick in firearms are often not being prosecuted for that conduct; instead, they are being prosecuted for other related conduct. Moreover, the penalties available for many corrupt FFLs who traffick hundreds of firearms, may be limited to misdemeanor recordkeeping violations. In addition, a trafficker who traffics 100 guns is subject to the same penalty as the straw purchaser who transfers 5 guns.

*Obstacles to prosecution of straw purchasers and unlicensed dealers.* Of the 638 investigations (41.7 percent of 1,530) where ATF agents reported that straw purchasing violations were occurring, a total of 427 were recommended for prosecution and not declined by the prosecutor (67 percent of 638; 51 were declined and 160 were still ongoing). The prosecutor charged at least one defendant with making false statements to acquire firearms in 190 of the 427 cases accepted for prosecution in which ATF agents reported straw purchasing was occurring.

Of the 486 investigations (31.8 percent of 1,530) where ATF agents reported that dealing without a license violations were occurring, a total of 296 of these investigations were recommended for prosecution and accepted by the prosecutor (61 percent of 486; 37 were declined and 153 were still ongoing). The prosecutor charged at least one defendant with dealing without a license in only 112 of the 296 cases accepted for prosecution in which ATF agents reported dealing without a license was occurring.

Thus, although ATF agents reported that straw purchasing and dealing without a license violations were occurring in the cases accepted for prosecution, the prosecutor was only able to charge at least one defendant with these violations in less than 45 percent of the straw purchasing cases and less than 38 percent of the dealing without a license cases. The fact that prosecutors accepted the cases shows that the conduct was viewed as constituting serious offenses. However, the relatively low percentage of charges facially tied to the trafficking conduct suggests that violations explicitly relating to firearms trafficking present challenges in court.

*Challenges to enforcement against corrupt FFLs.* The most common violation by FFLs associated with trafficking is recordkeeping violations. Failure to keep required records was found in almost half of the trafficking investigations involving FFLs, and the FFL making false entries in the records was found in just under a fifth of these investigations. These violations are primarily misdemeanors, despite being associated with investigations involving a high volume of trafficked firearms.

*Limited penalties for large scale traffickers.* The case review shows that while most trafficking investigations involve under 50 firearms, some investigations involve more than 50 firearms. Yet, the sentencing guidelines do not distinguish between a trafficker responsible for diverting 50 or 1,000 firearms. Thus, punishment can be disproportionately low given the gravity of the conduct and the threat to public safety. The more firearms illegally trafficked, the greater risk that some of those firearms will be used to commit serious crimes. The sentencing regime should be changed so that sentences are proportionate to impact. To address this concern, the Department of the Treasury has sought changes in the sentencing guidelines.[38]

---

[38] See letter from James E. Johnson, Under Secretary of the Treasury (Enforcement) to the Honorable Diane E. Murphy, Chair, U.S. Sentencing Commission, January 21, 2000; letter from James E. Johnson, Under Secretary of the Treasury (Enforcement) to Mr. John R. Steer, General Counsel, U.S. Sentencing Commission, November 17, 1999.

## 5-4. Investigative Partnerships and Resources

*Role of State and local law enforcement.* The case review reveals a rapidly developing capability to identify and apprehend gun traffickers. Most ATF trafficking investigations, 68 percent (1,037 of 1,530), involved the cooperation of State and local law enforcement agencies. This close working relationship seems especially appropriate because 70 percent of the trafficking investigations involved intrastate trafficking and about 10 percent involved trafficking in firearms stolen from residences. While slightly less than 10 percent of case referrals were to a State or local prosecutor, State and local trafficking enforcement can be expected to develop further with the growing use of firearms and ballistics trace information by State and local law enforcement agencies.

*Firearms tracing.* Nearly 20 percent of the trafficking investigations were initiated through trace analysis after the recovery of crime guns. Beyond the initiation of investigations, tracing was used as an investigative tool to gain information on recovered crime guns in 60 percent of the investigations.

*Secondhand guns.* The important role of tracing is reflected in the fact that a quarter of investigations involve only secondhand guns, while about 75 percent of the investigations involve at least some new guns. New guns are effectively traceable to the last retail purchaser, while secondhand guns are traceable only to the first purchaser, who may be several possessors removed from the source who supplied the gun to the criminal. ATF does not know what proportion of gun crimes are committed with new and secondhand firearms. It is clear, however, that secondhand firearms play a major role in firearms trafficking.

Continued growth of our ability to reduce the illegal market in firearms through enforcement activity clearly depends on expansion of our investment in comprehensive tracing of firearms and use of trace analysis, on investigative practices like the systematic debriefing of arrested violent offenders on the sources of their guns, and on the deployment of the National Integrated Ballistics Information Network (NIBIN), which can link spent cartridges and bullets to traceable firearms.

# APPENDICES

# APPENDIX A

## Statutes Relating to Firearms Trafficking

| Title 18, Section | Makes it illegal for | To | Mental Element(s) | Penalty, up to; Section |
|---|---|---|---|---|
| 2 | Any person | Aid, abet, counsel, command or solicit a criminal act | Knowingly, with the intent to assist in the commission of a crime | Same as for underlying crime |
| 371 | Any person | Agree with at least one other person to violate the law, with one person committing at least one overt act in furtherance of the agreement | True agreement with the intent to accomplish the objective(s) of the conspiracy | 5 years if underlying crime is a felony; § 371 |
| 521 | Criminal street gangs-5 or more persons whose primary purpose involves committing certain offenses. | Provides sentencing enhancement for gang members who have specified convictions within the previous 5 years. | Activities must affect interstate or foreign commerce. | Sentencing enhancement of up to 10 years; § 521. |
| 922(a)(1)(A) | Any person | Engage in the business of dealing in firearms without a license | Willfulness; perpetrator must have acted with a bad purpose, either to violate the law or in conscious disregard of the law, but does not have to have known of the licensing requirement. | 5 years; § 924(a)(1)(D) |
| 922(a)(3) | Nonlicensee | Transport or receive firearm obtained in another state into his state of residence | Willfulness; not required to know he was breaking a specific law, but must have had bad purpose or motive | 5 years; § 924(a)(1)(D) |
| 922(a)(5) | Nonlicensee | Deliver firearm to unlicensed person whose residence is in a state different from transferor's | Willfulness; plus knowing or having reasonable cause to believe transferee resided in another state | 5 years; § 924(a)(1)(D) |

| Title 18, Section | Makes it illegal for | To | Mental Element(s) | Penalty, up to; Section |
|---|---|---|---|---|
| 922(a)(6) | Any person | Make a materially false statement to a licensee, to obtain or attempt to obtain a firearm | A lie is a knowing false statement. The statement must be "intended or likely to deceive" the licensee. | 10 years; § 924(a)(2) |
| 922(b)(2) | Licensee | Deliver firearm to a person where the purchase or possession of the firearm by that person would violate state law or published ordinance. | Willfulness | 5 years; § 924(a)(1)(D) |
| 922(b)(3) | Licensee | Deliver a firearm to a person residing in a state other than the licensee's | Willfulness; Also, licensee must know or have reasonable cause to believe that the transferee resides in another state | 5 years; § 924(a)(1)(D) |
| 922(b)(5) | Licensee | dispose of a firearm without making entries in records required to be kept under § 923. | Willfulness | 5 years; § 924(a)(1)(D) |
| 922(d) | Any person | Dispose of a firearm to a prohibited person | Transferor must know or have reasonable cause to believe the transferee is prohibited | 10 years; § 924(a)(2) |
| 922(g) | Any prohibited person | Possess or receive a firearm or ammunition that has moved in interstate or foreign commerce | Person must know he is in a prohibited category but need not know he is prohibited. Person must know he is in possession of a firearm. | 10 years; § 924(a)(2) |
| 922(i) | Any person | Transport or ship a stolen firearm in interstate or foreign commerce | Person must know or have reasonable cause to believe the firearm was stolen. | 10 years; § 924(a)(2) |
| 922(j) | Any person | Receive, possess, conceal, store, barter, sell or dispose of a stolen firearm that has moved in interstate or foreign commerce | Person must know or have reasonable cause to believe the firearm was stolen. | 10 years; 924(a)(2) |

