*Department of the Treasury, Bureau of Alcohol, Tobacco and Firearms   •   Youth Crime Gun Interdiction Initiative*

Atlanta area FFL. Further investigation revealed that she was married to a 22-year-old convicted felon who was directing her and another 23-year-old female to straw purchase firearms. At the time of these illegal purchases, the 22-year-old convicted felon was enlisted in the U.S. Air Force. These three individuals were responsible for trafficking 28 pistols to New York City. The trafficked firearms included Ruger 9mm and .45 semiautomatic pistols, Intratec .45 semiautomatic pistols, Desert Eagle .40 caliber semiautomatic pistols, Sig Sauer .40 semiautomatic pistols, and Lorcin 9mm semiautomatic pistols.

In February 2000, with the assistance of the U.S. Air Force Office of Special Investigations, agents arrested the youth, his wife, and the second female. The females were charged with violations of 18 USC Sections 2, Aiding, Abetting, Counseling, Commanding, or Soliciting a Federal Crime, and 922(a)(6), Making False Statements to a Licensee to Attempt to Obtain a Firearm. The 22-yeard-old convicted felon was charged with 922(g)(1), Convicted Felon in Illegal possession of Firearms. All defendants pled guilty to these charges. On December 4, 2000, the 22-year-old convicted felon was sentenced to 64 months incarceration and 36 months supervised release. Likewise, his wife was sentenced to 10 months incarceration and 24 months supervised release. On January 31, 2001, the 23-year-old female was sentenced to 8 months incarceration and 24 months supervised release.

**Police Officer Killed by Firearm Provided to Gang Members by In-State Straw Purchaser**. *Chicago, IL.* In August 1998, a Chicago Police Department officer was shot and killed by a street gang member. ATF subsequently traced the handgun used in the incident. The trace revealed that the handgun had been purchased by a 22-year-old youth at an Illinois FFL just outside the city limits. Further Project LEAD analyses revealed that this youth was also the purchaser of a number of guns recovered from gang members who were in possession of guns and narcotics crimes in public housing projects on the south side of Chicago. Further investigation revealed that the youth had purchased 13 new and used handguns, including Taurus .357 revolvers and Smith & Wesson .357 revolvers. The youth admitted to purchasing handguns on 5 separate occasions for members of the Gangster Disciples Street Gang.

The youth was arrested on April 13, 2000, and charged with 18 USC Sections 371, Conspiracy to Commit a Federal Crime, and 922(a)(1)(A), Engaging in the Business of Selling Firearms Without a License. On July 27, 2000, the youth pled guilty to these charges and, on March 14, 2001, was sentenced to 37 months of incarceration followed by 3 years supervised release.

**Interstate Trafficking in New Firearms to Gang Members by Straw Purchasing Ring.** *Milwaukee, WI.* Through analysis of multiple sales data, ATF uncovered the purchase of 46 new handguns, including many Lorcin and Bryco semiautomatic pistols, by three defendants at an FFL in Wisconsin between June 1998 and April 1999. These handguns were subsequently transported and illegally sold to juvenile and youth gang members in Chicago, Illinois. At the time this investigation was completed, the Chicago Police Department, Cicero (Illinois) Police Department, and Rockford (Illinois) Police Department had recovered 17 of these handguns. Sixteen of these handguns were recovered from juveniles, many of whom were members of the Latin Kings Street Gang.

On six occasions between June and September 1998, a 24-year-old defendant purchased 26 handguns from the Wisconsin FFL. Immediately after purchase he gave most of the handguns to his co-conspirator, a 20-year-old youth, for the purpose of reselling the handguns. The 20-year-old transported the handguns from Wisconsin to Chicago, where he sold them to Latin King gang members. In December 1998, another 24-year-old defendant became involved in unlawfully dealing firearms after the 20-year-old youth suggested that he could make money buying and selling firearms. On four occasions between December 1998 and April 1999, the third defendant bought a total of 20 handguns from the same Wisconsin FFL. He later admitted that he sold these handguns to gang members in Chicago. On May 15, 1999, ATF executed Federal search warrants and interviewed the three defendants. Each made admissions regarding unlicensed firearms dealing.

In February and March of 2000, each defendant pled guilty to one count of 18 USC Section 922(a)(1)(A), Dealing Firearms Without a License. On April 28, 2000, the first 24-year old was sentenced to 4 months imprisonment, 4 months home detention, and 2 years supervised release. On May 12, 2000, the 20-year-old defendant was sentenced to 3 years imprisonment, 3 years supervised release, and a $1000 fine. On May 19, 2000, the second 24-year-old defendant was sentenced to 5 months imprisonment, 5 months home detention, and 3 years supervised release.

**International Firearms Trafficking by Large-Scale Straw Purchasing Ring Buying New and Used Guns from Licensed Dealers and Unlicensed Sellers at Gun Shows.** *Phoenix, AZ.* Using Project LEAD and Multiple Sales data, ATF agents identified several individuals that were associated with suspicious purchasing patterns and a number of firearms recovered in narcotics crimes in Tucson, Phoenix, and Mexico between 1996 and 2000. Further investigation revealed that a 24-year-old youth paid five friends and acquaintances from his neighborhood to purchase the firearms for him. The youth used these straw purchasers in an attempt to circumvent the Multiple Sale reporting procedures. Although the confirmed firearm purchases were from licensed dealers, the youth and his ring of straw purchasers were known to frequent gun shows and purchase firearms. Further investigation revealed that this ring of straw purchasers provided in excess of 100 firearms, including Browning 9mm semiautomatic pistols, Colt .38 pistols, Ruger 9mm semiautomatic pistols, and Beretta .380 and 9mm semiautomatic pistols, to drug traffickers moving guns to Mexico.

In August 2000, the defendants were arrested and charged with violating 18 USC Sections 371, Conspiracy to Commit a Federal Crime; 922(a)(1)(A), Engaging in the Business of Dealing Firearms Without a License; and multiple counts of 924(a)(1)(A), Providing False Statements to a Firearms Dealer.

On June 18, 2001, the 24-year-old youth pled guilty to 18 USC Sections 922(a)(1)(A), Engaging in the Business of Dealing Firearms Without a License; and 10 counts of 924(a)(1)(A), Providing False Statements to a Firearms Dealer. He was sentenced to 34 months incarceration and fined $5000.

The lead straw purchaser for the 24-year-old youth pled guilty to18 USC Sections 922(a)(1)(A), Engaging in the Business of Dealing Firearms Without a License; and 2 counts of 924(a)(1)(A), Providing False Statements to a Firearms Dealer. He was sentenced to 15 months incarceration, and fined $1,000. The other four individuals cooperated with the Government in this investigation. They each pled guilty to one count of 18 USC Section 924(a)(1)(A), Providing False Statements to a Firearms Dealer and were sentenced to probation.

**Large-Scale Trafficking in New and Used Firearms by Licensed Dealer**. *West Palm Beach, FL.* In June 1999, an investigation was initiated into the business practices of a West Palm Beach licensed firearms dealer. The investigation was initiated after ATF firearms trace data analyses revealed this FFL as a top source of recovered crime guns in Palm Beach County each year between 1995 and 1999. Further data analyses revealed that the FFL also had high numbers of multiple firearms sales, NICS denials, and firearms theft reports. ATF also received information from a confidential informant that FFL employees were facilitating straw purchases of firearms to prohibited persons by coaching the prohibited person on how to bring a friend with them who can purchase the firearm.

During the investigation, two different ATF confidential informants with prior felony convictions were sent in to the FFL on multiple occasions, completed an ATF Form 4473, were denied purchase approval during the records check, and were then coached by the owner and a manager on bringing in friends to get the guns for them. Then, on several occasions the felons went back to the FFL, handed the owner and manager money, had a "friend" (actually an undercover ATF agent) fill out the 4473 form for approval, and had the owner and a manager hand the guns to the felon. All transactions were electronically recorded. On one occasion, the owner asked the confidential informant to come to a back room where the owner took out a MAC-10 9MM pistol and silencer, fired the weapon into some tires,

and asked the informant if he was interested. The confidential informant purchased the MAC-10 and silencer with the undercover ATF agent completing the paperwork for the MAC-10 with no mention of the unregistered silencer having no serial number. In January and August 2000, Federal search warrants were served at the business by ATF. During both search warrants, ATF special agents and an inspector examined records and discovered that the FFL had been making false entries and significantly altering firearms purchase and sales records. The business records were seized as evidence.

On March 26, 2001, the owner and manager of the gun store pled guilty to 18 USC Section 371, Conspiracy to Commit an Offense against the United States. The plea agreement also required that the license be immediately surrendered. On August 15, 2001, the owner was sentenced to 30 months in prison and fined $60,000. The manager was sentenced to 14 months in prison.

Although this FFL has been out of business for a year, it continues to be a significant source of traced crime guns, and probably will be for years to come due to the number of firearms they transferred to criminals, gang members, and youths. Based on best estimates from cooperating employees at the FFL, at least 1,000 firearms were transferred illegally over the last 2 years of their business operations. Their self-admitted business motto was "No one leaves without a gun". Firearms sold by this FFL have been recovered in crimes in foreign countries and throughout the United States.

# 4 - Information for Law Enforcement Executives

This section answers frequently asked questions from law enforcement executives about the Youth Crime Gun Interdiction Initiative, comprehensive tracing, and ATF's firearms enforcement programs.

**What are the selection criteria for YCGII cities?**
Experience over the years has resulted in ATF modifying the selection criteria to focus on cities with a great number of firearms recoveries and a greater law enforcement infrastructure to support the program. The selection criteria utilize the following:
- City population,
- Youth and juvenile crime rates as derived from the Uniform Crime Reports (UCR),
- Known trafficking source or market areas,
- History of firearms tracing, and
- Mix of city size and demographics.

**What are the primary goals of the YCGII program?**
The primary goals of the YCGII program are:
- Ensure that 100 percent of all recovered crime guns are traced through ATF's National Tracing Center (NTC),
- Conduct research and analysis to determine community-wide patterns and trends,
- Produce an annual report for State and local authorities for use in developing informed enforcement strategies focused on the reduction of firearms violence and the interdiction of firearms to age groups of concern, and
- Use this information to increase the effectiveness of enforcement efforts in the apprehension and prosecution of those who illegally possess and traffic firearms.

**What is a crime gun trace?**
A crime gun trace by ATF's National Tracing Center (NTC) seeks to identify the Federal firearms licensees (FFLs) who first came in contact with the firearm, i.e., manufacturer, wholesaler, retailer, and the individual who first purchased the firearm from the retail dealer.

In addition, for certain FFLs, the NTC may also be able to provide trace information for firearms re-sold as used guns and subsequently recovered by law enforcement. Finally, ATF special agents and their State and local counterparts sometimes conduct investigative traces which seek to identify the complete chain of possessors from initial retail purchase to recovery by law enforcement.

**What is the investigative value of a crime gun trace?** A firearms trace acts as an avenue to obtain additional investigative leads which may tie the suspect to the firearm itself, and to other crimes otherwise unknown if the gun had not been traced. The appearance of an FFL or a first purchaser in association with a crime gun or in association with multiple crime guns does not show that either the FFL or first purchaser has committed unlawful acts. Rather, such information may provide a starting point for further and more detailed investigations.

**How does my agency submit a crime gun trace request to the NTC?** Traces can be submitted by fax (1-800-578-7223). In emergencies, trace requests can be made by telephone (1-800-788-7133). Trace forms can be obtained by calling the ATF Distribution Center (703-455-7801), by calling your local ATF office, or through the Internet at www.atf.treas.gov.

**Will my department be charged for an NTC trace?** The NTC will trace any and all crime guns submitted for tracing at no charge.

**What is comprehensive crime gun tracing?** Comprehensive crime gun tracing occurs when law enforcement authorities in a given jurisdiction routinely submit the serial number, manufacturer, model, caliber, and weapon type of all firearms recovered in their jurisdiction to ATF's NTC. For more complete analysis, law enforcement authorities may submit information on the possessor of the

firearm (when there is a possessor), associate (any individual who may be associated with the possessor at the time of recovery), and recovery date and address.

### What is the investigative value to my department of comprehensive crime gun tracing?

Large numbers of traces can be analyzed to develop proactive leads to gun traffickers, armed offenders, and illegal possessors of firearms. When the NTC compiles comprehensive crime gun trace information for a law enforcement agency, it can furnish information relating to the following questions: 1. What kinds of guns are being recovered in my area? 2. What types of crimes are associated with these recovered crime guns? 3. Who are the dealers that are the source of crime guns recovered in my area? 4. Who are the individuals supplying firearms to the criminals and juveniles in my area? 5. Where are the recovery locations? 6. Are the source areas in the county or the State, or from out-of-State? 7. Where should my resources be concentrated to stem the flow of firearms to my streets?

With this information, a department working with ATF can maximize enforcement leads to illegal suppliers and their violent customers and establish enforcement strategies to reduce juveniles and criminals illegal access to guns. Firearms tracing can also lead to improved officer safety, since it can alert officers to crime gun activity at a specific address, or by a particular individual.

### What is the best method of comprehensive trace submission?

The Electronic Trace Submission System (ETSS) is a stand-alone database that enables ATF field offices and other law enforcement organizations to capture firearm trace related data. This data is then exported from ETSS and the Batch File is then transferred electronically to the NTC for processing. Agencies with only a few hundred traces a year can use fax or mail submission or request ETSS from ATF.

### How much does comprehensive tracing cost?

ETSS is currently available to all ATF field offices and can be downloaded from the NTC page on the ATF Intraweb at no charge. Upon request, police departments can upload ETSS by CD-ROM. The largest cost to the department is likely to be the cost of entering trace information in person hours.

### What assistance in establishing comprehensive tracing is available from ATF?

Comprehensive crime gun tracing is free to the requesting jurisdiction. The NTC will also work with police departments to establish the easiest methods for them to trace firearms. The Crime Gun Analysis Branch (CGAB) will conduct a full assessment of a city's capability for comprehensive tracing and recommend the steps needed to achieve this goal, including providing funding to improve the city's crime gun data collection process. ATF will also provide the city with a detailed plan of action highlighting specific activities that each party would perform. ATF also provides training directly and in conjunction with the International Association of Chiefs of Police and the Bureau of Justice Assistance.

### Will my law enforcement agency receive responses to trace requests directly?

After a firearm is submitted for tracing, the trace report containing the results of the trace is returned to the requester.

### How long does a trace response take?

A routine firearm trace averages 12 working days.

### Are there special provisions for urgent traces?

Urgent traces, which must adhere to certain criteria, are completed within 24 hours. Criteria for an urgent trace include: assaults, bank robbery, kidnapping, murder/suicide, rape/sex crimes, terrorist act or threat, undercover investigation, high profile, needed for court, needed to hold a suspect in custody, or issuance of a search warrant.

### Are trace responses on paper or electronic?

Currently, Federal, State, and local law enforcement agencies can submit trace requests electronically, but can only receive trace responses on paper. In addition, the NTC will respond to law enforcement organization requests for an extract of a jurisdictions trace information and provide it on disk.

### Can investigators search available crime gun trace information for investigative leads?

ATF developed Online LEAD, a firearms trafficking information system, to enable investigators to search

for criminal patterns in trace information. It has proven to be a powerful tool in the hands of field investigators. By analyzing the raw data contained in firearms trace and multiple sales records, Online LEAD generates a wealth of investigative leads. For example, ATF and other law enforcement agencies can identify firearms traffickers by researching both the sources of firearms and their destinations. For individual jurisdictions, the value of Online LEAD depends on law enforcement agencies tracing crime guns comprehensively.

**Do State and local law enforcement agencies have access to Online LEAD?**
Yes. Online LEAD is located at ATF field offices and is readily available to local task forces. The Online LEAD crime gun information system allows ATF agents and inspectors to access crime gun trace and multiple sales data directly from their desktop computers using the ATF Intraweb. The data in the Online LEAD system is updated automatically every 24 hours.

