# Exhibit 51



# Bureau of Alcohol, Tobacco, Firearms and Explosives

## ATF News Release

At The Frontline Against Violent Crime     Columbus Field Division

Contact: Senior Special Agent David D. Coulson
Public Information Officer
(219) 746-9776
Public Information Officer Jeff Robinson
City of Powell
(614) 396-3322

For Immediate Release
February 9, 2012
www.atf.gov

## ATF OFFERS REWARD IN GUN SHOP BURGLARY

### *Firearms Stolen from Powder Room Gun Shop*

Powell, Ohio — The Bureau of Alcohol, Tobacco, Firearms and Explosives (ATF) is offering a reward of up to $5,000 for information leading to the arrest and conviction of the persons(s) responsible for the theft of firearms from Powder Room Gun Shop, 2470 East Powell Road, Powell, Ohio. The burglary occurred Wednesday in the early morning hours.

ATF, Powell Police Department, and the Ohio Bureau of Identification and Investigations are investigating the overnight theft of 80 plus firearms. Investigators have developed information regarding this burglary; however, they need additional information from the public that may assist them in solving the case. These firearms pose a potential danger and investigators are seeking information that would aid in the resolution of this investigation.

"Through experience, we know stolen firearms are used in furtherance of drug and gang related activities, and are also utilized by violent criminals to perpetrate additional crimes," said Robert Browning, Special Agent in Charge, ATF Columbus Field Division. "Law enforcement is seeking assistance from the public in locating these weapons and identifying those responsible."

"Our collaborative law enforcement effort requires the public's help in locating the stolen weapons and identifying the persons responsible for this crime," stated Powell Police Department Chief Gary Vest.

Anyone with information is asked to call the ATF crime gun hotline 1–800–ATF–GUNS (1–800–283–4867), the ATF Columbus Field Office at (614) 827–8450 or the Powell Police Department at (614) 396–3346 or (614) 885–5005. Callers may remain anonymous.

ATF is the lead federal law enforcement agency with jurisdiction in violent crimes involving firearms and regulates the firearms industry. More information on ATF and its programs is available at www.atf.gov.

### ###

## Bureau of Alcohol, Tobacco, Firearms and Explosives

# ATF   News Release

*At The Frontline Against Violent Crime*     Charlotte Field Division

| | |
|---|---|
| David Riddleberger, Supervisor | For Immediate Release |
| (919) 719-2021 | December 8, 2011 |
| Earl Woodham, PIO Supervisor | www.atf.gov |
| (704) 716-1843 | |

## ATF OFFERS $2,500 REWARD FOR GUN STORE BURGLARY

ROANOKE RAPIDS, N.C. – Melvin D. King, Jr., Acting Special Agent in Charge of the Charlotte Field Division, Bureau of Alcohol, Tobacco, Firearms and Explosives (ATF), has announced a reward of up to $2,500 for information that leads to the arrest and conviction of the persons responsible for a gun store burglary in Roanoke Rapids, North Carolina.

On Friday December 2, 2011, at approximately 3:00 a.m. unknown persons broke into P&A Pawn, 930 Roanoke Avenue, Roanoke Rapids, NC and stole forty-three firearms, all of which were handguns. P&A Pawn is a federally licensed firearms dealer.

The burglary investigation of P&A Pawn is being conducted by ATF and the Roanoke Rapids Police Department. Anyone with information about this crime may report it to the:

- **ATF Raleigh Field Office: (919) 719 - 2021**
- **ATF Gun Hotline: (800) ATF GUNS (800) 283-4867**
- **Roanoke Rapids Police Department: (252) 533-2810**
- **Halifax County Crime Stoppers: (252) 583-4444**

All information will be treated confidentially and the callers will remain anonymous if they request.

ATF is the federal agency with jurisdiction for investigating federal firearms violations and regulating the firearms industry. More information on ATF and its programs can be found at www.atf.gov (www.atf.gov) .

### ###

# ATF offers $10,000 reward for information on theft from Shrewsbury gun store.



Published: 11/15 11:06 am

Updated: 11/15 11:08 am

The Philadelphia Field Division, Bureau of Alcohol, Tobacco, Firearms and Explosives (ATF) announced a reward of up to $10,000 for information leading to the arrest and conviction of the person(s) responsible for the theft of 90 firearms from the Gun Bunker gun store located in Shrewsbury, Pa.

The theft occurred between 3 and 6 a.m. Monday, at 60 East Forrest Ave. The burglary investigation is being conducted by ATF and the Pennsylvania State Police. Investigators seek public assistance that may aid them in solving the theft of the firearms.

"Gun thieves are a principal source of firearms for criminals who threaten public safety," said ATF Philadelphia Field Division Acting Special Agent in Charge Essam Rabadi. "ATF is dedicated to ensuring our communities are a secure place to live and work. We ask the public to provide any information that would aid investigators in recovering the stolen firearms and arresting those responsible for the theft."

Anyone having information should call the ATF Hotline 1-800-ATF-GUNS (1-800-283-4867) or email: **ATFTips@atf.gov**.

Copyright 2011 Newport Television LLC All rights reserved. This material may not be published, broadcast, rewritten, or redistributed.

**Sponsored Links**

#### Overstock Laptops: $37.79
Get a brand new laptop for $37.79. Limit 1 A Customer. Grab Yours Now.
www.dealfun.com/Laptops

#### Mom is 50, Looks 30
Mom Reveals $5 Wrinkle Therapy That Makes Botox Doctors Furious!
http://lifestyleforwomen.net

#### Mortgage Rates Hit 2.50%
White House Program Cuts Up To $1000 Off Monthly Mortgage Payments! (3. 1% APR)
www.SeeRefinanceRates.com

**Buy a link here**



**Bureau of Alcohol, Tobacco, Firearms and Explosives**

# ATF News Release

At The Frontline Against Violent Crime      San Francisco Field Division

Contact: Helen Dunkel, Special Agent, PIO
Office: (925) 557-2815
Cell: (925) 202-8135
Helen.Dunkel@atf.gov
Contact: Keith Paul, PIO
Henderson Police Department
Office: (702) 267-4510

For Immediate Release
September 6, 2011
www.atf.gov

## ATF AND HENDERSON PD OFFER REWARD OF $5,000 IN GUN SHOP BURGLARY

HENDERSON, Nev. – Special Agent in Charge Stephen C. Herkins of the Bureau of Alcohol, Tobacco, Firearms and Explosives (ATF), San Francisco Field Division and Police Chief Jutta Chambers, Henderson Police Department, announced today the offer of a reward of $5,000 for information leading to the arrest and conviction of those responsible for the burglary of Lock and Load Tactical, a Federal Firearms Licensee, located in Henderson, Nev.

On Aug. 13, 2011 at approximately 3:30 a.m., five unidentified suspects drove a stolen vehicle into Lock and Load Tactical, located at 9340 S. Eastern Ave., Suite 104, Henderson, and stole 22 firearms. The suspects departed in a second dark-colored vehicle.

"Stolen firearms are frequently used in violent crimes by prohibited individuals and gang members," said SAC Stephen C. Herkins. "Law enforcement is seeking help from the public in locating these weapons and identifying those responsible."

"It is important for our community to get those stolen guns off the streets before they land in the hands of criminals," Chief Chambers said. "It is crimes like this that can put guns into the wrong hands and spawn additional crimes creating more victims."

Anyone having information about the burglary should immediately call the ATF hotline at 1-800-ATF-GUNS or Crime Stoppers at (702) 385-5555 to remain anonymous. You may also call the Henderson Police Department at (702) 267-4750 or visit www.crimestoppersofnv.com (www.crimestoppersofnv.com) .

ATF is the lead Federal law enforcement agency with jurisdiction over violent crimes involving firearms. ATF also regulates the firearms industry and works with licensed firearms dealers to ensure compliance with Federal firearms laws.

More information on ATF and its programs is available at www.atf.gov (www.atf.gov) .

Please see below 3 photos of a ball cap possibly left behind by the suspects involved.







###

## Bureau of Alcohol, Tobacco, Firearms and Explosives

# ATF News Release

*At The Frontline Against Violent Crime* — Charlotte Field Division

Contact: David Riddleberger, Supervisor
(919) 719-2021
Earl Woodham, PIO Supervisor
(704) 716-1843

For Immediate Release
August 3, 2011
www.atf.gov

## ATF OFFERS $2,500 REWARD FOR GUN STORE BURGLARY

*19 Firearms Taken in Burglary of Licensed Firearms Dealer*

RALEIGH, N.C. – Zebedee T. Graham, Special Agent in Charge of the Charlotte Field Division, Bureau of Alcohol, Tobacco, Firearms and Explosives (ATF), has announced a reward of up to $2,500 for information that leads to the arrest and conviction of the person or persons responsible for the burglary of Bear Creek Gun Shop and Gunsmithing, 2411 E. Millbrook Avenue, Raleigh, North Carolina. This business is a federally licensed firearms dealer.

On July 28, 2011, unknown persons broke into Bear Creek Gun Shop in the early morning hours and stole 19 firearms. The burglary of this gun shop is being investigated by ATF and the Raleigh Police Department.

Anyone with information about this crime may report it to the:

**ATF Raleigh Field Office: (919) 719-2021**

**ATF Gun Hotline: (800) ATF-GUNS - (800) 283-4867**

**Raleigh Police Department: (919) 834-4357 (HELP)**

All information will be treated confidentially and callers will remain anonymous upon request.

ATF is the federal agency with jurisdiction to investigate federal firearms violations and regulate the firearms industry. More information on ATF and its programs can be found at www.atf.gov (www.atf.gov) .

### ###

## Bureau of Alcohol, Tobacco, Firearms and Explosives

# ATF News Release

At The Frontline Against Violent Crime          Public Affairs Division – Washington, DC

Contact: Special Agent Christian Hoffman, PIO
Office: (818) 265-2507
Cell: (213) 216-3622
christian.hoffman@atf.gov

For Immediate Release
July 29, 2011
www.atf.gov

## $10,000 REWARD OFFERED FOR INFORMATION REGARDING THE FORT IRWIN FIREARMS THEFT

LOS ANGELES — Special Agent in Charge John A. Torres of the Los Angeles Field Division, Bureau of Alcohol, Tobacco, Firearms and Explosives (ATF), today announced that ATF and the Federal Bureau of Investigation (FBI) are offering a reward of up to $10,000 for information leading to the arrest and conviction of the person or persons responsible for a Fort Irwin firearms theft which occurred on the night of July 15, 2011.

