# Exhibit 56

# Disproportionate sales of crime guns among licensed handgun retailers in the United States: a case–control study

## G J Wintemute

► Additional information is published online only at http://injuryprevention.bmj.com/content/vol15/issue5

Correspondence to:
Dr G J Wintemute, Violence Prevention Research Program, University of California, Davis, 2315 Stockton Blvd, Sacramento, CA 95817, USA; gjwintemute@ucdavis.edu

Accepted 27 May 2009

## ABSTRACT
**Objective:** To determine risk factors among licensed firearm retailers for disproportionate sales of handguns that are later subjected to ownership tracing, generally after use in crime.
**Design:** Case–control; the study period was 1998–2003. Cases were all eligible firearm retailers whose handguns were later traced at a rate that significantly (p<0.05) exceeded the expected value. Controls were a 4:1 random sample of the remainder. Data were obtained from sales and tracing records for 1998–2003 and site visits conducted August–December, 2004.
**Subjects and setting:** 60 cases and 240 controls, from the 573 retailers in California selling ≥ 50 handguns annually during the study period.
**Main outcome measure:** Status as a case. Odds ratios were used to measure relative risk.
**Results:** In multivariate analyses, cases had larger sales volumes, sold inexpensive handguns more often, had a higher percentage of sales denied because the prospective purchasers were prohibited from owning firearms, and were more likely to be in an urban area, in or near a city with a policy of tracing all recovered crime guns. The effects of several risk factors, including status as a pawnbroker and sales to law enforcement personnel, appeared to be mediated by purchaser characteristics for which denied sales are a proxy measure.
**Conclusions:** A number of factors—most of them characteristics of the retailers or of their handgun purchasers, and most of them available in existing data—were linked to disproportionate sales of handguns that are later used in crime.

An estimated 348 910 violent crimes involving guns, including an estimated 11 512 homicides, were committed in the USA in 2007.[1][2] Firearms are used in an estimated 68% of all homicides in the US, and handguns in 73% of homicides involving firearms.[2]

American-made guns are also often used in crimes in other countries. Ninety percent of guns recovered by Mexican law enforcement agencies, and then successfully traced by the Bureau of Alcohol, Tobacco, Firearms and Explosives (ATF), are imported illegally into Mexico from the USA.[3] The same is true for most recovered crime guns in major Canadian cities.[4]

Federally licensed retailers are important sources of these guns.[5] Of persons incarcerated during the 1990s for gun crimes, 12–19% of those in state prisons[6] and 19% of those in federal prisons[7] purchased their guns personally from a gun dealer or pawnshop. Others use surrogate or "straw"

purchasers and acquire guns from licensed retailers indirectly.[8] Licensed retailers who are themselves corrupt are linked to nearly half (48%) of guns that are trafficked—intentionally diverted into illegal commerce.[8]

A retailer's importance as a source of crime guns is often estimated by the number of guns it sells that are later subjected to ownership traces by ATF. Traces are performed at the request of law enforcement agencies worldwide on guns they have recovered, usually in connection with a crime. A completed trace ends with the gun's first retail sale. In 1998, just 1020 (1.2%) of 83 272 licensed retailers accounted for 57.4% of all traced guns.[9] In at least 17 major US urban areas, 10 or fewer retailers account for the majority of all traced crime guns.[10]

We previously found that the number of traced handguns linked to a retailer was not simply a function of the number of handguns that retailer had sold.[11] Increased risk of selling guns that were later traced was related chiefly to retailer-level characteristics such as licensure as a pawnbroker. Community variables, except for the local policy on gun tracing, were unimportant. That study was limited by its focus on the highest-volume retailers and reliance on data from existing records.[11]

This study extends our previous work, adding field observational data from site visits to records-based data and examining a broader retailer population. To our knowledge, no study involving observational data has previously been conducted. Given the exploratory nature of that portion of the work, our principal objective is to assess a wide variety of potential risk factors in the observational data to generate hypotheses for more focused investigation in the future. We do not derive a formal prediction instrument.

We also begin an exploration of why certain factors are associated with disproportionate sales of crime guns. A strong and seemingly paradoxical direct association exists between denials of gun purchase and sales of traced guns.[11][12] It raises the possibility that retailers who disproportionately sell guns that are later used in crime somehow attract purchasers who acquire guns with criminal intent. If this is the case, the effect of other risk factors might be mediated by the propensity for criminal activity of those purchasers.[13] Denials of gun purchase, a measure of previous criminal activity among prospecitve gun purchasers, may be a marker for that propensity. We therefore determine whether denials serve as a mediator variable for other risk factors identified by our analysis.

10-cv-04184 Document #: 169-2 Filed: 03/12/12 Page 3 of 55 PageID #:4399

## METHODS

### Study design, setting and participants

We used a case–control study design; the study period was 1998–2003.

The California Department of Justice (CDOJ) provided records of handgun sales by licensed retailers and of proposed sales that CDOJ denied under laws prohibiting felons, violent misdemeanants and certain others from purchasing firearms. (In California, almost all transfers of firearms, including those between private parties, must be processed by a licensed retailer.) ATF provided records of all gun traces initiated during the study period, regardless of the location of the requesting law enforcement agency. (Supplementary material on these records is available online.)

We identified the 573 retailers who sold handguns for at least 1 year during 1998–2003 and averaged at least 50 handgun sales annually for the years they were in business during that time. For these retailers, we identified all handguns sold and then linked the datasets to identify all traces of these handguns by ATF. (Supplementary material on linkage procedures is available online.)

Although ATF traces ordinarily terminate with a gun's first retail sale, at least 85% of recovered crime guns change hands again before their recovery by a police agency.[10] Some of these transfers involve licensed retailers. We used an established procedure to link each traced handgun to the retailer whose transfer of that gun most closely preceded its recovery.[11 14] (Supplementary material on updating traces is available online.)

For all 573 retailers combined, we determined the rate at which handguns sold during 1998–2003 were later traced. This was expressed as traces per 1000 gun-years of exposure to the risk of being traced, analogous to person-years of exposure in a cohort study.[11] (Supplementary material on the calculation of gun-years at risk is available online.) We then used a binomial distribution to identify retailers for whom the actual number of traced handguns exceeded the expected number (predicted by the aggregate tracing rate) by a margin that achieved statistical significance (p<0.05). These 60 retailers were defined as cases. We then chose a random sample of 240 controls, for a 4:1 control/case ratio.

The study was approved by the UC Davis Institutional Review Board.

### Variables and data collection

Variables fell into four classes: relating to the retailer, the retailer's handgun purchasers (including those who were denied), the local physical environment and the general socio-economic environment. Appendix table 1 (online) gives the rationale for the inclusion of each and its hypothesised relationship to status as a case.

The records-based variables from our previous study[11] are included along with variables based on data collected during site visits. Given the exploratory nature of the site visits, we were inclusive in identifying variables that might be related to status as a case. These variables were largely identified through a review of studies involving site visits to sellers of cigarettes,[15–19] alcohol[20–25] and guns[26 27] and preliminary visits to ~30 retailers in Northern California. A few variables were included following the first ~20 site visits conducted for the study. Where necessary, retailers were revisited to collect the additional data.

I conducted all site visits between August and December, 2004; I was unaware of retailers' status as cases or controls. I assessed the local physical environment and the exterior of the premises first; this required ~15 min. An interior inspection

lasting 15–20 min was facilitated by a token purchase. Lastly, I made a subjective assessment of each retailer's status as a case or control. I recorded my observations immediately after the visit on a pre-printed form. I did this before leaving the vicinity, to allow a return to add missing data.

Complete site visit data could not be collected when retailers had moved or gone out of business, were on restricted military installations, or were at residences or non-retail commercial premises. Exterior variables were therefore divided into two groups: "fixed", not susceptible to modification by the occupant of the premises and likely to be valid at sites that were no longer occupied by the study subject (eg, proximity of nearest alcohol outlet); and "modifiable" (eg, security measures). Data for interior variables were collected only for retail premises that were still occupied by the study subject.

I prepared data for records-based variables for analysis. Site visit data were coded and entered by project staff, whom I trained. Dual data entry was used, with discrepancies resolved by me or a third staff member.

### Statistical methods

As before,[11] we replaced each retailer's handgun sales volume with an estimate of gun-years of exposure to the risk of being traced during the study period for that retailer's handguns. Records-based variables for subsets of handgun sales were expressed as percentages of total gun-years of exposure.

Some records-based and site visit variables correlated highly, such as sales of inexpensive handguns as determined from records and the prevalence of inexpensive handguns during the site visit. In such cases, site-visit variables were used given the study's primary focus on the observational data. Many site visit variables were categorical. Given the relatively small number of study subjects, categories were combined in a manner that provided the best fit to the data.

Odds ratios (ORs) with 95% CIs were used to quantify relative risks. Regressions involving modifiable exterior variables were restricted to retailers who still occupied the premises; regressions involving interior variables were restricted to occupied premises for which an interior inspection could be performed. Forward stepwise regression was used to produce multivariate models, using entry and retention criteria of p ≤ 0.30 and p ≤ 0.10, respectively.

Terms for interactions between local policy on gun tracing and retailer licence type (dealer, pawnbroker) were added to the final multivariate models. A separate analysis was performed for retailers near a city with a policy of tracing recovered crime guns.

Logistic and linear regression were used to test whether denials met the criteria for status as a mediator for other variables that were associated with case status in bivariate regression.[13] (Further information on mediation is in the supplementary material available online.)

The Hosmer–Lemeshow test was used to assess goodness of fit for multivariate models.

## RESULTS

### Participants

The study population of 300 retailers (52.4% of 573 who met the eligibility criteria) included 60 cases and 240 controls (fig 1). We excluded 16 retailers at private residences, three at military installations, and one that could not be located. Residential retailers were less likely than others to be cases, but the difference was not statistically significant (OR 0.25, 95% CI

Injury Prevention 2009;15:291–299. doi:10.1136/ip.2007.017301



**Figure 1** Flow diagram showing numbers of study subjects with data available for analysis, and numbers of and reasons for exclusions.

0.03 to 1.96). Additional restrictions applied to analyses including site visit data (fig 1).

Cases were linked to more traced handguns than controls were, whether traces were expressed as counts (cases, median 15, interquartile range (IQR) 7–32; controls, median 2, IQR 0–4) or per 1000 gun-years of exposure (cases, median 5.6, IQR 4.0–8.1; controls, median 1.1, IQR 0.0–2.0).

**Main results**

A wide array of variables was associated with case status (table 1). Among retailer variables, particularly large and significant associations were seen with status as a pawnbroker, median elapsed time from sale to recovery for traced guns, and the prevalence of several specific weapon types (handguns, inexpensive or used handguns, assault rifles and fantasy knives or swords), among others. Strong associations were also seen with the percentage of sales that were denied and environmental characteristics including the nature and maintenance of the business premises, the general nature of the location, and, particularly, proximity to a jurisdiction with a comprehensive gun tracing policy (OR 6.78, 95% CI 3.52 to 13.04).

Retailers who no longer sold handguns were not more likely than others to be cases. Proximity to a retail alcohol outlet was unrelated to case status, as were retailer hours of operation and most safety and security measures.

Table 2 gives multivariate regression results for records-based and exterior site visit variables. Sales of inexpensive handguns, urban location, the robbery rate and local gun tracing policy were associated with case status, whether just fixed exterior variables or all exterior variables were included. Case status was substantially more likely for every percentage point increase in denied sales.

When interior variables were included (table 3), handgun sales became a risk factor for case status; sales volume, sales of inexpensive handguns (now approximated by observed prevalence at the premises), denied sales, urban location, the robbery rate and local tracing policy persisted as risk factors.

**Other analyses**

Adding terms for interactions between local tracing policy or licence type did not affect the results.

Adding elapsed time from sale to recovery and restricting the analysis to retailers with traces yielded nearly identical results for the variables in tables 2 and 3 (data not shown). Elapsed time from sale to recovery was inversely associated with case status in the models that included all exterior variables (per year of increase, OR = 0.54, 95% CI 0.26 to 1.09) and both exterior and interior variables (per year of increase, OR = 0.21, 95% CI 0.05 to 0.88).

Given the importance of local tracing policy as a risk factor, a separate analysis was conducted for the 109 subjects (43 cases,

**Table 1** Descriptive statistics and results of bivariate regressions for retailers at commercial sites

**A Continuous variables**

| Variable | Cases Median (IQR) | Controls Median (IQR) | OR (95% CI) | p Value |
|---|---|---|---|---|
| **Retailer characteristics** | | | | |
| Gun-years of exposure (×1000) | 2.5 (1.0–6.6) | 1.6 (1.0–3.2) | 1.05 (1.00 to 1.09) | 0.030 |
| Years with sales | 5 (4–5) | 5 (4–5) | 1.05 (0.84 to 1.32) | 0.651 |
| Gun-years from sales of inexpensive handguns (%)* | 2.1 (0.2–8.2) | 1.4 (0.3–4.2) | 1.07 (1.02 to 1.12) | 0.004 |
| Gun-years from sales at gun shows (%) | 0.1 (0.0–0.4) | 0.2 (0.0–2.1) | 0.96 (0.91 to 1.01) | 0.128 |
| Gun-years from sales of multiple guns (%)† | 9.0 (5.8–15.2) | 7.5 (4.5–11.6) | 1.05 (1.01 to 1.09) | 0.020 |
| Median time from sale to recovery (years)‡ | 1.1 (0.8–1.5) | 1.4 (0.9–2.2) | 0.57 (0.38 to 0.85) | 0.006 |
| **Purchaser characteristics** | | | | |
| Gun-years from police sales (%)¶ | 4.4 (2.7–8.2) | 6.7 (4.6–9.7) | 0.88 (0.81 to 0.96) | 0.002 |
| Denials (% of (sales + denials)) | 2.4 (1.7–3.7) | 1.6 (1.0–2.2) | 2.25 (1.70 to 2.98) | <0.0001 |
| Median age of purchasers (years) | 40 (37–42) | 43 (40–45) | 0.83 (0.77 to 0.90) | <0.0001 |
| Male purchasers (%) | 91.8 (90.0–93.7) | 92.8 (90.2–94.3) | 0.90 (0.82 to 0.99) | 0.023 |
| **General environmental characteristics§** | | | | |
| Federal firearm licensees (per 100 000 persons) | 4.2 (4.2–8.1) | 8.1 (5.0–14.8) | 0.83 (0.76 to 0.91) | <0.0001 |
| Homicide (per 100 000 persons) | 9.5 (5.9–10.5) | 4.6 (2.8–6.1) | 1.34 (1.21 to 1.49) | <0.0001 |
| Rape (per 100 000 persons) | 29.0 (29.0–34.2) | 29.0 (24.3–34.0) | 1.02 (0.99 to 1.06) | 0.195 |
| Robbery (per 100 000 persons) (×10)) | 29.9 (20.0–29.9) | 11.9 (8.5–20.0) | 1.14 (1.10 to 1.18) | <0.0001 |
| Aggravated assault (per 100 000 persons (×10)) | 57.4 (37.7–60.8) | 33.9 (23.4–48.6) | 1.07 (1.05 to 1.10) | <0.0001 |
| Felony weapons offenses (per 100 000 persons)** | 46.2 (46.2–50.3) | 46.2 (44.5–59.2) | 0.99 (0.98 to 1.01) | 0.511 |
| Misdemeanour weapons offenses (per 100 000 persons)†† | 12.6 (12.6–16.1) | 12.6 (10.9–18.9) | 0.96 (0.91 to 1.01) | 0.111 |
| Black population (%) | 9.8 (6.7–9.8) | 5.3 (1.7–9.1) | 1.27 (1.17 to 1.39) | <0.0001 |
| Latino population (%) | 44.6 (26.8–44.6) | 30.8 (17.7–44.0) | 1.05 (1.02 to 1.07) | 0.0003 |
| Males aged 20–29 (% of males aged 40–44) | 208 (179–208) | 184 (159–208) | 1.01 (1.00 to 1.02) | 0.014 |
| Unemployed persons (% of persons aged ≥16) | 5.0 (4.2–5.0) | 4.4 (3.4–5.0) | 1.18 (0.96 to 1.45) | 0.125 |
| Households headed by a single female (%) | 14.7 (13.0–14.7) | 11.8 (10.7–14.7) | 1.45 (1.23 to 1.71) | <0.0001 |
| Median household income (×US$1000) | 42.2 (42.2–47.1) | 42.9 (38.7–55.9) | 0.98 (0.96 to 1.01) | 0.292 |
| Households (per 10 000 persons (×100)) | 32.9 (32.9–33.1) | 32.9 (32.8–36.3) | 0.90 (0.80 to 1.01) | 0.059 |

**B Categorical variables**

| Characteristic | Cases N (%) | Controls N (%) | OR (95% CI) | p Value |
|---|---|---|---|---|
| **Retailer characteristics: general and exterior** | | | | |
| Licensed as pawnbroker | 19 (32.8) | 45 (20.3) | 1.92 (1.01 to 3.63) | 0.046 |
| "Closed": no continuing record of handgun sales in Department of Justice data | 15 (25.9) | 55 (24.8) | 1.06 (0.55 to 2.05) | 0.865 |
| Nature of business‡‡ | | | | 0.013 |
| Pawnshop | 22 (46.8) | 45 (24.9) | 2.91 (1.41 to 5.99) | |
| Sporting goods, other | 8 (17.0) | 35 (19.3) | 1.36 (0.54 to 3.42) | |
| Gun dealer | 17 (36.2) | 101 (55.8) | Referent | |
| Size of establishment | | | | 0.803 |
| Large | 35 (60.3) | 127 (58.5) | 1.08 (0.60 to 1.95) | |
| Small | 23 (39.7) | 90 (41.5) | Referent | |
| External indication of gun sales‡‡ | 26 (57.8) | 115 (65.0) | 0.74 (0.38 to 1.44) | 0.372 |
| Guns visible from exterior‡‡ | 8 (17.8) | 37 (20.9) | 0.82 (0.35 to 1.91) | 0.642 |
| Exterior signage: products‡‡ | 17 (37.8) | 99 (55.6) | 0.48 (0.25 to 0.95) | 0.034 |
| Exterior signage: events‡‡ | 6 (13.3) | 39 (21.9) | 0.54 (0.22 to 1.39) | 0.205 |
| Exterior signage: political‡‡ | 7 (15.6) | 47 (26.4) | 0.51 (0.22 to 1.23) | 0.135 |
| Total hours open | | | | 0.436 |
| 0–19 | 14 (24.1) | 51 (23.0) | 0.85 (0.36 to 2.00) | |
| 20–39 | 7 (12.1) | 29 (13.1) | 0.74 (0.26 to 2.09) | |

