### 4.2. Sales and Recoveries by Firearm Characteristics

#### 4.2.1. Firearm Characteristics Measured

Firearm characteristics available from the sales data included manufacturer, type, caliber, and barrel length. Type categories examined here include semiautomatic pistols, revolvers, derringers, semiautomatic assault weapons (military-style pistols, rifles, and shotguns as defined by federal and/or Maryland law),[37] and other types (voluntarily registered rifles and shotguns and other miscellaneous firearms with unclear type classifications). For analysis, calibers were grouped into small (.22, .25, .32), medium (.380, .38, 9mm), large (.357, .40, .41, 44, .45, 10mm), and missing/other categories.[38] Barrel length measurements were used to classify guns according to their size and thus their ease of concealment. Because the barrel length measurements were imprecise,[39] two classifications were used: guns having barrels of three inches or less and guns having barrels of four inches or less.[40]

Firearm price was not recorded in the MSP data. However, a rough indicator for price and quality was created by flagging handguns made by manufacturers that primarily produced cheap handguns, defined as handguns with a new retail price of $150 or less, during the 1990s.[41] This group included firearms made by Davis Industries, Hi-Point, Phoenix/Raven, and New England Firearms. Although many of these guns are generally considered to be of the SNS type, they were not prohibited by the Maryland SNS law.[42] Eighty-six percent of the cheap handguns as defined here also had short barrels, thus matching the standard definition of an SNS handgun.[43]

---

[37] As defined in federal and state laws, assault weapons are semiautomatic firearms that have military-style features such as flash hiders, threaded barrels for attaching silencers and bayonet mounts and that typically come equipped with ammunition magazines holding 20 or more rounds (e.g., see Koper, 2004; Roth and Koper, 1997).

[38] These categorizations were based on convention in the firearms literature (e.g., Wintemute et al., 1998b) and are rooted in assessments of the power of different calibers as computed by measures like kinetic energy or relative stopping power (e.g., see DiMaio, 1985: 140; Warner, 1995: 223; Wintemute, 1996: 1751).

[39] For example, a barrel of three-and-a-half inches might have been coded as three inches, four inches, or anything in between.

[40] The three inch criterion has been used commonly by ATF and other analysts to define "Saturday night specials" (SNS), a group of handguns thought to be particularly attractive for criminal purposes due in part to the ease with which they can be concealed (see Chapter 2). The three inch criterion is also factored into federal regulations limiting the importation of handguns into the United States (see Chapter 2).

[41] Note that it was not possible to reliably identify firearms that were likely to sell for $150 or less in used condition.

[42] See Fennell (1992) for a discussion of the drafting and implementation of Maryland's SNS law.

[43] In preliminary analysis, a proxy SNS indicator was also tested that reflected guns having both a price of $150 or less and a barrel of no more than three inches. This indicator largely overlapped with the cheap gun indicator, but the latter was a stronger predictor of recovery. The statistical models described in the next chapter performed somewhat better when using separate indicators for firearm size and price as opposed to using just the SNS indicator. Moreover, use of separate price and size indicators provides some sense of the comparative importance of these firearm features to criminal users and traffickers.

### 4.2.2. Analysis of All Sales and Recoveries, 1990-2000

For the full sample, the most frequently recovered guns were semiautomatic pistols (74.5%), medium caliber handguns (67.6%), and handguns with barrels of four inches or less (70%) (Table 9). Low priced handguns accounted for nearly a fifth (19.3%) of the recovered guns. Handguns made by Davis Industries were the most frequently recovered gun make, accounting for 15.3% of recoveries (Table 10). Other frequently recovered gun makes included Sturm Ruger (13.9% of recoveries) and Smith and Wesson (12.4% of recoveries).

Taking sales volume into account, the firearms most likely be recovered (i.e., those with the greatest percentage of sales resulting in recovery) were semiautomatic pistols (3.9% recovered) and assault weapons (3.2% recovered), medium caliber guns (4.7% recovered), short-barreled guns (4.6% of those with barrels of three inches or less were recovered as were 4.1% of those with barrels of four inches or less), and lower priced guns (10.4% recovered). The most dramatic differential was that for price; 10.4% of guns made by cheap gun manufacturers were recovered by police in contrast to 2.8% of other guns. Among gun makes, Davis Industries firearms had the highest probability of recovery (11.5%). Other makes with a relatively high probability of recovery were AEI (8.8%), Star (5.9%), and Rossi (5.7%).

Time to crime for recovered firearms generally revealed similar firearm risk factors (Tables 11 and 12). Average recovery times tended to be somewhat faster for pistols, medium and large caliber handguns, smaller handguns, and cheaper firearms. Results were more mixed for gun manufacturers, but Davis Industries' handguns had the fastest time to crime.

**Table 9. Gun Sales and Recoveries by Firearm Characteristics (N=235,011 Gun Sales in Maryland, 1990-Oct. 1999)**

| Characteristic | Sales (% of All Sales) | Recoveries (% of All Recoveries) | % of Sales Resulting in Recovery |
|---|---|---|---|
| **Gun Type** | | | |
| Semiautomatic | 143,130 (60.9%) | 5,640 (74.5%) | 3.9% |
| Revolver | 81,259 (34.6%) | 1,683 (22.2%) | 2.1% |
| Derringer | 1,624 (0.7%) | 2 (0.03%) | 0.12% |
| Assault Weapon | 6,509 (2.8%) | 205 (2.7%) | 3.2% |
| Other | 2,489 (1.1%) | 45 (0.6%) | 1.8%* |
| **Caliber** | | | |
| Small | 41,401 (17.6%) | 776 (10.2%) | 1.9% |
| Medium | 110,070 (46.8%) | 5,120 (67.6%) | 4.7% |
| Large | 77,263 (32.9%) | 1,650 (21.8%) | 2.1% |
| Misc. | 6,277 (2.7%) | 29 (0.4%) | 0.5%* |
| **Size** | | | |
| Barrel <= 3" | 62,699 (26.7%) | 2,901 (38.3%) | 4.6% |
| Barrel >3" | 172,312 (73.3%) | 4,674 (61.7%) | 2.7%* |
| Barrel <=4" | 129,360 (55.0%) | 5,302 (70.0%) | 4.1% |
| Barrel > 4" | 105,651 (45.0%) | 2,273 (30.0%) | 2.2%* |
| **Price (Quality)** | | | |
| Price <=$150 | 14,024 (6.0%) | 1,460 (19.3%) | 10.4% |
| Price > $150 | 220,987 (94.0%) | 6,115 (80.7%) | 2.8%* |

Recovery figures are based on national police recoveries reported to ATF as of March 2000
* Differences across groups statistically significant at p<=.01

36

**Table 10. Gun Sales and Recoveries by Firearm Manufacturer (N= N=235,011 Gun Sales in Maryland, 1990-Oct. 1999)**

| Manufacturer | Sales (% All Sales) | Recoveries (% of All Recoveries) | % of Sales Resulting in Recovery * |
|---|---|---|---|
| Amadeo Rossi | 6,847 (2.9%) | 390 (5.2%) | 5.7% |
| Beretta | 19,289 (8.2%) | 476 (6.3%) | 2.5% |
| Bersa | 2,812 (1.2%) | 248 (3.3%) | 8.8% |
| Browning | 5,650 (2.4%) | 56 (0.7%) | 1.0% |
| Colt | 20,298 (8.6%) | 268 (3.5%) | 1.3% |
| Davis Industries | 10,111 (4.3%) | 1,160 (15.3%) | 11.5% |
| Glock | 14,412 (6.1%) | 639 (8.4%) | 4.4% |
| Sig Sauer | 7,634 (3.3%) | 97 (1.3%) | 1.3% |
| Smith & Wesson | 42,002 (17.9%) | 939 (12.4%) | 2.2% |
| Star | 3,004 (1.3%) | 177 (2.3%) | 5.9% |
| Sturm Ruger | 40,174 (17.0%) | 1,055 (13.9%) | 2.6% |
| Tauras | 23,364 (9.9%) | 765 (10.1%) | 3.3% |
| Other | 39,414 (16.8%) | 1,305 (17.2%) | 3.3% |

Recovery figures are based on national police recoveries reported to ATF as of March 2000
Listed manufacturers ranked in the top 10 for sales and/or recoveries
* Differences across groups statistically significant at p<=.01

**Table 11. Time to Recovery by Firearm Characteristics (N=7,575 Guns Sold in Maryland, 1990-Oct. 1999, and Recovered by Police, 1990-March 2000)**

| Characteristic | Average Time to Recovery |
|---|---|
| **Gun Type** | |
| Semiautomatic (N=5,640) | 865 days (2.4 years) |
| Revolver (N=1,683) | 1,154 days (3.2 years) |
| Derringer (N=2) | 402 days (1.1 years) |
| Assault Weapon (N=205) | 981 days (2.7 years) |
| Other (N=45) | 1,149 days (3.1 years)* |
| **Caliber** | |
| Small (N=776) | 1,067 days (2.9 years) |
| Medium (N=5,120) | 909 days (2.5 years) |
| Large (N=1,650) | 944 days (2.6 years) |
| Misc. (N=29) | 1,148 days (3.1 years)* |
| **Size** | |
| Barrel <= 3" (N=2,901) | 916 days (2.5 years) |
| Barrel >3" (N=4,674) | 945 days (2.6 years) |
| Barrel <=4" (N=5,302) | 902 days (2.5 years) |
| Barrel > 4" (N=2,273) | 1008 days (2.8 years)* |
| **Price (Quality)** | |
| Price <=$150 (N=1,460) | 751 days (2.1 years) |
| Price > $150 (N=6,115) | 978 days (2.7 years)* |

* Differences across groups statistically significant at $p <= .01$

**Table 12. Time to Recovery by Firearm Manufacturer (N=7,575 Guns Sold in Maryland, 1990-Oct. 1999, and Recovered by Police, 1990-March 2000)**

| Manufacturer | Average Time to Recovery * |
|---|---|
| Amadeo Rossi (N=390) | 946 days (2.6 years) |
| Beretta (N=476) | 1,032 days (2.8 years) |
| Bersa (N=248) | 973 days (2.7 years) |
| Browning (N=56) | 1,202 days (3.3 years) |
| Colt (N=268) | 1,143 days (3.1 years) |
| Davis Industries (N=1,160) | 784 days (2.1 years) |
| Glock (N=639) | 932 days (2.6 years) |
| Sig Sauer (N=97) | 974 days (2.7 years) |
| Smith & Wesson (N=939) | 1,015 days (2.8 years) |
| Star (N=177) | 955 days (2.6 years) |
| Sturm Ruger (N=1,055) | 923 days (2.5 years) |
| Tauras (N=765) | 1,042 days (2.9 years) |
| Other (N=1,305) | 849 days (2.3 years) |

Listed manufacturers ranked in the top 10 for sales and/or recoveries
* Differences across groups statistically significant at $p < 0.01$

### 4.2.3. Local Analyses, 1994-2000

Similar patterns were found in the local analyses for the Baltimore and D.C. areas (Tables 13 through 20). In brief, handguns were most likely to be recovered and generally had shorter recovery times if they were semiautomatic, medium caliber, short-barreled, and/or inexpensive (though the relationships between gun characteristics and recovery time were not as strong in the D.C. analysis). Handguns in these categories accounted for large or otherwise disproportionate shares of crime guns. Gun makes that had the highest risk of recovery in the local analyses included Davis Industries, Hi-Point, AEI, Rossi, Phoenix/Raven, and Star. In some cases, these makes were also among the most frequently recovered guns or among those with faster recovery times. Most notably, guns made by Davis Industries were the most frequently recovered and among the fastest in recovery time in both the Baltimore and D.C. analyses.

**Table 13. Gun Sales and Baltimore Recoveries by Firearm Characteristics (N=71,956 Gun Sales to Buyers in Baltimore PMSA, 1994-Oct. 1999)**

| Characteristic | | Sales (% All Sales to Baltimore PMSA Buyers) | Recoveries in Baltimore City (% of Baltimore Recoveries) | % of Sales Resulting in Recovery |
|---|---|---|---|---|
| Gun Type | | | | |
| | Semiautomatic | 46,684 (64.9%) | 1,476 (79.8%) | 3.2% |
| | Revolver | 22,926 (31.9%) | 345 (18.7%) | 1.5% |
| | Derringer | 402 (0.6%) | 0 (0.0%) | 0.0% |
| | Assault Weapon | 1,451 (2.0%) | 21 (1.1%) | 1.5% |
| | Other | 493 (0.7%) | 8 (0.4%) | 1.6%* |
| Caliber | | | | |
| | Small | 12,499 (17.4%) | 188 (10.2%) | 1.5% |
| | Medium | 32,275 (44.9%) | 1,232 (66.6%) | 3.8% |
| | Large | 25,555 (35.5%) | 423 (22.9%) | 1.7% |
| | Misc. | 1,627 (2.3%) | 7 (0.4%) | 0.4%* |
| Size | | | | |
| | Barrel <= 3" | 19,604 (27.2%) | 749 (40.5%) | 3.8% |
| | Barrel >3" | 52,352 (72.8%) | 1,101 (59.5%) | 2.1%* |
| | Barrel <=4" | 41,803 (58.1%) | 1,366 (73.8%) | 3.3% |
| | Barrel > 4" | 30,153 (41.9%) | 484 (26.2%) | 1.6%* |
| Price (Quality) | | | | |
| | Price <=$150 | 4,883 (6.8%) | 473 (25.6%) | 10.0% |
| | Price > $150 | 67,073 (93.2%) | 1,377 (74.4%) | 2.1%* |

Recovery figures based on police recoveries reported to ATF as of March 2000
* Differences across groups statistically significant at p<=.01

**Table 14. Gun Sales and Baltimore Recoveries by Firearm Manufacturer (N=71,956 Gun Sales to Buyers in Baltimore PMSA, 1994-Oct. 1999)**

| Manufacturer | Sales (% All Sales to Baltimore PMSA Buyers) | Recoveries in Baltimore City (% of Baltimore Recoveries) | % of Sales Resulting in Recovery * |
|---|---|---|---|
| Amadeo Rossi | 2,075 (2.9%) | 105 (5.7%) | 5.1% |
| Beretta | 5,560 (7.7%) | 97 (5.2%) | 1.7% |
| Bersa | 1,107 (1.6%) | 78 (4.2%) | 7.1% |
| Colt | 6,203 (8.6%) | 47 (2.5%) | 0.8% |
| Davis Industries | 2,951 (4.1%) | 348 (18.8%) | 11.8% |
| Glock | 5,233 (7.3%) | 146 (7.9%) | 2.8% |
| Hi Point | 493 (0.7%) | 67 (3.6%) | 13.6% |
| Makarov | 1,626 (2.3%) | 0 (0.0%) | 0.0% |
| Phoenix Arms | 1,262 (1.8%) | 54 (2.9%) | 4.3% |
| Sig Sauer | 2,998 (4.2%) | 15 (0.8%) | 0.5% |
| Smith & Wesson | 11,612 (16.1%) | 181 (9.8%) | 1.6% |
| Sturm Ruger | 11,566 (16.1%) | 265 (14.3%) | 2.3% |
| Tauras | 7,425 (10.3%) | 187 (10.1%) | 2.5% |
| Other | 11,845 (16.5%) | 260 (14.1%) | 2.2% |

Recovery figures are based on police recoveries reported to ATF as of March 2000
Listed manufacturers ranked in the top 10 for sales and/or recoveries
* Differences across groups statistically significant at p<=.01

**Table 15. Time to Recovery in Baltimore by Firearm Characteristics (N=1,850 Guns Sold to Baltimore PMSA Buyers, 1994-Oct. 1999, and Recovered in Baltimore, 1994-March 2000)**

| Characteristic | Average Time to Recovery |
|---|---|
| Gun Type | |
| Semiautomatic (N=1,476) | 600 days (1.6 years) |
| Revolver (N=345) | 699 days (1.9 years) |
| Assault Weapon (N=21) | 934 days (2.6 years) |
| Other (N=8) | 298 days (0.8 years)* |
| Caliber | |
| Small (N=188) | 660 days (1.8 years) |
| Medium (N=1,232) | 605 days (1.7 years) |
| Large (423) | 651 days (1.8 years) |
| Misc. (N=7) | 690 days (1.9 years) |
| Size | |
| Barrel <= 3" (N=749) | 608 days (1.7 years) |
| Barrel >3" (N=1,101) | 630 days (1.7 years) |
| Barrel <=4" (N=1,366) | 595 days (1.6 years) |
| Barrel > 4" (N=484) | 697 (1.9 years)* |
| Price (Quality) | |
| Price <=$150 (N=473) | 568 days (1.6 years) |
| Price > $150 (N=1,377) | 639 days (1.8 years)* |

* Differences across groups statistically significant at p<=.01

**Table 16. Time to Recovery in Baltimore by Firearm Manufacturer (N=1,850 Guns Sold to Baltimore PMSA Buyers, 1994-Oct. 1999, and Recovered in Baltimore, 1994-March 2000)**

| Manufacturer | Average Time to Recovery |
|---|---|
| Amadeo Rossi (N=105) | 660 days (1.8 years) |
| Beretta (N=97) | 628 days (1.7 years) |
| Bersa (N=78) | 662 days (1.8 years) |
| Colt (N=47) | 683 days (1.9 years) |
| Davis Industries (N=348) | 564 days (1.5 years) |
| Glock (N=146) | 599 days (1.6 years) |
| Hi Point (N=67) | 585 days (1.6 years) |
| Phoenix Arms (N=54) | 559 days (1.5 years) |
| Sig Sauer (N=15) | 721 days (2.0 years) |
| Smith & Wesson (N=181) | 632 days (1.7 years) |
| Sturm Ruger (N=265) | 648 days (1.8 years) |
| Tauras (N=187) | 647 days (1.8 years) |
| Other (N=260) | 632 days (1.7 years) |

Listed manufacturers ranked in the top 10 for sales and/or recoveries

**Table 17. Gun Sales and D.C. Recoveries by Firearm Characteristics (N=48,039 Gun Sales to Buyers in D.C. PMSA, 1994-Oct. 1999)**

| Characteristic | (% of All Sales to DC PMSA Buyers) | Recoveries in DC (% of DC Recoveries) | % of Sales Resulting in Recovery |
|---|---|---|---|
| Gun Type | | | |
| Semiautomatic | 31,108 (64.8%) | 440 (83.2%) | 1.4% |
| Revolver | 15,326 (31.9%) | 77 (14.6%) | 0.5% |
| Derringer | 264 (0.6%) | 0 (0.0%) | 0.0% |
| Assault Weapon | 923 (1.9%) | 11 (2.1%) | 1.2% |
| Other | 418 (0.9%) | 1 (0.2%) | 0.2%* |
| | | | |
| Caliber | | | |
| Small | 7,260 (15.1%) | 37 (6.7%) | 0.5% |
| Medium | 22,763 (47.4%) | 375 (70.9%) | 1.6% |
| Large | 16,828 (35.0%) | 116 (21.9%) | 0.7% |
| Misc. | 1,188 (2.5%) | 1 (0.2%) | 0.1%* |
| | | | |
| Size | | | |
| Barrel <= 3" | 13,050 (27.2%) | 197(37,2%) | 1.5% |
| Barrel >3" | 34,989 (72.8%) | 332 (62.8%) | 1.0%* |
| | | | |
| Barrel <=4" | 28,329 (59.0%) | 389 (73.5%) | 1.4% |
| Barrel > 4" | 19,710 (41.0%) | 140 (26.5%) | 0.7%* |
| | | | |
| Price (Quality) | | | |
| Price <=$150 | 2,898 (6.0%) | 134 (25.3%) | 4.6% |
| Price > $150 | 45,141 (94.0%) | 395 (74.7%) | 0.9%* |

Recovery figures are based on police recoveries reported to ATF as of March 2000
* Differences across groups statistically significant at p<=.01

41

**Table 18. Gun Sales and D.C. Recoveries by Firearm Manufacturer (N=48,039 Gun Sales to Buyers in D.C. PMSA, 1994-Oct. 1999)**

| Manufacturer | Sales (% All Sales to DC PMSA Buyers) | Recoveries in DC (% of DC Recoveries) | % of Sales Resulting in Recovery* |
|---|---|---|---|
| Amadeo Rossi | 1,750 (3.6%) | 27 (5.1%) | 1.5% |
| Astra | 585 (1.2%) | 22 (4.2%) | 0.5% |
| Beretta | 4,563 (9.5%) | 22 (4.2%) | 0.5% |
| Colt | 3,894 (8.1%) | 9 (1.7%) | 0.2% |
| Davis Industries | 1,902 (4.0%) | 86 (16.3%) | 4.5% |
| Glock | 3,001 (6.3%) | 32 (6.1%) | 1.1% |
| Heckler and Koch | 1,181 (2.5%) | 11 (2.1%) | 0.9% |
| Hi Point | 399 (0.8%) | 39 (7.4%) | 9.8% |
| Sig Sauer | 2,027 (4.2%) | 7 (1.3%) | 0.4% |
| Smith & Wesson | 9,162 (19.1%) | 81 (15.3%) | 0.9% |
| Star | 634 (1.3%) | 17 (3.2%) | 2.7% |
| Sturm Ruger | 7,725 (16.1%) | 82 (15.5%) | 1.1% |
| Tauras | 3,883 (8.1%) | 28 (5.3%) | 0.7% |
| Other | 7,333 (15.3%) | 66 (12.5%) | 0.9% |

Listed manufacturers ranked in the top 10 for sales and/or recoveries
* Differences across groups statistically significant at $p <= .01$

**Table 19. Time to Recovery in D.C. by Firearm Characteristics (N=529 Guns Sold to D.C. PMSA Buyers, 1994-Oct. 1999, and Recovered in D.C., 1994-March 2000)**

| Characteristic | Average Time to Recovery |
|---|---|
| Gun Type | |
|     Semiautomatic (N=440) | 559 days (1.5 years) |
|     Revolver (N=77) | 735 days (2.0 years) |
|     Assault Weapon (N=11) | 517 days (1.4 years) |
|     Other (N=1) | 282 days (0.8 years)* |
| Caliber | |
|     Small (N=37) | 602 days (1.6 years) |
|     Medium (N=375) | 578 days (1.6 years) |
|     Large (N=116) | 589 days (1.6 years) |
|     Misc. (N=1) | 984 days (2.7 years) |
| Size | |
|     Barrel <= 3" (N=197) | 595 days (1.6 years) |
|     Barrel >3" (N=332) | 577 days (1.6 years) |
|     Barrel <=4" (N=389) | 583 days (1.6 years) |
|     Barrel > 4" (N=140) | 584 days (1.6 years) |
| Price (Quality) | |
|     Price <=$150 (N=134) | 565 days (1.5 years) |
|     Price > $150 (N=395) | 590 days (1.6 years) |

* Differences across groups statistically significant at $p <= .05$

42

**Table 20. Time to Recovery in D.C. by Firearm Manufacturer (N=589 Guns Sold to D.C. PMSA Buyers, 1994-Oct. 1999, and Recovered in D.C., 1994-March 2000)**

| Manufacturer | Average Time to Recovery* |
|---|---|
| Amadeo Rossi (N=27) | 788 days (2.2 years) |
| Astra (N=22) | 566 days (1.6 years) |
| Beretta (N=22) | 589 days (1.6 years) |
| Colt (N=9) | 680 days (1.9 years) |
| Davis Industries (N=86) | 594 days (1.6 years) |
| Glock (N=32) | 453 days (1.2 years) |
| Heckler and Koch (N=11) | 524 days (1.4 years) |
| Hi Point (N=39) | 557 days (1.5 years) |
| Sig Sauer (N=7) | 908 days (2.5 years) |
| Smith & Wesson (N=81) | 518 days (1.4 years) |
| Star (N=17) | 529 days (1.4 years) |
| Sturm Ruger (N=82) | 548 days (1.5 years) |
| Tauras (N=28) | 601 days (1.6 years) |
| Other (N=66) | 660 days (1.8 years) |

Listed manufacturers ranked in the top 10 for sales and/or recoveries
* Differences across groups statistically significant at $p <= .01$

## 4.3. Sales and Recoveries by Transaction Characteristics

### 4.3.1. Transaction Characteristics Measured

The discussion of transaction characteristics focuses primarily on the distinction between single and multiple sales. For the descriptive analysis examined here, two definitions of a multiple sale were employed. The "federal definition" refers to the purchase of two or more handguns by the same individual from the same gun dealer within five consecutive business days. Federal regulations require licensed gun dealers to report such transactions to the ATF, thereby enabling ATF to monitor these sales for illegal gun trafficking (ATF, 1995b: 59). Multiple sales were also examined using a broader "state definition" that corresponds to the purchase of two or more handguns by the same person from any gun dealer(s) within a 30-day period.[44] This definition is consistent with the logic of one-gun-a-month (OGM) laws, such as that in Maryland, and it captures the activities of buyers who may have spread multiple buys over several dealers and/or days to avoid federal reporting requirements. Nonetheless, during the period prior to Maryland's OGM law (a period of particular interest for reasons discussed below), 82% of the guns purchased in multiple sales under the state definition were also purchased in transactions that met the federal definition of a multiple sale, in almost all cases involving same-day, same-dealer purchases.[45]

---

[44] More specifically, a purchase was counted as a multiple sale if the buyer made any other purchases on the same day, during the prior 30 days, or during the subsequent 30 days.
[45] Federally-defined multiple sales were approximated based on purchases from the same dealer within any five consecutive calendar days.

