its crime-fighting mission, ATF's business relationships with the firearms industry and larger gun-owning community have been a perennial source of tension, which from time to time has been the subject of congressional oversight.[43] Nevertheless, under current law, ATF Special Agents (SAs) and Industry Operations Investigators (IOIs) are authorized to inspect or examine the inventory and records of an FFL *without search warrants* under three scenarios:[44]

- in the course of a reasonable inquiry during the course of a criminal investigation of a person or persons other than the FFL;

- to ensure compliance with the record keeping requirements of the GCA—not more than once during any 12-month period, or at any time with respect to records relating to a firearm involved in a criminal investigation that is traced to the licensee; or

- when such an inspection or examination is required for determining the disposition of one or more firearms in the course of a criminal investigation.

By inspecting the firearms transfer records that FFLs are required by law to maintain, ATF investigators are able to trace crime guns from their domestic manufacturer or importer to the first retail dealer that sold those firearms to persons in the general public, generating leads in homicide and other criminal investigations.[45] In addition, by inspecting those records, ATF investigators are often able to uncover evidence of corrupt FFLs transferring firearms "off the books," straw purchases,[46] and other patterns of suspicious behavior.

In July 2004, the DOJ Office of Inspector General (OIG) reported on ATF inspections of FFLs. Among other things, the OIG reported that ATF inspected the operations of 4.5% of the 104,000 FFLs in FY2002.[47] Since then, according to ATF, 10,106 firearms compliance inspections were conducted in FY2007, covering about 9.3% of the nearly 109,000 FFLs in that fiscal year;[48]

---

[43] For example, in the 109th Congress, the House Judiciary Crime, Terrorism, and Homeland Security Subcommittee held two oversight hearings examining ATF firearms enforcement operations at gun shows in Richmond, VA, in 2005. ATF agents reportedly provided state and local law enforcement officers with confidential information from background check forms (ATF Form 4473s), so that those officers could perform residency checks on persons who had otherwise legally purchased firearms at those gun shows. Questions were also raised as to whether ATF agents had profiled gun purchasers at those gun shows on the basis of race, ethnicity, and gender. See U.S. Congress, House of Representatives, Committee on the Judiciary, Subcommittee on Crime, Terrorism, and Homeland Security, *Oversight Hearing on the Bureau of Alcohol, Tobacco, Firearms, and Explosives (BATFE) Parts I & II: Gun Show Enforcement*, February 15 and 28, 2006. Also see Department of Justice, Office of the Inspector General, *The Bureau of Alcohol, Tobacco, Firearms and Explosives' Investigative Operations at Gun Shows*, Report Number I-2007-007, June 2007.

[44] 18 U.S.C. § 923(g)(1)(B).

[45] U.S. Department of Justice, Bureau of Alcohol, Tobacco, and Firearms, "ATF Fact Sheet: ATF's National Tracing Center," March 2010.

[46] A "straw purchase" occurs when a person, who is otherwise eligible to purchase a firearm, purchases a firearm from a federally licensed dealer for another person, who is either prohibited from possessing a firearm or does not want a paper trail linking him to the purchased firearm. Under 18 U.S.C. § 922(a)(6), it is illegal to a make a false statement to a federally licensed firearms dealer. Both the dealer and the buyer are required to fill out an ATF Form 4473, on which the buyer (transferee) attests to the dealer (transferor) that he is buying the firearm for himself and that he is not otherwise prohibited from possessing a firearm. Knowingly making a false statement on an ATF Form 4473 is punishable under 18 U.S.C. § 924(a)(2) by a fine or imprisonment for 10 years or both.

[47] U.S. Department of Justice, Office of the Inspector General, *Inspections of Firearms Dealers by the Bureau of Alcohol, Tobacco, Firearms and Explosives*, Report Number I-2004-005, (July 2004), p. xi.

[48] U.S. Department of Justice, Bureau of Alcohol, Tobacco, Firearms and Explosives, *ATF Congressional Budget Submission, Fiscal Year 2008*, (February 2007), p. 29.

---

11,169 compliance inspections in FY2008, covering nearly 10% of the 111,600 FFLs; and 11,375 compliance inspections in FY2009, covering nearly 10% of the 115,101 FFLs.[49] Notwithstanding progress, at a March 2010 CJS Appropriations Subcommittee hearing, ATF Deputy Director Melson testified that many FFLs are not inspected for five years or more because of a lack of ATF personnel.[50]

## Southwest Border Gun Trafficking[51]

On the Southwest border with Mexico, firearms violence has reportedly spiked in recent years as drug trafficking organizations (DTOs) have competed for control of key smuggling corridors into the United States.[52] Beginning in December 2006, Mexican President Felipe Calderón responded by deploying elements of the Mexican Army and federal police to trouble spots around Mexico, including on the northern frontier.[53] The DTOs and other criminals, however, are reportedly buying semiautomatic versions of AK-47 and AR-15-style assault rifles, other military style firearms, and .50 caliber sniper rifles in the United States.[54] With those rifles and other small arms, the DTOs are reportedly achieving parity in terms of firepower in shootouts with the Mexican Army and law enforcement.[55] In March 2008, President Calderón called upon the United States to increase its efforts to suppress the flow of illegal U.S. firearms into Mexico.[56]

ATF reports that there are 6,647 FFLs in the United States operating in the Southwest border region of Texas, New Mexico, Arizona, and California.[57] Moreover, ATF reports that DTOs are increasingly using surrogates (straw purchasers) in the United States to buy 10 to 20 military-style firearms at a time from FFLs. These firearms are reportedly routinely smuggled into Mexico in smaller shipments of four or five firearms as part of a process known as the "ant run."[58]

### Project Gunrunner

For FY2006, ATF dedicated 84 SAs and 15 IOIs to a Southwest border initiative known as "Project Gunrunner" to disrupt the illegal flow of guns from the United States to Mexico.[59] For FY2007, ATF increased those numbers to 103 SAs and 36 IOIs for this effort.[60] Those agents

---

[49] U.S. Department of Justice, Bureau of Alcohol, Tobacco, Firearms and Explosives, *ATF Congressional Budget Submission, Fiscal Year 2010*, May 2009, p. 5.

[50] U.S. Congress, House Committee on Appropriations, Subcommittee on Commerce, Justice, Science, and Related Agencies, *Hearing on President Obama's Fiscal Year 2011 Budget Request for the Bureau of Alcohol, Tobacco, Firearms, and Explosives*, 111th Congress, 2nd Session, March 4, 2010 (CQ Congressional Transcripts).

[51] For further information, see CRS Report R40733, *Gun Trafficking and the Southwest Border*, by Vivian S. Chu and William J. Krouse.

[52] For further information, see CRS Report R41075, *Southwest Border Violence: Issues in Identifying and Measuring Spillover Violence*, coordinated by Kristin M. Finklea.

[53] Ibid.

[54] Sara Miller Llana, "US Guns Arm Mexico's Drug Wars," *Christian Science Monitor*, July 19, 2007, p. 1.

[55] Oscar Becera, "Firing Line—Tracking Mexico's Illegal Weapons," *Jane's Intelligence Review*, April 28, 2008.

[56] Ibid.

[57] ATF briefing provided to CRS on May 5, 2008.

[58] Oscar Becera, "Firing Line—Tracking Mexico's Illegal Weapons," *Jane's Intelligence Review*, April 28, 2008.

[59] U.S. Department of Justice, Office of Inspector General, Evaluation and Inspections Division, *Review of ATF's Project Gunrunner*, I-2011-001, November 2010, p. 6.

[60] Ibid.

investigated 187 firearms trafficking cases and recommended 465 defendants for prosecution.[61] By the end of FY2008, ATF had deployed 148 SAs and 47 IOIs to the Southwest border to bolster Project Gunrunner[62] at an estimated cost of $32.2 million.[63] According to the DOJ Office of Inspector General, ATF has established five main objectives for Project Gunrunner:

- investigate individuals responsible for illicit firearms trafficking along the Southwest border;

- coordinate with U.S. and Mexican law enforcement along the border in firearms cases and violent crime;

- train U.S. and Mexican law enforcement officials to identify firearms traffickers;

- provide outreach education to gun dealers; and

- trace all firearms to identify firearms traffickers, trends, and patterns, and networks.[64]

The ATF FY2009 budget request was $1.028 billion, including $948,000 to fund 12 industry operations investigator positions to bolster efforts already underway as part of Project Gunrunner.[65] This was the only program increase/budget enhancement in the ATF FY2009 budget request. As described above, the Omnibus Appropriations Act, 2008 (P.L. 111-8) included $1.054 billion for ATF, including an increase of not less than $5.9 million for Project Gunrunner.[66] Also, to ramp up Project Gunrunner, the American Recovery and Reinvestment Act (ARRA; P.L. 111-5) included $10 million for ATF and $30 million to assist state and local law enforcement with counter-narcotics efforts. In addition, the Supplemental Appropriations Act, 2009 (P.L. 111-32), included $6 million for Project Gunrunner. As a result, Congress provided a total of $21.9 million in increasing funding for Project Gunrunner for FY2009.[67] In congressional testimony, ATF Deputy Director Kenneth Melson summed up the results of Project Gunrunner:

> Between fiscal year 2005 and fiscal year 2009, ATF has had [a] significant impact on the trafficking in Southwest Border States. ATF has recommended 984 cases involving 2,034 defendants for prosecution. To date, 1,397 defendants have been arrested, 1,303 defendants

---

[61] Statement of William Hoover, Assistant Director for Field Operations, Bureau of Alcohol, Tobacco, Firearms and Explosives, before the Subcommittee on the Western Hemisphere, Committee on Foreign Affairs, House of Representatives, concerning "U.S. Obligations under the Mérida Initiative," February 7, 2008.

[62] U.S. Department of Justice, Office of Inspector General, Evaluation and Inspections Division, *Review of ATF's Project Gunrunner*, I-2011-001, November 2010, p. 6.

[63] CRS conversations with Bureau of Alcohol, Tobacco, Firearms and Explosives, Office of Legislative Affairs, May 14, 2008.

[64] U.S. Department of Justice, Office of the Inspector General, *Interim Review of ATF's Project Gunrunner*, Report Number I-2009-006, September 2009, p. 3.

[65] U.S. Department of Justice, Bureau of Alcohol, Tobacco, Firearms and Explosives, *Congressional Budget Submission, Fiscal Year 2009* (February 2008), Exhibit C—Program Increases/Offsets by Decision Unit.

[66] House reported language accompanying the FY2009 CJS appropriations bill indicated that the House bill (H.R. 7322; H.Rept. 110-919) would have provided $5 million for Project Gunrunner. Corresponding report language accompanying a Senate bill (S. 3182; S.Rept. 110-397) was silent as to whether such an increase would be provided under that bill. The Senate, however, had included $15 million for Project Gunrunner in the FY2008 supplemental appropriations bill (H.R. 2642), but that funding was not included in the enacted appropriation (P.L. 110-252).

[67] According to DOJ, ATF allocated 187 SAs, 142 IOIs, and 25 other positions for FY2009. See U.S. Department of Justice, Office of Inspector General, Evaluation and Inspections Division, *Review of ATF's Project Gunrunner*, I-2011-001, November 2010, p. 6.

---

have been indicted, 850 defendants have been convicted, and 636 defendants have been sentenced to an average of 86 months incarceration. Three-hundred and seven of the cases and 881 of the defendants recommended for prosecution involve gang related offenses. Four hundred and ninety-seven cases have [been] charged [with] violations related to trafficking of an estimated 14,923 firearms. One hundred and fifty-nine of these cases involved gang-related trafficking of over 3,665 firearms. In all investigations, over 6,688 firearms have been seized and are no longer available to violent criminals and gang members.[68]

The ATF FY2010 budget request was $1.121 billion for ATF, including a proposed increase of $17.9 million and 92 permanent positions (including 34 SAs) to support Project Gunrunner.[69] Congress matched this request in the Consolidated Appropriations Act, 2010 (H.R. 3288), including the $17.9 million for Project Gunrunner.[70] According to the House Committee, this increase would bring total funding for Southwest border firearms trafficking efforts to $59.9 million. This amount includes one-time stimulus funding of $10 million provided in the American Recovery and Reinvestment Act (ARRA; P.L. 111-5).[71] By comparison, Senate report language noted that this increase would bring total Project Gunrunner funding to over $61 million. By mid-February 2010, ATF reported that it had deployed approximately 190 SAs, 145 IOIs, and 25 support staff to Project Gunrunner in the four contiguous border states.[72] DOJ reported that the final FY2010 allocation for Project Gunrunner included 224 SAs, 165 IOIs, and 32 other positions.[73]

The ATF FY2011 budget request included $1.163 billion, including $11.8 million to annualize the 37 positions (21 SAs) previously funded under the ARRA (P.L. 111-5). During a March 2010 CJS appropriations hearing, Representative Mollohan questioned ATF Deputy Director Melson about emerging gun trafficking patterns and ATF initiatives, like Project Gunrunner, undertaken to respond to related criminal activity.[74] Melson observed that while firearms were being illegally trafficked principally from Southwest border states into Mexico, they were also being trafficked from other states within the interior of the United States.[75] Representative Mollohan noted that, despite the apparent success of ATF's efforts, the request did not include any additional positions

---

[68] Statement of Kenneth E. Melson, Deputy Director, Bureau of Alcohol, Tobacco, Firearms and Explosives, before the House Appropriations Committee, Subcommittee on Commerce, Justice, Science, and Related Agencies, on the Fiscal Year 2011 Appropriations, March 4, 2011.

[69] U.S. Department of Justice, Justice Management Division, *FY2010 Budget and Performance Summary* (May 2009), p. 139. Available at http://www.usdoj.gov/jmd/2010summary/.

[70] The House-reported FY2010 CJS appropriations bill (H.R. 2847; H.Rept. 111-149) would have provided ATF with $1.106 billion, including the requested $17.9 million for Project Gunrunner. The Senate-reported version of this bill (H.R. 2847; S.Rept. 111-34) would have provided ATF with the same amount as requested by the Administration ($1.121 billion), including the $17.9 million increase for Project Gunrunner.

[71] U.S. Congress, House Committee on Appropriations, Subcommittee on Commerce, Justice, Science, and Related Agencies, *Commerce, Justice, Science, and Related Agencies Appropriations Bill, 2010*, to accompany H.R. 2847, 111th Cong., 1st sess., June 12, 2009, H.Rept. 111-149, p. 66.

[72] Statement of Kenneth E. Melson, Deputy Director, Bureau of Alcohol, Tobacco, Firearms and Explosives, before the House Appropriations Committee, Subcommittee on Commerce, Justice, Science, and Related Agencies, *Fiscal Year 2011 Appropriations*, March 4, 2011.

[73] U.S. Department of Justice, Office of Inspector General, Evaluation and Inspections Division, *Review of ATF's Project Gunrunner*, I-2011-001, November 2010, p. 6.

[74] U.S. Congress, House Committee on Appropriations, Subcommittee on Commerce, Justice, Science, and Related Agencies, *Hearing on President Obama's Fiscal Year 2011 Budget Request for the Bureau of Alcohol, Tobacco, Firearms, and Explosives*, 111th Congress, 2nd Session, March 4, 2010 (CQ Congressional Transcripts).

[75] Ibid.

---

to bolster ongoing efforts to address illegal gun trafficking.[76] As described above, Congress provided ATF with $37.5 million in supplemental appropriations for FY2010 (P.L. 111-230) for Project Gunrunner, as requested by the Administration.

