# Exhibit 64

COPY

1

2        CITY OF CHICAGO

3     COMMITTEE ON POLICE AND FIRE

4

5

6

7

8

9

10

11              REPORT OF PROCEEDINGS of a

12    meeting of the City of Chicago, Committee on

13    Police and Fire, taken on June 29, 2010, 1:00

14    p.m., City Council Chambers, Chicago, Illinois,

15    and presided over by ALDERMAN ANTHONY BEALE,

16    Chairman.

17

18

19       Reported by:  Donna T. Wadlington, C.S.R.

20

21

22

WADLINGTON REPORTING SERVICE, INC.
              (312) 372-5561

CITY000103

1    waiver of the registration fee for peace

2    officers and/or retired peace officers.

3         CORPORATION COUNSEL GEORGES:  Okay.

4         ALDERMAN BURKE:  Not only of our

5    jurisdiction but any other retired peace officer

6    who may be residing in the city of Chicago, but

7    retired from another agency, including state and

8    federal.

9         CHAIRMAN BEALE:  Any other questions?

10   Thank you so much, Mara.

11        CORPORATION COUNSEL GEORGES:  Thank

12   you.

13        CHAIRMAN BEALE:  For the record,

14   Father Pfleger was here to testify.  He had to

15   leave.  He had another engagement, but we just

16   wanted to recognize him.  He definitely wanted

17   to testify before this Committee.

18             Next we have our

19   Superintendent.

20        SUPERIENTENDENT WEIS:  Good afternoon,

21   Chairman Beale, committee members, and Aldermen.

22             My name is Jody Weis,

1    Superintendent of the Chicago Police Department.

2    Thank you for allowing me to appear before you

3    today.

4            The Supreme Court's ruling in

5    *McDonald* vs. *the City of Chicago*, means that

6    Chicago's current ordinance which does not allow

7    registration and consequently the ownership of

8    handguns is still in effect until the Seventh

9    Circuit invalidates it.

10            As a practical matter, it is

11   clear that such a provision will ultimately be

12   struck down based on the Supreme Court's

13   decision in *Heller* case, in which the Court

14   ruled that Washington, DC's handgun ban violated

15   the Second Amendment.  We must ensure that we

16   continue to do all that we can to protect our

17   city, our residents and our visitors.

18            Since the 1980's the City has

19   tightly regulated the registration of handguns.

20   We know that handguns are the No. 1 weapon used

21   in homicides and shootings in Chicago.  Each

22   year at least 75 percent of our homicides are

1  committed with firearms, nearly all of which

2  were handguns.  Violent crime committed by the

3  use of firearms continues to be a challenge for

4  us.  We will continue our efforts to reduce the

5  amount of violence by vigorously ensuring that

6  only people who are trained and authorized to

7  have firearms possess them.  We must make sure

8  that we do all that we can to keep our streets

9  safe for our residents, for our visitors, and

10  for our police officers.

11           The Department recovers nearly

12  10,000 firearms each year.  The majority of the

13  illegal guns that our officers take off the

14  street each year are illegal handguns.

15           Now that the Court has given

16  us the ruling and people will be allowed to

17  register handguns, we want to assure the public

18  that we will do all we can to regulate handguns

19  and that only people who pass a background check

20  and are trained and qualified to register a

21  firearm will be allowed to do so.

22           A vigorous overall

1    registration system is good public policy, a

2    comprehensive registration and renewal process,

3    and an automated system for updating

4    requirements should be applied to all of our

5    residents with firearms.

6              An effective registration

7    process requires that we know the name of the

8    gun -- the gun maker and its identifying

9    characteristics, the caliber gauge, the model

10   type, and the serial number and the source of

11   the gun.  It also requires that firearms be

12   registered quickly after their acquisition, and

13   that information be confirmed on an annual

14   basis.

15             Registration provides law

16   enforcement with essential information about

17   firearm ownership, will facilitate the return of

18   lost or stolen firearms to their rightful

19   owners, assist law enforcement in determining

20   whether registered owners are eligible to

21   possess firearms, or whether they are falling

22   into a prohibitive class and track legal

1    firearms that has been used in a crime.

2                  It also permits officers to

3    charge individuals with a crime if an individual

4    is in possession of unregistered firearms and

5    prevents officers to seize unregistered weapons.

6                  Furthermore, it is important

7    for first responders to know whether a home has

8    a gun in it or not and when they respond to a

9    scene.  Registration may also allow officers to

10   determine in advance whether individuals

11   involved in a call may have firearms.

12   Registration is so important that substantial

13   fines, some jail time, or the revocation of

14   one's gun rights can be appropriate penalties.

15                  Determining who can be

16   eligible to posses a firearm is also very

17   important.  The State of Illinois has set

18   guidelines of who should or shouldn't have a

19   firearm owner's identification card.  Like the

20   requirements of the State mandates for a FOID

21   card, we need regulations that will permit only

22   qualified individuals to possess firearms.

CITY000169

By regulating who is given a permit to possess a firearm, we wish to ensure that dangerous, irresponsible or inappropriate persons are not allowed to possess dangerous weapons.

It is therefore appropriate to exclude persons who are younger than eighteen, who lack a valid FOID card, who have been convicted of a felony, a violent crime, domestic violence, two or more DUI's or the unlawful use of a weapon. It is also appropriate to exclude those who lack adequate vision or who have not been trained in proper firearm use. Compliance with licensing requirements is so important that substantial fines, some jail time or revocation of one's ability to own a weapon are appropriate penalties.

We also recognize that there are certain people who by the nature of their occupation and their extensive training can be exempted from certain requirements. Many of these men and women, such as peace officers,

1    have spent their entire careers protecting
2    others.  Safety is at the core of all firearms
3    training, and it is an essential part of any
4    course of instruction on firearms.
5                    Our firearms training unit,
6    recruit firearm curriculum consists of 80 hours
7    of instruction, over 21 sessions while they're
8    at the Academy.  All current police officers are
9    also required to requalify with their duty
10   weapons on an annual basis.  It is important for
11   all firearm owners, especially handgun owners,
12   to know how to properly use a weapon, how it
13   looks -- I mean, sorry, how it works, how it is
14   safely loaded and unloaded and safely stored.
15   They should also be familiar with all applicable
16   laws.  Proper training which requires both range
17   and classroom instruction reduces injuries
18   caused by accidental or improper use of
19   firearms.
20                    Each year too many of our
21   children are killed by firearms, and we must do
22   all we can to protect them.  Some are victims of

1  gun violence on the street, and we are

2  continually faced with this challenge.  However,

3  we know that the presence of unlocked guns in

4  the home increases the risks of both accidental

5  gun injuries and intentional shootings.  It is

6  therefore important to make it unlawful to store

7  or leave a firearm or ammunition where a minor

8  under the age of eighteen may gain access.  The

9  firearm should be secured by a trigger lock or

10  similar device, or placed in a securely locked

11  box or container.

12  The International Association

13  of Chiefs of Police recommends that the state

14  and local government mandates safe storage of

15  firearms.  Researchers have found that millions

16  of children live in homes with easily accessible

17  guns.  According to Harvard University's

18  National Violent Injury Statistics System, of

19  youth who committed suicide with firearms 82

20  percent, 82 percent obtained the firearms from

21  their home, usually a parent's weapon.

22  Child access prevention laws

1   have been shown to be effective at reducing

2   unintentional firearms death among children.  A

3   2005 study in the Journal of the American

4   Medical Association found that the practices of

5   keeping firearms locked and unloaded, and

6   storing ammunition in a locked location separate

7   from the firearm, serves as a protective measure

8   to reduce youth suicide and unintentional injury

9   in homes with children and teenagers.

10                  One operable firearm is all a

11  person should need for self-defense.  This rule

12  does not burden the right to self-defense.

13  Allowing multiple operable guns per home

14  increases the risk of non-self-defense related

15  injuries and death from firearms.  We must

16  recognize the danger of firearms, especially

17  handguns, and identify common sense regulations

18  to better protect our City, our residents, and

19  our visitors.

20                  I will be joined later today

21  with Acting Deputy Superintendent Ernie Brown

22  and Sergeant Kevin Johnson.  They will be

1  speaking later in the program.

2              I'll be glad to take any

3  questions.

4              CHAIRMAN BEALE:  Superintendent?

5              SUPERIENTENDENT WEIS:  Yes, sir.

6              CHAIRMAN BEALE:  I believe it was

7  2007, 2008 where your Department took about

8  10,000 guns off of the street; is that correct?

9              SUPERIENTENDENT WEIS:  That is

10  correct.

11              CHAIRMAN BEALE:  Do you know how many

12  homicides we had in 2007, 2008?

13              SUPERIENTENDENT WEIS:  In 2007 I

14  believe we had approximately 445 homicides.  In

15  2008 we had 512 homicides.

16              CHAIRMAN BEALE:  We had that many

17  homicides and we still took 10,000 guns off of

18  the street?

19              SUPERIENTENDENT WEIS:  Approximately.

20              CHAIRMAN BEALE:  So what impact do you

21  think this would have on the City of Chicago if

22  we don't act and put something in place?

1            SUPERIENTENDENT WEIS:  In terms of?

2            CHAIRMAN BEALE:  If we do not act and

3  put some strong legislation in place to prevent

4  people from just going and buying guns at their,

5  you know, freewill, without having some

6  regulations in place, what kind of impact would

7  that have on the City of Chicago?

8            SUPERINTENDENT WEIS:  Well, I think

9  it's critical that we have some regulations in

10  place.  I think most people that are familiar

11  with firearms would agree that a firearm in the

12  hands of someone who is untrained, that firearm

13  is probably more of a danger to him or her than

14  the person he might be trying to defend himself

15  against.

16            If we don't establish certain

17  procedures, I think the danger to our young

18  people, children, where their parents may have

19  gone out and purchased a weapon, children know

20  where everything seems to be in a home.  And I

21  think we have to make sure we have strong

22  provisions that would prevent a child from

1  gaining access to a weapon that's owned by his

2  parents, therefore, allowing an immature

3  individual to go out and perhaps act out in

4  violence or anger and cause a tragic death of

5  another one of our young people.

6           CHAIRMAN BEALE:  Thank you.

7               Questions?  Alderman Fioretti.

8       ALDERMAN FIORETTI:  Thank you,

9  Mr. Chairman.  Thank you, Superintendent.

10              You know, how many -- you

11  know, you said 10,000 guns are taken off the

12  streets.  I'm assuming that's not from the

13  turn-in, the voluntary turn-in that we have once

14  a year, correct?

15      SUPERIENTENDENT WEIS:  It's a

16  combination thereof.  For '06, '07, and '08, we

17  averaged more than 13,000 weapons recovered each

18  of those years.  Some of those were attributed

19  to the gun turn-in program.

20              But for example, as of today,

21  this year we've taken in over 4100 weapons.  So

22  we average more weapon recoveries than any other

1    city in the United States.

2         ALDERMAN FIORETTI:  And then those

3    that are prosecuted, how many, if you know right

4    now or your staff does, how many have been

5    prosecuted under this ordinance?

6         SUPERIENTENDENT WEIS:  There haven't

7    been many, but I want to explain that.  We

8    always go after the penalties with the stronger

9    -- or we always go after the laws with the

10   stronger penalties.  So if we have a chance to

11   prosecute someone federally, we will.  If we

12   have the chance to prosecute someone under the

13   State's statutes, we certainly would.

14              So we try to use those laws

15   that give us the greatest hammer over some of

16   the criminals carrying the weapons.  So I think

17   the fact that the number of people charged with

18   the local ordinance is not a true reflection of

19   its use because we're always trying to grain --

20   use the more -- the stricter penalties.

21        ALDERMAN FIORETTI:  You know, there

22   were a couple other disturbing remarks in this

1   -- the majority opinion here, and it blamed

2   elected officials for the problems in minority

3   areas and the high crime in minority areas.  And

4   I'm very offended by that, as I think most of my

5   colleagues were, because it's all on Page 43 as

6   the Corporation Counsel said.

7           But, you know, I know you're

8   understaffed and what aims do we have to bring

9   the staffing levels up so we can combat this

10  issue of crime that's happening throughout our

11  city?

12          SUPERIENTENDENT WEIS:  Well, we're --

13  we worked with the Budget Office.  We're always

14  looking to hire more police officers, but I know

15  we also have to work within the financial

16  constraints of the City.  So we -- we're looking

17  to hire more all the time.  But, you know, it

18  isn't strictly upon the Chicago Police

19  Department for the hiring decisions.

20          ALDERMAN FIORETTI:  But I think as

21  elected -- you know, here's where I see it,

22  under Page 43.  Actually, they had it on two

1    pages.

2              On the second page of the

3    decision, "The Chicago petitioners and their

4    amici, however, argue that the handgun ban has

5    left them vulnerable to criminals.  Chicago

6    Police Department statistics, we are told,

7    reveal the City's handgun murder rate has

8    actually increased since the ban was enacted and

9    that Chicago residents now face one of the

10   highest murder rates in the country and rates of

11   other violent crimes that exceed the average in

12   comparable cities."  That was on Page 2.

13             But then when we get to Page

14   43, after the call for the National Guard, the

15   Court goes on and says, "If as petitioners

16   believe their safety and the safety of other

17   law-abiding members of the community would be

18   enhanced by the possession of handguns in the

19   home for self-defense, then the Second Amendment

20   right protects the rights of minorities and

21   other residents of high-crime areas whose needs

22   are not being met by elected public officials."

1     That tells me that no matter
2  what the budget constraints are that we need to
3  fill the ranks of the Chicago Police Department,
4  and it's been placed upon the people in this
5  body here that we are the ones that are causing
6  those that are being shot in the city of
7  Chicago.
8     We need to come to a
9  resolution to fully staff the Department as soon
10  as possible.  And whatever way we can work
11  together through this -- through the Chair of
12  this Committee, we need to do that soon.
13  Because this opinion clearly states that the
14  problems that are happening in the street is
15  happening because of the elected officials.
16     And you know what, I know
17  these people that are all in this room here try
18  their damndest everyday to make sure and work
19  with our communities to stop the crime.  But
20  we -- you know, with 80,000 gang members out
21  there, we're a little bit overwhelmed, but we've
22  got to keep pushing with you and working with

1    you and our communities to stop the violence.

2              CHAIRMAN BEALE:  To that point,

3    Alderman Fioretti, I think also you can take

4    that a step further.  I know we've been battling

5    the allocation of resources here in the city of

6    Chicago,  Whereas, you know, there are certain

7    districts that are slower than others.  And if

8    we were able to move some of those resources to

9    the high-crime areas, I think that would also

10   address some of the concerns that you are

11   bringing up as far as that particular issue is

12   concerned, so...

13             ALDERMAN FIORETTI:  Well,

14   Mr. Chairman, but we need to -- you know, either

15   we fill the ranks and we fill whatever the

16   number is, if we're a thousand down or if we're

17   two thousand down.

18                  You know, the burden that's

19   placed upon the guys and gals in blue everyday

20   is increased by the stress of them having to

21   just fill out the paperwork.

22                  And you know what, when we're

1     all in trouble we call 911. We want these folks

2     out there. We don't want them to be wasting --

3     waiting there for what may be perceived in our

4     communities for an hour waiting for the

5     Department.

6             I listen to the -- somebody

7     told me to go listen to a tape just recently,

8     and it sounded like it was bedlam out there.

9     And you know what, if the Supreme Court thinks

10     that elected officials aren't doing their job

11     here in the city, well, we've got to make sure

12     that we fill these ranks and we've got to fill

13     them now.

14             And you know what, I agree,

15     you know, Superintendent, if we put that cadet

16     out on the street, it's going to take him quite

17     awhile to be -- to understand what's happening

18     out there. And it takes quite awhile for the

19     training and I agree. But, you know, if we're

20     that far down, we've got to take back our

21     streets with our people, and the only way we can

22     do it is by coming to whether or not the 13,500

1  budgeted positions is sufficient.  And we've got

2  to realize that we've got to make the sacrifices

3  with our communities to make sure our citizens

4  are safe.

5         CHAIRMAN BEALE:  Alderman Burke.

6         ALDERMAN BURKE:  Superintendent, I

7  asked the Corporation Counsel earlier if she

8  knew how many registered guns there are in

9  Chicago now.  Do you know?

10        SUPERIENTENDENT WEIS:  Yes, sir.  We

11 have 95,700 registered weapons.

12        ALDERMAN BURKE:  And what was the high

13 point years ago?

14        SUPERIENTENDENT WEIS:  That I don't

15 know, Chairman.

16        ALDERMAN BURKE:  600,000, 700,000?

17 Who knows?

18        SUPERIENTENDENT WEIS:  I don't know.

19        ALDERMAN BURKE:  Are you familiar with

20 the New York program for registering gun

21 offenders?

22        SUPERIENTENDENT WEIS:  Is that the New

1    York --

2              ALDERMAN BURKE:  New York City Police.

3              SUPERIENTENDENT WEIS:  -- City?  A

4    little bit.

5              ALDERMAN BURKE:  I'm going to give you

6    a copy of that as I gave to the Corporation

7    Counsel.  I would like you to think about that

8    and whether or not you support that.

9              Do you think the sex offender

10   registration is effective?

11             SUPERIENTENDENT WEIS:  I think it is.

12   I think it lets everybody know who actually was

13   a sex offender.

14             As you pointed out in your

15   comments earlier, sir, it allows the officers if

16   they should pull over that car to know that they

17   have someone who at least has shown in his past

18   that he was willing to use a weapon.

19             So I think the advantages of

20   the sex offender registration, it would be a

21   logical conclusion that a registration of gun

22   offenders would make sense.

1      ALDERMAN BURKE:  Thank you.

2      CHAIRMAN BEALE:  Alderman Reboyras.

3      ALDERMAN REBOYRAS:  Thank you

4  Mr. Chairman.  Good afternoon, Superintendent.

5  Thank you for being here with us today.

6      SUPERIENTENDENT WEIS:  Good afternoon.

7      ALDERMAN REBOYRAS:  With this new,

8  possible gun legislation that we may need to

9  craft or draft, I should say, will this create

10  new training, a new training mechanism for our

11  police officers that are in the streets today or

12  do you anticipate a procedural change on how

13  they handle a household visit as opposed to

14  today?

15               And will that require

16  training, possibly additional dollars?  I don't

17  know.  I don't know.

18      SUPERIENTENDENT WEIS:  I don't think

19  the training will have to be modified

20  significantly because we train right now in a

21  use of force model where I think it will require

22  some extra dollars, and an enhancement would be

1  in an automation of the current system.

2          We would definitely have to --

3  we want to put this system online.  We want to

4  automate it so that the officers, when they

5  respond to that call, would have the knowledge

6  right at their fingertips, right on the computer

7  in their car, that there is a weapon registered

8  in that home.

