# Exhibit 66

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | | |
|---|---|---|
| ILLINOIS ASSOCIATION OF FIREARMS RETAILERS, KENNETH PACHOLSKI, KATHRYN TYLER, and MICHAEL HALL, | ) ) ) ) | Civil Action No. 10-cv-04184 |
| Plaintiffs, | ) ) | Judge Edmond E. Chang |
| v. | ) ) | Magistrate Judge Geraldine Soat Brown |
| THE CITY OF CHICAGO and RICHARD M. DALEY, Mayor of the City of Chicago, | ) ) ) ) | |
| Defendants. | ) | |

**PLAINTIFFS' OBJECTIONS AND RESPONSES TO DEFENDANTS' THIRD SET OF
REQUESTS FOR PRODUCTION AND THIRD SET OF INTERROGATORIES**

 Plaintiffs Kenneth Pacholski, Kathryn Tyler, Michael Hall, and the Illinois Association of

Firearms Retailers ("ILAFR"), by and through their attorneys, hereby submit their objections and

responses to Defendants' Third Set of Requests for Production and Third Set of Interrogatories.

**GENERAL OBJECTIONS**

 1. Plaintiffs object to each definition, instruction, document request, and

interrogatory to the extent that it attempts to impose discovery obligations greater than those

required under the Federal Rules of Civil Procedure, the Local Rules of the United States District

Court for the Northern District of Illinois, and/or the orders of the Court in this case.

 2. Plaintiffs object to each definition, instruction, document request, and

interrogatory to the extent that it requests information not relevant to this litigation or not

reasonably calculated to lead to the discovery of admissible evidence.

 3. Plaintiffs object to each definition, instruction, document request, and

interrogatory to the extent that it calls for the disclosure of any information or document that (a) contains privileged attorney-client communications, (b) constitutes attorney work product, (c) is otherwise protected from disclosure under applicable privileges, immunities, laws, or rules.

4.      Plaintiffs' counsel and Defendants' counsel have reached a reciprocal agreement whereby communications between litigation counsel and clients specifically about the *ILAFR, Ezell,* and *Second Amendment Arms* litigations is not considered responsive to discovery requests and does not have to be logged on a privilege log.  These Objections and Responses are tendered in reliance on that agreement.

5.      Plaintiffs object to each definition, instruction, document request, and interrogatory to the extent that it requests information outside the Plaintiffs' possession, custody, or control.

6.      Plaintiffs object to each definition, instruction, document request, and interrogatory as unduly burdensome and beyond the scope of obligations imposed by the Federal Rules of Civil Procedure to the extent it seeks documents and information that are publicly available and/or otherwise in the custody and control of third parties.  To the extent Defendants' discovery requests place an obligation on Plaintiffs to produce documents and information from individuals and/or entities who are not uniquely within Plaintiffs' custody and control, the Requests are objectionable.  *See* Fed. R. Civ. P. 26(b)(2)(C)(i).

7.      Plaintiffs object to each definition, instruction, document request, and interrogatory to the extent that it seeks legal bases, legal conclusions, or opinions.

8.      Plaintiffs object to each definition, instruction, document request, and interrogatory to the extent it prematurely calls for production or identification of documents and information that need not be made available under the Court's orders and/or are otherwise

unavailable to Plaintiffs in final form at this time. Accordingly, although Plaintiffs are

responding to these discovery requests to the best of their present ability subject to the objections

noted herein, the information contained herein is necessarily and expressly subject to change and

to supplementation as circumstances associated with and surrounding this litigation continue to

develop and unfold. Plaintiffs reserve the right to seasonably supplement their responses to

Defendants' discovery requests and to proffer other information that Plaintiffs may use to

prosecute the claims in this lawsuit and/or demonstrate the unconstitutionality of the challenged

ordinance provisions.

9.      Plaintiffs object to these discovery requests to the extent they are unreasonably

and unjustifiably intrusive and to the extent responses would create unjustified and unnecessary

safety risks to Plaintiffs and their families.

10.     Plaintiffs object to each definition, instruction, document request, and

interrogatory to the extent it calls for the production or identification of sensitive confidential

information such as Social Security numbers and personal financial information. Such

information will be redacted from documents containing otherwise responsive nonprivileged

material.

11.     When Plaintiffs state they will produce responsive documents or provide

information, they so state only to the extent responsive documents or information exist and are in

their possession, custody, or control.

12.     Each individual Plaintiff objects, responds to, and answers these discovery

requests only for himself, herself, or itself, and does not make any representations as to any

objections, responses, or answers proffered by any other Plaintiff.

13.     Plaintiffs reserve all objections to the admissibility of any information into

evidence in this litigation (including information contained in the responses to these discovery requests), including, without limitation, objections as to relevance and materiality.

Subject to and without waiving any of the foregoing General Objections, which are hereby incorporated into each response given below, Plaintiffs are answering these discovery requests in substance to the extent practicable and reasonable under the present circumstances, as stated below.

## SPECIFIC OBJECTIONS AND RESPONSES
## TO DEFENDANTS' THIRD SET OF DOCUMENT REQUESTS

**REQUEST NO. 1:** All documents relating to any ILAFR member's desire, intention, anticipation, and/or plan to sell firearms and/or operate shooting ranges inside Chicago, including but not limited to all documents reflecting or describing: (a) business plans, sales or profit projections or forecasts, and market or customer analyses or studies, whether contemplated, anticipated, projected, actual; (b) the cost or other investment or outlay entailed in opening the business, whether contemplated, anticipated, projected, or actual; (c) the location, size, type, and nature of the business; (d) the inventory, goods, and/or services to be offered at the business, including the prices at which they will be offered to the public; (e) purchase contracts, leases, architectural renderings, or other documents relating to the acquisition and/or use of land in Chicago on which the business would be operated; (f) communications with attorneys, real estate agents, accountants, bankers, construction contractors, vendors, suppliers, governmental licensing or permitting authorities, or any other person or entity regarding the business.

**RESPONSE TO REQUEST NO. 1:** Plaintiffs reiterate their General Objections as if specifically set forth below in response to this Request. Plaintiffs object to this Request to the extent it seeks documents or information subject to the attorney-client privilege, work-product protection, or any other applicable privilege. Plaintiffs object to this Request as vague, ambiguous, and overly burdensome, and as calling for documents and information irrelevant to this lawsuit, including to the extent it seeks all documents relating to the "desire, intention, anticipation, and/or plan to sell firearms and/or operate shooting ranges inside Chicago" of any and all ILAFR members. Plaintiffs further object to this Request to the extent it seeks documents and information in the possession, custody, or control of third parties.

4

Plaintiff ILAFR further objects to this Request to the extent that it seeks production of confidential membership information. Such information is privileged from compelled production by the government under the First and Fourteenth Amendments to the United States Constitution. Plaintiff ILAFR further objects to this Request to the extent it seeks confidential trade secrets.

Subject to and without waiving its objections, Plaintiff ILAFR states that it is not in possession, custody, or control of any nonprivileged documents responsive to this request.

Subject to and without waiving the objections, the individual Plaintiffs state that they are not in possession, custody, or control of any nonprivileged documents responsive to this request.

**REQUEST NO. 2:** All documents relating to or depicting every trigger lock, barrel lock, or other mechanism (other than a firearm safety mechanism) designed to render a firearm temporarily inoperable that is used, is usable, or has been used on a firearm owned or possessed by any individual Plaintiff.

**RESPONSE TO REQUEST NO. 2:** Plaintiffs reiterate their General Objections as if specifically set forth below in response to this Request. Plaintiffs object to this Request to the extent it seeks documents or information subject to the attorney-client privilege, work-product protection, or any other applicable privilege.

Plaintiffs object to this Request, to the extent it calls for all documents relating to every "trigger lock, barrel lock, or other mechanism ... designed to render a firearm temporarily inoperable that is used, is usable, or has been used on a firearm" they have owned or possessed, as vague, ambiguous, overly burdensome, and calling for documents and information irrelevant to this lawsuit. Plaintiffs further object to this Request as calling for documents that are publicly available or in the possession, custody, and/or control of third parties and are thus as readily or more easily accessed by Defendants than by Plaintiffs, including, for example, to the extent the Request calls for all documents related to mechanisms that are "usable" on firearms the

5

individual Plaintiffs have registered with the City.

Subject to and without waiving the above-noted objections, the individual Plaintiffs will produce any non-privileged documents that are available after a reasonable search for documents directly relating to trigger locks, barrel locks, or other mechanisms (other than a firearm safety mechanism) designed to render a firearm temporarily inoperable that they use or have used on a firearm they own or possess.

Subject to and without waiving the above-noted objections, Plaintiff ILAFR states that it is not in possession, custody, or control of any nonprivileged documents responsive to this request.

## SPECIFIC OBJECTIONS AND RESPONSES
## TO DEFENDANTS' THIRD SET OF INTERROGATORIES

**INTERROGATORY NO. 1:** For each of the past 20 years, and as to each ILAFR member that desires, intends, anticipates, and/or plans to sell firearms and/or operate shooting ranges inside Chicago, identify that member and identify and describe all facts relating to that desire, intention, anticipation, and/or plan, including but not limited to: (a) business plans, sales or profit projections or forecasts, and market or customer analyses or studies, whether contemplated, anticipated, projected, actual; (b) the cost or other investment or outlay entailed in opening the business, whether contemplated, anticipated, projected, or actual; (c) the location, size, type, and nature of the business; (d) the inventory, goods, and/or services to be offered at the business, including the prices at which they will be offered to the public; (e) purchase contracts, leases, architectural renderings, or other documents relating to the acquisition and/or use of land in Chicago on which the business would be operated; (f) communications with attorneys, real estate agents, accountants, bankers, construction contractors, vendors, suppliers, governmental licensing or permitting authorities, or any other person or entity regarding the business.

**RESPONSE TO INTERROGATORY NO. 1**: Plaintiffs reiterate their General Objections as if specifically set forth below in response to this Interrogatory. Plaintiffs object to this Interrogatory as vague, ambiguous, and overly burdensome, and as calling for documents and information irrelevant to this lawsuit, including to the extent it seeks all documents relating to the "desire, intention, anticipation, and/or plan to sell firearms and/or operate shooting ranges inside Chicago" of any and all ILAFR members for "each of the past 20 years." Plaintiffs object to this Interrogatory to the extent it seeks documents and information in the possession, custody, or control of third parties.

Plaintiff ILAFR further objects to this Interrogatory to the extent that it seeks production of confidential membership information. Such information is privileged from compelled production by the government under the First and Fourteenth Amendments to the United States Constitution. Plaintiff ILAFR further objects to this Interrogatory to the extent it seeks confidential trade secrets.

Subject to and without waiving these objections, Plaintiffs state that ILAFR member William Campion intends to sell firearms, ammunition and accessories at sporting goods shows

7

and/or gun shows in Chicago if the ordinance at issue in this lawsuit is found unconstitutional.

He would arrange for the delivery of firearms through local federally licensed firearms dealers

after all the buyer's required qualifications are confirmed. The firearms he would sell would be

strictly limited to those covered by his Class I Federal Firearms License. Generally, these are

shotguns, rifles and handguns. Prices would be determined based on market conditions at the

time of the sale.

**INTERROGATORY NO. 2**: Identify and describe, including by make, model, and manufacturer, every trigger lock, barrel lock, or other mechanism (other than a firearm safety mechanism) designed to render a firearm temporarily inoperable that is used, is usable, or has been used on a firearm owned or possessed by any individual Plaintiff.

**RESPONSE TO INTERROGATORY NO. 2**: Plaintiffs reiterate their General Objections as if

specifically set forth below in response to this Interrogatory. Plaintiffs object to this

Interrogatory, to the extent it calls for information relating to every "trigger lock, barrel lock, or

other mechanism … designed to render a firearm temporarily inoperable that is used, is usable,

or has been used on a firearm" they have owned or possessed, as vague, ambiguous, overly

burdensome, and calling for information irrelevant to this lawsuit. Plaintiffs further object to this

Interrogatory as calling for information that is publicly available or in the possession, custody,

and/or control of third parties and is thus as readily or more easily accessed by Defendants than

by Plaintiffs, including, for example, to the extent the Interrogatory calls for information related

to mechanisms that are "usable" on firearms the individual Plaintiffs have registered with the

City.

At present, and subject to and without waiving these objections, Plaintiffs' rights to

supplement their response to this Interrogatory, or to proffer other information, Plaintiffs state as

follows:

Plaintiff Tyler states that she has not used a trigger lock, barrel lock, or other mechanism

8

(other than a firearm safety mechanism) designed to render a firearm temporarily inoperable.

Plaintiff Pacholski states that he has used Franzen keyed trigger locks. Plaintiff Pacholski incorporates by reference the descriptions of Franzen keyed trigger locks contained in documents produced in response to Document Request No. 2. Plaintiff Pacholski states that he has also used a plastic coated steel cable that runs through the triggers of several guns kept in a display case. The steel cable is locked to handles that are mounted into the side of the cabinet with 2 keyed Master locks.

Plaintiff Hall states that he has used a padlock with an approximately 12-inch flexible steel cable that is looped from the opening end of the lock, through the open slide of a firearm, and then returned to the padlock. This locking device came with the Stoeger pistol he has registered with the City. He has also used an armadillo padlock, made by Ruger, which runs through the chamber of a firearm. It has an approximately 4-inch solid steel loop that runs from the opening part of the loop, through the chamber, and back into the keyed padlock. It can only be used with the firearm's barrel removed. He has also used a Master Lock 94 resettable combination gun lock and a Regal Model RTL06 trigger lock. Plaintiff Hall incorporates by reference the descriptions of these two locking mechanisms contained in documents produced in response to Document Request No. 2.

Dated: March 9, 2011

Stephen Kolodziej
Atty. ID# 6216375
BRENNER FORD MONROE & SCOTT LTD.
33 N. Dearborn St., Suite 300
Chicago, IL 60602
Tel: (312) 781-1970
Fax: (312)781-9202
Email: skolodziej@brennerlawfirm.com

Respectfully submitted

Charles J. Cooper
David H. Thompson
Peter A. Patterson
COOPER & KIRK, PLLC
1523 New Hampshire Ave., NW
Washington, D.C. 20036
Tel: (202) 220-9600

9

Fax: (202) 220-9601
Email: ccooper@cooperkirk.com

*Counsel for Plaintiffs*

## VERIFICATION

**STATE OF ILLINOIS**

**CITY OF CHICAGO**

Michael Hall states that the information pertaining to him contained in the foregoing responses has been collected and the responses prepared with the advice and assistance of counsel, and that, subject to any inadvertent or undiscovered errors, and based on the records and information still in existence and thus discovered, the responses are true to the best of his knowledge, recollection, and belief based upon the information known or made available to him.

DATED: March 9, 2011

Michael Hall

## VERIFICATION

**STATE OF ILLINOIS**

**CITY OF CHICAGO**


Kenneth Pacholski states that the information pertaining to him contained in the foregoing responses has been collected and the responses prepared with the advice and assistance of counsel, and that, subject to any inadvertent or undiscovered errors, and based on the records and information still in existence and thus discovered, the responses are true to the best of his knowledge, recollection, and belief based upon the information known or made available to him.


DATED:  March 9, 2011


Kenneth Pacholski

## VERIFICATION

**STATE OF ILLINOIS**

**CITY OF CHICAGO**

Kathryn Tyler states that the information pertaining to her contained in the foregoing responses has been collected and the responses prepared with the advice and assistance of counsel, and that, subject to any inadvertent or undiscovered errors, and based on the records and information still in existence and thus discovered, the responses are true to the best of her knowledge, recollection, and belief based upon the information known or made available to her.

DATED: March 9, 2011

*Kathryn J Tyler*

Kathryn Tyler

## VERIFICATION

**STATE OF ILLINOIS**

**CITY OF CARBONDALE**

Whitney O'Daniel, on behalf of the Illinois Association of Firearms Retailers, states that the information pertaining to the Illinois Association of Firearms Retailers contained in the foregoing responses has been collected and the responses prepared with the advice and assistance of counsel, and that, subject to any inadvertent or undiscovered errors, and based on the records and information still in existence and thus discovered, the responses are true to the best of his knowledge, recollection, and belief based upon the information known or made available to him.

DATED:  March 9, 2011

_____

Whitney O'Daniel

On behalf of the Illinois Association
of Firearms Retailers

## CERTIFICATE OF SERVICE

I, Aaron Cummings, hereby certify that on this 9th day of March, 2011, I caused a

copy of the foregoing to be served by first-class United States mail on:

Michael A. Forti
Andrew W. Worseck
Rebecca Alfert Hirsch
William Macy Aguiar
City of Chicago, Department of Law
Constitutional and Commercial Litigation Division
30 N. LaSalle St., Suite 1230
Chicago, IL 60602

Aaron Cummings

# Exhibit 67

# Evaluating
# Gun Policy

EXHIBIT 20
Witness Kleck
Date 10.28.11
Reporter: Danielle Freeze



BROOKINGS METRO SERIES



**BROOKINGS**
**METRO**
**SERIES**

The Center on Urban and Metropolitan Policy at the Brookings Institution is integrating research and practical experience into a policy agenda for cities and metropolitan areas. By bringing fresh analyses and policy ideas to the public debate, the center hopes to inform key decisionmakers and civic leaders in ways that will spur meaningful change in our nation's communities.

As part of this effort, the Center on Urban and Metropolitan Policy has established the Brookings Metro Series to introduce new perspectives and policy thinking on current issues and attempt to lay the foundation for longer-term policy reforms. The series will examine traditional urban issues, such as neighborhood assets and central city competitiveness, as well as larger metropolitan concerns, such as regional growth, development, and employment patterns. The Metro Series will consist of concise studies and collections of essays designed to appeal to a broad audience. While these studies are formally reviewed, some will not be verified like other research publications. As with all publications, the judgments, conclusions, and recommendations presented in the studies are solely those of the authors and should not be attributed to the trustees, officers, or other staff members of the Institution.

