# Exhibit 75

# SPECIAL ARTICLE

## GUN OWNERSHIP AS A RISK FACTOR FOR HOMICIDE IN THE HOME

Arthur L. Kellermann, M.D., M.P.H., Frederick P. Rivara, M.D., M.P.H.,
Norman B. Rushforth, Ph.D., Joyce G. Banton, M.S., Donald T. Reay, M.D.,
Jerry T. Francisco, M.D., Ana B. Locci, Ph.D., Janice Prodzinski, B.A.,
Bela B. Hackman, M.D., and Grant Somes, Ph.D.

**Abstract** *Background.* It is unknown whether keeping a firearm in the home confers protection against crime or, instead, increases the risk of violent crime in the home. To study risk factors for homicide in the home, we identified homicides occurring in the homes of victims in three metropolitan counties.

*Methods.* After each homicide, we obtained data from the police or medical examiner and interviewed a proxy for the victim. The proxies' answers were compared with those of control subjects who were matched to the victims according to neighborhood, sex, race, and age range. Crude and adjusted odds ratios were calculated with matched-pairs methods.

*Results.* During the study period, 1860 homicides occurred in the three counties, 444 of them (23.9 percent) in the home of the victim. After excluding 24 cases for various reasons, we interviewed proxy respondents for 93 percent of the victims. Controls were identified for 99 percent of these, yielding 388 matched pairs. As compared with the controls, the victims more often lived alone or rented their residence. Also, case households more commonly contained an illicit-drug user, a person with prior arrests, or someone who had been hit or hurt in a fight in the home. After controlling for these characteristics, we found that keeping a gun in the home was strongly and independently associated with an increased risk of homicide (adjusted odds ratio, 2.7; 95 percent confidence interval, 1.6 to 4.4). Virtually all of this risk involved homicide by a family member or intimate acquaintance.

*Conclusions.* The use of illicit drugs and a history of physical fights in the home are important risk factors for homicide in the home. Rather than confer protection, guns kept in the home are associated with an increase in the risk of homicide by a family member or intimate acquaintance. (N Engl J Med 1993;329:1084-91.)

HOMICIDE claims the lives of approximately 24,000 Americans each year, making it the 11th leading cause of death among all age groups, the 2nd leading cause of death among all people 15 to 24 years old, and the leading cause of death among male African Americans 15 to 34 years old.[1] Homicide rates declined in the United States during the early 1980s but rebounded thereafter.[2] One category of homicide that is particularly threatening to our sense of safety is homicide in the home.

Unfortunately, the influence of individual and household characteristics on the risk of homicide in the home is poorly understood. Illicit-drug use, alcoholism, and domestic violence are widely believed to increase the risk of homicide, but the relative importance of these factors is unknown. Frequently cited options to improve home security include the installation of electronic security systems, burglar bars, and reinforced security doors. The effectiveness of these protective measures is unclear, however.

Many people also keep firearms (particularly handguns) in the home for personal protection. One recent survey determined that handgun owners are twice as likely as owners of long guns to report "protection from crime" as their single most important reason for keeping a gun in the home.[3] It is possible, however, that the risks of keeping a firearm in the home may outweigh the potential benefits.[4]

To clarify these issues, we conducted a population-based case–control study to determine the strength of the association between a variety of potential risk factors and the incidence of homicide in the home.

## METHODS

### Identification of Cases

Shelby County, Tennessee; King County, Washington; and Cuyahoga County, Ohio, are the most populous counties in their respective states. The population of King County is predominantly white and enjoys a relatively high standard of living. In contrast, 44 percent of the population of Shelby County and 25 percent of the population of Cuyahoga County are African American. Fifteen percent of the households in Shelby County and 11 percent of Cuyahoga County live below the poverty level, as compared with 5 percent in King County.[5-7]

All homicides involving residents of King County or Shelby County that occurred between August 23, 1987, and August 23, 1992, and all homicides involving residents of Cuyahoga County that occurred between January 1, 1990, and August 23, 1992, were reviewed to identify those that took place in the home of the victim. Any death ruled a homicide was included, regardless of the method used. Assault-related injuries that were not immediately fatal were included if death followed within three months. Cases of homicide involving children 12 years of age or younger were excluded at the request of the medical examiners.

### Selection of Case Subjects and Recruitment of Case Proxies

A home was defined as any house, apartment, or dwelling occupied by a victim (i.e., a case subject) as that person's principal residence. Homicides occurring in adjacent structures (e.g., a ga-

From the Departments of Internal Medicine (A.L.K., J.G.B., B.B.H.), Preventive Medicine (A.L.K.), Biostatistics and Epidemiology (A.L.K., G.S.), and Pathology (J.T.F.), University of Tennessee, Memphis; the Departments of Pediatrics (F.P.R.), Epidemiology (F.P.R.), and Pathology (D.T.R), University of Washington, Seattle; Harborview Injury Prevention and Research Center, Seattle (F.P.R., J.P.); and the Departments of Biology (N.B.R., A.B.L.) and Epidemiology and Biostatistics (N.B.R.) and the Center for Adolescent Health (N.B.R.), Case Western Reserve University, Cleveland. Address reprint requests to Dr. Kellermann at the Emory Center for Injury Prevention, School of Public Health, Emory University, 1599 Clifton Rd., Atlanta, GA 30329.

Supported by grants (CCR 402424 and CCR 403519) from the Centers for Disease Control and Prevention.

The New England Journal of Medicine
Downloaded from nejm.org on September 16, 2011. For personal use only. No other uses without permission.
Copyright © 1993 Massachusetts Medical Society. All rights reserved.

rage) or the surrounding yard were also included. Murder–suicides and multiple homicides were considered a single event. In the case of a murder–suicide, the homicide victim was included if he or she was older than the suicide victim; in multiple homicides, the oldest victim was included.

Reports made at the scene were collected to ensure that study criteria were met. In King County, the medical examiner's staff conducted all investigations of the homicide scene. In Shelby County and Cuyahoga County, police detectives conducted these investigations. In addition to recording the details of the incident for law-enforcement purposes, investigators obtained the names of persons close to the victim who might provide us with an interview at a later date, thereby serving as proxies for the victim. These lists were supplemented with names obtained from newspaper accounts, obituaries, and calls to funeral homes.

Approximately three weeks after a victim's death, each proxy was sent a signed letter outlining the nature of the project. A $10 incentive was offered, and a follow-up telephone call was made a few days later to arrange a time and place for an interview. At the time of this meeting, informed consent was obtained.

### Selection and Recruitment of Controls

After each interview with a case proxy, we sought a control subject matched to the case subject according to sex, race, age range (15 to 24 years, 25 to 40 years, 41 to 60 years, and 61 years or older), and neighborhood of residence. To minimize selection bias, the controls were identified by a previously validated procedure for the random selection of a matching household in the neighborhood.[8-10] After marking off a one-block avoidance zone around the home of the case subject, the interviewer started a neighborhood census at a randomly assigned point along a predetermined route radiating out from the case subject's residence. Households where no one was home were approached twice more, at different times of day and on different days of the week. If contact could not be established after three tries, no further efforts were made. After each neighborhood census was completed, an adult (a person 18 years old or older) in the first household with a member who met the matching criteria was offered a $10 incentive and asked to provide an interview. Whenever possible, attempts were made to interview a proxy for the actual matching control subject. When no interview was granted, the next matching household on the route was approached. If a closer match on the route was found on the second or third visit to the neighborhood, an adult respondent in the closer household was interviewed and any earlier, more distant interviews were discarded. Overall, census data were obtained from 70 percent of the households approached to identify each match. Eighty-four percent of the interviews were obtained from the closest matching household, 13 percent from the second, 3 percent from the third, and <1 percent from the fourth.

### Interviews

Case and control interviews were identical in format, order, and content. Each was brief, highly structured, and arranged so that more sensitive questions were not broached until later in the interview. Items drawn from the Short Michigan Alcoholism Screening Test,[11] the Hollingshead–Wilson two-factor index of social position,[12] and a 1978 poll of gun ownership by Decision Making Information[13] were included. Particularly sensitive questions were preceded by "permissive" statements, such as the following: "Many people have quarrels or fights. Has anyone in this household ever been hit or hurt in a fight in the home?"

### Statistical Analysis

Data from reports prepared by medical examiners and police were used to describe the study population. Interview data were used for risk assessment, because these were collected in an analogous manner from the case proxies and matching control households. Since members of a household might acquire firearms or remove them from the home in response to a homicide in the neighborhood, answers were adjusted to reflect the state of affairs on the date of the homicide. Mantel–Haenszel chi-square analysis for

matched pairs was used to calculate the crude odds ratio associated with each variable. Multivariate analyses used conditional logistic regression, the appropriate technique for a matched-pairs design.[14]

Potentially confounding variables were identified and controlled for by a two-step procedure. First, models containing closely related variables (such as those describing the use of alcohol in the home) were constructed to identify the variable or variables in each set that were most predictive of whether the household in question was a case or a control household. Next, a model that incorporated the variables selected in this initial step was constructed to select those that remained significant after we controlled for the effects of the remaining variables in the model. An additional model was constructed to look for interaction effects among the significant variables. Since no interaction terms significantly altered the adjusted odds ratios, the final model included six variables and was based on complete data from 316 matched pairs. After this analysis, an alternative modeling procedure was used to retain potentially confounding variables if they were even marginally significant (P<0.20). Although this approach added two variables, it did not significantly alter the adjusted odds ratios of the six included in our final model.

After completing this initial series of calculations, we examined the relation between homicide in the home and gun ownership, using various strata of the full study sample. To limit bias resulting from potentially faulty reporting, one analysis was limited to pairs with a case interview obtained from a proxy who lived in the home of the victim. To determine whether gun ownership was associated with an increased risk of homicide by firearms as compared with homicide by other means, cases were stratified according to method. To discern whether guns in the home decrease the risk of an intruder-related homicide or increase the risk of being killed by a family member, additional analyses stratified according to circumstance and the relationship between the victim and the offender were also conducted. After these were completed, a comparable series of stratified analyses was performed to assess more clearly the relation between gun ownership and previous violence in the home.

## RESULTS

### Study Population

There were 1860 homicides in the three counties during the study period. Four hundred forty-four (23.9 percent) took place in the home of the victim. After we excluded the younger victim in 19 double deaths, 2 homicides that were not reported to project staff, and 3 late changes to a death certificate, 420 cases (94.6 percent) were available for study.

### Reports on the Scene

Most of the homicides occurred inside the victim's home (Table 1). Eleven percent occurred outside the home but within the immediate property lines. Two hundred sixty-five victims (63.1 percent) were men; 36.9 percent were women. A majority of the homicides (50.9 percent) occurred in the context of a quarrel or a romantic triangle. An additional 4.5 percent of the victims were killed by a family member or an intimate acquaintance as part of a murder–suicide. Thirty-two homicides (7.6 percent) were related to drug dealing, and 92 homicides (21.9 percent) occurred during the commission of another felony, such as a robbery, rape, or burglary. No motive other than homicide could be established in 56 cases (13.3 percent):

The great majority of the victims (76.7 percent) were killed by a relative or someone known to them. Homicides by a stranger accounted for only 15 cases (3.6 percent). The identity of the offender could not be

The New England Journal of Medicine
Downloaded from nejm.org on September 16, 2011. For personal use only. No other uses without permission.
Copyright © 1993 Massachusetts Medical Society. All rights reserved.

established in 73 cases (17.4 percent). The remaining cases involved other offenders or police acting in the line of duty.

Two hundred nine victims (49.8 percent) died from gunshot wounds. A knife or some other sharp instrument was used to kill 111 victims (26.4 percent). The remaining victims were either bludgeoned (11.7 percent), strangled (6.4 percent), or killed by other means (5.7 percent).

Evidence of forced entry was noted in 59 cases (14.0 percent). Eighteen of these involved an unidentified intruder; six involved strangers. Two involved the police. The rest involved a spouse, family member, or some other person known to the victim.

Attempted resistance was reported in 184 cases (43.8 percent). In 21 of these (5.0 percent) the victim unsuccessfully attempted to use a gun in self-defense. In 56.2 percent of the cases no specific signs of resistance were noted. Fifteen victims (3.6 percent) were killed under legally excusable circumstances. Four were shot by police acting in the line of duty. The rest were killed by another member of the household or a private citizen acting in self-defense.

### Comparability of Case Subjects and Controls

Potential proxy respondents were identified for 405 of the 420 case subjects (96.4 percent). Interviews were obtained from 93 percent of those approached in Shelby County, 99 percent in Cuyahoga County, and 98 percent in King County. The households of those who agreed to be interviewed did not differ from the households of those who refused with respect to the age, sex, or race of the victim or the method of homicide (firearm vs. other).

Interviews with a matching control were obtained for 99.7 percent of the case interviews, yielding 388 matched pairs. Three hundred fifty-seven pairs were matched for all three variables, 27 for two variables, and 4 for a single variable (sex). The demographic characteristics of the victims and controls were similar, except that the case subjects were more likely to have rented their homes (70.4 percent vs. 47.3 percent) and to have lived alone (26.8 percent vs. 11.9 percent) (Table 2). Although efforts were made to conduct every interview in person, proxy respondents for the case subjects were much more likely than the controls to request a telephone interview (40.2 percent vs. 12.6 percent). Despite efforts to interview a proxy respondent for each control, only 48.2 percent of the control interviews were obtained in this manner.

### Univariate Analysis

Alcohol was more commonly consumed by one or more members of the households of case subjects than by members of the households of controls (Table 3). Alcohol was also more commonly consumed by the case subjects themselves than by their matched controls. Case subjects were reported to have manifested behavioral correlates of alcoholism (such as trouble at work due to drinking) much more often than matched controls. Illicit-drug use (by the case subject or another household member) was also reported more commonly by case households than control households.

Previous episodes of violence were reported more frequently by members of case households. When asked if anyone in the household had ever been hit or hurt in a fight in the home, 31.8 percent of the proxies for the case subjects answered affirmatively, as compared with only 5.7 percent of controls. Physical fights in the home while household members were drinking and fighting severe enough to cause injuries were re-

**Table 1. Characteristics of 420 Homicides Committed in the Homes of the Victims.\***

| CHARACTERISTIC | No. (%) OF VICTIMS |
|---|---|
| **Scene** | |
| Inside residence | 373 (88.8) |
| Within immediate property line | 47 (11.2) |
| **Sex of victim** | |
| Female | 155 (36.9) |
| Male | 265 (63.1) |
| **Race or ethnic group of victim** | |
| White | 140 (33.3) |
| Black | 260 (61.9) |
| Native American, Eskimo, Aleut | 4 (1.0) |
| Asian or Pacific Islander | 7 (1.7) |
| Other | 9 (2.1) |
| **Age group of victim (yr)** | |
| 15–24 | 58 (13.8) |
| 25–40 | 171 (40.7) |
| 41–60 | 106 (25.2) |
| ≥61 | 85 (20.2) |
| **Circumstances** | |
| Altercation or quarrel | 185 (44.0) |
| Romantic triangle | 29 (6.9) |
| Murder–suicide | 19 (4.5) |
| Felony-related | 92 (21.9) |
| Drug dealing | 32 (7.6) |
| Homicide only | 56 (13.3) |
| Other | 7 (1.7) |
| **Relationship of offender to victim** | |
| Spouse | 70 (16.7) |
| Intimate acquaintance | 58 (13.8) |
| First-degree relative | 40 (9.5) |
| Other relative | 12 (2.9) |
| Roommate | 12 (2.9) |
| Friend or acquaintance | 130 (31.0) |
| Police officer | 4 (1.0) |
| Stranger | 15 (3.6) |
| Unknown (unidentified suspect) | 73 (17.4) |
| Other | 6 (1.4) |
| **Method of homicide** | |
| Handgun | 180 (42.9) |
| Rifle | 10 (2.4) |
| Shotgun | 15 (3.6) |
| Unknown firearm | 4 (1.0) |
| Knife or sharp instrument | 111 (26.4) |
| Blunt instrument | 49 (11.7) |
| Strangulation or suffocation | 27 (6.4) |
| Burns, smoke, scalding | 10 (2.4) |
| Other | 14 (3.3) |
| **Victim resisted assailant** | |
| Yes | 184 (43.8) |
| No | 140 (33.3) |
| Not noted | 96 (22.9) |
| **Evidence of forced entry** | |
| Yes | 59 (14.0) |
| No | 354 (84.3) |
| Not noted | 7 (1.7) |
| **Legally excusable circumstances** | |
| Yes | 15 (3.6) |
| No | 405 (96.4) |

\*Because of rounding, not all percentages total 100.

The New England Journal of Medicine
Downloaded from nejm.org on September 16, 2011. For personal use only. No other uses without permission.
Copyright © 1993 Massachusetts Medical Society. All rights reserved.

**Table 2. Demographic Characteristics of 388 Pairs of Case Subjects and Controls.***

| CHARACTERISTIC | CASE SUBJECTS | CONTROLS |
|---|---|---|
| Sex (%) | | |
|   Male | 63.1 | 63.1 |
|   Female | 36.9 | 36.9 |
| Race or ethnic group (%) | | |
|   White | 32.9 | 34.5 |
|   Black | 62.1 | 61.6 |
|   Native American, Eskimo, Aleut | 1.0 | 0.5 |
|   Asian or Pacific Islander | 2.8 | 2.8 |
|   Other | 1.0 | 0.5 |
| Age group — yr (%) | | |
|   15–24 | 13.1 | 13.1 |
|   25–40 | 40.2 | 40.5 |
|   41–60 | 26.0 | 26.0 |
|   ≥61 | 20.6 | 20.4 |
| Median years of education of household head | 12 | 12 |
| Median socioeconomic status of household head† | 4 | 4 |
| Type of dwelling (%) | | |
|   House | 54.6 | 60.3 |
|   Other | 45.4 | 39.7 |
|   Rented | 70.4 | 47.3 |
|   Owned | 29.6 | 52.7 |
| Median no. of residents/room | 0.5 | 0.6 |
| Lived alone (%) | 26.8 | 11.9 |
| Telephone interview (%) | 40.2 | 12.6 |
| Proxy respondents interviewed | 100 | 48.2 |

*Because of rounding, not all percentages total 100.

†Socioeconomic status was measured according to the Hollingshead score on a scale of 1 to 5, with 1 as the highest score.[12]

ported much more commonly by case proxies than controls. One or more members of the case households were also more likely to have been arrested or to have been involved in a physical fight outside the home than members of control households.

Similar percentages of case and control households reported using deadbolt locks, window bars, or metal security doors. The case subjects were slightly less likely than the controls to have lived in a home with a burglar alarm, but they were slightly more likely to have controlled security access. Almost identical percentages of case and control households reported owning a dog.

One or more guns were reportedly kept in 45.4 percent of the homes of the case subjects, as compared with 35.8 percent of the homes of the control subjects (crude odds ratio, 1.6; 95 percent confidence interval, 1.2 to 2.2). Shotguns and rifles were kept by similar percentages of households, but the case households were significantly more likely to have a handgun (35.7 percent vs. 23.3 percent; crude odds ratio, 1.9; 95 percent confidence interval, 1.4 to 2.7). Case households were also more likely than control households to contain a gun that was kept loaded or unlocked (Table 3).

**Multivariate Analysis**

Six variables were retained in our final conditional logistic-regression model: home rented, case subject or control lived alone, any household member ever hit or hurt in a fight in the home, any household member

ever arrested, any household member used illicit drugs, and one or more guns kept in the home (Table 4). Each of these variables was strongly and independently associated with an increased risk of homicide in the home. No home-security measures retained significance in the final model. After matching for four characteristics and controlling for the effects of five more, we found that the presence of one or more firearms in the home was strongly associated with an increased risk of homicide in the home (adjusted odds ratio, 2.7; 95 percent confidence interval, 1.6 to 4.4).

Stratified analyses with our final regression model revealed that the link between guns and homicide in the home was present among women as well as men, blacks as well as whites, and younger as well as older people (Table 5). Restricting the analysis to pairs with data from case proxies who lived in the home of the victim demonstrated an even stronger association than that noted for the group overall. Gun ownership was most strongly associated with homicide at the hands of a family member or intimate acquaintance (adjusted odds ratio, 7.8; 95 percent confidence interval, 2.6 to 23.2). Guns were not significantly linked to an increased risk of homicide by acquaintances, unidentified intruders, or strangers. We found no evidence of a protective benefit from gun ownership in any subgroup, including one restricted to cases of homicide that followed forced entry into the home and another restricted to cases in which resistance was attempted. Not surprisingly, the link between gun ownership and homicide was due entirely to a strong association between gun ownership and homicide by firearms. Homicide by other means was not significantly linked to the presence or absence of a gun in the home.

Living in a household where someone had previously been hit or hurt in a fight in the home was also strongly and independently associated with homicide, even after we controlled for the effects of gun ownership and the other four variables in our final model (adjusted odds ratio, 4.4; 95 percent confidence interval, 2.2 to 8.8) (Table 4). Previous family violence was linked to an increased risk of homicide among men as well as women, blacks as well as whites, and younger as well as older people (Table 6). Virtually all of this increased risk was due to a marked association between prior domestic violence and homicide at the hands of a family member or intimate acquaintance (adjusted odds ratio, 20.4; 95 percent confidence interval, 3.9 to 104.6).

**DISCUSSION**

Although firearms are often kept in homes for personal protection, this study shows that the practice is counterproductive. Our data indicate that keeping a gun in the home is independently associated with an increase in the risk of homicide in the home. The use of illicit drugs and a history of physical fights in the home are also important risk factors. Efforts to increase home security have largely focused on preventing unwanted entry, but the greatest threat

The New England Journal of Medicine
Downloaded from nejm.org on September 16, 2011. For personal use only. No other uses without permission.
Copyright © 1993 Massachusetts Medical Society. All rights reserved.

THE NEW ENGLAND JOURNAL OF MEDICINE

to the lives of household members appears to come from within.

We restricted our study to homicides that occurred in the home of the victim, because these events can be most plausibly linked to specific individual and household characteristics. If, for example, the ready availability of a gun increases the risk of homicide, this effect should be most noticeable in the immediate environment where the gun is kept. Although our case definition excluded the rare instances in which a nonresident intruder was killed by a homeowner, our methodology was capable of demonstrating significant protective effects of gun ownership as readily as any evidence of increased risk.

Previous studies of risk factors for homicide have employed correlational analysis[15] or retrospective-cohort[16] or time-series[17] designs to link rates of homicide to specific risk factors. However, hazards suggested by ecologic analysis may not hold at the level of individual households or people.[18] In contrast to these approaches, the case–control method studies individual risk factors in relation to a specific outcome of interest. Case–control research is particularly useful when the list of candidate risk factors is large and the rate of adverse outcomes is relatively low. Under these circumstances, it is usually the analytic method of choice.[19]

Although case–control studies offer many advantages over ecologic studies, they are prone to several sources of bias. To minimize selection bias, we included all cases of homicide in the home and rigorously followed an explicit procedure for randomly selecting neighborhood control subjects. High response rates among case proxies (92.6 percent) and matching controls (80.6 percent) minimized nonresponse bias. Case respondents did not differ significantly from nonrespondents with regard to the age, sex, and race of the victim and the type of weapon involved. Although double homicides and murder–suicides were considered single events to avoid overrepresenting their effects, the number of cases excluded for this reason was small.

Other threats to the validity of the study were less easy to control. A respondent's recollection of events can be powerfully affected by a tragedy as extreme as a homicide in the home. To diminish the effect of recall bias, we delayed our contact with the case proxies to allow for an initial period of grief. We also used a simple, forced-choice questionnaire to ascertain information in a comparable manner from case respondents and controls. We tried to obtain data on victims and controls as similarly as possible by interviewing proxy respondents for the controls whenever possible. Although we were able to do so only 48 percent of the time, the responses we obtained from this subgroup were consistent with those obtained from the study population overall.

Potential misreporting of sensitive information was a serious concern, since we had no way to verify each respondent's statements independently. If case proxies or controls selectively withheld sensitive

Table 3. Univariate Analysis of Hypothesized Risk on Protection Factors Derived from Data on 388 Matched Pairs of Case Subjects and Controls.

| Variable | Case Subjects | Controls | Crude Odds Ratio (95% CI)* |
|---|---|---|---|
| | no. (%)† | | |
| **Behavioral factors** | | | |
| Any household member drank alcoholic beverages | 277 (73.3) | 217 (55.9) | 2.4 (1.7–3.3) |
| Case subject or control drank alcoholic beverages | 238 (62.8) | 162 (41.9) | 2.6 (1.9–3.5) |
| Drinking caused problems in the household | 92 (24.8) | 22 (5.7) | 7.0 (4.2–11.8) |
| Any household member had trouble at work because of drinking | 32 (9.0) | 3 (0.8) | 10.7 (4.1–27.5) |
| Case subject or control had trouble at work because of drinking | 20 (5.5) | 1 (0.3) | 20.0 (4.9–82.4) |
| Any household member hospitalized because of drinking | 41 (11.4) | 9 (2.3) | 9.8 (4.2–22.5) |
| Case subject or control hospitalized because of drinking | 28 (7.6) | 2 (0.5) | 14.0 (4.7–41.6) |
| Any household member used illicit drugs | 111 (31.3) | 23 (6.0) | 9.0 (5.4–15.0) |
| Case subject or control used illicit drugs | 74 (20.3) | 16 (4.2) | 6.8 (3.8–12.0) |
| Any physical fights in the home during drinking | 92 (25.3) | 13 (3.4) | 8.9 (5.2–15.3) |
| Any household member hit or hurt in a fight in the home | 117 (31.8) | 22 (5.7) | 7.9 (5.0–12.7) |
| Any family member required medical attention because of a fight in the home | 62 (17.3) | 8 (2.1) | 10.2 (5.2–20.0) |
| Any adult household member involved in a physical fight outside the home | 103 (29.9) | 70 (18.8) | 2.1 (1.4–3.0) |
| Any household member arrested | 193 (52.7) | 90 (23.4) | 4.2 (3.0–6.0) |
| Case subject or control arrested | 132 (36.0) | 60 (15.7) | 3.5 (2.4–5.2) |
| **Environmental factors** | | | |
| Home rented | 271 (70.4) | 183 (47.6) | 5.9 (3.8–9.2) |
| Public housing | 41 (11.1) | 38 (9.8) | 1.5 (0.7–3.3) |
| Case subject or control lived alone | 103 (26.8) | 46 (11.9) | 3.4 (2.2–5.1) |
| Deadbolt locks | 243 (68.8) | 292 (75.3) | 0.8 (0.5–1.0) |
| Window bars | 71 (20.2) | 81 (20.9) | 0.8 (0.5–1.3) |
| Metal security door | 95 (25.4) | 104 (26.8) | 0.9 (0.6–1.3) |
| Burglar alarm | 26 (7.1) | 43 (11.1) | 0.6 (0.4–1.0)‡ |
| Controlled security access to residence | 52 (13.9) | 38 (9.8) | 2.3 (1.2–4.4) |
| Dog or dogs in home | 94 (24.2) | 87 (22.4) | 1.1 (0.8–1.6) |
| Gun or guns in home | 174 (45.4) | 139 (35.8) | 1.6 (1.2–2.2) |
| Handgun | 135 (35.7) | 90 (23.3) | 1.9 (1.4–2.7) |
| Shotgun | 50 (13.6) | 65 (16.8) | 0.7 (0.5–1.1) |
| Rifle | 45 (12.2) | 54 (13.9) | 0.8 (0.5–1.3) |
| Any gun kept unlocked | 105 (29.6) | 69 (17.8) | 2.1 (1.4–3.0) |
| Any gun kept loaded | 93 (26.7) | 48 (12.5) | 2.7 (1.8–4.0) |
| Guns kept primarily for self-defense | 125 (32.6) | 86 (22.2) | 1.7 (1.2–2.4) |

*Results were calculated with the Mantel–Haenszel chi-square statistic for matched pairs. CI denotes confidence interval.