*FOLLOWING THE GUN: ENFORCING FEDERAL LAWS AGAINST FIREARMS TRAFFICKERS*     49

| Title 18, Section | Makes it illegal for | To | Mental Element(s) | Penalty, up to; Section |
|---|---|---|---|---|
| 922(k) | Any person | Transport, ship or receive in interstate or foreign commerce a firearm with the serial number obliterated or altered, or to possess such a firearm that has been so transported or shipped | Knowing | 5 years; § 924(a)(1)(B) |
| 922(l) | Any person | Except as provided by § 925(d), to import or bring firearms or ammunition into the United States, or to possess such firearms or ammunition, or to receive such firearms or ammunition | "Knowing" as to the importation; "Willful" as to possession or receipt | 5 years; § 924(a)(1)(C) and (D) |
| 922(m) | Licensee | Make a false entry in, fail to make an entry in or fail to properly maintain records the licensee is required to keep | Knowing | 1 years; § 924(a)(3)(B) |
| 922(u) | Any person | Steal an "inventory" firearm from an FFL which has traveled in interstate or foreign commerce. | Knowing | 10 years; § 924(i)(1) |
| 924(a)(1)(A) | Any person | Make a false statement or representation in an FFL's required records or in applying for a license or relief from disabilities | Knowing | 5 years; § 924(a)(1)(A) |
| 924(b) | Any person | Ship, transport, or receive a firearm in interstate or foreign commerce | With the intent to commit a felony with the firearm or knowing or having reasonable cause to believe that a felony will be committed with the firearm. | 10 years; § 924(b) |

| Title 18, Section | Makes it illegal for | To | Mental Element(s) | Penalty, up to; Section |
|---|---|---|---|---|
| 924(c) | Any person | Uses or carries a firearm during or in relation to a Federal crime of violence or Federal drug trafficking crime; OR possess a firearm in furtherance of a Federal crime of violence or Federal drug trafficking crime. | Knowing | Minimum mandatory 5 years; 7 years if the firearm is brandished; 10 years if the firearm is discharged; additional enhancements for short-barrel rifles, short-barrel shotguns, machineguns, destructive devices, fire arms equipped with a silencer. Enhancements for second or subsequent conviction. Death penalty if death of a person results; § 924(c), 924(j). |
| 924(h) | Any person | Transfer a firearm knowing it will be used to commit a crime of violence or a drug trafficking crime | Knowing for both elements | 10 years; § 924(h) |
| 924(k) | Any person | Smuggle or knowingly brings a firearm into the United States, or attempts to do so | Intending to engage in or promote conduct that violates state or Federal drug laws or that constitutes a crime of violence as defined in § 924(c)(3) | 10 years; § 924(j) |
| 924(l) | Any person | Steal a firearm that has traveled in interstate or foreign commerce | Theft is an intentional taking. | 10 years; § 924(k) |
| 924(m) | Any person | Steal a firearm from an FFL (no interstate commerce element) | Theft is an intentional taking. | 10 years; § 924(l) |

| Title 18, Section | Makes it illegal for | To | Mental Element(s) | Penalty, up to; Section |
|---|---|---|---|---|
| 924(n) | Any person | Travel from any state or foreign country into a state and acquires or attempts to acquire a firearm in such state | With the intent to violate 18 U.S.C. § 922(a)(1)(A) | 10years; § 924(n) |
| 1001 | Any person | Make or use a false material statement in a Government-related matter | A lie is a knowing false statement. The statement must have been made for a bad purpose | 5 years; § 1001 |
| 1341 | Any person | Use the mail to perpetrate or advance a scheme to defraud | Having a scheme to defraud; Using the mail with specific intent to perpetrate or advance the scheme | 5 years; 30 years if the scheme involves a financial institution. § 1341 |
| 2117 | Any person | Burglarize a place or conveyance containing interstate or foreign shipments | Specific intent to commit a larceny therein | 10 years; § 2117 |

# APPENDIX B

## Methodology

The case review presented in this report originated in a Congressional request for information about ATF's enforcement activities. Specifically, the House and Senate Committees on Appropriations requested ATF to report on trafficking investigations by February 1999 in connection with funding for ATF's Youth Crime Gun Interdiction Initiative (YCGII), the component of ATF's firearms enforcement programs focused on illegal acquisition, possession, and use of guns by youth and juveniles.[39]

In response, ATF Headquarters requested all ATF Special Agents in Charge to provide information on all firearms trafficking investigations in their respective areas between July 1996 (the commencement date of YCGII) and December 1998 (the end of the last calendar year before February 1999). A survey was sent to each Field Division requesting information for each investigation.

The 23 ATF Field Divisions submitted a total of 1,530 reports on investigations, including ongoing investigations and perfected cases referred for prosecution. Information on 648 investigations involving youth and juveniles were reviewed and provided the basis for a report to Congress on the performance of

YCGII in February 1999.[40] In this report, ATF and an outside researcher review all 1,530 investigations.[41]

This report also reviews the disposition of cases referred by ATF for prosecution. To develop disposition information, ATF, in December 1999, sent supplementary surveys for the 1,530 submitted investigations to the 23 ATF Field Divisions. All surveys were returned to ATF Headquarters by March 15, 2000, for analysis by ATF personnel and outside researchers. Case disposition information was reviewed by outside researchers working with the Bureau of Justice Statistics, which has statutory authority for collecting and maintaining Federal case disposition information.[42]

---

[39] The Statement of Managers accompanying the 1998 Conference Report stated that: "the conferees believe that the proposed increase in funding must be supported by evidence of a significant reduction in youth crime, gun trafficking, and gun availability. The conferees would like to see additional evidence linking the Youth Crime Gun Interdiction Initiative (YCGII) to a corresponding decrease in gun trafficking among youths and minors. Therefore, the conferees direct ATF to report no later than February 1, 1999 on the performance of YCGII." Conference Report to Accompany H.R. 4328, October 19, 1998.

[40] See *Youth Crime Gun Interdiction Initiative: Performance Report.* Report to the Senate and House Committees on Appropriations Pursuant to Conference Report 105-825, October 1998. Department of the Treasury, Bureau of Alcohol, Tobacco, and Firearms, 1999.

[41] Dr. Anthony A. Braga of the John F. Kennedy School of Government, Harvard University.

[42] Dr. Anthony A. Braga of the John F. Kennedy School of Government, Harvard University and Dr. Joel Garner of the Joint Centers for Justice Studies, Sheperdstown, West Virginia.

---

## Use of Surveys

ATF has a developing capacity to gather information from its Field Divisions. The analysis in this report is based on the best information currently available. ATF has conducted two previous case reviews, on gun shows and firearms trafficking.[43] These found that the survey methodology used here provided an accurate picture of the working knowledge held by agents involved in the investigations. A random sample of survey responses involving gun show investigations were carefully reviewed and compared to information contained in the investigation files. The investigation files contained a variety of information on the investigation, including a summary of the case, a set of progress reports documenting ATF agent investigative activities, police reports, evidence inventory, interview transcripts, and court documents. The review revealed that the survey responses were accurate when compared to the paperwork documenting the specifics of the gun show investigation. Another sample was drawn from the gun show investigation data to verify the numbers of firearms reported as trafficked in each investigation.[44] Based on this review, the estimates of trafficked firearms made by the ATF agents were found to have a reasonable basis. Estimates were based on audits of firearms seized by the agents, firearms purchased by agents during the investigation, reconstruction of dealer records, ATF National Tracing Center crime gun recovery information, admissions by defendants, and information from confidential informants.

In addition, with the assistance of the Department of Justice, Bureau of Justice Statistics' Federal Justice Statistics Program, consistency was established between case disposition and sentencing information in the ATF survey and similar case disposition and sentencing information in automated records maintained by the Executive Office for U.S. Attorneys and the Administrative Office of the U.S. Courts.

## What These Data Represent

Because these analyses are based on a survey of ATF special agents reporting information about firearms trafficking investigations, they reflect what ATF encountered and investigated in trafficking investigations. They do not look at the sources of firearms in other ATF investigations, such as investigations of armed career criminals or armed narcotic traffickers. Most importantly, they do not necessarily reflect typical criminal diversions of firearms or the typical acquisition of firearms by youth, juveniles, and adults. Except where noted, the unit of analysis in the review is the investigation itself.