**Do all crime gun traces result in identification of purchasers, and if not, why submit all recovered firearms for tracing?**
Currently over 53 percent of traces from participating cities result in the identification of a purchaser, and many of these are relatively recent gun buyers. Even without purchaser results, most crime gun traces result in useful information. With gun dealer but not purchaser information, traces can reveal concentrations of crime guns flowing from particular dealers, and provide information on the source States and counties of these firearms, thus helping local law enforcement officials understand whether crime guns they recover have crossed jurisdictional lines. Other information supplied, such as possessor, associate, and recovery information, will allow comprehensive crime gun analysis for your jurisdiction.

**Can ATF's CGAB assist my agency in specific investigations?**
The CGAB, located at the National Tracing Center, can provide information useful for officer safety precautions when conducting search warrants, to assist in an investigation, hold a suspect, or acquire a search warrant. Your agency can request analysis of

crime gun trace data in your jurisdiction by fax (304-260-3640), email CrimeGunAnalysisBranch@trac.atf.treas.gov), or telephone (1-866-360-3418). The CGAB can provide assistance by running an individual suspects name and/or address through the Firearms Tracing System (FTS) to determine whether any firearms have been recovered at a particular address in connection with warrant service, or if an individual at that address has purchased multiple firearms or been involved in crime gun traces.

**Can the CGAB assist my agency in using crime gun trace information for strategic purposes?**
Analysis of crime gun trace data in your jurisdiction can be provided through the CGAB and Online LEAD. The CGAB can analyze your crime gun trace and related multiple sales information to help identify problems in your jurisdiction. A trace study can be conducted to identify trends and patterns in crimes involving firearms. The CGAB can provide leads and proactive referrals on individuals who may be suspected of straw purchasing or firearms trafficking in your jurisdiction.

**Does the NTC provide crime gun mapping?**
The CGAB can map crime gun recovery locations on a map of your jurisdiction demonstrating trends and patterns with areas of high amounts of crime gun recovery locations. Mapping of crime gun recovery locations can be provided most effectively when a jurisdiction is tracing comprehensively and when complete recovery address information is supplied.

**What does ATF view as best practices in using crime gun tracing as an investigative tool?**
Best practices include first ensuring that you are maximizing ATF as a resource by requesting traces through the NTC on all recovered firearms; ensuring that possessors of recovered firearms are interviewed to determine their sources; and ensuring that ATF is the central recipient of all firearms-related information. You should also use other statistical data as shown in the annual Crime Gun Trace Reports and, where possible, develop a gun unit dedicated to investigating firearms offenses and developing strategies based on the analysis, including working with ATF in the conduct of joint firearms trafficking investigations.

## How does the FTS relate to the National Integrated Ballistics Identification Network (NIBIN)?

Crime gun tracing and ballistics identification are both crime gun investigative tools. Tracing can be conducted when the crime gun itself is recovered. If only a cartridge or bullet is recovered, this image can be analyzed so that it can be tied with previously identified shooters or firearms. Increasingly, departments are using both tools to assist in solving gun crimes. Ballistics Imaging technology does not automatically submit the crime gun to be traced through the National Tracing Center.

## How will comprehensive crime gun tracing help reduce youth gun violence?

Comprehensive crime gun tracing will provide an information platform for developing the best local investigative strategies. One of the findings of the Crime Gun Trace Reports is that a large proportion of youth crime guns are quite new and most likely deliberately and illegally trafficked. Many crime guns were first sold at retail in-State. The long held presumption that guns used in crimes were all borrowed from home, stolen, or trafficked across State lines appears to be incorrect. Comprehensive crime gun tracing and trace analysis can support both trafficking investigations aimed at these sources of newer firearms and the deployment of traditional criminal investigation techniques (debriefings, confidential informants, turning of arrestees, etc.) aimed at sources of new and older firearms. Because juveniles have less access to the firearms market than adults, a strategy that targets their illegal supply can be especially productive.

## How does tracing relate to a strategy of deterring and incarcerating persons illegally possessing, carrying, or using firearms?

Local law enforcement authorities are actively searching to find the best mix of local enforcement operations. ATF is providing new assistance to that effort by working to institute comprehensive tracing and ballistics identification capabilities and use these tools to support gun crime investigations. These tools are providing new opportunities to attack gun criminals and the illegal gun market, which includes many felons acting as gun traffickers. At the Federal level, ATF believes that a balance between attacking the illegal supply of firearms to prohibited persons, including juveniles and adult felons, and deterring and incarcerating armed violent offenders, is necessary to reduce violent crime.

## What are common types of illegal diversion?

Corrupt Federal firearms licensees, unlicensed sellers, straw purchasers, thieves, and traffickers in stolen guns, all contribute to the illegal market in guns. ATF utilizes all aspects of comprehensive trace data to initiate criminal investigations and to develop ATF regulatory enforcement strategies.

## How does comprehensive tracing relate to an ATF regulatory enforcement strategy?

Comprehensive trace data are used to initiate criminal investigations and to develop ATF regulatory enforcement strategies. The focused inspection program addresses some of the following:

- firearms dealers with a significant percentage of unsuccessful firearms traces,
- reported Multiple Sales/unreported Multiple Sales,
- firearms dealers with *more* than one theft involving less than ten firearms, and
- dealers identified with short time to crime firearms.

Comprehensive tracing also allows ATF to identify Federal firearms dealers who may have serious recordkeeping problems, inventory problems, and who may be associated with crime guns. In addition, firearm dealers who do not respond to a crime gun trace request or provide incorrect information in response to firearms trace request(s) are identified. Dealers who have been cited for firearm violations are advised of the correct recordkeeping procedures and if the violations continue, are subject to administrative action, including license revocation.

# 5 - Progress and Plans: The Strategic Use of Crime Gun Information

This section describes the progress made in comprehensive crime gun tracing during the past year. Crime gun tracing is voluntary for most law enforcement agencies. Through the Youth Crime Gun Interdiction Initiative (YCGII) and other firearms enforcement programs, ATF in 1996 began a concerted effort to work with other law enforcement organizations to maximize the utility of this critical investigative tool. To develop and encourage crime gun tracing, ATF continues to strive to improve the tracing process, quantity, quality, and delivery of crime gun information, and related investigative services to ATF agents and their State and local partners.

## 5-1 Level and Quality of Crime Gun Tracing

**Number of Crime Guns Traced.** The number of firearm traces submitted to the National Tracing Center (NTC) remained relatively constant; from 206,070 traces in 1999 to 206,115 traces in 2000. Law enforcement officials in the 50 participating YCGII locations submitted approximately 96,902 crime gun trace requests between January 1, 2000, and December 31, 2000, 47 percent of the total number of crime gun trace requests submitted to the NTC during this period. The 17 new YCGII cities submitted 17,510 trace requests.

**Comprehensive Crime Gun Tracing.** Police departments that join the YCGII make a commitment to trace all crime guns recovered in their jurisdictions in order to maximize investigative leads and permit analysis of local crime gun patterns by age group. While other law enforcement agencies are making similar commitments and meeting them successfully, the annual Crime Gun Trace Reports currently include only YCGII cities. ATF makes a special effort to ensure the accuracy of the information collected for these reports. While the NTC cannot determine definitively whether all recovered crime guns are being traced, an evaluation can be made based on the number of trace requests, the tracing infrastructure in the law enforcement agencies, and on information obtained from local officials. On this basis, the NTC determined that during 2000, 38 of the 50 locations participating in YCGII were tracing comprehensively. These cities include:

| | | | | |
|---|---|---|---|---|
| Atlanta, GA | Chicago, IL | Jacksonville, FL | New Orleans, LA | Richmond, VA |
| Baltimore, MD | Cincinnati, OH | Los Angeles, CA | Nashville, TN | Salinas, CA |
| Baton Rouge, LA | Dallas, TX | Louisville, KY | New York, NY | San Antonio, TX |
| Birmingham, AL | Gary, IN | Memphis, TN | Oklahoma City, OK | San Jose, CA |
| Boston, MA | Greensboro/Highpoint/ | Miami, FL | Philadelphia, PA | St. Louis, MO |
| Camden, NJ | Winston Salem, NC | Milwaukee, WI | Phoenix, AZ | Tampa, FL |
| Charlotte- | Houston, TX | Minneapolis, MN | Pittsburgh, PA | Tucson, AZ |
| Mecklenburg, NC | Indianapolis, IN | Newark, NJ | Portland, OR | Washington, DC |

Of the remaining cities, a sufficient number of traces for a city-based analysis were received to complete a City Report. In each City Report, Table H reports each city's number of trace submissions.

**Number of Completed Traces.** The NTC is continually improving its ability to diagnose the reasons for missing crime gun trace information, to learn what type of crime gun information is most consistently missing or inaccurately reported and to determine whether the failure to match serial numbers is due to obliteration, faulty recording, incorrect Federal Firearms Licensee (FFL) records or data mismanagement. This effort is shown in Tables I and J of the City Reports and summarized here nationally for all YCGII cities with a population of over 250,000.

**Increased FFL identification rate.** Traces in which a Federal firearms licensee was identified accounted for 71 percent of crime gun traces initiated. This represents a decline from the 75 percent rate reported in the 1999 Crime Gun Trace Reports and an increase from the 66 percent rate reported in the 1998 Crime Gun Trace Reports.

**Obstacles to identifying purchasers.** As in 1999, the NTC identified retail purchasers for over half (53 percent, 47,478) YCGII crime guns. Where a trace was initiated by the NTC, purchasers were not identified for several reasons, including:

- problem with crime gun serial number (10.8 percent)
- records on this crime gun unavailable (6.8 percent)
- problem with importer name (5.6 percent)
- problem with manufacturer name (3.5 percent)
- records not available (1.5 percent)
- expiration of 20-year record retention requirement (2.4 percent)

**Uninitiated traces.** The NTC did not initiate a trace for 12.8 percent (11,320) of the trace requests, for several reasons, including:

- firearms manufactured before 1969 and not traceable through Out-of-Business records (8.8 percent)
- trace request submitted for informational purposes only (3.4 percent)
- other reasons (0.6 percent)

The initiation of 87 percent of the trace requests from YCGII jurisdictions is a slight decrease from 1999 (90 percent).

**Other limitations.** With sufficient information about the crime gun, the NTC can identify the firearms first retail purchaser. In most cases, it cannot identify retail purchasers of crime guns re-sold by FFLs as used guns, or of crime guns acquired as used guns from unlicensed sellers. As a result of the structure of the firearms laws, an NTC trace usually stops at the first retail purchase of the firearm recovered by law enforcement.

# 5-2 Investigative Support for State and Local Law Enforcement Agencies

**Crime Gun Analysis Branch Support.** The NTC Crime Gun Analysis Branch (CGAB) has been increasingly active in responding to requests from law enforcement agencies for assistance in developing strategic overviews of the local crime gun problem and in law enforcement investigations and regulatory inspections. In 2000, the CGAB completed over 37 crime gun mapping requests, including 15 YCGII cities; 334 requests for crime gun trace information; 389 requests for queries of the Firearms Tracing System (FTS) concerning individuals; 1,162 requests for queries concerning FFLs and 96 proactive referrals to investigators on suspected firearms traffickers. CGAB also made 18 presentations in 2000 on crime gun trace analysis through crime gun mapping and Online LEAD and prepared the Crime Gun Trace Reports.

**Field Resource: Online LEAD.** Online LEAD is ATF's crime gun trafficking information tool. In 2000, the number of ATF investigators using Online LEAD increased to approximately 1,800 users. In November 1999, Online LEAD was deployed to all ATF field offices to enable ATF agents, inspectors, and local task force officers to access crime gun trace and related multiple sales information directly from their desktop computers using the ATF Intraweb, with over 375 users from YCGII cities receiving access. ATF investigators in all locations can now access not only local but all nationwide crime gun information, facilitating regional and interstate investigations.

**Training: Firearms Tracing and Illegal Trafficking Investigations.** In 1999, ATF developed a training CD-ROM to help train Federal, State and local law enforcement officers participating in YCGII in firearms identification and tracing procedures. ATF field agents learned how to use the YCGII Instructor CD-ROM and then delivered it locally. Because of the important role of firearms trafficking investigations in the reduction of violent crime, the International Association of Chiefs of Police, in a program funded by the Department of Justice's Bureau of Justice Assistance, continued to provide training at the NTC for police departments interested in starting comprehensive crime gun tracing and trafficking enforcement programs.

**Training: Restoration of Obliterated Serial Numbers.** ATF continues to work with police departments and law enforcement laboratories to restore obliterated serial numbers on crime guns and to develop local coordinated enforcement efforts to trace and proactively target leads derived from recovered crime guns with obliterated serial numbers. ATF has developed a 3-day session of instructional and hands-on training for State and local investigators and firearm examiners covering the importance of restoring obliterated serial numbers and tracing those firearms. Eleven training sessions were held during this reporting period, four in YCGII cities with representatives from four additional YCGII cities in attendance.

# 5-3 Improvements in the Tracing Process and Tracing Support for State and Local Law Enforcement Agencies

Currently, a routine firearm trace takes an average of 12 business days to complete. Urgent traces are completed within 24 hours. In 2000, ATF continued to take steps to shorten the time it takes to complete a routine trace, and facilitate law enforcement agencies ability to submit and receive trace information. Compared to 1999, however, there was an increase in the completion time of the tracing process. This increase can be attributed to a higher rate of successful traces through Out-of-Business records and greater attention to improving the quality of traces being submitted.

### Access 2000: Firearms Industry Cooperation.
Access 2000 is an ATF produced system that allows a manufacturer, importer or wholesaler to download a subset of their firearms data into a stand-alone personal computer. ATF tracers can then dial up and query on a specific serial number in order to obtain a disposition on the firearm. Access 2000 also allows 24-hour access to manufacturer, importer or wholesaler records and is particularly useful for urgent traces. The system shortens the trace process from 1 to 3 days by eliminating the step of calling or faxing the manufacturer, importer or wholesaler and waiting for the results of the crime guns disposition, while also reducing firearms industry trace-related costs. In 2000, use of Access 2000 increased from 10 to 17 manufacturers and/or wholesalers, and now includes 10 manufacturers: Beretta U.S.A. Corp., H&R 1871 Inc., Smith & Wesson, Taurus, Heckler & Koch, Marlin, Mossberg, Colt, Remington Arms and Glock G.m.b.H.; and 7 major wholesalers: RSR Wholesale Guns, Davidsons Supply Company, Acusport, Ellett Brothers, Interarms, Ashland Shooting Supplies and Sports South. Valor Corporation, another major importer, allows queries of crime gun traces to be conducted via the Internet.

### Multiple Sales Records and Crime Gun Tracing.
The NTC continues to use multiple sales records to speed crime gun tracing. FFLs are required by law to report multiple sales transactions of handguns and to forward those records to the NTC. To facilitate crime gun tracing, the NTC began maintaining multiple sales information in a Multiple Sales Database linked to the FTS. When a crime gun trace request is received, the serial number is entered into the FTS. If the serial number entered matches a serial number in the Multiple Sales Database, the crime gun trace request can be closed immediately with the multiple sales purchaser information without time-consuming telephone calls to FFLs. In 2000, approximately 3 percent (2,752) of YCGII traces were completed with purchaser information from a multiple sales transaction. Because the Multiple Sales Database was established in November 1998, and there may be a delay of several years before a crime gun is traced, the NTC anticipates resolving more traces through the multiple sales database in the future.

### Out-of-Business Records Imaging and Crime Gun Tracing.
The NTC is also using FFL Out-of-Business records to speed crime gun tracing. When an FFL discontinues business, the FFL is required by law to forward business records within 30 days to the Out-of-Business Records Center (OBRC) located at the NTC. OBRC receives and microfilms the acquisition and disposition records and ATF Form 4473 from all firearm transactions completed by FFLs who have discontinued business. OBRC processed 48,345 firearm traces from January 1, 2000 to December 31, 2000. In this time period, over 14 percent of all crime gun traces were completed with information from an out-of-business dealer.