Twenty–six AK–74 rifles and one Dragunov rifle were stolen from the weapon storage area of a supply warehouse on Fort Irwin Army Post in Fort Irwin, California.

ATF, FBI, and California Department of Justice Officers responded to Fort Irwin to conduct interviews of employees at the storage warehouse from where the firearms were stolen. Working with the U.S. Army Criminal Investigations Command, arrests have been made in conjunction with the theft and one firearm was recovered. Investigators are seeking assistance from the community and surrounding areas in identifying other possible culprits and recovering the remaining 26 stolen firearms.

"Although our agents and officers are vigorously investigating this theft, we request the public's assistance to help us arrest and prosecute those individuals responsible for this crime," said Torres. "Community participation is necessary to improve the likelihood that ATF and our law enforcement partners will track down the firearms as well as the criminals who have sought to destabilize our community through illegal activity".

Any information regarding this burglary or the recovery of the firearms should be reported to: ATF Gun Hotline: (800) ATF GUNS; (800) 283–4867 or the Fort Irwin CID Office at 760–380–5812.

More information about ATF and its programs is available at www.atf.gov (../../../.. /Templates/www.atf.gov) .

###

## Bureau of Alcohol, Tobacco, Firearms and Explosives

# ATF    News Release

At The Frontline Against Violent Crime                    Louisville Field Division

Contact: George Huffman
Public Information Officer
(502) 753-3554

For Immediate Release
May 3, 2011
www.atf.gov

## ATF OFFERS $2,500 REWARD IN GUN SHOP BURGLARY

JEFFERSONTOWN, Ky. – Special Agent in Charge Paul J. Vido of the Louisville Field Division, Bureau of Alcohol, Tobacco, Firearms and Explosives (ATF) and Chief Rick Sanders, Jeffersontown Police Department, today announced that ATF is offering a reward of up to $2,500 for information leading to the arrest and conviction of the persons responsible for the theft of firearms that occurred at 111 Gun Shop, a federal firearms licensee, in Jeffersontown. The burglary occurred on April 26.

"Firearms theft from licensed gun dealers is a top priority for ATF. Experience shows us that these guns will likely end up being used in a crime. These guns in the hands of criminals endanger everyone's safety. With this reward, it is ATF's hope that someone will come forward with information that will lead to the arrest of the suspects responsible," said Vido.

ATF and the Jeffersontown Police Department are seeking the public's assistance in identifying those responsible. Anyone with information is encouraged to call ATF at (502) 753-3450 or the Jeffersontown Police Department at (502) 267-0503. Callers can also call the ATF Hotline at 1-800-ATF-GUNS (800-283-4867). All calls will be kept confidential.

More information about ATF and its programs is available at www.atf.gov (www.atf.gov) .

###

**Bureau of Alcohol, Tobacco, Firearms and Explosives**

# ATF    News Release

At The Frontline Against Violent Crime       Tampa Field Division

Contact: SOO/PIO Christopher Sharp        For Immediate Release
(813) 202-7318                                 April 22, 2011
                                                 www.atf.gov

## ATF OFFERS $5,000 REWARD FOR INFORMATION REGARDING A THEFT OF FIREARMS

### *12 Firearms Stolen From Licensed Dealer*

TALLAHASSEE, FLA. — Special Agent in Charge (SAC) Virginia O'Brien, Tampa Field Division, Bureau of Alcohol, Tobacco, Firearms and Explosives (ATF), today announced a reward of up to $5,000 for information leading to the arrest and conviction of the person or persons responsible for the burglary of Angel's Gun Shop and Business Center located at 30871 Blue Star Highway, Midway, Fla.

In the early morning hours of March 20, 2011, 12 firearms were stolen during a burglary of Angel's Gun Shop and Business Center, a Federal Firearms Licensee (FFL). This is the second burglary and theft of firearms from Angel's Gun Shop and Business Center in the last 18 months. During the March 20 burglary nine hand guns, two black powder weapons and one long gun were stolen from the FFL.

"The theft of firearms poses a serious threat to the community," said O'Brien. "These firearms, in the hands of criminals, can cause immeasurable harm to innocent victims."

ATF is the federal law enforcement agency that investigates firearms thefts, which can result in significant federal prison sentences for the person or persons responsible.

The burglary of Angel's Gun Shop and Business Center is being investigated by ATF's Tallahassee Field Office and the Gadsden County Sheriff's Office. Anyone with information about this crime should contact the following agencies:

ATF Gun Hotline: (800) ATF GUNS or (800) 283–4867

ATF Tallahassee Field Office: (850) 942–9660

Gadsden County Sheriff's Office: (850) 627–9233.

All information will be treated confidentially and callers can remain anonymous.

More information on ATF and its programs can be found at www.atf.gov (../../../.. /Templates/www.atf.gov) .

### ###

## Bureau of Alcohol, Tobacco, Firearms and Explosives

# ATF   News Release

At The Frontline Against Violent Crime                    Detroit Field Division

Contact: Special Agent Donald Dawkins
Public Information Officer, ATF
(313) 407-6018 Cell

For Immediate Release
April 25, 2011
www.atf.gov

## ATF OFFERS $1,000 REWARD FOR INFORMATION ON FIREARMS THEFT FROM JERRY'S GUNSMITHING

FLINT, MICH. — The Bureau of Alcohol, Tobacco, Firearms and Explosives (ATF) is offering a reward of up to $1,000 for information leading to the recovery of firearms and/or the arrest and conviction of the individuals responsible for the April 23 break–in and theft of firearms from Jerry's Gunsmithing and Black Powder Shop, a Federal Firearms Licensee located in Chesaning Township.

Jerry's Gunsmithing and Black Powder Shop also experienced a break–in on April 8, 2010, that is unsolved. The reward money applies for this break–in also.

The National Shooting Sports Foundation (NSSF) will match any reward that is paid out by ATF. Therefore there is a potential reward of up to $2,000.

"The theft of firearms from licensed gun dealers is a top priority for ATF", said Thomas Brandon, Special Agent in Charge (SAC) of the ATF Detroit Field Division. "Our experience shows that these guns are quickly used in violent crimes. We also know that tips from the public have resulted in the recovery of stolen firearms."

William Federspiel, Saginaw County Sheriff stated, "I encourage the citizens of Saginaw County and the surrounding area to contact the Saginaw County Sheriff's Office or ATF with any information they may have that may lead to the perpetrators of these crime."

ATF and the Saginaw County Sheriff's Office are seeking the public's assistance in identifying the individuals responsible. Anyone with information is encouraged to call the Saginaw County Sheriff's Office at 989–790–5446 or the ATF Flint Field office at 810–341–5710. Callers may also call ATF at 1–800 ATF–GUNS (1–800–283–4867) or text their tip to 274637 (CRIMES) with "ATF" in the body of the text.

For more information on ATF, go to www.atf.gov (../../../../Templates/www.atf.gov) .

###

## Bureau of Alcohol, Tobacco, Firearms and Explosives

# ATF    News Release

At The Frontline Against Violent Crime       Detroit Field Division

Contact: : Special Agent Donald Dawkins      For Immediate Release
Public Information Officer, ATF              February 28, 2011
(313) 407-6018 Cell                    www.atf.gov

## ATF OFFERS $2,000 REWARD FOR INFORMATION ON FIREARMS THEFT FROM PARROT'S OUTPOST

FLINT, MICH. – The Bureau of Alcohol, Tobacco, Firearms and Explosives (ATF) is offering a reward of up to $2,000 for information leading to the recovery of firearms and/or the arrest and conviction of the individuals responsible for the Feb. 27 break-in and theft of 15 firearms from Parrott's Outpost, a Federal Firearms Licensee located in Onaway.

"The theft of firearms from licensed gun dealers is a top priority for ATF," said Thomas Brandon, Special Agent in Charge (SAC) of the ATF Detroit Field Division. "Our experience shows us that these guns quickly become used in violent crimes. We also know that tips from the public have resulted in the recovery of stolen firearms."

Chief James Gibson, Onaway Police Department said, "We are hoping that if anyone has information that could lead to the recovery of these firearms or those responsible for the theft come forward. This is a crime that we take very seriously and will pursue those responsible."

ATF and the Onaway Police Department are seeking the public's assistance in identifying the individuals responsible. Anyone with information is encouraged to call the Onaway Police Department at 989-733-7755, Presque Isle County Central Dispatch at 989-734-2156 or the ATF Flint Field Office at 810-341-5710. Callers may also call ATF at 1-800 ATF-GUNS (1-800-283-4867) or text their tip to 274637 (CRIMES) with "ATF" in the body of the text.

For more information on ATF, go to www.atf.gov (www.atf.gov) .

###

Case: 1:10-cv-04184 Document #: 169-1 Filed: 03/12/12 Page 14 of 40 PageID #:4370

## Bureau of Alcohol, Tobacco, Firearms and Explosives

# ATF News Release

At The Frontline Against Violent Crime       Charlotte Field Division

Contact: David Riddleberger, Supervisor
(919) 719-2021
Earl Woodham, PIO Supervisor
(704) 716-1843

For Immediate Release
January 6, 2011
www.atf.gov

## ATF OFFERS $2,500 REWARD FOR GUN STORE BURGLARY

### *Seventy-three Firearms Stolen*

Raleigh, N.C. — Zebedee T. Graham, Special Agent in Charge of the Charlotte Field Division, Bureau of Alcohol, Tobacco, Firearms and Explosives (ATF), has announced a reward of up to $2,500 for information that leads to the arrest and conviction of the person or persons responsible for the burglary of American Jewelry & Pawn, 4510 Sunset Avenue, Rocky Mount, North Carolina. American Jewelry & Pawn is a federally licensed firearms dealer.

On December 27, 2010, unknown persons broke into American Jewelry & Pawn in the early morning hours and illegally entered American Jewelry & Pawn and stole seventy-three firearms.

The burglary of American Jewelry & Pawn is being investigated by ATF and the Rocky Mount Police Department.

Anyone with information about this crime may report it to the:

ATF Raleigh Field Office: (919) 719 - 2021

ATF Gun Hotline: (800) ATF-GUNS (800) 283-4867

Rocky Mount Police Department: (252) 977-1111 or (252) 972-1411

All information will be treated confidentially and the callers will remain anonymous if they request.