Continued

**Table 1**  Continued

**B Categorical variables**

| Characteristic | Cases N (%) | Controls N (%) | OR (95% CI) | p Value |
|---|---|---|---|---|
| 40–49 | 12 (20.7) | 71 (32.0) | 0.52 (0.22 to 1.25) | |
| 50–59 | 12 (20.7) | 31 (14.0) | 1.19 (0.48 to 2.97) | |
| ≥60 | 13 (22.4) | 40 (18.0) | Referent | |
| Open evenings | 15 (25.9) | 51 (23.0) | 1.17 (0.60 to 2.28) | 0.645 |
| Open Monday | 39 (67.2) | 137 (61.7) | 1.27 (0.69 to 2.35) | 0.438 |
| Security: pylons‡‡ | 11 (24.4) | 39 (20.7) | 1.15 (0.54 to 2.48) | 0.716 |
| Security: lighting‡‡ | 6 (13.3) | 16 (9.0) | 1.56 (0.57 to 4.24) | 0.385 |
| Security: alarm‡‡ | 5 (11.1) | 20 (11.2) | 0.99 (0.35 to 2.79) | 0.981 |
| Security: camera‡‡ | 1 (2.2) | 11 (6.2) | 0.35 (0.04 to 2.75) | 0.315 |
| Security: window bars‡‡ | 19 (42.2) | 91 (48.9) | 0.70 (0.36 to 1.35) | 0.287 |
| Security: small or absent windows‡‡ | 12 (26.7) | 21 (11.8) | 2.72 (1.22 to 6.07) | 0.015 |
| Security: other barrier‡‡ | 12 (26.7) | 10 (5.6) | 6.11 (2.44 to 15.30) | 0.0001 |
| Security: signage‡‡ | 2 (4.4) | 24 (13.5) | 0.30 (0.07 to 1.31) | 0.110 |
| Security: total measures observed‡‡ | | | | 0.487 |
| 2 | 17 (37.8) | 55 (30.9) | 1.62 (0.72 to 3.62) | |
| ≥3 | 15 (33.3) | 55 (30.9) | 1.43 (0.63 to 3.25) | |
| 0–1 | 13 (28.9) | 68 (38.2) | Referent | |
| **Retailer characteristics: interior** | | | | |
| Interior improvements | | | | 0.644 |
| Immediately noticeable | 6 (14.0) | 30 (17.7) | 0.65 (0.23 to 1.82) | |
| Average | 20 (46.5) | 85 (50.0) | 0.76 (0.37 to 1.58) | |
| None | 17 (39.5) | 55 (32.4) | Referent | |
| Empty space | | | | 0.516 |
| Immediately noticeable | 3 (7.0) | 23 (13.5) | 0.47 (0.12 to 1.88) | |
| Average | 29 (67.4) | 107 (62.9) | 0.99 (0.45 to 2.16) | |
| None | 11 (25.6) | 40 (23.5) | Referent | |
| Number of guns visible | | | | 0.169 |
| >250 | 9 (20.9) | 26 (15.3) | 0.83 (0.31 to 2.24) | |
| 51–250 | 12 (27.9) | 74 (43.5) | 0.39 (0.16 to 0.94) | |
| 1–50 | 9 (20.9) | 39 (22.9) | 0.55 (0.21 to 1.46) | |
| 0 | 13 (30.2) | 31 (18.2) | Referent | |
| Handguns (% of guns) | | | | 0.014 |
| >50% | 15 (50.0) | 37 (26.6) | 2.76 (1.23 to 6.19) | |
| ≤50% | 15 (50.0) | 102 (73.4) | Referent | |
| Used handguns | 19 (79.2) | 66 (57.4) | 2.82 (0.99 to 8.08) | 0.053 |
| Inexpensive handguns (<US$200) (% of handguns) | | | | 0.035 |
| ≥10% | 7 (26.9) | 13 (10.7) | 3.06 (1.08 to 8.66) | |
| <10% | 19 (73.1) | 108 (89.3) | | |
| Assault-type rifles | 14 (46.7) | 42 (30.2) | 2.02 (0.91 to 4.51) | 0.086 |
| Paintball equipment | 3 (7.0) | 12 (7.1) | 0.99 (0.27 to 3.67) | 0.985 |
| Airguns | 2 (4.7) | 9 (5.3) | 0.87 (0.18 to 4.20) | 0.865 |
| Fantasy knives and/or swords | 6 (14.0) | 9 (5.3) | 2.90 (0.97 to 8.65) | 0.056 |
| Antique guns | 1 (2.3) | 12 (7.1) | 0.31 (0.04 to 2.48) | 0.272 |
| Consignment guns | 1 (2.3) | 10 (5.9) | 0.38 (0.05 to 3.06) | 0.364 |
| All guns secured | 29 (69.1) | 119 (73.9) | 0.79 (0.38 to 1.66) | 0.528 |
| Locks displayed | 7 (16.3) | 15 (8.8) | 2.01 (0.76 to 5.29) | 0.158 |
| Safety materials on display | 2 (4.7) | 18 (10.6) | 0.41 (0.09 to 1.85) | 0.247 |
| Interior signage: products | 20 (46.5) | 110 (64.7) | 0.47 (0.24 to 0.93) | 0.031 |
| Interior signage: events | 6 (14.0) | 62 (36.5) | 0.28 (0.11 to 0.71) | 0.007 |
| Interior signage: security | 5 (11.6) | 22 (12.9) | 0.89 (0.32 to 2.49) | 0.817 |
| Interior signage: legal information | 30 (69.8) | 131 (77.1) | 0.69 (0.33 to 1.44) | 0.322 |
| Interior signage: "Don't Lie" campaign | 5 (11.6) | 22 (12.9) | 0.89 (0.32 to 2.49) | 0.817 |
| Interior signage: political | 10 (23.3) | 60 (35.3) | 0.56 (0.26 to 1.21) | 0.137 |
| Number of staff | | | | 0.030 |
| ≥3 | 18 (41.9) | 44 (25.9) | 3.62 (1.40 to 9.41) | |
| 2 | 18 (41.9) | 64 (37.7) | 2.49 (0.97 to 6.38) | |
| 1 | 7 (16.3) | 62 (36.5) | Referent | |
| Uniforms for staff | 6 (14.3) | 19 (11.3) | 1.31 (0.49 to 3.51) | 0.595 |
| Nature of business: shooting range | 3 (7.0) | 20 (11.8) | 0.56 (0.16 to 1.99) | 0.372 |

Continued

**Table 1** Continued

**B Categorical variables**

| Characteristic | Cases N (%) | Controls N (%) | OR (95% CI) | p Value |
|---|---|---|---|---|
| Nature of business: gunsmith | 4 (9.3) | 38 (22.4) | 0.36 (0.12 to 1.06) | 0.064 |
| **Purchaser characteristics** | | | | |
| Number of other customers | | | | 0.084 |
| ≥5 | 9 (20.9) | 16 (9.4) | 2.20 (0.86 to 5.64) | |
| 2–4 | 12 (27.9) | 68 (40.0) | 0.69 (0.32 to 1.49) | |
| ≤1 | 22 (51.2) | 86 (50.6) | Referent | |
| Other customers: females | 11 (25.6) | 34 (20.0) | 1.38 (0.63 to 3.00) | 0.424 |
| Other customers: possibly gang or juvenile | 4 (9.3) | 3 (1.8) | 5.71 (1.23 to 26.54) | 0.026 |
| Other customers: hangers-out | 4 (9.3) | 19 (11.2) | 0.82 (0.26 to 2.53) | 0.724 |
| **Local environmental characteristics** | | | | |
| Nature of site | | | | 0.0007 |
| Business block | 34 (58.6) | 73 (33.0) | 4.66 (2.10 to 10.33) | |
| Freestanding | 15 (25.9) | 58 (26.2) | 2.59 (1.06 to 6.30) | |
| Mall, business/industrial park | 9 (15.5) | 90 (40.7) | Referent | |
| Site maintenance‡‡ | | | | 0.412 |
| Poor | 5 (11.1) | 11 (6.2) | 2.47 (0.65 to 9.33) | |
| Fair | 33 (73.3) | 129 (72.5) | 1.39 (0.56 to 3.39) | |
| Good | 7 (15.6) | 38 (21.4) | Referent | |
| Nearest alcohol outlet | | | | 0.287 |
| Same premises, next door, same block | 25 (44.6) | 80 (36.9) | 1.38 (0.76 to 2.50) | |
| Farther away | 31 (55.4) | 137 (63.1) | Referent | |
| Nature of nearest street/road | | | | |
| Commercial (≥4 lanes) | 45 (77.6) | 143 (64.4) | 1.91 (0.97 to 3.76) | 0.060 |
| Commercial (2 lanes), residential, other | 13 (22.4) | 79 (35.6) | Referent | |
| Located at intersection | 13 (22.4) | 45 (20.4) | 1.13 (0.56 to 2.27) | 0.732 |
| **General environmental characteristics** | | | | |
| *In or <25 miles from city with comprehensive tracing* | 43 (74.1) | 66 (29.7) | 6.78 (3.52 to 13.04) | <0.0001 |
| Nature of location | | | | <0.0001 |
| Centre city, other urban | 31 (53.5) | 47 (21.2) | 4.28 (2.33 to 7.85) | |
| Suburban, small town, rural | 27 (46.6) | 175 (78.8) | Referent | |
| **Overall assessment** | | | | |
| Site observer's assignment of case status | 18 (31.0) | 18 (8.1) | 5.10 (2.44 to 10.65) | <0.0001 |

Variables are grouped by the entity they describe: the retailer, the retailer's handgun purchasers, the local physical environment or the general socioeconomic environment. Variables derived from handgun sales and trace records, and not from site visits, are in italics. Because their descriptive statistics differ, continuous variables and categorical variables are listed separately. Additional definitional information and the rationale for including these variables are in Appendix table 1.
*Handguns manufactured by seven companies—Bryco Arms/Jennings Firearms, Davis Industries, High Point Firearms, Lorcin Engineering, Phoenix Arms, Raven Arms, Sundance Industries—whose handguns all had suggested retail prices of ~US$150 or less; almost no such handguns were manufactured by other companies during the study period.
†Sales of more than one handgun in a single transaction.
‡ The time between the dates of a gun's sale and its recovery by police, in years. Results are for the 58 cases and 165 controls with handgun traces.
¶Sales to police agencies or individuals who were exempt, because of police employment, from California's required basic firearms safety course.
§For the county in which the retailer is located.
**An arrest rate. Examples: unlawful possession of a weapon on the person, in a vehicle or in a public place (charged as a felony), unlawful possession of weapon in public building, possession of short-barrelled shotgun or rifle, possession of firearm by felon, carrying firearm with intent to commit felony, obliterating firearm serial number.
††An arrest rate. Examples: unlawful possession of a weapon on the person, in a vehicle or in a public place (charged as a misdemeanour), possession of weapon with intent to assault, knowingly filing false firearm purchase application, selling firearms without a licence, possession of unregistered assault weapon, sale of ammunition to a minor.
‡‡An external characteristic that was subject to alteration by the occupant. Data for these variables were included only for the 223 retailers who still occupied the premises listed in California Department of Justice's records.
IQR, interquartile range; OR, odds ratio.

66 controls) located in or near a jurisdiction with a comprehensive tracing policy. Results were again similar (data not shown).

Table 4 summarises the mediation analysis. Of the variables that were associated with case status in a bivariate regression, seven met criteria for at least partial mediation.

## DISCUSSION

### Key results

Several factors are strongly associated with handgun retailers' risk of disproportionate sales of guns that are later used in crimes. Most are measured at the retailer level and describe the retailers themselves or their purchasers. Some, including status

*Injury Prevention* 2009;15:291–299. doi:10.1136/ip.2007.017301

**Table 2** Variables associated with case status for 280 retailers in a model using records-based and fixed exterior site visit variables, and for 223 retailers in a model using records-based and all exterior site visit variables

| Variable | Records-based and fixed exterior variables (n = 280*) | | Records-based and all exterior variables (n = 223†) | |
|---|---|---|---|---|
| | aOR (95% CI) | p Value | aOR (95% CI) | p Value |
| **Retailer characteristics** | | | | |
| *Gun-years of exposure* (×1000) | | | 1.09 (0.99 to 1.21) | 0.084 |
| *Gun-years from sales of inexpensive handguns* (%) | 1.08 (1.02 to 1.15) | 0.014 | 1.07 (1.00 to 1.15) | 0.060 |
| Security: small or absent windows | | | 4.73 (1.28 to 17.53) | 0.020 |
| **Purchaser characteristics** | | | | |
| *Denials* (% of (sales + denials)) | 2.39 (1.59 to 3.59) | <0.0001 | 3.09 (1.80 to 5.31) | <0.0001 |
| **General environmental characteristics** | | | | |
| *Robbery* (×10) | 1.09 (1.04 to 1.14) | 0.001 | 1.11 (1.04 to 1.18) | 0.001 |
| *In or <25 miles from city with comprehensive tracing* | 6.99 (2.47 to 10.73) | 0.0002 | 8.75 (2.44 to 31.31) | 0.0009 |
| Nature of location | | 0.0002 | | 0.002 |
| Centre city, other urban | 5.01 (2.13 to 11.75) | | 5.53 (1.86 to 16.42) | |
| Suburban, small town, rural | Referent | | Referent | |

Records-based variables are in italics.
*Hosmer–Lemeshow statistics: $\chi^2$ = 10.47, p = 0.23.
†Hosmer–Lemeshow statistics: $\chi^2$ = 11.66, p = 0.17.
aOR, adjusted odds ratio.

as a pawnshop, denied sales, sales of inexpensive handguns, multiple-gun sales, urban location and a short elapsed time from sale to recovery for traced guns, have been identified repeatedly.[11 12 26 28 29] Some of the risk factors identified in the observational data, including urban location and prevalence of inexpensive handguns, are available or have near analogues in the existing records.

The relationship to denied sales is particularly strong. The two models based on the most complete data also identify overall sales volume as a risk factor for disproportionate, not just frequent, sales of traced guns. As before,[11] characteristics of the general socioeconomic environment seem to be less

**Table 3** Predictors of case status for 213 retailers in a model using records-based and both exterior and interior site visit variables

| Variable | aOR (95% CI) | p Value |
|---|---|---|
| **Retailer characteristics** | | |
| *Gun-years of exposure* (×1000) | 1.29 (1.08 to 1.52) | 0.004 |
| Handguns (% of guns) | | 0.089 |
| >50% | 5.19 (0.78 to 34.54) | |
| ≤50% | Referent | |
| Inexpensive handguns (<US$200) (% of handguns) | | 0.023 |
| ≥10% | 21.86 (1.53 to 312.32) | |
| <10% | Referent | |
| Interior signage: political | 0.02 (<0.001 to 0.39) | 0.010 |
| **Purchaser characteristics** | | |
| *Denials* (% of (sales + denials)) | 9.13 (2.06 to 40.44) | 0.004 |
| **General environmental characteristics** | | |
| *Robbery* | 1.02 (1.01 to 1.03) | 0.003 |
| *In or <25 miles from city with comprehensive tracing* | 26.57 (1.91 to 370.21) | 0.015 |
| Nature of location | | 0.071 |
| Centre city, other urban | 5.73 (0.86 to 38.11) | |
| Suburban, small town, rural | Referent | |

Records-based variables are in italics.
Hosmer–Lemeshow statistics: $\chi^2$ = 3.35, p = 0.91.
aOR, adjusted odds ratio.

**Table 4** Summary of results of testing the hypothesis that the percentage of sales that are denied (or some factor for which it is a proxy measure) acts as a mediator for other variables associated with case status

| Meets criteria for mediation | Does not meet criteria for mediation |
|---|---|
| **Retailer characteristics** | |
| **Gun-years from sales of inexpensive handguns (%)** | *Gun-years of exposure* |
| **Licensed as pawnbroker** | *Gun-years from sales of multiple guns (%)* |
| **Inexpensive handguns (<US$200) (% of handguns)** | *Median time from sale to recovery (years)* |
| Interior signage: products | Nature of business |
| Interior signage: events | Security: other barrier |
| | **Security: small or absent windows** |
| | Handguns (% of guns) |
| | Number of staff |
| **Purchaser characteristics** | |
| **Gun-years from police sales (%)** | *Median age of purchasers (years)* |
| *Male purchasers (%)* | Other customers: high risk |
| **Local environmental characteristics** | |
| | Nature of site |
| **General environmental characteristics** | |
| | *Federal firearm licensees (per 100 000 persons)* |
| | *Homicide (per 100 000 persons)* |
| | **Robbery (per 100 000 persons)** |
| | *Aggravated assault (per 100 000 persons)* |
| | *Black population (%)* |
| | *Latino population (%)* |
| | *Males aged 20–29 (% of males aged 40–44)* |
| | *Households headed by a single female (%)* |
| | **Nature of location** |
| | **In or <25 miles from city with comprehensive tracing** |

See text for details. Records-based variables are in italics. Variables that appear in the multivariate models (tables 2, 3) are in bold. "Interior signage: political" is in the model displayed in table 3 and meets criteria for mediation. It is not included in the table because it is not a predictor of case status in a bivariate regression (p = 0.137, table 1).

*Injury Prevention* 2009;**15**:291–299. doi:10.1136/ip.2007.017301

important, except for urban location (a large effect) and the robbery rate (a small effect). One further and important exception is local policy on gun tracing, which would disappear as a risk factor under the desired condition that all communities traced recovered crime guns.

Several risk factors that might represent a retailer's attractiveness to high-risk purchasers also satisfy the computational criteria for mediation by the percentage of sales that are denied. These include sales of inexpensive handguns, licensure as a pawn broker, sales to women (who may act as straw purchasers[8]) and sales to law enforcement (intuitively a deterrent, and a protective factor in these data). Others, including multiple-gun sales, do not.

Such findings are consistent with the suggestion that the effects of some risk factors may be mediated by purchaser characteristics for which denied sales are a proxy measure. How might this occur? Retailers having certain characteristics may attract prospective purchasers who are at high risk of committing gun crimes themselves or who provide guns to others who have criminal intent. Such retailers might be described as "bad guy magnets." To the extent that their prospective purchasers are prohibited from purchasing guns, their denied sales increase; denied sales become a measure of "bad guy magnetism." Simultaneously, to the extent that the purchasers are not prohibited persons—with the results that their gun purchases are approved, with some of those guns being used in crime, and some of those crime guns being recovered and traced—these retailers risk becoming disproportionate sources of crime guns.

Factors we could not assess may also determine which retailers are disproportionate sources of crime guns. One may be word of mouth. Like other consumers, gun purchasers with criminal intent may rely on recommendations from peers (or superiors, in organised trafficking enterprises).[30] Past performance is another; trafficking investigations often document long-term relationships between illegal buyers and sellers.[8 30 31]

## Limitations

Our findings are subject to several limitations. This is a single-state study, and generalisability may be limited. California has its own licensing and inspection programme; its handgun retailers may not be representative. Sales of handguns that fail specified safety tests, which tend to be inexpensive, were prohibited beginning in 2001. The sale of multiple handguns to an individual in any 30 day period became illegal in 2000. These changes may have affected our results for those two variables. Only one set of site visit observations was collected, and by a single observer; the interobserver reliability and stability over time of the site visit data are unknown. For a variety of reasons, data were sometimes missing. We could not include long guns in the analysis, as CDOJ cannot retain sales records for them. (Such data might well show that another risk factor identified during site visits, handguns as a proportion of guns on display, could also be approximated from existing records.) The traced handguns used for our outcome measure are necessarily a subset of handguns sold by our subjects during 1998–2003 and used in crime. Most traced guns in California come from cities with comprehensive tracing policies, however, reducing the potential for selection bias.[14 32]

Perhaps most important, we made no observational assessment of the sales practices of the retailers, and particularly of their willingness to engage in illegal sales such as straw purchases. Previous research suggests that such willingness is widespread.[33] Other corrupt behaviours, such as willingness to sell guns without records, would also have been missed.[31 34]

**What is already known on this subject**

▸ Nationwide, 1.2% of licensed gun retailers sell 57% of guns that are later used in crime, a concentration only partly accounted for by differences in total numbers of handguns sold.
▸ Previous records-based research found relationships between characteristics of handgun retailers or their clienteles and disproportionate sales of guns that were later used in crime; community-level variables were less important.

**What this study adds**

▸ Even when observational data from site visits are available, most risk factors for disproportionate sales of crime guns can be identified from existing records.
▸ Some risk factors may act indirectly by attracting (or deterring) purchasers who acquire guns with criminal intent or whose guns are at high risk of diversion to criminal use.
▸ Data already collected for individual retailers at the federal level—the number of background checks requested and the number of denied sales—would permit screening to identify those who may be disproportionate sellers of guns that will be used in crime.

These limitations notwithstanding, our findings may assist efforts to prevent gun violence. The US Department of Justice stresses the need to identify retailers who are disproportionate sources of crime guns.[35] Denied sales may be a useful initial screening tool, if paired with the number of background check queries to the National Instant Criminal Background Check System as a surrogate for gun sales.[36] These data are available.

Screening and focused enforcement could help disrupt illegal gun commerce without unduly affecting the legitimate gun market. A focus on high-risk retailers can be effective,[28–30 37 38] although results may be only temporary (D Webster, personal communication, 2007). Given the importance of the United States as a source of crime guns elsewhere, such actions could have benefits in many countries.

Further research will be necessary to identify firmly risk factors for disproportionate sales of crime guns, particularly those involving retailer behaviour, and their mechanisms of action.

**Acknowledgements:** I am grateful to the California Department of Justice Firearms Division and the National Tracing Center of Bureau of Alcohol, Tobacco, Firearms and Explosives, to Anthony Braga, Philip Cook, Jess Kraus, Glenn Pierce and Stephen Teret for their helpful suggestions, to Daniel Webster for raising the possibility of a mediation effect, and to Barbara Claire and Vanessa McHenry for their expert technical assistance.

**Funding:** This research was supported by grant 2002-IJ-CX-0005 from the National Institute of Justice. Additional support was provided by grants 1999-8827 and 2001-17381 from The David and Lucile Packard Foundation and grants from The Joyce Foundation, The Richard and Rhoda Goldman Fund and The Eli and Edythe L Broad Foundation. The study sponsors played no role in study design, collection, analysis, and interpretation of data, the writing of the report or the decision to submit the paper for publication.

**Competing interests:** None.

**Contributorship:** GJW certifies that he participated in the design of the study, the analysis of the data, the interpretation of the findings, the writing of the report, and the decision to submit the paper for publication, and has seen and approved the final version. Each person listed in the acknowledgments has given permission to be so listed.