43

Separate analyses are also presented for guns purchased before and after Maryland's Gun Violence Act of 1996 (GVA). As discussed earlier, this law generally prohibits gun buyers in Maryland from purchasing more than one handgun (or assault weapon) within any 30-day period. Exceptions were made, however, for gun collectors registered with MSP and for some other special circumstances (e.g., a bulk purchase from an estate sale). For this reason, one may expect that multiple sales made after the GVA were lower risk transactions than those made before the GVA.

In addition, the GVA specifically forbids straw purchasing and requires that secondhand sales of handguns be conducted through licensed gun dealers or the MSP so that background checks may be conducted on prospective buyers. These provisions may have discouraged straw purchasing and other secondhand sales to prohibited buyers. If so, guns sold in single sales after the GVA may have been at lower risk of criminal use than guns sold in single sales before the GVA.

### 4.3.2. Analysis of All Sales and Recoveries, 1990-2000

Prior to the GVA, 22.3% of sales met the federal definition of a multiple sale and 27.4% met the state definition of a multiple sale (Table 21). After the GVA, these respective percentages dropped to 10.1% and 14.3%. Depending on how multiple sales were defined, 22% to 25% of all pre-GVA guns that were recovered originated from multiple sales.

For pre-GVA sales, the risk of recovery was essentially equal between federally-defined multiple sales and other sales (3.5% and 3.6%, respectively). Using the state definition, pre-GVA multiple sales were at lower risk of recovery (3.3%) than were other pre-GVA sales (3.7%). As will be shown in subsequent sections, however, this pattern changes when factors such as buyer demographics are taken into account (also see Koper, 2005). Further, using both the federal and state definitions of a multiple sale, recovery time was shorter for pre-GVA multiple sales than for pre-GVA single sales, which provides some indication that multiple sales may have been associated with gun trafficking (Table 22). Using the federal definition, for example, recovered guns sold in a pre-GVA multiple sale had an average recovery time of 915 days, while the average for recovered guns sold in single sales was 1,076 days.

As expected, guns sold in multiple sales after the GVA, defined with either the federal or state multiple sales criteria, were at lower risk of recovery than were guns sold in post-GVA single sales (Table 21). However, differences in time to crime were not apparent between these groups (Table 22).

Finally, informal comparisons between pre- and post-GVA sales (these comparisons were not tested for statistical significance) would seem to provide some indications that the GVA may have reduced the flow of guns to criminals through both single and multiple sales. To illustrate, 3.5% of federally-defined pre-GVA multiple sales were recovered in contrast to only 1.1% of those made after the GVA. Likewise, the percentage of federally-defined single sales that were recovered dropped from 3.6%

for pre-GVA sales to 1.1% for post-GVA sales (Table 21). However, these differences may simply be due to the fact that post-GVA sales, which took place from October 1996 onward, had shorter potential follow-up times than did pre-GVA sales.[46] (This is also the reason for the large differences in time to recovery for pre- and post-GVA sales shown in Table 22.) The multivariate analysis in Chapter 5 compensates for this problem by controlling for each gun's period at-risk.[47]

**Table 21. Gun Sales and Recoveries by Transaction Characteristics (N=235,011 Gun Sales in Maryland, 1990-Oct. 1999)**

| Characteristic | Sales (% of All Sales) | Recoveries (% of All Recoveries) | % of Sales Resulting in Recovery |
|---|---|---|---|
| Pre-GVA Multiple Sale (State Definition) | | | |
|     No | 130,883 (72.6%) | 4,850 (75.1%) | 3.7% |
|     Yes | 49,361 (27.4%) | 1,612 (24.9%) | 3.3%* |
| | | | |
| Post-GVA Multiple Sale (State Definition) | | | |
|     No | 46,935 (85.7%) | 1,032 (92.7%) | 2.2% |
|     Yes | 7,832 (14.3%) | 81 (7.3%) | 1.0%* |
| | | | |
| Pre-GVA Multiple Sale (Federal Definition) | | | |
|     No | 139,970 (77.7%) | 5,041 (78.0%) | 3.6% |
|     Yes | 40,274 (22.3%) | 1,421 (22.0%) | 3.5% |
| | | | |
| Post-GVA Multiple Sale (Federal Definition) | | | |
|     No | 49,216 (89.9%) | 1,053 (94.6%) | 2.1% |
|     Yes | 5,551 (10.1%) | 60 (5.4%) | 1.1%* |

Recovery figures are based on national police recoveries reported to ATF as of March 2000
Pre-GVA sales include sales from January 1990 through September 1996. Post-GVA sales include sales from October 1996 through October 1999.
* Differences across groups statistically significant at $p <= .01$

[46] In other words, the time from sale until the end of the study period was shorter for guns sold after the GVA. For the purposes of this study, therefore, guns sold after the GVA were at-risk of criminal use for shorter periods of time.

[47] The MSP sales database used in this study did not distinguish between retail and secondhand sales that were conducted through licensed dealers during the post-GVA period. This precludes general comparisons of primary and secondary market sales. However, the database did have records on over 1,100 secondhand sales that were conducted through the MSP. Overall, guns sold in these transactions had a lower probability of recovery than did other post-GVA sales (0.4% versus 2.1%). For the purposes of this study, the MSP sale designation is treated as a dealer characteristic rather than a transaction characteristic.

**Table 22. Time to Recovery by Transaction Characteristics (N=7,575 Guns Sold in Maryland, 1990-Oct. 1999, and Recovered by Police, 1990-March 2000)**

| Characteristic | Average Time to Recovery |
|---|---|
| Pre-GVA Multiple Sale (State Definition) | |
|     No (N=4,850) | 1,072 days (2.9 years) |
|     Yes (N=1,612) | 946 days (2.6 years)* |
| | |
| Post-GVA Multiple Sale (State Definition) | |
|     No (N=1,032) | 319 days (0.9 years) |
|     Yes (N=81) | 298 days (0.8 years) |
| | |
| Pre-GVA Multiple Sale (Federal Definition) | |
|     No (N=5,041) | 1,076 days (2.9 years) |
|     Yes (N=1,421) | 915 days (2.5 years)* |
| | |
| Post-GVA Multiple Sale (Federal Definition) | |
|     No (N=1,053) | 318 days (0.9 years) |
|     Yes (N=60) | 301 days (0.8 years) |

Pre-GVA sales include sales from January 1990 through September 1996. Post-GVA sales include sales from October 1996 through October 1999.
* Differences across groups statistically significant at $p <= .01$

### 4.3.3. Local Analyses, 1994-2000

For guns sold in the Baltimore area, pre-GVA multiple sales had a lower risk of recovery in Baltimore than did pre-GVA single sales (Table 23). However, the former had shorter recovery times when they were recovered (Table 24). For guns sold in the D.C. area, in contrast, there were no pronounced differences in the likelihood of recovery or time to recovery between pre-GVA single and multiple sales (Tables 25 and 26). In both sets of local analyses, guns sold after the GVA had lower chances of recovery and shorter recovery times, whether comparing single or multiple sales. However, comparisons between pre- and post-GVA sales should be regarded cautiously for the reasons discussed above.

**Table 23. Gun Sales and Baltimore Recoveries by Transaction Characteristics (N=71,956 Guns Sales to Baltimore PMSA Buyers, 1994-Oct. 1999)**

| Characteristic | Sales (% All Sales to Baltimore PMSA Buyers) | Recoveries in Baltimore City (% of Baltimore Recoveries) | % of Sales Resulting in Recovery |
|---|---|---|---|
| Pre-GVA Multiple Sale (State Definition) | | | |
|     No | 30,336 (68.5%) | 1,016 (74.9%) | 3.4% |
|     Yes | 13,961 (31.5%) | 341 (25.1%) | 2.4%* |
| | | | |
| Post-GVA Multiple Sale (State Definition) | | | |
|     No | 23,704 (85.7%) | 459 (93.1%) | 1.9% |
|     Yes | 3,955 (14.3%) | 34 (6.9%) | 0.9%* |
| | | | |
| Pre-GVA Multiple Sale (Federal Definition) | | | |
|     No | 32,994 (74.5%) | 1,058 (78.0%) | 3.2% |
|     Yes | 11,303 (25.5%) | 299 (22.0%) | 2.7%* |
| | | | |
| Post-GVA Multiple Sale (Federal Definition) | | | |
|     No | 24,951 (90.2%) | 470 (95.3%) | 1.9% |
|     Yes | 2,708 (9.8%) | 23 (4.7%) | 0.9%* |

Recovery figures are based on police recoveries reported to ATF as of March 2000.
Pre-GVA sales include sales from January 1994 through September 1996. Post-GVA sales include sales from October 1996 through October 1999.
* Differences across groups statistically significant at $p \leq .01$

**Table 24. Time to Recovery in Baltimore by Transaction Characteristics (N=1,850 Guns Sold to Baltimore PMSA Buyers, 1994-Oct. 1999, and Recovered in Baltimore, 1994-March 2000)**

| Characteristic | Average Time to Recovery |
|---|---|
| Pre-GVA Multiple Sale (State Definition) | |
| No (N=1,016) | 752 days (2.1 years) |
| Yes (N=341) | 670 days (1.8 years)* |
| | |
| Post-GVA Multiple Sale (State Definition) | |
| No (N=459) | 321 days (0.9 years) |
| Yes (N=34) | 266 days (0.7 years) |
| | |
| Pre-GVA Multiple Sale (Federal Definition) | |
| No (N=1,058) | 757 days (2.1 years) |
| Yes (N=299) | 641 days (1.8 years)** |
| | |
| Post-GVA Multiple Sale (Federal Definition) | |
| No (N=470) | 320 days (0.9 years) |
| Yes (N=23) | 260 days (0.7 years) |

Pre-GVA sales include sales from January 1990 through September 1996. Post-GVA sales include sales from October 1996 through October 1999.
*Differences across groups statistically significant at $p \leq .05$
**Differences across groups statistically significant at $p \leq .01$

**Table 25. Gun Sales and D.C. Recoveries by Transaction Characteristics (N=48,039 Gun Sales to Buyers in D.C. PMSA, 1994-Oct. 1999)**

| Characteristic | Sales (% of All Sales) | Recoveries in DC (% of DC Recoveries) | % of Sales Resulting in Recovery |
|---|---|---|---|
| Pre-GVA Multiple Sale (State Definition) | | | |
| No | 19,645 (69.6%) | 298 (71.1%) | 1.5% |
| Yes | 8,563 (30.4%) | 121 (28.9%) | 1.4% |
| Post-GVA Multiple Sale (State Definition) | | | |
| No | 16,606 (83.7%) | 103 (93.6%) | 0.6% |
| Yes | 3,225 (166.3%) | 7 (6.4%) | 0.2%** |
| Pre-GVA Multiple Sale (Federal Definition) | | | |
| No | 21,059 (74.7%) | 306 (73.0%) | 1.5% |
| Yes | 7,149 (25.3%) | 113 (27.0%) | 1.6% |
| Post-GVA Multiple Sale (Federal Definition) | | | |
| No | 17,461 (88.1%) | 104 (94.6%) | 0.6% |
| Yes | 2,370 (12.0%) | 6 (5.5%) | 0.3%* |

Recovery figures are based on police recoveries reported to ATF as of March 2000.
Pre-GVA sales include sales from January 1994 through September 1996. Post-GVA sales include sales from October 1996 through October 1999.
* Differences between groups statistically significant at $p <= .05$
** Differences between groups statistically significant at $p <= .01$

**Table 26. Time to Recovery in D.C. by Transaction Characteristics (N=529 Guns Sold to D.C. PMSA Buyers, 1994-Oct. 1994, and Recovered in D.C., 1994-March 2000)**

| Characteristic | Average Time to Recovery |
|---|---|
| Pre-GVA Multiple Sale (State Definition) | |
| No (N=298) | 661 days (1.8 years) |
| Yes (N=121) | 667 days (1.8 years) |
| Post-GVA Multiple Sale (State Definition) | |
| No (N=103) | 275 days (0.8 years) |
| Yes (N=7) | 363 days (1.0 years) |
| Pre-GVA Multiple Sale (Federal Definition) | |
| No (N=306) | 658 days (1.8 years) |
| Yes (N=113) | 675 days (1.8 years) |
| Post-GVA Multiple Sale (Federal Definition) | |
| No (N=104) | 273 days (0.7 years) |
| Yes (N=6) | 412 days (1.1 years) |

Pre-GVA sales include sales from January 1994 through September 1996. Post-GVA sales include sales from October 1996 through October 1999.

## 4.4. Sales and Recoveries by Dealer Characteristics

### 4.4.1. Dealer Characteristics Measured

Dealer information available from the MSP gun sales data included the name, location, and phone number of the gun dealer that made each sale, as well as information about the ownership of that business. In addition, project staff utilized ATF records to identify all pawnbrokers that operated as gun dealers in Maryland during the study period.[48] These sources were used to classify gun dealers in terms of type (regular dealer versus pawnbroker), years in business, size (as measured by sales volume), and proximity to Baltimore city and D.C.

Table 27 provides descriptive statistics on the full population of 629 dealers that were active between 1990 and 1999. (For this portion of the analysis, the firearms sales data were aggregated at the dealer level; hence, the units of observation are dealers rather than sales.) As will be discussed in further detail below, dealers sold an average of 374 guns during the study period and were linked to an average of 12 crime guns. Pawnbrokers accounted for approximately 7% of the dealers. Twenty-one percent of the dealers were located within 20 miles of Baltimore city (including those within the city), and 11% were located within 20 miles of D.C. On average, dealers were active for five years of the study period.

**Table 27. Characteristics of Handgun Dealers (N=629 Dealers Active in Maryland, 1990-Oct. 1999)**

| | |
|---|---|
| Sales | Average=374, median=39 |
| Recoveries | Average=12, median=0 |
| Pawnshop | 7% |
| Location (relative to cities) | 34% in Baltimore PMSA (21% within 20 miles of Baltimore city) |
| | 23% in D.C. PMSA (11% within 20 miles of D.C.) |
| Years Active | Average = 5 years |
| Storefront | 66% |
| "Gun Store" | 63% |
| Multiple locations | 10% |

Recovery figures are based on national police recoveries reported to ATF as of March 2000

A few other potential dealer risk factors that were derived from the data require further explanation. First, each dealer was classified as having a storefront or residential location, approximated by whether the business and business owner's addresses were the same. By this criterion, two-thirds of the Maryland dealers were storefront dealers. At different points during the 1990s, the percentage of gun dealers nationwide that operated

---

[48] Electronic listings of federally-licensed gun dealers can be obtained from ATF via Basics Information Systems in Wheaton, Maryland.

from residential rather than commercial premises varied from 74% in 1992 (ATF, 1993) to 56% in 1998 (ATF, 2000a: 16). Due to resource constraints, ATF tended to focus its resources on larger, storefront dealers, thereby increasing opportunities for residential dealers to operate without regard to legal requirements for paperwork, background checks, waiting periods, and the like. Research in a few locations suggests that residential dealers can be important players in the illegal firearms market. A 1989-1990 ATF study of crime guns recovered in Detroit, for example, found that one-third of the dealers linked to 5 or more guns confiscated by police were residential dealers and that 6 of the 10 dealers most frequently linked to crime guns were residential dealers (Violence Policy Center, 1992: 78-82; also see Wachtel, 1998). Other evidence, however, suggests that residential dealers during this time were largely hobbyists who made few sales and were less likely to be linked to crime guns than larger storefront dealers (ATF, 1993; Koper, 2002).

A related characteristic is whether the dealer operated from a business normally associated with firearms, measured by whether the name of the business included terms like "guns", "firearms", "sporting goods", and the like. In 1998, most dealers operating out of commercial premises nationwide were located in businesses such as auto parts stores, funeral homes, and other businesses not normally associated with firearms (ATF, 2000a: 16). As with residential dealers, these less obvious gun dealers could be at greater or lesser risk of selling crime guns than more obvious, and typically larger, gun stores. Nearly two-thirds (63%) of the Maryland dealers had names clearly suggesting a business associated with firearms or sporting goods.

Finally, dealers were classified as having a single location or multiple locations; dealers were coded as the latter if they appeared to have the same name, owner, or phone number as any other dealer(s). This was done to approximate retail chain dealers and assess whether their management and/or visibility put them at differential risk of selling crime guns.[49] Ten percent of the Maryland dealers were thus categorized as multiple location businesses.

*4.4.2. Analysis of All Sales and Recoveries, 1990-2000*

The average number of sales per dealer was 374, and the median was 39 (note that these are not annual figures) (Table 27). As shown in Table 28, sales volume varied substantially among dealers; dealers ranking in the bottom 10% on sales volume sold 3 or fewer guns each for the entire period, while dealers in the top 10% sold over 900 per dealer.

The average number of crime guns linked to each dealer during the study period was 12, but most dealers (55%) were not linked to any crime guns (thus the median value was zero) (Table 28). The 63 dealers ranking in the top ten percent on the number of

---

[49] Unfortunately, the number of each dealer's prospective buyers whose purchases were denied because of a background check was not available. Other research has shown this to be a predictor of the number of crime guns with which a dealer is associated (Wintemute et al., 2005).

recoveries were each linked to 14 or more recovered guns and together sold over 90% of all recovered guns. (In large part, these were also the dealers that sold the most guns.)

**Table 28. Distribution of Gun Sales and Recoveries among Dealers (N=629 Dealers Active in Maryland, 1990-Oct. 1999)**

|  | Sales | Recoveries | Recoveries per Sale |
|---|---|---|---|
| 10th percentile | 3 | 0 | 0 |
| 25th percentile | 11 | 0 | 0 |
| Median | 39 | 0 | 0 |
| 75th percentile | 203 | 3 | 0.02 |
| 90th percentile | 922 | 14 | 0.04 |
| Maximum | 10,498 | 827 | 0.33 |

Recovery figures are based on national police recoveries reported to ATF as of March 2000

The final column of Table 28 shows that recoveries per sale ranged from zero to 0.33 (or, 33%). For dealers ranking in the 90th percentile or higher, roughly 4% or more of their sales resulted in police recoveries. Some of the dealers with the largest ratios of recoveries to sales were small dealers who made very few sales and were linked to few recoveries; for example, the maximum ratio value of 0.33 was attributable to two dealers who each had three sales resulting in one recovery. Perhaps more importantly, there was notable variation in the recovery to sale ratio among dealers linked to large numbers of gun recoveries. Among the ten dealers who sold the most crime guns, for instance, the recovery per sale figure ranged from 0.022 to 0.191 (in percentage terms, from 2.2% to 19.1%). This demonstrates that there is substantial variation in risk levels among dealers connected to the most crime guns, a factor that may be useful to law enforcement and regulatory agencies responsible for regulation of gun dealers.

Table 29 provides further illustration of the distribution of crime gun sales among dealers. Forty-five percent of the dealers sold at least one gun that was recovered by police during the study period. However, just 5%—31 dealers—sold at least 50 crime guns each and accounted for more than three-quarters of all crime gun sales.

**Table 29. Distribution of Gun Recoveries among Dealers (N=629 Dealers Active in Maryland, 1990-Oct. 1999)**

| Sales of Recovered Guns | Percentage (and Number) of Dealers | Percentage of Recoveries |
|---|---|---|
| 1 or more | 45% (284) | 100% |
| 5 or more | 22% (138) | 96% |
| 10 or more | 14% (88) | 92% |
| 25 or more | 7% (44) | 84% |
| 50 or more | 5% (31) | 78% |

Recovery figures are based on national police recoveries reported to ATF as of March 2000

52

Table 30 and Table 31 contrast sale and recovery figures for different categories of dealers. Referring to the last two columns of these tables, the dealers who were most likely to have sold crime guns and who had the highest percentages of sales resulting in recovery were pawnbrokers, older dealers (particularly those that had been operating for more than 2 or 3 years), high volume dealers, dealers close to Baltimore or D.C., storefront dealers, gun shops, and multiple location businesses. For example, 80% of pawnbrokers had sold at least one recovered firearm, whereas only 42.8% of regular dealers had sold any crime guns. On average, 3.9% of pawnbrokers' sales resulted in recovery in contrast to 1.4% of sales made by other dealers.

Some of these risk factors were also evident in the time to recovery analysis (Tables 32 and 33). Time to recovery was generally shorter for guns sold by pawnbrokers, dealers close to urban areas (though these differences were not statistically significant), storefront dealers, gun shops, and dealers with multiple locations.

### 4.4.3. Local Analyses, 1994-2000

The local analyses focus on the comparisons of sales, recoveries, and time to recovery across dealer categories (see tables 34 through 41). As in the full analysis, dealers in the Baltimore and D.C. areas were more likely to have sold crime guns and to have a higher percentage of their sales recovered if they were: pawnbrokers; older, larger, storefront, or multiple location dealers; gun shops; or dealers located in or close to high crime areas. However, time to recovery patterns were more mixed. (Since the number of dealers involved in some of these analyses was very small, statistical significance tests are not emphasized.)