## Electronic Trace Submission System

ATF maintains a foreign attaché in Mexico City to administer an Electronic Trace Submission System (ETSS), also known as the eTrace program, for Mexican law enforcement authorities. From FY2005 through FY2007, ATF traced just over 11,700 firearms recovered by Mexican authorities, and approximately 90% of those firearms were either manufactured in, or imported into, the United States.[77] Caution should be exercised when drawing conclusions from ATF firearm trace data, however. Although it is valid to say that 90% of traced firearms originated in the United States, it would be incorrect to conclude that 90% of all guns used in crime in Mexico originated in the United States. Although crime gun trace data are useful measurements of crime gun trends, in most cases the issues of consistent, random, and unbiased data collection have not been adequately addressed through comprehensive tracing and other controls. Hence, it is often not possible to test for statistical significance.[78] Nevertheless, even though a statistically valid percentage estimate of U.S.-sourced firearms used in crime in Mexico cannot be made based on trace data, criminal investigations have documented that there is great demand for certain firearms that are available in normal (non-military) commercial channels in the United States and that those firearms have been illegally trafficked to Mexico in large numbers.

Moreover, successful firearm traces are instrumental in developing investigative leads in homicide and gun trafficking cases. According to ATF, some of those cases uncover corrupt FFLs who were involved in larger criminal conspiracies to smuggle firearms into Mexico.[79] In January 2008, ATF announced that e-Trace technology would be deployed to an additional nine U.S. consulates in Mexico (Mérida, Juarez, Monterrey, Nogales, Hermosillo, Guadalajara, Tijuana, Matamoros, and Nuevo Laredo).[80] The number of traces performed by ATF for Mexican authorities during FY2008 increased markedly. For FY2008, preliminary data showed that ATF had traced 7,743 firearms recovered by Mexican authorities, as compared with the 11,700 firearms traced over a three-year period, FY2005-FY2007.[81] Of those firearms, 63.5% were

---

[76] Ibid.

[77] ATF briefing provided to CRS on May 5, 2008.

[78] With regard to the limitations of firearms trace data, Congress has included a general provision in the annual CJS appropriations act for the last several years that prohibits ATF from releasing "tracing studies" without adequate disclaimers that make it clear that broad conclusions about firearms-related crime cannot be made from such data, because: "(1) Firearm traces are designed to assist law enforcement authorities conducting investigations by tracking the sale and possession of specific firearms. Law enforcement agencies may request firearms traces for any reason, and those reasons are not necessarily reported to the Federal Government. Not all firearms traced are used in crime and not all firearms traced are used in crime. (2) Firearms selected for tracing are not chosen for purposes of determining which types, makes, or models of firearms are used for illicit purposes. The firearms selected do not constitute a random sample and should not be considered representative of the larger universe. Firearms are normally traced to the first retail seller, and sources reported for firearms do not necessarily represent the sources and methods by which firearms in general are acquired for use in crime." For FY2010, see §516 of P.L. 111-117; December 16, 2009; 123 Stat. 3151-3152.

[79] ATF briefing provided to CRS on May 5, 2008.

[80] Bureau of Alcohol, Tobacco, Firearms and Explosives, Office of Public Affairs, "ATF Expands Efforts to Combat Illegal Flow of Firearms to Mexico," January 16, 2008.

[81] ATF briefing provided to CRS on April 16, 2009.

determined to have been manufactured in the United States and 29.5% were determined to have been manufactured abroad, but imported into the United States.[82] Consequently, 93% of firearms traced by ATF during FY2008 for Mexican authorities were either made in, or imported to, the United States.[83]

In March 2010, ATF released eTrace 4.0, a Spanish language version of the software, to Mexico, Guatemala, and Costa Rica.[84] ATF anticipates that trace requests from these countries will increase markedly in FY2010 and FY2011 with this new software.[85] Also, as part of the National Integrated Ballistic Imaging Network (NIBIN) program, ATF is currently establishing a U.S.-Mexico ballistic information exchange capability that will allow firearms technicians to acquire and compare digital images of markings left on fired bullets and cartridges either gathered in test-firings or recovered at crime scenes.[86] Canada already participates in ATF's NIBIN program.

## DOJ OIG Report, Mexican Trace Data, and Multiple Long Gun Sales[87]

In November 2010, the OIG released another review of Project Gunrunner, in which updated Mexican firearms trace data were reported.[88] According to the new data, ATF traced 64,510 firearms for Mexican authorities that were reportedly seized during FY2006-FY2009.[89] For firearms traced between December 1, 2006, and December 31, 2009, and sold for the first time, OIG analysis showed that those firearms included 973 rifles (77%) and 279 handguns (23%).[90] It also indicated that traced long guns had a shorter time-to-crime interval than handguns.[91]

While the OIG was somewhat critical of ATF's eTrace progam for yielding little "usable investigative leads,"[92] the OIG recommended that ATF work with DOJ to develop a reporting requirement for multiple long gun sales[93] because Mexican DTOs have demonstrated a marked preference for military-style firearms capable of accepting high-capacity magazines.[94] The IG also recommended that ATF focus its investigative efforts on more complex criminal conspiracies involving high-level traffickers rather than on low-level straw purchasers.

---

[82] Ibid.

[83] Ibid.

[84] U.S. Congress, House Committee on Appropriations, Subcommittee on Commerce, Justice, Science, and Related Agencies, *Hearing on President Obama's Fiscal Year 2011 Budget Request for the Bureau of Alcohol, Tobacco, Firearms, and Explosives*, 111th Congress, 2nd Session, March 4, 2010 (CQ Congressional Transcripts).

[85] Ibid.

[86] U.S. Department of Justice, Bureau of Alcohol, Tobacco, Firearms and Explosives, *Congressional Budget Submission, Fiscal Year 2011* (February 2010), p. 60.

[87] This section was coauthored by the report's author, William J. Krouse, and Vivian S. Chu and Vanessa K. Burrows, CRS Legislative Attorneys. Questions on case law related to demand letters should be referred to Ms. Chu. Questions on the Paperwork Reduction Act (PRA) of 1995 should be referred to Ms. Burrows.

[88] U.S. Department of Justice, Office of Inspector General, Evaluation and Inspections Division, *Review of ATF's Project Gunrunner*, I-2011-001, November 2010.

[89] Ibid., p. 25.

[90] Ibid., p. 38.

[91] Ibid.

[92] Ibid, p. 73.

[93] Ibid, p. 40.

[94] Ibid, p. 38.

On December 17, 2010, DOJ and ATF requested that the Office of Management and Budget approve on an expedited basis a "60-day emergency notice of information collection" by January 5, 2011.[95] This expedited approval was requested under provisions of the Paperwork Reduction Act.[96] Under the proposal, ATF would require federal firearms licensees (FFLs) to report whenever they make multiple sales or other dispositions of more than one rifle within five consecutive business days to an unlicensed person. Such reporting would be limited to firearms that are (1) semiautomatic, (2) chambered for ammunition of greater than .22 caliber, and (3) capable of accepting a detachable magazine. On December 20, 2010, acting ATF Director Kenneth Melson later clarified that the proposed multiple rifle sales reporting requirement would be (1) limited to FFLs operating in Southwest border states (Texas, New Mexico, Arizona, and California) and (2) confined initially to a one-year pilot project.[97]

On February 4, 2011, OMB informed ATF that it would not grant the emergency approval.[98] Nevertheless, the notice's 60-day comment period ran through February 16, 2011. When DOJ and ATF finished considering an initial round of comments, a subsequent 30-day comment period was initiated on April 29, 2011.[99] Following this period, OMB will have up to 30 days (until the end of June 2011) to issue a decision on the ATF proposal. Several Members of Congress strongly oppose this proposal.[100] They maintain that if Congress authorized multiple handgun sales reporting in statute in 1986, then it is incumbent upon ATF to request from Congress similar statutory authority for multiple rifles sales reporting.[101]

## Operation Fast and Furious

In February 2011, ATF and Project Gunrunner came under renewed scrutiny for a Phoenix, AZ-based investigation known as Operation Fast and Furious.[102] ATF whistleblowers have alleged that suspected straw purchasers were allowed to amass relatively large quantities of firearms as part of long-term gun trafficking investigations.[103] As a consequence, some of these firearms are

---

[95] Department of Justice, Bureau of Alcohol, Tobacco, Firearms and Explosives, "60-Day Emergency Notice of Information Collection Under Review: Report of Multiple Sale or Other Disposition of Certain Rifles," 75 *Federal Register* 79021, December 17, 2010.

[96] For further information, see CRS Report RL40636, *Paperwork Reduction Act (PRA): OMB and Agency Responsibilities and Burden Estimates*, by Curtis W. Copeland and Vanessa K. Burrows (out-of-print; available upon request).

[97] Department of Justice, Bureau of Alcohol, Tobacco, Firearms and Explosives, "Acting Director Announces Demand Letters for Multiple Sales of Specific Long Guns in Four Border States," News Release, December 20, 2010.

[98] Mike Lillis, "House Dems Upset with Delay on Gun Proposal Along Border," *The Hill*, February 9, 2011, p. 3.

[99] Department of Justice, Bureau of Alcohol, Tobacco, Firearms and Explosives, "Agency Information Collection Activities; Proposed Collection Comments Requested: Report of Multiple Sale or Other Disposition of Certain Rifles," 76 *Federal Register* 24058, April 29, 2011.

[100] Congressional Documents and Publications, "Rehberg Leads Bipartisan Letter to ATF Questioning New Firearm Dealer Regulations," Representative Dennis Rehberg (R-MT) News Release, December 23, 2010. On February 19, 2011, the House adopted an amendment to the Full-Year Continuing Appropriations Act, 2011 (H.R. 1) that would have prohibited ATF from implementing this requirement. While the House passed H.R. 1, the Senate rejected this bill on March 9, 2011, for budgetary considerations that went well beyond concerns about this policy rider. Meanwhile, the Department of Defense and Full-Year Continuing Appropriations Act, 2011 (H.R. 1473; P.L. 112-10) does not include a similar rider.

[101] Ibid.

[102] James V. Grimaldi and Sari Horwitz, "ATF Probe Strategy Is Questioned," *Washington Post*, February 2, 2011, p. A04.

[103] Ibid.

alleged to have "walked," meaning that they were trafficked to gunrunners and other criminals before ATF moved to arrest the suspects and seize all of their contraband firearms.[104] Some of these firearms were possibly smuggled into Mexico.[105] Two of these firearms—AK-47 style rifles—were reportedly found at the scene of a shootout near the U.S.-Mexico border where U.S. Border Patrol Agent Brian Terry was shot to death.[106] Press accounts assert that ATF has acknowledged that as many as 195 firearms that were purchased by persons under ATF investigation as part of Operation Fast and Furious were recovered in Mexico.[107] Questions, moreover, have been raised about whether a firearm—an AK-47 style handgun—that was reportedly used to murder U.S. ICE Special Agent Jamie Zapata and wound Special Agent Victor Avila in Mexico on February 15, 2011, was initially trafficked by a subject of a Houston, TX-based ATF Project Gunrunner investigation.[108]

U.S. and Mexican policymakers have expressed their dismay over the circumstances surrounding Operation Fast and Furious.[109] Senator Charles E. Grassley, the ranking minority member on the Senate Judiciary Committee, wrote letters to ATF Acting Director Kenneth E. Melson[110] and U.S. Attorney General Eric H. Holder[111] voicing his concerns about Operation Fast and Furious and the whistleblower allegations that were brought to him. Attorney General Holder instructed the DOJ OIG to review ATF's gun trafficking investigations.[112] On March 8, 2011, however, Senator Grassley called for an independent review of the related allegations because the DOJ OIG had made recommendations about Southwest border gun trafficking investigations in its November 2011 audit that might possibly influence its future findings.[113]

On March 9, 2011, Representative Lamar Smith, chair of the House Judiciary Committee, wrote the Attorney General and commended him for tasking the OIG with a review of ATF's firearms trafficking investigatory methods.[114] On April 1, 2011, Representative Darrell Issa, chair of the House Oversight and Government Reform Committee, issued a subpoena to DOJ and ATF for documents related to Project Gunrunner following several unanswered requests for information related to ATF's anti-gun trafficking efforts on the Southwest border.[115]

---

[104] Ibid.

[105] John Solomon, David Heath, and Gordon Witkin, "ATF Let Hundreds of U.S. Weapons Fall Into Hands of Suspected Mexican Gunrunners: Whistleblower Says Agents Strongly Objected to Risky Strategy," *Center for Public Integrity.*

[106] Ibid.

[107] Kim Murphy and Ken Ellingwood, "Mexico Demands Answers on Guns," *Chicago Tribune,* March 11, 2011, p. 13.

[108] Ibid.

[109] Ken Ellingwood, "Mexico: U.S. Never Said Guns Came Across; Washington Didn't Reveal Tracked Arms Were Passing the Border, Agency Asserts," *Los Angeles Times,* March 12, 2011.

[110] Jerry Seper, "Lawmaker Suspects ATF Not Compliant with Probe of Death," *Washington Times,* April 11, 2011, p. 3.

[111] Kim Murphy, "Dealers Under Federal Gun To Sell To Suspects; Emails Show ATF Pushed Sales That Made It To Mexico, linked to U.S. Deaths," *Chicago Tribune,* April 15, 2011, p. 22.

[112] Pete Yost, "Justice IG to Look into Anti-Gun Efforts on Border," *Associated Press Online,* March 4, 2011.

[113] James V. Grimaldi, "ATF Faces Federal Review Over Tactics to Foil Gunrunning Rings," *Washington Post,* March 10, 2011, p. A04.

[114] A copy of that letter is available at http://judiciary.house.gov/news/pdfs/HJC%20Gunrunner%20Letter.pdf.

[115] House Committee on Oversight and Government Reform, "Chairman Issa Subpoenas ATF for 'Project Gunrunner' Documents," press release, April 1, 2011.

### Related Legislation in the 110th and 111th Congresses

In the 110th Congress, the House Committee on Foreign Affairs reported the Mérida Initiative to Combat Illicit Narcotics and Reduce Organized Crime Authorization Act of 2008 (H.R. 6028; H.Rept. 110-673) on May 14, 2008.[116] This bill would have authorized a total of $73.5 million to be appropriated over three years, for FY2008 through FY2010, to increase the number of ATF positions dedicated to Project Gunrunner ($45 million) and assign ATF agents to Mexico ($28.5 million). The House passed this bill on June 10, 2008, by a roll call vote: 311 to 106 (Roll no. 393). Similar authorizations were included in the Southwest Border Violence Reduction Act of 2008 (S. 2867, H.R. 5863, and H.R. 5869). In the 111th Congress, similar bills were introduced (S. 205, H.R. 495, H.R. 1448, and H.R. 1867). The three-year Mérida Initiative expired at the end of FY2010. In recent talks, Mexican and U.S. officials have agreed to refocus and continue the initiative, however.[117]

# Arson and Explosives Budget Program

ATF's arson and explosives budget program covers activities related to administering and enforcing federal laws governing the manufacture, importation, and distribution of explosives, as well as investigating arson cases with a federal nexus. The federal statutory provisions regulating explosives commerce in the United States were enacted under Title XI of the Organized Crime Control Act of 1970 (often referred to as the Explosives Control Act of 1970).[118] The Anti-Arson Act of 1982 amended this act to create a federal crime of arson.[119] The act was amended further by the Safe Explosives Act, which was included in the Homeland Security Act of 2002.[120] The proposed FY2011 allocation for the ATF arson and explosives program is $302.4 million, or about 26% of the FY2011 budget request ($1.163 billion). The proposed FY2011 allocation includes a program increase of $320,000 for Emergency Support Function #13.