9          Right now our process is

10  manual, and depending upon how the Council

11  develops the ordinance, we would definitely like

12  to automate that system, which I think will

13  require an expansion of our current contracts to

14  allow for that enhancement to our computer

15  system.

16          ALDERMAN REBOYRAS:  I think

17  additionally, Superintendent, people move.  So

18  to should their records and their information

19  and their data.  So I think that's key.  That's

20  important.  And you have your work cut out for

21  you.  I mean we all do.

22          SUPERIENTENDENT WEIS:  Right.

1    ALDERMAN REBOYRAS:  Thank you.

2    CHAIRMAN BEALE:  Alderman Pope.

3    ALDERMAN POPE:  Thank you,

4  Mr. Chairman.  Good afternoon, Superintendent.

5    SUPERIENTENDENT WEIS:  Good afternoon.

6    ALDERMAN POPE:  Your remarks are right

7  on target.  I really appreciate some of your

8  suggestions and I think all of them should be

9  incorporated.  I do have a question or two

10 though.

11    You mentioned the training of

12 the officers that they currently receive for

13 firearms.  Any suggestions or ideas about how

14 many hours John Public should receive for

15 training via our ordinance and who might conduct

16 that training?

17    And I don't know if you're

18 familiar with other municipalities who allow the

19 public to carry handguns and what their training

20 might be.

21    SUPERIENTENDENT WEIS:  The only one

22 I'm familiar with, sir, is I believe in

# Exhibit 65

## IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ILLINOIS
## EASTERN DIVISION

|  |  |  |
|---|---|---|
| ILLINOIS ASSOCIATION OF FIREARMS RETAILERS, KENNETH PACHOLSKI, KATHRYN TYLER, and MICHAEL HALL, | ) ) ) ) ) | |
| Plaintiffs, | ) ) | Case No: 10-CV-4184 Judge Edmond E. Chang |
| v. | ) ) ) | |
| THE CITY OF CHICAGO and RICHARD M. DALEY, Mayor of the City of Chicago, | ) ) ) | |
| Defendants | ) ) ) ) | |

## DECLARATION OF DANIEL W. WEBSTER

I, DANIEL W. WEBSTER, declare, pursuant to 28 U.S.C. § 1746, the following to be true and correct under penalty of perjury:

1.    I am a tenured Professor of Health Policy and Management with a joint appointment in the School of Education's Division of Public Safety Leadership at Johns Hopkins University. I serve as the Co-Director of the Johns Hopkins Center for Gun Policy and have spent almost 30 years researching gun-related violence and injury.

2.    Among other topics, I am an expert on the impact of firearms availability on suicides, homicides and unintentional deaths and injuries. I have also studied the impact of firearms safe storage regulations and practices.

3.    I have been retained by Defendants in the above-captioned matter as an expert witness.

4.    On August 15, 2011, I disclosed an expert report attached as Exhibit A.

5.    I identified an error in the export report when I described the measure of firearm ownership used in a study of the relationship between changes in firearm ownership and population suicide rates. The measure used in this study (reference 18 in the report, Miller et al. 2006) was the prevalence of household gun ownership based on data from the General Social Survey and not the ratio of firearm suicides to all suicides. Although I referred to the wrong measure of gun ownership used, I correctly described the findings that changes in population suicide rates were associated with changes in gun ownership measures after controlling for other factors associated with suicide risks.

6.    I stand by the opinions in the attached report for all the reasons set forth therein. The expert report of Dr. Gary Kleck, disclosed by Plaintiffs on September 30, 2011, contends that several of the studies upon which I relied were imperfect in one way or another. I acknowledge that any individual study may have limitations, but base my expert opinions here on trends that have been identified in the literature as a whole. The studies cited in the attached report are sufficiently valid to support my opinions, and I attest that the attached report is a true and correct representation of my expert opinions in this matter and incorporate Exhibit A (with the correction noted above) as if it was set out here in full.

Dated: February 24, 2012

Further the Declarant Sayeth Not,

By: _Daniel W Webster_

Daniel W. Webster

701147919 11070255

# EXHIBIT A

**Report by Daniel W. Webster, ScD, MPH on the Justification for Chicago's Limit of One Operable Firearm in the Home.**

## I.    Qualifications

I began my career in public safety research in 1985 as a Research Associate at the University of Michigan and have focused most of my research on gun-related injuries and violence during the past 22 years. I have a Masters of Public Health degree from the University of Michigan and a doctorate in Health Policy and Management from the Johns Hopkins School of Public Health. This graduate training included many advanced courses in epidemiology, research methods, and statistical analysis.

Immediately prior to joining the faculty at Johns Hopkins, I directed a program on violence research at the Washington (DC) Hospital Center. I joined the faculty of the Johns Hopkins School of Public Health in 1992, and I am a tenured Professor of Health Policy and Management with a joint appointment in the School of Education's Division of Public Safety Leadership. For the past 10 years, I have served as Co-Director of the Johns Hopkins Center for Gun Policy. I also have served as Associate Director for Research for the Johns Hopkins Center for the Prevention of Youth Violence since 2005. I teach graduate courses on violence prevention and research and evaluation methods at Johns Hopkins, direct a certificate program in injury control, and serve on the steering committee of a National Institutes of Health funded pre- and post-doctoral training program in violence prevention research.

I have directed numerous studies related to gun violence and its prevention. I have published 62 articles in scientific, peer-reviewed journals. These articles are listed on my *curriculum vitae*, attached as Exhibit 1.

I am being compensated at a rate of $250/hour for my time in rendering my opinion and testimony in this matter. I have testified as an expert in one other case, *City of New York v. A-1 Jewelry & Pawn, Adventure Outdoors, Inc., et al.*, 06-CV-2233 (E.D.N.Y. May 15, 2006).

## II.    Chicago's limitation to a single operable firearm in the home

This report and my expert testimony will focus on section 8-20-040 of Chicago's firearms ordinance, a provision pertaining to firearms kept or maintained in a home. That section reads:

> *Subject to section 8-20-050, every person who keeps or possesses a firearm in his home shall keep no more than one firearm in his home assembled and operable. If more than one person in the home has a valid CFP and registration certificate, each person with a valid CFP and registration certificate is entitled to have one such firearm assembled and operable in the home. All other firearms kept or possessed by that person in his home shall be broken down in a nonfunctioning state or shall have a trigger lock or other mechanism, other than the firearm safety mechanism, designed to render the firearm temporarily inoperable.*

1

This section of Chicago's gun ordinance limits the harms from the availability of operable firearms in the home, while still allowing qualified citizens to legally keep an operable firearm in their home for self-defense. This report summarizes the research relevant to the risks of keeping firearms in the home and provides my expert opinions on the degree to which the research supports Chicago's limit to one operable firearm within the home for every person with a valid Chicago Firearm Permit and registration certificate. Because there has been no study of this particular requirement of Chicago's ordinance, the research that I summarize focuses on what is known about the relationships between the accessibility of firearms in the home and risks of suicide, homicide, and accidental shootings. In addition, I discuss what is known about gun ownership and burglaries and how criminals gain access to firearms through theft. The material below is organized based on the conclusions that I have drawn pertinent to the single operable firearm in the home restriction and the research that supports those conclusions.

### III.    Materials reviewed

The opinions that I articulate in this report are based on my review of numerous studies published in scientific peer-reviewed journals and in books, the Chicago firearms ordinance and discovery materials from *Illinois Association of Firearms Retailers, et al., v. City of Chicago, et al.*, 10-CV-4184 (N.D. Ill.), made available to me. The material I used to formulate my opinions is listed in the attached Exhibit 2. I reserve the right to amend my report, opinion, and testimony as additional material becomes available.

### IV.    Summary of expert opinions

1. *The availability of firearms in homes increases the risks of suicide, homicide, and deaths from unintentional shootings.*
2. *These risks increase as the number of firearms kept in the home increases.*
3. *The safe storage of firearms reduces the risks associated with keeping firearms in the home.*
4. *Lower levels of firearm availability decrease burglaries and the number of guns reaching criminals through theft.*
5. *There is no research that supports the notion that increasing the number of operable firearms in the home makes occupants safer.*
6. *The Chicago gun ordinance, by limiting firearm possession within the home to one operable firearm for each Chicago Firearm Permit holder in a household and requiring any other guns to be in an inoperable state, is likely to lead to a public safety benefit by reducing violent deaths within the home and reducing the number of operable guns obtained by criminals through theft.*

### V.    Research support for my opinion that the availability of firearms in the home increases the risks of suicide, homicide, and deaths from unintentional shootings

#### A.  Gun Availability and Suicides

Debates about gun policy tend to focus solely on violent crime, but policies and personal decisions about keeping firearms in the home should take into consideration that the majority of

firearm-related deaths that occur within U.S. homes are suicides. Even within the most urban counties in the U.S., suicides account for more than one third of all firearm-related deaths (3,620 of 10,267 in 2007).[1]  The research evidence presented below shows that the availability of firearms within homes increases the risk of suicide to the home's occupants. Data from 2005 in Chicago—when the city's handgun ban was in force—indicate that 32 percent of the 188 suicides recorded were committed with a firearm. This is significantly lower than the percentage of suicides in 2005 that were committed with a firearm for the entire U.S. (52%, 17,002 of 32,559) and for all large central metropolitan counties in the U.S. (44%, 3,610 of 8,271). Chicago's suicide rate of 6.6 per 100,000 residents for 2005 is notably lower than that of the U.S. as a whole (11.0) and lower than that of the most urban counties in the U.S. (9.4). Chicago has an interest in saving the lives of its citizens by keeping its suicide rate low by reducing the availability of firearms within homes to children, adolescents, and unauthorized individuals.

I reviewed several types of studies to arrive at my conclusions about the relationship between firearm availability within the home and the risk of suicide, homicide, and unintentional firearm deaths. The studies use different designs, study samples or populations, and analytic methods, but the findings are strikingly consistent in showing a positive association between keeping firearms in the home and the risk of suicide.

**Household Studies**

There have been many case-control studies of households that measure the association between the presence of firearms in the home and being a "case" (being in a household where someone dies as a result of a suicide, homicide, or unintentional shooting death) versus a control (household that has not experienced a suicide, homicide, or unintentional shooting death). In essence, case-control studies determine whether cases had greater exposure to a factor of interest, in this case being in a home with a firearm, than did controls. As a study design, case-control studies have limitations, perhaps most importantly the difficulty in discerning the direction of cause (*e.g.*, firearm ownership) and effect (*e.g.*, suicide), because suicidal intentions can cause someone to bring a gun into their home as well as their having a gun in the home contributing to a suicide. However, case-control study designs are often the only practical method for examining risks for relatively rare outcomes such as suicides, homicides, and deaths resulting from unintentional shootings. Furthermore, some studies examined the amount of time between a firearm acquisition and a suicide within the home as well as whether the person acquiring the firearm was the person who committed suicide.

Nearly all of the case-control studies have shown a positive relationship between gun ownership and suicides, with firearm ownership being associated with large increases in the risk of suicide to household members. In a study of 803 suicides, 565 of which occurred within residences in two metropolitan counties, Kellermann and colleagues[2] reported that firearm ownership was associated with a 4.7-fold increase in suicide after controlling for any differences between cases and controls with respect to age, sex, race, failure to graduate from high school, living alone, alcohol consumption, prior alcohol-related hospitalization, current use of prescription medication for depression or mental illness, and use of illicit drugs. Elevated suicide risks were observed only for suicides committed with a firearm. Individuals who committed suicide by other means were no more or less likely to have had a firearm in their

3

home. The association between being in a home with a firearm and suicide was stronger for males (aOR = 6.4) who would be much more likely to have acquired the firearm(s) kept in the home, than for females (aOR = 3.3). Thus, the data indicate that the risk of suicide was three times higher for women living in homes with a firearm even though females are far less likely than are males to purchase and own firearms. This substantial increase in suicide risk for females makes it hard to attribute the firearms-suicide association as being solely attributable to suicidal intent prompting firearm ownership. The guns-suicide association was also much stronger in situations where there was no prior history of mental illness (aOR = 32.8) than when there was mental illness (aOR = 3.0). The positive association between firearm ownership and suicides in the home was highest for those ages 24 and younger. These differences in the importance of the availability of firearms in the home for determining suicide risks are consistent with the notion that many suicidal acts are impulsive rather than highly planned acts and that the presence of a very highly lethal means of suicide such as a firearm greatly determines the lethality of these impulsive suicidal acts.

Cummings and colleagues conducted a case-control study to examine the association between legal purchases of handguns and suicide and homicide using data from a large population of individuals enrolled in a health maintenance organization in metropolitan Seattle, Washington, over a 13-year period.[3] One advantage to this study over the one by Kellermann and colleagues is that it does not rely upon data from proxy respondents for the cases but uses preexisting administrative data to measure risk factors including handgun purchases. The cases were 353 suicide victims and 117 homicide victims who were members of the HMO. Each case was matched with five control subjects from the same HMO membership of the same age, sex, and ZIP code of residence. After controlling for the individual's age, sex, the number of family members in the home, and neighborhood affluence and education levels, the risk of suicide was 1.9 times higher for members of households where a family member had legally purchased a handgun from a licensed gun dealer. Elevated risks for suicide within homes with handgun purchases were exclusive to suicides committed with a firearm (RR = 3.1); however, there was no association between handgun purchase and suicide by other means. The association between handgun purchases and suicide risks was slightly higher for the person who purchased the handgun (RR = 2.0, CI = 1.4 to 2.8) than for other family members (RR = 1.5, CI = 0.9 to 2.5), and risks were greatest when a handgun had been purchased less than a year before death. Nevertheless, the median interval between the most recent handgun purchase by a household member and a suicide was 10.7 years, indicating that, in most instances, the suicide victim did not purchase a gun in order to complete a plan to commit suicide but rather used a firearm that had been purchased years ago, sometimes by individuals other than the one who committed suicide. There was a positive association between handgun purchase and suicide when handguns were purchased five years or more before the suicide occurred.

In a nationally representative study, based on data from the National Mortality Follow-Back Survey and the National Health Interview Study, firearm ownership was associated with a threefold increase in the risk of suicide for household members.[4] The increased risk of suicide connected to guns in the home was exclusive to suicides committed with a firearm. Risks for suicide by means other than firearms were slightly lower among those living in a home with a gun, but a much stronger association between guns and firearm suicide led to a net increase in suicide by any means. Suicide risk increases connected to household firearm ownership were

4

greatest for young adults ages 18–24, increasing the odds of suicide in this age group to four times higher than in similar households where there were no firearms.

The increased risk of suicide from guns in the home may be greatest for adolescents for whom suicides are often impulsive acts and ready availability of the most lethal means of self-harm determines whether a teen lives or dies from his or her impulses.[5]  Suicide is the third leading cause of death for teens ages 15 to 19 years, and 43 percent are committed with firearms.[6]  Local studies have found that about two-thirds of adolescents who commit suicide with a firearm obtained the gun from within their own homes or the home of a relative or friend[7] and where the gun was typically left unlocked.[8]

A series of studies of adolescent suicides in Western Pennsylvania have shown that adolescents who died from suicides there were much more likely to have lived in homes with firearms than adolescents in the following comparison groups: adolescents who had been hospitalized for nonfatal suicide attempts and had psychiatric disorders,[9] adolescents with psychiatric disorders who had never attempted suicide,[10] adolescents with a lifetime history of affective disorders who were living at home with their families,[11] adolescents in a demographically-matched group of community controls without psychiatric conditions,[12] and a general survey of adolescents drawn from the same area as the suicides.[13]

### Cohort Studies

Cohort studies measure exposures (*e.g.*, having firearms in the home) within a population and how those exposures are associated with subsequent outcomes (*e.g.*, suicides). Wintemute and colleagues conducted a population-based cohort study to compare mortality among 238,292 persons who purchased a handgun in California in 1991 with that in the general adult population of the state. Mortality was examined for a period from the time of handgun purchase through the end of 1996. Sex-specific standardized mortality ratios (SMR – the ratio of the number of deaths among handgun purchasers to the number expected on the basis of age- and sex-specific rates among adults in California) were calculated for several age groups. During the first year after the purchase of a handgun, suicide was the leading cause of death among handgun purchasers. Handgun purchasers experienced suicide rates more than four times that of all Californians. The increased risk was attributable entirely to the excess risk of suicide with a firearm (SMR = 7.1). Handgun purchasers remained at increased risk for suicide by firearm throughout the six year study period, especially among women (SMR = 15.5 compared with 3.2 for men).[14]

### Ecological Studies

The case-control and cohort studies referenced above measure the exposure and outcome at the level of individuals or households. In contrast, ecological studies measure relationships that are measured in the aggregate, whether at the city, county, state, or national level. Several ecological (mostly U.S. state-level) studies have shown that populations with higher rates of firearm ownership tend to have significantly higher risks for suicide after controlling for common causes and correlates of those outcomes.[15]  For example, Miller and his colleagues from Harvard University analyzed data on suicide rates across the 50 U.S. states and controlled for differences in rates of poverty, urbanization, unemployment, mental illness, and drug and alcohol

5

dependence and abuse. As would be expected, if access to firearms in the home increased the risk for suicide, the prevalence of household firearm ownership was positively associated with suicides committed with firearms, but was unrelated to the risk for suicide by other means. This positive relationship between the prevalence of firearm ownership and higher population suicide rates was also observed in a study comparing different regions of the United States.[16]

Most ecological studies which examine the association between firearm ownership and suicide have been cross-sectional, comparing suicide rates with gun ownership for a selected time period. Studies based on longitudinal studies, which compare *changes* in firearm ownership in relation to *changes* in suicide rates are less vulnerable to potential threats to validity. Miller and colleagues conducted such a study by examining annual changes in suicides in relation to annual changes in a validated, surrogate measure of firearm ownership[17] over the period 1980 through 2002. After statistically controlling for changes in age, unemployment, per capita alcohol consumption, and poverty, for every 10 percent reduction in firearm ownership, there was a 4.2 percent reduction in the rate of suicides with firearms and a 2.5 percent reduction in suicides by any means. There was no relationship between changes in firearm ownership and changes in non-firearm suicides.[18]

Some have speculated that the consistently positive association between firearm ownership and heightened risk of suicide might be due to unmeasured confounders—factors that are correlated with firearm ownership that are causally related to suicide risks. However, there do not appear to be higher rates of mental illness in homes with firearms compared with homes with no firearms.[19, 20]

Discretionary permit-to-purchase licensing laws allow law enforcement agencies issuing permits to purchase firearms to use their discretion in issuing these permits. That is, even if a person does not meet one of the explicit categories of disqualification, he or she could be denied a permit to purchase a firearm by law enforcement officials. Decisions about whether to issue such a permit can be based on evidence of special need for protection, good moral character, and presumably what is in the best interest of public safety. Massachusetts, New Jersey, and New York are the only three states that have and use discretionary permit-to-purchase laws. These states also have some of the most stringent nondiscretionary requirements for issuing permits to purchase firearms. These three states have among the lowest rates of household gun ownership. The data in the table below contrast these three states' firearm ownership and age-adjusted suicide rates among non-Hispanic whites. Thus, the data presented control for three demographic factors associated with suicide rates – age, race, and ethnicity. The data indicate that the prevalence of firearms within homes in these states is less than half as high as the national average and suicide rates are 37% to 45% lower than the national average. Although these data alone do not prove that policies that reduce the prevalence of firearms in homes lead to fewer suicides, it is consistent with that thesis.