The Brookings Metro Series

*Edgeless Cities: Exploring the Elusive Metropolis*
Robert E. Lang

*Growth and Convergence in Metropolitan America*
Janet Rothenberg Pack

*Laws of the Landscape: How Policies Shape Cities in Europe and America*
Pietro S. Nivola

*Low-Income Homeownership: Examining the Unexamined Goal*
Nicolas P. Retsinas and Eric S. Belsky, editors

*Redefining Urban and Suburban America: Evidence from Census 2000*
Bruce Katz and Robert E. Lang, editors

*Reflections on Regionalism*
Bruce J. Katz, editor

*Savings for the Poor: The Hidden Benefits of Electronic Banking*
Michael A. Stegman

# Evaluating Gun Policy

## *Effects on Crime and Violence*

Jens Ludwig
Philip J. Cook
*editors*

BROOKINGS INSTITUTION PRESS
*Washington, D.C.*

*Copyright © 2003*
THE BROOKINGS INSTITUTION
1775 Massachusetts Avenue, N.W.
Washington, D.C. 20036
*www.brookings.edu*

All rights reserved

*Library of Congress Cataloging-in-Publication data*

Evaluating gun policy: effects on crime and violence / Jens Ludwig and
Philip J. Cook, editors.
    p.    cm.
Includes bibliographical references and index.
  ISBN 0-8157-5312-8 (cloth : alk. paper)—
  ISBN 0-8157-5311-X (pbk. : alk. paper)
  1. Gun control—United States. 2. Violent crimes—United States.
I. Ludwig, Jens. II. Cook, Philip J., 1946–

HV7436 .E9 2003
364.15'0973—dc21
                                                  2002014696

9 8 7 6 5 4 3 2 1

The paper used in this publication meets minimum requirements of the
American National Standard for Information Sciences—Permanence of Paper
for Printed Library Materials: ANSI Z39.48-1992.

Typeset in Adobe Garamond

Composition by Circle Graphics
Columbia, Md.

Printed by R. R. Donnelley
Harrisonburg, Virginia

PHILIP J. COOK
JENS LUDWIG

# 3 | *Guns and Burglary*

Compared with other wealthy nations, the United States has a high rate of civilian firearms ownership, with 35–40 percent of all households possessing at least one gun.[1] The net effect of widespread gun ownership on the amount and costs of crime remains a contentious issue because guns have virtuous as well as vicious uses: the ready availability of guns may increase gun use by criminal assailants and thereby increase the lethality of assaults and robberies.[2] The widespread ownership of guns, however, may in-

This paper was supported in part by a grant from the Joyce Foundation. Thanks to Marjorie Cohen, Brian Deer, Zac Hudson, Sinead Keegan, Josh Pinkston, Justin Treloar, Eric Younger, and especially Bob Malme for excellent research assistance, to the Prince George's County Police Department, Stacy Dickert-Conlin, Mark Duggan, Pat Mayhew (and others at the British Crime Survey), Robert Moffitt and Steve Raphael for data, and to Ed Glaeser, David Kopel, Arik Levinson, Bruce Sacerdote and seminar participants at the National Bureau of Economic Research, University of Maryland, William and Mary, and the Brookings Conference on Gun Violence for helpful comments. The research in this paper was conducted while the authors were Census Bureau research associates at the Triangle Census Research Data Center. Research results and conclusions are those of the authors and do not necessarily indicate concurrence by the Bureau of the Census. This paper has been screened to ensure that no confidential data are revealed. We thank Alison Hagy and Michelle Danis for their guidance at the Center.

1. Smith (2000).
2. See Zimring (1968, 1972); Cook (1987, 1991); Zimring and Hawkins (1997); and Duggan (2001). Besides its effects on crime, gun ownership may impose other costs on society. It may increase the suicide rate (Miller and Hemenway [1999]; Ludwig and Cook [2000]; Cutler, Glaeser and Norberg [2001]; Wintemute and others [1999]; Mark Duggan, chapter 2 in this volume) and the rate of unintentional shootings (Miller, Azrael, and Hemenway [2001]). The relative frequency of different circumstances for shootings in residences has been documented in Kellermann and Reay (1986) and Lee and others (1991).

Copyright 2003, The Brookings Institution

Case: 1:10-cv-04184 Document #: 169-7 Filed: 03/12/12 Page 23 of 69 PageID #:4729

crease the likelihood that victims will be able to defend themselves against attack and even inflict injury on would-be assailants, which would tend to deter assaults and reduce the likelihood of victim losses in the event of assault.[3]

The balance between virtuous and vicious uses has traditionally favored keeping a gun at home over carrying one in public, with the latter subject to more stringent regulation. Guns in the home do not threaten the public at large in any direct way and may enhance the capacity for defending against intruders. Furthermore, armed households arguably provide a deterrent to residential burglary, particularly to "hot" burglaries of occupied dwellings; if burglars lack "inside" knowledge about which households are armed, this crime-control benefit is not limited to those homes that actually have guns ready at hand but extends to the entire community.[4] Thus there may be a positive externality to keeping a gun at home for self-defense.

Although the existence of a burglary-deterrent effect is asserted frequently and with great confidence by advocates, the empirical support for this assertion is weak.[5] The available evidence consists of anecdotes, interviews with burglars, casual comparisons with other countries, and the like. A more systematic exploration requires data on local rates of gun ownership and of residential burglary, and such data have only recently become available. In this chapter we exploit a new well-validated proxy for local gun-ownership prevalence—the proportion of suicides that involve firearms—together with newly available geo-coded data from the National Crime Victimization Survey, to produce the first systematic estimates of the net effects of gun prevalence on residential burglary patterns.

The importance of such empirical work stems in part from the fact that theoretical considerations do not provide much guidance in predicting the net effects of widespread gun ownership. Guns in the home may pose a threat to burglars but may also serve as an inducement, since guns are particularly valuable loot.[6] Other things equal, a gun-rich community provides more lucrative burglary opportunities than one in which guns are more sparse.[7] The net result

3. Kleck (1997); Lott (2000).

4. Kopel (2001).

5. For some recent assertions on the deterrent effect in the popular press, see, for example, Thomas Armstrong, "Will More Gun Control Just Do More Harm?" *San Diego Union-Tribune,* March 23, 2000, p. B13; Gordon Witkin, "Should You Own a Gun?" *USNews,* August 15, 1994, p. 24; Dan Rowe, "Expert Links Gun Control to High Rate of Break-Ins," *National Post* (Canada). December 19, 2001. Tucker (1996); Steyn (2000);

6. Cook, Molliconi, and Cole (1995).

7. Guns may also be useful inputs into the burglary production process and may be less costly for criminals to obtain in areas with high levels of gun ownership.

Copyright 2003, The Brookings Institution

for burglary rates and "hot" burglary rates depends in part on the extent to which burglars can discriminate between occupied and unoccupied homes, and on how they assess the relevant risk-reward trade-off.

The new empirical results reported here provide no support for a net deterrent effect from widespread gun ownership. Indeed, our analysis concludes that residential burglary rates tend to increase with community gun prevalence, while the "hot" proportion of these burglaries is unaffected. The challenge to establishing a causal interpretation to these results comes from the possibility that gun ownership may be both cause and effect of local burglary patterns or that both variables may be driven by some unmeasured third factor. Although there is no entirely persuasive way to rule out such competing explanations, our findings are robust to a variety of empirical approaches.

Our main results come from cross-section regression analysis of National Crime Victimization Survey (NCVS) data augmented by a proxy measure of county-level gun prevalence. In this analysis we control for a long list of household- and county-level attributes. In one specification we also allow each state to have its own intercept, which controls for unmeasured state-level variables by focusing on within-state, across-county variation in gun ownership and burglary rates.

To deal with the potential problem of reverse causation, we replicate our analyses using a twenty-two-year panel of police-reported crime data obtained from the FBI's *Uniform Crime Reports* (UCR) finding that lagged gun-ownership rates are positively related to future burglary rates. However, lagged burglary rates appear to have a negligible effect on future gun prevalence, at least in the short run. Unfortunately the UCR data do not distinguish between burglaries to occupied versus unoccupied homes and thus cannot support a separate analysis of hot burglaries.

The issue of reverse causation is also addressed by use of "instrumental variables" (IV) estimates. The specific instrument employed in these estimates is the percentage of the state population living in rural areas in 1950, an indicator of rural tradition in the state to which gun ownership is closely tied. The resulting estimates are compatible with the ordinary-least-squares estimates in suggesting a nonnegative relationship between gun density and burglary rates.

## Review of the Existing Evidence

The evidence typically cited in discussions of how gun prevalence affects residential burglary rates is of five types. First, data on the frequency of gun use by householders against intruders are cited to support the plausibility of the deter-

Copyright 2003, The Brookings Institution

rence hypothesis. Second, interviews with burglars or former burglars provide more direct evidence on the deterrent effect and also on the inducement to burglary of guns in the home. Third, international comparisons are offered, usually comparing the percentage of residential burglaries that are "hot" in the United States with one or more other countries that have lower gun prevalence. Fourth, anecdotes (sometimes supported with data) are recounted about how burglary rates were affected by interventions intended to change household gun prevalence. Finally, there have been two systematic studies, including regression analyses of panel data, on the effect of gun prevalence on overall (residential plus nonresidential) burglary rates.[8]

## Frequency of Gun Use in Self-Defense

The frequency with which guns are used in defense against burglary has been estimated from survey data from time to time. Unfortunately, the estimates differ by an order of magnitude, depending on how the survey is conducted and what questions are asked.

At the high end is a 1994 random-digit-dial telephone survey that generated an estimate of 503,000 instances in the preceding twelve months in which some member of the household retrieved a gun to fend off an intruder who was actually seen.[9] The survey was conducted by a private firm, DataStat, on behalf of the federal government. It completed 5,238 interviews, of which twenty-two respondents reported one or more uses of a gun in the event of an intruder; five of these accounted for nearly half of all the reported instances. Almost all of these reports (98.9 percent) indicated that the intruder had been scared off.

At the low end are estimates based on the National Crime Victimization Survey (NCVS), which is conducted every six months by the Census Bureau. The NCVS includes respondents from a sample of about 50,000 households, the members of which are usually interviewed in person; the design of this survey represents best practice in the area. Based on a special tabulation of NCVS data by the Bureau of Justice Statistics, Philip Cook estimated that there were an annual average of just 32,000 instances a year for the period 1979–87 in which a householder used a gun against someone who broke into the home or attempted to do so.[10]

8. Lott (2000); Duggan (2001).
9. Ikeda and others (1997).
10. Cook (1991, p. 56).

Copyright 2003, The Brookings Institution

Is the "right" answer 32,000 or 503,000? There is no obvious way to reconcile these two estimates. The same puzzle has arisen in survey-based estimates of self-defense uses of guns in other circumstances, which also differ by an order of magnitude, and that discussion will not be reviewed here.[11] Suffice it to say that survey-based estimates for rare and normatively charged events such as gun self-defense are highly sensitive to survey method, and that we are inclined to place somewhat more faith in the NCVS results for reasons explained in our earlier work.[12]

Cook estimated that there were about 1.0 million burglaries each year of occupied residences during the period 1979–87.[13] The NCVS estimate then implies that in one in every thirty such burglaries was a gun used in self-defense. The DataStat estimate suggests that fully half of such burglaries resulted in self-defense with a gun. The credibility of the "deterrence" claim depends in part on which of these two estimates is closer to the truth.[14]

## Interviews with Burglars

Evidence directly relevant for judging the "deterrence" and "inducement" hypotheses comes from surveys of felons. For example, in one 1982 convenience sample of 1,823 state prisoners, 35 percent of respondents "strongly agreed" and 39 percent "agreed" that "one reason burglars avoid houses when people are at home is that they fear being shot." Of the respondents who used a gun to commit the crime for which they were incarcerated, 50 percent reported that the possibility of encountering an armed victim was "very important" in their decision to employ a gun, while another 12 percent reported that this motivation was "somewhat important."[15]

At the same time guns are of considerable value to burglars, who typically prefer items that are easy to carry, easily concealed, and have high "pound for pound value."[16] As one St. Louis burglar reported, "A gun is money with a trigger."[17] Another respondent in the same study expressed a preference for working in neighborhoods with high proportions of white residents since households

---

11. Kleck and Gertz (1995); Smith (1997).
12. Cook, Ludwig, and Hemenway (1997).
13. Cook (1991).
14. A study of home-invasion burglaries (unwanted entry of a single-family home while one or more individuals were present in the home) in Atlanta based on 198 police reports during summer 1994 found that just 1.5 percent of victims used a gun in self-defense. Kellermann and others (1995).
15. Wright and Rossi (1994).
16. Shover (1991); Wright and Decker (1994).
17. Wright and Decker (1994).

Copyright 2003, The Brookings Institution

in these areas are likely to have "the basics," including guns: "White people hunt a lot more so than blacks."[18]

Nearly half of the respondents to the prison survey mentioned above report that they have stolen a gun during their lifetimes; of this group, 70 percent usually steal guns to sell or trade rather than to keep for themselves.[19]

## International Comparisons

Since the prevalence of household gun possession is much higher in the United States than in Canada, Britain, and other wealthy nations, one common test of the "deterrence" hypothesis has been to compare residential burglary rates and patterns across these nations. As it turns out, relevant data are hard to come by. The *Uniform Crime Reports* do not provide a basis for estimating the number of "hot" burglaries (burglaries of occupied residences), nor do the police-recorded data systems of other countries. Relevant survey-based estimates can be generated for the United States from the NCVS, but no other country has an annual crime survey of comparable quality.[20] There have been occasional crime surveys in other nations, which suggest that other countries tend to have a higher percentage of residential burglaries involving occupied dwellings than the United States. Table 3-1 (top panel) lists some of the relevant estimates that have been reported by Gary Kleck and David Kopel.[21]

One obvious problem with these comparisons is that the hot burglary rate for each country or city is measured at a different point in time. For two countries—the United States and Great Britain—survey measures of hot burglary rates are available for a common year, 1998. When we standardize for period effects in this way, the difference across the two countries in the hot burglary rate is reduced from the factor of 4 or 5 to 1 reported by Kleck and Kopel (top panel) to a factor of about 2 to 1 (bottom panel).

18. See Wright and Decker (1994, p. 90). On the other hand, a burglar interviewed by Rengert and Wasilchick (1985, p. 62) said that he shunned burglaries in neighborhoods in which the residents were of a different race because, "You'll get shot if you're caught there."

19. See Wright and Rossi (1994). The prevalence of gun theft in the Wright and Rossi convenience sample of prisoners is higher than in the nationally representative sample of prisoners interviewed as part of the 1991 Survey of Inmates of State Correctional Facilities, in which only 10 percent of respondents report ever having stolen a gun.

20. One attempt to generate internationally comparable survey-based results is the United Nations-sponsored International Crime Survey. This survey includes the United States, but it is far smaller and in other ways inferior to the NCVS. More to the point, it does not include items that would permit the estimate of a hot burglary rate.

21. Kleck (1997); Kopel (2001).

Copyright 2003, The Brookings Institution

80                                    PHILIP J. COOK AND JENS LUDWIG

Table 3-1. *International Comparisons of Hot Burglary Rates*

| Source | Country | Year | Hot burglary rate (percent) |
|---|---|---|---|
| Mayhew and others (1993)[a] | United Kingdom | 1982–88 | 43 |
| Block (1984)[a] | Netherlands | 1977 | 48 |
| Block (1984)[a] | United States | 1976 | 9 |
| Bureau of Justice Statistics (BJS) (1985)[b] | United States | 1983 | 12 |
| BJS (1999) | United States | 1998 | |
|   Resident at home | | | 20.5 |
|   Resident's location at time of burglary unspecified or unknown | | | 28.3 |
| Home Office (1999) | United Kingdom | 1998 | |
|   Resident at home | | | 46 |
|     Aware of burglary | | | 25 |
|     Unaware of burglary | | | 21 |
| Adjusted U.K. hot burglary rate | United Kingdom | 1998 | |
|   Upper bound | | | 45 |
|   Lower bound | | | 36 |

a. Cited in Kleck (1997).
b. Cited in Kopel (2001).

But comparability problems remain. The bottom panel of table 3-1 high-lights one difference. In 28 percent of American burglaries NCVS respondents did not know their whereabouts at the time of the burglary, a category that is not included in the British Crime Survey (BCS). Judging from the open-ended narratives provided by BCS burglary victims, a number of cases in which the respondent apparently did not know whether anyone was at home at the time of the burglary are classified as "respondent home, unaware of the burglary."[22] As seen in the last row of table 3-1, adjusting for this coding discrepancy between

22. Our best guess is that at least 7 percent and perhaps as many as 46 percent of the cases coded as "respondent home but unaware of burglary" in the BCS—and thus counted as "hot"—would be coded as "victim location unknown" in the NCVS and counted as "cold" burglaries. This inference stems from the fact that many of the respondents in this BCS category discover evidence of the burglary only after the fact, in the form of damage or other signs of forcible entry. Examples of such cases include the BCS respondent who reported that "there was evidence on the patio door that a tool had been used to try to open it; the marks were noticed in April, we don't know when they tried to break in," and another who

Copyright 2003, The Brookings Institution

the BCS and NCVS lowers the hot burglary rate in the United Kingdom from 46 percent to between 36 percent and 45 percent.[23]

More important, even if we had comparable data there would remain the fact that a variety of potential explanations are plausible for an observed difference in the percentage of residential burglaries that involve occupied dwellings. For example, when burglars are arrested, the punishment is more certain and severe in the United States than in England and Wales (table 3-2). The difference in penalties provides an alternative explanation for why American burglars take extra care to avoid contact with victims. American and British households differ in several other ways that are also likely to affect the cost-benefit calculus facing burglars, including substantial differences in the proportion of households that have dogs or lack men. Without controlling for the other differences that may be important, attributing the disparity in hot burglary rates to one particular difference—gun prevalence—is entirely unpersuasive.

## Case Studies

A variety of anecdotes have been offered in support of the deterrence hypothesis, but few have been well documented.[24] The case of Kennesaw, Georgia, which adopted an ordinance in 1982 requiring every household to keep a gun, has been prominent. There have been several published analyses of the burglary trend in Kennesaw around the time of the ordinance, with contradictory results.[25] In any event, this is not a good test of the deterrence hypothesis, since the ordinance was purely symbolic. Most homes in Kennesaw already had

---

reported that "someone came into my flat, probably while I was asleep after my dinner, and stole a metal case." Cases in which the respondent simply reports finding evidence of an attempted break-in, but does not elaborate on his or her uncertainty about when the crime occurred or where he or she was at the time, are far more common.