†Percentages reflect the proportion of subjects who responded yes among all subjects who gave a response.

‡The value is statistically significant; the upper bound of the 95 percent confidence interval is 1.0 because of rounding.

The New England Journal of Medicine
Downloaded from nejm.org on September 16, 2011. For personal use only. No other uses without permission.
Copyright © 1993 Massachusetts Medical Society. All rights reserved.

Table 4. Variables Included in the Final Conditional Logistic-Regression Model Derived from Data on 316 Matched Pairs of Case Subjects and Controls.*

| VARIABLE | ADJUSTED ODDS RATIO (95% CI) |
|---|---|
| Home rented | 4.4 (2.3–8.2) |
| Case subject or control lived alone | 3.7 (2.1–6.6) |
| Any household member hit or hurt in a fight in the home | 4.4 (2.2–8.8) |
| Any household member arrested | 2.5 (1.6–4.1) |
| Any household member used illicit drugs | 5.7 (2.6–12.6) |
| Gun or guns kept in the home | 2.7 (1.6–4.4) |

*Conditional logistic-regression analysis requires that data on all the variables of interest be available for both case subjects and their matched controls. Therefore, 72 pairs with missing data on any of the six variables of interest were excluded from this analysis. CI denotes confidence interval.

information about illicit-drug use, alcoholism, or violence in the home, inaccurate estimates of risk could result. We attempted to minimize this problem by reassuring our respondents of the confidentiality of their responses. We also placed "permissive" statements before each potentially intrusive question to encourage honest replies. Very few respondents refused to answer our questions, although all were assured that they were free to do so.

The rate of domestic violence reported by our control respondents was somewhat less than that noted in a large telephone survey.[20] This may be due to regional or temporal differences in rates of battering, variations in the way we phrased our questions (e.g., screening as compared with an exploratory line of inquiry), or the increased anonymity afforded by telephone interviews as compared with our face-to-face encounters.

Underreporting of gun ownership by control respondents could bias our estimate of risk upward. We do not believe, however, that misreporting of gun ownership was a problem. In two of our three study communities, a pilot study of homes listed as the addresses of owners of registered handguns confirmed that respondents' answers to questions about gun ownership were generally valid.[21] Furthermore, the rate of gun ownership reported by control respondents in each study community was comparable to estimates derived from previous social surveys[22] and Cook's gun-prevalence index.[15]

Four limitations warrant comment. First, our study was restricted to homicides occurring in the home of the victim. The dynamics of homicides occurring in other locations (such as bars, retail establishments, or the street) may be quite different. Second, our research was conducted in three urban counties that lack a substantial percentage of Hispanic citizens. Our results may therefore not be generalizable to more rural communities or to Hispanic households. Third, it is possible that reverse causation accounted for some of the association we observed between gun ownership

and homicide — i.e., in a limited number of cases, people may have acquired a gun in response to a specific threat. If the source of that threat subsequently caused the homicide, the link between guns in the home and homicide may be due at least in part to the failure of these weapons to provide adequate protection from the assailants. Finally, we cannot exclude the possibility that the association we observed is due to a third, unidentified factor. If, for example, people who keep guns in their homes are more psychologically prone to violence than people who do not, this could explain the link between gun ownership and homicide in the home. Although we examined several behavioral markers of violence and aggression and included two in our final logistic-regression model, "psychological confounding" of this sort is difficult to control for. "Psychological autopsies" have been used to control for psychological differences between adolescent victims of suicide and inpatient controls with psychiatric disorders,[23,24] but we did not believe this approach was practical for a study of homicide victims and neighborhood controls. At any rate, a link between gun ownership and any psychological tendency toward violence or victimization would have to be extremely strong to account for an adjusted odds ratio of 2.7.

Given the univariate association we observed between alcohol and violence, it may seem odd that no alcohol-related variables were included in our final multivariate model. Although consumption of alcoholic beverages and the behavioral correlates of alcoholism were strongly associated with homicide, they were also related to other variables included in our final model. Forcing the variable "case subject or control drinks" into our model did not substantially alter

Table 5. Homicide in the Home in Relation to Gun Ownership, According to Subgroup.

| SUBGROUP | NO. OF PAIRS | ADJUSTED ODDS RATIO (95% CI)* |
|---|---|---|
| Sex | | |
| Female | 121 | 3.6 (1.6–8.1) |
| Male | 195 | 2.3 (1.1–4.6) |
| Race | | |
| White | 103 | 2.7 (1.0–6.9)† |
| Black | 196 | 2.9 (1.5–5.7) |
| Age (yr) | | |
| 15–40 | 169 | 3.4 (1.4–8.0) |
| ≥41 | 147 | 2.3 (1.2–4.6) |
| Suspect related to or intimate with victim | | |
| Yes | 138 | 7.8 (2.6–23.2) |
| No | 178 | 1.8 (1.0–3.4) |
| Evidence of forced entry | | |
| Yes | 46 | 2.5 (0.7–8.4) |
| No | 219 | 2.8 (1.5–5.2) |
| Victim resisted assailant | | |
| Yes | 141 | 3.0 (1.3–6.2) |
| No | 105 | 3.1 (1.2–8.1) |
| Method of homicide | | |
| Firearm | 159 | 4.8 (2.2–10.3) |
| Other | 105 | 1.2 (0.5–2.7) |

*All the results were calculated by conditional logistic-regression after control for the covariates listed in Table 4. CI denotes confidence interval.

†The value is statistically significant; the lower bound of the 95 percent confidence interval is 1.0 because of rounding.

The New England Journal of Medicine
Downloaded from nejm.org on September 16, 2011. For personal use only. No other uses without permission.
Copyright © 1993 Massachusetts Medical Society. All rights reserved.

Table 6. Homicide in the Home in Relation to Prior Domestic Violence, According to Subgroup.

| SUBGROUP | NO. OF PAIRS | ADJUSTED ODDS RATIO (95% CI)* |
|---|---|---|
| **Sex** | | |
| Female | 121 | 4.4 (1.6–11.9) |
| Male | 195 | 4.4 (1.5–12.6) |
| **Race** | | |
| White | 103 | 6.9 (1.7–27.6) |
| Black | 196 | 2.9 (1.2–7.3) |
| **Age (yr)** | | |
| 15–40 | 169 | 5.2 (1.7–16.0) |
| ≥41 | 147 | 4.5 (1.7–12.0) |
| **Suspect related to or intimate with victim** | | |
| Yes | 138 | 20.4 (3.9–104.6) |
| No | 178 | 1.9 (0.8–4.7) |
| **Victim resisted assailant** | | |
| Yes | 141 | 7.2 (2.1–25.3) |
| No | 105 | 4.0 (1.0–17.0) |
| **Evidence of forced entry** | | |
| Yes | 46 | 1.4 (0.4–4.4) |
| No | 219 | 8.1 (2.8–23.1) |
| **Method of homicide** | | |
| Firearm | 159 | 3.1 (1.0–9.0) |
| Other | 157 | 5.4 (1.9–15.6) |

*All the results were calculated by conditional logistic regression after control for the covariates listed in Table 4. CI denotes confidence interval.

the adjusted odds ratios for the other variables. Furthermore, the adjusted odds ratio for this variable was not significantly greater than 1.

Large amounts of money are spent each year on home-security systems, locks, and other measures intended to improve home security. Unfortunately, our results suggest that these efforts have little effect on the risk of homicide in the home. This finding should come as no surprise, since most homicides in the home involve disputes between family members, intimate acquaintances, friends, or others who have ready access to the home. It is important to realize, however, that these data offer no insight into the effectiveness of home-security measures against other household crimes such as burglary, robbery, or sexual assault. In a 1983 poll, Seattle homeowners feared "having someone break into your home while you are gone" most and "having someone break into your home while you are at home" 4th on a list of 16 crimes.[25] Although homicide is the most serious of crimes, it occurs far less frequently than other types of household crime.[2] Measures that make a home more difficult to enter are probably more effective against these crimes.

Despite the widely held belief that guns are effective for protection, our results suggest that they actually pose a substantial threat to members of the household. People who keep guns in their homes appear to be at greater risk of homicide in the home than people who do not. Most of this risk is due to a substantially greater risk of homicide at the hands of a family member or intimate acquaintance. We did not find evidence of a protective effect of keeping a gun in the home, even in the small subgroup of cases that involved forced entry.

Saltzman and colleagues recently found that assaults by family members or other intimate acquaint-

ances with a gun are far more likely to end in death than those that involve knives or other weapons.[26] A gun kept in the home is far more likely to be involved in the death of a member of the household than it is to be used to kill in self-defense.[4] Cohort and interrupted time-series studies have demonstrated a strong link between the availability of guns and community rates of homicide.[2,15-17] Our study confirms this association at the level of individual households.

Previous case–control research has demonstrated a strong association between the ownership of firearms and suicide in the home.[10,23,24] Also, unintentional shooting deaths can occur when children play with loaded guns they have found at home.[27] In the light of these observations and our present findings, people should be strongly discouraged from keeping guns in their homes.

The observed association between battering and homicide is also important. In contrast to the money spent on firearms and home security, little has been done to improve society's capacity to respond to the problem of domestic violence.[28,29] In the absence of effective intervention, battering tends to increase in frequency and severity over time.[28-30] Our data strongly suggest that the risk of homicide is markedly increased in homes where a person has previously been hit or hurt in a family fight. At the very least, this observation should prompt physicians, social workers, law-enforcement officers, and the courts to work harder to identify and protect victims of battering and other forms of family violence. Early identification and effective intervention may prevent a later homicide.[31,32]

We are indebted to the men and women of the following law-enforcement agencies and offices for their support of this project: in Shelby County, Tennessee, the Memphis Police Department, Shelby County Sheriff's Department, Bartlett Police Department, Collierville Police Department, Germantown Police Department, Millington Police Department, and Shelby County Medical Examiner's Office; in Cuyahoga County, Ohio, the Cleveland Police Department and Cuyahoga County Coroner's Office; and in King County, Washington, the Seattle Police Department, Bellevue Police Department, King County Sheriff's Department, and King County Medical Examiner's Office. Without their assistance, this work would not have been possible. We are also indebted to Noel Weiss and William Applegate for their comments and suggestions, to Vivian C. Driscoll and Steven Walker for their help with data collection, and to LaGenna Betts for her assistance in the preparation of the manuscript.

## REFERENCES

1. Hammett M, Powell KE, O'Carroll PW, Clanton ST. Homicide surveillance — United States, 1979–1988. MMWR CDC Surveill Summ 1992;41:1-33.
2. Reiss AJ Jr, Roth JA, eds. Understanding and preventing violence: panel on the understanding and control of violent behavior. Washington, D.C.: National Academy Press, 1993:42-97.
3. Weil DS, Hemenway D. Loaded guns in the home: analysis of a national random survey of gun owners. JAMA 1992;267:3033-7.
4. Kellermann AL, Reay DT. Protection or peril? An analysis of firearm-related deaths in the home. N Engl J Med 1986;314:1557-60.
5. Bureau of the Census. 1990 census of population: Tennessee. Washington, D.C.: Government Printing Office, 1992. (Publication nos. CPH-5-44 and CP-1-44.)
6. Idem. 1990 census of population: Washington. Washington, D.C.: Government Printing Office, 1992. (Publication nos. CPH-5-49 and CP-1-49.)
7. Idem. 1990 census of population: Ohio. Washington, D.C.: Government Printing Office, 1992. (Publication nos. CPH-5-37 and CP-1-37.)

Downloaded from nejm.org on September 16, 2011. For personal use only. No other uses without permission.
Copyright © 1993 Massachusetts Medical Society. All rights reserved.

8. Yu MC, Mack T, Hanisch R, Peters RL, Henderson BE, Pike MC. Hepatitis, alcohol consumption, cigarette smoking, and hepatocellular carcinoma in Los Angeles. Cancer Res 1983;43:6077-9.

9. Mack TM, Yu MC, Hanisch R, Henderson BE. Pancreas cancer and smoking, beverage consumption, and past medical history. J Natl Cancer Inst 1986;76:49-60.

10. Kellermann AL, Rivara FP, Somes G, et al. Suicide in the home in relation to gun ownership. N Engl J Med 1992;327:467-72.

11. Selzer ML, Vinokur A, van Rooijen L. A self-administered Short Michigan Alcoholism Screening Test (SMAST). J Stud Alcohol 1975;36:117-26.

12. The index of social position: appendix two. In: Hollingshead AB, Redlich FC. Social class and mental illness: a community study. New York: John Wiley, 1958:387-97.

13. Attitudes of the American electorate toward gun control. Santa Ana, Calif.: Decision Making Information, 1978.

14. Hosmer DW, Lemeshow S. Applied logistic regression. New York: John Wiley, 1989.

15. Cook PJ. The effect of gun availability on robbery and robber murder: a cross section study of fifty cities. Policy Stud Rev Annu 1979;3:743-81.

16. Sloan JH, Kellermann AL, Reay DT, et al. Handgun regulations, crime, assaults, and homicide: a tale of two cities. N Engl J Med 1988;319:1256-62.

17. Loftin C, McDowall D, Wiersema B, Cottey TJ. Effects of restrictive licensing of handguns on homicide and suicide in the District of Columbia. N Engl J Med 1991;325:1615-20.

18. Morgenstern H. Uses of ecologic analysis in epidemiologic research. Am J Public Health 1982;72:1336-44.

19. Schlesselman JJ, ed. Case control studies: design, conduct, analysis. New York: Oxford University Press, 1982.

20. Straus MA, Gelles RJ, Steinmetz SK. Behind closed doors: violence in the American family. Garden City, N.Y.: Anchor Press, 1980.

21. Kellermann AL, Rivara FP, Banton J, Reay D, Fligner CL. Validating survey responses to questions about gun ownership among owners of registered handguns. Am J Epidemiol 1990;131:1080-4.

22. Wright JD, Rossi P, Daly K, Weber-Burdin E. Weapons, crime, and violence in America: a literature review and research agenda. Washington, D.C.: Government Printing Office, 1983:212-60, 361-411.

23. Brent DA, Perper JA, Goldstein CE, et al. Risk factors for adolescent suicide: a comparison of adolescent suicide victims with suicidal inpatients. Arch Gen Psychiatry 1988;45:581-8.

24. Brent DA, Perper JA, Allman CJ, Moritz GM, Wartella ME, Zelenak JP. The presence and accessibility of firearms in the homes of adolescent suicides: a case-control study. JAMA 1991;266:2989-95.

25. Warr M, Stafford M. Fear of victimization: a look at the proximate causes. Soc Forces 1983;61:1033-43.

26. Saltzman LE, Mercy JA, O'Carroll PW, Rosenberg ML, Rhodes PH. Weapon involvement and injury outcomes in family and intimate assaults. JAMA 1992;267:3043-7.

27. Wintemute GJ, Teret SP, Kraus JF, Wright MA, Bradfield G. When children shoot children: 88 unintended deaths in California. JAMA 1987;257:3107-9.

28. American Medical Association. Violence against women: relevance for medical practitioners. JAMA 1992;267:3184-9.

29. National Committee for Injury Prevention and Control. Domestic violence. Am J Prev Med 1989;5:Suppl:223-32.

30. Stark E, Flitcraft AH. Spouse abuse. In: Rosenberg ML, Fenley MA, eds. Violence in America: a public health approach. New York: Oxford University Press, 1991:123-57.

31. Mercy JA, Saltzman LE. Fatal violence among spouses in the United States, 1976-1985. Am J Public Health 1989;79:595-9.

32. Kellermann AL, Mercy JA. Men, women, and murder: gender-specific differences in rates of fatal violence and victimization. J Trauma 1992;33:1-5.

---

## IMAGES IN CLINICAL MEDICINE

Images in Clinical Medicine, a regular *Journal* feature, presents a variety of clinically important visual images, emphasizing those a doctor might encounter in an average day at the office, the emergency department, or the hospital. If you have an original unpublished, high-quality color or black-and-white photograph of a typical image that you would like considered for publication, send it with a brief descriptive legend to Kim Eagle, M.D., Massachusetts General Hospital, Cardiac Unit, ACC 4, 15 Parkman St., Boston, MA 02114. Two 5-by-7-inch prints should be sent. If you submit a slide, please send a 5-by-7-inch print along with it. No more than two persons will receive credit for submitting an image.

The New England Journal of Medicine
Downloaded from nejm.org on September 16, 2011. For personal use only. No other uses without permission.
Copyright © 1993 Massachusetts Medical Society. All rights reserved.

# Exhibit 76

| RESEARCH AND PRACTICE |

# Risk Factors for Femicide in Abusive Relationships: Results From a Multisite Case Control Study

| Jacquelyn C. Campbell, PhD, RN, Daniel Webster, ScD, MPH, Jane Koziol-McLain, PhD, RN, Carolyn Block, PhD, Doris Campbell, PhD, RN, Mary Ann Curry, PhD, RN, Faye Gary, PhD, RN, Nancy Glass, PhD, MPH, RN, Judith McFarlane, PhD, RN, Carolyn Sachs, MD, MPH, Phyllis Sharps, PhD, RN, Yvonne Ulrich, PhD, RN, Susan A. Wilt, DrPH, Jennifer Manganello, PhD, MPH, Xiao Xu, PhD, RN, Janet Schollenberger, MHS, Victoria Frye, MPH, and Kathryn Laughon, MPH

Femicide, the homicide of women, is the leading cause of death in the United States among young African American women aged 15 to 45 years and the seventh leading cause of premature death among women overall.[1] American women are killed by intimate partners (husbands, lovers, ex-husbands, or ex-lovers) more often than by any other type of perpetrator.[2–4] Intimate partner homicide accounts for approximately 40% to 50% of US femicides but a relatively small proportion of male homicides (5.9%).[1,5–10] The percentage of intimate partner homicides involving male victims decreased between 1976 and 1996, whereas the percentage of female victims increased, from 54% to 72%.[4]

The majority (67%–80%) of intimate partner homicides involve physical abuse of the female by the male before the murder, no matter which partner is killed.[1,2,6,11–13] Therefore, one of the major ways to decrease intimate partner homicide is to identify and intervene with battered women at risk. The objective of this study was to specify the risk factors for intimate partner femicide among women in violent relationships with the aim of preventing this form of mortality.

## METHODS

An 11-city case–control design was used; femicide victims were cases (n=220), and randomly identified abused women residing in the same metropolitan area were control women (n=343). Co-investigators at each site collaborated with domestic violence advocacy, law enforcement, and medical examiner offices in implementing the study. Sampling quotas for cases and control women in each city were proportionately calculated so that the cities with the highest annual femicide rates included the largest number of cases and control women.

*Objectives.* This 11-city study sought to identify risk factors for femicide in abusive relationships.

*Methods.* Proxies of 220 intimate partner femicide victims identified from police or medical examiner records were interviewed, along with 343 abused control women.

*Results.* Preincident risk factors associated in multivariate analyses with increased risk of intimate partner femicide included perpetrator's access to a gun and previous threat with a weapon, perpetrator's stepchild in the home, and estrangement, especially from a controlling partner. Never living together and prior domestic violence arrest were associated with lowered risks. Significant incident factors included the victim having left for another partner and the perpetrator's use of a gun. Other significant bivariate-level risks included stalking, forced sex, and abuse during pregnancy.

*Conclusions.* There are identifiable risk factors for intimate partner femicides. (*Am J Public Health.* 2003;93:1089–1097)

### Femicide Cases

All consecutive femicide police or medical examiner records from 1994 through 2000 at each site were examined to assess victim–perpetrator relationships. Cases were eligible if the perpetrator was a current or former intimate partner and the case was designated as "closed" by the police (suicide by the perpetrator, arrest, or adjudication, depending on the jurisdiction). Records were abstracted for data specific to the homicide.

At least 2 potential proxy informants, individuals knowledgeable about the victim's relationship with the perpetrator, were identified from the records. The proxy who, in the investigator's judgment, was the most knowledgeable source was then sent a letter explaining the study and including researcher contact information. If no communication was initiated by the proxy, study personnel attempted telephone or (in the few cases in which no telephone contact was possible) personal contact.

If the first proxy was not knowledgeable about details of the relationship, she or he was asked to identify another willing potential proxy informant. When a knowledgeable proxy was found, informed consent was obtained. In 373 of the 545 (68%) total femicide cases abstracted, a knowledgeable proxy was identified and located. In 82% (307/373) of these cases, proxies agreed to participate. Two exclusion criteria, age (18–50 years) and no previous abuse by the femicide perpetrator, resulted in the elimination of 87 additional cases (28.3% of 307 cases), with 59 (19.2% of 307 cases) eliminated solely as a result of the latter criterion.

Researchers and doctoral students experienced in working with victims of domestic violence conducted telephone or in-person interviews in English or Spanish; interviews were 60 to 90 minutes in duration. Both proxies and abused control women were excluded if they could speak neither English nor Spanish.

### Abused Control Women

Stratified random-digit dialing (up to 6 attempts per number) was used to select women aged 18 to 50 years who had been involved "romantically or sexually" in a relationship at some time in the past 2 years in the same cities in which the femicides occurred. A woman was considered "abused" if she had been physically assaulted or threatened with a weapon by a current or former intimate partner during the past 2 years; we

| RESEARCH AND PRACTICE |

identified episodes of abuse with a modified version of the Conflict Tactics Scale with stalking items added.[11,14]

English- and Spanish-speaking telephone interviewers employed by an experienced telephone survey firm completed sensitivity and safety protocol training.[15] A total of 4746 women met the age and relationship criteria and were read the consent statement. Among these women, 3637 (76.6%) agreed to participate, 356 (9.8%) of whom had been physically abused or threatened with a weapon by a current or recent intimate partner. Thirteen abused control women were excluded from the analysis because they reported that the injuries from their most severe incident of abuse were so severe that they thought they could have died.

### Risk Factor Survey Instrument

The interview included previously tested instruments, such as the Danger Assessment,[16,17] and gathered information on demographic and relationship characteristics, including type, frequency, and severity of violence, psychological abuse, and harassment; alcohol and drug use; and weapon availability. The Danger Assessment had been translated to and validated in Spanish in earlier research; the remainder of the survey was translated and back-translated by our Spanish-speaking interviewers and by project staff in Houston, Los Angeles, and New York. A factor analysis of the risk items was used in constructing scales measuring partners' controlling and stalking behaviors. Each scale was internally consistent ($\alpha$=.83 and .75, respectively).

### Data Analysis

Logistic regression was used to estimate the independent associations between each of the hypothesized risk factors and the risk of intimate partner femicide. Because the importance of certain risk factors may not be detected when their effects are mediated by more proximal risk factors, we sequentially added blocks of conceptually similar explanatory variables along a risk factor continuum ranging from most distal (demographic characteristics of perpetrators and victims) to most proximal (e.g., weapon used in the femicide or most serious abuse incident). Variables not significantly associated with femi-

cide risk were dropped from subsequent models. Model coefficients were exponentiated so that they could be interpreted as adjusted odds ratios (ORs).

## RESULTS

Demographic, background, and relationship variables that differentiated case women from control women in bivariate analyses are presented in Tables 1 and 2. Table 3 displays findings from the series of logistic regression models. The strongest sociodemographic risk factor (model 1) for intimate partner femicide was the abuser's lack of employment (adjusted OR=5.09; 95% confidence interval [CI]=2.74, 9.45). Instances in which the abuser had a college education (vs a high school education) were protective against femicide (adjusted OR=0.31; 95% CI=0.12, 0.80), as were instances in which the abuser had a college degree and was unemployed but looking for work. Race/ethnicity of abusers and victims was not independently associated with intimate partner femicide risk after control for other demographic factors.

When additional individual-level risk factors for homicide were added to the model (model 2), both abuser's access to a firearm (adjusted OR=7.59; 95% CI=3.85, 14.99) and abuser's use of illicit drugs (adjusted OR=4.76; 95% CI=2.19, 10.34) were strongly associated with intimate partner femicide, although the abuser's excessive use of alcohol was not. Although the abuser's access to a firearm increased femicide risk, victims' risk of being killed by their intimate partner was lower when they lived apart from the abuser and had sole access to a firearm (adjusted OR=0.22). Neither alcohol abuse nor drug use by the victim was independently associated with her risk of being killed.

Relationship variables were added in model 3. Never having lived with the abusive partner significantly lowered women's risk of femicide (OR=0.39; 95% CI=0.16, 0.97). Having been separated from an abusive partner after living together was associated with a higher risk of femicide (adjusted OR=3.64; 95% CI=1.71, 7.78), as was having ever left or having asked the partner to leave (adjusted OR=3.19; 95% CI=1.70, 6.02). Having a child living in the home who was not the abu-

sive partner's biological child more than doubled the risk of femicide (adjusted OR=2.23; 95% CI=1.13, 4.39). Addition of the relationship variables resulted in victims' sole access to a firearm no longer being statistically significant and substantially reduced the effects of abuser's drug use.