ATF agents and their State and local counterparts gather investigative information to build a case worthy of prosecution, rather than to gather research information. Information generated as part of a criminal investigation, therefore, does not necessarily capture all data about trafficking, trafficking patterns, and the use of trafficked guns in crime. For instance, agents may provide very detailed descriptions of firearms used as evidence in the case but no estimate, much less a detailed description, of all the firearms involved in the trafficking enterprise. Thus, in general, agents did not provide enough consistent and specific infor-

---

[43] See US Department of Treasury and US Department of Justice, 1999. *Gun Shows: Brady Checks and Crime Gun Traces.* Washington, DC: US Department of Treasury and US Department of Justice.

[44] See US Department of Treasury and US Department of Justice, 1999. *Gun Shows: Brady Checks and Crime Gun Traces.* Washington, DC: US Department of Treasury and US Department of Justice.

mation to determine the number of handguns, rifles, and shotguns trafficked in a particular investigation. There may also be little information in the case file on the degree to which trafficked firearms were subsequently used in crime. This is primarily because comprehensive tracing of crime guns does not exist nationwide and, until the practice was initiated in 17 cities through the Youth Crime Gun Interdiction Initiative in 1996, even major cities did not trace all recovered crime guns. Figures on new, secondhand, and stolen firearms only reflect the number of investigations in which the traffickers were known to deal in these kinds of weapons. Figures on stolen firearms are subject to the usual problems associated with determining whether a firearm has been stolen, due to the fact that most gun owners do not report stolen firearms to the police. Such limitations apply to much of the data collected in this research.

Even the investigative data reported in the survey has limitations, because the review analyzes information both from investigations referred for prosecution and adjudicated, and from investigations not yet referred for prosecution. One third of the investigations were reported by the agents as fully adjudicated (514 of 1,530). Not all violations described will necessarily be charged as crimes or result in convictions, and case agents at the time of the survey might not know the exact number of offenders in the investigation, the numbers and types of firearms involved, and the types of crimes associated with recovered firearms. Some information may have been underreported. For example, it is likely that the number of firearms involved in the investigations could increase, as could the number and types of violations, as more information is uncovered by agents working the investigations.

# SURVEY FORMS

**ATF Field Division:**


**ATF Investigation Number:**


**Investigation Title:**


## 1. How was the investigation initiated?

    1= confidential informant

    2= referral from another state, local, or federal agency

    3= FFL reported suspicious activity

    4= developed from another investigation

    5= review of multiple sales forms

    6= Project LEAD or other local tracing project

    7= gun recovered and traced to origins

    8= ATF initiated investigation of suspicious activity (e.g. ATF Gun Show Task Force)

    9= ATF Regulatory inspection of FFL records

    10= anonymous tip

    11= other  Please specify:_____


## 2. What were the violations in the investigation?

Please use the space below to write all violations associated with the traffickers in the investigation (e.g., trafficking, straw purchasing, dealing by non-licensed individuals, "off paper" sales, sales to prohibited persons, obliterating firearms, etc.)

**3.  Were there any Title II violations in this investigation?**

0= NO                          1= YES

Please use the space below to describe the Title II violations (e.g., machine guns, converted guns, conversion kits, silencers, grenades, short barreled firearms, etc.).

**4.  Please describe the trafficking enterprise.**

Circle all appropriate trafficking channels listed below.  For example, if a FFL was trafficking firearms at a flea market, choices 1 and 7 would be selected.

1= Firearms trafficked by licensed dealer, including pawnbroker.

2= Firearms trafficked by straw purchaser or straw purchasing ring.

3= Trafficking in firearms stolen from FFL.

4= Trafficking in firearms stolen from common carrier.

5= Trafficking in firearms stolen from residence.

6= Trafficking in firearms by unregulated private sellers.

7= Trafficking in firearms at gun shows, flea markets, auctions, or want ads and gun magazines.

8= Other.        Please specify:_____

**5.  Were there NEW guns being trafficked?**

0= NO                          1= YES

**6.  Were there OLD guns being trafficked?**

0= NO                              1= YES


**7.  Were there USED guns being trafficked?**

0= NO                              1= YES


**8.  Were the firearms being trafficked INTERSTATE?**

0= NO                              = YES


**9.  Were the firearms being trafficked INTRASTATE?**

0= NO                              1= YES


**10. Were the firearms being trafficked INTERNATIONALLY?**

0= NO                              1= YES


**11. Please describe the number and types of firearms involved in the investigation.**

Please provide as much detail as possible; if the number of handguns and long guns are not known, only fill in the number of firearms.


Total number of firearms:           _____

Total number of handguns:           _____

Total number of long guns:          _____

Total number of rifles:             _____

Total number of shot guns:          _____

Beyond the number of firearms known to be involved in the investigation, please estimate the number of firearms that may have been trafficked by the individual(s) under investigation.

Estimated firearms: _____

## 12. Did this investigation involve YOUTH (person ages 18-24)?

0= NO                          1= YES

If yes, how were youth involved? Circle all that apply

1= straw purchaser(s)

2= trafficker(s)

3= possessor(s) of trafficked firearms

4= thief/robber(s)

5= other.                Please specify:_____

## 13. Did this investigation involve JUVENILES (person ages 17 and under)?

0= NO                          1= YES

If yes, how were juveniles involved? Circle all that apply

1= straw purchaser(s)

2= trafficker(s)

3= possessor(s) of trafficked firearms

4= thief/robber(s)

5= other.                Please specify:_____

*FOLLOWING THE GUN: ENFORCING FEDERAL LAWS AGAINST FIREARMS TRAFFICKERS* 59

**14. Were the trafficked firearms known to be recovered in subsequent crimes?**

0= NO                    1= YES

If yes, please enter the number for each crime below.  If exact numbers are unknown, please simply put a check in the space provided.

Homicide:                    _____

Assault:                     _____

Robbery:                     _____

Sexual assault/ rape:        _____

Property crime:              _____

Felon in possession:         _____

Juvenile in possession:      _____

Illegal possession:          _____

Drug offense:                _____

Other (please specify):      _____

**15. Please provide information on the defendant(s) in the investigation. Please use the space below to describe their role in the case (e.g. straw purchaser, FFL, trafficker, etc.), age, sex, race, and whether the person had a felony record.**

**16. If there were straw purchasers involved in this investigation, please provide any information you may have on the relationship between the straw purchaser and the actual trafficker.** Please circle all that apply.

1= Friend

2= Intimate

3= Relative

4= Business relationship (paid with money or drugs to buy guns for the trafficker)

5= Straw purchaser is the trafficker.

6= Other

Please specify: _____

*FOLLOWING THE GUN: ENFORCING FEDERAL LAWS AGAINST FIREARMS TRAFFICKERS*          61

**17. Has this case been adjudicated?**

    0= NO                           1= YES

**18. Please use this page to summarize any other pertinent information on this investigation.**

## Bureau of Alcohol, Tobacco, and Firearms
## Supplementary Survey of Recent Gun Trafficking Investigations

*INSTRUCTIONS:*

We would like to know some additional information regarding the disposition of the firearms trafficking investigation listed below that your Field Division submitted to ATF Headquarters. Please select the appropriate response or write your response to the following questions in the space provided. Thanks for your time and consideration in this important matter.

Field Division:

ATF Investigation Number:

ATF Investigation Title:

1)    ˙Was this investigation recommended for prosecution?    ____ YES    _____ NO

2)    Who was the investigation recommended to for prosecution?

_____ US Attorney's Office

_____  State/ local prosecutor

If the investigation was not or has not been recommended, please briefly state why.

3)    If this investigation was recommended for prosecution, was the submission declined by the prosecutor?

____ YES    _____ NO

4)    If the investigation was accepted for prosecution, please list the <u>defendants</u> (name, DOB) in the case and the <u>charges</u> under which they were prosecuted.

5)    Has the case been fully adjudicated?

     _____ YES      _____ NO      _____ ON APPEAL

     _____ Some defendants have been adjudicated, some not


     For the adjudicated defendants, please list the sentence for each individual.




6)    Please name the prosecutor(s) of the case and identify which U.S. Attorney District or local court he/she works.




7)    Did this investigation involve the cooperation of a local or state police department?


     _____ YES            _____ NO




8)    Was the tracing of firearms used in this investigation?