# 5-4 Future Developments

**Investigative Tracing for Crime Guns.**  ATF encourages all YCGII cities to conduct investigative traces on all crime guns recovered from juveniles and youths up to age 21.  Investigative traces go beyond the first retail purchaser through the chain of possession until the crime gun reaches its final possessor.  After its initial retail purchase, a crime gun may be transferred repeatedly before being used in a crime.  For instance, it may be re-sold by an unlicensed seller, stolen, and then re-sold to an FFL, and re-sold again.  In an investigative trace, special agents attempt to track the full chain of possession to determine how the juvenile or youth obtained the firearm, to build a case against any illegal suppliers.  Analysis of investigative trace information will increase our understanding of how prohibited and young people obtain crime guns.

**Firearms Identification Guide**.  To address the problem of unsuccessful traces due to faulty information on the trace request form, the NTC has developed a CD-ROM for reference use by the law enforcement community in firearms identification.  Volume I of this CD contains graphic illustrations, historical data, and specifications on the 20 most frequently traced firearms.  Subsequent volumes will illustrate additional firearms until the goal of 100 of the top traced firearms has been achieved.  The CD is intended to be a stand-alone reference and training aid that can be utilized by everyone from entry level personnel to senior investigators to crime laboratories.

**Electronic Trace Submission (ETSS).**  ETSS Version 2.6 was released in fiscal year 2001.  Currently, there are 167 Federal, State and local law enforcement agencies that have received ETSS training for the purpose of submitting firearms traces.  The NTC currently receives approximately 61 percent of firearms trace data via electronic format.

**Regional Crime Gun Centers**.  Three Regional Crime Gun Centers (RCGC) have been established to ensure 100% comprehensive tracing of all recovered crime guns.  The purpose of the RCGC is to analyze patterns and trends on a local level that can be detected through comprehensive trace information on recovered crime guns.  Equipped with the best technological hardware and research software available, the RCGC is staffed with ATF personnel as well as State and local investigators and analysts in order to analyze patterns and trends, develop investigative leads to stop the flow of crime guns into the communities and to assist the State and local police departments in the allocation of their resources.  New York, Chicago and Washington D.C. are the first cities to utilize this concept on a local level.  Combined, the cities have analyzed over 12,477 firearms and developed 361 investigative leads.  More than 39 percent of the leads generated have involved over 20 different States.  Los Angeles is the only RCGC site planned for the upcoming year.  ATF is currently developing technology that would greatly enhance the development of future RCGC sites nationwide, as well as allowing quicker access to crime gun trace information by State and local investigative agencies.

**National Integrated Ballistic Information Network (NIBIN).**  ATF has successfully integrated its expertise in the regulation of the firearms industry and the effective enforcement of the Federal firearms laws with technological advances in the forensic ballistics examination field.  This unique program uses all of the resources that ATF has to offer in working with our law enforcement counterparts to reduce violent firearms violence.

Just as each fingerprint is different, a firearm leaves unique, identifiable characteristics on expelled ammunition.  ATF's NIBIN Program employs the Integrated Ballistics Identification System to compare images of ballistic evidence (projectiles and shell casings) obtained from crime scenes and recovered firearms.  As new images are entered, the system searches the existing data base for possible matches that must be confirmed by a firearms examiner.  As a result, the system has amassed a large ballistics image data base filled with crime gun data from all over the country from which Federal, State and local law enforcement agencies may obtain intelligence information.

With this program, ATF has created a national resource that enables participating law enforcement agencies to store shooting-related data and test-fire exemplars from recovered firearms in one common system capable of performing comparisons and producing probable matches. Also, ATF has developed a mechanism to serve as a repository for all crime gun data that parallels the Automated Fingerprint Analysis System maintained by the Federal Bureau of Investigation. Automated ballistic technology is one more weapon in the arsenal of resources that ATF maintains to assist our partners.

**YCGII Contract Support**. To enhance the quality and efficiency of firearm trace submissions, the National Tracing Center supports a program to place retired law enforcement officers in strategic locations around the country to assist comprehensive tracing efforts. Retired ATF agents and State/local law enforcement officers knowledgeable in firearms identification and nomenclature have been contracted to secure and transmit pertinent firearms trace data to the NTC. Currently, 23 contracted analysts and data entry clerks have been retained for this task. This program is expected to expand in an effort to ease the tracing burden on law enforcement agencies.

# Appendix A

# Glossary

## ASSOCIATE

Any person or persons who can be linked to the possessor of the crime gun at the time of its recovery by law enforcement.

## ATF FORM 3310.4, MULTIPLE SALES REPORT

A form completed by all Federal Firearms Licensees (FFLs) whenever they transfer two or more handguns within 5 consecutive business days to the same individual. The completed form contains full identifying information concerning the purchaser, the firearms, the date of transfer, and the FFL. FFLs are required by Federal law to forward this form to the National Tracing Center either by fax or mail by the close of business on the day on which the sale occurs. 18 U.S.C., Chapter 44, Sec 923 (g)(3).

## ATF NATIONAL TRACING CENTER DIVISION (NTC)

The Division includes the National Tracing Branch (NTB) and the Crime Gun Analysis Branch (CGAB). The NTB works with law enforcement entities and the firearms industry to trace the origin and initial sale history of a firearm recovered by law enforcement officials in the United States or abroad. In some instances, the NTB traces crime guns that are sold as used guns by FFLs. The NTB is also the repository for all FFL out-of-business records and multiple sales records. The CGAB provides investigative leads to ATF field personnel, houses the FFL lost and stolen firearms reports, supports the worldwide law enforcement community by identifying firearms traffickers who supply firearms to criminals and juveniles, and prepares maps, trends, and pattern analyses, including the annual Crime Gun Trace Reports.

## CALIBER

The diameter of a projectile intended to be expelled from a firearm or the dimension of the bore of a given firearm.

## COLLECTOR

Any person who acquires, holds, or disposes of firearms as curios or relics.

## COMPREHENSIVE TRACING

The tracing by law enforcement of all recovered crime guns in a geographic area (e.g., town, county, metropolitan area, or State). Trace information is used to maximize investigative leads for use in identifying illegal firearms traffickers and violent criminals, and to analyze crime gun trends and patterns.

## CRIME GUN

A crime gun is any firearm that is illegally possessed, used in a crime, or suspected to have been used in a crime. An abandoned firearm may also be categorized as a crime gun if it is suspected it was used in a crime or illegally possessed.

## DEALER

Any person engaged in the business of selling firearms at wholesale or retail, or any person engaged in the business of repairing firearms or of making or fitting special barrels, stocks, or trigger mechanisms to firearms, or any licensee who is a pawnbroker.

## ELECTRONIC TRACE SUBMISSION SYSTEM (ETSS)

ETSS can be a stand-alone or part of a networked, multi-user system that enables ATF Field Offices and other law enforcement organizations to capture firearm trace related data. This data is exported from ETSS and the batch file is then electronically sent for processing to the National Tracing Center (NTC).

## ENGAGED IN THE BUSINESS

A person is engaged in the business as a dealer in firearms if he or she devotes time, attention, and labor to dealing in firearms as a regular course of trade or business with the principal objective of livelihood and profit through the repetitive purchase and resale of firearms. The term does not include a person who makes occasional sales, exchanges, or purchases of firearms for the enhancement of a personal collection or for a hobby, or who sells all or part of his or her personal collection of firearms.

## FEDERAL FIREARMS LICENSEE (FFL)

Any persons, including a partnership, corporation, or business entity, holding a valid license issued by ATF that allows them or their employees to engage in the business of dealing, manufacturing, importing, repairing or pawnbrokering firearms. By law, all FFLs must keep records of their firearms transactions and forward all their records to ATF upon going out of business.

## FIREARM SERIAL NUMBER

The Gun Control Act of 1968 requires that an individual serial number be affixed to firearms manufactured or imported into the United States. This unique serial number is one of several key elements used in accurately identifying a firearm and tracing it to the FFL who first sold it to an unlicensed purchaser.

## FIREARM TRACE

The systematic process of tracking a recovered crime gun's history from its source (manufacturer/importer) through the chain of distribution (wholesaler/retailer) to the individual who first purchases the firearm.

## FIREARM TRACE REQUEST

Information submitted to the NTB by the law enforcement community to solve individual crimes and acquire illegal trafficking information. Requests may be submitted by telephone (high priority/urgent), facsimile, mail, or as an electronic file through several different formats. ATF trace request forms require specific information to include, but not limited to, a description of the firearm, the individuals possessing or associated with the firearm, the recovery location, and the underlying offense that brought the crime gun to the attention of law enforcement.

## FIREARM TYPE

The NTC categorizes firearms into a number of types that include, but are not limited to, pistols, revolvers, derringers, shotguns, rifles, combination firearms, machine guns, destructive devices, and unknown gun type. Firearms are generally described by identifying the firearm type, manufacturer, and caliber. This information, together with additional data such as the serial number and model, are used to accurately trace a firearm.

## SEMIAUTOMATIC PISTOL

Any repeating pistol which utilizes a portion of the energy of a firing cartridge to extract the fired cartridge case and chamber the next round, and which requires a separate pull of the trigger to fire each cartridge.

## PISTOL

A weapon originally designed, made, and intended to fire a projectile (bullet) from one or more barrels when held in one hand, and having (a) a chamber(s) as an integral part(s) of, or permanently aligned with, the bore(s); and (b) a short stock designed to be gripped by one hand and at an angle to and extending below the line of the bore(s).

## REVOLVER

A projectile weapon of the pistol type, having a breechloading chambered cylinder so arranged that the cocking of the hammer or movement of the trigger rotates it and brings the next cartridge in line with the barrel for firing.

## DERRINGER

The term "derringer" has no legal definition, but for the purposes of this report it is interpreted as any one of a variety of small pocket or palm size pistols having one or more barrels.

## RIFLE

A weapon designed or redesigned, made or remade, and intended to be fired from the shoulder, and designed or redesigned and made or remade to use the energy of the explosive in a fixed metallic cartridge to fire only a single projectile through a rifled bore for each single pull of the trigger.

## SHOTGUN

A weapon designed or redesigned, made or remade, and intended to be fired from the shoulder, and designed or redesigned and made or remade to use the energy of the explosive in a fixed shotgun shell to fire through a smooth bore either a number of ball shot or a single projectile for each single pull of the trigger.

*Department of the Treasury, Bureau of Alcohol, Tobacco and Firearms*  •  *Youth Crime Gun Interdiction Initiative*

### COMBINATION GUN

A multi-barreled firearm designed or redesigned, made or remade, and intended to be fired from the shoulder having two or more different caliber barrels. Such firearms generally exhibit some combination of rifled barrels and smoothbore shotgun barrels.

### MACHINEGUN

This term includes, in part, any weapon which shoots, is designed to shoot, or can be readily restored to shoot, automatically more than one shot, without manual reloading, by a single function of the trigger. The term shall also include the frame or receiver of any such weapon.

## DESTRUCTIVE DEVICE

This term includes, in part, any type of weapon by whatever name known which will, or which may be readily converted to, expel a projectile by the action of an explosive or other propellant, and which has any barrel with a bore of more than one-half inch in diameter.

## IMPORTER

Any person engaged in the business of importing or bringing firearms or ammunition into the United States for purposes of sale or distribution. The term shall include any person who engages in such business on a part-time basis.

## INVESTIGATIVE TRACE

Investigative traces are traces that go beyond the first retail purchaser through the chain of possession until the crime gun reaches the crime gun possessor. After its initial retail purchase, a crime gun may be transferred repeatedly before being used in a crime. Further information regarding the crime gun's trail is obtained by ATF field personnel and/or other members of the law enforcement community.

## MANUFACTURER

Any person engaged in the business of manufacturing firearms or ammunition for purposes of sale or distribution. The term shall include any person who engages in such business on a part-time basis.

## MARKET AREA

An area where firearms acquired in one or more source areas are possessed by individuals from whom they are later recovered.

### OBLITERATED SERIAL NUMBER

Some individuals obliterate or attempt to obliterate the firearm serial number to make it more difficult to trace. ATF and local law enforcement agencies can restore the serial numbers of many of these crime guns. Obliteration of a serial number is a felony under Federal law, as is the possession of a firearm with an obliterated serial number.

### PAWNBROKER

Any person whose business or occupation includes the taking or receiving, by way of pledge or pawn, of any firearm as security for the payment or repayment of money.

### POSSESSOR

The individual in possession of a crime gun at the time of its recovery by law enforcement.

### ONLINE LEAD

ATF's information system designed to produce investigative leads concerning illegal firearms trafficking. The system compiles trace information in order to identify recurring trends and patterns that may indicate illegal trafficking. Online LEAD is an investigative tool provided to ATF field offices for use by local and State task forces.

### PURCHASER

The individual who purchases a firearm from an FFL. A firearm trace seeks to identify the FFL who first sold the crime gun and the first individual who purchased the firearm. This information can assist law enforcement officials in investigations and in understanding the sources of illegal trafficking in firearms.

### SOURCE AREA

A geographic area where illegal firearms traffickers obtain firearms that they acquire and transport to other locations for unlawful resale and/or transfer.

### SOURCE STATE

The State in which the FFL that first sold the crime gun at retail is located. The source State can only be determined if a trace identifies the FFL who sold the firearm.

### STRAW PURCHASE

The acquisition of a firearm(s) from a Federally licensed firearms dealer by an individual (the straw purchaser) for the purpose of concealing the identity of the true intended receiver of the firearm(s).

---

## STRAW PURCHASER

A person illegally purchasing a firearm from a Federally licensed firearms dealer for another person, including for unlicensed sellers, criminal users, juveniles, and other prohibited possessors. Straw purchasers may be friends, associates, relatives, or members of the same gang.

## TIME-TO-CRIME

The period of time between a firearm's acquisition by an unlicensed person from a retail licensee and law enforcement's recovery of that firearm during use, or suspected use, in a crime. A short time-to-crime suggests the firearm will be easier to trace. This measure can be an important indicator of illegal firearms trafficking. In those instances where the date of recovery is not provided, the date of the trace request is utilized to calculate time-to-crime.

# Appendix B

*Department of the Treasury, Bureau of Alcohol, Tobacco and Firearms* ● *Youth Crime Gun Interdiction Initiative*

# Technical Notes

## 1. Interpreting Information in National Tracing Center Records from Participating Jurisdictions

This note discusses limitations in using this information to compare one participating jurisdiction with another and to track the same jurisdiction from 1 year to the next.

The Youth Crime Gun Interdiction Initiative (YCGII) began in 1996. It is an emerging collaboration among Federal, State, and local law enforcement officials, ATF field offices, the ATF National Tracing Center, and ATF contractors from the academic community to improve enforcement of the Federal firearms laws, especially those relating to illegal firearms transfers to youth offenders, felons, juveniles, and other prohibited persons.

This is the fourth report published by ATF that uses information from trace requests submitted from YCGII jurisdictions to describe crime guns recovered by law enforcement agencies in those jurisdictions. This information improves the knowledge base for the enforcement of Federal and State firearm laws and regulations. It is, however, subject to several limitations. These arise out of three basic factors:

First, the program is undergoing constant change. Over the first 4 years of the YCGII program's operation, for United States cities with populations over 250,000 inhabitants, the percent of the population covered by participating YCGII jurisdictions increased from 28.5 percent to 80.4 percent (see Graph 1). Over this period, the number of cities in the over 250,000-population group also increased from 11 to 44 cities (or from 16.7 to 66.7 percent of this group). These improvements in program coverage are important because achieving comprehensive tracing in cities with populations of over 250,000 inhabitants has been a primary objective of the YCGII program. However, because of YCGII's rapid increases in program coverage, year-to-comparisons for aggregate population group of cities over 250,000 are inappropriate.

Second, the extent of program implementation varies from one jurisdiction to another based on each one's size, extent of agency computerization, information intake procedures, firearms-focused law enforcement activity, and the nature of its crime gun problem. At this stage of development, it is not appropriate to attempt to impose a single standard on all participating jurisdictions.

Third, the program is still developing. ATF and local law enforcement agencies are still learning from each other how to best implement this program and to utilize the information obtained. This report and others to be produced by the Crime Gun Analysis Branch (CGAB) of the National Tracing Center are part of that developing process.

These factors result in data limitations, among them changing law enforcement procedures to obtain all crime guns from all agencies does not happen immediately or consistently throughout a particular agency. In such jurisdictions, the lag in reporting recovered firearms to ATF will generate data on fewer firearms than law enforcement agencies actually recovered.