ATF is the federal agency with jurisdiction for investigating federal firearms violations and regulating the firearms industry. More information on ATF and its programs can be found at www.atf.gov.

*###*



**U.S. Department of Justice**

*United States Attorney*
*Northern District of Ohio*

**For Immediate Release**
**August 5, 2011**

*Northern District of Ohio*

www.justice.gov/usao/oh

**Steven M. Dettelbach, United States Attorney**
Contact: Mike Tobin, Director of Community Relations
(216) 622-3651
Mike.Tobin@usdoj.gov

# THREE SENTENCED ON BURGLARY OF GREAT LAKES OUTDOOR SUPPLY

Steven M. Dettelbach, United States Attorney for the Northern District of Ohio, and Robert Browning, Special Agent in Charge, Bureau of Alcohol, Tobacco, Firearms and Explosives (ATF), Columbus Field Division, today announced that Dwayne Freeman, age 41; Edward E. Brown, age 41; and Isabel Abdur–Razzaque, age 51, all of Cleveland, Ohio, were sentenced after pleading guilty to charges of conspiracy, theft of firearms from a Federal Firearms Licensee, being a felon in possession of firearms, and possession of stolen firearms. All three defendants appeared before Judge Donald C. Nugent this afternoon and were sentenced as follows:

- Edward E. Brown - 15 years imprisonment;
- Dwayne Freeman - 14 years imprisonment; and
- Isabel Abdur-Razzaque - 8 months of house arrest and two years probation.

The charges were a result of a joint investigation conducted by ATF, the Chester Township Police Department, Cleveland Police Department and the Ohio Adult Parole Authority relating to the burglary of Great Lakes Outdoor Supply.

In August, 2010, Dwayne Freeman, Edward E. Brown and Isabel Abdur–Razzaque conspired to break into Great Lakes Outdoor Supply in Chesterland, Ohio, to steal firearms that they could sell at a later time. Abdur–Razzaque placed a bogus telephone call to the Chester Township Police Department, stating that she was being assaulted by her boyfriend. Police responded to the call at the address supplied by Abdur–Razzaque and discovered the address to be unoccupied. At the time police were responding to the bogus call, Freeman and Brown drove a van into Great Lakes Outdoor Supply and stole 58 firearms from the store's display cases.

Freeman was also charged with possessing 58 stolen firearms, after he had been previously convicted of Robbery in the Cuyahoga County Common Pleas Court and Aggravated Robbery in the Franklin County Common Pleas Court; and Brown with

possessing the 58 stolen firearms, including a Heckler & Koch, model SL8, .223 rifle, and a Smith & Wesson, model M&P, 9mm pistol, after he had been previously convicted of Aggravated Burglary in the Cuyahoga County Common Pleas Court.

The matter was prosecuted by Assistant United States Attorney David M. Toepfer.

United States Attorney Steven M. Dettelbach said, "This case sends an strong message to those who would steal and then illegally sell guns on the streets of Northeast Ohio. Not only is this behavior intolerable, it will be punished severely. I am very proud of the work done by ATF and our local law enforcement partners."

###



**U.S. Department of Justice**
*United States Attorney*
*Western District of Wisconsin*

**For Immediate Release**
**July 26, 2011**

*Western District of Wisconsin*

*www.justice.gov/usao/wiw*

**John W. Vaudreuil, United States Attorney**
Contact: Rita M. Rumbelow, Director of
Community Relations
(608) 264-5158
rita.rumbelow@usdoj.gov

# FINAL SENTENCING IN GRAMPA'S GUNSHOP BURGLARY

Madison, Wis. — John W. Vaudreuil, United States Attorney for the Western District of Wisconsin, announced that Antonio Parker, 20, Chicago, was sentenced today by U.S. District Judge Barbara B. Crabb to 40 months in prison, without the possibility of parole, for stealing 20 firearms from Grampa's Gun Shop, 1374 Williamson Street, Madison, on March 13, 2010. Parker pleaded guilty to this charge on April 28, 2011.

The owner of Grampa's Gun Shop placed a 911 call on March 13 after codefendant Darren Richardson and a juvenile accomplice forcibly entered his business and forced him into a bathroom. Richardson bound the owner's ankles and wrists with duct tape and made verbal threats. Another co-defendant, Daniel Barlow, acted as the getaway driver, with Parker in the car as a passenger. Parker used his cell phone to communicate with Richardson and the juvenile accomplice while they were in Grampa's. Parker and Richardson also took most of the stolen guns back to Chicago, with the exception of those that were given to co-defendants for their help. One of the stolen firearms has been recovered in Minnesota and seven have been recovered in the Chicago area.

On December 28, 2011, Richardson was sentenced to 46 months in prison. On January 13, 2011, Barlow was sentenced to 40 months in prison. Three juvenile accomplices have been charged in Dane County Circuit Court.

The charge against Parker was the result of an investigation conducted by the Madison Police Department and the Bureau of Alcohol, Tobacco, Firearms and Explosives. The prosecution of the case has been handled by Assistant U.S. Attorney Rita M. Rumbelow.

###

Case: 1:10-cv-04184 Document #: 169-1 Filed: 03/12/12 Page 18 of 40 PageID #:4374


Get the right coverage for your car    TRAVELERS
Get a quote
It's better under the umbrella®

# Chicago Tribune
### Breaking News, Since 1847



Home | News | Business | Sports | A&E | Travel | Health | Opinion | Real Estate | Cars | Jobs | Deals

Breaking | Chicagoland | Suburbs | Nation & World | Obituaries | Health | Clout St. | Politics | Watchdog | Schools | Religion | Lottery

Home → Collections → Weapons

Ads By Google

**4 Ways to Avoid Running Out of Money During Retirement**

If you have a $500,000 portfolio, download the guide by *Forbes* columnist Ken Fisher's firm. Even if you have something else in place, this must-read guide includes research and analysis you can use right now. Don't miss it!

**Click Here to Download Your Guide!**

FISHER INVESTMENTS



**A New Way to Cover Your Gray Hair**

A woman's hair is, traditionally, her crowning glory. So when that luscious mane suddenly fades, replaced by coarse strands of unruly, hard-to-cover grays... Read More »

eSalon

## Related Articles

3 teens detained over stolen police guns
*May 17, 2010*

Most weapons stolen from Harvey shooting range recovered
*May 12, 2010*

Jail call implying gun deal is heard
*April 5, 2007*

Harvey gun trial begins
*April 4, 2007*

Officer accused of misconduct
*August 11, 2006*

## Find More Stories About

Weapons

Shooting Range

# Weapons stolen from Harvey police shooting range

May 12, 2010 | By William Lee, Tribune reporter



Recommend    0    0    Tweet    +1

Nearly two dozen weapons, including high-powered assault rifles, were stolen from a shooting range belonging to south suburban Harvey police, prompting a statewide alert this week.

At least 21 weapons, which included handguns, MP5 and AR-15 assault rifles, were reported stolen from a trailer on the semi-wooded property of the shooting range at 153rd Street and Campbell Avenue about 9 a.m. Monday, according to Harvey police and the Bureau of Alcohol, Tobacco, Firearms and Explosives.

Ads By Google

**Public Arrest Records**
See anyone's past criminal history. Unlimited searches. Peace of mind.
InstantCheckMate.com

**Weapons Permit Course**
Get a 30 state CCW, Plus Top Notch Real Training- Not The Bare Minimum
www.FrontSight.com

**Humana RightSource**
Register Now. Get Medicare Diabetic Supplies Delivered to Your Door.
www.Humana-Medicare.com/Rightsource

**Diabetic Neuropathy Help**
Diabetic Neuropathy? Time To Learn What Your Doctor Isn't Telling You!
Neuropathy.HealthCenter.com

Special Agent Tom Ahern, an ATF spokesman, said his agency was working with the Illinois State Police to determine exactly how the weapons were removed and to trace their histories.

Ahern did not know if the stolen assault weapons were equipped to be fully automatic. He said several weapons were left behind after the theft.

News of the theft prompted state police to issue a statewide "terrorism report," notifying all local municipalities about the missing weapons, according to a Harvey news release.

By Tuesday evening, mere hours after Cook County sheriff's officials agreed to join the probe on the sole condition that their investigation be independent of Harvey police's, sheriff's officials had pulled out of the investigation, claiming that Harvey officials weren't cooperating, a spokesman said.

Sheriff Tom Dart has been critical of Harvey's internal operations and his department was part of a task force that raided Harvey's police station in January 2007, seizing evidence from unsolved crimes. Investigators from state police and the state's attorney's office subsequently filed murder and attempted murder charges upon the seized evidence.

Law enforcement sources said the shooting range wasn't a secure facility and isn't equipped for storing weapons.

The Harvey Police Department has been embroiled in controversy regarding weapons in the past.

Last August, Hollis Dorrough, a former Harvey detective, was convicted of taking a handgun from police custody and returning it to the family of the felon arrested for having it, in exchange for cash.

The case, coupled with Harvey's high homicide rate, led to calls for a state police takeover of the crime-ridden suburb, but Mayor Eric Kellogg called instead for a new policy on how weapons were inventoried.

Tribune reporter Kristen Schorsch and freelance reporter Marjorie Ritchie contributed.

wlee@tribune.com

Ads By Google

**The Economist Magazine**
Official Site Offer. Get 12 Issues For Just $12!
EconomistSubscriptions.com

**Foods That Cause Diabetes**
Diabetes Can Be Prevented! Learn About Diabetes Foods To Avoid
Susanfosterclinic.com

**Featured Articles**



Younger onset Alzheimer's patients stay active



Jim Belushi champions gout treatment



Robber tussles with martial-arts expert, gets beaten and shot

MORE:
Now hear this

'All My Children,' 'One Life to Live' not quite dead yet

Bulls interested in trading for Howard

Doctors rethinking prescribing Abbott's Niaspan

Subway offering $2 subs in December

Unemployed teachers finding work as nannies

**Chicago Tribune**

Index by Keyword | Index by Date | Privacy Policy | Terms of Service

# Exhibit 52

THE SACRAMENTO BEE    sacbee.com

This section contains unedited press releases distributed by PR Newswire. These releases reflect the views of the issuing entity and are not reviewed or edited by the Sacramento Bee staff. More information on PR Newswire can be found on their web site. You can contact the service with questions or concerns here.