**Provenance and peer review:** Not commissioned; externally peer reviewed.

# REFERENCES

1. **Rand MR**. Criminal victimization, 2007. Report No NCJ 224390. Washington, DC: Bureau of Justice Statistics, 2008.
2. **Federal Bureau of Investigation**. Crime in the United States, 2007. Washington, DC: Federal Bureau of Investigation, 2008.
3. Statement of William Newell before the Committee on Appropriations, Subcommittee on Commerce, Justice, Science and Related Agencies, United States House of Representatives. Washington, DC. 24 March 2009.
4. **Graduate Institute of International Studies**. Small arms survey 2002: counting the human cost. Oxford: Oxford University Press, 2002.
5. **Braga AA**, Cook PJ, Kennedy DM, et al. The illegal supply of firearms. In: Tonry M, ed. Crime and justice: a review of research. Chicago, IL: The University of Chicago Press, 2002:319–52.
6. **Harlow CW**. Firearm use by offenders. Report No NCJ 189369. Washington, DC: Bureau of Justice Statistics, 2001.
7. **Scalia J**. Federal firearm offenders. 1992–98. Report No NCJ 180795. Washington, DC: Bureau of Justice Statistics, 2000.
8. **Bureau of Alcohol Tobacco and Firearms**. Following the gun: enforcing federal laws against firearms traffickers. Washington, DC: Bureau of Alcohol, Tobacco and Firearms, 2000.
9. **Bureau of Alcohol Tobacco and Firearms**. Commerce in firearms in the United States. Washington, DC: Bureau of Alcohol, Tobacco and Firearms, 2000.
10. **Bureau of Alcohol Tobacco and Firearms**. Crime gun trace reports (2000). Washington, DC: Bureau of Alcohol, Tobacco and Firearms, 2002.
11. **Wintemute GJ**, Cook P, Wright MA. Risk factors among handgun retailers for frequent and disproportionate sales of guns used in violent and firearm related crimes. Inj Prev 2005;11:357–63.
12. **Pierce GL**, Braga AA, Hyatt RRJ, et al. Characteristics and dynamics of illegal firearms markets: implications for a supply-side enforcement strategy. Justice Quarterly 2004;21:391–422.
13. **Baron RM**, Kenney DA. The moderator-mediator variable distinction in social psychological research: conceptual, strategic, and statistical considerations. J Pers Soc Psychol 1986;51:1173–82.
14. **Wintemute GJ**, Romero MP, Wright MA, et al. The life cycle of crime guns: a description based on guns recovered from young people in California. Ann Emerg Med 2004;43:733–42.
15. **Altman DG**, Foster V, Rasenick-Douss L, et al. Reducing the illegal sale of cigarettes to minors. JAMA 1989;26:80–4.
16. **Arday DR**, Klevens RM, Nelson DE, et al. Predictors of tobacco sales to minors. Prev Med 1997;26:8–13.
17. **Erickson AD**, Woodruff SI, Wildey MB, et al. A baseline assessment of cigarette sales to minors in San Diego, California. J Community Health 1993;18:213–24.
18. **Centers for Disease Control and Prevention**. Minors' access to smokeless tobacco — Florida, 1994. MMWR Morb Mortal Wkly Rep 1995;44:839–41.
19. **Forster JL**, Hourigan M, McGovern P. Availability of cigarettes to underage youth in three communities. Prev Med 1992;21:320–8.
20. **Freisthler B**, Gruenewald PJ, Treno AJ, et al. Evaluating alcohol access and the alcohol environment in neighborhood areas. Alcohol Clin Exp Res 2003;27:477–84.
21. **Forster JL**, Murray DM, Wolfson M, et al. Commercial availability of alcohol to young people: results of alcohol purchase attempts. Prev Med 1995;24:342–7.
22. **Forster JL**, McGovern PG, Wagenaar AC, et al. The ability of young people to purchase alcohol without age identification in northeastern Minnesota, USA. Addiction 1994;89:699–705.
23. **Preusser DF**, Williams AF. Sales of alcohol to underage purchasers in three New York counties and Washington, DC. J Public Health Policy 1992;13:306–17.
24. **Wolfson M**, Toomey TL, Forster JL, et al. Characteristics, policies and practices of alcohol outlets and sales to underage persons. J Stud Alcohol 1996;57:670–4.
25. **Wolfson M**, Toomey TL, Murray DM, et al. Alcohol outlet policies and practices concerning sales to underage people. Addiction 1996;91:589–602.
26. **Bureau of Alcohol Tobacco and Firearms**. Operation Snapshot: an analysis of the retail regulated firearms industry. Washington, DC: Bureau of Alcohol, Tobacco and Firearms, 2000.
27. **Sanguino SM**, Dowd MD, McEnaney SA, et al. Hangun safety: what do consumers learn from gun dealers? Arch Pediatr Adolesc Med 2002;156:777–80.
28. **Koper CS**. Federal Legislation and gun markets: how much have recent reforms of the federal firearms licensing system reduced criminal gun suppliers? Criminol Public Pol 2002;1:151–78.
29. **Webster D**, Vernick J, Bulzacchelli M. Effects of a gun dealer's change in sales practices on the supply of guns to criminals. J Urban Health 2006;83:778–87.
30. **Mayors Against Illegal Guns**. Inside straw purchasing: how criminals get guns illegally. http://www.mayorsagainstillegalguns.org/downloads/pdf/inside-straw-purchases.pdf (accessed 22 Jun 2009).
31. **Braga AA**, Kennedy DM. Gun shows and the illegal diversion of firearms. Georgetown Public Pol Rev 2000;6:7–24.
32. **Cook PJ**, Braga AA. Comprehensive firearms tracing: strategic and investigative uses of new data on firearms markets. Ariz Law Rev 2001;43(Summer):277.
33. **Sorenson SB**, Vittes K. Buying a handgun for someone else: firearm dealer willingness to sell. Inj Prev 2003;9:147–50.
34. **Ricker RA**. Declaration in support of plaintiffs' opposition to defendant manufacturers' motion for summary judgment in People et al v Arcadia Machine and Tool, Inc., et al.San Diego: Superior Court of California; Judicial Counsel Coordination Proceeding No 4095, 2003.
35. **US Department of Justice, Office of the Inspector General, Evaluation and Inspections Division**. Inspections of firearms dealers by the Bureau of Alcohol, Tobacco, Firearms and Explosives, Report No I-2004-005. Washington, DC: US Department of Justice, 2004.
36. **General Accounting Office**. Gun control: potential effects of next-day destruction of NICS background check records. Washington, DC: General Accounting Office, 2002.
37. **Braga A**, Pierce GL. Disrupting illegal firearms markets in Boston: the effects of Operation Ceasefire on the supply of new handguns to criminals. Criminol Public Pol 2005;4:717–48.
38. **Webster D**, Bulzacchelli M, Zeoli A, et al. Effects of undercover police stings of gun dealers on the supply of new guns to criminals. Inj Prev 2006;12:225–30.

# Exhibit 57

# BMC Public Health


BioMed Central

Open Access

Research article

# Homicide and geographic access to gun dealers in the United States

## Douglas J Wiebe*[1], Robert T Krafty[2], Christopher S Koper[3], Michael L Nance[4], Michael R Elliott[5] and Charles C Branas[1]

Address: [1]Department of Biostatistics and Epidemiology, University of Pennsylvania School of Medicine, Philadelphia PA, USA, [2]Department of Statistics, University of Pittsburgh, Pittsburgh PA, USA, [3]Police Executive Research Forum, Washington DC, USA, [4]Department of Surgery, The Children's Hospital of Philadelphia, Philadelphia PA, USA and [5]Department of Biostatistics, University of Michigan, Ann Arbor MI, USA

Email: Douglas J Wiebe* - dwiebe@exchange.upenn.edu; Robert T Krafty - krafty@pitt.edu; Christopher S Koper - ckoper@policeforum.org; Michael L Nance - NANCE@email.chop.edu; Michael R Elliott - mrelliot@umich.edu; Charles C Branas - cbranas@upenn.edu

* Corresponding author

Published: 23 June 2009

BMC Public Health 2009, 9:199   doi:10.1186/1471-2458-9-199

This article is available from: http://www.biomedcentral.com/1471-2458/9/199

Received: 1 May 2008
Accepted: 23 June 2009

© 2009 Wiebe et al; licensee BioMed Central Ltd.

This is an Open Access article distributed under the terms of the Creative Commons Attribution License (http://creativecommons.org/licenses/by/2.0), which permits unrestricted use, distribution, and reproduction in any medium, provided the original work is properly cited.

## Abstract

**Background:** Firearms are the most commonly used weapon to commit homicide in the U.S. Virtually all firearms enter the public marketplace through a federal firearms licensee (FFL): a store or individual licensed by the federal government to sell firearms. Whether FFLs contribute to gun-related homicide in areas where they are located, in which case FFLs may be a homicide risk factor that can be modified, is not known.

**Methods:** Annual county-level data (1993–1999) on gun homicide rates and rates of FFLs per capita were analyzed using negative binomial regression controlling for socio-demographic characteristics. Models were run to evaluate whether the relation between rates of FFLs and rates of gun homicide varied over the study period and across counties according to their level of urbanism (defined by four groupings, as below). Also, rates of FFLs were compared against FS/S – which is the proportion of suicides committed by firearm and is thought to be a good proxy for firearm availability in a region – to help evaluate how well the FFL variable is serving as a way to proxy firearm availability in each of the county types of interest.

**Results:** In major cities, gun homicide rates were higher where FFLs were more prevalent (rate ratio [RR] = 1.70, 95% CI 1.03–2.81). This association increased (p < 0.01) from 1993 (RR = 1.69) to 1999 (RR = 12.72), due likely to federal reforms that eliminated low-volume dealers, making FFL prevalence a more accurate exposure measure over time. No association was found in small towns. In other cities and in suburbs, gun homicide rates were significantly lower where FFLs were more prevalent, with associations that did not change over the years of the study period. FFL prevalence was correlated strongly (positively) with FS/S in major cities only, suggesting that the findings for how FFL prevalence relates to gun homicide may be valid for the findings pertaining to major cities but not to counties of other types.

**Conclusion:** Modification of FFLs through federal, state, and local regulation may be a feasible intervention to reduce gun homicide in major cities.

*BMC Public Health* 2009, 9:199

http://www.biomedcentral.com/1471-2458/9/199

## Background

Homicide is a major cause of death in the U.S. and the second leading cause of death among 15–34 year-olds.[1] During each year of the past quarter century (1980–2005), more homicides were committed with firearms than with all other weapon types combined.[2] Firearms accounted for 331,270 homicides over this period.[2]

A correspondingly large firearm manufacturing and dealer distribution system exists in the U.S. and is thought to contribute to the incidence of firearm homicide. [3-5] The number of federally-licensed firearm dealers (FFLs), which include gun stores and individuals that are licensed by the federal government to ship, transport, and receive firearms in interstate commerce and engage in retail sales, may play a major role. There were 104,840 FFLs in the U.S. in 2001.[6] No publicly available data report the number of guns sold by FFLs. However, data on gun purchases and on guns seized and guns recovered by police indicate that firearms flow through FFLs into U.S. communities at a rate that sums into the millions each year. [7-9] A state-level study, using self-reports of household firearm ownership as a proxy for gun availability, found that the states where guns were most common experienced the highest rates of gun homicide.[10] Similarly, it is possible that a greater number of FFLs is associated with greater gun availability and ultimately, increased gun homicide rates.

Although the federal government is responsible for regulating which individuals or businesses are issued an FFL, the decision about where an FFL can operate is a local matter. Therefore, it is helpful to adopt an urban planning perspective when considering the possibility that FFLs could be impacting local homicide rates.[11,12] Like other businesses, FFLs are subject to regulations including zoning laws which dictate how land parcels can be used. In addition to zoning laws, state-level legislation, although currently in place in only a minority of states, can mandate additional licensing requirements and periodic inspection of gun dealer records.[13] Therefore, if FFLs do act as a spigot through which firearms flow into a community and thereby contribute to homicide, it is possible that regulating the locations and activities of stores where firearms are sold is a way to curb homicide. With this in mind, we considered whether licensed gun dealers function as a proxy for gun availability in counties in the U.S., and studied whether having a disproportionately high number of FFLs in a county was associated an elevated rate of homicide committed with guns. Other studies examining mortality as a function of gun availability have used FS/S – the proportion of suicides that were committed with firearms as opposed to other methods – as a way to measure by proxy the extent of gun availability in a geographic area. Whereas FS/S appears to serve well as

a proxy for gun availability, FS/S is not a risk factor that is modifiable.[10,14,15] FFLs are modifiable, in contrast, in terms of their locations and retail practices, and thus in this way this analysis is investigating a public health issue with direct policy relevance.

## Methods

### Data and Variables

Our dataset consisted of seven separate, year-specific entries for 3,112 counties (including the District of Columbia and county equivalents such as boroughs and independent cities), totaling 21,784 observations of county-level data for the U.S. from 1993 to 1999. The outcome measure was annual firearm homicide rates per 100,000 population in U.S. counties for the years 1993 through 1999. The rates were calculated with firearm homicide data from the National Center for Health Statistics' (NCHS) Multiple Cause of Death files (defined as International Classification of Diseases-Ninth Revision [ICD-9] codes E965.0–E965.4 for 1993–1998 and ICD-10 codes X93–X95 for 1999) and population data from U.S. Census data. Permission to include counties with fewer than 100,000 persons was obtained from the NCHS Division of Vital Statistics. We calculated this outcome measure separately by year for each U.S. county. Our primary predictor measure was the annual per capita prevalence of "type one" (firearm dealer) and "type two" (pawnbroker) FFLs (per 1,000 population) in counties for the years 1993 through 1999. The FFL data were obtained from Basic Information Systems, Inc. (Wheaton, Maryland), which provided data from the Bureau of Alcohol, Tobacco, Firearms and Explosives (ATF) on the annual number and type of FFLs in the U.S. by county for the study period. FFL data were not available for counties in Alaska and therefore Alaska was not included in the analysis. FFL data for years after 1999 were not available.

Covariates were used to control for several county-level factors thought to be potential confounders of the association between FFL rates and homicide rates being studied (e.g., [10]): percent of population 15–29 years old, percent male, percent African American, percent Native American, percent Hispanic, percent married, percent living alone, percent female headed households, average per capita income, percent of persons below the poverty level, percent of the civilian labor force unemployed, percent over age 25 who were college educated, hospital beds per capita, and percent of arrests that were drug-related. Each of these variables was obtained from the U.S. Census Bureau and the Area Resource File[16] with the exception of drug-related arrests, which was obtained from the Federal Bureau of Investigation's county-level Uniform Crime Reports (UCR),[17] and was incorporated given evidence that drug arrests may be feasible as an indicator of drug activity.[18,19] Because the UCR arrest data are derived

BMC Public Health 2009, 9:199

http://www.biomedcentral.com/1471-2458/9/199

from police jurisdictions, which do not correspond exactly with county boundaries, a second variable that adjusted for the discrepancy by distance-based weighting between police jurisdiction centroids and county centroids was included in the model. Also, the covariates included a variable for urbanization defined according to a modification of the rural-urban continuum classification (mRUC) scheme [20-22] designed by the U.S. Department of Agriculture.[23] This variable initially included 11 categories that were collapsed to four categories for parsimony during preliminary analyses: major cities (mRUC 1: central counties of one million population or more); other cities (mRUC 2: central counties of metropolitan areas of one million population or more); suburbs (mRUC 3–5: fringe counties of metropolitan areas of one million population or more, ranging to counties in metropolitan areas of fewer than 250,000 population); and small towns (mRUC 6–11: urban counties with a population of 20,000 or more adjacent to a metropolitan area, ranging to completely rural counties of less than 2,500 urban population not adjacent to a metro area). Each variable was measured annually except for urbanization, persons below the poverty level, female-headed households, persons living alone, persons married, and persons college-educated. These variables were based on data available either decennially and/or for certain intercensal years. Intercensal years without data were linearly interpolated or forecast based on known values. Additionally, a linear trend for year was included to account for temporal variability.

Given that the availability of firearms in one county may depend on how many FFLs exist in surrounding counties, a variable was included to reflect the prevalence of FFLs in counties surrounding the index county, weighted by the inverse of the squared rectilinear distance between county population-weighted centroids. The leniency of state firearm laws in each county was controlled for as well. This was done by coding each county according to a classification scheme published annually since 1997. [24-29] The scheme uses an integer scale ranging from 0 to 100, with 0 representing maximum restrictiveness and 100 representing maximum leniency, to reflect state laws pertaining to the acquisition, ownership, and transportation of firearms and ammunition. Leniency scores were assigned separately to each county for each year. The leniency scores used for 1997 through 1999 were taken directly from published information. We linearly extrapolated leniency scores for the years 1993 through 1996 based on the values published for the period 1997 through 2002. Finally, a variable containing county-level annual nongun homicide rates (defined as ICD-9 codes E960–E964 and E965.5–E967.9 for 1993–1998 and ICD-10 codes X85–X92 and X96–Y08 for 1999) was derived for inclusion in the final statistical model. This was done to explore the

possibility that such an adjustment could help control for a latent homicidal tendency at the county level and isolate the contribution of FFLs to gun homicide.

*Statistical Analysis*
Plots were generated to assess annual prevalence rates of FFLs and rates of homicide in the U.S. Negative binomial generalized linear regression conducted at the county level was used to estimate the association between the prevalence of FFLs and rates of gun homicide in U.S. counties during the 1993–1999 study period. Model coefficients were converted into incidence rate ratios (RR), and the result of the final statistical model are presented. Correlation stemming from use of multiple data years was accounted for with generalized estimating equations under a working independence correlation matrix. Spearman correlation coefficients and variance inflation factors were used to identify multicollinearity and for diagnostic purposes. Also, variation by year and urbanization, for reasons discussed below, was then investigated by restricting analyses to individual data years and using interaction terms to permit the relation between the prevalence of FFLs and rates of gun homicide to vary across counties according to their size (i.e., on the rural-urban continuum). The variable used to represent a linear trend for year was excluded from the year-specific models. The adjusted RR estimates derived from these models are presented in a summary table.

To gain insight into how well the FFL prevalence variable may be serving as a way to proxy gun availability in counties of each grouping, the proportion of suicides committed with firearms (FS/S) – which is considered an accurate proxy for household gun availability and has been studied in state-level and region-level analyses [10,14,15] – was computed within each county by year and modeled in place of our FFL variable. Spearman correlation coefficients were also calculated to determine how well FS/S was correlated with the FFL prevalence rate within counties of each grouping.

**Results**
In 1993, 17,984 gun homicides and 6,141 nongun homicides occurred in the U.S. At that time a total of 253,314 gun manufacturers, gun stores and individuals held active licenses to sell firearms (i.e., FFLs). The annual incidence rates of gun and nongun homicide and the annual prevalence rates of FFLs in the U.S. from 1993 to 1999 are shown in Figure 1. Rates of gun homicide dropped considerably over this period, ranging from 3.98 per 100,000 in 1993 to 2.55 per 100,000 in 1999. By contrast, rates of nongun homicide fluctuated little, ranging from a high in 1993 of 1.52 per 100,000 to a low in 1999 of 1.11 per 100,000. The prevalence of FFLs decreased even more dramatically than did gun homicide, ranging from 1.99 per

CITY 000590

BMC Public Health 2009, 9:199          http://www.biomedcentral.com/1471-2458/9/199



**Figure I**
**Homicide incidence rate and federal firearms licensee (FFL) prevalence rate in the U.S., 1993–1999.**

**Table I: Characteristics of U.S. counties, 1993–1999**

|  | Mean | Standard deviation | Minimum | Maximum |
|---|---|---|---|---|
| Homicide rate (per 100,000) | 4.63 | 7.87 | 0.00 | 187.27 |
| Gun | 3.25 | 6.53 | 0.00 | 187.27 |
| Non-gun | 1.38 | 3.54 | 0.00 | 97.75 |
| Federal firearms licensees (FFL) (per 1,000) | 1.15 | 1.10 | 0.001 | 30.93 |
| % of population age 15–29 years | 0.31 | 0.36 | 0.09 | 0.81 |
| % male | 49.32 | 1.95 | 43.86 | 82.20 |
| % African American | 9.20 | 15.00 | 0.00 | 86.76 |
| % Native American | 1.18 | 7.42 | 0.00 | 97.69 |
| % Hispanic | 5.21 | 11.81 | 0.00 | 99.41 |
| % married | 44.96 | 5.04 | 18.50 | 58.60 |
| % living alone | 24.67 | 3.83 | 7.91 | 77.51 |
| % of female headed households | 10.17 | 3.98 | 0.78 | 36.07 |
| % of persons below poverty level | 15.22 | 6.58 | 0.00 | 55.27 |
| % of adult population college educated | 24.23 | 7.06 | 8.41 | 64.36 |
| % of arrests that were drug related | 7.29 | 4.96 | 0.00 | 100.00 |
| Average per capita income (%) | 19347 | 4985 | 1185 | 75702 |
| Unemployment rate | 5.87 | 3.04 | 0.00 | 37.90 |
| Hospital beds per 1,000 population | 2.85 | 3.98 | 0.00 | 7.41 |
| Urbanization (11-code mRUC) | 8.00 | 2.74 | 1 | 11 |
| Urbanization (collapsed mRUC) | 3.67 | 0.61 | 1 | 4 |
| Leniency of state gun laws | 75.71 | 17.21 | 3 | 100 |

mRUC denotes modified rural-urban continuum codes. 11 codes were collapsed into 4 groups for analysis.
Data exclude Alaska due to lack of FFL information.