**Table 30. Gun Sales and Recoveries by Dealer Characteristics (N=629 Dealers Active in Maryland, 1990-Oct. 1999)**

| Characteristic | Sales (avg.) | Recoveries (avg.) | % With Recoveries | % of Sales Recovered (avg.) |
|---|---|---|---|---|
| Dealer Type | | | | |
| Pawnbroker (N=40) | 593 | 25 | 80.0% | 3.9% |
| Other dealer (N=589) | 359 | 11 | 42.8%** | 1.4%** |
| | | | | |
| Years in Business | | | | |
| 0-1 yr (N=74) | 5 | 0 | 2.7% | 0.6% |
| 1-2 yrs (N=107) | 36 | 1 | 21.5% | 1.1% |
| 2-3 yrs (N=65) | 66 | 1 | 38.5% | 1.3% |
| 3-4 yrs (N=71) | 185 | 4 | 56.3% | 1.5% |
| 4-5 yrs (N=62) | 201 | 4 | 53.2% | 2.1% |
| 5-6 yrs (N=51) | 492 | 22 | 60.8% | 2.6% |
| 6-7 yrs (N=34) | 289 | 5 | 55.9% | 1.7% |
| 7-8 yrs (N=26) | 309 | 6 | 53.9% | 2.0% |
| 8-9 yrs (N=27) | 350 | 6 | 59.3% | 0.9% |
| 9-10 yrs (N=42) | 224 | 5 | 52.4% | 1.5% |
| 10+yrs (N=70) | 1,988 | 73 | 84.3%** | 2.4%* |
| | | | | |
| Dealer Size (sales volume) | | | | |
| <= 25th percentile (N=155) | 6 | 0 | 7.1% | 1.2% |
| 26th-50th percentile (N=160) | 28 | 0 | 18.8% | 0.8% |
| 51st-75th percentile (N=157) | 98 | 1 | 56.1% | 1.6% |
| >75th percentile (N=157) | 1,365 | 46 | 98.7%** | 2.6%** |
| | | | | |
| Distance to Baltimore | | | | |
| <=10 miles (N=75) | 823 | 43 | 65.3% | 3.0% |
| 11-20 miles (N=59) | 507 | 14 | 52.5% | 1.3% |
| >20 miles (N=495) | 290 | 7 | 41.2%** | 1.3%** |
| | | | | |
| Distance to DC | | | | |
| <=10 miles (N=30) | 647 | 45 | 60.0% | 3.7% |
| 11-20 miles (N=42) | 479 | 18 | 35.7% | 1.6% |
| >20 miles (N=557) | 351 | 10 | 45.1% | 1.4%** |

Recovery figures are based on national police recoveries reported to ATF as of March 2000
* Differences statistically significant at $p<=.05$
** Differences statistically significant at $p<=.01$

**Table 31. Gun Sales and Recoveries by Dealer Characteristics (N=629 Dealers Active in Maryland, 1990-Oct. 1999)**

| Characteristic | Sales (avg.) | Recoveries (avg.) | % With Recoveries | % of Sales Recovered (avg.) |
|---|---|---|---|---|
| "Storefront" (N=415) | 519 | 18 | 54.2% | 1.7% |
| "Home-based" (N=214) | 91 | 1 | 27.8%** | 1.2%* |
| "Gun" store (N=449) | 480 | 16 | 53.9% | 1.9% |
| Other business (N=180) | 108 | 2 | 23.3%** | 0.7%** |
| Multiple locations (N=64) | 663 | 25 | 75.0% | 2.8% |
| Single location (N=565) | 341 | 11 | 41.8%** | 1.4%** |

Recovery figures are based on national police recoveries reported to ATF as of March 2000
* Differences statistically significant at p<=.05
** Differences statistically significant at p<=.01

**Table 32. Time to Recovery by Gun Dealer Characteristics (N=284 Dealers That Sold Guns Recovered by Police, 1990-March 2000)**

| Characteristic | Average Time to Recovery |
|---|---|
| **Dealer Type** | |
| Pawnbroker (N=32) | 715 days (2.0 years) |
| Other dealer (N=252) | 1,144 days (3.1 years)* |
| | |
| **Years in Business** | |
| 0-1 yr (N=2) | 864 days (2.4 years) |
| 1-2 yrs (N=23) | 1,344 days (3.7 years) |
| 2-3 yrs (N=25) | 904 days (2.5 years) |
| 3-4 yrs (N=40) | 1,059 days (2.9 years) |
| 4-5 yrs (N=33) | 1,143 days (3.1 years) |
| 5-6 yrs (N=31) | 1,035 days (2.8 years) |
| 6-7 yrs (N=19) | 1,123 days (3.1 years) |
| 7-8 yrs (N=14) | 1,246 days (3.4 years) |
| 8-9 yrs (N=16) | 1,118 days (3.1 years) |
| 9-10 yrs (N=22) | 1,100 days (3.0 years) |
| 10+yrs (N=59) | 1,067 days (2.9 years) |
| | |
| **Dealer Size (sales volume)** | |
| <= 25th percentile (N=11) | 1,425 days (3.9 years) |
| 26th-50th percentile (N=30) | 1,022 days (2.8 years) |
| 51st-75th percentile (N=88) | 1,159 days (3.2 years) |
| >75th percentile (N=155) | 1,051 days (2.9 years) |
| | |
| **Distance to Baltimore** | |
| <=10 miles (N=49) | 1,023 days (2.8 years) |
| 11-20 miles (N=31) | 1,005 days (2.8 years) |
| >20 miles (N=204) | 1,127 days (3.1 years) |
| | |
| **Distance to DC** | |
| <=10 miles (N=18) | 842 days (2.3 years) |
| 11-20 miles (N=15) | 1,111 days (3.0 years) |
| >20 miles (N=251) | 1,113 days (3.0 years) |

* Differences between groups statistically significant at p<=.01

**Table 33. Time to Recovery by Gun Dealer Characteristics (N=284 That Sold Guns Recovered by Police, 1990-March 2000)**

| Characteristic | Average Time to Recovery |
| --- | --- |
| "Storefront" (N=225) | 1,042 days (2.9 years) |
| "Home-based" (N=59) | 1,302 days (3.6 years)* |
| | |
| "Gun" store (N=242) | 1,056 days (2.9 years) |
| Other business (N=42) | 1,329 days (3.6 years)** |
| | |
| Multiple locations (N=48) | 898 days (2.5 years) |
| Single location (N=236) | 1,136 days (3.1 years)* |

\* Differences between groups statistically significant at p<=.05
\*\* Differences between groups statistically significant at p<=.01

**Table 34. Gun Sales and Baltimore Recoveries by Gun Dealer Characteristics (N=214 Dealers Active in the Baltimore PMSA, 1994-Oct. 1999)**

| Characteristic | Sales (avg.) | Recoveries (avg.) | % With Recoveries | % of Sales Recovered (avg.) |
|---|---|---|---|---|
| **Dealer Type** | | | | |
| Pawnbroker (N=23) | 598 | 19 | 60.9% | 2.7% |
| Other dealer (N=191) | 314 | 7 | 39.3%** | 1.2% |
| | | | | |
| **Years in Business** | | | | |
| 0-1 yr (N=15) | 5 | 0 | 0% | 0% |
| 1-2 yrs (N=29) | 13 | 0 | 13.8% | 0.9% |
| 2-3 yrs (N=21) | 73 | 1 | 28.6% | 0.9% |
| 3-4 yrs (N=19) | 222 | 3 | 57.9% | 0.9% |
| 4-5 yrs (N=23) | 99 | 2 | 21.7% | 0.9% |
| 5-6 yrs (N=28) | 546 | 15 | 67.9% | 2.8% |
| 6-7 yrs (N=10) | 169 | 2 | 50.0% | 1.4% |
| 7-8 yrs (N=12) | 258 | 4 | 50.0% | 1.3% |
| 8-9 yrs (N=11) | 238 | 1 | 45.5% | 0.5% |
| 9-10 yrs (N=16) | 219 | 3 | 37.5% | 1.9% |
| 10+yrs (N=30) | 1303 | 40 | 73.3%** | 2.0%* |
| | | | | |
| **Dealer Size** | | | | |
| <= 25th percentile (N=54) | 5 | 0 | 7.4% | 0.8% |
| 26th-50th percentile (N=53) | 26 | 0 | 17.0% | 0.9% |
| 51st-75th percentile (N=54) | 133 | 1 | 48.2% | 1.3% |
| >75th percentile (N=53) | 1,225 | 33 | 94.3%*** | 2.4%** |
| | | | | |
| **Distance to Baltimore** | | | | |
| <=10 miles (N=62) | 559 | 22 | 54.8% | 2.3% |
| 11-20 miles (N=47) | 441 | 8 | 51.1% | 1.3% |
| >20 miles (N=105) | 174 | 1 | 29.5%*** | 0.8%*** |

Recovery figures are based on police recoveries reported to ATF as of March 2000
* Differences across groups statistically significant at p<=.1
** Differences across groups statistically significant at p<=.05
*** Differences across groups statistically significant at p<=.01

**Table 35. Gun Sales and Baltimore Recoveries by Gun Dealer Characteristics (N=214 Dealers Active in the Baltimore PMSA, 1994-Oct. 1999)**

| Characteristic | Sales (avg.) | Recoveries (avg.) | % With Recoveries | % of Sales Recovered (avg.) |
|---|---|---|---|---|
| "Storefront" (N=157) | 435 | 12 | 50.3% | 1.6% |
| Non-storefront (N=57) | 95 | 0 | 17.5%** | 0.6%** |
| "Gun" store (N=156) | 440 | 12 | 51.3% | 1.7% |
| Other business (N=58) | 87 | 1 | 15.5%** | 0.4%** |
| Multiple locations (N=23) | 725 | 26 | 73.9% | 3.4% |
| Single location (N=191) | 299 | 7 | 37.7%** | 1.1%* |

Recovery figures are based on police recoveries reported to ATF as of March 2000
* Differences between groups statistically significant at $p <= .05$
** Differences between groups statistically significant at $p <= .01$

**Table 36. Time to Recovery by Gun Dealer Characteristics (N=89 Baltimore PMSA Dealers That Sold Guns Recovered in Baltimore, 1994-March 2000)**

| Characteristic | Average Time to Recovery |
|---|---|
| Dealer Type | |
| Pawnbroker (N=14) | 727 days (2.0 years) |
| Other dealer (N=75) | 667 (1.8 years) |
| | |
| Years in Business | |
| 0-1 yr (N=15) | N/A |
| 1-2 yrs (N=4) | 638 days (1.7 years) |
| 2-3 yrs (N=6) | 512 days (1.4 years) |
| 3-4 yrs (N=11) | 592 days (1.6 years) |
| 4-5 yrs (N=5) | 417 days (1.1 years) |
| 5-6 yrs (N=19) | 761 days (2.1 years) |
| 6-7 yrs (N=5) | 805 days (2.2 years) |
| 7-8 yrs (N=6) | 934 days (2.6 years) |
| 8-9 yrs (N=5) | 806 days (2.2 years) |
| 9-10 yrs (N=6) | 612 days (1.7 years) |
| 10-11 yrs (N=22) | 646 days (1.8 years) |
| | |
| Dealer Size | |
| <= 25th percentile (N=4) | 374 days (1.0 years) |
| 26th-50th percentile (N=9) | 557 days (1.5 years) |
| 51st-75th percentile (N=26) | 866 days (2.4 years) |
| >75th percentile (N=50) | 624 days (1.7 years)* |
| | |
| Distance to Baltimore | |
| <=10 miles (N=34) | 683 days (1.9 years) |
| 11-20 miles (N=24) | 612 days (1.7 years) |
| >20 miles (N=31) | 720 days (2.0 years) |

* Differences statistically significant at $p <= .05$

**Table 37. Time to Recovery by Gun Dealer Characteristics (N=89 Baltimore PMSA Dealers That Sold Guns Recovered in Baltimore, 1994-March 2000)**

| Characteristic | Time to Recovery (avg.) |
|---|---|
| "Storefront" (N=79) | 689 days (1.9 years) |
| Non-storefront (N=10) | 580 days (1.6 years) |
| "Gun" store (N=80) | 648 days (1.8 years) |
| Other business (N=9) | 935 days (2.6 years) |
| Multiple locations (N=17) | 603 days (1.7 years) |
| Single location (N=72) | 694 days (1.9 years) |

**Table 38. Gun Sales and D.C. Recoveries by Gun Dealer Characteristics (N=144 Dealers Active in the D.C. PMSA, 1994-Oct. 1999)**

| Characteristic | Sales (avg.) | Recoveries (avg.) | % With Recoveries | % of Sales Recovered (avg.) |
|---|---|---|---|---|
| Dealer Type | | | | |
| Pawnbroker (N=10) | 106 | 3 | 40.0% | 2.1% |
| Other dealer (N=134) | 327 | 4 | 17.2%* | 0.2% |
| Years in Business | | | | |
| 0-1 yr (N=10) | 8 | 0 | 0% | 0% |
| 1-2 yrs (N=21) | 22 | 0 | 4.8% | 0.3% |
| 2-3 yrs (N=14) | 75 | 0 | 14.3% | 0.1% |
| 3-4 yrs (N=15) | 66 | 0 | 6.7% | 0.0% |
| 4-5 yrs (N=14) | 260 | 1 | 14.3% | 0.7% |
| 5-6 yrs (N=9) | 134 | 5 | 22.2% | 0.8% |
| 6-7 yrs (N=12) | 124 | 1 | 8.3% | 0.2% |
| 7-8 yrs (N=8) | 268 | 2 | 25.0% | 0.4% |
| 8-9 yrs (N=10) | 255 | 1 | 20.0% | 0.1% |
| 9-10 yrs (N=11) | 65 | 1 | 9.1% | 0.3% |
| 10+yrs (N=20) | 1,531 | 20 | 65.0%** | 0.7% |
| Dealer Size (sales volume) | | | | |
| <= 25th percentile (N=36) | 4 | 0 | 0% | 0% |
| 26th-50th percentile (N=36) | 20 | 0 | 0% | 0% |
| 51st-75th percentile (N=36) | 66 | 0 | 11.1% | 0.5% |
| >75th percentile (N=36) | 1,158 | 14 | 63.9%** | 0.8%** |
| Distance to DC | | | | |
| <=10 miles (N=25) | 451 | 11 | 28.0% | 1.1% |
| 11-20 miles (N=33) | 333 | 5 | 18.2% | 0.3% |
| >20 miles (N=86) | 264 | 4 | 16.3% | 0.1%** |

Recovery figures are based on police recoveries reported to ATF as of March 2000
* Differences across all groups statistically significant at p<=.1
** Differences across all groups statistically significant at p<=.01

**Table 39. Gun Sales and D.C. Recoveries by Gun Dealer Characteristics (N=144 Dealers Active in the D.C. PMSA, 1994-Oct. 1999)**

| Characteristic | Sales (avg.) | Recoveries (avg.) | % With Recoveries | % of Sales Recovered (avg.) |
|---|---|---|---|---|
| "Storefront" (N=99) | 440 | 5 | 25.3% | 0.5% |
| Non-storefront (N=45) | 31 | 0 | 4.4%** | 0.0%** |
| "Gun" store (N=104) | 380 | 5 | 23.1% | 0.5% |
| Other business (N=40) | 135 | 1 | 7.5%* | 0.0%** |
| Multiple locations (N=19) | 558 | 4 | 36.8% | 0.5% |
| Single location (N=125) | 275 | 3 | 16.0%* | 0.3% |

Recovery figures are based on police recoveries reported to ATF as of March 2000
* Differences between groups statistically significant at $p <= .05$
** Differences between groups statistically significant at $p <= .01$

**Table 40. Time to D.C. Recovery by Gun Dealer Characteristics (N=27 D.C. PMSA Dealers That Sold Guns Recovered in D.C., 1994-March 2000)**

| Characteristic | Average Time to Recovery |
|---|---|
| **Dealer Type** | |
| Pawnbroker (N=4) | 443 days (1.2 years) |
| Other dealer (N=23) | 706 days (1.9 years) |
| **Years in Business** | |
| 0-1 yr (N=0) | N/A |
| 1-2 yrs (N=1) | 268 days |
| 2-3 yrs (N=2) | 396 days |
| 3-4 yrs (N=1) | 565 days |
| 4-5 yrs (N=2) | 375 days |
| 5-6 yrs (N=2) | 1,147 days |
| 6-7 yrs (N=2) | 989 days |
| 7-8 yrs (N=2) | 655 days |
| 8-9 yrs (N=2) | 1,000 days |
| 9-10 yrs (N=1) | 712 days |
| 10+ yrs (N=13) | 641 days |
| **Dealer Size** | |
| <= 25th percentile (N=0) | N/A |
| 26th-50th percentile (N=0) | N/A |
| 51st-75th percentile (N=4) | 684 days (1.9 years) |
| >75th percentile (N=23) | 664 days (1.8 years) |
| **Distance to DC** | |
| <=10 miles (N=7) | 504 days (1.4 years) |
| 11-20 miles (N=6) | 605 days (1.7 years) |
| >20 miles (N=14) | 775 days (2.1 years) |

**Table 41. Time to D.C. Recovery by Gun Dealer Characteristics (N=27 D.C. PMSA Dealers That Sold Guns Recovered in D.C., 1994-March 2000)**

| Characteristic | Average Time to Recovery |
|---|---|
| "Storefront" (N=25) | 675 days (1.8 years) |
| Non-storefront (N=2) | 568 days (1.6 years) |
| | |
| "Gun" store (N=24) | 676 days (1.9 years) |
| Other business (N=3) | 594 days (1.6 years) |
| | |
| Multiple locations (N=7) | 541 days (1.5 years) |
| Single location (N=20) | 712 days (2.0 years) |

62

## 5. ASSESSING CRIME GUN RISK FACTORS WITH UNIVARIATE AND MULTIVARIATE SURVIVAL ANALYSES

This chapter examines the relationships between hypothesized risk factors and gun recovery more rigorously using methods of survival analysis, a group of statistical techniques for analyzing the occurrence and timing of events (Allison, 1995). These methods were used to analyze the time from each handgun's sale in Maryland until its recovery by police or the end of the study period (March 2000), whichever came first. In the latter case, an observation was censored, meaning that we know only that the gun was not recovered—i.e., that it "survived"—during the time that elapsed between its sale and the end of the study period. Survival analysis techniques were developed specifically for the study of censored data. These methods allow us to control for the time during which each firearm was observed to be at-risk of criminal use and to assess the simultaneous influence of buyer, dealer, firearm, and transaction characteristics on the likelihood and timing of firearm recovery.

### 5.1. Probability of Police Recovery:  Univariate Survival Analyses

*5.1.1. Analysis of All Sales and Recoveries, 1990-2000*

Table 42 shows the probability that handguns purchased in Maryland were recovered anywhere and reported to ATF within selected follow-up periods. These estimates are based on the life table method of survival analysis.[50] They differ from the recovery percentages presented in Chapter 4 because the life table estimates adjust for censoring and thus account for differences in follow-up time for guns sold at different points during the study period.

Overall, handguns sold in Maryland had a 1% chance of being recovered by police within one year of sale, a 3.2% chance of recovery within five years, and a 4.7% chance recovery within 10 years. We can expect therefore that roughly 5% of the guns sold in Maryland during the study period were recovered by police somewhere in the nation within 10 years. These are only minimum estimates of recovery, however,

---

[50] In the life table method, the analyst groups the event times into intervals of a chosen length – in this application, one year – and calculates $S_t$, which is the probability that the case "survived" (i.e., did not experience the event of interest) to the start of interval t. For each interval, the value of $S_t$ is based on the probabilities of events occurring in prior intervals. For example, the probability of surviving to the third interval or beyond would be the product of $(1-q_1)(1-q_2)$, where $q_1$ and $q_2$ represent the probabilities of events occurring during intervals 1 and 2, respectively. For a given interval, the probability of an event (conditional on survival to the start of the interval) is denoted as $q = d / (n - m/2)$, where d equals the number of events occurring during the interval, n refers to the sample at risk at the start of the interval (i.e., the number of cases that haven't experienced an event or been censored by the start of the interval), and m is the number of cases censored during the interval (Teachman, 1983:270). For further discussion of the life table method, see Allison (1995) and Teachman (1983).

The values presented in Table 42 are based on $1-S_t$. To illustrate, the probability that a handgun survived (i.e., was not recovered by police) to the start of year 2 was 0.9901. Conversely, the probability that the gun was recovered by the start of year 2 was 1-0.9901, or about .01, which is presented in Table 42 as the probability that the gun was recovered within 1 year.

because they are based on only those guns that police reported to ATF for tracing. (As discussed earlier, gun tracing is voluntary.)

**Table 42. Likelihood of Gun Recovery within Selected Periods (N=235,011 Guns Sold in Maryland, 1990-Oct. 1999)**

| Follow-Up Time | Probability of Recovery (Cumulative) |
|----------------|--------------------------------------|
| 1 year | 1.0% |
| 2 years | 1.7% |
| 3 years | 2.2% |
| 4 years | 2.7% |
| 5 years | 3.2% |
| 6 years | 3.6% |
| 7 years | 3.9% |
| 8 years | 4.2% |
| 9 years | 4.5% |
| 10 years | 4.7% |

Life table estimates
Recovery estimates are based on national police recoveries reported to ATF as of March 2000

Figure 4 shows the probability that a gun was recovered within a particular year, given that the gun had not been recovered by the start of that year. For the full sample of sales and recoveries, guns had a 1% chance of being recovered within a year of being sold. Given that a gun was not recovered within its first year of circulation, it had an approximately 0.6% chance of recovery during its second year, and so on.[51] This graph reveals that guns were at greatest risk of criminal use soon after sale – in other words, when they were new. This lends support to the "new guns" hypothesis (Zimring, 1976; also see Pierce et al., 2003), which states that criminals make disproportionate use of newer firearms, and it helps demonstrate the importance of retail market diversion in supplying illegal gun markets. It also suggests that criminals and traffickers prefer newer firearms.

---

[51] These are not estimates of the hazard rate (a survival analysis statistic to be discussed later), but they are roughly comparable (the hazard rate follows the same general pattern shown in Figure 4).

# Figure 4.  Probability of Recovery By Year of Follow-Up



Based on recoveries by police throughout the nation and reported to ATF, 1990-March 2000

### 5.1.2. Local Analyses, 1994-2000

Turning to the local analyses, guns sold after 1993 to buyers in the Baltimore PMSA had a 3.2% chance of being recovered by police in Baltimore within 5 years (Table 43). Guns sold after 1993 to buyers in the Maryland suburbs of D.C. had a 1.4% chance of recovery in D.C. within 5 years (Table 44). (The local analyses focus on recovery probabilities up to five years because most of the guns had less than six years of potential follow-up time.) As in the national analysis, guns were at greatest risk of recovery in the first year after sale, and this risk declined over time (graph not shown).