Among law enforcement agencies, the ATF is recognized for its investigative expertise in responding to both arson and explosive incidents. The Attorney General (AG), for example, made the ATF responsible for maintaining a consolidated database of all arson and explosive incidents that occur in the United States. Reportedly, as part of the department's law enforcement information-sharing program, this and other databases are to be linked and made Web-accessible, and first responders anywhere in the United States are to have access to critical information about arson and explosive cases nationwide.[121] Nevertheless, as described below, both ATF and the FBI share concurrent jurisdiction over federal criminal investigations involving explosives, and both bureaus have maintained separate databases on explosives incidents. At times, this shared jurisdiction appears to have resulted in an inter-agency rivalry.

---

[116] For further information, see CRS Report R41349, *U.S.-Mexican Security Cooperation: the Mérida Initiative and Beyond*, by Clare Ribando Seelke and Kristin M. Finklea.

[117] Ibid.

[118] P.L. 91-452; October 15, 1970; 84 Stat. 952; codified, as amended, at Chapter 40, 18 U.S.C. § 841 et seq.

[119] P.L. 97-298; October 12, 1982; 96 Stat. 1319.

[120] P.L. 107-296; November 25, 2002; 116 Stat. 2280 (Title XI, Subtitle C of the Homeland Security Act of 2002).

[121] The Federal Bureau of Investigation reportedly continues to maintain its own bomb data center despite the AG's memorandum. See Jerry Markon, "FBI, ATF Battle for Control of Cases: Cooperation Lags Despite Merger," *Washington Post*, May 10, 2008, p. A1.

---

## Safe Explosives Act

Under the Safe Explosives Act,[122] Congress made ATF responsible for more closely regulating the U.S. explosives industry. This act made ATF responsible for fully investigating all explosive thefts and losses, as well as providing background checks for licensees and permittees to prevent prohibited persons from acquiring explosives. In FY2008, ATF completed 68,645 explosives employee/possessor background checks and 3,231 responsible persons background checks. The act also requires ATF to inspect explosive licensees and permittees every three years to ensure that all explosive materials are properly stored and accounted for. ATF reports that there are about 12,000 licensees and permittees nationwide, so that to comply with the act, about 4,000 inspections would need to be conducted by ATF annually.[123] ATF conducted 3,291 explosives compliance inspections in FY2007 (or about 28% of licensees/permittees), 3,055 in FY2008 (27%), and 2,640 in FY2009 (22%).[124]

## ATF and FBI Concurrent Jurisdiction over Explosives Investigations

As described above, ATF was transferred from Treasury to DOJ in January 2003. This transfer, however, did little to ameliorate the perennial source of tension between the ATF and FBI over their concurrent jurisdiction over explosives. In March 2003, then Attorney General John Ashcroft convened an Explosives Review Group (ERG) to develop recommendations to improve coordination between the ATF and FBI. In August 2004, the Attorney General responded to the ERG's report and directed (1) the ATF and FBI to consolidate all of DOJ's arson and explosives incidents databases into a single database; (2) that all consolidated arson and explosives incident databases be maintained by the ATF; and (3) both agencies coordinate post-blast explosives training and explosives detection canine training.[125] In response to this directive, ATF established the U.S. Bomb Data Center (USBDC) as the sole repository of arson and explosives related incident data.[126] On the other hand, the Attorney General also directed the FBI to take the lead on any terrorism-related cases (domestic and international) that involved explosives, and directed ATF to take the lead on all other criminal cases involving explosives.

Notwithstanding the Attorney General's directives, the partnership on federal explosives-related investigations between the FBI and ATF continues to be marked by what has been described as an acrimonious rivalry and competition for mission share and resources.[127] The FBI apparently had not transferred its bomb data to the ATF, arguing that such a transfer would be detrimental to the

---

[122] P.L. 107-296; November 25, 2002; 116 Stat. 2280 (Title XI, Subtitle C of the Homeland Security Act of 2002).

[123] U.S. Department of Justice, Bureau of Alcohol, Tobacco, Firearms and Explosives, *ATF Congressional Budget Submission, Fiscal Year 2007* (February 2006), p. 53.

[124] U.S. Department of Justice, Bureau of Alcohol, Tobacco, Firearms and Explosives, *ATF Congressional Budget Submission, Fiscal Year 2011* (February 2010), p. 60.

[125] U.S. Department of Justice, Office of the Inspector General, *The Bureau of Alcohol, Tobacco, Firearms and Explosives' and Federal Bureau of Investigation's Arson and Explosives Intelligence Databases*, Audit Report 05-01, October 2004, p. 34.

[126] Bureau of Alcohol, Tobacco, Firearms and Explosives, "ATF Fact Sheet: U.S. Bomb Data Center," September 2008.

[127] Jerry Markon, "End FBI-ATF Rift, Senators Urge," *Washington Post*, May 17, 2008, p. A03.

---

FBI's ability to conduct counterterrorism investigations.[128] In response to this, the Senate Judiciary Committee chair, Senator Patrick Leahy, and ranking minority member of that committee, Senator Arlen Specter, wrote a letter to the then Attorney General, Michael Mukasey, urging that an end be brought to this inter-agency rivalry.[129] Meanwhile, FBI and ATF officials at the headquarters level have maintained that their partnership produces examples of interagency cooperation on a daily basis. They point to their jointly administered Terrorist Explosive Device Analytical Center (TEDAC), which is based at the FBI laboratory in Quantico, VA. This center was established to process and evaluate evidence from improvised explosive devices (IEDs) that have been recovered in Iraq and Afghanistan.[130]

In October 2009, the DOJ OIG found that ATF and FBI are not adequately coordinating explosives investigations and related operations and that the two agencies have developed parallel capabilities to respond to explosives incidents.[131] As noted above, both agencies maintain separate explosives-related databases, despite the Attorney General's May 2004 directives. Nor have the agencies coordinated post-blast explosives training and explosives detection canine training, despite a directive from the Attorney General to do so. The OIG also observed that investigative jurisdictional disputes, lack of information sharing, and lack of coordination between the two agencies hinders DOJ's ability to effectively respond, investigate, and prevent explosives crimes. The OIG underscored that these circumstances could increase the risk that DOJ would not meet the requirements set out by then President George W. Bush in Homeland Security Directive (HSPD)-19, which envisions a comprehensive U.S. government strategy to mitigate the threat, and prevent the use, of explosives by terrorists.[132]

# Alcohol and Tobacco Budget Program

The ATF alcohol and tobacco budget program covers expenses related to agency efforts to counter a rising trend in the illegal diversion of tobacco products, as well as the illegal movement of distilled alcohol products. The FY2010 allocation for the Alcohol and Tobacco program totals $22.3 million, or about 2% of ATF's direct appropriation ($1.115 billion) for salaries and expenses, which is in line with historical budget trends (FY2004 through FY2010). The proposed FY2011 allocation accompanying the Administration's budget request is $23.3 million, or again about 2% of the request ($1.163 billion). In addition, through DOJ's asset forfeiture authority, ATF also has "churning budget authority," or the authority to obligate the proceeds of seized assets to fund tobacco diversion and other long-term, complex undercover investigations.[133]

Notwithstanding this additional funding authority, in September 2009, the DOJ OIG issued a report on ATF's efforts to prevent tobacco diversion, which includes contraband cigarette

---

[128] Ibid.

[129] Ibid.

[130] Federal Bureau of Investigation, Fact Sheet on Terrorist Explosive Device Analytical Center, revised June 15, 2009, available at http://www.fbi.gov/page2/june09/tedac061709.html.

[131] U.S. Department of Justice, Office of the Inspector General, Audit Division, *Explosives Investigation Coordination Between the Federal Bureau of Investigation and the Bureau of Alcohol, Tobacco, Firearms and Explosives*, Audit Report 10-01, October, 2009, p. 12.

[132] Ibid., p. 33.

[133] U.S. Department of Justice, Office of the Inspector General, *The Bureau of Alcohol, Tobacco, Firearms and Explosives' Efforts to Prevent the Diversion of Tobacco*, Report Number I-2009-005, September 2009, p. 6.

trafficking. In this report, the Inspector General found that tobacco diversion investigations, along with alcohol diversion investigations, are accorded a low priority at ATF, as compared to its other mission areas, such as investigating firearms- and explosives-related crime, particularly violent crime, and arson.[134] This low priority is partly the result of the view that tobacco diversion is largely a nonviolent crime, despite its connections with terrorist financing and organized crime.[135] Between FY2004 and FY2008, ATF conducted 645 alcohol and tobacco diversion investigations, or about 1% of ATF's investigative caseload. Of these cases, 566 investigations (88%) involved tobacco and 79 (12%) involved alcohol.[136] With regard to the greater number of tobacco cases than alcohol cases, ATF observed that tobacco diversion is much more lucrative to criminal enterprises than is alcohol, as the latter is much more difficult to transport in large quantities. Alcohol diversion, moreover, is also limited to certain geographic areas and generally such cases today are handled by state and local authorities.

The FY2011 budget request includes a program increase of $24,000 for Emergency Support Function #13. It is significant to note that the OIG reported that the FY2010 departmental budget request to the Office of Management and Budget (OMB) included $28.3 million for tobacco diversion, but this request was denied by OMB and was not included in the ATF's FY2010 congressional budget submission (request).[137]

## Alcohol Diversion

The federal statutes that address the diversion of distilled spirits (alcohol) are many. They include, but are not limited to, the Internal Revenue Code (IRC),[138] the Federal Alcohol Administration (FAA) Act,[139] the 21st Amendment, the Webb-Kenyon Act,[140] the Federal Criminal Code,[141] and federal Indian laws.[142] Although ATF has primary jurisdiction for illegal interstate transportation of liquor and related racketeering activities, the regulatory statutes underlying those violations are found in the IRC. In addition, the Department of the Treasury has primary jurisdiction over the IRC, as well as the FAA and Webb-Kenyon Act. While historically ATF traces its roots back to Eliot Ness and other Treasury agents who battled organized crime during the era of prohibition and illegal liquor production (moonshining), since its transfer to DOJ, ATF's role in enforcing liquor laws has been diminished, as is evident in part by its small investigative caseload. Most of the ATF personnel dedicated to the regulation of alcohol and tobacco remained at Treasury within the Alcohol and Tobacco Tax and Trade Bureau (TTB).[143]

---

[134] Ibid., p. 35.

[135] Ibid., p. 15.

[136] Ibid., p. 1.

[137] Ibid., p. 22.

[138] See 26 U.S.C., Chapter 51, Alcohol Excise Taxes.

[139] See 27 U.S.C., Chapter 8, Federal Alcohol Administration Act.

[140] The Liquor Law Repeal and Enforcement Act of 1913 (37 Stat. 699), otherwise known as the Webb-Kenyon Act, prohibits a person from receiving, possessing, selling, or in manner using, intoxicating liquor of any kind that has been transported from one state into another in violation of any law of any state. See 27 U.S.C., Chapter 9.

[141] See 18 U.S.C., Chapters 59 and 95, which are related liquor traffic and racketeering.

[142] See 18 U.S.C., Chapter 53.

[143] For FY2010, Congress appropriated $103 million for the TTB, of which $3 million was provided to hire, train, and equip SAs and related support personnel. When ATF was transferred to DOJ, all its SAs were also transferred to DOJ as part of the newly constituted ATF. Consequently, until FY2010, the TTB had no funded SA positions, with which to (continued...)

## Tobacco Diversion

According to ATF, it has primary jurisdiction over criminal provisions related to tobacco in the Contraband Cigarette Trafficking Act (CCTA) of 1978.[144] In May 2004, the General Accounting Office (now the Government Accountability Office) reported that the illegal diversion and smuggling of cigarettes in the United States results in an unknown but significant loss in tax revenues.[145] ATF criminal intelligence indicates that cigarette bootlegging is a lucrative criminal venture that terrorist groups have used and would possibly use to finance their future criminal activities,[146] including drug and weapons trafficking, identity theft, and various types of fraud. ATF has investigated Armenian, Chinese, Middle Eastern, Russian, Taiwanese, Ukrainian, and Native American organized crime groups engaged in diverting large quantities of contraband and counterfeit cigarettes and counterfeit tax stamps.[147] These activities have become increasingly lucrative as states and the federal government have raised excise taxes on cigarettes.[148] According to the Inspector General, transporting contraband cigarettes from low-tax states to high-tax states, and reselling those cigarettes on the black market, can yield high profits:

- a car load of 10 cases can yield an estimated $18,000 to $23,000;

- a van load of 50 cases, an estimated $90,000 to $115,000; and

- a small truck load of 200 cases, an estimated $360,000 to $465,000.[149]

Nonetheless, the Inspector General described the ATF's tobacco diversion efforts as "ad hoc,"[150] and underscored that there is no systematic method within the agency to share intelligence and information between field divisions.[151] The Inspector General reported, moreover, that ATF headquarters is not facilitating information sharing between its field agents and personnel at Treasury's TTB, which maintains a database on tobacco licensees, and had not coordinated with tobacco companies, which often provide cigarettes for undercover operations.[152]

---

(...continued)
hire criminal investigators to conduct alcohol- or tobacco-related investigations.

[144] P.L. 95-575; November 2, 1978; 92 Stat. 2463; codified, as amended, at 18 U.S.C., Chapter 114, § 2341 et seq. The Department of the Treasury, however, has primary jurisdiction of the Internal Revenue Code (IRC) provisions related to excise taxes on cigarettes that have to be violated in order to trigger the criminal provisions in the CCTA. See 26 U.S.C., Chapter 52, Tobacco Excise Taxes.

[145] U.S. General Accounting Office, *Cigarette Smuggling: Federal Law Enforcement Efforts and Seizures Increasing*, GAO-04-641 (May 2004), p. 7.

[146] Ibid.

[147] U.S. Department of Justice, Office of the Inspector General, Evaluation and Inspections Division, *The Bureau of Alcohol, Tobacco, Firearms and Explosives' Efforts to Prevent the Diversion of Tobacco*, Report Number I-2009-005, September 2009, p. 15.

[148] Ibid., p. 11.

[149] Ibid., p. 13.

[150] Ibid., p. 26.

[151] Ibid., p. 26.

[152] Ibid., p. 23.

# Related Legislation in the 110th and 111th Congresses

The 110th and 111th Congresses considered legislation to strengthen federal laws that address contraband cigarette trafficking. Representative Anthony Weiner introduced the Prevent All Cigarette Trafficking (PACT) Act (H.R. 1676). The House Judiciary Committee reported this measure (H.Rept. 111-117) on May 18, 2009, and the House passed it on May 21, 2009, by a recorded vote (two-thirds required): 397-11 (Roll no. 287). Senator Herb Kohl introduced a similar measure (S. 1147). The Senate Judiciary Committee amended the bill with substitute language and reported it without a written report on November 11, 2009. It was passed by the Senate on March 11, 2010. It was passed by the House on March 17, 2010, by a recorded vote (two-thirds required): 387-25 (Roll no. 124). On March 31, 2010, President Obama signed S. 1147 into law (P.L. 111-154).

The House-passed H.R. 1676 included two sections that addressed ATF's tobacco diversion mission, but only one of these sections (section 5) was included in the Senate- and House-passed bill (S. 1147) that was signed into law by the President. Section 7 of the House-passed H.R. 1676, which was not included in P.L. 111-154, would have authorized ATF to establish

- six regional contraband tobacco trafficking teams over a three-year period in New York City; Washington, DC; Detroit; Los Angeles; Seattle; and Miami;

- a tobacco intelligence center to serve as the "nerve center" for all ongoing tobacco diversion investigations;

- a covert national warehouse for undercover operations; and

- a computer database to track the retail sale of tobacco products through the Internet, by mail-order, or in any other non-face-to-face transaction.