6

*Table 1. Prevalence of household firearm ownership (2001) and age-adjusted suicide rates (2001-2003) for the three states with the most restrictive laws pertaining to permits to purchase a handgun by allowing local law enforcement discretion in issuing permits in comparison to U.S. totals.*

|  | household gun prevalence (%), 2002 | age-adjusted suicide rates – non-Hispanic whites, 2001–2003[i] |
|---|---|---|
| New York | 18.0 | 7.73 |
| New Jersey | 12.3 | 8.35 |
| Massachusetts | 12.6 | 7.30 |
| United States | 31.7 | 13.15 |

[i] per 100,000 population per year

## B. Gun Availability and Homicides

Twelve percent of all violent crimes and 22.6 percent of all violent crimes committed against females are committed by the victims' intimate partners (*e.g.*, spouses, boyfriends),[21] often living in the same household with the victim. One third of all female homicide victims were killed by an intimate partner.[22] For the years 1999–2010, 1,053 of Chicago's 6,430 (16.4%) homicides occurred within residences.[23]

### Household Studies

Kellermann and colleagues used a case-control study design to examine the relationship between firearm ownership and the risk of homicide in the home.[24] The cases were homicide incidents which occurred within residences in three metropolitan counties, and controls were matched with cases by sex, race, age group, and neighborhood of residence. Of the 347 homicide victims in this study for which the offender-victim relationship was known, 52 percent were killed by a spouse or other intimate partner, first-degree relative, or roommate and only 4 percent were killed by strangers. After statistically controlling for differences due to home rental versus ownership, living alone, household members' involvements in fights within the home, history of arrest, and illicit drug use, firearm ownership was associated with a risk of homicide that was 2.7 times higher than in homes without firearms. The firearm-homicide relationship was greatest for homicides committed by the victim's intimate partner or family member.

A subsequent study drawing upon the same data in the Kellermann study focused on a subset of the cases in which the person killed was a woman. In this study, there was a nearly fivefold increased risk of a woman being the victim of a homicide associated with living in a home with firearms.[25] In the majority of these cases, the victim was killed by an intimate partner or other family member. I was a co-investigator of a subsequent case-control study of women from 11 cities who had been in physically abusive intimate relationships that found a near

7

identical association (OR = 5.3) between the abuser's ownership of a firearm and the woman being murdered by her intimate partner.[26]

In addition to examining the association between handgun purchases and suicide risks to household members, the study of the HMO population cited above (Cummings, *et al.* 1997) also reported that the risk of homicide was more than twice as high (RR = 2.2) within households where there had been one or more handguns purchased. The elevated risk for homicide was similar among the handgun purchaser and his or her family members. A concern about case-control studies is that the risk of being a homicide victim could prompt gun acquisition and confound the estimated causal effect of gun ownership on homicide risks. However, in Cummings' study of the HMO population, the median interval between first family handgun purchase and any homicide death was 11.3 years, and the risk of homicide was unrelated to how recently a handgun was purchased. Thus, it seems unlikely that the association measured is due to homicide risks prompting gun ownership.

Wiebe's nationally representative study of the risk of violent death associated with the presence of guns in the home demonstrated a positive association between living in a home with at least one firearm and homicide victimization.[27] Overall, the odds of gun ownership were 41 percent higher among victims of homicide compared with demographically matched controls. The positive association between firearm ownership and homicide risk was greater for females (aOR = 2.72) than for males (aOR = 1.23). Twenty-nine percent of the homicides of male victims and 55 percent of homicides of females occurred outside the home. Thus, while adult males more commonly bring firearms into the home (male:female ratio of gun ownership is about 4 to 1), they are more commonly victimized outside the home. In contrast, females suffer increased risk within their own homes when males bring firearms into the home.

While prior case-control studies examined the association between gun ownership and homicide victimization, criminologists Kleck and Hogan conducted a national case-control study in which the outcome of interest was homicide perpetration. Data from their cases came from the U.S. Census Bureau's Survey of State Prison Inmates of 1991 who had committed a homicide as an adult between 1980 and 1991. Controls were taken from the General Social Survey of the U.S. population. They found gun ownership was positively associated with homicide perpetration. After statistically controlling for age, sex, race, Hispanic ethnicity, marital status, personal income, education, military veteran status, and having a child less than 18 years of age, the odds that a gun owner would commit a homicide was 1.36 times higher than the odds of a non-gun owner committing a homicide after controlling for confounders.[28] Although the strength of the association between gun ownership and homicide perpetration risk was lower than was observed in the case-control studies of homicide victimization, the direction of the association was consistent with the other studies.

**Cohort Studies**

Wintemute's study of the mortality risks for a cohort of legal handgun purchasers in California compared to the general population of Californians with the same age and sex distribution examined risks for homicide as well as for suicide. The risk of being a victim of homicide with a firearm was twice as high among women handgun purchasers relative to

8

California women of the same age, but was lower among men who legally purchased firearms (SMR = 0.8). I suspect that the elevated risk for women was due to the fact that women are more likely to be killed by an intimate partner or family member who might have access to a firearm kept in the woman's home, whereas men are more commonly murdered on the street by an acquaintance or a stranger.

### Ecological Studies

*Cross-sectional Studies*

Miller and colleagues conducted a study to assess the cross-sectional association between the prevalence of firearms in the home and homicide rates at the state level. The researchers statistically controlled for differences across states in rates of aggravated assault, robbery, unemployment, urbanization, per capita alcohol consumption, and economic resource deprivation. States with higher rates of household firearm ownership had significantly higher homicide victimization rates for men, women, and children. Differences in the prevalence of household firearm ownership were associated with proportionately similar differences in rates of homicide committed with firearms. Consistent with the hypothesis that the positive association between gun ownership and homicide was due to gun availability and not to differences in the propensity for violence between gun owners and people who do not own guns, non-gun homicide victimization was not associated with firearm ownership.[29] In my opinion, this study might understate the cross-sectional relationship between firearm ownership and homicide rates because the statistical models control for crimes that could themselves be caused by higher levels of gun ownership (aggravated assaults and robberies). These findings were consistent with those of a similar prior study conducted by these same researchers but that relied on a surrogate measure of gun ownership rather than direct survey data[30] and a subsequent study using similar data.[31] *

Miller and colleagues also published studies on the association between gun availability and homicide of children ages 5 − 14 years[32] and homicides of women ages 20 and over.[33] In each case, they report statistically significant positive associations between gun availability and firearm homicide rates at the state level, but no gun availability effects on non-firearm homicides. It is worth noting concerning the studies focusing on gun availability effects on risks to children and women that they are rarely the ones who bring a firearm into the home, and therefore, positive associations between gun availability and homicide risks are unlikely to be due to individuals being motivated by their own risk of homicide to acquire a gun.

---

\* Kleck and Patterson analyzed cross-sectional data for 170 U.S. cities with populations of 100,000 or more and report that gun ownership has no impact on homicide. To address the concern that cross-sectional associations between gun ownership and homicide could be due to higher homicide rates prompting increased gun ownership for protection, the researchers used a two-stage least squares regression approach to the analyses, which involves using an instrumental variable in the first stage to estimate gun ownership levels absent any effects from homicide rates. But this analytic approach is contingent upon the instrumental variable being used to measure gun ownership meeting several conditions that are typically difficult to meet. A detailed criticism of Kleck and Patterson's study correctly points out that Kleck and Patterson failed to provide common statistical tests to confirm that the instrumental variable they used met these conditions. Thus, the validity of Kleck and Patterson's findings are unclear.

The three states with the most restrictive laws for issuing permits to purchase or possess firearms because they allow police discretion in issuing permits and have broad disqualifications for firearm possession including convictions for many misdemeanor crimes are Massachusetts, New Jersey, and New York. These states also have some of the lowest rates of gun ownership among the 50 states. As was the case for suicides, the data in Table 2 indicate that, with the exception of New Jersey's rates for blacks, these states have much lower homicide rates for large central metropolitan counties, the counties that are most similar to Chicago's population. It is worth noting that the vast majority of guns used in crime in these three states were originally purchased from gun dealers in states with much weaker gun laws.[34]

*Table 2. Prevalence of household firearm ownership (2001) and age-adjusted homicide rates (1999-2007) among residents of large central metropolitan counties for the three states with the most restrictive laws pertaining to permits to purchase a handgun by allowing local law enforcement discretion in issuing permits in comparison to U.S. totals.*

|  | household gun prevalence (%), 2001 | age-adjusted homicide rates – non-Hispanic whites, 1999–2007[i] | age-adjusted homicide rates – blacks, 1999–2007[i] |
|---|---|---|---|
| New York | 18.0 | 2.2 | 16.0 |
| New Jersey | 12.3 | 2.5 | 27.7 |
| Massachusetts | 12.6 | 1.9 | 22.0 |
| United States | 31.7 | 3.3 | 28.5 |

[i] per 100,000 population per year

*Longitudinal Studies*

Longitudinal study designs are generally preferable to cross-sectional studies because they can ascertain temporal relationships between variables. This is important for studying the relationship between gun ownership and homicide, because gun ownership may affect homicide risks and homicide risks can affect firearm acquisition. McDowall studied changes in two proxy measures for gun ownership—the proportion of suicides committed with a firearm and the proportion of robberies committed with a firearm—to study the temporal relationship between firearm availability and homicide rates in Detroit. Using methods to negate reverse causality and statistically controlling for changes in racial composition of the city, the proportion in the high-risk 15–24 year age group, the homicide clearance rate lagged by one year, and the robbery rate, gun ownership was positively associated with Detroit's homicide rate. Licenses issued to purchase handguns were also positively associated with homicide rates.[35]

In a similar study, Sorenson and Berk examined temporal relationships between handgun sales (lagged one year to avoid concerns of reverse causation) and age-, sex-, and race-specific homicide rates after controlling for racial composition, cohort size, beer sales, unemployment, and migration for the period 1972–1993. Lagged handgun sales were positively associated with

homicide rates for males of every age group and race/ethnicity; however, they found no relationship between handgun sales and homicide victimization of females.[36]

Magaddino and Medoff examined data for the years 1947–1977 and found that, while new guns, both manufactured and imported, did not predict homicide rates, the *cumulative* number of handguns available was positively associated with homicide rates.[37] A weakness of studies of this type is that the studies aggregate data over the entire United States, ignoring considerable variation at state and local levels in gun sales and homicides.

In his book *More Guns, Less Crime*, John Lott, Jr. used state-level data on gun ownership from exit polling data following the 1988 and 1996 presidential elections and reported a negative relationship between gun ownership and homicide rates (suggesting that measured increases in gun ownership led to decreases in homicide rates) over these two time periods.[38] However, the polling data Lott used only included actual voters who represent a non-random minority of the actual adult population. His findings on changes in gun ownership are inconsistent with rigorous surveys designed to accurately reflect conditions across all households that show gun ownership declining from 1988 to 1996 (*e.g.*, the University of Chicago's General Social Survey).[39]

In a study examining longitudinal data at the state and county levels, economist Mark Duggan examined the dynamic relationship between gun ownership and crime over the period 1980-1998 using state- and county-level data on a validated proxy for gun ownership. To avoid the potential for reverse causality (higher homicide rates prompting higher rates of gun ownership), Duggan examined the relationship between gun ownership lagged by one year (t – 1) with homicide rates. Data from this study demonstrate that changes in gun ownership were positively related to changes in homicide rates. As with other studies, the gun ownership-homicide relationship is due entirely to gun ownership's effects on homicides committed with firearms. Gun ownership does not predict rates of homicides committed without firearms. This pattern of findings was the same for analyses done at the state level and at the county level. Duggan estimates that a third of the dramatic reductions in firearm homicide rates relative to changes in non-firearm homicide rates that occurred from 1993 to 1998 could be attributed to declines in the fraction of homes with firearms.[40]

Noted economists and experts on gun policy, Philip Cook and Jens Ludwig, analyzed 20 years of state- and county-level data and also found a significant positive association between gun availability and homicides with the relationship being exclusive to homicides committed with a firearm. They estimate elasticities of +.1 to +.3 between gun ownership and homicides.[41]

## C. Gun availability and Deaths from Unintentional Shootings

### Household Studies

To my knowledge, there has been only one household study that has examined the relationship between firearms in the home and the risk of unintentional firearm deaths. In this study, Wiebe (2003) used data from nationally representative data—the 1993 National Mortality Followback Survey and 1994 National Health Interview Study (NHIS)—and a case-control study design to assess the association between the presence of firearms in the home and risks of death

11

from an unintentional shooting. Cases consisted of 84 persons killed as a result of an unintentional shooting. Each case was matched with up to 20 controls from the NHIS matched by sex, age group, race, and region of residence and the analyses statistically controlled for any differences between the cases and controls with respect to marital status, education level, and annual family income. The risk of an unintentional shooting death was 3.7 times higher within homes with any firearm. Elevated risks were greatest, *i.e.*, there was more than a fivefold increase in risk for unintentional shooting death (RR = 5.3), in homes that kept only handguns, a condition more likely to be the case for gun owners in urban settings such as Chicago.[42]

### Ecological Studies

I found only one ecological study designed to assess the relationship between firearm availability and the risk of death from an unintentional shooting. Miller and colleagues studied the association between a state's rate of deaths due to unintentional shootings and the prevalence of firearms. They found a very strong positive relationship between measures of firearm availability and the rate of deaths from unintentional shootings which was strongest for young children and teens.[43]

VI.  **Research support for my opinion that the risks for suicide, homicide, and deaths from unintentional shootings increase as the number of firearms kept in the home increases.**

My opinion that the risks for suicide, homicide, and deaths from unintentional shootings increase as the number of firearms kept in the home increases is based, in part, on the evidence presented above which demonstrates that firearm availability contributes to higher risks for these outcomes; if a variable is associated with an outcome, it is often the case that more of the variable will be associated with more of the outcome. However, there is, in fact, data that supports this conclusion as well; there is evidence of a dose-response relationship between the number of guns in a home and the risk for suicide, homicide, and deaths from unintentional shootings in the only studies that have examined this association. Cummings and colleagues report from their study of a large population of HMO enrollees that the relative risk for suicide, compared with no family purchases of handguns, was 1.6 for one purchase, 1.8 for two purchases, and 2.7 when there were three or more handgun purchases. Although the confidence intervals of these point estimates overlap, the best estimates increase with the number of guns in the home. In this same study, Cummings and colleagues found a dose-response relationship between the number of handguns purchased by a family and the risk of homicide to family members. The risk for homicide increased with the number of handguns purchased with relative risk measures going from 1.1 for one handgun, 2.1 for two handguns, to 6.2 for three or more handgun purchases.

Wiebe reported in his nationally representative case-control study that the increased risk of death from an unintentional shooting was somewhat greater in homes with multiple firearms (RR = 3.9) than in homes with a single firearm (RR = 3.4). The confidence intervals for these point estimates overlap, but the ordered relationship between the point estimates is consistent with the findings from Cummings and colleagues.

**VII.** **Research support for my opinion that the safe storage of firearms reduces the risk of suicide, homicide, and deaths from unintentional shootings.**

Data from Kellermann, *et al.*'s study of risk factors for suicide within the home suggest that safe gun storage practices reduce the risk of suicide within the home. The adjusted odds ratios contrasting risks compared with similar households with no firearms clearly show a progression of increasing risk with increasing ease of access—all guns locked up (aOR = 2.4), all guns stored unloaded (aOR = 3.3), any gun left unlocked (aOR = 5.6), and any gun kept loaded (aOR = 9.2) which would make guns most readily available for misuse.

Safe storage of firearms is likely to be particularly important for protecting teens from killing themselves or others. Groups as diverse as the National Rifle Association and the American Academy of Pediatrics recommend that gun owners store their guns so that they are inaccessible to unauthorized persons including children and teens.[44, 45]

Grossman and colleagues conducted a case-control study to assess the relationship between firearm storage practices and adolescents' risk of suicide and unintentional shootings. They collected data for cases from households where a youth less than 18 years of age was killed as a result of a suicide or unintentional shooting and examined these deaths in 37 counties in the states of Washington, Oregon, and Missouri, in addition to nonfatal self-inflicted or unintentional shooting victims treated at trauma centers in Seattle, Spokane, and Tacoma, Washington and Kansas City, Missouri. Cases included 82 self-inflicted shootings (95% fatal) and 24 unintentional shootings (50% fatal). Controls were identified through random surveys of the counties where the cases were drawn and consisted of households where at least one firearm was kept in or near (*e.g.*, garage) the home. Data from this study indicate that the risk of self-inflicted and unintentional firearm injuries was about 70 percent lower in gun-owning homes that stored their firearms locked up and unloaded compared with homes where guns were not stored locked up and unloaded. The relationship between gun storage practices and firearm deaths to adolescents was similar for suicide and unintentional shootings.[46]

Using data from statewide surveys of health and safety practices conducted by the Centers for Disease Control and Prevention that included questions about firearm ownership and storage practices, Miller and colleagues conducted a state-level ecological study to assess the relationship between firearm storage and rates of death from unintentional shootings. Controlling for the prevalence of guns in the home as well as urbanization and poverty levels, states in which it was less common to store firearms unlocked and unloaded had significantly lower rates of unintentional firearm deaths. The researchers contrasted data between the six states with the highest percentage of individuals living in households with loaded firearms with the 10 states where this practice was least common. Although the six states with the highest prevalence of exposure to loaded firearms within the home had less than half as many people and fewer people exposed to firearms than was the case with the 10 states with the lowest percentage of homes with a loaded firearm, there were more than twice as many unintentional shooting deaths to youth under age 18 years than in the 10 states where living in a home with a loaded firearm was least common.[47]

13

Recognizing the risks of unsupervised access of firearms to children and teens, 18 states and the District of Columbia have passed laws requiring gun owners to store their firearms in a manner that prevents access to underage youth, typically requiring guns to be stored away locked or with a trigger guard to prevent the gun from firing if handled when locked. In research that I conducted, I found that these so-called child access prevention (CAP) laws are associated with significant reductions in suicides of teens ages 14 – 17 years in the states where they have been adopted.[48] Cummings and colleagues also examined the effects of CAP laws on suicides and found a negative relationship between presence of a CAP law and suicide risks among youth under age 15.[49]

There is also evidence that CAP laws intended to require firearm storage that would make firearms either inaccessible or unable to be fired can reduce unintentional shooting deaths of children and teens. Cummings and colleagues conducted the first evaluation of CAP laws and reported that the laws were associated with significant reductions in deaths due to unintentional shootings of youth under age 15. Subsequent research that I conducted with Marc Starnes, as well as a study conducted by Hepburn and colleagues, showed that the effects of CAP laws on unintentional firearm deaths to youth were uneven across states. Reductions were only statistically significant in Florida and California where the laws were likely to garner significant publicity.[50, 51] Florida's law received considerable publicity because it was the first state to pass a CAP law, doing so after a series of highly publicized deaths of children killed in unintentional shootings resulting from underage access to firearms in the home. Florida and California are among the few states where CAP law violators can be charged with a felony crime. The ability of prosecutors to charge CAP law violators with a felony may increase the likelihood of prosecution and increased publicity and awareness of CAP laws.