23. However, differences in survey methods or reporting across countries could also in principle mask even larger differences in hot burglary rates than those reported in table 3-1. The ratio of completed to attempted burglaries is far higher in the United States (3 or 4 to 1) than in the United Kingdom (nearly equal in most years). Perkins and others (1996); Home Office (1999). One possible explanation for the relative scarcity of burglary attempts in the American NCVS data is that Americans are less likely then the English to report burglary attempts to interviewers. In this case, the denominator for the NCVS-based "hot burglary" calculations are too low, which could lead us to either over- or understate the hot burglary rate in the United States, depending on what fraction of the unreported burglary attempts are to occupied homes.

24. Kopel (2001).

25. Kleck (1991, pp. 136–38); McDowall, Lizotte, and Wiersema (1991); Kleck (1998).

Copyright 2003, The Brookings Institution

Table 3-2. *Socioeconomic and Other Differences between United States and United Kingdom, 1998*

|  | United States | United Kingdom |
|---|---|---|
| Average punishment for burglars, 1996[a] | | |
| Convictions per 1,000 burglary arrests | 10 | 6 |
| Probability of custody given conviction (percent) | 55 | 45 |
| Average time served for those given custody (months) | 15 | 7 |
| Households headed by single female (percent) | 29[b] | 22[c] |
| People living in free-standing, single-family homes (percent) | 63[d] | 23[c] |
| People who own their own home (percent) | 66[e] | 69[e] |
| Households that contain children (percent) | 34 (child is under 18)[b] | 29 (youngest person under 15)[c] |
| Population nonwhite (percent) | 17[b] | 7[c] |
| Households that own dogs (percent)[f] | 40 | 20 |

a. The U.K. figure is for England and Wales, courtesy of David Farrington. Probability of custody given conviction for England and Wales is for 1997, from *Criminal Statistics, England and Wales* (The Stationery Office, 1997). Other findings are from the British Crime Survey, Criminal Sentencing Statistics, Bureau of Justice Statistics, U.S. Department of Justice, 1998.

b. U.S. Bureau of the Census (1999).

c. *Living in Britain 1998* (General Household Survey).

d. U.S. Bureau of the Census, American Housing Survey for the United States, 1999.

e. U.S. Bureau of the Census, Housing Vacancy Survey, Third Quarter 2001.

f. Figure for United Kingdom is for 2000 from Claritas Precision Marketing Solutions. Figure for United States is from American Pet Products Manufacturers Association, National Pet Owners Survey, 2001–02.

a gun before the ordinance, and it seems unlikely that the ordinance had an effect on prevalence since there was no penalty specified in the law for refusal to comply.

## Regression Analysis of Panel Data

Two previous studies have examined the relationship between gun ownership and overall burglary rates within the United States. Both studies rely on UCR data that lump together residential and nonresidential burglary and do not allow

Copyright 2003, The Brookings Institution

hot burglaries to be identified separately. These studies yield conflicting results about the relationship between gun prevalence and burglary rates.

John Lott analyzes state-level UCR data for two years—1988 and 1996—and finds that after controlling for region and period effects as well as a variety of state covariates, a 1 percentage point increase in gun-ownership rates reduces burglary rates by 1.6 percentage points. One problem with this analysis is Lott's choice of data to measure state gun ownership rates. He employs two voter-exit surveys that, among other problems, are not comparable with each other, as suggested by the fact that the individual gun-ownership rate is 10 percentage points higher in the 1996 survey than the 1988 survey, 37 percent versus 27 percent.[26] In contrast, estimates from the General Social Survey, which has included items on guns since 1972 and is widely regarded as the best ongoing source of data on this topic, indicate that gun-ownership rates were actually declining slightly during this period.[27]

Mark Duggan uses a different measure for local gun prevalence—subscription rates to *Guns&Ammo Magazine*.[28] While Lott relies on state-level UCR data measured at just two points in time, Duggan uses annual county- and state-level UCR data for the period 1980–98, which enables him to control for county or state fixed effects as well as other covariates. Duggan's state-level analysis finds a positive and statistically significant relationship between changes in gun ownership rates and UCR burglary rates two years in the future, while the regression coefficient on the one-year lag of the change in gun prevalence is negligible.

## Measuring Crime Rates and Gun Prevalence

Direct measures of burglary rates are available from two independent sources, the *Uniform Crime Reports* (UCR), which are tabulations of crime reported to and recorded by the police and then forwarded to the Federal Bureau of Investigation (FBI), and the National Crime Victimization Survey (NCVS). For measuring gun ownership rates at the local level we rely on a well-validated proxy measure, the proportion of suicides that involve firearms.

26. Lott (2000, p. 36).
27. Smith (2000).
28. Duggan (2001).

Copyright 2003, The Brookings Institution

*Uniform Crime Reports*

The FBI's UCR system compiles records each year from law enforcement agencies across the country for crimes known to the police. While the UCR is the only source for measuring annual crime rates for subnational jurisdictions such as states or counties, these data have several problems. First, only a fraction of serious crimes are reported to the police, and the probability that victims do report crimes seems to be systematically related to factors such as socioeconomic status, urbanicity, and local police resources.[29] Second, some law enforcement agencies do not report complete crime information to the FBI in some years. The FBI attempts to fill in missing data by an imputation procedure, which of course introduces another sort of error. Third, the published data on UCR burglary rates lump together residential and nonresidential burglaries. Although local jurisdictions are supposed to report a breakdown of burglary counts by the type of victim (residential or nonresidential) and these data are available from the UCR in unpublished form, in practice the quality control on these data seems weaker than for the overall burglary counts. Nationwide, nonresidential burglaries make up one-third of the total reported in the UCR.[30]

The UCR data do not distinguish between burglaries of occupied and unoccupied buildings. In fact, some of the hot burglaries will not even be included in the UCR burglary count, since incidents are classified by the most serious of the crimes recorded by the police. If the police record that the perpetrator robbed the occupant after breaking into the dwelling, for example, then the entire incident is recorded as a robbery rather than a burglary.

Our calculations draw on UCR data for the period 1977 through 1998, measured at both the state and county levels. The advantage of using county-level data is that we are able to account for some sources of within-state heterogeneity. The disadvantage is that they appear to be far more sensitive to problems with the imputation methods used to correct for missing data, and information on the local-area sociodemographic characteristics that may be relevant in explaining burglary rates are less readily available at the county than state level.[31]

29. Laub (1981); Levitt (1998a).
30. FBI (1996, p. 39).
31. Maltz (1999).

Copyright 2003, The Brookings Institution

## National Crime Victimization Survey

Since 1973 the National Crime Victimization Survey (NCVS) has provided analysts with a rich source of information on certain household and personal crimes. Conducted by the Census Bureau for the Bureau of Justice Statistics, the NCVS collects victimization reports from residents drawn from a sample of 50,000 to 60,000 housing units. Households are selected to participate using a multistage sampling procedure in which the probability of selection depends in part on the size of the respondent's county as well as other factors; sampling weights are provided with the NCVS to generate nationally representative estimates, which are used in all of the analysis that follows. Housing units selected for the NCVS are interviewed initially in person and then reinterviewed six more times at six-month intervals either in person or on the telephone. Surveys are conducted with every household resident who is 12 years of age or older, yielding a total of 90,000 to 100,000 survey responses. Response rates with the NCVS are typically on the order of 95 percent.[32]

Our analysis relies on a special restricted-use version of the NCVS that identifies the county in which survey respondents reside. This geocoding enables us to merge information from the NCVS with a measure of gun prevalence in the respondent's county. Given the limited number of years for which geocoded NCVS data are available, we pool these data and focus our attention on cross-sectional analyses with the NCVS.[33]

## Household Gun Prevalence

Since the United States does not maintain a registry of guns in private hands, survey data are the primary means of generating national and regional estimates for gun ownership rates and patterns. According to the 1999 General Social Survey, 36 percent of households own at least one firearm.[34] Unfortunately, neither the General Social Survey nor any other provides reliable estimates for each of the fifty states or for local jurisdictions. Hence exploring the effect of gun prevalence at the subregional level requires use of a proxy variable.

Recent research demonstrates that among the readily computed proxies that have been used for this purpose, one has the greatest validity: the percentage of

32. Perkins and others (1996).

33. While geocoded NCVS data are now available through restricted-use Census data centers for 1987 through 1998, our own analyses rely on data for the period 1994–98. Even with the full 1987–98 sample, however, there is unlikely to be enough overtime variation in gun ownership rates to support a fixed-effects analysis, since (as we discuss) there is only modest overtime variation even for the 1977–98 period.

34. Smith (2000, p. 52).

Copyright 2003, The Brookings Institution

suicides committed with a gun. This proxy "outperforms" such measures as the percentage of homicides committed with a gun, the prevalence of membership in the National Rifle Association, or the subscription rates for gun-oriented magazines.[35] As an example, the cross-section correlation between this proxy and survey-based estimates available for twenty-one states (from the Behavioral Risk Factor Surveillance System) is .90; the corresponding correlation for the subscription rate to *Guns&Ammo* is .67, and to the NRA membership prevalence is .55.

Inspection of our proxy highlights the substantial variation in gun ownership across states within the United States. Since suicide is a fairly rare event, in our cross-sectional analyses we improve the reliability of our proxy measure by combining suicide data for the period 1987 through 1996. This measure ranges from close to 30 percent in Hawaii and Massachusetts to more than 75 percent in Louisiana, Alabama, and Mississippi. Although these examples highlight the substantial regional differences in gun ownership rates, there is also considerable intraregional variation.[36] For example, the proportion of suicides involving guns equaled 67 percent in Vermont but only 57 percent in nearby New Hampshire and 31 percent in Massachusetts. In Illinois, guns were involved in 47 percent of suicides, compared with 55 and 63 percent in Wisconsin and Indiana, respectively. There is also substantial within-state variation among counties, even when the sample is limited to the set of large counties (with populations of 100,000 or more) for which Vital Statistics reports separate county-level mortality information.[37]

Our ability to exploit standard panel-data techniques to control for confounding factors and reverse causation is limited somewhat by the fact that the cross-section structure of gun ownership is quite stable over time. For example, in our state panel data for 1977–98 fully 90 percent of the variation in gun ownership rates is cross sectional. But the inter-temporal variation is still sufficient to generate reliable results.

## Gun Prevalence and Burglary Rates

Our empirical strategy is to explore the effect of gun prevalence on burglary rates and then turn to hot burglary. We begin by developing a simple model demon-

---

35. Azrael, Cook, and Miller (2001).
36. Cook and Ludwig (1996); Glaeser and Glendon (1998).
37. We also exclude from our analytic sample counties that have fewer than fifty suicides during the 1987–96 period, although this constraint excludes relatively few additional counties.

Copyright 2003, The Brookings Institution

strating that the net effect of gun prevalence on residential burglary rates may be positive or negative, depending on the relative magnitude of the deterrence effect and what we are calling the "inducement" effect. We then estimate this relationship using data from the UCR and NCVS.

## Model

The opposing effects of gun prevalence on residential burglary rates are highlighted by a simple model of the expected utility of a single burglary opportunity, as in equation 1. Let $G$ represent the proportion of households in the community that possess guns, where $P$ is the probability that the burglar encounters an armed household resident and is shot, $D$ is the utility associated with being shot (which we assume is independent of wealth), and $L$ is the expected loot associated with committing a successful burglary. To further simplify the model, we assume that the burglar is risk neutral with respect to wealth and is endowed with wealth $W$.

$$(1) \qquad E[U[G]] = P[G] \times D + (1 - P[G]) \times (L[G] + W)$$

The probability of being shot ($P$) is an upward-sloping function of $G$. The loot associated with successful burglaries ($L$) is a function of $G$ with $L' > 0$ because guns present an attractive target for theft.[38]

An increase in gun prevalence will increase the utility of this burglary prospect if the additional utility from increased loot outweighs the increased probability of suffering a loss in utility from being shot, as in (2). If burglars are able to determine which homes are occupied, reducing $P$ for a given level of $G$, then the inducement effect becomes more important compared with the deterrent effect. In the extreme case in which burglars are always able to avoid occupied homes (that is, $P = 0$), more guns unambiguously increase the net gains to burglary.

$$(2) \qquad (1 - P)L' > P'(L + W - D)$$

This result can be translated into a corresponding prediction about the burglary rate on the assumption that one such prospect is available to each potential

---

38. Gun prices may also be relevant in two opposing respects. First, as Mark Kleiman has pointed out to us, black-market gun prices may be inversely related to $G$, which if true would weaken the argument that the expected loot increases with gun prevalence. By the same reasoning, it will be cheaper for burglars to arm themselves in cities with high gun prevalence, a fact that may be relevant to the extent that gun possession makes a burglar bolder. See Cook (1976, 1991) for a similar argument on robbery.

Copyright 2003, The Brookings Institution

burglar during each period. (The only complication has to do with the logical possibility that a burglar who is shot will drop out in subsequent periods.) The model demonstrates the possibility that more guns will result in more or fewer burglaries. Empirical work may help resolve this ambiguity.

## UCR Results

We begin our empirical exploration using data from the Uniform Crime Reports, which are available for each year since 1977 and form the basis of earlier analyses on the same topic by John Lott and Mark Duggan.[39] Standard panel-data techniques yield a positive estimated relationship between changes in gun prevalence and changes in burglary rates. In an effort to deal with the possibility of omitted-variables bias, a set of estimates utilizing an instrumental variable for gun prevalence is also presented, with qualitatively similar findings.

*Panel Data Results.* The baseline model is described in equation 3, which we estimate using state-level UCR data. The key outcome measure of interest, $\Delta B_{it}$, equals the change in state $i$'s burglary rate between period $t-1$ and $t$. The key explanatory variable of interest is the change in the state's gun index, $\Delta G_{it-1}$, which is lagged one period to minimize the problem of reverse causation; this problem arises because burglary rates may be the cause as well as the effect of gun prevalence if the demand for guns is influenced by a concern for defending against intruders. To reduce the measurement error associated with the gun proxy, each observation in our panel corresponds to a state rather than a county, and to a three-year rather than the more usual single-year period.[40] Thus for the period 1977–98 each state contributes seven observations to the panel.[41] To control for possibly confounding factors the model conditions on a vector of state sociodemographic characteristics $X_{it}$ including per capita income, racial composition, prisoners per capita, the poverty rate, and alcohol consumption.

$$(3) \qquad \Delta B_{it} = \beta_0 + \beta_1 \Delta G_{it-1} + \beta_2 \Delta X_{it} + \gamma_i + \delta_t + \nu_{it}$$

39. See Lott (2000) and Duggan (2001). Because of problems with the crime data reported by law enforcement authorities to the UCR system our analytic sample excludes observations from Illinois, 1993–98, Kansas, 1993–98, Kentucky, 1996–98, and New Hampshire, 1997. Maltz (1999).

40. As it turns out, estimating equation 3 using single-year observations for each state rather than three-year averages yields point estimates that are similar to those in table 3-4 but with larger standard errors.

41. The last observations in the series are for the four-year period 1995–98.

Copyright 2003, The Brookings Institution

Since the outcome variable is measured in change rather than level form, the time-invariant inter-state structure of burglary rates drops out. The model also includes state fixed effects ($\gamma_i$) to control for unmeasured factors that may change over time and drive state-specific *trends* in burglary rates, and period effects ($\delta_t$) to adjust for nationwide changes over time in burglary trends. Because a given change in gun prevalence may have a larger effect on burglary rates in areas in which those rates are high, we also estimate a constant-proportional-effect version of equation 3 that uses the natural logarithm of the burglary rate as the outcome measure. To further control for time-varying unmeasured state attributes that may bias our findings, we reestimate equation 3 in a variety of alternative forms, including models that condition on lagged changes in burglary rates, state-specific linear trends, and region-period interactions, as well as a version that controls for serial correlation by allowing the error structure in (3) to follow an autoregressive process that is unique to each state. The UCR-based results are consistent in demonstrating that gun prevalence has a positive association with burglary. Table 3-3 summarizes the results for the coefficient and standard-error estimates on the gun-prevalence variable in our models. (Since the additional covariates generally have the expected effect we do not focus on them in our discussion; the full set of coefficient estimates for the "base" model is relegated to the appendix, table 3A-1).

The base model includes state and year fixed effects and several covariates. The estimated coefficients (reported in the first line of table 3-4) are positive and statistically significant in both the linear and semilog specifications and imply an elasticity of burglary with respect to the gun-prevalence proxy on the order of +0.67. The elasticity of burglaries with respect to gun ownership is slightly lower (around +0.4 or +0.5) because the proxy measure, while linearly related to gun prevalence over the relevant range, is not proportional.[42] For simplicity, and to facilitate comparisons with previous research, we focus on the elasticity of the burglary rate with respect to our gun proxy measure.

These findings are fairly robust to changes in how the model is estimated. Subsequent lines of table 3-3 report the results of conditioning on the lagged value of the dependent variable, including linear state-specific trends or region-period

42. See Azrael, Cook, and Miller (2001). The average burglary rate for the 1977–98 period was 1,276 per 100,000, while the average value for our gun prevalence proxy equaled fifty-eight, and the average gun ownership rate in the United States equaled around 40 percent. The discrepancy in elasticity estimates occurs because the gun proxy increases one-for-one with actual household gun ownership rates, while the national average for the former is far higher than for the latter (58 versus 40 percent). Thus a forty-point increase in the proportion of suicides that involve guns represents around a 70 percent increase with respect to our gun proxy but a 100 percent increase in actual household gun ownership rates.

Copyright 2003, The Brookings Institution

Table 3-3. *Effects of Gun Prevalence on Burglary Rates*

| Model | Dependent variable UCR burglary rate | Log UCR burglary rate |
|---|---|---|
| Base model | 14.62* | 0.0115* |
|  | (6.78) | (0.0045) |
| Use log gun prevalence in base model | 609** | 0.4898* |
|  | (331) | (0.2306) |
| Condition on lagged dependent variable in base model | 9.67* | 0.0076* |
|  | (4.75) | (0.0033) |
| Add linear state-specific trends in base model | 11.11 | 0.0090 |
|  | (7.84) | (0.0053) |
| Add region-year interactions to base model | 9.00 | 0.0075** |
|  | (6.46) | (0.0044) |
| Correct for serial correlation in error term | 16.96* | 0.0115* |
|  | (3.81) | (0.0025) |

Note: Table shows repeated thirty-six-month cross-sections; UCR state-level data, 1977–98, coefficients on lagged gun-prevalence variable in specified model, and robust standard errors in parentheses. Base model also includes state and year fixed effects, as well as controls for state unemployment rate, median per capita income, alcohol consumption per capita, percent poor, and percent black. State population used as weights. The correction for serial correlation allows the intertemporal correlation in the error structure to be state specific. County-level model controls for county and year fixed effects, per capita income, and unemployment rate. Data available only through 1995.