Variables related to abusive partners' controlling behaviors and verbal aggression were added in model 4. The effects of a highly controlling abuser were modified by whether the abuser and victim separated after living together. The risk of intimate partner femicide was increased 9-fold by the combination of a highly controlling abuser and the couple's separation after living together (adjusted OR=8.98; 95% CI=3.25, 24.83). Femicide risk was increased to a lesser degree when the abuser was highly controlling but the couple had not separated (adjusted OR=2.90; 95% CI=1.41, 5.97) and when the couple had separated after living together but the abuser was not highly controlling (adjusted OR=3.10; 95% CI=1.20, 8.05).

Threatening behaviors and stalking were added in model 5. Abusers' previous threats with a weapon (adjusted OR=4.08; 95% CI=1.91, 8.72) and threats to kill (adjusted OR=2.60; 95% CI=1.24, 5.42) were associated with substantially higher risks for femicide. After control for threatening behaviors, there were no significant independent effects of abusers' drug use (OR=1.64; 95% CI= 0.88, 3.04). The effects of high control with separation (adjusted OR=4.07; 95% CI= 1.33, 12.4) and access to guns (adjusted OR=5.44; 95% CI=2.89, 10.22), although substantially reduced, remained strong.

Stalking and threats to harm children and other family members were not independently associated with intimate partner femicide risk after variables had been entered in the first models. When variables related to previous physical abuse were included in model 6, previous arrest of the abuser for domestic violence was associated with a decreased risk of intimate partner femicide (adjusted OR=0.34; 95% CI=0.16, 0.73). The association between abusers' use of forced sex on victims and increased intimate partner femicide risks approached statistical significance (adjusted OR=1.87; 95% CI=0.97, 3.63; $P$<.07).

| RESEARCH AND PRACTICE |

**TABLE 1—Sociodemographic Characteristics of Victims and Perpetrators and General Risk Factors for Homicide, by Group**

| | Victims | | | Perpetrators | | |
|---|---|---|---|---|---|---|
| | Nonfatal Physical Abuse (n = 343) | Homicide (n = 220) | P | Nonfatal Physical Abuse (n = 343) | Homicide (n = 220) | P |
| **Sociodemographic variables** | | | | | | |
| Age, y, mean ± SD | 30.1 ± 8.6 | 31.4 ± 7.7 | .081 | 31.2 ± 9.2 | 34.2 ± 8.7 | <.001 |
| Don't know/refused/missing | 0 | 0 | | 4 | 20 | |
| Race/ethnicity, No. (%) | | | <.001 | | | <.001 |
| Black/African American | 70 (20.6) | 104 (47.3) | | 83 (24.3) | 107 (48.9) | |
| White | 157 (46.3) | 53 (24.1) | | 153 (44.7) | 49 (22.4) | |
| Latino/Hispanic | 82 (24.2) | 53 (24.1) | | 80 (23.4) | 58 (26.5) | |
| Other | 30 (8.9) | 10 (4.5) | | 26 (7.6) | 5 (2.3) | |
| Don't know/refused/missing | 4 | 0 | | 1 | 1 | |
| Education, No. (%) | | | <.001 | | | <.001 |
| Less than high school | 61 (17.9) | 71 (33.2) | | 92 (28.0) | 70 (48.9) | |
| High school | 73 (21.5) | 59 (27.5) | | 91 (27.7) | 47 (32.9) | |
| Some college/trade school | 109 (32.1) | 68 (31.8) | | 58 (17.7) | 17 (11.9) | |
| College/trade school | 97 (28.5) | 16 (7.5) | | 87 (26.5) | 9 (6.3) | |
| Don't know/refused/missing | 3 | 6 | | 15 | 77 | |
| Employment, No. (%) | | | <.001 | | | <.001 |
| Full-time | 179 (52.2) | 114 (51.8) | | 229 (68.2) | 84 (39.6) | |
| Part-time | 70 (20.4) | 31 (14.1) | | 39 (11.6) | 20 (9.5) | |
| Unemployed, seeking job | 40 (11.7) | 12 (5.5) | | 25 (7.4) | 13 (6.1) | |
| Unemployed, not seeking job | 54 (15.7) | 63 (28.6) | | 43 (12.8) | 95 (44.8) | |
| Don't know/refused/missing | 0 | 0 | | 7 | 8 | |
| Income (annual household), $, No. (%) | | | .005 | | | |
| Less than 10 000 | 67 (21.7) | 25 (18.8) | | | | |
| 10 000–19 999 | 49 (15.9) | 32 (24.1) | | | | |
| 20 000–29 999 | 43 (13.9) | 20 (15.0) | | | | |
| 30 000–39 999 | 41 (13.3) | 29 (21.8) | | | | |
| 40 000 or more | 109 (35.3) | 27 (20.3) | | | | |
| Don't know/refused/missing | 34 | 87 | | | | |
| **General violence/homicide risk variables** | | | | | | |
| Threatened/attempted suicide | | | .091 | | | .149 |
| Yes | 33 (9.6) | 12 (5.6) | | 68 (20.1) | 45 (25.0) | |
| Don't know/refused/missing | 0 | 6 | | 4 | 40 | |
| Problem alcohol drinker, No. (%) | | | <.001 | | | <.001 |
| Yes | 27 (7.9) | 36 (19.1) | | 106 (30.9) | 105 (52.0) | |
| Don't know/refused/missing | 0 | 32 | | 0 | 18 | |
| Illicit drug use, No. (%) | | | .002 | | | <.001 |
| Yes | 49 (14.3) | 48 (25.3) | | 101 (30.4) | 123 (65.4) | |
| Don't know/refused/missing | 1 | 30 | | 11 | 32 | |
| Access to a firearm,[a] No. (%) | | | .996 | | | <.001 |
| Yes | 17 (5.0) | 10 (5.0) | | 82 (23.9) | 143 (65.0) | |
| Don't know/refused/missing | 2 | 19 | | 0 | 0 | |

*Continued*

Incident-level variables were added in model 7. Abuser's use of a gun in the worst incident of abuse was associated with a 41-fold increase in risk of femicide after control for other risk factors, this effect apparently mediating the effects of abuser's access to a gun, which was no longer significant. However, previous threats with a weapon continued to be associated with increased femicide risks (OR = 4.41; 95% CI = 1.76, 11.06).

When the worst incident of abuse was triggered by the victim's having left the abuser for another partner or by the abuser's jealousy, there was a nearly 5-fold increase in femicide risk (adjusted OR = 4.91; 95% CI = 2.42, 9.96). When the incident was triggered by the victim's having left the abuser for any other reason, femicide risks were also significantly increased (adjusted OR = 4.04; 95% CI = 1.80, 9.06). These incident-level effects appear to mediate those related to highly controlling abusers and separation after cohabitation.

Each of the models included in Table 3 demonstrated an adequate fit according to Hosmer–Lemeshow[18] goodness-of-fit tests. Model 6 correctly predicted the case status of 73% of the cases and 93% of the control women. Model 7 correctly predicted the case status of 81% of the cases and 95% of the control women.

## DISCUSSION

Seventy-nine percent (220/279) of the femicide victims aged 18 to 50 years and 70% of the 307 total femicide cases were physically abused before their deaths by the same intimate partner who killed them, in comparison with 10% of the pool of eligible control women. Thus, our first premise, that physical violence against the victim is the primary risk factor for intimate partner femicide, was upheld. The purpose of this study, however, was to determine the risk factors that, over and above previous intimate partner violence, are associated with femicide within a sample of battered women. Our analysis demonstrated that a combination of the most commonly identified risk factors for homicide, in conjunction with characteristics specific to violent intimate relationships, predicted intimate partner femicide risks.

| RESEARCH AND PRACTICE |

**TABLE 1—Continued**

| | | | <.001 |
|---|---|---|---|
| Arrest for violent crime, No. (%) | | | |
| Yes | | 38 (11.5) | 43 (21.8) |
| Don't know/refused/missing | | 12 | 23 |

*Note.* The referent time periods for all risk variables were the year previous to the most abusive event for abused control women and the year previous to the femicide for femicide victims.

[a]For abused women, gun access was defined as a woman's sole access to a firearm on the basis of her living apart from her partner and reporting having a gun in the home; gun access for partner was based on reports of his personal ownership of a firearm or living in a household with a firearm.

The model-building strategy we used allowed for consideration of different levels of prevention and the degree to which intimate partner femicides could be prevented by strategies directed at risk factors for homicide in general. For example, our analysis and those of others suggest that increasing employment opportunities, preventing substance abuse, and restricting abusers' access to guns can potentially reduce both overall rates of homicide and rates of intimate partner femicide.

In comparing our femicide perpetrators with other abusive men, we found that unemployment was the most important demographic risk factor for acts of intimate partner femicide. In fact, abuser's lack of employment was the only demographic risk factor that significantly predicted femicide risks after we controlled for a comprehensive list of more proximate risk factors, increasing risks 4-fold relative to the case of employed abusers (model 6). Unemployment appears to underlie increased risks often attributed to race/ethnicity, as has been found and reported in other analyses related to violence.[19,20]

The present results revealed that traits of perpetrators thought to be characteristic of violent criminals in general[21] tended to be no more characteristic of femicide perpetrators than of other batterers. For instance, in contrast to results of previous research comparing abusers and nonabusers,[22] our regression analyses showed that arrests for other crimes did not differentiate femicide perpetrators from perpetrators of intimate partner violence. After controlling for other risk factors, prior arrest for domestic violence actually decreased the risk for femicide, suggesting that arrest of abusers protects against future intimate partner femicide risks. Perpetrator drug abuse significantly increased the risk of intimate partner femicide, but only before the effects of previous threats and abuse were added. Drug abuse, therefore, was associated with patterns of intimate partner abuse that increase femicide risks.

Our iterative model-building strategy also allowed us to observe whether the effects of more proximate risk factors mediate the effects of more distal factors in a manner consistent with theory. For example, the 8-fold increase in intimate partner femicide risk associated with abusers' access to firearms attenuated to a 5-fold increase when characteristics of the abuse were considered, including previous threats with a weapon on the part of the abuser. This suggests that abusers who possess guns tend to inflict the most severe abuse.

However, consistent with other research,[3,23,15,24,25] gun availability still had substantial independent effects that increased homicide risks. As expected, these effects were due to gun-owning abusers' much greater likelihood of using a gun in the worst incident of abuse, in some cases, the actual femicide. The substantial increase in lethality associated with using a firearm was consistent with the findings of other research assessing weapon lethality. A victim's access to a gun could plausibly reduce her risk of being killed, at least if she does not live with the abuser. A small percentage (5%) of both case and control women lived apart from the abuser and owned a gun, however, and there was no clear evidence of protective effects.

Previous arrests for domestic violence was protective against intimate partner femicide in both of the final models. In most of the cities where data were collected, there is a coordinated community response to domestic violence. Under optimal conditions, such responses include adequate and swift adjudication, close supervision of parole outcomes through periodic court reviews or specialized probation programs, ongoing risk management for arrested perpetrators and ongoing safety planning for victims, and close supervision involving sanctions for batterers who drop out of mandated intervention programs.[26] Under these kinds of conditions, arrest can indeed be protective against domestic violence escalating to lethality.

Two relationship variables remained significant throughout the models. Consistent with earlier research,[27,28] instances in which a child of the victim by a previous partner was living in the home increased the risk of intimate partner femicide. Situations in which the victim and abuser had never lived together were protective, validating safety advice that battered women have offered to other battered women in interview studies.[29] Women who separated from their abusive partners after cohabitation experienced increased risk of femicide, particularly when the abuser was highly controlling. Other studies have revealed the same risks posed by estrangement,[30,31] but ours further explicates the findings by identifying highly controlling male partners as presenting the most danger in this situation. At the incident level, we found that batterers were significantly more likely to perpetrate homicide if their partner was leaving them for a different partner.

The bivariate analysis supported earlier evidence that certain characteristics of intimate partner violence are associated with intimate partner femicide, including stalking, strangulation, forced sex, abuse during pregnancy, a pattern of escalating severity and frequency of physical violence, perpetrator suicidality, perception of danger on the part of the victim, and child abuse.[15,16,20,32–37] However, these risk factors, with the exception of forced sex, were not associated with intimate partner femicide risk in the multivariate analysis. Many of these characteristics of abuse are associated with previous threats with a weapon and previous threats to kill the victim, factors that more closely predict intimate partner femicide risks.

This investigation is one of the few studies of intimate partner femicide to include a control population and, to our knowledge,

| RESEARCH AND PRACTICE |

**TABLE 2—Relationship Dynamics, Threatening Behavior, and Abuse Characteristics**

| | Abused Control Women (n = 343) | Homicide Victims (n = 220) | P |
|---|---|---|---|
| **Relationship variables** | | | |
| Age difference, y, mean ± SD | 1.1 ± 5.7 | 2.9 ± 6.4 | .001 |
| Length of relationship, No. (%) | | | .023 |
| 1 month or less | 5 (1.5) | 0 | |
| 1 month to 1 year | 94 (27.5) | 44 (20.0) | |
| 1 or more years | 243 (71.0) | 176 (80.0) | |
| Don't know/refused/missing | 1 | 0 | |
| Relationship partner, No. (%) | | | .005 |
| Husband | 101 (29.7) | 85 (39.0) | |
| Boyfriend | 86 (25.3) | 65 (29.8) | |
| Ex-husband | 36 (10.6) | 20 (9.2) | |
| Ex-boyfriend | 117 (34.4) | 48 (22.0) | |
| Don't know/refused/missing | 3 | 2 | |
| Separated, No. (%) | | | <.001 |
| Yes | 117 (34.9) | 101 (55.2) | |
| Don't know/refused/missing | 8 | 37 | |
| Cohabitation, No. (%) | | | <.001 |
| Yes | 174 (50.7) | 81 (45.0) | |
| In the past year, but not currently | 39 (11.4) | 68 (37.8) | |
| Previously, but not in the past year | 11 (3.2) | 11 (6.1) | |
| Never | 118 (34.7) | 20 (11.1) | |
| Don't know/refused/missing | 1 | 40 | |
| Biological child(ren) of victim and partner living in the household, No. (%) | | | .034 |
| Yes | 98 (28.6) | 73 (37.4) | |
| Don't know/refused/missing | 0 | 25 | |
| Biological child(ren) of victim, and not of partner, living in the household, No. (%) | | | <.001 |
| Yes | 60 (17.5) | 82 (38.7) | |
| Don't know/refused/missing | 0 | 8 | |
| **Relationship abuse dynamics** | | | |
| Partner controlling behaviors (score > 3), No. (%) | | | <.001 |
| Yes | 84 (24.5) | 145 (65.9) | |
| Partner called victim names to put her down, No. (%) | | | <.001 |
| Yes | 164 (47.8) | 151 (77.8) | |
| Don't know/refused/missing | 0 | 26 | |
| **General violence/homicide risk variables** | | | |
| Partner violent outside home, No. (%) | | | <.001 |
| Yes | 116 (35.5) | 102 (55.7) | |
| Don't know/refused/missing | 16 | 37 | |
| Partner threatened to kill woman, No. (%) | | | <.001 |
| Yes | 50 (14.6) | 142 (73.6) | |
| Don't know/refused/missing | 1 | 27 | |
| Partner threatened to kill family, No. (%) | | | <.001 |
| Yes | 26 (7.6) | 72 (33.8) | |
| Don't know/refused/missing | 0 | 7 | |

*Continued*

the first to examine the connection between relationship variables and specific demographic characteristics of victims and perpetrators. Perhaps the most important limitation of the study is its necessary reliance on proxy respondents for data regarding hypothesized risk factors for intimate partner femicide cases. Because we obtained data from control women directly, rather than from a proxy, observed differences between case and control women may have been wholly or partly attributable to differences in accuracy of reporting between victims and their proxies. To examine this issue, we conducted a small pilot study comparing responses of victims of attempted femicide and responses of their proxy respondents and found good agreement between summed Danger Assessment scores from the 2 sources of information. Furthermore, there was no clear tendency for proxies to underreport or overreport victims' exposure to specific risk factors relative to the self-reports of victims themselves.[35]

It is also possible that some of the women who were excluded from this analysis because of no record of previous physical violence were in fact being abused, unknown to the proxy. However, we found fairly good correspondence with police records of previous domestic violence, and, if anything, we found more knowledge of previous physical abuse among proxies than among police. A related limitation is the relatively large proportion of "don't know" responses from proxies regarding certain hypothesized risk factors of a more personal nature (e.g., forced sex). Our decision to treat these "don't know" responses as representing absence of the "exposure" produced conservative biases in our estimates of relationships with intimate partner femicide risks. Therefore, we may have inappropriately failed to reject the null hypothesis in the case of some of these variables with large amounts of missing data and near-significant associations with intimate partner femicide risk.

Another limitation was that we excluded women who did not reside in large urban areas (other than Wichita, Kan) and control group women who did not have telephones. We also failed to keep records of exactly which proxy interviews (estimated to be less

*Campbell et al.* | Peer Reviewed | Research and Practice | **1093**

| RESEARCH AND PRACTICE |

**TABLE 2—Continued**

| | | | |
|---|---|---|---|
| Partner threatened woman with a weapon, No. (%) | | | <.001 |
| Yes | 16 (4.7) | 110 (55.3) | |
| Don't know/refused/missing | 0 | 21 | |
| Partner threatened to harm children, No. (%) | | | <.001 |
| Yes | 4 (1.2) | 36 (18.5) | |
| Don't know/refused/missing | 7 | 25 | |
| Stalking behavior (score > 3), No. (%) | | | <.001 |
| Yes | 21 (6.1) | 47 (21.4) | |
| Don't know/refused/missing | 0 | 0 | |
| **Characteristics of physical violence** | | | |
| Increase in frequency, No. (%) | | | <.001 |
| Yes | 88 (25.7) | 109 (59.9) | |
| Don't know/refused/missing | 5 | 38 | |
| Increase in severity, No. (%) | | | <.001 |
| Yes | 70 (20.4) | 105 (64.4) | |
| Don't know/refused/missing | 5 | 57 | |
| Partner tried to choke (strangle) woman, No. (%) | | | <.001 |
| Yes | 34 (9.9) | 84 (56.4) | |
| Don't know/refused/missing | 1 | 71 | |
| Forced sex, No. (%) | | | <.001 |
| Yes | 51 (14.9) | 84 (57.1) | |
| Don't know/refused/missing | 1 | 73 | |
| Abused during pregnancy (ever), No. (%) | | | <.001 |
| Yes | 24 (7.0) | 49 (25.8) | |
| No or never been pregnant | 319 (93.0) | 141 (74.2) | |
| Don't know/refused/missing | 0 | 30 | |
| Partner arrest previously for domestic violence, No. (%) | | | .003 |
| Yes | 46 (13.9) | 50 (25.6%) | |
| Don't know/refused/missing | 12 | 25 | |
| **Incident-level variables** | | | |
| Gun used, No. (%) | | | <.001 |
| Yes | 3 (0.9) | 84 (38.2) | |
| Partner used alcohol or drugs, No. (%) | | | <.001 |
| Yes | 123 (34.6) | 133 (60.5) | |
| Victim used alcohol or drugs, No. (%) | | | <.001 |
| Yes | 44 (12.4) | 53 (24.1) | |
| Order of protection, No. (%) | | | <.001 |
| Yes | 16 (4.7) | 54 (24.5) | |
| Trigger: jealousy, No. (%) | | | <.001 |
| Yes | 52 (17.1) | 85 (38.6) | |
| No or don't know | 291 (82.9) | 135 (61.4) | |
| Trigger: woman leaving, No. (%) | | | <.001 |
| Yes | 32 (10.5) | 72 (32.7) | |
| No or don't know | 311 (89.5) | 148 (67.3) | |
| Trigger: woman has new relationship, No. (%) | | | <.001 |
| Yes | 7 (2.0) | 26 (11.8) | |
| No or don't know | 336 (98.0) | 194 (88.2) | |

*Note.* Unless otherwise noted, the referent time periods for risk variables were the year previous to the most abusive event for abused control women and the year previous to the femicide for femicide victims.

than 10% of the total) were conducted in person rather than by telephone, and thus we cannot evaluate the effects of this source of bias. Finally, we have no way to compare the control women who participated with those who did not, and women living in the most dangerous situations may have been less likely to participate as control women. If so, true exposure to the risk factors of interest among women involved in abusive intimate relationships may be greater than our control data suggest, thus inflating our estimates of increased risks associated with these exposures.

## CONCLUSIONS

In light of our findings, it is important to consider the role medical professionals might play in identifying women at high risk of intimate partner femicide. The variables that remained significant in model 6 are those most important for identifying abused women at risk for femicide in the health care system and elsewhere, whereas those that were significant in model 7 are particularly important in prevention of the lethal incident itself. When women are identified as abused in medical settings, it is important to assess perpetrators' access to guns and to warn women of the risk guns present. This is especially true in the case of women who have been threatened with a gun or another weapon and in conditions of estrangement. Under federal law, individuals who have been convicted of domestic violence or who are subject to a restraining order are barred from owning firearms. Judges issuing orders of protection in cases of intimate partner violence should consider the heightened risk of lethal violence associated with abusers' access to firearms.

Often, battered women like the idea of a health care professional notifying the police for them; however, with the exception of California, states do not require health care professionals to report to the criminal justice system unless there is evidence of a felony assault or an injury from an assault.[38–40] In states other than California, the professional can offer to call the police, but the woman should have the final say, in that she can best assess any increased danger that might

| RESEARCH AND PRACTICE |

**TABLE 3—Hypothesized Risk Factors for Intimate Partner Femicide Among Women Involved in a Physically Abusive Intimate Relationship Within the Past 2 Years: Adjusted Odds Ratios**

| | Model 1 | Model 2 | Model 3 | Model 4 | Model 5 | Model 6 | Model 7 |
|---|---|---|---|---|---|---|---|
| Abuser age | 1.10*** | 1.08*** | NS | | | | |
| Abuser race/ethnicity | NS | | | | | | |
| Abuser education (reference group: high school graduates) | | | | | | | |
| Less than high school | 1.40 | NS | | | | | |
| Some college | 0.72 | NS | | | | | |
| College | 0.31* | NS | | | | | |
| Abuser job status (reference group: employed full time) | | | | | | | |
| Employed part time | 1.61 | NS | NS | NS | NS | NS | NS |
| Unemployed, seeking job | 1.34 | NS | NS | NS | NS | NS | NS |
| Unemployed, not seeking job | 5.09*** | 6.27*** | 4.00*** | 3.24*** | 4.28*** | 4.42*** | 4.35* |
| Victim age | NS | | | | | | |
| Victim race/ethnicity | NS | | | | | | |
| Victim education (reference group: high school graduates) | | | | | | | |
| Less than high school | 1.61 | NS | NS | NS | | | |
| Some college | 0.87 | NS | NS | | | | |
| College | 0.31** | 0.15* | 0.28* | NS | | | |
| Victim job status (reference group: employed full time) | | | | | | | |
| Employed part time | 0.95 | NS | NS | | | | |
| Unemployed, seeking job | 0.13*** | 0.25* | NS | | | | |
| Unemployed, not seeking job | 0.99 | NS | NS | | | | |
| General risk factors for homicide | | | | | | | |
| Abuser problem drinker | | NS | | | | | |
| Abuser used illicit drugs | | 4.76*** | 2.19* | 1.88* | NS | NS | |
| Abuser mental health | | NS | | | | | |
| Abuser threatened suicide | | NS | | | | | |
| Abuser hurt pet | | NS | | | | | |
| Abuser access to gun | | 7.59*** | 9.21*** | 8.28*** | 5.44*** | 5.38*** | NS |
| Abuser arrest for violent crime | | NS | | | | | |
| Victim problem drinker | | NS | | | | | |
| Victim used illicit drugs | | NS | | | | | |
| Victim sole access to gun | | 0.22* | NS | NS | NS | NS | NS |
| Relationship variables | | | | | | | |
| Married | | | NS | | | | |
| Divorced | | | NS | | | | |
| Time in relationship | | | NS | | | | |
| Cohabitation (reference: living together during entire past year) | | | | | | | |
| Living together less than 1 year | | | NS | | | | |
| Previously lived together, separated at time of incident | | | 3.64** | | | | |
| Never lived together | | | 0.39** | 0.30** | 0.36* | 0.34** | 0.31** |

*Continued*

result from the police being notified. An excellent resource for referral, shelter, and information is the National Domestic Violence Hotline (1-800-799-SAFE).