     _____ YES            _____ NO


     If yes, what was the role of tracing?  (please select all that apply)

     _____ Investigation was initiated through firearms tracing

     _____ Recovered firearms were traced after the investigation was initiated

     _____ Other, please describe:

This report is also accessible via the Internet on the ATF website:

**http://www.atf.treas.gov**


For further information or additional copies of this report, contact ATF's
Office of Liaison and Public Information
(202) 927-8500


For sale by the U.S. Government Printing Office
Superintendent of Documents, Mail Stop: SSOP, Washington, DC 20402-9328
048-000-00534-9

# Exhibit 45

# Crime Gun Trace Reports
# (2000)
## National Report



The Youth Crime Gun
Interdiction Initiative

**July 2002**

Department of the Treasury
**Bureau of Alcohol, Tobacco and Firearms**




# Youth Crime Gun Interdiction Initiative 2001 Cities



Department of the Treasury
Bureau of Alcohol, Tobacco and Firearms
National Tracing Center Division
Crime Gun Analysis Branch

# Foreword by the Director of the
# Bureau of Alcohol, Tobacco and Firearms

This publication of crime gun data for calendar year 2000 marks the fourth annual compilation of firearms trace analyses since the inception of the Youth Crime Gun Interdiction Initiative (YCGII) in 1996. As the number of communities involved has increased from the original 17 to 55, so has the value of this information as a relevant tool for law enforcement. With this knowledge, communities have formulated sound gun enforcement strategies for proactive use in firearms investigations. This is a direct result of the strong partnerships our agents have forged with every participating agency. Any level of success is impossible without this valued cooperation.

This report analyzing calendar year 2000 gun traces was delayed as a result of our redirection of a portion of our law enforcement resources after the tragic events of September 11, 2001. ATF agents, inspectors, and support staff joined thousands of other Federal, State and local law enforcement personnel across the country to pursue every available lead. At our National Tracing Center, a majority of the staff was dedicated to reviewing and analyzing massive amounts of related information.

The information in this report clearly demonstrates our commitment to this program, to our partnerships, and to the protection of our citizens. The enforcement approach embodied in YCGII provides each community the opportunity and ability to customize their efforts to address their own gun problems, trends, sources, and investigations. As we have seen, violence against Americans can take many forms. With strong partnerships, continued vigilance, and the use of the information at hand, we can continue to challenge those who would criminally use an illegally obtained firearm.

Bradley A. Buckles

*Department of the Treasury, Bureau of Alcohol, Tobacco and Firearms* • *Youth Crime Gun Interdiction Initiative*

# Highlights of the *National Report*

This is the fourth year of ATF's *Crime Gun Trace Reports*. This year, a *National Report* provides national findings based on 88,570 crime gun traces recovered and submitted in calendar year 2000. These trace requests came from 46 cities with a population of 250,000 or more participating in ATF's Youth Crime Gun Interdiction Initiative. Individual *City Reports* provide complete information on the trace results in 50 cities. The *National* and *City* Reports are posted on the Internet at www.atf.treas.gov

## Possessors of Crime Guns

**Juvenile.** About 8 percent of crime guns were recovered from juveniles (Ages 17 & Younger).

**Youth.** About 33 percent of crime guns were recovered from youth (Ages 18-24).
- Individuals *21 years of age* were the most frequent possessors of traced crime guns, followed closely by possessors ages 20 and 19.

**Adult.** About 59 percent of crime guns were recovered from adults (Ages 25 & Older).

## Indicators of Illegal Diversion

**Few Crime Gun Possessors Bought Their Guns Directly from Federally Licensed Gun Dealers.** Only about 12 percent of traced crime guns were recovered from possessors who had purchased those firearms from Federal firearms licensees (FFLs). About 88 percent of traced crime guns changed hands at least once before recovery by law enforcement as crime guns. Such transfers may be lawful or unlawful.

**Many Crime Guns Had Short Time-to-Crime.** Notwithstanding that most crime guns were bought from an FFL by someone other than their criminal possessor, many crime guns were recovered soon after their initial purchase. To the investigator, the short time from retail sale to crime, known as "time-to-crime", suggests illegal diversion or criminal intent associated with the retail purchase from the FFL. The median time-to-crime for crime guns traced was 6.6 years, but law enforcement recovered many crime guns much more rapidly.
- About 15 percent of crime guns were recovered *within 1 year* of their first retail purchase.
- 31 percent of crime guns were recovered *within 3 years* of their first retail purchase.

**Many Firearms Offenses Involved New Guns.** The concentration of crime guns with a relatively short time-to-crime also indicates that many firearm offenses, including violent offenses with firearms, involve new guns. This is even more so for crime guns possessed by youth.
- Almost a third of crime guns (31 percent) recovered in 2000 were purchased in 1997 or later.
- Half of all semiautomatic pistols recovered from *youth* were purchased in September 1996 or later.
- The median time-to-crime for crime guns possessed by *youth* (4.5) is a year and a half shorter than for *adults* (6.0).

**Many Crime Guns Acquired in Multiple Sales.** The acquisition of handguns in multiple sales can be an important trafficking indicator. Handguns sold in multiple sales reported to the National Tracing Center accounted for 20 percent of all handguns sold and traced in 2000.

**Multiple Sales and Obliteration**. Obliteration of a firearm serial number is a trafficking indicator. Among handguns purchased as part of a multiple sale and traced in 2000, 1.6 percent had obliterated serial numbers.

*Youth Crime Gun Interdiction Initiative* • *Department of the Treasury, Bureau of Alcohol, Tobacco and Firearms*

# Crime Guns

Firearms traced by law enforcement nationally are for the most part concentrated among a limited number of *types* and *calibers*, and *manufacturers* and *models*. By focusing investigative efforts on the sources of these firearms, especially those with a short time-to-crime, law enforcement can identify and arrest both illegal suppliers of firearms and their illegally armed customers.

**Handguns** comprised over three-quarters (77 percent) of all traced crime guns. *Four handgun types* made up 60 percent of all handguns traced:

- 9mm semiautomatic pistols
- .380 caliber semiautomatic pistols
- .25 caliber semiautomatic pistols
- .38 caliber revolvers

**Semiautomatic pistols** accounted for half (50 percent) of all traced crime guns. The *9mm semiautomatic* pistol was the most frequently traced type of crime gun (23 percent), and was especially frequent among youth possessors (28 percent).

**Long guns,** including shotguns and rifles, accounted for one in five traced crime guns (22 percent).
- The 12 gauge shotgun, .22 caliber rifle and 7.62 rifle account for more than two thirds of all traced long guns.
- Long guns were nearly twice as likely to be recovered from adults (26 percent) as from youths (15 percent) and juveniles (15 percent).

## Most Frequently Traced Crime Guns

These guns were the most frequently traced by law enforcement officials for all age groups, by manufacturer, caliber, and type. These 10 firearms accounted for 22 percent (19,743) of all trace requests (88,570).

|     | Manufacturer | Caliber | Type of Crime Gun |
| --- | --- | --- | --- |
| 1. | Smith & Wesson | .38 | Revolver |
| 2. | Ruger | 9mm | Semiautomatic Pistol |
| 3. | Lorcin Engineering | .380 | Semiautomatic Pistol |
| 4. | Raven Arms | .25 | Semiautomatic Pistol |
| 5. | Mossberg | 12 GA | Shotgun |
| 6. | Smith & Wesson | 9mm | Semiautomatic Pistol |
| 7. | Smith & Wesson | .357 | Revolver |
| 8. | Bryco Arms | 9mm | Semiautomatic Pistol |
| 9. | Bryco Arms | .380 | Semiautomatic Pistol |
| 10. | Davis Industries | .380 | Semiautomatic Pistol |

# Figure A: Most Frequently Traced Crime Guns by Manufacturer, Caliber and Type for All Age Groups



**1. SMITH & WESSON .38**
**Revolver**



**2. STURM, RUGER & CO. 9mm**
**Semiautomatic Pistol**



**3. LORCIN ENGINEERING. .380**
**Semiautomatic Pistol**



**4. RAVEN ARMS .25**
**Semiautomatic Pistol**



**5. MOSSBERG, O. F. & SONS 12 GA**
**Shotgun**



**6. SMITH & WESSON 9mm**
**Semiautomatic Pistol**



**7. SMITH & WESSON .357**
**Revolver**



**8. BRYCO ARMS 9mm**
**Semiautomatic Pistol**



**9. BRYCO ARMS .380**
**Semiautomatic Pistol**



**10. DAVIS INDUSTRIES .380**
**Semiautomatic Pistol**

## Crime Guns with the Most Investigative Potential

Short time-to-crime guns have the most immediate investigative potential for law enforcement officials because they are likely to have changed hands less frequently. Time-to-crime varied substantially by firearm type, age of purchaser, and specific model.