The data reported here also reflects the behavior of law enforcement agencies whose policies and practices, including when and how firearms are recovered and how those recoveries are recorded, are changing in response to local attention to firearms crimes. These changes could increase or decrease the number of firearms trace requests made to the National Tracing Center.

Crime rates are changing. Changes in the number of trace requests could reflect changes in the number of crime guns that come to the attention of law enforcement agencies.

While the 50 participating jurisdictions represent a wide spectrum of American life, they do not represent a national sample of law enforcement agencies or crime guns recovered by law enforcement agencies. Participation in this program is voluntary, and jurisdictions included were not selected to be representative of the nation as a whole, rather they were included primarily because of a focus on youth gun crime. In 2000, however, 44 of the 50 jurisdictions had a population over 250,000. The population of these 44 jurisdictions represents more than four-fifths of the population of all U.S. cities combined with

populations of 250,000 or more. This made it appropriate to generate summary data for these large cities as a group.

For these and other reasons, the available data from the participating jurisdictions does not yet constitute a fully developed statistical series from which reliable comparisons can be made from one reporting period to the next or from one participating jurisdiction to another. The data is used in this report as descriptive of the trace requests of particular jurisdictions during the past year. The nature of these limitations is similar to those initially encountered by the Federal Bureau of Investigation's Uniform Crime Reports program (UCR). Begun in the 1930's as a voluntary program by a few large jurisdictions, the UCR program has been developed over the past 70 years to include consistent definitions and standards, detailed reporting procedures, and nearly uniform participation by law enforcement agencies. The purpose of YCGII is to assist law enforcement by providing a detailed description of crime guns recovered in a given jurisdiction during the past year, and that is the most appropriate use of the data in this report.

## Table B1: Percent of Cities and Percent of Population of Cities over 250,000 Inhabitants Participating in the YCGII Program by Year

|  | YCGII Program Year | | | |
|---|---|---|---|---|
|  | 1997 | 1998 | 1999 | 2000 |
| Percent of Cities over 250,000 in YCGII Program | 16.7 | 30.3 | 45.5 | 66.7 |
| Percent of Population in Cities in YCGII Program | 28.5 | 54.1 | 67.2 | 80.4 |

# Figure B1: Percent of Population from Cities over 250,000 Inhabitants Participating in the YCGII Program by Year



# Figure B2: Percent of Cities and Percent of Population of Cities over 250,000 Inhabitants Participating in the YCGII Program by Year



## 2. National Analysis Based on 80.4 Percent of the Population of Cities with 250,000 or More Inhabitants

This percentage is sufficient for this report to constitute a national report on crime guns in cities of this size. ATF is providing the analysis on a population basis in order to permit use of crime gun trace information in conjunction with the FBI's Uniform Crime Reports, which publish the crime statistics submitted by law enforcement agencies by size of the jurisdiction's population.

## 3. Classification of Traces Based on Time and Geography

In order to include all crime guns traced from each city during the calendar year period of this report, the Crime Gun Analysis Branch employed the following criteria. If the recovery date on the trace fell within 2000, the trace was included. If no recovery date was given, but the trace was received by the National Tracing Center during 2000, the trace was also included. A careful analysis of recovery State, recovery city, tracing agency ORI Code, tracing agency name, local ATF office codes, and tracing agency city was conducted to determine which traces were from recoveries in each of the 50 cities. The ORI code is used to identify law enforcement agencies in the Firearms Tracing System database. If the recovery city and State fields included either a known city name or the name of a known sub-unit of a YCGII city (for example Bronx, NY), the trace was included in the analysis. If no recovery city was given, but the tracing agency was identified as the YCGII city's main police department or an agency whose jurisdiction was only within the city, the trace was also included.

## 4. Calculation of Percentages

The tables and figures in this report were prepared using the Statistical Package for the Social Sciences (SPSS) or Microsoft Excel software. We have chosen to report all percentages as these programs calculated them. It is occasionally possible, using a calculator or different software, to produce percentages that differ by as much as 0.1 percent from the reported percentages.

## 5. Possessor's Age

## Table B2: Age of Possessor from Figure 1

| Age | Frequency | Age | Frequency |
|-----|-----------|-----|-----------|
| 10 | 13 | 46 | 464 |
| 11 | 35 | 47 | 604 |
| 12 | 54 | 48 | 431 |
| 13 | 141 | 49 | 600 |
| 14 | 331 | 50 | 203 |
| 15 | 569 | 51 | 263 |
| 16 | 1,147 | 52 | 277 |
| 17 | 1,706 | 53 | 272 |
| 18 | 2,569 | 54 | 200 |
| 19 | 2,744 | 55 | 211 |
| 20 | 2,751 | 56 | 182 |
| 21 | 2,930 | 57 | 123 |
| 22 | 2,553 | 58 | 137 |
| 23 | 2,420 | 59 | 137 |
| 24 | 2,118 | 60 | 120 |
| 25 | 1,942 | 61 | 107 |
| 26 | 1,768 | 62 | 105 |
| 27 | 1,651 | 63 | 111 |
| 28 | 1,620 | 64 | 54 |
| 29 | 1,339 | 65 | 77 |
| 30 | 1,321 | 66 | 77 |
| 31 | 1,174 | 67 | 65 |
| 32 | 1,041 | 68 | 73 |
| 33 | 1,019 | 69 | 50 |
| 34 | 1,067 | 70 | 73 |
| 35 | 976 | 71 | 42 |
| 36 | 932 | 72 | 48 |
| 37 | 1,044 | 73 | 54 |
| 38 | 1,040 | 74 | 38 |
| 39 | 831 | 75 | 43 |
| 40 | 1,017 | 76 | 464 |
| 41 | 878 | 77 | 604 |
| 42 | 845 | 78 | 431 |
| 43 | 746 | 79 | 600 |
| 44 | 699 | 80 | 203 |
| 45 | 699 | | |

## 6. Distance to Recovery Location

Distance to crime gun recovery location is defined as distance in miles between the business location of the Federally licensed firearms dealer that sold a crime gun recovered by a law enforcement agency and the recovery location of the firearm. Distance-to-Recovery is calculated as the distance between the centroids of the zip code of the Federally licensed firearms dealer that sold the crime gun and the zip code of the location where the gun was recovered by a law enforcement agency. Distance-to-recovery is calculated for crime guns, 1) that were traced to a first time retail purchaser, 2) where a zip code is available for the business location of the FFL that sold the gun or where a zip code could be derived from the business address of the FFL, and 3) where there is a zip code for the location where the crime gun was recovered or where the a zip code could be derived from the street address of the recovery location.

## 7. Time-to-Crime Estimation

In previous reports to estimate the percentage of crime guns rapidly diverted from retail sale at Federally licensed firearms dealers, ATF produced high and low estimates of the proportion of guns rapidly diverted to crime gun status. These estimates were derived because resource limitations did not allow the National Tracing Center to trace many older crime guns. Since 1999, however, additional resources have enabled the National Tracing Center to initiate traces on all recovered crime guns without respect to the age of the gun. The only exception to this standard is for crime guns that were manufactured prior to 1969 or crime guns that were sold by a manufacturer, wholesaler, or retail gun dealer more than 20 years prior to the gun's recovery by a law enforcement agency. (FFLs are not required to maintain firearm sale and purchase records beyond 20 years.) However, firearms in these latter two categories are still traced by ATF if records of their sale and purchase can be located in ATF's FFL out-of-business records files.

These changes in ATF's tracing procedures have greatly reduced or eliminated the utility of ATF's high and low estimates of time-to-crime, because the percentage of firearms traces not initiated due to the age of the firearm has dropped to approximately ten percent of all trace requests from approximately 30 percent of all trace requests in 1997 and 22 percent in 1998. In addition, there are other categories of crime guns trace requests for which traces are not initiated (e.g., crime guns with obliterated serial numbers) which if they could be traced would yield lower not higher estimates of time-to-crime.

# Appendix C

*Department of the Treasury, Bureau of Alcohol, Tobacco and Firearms* • *Youth Crime Gun Interdiction Initiative*

---

OMB No. 1512-0541

**DEPARTMENT OF THE TREASURY**
**BUREAU OF ALCOHOL, TOBACCO AND FIREARMS**
**NATIONAL TRACING CENTER TRACE REQUEST**

FOR NTC DATA ENTRY ONLY

Phone: 1-800-788-7133        *Falling Waters, WV 25419*        FAX: 1-800-578-7223

NOTE:   * - REQUIRED ENTRY FIELD *(Must be completed for trace processing)*   ** - REQUIRED ENTRY WITH LISTED DATA RESPONSE *(See back for codes and options)*

**PART I - TRACE INITIATION INFORMATION**

1a. DATE OF REQUEST     1b. PRIORITY**  ☐ ROUTINE   ☐ URGENT *(Justification required)*     ☐ FOR NTC INFORMATION ONLY

JUSTIFICATION

1c. SPECIAL INSTRUCTIONS

**PART II - CRIME CODE INFORMATION**

2a. ☐ GANG INVOLVED?  GANG NAME:                                    2b.  PROJECT CODE**:    2c. NCIC CRIME CODE**:
☐ JUVENILE INVOLVED?  ☐ YOUTH CRIME GUN   ☐ ENTERED IN NIBIN? NIBIN No.:

**PART III - ATF AGENT REQUESTING TRACE**

3a. ORGANIZATION CODE*    3b. PHONE NUMBER:          3c. ATF SPECIAL AGENT'S NAME *(Last, first, middle)*
FAX NUMBER:

3d. BADGE NUMBER    3e. ATF CASE NUMBER    3f. FIELD OFFICE

**PART IV - OTHER AGENCY REQUESTING TRACE**

4a. ORI NUMBER*    4b. PHONE NUMBER:          4c. OTHER AGENCY OFFICER'S NAME *(Last, first, middle)*
FAX NUMBER:

4d. BADGE NUMBER    4e. OTHER AGENCY CASE NUMBER    4f. DEPARTMENT/UNIT

4g. MAILING ADDRESS

**PART V - FIREARMS INFORMATION**

5a. SERIAL NUMBER*              ☐ OBLITERATED          5b. FIREARMS MANUFACTURER*
☐ ATTEMPT TO RAISE

5c. TYPE**        5d. CALIBER*        5e. MODEL*        5f. COUNTRY OF ORIGIN* *(Importer required if other than U.S.)*

5g. IMPORTER*              5h. ADDITIONAL MARKINGS*

**PART VI - POSSESSOR INFORMATION**

6a. NAME *(Last)*        *(First)*        *(Middle)*        *(Suffix)*  ☐ CRIMINAL HISTORY

ALIAS *(AKA) (Last)*        *(First)*        *(Middle)*        *(Suffix)* AKA DATE OF BIRTH

6b. HEIGHT   6c. WEIGHT   6d. SEX   6e. RACE   6f. ADDRESS - ROUTE NUMBER

6g. APT. NUMBER  6h. STREET No.  6i. DIRECTION  6j. STREET NAME                6k. CITY

6l. COUNTY        6m. STATE        6n. ZIP CODE        -        6o. COUNTRY

6p. DATE OF BIRTH  6q. PLACE OF BIRTH    6r. POSSESSOR'S ID NUMBER    ID TYPE/STATE

**PART VII - ASSOCIATE INFORMATION**

7a. NAME *(Last)*        *(First)*        *(Middle)*        *(Suffix)*  ☐ CRIMINAL HISTORY

ALIAS *(AKA) (Last)*        *(First)*        *(Middle)*        *(Suffix)* AKA DATE OF BIRTH

7b. HEIGHT   7c. WEIGHT   7d. SEX   7e. RACE   7f. ADDRESS - ROUTE NUMBER

7g. APT. NUMBER  7h. STREET No.  7i. DIRECTION  7j. STREET NAME                7k. CITY

7l. COUNTY        7m. STATE•        7n. ZIP CODE        -        7o. COUNTRY

7p. DATE OF BIRTH  7q. PLACE OF BIRTH    7r. ASSOCIATE'S ID NUMBER    7s. ID TYPE/STATE

**PART VIII - FIREARM RECOVERY INFORMATION**

8a. RECOVERY DATE*  8b. ROUTE NUMBER  8c. APT. NUMBER  8d. STREET No.  8e. DIRECTION  8f. STREET NAME

8g. CITY*                    8h. STATE*        8i. ZIP CODE        -

8j. ADDITIONAL INFORMATION

ATF F 3312.1 (3-2000) PREVIOUS EDITION IS OBSOLETE

---

*Youth Crime Gun Interdiction Initiative* • *Department of the Treasury, Bureau of Alcohol, Tobacco and Firearms*

## INSTRUCTIONS FOR COMPLETING ATF F 3312.1 - REQUEST FOR A FIREARMS TRACE

**GENERAL INSTRUCTIONS -** *Required Data Entry Fields And **Available Options/Codes Listed For Reference

The information requested on this form is needed to initiate a trace request. All fields marked with an asterisk (*) indicate required entry data fields. All areas must be completed in order to effectively and expeditiously execute the trace request. Fields marked with a double asterisk (**) indicate areas of required data entry with available options and codes listed for reference (*refer to lists below to determine the appropriate entry and correct nomenclature).*

**REQUIRED ENTRY FIELDS INCLUDE:**

Question 1b** - *(Justify Urgent Trace)* See Priorities listed below
Question 2b** & 2c** - Include Project Code and list NCIC Code
Question 3a* - Office Organizational Code *For Use by ATF Requester Only*
Question 4a* - ORI - NCIC Originating Requestor Identifier
Question 5a*, 5b*, 5c**, 5d*, 5e*, 5f*, 5g* & 5h* - Verify data
Question 8a*, 8g* & 8h* - Confirm Recovery data to be submitted

**QUESTION 1B - TRACE PRIORITY** *(Entered Numbered Qualifier to Justify Urgent Trace Request)*

**NOTE:** An urgent trace is deemed necessary when the violation are significant and circumstances warrant or require that the firearm be traced without undue delay. Examples of this are: to hold a suspect, provide probable cause, officer and public safety, etc. The following are examples of significant violations.

| | | | |
|---|---|---|---|
| **1 - Assault** | **3 - Kidnapping** | **5 - Rape/Sex** | **7 - Terrorist Threat** |
| **2 - Bank Robbery** | **4 - Murder/Suicide** | **6 - Terrorist Act** | **8 - Other** *(specify circumstance)* |

**QUESTION 2B - PROJECT CODES** *(Enter all codes that apply)*

| | | |
|---|---|---|
| **AIS** - Adult in School | **OBL** - Obligated Serial Number | **MUN** - Murderand Narcolics *(Ages 25 & older)* |
| **GNG** - Gang Related | **ORG** - Organized Crime | **MIL** - Militia Related Project |
| **JSS** - Juvenile & School *(Ages 17 & under)* | **SCH** - School Involvement *(No Possessor)* | **YCG** - Youth Crime Gun |
| **JVV** - Juvenile & Violence *(Ages 17 & under)* | **SEN** - Sensitive/Significant | **YIS** - Juvenile and School *(Ages 18 - 24)* |

**QUESTION 2C - NCIC CRIME CODES** *(Enter one code only. For complete listing refer to NCIC Manual)*

| | | | | | |
|---|---|---|---|---|---|
| 0199 | Sovereignty | 1311 | Aggravated Assault *(Police)* | 2999 | Damage Property |
| 0299 | Military | 1399 | Assault | 3599 | Dangerous Drugs |
| 0399 | Immigration | 1499 | Abortion | 3699 | Sex Offense |
| 0907 | Homicide *(Police)* | 1602 | Threat *(Terroristic)* | 3799 | Obscenity |
| 0911 | Homicide *(Suicide)* | 1702 | Material Witness *(Federal)* | 3802 | Cruelty Toward Child |
| 0999 | Homicide *(Street)* | 2099 | Arson | 3803 | Cruelty Toward Spouse |
| 1099 | Kidnapping | 2199 | Extortion | 3999 | Gambling |
| 1101 | Rape | 2299 | Burglary | 4099 | Commercial Sex |
| 1199 | Sexual Assault | 2399 | Larceny | 4199 | Liquor |
| 1201 | Robbery *(Business)* | 2411 | Unauthorized Use of Auto | 4899 | Obstruction Police |
| 1204 | Robbery *(Street)* | 2499 | Stolen Vehicle | 4999 | Flight - Escape |
| 1211 | Bank Robbery | 2599 | Counterfeiting | 5099 | Obstruct |
| 1212 | Car Jacking | 2699 | Fraud | 5199 | Bribery |
| 1299 | Robbery | 2799 | Embezzlement | 5211 | Explosives |
| 1301 | Aggravated Assault *(Family)* | 2899 | Stolen Property | 5212 | Possession of Weapon |

| | |
|---|---|
| 5399 | Public Peace |
| 5499 | Traffic Offense |
| 5599 | Health - Safekeeping |
| 5699 | Civil Rights |
| 5799 | Invade Privacy |
| 5899 | Smuggling *(Customs)* |
| 5999 | Election Laws |
| 6099 | Antitrust |
| 6199 | Tax Revenue |
| 6299 | Conservation |
| 7099 | Crimes Against Person |
| 7199 | Property Crimes |
| 7299 | Morals |
| 7399 | Public Order Crimes |
| 8100 | Escape *(Juvenile)* |

**QUESTION 5C - TYPE OF FIREARM**

**C = Combination** - A weapon designed to be fired from the shoulder which is fitted with both a rifled barrel 16" or greater in length and a smooth-bore barrel 18" or greater in length with an overall length of 26" or more.