# ATF Offers Rewards for Information on Two Gun Store Burglaries

By Bureau of Alcohol, Tobacco, Firearms and Explosives
Published: Tuesday, Dec. 6, 2011 - 11:11 am

More on sacbee.com    powered by Lingospot

**ATF and Firearms Industry Join Forces to Stop Illegal Purchases of Firearms in Northeastern...**
Bureau of Alcohol, Tobacco, Firearms and Explosives, 1 week, 2 days.ago

**Holder calls Fast and Furious tactic inexcusable**
PETE YOST, 1 week, 1 day ago

**Long Beach fire seeks help ID'ing arson suspects**
1 week, 3 days ago

LINCOLN, Neb., Dec. 6, 2011 -- /PRNewswire-USNewswire/ -- The Bureau of Alcohol, Tobacco, Firearms and Explosives (ATF) Kansas City Field Division and the Lincoln Police Department announced today ATF is offering individual rewards of $2,500 for information leading to the arrest and conviction of the person or persons responsible for two separate gun store burglaries in Lincoln.

The first theft occurred at approximately 1:40 a.m. on Nov. 4, at Capitol City Pawn, 2541 North Eleventh St., Lincoln, Neb. Seven firearms, all of which were handguns, were stolen during the burglary. This business is a federally licensed firearms dealer.

The second theft occurred at approximately 12:15 a.m. on Nov. 25 at Acher Arms, 1334 South 33rd St., Lincoln, Neb. Ten firearms, all of which were handguns, were stolen during the burglary. This business is also a federally licensed firearms dealer.

It is unknown at this time if the burglaries are related. The ongoing investigation is being conducted by ATF and the Lincoln Police Department. Anyone with information about the incidents is urged to call ATF at 1-800-ATF-GUNS or the Lincoln Police Department at 402-441-6000.

More information about ATF and its programs is available at www.atf.gov.

Contact: SA Trista Frederick, PIO, ATF Office: (816) 559-0724 Officer Katie Flood, Lincoln Police DepartmentOffice: (402) 441-7226www.atf.gov

SOURCE Bureau of Alcohol, Tobacco, Firearms and Explosives

Recommend    Sign Up to see what your friends recommend.

## About Comments

Reader comments on Sacbee.com are the opinions of the writer, not The Sacramento Bee. If you see

Case: 1:10-cv-04184 Document #: 169-1 Filed: 03/12/12 Page 22 of 40 PageID #:4378

Home / News / Local News / Local Crime & Courts / Local Crime & Courts

# ATF offers reward for Lincoln gun burglaries

- Story
- Discussion

ATF offers reward for Lincoln gun burglaries

By the Lincoln Journal Star JournalStar.com | Posted: Tuesday, December 6, 2011 1:30 pm | (13) Comments

Font Size:
Default font size
Larger font size

- 1 retweet
- Recommend  Sign Up to see what your friends recommend.

## Related Documents

- Related: Acher Arms reward poster
- Related: Capitol City reward poster

The Bureau of Alcohol, Tobacco, Firearms and Explosives is offering $2,500 rewards for information leading to the arrest and conviction for those behind two Lincoln gun store burglaries last month.

Investigators say they don't know whether the two were related. But, in all, more than a dozen handguns were taken in the burglaries three weeks apart.

According to a joint news release from the ATF Kansas City Field Division and Lincoln police, the first happened at 1:40 a.m. Nov. 4 at Capitol City Pawn, 2541 N. 11th St.

Seven handguns were stolen during the burglary.

The second theft happened at about 12:15 a.m. Nov. 25 at Acher Arms, 1334 S. 33rd St. In that burglary, 10 handguns were stolen.

Both business are federally licensed firearms dealers.

The ongoing investigation is being conducted by ATF and the Lincoln police. Anyone with information about the burglaries should call the ATF at 800-283-4867 or Lincoln police at 402-441-6000.

Copyright 2011 JournalStar.com. All rights reserved. This material may not be published, broadcast, rewritten or redistributed.

# Exhibit 53

William Campion                                                March 10, 2011

                                                              1
IN THE UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION
BRETT BENSON, et al.,        )
        Plaintiffs,          )
        -v-                  ) No. 10 CV-4184
CITY OF CHICAGO, et al.,     )
        Defendants.          )

        The deposition of WILLIAM CAMPION, called for
examination, taken pursuant to the Federal Rules of
Civil Procedure of the United States District
Courts pertaining to the taking of depositions,
taken before MARY C. LaCORCIA, CSR No. 84-1497, a
Notary Public within and for the County of Cook,
State of Illinois, and a Certified Shorthand
Reporter of said state, at Suite 1230, 30 North
LaSalle Street, Chicago, Illinois, on March 10,
2011, commencing at 10:08 a.m.

                                                              3
1   REPORTED BY: MARY C. LaCORCIA, CSR No. 84-1497.
2       (WHEREUPON, the witness was duly
3       sworn.)
4       WILLIAM CAMPION,
5   called as a witness herein, having been first duly
6   sworn, was examined and testified as follows:
7       EXAMINATION
8   BY MR. AGUIAR:
9   Q.   Sir, would you state and spell your name
10  for the record, please?
11  A.   William E. Campion, C-a-m-p-i-o-n.
12  Q.   Good morning, Mr. Campion, my name is
13  Bill Aguiar. I'm joined by my co-counsel, Rebecca
14  Hirsch? This is the case of Benson versus the City
15  of Chicago, 10-CV-4184 currently pending in the
16  United States District Court for the Northern
17  District Court of Illinois.
18      Let the record reflect that plaintiff's
19  counsel in this case is joining us telephonically.
20  Peter, do you want to identify yourself for the
21  record?
22      MR. PATTERSON: Peter A. Patterson, counsel
23  for the plaintiffs in this litigation with the law
24  firm of Cooper & Kirk.

                                                              2
1   PRESENT:
2       COOPER & KIRK, PLLC,
3       (1523 New Hampshire Avenue, NW,
4       Washington, D.C. 20036
5       202-220-9600), by:
6   MR. PETER PATTERSON,
7       appeared on telephonically on behalf of
8       the Plaintiffs;
9
10  CORPORATION COUNSEL,
11      (30 North LaSalle Street, Suite 1230,
12  Chicago, Illinois 60602-2580,
13  312-744-4216), by:
14  MR. WILLIAM MACY AGUIAR,
15  MS. REBECCA ALFERT HIRSCH,
16      appeared on behalf of the Defendants;
17
18  STONE & JOHNSON, CHARTERED,
19      (200 East Randolph Street, 24th Floor,
20  Chicago, Illinois 60601,
21  312-332-5656), by:
22  MR. CHRISTIAN D. AMBLER,
23      appeared on behalf of the Deponent.
24

                                                              4
1       MR. AGUIAR: We have no objection to you
2   appearing telephonically here today. I just want
3   to make that clear for the record.
4   BY MR. AGUIAR:
5   Q.   Mr. Campion, have you ever been deposed
6   before?
7   A.   Yes.
8   Q.   How many times have you been deposed
9   before?
10  A.   Probably a half dozen, seven times,
11  maybe.
12  Q.   When was your last deposition?
13  A.   To the best of my recollection, it was
14  1983.
15  Q.   So it has been some time since you were
16  last deposed. That being the case, I would like to
17  review a couple of ground rules for today's
18  proceeding.
19      The first and most important is that if
20  you don't understand a question that I ask you, by
21  all means let me know that, and I will do my best
22  to rephrase the question so that you do understand
23  it. If you do answer my question, I'm going to
24  assume that you have understood it as I have asked



ESQUIRE
an Alexander Gallo Company

Toll Free: 800.708.8087
Facsimile: 312.673.8138

Suite 1200
311 West Monroe Street
Chicago, IL 60606
www.esquiresolutions.com

William Campion                                                    March 10, 2011

5

1  it.
2        It is also important that you not nod or
3  shake your head in response to a question. The
4  court reporter can only take down verbal responses,
5  so it is important that you answer verbally any
6  question that I may ask you.
7        It is also important that we don't speak
8  over one another. That tends to drive the court
9  reporters crazy and makes a bad record. So I would
10 ask that you wait until I finish my question before
11 you answer.
12       If at any time you need a break, by all
13 means let me know that, and I will do my best to
14 accommodate that. The only time I ask that you not
15 ask for a break is if we have a question pending.
16 Do you understand the rules?
17    A.   Yes.
18    Q.   The next two questions are somewhat
19 invasive, but I'm asking them just for a clear
20 record today. The first is, have you taken any
21 medication that would affect your ability to
22 understand my questions or provide complete answers
23 to them?
24    A.   No.

7

1        (WHEREUPON, a certain document was
2        marked Campion Deposition Exhibit
3        No. 2, for identification, as of
4        03/10/2011.)
5  BY MR. AGUIAR:
6    Q.   Mr. Campion, I'm handing you what the
7  court reporter marked as Exhibit 2. Take a look at
8  that for me, please.
9        Exhibit 2 is a subpoena directed to
10 Camco Sales & Service. Have you seen Exhibit 2
11 before?
12    A.   I have.
13    Q.   Have you heard of a company called Camco
14 Sales & Service?
15    A.   Yes.
16    Q.   How are you familiar with Camco Sales &
17 Service?
18    A.   That is my company.
19    Q.   So you own Camco?
20    A.   Yes.
21    Q.   Does it have any other owners?
22    A.   No.
23    Q.   Is Camco incorporated?
24    A.   No.

6

1    Q.   Are there any other reasons why you
2  might not be able to understand my questions or
3  provide complete answers to them?
4    A.   No.
5    MR. AGUIAR:   Let's start with Exhibit 1.
6        (WHEREUPON, a certain document was
7        marked Campion Deposition Exhibit
8        No. 1, for identification, as of
9        03/10/2011.)
10 BY MR. AGUIAR:
11    Q.   Mr. Campion --
12    MR. AMBLER:   Before you get going, let me
13 identify myself for the record as well. I'm
14 Christian Ambler. I'm the attorney here
15 representing William Campion, individually.
16 BY MR. AGUIAR:
17    Q.   Mr. Campion, I'm handing you what has
18 been marked as Exhibit No. 1. It is a subpoena
19 directed to you. Have you seen this before?
20    A.   Yes.
21    Q.   You are appearing here today pursuant to
22 the subpoena?
23    A.   Yes.
24    MR. AGUIAR:   Let's mark this as Campion 2.