CITY 000591

BMC Public Health 2009, 9:199

http://www.biomedcentral.com/1471-2458/9/199

1,000 in 1993 to 0.70 per 1,000 in 1999. The average amount by which gun homicide rates and FFL prevalence rates decreased over the seven-year period was approximately equal (23% and 22%, respectively).

Table 1 shows characteristics of U.S. counties. The rate of gun homicide ranged from 0.00 per 100,000 to 187.27 per 100,000 and the rate of nongun homicide ranged from 0.00 per 100,000 to 97.75 per 100,000, with average gun and nongun homicide rates of 3.25 per 100,000 and 1.38 per 100,000, respectively. The number of FFLs ranged from 0.001 per 1,000 to 30.93 per 1,000 with an average of 1.15 per 1,000. There were no counties without FFLs; each county had at least one FFL active during each study year.

Table 2 shows results of the overall statistical model, which adjusted for covariates using regression but did not permit for the possibility that the relation between the prevalence of FFLs and gun homicide rates could vary over the years of the study period and according to county type (i.e., urbanization). The variable for percent of female headed households was excluded during the model building process due to multicolinearity. The results based on this overall model suggested that the prevalence of FFLs in U.S. counties was not associated with the rate of gun homicide in the county (RR = 0.98, 95% confidence interval [CI] 0.93 to 1.04) (Table 2). However, inclusion of an interaction term revealed that the relation between FFLs and gun homicide was found to vary significantly by urbanization (p < 0.01). The subsequent modeling revealed that in major cities, a disproportionately high prevalence of FFLs was associated with significantly higher gun homicide rates (RR = 1.70, 95% CI 1.03 to 2.81) (Table 3). Additionally, the magnitude of this association increased significantly over the study period with an average increase of 90% per year (p < 0.001) (Figure 2). By contrast, in other cities and in suburbs a disproportionately high prevalence of FFLs was associated with significantly lower gun homicide rates (RR = 0.73, 95% CI 0.57 to 0.93; RR = 0.87, 95% CI 0.77 to 0.97, respectively), and the magnitude of these associations did not change when tested for trend over the study period. The prevalence of FFLs was not associated with gun homicide rates in small towns. Inclusion of the covariate representing county-level rates of nongun homicide did not substantively change the results. Also, the results did not change substantively when the variable that was used to adjust for the impact of the prevalence of FFLs in surrounding counties was excluded from the models.

The results of the models run with FS/S used in place of the FFL prevalence variable (not presented) were generally consistent with our findings, although the link between gun availability and gun homicide appeared to be even stronger (positive) and more widespread than seen in the

**Table 2: Gun homicide rates as a function of the number of federal firearms licensees in U.S. counties**

| | Incident rate ratio | SE | P-value | 95% CI |
|---|---|---|---|---|
| FFLs | 0.98 | 0.027 | 0.482 | 0.93, 1.04 |
| FFLs in surrounding counties | 1.03 | 0.009 | 0.001 | 1.01, 1.05 |
| Year | 0.96 | 0.009 | 0.000 | 0.95, 0.98 |
| % poverty | 1.05 | 0.004 | 0.000 | 1.05, 1.06 |
| % married | 1.04 | 0.005 | 0.000 | 1.03, 1.05 |
| % college educated | 1.00 | 0.003 | 0.699 | 0.99, 1.01 |
| % African American | 1.03 | 0.001 | 0.000 | 1.03, 1.03 |
| % Native American | 1.01 | 0.003 | 0.006 | 1.00, 1.01 |
| % Hispanic | 1.01 | 0.002 | 0.000 | 1.00, 1.01 |
| % 15–24 years old | 0.95 | 0.432 | 0.913 | 0.39, 2.32 |
| % male | 1.02 | 0.009 | 0.075 | 1.00, 1.03 |
| % living alone | 1.02 | 0.006 | 0.000 | 1.01, 1.04 |
| % of arrests that were drug related | 1.02 | 0.003 | 0.000 | 1.01, 1.02 |
| Drug arrest jurisdiction adjustment | 0.92 | 0.037 | 0.030 | 0.85, 0.99 |
| Hospital beds | 1.00 | 0.000 | 0.000 | 1.00, 1.00 |
| Average per capita income | 1.00 | 0.000 | 0.096 | 1.00, 1.00 |
| Unemployment rate | 1.01 | 0.006 | 0.331 | 0.99, 1.02 |
| Leniency of state gun laws | 1.01 | 0.001 | 0.000 | 1.01, 1.01 |
| Major cities | 1.97 | 0.226 | 0.000 | 1.57, 2.46 |
| Other cities | 1.39 | 0.117 | 0.000 | 1.17, 1.63 |
| Suburbs | 1.27 | 0.045 | 0.000 | 1.19, 1.37 |
| Small towns (reference) | -- | | | |

Results of generalized linear negative binomial regression.
SE denotes standard error.
CI denotes confidence interval.

BMC Public Health 2009, 9:199                                    http://www.biomedcentral.com/1471-2458/9/199

Table 3: Gun homicide rates (per 100,000 population) as a function of the prevalence of federal firearms licensees (FFLs) (per 1,000 population) in U.S. counties, by county type and year, 1993–1999

| | Incident rate ratio (95% CI) | Incident rate ratio (95% CI) | | | |
|---|---|---|---|---|---|
| | All counties | Major cities | Other cities | Suburbs | Small towns |
| 1993–1999 | 0.98 (0.93, 1.04) | 1.70 (1.03, 2.81) | 0.73 (0.57, 0.93) | 0.87 (0.77, 0.97) | 1.00 (0.95, 1.05) |
| 1993 | 1.09 (1.02, 1.16) | 1.69 (0.98, 2.90) | 0.86 (0.67, 1.11) | 0.99 (0.84, 1.18) | 1.11 (1.04, 1.18) |
| 1993 | 1.03 (0.91, 1.15) | 1.65 (0.72, 3.77) | 0.62 (0.42, 0.92) | 0.78 (0.63, 0.96) | 1.07 (0.96, 1.19) |
| 1995 | 0.84 (0.73, 0.94) | 2.16 (0.65, 7.20) | 0.30 (0.17, 0.53) | 0.65 (0.52, 0.82) | 0.87 (0.77, 0.98) |
| 1996 | 0.95 (0.80, 1.13) | 2.58 (0.33, 19.99) | 0.64 (0.08, 5.10) | 0.71 (0.47, 1.08) | 0.99 (0.83, 1.17) |
| 1997 | 0.96 (0.80, 1.15) | 3.12 (0.22, 44.78) | 0.28 (0.08,0.96) | 0.48 (0.30, 0.76) | 1.03 (0.87, 1.13) |
| 1998 | 0.92 (0.73, 1.15) | 11.24 (0.46, 277.38) | 0.29 (0.10, 0.87) | 0.48 (0.31, 0.72) | 0.98 (0.79, 1.22) |
| 1999 | 0.85 (0.67, 1.07) | 12.72 (0.64, 253.19) | 0.51 (0.13, 2.00) | 0.62 (0.38, 1.01) | 0.89 (0.70, 1.12) |

Results of generalized linear negative binomial regression models adjusted for covariates.
CI indicates confidence interval.

analysis presented here. Importantly though, FS/S was strongly (positively) correlated with FFL prevalence in major cities (Spearman correlation coefficient = 0.67) but was weakly correlated and not correlated with FS/S in other cities (0.32), suburbs (0.16), or small towns (0.07), respectively. From this evidence it appears that FFL prevalence is a good proxy for firearm availability in major cities only, suggesting that the findings for how FFL prevalence relates to gun homicide may be valid for the findings pertaining to major cities but not to counties of other types.

## Discussion

Our analyses provide evidence of an association between the per capita rate of licensed firearm dealers in a county and its rate of firearm homicide. In particular, we found that having a disproportionately high number FFLs was associated with significantly higher rates of firearm homicide in major cities. As such, FFLs may represent a risk factor for gun homicide that is modifiable. To the best of our knowledge, the association between licensed gun dealers and homicide rates has not previously been estimated. We also found more FFLs to be associated with significantly lower firearm homicide rates in other cities and in suburbs. Possible explanations for both findings are discussed below.

Our evaluation strategy followed the assumption that the number of FFLs in a county gives some indication of the prevalence of firearms (i.e., a proxy of gun availability). Although no available data report the number of guns

sold per dealer, the basic finding that major cities having the most FFLs per capita also have the highest rates of gun homicide is consistent with what is known about how FFLs and communities relate in terms of gun availability. Data from gun traces (a determination of the chain of ownership, usually conducted in connection with a criminal investigation) conducted by the ATF may provide the best insight. Between July 1996 and December 1998, the ATF conducted 1,530 trace investigations to determine whether guns used during crimes were trafficked from an FFL into the illegal gun market and to determine the point of first purchase.[8] FFLs accounted for less than 10 percent of the 1,530 trace investigations but for nearly half (40,000) of all firearms involved in these traces. The average number of firearms trafficked by the FFLs under investigation was 350, which far exceeds the average number of firearms trafficked by other means including gun shows (130 guns), unlicensed gun dealers (75 guns), and straw purchasers (37 guns). The large volume of firearms that can be obtained by FFLs is possibly what underlies this discrepancy and why FFLs may figure prominently as a risk factor. In addition, a study where researchers telephoned FFLs and posed as customers provides additional evidence of how FFLs can facilitate the flow of guns to criminals. Gun dealers were generally willing to sell a handgun even when the buyer indicated an intention to purchase the gun illegally on behalf of someone else.[30]

Other ATF data provide additional support for the possibility that gun homicide is a function of local FFLs. Guns are often found to have been used for criminal purposes

CITY  000593

BMC Public Health 2009, 9:199

http://www.biomedcentral.com/1471-2458/9/199



**Figure 2**
**Annual gun homicide rates as a function of the prevalence of federal firearms licensees (FFLs) in U.S. counties, by county type, 1993–1999.**

not far from the gun dealer where they were first obtained. Approximately 62 percent of crime guns traced by the ATF were first purchased from FFLs in the state where they were recovered by police, one-quarter (25.9%) of crime guns were recovered in the county where they were purchased, and 10.5 percent were recovered in a county adjacent to the county of purchase, almost all of which were in the same state (9.5%).[6] Moreover, almost one-third (32.2%) of traced crime guns are recovered by police within 10 miles of the FFL where they were first purchased, and over one-third (34.3%) are recovered between 11 and 250 miles of the FFL where they were first purchased.[6,8] Thus, an FFL appears most likely to have an effect in the home or surrounding counties.

A recent study showing that gun dealers in or near major cities are at substantially elevated risk of selling guns used in crime may help to explain the strong positive association found here between FFL prevalence and gun homicide in major cities specifically.[31] Also, we found that the association between FFLs and gun homicides in major cities grew stronger from 1993 to 1999. This finding is consistent with what resulted when in the 1990s the federal government took steps to regulate FFLs more closely. Before this time, the process to obtain a license to sell firearms was appreciably simpler.[4] The Gun Control Act of 1968 required the ATF to issue a license to any applicant who was at least 21 years old, had premises from which they intended to conduct business, and who otherwise

was not prohibited by law from purchasing a firearm.[4] At the time, the fee to obtain or annually renew an FFL was $10. The ATF received an average of 33,000 applications for FFLs each year over the decade that followed. Fully 169,052 FFLs were active by 1978. That number increased steadily thereafter and by 1992 reached a national peak of 284,117 FFLs. Not all FFLs were legitimate businesses, however. Any FFL enabled the holder to purchase large numbers of firearms, often at wholesale prices, and to buy from sellers in other states.[6] Many of these dealers made few if any registered sales, suggesting they were not truly engaged in the business of firearms dealing as required by federal law, and a substantial proportion of the extant FFLs were not in compliance with applicable federal, state, and local laws.[4]

With the system becoming increasingly difficult for the ATF to monitor, Congress acted and in 1993 and 1994 increased the FFL application fee 20-fold to $200 and imposed new laws intended to shut down inactive or corrupt FFLs.[4] In the years that followed, the number of FFLs nationally dropped from about 260,000 in 1993 to 80,000 in 1999. Our effect estimates suggest that the association between FFL prevalence and homicide may have been weaker in the early 1990s than in later years because there existed a large number of low volume dealers who contributed less to the supply of firearms.[4] Hence, with FFLs over time becoming a better measure of the exposure under study, the actual magnitude of the association

CITY 000594

BMC Public Health 2009, 9:199

http://www.biomedcentral.com/1471-2458/9/199

between FFLs and gun homicide may be more accurately portrayed in the last few years of our study.

In contrast to what was observed for major cities, we found a negative association between gun homicide and FFL prevalence in other cities and suburbs. When considered in conjunction with the finding that FFL prevalence and FS/S are correlated strongly in major cities but correlated weakly in other cities and suburbs, this suggests that FFL prevalence is not a good proxy for gun availability in other cities and suburbs and hence the models based on those areas should not be interpreted as providing valid estimates of the relation between gun availability and gun homicide. We can consider these findings in light of our understanding of how the relation between FFLs and gun homicide may vary across counties of different urbanization types. In major city areas with higher crime rates, there will be greater criminal demand for guns and, hence, a larger illegal market for guns. It thus seems more likely that a weapon sold in a major city, as compared to one sold in another county type, will end up in the hands of a criminal user through theft, straw purchase, gun trafficking, or some other kind of transaction in the secondhand market. Also, it is possible that handguns rather than long guns account for a higher share of guns sold in major cities. Further, it would also stand to reason that an "average" gun possessor has a greater chance of using a gun criminally in an area with higher rates of gun violence. Also, gun culture and the roles of guns in peoples' lives vary dramatically across urban-rural continuum. Firearm ownership is more widespread in rural areas than urban areas, so the need to purchase a firearm from an FFL may be less necessary in rural than urban areas. The role of firearms certainly varies by county type in terms of firearm mortality, in that rates of firearm-related mortality in the U.S. are equally high in both the most urban and the most rural counties, with the nuance being that it is the gun homicide rate that is high in the most urban counties and it is the gun suicide rate that is high in the most rural counties.[20] Each of these points highlights the importance of stratifying analyses by county type and identifying variables that measure firearm availability accurately in the county type at the focus of a particular study, an important point that has been made previously.[32] The FS/S comparisons suggest that the FFL variable used here provides an adequate proxy in major city counties alone.

If the FFL variable is not a good proxy for gun availability in counties we have defined as other cities and suburbs, our analyses cannot inform the issue of how gun availability relates to gun homicide in counties of these types. It may be the case that the impact of guns on a community may vary by community type and may be protective in other cities and suburbs. In one study of 170 U.S. cities with a population of at least 100,000, however, rates of homicide and of gun-related assault were found to be positively associated with the prevalence of firearms.[33] Even so, it is possible that the mixing in that study of what we have termed major cities, other cities and suburbs may have prevented the authors from detecting modification of this effect across area type. Another study of counties in Illinois initially found that the rate of firearm ownership was negatively associated with all measures of violent crime, including homicide, but had failed to control for urbanization.[34] Subsequent multivariate analyses with control for urbanization found no significant association between the rate of firearm ownership and homicide. A number of ecologic studies conducted at the state level [10,14] and individual-level studies [35-37] alike have found firearm availability to be a risk factor for homicide rather than a protective factor, yet other studies have not found clear effects of the relation between gun availability and homicide, e.g.,[34,38] and a recent National Academy of Sciences report concluded that the body of research on this topic is inconclusive.[39] Our findings highlight the need to account for urbanization in the studies that will follow.

Our analysis had several strengths. First, it was conducted at the county level to account for within-state variability in homicide rates and FFL prevalence. This also allowed us to control for the possibilities that the homicide rate in a county was influenced by FFLs in surrounding counties and by the leniency or permissiveness of neighboring state firearm laws. Second, our analysis examined the link between FFLs and homicide over county urbanization type. Third, the study years coincided with a period when changes to federal firearm licensing regulations produced a change in the composition of the pool of FFLs nationally. As FFLs became fewer the pool became more homogenous, and hence may have provided an exposure variable that became a better measure of gun availability over time. The finding that the association between FFLs and gun homicide in major cities grew stronger over time adds support to our interpretation of the results, as does the finding based on our comparison with FS/S that FFL prevalence appears to be a good proxy for gun availability in counties defined as major cities but not in other county types.

Also, two aspects of the present study are unique and have implications for how firearm homicide is studied and how the incidence of firearm homicide may be reduced. First, because the link between gun homicide and gun availability (as measured by the prevalence of FFLs) was found to vary significantly within states according to the urbanization levels of counties, it appears that studies conducted using broader geographic units of analysis (states, census divisions, etc.) may fail to detect important nuances in the nature of gun availability.

CITY 000595

*BMC Public Health* 2009, 9:199          http://www.biomedcentral.com/1471-2458/9/199

Second, to the best of our knowledge, our study, in focusing on gun dealers as a potential risk factor for homicide, is the first to assess a tangible measure of gun availability that can be modified as part of prevention activities. Law enforcement, city planners, and legal strategists in cities with high gun homicide rates can concretely focus in on excessive or problem gun dealers as opposed to the more nebulous issue of "gun availability." Moreover, local efforts to close down illegal gun commerce have already shown the potential to be effective.[33,40,41] As one example, zoning laws, which control the location and operation of stores and individual dealers licensed to sell firearms, have been used to regulate locations of FFLs in several U.S. communities.[11,12,42] An attempt to launch a coordinated effort to identify and act on problematic gun dealers will surely face challenges, however. For one, a key component of such efforts will be the policing activities of the ATF which, in having inspected fewer than 10% of FFLs in each year since 1979 and fewer than 5% of FFLs in most of those years, may have resources insufficient for the task.[6]

Our analysis also had limitations. As discussed, we could not account for the actual volume of firearms introduced by each FFL into the community. Although gun sales data are not currently available for a more focused test, the recent National Academy of Sciences report called for better information on FFLs to be collected and made available for research.[39] Additionally, we did not explicitly accommodate spatial autocorrelation in the estimation of the FFL effect estimates. Refitting the models presented in Table 2 and Table 3 including a simultaneous autoregressive (SAR) structure,[43] assuming that correlation declined in proportion to the square of the distance between counties, generally changed coefficients by less than 5%. Also, data for FFLs for years after 1999 were not available. Thus we could not analyze a more recent period. Nevertheless, we do not anticipate that the relation observed here between FFLs and homicide would have changed since the study period and thus this characteristic of the data should not be interpreted as devaluing the findings. Finally, it may be that high rates of homicide may lead to increased demand for firearms and hence additional FFLs, in which case the results of the "FFL as risk factor" hypothesis that our models have been designed to test would be spurious. A stronger analytic approach would be to test whether within-county increases in FFL prevalence were followed by increases in the rate of gun homicide. We considered that approach, but found many instances in which a county experienced no gun homicides in certain years but some homicides in the subsequent year, which prevents an annual change in homicide rate from being calculated. Also, as discussed above, we found evidence that FFL prevalence became a better proxy for firearm availability over time, which led

to our preference for the 1999 models and our judgment to refrain from including change models in the current manuscript. An instrumental variable approach could be pursued as well, to attempt to remove from the models the influence of circularity that may exist. We hope this manuscript will inform how such design alternatives may be approached, and acknowledge their need given the cross-sectional nature of the present study.

## Conclusion
If locations of retailers licensed to sell firearms are indeed functioning as a spigot through which deadly firearms flow into criminal hands, then communities with greater geographic access to these dealers should ostensibly experience more firearm homicides. Our findings are consistent with the hypothesis that this is occurring in major U.S. cities. The modification of FFLs, as tangible entities that are tracked and overseen at the national level and, in some cases, at the state and local levels, may be a feasible intervention to reduce firearm homicide.

## Competing interests
The authors declare that they have no competing interests.

## Authors' contributions
CB, MN and ME conceived of the study and supervised all aspects of its implementation. ME and RK computed variables involved in the spatial component of the analysis and DW and ME conducted the statistical analysis. DW and CB drafted the manuscript. All authors helped to conceptualize ideas, interpret findings, and revise drafts of the manuscript.

## Acknowledgements
Funded through grants from the National Institute on Alcohol Abuse and Alcoholism (R01 AA013119), the National Institute of Justice (Project Safe Neighborhoods), and the Joyce Foundation.

## References
1. CDC: **WISQARS Leading cause of death reports, 2005.** 2008 [http://www.cdc.gov/injury/wisqars/].
2. Fox JA, Zawitz MW: **Weapons used (1980–2005).** In: **Homicide trends in the U.S.** 2008 [http://www.ojp.usdoj.gov/bjs/homicide/tables/weaponstab.htm].
3. Diaz T: *Making a killing: the business of guns in America* New York, NY: New York Press; 1999.
4. Koper CS: **Federal legislation and gun markets: how much have recent reforms of the federal firearms licensing system reduced criminal gun suppliers?** *Criminology and Public Policy* 2002, 1(2):151-178.
5. Wintemute GJ: **Relationship between illegal use of handguns and handgun sales volume.** *JAMA* 2000, 284(5):566-567.
6. ATF: **Firearms commerce in the United States.** Washington, DC: U.S. Department of Justice, Bureau of Alcohol, Tobacco and Firearms; 2002.
7. Cook PJ, Ludwig J: *Guns in America: national survey on private ownership and use of firearms (NCJ 165476)* Washington, DC: U.S. Department of Justice, National Institute of Justice; 1997.
8. ATF: *Following the gun: enforcing federal laws against firearms traffickers* Washington DC: Department of the Treasury, Bureau of Alcohol, Tobacco & Firearms; 2000.