**Table 43. Likelihood of Baltimore Gun Recovery within Selected Periods (N=71,956 Guns Sold to Baltimore PMSA Buyers, 1994-Oct. 1999)**

| Follow-Up Time | Probability of Recovery (Cumulative) |
|---|---|
| 1 year | 1.1% |
| 2 years | 1.8% |
| 3 years | 2.3% |
| 4 years | 2.8% |
| 5 years | 3.2% |

Life table estimates
Recovery estimates are based on police recoveries reported to ATF as of March 2000

**Table 44. Likelihood of D.C. Gun Recovery within Selected Periods (N=48,039**

| Follow-Up Time | Probability of Recovery (Cumulative) |
|---|---|
| 1 year | 0.5% |
| 2 years | 0.8% |
| 3 years | 1.0% |
| 4 years | 1.2% |
| 5 years | 1.4% |

Life table estimates
Recovery estimates are based on police recoveries reported to ATF as of March 2000

**5.2. Assessing the Simultaneous Influences of Buyer, Firearm, Transaction, and Dealer Characteristics on Gun Recovery: Multivariate Survival Analyses**

Having examined the overall probability of gun recovery, we now consider how that probability was influenced by the characteristics of buyers, sellers, firearms, and transactions. The bivariate analyses in Chapter 4 revealed numerous factors that were related to gun recovery. However, these factors may be related in various ways that affect their utility as crime gun and trafficking indicators. For example, cheap handguns were at higher risk of recovery by police in the bivariate analyses. Yet if cheap handguns were more likely to be purchased in areas of lower income and higher crime, then accounting for the buyer's area of residence might eliminate or reduce the apparent relationship between cheap handguns and criminal gun use.

To provide a contrasting example, multiple sales did not appear to be a strong risk factor in Chapter 4. However, multiple sales were associated with other factors like buyer demographics that could have obscured the relationship between multiple sales and gun recovery. Older gun buyers and white gun buyers, for instance, were more likely to purchase guns in multiple sales, but the guns they purchased were less likely to be used in crime. Indeed, an earlier study conducted with some of the data examined here revealed that multiple sales were a risk factor for criminal gun use after controlling for the buyer's demographics and area of residence (Koper, 2005).

66

Therefore, to provide a more rigorous assessment of potential crime gun risk factors, a series of multivariate survival models were estimated to test the simultaneous influence of buyer, seller, firearm, and transaction characteristics on the likelihood of gun recovery.[52]

## 5.2.1. Methodological Approach

The following variables were selected for the survival models based on the results of the analyses in Chapter 4, preliminary modeling, and other considerations such as sample sizes and policy relevance.

*Buyer characteristics:* gender; race (categorized as white, black, and other or as white and non-white); age measured in years (the square of the buyer's age was also included to examine whether the age effect changed over the life span—that is, to test for a non-linear effect); whether the buyer had been linked to any prior gun recoveries as of the sale date (coded as yes/no); and county of residence.

*Firearm characteristics:* gun type, classified as semiautomatic versus others (semiautomatics included regular semiautomatic pistols and semiautomatic assault weapons); small, medium, or large caliber; small size, approximated by

---

[52] This study utilizes methods similar to those used by Pierce et al. (2003; 2004), who employed survival analysis to ascertain the association between time to recovery and various characteristics of buyers, sellers, possessors, and firearms. Direct comparisons between this study and the work of Pierce et al. are complicated, however, by a number of considerations. The Pierce et al. work was a time to crime study based on national and local samples of recovered firearms (the researchers employed survival analysis because some recovery times could only be measured as a lower bound). This study, in contrast, is a risk assessment analysis that compares guns recovered by police to guns not recovered by police in order to determine which guns are most likely to be used in crime. Further, the variables available for analysis differed substantially between the studies. Focusing on variables most comparable to those used in this study, the Pierce et al. analysis suggested that guns reached criminal users more quickly when sold by pawnbrokers, dealers that sold higher numbers of recovered guns, and dealers that made higher numbers of multiple sales; when purchased by younger buyers, buyers linked to prior firearm recoveries, and buyers from high-crime areas (as approximated by the number of crime guns traced to the buyer's zip code); and when the firearm was a semiautomatic pistol. (Other key findings from that study (cited in Chapter 2) showed that guns had shorter recovery times when sold by dealers selling older guns and by dealers with higher numbers of prospective buyers that failed a background check; when sold in states having less stringent gun purchasing laws; when the purchaser and eventual possessor of the gun were closer in age and geographic proximity; when the purchaser and eventual possessor of the gun were family members or known associates; and when final possessor was younger.) Finally, Pierce et al. utilized a stepwise modeling procedure in which dealer variables were entered into the model before other variable groups (thus forcing dealer variables to take precedence over others) based on the argument that dealer characteristics are temporally antecedent to other factors in the trafficking process. Although the causal ordering issue is arguably uncertain (e.g., honest dealers may unknowingly sell to straw purchasers), the stepwise approach was also consistent with Pierce et al.'s emphasis on the development of gun trafficking indicators for use by law enforcement—particularly ATF, which is responsible for regulation of gun dealers. Because the current study has a broader emphasis on a variety of policy issues besides dealer regulation and gun trafficking investigation (e.g., regulation of multiple sales, regulation of SNS-type firearms, and regulation of secondhand sales)—and because of uncertainty regarding the causal ordering of suspected risk factors—stepwise modeling is not used here. This study also controls for dependence between guns sold by the same dealer.

whether the gun had a barrel of three inches or less; and low quality/cheap gun, based on whether the gun was made by a manufacturer specializing in guns priced at $150 or less.[53]

*Transaction characteristics*: an indicator for multiple sales as defined by federal regulations (i.e., the purchase of multiple handguns by the same person from the same dealer within a five day span);[54] an indicator for sales made after Maryland's Gun Violence Act of 1996 (GVA); and an indicator for multiple sales made after the GVA (i.e., an interaction term between the multiple sale and GVA indicators).

*Dealer characteristics*: dealer type, classified as regular or pawnbroker; the number of years the dealer had been in business as of the sale date; the number of prior sales made by the dealer that had resulted in a gun recovery as of the sale date; the dealer's proximity to Baltimore and/or Washington, D.C.; the dealer's size as measured by sales volume during the year in which the sale was made;[55] and separate indicators for storefront dealers, gun shop/sporting goods stores, and retail chain dealers.

The simultaneous effects of these factors on gun recovery were assessed using Cox proportional hazards models. These models provide estimates of how the selected characteristics affected a gun's "hazard rate", which essentially represents the risk that the event of interest—in this case, a recovery—occurred at a given point in time, conditional on the event not having occurred prior to that point.[56] In addition to the variables listed above, the models also included the year of sale. This was done to control for each gun's potential follow-up period (i.e., its time at-risk) as well as for temporal trends in crime and gun tracing that may have influenced the results. The

---

[53] Preliminary modeling indicated that the variability in gun recovery can be explained as well by a gun's manufacturer as it can be by the characteristics discussed above. However, the firearm characteristics used in the models discussed in the text represent the characteristics that explain why certain gun makes are at greater risk of criminal use, and they are more directly relevant to policymaking.

[54] Preliminary modeling suggested that guns sold in federally-defined multiple sales (see the definition above) were at somewhat higher risk of recovery than were guns sold in sales meeting the broader state definition of a multiple sale (i.e., the purchase of multiple handguns by one individual from any dealer(s) within a 30-day period).

[55] Other things being equal, we can expect that dealers who sold more guns were linked to higher numbers of gun recoveries (see Chapter 4 and Wintemute et al., 2005). Because this analysis focuses on the risk that each firearm was used in crime (as opposed to the number of guns traced back to a dealer), sales volume is largely factored out. Nonetheless, dealer size was included in the models to determine whether larger dealerships—which were presumably more well-known and accessible—were at greater or lesser risk for selling crime guns than were smaller dealerships, which may have catered to a different class of customers.

[56] The Cox proportional hazards model is often expressed as: $h_i(t) = \lambda_0(t)\exp(B_1 x_{i1} + \ldots + B_k x_{ik})$, where $h_i(t)$ represents the hazard for subject i at time t, $\lambda_0(t)$ represents a baseline hazard function (which can be regarded as the hazard function for a subject whose covariates all have values of zero), $x_{i1}$ through $x_{ik}$ represent a set of fixed covariates, and $B_1$ through $B_k$ represent the effects of those covariates (these effects are then exponentiated) (Allison, 1995: 113-114). The model assumes that the ratio of the hazards for any two subjects remains constant over time (i.e., that they remain proportional to one another) but makes no assumption about the distribution, or shape, of the baseline hazard rate.

models were estimated with robust standard errors (Lin and Wei, 1989) that were also adjusted for dependence between guns sold by the same dealer.[57]

### 5.2.2. Model for All Sales and Recoveries, 1990-2000

Table 45 presents the results of models based on all sales and recoveries. The effect of each indicator is presented as a hazard ratio, which shows the indicator's multiplicative impact on the hazard rate of recovery. If the ratio is greater than one, it indicates that the characteristic in question increased the hazard; a ratio less than one shows that the characteristic reduced the hazard. If the buyer was male, for example, the hazard was reduced by a factor of 0.819 (second column of Table 45). This effect can also be expressed in percentage terms by subtracting one from the hazard ratio and multiplying the difference by 100. Thus, the hazard of recovery was reduced by (0.819-1)*100 = 18.1% when the buyer was male (in other words, the hazard was 18.1% lower for males than for females). Ninety-five percent confidence intervals are also presented showing a likely range for each estimated hazard ratio (coefficients that were statistically significant at the 5% level are listed in bold).

To provide another illustration, the race indicators show the impact of black and white buyers relative to buyers of other races (the latter serve as the omitted reference category for the race variables). The hazard ratio for black buyers indicates that the hazard of recovery was 2.4 times higher when the buyer was black than when the buyer was of another non-white race. Alternatively, we can say that hazard of recovery was increased by (2.408-1)*100 = 140.8% for guns purchased by black buyers. For guns purchased by white buyers, on the other hand, the hazard was reduced by a factor of 0.6, which amounts to a decrease of 40% relative to guns bought by other non-black buyers.

---

[57] Estimation was done using procedure PHREG in SAS software, version 9.1.3.

**Table 45. Effects of Buyer, Firearm, Transaction, and Dealer Characteristics on Risk of Police Recovery:  Cox Proportional Hazards Model Estimates (N=235,011 Gun Sales in Maryland, 1990-1999)**

| | Hazard Ratios and 95% Confidence Intervals | |
|---|---|---|
| | All Recoveries | Recovery From Possessor Who Was Not Buyer |
| **Buyer Characteristics:** | | |
| Male | **0.819** | **0.664** |
| | (0.750 – 0.894) | (0.598-0.737) |
| Black | **2.408** | **2.625** |
| | (2.056-2.820) | (2.044-3.370) |
| White | **0.601** | **0.751** |
| | (0.502-0.719) | (0.586-0.961) |
| Age | **0.891** | **0.903** |
| | (0.876-0.906) | (0.884-0.922) |
| Age sq. | **1.001** | **1.001** |
| | (1.001-1.001) | (1.001-1.001) |
| Prior crime gun | **1.599** | **1.700** |
| | (1.404-1.820) | (1.422-2.032) |
| Anne Arunel Co. | **1.379** | **1.670** |
| | (1.138-1.670) | (1.267-2.200) |
| Balt. City | **2.647** | **3.354** |
| | (2.185-3.231) | (2.547-4.417) |
| Balt. Co. | **1.793** | **2.395** |
| | (1.495-2.152) | (1.836-3.125) |
| Calvert Co. | 1.083 | 1.168 |
| | (0.858-1.368) | (0.725-1.884) |
| Carroll Co. | **1.386** | **1.742** |
| | (1.090-1.762) | (1.227-2.475) |
| Charles Co. | **1.481** | **1.567** |
| | (1.128-1.943) | (1.055-2.328) |
| Fredrick Co. | 0.834 | 1.216 |
| | (0.573-1.215) | (0.739-2.003) |
| Hartford Co. | 1.263* | **1.727** |
| | (0.982-1.626) | (1.255-2.377) |
| Howard Co. | 1.198 | **1.654** |
| | (0.942-1.525) | (1.191-2.297) |
| Montgomery Co. | **1.316** | 1.284* |
| | (1.089-1.592) | (0.974-1.693) |
| Prince George's Co. | **1.946** | **1.902** |
| | (1.620-2.339) | (1.430-2.528) |
| Queen Anne Co. | 1.251 | **1.909** |
| | (0.779-2.009) | (1.007-3.621) |
| **Firearm Characteristics:** | **1.383** | **1.466** |
| Semiautomatic | (1.301-1.471) | (1.349-1.595) |
| | **1.632** | **1.859** |
| Medium caliber | (1.484-1.796) | (1.612-2.144) |
| | **1.500** | **1.784** |
| Large caliber | (1.338-1.681) | (1.523-2.091) |
| | **1.189** | **1.174** |
| Barrel<=3" | (1.101-1.284) | (1.064-1.295) |
| | **1.627** | **2.005** |
| Cheap gun | (1.428-1.854) | (1.710-2.351) |

|  | Hazard Ratios and 95% Confidence Intervals | |
|---|---|---|
|  | All Recoveries | Recovery From Possessor Who Was Not Buyer |
| **Transaction Characteristics:** | | |
| Multiple sale | **1.160** | **1.232** |
|  | (1.061-1.268) | (1.117-1.359) |
| Post-GVA | 1.141 | 1.060 |
|  | (0.891-1.461) | (0.776-1.447) |
| Post-GVA multiple sale | **0.627** | 0.759 |
|  | (0.433-0.907) | (0.479-1.203) |
| **Dealer Characteristics:** | | |
| Pawnbroker | 1.012 | 1.139 |
|  | (0.812-1.263) | (0.917-1.416) |
| Years in business | 0.977 | 0.969 |
|  | (0.942-1.013) | (0.930-1.010) |
| Prior crime guns | **1.001** | **1.001** |
|  | (1.001-1.002) | (1.001-1.002) |
| Storefront | **1.256** | 1.173 |
|  | (1.042-1.514) | (0.915-1.503) |
| Multiple locations | 1.069 | 1.047 |
|  | (0.919-1.243) | (0.894-1.226) |
| Gun/sporting store | 1.184 | 1.154 |
|  | (0.961-1.460) | (0.898-1.482) |
| Sales for year | 1.000 | **0.9999** |
|  | (1.000-1.000) | (1.000-1.000) |
| <=5 miles from city | **2.077** | **2.035** |
|  | (1.544-2.792) | (1.542-2.686) |
| 6-10 miles from city | **1.494** | **1.569** |
|  | (1.317-1.696) | (1.349-1.825) |
| 11-15 miles from city | **1.290** | **1.416** |
|  | (1.104-1.507) | (1.172-1.712) |
| 16-20 miles from city | **1.165** | **1.171** |
|  | (1.012-1.340) | (1.022-1.343) |

Coefficients in bold were statistically significant at p<=.05. Coefficients denoted by (*) were statistically significant at p<=.10. Estimates are based on separate analyses of: 1) all 7,575 police recoveries reported by police throughout the nation to ATF as of March 2000; and 2) 3,305 cases in which the possessor was not the last registered buyer. Buyer county effects are interpreted relative to buyers outside the Baltimore and D.C. PMSAs. Indicators for year of sale are not shown. Models were estimated with robust standard errors adjusted for dealer-level clustering.

Turning to other buyer characteristics, the risk of recovery declined with the buyer's age (by about 11% per year of age) up until roughly age 58, at which point the effect leveled off;[58] hence, younger buyers were higher risk purchasers. In addition, the hazard of recovery was about 60% higher for guns purchased by persons who were linked to prior gun recoveries.

---

[58] This inflection point is calculated as b1 / (-2 * b2), where b1 is the coefficient for age and b2 is the coefficient for age-squared. (Both coefficients were used in their original metrics rather than as hazard ratios.)

With respect to geographical patterns, the model includes indicators for buyers in each of the counties in the Baltimore and D.C. PMSAs. These buyer county effects are interpreted relative to buyers in counties outside the Baltimore and D.C. metropolitan areas. Guns purchased by Baltimore city residents, for instance, were nearly 2.7 times as likely to be recovered as were guns purchased by buyers from rural areas. Buyers from several other suburban counties around Baltimore and D.C. were also at higher risk, with effects ranging from about 32% for Montgomery County buyers to about 95% for buyers from Prince George's County.

In terms of firearm characteristics, semiautomatics, medium and large caliber handguns, small (i.e., short-barreled) handguns, and cheap handguns were all at greater risk of recovery. The strongest effects were for medium caliber and cheap handguns. The hazard for medium caliber handguns was about 63% higher than that for small caliber handguns (the omitted reference group for the caliber categories). Likewise, the hazard for cheap handguns was about 63% higher than that for better quality firearms.

To interpret the transaction characteristics, note that: the multiple sales variable represents multiple sales made prior to the GVA; the GVA variable represents single sales made after the GVA; and the multiple sale-GVA term represents multiple sales made after the GVA (i.e., an interaction of the multiple sale and GVA terms). The results show that multiple sales made prior to the GVA were 16% more likely to be recovered than were pre-GVA single sales. However, multiple sales made after the GVA—which restricted multiple sales primarily to registered collectors—had a reduced likelihood of recovery (see the multiple sales-GVA term). Single sales made after the GVA, in contrast, were no more or less likely to be recovered by police than were those made before the GVA.

Finally, a few gun dealer characteristics were also related to the likelihood of gun recovery. Most notably, guns sold by dealers located in or near Baltimore or Washington, D.C. were more likely to be used in crime. Guns sold by dealers operating within 5 miles of either city were over twice as likely to be recovered as were guns sold by dealers operating further than 20 miles from both cities (the latter group constitutes the omitted reference group for the set of indicators representing a dealer's distance from the cities). This risk declined as a dealer's distance from both cities increased; the hazard for guns sold by dealers within 16 to 20 miles of either city, for instance, was only 16.5% higher than that for guns sold by dealers more than 20 miles from either city.[59] In addition, guns were at higher risk when sold by storefront dealers and dealers linked to prior gun recoveries. The latter effect amounted to an increase of 0.1% per prior recovery; the hazard thus increased by 10% for every 100 crime guns the dealer had sold.[60]

---

[59] Preliminary modeling indicated that dealers operating 21 to 25 miles from either city were not at elevated risk relative to dealers farther from the cities.
[60] Because the number of recoveries reported to ATF was especially low prior to 1994, an additional model was estimated based on all sales made after 1994 and all recoveries of those guns. The post-1993 model generally produced effect sizes and inferences very similar to those reported in the text for all sales and recoveries from 1990 onward.

As discussed in Chapter 3, guns were recovered from the most recently registered purchaser in 12% to 18% of the recoveries and from someone else in 45% to 51% of the recoveries. In 37%, it was unclear whether the purchaser and final possessor were the same. Since a recovery from someone other than the last lawful purchaser is a better indicator of gun trafficking, an additional model was estimated predicting the 3,305 cases in which a gun was clearly recovered from someone other than the most recent buyer.[61] In general, the inferences from this model (third column of Table 45) were similar to those of the main model, and effects became larger for a number of risk factors. The most notable differences were that significant buyer county effects emerged for Harford, Howard, and Queen Anne's counties, while the Montgomery County indicator became statistically insignificant. In addition, the gun dealer storefront indicator was not a significant risk factor and the largest volume dealers were at a slightly reduced risk. These patterns could point to potential refinements in trafficking indicators—for example, some noteworthy trafficking operations may originate from places farther removed from cities—but these results should be viewed very cautiously because they may have been biased by the substantial percentage of cases with missing information about possessors.

## 5.2.3. Local Analyses, 1994-2000

Next, we examine how buyer, seller, firearm, and transaction characteristics influenced the likelihood that guns sold in the Baltimore and D.C. PMSA areas were later recovered by police in Baltimore and D.C., respectively.[62] Results for Baltimore area sales and Baltimore city recoveries are presented in Table 46, while the results for D.C. area sales and D.C. recoveries are shown in Table 47.[63]

### 5.2.3.1. Baltimore Area Sales and Baltimore City Recoveries

For the main Baltimore model (second column of Table 46), the buyer's race and area of residence stood out as leading predictors of recovery in Baltimore city. Guns purchased by black buyers were over four times more likely to be recovered in Baltimore than were guns purchased by buyers of other races. (Based on sample sizes, white buyers and buyers of other races were combined and contrasted against black buyers in the local models). In addition, guns were more than three times as likely to be recovered in Baltimore when sold to Baltimore city residents (the geographical indicators for the buyer's residence are interpreted relative to Anne Arundel County). Buyers were also at higher risk if they were female, young, linked to prior gun recoveries, and/or living in suburban Baltimore County.

---

[61] This is based on the most stringent definition of a purchaser and possessor match (see Chapter 3). Other recoveries were treated as censored cases as of the date of recovery. This is known as a "competing risks" model (Allison, 1995).

[62] The local models are competing risks models (Allison, 1995) in which recoveries outside the location of interest are treated as cases that were censored at the time of recovery. Thus, the Baltimore model treats recoveries outside Baltimore as censored cases, and the D.C. model treats recoveries outside D.C. as censored cases.

[63] In the local models, Baltimore and D.C. area sales were defined based on the buyer's area of residence.

As in the national analysis, firearm characteristics predicting recovery included semiautomatic type, medium to large caliber, a short barrel (i.e., small size), and low price. Medium caliber and low price were again the strongest predictors among the firearm characteristics, increasing the likelihood of recovery by 56% to 57% each.

Transaction characteristics were not significant predictors of recovery in Baltimore. Guns sold in multiple sales prior to the GVA were no more likely than other guns to be recovered in Baltimore, though an important qualification to this finding is discussed below. There is some indication that risk levels were lower for guns sold in multiple sales after the GVA, but this effect was statistically insignificant and may have therefore been due to chance. There also appears to have been no general effect from the GVA.

Among the dealer characteristics, proximity to Baltimore stood out as the most powerful predictor. Sales made by dealers in or within 5 miles of the city were about 2.6 times as likely to be recovered as were guns sold by dealers located more than 20 miles from the city (the omitted reference group for the dealer location variables). Risk levels were also substantially elevated for other dealers operating within 20 miles of the city.

In addition, prior sales of crime guns and sales volume had small but statistically significant effects. Guns had slightly elevated risk levels when sold by dealers associated with prior crime guns (10% for every 100 prior crime guns) and slightly reduced risk levels when sold by larger volume dealers (3% for every 100 annual sales). Guns sold by gun shops and retail chain dealers had elevated hazards that nearly reached conventional levels of statistical significance.

As for the national analysis, a separate model was estimated predicting just those cases in which a gun was recovered from someone other than the most recently registered purchaser (third column of Table 46). The inferences from this model were very similar to those from the preceding model. One notable difference, however, was that multiple sales were a significant risk factor (increasing the hazard of recovery by nearly 23%) when focusing specifically on recoveries from persons other than the last buyer. In addition, the hazard was lower in this model for guns sold by dealers who had been in business for a longer time (by about 6% per year in operation). Other notes of interest are that effects became stronger for female buyers and for cheap, semiautomatic, and medium to large caliber firearms while becoming somewhat weaker for race of the buyer, short-barreled guns, and buyer and dealer locations.