For these purposes, section 7 would have also authorized to be appropriated $8.5 million for five years beginning with FY2010. By comparison, the other section, which was included in P.L. 111-154, authorizes ATF to enter the business premises of "delivery sellers" and inspect their records and information and any cigarettes or smokeless tobacco stored at such premises. It also authorizes federal district courts to compel such inspections, and imposes a civil penalty for failure to comply with inspections. In the 110th Congress, the House passed a similar bill (H.R. 4081) on September 10, 2008, by a recorded vote (two-thirds required): 379 to 12 (Roll no. 584). This bill was reported by the House Judiciary Committee on the previous day (H.Rept. 110-836). The Senate Judiciary Committee reported a similar bill on September 11, 2007 (S. 1027; S.Rept. 110-153), but the Senate took no further action on this bill.

# Appendix. Authorizations Compared to Appropriations

Congress last provided authorizations for ATF's annual appropriation in the Violence Against Women and Department of Justice Reauthorization Act of 2005.[153] This act authorized appropriations for DOJ as a whole and ATF as a DOJ agency for FY2006 through FY2009. Congress did not associate authorized dollar amounts with FTE or permanent positions. The annual authorization for appropriations lapsed for FY2010, as the 110th and 111th Congresses have not considered legislation to reauthorize appropriations for either DOJ or ATF. As **Table A-1** shows, Congress has generally appropriated more money for ATF than has been authorized.[154]

**Table A-1. ATF Authorizations Compared to Appropriations**

(Dollars in millions)

|  | FY2006 | FY2007 | FY2008 | FY2009 | FY2010 |
|---|---|---|---|---|---|
| Authorization | 923.6[a] | 960.6[a] | 999.0[a] | 1,038.9[a] | NA |
| Appropriation | 935.8[b] | 988.1[c] | 1,011.6[d] | 1,078.2[e] | 1,158.3[f] |

**Source:** FY2006 CJS Appropriations Act (P.L. 109-108); Gulf Hurricanes and Pandemic Influenza Supplemental Appropriations Act, 2006 (P.L. 109-148); Global War on Terror and Hurricane Recovery Supplemental Appropriations Act, 2006 (P.L. 109-234); Revised Continuing Appropriation Resolution, 2007 (P.L. 110-5); Katrina-Iraq Supplemental Appropriations Act (P.L. 110-28); Consolidated Appropriations Act, 2008 (P.L. 110-161); Supplemental Appropriations Act, 2008 (P.L. 110-252); Omnibus Appropriations Act, 2009 (P.L. 111-8); Supplemental Appropriations Act, 2009 (P.L. 111-32); American Recovery and Reinvestment Act of 2009 (P.L. 111-5); Consolidated Appropriations Act, 2010 (P.L. 111-117); and FY2010 border security emergency supplemental appropriation (P.L. 111-230).

**Notes:** NA = no authorization.

a.  Authorizations for appropriations provided in the Violence Against Women and Department of Justice Reauthorization Act of 2005 (P.L. 109-162).

b.  Includes a supplemental appropriation of $20 million provided under P.L. 109-148 and $4 million under P.L. 109-234.

c.  Includes a supplemental appropriation of $4.0 million provided under P.L. 110-28.

d.  Includes a supplemental appropriation of $4.0 million provided under P.L. 110-252.

e.  Includes supplemental appropriations of $10 million provided under P.L. 111-5 and $14 million under P.L. 111-32.

f.  Includes a supplemental appropriation of $37.5 million provided under P.L. 111-230.

---

[153] P.L. 109-162, January 5, 2006, 119 Stat. 2960.

[154] For further information, see CRS Report RS20371, *Overview of the Authorization-Appropriations Process*, by Bill Heniff Jr.

## Author Contact Information

William J. Krouse
Specialist in Domestic Security and Crime Policy
wkrouse@crs.loc.gov, 7-2225

# Exhibit 60

Case: 1:10-cv-04184 Document #: 169-4 Filed: 03/12/12 Page 18 of 54 PageID #:4548

## Bureau of Alcohol, Tobacco, Firearms and Explosives

# ATF  Fact Sheet

At The Frontline Against Violent Crime          Public Affairs Division — Washington, DC

Contact: ATF Public Affairs Division
(202) 648-8500

March 2011
www.atf.gov

## FACTS AND FIGURES (FY 2010)

### Personnel

- Special Agents (1811): 2,562
- Industry Operations Investigators (1801 and 1854): 624
- Administrative/Professional/Technical: 1,738
- Total employees: 5,107
- Field Divisions: 25

### Cases and Prosecutions

**Historical (FY 2005-2010)**

- Cases:
    - Recommended for prosecution: 73,829
    - Indicted: 55,607
    - Resulted in convictions: 43,028

- Defendants:
    - Recommended for prosecution: 110,197
    - Defendants indicted: 81,596
    - Number convicted: 60,753
    - Average incarceration: 48,313 were sentenced to an average of 180 months
    - Defendants previously convicted felons: 61%
    - Defendants with prior arrest records: 22%

**FY 2010**

- Cases:
    - Recommended for prosecution: 17,893
    - Defendants indicted: 11,243
    - Number convicted: 5,322
    - Average incarceration: 2,868 defendants were sentenced to prison receiving an average sentence of 147 months.
    - Received life sentence: 41
    - Received death sentences: 16
    - Engaged in gang-related crimes: 4,956
    - Defendants previously convicted felons: 60%

- o Defendants with prior arrest records: 22%
- Defendants:
  - o Recommended for prosecution: 17,677
  - o Defendants indicted: 10,630
  - o Number convicted: 8,489
  - o Average incarceration: 2,987 defendants were sentenced to prison receiving an average sentence of 155.3 months.
  - o Received life sentence: 30
  - o Received death sentences: 9
  - o Engaged in gang-related crimes: 4,076
  - o Defendants previously convicted felons: 62%
  - o Defendants with prior arrest records: 84%
- Initiated criminal investigations to these specific areas:
  - o Firearms cases, including illegal possession and firearms trafficking: 10,072
  - o Arson and explosives cases, including bombings and attempted bombings: 564
  - o Alcohol and tobacco diversion cases: 95
  - o Explosives thefts: 24

## Inspections

- In FY 2010, ATF conducted the following compliance inspections:
  - o Federal firearms licensee (FFL) inspections: 10,538
  - o Federal explosives licensee (FEL) inspections: 3,925
- In FY 2010, firearms compliance inspections resulted in the following recommendations:
  - o No Violations: 5,293
  - o Report of Violations: 1,366
  - o Warning Letter: 1,408
  - o Warning Conference: 820
  - o Revoke License or Denial of Renewal: 67
  - o Surrender of License: 33
  - o Out-of-business: 1,373
  - o Other : 178
  - o Total: 10,538
- In FY 2010, firearms application inspections conducted: 7,575
- In FY 2010, explosives compliance inspections resulted in the following recommendations:
  - o No Violations: 2,722
  - o Report of Violations: 347
  - o Warning Letter: 151
  - o Warning Conference: 54

- o Revoke License or Permit: 5
- o Surrender of License or Permit: 7
- o Out-of-business: 595
- o Other : 44
- o Total: 3,925
- In FY 2010, explosives application inspections conducted: 1,115

## Licensing Centers, Imports and NFA

- In FY 2010, ATF processed:
  - o National Firearms Act (NFA) registrations and/or transfers: 826,393
  - o Import permit applications: 9,278

## Canine

- In FY 2010, ATF explosives detection canine teams:
  - o Participated in 529 investigative searches
  - o Assisted in 121 search warrants
  - o Safeguarded over 27 million spectators at major events
  - o Recovered:
    - ▪ 110 firearms
    - ▪ more than 1,900 shell casings
    - ▪ 70 explosive devices in the U.S.
    - ▪ 13 homemade explosive devices in the U.S.
- In FY 2010, ATF trained:
  - o 204 explosives detection canine teams on National Odor Recognition Testing (NORT) standards
  - o 204 on peroxide-based explosives
  - o 434 military working dogs on homemade explosives for the Joint Improvised Explosive Device Defeat organization

## Tracing

- The National Tracing Center (NTC) traced more than 336,914 firearms for our agents and our law enforcement partners globally.

## NIBIN

- NIBIN partners have completed more than 2 million acquisitions
- NIBIN partners have confirmed more than 40,000 NIBIN hits

## Laboratories

- Our state-of-the-art laboratories, which examine forensic evidence such as ballistics and DNA, as well as reconstruct and test arson and fire scenarios—in

Fiscal Year 2010, ATF's laboratories completed the following:

- o Processed 3,329 forensic cases
- o Processed 101 fire research cases

## National Response Team (NRT)

- Since 1978, the NRT has been activated to more than 700 significant incidents throughout the U.S.
- In FY 2010, the NRT:

  - o Responded to: 26 incidents
  - o Property damage estimated value at: $434 million

## Alcohol and Tobacco

- During FY 2010:

  - o Recommended defendants for prosecution: 219
  - o Seized: approximately $63.2 million in criminal contraband

## Training

### Historical

- In FY 2007-08, ATF provided firearms-related training to:

  - o 885 Mexican police and prosecutors
  - o More than 4,000 members of the international law enforcement community
  - o More than 1,000 police officials trained at the International Law Enforcement Academies across the globe in Africa, Eastern Europe, Asia, and Latin America

- Gang Resistance Education And Training (GREAT):

  - o Since 1991, GREAT has graduated more than 5 million school children. More than 10,000 law enforcement officers and professionals have been certified as GREAT instructors.

### FY 2010

- In FY 2010, ATF provided the following training:

  - o **Project Safe Neighborhood:** 182 Assistant U.S. Attorneys, State and local prosecutors, State and local police officers and sheriffs, and ATF special agents
  - o **Post-Blast Investigative Techniques:** Approximately 782 military personnel, including training conducted in Iraq and Afghanistan, and in collaboration with the Joint Improvised Explosive Device Defeat Organization at Fort Irwin, California
  - o **Explosives-related courses:** More than 763 law enforcement personnel, including 295 State and local investigators and

bomb squad personnel

- o **Arson-related courses:** 737 personnel in arson-related courses
- o **Improvised explosive device (IED):** U.S. Marshal Court Security Officers on IED familiarization and security
- o **Gang Resistance Education And Training (GREAT):**
  - ATF agents taught students: 2,587
  - ATF agents trained as instructors: 30

## Budget

- Enacted appropriations for FY 2010: $$1,120,800

For more information on ATF, go to www.atf.gov (http://www.atf.gov/) .

###

# Exhibit 61

 

# Firearms Commerce

# in the

# United States

# 2011

United States Department of Justice

Bureau of Alcohol, Tobacco, Firearms

and Explosives

# INTRODUCTION

The purpose of this report is to provide an overview of firearms commerce in the United States and the role of the Bureau of Alcohol, Tobacco, Firearms and Explosives (ATF) in regulating firearms commodities. ATF is responsible for enforcing the Gun Control Act (GCA) of 1968, as amended. The GCA regulates the manufacture, importation, distribution, and sale of firearms, and it contains criminal provisions related to the illegal possession, use, or sale of firearms. ATF also administers the National Firearms Act (NFA), which requires the registration of certain weapons, such as machineguns and destructive devices[1], and imposes taxes on the making and transfer of those weapons.

This edition contains information about domestic firearms manufacturing, as well as the importation and exportation of firearms. It also provides an update on certain ATF regulatory initiatives, including our collaboration with the firearms industry, to improve compliance with Federal firearms laws and to prevent the diversion of firearms to illegal markets. Further, it furnishes select data sets regarding domestic firearms manufacturing, and the importation and exportation of firearms.

Part I contains information about domestic firearms manufacturing and the importation and exportation of firearms to provide a better understanding of the firearms market.

Part II provides an overview of recent ATF regulatory program initiatives that focus and improve ATF's ability to conduct firearms inspections, ensure compliance, and foster communication and cooperation with the firearms industry.

Part III describes how ATF's enforcement and regulatory missions work together to prevent the unlawful diversion of firearms into illegal markets.

The appendix to this report presents a series of statistical tables containing the most up-to-date information available about the firearms industry and ATF's regulatory activities. Through these activities, ATF works to ensure compliance with Federal firearms laws and to prevent firearms from being diverted, either knowingly or unknowingly, to persons prohibited from possessing them.

---

[1] Examples of a destructive device include (a) Any explosive, incendiary, or poison gas (1) bomb, (2) grenade, (3) rocket having a propellant charge of more than 4 ounces, (4) missile having an explosive or incendiary charge of more than one-quarter ounce, (5) mine; (b) weapon which may be readily converted to expel a projectile by the action of an explosive or other propellant, and which has any barrel with a bore of more than one-half inch in diameter, etc.

# Mission

The Bureau of Alcohol, Tobacco, Firearms and Explosives (ATF) is a law enforcement organization within the U.S. Department of Justice (DOJ). ATF is dedicated to the reduction of violent crime, prevention of terrorism, and protection of our Nation. ATF investigates and prevents crimes that involve the unlawful manufacture, sale, possession, and use of firearms and explosives; acts of arson and bombings; and illegal trafficking of alcohol and tobacco products. ATF regulates the scope of firearms and explosives business activities—from manufacture and/or importation through retail sales; screens and licenses qualified entities that engage in commerce in these commodities; and specifies the form and content of their business records. ATF has established certain standards for the safe storage of explosive materials to which Federal explosive licensees and permittees must adhere.

ATF works closely with government and nongovernment groups in carrying out its regulatory and law enforcement missions. These include industry groups; professional organizations; international, Federal, State, local, and tribal law enforcement authorities; other Federal and public safety agencies; academia; and the communities we serve.

# Recent History

On November 25, 2002, President George W. Bush signed into law the Homeland Security Act of 2002. The Homeland Security Act divided the functions of ATF into two agencies.

On January 24, 2003 (60 days after the Homeland Security Act became law), part of the former ATF was transferred from the Department of the Treasury to the Department of Justice and renamed the Bureau of Alcohol, Tobacco, Firearms and Explosives (preserving the acronym "ATF"). ATF was given the authority to administer and enforce the Gun Control Act of 1968 (GCA), the National Firearms Act of 1934 (NFA), and the Arms Export Control Act (AECA) permanent import provisions. ATF was also tasked with overseeing explosives and arson programs and administering the United States Criminal Code provisions relating to alcohol and tobacco smuggling and diversion. For more information visit www.atf.gov.

On the same day, the Alcohol and Tobacco Tax and Trade Bureau (TTB) was created within the Department of the Treasury to handle the regulatory and taxation aspects of the alcohol and tobacco industries. The TTB was entrusted with administering the laws and regulations governing firearms and ammunition excise tax. For more information about TTB activities, visit TTB at www.ttb.gov.

# PART I:  Firearms Entering Into Commerce

In enforcing the Gun Control Act (GCA) and National Firearms Act (NFA), ATF collects data on the manufacture, importation, and exportation of firearms.  This section presents information on current firearms manufacturers and their reported sales volume, along with a review of the necessary procedures for importing and exporting firearms.

## Manufacturers' Sales, Exports, and Imports

As of 2011, there are approximately 5,400 licensed firearms manufacturers and 950 licensed importers in the United States.  A Federal firearms license is required to engage in the business of manufacturing, importing, or dealing in firearms.  These businesses are required by law to maintain records of the production, exportation, importation, acquisition, and disposition of firearms.

Manufacturers' reports to ATF show the number of manufactured firearms disposed of in commerce each calendar year, as well as the number produced for export.  In 2009, the most recent calendar year for which information is available, manufacturers disposed of over 2.4 million handguns and more than 3 million rifles and shotguns into commerce.  Detailed production information from these manufacturers' reports is contained in the exhibits at the end of this report.

Importation and exportation statistics may also be found in the exhibits.  Manufacturers' export volume for calendar year 2009, the most recent year for which complete data is available, reached more than 194,000 firearms.  Compared with the 2000 export volume of 188,460 firearms, the increase in firearms exported is significantly less than the increase in firearms imported.