VIII.    **Research support for my opinion that greater firearm availability within homes increases the risk of home burglaries and of guns entering the illegal market via theft.**

John Lott, Jr. and others claim that, if more people owned guns, there would be a greater deterrent to criminals breaking into homes. However, a careful empirical examination of the data proves that the opposite is true. Economists Phillip Cook and Jens Ludwig analyzed longitudinal burglary data from the Uniform Crime Reports at the state and county levels and cross-sectional data from a special restricted-access version of the National Crime Victimization Survey (NCVS) that identified the county in which the survey residents reside. In the longitudinal analyses they found that a one-year lag of a gun availability proxy (ratio of firearm suicides to all suicides) was positively associated with higher burglary rates with the elasticity of burglaries to gun ownership ranging from around +0.4 to +0.5. Estimates of the effects of gun ownership on burglaries were similar when the researchers used an instrumental variable for gun ownership rather than the gun suicide proxy.

A limitation to these analyses is that commercial burglaries are lumped together with residential burglaries in the UCR data. Cook and Ludwig's cross-sectional analyses of NCVS data reveal a strikingly similar positive association between a county's prevalence of gun ownership and the probability that a household reported a home burglary after controlling for characteristics of the household and county. They also found that, contrary to the view that gun

14

ownership reduces the likelihood that a home is burglarized while someone is at home, there was no statistically significant relationship between county-level gun ownership and the probability that someone was at home during a burglary attempt. The authors argue that the presence of firearms in homes represents attractive loot for criminals, thus providing increased incentives for home burglaries which appear to outweigh any deterrent effects resulting from fears of being shot by a home occupant.[52] The average U.S. gun owner owns six or seven guns (mean = 6.6 in 2004 national survey[53]), many of which are not locked up. Furthermore, data from a nationally representative survey conducted in the 1990s suggest that as many as 500,000 firearms are stolen each year from U.S. citizens.[54] A nationally representative survey of inmates at state prisons from 1997 revealed that 10 percent of firearm offenders had obtained the weapon they had used in crime through theft and another eight percent obtained their gun through a fence or black market source, and, presumably, many of these guns had been stolen from homes.[55]

These data and findings suggest that Chicago's current requirements for keeping firearms in the home will minimize the number of guns available to criminals. Chicago's law limiting licensed gun owners to one operable firearm should decrease the number of operable guns in the home and the potential value of such guns to would-be thieves by making it more difficult for thieves to steal any firearms kept in the home by requiring additional guns to be stored in an inoperable fashion.

## IX. There is no research that supports the notion that increasing the number of operable firearms in homes makes occupants safer.

The notion that citizens use guns in self-defense far more commonly than they are victimized by someone with a gun was supported by data from a national survey directed by criminologist Gary Kleck. Kleck and Gertz conducted a national phone survey of 4,977 adults. Fifty-six (1.1%) respondents reported having used a gun defensively within the past 12 months in situations in which they report being the would-be victim of a crime. The data were used to make a projection that 2.5 million times per year a U.S. citizen used a firearm defensively in situations when someone was committing or attempting to commit a crime.[56] The projections from this survey are discordant with data from other sources of data relevant to crime and violence. Aside from the fact that the number of defensive gun uses from Kleck and Gertz is 22 times higher than what was estimated from the National Crime Victimization Survey (NCVS), Kleck and Gertz's data fail tests of external validity. For example, Kleck and Gertz data indicate that there are over 200,000 assailants who are wounded by civilians defending themselves with firearms against crime each year, yet a national surveillance system for hospital emergency department visits indicates that fewer than 100,000 people are treated for gunshot wounds annually in the United States. Subsequent surveys conducted by Hemenway and colleagues were designed to measure all civilian uses of guns, hostile or aggressive as well as defensive. Their data indicate that survey respondents admitted to far more aggressive or hostile uses of guns than defensive uses of guns, and many of the so-called defensive uses were of questionable legality due to inadequate justification for using deadly force.[57] This finding is far more consistent with the research showing that greater gun availability tends to be associated with higher rates of homicide.

15

No prior study of civilian defensive gun use has examined questions most directly relevant to Chicago's regulations for keeping firearms in the home. For example, I am not aware of studies examining situations in which more than one operable firearm was available or needed for self-defense or whether a gun owner was unable to access his or her gun because it was not kept in the room where he or she was at the time a crime was committed. Put another way, I am not aware of any research indicating that requirements (such as those in the Chicago ordinance) reduce the ability of a person to effectively use a firearm for self-defense in the home.

X.   **The Chicago gun ordinance, by limiting firearm possession within the home to one operable firearm for each Chicago Firearm Permit holder in a household and requiring any other guns to be stored in an inoperable state, is likely to lead to a public safety benefit by reducing violent deaths within the home and reducing the number of operable guns obtained by criminals through theft.**

Prior research demonstrates that reducing the availability of firearms in the home, especially reduced availability for unauthorized users such as children and adolescents, decreases the risk for suicide, homicide, and deaths from unintentional shootings. Not only does gun ownership appear to increase these risks relative to not having a gun in the home, there also appears to be a dose-response relationship in which risks increase with the number of guns kept in the home. Similarly, risks of violent death within the home of gun owners are reduced by safe storage practices such as locking up guns. Although Chicago's gun ordinance allows each person with a valid Chicago Firearms Permit to keep a single operable firearm in their home, the ordinance should lead to reduced availability of operable firearms to household members when they become distraught, suicidal, angry, or otherwise lose control of their emotions and, thus, lead to fewer tragic deaths. The ordinance does not prevent CFP holders from keeping a single operable firearm in their home. But I expect that it would make firearms less available than would otherwise be the case, because a typical gun owner in the United States owns six firearms that could be operable, and hence, available, for misuse.[51] By limiting the availability of operable firearms within the home, the ordinance is also likely to reduce burglaries that might occur if Chicago Firearm Permit holders could own an unlimited number of firearms with no requirements for safe storage.

*Daniel W Webster*                                    August 12, 2011

Daniel Webster
Professor

---

**References**

[1] National Center for Injury Prevention and Control. WISQARS Injury Mortality Reports, 1999–2007. Centers for Disease Control and Prevention, Atlanta, GA. Accessed August 3, 2011.

[2] Kellermann AL, Rivara FP, Somes G, *et al.* Suicide in the home in relation to gun ownership. *New England Journal of Medicine* 1992; 327:467–72.

[3] Cummings P, Koepsell TD, Grossman DC, Savarino J, Thompson RS. The association between the purchase of a handgun and homicide or suicide. *American Journal of Public Health* 1997; 87:974–78.

[4] Weibe DJ. Homicide and suicide risks associated with firearms in the home. *Annals of Emergency Medicine* 2003; 41:771–82.

[5] Azrael D, Hemenway D, Miller M, Barber CW, Schackner R. Youth suicide: insights from 5 years of Arizona Child Fatality Review Team data. *Suicide and Life Threatening Behavior* 2004; 34:36–43.

[6] National Center for Injury Prevention and Control. WISQARS Injury Mortality Reports, 1999–2007. Centers for Disease Control and Prevention, Atlanta, GA. Accessed August 3, 2011.

[7] Grossman DC, Reay DT, Baker SA. Self-inflicted and unintentional firearm injuries among children and adolescents: the source of the firearm. *Arch Pediatr Adolesc Med.* 1999; 153:875–78.

[8] Shah S, Hoffman RE, Wake L, Marine WM. Adolescent suicide and household access to firearms in Colorado: results of a case-control study. *Journal of Adolescent Health* 2000; 26:157–63.

[9] Brent DA, Perper JA, Goldstein CE, *et al.* Risk factors for adolescent suicide: a comparison of adolescent suicide victims with suicidal inpatients. *Archives of Gen Psychiatry* 1988; 45:581–88.

[10] Brent DA, Perper JA, Allman CJ, Moritz G, Wartella ME, Zelenak JP. The presence and accessibility of firearms in the homes of adolescent suicides, a case-control study. *Journal of the American Medical Association* 1991; 266:2989–95.

[11] Brent D, Perper JA, Moritz G, Baugher M, Schweers J, Roth, C. Suicide in affectively ill adolescents: A case-control study. *Journal of Affective Disorders* 1994; 31:193–202.

[12] Brent DA, Perper JA, Moritz G, Baugher M, Allman C. Suicide in adolescents with no apparent psychopathology. *Journal of the American Academy of Child and Adolescent Psychiatry* 1993; 32:494–500.

[13] Brent DA, Perper JA, Moritz G, Baugher M, Schweers J, Roth C. Firearms and adolescent suicide: a community based case control study. *American Journal of Diseases of Children* 1993; 147:1066–71.

[14] Wintemute GJ, Parham CA, Beaumont JJ, Wright M, Drake C. Mortality among recent purchasers of handguns. *New England Journal of Medicine* 1999; 341:1583–89.

[15] Miller M, Lipmann SJ, Azrael D, Hemenway D. Household firearm ownership and rates of suicide across the 50 United States. *Journal of Trauma* 2007; 62:1029-34.

[16] Miller M, Azrael D, Hemenway D. Household firearm ownership and suicide rates in the United States. *Epidemiology* 2002; 13:512–24.

[17] Azrael D, Cook PJ, Miller M. State and local prevalence of firearm ownership: measurement, structure and trends. *Journal of Quantitative Criminology* 2004; 20:43–62.

[18] Miller M, Azrael D, Hepburn LM, Hemenway D, Lipmann SJ. The association between changes in household firearm ownership and rates of suicide in the United States, 1981–2002. *Injury Prevention* 2006; 12:178–82.

[19] Miller M. Recent psychopathology, suicidal thoughts and suicide attempts in households with and without firearms: findings from the National Comorbidity Study Replication. *Injury Prevention* 2009; 15:183–87.

[20] Hemenway D, Miller M. Association of rates of household handgun ownership, lifetime major depression, and serious suicidal thoughts with rates of suicide across US census regions. *Injury Prevention* 2002; 8:313–18.

[21] Bureau of Justice Statistics. *Criminal Victimization in the United States, 2008 – Statistical Tables*. Table 43a. NCJ 231173 Office of Justice Programs, U.S. Department of Justice, Washington, DC, May 2011.

[22] Fox JA, Zawitz MW. Homicide Trends in the United States. Bureau of Justice Statistics, Office of Justice Programs, U.S. Department of Justice. http://bjs.ojp.usdoj.gov/content/homicide/relationship.cfm. Accessed Aug. 8, 2011.

[23] City of Chicago. Reported Incidents by Offense Type, Location Description, and Year (1999–2010) CITY1377-79.

[24] Kellermann AL, Rivara F, Rushforth NB, *et al*. Gun ownership as a risk factor for homicide in the home. *New England Journal of Medicine* 1993; 329:1084–91.

[25] Baily JE, Kellermann AL, Somes G, Banton JG, Rivara F, Ruthforth NB. Risk factors for violent death of women in the home. *Archives of Internal Medicine* 1997; 15:777–82.

[26] Campbell JC, Webster DW, Koziol-McLain J, *et al*. Risk factors for femicide within physically abusive intimate relationships: Results from a multi-site case control study. *American Journal of Public Health* 2003; 93:1089–97.

[27] Wiebe DJ. Firearms in US homes as a risk factor for unintentional gunshot fatality. *Accident Analysis and Prevention*. 2003; 35:711–16.

[28] Kleck G, Hogan M. National case-control study of homicide offending and gun ownership. *Social Problems* 1999; 46:275-293

[29] Miller M, Hemenway D, Azrael D. State-level homicide victimization rates in the US in relation to survey measures of household firearm ownership, 2001–2003. *Social Sciences & Medicine* 2007; 64:656–64.

[30] Miller M, Azrael D, Hemenway D. Rates of household firearm ownership and homicide across US regions and states, 1988–1997. *American Journal of Public Health* 2002; 92:1988–93.

[31] Gius M. The effect of gun ownership rates on homicide rates: a state-level analysis. *Applied Economics Letters* 2009; 16:1687–90.

[32] Miller M, Azrael D, Hemenway D. Firearm availability and unintentional firearm deaths, suicide, and homicide among 5–14 year olds. *Journal of Trauma, Injury, Infection, and Critical Care* 2002; 52:267-275.

[33] Miller M, Azrael D, Hemenway D. Firearm availability and suicide, homicide, and unintentional firearm deaths among women. *Journal of Urban Health* 2002; 79:26–38.

[34] Mayors Against Illegal Guns. *Trace the Guns: The Link Between Gun Laws and Interstate Trafficking.* September 2010.

[35] McDowall D. Firearm availability and homicide rates in Detroit, 1951–1986. *Social Forces* 1991; 69:1085-1101.

[36] Sorenson SB, Berk R. Handgun sales, beer sales, and youth homicide. *Journal of Public Health Policy* 2001; 22:182–97.

[37] Magaddino JF, Medoff M. An empirical analysis of federal and state firearm control laws. 225-258 in DB Kates (ed), *Firearms and Violence.* Cambridge, MA: Ballinger, 1984.

[38] Lott, John Jr. *More Guns, Less Crime: Understanding Crime and Gun Control Laws.* Second edition. Chicago: University of Chicago Press, 2000.

[39] Smith TW. Public Attitudes Towards the Regulation of Firearms. National Opinion Research Center, University of Chicago, May 2007.

[40] Duggan M. More guns, more crime. *The Journal of Political Economy* 2001; 109:1086–114.

[41] Cook PJ, Ludwig J. The social costs of gun ownership. *Journal of Public Economics* 2006; 90: 379–91.

[42] Wiebe DJ. Firearms in US homes as a risk factor for unintentional gunshot fatality. *Accident Analysis and Prevention* 2003; 35:711–16.

[43] Miller M, Azrael D, *et al.* Firearm availability and unintentional firearm deaths. *Accident Analysis and Prevention* 2001; 33:477–84.

19

[44] National Rifle Association. NRA Gun Safety Rules. http://www.nrahq.org/education/guide.asp. Accessed August 3, 2011.

[45] American Academy of Pediatrics. Safety and Prevention: Gun Safety: Keeping Children Safe. http://www.healthychildren.org/English/safety-prevention/all-around/Pages/Gun-Safety-Keeping-Children-Safe.aspx. Accessed August 3, 2011.

[46] Grossman DC, Mueller BA, Riedy C, Dowd MD, Villaveces A, Prodzinski J, Nakagawara J, Howard J, Thiersch N, Harruff R. Gun storage practices and risk of youth suicide and unintentional firearm injuries. *Journal of the American Medical Association* 2005; 293(6):707–14.

[47] Miller M, Azrael D, Hemenway D, Vrinitotis M. Firearm storage practices and rates of unintentional firearm deaths in the United States. *Accident Analysis & Prevention* 2005; 661–67.

[48] Webster DW, Vernick JS, Zeoli AM, Manganello JA. Effects of youth-focused firearm laws on youth suicides. *Journal of the American Medical Association* 2004; 292:594–601.

[49] Cummings P, Grossman DC, Rivara FP, Koepsell TD. State gun safe storage laws and child mortality due to firearms. *JAMA* 1997; 278:1084–86.

[50] Webster DW, Starnes M. Reexamining the association between child access prevention gun laws and unintentional firearm deaths among children. *Pediatrics* 2000; 106:1466–69.

[51] Hepburn L, Azrael D, Miller M, Hemenway D. The effect of child access prevention laws on unintentional child firearm fatalities, 1979-2000. *Journal of Trauma* 2006; 61:423–28.

[52] Cook PJ, Ludwig J. "The Effects of Gun Prevalence on Burglary: Deterrence vs. Inducement." 74–120 in *Evaluating Gun Policy*. J Ludwig and PJ Cook, (eds). Washington, DC: Brookings, 2003.

[53] Hepburn L, Miller M, Azrael D, Hemenway D. The US gun stock: results from the 2004 national firearms survey. *Injury Prevention* 2007; 13:15–19.

[54] Cook PJ, Ludwig J. Guns in America: Results of a Comprehensive Survey of Gun Ownership and Use. Washington, DC: Police Foundation, 1996.

[55] Harlow CW. Firearm Use by Offenders: Survey of Inmates in State and Federal Correctional Facilities. Special Report from the U.S. Bureau of Justice Statistics, U.S. Department of Justice Washington, DC, November 2001.

[56] Kleck G, Gertz M. Armed resistance to crime: the prevalence and nature of self-defense with a gun. *Journal of Criminal Law and Criminology* 1995; 86:150–87.

[57] Hemenway D, Azrael D, Miller M. Gun use in the United States: Results from two national surveys. *Injury Prevention* 2000; 6:263–67.

20

# EXHIBIT 1

# CURRICULUM VITAE

## Daniel William Webster

## PERSONAL DATA

5413 Harwood Road
Bethesda, MD 20814
(301) 652-1042

Department. of Health Policy & Management
Johns Hopkins Bloomberg School of Public Health
624 N. Broadway, Room 593
Baltimore, MD 21205
(410) 955-0440 (office)
(301) 646-1739 (mobile)
fax (410) 614-9055
e-mail: dwebster@jhsph.edu

## EDUCATION AND TRAINING

Doctor of Science, 1991, The Johns Hopkins University, School of Hygiene and Public Health, Department of Health Policy and Management.

Masters of Public Health, 1985, The University of Michigan, School of Public Health, Department of Health Planning and Administration.