*Statistically significant at the 5 percent level.
**Statistically significant at the 10 percent level.

interaction terms in the model, or accounting for serial correlation in the error structure. Several of these changes reduce the magnitude of the coefficient on the gun proxy somewhat from the base model but do not qualitatively change the findings. Using a model specification similar to that employed by Mark Duggan, in which the log burglary rate is regressed against the lagged and twice-lagged values of the log burglary and gun ownership variables, yields qualitatively similar findings (table 3A-1).[43]

In part because the gun-prevalence variable is lagged in these regressions, it seems unlikely that the results reflect the reverse-causal effect of burglary rates on the demand for gun ownership. To further explore this possibility, we regress gun prevalence on the lagged burglary rate; that is, equation 3 is reestimated with $B$ and $G$ interchanged. In this set-up the coefficient estimate for the lagged burglary rate ($\Delta B_{i,t-1}$) is typically quite close to zero. Only when region-period interaction terms are included in the model does the burglary coefficient become statistically significant, and even then the implied elasticity is on the order of

43. Duggan (2001).

Copyright 2003, The Brookings Institution

+0.06 or +0.07, far smaller than the estimated effect of the lagged gun proxy on burglary rates. Thus it appears that gun prevalence drives burglary, but burglary does not drive gun prevalence.

*Instrumental Variables Estimates.* Another way to address the endogeneity issue is by finding an instrument for gun prevalence that is not plausibly correlated with the error term in the burglary regression. The ideal instrument must pass three tests: it must be highly correlated with gun prevalence, not affected by the current burglary rate, and uncorrelated with any influential omitted variables. The instrument that we use exploits the fact that the cross-section structure of gun ownership rates has been highly stable over time and is driven in large part by each area's local rural tradition.[44] The instrument is the fraction of a state's population that lived in a rural area in 1950. It passes the first two tests: it is highly predictive of each state's gun ownership rate in the 1980s or 1990s and is presumably not influenced by burglary rates occurring many years later. We have less confidence in how it does by the third test; "rural tradition" in a state may be correlated with other factors that influence burglary rates, not all of which are necessarily captured by the covariates in our specification (which in this case include a measure of current urbanicity). Subject to that warning, we find that gun prevalence, as instrumented, tends to have a positive association with burglary rates.

The "instrumental variables" estimates come from estimating equations 4 and 5 using two-stage least squares. Because our instrument is defined by a single year's data (1950), we are limited to a cross-sectional analysis of burglary. In the equations $G_i$ represents state ($i$)'s gun ownership rate for the period 1987–96, $B_i$ represents the state's average burglary rate over the period 1993 to 1995, $X_i$ represents the average value of the state-level covariates described above for the 1993–95 period (including a measure of the fraction of the state's population currently living in a metropolitan statistical area), and $R_i$ represents the fraction of state ($i$)'s population that lived in rural areas in 1950. The first-stage equation 4 yields a predicted value ($\Gamma$) for each state's gun ownership rate, which is then substituted for the actual gun proxy in the second-stage equation 5.

$$(4) \qquad G_i = \alpha_0 + \alpha_1 R_i + \alpha_2 X_i + v_i$$

$$(5) \qquad B_i = \theta_0 + \theta_1 \Gamma_i + \theta_2 X_i + e_i$$

44. Azrael, Cook, and Miller (2001).

Copyright 2003, The Brookings Institution

PHILIP J. COOK AND JENS LUDWIG

Table 3-4. *Instrumental Variables Analysis of Effect of Guns on Burglary*

| Stage | Results |
|---|---|
| *State-level data, first-stage* | |
| Effects of percent rural, 1950, on percent suicides with guns, 1987–96 (beta, se) | 0.60 (.13)* |
| F statistic on instrument (df) | 20.0 (1,47)* |
| Partial R² on instrument | .0296 |
| *State-level data, second-stage* | |
| Effect of percent suicides with guns, 1987–96, on average burglary rate, 1993–95 (beta, se) | 10.11 (10.99) |
| *County-level data, first-stage* | |
| Effects of percent rural, 1950, on percent suicides with guns, 1987–96 (beta, se) | 0.34 (.06)* |
| F statistic on instrument (df) | 35.7 (1,47)* |
| Partial R-squared on instrument | .0751 |
| *County-level data, second-stage* | |
| Effect of percent suicides with guns, 1987–96, on average burglary rate, 1993–95 (beta, se) | 9.02 (11.27) |

Note: Regression model for state-level estimates includes covariates for state, age, and race distribution, region, prisoners per capita, unemployment rate, poverty rate, and percent living in metropolitan areas. Regression model for county-level data controls for region, county per capita income, and unemployment rate. All regressions estimated using state (county) population as weights.

* Statistically significant at the 5 percent level.

Table 3-4 shows that the instrument R has a very strong relationship with cross-sectional variation in gun ownership rates. Using state-level cross-section data (top panel, table 3-4) the F statistic for the significance of the instrument in the first-stage equation is equal to 20 ($p < .01$), while the partial R-squared is equal to 0.03. As seen in the bottom panel of table 3-4, the instrument has similarly strong predictive power when gun-ownership levels are measured at the county level (with standard errors adjusted for the fact that the instrument varies at the state rather than county level).

The second-stage estimates (table 3-4) are positive and thus consistent with a net inducement effect for both the state and county data. Although the point estimates are not statistically significant, the implied elasticities of burglary with respect to gun ownership are equal to +0.46 and +0.41, respectively, consistent with the panel-data results shown in table 3-3. Estimating the instrumental variables model using a different three-year cross-section from the mid-1980s through the late 1990s yields qualitatively similar results to those shown in table 3-4: the estimated effects of guns on burglary rates are positive or close to zero.

Copyright 2003, The Brookings Institution

Case: 1:10-cv-04184 Document #: 169-7 Filed: 03/12/12 Page 41 of 69 PageID #:4747

In interpreting the instrumental-variables estimates in table 3-4 reverse causation can be ruled out, but there remains the possibility that the influence on current burglary rates of "percent rural in 1950" is not only through gun prevalence but also through some other mechanism not otherwise accounted for. However, any bias that results from this problem is likely to exaggerate the deterrent effect of gun prevalence, because rural areas have on average lower burglary rates and higher gun ownership rates than urban areas even after conditioning on various local-area characteristics. (See appendix 3B for a formalization of this argument.) Because our instrumental-variables strategy arguably overstates the deterrent effect of gun prevalence yet still yields estimates suggesting a net inducement effect, more guns seem more likely to lead to more rather than fewer burglaries.[45]

## NCVS Results

The National Crime Victimization Survey (NCVS) provides an alternative source of data on residential burglary that is superior to the UCR data in a number of ways, as discussed above (section IIIA). The UCR, unlike the NCVS, lump together residential burglaries with commercial burglaries, only include crimes that happen to be reported to the police, and classify some incidents that included a burglary as robberies or assaults. Further they are only available at an aggregate level. The geocoded version of the NCVS data allow a fine-grained analysis of geographic patterns in residential burglary. However, since we only have access to these data in geo-coded form for the period 1994–98, we cannot reproduce the analysis of intertemporal patterns reported in the previous section.

*The Probability of Burglary Victimization.* Table 3-5 reports the results of a cross-section regression analysis using almost 330,000 household survey responses taken from the 1994 through 1998 twice-annual waves of the NCVS. Only households in counties with a population of 100,000 or more are included. The dependent variable in each case is a 0–1 indicator of

---

45. We also experimented with a variety of other instrumental variables although with little success. The proportion of households headed by a female has mixed predictive power in first-stage equations. Since the second-stage point estimates are typically negative, equally consistent with either a net deterrent effect or the omitted variables bias that is likely to be in the direction of the deterrent effect, these results are not very informative. A variety of state sales and excise tax variables often had first-stage explanatory power but failed standard overidentification tests.

Copyright 2003, The Brookings Institution

Table 3-5. *Determinants of Burglary-Victimization Probability*

| | Dependent variable (burglary in previous 6 months) | | |
|---|---|---|---|
| Explanatory variable | Model 1 | Model 2 | Model 3 |
| *Gun prevalence* | .0137* | .0110** | .0126** |
| | (.0030) | (.0043) | (.0053) |
| *Residential characteristics* | | | |
| Type of building | | | |
| 1 unit | ... | ... | ... |
| 2–4 units | −.1266 | −.1388 | −.1400 |
| | (.1027) | (.1036) | (.1027) |
| 5 or more units | −.7208* | −.7184* | −.7524* |
| | (.1034) | (.1033) | (.0992) |
| Mobile home | .3494*** | .3330 | .2505 |
| | (.2032) | (.2057) | (.2064) |
| Other type | −.5303 | −.5044 | −.4290 |
| | (.3330) | (.3350) | (.3272) |
| Location | | | |
| Urban area | ... | ... | ... |
| Suburban area | −.5711* | −.4981* | −.5434* |
| | (.0754) | (.0763) | (.0749) |
| Rural area | −.6773* | −.6081* | −.4483** |
| | (.2020) | (.1901) | (.1951) |
| *Household characteristics* | | | |
| Male head | −.2144* | −.2115* | −.2016* |
| | (.0645) | (.0632) | (.0628) |
| Renter occupied | .3912* | .3816* | .3797* |
| | (.0863) | (.0862) | (.0850) |
| Children under 12 | | | |
| None | ... | ... | ... |
| 1 | .2570* | .2466** | .2418** |
| | (.0956) | (.0963) | (.0965) |
| 2 or more | .5872* | .5705* | .5549* |
| | (.0938) | (.0945) | (.0939) |
| Children over 12 | | | |
| None or 1 | ... | ... | ... |
| 2 | .1865** | .1807** | .1697** |
| | (.0839) | (.0833) | (.0835) |
| 3 or more | .9443* | .9227* | .9116* |
| | (.0979) | (.0987) | (.0987) |
| Time at address | | | |
| More than 2 years | ... | ... | ... |
| Two years or less | .1858** | .1884** | .1759** |
| | (.0779) | (.0779) | (.0787) |
| Unknown | 1.3785* | 1.3783* | 1.3650* |
| | (.1139) | (.1136) | (.1136) |
| | | | *(continued)* |

Copyright 2003, The Brookings Institution

Table 3-5. (continued)

| Explanatory variable | Dependent variable (burglary in previous 6 months) | | |
| --- | --- | --- | --- |
| | Model 1 | Model 2 | Model 3 |
| **Characteristics of household head** | | | |
| Race | | | |
| White | ... | ... | ... |
| Black | .4208* | .4292* | .4801* |
| | (.1267) | (.1296) | (.1241) |
| Other | −.2971*** | −.3267** | −.4979* |
| | (.1653) | (.1563) | (.1721) |
| Age | | | |
| Under 25 | ... | ... | ... |
| 25–34 | −.9037* | −.9184* | −.9218* |
| | (.1898) | (.1889) | (.1879) |
| 35–44 | −.7549* | −.7684* | −.7774* |
| | (.1911) | (.1894) | (.1893) |
| 45–54 | −.9708* | −.9882* | −.9940* |
| | (.1991) | (.1976) | (.1975) |
| 55–64 | −1.3133* | −1.3331* | −1.3573* |
| | (.2134) | (.2118) | (.2127) |
| 65 or older | −1.7764* | −1.7891* | −1.818* |
| | (.2405) | (.2399) | (.2415) |
| Marital status | | | |
| Married | ... | ... | ... |
| Divorced | .9170* | .9169* | .8937* |
| | (.1221) | (.1217) | (.1217) |
| Separated | .8380* | .8320* | .8544* |
| | (.1945) | (.1940) | (.1936) |
| Widowed | .1745 | .1813 | .2011*** |
| | (.1132) | (.1128) | (.1137) |
| Never married | .2498** | .2474** | .2492* |
| | (.1008) | (.1014) | (.1006) |
| Unknown | −.1969 | −.2035 | −.2355 |
| | (.2677) | (.2677) | (.2668) |
| Education | | | |
| High school dropout | ... | ... | ... |
| High school graduate | −.0559 | −.0301 | −.0473 |
| | (.1103) | (.1138) | (.1147) |
| Some college | .0430 | .0583 | −.0042 |
| | (.1234) | (.1263) | (.1299) |
| College graduate | −.2472** | −.2246**** | −.2669** |
| | (.1124) | (.1151) | (.1163) |
| Unknown | −.3423*** | −.3249* | −.3458*** |
| | (.1993) | (.2003) | (.2006) |
| | | | (continued) |

Copyright 2003, The Brookings Institution

PHILIP J. COOK AND JENS LUDWIG

Table 3-5. (continued)

| | Dependent variable (burglary in previous 6 months) | | |
|---|---|---|---|
| Explanatory variable | Model 1 | Model 2 | Model 3 |
| Work status | | | |
| Work past 7 days | −.2188** | −.2162*** | −.1986* |
| | (.0857) | (.0861) | (.0859) |
| Unknown | −.4561** | −.4548** | −.4200* |
| | (.2171) | (.2176) | (.2136) |
| Away from home during evenings | | | |
| Every night | .3497* | .3536* | .3678* |
| | (.0884) | (.0877) | (.0869) |
| Once a week | .0308 | .0358 | .0393 |
| | (.0663) | (.0662) | (.0657) |
| Less than once a week | . . . | . . . | . . . |
| Unknown | −1.1566* | −1.1542* | −1.1857 |
| | (.2158) | (.2166) | (.2125) |
| County demographics | | | |
| Percent black | | −.0046 | |
| | | (.0083) | |
| Percent Hispanic | | .0057 | |
| | | (.0044) | |
| Percent in poverty | | .0146 | |
| | | (.0173) | |
| Percent female labor force participation | | .0167 | |
| | | (.0241) | |
| Density (1,000 persons per square kilometer) | | −.0309** | |
| | | (.0121) | |
| Intercept | 3.0817* | 2.7482* | 3.200* |
| | (.3844) | (.5005) | (.4657) |
| State fixed effects? | No | No | Yes |

Note: Table shows cross-section OLS regression results, National Crime Victimization Survey (NCVS) data, 1994–98, coefficients, and standard errors (×100). All regression specifications also included dummy variables for household income levels. Model 3 also included state fixed effects.
* Significant at the 1 percent level.
** Significant at the 5 percent level.
*** Significant at the 10 percent level.

whether or not the household reported being victimized by at least one illegal break-in or attempt during the preceding six months. The average for this variable is 2 percent.

The coefficients and standard errors are least-squares estimates and are to be interpreted as the change in the probability of burglary (in percentage terms) resulting from a one-unit increase in the independent variable. All our estimates

Copyright 2003, The Brookings Institution

are calculated using the survey's sampling weights, and Huber-White standard errors are calculated to adjust for the clustering of NCVS observations within counties.[46] Each regression controls for a variety of household characteristics, chosen in part on the basis of previous research.[47] The three models differ with respect to the inclusion of other controls; model 2 includes five county-level descriptors, while model 3 includes a complete set of state fixed effects.[48] As it turns out, most of the coefficient estimates on household characteristics are similar across the three models. Before commenting on the gun-prevalence estimates, we offer a few observations on the results for these household characteristics, which are not without interest in their own right.

The covariates can be classified as either socioeconomic-status (SES) variables or as variables that characterize the vulnerability of the household to burglary. The results for the SES variables are quite consistent: burglary risk falls as education, age, or income increases. It is lower for households headed by a married couple rather than an unmarried adult, and it is lower if the head is employed. Renter units are more likely to be burglarized than owner-occupied residences. Even accounting for those characteristics, blacks are more likely to be burglarized than whites or other ethnic groups. The results for the variables that characterize vulnerability are also quite sensible. Households are more likely to be burglarized if they are in an apartment building rather than in free-standing residences; if located in the city rather than in the suburbs and rural areas of these (predominantly urban) counties; if the head is away from home almost every night; and if it is new to the neighborhood, having moved there within the last two years. A bit mysterious is the finding that having children at home increases the risk of burglary victimization.

The estimated effects of county-population characteristics are also interesting. These might be expected to influence the effectiveness of law enforcement, as well as the supply of criminals. As it turns out, racial composition, poverty, and female labor-force participation have little apparent effect on the likelihood of burglary victimization. Population density has a negative effect.[49]

---

46. The choice of a linear-probability approach may be questioned: standard practice when there is a binary dependent variable is to estimate a nonlinear form, such as a probit or logit. As a test, we ran a probit regression of the basic burglary specification. The qualitative results were unchanged from the linear-probability model.

47. Smith and Jarjoura (1989); Shover (1991); Wright and Decker (1994).

48. The purpose for including state fixed effects was to control for regional culture and the relevant characteristics of the state criminal-justice system.

49. We also experimented with controlling for two county-level crime rates, motor-vehicle theft and larceny, either by themselves or in conjunction with the other county-level variables. These crime rates may be indicative of the supply of criminals in the county and of the effectiveness of the criminal justice system. Their inclusion had little effect on the results and are not reported here.

Copyright 2003, The Brookings Institution

The key explanatory variable of interest in these models is the proxy for gun-ownership prevalence, the proportion of suicides in the respondent's county that involved firearms during the ten-year period from 1987 through 1996. As seen in table 3-5, the findings for this variable are strong and consistent with the findings from the UCR data. The probability of burglary victimization increases with gun prevalence in the county. In particular, an increase of 10 percentage points (from, say, 50 to 60) in the gun-prevalence indicator is associated with an increase in the probability of being burglarized by about 0.12 percent, for example, from 1.80 percent to 1.92 percent. These results imply an elasticity of burglary for the gun proxy equal to .36 at the mean value of 54.