If a woman confides that she is planning to leave her abuser, it is critical to warn her not to confront him personally with her decision. Instead, she needs to leave when he is not present and leave a note or call him later. It is also clear that extremely controlling abusers are particularly dangerous under conditions of estrangement. A question such as "Does your partner try to control *all* of your daily activities?" (from the Danger Assessment[15]) can quickly assess this extreme need for control. Health care professionals can also expeditiously assess whether the perpetrator is unemployed, whether stepchildren are present in the home, and whether the perpetrator has threatened to kill the victim. Under these conditions of extreme danger, it is incumbent on health care professionals to be extremely assertive with abused women about their risk of homicide and their need for shelter.[41] ∎

**About the Authors**

*Jacquelyn C. Campbell, Phyllis Sharps, and Kathryn Laughon are with the School of Nursing, Johns Hopkins University, Baltimore, Md. Daniel Webster, Jennifer Manganello, and Janet Schollenberger are with the Bloomberg School of Public Health, Johns Hopkins University. Jane Koziol-McLain is with the School of Nursing, Auckland University of Technology, Auckland, New Zealand. Carolyn Rebecca Block is with the Illinois Criminal Justice Information Authority, Chicago. Doris Campbell is with the College of Medicine, University of South Florida, Tampa. Mary Ann Curry and Nancy Glass are with the School of Nursing, Oregon Health Sciences University, Portland. Faye Gary is with the College of Nursing, University of Florida, Gainesville. Judith McFarlane is with the School of Nursing, Texas Women's University, Houston. Carolyn Sachs is with the School of Medicine, University of California Los Angeles. Yvonne Ulrich is with the School of Nursing, University of Washington, Seattle. Susan A. Wilt is with the New York City Department of Health. Xiao Xu is with Covance Inc, Washington, DC. Victoria A. Frye is with St. Luke's Medical Center, New York City.*

*Requests for reprints should be sent to Jacquelyn C. Campbell, PhD, RN, Johns Hopkins University, School of Nursing, 525 N Wolfe St, #436, Baltimore, MD 21205-2110 (e-mail: jcampbell@son.jhmi.edu).*

*This article was accepted September 23, 2002.*

**Contributors**

J.C. Campbell designed the study and wrote most of the introductory and Discussion sections. D. Webster analyzed the data, wrote most of the Results section, and contributed to the Methods and Discussion sections. J. Koziol-McLain wrote the Methods section, con-

| RESEARCH AND PRACTICE |

## TABLE 3—Continued

| | | | | | |
|---|---|---|---|---|---|
| Victim left or asked abuser to leave | 3.20** | 2.40** | NS | | |
| Victim-abuser had biological child | NS | | | | |
| Victim had child by a previous partner in home | 2.23** | 1.70 | 1.94* | 2.44** | 2.35* |
| Abuser-victim age difference | NS | | | | |
| Abuser control of victim, verbal aggression | | | | | |
| Calls names | | | NS | | |
| Not high control and separated after living together | | 3.10* | 3.36* | 3.64* | 3.10* |
| High control and not separated after living together | | 2.90** | 2.09* | 2.08* | 2.40* |
| High control and separated after living together | | 8.98*** | 4.07* | 5.52** | 3.43* |
| Abuser threats and stalking | | | | | |
| Threatened to harm children | | | NS | | |
| Threatened to harm family | | | NS | | |
| Threatened victim with weapon | | | 4.08*** | 3.38*** | 4.41* |
| Threatened to kill victim | | | 2.60** | 3.22** | NS |
| Stalking | | | NS | | |
| Physical abuse before worst incident | | | | | |
| Abuse increasing in frequency and severity | | | | NS | |
| Choked (strangled) | | | | NS | |
| Forced sex | | | | 1.87 | |
| Abused when pregnant | | | | NS | |
| Previous arrest for domestic violence | | | | 0.34** | 0.31* |
| Incident-level risk factors | | | | | |
| Abuser used alcohol or drugs | | | | | NS |
| Victim used alcohol or drugs | | | | | NS |
| Abuser used gun | | | | | 41.38** |
| Trigger: jealousy/victim left for other relationship | | | | | 4.91*** |
| Trigger: victim left abuser for other reasons | | | | | 4.04*** |

*Note.* NS = nonsignificant.
*P < .05; **P < .01; ***P < .001.

tributed to the Results section, and prepared the tables. J. Manganello contributed to the data analysis and Results sections. All other authors collected data, contributed to the introductory and Discussion sections, and reviewed the article.

### Acknowledgments
This research was supported by joint funding from the National Institute on Alcohol Abuse and Alcoholism, the National Institute on Drug Abuse, the National Institute of Mental Health, the National Institutes on Aging, the Centers for Disease Control and Prevention, and the National Institute of Justice (grant R01 # DA/AA11156).

We would like to thank our advocacy, criminal justice, and medical examiner collaborators at each of the sites, along with the women and family members who told their stories. We also thank Arthur Kellerman, MD, for his wise consultation and original ideas. Finally, we thank the staff of the Data Stat Survey Research Firm and Jo Ellen Stinchcomb, Nadiyah Johnson, and the many other assistants and students for all of their work.

### Human Participant Protection
Institutional review board approval was obtained from each study site. Informed consent was obtained by telephone from all participants who were interviewed.

## References

1. Greenfield LA, Rand MR, Craven D, et al. *Violence by Intimates: Analysis of Data on Crimes by Current or Former Spouses, Boyfriends, and Girlfriends.* Washington, DC: US Dept of Justice; 1998.

2. Mercy JA, Saltzman LE. Fatal violence among spouses in the United States: 1976–85. *Am J Public Health.* 1989;79:595–599.

3. Bailey JE, Kellermann AL, Somes GW, Banton JG, Rivara FP, Rushforth NP. Risk factors for violent death of women in the home. *Arch Intern Med.* 1997;157:777–782.

4. Bachman R, Saltzman LE. *Violence Against Women: Estimates From the Redesigned Survey.* Washington, DC: Bureau of Justice Statistics; 1995.

5. Browne A, Williams KR, Dutton DC. Homicide between intimate partners. In: Smith MD, Zah M, eds. *Homicide: A Sourcebook of Social Research.* Thousand Oaks:Sage,1998:149–164.

6. Langford L, Isaac NE, Kabat S. Homicides related to intimate partner violence in Massachusetts. *Homicide Stud.* 1998;2:353–377.

7. Moracco KE, Runyan CW, Butts J. Femicide in North Carolina. *Homicide Stud.* 1998;2:422–446.

8. Frye V, Wilt S, Schomburg D. Female homicide in New York City, 1990–1997. Available at: http://www.nyc.gov/html/doh/pdf/ip/female97.pdf. Accessed August 18, 2002.

9. National Institute of Justice. *A Study of Homicide in Eight US Cities: An NIJ Intramural Research Project.* Washington, DC: US Dept of Justice; 1997.

10. Wilt SA, Illman SM, Brodyfield M. *Female Homicide Victims in New York City.* New York, NY: New York City Dept of Health; 1995.

11. Campbell JC. "If I can't have you, no one can": power and control in homicide of female partners. In: Radford J, Russell DEH, eds. *Femicide: The Politics of Woman Killing.* New York, NY: Twayne; 1992:99–113.

12. McFarlane J, Campbell JC, Wilt S, Sachs C, Ulrich Y, Xu X. Stalking and intimate partner femicide. *Homicide Stud.* 1999;3:300–316.

13. Pataki G. *Intimate Partner Homicides in New York State.* Albany, NY: New York State Governor's Office; 1997.

14. Straus MA, Gelles RJ. *Physical Violence in American Families: Risk Factors and Adaptations to Family Violence in 8,145 Families.* New Brunswick, NJ: Transaction Publishers; 1990.

15. Johnson H, Sacco VF. Researching violence against women: Statistics Canada's national survey. *Can J Criminology.* 1995;37:281–304.

16. Campbell JC. Prediction of homicide of and by battered women. In: Campbell JC, ed. *Assessing the Risk of Dangerousness: Potential for Further Violence of Sexual Offenders, Batterers, and Child Abusers.* Newbury Park, Calif: Sage Publications; 1995:93–113.

17. Campbell JC, Sharps P, Glass NE. Risk assessment for intimate partner violence. In: Pinard GF, Pagani L, eds. *Clinical Assessment of Dangerousness: Empirical Contributions.* New York, NY: Cambridge University Press; 2000:136–157.

18. Hosmer DW, Lemeshow S. A goodness-of-fit test

| RESEARCH AND PRACTICE |

for the multiple logistic regression model. *Commun Stat.* 1980;A10:1043–1069.

19. Hawkins DF. Inequality, culture, and interpersonal violence. *Health Aff (Millwood).* 1993;12:80–95.

20. Stets JE. Job autonomy and control over one's spouse: a compensatory process. *J Health Soc Behav.* 1995;35:244–258.

21. Fagan J, Stewart DE, Hansen K. Violent men or violent husbands? Background factors and situational correlates. In: Gelles RJ, Hotaling G, Straus MA, Finkelhor D, eds. *The Dark Side of Families.* Beverly Hills, Calif: Sage Publications; 1983:49–68.

22. Weiner NA, Zahn MA, Sagi RJ. *Violence: Patterns, Causes, Public Policy.* New York, NY: Harcourt Brace Jovanovich; 1990.

23. Browne A, Williams KR, Dutton DC. Homicide between intimate partners. In: Smith MD, Zahn M, eds. *Homicide: A Sourcebook of Social Research.* Thousand Oaks, Calif: Sage Publications; 1998:149–164.

24. Arbuckle J, Olson L, Howard M, Brillman J, Anctil C, Sklar D. Safe at home? Domestic violence and other homicides among women in New Mexico. *Ann Emerg Med.* 1996;27:210–215.

25. Kellerman AL, Rivara FP, Rushforth NB. Gun ownership as a risk factor for homicide in the home. *N Engl J Med.* 1993;329:1084–1091.

26. Gondolf EW. *Batterer Intervention Systems: Issues, Outcomes, and Recommendations.* Thousand Oaks, Calif: Sage Publications; 2002.

27. Daly M, Wiseman KA, Wilson M. Women and children sired by previous partners incur excess risk of uxoricide. *Homicide Stud.* 1997;1:61–71.

28. Brewer VE, Paulsen DJ. A comparison of US and Canadian findings on uxoricide risk for women with children sired by previous partners. *Homicide Stud.* 1999;3:317–332.

29. Campbell JC, Miller P, Cardwell MM, Belknap RA. Relationship status of battered women over time. *J Fam Violence.* 1994;9:99–111.

30. Wilson M, Daly M. Spousal homicide risk and estrangement. *Violence Vict.* 1993;8:3–15.

31. Dawson R, Gartner R. Differences in the characteristics of intimate femicides: the role of relationship state and relationship status. *Homicide Stud.* 1998;2:378–399.

32. Campbell JC, Soeken K, McFarlane J, Parker B. Risk factors for femicide among pregnant and nonpregnant battered women. In: Campbell JC, ed. *Empowering Survivors of Abuse: Health Care for Battered Women and Their Children.* Thousand Oaks, Calif: Sage Publications; 1998:90–97.

33. Campbell JC, Soeken K. Forced sex and intimate partner violence: effects on women's health. *Violence Women.* 1999;5:1017–1035.

34. McFarlane J, Soeken K, Campbell JC, Parker B, Reel S, Silva C. Severity of abuse to pregnant women and associated gun access of the perpetrator. *Public Health Nurs.* In press.

35. Websdale N. *Understanding Domestic Homicide.* Boston, Mass: Northeastern University Press; 1999.

36. Weisz A, Tolman R, Saunders DG. Assessing the risk of severe domestic violence: the importance of survivors' predictions. *J Interpersonal Violence.* 2000;15:75–90.

37. Saunders DG, Browne A. Intimate partner homicide. In: Ammerman RT, Hersen M, eds. *Case Studies in Family Violence.* New York, NY: Kluwer Academic Publishers; 2000:415–449.

38. Chalk R, King P. Violence in families: assessing prevention and treatment programs. In: Chalk R, King PA, eds. *Health Care Interventions.* Washington, DC: National Academy Press; 1998.

39. Gielen AC, O'Campo P, Campbell J, et al. Women's opinions about domestic violence screening and mandatory reporting. *Am J Prev Med.* 2000;19:279–285.

40. Rodriguez MA, McLoughlin E, Nah G, Campbell JC. Mandatory reporting of domestic violence injuries to the police: what do emergency department patients think? *JAMA.* 2001;286:580–583.

41. Wadman MC, Muelleman RL. Domestic violence homicides: ED use before victimization. *Am J Emerg Med.* 1999;17:689–691.



## War and Public Health

*by Barry S. Levy and Victor W. Sidel*

### Updated edition with all-new epilogue

In this softcover edition, contributors demonstrate the devastating effects of war. They discuss nuclear weapons, biological and chemical weapons, conventional arms and services, the United Nations, and the enormous costs involved in depriving warring nations from focusing on the health and welfare of their citizens.

This book should be on the reading list of not only health professionals but of all those who are interested in international studies, diplomacy or the military.

ISBN 0-87553-023-0
2000 ■ 417 pages ■ softcover
$17.00 APHA Members
$23.50 Nonmembers
plus shipping and handling

**American Public Health Association**

**Publication Sales**
Web: www.apha.org
E-mail: APHA@TASCO1.com
Tel: (301) 893-1894
FAX: (301) 843-0159          WR0117

# Exhibit 77



Social Science & Medicine 64 (2007) 656–664



SOCIAL
SCIENCE
—&—
MEDICINE

www.elsevier.com/locate/socscimed

# State-level homicide victimization rates in the US in relation to survey measures of household firearm ownership, 2001–2003

Matthew Miller*, David Hemenway, Deborah Azrael

*Harvard School of Public Health, Boston, MA, USA*

Available online 27 October 2006

## Abstract

Two of every three American homicide victims are killed with firearms, yet little is known about the role played by household firearms in homicide victimization. The present study is the first to examine the cross sectional association between household firearm ownership and homicide victimization across the 50 US states, by age and gender, using nationally representative state-level survey-based estimates of household firearm ownership. Household firearm prevalence for each of the 50 states was obtained from the 2001 Behavioral Risk Factor Surveillance System. Homicide mortality data for each state were aggregated over the three-year study period, 2001–2003. Analyses controlled for state-level rates of aggravated assault, robbery, unemployment, urbanization, per capita alcohol consumption, and a resource deprivation index (a construct that includes median family income, the percentage of families living beneath the poverty line, the Gini index of family income inequality, the percentage of the population that is black and the percentage of families headed by a single female parent). Multivariate analyses found that states with higher rates of household firearm ownership had significantly higher homicide victimization rates of men, women and children. The association between firearm prevalence and homicide victimization in our study was driven by gun-related homicide victimization rates; non-gun-related victimization rates were not significantly associated with rates of firearm ownership. Although causal inference is not warranted on the basis of the present study alone, our findings suggest that the household may be an important source of firearms used to kill men, women and children in the United States.
© 2006 Published by Elsevier Ltd.

*Keywords:* Homicide; Firearms; Guns; Violence; Epidemiology; USA

## Introduction

Approximately two in three homicide victims in the US are killed with guns(Centers for Disease Control and Prevention), yet the role of household firearms in homicide victimization has not been well

*Corresponding author. Tel.: + 1 617 432 1459.
*E-mail addresses:* mmiller@hsph.harvard.edu (M. Miller), hemenway@hsph.harvard.edu (D. Hemenway), azrael@hsph.harvard.edu (D. Azrael).

0277-9536/$ - see front matter © 2006 Published by Elsevier Ltd.
doi:10.1016/j.socscimed.2006.09.024

characterized. Case-control studies suggest that the presence of a gun in the home is a risk factor for homicide in the home (Kellermann et al., 1993), that the risk is higher for women than for men (Bailey et al., 1997a, b), and that when any family member purchases a handgun all members of the household are at increased risk of homicide victimization (Cummings, Koepsell, Grossman, Savarino, & Thompson, 1997). Limitations of existing case–control studies include not controlling for (1) possible differential recall of firearm ownership by

*M. Miller et al. / Social Science & Medicine 64 (2007) 656–664* 657

cases compared to controls, and (2) possible reverse causation—i.e. gun ownership may sometimes be a response to an increased risk of homicide victimization (Hemenway, 2004; Hepburn & Hemenway, 2004; National Research Council, 2005).

Most (Brearly, 1932; Brill, 1977; Cook, 1979; Duggan, 2001; Lester, 1988, 1990; Seitz, 1972), but not all, (Kaplan & Geling, 1998; Kleck & Patterson, 1993) ecologic studies have found a positive association between various measures of firearm availability and overall rates of homicide. Among nationally representative studies, those using surveys to estimate household firearm ownership have been limited to evaluating variation across the 9 US Census regions. With only 9 units of observation, these studies have not been able to control for potential ecologic confounders. Until now, for state, city and county analyses, researchers have been forced to use proxies of firearm ownership (Duggan, 2001; Miller, Azrael, & Hemenway, 2002; Price, Thompson, & Dake, 2004), the use of which has been criticized by a recent NAS report as possibly introducing bias (National Research Council, 2005). It is only since the 2001, Behavioral Risk Factor Surveillance System (2001) added questions about household firearm ownership that large-scale survey data have been available on household firearm ownership for all 50 states. The present investigation is the first nationally representative study to use state-level, survey-based estimates of household firearm ownership to examine the association between household gun ownership and homicide rates.

## Methods

In this analysis, outcomes are state-level rates of homicide, firearm homicide and non-firearm homicide, aggregated over the 3-year study period, 2001–2003. Homicide mortality data for each state were obtained through the CDC's Web-based Injury Statistics Query and Reporting System (Centers for Disease Control and Prevention). Homicide data, grouped by firearm (ICD-10 E-codes X93-X95) and non-firearm methods (E-codes X85-X92, X96-Y09, Y87.1), were further stratified by gender and age (5–14, 15–17, 18–34, and 35 years of age and older). Non-firearm homicide from terrorism (E-code U01.1) was excluded from analyses. Mortality data are aggregated (2001–2003) to provide a sufficient number of observations to allow comparisons across age and gender sub-groupings.

Gun-related deaths of undetermined intent constituted less than 3% of all gun-related deaths and were excluded from the analyses.

The key independent variable of interest is household firearm prevalence. State level data on the percentage of individuals living in households with firearms were obtained from the 2001 Behavioral Risk Factor Surveillance System (BRFSS). The BRFSS, the world's largest telephone survey (over 200,000 adult respondents annually), is an ongoing data collection program sponsored by the Centers for Disease Control and Prevention (CDC), with all 50 states participating. Data were representative of the US in 2001 at the state and national level. BRFSS questionnaires and data are available on the Internet at www.cdc.gov/brfss; the BRFSS uses a complex sampling and weighting scheme described in detail elsewhere . Firearm prevalence estimates presented exclude respondents who did not know or refused to answer the BRFSS firearm questions (fewer than 4% of all respondents). The verbatim firearm question and the preface to the questions reads: "The next question is about firearms, including weapons such as pistols, shotguns, and rifles; but not BB guns, starter pistols, or guns that cannot fire. Are any firearms now kept in or around your home? Include those kept in a garage, outdoor storage area, car, truck, or other motor vehicle."

Multivariate analyses adjust for several potential confounders previously identified in the literature: rates of aggravated assault and robbery (Hsieh & Pugh, 1993), urbanization (Fingerhut, Ingram, & Feldman, 1992), unemployment (Karpati, Galea, Awerbuch, & Levins, 2002; Reed, Smith, Helmer, Lancaster, & Carman, 2003), alcohol use (Goodman et al., 1986), the percentage of the population 18–34 years of age (Gastil, 1971; Land, McCall, & Cohen, 1990; Loftin & Hill, 1974), the percentage divorced (Land et al., 1990), and a binary indicator variable for living in the southern census region (Gastil, 1971; Huff-Corzine, Corzine, & Moore, 1986; Land et al., 1990). In addition, we use principal components analysis (Wall, Rechtsteiner, & Rocha, 2003) to generate a "resource deprivation index", a construct originally described by Land et al. (1990) to have an invariant relationship with homicide rates across time and space. As in Land et al. (1990), our resource deprivation index includes three income variables (median family income, the percentage of families living beneath the poverty line, and the Gini index of family income inequality)

*M. Miller et al. / Social Science & Medicine 64 (2007) 656–664*

and two social indicators (the percentage of the population that is black and the percentage of families headed by a single female parent).

Rates of aggravated assault and robbery in 2001 were obtained from the Federal Bureau of Investigation's Uniform Crime Reports (Federal Bureau of Investigation, 2002). Alcohol consumption data were identified in each state during each year 1999–2002 and the average of these four values for each state were used as our state level alcohol variable. Alcohol consumption data came from the National Institute on Alcohol Abuse and Alcoholism (National Institute on Alcohol Abuse and Alcoholism, 2005). The percentage of people living at or under the poverty level, divorced, the percent living in metropolitan areas, and the percent of the workforce 16 years and older who are unemployed pertain to the year 2000 only, and come from Census 2000 (US Bureau of the Census, 2004). The percentage of the population between 18 and 34 years of age in 2001 come from the National Center for Injury Prevention and Control database (available at http://webapp.cdc.gov/sasweb/ncipc/mortrate10.html).

To derive estimates of the association between household firearm prevalence and homicide, we used negative binomial regression models and generalized estimating equations to estimate regression parameters. Negative binomial regression is appropriate for estimating models for count data that are overdispersed (i.e. the variance is greater than the mean) (Lawless, 1987), as is the case with

state-level homicide data. Likelihood ratio tests rejected the null hypothesis that the distributions were Poisson. To take into account the possibility that the data may be spatially correlated, in this case within census region, we ran models that clustered observations within regions and made appropriate adjustments to standard errors for accurate hypothesis testing. Model coefficients were converted to incident rate ratios so that effects could be expressed in terms of percentage changes in homicide rates for each one-percentage point change in household firearm prevalence. We used 2-tailed tests of significance and $[\alpha] \leqslant 0.05$ for rejecting the null hypothesis of no effect.

The relationship between each covariate and homicide rates is presented for the population as a whole (Table 3). With the exception of southern census region, which is a binary variable, all covariates in Table 3 are standardized so they each have a mean of zero and a standard deviation of one unit. Standardization was performed to facilitate an intuitive comparison across covariates.

Fig. 1 shows a scatter plot of household firearm prevalence vs. firearm homicide victimization rate for the population as a whole, controlling for the robbery rate. Three regression lines are drawn (weighted by the square root of the population), one for states with robbery rates greater than one standard deviation from the mean, one for states within one standard deviation of the mean, and one for states with robbery rates lower than one standard deviation from the mean. Slopes derived



Fig. 1. Household firearm ownership and firearm homicide victimization rate, by state-level standardized robbery rates.

from these three regression lines are reported in the results section.

## Results

For the population as a whole, over the three year study period the (unweighted) mean number of homicides, firearm homicides and non-firearm homicides per state ($+$ standard deviation; range) were, respectively, 1043 ($+$1301; 28 to 7150), 693 ($+$909; 16 to 5181), and 351 ($+$ 405; 8 to 1969). The median number of homicides, firearm homicides and non-firearm homicides per state were, respectively, 586, 358, and 224. Our measure of state level household firearm ownership had a mean of 35%, a standard deviation of 12% and a range from 8% to 56%; the median household firearm ownership prevalence was 37%.

Unadjusted (bivariate) results showed a significant relationship between household firearm prevalence and rates of firearm homicide victimization for women but not for men. Firearm prevalence was not associated with rates of non-firearm homicide for any age–sex subgroup or for the population as a whole (Table 1).

In multivariate analyses, homicide victimization rates and firearm homicide victimization rates were significantly related to the prevalence of household firearm ownership for each of our age–sex strata and for the US population as a whole (Table 2). Overall, each one-percentage point difference in household firearm ownership was associated with a

3.3% difference in firearm homicide victimization (95% CI 2.4%, 4.2%) and a 2.2% difference in the rate of homicide victimization (95% CI 1.4%, 2.9%). Non-firearm homicide victimization was not associated with firearm prevalence.

The results presented in Tables 1 and 2 are derived from incidence rate ratios and relate the *relative* difference in the dependent variable, expressed as a percentage (e.g. a three percent increase in the firearm homicide victimization rate), for each one-percentage point *absolute* difference in household firearm prevalence. Since approximately one in three US household contained firearms according to the 2001 BRFSS, each one-percentage point *absolute* difference in gun ownership reflects, on average, approximately a 3% change in relative gun ownership. Thus, since a one percentage point absolute increase in household firearm ownership prevalence is associated with a 3% increase in firearm homicide, rates of firearm homicide victimization increase in approximate proportion to (relative) increases in firearm prevalence. The coefficient of elasticity in the middle range of firearm prevalence is approximately one.

Additional multivariate analyses for the population as a whole were conducted comparing homicide victimization in the states in the highest compared to the lowest quartile of firearm ownership. Compared to states within the lowest quartile of firearm prevalence, states within the highest quartile had significantly higher firearm and overall homicide victimization rates: firearm homicide rates were

Table 1
Unadjusted results: percentage increase in homicide victimization rates (95% CIs) for each one-percentage point *absolute* increase in household firearm ownership

|  | Homicide | Firearm homicide | Non-firearm homicide |
|---|---|---|---|
| Kids 5–14 | 0.9% (−0.3%–2.1%) | 1.6% (−0.3%–3.4%) | 0.2% (−1.1%–1.6%) |
| Adolescents 15–17 | −0.9% (−2.6%–0.8%) | −1.1% (−3.1%–0.9%) | −0.4% (−1.7%–1.0%) |
| Women |  |  |  |
| Ages 18–34 | 1.3% (−0.3%–2.9%) | 2.2% (0.4%–4.1%)* | 0.2% (−1.3%–1.6%) |
| Ages 35+ | 1.3% (−0.4%–3.0%) | 2.6% (0.5%–4.8%)* | 0.4% (−1.0%–1.8%) |
| All Ages | 1.3% (−0.2%–2.2%)~ | 2.4% (0.4%–4.4%)* | 0.6% (−0.7%–1.8%) |
| Men |  |  |  |
| Ages 18–34 | −0.6% (−3.0%–1.8%) | −0.7% (−3.4%–2.0%) | −0.2% (−1.4%–1.0%) |
| Ages 35+ | 1.2% (−0.8%–3.0%) | 1.8% (−0.5%–4.1%) | 0.5% (−0.9%–1.9%) |
| All Ages | 0.1% (−1.8%–2.2%) | 0.0% (−2.3%–2.6%) | 0.3% (−0.9%–1.4%) |
| Total | 0.5% (−1.4%–2.3%) | 0.5% (−1.8%–2.9%) | 0.4% (−0.8%–1.5%) |

Values derived from rate ratios computed using negative binomial regression.
~ $P<0.1$;
* $P<0.05$;

*M. Miller et al. / Social Science & Medicine 64 (2007) 656–664*

Table 2
Multivariate results: percentage increase in homicide victimization rates (95% CIs) for each one-percentage point *absolute* increase in household firearm ownership

|  | Homicide | Firearm homicide | Non-firearm homicide |
|---|---|---|---|
| Kids 5–14 | 2.4% (0.0%–4.8%)* | 3.8% (0.2%–7.5%)* | 0.6% (−1.8%–3.1%) |
| Adolescents 15–17 | 2.4% (0.6%–4.3%)** | 2.8% (0.7%–5.0%)* | 0.6% (−1.1%–2.3%) |
| Women |  |  |  |
| Ages 18–34 | 2.3% (1.2%–3.4%)*** | 4.0% (2.3%–5.6%)*** | 0.6% (−0.7%–1.9%) |
| Ages 35+ | 1.7% (0.3%–3.0%)* | 4.4% (2.7%–6.2%)*** | −0.2% (−1.5%–1.1%) |
| All ages | 2.0% (1.0%–3.1%)*** | 4.1% (2.6%–5.6%)*** | 0.5% (−0.4%–1.4%) |
| Men |  |  |  |
| Ages 18–34 | 3.0% (1.2%–4.8%)*** | 3.4% (1.4%–5.6%)*** | 0.3% (−1.6%–2.2%) |
| Ages 35+ | 2.0% (0.7%–3.2%)** | 3.4% (2.2%–4.6%)*** | 0.7% (−0.5%–1.8%) |
| All Ages | 2.4% (1.4%–3.3%)*** | 3.2% (2.2%–4.3%)*** | 0.6% (−0.7%–2.0%) |
| Total | 2.2% (1.4%–2.9%)*** | 3.3% (2.4%–4.2%)*** | 0.6% (−0.5%–1.6%) |

Multivariate results control for urbanization, resource deprivation, unemployment, divorce, percent of the population 18–34 years old, aggravated assault rate, robbery rate, per capita alcohol consumption, and Southern region.
Values derived from rate ratios computed using negative binomial regression.
*$P<0.05$;
**$P<0.01$;
***$P<0.001$

114% higher (95% CI 38%, 211%) and homicide rates were 60% higher (27%, 101%). Non-firearm homicide rates were not significantly different in the states with the highest compared to the lowest quartile of firearm prevalence.