**Shortest and Longest Median Time-to-Crime by Type.** Semiautomatic pistols had the shortest median time-to-crime, 4.5 years. Revolvers had the longest median time-to-crime, 12.3 years.

**Shortest Median Time-to-Crime by Manufacturer, Caliber, and Type.** The most frequently traced crime guns (by manufacturer, caliber, and type), over half of which were recovered in 3 years or less, were all semiautomatic pistols: Bryco Arms 9mm, Bryco Arms .380 caliber, and Ruger 9mm.

- **Juveniles.** The Bryco Arms 9mm semiautomatic pistol recovered from juveniles had a median time-to-crime of just 1.5 years.
- **Youth.** The Hi-Point 9mm semiautomatic pistol recovered from youths had a median time-to-crime of 1.0 years followed by the Bryco Arms 9mm semiautomatic pistol at 1.1 years.

**Time-to-Crime Among Long Gun Models.** Two long gun models have a median time-to-crime at or below 3 years; the Hi-Point model 995 rifle (1.8 years) and the Maverick Arms model 88 shotgun (3.0 years). The Maverick Arms shotgun also has a median time-to-crime below 3 years for juvenile, youth and adult age groups. The Hi-Point model 995 rifle, has the fastest median time-to-crime among both the juvenile and youth age groups, at 1.3 and 1.7 years respectively.

## Officer Safety

ATF provides officer safety information relating to crime in order to assist State and local law enforcement managers in assessing potential departmental safety measures. For all age groups, the North China Industries Model SKS 7.62mm rifle is the rifle model most frequently encountered by law enforcement officers. The North China Industries Model MAK90 7.62mm caliber rifle is also encountered in significant numbers, and the Colt Model AR15 .223 caliber rifle is among the long guns most frequently recovered from adult possessors. These high capacity rifles pose an enhanced threat to law enforcement, in part because of their ability to expel projectiles at velocities that are capable of penetrating the type of soft body armor typically worn by the law enforcement officers.

## Geographic Patterns

Crime guns form part of local, regional, and national trafficking patterns.

**In-State sources.** About 62 percent of crime guns were first purchased from FFLs in the State in which the guns were recovered by law enforcement officials. The source FFLs were within the same counties as the recovery cities for over one third of the crime guns (35 percent), and another 12 percent were in adjacent counties in the same State or a neighboring State.

**Regional sources.** For traces where a recovery location was provided and distance calculations could be completed (44,905), approximately one third (32 percent) of these crime guns were purchased within 10 miles and almost half (48 percent) within 25 miles of the originating purchase location. More than one third (34 percent) of the traced firearms originated more than 250 miles from the location where they were recovered.

**National Patterns.** National trafficking patterns account for 30 percent or more of guns traced from nine cities. The most striking case is that of New York City, NY, where 73.4 percent of crime guns came from national sources including Virginia, North Carolina, Georgia and Florida. Newark and Jersey City, NJ, which

*Department of the Treasury, Bureau of Alcohol, Tobacco and Firearms* • *Youth Crime Gun Interdiction Initiative*

are located near New York, NY, experience strikingly similar national trafficking patterns with 80.2 and 74.5 percent of their crime guns coming from national sources. Other cities on the Eastern shore with high percentages of nationally sourced guns include Washington, DC (38.6 percent), and Camden, NJ (50.6 percent). A second trafficking pattern runs from the South to large cities in the Midwest. Chicago, IL, has 32.8 percent of crime guns from national sources and Detroit, MI, 44.5 percent. Mississippi, Kentucky and Georgia are important national source areas for Chicago, IL. Kentucky, Georgia and Alabama are significant for Detroit, MI.

# Crime Gun Trace Reports (2000)

## National Report



**The Youth Crime Gun Interdiction Initiative**

**July 2002**
Department of the Treasury
**Burea of Alcohol, Tobacco and Firearms**



*Department of the Treasury, Bureau of Alcohol, Tobacco and Firearms • Youth Crime Gun Interdiction Initiative*

# CRIME GUN TRACE REPORTS (2000)
## *National Report*

### Table of Contents

Foreword by the Director of the Bureau of Alcohol, Tobacco and Firearms..................................................i

Highlights of the *National Report*..................................................ix

1. **Introduction**..................................................1
   Youth Crime Gun Interdiction Initiative Cities..................................................2
   The Youth Crime Gun Interdiction Initiative..................................................3
   Following the Gun to Successful Firearms Enforcement..................................................4

2. **General Findings**..................................................5
   2-1 **Introduction**..................................................5
   2-2 **Age of Possessors**..................................................6
   2-3 **Firearm Type, Caliber, Manufacturer, and Model**..................................................8
       Firearm Type..................................................9
       Type and Caliber/Gauge of Firearms..................................................11
       Manufacturer, Caliber/Gauge, and Type of Firearms..................................................15
       Firearm Manufacturer and Model..................................................20
   2-4 **Results of Trace Requests**..................................................25
   2-5 **Possessors and Purchasers**..................................................29
   2-6 **Time-to-Crime**..................................................30
       Time-to-Crime by Firearm Type..................................................32
       Time-to-Crime for Top Ten Crime Guns by Manufacturer, Caliber, and Type..................................................34
       Time-to-Crime by Manufacturer and Model..................................................36
   2-7 **Recovery Location and Source Location**..................................................41
       Regional and National Geographic Source Patterns..................................................46
   2-8 **Crime Guns with Obliterated Serial Numbers**..................................................50
   2-9 **Multiple Sales**..................................................52

3. **Enforcement Information**..................................................53
   Case Examples..................................................54

4. **Information for Law Enforcement Executives**..................................................63

5. **Progress and Plans: The Strategic Use of Crime Gun Information**..................................................67
   5-1 **Level and Quality of Crime Gun Tracing**..................................................67
       Number of Crime Guns Traced..................................................67
       Comprehensive Crime Gun Tracing..................................................67
       Number of Completed Traces..................................................68
       Increased FFL Identification Rate..................................................68
       Obstacles to Identifying Purchasers..................................................68
       Uninitiated Traces..................................................68
       Other Limitations..................................................68

**5-2    Investigative Support for State and Local Law Enforcement Agencies**................................**69**
Crime Gun Analysis Branch Support...........................................................................69
Field Resource: Online LEAD.................................................................................69
Training:  Firearms Tracing and Illegal Trafficking Investigations.............................69
Training:  Restoration of Obliterated Serial Numbers...............................................69

**5-3    Improvements in the Tracing Process and Tracing Support for State and          d
Local Law Enforcement Agencies**..........................................................................**70**

Access 2000:  Firearms Industry Cooperation...........................................................70
Multiple Sales Records and Crime Gun Tracing.........................................................70
Out-of-Business Records Imaging and Crime Gun Tracing..........................................70

**5-4    Future Developments**................................................................................**71**
Investigative Tracing for Crime Guns.......................................................................71
Firearms Identification Guide ................................................................................71
Electronic Trace Submission...................................................................................71
Regional Crime Gun Centers...................................................................................71
National Integrated Ballistic Information Network......................................................71
YCGII Contract Support.........................................................................................72


**Appendices**                                                                                                     **s**
   A.    **Glossary**................................................................................................**A-1**
   B.    **Technical Notes**.....................................................................................**B-1**
   C.    **Trace Request Form**...............................................................................**C-1**

**Acknowledgements**

*Department of the Treasury, Bureau of Alcohol, Tobacco and Firearms* • *Youth Crime Gun Interdiction Initiative*