**M = Machine Gun** - A weapon of handgun, rifle or shotgun configuration designed to automatically fire more than one shot, without manually reloading, by a single function of the trigger.

**P = Pistol** - A weapon which includes single shot and both single or double-action semiautomatic handguns fitted with a barrel(s) with an integral chamber design or having a chamber(s) permanently aligned with the barrel.

**PR = Pistol/Revolver** - A weapon which includes both single and double-action handguns having a breechloading chambered cylinder designed with a repetitive function based on rotation.

**PD = Pistol/Derringer** - A weapon which includes single barrel, superposed *(over/under)* and multi-barrel configuration handguns based on a hinged or pivoting barrel small frame pistol design.

**R = Rifle** - A weapon designed to be fired from the shoulder which discharges a single projectile through one or more rifled barrels 16" or greater with an overall length of 26" or more.

**S = Shotgun** - A weapon designed to be fired from the shoulder which discharge a single or multiple projectiles through one or more smooth-bore barrels 18" or greater in length with an overall length of 26" or more.

### PAPERWORK REDUCTION ACT

This request is in accordance with the Paperwork Reduction Act of 1995. The information collection is used by Federal, State and local law enforce-ment officials to request that the Bureau of Alcohol, Tobacco and Firearms trace firearms used or suspected to have been used in crimes.

The estimated average burden associated with this collection of information is 6 minutes per respondent or recordkeeper, depending on individual circumstances. Comments concerning the accuracy of this burden estimate and suggestions for reducing this burden should be addressed to Reports Management Officer, Document Services Branch, Bureau of Alcohol, Tobacco and Firearms, Washington, DC 20226.

An agency may not conduct or sponsor, and a person is not required to respond to, a collection of information unless it displays a currently valid OMB control number.

ATF F 3312.1 (3-2000)

# Exhibit 46

# Exhibit 47

1

IN THE UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF ILLINOIS

EASTERN DIVISION


ILLINOIS ASSOCIATION OF    )

FIREARMS RETAILERS,     )

KENNETH PACHOLSKI,      )

KATHRYN TYLER, and      )

MICHAEL HALL         )

    Plaintiffs,    )

  vs.         ) No. 10 CV 04184

THE CITY OF CHICAGO and    )

RICHARD M. DALEY, Mayor    )

of the City of Chicago,    )

    Defendants.    )

   The deposition of KEVIN JOHNSON, called

for examination pursuant to the Rules of Civil

Procedure for the United States District Courts

pertaining to the taking of depositions, taken

before JENNIE MODI, a notary public within and for

the County of Cook and State of Illinois, at 33

North Dearborn Street, Suite 300, Illinois, on the

19th day of April, 2011, at the hour of 9:12

o'clock a.m.

2



1    APPEARANCES:

2

3        COOPER & KIRK, by

4        MR. PETER A. PATTERSON,

5          1523 New Hampshire Avenue Northwest,

6          Washington, D.C.  20036,

7          202-220-9600,

8            Representing the Plaintiffs;

9

10       MR. WILLIAM MACY AGUIAR,

11         ASSISTANT CORPORATION COUNSEL,

12         DEPARTMENT OF LAW,

13         30 North LaSalle Street, Suite 1230,

14         Chicago, Illinois  60602,

15         312-744-4216,

16           Representing the Defendants.

17

18

19

20

21

22

23

24

1    your desire to join the CAGE team?

2        A.  I was given an assignment by my superiors

3    to.

4        Q.   So the assignment came from your

5    superiors, it wasn't something that you had

6    expressed interest in beforehand?

7        MR. AGUIAR:  You can answer the question if you

8    understand it.

9        THE WITNESS:  No, I did not seek.

10    BY MR. PATTERSON:

11        Q.   Okay.  So what are your responsibilities

12    with the CAGE team?

13        A.   The primary function of the CAGE team is

14    to investigate illegal firearms trafficking in the

15    City of Chicago.

16        Q.   Okay.  And how about you personally, what

17    sorts of things do you do with the CAGE team?

18        A.   I supervise men and women under my

19    command, direct them in their investigations, give

20    advice and handled administrative paperwork for

21    them.

22        Q.   Okay.  And how many people are under your

23    supervision?

24        A.   There are eight assigned directly, and

92

1       patrons or operators of firearms ranges.

2               Is that something that you have knowledge

3       about?

4       A.  Yes.

5       Q.  Okay.  And what is your experience with

6       that topic of -- let's start with theft of firearms

7       by patrons of firearms stores.  What experience do

8       you have with that subject?

9       A.  Just -- we handled an investigation not

10      too long ago whereas there were 167 guns that were

11      taken that were going to Gander Mountain here, from

12      Bill Hicks in Minnesota, were being transported to

13      Gander Mountain, Illinois.  During transport in

14      Indiana, 167 guns were taken off of the trailer and

15      found in the streets of Chicago, and they were

16      transported to different areas of Chicago.

17      Q.  Okay.  So that would be theft of firearms

18      from, you know, an operator of a firearms store, is

19      that what --

20      A.  Well, transport of firearms.

21      Q.  Transport of firearms.  Okay.  So in your

22      experience, is there a risk that firearms stores

23      lead to a greater theft of firearms?

24      A.  Yes.  Just recently, a few weeks ago they

93

1    had a theft in Tinley Park of a gun store.

2    Q.  Okay.

3    A.  And they made off with approximately 26

4    firearms.

5    Q.  Okay.  And do you have any evidence that

6    the presence of firearms stores in a particular

7    community leads to an increase in the size of the

8    illegal firearms market?

9    A.  No, but it creates an opportunity

10    for theft.

11    Q.  Right.  But you don't have any evidence

12    that the illegal firearms market overall increases

13    based on the operations of firearms stores?

14    MR. AGUIAR:  Objection.  You're talking about

15    empirical evidence, correct?

16    MR. PATTERSON:  Empirical evidence.

17    MR. AGUIAR:  Okay.

18    THE WITNESS:  No, I don't have any empirical

19    evidence.

20    BY MR. PATTERSON:

21    Q.  Okay.  And the evidence that you do have

22    is anecdotal evidence or do you have -- well, let

23    me back up.

24    Do you have any evidence, empirical or

124

1      STATE OF ILLINOIS  )

2                        )  SS:

3      COUNTY OF C O O K  )

4          I, JENNIE MODI, a notary public within and

5      for the County of Cook County and State of

6      Illinois, do hereby certify that heretofore,

7      to-wit, the 19th day of April, 2011, personally

8      appeared before me, at 33 North Dearborn Street,

9      Suite 300, Chicago, Illinois, KEVIN JOHNSON, in a

10     cause now pending and undetermined in the Circuit

11     Court of Cook County, Illinois, wherein ILLINOIS

12     ASSOCIATION OF FIREARMS RETAILERS, et al., are the

13     Plaintiffs, and THE CITY OF CHICAGO, et al., are

14     the Defendants.

15         I further certify that the said KEVIN

16     JOHNSON was first duly sworn to testify the truth,

17     the whole truth and nothing but the truth in the

18     cause aforesaid; that the testimony then given by

19     said witness was reported stenographically by me in

20     the presence of the said witness, and afterwards

21     reduced to typewriting by Computer-Aided

22     Transcription, and the foregoing is a true and

23     correct transcript of the testimony so given by

24     said witness as aforesaid.

125

1       I further certify that the signature to

2   the foregoing deposition was reserved by counsel

3   for the respective parties.

4       I further certify that the taking of this

5   deposition was pursuant to notice and that there

6   were present at the deposition the attorneys

7   hereinbefore mentioned.

8       I further certify that I am not counsel

9   for nor in any way related to the parties to this

10  suit, nor am I in any way interested in the outcome

11  thereof.

12      IN TESTIMONY WHEREOF:  I have hereunto set

13  my hand and affixed my notarial seal this 4th day

14  of May, 2011.

15

16

17

18

19  _____

20  NOTARY PUBLIC, Cook County, ILLINOIS

21      LIC. NO. 084-004497.

22

23

24

# Exhibit 48

## Bureau of Alcohol, Tobacco, Firearms and Explosives

# ATF  News Release

### At The Frontline Against Violent Crime                    Columbus Field Division

Contact: Senior Special Agent David D. Coulson
Public Information Officer
(219) 746-9776

For Immediate Release
December 15, 2011
www.atf.gov

## ATF OFFERS REWARD IN GUN SHOP BURGLARY

### *33 Handguns Stolen from Deb's Gun Range*

Hammond, Ind. – The Bureau of Alcohol, Tobacco, Firearms and Explosives (ATF) is offering a reward of up to $5,000 for information leading to the arrest and conviction of the persons(s) responsible for the theft of firearms from Deb's Gun Range, 6819 Kennedy Avenue, Hammond, Ind. The burglary occurred at approximately 4:15 a.m. on Thursday, Dec. 15.

ATF and the Hammond Police Department are investigating the theft of 33 firearms. Investigators have developed information regarding this burglary; however, they need additional information from the public that may assist them in solving the case. These firearms pose a potential danger and investigators are seeking information that would aid in the resolution of this investigation.

"Through experience, we know that stolen firearms are used in furtherance of drug and gang related activities, and as well are utilized by violent criminals to perpetrate additional crimes. Law enforcement is seeking assistance from the public in locating these weapons and identifying those responsible," said Robert Browning, Special Agent in Charge, ATF Columbus Field Division.

Anyone with information is asked to call the ATF crime gun hotline 1-800-ATF-GUNS (1-800-283-4867) or the Hammond Police Department at (219) 852-2906. The ATF hotline is toll free and callers may remain anonymous.

ATF is the lead federal law enforcement agency with jurisdiction in violent crimes involving firearms and regulates the firearms industry. More information on ATF and its programs is available at www.atf.gov (www.atf.gov) .

### ###

# Exhibit 49

Tinley Park Police Department
**ORIGINAL**
Incident Report

Report 02/16/2011 06:37

Case # **01-11-003384**

| | | | | | |
|---|---|---|---|---|---|
| **I**<br>**N**<br>**C**<br>**I**<br>**D**<br>**E**<br>**N**<br>**T** | Case #<br>01-11-003384 | Report<br>02/16/2011 06:37 | Occurred From<br>02/16/2011 01:00 | Occurred To<br>02/16/2011 01:19 | Report Type<br>Original |
| | Dept. Classification<br>BURGLARY TO BUSINESS | | Case Status<br>REPORT TAKEN | Case Status Date<br>02/16/2011 | Cleared |
| | Common Name<br>FREDDIE BEAR SPORTS - 17250 S OAK PARK AV Tinley Park, IL 60477 (COOK COUNTY) | | | | |
| | Day of Week : WEDNESDAY<br>Dispatched : 02/16/2011 01:03<br>Arrived : 02/16/2011 01:03<br>Location Type : BUSINESS PLACE-COMMERCIAL<br>Alcohol Related : NO | | Drug Related : NO<br>Total Damaged Property Value : $0.00<br>Total Stolen Property Value : $0.00<br>Total Recovered Property Value : $0.00 | | |

| | | | |
|---|---|---|---|
| **O**<br>**F**<br>**F**<br>**E**<br>**N**<br>**S**<br>**E**<br><br>**1** | State Classification<br>BURGLARY | | Attempted/Committed |
| | Statute/Ordinance | Location Type<br>BUSINESS PLACE-COMMERCIAL | Disposition Date |
| | | | |

End of Offense: 1

| | | | |
|---|---|---|---|
| **P**<br>**E**<br>**R**<br>**S**<br>**O**<br>**N**<br><br>**1** | Person Type<br>C O M P L A I N A N T | Business/Person Name<br>MARNIE L. KOCH | Business Phone<br>(708) 429-1000 |
| | Home Phone | Person Address | |
| | Other Phone | Employer Address<br>17265 S OAK PARK AV Tinley Park IL 60477 ,COOK County | |
| | Race<br>WHITE | Sex<br>Female | SSN | DL Exp. Date | DL Number |
| | Birth Date | Birth Place | | | |
| | Age : 30<br>DL State : IL<br>Adult/Juvenile : ADULT | Employer : DURBINS<br>Can Identify Offender : NO<br>Body Marks: | | |

End of Person: 1

| | | | |
|---|---|---|---|
| **P**<br>**E**<br>**R**<br>**S**<br>**O**<br>**N**<br><br>**2** | Person Type<br>W I T N E S S | Business/Person Name<br>CHRISTOPHER E. ORTH | Business Phone |
| | Home Phone | Person Address | |
| | Other Phone | Employer Address | |
| | Race<br>WHITE | Sex<br>Male | SSN | DL Exp. Date | DL Number |
| | Birth Date | Birth Place | | | |
| | Age : 027<br>DL State : IL<br>Adult/Juvenile : ADULT | Can Identify Offender : NO<br>Body Marks: | | |

End of Person: 2

| Reporting Officer<br>B. BISHOP    (202) | Department<br>TINLEY PARK POLICE DEPARTMENT | Report Status:<br>Approved |
|---|---|---|
| Supervising Officer | | Date/Time |
| Verifying Officer<br>4 JONATHON W POPP    (172) | Department<br>TINLEY PARK POLICE DEPARTMENT | Date / Time<br>02/16/2011 16:18 |

**Tinley Park Police Department**
ORIGINAL
Incident Report

Case # **01-11-003384**

| PERSON 3 | Person Type | Business/Person Name | | | | Business Phone |
|---|---|---|---|---|---|---|
| | VICTIM | FREDDIE BEAR SPORTS | | | | (708) 532-4133 |
| | Home Phone | Person Address | | | | |
| | | Use Address from Incident Location Information | | | | |
| | Other Phone | Employer Address | | | | |
| | Race | Sex | SSN | DL Exp. Date | | DL Number |
| | Birth Date | Birth Place | | | | |
| | Victim Type : BUSINESS | | | Body Marks: | | |
| | Will File Charges : YES | | | | | |

End of Person: 3

| PERSON 4 | Person Type | Business/Person Name | | | | Business Phone |
|---|---|---|---|---|---|---|
| | OTHER PERSON | DONALD J. SHANTO | | | | (708) 532-4133 |
| | Home Phone | Person Address | | | | |
| | Other Phone | Employer Address | | | | |
| | | Use Address from Incident Location Information | | | | |
| | Race | Sex | SSN | DL Exp. Date | | DL Number |
| | WHITE | Male | | | | |
| | Birth Date | Birth Place | | | | |
| | Age : 062 | | | Will File Charges : YES | | |
| | Adult/Juvenile : ADULT | | | Can Identify Offender : NO | | |
| | Employer : FREDDIE BEAR SPORTS | | | Body Marks: | | |