8

1    Q.   Is it licensed to do business in
2  Illinois?
3    A.   Yes.
4    Q.   When did you first take out the license
5  with the State of Illinois for Camco?
6    A.   To the best of my recollection, it was
7  two-and-a-half years ago.
8    Q.   Has it been licensed ever since?
9    A.   Yes.
10    Q.   Does Camco have any officers?
11    A.   No.
12    Q.   Are you the president?
13    A.   Yes.
14    Q.   Basically, it is your company alone; is
15 that a correct statement?
16    A.   Yes.
17    Q.   Does Camco have any employees?
18    A.   No.
19    Q.   Are you appearing here today in response
20 to the subpoena, which is Exhibit 2, on behalf of
21 Camco?
22    A.   Yes.
23    Q.   Because you are the sole owner of Camco,
24 would it be fair to presume that any answer you



ESQUIRE
an Alexander Gallo Company

Toll Free: 800.708.8087
Facsimile: 312.673.8138

Suite 1200
311 West Monroe Street
Chicago, IL 60606
www.esquiresolutions.com

William Campion                                          March 10, 2011

33

1    A.   It's in a separate building.
2    Q.   On the farm, correct?
3    A.   Yes.
4    Q.   How many buildings are on your farm?
5    A.   Five, at this time.
6    Q.   One of them is your office?
7    A.   Office and store, yes.
8    Q.   You say "store"; what kind of store?
9    A.   Gun shop.
10   Q.   Does the gun shop have a name?
11   A.   Camco Sales.
12   Q.   Do you keep any firearms at the gun
13   shop?
14   A.   No.
15   Q.   Why don't you store any guns at the
16   shop?
17   A.   Mostly a safety issue.
18   Q.   Why is it a safety issue?
19   A.   I'm out in the middle of nowhere.  The
20   response time is typically 45 minutes for any kind
21   of police presence.  So I don't keep an inventory.
22   I take orders for firearms and procure them for the
23   customers.
24   Q.   So you think it is a safety concern of

34

1    keeping the firearms in your store, on the farm?
2    A.   I keep them in a safe.
3    Q.   Why is it a safety concern?
4    A.   I don't have the safe in the store.
5    Q.   Where is the safe?
6    A.   Located in an adjacent building.
7    Q.   What do you store in the safe?
8    A.   Firearms.
9    MR. AMBLER:  Let me just object to the
10   relevance of these questions to the extent that
11   they go to proprietary issues and safety issues
12   that Mr. Campion has expressed.  Given those
13   concerns, I don't think these questions about the
14   specifics of where on his property he keeps various
15   materials -- the relevance of that information, the
16   irrelevance of it, I don't think the questions are
17   proper.
18   BY MR. AGUIAR:
19   Q.   Okay.  We were talking a second ago that
20   your safe is in a different building, and that is
21   where you store the firearms, correct?
22   A.   Yes.
23   Q.   And those are firearms that you have
24   procured for your customers?

35

1    A.   Yes.
2    Q.   You don't keep firearms -- you don't
3    keep firearms in your store.
4    A.   Correct.
5    Q.   You have a safety concern?
6    A.   Yes.
7    Q.   You talked about response time.  You
8    have a concern because the response time is long?
9    A.   Yes.
10   Q.   What kind of response -- what are you
11   concerned might happen?
12   MR. AMBLER:  Objection, if you are asking him
13   to speculate.
14   MR. AGUIAR:  I'm asking why he has a concern
15   as to keeping the guns in the store.
16   BY THE WITNESS:
17   A.   I don't have the safe in the store.
18   BY MR. AGUIAR:
19   Q.   Are you afraid someone might break in?
20   A.   No, it is just too big.
21   Q.   You only have firearms for your
22   customers -- that you actually procured for your
23   customers?
24   A.   Say it again?

36

1    Q.   You only keep firearms that you procured
2    for your customers in the safe; is that correct?
3    A.   No.
4    Q.   Do you keep firearms of your own?
5    A.   No.
6    Q.   What else do you keep in the safe, then?
7    A.   Inventory.
8    Q.   What kind of inventory?
9    A.   Firearms.
10   Q.   Why don't you describe to me how you
11   operate the business.  That might help us go at it
12   a different direction.
13        So say you procure firearms for your
14   customers?
15   A.   Correct.
16   Q.   Is it fair to say that people come to
17   you to buy a firearm, and you go about procuring it
18   for them?
19   A.   Correct.
20   Q.   How does the customer identify which
21   weapon he or she might want to acquire for him or
22   her?
23   A.   They might have seen it on line.  They
24   may have seen it in a magazine.  They may have seen



ESQUIRE
an Alexander Gallo Company

Toll Free: 800.708.8087
Facsimile: 312.673.8138

Suite 1200
311 West Monroe Street
Chicago, IL 60606
www.esquiresolutions.com

William Campion                                    March 10, 2011

**45**

1  your customer?
2      A.  It has to pay through me.
3      Q.  Why is that?
4      A.  Federal law.
5      Q.  Do you know of any requirement that you
6  have to go through in order to pass that gun to
7  your customer?
8      MR. AMBLER:  Objection, legal conclusion.
9  BY MR. AGUIAR:
10     Q.  If you know?
11     A.  Can you be —
12     Q.  How about this:  Do you have any
13  procedures before you turn over the firearm to your
14  customer?
15     A.  Yes.
16     Q.  What are those procedures?
17     A.  I require them to comply with federal
18  law, making out a 4473 Form.
19          I also do the instant background check
20  through the Illinois State Police, and they have to
21  pay for it.  And they also must produce a current
22  FOID card.
23     Q.  How do you go about doing an instant
24  background check?

**46**

1      A.  You register with the Illinois State
2  Police, who does the background checks through the
3  National Crime Information Center, NCIS, with the
4  FBI.  And they give you a go or no go at that time,
5  or they could also give you a delayed.  And I have
6  only had that happen once because of the snowstorm
7  and computer problems.
8          Once you have registered yourself with
9  the Illinois State Police, they give you a dealer
10  number and phone number to call — toll free
11  number, although they charge you $2 a call.
12          You call the number and punch in your
13  dealer number, and then it is an automatic response
14  system that asks for the FOID number of the
15  purchaser, whether it is a pistol or a long gun.
16  They don't specify shotgun, rifle.  It is just long
17  gun.  You punch in the number, the date of birth,
18  whether it is a handgun or long gun and your
19  federal firearms' license number, which is an
20  abbreviated number for their purposes, and then
21  they give you a go number, generally starting with
22  an "A" of an approval number, unless you get a
23  delay.
24          If you get a delay, then you can't

**47**

1  deliver the firearm, and the delay could be for any
2  reason.  Either it is a bad FOID, or there is a —
3  some other reason, or could be a computer glitch,
4  as it was in the one that I have.
5          At that point, an examiner will call you
6  directly.  And you will speak to the examiner and
7  get his or her name and number, and they will issue
8  a go and give you the number, or issue a no go with
9  no reason.  And you are not allowed to deliver a
10  firearm until that happens.
11     Q.  You have only had one delay?
12     A.  Yes.
13     Q.  That was caused by a snowstorm?
14     A.  Yes.  That is the way it was explained
15  to me.
16     Q.  It had nothing to do with the purchaser
17  of the firearm?
18     A.  Correct.  It was a police officer.
19     Q.  Was the police officer able to purchase
20  the firearm from you?
21     A.  Yes.
22     Q.  Do you recall ever selling a firearm to
23  a Chicago resident?
24     A.  No, I don't.

**48**

1      Q.  Do you offer any services that someone
2  can't get at a normal gun store?  Why would someone
3  come to you as opposed to going to a traditional
4  gun store, if you know?
5      MR. AMBLER:  Objection, speculation.
6  BY THE WITNESS:
7      A.  Generally, because I can save them
8  money.
9  BY MR. AGUIAR:
10     Q.  How is that?
11     A.  I have very little overhead, and I don't
12  charge the high markups that are generally found in
13  a standard gun shop.
14     Q.  Has Camco ever been the subject of an
15  investigation from the Bureau of Alcohol, Tobacco &
16  Firearms?
17     A.  No.
18     Q.  How about an inspection?
19     A.  Not yet.
20     Q.  I know the name of the company is Camco
21  Sales & Service.  I'm curious what that "& Service"
22  part involves?
23     A.  I would eventually like to service what
24  I sell.



ESQUIRE
an Alexander Gallo Company

Toll Free: 800.708.8087
Facsimile: 312.673.8138

Suite 1200
311 West Monroe Street
Chicago, IL 60606
www.esquiresolutions.com

William Campion                                    March 10, 2011

49

1    Q.   Do you currently service what you sell?
2    A.   I do not.
3    Q.   Is there any particular training that
4  you would need to get to be able to service
5  firearms?
6    A.   Yes.
7    Q.   What is that training?
8    A.   Recertified as an armorer.
9    Q.   What is an armorer?
10   A.   An armorer is a plumber.  He replaces
11  parts, tunes up, and makes sure it is operating
12  properly versus gunsmith, who is highly skilled,
13  highly trained and has done an internship or
14  slaveship in some other shop.
15   Q.   How long does it take to obtain a
16  certification as an armorer, if you know?
17   A.   The classes that I have been to
18  generally take from three to five days, and are
19  offered by the manufacturers themselves.
20   Q.   So you would be certified on a specific
21  firearm?
22   A.   Yes.
23   Q.   You would only be able to service those
24  particular firearms?