*BMC Public Health* 2009, 9:199

9.  PF: Guns in America: results of a comprehensive national survey on firearms ownership and use. Washington, DC: Washington, DC: Police Foundation; 1996.
10. Miller M, Azrael D, Hemenway D: **Rates of household firearm ownership and homicide across US regions and states, 1988–1997.** *Am J Public Health* 2002, **92(12):**1988-1993.
11. Dannenberg AL, Jackson RJ, Frumkin H, Schieber RA, Pratt M, Kochtitzky C, Tilson HH: **The impact of community design and land-use choices on public health: a scientific research agenda.** *Am J Public Health* 2003, **93(9):**1500-1508.
12. Corburn J: **Confronting the challenges in reconnecting urban planning and public health.** *Am J Pub Health* 2004, **94(4):**541-546.
13. Vernick JS, Hepburn LM: State and federal gun laws: trends for 1970–1999. In *Evaluating gun policy* Edited by: Ludwig J, Cook PJ. Washington, DC: Brookings Institution Press; 2003:345-402.
14. Miller M, Azrael D, Hemenway D: **Firearm availability and suicide, homicide, and unintentional firearm deaths among women.** *J Urban Health* 2002, **79(1):**26-38.
15. Miller M, Azrael D, Hemenway D: **Firearm availability and unintentional firearm deaths, suicide, and homicide among 5–14 year olds.** *J Trauma* 2002, **52(2):**267-274.
16. Area Resource File (ARF), 1994–2000 Rockville, MD: US Department of Health and Human Services, Health Resources and Services Administration, Bureau of Health Professions.
17. U.S. Dept. of Justice FBoI: *Uniform Crime Reporting Program Data [United States]: County-Level Detailed Arrest and Offense Data (1993 – 1999) (ICPSR study numbers 6545, 6669, 6850, 2389, 2764, 2910 and 3167)* Ann Arbor, MI: Inter-university Consortium for Political and Social Research.
18. Warner BD, Wilson Coomer B: **Neighborhood drug arrest rates: are they a meaningful indicator of drug activity? A research note.** *J Res Crime Delinquency* 2003, **40(2):**123-138.
19. Rosenfeld R: **Are arrest statistics a valid measure of illicit drug use? The relationship between criminal justice and public health indicators of cocaine, heroin, and marijuana use.** *Justice Quarterly* 16(3):685-700.
20. Branas CC, Nance ML, Elliott MR, Richmond TS, Schwab CW: **Urban-rural shifts in intentional firearm death: different causes, same results.** *Am J Public Health* 2004, **94(10):**1750-1755.
21. Nance ML, Denysenko L, Durbin DR, Branas CC, Stafford PW, Schwab CW: **The rural-urban continuum: variability in statewide serious firearm injuries in children and adolescents.** *Arch Pediatr Adolesc Med* 2002, **156(8):**781-785.
22. Branas CC, Richmond TS, Schwab CW: **Firearm homicide and firearm suicide: opposite but equal.** *Public Health Rep* 2004, **119(2):**114-124.
23. Butler MA, Beale CL: Rural-urban continuum codes for metro and nonmetro counties, 1993. Washington, DC: U.S. Department of Agriculture, Economic Research Service; 1994.
24. Kappas JS: *Traveler's guide to the firearm laws of the fifty states* Covington, KY: Traveler's Guide; 1997.
25. Kappas JS: *Traveler's guide to the firearm laws of the fifty states (first edition, second printing)* Covington, KY: Traveler's Guide; 1997.
26. Kappas JS: *Traveler's guide to the firearm laws of the fifty states (third edition)* Covington, KY: Traveler's Guide; 1998.
27. Kappas JS: *Traveler's guide to the firearm laws of the fifty states (fourth edition)* Covington, KY: Traveler's Guide; 1999.
28. Kappas JS: *Traveler's guide to the firearm laws of the fifty states (fifth edition)* Covington, KY: Traveler's Guide; 2000.
29. Kappas JS: *Traveler's guide to the firearm laws of the fifty states (sixth edition)* Covington, KY: Traveler's Guide; 2002.
30. Sorenson SB, Vittes KA: **Buying a handgun for someone else: firearm dealer willingness to sell.** *Inj Prev* 2003, **9(2):**147-150.
31. Koper CS: **Crime gun risk factors: buyer, seller, firearm, and transaction characteristics associated with gun trafficking and criminal gun use.** In *Report to the National Institute of Justice* Philadelphia: Jerry Lee Center of Criminology, University of Pennsylvania; 2007.
32. Hemenway D: **Appendix A: Methodology.** In *Private guns, public health* Ann Arbor: University of Michigan Press; 2004:230-232.
33. Kleck G, Patterson E: **The impact of gun control and gun ownership levels on violence rates.** *Journal of Quantitative Criminology* 1993, **9(3):**249-287.
34. Bordua DJ: **Firearms ownership and violent crime: a comparison of Illinois counties.** In *The social ecology of crime* Edited by: Byrne JM, Sampson RJ. New York: Springer-Verlag; 1986:156-207.
35. Kellermann AL, Rivara FP, Rushforth NB, Banton JG, Reay DT, Francisco JT, Locci AB, Prodzinski J, Hackman BB, Somes G: **Gun ownership as a risk factor for homicide in the home.** *N Engl J Med* 1993, **329(15):**1084-1091.
36. Wiebe DJ: **Homicide and suicide risks associated with firearms in the home: a national case-control study.** *Ann Emerg Med* 2003, **41:**771-782.
37. Grassel KM, Wintemute GJ, Wright MA, Romero MP: **Association between handgun purchase and mortality from firearm injury.** *Inj Prev* 2003, **9(1):**48-52.
38. Centerwall BS: **Homicide and the prevalence of handguns: Canada and the United States, 1976 to 1980 [see comments].** *Am J Epidemiol* 1991, **134(11):**1245-1260.
39. Wellford CF, Pepper JV, Petrie CV, Eds: *Firearms and violence: a critical review. National Academy of Sciences, National Research Council* Washington, DC: National Academies Press; 2005.
40. Braga AA, Pierce GL: **Disrupting illegal firearms markets in Boston: the effects of Operation Cease Fire on the supply of new handguns to criminals.** *Criminology and Public Policy* 2005, **4(4):**717-748.
41. Webster DW, Bulzacchelli MT, Zeoli AM, Vernick JS: **Effects of undercover police stings of gun dealers on the supply of new guns to criminals.** *Inj Prev* 2006, **12(4):**225-230.
42. Veen J, Dunbar S, Reuland M, Steadman J: **The BJA Firearms Trafficking Program: demonstrating effective strategies to control violent crime (NCJ 166818).** Washington, DC: U.S. Department of Justice; 1997.
43. Cressie NAC: *Statistics for spatial data* New York: Wiley; 1993.

## Pre-publication history

The pre-publication history for this paper can be accessed here:

http://www.biomedcentral.com/1471-2458/9/199/prepub

**Publish with BioMed Central and every scientist can read your work free of charge**

"BioMed Central will be the most significant development for disseminating the results of biomedical research in our lifetime."

Sir Paul Nurse, Cancer Research UK

Your research papers will be:

* available free of charge to the entire biomedical community
* peer reviewed and published immediately upon acceptance
* cited in PubMed and archived on PubMed Central
* yours — you keep the copyright

Submit your manuscript here:
http://www.biomedcentral.com/info/publishing_adv.asp



BioMedcentral

CITY 000597

# Exhibit 58

# Crime Gun Risk Factors: Buyer, Seller, Firearm, and Transaction Characteristics Associated with Gun Trafficking and Criminal Gun Use

## Report to the National Institute of Justice, U.S. Department of Justice

### By

### Christopher S. Koper

### (With Contributions by Mary Shelley)

### 2007

Jerry Lee Center of Criminology
University of Pennsylvania
3809 Walnut Street
Philadelphia, PA 19104

## TABLE OF CONTENTS

| | |
|---|---|
| Acknowledgements | 3 |
| Executive Summary | 4 |
| 1. Introduction | 7 |
| 2. Background: Gun Markets and Gun Trafficking | 8 |
|     2.1. Gun Markets and Criminal Gun Acquisition | 8 |
|     2.2. Potential Risk Factors for Criminal Gun Use and Trafficking | 11 |
| 3. Study Setting and Data Sources | 17 |
|     3.1. Study Setting | 17 |
|     3.2. Maryland Gun Sales Data | 18 |
|     3.3. Crime Gun Data | 20 |
| 4. Sales, Recoveries, and Time to Recovery by Buyer, Firearm, Transaction, and Dealer Characteristics: Bivariate, Descriptive Analyses | 25 |
|     4.1. Sales and Recoveries by Buyer Characteristics | 25 |
|     4.2. Sales and Recoveries by Firearm Characteristics | 34 |
|     4.3. Sales and Recoveries by Transaction Characteristics | 43 |
|     4.4. Sales and Recoveries by Dealer Characteristics | 50 |
| 5. Assessing Crime Gun Risk Factors with Univariate and Multivariate Survival Analyses | 63 |
|     5.1. Probability of Police Recovery: Univariate Survival Analyses | 63 |
|     5.2. Assessing the Simultaneous Influences of Buyer, Dealer, Firearm, and Transaction Characteristics on Gun Recovery: Multivariate Survival Analyses | 66 |
| 6. Discussion and Conclusions | 82 |
|     6.1. Summary of Findings | 82 |
|     6.2. Study Limitations | 84 |
|     6.3. Implications for Policy and Practice | 85 |
|     6.4. Research Recommendations | 88 |
| References | 90 |

## ACKNOWLEDGEMENTS

This research was supported by grant 2004-IJ-CX-0030 from the National Institute of Justice (United States Department of Justice) to the University of Pennsylvania and by funding from the Smith Richardson Foundation. (Data acquisition was also supported by grant 97-IJ-CX-0053 from the National Institute of Justice to Northeastern University.) Contributor Mary Shelley provided assistance with data management and statistical analysis. The author thanks the Maryland State Police (especially Jack Simpson) and Glenn Pierce for assistance with data acquisition, David Huffer for data management support, and Janel McCaffrey for administrative assistance. The author is also grateful to Lois Mock of the National Institute of Justice for her support and advice throughout the project. Finally, anonymous peer reviews for the National Institute of Justice provided helpful comments on an earlier draft of this report. The views expressed here are those of the author and should not be attributed to the United States Department of Justice, the trustees of the University of Pennsylvania, the Smith Richardson Foundation, or any of the other aforementioned persons or organizations.

## EXECUTIVE SUMMARY

Controlling gun crime continues to be a difficult challenge for policymakers and practitioners in the United States. With an estimated 258 million guns in private hands and millions more produced each year, there are many sources and means through which offenders can obtain firearms despite legal restrictions on gun purchasing and ownership by convicted felons, juveniles, and other high-risk groups. In order to better understand the workings of illicit gun markets—and particularly the rapid diversion of guns from the retail market into criminal channels—this study utilizes a decade's worth of data on handgun sales in the state of Maryland and subsequent recoveries of those guns by police in order to identify the characteristics of firearms, sellers, buyers, and sales transactions that predict whether a gun is used in crime subsequent to purchase. The study provides some of the most sophisticated evidence to date on crime use risks associated with high-risk buyers, problem gun dealers, preferred crime guns, purchases involving multiple guns, and other suspected trafficking indicators.

The study is based on three sets of analyses: 1) analysis of 235,011 handgun sales in Maryland from 1990 through October 1999 and 7,575 recoveries of those guns reported by police throughout the nation to the federal Bureau of Alcohol, Tobacco, Firearms, and Explosives (ATF) from 1990 through March 2000; 2) analysis of 71,956 handgun sales in the Baltimore metropolitan area from 1994 through October 1999 and 1,850 recoveries of those guns reported by Baltimore police to ATF from 1994 through March 2000; and 3) analysis of 48,039 handgun sales in the Maryland counties of the Washington, D.C. metropolitan area from 1994 through October 1999 and 529 recoveries of those guns reported by D.C. police to ATF from 1994 through March 2000.

### Key Findings

Adjusting for dates of sale, guns sold in Maryland during the 1990s had at least a 4.7% chance of being recovered by police somewhere throughout the nation within 10 years. Handguns sold in the Baltimore area had a 3.2% of being recovered in Baltimore within 5 years, and those sold in the Maryland portion of the D.C. area had a 1.4% chance of being recovered in D.C. within 5 years. Risk factors affecting gun recovery were assessed with multivariate survival analysis and were fairly consistent across the different areas and time periods. Conclusions were also similar whether examining all recoveries or just those guns recovered from someone other than the last registered buyer (which accounted for the majority of recoveries and provide a stronger indicator of trafficking).

Buyer risk factors: Buyers were at higher risk if they were African-American, young, female, living in or close to Baltimore or D.C., or had previously purchased guns that were recovered by police.

- Guns were generally 4 to 5 times more likely to be recovered by police when purchased by African-American buyers and up to 3 times more likely when purchased by buyers from Baltimore City or suburbs close to Baltimore or D.C.

4

The risk of a gun's recovery dropped by about 10% to 12% with each one-year increase in the buyer's age. Black buyers made nearly two-thirds of the purchases that resulted in a subsequent gun recovery, buyers in their twenties accounted for about half, and buyers from just three counties—Baltimore city, Baltimore County, and Prince George's County—accounted for about three-quarters.

- Female buyers purchased roughly 12% to 16% of guns later used in crime, and buyers linked to prior crime guns accounted for no more than 5%. However, the risk of recovery was up to 57% higher for handguns purchased by female buyers and up to 92% higher for buyers that had previously purchased a gun recovered by police. Although females engage in less gun crime than do males, the findings suggest they are more likely to act as "straw purchasers" who buy on behalf of illegal buyers.

Seller (gun dealer) risk factors: Most crime guns were sold by a relatively small share of dealers located in or close to urban areas.

- Fourteen percent of the dealers in the state sold 92% of the crime guns; 5%, or 31 dealers, sold at least 50 crime guns each and together accounted for about three-quarters of the crime guns.

- Dealers located within 20 miles of Baltimore sold 90% of the Maryland guns recovered in Baltimore; dealers located within 20 miles of D.C. sold 75% of the Maryland guns recovered in D.C. Guns were up to 2.7 times more likely to be recovered when sold by dealers located in or close to these cities.

- Other dealer characteristics—such as time in business, type of establishment, and having a pawnbroker's license—did not predict sales of crime guns as strongly or consistently, though they mattered in some contexts.

Firearm risk factors: Criminal gun users and traffickers seemed to prefer handguns that were semiautomatic, medium to large caliber, easily concealable, and/or cheap.

- Semiautomatic pistols, which generally have larger ammunition capacities than other handguns, were 34% to 56% more likely to be used in crime and accounted for at least three-quarters of the recovered guns. The risk of criminal use was also generally 41% to 91% higher for medium and large caliber handguns, which inflict more lethal wounds, and tended to be highest for medium caliber weapons. Medium to large caliber handguns accounted for 90% or more of the recovered guns; medium caliber guns alone accounted for two-thirds.

- Easily concealable handguns, defined as those having a barrel of 3 inches or less, were 16% to 22% more likely to be used in crime than larger handguns in most analyses and constituted roughly 40% of crime guns (the majority of crime guns had barrels of no more than 4 inches). Cheap handguns, defined as those retailing for $150 or less (and commonly referred to as "Saturday night specials"), were

5

typically 58% to 98% more likely to be used in crime than more expensive firearms and accounted for upwards of 20% of recovered guns.

<u>Transaction risk factors:</u> the simultaneous or rapid purchase of multiple guns by one individual—commonly known as a "multiple sale"—was a risk factor for gun trafficking.

- Guns sold in multiple sales were up to 64% more likely to be used in crime and accounted for roughly a quarter of recovered guns. Risks associated with multiple sales were greatest when examining the flow of guns from Maryland into D.C. and when examining recoveries from someone who was not the last registered buyer.

**Implications for Practice, Policy and Future Research**

- There may be substantial opportunity for enforcement action against illicit gun markets, which are often supplied heavily by localized diversions of guns from retail. This may be especially true in states (like Maryland) that have laws regulating private gun sales and prohibiting straw purchasing. Study of the implementation and enforcement of these laws is needed.

- Risk factors like those identified in this study could potentially be used to guide gun trafficking investigations and to develop prevention efforts (such as raising public awareness about the problems of straw purchasing and illegal gun sales) for high-risk actors and areas.

- Regulatory oversight and investigation of licensed gun dealers should emphasize large volume dealers in urban areas and, more generally, dealers with a relatively large percentage of their sales resulting in crime gun recoveries.

- The results provide some support for policies like "Saturday night special" bans and one-gun-a-month laws that regulate particular types of firearms and transactions. This study does not address whether such policies can reduce gun crime, but it shows that particular types of guns and transactions are at higher risk and account for a substantial share of crime guns. At a minimum, it seems that federal reporting requirements for multiple sales are prudent and that law enforcement should emphasize multiple sales and high-risk firearms in trafficking investigations.

- Priorities for future research should include: replicating these results in other locations that have comparable data systems; refining the identification of risk factors, particularly by incorporating elements unavailable for this study such as buyer criminal history, dealer regulatory history, and neighborhood factors; assessing the current state of practice in gun trafficking enforcement; and designing and evaluating risk-based enforcement and prevention interventions to reduce gun trafficking and gun crime.

6

## 1. INTRODUCTION

Despite the recent drop in gun violence, criminal misuse of firearms continues to be one of America's most serious crime problems. In 2003, there were roughly 11,000 murders with firearms (calculated from Federal Bureau of Investigation 2004:19) and another 367,000 non-fatal violent crimes with guns (Catalano, 2004:10). By some estimates, the total costs of gun violence in the United States – including medical, criminal justice, and other government and private costs – could be as high as $80 billion per year (Cook and Ludwig, 2000).

Further, the recent downturn in gun crime does not appear to have been driven in any large way by a reduction in the availability of guns to offenders. While the number of gun homicides plummeted by 41% from 1993 to 1999, for example, the percentage of homicides committed with guns declined by a modest 6%, from 69.6% to 65.2% (Federal Bureau of Investigation, 1994; 2000). Similarly, the percentage of robberies committed with guns declined by only 6% (from 42.4% to 39.9%) in police statistics and 14% (from 25.1% to 21.5%) in victimization surveys during this same period (Federal Bureau of Investigation, 1994; 2000; Maguire and Pastore, 1995:236; 2001:198). Hence, reducing the availability of guns to criminals remains an important policy concern.

Controlling gun crime is a difficult challenge. With an estimated 258 million guns in private hands in the United States (National Research Council, 2005), there are many sources from which offenders can obtain firearms despite legal restrictions on gun purchasing and ownership by convicted felons, juveniles, and other high-risk groups. However, studies of the types and origins of guns used in crime have revealed potentially promising intervention points for reducing the flow of guns into illicit markets. These intervention points include gun dealers who sell large numbers of guns used in crime, guns that are used in crime soon after purchase, gun makes and models that offenders frequently use, and buyers who purchase multiple guns in a short time span. Nevertheless, these analyses are typically based on the sales histories of guns recovered by police without reference to the types and origins of guns not used in crime. Such studies cannot be used to assess the relative risks of criminal use for different types of guns sold in different types of transactions involving different types of buyers and sellers.

This study utilizes a decade's worth of data on handgun sales in the state of Maryland and subsequent recoveries of those guns by police in order to identify the characteristics of firearms, sellers, buyers, and sales transactions that predict whether a gun is used in crime subsequent to purchase. In so doing, the study provides some of the most sophisticated evidence to date on crime use risks associated with problem gun dealers, preferred crime guns, purchases involving multiple guns, and other suspected trafficking indicators. Practitioners and policymakers might use such evidence to: 1) improve the effectiveness of law enforcement and regulatory efforts to identify dealers, buyers, and networks diverting guns into criminal channels; and 2) inform legislative debates on the efficacy of gun control strategies involving regulation of gun dealers, bans on particular types of firearms, one-gun-a-month laws, and regulation of secondhand gun markets.

7

## 2. BACKGROUND: GUN MARKETS AND GUN TRAFFICKING

### 2.1. Gun Markets and Criminal Gun Acquisition

Firearms are distributed in markets commonly referred to as primary and secondary markets (Cook et al., 1995). Primary markets include transactions by federally-licensed gun dealers who are often referred to as federal firearms licensees (FFLs). Licensed dealers are required to follow federal and state background check procedures to verify the eligibility of purchasers,[1] observe any legally required waiting period prior to making transfers, maintain records of gun acquisitions and dispositions, and report multiple sales (i.e., purchases of more than one handgun by the same buyer within five business days) and losses due to theft to federal authorities.