**Table 46. Effects of Buyer, Firearm, Transaction, and Dealer Characteristics on Risk of Police Recovery in Baltimore: Cox Proportional Hazards Model Estimates (N=71,956 Gun Sales to Buyers in the Baltimore PMSA, 1994-Oct. 1999)**

| | Hazard Ratios and 95% Confidence Intervals | |
|---|---|---|
| | All Recoveries | Recovery From Possessor Who Was Not Buyer |
| **Buyer Characteristics:** | | |
| Male | **0.800** | 0.637 |
| | (0.720 – 0.890) | (0.538-0.755) |
| Black | **4.259** | **3.919** |
| | (3.651-4.967 | (3.403-4.512) |
| Age | **0.895** | 0.910 |
| | (0.876-0.913) | (0.880-0.941) |
| Age sq. | **1.001** | **1.001** |
| | (1.001-1.001) | (1.000-1.001) |
| Prior crime gun | **1.627** | **1.640** |
| | (1.330-1.992) | (1.329-2.024) |
| Balt. City | **3.211** | **2.715** |
| | (2.511-4.105) | (2.092-3.523) |
| Balt. Co. | **1.885** | **1.743** |
| | (1.531-2.321) | (1.382-2.197) |
| Carroll Co. | 1.081 | 1.007 |
| | (0.687-1.702) | (0.668-1.517) |
| Hartford Co. | 1.160 | 1.138 |
| | (0.795-1.693) | (0.853-1.517) |
| Howard Co. | 0.851 | 0.968 |
| | (0.567-1.276) | (0.576-1.629) |
| Queen Anne Co. | 0.604 | 0.329 |
| | (0.158-2.314) | (0.056-1.926) |
| **Firearm Characteristics:** | | |
| Semiautomatic | **1.341** | **1.562** |
| | (1.177-1.528) | (1.274-1.916) |
| Medium caliber | **1.561** | **1.728** |
| | (1.300-1.875) | (1.390-2.148) |
| Large caliber | **1.408** | **1.722** |
| | (1.139-1.740) | (1.350-2.197) |
| Barrel <=3" | **1.223** | **1.164** |
| | (1.090-1.373) | (1.005-1.348) |
| Cheap gun | **1.577** | **1.970** |
| | (1.259-1.975) | (1.537-2.525) |
| **Transaction Characteristics:** | | |
| Multiple sale | 1.094 | **1.227** |
| | (0.918-1.305) | (1.008-1.495) |
| Post-GVA | 1.087 | 1.105 |
| | (0.691-1.708) | (0.735-1.661) |
| Post-GVA multiple sale | 0.699 | 0.818 |
| | (0.435-1.125) | (0.467-1.432) |
| **Dealer Characteristics:** | | |
| Pawnbroker | 1.038 | 0.848 |
| | (0.742-1.452) | (0.630-1.142) |
| Years in business | 0.974 | **0.941** |
| | (0.922-1.029) | (0.892-0.992) |
| Prior crime guns | **1.001** | **1.001** |
| | (1.001-1.002) | (1.000-1.002) |
| Storefront | 1.449 | 1.604 |
| | (0.871-2.411) | (0.837-3.071) |

75

| Dealer Characteristics (continued) | Hazard Ratios and 95% Confidence Intervals | |
| --- | --- | --- |
| | All Recoveries | Recovery From Possessor Who Was Not Buyer |
| Multiple locations | 1.224* | 1.257* |
| | (0.975-1.537) | (0.989-1.598) |
| Gun/sporting store | 1.600* | 1.662* |
| | (0.948-2.700) | (0.970-2.849) |
| Sales for year | **0.9997** | **0.9997** |
| | (1.000-1.000) | (1.000-1.000) |
| <=5 miles from Baltimore | **2.599** | **2.712** |
| | (1.672-4.041) | (1.750-4.203) |
| 6-10 miles from Baltimore | **1.991** | **1.916** |
| | (1.461-2.711) | (1.406-2.612) |
| 11-15 miles from Baltimore | **1.924** | **1.752** |
| | (1.357-2.729) | (1.219-2.517) |
| 16-20 miles from Baltimore | **1.515** | **1.391** |
| | (1.107-2.075) | (1.009-1.917) |

Coefficients in bold were statistically significant at $p<=.05$. Coefficients denoted by (*) were statistically significant at $p<=.10$. Estimates are based on separate analyses of: 1) all 1,850 police recoveries reported by police to ATF as of March 2000; and 2) 967 cases in which the possessor was not the last registered buyer. Buyer county effects are interpreted relative to buyers in Anne Arundel County. Indicators for year of sale are not shown. Models were estimated with robust standard errors adjusted for dealer-level clustering.

### 5.2.3.2. D.C. Area Sales and D.C. Recoveries

Among buyer characteristics, race and area of residence again stood out as leading predictors in the main model of D.C. area sales and D.C. recoveries (second column of Table 47). Guns purchased by black buyers were more than five times as likely to be recovered in D.C. as were guns purchased by buyers of other races. Further, guns were about three times as likely to be recovered in D.C. when sold to residents of Prince George's County (the county indicators are interpreted relative to Frederick County). Guns were also at higher risk when purchased by young buyers and buyers linked to prior gun recoveries.

Firearm characteristics predicting recovery in D.C. included semiautomatic type, medium to large caliber, and low price. These effects ranged from a 42.8% increase in risk for semiautomatics to a 90.8% increase in risk for cheap guns. Barrel length, in contrast, was not a significant risk factor.

Guns purchased in multiple sales were at higher risk of recovery in D.C., and the magnitude of this effect (a 38.8% increase in the hazard) was larger than that in the national analysis. This is consistent with the notion that multiple sales are an important mechanism for the trafficking of guns from jurisdictions with more lenient gun controls to those with more stringent gun controls. Multiple sales made after the GVA had lower risk levels, a finding which is suggestive but which was not statistically significant and

76

may therefore have been due to chance. There was no clear effect from the GVA on single sales.

Turning to dealer characteristics, guns sold by pawnbrokers were more than twice as likely to be recovered in D.C. as were those sold by regular dealers. Proximity to D.C. was another important factor. Relative to dealers operating more than 20 miles from D.C., risk levels were nearly 2.5 times higher for dealers within 10 miles of the city and about 1.7 times higher for dealers located 11-15 miles from the city. Other dealer characteristics did not emerge as clear risk factors, although larger volume dealers may have had slightly elevated risk levels.[64]

Finally, a model predicting cases in which a gun was recovered from someone other than the last buyer generally yielded the same inferences as did the main D.C. model (third column of Table 47). However, females were at significantly higher risk of buying crime guns in this model, and effects became larger for prior crime gun purchases, buyers from Prince George's County, medium and large caliber handguns, multiple sales, and pawnbrokers. Two predictors that were significant in the main model, semiautomatic weapon type and purchase from a dealer located within 11 to 15 miles of D.C., were not significant predictors in the alternative model. Effects for the buyer's race and the dealer's proximity to D.C. were diminished somewhat.

---

[64] This analysis and discussion has focused on recoveries in D.C. because D.C. traced guns comprehensively during this period and because contrasts of these results with those of the Baltimore models provide some insights into differences between intrastate and interstate gun trafficking patterns. However, 65% of the guns that were sold in the Maryland suburbs of D.C. and recovered by police were recovered outside D.C., typically in Maryland jurisdictions near to D.C. A model predicting recoveries outside D.C. produced some results that differed from those of the D.C. recovery model: most notably, the race effect was greatly diminished, though still statistically significant; buyer county effects were not limited to just Prince George's County; multiple sales were not a significant risk factor; and dealers were at greater risk if they were linked to prior sales of crime guns and were located farther from D.C.. These results suggest there are differences between intrastate and interstate gun diffusion patterns in the D.C. area, but they could be biased by variation in tracing practices among Maryland law enforcement agencies.

**Table 47. Effects of Buyer, Firearm, Transaction, and Dealer Characteristics on Risk of Police Recovery in Washington, D.C.: Cox Proportional Hazards Model Estimates (N=48,039 Gun Sales to Maryland Buyers in the D.C. PMSA, 1994-Oct. 1999)**

| | Hazard Ratios and 95% Confidence Intervals | |
| --- | --- | --- |
| | All Recoveries | Recovery From Possessor Who Was Not Buyer |
| **Buyer Characteristics:** | | |
| Male | 1.007 | 0.671 |
| | (0.778-1.302) | (0.462-0.973) |
| Black | 5.202 | 4.572 |
| | (3.688-7.336) | (2.790-7.493) |
| Age | 0.878 | 0.861 |
| | (0.841-0.917) | (0.807-0.920) |
| Age sq. | 1.001 | 1.001 |
| | (1.000-1.001) | (1.000-1.002) |
| Prior crime gun | 1.365 | 1.922 |
| | (1.063-1.754) | (1.155-3.199) |
| Calvert Co. | 0.623 | 0.514 |
| | (0.102-3.804) | (0.069-3.802) |
| Charles Co. | 1.489 | 1.210 |
| | (0.615-3.603) | (0.286-5.123) |
| Montgomery Co. | 1.484 | 1.816 |
| | (0.673-3.270) | (0.553-5.964) |
| Prince George's Co. | 3.170 | 3.644 |
| | (1.389-7.237) | (1.042-12.741) |
| **Firearm Characteristics:** | | |
| Semiautomatic | 1.428 | 1.265 |
| | (1.077-1.895) | (0.849-1.886) |
| Medium caliber | 1.450 | 2.349 |
| | (1.019-2.064) | (1.433-3.850) |
| Large caliber | 1.511 | 1.909 |
| | (1.107-2.063) | (1.187-3.070) |
| Barrel <=3" | 1.053 | 1.060 |
| | (0.799-1.387) | (0.735-1.529) |
| Cheap gun | 1.908 | 1.865 |
| | (1.556-2.338) | (1.378-2.525) |
| **Transaction Characteristics:** | | |
| Multiple sale | 1.388 | 1.641 |
| | (1.108-1.739) | (1.234-2.182) |
| Post-GVA | 0.883 | 0.608 |
| | (0.585-1.334) | (0.141-2.614) |
| Post-GVA multiple sale | 0.496* | 0.570 |
| | (0.240-1.025) | (0.247-1.318) |
| **Dealer Characteristics:** | | |
| Pawnbroker | 2.252 | 3.229 |
| | (1.476-3.436) | (1.841-5.665) |
| Years in business | 1.033 | 1.048 |
| | (0.946-1.129) | (0.930-1.182) |
| Prior crime guns | 1.000 | 1.000 |
| | (0.999-1.000) | (0.999-1.002) |
| Storefront | 0.690 | 0.617 |
| | (0.342-1.390) | (0.245-1.554) |
| Multiple locations | 1.001 | 1.251 |
| | (0.799-1.254) | (0.917-1.706) |

| Dealer Characteristics (continued) | Hazard Ratios and 95% Confidence Intervals | |
| --- | --- | --- |
| | All Recoveries | Recovery From Possessor Who Was Not Buyer |
| Gun/sporting store | 0.954 | 0.718* |
| | (0.704-1.294) | (0.492-1.049) |
| Sales for year | 1.0003* | 1.000 |
| | (1.000-1.001) | (1.000-1.001) |
| <=10 miles from D.C. | **2.448** | **1.890** |
| | (1.816-3.301) | (1.242-2.878) |
| 11-15 miles from D.C | **1.661** | 1.386 |
| | (1.147-2.403) | (0.795-2.416) |
| 16-20 miles from D.C. | 1.291 | 1.491 |
| | (0.935-1.784) | (0.848-2.620) |

Coefficients in bold were statistically significant at p<=.05. Coefficients denoted by (*) were statistically significant at p<=.10. Estimates are based on separate analyses of: 1) all 529 police recoveries reported by police to ATF as of March 2000; and 2) 233 cases in which the possessor was not the last registered buyer. Buyer county effects are interpreted relative to buyers in Frederick County. Indicators for year of sale are not shown. Models were estimated with robust standard errors adjusted for dealer-level clustering.

### 5.2.4. Summary of Multivariate Survival Analyses

In sum, the national and local survival models reveal numerous factors that were associated with criminal use and trafficking of guns sold in Maryland during the 1990s. Buyers tended to be at higher risk if they were black, young, female, living in or close to cities, and had previously purchased guns that were recovered by police. Criminal gun users seemed to have preferences for handguns that were semiautomatic, medium to large caliber, short-barreled, and cheap. Guns sold in multiple sales were more likely to be used in crime, particularly outside the state. After accounting for these buyer, firearm, and transaction characteristics, most gun dealer characteristics did not predict gun recovery as strongly or consistently. However, dealers operating in or near cities were at substantially higher risk. Overall, the strongest predictors tended to be the buyer's race, the buyer's area of residence, and the dealer's location. The effects of key predictors are graphically illustrated in figures 5 and 6 using the estimates from the Baltimore analyses.[65]

---

[65] The Baltimore results are perhaps the most informative because they are based on comprehensive gun recovery data and because guns sold in Maryland were more likely to be recovered in Baltimore than in D.C.

## Figure 5.  Effects of Buyer, Dealer, and Firearm Characteristics on Baltimore Gun Recovery



## Figure 6. Effects of Buyer, Seller, Firearm, and Transaction Characteristics on Baltimore Gun Recovery (Buyer not Possessor)



80

To provide some further sense of how these factors were related to criminal gun use and trafficking, the models' results can also be used to estimate the probability that particular gun transactions would have resulted in a crime gun recovery within a given timeframe (Allison, 1995: 165-173). The examples presented here are based on the local models since those models were estimated with comprehensive gun recovery data. Consider, for example, a cheap handgun purchased by a black resident of Baltimore City from a gun dealer within five miles of the city. Holding other factors (i.e., other buyer, firearm, transaction, and dealer characteristics) at their average values for the Baltimore PMSA, the Baltimore model implies a 21% chance that this firearm would have been recovered by Baltimore police within 5 years. If the buyer had also made a prior purchase of a gun used in crime, this probability would have risen to 32%. These recovery probabilities are 6 to 9 times higher than the overall 5-year recovery probability of 3.4% for all gun purchases in the Baltimore PMSA (estimated from the life table analysis—see Table 43).

Turning to the D.C. area, a cheap gun purchased by a black resident of Prince George's County from a dealer within 10 miles of D.C. had a 7% chance of being recovered in D.C. within 5 years, holding other factors at their average values for the D.C. area. If the gun was also purchased in a multiple sale prior to the GVA, this probability would have risen to 10%. In contrast, the overall probability of a D.C. area sale resulting in a D.C. recovery within 5 years was only 1.4% (see the life table analysis in Table 44).[66]

---

[66] Alternatively, one could compute life table estimates for the groups highlighted in the text. Life table estimates of gun recovery for these groups are actually higher than the model-based estimates discussed in the text, most likely because the former reflect the influence of other variables (for example, the age composition of a group) that were held at their means for the model-based predictions.

# 6. DISCUSSION AND CONCLUSIONS

## 6.1. Summary of Findings

This study has revealed several characteristics of buyers, sellers, firearms, and sales transactions that were associated with criminal use and trafficking of guns sold in Maryland during the 1990s. Identified risk factors were generally consistent across analyses that examined all guns sold in Maryland and all recoveries of those guns by police throughout the nation; guns sold in the Baltimore PMSA and recoveries of those guns in Baltimore City; and guns sold in the Maryland counties of the Washington, D.C. PMSA and recovered in D.C.

In terms of buyer characteristics, guns were more likely to be recovered by police when the buyers were black (and, to a lesser extent, of other non-white races), young, female, or living in or close to Baltimore or D.C. (the major cities in and around Maryland). Buyers were also at greater risk if they had previously purchased guns that were recovered by police. The strongest effects were those associated with the buyer's race and county of residence. Guns purchased by black buyers were four to five times as likely to be recovered by police as those purchased by white buyers, and guns purchased by buyers from Baltimore City or from counties adjacent to Baltimore or D.C. were up to three times more likely to be recovered than were guns purchased by buyers who resided farther from these cities. Recovery risk also dropped by about 10% to 12% for each one-year increase in the buyer's age. Overall, black buyers made nearly two-thirds of the purchases that resulted in a gun recovery, buyers in their twenties accounted for about half, and buyers from just three counties—Baltimore city, Baltimore County, and Prince George's County—accounted for about three-quarters.

Although female buyers purchased only 12% to 16% of guns later used in crime, guns purchased by females were up to 57% more likely to be used in crime. This suggests that female buyers are more likely than male buyers to act as straw purchasers who buy on behalf of illegal buyers and traffickers. Finally, if the buyer was linked to a prior crime gun recovery—arguably a clear indication of a potentially problematic buyer—the gun was up to 92% more likely to be recovered, though these buyers accounted for no more than 5% of the recovered guns.

Turning to gun dealers, a relatively small share of dealers located in or close to urban areas accounted for most sales of crime guns. Fourteen percent of the dealers in the state sold over 90% of the identified crime guns, and just 5% sold about three-quarters.

Dealers who were most likely to have sold crime guns and who had the highest percentages of sales resulting in recovery were pawnbrokers, older dealers, high volume dealers, dealers close to Baltimore or D.C., storefront dealers, gun shops, and multiple location businesses. However, after accounting for buyer, firearm, and transaction characteristics (in multivariate survival analyses), the dealer's distance to a city (Baltimore or D.C.) was the primary characteristic of importance; guns sold by dealers

located in Baltimore or located close to either Baltimore or D.C. were up to 2.7 times more likely to be recovered than guns sold by dealers farther from these cities. Dealers located within 20 miles of Baltimore sold 90% of the Maryland guns recovered in Baltimore, while dealers located within 20 miles of D.C. sold 75% of the Maryland guns recovered in D.C. Other dealer characteristics were not strong or consistent predictors of gun recovery. This suggests that the risk of a dealer selling crime guns is strongly linked to the dealer's location, clientele and wares, a pattern that has also emerged from other research (Wintemute et al., 2005).

Criminal gun users and traffickers seemed to have preferences for handguns that were semiautomatic, medium to large caliber, short-barreled, and cheap. Each of these characteristics generally raised the likelihood of police recovery by 20% to 98%, though the strongest risk factors tended to be low price and medium caliber. Semiautomatic pistols and medium to large caliber handguns constituted the vast majority of crime guns. Easily concealable handguns (those with a barrel of 3 inches or less) accounted for roughly 40% of crime guns, and low-priced, SNS-type handguns accounted for upwards of 25%.

Guns were also up to 64% more likely to be recovered when they were sold in multiple sales, which accounted for about a quarter of crime guns. This was most apparent when examining recoveries in D.C., which reinforces the view that multiple sales are an important mechanism for the trafficking of guns from jurisdictions with more lenient gun controls into those with more stringent controls. However, guns sold in multiple sales also had an elevated risk of being recovered within the state from someone other than the last registered buyer. Furthermore, there was a consistent tendency (albeit not usually a statistically significant one) for guns sold in multiple sales to be at lower risk after the passage of Maryland's Gun Violence Act of 1996, which restricted multiple sales primarily to registered collectors.

The findings summarized above are based primarily on the results of multivariate survival modeling. However, many of the risk factors identified through survival modeling were also apparent from simple cross-tabulations of sales and recoveries with the characteristics of interest. A practical implication of this is that law enforcement analysts with access to sales and recovery data should be able to identify many risk factors reliably using simple analytical techniques.[67, 68]

---

[67] As highlighted throughout the report, high-risk categories of actors, firearms, and transactions often accounted for substantial portions of the recovered guns. In the local analyses, for example, the majority of crime guns were semiautomatic, medium caliber, and relatively concealable (most had barrels of four inches or less). In addition, the most common make was Davis Industries, a manufacturer of cheap guns. Hence, the types of guns used most frequently in crime also tended to be the types at highest risk of being used in crime. More generally, this suggests that gun recovery data provide good indicators of problematic groups, firearms, and transactions. This is a subtle point, but it is a potentially important and fortuitous finding given that researchers and law enforcement do not have access to gun registration records in most states and therefore cannot conduct the sorts of risk assessments undertaken for this study. Besides Maryland, the only states with centralized gun registration records are California, Connecticut, Hawaii, Massachusetts, Michigan, New Jersey, and New York (Vernick and Hepburn, 2003).

[68] Because factors associated with a shorter recovery time are often considered to be promising trafficking indicators when risk analyses cannot be performed (e.g., see Pierce et al., 2003; 2004), a series of auxiliary

Other findings of note include the strong local character of illegal gun markets and the extent to which illegal gun users obtain guns through the primary market. Overwhelming majorities of the guns recovered in Baltimore and D.C. originated from those cities' respective metropolitan areas. Further, as many as a quarter of the crime guns may have been recovered from their last legally-registered purchaser.

## 6.2. Study Limitations

This study is based on sales as reported by primary market (i.e., retail) gun dealers. It cannot address sales in the secondary market prior to October 1996, unregistered secondary market sales that took place after October 1996, or covert sales made by corrupt dealers in the primary market. Further, the study is based on crime guns that could be matched to sales records based on make and serial number. If purchasers with criminal intent are more likely to obliterate serial numbers, then these results may understate the importance of some suspected trafficking indicators.[69]

Potentially important factors that could not be examined in this study might include, among others, the buyer's prior criminal history (i.e., arrests and misdemeanor convictions that do disqualify a person from buying firearms) (Wintemute et al., 1998a) and known associations with criminal actors (Pierce et al., 2004), the percentage of a dealer's prospective buyers whose sales were denied because they failed a background check (Pierce et al., 2004; Wintemute et al., 2005), criminal activity in the buyer's immediate neighborhood (Pierce et al., 2004), prior regulatory violations by the gun dealer, and features of a dealer's location besides proximity to high-crime areas (such as location along a major thoroughfare). Police practices, including the emphasis placed on seizing guns and the people and places that were the focus of enforcement efforts, may be another relevant factor. Finally, the recovery of a gun by law enforcement is not necessarily indicative of criminality on the part of the former buyer or seller. (Other limitations to the data were discussed earlier.)

---

models (not shown) were estimated in which the recovery time of each recovered firearm was regressed on the buyer, seller, firearm, and transaction characteristics. (The estimates were computed using generalized estimating equations that allowed for dependence between guns sold by the same dealer. Guns that were not recovered were not included in these analyses). Relative to the risk models presented in the text, the results of the recovery time models were more variable between the national and local analyses and between analyses using all recoveries and those using just recoveries from someone other than the last registered buyer. Further validation of time to recovery as a trafficking indicator may therefore be warranted. Nonetheless, there was some tendency across the models for recovery time to be shorter for guns purchased by buyers who were female, young, non-white, and/or associated with prior gun recoveries; high-risk handguns (semiautomatics, cheap guns, etc.); guns sold in multiple sales; and guns sold by dealers located in or very close to Baltimore or D.C. Hence, some commonly suspected trafficking indicators, including purchase of prior crime guns, purchase of guns in multiple sales, and purchase of cheap guns, tended to be associated with short recovery times as expected. These results must be interpreted with great caution, however, due to the highly truncated recovery times of the guns in this study (as described in Chapter 3, most of the recovered guns were seized within three years of purchase).

[69] For example, some ATF research suggests that crime guns are more likely to have an obliterated serial number if they are semiautomatic or were purchased in a multiple sale (ATF, 2000c, pp.38-40).

We must also be cautious about generalizing these findings to other states and perhaps to other time periods. The state of Maryland licensed handgun dealers, required a waiting period on handgun sales, and banned many cheap handguns throughout the full study period. For portions of this period, the state also regulated private sales and restricted multiple sales. These laws may have discouraged gun trafficking in the state, especially large-scale, repetitive trafficking. On the other hand, it is not particularly difficult to buy a gun from a dealer in Maryland – one need only pass a background check and wait a week – and the state's proximity to a major city with a handgun ban (D.C.) may have provided an incentive for trafficking. In other jurisdictions, risk factors for intrastate and/or interstate trafficking may differ.