## Regulation of Firearms Importation and Exportation

The process of importing and exporting firearms into the United States is regulated by several Federal agencies.  ATF administers the import provisions of the GCA, the NFA, and the permanent import provisions of the AECA.  This includes the approval or denial of applications to import firearms and ammunition for persons, businesses, and government entities wishing to import such materials into the United States.

ATF also provides technical advice and assistance to the public regarding import requirements applicable to any firearms or ammunition brought into the United States from another country. (See "Technical Assistance to Industry, Law Enforcement, and the Public")

An organization within the Department of State, the Directorate of Defense Trade Controls, regulates the export of firearms other than sporting shotguns.  A person wishing to export these firearms must first obtain an export license from the Department of State prior to shipping them. Within the Department of Commerce, the Bureau of Industry and Security regulates the export of

sporting shotguns with barrels between 18 and 28 inches in length. A general license from the Bureau of Industry and Security is required to export sporting shotguns.

## Statutory Requirements for Importation

The Gun Control Act of 1968 (GCA) generally prohibits the importation of firearms into the United States. However, the GCA creates four categories of firearms that the Attorney General must authorize for importation: These include firearms that are (1) being used for scientific or research purposes, or particular competition or training purposes; (2) unserviceable firearms (other than machineguns) that are designated as curios or museum pieces; (3) firearms that were previously taken out of the United States by the person who is bringing them back; and (4) firearms—other than National Firearms Act and surplus military weapons—that are of a type "generally recognized as particularly suitable for or readily adaptable to sporting purposes" (the "sporting purposes" test). Firearms in this final category comprise the majority of those that are imported into the United States.

Due to a change in the GCA in 1998 that made nonimmigrant aliens prohibited persons, ATF amended its import regulations to require that all nonimmigrant aliens must obtain an import permit to temporarily import firearms for lawful sporting purposes. ATF began processing temporary import applications from nonimmigrant aliens in February 2002. Nonimmigrant aliens must possess a valid hunting license from any state prior to completing the application, or an invitation or registration to a shooting event or trade show, to submit with their application. Prior to this change, these individuals were not required to obtain permits to import firearms temporarily into the United States for sporting purposes, such as for participation in hunting or competitive shooting events. During FY 2010, ATF received 7,228 import applications from nonimmigrant aliens.

## Technical Assistance for Industry, Law Enforcement, and the Public

ATF maintains a staff of firearms enforcement officers (FEOs) who provide technical advice and services for manufacturers and importers of firearms, as well as licensed dealers, and the general public. FEOs examine firearms and related products and classify them under the GCA, NFA, and AECA. The FEO also classifies firearms in order to support law enforcement investigations and programs.

# PART II:  Regulatory Initiatives and Programs

Part II discusses new and ongoing regulatory programs that have improved ATF's ability to ensure firearms industry compliance and to prevent unlawful firearms sales and trafficking.

## The Federal Firearms Licensing Center (FFLC)

The Federal Firearms Licensing Center (FFLC) issues Federal firearms licenses.  The FFLC processes applications from persons seeking to engage in firearms commerce in accordance with Federal regulations. The FFLC screens all persons who apply for a Federal firearms license to ensure that felons and other prohibited persons do not gain access to firearms.

## The Brady Handgun Violence Prevention Act (Brady Act)

The Brady Act requires a background check through the National Instant Criminal Background Check System (NICS), or a State agency, prior to the transfer of a firearm from a FFL to a non-licensee.  While the Federal Bureau of Investigation (FBI) or State agencies perform the NICS record checks, ATF analyzes NICS denials, and investigates and enforces Brady Act violations, including the actual or attempted acquisition of a firearm by a prohibited person.

## Regulation of Imports, Firearms, and Ammunition

ATF regulates imports of firearms, ammunition, and certain other defense articles through the issuance of import permits.  ATF maintains close liaison with the Departments of State and Defense to ensure that import permits do not conflict with the foreign policy and national security interests of the United States.

# Licensee Population

ATF is responsible for licensing persons engaged in the business of manufacturing, importing, and dealing in firearms.  In addition, ATF issues collector licenses for those who desire to engage in lawful interstate transactions in curio or relic firearms[2].

ATF evaluates information on license applications to determine applicant eligibility for licensing.  A review of historical data reveals that the Federal firearms licensee population

---

[2] Firearms which are of special interest to collectors by reason of some quality other than is associated with firearms intended for sporting use or as offensive or defensive weapons. To be recognized as curios or relics, firearms must fall within one of the following categories: (1) Firearms which were manufactured at least 50 years prior to the current date, but not including replicas thereof; (2) Firearms which are certified by the curator of a municipal, State, or Federal museum which exhibits firearms to be curios or relics of museum interest; and (3) Any other firearms which derive a substantial part of their monetary value from the fact that they are novel, rare, bizarre, or because of their association with some historical figure, period, or event.

decreased from a high of more than 286,000 in April 1993, to a low of 102,020 in March 2000, likely due in part to the increase in license fees and requirements to comply with State and local law implemented in 1993 and 1994. Since March 2000, the licensee population has slowly increased to the 2010 level of 118,487 licensees. Trend analysis indicates overall decreases in the number of dealer FFLs and a significant increase in the number of collector FFLs—with approximately 48 percent now licensed as collectors, approximately 45 percent as dealers and pawnbrokers, and 5 percent as manufacturers and importers.

It is also instructive to note the transitory nature of the FFL population. Each year, a significant number of licensees choose to voluntarily cease operations or fail to renew their licenses. For example, during FY 2009, ATF issued over 13,700 new firearms licenses. However, during the same period, the total number of licensees increased by only 2,452.

# Firearms Qualification and Compliance Inspection Program

The United States Congress declared that the purpose of the Gun Control Act (GCA) was to provide support to Federal, State, and local law enforcement officials in their fight against crime and violence. Major portions of GCA regulations pertain to licensing and recordkeeping provisions to ensure that individuals who are engaged in the firearms business hold Federal firearms licenses and keep accurate records of firearms acquisition and disposition. Anyone wishing to engage in the activity of importing, manufacturing, or dealing in firearms, or manufacturing or importing ammunition, must obtain a Federal firearms license. Once a license is issued, the licensee has a responsibility to be in full compliance with Federal firearms laws and regulations.

To ensure its mission objectives, ATF conducts face-to-face qualification inspections for all new firearms business applicants. These qualification inspections serve two functions: (1) ensure the applicants understand statutory and regulatory requirements and (2) ensure that only qualified applicants receive a Federal firearms license. ATF conducted almost 7,000 license applicant inspections in FY 2009. During these inspections, ATF Industry Operations Investigators (IOIs) provide extensive education and information about the Federal firearms laws and regulations, and how to stay in compliance with them.

To ensure compliance with recordkeeping requirements, ATF may inspect a licensee once every 12 months. ATF may also inspect a licensee when there is reasonable cause to believe a violation has occurred and a warrant has been issued by a Federal magistrate. Exceptions to the warrant requirement include inspections during the course of a criminal investigation of a person or persons other than the licensee or for determining the disposition of one or more particular firearms in the course of a bona fide criminal investigation.

# FFL eZ Check System

FFL eZ Check, which became operational in October 2000, was created to help the firearms industry prevent the fraudulent use of firearms licenses. Prior to a licensee's disposal of a firearm to another licensee, he or she must verify the identity and license status of the person to whom the firearm will be transferred. This is generally accomplished by obtaining a certified copy of the license.

The advent of new computer imaging, scanning, and internet technologies have made it increasingly easier for an unlicensed person to create an authentic looking copy of a license and to fraudulently use that copy to attempt to order firearms from legitimate FFLs.

To help prevent this unlawful activity from occurring, licensees can access ATF's FFL eZ Check at www.atf.gov/applications/fflezcheck. The FFL eZ Check allows an FFL to verify a license prior to transferring a firearm to another licensee. In 2010, FFL eZ Check recorded more than 850,000 license verifications, showing increased usage each year for the tenth consecutive year.

FFL eZ Check also provides a toll-free number (1-877-560-2435) for licensees to call in order to confirm the validity of a particular license. The toll-free number is operational five days a week during standard business hours.

# Industry Education

ATF is continually developing and strengthening new working relationships with the firearms industry and consumers through education and outreach. ATF regularly holds informational seminars for licensees to keep them informed about legislative and regulatory changes that affect their businesses. ATF also provides a variety of instructional and informational materials to the industry, including regularly updated reference guides about Federal, State, and local firearms laws and regulations, such as the NFA Handbook and the ATF Guidebook on Importation and Verification of Firearms, Ammunition and Implements of War, licensee newsletters, and a manual for dealers to help them evaluate their vulnerability to thefts. This information is available at www.atf.gov.

To address industry concerns and deal with firearms issues that affect the industry and general public, ATF participates in regularly scheduled meetings with representatives from the National Shooting Sports Foundation (NSSF). ATF also meets with representatives from the National Pawnbrokers Association (NPA), the National Auctioneers Association, and the National Association of Arms Shows (NAAS), in an effort to educate show promoters and attendees about the Federal laws and regulations governing firearms sales at gun shows.

Further, ATF participates in numerous conferences and trade shows sponsored by various firearms industry organizations. The Shooting, Hunting, Outdoor Trade Show and Conference (SHOT Show), sponsored by the National Shooting Sports Foundation, is the largest trade show for all professionals involved with the shooting sports and hunting industries. ATF has been participating in the SHOT Show for over 25 years, regularly hosting an informational booth so

that subject-matter experts can be on hand to answer questions and discuss regulatory issues with the 35,000 industry members who attend the show each year.

During the SHOT Show, ATF also attends meetings and conducts seminars to educate industry members about a host of issues such as anti-straw-purchase programs and firearms licensee requirements. Executive-level meetings with the National Firearms Act Trade and Collectors Association (NFATCA) and Firearms and Ammunition Importers Roundtable (FAIR) have become regular features of ATF's SHOT Show participation. In addition, ATF meets collectively with compliance officers from the largest retail firearms dealers on a regular basis.

One example of the positive nature of these activities is the joint ATF-NSSF educational campaign, entitled "Don't Lie for the Other Guy," which is an effort to prevent prohibited individuals from obtaining firearms. This educational campaign is intended to discourage people from illegally purchasing firearms on behalf of others, often for persons who are unable to legally possess firearms. Moreover, it heightens awareness of these illegal sales among licensed dealers. More information about the Don't Lie for the Other Guy campaign can be found at the campaign website www.dontlie.org.

Currently, more than 50,000 Don't Lie Educational Kits have been distributed to FFLs nationwide. FFLs use these kits to train their employees in detecting and deterring illegal straw purchases of firearms. In 2008, the program was expanded to incorporate a consumer awareness component. ATF uses outdoor advertising and public service announcements to convey the important message that buying guns for people who can't or won't buy guns for themselves is a Federal crime punishable by up to 10 years in prison and a fine of up to $250,000. The program alerts the potential straw purchasers of the penalties associated with straw purchases before they enter licensee places of business.

In addition, ATF and NSSF jointly hosted the Don't Lie for the Other Guy educational seminars for licensees at convenient locations around the country. Over 8,000 licensees have attended over 70 of these seminars. The NSSF also prints and distributes the educational kits for firearms retailers. The kits contain posters, pamphlets, and other educational materials including a DVD that depicts five scenarios that straw purchasers use to obtain firearms illegally.

ATF also meets frequently with representatives of the FAIR trade group to discuss issues of mutual interest with respect to the importation of firearms and munitions. Furthermore, ATF attends an annual educational conference for licensed importers and defense contractors along with the Departments of State, Commerce, Treasury, and Homeland Security to discuss issues, concerns, and legislation affecting the import sector of the industry.

ATF continues to work with the firearms industry during times of heightened awareness regarding thefts, unusual purchases, or attempted illegal straw purchases of firearms. Additionally, ATF will continue to notify firearms shippers, when necessary, about the importance of maintaining increased awareness of unusual or suspicious activity. ATF is committed to keeping lines of communication open on issues affecting public safety.

# PART III: Integration of Law Enforcement and Regulatory Missions

## ATF's Role in Eliminating Illegal Firearms Trafficking

The goal of ATF's illegal firearms trafficking enforcement program is to reduce violent crime and protect national security. ATF investigates and arrests individuals and organizations who illegally supply firearms to prohibited individuals. ATF is the Federal law enforcement organization that regulates the firearms industry. It deters the diversion of firearms from lawful commerce into the illegal market with enforcement strategies and technology. In addition, ATF regulates the firearms industry to promote compliance, to prevent diversion, and to detect those criminals who bring violence to our communities. ATF's illegal firearms trafficking and violent crime strategies provide state and local governments a solution for crime that originates within and outside of their jurisdictions.

## Integrated Violence Reduction Strategy (IVRS)

The focus of the Integrated Violence Reduction Strategy (IVRS) is to remove violent offenders from our communities, keep firearms from prohibited persons, eliminate illegal firearms transfers, and prevent firearms violence through community outreach. IVRS builds upon traditional enforcement efforts with the use of State-of-the-art technology, intelligence and information sharing, industry regulation, and community outreach.

## The ATF National Tracing Center (NTC)

The ATF National Tracing Center (NTC) is the only firearms tracing facility in the United States. GCA regulations define the required records that allow ATF to trace each firearm from its point of manufacture or importation to the point of its first retail sale. The NTC traces crime guns for Federal, State, local, and international law enforcement agencies to provide investigative leads. By tracing firearms recovered by law enforcement authorities, ATF is able to discern patterns of names, locations, and weapon types. This information provides invaluable leads that help identify persons engaged in the unlawful diversion of firearms into illegal commerce, links suspects to firearms in criminal investigations, identifies potential traffickers, and detects intrastate, interstate, and international patterns in trafficking.

## Illegal Firearms Trafficking Information and Intelligence

Because of ATF's unique combination of criminal and regulatory authorities under the GCA, the National Firearms Act (NFA), and the Arms Export Control Act (AECA), it has developed specialized expertise, information, and intelligence resources to more effectively enforce these laws. ATF intelligence research specialists combine ATF proprietary data (e.g.,

9

Multiple Sales and FFL Out of Business Records) and all source information to identify firearms traffickers, illegal firearms trafficking corridors, and armed violators. ATF intelligence products provide special agents with comprehensive information to detect, investigate, apprehend, and recommend for prosecution those individuals or groups of persons who unlawfully transfer or possess firearms. These tools also assist industry operations investigators (IOIs) in conducting thorough qualification and compliance investigations. ATF's sharing of information and intelligence products contribute to our national security efforts.

## Enforcement of the National Firearms Act

By law, ATF regulates National Firearms Act (NFA) weapons such as machineguns, short-barreled rifles, short-barreled shotguns, silencers, certain concealable firearms, and destructive devices. The NFA requires that firearm importers, manufacturers, and makers register NFA weapons. ATF approves or disapproves all NFA transfers and processes all applications and notices to manufacture, transfer, and register NFA items. ATF uses the National Firearms Registration and Transfer Record (NFRTR) to support FFL inspections and criminal investigations. In addition, ATF continually provides technical information to the industry and the public concerning the requirements of the NFA.