Bachelors of Arts, 1982, The University of Northern Colorado, Psychology.

## PROFESSIONAL EXPERIENCE

**Professor, 2010 – present; Associate Professor, 2001-2010; Assistant Professor 1995-2001; Instructor, 1992-1995.** Department of Health Policy and Management, Johns Hopkins Bloomberg School of Public Health, Baltimore, MD.

> Selected Duties/Responsibilities:
> Teach courses on violence prevention and health policy evaluation methods; direct Injury Control Certificate program; chair advise students; oversee independent studies.

**Professor, 2010 – present,** Division of Public Safety Leadership, School of Education, Johns Hopkins University, Baltimore, MD.

**Associate Director for Research, 2005 – present, Core Faculty, 2000 - present.** Center for the Prevention of Youth Violence. Johns Hopkins Bloomberg School of Public Health, Baltimore, MD.
> Selected Duties/Responsibilities:
> PI on studies including an evaluation of firearm and alcohol restrictions for youth, an evaluation of state firearm sales regulations and an evaluation of a community gun violence prevention program.

Daniel W. Webster, Sc.D., M.P.H.                                                          page 2

**Center Co-Director, 2001 – present.** Johns Hopkins Center for Gun Policy and Research.
Johns Hopkins Bloomberg School of Public Health, Baltimore, MD.

> Selected Duties/Responsibilities:
> Secure funding to advance the Center's mission; develop and direct the Center's research
> activities; and serve as principal investigator of evaluations of gun policies.

**Core Faculty, 1992 - present.** Center for Injury Research and Policy, Johns Hopkins
Bloomberg School of Public Health, Baltimore, MD.
> Selected Duties/Responsibilities:
> Serve as co-investigator of study to determine risk factors for homicide and near
> homicide of women in abusive relationships with intimate partners; study the predictive
> validity of several risk assessment tools for intimate partner violence.

**Director of Violence Research, 1990-1992.** Washington Hospital Center, Trauma, Surgical
Critical Care, and Emergency Medicine Department, Washington, DC.
> Selected Duties/Responsibilities:
> Initiated the development of a violence research program; served as technical advisor and
> evaluator of a youth violence prevention program; directed epidemiologic studies of injuries
> resulting from interpersonal violence; studied correlates of youth weapon carrying.

**Graduate Research/Teaching Assistant, 1987-1990.** The Johns Hopkins University, Injury
Prevention Center and Department of Pediatrics, Baltimore, MD.

**Guest Researcher, 1988.** National Institute on Aging; Epidemiology, Demography, and Biometry
Program, Bethesda, MD.

**Injury Control Analyst, 1986 - 1987.** Research, Development and Marketing Department,
American National Red Cross, Washington, DC.

**Research Associate II, 1985 - 1986.** Program for Urban Health Research, Department of
Epidemiology, School of Public Health, The University of Michigan, Ann Arbor.

**Research Associate I, 1984-1985.** Systems Analysis Division, The University of Michigan
Transportation Research Institute, Ann Arbor.

**Research Assistant I, 1983-1984.** Department of Health Behavior and Health Education, School of
Public Health, The University of Michigan, Ann Arbor.

**Social Worker, 1983.** Department for Social Services, Cabinet for Human Resources,
Commonwealth of Kentucky, Warsaw, Kentucky.

Daniel W. Webster, Sc.D. M.P.H.                                                    page 3

## PROFESSIONAL ACTIVITIES

*Society Membership and Leadership*
American Public Health Association, Injury Control and Emergency Health Services Section, Policy
Committee, Faculty for training seminar on Design & Evaluation of Violence Prevention Programs.

American Society of Criminology, Firearms Program Chair 2009.

*Participation on Advisory Panels and Task Forces*
Invited participant to the Baltimore City GunStat project to provide technical assistance to law
enforcement officials on gun law enforcement strategies, 2007 to present.

Expert reviewer, Child Death Review Capacity Building Project, Harborview (University of
Washington) Injury Prevention and Research Center, 2006.

Advisory Council to the California Department of Justice for planning gun violence prevention
campaign, 2005 - 2009.

Lethality Assessment Committee, advisory group for the Maryland Network Against Domestic
Violence to develop a model lethality assessment protocol for police and providers of services to
victims of intimate partner violence, 2003 to present.

Johns Hopkins Univ. President's Council on Urban Health, Violence Working Group, 1998-2000.

Baltimore City Task Force on Gunshot Wound Lethality, 1996-1997.

Family Violence Task Force, Medical and Chirurgical Faculty of Maryland, 1993-1994.

Committee on School Safety, Committee on School Environment, Baltimore City Pub. Schools 1989.

*Grant Review*
National Center for Injury Control and Prevention, Centers for Disease Control and Prevention,
Youth Violence Prevention Through Community-Level Change, April 2004.

National Center for Injury Control and Prevention, Centers for Disease Control and Prevention, May
2001. (Also selected for NCIPC-CDC review panel, June 1998)

National Institutes of Health, Clinical Sciences Special Emphasis Panel, Small Business Innovation
Research Program, March 1999.

National Institute for Mental Health, Behavioral Science Track Award for Rapid Transition
B/START) Program, April 1998.

The Abell Foundation on proposals related to violence prevention, Baltimore, MD 1992-93.

Daniel W. Webster, Sc.D., M.P.H.                                                                 page 4

*Consultations*
Mayors Against Illegal Guns, 2006 to present.

California Dept. of Justice, Firearms Division, 2005-2006. Provide advice about how the state should use funds from its litigation against Wal-Mart to advance gun violence prevention.

The Robert Wood Johnson Foundation, 2005-2006. Prepare advice and white papers on the prevention of youth violence and the prevention of intimate partner violence.

National Association for the Advancement of Colored People, 1999-2000. Assistance with gun violence victimization survey of NAACP members for use in lawsuit against the gun industry.

Duke University and Georgetown University, 1998-1999. Consultation on project to estimate the economic costs associated with firearm injuries.

Consortium of Virginia Urban Municipalities on strategies to reduce violence, 1992.

Center to Prevent Handgun Violence, Washington, DC, 1991-1993. Conducted survey of pediatricians on materials being developed for education families about firearm injury prevention.

*Testimony*
Maryland Senate and House of Delegates, SB 162 / HB 330, Bill to reduce maximum capacity of detachable ammunition magazines, Feb. – March, 2011.

Maryland Senate and House of Delegates, SB 161 / HB 1043, Bill to provide state police with greater authority to regulate licensed handgun dealers, Feb. – March, 2011.

Maryland Senate and House of Delegates, SB 239 / HB 241, Bill to create a minimum sentence of 18 months for all defendants convicted of illegal possession of a loaded firearm, Feb. – March, 2011.

Maryland Senate and House of Delegates, SB 240 / HB 252, Bill to allow longer sentences for felons illegally possessing firearms and extend prohibitions to include long guns, Feb. – March, 2011.

U.S. House of Representatives, Forum on the Gun Show Loophole Act of 2009. July 14, 2010.

Chicago City Council, Committee on Police and Fire Departments, Hearing on a new legislation to replace the city's handgun ban with comprehensive gun regulations. June 29, 2010.

Maryland Senate and House, SB 645 and HB 820, Firearms Safety Act of 2010, March 2010.

District of Columbia Council, Committee on Public Safety and the Judiciary, Hearing on a bill to rewrite many provisions of its firearms laws. October 1, 2008.

District of Columbia Council, Committee on Public Safety and the Judiciary, Hearing on the revision of the District's gun laws in response to the Supreme Court's ruling that the law was unconstitutional. July 2, 2008.

Daniel W. Webster, Sc.D. M.P.H.                                                    page 5

*Testimony (cont.)*
Maryland Senate, SB 642 Restrictions on pretrial release for offenses involving firearms. Mar. 2008.

Maryland Senate, SB586 Restrictions on Possession of Firearms - Conviction of Disqualifying Crime and Protective Order Respondent, March 2008.

Maryland Senate, SB585 Reporting Lost or Stolen Firearms, March 2008.

Baltimore City Council, Law to Establish a Registry for Gun Offenders, August 2007.

United States Congress, House Committee on Government Oversight and Reform, May 10, 2007.

Connecticut Senate, RB 5600, Act to Require Reporting of Theft or Loss of a Firearm. March 2004.

Maryland Senate, SB 83, Law Enforcement – Forfeited Property and Agency-Owned Handguns – Disposition; SB 528, Firearm Loss and Theft Reporting; SB 494 Assault Weapons Ban; Feb. 2003.

Maryland Senate, SB 224 Gun Accountability Act of 2002; SB 225 Gun Safety Act of 2002; SB 969 Minors Access to Firearms, March 12, 2002.

Maryland Senate, SB 448, Bodywire Evidence and Illegal Gun Sales, February 22, 2002.

Maryland Senate, SB 384, Minors' Access to Firearms - Felony.  March 13, 2001.

Maryland House of Delegates, HB 1131, Mandatory Licensing of Handgun Purchasers, March 2000.

California State Assembly, Committee on Public Safety, hearing on a right-to-carry handgun law, November 18, 1997.  (Written)

Baltimore City Grand Jury Commission on the Prevention of Gun Violence, March 25, 1993.

Maryland Senate, SB 326, Assault Pistols Act of 1993, March 17, 1993.

Maryland House of Delegates, HB 400, Responsible Alcohol Server Training Bill, Jan. 1989.


**EDITORIAL ACTIVITIES**

*Scientific Journal Peer Review*
American Journal of Epidemiology
American Journal of Preventive Medicine
American Journal of Public Health
Annals of Emergency Medicine
Archives of Pediatric and Adolescent Medicine
Guide to Clinical and Preventive Services

Daniel W. Webster, Sc.D. M.P.H.                                                page 6

*Scientific Journal Peer Review*
Health Education and Behavior (Special Issue Editorial Board Member)
Health Education Research
Injury Prevention (Editorial Board, 2005-2010)
JAMA (Journal of the American Medical Association)
Journal of Crime and Delinquency
Journal of Criminal Justice
Journal of General and Internal Medicine
Journal of Health Politics, Policy, and Law
Journal of Interpersonal Violence
Journal of Policy Analysis & Management
Journal of Quantitative Criminology
Journal of Trauma
Journal of Urban Health
Journal of Women's Health
New England Journal of Medicine
Pediatrics
Politics and Policy
Social Science & Medicine
Western Criminology Review

## HONORS AND AWARDS

Delta Omega Honorary Society in Public Health – Alpha Chapter, Johns Hopkins Bloomberg School of Public Health, Faculty induction, 2005.

Education Award from the Maryland Network Against Domestic Violence, 2004.

Delta Omega Honorary Society - Alpha Chapter Certificate of Merit, 1989.

William Haddon Memorial Fellowship, The Johns Hopkins School of Public Health, 1988-1989.

Public Health Traineeship, The Johns Hopkins School of Public Health, 1987-1989.

Public Health Traineeship, The University of Michigan School of Public Health, 1983-1985.


## PUBLICATIONS

*Peer Reviewed Journal Articles*
**Webster DW**, Vernick JS, Bulzacchelli MT, Vittes KA. Recent federal gun laws, gun dealer accountability and the diversion of guns to criminals in Milwaukee. *Journal of Urban Health*, in press.

Yang C, German D, **Webster DW**, Latkin C. Experiencing violence as a predictor of drug use relapse among former drug users in Baltimore, Maryland. *Journal of Urban Health*, in press.

Daniel Webster, Sc.D., M.P.H.                                                              page 7

*Peer Reviewed Journal Articles* (cont.)
Vernick JS, Rutkow L, **Webster DW**, Teret SP. Changing the constitutional landscape for firearms: the Supreme Court's recent second amendment decisions. *Amer. Journal of Public Health*, in press.

Franklin FA II, Pan WK, **Webster DW**, LaVeist TA. Alcohol outlets and violent crime in the nation's capital. *Western Journal of Emergency Medicine* 2010;11:283-290.

Wintemute GJ, Hemenway D, **Webster DW**, Pierce G, Braga AA. Gun shows and gun violence: fatally flawed study yields misleading results. *American Journal of Public Health* 2010;100:1856-60.

Wright MA, Wintemute GJ, **Webster DW**. Factors affecting a recently-purchased handgun's risk for use in crime under circumstances that suggest gun trafficking. *J Urban Health* 2010; 87:352-364.

Zeoli AM, **Webster DW**. Effects of domestic violence policies, alcohol taxes and police staffing levels on intimate partner homicide in large U.S. cities. *Injury Prevention* 2010;16:90-95.

**Webster DW**, Frattaroli S, Vernick JS, O'Sullivan C, Roehl J, Campbell JC. Women with protective orders report failure to remove firearms from their abusive partners: Results from an exploratory study. *Journal of Women's Health* 2010;19:93-98.

**Webster DW**, Vernick JS. Keeping Firearms from Drug and Alcohol Abusers. *Injury Prevention* 2009;15:425-427.

**Webster DW**, Vernick JS, Bulzacchelli MT. Effects of state-level firearm seller accountability policies on firearms trafficking. *Journal of Urban Health* 2009;86:525-537.

Snider C, **Webster D**, O'Sullivan CS, Campbell JC. Intimate partner violence: Development of a Brief Risk Assessment for the Emergency Department. *Academic Emergency Medicine* 2009;16:1-8.

Rutkow L, Vernick JS, **Webster DW**, Lennig DJ. Violence against women and the Supreme Court: recent challenges and opportunities for advocates and practitioners. *Violence Against Women* 2009;15:1248-1258.

Campbell JC, **Webster DW**, Glass N. The Danger Assessment: Validation of a Lethality Risk Assessment Instrument for Intimate Partner Femicide. *J Interpersonal Violence* 2009;24:653-674.

Hu G, **Webster DW**, Baker SP. Hidden homicide trends in the U.S., 1999-2004. *J Urban Health* 2008;85:597-606.

Bulzacchelli MT, Vernick JS, Sorock GS, **Webster DW**, Lees PS. Circumstances of Fatal Lockout/Tagout- Related Injuries in Manufacturing. *Amer J Industrial Medicine* 2008;51:728-734.

Outwater A, Campbell JC, **Webster DW**, Mgaya E. Homicide death in Sub-Saharan Africa: A review 1970-2004. *African Safety Promotion* 2008;5:31-44.

Vernick JS, Hodge J , **Webster DW**. The ethics of restrictive licensing for handguns:

Daniel Webster, Sc.D., M.P.H.                                          page 8

*Peer Reviewed Journal Articles* (cont.)
Comparing the United States and Canadian approaches to handgun regulation. *Journal of Law, Medicine, and Ethics* 2007;35:668-678.

Bulzacchelli MT, Vernick JS, **Webster DW**, Lees PS. Effects of OSHA's Control of Hazardous Energy (Lockout/Tagout) Standard on Rates of Machinery- Related Fatal Occupational Injury. *Injury Prevention* 2007;13:334-338.

Vernick JS, **Webster DW**. Policies to prevent firearms trafficking. *Injury Prevention* 2007;13:78-79.

Weiner J, Wiebe DJ, Richmond TS, Beam K, Berman AL, Branas CC, Cheney RA, Coyne-Beasley T, Firman J, Fishbein M, Hargarten S, Hemenway D, Jeffcoat R, Kennedy D, Koper CS, Lemaire J, Miller M, Roth JA, Schwab W, Spitzer R, Teret SP, Vernick JS, **Webster D**. Reducing firearm violence: a research agenda. *Injury Prevention* 2007;13:80-84.

Vernick JS, **Webster DW**, Bulzacchelli MT. Regulating firearms dealers in the United States: an analysis of state law and opportunities for improvement. *Journal of Law, Medicine, and Ethics* 2006;34:765-775.

Vernick JS, Teret SP, Smith GA, **Webster DW**. Counseling About Firearms: Proposed Legislation is a Threat to Physicians and Their Patients. *Pediatrics* 2006; 118:2168-72.

Manganello J, **Webster DW**, Campbell JC. Intimate partner violence and health provider training and screening in the news. *Journal of Women's Health* 2006; 43:21-40.

**Webster DW**, Zeoli AM, Bulzacchelli MT, Vernick JS. Effects of police stings of gun dealers on the supply of new guns to criminals. *Injury Prevention* 2006;12:225-230.

**Webster DW**, Vernick JS, Bulzacchelli MT. Effects of a gun dealer's change in sales practices on the supply of guns to criminals. *Journal of Urban Health* 2006; 83:778-787.

Koziol-McLain J, **Webster DW**, MacFarlane J, Block CR, Glass N, Campbell JC. Risk factors for femicide-suicide in abusive relationships: results from a multi-site case control study. *Violence & Victims* 2006;21:3-21.

Vernick JS, Johnson SB, **Webster DW**. Firearm suicide in Maryland: characteristics of older versus younger suicide victims. *Maryland Medicine*, 2005; 6(3):24-27.

Lewin NL, Vernick JS, Beilenson PL, Mair JS, Lindamood LM, Teret SP, **Webster DW**. Using local public health powers as a tool for gun violence prevention: the Baltimore youth ammunition initiative. *American Journal of Public Health* 2005; 95:762-765.

**Webster DW**, Vernick JS, Zeoli AM, Manganello JA. Effects of youth-focused firearm laws on youth suicides. *JAMA* 2004; 292:594-601.

Daniel Webster, Sc.D., M.P.H.                                    page 9

*Peer Reviewed Journal Articles* (cont.)

Vernick JS, O'Brien M, Hepburn LM, Johnson SB, **Webster DW**, Hargarten SW. Unintentional and undetermined firearm deaths: A preventable death analysis of three safety devices. *Injury Prevention* 2003; 9:307-311.

Vernick JS, Pierce MW, **Webster DW**, Johnson SB, Frattaroli S. Technologies to detect concealed weapons: Fourth Amendment limits on a new public health and law enforcement tool. *Journal of Law, Medicine, and Ethics* 2003; 31:567-579.

Campbell JC, **Webster DW**, Koziol-McLain J, et al. Risk factors for femicide within physically abusive intimate relationships: Results from a multi-site case control study. *American Journal of Public Health* 2003; 93:1089-1097.

Campbell JC, **Webster DW**, Koziol-McLain J, et al. Assessing risk factors for intimate partner homicide. *NIJ Journal* 2003;250:14-19.

Roche KM, **Webster DW**, Alexander CS, Ensminger ME. Neighborhood variations in the salience of parental support to boys' fighting. *Adolescent and Family Health* 2003;3:55-63.

Solomon BS, Duggan AK, **Webster DW**, Serwint JR. Pediatric resident firearm safety counseling during adolescent health maintenance visits. *Archives of Pediatric and Adolescent Medicine* 2002;156:769-775.