Our preferred explanation for why higher gun prevalence would engender a higher burglary rate is in terms of the monetary payoff to burglary—guns are valuable loot because they are portable and are readily sold or fenced. The plausibility of this explanation is supported by a regression analysis of the likelihood that one or more guns are stolen in a burglary in the NCVS, using the same array of model specifications as in table 3-5. In every case the coefficient is positive and significantly different from zero, indicating the unsurprising result that higher gun prevalence is associated with more guns being stolen.

However, the implied effect of gun prevalence on the overall profitability of residential burglary is not great. The likelihood of a gun being stolen in a successful residential burglary included in this sample is just 5.1 percent overall; an increase of ten points in the gun-prevalence proxy would increase the probability of guns being part of the loot by 1 percentage point. On the basis of data from a special study of burglaries in Prince George's County, we estimate the expected market value of this "prize" as about $30.[50] NCVS data for 1994–98 suggest a somewhat higher value, perhaps as high as $70—equal to about 5 percent of the mean burglary ($1,505) and 20 percent of the median ($330).[51] The actual value to the burglar depends on the local black market. In most cities the value would be less than in the licit market.[52]

---

50. Data on successful burglaries in Prince George's County, Maryland, were provided by the police for the years 1998–2000. There were 10,592 reported to the police during that time, of which 4.2 percent had at least one gun stolen. On average 1.8 guns were stolen, valued at an average of $327.

51. Our estimate is based on the 4,809 burglary cases reported by respondents to the NCVS between 1994 and 1998 in which something was stolen. While the NCVS does not provide information on the value of the stolen guns, it does provide information on the total value of all items that were stolen as well as the types of goods that were stolen. The value of the stolen guns to the victim is inferred by regressing the total value of what was stolen against indicators for the types of items that were taken. The regression also controls for household income, whether the home is owner occupied, and the household head's educational attainment. The coefficient on the dummy variable indicating that guns were part of the loot equals $1,384. That may be biased if burglaries in which guns are stolen tend to involve households with greater portable wealth in ways that are not fully reflected in the covariates.

52. Cook, Molliconi, and Cole (1995).

Copyright 2003, The Brookings Institution

This sort of expected-value calculation presumes that burglars encounter guns by chance. But in some burglaries the burglar has knowledge of the household and its possessions because he is a neighbor or former spouse or friend. In any event, it seems relevant that in 14 percent of the NCVS cases in which a gun was stolen, it was the *only* item stolen.[53]

*Specification Checks.* How credible is the causal interpretation of the positive coefficient on gun prevalence?[54] One concern is that gun prevalence may be correlated with an omitted variable that is an important determinant of burglary. The most familiar approach to dealing with this possibility is to utilize instrumental variables, as we did in the previous section for the UCR data. We did experiment with this approach for the NCVS data, and our results are reported in the next section. But first we present the results of a specification test in which other household-experience variables unlikely to be influenced by gun prevalence are substituted for burglary victimization in the regressions. This test is motivated by the intuitive notion that if gun prevalence is statistically associated with these other outcome variables, then there must be an influential omitted variable in those regressions. Such a finding would suggest that there may also be an influential omitted variable in the burglary regressions.

The choice of alternative outcome measures with which to conduct this "test" seems fairly arbitrary. Our intuition was that it would be most meaningful to look at other types of crime victimization. Among the possibilities included in the NCVS, the most attractive option was motor-vehicle theft, a household crime (like burglary) that is almost always a crime of stealth, for which household gun ownership would matter very little either as a deterrent or enticement. We also analyzed two quite different variables from the NCVS, namely, whether there was a telephone in the residence and whether the respondent used public transportation.

Table 3-6 reports the results of rerunning our basic set of regressions (from table 3-5) for these outcomes. The first column repeats the estimated coefficients on gun prevalence for the burglary regressions. The second column gives the estimated coefficients when the same regressions are run with motor-vehicle theft in place of burglary as the dependent variable. The coefficient estimates are reassuringly close to zero in all specifications. "Telephone in residence" (the third column) has a negative relationship to gun prevalence, but the estimated

---

53. In another 6 percent of cases in which guns were part of the loot, the only other item taken was cash.

54. Thanks to Bruce Sacerdote for suggesting this approach.

Copyright 2003, The Brookings Institution

Table 3-6. *Specification Tests for Burglary Regressions*

| Covariates in specification | Burglary | Motor-vehicle theft | Telephone in residence | Use public transportation |
|---|---|---|---|---|
| Simple | .0245* | .0010 | −.0450* | −.733* |
| | (.0034) | (.0013) | (.0141) | (.103) |
| Household characteristics | .0137* | .0003 | −.0255* | −.730* |
| | (.0030) | (.0014) | (.0100) | (.076) |
| Household characteristics and state fixed effects | .0126** | −.0001 | −.0277 | −.937* |
| | (.0053) | (.0029) | (.0175) | (.112) |
| Household characteristics and county covariates | .0110** | .0003 | .0040 | −.550* |
| | (.0043) | (.0019) | (.0130) | (.068) |

Note: Table shows cross-section OLS regression results, NCVS data, 1994–98, coefficients, and standard errors. Each entry is the estimated coefficient and standard error on the gun-prevalence proxy from a regression with specification as indicated.

\* Significant at the 1 percent level.
\*\* Significant at the 5 percent level.
\*\*\* Significant at the 10 percent level.

coefficient shrinks to near zero when we introduce the county-level social and demographic covariates.[55]

The final column of table 3-6 reports the troubling results for the use of public transportation. The coefficient estimates are significantly negative in all specifications. Although it is possible that gun prevalence does have a negative effect on use of public transportation, it seems unlikely that this mechanism is what explains these strong results—more likely the explanation is omitted-variable bias. Perhaps, for example, the missing variable is trust and support for government. Prevalent distrust of government and a taste for self-reliance may lead to more guns and less investment in public transit. Whether that same omitted variable is also present in the burglary regressions is not clear; one test of these ideas proved inconclusive.[56]

55. Particularly important are the percentage of households that are headed by females (positively related to the prevalence to telephones) and the prevalence of poverty and of black households (both of which are negatively related).

56. One proxy for "trust in government" is voting Democratic in a presidential election. We computed the percentage of voters who chose Clinton over Dole in the 1996 presidential election for each of the counties included in our sample. Voters who chose a third candidate were dropped. When included in the "public transportation" regression, that variable proved to have a significant positive effect, but with little effect on the coefficient on gun prevalence. The same was true when we included this co-variate in the burglary equation.

Copyright 2003, The Brookings Institution

Table 3-7. *Effects of Gun Prevalence on Probability of Burglary*

| Covariates in specification | First stage (IV on gun prevalence) | Second stage (gun prevalence on burglary) |
|---|---|---|
| None | .5433* | .0199** |
|  | (.0985) | (.0104) |
| Household characteristics | .5440* | .0098 |
|  | (.0591) | (.0083) |
| Household characteristics and county covariates | .3503* | .0108 |
|  | (.0642) | (.0130) |

Note: Table shows two-stage least squares regression results, NCVS data, 1996–98, coefficients, and standard errors. Entries in the first-stage column are the estimated coefficients and asymptotic standard errors of the instrumental variable (percent rural in the state in 1950). Entries in the second stage are the estimated coefficients and asymptotic standard errors for gun prevalence proxy on the probability of burglary (N,192,286).

* Significant at the 1 percent level.
** Significant at the 10 percent level.

*Results from Instrumental-Variable Regressions.* Table 3-7 presents the results of two-stage least-squares regressions that rely on the same instrument as in the UCR results, namely, the percentage of the state population that lived in a rural area in 1950. This instrument performs very well in the first stage and is positively related to burglary in the second stage. The magnitudes of the coefficient estimates are very similar to the magnitudes in the ordinary-least-squares analysis but due to the inflated standard errors are no longer discernibly different from zero in a statistical sense.

We also ran these regressions with the other outcome variables, as in table 3-8, and with very similar results. Coefficient estimates for motor-vehicle theft and telephone are insignificant, but the use of public transportation remains strongly negatively related to gun prevalence.

## Conclusions

Taken together, the results reported here provide suggestive evidence that increases in gun ownership may lead to more burglaries. Using a new geocoded version of the NCVS we estimate the elasticity of burglary-victimization probability with respect to our county-level gun proxy to be +0.3 to +0.4, an estimate that is fairly robust to different specifications. Panel-data estimates from the UCR imply an elasticity of +0.6 to +0.7. When we address the problem of reverse causation by instrumenting for current gun ownership rates using across-state variation in the proportion of the population living in rural areas in 1950

Copyright 2003, The Brookings Institution

we obtain qualitatively similar results. While lagged urbanicity may well be correlated with unmeasured factors that affect burglary rates, the direction of bias runs in the opposite direction of our findings (toward overstating deterrence and understating inducement effects) and thus seems unlikely to explain away our findings described earlier. The causal mechanism by which higher gun prevalence would engender higher burglary rates could be through the effect on the value of loot.

## Guns and Hot Burglaries

The empirical results just reported are for residential burglary of all kinds. But much of the public discussion about the possible deterrent value of guns has focused on hot burglaries of occupied dwellings. In what follows we use a simple model to demonstrate that an increase in gun prevalence has an ambiguous effect on the rate of hot burglary. Cross-section NCVS regressions indicate that in practice local gun prevalence has little effect on the share of burglaries that are hot.

### Model

The previous section developed a simple utility-maximizing model for burglars, which highlighted the ambiguous effects of changes in gun prevalence on the overall burglary rate. The effect of guns on hot burglaries is highlighted by the aggregate burglary equation 6, in which $G$ (as before) is the proportion of households that keep guns, $H[G]$ represents the rate of hot burglaries, $h[G]$ represents the proportion of burglaries that are hot, and $B[G]$ represents the overall burglary rate.

$$(6) \qquad H[G] = h[G] \times B[G]$$

$$(7) \qquad H' = h'B + hB'$$

In this setup an increase in gun ownership has an ambiguous net effect on the rate of hot burglaries, as suggested by equation 7. The sign of $B'$ must be determined empirically, since more guns may in theory lead to either more or fewer burglaries. The empirical findings discussed earlier suggest that more guns may increase the burglary rate, in which case the second term on the right-hand side of equation 7, $B'h$, is positive. The sign of the first term on the right-hand side of (7) is negative ($h' < 0$) if higher gun prevalence diverts burglars away from

Copyright 2003, The Brookings Institution

Table 3-8. *Effects of Gun Prevalence on Probability of Hot Burglary*

| | Dependent variable (gun stolen in residential burglary) | |
|---|---|---|
| Covariates in specification | Burglary cases only (N = 6,929) | Complete sample (N = 329,101) |
| None | −.0837 | .00587* |
| | (.0523) | (.00127) |
| Household characteristics | −.0495 | .00348* |
| | (.0517) | (.00128) |
| Household characteristics and state fixed effects | −.0625 | .00376** |
| | (.0909) | (.00228) |
| Household characteristics and county covariates | −.0226 | .00339** |
| | (.0720) | (.00077) |

Note: Table shows cross-section OLS regression results, NCVS data, 1994–98, coefficients, and standard errors. Each entry is the estimated coefficient and standard error on the gun-prevalence proxy from a regression with specification and data as indicated.

*Significant at the 1 percent level.
**Significant at the 10 percent level.

occupied homes through a deterrent effect and positive if the opportunity to steal a gun is worth enough so that higher gun prevalence encourages burglars to take a greater chance.

Even if more guns in circulation causes burglars to take extra care to avoid occupied homes, the effect on the parameter of greatest policy interest—the probability that an occupied home is burgled—is ambiguous because of the increase in the total number of burglaries.

## NCVS Results

The results from a cross-sectional analysis of NCVS data in the period 1994–98 are presented in table 3-8. The first column of estimates are of the effect of gun prevalence on the likelihood that someone is at home when there is a burglary (22 percent on average). Although the coefficient estimates are negative in every case (suggesting a deterrent effect), they are not discernibly different from zero, and in all but the simple regression have $t$ statistics less than one. While null findings may sometimes simply reflect a lack of statistical power, in this case the NCVS data support a quite precise estimate, with the standard errors all less than one-tenth of 1 percentage point.

If, as suggested by these results, more guns lead to more burglaries but do not change the proportion of burglaries that are hot, we would expect an increase in

Copyright 2003, The Brookings Institution

gun prevalence to be associated with higher rates of hot burglary. Consistent
with this expectation, the estimates reported in the last column of table 3-8 show
that an increase in gun prevalence increases the probability that a household is
victimized by a hot burglary. A 10 percentage point increase in the gun proxy
increases the rate of hot burglaries by .03 or .04 percent, roughly in proportion
to the increase in the overall burglary rate.[57]

## Discussion

This chapter is motivated by the plausible although untested claim that wide-
spread gun ownership deters burglars and diverts them from occupied homes.
Previous evidence on this point is indirect, anecdotal, or based on flawed data,
and in any case provides no clear conclusion. The new results reported here sug-
gest that if there is such a deterrent effect, it may well be swamped by other fac-
tors associated with gun prevalence—most likely, it seems to us, that guns are
particularly attractive loot. Cross-section analysis of the NCVS and panel-data
analysis of the UCR yield similar findings: a 10 percent increase in our measure
of gun ownership increases burglary rates by 3 to 7 percent. These results do not
seem likely to occur because of reverse causation: among other evidence on this
matter is the findings from our instrumental-variable estimates, which are con-
sistent with the OLS results. Most important, we find that gun prevalence has
little effect on the fraction of residential burglaries in which someone is at home,
and that the hot-burglary victimization rate tends to increase with gun preva-
lence. These results are robust to alternative specifications and data sets. We con-
clude that keeping a gun at home is unlikely to provide a positive externality in
the form of burglary deterrence. If anything, residences in a neighborhood with
high gun prevalence are at greater risk of being burglarized, hot and otherwise.
There is an irony here: guns are often kept to protect the home, but the aggre-
gate effect of individual decisions to keep guns at home may be an increase in
the victimization rate.

57. We also repeated these OLS estimates for a sample restricted to a group that is unusually
susceptible to hot burglary rates, female-headed households. The results are qualitatively similar,
although with larger standard errors.

Copyright 2003, The Brookings Institution

# Appendix A

### Table 3A-1. *Effects of Gun Prevalence on Burglary Rates*

| Item | Outcome measure | | |
|---|---|---|---|
| | $Burg_{it}$ | $Log\ Burg_{it}$ | $Log\ Burg_{it}$ |
| $G_{it}$ | 14.6153** | 0.0015** | |
| | (6.7823) | (0.0045) | |
| $Log\ G_{it-1}$ | | | 0.6977 |
| | | | (0.2076)* |
| $Log\ G_{it-2}$ | | | 0.4682** |
| | | | (0.2665) |
| $Log\ Burg_{it-1}$ | | | −0.3604 |
| | | | (0.1660)* |
| $Log\ Burg_{it-2}$ | | | −0.0246 |
| | | | (0.1291) |
| State unemployment rate | 7.6282** | 0.0064 | 0.0014 |
| | (3.8702) | (0.0031)* | (0.0032) |
| Per capita income | 14.9466 | −0.0239 | −0.0089 |
| (thousands of dollars) | (15.2464 | (0.0150) | (0.0142) |
| Prisoners per capita | −0.4338* | −0.0003* | −0.0005* |
| | (0.1259) | (0.0001) | (0.0001) |
| Alcohol consumption per capita | 15.8253 | 0.0318 | 0.0700 |
| | (106.6787) | (0.0614) | (0.0705) |
| Percent poor | 18.5883 | 0.0102 | 0.0103 |
| | (11.7789) | (0.0070) | (0.0070) |
| Percent black | 1.6348 | 0.0017 | 0.0025 |
| | (2.9934) | (0.0022) | (0.0022) |
| Year effects included in model? | Yes | Yes | Yes |
| State fixed effects included in model? | Yes | Yes | Yes |
| N | 253 | 253 | 202 |
| $R^2$ | 0.5863 | 0.6135 | 0.7102 |

Note: The table shows regression results from repeated thirty-six-month cross-sections, UCR state-level data, 1977–98, complete list of coefficients and standard errors. Missing values for covariates are set to zero with missing-data dummies included as additional controls (not shown). State population used as weights; robust standard errors presented in parentheses.

\* Significant at the 5 percent level.

\*\* Significant at the 10 percent level.

Copyright 2003, The Brookings Institution

## Appendix B: Assessing the Likely
## Direction of Error in the Estimates

In this appendix we outline the argument for why any bias in our instrumental-variables (IV) estimates introduced by correlation between our instrument and the unobserved determinants of burglary rates is likely to lead us to overstate deterrence and understate inducement effects.

In equations B1 and B2 we reproduce the first- and second-stage equations that we use to derive our IV estimates for the state-level UCR data. $Burg_i$ represents state ($i$)'s burglary rate, $G_i$ is the gun-prevalence proxy, $e_i$ is a stochastic error term, and $R_i$ represents the proportion of the state that lived in rural areas in 1950. We use two-stage least squares to estimate a predicted value of the gun index in the first-stage equation B1 as a function of the instrumental variable, the proportion of the state living in rural areas in 1950; the predicted value for the gun index from this first-stage equation is then substituted for the actual value in the second-stage equation B2. Note that the actual equations that we estimate also include a common set of exogenous control variables $X_i$ and intercept terms. Because the inclusion of covariates does not change the analysis, we exclude covariates from the equations to simplify the discussion.[58] We also note that the county-level UCR analysis and household-level NCVS estimates are calculated using the same set of equations, with $R_i$ measured at the state level, $G_i$ measured at the county level, and the second-stage standard errors adjusted accordingly.

$$(B1) \qquad G_i = \alpha R_i + v_i$$

$$(B2) \qquad Burg_i = \theta \Gamma_i + e_i$$

John Bound, David Jaeger, and Regina Baker show that in this set-up the bias of the instrumental variables estimate for $\theta$ is given by equation B3, where $\sigma_G^2$ represents the variance of the gun index variable and $\sigma_{\Gamma,e}$ represents the covariance between the predicted value of the gun index from the first stage equation, $\Gamma = \hat{G}$ and the second-stage error term, $e$.[59]

$$(B3) \qquad \text{plim } \theta_{IV} - \theta = \sigma_{\Gamma,e} / \sigma_G^2$$

Our argument that this bias is likely to overstate the deterrent effect of guns on burglaries stems from the fact that areas that were more rural in 1950 have higher gun ownership rates ($\alpha > 0$), as shown in table 3-4, and that areas that

---

58. Bound, Jaeger and Baker (1995).
59. Bound, Jaeger and Baker (1995).

Copyright 2003, The Brookings Institution

are currently more rural have if anything lower burglary rates than urban communities. This second observation comes from cross-section analysis of the NCVS, which suggests that households outside of metropolitan statistical areas (MSAs) clearly have lower burglary rates than other respondents even after conditioning on the rich set of household characteristics described in the text. We similarly find in the UCR that states in which a larger proportion of residents currently live in MSAs have relatively higher burglary rates. These findings suggest that the covariance between the instrument and the second-stage error term, $\sigma_{R,\epsilon}$, is negative. If $\alpha > 0$ and $\sigma_{R,\epsilon} < 0$ then $\sigma_{\Gamma,\epsilon} < 0$ and, because $\sigma_G^2 > 0$, the IV estimate will be biased in the direction of overstating the deterrent effect from guns.