Sensitivity analyses were conducted to see if our results held when the states most extreme in firearm ownership were excluded from analyses. Results from analyses that excluded the 5 states with the highest household firearm prevalence were similar to results obtained when all 50 states were included. Results from analyses that excluded the 5 states with the lowest household firearm prevalence were similar to results obtained when all 50 states were included. Additional sensitivity analyses found that a more parsimonious model that included only three independent variables (firearm ownership, urbanization, and resource deprivation) produced findings similar to those presented in Table 2 using the full model (not shown). For example, when covariates included only firearm prevalence, urbanization and resource deprivation, each 1-percentage point *absolute* difference (or, equivalently, each 3% *relative* change) in firearm prevalence was associated with a 4.1% relative difference in firearm homicide victimization for the population as a whole (95% CI 1.6%, 6.6%), and a 2.9% difference in homicide victimization(95% CI 0.9%, 4.9%) (not shown).

In addition to household firearm prevalence, other covariates were significantly associated with homicide and firearm homicide victimization in multivariate analyses. These included the percentage of the population living in urbanized areas, the robbery and aggravated assault rates, the resource deprivation index and living in the southern census region (Table 3). Covariates associated with non-firearm homicide victimization included the robbery rate, resource deprivation, and the divorce rate (Table 3).

Fig. 1 illustrates the simultaneous contribution of household firearm ownership and robbery on firearm homicide victimization for the population as a whole. In states with similar robbery rates, where household firearm prevalence is higher, firearm homicide victimization is higher. The slope of the lines relating household firearm prevalence to firearm homicide rates are 0.06, 0.10, and 0.10 for, respectively, states with robbery rates more than 1 standard deviation below the mean, within one standard deviation of the mean, and more than 1 standard deviation above the mean.

### Discussion

States with higher rates of household firearm ownership had significantly higher homicide victimization rates in multivariate analyses. The

*M. Miller et al. / Social Science & Medicine 64 (2007) 656–664*                    661

Table 3
Percentage increase in homicide victimization rates (95% CIs) for each one standard deviation increase in measured covariates

|  | Homicide | Firearm homicide | Non-firearm homicide |
|---|---|---|---|
| Household firearm ownership | 29.6% (17.5%–43.1%)*** | 47.1% (31.0%–65.3%)*** | 8.3% (−4.9%–23.2%) |
| % of population living inside urban areas | 7.7% (−4.4%–21.3%) | 19.8% (6.7%–34.5%)** | −6.5% (−18.0%–6.6%) |
| Factor of resource deprivation | 20.7% (13.4%–28.5%)*** | 28.0% (18.1%–38.9%)*** | 9.3% (2.6%–16.5%)** |
| Unemployment rate | 0.1% (−5.3%–5.8%) | −1.5% (−8.5%–6.0%) | 2.4% (-1.1–6.1%) |
| % population, divorced | 5.1% (−3.0%–14.0%) | 4.0% (−6.5%–15.6%) | 7.4% (1.0%–14.3%)* |
| % of population, ages 18-34 | 2.0% (−3.2%–7.4%) | 1.4% (−6.1%–9.6%) | 2.8% (0.0%–5.7%)* |
| Aggravated assault rate | 9.5% (2.5%–17.0%)** | 10.9% (2.5%–20.1%)* | 6.8% (−0.9%–15.2%) |
| Robbery rate | 35.7% (29.8%–41.9%)*** | 42.5% (33.6%–51.9%)*** | 26.1% (22.0%–30.3%)*** |
| South[a] | 23.2% (17.8%–28.8%)*** | 38.4% (33.4%–43.6%)*** | 1.5% (−5.7%–9.2%) |
| Per capita alcohol consumption | −5.8% (−10.7%––0.6%)* | −6.9% (−13.1%––0.3%)[1]* | −4.4% (−9.3%–0.9%)** |

Values derived from rate ratios computed from negative binomial regression.
States with firearm prevalence more than one standard deviation above the mean: Alabama, Arkansas, West Virginia, Mississippi, South Dakota, Idaho, Alaska, Montana, Wyoming.
States with firearm prevalence more than one standard deviation below the mean: Hawaii, Massachusetts, Rhode Island, New Jersey, Connecticut, New York, Illinois, California, Maryland
*$P < 0.05$;
**$P < 0.01$;
***$P < 0.001$.
[a]Because South is a binary variable, rate ratios refer to Southern vs. non-Southern census region location.

association between firearm prevalence and homicide victimization in our study was driven by gun-related homicide victimization rates; non-gun-related victimization rates were not significantly associated with rates of firearm ownership. This result held overall, for women and for men, and across age groups, consistent with previous ecologic work that relied on a proxy measure for household firearm ownership rather than direct survey estimates (Miller et al., 2002).

Consistent with findings from individual-level studies that found household firearm ownership was associated with lethal victimization of women (Bailey et al., 1997b; Wintemute, Parham, Beaumont, Wright, & Drake, 1999) and with studies that found a gun in the home was a risk factor for homicides in the home perpetrated by family members, intimates or acquaintances (Kellermann et al., 1993), we found that household firearm prevalence was associated with firearm homicide victimization of women in unadjusted as well as in multivariate analyses. Our finding from *unadjusted* analyses that women (but not men) appear to be at increased risk of homicide victimization from household firearms suggests that household guns may play a more direct role in femicides than in homicide involving male victims. Although direct information about the location of lethal shootings and the source of firearms used in homicides do not

exist for our national data set, prior work on the distribution of homicide location by gender is consistent with this possibility. For example, findings from the Chicago Homicide Dataset (Block, 1987), found that more than half of all female homicide victims but fewer than a quarter of all male homicide victims were killed in a home.

Young adult males are often killed by other young adult males and are more often killed in the street than are other homicide victims (Block, 1987). Three possible mechanisms may help explain why state-level household firearm prevalence is associated with homicide victimization of young adult males in our multivariate analyses. First, states with high rates of gun ownership tend to have less stringent regulations of firearm sales (Brady Campaign to Prevent Gun Violence, 2006), perhaps making it easier to obtain guns from a variety of street sources. Second, theft in states with high levels of gun ownership may be more likely to result in a ready source of illegal firearms. And third, altercations that escalate to physical violence may be more likely to prove fatal when firearms, including household firearms, are present.

In our analyses we have the advantage of being able to use survey measures of household firearm ownership. However, because our firearm prevalence estimates come from a survey of adults we do not have direct information about firearms that

minors may have in the home that are not known to their parents. In addition the BRFSS firearm question does not provide potentially important information about many characteristics of firearm availability that may be related to the rate of homicide. For example, our measure does not differentiate handguns from long guns, or provide information on the number of firearms in gun owning households, the caliber of gun(s), or the ease with which firearms can be obtained in secondary market transfers.

Our study does not establish a causal relationship between guns and homicide. It is possible that a non-causal relationship explains our findings or that the association we observe might have arisen because individuals in states with historically high homicide rates acquired more guns (than did individuals in low-homicide states), as a defensive response to actual high homicide rates in their communities (i.e. "reverse causation"). This broad notion of reverse causation, while consistent with our association between household firearms and firearm and overall homicide, does not explain why firearm ownership is *not* also significantly associated with rates of non-firearm homicide. Furthermore, rates of robbery and aggravated assault are not associated with household firearm prevalence, even after controlling for urbanization and resource deprivation (not shown). Since individuals who obtain firearms in an attempt to protect themselves from violence plausibly respond to non-fatal violence (which is far more common than fatal violence), the lack of association between firearm prevalence and non-lethal violent crime militates against reverse causation as an adequate explanation for our findings. In addition, although several studies have documented that individuals obtain firearms for various reasons, including self-defense, almost nothing is known about whether the specific perceptions that motivate individuals to acquire firearms for self-defense have any relationship to actual homicide rates, overall or for any group.(-Azrael, Miller, & Hemenway, 2000; Hemenway, 2004; Hemenway, Solnick, & Azrael, 1995; Howard, Webster, & Vernick, 1999; Senturia, Christoffel, & Donovan, 1994; Smith, 1998; Webster, Wilson, Duggan, & Pakula, 1992).

Consistent with previous work, we found that homicide rates were higher in areas with higher rates of urbanization (Parker & Smith, 1979), robbery (Baker, O'Neill, Ginsburg, & Li, 1992; Fingerhut et al., 1992; Hsieh & Pugh, 1993; Parker & Pruitt,

2000) and resource deprivation (Land et al., 1990); like others we also find that homicide rates are higher in the South (Gastil, 1971; Huff-Corzine et al., 1986; Land et al., 1990).

A limitation of the study is that other factors not included in the analyses may affect homicide rates. In addition, the measures for the control variables that we do use are only approximations (e.g. rates of aggravated assault come from police reports which generally underreport actual incidence) and represent aggregate, not individual-level information about our dependent and independent variables.

Our aggregate measures avoid the case–control problem of recall bias (e.g. cases being more likely to recall a firearm in the home than for controls), but this advantage comes at the possible interpretative cost of assuming group-level associations reflect individual risk factors (i.e. the ecologic fallacy) (Piantadosi, 1994). Nevertheless, our results accord with finding from prior individual-level studies (Bailey et al., 1997b; Kellermann et al., 1993; Wintemute et al., 1999).

Although we do not know whether the firearm used in a given homicide came from the victim's home, our results do not strictly require this interpretation; our results are also consistent with the possibility that the ease with which firearms may be obtained by potential perpetrators of homicide is related to the local prevalence of household firearms. For some types of homicide victimization this may reflect the use of guns from the victim's home, as might be the case in intimate partner homicides. For other types of homicide victimization, as might characterize a large proportion of inner city youth homicide, this may reflect the use of guns obtained through local burglaries. Unfortunately, our group-level data do not allow examination of these speculations.

Our study has additional limitations. Firearm prevalence data for this study comes from 2001, whereas mortality data are state-level aggregates over the 3-years 2001–2003. Although our outcome data (homicide) do not precede our exposure data, we nevertheless use household firearm measures from 2001 to assess homicide not only in 2001, but in 2002 and 2003. The effect of this temporal discrepancy on our results is likely to be small since guns are highly durable. In fact, the correlation coefficient relating state level household firearm ownership from the BRFSS in 2001 compared to 2002 is 0.99. Other studies have shown that the cross sectional pattern of household firearm ownership

tends to be quite constant over longer time periods as well (Azrael, Cook, & Miller, 2004). Moreover, the pattern of association between household firearm prevalence and homicide we present using aggregate mortality data (2001–2003) is very similar to the pattern when outcome data are limited to any one of these years (not shown), though subgroup analyses are limited due to small numbers in some subgroups.

Despite these limitations, our cross-sectional finding that household firearm prevalence is a risk factor for homicide victimization of Americans is consistent with many previous studies, as summarized in a recent review (Hepburn & Hemenway, 2004). Our findings that household firearm ownership rates are related to firearm and overall homicide rates, but not to non-firearm homicide rates, for women, children and men of all ages, even after controlling for several potential confounders previously identified in the literature, suggests that household firearms are a direct and an indirect source of firearms used to kill Americans both in their homes and on their streets.

## Acknowledgement

This study was supported by the Joyce Foundation.

## References

Azrael, D., Cook, P., & Miller, M. (2004). State and local prevalence of firearms ownership: Measurement, structure and trends. *Journal of Quantitative Criminology, 20*, 43–62.

Azrael, D., Miller, M., & Hemenway, D. (2000). Are household firearms stored safely? It depends on whom you ask. *Pediatrics, 106*(3), E31.

Bailey, J. E., Kellerman, A. L., Somes, G. W., Banton, J. G., Rivara, F. P., & Rushforth, N. P. (1997a). Risk factors for violent death of women in the home. *Archives of Pediatrics and Adolescent Medicine, 157*(7), 777–782.

Bailey, J. E., Kellermann, A. L., Somes, G. W., Banton, J. G., Rivara, F. P., & Rushforth, N. P. (1997b). Risk factors for violent death of women in the home. *Archives of Internal Medicine, 157*(7), 777–782.

Baker, S. P., O'Neill, B., Ginsburg, M. J., & Li, G. (1992). *The injury fact book.* New York: Oxford University Press.

Behavioral Risk Factor Surveillance System. (2001). Survey data. Available at ⟨http://www.cdc.gov/brfss/ti-surveydata2001.htm⟩. Last accessed 2/5/2003.

Block, C. R. (1987). *Homicide in Chicago: Aggregate and time series perspectives on victim, offender and circumstance.* Chicago: Center for Urban Policy, Loyola University Chicago.

Brady Campaign to Prevent Gun Violence. (2006). State Report Cards [Online]. Available at: ⟨http://www.bradycampaign.org/facts/reportcards/⟩. Accessed April 12, 2006.

Brearly, H. (1932). *Homicide in the United States.* Chapel Hill, NC: University of North Carolina Press.

Brill, S. (1977). *Firearm abuse: A research and policy report.* Washington, DC: Police Foundation.

Centers for Disease Control and Prevention Web-based Injury Statistics Query and Reporting System (WISQARS) [On-line]: Office of Statistics and Programming, National Center for Injury Prevention and Control, Centers for Disease Control and Prevention (producer). [Accessed June 2005].

Cook, P. J. (1979). The effect of gun availability on robbery and robbery murder. In R. Haverman, & B. Zellner (Eds.), *Policy studies review annual.* Thousand Oaks: Sage Publications.

Cummings, P., Koepsell, T. D., Grossman, D. C., Savarino, J., & Thompson, R. S. (1997). The association between the purchase of a handgun and homicide or suicide. *American Journal of Public Health, 87*(6), 974–978.

Duggan, M. (2001). More guns, more crime. *Journal of Political Economy, 109*(5), 1086–1114.

Federal Bureau of Investigation. (2002). *Crime in the United States (2001pp. Table 5, p. 76).* Washington, DC: Department of Justice.

Fingerhut, L. A., Ingram, D. D., & Feldman, J. J. (1992). Firearm and nonfirearm homicide among persons 15 through 19 years of age: Differences by level of urbanization, United States, 1979 through 1989. *Journal of the American Medical Association, 267*(22), 3048–3053.

Gastil, R. (1971). Homicide and a regional culture of violence. *American Sociological Review, 36*, 412–427.

Goodman, R. A., Mercy, J. A., Loya, F., Rosenberg, M. L., Smith, J. C., Allen, N. H., et al. (1986). Alcohol use and interpersonal violence: Alcohol detected in homicide victims. *American Journal of Public Health, 76*(2), 144–149.

Hemenway, D. (2004). *Private guns public health.* Ann Arbor, MI: University of Michigan Press.

Hemenway, D., Solnick, S. J., & Azrael, D. R. (1995). Firearm training and storage. *Journal of the American Medical Association, 273*(1), 46–50.

Hepburn, L., & Hemenway, D. (2004). Firearm availability and homicide: A review of the literature. *Aggression and Violent Behavior: A Review Journal, 9*(4), 417–440.

Howard, K. A., Webster, D. W., & Vernick, J. S. (1999). Beliefs about the risks of guns in the home: Analysis of a national survey. *Injury Prevention, 5*, 284–289.

Hsieh, C., & Pugh, M. (1993). Poverty, income inequality, and violent crime: A meta-analysis of recent data studies. *Criminal Justice Review, 18*, 182–202.

Huff-Corzine, L., Corzine, J., & Moore, D. C. (1986). Southern exposure: Deciphering the south's influence on homicide rates. *Social Forces, 64*, 906–924.

Kaplan, M., & Geling, O. (1998). Firearm suicides and homicides in the United States: Regional variations and patterns of gun ownership. *Social Science & Medicine, 46*(9), 1227–1233.

Karpati, A., Galea, S., Awerbuch, T., & Levins, R. (2002). Variability and vulnerability at the ecological level: Implications for understanding the social determinants of health. *American Journal of Public Health, 92*(11), 1768–1772.

Kellermann, A. L., Rivara, F. P., Rushforth, N. B., Banton, J. G., Reay, D. T., Francisco, J. T., et al. (1993). Gun ownership

as a risk factor for homicide in the home. *New England Journal of Medicine*, 329(15), 1084–1091.

Kleck, G., & Patterson, E. (1993). The impact of gun control and gun ownership levels on violence rates. *Journal of Quantitative Criminology*, 9, 249–287.

Land, K. C., McCall, P. L., & Cohen, L. E. (1990). Structural covariates of homicide rates: Are there any invariances across time and social space? *American Journal of Sociology*, 95(4), 922–963.

Lawless, J. E. (1987). Negative binomial and mixed Poisson regression. *Canadian Journal of Statistics*, 15, 209–225.

Lester, D. (1988). Firearm availability and the incidence of suicide and homicide. *Acta Psychiatrica Belgica*, 88(5–6), 387–393.

Lester, D. (1990). Relationship between firearm availability and primary and secondary murder. *Psychological Reports*, 67(2), 490.

Loftin, C., & Hill, R. H. (1974). Regional culture and homicide: An examination of the Gastil–Hackney thesis. *American Sociological Review*, 39, 714–724.

Miller, M., Azrael, D., & Hemenway, D. (2002). Rates of household firearm ownership and homicide across US regions and states, 1988–1997. *American Journal of Public Health*, 92(12), 1988–1993.

National Institute on Alcohol Abuse and Alcoholism. (2005). Per capita ethanol consumption for states, census regions, and the United States, 1970–1998 [Table]. [Accessed January 10, 2005 from http://www.niaaa.nih.gov/databases/consum03.txt].

National Research Council. (2005). Firearms and violence: A critical review. Committee to improve research information and data on firearms. In F. Charles, M. Wellford, V. John, N. Pepper, V. Carol, & H. Petrie (Eds.), *Committee on law and justice, division of behavioral and social sciences and education*. Washington, DC: The National Academies Press.

Parker, K., & Pruitt, M. (2000). Poverty, poverty concentration, and homicide. *Social Science Quarterly*, 81, 555–570.

Parker, R. N., & Smith, M. D. (1979). Deterrence, poverty, and type of homicide. *American Journal of Sociology*, 85, 614–624.

Piantadosi, S. (1994). Invited commentary: Ecologic biases. *American Journal of Epidemiology*, 139(8), 761–764 discussion 769–771.

Price, J. H., Thompson, A. J., & Dake, J. A. (2004). Factors associated with state variations in homicide, suicide, and unintentional firearm deaths. *Journal of Community Health*, 29(4), 271–283.

Reed, J. A., Smith, R. S., Helmer, S. D., Lancaster, B. A., & Carman, C. G. (2003). Rates of unemployment and penetrating trauma are correlated. *Southern Medical Journal*, 96(8), 772–774.

Seitz, S. (1972). Firearms, homicide, and gun control effectiveness. *Law and Society Review*, 6, 595–614.

Senturia, Y. D., Christoffel, K. K., & Donovan, M. (1994). Children's household exposure to guns: A pediatric practice-based survey. *Pediatrics*, 93(3), 469–475.

Smith, T. W. (1998). *1997–98 National gun policy survey of the national opinion research center: Research findings*. Chicago, IL: National Opinion Research Center, University of Chicago.

US Bureau of the Census. (2004). Census 2000 Summary Files 1 and 3. Available at: ⟨http://factfinder.census.gov/⟩. Accessed June 10, 2004.

Wall, M. E., Rechtsteiner, A., & Rocha, L. M. (2003). Singular value decomposition and principal component analysis. In D. P. Berrar, W. Dubitzky, & M. Granzow (Eds.), *A practical approach to microarray data analysis* (pp. 91–109). Norwell, MA: Kluwer.

Webster, D. W., Wilson, M. E., Duggan, A. K., & Pakula, L. C. (1992). Parents' beliefs about preventing gun injuries to children. *Pediatrics*, 89(5, Part 1), 908–914.

Wintemute, G. J., Parham, C. A., Beaumont, J. J., Wright, M., & Drake, C. (1999). Mortality among recent purchasers of handguns. *New England Journal of Medicine*, 341(21), 1583–1589.

# Exhibit 78

# Firearm Availability and Unintentional Firearm Deaths, Suicide, and Homicide among 5–14 Year Olds

*Mathew Miller, MD, MPH, ScD, Deborah Azrael, PhD, and David Hemenway, PhD*

**Background:** In the United States, only motor vehicle crashes and cancer claim more lives among children than do firearms. This national study attempts to determine whether firearm prevalence is related to rates of unintentional firearm deaths, suicides, and homicides among children.

**Methods:** Pooled cross-sectional time-series data (1988–1997) were used to estimate the association between the rate of violent death among 5–14 year olds and four proxies of firearm availability, across states and regions.

**Results:** A statistically significant association exists between gun availability and the rates of unintentional firearm deaths, homicides, and suicides. The elevated rates of suicide and homicide among children living in states with more guns is not entirely explained by a state's poverty, education, or urbanization and is driven by lethal firearm violence, not by lethal nonfirearm violence.

**Conclusion:** A disproportionately high number of 5–14 year olds died from suicide, homicide, and unintentional firearm deaths in states and regions where guns were more prevalent.

**Key Words:** Firearms, Guns, Children, Homicide, Suicide, Unintentional death, Accidents, Violence.

*J Trauma.* 2002;52:267–275.

In the United States, only motor vehicle crashes and cancer claim more lives among children 5–14 years old than do firearms.[1] Between 1988 and 1997, the last 10 years for which complete U.S. data are available, 6,817 children 5–14 years of age died from firearms.[1]

In contrast, children in other industrialized nations are not dying from guns. Compared with children 5–14 years old in other industrialized nations, the firearm-related homicide rate in the United States is 17 times higher, the firearm-related suicide rate 10 times higher, and the unintentional firearm-related death rate 9 times higher.[2] Overall, before a child in the United States reaches 15 years of age, he or she is 5 times more likely than a child in the rest of the industrialized world to be murdered, 2 times as likely to commit suicide and 12 times more likely to die a firearm-related death.[2,3]

Within the United States, case-control studies have found that the purchase of a handgun[4] and the presence of a handgun in the home are strongly associated with an increased risk of homicide and suicide among adults[5–7] and an increased risk of suicide among adolescents.[5–12] Cohort, cross-sectional, and interrupted time series studies suggest a strong link between the availability of guns and rates of homicide

and suicide among adults[13–20] and with the rate of unintentional firearm death among all age groups.[21]

Case-control and cohort studies of lethal firearm violence have several advantages over cross-sectional studies, but these have been geographically limited and have not focused on children. Nationally representative cross-sectional studies, on the other hand, have been hampered by the lack of direct measures of gun availability at levels smaller than the nine census regions. Our study extends previous findings by focusing on children and by using three different state-level proxies for gun availability (one survey-based measure available for a nonrandom 21/50 states; two nonsurvey measures derived for all 50 states) and an additional survey-based regional-level measure of gun availability to explore the relationship between firearm availability and violent death among 5–14 year olds. State-level analyses adjust for state urbanization, poverty, and education levels.

## MATERIALS AND METHODS

We used pooled cross-sectional time-series data from the 50 states over a 10-year period (1988–1997) to examine the association between four different measures of the availability of firearms and the corresponding rates of suicide, homicide, and unintentional firearm deaths among children 5–14 years old.

State- and year-specific population figures and data for the number of suicides (*International Classification of Diseases, Ninth Revision* [ICD-9] codes E950.0–E959), homicides (E960.0–E969), suicides by firearm (E955.0–E955.4), homicides by firearm (E965.0–E965.4), and unintentional deaths caused by firearm (E922.0–E922.9) come from the National Center for Health Statistics (NCHS) mortality files. Deaths from firearms of undetermined intention (ICD-9 E985) constitute less than 3% (186/6,187) of all firearm

Submitted for publication December 12, 2000.

Accepted for publication July 24, 2001.

From the Harvard School of Public Health, Department of Health Policy and Management, Boston, Massachusetts.

This research was supported in part by grants from the Centers for Disease Control and Prevention, the Joyce Foundation, the Robert Wood Johnson Foundation, the Packard Foundation, and the Center on Crimes, Communities and Culture of the Open Society Institute.

Address for reprints: Matthew Miller, MD, MPH, ScD, Harvard School of Public Health, Department of Health Policy and Management, 677 Huntington Avenue, Boston, MA 02115; email: mmiller@hsph.harvard.edu.

deaths among 5–14 year olds and are excluded from analyses. Region-specific population and mortality figures were derived by aggregating the corresponding state-based figures.

Two of our measures of firearm availability come from published survey-based estimates of household firearm ownership, one at the regional level and the other at the state level. Our regional survey-based measure of firearm availability, collected at the level of the nine census regions, comes from the average of reported household gun ownership rates between 1988 and 1997, as reported in the General Social Surveys (GSS).[22] At the state level, published data on reported household gun ownership rates are available for 21 states from the Behavioral Risk Factor Surveillance System (BRFSS) from the 1990s.[23] The 21 states for which the BRFSS obtained data on household gun ownership are a nonrandom sample of those states that self-selected to ask questions about household firearms. However, these states did not appear to select on the basis of the rates of violent death among children or the purported relationship between gun levels and violent death rates. The implications of this nonrandom selection cannot be evaluated directly. Nevertheless, since results from the BRFSS states are substantively similar to those obtained from the nationally representative gold-standard survey based estimates of household firearm ownership (GSS), the BRFSS estimates can be viewed as corroborating rather than primary evidence of the validity of the association observed with GSS estimates. Furthermore, as both the BRFSS the GSS measures are very highly correlated with each other and with our independently derived proxies, these measures as a group supply consistent findings about the association between firearm availability and violent death among children.