## LIST OF TABLES *(National Report)*

Table 1:     Age Group of Crime Gun Possessor.............................................................................7
Table 2:     Firearm Type by Age Group of Possessor...................................................................10
Table 3:     Top Ten Handguns by Type and Caliber by Age Group of Possessor...........................11
Table 4:     Top Ten Long Guns by Type and Caliber/Gauge by Age Group of Possessor.............. 13
Table 5:     Top Ten Crime Guns by Manufacturer, Caliber/Gauge, and Type by Age Group      T
             of Possessor.............................................................................................................15
Table 6:     Top Ten Handguns by Manufacturer, Caliber, and Type............................................ 19
Table 7:     Top Ten Long Guns by Manufacturer, Caliber/Gauge, and Type................................ 19
Table 8:     Top Ten Handguns by Manufacturer and Model by Age Group of Possessor............... 20
Table 9:     Top Ten Long Guns by Manufacturer and Model by Age Group of Possessor.............23
Table 10:    Traces Initiated and Purchasers Identified................................................................ 26
Table 11:    Reasons Traces Not Initiated and Purchasers Not Identified......................................27
Table 12:    Median Time-to-Crime in Years by Firearm Type and Age Group of Possessor........................ 32
Table 13:    Time-to-Crime for Top Ten Crime Guns by Age Group of Possessor..........................34
Table 14:    Median Time-to-Crime for Top Ten Handguns by Manufacturer and Model     T
             by Age Group of Possessor.......................................................................................36
Table 15:    Median Time-to-Crime for Top Ten Long Guns by Manufacturer and Model     T
             by Age Group of Possessor.......................................................................................38
Table 16:    Intrastate and Interstate Sources of Crime Guns....................................................... 42
Table 17:    County, State, and Interstate Sources of Crime Guns ................................................ 42
Table 18:    Miles from Recovery Location to Originating Location................................................ 44
Table 19:    Concentration of Traces Among Active Dealers......................................................... 47
Table 20:    Crime Guns with Obliterated Serial Numbers for Selected Cities................................51
Table 21:    Multiple Sales and Obliterated Serial Numbers Among Handguns Sold and     T
             Traced in 2000........................................................................................................ 52

## LIST OF FIGURES *(National Report)*

Figure 1:    Age of Crime Gun Possessor......................................................................................7
Figure 2:    Major Gun Types by Age Group of Possessor............................................................ 10
Figure 3:    Top Ten Handguns by Type and Caliber for All Ages................................................. 12
Figure 4:    Top Ten Long Guns by Type and Caliber/Gauge for All Ages.....................................14
Figure 5:    Traces Initiated and Purchasers Identified................................................................ 28
Figure 6:    Percent of Traced Crime Guns by Time-to-Crime..................................................... 31
Figure 7:    Cumulative Percentage of Traced Crime Guns by Time-to-Crime..............................31
Figure 8:    Median Time-to-Crime by Firearm Type.................................................................. 33
Figure 9:    Median Time-to-Crime by Age Group of Possessor................................................... 33
Figure 10:   Distance to Recovery Location................................................................................. 44
Figure 11:   Cumulative Distance to Recovery Location............................................................... 45
Figure 12a:  Proportion of Crime Guns from Local, Regional and National Sources by City...........48
Figure 12b:  Proportion of Crime Guns from Local, Regional and National Sources by City...........49

# 1 - Introduction

This is the fourth year of ATF's publication of the National Tracing Center (NTC) *Crime Gun Trace Reports*. The reports provide extensive analyses of crime gun traces submitted in calendar year 2000 by law enforcement officials in selected cities throughout the country participating in ATF's Youth Crime Gun Interdiction Initiative. The analysis of a large number of individual traces from many similar jurisdictions helps identify consistent crime gun patterns that may not be apparent from information in a single trace or traces from a single jurisdiction or State. With information about patterns and trends, more violent criminals can be arrested more efficiently, more focused regulatory enforcement can be undertaken, and more gun crime and violence can be prevented.

**Two Report Formats.** Crime gun tracing as a law enforcement tool has grown sufficiently to provide the 2000 Crime Gun Trace Reports in two formats:

- The *National Report* provides national analysis based on findings from crime gun traces in 41 communities including 44 of 67 cities in the U.S. with populations of 250,000 or more. These cities comprise 80 percent of the population of cities of this size.

- The 47 separate *City Reports* provide detailed information on the trace results in the 39 large communities and eight communities with populations between 100,000 and 250,000.

**Information for Law Enforcement, the Firearms Industry, and the Public.** The *Crime Gun Trace Reports* have three audiences. They provide crime gun information to the *Federal, State, and local law enforcement agencies* that submit trace requests, boosting their information resources for arresting gun criminals, responding to gun violence, and establishing a benchmark for crime gun measurements. They inform *federally licensed firearms dealers* of crime gun patterns, allowing them to build sounder and safer businesses. They inform the *public, Congress, and State and local authorities*, building cooperation by communicating what ATF agents, inspectors, and State and local law enforcement investigating violent criminals see in their everyday enforcement operations.

**Reinforcing Law Enforcement Collaboration.** As a result of the collaboration of thousands of law enforcement and regulatory personnel and the FFLs that routinely respond to the National Tracing Center's inquiries, the *Crime Gun Trace Reports*

provide an overview of crime guns throughout the country in significantly greater detail than previously available. ATF's primary operational focus is on the Federal offender. By reporting trace information in standardized form, ATF intends to enable State and local law enforcement officials to evaluate the information independently and to gain perspective on their local circumstances in order to adjust enforcement and preventive strategies accordingly.

**How Law Enforcement Can Use this Report.** Local law enforcement executives and Federal, State, and local prosecutors and investigators can make many uses of these reports. They furnish information relating to the following questions, among others:

1. *How many crime guns are being recovered from different age groups of offenders?*
2. *What kinds of guns are being recovered in my area?*
3. *What types of crimes are associated with these recovered crime guns?*
4. *Are the source areas in the county or State, or from out of State?*
5. *What types of guns are moving the fastest from the retail seller to recovery in crime?*
6. *Which guns may pose a special hazard to law enforcement officers?*

Using this information, law enforcement managers can decide what aspects of the firearms market deserve priority focus, by age group, by source area, or by type of crime, or any combination of these. Once these priorities are determined, information about specific crime guns and offenders can be obtained using all available investigative resources, including debriefing of arrestees, undercover and confidential informant operatives; Online LEAD;

Brady background check denial information; stolen firearms information; and special analyses by the Crime Gun Analysis Branch and equivalent analytic services in local police departments.

The combination of strategic information such as provided in these reports and investigative information will allow Federal, State, and local law enforcement officers to make the best use of available resources. Based on these factors, ATF and local law enforcement may decide to undertake criminal prosecution against traffickers, including felons, straw purchasers, firearms thieves, and unlicensed dealers, or regulatory actions against Federal firearms licensees.

**Contents of the Reports.** The National and City Reports include information about:

- **Highlights:** The National and City Reports each contain sections with highlights of the findings in the reports, focused on crime gun information relevant to law enforcement officials;

- **Possessors:** the age group and crimes of the crime gun possessors;

- **Crime guns:** the types, manufacturers, calibers, and, in some cities, models of the most frequently traced crime guns, including the most frequently traced crime guns for each city;

- **Gun trafficking indicators:** the time-to-crime and geographic sources of crime guns, multiple sales information, and percentage of crime guns with obliterated serial numbers;

- **Enforcement information:** successful Federal, State, and local investigations of the illegal diversion of firearms;

- **Information for law enforcement executives:** information and responses to frequently asked questions about crime gun tracing and related enforcement operations;

- **Crime gun tracing information:** number of traces submitted, degree of completeness of information provided, disposition of traces, and current and future developments in crime gun tracing; and

- **Technical information:** back-up information about the analysis, figures, and tables in the reports.