End of Person: 4

| PERSON 5 | Person Type | Business/Person Name | | | | Business Phone |
|---|---|---|---|---|---|---|
| | SUSPECT/ARRES | LAWLESS HAWK | | | | |
| | Home Phone | Person Address | | | | |
| | (708) 534-3511 | 542 CIRCLE DR UNIVERSITY PARK IL 60484 ,WILL County | | | | |
| | Other Phone | Employer Address | | | | |
| | Race | Sex | SSN | DL Exp. Date | | DL Number |
| | BLACK | Male | | | | H20052088227 |
| | Birth Date | Birth Place | | | | |
| | 08/10/1988 | | | | | |
| | Age : 022 | | | Adult/Juvenile : ADULT | | |
| | DL State : IL | | | Hair Color : BLACK | | |
| | Min. Height : 6'02" | | | Eye Color : BROWN | | |
| | Min. Weight : 175 lbs | | | Body Marks: | | |

End of Person: 5

| PERSON 6 | Person Type | Business/Person Name | | | | Business Phone |
|---|---|---|---|---|---|---|
| | SUSPECT/ARRES | SAMMIE GARRETT Jr. | | | | |
| | Home Phone | Person Address | | | | |
| | | 15322 KILPATRICK AV OAK FOREST IL 60452 ,COOK County | | | | |
| | Other Phone | Employer Address | | | | |
| | Race | Sex | SSN | DL Exp. Date | | DL Number |
| | BLACK | Male | | | | G63078067288 |
| | Birth Date | Birth Place | | | | |
| | 10/09/1967 | | | | | |
| | Age : 043 | | | Adult/Juvenile : ADULT | | |
| | DL State : IL | | | Hair Color : BLACK | | |

| Reporting Officer | Department | Report Status: |
|---|---|---|
| B. BISHOP (202) | TINLEY PARK POLICE DEPARTMENT | Approved |
| Supervising Officer | | Date/Time |
| Verifying Officer | Department | Date / Time |
| 4 JONATHON W POPP (172) | TINLEY PARK POLICE DEPARTMENT | 02/16/2011 16:18 |

| P<br>E<br>R<br>S<br>O<br>N | | Min. Height : 5'09"<br>Min. Weight : 201 lbs | | | Eye Color : BROWN<br>Body Marks: | | |
|---|---|---|---|---|---|---|---|
| | | | | End of Person : | 6 | | |

| P<br>E<br>R<br>S<br>O<br>N | **7** | Person Type<br>S U S P E C T / A R R E S | Business/Person Name<br>JHERAMIE P. MACK | | | | Business Phone |
|---|---|---|---|---|---|---|---|
| | | Home Phone<br>(773) 587-9208 | Person Address<br>93 FOREST BL PARK FOREST IL 60466 ,COOK County | | | | |
| | | Other Phone | Employer Address | | | | |

| | Race<br>BLACK | Sex<br>Male | SSN | DL Exp. Date | DL Number<br>M20043585318 |
|---|---|---|---|---|---|
| | Birth Date<br>11/08/1985 | Birth Place | | | |
| | Age : 025<br>DL State : IL<br>Min. Height : 5'08"<br>Min. Weight : 200 lbs | | Adult/Juvenile : ADULT<br>Hair Color : BLACK<br>Eye Color : BROWN<br>Body Marks : | | |

| | | | End of Person : | 7 |
|---|---|---|---|---|

| V<br>E<br>H<br>I<br>C<br>L<br>E | **1** | Tag #<br>59066X-B | Tag Expiration | Year<br>2001 | Make<br>FORD | | Model<br>ECONOLINE | Vehicle Style<br>VAN |
|---|---|---|---|---|---|---|---|---|
| | | Tag Country | | Tag State<br>IL | Vehicle Type<br>TRUCK | | VIN<br>1FTSS34L71HB64860 | Category<br>SUSPECT |
| | | Top Color : BLUE<br>Bottom Color : BLUE<br>NCIC Number : V814195270 | | | | NCIC Entry Date : 02/09/2011<br>Miscellaneous Number : V11B3543 | | |

| | | | End of Vehicle : | 1 |
|---|---|---|---|---|

| N<br>A<br>R<br>R<br>A<br>T<br>I<br>V<br>E | **1** | Topic | Original Narrative |
|---|---|---|---|

    On 02/16/11 at 0100 hrs., this department received a report of a burglary in progress at Freddie Bear Sports located at 17250 S. Oak Park Ave. Witness Christopher E. Orth stated that he was outside Durbins (17265 S. Oak Park Ave.) on the west side of the business facing Oak Park Ave. Orth stated that he was having a cigarette when he observed a blue work van with racks on top pull in front of Freddie Bear Sports and stop. Orth stated that the van had no front plate. Two subjects exited the van on the passenger side carrying what appeared to be a large clear tote container. The subjects were wearing hooded dark clothing and Orth could not see their faces. There was a third subject who remained in the driver's seat of the van. The two subjects shattered one of the front doors to the business and entered. Orth stated that he ran into Durbins and told bartender Marnie Koch to call the police. Orth went back outside and observed the two subjects exit Freddie Bear Sports and enter the van on the passenger side carrying the tote. The van fled southbound on Oak Park Ave. Orth stated that the first two digits on the van's license plate were "59". Orth stated that he lost sight of the van as it approached 175th St.

    Complainant Marnie L. Koch stated that she was the bartender on duty at Durbins when witness Christopher Orth came into the bar and stated "call the police the fish place is getting robbed." Koch stated that she called this department and went outside. Koch stated that she observed a blue Ford Econoline van with no windows parked facing south in front of Freddie Bear Sports across the street. Koch observed two subjects wearing dark hooded sweatshirts exit the business carrying a large white container. Koch stated that she could not see the subjects' faces. The subjects got into the van with

| Reporting Officer<br>B. BISHOP    (202) | Department<br>TINLEY PARK POLICE DEPARTMENT | Report Status:<br>Approved |
|---|---|---|
| Supervising Officer | | Date/Time |
| Verifying Officer<br>4 JONATHON W POPP    (172) | Department<br>TINLEY PARK POLICE DEPARTMENT | Date / Time<br>02/16/2011 16:18 |

the container. The van fled the scene southbound past 173rd Pl. and through the red light at 175th St. Koch stated that she lost sight of the van after 175th St.

TPPD Communications relayed the description and last know direction of the van via police radio. At 0103 hrs, Ofc. Hill # 2 advised that he observed a van matching the suspect vehicle description heading south on Oak Park Ave. in the 17900 block. The vehicle was displaying Illinois B truck registration 59066X-B. Communications advised that the van was stolen out of Calumet City (LEADS number V11B3543). TPPD Police units attempted to stop the van and subsequently pursued the van onto eastbound Interstate 80 from Harlem Ave. At 0119 hrs., Sgt. Popp advised that the three listed suspects (Lawless Hawk, Sammie Garrett, and Jheramie Mack) were taken into custody off of 167th St. east of Kedzie Ave. See supplementary reports.

At 0109 hrs., R/O and Ofc. Taylor # 128 arrived on scene at Freddie Bear Sports. The northeast glass door facing Oak Park Ave. was shattered. R/O could see a large red landscaping rock on the floor inside the business just inside the door. R/O and Ofc. Taylor cleared the business and advised that the scene was secure. During the search of the business, R/O and Ofc. Taylor observed that four glass display cases along the north wall of the business had been shattered. R/O and Ofc. Taylor stood by and protected the scene until Inv. Dajani arrived on scene.

Inv. Dajani photographed the scene. At 0141 hrs., Freddie Bear employee Donald Shanto arrived on scene. Shanto surveyed the scene briefly and was able to determine that handguns were removed from the cases along the north wall.

R/O evaluated the northeast door, the display cases along the north wall, the floor, and the exterior of the business for evidence. R/O recovered the red landscaping brick from the floor as evidence. R/O recovered a small piece of glass that appeared to have blood on it from on top of the display cabinet marked "Used Firearms" (case # 3 on crime scene diagram). Both items were secured inside squad car 13B at the scene.

The four display cases along the north wall faced south and had sliding doors on the rear. R/O completed a diagram of the scene which depicts the location of each case.

Case # 1 was furthest west along the north wall and had the top shattered. Per Shanto, it appeared that no handguns were removed from that case.

Case # 2 was positioned directly east of case # 1 along the north wall and had the top shattered. Per Shanto, multiple handguns had been removed from this case.

Case # 3 was positioned directly east of case # 2 along the north wall and had the top shattered. Per Shanto, it appeared that no handguns were removed from that case. The top of case # 3 was the case labeled "Used Firearms" and was where R/O recovered the piece of glass with blood on it.

Case # 4 was positioned directly east of case # 3 along the north wall and had the top shattered. Per Shanto, this case was labeled "Law Enforcement" and had multiple handguns removed from inside. Shanto stated that he could not be sure how many handguns had been taken from any case until an inventory had been completed. Shanto advised there was a video surveillance system inside the business, but he was unable to access it.

R/O inventoried the piece of glass with blood on it and the red landscaping brick and secured them in evidence locker # 6. Complaints to be signed.

End of Narrative: 1

| Reporting Officer<br>B. BISHOP (202) | Department<br>TINLEY PARK POLICE DEPARTMENT | Report Status:<br>Approved |
| Supervising Officer | | Date/Time |
| Verifying Officer<br>4 JONATHON W POPP (172) | Department<br>TINLEY PARK POLICE DEPARTMENT | Date / Time<br>02/16/2011 16:18 |

# Tinley Park Police Department

ORIGINAL

Incident Report

Case # 01-11-003384

| | | |
|---|---|---|
| **I N C I D E N T** | **Case #** 01-11-003384 | **Report** 02/16/2011 13:53 | **Occurred From** 02/16/2011 09:50 | **Occurred To** 02/16/2011 11:34 | **Report Type** Supplemental |

| **Dept. Classification** BURGLARY TO BUSINESS | **Case Status** REPORT TAKEN | **Case Status Date** 02/16/2011 | **Cleared** |

| **Common Name** Mi Jack - 3111 W 167th ST Hazel Crest, IL 60429 (COOK COUNTY) |

| **Day of Week :** WEDNESDAY **Location Type :** BUSINESS PLACE-COMMERCIAL **Alcohol Related :** UNKNOWN **Drug Related :** UNKNOWN | **Total Damaged Property Value :** $0.00 **Total Stolen Property Value :** $0.00 **Total Recovered Property Value :** $0.00 |

**OFFENSE 1**

| **State Classification** BURGLARY | | **Attempted/Committed** |
|---|---|---|
| **Statute/Ordinance** | **Location Type** BUSINESS PLACE-COMMERCIAL | **Disposition Date** |
| **Evidence Collected :** YES | | |

End of Offense: 1

**PROPERTY 1**

| **Category** RECOVERED | **Property Type** FIREARMS-HANDGUNS | **Make** Glock | **Model** 39 |
|---|---|---|---|
| **Serial #** PTX190 | **Color** BLACK | **Description** Glock 39 .45/ 6 round magazine | **Condition** |
| **Recovery Location :** Use Address from Incident Location Information | | | |

End of Property: 1

**PROPERTY 2**

| **Category** EVIDENCE | **Property Type** NONE | **Make** Kingston | **Model** |
|---|---|---|---|
| **Serial #** | **Color** | **Description** 512 Mb memory card | **Condition** |

End of Property: 2

**NARRATIVE 1**

**Topic**

In summary, R/O arrived at 3111 167th St., Hazel Crest (MI Jack, business) for evidence technician duties for a found handgun. R/O spoke with Ofc. Schmeckpeper # 63 who advised that he located a black handgun at the southeast corner of 3111 167th St., between the property fence line and the Interstate 80 fence line. R/O photographed the scene including footwear impressions in the snow near the gun and R/O collected the handgun. The handgun is a black Glock 39, 45 G.A.P. with a serial number of PTX190. The handgun also had an empty 6 round magazine inside the handgun with no ammunition inside the handgun. R/O opened the handgun and made the gun safe with a pen (used as a chamber block for packaging) in the slide.

| **Reporting Officer** 4 STEVEN G ROBERTS    (190) | **Department** TINLEY PARK POLICE DEPARTMENT | **Report Status:** Approved |
|---|---|---|
| **Supervising Officer** | | **Date/Time** |
| **Verifying Officer** CHRIS BUTLER    (322) | **Department** TINLEY PARK POLICE DEPARTMENT | **Date / Time** 02/16/2011 14:19 |

CITY 004912

ORIGINAL

**Tinley Park Police Department**

Incident Report

Case # 01-11-003384

R/O then photographed some footwear impressions in the snow at the rear of 16760 Richmond Ave., Hazel Crest. R/O was unable to determine if the footwear impressions at the rear of 16760 Richmond Ave., were the same as the footwear impressions at 3111 167th St.. The temperature was above freezing and the snow was starting to melt.

R/O completed a photo log of the images that R/O captured and inventoried the handgun/ magazine, and the memory card from the camera. R/O inventoried the handgun (serial # PTX190) as item # 33 and the memory card as item # 34.

End of Narrative: 1

| Reporting Officer 4 STEVEN G ROBERTS (190) | Department TINLEY PARK POLICE DEPARTMENT | Report Status: Approved |
| Supervising Officer | | Date/Time |
| Verifying Officer CHRIS BUTLER (322) | Department TINLEY PARK POLICE DEPARTMENT | Date / Time 02/16/2011 14:19 |

CITY 004913

2 of 2

| I N C I D E N T | Case # 01-11-003384 | Report 02/16/2011 11:13 | Occurred From 02/16/2011 01:00 | Occurred To | Report Type Supplemental |
|---|---|---|---|---|---|
| | Dept. Classification BURGLARY TO BUSINESS | | Case Status REPORT TAKEN | Case Status Date 02/16/2011 | Cleared |
| | Common Name Freddie Bear Sports - 17250 S Oak Park AV Tinley Park, IL 60477 (COOK County) | | | | |
| | Day of Week : WEDNESDAY Location Type : SPORTING GOODS STORE - INDEPENDENT Alcohol Related : UNKNOWN Drug Related : YES | | | Total Damaged Property Value : $0.00 Total Stolen Property Value : $0.00 Total Recovered Property Value : $0.00 | |

| N A R R A T I V E | Topic | Supplemental Narrative |
|---|---|---|
| | 1 | While at post on training duties I heard a dispatch regarding a robbery at Freddie Bear Sports. While responding to the call from post, dispatch advised that two subjects were seen exiting the store wearing ski masks and carrying a safe. The subjects then entered a blue van and fled S/B on Oak Park ave. While en route I heard Ofc. Hill run a license plate and advise he was behind the vehicle S/B Oak Park, approaching 183rd St. I observed the offending vehicle and Ofc. Hill, with emergency lights and siren activated, traveling W/B on 183rd St. headed toward Harlem Ave. |

I entered the intersection of Harlem and 183rd with emergency lights activated, and blocked N/B traffic as the offending vehicle entered the intersection and proceeded S/B on Harlem. I then proceeded S/B on Harlem to assist Ofc. Hill.

The offending vehicle refused to yield as it continued S/B and onto the ramp to E/B I-80. Due to the serious nature of the crime, and the likelyhood that the offenders were in possession of numerous stolen firearms, I decided to commit to the pursuit and assist Ofc Hill. Once on the interstate I advised TPPD communications that I as leaving the jurisdiction and to notify Commander McCain and get another supervisor assigned to cover my watch. I then began broadcasting the pursuit on ISPERN as Ofc. Hill maintained communication with TPPD dispatch.

Ofc. Diorio joined the pursuit near I-57. The pursuit continued E/B until Kedzie Ave. when the offending vehicle made a sudden exit. I took the lead in the pursuit as the offending vehicle exited the interstate. and drove through a red light onto N/B Kedzie. The vehicle continued N/B until 167th St. where it turned right onto E/B 167th St.

I lost sight of the vehicle for a few seconds due to distance and snow banks that limited my line of sight. As I turned E/B onto 167th the offending vehicle was in my lane facing W/B. It appeared that it had lost control in the turn and spun out, ending up partially stuck in a snow bank on the south side of the road. As I closed with the vehicle it began moving in an attempt to flee, at the same time the side door, facing me, opened and a male black subject tried jumping out. The subject appeared to be holding a handgun. Fearing that the subject would exit and use deadly force against me, I struck the side door of the van with the front passenger bumper of my car preventing the armed subject from exiting and pinning the van against a snow drift.