50

1    A.   It is a bad question in that, no, it
2  doesn't limit me to only servicing that firearm.
3       As an armorer, in order to obtain
4  warranty service for a firearm, you would only work
5  on that firearm.
6       But as an armorer, you get trained in a
7  multitude of different firearms.  And basically, a
8  wrench is a wrench, and you are working on the same
9  type of systems over and over again.  The only
10  thing that changes is the parts.
11   Q.   You said you were certified once before?
12   A.   Yes.
13   Q.   When was that?
14   A.   When I was with the department, they
15  sent me to school.
16   Q.   How long did that school last for?
17   A.   As I said, anywhere from three to five
18  days, generally.  You are only working on one thing
19  at a time, so it is over and over and over to make
20  sure you get it right.
21   Q.   Are you currently a member of the
22  Illinois Association of Firearms' Retailers?
23   A.   I am.
24   Q.   When did you first become a member of

51

1  ILAFR?
2    A.   It was the end of last summer.
3    Q.   Have you been a member continuously
4  since then?
5    A.   Yes.
6    Q.   Do you know of any member of ILAFR that
7  intends to open a gun shop or range in Chicago?
8    A.   I do not, no.
9    MR. AGUIAR:  Mark this as 3.
10       (WHEREUPON, a certain document was
11       marked Campion Deposition Exhibit
12       No. 3, for identification, as of
13       03/10/2011.)
14  BY MR. AGUIAR:
15   Q.   I'm handing you what has been marked as
16  Exhibit 3.  This is Plaintiffs' Second Amended
17  Complaint for Declaratory Judgment and Injunctive
18  Relief filed in this case.  Have you seen it
19  before?
20   A.   I have not.
21   Q.   I would ask that you turn to Page 10 of
22  this document, and direct your attention to
23  Paragraph 40.  And I will read aloud the first part
24  of that.  The Plaintiffs have said in their

52

1  complaint, "Plaintiff ILAFR has members that desire
2  to sell firearms and operate shooting ranges inside
3  Chicago city limits for patronage by law-abiding
4  residents and would do so, but for the ordinance."
5       As a member of ILAFR, do you have any
6  intention to operate a shooting range or gallery
7  within the City of Chicago?
8    A.   I do not.
9    Q.   Do you have any intention or interest in
10  selling firearms within the City of Chicago?
11   A.   I do.
12   Q.   Is it your intention to establish a
13  traditional brick and mortar store in the City of
14  Chicago?
15   MR. AMBLER:  You are talking about but for the
16  ordinance?
17   MR. AGUIAR:  All of my questions are but for
18  the ordinance, yes.
19  BY THE WITNESS:
20   A.   No.
21  BY MR. AGUIAR:
22   Q.   You don't intend to open up something
23  like Illinois Gun Works in the City of Chicago?
24   A.   No.



ESQUIRE
an Alexander Gallo Company

Toll Free: 800.708.8087
Facsimile: 312.673.8138

Suite 1200
311 West Monroe Street
Chicago, IL 60606
www.esquiresolutions.com

William Campion                                   March 10, 2011

---

65

1    A.   There are lockable chamber locks that
2  would go on each firearm.  There is also a titanium
3  cable that you pass through the hand guard of all
4  of the firearms and then lock that.  So if you are
5  going to pick them up, you are going to pick up 100
6  or 200 pounds worth of gun that already have lock
7  devices on them to prevent rounds from being
8  chambered, the weapons to be dry fired or
9  purloined.
10   Q.   Are those locks what are called trigger
11  locks?
12   A.   That is one form of a lock, yes.  There
13  is also a chamber lock that actually goes in
14  through the muzzle end and have a lock on them.
15  There are safety locks that go around the trigger
16  guard.  There are locks that actually pass through
17  the trigger guard and the barrel to disallow the
18  potential for placing a live round in the chamber.
19   Q.   You said you have chamber locks; is that
20  what you said?
21   A.   Yes.
22   Q.   Would you have trigger locks and other
23  locks, as well, or just the chamber lock?
24   A.   If I used the cable system, I couldn't

---

66

1  use the trigger lock.  I'm going to use the wire.
2  Nobody is going anywhere with that wire through
3  them.
4    Q.   Would you have ammunition present with
5  you at one of these shows?
6    A.   I would have to say possibly.  I won't
7  say yes or no.  It depends on what kind of safety
8  system I could purchase in order to store the
9  ammunition on site and be able to sell the
10  ammunition to the customers as they came through
11  after presenting an FOID.
12   Q.   When you say "safety system," you mean
13  like a safe?
14   A.   There are portable display locking
15  systems that are available from various
16  manufacturers to where they are either a metal can
17  that has a padlock system on it, or some other type
18  of portable -- I guess you could call them a safe.
19      But they are not a safe in the
20  traditional form of a dial lock and a handle and
21  weighing 5,000 pounds.  They are just devices to
22  prevent anyone from getting into them without
23  authorization.
24   MR. AGUIAR: Can we go off the record for a

---

67

1  few minutes?
2      (WHEREUPON, there was a brief
3      interruption.)
4    MR. AGUIAR:  Back on the record.  Pete, are
5  you there?
6    MR. PATTERSON:  Yes.
7  BY MR. AGUIAR:
8    Q.   A couple of final questions, and then we
9  can move on.  I want to go back to something you
10  talked about earlier, and this was about -- you had
11  said that you had a safety concern for keeping your
12  firearms in your store on your farm.
13      And you said something about the
14  response time is too long.  What exactly are you
15  concerned would happen if the firearms were in the
16  gun store on your property?
17   A.   I can't secure them in the store.  They
18  have to be secured in a safe.  And I had to agree
19  to that in order to get my license.  So I don't
20  have a concern -- safety concern for the firearms
21  that aren't in there.
22   Q.   Okay.  But you have a safety concern of
23  putting them in the actual store itself?
24   A.   Yes.

---

68

1    Q.   What is that concern?  What are you
2  afraid is going to happen, if anything?
3    A.   As with any business, the potential for
4  burglary is there.
5    Q.   You are concerned someone would break in
6  and steal the firearms?
7    A.   Which can't happen without a blowtorch,
8  where they are stored now, not in the store.
9    Q.   But if they were in the store, they
10  could?
11   A.   If they were in the store, physically,
12  they could, sure.
13   Q.   Let's go back to something we were just
14  talking about a second ago.
15      What is the reason for your belief that
16  if the City's ordinance is invalidated, that gun
17  shows or sporting good shows, which have guns, will
18  actually come to Chicago?
19   A.   It is an untapped market at this point.
20  There has not been anything held in the City for
21  decades because of the laws, ordinances.
22      As with any untapped market, people want
23  to tap into it.  They want to bring a new product
24  into the market.  They want to show a new product

---



**ESQUIRE**
an Alexander Gallo Company

Toll Free: 800.708.8087
Facsimile: 312.673.8138

Suite 1200
311 West Monroe Street
Chicago, IL 60606
www.esquiresolutions.com

William Campion                                                    March 10, 2011

77
```
 1   STATE OF ILLINOIS )
 2               ) SS:
 3   COUNTY OF C O O K )
 4        I, MARY C. LaCORCIA, CSR No. 84-1497, a
 5   Notary Public within and for the County of Cook,
 6   State of Illinois, and a Certified Shorthand
 7   Reporter of said state, do hereby certify:
 8        That previous to the commencement of the
 9   examination of the witness, the witness was duly
10   sworn to testify the whole truth concerning the
11   matters herein;
12        That the foregoing deposition transcript
13   was reported stenographically by me, was thereafter
14   reduced to typewriting under my personal direction
15   and constitutes a true record of the testimony
16   given and the proceedings had;
17        That the said deposition was taken
18   before me at the time and place specified;
19        That I am not a relative or employee or
20   attorney or counsel, nor a relative or employee of
21   such attorney or counsel for any of the parties
22   hereto, nor interested directly or indirectly in
23   the outcome of this action.
24        IN WITNESS WHEREOF, I do hereunto set my
```

79
```
 1            I N D E X
 2   WILLIAM CAMPION            EXAMINATION
 3   BY MR. AGUIAR              3
 4
 5
 6            E X H I B I T S
 7   CAMPION DEPOSITION EXHIBIT      MARKED FOR ID
 8   No. 1            6
 9   No. 2            7
10   No. 3            51
11   No. 4            53
12   No. 5            71
13
14
15
16
17
18
19
20
21
22
23
24
```

78
```
 1   hand and affix my seal of office at Chicago,
 2   Illinois, this 16th day of March, 2011.
 3
 4
 5
 6
 7        Notary Public, Cook County, Illinois.
 8        My commission expires 12/16/13.
 9
10   MARY C. LaCORCIA, CSR No. 84-1497
11
12
13
14
15
16
17
18
19
20
21
22
23
24
```



OFFICIAL SEAL
MARY CATHERINE LACORCIA
Notary Public - State of Illinois
My Commission Expires Dec 16, 2013

# ESQUIRE
an Alexander Gallo Company

Toll Free: 800.708.8087
Facsimile: 312.673.8138

Suite 1200
311 West Monroe Street
Chicago, IL 60606
www.esquiresolutions.com

# Exhibit 54

**COPY**

IN THE UNITED STATES DISTRICT COU[RT]
NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

```
ILLINOIS ASSOCIATION OF FIREARMS)
RETAILERS, KENNETH PACHOLSKI,   )
KATHRYN TYLER, and MICHAEL HALL,)
             Plaintiffs,        )
        -vs-                    )  No. 10 CV 04184
THE CITY OF CHICAGO and         )
RICHARD M. DALEY, Mayor         )
of the City of Chicago,         )
             Defendants.        )
```

The deposition of EUGENE WILLIAMS called
for examination pursuant to Notice and the Rules of
Civil Procedure for the United States District
Courts pertaining to the taking of depositions,
taken before Jana E. Cox, a notary public within
and for the County of Cook and State of Illinois,
at 33 North Dearborn Street, Chicago, Illinois, on
the 29th day of April, 2011, at the hour of 9:03 a.m.

Reported By: Jana E. Cox, CSR
License No.: 084-004399

1

---

```
1   APPEARANCES:
2       COOPER & KIRK
3       BY:  MR. PETER A. PATTERSON
4       1523 New Hampshire Avenue Northwest
5       Washington, D.C. 20036
6       (202) 220-9600
7           Representing the Plaintiffs;
8
9       ASSISTANT CORPORATION COUNSEL
10      DEPARTMENT OF LAW
11      BY:  MR. ANDREW WORSECK
12      30 North LaSalle Street, Suite 1230
13      Chicago, Illinois 60602
14      (312) 744-7129
15          Representing the Defendants.
16
17
18
19
20
21
22
23
24
```

2

---

```
                    I N D E X
2   WITNESS                    EXAMINATION
3   EUGENE WILLIAMS
4       By Mr. Patterson              4, 58
5       By Mr. Worseck               44
6
7
8
9
10
11
12                  E X H I B I T S
13  NUMBER                    MARKED FOR ID
14  Williams Deposition Exhibit
15      No. 1                        30
16
17
18
19
20
21
22
23
24
```

3

---

```
1               (Witness sworn.)
2           EUGENE WILLIAMS,
3   called as a witness herein, having been first duly
4   sworn, was examined and testified as follows:
5           EXAMINATION
6   BY MR. PATTERSON:
7       Q.  Would you please state your name for the
8   record.
9       A.  Eugene Williams.
10      Q.  Chief Williams, have you been deposed
11  before?
12      A.  Yes, I have.
13      Q.  How many times have you been deposed?
14      A.  Several.
15      Q.  And do you recall what the cases were in
16  which you've been deposed?
17      A.  No.  They were quite some time ago.
18      Q.  Were they in your capacity as a police
19  officer or in some other capacity?
20      A.  Police officer.
21      Q.  And since you have been deposed, you're
22  probably familiar, but let's go over a few ground
23  rules to start.  There aren't many.  First I will
24  ask questions, and I just ask that you wait until I
```

4

---

1 (Pages 1 to 4)

1  able to pursue to reduce gun violence?
2     A.  Yes.
3     Q.  Another tool would be to reduce the
4  availability of guns to be accessed by those people
5  who maintain the desire to acquire those guns?
6     A.  Yes.
7     Q.  Again, it's a multi-pronged approach, and
8  you would like all of the prongs to be available to
9  best address the gun violence problem in Chicago?
10    A.  Correct.
11    Q.  Earlier Mr. Patterson asked you about the
12 provision in the ordinance that states that
13 basically a homeowner is entitled to have one
14 operable firearm in the home and any additional
15 firearms need to be stored or rendered inoperable
16 in a certain way. Do you remember that line of
17 questioning in general?
18    A.  I do.
19    Q.  And one of the purposes served by that
20 provision is reducing the ability of a burglar or
21 intruder to use a gun they might come across in the
22 course of breaking into a house against the home
23 owner?
24    A.  Yes.