Secondary markets encompass secondhand gun transactions made by non-licensed individuals.[2] Approximately 30% to 40% of all guns sales occur in the secondhand market (Cook and Ludwig, 1996). Secondary market sellers are prohibited from knowingly transferring guns to ineligible purchasers (e.g., convicted felons and drug abusers). However, secondary transfers are not subject to federal record-keeping and background check requirements, thus making the secondary market largely unregulated and, consequently, a better source of guns for criminal users.[3] In the secondary market, ineligible buyers may obtain guns (through collusion or misrepresentation) from a variety of legitimate and illegitimate gun owners: relatives, friends and other associates; fences and other street dealers; drug dealers and addicts; and persons selling through classified ads or at gun shows (e.g., see Beck et al., 1993; Harlow, 2001; Sheley and Wright, 1993; Wright and Rossi, 1986). Of course, ineligible purchasers may also steal guns; approximately 600,000 guns are stolen each year from private owners, dealers, and common carriers (Cook and Ludwig, 1996:29-30; ATF, 2000a:27-28).

Although secondary market transactions and theft appear to be the predominate sources for the supply of firearms to criminals, the primary market is also important as a proximate or near-proximate source. To begin with, retail dealers serve as the direct source for roughly 11% to 14% of gun offenders (Harlow, 2001; Pierce et al. 2004), most of whom were probably legally eligible buyers when they obtained their firearms.

In addition, many firearms are diverted from the primary market into illicit channels (e.g., see Braga et al., 2002). This diversion occurs in a number of ways (besides theft). Two mechanisms of particular relevance to this study are "straw

---

[1] In general, federal law prohibits gun sales to convicted felons, juveniles, fugitives from justice, drug abusers, persons who have been adjudicated as mentally defective or committed to a mental institution, illegal aliens, persons who have been dishonorably discharged from the military, persons who have renounced their citizenship, and persons under a court restraining order pertaining to an intimate partner or child.

[2] Persons who make only occasional sales of firearms from their personal collection are not required to obtain a federal firearms license (ATF, 2000a:11).

[3] Some states require that secondary market participants conduct transactions through licensed dealers or law enforcement authorities (Vernick and Hepburn, 2003). Even in these states, however, it is not clear how well these laws are enforced, a point to which we will return.

purchasing" and unlawful activity by licensed dealers. Straw purchasers are legally eligible gun buyers who purchase guns for illegal users and traffickers or to make illicit sales themselves. Straw purchasers include small-scale actors who make one-time or occasional purchases as well as rings of buyers who traffic large numbers of firearms through systematic, repetitive operations. The full extent of straw purchasing cannot be determined from available data,[4] but it appears to be a fairly common supply mechanism for criminals and juveniles. A survey of juveniles incarcerated in four states, for instance, revealed that a third had asked someone, most commonly a family member or friend, to buy a gun for them at a retail outlet at some point in the past (Sheley and Wright, 1993:6). Another rough indicator is the share of crime guns that are new but that have changed hands at least once. To illustrate, approximately one quarter of guns confiscated by police are less than three years old, and most of these are recovered from persons other than the original buyers (Cook and Braga, 2001:294-295); this implies that many of these guns were diverted from the primary market via straw purchasing and other means.

Straw purchasers move several thousand guns into criminal channels each year based on just those cases known to the federal Bureau of Alcohol, Tobacco, Firearms, and Explosives (ATF), the agency responsible for enforcement of federal gun laws. Nearly half of gun trafficking investigations conducted by ATF from July 1996 to December 1998 involved straw purchasers who had diverted an average of 37 guns per case and a total of nearly 26,000 guns (ATF, 2000b: 12-13). Case studies also suggest that larger, repetitive straw purchasing operations and corrupt licensed dealers (discussed below) divert a considerable number of guns to the street markets from which roughly 25% to 40% of offenders obtain firearms and to the interstate flow of guns into areas with strict gun laws and lower levels of gun ownership (ATF, 2000b; Kennedy et al., 1996:174; Wachtel, 1998).[5]

Licensed gun dealers may also facilitate the flow of guns into criminal channels. Some dealers engage in illegal sales (i.e., sales without proper background checks and paperwork), either by selling directly to prohibited users or by colluding with unlicensed street dealers (e.g., see ATF, 2000b; Wachtel, 1998). Licensed dealers involved in such activities have the ability to divert large numbers of firearms into illegal commerce. In federal gun trafficking investigations conducted from July 1996 through December 1998, cases involving corrupt dealers averaged over 350 guns per case and involved more than

---

[4] In a recent national survey of prison inmates, 14% of gun offenders reported that they obtained the gun used in their conviction offense from a retail outlet, 40% indicated that a family member or friend was the source, 39% cited a "street" or "illegal" source (including theft, drug dealers, and fences), and 7% reported using "other" sources (Harlow, 2001:6). Yet, as noted by others (e.g., Kennedy et al., 1996; Wachtel, 1998), such data tell us nothing about the role of small or large-scale straw purchasers as direct or indirect sources for these offenders. Many of the acquisitions from dealers and from family and friends may have involved straw purchases. And as noted below, some of the guns obtained through street sources may have been originally supplied through straw purchasing.

[5] The estimate that 25% to 40% of offenders obtain guns from street sources is based on surveys of adult and juvenile gun offenders showing the percentages that acquire firearms directly from fences, drug dealers, "street" sources, or the "black market" (Beck et al., 1993:19; Harlow, 2001:6; Sheley and Wright, 1993:6; Wright and Rossi, 1986:183).

9

40,000 guns in total (ATF, 2000b: 12-13,15). Although the full extent of gun trafficking by licensed dealers is unknown, a reasonable upper bound estimate is perhaps provided by a 1998 ATF study with a national sample of randomly selected dealers which found that 8% of regular dealers and 27% of pawnbrokers had one or more firearms missing from inventory (unpublished ATF data). Further, 1% of the regular dealers and 7% of the pawnbrokers could not account for more than 25 firearms. The latter two figures extrapolate to roughly 1,300 dealers nationwide.[6]

Dealers may also facilitate straw purchasing by suggesting this course of action to prohibited buyers or by turning a blind eye to obvious instances of straw purchasing. These more subtle forms of wrongdoing may be much more widespread among dealers than more blatant forms of trafficking; recent evidence suggests that half of dealers in large cities may be willing to sell handguns to buyers who are purchasing on behalf of someone else (Sorensen and Vittes, 2003).[7]

Whether through straw purchasing, illegal dealer activity, or other means, guns that move quickly into criminal channels (i.e., close to retail diversions) are often highlighted in gun market studies. Analysts and practitioners tend to focus particularly on guns that are recovered within three or four years of purchase (the time that elapses between a gun's purchase and recovery is commonly referred to as "time to crime"). When a gun moves quickly into criminal channels, it is more indicative of a gun that was purchased at retail with criminal intent (reportedly, this is consistent with the experience of ATF investigators).[8] In addition, this segment of the illicit gun market may be more vulnerable to enforcement action; when a gun is relatively new, law enforcement agencies have a better chance of reconstructing its ownership history and identifying persons associated with it.

Further, much of this diversion activity appears to be fairly localized. In most places, the majority of crime guns originate from within the state (e.g., see ATF 2000c). Moreover, national data suggest that nearly half of crime guns are recovered within 25

---

[6] As of 2001, there were 63,845 regular gun dealers and 9,199 pawnbrokers licensed to sell guns in the United States (ATF, 2001/2002:E12).

[7] Federal law allows legally-eligible buyers to purchase guns for others when those guns are to be given as gifts. The statistics cited in the text do not correspond to instances of gift-giving.

[8] Estimates of the age of crime guns in relation to estimates of the age of the civilian gun stock also suggest that criminals are more than twice as likely to use newer guns as older ones (Pierce et al., 2003; also see Zimring 1976). This implies that quick diversion of guns from retail outlets is a particularly important component of the illicit gun supply. It also suggests that criminals and traffickers prefer newer firearms.

This study provides more definitive evidence on this issue by tracking representative samples of guns, both those used in crime and those not, from retail sale onward. As discussed below, this study also refines the measurement of time to crime by including records on dealer sales of used guns (time to crime is typically based on the first retail sale, which is not necessarily the most recent sale) and by controlling for extraneous factors likely to be associated with time to crime (e.g., a dealer's time in business or a gun model's production history).

miles of where they were originally purchased (ATF, 2002a: 43-44; Pierce et al., 2004).[9],[10]

## 2.2. Potential Risk Factors for Criminal Gun Use and Trafficking

To improve our understanding of illicit gun markets and primary market diversion, this study examines how the risk of a gun being used in crime subsequent to purchase varies across different types of buyers, sellers, firearms, and sales transactions. The following sections discuss potential risk factors and gun trafficking indicators corresponding to these elements.

### 2.2.1. Gun Buyers

Buyer characteristics linked to criminal gun use and trafficking are likely to include factors such as criminal history, criminal associates, demographics, area of residence, and perhaps gun purchasing history. A study of California handgun buyers, for instance, revealed that buyers with a misdemeanor conviction that did not disqualify them from buying firearms legally were five times as likely as buyers with no criminal history to commit future offenses involving firearms or violence; those with two or more misdemeanor convictions were more than seven times as likely to commit such offenses (Wintemute et al., 1998a). Similarly, we can expect that buyers from demographic groups and areas at high risk for gun violence (e.g., urban, African-American males in their twenties) are at greater risk of committing subsequent gun offenses (though this has not been examined specifically).

In terms of gun diversion and trafficking, buyers from high-risk groups are probably more likely to have social ties to other high-risk and prohibited gun possessors and to provide guns to such persons through secondhand sales, straw purchases, and other arrangements. Between one-third and one-half of gun offenders obtain their firearms from friends and family members (e.g., see Harlow, 2001; Sheley and Wright, 1993; Wright and Rossi, 1986), and many offenders obtain their guns from local sources (see discussion above). In a multi-site survey of juveniles, for example, one-third of incarcerated juveniles and 18% of inner city students reported having asked someone, most commonly a family member or friend, to buy a gun for them at a store at some point in the past (Sheley and Wright, 1993:6). There is also evidence from national data that crime guns recovered from someone other than the first purchaser have a shorter time to crime if the purchaser was less than 25 years of age, had made a prior purchase(s) of a gun(s) recovered by police, lived in an area with higher levels of gun crime, was a family member or known associate of the final gun possessor, or lived near the possessor or one of the possessor's associates (Pierce et al., 2004).[11]

---

[9] Crime guns from out-of-state and distant locations are more common in jurisdictions with more restrictive gun controls (such as New York and Massachusetts), suggesting that interstate trafficking is more prevalent in such jurisdictions.

[10] For extensive reviews of gun markets, see Braga et al. (2002), Cook et al. (1995), Kleck (1999), Koper and Reuter (1996), National Research Council (2005:72-101), and Pierce et al. (2003).

[11] On a related note, a California study suggests that the chance of a retailer's gun sales resulting in crime gun recoveries declines as the age of the retailer's customers increases (Wintemute et al., 2005).

*2.2.2. Gun Sellers: Licensed Gun Dealers*

A majority of guns recovered by police are initially sold at retail by a minority of gun dealers who tend to be larger volume dealers. In California, for example, about 12% of the dealers who sold handguns from 1996 to 2000 accounted for nearly 82% of all handgun sales in the state and nearly 86% of handgun sales resulting in a gun recovery associated with a violent or firearm-related offense (Wintemute et al., 2005). Likewise, all of the firearms recovered by police throughout the nation and reported to ATF for investigative gun tracing (defined below) during 1998 originated with just 14% of the nation's gun dealers (ATF, 2000a:23).[12] Indeed, a mere 120 dealers nationwide were linked to nearly 55,000 crime guns recovered from 1996 to 2000 and accounted for 15% of all recoveries reported to ATF during that time (Americans for Gun Safety Foundation, 2004). (Eleven of these dealers were located in Maryland, the setting for this study.)

In addition, evidence suggests that gun dealers who are also licensed pawnbrokers are more likely to sell crime guns and commit regulatory or criminal infractions (ATF, 2000a; Pierce et al., 2004; Wintemute et al., 2005). In 1998, for instance, 32% of pawnbrokers were linked to a gun recovered by police, in contrast to only 12% of other dealers (ATF, 2000a:23). In that same year, 45% of pawnbrokers inspected by ATF and 30% of other inspected dealers were found to have one or more violations (ATF, 2000a:30). Further, a California study suggests that pawnbrokers sell crime guns at a rate 26% to 30% higher than that of other dealers even after taking sales volume into account (Wintemute et al., 2005).

The concentration of crime gun sales among a relatively small percentage of dealers, particularly high-volume dealers and pawnbrokers, provides an obvious focus for regulatory and law enforcement efforts. Beyond these factors, however, little is known about the dealers who are most likely to sell crime guns. Other relevant dealer characteristics might include time in business, proximity to high-crime areas, regulatory history, and type of business premises, among others. Comparing the risk that a gun is used in crime subsequent to sale across different groups of dealers defined by such characteristics might refine the identification of problem dealers and help law enforcement and regulatory agencies make more efficient use of their resources.

*2.2.3. Firearm Characteristics*

Characteristics of handguns that affect their attractiveness to criminals and traffickers are likely to include type (i.e., semiautomatic versus non-semiautomatic), caliber, make, model, and size.[13] Much analysis and debate on this topic has focused in

---

[12] Note, however, that is figure almost certainly understates the percentage of dealers that sell guns used in crime because not all law enforcement agencies submit information on recovered firearms to ATF (see discussion below).

[13] This discussion focuses on handguns because the data used in this study are based primarily on handgun sales. Moreover, handguns constitute the vast majority of guns used in crime. For example, in a 1996-1997 study of guns confiscated by police and reported to ATF in 17 cities, the percentage that were

12

particular on inexpensive, low-quality, easily concealable handgun models commonly
referred to as "Saturday night specials" (SNS). During the 1960s and 1970s, SNS guns
were commonly defined as guns costing $50 or less with a barrel of three inches or less
and a small caliber (generally .32 or smaller) (e.g., ATF, 1976; 1977; Brill, 1977). In
more contemporary discussions, SNS-type handguns have typically been defined as
costing $150 or less with a barrel of no more than three inches and a medium or small
caliber (generally 9mm or smaller) (e.g., Wintemute et al., 1998b).[14]

The cheap prices of these guns and the ease with which they may be concealed
are thought to make them particularly attractive to criminals and juvenile possessors and,
hence, more profitable for traffickers. Since 1968, the federal government has banned the
importation of small handguns, defined as semiautomatic pistols with an overall length
less than six inches (which generally corresponds to a barrel length of less than three
inches—for example, see Warner, 1999) or revolvers with a barrel less than three inches
(U.S. Department of the Treasury, 1998: Exhibit 4). As of 2003, seven states also
restricted sales of domestically manufactured SNS-type guns (Vernick and Hepburn,
2003: 370-371).

There is substantial evidence that SNS handguns play a prominent role in illicit
gun markets and gun violence: they account for a number of the guns most frequently
used in crime and having the shortest time to crime (e.g., see ATF, 1995a; 2000c;
Wintemute, 1994); they are perhaps three to four times more common among crime guns
than among the nation's civilian handgun stock (Wintemute, 1994: 63); and acquisition
of SNS-type guns is associated with past and future criminality (Wintemute et al., 1998b;
also see Wright et al., 2005). Yet this evidence may be confounded by local patterns of
gun buying and gun use. Because SNS guns are inexpensive, they may be more
prevalent among the civilian gun stock in poorer areas, such as cities, where gun crime is
concentrated. Further, the relatively short time to crime exhibited by some of these guns
may reflect the fact that they have been in production for shorter periods of time than
guns made by other manufacturers. This study provides more rigorous evidence on the
SNS issue by controlling for the location of gun buyers and sellers and by tracking
representative samples of SNS and non-SNS handguns from sale onward. As described
below, the study also attempts to differentiate between the effects of price and size on
criminal gun use.

Besides price and size, handgun type and caliber are additional characteristics that
affect the lethality of firearms and possibly their desirability for criminal purposes. With
respect to handgun types, semiautomatic pistols generally have larger ammunition
capacities than do revolvers, the primary type of non-semiautomatic handgun, and many
models permit a somewhat more rapid rate of fire.[15] Whereas revolvers typically hold 5

handguns had a median value of 76% (ATF, 1997). Further, some studies suggest that handguns are used
in 90% or more of gun homicides in urban areas (Hargarten et al., 1996; McGonigal et al., 1993).
[14] Contemporary SNS handguns include models that were made or continue to be made by companies such
as David Industries, Lorcin Engineering, Phoenix Arms, Bryco Arms, and Hi-Point (e.g., see Wintemute,
1994).
[15] Revolvers contain ammunition in a rotating cylinder. Each trigger pull rotates the cylinder (to bring the
next bullet into alignment with the barrel), cocks the hammer, and fires the weapon. Contemporary

13

to 6 rounds, semiautomatic pistols commonly hold 5 to 17 rounds (e.g., see Fjestad, 1996; Warner, 1995). Studies suggest that gun attacks involving semiautomatics tend to result in more shots fired, more persons hit, and more wounds inflicted per victim than do attacks with other firearms (Koper, 2004: 83-89; McGonigal et al., 1993; Reedy and Koper, 2003; Richmond et al., 2003; Roth and Koper, 1997: Chapter 6).

A handgun's caliber refers to the size of the bullet fired by the gun, measured in inches or millimeters. The ability of firearms with larger calibers to inflict more lethal wounds is well established in medical, forensics, and criminological research (e.g., see DiMaio, 1985; Kleck, 1984; Zimring, 1972).

Semiautomatics and larger caliber handguns (i.e., those larger than .32 caliber) now account for the majority of handguns used in crime (e.g., see ATF, 2000c; Caruso et al., 1999; Koper, 1995; 1997). However, recent increases in criminal use of these weapons have largely followed manufacturing and sales trends in the general civilian handgun market (Diaz, 1999; Dowd et al., 1998; Wintemute, 1996; Zawitz, 1995). Although survey evidence suggests criminal users have some preference for semiautomatics and large caliber handguns (Sheley and Wright, 1993: 4-5; Wright and Rossi, 1986: 162-169), it is not clear from available data that criminal users are actually more likely than other gun buyers to obtain and use semiautomatics or large caliber handguns (e.g., see Wintemute et al., 1998b; but also see Wright et al., 2005). Hence, while trends in the use of these weapons are an important policy concern,[16] it is not clear that gun type and caliber are risk factors for criminal gun use and trafficking. An exception is that buyers of military-style, semiautomatic "assault" pistols—which often have magazines holding more than 20 rounds, design features to facilitate spray fire (such as having a barrel shroud), threaded barrels for attaching silencers, and/or other features useful in military or criminal applications (Koper, 2004)—are more likely to have prior criminal histories and engage in subsequent criminal acts (Wintemute et al., 1998c). However, military-style assault weapons are generally used in no more than 1% to 6% of gun crimes (Koper, 2004).

---

revolvers typically require 12 to 15 pounds of pressure on the trigger to fire when they are not manually cocked (DiMaio, 1985: 5). Semiautomatic pistols, in contrast, hold ammunition in a magazine that is inserted into the grip of the gun. Many semiautomatics permit a somewhat more rapid rate of fire than do revolvers because the former have a firing mechanism that automatically loads a new round and cocks the gun for firing after each shot, thus requiring less pressure on the trigger for subsequent shots. (More specifically, "single-action" and "double-action" semiautomatics require manual cocking or a heavier trigger pull, respectively, for the first shot, but require no manual cocking and less trigger pressure for subsequent shots. More recently, gun manufacturers have also developed double-action-only semiautomatics that do not cock themselves automatically after each shot. These guns operate more like revolvers, requiring more pressure on the trigger for each shot [Wintemute, 1996: 1751]).

[16] There have been some legislative attempts to limit crimes with semiautomatic firearms or subsets thereof. Federal legislation passed in 1994 provides penalty enhancements for certain crimes committed with semiautomatic firearms as opposed to other types of firearms, but the effects of this legislation have not been studied. This same legislation also included a ten year ban on semiautomatic assault weapons (i.e., semiautomatics with multiple military-style features) and ammunition magazines holding more than ten rounds. (A few states and cities have similar legislation.) While this legislation was in effect, criminal use of assault weapons (which was rare even before the ban) declined, but there was no reduction in criminal use of semiautomatics equipped with large capacity magazines, primarily because the ban exempted sales and importation of millions of such magazines manufactured before the ban (Koper, 2004).