## 6.3. Implications for Policy and Practice

### 6.3.1. Implications for Enforcement and Prevention

Notwithstanding the caveats noted above, the study's results help to illuminate the workings of illegal gun markets and have a number of implications for gun policy and enforcement. One implication is that law enforcement should place greater emphasis on local gun markets and networks. Although high percentages of illegal gun possessors obtain guns from family, friends, and street sources rather than directly from retail outlets, this study suggests that those social networks are often supplied heavily by local diversions of guns from the primary retail market. Patterns in the Baltimore area illustrate this well. Over 60% of Baltimore's crime guns originate from within the state (ATF, 2002b), and those in-state guns come almost entirely from the Baltimore metropolitan area. Many of these guns move into criminal channels rapidly; as shown by this study, nearly 1,900 guns that were purchased legally in the Baltimore area between January 1994 and October 1999 were recovered by police in Baltimore as of March 2000. Buyers whose guns are most likely to be used in crime are often geographically proximate and demographically similar to those who are at greatest risk for involvement in gun violence. The fact that many crime guns originate locally and are relatively new should facilitate law enforcement efforts to identify dealers and other persons associated with criminal gun diversion. Further, the proximity and likely familiarity of many buyers and sellers would seem to present additional enforcement leverage; it seems reasonable to conclude that many persons who provide crime guns know the legal status of those to whom they sell, give, loan, or trade guns.

Accordingly, there may be substantial potential for enforcement action against illegal gun markets, particularly in jurisdictions like Maryland that regulate secondary market gun transfers and that explicitly prohibit straw purchasing.[70] Nevertheless, we know little about how secondary market laws are used in practice, a point to which we return below.

Risk factor assessment might also be used to guide enforcement and prevention efforts in various ways. Recovered crime guns associated with higher numbers of

---

[70] If, for example, a gun that is legally registered to person A is recovered from person B, then there is the potential for criminal investigation of both persons A and B.

identified risk factors, for instance, may have greater potential for investigation in gun trafficking cases.[71]  In terms of prevention, policing agencies might consider distributing notices to all handguns buyers or more specifically to handgun buyers in high-risk areas, urging them to secure their firearms against theft (and perhaps offering trigger locks or other anti-theft devices) and reminding them of applicable laws and penalties regarding straw purchasing and secondhand transfers.  Such information could be distributed at the point of sale or, perhaps to greater effect, by mailings from state or local authorities.[72]  More aggressive action, such as personal contact by law enforcement, may be prudent and justifiable for certain categories of high-risk buyers, including people who have been linked to prior gun recoveries, persons who have purchased high-risk guns (e.g., cheap guns) in multiple sales, buyers with prior criminal histories (i.e., arrests and misdemeanor convictions), known associates of gang members or drug dealers, and others.  Also, prevention programs that try to steer high-risk persons like teens and young adults away from gun violence might incorporate elements dealing with straw purchasing and other forms of gun trafficking.

The overriding point is that more emphasis could be placed on reactive and proactive strategies that address the diversion of guns from the primary market and into criminal channels.  Such efforts could be informed by further study and consideration of crime gun risk factors like those illuminated by this study.

Another issue that warrants discussion here is the role of race in the findings and its attendant implications.  The strong race effects found in this study may raise concern that law enforcement will target non-white (and especially black) gun buyers in trafficking investigations.  This study has attempted to identify a number of risk factors that operate independently of race and that are appropriate foci for law enforcement attention (e.g., links to prior crime guns and purchase of guns in multiple sales).  Having said this, attempts to disrupt gun distribution networks in high-crime areas may often have disproportionate impacts on minority gun buyers, even when guided by factors that are intended to be race-neutral, and this issue will need to be addressed by law enforcement and community members.  More broadly, these results suggest that there is an urgent need to raise awareness about the problems of straw purchasing and illegal gun sales (as well as gun theft), particularly in minority communities located in or close to high-crime areas, and to address these problems using both enforcement and prevention strategies.

### 6.3.2. Implications for Regulation of Gun Dealers

Retail gun dealers provide an obvious focus for law enforcement and regulatory action to reduce gun crime for a number of reasons:  they are regulated by federal law and in some cases, by state and local laws;  they serve as the initial points of distribution for the dissemination of guns into the population;  and sales of guns used in crime tend to

---

[71]  Alternatively, investigators may choose to focus on outlier cases that don't fit typical patterns (e.g., city crime guns with short recovery times that originate from farther suburbs or rural areas).

[72]  A similar strategy is currently being tested with gun buyers in high-crime areas of Los Angeles (Tita and Ridgeway, 2006).

be concentrated among a relatively small percentage (and number) of gun dealers. Although much of the variability in dealers' sales of crime guns may stem from sales volume, location, clientele, and types of products sold, careful monitoring of dealers with large numbers or percentages of sales resulting in crime gun recoveries should arguably be a priority for law enforcement insofar as it facilitates: 1) identification of dealers who facilitate straw purchases or engage in other unlawful activities; 2) identification of dealers that are unknowingly frequented by straw purchasers; and 3) improved cooperation between law enforcement and dealers in thwarting illegal firearms commerce.

Having said this, emphasis should be given to the monitoring of large volume dealers in urban areas and, more generally, to dealers with a relatively large percentage of their sales resulting in crime gun recoveries. Identifying the latter group of dealers can be done most readily in jurisdictions like Maryland that maintain centralized gun registration records. Yet even in locations without such record systems, authorities could collect information about dealer sales volume in the course of periodic inspections and license renewals that are required for licensed gun dealers. This information could then be used as a benchmark against which to assess sales of crime guns by individual dealers and by different groups of dealers.

### 6.3.3. Implications for Gun Control Policies

As discussed above, gun registration and regulation of secondhand sales may have the potential, if properly used, to substantially disrupt illicit gun markets. Having said this, there is no evidence that Maryland's secondary market and straw purchasing laws have been effective—guns purchased after implementation of those laws in late 1996 were no less likely to be used in crime than were guns sold earlier. A caveat, however, is that this study is based on data from only the first few years that these policies were in effect. Moreover, this investigation has not examined efforts or problems associated with the implementation of the laws.

The results also provide some support for restrictions on particular types of firearms and transactions, most notably SNS handguns and multiple sales, and other policies to discourage crimes with certain types of weapons (e.g., federal sentence enhancements for crimes committed with semiautomatics). Whether these sorts of policies can reduce gun crime is a complex issue; one must consider, for example, the possible substitution of other types of firearms and supply sources for those that are restricted (National Research Council, 2005: 72-101; for further discussion of the impacts of Maryland's SNS law, see Koper, 2005: 770-772; Vernick et al., 1999; Webster et al., 2002). In the case of SNS bans, policymakers must also consider the discriminatory impact such laws may have on lawful gun buyers of low income (Cook, 1981). Nevertheless, this study shows that particular types of guns and transactions are at higher risk, and that they account for a substantial share of crime guns. At a minimum, the findings suggest that reporting requirements for multiple sales are prudent and that law enforcement should emphasize multiple sales and particular types of firearms in trafficking investigations.

87

### 6.4. Research Recommendations

To conclude, this study has identified a number of risk factors associated with criminal use or trafficking of guns purchased from retail outlets. This research complements other recent efforts to develop improved indicators of gun trafficking (Pierce et al., 2003; 2004; Wintemute et al., 2005). But unlike most prior studies of crime guns, this study used longitudinal analysis of the sale and subsequent criminal use of representative samples of handguns sold at retail, thus permitting a more refined assessment of the risks that different types of guns purchased in different types of transactions involving different types of buyers and sellers are used in crime.

Replication of these results in other jurisdictions that maintain similar data systems would help show which of these results can be generalized to other locations and which are perhaps more idiosyncratic to gun markets in and around Maryland. It is also likely that the development of trafficking indicators from these sorts of data can be improved. Techniques such as data mining might be used, for instance, to further assess combinations of risk factors that are highly predictive of gun recovery or to examine particular types of recoveries—such as those associated with violent crimes or juvenile crimes—that have high policy relevance but that are rarer. In addition, future research efforts might incorporate other useful data elements that could not be examined here, including the buyer's criminal history, the dealer's regulatory history, and characteristics of the buyer and/or dealer's neighborhood.

Other forms of basic research on illicit gun markets might also help clarify the mechanisms that relate the risk factors identified here to criminal gun use. To what extent, for instance, is the relationship between gun recovery and the buyer's race or area of residence due to risk of theft as opposed to straw purchasing (or other forms of trafficking) or social diffusion through secondhand sales? Studies of these issues could include end-to-end tracing studies (in which guns are traced through every retail and secondary sale prior to recovery), studies of gun trafficking investigations, interviews with convicted gun traffickers and other gun offenders, and ethnographic research on illegal gun acquisition. (In the process, such investigations could also provide further evidence on the validity of time to crime as a trafficking indicator.)

Finally, there is a need for research on enforcement efforts directed at illegal gun markets. As noted above, this study suggests there may be substantial potential for attacking these markets, particularly in jurisdictions like Maryland that have laws regulating the secondary market. However, there has been virtually no research on the use of these laws in Maryland or elsewhere. The fragmentary evidence that is available suggests there are no systematic attempts to enforce them (e.g., Cook et al., 1995; Jacobs, 2002). In general, there is a dire need for research on how workable these laws are, how well enforced they are, and how they might be better utilized.

In addition to assessing the current state of practice in gun trafficking enforcement, researchers and practitioners should also collaborate in the design and

evaluation of experimental interventions to disrupt illicit gun markets. Such interventions might focus on guns used in particularly serious crimes, guns recovered from juveniles or other groups of high interest, and/or guns recovered in high-crime neighborhoods.

This study has provided one step in the identification of risk factors for criminal gun use and trafficking. This study and future research along the lines discussed above could potentially be used to improve the effectiveness and fairness of law enforcement and regulatory efforts to identify networks diverting guns into criminal channels and to inform debates on the efficacy of various gun control policies, including OGM laws, regulation of gun dealers, gun bans, and others.

89

# REFERENCES

Allison, P.D. (1995). *Survival Analysis Using the SAS System: A Practical Guide*, SAS Institute, Inc., Cary, North Carolina

Americans for Gun Safety Foundation. 2004. *Selling Crime: High Crime Gun Stores Fuel Gun Criminals*. Washington, D.C.

Beck, A., Gilliard, D., Greenfeld, L., Harlow, C., Hester, T., Jankowski, L., Snell, T., Stephan, J., and Morton, D. (1993). *Survey of State Prison Inmates, 1991* (NCJ-136949), Bureau of Justice Statistics, United States Department of Justice, Washington, DC.

Braga, A., Cook, P.J., Kennedy, D.M., and Moore, M.H. (2002). The illegal supply of firearms. In Tonry, M. (ed.), *Crime and Justice: A Review of Research (Volume 29)*, University of Chicago, Chicago.

Brill, S. (1977). *Firearm Abuse: A Research and Policy Report,* Police Foundation, Washington, DC.

Bureau of Alcohol, Tobacco, and Firearms. (1976). *Project Identification: A Study of Handguns Used in Crime,* United States Department of the Treasury, Washington, DC.

Bureau of Alcohol, Tobacco, and Firearms. (1977). *Concentrated Urban Enforcement (CUE),* United States Department of the Treasury, Washington, DC.

Bureau of Alcohol, Tobacco, and Firearms. (1993). *Operation Snapshot*, United States Department of the Treasury, Washington, DC.

Bureau of Alcohol, Tobacco, and Firearms. (1995a). *The National Tracing Center 1994 Yearend Report*, United States Department of the Treasury, Washington, DC.

Bureau of Alcohol, Tobacco, and Firearms. (1995b). *Federal Firearms Regulations Reference Guide*, United States Department of the Treasury, Washington, DC.

Bureau of Alcohol, Tobacco, and Firearms. (1997). *Crime Gun Trace Analysis Reports: The Illegal Youth Firearms Markets in 17 Communities*, United States Department of the Treasury, Washington, DC.

Bureau of Alcohol, Tobacco, and Firearms. (1998). *State Laws and Published Ordinances – Firearms (21st ed.),* United States Department of the Treasury, Washington, DC.

Bureau of Alcohol, Tobacco, and Firearms. (1999a). *Crime Gun Trace Analysis Reports: The Illegal Youth Firearms Markets in 27 Communities*, United States Department of the Treasury, Washington, DC.

Bureau of Alcohol, Tobacco, and Firearms. (2000a). *Commerce in Firearms in the United States*, United States Department of the Treasury, Washington, DC.

Bureau of Alcohol, Tobacco, and Firearms. (2000b). *Following the Gun: Enforcing Federal Firearms Laws Against Firearms Traffickers*, United States Department of the Treasury, Washington, DC.

Bureau of Alcohol, Tobacco, and Firearms. (2000c). *Crime Gun Trace Reports (1999): National Report*, United States Department of the Treasury, Washington, DC.

Bureau of Alcohol, Tobacco, and Firearms. (2000d). *Crime Gun Trace Reports (1999): Baltimore*, United States Department of the Treasury, Washington, DC.

Bureau of Alcohol, Tobacco, and Firearms. (2000e). Crime Gun Trace Reports (1999): Washington, D.C., United States Department of the Treasury, Washington, D.C.

Bureau of Alcohol, Tobacco, and Firearms. (2001/2002). *Commerce in Firearms in the United States, 2001-2002*, United States Department of the Treasury, Washington, DC.

Bureau of Alcohol, Tobacco, and Firearms. (2002a). *Crime Gun Trace Reports (2000): National Report*, United States Department of the Treasury, Washington, DC.

Bureau of Alcohol, Tobacco, and Firearms. (2002b). *Crime Gun Trace Reports (2000): Baltimore*, United States Department of the Treasury, Washington, DC.

Bureau of Alcohol, Tobacco, and Firearms. (2002c). *Crime Gun Trace Reports (2000): Washington, DC*, United States Department of the Treasury, Washington, DC.

Bureau of Alcohol, Tobacco, and Firearms. (2003). *State Laws and Published Ordinances – Firearms (24th ed.)*, United States Department of the Treasury, Washington, DC.

Caruso, R.P., Jara, D.I. and Swan, K.G. (1999). Gunshot wounds: Bullet caliber is increasing. *The Journal of Trauma: Injury, Infection, and Critical Care* 46:462-465.

Catalano, S.M. (2004). Criminal Victimization, 2003 (NCJ-205455). Bureau of Justice Statistics, United States Department of Justice, Washington, DC.

Cook, P. (1981). The "Saturday Night Special": An assessment of alternative definitions from a policy perspective. *The Journal of Criminal Law and Criminology* 72:1735-1745.

Cook, P.J. and Braga, A.A. (2001). Comprehensive firearms tracing: Strategic and investigative uses of new data on firearms markets. *Arizona Law Review* 43:277-309.

Cook, P.J. and Ludwig, J. (1996). *Guns in America: Results of a Comprehensive National Survey on Firearms Ownership and Use*, Police Foundation, Washington, DC.

Cook, P.J. and Ludwig, J. (2000). *Gun Violence: The Real Costs*. New York: Oxford University Press.

Cook, P.J., Molliconi, S., and Cole, T.B. (1995). Regulating gun markets. *Journal of Criminal Law and Criminology* 86:59-92.

Diaz, T. 1999. *Firearms Industry Marketing, Lethality, and Death and Injury in the United States.* Paper presented at the annual meeting of the American Society of Criminology, Toronto.

DiMaio, V.J.M. (1985). *Gunshot Wounds: Practical Aspects of Firearms, Ballistics, and Forensic Techniques,* Elsevier, New York.

Dowd, M.D., Grossman, D.C., Cummings, P., and Britt, J. (1998). Handgun purchase trends, Washington state: Differences by age of buyer. *Annals of Emergency Medicine* 32:60-64.

Eichel, L. (2006). Evidence scant on the effectiveness of one-gun laws. *Philadelphia Inquirer* September 27:A12.

Federal Bureau of Investigation, (1995, 2004-2005). *Crime in the United States*, United States Department of Justice, Washington, DC.

Fennell, M. (1992). Missing the mark in Maryland: How poor drafting and implementation vitiated a model state gun control law. *Hamline Journal of Public Law and Policy* 13:37-71.

Fjestad, S.J. (1996). *Blue Book of Gun Values* (17th ed.), Blue Book Publications, Minneapolis.

Hargarten, S.W., Karlson, T.A., O'Brien, M., Hancock, J., and Quebbeman, E. (1996). Characteristics of firearms involved in fatalities. *JAMA* 275:42-45.

Harlow, C.W. (2001). *Firearm Use By Offenders* (NCJ-189369, Revised Feb. 2002), Bureau of Justice Statistics, U.S. Department of Justice, Washington, DC.

Jacobs, J.B. (2002). *Can Gun Control Work?* Oxford University Press, New York.

Kennedy, D.M., Piehl, A.M., and Braga, A.A. (1996). Youth violence in Boston: gun markets, serious youth offenders, and a use-reduction strategy. *Law and Contemporary Problems* 59:147-196.

Kleck, G. (1984). Handgun-only control: A policy disaster in the making. In Kates, D.B. (ed.), *Firearms and Violence: Issues of Public Policy*, Ballinger, Cambridge, Massachusetts, pp. 167-222.

Kleck, G. (1997). *Targeting Guns: Firearms and Their Control*. Aldine de Gruyter, New York.

Kleck, G. (1999). BATF gun trace data and the role of organized gun trafficking in supplying guns to criminals. *Saint Louis University Public Law Review* 18:23-45.

Koper, C.S. (1995). *Gun Lethality and Homicide: Gun Types Used By Criminals and the Lethality of Gun Violence in Kansas City, Missouri, 1985-1993,* (Ph.D. Dissertation), Department of Criminology and Criminal Justice, University of Maryland, College Park.

Koper, C.S. (1997). *Gun Density Versus Gun Type: Did the Availability of More Guns or More Lethal Guns Drive Up the Dallas Homicide Rate, 1980-1992?* (Report NCJ-187106 to the National Institute of Justice), Crime Control Institute, Philadelphia.

Koper, C.S. (2002). Federal legislation and gun markets: How much have recent reforms of the federal firearms licensing system reduced criminal gun suppliers? *Criminology and Public Policy* 1:151-178.

Koper, C.S. (2004). *An Updated Assessment of the Federal Assault Weapons Ban: Impacts on Gun Markets and Gun Violence, 1994-2003.* (Report NCJ-204431 to the National Institute of Justice), Jerry Lee Center of Criminology, University of Pennsylvania, Philadelphia.

Koper, C.S. (2005). Purchase of multiple firearms as a risk factor for criminal gun use: Implications for gun policy and enforcement. *Criminology and Public and Policy* 4:749-778.

Koper, C.S. and Reuter, P. (1996). Suppressing illegal gun markets: Lessons from drug enforcement. *Law and Contemporary Problems* 59:119-146.

Lin, D.Y. and Wei, L.J. 1989. The robust inference for the Cox proportional hazards model. *Journal of the American Statistical Association* 84(408):1074-1078.

Maguire, K. and Pastore, A.L. (eds.). (1995). *Sourcebook of Criminal Justice Statistics – 1994,* Bureau of Justice Statistics, United States Department of Justice, Washington, DC.

Maguire, K. and Pastore, A.L. (eds.). (2000). *Sourcebook of Criminal Justice Statistics – 1999,* Bureau of Justice Statistics, United States Department of Justice, Washington, DC.

Maguire, K. and Pastore, A.L. (eds.). (2001). *Sourcebook of Criminal Justice Statistics – 2000,* Bureau of Justice Statistics, United States Department of Justice, Washington, DC.

McGonigal, M.D., Cole, J., Schwab, C.W., Kauder, D.R., Rotondo, M.F., and Angood, P.B. (1993). Urban firearm deaths: a five-year perspective. *The Journal of Trauma*: 35:532-537.

National Research Council (Wellford, C.F., Pepper, J.V., and Petrie, C.V., eds.). (2005). *Firearms and Violence: A Critical Review*. The National Academies Press, Washington, DC.

Pierce, G.L., Braga, A.A., Hyatt, Jr., R.R., and Koper, C.S. (2004). Characteristics and dynamics of illegal firearms markets: Implications for a supply-side enforcement strategy. *Justice Quarterly* 21:391-422.

Pierce, G.L., Braga, A.A., Koper, C.S., McDevitt, J., Carlson, D., Roth, J., Saiz, A., Hyatt, R., and Griffith, R.E. (2003). *The Characteristics and Dynamics of Crime Gun Markets: Implications for Supply-Side Focused Enforcement Strategies* (Final Report to the National Institute of Justice), College of Criminal Justice, Northeastern University, Boston.

Reedy, D.C. and Koper, C.S. (2003). Impact of handgun types on gun assault outcomes: a comparison of gun assaults involving semiautomatic pistols and revolvers. *Injury Prevention* 9:151-155.

Richmond, T.S, Branas, C.C, Cheney, R.A, and Schwab, C.W. (2004). *The Case for Enhanced Data Collection of Handgun Type*, Firearm and Injury Center at Penn, University of Pennsylvania, Philadelphia.

Roth, J.A. and Koper, C.S. (1997). *Impact Evaluation of the Public Safety and Recreational Firearms Use Protection Act of 1994*, The Urban Institute, Washington, D.C.

Sheley, J.F. and Wright, J.D. (1993). *Gun Acquisition and Possession in Selected Juvenile Samples* (NCJ-145326), National Institute of Justice, United States Department of Justice, Washington, DC.

Sorenson, S.B. and Vittes, K.A. (2003). Buying a handgun for someone else: Firearm dealer willingness to sell. *Injury Prevention* 9:147-150.

Teachman, J.D. (1983). Analyzing social processes: Life tables and proportional hazards models. *Social Science Research* 12:263-301.

Tita, G. and Ridgeway, G. (2006). *Supply-Side Strategies to Reduce Illegal Gun Markets in Los Angeles*. Presentation at the annual meeting of the American Society of Criminology, Los Angeles.

United States Department of the Treasury. (1998). *Department of the Treasury Study on the Sporting Suitability of Modified Semiautomatic Assault Rifles*, Washington, DC.

Vernick, J.S. and Hepburn, L.M. (2003). State and federal gun laws: Trends for 1970-99. In Ludwig, J. and Cook, P.J. (eds.), *Evaluating Gun Policy: Effects on Crime and Violence*, Brookings Institution Press, Washington, DC.

Vernick, J.S., Webster, D.W., and Hepburn, L.M. 1999. "Effects of Maryland's law banning Saturday night special handguns on crime guns." Injury Prevention 5:259-263.

Violence Policy Center. (1992). More Gun Dealers Than Gas Stations, Washington, DC.

Violence Prevention Research Program. (2002). *Handgun Commerce in California, 1999.*, University of California, Davis, Sacramento, CA.

Wachtel, J. (1998). Sources of crime guns in Los Angeles, California. *Policing: An International Journal of Police Strategies and Management* 21:220-239.

Warner, K. (ed.). (1995). *Gun Digest 1995/49th Annual Edition,* DBI Books, Northbrook, IL.

Warner, K. (ed.). (1999). *Gun Digest 1999/53rd Annual Edition,* DBI Books, Northbrook, IL.

Webster, D.W., Vernick, J.S., and Hepburn, L.M. (2002). Effects of Maryland's law banning "Saturday night special" handguns on homicides. *American Journal of Epidemiology* 155:406-412.