## Summary

ATF strives to provide the public with the most up-to-date information on the firearms industry, as well as to promote industry collaboration and compliance. ATF will continue to release yearly statistical data relating to the industry, along with information concerning new regulatory initiatives. Any suggestions to improve the usefulness of the data presented in this report may be submitted to:

Bureau of Alcohol, Tobacco, Firearms and Explosives
Office of Enforcement Programs and Services
99 New York Avenue, NE
Washington, DC 20226

## Exhibit 1.  Firearms Manufactured (1986-2009)

| Calendar Year | Pistols | Revolvers | Rifles | Shotguns | Misc. Firearms[1] | Total Firearms |
|---|---|---|---|---|---|---|
| 1986 | 662,973 | 761,414 | 970,507 | 641,482 | 4,558 | 3,040,934 |
| 1987 | 964,561 | 722,512 | 1,007,661 | 857,949 | 6,980 | 3,559,663 |
| 1988 | 1,101,011 | 754,744 | 1,144,707 | 928,070 | 35,345 | 3,963,877 |
| 1989 | 1,404,753 | 628,573 | 1,407,400 | 935,541 | 42,126 | 4,418,393 |
| 1990 | 1,371,427 | 470,495 | 1,211,664 | 848,948 | 57,434 | 3,959,968 |
| 1991 | 1,378,252 | 456,966 | 883,482 | 828,426 | 15,980 | 3,563,106 |
| 1992 | 1,669,537 | 469,413 | 1,001,833 | 1,018,204 | 16,849 | 4,175,836 |
| 1993 | 2,093,362 | 562,292 | 1,173,694 | 1,144,940 | 81,349 | 5,055,637 |
| 1994 | 2,004,298 | 586,450 | 1,316,607 | 1,254,926 | 10,936 | 5,173,217 |
| 1995 | 1,195,284 | 527,664 | 1,411,120 | 1,173,645 | 8,629 | 4,316,342 |
| 1996 | 987,528 | 498,944 | 1,424,315 | 925,732 | 17,920 | 3,854,439 |
| 1997 | 1,036,077 | 370,428 | 1,251,341 | 915,978 | 19,680 | 3,593,504 |
| 1998 | 960,365 | 324,390 | 1,535,690 | 868,639 | 24,506 | 3,713,590 |
| 1999 | 995,446 | 335,784 | 1,569,685 | 1,106,995 | 39,837 | 4,047,747 |
| 2000 | 962,901 | 318,960 | 1,583,042 | 898,442 | 30,196 | 3,793,541 |
| 2001 | 626,836 | 320,143 | 1,284,554 | 679,813 | 21,309 | 2,932,655 |
| 2002 | 741,514 | 347,070 | 1,515,286 | 741,325 | 21,700 | 3,366,895 |
| 2003 | 811,660 | 309,364 | 1,430,324 | 726,078 | 30,978 | 3,308,404 |
| 2004 | 728,511 | 294,099 | 1,325,138 | 731,769 | 19,508 | 3,099,025 |
| 2005 | 803,425 | 274,205 | 1,431,372 | 709,313 | 23,179 | 3,241,494 |
| 2006 | 1,021,260 | 385,069 | 1,496,505 | 714,618 | 35,872 | 3,653,324 |
| 2007 | 1,219,664 | 391,334 | 1,610,923 | 645,231 | 55,461 | 3,922,613 |
| 2008 | 1,609,381 | 431,753 | 1,734,536 | 630,710 | 92,564 | 4,498,944 |
| 2009 | 1,868,258 | 547,195 | 2,248,851 | 752,699 | 138,815 | 5,555,818 |

Source:  ATF's Annual Firearms Manufacturing and Exportation Report (AFMER).

[1]  Miscellaneous firearms are any firearms not specifically categorized in any of the firearms categories defined on the ATF Form 5300.11 Annual Firearms Manufacturing and Exportation Report. (Examples of miscellaneous firearms would include pistol grip firearms, starter guns, and firearm frames and receivers.)

The AFMER report excludes production for the U.S. military but includes firearms purchased by domestic law enforcement agencies.  The report also includes firearms manufactured for export.

AFMER data is not published until one year after the close of the calendar year reporting period because the proprietary data furnished by filers is protected from immediate disclosure by the Trade Secrets Act. For example, calendar year 2009 data was due to ATF by April 1, 2010, but not published until January 2011.



## Exhibit 2.  Firearms Manufacturers' Exports (1986-2009)

| Calendar Year | Pistols | Revolvers | Rifles | Shotguns | Misc. Firearms[1] | Total Firearms |
|---|---|---|---|---|---|---|
| 1986 | 16,511 | 104,571 | 37,224 | 58,943 | 199 | 217,448 |
| 1987 | 24,941 | 134,611 | 42,161 | 76,337 | 9,995 | 288,045 |
| 1988 | 32,570 | 99,289 | 53,896 | 68,699 | 2,728 | 257,182 |
| 1989 | 41,970 | 76,494 | 73,247 | 67,559 | 2,012 | 261,282 |
| 1990 | 73,398 | 106,820 | 71,834 | 104,250 | 5,323 | 361,625 |
| 1991 | 79,275 | 110,058 | 91,067 | 117,801 | 2,964 | 401,165 |
| 1992 | 76,824 | 113,178 | 90,015 | 119,127 | 4,647 | 403,791 |
| 1993 | 59,234 | 91,460 | 94,272 | 171,475 | 14,763 | 431,204 |
| 1994 | 93,959 | 78,935 | 81,835 | 146,524 | 3,220 | 404,473 |
| 1995 | 97,969 | 131,634 | 90,834 | 101,301 | 2,483 | 424,221 |
| 1996 | 64,126 | 90,068 | 74,557 | 97,191 | 6,055 | 331,997 |
| 1997 | 44,182 | 63,656 | 76,626 | 86,263 | 4,354 | 275,081 |
| 1998 | 29,537 | 15,788 | 65,807 | 89,699 | 2,513 | 203,344 |
| 1999 | 34,663 | 48,616 | 65,669 | 67,342 | 4,028 | 220,318 |
| 2000 | 28,636 | 48,130 | 49,642 | 35,087 | 11,132 | 172,627 |
| 2001 | 32,151 | 32,662 | 50,685 | 46,174 | 10,939 | 172,611 |
| 2002 | 22,555 | 34,187 | 60,644 | 31,897 | 1,473 | 150,756 |
| 2003 | 16,340 | 26,524 | 62,522 | 29,537 | 6,989 | 141,912 |
| 2004 | 14,959 | 24,122 | 62,403 | 31,025 | 7,411 | 139,920 |
| 2005 | 19,196 | 29,271 | 92,098 | 46,129 | 7,988 | 194,682 |
| 2006 | 144,779 | 28,120 | 102,829 | 57,771 | 34,022 | 367,521 |
| 2007 | 45,053 | 34,662 | 80,594 | 26,949 | 17,524 | 204,782 |
| 2008 | 54,030 | 28,205 | 104,544 | 41,186 | 523 | 228,488 |
| 2009 | 56,402 | 32,377 | 61,072 | 36,455 | 8,438 | 194,744 |

Source:  ATF's Annual Firearms Manufacturing and Exportation Report (AFMER).

[1] Miscellaneous firearms are any firearms not specifically categorized in any of the firearms categories defined on the ATF Form 5300.11 Annual Firearms Manufacturing and Exportation Report. (Examples of miscellaneous firearms would include pistol grip firearms, starter guns, and firearm frames and receivers.)

The AFMER report excludes production for the U.S. military but includes firearms purchased by domestic law enforcement agencies.  The report also includes firearms manufactured for export.



Exhibit 2a. Firearms Manufacturers' Exports (1986-2009)

## Exhibit 3. Firearms Imports (1986-2010)

| Calendar Year | Shotguns | Rifles | Handguns | Total Firearms |
|---|---|---|---|---|
| 1986 | 201,000 | 269,000 | 231,000 | 701,000 |
| 1987 | 307,620 | 413,780 | 342,113 | 1,063,513 |
| 1988 | 372,008 | 282,640 | 621,620 | 1,276,268 |
| 1989 | 274,497 | 293,152 | 440,132 | 1,007,781 |
| 1990 | 191,787 | 203,505 | 448,517 | 843,809 |
| 1991 | 116,141 | 311,285 | 293,231 | 720,657 |
| 1992 | 441,933 | 1,423,189 | 981,588 | 2,846,710 |
| 1993 | 246,114 | 1,592,522 | 1,204,685 | 3,043,321 |
| 1994 | 117,866 | 847,868 | 915,168 | 1,880,902 |
| 1995 | 136,126 | 261,185 | 706,093 | 1,103,404 |
| 1996 | 128,456 | 262,568 | 490,554 | 881,578 |
| 1997 | 106,296 | 358,937 | 474,182 | 939,415 |
| 1998 | 219,387 | 248,742 | 531,681 | 999,810 |
| 1999 | 385,556 | 198,191 | 308,052 | 891,799 |
| 2000 | 331,985 | 298,894 | 465,903 | 1,096,782 |
| 2001 | 428,330 | 227,608 | 710,958 | 1,366,896 |
| 2002 | 379,755 | 507,637 | 741,845 | 1,629,237 |
| 2003 | 407,402 | 428,837 | 630,263 | 1,466,502 |
| 2004 | 507,050 | 564,953 | 838,856 | 1,910,859 |
| 2005 | 546,403 | 682,100 | 878,172 | 2,106,675 |
| 2006 | 606,820 | 659,393 | 1,166,309 | 2,432,522 |
| 2007 | 725,752 | 631,781 | 1,386,460 | 2,743,993 |
| 2008 | 535,960 | 602,364 | 1,468,062 | 2,606,386 |
| 2009 | 558,679 | 864,010 | 2,184,417 | 3,607,106 |
| 2010 | 509,913 | 547,449 | 1,782,585 | 2,839,947 |

Source: ATF and United States International Trade Commission.

Statistics prior to 1992 are for fiscal years; 1992 is a transition year with five quarters.

15



## Exhibit 4.  Importation Applications (1986-2010)

| Fiscal Year | Licensed Importer | Military | Other | Total |
|---|---|---|---|---|
| 1986 | 7,728 | 9,434 | 2,631 | 19,793 |
| 1987 | 7,833 | 8,059 | 2,130 | 18,022 |
| 1988 | 7,711 | 7,680 | 2,122 | 17,513 |
| 1989 | 7,950 | 8,293 | 2,194 | 18,437 |
| 1990 | 8,292 | 8,696 | 2,260 | 19,248 |
| 1991 | 8,098 | 10,973 | 2,412 | 21,483 |
| 1992 | 7,960 | 9,222 | 2,623 | 19,805 |
| 1993 | 7,591 | 6,282 | 2,585 | 16,458 |
| 1994 | 6,704 | 4,570 | 3,024 | 14,298 |
| 1995 | 5,267 | 2,834 | 2,548 | 10,649 |
| 1996 | 6,340 | 2,792 | 2,395 | 11,527 |
| 1997 | 8,288 | 2,069 | 1,395 | 11,752 |
| 1998 | 8,767 | 2,715 | 1,536 | 13,019 |
| 1999 | 9,505 | 2,235 | 1,036 | 12,776 |
| 2000 | 7,834 | 2,885 | 1,416 | 12,135 |
| 2001 | 9,639 | 3,984 | 1,569 | 15,192 |
| 2002 | 9,646 | 6,321 | 3,199 | 19,166 |
| 2003 | 8,160 | 2,264 | 2,081 | 12,505 |
| 2004 | 7,539 | 1,392 | 1,819 | 10,750 |
| 2005 | 7,539 | 1,320 | 1,746 | 10,605 |
| 2006 | 8,537 | 1,180 | 1,505 | 11,222 |
| 2007 | 8,004 | 1,081 | 1,236 | 10,321 |
| 2008 | 7,610 | 718 | 980 | 9,308 |
| 2009 | 7,967 | 504 | 970 | 9,441 |
| 2010 | 7,367 | 823 | 1,088 | 9,278 |

Source: ATF's Firearms and Explosives Import System (FEIS)

Import data excludes temporary permits issued to nonimmigrant aliens.



## Exhibit 5. Firearms Imported into the United States by Country 2010

| | Handguns | Rifles | Shotguns | Total Firearms |
|---|---|---|---|---|
| Brazil | 526,011 | 46,243 | 169,136 | 741,390 |
| Austria | 431,118 | 2,759 | 497 | 434,374 |
| Italy | 129,509 | 16,393 | 139,181 | 285,083 |
| Germany | 230,477 | 33,847 | 2,364 | 266,688 |
| Croatia | 239,021 | 0 | 0 | 239,021 |
| Turkey | 24,443 | 400 | 122,721 | 147,564 |
| Canada | 6 | 154,953 | 0 | 154,959 |
| Russia | 1,050 | 90,854 | 3,708 | 95,612 |
| Argentina | 74,245 | 0 | 0 | 74,245 |
| China[1] | 0 | 300 | 61,956 | 62,256 |
| Romania | 16,945 | 35,197 | 0 | 52,142 |
| Japan | 0 | 49,946 | 344 | 50,290 |
| Philippines | 44,626 | 2,050 | 1,139 | 47,815 |
| Serbia | 12,455 | 28,042 | 0 | 40,497 |
| Czech Republic | 21,140 | 15,148 | 34 | 36,322 |
| Belgium | 18,874 | 16,017 | 48 | 34,939 |
| Finland | 0 | 26,464 | 0 | 26,464 |
| United Kingdom | 387 | 6,839 | 6,221 | 13,447 |
| Spain | 989 | 6,898 | 1,722 | 9,609 |
| Ukraine | 0 | 8,800 | 0 | 8,800 |
| Portugal | 0 | 4,740 | 704 | 5,444 |
| Bulgaria | 3,325 | 0 | 0 | 3,325 |
| Poland | 3,922 | 0 | 70 | 3,992 |
| Israel | 2,645 | 0 | 0 | 2,645 |
| Switzerland | 738 | 1,295 | 0 | 2,033 |
| Other[2] | 659 | 264 | 68 | 991 |
| Totals | 1,782,585 | 547,449 | 509,913 | 2,839,947 |

Source: United States International Trade Commission

[1] On May 26, 1994, the United States instituted a firearms imports embargo against China. Shotguns, however, are exempt from the embargo.

[2] Imports of fewer than 1,000 per country.



Exhibit 5a. Imported Firearms by Type 2010

Rifles
19%

Shotguns
18%

Handguns
63%

# Exhibit 6. National Firearms Act Tax Revenues and Related Activities
## (1979-2010)

| Fiscal Year [1] | Occupational Tax Paid [2] | Transfer and Making Tax Paid [3] | Enforcement Support [4] | |
|---|---|---|---|---|
| | | | Certifications | Records Checks |
| 1979 | ... | $500,000 | 3,559 | ... |
| 1980 | ... | $716,000 | 4,377 | ... |
| 1981 | $268,000 | $611,000 | 1,482 | 3,627 |
| 1982 | $391,000 | $723,000 | 1,306 | 2,841 |
| 1983 | $591,000 | $594,000 | 4,335 | ... |
| 1984 | $596,000 | $666,000 | 1,196 | 2,771 |
| 1985 | $606,000 | $594,000 | 921 | 3,682 |
| 1986 | $667,000 | $1,372,000 | 690 | 3,376 |
| 1987 | $869,000 | $1,576,000 | 575 | 4,135 |
| 1988 | $2,095,000 | $1,481,000 | 701 | 3,738 |
| 1989 | $1,560,000 | $1,527,000 | 1,196 | 6,128 |
| 1990 | $1,442,000 | $1,308,000 | 666 | 7,981 |
| 1991 | $1,556,000 | $1,210,000 | 764 | 7,857 |
| 1992 | $1,499,000 | $1,237,000 | 1,257 | 8,582 |
| 1993 | $1,493,000 | $1,264,000 | 1,024 | 7,230 |
| 1994 | $1,444,000 | $1,596,000 | 586 | 6,283 |
| 1995 | $1,007,000 | $1,311,000 | 882 | 5,677 |
| 1996 | $1,143,000 | $1,402,000 | 529 | 5,215 |
| 1997 | $1,284,000 | $1,630,000 | 488 | 4,395 |
| 1998 | $1,299,000 | $1,969,000 | 353 | 3,824 |
| 1999 | $1,330,000 | $2,422,000 | 345 | 3,994 |
| 2000 | $1,399,000 | $2,301,000 | 422 | 4,690 |
| 2001 | $1,456,000 | $2,800,000 | 367 | 2,862 |
| 2002 | $1,492,000 | $1,510,000 | 503 | 3,644 |
| 2003 | $1,758,000 | $2,699,000 | 475 | 3,749 |
| 2004 | $1,640,000 | $3,052,000 | 460 | 3,511 |
| 2005 | $1,659,000 | $2,810,000 | 471 | 3,527 |
| 2006 | $1,709,000 | $3,951,000 | 433 | 3,349 |
| 2007 | $1,815,000 | $4,890,000 | 418 | 3,390 |
| 2008 | $1,950,000 | $5,742,000 | 304 | 3,191 |
| 2009 | $2,125,000 | $7,971,000 | 638 | 3,175 |
| 2010 | $2,530,000 | $7,183,511 | 810 | 3,211 |

Source: ATF's National Firearms Registration and Transfer Record (NFRTR).