**Webster DW**, Vernick JS, Hepburn LM. Effects of Maryland's law banning Saturday night special handguns on homicides. *American Journal of Epidemiology* 2002;155:406-412.

**Webster DW**, Freed LH, Frattaroli S, Wilson MH. How delinquent youth acquire guns: Initial versus most recent gun acquisitions. *Journal of Urban Health* 2002;79:60-69.

Frattaroli S, **Webster DW**, Teret SP. Unintentional gun injuries, firearm design, and prevention: A perspective on urban health. *Journal of Urban Health* 2002;79:49-59.

Sachs CJ, Kosiol-McLain J, Glass N, **Webster DW**, Campbell JC. A population-based survey assessing support for mandatory domestic violence reporting by healthcare personnel. *Women and Health* 2002;35:121-133.

**Webster DW**, Vernick JS, Hepburn LM. The relationship between licensing, registration and other state gun sales laws and the source state of crime guns. *Injury Prevention* 2001;7:184-189.

Sharps PW, Campbell JC, Campbell D, Gary F, **Webster DW**. The role of alcohol use in intimate partner femicide. *American Journal on Addictions*, 2001;10:122-135.

Freed LH, **Webster DW**, Longwell JJ, Carrese J, Wilson MH. Deterrents to gun acquisition and carrying among incarcerated adolescent males. *Archives of Pediatric and Adolescent Medicine* 2001;155:335-341.

Daniel Webster, Sc.D., M.P.H.                                              page 10

*Peer Reviewed Journal Articles* (cont.)
**Webster DW**, Starnes M.  Reexamining the association between child access prevention gun laws and unintentional firearm deaths among children, *Pediatrics*, 2000;106:1466-1469.

Vernick JS, **Webster DW**, Hepburn LM.  Maryland's law banning Saturday night special handguns: Effects on crime guns. *Injury Prevention* 1999; 5:259-263.

Howard KA, **Webster DW**, Vernick JS.  Beliefs about the risks of firearms in the home: Analysis of a national survey (U.S.A.). *Injury Prevention* 1999;5:284-289.

Teret SP, **Webster DW**.  Reducing gun deaths in the United States: Personalized guns would help – and would be achievable. *British Medical Journal* 1999:318:1160-1161.

Teret SP, **Webster DW**, Vernick JS, et al.  Public support for innovative gun policies: The results of two national surveys. *New England Journal of Medicine* 1998;339:813-818.

**Webster DW**, Vernick JS, Ludwig J.  No proof that right-to-carry laws reduce violence, *American Journal of Public Health*, 1998;88:982-983.

**Webster DW**, Vernick JS, Ludwig J, Lester KJ.  Flawed gun policy research could endanger public safety. *American Journal of Public Health* 1997;87:918-921.

Vernick JS, Teret SP, **Webster DW**.  Regulating firearm advertising promising home protection: The legal basis for a public health intervention. *JAMA* 1997;277:1391-1397.

**Webster DW**, Wilson MEH.  Gun violence among youth and the pediatrician's role in primary prevention. *Pediatrics* 1994;94:617-622.

**Webster DW.**  The unconvincing case for school-based conflict resolution programs for adolescents. *Health Affairs* 1993;12(4):126-141.

**Webster DW**, Gainer PS, Champion HR.  Weapon carrying among inner-city junior high school students: Defensive behavior vs aggressive delinquency. *Amer J Public Health* 1993; 83:1604-1608.

Gainer PS, **Webster DW**, Champion HR.  A youth violence prevention program description and preliminary evaluation. *Archives of Surgery* 1993;128:303-308.

**Webster DW**, Champion HR, Gainer PS, Sykes L.  Epidemiologic changes in gunshot wounds in Washington, DC, 1983-1990. *Archives of Surgery* 1992;127:694-698.

Oschner MG, Hoffman AP, DiPasquale D, Cole FJ, **Webster DW**, Champion HR.  Associated aortic rupture-pelvic fracture: an alert for orthopedic and general surgeons. *J Trauma*, 1992;33:429-34.

**Webster DW**, Wilson MEH, Duggan AK, Pakula LC.  Parents' beliefs about preventing gun injuries to children. *Pediatrics* 1992;89:908-914.

Daniel Webster, Sc.D, M.P.H.                                                          page 11

*Peer Reviewed Journal Articles* (cont.)
**Webster DW**, Wilson MEH, Duggan AK, Pakula LC. Firearm injury prevention counseling: a study of pediatricians' beliefs and practices. *Pediatrics* 1992;89:902-907.

Harburg E, DiFrancesco W, **Webster DW**, Gleiberman L, Schork MA: Familial transmission of alcohol use: II. Imitation of and aversion to parent drinking (1960) by adult offspring (1977); Tecumseh, Michigan. *Journal of Studies on Alcohol* 1990;51:245-256.

**Webster DW**, Harburg E, Gleiberman L, Schork MA, DiFrancesco W: Familial transmission of alcohol use: I. Parent and adult offspring alcohol use over 17 years, Tecumseh, Michigan. *Journal of Studies on Alcohol* 1989;50:557-566.

Wagenaar AC, **Webster DW**, Maybee RG: Effects of child restraint laws on traffic fatalities in eleven states. *Journal of Trauma* 1987;27:726-732.

Wagenaar AC, **Webster DW**: Preventing injuries to children through compulsory automobile safety seat use. *Pediatrics* 1986;78:662-672.

*Journal Articles Not Peer-Reviewed*
**Webster DW**, Chaulk CP, Teret SP, Wintemute GJ. Reducing firearm injuries. *Issues in Science & Technology* 1991; 7 (Spring): 73-79.

**Webster DW**. Suicide in the subway: case consultation: suicide and mass transit: commentary. Journal of Suicide and *Life-Threatening Behavior* 1991;21:209-212.

*Manuscripts Under Review*
**Webster DW**, Vernick JS, Mendel J, Mahoney P. Effects of a community public health program to reduce shootings on young men's attitudes about gun violence. *Injury Prevention.*

*Abstracts*
Mang KM, Grossman DC, Rivara FP, **Webster DW**. Firearm injury prevention counseling by child health providers. *American Journal of Diseases of Children* 1993;147:448.

Other Publications
Vernick JS, **Webster DW**, Vittes KA. *Law and Policy Approaches to Keeping Guns from High Risk People* (book chapter), in Culhane J. ed. *Reconsidering Law and Policy Debates: A Public Health Perspective.* Cambridge University Press; in press 2010.

Vernick JS, **Webster DW**. Amicus Brief to the U.S. Supreme Court regarding District of Columbia versus Heller for the petitioner. Written on behalf of the American Public Health Assoc., American College of Preventive Medicine, American Trauma Society, and the American Assoc. of Suicidology, January 2008.

**Webster DW**. Child Access Prevention (CAP) Laws. In Gregg Lee Carter (Ed.) Entry in *Encyclopedia of Guns in American Society.* Santa Barbara, CA: ABC-CLIO, 2003.

Daniel Webster, Sc.D, M.P.H.                                          page 12

*Reports*

**Webster DW**, Illangasekare SL.  Best Practices for the Prevention Youth Homicide and Serious Violence.  Johns Hopkins Urban Health Institute, October 2010.

**Webster DW**, Vernick JS, Mendel J.  Interim Evaluation of Baltimore's *Safe Streets* Program. Johns Hopkins Center for the Prevention of Youth Violence, Jan. 2009.

**Webster DW**, Mendel J.  Effects of Baltimore's *Operation Safe Kids* on Re-Arrest.  Johns Hopkins Center for the Prevention of Youth Violence, June 2008.

**Webster DW**.  Interventions to reduce deaths and injuries associated with youth violence. White paper commissioned by the Robert Wood Johnson Foundation.  May 2006.

**Webster DW**.  Preventing intimate partner violence.  White paper commissioned by the Robert Wood Johnson Foundation.  June 2006.

**Webster DW**, Vernick JS, Teret SP.  How Cities Can Reduce Illegal Guns and Gun Violence.  Johns Hopkins Center for Gun Policy and Research, April 2006. Updated January 2008.

Campbell JC, **Webster DW**, O'Sullivan C, Roehl J, Mahoney P, White M, Guertin K.  Intimate Violence Risk Assessment Validation Study. Report submitted to the National Institute of Justice, September, 2004. 2000WTVX0011.

**Webster DW**, Kim A.  Evaluation of the Maryland Gun Violence Act of 1996: Effects on the Illicit Gun Market.  Prepared for the U.S. Bureau of Alcohol, Tobacco, and Firearms, September 2003.

**Webster DW**, Vernick JS, Kaljee L, Cameron DD, Frattaroli S, Johnson S.  Public attitudes About New Law Enforcement Technologies and Related to Strategies to Reduce Gun Violence.  Report by the Johns Hopkins Center for Gun Policy and Research to the National Institute of Justice, 2002.

**Webster DW**, Ludwig J.  Myths About Defensive Gun Use and Permissive Concealed Carry Handgun Laws.  Resource paper for *Making the Case on Public Health and Guns: A Curriculum for Advocates*, Berkeley, CA: Berkely Media Studies Group, 2000.

**Webster DW**, Howard KA, Frattaroli S.  A Case Study of Mediascope's Efforts Concerning Violence in the Media.  Report prepared for The California Wellness Foundation.  Johns Hopkins University, Department of Health Policy and Management, January 1996.

**Webster DW**, Ronzio CR, Frattaroli S, Howard KA, Batalden MK.  Evaluation Report for Year 1 of "The Campaign to Prevent Handgun Violence Against Kids."  Johns Hopkins University, Department of Health Policy and Management, July 1995.

**Webster DW**. Fieldtest of Center to Prevent Handgun Violence's Pediatrician Firearm Injury Prevention Counseling Materials.  October 1993.

CURRICULUM VITAE

Daniel W. Webster, Sc.D., M.P.H.

PART II

TEACHING

*Classroom Instruction*
Instructor:      Understanding and Preventing Violence, 1993- present.
                 Special Studies Seminar on Violence Research, 2000, 2002.
                 Graduate Seminar in Injury Research and Policy, 2005 – present.
Co-Instructor: Research and Evaluation Methods for Health Policy, 2008 – 2010.
Lead Instructor: Research and Evaluation Methods for Health Policy, 2011 – present.

Lecturer in the following JHU courses:      Health Policy I: Social & Economic Determinants
                                            of Health
                                            Proposal Writing (Health Policy & Management)
                                            Introduction to Health Policy and Management
                                            Problem Solving in Public Health
                                            Public Health Protection and Practice
                                            Adolescence and Adolescent Health
                                            Issues in Injury and Violence Prevention
                                            Methodological Issues in Injury and Violence
                                            Design and Evaluation of Injury Interventions
                                            Graduate Seminar in Health and Public Policy
                                            Suicide as a Public Health Problem
                                            Applications in Program Monitoring and Evaluation
                                            Alcohol, Society, and Health

*Advising and Thesis Committees*
Primary advisor to:      Kim Ammann Howard, PhD, 1997
                         Jennifer Manganello, PhD, 2003
                         Allegra Kim, PhD candidate, PhD 2006
                         April Zeoli, PhD, 2007
                         Elizabeth Saylor, PhD candidate, 2003 - 2007
                         Jennifer Mendel, PhD candidate, 2006 – present
                         Jillian Fry, PhD candidate, 2007- present
                         James Saltzman, MPH, 2007-2008
                         Gayle Nelson, MPH, 2007-2009
                         Summer Venable, MPH, 2008-2010
                         Jeane Garcia Davis, MPH, 2008-2011
                         Donald Chalfin, MPH, 2010 -

Co-advisor to:      Leonardo Goe (MHS Health Policy), 1997-98
                    Rachel Garfield (MHS Health Policy), 1998-
                    Emma (Beth) McGinty, PhD candidate, 2010-

Daniel Webster, Sc.D., M.P.H.                                            page 14

Thesis committees:           Kathleen Roche, PhD in MCH, August 1998
                             Shannon Frattaroli, PhD in HPM, December 1998
                             Li-Hui Chen, PhD in HPM, March 1999
                             Marsh Rosenberg, PhD in Mental Hygiene, March 2001
                             Lisa Hepburn, PhD in HPM, March 2001
                             Swapnil P. Maniar, PhD in PFHS, September 2005
                             Maria Bulzacchelli, PhD in HPM, October 2006
                             April Zeoli, PhD in HPM, July 2007
                             Anne Outwater, PhD in Nursing, December 2007
                             Donna Ansara, PhD in PFHS, December 2008
                             Vanessa Kuhn, PhD in HPM, July 2010

Preliminary oral exam        Shannon Frattaroli, Marguerite Roe, Li-Hui Chen, Mary Beth Skupien,
committees:                  Monique Shepard, Beth Hooten, Farfifteh Duffy, Mary Garza, Lisa
                             Hepburn, Marc Starnes, Jennifer Manganello, Allegra Kim, Christina
                             Pallitto, Swapnil Maniar, Christine Koth, Maria Bulzacchelli, Margaret
                             Haynes, Frank Franklin, Donna Ansara, Vanessa Kuhn, Susan
                             Ghanbarpour, Greg Tung, Adam, Milam, Michael Kim.

Post-Doctoral Mentoring      Lorraine Freed, MD, MPH, RWJ Clinical Scholar 1996-98
                             Shannon Frattaroli, Kellogg Community Health Scholar, 1999-2000
                             Barry Solomon, MD, Pediatric Fellow, 1999-2002
                             Erica Sutton, MD, NIMH Violence Research Fellow, 2003-2005

*Program Management / Training Program Involvement*
Interim Program Head, PhD program in Prevention and Public Policy, 2006 – 2007.

Faculty Director, Certificate Program in Injury Control, 1999- present

Executive Committee and Core Faculty, Interdisciplinary Research Training Program on Violence
(pre- and post-doctoral training program funded by NIMH), 1999-present

Resource Faculty, Alcohol, Injury and Violence Training Program (pre-doctoral training program
funded by NIAAA), 2001-2007.


## ACADEMIC COMMITTEES

Academic Policy and Admissions Committee, HPM, 2006 – 2007.
Qualifying Exam Committee, HPM, 1998- 1999, 2001 – 2008, Chair 2004 – 2008.
HPM Doctoral Admissions Committee, 2006 – 2007.
Affirmative Action Committee, School, 2005 – present.
3 Ad Hoc Committees for Appointments and Promotions, 2006 – present.
Search Committee, Leon Robertson Chair in Injury Control, 2005 – 2006.
Academic Policy and Admissions Committee, HPM, 1997- 1999

Daniel Webster, Sc.D., M.P.H.                                             page 15

## ACADEMIC COMMITTEES (cont.)
Strategic Planning Committee, HPM, 2003 - present
Ad-Hoc Committee on Statistics Training, HPM, 1997-1998
Research Policy Committee, HPM, 1995-97

## RESEARCH GRANT PARTICIPATION

*Active Support*

| | |
|---|---|
| Title: | Gun Violence Reduction Program |
| Dates: | 1/01/11 – 12/31/13 |
| Principal Investigator: | Daniel W. Webster |
| Sponsoring Agency: | Anonymous donor |
| Funding Level: | $500,000 |
| Main Objectives: | Conduct research, policy analysis, and technical assistance to inform efforts to reduce the availability of illegal guns and gun violence. |
| Effort: | 40% |

| | |
|---|---|
| Title: | Evaluation of Baltimore Policing Strategies to Reduce Gun Violence |
| Dates: | 10/1/2010 – 3/31/2012. |
| Principal Investigator: | Daniel W. Webster |
| Sponsoring Agency: | U.S. Dept. of Justice, Bureau of Justice Assistance |
| Funding Level: | $60,000 |
| Main Objectives: | Develop unbiased estimates of the impact of 3 strategies being implemented by Baltimore police to reduce violence. |
| Effort: | 15% |

| | |
|---|---|
| Title: | Analyzing and Developing Policies to Limit Firearm Access by High-Risk People |
| Dates: | 5/1/09 – 4/30/11 |
| Principal Investigator: | Daniel W. Webster |
| Sponsoring Agency: | The Joyce Foundation |
| Funding Level: | $179,971 |
| Main Objectives: | Research and describe state laws pertaining to firearm prohibitions for substance abusers and the potential public safety gains for expanding current prohibition categories for firearm purchase and possession. |
| Effort: | 15% year 1, 18% year 2 |

| | |
|---|---|
| Title: | Impact of Safe Streets' Outreach Workers on the Lives of Their Clients |
| Dates: | 12/1/09 – 6/30/10 |
| Principal Investigator: | Daniel W. Webster |
| Sponsoring Agency: | Baltimore City Health Department |
| Funding Level: | $72,000 |
| Main Objectives: | Measure the impact of the Safe Streets program on the clients of the program's outreach workers and provide analyses of the relationships between program activities and gun violence. |
| Effort: | 25% |

Daniel Webster, Sc.D., M.P.H.                                                     page 16

## RESEARCH GRANT PARTICIPATION

Title:                      Gun Violence Reduction Program
Dates:                      1/01/08 – 12/31/10
Principal Investigator:     Daniel W. Webster
Sponsoring Agency:          Anonymous donor
Funding Level:              $500,000
Main Objectives:            Conduct research, policy analysis, and technical assistance to inform efforts to
                            reduce the availability of illegal guns and gun violence.
Effort:                     25%

*Prior Support*
Title:                      Data for Combating Illegal Guns
Dates:                      1/01/08 – 12/31/08
Principal Investigator:     Daniel W. Webster
Sponsoring Agency:          Maryland Governor's Office for Crime Control and Prevention
Funding Level:              $75,419
Main Objectives:            Assist Baltimore City and Maryland State Police to collect and analyze data on
                            crime guns and illegal gun trafficking.
Effort:                     10%

Title:                      Analyzing & Assisting Innovative City-Level Efforts to Prevent Gun Violence
Dates:                      5/1/07 – 4/30/09
Principal Investigator:     Daniel W. Webster
Sponsoring Agency:          The Joyce Foundation
Funding Level:              $175,000
Main Objectives:            Analyze data on illegal gun trafficking and provide consultation to enhance
                            data to inform efforts to stem gun trafficking in Milwaukee. Case study of
                            Chicago Police Department's efforts to thwart gun trafficking.
Effort:                     20%-25%

Title:                      Evaluation of the California Firearms Domestic Violence Education and
                            Intervention Project
Dates:                      1/15/07 – 1/14/10
Principal Investigator:     Garen Wintemute (UC Davis) and Shannon Frattaroli (JHBSPH)
Sponsoring Agency:          California Department of Justice
Funding Level:              $31,481 subcontract from UC Davis for first year
Main Objectives:            Evaluate a program in 2 California counties to enhance implementation of state
                            laws prohibiting certain domestic violence offenders from possessing firearms.
Effort:                     10%