Note that while the equations presented in the tables include a set of exogenous control variables, $X_i$, we have replicated the empirical analysis *without* covariates and obtain qualitatively similar findings—a positive coefficient in the second stage for the effects of predicted gun prevalence on burglary. With the UCR, the second-stage estimate is equal to +1.9 with the state-level data ($p = .67$) and +14.2 with the county-level data ($p < .01$). With the NCVS (reported in the top row, table 3-9), the second-stage coefficient is equal to +.02 and statistically significant at the 10 percent level ($p = .06$).


COMMENT BY

# Bruce Sacerdote


This chapter explores the critical policy question of whether the presence of guns in households deters household burglaries or induces them by providing valuable loot. The authors do an excellent job of tackling this question by using multiple data sets. In the final analysis, Philip J. Cook and Jens Ludwig show convincingly that there is no evidence in these data that increases in guns in households reduce burglaries on net. Instead the authors offer evidence to support the hypothesis that the presence of guns actually induces burglaries.

Ultimately the effect of guns on burglaries is an empirical question, and we do not have simple policy experiments in this area nor do we have good data on individual ownership of guns. For this reason the authors use a clever proxy for gun ownership and test for the proxy's effect on burglaries. They use the proportion of suicides in a state (or county in the results from the National Crime Victimization Survey [NCVS]) that involve firearms. This proxy turns out to be highly correlated with gun ownership rates across states, which makes it a useful measure. Given how quick and effective guns are as a method of suicide,

Copyright 2003, The Brookings Institution

# Exhibit 68

# The Association between the Purchase of a Handgun and Homicide or Suicide

## A B S T R A C T

*Objectives.* The purpose of this study was to determine whether purchase of a handgun from a licensed dealer is associated with the risk of homicide or suicide and whether any association varies in relation to time since purchase.

*Methods.* A case–control study was done among the members of a large health maintenance organization. Case subjects were the 353 suicide victims and 117 homicide victims among the members from 1980 through 1992. Five control subjects were matched to each case subject on age, sex, and zip code of residence. Handgun purchase information was obtained from the Department of Licensing.

*Results.* The adjusted relative risk for suicide was 1.9 (95% confidence interval [CI] = 1.4, 2.5) for persons with a history of family handgun purchase from a registered dealer. The adjusted relative risk for homicide, given a history of family handgun purchase, was 2.2 (95% CI = 1.3, 3.7). For both suicide and homicide, the elevated relative risks persisted for more than 5 years after the purchase.

*Conclusions.* Legal purchase of a handgun appears to be associated with a long-lasting increased risk of violent death. (*Am J Public Health.* 1997;87:974–978)

*Peter Cummings, MD, MPH, Thomas D. Koepsell, MD, MPH, David C. Grossman, MD, MPH, James Savarino, PhD, MS, and Robert S. Thompson, MD*

## Introduction

In the United States in 1994 there were 31 142 suicides and 24 926 homicides with respective age-adjusted mortality rates of 12.0 and 9.6 per 100 000; firearms were used in 60% of suicides and 72% of homicides.[1] Guns are thought to be present in 49% of US households,[2] and 33% of gun owners report that protection is the primary reason for ownership.[3] Firearms can sometimes provide safety benefits to their owners.[4,5] Whether the benefits of firearm ownership outweigh the risks is debated.[6–9]

Evidence that access to firearms may increase the risk of suicide and homicide comes from five case–control studies.[10–14] These studies have several limitations. First, they used information from proxy respondents for case subjects, but often interviewed control subjects directly; this difference might have biased the results.[15] Second, interviews were used to ascertain gun ownership; bias could have resulted if there was deception by some respondents and the degree of deception differed between the case and control subjects. Third, two of the studies were confined to events in homes.[12,14] Persons without guns might choose a suicide method that necessitated leaving the home and there might be no association between gun ownership and that suicide.[16] Only 24% of murders in the study area occurred in the home,[14] so the association between gun ownership and most homicides is unknown.[17] Fourth, three of the studies were confined to adolescents.[10,11,13] Finally, the study of homicides[14] was criticized[17] because the socioeconomic status of many victims was low. It is conceivable that firearms might be a risk factor for homicide among the poor but not among others.

To address these issues, we studied the predominantly middle-class members of a health maintenance organization. Our main question was whether purchase of a handgun from a licensed dealer was associated with an increased or decreased risk of suicide or homicide. In addition, we asked whether risk or benefit varied in relation to the time since purchase, number of handguns purchased, or caliber of weapon purchased.

## Methods

Group Health Cooperative of Puget Sound, a health maintenance organization in Washington State, grew from 320 000 members in 1980 to 450 000 members in 1992. Compared with the 1984 adult population of the United States, a random sample of 1133 adult Group Health members in 1984 were more often female (55% vs 52%), more likely to have completed high school (91% vs 70%),

Peter Cummings, Thomas D. Koepsell, and David C. Grossman are with the Harborview Injury Prevention and Research Center. Peter Cummings and Thomas D. Koepsell are also with the School of Public Health and Community Medicine, and David C. Grossman is also with the School of Medicine, at the University of Washington. James Savarino and Robert S. Thompson are with the Center for Health Studies of Group Health Cooperative of Puget Sound. All institutions are in Seattle, Wash.

Requests for reprints should be sent to Peter Cummings, MD, MPH, Harborview Injury Prevention and Research Center, Box 359960, 325 Ninth Ave, Seattle, WA 98104–2499.

This paper was accepted September 18, 1996.

**Editor's Note.** See related editorial by Morgenstern (p 899), comment by Kellermann (p 910), and commentary by Webster et al. (p 918) in this issue.

Handgun Purchase

less often African American (3% vs 11%), and less likely to have a family income below $15 000 (20% vs 33%).[18-21]

A case subject was a Group Health member who died of suicide or homicide during the period January 1, 1980, through December 31, 1992. Computerized Washington State death certificates were compared with computerized Group Health membership records to identify case subjects. For each case subject, five control subjects were sought from the membership file. Control subjects were randomly selected from among persons who were Group Health members on the day the case subject died and who matched that person on sex, age (within 6 years), and zip code of residence. If five control subjects could not be found within the case subject's zip code, we selected additional control subjects from adjoining zip codes. The case subject's date of death became the reference date for his or her matched control subjects. For each case and control subject, we identified family members (spouse or children) who were enrolled under the same Group Health policy.

When a handgun (but not a long gun) is purchased from a licensed dealer in Washington State, information about the sale must be reported to the Department of Licensing. This information was computerized for purchases from 1940 through June 1993. This file was linked to the subjects and family members to identify the handgun purchase history of each study subject and his or her family prior to death or reference date. We defined three categories of handgun purchase: (1) family purchase (purchase by the subject or any family member), (2) personal purchase (purchase by the study subject), and (3) family member purchase (purchase by any family member, but not the study subject).

The most recent address prior to death or reference date for each subject was obtained from Group Health files. Computerized geocoding methods (Harte-Hanks Data Technologies, Billerica, Mass) were used to map this address to a census block group. The socioeconomic status of persons in each census block group was measured by means of 1990 census variables: median family income in 1989, median value of owner-occupied homes, and average years of education for persons over 24 years of age.[22]

Person-years of Group Health membership were calculated by age and sex. Age-adjusted rates were directly standardized to the 1940 United States population.[23] Odds ratios from conditional logistic regression, which accounted for the

| | Suicides/100 000 Member-Years (95% CI) | Homicides/100 000 Member-Years (95% CI) |
|---|---|---|
| **TABLE 1—Incidence of Suicide and Homicide among Members of Group Health Cooperative, Washington State, 1980 through 1992** | | |
| All members | 8.3 (7.5, 9.2) | 2.7 (2.2, 3.2) |
| Age, y | | |
| 0–12 | 0.1 (0.0, 0.7) | 1.2 (0.6, 2.3) |
| 13–19 | 8.8 (6.3, 11.2) | 3.9 (2.3, 6.1) |
| 20–49 | 9.3 (8.0, 10.7) | 2.8 (2.1, 3.6) |
| 50+ | 12.4 (10.4, 14.7) | 2.9 (2.0, 4.1) |
| Sex | | |
| Men | 13.4 (11.9, 15.1) | 2.9 (2.2, 3.7) |
| Women | 3.8 (3.0, 4.6) | 2.4 (1.9, 3.2) |
| Deaths involving firearms | | |
| Men | 8.6 (7.4, 9.9) | 1.6 (1.2, 2.3) |
| Women | 1.2 (0.9, 1.8) | 1.4 (1.0, 2.0) |
| All | 4.7 (4.1, 5.4) | 1.5 (1.2, 1.9) |

*Note.* CI = confidence interval.

matched design, were used to approximate relative risks.[24] Potential confounding variables examined were the number of family members and the measures of census block group affluence and education. The chi-square approximation of the likelihood ratio statistic was used for tests of heterogeneity, trend, and interaction.

## Results

### Incidence Rates

From 1980 through 1992, there were 4 407 197 person-years of Group Health membership, with 366 suicides and 117 deaths by homicide (Table 1). Age-adjusted Group Health mortality per 100 000 persons per year was 7.8 for suicide and 2.7 for homicide. The incidence of suicide was 3.6 times higher for males, while homicide rates showed little difference by gender. Among suicides, 52.7% used a gun, and 56.4% of homicides involved a firearm.

### Comparison of Case and Control Subjects

Five matched control subjects were identified for 96.3% of all case subjects. No control subjects were found for 13 suicides, but at least one was found for each homicide victim. Among control subjects, 97.8% had an age at reference date that differed from their respective case subject's age at death by less than 2 years, and 99.1% resided in the same zip code as their matching case subject. Case subjects were more likely than control subjects to have no family members

(33.7% vs 25.4% for suicides and 31.9% vs 26.1% for homicide victims).

Not all addresses could be geocoded; census block group data could be linked to 83.4% of all matched case subjects and 83.4% of all control subjects. Suicides showed little difference from control subjects for the census variables; P values for trend tests were all greater than .8. Homicide victims were more likely than control subjects in the same zip code area to reside in poor neighborhoods, as judged by median family income (test for trend, $P = .01$), but showed little difference from control subjects in median value of neighborhood homes (test for trend, $P = .8$) or in the educational attainment of neighborhood adults (test for trend, $P = .6$).

### Suicide and Handgun Purchase

Persons who committed suicide were more likely than control subjects to have a history of family handgun purchase (24.6% vs 15.1%). The relative risk for suicide, given a family handgun purchase, was 1.9 (95% confidence interval [CI] = 1.4, 2.5) (Table 2). The relative risks for suicide given a personal or family member handgun purchase were also elevated, although the elevated risk for family member purchase was not statistically significant. These estimates are adjusted for the matching variables; further adjustment for family size or the socioeconomic status variables resulted in no important change. The relative risk for suicide involving a gun was 3.1 (95% CI = 2.2, 4.4) for persons with a family handgun

Cummings et al.

**TABLE 2—Handgun Purchase History and Relative Risk Estimates for Matched Suicides and Control Subjects**

| Handgun Purchase History | Suicides (n = 353) | | Control Subjects (n = 1756) | | Adjusted Relative Risk[a] | 95% Confidence Interval | $p$[b] |
|---|---|---|---|---|---|---|---|
| | No. | (%) | No. | (%) | | | |
| Category of purchase | | | | | | | . . . |
| Family | 87 | (24.6) | 265 | (15.1) | 1.9 | 1.4, 2.5 | |
| Personal | 62 | (17.6) | 177 | (10.1) | 2.0 | 1.4, 2.8 | |
| Family member | 25 | (7.1) | 88 | (5.0) | 1.5 | 0.9, 2.5 | |
| Time since family purchase, y | | | | | | | .03[c] |
| <1 | 11 | (3.1) | 12 | (0.7) | 5.7 | 2.4, 13.5 | |
| 1–4 | 11 | (3.1) | 37 | (2.1) | 1.7 | 0.8, 3.4 | |
| ≥5 | 65 | (18.4) | 216 | (12.3) | 1.7 | 1.3, 2.3 | |
| No. family purchases | | | | | | | .06 |
| 1 | 45 | (12.7) | 162 | (9.2) | 1.6 | 1.1, 2.2 | |
| 2 | 14 | (4.0) | 44 | (2.5) | 1.8 | 1.0, 3.4 | |
| ≥3 | 28 | (7.9) | 59 | (3.4) | 2.7 | 1.7, 4.4 | |
| Maximum caliber of family purchase[d] | | | | | | | .3 |
| .22–.30 | 30 | (8.5) | 107 | (6.1) | 1.6 | 1.0, 2.4 | |
| .32–.45 | 56 | (15.9) | 153 | (8.7) | 2.1 | 1.5, 2.9 | |

[a]Adjusted for age, sex, zip code area, and reference date.
[b]Statistical significance of any trend across the presented categories.
[c]Test for heterogeneity of exposure categories.
[d]Data missing for 1 case and 5 control subjects.

**TABLE 3—Handgun Purchase History and Relative Risk Estimates for Matched Homicide Victims and Control Subjects**

| Handgun Purchase History | Homicide Victims (n = 117) | | Control Subjects (n = 582) | | Adjusted Relative Risk[a] | 95% Confidence Interval | $p$[b] |
|---|---|---|---|---|---|---|---|
| | No. | (%) | No. | (%) | | | |
| Category of purchase | | | | | | | . . . |
| Family | 25 | (21.4) | 69 | (11.9) | 2.2 | 1.3, 3.7 | |
| Personal | 11 | (9.4) | 29 | (5.0) | 2.2 | 1.0, 4.7 | |
| Family member | 14 | (12.0) | 40 | (6.9) | 2.1 | 1.0, 4.2 | |
| Time since family purchase, y | | | | | | | .3 |
| <5 | 3 | (2.6) | 17 | (2.9) | 1.0 | 0.3, 3.6 | |
| 5–9 | 5 | (4.3) | 11 | (1.9) | 2.9 | 0.9, 8.9 | |
| ≥10 | 17 | (14.5) | 41 | (7.0) | 2.5 | 1.3, 4.7 | |
| No. family purchases | | | | | | | .004 |
| 1 | 7 | (6.0) | 37 | (6.4) | 1.1 | 0.5, 2.5 | |
| 2 | 7 | (6.0) | 20 | (3.4) | 2.1 | 0.8, 5.2 | |
| ≥3 | 11 | (9.4) | 12 | (2.1) | 6.2 | 2.4, 15.6 | |
| Maximum caliber of family purchase[c] | | | | | | | .2 |
| .22–.30 | 5 | (4.3) | 23 | (4.0) | 1.3 | 0.5, 3.4 | |
| .32–.45 | 20 | (17.1) | 44 | (7.6) | 2.7 | 1.5, 5.0 | |

[a]Adjusted for age, sex, zip code area, and reference date.
[b]Statistical significance of any trend across the presented categories.
[c]Data missing for 2 control subjects.

gun was 10.7 years (range, 11 days to 52.5 years). The relative risk for suicide given a family handgun purchase was greatest within the first year after purchase but remained elevated even after 5 years (Table 2).

The association between handgun purchase and suicide tended to become stronger as the number of handguns purchased increased (test for trend across categories, $P = .06$) (Table 2). When persons were classified by the largest caliber of any family handgun purchase, the relative risk of suicide showed little variation by caliber.

The association between family handgun purchase and suicide was estimated in several subgroups. No statistically significant differences in the relative risk estimates were found for categories of sex, age, or neighborhood median family income (data not shown).

*Homicide and Handgun Purchase*

Homicide victims were more likely than control subjects to have a history of family handgun purchase (21.4% vs 11.9%). The relative risk of death by homicide for those with a family handgun purchase was 2.2 (95% CI = 1.3, to 3.7) (Table 3). The relative risks for death by homicide given a personal or family member purchase were also elevated, although these estimates were of borderline statistical significance. These estimates are adjusted for the matching variables; further adjustment for family size or the census variables resulted in no important change. The relative risk for death by homicide involving a gun was 2.2 (95% CI = 1.1, 4.4) for persons with a family handgun purchase compared with others, while the corresponding relative risk for homicide not involving a gun was 2.0 (95% CI = 0.9, 4.7).

The median interval between first family handgun purchase and any homicide death with a gun was 11.3 years (range, 5.1 to 21.9 years). The relative risk of death by homicide associated with family handgun purchase bore no statistically significant relationship to time since purchase (Table 3).

There was a stronger association between handgun purchase and death by homicide as the number of handguns purchased increased (test for trend across categories, $P = .004$) (Table 3). When persons were classified by the largest caliber of any family handgun purchase, the relative risk of homicide did not show a statistically significant variation by caliber.

purchase compared with others, while the relative risk for suicide not involving a gun was 0.8 (95% CI = 0.4, 1.3).

The median interval between the first handgun purchase by the victim or any family member and any suicide with a

Handgun Purchase

When subgroups were analyzed, the association between family handgun purchase and death by homicide was not statistically different by categories of sex, age, or neighborhood median family income (data not shown).

## Discussion

Members of a health maintenance organization whose families had a history of registered handgun purchase had risks of death by suicide and homicide that were twice as high as those of members of the same age, sex, and neighborhood who had no history of handgun purchase. The increased relative risks persisted for more than 5 years after the purchase.

From 1980 through 1992, the age-adjusted suicide rate in the Group Health population was 7.8 per 100 000 persons per year; the corresponding rate was 13.2 in Washington State and 11.5 in the United States (mortality and population data from the National Center for Health Statistics). The middle-class nature of the study population is reflected in the low age-adjusted homicide rate: 2.7 per 100 000 persons per year for Group Health members during the study period, compared with 5.3 for all of Washington and 9.5 for the United States.