Direct measures of household firearm ownership are not available at the state level for all 50 states. When all 50 states are analyzed (at the state level), proxies for firearm availability are two derived measures: (1) Cook's Index, developed and previously validated at the city level;[16] and (2) the fraction of all suicides that involve a gun. Both of these measures have been used in cross-sectional studies within the United States,[24–27] and Cook's Index has also been independently correlated with household gun ownership levels across 14 industrialized nations.[28]

Cook's Index for a given state in a given year is calculated by averaging (over all age groups) the percentage of all suicides committed with a firearm and the percentage of all homicides committed with a firearm. That is, Cooks Index = (fraction of suicides with guns + fraction of homicides with guns)/2. In our investigation of childhood mortality rates, to avoid having violent deaths among children appear in both the dependent and the key independent variables, we used a modified Cook's Index that excluded suicides and homicides among children 0–19 years of age from the calculation. Since 5–14 year old children account for less than 2% of all suicides and homicides, it is not surprising that analyses using the modified index were qualitatively and quantitatively similar

to those using a Cook's Index derived from all age groups. All results presented are based on the modified index.

The second mortality-derived estimate of firearm availability is closely related to Cook's Index: the fraction of suicides that are gun related. This proxy is referred to as FS/S in the text to indicate that it is the number of firearm suicides in a given state-year (among adults) divided by the total number of suicides in that state-year (among adults). The proxy FS/S is based on the assumption that firearms are likely to be more readily available in states where guns make up a larger fraction of all suicides than in states where guns make up a smaller fraction of all suicides—independent of the number or rate of suicides in a state. A state's FS/S and Cook's Index reflect the distribution of firearm vs. nonfirearm means of suicide (in the case of FS/S) and the distribution of firearm vs. nonfirearm means of suicide and homicide (in the case of Cook's Index). Neither FS/S nor Cook's Index inherently reflects the rate of suicides or homicides in a state and so do not bias our testing of the null hypothesis, i.e., that there is no relationship between gun availability and overall suicide rates. FS/S merely reflects the distribution of these means.

That FS/S does not by construction (i.e., in itself) bias the overall associations is corroborated by the results of a Monte Carlo-type simulation of 10,000 recursive loops in which positive random numbers are generated for the number of suicides, firearm suicides, and total population in the 50 states. These random numbers are generated so that FS < S. As expected, the correlation between overall suicide rates and FS/S is zero.

Qualitatively and statistically similar results were obtained whether Cook's Index (and FS/S) assumed the average Cook's Index (average FS/S) for each state over the 10-year study period, a 5-year rolling average, or a specific value for each state-year. We present results using 10-year averaged values for all our proxies because the gun stock in the United States is so high (over 200 million guns) that changes in a state's stock are likely to be quite small from year to year, and because using a 5-year rolling average would require us to drop data from 1996 and 1997. The 10-year averaged measures yielded regressions that were qualitatively similar to regressions using 5-year rolling averages and also to regressions in which we used the specific Cook's Index (FS/S) for each state-year.

To make the comparisons among our four proxies more intuitive, all were standardized so that each proxy has a mean of zero and a SD of 1. The raw average values (1988–1997) for Cook's Index, FS/S, and the BRFSS survey-based gun ownership levels are presented out to 2 decimal points in Table 1, ranked according to Cook's Index. The dependent variable used in our analyses is the number of deaths per population per state-year among 5–14 year olds. Distributions of death rates were skewed and variances were greater than the means. Consequently, negative binomial models were used (rather than Poisson).

*Firearm Availability and Violent Deaths among Children*

**Table 1** State-Level Proxies of Firearm Availability, Average (Nonstandardized) Values 1988–1997, Ranked by Cook's Index

| Mean (SD) | Cook's Index 0.61 (0.09) | BRFSS 0.39 (0.14) | FS/S 0.61 (0.12) | Firearm Death Rate 1.99 (0.85)[a] |
|---|---|---|---|---|
| Hawaii | 0.37 | | 0.29 | 0.51 |
| Massachusetts | 0.40 | | 0.31 | 0.54 |
| New Jersey | 0.43 | 0.12 | 0.35 | 0.51 |
| Rhode Island | 0.45 | 0.14 | 0.36 | 0.54 |
| Delaware | 0.48 | 0.28 | 0.48 | 1.62 |
| South Dakota | 0.48 | | 0.63 | 1.92 |
| Minnesota | 0.52 | | 0.51 | 1.36 |
| New York | 0.53 | 0.14 | 0.37 | 0.94 |
| Iowa | 0.54 | | 0.55 | 1.05 |
| New Hampshire | 0.54 | | 0.57 | 0.57 |
| Connecticut | 0.56 | 0.18 | 0.44 | 1.09 |
| Illinois | 0.56 | | 0.47 | 2.19 |
| North Dakota | 0.56 | | 0.59 | 2.54 |
| Colorado | 0.57 | 0.38 | 0.57 | 1.92 |
| Maine | 0.57 | | 0.61 | 1.56 |
| Washington | 0.58 | | 0.57 | 1.49 |
| Wisconsin | 0.58 | 0.49 | 0.54 | 1.48 |
| Utah | 0.58 | | 0.59 | 2.02 |
| New Mexico | 0.59 | 0.43 | 0.63 | 2.43 |
| Pennsylvania | 0.60 | 0.41 | 0.55 | 1.10 |
| Oregon | 0.60 | 0.49 | 0.61 | 2.05 |
| Nebraska | 0.61 | | 0.58 | 1.98 |
| California | 0.61 | 0.30 | 0.53 | 2.00 |
| Ohio | 0.62 | | 0.60 | 1.38 |
| Alaska | 0.63 | | 0.70 | 3.97 |
| Michigan | 0.63 | 0.46 | 0.57 | 1.87 |
| Montana | 0.63 | | 0.67 | 3.81 |
| Maryland | 0.63 | | 0.56 | 1.33 |
| Florida | 0.64 | | 0.60 | 1.98 |
| Nevada | 0.65 | | 0.67 | 2.51 |
| Kansas | 0.65 | 0.41 | 0.64 | 2.10 |
| Vermont | 0.65 | | 0.67 | 1.35 |
| Oklahoma | 0.65 | 0.54 | 0.69 | 2.65 |
| Indiana | 0.66 | 0.40 | 0.63 | 1.65 |
| Arizona | 0.67 | 0.33 | 0.67 | 2.57 |
| Idaho | 0.67 | 0.57 | 0.71 | 3.52 |
| Missouri | 0.68 | | 0.65 | 2.20 |
| South Carolina | 0.69 | | 0.72 | 2.58 |
| Texas | 0.69 | | 0.68 | 2.37 |
| Virginia | 0.69 | | 0.68 | 1.71 |
| Wyoming | 0.70 | | 0.74 | 3.05 |
| North Carolina | 0.70 | | 0.72 | 2.13 |
| Georgia | 0.72 | | 0.74 | 2.10 |
| Tennessee | 0.72 | | 0.74 | 2.58 |
| Kentucky | 0.72 | 0.49 | 0.74 | 1.90 |
| West Virginia | 0.73 | 0.51 | 0.75 | 1.88 |
| Arkansas | 0.73 | | 0.75 | 3.15 |
| Mississippi | 0.74 | 0.55 | 0.80 | 3.33 |
| Alabama | 0.75 | | 0.78 | 3.01 |
| Louisiana | 0.75 | 0.53 | 0.76 | 3.33 |

[a] The overall firearm death rate among 5–14 year olds.

A state's homicide, suicide, and unintentional firearm death rates in a given year are not independent from rates in that state in other years. To account for this nonindependence, standard errors in regressions were corrected by clustering observations (by state in the regressions presented in Table 2; by region in Table 3).

Primary analyses use incidence rate ratios (IRR), obtained by exponentiating beta coefficients in the negative binomial regressions, to express the magnitude of the association between a state's suicide, homicide, and unintentional firearm death rate and that state's standardized proxy for gun availability. Since the SD of each of the standardized proxies

*The Journal of* **TRAUMA**® *Injury, Infection, and Critical Care*

**Table 2** Crude and Multivariate Adjusted Incidence Rate Ratios (IRRs) of State-Level Homicide, Suicide, and Unintentional Gun Deaths among 5–14 Year Olds in the United States, by State-Level Proxies of Firearm Availability (1988–1997)

|  | No. of States | Firearm | Nonfirearm | Total |
|---|---|---|---|---|
| **Homicide rate** |  |  |  |  |
|   Bivariate |  |  |  |  |
|     Cook's Index | 50 | 1.29 (1.16, 1.43)*** | 1.04 (0.96, 1.14) | 1.19 (1.10, 1.29)*** |
|     FS/S | 50 | 1.18 (1.04, 1.34)** | 1.00 (0.93, 1.09) | 1.11 (1.01, 1.22)* |
|     Household gun | 21 | 1.11 (0.93, 1.32) | 0.99 (0.90, 1.09) | 1.06 (0.94, 1.19) |
|   Multivariate |  |  |  |  |
|     Cook's Index | 50 | 1.31 (1.17, 1.47)*** | 1.03 (0.93, 1.15) | 1.19 (1.09, 1.30)*** |
|     FS/S | 50 | 1.23 (1.06, 1.41)** | 1.02 (0.91, 1.13) | 1.14 (1.03, 1.28)* |
|     Household gun | 21 | 1.23 (1.06, 1.42)** | 1.00 (0.89, 1.13) | 1.13 (1.01, 1.26)* |
| **Suicide rate** |  |  |  |  |
|   Bivariate |  |  |  |  |
|     Cook's Index | 50 | 1.38 (1.14, 1.66)*** | 0.93 (0.85, 1.02) | 1.13 (1.00, 1.27)* |
|     FS/S | 50 | 1.53 (1.32, 1.77)*** | 0.99 (0.90, 1.09) | 1.23 (1.11, 1.36)*** |
|     Household gun | 21 | 1.86 (1.53, 2.25)*** | 1.09 (0.94, 1.26) | 1.40 (1.22, 1.61)*** |
|   Multivariate |  |  |  |  |
|     Cook's Index | 50 | 1.48 (1.23, 1.79)*** | 1.03 (0.92, 1.14) | 1.21 (1.08, 1.35)** |
|     FS/S | 50 | 1.64 (1.40, 1.92)*** | 1.08 (0.97, 1.21) | 1.31 (1.18, 1.45)*** |
|     Household gun | 21 | 1.67 (1.29, 2.17)*** | 1.03 (0.88, 1.20) | 1.27 (1.06, 1.53)* |
| **Unintentional firearm death rate** |  |  |  |  |
|   Bivariate |  |  |  |  |
|     Cook's Index | 50 | 1.89 (1.60, 2.22)*** |  |  |
|     FS/S | 50 | 1.99 (1.78, 2.22)*** |  |  |
|     Household gun | 21 | 2.11 (1.82, 2.44)*** |  |  |
|   Multivariate |  |  |  |  |
|     Cook's Index | 50 | 1.54 (1.27, 1.85)*** |  |  |
|     FS/S | 50 | 1.64 (1.39, 1.92)*** |  |  |
|     Household gun | 21 | 1.64 (1.27, 2.13)*** |  |  |

In the multivariate analyses, incidence rate ratios are adjusted for the percentage of a state's population living in poverty, the percentage of the adult population with at least a high school education, and the percentage of the state's population living in urban areas.

IRRs represent the percentage change in the dependent variable (e.g., the suicide rate) for a unit change in the independent variable (i.e., for a change of 1 SD of the proxy under consideration).

Gun availability is measured using three different state-level proxies: (1) Cook's Index, calculated using mortality statistics among the adult U.S. population, and defined as the average of two proportions: (1/2) * [(firearm suicides/all suicides) + (firearm homicides/all homicides)]; (2) FS/S, the percentage of suicides among adults that are firearm suicides; and (3) the percentage of household that reported owning a firearm in the BRFSS survey of a nonrandom 21 states (Household gun). These 21 states are CT, DE, NJ, NY, PA, RI, IN, KS, MI, WI, KY, LO, OK, WV, AZ, CA, CO, ID, NM, OR, WA. These three proxies are standardized so that their mean equals zero and their SD equals 1.

IRRs correspond to the standardized proxies, which range from 4.3 SD for Cook's Index to 4.0 SD for FS/S to 3.2 SD for Household gun levels.

*** $p < 0.001$; ** $p < 0.01$; * $p < 0.05$.

is, by construction, equal to 1, the reported IRRs represent the percentage change in the dependent variable (e.g., the suicide rate) for a unit change in the independent variable (i.e., for a change of 1 SD of the proxy under consideration). Because the proxies differ somewhat from each other in their ranges (and a given proxy will have a different range when considered at the state vs. the regional level), comparisons of IRRs must take into account the range of the particular proxy under the conditions specified. The relevant ranges are specified in the legends for each table.

In the state-based analyses, multivariable analyses adjust for other independent variables that have been found to be associated with violent death, including the percentage of the population living in poverty,[29] the percentage of the adult population with at least a high school education,[30] and the percentage of the state's population living in urban areas.[31,32] When data for these control variables were not available for all years, values for missing observations were interpolated from surrounding years. Whether interpolations were linear interpolations from the surrounding years or averages of the 4 years closest to the missing year did not materially affect results. Linear interpolations were used in the data presented. Data for control variables come from the Statistical Abstracts of the United States (education, poverty, and urbanicity). In the region-based analyses we do not control for other variables because of the small number of observations.

Mortality data were electronically available in 5-year age groupings. The age-groupings we could choose from in evaluating the effect of firearm availability on violent death among children were children aged 0–4, 5–9, 10–14, and

**270**

**Table 3** Crude Incidence Rate Ratios (IRRs) of Regional-Level Homicide, Suicide, and Unintentional Gun Deaths among 5–14 Year Olds in the United States, by Region-Level Proxies of Firearm Availability (1988–1997)

| | Firearm | Nonfirearm | Total |
|---|---|---|---|
| **Homicide rate** | | | |
| Cook | 1.26 (1.08, 1.45)** | 1.06 (0.99, 1.14)⁻ | 1.18 (1.06, 1.31)** |
| FS/S | 1.20 (1.02, 1.41)* | 1.04 (0.97, 1.11) | 1.14 (1.02, 1.28)** |
| GSS | 1.18 (0.97, 1.42)⁻ | 1.03 (0.96, 1.10) | 1.11 (0.97, 1.26) |
| **Suicide rate** | | | |
| Cook | 1.39 (1.12, 1.73)** | 0.95 (0.83, 1.09) | 1.15 (0.99, 1.34)⁻ |
| FS/S | 1.49 (1.20, 1.84)*** | 1.00 (0.85, 1.18) | 1.23 (1.04, 1.46)* |
| GSS | 1.46 (1.14, 1.86)** | 0.99 (0.83, 1.18) | 1.21 (1.01, 1.46)* |
| **Unintentional firearm death rate** | | | |
| Cook | 1.90 (1.57, 2.30)*** | | |
| FS/S | 1.88 (1.61, 2.19)*** | | |
| GSS | 1.85 (1.50, 2.30)*** | | |

Gun availability is measured using four different regional-level proxies, three derived by aggregating state-level proxies into appropriate regions and one regionally gathered survey estimate of household gun ownership rates. The three aggregated state-level proxies are (1) Cook's Index, calculated using mortality statistics among the adult US population, and defined as the average of two proportions: (1/2) * [(firearm suicides/all suicides) + (firearm homicides/all homicides)]; (2) FS/S, the percentage of suicides among adults that are firearm suicides; and (3) the percentage of household that reported owning a firearm in the BRFSS survey of a nonrandom 21 states (household gun). These 21 states are: CT, DE, NJ, NY, PA, RI, IN, KS, MI, WI, KY, LO, OK, WV, AZ, CA, CO, ID, NM, or WA. All proxies in this table are standardized at the regional level so that their mean equals zero and their SD equals 1.

IRRs correspond to the standardized proxies. When all three state-level proxies are collapsed into the nine official census regions the range for all standardized proxies is approximately equal: 3.5, 3.1, 3.4, 3.4 for Cook's Index, FS/S, the GSS regional-survey based estimates of all guns and handguns, respectively.

*** $p < 0.001$; ** $p < 0.01$; * $p < 0.05$; ⁻ $p < 0.1$.

15–19. There are several reasons we did not include children under age 5 in our evaluation. Evaluating the relationship between firearm availability on suicide in 0–4 year olds is impossible, since death among children in this age group is never attributed to suicide. Similarly, homicide in this age group is largely attributable to shaken baby syndrome or similar trauma, a far less common means among older children. Nevertheless, when we evaluated the relationship between firearm availability and violent death among 0–14 year olds we obtained results very similar to those among 5–14 year olds. We did not include 15–19 year olds in our evaluation because the social and cultural forces that influence violence among this age group are so different from those that affect younger children.

## RESULTS

Over the 10-year study period (1988–1997), 6,817 children 5–14 years of age were killed with firearms in the United States (3,447 firearm homicides, 1,588 firearm suicides, and 1,782 unintentional firearm deaths). An additional 1,889 children died from nonfirearm homicide, 1,328 from nonfirearm suicides.

Regardless of the proxy chosen, in the multivariate analyses at the state level, we found a positive and statistically significant association between gun availability and state-level rates of unintentional firearm deaths, homicides, firearm homicides, suicides, and firearm suicides among children (Table 2). The increased rate of homicide and suicide in states with high gun levels was accounted for by significantly ele-

vated firearm (but not nonfirearm) suicide and homicide rates (Table 2). Results from the 21-state BRFSS sample are significant even though they do not include three out of five of the states with the highest gun levels and three out of five states with the lowest gun levels (as ranked by Cook's Index).

At the regional level we still generally observe, regardless of the proxy chosen, a positive and statistically significant association between gun availability and the level of unintentional firearm deaths and suicides among children (Table 3). The only exception is for the homicide rate. Results with the GSS proxy are similar to those obtained with the other proxies, but the firearm availability–homicide relationship is not statistically significant (Table 3).

Table 4 compares the actual number of children 5–14 years old who died from unintentional firearm deaths, suicides, and homicides (1988–1997) in the five states with the highest Cook's Index values to the corresponding rates in the five states with the lowest Cook's Index values. These states are chosen on the basis of their extreme firearm ownership levels, not on the basis of their extreme violent death rates among children. Although the number of children in the two groups was similar, compared with children living in the low-gun states (Hawaii, Massachusetts, Rhode Island, New Jersey, and Delaware), children living in the high-gun states (Louisiana, Alabama, Mississippi, Arkansas, and West Virginia) were 16 times as likely to die from unintentional firearm injury, 7 times as likely to die from firearm suicide, 3 times as likely to die from firearm homicide and, overall, twice as likely to die from suicide and homicide.

**Table 4** Homicide, Suicide, and Unintentional Gun Deaths among 5–14 Year Olds: The Five U.S. States with the Highest vs. the Lowest Average Cook's Index of Gun Availability (1988–1997)[a]

| | High-Gun States | Low-Gun States | Mortality Rate Ratio (High-Gun:Low-Gun) |
|---|---|---|---|
| Total population of 5–14 Year olds (1988–1997) | 23 Million | 22 Million | |
| Suicides | | | |
| Gun suicides | 153 | 22 | 6.7 |
| Nongun suicides | 69 | 82 | 0.8 |
| Total | 222 | 104 | 2.0 |
| Homicides | | | |
| Gun homicides | 298 | 86 | 3.3 |
| Nongun homicides | 143 | 110 | 1.3 |
| Total | 441 | 196 | 2.2 |
| Unintentional firearm deaths | 253 | 15 | 16.3 |

[a] The five states with the highest average gun levels (1988–1997) were Louisiana, Alabama, Mississippi, Arkansas, and West Virginia. The five states with the lowest average gun levels were Hawaii, Massachusetts, Rhode Island, New Jersey, and Delaware.

Our firearm proxies give similar results, since they are highly correlated (Table 1). Not only are Cook's Index and (its component) FS/S highly correlated, but these proxies are also highly correlated with survey-based measures. At the state level, the correlation coefficient for the BRFSS survey-based estimates of household firearm ownership (among the 21 states for which data are available) is 0.81 with Cook's Index and 0.89 with FS/S. Considering the subgroup of 21 states for which BRFSS provides household firearm ownership levels, the five states with the highest household ownership levels according to the BRFSS are the same five states with the highest FS/S and constitute four out of five of the states with the highest Cook's Index. Similarly, the five states with the lowest household gun levels according to the BRFSS correspond to the same five states with the lowest levels according to both FS/S and Cook's Index. At the regional level, our modified Cook's Index and FS/S are also highly correlated with household firearm ownership levels reported in the GSS (correlation coefficient = 0.91 and 0.96, respectively).

## DISCUSSION

The present study examines the relationship between firearm availability and violent death among children within the United States. We found that each of our four proxies leads to the same conclusion: children 5–14 years old were more likely to die from unintentional firearm injuries, suicides and homicides if they lived in states (or regions) with more rather than fewer guns. In contrast, nonfirearm homicides and nonfirearm suicides were not significantly associated with the availability of guns. The relationship between guns and violent death among children remains statistically significant even after controlling for state-level poverty, education, and urbanization.

If, as has been suggested for adolescents and adults,[33–35] suicides among children are commonly impulsive acts, the easier it is to find lethal means, such as firearms, the more suicides there might be. On the other hand, if the choice of firearm has less to do with the availability of the weapon than with the strength of the intent, persons determined to kill others or themselves will work harder to get a gun where guns are less available, or will substitute other lethal means. Consistent with some,[13,15,17–20] but not all,[36] previous studies among U.S. adults, we found that not only firearm-related but also overall suicide rates were significantly associated with state gun levels, suggesting that among 5–14 year olds substitution of equally lethal means for guns is incomplete.

Despite the strong and robust association between lethal firearm violence and state gun levels, we failed to find a statistically significant relationship between state gun levels and either nonfirearm homicide or nonfirearm suicide among 5–14 year olds (Table 2). To the extent that rates of nonfirearm lethal violence reflect violent tendencies, our study indicates that 5–14 year old children living in high-gun states are not significantly more lethally violent toward themselves than are children in low-gun states, nor are they significantly more likely to be victims of lethal nongun attacks. Rather, the disproportionately high level of overall lethal violence where guns are more available suggests that where there are more guns, violence is more likely to turn lethal.

Our proxies for firearm availability are even more strongly associated with the rate of unintentional firearm death than with the rate of intentional firearm deaths (Tables 2–4). Over the 10-year study interval, 6,817 children between 5 and 14 years of age died from firearms, 1,782 from unintentional firearm injury alone. We could find no data to suggest that where there are more guns parents care less about their children's welfare. Yet, unintentional firearm deaths are an order of magnitude greater in high-gun compared with low-gun states (Table 4).

Our study includes both survey-based reports of household firearm ownership rates and estimates of firearm availability that rely on mortality data. We used Cook's Index and FS/S because these proxies allow us to analyze data from all 50 states. In addition, using measures that rely on different estimating mechanisms may capture different (perhaps complementary) aspects of the relevant variable. The extent to which Cook's Index or FS/S captures some aspects of firearm availability better (or less well) than do survey-based estimates of household gun ownership rates is unknown. In any event, household gun ownership levels (BRFSS and GSS measures) and our mortality-derived estimates (Cook's Index and FS/S) are highly correlated, suggesting that they are providing information about the same construct, at least in this age group. We obtained substantively and statistically similar results with all four proxies.

Our findings are robust (Tables 2–4). The proxy chosen does not drive the regression results. Regressions are also not driven by either the largest states or the states most extreme in gun levels. Statistically significant and qualitatively consistent results were produced regardless of whether the data analyzed were all 50 states, the 40 largest, or the 40 smallest states; excluding the 5 states with the highest (or lowest) Cook's Index (or FS/S) did not materially or statistically alter our findings. Even when we used the survey-based estimates of household firearm ownership rates among only 21 states (or among only nine regions), we obtained similar results. Including the 186 (2.6%) firearm deaths coded as firearm deaths of undetermined origin (ICD-9 E985) did not alter our findings, regardless of whether these deaths were included as firearm suicides, firearm homicides, or unintentional firearm deaths. Although we do not know exactly how measures of household firearm ownership relate to the availability of firearms to children, it is remarkable that despite the crudeness of our measures, survey based and proxy alike, we consistently see a relationship between these measures and the rate of violent death among children.

The use of FS/S as a proxy of firearm assumes nothing about the relative rate of overall suicides in a state. If in state A for every 100 suicides 90 are firearm suicides and in state B for every 100 suicides 10 are firearm suicides, use of the proxy FS/S assumes only that guns are more readily available in state A than in state B. The null hypothesis (which we set out to test) states that gun availability does not influence the overall suicide rate, i.e., that if people really want to commit suicide they will find the means. FS/S merely reflects the distribution of these means. Therefore, FS/S does not, per se, bias our testing—and ultimate rejection—of the null hypothesis. Even at the level of the nine census regions, the null hypothesis can be rejected: overall suicide rates are higher where there are more guns, whatever measure of firearm availability is chosen. These findings are consistent with those of others who have described incomplete substitution as an explanation for decreases in suicide rates when a particularly lethal means is restricted.[37–40]

A potentially more problematic issue is that of reverse causation, though only in the case of homicide (reverse causation is not a problem for suicide or for unintentional firearm deaths). It might be that where homicide rates are higher, individuals (most likely individuals older than our cohort) are more likely to obtain guns in the belief that they are protecting themselves and their families. In this case, the direction of any causal relationship between high gun levels and high homicide rates cannot be determined. In addition, homicide rates among children are not expected to be independent of homicide rates among adults in the same state; hence the removal of 5–14 year olds from the calculation of Cook's Index and FS/S is only a partial solution to the problem of reverse causation. Nevertheless, our finding that all our proxies for gun availability are significantly related to a state's rate of gun-homicide and overall homicide but not to the rate

of nongun homicide is consistent with firearm availability playing some causal role in homicide rates among children.

Drawing causal inferences from group data to individual behaviors is generally referred to as the "ecological fallacy."[41–44] For example, although the poverty rate in a given state with a high unintentional gun death rate may be disproportionately high, that does not prove that the actual individuals in this state who are dying from guns are disproportionately poor. On the other hand, if a person dies from gunfire, that particular individual did come in contact with a bullet. The ecological fallacy is thus not likely to be a major issue with our analyses.

Another limitation of our study is that our analyses may not account for some reasons that states with higher household gun levels have higher violent death rates. Although we include some state-level confounders (poverty, urbanization, and education), these represent only a small number of the characteristics likely to affect suicides, homicides, or unintentional firearm deaths. We do not, for example, account for parenting practices, domestic abuse, or firearm storage patterns. It is not clear, however, whether accounting for these or other state-level characteristics would revise the magnitude of observed association upward or downward.