## Youth Crime Gun Interdiction Initiative Cities

| City | State |
|---|---|
| Albuquerque* | New Mexico |
| Anaheim, Long Beach, Santa Anna* | California |
| Atlanta | Georgia |
| Austin* | Texas |
| Baltimore | Maryland |
| Baton Rouge* | Louisiana |
| Birmingham | Alabama |
| Boston | Massachusetts |
| Buffalo* | New York |
| Camden | New Jersey |
| Charlotte-Mecklenburg | North Carolina |
| Chicago | Illinois |
| Cincinnati | Ohio |
| Cleveland | Ohio |
| Dallas | Texas |
| Denver-Aurora | Colorado |
| Detroit | Michigan |
| Gary | Indiana |
| Greensboro, Winston-Salem, Highpoint* | North Carolina |
| Houston | Texas |
| Indianapolis* | Indiana |
| Jacksonville* | Florida |
| Jersey City | New Jersey |
| Las Vegas | Nevada |
| Los Angeles | California |
| Louisville | Kentucky |
| Memphis | Tennessee |
| Miami | Florida |
| Milwaukee | Wisconsin |
| Minneapolis | Minnesota |
| Nashville* | Tennessee |
| New Orleans | Louisiana |
| New York | New York |
| Newark | New Jersey |
| Oakland | California |
| Oklahoma City* | Oklahoma |
| Philadelphia | Pennsylvania |
| Phoenix | Arizona |
| Pittsburgh* | Pennsylvania |
| Portland | Oregon |

*Department of the Treasury, Bureau of Alcohol, Tobacco and Firearms* • *Youth Crime Gun Interdiction Initiative*

| | | | |
|---|---|---|---|
| Richmond...................................... | Virginia | St. Louis............................... | Missouri |
| Salinas....................................... | California | Stockton*............................. | California |
| San Jose...................................... | California | Tampa................................. | Florida |
| San Antonio................................. | Texas | Tucson................................ | Arizona |
| Seattle....................................... | Washington | Washington...................... | District of Columbia |

\* City became a partner in the Youth Crime Gun Interdiction Initiative in 2000

---

## The Youth Crime Gun Interdiction Initiative

The annual *Crime Gun Trace Reports* began in 1997 as part of ATF's Youth Crime Gun Interdiction Initiative (YCGII), a youth-focused firearms enforcement program that is a component of ATF's overall firearms enforcement program, the Integrated Violence Reduction Strategy. For this reason, YCGII is referred to throughout this report.

**Participating jurisdictions.** While many law enforcement agencies trace some crime guns, agencies participating in YCGII commit to instituting comprehensive tracing of all crime guns, providing the maximum investigative leads for law enforcement officials, and permitting optimal strategic analysis. These cities received special support from ATF. ALL cities with *City Reports* participate in YCGII. As more law enforcement agencies acquire crime gun tracing as an investigative tool, or implement State comprehensive crime gun tracing laws, ATF expects to include trace information from these jurisdictions in the annual *Crime Gun Trace Reports.*

**National Tracing Center and Crime Gun Analysis Branch: field support.** The National Tracing Division staff conducts traces, analyzes the results, provides case leads, crime gun mapping, and jurisdictional analysis for ATF agents and inspectors and for other law enforcement agencies, and prepares the *Crime Gun Trace Reports.* The YCGII staff at the National Tracing Center provides trace support for all ATF firearms enforcement programs and locally based gun enforcement initiatives. A national update on crime gun tracing is included in the *National Report*, and city information in each *City Report.*

**In the field: investigation, inspections, trace support, and training.** In the field, YCGII is an enforcement collaboration among Federal, State, and local law enforcement agencies, and ATF agents and inspectors. The primary role of the YCGII field staff is to conduct criminal investigations and regulatory inspections. YCGII also provides joint training in tracing, serial number restoration, and gun enforcement investigative methods to ATF agents and their State and local partners. YCGII staff also assists local law enforcement agencies to establish crime gun tracing, with technical support and training.

**YCGII's special focus on juvenile and youth gun crime.** As the *National Report* shows, juveniles (ages 17 and under) accounted for 8 percent of traced crime guns, and youth (ages 18-24) accounted for 33 percent of traced crime guns. ATF agents and inspectors participating in YCGII have a special responsibility for developing investigative information and carrying out enforcement actions involving juveniles and youth. Because juveniles are prohibited from acquiring and possessing handguns without parental involvement, some form of illegal diversion is almost always implicated in an investigation involving a juvenile's possession of a handgun, making crime handgun tracing especially critical. The *Crime Gun Trace Reports,* therefore, focus throughout on the variations in the crime guns and sources of illegal supply to juveniles, youth, and adults.

---

*Youth Crime Gun Interdiction Initiative* • *Department of the Treasury, Bureau of Alcohol, Tobacco and Firearms*

### Following the Gun to Successful Firearms Enforcement

**Crime gun tracing.** Crime gun tracing is a law enforcement tool developed by ATF to investigate violations of the Nation's firearms laws. A crime gun trace identifies the Federal firearms licensee (FFL) who is the original retail seller of the firearm and the firearm's retail purchaser by tracking the manufacturer, caliber, and serial number on transfer documentation from the manufacturer or importer through the wholesaler to the retail seller and first purchaser. A *crime gun trace alone does not mean that an FFL or firearm purchaser has committed an unlawful act. Crime gun trace information is used in combination with other investigative facts in regulatory and criminal enforce*ment. Crime gun tracing has three primary purposes:

- **Identifying individual armed criminals for prosecution.** Like a fingerprint or other identifying evidence, a crime gun trace is used in individual cases to link a firearm offender to his or her weapon, or identify the illegal supplier of a firearm to the criminal, juvenile, or other person prohibited from possessing a firearm. Such investigative work is conducted by local officials and by ATF.

- **Proactive local investigative and strategic analysis to target armed violent criminals and gun traffickers for prosecution.** When officials in a jurisdiction trace all recovered crime guns, law enforcement officials are able to detect patterns in the buying and selling of crime guns in their areas (pattern and trend analysis). This information combined with other indicators leads to the arrest of additional traffickers and armed felons and to regulatory enforcement actions against Federal firearms licensees violating the firearms laws and trafficking illegally. Analysis and mapping of local crime gun patterns is done by ATF at the Crime Gun Analysis Branch and in the field and by State and local law enforcement officials with access to ATFs Online LEAD crime gun information system, or using State firearms information systems.

- *Crime Gun Trace Reports* **to assist law enforcement officials in placing local crime guns in a regional and national strategic enforcement context.** Analysis of all available comprehensive trace information, locally and nationally, informs Federal, State, and local authorities of the source and market areas for crime guns, and other regional patterns. This information enables ATF to target criminal and regulatory resources, and assist Federal, State, and local law enforcement officials to develop national, regional, and local strategic responses to gun crime. ATF is uniquely qualified to conduct such analysis because it is the repository for crime gun traces and related information from all jurisdictions that trace crime guns.

**Ballistics identification in relation to crime gun tracing.** Many agencies are now using both crime gun tracing and ballistics identification to support firearm investigations. An expended cartridge or bullet may be recovered in addition to or in the absence of a crime gun. Once entered in an imaging database, the recovered cartridge or bullet can be matched to previously entered ballistics images to identify repeat uses of the same firearm. Currently, ballistics images also can provide the basis for a crime gun trace only if the firearm with which they are associated has been previously traced and a cartridge or bullet from that firearm entered into a local database of the National Integrated Ballistics Information Network. Ballistics Imaging technology does not automatically submit the crime gun to be traced through the National Tracing Center. In the future, expansion of the crime gun tracing system to include trace information derived from ballistics images as well as recovered firearms will allow additional firearms crimes to be solved and a more complete understanding of how violent offenders and prohibited persons illegally obtain firearms.

*Department of the Treasury, Bureau of Alcohol, Tobacco and Firearms   •   Youth Crime Gun Interdiction Initiative*

# 2 - General Findings

## 2 - 1 Introduction

This section describes key crime gun patterns based on the analysis of information from 88,570 trace requests made by law enforcement officials in 44 communities participating in the Youth Crime Gun Interdiction Initiative that have populations greater than 250,000[1]. The 44 jurisdictions over 250,000 comprise two thirds (67 percent) of the 68 U.S. jurisdictions which, according to the 2000 census, have a population over 250,000. The population of these 44 jurisdictions is 39 million persons, which is 80 percent of the 49 million persons living in U.S. cities having over 250,000 inhabitants[2]. While not yet meeting the program's long-term goal of complete national geographic coverage, this sample provides a reasonable basis for analyzing and reporting crime gun trace information.

This section uses information from trace requests and completed traces to describe the relationship between the crime gun possessor's age and:
- the type, manufacturer, caliber, and model of crime guns recovered,
- the results of trace requests,
- the recovery date and location, and
- the date and location of crime gun purchases.

In addition, this section describes the nature of crime guns when exploring time-to-crime, obliterated serial numbers and multiple sale transactions.

**Possessor Age Group.** To show age differences in crime gun information, this report puts the 88,570 trace requests into three age groups–*Juvenile* (Ages 17 & Younger), *Youth* (Ages 18-24), and *Adult* (Ages 25 & Older). The total for all age groups is also included, and some of the analyses also provide information about the trace requests for which age is unknown.