As I exited my squad I observed a male black subject exit the rear of the van and flee E/B. I gave chase and observed another male black subject running E/B along a fence line South of 167th. As I cleared the back of the van a third male black subject ran behind me from the driver's side of the van N/B. Ofc's Hill, Diorio and K-9 Thor pursued the third subject.

I pursued the two subjects E/B for approximately 25 yards when the subject next to the fence began climbing it in an attempt to head S/B into Mijack property. I continued pursuing the subject running E/B because he was pulling numerous items out of his pants pockets and throwing them to the ground. I

| Reporting Officer 4 JONATHON W POPP (172) | Department TINLEY PARK POLICE DEPARTMENT | Report Status: Approved |
|---|---|---|
| Supervising Officer | | Date/Time |
| Verifying Officer 4 KEVIN R SCHULTZ (140) | Department TINLEY PARK POLICE DEPARTMENT | Date / Time 02/16/2011 19:59 |

# Tinley Park Police Department

## Incident Report

could not identify the items due to the darkness. I stopped my pursuit of the subject when he entered the parking lot of Mijack and headed South behind buildings on the property.

I returned to 167th St., contacted ISPERN and began coordinating containment and search for the suspects. All three suspects were located and taken into custody within 15 minutes.

I stayed on scene and coordinated evidence recovery and prisoner transports.

Multiple handguns were found at the scene and along the routes taken by the two offenders that fled E/B. Chief O'Connel arrived on scene and was briefed regarding the pursuit and apprehension of the offenders. Chief O'Connel directed me to return to post to coordinate the processing of evidence and prisoners. I was advised to contact Hazelcrest P.D. at a later time for the crash report involving my squad.

Upon arrival at post I met with the officers involved in the incident and coordinated assignments with Investigator Dajani and Commander Vacarro.

On 02/16/11 at 1130 hrs. Ofc.Cotton #615 Hazelcrest P.D. came to TPPD and completed the crash report. HPD # 11-1505.

Pursuit report attached.

Nothing further.

| | End of Narrative: 1 |

| Reporting Officer | Department | Report Status: |
| 4 JONATHON W POPP    (172) | TINLEY PARK POLICE DEPARTMENT | Approved |
| Supervising Officer | | Date/Time |
| Verifying Officer | Department | Date / Time |
| 4 KEVIN R SCHULTZ    (140) | TINLEY PARK POLICE DEPARTMENT | 02/16/2011 19:59 |

ORIGINAL

# Tinley Park Police Department

### Incident Report

Case # 01-11-003384

| | | | | | |
|---|---|---|---|---|---|
| **I N C I D E N T** | Case # 01-11-003384 | Report 02/16/2011 18:19 | Occurred From | Occurred To | Report Type Supplemental |
| | Dept. Classification BURGLARY TO BUSINESS | | Case Status REPORT TAKEN | Case Status Date | Cleared |
| | Common Name | | | | |
| | Total Damaged Property Value : $0.00 Total Stolen Property Value : $0.00 | | | Total Recovered Property Value : $0.00 | |

| | | |
|---|---|---|
| **N A R R A T I V E** | **1** | **Topic**        Supplemental Narrative<br><br>On 02-16-11 at 1311hrs, I was dispatched to the Tinley Park Police Department (TPPD) lockup for a prisoner who was vomiting.<br><br>Upon arrival I was told by Trace Ambulance paramedics that they were going to be transporting Lawless Hawk M/B 08-10-88, to South Suburban Hospital.<br><br>I followed the ambulance to the hospital.<br><br>When we arrived at the hospital, I handcuffed Hawk to the hospital bed. Hawk was given some medication for an upset stomach due to drinking to much alcohol the night before.<br><br>At 1740hrs Hawk was released from the hospital and transported back to TPPD.<br><br>When I got back to TPPD, I placed Hawk back in the lockup cell and put his hospital paperwork in locker #6 with the rest of his property. |

End of Narrative: 1

| | | |
|---|---|---|
| **Reporting Officer** 4 WILLIAM J GRABS (200) | **Department** TINLEY PARK POLICE DEPARTMENT | **Report Status:** Approved |
| **Supervising Officer** | | **Date/Time** |
| **Verifying Officer** 4 KEVIN R SCHULTZ (140) | **Department** TINLEY PARK POLICE DEPARTMENT | **Date / Time** 02/16/2011 20:01 |

CITY 004916

1 of 1

# Tinley Park Police Department

**ORIGINAL**

## Incident Report

Case # 01-11-003384

| | | | | | |
|---|---|---|---|---|---|
| **I N C I D E N T** | **Case #**<br>01-11-003384 | **Report**<br>02/16/2011 16:05 | **Occurred From**<br>02/16/2011 01:00 | **Occurred To**<br>02/16/2011 01:19 | **Report Type**<br>Supplemental |

| | |
|---|---|
| **Dept. Classification**<br>BURGLARY TO BUSINESS | **Case Status**<br>REPORT TAKEN |

**Case Status Date** | **Cleared**

**Common Name**
Freddie Bear Sports - 17250 S Oak Park Ave. Tinley Park, IL 60477 (COOK COUNTY)

Day of Week : WEDNESDAY
Dispatched : 02/16/2011 01:03
Arrived : 02/16/2011 01:03
Location Type : BUSINESS PLACE-COMMERCIAL
Alcohol Related : UNKNOWN

Drug Related : UNKNOWN
Total Damaged Property Value : $0.00
Total Stolen Property Value : $0.00
Total Recovered Property Value : $0.00

### OFFENSE 1

| | | |
|---|---|---|
| **State Classification**<br>BURGLARY | | **Attempted/Committed** |
| **Statute/Ordinance** | **Location Type**<br>BUSINESS PLACE-COMMERCIAL | **Disposition Date** |
| How Entry : DOOR (FRONT)<br>Forced Entry : YES | Evidence Collected : YES<br># of People Arrested : 3 | |

**End of Offense:** 1

### NARRATIVE 1

**Topic**  **Supplemental Narrative**

On above date and time, I heard a dispatch, of a robbery, at Freddy Bear Sports, 17250 Oak Park Avenue, and two subjects carrying out a gray safe. Dispatch further advised that a blue, Ford, Econoline, panel van, was s/b on Oak Park Avenue and went through the red light at 175th Street and continued s/b Oak Park. I then pulled on to Oak Park Avenue, at 176th Street and headed s/b, at which point, I observed a dark Ford suv behind the suspect blue van. I passed the suv and pulled in behind the van to obtain a license plate number. I gave the truck registration of 59066X. The van then turned w/b on 183rd St., from s/b Oak Park Avenue without stopping. As I turned westbound , I observed a Tinley Park squad car with his overhead lights on, at about the 6900 block of 183rd St. I then activated my overhead lights and sirens to stop the van. The van continued w/b on 183rd St., passing the Tinley Park squad. I continued to follow the van as it approached Harlem Avenue. The van went through the red light and turned southbound on Harlem Avenue, from w/b 183rd Street. The van began to increase speed s/b, then the van got on the on ramp to I-80 eastbound.

At this point, I was advised by dispatch, that the suspect vehicle was reported stolen out of Calumet City, IL. The van then continued eastbound I-80, increasing speed to approximately ninety-five mph. Then van continually weaved from lane to lane while e/b I-80. I believed the circumstances dictated that I continue to pursue because the location of the robbery and the likelyhood of multiple stolen firearms. The van continued e/b at ninety-five mph, feinting to exit at I-57 northbound, and continuing e/b. During this time, I stayed in the middle lane of e/b traffic following from a safe distance with my lights and sirens on. Upon approaching the exit ramp to Kedzie Avenue, I continued to stay in the middle lane of e/b I-80 and decreased speed because the van began to swerve violently and head toward the exit. At this point, the van did get on the exit ramp, I slowed my vehicle, at which point, Sgt. Popp took the lead in the pursuit, as he stayed in the southern most lane of e/b I-80, and I then cut in behind Sgt. Popp. The van then sped northbound on Kedzie Avenue and approached 167th Street. At this point, the vehicle turned eastbound on 167th Street, lost control, spun out, and was facing westbound in the eastbound lanes of traffic, in a snow drift. At this point, I pulled parallel to Sgt. Popp's

| **Reporting Officer**<br>4 KENNETH J HILL  (189) | **Department**<br>TINLEY PARK POLICE DEPARTMENT | **Report Status:**<br>Approved |
|---|---|---|
| **Supervising Officer** | | **Date/Time** |
| **Verifying Officer**<br>4 KEVIN R SCHULTZ  (140) | **Department**<br>TINLEY PARK POLICE DEPARTMENT | **Date / Time**<br>02/16/2011 22:21 |

CITY 004917

vehicle and exited my vehicle, leaving the lights and sirens on. The offenders inside the van, appeared to exit out of the back of the van due to Sgt. Popp's vehicle being pinned by the passenger side of the van and not allowing the van side doors to open.

I observed a male black subject, wearing a light gray jacket run north from the back of the van. I drew my firearm and told the offender " stop you are under arrest" and then gave chase and followed the subject on to the property of Speedway gas station (16649 S. Kedzie). I observed the subject attempt to get into an occupied vehicle and the vehicle sped off, out of the parking lot. At this point, the offender grabbed the door handle of a suv, which was locked or he slipped off and he continued north through the parking lot. At this point, I realized that Ofc. Diorio and his canine partner were behind me. We all continued the chase, when the canine "Thor" hit my left leg while passing me, causing me to fall. I rolled, got up and continued to pursue. The offender came to a stop and put his hands in the air. I ordered him to the ground three times. The offender complied and was handcuffed without further incident. I searched the offender, with the assistance of Ofc. Ringhofer and placed him in my squad car and ran his name (Garrett, Sammie) through Tinley Park Dispatch.

Officer Davis #510 of the Markham Police Department apprehended Lawless Hawk II, at Simply Storage (16643 S. Kedzie, Markham IL.). Hawk was turned over to me from Markham PD. I handcuffed Hawk and removed Markham PD's cuffs. I then searched Hawk and recovered a Springfield Armory, 1911-A1, .45, from the waistband of Hawk. Hawk was then transported to Tinley Park PD by Oak Forest PD for processing.

While on scene, I observed Sgt. Popp move his vehicle away from the suspect van. I then observed a Glock 31C, .357 Sig caliber, laying on the roadway, that was previously under Sgt. Popp's vehicle. I recovered that pistol, and the Springfield .45 recovered from Hawk previously, and transported them to TPPD along with Garrett, Sammie for processing.

Once at TPPD, I searched Garrett again and secured him in a cell. At this point, I was told by Garrett that he had swallowed powder cocaine, his chest hurt and he wanted to go to the hospital. Paramedics were summoned and Garrett was transported to South Suburban Hospital for observation. I then tendered both pistols to Ofc. Ringhofer#55, for inventory purposes.

End of Narrative: 1

| Reporting Officer<br>4 KENNETH J HILL    (189) | Department<br>TINLEY PARK POLICE DEPARTMENT | Report Status:<br>Approved |
|---|---|---|
| Supervising Officer | | Date/Time |
| Verifying Officer<br>4 KEVIN R SCHULTZ    (140) | Department<br>TINLEY PARK POLICE DEPARTMENT | Date / Time<br>02/16/2011 22:21 |

CITY  004918

**Tinley Park Police Department**

**ORIGINAL**

Incident Report

Case # **01-11-003384**

| | Case #<br>01-11-003384 | Report<br>02/16/2011 22:58 | Occurred From | Occurred To | Report Type<br>Supplemental |
|---|---|---|---|---|---|
| I N C I D E N T | Dept. Classification<br>BURGLARY TO BUSINESS | | Case Status<br>REPORT TAKEN | Case Status Date<br>02/16/2011 | Cleared |
| | Common Name<br>(COOK County) | | | | |
| | Total Damaged Property Value : $0.00<br>Total Stolen Property Value : $0.00 | | | Total Recovered Property Value : $0.00 | |

| | | Topic | Supplemental Narrative | |
|---|---|---|---|---|
| N A R R A T I V E | 1 | On 16 February 2011 at 1600 hours, I was assigned to a prisoner watch detail at South Suburban Hospital. I relieved Officer Barden #71 in room 261. At 1745 hours, I was informed by the staff that the patient, Sammie Garrett Jr. M/B 10-09-67 was discharged from the hospital. I informed TPPD Communications that I was enroute to TPPD lockup with the prisoner. I secured his legs with leg irons and he was handcuffed (double-locked checked for comfort). I transported him back to TPPD lockup in patrol unit #18A without incident. He was informed that my audio and video equipment was recording while enroute to TPPD. He was brought inside lockup and turned over to Investigator Dajani #23. I have nothing further to report at this time. | | |
| | | | End of Narrative: 1 | |

| Reporting Officer<br>PATROLMAN M. EGGEBRECHT (217) | Department<br>TINLEY PARK POLICE DEPARTMENT | Report Status:<br>Approved |
|---|---|---|
| Supervising Officer | | Date/Time |
| Verifying Officer<br>4 KEVIN R SCHULTZ (140) | Department<br>TINLEY PARK POLICE DEPARTMENT | Date / Time<br>02/16/2011 23:38 |

CITY 004919

1 of 1

# ORIGINAL

## Tinley Park Police Department

### Incident Report

| | | | | |
|---|---|---|---|---|
| **Case #**<br>01-11-003384 | **Report**<br>02/16/2011 08:40 | **Occurred From** | **Occurred To** | **Report Type**<br>Supplemental |
| **Dept. Classification**<br>BURGLARY TO BUSINESS | | **Case Status**<br>REPORT TAKEN | **Case Status Date** | **Cleared** |
| **Common Name** | | | | |
| **Total Damaged Property Value :** $0.00<br>**Total Stolen Property Value :** $0.00 | | | **Total Recovered Property Value :** $0.00 | |

**NARRATIVE 1**

**Topic**  Supplemental Narrative

In summary, at 0140 hours on 02/16/11, I was advised of this incident. I arrived at the scene at 0200 hours on 02/16/11. I met with Commander Vaccaro and Reporting Officer Bishop. I was given a preliminary briefing in reference to this incident. I learned that the suspect vehicle in this incident was reported stolen on 02/08/11 (Calumet City PD Case #11-4896, victim Oyewole Ajilokun M/B DOB ▓▓▓▓▓▓▓▓▓▓▓▓ I photographed the scene.

I arrived at the Tinley Park Police Department. I learned that the subjects in custody in reference to this incident were identified as Sammie Garrett Jr (M/B DOB 10/09/67), Jheramie Mack (M/B DOB 11/08/85), and Lawless Hawk (M/B DOB 08/10/88). I observed Mack's right thumb was bandaged by Trace Paramedics. I also observed Mack's clothing had what appeared to be blood stains on it (2 black wool mits, one Russell Athletic T-shirt, one Chicago Bears T-shirt, one Basic Additions T-shirt, one Purdue University T-shirt). I subsequently air dried these items in the Tinley Park sallyport before packaging them into evidence.

At 0513 hours on 02/16/11, I read Mack his Miranda Warnings verbatim from the pre-printed form. Mack invoked his rights and refused to sign the waiver form. Mack subsequently gave me written consent to obtain a DNA sample by use of a buccal swab kit. I obtained a DNA sample from Mack and placed him back in the holding cell.

At 0551 hours on 02/16/11, I read Hawk his Miranda Warnings verbatim from the pre-printed form. Hawk waived his rights and signed the waiver form. Hawk advised me that he and Garrett were cousins. Hawk subsequently invoked his rights and did not wish to answer any further questions from me. Hawk subsequently gave me written consent to obtain a DNA sample by use of a buccal swab kit. I obtained a DNA sample from Hawk and placed him back in the holding cell.

At 0800 hours on 02/16/11, I processed the suspect vehicle at the Tinley Park Police Department. I was unable to obtain anything of evidentiary value. I observed shattered glass in the rear compartment of the suspect vehicle. I photographed this as well. The memory card was placed into evidence (see proof sheet attached).