49

1     Q.  If that gun is broken down or secured with
2  a trigger lock, the intruder won't be able to use
3  it at all or at least quickly against the
4  homeowner?
5     A.  Correct.
6     Q.  And another purpose served by that
7  provision is reducing the number of firearms
8  accidents or suicides or domestic violence
9  shootings that would occur in the home by reducing
10 the number of operable firearms that could be
11 misused in those sorts of situations?
12    A.  Correct.
13    Q.  And do you remember a line of questioning
14 about first responders coming to homes that may
15 have guns in them?
16    A.  Yes.
17    Q.  And there was some questioning about the
18 assumptions that officers have regarding whether
19 firearms are in that home?
20    A.  Yes.
21    Q.  There were some questions about whether
22 first responders are made aware of whether that
23 home may or may not have guns in it?
24    A.  Yes.

50

1     Q.  And would you agree regardless of whatever
2  assumptions a responding officer brings to bear and
3  regardless of whether they have actual knowledge
4  regarding the presence of firearms in that home,
5  public safety is nonetheless enhanced by reducing
6  the number of firearms in that home that they be
7  misused as against a first responder?
8     A.  I would agree.
9     Q.  One way of serving that end is by reducing
10 the number of operable weapons that would be in
11 that home?
12    A.  I agree.
13    Q.  Have Chicago police officers ever been
14 harmed by guns in the course of responding to
15 emergency calls at residences in Chicago?
16    A.  Yes. I don't have the specifics, but yes,
17 they have.
18    Q.  That's something you're familiar with in
19 your 30 years of experience on the force?
20    A.  Yes. And if I could -- I remember the
21 question that had to do with had a legally
22 possessed gun been used to hurt a police officer.
23 And just trying to remember, you know, things as
24 they come back. I remember a police officer's gun

51

1  was taken from him in the parking lot of a police
2  station. It was a legally possessed gun, and he
3  was shot to death -- Officer Thor Soderberg -- in
4  the parking lot of the Targeted Response Unit. You
5  know, that just goes to even police officers or
6  even people who have firearms, they can be taken
7  from them and they can be shot. So we had a
8  officer shot and killed because a weapon was taken.
9  I just wanted to correct that point.
10    Q.  And CPD officers who have responded to
11 calls at residences have been harmed by guns being
12 possessed by people in those residences, correct?
13    A.  Correct.
14    Q.  And regular civilian citizens of Chicago
15 have been harmed by guns that are possessed by
16 people in their residences, correct?
17    A.  Correct.
18    Q.  That's something that you've become
19 familiar with in your 30 plus years on the force?
20    A.  Yes.
21    Q.  Do you remember a line of questioning
22 about the definition of home that's in the Chicago
23 gun ordinance?
24    A.  Yes.

52

13 (Pages 49 to 52)

1    Q.  And generally about the requirement that
2  while you're allowed to have an operable firearm
3  within the four corners of your home, you're not
4  permitted to bring that weapon out into your yard
5  or your porch, etc. --
6    A.  Yes.
7    Q.  -- garage?
8        Those areas of one's property are
9  generally less secured than the home?
10   A.  Yes.
11   Q.  Those areas are easier to access by
12  criminals or other people with improper
13  motivations?
14   A.  Yes, they are.
15   Q.  It's easier for a criminal to steal a gun
16  from someone if they're standing out in their yard
17  as opposed to if they're in their home?
18   A.  I would say yes.
19   Q.  And garages are a feature of homes in
20  Chicago that in your experience on the force are
21  generally much less secure than the home and the
22  target of break-ins or other crime to a much
23  greater degree than is a home?
24       MR. PATTERSON:  Objection, speculation.
                                                    53

1    A.  Definitely possible.
2    Q.  And the kinds of intimidation, escalation
3  and other deadly gun use that you talked about
4  earlier, all of those concerns could exist in the
5  context of a parking lot or other gathering place
6  associated with a gun store or a gun range in
7  Chicago?
8    A.  Yes, it could.
9    Q.  And in your 30 years of experience on the
10  force, you've become aware of instances where
11  intimidation, escalation, and other deadly gun use
12  have occurred out on the public way in Chicago?
13   A.  Yes, I have.
14   Q.  Those same sorts of things could occur --
15  even though Chicago hasn't had gun stores or gun
16  ranges open to the public, those same sorts of
17  things could occur in public meeting spaces or
18  congregation spaces around those establishments?
19   A.  I believe they could.
20   Q.  Are you aware of any instances in which
21  the homes of Chicago police officers have been
22  targeted for the theft of the guns that are
23  expected to be in those homes?
24   A.  I am aware that in the briefing some gang
                                                    55

1        THE WITNESS:  In my experience, yes.
2  BY MR. WORSECK:
3    Q.  In your experience on the force, are you
4  aware of instances in which a homeowner or other
5  citizen on private property, private residential
6  property, for instance standing out in a yard or
7  standing on a porch has used a firearm to
8  intimidate others or to shoot others?
9    A.  Yes.
10   Q.  That sort of intimidation and shooting is
11  very much the same as has and could occur on a
12  public street or public sidewalk?
13   A.  Yes.
14   Q.  You indicated earlier I believe that when
15  a person steps out of their home, whether into
16  their front yard, out into the public way, a
17  sidewalk or a street, they become a much greater
18  target of theft of that firearm being taken from
19  them?
20   A.  I would agree.
21   Q.  And would that concern also exist in the
22  context of people congregating at gun stores or at
23  shooting ranges, say, for instance, in the parking
24  lot of that kind of establishment?
                                                    54

1  members that it has been a part of their initiation
2  sometimes into gangs is to target police officer's
3  house and break into a police officer's house, get
4  a police officer's gun in order to be initiated
5  into a gang.
6    Q.  And would you agree that if criminals are
7  willing to break into the homes of a Chicago police
8  officer and steal their guns, that the same
9  criminals or other criminals would be willing to
10  break into the homes of the average citizen to
11  steal that citizen's guns?
12   A.  I agree with that and likewise on the
13  street which is what I just described earlier with
14  Officer Soderberg.  They're willing to break into
15  houses of police officers to get guns, and they're
16  willing to attack a police officer in full uniform
17  on the grounds of a police facility and take a gun
18  and shoot and kill a police officer.  I'm sure it
19  is my experience that would apply as well to a
20  common citizen.
21   Q.  Are you aware of a theft of guns from the
22  Harvey Police Department shooting range?
23   A.  I am.  Several of them were fully
24  automatic weapons.
                                                    56

14 (Pages 53 to 56)

1  Q. Would you agree that if criminals are
2  willing to break into a law enforcement agent's
3  shooting range to steal guns belonging to a law
4  enforcement agency, criminals would be willing to
5  break into a civilian shooting range and steal
6  weapons that would be stored at that range?
7  A. Yes.
8  Q. They would be willing to break into a
9  civilian gun store and steal guns that are stored
10  within that store?
11  A. Yes.
12  Q. Chief Williams, the answers you've given
13  here, is it fair to say those are based on your
14  best recollection as you sit here today?
15  A. Yes, they are.
16  Q. It's possible that there could be other
17  instances or other evidence or other information
18  that would relate to and support the various
19  answers you've given today or the various subjects
20  you've talked about today that you can't recall or
21  that you're not aware of as you sit here today?
22  A. That's correct.
23  MR. WORSECK: I have nothing further.
24

57

FURTHER EXAMINATION
BY MR. PATTERSON:
3  Q. I'm going to have few questions here. You
4  recall Mr. Worseck asked you a number of questions
5  about instances in which gun possession either in
6  the public or in the home could lead to negative
7  consequences including violence, intimidation,
8  escalation of situations. Do you recall that --
9  A. Yes.
10  Q. -- general line of questioning?
11  A. Yes, I do.
12  Q. Are you aware of instances in your
13  experience in which -- other than the Chicago
14  police officer that had his gun taken from him that
15  you mentioned where lawfully possessed firearms led
16  to those negative consequences that you described?
17  A. I cannot recall any others at this time.
18  Q. And the officer who had his gun taken from
19  him and was unfortunately killed, the person that
20  shot him did not lawfully possess that firearm, did
21  he?
22  A. No.
23  Q. And after that situation police officers
24  still carried firearms; is that correct?