14

*2.2.4. Transaction Characteristics*

        With respect to transaction characteristics, this study focuses on the distinction
between single and multiple sales. The term "multiple sale" refers to the simultaneous or
rapid purchase of multiple guns by one individual. Multiple sales provide an obvious
means by which illegal gun traffickers, working alone or with other buyers, can
accumulate many firearms in a short period for sale in illegal markets. Accordingly,
federal regulations require licensed gun dealers to notify ATF whenever they sell
multiple handguns to any one individual within five consecutive business days (ATF,
1995b:59), thereby enabling authorities to monitor these sales for illegal trafficking. In
addition, a few states, including South Carolina, Virginia, Maryland, and California, have
responded to this problem by enacting one-gun-a-month (OGM) laws that restrict
handgun buyers (and sometimes buyers of other designated weapons) to one purchase
every thirty days (ATF, 1998; 2003; Vernick and Hepburn, 2003); however, South
Carolina recently repealed its OGM law, which was enacted in 1975 (Eichel, 2006).

        Although authorities consider multiple sales to a sign of possible gun trafficking
(e.g., see ATF, 2000c), there has been very little direct investigation of the link between
multiple sales in supplying criminal offenders. Two key questions with implications for
the use of multiple sales as a trafficking indicator and for the efficacy of OGM laws are
whether guns purchased in multiple sales are more likely than other guns to be used in
crime and whether they provide a substantial share of crime guns. Multiple sales are
probably fairly common, considering that three-quarters of gun owners possess more than
one gun (Cook and Ludwig, 1996: 15).[17] Yet many who purchase guns in multiple sales
are likely to be low-risk buyers (e.g., gun collectors), so the risk that guns sold in multiple
sales are used in crime is likely to vary across different groups of buyers.

        An ATF study that linked multiple sales directly to crime guns found that multiple
sales accounted for 22% of a sub-sample of handguns recovered by police in 32 cities
(ATF 2000c: 40). Moreover, handguns linked to multiple sales were over twice as
common (51%) among handguns with an obliterated serial number, an obvious flag for
potential trafficking. Nonetheless, the study was based on only the 5% of recovered
handguns (and 4% of all recovered guns) successfully traced to a retail sale that occurred
within the prior year,[18] and the link between multiple sales and obliterated serial numbers
was not as strong in a later sample (ATF 2002a: 52).[19] And because the study examined
only guns used in crime, it provides no basis for comparing the risks that handguns sold

---

[17] On a related note, Californians who purchased more than one handgun during 1999 (prior to the state's
OGM law) accounted for about half of all handgun sales in the state that year (Violence Prevention
Research Program, 2002:62).
[18] The full study was based on 49,832 handguns (and 64,637 total guns) reported to ATF by the 32 cities
during 1999 (p. 11). The multiple sales analysis was based on 2,378 successfully traced handguns that
were sold at retail for the first time in 1999 and recovered that same year (p. 40).
[19] In the later study (based on data from 2000), multiple sales accounted for 20% of all recovered handguns
and 27% of recovered handguns with an obliterated serial number. This multiple sale analysis was also
based on a small subset of guns both sold and recovered within a one-year period.

in single and multiple sales are used in crime. Information on multiple sales and crime from other sources is fragmentary but suggestive of a link.[20]

### 2.2.5. Assessing Buyer, Seller, Firearm, and Transaction Characteristics as Risk Factors

As the preceding discussion suggests, prior research has highlighted certain groups of actors, firearms, and sales that are potentially problematic, though evidence on these matters is rather limited. Further, with the exception of a few California studies that have examined the risk of arrest for different types of gun buyers and the risk of recovery for guns sold by different types of dealers (e.g., Wintemute et al., 1998a; 1998b; 2005), this research has usually been based on investigation of the types and origins of guns used in crime without reference to the types and origins of guns not used in crime. For example, numerous studies have examined the percentages of crime guns recovered by police that are of different types as well as the average time between sale and recovery (alternatively, the time to crime) associated with different types of guns. The most sophisticated of these studies, which employed a framework similar to that utilized in this study, examined time to recovery as a function of various buyer, dealer, possessor, and firearm characteristics using multivariate modeling (Pierce et al., 2003; 2004).[21] However, these studies have not been able to assess the risk of criminal gun use across different categories of actors, firearms, and transactions.

Having the ability to make risk assessments for different categories of actors, firearms, and transactions can potentially refine thinking about policy and practice in a number of ways. Such studies have rarely been possible, however, because few jurisdictions maintain—and, consequently, few analysts have access to—the gun sales and registration records that are necessary to make such comparisons.[22] This study assesses risk factors for criminal gun use and trafficking through longitudinal study of the sale and subsequent criminal use of guns sold in Maryland, a state that does maintain such records.

---

[20] For example, ATF inspections of Chicago-area gun retailers during the 1970s showed that half of multiple sales involved some form of federal violation in contrast to only 1% of randomly selected transactions (Zimring, 1975:192). A study of guns recovered from persons under the age of 25 in California during 1998 and 1999 revealed that about half of the guns linked to purchasers associated with more than one recovered gun were purchased in multiple sales (Wintemute et al., 2004). Firearms linked to these purchasers accounted for only 6% of crime guns with identified purchasers, but they moved into criminal channels more quickly; the median time from retail sale to recovery was just over two years for these guns but was almost six-and-a-half years for the full sample. In addition, a recent national study found that guns sold by dealers making higher numbers of multiple sales are recovered by police more quickly than guns sold by dealers making fewer multiple sales (Pierce et al., 2003; 2004). The study did not reveal whether guns sold in multiple sales were more likely to be used in crime or whether they moved into criminal channels more quickly, but some findings suggested that multiple sales were correlated weakly to moderately with other gun trafficking indicators. Finally, there are indications that OGM laws reduce the flow (and, presumably, trafficking) of guns from states with lenient gun controls to those with more restrictive gun laws (Weil and Knox, 1996).

[21] See page 67 for further discussion of this study.

[22] As of 1999, eight states and the District of Columbia maintained centralized gun registration systems (Vernick and Hepburn, 2003: Table 9A-3).

## 3. STUDY SETTING AND DATA SOURCES

### 3.1. Study Setting

The state of Maryland had a population of approximately 4.8 million in 1990, which grew to nearly 5.3 million by 2000. Maryland is one of the most densely populated states in the nation, with 87% of its population residing in the metropolitan area of Baltimore, the state's largest city (which has over 650,000 residents), and the suburbs of Washington, D.C., a city of more than 570,000 persons that borders the state (see Figure 1).



Despite relatively stringent gun controls (see discussion below), Maryland had comparatively high rates of violence throughout the 1990s. Maryland's crime rate is driven largely by crime in Baltimore, which had the third highest murder rate among the nation's largest cities in 1998 (Maguire and Pastore, 2000: 288) and, unlike many other big cities, experienced little decline in its homicide rate during the 1990s. Guns are plentiful in Baltimore, where police seize in the neighborhood of 4,000 a year (ATF, 1999a; 2000d; 2002b). Other large, high-crime jurisdictions in the state include Baltimore County, a suburban county surrounding Baltimore city, and Prince George's County, a suburban county bordering Washington, D.C. (see Figure 1). From 1995 to

17

1999, three-quarters of the violent crimes in Maryland occurred in Baltimore city, Baltimore County, or Prince George's County.

Maryland's proximity to Washington, D.C. (hereafter, D.C.) also has implications for gun markets in the state. Despite having a handgun ban in place since the mid-1970s, D.C. has high levels of gun violence. During the 1990s, police in D.C. recovered 2,000 to 3,000 guns annually (ATF, 1999a; 2000e; Wilber, 2004), and the city's murder rate ranked first or near the top among the nation's largest cities (e.g., see Maguire and Pastore, 1995: 320; 2000: 288; 2001: 301). D.C.'s stringent gun controls, high levels of violence, and proximity make it a likely destination for gun trafficking out of Maryland, from which it gets 20% to 30% of its crime guns (ATF, 1997; 1999a; 2000e; 2002c).

Maryland has licensed handgun dealers and required background checks and a seven-day waiting period for handgun buyers since the 1960s (Vernick and Hepburn, 2003), all of which gave rise to the gun sales database described below. The state also instituted background checks for sales of military-style assault weapons (as defined by state law) in 1989, followed by a later state ban on assault pistols. Since 1990, moreover, the state has prohibited sales of many, though not all, SNS-type handguns. In October 1996, Maryland passed gun legislation that, among other things, limited handgun buyers to one purchase per month, established background check requirements for secondhand sales of handguns, and banned straw purchasing.

## 3.2. Maryland Gun Sales Data

The Maryland State Police (MSP) maintain a registry of all handgun sales (and assault weapon sales) made by gun dealers in the state. This study is based on 235,011 gun sales made in Maryland from 1990 through October 1999.[23] For each sale, the following data were extracted: characteristics of the firearm (e.g., type, manufacturer, model, serial number); the buyer's identification, demographics, and residence; the identification, location, and other selected characteristics of the dealer; and the date of the sale. From these data, it was possible to measure numerous buyer, seller, gun, and transaction characteristics that are described below.

An important feature of this database is that it is based on the most recent sale of each firearm.[24] Analysis of each firearm's most recent sale has a number of advantages relative to an analysis that is based on a gun's first retail sale, as is typically the case in studies based on ATF gun tracing data (described below): it identifies the most recent

---

[23] The MSP database contains records of 264,358 completed sales for this period. Eleven percent of these records were omitted from the study due primarily to insufficient information about the firearms (particularly gun make and serial number, which, as described below, were necessary for determining which guns were later recovered by police). Private secondhand sales conducted through licensed gun dealers and the MSP were recorded in the data from October 1996 through October 1999 (more is said about this below).

[24] Because the database generally contains only the most recent sale of each firearm, it undercounts the true number of sales to some degree and precludes an examination of each firearm's complete transaction history. However, it also has advantages noted in the text.

18

buyer and seller associated with each firearm, thus reducing false positives in the identification of buyers and dealers associated with crime guns; it provides a more accurate measurement of time to crime; and, by including a dealer's sales of used guns, it arguably provides a more refined measure of dealer sales volume against which to assess a dealer's sales of crime guns.

### 3.2.1. Trends and Geographic Patterns in Handgun Sales

As shown in Figure 2, handgun sales in Maryland rose during the early 1990s, increasing from about 22,000 in 1990 to a peak of approximately 36,000 in 1994. Sales then declined during the latter part of the decade, falling to about 18,000 by 1998, the last year for which complete sales data were available.[25]



## Figure 2. Handgun Sales in Maryland, 1990-1999

Data for 1999 are based on sales through October.

Eighty-seven percent of handguns were purchased by buyers in the metropolitan areas of Baltimore and D.C. (see Figure 1);[26] nearly two-thirds were purchased by

---

[25] The increase in sales during the early 1990s was likely due to the increasing crime rates of the early 1990s and to the anticipatory effects of national and local gun legislation that was debated and passed during that time (for example, the federal Brady Act and the federal and state bans on assault weapons). The falling sales of the late 1990s, in contrast, may have been caused by a combination of falling crime rates, saturation of the market following the rising sales of the early 1990s, and Maryland's 1996 Gun Violence Act, which restricted handgun buyers to one purchase per month.

[26] Likewise, approximately 87% of sales were made by dealers in the Baltimore or D.C. PMSAs.

19

residents of Baltimore city or one of the suburban counties sharing a border with Baltimore city (i.e., Baltimore County and Anne Arundel County) or D.C. (i.e., Prince George's and Montgomery counties) (see Chapter 4). Buyers and sellers were typically located near to one another: 87% of sales involved buyers and sellers from the same PMSA, and 59% involved buyers and sellers from the same county.

## 3.3. Crime Gun Data

To determine if and when handguns sold in Maryland were subsequently recovered by police, the Maryland sales records were linked to a national database on approximately one million guns recovered by law enforcement agencies and reported to ATF for investigative tracing from 1990 through March 2000. A gun trace is an investigation that tracks the sales history of a gun from its manufacture through its first point of retail sale by a licensed dealer. Upon request, ATF traces guns seized by law enforcement as a service to federal, state, and local authorities. To initiate a trace, law enforcement agencies must provide ATF with detailed information about the firearm, such as make, model, serial number, and caliber.[27]

Although ATF tracing data provide the only available national sample of guns used in crime and otherwise possessed or carried by criminal and high-risk groups, they have limitations for research purposes (e.g., see Cook and Braga, 2001; Kleck, 1999; National Research Council, 2005: 37-40). Guns reported to ATF for tracing represent a subset of guns used in crime, and they may not be representative of all crime guns. To begin with, law enforcement agencies do not seize all guns used in crime, though the guns that they do recover are generally considered to be a reasonably representative sample of crime guns (Brill, 1977; Cook and Braga, 2001). More importantly, gun tracing is voluntary; some law enforcement agencies trace all recovered guns as a matter of policy, while others trace guns only when needed for specific investigations, if at all. These patterns have not been studied systematically but undoubtedly vary widely based on a range of organizational and contextual factors, thus introducing additional bias of an unknown degree into the sample of traced guns.[28]

As of the mid-1990s, it appeared that law enforcement agencies throughout the United States requested traces for about a quarter of gun homicides but only 1% of gun robberies and gun assaults known to police (calculated from ATF, 1995a and Federal Bureau of Investigation, 1995: 13,18,26,29,31,32). However, gun tracing became increasingly common during the 1990s due to a renewed federal emphasis on gun trafficking investigations and dealer regulation, improvements in the tracing process, and

---

[27] Note that the Maryland data, rather than the ATF trace results, were used to determine if and when the crime guns were sold in Maryland. ATF trace results identify the first retail dealer that sold the gun, who may differ from the Maryland dealer who most recently sold the gun. Also, ATF tracing results are sometimes incomplete due to factors like the failure of dealers to submit their sales records to ATF when they go out of business (e.g., see ATF, 1999a).

[28] Factors influencing tracing practices might include, for instance, the types of firearms confiscated (e.g., see Kleck, 1997:112,141), the availability of state or local gun registration data, knowledge of ATF's tracing capabilities and procedures, the types of investigations being conducted, participation in federal/state/local law enforcement task forces, and the stringency of state and local gun laws.

20

ATF promotional efforts and special initiatives that greatly increased tracing among state and local police agencies (ATF, 2000a: 19-21; Cook and Braga, 2001). ATF received approximately 200,000 trace requests in 1999 (ATF 2000a: 25), up from 83,359 in 1994 and only 37,181 in 1990 (ATF, 1995a). As part of ATF's Youth Crime Gun Interdiction Initiative (YCGII), 17 major cities have been requesting traces on all confiscated firearms since at least 1996 (ATF, 1997). By 2000 (the end of this study period), the effort had been expanded to 50 cities and metropolitan areas, most of which had successfully implemented comprehensive tracing (see www.atf.gov/firearms/ycgii/2000/index.htm). Further, six states (including Maryland) were instituting or had successfully achieved comprehensive statewide tracing by the end of the 1990s (ATF, 2000c: 51).

### 3.3.1. Crime Guns Recovered in Baltimore and Washington, D.C.

Although the developments described above have arguably made tracing data more representative of crime guns in general and enhanced their utility for policy research (e.g., see Cook and Braga, 2001; Pierce et al., 2003; 2004), the variation in gun tracing across places and over time may bias analyses based on national tracing data. Therefore, separate analyses were conducted based on recoveries in Baltimore and D.C., the primary local jurisdictions of interest in this study. Police in these cities traced guns comprehensively from 1994 to 2000 (both department's participated in ATF's YCGII from its inception), thus providing unbiased data on guns recovered by police in these cities over several years.[29] The Baltimore and D.C. analyses are based on guns both sold and recovered after 1993.

The Baltimore and D.C. analyses provide indications as to whether trafficking indicators developed from national tracing data can be validated using more representative samples of crime guns (for a similar approach, see Pierce et al., 2003; 2004). Further, they provide insights into the workings of local gun markets. As noted earlier, local markets provide a large if not predominant share of the criminal supply in most places. Nationally, about half of traced guns are recovered within 25 miles of where they were purchased (ATF, 2002a: 43-44); similarly, recent data suggest that 63% of guns recovered in Baltimore and 44% of those recovered in D.C. are purchased within 25 miles of their purchase locations (ATF, 2002b: 17; 2002c: 17).[30]

Contrasts of the Baltimore and D.C. results also yield insights into differences between interstate and intrastate gun markets. Due to the restrictions on the legal supply of handguns in D.C., it seems likely that trafficking guns from Maryland into D.C. is more profitable than trafficking guns within Maryland. Consequently, trafficking indicators predicting recoveries in Baltimore may differ from those predicting recoveries in D.C.

---

[29] The YCGII did not begin until August of 1996. For this project, however, January of 1994 was designated as the starting point of comprehensive tracing in Baltimore and D.C. This designation was based on patterns in the tracing data and discussions with ATF officials.

[30] Crime guns from out-of-state and distant locations are more common in jurisdictions with more restrictive gun controls (such as New York, Massachusetts, and Washington, D.C.), which is likely due in part to higher levels of interstate gun trafficking in such jurisdictions.

*3.3.2. Trends and Patterns in Crime Gun Recoveries*

    *3.3.2.1. Trends.* Of the 235,011 handguns sold in Maryland from 1990 through October 1999, 7,575 (3.2%) were recovered by police in criminal investigations and reported to ATF as of March 2000.[31] Recoveries and traces of these guns rose from 16 in 1990 to about 1,200 by 1996 and then remained fairly steady through 1999 (Figure 3). The increase in reported recoveries reflects growth over time in both the sample of guns under study (with each passing year, more guns were in circulation and thus at-risk for criminal use) and the utilization of gun tracing, particularly by police in Baltimore and D.C.



## Figure 3.  Police Recoveries of Guns Sold in MD, 1990-1999

Based on recoveries by police throughout the nation and reported to ATF, 1990-March 2000.

    *3.3.2.2. Geographic Patterns.* About half (48.5%) of the reported gun recoveries occurred in Baltimore, and 14.4% occurred in D.C. Geographic information for recoveries outside Baltimore and D.C. was limited, but approximately 20% of the recoveries appear to have occurred outside Maryland and D.C.

---

[31] MSP sales records were linked to the ATF database based on gun make, serial number, and caliber. Matches were not counted as police recoveries if the tracing date was before the date of sale (which suggests that an earlier recovered firearm was released by law enforcement and resold). Also, 294 records were dropped from the analysis due to ambiguous partial matches (for example, cases in which the manufacturer and serial number matched but the caliber did not).

Analysis of recoveries in Baltimore and D.C. revealed strong local patterns of gun diffusion. Approximately 95% of the guns sold in Maryland and recovered in Baltimore originated in the Baltimore PMSA (based on buyer and/or dealer location), and 90% were purchased within 20 miles of Baltimore (based on dealer location). For guns purchased in Maryland and recovered in D.C., 86% to 90% originated in the D.C. PMSA (based on buyer and/or dealer location), and 75% were purchased within 20 miles of D.C. (based on dealer location).[32] Based on these highly localized patterns, the analyses of the Baltimore and D.C. gun markets focus on sales made in each city's PMSA.

*3.3.2.3. Crime Types.* Two-thirds (66%) of the recovered firearms were associated with weapons offenses (i.e., illegal gun possession and/or carrying). Approximately 16% were recovered during investigations of violent crime (including murder, robbery, aggravated assaults, kidnapping, and sex crimes), and another 13% were seized during drug cases. (The analyses presented throughout this report are based on recoveries for all offense types.)

*3.3.2.4. Possessors.* Information on the persons from whom the guns were seized was available for 63% of the recoveries. Of these guns, an estimated 19% to 28% were recovered from the most recently registered Maryland purchaser.[33,34] In the local analyses, possessors were identified for 75% of the Baltimore recoveries and 62% of the D.C. recoveries; the purchaser-possessor match rate for cases that had an identified possessor was roughly 19% to 26% in Baltimore and 23% to 25% in D.C.

These match rates are higher than the 11% rate that has been reported in national tracing studies (ATF, 2000c). This is likely due in large part to differences in the data sources. Tracing studies are typically based on information about the first retail purchaser. In contrast, the Maryland sales database used in this study contains information about the most recently registered Maryland purchaser, who may have purchased the gun used from a dealer or from another private gun owner (as of October 1996, Maryland law required private sales of handguns to be conducted through a licensed dealer or the MSP). At any rate, these patterns suggest that illegal gun users are more reliant on the primary gun market than is apparent from other tracing studies, though they could also reflect characteristics unique to Maryland's gun market.[35]

---

[32] The analyses for Baltimore and D.C. are based on guns both sold and recovered after 1993.

[33] The ATF crime gun database contained an anonymous possessor identifier based on partial letters from the possessor's first and last names and on the possessor's date of birth and gender. The ranges stated for the purchaser and possessor match rate are based on matches of the name and date of birth at the low end and matches of the name only at the high end.

[34] The age of the possessor was reported for 3,492 of the recoveries (46% of all recoveries). For these cases, 55% of the possessors were 25 or older, 36% were 18 to 24, and 8% were under 17. (The analyses in this report are based on recoveries from persons of all ages.)