Weil, D.S. and Knox, R.C. (1996). Effects of limiting handgun purchases on interstate transfer of firearms. *JAMA* 275:1759-1761.

Wilber, D.Q. (2004). D.C. police sweeping the street for guns. *The Washington Post* July 4:C6.

Wintemute, G.J. (1994). *Ring of Fire: The Handgun Makers of Southern California,* Violence Prevention Research Program, University of California, Davis.

Wintemute, G.J. (1996). The relationship between firearm design and firearm violence: Handguns in the 1990s." *JAMA* 275:1749-1753.

Wintemute, G.J., Drake, C.M., Beaumont, J.J., Wright, M.A., and Parham, C.A. (1998a). Prior misdemeanor convictions as a risk factor for later violent and firearm-related criminal activity among authorized purchasers of handguns. *JAMA* 280:2083-2087.

Wintemute, G.J., Parham, C.A., Wright, M.A., Beaumont, J.J., and Drake, C.M. (1998b). Weapons of choice: Previous criminal history, later criminal activity, and firearm preference among legally authorized young adult purchasers of handguns. *The Journal of Trauma: Injury, Infection, and Critical Care* 44:155-160.

95

Wintemute, G.J., Wright, M.A., Parham, C.A., Drake, C.M., Beaumont, J.J. (1998c). Criminal activity and assault-type handguns: A study of young adults. *Annals of Emergency Medicine* 32.

Wintemute, G.J., Romero, M.P., Wright, M.A., and Grassel, K.M. (2004). The life cycle of crime guns: A description based on guns recovered from young people in California. *Annals of Emergency Medicine* 43:733-742.

Wintemute, G.J., Cook, P.J., and Wright, M.A. (2005). Risk factors among retail handgun dealers for frequent and disproportionate sales of guns used in violent and firearm related crimes. *Injury Prevention* 11:357-363.

Wright, J.D. and Rossi, P.H. (1986). *Armed and Considered Dangerous: A Survey of Felons and Their Firearms*, Aldine de Gruyter, New York.

Wright, M.A., Wintemute, G.J., and Claire, B.E. 2005. "People and guns involved in denied and completed handgun sales." *Injury Prevention* 2005(11):247-250.

Zawitz, M.W. (1995). *Guns Used in Crime* (NCJ-148201), Bureau of Justice Statistics, United States Department of Justice, Washington, DC.

Zimring, F.E. (1972). The medium is the message: Firearm caliber as a determinant of death from assault. *The Journal of Legal Studies* 1:97-123.

Zimring, F.E. (1975). Firearms and federal law: The Gun Control Act of 1968. *Journal of Legal Studies* 4:133-198.

Zimring, F.E. (1976). Street crime and new guns: Some implications for firearms control. *Journal of Criminal Justice* 4:95-107.

# Exhibit 59



*Congressional Research Service*

# The Bureau of Alcohol, Tobacco, Firearms and Explosives (ATF): Budget and Operations for FY2011

**William J. Krouse**
Specialist in Domestic Security and Crime Policy

June 6, 2011

Congressional Research Service

7-5700

www.crs.gov

R41206

**CRS Report for Congress**
*Prepared for Members and Committees of Congress*

# Summary

The Bureau of Alcohol, Tobacco, Firearms and Explosives (ATF) is the lead federal law enforcement agency charged with administering and enforcing federal laws related to the manufacture, importation, and distribution of firearms and explosives. Congress transferred ATF's enforcement and regulatory functions for firearms and explosives from the Department of the Treasury to the Department of Justice (DOJ) as part of the Homeland Security Act (P.L. 107-296). ATF is also responsible for investigating arson cases with a federal nexus, as well as criminal violations of federal laws governing the manufacture, importation, and distribution of alcohol and tobacco. Congress authorized appropriations for ATF in the Department of Justice Authorization Act of 2005 (P.L. 109-162) for FY2006 through FY2009; however, the 111th Congress did not consider legislation to reauthorize annual appropriations for DOJ or ATF.

From FY2001 through FY2010, Congress increased direct appropriations for the ATF from $771.0 million to $1.158 billion. The FY2010 appropriation amount includes $37.5 million in supplemental appropriations for Project Gunrunner (P.L. 111-230). With this supplemental, Congress has provided ATF with $86.5 million in budget increases over three fiscal years, FY2008 through FY2010, to combat gun trafficking. Most of this funding has been allocated to Project Gunrunner, an ATF initiative to reduce gun trafficking across the Southwest border, or other projects to assist the government of Mexico.

For FY2011, the Administration requested $1.163 billion for ATF, an increase of 3.8% over the agency's initial FY2010 appropriation ($1.121 billion), which included $1.115 billion for salaries and expenses and $6 million for construction. For Project Gunrunner, the request included $11.8 million to annualize 37 positions that were previously funded by the American Recovery and Reinvestment Act (P.L. 111-5). It also included $1.2 million to enable ATF to coordinate state and local law enforcement efforts in the event of a national emergency and, thus, fulfill the Attorney General's Emergency Support Function (ESF) #13 obligations under the National Response Framework (NRF). The FY2011 request assumed $35.2 million and 46 FTE positions in base adjustments, less offsets and other reductions. The Senate Appropriations Committee reported a bill (S. 3636) that would have matched the FY2011 request, but no further action was taken on that bill. In the absence of an enacted FY2011 CJS appropriations bill, Congress passed a series of continuing resolutions (CRs) that temporarily funded ATF at its FY2010 enacted level.

On April 14, 2011, Congress passed the Department of Defense and Full-Year Continuing Appropriations Act, 2011 (H.R. 1473; P.L. 112-10) and funded ATF for the rest of FY2011 at its FY2010 enacted level, reduced by two-tenths of a percent. Hence, ATF's FY2011 appropriation is $1.113 billion. Other emerging issues related to the ATF budget and operations include a proposal to require multiple rifle sales reports from Southwest border state gun dealers and the agency's conduct of a Phoenix, AZ-based investigation known as "Operation Fast and Furious." This report complements CRS Report RL34514, *The Bureau of Alcohol, Tobacco, Firearms and Explosives (ATF): Budget and Operations for FY2008, FY2009, and FY2010.* For the FY2011 budget cycle, this report will be updated as needed. For coverage of ATF's FY2012 budget request, see CRS Report RL32842, *Gun Control Legislation.*

# Contents

Legislative Developments ................................................................................................ 1

ATF Mission ...................................................................................................................... 1

ATF Appropriations .......................................................................................................... 2
  ATF Budget Structure .................................................................................................... 3
  Administration's FY2011 Request and Appropriation ................................................... 4
  Funding and Staffing, FY1999-FY2010 ........................................................................ 6

Regulatory Backlogs ......................................................................................................... 8

Firearms Budget Program ............................................................................................... 10
  Violent Crime and Gangs ............................................................................................ 10
  Compliance Inspections of Licensed Gun Dealers ...................................................... 11
  Southwest Border Gun Trafficking .............................................................................. 13
    Project Gunrunner .................................................................................................... 13
    Electronic Trace Submission System ....................................................................... 16
    DOJ OIG Report, Mexican Trace Data, and Multiple Long Gun Sales ................... 17
    Operation Fast and Furious ...................................................................................... 18
    Related Legislation in the 110th and 111th Congresses ........................................... 20

Arson and Explosives Budget Program ........................................................................... 20
  Safe Explosives Act ..................................................................................................... 21
  ATF and FBI Concurrent Jurisdiction over Explosives Investigations ........................ 21

Alcohol and Tobacco Budget Program ............................................................................ 22
  Alcohol Diversion ........................................................................................................ 23
  Tobacco Diversion ....................................................................................................... 24
  Related Legislation in the 110th and 111th Congresses ............................................... 25

# Figures

Figure 1. ATF Appropriations, FY2011 Request .............................................................. 4

# Tables

Table 1. ATF Appropriations for Salaries and Expenses (S&E) and Construction Line
  Item Appropriations Accounts, FY2010 Enacted Compared to FY2011 Request ...................... 5

Table 2. ATF Appropriations, FY1999-FY2010 ............................................................... 7

Table A-1. ATF Authorizations Compared to Appropriations ......................................... 26

# Appendixes

Appendix. Authorizations Compared to Appropriations ................................................. 26

# Contacts

Author Contact Information ....................................................................................................... 27

This report provides an overview of the Bureau of Alcohol, Tobacco, Firearms and Explosives (ATF) budget and operations. The report chronicles congressional action on the FY2011 Commerce, Justice, Science (CJS), and Related Agencies Appropriations bills, as well as an FY2010 supplemental appropriations bill, that have included funding for ATF.

# Legislative Developments

On April 14, 2011, Congress passed the Department of Defense and Full-Year Continuing Appropriations Act, 2011 (H.R. 1473; P.L. 112-10). Under this act, for FY2011 Congress has funded the ATF salaries and expenses account at slightly below its FY2010 enacted level of funding (reduced by two-tenths of a percent). Hence, ATF's FY2011 appropriation is $1.113 billion. In addition, during consideration of a Full-Year Continuing Appropriations Act, 2011 (H.R. 1) on February 19, 2011, the House adopted an amendment that would have prohibited funds provided under that act from being used to require federally licensed gun dealers in the four Southwest border states to submit multiple rifle or shotgun sales reports. The House went on to pass H.R. 1, but the Senate rejected this bill on March 9, 2011, for budgetary considerations that went well beyond concerns about this policy rider. Nevertheless, Congress did not include a similar rider as part of P.L. 112-10. Besides ATF's multiple rifle sales reporting proposal, another emerging issue related to the ATF budget and operations includes the agency's conduct of a Phoenix, AZ-based investigation known as "Operation Fast and Furious."

# ATF Mission

Located in DOJ, the ATF is the lead federal law enforcement agency charged with administering and enforcing federal laws related to the manufacture, importation, and distribution of firearms and explosives. As part of the Homeland Security Act, Congress transferred ATF's enforcement and regulatory functions for firearms and explosives to DOJ from the Department of the Treasury (Treasury), adding "explosives" to ATF's title.[1] ATF is also responsible for investigating arson cases with a federal nexus, as well as criminal violations of federal laws governing the manufacture, importation, and distribution of alcohol and tobacco. The regulatory aspects of those alcohol and tobacco laws are the domain of the Tax and Trade Bureau (TTB), which was established at Treasury following ATF's transfer to DOJ.[2]

As a law enforcement agency within DOJ, ATF's first priority is preventing terrorist attacks within the United States.[3] ATF is responsible for countering the illegal use and trafficking of

---

[1] P.L. 107-296, 116 Stat. 2135, November 25, 2002, § 1111 (effective January 24, 2003).

[2] ATF was originally established as a separate bureau in the Department of the Treasury (DOT) in 1972 by Treasury Department Order No. 120-1. While ATF traces its origins back to the first federal tax on distilled spirits in 1791, its firearm regulatory responsibilities can largely be traced back to the 1934 National Firearms Act (NFA). As the NFA is essentially a tax law, it was administered initially by the Department of the Treasury's Bureau of Internal Revenue (BIR) and its Miscellaneous Tax Unit. In 1942, the firearm enforcement duties were transferred to BIR's Alcohol Tax Unit (ATU). In 1952, the BIR was reorganized and renamed the Internal Revenue Service (IRS) and the firearm and tobacco programs were transferred to ATU, which was renamed, the Alcohol and Tobacco Tax Division (ATTD). Following the Gun Control Act of 1968, the ATTD was given responsibility for explosives as well, and was renamed the Alcohol, Tobacco and Firearms Division (ATFD). See George Thomas Kurian, Editor in Chief, *A Historical Guide to the U.S. Government*, Vicki Herrmann, "Alcohol, Tobacco and Firearms, Bureau of," (New York, 1998), pp. 39-41.

[3] U.S. Department of Justice, Office of the Attorney General, *Stewards of the American Dream: FY 2007—FY 2012* (continued...)

firearms and explosives, and the criminal diversion of alcohol and tobacco products as an illegal source of funding for terrorist activities. In criminal investigations, ATF agents have reportedly uncovered foreign terrorists and their supporters bootlegging cigarettes as part of larger terrorist-financing operations in the United States.[4] With those responsibilities, ATF special agents are partners on DOJ's Joint Terrorism Task Forces.[5]

As shown below, however, the lion's share of ATF's resources are allocated to its firearms compliance and investigations program. While the ATF periodically checks the records of federally licensed gun dealers, the major focus of the firearms program is the reduction of firearms-related violence.

# ATF Appropriations

In the 10-year period from FY2001 through FY2010, Congress increased direct appropriations for the ATF by 50.2%, from $771.0 million to $1.158 billion. Moreover, over three fiscal years, FY2008 through FY2010, Congress provided ATF with about $86.5 million in program increases to address firearms trafficking, or the diversion of firearms from legal to illegal markets. Most of this funding has been dedicated to ATF efforts to reduce firearms trafficking from the United States to Mexico.[6] To these ends, under the Mérida Initiative ATF released a Spanish-language version of its firearms trace request software (e-Trace 4.0) to Mexico, Guatemala, and Costa Rica and established a U.S.-Mexico ballistic evidence exchange capability under the National Integrated Ballistic Imaging Network (NIBIN) program.[7] For FY2010, Congress also provided ATF with nearly $30 million for the construction of a National Center for Explosives Training and Research (NCETR).[8]

In the 110th Congress, the House passed a bill (H.R. 6028) that would have authorized increasing ATF appropriations over three years, for FY2008 through FY2010, by nearly $74 million to

---

(...continued)
*Strategic Plan.*

[4] U.S. Department of Justice, Office of the Inspector General, Evaluation and Inspections Division, The Bureau of Alcohol, Tobacco, Firearm and Explosives' Efforts to Prevent the Diversion of Tobacco, Report Number I-2009-005 (September 2009), p. 15.

[5] U.S. Department of Justice, Office of the Inspector General, *The Department of Justice's Terrorism Task Forces*, Report Number I-2005-007, June 2005.

[6] For further information on Operation Gunrunner, see CRS Report R40733, *Gun Trafficking and the Southwest Border*, by Vivian S. Chu and William J. Krouse.

[7] In the late 1990s, ATF developed NIBIN to enable law enforcement agencies to share computerized images of bullets and cartridge casings recovered by law enforcement, including crime scene evidence. To capture such images, ATF also deploys Integrated Ballistic Identification Systems to state and local law enforcement agencies. Those images are uploaded into several regional computer networks under the NIBIN program. For further information, see Daniel L. Cork et al., *Ballistic Imaging, Committee to Assess the Feasibility, Accuracy, and Technical Capability of a National Ballistic Database*, National Research Council, 2008, p. 133.

[8] NCETR (pronounced "en-SEE-der") was authorized under section 1114 of the Homeland Security Act of 2002 (P.L. 107-296; 116 Stat. 2280). Although this provision designated Fort A.P. Hill as the location for this center, it has been established at Redstone Arsenal in Huntsville, AL. At NCETR, ATF is providing explosives-related research and training to federal, state, local, and international law enforcement personnel. Hence, it is co-located with the FBI Hazardous Devices School, where the FBI has been providing explosives-related training to federal state, local, and international law enforcement personnel since the 1980s. In addition, the FBI is relocating the Terrorist Explosive Device Analytical Center (TEDAC) to Redstone Arsenal. It is located currently in Quantico, VA.

address Southwest border gun trafficking. As a DOJ bureau, the ATF authorization of appropriations expired for FY2010. Previously, Congress provided annual appropriations authorizations, for FY2006 through FY2009, in the Department of Justice Authorization Act of 2005 (P.L. 109-162) (see **Appendix**). In the 111th Congress, no action was taken on bills to reauthorize or increase ATF appropriations. However, the 111th Congress granted ATF greater authority to inspect the businesses and records of "cigarette deliverers" in the Prevent All Cigarette Trafficking Act (P.L. 111-154).

For oversight purposes, it is also notable that in the fall of 2009 the DOJ Office of Inspector General (OIG) released three reports on ATF operations. The first examined Project Gunrunner, an ATF initiative to reduce illegal gun trafficking from the United States to Mexico.[9] The second examined ATF's efforts to investigate contraband cigarette trafficking.[10] The third examined ATF's concurrent jurisdiction with the Federal Bureau of Investigation (FBI) for explosives-related investigations.[11] In November 2010, moreover, the OIG released another review of Project Gunrunner, recommending among other things that ATF ought to work with DOJ to explore options to require reporting of multiple long gun sales from federally licensed gun dealers in the four Southwest border states.[12]

## ATF Budget Structure

Congress appropriates funding annually for ATF in a salaries and expenses account and, for some, but not all years, in a construction account. Both accounts are given a line item in the CJS appropriations bill. With regard to salaries and expenses, the ATF subdivides this account into three budget decision units:

- firearms compliance and investigations,
- arson and explosives investigations, and
- alcohol and tobacco diversion.

Although Congress does not appropriate monies for the ATF (or any other DOJ agency) by decision unit, the appropriators often address whether program increases requested specifically by the Administration are to be provided in report language and more rarely in bill language for the salaries and expenses account itself. As a consequence, the amounts requested for decision units are binding in the sense that the appropriators are aware of the increases that were provided in the annual bureau appropriation and how those increases would affect the decision unit totals. If funding is shifted from one decision unit to another, statutory budget reprogramming requirements are usually triggered, under which DOJ and its agencies are required to notify the

---

[9] U.S. Department of Justice, Office of the Inspector General, Evaluation and Inspections Division, *Interim Review of ATF's Project Gunrunner*, Report Number I-2009-006, September 2009.

[10] U.S. Department of Justice, Office of the Inspector General, Evaluations and Inspections Division, *The Bureau of Alcohol, Tobacco, Firearms and Explosives' Efforts to Prevent the Diversion of Tobacco*, Report Number I-2009-0005, September 2009.

[11] U.S. Department of Justice, Office of the Inspector General, Audit Division, *Explosives Investigation Coordination Between the Federal Bureau of Investigation and the Bureau of Alcohol, Tobacco, Firearms and Explosives*, Audit Report 10-01, October 2009.

[12] U.S. Department of Justice, Office of Inspector General, Evaluation and Inspections Division, *Review of ATF's Project Gunrunner*, Report Number 1-2011-001, November 2010.

---

appropriations committees about such shifts.[13] ATF budget decision units are described in greater detail below.

## Administration's FY2011 Request and Appropriation

In February 2010, DOJ released the *ATF Congressional Budget Submission, Fiscal Year 2011.*[14] The FY2011 budget request included $1.163 billion for ATF. At the time of the budget request, this amount represented an increase of $42.2 million, or 3.8%, compared to the FY2010-enacted appropriation of $1.121 billion. **Figure 1** shows proposed budget decision unit allocations accompanying the FY2011 budget request. Of these programs, the firearms compliance and investigations decision unit was to be allocated the lion's share, 72%, of appropriated funding. The arson and explosives investigations decision unit and the alcohol and tobacco diversion decision unit were to be allocated 26% and 2%, respectively, of the requested appropriation.

**Figure 1. ATF Appropriations, FY2011 Request**



**FY2011 Request**
*dollars in millions*
($1,163.0)

Arson & Explosives ($302.4) 26%
Alcohol & Tobacco ($23.3) 2%
Firearms ($837.4) 72%
Construction ($0)

**Source:** *ATF Congressional Budget Submission, Fiscal Year 2011.*

As **Table 1** shows, the FY2010 appropriation of $1.121 billion included $1.115 billion for salaries and expenses and $6 million for construction. The Administration, however, requested no funding for ATF construction for FY2011. Compared to the $1.115 billion Congress initially appropriated for ATF salaries and expenses for FY2010, the Administration's FY2011 budget request proposed a net increase of $48.2 million and 86 full-time equivalent (FTE) positions for ATF. This amount included

- $35.2 million in base adjustments (less certain offsets and other reductions) and 46 FTE positions;[15]

---

[13] The Consolidated Appropriations Act, 2010 (P.L. 111-117, section 505 of the CJS general provisions [123 Stat. 3149-3159]), includes several requirements regarding the reprogramming of funding provided under Division B of the act. Among other things, these requirements prohibit any reprogramming that proposes to use funds directed for a specific activity by either the House or Senate Appropriations Committees, unless both Committees are notified 15 days in advance.

[14] Available at http://www.justice.gov/jmd/2011justification/pdf/fy11-atf-justification.pdf.

[15] For most DOJ agencies, the Administration of President George W. Bush had routinely proposed "base adjustments" to the number of FTE and permanent positions that were considered "authorized" (funded or appropriated for) as part of estimating an agency's base budget, which was a departure from past practices. For FY2010 and FY2011, the Obama Administration proposed making similar adjustments to the ATF base budget, as described above. The base budget essentially represents an estimated level of resources that an agency would need to provide the anticipated level of services for the current fiscal year in the next fiscal year. In the past, base budgets did not include adjustments to the number of permanent positions, and the number of "authorized" permanent positions was generally static, unless changed by Congress by increasing or decreasing funding associated with those positions. As happened in the FY2008 budget cycle, the Administration has periodically (about every 10 years) proposed eliminating "hollow" positions, for which the modular costs and underlying assumptions are no longer sufficient to fund those positions. Authorized or funded positions are generally displayed by job series in a "Table of Organization" in the agency's budget submissions to Congress. The ATF FY2011 proposed budget assumed base adjustments of $41.9 million that were reduced by $6.7 (continued...)

- $11.8 million and 37 FTE positions for Project Gunrunner; and
- and $1.2 million and 3 FTE positions for Emergency Support Function #13.[16]

The $13.0 million in proposed program increases are broken out by budget decision unit in **Table 1** in the "FY2011 Increases" column. The $1.2 million for Emergency Support Function #13 is spread across all three budget decision units: $854,000 for firearms, $320,000 for arson and explosives, and $24,000 for alcohol and tobacco. The $35.2 million in base adjustments and other offsets is the difference between the "FY2010 Enacted" and "FY2011 Base" columns.

### Table 1. ATF Appropriations for Salaries and Expenses (S&E) and Construction Line Item Appropriations Accounts, FY2010 Enacted Compared to FY2011 Request

(Dollars in thousands)

| Decision Units | FY2010 Enacted[a] | | FY2011 Base[b] | | FY2011 Increases[c] | | FY2011 Request | |
|---|---|---|---|---|---|---|---|---|
| | Dollars | FTE[d] | Dollars | FTE[d] | Dollars | FTE[d] | Dollars | FTE[d] |
| Firearms | $802,636 | 3,614 | $824,651 | 3,660 | $12,699 | 40 | $837,350 | 3,700 |
| Arson & Explosives | 289,841 | 1,321 | 302,057 | 1,321 | 320 | 0 | 302,377 | 1,321 |
| Alcohol & Tobacco | 22, 295 | 90 | 23,235 | 90 | 24 | 0 | 23,259 | 90 |
| S&E Subtotal | 1,114,772 | 5,025 | 1,149,943 | 5,071 | 13,043 | 40 | 1,163,986 | 5,111 |
| Construction | 6,000 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Total | 1,120,772 | 5,025 | 1,149,943 | 5,071 | 13,043 | 40 | 1,163,986 | 5,111 |

**Source:** *ATF Congressional Budget Submission, Fiscal Year 2011.*

**Notes:** Amounts may not add to totals due to rounding.

a. The FY2010 enacted amounts do not reflect $37.5 million and 53 FTE positions provided by an emergency border security supplemental appropriation (P.L. 111-230).

b. The base budget essentially represents an estimated level of resources that ATF would need to provide the anticipated level of services for the current fiscal year (FY2010) in the next fiscal year (FY2011).

c. FY2011 increases are requested program increases over base. In other words, if appropriated, these resources will be for new activities and services.

d. A full-time equivalent (FTE) position represents the amount of funding necessary to provide for a single position for an entire year. Not all positions (new, temporary, and part-time) are fully funded for the entire year. New positions, for example, are often partially funded, as such positions are filled incrementally and at some point during the fiscal year. Hence, they do not require full funding for the first year.