[1] Data from 1997-2000 were based on calendar year data.

[2] Occupational tax revenues for FY 1990-1996 include collections made during the fiscal year for prior tax years.

[3] Importers, manufacturers, or dealers in NFA firearms are subject to a yearly occupational tax.

[4] ATF searches the NFRTR in support of criminal investigations and regulatory inspections in order to determine whether persons are legally in possession of NFA weapons and whether transfers are made lawfully.

21

# Exhibit 7. National Firearms Act Firearms Processed
## by Form Type (1990-2010)

| Calendar Year[1] | Application to Make NFA Firearms[2] (ATF Form 1) | Manufactured and Imported (ATF Form 2) | Application for Tax Exempt Transfer Between Licensees (ATF Form 3) | Application for Taxpaid Transfer (ATF Form 4) | Application for Tax-Exempt Transfer[3] (ATF Form 5) | Exported (ATF Form 9) | Total Firearms Processed[4] |
|---|---|---|---|---|---|---|---|
| 1990 | 399 | 66,084 | 23,149 | 7,024 | 54,959 | 21,725 | 173,340 |
| 1991 | 524 | 80,619 | 19,507 | 5,395 | 44,146 | 40,387 | 190,578 |
| 1992 | 351 | 107,313 | 26,352 | 6,541 | 45,390 | 22,120 | 208,067 |
| 1993 | 310 | 70,342 | 22,071 | 7,388 | 60,193 | 24,041 | 184,345 |
| 1994 | 1,076 | 97,665 | 27,950 | 7,600 | 67,580 | 34,242 | 236,113 |
| 1995 | 1,226 | 95,061 | 18,593 | 8,263 | 60,055 | 31,258 | 214,456 |
| 1996 | 1,174 | 103,511 | 16,931 | 6,418 | 72,395 | 40,439 | 240,868 |
| 1997 | 855 | 110,423 | 18,371 | 7,873 | 70,690 | 36,284 | 244,496 |
| 1998 | 1,093 | 141,101 | 27,921 | 10,181 | 93,135 | 40,221 | 313,652 |
| 1999 | 1,071 | 137,373 | 28,288 | 11,768 | 95,554 | 28,128 | 302,182 |
| 2000 | 1,334 | 141,763 | 23,335 | 11,246 | 96,234 | 28,672 | 302,584 |
| 2001 | 2,522 | 145,112 | 25,745 | 10,799 | 101,955 | 25,759 | 311,892 |
| 2002 | 1,173 | 162,321 | 25,042 | 10,686 | 92,986 | 47,597 | 339,805 |
| 2003 | 1,003 | 156,620 | 21,936 | 13,501 | 107,108 | 43,668 | 343,836 |
| 2004 | 980 | 83,483 | 20,026 | 14,635 | 54,675 | 19,425 | 193,224 |
| 2005 | 1,902 | 65,865 | 26,603 | 14,606 | 26,210 | 20,951 | 156,137 |
| 2006 | 2,610 | 188,134 | 51,290 | 20,534 | 100,458 | 42,175 | 405,201 |
| 2007 | 3,553 | 296,267 | 51,217 | 22,260 | 194,794 | 76,467 | 644,558 |
| 2008 | 4,583 | 424,743 | 71,404 | 26,917 | 183,271 | 206,411 | 917,329 |
| 2009 | 5,345 | 371,920 | 56,947 | 31,551 | 201,267 | 163,951 | 830,981 |
| 2010 | 5,169 | 296,375 | 58,875 | 33,059 | 189,449 | 136,335 | 719,262 |

Source: ATF's National Firearms Registration and Transfer Record (NFRTR).

[1] Data from 1990 – 1996 represent fiscal year.

[2] Firearms manufactured by, or on behalf of, the U.S. Government or any department, independent establishment, or agency thereof are exempt from the making tax.

[3] Firearms may be transferred to the U.S. Government or its possessions, to State governments, or to official police organizations without the payment of a transfer tax. Further, transfers of NFA firearms between licensees registered as importers, manufacturers, or dealers who have paid the special occupational tax are likewise exempt from transfer tax.

[4] Totals do not include ATF Form 5320.20 or ATF Form 10 because these do not relate to commercial transactions.



Exhibit 7a. National Firearms Act Firearms Processed by Form Type (1990-2010)

## Exhibit 8. National Firearms Act Registered Weapons
## by State (December 2010)

| State | Any Other Weapon[1] | Destructive Device[2] | Machinegun[3] | Silencer[4] | Short Barreled Rifle[5] | Short Barreled Shotgun[6] | Total |
|---|---|---|---|---|---|---|---|
| Alabama | 1,085 | 38,742 | 14,201 | 7,195 | 791 | 2,013 | 64,027 |
| Alaska | 307 | 2,840 | 1,602 | 1,779 | 419 | 1,071 | 8,018 |
| Arkansas | 568 | 43,567 | 4,188 | 5,705 | 839 | 977 | 55,844 |
| Arizona | 1,029 | 63,380 | 15,633 | 13,828 | 4,388 | 1,747 | 100,005 |
| California | 3,562 | 195,423 | 26,237 | 4,798 | 2,643 | 10,103 | 242,766 |
| Colorado | 856 | 34,346 | 5,766 | 4,792 | 1,675 | 1,348 | 48,783 |
| Connecticut | 633 | 8,846 | 21,943 | 4,568 | 878 | 2,518 | 39,386 |
| District of Columbia | 69 | 34,059 | 4,103 | 160 | 182 | 978 | 39,551 |
| Delaware | 32 | 1,974 | 515 | 257 | 85 | 441 | 3,304 |
| Florida | 2,906 | 92,609 | 27,607 | 22,517 | 6,019 | 5,313 | 156,971 |
| Georgia | 1,687 | 43,185 | 20,129 | 29,004 | 2,755 | 9,241 | 106,001 |
| Hawaii | 34 | 5,019 | 428 | 102 | 50 | 59 | 5,692 |
| Iowa | 870 | 11,058 | 3,055 | 229 | 314 | 882 | 16,408 |
| Idaho | 561 | 12,432 | 3,822 | 8,993 | 900 | 379 | 27,087 |
| Illinois | 947 | 79,858 | 23,625 | 1,007 | 1,100 | 1,633 | 108,170 |
| Indiana | 1,285 | 32,239 | 16,623 | 11,471 | 1,886 | 8,303 | 71,807 |
| Kansas | 670 | 18,638 | 2,765 | 1,284 | 845 | 822 | 25,024 |
| Kentucky | 983 | 20,527 | 8,706 | 7,481 | 1,188 | 1,615 | 40,500 |
| Louisiana | 511 | 43,001 | 6,274 | 3,302 | 1,352 | 1,443 | 55,883 |
| Massachusetts | 817 | 12,255 | 6,341 | 4,769 | 1,035 | 844 | 26,061 |
| Maryland | 893 | 38,657 | 23,393 | 5,991 | 1,408 | 3,679 | 74,021 |
| Maine | 556 | 2,342 | 4,597 | 1,135 | 1,370 | 376 | 10,376 |
| Michigan | 1,038 | 20,312 | 8,656 | 1,322 | 628 | 1,094 | 33,050 |
| Minnesota | 2,625 | 33,944 | 7,876 | 632 | 1,044 | 995 | 47,116 |
| Missouri | 1,286 | 23,468 | 7,660 | 3,382 | 1,523 | 2,088 | 39,407 |
| Mississippi | 387 | 5,854 | 3,797 | 2,416 | 435 | 686 | 13,575 |
| Montana | 385 | 2,652 | 1,842 | 1,631 | 404 | 338 | 7,252 |
| North Carolina | 801 | 64,510 | 10,026 | 6,862 | 2,251 | 2,377 | 86,827 |
| North Dakota | 171 | 1,433 | 1,226 | 1,434 | 214 | 149 | 4,627 |
| Nebraska | 703 | 4,873 | 2,012 | 1,792 | 546 | 734 | 10,660 |
| New Hampshire | 410 | 3,203 | 5,479 | 2,293 | 1,121 | 349 | 12,855 |
| New Jersey | 422 | 35,733 | 6,749 | 850 | 584 | 2,267 | 46,605 |
| New Mexico | 269 | 52,092 | 3,652 | 2,451 | 743 | 582 | 59,789 |
| Nevada | 674 | 27,385 | 6,342 | 5,575 | 2,186 | 742 | 40,008 |
| New York | 1,853 | 33,689 | 6,675 | 892 | 948 | 7,243 | 51,300 |
| Ohio | 1,710 | 67,249 | 16,254 | 7,450 | 2,364 | 3,589 | 98,616 |
| Oklahoma | 1,065 | 12,184 | 6,858 | 6,615 | 1,402 | 1,398 | 29,522 |
| Oregon | 1,446 | 16,429 | 6,234 | 8,391 | 1,993 | 1,225 | 35,718 |
| Pennsylvania | 1,891 | 103,223 | 17,355 | 10,059 | 3,302 | 11,057 | 146,887 |
| Rhode Island | 43 | 2,633 | 572 | 26 | 108 | 112 | 3,494 |
| South Carolina | 650 | 24,634 | 6,165 | 6,096 | 976 | 2,233 | 40,754 |
| South Dakota | 339 | 3,151 | 1,425 | 1,336 | 216 | 169 | 6,636 |
| Tennessee | 1,436 | 30,812 | 11,883 | 7,765 | 2,143 | 5,398 | 59,437 |
| Texas | 6,113 | 141,891 | 26,978 | 36,204 | 6,958 | 6,056 | 224,200 |
| Utah | 355 | 12,629 | 5,936 | 4,400 | 1,576 | 1,090 | 25,986 |
| Virginia | 2,456 | 146,071 | 28,760 | 13,207 | 5,807 | 5,869 | 202,170 |
| Vermont | 217 | 2,113 | 1,064 | 66 | 112 | 92 | 3,664 |
| Washington | 1,631 | 32,863 | 3,650 | 5,136 | 975 | 728 | 44,983 |
| Wisconsin | 728 | 22,776 | 6,067 | 3,861 | 1,207 | 1,087 | 35,726 |
| West Virginia | 420 | 5,905 | 2,375 | 1,784 | 519 | 514 | 11,517 |
| Wyoming | 285 | 95,528 | 1,634 | 777 | 311 | 369 | 98,904 |
| Other US Territories | 6 | 286 | 175 | 15 | 11 | 47 | 540 |
| Total | 52,676 | 1,864,522 | 456,930 | 285,087 | 74,729 | 116,462 | 2,850,406 |

Source: ATF's National Firearms Registration and Transfer Record (NFRTR).

[1]  The term "any other weapon" means any weapon or device capable of being concealed on the person from which a shot can be discharged through the energy of an explosive, a pistol or revolver having a barrel with a smooth bore designed or redesigned to fire a fixed shotgun shell, weapons with combination shotgun and rifle barrels 12 inches or more, less than 18 inches in length, from which only a single discharge can be made from either barrel without manual reloading, and shall include any such weapon which may be readily restored to fire. Such term shall not include a pistol or a revolver having a rifled bore, or rifled bores, or weapons designed, made, or intended to be fired from the shoulder and not capable of firing fixed ammunition.

[2]  Destructive device generally is defined as (a) Any explosive, incendiary, or poison gas (1) bomb, (2) grenade, (3) rocket having a propellant charge of more than 4 ounces, (4) missile having an explosive or incendiary charge of more than one-quarter ounce, (5) mine, or (6) device similar to any of the devices described in the preceding paragraphs of this definition; (b) any type of weapon (other than a shotgun or a shotgun shell which the Director finds is generally recognized as particularly suitable for sporting purposes) by whatever name known which will, or which may be readily converted to, expel a projectile by the action of an explosive or other propellant, and which has any barrel with a bore of more than one-half inch in diameter; and
(c) any combination of parts either designed or intended for use in converting any device into any destructive device described in paragraph (a) or (b) of this section and from which a destructive device may be readily assembled. The term shall not include any device which is neither designed nor redesigned for use as a
weapon; any device, although originally designed for use as a weapon, which is redesigned for use as a signaling, pyrotechnic, line throwing, safety, or similar device; surplus ordnance sold, loaned, or given by the Secretary of the Army pursuant to the provisions of section 4684(2), 4685, or 4686 of title 10, United States
Code; or any other device which the Director finds is not likely to be used as a weapon, is an antique, or is a rifle which the owner intends to use solely for sporting, recreational, or cultural purposes.

[3]  Machinegun is defined as any weapon which shoots, is designed to shoot, or can be readily restored to shoot, automatically more than one shot, without manual reloading, by a single function of the trigger. The term shall also include the frame or receiver of any such weapon, any part designed and intended solely and exclusively, or combination of parts designed and intended, for use in converting a weapon into a machine gun, and any combination of parts from which a machine gun can be assembled if such parts are in the possession or under the control of a person.

[4]  Silencer is defined as any device for silencing, muffling, or diminishing the report of a portable firearm, including any combination of parts, designed or redesigned, and intended for the use in assembling or fabricating a firearm silencer or firearm muffler, and any part intended only for use in such assembly or fabrication.

[5]  Short-barreled rifle is defined as a rifle having one or more barrels less than 16 inches in length, and any weapon made from a rifle, whether by alteration, modification, or otherwise, if such weapon, as modified, has an overall length of less than 26 inches.

[6]  Short-barreled shotgun is defined as a shotgun having one or more barrels less than 18 inches in length, and any weapon made from a shotgun, whether by alteration, modification, or otherwise, if such weapon as modified has an overall length of less than 26 inches.