Title:                      Baseline Data for Evaluating a Community Initiative to Reduce Youth
                            Homicides
Dates                       3/01/07 – 2/28/09
Principal Investigator:     Daniel W. Webster

Daniel Webster, Sc.D., M.P.H.                                        page 17

## RESEARCH GRANT PARTICIPATION
*Prior Support*
Sponsoring Agency:   Baltimore City Health Department
Funding Level:       $75,122
Main Objectives:     Collect and analyze baseline data on violent crime and youths' attitudes
                     relevant to gun violence in intervention and comparison neighborhoods.
Effort:              6%

Title:               Evaluation of a community gun violence prevention initiative in Baltimore.
Dates:               9/1/05 – 8/31/10
Principal Investigator: Daniel W. Webster
Sponsoring Agency:   Centers for Disease Control and Prevention
Funding Level:       $745,352
Main Objectives:     Estimate the impact of the initiative on youth gun violence victimization and
                     perpetration and attitudes and behaviors of high risk youth.
Effort:              25%-30%

Title:               Effects of a Formal Danger Assessment and Risk Communication Intervention
                     on Actions Taken to Reduce Risks of Intimate Partner Violence
Dates:               9/1/04 – 8/31/09
Principal Investigator: Daniel W. Webster
Sponsoring Agency:   Centers for Disease Control and Prevention
Funding Level:       $485,000

Main Objectives:     Determine whether a formal, quantitative assessment of danger, and a standard
                     protocol for communicating the assessed risk of future partner violence and
                     scientific support for protection strategies is more effective than current
                     procedures in motivating protective actions and lowers risk for future violence.
Effort:              20%-25%

Title:               Reducing Illegal Gun Trafficking Through Research and Technical Assistance
Dates:               5/1/05 – 4/30/08
Principal Investigator: Daniel W. Webster
Sponsoring Agency:   The Joyce Foundation
Funding Level:       $181,117
Main Objective:      Disseminate research findings to law enforcement agencies, advocates, and the
                     media on policies and enforcement efforts shown to reduce illegal gun
                     trafficking.  Estimate the association between indicators of illegal gun
                     trafficking, gun availability to criminals, and gun violence.
Effort:              25%-30%

Title:               Effects of Police Stings of Gun Dealers on the Illegal Gun Market
Dates:               11/1/03 - 10/31/04
Principal Investigator: Daniel W. Webster
Sponsoring Agency:   The Overbrook Foundation
Funding Level:       $37,000

Daniel Webster, Sc.D., M.P.H.                                       page 18

## RESEARCH GRANT PARTICIPATION
*Prior Support (cont.)*

| | |
|---|---|
| Main Objectives: | Assess the impact of police stings of 12 gun dealers suspected of making illegal gun sales in Chicago on the flow of new guns into the illicit gun market. |
| Effort: | 20% |

| | |
|---|---|
| Title: | Evaluating and Developing Policies to Regulate Licensed Gun Dealers |
| Dates: | 4/1/02 - 3/31/04 |
| Principal Investigator: | Daniel W. Webster |
| Sponsoring Agency: | The John D. and Catherine T. MacArthur Foundation |
| Funding Level: | $260,000 |
| Main Objectives: | 1) Document state policies and enforcement practices relevant to the regulation and oversight of licensed gun dealers; 2) Assess the effect of those measures on gun trafficking; and 3) Develop recommendations for effective strategies for deterring illegal gun sales involving licensed gun dealers. |
| Effort: | 35% |

| | |
|---|---|
| Title: | Working with Health Commissioners to Reduce Gun Violence |
| Dates: | 7/01/03 - 6/30/04 |
| Principal Investigator: | Jon S. Vernick |
| Sponsoring Agency: | Richard and Rhoda Goldman Fund |
| Funding Level: | $100,000 |
| Main Objective: | Identify and provide technical assistance to city or county health commissioners in order to use public health powers to shut down corrupt gun dealers who endanger the public's health. |
| Effort: | 15% |

| | |
|---|---|
| Title: | Separating Kids from Guns Program |
| Dates: | 10/01/01 - 9/30/03 |
| Principal Investigator: | Shannon Frattaroli |
| Co-PI: | Daniel W. Webster |
| Sponsoring Agency: | The David and Lucille Packard Foundation |
| Funding Level: | $300,000 |
| Main Objective: | Conduct research, perform policy analysis, disseminate information relevant to protecting children and adolescents from unsupervised access to guns. |
| Responsibilities: | Plan and monitor progress on project activities, lead research on the effects of child access prevention laws on youth suicides. |
| Effort: | 25% |

| | |
|---|---|
| Title: | Johns Hopkins Center for Gun Policy and Research |
| Dates: | 01/01/99 - 4/30/04 |
| Sponsoring Agency: | The Joyce Foundation |
| Principal Investigator: | Stephen P. Teret (1995-2001), Jon S. Vernick (2001-present) |
| Co-Prin. Invest.: | Daniel W. Webster (2001-present) |
| Funding Level: | 2001-2003: $600,000 |
| Main Objective: | Develop and analyze policies to reduce firearm injuries. |

Daniel Webster, Sc.D., M.P.H.                                                    page 19

## RESEARCH GRANT PARTICIPATION

Responsibilities:     Co-direct Center, initiate and conduct research and analysis relevant to gun
                      policy; develop and analyze gun policy surveys; assist groups working to
                      reduce gun violence; serve as resource to media and policymakers.

Effort:               15% (05/01/03 - 4/30/04)
                      35% (05/01/01 - 4/30/03)
                      25% (01/01/00 - 4/30/01)
                      35% (01/01/96 - 12/31/99)
                      20% (01/01/95 - 12/31/96)

Title:                Effects of Minimum Age Restrictions on Handgun Purchase and Possession –
                      Center for the Prevention of Youth Violence
Dates:                10/01/00 - 9/30/05
Principal Investigator: Daniel W. Webster
Sponsoring Agency:    Centers for Disease Control and Prevention
Funding Level:        $306,695
Main Objective:       Estimate the effects of minimum age restrictions on handgun purchases and
                      possession on youth homicide offending and suicides
Responsibilities:     Design study, oversee data collection, plan and oversee data analysis, interpret
                      data, make presentations at professional meetings, write articles
Effort:               33% - 20%

Title:                Evaluation of Instruments to Assess Risk for Intimate Partner Violence
Dates:                08/01/00 - 03/31/04
Principal Investigator: Jacquelyn C. Campbell
Sponsoring Agency:    National Institute of Justice
Funding Level:        $619,792
Main Objective:       Determine the sensitivity, specificity, and predictive value of four instruments
                      designed to assess future risk for violent victimization by an intimate partner.
Responsibilities:     Co-Investigator, consult on study design, plan and conduct data analysis, write
                      articles for publication.
Effort:               20%

Title:                The Center for Injury Research and Policy:
Dates:                1987-2005
Sponsoring Agency:    Centers for Disease Control and Prevention
Principal Investigator: Ellen MacKenzie
Funding Level:        1999-2003: $750,000 per year.
Main Objective:       One of the eight regional injury control research centers.
Responsibilities:     Evaluate state-level gun policies, direct study of risk factors for serious injuries
                      from intimate partner assaults, develop research proposals, serve as resource to
                      students, media, practitioners, and policy makers.

Effort:               10% (09/03/03 - 8/31/04)          20% (04/01/94 - 08/31/94)
                      10% (09/01/00 - 8/31/01)          50% (07/01/92 - 03/31/94)
                      20% (09/01/99 - 8/31/00)          100% (04/01/92 - 06/30/93)
                      25% (09/01/94 - 08/31/98)         10% (09/01/98 - 08/31/99)

Daniel Webster, Sc.D., M.P.H.                                        page 20

## RESEARCH GRANT PARTICIPATION (cont.)

*Previous Support:* *(cont.)*

| | |
|---|---|
| Title: | Developing and Analyzing Data for Effective Gun Law Enforcement |
| Dates: | 03/01/01 - 02/28/02 |
| Principal Investigator: | Daniel W. Webster |
| Sponsoring Agency: | Governor's Office of Crime Control and Prevention |
| Funding Level: | $102,911 |
| Main Objective: | Develop databases for information about the sources of crime guns and the prosecution of gun crimes |
| Effort: | 35% |

| | |
|---|---|
| Title: | Developing a Dataset of State Gun Laws |
| Dates: | 12/01/00 - 11/30/01 |
| Principal Investigator: | Jon S. Vernick |
| Sponsoring Agency: | Annie E. Casey Foundation |
| Funding Level | $45,000 |
| Main Objective: | Determine the presence and effective dates of specific types of gun laws in each of the 50 U.S. states and the District of Columbia. Create a dataset with this information and provide the information to interested researchers. |
| Responsibilities: | Provide input into decisions about what laws to research and dataset format. |
| Effort: | 10% |

| | |
|---|---|
| Title: | Effects of Personalized Guns in Maryland |
| Dates | 9/1/99 - 8/31/00 |
| Sponsoring Agency: | The Abell Foundation |
| Funding Level: | $40,533 |
| Principal Investigator: | Stephen Teret |
| Main Objective: | Assess likely effects of a law to require personalized guns in Maryland |
| Responsibilities: | Examine likely consumer reactions to personalized guns, effects on mortality |
| Effort: | 10% |

| | |
|---|---|
| Title: | Risk Factors for Homicide in Violent Intimate Relationships |
| Dates: | 09/01/96 - 02/28/00 |
| Sponsoring Agency: | NIDA, NIMH, CDC, NIJ, NIA |
| Principal Investigator: | Jacquelyn Campbell |
| Funding Level: | $1,267,744 |
| Main Objective: | Determine risk factors for homicide or attempted homicide among women involved in violent intimate relationships and develop predictive screening devices for clinicians, shelter workers, and the courts. |
| Responsibilities: | Assist in study design, assess data completeness and reliability, construct and evaluate predictive models, and write articles. |
| Effort: | 10% (09/01/99 - 02/28/00) |
| | 25% (09/01/98 - 08/31/99) |
| | 10% (09/01/97 - 08/31/98) |
| | 15% (09/01/96 - 08/31/97) |

Daniel Webster, Sc.D., M.P.H.                                              page 21

## RESEARCH GRANT PARTICIPATION (cont.)

*Previous Support: (cont.)*

| | |
|---|---|
| Title: | Preventing Firearm Suicide and Unintentional Deaths Through Safer Gun Design |
| Dates: | 01/01/00 - 12/31/00 |
| Principal Investigator: | Jon S. Vernick |
| Sponsoring Agency: | Funders' Collaborative for Gun Violence Prevention |
| Funding Level: | $176,755 |
| Main Objective: | Evaluate potential benefits of safer gun designs |
| Responsibilities: | Co-Investigator, consult on study design and data analysis |
| Effort: | 10% |

| | |
|---|---|
| Title: | Public Attitudes About New Law Enforcement Technologies |
| Dates: | 06/01/97 – 05/31/99 |
| Sponsoring Agency: | National Institute of Justice |
| Principal Investigator: | Daniel W. Webster |
| Funding Level: | $266,625 |
| Main Objectives: | Assess public attitudes relevant to new law enforcement strategies to detect concealed weapons in high-crime areas including the use of new technology and the determinants of those attitudes including concerns about safety, invasion of privacy, and fairness in the way that law enforcement officials apply new technology. Study includes a qualitative study of residents of a high-crime neighborhood in Baltimore and a national phone survey of urban residents. |
| Responsibilities: | Oversee all aspects of the project including managing subcontracts, communicate with funding agency, design the study and data collection instruments, analyze qualitative and quantitative data, writing reports and articles for publication. |
| Effort: | 33% |

| | |
|---|---|
| Title: | Evaluation of the California Violence Prevention Initiative |
| Dates: | 07/01/93 - 04/15/96 |
| Sponsoring Agency: | The California Wellness Foundation |
| Principal Investigator: | Stephen P. Teret |
| Co-Prin. Investigator: | Daniel W. Webster |
| Funding Level: | $3.1 million |
| Main Objectives: | Conduct process and outcome evaluation of a statewide violence prevention initiative involving advocacy for policies to reduce violence, community mobilization, leadership development for community activists for violence prevention, and research applicable to violence prevention. |
| Responsibilities: | With PI, oversee and manage all aspects of the evaluation of the initiative. Design data collection instruments and protocols for the evaluation of the policy and community action components. Analyze data from periodic statewide surveys to assess changes in public support for violence prevention policy initiatives. |
| Effort: | 50% |

Daniel Webster, Sc.D., M.P.H.

## RESEARCH GRANT PARTICIPATION (cont.)
### *Previous Support: (cont.)*

| | |
|---|---|
| Title: | Evaluation of Violence Prevention Public Education Campaign |
| Dates: | 04/01/94 - 03/31/95 |
| Sponsoring Agency: | The California Wellness Foundation |
| Principal Investigator: | Daniel W. Webster |
| Funding Level: | $40,000 |
| Main Objectives: | The describe all facets of the campaign and the political and social context in which the campaign is conducted and evaluate the effects of the campaign on public opinion, opinion leaders, the media, and policy makers. |
| Responsibilities: | Oversee all aspects of the evaluation and coordinate evaluation activities with those conducting the campaign. Analyze data from public opinion polls, policy maker surveys, and newspaper coverage of violence and guns. |
| Effort: | 20% |

| | |
|---|---|
| Title: | Planning "The Consortium on Gun Policy and Information" |
| Dates: | 04/01/94 - 10/31/94 |
| Sponsoring Agency: | The Joyce Foundation |
| Principal Investigator: | Stephen P. Teret |
| Funding Level: | $40,000 |
| Main Objectives: | To assess the need for a "Consortium on Gun Policy and Information" that would provide factual information on firearms and the public's health to various consumers. Examine the feasibility of creating a Consortium, explore the policy role that such an organization might fulfill, and describe the methods by which accurate information could be disseminated. |
| Responsibilities: | Participate in the planning sessions and be involved in crafting gun injury epidemiology materials developed for the media and other consumers. |
| Effort: | 10% |

## PRESENTATIONS
### *Scientific Meetings*

**Webster DW**, Mendel JS, Vernick. Evaluating Baltimore's Safe Streets Program's effects on violence. Presented at the annual meetings of the American Public Health Association, Denver, November 2010.

**Webster DW**, Vernick JS, Mendel JS. Interim evaluation of Baltimore's Safe Streets initiative: Effects on gun violence. Presented at the Annual Meetings of the American Public Health Association, Philadelphia, November 2009.

**Webster DW**. Impact of danger assessment screening and safety education on abused women's perceived risk of serious re-abuse. Presented at the Annual Meetings of the American Public Health Association, Philadelphia, November 2009.

Daniel Webster, Sc.D., M.P.H.                                                    page 23

## PRESENTATIONS
*Scientific Meetings* (cont.)

Mendel JS, **Webster DW**, Vernick JS. Street outreach to prevent gun violence in Baltimore: An analysis of high-risk conflict mediation. Presented at the Annual Meetings of the American Public Health Association, Philadelphia, November 2009.

Vernick JS, **Webster DW.** An environmental approach to preventing firearm violence: targeting illegal gun trafficking. Annual Meetings of Amer. Public Health Assoc., Philadelphia, Nov. 2009.

Vittes KA, **Webster DW.** Potential effects of expanding firearm prohibitions in the U.S.: analysis of data from a national survey of prisoners. Presented at the Annual Meetings of the American Public Health Association, Philadelphia, November 2009.

**Webster DW**, Vernick JS, Bulzacchelli MT. Effects of Policies to Promote Firearm Dealer and Owner Accountability on Firearm Trafficking. Presented at the Annual Meeting of the American Public Health Association, Washington, DC, November 2007.

**Webster DW.** Firearm violence roundtable: Data collection, data quality, and data access. Roundtable discussion led at the Annual Meeting of the American Public Health Association, Washington, DC, November 2007.

**Webster DW**, Vernick JS. Implementation of a Community Gun Violence Prevention Program: A Focus on Outreach Workers' Efforts. Presented at the Annual Meeting of the American Public Health Association, Washington, DC, November 2007.

**Webster DW**, Mahoney P, Campbell JC, Ghanbarpou S, Stockman J. Factors associated with seeking a long term protective order and staying away among women seeking temporary protective orders against a male partner. Presented at the Annual Meeting of the American Public Health Association, Washington, DC, November 2007.

**Webster DW**, Mahoney P, Campbell JC, Ghanbarpou S. Communicating empirically-based information about risks and protection strategies to survivors of intimate partner violence. Presented at the Annual Meeting of the American Public Health Association, Washington, DC, Nov. 2007.

**Webster DW**, Vernick JS, Bulzacchelli MT. Association Between Regulations and Oversight of Firearm Dealers and Gun Trafficking. Presented at the Annual Meeting of the American Society of Criminology, Atlanta, November 2007.

Campbell JC, O'Sullivan C, Roehl J, **Webster DW**, Mahoney P, White M, Eliacin J, Guertin K. What battered women know and do to protect themselves from abuse: results and methodological challenges from the domestic violence risk assessment validation experiment. Paper presented at the 9th International Family Violence Research Conference, Portsmouth, NH, July 2005.

**Webster DW**, Vernick JS, Manganello JA, Zeoli AM. Effects of youth-focused firearm laws on youth suicides. Paper presented at the annual meeting of the American Public Health Association, Washington, DC, November 2004.

Daniel Webster, Sc.D., M.P.H.                                        page 24

## PRESENTATIONS
### Presentations at Scientific Meetings (cont.)

Vernick JS, **Webster DW**, Pierce MW, Johnson SB, Frattaroli S. Judging the constitutionality of injury interventions using empirical data: The case of concealed weapons detectors. Paper presented at the annual meeting of the American Public Health Association, Washington, DC, November 2004.

Vernick JS, Lewin NL, Beilenson PL, Mair JS, Lindamood MM, Teret SP, **Webster DW**. Using local public health powers as a tool for gun violence prevention: The Baltimore Youth Ammunition Initiative. Paper to be presented at the annual meeting of the American Public Health Association, Washington, DC, November 2004.

**Webster DW**. Cracking down on corrupt gun dealers in Chicago: Effects on the illicit gun market. Paper presented at the annual meeting of the American Public Health Association, San Francisco, November 2003.

Campbell JC, **Webster DW**, Mahoney P, Rhoel J, O'Sullivan C. Domestic violence risk assessment and history of injury. Presented at the Annual Meeting of the American Public Health Association, San Francisco, November 2003.

Kim A, **Webster DW**. Effects of a one-gun-a-month purchase limit on illicit gun trafficking and availability. Presented at the Annual Meeting of the American Public Health Association, San Francisco, November 2003.