Inability to measure and control for other differences between case and control subjects could have biased our relative risk estimates. Three previous studies of the association between gun ownership and suicide[11–13] and the only previous study regarding death by homicide[14] adjusted their relative risk estimates for variables that we did not measure, including psychiatric history, substance abuse, criminal history, and previous household violence. In three of these studies[12–14] these adjustments increased the relative risk estimates.

Residual confounding in our study can be assessed indirectly by examining the relative risk estimates for suicide and homicide deaths without a gun; we would expect handgun purchase to have little positive association with deaths that do not involve a gun. For suicide by means other than a firearm, the relative risk was 0.8 (95% CI = 0.4, 1.3) among those with a history of handgun purchase. The finding that this estimate is close to 1.0 suggests that the underlying risk of suicide was similar between handgun purchasers and nonpurchasers apart from purchase history.

For death by homicide by means other than a gun, the relative risk was 2.0 (95% CI = 0.9, 4.7) among those with a history of family handgun purchase. Although chance could explain this finding, another explanation may be that handgun purchasers were more inclined toward violence or lived in more dangerous surroundings and these factors induced them to purchase handguns. This violent personality or environment may have increased the risk for both gun-related and other homicide death, regardless of exposure to handgun purchase. If this theory is true, then the apparent association between handgun purchase and all homicide deaths may be due to uncontrolled confounding. Another explanation might be that some handgun purchasers were encouraged by their ownership of a gun to engage in activities that increased their risk for homicide by any means.

Handgun purchase from a licensed dealer can be considered a proxy measure for handgun ownership. Some study subjects classified as exposed to handguns may have disposed of their handguns; others classified as not exposed may have possessed handguns that they purchased legally from sources other than a registered dealer, purchased out of state, or obtained illegally. If such errors in classification occurred with similar frequency among case and control subjects, the relationship between handgun ownership and risk could have been underestimated in our study.[25] It is also possible that persons inclined to commit homicide may have been more likely to procure handguns exclusively by private or illegal means; these transactions are not reported to the state. If this pattern is present, it would tend to bias our relative risk estimates for homicide toward zero.

There is evidence that handgun purchase records did not grossly underestimate exposure to handguns in our study. In 1992, of 1000 Seattle adults interviewed, 14.2% reported household ownership of a handgun.[26] This figure is similar to the prevalence of family handgun purchase history among our control subjects matched to suicide and homicide victims (15.1% and 11.9%, respectively).

Defining exposure as purchase of a handgun from a dealer offered some advantages. Because exposure was recorded before the outcome, recall bias was eliminated. We did not have to rely on proxy respondents for exposure information regarding the case subjects, and deception regarding exposure was eliminated. Those who recommend purchase of a handgun for protection are referring to legal purchase, and many of these purchases would be from dealers. If this exposure is associated with an increased risk of death, the overall risk of legal handgun purchase may outweigh any protective benefit.

Our finding of an increased relative risk for suicide among persons in families that purchased handguns agrees in general with the findings of previous case–control studies of suicide and gun ownership. Three studies were conducted among adolescents in western Pennsylvania.[10,11,13] Using inpatients as control subjects, the first study reported that the relative risk for suicide among those with firearms in the home was 2.7,[10] and the second study gave an estimate of 2.1.[11] The third study used population-based control subjects and reported an adjusted relative risk for suicide, given a handgun in the home, of 9.5 (95% CI = 1.7, 53.9).[13] A study conducted in Tennessee and Washington estimated that the relative risk for suicide in the home among handgun owners was 5.8.[12]

Our finding regarding death by homicide and purchase of a handgun was similar to that of the only previous case–control study of this association. In Tennessee, Washington, and Ohio, victims of homicide in the home were compared with population-based control subjects; the relative risk for homicide, adjusted for matching variables, was 1.9 (95% CI = 1.4, 2.7) among handgun owners.[14] The authors reported a relative risk of 2.7 among owners of any firearm compared with nonowners, after further adjustment for other variables, but a fully adjusted relative risk estimate for handguns was not given.

Some persons may purposely buy a handgun to commit suicide or homicide. There was evidence in our data that this was true for suicide; within the first year after purchase, the relative risk of suicide was more than fivefold higher among those with a family history of handgun purchase. After the first year the increased relative risk of suicide persisted at a lower level, consistent with the theory that the presence of a handgun in the home may facilitate suicide during a period of despondency. For homicide the results were different; no Group Health member was murdered with a gun within 5 years of any first handgun purchase, and the elevated risks for death by homicide associated with handgun purchase did not show any statistically significant variation by time since purchase. This suggests that in the Group Health population, deliberate

legal purchase of a handgun to commit murder within a family is a rare event.

Our findings should be of interest to persons who own a handgun or are considering the purchase of a handgun. While there are occasional situations in which handguns offer protection against violent death, our study and previous studies agree that on average, the acquisition of a handgun appears to be associated with an increased risk of violent death. □

## Acknowledgment

This study was supported by a grant from the Group Health Foundation, Seattle, Wash.

## References

1. Singh GK, Kochanek KD, MacDorman MF. Advance report of final mortality statistics, 1994. *Month Vital Stat Rep.* 1996;45(3), suppl.

2. *Crime Victimization in the United States.* Washington, DC: US Dept of Justice, Bureau of Justice Statistics; 1993.

3. Hemenway D, Solnick SJ, Azrael DR. Firearm training and storage. *JAMA.* 1995; 273:46–50.

4. Rand MR. *Guns and Crime: Handgun Victimization; Firearm Self-Defense, and Firearm Theft.* Washington, DC: US Dept of Justice, Bureau of Justice Statistics; 1994.

5. McDowall D, Wiersema B. The incidence of defensive firearm use by US crime victims, 1987 through 1980. *Am J Public Health.* 1994;84:1982–1984.

6. Nisbet L. *The Gun Control Debate: You Decide.* New York, NY: Prometheus Books; 1990.

7. Kellermann AL. Gun Smoke. *J Med Assoc Ga.* 1994;83:254–255. Letter.

8. Suter EA. Guns in the medical literature—a failure of peer review. *J Med Assoc Ga.* 1994;83:133–148.

9. Faria MA Jr. Gun smoke: the editor responds. *J Med Assoc Ga.* 1994;83:255–259. Letter.

10. Brent DA, Perper JA, Goldstein CE, et al. Risk factors for adolescent suicide: a comparison of adolescent suicide victims with suicidal inpatients. *Arch Gen Psychiatry.* 1988;45:581–588.

11. Brent DA, Perper JA, Allman CJ, Moritz GM, Wartella ME, Zelenak JP. The presence and accessibility of firearms in the homes of adolescent suicides: a case-control study. *JAMA.* 1991;266:2989–2995.

12. Kellermann AL, Rivara FP, Somes G, et al. Suicide in the home in relation to gun ownership. *N Engl J Med.* 1992;327:467–472.

13. Brent DA, Perper JA, Moritz G, Baugher M, Schweers J, Roth C. Firearms and adolescent suicide: a community based case-control study. *Am J Dis Child.* 1993; 147:1066–1071.

14. Kellermann AL, Rivara FP, Rushforth NB, et al. Gun ownership as a risk factor for homicide in the home. *N Engl J Med.* 1993;329:1084–1091.

15. Litaker D. Guns and homicide in the home. *N Engl J Med.* 1994;330:365–366. Letter.

16. Zimring FE. Policy research on firearms and violence. *Health Affairs.* 1993;12:109–122.

17. Blackman PH. Guns and homicide in the home. *N Engl J Med.* 1994;330:366. Letter.

18. *Current Population Reports, Estimates of the Population of the United States by Age, Sex, and Race: 1980 to 1986.* Washington, DC: US Dept of Commerce, Bureau of the Census; 1987.

19. *County and City Data Book.* Washington, DC: US Dept of Commerce, Bureau of the Census; 1988.

20. *1990 Census of Population, General Population Characteristics, Washington.* Washington, DC: US Dept of Commerce, Bureau of the Census; 1992.

21. *Current Population Reports, Money Income of Households, Families, and Persons in the United States, 1984.* Washington, DC: US Dept of Commerce, Bureau of the Census; 1986.

22. *1990 Census of Population and Housing, Summary Tape File 3A.* Washington, DC: US Dept of Commerce, Bureau of the Census; 1992.

23. Curtin LR, Klein RJ. *Direct Standardization (Age-Adjusted Death Rates).* Hyattsville, Md: National Center for Health Statistics; 1995.

24. Breslow NE, Day NE. *Statistical Methods in Cancer Research. Volume I—The Analysis of Case-Control Studies.* Lyon, France: International Agency for Research on Cancer; 1980.

25. Armstrong BK, White E, Saracci R. *Principles of Exposure Measurement in Epidemiology.* New York, NY: Oxford University Press; 1992.

26. Callahan CM, Rivara FP, Koepsell TD. Money for guns: evaluation of the Seattle gun buy-back program. *Public Health Rep.* 1994;109:472–477.

Copyright of American Journal of Public Health is the property of American Public Health Association and its content may not be copied or emailed to multiple sites or posted to a listserv without the copyright holder's express written permission. However, users may print, download, or email articles for individual use.

# Exhibit 69



**PERGAMON**

Accident Analysis and Prevention 35 (2003) 711–716



**ACCIDENT ANALYSIS & PREVENTION**

www.elsevier.com/locate/aap

# Firearms in US homes as a risk factor for unintentional gunshot fatality

Douglas J. Wiebe*

*Violence Prevention Research Group, UCLA School of Public Health, 650 C. E. Young Drive South, Box 951772, Los Angeles, CA 90095-1772, USA*

Received 10 December 2001; received in revised form 11 March 2002; accepted 22 April 2002

## Abstract

This study used national data and a matched case-control design to estimate the relative risk of death by an unintentional gunshot associated with having firearms in the home. A sample of adults who died in the United States in 1993 from unintentional gunshot injuries was drawn from the National Mortality Followback Survey (NMFS) ($n = 84$). Twenty controls were sought for each case from the 1994 National Health Interview Survey (NHIS) and matched to the cases by sex, age group, race, and region of residence ($n = 1451$). Subjects were classified as having or not having guns in the home based interview responses. The relative risk of death by an unintentional gunshot injury, comparing subjects living in homes with and without guns, was 3.7 (95% confidence interval (CI) = 1.9–7.2). Adjustment for covariates resulted in little change in the effect estimates. There was evidence of a dose-response effect: compared to subjects living in homes with no guns, the relative risk was 3.4 (95% CI = 1.5–7.6) among subjects with one gun and 3.9 (95% CI = 2.0–7.8) among subjects with multiple guns in the home. Having handguns in the home was associated with the largest effect estimates. Tests of homogeneity showed that the effect estimates did not vary significantly across categories of the matching variables. Firearms in the home appear to be a risk factor for unintentional gunshot fatality among adults. The magnitude of the observed effect estimates should be compared with those from additional studies.
© 2003 Elsevier Science Ltd. All rights reserved.

*Keywords:* Firearms; Guns; Unintentional fatality; Accident

## 1. Introduction

Firearms are present in approximately one-third of US households (Davis and Smith, 2000). A national estimate suggests that the privately owned firearm stock sums to nearly 200 million guns (Cook and Ludwig, 1997). Commonly cited reasons for firearm ownership are sport shooting, hunting, and self protection (Cook and Ludwig, 1997). Unfortunately, the handling and use of firearms can have serious unintended consequences that include unintentional gunshot injuries and death.

In 1989–1998, approximately 3500 children and 9300 adults died in unintentional shootings in the US (National Center for Health Statistics, 1989–1998). Although it has been declining annually, death from unintentional shooting remains an important public health problem. On average two people die each day in the US from unintentional gunshot injuries (Minino and Smith, 2001). Unintentional injuries that are fatal represent only part of the harm (Annest et al., 1995). For every unintentional gunshot fatality in the US, another 13 people are treated for non-fatal gunshot injuries in hospital emergency departments (Gotsch et al., 2001).

Evidence that firearm availability is a risk factor for homicide (Kellermann et al., 1993; Cummings et al., 1997) and suicide (e.g. Kellermann et al., 1992; Cummings et al., 1997) comes from multiple case-control studies. By contrast, case-control designs have not been used to investigate a link between firearm availability and death by unintentional shooting. State-level research provides evidence that such an association exists. In the US during 1979–1997, the rate of unintentional gunshot fatalities in states with the highest levels of gun availability was nine times higher than the rate in states with the lowest levels of gun availability (Miller et al., 2001). During 1988–1997, the rate of child unintentional gunshot deaths was 16 times higher in states where guns were most prevalent compared to states where guns were least prevalent (Miller et al., 2002). Results from a study of child deaths in California provide evidence that the association may stem from a gun kept in the decedent's home. During 1977–1983, the prevalence of a handgun in homes of children killed in unintentional gunshot shootings was two times higher than predicted based on the level of handgun availability in homes in the region (Wintemute et al., 1989). This article presents a case-control study that further examined the topic.

* Tel.: +1-310-794-7690; fax: +1-310-794-1805
*E-mail address:* dwiebe@cceb.med.upenn.edu (D.J. Wiebe).

## 2. Methods

The purpose was to derive an estimate of the relative risk for unintentional gunshot fatality associated with living in a home where firearms were or were not present. The subjects consisted of a sample of adults who died from unintentional gunshot injuries in the US and living controls. The cases came from the 1993 National Mortality Followback Survey (NMFS, 1993) (National Center for Health Statistics, 1998). The NMFS data combine information from surveys and death certificates and contain detailed demographic, health, and lifestyle characteristics of a sample of persons 15 years and older who died in the US. The NCHS has conducted the survey six times since 1961. The 1993 version was the most recent and was the first to elicit information about guns kept in the decedent's home. It was also the first to include decedents under age 25.

The decedents in the 1993 NMFS ($n = 22,957$) were sampled from the Current Mortality Sample, a systematic random sample of death certificates for US residents 15 years and older who died in 1993 (excluding decedents from South Dakota) (Centers for Disease Control and Prevention, no date). Interviews were conducted with next of kin to obtain information about the decedent. About two-thirds of the proxy respondents were interviewed by telephone, one-third were interviewed in person. The response rate was 83%.

The firearms section of the survey began with a statement read by the interviewer: "The next questions are about safety and firearms. Firearms include pistols, shotguns, rifles, and other types of guns. Do not include guns that cannot fire, starter pistols, or BB guns." The present analysis used data based on responses to the first three questions. To wit, all respondents were asked "At any time during the last year of life, were there any firearms kept in or around (the decedent's) home? Include those kept in a garage, outdoor storage area, truck or car." Those responding yes were asked "Was there one or more than one firearm?" and were asked to specify the type or types of firearms. The location of the shooting was assessed with the question "Where did the fatal accident or injury happen?"

Control subjects were drawn from the 1994 National Health Interview Survey (NHIS) (National Center for Health Statistics, 1996). This survey, like the NMFS, is conducted by the NCHS. It is administered annually to non-institutionalized civilians 17 years and older in the US. The survey elicits information on health and health-related practices. In 1994, the Year 2000 Objectives Supplement was added to the survey (National Center for Health Statistics, 1997). The supplement contained a firearms section with questions almost identical to those on the NMFS. The supplement was administered during an in-person interview to one person 18 years or older ($n = 19,738$) per household among half of the NHIS households interviewed in 1994. The response rate was 80%.

The firearms section of the survey began with the statement "The next questions are about safety and firearms. Firearms include pistols, shotguns, rifles, and other types of guns. Do not include guns that cannot fire, starter pistols, or BB guns. *Read if necessary*: sometimes the use of firearms can lead to injury, which is a health problem." (Italics in original). All respondents were then asked "Are any firearms now kept in or around your home? Include those kept in a garage, outdoor storage area, truck or car." Those responding yes were asked "Is there one or more than one firearm?" and were asked to specify the type or types of firearms.

Cases were selected for this analysis if they died from an unintentional gunshot fatality as classified by the ninth revision of the International Classification of Diseases (World Health Organization, 1977). For each case, 20 randomly selected controls were sought and matched to the cases by sex, race, region of residence (north-east, midwest, south, west), and age group (18–24, 25–34, 35–44, 45–54, 55–64, 65–74, 75 years and older). Cases 15–17 years were excluded (10 males, one female) because the minimum age of controls was 18 years.

Odds ratios were calculated with conditional logistic regression to estimate relative risks (Kleinbaum et al., 1982; King and Zeng, 2002) of dying from an unintentional gunshot injury, comparing those living in homes with and without firearms. A dose-response effect was assessed by differentiating subjects with one gun in the home from those with multiple guns, and comparing each group to those with no guns. Also, subjects were categorized as having in their home handguns only, long guns only, or both handguns and long guns, to estimate the effect associated with different gun types.

Wald tests (two-sided $P < 0.05$) were used to test the homogeneity hypothesis that the relative risk estimates were uniform across categories of the matching variables (Rothman and Greenland, 1998). To test homogeneity by age, subjects were collapsed into three groups: 18–24, 25–39, and 40 years and older.

Without previous case-control studies on the topic, it was unclear whether the effect estimates required statistical adjustment to control confounding from other factors. Marital status, education level, and income are related to gun ownership (Nelson et al., 1996; Cook and Ludwig, 1997), but may not be risk factors for death by an unintentional gunshot injury. To explore the potential for confounding, a model was run excluding and then including variables indicating marital status, education level, and annual family income as covariates. Adjusted and unadjusted results are presented.

With the exception of the variables used for matching, each of the variables used in the analysis had some missing data. The amount of missing data ranged from <1% on the marital status variable for controls to 56% on the income variable for controls. Data were missing for the variable indicating the presence of a firearm for 3% of controls and 21% of cases. To prevent subjects with missing data

*D.J. Wiebe / Accident Analysis and Prevention 35 (2003) 711–716*

from being excluded from the analysis, values were multiply imputed for the missing values using Amelia software (Honaker et al., 2001) following methods described by King et al. (2001). Five imputed data sets were generated. The data were analyzed simultaneously with Stata software (Stata Corporation, 2001).