Many geographic U.S. studies find a positive and statistically significant relationship between gun density measures and overall homicide[45] and suicide[46] rates. Consistent with these studies, we find that of the 6,817 children 5–14 years killed with firearms between 1988 and 1997, a disproportionately large number, per population, died in states where guns were more prevalent, regardless of the proxy chosen to estimate firearm availability. Moreover, the elevated rates of suicide and homicide among children living in states with more guns appears to be driven by lethal firearm violence, not by nonfirearm violence. Our findings suggest that, on average, where there are more guns children are not protected from becoming, but are rather much more likely to be, victims of lethal violence.

## REFERENCES

1. National Center for Injury Prevention and Control, Centers for Disease Control and Prevention: Injury Mortality Statistics. Available at http://wonder.cdc.gov/mortsql.shtml.

2. Centers for Disease Control and Prevention. Rates of homicide, suicide, and firearm-related deaths among children: 26 industrialized countries. *MMWR Morb Mortal Wkly Rep.* 1997;46:101–105.

3. Krug EG, Dahlberg LL, Powell KE. Childhood homicide, suicide, and firearm deaths: an international comparison [published erratum appears in *World Health Stat Q.* 1997;50:210]. *World Health Stat Q.* 1996;49:230–235.

4. Cummings P, Koepsell TD, Grossman DC, Savarino J, Thompson RS. The association between the purchase of a handgun and homicide or suicide. *Am J Public Health.* 1997;87:974–978.

5. Kellermann AL, Rivara FP, Somes G, et al. Suicide in the home in relation to gun ownership. *N Engl J Med.* 1992;327:467–472.

6. Kellermann AL, Rivara FP, Rushforth NB, et al. Gun ownership as a risk factor for homicide in the home. *N Engl J Med.* 1993; 329:1084–1091.

7. Bailey JE, Kellermann AL, Somes GW, Banton JG, Rivara FP, Rushforth NP. Risk factors for violent death of women in the home. *Arch Intern Med.* 1997;157:777–782.

8. Brent DA, Perper JA, Goldstein CE, et al. Risk factors for adolescent suicide: a comparison of adolescent suicide victims with suicidal inpatients. *Arch Gen Psychiatry.* 1988;45:581–588.

9. Brent DA, Perper JA, Allman CJ, Moritz GM, Wartella ME, Zelenak JP. The presence and accessibility of firearms in the homes of adolescent suicides: a case-control study. *JAMA.* 1991;266:2989–2995.

10. Brent DA, Perper J, Moritz G, Baugher M, Allman C. Suicide in adolescents with no apparent psychopathology. *J Am Acad Child Adolesc Psychiatry.* 1993;32:494–500.

11. Brent DA, Perper JA, Moritz G, Baugher M, Schweers J, Roth C. Firearms and adolescent suicide: a community case-control study. *Am J Dis Child.* 1993;147:1066–1071.

12. Bukstein OG, Brent DA, Perper JA, et al. Risk factors for completed suicide among adolescents with a lifetime history of substance abuse: a case-control study. *Acta Psychiatr Scand.* 1993;88:403–408.

13. Loftin C, McDowall D, Wiersema B, Cottey TJ. Effects of restrictive licensing of handguns on homicide and suicide in the District of Columbia. *N Engl J Med.* 1991;325:1615–1620.

14. Sloan JH, Kellermann AL, Reay DT, et al. Handgun regulations, crime, assaults, and homicide: a tale of two cities. *N Engl J Med.* 1988;319:1256–1262.

15. Wintemute GJ, Parham CA, Beaumont JJ, Wright M, Drake C. Mortality among recent purchasers of handguns. *N Engl J Med.* 1999;341:1583–1589.

16. Cook P. The effect of gun availability on robbery and robber murder: a cross sectional study of 50 cities. *Policy Stud Rev Annu.* 1979;3:743–781.

17. Clark R, Jones P. Suicide and the increased availability of handguns in the United States. *Soc Sci Med.* 1989;28:805–809.

18. Boor M, Bair JH. Suicide rates, handgun control laws, and sociodemographic variables. *Psychol Rep.* 1990;66(3 pt 1):923–930.

19. Markush RE, Bartolucci AA. Firearms and suicide in the United States. *Am J Public Health.* 1984;74:123–127.

20. Marzuk PM, Leon AC, Tardiff K, Morgan EB, Stajic M, Mann JJ. The effect of access to lethal methods of injury on suicide rates. *Arch Gen Psychiatry.* 1992;49:451–458.

21. Miller M, Azrael D, Hemenway D. Firearm availability and unintentional firearm deaths. *Accid Anal Prev.* 2001;33:447–484.

22. Davis J, Smith T. *General Social Surveys, 1972–1998* [machine-readable data file]. Principal Investigator James A. Davis; Director and Co-Principal Investigator, Tom W. Smith; Sponsored by National Science foundation—NORC ed.—Chicago: National Opinion Research Center [producer]; Storrs, CT: The Roper Center for Public Opinion Research, University of Connecticut [distributor]; 1998.

23. Powell KE, Jacklin BC, Nelson DE, Bland S. State estimates of household exposure to firearms, loaded firearms, and handguns, 1991 through 1995. *Am J Public Health.* 1998;88:969–972.

24. Lester D. Gun control, gun ownership, and suicide prevention. *Suicide Life Threat Behav.* 1988;18:176–180.

25. Lester D. Gun ownership and suicide in the United States. *Psychol Med.* 1989;19:519–521.

26. Lester D. Relationship between firearm availability and primary and secondary murder. *Psychol Rep.* 1990;67:490.

27. Lester D. The availability of firearms and the use of firearms for suicide: a study of 20 countries. *Acta Psychiatr Scand.* 1990;81:146–147.

28. Killias M. International correlations between gun ownership and rates of homicide and suicide. *Can Med Assoc J.* 1993;148:1721–1725.

29. Young TJ. Poverty, suicide, and homicide among Native Americans. *Psychol Rep.* 1990;67(3 pt 2):1153–1154.

30. Saucer PR. Education and suicide: the quality of life among modern Americans. *Psychol Rep.* 1993;73:637–638.

31. Fingerhut LA, Ingram DD, Feldman JJ. Homicide rates among US teenagers and young adults: differences by mechanism, level of urbanization, race, and sex, 1987 through 1995. *JAMA.* 1998; 280:423–427.

32. Fingerhut LA, Jones C, Makuc DM. Firearm and motor vehicle injury mortality: variations by state, race, and ethnicity—United States, 1990–91. *Adv Data.* 1994;242:1–12.

33. Browning CH. Handguns and homicide: a public health problem. *JAMA.* 1976;236:2198–2200.

34. Baker SP. Without guns, do people kill people? [editorial]. *Am J Public Health.* 1985;75:587–588.

35. Adelson L. The gun and the sanctity of human life; or the bullet as pathogen. *Pharos.* 1980;43:15–25.

36. Sloan JH, Rivara FP, Reay DT, Ferris JA, Kellermann AL. Firearm regulations and rates of suicide: a comparison of two metropolitan areas. *N Engl J Med.* 1990;322:369–373.

37. Rich CL, Young JG, Fowler RC, et al. Guns and suicide: possible effects of some specific legislation. *Am J Psychiatry.* 1990;147:342–346.

38. Carrington PJ, Moyer S. Gun control and suicide in Ontario. *Am J Psychiatry.* 1994;15:606–608.

39. Gunnell D, Middleton N, Frankel S. Method availability and the prevention of suicide: a re-analysis of secular trends in England and Wales 1950–1975. *Soc Psychiatry Psychiatr Epidemiol.* 2000; 35:437–443.

40. Hassall C, Trethowan WH. Suicide in Birmingham. *BMJ.* 1972; 1:717–718.

41. Schwartz S. The fallacy of the ecological fallacy: the potential misuse of a concept and the consequences. *Am J Public Health.* 1994;84:819–824.

42. Piantadosi S, Byar DP, Green SB. The ecological fallacy. *Am J Epidemiol.* 1988;127:893–904.

43. Kalimo E, Bice TW. Causal analysis and ecological fallacy in cross-national epidemiological research. *Scand J Soc Med.* 1973;1:17–24.

44. Dutton DG. Patriarchy and wife assault: the ecological fallacy. *Violence Vict.* 1994;9:167–82.

45. Ohsfeldt R, Morrisey M. Firearms, firearms injury and gun control: a critical survey of the literature. *Adv Health Econ Health Serv Res.* 1992;13:65–82.

46. Miller M, Hemenway D. The relationship between firearms and suicide: a review of the literature. *Aggression Violent Behav.* 1999; 4:59–75.

## EDITORIAL COMMENT
### Firearm Availability and Childhood Death

Violence is a significant problem that trauma surgeons and other health care professionals see literally everyday. When firearms mix with violence, the outcome is much more likely to be lethal.[1] In the United States, we live in an excessively violent society[2] that also happens to be the world's largest market for civilian firearms.[3] Yet, at the same time, we are committed to improving the health and welfare of our children. *Are we really to believe then that plentiful firearms and healthy children can coexist?*

The study by Miller and colleagues provides important information to help answer this question. These authors use four measures of firearm "availability" (two survey and two derived measures) to indicate firearm availability at both the state and regional level. As the authors indicate, these are rather crude measures of firearm availability and provide

aggregate data only. The derived measures (a modified Cook Index and the FS/S) are estimates of firearm availability based on the fractions of adult homicides and/or adult suicides that are firearm-related in each state. The authors take appropriate care in describing the derivation, testing, and limitations of these measures, noting (although not in detail) that their high correlation with survey data on firearm availability support their use. The use of derived measures is clearly a limitation. However, these measures are some of the best available, since, unlike motor vehicles, civilian ownership of firearms is not archived for any serviceable length of time by federal or state data agencies.

During the 10-year study period, Miller and colleagues found that 6,817 children between the ages of 5 and 14 years of age were killed with firearms in the United States, outstripping those who were killed by non-firearm homicide or suicide. Even controlling for poverty, urbanization, and education (known correlates of firearm violence), a strong, positive association between firearm availability and firearm death was found in this age group at the state and regional levels. However, factors not controlled for in this study may have modified the relationship between firearm availability and firearm death, as indicated by the very high rates in Alaska, Idaho, and Montana, states not ranking in the top 10 high gun availability states. Future studies are needed to identify other risk factors that contribute to the exceptionally high firearm death rates for 5- to 14-year-olds in these states.

Although no conclusions about cause and effect can be made, this study provides compelling evidence that states with high firearm availability are states with high childhood firearm death rates. As trauma professionals we cannot and should not ignore the fact that children living in the five highest gun availability states are estimated to be 16 times more likely to die from unintentional firearm injury, 7 times more likely to die from firearm suicide, and 3 times more likely to die from homicide compared with those living in the five lowest gun availability states. These findings reinforce the belief that high levels of firearm availability place our children at risk and seriously undermine attempts to improve their health and welfare.

The lethality of firearm violence and its toll on the nation's children should rouse trauma surgeons and other health care professionals to transfer some of the assertive spirit they display during trauma resuscitations to other, more proactive injury prevention activities. This study, along with lessons learned from successfully reducing the toll of motor vehicle crashes,[4] point to three specific steps that can be taken. First, comprehensive data about all violent deaths is critical to building the scientific foundation for prevention. At the federal level, the National Violent Death Reporting System, modeled after the Fatality Analysis Reporting System (FARS), is being proposed as a critical step in providing detailed data about violent injury throughout the United States. We can support this endeavor through grassroots efforts and by working directly with our federal and state officials. Second, civilian registration of all firearms would provide valuable and accurate data on firearm availability. Registering a firearm should be no different from registering a car and should not infringe on legal firearm ownership. Finally, community-specific data applicable to our own "home towns" is crucial to dispelling local myths about firearms and firearm violence. Combining data from trauma centers, local medical examiners/coroners, police, and crime labs is vital to understanding and disseminating accurate profiles of firearm violence in our communities. Only then can we develop meaningful interventions. If we, as health care professionals are to safeguard and promote healthy lives for our children, these steps seem obvious. Their accomplishment await only our determination, support, and energy.

**Therese S. Richmond, PhD, CRNP**
**C. William Schwab, MD**
**Charles C. Branas, PhD**
*Firearm Injury Center at Penn*
*University of Pennsylvania*
*Philadelphia, Pennsylvania*

## REFERENCES

1. Gotsch KE, Annest JL, Mercy JA, Ryan GW. Surveillance for fatal and nonfatal firearm-related injuries – United States, 1993–1998. *MMWR Surveill Summ.* 2001;50(SS-2):1–36.
2. Krug EG, Powell KE, Dahlberg LL. Firearm-related deaths in the United States and 35 other high- and upper-middle-income countries. *Int J Epidemiology.* 1998;27:214–221.
3. Diaz T. *Making a Killing: The Business of Guns in America.* New York, NY: New Press; 1999:69–84.
4. Morbidity and Mortality Weekly Report. Motor-vehicle safety: A 20th century public health achievement. *MMWR Morb Mortal Wkly Rep.* 1999;48:369–374.

# Exhibit 79

Journal of Urban Health: Bulletin of the New York Academy of Medicine    Vol. 79, No. 1, March 2002
© 2002 The New York Academy of Medicine

# Firearm Availability and Suicide, Homicide, and Unintentional Firearm Deaths Among Women

Matthew Miller, Deborah Azrael, and David Hemenway

**ABSTRACT**

Context. *In the United States, more than 45,000 women died from gun violence over the last decade.*

Objective. *To determine whether measures of firearm availability are related to rates of suicide, homicide, and unintentional firearm deaths among women in the United States.*

Design. *Pooled cross-sectional time series data on suicide, homicide, and unintentional firearm deaths (1988–1997) were used to estimate the association between the rate of violent death among women and four proxies of firearm availability. Two proxies came from survey reports of household firearm ownership rates; two were derived from mortality statistics.*

Setting. *United States, 1988–1997.*

Results. *The increased rate of suicide and homicide in states with high gun levels was accounted for primarily by significantly elevated firearm suicide and firearm homicide rates. Unintentional firearm death rates were also increased in states with more guns. At the regional level, qualitatively similar results were obtained.*

Conclusion. *Between 1988 and 1997, the suicide, homicide, and unintentional firearm death rates among women were disproportionately higher in states where guns were more prevalent. The elevated rates of violent death in states with more guns was not entirely explained by a state's poverty or urbanization and was driven primarily by lethal firearm violence, not by lethal nonfirearm violence.*

**KEYWORDS**    *Accidents, Firearms, Guns, Homicide, Suicide, Unintentional Death, Violence, Women.*

## INTRODUCTION

In the United States, over 45,000 women died from gun violence between 1988 and 1997.[1] Among women 20 years of age and older, 22,614 took their own lives with guns, 21,587 were shot and killed by others, and 1,114 were killed unintentionally

Correspondence: Matthew Miller, MD, MPH, ScD, Department of Health Policy and Management, 677 Huntington Avenue, Boston, MA 02115. (E-mail: mmiller@hsph.harvard.edu)

with firearms. An additional 34,049 died from nonfirearm suicides and 20,438 from nonfirearm homicides.

Case-control studies suggest that the presence of a gun in the home substantially increases the risk of suicide and homicide among women[2] and among adults.[3,4] These findings are consistent with those of others, suggesting that the purchase of a handgun[5] is associated with an increased risk of suicide and homicide among adults and an increased risk of suicide among adolescents.[2,6–10] Cross-sectional and interrupted time series studies suggest a link between the availability of guns and rates of suicide and homicide among adults[11–17] and with the rate of unintentional firearm deaths among children and adults.[18,19]

Case-control studies of household gun ownership and violent deaths provide useful, individual-level information about context; interrupted time series studies help control for many unobserved time-invariant confounders. These studies, however, have been geographically limited. In addition, case-control studies have not accounted for the risk associated with gun availability in the larger community. For example, case-control studies have been unable to take into account how having gun-owning neighbors might deter would-be murderers from preying on members of a community or, alternatively, how an armed neighbor might turn an otherwise nonlethal argument into a fatal one. Although nationally representative cross-sectional studies of firearm availability and mortality net out (or sum) individual- and area-level risk, these studies have been hampered by the lack of direct measures of gun availability at levels smaller than the nine census regions. In addition, none have specifically focused on risk factors for women—which case-control studies suggest may differ from those for men (e.g., homicide by intimates is a far greater problem when the victim is a woman than when the victim is a man).[2,20] Furthermore, because of the much higher rate of violent death among men compared to women, previous analyses are dominated by the relationships between violent death and risk factors among men.

Our study extended previous findings by focusing on women and by further exploring the relationship between firearm levels and violent death at the state level. We took advantage of the greater variability in dependent and independent variables that exist when states rather than regions are compared by using three state-level proxies for gun availability (one survey-based measure available for a nonrandom 21/50 states and two nonsurvey measures derived for all 50 states). These results were then compared to those obtained at the regional level, for which another survey-based measure of firearm ownership was available. In addition, we adjusted for poverty and urbanization levels, factors previously linked to the rate of violent death.[21–27]

## METHODS

We used pooled cross-sectional time series data from the 50 US states over a 10-year period (1988–1997) to examine the association between four different measures of the availability of firearms and the corresponding rates of suicide, homicide, and unintentional firearm deaths among adult women 20 years of age and older. Women were divided into six groups by years of age (20–24, 25–34, 35–44, 45–54, 55–64, and 65 and older).

State- and year-specific population figures and data for the number of suicides (International Classification of Diseases, 9th revision [ICD-9], codes E950.0–E959), homicides (E960.0–E969), suicides by firearm (E955.0–E955.4), homicides

by firearm (E965.0–E965.4), unintentional deaths caused by firearm (E922.0–E922.9) came from the National Center for Health Statistics (NCHS) Mortality Files. Deaths from firearms of undetermined intention (ICD-9 E985) constituted less than 2% (606/45,315) of all firearm deaths among women and were excluded from analyses. Region-specific population and mortality figures were derived by aggregating the corresponding state-based figures.

Two of our measures of firearm availability came from published survey-based estimates of household firearm ownership, one at the state level and the other at the regional level. At the state level, published data on reported household gun ownership rates are available for 21 states from the 1990s Behavioral Risk Factor Surveillance System (BRFSS).[28] The 21 states for which the BRFSS obtained data on household gun ownership are a nonrandom sample; they were not, however, selected on the basis of the rates of violent death or the purported relationship between gun levels and violent death rates. The second survey-based measure of firearm availability, collected at the level of the nine census regions, comes from the average of reported household gun ownership rates between 1988 and 1998, as reported in the General Social Surveys (GSS).[29]

Direct measures of exposure to guns are not available at the state level for all 50 US states. To allow all 50 states to contribute to the analyses, we used two measures derived from mortality statistics as proxies for firearm availability: (1) Cook's Index, developed and previously validated at the city level,[14] and (2) the fraction of all suicides that involved a gun. Both of these measures have been used in cross-sectional studies within the United States,[30–32] and Cook's Index has also been independently correlated with household gun ownership levels across 14 industrialized nations.[33]

Cook's Index for a given state in a given year is calculated by averaging (among adults of both genders 20 years old and older) the percentage of all suicides committed with a firearm and the percentage of all homicides committed with a firearm. That is,

$$\text{Cook's Index} = (\text{Fraction of suicides with guns} + \text{Fraction of homicides with guns})/2$$

The second mortality-derived estimate of firearm availability is closely related to Cook's Index: the fraction of suicides that are gun related. This proxy is referred to as FS/S in the text to indicate that it is the number of firearm suicides in a given state-year (among adults) divided by the total number of suicides in that state-year (among adults).

A state's FS/S and Cook's Index reflect the distribution of firearm versus non-firearm means of suicide (in the case of FS/S) and the distribution of firearm versus nonfirearm means of suicide and homicide (in the case of Cook's Index). Neither FS/S nor Cook's Index inherently reflects the number or rate of suicides or homicides in a state. For example, FS/S is based on the assumption that firearms are likely to be more readily available in states where guns make up a larger fraction of all suicides than in states where guns make up a smaller fraction of all suicides—independent of the number or rate of suicides in a state. If 90 of every 100 suicides in state A are firearm suicides and in state B 10 of every 100 suicides are firearm suicides, FS/S assumes that guns are more readily available in state A than in state B. FS/S assumes nothing about the relative number or rate of suicides in state A and state B. The null hypothesis (which we set out to test) states that gun availability does not influence the overall suicide rate—that is, if people really want to commit suicide, they will find the means. FS/S merely reflects the distribution of

Case: 1:10-cv-04184 Document #: 169-9 Filed: 03/12/12 Page 44 of 53 PageID #:4861

these means. Therefore, FS/S and, by similar reasoning, Cook's Index do not per se bias our testing of the null hypothesis.

Qualitatively and statistically similar results were obtained whether Cook's Index (or FS/S) assumed the average Cook's Index (average FS/S) for each state over the 10-year study period, a 5-year rolling average, or a specific value for each state-year. We present results using 10-year averaged values for all our proxies since the gun stock in the United States is so high (over 200 million guns) that changes in a state's stock are likely to be quite small from year to year and because using a 5-year rolling average would require us to drop data from 2 of our 10 years of data (i.e., 1996 and 1997). The 10-year averaged measures yielded regressions that were qualitatively similar to regressions using 5-year rolling averages and also to regressions in which we used the specific Cook's Index (FS/S) for each state-year.

To make the comparisons among our four proxies more intuitive, all were standardized so that each proxy had a mean of 0 and a standard deviation of 1. The raw average values (1988–1997) for Cook's Index, FS/S, and the BRFSS survey-based gun ownership levels are presented to two decimal points in Table 1, ranked according to Cook's Index. The dependent variable used in our analyses is the number of deaths per population per state/year. Distributions of death rates were skewed, and variances were greater than the means. Consequently, negative binomial models were used (rather than Poisson).

A state's suicide, homicide, and unintentional firearm death rates in a given year were not independent from rates in that state in other years. To account for this nonindependence, standard errors in regressions were corrected by clustering observations (by state in the regressions presented in Table 2, by region in Table 3).

Primary analyses use incidence rate ratios (IRRs), obtained by exponentiating β coefficients in the negative binomial regressions, to express the magnitude of the association among suicide, homicide, and unintentional firearm death rates and gun availability. Since the standard deviation of each of the standardized proxies is, by construction, equal to 1, the reported IRRs represent the percentage change in the dependent variable (e.g., the suicide rate) for a unit change in the independent variable (i.e., for a change of one standard deviation of the proxy under consideration). Because the proxies differ somewhat from each other in their ranges (and a given proxy will have a different range when considered at the state vs. the regional level), comparisons of IRRs must take into account the range of the particular proxy under the conditions specified. The relevant ranges are specified in the legends for each table.

State-based analyses adjust for the percentage of the population living in poverty and the percentage of the population living in urban areas, factors that have been linked to homicide and suicide rates.[22–27] When data for these control variables were not available for all years, values for missing observations were interpolated from surrounding years. Whether interpolations were linear interpolations from the surrounding years or averages of the 4 years closest to the missing year did not materially affect results. Linear interpolations were used in the data presented. Data for control variables came from the Statistical Abstracts of the United States (poverty and urbanicity). In the region-based analyses, we did not control for other variables because of the small number of observations.

## RESULTS

Overall, bivariate and multivariate results showed positive and statistically significant associations between gun availability and state-level rates of suicide, homicide,

**TABLE 1. State-level proxies of firearm availability, nonstandardized average values ranked by Cook's Index, 1988–1997**

| State | BRFSS | FS/S | Cook's Index |
|---|---|---|---|
| Hawaii | | 0.29 | 0.37 |
| Massachusetts | | 0.31 | 0.40 |
| New Jersey | 0.12 | 0.35 | 0.43 |
| Rhode Island | 0.14 | 0.36 | 0.45 |
| Delaware | 0.28 | 0.48 | 0.48 |
| South Dakota | | 0.63 | 0.48 |
| Minnesota | | 0.51 | 0.52 |
| New York | 0.14 | 0.37 | 0.53 |
| Iowa | | 0.55 | 0.54 |
| New Hampshire | | 0.57 | 0.54 |
| Connecticut | 0.18 | 0.44 | 0.56 |
| Illinois | | 0.47 | 0.56 |
| North Dakota | | 0.59 | 0.56 |
| Colorado | 0.38 | 0.57 | 0.57 |
| Maine | | 0.61 | 0.57 |
| Washington | | 0.57 | 0.58 |
| Wisconsin | 0.49 | 0.54 | 0.58 |
| Utah | | 0.59 | 0.58 |
| New Mexico | 0.43 | 0.63 | 0.59 |
| Pennsylvania | 0.41 | 0.55 | 0.60 |
| Oregon | 0.49 | 0.61 | 0.60 |
| Nebraska | | 0.58 | 0.61 |
| California | 0.30 | 0.53 | 0.61 |
| Ohio | | 0.60 | 0.62 |
| Alaska | | 0.70 | 0.63 |
| Michigan | 0.46 | 0.57 | 0.63 |
| Montana | | 0.69 | 0.63 |
| Maryland | | 0.56 | 0.63 |
| Florida | | 0.60 | 0.64 |
| Nevada | | 0.67 | 0.65 |
| Kansas | 0.41 | 0.64 | 0.65 |
| Vermont | | 0.67 | 0.65 |
| Oklahoma | 0.54 | 0.69 | 0.65 |
| Indiana | 0.40 | 0.63 | 0.66 |
| Arizona | 0.33 | 0.67 | 0.67 |
| Idaho | 0.57 | 0.71 | 0.67 |
| Missouri | | 0.65 | 0.68 |
| South Carolina | | 0.72 | 0.69 |
| Texas | | 0.68 | 0.69 |
| Virginia | | 0.68 | 0.69 |
| Wyoming | | 0.74 | 0.70 |
| North Carolina | | 0.72 | 0.70 |
| Georgia | | 0.74 | 0.72 |
| Tennessee | | 0.74 | 0.72 |
| Kentucky | 0.49 | 0.74 | 0.72 |
| West Virginia | 0.51 | 0.75 | 0.73 |
| Arkansas | | 0.75 | 0.73 |
| Mississippi | 0.55 | 0.80 | 0.74 |
| Alabama | | 0.78 | 0.75 |
| Louisiana | 0.53 | 0.76 | 0.75 |

BRFSS, Behavioral Risk Factor Surveillance System; FS/S, firearm suicides in a state-year (among adults) divided by the total number of suicides in that state-year (among adults).