**Annual Reports of Criminal Behavior.** This compilation of information from crime gun trace requests initiated during calendar year 2000 complements the Federal Bureau of Investigation (FBI) *Uniform Crime Report*s, the *National Crime Victimization Survey* of the Bureau of Justice Statistics, ATF's reporting on firearms commerce and firearms trafficking investigations,[3] and other efforts to improve understanding of violent crime in the United States.

---

[1] In addition to these 44 communities, the trace requests from three North Carolina communities—Greensboro, Winston-Salem and High Point—are included in the national findings. These three closely connected communities are administered as one jurisdiction by the YCGII program.

[2] Percentages reported in the text of this section are rounded to the nearest percent.

[3] *Following the Gun: Enforcing Federal Laws Against Firearms Traffickers*, Department of the Treasury, Bureau of Alcohol, Tobacco and Firearms, June 2000; *Commerce in Firearms in the United States (1999)*, Department of the Treasury, Bureau of Alcohol, Tobacco and Firearms, February 2000.

*Youth Crime Gun Interdiction Initiative* • *Department of the Treasury, Bureau of Alcohol, Tobacco and Firearms*

# 2 - 2 Age of Possessors

**Possessor's Age.** Information on the age of the crime gun possessor is included in 53,865 (61 percent) of the 88,570 trace requests received from participating jurisdictions. Age of possessors is determined based on the possessor's date of birth and the date that the crime gun was recovered.

**Peak Ages 19 to 21.** As displayed in *Figure* 1, the age of crime gun possessors with the single most frequent number of trace requests (2,930) is 21, followed closely by ages 20 (2,751) and 19 (2,744). There is a dramatic increase in the number of traces from (141) age 13 to (2,569) age 18. More than 18,000 crime guns are recovered from individuals between the ages of 18 and 24, the peak years for being a crime gun possessor. The number of crime gun trace requests drops steadily from (1,942) age 25 to (1,321) age 30, and at age 50, there are only 584 trace requests.[4]

**Juvenile, Youth, and Adult Crime Guns.** As presented in *Table* 1, among the trace requests for which the possessor's age is known, adult possession accounts for more than 59 percent of the trace requests, youth possession accounts for 33 percent, and the juvenile category accounts for 8 percent.

**City Variations.** The age distribution of crime gun possessors can vary considerably from the national averages across cities. In certain cities, firearms were recovered predominantly from adults. For example, adults comprise 83 percent of the gun possessors in *San Jose, CA*; 77 percent of the gun possessors in *Miami, FL*; 76 percent of the gun possessors in *Tampa*, FL; 73 percent of the gun possessors in *Portland, OR*; and 72 percent of the gun possessors in *Jacksonville, FL* and *Oklahoma City, OK*. In other cities, firearms are most frequently recovered from youth. Youth comprise 58 percent of the gun possessors in *Newark, NJ*; 49 percent of the gun possessors in *Washington, DC*; 47 percent of the gun possessors in *Gary, IN*; and 46 percent of the gun possessors in *Stockton, CA*.

**Age of Firearm-Related Homicide Offenders.** Gun homicides committed by juveniles and youth have declined 53 percent, from 11,657 in 1993 to 6,147 in 1999. Offenders under 25 years of age account for 56 percent of all gun homicides in 1999. Juveniles alone accounted for 11 percent of gun homicides in 1999, the latest year for which detailed information is currently available.[5]

**Age of Violent Offenders.** Information about the age of crime gun possessors closely parallels data gathered on violent crime from other sources. The number of persons arrested for murder, forcible rape, robbery, and aggravated assault peaks at ages 18 or 19. Individuals aged 18 to 20 account for 21 percent of all persons arrested for murder, 15 percent for forcible rape, 22 percent for robbery, and 12 percent for aggravated assault.[6]

---

[4] For a detailed listing of the number of trace requests by age, see Appendix B.

[5] James A. Fox and Marianne W. Zawitz, *Homicide Trends in the U.S.*, Bureau of Justice Statistics, January 4, 2001.

[6] FBI *Uniform Crime Reports 2000*, Table 38, Section IV, page 12.

*Department of the Treasury, Bureau of Alcohol, Tobacco and Firearms* • *Youth Crime Gun Interdiction Initiative*

## Figure 1: Age of Crime Gun Possessor



## Table 1: Age Group of Crime Gun Possessor

|  | Number | Percent |
|---|---|---|
| Trace Requests for which Possessor's Age can be Determined | 54,241 | 100.0% |
| Crime Gun Trace Requests with: |  |  |
|     Juvenile Possessor (ages 17 & younger) | 4,112 | 7.6% |
|     Youth Possessor (ages 18 - 24) | 18,085 | 33.3% |
|     Adult Possessor (ages 25 & older) | 32,044 | 59.1% |

*Youth Crime Gun Interdiction Initiative* • *Department of the Treasury, Bureau of Alcohol, Tobacco and Firearms*

# 2 - 3 Firearm Type, Caliber, Manufacturer, and Model

**Trace Request Information**. Trace requests are required to include the type, caliber, manufacturer, and serial number of the crime gun because this information is necessary to trace a firearm from manufacturer and wholesale distributor to the initial retail sale. Information about the particular model of the firearm is not required but is provided consistently in some jurisdictions. (See Appendix C, ATF Firearm Trace Request Form.).

**Firearm Classification in this Report**. Generally, crime guns described in this report are classified by the different kinds of information provided on the ATF trace form. For some of the tables and figures in this report, firearms are placed into two basic groups: *handguns* and *long guns*. Handguns include *semiautomatic pistols, revolvers*, and *derringers*. Long guns include *shotguns* and *rifles*.[7]

**Crime Gun Patterns**. Classifying crime guns by type, caliber, manufacturer, and model allows law enforcement to differentiate among firearms. When large numbers of trace requests are analyzed, the patterns in crime gun types emerge. With more comprehensive information, more complete analysis is possible. In this report, patterns are highlighted by focusing on type, caliber, manufacturer, and model.

**Targeting Criminals, Promoting Officer Safety**. Detailed information about crime guns enables law enforcement to target criminal and regulatory resources on the sources of those crime guns. As criminals shift illegal sources, law enforcement officials can target the new sources and reduce future illegal acquisitions. Knowledge of which crime guns criminals are using is also an important consideration for State and local law enforcement in assessing potential departmental safety measures.

---

[7]A small number of firearms are accounted for in the *Other* category, not reported here.

*Department of the Treasury, Bureau of Alcohol, Tobacco and Firearms • Youth Crime Gun Interdiction Initiative*

# Firearm Type

**Handguns, Especially Semiautomatic Pistols**. As displayed in *Figure 2* and *Table 2,* crime guns are predominantly handguns (77 percent) and, among handguns, mostly semiautomatic pistols, which alone account for half (50 percent) of all crime guns traced.

**Juveniles and Youth with Handguns, Adults with More Long Guns**. Semiautomatic pistols are more prevalent among juveniles (57 percent) and youth (61 percent) than among adults (47 percent). A substantial portion of firearm traces, 22 percent, involve a shotgun or a rifle. Adults are almost twice as likely (26 percent) as juveniles (15 percent) to possess a recovered long gun.

**City Variations**. The distribution of semiautomatic pistols, revolvers, shotguns, and rifles among adult, youth, and juvenile possessors is remarkably stable across participating cities, but there are some important differences in a few cities.

- For example, 94 percent of the firearms submitted for tracing by *Atlanta, GA,* are handguns. Semiautomatic pistols are clearly the weapon of choice in *Atlanta*; 82 percent of youth recoveries, 73 percent of juvenile recoveries, and 68 percent of adult recoveries in Atlanta were semiautomatic pistols.

- Trace requests in *Phoenix, AZ,* and *Philadelphia, PA,* also reveal a high percentage of semiautomatic pistols across all age groups.

- In some cities, there are higher percentages of semiautomatic pistol recoveries in only one age group. For example, 77 percent of the guns recovered from youth in *Gary, IN,* 74 percent of the guns recovered from youth in *Louisville, KY,* and 72 percent of the guns recovered from juveniles in *Portland, OR,* are semiautomatic pistols.

- Revolvers are the most frequently recovered firearms from youth and juveniles in *Jersey City, NJ,* (67 percent) and *Pittsburgh, PA,* (45 percent).

- Long guns are also more frequently recovered from youth and juveniles in *San Jose, CA*; *Salinas,* CA; San *Antonio, TX*; and *Minneapolis, MN,* when compared with participating cities overall.