At 1000 hours on 02/16/11, Lorraine Bailey the manager of Freddie Bear Sports contacted me. Bailey advised me that neither she, nor the owner Lutger knew the suspects. Bailey indicated that they did not give the suspects permission to enter the business and take handguns. Bailey indicated that she and Lutger wished to pursue complaints.

| | | |
|---|---|---|
| **Reporting Officer**<br>Detective Sam Dajani  (209) | **Department**<br>Police | **Report Status:**<br>Approved |
| **Supervising Officer** | | **Date/Time** |
| **Verifying Officer**<br>PATRICK MCCAIN  (411) | **Department**<br>TINLEY PARK POLICE DEPARTMENT | **Date / Time**<br>02/17/2011 11:13 |

# ORIGINAL

## Tinley Park Police Department

### Incident Report

It should be noted that Officer Ringhofer advised me that when Mack was apprehended by Illinois State Police Troopers Farnesi #5371 and Okon #4802, Mack was in possession of three handguns. These handguns were stolen from Freddie Bears (Evidentiary items 9, 10, and 11). I also learned that when Hawk was apprehended by Markham PD Officer Davis #510, he was found in possession of a handgun that was stolen from Freddie Bear Sports (Evidentiary item 12).

At 1400 hours on 02/16/11, I obtained the surveillance footage from Tinley Park PD Dispatch which recorded Oak Park Avenue during the time this incident occurred. I observed what appeared to be the suspect vehicle proceed S/B on Oak Park Avenue at 173rd Pl. The time stamp on the video showed 0100:53 on 02/16/11. Based on the resolution of the footage, I was unable to obtain any description of the occupants of the vehicle.

At 1500 hours on 02/16/11, I met with Detective Boling at the Tinley Park Police Department. Detective Boling was able to obtain surveillance footage from Freddie Bears. Detective Boling noted that the time stamp on the surveillance footage was approximately one hour ahead. I observed at time stamp 0202 hours on 02/16/11, two male/black suspects make entry in the business with a gray storage container. I observed one subject wearing a black baseball cap with a P symbol on the front of the cap, shattering the glass cases where the firearms were stored with a metal object. This subject was also wearing a red scarf. Note, this clothing was consistent with what the suspect Mack wore at the time of his apprehension. Based on the resolution of the surveillance footage, I was unable to obtain a clear facial picture of this subject. I also observed the second suspect wearing a clothing description similar to what Hawk wore at the time of his apprehension. Based on the resolution of the surveillance footage, I was unable to obtain a clear facial picture of this suspect. This incident took less than one minute to occur. I placed the surveillance footage into evidence.

At 1759 hours on 02/16/11, I read Garrett his Miranda Warnings verbatim from the pre-printed form. Garrett waived his rights and agreed to speak to me. Garrett subsequently provided me with a written statement indicating that he drove Hawk and Mack to Freddie Bears knowing that they were going to commit a burglary. This statement was reduced to typing, typed by myself, read and signed by Garrett (see written statement for further).

At 1830 hours on 02/16/11, I was contacted by Ajilokun. Ajilokun advised me that he did not know any of the suspects. Ajilokun advised me that he did not give the suspects permission to possess or trespass in his vehicle. Ajilokun wished to pursue complaints. See Officer Ringhofer's report in reference to the disposition of the suspect vehicle.

At 1900 hours on 02/16/11, Freddie Bears Manager Lorraine Bailey faxed me an inventory of all the handguns that were stolen. The wholesale value of these handguns were noted on the inventory. It should be noted that all 26 handguns that were stolen in reference to this incident were recovered and accounted for.

At 2000 hours on 02/16/11, I made contact with the Cook County State's Attorney Office Felony Review. I spoke with ASA Jackie Kwilos. I advised Kwilos of the facts and circumstances of this incident. Kwilos approved felony charges (approval time 2010 hours on 02/16/10) against the suspects as follows:

Sammie Garrett - 1 felony count of Unlawful Use of Weapons by Felon, 1 felony count of Aggravated

| Reporting Officer | Department | Report Status: |
|---|---|---|
| Detective Sam Dajani   (209) | Police | Approved |
| Supervising Officer | | Date/Time |
| | | |
| Verifying Officer | Department | Date / Time |
| PATRICK MCCAIN   (411) | TINLEY PARK POLICE DEPARTMENT | 02/17/2011 11:13 |

CITY 004921

ORIGINAL

**Tinley Park Police Department**

Incident Report

Case # 01-11-003384

Fleeing and Eluding a Peace Officer, 1 felony count of Burglary, and 1 felony count of Unlawful Possession of a Stolen Motor Vehicle.

Jheramie Mack - 1 felony count of Burglary, 1 felony count of Aggravated Unlawful Use of Weapons. Kwilos advised me to charge Mack with 1 misdemeanor count of Criminal Trespass to Motor Vehicle.

Lawless Hawk - 1 felony count of Burglary, 1 felony count of Aggravated Unlawful Use of Weapons. Kwilos advised me to charge Hawk with 1 misdemeanor count of Criminal Trespass to Motor Vehicle.

I subsequently charged the suspects with the above listed charges. I processed all three suspects and detained them at the Tinley Park Police Dept lockup pending their bond hearings at the Bridgeview Courthouse on 02/17/11, at 0900 hours, in room 103. On 02/17/11, I will complete the Illinois State Police Online Crime Lab form requesting evidentiary items be forwarded to the I.S.P crime lab for analysis.

This case is cleared by felony arrests.

End of Narrative:   1

| Reporting Officer<br>Detective Sam Dajani   (209) | Department<br>Police | Report Status:<br>Approved |
|---|---|---|
| Supervising Officer | | Date/Time |
| Verifying Officer<br>PATRICK MCCAIN   (411) | Department<br>TINLEY PARK POLICE DEPARTMENT | Date / Time<br>02/17/2011 11:13 |

CITY  004922

3  of  3

# ILLINOIS STATE POLICE FIELD REPORT

| | | |
|---|---|---|
| **1. CADR** 1,2,3,4 | **2. How Notified** 5 | **3. Initial Notification** Date 02/16/11 Time 1:04 A P / Incident Occurrence Date 02/16/11 Time 1:04 A P |
| | | **4. Number** F-03-11-394 |

| 1. TYPE OF REPORT | 2. HOW ISP INITIALLY NOTIFIED | 6c. & 6e. RESPONDING VEHICLE | 7. SYMBOLS | 8h. EYES | 8i. HAIR | 14b. INJURIES | 14d. WEAPON | 14f. CASE STATUS |
|---|---|---|---|---|---|---|---|---|

**6** Brief Description
**ASSIST WITH TINLEY PARK POLICE DEPARTMENT WITH A BURGLARY AND PURSUIT**

| a. Location I80 WESTBOUND KEDZIE | City MARKHAM | County/Township COOK/BREMEN |
|---|---|---|

| b. Reporting Officer (Print or Type) - Last, First, Middle TPR. FARNESI N. | I.D. No. 5731 | Dist No. 03 | ★ | c. Response No. 1 | d. Assisting Officer - Last, First, Middle TPR. OKON, J. | I.D. No. 4802 | Dist No. 03 | ★ e. Response No. 03 |
|---|---|---|---|---|---|---|---|---|

**S 7** | a. Name - Last, First, Middle **MACK, JHERAMIE P** | b. Home Address **93 FOREST BLVD PARK FOREST, IL 60466**

| 8 | a. Home Telephone --- | b. Cellular Telephone --- | c. DOB 11/08/85 | d. Sex M | e. Race B | f. Height 508 | g. Weight 200 | h. Eyes ★ 3 | i. Hair ★ 2 | j. Complex. DBR | k. Build ★ 2 | l. Marital ★ 4 |
|---|---|---|---|---|---|---|---|---|---|---|---|---|

| 9 | a. Driver's License No. M200-4358-5318 | State IL | b. Social Security No. 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 | c. Place of Birth Illinois | d. Scars-Tattoos-Deformities-Amputations --- |
|---|---|---|---|---|---|

**CAUTION Y**

| 10 | a. Alias --- | b. Business Name, Address and Telephone --- | c. Occupation --- |
|---|---|---|---|

| 11 | a. Date Arrested 02/16/11 | Time 1:19 A P | b. Location of Arrest I80 EASTBOUND KEDZIE | c. Offense Section |
|---|---|---|---|---|

| 12 | a. Date Miranda Given | Time A P | b. Officer Name | I.D. No. | c. Fingerprint ☐ Yes ☐ No | d. Bond | e. Court App. Date |
|---|---|---|---|---|---|---|---|

| 13 | a. Where held | b. ISP Ticket No. | c. FBI Number 82047TB0 | d. BOI No. IL47346640 | e. LEADS Message No. | f. NCIC |
|---|---|---|---|---|---|---|

| 14 | a. Gang/Organization Affiliation | b. Injuries ★ | c. Address where treatment given | d. Weapon ★ | e. 1. ☐ Alcohol Involved 2. ☐ Drugs Involved | f. Case Status 1 |
|---|---|---|---|---|---|---|

**CAUTION**

**★ 7** | a. Name - Last, First, Middle | b. Home Address

| 8 | a. Home Telephone | b. Cellular Telephone | c. DOB | d. Sex | e. Race | f. Height | g. Weight | h. Eyes ★ | i. Hair ★ | j. Complex. | k. Build ★ | l. Marital ★ |
|---|---|---|---|---|---|---|---|---|---|---|---|---|

| 9 | a. Driver's License No. | State | b. Social Security No. | c. Place of Birth | d. Scars-Tattoos-Deformities-Amputations |
|---|---|---|---|---|---|

| 10 | a. Alias | b. Business Name, Address and Telephone | c. Occupation |
|---|---|---|---|

| 11 | a. Date Arrested | Time A P | b. Location of Arrest | c. Offense Section |
|---|---|---|---|---|

| 12 | a. Date Miranda Given | Time A P | b. Officer Name | I.D. No. | c. Fingerprint ☐ Yes ☐ No | d. Bond | e. Court App. Date |
|---|---|---|---|---|---|---|---|

| 13 | a. Where held | b. ISP Ticket No. | c. FBI Number | d. BOI No. | e. LEADS Message No. | f. NCIC |
|---|---|---|---|---|---|---|

| 14 | a. Gang/Organization Affiliation | b. Injuries ★ | c. Address where treatment given | d. Weapon ★ | e. 1. ☐ Alcohol Involved 2. ☐ Drugs Involved | f. Case Status |
|---|---|---|---|---|---|---|

## VEHICLE OR BOAT INFORMATION

| 15 | a. Color BLUE | b. Year 2001 | c. Make FORD | d. Model | e. Body Style VAN | f. Year/State 12/IL | g. License No. 59066X | h. Est. Damage |
|---|---|---|---|---|---|---|---|---|

| i. VIN/HIN 1FTSS34L71HB64860 | j. Vehicle Removed By --- | To --- |
|---|---|---|

| k. Owner PRINA J SERVICES INC | l. Address 510 MACKINAW AVE CALUMET CITY, IL 60409 | m. Telephone |
|---|---|---|

| 16 | a. Pursuit Termination Devices Used? ☐ Yes ☒ No | b. Evidence Submitted? ☐ Yes ☒ No | c. Video Tape Number | d. Copies to: |
|---|---|---|---|---|

| 17 | Signature of Reporting Officer *Tpr. N. F. #5731* | a. Date 02/16/11 | b. Quality Checked | I.D. No. | Initials | Page 1 of 2 |
|---|---|---|---|---|---|---|

THE CONTENTS OF THIS DOCUMENT ARE CONFIDENTIAL AND CONTAIN NEITHER RECOMMENDATIONS NOR CONCLUSIONS OF THE ILLINOIS STATE POLICE. THE CONTENTS OF THIS DOCUMENT ARE NOT TO BE DISTRIBUTED OUTSIDE THE ILLINOIS STATE POLICE.

IL 493-0384

CITY 004923

ISP 5-048 (05/05)

| ILLINOIS STATE POLICE Field Report Narrative/Addendum Form | 2. Report Date 02/16/11 | 3. Report Number F- 03-11-394 |
|---|---|---|

THE PURPOSE OF THIS FIELD REPORT IS TO DOCUMENT THE ASSIST WITH TINLEY PARK POLICE DEPARTMENT WITH THE APPREHENSION OF JHERAMIE P. MACK (M/B 11/08/85) INVOLVED IN A BURGLARY AND PURSUIT.

ON 02/16/11, AT APPROXIMATELY 1:04 AM, I (TPR. N. FARNESI #5731) RESPONDED TO AN ISPERN WITH TINLEY PARK POLICE INVOLVED IN A PURSUIT WITH A STOLEN VEHICLE (IL REG. 59066X) INVOLVED IN A BURGLARY OF A GUN STORE IN TINLEY PARK. TINLEY PARK PD ADVISED THEY WERE PURSUING THE VEHICLE I80 EASTBOUND HARLEM AVE. THE VEHICLE EXITED I80 AT KEDZIE AVE AND CONTINUED NORTHBOUND. THE VEHICLE STOPPED AT 167th ST AND KEDZIE AVE. THREE MALE BLACK SUBJECTS FLED FROM THE VEHICLE ON FOOT. ONE OF THE SUBJECTS RAN SOUTH THROUGH A PARKING LOT TOWARDS I80.

I STOPPED MY VEHICLE AT I80 WESTBOUND EAST OF KEDZIE AVE. I OBSERVED A MALE BLACK SUBJECT, LATER IDENTIFIED AS MACK RUNNING UP THE EMBANKMENT. MACK RAN OVER TO AN ABANDONED VEHICLE ON THE RIGHT SHOULDER AND TRIED TO GAIN ENTRY. I RAN TOWARDS MACK. MACK SAW ME AND RAN ACROSS THE WESTBOUND LANES, HOPPED THE GUARDRAIL, AND RAN ACROSS THE EASTBOUND LANES INTO A WOODED AREA. I PURSUED MACK ACROSS THE EXPRESSWAY AND SAW HIM RUN INTO THE WOODS WHERE HE BECAME ENTANGLED IN THE TREES. I TOOK A DEFENSIVE POSITION WITH MY RIFLE ON THE OUTSIDE OF THE TREE LINE IN THE DIRECTION WHERE HE WAS ATTEMPTING TO HIDE. TPR. J. OKON #4802 AND OFFICER J. NEWELL #547 (MARKHAM PD) ARRIVED ON SCENE WITHIN A MINUTE. TPR. OKON AND OFF. NEWELL WENT INTO THE TREE LINE WHERE MACK WAS ENTANGLED AND SECURED HIM. TPR. OKON HANDCUFFED MACK BEHIND HIS BACK, CUFFS CHECKED FOR FIT AND DOUBLE LOCKED. TPR. OKON SEARCHED MACK AND RECOVERED A GLOCK 33 (SERIAL #PYE737) IN MACK'S FRONT LEFT JEAN POCKET. ONCE MACK WAS BROUGHT OUT OF THE WOODS, A FURTHER SEARCH OF HIS PERSON REVEALED A GLOCK 26 (SERIAL #PNN929) IN HIS FRONT RIGHT JEAN POCKET AND A GLOCK 26 (SERIAL #PNN927) IN HIS RIGHT SWEAT PANTS POCKET.

MACK'S RIGHT INDEX FINGER WAS CUT DURING THE BURGLARY AND WAS BLEEDING. BLOOD WAS VISIBLE ON THE REAR TANG AREA OF THE GLOCK 36 AND ON ONE OF THE GLOCK 26'S SALES TAGS.

TPR. J. OKON TRANSPORTED MACK TO TINLEY PARK POLICE DEPARTMENT FOR PROCESSING. ALL THREE GUNS WERE SECURED IN THE TRUCK OF TPR. OKON'S SQUAD CAR AND TURNED OVER TO OFF. HILL #2 OF THE TINLEY PARK POLICE DEPARTMENT UPON ARRIVAL AT THEIR STATION.

| Signature of Reporting Officer | ID# 5731 | a. Date 02/16/11 | b. Quality Checked Initials | I.D No. | Page 2 of 2 |
|---|---|---|---|---|---|