58

1  A. Correct.
2  Q. And do you recall that you testified that
3  the limitation of one operable firearm per home
4  could reduce the number of suicides, reduce the
5  number of firearms that are used in domestic
6  violence situations and otherwise used for criminal
7  violence within the home?
8  A. Yes.
9  Q. Is an assumption of that -- of your
10  testimony that a person who otherwise would want to
11  commit suicide with a firearm or engage in domestic
12  violence or other criminal activity because of the
13  law limiting an individual to one operable firearm
14  per home would abide by that law and not use
15  another firearm that may be in the home?
16  MR. WORSECK: Objection, vague.
17  THE WITNESS: That wasn't my assumption.
18  BY MR. PATTERSON:
19  Q. Okay.
20  A. Simply the fact that there would be fewer
21  firearms available, and perhaps that person would
22  not know where the one firearm was and that was
23  operable and any other firearm that may have been
24  found would be inoperable which --

59

1  Q. For a person --
2  MR. WORSECK: I'm sorry. Were you finished?
3  THE WITNESS: -- which would prevent the person
4  from being shot or committing suicide.
5  BY MR. PATTERSON:
6  Q. For a person that knows where the firearm
7  is and knows the method to render it operable, a
8  firearm that is rendered temporarily inoperable, in
9  your experience would the law limiting an
10  individual to one operable firearm per home deter
11  the person from using that inoperable firearm?
12  MR. WORSECK: Objection, vague.
13  THE WITNESS: In my experience and in my
14  training we talk about distance and time. And so
15  to the extent that if a person was looking for a
16  weapon and trying to render it operable, that might
17  give an opportunity to call 911, give an
18  opportunity to get out of the house. So, you know,
19  my position would be if those weapons are
20  inoperable, that's valuable time. That's valuable
21  distance for them to, you know, exit themselves
22  from the situation potentially. So that's where I
23  was going with that.
24

60

15 (Pages 57 to 60)

1  noticed for today?

2      MR. WORSECK: We are not in a position to do

3  that as I indicated yesterday via my email to you.

4  We are not in a position to do that.

5      MR. PATTERSON: I just wanted to put on the

6  record that the City agreed to produce a witness on

7  that topic in January. The City proposed a date

8  for that topic to be today. We agreed, traveled

9  here in reliance on that proposal by the City,

10  issued a notice over ten days ago that is still

11  valid that the City is unilaterally informed us

12  that they're not going to fulfill. We have not

13  revoked that notice. I just wanted to put that on

14  the record.

15      MR. WORSECK: And as I indicated yesterday,

16  Pete, we were perfectly willing to produce

17  Chief Williams pursuant to his individual notice

18  which we did today. I assume that plaintiffs still

19  would want to have taken his deposition. So unless

20  you're saying you wouldn't have traveled here to

21  take his deposition at all, then I don't know that

22  the travel issue is germane.

23      MR. PATTERSON: Okay.

24      MR. WORSECK: We'll reserve signature.

65

---

1          IN THE UNITED STATES DISTRICT COURT

2            NORTHERN DISTRICT OF ILLINOIS

3                  EASTERN DIVISION

4  ILLINOIS ASSOCIATION OF FIREARMS)

5  RETAILERS, et al.,              )

6          Plaintiffs,             )

7          -vs-                    ) No. 10 CV 04184

8  THE CITY OF CHICAGO, et al.,    )

9          Defendants.             )

10

11      This is to certify that I have read the

12  transcript of my deposition taken in the

13  above-entitled cause by Jana E. Cox, Certified

14  Shorthand Reporter, on April 29, 2011, and that the

15  foregoing transcript accurately states the

16  questions asked and the answers given by me as they

17  now appear.

18      _____

19          EUGENE WILLIAMS

20  SUBSCRIBED AND SWORN TO

21  before me this _____ day

22  of _____, 2011.

23  _____

24      Notary Public

67

---

1      (Proceedings concluded at 10:34 a.m.)

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

66

---

1  STATE OF ILLINOIS )

2               ) SS:

3  COUNTY OF C O O K )

4      I, Jana E. Cox, a Notary Public within and

5  for the County of Cook and State of Illinois, do

6  hereby certify that heretofore, to-wit, on the

7  29th day of April, 2011, personally appeared before

8  me EUGENE WILLIAMS, a witness in a certain cause

9  now pending and undetermined in the United States

10  District Court, Northern District of Illinois,

11  Eastern Division, wherein ILLINOIS ASSOCIATION OF

12  FIREARMS is the Plaintiff and CITY OF CHICAGO is

13  the Defendant.

14      I further certify that the said EUGENE

15  WILLIAMS was by me first duly sworn to testify the

16  truth, the whole truth, and nothing but the truth

17  in the cause aforesaid; that the testimony then

18  given by said witness was reported stenographically

19  by me in the presence of said witness and

20  afterwards reduced to typewriting by Computer-Aided

21  Transcription, and the foregoing is a true and

22  correct transcript of the testimony so given by

23  said witness as aforesaid.

24      I further certify that the signature to

68

17 (Pages 65 to 68)

1  the foregoing deposition was not waived by counsel
2  for the respective parties.
3      I further certify that the taking of this
4  deposition was pursuant to Notice and that there
5  were present at the deposition the attorneys
6  hereinbefore mentioned.
7      I further certify that I am not counsel
8  for nor in any way related to the parties to this
9  suit, nor am I in any way interested in the outcome
10 thereof.
11     IN TESTIMONY WHEREOF:  I have hereunto set
12 my hand and affixed my notarial seal this 17th day
13 of May, 2011.
14
15
16
17    ___ *Jana E Cox*
18    NOTARY PUBLIC, COOK COUNTY, ILLINOIS
19
20
21
22
23
24                                           69

1        McCorkle Court Reporters, Inc.
2        200 N. LaSalle Street Suite 300
         Chicago, Illinois 60601-1014
3
4  DATE: May 17, 2011
   Andrew Worseck
5  30 N. LaSalle, Suite 1230
   Chicago, Illinois  60602
6
7  IN RE: IAFR vs. City of Chicago
   COURT NUMBER: 10 CV 04184
8  DATE TAKEN: April 29, 2011
   DEPONENT: Eugene Williams
9
   Dear Mr. Worseck:
10
   Enclosed is the deposition transcript for the
11 aforementioned deponent in the above-entitled
   cause. Also enclosed are additional signature
12 pages, if applicable, and errata sheets.
13 Per your agreement to secure signature, please
   submit the transcript to the deponent for review
14 and signature.  All changes or corrections must be
   made on the errata sheets, not on the transcript
15 itself.  All errata sheets should be signed and all
   signature pages need to be signed and notarized.
16
   After the deponent has completed the above, please
17 return all signature pages and errata sheets to me
   at the above address, and I will handle
18 distribution to the respective parties.
19 If you have any questions, please call me at the
   phone number below.
20
21 Sincerely,
22 Margaret Setina        Jana E. Cox
   Signature Department   Court Reporter
23
24 cc: Mr. Peter Patterson
                                              70

18 (Pages 69 to 70)

McCorkle Court Reporters, Inc.
Chicago, Illinois    (312) 263-0052

# Exhibit 55

100% **100% of our Retirement Funds beat their 5-year Lipper average** as of 12/31/11
Put our thinking to work for this year's IRA.
Past performance cannot guarantee future results.
T.RowePrice INVEST WITH CONFIDENCE    INVEST NOW

# Chicago Tribune

*Breaking News, Since 1847*

Home   News   Business   Sports   A&E   Travel   Health   Opinion   Real Estate   Cars   Jobs   Deals

Breaking   Chicagoland   Suburbs   Nation & World   Obituaries   Health   Clout St.   Politics   Watchdog   Schools   Religion   Lottery

Home → Collections → Weapons

Ads By Google



**Find new grub. Order for free.**

grubHub.com
happy eating

## Weapons stolen from Harvey police shooting range

May 12, 2010 | By William Lee, Tribune reporter

Recommend    0



Download

Nearly two dozen weapons, including high-powered assault rifles, were stolen from a shooting range belonging to south suburban Harvey police, prompting a statewide alert this week.

At least 21 weapons, which included handguns, MP5 and AR-15 assault rifles, were reported stolen from a trailer on the semi-wooded property of the shooting range at 153rd Street and Campbell Avenue about 9 a.m. Monday, according to Harvey police and the Bureau of Alcohol, Tobacco, Firearms and Explosives.

Ads By Google



*NEWS FROM AROUND THE WEB*    2/3

1   Bill Clinton would raise debt ceiling, bypass Cong

**Insomnia: Can't sleep? Try cooling your brain**

3   10 must-see places to visit in Florida

### Public Arrest Records

See anyone's past criminal history. Unlimited searches. Peace of mind.

instantcheckmate.com

Special Agent Tom Ahern, an ATF spokesman, said his agency was working with the Illinois State Police to determine exactly how the weapons were removed and to trace their histories.

Ahern did not know if the stolen assault weapons were equipped to be fully automatic. He said several weapons were left behind after the theft.

News of the theft prompted state police to issue a statewide "terrorism report," notifying all local municipalities about the missing weapons, according to a Harvey news release.

By Tuesday evening, mere hours after Cook County sheriff's officials agreed to join the probe on the sole condition that their investigation be independent of Harvey police's, sheriff's officials had pulled out of the investigation, claiming that Harvey officials weren't cooperating, a spokesman said.

Sheriff Tom Dart has been critical of Harvey's internal operations and his department was part of a task force that raided Harvey's police station in January 2007, seizing evidence from unsolved crimes. Investigators from state police and the state's attorney's office subsequently filed murder and attempted murder charges using the seized evidence.

Law enforcement sources said the shooting range wasn't a secure facility and isn't equipped for storing weapons.

The Harvey Police Department has been embroiled in controversy regarding weapons in the past.

Last August, Hollis Dorrough, a former Harvey detective, was convicted of taking a handgun from police custody and returning it to the family of the felon arrested for having it, in exchange for cash.

The case, coupled with Harvey's high homicide rate, led to calls for a state police takeover of the crime-ridden suburb, but Mayor Eric Kellogg called instead for a new policy on how weapons were inventoried.

Tribune reporter Kristen Schorsch and freelance reporter Marjorie Ritchie contributed.

wlee@tribune.com

Ads By Google

### Related Articles

3 teens detained over stolen police guns
May 17, 2010

Most weapons stolen from Harvey shooting range recovered
May 12, 2010

Jail call implying gun deal is heard
April 5, 2007

Harvey gun trial begins
April 4, 2007

Officer accused of misconduct
August 11, 2006

### Find More Stories About

Weapons

Shooting Range

**Featured Articles**



Jim Belushi champions gout treatment



Younger onset Alzheimer's patients stay active



Louis Farrakhan warns of racial hatred that could lead to attempts to kill President Obama

MORE:

Website gives Illinois customers power to compare electricity rates

Noodle promises no carbs or calories

Doctors rethinking prescribing Abbott's Niaspan

Rain postpones Daytona 500 to Monday

Scott calls trade from Blackhawks 'shocking'

Reports: Rasheed Wallace signs with Lakers



Index by Keyword | Index by Date | Privacy Policy | Terms of Service