[35] Survey studies suggest that as many as 21% of adult gun offenders obtained guns from licensed dealers prior to 1994 (Harlow, 2001: 6; Wright and Rossi, 1986: 183,185). In more recent years, this figure has declined to 14% (Harlow, 2001: 6), due likely to the federal Brady Act, which established a national background check system for purchases from licensed dealers, and reforms of the federal firearms licensing system that have greatly reduced the number of licensed gun dealers (ATF, 2000a; Koper, 2002).

23

*3.3.2.5. Time to Recovery.* Time from sale to recovery (the terms "time to recovery" and "time to crime" are used interchangeably throughout this report) averaged 934 days, or about 2.6 years, for the recovered guns (see Chapter 4). About 30% of the crime guns were recovered within a year of sale, and nearly two-thirds (64%) were recovered within three years. [36] Roughly 80% of the guns sold after 1993 that were recovered in Baltimore or D.C. were seized within 3 years of purchase (this figure did not differ appreciably between the cities). Hence, substantial numbers of guns were diverted quickly from the retail sector into criminal channels.

---

[36] The percentages and averages reported here are not strictly comparable to those in other tracing studies because this analysis is based on guns sold and recovered within a relatively short time period. For example, relatively few guns in the analysis had a follow-up period as long as ten years. In addition, time to recovery was calculated based on each gun's most recent sale in Maryland rather than its first retail sale, which is the point of origin used in other tracing studies. Consequently, the time to crime figures reported here are shorter than those typically found in tracing studies (e.g., ATF 2000c).

24

## 4. SALES, RECOVERIES, AND TIME TO RECOVERY BY BUYER, FIREARM, TRANSACTION, AND DEALER CHARACTERISTICS: BIVARIATE, DESCRIPTIVE ANALYSES

This chapter describes the buyer, seller, firearm, and transaction characteristics that were measured and examines sales, recoveries, and time to recovery across different groups of actors, firearms, and transactions. A multivariate analysis assessing the simultaneous influences of these factors on gun recovery is presented in Chapter 5.

### 4.1. Sales and Recoveries by Buyer Characteristics

#### 4.1.1. Buyer Characteristics Measured

Information available on buyers included age, race, gender, and county of residence. For each purchase, it was also possible to determine the number of guns the buyer had purchased in the past that had been recovered and traced as of that date.

#### 4.1.2. Analysis of All Sales and Recoveries, 1990-2000

Analysis of all sales and recoveries shows that handgun buyers were predominantly male (90.3%), white (81%), and 21 to 49 years of age (77.3%) (Table 1). The vast majority (99%) had not been associated with any prior gun traces at the time of purchase. (Nearly 86% of those linked to any prior traces were linked to only one; the maximum number of prior traces for a buyer was seven.) Compared to the full population of gun buyers, however, those who purchased guns that were later recovered by police were more likely to be female (14.8% for crime gun buyers versus 9.7% for all gun buyers), black (61.7% for crime gun buyers versus 17% for all buyers), in their twenties (49% for crime gun buyers versus 24.6% for all buyers), and to have made prior purchases of crime guns (2.8% for crime gun buyers versus 1% for all buyers).

This is also illustrated in the final column of Table 1, which shows the percentage of sales resulting in recovery for each buyer category. For example, 11.8% of guns purchased by blacks were recovered in contrast to 1.4% of guns purchased by whites and 3.3% of those purchased by persons of other races. Similarly, 8.8% of guns purchased by persons linked to prior traces were later recovered as opposed to only 3.2% of those purchased by other persons. Guns were also significantly more likely to be recovered when purchased by younger persons (6.4% of guns purchased by buyers aged 21 to 29 were recovered compared to about 3% for guns purchased by persons in their thirties and less than 2% for older buyers) and women (4.9% recovered versus 3% for guns purchased by men).

**Table 1. Gun Sales and Recoveries by Buyer Characteristics (N=235,011 Gun Sales in Maryland, 1990-October 1999)**

| Characteristic | Sales (% of All Sales) | Recoveries (% of All Recoveries) | % of Sales Resulting in Recovery |
|---|---|---|---|
| **Gender** | | | |
| Female | 22,874 (9.7%) | 1,123 (14.8%) | 4.9% |
| Male | 212,137 (90.3%) | 6,452 (85.2%) | 3.0%* |
| **Race** | | | |
| White | 189,710 (81%) | 2,720 (35.9%) | 1.4% |
| Black | 39,767 (17.0%) | 4,675 (61.7%) | 11.8% |
| Other | 5,534 (2.4%) | 180 (2.4%) | 3.3%* |
| **Age Group** | | | |
| 21 to 29 | 57,898 (24.6%) | 3,708 (49.0%) | 6.4% |
| 30 to 39 | 65,107 (27.7%) | 2,032 (26.8%) | 3.1% |
| 40 to 49 | 58,758 (25.0%) | 1,074 (14.2%) | 1.8% |
| 50 to 59 | 35,278 (15.0%) | 462 (6.1%) | 1.3% |
| 60+ | 17,970 (7.7%) | 299 (4.0%) | 1.7%* |
| **Any Prior Buyer Traces** | | | |
| No | 232,588 (99.0%) | 7,363 (97.2%) | 3.2% |
| Yes | 2,423 (1.0%) | 212 (2.8%) | 8.8%* |

Recovery figures are based on national police recoveries reported to ATF as of March 2000.
* Differences across groups statistically significant at p<=.01

As shown in Table 2, over half of the recovered guns were purchased by buyers in Baltimore city and Prince George's County, and another 19% were purchased by buyers in suburban Baltimore County. Further, the risk of recovery also varied by the buyer's county of residence. Guns purchased by buyers from Baltimore city and from suburban counties adjacent to Baltimore city and D.C. were at greatest risk. Slightly over 11% of guns purchased by buyers in Baltimore city were recovered, making that jurisdiction the highest-risk area in the state. Over 6% of guns purchased by buyers from Prince George's County were recovered, as were 3.3% of those purchased by Baltimore County buyers. For buyers from other PMSA counties (e.g., Anne Arundel, Charles, Montgomery), the risk of recovery was roughly 1.5% to 2%. For rural counties (e.g., Allegany, Cecil, Washington), recovery rates were typically around 1% or less.

**Table 2. Gun Sales and Recoveries by Buyer County (N=235,011 Gun Sales in Maryland, 1990-October 1999)**

| Buyer County | Sales (% of All Sales) | Recoveries (% of All Recoveries) | % of Sales Resulting in Recovery* |
|---|---|---|---|
| **Baltimore PMSA** | | | |
| Baltimore City | 18,359 (7.8%) | 2,036 (26.9%) | 11.1% |
| Anne Arundel | 25,610 (10.9%) | 477 (6.3%) | 1.9% |
| Baltimore County | 43,981 (18.7%) | 1,451 (19.2%) | 3.3% |
| Carroll | 9,709 (4.1%) | 125 (1.7%) | 1.3% |
| Harford | 11,961 (5.1%) | 182 (2.4%) | 1.5% |
| Howard | 9,569 (4.1%) | 148 (2.0%) | 1.6% |
| Queen Anne | 1,512 (0.6%) | 18 (0.2%) | 1.2% |
| **D.C. PMSA** | | | |
| Calvert | 3,862 (1.64%) | 54 (0.7%) | 1.4% |
| Charles | 7,043 (3.0%) | 125 (1.7%) | 1.8% |
| Frederick | 10,047 (4.3%) | 78 (1.0%) | 0.8% |
| Montgomery | 29,766 (12.7%) | 499 (6.6%) | 1.7% |
| Prince George's | 33,635 (14.3%) | 2,094 (27.6%) | 6.2% |
| **Non or Other PMSA** | | | |
| Allegany | 3,037 (1.3%) | 15 (0.2%) | 0.5% |
| Caroline | 902 (0.4%) | 5 (0.1%) | 0.6% |
| Cecil | 4,075 (1.7%) | 44 (0.6%) | 1.1% |
| Dorchester | 1,182 (0.5%) | 13 (0.2%) | 1.1% |
| Garrett | 1,267 (0.5%) | 9 (0.1%) | 0.7% |
| Kent | 597 (0.3%) | 4 (0.1%) | 0.7% |
| St. Mary's | 5,277 (2.3%) | 69 (0.9%) | 1.1% |
| Somerset | 735 (0.3%) | 7 (0.1%) | 1.0% |
| Talbot | 1,256 (0.5%) | 13 (0.2%) | 1.0% |
| Washington | 6,587 (2.8%) | 55 (0.7%) | 0.8% |
| Wicomico | 3,271 (1.4%) | 31 (0.4%) | 1.0% |
| Worcester | 1,771 (0.8%) | 23 (0.3%) | 1.3% |

Recovery figures are based on national police recoveries reported to ATF as of March 2000.
* Differences across all counties were statistically significant at $p <= .01$

In sum, race, age, and area of residence stand out as particularly important factors because buyers in these groups accounted for large and disproportionate shares of sales resulting in a gun recovery. Black buyers made nearly two-thirds of the purchases that resulted in a crime gun recovery, buyers in their twenties accounted for about half, and buyers from just three counties—Baltimore city, Baltimore County, and Prince George's County—accounted for about three-quarters. As described above, guns were also at notably greater risk of being recovered when purchased by buyers in these groups.

There were also significant differences in the time from sale to recovery for guns purchased by different groups of buyers. Those guns that were recovered tended to be recovered more quickly when purchased by females, blacks, younger buyers, and persons linked to prior traces (Table 3). For example, recovered guns had an average time to crime of 553 days (or about 1.5 years) when purchased by a buyer linked to one or more prior traces. Recovered guns purchased by other buyers, in contrast, had an average time to crime of 945 days (or about 2.6 years). Differences in time to recovery were also apparent across counties (Table 4). Guns were recovered most quickly when purchased by buyers from Prince George's County (average = 850 days) and least quickly when purchased by buyers from Talbot County, a non-PMSA rural jurisdiction (average = 1,510 days).

**Table 3. Time to Recovery by Buyer Characteristics (N=7,575 Guns Sold in Maryland, 1990-Oct.1999, and Recovered by Police, 1990-March 2000)**

| Characteristic | Average Time to Recovery |
|---|---|
| Gender | |
|     Female (N=1,123) | 854 days (2.3 years) |
|     Male (N=6,452) | 948 days (2.6 years)** |
| | |
| Race | |
|     White (N=2,720) | 1,117 days (3.1 years) |
|     Black (N=4,675) | 829 days (2.3 years) |
|     Other (N=180) | 907 days (2.5 years)** |
| | |
| Age Group | |
|     21 to 29 (N=3,708) | 816 days (2.2 years) |
|     30 to 39 (N=2,032) | 1,005 days (2.8 years) |
|     40 to 49 (N=1,074) | 1,077 days (3.0 years) |
|     50 to 59 (N=462) | 1,112 days (3.0 years) |
|     60+ (N=299) | 1,131 days (3.1 years)** |
| | |
| Any Prior Buyer Traces | |
|     No (N=7,363) | 945 days (2.6 years) |
|     Yes (N=212) | 553 days (1.5 years)* |

\* Differences across groups statistically significant at $p<=0.1$
\*\* Differences across groups statistically significant at $p<=.01$

**Table 4. Time to Recovery by Buyer County (N=7,575 Guns Sold in Maryland, 1990-Oct.1999, and Recovered by Police, 1990-March 2000)**

| Buyer County | Average Time to Recovery* |
|---|---|
| Baltimore PMSA | |
| Baltimore City (N=2,036) | 889 days (2.4 years) |
| Anne Arundel (N=477) | 995 days (2.7 years) |
| Baltimore County (N=1,451) | 959 days (2.6 years) |
| Carroll (N=125) | 1,129 days (3.1 years) |
| Harford (N=182) | 1,074 days (2.9 years) |
| Howard (N=148) | 1,093 days (3.0 years) |
| Queen Anne (N=18) | 1,391 days (3.8 years) |
| D.C. PMSA | |
| Calvert (N=54) | 1,145 days (3.1 years) |
| Charles (N=125) | 1,076 days (2.9 years) |
| Frederick (N=78) | 1,107 days (3.0 years) |
| Montgomery (N=499) | 993 days (2.7 years) |
| Prince George's (N=2,094) | 850 days (2.3 years) |
| Non or Other PMSA | |
| Allegany (N=15) | 971 days (2.7 years) |
| Caroline (N=5) | 1,197 days (3.3 years) |
| Cecil (N=44) | 1,082 days (3.0 years) |
| Dorchester (N=13) | 908 days (2.5 years) |
| Garrett (N=9) | 1,474 days (4.0 years) |
| Kent (N=4) | 1,126 days (3.1 years) |
| St. Mary's (N=69) | 1,048 days (2.9 years) |
| Somerset (N=7) | 1,081 days (3.0 years) |
| Talbot (N=13) | 1,510 days (4.1 years) |
| Washington (N=55) | 1,040 days (2.8 years) |
| Wicomico (N=31) | 1,087 days (3.0 years) |
| Worcester (N=23) | 1,434 days (3.9 years) |

* Differences across all counties statistically significant at $p <= .01$

*4.1.3. Local Analyses, 1994-2000*

Analyses of the local markets in the Baltimore and D.C. areas from 1994 to 2000 revealed very similar findings: in general, guns sold in the Baltimore and D.C. areas were at higher risk of recovery and tended to be recovered more quickly (in Baltimore City and D.C., respectively) when purchased by females, blacks, younger people, persons linked to prior traces, and buyers residing in or close to Baltimore city and D.C. (Tables 5 through 8).

29

**Table 5. Gun Sales and Baltimore Recoveries by Buyer Characteristics (N=71,956 Gun Sales to Buyers in Baltimore PMSA, 1994-Oct. 1999)**

| Characteristic | Sales (% All Sales to Baltimore PMSA Buyers) | Baltimore City Recoveries (% of Baltimore Recoveries) | % of Sales Resulting in Recovery |
|---|---|---|---|
| **Gender** | | | |
| Female | 6,598 (9.2%) | 286 (15.5%) | 4.3% |
| Male | 65,358 (90.8%) | 1,564 (84.5%) | 2.4%* |
| **Race** | | | |
| White | 60,080 (83.5%) | 611 (33.0%) | 1.0% |
| Black | 10,612 (14.8%) | 1,223 (66.1%) | 11.5% |
| Other | 1,264 (1.8%) | 16 (0.9%) | 1.3%* |
| **Age Group** | | | |
| 21 to 29 | 16,085 (22.4%) | 909 (49.1%) | 5.7% |
| 30 to 39 | 18,910 (26.3%) | 480 (26.0%) | 2.5% |
| 40 to 9 | 18,534 (25.8%) | 265 (14.3%) | 1.4% |
| 50 to 59 | 12,119 (16.8%) | 116 (6.3%) | 1.0% |
| 60+ | 6,308 (8.8%) | 80 (4.3%) | 1.3%* |
| **County** | | | |
| Baltimore City | 10,135 (14.1%) | 950 (51.4%) | 9.4% |
| Anne Arundel | 15,598 (21.7%) | 131 (7.1%) | 0.8% |
| Baltimore County | 26,717 (37.1%) | 641 (34.7%) | 2.4% |
| Carroll | 5,685 (7.9%) | 31 (1.7%) | 0.6% |
| Harford | 7,160 (10.0%) | 58 (3.1%) | 0.8% |
| Howard | 5,765 (8.0%) | 36 (2.0%) | 0.6% |
| Queen Anne | 896 (1.3%) | 3 (0.2%) | 0.3%* |
| **Any Prior Buyer Traces** | | | |
| No | 70,606 (98.1%) | 1,756 (94.9%) | 2.5% |
| Yes | 1,350 (1.9%) | 94 (5.1%) | 7.0%* |

Recovery figures are based on police recoveries reported to ATF as of March 2000
* Differences across groups statistically significant at p<=.01

**Table 6. Time to Recovery in Baltimore by Buyer Characteristics (N=1,850 Guns Sold to Baltimore PMSA Buyers, 1994-Oct. 1999, and Recovered in Baltimore, 1994-March 2000)**

| Characteristic | Average Time to Recovery |
|---|---|
| **Gender** | |
| Female (N=286) | 533 days (1.5 years) |
| Male (N=1,564) | 637 days (1.7 years)** |
| **Race** | |
| White (N=611) | 711 days(1.9 years) |
| Black (N=1,223) | 576 days (1.6 years) |
| Other (N=16) | 652 days (1.8 years)** |
| **Age Group** | |
| 21 to 29 (N=909) | 571 days (1.6 years) |
| 30 to 39 (N=480) | 644 days (1.8 years) |
| 40 to 49 (N=265) | 696 days (1.9 years) |
| 50 to 59 (N=116) | 696 days (1.9 years) |
| 60+ (N=80) | 693 days (1.9 years)** |
| **County** | |
| Baltimore City (N=950) | 600 days (1.6 years) |
| Anne Arundel (N=131) | 618 days (1.7 years) |
| Baltimore County (N=641) | 645 days (1.8 years) |
| Carroll (N=31) | 657 days (1.8 years) |
| Harford (N=58) | 669 days (1.8 years) |
| Howard (N=36) | 695 days (1.9 years) |
| Queen Anne (N=3) | 391 days (1.1 years) |
| **Any Prior Buyer Traces** | |
| No (N=1,756) | 626 days (1.7 years) |
| Yes (N=94) | 531 days (1.5 years)* |

*Differences across groups statistically significant at p<=0.1
**Differences across groups statistically significant at p<=.01

31

**Table 7. Gun Sales and D.C. Recoveries by Buyer Characteristics (N=48,039 Gun Sales to D.C. PMSA Buyers, 1994-Oct. 1999)**

| Characteristic | Sales (% All Sales to D.C. PMSA Buyers) | Recoveries in D.C. (% of D.C. Recoveries) | % of Sales Resulting in Recovery |
|---|---|---|---|
| **Gender** | | | |
| Female | 4,398 (9.2%) | 63 (11.9%) | 1.4% |
| Male | 43,641 (90.8%) | 466 (88.1%) | 1.1%* |
| **Race** | | | |
| White | 34,204 (71.0%) | 79 (14.9%) | 0.2% |
| Black | 11,830 (24.6%) | 433 (81.9%) | 3.7% |
| Other | 2,005 (4.2%) | 17 (3.2%) | 3.2%* |
| **Age Group** | | | |
| 21 to 29 | 11,604 (24.2%) | 315 (60.0%) | 2.7% |
| 30 to 39 | 13,642 (28.4%) | 128 (24.2%) | 0.9% |
| 40 to 49 | 11,646 (24.4%) | 52 (9.8%) | 0.5% |
| 50 to 59 | 7,706 (16.0%) | 29 (5.5%) | 0.4% |
| 60+ | 3,441 (7.2%) | 5 (1.0%) | 0.2%* |
| **County** | | | |
| Calvert | 2,166 (4.5%) | 3 (0.6%) | 0.1% |
| Charles | 4,193 (8.7%) | 12 (2.3%) | 0.3% |
| Frederick | 5,701 (11.9%) | 7 (1.3%) | 0.1% |
| Montgomery | 16,897 (35.4%) | 61 (11.5%) | 0.4% |
| Prince George's | 18,992 (39.5%) | 446 (84.3%) | 2.4%* |
| **Any Prior Buyer Traces** | | | |
| No | 47,330 (98.5%) | 506 (95.7%) | 1.1% |
| Yes | 709 (1.5%) | 23 (4.4%) | 3.2% |

Recovery figures are based on police recoveries reported to ATF as of March 2000
* Differences across groups statistically significant at p<=.01

**Table 8. Time to Recovery in D.C. by Buyer Characteristics (N=529 Guns Sold to D.C. PMSA Buyers, 1994-Oct. 1999, and Recovered in D.C., 1994-March 2000)**

| Characteristic | Average Time to Recovery |
|---|---|
| **Gender** | |
| Female (N=63) | 615 days (1.7 years) |
| Male (N=466) | 579 days (1.6 years) |
| **Race** | |
| White (N=79) | 697 days (1.9 years) |
| Black (N=433) | 571 days (1.6 years) |
| Other (N=17) | 362 days (1.0 years)** |
| **Age Group** | |
| 21 to 29 (N=315) | 548 days (1.5 years) |
| 30 to 39 (N=128) | 598 days (1.6 years) |
| 40 to 49 (N=52) | 616 days (1.7 years) |
| 50 to 59 (N=29) | 834 days (2.3 years) |
| 60+ (N=5) | 614 days (1.7 years)* |
| **County** | |
| Calvert (N=3) | 881 days (2.4 years) |
| Charles (N=12) | 634 days (1.7 years) |
| Frederick (N=7) | 774 days (2.1 years) |
| Montgomery (N=61) | 598 days (1.6 years) |
| Prince George's (N=446) | 575 days (1.6 years) |
| **Any Prior Buyer Traces** | |
| No (N=506) | 595 days (1.6 years) |
| Yes (N=23) | 321 days (0.9 years)** |

* Differences across groups statistically significant at $p \leq 0.1$
** Differences across groups statistically significant at $p \leq .05$