---

(...continued)

million in non-reoccurring costs and other offsets.

[16] Emergency Support Function #13 (ESF #13) falls under the Public Safety and Security Annex to the National Response Framework (NRF). The NRF sets broad responsibilities and lines of authority for federal agencies in the event of a national emergency or major disaster. Under the NRF, the Attorney General is responsible for ESF-13, which entails all hazards law enforcement planning and coordination for the entire United States and its territories. The Attorney General, in turn, has delegated his responsibility for ESF-13's implementation to the ATF. For more information, see CRS Report RL34758, *The National Response Framework: Overview and Possible Issues for Congress,* by Bruce R. Lindsay.

In March 2010, the House CJS subcommittee held a hearing on the ATF FY2011 budget submission. Members of the subcommittee raised questions about gun trafficking on the Southwest border, regulatory backlogs, violent crime impact teams, and inter-agency coordination on gang violence. On July 22, 2010, the Senate Appropriations Committee reported its FY2011 CJS appropriations bill (S. 3636; S.Rept. 111-229). This measure would have provided ATF with $1.163 billion for FY2011, matching the Administration's request. However, no further action was taken on this measure.

Also, on June 22, 2010, the Administration requested an FY2010 supplemental appropriation of $39.1 million for ATF to increase Southwest border gun trafficking investigations. The House Appropriations Committee included this amount in the Emergency Border Security Supplemental Appropriations Act, 2010 (H.R. 5875), and the House passed this measure on July 28, 2010. The Senate passed its version of H.R. 5875 (adopting the text of S. 3721 as a substitute amendment) on August 5, 2010. The Senate-passed version of H.R. 5875 included $37.5 million for ATF. On August 9, the House introduced a new border security supplemental bill (H.R. 6080), which was subsequently passed by the House on August 10. H.R. 6080 contains identical language to the Senate-passed H.R. 5875. Reportedly, the House took up the bill with a new number to avoid a dispute related to its constitutional obligation to originate all revenue measures.[17] This dispute arose with the addition of funding provisions in Senate-passed H.R. 5875 that were not included in the House-passed version. On August 12, the Senate passed H.R. 6080. On August 13, 2010, the President signed H.R. 6080 into law (P.L. 111-230). It provided ATF with an additional $37.5 million for Project Gunrunner.[18] This supplemental brought total FY2010 appropriated funding for the ATF to $1.158 billion.

In the absence of an enacted FY2011 CJS appropriations bill, the 112th Congress passed a series of CRs, which the President signed into law (P.L. 111-242, P.L. 111-290, P.L. 111-317, P.L. 111-322, P.L. 112-4, P.L. 112-6, and P.L. 112-8).[19] These CRs temporarily funded most federal agencies, including ATF, at their FY2010 enacted level of funding. On April 14, 2011, Congress passed the Department of Defense and Full-Year Continuing Appropriations Act, 2011 (H.R. 1473; P.L. 112-10). Under this act, for FY2011 Congress has funded the ATF salaries and expenses account at slightly below its FY2010 enacted level of funding (reduced by two-tenths of a percent). ATF's FY2011 appropriation is $1.113 billion.

## Funding and Staffing, FY1999-FY2010

As **Table 2** shows, from FY1999 to FY2010 Congress more than doubled ATF's appropriations from $541.6 million to nearly $1.158 billion. With some fluctuation, ATF staffing increased from 3,969 to 5,078 FTE positions, a 28% increase.[20] Since its transfer to DOJ in FY2003, ATF has also reported permanent positions, in addition to FTE positions.

---

[17] Theo Emery and Edward Epstein, "Border Security Bill Passes in House," *CQ Today*, August 10, 2010, online edition.

[18] According to ATF, this supplemental is two-year funding that will be fully expended by the end of FY2011. Only a portion ($13.2 million) is annualized as part of the President's FY2012 budget request: $7.2 million for two gunrunner teams and $6.0 million to increase tracing capacity at the National Tracing Center.

[19] See CRS Report RL30343, *Continuing Resolutions: Latest Action and Brief Overview of Recent Practices*, by Sandy Streeter.

[20] These staffing amounts do not reflect FTE positions provided for law enforcement availability pay (LEAP), overtime pay, or FTE positions funded with reimbursable resources.

## Table 2. ATF Appropriations, FY1999-FY2010

(Dollars in thousands)

| Fiscal Year | Appropriation(s) | Full-Time Equivalent (FTE) Positions[a] | Permanent Positions |
|---|---|---|---|
| 1999 | $541,574[b] | 3,969 | N/A |
| 2000 | $565,959[c] | 4,221 | 4,492 |
| 2001 | $771,143[d] | 4,643 | 5,049 |
| 2002 | $854,747[e] | 5,029 | 5,143 |
| 2003 | $826,801[f] | 5,111 | 5,231 |
| 2004 | $827,289[g] | 4,735[h] | 4,862[h] |
| 2005 | $882,465[i] | 4,885 | 5,073 |
| 2006 | $935,817[j] | 5,040 | 5,128 |
| 2007 | $988,097[k] | 5,053 | 5,128 |
| 2008 | $1,011,597[l] | 4,880[m] | 4,956[m] |
| 2009 | $1,078,215[n] | 4,957 | 5,008 |
| 2010 | $1,158,272[o] | 5,078 | 5,206 |

**Source:** CRS presentation of ATF funding and staffing data presented in Department of the Treasury and Department of Justice budget submissions to Congress for FY2000-FY2011.

**Notes:** N/A = not applicable

a. A full-time equivalent (FTE) position represents the amount of funding necessary to provide for a single position for an entire year. Not all positions (new, temporary, and part-time) are fully funded for the entire year. New positions, for example, are often partially funded, as such positions are filled incrementally and at some point during the fiscal year. Hence, they do not require full funding for the first year.

b. For FY1999, an appropriation of $541.6 million was provided in the Omnibus Consolidated and Emergency Supplemental Appropriations Act, 1999 (P.L. 105-277). This amount, however, does not reflect $14.5 million in Y2K emergency funding that was transferred to ATF for FY1999.

c. For FY2000, an appropriation of $566.0 million was provided in the Treasury and General Government Act, 2000 (P.L. 106-58). This amount, however, does not reflect a transfer of $40.9 million from the Violent Crime Reduction Trust Fund, nor the effect of a $1.2 million rescission under the Consolidated Appropriations Act, 2000 (P.L. 106-113).

d. For FY2001, an appropriation of $768.7 million was provided in the FY2001 Omnibus Appropriations Act (P.L. 106-554), $4.1 million in the FY2001 Transportation Appropriations Act (P.L. 106-346), and a rescission of $1.7 million under P.L. 106-554.

e. For FY2002, an appropriation of $823.3 million was provided in the FY2002 Treasury Appropriations Act (P.L. 107-67) and $31.4 million in the FY2002 Emergency Supplemental Appropriations Act (P.L. 107-117).

f. For FY2003, an appropriation of $886.4 million was provided in the Consolidated Appropriations Resolution, 2003 (P.L. 108-7). Under the Homeland Security Act of 2002 (P.L. 107-296), however, most of ATF was transferred to DOJ. Reflecting that transfer and the fact that part of ATF remained at Department of the Treasury as the Alcohol and Tobacco Tax and Trade Bureau (TTB), the FY2003 appropriation for ATF was $826.8 million, according to DOJ budget documents.

g. For FY2004, an appropriation of $836.1 million was provided by the Consolidated Appropriations Act, 2004 (P.L. 108-199). House Appropriations Committee tables showed the FY2004 ATF appropriation as $827.3 million (H.Rept. 108-576. p. 154).

h. The decrease of 376 FTE positions and 369 permanent positions for FY2004, as compared with FY2003, reflects TTB funding and staffing that remained at Treasury.

i. For FY2005, an appropriation of $886.4 million was provided in the Consolidated Appropriations Act, 2005 (P.L. 108-447). With rescissions, this amount was reduced to $878.5 million. Congress also provided ATF with $4.0 million in the Emergency Supplemental Appropriations Act for Defense, the Global War on Terror, and Tsunami Relief, 2005 (P.L. 109-13).

j. For FY2006, an appropriation of $911.8 million was provided in the Science, State, Justice, Commerce, and Related Agencies Appropriations Act, 2006 (P.L. 109-108). Congress also provided ATF with $20 million in the Department of Defense Emergency Supplemental Appropriations to Address Hurricanes in the Gulf of Mexico, and Pandemic Influenza Act (P.L. 109-148) and $4 million in the Emergency Supplemental Appropriations Act for Defense, the Global War on Terror, and Hurricane Recovery (P.L. 109-234).

k. For FY2007, an appropriation of $984.1 million was provided in the Continuing Resolution Act, 2007 (P.L. 110-5). Congress also provided ATF with a supplemental of $4.0 million in the Troop Readiness, Veterans' Care, Katrina Recovery, and Iraq Accountability Appropriations Act, 2007 (P.L. 110-28).

l. For FY2008, appropriations of $984.1 million for salaries and expenses and $23.5 million for construction were provided in the Consolidated Appropriations Act, 2008 (P.L. 110-161). Congress also provided ATF with $4.0 million in the Supplemental Appropriations Act, 2008 (P.L. 110-252).

m. The decrease of 173 FTE positions and 172 permanent positions for FY2008, as compared with FY2007, reflects adjustments to base and other technical adjustments to the ATF budget that were made to eliminate "hollow" or "unfunded" positions.

n. For FY2009, an appropriation of $1.054 billion was provided in the Omnibus Appropriations Act, 2009 (P.L. 111-8). Congress also provided ATF with $24.0 million in supplemental appropriations, of which $10.0 million was provided under the American Recovery and Reinvestment Act, 2009 (P.L. 111-5) and $14.0 million under the Supplemental Appropriations Act, 2009 (P.L. 111-32).

o. For FY2010, under the Consolidated Appropriations Act, 2010 (P.L. 111-117), Congress provided ATF with $1.021 billion (5,025 FTE positions and 5,101 permanent positions). This amount included $6 million for construction. Under the FY2010 border security emergency supplemental appropriation (P.L. 111-230), Congress provided ATF with an additional $37.5 million (53 FTE positions and 105 permanent positions).

The FY2010 appropriation under P.L. 111-117 initially funded 5,101 permanent positions, including 2,485 special agents (SAs), 834 industry operations investigators (IOIs, formerly inspectors) and investigative research specialists (IRIs), and 1,782 "other" positions.[21] For FY2010, Congress also provided ATF with an additional 105 positions through a $35.5 million supplemental appropriation to address Southwest border gun trafficking. These positions included 77 SAs, 14 IOIs, and 14 other positions. In addition, as has been the case in recent years, 55 ATF permanent positions (54 SAs and one other position) were funded through reimbursable resources.[22]

# Regulatory Backlogs

On March 4, 2010, the House CJS Appropriations Subcommittee held a hearing on the Administration's FY2011 ATF budget request.[23] As in past hearings, the subcommittee chair, Representative Alan Mollohan, observed that the request did not include any additional positions dedicated to regulation writers, despite a regulatory backlog.[24] He observed that 15 of 16 ATF

---

[21] U.S. Department of Justice, *ATF Congressional Budget Submission, Fiscal Year 2011*, Exhibit I—Detail of Permanent Positions by Category.

[22] Ibid.

[23] U.S. Congress, House Committee on Appropriations, Subcommittee on Commerce, Justice, Science, and Related Agencies, *Hearing on President Obama's Fiscal Year 2011 Budget Request for the Bureau of Alcohol, Tobacco, Firearms, and Explosives*, 111th Congress, 2nd Session, March 4, 2010 (CQ Congressional Transcripts).

[24] In the conference report accompanying the Consolidated Appropriations Act, 2010, conferees expressed their (continued...)

---

positions previously associated with such duties had remained at Treasury, following ATF's transfer to DOJ in January 2003.[25] (With the exception of two positions, those positions have not been backfilled.) If ATF previously needed anywhere near 16 positions for such purposes, Representative Mollohan asked rhetorically, was not the ATF request "woefully inadequate?"[26] ATF Deputy Director Kenneth Melson[27] did not comment on the regulatory backlog, but conceded that the agency needed additional "regulation writers."[28]

With regard to the regulatory backlog, it is significant to note that, in most cases, ATF IOIs serve as the "subject area experts," who are usually tasked with drafting regulations. ATF's capabilities to regulate U.S. firearms and explosives commerce adequately and deter the illegal use of these commodities is undergirded by its ability to promulgate clear and concise regulations. Although most of the ATF subject area experts on alcohol and tobacco remained with the Department of Treasury's Alcohol and Tobacco Tax and Trade Bureau (TTB), ATF is still responsible for the bulk of enforcement of criminal statutes related to these commodities. Other issues raised by subcommittee members included the scope of gun trafficking on the Southwest border, the effectiveness of violent crime impact teams, and inter-agency coordination on gang violence. These issues are discussed below.

---

(...continued)

concern generally with regulatory backlogs at DOJ agencies, and particularly at the ATF. Conferees noted, "While ATF and other relevant bureaus hold primary responsibility for getting their regulations drafted, reviewed and disposed of in a timely manner, the Department also plays a significant role, and lengthy delays in the Department's consideration of proposed regulations are contributing to the larger timeliness problem." With regard to reducing regulatory backlogs, conference report language directs DOJ to report within 120 days of enactment (April 16, 2010) to the Appropriations Committees on recommended process reforms and resource investments. (H.Rept. 111-366, p. 659.)

[25] U.S. Congress, House Committee on Appropriations, Subcommittee on Commerce, Justice, Science, and Related Agencies, *Hearing on President Obama's Fiscal Year 2011 Budget Request for the Bureau of Alcohol, Tobacco, Firearms, and Explosives*, 111th Congress, 2nd Session, March 4, 2010 (CQ Congressional Transcripts).

[26] Ibid.

[27] Section 504 of the USA PATRIOT Improvement and Reauthorization Act of 2005 (P.L. 109-177; March 9, 2006; 120 Stat. 247) requires the ATF Director to be appointed by the President with the advice and consent of the Senate. The position of ATF Director, however, has not been filled permanently since August 2006, after ATF Director Carl J. Truscott resigned due to preliminary findings by the DOJ OIG that he had engaged in questionable expenditures and management practices while serving as ATF Director. In September 2006, President George W. Bush appointed the U.S. Attorney for the District of Boston, Michael J. Sullivan, acting ATF Director. Sullivan served in both posts concurrently. In February 2008, his confirmation as ATF Director was blocked in the Senate, when several Senators voiced their concern about ATF's "overly aggressive" enforcement of gun laws and the nominee's views on such matters. Sullivan resigned as acting ATF Director on January 20, 2009. Ronnie Carter served as acting Director until April 2009, when Kenneth Melson was appointed acting Director. In November 2009, Melson was appointed Deputy Director, because the 210-day statutory limit on the acting Director's tenure had expired. On November 17, 2010, the Obama Administration nominated Andrew Traver, the ATF Special Agent in Charge in Chicago, to be ATF Director. Because the Senate did not act on this nomination in the 111th Congress, Traver was renominated by the Administration on January 5, 2011. See U.S. Department of Justice, Office of the Inspector General, Oversight and Review Division, *Report of Investigation Concerning Alleged Mismanagement and Misconduct by Carl J. Truscott, Former Director of the Bureau of Alcohol, Tobacco, Firearms and Explosives* (October 2006). Jonathan Saltzman, "Sullivan ATF Confirmation Blocked; La. Senator Objects to Gun-License Stance," *Boston Globe*, February 14, 2008, p. B1. Jonathan Saltzman, "US Attorney To Resign Sooner Than Expected: List of Finalists for Post Not Yet Sent To Obama," *Boston Globe*, April 16, 2009, p. 2. Andrew Ramanos, "Senate Returns ATF Nomination to White House," *Main Justice: Politics, Policy and the Law*, December 23, 2010. The White House, Office of the Press Secretary, "Presidential Nominations Sent to the Senate," January 5, 2011.

[28] U.S. Congress, House Committee on Appropriations, Subcommittee on Commerce, Justice, Science, and Related Agencies, *Hearing on President Obama's Fiscal Year 2011 Budget Request for the Bureau of Alcohol, Tobacco, Firearms, and Explosives*, 111th Congress, 2nd Session, March 4, 2010 (CQ Congressional Transcripts).

# Firearms Budget Program

ATF's firearms budget program funds activities related to administering and enforcing federal laws related to the manufacture, importation, and distribution of firearms. The principal focus of ATF's firearms-related activities, however, is the reduction of firearms-related violence. As part of this focus, the ATF has dedicated increased resources in recent years toward investigating the criminal activities of violent street gangs, ensuring that federally licensed gun dealers comply with the law, and suppressing gun trafficking. ATF's authority to regulate firearms commerce in the United States is derived generally from three statutes: (1) the National Firearms Act of 1934 (NFA),[29] (2) the Gun Control Act of 1968 (GCA),[30] and (3) the Arms Export Control Act of 1976.[31] The proposed FY2011 firearms program allocation accompanying the Administration's budget request is $837.4 million, or 72% of the FY2011 budget request ($1.163 billion). The proposed allocation includes an increase of $12.7 million over base ($11.8 million for Project Gunrunner and $854 thousand for Emergency Support Function #13).

## Violent Crime and Gangs

As a full partner in the President's Project Safe Neighborhoods (PSN), which was initiated in FY2001, ATF has joined with DOJ attorneys and other federal law enforcement agencies, along with state, local, and tribal authorities, to investigate and prosecute offenders, with a particular focus on armed violent and career criminals. ATF also leads the Attorney General's Violent Crime Impact Teams (VCITs) in 31 cities[32] in an effort to reduce the number of homicides and other violent crimes committed with firearms.[33] According to ATF, the VCITs assist state and local authorities by

- systematically investigating all firearms-related leads;

- responding to all street recoveries of firearms and interviewing those involved to determine the source of the firearms;

- targeting and investigating violent and career criminals, and removing them from the streets;

- infiltrating criminal groups through undercover operations and confidential informants;

- tracing all recovered guns used in crime to determine their origin;

---

[29] P.L. 73-474; June 26, 1934; 48 Stat. 1236, codified, as amended, at 26 U.S.C., Chapter 53, § 5801 et seq.

[30] P.L. 90-618; October 22, 1968; 82 Stat. 1213; codified, as amended, at 18 U.S.C., Chapter 44, § 921 et seq.

[31] P.L. 94-329, June 30, 1976; 90 Stat. 729; codified, as amended, at 22 U.S.C. § 2778 et seq.

[32] Those cities are Albuquerque, NM; Atlanta, GA; Baltimore, MD; Baton Rouge and New Orleans, LA; Birmingham, AL; Camden, NJ; Columbus, OH; Fresno, Los Angeles, and San Bernardino, CA; Greensboro, NC; Hartford, CT; Houston and Laredo, TX; Las Vegas, NV; Miami, Orlando, and Tampa, FL; Milwaukee, WI; Minneapolis, MN; Philadelphia and Pittsburgh, PA; Richmond, VA; Mesa and Tucson, AZ; San Juan, PR; Tulsa, OK; Memphis and Nashville, TN; and Jackson, MS.

[33] U.S. Department of Justice, Bureau of Alcohol, Tobacco, and Firearms, "ATF Fact Sheet: Violent Crime Impact Teams Initiative," March 2010.

- imaging and storing all ballistic evidence in the National Integrated Ballistic Information Network (NIBIN); and

- inspecting and, when appropriate, investigating corrupt federal firearms licensees.[34]

Under the VCIT initiative, defendants referred by ATF for prosecution in gang-related investigations have increased from 403 in FY2000 to 4,381 in FY2007, nearly a tenfold increase.[35] In FY2008, ATF referred over 4,100 gang members and their associates for prosecution.[36] For FY2010, Congress provided ATF with a $10 million increase to expand VCITs.

During the March 4, 2010, CJS appropriations hearing, Representative Frank Wolf questioned ATF Deputy Director Melson about how the FBI and ATF divided their anti-gang responsibilities.[37] Melson responded that, when operating in the same city, the two agencies usually divide their respective operational areas geographically, so that an ATF-led VCIT would work one high-crime area and an FBI-led Safe Streets Task Force would work another.[38] Representative Wolf also asked about ATF's presence at the FBI-led National Gang Intelligence Center (NGIC).[39] Melson responded that ATF has a presence at NGIC, as well as at the DOJ-led National Gang Targeting Enforcement and Coordination Center (GangTECC), and that ATF and its partner agencies were satisfied that the center was a success.[40] It is noteworthy that FY2010 conference report language accompanying the FY2010 Consolidated Appropriations Act directs ATF to coordinate with the FBI and other DOJ entities on efforts to maximize the effectiveness of anti-gang efforts and to report back to the Appropriations Committees within 120 days (April 16, 2010).[41] ATF indicated that the report's target release date was May 16, 2010.[42] Also, for FY2008, Congress appropriated $373,000 for ATF to assign two positions to GangTECC. This program increase was incorporated into ATF's base budgets for FY2009, FY2010, and the FY2011 request.

## Compliance Inspections of Licensed Gun Dealers

ATF inspects federal firearms licensees (FFLs) to monitor their compliance with the GCA and to prevent the diversion of firearms from legal to illegal channels of commerce. In the past, despite

---

[34] U.S. Department of Justice, Bureau of Alcohol, Tobacco, Firearms and Explosives, *ATF Congressional Budget Submission, Fiscal Year 2007* (February 2006), p. 47.

[35] U.S. Department of Justice, Bureau of Alcohol, Tobacco, Firearms and Explosives, *ATF Congressional Budget Submission, Fiscal Year 2009* (February 2008), p. 22.

[36] U.S. Department of Justice, Bureau of Alcohol, Tobacco, Firearms and Explosives, *ATF Congressional Budget Submission, Fiscal Year 2011* (February 2010), p. 9.

[37] U.S. Congress, House Committee on Appropriations, Subcommittee on Commerce, Justice, Science, and Related Agencies, *Hearing on President Obama's Fiscal Year 2011 Budget Request for the Bureau of Alcohol, Tobacco, Firearms, and Explosives*, 111th Congress, 2nd Session, March 4, 2010 (CQ Congressional Transcripts).

[38] Ibid.

[39] Ibid.

[40] Ibid. Also, for more information on the NGIC and GangTECC, see U.S. Department of Justice, Office of Inspector General, Evaluation and Inspections Division, *A Review of the Department's Anti-Gang Intelligence and Coordination Centers*, Report Number I-2010-001, November 2009.

[41] H.Rept. 111-366, p. 670.

[42] U.S. Department of Justice, Bureau of Alcohol, Tobacco, Firearms and Explosives, *ATF Congressional Budget Submission, Fiscal Year 2011* (February 2010), Exhibit M – Status of Congressionally Requested Studies, Reports, and Evaluations.