# Exhibit 9-1 National Firearms Act Special Occupational
# Taxpayers by State - Tax Year 2010

| State | Importers | Manufacturers | Dealers | Total |
|---|---|---|---|---|
| Alabama | 12 | 27 | 42 | 81 |
| Alaska | 0 | 7 | 24 | 31 |
| Arizona | 13 | 128 | 113 | 254 |
| Arkansas | 6 | 29 | 29 | 64 |
| California | 11 | 41 | 63 | 115 |
| Colorado | 1 | 32 | 46 | 79 |
| Connecticut | 8 | 41 | 35 | 84 |
| Delaware | 0 | 1 | 3 | 4 |
| District of Columbia | 0 | 0 | 1 | 1 |
| Florida | 23 | 127 | 208 | 358 |
| Georgia | 9 | 54 | 80 | 143 |
| Hawaii | 0 | 0 | 2 | 2 |
| Idaho | 0 | 56 | 30 | 86 |
| Illinois | 9 | 37 | 42 | 88 |
| Indiana | 2 | 38 | 64 | 104 |
| Iowa | 1 | 11 | 11 | 23 |
| Kansas | 3 | 14 | 37 | 54 |
| Kentucky | 7 | 26 | 45 | 78 |
| Louisiana | 2 | 22 | 59 | 83 |
| Maine | 1 | 15 | 16 | 32 |
| Maryland | 6 | 30 | 40 | 76 |
| Massachusetts | 2 | 40 | 22 | 64 |
| Michigan | 6 | 35 | 60 | 101 |
| Minnesota | 2 | 50 | 15 | 67 |
| Mississippi | 3 | 14 | 32 | 49 |
| Missouri | 3 | 49 | 63 | 115 |
| Montana | 2 | 11 | 21 | 34 |
| Nebraska | 0 | 8 | 12 | 20 |
| Nevada | 2 | 39 | 40 | 81 |
| New Hampshire | 5 | 23 | 35 | 63 |
| New Jersey | 2 | 5 | 17 | 24 |
| New Mexico | 3 | 12 | 28 | 43 |
| New York | 1 | 23 | 13 | 37 |
| North Carolina | 5 | 63 | 81 | 149 |
| North Dakota | 0 | 3 | 4 | 7 |
| Ohio | 2 | 70 | 96 | 168 |
| Oklahoma | 1 | 33 | 55 | 89 |
| Oregon | 2 | 65 | 53 | 120 |
| Pennsylvania | 8 | 68 | 104 | 180 |
| Rhode Island | 1 | 1 | 3 | 5 |
| South Carolina | 4 | 28 | 18 | 50 |
| South Dakota | 0 | 6 | 19 | 25 |
| Tennessee | 4 | 35 | 62 | 101 |
| Texas | 9 | 132 | 253 | 394 |
| Utah | 4 | 34 | 19 | 57 |
| Vermont | 4 | 12 | 8 | 24 |
| Virginia | 19 | 46 | 88 | 153 |
| Washington | 6 | 42 | 24 | 72 |
| West Virginia | 2 | 15 | 24 | 41 |
| Wisconsin | 2 | 45 | 39 | 86 |
| Wyoming | 1 | 6 | 14 | 21 |
| Total | 219 | 1,749 | 2,312 | 4,280 |

Source: ATF's National Firearms Act Special Occupational Tax Database (NSOT)

## Exhibit 10. Federal Firearms Licensees Total (1975-2010)

| Fiscal Year | Dealer | Pawn-broker | Collector | Manufacturer of | | Importer | Destructive Device | | | Total |
| | | | | Ammunition | Firearms | | Dealer | Manufacturer | Importer | |
|---|---|---|---|---|---|---|---|---|---|---|
| 1975 | 146,429 | 2,813 | 5,211 | 6,668 | 364 | 403 | 9 | 23 | 7 | 161,927 |
| 1976 | 150,767 | 2,882 | 4,036 | 7,181 | 397 | 403 | 4 | 19 | 8 | 165,697 |
| 1977 | 157,463 | 2,943 | 4,446 | 7,761 | 408 | 419 | 6 | 28 | 10 | 173,484 |
| 1978 | 152,681 | 3,113 | 4,629 | 7,735 | 422 | 417 | 6 | 35 | 14 | 169,052 |
| 1979 | 153,861 | 3,388 | 4,975 | 8,055 | 459 | 426 | 7 | 33 | 12 | 171,216 |
| 1980 | 155,690 | 3,608 | 5,481 | 8,856 | 496 | 430 | 7 | 40 | 11 | 174,619 |
| 1981 | 168,301 | 4,308 | 6,490 | 10,067 | 540 | 519 | 7 | 44 | 20 | 190,296 |
| 1982 | 184,840 | 5,002 | 8,602 | 12,033 | 675 | 676 | 12 | 54 | 24 | 211,918 |
| 1983 | 200,342 | 5,388 | 9,859 | 13,318 | 788 | 795 | 16 | 71 | 36 | 230,613 |
| 1984 | 195,847 | 5,140 | 8,643 | 11,270 | 710 | 704 | 15 | 74 | 40 | 222,443 |
| 1985 | 219,366 | 6,207 | 9,599 | 11,818 | 778 | 881 | 15 | 85 | 45 | 248,794 |
| 1986 | 235,393 | 6,998 | 10,639 | 12,095 | 843 | 1,035 | 16 | 95 | 52 | 267,166 |
| 1987 | 230,888 | 7,316 | 11,094 | 10,613 | 852 | 1,084 | 16 | 101 | 58 | 262,022 |
| 1988 | 239,637 | 8,261 | 12,638 | 10,169 | 926 | 1,123 | 18 | 112 | 69 | 272,953 |
| 1989 | 231,442 | 8,626 | 13,536 | 8,345 | 922 | 989 | 21 | 110 | 72 | 264,063 |
| 1990 | 235,684 | 9,029 | 14,287 | 7,945 | 978 | 946 | 20 | 117 | 73 | 269,079 |
| 1991 | 241,706 | 9,625 | 15,143 | 7,470 | 1,059 | 901 | 17 | 120 | 75 | 276,116 |
| 1992 | 248,155 | 10,452 | 15,820 | 7,412 | 1,165 | 894 | 15 | 127 | 77 | 284,117 |
| 1993 | 246,984 | 10,958 | 16,635 | 6,947 | 1,256 | 924 | 15 | 128 | 78 | 283,925 |
| 1994 | 213,734 | 10,872 | 17,690 | 6,068 | 1,302 | 963 | 12 | 122 | 70 | 250,833 |
| 1995 | 158,240 | 10,155 | 16,354 | 4,459 | 1,242 | 842 | 14 | 118 | 71 | 191,495 |
| 1996 | 105,398 | 9,974 | 14,966 | 3,144 | 1,327 | 786 | 12 | 117 | 70 | 135,794 |
| 1997 | 79,285 | 9,956 | 13,512 | 2,451 | 1,414 | 733 | 13 | 118 | 72 | 107,554 |
| 1998 | 75,619 | 10,176 | 14,875 | 2,374 | 1,546 | 741 | 12 | 125 | 68 | 105,536 |
| 1999 | 71,290 | 10,035 | 17,763 | 2,247 | 1,639 | 755 | 11 | 127 | 75 | 103,942 |
| 2000 | 67,479 | 9,737 | 21,100 | 2,112 | 1,773 | 748 | 12 | 125 | 71 | 103,157 |
| 2001 | 63,845 | 9,199 | 25,145 | 1,950 | 1,841 | 730 | 14 | 117 | 72 | 102,913 |
| 2002 | 59,829 | 8,770 | 30,157 | 1,763 | 1,941 | 735 | 16 | 126 | 74 | 103,411 |
| 2003 | 57,492 | 8,521 | 33,406 | 1,693 | 2,046 | 719 | 16 | 130 | 82 | 104,105 |
| 2004 | 56,103 | 8,180 | 37,206 | 1,625 | 2,144 | 720 | 16 | 136 | 84 | 106,214 |
| 2005 | 53,833 | 7,809 | 40,073 | 1,502 | 2,272 | 696 | 15 | 145 | 87 | 106,432 |
| 2006 | 51,462 | 7,386 | 43,650 | 1,431 | 2,411 | 690 | 17 | 170 | 99 | 107,316 |
| 2007 | 49,221 | 6,966 | 47,690 | 1,399 | 2,668 | 686 | 23 | 174 | 106 | 108,933 |
| 2008 | 48,261 | 6,687 | 52,597 | 1,420 | 2,959 | 688 | 29 | 189 | 113 | 112,943 |
| 2009 | 47,509 | 6,675 | 55,046 | 1,511 | 3,543 | 735 | 34 | 215 | 127 | 115,395 |
| 2010 | 47,664 | 6,895 | 56,680 | 1,759 | 4,293 | 768 | 40 | 243 | 145 | 118,487 |

Source: ATF Federal Firearms Licensing Center, Federal Licensing System (FLS). Data is based on active firearms licenses and related statistics as of the end of each fiscal year.

## Exhibit 11.  Federal Firearms Licensees by State 2010

| State | FFL Population |
|---|---|
| Alabama | 2,050 |
| Alaska | 988 |
| Arizona | 2,641 |
| Arkansas | 1,744 |
| California | 7,177 |
| Colorado | 2,295 |
| Connecticut | 1,561 |
| Delaware | 301 |
| District of Columbia | 25 |
| Florida | 5,995 |
| Georgia | 3,234 |
| Hawaii | 256 |
| Idaho | 1,265 |
| Illinois | 4,103 |
| Indiana | 2,541 |
| Iowa | 1,844 |
| Kansas | 1,699 |
| Kentucky | 2,179 |
| Louisiana | 1,858 |
| Maine | 856 |
| Maryland | 2,261 |
| Massachusetts | 3,165 |
| Michigan | 4,059 |
| Minnesota | 2,606 |
| Mississippi | 1,340 |
| Missouri | 5,500 |
| Montana | 1,414 |
| Nebraska | 1,061 |
| Nevada | 1,160 |
| New Hampshire | 969 |
| New Jersey | 491 |
| New Mexico | 1,005 |
| New York | 3,729 |
| North Carolina | 3,757 |
| North Dakota | 601 |
| Ohio | 4,218 |
| Oklahoma | 2,104 |
| Oregon | 2,317 |
| Pennsylvania | 5,446 |
| Rhode Island | 432 |
| South Carolina | 1,758 |
| South Dakota | 678 |
| Tennessee | 2,952 |
| Texas | 8,383 |
| Utah | 1,032 |
| Vermont | 526 |
| Virginia | 3,629 |
| Washington | 2,340 |
| West Virginia | 1,347 |
| Wisconsin | 2,757 |
| Wyoming | 764 |
| Other Territories | 74 |
| Total | 118,487 |

Source:  ATF, Federal Firearms Licensing Center, Firearms Licensing System.  Data is based on active firearms licenses and related statistics as of the end of the fiscal year.

# Exhibit 12.  Actions on Federal Firearms License Applications (1975 - 2010)

| Fiscal Year | Original Application | | | |
|---|---|---|---|---|
| | Processed | Denied[1] | Withdrawn[2] | Abandoned[3] |
| 1975 | 29,183 | 150 | 1,651 | ... |
| 1976 | 29,511 | 209 | 2,077 | ... |
| 1977 | 32,560 | 216 | 1,645 | ... |
| 1978 | 29,531 | 151 | 1,015 | 414 |
| 1979 | 32,678 | 124 | 432 | 433 |
| 1980 | 36,052 | 96 | 601 | 661 |
| 1981 | 41,798 | 85 | 742 | 329 |
| 1982 | 44,745 | 52 | 580 | 370 |
| 1983 | 49,669 | 151 | 916 | 649 |
| 1984 | 39,321 | 98 | 706 | 833 |
| 1985 | 37,385 | 103 | 666 | 598 |
| 1986 | 42,842 | 299 | 698 | 452 |
| 1987 | 36,835 | 121 | 874 | 458 |
| 1988 | 32,724 | 30 | 506 | 315 |
| 1989 | 34,318 | 34 | 561 | 360 |
| 1990 | 34,336 | 46 | 893 | 404 |
| 1991 | 34,567 | 37 | 1,059 | 685 |
| 1992 | 37,085 | 57 | 1,337 | 611 |
| 1993 | 41,545 | 343 | 6,030 | 1,844 |
| 1994 | 25,393 | 136 | 4,480 | 3,917 |
| 1995 | 7,777 | 49 | 1,046 | 1,180 |
| 1996 | 8,461 | 58 | 1,061 | 629 |
| 1997 | 7,039 | 24 | 692 | 366 |
| 1998 | 7,090 | 19 | 621 | 352 |
| 1999 | 8,581 | 23 | 48 | 298 |
| 2000 | 10,698 | 6 | 447 | 91 |
| 2001 | 11,161 | 3 | 403 | 114 |
| 2002 | 16,100 | 13 | 468 | 175 |
| 2003 | 13,884 | 30 | 729 | 289 |
| 2004 | 12,953 | 18 | 572 | 235 |
| 2005 | 13,326 | 33 | 943 | 300 |
| 2006 | 13,757 | 35 | 898 | 234 |
| 2007 | 14,123 | 32 | 953 | 402 |
| 2008 | 15,434 | 21 | 1,030 | 291 |
| 2009 | 16,105 | 20 | 1,415 | 724 |
| 2010 | 17,025 | 32 | 1,468 | 380 |

Source:  ATF, Federal Firearms Licensing Center, Firearms Licensing System.

[1]  Whenever ATF has reason to believe that an applicant is not qualified to receive a license, it may pursue denial of an application.  Grounds for denial may include falsification of the application, the prohibited status of the applicant (e.g., felon, drug user, illegal alien, etc.), failure to possess adequate business premises, and others, as prescribed by law.

[2]  An application may be withdrawn by an applicant at any time prior to the issuance of a license.

[3]  If ATF cannot locate an applicant during an attempted application inspection or cannot obtain required verification data, then the application will be abandoned.

# Exhibit 13. Federal Firearms Licensees and Compliance Inspections
## (FY 1969 - FY 2010)

| Fiscal Year | Licensees | Inspections | Percent Inspected |
|---|---|---|---|
| 1969 | 86,598 | 47,454 | 54.7 |
| 1970 | 138,928 | 21,295 | 15.3 |
| 1971 | 149,212 | 32,684 | 21.9 |
| 1972 | 150,215 | 31,164 | 20.7 |
| 1973 | 152,232 | 16,003 | 10.5 |
| 1974 | 158,753 | 15,751 | 10.0 |
| 1975 | 161,927 | 10,944 | 6.7 |
| 1976 | 165,697 | 15,171 | 9.1 |
| 1977 | 173,484 | 19,741 | 11.3 |
| 1978 | 169,052 | 22,130 | 13.1 |
| 1979 | 171,216 | 14,744 | 8.6 |
| 1980 | 174,619 | 11,515 | 6.5 |
| 1981 | 190,296 | 11,035 | 5.7 |
| 1982 | 211,918 | 1,829 | 0.8 |
| 1983 | 230,613 | 2,662 | 1.1 |
| 1984 | 222,443 | 8,861 | 3.9 |
| 1985 | 248,794 | 9,527 | 3.8 |
| 1986 | 267,166 | 8,605 | 3.2 |
| 1987 | 262,022 | 8,049 | 3.1 |
| 1988 | 272,953 | 9,283 | 3.4 |
| 1989 | 264,063 | 7,142 | 2.7 |
| 1990 | 269,079 | 8,471 | 3.1 |
| 1991 | 276,116 | 8,258 | 3.0 |
| 1992 | 284,117 | 16,328 | 5.7 |
| 1993 | 283,925 | 22,330 | 7.9 |
| 1994 | 250,833 | 20,067 | 8.0 |
| 1995 | 187,931 | 13,141 | 7.0 |
| 1996 | 135,794 | 10,051 | 7.4 |
| 1997 | 107,554 | 5,925 | 5.5 |
| 1998 | 105,536 | 5,043 | 4.8 |
| 1999 | 103,942 | 9,004 | 8.7 |
| 2000 | 103,658 | 3,640 | 3.5 |
| 2001 | 102,913 | 3,677 | 3.6 |
| 2002 | 103,411 | 5,467 | 5.2 |
| 2003 | 104,105 | 5,170 | 4.9 |
| 2004 | 106,214 | 4,509 | 4.2 |
| 2005 | 106,432 | 5,189 | 4.9 |
| 2006 | 107,316 | 7,294 | 6.8 |
| 2007 | 108,933 | 10,141 | 9.3 |
| 2008 | 112,943 | 11,100 | 9.8 |
| 2009 | 115,395 | 11,375 | 9.9 |
| 2010 | 118,487 | 10,538 | 8.9 |

Source: ATF