Campbell JC, **Webster DW**, Chouaf K, et al. "If I can't have you, no one can": Further exploration of estrangement increasing risk of intimate partner femicide. Presented at the Annual Meetings of the American Society of Criminology, Chicago, November 2002.

Kim A, **Webster DW**. The effects of the 1996 Maryland Gun Violence Prevention Act on Illicit Gun Markets. Presented at the Annual Meeting of Amer. Public Health Assoc., Philadelphia, Nov. 2002.

**Webster DW**, Vernick JS, Hepburn L. The association between licensing, registration, and other gun sales laws and the state-of-origin of crime guns. Presented at the National Association for Injury Control Research Centers meeting, Pittsburgh, May 2001.

**Webster DW**, Vernick JS, Hepburn L. The association between licensing, registration, and other complementary gun sales laws and the state-of-origin of crime guns. Presented at the annual meetings of the American Public Health Association, Boston, November 2000.

Campbell JC, **Webster DW**, et al. Risk factors for intimate partner femicide among women in physically abusive relationships. Presented at the annual meetings of the American Public Health Association, Boston, November 2000.

**Webster DW**, Vernick JS, Hepburn L. Can comprehensive gun control and enforcement keep guns from being used in crime? Presented at the annual meetings of the American Society of Criminology, Toronto, Ont., November 1999.

Daniel Webster, Sc.D., M.P.H.                                        page 25

## PRESENTATIONS
### *Presentations at Scientific Meetings (cont.)*
Roche K, **Webster DW**, Alexander C, Ensminger M. Neighborhood effects on the association between parenting and youth fighting. Presented at the American Sociological Association Annual Meetings, 1999.

**Webster DW**. Assessing sources of data on risk factors for intimate partner homicide: Proxy respondent surveys versus police records. Femicide Research Working Meeting, Chapel Hill NC, February 1999.

**Webster DW**, Campbell JC, Curry MA. Issues of using proxy informants in femicide research. Annual meetings of the American Society of Criminology, Washington DC, November 1998.

McFarlane J, **Webster DW**, Campbell JC, Block CR, Ulrich Y. Femicide with and without suicide by an intimate partner: A comparative analysis. Annual meetings of the American Society of Criminology, Washington DC, November 1998.

**Webster DW**, Vernick JS, Huang K. The effects of Maryland's law banning Saturday Night Specials on homicides. American Public Health Assoc. Annual Meeting, Washington DC, Nov. 1998.

Vernick JS, **Webster DW**, Huang K. Maryland's 1988 law banning Saturday Night Special handguns: Effects on intermediate outcomes. American Public Health Association Annual Meeting, Washington DC, November 1998.

**Webster DW**. Investigating a sudden increase in the lethality of shootings in Baltimore: A case study. American Public Health Association Annual Meeting, Indianapolis IN, November 1997.

Howard KA, **Webster DW**. Predictors of involvement in handgun control policy advocacy efforts. American Public Health Association Annual Meeting, Indianapolis IN, November 1997.

Freed LH, Wilson MHS, Longwell JJ, Carrese J, **Webster DW**. Deterrent to gun carrying among incarcerated adolescent males. To be presented at the Annual Meeting of the Robert Wood Johnson Clinical Scholars Meeting, November 1998.

**Webster DW**, Kaljee L, Vernick JS, Cameron DD. Attitudes about new law enforcement technologies and strategies for detecting concealed weapons in a high-crime urban community. Presented at the National Institute of Justice Annual Research and Evaluation Meetings, Washington DC, July 1998.

**Webster DW**, Campbell JC. Issues in using case-control methods in homicide research. Annual Meetings of the American Society of Criminology, San Diego CA, November 1997.

**Webster DW**. Methodological challenges to evaluating the Brady Law. Annual Meetings of the Homicide Research Working Group, Shepherdstown, WV, June 9 1997.

Daniel Webster, Sc.D., M.P.H.                                                page 26

*Presentations at Scientific Meetings (cont.)*

**Webster DW.**  Modifying guns tor to reduce child and adolescent mortality: A Risk Analysis. American Public Health Association Annual Meeting, New York, November 1996.

Howard KA, **Webster DW.**  Beliefs about keeping firearms in the home.  Presented at the American Public Health Association Annual Meeting, New York, November 1996.

Flora J, Schooler C, Rogers T, **Webster D.**  Support for violence prevention policies: Comparison of high-risk neighborhood residents and middle-class voters.  To be presented at the American Public Health Association Annual Meeting, New York, November 1996.

**Webster DW.**  School-based efforts to reduce adolescent violence.  Presented at Children Harmed and Harmful: Risks and Risk-Taking Among 10-15 Year-Olds, Working Conference.  Chicago, September 1994.

**Webster DW.**  Tackling the problem of gun carrying among youth:  Behavior change vs. environmental change.  Paper presented at the National Conference on Risk-Taking Behaviors Among Children and Adolescents.  Arlington, VA, June 1994.

**Webster DW.**  Individual vs. community perspective on the study and prevention of youth weapon carrying.  Public Health Service Annual Professional Meetings, Baltimore, MD, April 1994.

**Webster DW**, Wilson MEH.  The role of primary care pediatricians in preventing firearm injuries to children and youth.  Johnson & Johnson Pediatric Institute Conference on the Pediatrician's Role in Violence Prevention, Dulles, VA, March 1994.

**Webster DW**, Gainer PS, Champion, HR.  Determinants of weapon carrying within a sample of inner city junior high school students.  Paper to be presented at the American Public Health Association Annual Meetings, Washington, DC, November 1992.

**Webster DW.**  Short-term effects of a primary prevention program for youth violence.  American Psychiatric Association Annual Meetings, Washington, DC, May 1992.

**Webster DW**, Sykes L, Champion HR, Gainer PS.  The effects of Washington D.C.'s epidemic of gun violence on trauma center admissions and wound profiles.  American Public Health Association Annual Meetings, Atlanta, GA, November 1991.

Champion HR, Oschner MG, **Webster DW.**  A retrospective review of over 300 abdominal gunshot wounds at an urban Level I trauma center.  International Society of Surgery Conference, Stockholm, Sweden, August 1991.

Wilson MEH, **Webster DW**, Duggan AK, Pakula LC.  Firearm injury prevention counseling:  are pediatricians and parents ready?  American College of Physicians Annual Meetings, April 1991.

**Webster DW**, Wilson MEH, Duggan AK.  Parental beliefs and practices concerning firearm injury prevention. American Public Health Association Annual Meetings, New York, October 1990.

Daniel Webster, Sc.D., M.P.H.                                                                page 27

**Webster DW**, Wilson MH, Duggan AK. Determinants of pediatrician firearm injury prevention counseling practices. American Public Health Assoc. Annual Meetings, New York, October 1990.

**Webster DW**, Wilson MH, Duggan AK. Pediatrician attitudes and practices concerning firearm injury prevention counseling. Amer. Pediatric Soc./Soc. Pediatric Research Meetings, Chicago, 1990.

Waller AE, **Webster DW**, Baker SP. Homicide and suicide among children, United States, 1980-1985. American Public Health Association Annual Meeting, Chicago, October 1989.

Keyl PM, **Webster DW**, Smith GS, Baker SP. The effect of Maryland's seat belt law on fatality risks. SAE Conference on the Evaluation of Trends in Auto Safety, National Highway Traffic Safety Administration, Washington, DC, May 1989.

**Webster DW**, Baker SP. Geographical patterns of general aviation fatalities. American Public Health Association Meetings, Boston, November 1988.

*Invited Presentations / Seminars*
Evaluating Baltimore's Replication of Chicago's *CeaseFire* Program: Effects on Youth Attitudes and Gun Violence. Centers for Disease Control and Prevention, Atlanta, January 7, 2010.

Public Health Approaches to Gun Violence Prevention. Conference on Promoting Community Safety and Preventing Violence: Integrating Lessons from Research and Practice. Ohio State University, Columbus, OH, June 2009.

Keys to States Keeping Guns From Criminals and Reducing Gun Violence. Meeting of State Legislators Against Gun Violence, Gracie Mansion, New York, May 8, 2009.

Effects of Baltimore's Safe Streets Program: A Public Health Approach to Reducing Gun Violence. Trauma Seminar Series, Johns Hopkins Hospital, March 2009.

Effective Strategies for Combating Illegal Guns and Gun Violence. Roundtable on Gun Violence Prevention, International Association of Chiefs of Police, Chicago, IL, November 2008.

Research Supporting the Lethality Assessment Program. Maryland Judicial Conference, Linthicum Heights, MD, June 20, 2008.

Evidence-Based Strategies for Reducing Illegal Guns and Gun Violence. Seminar for the Baltimore Police Department Command Staff Training, Baltimore, May 22, 2008.

Preventing Gun Violence. Invited seminar for the Baltimore City Circuit Court Judges, April 2008.

How Cities Can Reduce Gun Violence. Mid-Atlantic Regional Meeting, Mayors Against Illegal Guns, March 2007.

Strategies to Reduce Illegal Gun Trafficking. Harvard Injury Control Research Center, January 2007.

Daniel Webster, Sc.D., M.P.H.                                          page 28

*Invited Seminars (cont.)*
Expert Panel, Midwest meeting of Mayors Against Illegal Guns, Chicago, October 2006.

Expert Panel for Mayors Against Illegal Guns Summit. New York, April 2006.

Promising Approaches for Violence Prevention. Association of Baltimore Area Grantmakers, Baltimore, March 2006.

Evidence of the Effectiveness of Gun Policies. Graduate Seminar in Injury Research and Policy, Johns Hopkins Bloomberg School of Public Health, February 2004.

Recent Research on Gun Violence Prevention. Seminar at the 2003 Child Advocacy Leadership Institute, Advocates for Children and Youth, Washington, DC, November 2003.

Gun Policy: Understanding the Research and Defending the Data. Seminar at 2002 Child Advocacy Leadership Institute, National Association of Child Advocates, Washington, DC, November 2002.

Preventing Gun Violence Among Youth. Seminar for the University of Maryland Journalism Fellowship in Child and Family Policy, Washington, DC, November 2002.

Opportunities for Preventing Gun Violence in the U.S. Robert W. Leraas Lecture, St. Olaf College, Northfield MN, October 2002.

The Impact of Gun Safe Storage Laws on Firearm Mortality Risks among Youth. National Academy of Sciences, Institute of Medicine Meeting on Youths and Gun Violence. Washington, DC, September 2002.

Recent Research on the Effectiveness of Gun Policies. Citizens' Conference to Stop Gun Violence. Arlington, VA, February 2002.

How Criminally-Involved Youth Obtain Their Guns. Citizens' Conference to Stop Gun Violence. Arlington, VA, February 2002.

The Role of Alcohol in Interpersonal Violence. Johns Hopkins University, Center for Injury Research and Policy Seminar, October 2001.

Risk Factors for Near Fatal Intimate Partner Assaults. Johns Hopkins University, Department of Mental Hygiene's Seminar Series on Violence Research, September 2001.

Effects of child access prevention gun laws on unintentional gun deaths to children. Presented at the annual meeting of the Handgun Epidemic Lowering Plan (HELP) Network, Atlanta, April 2001.

Methodological issues in evaluating the effects of gun policies. Seminar for the Center for Injury Research and Policy, Johns Hopkins School of Public Health, March 2001.

Daniel Webster, Sc.D., M.P.H.                                        page 29

*Invited Seminars (cont.)*
Public health models for reducing gun violence. Grand rounds presentation at George Washington
University School of Medicine, Washington, DC, April 2000.

Methodological challenges to studying risk factors for intimate partner homicide. Seminar for the
Center for Injury Research and Policy, Johns Hopkins School of Public Health, March 1999.

School-based interventions to reduce youth violence: Do our programs fit the problem? Annual
conference of Maryland State School Health Council, Ocean City MD, April 1998.

The role of health professionals in the prevention of youth violence. Continuing medical education
seminar at Bethesda Memorial Hospital, Boyton Beach, FL, February 1998.

Determinants of youth violence and scientific support for interventions. Best Practices in Adolescent
Health Conference, Annapolis MD, May 1996.

Media advocacy and public health: A case study of a campaign to increase support for handgun
restrictions. Johns Hopkins University School of Public Health Seminar, April 1995.

The evaluation of the policy program of the California Wellness Foundation's Violence Prevention
Initiative, MPH Seminar, November 1995.

The limitations of skill-focused conflict resolution curricula for reducing youth violence. Handgun
Epidemic Lowering Plan (HELP) Network Annual Meeting. Chicago, September 1994.

Promising public health approaches to violence prevention. Presentation to the Board of Directors,
Physicians for Social Responsibility, Bethesda, MD, March 1994.

The ability of gun laws to reduce deaths and injuries. Presentation to the Maryland State Office of
Strategic Drug Enforcement Coordination, Columbia, MD, January 1994.

The limitations of conflict resolution curricula for adolescents. National Symposium on Violence,
Safety, and Health in Urban Schools. Sponsored by the Council of Great City Schools, Washington,
DC, December 1993.

The role of public health in violence prevention. JHU Seminar sponsored by the Department of
Mental Hygiene and The Injury Prevention Center, December 1993.

Workshop on Educational Strategies to Prevent Firearm Injuries to Youth. Gun Violence in
Maryland: Science and Advocacy for Prevention -- symposium sponsored by The Johns Hopkins
Injury Prevention Center, Baltimore, MD, April 30, 1993.

Research on Strategies to Prevent Youth Violence. Creative Solutions to Problem of Urban Violence.
Symposium sponsored by the Baltimore Urban League and the YMCA. Baltimore, April 6, 1993.

Public Health Professionals' Role in Reducing Injuries from Violence. Preventive Medicine in

Daniel Webster, Sc.D., M.P.H.                                          page 30

*Invited Seminars (cont.)*
Minority Communities: First or Last Resort? Symposium sponsored by the Student National Medical Association of The Johns Hopkins School of Medicine. Baltimore, MD, April 3, 1993.

Health Professionals' Role in Limiting Children's Access to Firearms. Surgeon General's Invitational Workshop. Keeping Kids Safe: Strategies for Preventing Violence and Injury, Columbia, MD, November 19, 1992.

A Legislative Agenda for Violence Reduction. Consortium of Virginia Urban Municipalities, Williamsburg, VA, July 10, 1992.

Keynote Address: The epidemiology of violence and public health approaches to the problem. 13th Annual Institute of the Virginia Organization of Health Care Social Workers, Richmond, June 1992.


## ADDITIONAL INFORMATION

*Research Objectives*
To study the causes and prevention of interpersonal and self-inflicted violence and associated injuries; to study the effectiveness interventions intended to reduce severe forms of violence; to develop and assess instruments designed to assess the risk for future violence.

*Keywords*
violence, violence prevention, firearm injuries, gun policy, evaluation, domestic violence.

*Community Involvement*:
Coach, Bethesda-Chevy Chase Baseball Youth League 2001- 2010.

Served as Co-Chair of Social Justice Committee and as a member of the Board of Trustees at Temple Emanuel, Kensington, MD, 2004- 2007.

# EXHIBIT 2

## MATERIALS REVIEWED

In addition to the materials specifically referenced in the end notes to my report and my own articles referenced in my *curriculum vitae* attached as Exhibit 1, I reviewed and considered the following in forming my opinion:

1. Chicago City Ordinance, Ch. 4-144

2. Chicago City Ordinance, Ch. 8-20

3. Second Amended Complaint in *Illinois Association of Firearms Retailers, et al. v. City of Chicago*, No. 10-CV-4184 (N.D. Ill. Jan. 12, 2011)

4. Deposition of Kevin Johnson in *Illinois Association of Firearms Retailers, et al. v. City of Chicago*, No. 10-CV-4184 (N.D. Ill. Apr. 19, 2011)

5. Deposition of Eugene Williams in *Illinois Association of Firearms Retailers, et al. v. City of Chicago*, No. 10-CV-4184 (N.D. Ill. Apr. 29, 2011)

6. Deposition of Judith Martin in *Illinois Association of Firearms Retailers, et al. v. City of Chicago*, No. 10-CV-4184 (N.D. Ill. May 11, 2011)

7. Deposition of Marc Levison in *Illinois Association of Firearms Retailers, et al. v. City of Chicago*, No. 10-CV-4184 (N.D. Ill. May 23, 2011)

8. Deposition of Dana Alexander in *Illinois Association of Firearms Retailers, et al. v. City of Chicago*, No. 10-CV-4184 (N.D. Ill. May 26, 2011)

9. Plaintiffs' Response to City's Document Request No. 16 in *Illinois Association of Firearms Retailers, et al. v. City of Chicago*, No. 10-CV-4184 (N.D. Ill. Mar. 10 & Apr. 29, 2011)

10. Children's Memorial Research Center. Illinois Violent Death Reporting System 1(1) (Aug. 2007)

11. CPD Crime Data produced in *Illinois Association of Firearms Retailers, et al. v. City of Chicago*, No. 10-CV-4184 (N.D. Ill.) as CITY1376–470 (Reported Incidents by Offense Type, Location, Description, and Year)

12. CPD Crime Data produced in *Illinois Association of Firearms Retailers, et al. v. City of Chicago*, No. 10-CV-4184 (N.D. Ill.) as CITY1471 (# of Reported Crime Incidents Where Offense Was Home Invasion + A Firearm-Related Offense)

13. CPD Crime Data produced in *Illinois Association of Firearms Retailers, et al. v. City of Chicago*, No. 10-CV-4184 (N.D. Ill.) as CITY1472 (# of Firearms Turned in by Citizens at Annual "Gun Turn-In" Events in City of Chicago)

14.   CPD Data produced in *Illinois Association of Firearms Retailers, et al. v. City of Chicago*, No. 10-CV-4184 (N.D. Ill.) as CITY1473 (Civilian Registered Firearms)

15.   CPD Crime Data produced in *Illinois Association of Firearms Retailers, et al. v. City of Chicago*, No. 10-CV-4184 (N.D. Ill.) as CITY1474–502 (# of Crime Victims by Offense Type and Age)

16.   CPD Crime Data produced in *Illinois Association of Firearms Retailers, et al. v. City of Chicago*, No. 10-CV-4184 (N.D. Ill.) as CITY1503–12 (# of Crime Victims by Offense Type and Gender)

17.   Chicago Police Department. Crime Summary Index Report, Jan.–June 2011. Available online at https://portal.chicagopolice.org/portal/page/portal/ClearPath/News/Statistical%20Reports/Index%20Crime%20Statistics/2011%20Index%20Crime%20Statistics/mcsJune11.pdf

18.   National Opinion Research Center. General Social Survey. Available online at http://www.norc.org/GSS+Website/

19.   Smith, TW. Public Attitudes Towards the Regulation of Firearms.(Mar. 2007)