## 3. Results

Eighty-four unintentional shooting fatality case subjects were identified. Twelve were killed with a handgun, four with a shotgun, three with a hunting rifle, and 65 with an unspecified type of gun. Twenty controls were successfully matched by sex, age group, race, and region to 63 of the 84 cases. The remaining cases were matched with between four and 18 controls (average = 13). Table 1 shows characteristics of the cases and controls.

The prevalence of one or multiple firearms was considerably higher among case subjects than controls. Among subjects with guns in the home, equal proportions of cases and controls had both handguns and long guns, but the prevalence of handguns only was higher among cases than controls. The location the shooting occurred was provided for 73% of the cases. The most frequently mentioned locations were in a home or a private area around the home (54%), in a street or highway (12%), or in a place of recreation or sport (5%).

Table 2 shows that the relative risk of death by an unintentional shooting, comparing subjects living in homes with and without at least one gun, was 3.7. The inclusion of covariates showed that marital status, education level, and annual family income were associated with the outcome. However, adjustment for the effect of these variables resulted in little change in the relative risk estimate for having firearms in the home (4.7% increase when estimated at two decimal places). For parsimony and to enhance precision of the parameter estimates (Robinson and Jewell, 1991), the unadjusted results were preferred here. Covariates were not included in subsequent models.

The results in Table 3 show that the magnitude of the association between gun availability and unintentionally gunshot fatality increased with the availability of multiple guns. Compared to subjects living in homes where no guns were present, the relative risk of dying from an unintentional gunshot injury was 3.4 among subjects with one gun in the home and 3.9 among subjects with multiple guns in the home.

Table 4 shows that the relative risk of death by unintentional shooting was elevated among subjects with guns in the home regardless of gun type. The presence of handguns only or both handguns and long guns was associated with particularly high relative risk estimates.

Homogeneity tests based on the results from each model showed that the effect estimates did not differ significantly across categories of sex, race, age group, or region.

Table 1
Demographic characteristics of 84 matched sets of unintentional gunshot fatality cases and controls (in percentage)[a]

| | Cases, $n = 84$ | Controls, $n = 1451$ |
|---|---|---|
| **Sex** | | |
| Female | 19.1 | 22.1 |
| Male | 81.0 | 80.0 |
| **Race** | | |
| Black | 32.1 | 22.8 |
| White | 67.9 | 77.2 |
| Age, years (mean ± S.D.) | 34.3 ± 18.0 | 36.1 ± 17.8 |
| **Age group** | | |
| 15–24 years | 40.5 | 33.9 |
| 25–39 years | 31.0 | 36.0 |
| ≥40 years | 28.6 | 30.1 |
| **Region of residence** | | |
| Northeast | 9.5 | 8.2 |
| Midwest | 10.7 | 12.4 |
| South | 64.3 | 63.3 |
| West | 15.5 | 16.1 |
| **Marital status** | | |
| Never married | 50.0 | 39.0 |
| Widowed, separated, divorced | 16.7 | 14.4 |
| Married | 33.3 | 46.6 |
| **Education** | | |
| Less than high school | 40.6 | 20.4 |
| High school graduate | 43.5 | 36.1 |
| Some college or college graduate | 15.9 | 43.5 |
| **Annual family income (US$)** | | |
| <9000 | 21.6 | 16.8 |
| 9000–13,999 | 24.3 | 10.3 |
| 14,000–18,999 | 10.8 | 10.2 |
| 19,000–24,999 | 24.3 | 13.0 |
| 25,000–49999 | 16.2 | 33.5 |
| ≥50,000 | 2.7 | 16.2 |
| **Type of area (population)** | | |
| ≥250,000 | 46.4 | 87.0 |
| 100,000–249,999 | 10.7 | 9.6 |
| <100,000 (metropolitan) | 1.2 | 3.4 |
| Non-metropolitan | 41.7 | 0.0 |
| **Prevalence of firearms in the home** | | |
| None | 34.4 | 62.5 |
| One firearm | 21.3 | 12.6 |
| More than one firearm | 44.3 | 24.9 |
| **Type of firearm (s)** | | |
| Handgun(s) only | 33.3 | 22.4 |
| Long gun(s) only | 28.6 | 38.7 |
| Handgun(s) and long gun(s) | 38.1 | 38.9 |

*Source*: 1993 National Mortality Followback Survey (US Department of Health and Human Services, National Center for Health Statistics, 1996) and 1994 National Health Interview Survey: Year 2000 Objectives Supplement (US Department of Health and Human Services, National Center for Health Statistics, 1997).

[a] Percentages based on valid responses.

714 *D.J. Wiebe / Accident Analysis and Prevention 35 (2003) 711–716*

Table 2
Relative risk of unintentional gunshot fatality associated with the presence of a firearm(s) in the home

|  | RR[a] | 95% CI |
|---|---|---|
| **Model with no covariates** | | |
| Firearm(s) in home | | |
|  Yes | 3.7 | (1.9, 7.2) |
|  No (reference) | 1 | – |
| **Model adjusted for covariates** | | |
| Firearm(s) in home | | |
|  Yes | 3.9 | (1.9, 7.8) |
|  No (reference) | 1 | – |
| Married | | |
|  Yes | 0.5 | (0.3, 0.8) |
|  No (reference) | 1 | – |
| Education | | |
|  Less than high school | 6.4 | (2.7, 14.9) |
|  High school graduate | 2.8 | (1.3, 6.0) |
|  Some college or more (reference) | 1 | – |
| Annual family income[b] | 1.1 | (1.0, 1.1)[*] |

[a] RR, relative risk; CI, confidence interval.
[b] Coded 1 (<US$ 9000), 2 (US$ 9000–13,999), 3 (US$ 14,000–18,999), 4 (US$ 19,000–24,999), 5 (US$ 25,000–49,999), 6 (≥US$ 50,000).
[*] *P*-value = 0.08.

Table 3
Relative risk of unintentional gunshot fatality associated with having one firearm or multiple firearms in the home

|  | RR[a] | 95% CI |
|---|---|---|
| **Number of firearms in home** | | |
|  Multiple firearms | 3.9 | (2.0, 7.8) |
|  One firearm | 3.4 | (1.5, 7.6) |
|  None (reference) | 1 | – |

[a] RR, relative risk; CI, confidence interval.

Table 4
Relative risk of unintentional gunshot fatality associated with type of firearm(s) in the home

|  | RR[a] | 95% CI |
|---|---|---|
| **Type of firearm(s) in the home** | | |
|  Handguns and long guns | 4.1 | (2.0, 8.8) |
|  Long guns only | 3.1 | (1.4, 6.7) |
|  Handguns only | 5.3 | (2.8, 10.1) |
|  None (reference) | 1 | – |

[a] RR, relative risk; CI, confidence interval.

## 4. Discussion

This study of a sample of adults in the US provides evidence that the presence of a gun in the home was a risk factor for unintentional shooting death. Having multiple guns appeared to compound the hazard, as did having handguns in particular. This study is the first on the topic, to my knowledge, to use a case-control design to estimate the magni-

tude of these relations. Hence, it will be important to compare the observed effect estimates with those derived from subsequent studies. Nonetheless, the results are compelling and have implications for prevention. If the likelihood of death by unintentional gunshot is affected by gun availability, firearms should be a focus of prevention strategies.

Several aspects of the study design warrant comment. The data came from two surveys that may have varied in quality regarding firearm ownership information. Differential misclassification of cases and controls as either having or not having guns in the home could have biased the estimates. Additional information would be required to identify the direction of the bias. Several factors affect gun ownership information gathered through interviews (Kleck, 1997; Ludwig et al., 1998; Azrael et al., 2000), but interview responses are generally considered a valid source for research (Kellermann et al., 1990).

These data, like other large data sources available in the US, did not establish whether a gun used in a shooting had actually been kept in the decedent's home. This is a potential source of bias. However, there is evidence that such bias does not fully explain the effect estimates observed here. Studies with designs that do not depend on linking gun availability to individuals (i.e. ecological studies) found strong positive associations between state levels of firearm availability and rates of unintentional fatalities (Miller et al., 2001, 2002).

Wintemute et al. (1989) have reported evidence among children that the method of unintentional fatality—by handgun or long gun—may vary by the type of firearm kept in the home. The authors suggested that disparate storage methods may account for the difference, as handguns in particular may be kept for protection and, thus, kept in ways that permit access by children. The majority of the cases in the present study were classified as killed with a gun of unspecified type. Although this study found particularly high relative risk estimates associated with having handguns in the home, the interpretation of the finding is tempered since the proportion of deaths that involved a handgun was unknown.

The public health and medical literature has described unintentional shooting events. Even common firearm uses can be hazardous. Injuries are sustained when firearms discharge during cleaning and routine handling (Morrow and Hudson, 1986; Sinauer et al., 1996), during attempts to load or unload (Morrow and Hudson, 1986; Sinauer et al., 1996; Wintemute et al., 1989), and while hunting when triggers catch on objects (Carter, 1989), when people are mistaken for game (Carter, 1989; Cole and Patetta, 1988), when people are in a line of fire (Cole and Patetta, 1988), and when a person carrying a gun stumbles or falls (Morrow and Hudson, 1986). Guns are inadvertently discharged when loaded guns are mistaken for unloaded (Wintemute et al., 1987) and when loaded firearms are carried in vehicles (Carter, 1989; Sinauer et al., 1996). One in five firearm-related deaths of children 14 years and younger are unintentional (Murphy, 2000). Many of these shootings occur when a gun discharges during play or when being displayed (Wintemute et al., 1989).

Public health approaches to preventing both intentional and unintentional firearm-related injuries include developing automatic firearm safety devices that clearly indicate when a gun is loaded, and requiring devices that prevent use by unintended users (e.g. Carter, 1989; Frattaroli et al., 2002; Teret et al., 1998; Wintemute et al., 1989). This study provides additional evidence that fatal gunshot injuries, including unintentional injuries, can be prevented by restricting access to firearms and reducing firearm lethality. One is hard pressed to name another contextual risk factor that could be associated with homicide and suicide, as well as unintentional gunshot fatality.

## Acknowledgements

I wish to acknowledge Susan B. Sorenson for conceptual advice, Hal Morgenstern for methodological advice, Colin Loftin for suggesting the NHIS as a source of controls, and Catherine Taylor, Katherine Vittes and anonymous reviewers for helpful suggestions, and Michael Mitcheu and the UCLA Academic Technology Services consultants. The methodological framework was developed in conjunction with my dissertation committee members: Joan Petersilia, Richard McCleary, Colin Loftin, Valerie Jenness, and Lois Takahashi. Their contributions are appreciated. This work was supported in part by a grant from The California Wellness Foundation (TCWF). Created in 1992 as an independent, private foundation, TCWF's mission is to improve the health of the people of California by making grants for health promotion, wellness education and disease prevention programs. Partial funding was provided also by Public Health Foundation Enterprises, Inc., through a grant from The California Endowment. The paper builds upon dissertation research that was funded in part by a grant from the School of Social Ecology at the University of California-Irvine.

## References

Annest, J.L., Mercy, J.A., Gibson, D.R., Ryan, G.W., 1995. National estimates of non-fatal firearm-related injuries: Beyond the tip of the iceberg. J. Am. Med. Assoc. 273 (22), 1749–1754.

Azrael, D., Miller, M., and Hemenway, D., 2000. Are household firearms stored safely? It depends on whom you ask. Pediatrics, Vol. 106, p. e31 (http://www.pediatrics.org/cgi/content/full/106/3/e31).

Carter, G.L., 1989. Accidental firearm fatalities and injuries among recreational hunters. An. Emer. Med. 18, 406–409.

Centers for Disease Control and Prevention. Sample Design of the 1993 National Mortality Followback Survey. No date. Accessed, 20 February 2002 (http://www.cdc.gov/nchs/about/major/nmfs/sampdsn.pdf).

Cole, T.B., Patetta, M.J., 1988. Hunting firearm injuries, North Carolina. Am. J. Public Health 78, 1585–1586.

Cook, P.J., Ludwig, J., 1997. Guns in America: National Survey on Private Ownership and Use of Firearms, NCJ 165476, US Department of Justice, National Institute of Justice, Government Printing Office, Washington, DC.

Cummings, P., Koepsell, T.D., Grossman, D.C., Savarino, J., Thompson, R.S., 1997. The association between the purchase of a handgun and homicide or suicide. Am. J. Public Health 87, 974–978.

Davis, J.A., Smith, T.W., 2000. General Social Surveys, 1972–2000. (machine-readable data file). Principal Investigator, Davis, James A.; Director and Co-Principal Investigator, Smith, Tom W.; Co-Principal Investigator, Marsden, Peter V., NORC (Eds.) Chicago, National Opinion Research Center, producer; Storrs, CT: The Roper Center for Public Opinion Research, University of Connecticut (distributor).

Frattaroli, S., Webster, D.W., Teret, S.P., 2002. Unintentional gun injuries, firearm design, and prevention: what we know, what we need to know, and what can be done. J. Urban Health 79, 49–59.

Gotsch, K.E., Annest, J.L., Mercy, J.A., Ryan, G.W., 2001. Surveillance for fatal and non-fatal firearm-related injuries—United States, 1993–1998. In: CDC Surveillance Summaries, 13 April 2001, MMWR 2001, 50 (SS-2) 1–36.

Honaker, J., Joseph, A., King, G., Scheve, K., Singh, N., 2001. Amelia: A Program For Missing Data (windows version). Harvard University, Cambridge, MA (http://gking.harvard.edu/).

Robinson, L.D., Jewell, N.P., 1991. Some surprising results about covariate adjustment in logistic regression. Int. Stat. Rev. 58, 227–240.

Kellermann, A.L., Rivara, F.P., Banton, J., et al., 1990. Validating survey responses to questions about gun ownership among owners of registered handguns. Am. J. Epid. 131, 1080–1084.

Kellermann, A.L., Rivara, F.P., Somes, G., et al., 1992. Suicide in the home in relation to gun ownership. New Engl. J. Med. 327, 467–472.

Kellermann, A.L., Rivara, F.P., Rushforth, N.B., et al., 1993. Gun ownership as a risk factor for homicide in the home. New Engl. J. Med. 329, 1084–1091.

King, G., Zeng, L., 2002. Estimating risk and rate levels, ratios and differences in case-control studies. Stat. Med. 21, 1409–1427.

King, G., Honaker, J., Joseph, A., Scheve, K., 2001. Analyzing incomplete political science data: An alternative algorithm for multiple imputation. Am. Pol. Sci. Rev. 95, 49–69.

Kleck, G., 1997. Targeting Guns: Firearms and Their Control, Aldine de Gruyter, New York.

Kleinbaum, D.G., Kupper, L.L., Morgenstern, H., 1982. Epidemiologic Research: Principles and Quantitative Methods, Van Nostrand Reinhold, New York, pp. 146–147.

Ludwig, J., Cook, P.J., Smith, T.W., 1998. The gender gap in reporting household gun ownership. Am. J. Public Health 88, 1715–1718.

Miller, M., Azrael, D., Hemenway, D., 2001. Firearm availability and unintentional firearm deaths. Accident Anal. Prev. 33, 477–484.

Miller, M., Azrael, D., Hemenway, D., 2002. Firearm availability and unintentional firearm deaths, suicide, and homicide among 5–14 year olds. J. Trauma 52, 267–275.

Minino, A.M., Smith, B.L., 2001. Deaths: Preliminary Data for 2000. National Vital Statistics Reports, Vol. 49, pp. 12, National Center for Health Statistics, Hyattsville MD.

Morrow, P.L., Hudson, P., 1986. Accidental firearm fatalities in North Carolina, 1976–80. Am. J. Public Health 76 (9), 1120–1123.

Murphy, S.L., 2000. Deaths: Final Data for 1998. National Vital Statistics Reports, Vol. 48, pp. 11, National Center for Health Statistics, Hyattsville, MD.

National Center for Health Statistics, 1989–1998. Public Use Data Files and Documentation: Multiple Cause of Death for ICD-9, 1989–98 Data. Public Health Service, Hyattsville, MD (published annually).

National Center for Health Statistics, 1996. National Health Interview Survey, 1994 (computer file). ICPSR version. US Department of Health and Human Services Hyattsville, MD, National Center for Health Statistics (producer) 1995; Ann. Arbor, MI: Inter-University Consortium for Political and Social Research, MI, distributor (http://www.cdc.gov/nchs/).

National Center for Health Statistics, 1997. National Health Interview Survey, 1994: Year 2000 Objectives Supplement (computer file and data documentation). US Department of Health and Human Services, Hyattsville, MD, National Center for Health Statistics (producer) 1996; Ann. Arbor (distributor) (http://www.cdc.gov/nchs/).

National Center for Health Statistics, 1998. National Mortality Followback Survey—Provisional Data, 1993. Public Use Data File Documentation

*D.J. Wiebe / Accident Analysis and Prevention 35 (2003) 711–716*

(machine readable data file and documentation). National Center for Health Statistics, Centers for Disease Control and Prevention, Hyattsville, MD, (producer) (http://www.cdc.gov/nchs/).

Nelson, D.E., Grant-Worley, J.A., Powell, K., Mercy, J., Holzman, D., 1996. Population estimates of household firearm storage practices and firearm carrying in oregon. J. Am. Med. Assoc. 275, 1744–1748.

Rothman, K.J., Greenland, S., 1998. Modern Epidemiology, 2nd Edition. Lippincott-Raven, Philadelphia, PA, pp. 275–276.

Sinauer, N., Annest, J.L., Mercy, J.A., 1996. Unintentional, non-fatal firearm-related injuries: A preventable public health burden. J. Am. Med. Assoc. 275, 1740–1743.

Stata Corporation, 2001. Stata Statistical Software: Release 7.0. College Station, Stata Corporation, TX.

Teret, S.P., DeFrancesco, S., Hargarten, S.W., Robinson, K.D., 1998. Making guns safer. Issues Sci. Technol. 14 (4), 37–40.

Wintemute, G.J., Teret, S.P., Kraus, J.F., 1987. When children shoot children—88 unintended deaths in California. J. Am. Med. Assoc. 257, 3107–3109.

Wintemute, G.J., Kraus, J.F., Teret, S.P., Wright, M.A., 1989. Unintentional firearm deaths in California. J. Trauma 29 (4), 457–461.

World Health Organization, 1977. International Classification of Diseases, Ninth Revision. World Health Organization, Geneva, Switzerland.