TABLE 2.   Crude and multivariate adjusted incidence rate ratios (IRRs) of state-level suicide, homicide, and unintentional firearm deaths among women 20 years of age and older in the United States by state-level measures of household firearm availability, 1988–1997

| | Suicide | Firearm suicide | Nonfirearm suicide |
|---|---|---|---|
| **Bivariate** | | | |
| Cook | 1.09 (1.02, 1.15)* | 1.61 (1.46, 1.78)† | 0.86 (0.79, 0.93)† |
| FS/S | 1.12 (1.06, 1.19)† | 1.70 (1.50, 1.84)† | 0.88 (0.81, 0.95)* |
| BRFSS | 1.16 (1.05, 1.27)** | 1.64 (1.38, 1.95)† | 0.95 (0.84, 1.08) |
| **Multivariate** | | | |
| Cook | 1.13 (1.02, 1.24)‡ | 1.64 (1.39, 1.94)† | 0.93 (0.85, 1.02) |
| FS/S | 1.25 (1.15, 1.36)† | 2.01 (1.83, 2.22)† | 0.99 (0.91, 1.08) |
| BRFSS | 1.37 (1.22, 1.53)† | 1.88 (1.44, 2.44)† | 1.22 (1.09, 1.37)* |

| | Homicide | Firearm homicide | Nonfirearm homicide |
|---|---|---|---|
| **Bivariate** | | | |
| Cook | 1.34 (1.23, 1.46)† | 1.58 (1.46, 1.71)† | 1.17 (1.08, 1.27)† |
| FS/S | 1.26 (1.16, 1.38)† | 1.46 (1.32, 1.61)† | 1.11 (1.02, 1.21)‡ |
| BRFSS | 1.17 (1.01, 1.35)‡ | 1.32 (1.12, 1.56)* | 1.04 (0.90, 1.20) |
| **Multivariate** | | | |
| Cook | 1.37 (1.26, 1.48)† | 1.60 (1.48, 1.73)† | 1.20 (1.11, 1.31)† |
| FS/S | 1.33 (1.20, 1.47)† | 1.53 (1.36, 1.72)† | 1.17 (1.06, 1.30)* |
| BRFSS | 1.09 (0.97, 1.22) | 1.22 (1.08, 1.37)* | 1.01 (0.88, 1.15) |

| | Unintentional firearm deaths |
|---|---|
| **Bivariate** | |
| Cook | 2.29 (1.82, 2.88)† |
| FS/S | 2.20 (1.75, 2.75)† |
| BRFSS | 1.65 (1.33, 2.06)† |
| **Multivariate** | |
| Cook | 2.11 (1.62, 2.73)† |
| FS/S | 2.30 (1.54, 3.43)† |
| BRFSS | 1.28 (0.94, 1.74) |

In the multivariate analyses, IRRs are adjusted for the percentage of a state's population living in poverty and the percentage of the state's population living in urban areas.

IRRs represent the percentage change in the dependent variable (e.g., the suicide rate) for a unit change in the independent variable (i.e., for a change of one standard deviation of the proxy under consideration).

Gun availability is measured using three different state-level proxies: (1) Cook's Index (Cook), which is defined as the average of the fraction of suicides with guns and the fraction of homicides among adults with guns (among adults); (2) the percentage of suicides among adults that are firearm suicides (FS/S); and (3) the percentage of households that reported owning a firearm in the Behavior Risk Factor Surveillance System (BRFSS) survey of a nonrandom 21 states. These three proxies were standardized so that their mean equals 0 and their standard deviation equals 1.

IRRs correspond to the standardized proxies, which range from 4.2 standard deviations for Cook's Index to 4.1 standard deviations for FS/S to 3.2 standard deviations for BRFSS Household Gun levels.

*$P < .01$; †$P < .001$; ‡$P < .05$.

TABLE 3. Crude incidence rate ratios (IRRs) of regional suicide, homicide, and unintentional firearm deaths among women 20 years of age and older in the United States by region-level measures of household firearm availability, 1988–1997

| | Suicide | Firearm suicide | Nonfirearm suicide |
|---|---|---|---|
| Cook | 1.11 (1.02, 1.22)* | 1.56 (1.37, 1.78)† | 0.89 (0.76, 1.03) |
| FS/S | 1.13 (1.01, 1.27)* | 1.61 (1.40, 1.86)† | 0.90 (0.76, 1.06) |
| GSS Hand Guns | 1.14 (1.00, 1.31)‡ | 1.63 (1.33, 2.00)† | 0.90 (0.76, 1.05) |
| GSS All Guns | 1.09 (0.96, 1.25) | 1.53 (1.23, 1.89)† | 0.87 (0.75, 1.02)‡ |

| | Homicide | Firearm homicide | Nonfirearm homicide |
|---|---|---|---|
| Cook | 1.33 (1.22, 1.46)‡ | 1.52 (1.37, 1.67)‡ | 1.18 (1.07, 1.30)‡ |
| FS/S | 1.29 (1.13, 1.46)‡ | 1.45 (1.25, 1.68)‡ | 1.14 (1.01, 1.29)* |
| GSS Hand Guns | 1.29 (1.11, 1.49)§ | 1.45 (1.22, 1.72)‡ | 1.14 (1.00, 1.30)* |
| GSS All Guns | 1.23 (1.07, 1.42)§ | 1.38 (1.15, 1.65)‡ | 1.10 (0.98, 1.24) |

| | Unintentional firearm deaths |
|---|---|
| Cook | 2.11 (1.68, 2.65)‡ |
| FS/S | 2.01 (1.61, 2.52)‡ |
| GSS Hand Guns | 1.98 (1.68, 2.33)‡ |
| GSS All Guns | 1.98 (1.66, 2.66)‡ |

Gun availability is measured using four different regional-level estimates, two derived from mortality statistics, and two regionally gathered survey estimates of household gun ownership. The two derived proxies are (1) Cook's Index (Cook), which is defined as the average of the fraction of suicides among adults with guns and the fraction of homicides among adults with guns, and (2) the percentage of suicides among adults that are firearm suicides (FS/S). The survey-based measures are the regional household ownership rates of any firearms and of handguns in particular, as reported in the GSS.

All proxies in this table were standardized at the regional level so that their mean equals 0 and their standard deviation equals 1.

IRRs correspond to the standardized proxies. At the regional level, the range for all standardized measures of household gun ownership is approximately equal: 3.4, 3.1, 3.3, and 3.4 for Cook's Index, FS/S, GSS Hand Guns, and GSS All Guns, respectively.

*$P < .05$.
‡$P < .1$.
§$P < .01$.
†$P < .001$.

and unintentional firearm death among adult women (Table 2). The increased rate of suicide in states with high gun levels was accounted for by elevated firearm suicide rates, which more than offset the decrease in nonfirearm suicide rates in high-gun states. The increased rate of homicide in states with high gun levels was accounted for primarily by significantly elevated firearm homicide rates, although the rate of nonfirearm homicide was also elevated to a lesser extent.

The 21 states for which household firearm ownership rates are available (the BRFSS sample) do not include 2 of the 5 states with the highest gun levels and 2

of the 5 states with the lowest gun levels (as ranked by Cook's Index). Nevertheless, analyses showed an association between household firearm ownership rates and overall rates of both suicide and homicide (Table 2). For suicide, both bivariate and multivariate analyses are significant at the $P < .05$ level; for homicide, bivariate analyses are significant at the $P < .05$ level, but multivariate analyses do not quite reach statistical significance. Among the 21 states for which household gun owner-ship rates are published, for each standard deviation increase in the percentage of households reporting at least one firearm in the home (range = 3.2 standard devia-tions), the bivariate rate for overall suicide rate increased by 16% (driven by a 64% increase in firearm suicide rates); the overall homicide rate increased by 17% (driven by a 32% increase in firearm homicide).

When all 50 US states contribute to analyses (Table 2), for each standard devia-tion increase in Cook's Index (range = 4.2 standard deviations), the multivariate-adjusted rate for suicide increased by 13% (driven by an increase in firearm suicide rates of 64%); the homicide rate increased by 37% (driven by a 60% increase in the rate of firearm homicide). The corresponding unintentional firearm death rate increased by 111%. Similarly, when FS/S was used as the proxy for all 50 states, for each standard deviation increase in FS/S (range = 4.1 standard deviations), the multivariate-adjusted rates for suicide, homicide, and unintentional firearm deaths increased by 25%, 33%, and 130%, respectively.

At the regional level (Table 3), despite the contraction of variability in going from 50 states to 9 regions, we generally observe a positive association between gun availability and the rates of suicide, homicide, and unintentional firearm death. Results using household firearm ownership rates reported in the nationally repre-sentative GSS survey (the GSS proxy) are similar to those obtained with the other proxies. For each standard deviation in a given proxy, the suicide rate increased approximately 10%–15%, the homicide rate increased approximately 25%–30%, and the unintentional firearm death rate increased approximately 100%.

Differences in incidence rate ratios (i.e., point estimates) reported for proxies based on surveys and proxies derived from mortality statistics (Tables 2 and) ap-pear less to do with the gun availability proxies themselves and more to do with the sample of states in an analysis. For example, differences between point estimates reported for BRFSS and FS/S (Table 2) are largely due to the fact that results for BRFSS are based on analyses using only 21 of the 50 states used in the analyses for which we report incidence rate ratios for FS/S (and Cook's Index). When we re-stricted analyses to only the 21 states for which BRFSS firearm ownership measures are available, point estimates associated with BRFSS, Cook's Index, and FS/S are not statistically different and, overall, are within ±10% of one another (not shown). At the regional level, for which the samples are all equal (i.e., the nine census re-gions), survey-based measures (BRFSS and GSS) and the derived measures (Cook's Index and FS/S) have similar point estimates and a similar range of values (range 3.1 to 3.4; Table 3).

Table 4 compares the actual number of women who were victims of homicide, suicide, or unintentional firearm death (1988–1997) in the five states with the high-est Cook's values to the corresponding rates in the five states with the lowest Cook's values. These states were chosen on the basis of their extreme firearm levels, not on the basis of their extreme violent death rates among women. Compared to women living in the low-gun states (Hawaii, Massachusetts, Rhode Island, New Jersey, and Delaware), women living in the high-gun states (Louisiana, Alabama,

**TABLE 4.  Homicide, suicide, and unintentional gun deaths among women 20 years of age and older in the five US states with the highest versus the lowest average Cook's Index of gun availability, 1988–1997**

|  | High gun States | Low gun States | Mortality rate ratio (high gun : low gun) |
|---|---|---|---|
| Total population (1988–1997) | 57 million | 65 million | |
| **Suicides** | | | |
| Gun suicides | 2,294 | 401 | 6.5 |
| Nongun suicides | 1,197 | 2,262 | 0.6 |
| Total | 3,491 | 2,663 | 1.5 |
| **Homicides** | | | |
| Gun homicides | 2,309 | 536 | 4.9 |
| Nongun homicides | 1,626 | 1,114 | 1.7 |
| Total | 3,935 | 1,650 | 2.7 |
| Unintentional firearm deaths | 196 | 20 | 11.2 |

The five states with the highest average gun levels (1988–1997) were Louisiana, Alabama, Mississippi, Arkansas, and West Virginia. The five states with the lowest average gun levels were Hawaii, Massachusetts, Rhode Island, New Jersey, and Delaware.

Mississippi, Arkansas, and West Virginia) were 1.5 times as likely to die from suicide, 2.7 times as likely to die from homicide, and 11.2 times as likely to die from an unintentional firearm injury.

Our firearm proxies gave similar results since they are highly correlated (Table 1). Not only are Cook's Index and (the derivative) FS/S highly correlated, but these proxies are also highly correlated with survey-based measures. At the state level, the correlation coefficient for the BRFSS survey-based estimates of household firearm ownership (among the 21 states for which data are available) is 0.81 with Cook's Index and 0.88 with FS/S. Among the subgroup of 21 states for which BRFSS provides household ownership levels, the 5 states with the highest reported household ownership levels constituted 4 of the 5 states with the highest FS/S and 3 of the 5 states with the highest Cook's Index. Similarly, the 5 states with the lowest reported household gun levels corresponded to the same 5 states with the lowest FS/S and Cook's Index. At the regional level, our modified Cook's Index and FS/S were also highly correlated with household firearm ownership levels reported in the GSS (correlation coefficient = 0.86 and 0.89, respectively). The two survey-based estimates of household gun ownership rates were also similar: When the BRFSS estimates of household firearm ownership were collapsed to the regional level, the correlation with GSS estimates was 0.88. Because of the high correlations among all proxies, we believe that analyses using Cook's Index and FS/S (which use information from all 50 US states) better represent the relationship between gun availability and violent death among women in the United States than do analyses using only the nonrandom 21 states that provide gun ownership data from the BRFSS.

## DISCUSSION

The present study is the first nationwide cross-sectional study to examine the relationship between firearm availability and violent death among women within the United States. We found that each of our proxies led to the same conclusion:

Case: 1:10-cv-04184 Document #: 169-9 Filed: 03/12/12 Page 50 of 53 PageID #:4867

Women were more likely to die from suicide, homicide, and unintentional firearm injuries if they lived in states (or regions) with more, rather than fewer, guns. Overall, the relationship between guns and violent death among women persisted at both the state and the regional level, in virtually every age group (not shown), and even after controlling for state-level poverty and urbanization.

If, as has been suggested for adolescents and adults generally,[34-36] suicides and homicides among women are commonly impulsive acts, the easier it is to find lethal means, such as firearms, the more suicides and homicides there might be. On the other hand, if the choice of firearm has less to do with the availability of the weapon than with the strength of the intent, persons determined to kill others or themselves will work harder to get a gun where guns are less available or will substitute other lethal means. Consistent with some,[11-17,22,37] but not all,[38] previous studies among US adults, we found that not only firearm-related suicide rates, but also overall suicide rates, were significantly associated with state and regional gun levels. The increase in overall suicide rates associated with greater firearm availability, together with our finding of a small but significant inverse relationship between nonfirearm suicide rates and relative gun availability, suggests that substitution of equally lethal means for guns appears to occur, but does so incompletely.

The increased rate of homicide in states with high gun levels was accounted for primarily by significantly elevated firearm homicide rates (Table 2), although the rate of nonfirearm homicide was also elevated to a lesser extent. The disproportionately high level of firearm related (compared to nonfirearm-related) homicide in states (and regions) where guns are more available suggests that where there are more guns, regardless of the baseline level of nongun homicide, violence is more likely to turn lethal.

Over the 10-year study interval, 1,114 women died from unintentional firearm deaths. The 11-fold higher unintentional firearm death rate among women from the five states with the highest gun levels compared to that for women from the five states with the lowest gun levels (Table 4) is not readily accounted for by any identifiable variable other than guns. Because of the relatively small number of unintentional firearm deaths (606/45,315), the statistical significance of our findings is reduced when multivariate analyses are conducted and when cell size is limited by parsing deaths at the state level.

Using measures that rely on different estimating mechanisms may capture different (perhaps complementary) aspects of the relevant exposure variable. The extent to which Cook's Index or FS/S captures some of these factors better (or less well) than do survey-based estimates of household gun ownership rates is unknown. In any event, household gun ownership levels (BRFSS and GSS measures) and our mortality-derived estimates (Cook's Index and FS/S) are highly correlated, suggesting that they provide information about similar constructs.

Our findings are robust. The proxy chosen did not drive the regression results. Regressions also were not driven by either the largest states or the states most extreme in gun levels. Statistically significant and qualitatively consistent results were produced regardless of whether the data analyzed were for the 50 US states or the 40 largest or the 40 smallest states or when analyses excluded the 5 states with the highest (or lowest) Cook's Index (or FS/S). We obtained similar results even when we used the survey-based estimates of household firearm ownership rates among the non-random 21 states for which this measure was available. Analyses using only the 9 census regions likewise produced qualitatively similar findings. Including the 606 (1.3%) firearm deaths coded as firearm deaths of undetermined

origin (ICD-9 E985) did not alter our findings, regardless of whether these deaths were included as firearm suicides, firearm homicides, or unintentional firearm deaths.

Consistent with others, we found that overall unintentional firearm death rates were positively associated with poverty[23] and inversely related to urbanization.[23,24] In addition, we found that higher homicide rates were associated with higher rates of poverty[27] and urbanization[25,26] (not shown).

Drawing causal inferences from group data to individual behaviors is generally referred to as the "ecological fallacy."[39-42] For example, although the poverty rate in a given state with a high unintentional gun death rate may be disproportionately high, that does not prove that the actual individuals in this state who are dying from guns are disproportionately poor. On the other hand, if a person dies from gunfire, that particular individual did come in contact with a bullet. The ecological fallacy is thus not likely to be a major issue with our analyses.

A potentially more problematic issue is that of reverse causation—although only in the case of homicide (i.e., reverse causation is not a problem for suicide or for unintentional firearm deaths). It might be that, where homicide rates are higher, individuals are more likely to obtain guns in the belief that they are protecting themselves and their families. Our finding that the nonfirearm homicide rate was slightly higher in areas with more guns is consistent with this supposition. In this case, the direction of any causal relationship between high gun levels and high homicide rates cannot be determined. Nevertheless, our finding that all of our proxies of gun availability are much more strongly related (i.e., associated with disproportionately greater incidence rate ratios) to the rates of gun homicide (and overall homicide) than to the rate of nongun homicide is consistent with firearm availability playing some causal role in homicide rates among women.

Another limitation of our study is that our analyses may not have accounted for some reasons that states with higher gun levels have higher violent death rates. Although we included some potential state-level confounders (poverty and urbanization), these represent only a small number of the characteristics likely to affect suicides, homicides, or unintentional firearm deaths. It is not clear, however, whether accounting for these unobserved characteristics would revise the magnitude of observed association upward or downward.

Most geographically limited US studies have found a positive relationship between gun density measures and overall homicide[43] and suicide[44] rates. Consistent with these studies, we find that of the women in the United States who were killed with firearms between 1988 and 1997, a disproportionately large number, per population, died in states where guns were more prevalent. Moreover, the elevated rates of suicide and homicide among women living in states with more guns appear to be driven largely by lethal firearm violence, not by nonfirearm violence. Our findings suggest that, although guns may confer a theoretical or actual benefit to some women, overall, where there are more guns women are at higher risk of becoming victims of lethal violence.

## ACKNOWLEDGEMENT

This research was supported in part by grants from the Centers for Disease Control and Prevention; the Joyce Foundation; the Robert Wood Johnson Foundation; the Packard Foundation; the Center on Crimes, Communities, and Culture of the Open

Society Institute; and the Department of Health Policy and Management at the Harvard School of Public Health.

## REFERENCES

1. National Center for Health Statistics. Hyattsville, MD: US Department of Health and Human Services, Public Health Service, Centers for Disease Control and Prevention; 1998 Available at: http://wonder.cdc.gov/mortsql.shtml. Accessed June 2, 2001.

2. Bailey JE, Kellermann AL, Somes GW, Banton JG, Rivara FP, Rushforth NP. Risk factors for violent death of women in the home. *Arch Intern Med.* 1997;157(7):777–782.

3. Kellermann AL, Rivara FP, Rushforth NB, et al. Gun ownership as a risk factor for homicide in the home [see comments]. *N Engl J Med.* 1993;329(15):1084–1091.

4. Kellermann AL, Rivara FP, Somes G, et al. Suicide in the home in relation to gun ownership [see comments]. *N Engl J Med.* 1992;327(7):467–472.

5. Cummings P, Koepsell TD, Grossman DC, Savarino J, Thompson RS. The association between the purchase of a handgun and homicide or suicide [see comments]. *Am J Public Health.* 1997;87(6):974–978.

6. Brent DA, Perper JA, Goldstein CE, et al. Risk factors for adolescent suicide. A comparison of adolescent suicide victims with suicidal inpatients. *Arch Gen Psychiatry.* 1988; 45(6):581–588.

7. Brent DA, Perper JA, Allman CJ, Moritz GM, Wartella ME, Zelenak JP. The presence and accessibility of firearms in the homes of adolescent suicides. A case-control study [see comments]. *JAMA.* 1991;266(21):2989–2995.

8. Brent DA, Perper J, Moritz G, Baugher M, Allman C. Suicide in adolescents with no apparent psychopathology. *J Am Acad Child Adolesc Psychiatry.* 1993;32(3):494–500.

9. Brent DA, Perper JA, Moritz G, Baugher M, Schweers J, Roth C. Firearms and adolescent suicide. A community case-control study. *Am J Dis Child.* 1993;147(10):1066–1071.

10. Bukstein OG, Brent DA, Perper JA, et al. Risk factors for completed suicide among adolescents with a lifetime history of substance abuse: a case-control study. *Acta Psychiatr Scand.* 1993;88(6):403–408.

11. Loftin C, McDowall D, Wiersema B, Cottey TJ. Effects of restrictive licensing of handguns on homicide and suicide in the District of Columbia [see comments]. *N Engl J Med.* 1991;325(23):1615–1620.

12. Sloan JH, Kellermann AL, Reay DT, et al. Handgun regulations, crime, assaults, and homicide. A tale of two cities. *N Engl J Med.* 1988;319(19):1256–1262.

13. Wintemute GJ, Parham CA, Beaumont JJ, Wright M, Drake C. Mortality among recent purchasers of handguns [see comments]. *N Engl J Med.* 1999;341(21):1583–1589.

14. Cook P. The effect of gun availability on robbery and robber murder: a cross sectional study of 50 cities. *Policy Stud Rev Annu.* 1979;3:743–781.

15. Boor M, Bair JH. Suicide rates, handgun control laws, and sociodemographic variables. *Psychol Rep.* 1990;66(3 pt 1):923–930.

16. Markush RE, Bartolucci AA. Firearms and suicide in the United States. *Am J Public Health.* 1984;74(2):123–127.

17. Marzuk PM, Leon AC, Tardiff K, Morgan EB, Stajic M, Mann JJ. The effect of access to lethal methods of injury on suicide rates. *Arch Gen Psychiatry.* 1992;49(6):451–458.

18. Cummings P, Grossman DC, Rivara FP, Koepsell TD. State gun safe storage laws and child mortality due to firearms. *JAMA.* 1997;278(13):1084–1086.

19. Miller M, Azrael D, Hemenway D. Firearm Availability and Unintentional Firearm Deaths. *Accid Anal Prev.* 2001;33(4):477–484.

20. Kellermann AL, Mercy JA. Men, women, and murder: gender-specific differences in rates of fatal violence and victimization. *J Trauma.* 1992;33(1):1–5.

21. Browning CH. Epidemiology of suicide: firearms. *Compr Psychiatry.* 1974;15(6):549–553.

22. Hellensten J. *Motivation and Opportunity: an Ecological Investigation of US Urban Suicides 1970–1990* [dissertation]. University of California Irvine; 1995.

23. Baker S, O'Neill B, Ginsburg M, Li G. *The Injury Fact Book.* 2nd ed. New York: Oxford University Press; 1992.

24. Keck NJ, Istre GR, Coury DL, Jordan F, Eaton AP. Characteristics of fatal gunshot wounds in the home in Oklahoma: 1982–1983. *Am J Dis Child.* 1988;142(6):623–626.

25. Fingerhut LA, Ingram DD, Feldman JJ. Firearm and nonfirearm homicide among persons 15 through 19 years of age. Differences by level of urbanization, United States, 1979 through 1989. *JAMA.* 1992;267(22):3048–3053.

26. Fingerhut LA, Ingram DD, Feldman JJ. Homicide rates among US teenagers and young adults: differences by mechanism, level of urbanization, race, and sex, 1987 through 1995 [see comments]. *JAMA.* 1998;280(5):423–427.

27. Young TJ. Poverty, suicide, and homicide among Native Americans. *Psychol Rep.* 1990; 67(3 pt 2):1153–1154.

28. Powell KE, Jacklin BC, Nelson DE, Bland S. State estimates of household exposure to firearms, loaded firearms, and handguns, 1991 through 1995. *Am J Public Health.* 1998;88(6):969–972.

29. Davis J, Smith T. *General Social Surveys, 1972–1998* [machine-readable data file]. NORC ed. Chicago, IL: National Opinion Research Center [producer]; Storrs, CT: The Roper Center for Public Opinion Research, University of Connecticut [distributor]; 1998.

30. Lester D. The availability of firearms and the use of firearms for suicide: a study of 20 countries. *Acta Psychiatr Scand.* 1990;81(2):146–147.

31. Lester D. Relationship between firearm availability and primary and secondary murder. *Psychol Rep.* 1990;67:490.

32. Lester D. Gun ownership and suicide in the United States. *Psychol Med.* 1989;19(2):519–521.

33. Killias M. International correlations between gun ownership and rates of homicide and suicide [see comments]. *CMAJ.* 1993;148(10):1721–1725.

34. Adelson L. The gun and the sanctity of human life; or the bullet as pathogen. *Pharos.* 1980;43(3):15–25.

35. Baker SP. Without guns, do people kill people? [editorial]. *Am J Public Health.* 1985; 75(6):587–588.

36. Browning CH. Handguns and homicide. A public health problem. *JAMA.* 1976; 236(19):2198–2200.

37. Clark R, Jones P. Suicide and the increased availability of handguns in the United States. *Soc Sci Med.* 1989;28:805–809.

38. Sloan JH, Rivara FP, Reay DT, Ferris JA, Kellermann AL. Firearm regulations and rates of suicide. A comparison of two metropolitan areas [see comments]. *N Engl J Med.* 1990;322(6):369–373.

39. Schwartz S. The fallacy of the ecological fallacy: the potential misuse of a concept and the consequences [see comments]. *Am J Public Health.* 1994;84(5):819–824.

40. Piantadosi S, Byar DP, Green SB. The ecological fallacy. *Am J Epidemiol.* 1988;127(5):893–904.

41. Kalimo E, Bice TW. Causal analysis and ecological fallacy in cross-national epidemiological research. *Scand J Soc Med.* 1973;1(1):17–24.

42. Dutton DG. Patriarchy and wife assault: the ecological fallacy. *Violence Vict.* 1994;9(2):167–182.

43. Ohsfeldt R, Morrisey M. Firearms, firearms injury and gun control: a critical survey of the literature. *Adv Health Econ Health Serv Res.* 1992;13:65–82.

44. Miller M, Hemenway D. The relationship between firearms and suicide: a review of the literature. *Aggression Violent Behav.* 1999;4:59–75.