# Exhibit 83



**ELSEVIER**

Accident Analysis and Prevention 37 (2005) 661–667



**ACCIDENT
ANALYSIS
&
PREVENTION**

www.elsevier.com/locate/aap

# Firearm storage practices and rates of unintentional firearm deaths in the United States

Matthew Miller[*], Deborah Azrael, David Hemenway, Mary Vriniotis

*Harvard Injury Control Research Center, Harvard School of Public Health, 677 Huntington Ave., 3rd Fl., Boston, MA 02115, USA*

Received 14 February 2005; accepted 24 February 2005

### Abstract

*Background:* The American Academy of Pediatrics and the American Medical Association recommend storing firearms unloaded and locked up to minimize the chance of injury. Although these recommendations appeal to common sense, no study has yet addressed whether firearm storage practices influence the risk of unintentional firearm injury.

*Methods:* Negative binomial regression analyses were used to assess the cross sectional relation between firearm storage practices and rates of unintentional firearm death in the United States, controlling for rates of firearm prevalence, poverty and urbanization. Recently available state-level measures of household firearm prevalence and firearm storage practices were obtained from the 2002 Behavioral Risk Factor Surveillance System. Unintentional firearm death counts and population data came from the National Center for Health Statistics.

*Results:* Independent of firearm prevalence, urbanization, and poverty, a disproportionately large share of unintentional firearm fatalities occurred in states where gun owners were more likely to store their firearms loaded, the greatest risk occurring in states where loaded firearms were more likely to be stored unlocked.

*Conclusion:* Our findings provide empirical support for recommendations issued by the AMA and the AAP that firearms should be stored unloaded and locked, and suggest that promoting safer storage practices could save many lives.

© 2005 Elsevier Ltd. All rights reserved.

*Keywords:* Firearms; Mortality; Unintentional injury; Storage practices

## 1. Introduction

The circumstances involved in unintentional firearm fatalities are not well characterized. Although we know that 90% of the 11,509 Americans who died from unintentional firearm injuries between 1991 and 2000 were male and a quarter were under age eighteen (CDC, 2003b), we know little about the type of firearm involved or how the offending firearm had been stored.

Existing studies suggest that routine handling may play a role in both non-fatal (Stucky and Loder, 1991; Kennedy et al., 1993; Payne et al., 1993; Annest et al., 1995; Go DeVivo et al., 1995; Sinauer et al., 1996) and fatal (Morrow

and Hudson, 1986; Cole and Patetta, 1988; Carter, 1989; Wintemute et al., 1989; Grossman et al., 1999) events. For example, among children most fatal events occurred when children were playing with guns they had found, and in at least twenty percent of the cases the child who fired the gun did not know it was loaded (Wintemute et al., 1987, 1989). Of note, firearms owned by relatives or friends living in households *other than* the victim's accounted for half (49%) of all unintentional injuries and deaths (Grossman et al., 1999), suggesting that an ideal measure of firearm exposure captures firearms-related characteristics (e.g. storage practices) not only in the victim's home, but also in the community.

Two empirical studies (a case–control study (Wiebe, 2003) and an ecologic study (Miller et al., 2001)) have evaluated whether household firearm ownership is related to the rate of unintentional firearm deaths in the United States. Both found a strong relation between household firearm ownership and rates of unintentional firearm deaths. To our knowledge no

* Corresponding author. Tel.: +1 617 432 1459; fax: +1 617 432 3699.
  *E-mail addresses:* mmiller@hsph.harvard.edu (M. Miller),
azrael@hsph.harvard.edu (D. Azrael), hemenway@hsph.harvard.edu
(D. Hemenway), mvriniot@hsph.harvard.edu (M. Vriniotis).

0001-4575/$ – see front matter © 2005 Elsevier Ltd. All rights reserved.
doi:10.1016/j.aap.2005.02.003

*M. Miller et al. / Accident Analysis and Prevention 37 (2005) 661–667*

study has yet examined the relation between firearm storage practices and unintentional firearm deaths. Nonetheless, the American Academy of Pediatrics (1996) and the American Medical Association (1995) have issued specific recommendations regarding how firearms ought to be stored to minimize the chance of firearm injury. To our knowledge, the current study is the first to investigate the empirical basis of these recommendations with respect to unintentional firearm deaths.

## 2. Methods

### 2.1. Dependent variable: mortality data

The study group consisted of all unintentional firearm deaths (International Classification of Diseases, Ninth Revision JICD-91, E922.0-E922.9; Tenth Edition W32-W34) in the US between 1991 and 2000. Death counts and corresponding population data come from the National Center for Health Statistics (NCHS) mortality files (CDC, 2003a,b). Firearm deaths of undetermined intent were excluded from analyses (ICD-9 E985, ICD-10 Y22-Y24). Mortality data were collected by sex and age (0–17, 18–35, and over 35 years of age). Since unintentional firearm deaths are a relatively rare event, mortality rates were averaged over the 10-year study period.

### 2.2. Independent variables

Our primary objective was to assess the relation between statewide firearm storage practices and rates of unintentional firearm deaths, holding firearm prevalence constant. Data on firearm storage practices and firearm prevalence were obtained from the 2002 Behavioral Risk Factor Surveillance System (BRFSS), an ongoing telephone survey with over 200,000 adult respondents annually. All BRFSS questionnaires and data are available on the Internet at www.cdc.gov/brfss. The median response rate, based on the number of individuals reached by telephone was 76.7% and ranged from 62.5% in California to 99.8% in Minnesota (CDC, 2003c). Data are representative at the state and national level (CDC, 2002). The BRFSS uses a complex sampling and weighting scheme described in detail elsewhere (CDC, 2002). The minimum number of respondents in 2002 among the 50 states for the firearm prevalence question was 2438 (range 2438–13,072) and the greatest fraction of respondents who refused to answer the firearm questions was 8.6% (range 0.7–8.6%). These data are the first and only information ever collected about firearm storage practices across all US states. California is excluded from analyses because data on gun storage practices were not collected in a manner corresponding to the uniform collection of storage practice data from the remaining forty-nine states.

Estimates of state level firearm ownership and storage practices come from responses to the following three ques-

tions: (1) "Are any firearms kept in or around your home?"; (2) "Are any of these firearms now loaded?"; and (3) "Are any of these loaded firearms also unlocked? By unlocked, we mean you do not need a key or combination to get the gun or to fire it. We don't count a safety as a lock".

In addition to adjusting for firearm prevalence, multivariate analyses adjust for the percentage of a state's population living below the poverty level and the percentage living in urban areas, both of which are ecologic characteristics associated with unintentional firearm death rates (Baker et al., 1988). Poverty and urbanization for each state correspond to the mean values for each state from the 1990 Census and the 2000 Census.

### 2.3. Statistical analysis

We chose to model the data as event rates with the numerator being the number of unintentional firearm deaths in each state and the denominator being the population of that state over the study period (the person–time exposure). Therefore, the dependent variable is in the form of nonnegative integer values. We use a negative binomial regression model for discrete outcome data to assess the association between household firearm storage practices and unintentional firearm deaths. The primary outcome is the number of unintentional firearm deaths per state over the 10-year study period, 1991–2000, that had a range for the population as a whole from 5 to 1029 with a mean of 230.8 (variance of 5489). Because the variance was much greater than the mean, negative binomial models are more appropriate since they better account for such overdispersion than do Poisson models, which assume that the mean and variance are equal (Byers et al., 2003; Lawless, 1987). Several epidemiologic studies in this and other peer-review journals have used negative binomial models in such instances (Glynn et al., 1993; Miaou, 1994; Laberge-Nadeau et al., 1996; Abdel-Aty and Radwan, 2000; Scuffham et al., 2000; Webster et al., 2004; Markowitz et al., 2003). Independent control variables included in all models (models 1–3) are the percentage of a state's population living below the poverty level and the percentage living in urban areas. All analyses use STATA statistical package software (StataCorp, 2003).

Models assume that the number of unintentional firearm deaths, $Y_i$, follows a negative binomial distribution with parameters $\alpha$ and $\kappa$ (with $0 \le \alpha \le 1$ and $\kappa \ge 0$). The expected number of unintentional firearm deaths, $Y_i$, occurring within a given state $i$ defined by a known set of predictors $X_{i1}$, $X_{i2}$, ..., $X_{iq}$, is

*Function*$(Y_i) = \beta_0 + \beta_1 X_{i1} + \beta_2 X_{i2} + \cdots + \beta_q X_{iq}$

where $\beta_0$, $\beta_1$, ..., $\beta q$ are the regression coefficients and the $X_i$s are the independent variables. All models include the same three state-level independent variables: the BRFSS estimate of household firearm ownership rates, the percentage of a state's population living in urban areas, and the percentage of a state's population living below the poverty level. Model

M. Miller et al. / Accident Analysis and Prevention 37 (2005) 661–667

663

Table 1
Gun prevalence and storage practices (2002) and unintentional firearm death rate (1991–2000), by state

| State | Percent of individuals living in households with guns (column A) | Percent of column A who store guns loaded (column B) | Percent of column A who store guns loaded and unlocked (column C) | Percent of all persons living in households with loaded firearms (column A × column B) | Unintentional firearm death rate (per 100,000 person-years) |
|---|---|---|---|---|---|
| Rhode Island | 0.14 | 0.16 | 0.11 | 0.02 | 0.05 |
| Massachusetts | 0.13 | 0.13 | 0.03 | 0.02 | 0.06 |
| New Hampshire | 0.31 | 0.13 | 0.07 | 0.04 | 0.12 |
| Connecticut | 0.16 | 0.14 | 0.07 | 0.02 | 0.13 |
| New Jersey | 0.11 | 0.14 | 0.08 | 0.02 | 0.13 |
| Utah | 0.46 | 0.12 | 0.07 | 0.06 | 0.13 |
| Hawaii | 0.10 | 0.17 | 0.10 | 0.02 | 0.14 |
| New York | 0.18 | 0.13 | 0.07 | 0.02 | 0.18 |
| Maryland | 0.22 | 0.18 | 0.11 | 0.04 | 0.19 |
| Maine | 0.42 | 0.08 | 0.05 | 0.03 | 0.20 |
| Florida | 0.27 | 0.34 | 0.19 | 0.09 | 0.21 |
| Delaware | 0.27 | 0.24 | 0.13 | 0.06 | 0.23 |
| Minnesota | 0.45 | 0.08 | 0.05 | 0.04 | 0.23 |
| Illinois | 0.21 | 0.14 | 0.07 | 0.03 | 0.26 |
| Michigan | 0.41 | 0.14 | 0.08 | 0.06 | 0.26 |
| Pennsylvania | 0.37 | 0.15 | 0.10 | 0.06 | 0.27 |
| Iowa | 0.44 | 0.09 | 0.06 | 0.04 | 0.28 |
| Washington | 0.37 | 0.20 | 0.12 | 0.07 | 0.29 |
| Wisconsin | 0.45 | 0.08 | 0.05 | 0.04 | 0.30 |
| California | 0.21 | • | • | • | 0.32 |
| North Dakota | 0.55 | 0.06 | 0.04 | 0.03 | 0.33 |
| Colorado | 0.35 | 0.20 | 0.12 | 0.07 | 0.34 |
| Virginia | 0.37 | 0.24 | 0.14 | 0.09 | 0.41 |
| All States | 0.33 | 0.22 | 0.13 | 0.07 | 0.43 |
| Nevada | 0.33 | 0.30 | 0.18 | 0.10 | 0.45 |
| Vermont | 0.46 | 0.08 | 0.05 | 0.04 | 0.45 |
| Ohio | 0.32 | 0.17 | 0.11 | 0.05 | 0.46 |
| Nebraska | 0.42 | 0.10 | 0.06 | 0.04 | 0.48 |
| Oregon | 0.40 | 0.26 | 0.18 | 0.10 | 0.48 |
| Indiana | 0.40 | 0.24 | 0.15 | 0.10 | 0.54 |
| Kansas | 0.44 | 0.16 | 0.10 | 0.07 | 0.54 |
| Texas | 0.36 | 0.34 | 0.22 | 0.12 | 0.54 |
| New Mexico | 0.40 | 0.25 | 0.17 | 0.10 | 0.56 |
| Georgia | 0.41 | 0.33 | 0.18 | 0.14 | 0.57 |
| Arizona | 0.37 | 0.31 | 0.21 | 0.11 | 0.58 |
| North Carolina | 0.42 | 0.28 | 0.17 | 0.12 | 0.58 |
| West Virginia | 0.58 | 0.16 | 0.09 | 0.09 | 0.58 |
| Oklahoma | 0.45 | 0.29 | 0.17 | 0.13 | 0.64 |
| Missouri | 0.46 | 0.22 | 0.12 | 0.10 | 0.67 |
| South Carolina | 0.46 | 0.30 | 0.18 | 0.14 | 0.73 |
| Idaho | 0.57 | 0.21 | 0.14 | 0.12 | 0.77 |
| South Dakota | 0.60 | 0.10 | 0.07 | 0.06 | 0.77 |
| Montana | 0.62 | 0.21 | 0.14 | 0.13 | 0.91 |
| Arkansas | 0.59 | 0.27 | 0.18 | 0.16 | 0.94 |
| Louisiana | 0.46 | 0.29 | 0.16 | 0.13 | 0.98 |
| Kentucky | 0.49 | 0.25 | 0.14 | 0.12 | 1.09 |
| Wyoming | 0.63 | 0.21 | 0.14 | 0.13 | 1.16 |
| Tennessee | 0.47 | 0.26 | 0.14 | 0.12 | 1.29 |
| Alabama | 0.58 | 0.34 | 0.22 | 0.20 | 1.48 |
| Mississippi | 0.55 | 0.29 | 0.16 | 0.16 | 1.49 |
| Alaska | 0.61 | 0.25 | 0.18 | 0.15 | 2.37 |

1 has only these three independent variables. In model 2 adds to model 1 a fourth independent variable: the percentage of individuals in households with loaded firearms. In model 3, variable representing the percentage of individuals in households with loaded firearms is disaggregated into two mutually exclusive and exhaustive independent variables: those in households in which at least one firearm is both loaded and unlocked and those households in which all loaded firearms are locked away.

The magnitude of association between the rate of unintentional firearm death and our key independent variables are expressed using incident rate ratios (IRRs). Incidence rate ratios (IRR) are obtained by exponentiating the beta coefficients associated with each independent variable in the regression.

*M. Miller et al. / Accident Analysis and Prevention 37 (2005) 661–667*

Table 2
Incident rate ratios from negative binomial regression models for unintentional firearm death across the United States ($N = 49$ states)

|  | Model 1 firearm prevalence | Model 2 firearm prevalence and storing firearms loaded (storage reference: unloaded) | Model 3 firearm prevalence and storing firearms loaded and unlocked (storage reference: unloaded) |
|---|---|---|---|
| **All ages** |  |  |  |
| Firearm Prevalence | 1.05*** (1.03, 1.06) | 1.03*** (1.02, 1.05) | 1.03*** (1.02, 1.04) |
| Loaded | – | 1.04*** (1.03, 1.06) | – |
| And locked | – | – | 1.02 (0.97, 1.07) |
| And unlocked | – | – | 1.06*** (1.02, 1.10) |
| **Age 0–17** |  |  |  |
| Firearm prevalence | 1.06*** (1.04, 1.08) | 1.04*** (1.03, 1.06) | 1.04*** (1.02, 1.06) |
| Loaded | – | 1.04*** (1.02, 1.05) | – |
| And locked | – | – | 1.02 (0.96, 1.08) |
| And unlocked | – | – | 1.05*** (1.01, 1.08) |
| **Age 18–35** |  |  |  |
| Firearm prevalence | 1.04*** (1.02, 1.06) | 1.03** (1.01, 1.04) | 1.02** (1.01, 1.04) |
| Loaded | – | 1.04*** (1.02, 1.06) | – |
| And locked | – | – | 1.01 (0.95, 1.07) |
| And unlocked | – | – | 1.06*** (1.04, 1.09) |
| **Age 36 and older** |  |  |  |
| Firearm prevalence | 1.05*** (1.03, 1.07) | 1.03*** (1.01, 1.05) | 1.03** (1.01, 1.05) |
| Loaded | – | 1.04*** (1.02, 1.07) | – |
| And locked | – | – | 1.03 (0.97, 1.10) |
| And unlocked | – | – | 1.05* (1.01, 1.10) |
| **Males all ages** |  |  |  |
| Firearm prevalence | 1.05*** (1.03, 1.06) | 1.03*** (1.02, 1.05) | 1.03*** (1.02, 1.04) |
| Loaded | – | 1.04*** (1.02, 1.05) |  |
| And locked |  |  | 1.02 (0.97, 1.07) |
| And unlocked |  |  | 1.05** (1.02, 1.08) |
| **Females all ages** |  |  |  |
| Firearm prevalence | 1.06*** (1.03, 1.09) | 1.03** (1.01, 1.05) | 1.03* (1.00, 1.05) |
| Loaded | – | 1.07*** (1.04, 1.10) |  |
| And locked |  |  | 1.07 (0.99, 1.15) |
| And unlocked |  |  | 1.07** (1.02, 1.13) |

All models adjust for state level poverty and urbanization. Multivariate incident rate ratios (IRR) express the percentage increase in the rate of unintentional firearm deaths for each 1-percentage point increase in the given type of exposure. Model 1 relates unintentional firearm death rates to household firearm prevalence. Model 2 adds to model 1 another independent variable: the % individuals in households with loaded firearms. Model 3 adds to model 1 two mutually exclusive independent variables: (1) the % individuals in households in which at least one firearm is both loaded and unlocked, and (2) the % of individuals in households in which all loaded firearms are locked away.

  * $P < 0.05$.
  ** $P < 0.01$.
  *** $P < 0.001$.

Incidence rate ratios estimate the percentage increase in the rate of unintentional firearm deaths for each unit (1%) increase in the storage practice of interest (i.e., storing firearms loaded; loaded and unlocked). For example, a multivariate IRR of 1.03 indicates that the rate of unintentional firearm deaths is 3% higher in states where, say, 21% of gun owning households store their firearms loaded compared with states where 20% of gun owning households store their firearms loaded (holding firearm prevalence, urbanization and poverty constant).

To illustrate our main finding, we compare unintentional firearm deaths over our study period in the 10 states where the largest fraction of gun owners choose to store their firearms loaded to the six states where the smallest fraction of gun

owners store their firearms loaded. To control for firearm prevalence in this simple comparison, states were grouped such that the total number of individuals living in households with firearms is approximately equal in each grouping.

## 3. Results

Eleven thousand five hundred and nine (11,509) people died from unintentional firearm injuries over the 10-year study period. The rate of unintentional firearm fatalities was 0.43 per 100,000 person-years and ranged from 0.05 (Rhode Island) to 2.37 (Alaska) per 100,000 person-years (Table 1). In 2002, 33% of Americans lived in households with firearms

Table 3
Loaded guns and unintentional firearm deaths: a comparison of extremes (1991–2000)

|  | Six states with the highest % of individuals living in households with loaded firearms | Ten states with the lowest % of individuals living in households with loaded firearms |
|---|---|---|
| Total population (person-years) (million) | 211.0 | 567.2 |
| Number of person-years in a household with a gun (million) | 105.2 | 115.3 |
| Number of person-years in a household with a loaded gun (million) | 32.7 | 13.6 |
| Total unintentional firearm deaths | 2098 | 1041 |
| Unintentional firearm deaths age 0–17 | 501 | 243 |

States are chosen such that the total number of individuals in households with firearms is approximately equal in both groupings. The six states where the highest proportion of individuals live in households with loaded firearms are Alabama, Mississippi, Arkansas, Alaska, South Carolina, and Georgia. The 10 states with the smallest proportion are New Jersey, Massachusetts, Hawaii, Rhode Island, Connecticut, New York, Illinois, Maine, North Dakota, and Wisconsin.

(10% in Hawaii to 63% in Wyoming), 22% of whom lived in households with loaded guns (6% in North Dakota to 34% in Texas), and 13% of whom lived in households with guns that were loaded and unlocked (3% in Massachusetts to 22% in Alabama).

A disproportionately large share of unintentional firearm fatalities occurred in states where gun owners were more likely to store their firearms loaded or loaded and unlocked (Table 2, models 2 and 3). This finding held within each age group and for both sexes, even after controlling for rates of firearm prevalence, urbanization and poverty.

Independent of firearm prevalence, urbanization and poverty, the unintentional firearm death rate was, on average, 4% higher in states where an additional 1-percentage point of gun owning households stored their guns loaded (IRR = 1.04, $P < 0.001$, Table 2, model 2). This 4% increase in the rate of unintentional firearm deaths attributable to a 1-percentage point increase in the proportion of households that store their firearms loaded appears to reside largely and significantly in those households in which at least one of the loaded firearm is also unlocked (Table 2, model 3): the unintentional firearm death rate was 6% higher in states where an additional 1-percentage point of gun owning households stored firearms loaded and unlocked (IRR = 1.06, $P < 0.001$, Table 2, model 3), compared to households in which all firearms were unloaded. Those household in which all loaded firearms were stored locked away did not appear to have a significantly elevated risk of unintentional firearm deaths relative to households with unloaded guns (IRR = 1.02, $P > 0.05$, Table 2 model 3).

Since 7.3% of US households with firearms store at least one of their guns loaded (and 4.3% store at least one firearm loaded and unlocked), a 1-percentage point increase in the prevalence of loaded (loaded and unlocked) firearms represents, on average, a 14% (23%) increase in exposure to loaded (loaded and unlocked) firearms in the home.

Over the 10-year study period approximately twice as many people died from unintentional firearm injuries in the six states where firearm owners were most likely to store their firearms loaded (2098 deaths), compared with the 10 states where firearm owners were least likely to store their firearms loaded (1041 deaths), even though the number of people who lived in households with firearms was slightly lower in the former (Table 3). Since more than twice as many people lived in the group of 10 states (as lived in the six states), the actual mortality rate ratio is closer to 5–1.

Firearm storage practices (and firearm prevalence) estimates from the 2002 BRFSS were significantly and independently related to the cross sectional pattern of unintentional firearm death rates for *each* of the 10 years of our study period. For example, using 2001 mortality data for the population as a whole we found, independent of firearm prevalence, that the unintentional firearm death rate was 4% higher in states where an additional 1-percentage point of gun owning households stored guns loaded (IRR = 1.04, 95% CI: 1.02, 1.05, not shown).

## 4. Conclusion

For a given level of firearm prevalence, in states where fewer firearm owners store their guns loaded rates of unintentional firearm deaths are lower. Areas where gun owners tend to store firearms both loaded and unlocked have the highest rates of unintentional firearm deaths. These findings are consistent with previous work suggesting that many unintentional firearm shootings occur during routine handling, often when the shooter mistakenly believes the firearm is not loaded (Morrow and Hudson, 1986; Cole and Patetta, 1988; Carter, 1989; Wintemute et al., 1989; Sinauer et al., 1996; Grossman et al., 1999).

The association between storage practices and rates of unintentional firearm death does not differ significantly across age groups or sex. One possible explanation for this is that children are not the only ones who have difficulty knowing whether a firearm is loaded. Consistent with this possibility, a national survey of adults found that 20% of adults incorrectly believed that a pistol with its magazine removed could not be shot and an additional fourteen percent were unsure. Of note, 28% of adults who answered incorrectly or were unsure lived in gun-owning households (Vernick et al., 1999). Similarly, a study of all accidental firearm deaths in Maryland and Milwaukee concluded that 20% of the fatalities might have been prevented with loaded chamber indicators (Vernick et al., 2003). The incipient National Violent Death Reporting System (NVDRS) will eventually provide detailed informa-

tion about the circumstances involved in violent deaths, including unintentional firearm deaths, and may help explain our findings (Azrael et al., 2003).

Our firearm prevalence and storage practice data come from the 2002 BRFSS, whereas mortality data pertain to the years 1991–2000. The effect of this temporal discrepancy on our results is less of a concern for our prevalence estimates than for our storage practices estimates, since guns are highly durable. In fact, existing data show that the cross sectional pattern of household firearm ownership tends to be quite constant over time (Azrael et al., 2004).

Nothing, however, is known about the cross sectional stability of firearm storage practices over time. Indeed, 2002 is the only year such data were systematically collected in the United States. Consistent with the possibility that storage practices may also have remained fairly constant over the study period, we found that firearm storage practices (and firearm prevalence) estimates from the 2002 BRFSS were significantly and independently related to the cross sectional pattern of unintentional firearm death rates for *each* of the 10 years of our study period.

As with other group level analyses, our findings are subject to the ecologic fallacy (i.e., drawing causal inferences from group data to individual risk factors) (Piantadosi et al., 1988). Nevertheless, an ecologic approach to studying the relation between firearm storage practices and unintentional firearm death rates offers at least one important methodological advantage over customary individual level studies comparing firearm storage practices in the homes of cases versus controls: an ecologic approach captures exposure to firearms not only in the victim's home but also in the homes of others in the area. This measure of exposure is particularly relevant to studying unintentional firearm deaths since, as noted, half of all unintentional firearm fatalities, at least among children, appear to occur with firearms owned by relatives or friends living in households *other than* that of the victim (Grossman et al., 1999).

Because the data presented in this manuscript are the first systematically collected data on firearm storage practices across the 50 states, we cannot test whether our estimates are comparable to other published survey estimates across states. However, when we compare the 2002 BRFSS firearm storage estimates to the storage estimates from the Harvard Injury Control Center 1999 survey ($n = 2521$) we find similar results. For example, in the 1999 survey 9% of households with guns stored at least one gun loaded and unlocked and 21% stored at least one gun loaded, compared to 13 and 22% of households with guns in the 2002 BRFSS (Azrael et al., 2000).

Lastly, our firearm prevalence and storage measures do not provide direct information about other characteristics of firearms that may be related to the rate of unintentional firearm deaths. Although we know the percentage of individuals living in households with firearms and what fraction of these individuals live in households with loaded guns, we do not know whether the firearms in question were handguns or long guns, how many firearms (or loaded firearms) were in the homes, the caliber of gun(s), etc. Likewise, because there is no routine collection of this kind of information in any publicly available data system, we do not know whether individuals who stored their gun(s) loaded tend to (1) have a greater number of firearms in their household than individuals who store their guns unloaded, or (2) used their guns more often (e.g. to hunt or target shoot).

Despite these limitations, our findings lend direct empirical support to recommendations by the American Medical Association (1995) and the American Academy of Pediatrics to store firearms unloaded and locked.

## Acknowledgements

Dr. Miller assumes responsibility for the integrity of the work as a whole, from inception to published article. Drs. Miller, Azrael and Hemenway made substantial contributions to conception and design of the study as well as to the analysis and interpretation of data. Ms Vriniotis played a major role in the acquisition of data. Dr. Miller wrote the manuscript; Drs. Hemenway, Azrael and Ms Vriniotis revised it critically for important intellectual content. All authors have given final approval to the version here submitted. None of us have any financial interests related to the work submitted. Dr. Miller had full access to all the data in the study and takes responsibility for the integrity of the data and the accuracy of the data analysis. We are indebted to Dr. Arnold Epstein for his thoughtful comments and editorial assistance. Funding for this project came from the Joyce Foundation.

## References

Abdel-Aty, M.A., Radwan, A.E., 2000. Modeling traffic accident occurrence and involvement. Accid. Anal. Prev. 32 (5), 633–642.

American Academy of Pediatrics, 1996. Keep Your Family Safe From Firearm Injury. Elk Grove Village, IL. Available at: http://www.aap.org/advocacy/d1family.htm.

American Medical Association, 1995. AMA Campaign to Reduce Firearm Deaths. American Medical Association Policy Compendium: H-145.988. Chicago, IL.

Annest, J.L., Mercy, J.A., et al., 1995. National estimates of nonfatal firearm-related injuries beyond the tip of the iceberg. JAMA 273 (22), 1749–1754.

Azrael, D., Barber, C., et al., 2003. The benefits of surveillance: creating a national violent death reporting system. In: Ludwig, J., Cook, P.J. (Eds.), Evaluating Gun Policy: Effects on Crime and Violence. Brookings Institution Press, Washington, DC.

Azrael, D., Cook, P., et al., 2004. State and local prevalence of firearm ownership: measurement, structure and trends. J. Quant. Criminol. 20 (1), 43–62.

Azrael, D., Miller, M., Hemenway, D., 2000. Pediatrics 106 (3), e31.

Baker, S.P., Whitfield, R.A., et al., 1988. County mapping of injury mortality. J. Trauma 28 (6), 741–745.

Byers, A.L., Allore, H., et al., 2003. Application of negative binomial modeling for discrete outcomes: a case study in aging research. J. Clin. Epidemiol. 56 (6), 559–564.

Carter, G.L., 1989. Accidental firearm fatalities and injuries among recreational hunters. Ann. Emerg. Med. 18 (4), 406–409.

Centers for Disease Control and Prevention, 2002. Behavioral Risk Factor Surveillance System. Centers for Disease Control and Prevention (BRFSS). Available at: http://www.cdc.gov/brfss/technical_infodata/surveydata/2002.htm (accessed 9 February 2005).

Centers for Disease Control and Prevention, 2003a. Wide-ranging Online Data for Epidemiologic Research (WONDER). National Center for Health Statistics, Centers for Disease Control and Prevention. Available at: http://wonder.cdc.gov/mortSQL.html (accessed 9 February 2005).

Centers for Disease Control and Prevention, 2003b. Web-based Injury Statistics Query and Reporting System (WISQARS). National Center for Injury Prevention and Control, Centers for Disease Control and Prevention. Available at: http://www.cdc.gov/ncipc/wisqars/ (accessed 9 February 2005).

Centers for Disease Control and Prevention, 2003c. 2002 Behavioral Risk Factor Surveillance System Summary Data Quality Report. Centers for Disease Control and Prevention, Atlanta, GA. Available at: www.cdc.gov/brfss/technical_infodata/pdf/2002SummaryDataQualityReport.pdf (accessed 9 February 2005).

Cole, T.B., Patetta, M.J., 1988. Hunting firearm injuries North Carolina. Am. J. Public Health 78 (12), 1585–1586.

Glynn, R.J., Stukel, T.A., et al., 1993. Estimating the variance of standardized rates of recurrent events, with application to hospitalizations among the elderly in New England. Am. J. Epidemiol. 137 (7), 776–786.

Go, B., DeVivo, M., et al., 1995. The epidemiology of spinal cord injury. In: Stover, S., DeLisa, J., Whiteneck, G. (Eds.), Spinal Cord Injury: Clinical Outcomes From the Model Systems. Aspen Publishers Inc., Gaithersburg, MD, pp. 21–55.

Grossman, D.C., Reay, D.T., et al., 1999. Self-inflicted and unintentional firearm injuries among children and adolescents: the source of the firearm. Arch. Pediatr. Adolesc. Med. 153 (8), 875–878.

Kennedy, F., Gonzalez, P., et al., 1993. The Glasgow Coma Scale and prognosis in gunshot wounds to the brain. J. Trauma 35, 75–77.

Lawless, J., 1987. Negative binomial and mixed Poisson regression. Can. J. Stat. 15, 209–225.

Laberge-Nadeau, C., Dionne, G., et al., 1996. Medical conditions and the severity of commercial motor vehicle drivers' road accidents. Accid. Anal. Prev. 28 (1), 43–51.

Markowitz, S., Chatterji, P., et al., 2003. Estimating the impact of alcohol policies on youth suicides. J. Ment. Health Policy Econ. 6 (1), 37–46.

Miaou, S.P., 1994. The relationship between truck accidents and geometric design of road sections: Poisson versus negative binomial regressions. Accid. Anal. Prev. 26 (4), 471–482.

Miller, M., Azrael, D., et al., 2001. Firearm availability and unintentional firearm deaths. Accid. Anal. Prev. 33 (4), 477–484.

Morrow, P., Hudson, P., 1986. Accidental firearm fatalities in North Carolina, 1976–80. Am. J. Public Health 76 (9), 1120–1123.

Payne, J., Berne, T., et al., 1993. Outcome of treatment of 686 gunshot wounds of the trunk at Los Angeles County-USC Medical Center: implications for the community. J. Trauma 34, 276–281.

Piantadosi S., Byar, D., et al., 1988. The ecological fallacy. Am. J. Epidemiol. 127, 893–904.

Scuffham, P., Alsop, J., et al., 2000. Head injuries to bicyclists and the New Zealand bicycle helmet law. Accid. Anal. Prev. 32 (4), 565–573.

Sinauer, N., Annest, J.L., et al., 1996. Unintentional, nonfatal firearm-related injuries. A preventable public health burden. JAMA 275 (22), 1740–1743.

StataCorp, 2003. Stata Statistical Software: Release 8. StataCorp LP, College Station, TX.

Stucky, W., Loder, R., 1991. Extremity gunshot wounds in children. J. Pediatr. Orthop. V 11, 64–71.

Vernick, J.S., Meisel, Z.F., et al., 1999. I didn't know the gun was loaded: an examination of two safety devices that can reduce the risk of unintentional firearm injuries. J. Public Health Policy 20 (4), 427–440.

Vernick, J.S., O'Brien, M., et al., 2003. Unintentional and undetermined firearm related deaths: a preventable death analysis for three safety devices. Inj. Prev. 9 (4), 307–311.

Webster, D.W., Vernick, J.S., et al., 2004. Association between youth-focused firearm laws and youth suicides. JAMA 292 (5), 594–601.

Wiebe, D.J., 2003. Firearms in US homes as a risk factor for unintentional gunshot fatality. Accid. Anal. Prev. 35 (5), 711–716.

Wintemute, G.J., Kraus, J.F., et al., 1989. Unintentional firearm deaths in California. J. Trauma 29 (4), 457–461.

Wintemute, G.J., Teret, S.P., et al., 1987. When children shoot children: 88 unintended deaths in California. JAMA 257 (22), 3107–3109.

# Exhibit 84

1

```
 1              IN THE UNITED STATES DISTRICT COURT

 2            FOR THE NORTHERN DISTRICT OF ILLINOIS

 3                      EASTERN DIVISION

 4    ----------------------------------)

 5    ILLINOIS ASSOCIATION OF FIREARMS  )

 6    RETAILERS, KENNETH PACHOLSKI,     )

 7    KATHRYN TYLER, and MICHAEL HALL,  )

 8            Plaintiffs,               ) Civil Action No.:

 9    vs.                               ) 10-cv-04184

10    THE CITY OF CHICAGO and           )

11    RAHM EMANUEL, Mayor of the        )

12    City of Chicago,                  )

13            Defendants.               )

14    ----------------------------------)

15            Washington, D.C.

16            Wednesday, September 21, 2011

17            Videotaped Deposition of DANIEL W.

18    WEBSTER, Sc.D., MPH, a Witness herein, called for

19    examination by Counsel for Plaintiffs, in the

20    above-entitled matter, the witness being duly sworn

21    by MELISSA GILCREST, RDR, CRR, a Notary Public in and

22    for the District of Columbia, taken at the offices of
```

Daniel W. Webster, Sc.D., MPH                          September 21, 2011
                            Washington, D.C.

2

1    Cooper & Kirk, PLLC, 1523 New Hampshire Avenue, NW,

2    Washington, DC, at 9:06 a.m., on Wednesday, September

3    21, 2011, and the proceedings being taken down by

4    Stenotype by MELISSA GILCREST, RDR, CRR, and

5    transcribed under her direction.

6

7    APPEARANCES:

8

9         On behalf of Plaintiffs:

10             DAVID H. THOMPSON, ATTORNEY AT LAW

11             1523 New Hampshire Avenue, NW

12             Washington, DC 20036

13             (202) 220-9600

14             dthompson@cooperkirk.com

15

16

17

18

19

20

21

22

Daniel W. Webster, Sc.D., MPH                                    September 21, 2011

Washington, D.C.

3

1    APPEARANCES (Continued)

2        On behalf of Defendants:

3             RANJIT J. HAKIM, ATTORNEY AT LAW

4             CRAIG A. WOODS, ATTORNEY AT LAW

5             Mayer Brown LLP

6             71 South Wacker Drive

7             Chicago, Illinois 60606-4637

8             (312) 782-0600

9             rhakim@mayerbrown.com

10            cwoods@mayerbrown.com

11                   and

12            ANDREW WORSECK, ATTORNEY AT LAW

13            Assistant Corporation Counsel

14             Department of Law

15            Constitutional and Commercial Litigation

16            30 North LaSalle Street, Suite 1230

17            Chicago, Illinois 60606-2580

18            (312) 744-7129

19            aworseck@cityofchicago.org

20

21        ALSO PRESENT:

22            DAN REIDY, Videographer

201

1    drawing any inferences about individual level

2    associations between firearm storage and gun

3    violence?"

4                THE WITNESS:   Yes.   So, the study I made

5    reference to before regarding the measures from the

6    CDC survey about firearms storage showing protective

7    effects of storing guns locked and unloaded was

8    gathered -- they were looking at aggregate measures.

9    And therefore, it is -- you cannot be sure that they

10   apply for any individual household.

11               What it says, what you can infer is that

12   generally in areas with safer storage practices of

13   firearms, you will see lower risk and rates for

14   unintentional firearm deaths.

15   BY MR. THOMPSON:

16        Q.    When you refer to safer storage practices,

17   will you include locking a gun in a gun safe as a

18   safer storage practice?

19        A.    It is --

20               MR. HAKIM:   Objection, mischaracterizes.

21               THE WITNESS:   Safer compared to what?

22   BY MR. THOMPSON:

Daniel W. Webster, Sc.D., MPH

September 21, 2011

Washington, D.C.

251

1               CERTIFICATE OF NOTARY PUBLIC

2

3          I, Melissa Gilcrest, a Notary Public of the

4    District of Columbia, do hereby certify that the

5    within-named witness personally appeared before me at

6    the time and place herein set out, and after having

7    been duly sworn by me, was examined by counsel.

8          I further certify that the examination was

9    recorded stenographically by me and this transcript

10   is a true record of the proceedings.

11         I further certify that I am not of counsel to

12   any of the parties, nor related to any of the

13   parties, nor in any way interested in the outcome of

14   this action.

15

16                      _____

17                      Melissa J. Gilcrest

18                      Notary Public

19                      District of Columbia

20                      My commission expires: 10/14/2014

21

22

# Exhibit 85

■■ ORIGINAL CONTRIBUTION

# Association Between Youth-Focused Firearm Laws and Youth Suicides

Daniel W. Webster, ScD, MPH

Jon S. Vernick, JD, MPH

April M. Zeoli, MPH

Jennifer A. Manganello, PhD, MPH

S UICIDE IS THE THIRD LEADING cause of death among youth aged 10 to 19 years in the United States, accounting for 1883 deaths in 2001.[1] Firearms were used in approximately half of suicides within this age group in 2001; however, as recently as 1994, 7 of every 10 suicides among teenagers involved firearms.[1]

Firearms are one of the most lethal methods of self-harm.[2] Case-control studies using community and clinical samples have consistently found that the presence of firearms in the home substantially increased the risk of adolescent suicide.[3-7] In addition, a recent state-level study, using the ratio of firearm suicides to total suicides as a proxy for the prevalence of gun ownership, found that suicide rates among teenagers and adults are significantly higher in states with higher rates of gun ownership.[8]

Several firearm policies are intended to limit the access that underage youth have to firearms. Since 1968, federal law has required licensed firearms dealers to prohibit handgun sales to purchasers younger than 21 years. In 1994, a federal law established 18 years as the minimum legal age for possessing or purchasing handguns, including sales by gun owners who are not licensed dealers. Many states have also adopted laws establishing a minimum legal age for being able to purchase or possess a firearm. Another type of law intended to keep firearms from youth are gun safe storage laws, often referred to as child access prevention (CAP) laws. As of 2001, 18 states had some form of CAP law that makes it a crime to store firearms in a manner that allows them to be easily accessed by children and adolescents. Most require gun owners to lock up their guns.

**Context** Firearms are used in approximately half of all youth suicides. Many state and federal laws include age-specific restrictions on the purchase, possession, or storage of firearms; however, the association between these laws and suicides among youth has not been carefully examined.

**Objective** To evaluate the association between youth-focused firearm laws and suicides among youth.

**Design, Setting, and Participants** Quasi-experimental design with annual state-level data on suicide rates among US youth aged 14 through 20 years, for the period 1976-2001. Negative binomial regression models were used to estimate the association between state and federal youth-focused firearm laws mandating a minimum age for the purchase or possession of handguns and state child access prevention (CAP) laws requiring safe storage of firearms on suicide rates among youth.

**Main Outcome Measures** Association between youth-focused state and federal firearm laws and rates of firearm, nonfirearm, and total suicides among US youth aged 14 to 17 and 18 through 20 years.

**Results** There were 63954 suicides among youth aged 14 through 20 years during the 1976-2001 study period, 39655 (62%) of which were committed with firearms. Minimum purchase-age and possession-age laws were not associated with statistically significant reductions in suicide rates among youth aged 14 through 20 years. State CAP laws were associated with an 8.3% decrease (rate ratio [RR], 0.92; 95% confidence interval [CI], 0.86-0.98) in suicide rates among 14- to 17-year-olds. The annual rate of suicide in this age group in states with CAP laws was 5.97 per 100000 population rather than the projected 6.51. This association was also statistically significant for firearm suicides (RR, 0.89; 95% CI, 0.83-0.96) but not for nonfirearm suicides (RR, 1.00; 95% CI, 0.91-1.10). CAP laws were also associated with a significant reduction in suicides among youth aged 18 through 20 years (RR, 0.89; 95% CI, 0.85-0.93); however, the association was similar for firearm suicides (RR, 0.87; 95% CI, 0.82-0.92) and nonfirearm suicides (RR, 0.91; 95% CI, 0.85-0.98).

**Conclusions** There is evidence that CAP laws are associated with a modest reduction in suicide rates among youth aged 14 to 17 years. As currently implemented, minimum age restrictions for the purchase and possession of firearms do not appear to reduce overall rates of suicide among youth.

*JAMA. 2004;292:594-601*                                      www.jama.com

**Author Affiliations:** Center for the Prevention of Youth Violence (Dr Webster and Mr Vernick and Ms Zeoli) and Center for Gun Policy and Research (Dr Webster and Mr Vernick), Johns Hopkins Bloomberg School of Public Health, Baltimore, Md; Annenberg Public Policy Center, University of Pennsylvania, Philadelphia (Dr Manganello).
**Corresponding Author:** Daniel W. Webster, ScD, MPH, Center for Gun Policy and Research, Johns Hopkins Bloomberg School of Public Health, 624 N Broadway, Room 593, Baltimore, MD 21205 (dwebster @jhsph.edu).

©2004 American Medical Association. All rights reserved.

Downloaded from jama.ama-assn.org by guest on September 19, 2011

There has been little empirical research on the association between these youth-focused laws and rates of suicide among youth. Marvel[9] examined laws banning the possession of firearms by juveniles and found no evidence that these laws reduced youth suicides. However, in that study the outcome examined was suicides among youth aged 15 to 19 years, over half of which involve suicides among 18- and 19-year-olds, an age group not covered by most of the laws. We are not aware of any other study that has examined the association between minimum age restrictions for firearm purchases and firearm suicides among youth. In a study of the association between the first 12 CAP laws and mortality among youth through 1994, Cummings et al[10] reported that state CAP laws were associated with a 19% decline in suicides among youth aged 10 to 14 years. This estimate was not emphasized by the authors, presumably because the upper bound of the 95% confidence interval for the rate ratio was 1.01. Lott and Whitley[11] reported no statistically significant association between CAP laws and suicides among children younger than 15 years or among youth aged 15 to 19 years. However, their use of Tobit regression to estimate the laws' effects is vulnerable to bias when data are highly skewed and heteroskedastic, as is the case for state-level data on youth suicides.[12]

The study herein seeks to address the gap in research on the effects of firearm laws specifically designed to reduce the access that children and youth have to firearms. We examine the association between these laws and suicides among youth aged 14 through 20 years, an age group at much greater risk of firearm suicide than the younger groups examined in prior research.

## METHODS

### Study Design

To estimate the association between youth-focused firearm policies and suicide, we used a quasi-experimental design and regression analyses (described below) to contrast changes in rates of suicide among youth in states that adopted laws to restrict youth access to firearms with rate changes in states that did not make such changes in their laws, while controlling for potential confounders. State-level data sets were constructed that included the number of suicides among youth within each state for the years 1976 through 2001 for the 2 age groups potentially affected by the laws. Youth aged 14 to 17 years were the target group for laws establishing 18 years or younger as a minimum age for handgun purchase or possession, and for most CAP laws. Youth aged 18 through 20 years were legally affected by laws that increased the minimum age for handgun purchase or possession from 18 to 21 years.

### Outcome Variables

The outcome variables were the number of total, firearm, and nonfirearm suicides in each age group targeted by the laws. Death certificate data from the National Center for Health Statistics were used to identify suicide as a cause of death (*International Classification of Diseases, Ninth Revision* external cause of death codes E950-E959[13] and *International Classification of Diseases, 10th Revision* codes X60-X84, Y87.0, and U03[14]).

### Firearm Laws

We conducted legal research and consulted existing compilations of state laws[15] to obtain information about the youth-focused firearm laws of interest: minimum purchase age, minimum possession age, and CAP laws. When states had minimum-age cutoffs for purchase or possession of handguns that were different from those for purchase or possession of long guns, we used the cutoffs for handguns. We also collected information about other firearm laws, such as handgun licensing requirements (also known as permit-to-purchase laws), which might affect our outcomes of interest. For each law, we then determined the date it took effect, and whether there had been any changes to the law itself during the study period.

Dummy variables were created, set equal to 1 when the law was in effect for the whole year and equal to 0 when no law was in effect. For laws that were in effect for only part of a specific year, we set the law variable equal to 1 in a state-year if the law was in place for at least half of the year and equal to 0 otherwise. For the few laws that affected one part of our age groups (eg, age 17 years as the minimum age for firearm purchase), we set the law variable equal to 1 if the law applied to the majority of youth committing suicide in the age group and equal to 0 otherwise. The federal law establishing a minimum legal age for handgun purchase and possession was assumed to affect only states that, prior to the federal law, either had no minimum-age law of this type or had a law that established a minimum legal age younger than 18 years.

### Statistical Analysis

To derive estimates of the association between the laws and youth suicide, we used negative binomial regression models and generalized estimating equations to estimate regression parameters. Negative binomial regression is appropriate for estimating models for count data that are overdispersed (ie, the variance is greater than the mean),[16] as is the case with state-level youth suicide data. Likelihood ratio tests rejected the null hypothesis that the distributions were Poisson. Generalized estimating equations take into account that the data are correlated, in this case by state and year, and make appropriate adjustments to standard errors for accurate hypothesis testing.[17] Correlation matrices of model residuals were examined to identify any clear pattern of autocorrelation; however, no pattern was evident. Therefore, the models were specified with unstructured autocorrelation, as is recommended for studies of this type,[18] using the PROCGEN program in SAS version 8.2 (SAS Institute Inc, Cary, NC). Each model included the natural logarithm of the population as an offset variable with the coefficient constrained to equal 1. Model coefficients

©2004 American Medical Association. All rights reserved.

Downloaded from jama.ama-assn.org by guest on September 19, 2011

YOUTH-FOCUSED FIREARM LAWS AND YOUTH SUICIDES

were converted to rate ratios (RRs) so that effects could be expressed in terms of percentage changes in suicide rates. We used 2-tailed tests of significance and $\alpha \le .05$ for rejecting the null hypothesis of no effect.

When statistically significant associations were identified, we assessed whether an association not attributable to change in the covariates could be attributable to differential prelaw trends in states that passed the law vs those that did not pass the law. This was assessed by estimating the effects for a set of dummy variables representing each of the 5 years just prior to the passage of the law and each of the first 5 years the law was in place. We assessed the plausibility that significant changes in suicide rates for an age group were caused by the law by examining whether statistically significant associations were specific to suicides using firearms and were not associated with changes in suicide rates among young persons aged 22 to 24 years, a group not legally affected by the laws. We also estimated a model that included only those states that had enacted their laws prior to 1996, providing at least 6 years of follow-up data. Model fit was assessed by comparing deviance statistics with their asymptotic $\chi^2$ distribution[19] and the Akaike information criterion statistic.[20]

**Other Explanatory Variables**

In addition to the firearm law variables, the models included indicator variables for each state, suicides for a within-state comparison group (individuals aged 22 to 24 years), per capita beer consumption, percentage of the population living in rural areas, real income per capita, unemployment rates, percentage of the adult population with a bachelors degree, percentage of the population of black race, the ratio of adult firearm suicides to total suicides as a proxy for the prevalence of gun ownership, and percentage of the population affiliated with specific religious denominations. The dummy variables for each state control for baseline differences in youth suicide levels across the 50 states

(the District of Columbia was not included in our study). Because the state firearm policies of interest target a particular age group, we used within-state suicide rates among young persons aged 22 to 24 years who were not targeted by the law to control for difficult-to-measure social factors (eg, social norms regarding suicide) that influence suicide rates among young persons in a particular state and year. We used year dummy variables to control for national trends in suicides among youth but also estimated alternative models with linear trend parameters when such patterns were clearly evident.

Data on state population of youth aged 14 through 20 years[21-23] and the percentage of residents living in rural areas were obtained from the US Census.[24] Annual per capita beer consumption data based on beer sales were obtained from the Alcohol Epidemiologic Data System of the National Institute of Alcoholism and Alcohol Abuse.[25] Data on personal income, unemployment, educational attainment, and religious affiliation were provided by Markowitz et al,[26] who obtained the data from government and private sources.[27-29]

**RESULTS**

**Youth-Focused Firearm Laws**

As of 2001, federal law and the laws of 46 states have mandated a minimum age for the purchase of a handgun, with the age ranging from 14 to 21 years. Of these, 21 states enacted or changed their law during the study period. Federal law and the laws of 39 states mandated a minimum possession age, ranging from 15 to 21 years, with 29 states enacting or changing their law during the study period. Nearly all of these changes established 18 years as the minimum age for firearm possession. Only 3 states increased their minimum legal age for handgun possession to 21 years during the study period. Eighteen states had CAP laws as of 2001. The maximum age of youth covered by these CAP laws ranged from 13 to 17 years (TABLE 1). Only 3 states adopted permit-to-purchase firearms licensing systems during the study period.

Most law changes restricting the access of youth to firearms went into effect between 1990 and 1995. The federal law establishing 18 years as the minimum age for handgun purchase and possession went into effect in 1994. After Florida implemented the nation's first CAP law in late 1989, 14 more states followed suit before the end of 1995.

**Suicide Trends Among Youth**

There were 63 954 suicides among youth aged 14 through 20 years during the 1976-2001 study period, 39 655 (62%) of which were committed with firearms. Firearm suicide rates among youth aged 14 to 17 years increased steadily from 2.6 (per 100 000 population) in 1976 to 5.7 in 1994, and then declined rapidly to 2.5 in 2001 (FIGURE). There were less-dramatic changes in firearm suicide rates among youth aged 18 through 20 years, except for a steep decrease from 9.6 in 1994 to 5.9 in 2001. There were no noteworthy trends in rates of nonfirearm suicides within the 2 age groups.

**Association Between Firearm Laws and Suicides Among Youth Aged 14 to 17 Years**

Our regression models for suicides among youth aged 14 to 17 years reveal no statistically significant association between suicide rates and laws setting minimum ages for firearm purchase or possession enacted at the state or federal level (TABLE 2). State CAP laws were associated with an 8.3% reduction in suicide rates (RR, 0.92; 95% confidence interval [CI], 0.86-0.98). In states with CAP laws, the annual suicide rate for youth aged 14 to 17 years was 5.97 per 100 000 during the period in which these laws were in effect. Our model estimates that in the absence of these laws the expected rate would have been 6.51.

The reduction associated with CAP laws was observed for firearm suicides, which decreased an estimated 10.8% in response to the introduction of CAP laws (RR, 0.89; 95% CI, 0.83-0.96). There was no statistically significant association between CAP

©2004 American Medical Association. All rights reserved.

Downloaded from jama.ama-assn.org by guest on September 19, 2011

**Table 1.** State Firearm Laws Focused on Youth, 1976-2001

| State | Minimum Purchase/Sale Age | | Minimum Possession Age | | CAP Law (Effective Date) |
|---|---|---|---|---|---|
| | Age, y | Change During Study Period (Effective Date) | Age, y | Change During Study Period (Effective Date) | |
| Federal law | 18 | No law to age 18 (09/19/94) | 18 | No law to age 18 (09/19/94) | NA |
| Alabama | 18 | NA | * | NA | NA |
| Alaska | 16 | No law to age 16 (09/14/92) | 16 | No law to age 16 (01/01/80) | NA |
| Arizona | 18 | NA | 18 | No law to age 18 (07/18/93) | NA |
| Arkansas | 18 | No law to age 18 (01/01/76) | 18 | No law to age 18 (03/17/89) | NA |
| California | 18 | NA | 18 | NA | Up to age 17 (01/01/92) |
| Colorado | 18 | No law to age 18 (09/13/93) | 18 | No law to age 18 (09/13/93) | NA |
| Connecticut | 21 | Age 18 to age 21 (10/01/95) | * | NA | Up to age 15 (10/01/90) |
| Delaware | 21 | Age 16 to age 21 (07/16/87) | 18 | No law to age 18 (07/15/94) | Up to age 17 (07/12/94) |
| Florida | 18 | NA | 18 | No law to age 18 (01/01/94) | Up to age 15 (10/01/89) |
| Georgia | 18 | Age 21 to age 18 (07/01/94) | 18 | No law to age 18 (07/01/94) | NA |
| Hawaii | 21 | Age 18 to age 21 (07/01/94) | * | NA | Up to age 15 (06/29/92) |
| Idaho | 18 | Age 16 to age 18 (07/01/94) | 18 | No law to age 18 (07/01/94) | NA |
| Illinois | 21 | NA | 21 | NA | Up to age 14 (01/01/00) |
| Indiana | 18 | Age 21 to age 18 (07/01/77) | 18 | No law to age 18 (07/01/94) | NA |
| Iowa | 21 | Age 18 to age 21 (01/01/79) | * | NA | Up to age 13 (04/05/90) |
| Kansas | 18 | NA | 18 | No law to age 18 (07/01/94) | NA |
| Kentucky | 18 | No law to age 18 (07/15/94) | 18 | No law to age 18 (07/15/94) | NA |
| Louisiana | 18 | NA | 17 | No law to age 17 (09/07/99) | NA |
| Maine | 16 | NA | * | NA | NA |
| Maryland | 21 | NA | 21 | No law to age 21 (10/01/96) | Up to age 15 (10/01/92) |
| Massachusetts | 21 | Age 18 to age 21 (10/21/98) | 21 | Age 18 to age 21 (10/21/98) | Up to age 17 (10/21/98) |
| Michigan | 18 | NA | 18 | No law to age 18 (03/28/91) | NA |
| Minnesota | 18 | NA | 18 | NA | Up to age 13 (08/01/93) |
| Mississippi | 18 | NA | 18 | No law to age 18 (07/01/94) | NA |
| Missouri | 21 | Age 18 to age 21 (09/28/81) | * | NA | NA |
| Montana | * | NA | * | NA | NA |
| Nebraska | 21 | Age 18 to age 21 (06/07/91) | 18 | NA | NA |
| Nevada | 18 | NA | 18 | Age 14 to age 18 (07/01/95) | Up to age 17 (10/01/91) |
| New Hampshire | 18 | NA | * | NA | Up to age 16 (01/01/01) |
| New Jersey | 21 | Age 18 to age 21 (01/01/01) | 21 | Age 18 to age 21 (01/01/01) | Up to age 15 (01/17/92) |
| New Mexico | * | NA | 19 | No law to age 19 (07/01/94) | NA |
| New York | 21 | No law to age 21 (11/01/00) | 16 | NA | NA |
| North Carolina | 18 | NA | 18 | No law to age 18 (09/01/93) | Up to age 17 (12/01/93) |
| North Dakota | 18 | Age 17 to age 18 (07/01/85) | 18 | Age 17 to age 18 (07/01/85) | NA |
| Ohio | 21 | Age 17 to age 21 (11/09/95) | * | NA | NA |
| Oklahoma | 18 | NA | 18 | No law to age 18 (07/01/94) | NA |
| Oregon | 18 | NA | 18 | No law to age 18 (01/01/90) | NA |
| Pennsylvania | 18 | NA | 18 | No law to age 18 (09/11/95) | NA |
| Rhode Island | 21 | NA | 15 | NA | Up to age 15 (06/19/95) |
| South Carolina | 21 | NA | 21 | NA | NA |
| South Dakota | * | NA | 18 | No law to age 18 (07/01/94) | NA |
| Tennessee | 18 | NA | 18 | No law to age 18 (07/01/94) | NA |
| Texas | 18 | NA | * | NA | Up to age 16 (09/01/95) |
| Utah | 18 | No law to age 18 (10/21/93) | 18 | NA | NA |
| Vermont | 16 | NA | 16 | NA | NA |
| Virginia | 18 | NA | 18 | No law to age 18 (07/01/93) | Up to age 13 (07/01/92) |
| Washington | 18 | Age 21 to age 18 (07/01/94) | 18 | No law to age 18 (07/01/94) | NA |
| West Virginia | 18 | No law to age 18 (07/08/89) | 18 | No law to age 18 (07/08/89) | NA |
| Wisconsin | 18 | NA | 18 | NA | Up to age 13 (04/16/92) |
| Wyoming | * | NA | * | NA | NA |

Abbreviations: CAP, child access prevention; NA, not applicable/no change.      *Minimum age not established.

©2004 American Medical Association. All rights reserved.

Downloaded from jama.ama-assn.org by guest on September 19, 2011

YOUTH-FOCUSED FIREARM LAWS AND YOUTH SUICIDES



**Figure.** Youth Suicide Rates by Method and Age Group, United States, 1976-2001

laws and nonfirearm suicides among youth aged 14 to 17 years (RR, 1.00; 95% CI, 0.91-1.10). Estimates of the association between CAP laws and suicides among 14- to 17-year-olds were dependent on how national suicide trends were modeled. The estimates from the primary model noted above included separate linear-trend parameters for the 1976-1994 period of increasing suicide rates and for the 1995-2001 period of a downturn in rates. The trend parameters in this model were highly significant and, based on Akaike information criterion statistics, this model fit the data better than did a model that included year indicator variables. Models that assumed no overall pattern in youth suicide trends but that controlled for year-to-year fluctuations nationally with year indicator variables found no statistically significant association between CAP laws and suicide rates in the group aged 14 to 17 years. CAP law estimates did not vary substantially by whether violators could be charged with felony crimes or by the maximum age of youth targeted by the laws (data not shown).

The models used to estimate differences in suicide rates among youth aged 14 to 17 years in each of the 5 years before and after the adoption of a CAP law revealed no pattern of unmodeled differences between states with and those without CAP laws just prior to the adoption of these laws. When we examined the relationship between the length of time a CAP law was in place and the effects of the laws, there was also no clear pattern in successive postlaw year effects on total suicide rates, but the association between CAP laws and firearm suicide rates for this group was most pronounced for the first year the law was in effect (RR, 0.89; 95% CI, 0.77-1.02).

There was no statistically significant association between permit-to-purchase licensing laws and suicide rates among youth aged 14 to 17 years (RR, 1.06; 95% CI, 0.92-1.23). Association between the laws and suicide rates among youth aged 14 to 17 years were not substantially altered when the suicide rate among 22- to 24-year-olds and other covariates were removed from the model.

### Association Between Firearm Laws and Suicides Among Youth Aged 18 Through 20 Years

The model for total suicides among youth aged 18 through 20 years estimated that state laws that increased the legal age for handgun possession to 21 years during the study period were associated with a 12.9% increase in sui-

cide rates (RR, 1.13; 95% CI, 1.01-1.27) (Table 2). This effect was not statistically significant, however, either for firearm suicides (RR, 1.14; 95% CI, 0.98-1.34) or nonfirearm suicides (RR, 1.07; 95% CI, 0.90-1.27). State laws raising the minimum legal purchase age to 21 years were associated with a 9.0% decline in rates of firearm suicides among youth aged 18 through 20 years (RR, 0.91; 95% CI, 0.83-1.00); however, there was no statistically significant association for overall suicide rates (RR, 0.97; 95% CI, 0.91-1.05).

State CAP laws were associated with an 11.1% decline in suicide rates among youth aged 18 through 20 years (RR, 0.89; 95% CI, 0.85-0.93). In this group, suicide reductions associated with CAP laws were similar for firearm suicides (−12.9%; RR, 0.87; 95% CI, 0.82-0.92) and nonfirearm suicides (−8.8%; RR, 0.91; 95% CI, 0.85-0.98). The 3 permit-to-purchase licensing laws were associated with a 17.7% increase in suicide rates (RR, 1.18; 95% CI, 1.04-1.34).

## COMMENT

After steadily increasing between 1976 and 1994, rates of firearm suicides among youth have decreased sharply. Although many laws enacted during the early 1990s were intended to decrease access to firearms by children and youth, this study found no evidence that minimum-age restrictions for firearm purchase and possession have reduced suicide rates among the age groups targeted by the laws.

Our models estimate that 3 state laws that increased the minimum legal age for handgun possession to 21 years were associated with a 12.9% increase in total suicide risks among youth ages 18 through 20 years. There are several reasons, however, to doubt the validity of this estimate, including: (1) firearm and nonfirearm suicide rates were affected equally; (2) there was no increase in suicides among 14- to 17-year-olds associated with minimum possession age laws; (3) it is based on only 3 states, 2 of which adopted the change in the final 2 years of the study; and (4) the ab-

 ©2004 American Medical Association. All rights reserved.

Downloaded from jama.ama-assn.org by guest on September 19, 2011

YOUTH-FOCUSED FIREARM LAWS AND YOUTH SUICIDES

sence of a theory for how an intervention designed to reduced access to means of suicide could lead to a substantial increase in suicide rates. Similarly, our findings for permit-to-purchase licensing laws should be regarded with skepticism since they are based on just 3 changes in state law occurring during the study period, none of which involved a very restrictive licensing scheme.

We did find convincing evidence that the 18 CAP laws adopted during the study period led to an 8.3% reduction in suicide rates among youth aged 14 to 17 years. As would be expected if these reductions were attributable to reduced access to firearms, the reductions were specific to suicides committed with firearms and to the age group principally targeted by CAP laws. We found no association between CAP laws and suicide rates among young persons aged 22 to 24 years. Our estimate of the association between CAP laws and firearm suicides (−10.8%; 95% CI, −18.4% to −3.7%) among youth aged 14

**Table 2.** Association Between Youth-Focused Firearm Laws and Suicides Among Youth Aged 14 to 17 Years and 18 Through 20 Years

| | Aged 14 to 17 Years | | Aged 18 Through 20 Years | |
|---|---|---|---|---|
| | RR (95% CI) | P Value | RR (95% CI) | P Value |
| **Total Suicides** | | | | |
| Firearm laws | | | | |
| Federal law | | | | |
|   Minimum purchase age | 1.02 (0.91-1.14) | .72 | NA | NA |
|   Minimum possession age | 0.98 (0.90-1.08) | .75 | NA | NA |
| State laws | | | | |
|   Minimum purchase age | 1.04 (0.90-1.21) | .58 | 0.97 (0.91-1.05) | .47 |
|   Minimum possession age | 0.97 (0.90-1.05) | .44 | 1.13 (1.01-1.27) | .04 |
|   Child access prevention laws | 0.92 (0.86-0.98) | .005 | 0.89 (0.85-0.93) | <.001 |
|   Permit to purchase laws | 1.06 (0.92-1.23) | .43 | 1.18 (1.04-1.34) | .01 |
| Other covariates | | | | |
|   Linear time trend, 1976-1994 | 1.10 (1.07-1.12) | <.001 | NA | NA |
|   Linear time trend, 1995-2001 | 0.95 (0.93-0.98) | <.001 | NA | NA |
|   Per capita beer consumption | 0.99 (0.99-1.00) | .10 | 1.00 (0.99-1.01) | .27 |
|   Population living in rural areas | 0.99 (0.98-1.01) | .37 | 1.00 (0.99-1.01) | .50 |
|   Unemployment | 1.00 (0.99-1.00) | .48 | 1.01 (1.00-1.02) | .12 |
|   Real per capita income | 1.00 (1.00-1.00) | .22 | 1.00 (1.00-1.00) | .85 |
|   Adult population with bachelors degree | 0.99 (0.98-1.00) | .08 | 1.00 (0.99-1.01) | .78 |
| Religious affiliation | | | | |
|   Southern Baptist | 1.04 (1.00-1.07) | .01 | 1.01 (0.98-1.03) | .57 |
|   Other Protestant | 1.01 (0.99-1.02) | .37 | 0.99 (0.98-1.00) | .16 |
|   Mormon | 1.12 (1.05-1.18) | <.001 | 1.04 (0.98-1.09) | .17 |
|   Catholic | 0.98 (0.97-1.00) | .006 | 0.98 (0.98-0.99) | .002 |
| Proxy for adult firearm prevalence | 0.41 (0.26-0.64) | <.001 | 0.46 (0.32-0.65) | <.001 |
| Suicide rates among ages 22-24 y | 1.01 (1.00-1.01) | .002 | 1.01 (1.00-1.01) | .002 |
| **Firearm Suicides** | | | | |
| Federal law | | | | |
|   Minimum purchase age | 1.00 (0.87-1.16) | .96 | NA | NA |
|   Minimum possession age | 0.99 (0.89-1.09) | .80 | NA | NA |
| State laws | | | | |
|   Minimum purchase age | 1.04 (0.87-1.16) | .66 | 0.91 (0.83-1.00) | .05 |
|   Minimum possession age | 1.02 (0.92-1.12) | .77 | 1.14 (0.98-1.34) | .10 |
|   Child access prevention laws | 0.89 (0.83-0.96) | .003 | 0.87 (0.82-0.92) | <.001 |
|   Permit to purchase laws | 0.92 (0.76-1.10) | .33 | 1.22 (1.04-1.43) | .02 |
| **Nonfirearm Suicides** | | | | |
| Federal law | | | | |
|   Minimum purchase age | 1.08 (0.91-1.28) | .40 | NA | NA |
|   Minimum possession age | 1.12 (0.99-1.26) | .08 | NA | NA |
| State laws | | | | |
|   Minimum purchase age | 1.05 (0.85-1.31) | .64 | 1.05 (0.94-1.17) | .37 |
|   Minimum possession age | 0.93 (0.82-1.05) | .24 | 1.07 (0.90-1.27) | .44 |
|   Child access prevention laws | 1.00 (0.91-1.10) | .95 | 0.91 (0.85-0.98) | .02 |
|   Permit to purchase laws | 1.27 (1.00-1.61) | .047 | 1.14 (0.93-1.39) | .21 |

Abbreviations: CI, confidence interval; NA, not applicable; RR, rate ratio.

©2004 American Medical Association. All rights reserved.

Downloaded from jama.ama-assn.org by guest on September 19, 2011

to 17 years is consistent with, though smaller in magnitude than, the estimate of Cummings et al[10] of the association between CAP laws and firearm suicides among adolescents younger than 15 years (–19.0%; 95% CI, –34.0% to +1.0%). CAP laws were also associated with statistically significant declines in suicide rates among those in the group aged 18 through 20 years. However, the statistically significant negative association between CAP laws and rates of suicide using means other than firearms casts doubt on any causal connection between the laws and lower suicide rates in this group of older youth.

Some may question whether the reductions in youth suicides that were associated with CAP laws in this study might be spurious, since many in the group aged 14 to 17 years were older than the maximum age required for safe firearm storage. However, many older youth have younger siblings, relatives, or friends that may prompt their parents to comply with CAP law requirements. In addition, CAP laws may encourage gun owners with children young enough to be covered by the law to adopt safe storage practices that endure even after their children are beyond the age required for safe firearms storage under the law. Finally, gun owners simply may not respond to very specific aspects of a CAP law in order to be in compliance. Instead, CAP laws may increase awareness and change social norms to encourage gun owners to secure firearms from underage youth. These interpretations are consistent with our finding that the ages covered by the CAP law were unrelated to the association between CAP laws and suicides among youth.

There are several reasons that CAP laws might be more effective than minimum-age restrictions for firearm purchases and possession in reducing suicides among youth. First, a large majority of youth who commit or attempt suicide with a firearm use guns owned by their parents or relatives.[30,31] Second, the adopted restrictions on minimum purchase age did not affect the handgun sales practices required of licensed firearm dealers. Since 1968, federal law has prohibited licensed dealers from selling handguns to individuals younger than 21 years. In addition, there is little evidence that laws governing sales by those who are not dealers are vigorously enforced in most states[32] (Frattaroli S, unpublished doctoral dissertation, 1999; on file with the authors).

Thus, it is important to recognize that our study is not a test of the relationship between firearm availability and risk of suicide among youth. Our results for minimum purchase-age and possession-age laws suggest that these laws have not substantially reduced the availability of firearms to youth at risk for suicide. Therefore, our results are not necessarily inconsistent with prior research, such as findings from Wintemute et al[33] that adult handgun purchasers were at higher risk for suicide, even 6 years after purchase. If a youth's risk of suicide were greatest several years after he or she had acquired a firearm, we may have underestimated the full effect of these laws. But when we limited the analysis to state laws enacted through 1995—providing at least 6 years of follow-up data for the remaining 45 states—we still identified no significant effects for these laws.

As with prior studies of CAP laws, we were unable to directly measure whether these laws resulted in actual changes in firearm storage practices. Nevertheless, our weapon-specific estimates of the effects of CAP laws suggest that these laws did limit the access that youth have to firearms.

This study does not examine the full range of potential effects of CAP laws. Lott and Whitley[11] report that CAP laws were associated with increases in rapes (9%) and robberies (10%), presumably because firearms kept in locked storage are potentially less available for self-defense. Their findings are questionable because the vast majority of these crimes take place outside the home[34] and firearms are very rarely used for self-defense.[35]

Our study also does not consider the potential role that laws restricting the access of youth to firearms might have in reducing unintentional shootings or homicides. Two prior studies of the association between CAP laws and deaths among children younger than 15 years from unintentional shootings, with similar methods but over different time periods, produced similar estimates of aggregate effect (–23% and –17%).[10,36] However, one of these studies[36] found that the aggregate benefits were largely driven by a single state law (Florida). Marvel[9] found no evidence that laws prohibiting possession of firearms by juveniles were associated with youth being killed by guns or with their use of guns to commit homicide.

The reductions in suicides associated with CAP laws are relatively modest in terms of percentage change. However, because the laws target an important risk factor, a high-risk group, and a leading cause of death, the public health significance of the laws is meaningful. Assuming that the observed association is causal, we estimate that the 18 CAP laws implemented prior to 2002 have prevented 333 suicides among youth aged 14 to 17 years from the time that Florida implemented the nation's first CAP law (October 1989) through 2001. In 2001 alone, we estimate that there were 35 fewer suicides among this group in the 18 states with CAP laws than would have been expected without the laws. These benefits have been obtained with very modest levels of publicity and enforcement. Increased efforts to encourage compliance with CAP laws have the potential to enhance their effectiveness in preventing deaths and injuries resulting from unsupervised access of youth to firearms.

Further research is needed to ascertain what factors have contributed to the recent decline in firearm suicides among youth in the United States. The timing of the decline is coincident with the adoption of several laws designed to reduce youth access to firearms, yet the only evidence we found that these laws are responsible for reductions in suicides among youth was a modest reduction associated with CAP laws. The

 ©2004 American Medical Association. All rights reserved.

Downloaded from jama.ama-assn.org by guest on September 19, 2011

passage of many youth-focused fire-arm restrictions during the early 1990s may have been associated with broader changes in those social norms that involve allowing youth access to fire-arms—norms that affect states both with and without recent changes to their firearm laws. If the passage of laws restricting youth access to firearms influenced norms and practices both within and outside the states that adopted the laws, our estimates would understate the effect of these laws on suicide rates among youth.

**Author Contributions:** Dr Webster, as principal investigator of this study, had full access to all of the data in the study and takes responsibility for the integrity of the data and the accuracy of the data analyses.
*Study concept and design; drafting of the manuscript; obtained funding:* Webster, Vernick.
*Acquisition of data; critical revision of the manuscript for important intellectual content; administrative, technical, or material support:* Vernick, Manganello, Zeoli.
*Analysis and interpretation of data:* Webster, Vernick, Manganello, Zeoli.
*Statistical analysis; study supervision:* Webster.
**Funding/Support:** This study was funded by grant R49/CCR318627-04 from the Centers for Disease Control and Prevention, National Center for Injury Prevention and Control to the Johns Hopkins Center for the Prevention of Youth Violence.
**Role of the Sponsor:** The Centers for Disease Control and Prevention had no role in the design and conduct of the study; in the collection, analysis, or interpretation of the data; in the preparation of the data; or in the preparation, review, or approval of the manuscript.
**Acknowledgment:** We thank Lisa Hepburn and Sara Markowitz for assistance in obtaining the data for this study, Maria Bulzacchelli for assistance with data management, and Elizabeth Johnson for statistical advice.

**REFERENCES**

1. Centers for Disease Control and Prevention, National Center for Injury Prevention and Control. Web-based Injury Statistics and Query Reporting System. Available at: http://www.cdc.gov/ncipc/wisqars. Accessed December 17, 2003.
2. Shenassa ED, Catlin SN, Buka SL. Lethality of firearms relative to other suicide methods: a population based study. *J Epidemiol Community Health.* 2003; 57:120-124.
3. Brent DA, Perper JA, Moritz G, Baugher M, Schweers J, Roth C. Firearms and adolescent suicide: a community case-control study. *AJDC.* 1993;147:1066-1071.
4. Brent DA, Perper J, Moritz G, et al. Suicide in adolescents with no apparent psychopathology. *J Am Acad Child Adolesc Psychiatry.* 1993;32:494-500.
5. Kellermann AL, Rivara FP, Rushforth NB, et al. Suicide in the home in relationship to gun ownership. *N Engl J Med.* 1992;327:467-472.
6. Brent DA, Perper JA, Allman CJ, et al. The presence and accessibility of firearms in the homes of adolescent suicides: a case-control study. *JAMA.* 1991; 266:2989-2995.
7. Brent DA, Perper JA, Goldstein CE, et al. Risk factors for adolescent suicide: a comparison of adolescent suicide victims with suicidal inpatients. *Arch Gen Psychiatry.* 1988;45:581-588.
8. Miller M, Azrael D, Hemenway D. Household firearm ownership and rates of suicide in the United States. *Epidemiology.* 2002;13:517-524.
9. Marvel TB. The impact of banning juvenile gun possession. *J Law Econ.* 2001;44:691-713.
10. Cummings P, Grossman DC, Rivara FP, Koepsell TD. State gun safe storage laws and child mortality due to firearms. *JAMA.* 1997;278:1084-1086.
11. Lott JR Jr, Whitley JE. Safe storage gun laws: accidental deaths, suicides, and crime. *J Law Econ.* 2001; 44:6596-6689.
12. Greene WH. *Econometric Analyses.* Upper Saddle River, NJ: Prentice Hall; 2003:768-771.
13. World Health Organization (WHO). *Manual of the International Statistical Classification of Diseases, Injuries, and Causes of Death.* Geneva, Switzerland: WHO; 1977.
14. World Health Organization (WHO). *International Statistical Classification of Diseases and Related Health Problems.* Geneva, Switzerland: WHO; 1992.
15. Bureau of Alcohol, Tobacco and Firearms. *State Laws and Published Ordinances—Firearms.* Washington, DC: US Dept of the Treasury; 1988, 1994, 1998, 2000.
16. Lawless JE. Negative binomial and mixed Poisson regression. *Can J Stat.* 1987;15:209-225.
17. Liang KY, Zeger SL. Longitudinal data analysis using generalized linear models. *Biometrika.* 1986;73: 13-22.
18. Bertrand M, Duflo E, Mullainathan S. How much should we trust differences-in-differences estimates? *Q J Econ.* 2004:249-275.
19. Williams DA. Generalized linear model diagnostics using the deviance and single case deletions. *Appl Stat.* 1987;36:181-191.
20. Akaike H. A new look at the statistical model identification. *IEEE Trans Automatic Control.* 1974;19: 716-723.
21. US Census Bureau. Intercensal Estimates of the Resident Populations of States 1970 to 1980. US Dept of Commerce, 2002. Available at: http://eire.census.gov/popest/archives/pre1980/e7080sta.txt. Accessed October 1, 2003.
22. US Census Bureau. Historical Annual Time Series of State Population Estimates and Demographic Components of Change 1980 to 1990, by Single Year of Age and Sex. US Dept of Commerce, 2002. Available at: http://eire.census.gov/popest/archives/state/st_stig.php. Accessed October 1, 2003.
23. US Census Bureau. Population Estimates: 1990 to 1999 Annual Time Series of State Population Estimates, by Single Year of Age and Sex. US Dept of Commerce, 2002. Available at: http://eire.census.gov/popest/archives/state/st-99-10.php. Accessed October 1, 2003.
24. US Census Bureau. *Statistical Abstract of the United States.* Washington, DC: US Dept of Commerce; 1977-2002.
25. Nephew TM, Williams GD, Yi H, Hoy AK, Stinson FS, Dufour MC. *Apparent Per Capita Alcohol Consumption: National, State, and Regional Trends, 1977-2000.* Bethesda, Md: National Institute on Alcohol Abuse and Alcoholism, Division of Biometry and Epidemiology, Alcohol Epidemiological Data System; August 2003.
26. Markowitz S, Chatterji P, Kaestner R. Estimating the impact of alcohol policies on youth suicides. *J Ment Health Policy Econ.* 2003;6:37-46.
27. Bureau of Economic Analysis. *State Personal Income, 1929-2002* [database on CD-ROM]. Washington, DC: US Dept of Commerce; 2004.
28. Bureau of Labor Statistics. Historical data from the Current Population Survey. Washington, DC: US Department of Labor, 2003. Available at: http://www.bls.gov/lau/staadoc.htm. Accessed June 29, 2004.
29. Jones DE, Doty S, Horsch JE, et al. *Religious Congregations and Membership in the United States, 2000: An Enumeration by Region, State, and County Based on Data Reported by 149 Religious Bodies.* Nashville, Tenn: Glenmary Research Center; 2002.
30. Shah S, Hoffman RE, Wake L, Marine WM. Adolescent suicide and household access to firearms in Colorado: results of a case-control study. *J Adolesc Health.* 2000;26:157-163.
31. Grossman DC, Reay DT, Baker SA. Self-inflicted and unintentional firearm injuries among children and adolescents: the source of the firearm. *Arch Pediatr Adolesc Med.* 1999;153:875-878.
32. Vernick JS, Hepburn LM. State and federal gun laws: trends for 1970-99. In: Ludwig J, Cook PJ, eds. *Evaluating Gun Policy.* Washington, DC: Brookings Institution Press; 2003.
33. Wintemute GJ, Parham CA, Beaumont JJ, Wright M, Drake C. Mortality among recent purchasers of handguns. *N Engl J Med.* 1999;341:1583-1589.
34. Bureau of Justice Statistics. *Criminal Victimization in the United States, 2002: Statistical Tables.* Washington, DC: US Department of Justice; December 2003. Bureau of Justice Statistics Special Report NCJ 200561.
35. Perkins C. *Weapon Use and Violent Crime: National Crime Victimization Survey 1993-2001.* Washington, DC: US Dept of Justice; September 2003. Bureau of Justice Statistics Special Report NCJ 194820.
36. Webster DW, Starnes M. Reexamining the association between child access prevention gun laws and unintentional firearm deaths of children. *Pediatrics.* 2000;106:1466-1469.

©2004 American Medical Association. All rights reserved.

Downloaded from jama.ama-assn.org by guest on September 19, 2011

# Exhibit 80

# Firearm Availability and Homicide Rates in Detroit, 1951-1986*

**DAVID McDOWALL,** *University of Maryland*

*Abstract*

*This article examines the relationship between firearm availability and homicide rates in Detroit, Michigan. Noting the difficulties involved in measuring gun density, the analysis uses an indicator based on the relative frequency with which firearms are employed in robberies and suicides. Models estimated from time-series data are consistent with the argument that higher levels of firearm density increased the risk of homicide in the city. A variety of supplementary analyses support this finding and suggest that the effect of gun availability on Detroit's homicide rates is relatively large.*

Few topics in the study of crime are as controversial as the effect of aggregate gun ownership on rates of criminal violence. There is little doubt that the United States leads most Western nations both in violent crime and in the prevalence of privately owned firearms (see, e.g., Wright, Rossi & Daly 1983). Beyond this simple association, the relationship between gun availability and violence has been vigorously disputed. Many researchers argue that gun density has no effect on crime, while others suggest that crime rates might be higher if firearms were less readily available.

This article examines the influence of firearm availability on homicide rates in Detroit, Michigan, between 1951 and 1986. Firearm availability is measured by an index based on the use of guns, and the level of gun density is allowed to be both a cause and a consequence of the homicide rate. The results are consistent with the conclusion that firearm density had a substantial impact on the city's murder rate.

## Rationale for the Study

Firearm density may affect the risk of homicide in a variety of ways. Perhaps the most influential explanation of this risk, however, is the "objective dan-

* I am indebted to Colin Loftin and Brian Wiersema for their collaboration in the research upon which this article is based. David Bordua, Gary Kleck, and anonymous reviewers provided valuable comments on an earlier draft. Direct correspondence to the author at the Institute of Criminal Justice and Criminology, University of Maryland, College Park, MD 20742.

© The University of North Carolina Press     *Social Forces,* June 1991, 69(4):1085-1101

Copyright © 2001. All Rights Reseved.

1086 / *Social Forces* 69:4, June 1991

gerousness hypothesis," originally proposed by Zimring (1968; Newton & Zimring 1969; Zimring & Hawkins 1987).[1] The objective dangerousness hypothesis is based on two propositions. First, variations in the availability of firearms across time or space affect the frequency with which guns are used in crime. Second, use of a gun in a crime increases the risk that a homicide will occur.

Firearm availability may increase the use of guns in crimes for several reasons. Most obviously, it should be easier for potential criminals to acquire firearms when general levels of gun ownership are already high (Cook 1979). In addition, when many citizens own guns, offenders may have an incentive to acquire firearms to protect themselves against armed victims. Finally, criminals are likely to value firearms as much as their law-abiding neighbors do. Criminal demand for guns should therefore be greatest in areas were gun ownership is already supported by cultural traditions.

The theoretical link between the use of a gun in a crime and the risk of homicide is developed in Zimring's (1968) work. Zimring begins with the observation that although homicide is legally defined as a distinct category of crime, it is in practice the result of another offense, such as an assault, a robbery, or a rape. He further argues that while some homicides may be committed with a single-minded intention to kill, many are ambiguously motivated assaults in which the lethality of the weapon employed determines the outcome. Finally, he points out that gunshot victims are more likely to die from their wounds than are victims of alternative methods of attack. Other things being equal, the use of a gun in a crime should therefore increase the likelihood of a homicide.

Together, these considerations imply that homicide rates will rise as guns become relatively more available. There is nothing self-evident about the propositions, however, and they have been criticized on logical grounds (see especially Wright, Rossi & Daly 1983). In addition, Kleck (1988; also see Kates 1986) points out that high levels of firearm ownership may *deter* some offenses, counterbalancing any tendency of guns to promote criminal violence. Thus an evaluation of the argument that homicides increase with gun density must be based on empirical tests.

## Previous Research

Recent investigations have produced relatively little evidence that firearm availability is in fact an important determinant of homicide rates.[2] In perhaps the most extensive studies, Kleck (1979, 1984) examined the influence of firearm manufacturing and imports on murder rates in the United States. Kleck's model allowed for simultaneous causation between homicides and gun density, and it was estimated with time-series data aggregated to the national level. In his first study, based on the years 1947-1973, Kleck (1979) found that increases in firearm production were associated with higher rates of murder. However, a later analysis over a slightly longer period (1947-1978) failed to confirm this relationship (Kleck 1984).[3]

Copyright © 2001. All Rights Reserved.

Aside from the divergent findings of the two studies, Kleck's use of national-level data makes it difficult to draw firm conclusions from his results. As Wright, Rossi, and Daly (1983) note, increases in U.S. gun ownership have been disproportionately concentrated in small towns and rural areas, while homicide rates have risen most dramatically in large cities. National-level studies may therefore explain urban homicides with rural guns. A more convincing test would require data from smaller areas than the nation as a whole.

A major limitation to conducting research within the United States is that there is little information on firearm density for units smaller than broad regions of the nation. One method of overcoming this problem was proposed by Cook (1979), who developed a measure of gun density that can be used at the city level. Cook's measure is formed by summing the proportions of suicides and nonfelony homicides that involve guns, on the assumption that these acts are likely to be committed with the weapon most readily available. In support of his measure's validity, Cook found that the composite was highly correlated with survey reports of firearm ownership aggregated within regions.[4]

Using his measure to study robbery in a sample of fifty cities, Cook found that increases in gun density were associated with both a larger fraction of robberies committed with guns and higher rates of robbery-murder. McDowall (1986a) applied the measure to panel data from the same cities and reached similar conclusions after allowing for simultaneous relationships between gun density and robbery.

In contrast to Kleck's work, these results suggest that firearm availability does influence the rate of at least one type of homicide. However, the findings apply only to murders committed during robberies, and they do not allow estimates of the effect of gun density on homicide rates more generally. Indeed, since nonfelony homicides are a component of Cook's measure, the relationship between firearm density and total homicide rates cannot be studied with his approach.

Another method of measuring gun density at the subnational level was adopted by Bordua (1986), who used data on legal firearm ownership permits. Bordua concluded that firearm availability measured in this manner had essentially no influence on the homicide rates of Illinois counties. It is not unreasonable to suppose that levels of legally owned firearms are correlated with the total volume of available guns. There is no strong evidence, however, that this is actually the case, so inferences based on legal ownership must be regarded with skepticism.

The findings of these and other studies do not provide a strong basis for the claim that higher levels of gun density will produce appreciable increases in murder. However, little attention has been directed toward what appears to be the central issue: estimating the effect of firearm availability within units as small as *cities* on *overall* rates of homicide. The remainder of this article presents a model intended to address this question.

Copyright © 2001. All Rights Reseved.

## Empirical Specification

### AN INDEX OF GUN DENSITY

The following analysis is designed to estimate the influence of firearm avail-
ability on Detroit's homicide rate (per 100,000 residents).[5] The data are annual
and cover the period between 1951 and 1986. Firearm availability is measured
by an index composed of two indicators: (1) the proportion of Detroit robberies
committed with a gun and (2) the proportion of Detroit suicides committed with
a gun. For each year, the two indicator series were summed to form the index.[6]

Use of the gun density index assumes that as firearms become more
available they will be employed more frequently by robbers and by persons
wishing to commit suicide. Both assumptions have some support in the research
literature. Cook (1979) argues that gun density and the gun robbery fraction
should be associated, and he shows that the gun robbery fraction in cities was
highly correlated with his own gun density measure. Similarly, Lester (1986),
Markush and Bartolucci (1984), and Medoff and Magaddino (1983) found that
firearm suicide rates were strongly related to a variety of other indicators of the
density of guns. The gun robbery and gun suicide fractions were also strongly
related in Detroit: over the period studied, their correlation was .89.

To empirically evaluate the validity of the gun density index, two additional
analyses were performed. First, for a sample of fifty large U.S. cities, the 1974
and 1978 values of the index were correlated with Cook's (1979) estimates of
relative gun availability in the same two years. For these cities, the correlation
between the index and Cook's measure was .86 in 1974, and .85 in 1978. These
correlations provide evidence that the gun density index measures substantially
the same phenomena as Cook's composite.

Second, the fifty cities were grouped by U.S. census regions, and the 1974
mean value of the density index was computed for cities within each region.
These index means were then compared with estimates of regional urban gun
ownership derived from the 1973, 1974, and 1976 General Social Surveys (see
Cook 1979:260).[7] The index had a correlation of .87 with the survey estimate of
pistol ownership, and of .93 with the survey estimate of total firearm owner-
ship. This comparison shows that the gun density index is strongly related to an
external indicator with high face validity.

Together, these analyses support the argument that the gun density index
is a useful measure of firearm availability in large urban areas. Detroit is among
the largest U.S. cities, of course, so the index is suitable for the purposes of this
analysis.

### OTHER VARIABLES

Besides the gun density index, the model includes several other factors that may
influence homicide rates. In particular, there is consensus among researchers
that young people and nonwhites are overrepresented among both homicide
victims and homicide offenders. The proportion of Detroit's population that was
nonwhite and the proportion that was between the ages of 15 and 24 are thus
included to allow for variations in demographic composition.

Copyright © 2001. All Rights Reserved.

In addition, homicide rates may be affected by changes in the probability of punishment, although this possibility is somewhat more controversial (see, e.g., Nagin 1978). To take account of the deterrent effect of crime control activity, the model includes the homicide clearance rate lagged by one year.[8] The lagged clearance rate allows a mutual (but nonsimultaneous) relationship between sanction levels and homicides consistent with current research on deterrence (Pogue 1986; Phillips & Ray 1982).

Finally, Kleck (1984) suggests that any effect of gun density on homicides is transmitted through robbery. Kleck found that gun density increased robbery rates, which in turn produced higher rates of murder. Beyond this indirect effect, however, gun density and homicides were unrelated. The number of robberies per 100,000 residents is therefore included in the model to avoid confounding the direct effect of gun density with its indirect effect through robbery.

All of the explanatory variables except the gun density index are assumed to be exogenous to the model. However, McDowall and Loftin (1983; also see Young, McDowall & Loftin 1987) present evidence that violent crime rates strongly influenced the demand for handguns in Detroit. This finding suggests that gun density and homicide rates affect each other simultaneously, forming a mutually reinforcing loop. To allow for this nonrecursive relationship, the gun density index is specified to be an endogenous variable.

## Estimation

As a preliminary step in the analysis, all indicators were transformed to their natural logarithms.[9] The inferences drawn from the results, however, are very similar using either a linear or logarithmic functional form. Since Detroit's robbery rate was somewhat collinear with the other explanatory variables, two equations were estimated, one including the robbery rate and one excluding it.[10] Both equations were initially estimated using two-stage least squares. A variety of diagnostic criteria indicated that the errors of each equation followed weak first-order autoregressive processes,[11] and the final models were reestimated to allow for this autocorrelation.

The effects of the gun density index were estimated through a reduced-form equation that included the following variables: all the exogenous variables, all the exogenous variables lagged one year, the density index lagged one year, the homicide rate lagged one year, a constant, and a dummy variable for the period following the 1967 Detroit riot (1951-1967=0; 1968-1986=1). The lagged variables are necessary to achieve statistically consistent estimates in the presence of an autoregressive error term (Fair 1970).

Two assumptions are required to use the postriot variable as an instrument. Detroit's firearm density must have permanently increased in the riot's aftermath, and the riot must not have had a *lasting* impact on the city's homicide rate. McDowall and Loftin (1983, 1985) found that the riot sharply reduced confidence in collectively provided security in Detroit, stimulating a permanent increase in the demand for guns. There is no strong reason to believe, however, that the riot permanently affected Detroit's homicide rate.

Copyright © 2001. All Rights Reseved.

1090 / *Social Forces* 69:4, June 1991

TABLE 1:   Regression Equation for Homicides per 100,000 Detroit Residents, 1951-1986 (Excluding Robbery Rate)[a]

| Right-Hand Variable | Coefficient (b) | Standard Error (SE) | b/SE |
|---|---|---|---|
| Proportion of population aged 15-24 | 1.4989 | .3557 | 4.21* |
| Proportion of population nonwhite | .2817 | .1292 | 2.18* |
| Gun density index | 1.3071 | .2201 | 5.94* |
| Lagged homicide clearance rate | -.6319 | .1866 | -3.39* |
| Constant | 6.2447 | .6158 | 10.14* |

$\rho = -.3757$
$SEE^b = .1523$
$df = 31$

[a] All variables have been transformed to natural logarithms. Coefficients for the right-hand side variables were computed through a procedure combining two-stage least squares and estimated generalized least squares. The value of $\rho$ was estimated using maximum likelihood methods.
[b] Standard error of estimate
* $p < .05$, one-tailed test

That is, it is unlikely that any 1986 homicides, for example, were a direct consequence of the events of 1967.

The assumptions underlying use of the postriot variable appear to be plausible. However, like almost all identification restrictions in the social sciences, they cannot be logically justified beyond doubt. The extent to which the results depend on the postriot dummy will therefore be closely examined later in the article.

## Findings

Estimates of the models are presented in Table 1 (for the equation that excludes the robbery rate) and Table 2 (for the equation that includes it). The results in both tables are consistent with the argument that gun density influences homicides. Because of the log-transformations, the slopes may be interpreted approximately as the percentage change in the homicide rate expected from a 1% increase in the associated explanatory variable. Accordingly, the estimates show that each 1% increase in the gun density index is associated with an increase of more than 1% in homicides per 100,000.

Copyright © 2001. All Rights Reserved.

TABLE 2:   Regression Equation for Homicides per 100,000 Detroit Residents, 1951-1986 (Including Robbery Rate)[a]

| Right-Hand Variable | Coefficient (b) | Standard Error (SE) | b/SE |
|---|---|---|---|
| Proportion of population aged 15-24 | .7308 | .4279 | 1.71* |
| Proportion of population nonwhite | .1678 | .1224 | 1.37 |
| Gun density index | 1.1522 | .2023 | 5.70* |
| Lagged homicide clearance rate | -.3896 | .1897 | -2.05* |
| Robbery rate per 100,000 population | .2949 | .1080 | 2.73* |
| Constant | 2.8546 | 1.3645 | 2.09* |

$\rho$ = -.3821
SEE[b] = .1461
df = 30

[a]   All variables have been transformed to natural logarithms. Coefficients for the right-hand side variables were computed through a procedure combining two-stage least squares and estimated generalized least squares. The value of $\rho$ was estimated using maximum likelihood methods.
[b]   Standard error of estimate

*   $p < .05$, one-tailed test

The estimates indicate that changes in firearm availability altered the risk of homicide. The gun density index is measured from an arbitrary base, however, and the coefficients do not provide a sense of how much impact a *substantively plausible* change in gun density could have. One way to make the results more meaningful is to compare the homicide rate in 1986 with the rate expected if the 1986 gun density index equaled its value in some earlier year.

Detroit's 1986 homicide rate was 56.4 per 100,000 residents. Suppose that the gun density index were equal to its lowest value during the 1951-1986 period (which occurred in 1964). Further suppose that all other explanatory variables were held at their 1986 levels. In this case the 1986 homicide rate predicted from Table 1 would be 21.4 per 100,000 residents. This is only 38% of the actual rate for 1986 and represents a difference of 379 lives. Using more recent values, the predicted homicide rate would be only 96% as large if 1986 gun density were equal to 1980 gun density (a difference of 24 lives). It would be only 94% as large if 1986 gun density were equal to 1982 gun density (a difference of 37 lives).

Copyright © 2001. All Rights Reseved.

These differences are offered for purposes of illustration only, and they should be interpreted with caution. Disregarding other sources of error, the estimates are computed using the coefficients in Table 1. A different, though similar set of predictions would be obtained if the coefficients in Table 2 were used instead.

More important, despite the substantial effects, increases in gun density cannot completely account for Detroit's high murder rate. Detroit's 1986 homicide rate of 56.4 stands in stark contrast to the rate of 22.6 for all U.S. cities with populations of at least 500,000. Even if the gun density index in 1986 were equal to its value in 1980, Detroit would still be expected to have the highest homicide rate of any large city in the nation. Further, even if 1986 gun density were equal to 1980 gun density, the expected 1986 homicide rate would amount to a 45% increase over that in 1980. Murder rates grew explosively during the period studied, and this growth is due to factors other than the availability of firearms alone.

The results do suggest, however, that Detroit's homicide rate would be appreciably lower if gun density in the city could be reduced. Even a modest reduction, to levels that prevailed in the recent past, might result in a noticeable savings in lives. Although the availability of guns cannot explain the increase in Detroit homicides *entirely*, it appears to be a significant *part* of an explanation.

The effects of the other variables in the model are largely in accord with prior expectations. The homicide rate rose with increases in the proportions of the city's population that were young and nonwhite, and it fell with increases in the clearance ratio.[12] Further, the estimates in Table 2 show that higher robbery rates were accompanied by higher rates of murder. It is notable that despite moderately high collinearity, the gun density index still has a statistically significant effect on homicides even when the robbery rate is in the equation. As in Kleck's (1984) analysis, higher levels of robbery raise the risk of homicide. Contrary to Kleck, firearm availability also has a direct effect on Detroit homicides, independent of its influence through robbery rates.

## Sensitivity Analysis

### AN ALTERNATIVE MEASURE OF GUN DENSITY

Several additional analyses were conducted to examine the sensitivity of the results to changes in estimation methods and variable measurement. In the first analysis, the gun density index was replaced by the annual number of licenses issued (per 100,000 residents) to purchase handguns in Detroit.[13] There are two problems in using the license series as an indicator of firearm availability. First, it taps only *legal* handgun ownership and, as noted earlier, there is no solid evidence that the legal and illegal gun markets are strongly related. Second, each observation represents the number of *new* licenses issued in a given year; the series does not measure the *total* stock of legal handguns in the city.

Despite these weaknesses, the license series offers a method of assessing whether the results are heavily influenced by the construction of the gun density index. Although there is no evidence that levels of legal and illegal firearm ownership are highly correlated, there is also no evidence to the

Copyright © 2001. All Rights Reserved.

Case: 1:10-cv-04184 Document #: 170-1 Filed: 03/12/12 Page 33 of 81 PageID #:4967

contrary. Further, findings by Zimring (1976) suggest that firearms used for criminal purposes tend to have been recently acquired. If this is the case, homicides should be especially responsive to the number of new guns added to existing stocks. To the extent that licenses are positively related to the homicide rate, confidence is increased that the results of the main analysis are not an artifact of the way gun density is measured.

Equations substituting the license series for the gun density index are reported in the first two rows of Table 3. As is apparent from the estimates, the license series is much more collinear with the other variables than was the index. Even given the collinearity, however, increases in gun licenses are associated with large and statistically significant increases in the homicide rate.[14]

ALTERNATIVE ASSUMPTIONS ABOUT SIMULTANEITY

A second sensitivity analysis examined the dependence of the results on the use of the riot dummy variable as an instrument. In one set of models the riot dummy was replaced with an indicator of per capita income in Michigan.[15] Clotfelter (1981) and Kleck (1979) show that the demand for firearms increases with income, and Kleck (1979, 1984) employs median income as an instrument in his study of gun density and homicide rates in the United States. The use of per capita income thus follows past practice, except that Michigan's per capita income serves as a marker for its counterpart in Detroit.[16] Estimates of these models are presented in the third and fourth rows of Table 3, and the coefficients are extremely close to those in the main analysis.

In addition, two recursive models were estimated, dropping the assumption of *instantaneous* mutual causation. One model specified that gun density influenced homicides immediately (within one year) but that homicides affected the demand for firearms with a lag of one year or more. This model assumes that citizens modify their perceptions of risk only with some delay. The assumption has much in common with recent work in criminal deterrence, and a similar rationale (applied to offenders) was used to include the lagged clearance rate in the main analysis.

A second recursive model specified that homicide rates influenced gun density immediately and that gun density affected homicides with a lag of one year. This model does not have as much logical appeal as the first one, but it is an obvious alternative. Estimates for both models are contained in rows five through eight of Table 3. Again the results from these models are very similar to those in the main analysis.

In sum, almost identical results are produced under a variety of assumptions about the mutual relationship between firearm availability and homicides. Based on these estimates, the findings of the main analysis do not appear to be highly dependent on use of the postriot dummy as an instrumental variable.

ADDITIONAL VARIABLES

A third sensitivity analysis considered the possibility that the gun density index is confounded with omitted causes of the homicide rate. Of the covariates commonly employed in studies of homicide (see, e.g., Land, McCall & Cohen

Copyright © 2001. All Rights Reseved.

1094 / *Social Forces* 69:4, June 1991

TABLE 3: Supplementary Regression Equations for Homicides per 100,000 Detroit Residents, 1951-1986[a]

| Model | | Proportion of Population Aged 15-24 | Proportion of Population Nonwhite | Gun Density Index | Lagged Clearance Rate | Rob. Rate per 100,000 Population |
|---|---|---|---|---|---|---|
| 1[b] | b: | 1.3259 | .9194 | — | -.0868 | — |
| | SE: | .4242 | 1.5642 | | .3133 | |
| | b/SE: | 3.13* | .59 | | -.28 | |
| 2[b] | b: | 1.1061 | .1076 | — | -.0881 | .1135 |
| | SE: | .4215 | 1.2468 | | .2880 | .2021 |
| | b/SE: | 2.62* | .09 | | -.56 | .56 |
| 3[c] | b: | 1.5121 | .2878 | 1.2852 | -.6382 | — |
| | SE: | .3561 | .1294 | .2217 | .1868 | |
| | b/SE: | 4.25* | 2.22* | 5.80* | -3.42* | |
| 4[c] | b: | .7372 | .1697 | 1.1382 | -.3921 | — |
| | SE: | .4275 | .1223 | .2032 | .1897 | |
| | b/SE: | 1.72* | 1.39 | 5.60* | -3.61* | |
| 5[d] | b: | 1.6457 | .3107 | 1.1388 | -.6736 | — |
| | SE: | .3551 | .1292 | .2042 | .1865 | |
| | b/SE: | 4.63* | 2.41* | 5.58* | -3.61* | |
| 6[d] | b: | .8273 | .1839 | 1.0095 | -.4175 | .3054 |
| | SE: | .4283 | .1233 | .1885 | .1901 | .1081 |
| | b/SE: | 1.93* | 1.49 | 5.35* | -2.20* | 2.82* |
| 7[e] | b: | 1.9628 | .3307 | — | -.7112 | — |
| | SE: | .4071 | .1573 | | .1988 | |
| | b/SE: | 4.82* | 2.10* | | -3.58* | |
| 8[e] | b: | .9002 | .1418 | — | -.4041 | .3726 |
| | SE: | .4836 | .1491 | | .1976 | .1152 |
| | b/SE: | 1.86* | .95 | | -2.04* | 3.24* |
| 9[f] | b: | 1.3415 | -.2766 | 1.9255 | -.7007 | — |
| | SE: | .5377 | .4039 | .3389 | .1965 | |
| | b/SE: | 2.49* | -.68 | 5.68* | -3.57* | |
| 10[f] | b: | 1.5565 | -.2574 | 1.9244 | -.7815 | -.0607 |
| | SE: | .6376 | .4113 | .4548 | .2227 | .1669 |
| | b/SE: | 2.44* | -.63 | 4.23* | -3.51* | -.36 |

[a] All variables have been transformed to natural logarithms.
[b] Substitutes gun license series for gun density index. These estimates were computed using a procedure combining two-stage least squares and estimated generalized least squares. The value of ρ was estimated using maximum likelihood methods.
[c] Uses Michigan per capita income as an instrumental variable in place of Detroit riot dummy. These estimates were computed as in note a.
[d] Assumes that the relationship between gun density and the homicide rate is recursive and that the effects of gun density occur within one year. These estimates were computed using estimated generalized least squares, and the value of ρ was estimated using maximum likelihood methods.

Copyright © 2001. All Rights Reserved.

TABLE 3: Supplementary Regression Equations for Homicides (Continued)

| | Gun Lic. Issued per 100,000 Res. | Lagged Gun Density Index | Unempl. Rate | Infant Mortality Rate | Constant | ρ |
|---|---|---|---|---|---|---|
| 1[b] | .7951 .2986 2.66* | — | — | — | 2.1577 4.1675 -.52 | .7431 |
| 2[b] | .5253 .2397 2.19* | — | — | — | .0300 3.3257 .009 | .7284 |
| 3[c] | — | — | — | — | 6.2648 .6164 10.16* | -.3709 |
| 4[c] | — | — | — | — | 2.8529 1.3623 2.09* | -.3793 |
| 5[d] | — | — | — | — | 6.4727 .6172 10.49* | -.3331 |
| 6[d] | — | — | — | — | 2.9293 1.3686 2.14* | -.3477 |
| 7[e] | — | .9378 .1991 4.71* | — | — | 7.0157 .7096 9.89* | — |
| 8[e] | — | .8609 .1752 4.91* | — | — | 2.5611 1.5095 1.70* | — |
| 9[f] | — | — | .0152 .0827 .18 | .0075 .4381 .02 | 5.6544 .6611 8.55* | -.3733 |
| 10[f] | — | — | .0289 .0818 .35 | -.3570 .4412 -.63 | 6.4181 1.8810 3.41* | -.3914 |

[e] Assumes that the relationship between gun density and the homicide rate is recursive and that the effects of gun density occur with a lag of one year. Because diagnostic tests indicated that the errors from ordinary least squares estimation were not autocorrelated, these are ordinary least squares estimates.

[f] Includes the unemployment rate in the Detroit SMSA and the ratio of Detroit's infant mortality rate to the U.S. infant mortality rate as indicators of economic conditions. These estimates were computed as in note *a*. The series covers the years 1956-1986.

* $p < .05$, one-tailed test

Copyright © 2001. All Rights Reseved.

1990), the most plausible source of confounding appears to be economic hardship.[17] It is conceivable that firearm availability, poverty, and unemployment all share common causes. If so, omitting measures of economic hardship will produce statistically inconsistent estimates of the effect of the density index on the homicide rate.

Estimates of the civilian unemployment rate in the Detroit SMSA are available for the entire analysis period.[18] Direct measures of poverty are not available, and a proxy was constructed by dividing Detroit's infant mortality rate by the infant mortality rate for the U.S.[19] Equations including the poverty and unemployment variables are reported in the last two rows of Table 3.

As is commonly the case (see Land, McCall & Cohen 1990), the poverty measure is extremely collinear with the proportion of the city's population that was nonwhite. The effects of the poverty and proportion nonwhite variables are therefore statistically insignificant, and the signs of each tend to be negative. As is also a common finding (Land, McCall & Cohen 1990), the impact of the unemployment rate is statistically insignificant as well. The gun density index is not collinear with the hardship measures, however, and estimates of its effects do not differ substantially from those in the main analysis.

These results indicate that the influence of the density index on the homicide rate is not due to a correlation between firearm availability and economic hardship. The index may be confounded with other omitted determinants of homicide, of course, and this possibility clearly deserves further investigation. However, such an investigation would require additional theoretical development and a larger pool of indicators than is available here.

PARAMETER STABILITY

Finally, observations were deleted at the beginning and end of the series, and the basic models were estimated on these subsamples. This type of analysis is useful for determining whether the parameter estimates are unstable, as would be the case, for example, if multicollinearity was a problem (Maddala 1988:230-34). Because the series is relatively short, it did not seem reasonable to delete more than three observations at a time. The subsamples considered were thus 1951-1983, 1952-1984, 1953-1985, and 1954-1986. None of the estimates from these reduced samples provided evidence of instability.[20]

## Discussion and Conclusions

The motivation for this article was to test the hypothesis that firearm density is an important risk factor in determining homicide rates. The Detroit data are consistent with the hypothesis and fit a model in which increases in gun density resulted in higher rates of murder within the city. Beyond this basic conclusion, there are three issues that require further discussion.

First, the findings suggest that *if* the level of gun density could be reduced, homicide rates would fall. How a reduction in firearm density might be accomplished is by no means obvious, however. McDowall and Loftin (1983, 1985) argue that the demand for firearms in Detroit was due in part to increases in violent crime, and the models estimated in this article follow that assumption.

Copyright © 2001. All Rights Reserved.

An implication of the models is that homicides and gun density are mutually related, in the fashion of an arms race. Given concerns about personal security, it is not probable that citizens will voluntarily give up their access to guns; more likely, they will resist any effort at control. Gun control may in fact be least successful under the conditions where it would be most beneficial — that is, where levels of violence are already high.

Second, there are questions about errors of measurement in the gun density index used in the main analysis. The index assumes that firearm availability is a latent variable, responsible for any association between the gun suicide and gun robbery fractions. Gun density itself is never directly observed, and it is useful to consider the possibility that the index contains a substantial amount of invalidity (systematic error).[21]

There are two ways in which the analysis may be affected by invalidity. First, it is conceivable that the density index measures some factor other than the availability of guns. To be in accord with the results, this alternative factor would have to be strongly associated with the gun robbery fraction, the gun suicide fraction, and the homicide rate. Further, the factor would have to be correlated with Cook's (1979) measure of gun density and with survey data on firearm ownership. Although the existence of such a factor cannot be completely discounted, the simplest interpretation of the findings is that the index does measure firearm density, rather than some other construct.

It is also possible that the index measures variables *in addition* to gun density. If these additional variables are themselves related to homicides, estimates of the models will be statistically inconsistent. The possibility of a spurious component in the relationship between the index and the homicide rate cannot be eliminated with absolute confidence. However, an explanation based on spuriousness would have to be relatively complex, and therefore relatively unlikely.

A second way in which invalidity may influence the results is derived from Bordua's (1986) analysis. Bordua argues that firearms owned for *sporting* purposes are infrequently used in acts of violence against humans — such as in robberies, suicides, or homicides.[22] If this is true, there are at least two distinct *types* of gun density, each of which requires a different set of indicators. The density index does not directly measure the ownership of sporting firearms and, if Bordua is correct, the index will not allow estimates of the effect of *total* gun density on homicide rates. Given that levels of gun ownership for sport are unrelated to violence, however, the index will still consistently estimate the influence of *nonsporting* guns on homicides. Further, the high correlation between the index and survey estimates of total firearm ownership casts doubt on the idea that separate measures are necessary for sporting and nonsporting guns.

Overall, measurement bias does not appear to be a reasonable explanation of the observed relationships. Measurement issues nag, however, and they cannot be fully resolved with the available data.[23] Confidence in the results would surely be strengthened if the same conclusions could be reached using other indicators known to have different error properties.

Finally, there is the question of whether the findings can be generalized beyond Detroit, a city with a well-deserved reputation for criminal violence. An

Copyright © 2001. All Rights Reseved.

equivalent formulation of the question is: Are there features of Detroit that would confound the relationship between murder and firearm availability? No definitive answer is possible without replication in other settings. Nevertheless, there appears to be nothing about Detroit's criminal, social, or economic environment that would influence the association between firearm availability and homicide rates in a unique way. Detroit has high levels of gun availability and homicides, but there is no obvious reason to believe that the *relationship* between the variables is different in Detroit than in other cities.

The analysis in this article should be replicated, both in other areas and with other measures of gun density. Knowledge about gun use is very limited, and many problems are yet to be resolved. Notwithstanding the fact that questions remain, the results provide evidence that firearms make an important contribution to urban homicide rates.

## Notes

1. The term *objective dangerousness* is attributable to Cook (1984). Cook also provides a detailed description of the reasoning and evidence supporting the hypothesis.

2. Only recent studies are reviewed here. For useful discussions of earlier research, see Kleck (1984) or Wright, Rossi, and Daly (1983).

3. Kleck attributes the differences in his findings to changing patterns of gun ownership over the period. A high degree of multicollinearity, which is common in national time-series studies, could also account for the results.

4. Cook (1985) argues that his measure is useful only for cross-sectional research, and he recommends against its application to temporal data. Examining a panel of cities at three time points, Cook found that the lagged and contemporaneous values of his measure were strongly correlated. Because of this apparent stability, Cook concluded that the measure should not be used to study variation over time. High stability is common in the type of analysis Cook performed, however, and McDowall's (1986a) multivariate study found the measure to be much less stable than Cook's bivariate correlations would suggest. Moreover, although stability lowers the reliability of *change score* estimates (Kessler & Greenberg 1981:140-45), it has little bearing on the present analysis, which examines the *level* of gun density over time.

5. Homicide data were taken from the Detroit Police Department's *Annual Report* (1951-86). Excusable and justifiable homicides were excluded. Residential population by age and race (used to construct several variables in the analysis) was taken from the U.S. Bureau of the Census (1960, 1970, 1980). Intercensus estimates for 1951-1979 were computed using a modified component method. Population was aged using life tables, with deaths subtracted and births added. Migration was estimated by distributing an age category's yearly percentage change relative to the yearly percentage change in the Detroit School Census. Population estimates for 1981-1986 were obtained from the Detroit Health Department's *Data Book* (1981-1983) and from its unpublished memoranda (1984-1986).

6. Gun robberies and total robberies were taken from the Detroit Police Department's *Annual Report* (1951-1986). Gun suicides (by place of occurrence) for 1951-1961 and 1966-1986 were provided by David Foust of the epidemiology/biostatistics division of the Detroit Health Department. Data were unavailable for 1962-1965, so values were estimated. Total suicides (by place of occurrence) were provided by David Foust for 1951-1965 and 1984-1986. Values for 1966-1983 were taken from the Detroit Health Department's *Data Book* (1966-1983).

7. Although the census bureau distinguishes nine regions, some regions have few large cities. For this analysis, New England was combined with Mid-Atlantic, and Mountain was combined with Southwest Central.

8. Homicides cleared by arrest were taken from the Detroit Police Department's *Annual Report* (1951-1986). Clearances of excusable and justifiable homicides were excluded.

Copyright © 2001. All Rights Reserved.

9. The decision to perform this transformation was based on Box-Cox tests (see, e.g., Maddala 1988:177-80).

10. Collinearity was assessed by examining the variance inflation factors (VIFs) for the second-stage matrix of explanatory variables at the final iteration of the estimation process. None of the VIFs in the model that omitted the robbery rate approached 10, the cut-off value conventionally used to indicate collinearity problems (see, e.g., Madansky 1988:206). In the model that included the robbery rate, the largest VIF was 10.25.

11. Durbin-Watson and Box-Ljung statistics were computed on the residuals from each equation, and residual autocorrelograms were visually examined.

12. In Table 2, the coefficient for the nonwhite population variable is not large enough to be statistically significant. Table 2 includes the robbery rate, however, and as noted earlier, this indicator is relatively collinear with the other variables in the model.

13. The number of licenses to purchase handguns was taken from unpublished data provided by the records and statistics division of the Detroit Police Department.

14. In a more limited analysis, Fisher (1976) also reports a positive relationship between legally registered firearms and homicides in Detroit.

15. Income data for Detroit were not available. Estimates of per capita personal income for the Detroit SMSA and for Wayne County (which includes the city of Detroit and some of its suburbs) were available for 1959, 1965, and 1969-1986. Over this period the correlation between Michigan's per capita income and that of the Detroit SMSA was .99, and the correlation between Michigan's per capita income and that of Wayne County was .98.

16. Michigan's per capita personal income was taken from the U.S. Bureau of Economic Analysis (1984, Table 2) for 1951-1968, and from the U.S. Bureau of Economic Analysis (1987:43-55) for 1969-1986. The consumer price index for the Detroit area (U.S. Bureau of Labor Statistics 1989:487) was used to deflate the income estimates.

17. Note that economic hardship (measured, for example, by poverty and unemployment) is conceptually distinct from the level of real wealth measured by per capita income. Aggregate increases in wealth provide more discretionary income with which to buy guns, but higher levels of wealth bear no necessary relationship to the size of poor populations.

18. These estimates were obtained from unpublished data provided by the Michigan Employment Security Commission.

19. McDowall (1986b) discusses use of this indicator as a measure of relative poverty. The U.S. infant mortality rate was obtained from *Vital Statistics of the United States* (U.S. National Center for Health Statistics 1951-1986). Detroit's infant mortality rate for 1951-1977 and for 1984-1986 was provided by David Foust of the epidemiology/biostatistics division of the Detroit Health Department. For 1978-1983 the Detroit data were taken from the Detroit Health Department's *Data Book* (1978-1983).

20. These eight tables are available from the author. In addition, for the recursive versions of the model, equations based on the levels of the variables were compared with equations based on their first-differences. Plosser, Schwert, and White (1982) point out that estimates based on levels and first-differences will be equal (in the probability limit) if a model is correctly specified. A test proposed by them failed to reject the null hypothesis of equality between the two sets of estimates.

21. Unreliability (random error) is not likely to pose a major problem for the analysis. If the two components of the index are parallel measures, their correlation of .89 provides an estimate of the composite's reliability. If the two components do not satisfy the requirements of parallel measurement, their correlation is a lower bound on the reliability.

22. It is worth noting, however, that the sporting-oriented subculture discussed by Bordua is most common in rural areas (Lizotte, Bordua & White 1981), and rural homicide rates are relatively high (see, e.g., Wilkinson 1984).

23. Imperfect measurement is obviously not confined only to the gun density index. As in other criminological investigations, *all* of the variables are measured with error, and there is little information about the error structures.

Copyright © 2001. All Rights Reseved.

**1100 / *Social Forces*  69:4, June 1991**

**References**

Bordua, David J. 1986. "Firearms Ownership and Violent Crime: A Comparison of Illinois Counties." Pp. 156-88 in *The Social Ecology of Crime*, edited by James M. Byrne and Robert J. Sampson. Springer-Verlag.

Clotfelter, Charles T. 1981. "Crime, Disorders, and the Demand for Handguns: An Empirical Analysis." *Law and Policy Quarterly* 3:425-41.

Cook, Philip J. 1979. "The Effect of Gun Availability on Robbery and Robbery Murder: A Cross-Section Study of 50 Large Cities." Pp. 743-81 in *Policy Studies Review Annual*. Vol. 3, edited by Robert H. Haveman and B. Bruce Zellner. Sage.

____. 1984. "The Influence of Gun Availability on Violent Crime Patterns." Pp. 49-89 in *Crime and Justice: An Annual Review of Research*. Vol 4., edited by Michael Tonry and Norval Morris. University of Chicago Press.

____. 1985. "Report on a City-Specific Gun Prevalence Index." Unpublished manuscript, Institute of Policy Sciences and Public Affairs, Duke University.

Detroit Health Department. 1966-1983 (annual volumes). *Data Book*.

Detroit Police Department. 1951-1986 (annual volumes). *Annual Report*.

Fair, Ray C. 1970. "The Estimation of Simultaneous Equation Models with Lagged Endogenous Variables and First-Order Serially Correlated Errors." *Econometrica* 38:507-16.

Fisher, Joseph C. 1976. "Homicide in Detroit: The Role of Firearms." *Criminology* 14:387-400.

Kates, Don B., Jr. 1986. "The Battle over Gun Control." *The Public Interest* 84:42-52.

Kessler, Ronald C., and David F. Greenberg. 1981. *Linear Panel Analysis: Models of Quantitative Change*. Academic.

Kleck, Gary. 1979. "Capital Punishment, Gun Ownership, and Homicide." *American Journal of Sociology* 84:882-910.

____. 1984. "The Relationship Between Gun Ownership Levels and Rates of Violence in the United States." Pp. 99-132 in *Firearms and Violence: Issues of Public Policy*, edited by Don B. Kates. Ballinger.

____. 1988. "Crime Control Through the Private Use of Armed Force." *Social Problems* 35:1-21.

Land, Kenneth C., Patricia L. McCall, and Lawrence E. Cohen. 1990. "Structural Covariates of Homicide Rates: Are There Any Invariances Across Time and Social Space?" *American Journal of Sociology* 95:922-63.

Lester, David. 1986. "Availability of Guns and the Likelihood of Suicide." *Sociology and Social Research* 71:287-88.

Lizotte, Alan J., David J. Bordua, and Carolyn S. White. 1981. "Firearms Ownership for Sport and Protection: Two Not So Divergent Models." *American Sociological Review* 46:499-503.

Madansky, Albert. 1988. *Prescriptions for Working Statisticians*. Springer-Verlag.

Maddala, G.S. 1988. *Introduction to Econometrics*. Macmillan.

Markush, Robert E., and Alfred A. Bartolucci. 1984. "Firearms and Suicide in the United States." *American Journal of Public Health* 74:123-27.

McDowall, David. 1986a. "Gun Availability and Robbery Rates: A Panel Study of Large U.S. Cities, 1974-1978." *Law and Policy* 8:135-48.

____. 1986b. "Poverty and Homicide in Detroit, 1926-1978." *Violence and Victims* 1:23-34.

McDowall, David, and Colin Loftin. 1983. "Collective Security and the Demand for Legal Handguns." *American Journal of Sociology* 88:1146-61.

____. 1985. "Collective Security and Fatal Firearm Accidents." *Criminology* 23:401-16.

Copyright © 2001. All Rights Reserved.

Case: 1:10-cv-04184 Document #: 170-1 Filed: 03/12/12 Page 41 of 81 PageID #:4975

Medoff, Marshall H., and Joseph P. Magaddino. 1983. "Suicides and Firearm Control Laws." *Evaluation Review* 7:357-72.

Nagin, Daniel. 1978. "General Deterrence: A Review of the Empirical Literature." Pp. 95-139 in *Deterrence and Incapacitation: Estimating the Effects of Criminal Sanctions on Crime Rates*, edited by Alfred Blumstein, Jacqueline Cohen, and Daniel Nagin. National Academy of Sciences.

Newton, George D., Jr., and Franklin E. Zimring. 1969. *Firearms and Violence in American Life: A Staff Report Submitted to the National Commission on the Causes and Prevention of Violence*. National Commission on the Causes and Prevention of Violence.

Phillips, Llad, and Subhash Ray. 1982. "Evidence on the Identification and Causality Dispute About the Death Penalty." Pp. 313-40 in *Applied Time Series Analysis*, edited by O.D. Anderson and M. Perryman. North-Holland.

Plosser, Charles I., G. William Schwert, and Halbert White. 1982. "Differencing As a Test of Specification." *International Economic Review* 23:535-52.

Pogue, Thomas F. 1986. "Offender Expectations and Identification of Crime Supply Functions." *Evaluation Review* 10:455-82.

U.S. Bureau of the Census. 1960. *Census of Population*. U.S. Government Printing Office.

____. 1970. *Census of Population*. U.S. Government Printing Office.

____. 1980. *Census of Population*. U.S. Government Printing Office.

U.S. Bureau of Economic Analysis. 1984. *State Personal Income: Estimates for 1929-82 and a Statement of Sources and Methods*. U.S. Department of Commerce.

____. 1987. "State Personal Income, 1969-1986: Revised Estimates." *Survey of Current Business* 67:43-45.

U.S. Bureau of Labor Statistics. 1989. *Handbook of Labor Statistics*. U.S. Government Printing Office.

U.S. National Center for Health Statistics. 1951-1986 (annual volumes). *Vital Statistics of the United States*. Vols. 1 and 2. U.S. Government Printing Office.

Wilkinson, Kenneth P. 1984. "A Research Note on Homicide and Rurality." *Social Forces* 63:445-52.

Wright, James D., Peter H. Rossi, and Kathleen Daly, with Eleanor Weber-Burdin. 1983. *Under the Gun: Weapons, Crime, and Violence in America*. Aldine.

Young, Robert L., David McDowall, and Colin Loftin. 1987. "Collective Security and the Ownership of Firearms for Protection." *Criminology* 25:101-16.

Zimring, Franklin E. 1968. "Is Gun Control Likely to Reduce Violent Killings?" *University of Chicago Law Review* 35:721-37.

____. 1976. "Street Crimes and New Guns: Some Implications for Firearms Control." *Journal of Criminal Justice* 4:95-107.

Zimring, Franklin E., and Gordon Hawkins. 1987. *The Citizen's Guide to Gun Control*. Macmillan.

Copyright © 2001. All Rights Reseved.

Copyright of Social Forces is the property of University of North Carolina Press and its content may not be copied or emailed to multiple sites or posted to a listserv without the copyright holder's express written permission. However, users may print, download, or email articles for individual use.

# Exhibit 81

# More Guns, More Crime

## Mark Duggan

*University of Chicago and National Bureau of Economic Research*

This paper examines the relationship between gun ownership and crime. Previous research has suffered from a lack of reliable data on gun ownership. I exploit a unique data set to reliably estimate annual rates of gun ownership at both the state and the county levels during the past two decades. My findings demonstrate that changes in gun ownership are significantly positively related to changes in the homicide rate, with this relationship driven almost entirely by an impact of gun ownership on murders in which a gun is used. The effect of gun ownership on all other crime categories is much less marked. Recent reductions in the fraction of households owning a gun can explain one-third of the differential decline in gun homicides relative to nongun homicides since 1993.

## I.  Introduction

Do changes in gun ownership influence the crime rate? Although guns are involved in nearly 70 percent of all homicides and a substantial share of other violent crimes, the direction of this relationship is theoretically ambiguous. For example, if guns increase the likelihood that any particular dispute will result in an individual's death, then increases

I am grateful to David Autor, Arnold Barnett, Gary Becker, Judith Chevalier, David Cutler, John Donohue, Martin Feldstein, Maitreesh Ghatak, Edward Glaeser, Austan Goolsbee, Michael Greenstone, Lawrence Katz, John Lott, Jens Ludwig, Bill Lynk, Michael Maltz, Jeff Milyo, Michael Moore, Casey Mulligan, Sam Peltzman, Sherwin Rosen, Allen Sanderson, Andrei Shleifer, two anonymous referees, Steven Levitt, and seminar participants at the American Bar Foundation, Berkeley, Massachusetts Institute of Technology, Northwestern, and the University of Chicago for many helpful comments. Thanks also to Russell Badowski, Hung-Lin Chen, and Tasha Espinoza for outstanding research assistance. Financial support from the Alfred P. Sloan Foundation is gratefully acknowledged. All viewpoints expressed in this paper are solely my own and do not reflect those of any of the individuals or institutions mentioned above. I bear full responsibility for any errors.

[*Journal of Political Economy*, 2001, vol. 109, no. 5]
© 2001 by The University of Chicago. All rights reserved. 0022-3808/2001/10905-0006$02.50

CITY 000740

in gun ownership will serve to increase the number of homicides. Alternatively, if criminals are deterred from committing crimes when potential victims are more likely to possess a firearm, then more gun ownership may lead to a reduction in criminal activity.

Until recently, empirical work that attempted to answer this question typically took one of two approaches. In the first, researchers estimated the effect that changes in the total stock of guns in the United States had on the nation's crime rate (Kleck 1984; Magaddino and Medoff 1984). A more developed branch of studies estimated the level of gun ownership in a region, state, or city and then explored whether crime and gun ownership were significantly related (Cook 1982; Kleck and Patterson 1993). The results of these studies were mixed, with some implying that guns increased the amount of criminal activity and others finding the opposite.

Both types of studies had important limitations. The time-series analyses that used annual, national-level data were limited because of the small number of observations that could be used for estimating the relationship between gun ownership and crime. Furthermore, the level of aggregation prevented researchers from examining whether the relationship held within smaller geographic areas, or whether instead gun ownership was changing in one region of the country while criminal activity was changing in another. The cross-sectional studies had two weaknesses. First, because reliable data on gun ownership were available at only the national level, researchers constructed proxies, such as the fraction of crimes committed with a gun, to estimate the level of gun ownership in an area. It is not clear, however, if these proxies accurately captured differences in gun ownership across areas. More important, any significant statistical relationship between guns and crime could have been driven by reverse causation or omitted variables.

The main impediment to applied work in this area was the absence of a reliable measure of gun ownership that could be measured across geographic areas over time. In this paper I propose a new way to measure gun ownership at both the state and county levels on an annual basis. Specifically, I argue that state- and county-level sales data for one of the nation's largest gun magazines, *Guns & Ammo*, provide a much more accurate way to measure both the level and the change in gun ownership within an area.

I use several methods to test the validity of this new proxy variable. First, I show that sales rates of gun magazines are significantly higher in counties with average individual-level characteristics similar to those of the average gun owner. Second, I use death data from the National Center for Health Statistics (NCHS) to show that there is approximately a one-for-one relationship between sales rates and the death rate from gun accidents. Third, using gun show data from publications of the

National Rifle Association (NRA), I show that the number of gun shows per capita is significantly positively related to the sales rate of this magazine. Fourth, using annual state-level data on NRA membership, I demonstrate that sales of *Guns & Ammo* are significantly positively related to the level of and changes in NRA membership rates. And finally, I use data from the General Social Survey (GSS) to show that state-level estimates of gun ownership are significantly positively related to sales rates of gun magazines and that this proxy also captures variation within a state over time in rates of gun ownership. While none of these tests individually proves that this magazine is a sufficiently accurate proxy variable, taken together they suggest that this panel data set represents the richest one ever assembled for measuring gun ownership.

Having demonstrated the validity of this proxy variable, I next use these data to examine the dynamic relationship between gun ownership and crime. My findings reveal that changes in homicide and gun ownership are significantly positively related. This relationship is almost entirely driven by the relationship between lagged changes in gun ownership and current changes in homicide, suggesting that the relationship is not driven simply by individuals' purchase of guns in response to increases in criminal activity.

One possible explanation for this finding, however, is that individuals purchase guns in response to expected future increases in crime. My finding that lagged changes in gun ownership are strongly positively related to changes in gun homicide rates, but bear no corresponding relationship with nongun homicide rates, does not support this hypothesis. Instead, it suggests that an increase in the number of guns leads to a substantial increase in the number of homicides. The relationship with all other crime categories is much less marked, implying that firearms increase criminal activity primarily through their impact on homicides.

These findings contradict the results from recent work suggesting that legislation allowing individuals to carry concealed weapons (CCW) caused a significant decline in violent crime (Lott and Mustard 1997). I therefore use the magazine sales data to revisit in greater detail the impact of state CCW laws on crime rates. Theoretically, CCW legislation could have reduced the crime rate by increasing the likelihood that potential victims would be carrying a firearm. This could change if (1) the fraction of individuals owning a gun increased or (2) the frequency with which existing owners carried their guns increased.

Using the magazine sales data, I first examine whether the passage of CCW laws led to increases in the rate of gun ownership and find no evidence of such a pattern. I then investigate whether criminals were deterred from committing crimes because of a perception that the existing set of gun owners would carry their guns with them more fre-

CITY 000742

quently. I find no evidence that counties with above-average rates of gun ownership within CCW states experienced larger declines in crime than low-ownership counties did, suggesting either that gun owners did not increase the frequency with which they carried their guns or that criminals were not deterred by the greater likelihood that their victims would be armed. These findings weaken the claim that CCW legislation could plausibly have reduced violent crime rates. Consistent with this, robustness tests of the Lott-Mustard results demonstrate that their central results are inaccurate.

From 1993 to 1998, the number of gun homicides declined by 36 percent, whereas the number of nongun homicides declined by only 18 percent. During that same time period, national survey estimates suggest that the share of households with at least one gun fell by more than 17 percent. My point estimates imply that this decline in gun ownership can explain approximately one-third of the differential decline in gun homicides during this time period, with the largest declines occurring in areas with the largest reductions in ownership of firearms. Whether this decline in gun ownership also partially explains the substantial decline in the number of gun suicides during this same time period is an important topic for future research.[1]

## II.   Do Sales of *Guns & Ammo* Accurately Estimate Gun Ownership?

*Guns & Ammo* is the nation's fourth largest firearms magazine. Approximately 600,000 copies were sold in 1998, with almost 90 percent of these sales resulting from subscriptions and the remainder sold as single copies. In contrast to the three gun magazines with greater circulation (*American Rifleman, American Hunter,* and *North American Hunter*), sales data for this magazine are available annually at both the state and the county levels. More important, *Guns & Ammo* is focused relatively more on handguns than these other three magazines. Because handguns are the weapon of choice in the vast majority of firearms-related crimes and are more likely to be purchased for self-defense purposes than rifles or shotguns, this magazine is a more appropriate one for analyzing the dynamic relationship between crime and gun ownership.

In this section, I first examine whether sales rates of gun magazines are significantly higher in counties with average individual-level characteristics similar to those of the typical gun owner. Recent work by Glaeser and Glendon (1998) uses data from the annual GSS to deter-

[1] After reaching a peak of 18,964 in 1993, the number of gun suicides fell in each of the next five years and stood at 17,424 in 1998. During that same time period, the number of nongun suicides actually increased (although by a smaller amount) from 12,200 to 13,151.

TABLE 1
DETERMINANTS OF GUN MAGAZINE SALES AT THE COUNTY LEVEL

| VARIABLE | Log($Guns\ \&\ Ammo$ Sales in 1990 per 1,000 Residents) ($N=492$) | | |
|---|---|---|---|
| | (1) | (2) | (3) |
| % college grads$_{90}$ | -1.39*** (.27) | -1.66*** (.24) | -2.06*** (.32) |
| % no high school diploma$_{90}$ | -1.95*** (.25) | -1.88*** (.23) | -1.39*** (.27) |
| Log(income per capita$_{90}$) | .205** (.080) | .313*** (.079) | .356*** (.116) |
| % rural$_{90}$ | .249*** (.059) | .160*** (.056) | .216*** (.055) |
| % white$_{90}$ | .396*** (.101) | .364*** (.101) | .008 (.123) |
| % males$_{81}$ | 5.18*** (1.08) | 5.07*** (1.05) | 3.20*** (1.17) |
| % aged 0–17$_{90}$ | | | -2.45*** (.55) |
| % aged 65+$_{90}$ | | | -1.67*** (.50) |
| % poor$_{90}$ | | | -.446 (.427) |
| Population density$_{90}$ | | | -.0198*** (.0028) |
| Midwest | .049* (.028) | | |
| South | .162*** (.028) | | |
| West | .267*** (.034) | | |
| State fixed effects? | no | yes | yes |
| $R^2$ | .548 | .747 | .780 |

NOTE.—The dependent variable is the log of the sales rate of *Guns & Ammo* per 1,000 residents. The data set consists of all counties in the United States in 1990 with a population of 100,000 or more. All other counties are collapsed into "rest of state" observations. County-level demographic and economic indicators are obtained from the 1990 Census. Standard errors are included in parentheses.
* Significant at the 10 percent level.
** Significant at the 5 percent level.
*** Significant at the 1 percent level.

mine which types of individuals are most likely to own guns. Their findings reveal that people living in western and southern states are significantly more likely to own one or more guns than midwesterners, with people from eastern states being the least likely. The authors also find that high school dropouts and college graduates are relatively unlikely to own a firearm and that white males living in rural areas are the most likely to own a gun. Finally, when they control for an individual's educational attainment, the authors demonstrate that the probability of gun ownership is increasing with the person's income.

The county-level regression results presented in table 1 suggest that the readers of this magazine are quite similar to typical gun owners.

CITY 000744

These regressions explain the log of the sales rate for *Guns & Ammo* at the county level in 1990.[2] Consistent with the findings of Glaeser and Glendon, column 1 reveals that counties with more high school dropouts or college graduates have significantly lower sales rates than other areas. The coefficient estimates on the region dummies demonstrate that counties in the West or South have much higher sales rates than counties in the East or Midwest. Rural counties with relatively many white males also have more per capita sales of gun magazines than other areas, and average income is significantly positively related to sales of this magazine.

In column 2, I include state fixed effects in the regression and find that the estimates from the first specification are largely unchanged. This suggests that the proxy variable is not simply picking up variation across states in gun ownership but that there is substantial within-state variation as well. In column 3, I include additional explanatory variables in the regression and find that densely populated counties and those with relatively many children or elderly individuals have lower rates of gun ownership. This first set of regressions suggests that the observable characteristics of those individuals who purchase this magazine are quite consistent with those of gun owners, implying that sales rates of *Guns & Ammo* accurately proxy for the rate of gun ownership in an area.[3]

The next set of regressions summarized in table 2 provides further support for the accuracy of this proxy. In places with higher rates of gun ownership, one would expect to find more sales of firearms. While state-level data on gun sales are unavailable, the first specification utilizes data on the location of gun shows[4] in the United States to examine whether states with high sales rates of *Guns & Ammo* have relatively more gun shows (and presumably more gun sales) per person. The significant coefficient estimate of .995 implies that a 10 percent increase in the magazine's sales rate is associated with a 10 percent increase in the number of gun shows per capita.

---

[2] The 444 counties with a population of 100,000 or more in 1990 are included in the regression, with all other counties combined into a "rest of state" category. While these 444 counties account for only 14 percent of the 3,142 counties, approximately 75 percent of the U.S. population resides in one of these counties.

[3] Cook (1987) uses the fraction of robberies committed with a gun to proxy for the rate of gun ownership in 44 U.S. cities. While this may be an accurate proxy at the city level, the sales rate of *Guns & Ammo* appears to be a significantly better measure overall. The correlation between this magazine's state-level sales rate and the estimated ownership from the GSS is significantly positive at .61, whereas the correlation is only .09 (and statistically insignificant) between the fraction of robberies committed with a gun and the GSS estimates.

[4] These data are obtained from the NRA's publication *American Rifleman*. Eight states had no gun shows reported in 1996. Including these states in the regression by replacing the dependent variable with log (0.1/pop) leads to a slightly greater and more significant coefficient estimate.

CITY 000745

TABLE 2

RELATIONSHIP OF GUN MAGAZINE SALES WITH GUN SHOWS, GUN ACCIDENTS, AND GUN SUICIDES

|  | Log(Gun Shows) (1) | Log(Gun Accidents) (2) | Log(Gun Suicides) (3) | Log(Nongun Suicides) (4) |
|---|---|---|---|---|
| Log(*Guns & Ammo*) | .995*** | 1.183*** | 1.437*** | .044 |
|  | (.363) | (.370) | (.169) | (.128) |
| $R^2$ | .155 | .179 | .595 | .002 |
| Observations | 43 | 50 | 51 | 51 |

NOTE.—The dependent variable in the first specification is the log of the number of gun shows per state resident in 1996. The next three dependent variables are the log of the 1996 state-level death rate from gun accidents, gun suicides, and nongun suicides, respectively. Regressions are weighted by state population. Standard errors are included in parentheses.
*** Significant at the 1 percent level.

Columns 2–4 use state-level data from the NCHS on the underlying cause of all deaths in the United States in 1996. The second specification shows that there are significantly more deaths (per capita) from gun accidents in those states with higher sales rates of gun magazines and that there is again an elasticity of approximately one. The third and fourth specifications show that gun suicide rates are significantly greater in states with relatively high sales rates of gun magazines; there is no corresponding relationship between estimated rates of gun ownership and nongun suicides. Previous work has used the fraction of suicides that are committed with a gun as a proxy for gun ownership (Cook and Moore 1995), and this pair of regressions demonstrates that this fraction is significantly higher in places with more gun ownership.[5]

The results of the first two specifications displayed in table 3 use state-level data for 1982–98[6] on membership in the NRA to investigate its relationship with *Guns & Ammo* sales. The significant coefficient estimate of .807 in the first specification shows that states with more NRA members per capita have significantly higher sales rates for this magazine. The second specification uses annual state-level data and includes both year and state fixed effects. The significant estimate of .389 implies that, within a state, rates of NRA membership are significantly positively

[5] Codes from the international classification of diseases (ICD9) for gun suicides, suicides, and gun accidents begin with 9550–54, 95, and 922, respectively. The findings of Sloan et al. (1990) and Kellermann et al. (1992) suggest that gun ownership leads to more suicides because of the relatively high success rate for this method. Whether their findings are due to a true causal effect or are instead driven by unobserved differences in the propensity to commit suicide by gun and nongun owners is unclear.

[6] This paper focuses on the 1980–98 time period, but NRA data are unavailable before 1982. To calculate membership, I use data from the Audit Bureau of Circulations and calculate the sum of magazine subscriptions for *American Rifleman* and *American Hunter* (and *American Guardian* beginning in 1998). Each member of the NRA receives a subscription to one of these magazines, and the magazine is not sold on the newsstand. Only NRA members can subscribe.

CITY 000746

TABLE 3
RELATIONSHIP OF GUN MAGAZINE SALES WITH NRA MEMBERSHIP AND GSS GUN
OWNERSHIP

|  | Log(NRA Membership) | | Log(GSS Ownership) | |
|---|---|---|---|---|
|  | (1) | (2) | (3) | (4) |
| Log(*Guns & Ammo*) | .807*** | .389*** | .975*** | .354*** |
|  | (.152) | (.022) | (.188) | (.114) |
| $R^2$ | .431 | .967 | .384 | .712 |
| Observations | 51 | 867 | 45 | 488 |
| Year fixed effects? |  | yes |  | yes |
| State fixed effects? |  | yes |  | yes |

NOTE.—The dependent variable in the first specification is the log of the average NRA membership rate (per 1,000 state residents) from 1982 to 1998. The dependent variable in col. 2 is the log of the NRA membership rate, with annual state-level observations from 1982 to 1998. The dependent variable in the third specification is the log of the fraction of 1980–98 GSS respondents within a state who claim to own at least one gun. Only 45 states are included because GSS data are not available for six of the smaller states. The dependent variable in the fourth specification contains annual state-level observations for the same variable. There were 18,755 respondents to the question during the 1980–98 surveys. Regressions 1 and 2 are weighted by the state population and regressions 3 and 4 are weighted by the number of GSS survey respondents within each state. Standard errors are included in parentheses.
   *** Significant at the 1 percent level.

related with magazine sales rates, providing additional evidence that this proxy is a good measure both of the level and of the change in gun ownership within an area.

   In the last two specifications I use data from the GSS to provide a final test of the validity of this proxy. In many of the GSS surveys, respondents are asked whether they own a gun. I use data from the 1980–98 surveys to examine whether states with more reported gun ownership have higher sales rates for this gun magazine during the same time period.[7] In column 3 of table 3, I use all the GSS survey data and find that states with higher average rates of gun ownership during this time period have significantly more magazines sold per state resident. The significant coefficient estimate suggests an approximate one-for-one relationship between the reported rate of gun ownership and the sales rate for this magazine. The specification summarized in column 4 uses annual state-level data and includes both state and year fixed effects. The significantly positive estimate of .354 suggests that this magazine's sales are a valid measure both of the level and of the change in gun ownership within an area. It is worth noting that the *Guns & Ammo* sales rate does not explain all of the variation in specification 4, presumably because the sample size within each state-year cell of the GSS

   [7] It is worth noting that the GSS was designed to be nationally representative, and therefore the samples from any individual state will not necessarily be a representative sample of state residents. Furthermore, the number of respondents for the average state in a typical year is only 38. Small sample sizes, coupled with the potential nonrepresentativeness of respondents, have prevented researchers from using GSS data to reliably estimate the dynamic relationship between gun ownership and crime. In the absence of a better source of survey data, I nevertheless use the GSS to provide one final test of the validity of my proxy.

CITY 000747

is small and because the magazine sales rate is an imperfect proxy for the rate of gun ownership.

Taken together, the results in this section strongly suggest that this panel data set of *Guns & Ammo* sales rates provides a much richer set of information about gun ownership than any that has previously been assembled. One potential concern, however, is that very few readers of this magazine may be criminals. Even if only law-abiding citizens read this magazine, nearly 500,000 guns are stolen annually, suggesting that increases in gun ownership among law-abiding citizens will increase the availability of firearms for criminals. Additionally, many criminals purchase their firearms on the secondhand market, which is much less regulated than the market for new guns from federally licensed dealers. Evidence from the Bureau of Alcohol, Tobacco, and Firearms reveals that a substantial share of the transactions at gun shows involve at least one previously convicted criminal (Handgun Control Inc. 1999). Thus the ease with which criminals can acquire their guns is bound to be much greater in those places with the most gun ownership among law-abiding citizens.

## III. The Relationship between Crime and Gun Ownership

Because firearms are used in a significant fraction of all violent crimes, but are also frequently used for self-defense purposes, changes in the number of guns within an area could have an important impact on the level and average seriousness of criminal activity. Kleck (1991) and Kleck and Patterson (1993) argue that, because guns are used frequently in self-defense, they act as an effective deterrent to criminal activity. Thus increases in gun ownership reduce the crime rate,[8] suggesting that there may be positive externalities associated with gun ownership. As the fraction of individuals owning a firearm increases, the expected punishment from committing a crime may also increase.[9]

Findings to the contrary claim that a greater availability of firearms will lead to more crime, either by increasing the likelihood that any crime will result in a victim's death (Zimring 1972; Cook 1979) or by increasing the probability that a domestic dispute will result in the death

---

[8] Estimates regarding the frequency with which gun owners successfully defend themselves from criminals vary widely. Data from the National Crime Victimization Survey suggest approximately 75,000 cases of self-defense annually, amounting to approximately 2 percent of all violent crimes (McDowall, Loftin, and Wiersema 1992). Using the same data, Cook (1991) finds that only 3 percent of victims successfully used a gun against a criminal who intruded while they were home. Kleck's (1991) and Kleck and Patterson's (1993) estimates, at more than one million, are greater by an order of magnitude.

[9] Becker (1968) develops a model in which criminal behavior is substantially affected by the expected costs of committing a crime. Positive externalities have been found for other types of victim protection (Ayres and Levitt 1998).

CITY  000748

of one or more individuals (Kellermann et al. 1992). Donohue and Levitt (1998) develop a model in which firearms may reduce the predictability of the outcomes of fights and consequently increase the number of violent confrontations that occur.

Much of the previous empirical work that examined this issue used cross-sectional estimates of gun ownership. These studies were unable to control for unobserved differences across areas that could plausibly affect both gun ownership and crime, and the estimates were typically quite sensitive to precisely which control variables were included in the regressions. Furthermore, any significant relationship could have been driven by a causal effect of guns on crime or the reverse.[10] In this section I build on previous work by exploiting nearly 20 years of both state- and county-level sales data of gun magazines to explore the dynamic relationship between gun ownership and crime.

### A.   The Relationship between Changes in Homicide and Gun Ownership

I first use the annual, state-level sales data from gun magazines described above to investigate whether changes in gun ownership are positively related to changes in homicide rates by running specifications of the following form:

$$\Delta \log (\text{homicides}_{it}) = \alpha + \beta \Delta \log (\text{guns}_{it}) + \rho \Delta X_{it} + \lambda_t + \mu_i + \epsilon_{it} \quad (1)$$

In this regression $\text{guns}_{it}$ equals the gun magazine's sales rate in state $i$ during year $t$. I obtain homicide data from two different sources: the Federal Bureau of Investigation (FBI) and the NCHS. The NCHS data are a more accurate source of homicide data since 5–8 percent of homicides are not reported in the FBI state-level data each year. The variables $X_{it}$ include control variables for the log of per capita personal income, the unemployment rate, and the fraction of state residents that are between the ages of 18 and 24. Throughout this section, the measures of crime and gun ownership are defined in per capita terms, and summary statistics for these variables are included in column 1 of table 7 below.

The coefficient estimates presented in table 4 demonstrate that changes in state-level homicide rates are significantly positively related to changes in gun ownership. The first three specifications use FBI homicide data when calculating the left-hand-side variable, and the latter

---

[10] Using instrumental variables, Kleck and Patterson (1993) use cross-sectional data to estimate this relationship. To be valid, these instruments must be related to crime only through their relationship with gun ownership. Their instruments, which include city-level gun control laws, are likely to respond to criminal activity and thus fail to meet this test.

CITY  000749

TABLE 4
RELATIONSHIP BETWEEN CHANGES IN THE HOMICIDE RATE AND CHANGES IN GUN
OWNERSHIP

| | $\Delta$Log(FBI Homicides$_{it}$) | | | $\Delta$Log(NCHS Homicides$_{it}$) | | |
|---|---|---|---|---|---|---|
| | (1) | (2) | (3) | (4) | (5) | (6) |
| $\Delta$log(guns$_{it}$) | .226*** | .187** | .194** | .226*** | .191** | .178** |
| | (.079) | (.083) | (.085) | (.072) | (.077) | (.078) |
| State trend dummies? | no | yes | yes | no | yes | yes |
| $R^2$ | .159 | .173 | .174 | .222 | .237 | .240 |

NOTE.—The dependent variable in specifications 1–3, $\Delta$log(FBI homicides$_{it}$), is the change in the log of the state-level homicide rate as reported to the FBI. The dependent variable in specifications 4–6, $\Delta$log(NCHS homicides$_{it}$), is equal to the change in the log of the state-level homicide rate using data from the National Center for Health Statistics. The variable $\Delta$log(guns$_{it}$) equals the change in the log of the state-level sales rate of gun magazines. The sample includes state-year observations for 1980–98. The number of observations is 918 in all regressions. Each regression includes year fixed effects and is weighted by state population. White standard errors are in parentheses.
** Significant at the 5 percent level.
*** Significant at the 1 percent level.

three employ the corresponding data from the NCHS.[11] The coefficient estimates are not significantly affected by the inclusion of state trend dummies or by state-level economic and demographic controls, as the second and third specifications reveal. The coefficient estimates suggest that a 10 percent increase in the rate of gun ownership is associated with approximately a 2 percent increase in the homicide rate.

This finding is consistent with the theory that increases in gun ownership lead to a rise in criminal activity but also supports the hypothesis that an increase in crime leads more individuals to purchase a gun for self-defense purposes. The set of regressions summarized in table 5 aims to differentiate between these alternative stories by examining whether lagged increases in gun ownership are associated with increases in crime or whether the opposite is true. Columns 1–4 summarize the results from specifications of the following form:

$$\Delta \log (homicides_{it}) = \alpha + \sum_{\tau=1}^{2} \beta_\tau \Delta \log (guns_{i,t-\tau})$$

$$+ \sum_{\tau=1}^{2} \gamma_\tau \Delta \log (homicides_{i,t-\tau})$$

$$+ \rho \Delta X_{it} + \lambda_t + \mu_i + \epsilon_{it} \qquad (2)$$

The coefficient estimate on $\Delta$log(guns$_{i,t-1}$) in column 1 implies that a 10 percent increase in gun ownership in the current year is associated with a 2.14 percent increase in the homicide rate in the following year. The significantly negative estimate of $-.356$ on the $\Delta$log(FBI

[11] Like the suicide data used above, the NCHS homicide data are tabulated from death certificates. The NCHS homicides include those with an ICD9 code beginning in 96 and therefore exclude deaths from legal executions or other legal interventions.

CITY 000750

TABLE 5
STATE-LEVEL ESTIMATES OF THE RELATIONSHIP BETWEEN CHANGES IN RATES OF HOMICIDE AND GUN OWNERSHIP

| | $\Delta$Log(FBI Homicides$_{st}$) | | | | $\Delta$Log(Guns$_{st}$) | | | |
|---|---|---|---|---|---|---|---|---|
| | (1) | (2) | (3) | (4) | (5) | (6) | (7) | (8) |
| $\Delta$log(guns$_{s,t-1}$) | .214** | .210** | .180* | .190* | .100* | .102* | .082 | .011 |
| | (.099) | (.100) | (.103) | (.103) | (.054) | (.054) | (.050) | (.050) |
| $\Delta$log(guns$_{s,t-4}$) | | .245** | .210** | .214** | | .134*** | .080*** | .070** |
| | | (.092) | (.094) | (.095) | | (.038) | (.035) | (.034) |
| $\Delta$log(FBI homicides$_{s,t-1}$) | −.356*** | −.386*** | −.428*** | −.427*** | .013 | .025** | .019* | .019* |
| | (.050) | (.050) | (.049) | (.050) | (.010) | (.011) | (.011) | (.011) |
| $\Delta$log(FBI homicides$_{s,t-4}$) | | −.065* | −.102*** | −.102** | | .032*** | .027*** | .029** |
| | | (.048) | (.050) | (.050) | | (.012) | (.012) | (.012) |
| $\Delta$log(per capita income$_{st}$) | | | | −.276 | | | | .694*** |
| | | | | (.390) | | | | (.134) |
| $\Delta$unemployment rate$_{st}$ | | | | −.300 | | | | .588** |
| | | | | (.749) | | | | (.276) |
| $\Delta$% aged 18–24$_{st}$ | | | | −.673 | | | | 1.946 |
| | | | | (3.957) | | | | (1.788) |
| State trend dummies? | no | no | yes | yes | no | no | yes | yes |
| $R^2$ | .270 | .281 | .317 | .317 | .500 | .628 | .661 | .677 |

NOTE.—The dependent variable in specifications 1–4, $\Delta$log(FBI homicides$_{st}$), is the change in the log of the state-level homicide rate (from FBI data). The dependent variable in specifications 5–8, $\Delta$log(guns$_{st}$), is equal to the change in the log of the state-level rate of gun magazines. The sample includes state-year observations for 1980–98. The number of observations is 816 in all regressions except 1 and 5, which have 867 each. Each regression includes year fixed effects and is weighted by state population. White standard errors are in parentheses.
* Significant at the 10 percent level.
** Significant at the 5 percent level.
*** Significant at the 1 percent level.

CITY 000751

homicides$_{i,t-1}$) coefficient demonstrates that there is substantial regression to the mean in state-level homicide rates. Results from the second specification show that this relationship between lagged changes in gun ownership and current changes in the homicide rate continues into the subsequent year as well. To control for differences in homicide trends across states during the time period of interest, I next include state trend dummies in specification 3. The estimates for $\Delta\log(\text{guns}_{i,t-1})$ and $\Delta\log(\text{guns}_{i,t-2})$ decline slightly but remain significantly positive. Adding state-level control variables to this regression has virtually no impact on the coefficient estimates for $\Delta\log(\text{guns}_{i,t-1})$ and $\Delta\log(\text{guns}_{i,t-2})$.

In columns 5–8, I summarize the results from analogous regressions with $\Delta\log(\text{guns}_{i,t})$ as the dependent variable. In most cases, the estimated relationships between lagged changes in homicide rates and current changes in gun ownership are significantly positive, providing support for the hypothesis that individuals purchase firearms in response to an increase in criminal activity. However, the estimated effect is much smaller in magnitude than in the previous four regressions: a 10 percent increase in the homicide rate is associated with only a 0.2–0.3 percent increase in gun ownership in the subsequent year. If these dynamic specifications are accurately capturing a causal relationship, then it appears that gun ownership has a much greater impact on murder rates than murder rates have on gun ownership.

## B. Gun versus Nongun Homicides

One factor not addressed above is that individuals may purchase guns in response to expected future increases in criminal activity. Rather than demonstrating a causal effect of gun ownership on crime, the observed relationship in columns 1–4 of table 5 may instead represent a causal effect of expected increases in crime on current gun ownership. Heckman (2000) points out, for example, that future $Y_t$ often determines current $X_t$ in dynamic economic models.

One way to differentiate between these two hypotheses is to divide homicides into two categories: those committed with a firearm and those committed with some other weapon. If changes in gun ownership have a similar relationship with both types of homicide, then one could reasonably conclude that individuals are purchasing more firearms in response to expected increases in crime or that increases in gun ownership simply proxy for increases in the average criminal tendencies of the population. Alternatively, if current increases in gun ownership are more strongly related to future increases in gun homicides, then the theory that a rise in gun ownership is causing an increase in the homicide rate would be much more plausible.

The regression results summarized in table 6 use the NCHS data to

CITY 000752

TABLE 6

RELATIONSHIP BETWEEN LAGGED CHANGES IN GUN OWNERSHIP AND CURRENT CHANGES IN GUN AND NONGUN HOMICIDES

| | $\Delta$Log(Gun Homicides$_{st}$) | | | | $\Delta$Log(Nongun Homicides$_{st}$) | | | |
|---|---|---|---|---|---|---|---|---|
| | (1) | (2) | (3) | (4) | (5) | (6) | (7) | (8) |
| $\Delta$log(guns$_{s,t-1}$) | .316*** | .302*** | .306*** | .291** | | .118 | .020 | .022 |
| | (.111) | (.112) | (.117) | (.118) | | (.088) | (.092) | (.093) |
| $\Delta$log(guns$_{s,t-2}$) | | .296*** | .223** | .215* | | .111 | .040 | .037 |
| | | (.107) | (.112) | (.114) | | (.096) | (.099) | (.100) |
| $\Delta$log(gun homicides$_{s,t-1}$) | | -.322*** | -.372*** | -.376*** | | | | |
| | | (.039) | (.046) | (.047) | | | | |
| $\Delta$log(gun homicides$_{s,t-2}$) | | -.038 | -.071* | -.071* | | | | |
| | | (.040) | (.042) | (.042) | | | | |
| $\Delta$log(nongun homicides$_{s,t-1}$) | | | | | -.453*** | -.557*** | -.589*** | -.588*** |
| | | | | | (.042) | (.044) | (.044) | (.045) |
| $\Delta$log(nongun homicides$_{s,t-2}$) | | | | | | -.222*** | -.253*** | -.253*** |
| | | | | | | (.040) | (.042) | (.042) |
| $\Delta$log(per capita income$_{st}$) | | | | .197 | | | | .000 |
| | | | | (.424) | | | | (.421) |
| $\Delta$unemployment rate$_s$ | | | | .691 | | | | -.453 |
| | | | | (.905) | | | | (.798) |
| $\Delta$% aged 18–24$_{st}$ | | | | .045 | | | | 3.474 |
| | | | | (4.693) | | | | (4.620) |
| State trend dummies? | no | no | yes | yes | no | no | yes | yes |
| $R^2$ | .294 | .299 | .328 | .329 | .257 | .303 | .336 | .337 |

NOTE.—The dependent variable in specifications 1–4, $\Delta$log(gun homicides$_{st}$), is the change in the log of the standard gun homicide rate. The dependent variable in specifications 5–8, $\Delta$log(nongun homicides$_{st}$), is equal to the change in the log of the state-level nongun homicide rate. These data are obtained from the NCHS. The sample includes state-year observations for 1980–98. The number of observations is 816 in all regressions except 1 and 5, which have 867 each. Each regression includes year fixed effects and is weighted by state population. White standard errors are in parentheses.
\* Significant at the 10 percent level.
\*\* Significant at the 5 percent level.
\*\*\* Significant at the 1 percent level.

CITY 000753

run specifications analogous to those presented in table 5. A comparison of the coefficient estimates for $\Delta\log(\text{guns}_{i,t-1})$ and $\Delta\log(\text{guns}_{i,t-2})$ in the $\Delta\log(\text{gun homicides}_{i,t-1})$ and $\Delta\log(\text{nongun homicides}_{i,t-2})$ specifications reveals that increases in gun ownership are significantly positively related to increases in gun homicides but bear no corresponding relationship with nongun homicides. This finding strongly supports the hypothesis that increases in gun ownership lead to future increases in homicides, since it is not plausible that individuals would purchase firearms in response to predictable increases in gun homicides but be unresponsive to expected increases in nongun homicides.

### C. Other Crime Categories

The results from previous research suggest that guns influence criminal activity primarily by increasing the likelihood that a victim will be murdered and by raising the probability that an individual criminal will be successful (Cook and Moore 1995), but that changes in gun ownership have a smaller impact on the number of other crimes committed. If this hypothesis is true, then one would expect to find a much weaker relationship between changes in gun ownership rates and future changes in other crime rates.

To test this hypothesis, I run specifications similar to the ones described above for every individual crime category. In each specification, I include lagged changes both for the gun magazine sales and for the appropriate crime category. I use data from the FBI's *Uniform Crime Reports*, which provides annual state-level data on the number of homicides, robberies, aggravated assaults, rapes, burglaries, larcenies, and auto thefts. The coefficient estimates for $\Delta\log(\text{guns}_{i,t-1})$ and $\Delta\log(\text{guns}_{i,t-2})$ are displayed in table 7, which also provides summary statistics for each of the variables of interest.

As is clear from the coefficient estimates, the relationship between state-level changes in gun ownership and future increases in robberies, aggravated assaults, and rapes is much smaller than the corresponding one with gun homicides. In all three cases, the two coefficient estimates of interest are statistically insignificant. Similarly small estimates are found for the three specifications relating to property crimes (burglary, larceny, and theft), although two of the six coefficient estimates are significantly positive. Given that nearly 500,000 guns are reported stolen annually, guns are apparently considered a valuable commodity to criminals. It is therefore plausible that increases in firearm ownership may increase the payoff to crimes of theft. In any case, the estimated effect is much smaller than the corresponding one for homicides, which is driven entirely by a relationship between changes in gun ownership and gun homicides. This set of findings strongly suggests that increases in

TABLE 7
RELATIONSHIP BETWEEN CHANGES IN GUN OWNERSHIP AND FUTURE CHANGES IN CRIME

| DEPENDENT VARIABLE | MEAN AND STANDARD DEVIATION OF DEPENDENT VARIABLE (1) | $\Delta$Log(Guns) COEFFICIENT ESTIMATES | |
|---|---|---|---|
| | | $t-1$ (2) | $t-2$ (3) |
| $\Delta$log(gun homicide$_{it}$) | −.026 (.166) | .306*** (.117) | .223** (.112) |
| $\Delta$log(nongun homicide$_{it}$) | −.028 (.163) | .020 (.092) | .040 (.099) |
| $\Delta$log(FBI homicide$_{it}$) | −.027 (.123) | .180* (.103) | .210** (.094) |
| $\Delta$log(FBI robbery$_{it}$) | −.017 (.104) | −.016 (.097) | .069 (.069) |
| $\Delta$log(FBI assault$_{it}$) | .010 (.091) | −.007 (.085) | −.013 (.061) |
| $\Delta$log(FBI rape$_{it}$) | −.003 (.085) | −.052 (.073) | −.092 (.060) |
| $\Delta$log(FBI burglary$_{it}$) | −.038 (.065) | −.002 (.054) | .094* (.049) |
| $\Delta$log(FBI larceny$_{it}$) | −.009 (.048) | .081** (.036) | .032 (.035) |
| $\Delta$log(FBI auto theft$_{it}$) | −.004 (.096) | .043 (.077) | .019 (.073) |

NOTE.—The coefficient estimates for $\Delta$log(guns$_{t-1}$) and $\Delta$log(guns$_{t-2}$) (from a specification analogous to specification 3 in table 6) are displayed in cols. 2 and 3. Each specification includes lagged changes of the appropriate crime category. The summary statistics for each of the dependent variables are provided in col. 1. The mean and standard deviation for $\Delta$log(guns$_i$) are .003 and .074, respectively. For all specifications, the sample includes state-year observations for 1980–98, resulting in 816 observations. Each regression includes year fixed effects and is weighted by state population. White standard errors are in parentheses.
* Significant at the 10 percent level.
** Significant at the 5 percent level.
*** Significant at the 1 percent level.

gun ownership lead to increases in the number of homicides, but the evidence for effects on other crime categories is much weaker. The next subsection uses county-level FBI crime data to further probe these results.

## D. County-Level Estimates of the Relationship between Gun Ownership and Crime

The FBI's *Uniform Crime Reports* data provide annual county-level information on the number of crimes in each of the seven categories described above. An examination of these data reveals that there is substantial underreporting, with many states neglecting to provide

CITY 000755

county-level crime data for multiple years.[12] In constructing the state-level crime data utilized above, the FBI attempts to account for under-reporting or changes in the reporting practices of police precincts. Thus state-level data are likely to be a more reliable guide to changes in crime patterns. Despite the problems associated with the county-level crime data, I use them here to probe the state-level results described above. I include in the empirical analysis in this section all counties with populations of 100,000 or more and collapse the remaining counties within each state into 48 "rest of state" observations.[13]

Table 8 summarizes a set of specifications analogous to the ones presented in table 5 that examine the dynamic relationship between changes in gun ownership and changes in homicide rates. The statistically significant estimate of .142 in column 1 implies that a 10 percent increase in gun ownership is associated with a 1.42 percent increase in the homicide rate in the following year. This result is similar to the state-level estimate, although it is slightly smaller in magnitude. The coefficient estimate for the second lagged change in gun ownership is also significantly positive, as column 2 shows. Including county trend dummies in column 3 does not appreciably affect the two coefficient estimates, although the second one becomes insignificantly positive. In specification 4, I adjust the standard errors to account for the possibility that county-level changes in homicides or in gun ownership within a state during a year may not be independent.[14] Columns 5–8 reveal that, as was true in the state-level regressions, the relationship between lagged changes in homicide rates and current changes in rates of gun ownership are much smaller in magnitude.

In table 9, I present the results from regressions analogous to specification 4 in table 8 that examine the relationship between lagged

[12] See Maltz (1999) for a detailed description of the reporting problems with county-level crime data. The states that are especially bad at reporting at the county level are Vermont, Illinois, Montana, and Mississippi. Many other states, including Florida, Georgia, Iowa, and Kentucky, fail to report any crime data for one or more years. A comparison of the summary statistics at the state and county levels reveals that county-level data are substantially noisier, with standard deviations that are typically two to three times as large as the corresponding ones from state-level data (tables 7 and 9). In approximately one out of five cases, the sum of county crimes within a state deviates by more than 20 percent from the statewide total reported by the FBI.

[13] While this accounts for less than 14 percent of all counties, those with a population of 100,000 or more in 1990 account for almost 75 percent of the U.S. population in 1990. Without this adjustment, approximately half of the county-year observations will have zero murders. After the adjustment, virtually none do. Owing to reporting inconsistencies with the magazine sales data, St. Louis County and St. Louis City are combined into one observation, as are Baltimore County and Baltimore City and the five counties in New York City. For the same reason, there is only one observation annually for the state of Alaska and one annually for the state of Hawaii.

[14] For example, there may be state-level changes in legislation that similarly affect county-level rates of gun ownership within a state, or the police within a state may change the accuracy with which they report homicides in particular years.

TABLE 8
COUNTY-LEVEL ESTIMATES OF THE RELATIONSHIP BETWEEN CHANGES IN RATES OF HOMICIDE AND GUN OWNERSHIP

| | $\Delta\log$(FBI Homicides$_{it}$) | | | | $\Delta\log$(Guns$_{it}$) | | | |
|---|---|---|---|---|---|---|---|---|
| | (1) | (2) | (3) | (4) | (5) | (6) | (7) | (8) |
| $\Delta\log$(guns$_{i,t-1}$) | .142*** | .152*** | .145** | .145** | −.030 | −.028 | −.081*** | −.081** |
| | (.054) | (.055) | (.055) | (.063) | (.032) | (.033) | (.034) | (.039) |
| $\Delta\log$(guns$_{i,t-2}$) | | .098* | .087 | .087 | | −.078*** | −.125*** | −.125*** |
| | | (.055) | (.057) | (.057) | | (.017) | (.017) | (.025) |
| $\Delta\log$(FBI homicides$_{i,t-1}$) | −.425*** | −.548*** | −.570*** | −.570*** | .001 | .008 | .008 | .008 |
| | (.024) | (.025) | (.023) | (.026) | (.003) | (.003) | (.003) | (.003) |
| $\Delta\log$(FBI homicides$_{i,t-2}$) | | −.255*** | −.276*** | −.276*** | | .004 | .004 | .004 |
| | | (.021) | (.020) | (.019) | | (.003) | (.003) | (.003) |
| County trend dummies? | no | no | yes | yes | no | no | yes | yes |
| Observations | 7,766 | 7,181 | 7,181 | 7,181 | 7,963 | 7,359 | 7,359 | 7,359 |
| $R^2$ | .201 | .260 | .287 | .287 | .260 | .267 | .318 | .318 |

NOTE.—The dependent variable in specifications 1–4, $\Delta\log$(FBI homicides$_{it}$), is the change in the log of the county-level homicide rate. The dependent variable in specifications 5–8, $\Delta\log$(guns$_{it}$), is equal to the change in the log of the county-level sales rate of gun magazines. The sample includes county-year observations for 1980–98. Counties with a population of 100,000 or more in 1990 are included, with all other counties collapsed into rest of state categories for each year. Certain county-year observations are missing because of missing crime data. Each regression includes year fixed effects and is weighted by county population. White standard errors are in parentheses.
  * Significant at the 10 percent level.
 ** Significant at the 5 percent level.
*** Significant at the 1 percent level.

CITY 000757

TABLE 9
RELATIONSHIP BETWEEN CHANGES IN GUN OWNERSHIP AND FUTURE CHANGES IN CRIME

| DEPENDENT VARIABLE | MEAN AND STANDARD DEVIATION OF DEPENDENT VARIABLE (1) | ΔLog(Guns) COEFFICIENT ESTIMATES | |
|---|---|---|---|
| | | $t-1$ (2) | $t-2$ (3) |
| $\Delta$log(FBI homicide$_{it}$) | −.028 | .145** | .087 |
| | (.499) | (.063) | (.057) |
| $\Delta$log(FBI robbery$_{it}$) | −.006 | .069* | −.026 |
| | (.376) | (.041) | (.046) |
| $\Delta$log(FBI assault$_{it}$) | .006 | .095 | −.062 |
| | (.270) | (.037) | (.055) |
| $\Delta$log(FBI rape$_{it}$) | .000 | .011 | −.059 |
| | (.313) | (.042) | (.051) |
| $\Delta$log(FBI burglary$_{it}$) | −.042 | .019 | −.023 |
| | (.226) | (.031) | (.037) |
| $\Delta$log(FBI larceny$_{it}$) | −.014 | .023 | −.038 |
| | (.298) | (.049) | (.044) |
| $\Delta$log(FBI auto theft$_{it}$) | .000 | .071* | .007 |
| | (.333) | (.037) | (.045) |

NOTE.—The coefficient estimates for $\Delta$log(guns$_{t-1}$) and $\Delta$log(guns$_{t-2}$) (from a specification analogous to specification 3 in table 6) are displayed in cols. 2 and 3. Each specification includes two lagged changes for the appropriate crime category. Summary statistics for each of the dependent variables are provided in col. 4. The mean and standard deviation of $\Delta$log(guns) are .003 and .114, respectively. For all specifications, the sample includes county-year observations for 1980–98. Each regression includes year fixed effects and is weighted by county population. White standard errors are in parentheses.
* Significant at the 10 percent level.
** Significant at the 5 percent level.

changes in gun ownership and current changes in the other six types of crime. Consistent with the state-level analyses summarized in table 7, changes in gun ownership are more strongly related with future changes in the homicide rate than with changes in the other crime categories.

Taken together, the results in this section provide strong support for the hypothesis that increases in gun ownership lead to future increases in the homicide rate. From 1993 to 1998, the number of gun homicides fell by more than 36 percent, whereas the number of homicides in which some other weapon was used fell by only 18 percent.[15] The GSS estimates suggest that the share of households with at least one gun fell from 42.4 percent to 34.9 percent during that same time period. From the coefficient estimates from table 6 and the GSS estimates of gun ownership, my findings suggest that approximately one-third of the *differential* decline in gun homicides, relative to nongun homicides, can be explained by reductions in the fraction of households owning a gun.[16] These gains

[15] See Donohue and Levitt (2001) for a discussion of other factors leading to recent reductions in the overall crime rate.
[16] Errors-in-variables problems with the proxy variable will tend to bias downward my estimates of the relationship between changes in gun ownership and changes in crime, suggesting that the true impact of the reduction in gun ownership may be even greater.

CITY 000758

have been concentrated in the states with the largest relative reductions in gun ownership.

I also find some support for the theory that gun ownership increases other crime rates, but in all cases the estimated effects are much smaller than the corresponding one for the homicide rate.[17] This set of findings conflicts with recent research suggesting that the increases in gun ownership caused by the passage of CCW legislation led to reductions in rates of violent crime (Lott and Mustard 1997; Lott 1998). In the next section, I use the sales data for gun magazines to examine the reason for this discrepancy.

## IV.  Testing the Impact of CCW Laws

Recent work has explored whether states that enacted CCW laws experienced significant declines in crime relative to other states. The first paper in this literature argued that the passage of this legislation in 10 states between 1985 and 1991 led to a substantial reduction in violent crimes (and a corresponding increase in property crimes), as criminals were deterred by the greater likelihood that potential victims would be armed and therefore able to defend themselves (Lott and Mustard 1997). A series of studies probed the robustness of the Lott-Mustard results (Black and Nagin 1998; Ludwig 1998; Ayres and Donohue 1999; Moody 2000), with some finding support for their central conclusions and others finding that the estimated effects were quite fragile and sensitive to the precise specification used.

Despite the abundance of recent papers in this literature, none has examined whether CCW legislation increased the likelihood that potential victims would be armed. This probability could change if (1) the fraction of individuals owning a gun increased or if (2) the frequency with which existing owners carried their guns increased. Using the sales data for gun magazines, I test whether CCW legislation had an impact through either of these causal pathways. Finding no evidence of this, I then probe the Lott-Mustard findings and determine that their central results are inaccurate. Taken together, the three sets of findings in this section cast considerable doubt on the hypothesis that CCW legislation could plausibly have affected the rate of violent crime.

[17] If county trends are not included in the first-difference specifications, changes in county-level rates of gun ownership are significantly positively related to subsequent changes in other types of violent crime (Duggan 2000).

1106                                                   JOURNAL OF POLITICAL ECONOMY

TABLE 10

IMPACT OF CCW LEGISLATION ON ESTIMATED CHANGES IN GUN OWNERSHIP

| | $\Delta \log(\text{Guns}_{it})$ ($N=765$) | | |
|---|---|---|---|
| | (1) | (2) | (3) |
| $\text{CCW}_{it}$ | .0038 | .0009 | .0038 |
| | (.0077) | (.0099) | (.0099) |
| $R^2$ | .701 | .717 | .743 |
| State trend dummies? | no | yes | yes |
| State controls? | no | no | yes |

NOTE.—The observations include annual state-level data for 1978–92 (first change includes 1977 data). $\text{CCW}_{it}$ is set equal to one in the year that legislation regarding carrying concealed weapons is passed within a state and equals one in all subsequent years as well. All regressions include year fixed effects and are weighted by state population. White standard errors are in parentheses.

## A. The Impact of CCW Legislation on Gun Ownership

Ten states[18] passed legislation between 1985 and 1991 that allowed individuals to carry concealed handguns. If the option to carry a firearm increased the perceived benefit associated with owning a gun, then one would expect to find an increase in the fraction of individuals owning one. To test whether gun ownership did increase in CCW states following the passage of this legislation, I run specifications of the following form:

$$\Delta \log(\text{guns}_{it}) = \alpha + \rho \text{CCW}_{it} + \beta \Delta X_{it} + \mu_i + \lambda_i + \epsilon_{it}. \quad (3)$$

In this regression, $i$ and $t$ index states and years, respectively; $\text{guns}_{it}$ equals the number of gun magazines sold in state $i$ in year $t$; and $\text{CCW}_{it}$ is a dummy variable set equal to one if a state allows individuals to carry concealed weapons and zero otherwise. If CCW legislation led to substantial increases in the fraction of individuals owning a gun,[19] then one would expect to find a significantly positive coefficient estimate on $\text{CCW}_{it}$.

The set of regressions summarized in table 10, however, suggests that gun ownership did not increase significantly in the states that passed CCW legislation relative to other states. In the first specification I regress the change in the state-level estimates of gun ownership on a CCW dummy variable. Year fixed effects are included to control for changes in gun ownership that are occurring at the national level. The insignificant estimate of .0038 in the first specification suggests that gun ownership did not increase substantially more in those states that en-

---

[18] The 10 states are Maine (1985); Florida (1987); Virginia (1988); Georgia, Pennsylvania, and West Virginia (1989); Idaho, Mississippi, and Oregon (1990); and Montana (1991). The Pennsylvania law did not include the county of Philadelphia.

[19] In analogous studies of the effect of changes in the prison population and the police force on the crime rate, Levitt (1996, 1997) first demonstrates that his instruments (legislation on prison overcrowding and the timing of mayoral elections) had a significant impact on the number of prisoners and on the number of police. He then uses this plausibly exogenous variation to examine the impact on crime.

CITY 000760

acted CCW legislation. This estimate remains small and statistically insignificant if I include state trend dummies or control variables for states' economic indicators and demographic characteristics, as the second and third specifications demonstrate. The results are similar if I run these regressions instead at the county level with a similar CCW dummy variable, run the regressions in levels of gun ownership with state and year fixed effects, or extend the time period under consideration. Thus it does not appear that the CCW legislation reduced crime by significantly increasing the rate of gun ownership, suggesting that the benefits of carrying a firearm were not sufficiently large to induce many individuals who did not already own a firearm to purchase one. This finding weakens the evidence for one of the two causal pathways described above.

B.   Did Crime Decline More in High-Ownership Counties?

Despite the apparent absence of an effect on gun ownership, the passage of CCW laws could still have caused a reduction in crime rates. Criminals in CCW states may have been deterred from committing crimes because of a perception that the existing set of gun owners would now carry their guns with them more frequently. If CCW legislation did lead to a reduction in crime through this channel, one would expect to detect the greatest change in those counties with relatively higher rates of gun ownership within CCW states.

The logic of this argument is straightforward. Suppose that there are two types of counties: those with high gun ownership and those with low ownership. If the frequency with which any individual owner carried her gun increased uniformly across counties, then the probability that a potential victim would be armed would increase more significantly in high-ownership areas. As long as criminals did, on average, accurately perceive differences in gun ownership rates across areas, one would expect to see the largest declines in crime in those counties with the highest gun ownership when the legislation was enacted. Although there is no perfect way to test whether criminals accurately estimate gun ownership rates, it seems implausible that criminals would systematically mistake high-ownership areas for low-ownership ones and vice versa. The fact that guns are frequently stolen and that criminals often purchase their firearms at gun shows would provide them with two direct sources of information regarding the rate of gun ownership within an area.

One potential problem with this line of reasoning is that the increase in the propensity of carrying a firearm after the passage of CCW legislation may vary systematically with the rate of gun ownership. It seems likely, however, that this carrying probability for an individual gun owner would increase most in areas with the highest rates of ownership, be-

TABLE 11

EFFECT OF PRE-CCW GUN OWNERSHIP ON SUBSEQUENT CHANGES IN CRIME

| | $\Delta$Log(Violent Crime$_{it}$) ($N$=629) | | $\Delta$Log(Property Crime$_{it}$) ($N$=613) | |
|---|---|---|---|---|
| | (1) | (2) | (3) | (4) |
| Log(guns$_{it}$) | −.037 | .031 | −.007 | .031 |
| | (.051) | (.061) | (.040) | (.045) |
| $\Delta$log(violent crime$_{t-1}$) | | −.453*** | | |
| | | (.148) | | |
| $\Delta$log(property crime$_{t-1}$) | | | | −.249 |
| | | | | (.214) |
| $R^2$ | .137 | .243 | .281 | .306 |
| State effects? | yes | yes | yes | yes |

NOTE.—Observations include those counties in the 10 CCW states with nonmissing crime data. $\Delta$violent crime$_{it}$ is defined to be the change in the log of the violent crime rate from one year before the CCW legislation was passed to two years after. The property crime dependent variable is defined similarly. Regressions are weighted by county population. White standard errors are in parentheses.

*** Significant at the 1 percent level.

cause these individuals are likely to have a greater taste for gun ownership. This would therefore strengthen the claim that the probability of carrying a firearm would increase most in high-ownership counties after CCW legislation is passed.

In table 11, I explore whether, within CCW states, those counties with the highest rate of pre-CCW gun ownership had the largest changes in their rates of violent and property crimes. I include only those counties located in the 10 states that passed CCW legislation during the time period of interest. In these regressions, the gun ownership measure is simply the log of the sales rate of gun magazines in a county in the year before the CCW legislation was passed. The left-hand-side variable $\Delta$log(violent crime$_{it}$) is the log difference between the violent crime rate two years after the passage of CCW legislation and one year before. The variable $\Delta$log(property crime$_{it}$) is defined similarly.

The first specification suggests that there were not significantly greater reductions in rates of violent crime in those counties with high rates of pre-CCW gun ownership. The estimate on the log(guns$_{it}$) coefficient is not affected much by the inclusion of preexisting trends in violent crime rates, as the second specification shows. The corresponding regressions for changes in property crime rates, summarized in columns 3 and 4, are not consistent with the hypothesis that property crime changed differentially in places with more gun ownership following the passage of CCW legislation. Similar specifications for each of the individual crime categories demonstrate that there is no significant relationship between the pre-CCW level of gun ownership and the subsequent change in any type of violent or property crime.

Thus it appears that violent crime did not decline significantly more in counties within CCW states that had high rates of gun ownership,

CITY  000762

suggesting either that existing gun owners did not increase the frequency with which they carried their guns or that this carrying had a negligible impact on the behavior of criminals. In either case, this finding weakens the evidence for the second channel through which CCW legislation could have affected the crime rate.

### C.   Robustness Checks of the Lott-Mustard Results

Given that CCW legislation did not lead to significant increases in gun ownership, nor reduce crime relatively more in places with high pre-CCW rates of gun ownership, it does not appear that CCW legislation could plausibly have caused a reduction in crime rates. Therefore, it would be surprising if one did find a strong reduction in violent crime rates following the passage of CCW legislation. After all, what would the causal pathway be? If such a relationship did exist, then possible explanations would be that (1) CCW states were simultaneously taking other, more effective, measures to reduce violent crime; (2) states pass CCW legislation when crime is peaking and crime rates exhibit regression to the mean; or (3) there is an omitted variable that is leading to a spurious relationship.

In this subsection I probe the Lott-Mustard results to investigate whether there is, in fact, a significant relationship between the passage of CCW legislation and criminal activity. The first set of specifications, summarized in column 1 of table 12, replicate the Lott-Mustard results and represent regressions of the following form:

$$\log(\text{crime}_{ijt}) = \alpha + \beta X_{ijt} + \rho \text{CCW}_{jt} + \lambda_t + \mu_i + \epsilon_{ijt}. \qquad (4)$$

In this equation, $i$, $j$, and $t$ index counties, states, and years, respectively. The coefficient estimates in column 1 suggest that violent crime rates are significantly lower after states pass CCW legislation and that property crime rates are correspondingly higher.

One limitation of this analysis is that it implicitly assumes that CCW laws are varying at the county-year level, when in fact they are varying only at the state-year level.[20] Therefore, one must adjust the standard errors appropriately to account for the fact that county-level disturbances may be correlated within a state during a particular year.[21] Column 2 presents coefficient estimates for $\rho$ from nine analogous regressions that properly account for this. In all cases, the standard errors increase substantially, and several of the estimates become statistically

---

[20] One exception to this is Philadelphia, which was exempt from Pennsylvania's CCW legislation during the time period under consideration.
[21] See Moulton (1990) for a discussion of this issue. In essence, Lott and Mustard are assuming that there are 700 independent "natural experiments" when in fact there are only 10.

TABLE 12
ROBUSTNESS CHECKS ON THE LOTT-MUSTARD RESULTS

| | COEFFICIENT ESTIMATES ON CCW DUMMY VARIABLE | | | | | |
|---|---|---|---|---|---|---|
| | (1) | (2) | (3) | (4) | (5) | (6) |
| Log(murder$_{it}$) | −.0733*** | −.0733** | −.0531* | −.0639* | −.0093 | .0004 |
| | (.0157) | (.0295) | (.0304) | (.0356) | (.0351) | (.0529) |
| | 26,458 | 26,458 | 26,458 | 26,458 | 46,979 | 46,979 |
| Log(rape$_{it}$) | −.0520*** | −.0520 | −.0426** | .0344 | .0563 | −.0401 |
| | (.0122) | (.0232) | (.0217) | (.0354) | (.0388) | (.0433) |
| | 33,865 | 33,865 | 33,865 | 33,865 | 46,161 | 46,161 |
| Log(assault$_{it}$) | −.0699*** | −.0699 | −.0582** | −.0558* | −.0460 | .0129 |
| | (.0144) | (.0277) | (.0263) | (.0286) | (.0294) | (.0432) |
| | 43,445 | 43,445 | 43,445 | 43,445 | 46,893 | 46,893 |
| Log(robbery$_{it}$) | −.0225* | −.0225 | .0234 | .0417 | .0995* | −.0075 |
| | (.0133) | (.0334) | (.0364) | (.0509) | (.0562) | (.0926) |
| | 34,949 | 34,949 | 34,949 | 34,949 | 46,974 | 46,974 |
| Log(violent crime$_{it}$) | −.0488*** | −.0488** | −.0250 | −.0072 | .0029 | −.0076 |
| | (.0098) | (.0213) | (.0213) | (.0254) | (.0254) | (.0400) |
| | 43,451 | 43,451 | 43,451 | 43,451 | 46,070 | 46,070 |
| Log(burglary$_{it}$) | .0005 | .0005 | .0320 | .0758** | .0897** | .0200 |
| | (.0076) | (.0229) | (.0244) | (.0337) | (.0336) | (.0537) |
| | 45,769 | 45,769 | 45,769 | 45,769 | 46,970 | 46,970 |
| Log(larceny$_{it}$) | .0334*** | .0334 | .0298 | .0487 | .0483* | .0132 |
| | (.0089) | (.0227) | (.0259) | (.0303) | (.0294) | (.0497) |
| | 45,743 | 45,743 | 45,743 | 45,753 | 46,973 | 46,973 |
| Log(auto theft$_{it}$) | .0701*** | .0701** | .0998*** | .0919** | .1114*** | .0545 |
| | (.0113) | (.0259) | (.0259) | (.0443) | (.0436) | (.0570) |
| | 44,360 | 44,360 | 44,360 | 44,360 | 46,978 | 46,978 |
| Log(property crime$_{it}$) | .0267*** | .0267 | .0452** | .0647** | .0686** | .0219 |
| | (.0072) | (.0189) | (.0190) | (.0266) | (.0261) | (.0455) |
| | 45,940 | 45,940 | 45,940 | 45,940 | 46,963 | 46,963 |

NOTE.—Each cell contains a coefficient estimate for the CCW dummy variable from specifications analogous to eq. (4) in the text. The dependent variable in each case is the log of the crime rate (per 100,000 county residents). Col. 1 replicates the results from Lott-Mustard (1997). Col. 2 contains the same coefficient estimates with the proper adjustment to the standard errors, accounting for the fact that the dependent variable of interest varies only at the state-year level. The specifications summarized in col. 3 correct the CCW dummy variable so that it is consistently defined across states. Col. 4 includes only county and year fixed effects, in addition to the CCW dummy variable, but retains the same sample that is included in cols. 1–3. The fifth specifications summarized in col. 5 include those counties with nonmissing crime rate data. The coefficients displayed in col. 6 equal the difference between the CCW dummy variable and the estimate for the dummy variable that equals one in the year before a state passed CCW legislation.
* Significant at the 10 percent level.
** Significant at the 5 percent level.
*** Significant at the 1 percent level.

insignificant.[22] The regressions summarized in column 3 adjust the Lott-

[22] As Bertrand, Duflo, and Mullainathan (2001) point out, the Moulton correction alone is typically not sufficient for differences-in-differences estimators that utilize more than two periods of data because of autocorrelation in both the intervention variable and the economic variable of interest. A simple application of their randomization inference test to the Lott-Mustard data reveals that the true standard errors are approximately twice as large as those listed in col. 2. For example, the standard errors in the log(murder) and log(rape) specifications approximately double from .030 to .057 and from .023 to .048, respectively. As a result, none of the coefficient estimates on the CCW dummy variable remain statistically significant, and all the $t$-statistics have a magnitude of less than 1.3.

CITY 000764

Mustard CCW dummy variable to be consistently defined across states.[23] For all five violent crime categories, the coefficient estimates become less negative, suggesting that the point estimates from the previous columns are systematically biased.

The coefficient estimates displayed in column 4 are obtained from specifications that utilize the same sample of counties but include only year and county fixed effects with the CCW dummy variable. This robustness check is motivated by the fact that the previous specifications include dozens of control variables that are quite imprecisely estimated at the county level on an annual basis. More important, some of these controls are mechanically related to the dependent variables in each specification,[24] which could bias the CCW coefficient estimates. A comparison of the estimates listed in columns 3 and 4 indicates that this adjustment weakens the CCW findings in all but one of the specifications of violent crime.

Because a substantial share of all county-year observations are excluded from these regressions, one important issue concerns the sensitivity of the coefficient estimates to the resulting sample selection. Column 5 provides results from regressions that include all county-year observations with nonmissing crime data and demonstrates that the CCW dummy variable is not significantly negatively related to any of the five violent crime variables.[25] It therefore appears that the sample selection leads to an overestimate of the impact of CCW legislation on violent crime.

While the column 5 estimates do not suggest a significant relationship between CCW legislation and violent crime, there is a significantly positive relationship between the passage of CCW legislation and the rate of property crimes. The results summarized in column 6 probe the robustness of this result by estimating specifications of the following form:

$$\log(\text{crime}_{ijt}) = \alpha + \beta X_{ijt} + \gamma \text{CCWPRE}_{jt} + \rho \text{CCW}_{jt}$$

$$+ \lambda_t + \mu_i + \epsilon_{ijt}. \tag{5}$$

The dummy variable CCWPRE equals one in the year *prior* to the passage of CCW legislation and in every year thereafter. Thus the estimate for the CCW variable essentially represents the difference between average crime rates following the passage of CCW legislation and in the year

---

[23] In their regressions, the CCW dummy is set equal to one in the year that legislation was passed and in all years thereafter for eight of the 10 states. For Florida and Georgia the dummy variable is set equal to one in the year after the legislation was passed.

[24] For example, the number of crimes is in the numerator of the dependent variable and in the denominator of one of the explanatory variables—the arrest rate.

[25] If one runs similar specifications using annual state-level data, the results also do not support the Lott-Mustard findings.

CITY 000765

immediately before. In all specifications, the coefficient estimate for the CCW dummy variable is statistically insignificant. This finding suggests that property crime rates were trending up differentially in CCW states prior to the passage of the legislation and that the passage of the law was not associated with a significant change in property crime relative to its pre-CCW rate.

Carrying concealed weapons legislation could plausibly have affected the crime rate through two channels. Using the magazine sales data, I find no evidence to suggest that CCW laws caused a reduction in the violent crime rate through either of these two pathways. Consistent with this, robustness checks of the Lott-Mustard findings cast considerable doubt on the hypothesis that CCW legislation had any effect on crime rates.

## V.   Conclusion

This paper uses a unique data set to demonstrate that increases in gun ownership lead to substantial increases in the overall homicide rate. This is driven entirely by a relationship between firearms and homicides in which a gun is used, implying that the results are not driven by reverse causation or by omitted variables. The relationship between changes in gun ownership and changes in all other crime categories is weaker and typically insignificant, suggesting that guns influence crime primarily by increasing the homicide rate.

The data employed in this paper should allow researchers to answer other important questions regarding the impact of alternative gun control policies and the effect of gun ownership on other outcomes of interest. After peaking at more than 39,000 in 1993, the number of individuals dying from gun-inflicted injuries fell by 23 percent during the next five years. While much of this decline is due to a reduction in gun homicides, the number of deaths from gun suicides has also fallen substantially. Whether recent reductions in firearm ownership have caused the reduction in the nation's suicide rate is an important topic for future research.

More generally, the magazine sales data employed in this paper suggest an alternative strategy for estimating variables that have previously been considered unobservable. Similar applications of these data in other settings may allow researchers to answer other important empirical questions more convincingly.

## References

Ayres, Ian, and Donohue, John J., III. "A Trend Analysis of Shall-Issue Laws." Manuscript. Stanford, Calif.: Stanford Law School, 1999.

Ayres, Ian, and Levitt, Steven D. "Measuring Positive Externalities from Unob-
  servable Victim Precaution: An Empirical Analysis of Lojack." *Q.J.E.* 113 (Feb-
  ruary 1998): 43–77.
Becker, Gary S. "Crime and Punishment: An Economic Approach." *J.P.E.* 76
  (March/April 1968): 169–217.
Bertrand, Marianne; Duflo, Esther; and Mullainathan, Sendhil. "How Much
  Should We Trust Differences-in-Differences Estimates?" Manuscript. Cam-
  bridge: Massachusetts Inst. Tech., 2001.
Black, Dan A., and Nagin, Daniel S. "Do Right-to-Carry Laws Deter Violent
  Crime?" *J. Legal Studies* 27 (January 1998): 209–19.
Cook, Philip J. "The Effect of Gun Availability on Robbery and Robbery Murder:
  A Cross-Section Study of Fifty Cities." In *Policy Studies Review Annual*, vol. 3,
  edited by Robert H. Haveman and B. Bruce Zellner. Beverly Hills, Calif.: Sage
  Pubs., 1979.
———. "The Role of Firearms in Violent Crime." In *Criminal Violence*, edited by
  Marvin E. Wolfgang et al. Beverly Hills, Calif.: Sage Pubs., 1982.
———. "Robbery Violence." *J. Criminal Law and Criminology* 78 (Summer 1987):
  357–76.
———. "The Technology of Personal Violence." In *Crime and Justice: A Review
  of Research*, vol. 14, edited by Michael H. Tonry. Chicago: Univ. Chicago Press,
  1991.
Cook, Philip J., and Moore, Mark H. "Gun Control." In *Crime*, edited by James
  Q. Wilson and Joan Petersilia. San Francisco: Inst. Contemporary Studies Press,
  1995.
Donohue, John J., III, and Levitt, Steven D. "Guns, Violence, and the Efficiency
  of Illegal Markets." *A.E.R. Papers and Proc.* 88 (May 1998): 463–67.
———. "Legalized Abortion and Crime." *Q.J.E.* 116 (May 2001): 379–420.
Duggan, Mark G. "More Guns, More Crime." Working Paper no. 7967. Cam-
  bridge, Mass.: NBER, 2000.
Glaeser, Edward L., and Glendon, Spencer. "Who Owns Guns? Criminals, Vic-
  tims, and the Culture of Violence." *A.E.R. Papers and Proc.* 88 (May 1998):
  458–62.
Handgun Control Inc. "Can We Close the Gun Show Loophole?" *Monitor Fed.
  and State Firearms Legislation* 5, no. 1 (1999): 1–2.
Heckman, James J. "Causal Parameters and Policy Analysis in Economics: A
  Twentieth Century Retrospective." *Q.J.E.* 115 (February 2000): 45–97.
Kellermann, Arthur L., et al. "Suicide in the Home in Relation to Gun Own-
  ership." *New England J. Medicine* 327 (August 13, 1992): 467–72.
Kleck, Gary. "The Relationship between Gun Ownership Levels and Rates of
  Violence in the United States." In *Firearms and Violence: Issues of Public Policy*,
  edited by Don B. Kates, Jr. Cambridge, Mass.: Ballinger (for Pacific Inst. Public
  Policy Res.), 1984.
———. *Point Blank: Guns and Violence in America*. New York: Aldine de Gruyter,
  1991.
Kleck, Gary, and Patterson, E. Britt. "The Impact of Gun Control and Gun
  Ownership Levels on Violence Rates." *J. Quantitative Criminology* 9, no. 3
  (1993): 249–87.
Levitt, Steven D. "The Effect of Prison Population Size on Crime Rates: Evidence
  from Prison Overcrowding Legislation." *Q.J.E.* 111 (May 1996): 319–51.
———. "Using Electoral Cycles in Police Hiring to Estimate the Effect of Police
  on Crime." *A.E.R.* 87 (June 1997): 270–90.

CITY 000767

Lott, John R., Jr. *More Guns, Less Crime: Understanding Crime and Gun-Control Laws.* Chicago: Univ. Chicago Press, 1998.

Lott, John R., Jr., and Mustard, David B. "Crime, Deterrence, and Right-to-Carry Concealed Handguns." *J. Legal Studies* 26 (January 1997): 1–68.

Ludwig, Jens. "Concealed-Gun-Carrying Laws and Violent Crime: Evidence from State Panel Data." *Internat. Rev. Law and Econ.* 18 (September 1998): 239–54.

Magaddino, Joseph P., and Medoff, Marshall H. "An Empirical Analysis of Federal and State Firearm Control Laws." In *Firearms and Violence: Issues of Public Policy,* edited by Don B. Kates, Jr. Cambridge, Mass.: Ballinger (for Pacific Inst. Public Policy Res.), 1984.

Maltz, Michael D. "Bridging Gaps in Police Crime Data." Report NCJ-1176365. Washington: Dept. Justice, Off. Justice Programs, Bur. Justice Statis., 1999.

McDowall, David; Loftin, Colin; and Wiersema, Brian. "The Incidence of Civilian Defensive Firearm Use." Manuscript. College Park: Univ. Maryland, Inst. Criminal Justice, 1992.

Moody, Carlisle E. "Testing for the Effects of Concealed Weapons Laws: Specification Errors and Robustness." Manuscript. Washington: American Enterprise Inst., 2000.

Moulton, Brent R. "An Illustration of a Pitfall in Estimating the Effects of Aggregate Variables on Micro Units." *Rev. Econ. and Statis.* 72 (May 1990): 334–38.

Sloan, John Henry, et al. "Firearm Regulations and Rates of Suicide: A Comparison of Two Metropolitan Areas." *New England J. Medicine* 322 (February 8, 1990): 369–73.

Zimring, Franklin E. "The Medium Is the Message: Firearm Caliber as a Determinant of Death from Assault." *J. Legal Studies* 1 (January 1972): 97–123.

CITY  000768

# Exhibit 82

■■■ ORIGINAL CONTRIBUTION

# Gun Storage Practices and Risk of Youth Suicide and Unintentional Firearm Injuries

David C. Grossman, MD, MPH

Beth A. Mueller, DrPH

Christine Riedy, PhD, MPH

M. Denise Dowd, MD, MPH

Andres Villaveces, MD, PhD

Janice Prodzinski, BA

Jon Nakagawara, MHA

John Howard, MD

Norman Thiersch, MD

Richard Harruff, MD

THE PRESENCE OF A HOUSEHOLD firearm is associated with an increased risk of suicide among adults and adolescents.[1-6] In a study of suicide attempters and completers, investigators found that 75% of the guns were stored in the residence of the victim, friend, or relative.[7] The public health importance of household firearms is a function both of the relative risk of exposure and the prevalence of firearms in the environment of children and adolescents.[8] Schuster et al[9] estimated from the National Health Interview Survey that 35% of homes in the United States with children younger than 18 years reported owning at least 1 firearm, and that 43% of these homes had at least 1 unlocked firearm. Reports from other surveys have derived similar estimates of the fraction of the population at risk from unlocked household firearms.[10]

Unloading and locking all guns and ammunition in the home can potentially reduce access to guns by youth. The policy issue of safe storage of firearms, both in legislative and clinical ap-

**Context** Household firearms are associated with an elevated risk of firearm death to occupants in the home. Many organizations and health authorities advocate locking firearms and ammunition to prevent access to guns by children and adolescents. The association of these firearm storage practices with the reduction of firearm injury risk is unclear.

**Objective** To measure the association of specific household firearm storage practices (locking guns, locking ammunition, keeping guns unloaded) and the risk of unintentional and self-inflicted firearm injuries.

**Design and Setting** Case-control study of firearms in events identified by medical examiner and coroner offices from 37 counties in Washington, Oregon, and Missouri, and 5 trauma centers in Seattle, Spokane, and Tacoma, Wash, and Kansas City, Mo.

**Cases and Controls** Case firearms were identified by involvement in an incident in which a child or adolescent younger than 20 years gained access to a firearm and shot himself/herself intentionally or unintentionally or shot another individual unintentionally. Firearm assaults and homicides were excluded. We used records from hospitals and medical examiners to ascertain these incidents. Using random-digit dial telephone sampling, control firearms were identified by identification of eligible households with at least 1 firearm and children living or visiting in the home. Controls were frequency matched by age group and county.

**Main Exposure Measures** The key exposures of interest in this study were: (1) whether the subject firearm was stored in a locked location or with an extrinsic lock; (2) whether the firearm was stored unloaded; (3) whether the firearm was stored both unloaded in a locked location; (4) whether the ammunition for the firearm was stored separately; and (5) whether the ammunition was stored in a locked location. Data regarding the storage status of case and control guns were collected by interview with respondents from the households of case and control firearms.

**Results** We interviewed 106 respondents with case firearms and 480 with control firearms. Of the shootings associated with the case firearms, 82 were suicide attempts (95% fatal) and 24 were unintentional injuries (52% fatal). After adjustment for potentially confounding variables, guns from case households were less likely to be stored unloaded than control guns (odds ratio [OR], 0.30; 95% confidence interval [CI], 0.16-0.56). Similarly, case guns were less likely to be stored locked (OR, 0.27; 95% CI, 0.17-0.45), stored separately from ammunition (OR, 0.45; 95% CI, 0.34-0.93), or to have ammunition that was locked (OR, 0.39; 95% CI, 0.23-0.66) than were control guns. These findings were consistent for both handguns and long guns and were also similar for both suicide attempts and unintentional injuries.

**Conclusions** The 4 practices of keeping a gun locked, unloaded, storing ammunition locked, and in a separate location are each associated with a protective effect and suggest a feasible strategy to reduce these types of injuries in homes with children and teenagers where guns are stored.

*JAMA. 2005;293:707-714*                                    www.jama.com

**For editorial comment see p 740.**

**Author Affiliations** are listed at the end of this article.
**Corresponding Author:** David C. Grossman, MD, MPH, Department of Preventive Care, Group Health Cooperative, 1730 Minor Ave, Suite 1600, Seattle, WA 98101 (grossman.d@ghc.org).

©2005 American Medical Association. All rights reserved.

Downloaded from jama.ama-assn.org by guest on December 12, 2011

proaches, has received much attention in the medical and public health communities over the past decade.[11,12] Existing evidence supporting this approach to the prevention of firearm injuries among youth is largely derived from ecological studies of the effects of laws requiring parents to securely store firearms.[13,14] Securely storing guns is perhaps a more plausible strategy for unintentional gun injuries among toddlers and young children, but the plausibility of this strategy to reduce youth suicide is less clear.[15] A high level of intent to harm oneself may lead an actively suicidal youth to defeat gunlocks and safes.

To date, only a few studies have indirectly addressed if secure firearm storage is an effective preventive measure for either firearm suicides or unintentional firearm injuries, but few have had sufficient statistical power to detect this association.[1,3] The purpose of this study was to measure the association of household firearm storage practices and the risk of unintentional and self-inflicted firearm injuries associated with child or adolescent access to firearms in the home.

## METHODS

### Study Design and Case Selection

This study used a case-control design, and the key exposure was firearm storage practices of guns in households with children. The design was not population-based due to the referral patterns of decedents and injured victims to medical examiner offices and trauma centers. The geographic area for both cases and controls included a convenience sample of 37 counties in the states of Washington, Oregon, and Missouri. Nonfatal cases were identified in 5 level I or II trauma centers in the cities of Seattle, Tacoma, and Spokane, Wash, and Kansas City, Mo. Controls were selected from households having both firearms and exposure to children and were identified by random-digit dial telephone surveys.

### Case Definition and Identification of Cases

A case firearm was identified by involvement in an incident in which a child or adolescent younger than 20 years gained access to a household firearm and shot himself/herself or another individual. Only suicide attempts and unintentional firearm injuries, both fatal and nonfatal, were included. Assaults and homicides with a firearm were excluded since we believed that gaining access to a valid source of information regarding the storage status of the firearm would be hampered by legal constraints. Shootings must have occurred with a powder firearm such as a handgun, rifle, or shotgun. Shootings with pellet ("BB") or air guns were excluded. Because of the method of control selection, households from which the firearms originated must also have had working telephones. The reference firearm may have originated from either the victim's or shooter's household or from the household of a third party.

Potentially eligible shooting incidents were identified through 3 sources: medical examiners' offices, coroners' offices, and trauma centers. For fatal cases, we queried the offices of medical examiners and coroners from each of the participating counties on a monthly basis to determine if any new cases of firearm deaths to youths younger than 20 years had been recorded. If there was a positive response, these files were reviewed by study staff to determine if the shooting met criteria for inclusion. The medical examiner or coroner made the final determination of intent for each shooting. Study staff reviewed the medical examiner/coroner files, which often included a death certificate, a scene investigation report, and autopsy and police reports. In a number of circumstances, further information from police records was needed to determine if the case met study eligibility criteria, particularly if the source of the gun was unclear. These records were requested by the appropriate law enforcement agency and included in the medical examiner/coroner files for further review. Final determination of eligibility for the study was made after the interview with representatives of the vic-

tim's household and/or the household from which the gun originated.

We enrolled cases both prospectively and retrospectively. Potentially eligible "case" firearms were involved in shooting events that resulted in a fatal or nonfatal injury from January 1, 1994, to December 1, 2001. Shootings resulting in nonfatal injuries were only identified prospectively from January 1999 to November 2001. Enrollment for all cases started in January 1999. The earliest shooting incident enrolled in the study occurred in April 1994.

To identify firearms involved in nonfatal injuries, we conducted surveillance at 5 large level I and II trauma centers in 4 cities within the participating counties. Local coordinators reviewed the emergency department logs at these institutions monthly to determine if any potentially eligible cases were seen in the emergency department. All firearm injuries to children and adolescents were reviewed by the study staff and type of intent (unintentional or suicide) was determined based on the medical record.

The gun owner (usually, but not always, the victim's parent) in all potential case events was contacted by letter from the relevant examiner/coroner (for fatal cases) or from one of the investigators (D.C.G. or M.D.D., for nonfatal cases) to introduce the study and to invite participation. A follow-up telephone call by a study team member was conducted to answer questions and schedule an interview.

A total of 525 events involving firearms that potentially met criteria for inclusion as cases were identified from medical examiners, coroners, and hospitals. Of these, 213 were excluded as homicide/assault incidents and 21 were excluded because of uncertain eligibility. Contacts were attempted with a total of 291 potential cases. An additional 23 were found to be ineligible after further information was obtained, leaving 268 who were approached for an interview. Of these, 64 (24%) refused to be interviewed, 80 (30%) could not be located or contacted, and 18 (7%) were found to be ineligible after the in-

©2005 American Medical Association. All rights reserved.

Downloaded from jama.ama-assn.org by guest on December 12, 2011

terview was completed. A total of 106 of 250 who were potentially eligible (42%) (or 106 of 170 whom we successfully contacted [62%]) were included as cases. Of the 106 cases, 82 (77%) were associated with a suicide attempt, and 24 (23%) were associated with an unintentional firearm injury. Sixty-four cases were from Washington State, 27 were from Missouri or Kansas, and the remainder were from Oregon (n=12), Alaska (n=1), Idaho (n=1), and Montana (n=1). There were no important demographic (victim age and sex, respondent sex, injury intent, and outcome) or circumstantial differences between responders and nonresponders among the cases, except whether the case was prospectively or retrospectively identified. A larger proportion of retrospective cases refused to participate or could not be located.

## Control Definition and Identification of Controls

Control firearms were identified from randomly selected households in the same counties from which cases were identified. A control was eligible if there was a firearm stored in or around the house (eg, in the garage, car, or attached storage area) on the date of the matched gun's shooting incident and if there was at least 1 child living or visiting the home at least 2 or more days per year under adult supervision. We attempted to select approximately 4 controls for every case, which were frequency matched by age group (of the shooter) and county of residence. Households in which control firearms were stored were identified by random-digit telephone dialing in counties where case guns were stored. The telephone screening was conducted by a private research firm (Gilmore Research Group, Seattle, Wash) using banks of residential telephone prefixes. At least 10 different attempts were made on different days and times to reach a household before listing it as nonresponsive. When a residence was successfully contacted, the interviewer confirmed that the responder

was an adult household member. A brief screening interview with several child safety questions was then conducted to identify potential households with control firearms and child residents or visitors. Eligible respondents were invited to participate in a second interview with one of the study interviewers.

A total of 37 797 telephone numbers were dialed in the eligible counties, and 14 840 contacts were made. A total of 6892 (46%) of screening interviews were refused, and 7320 (49%) completed the screening interview. Of these, 627 (9%) met eligibility criteria for inclusion as controls. Of these, we successfully completed a full interview with 493 respondents (79%). Of these, 480 households with firearms were ultimately determined to be eligible and were included in the final analyses.

## Exposure Measurement

Case firearms were defined as the gun used in the fatal or nonfatal shooting incident identified during the study period. Since many homes have more than 1 gun, the control firearms were defined as the household gun most recently fired or acquired. The key exposures of interest in this study were whether the subject firearm was locked and/or unloaded and whether its ammunition was locked and/or stored in a separate location. Additional information was gathered about the type of extrinsic locking device used, if any. The reference date used for exposure recall was the date of the shooting incident for cases or, for controls, January 1 of their respective case's index year.

Respondents were asked questions about each of up to 5 firearms stored in the home, beginning with the case or control gun. For each gun, the type of firearm, purpose, number of years owned, and details of storage (use of various extrinsic locking devices, whether stored loaded) and ammunition (whether stored locked, proximity to firearm) were queried. Up to 3 different extrinsic locking devices were recorded for each firearm, and up to 3 were recorded for the relevant ammunition.

Firearms were categorized with respect to locking status by the reported use (use on the reference date and usual use) of any of the following extrinsic locking devices or practices: trigger lock; lockable box; lockable gun safe, lockable cabinet or gun rack; lockable non–gun-specific safe or box. In addition, guns stored in locked drawers, cabinets, or rooms were categorized as "locked." A similar strategy was used to categorize ammunition storage practices. Respondents were also asked whether guns were stored in the "same location as the ammunition or bullets." Firearms that were stored loaded were classified as being in the same location as ammunition.

## Data Collection

All data were collected in a structured interview by 1 of 2 experienced interviewers, either in-person or on the telephone. Both interviewers received additional training in dealing with bereaved family members. In most instances, the respondent was one of the adults residing in the house where the gun was stored. The interview took about 30 minutes. The respondents were shown photographs of various intrinsic and extrinsic safety devices and firearm types to aid recall. If the interview was conducted by telephone, the subjects received a set of photographs by mail prior to the interview. At the completion of the interview, bereaved families were given an opportunity to talk in open-ended fashion about the child and the circumstances surrounding his/her injury or death. If the family desired, written material regarding social and counseling resources for survivors were provided after the interview.

Participants in this study classified their racial and ethnic background during the interview process. Participants used categories developed by the investigators, and these included an option for "mixed race." We collected racial and ethnic data to assess the comparability of the case and control populations in the study. No analyses were performed using race as a predictor variable.

©2005 American Medical Association. All rights reserved.

Downloaded from jama.ama-assn.org by guest on December 12, 2011

GUN STORAGE PRACTICES AND RISK OF YOUTH SUICIDE AND UNINTENTIONAL INJURIES

**Statistical Analysis**

Analyses to calculate odds ratios (ORs) as estimates of the risk ratio of a shooting event associated with gun storage practices and use of specific devices were conducted using multivariable logistic regression, which allowed evaluation and control of other factors that may have affected the relationships of interest. Evaluation of confounding included assessment of several factors for their possible effects on the OR and included (after adjustment for county of residence and ages of children in the home, variables for which controls were frequency matched): respondent sex, age, household annual income level, and education level; type of firearm (handgun vs long gun); sex and age of the firearm owner; number of other guns stored in the home; and whether the reference firearm purpose was recreational or for protection. Only those factors that meaningfully altered the risk ratios (by >10%) were retained in the regression model. Unless otherwise indicated, all risk estimates were adjusted for county, ages of children in the home, and type of reference firearm. Analyses were conducted using SPSS (version 10.5, SPSS Inc, Chicago, Ill) and Egret (version 0.26.6, Cytel Software Corp, Cambridge, Mass) statistical software.

This project was approved by the institutional review board (IRB) of the University of Washington, the University of Missouri-Kansas City Social Sciences IRB, and several hospital IRBs prior to the conduct of this study. All participants gave written informed consent prior to the interviews.

**RESULTS**

Of the 106 shooting incidents included in the study, there were 82 suicide attempts (95% fatal) and 24 unintentional injuries (50% fatal).

Respondents from households with case and control firearms were generally similar with regard to sex, race, and whether they were homeowners or living in single-family homes (TABLE 1). Respondents from households with case firearms were somewhat less likely to be married, a college graduate, or to have a household income of at least $70 000. They also had fewer children younger than 20 years living in the home; however, the number of children living or visiting at least 2 days per year was similar in both groups.

**Table 1.** Personal and Household Characteristics of Respondents With Case and Control Firearms*

| Characteristic | No. (%) | |
| --- | --- | --- |
| | Cases (n = 106) | Controls (n = 480) |
| Respondent sex | | |
| Male | 35 (33.0) | 144 (30.0) |
| Female | 62 (58.5) | 322 (67.1) |
| Both male and female† | 9 (8.5) | 14 (2.9) |
| Race/ethnicity | | |
| White | 89 (84.8) | 431 (90.4) |
| Black | 6 (5.7) | 10 (2.1) |
| Native American | 4 (3.8) | 12 (2.5) |
| Asian/Pacific Islander | 2 (1.9) | 6 (1.3) |
| Mixed race | 1 (1.0) | 7 (1.5) |
| Other | 0 (0) | 2 (0.4) |
| Hispanic | 3 (2.8) | 9 (1.9) |
| Homeowner | 86 (81.1) | 407 (84.8) |
| Married | 74 (69.8) | 390 (81.3) |
| Highest level of education | | |
| High school graduation or less | 29 (27.4) | 91 (19.1) |
| Some college or vocational/technical education | 54 (50.9) | 209 (43.8) |
| College graduate + graduate education | 23 (21.7) | 177 (37.1) |
| Annual household income, $ | | |
| <35 000 | 26 (26.8) | 80 (17.4) |
| 35 000-49 999 | 22 (22.7) | 93 (20.2) |
| 50 000-69 999 | 22 (22.7) | 120 (26.0) |
| ≥70 000 | 27 (27.8) | 168 (36.4) |
| No. of adults living in home | | |
| 1 | 23 (21.7) | 55 (11.5) |
| 2 | 62 (58.5) | 353 (73.5) |
| 3 | 17 (16.0) | 60 (12.5) |
| ≥4 | 4 (3.8) | 12 (2.5) |
| No. of children <20 y living at home | | |
| 0 | 45 (42.5) | 134 (27.9) |
| 1 | 32 (30.2) | 109 (22.7) |
| 2 | 15 (14.2) | 152 (31.7) |
| ≥3 | 14 (13.2) | 85 (17.7) |
| No. of children <20 y living or visiting home ≥2 d per y | | |
| 1-4 | 20 (18.9) | 83 (17.3) |
| 5-9 | 22 (20.8) | 116 (24.2) |
| 10-19 | 27 (25.5) | 125 (26.1) |
| 20-39 | 20 (18.9) | 84 (17.5) |
| 40-59 | 7 (6.6) | 29 (6.1) |
| ≥60 | 10 (9.4) | 42 (8.8) |
| Lives in single-family home | 98 (92.5) | 438 (91.3) |
| No. of firearms stored in the home | | |
| 1 | 22 (21.8) | 99 (20.9) |
| 2 | 16 (15.8) | 78 (16.5) |
| 3-4 | 19 (18.8) | 113 (23.9) |
| 5-9 | 23 (22.8) | 115 (24.3) |
| ≥10 | 21 (20.8) | 68 (14.4) |

*Numbers may not add to totals because of missing values.
†Interviews in which both a male and female respondent participated.

©2005 American Medical Association. All rights reserved.

Downloaded from jama.ama-assn.org by guest on December 12, 2011

The median number of firearms stored in homes with case firearms was 4 (interquartile range, 2-8); the median for homes with control firearms was 3 (interquartile range, 2-5, data not shown). Case firearms were more likely to be owned by a male child (21%) than were control firearms (5%) (TABLE 2).

Most of the case (49%) and control (51%) firearms were purchased new or used (25% and 20%, respectively). However, 31% of case guns were primarily for protection compared with 19% of control guns; 26% of case guns were primarily for hunting, compared with 45% of control guns. A greater proportion of case guns (39%) than control guns (27%) had been owned less than 5 years.

Case guns were less likely to be stored unloaded than control guns (OR, 0.30; 95% confidence interval [CI], 0.16-0.56) (TABLE 3). Similarly, case guns were less likely to be stored locked (OR, 0.27; 95% CI, 0.17-0.45), stored separately from ammunition (OR, 0.45; 95% CI, 0.34-0.93), or to have ammunition that was locked (OR, 0.39; 95% CI, 0.23-0.66) than were control guns. Relative to firearms that were unlocked and loaded, those stored locked and unloaded were less likely to be involved in a shooting (OR, 0.16, 95% CI, 0.08-0.33) after adjustment for region, ages of children at home, and type of reference firearm [data not shown]).

The effects of accessibility of the gun and ammunition were also evaluated separately. Having only the ammunition accessible (with the reference firearm locked) was associated with a reduced risk of a case shooting event (OR, 0.34; 95% CI, 0.17-0.66) relative to having both the gun and ammunition unlocked (Table 3). Having both gun and ammunition locked was associated with an OR of 0.22 (95% CI, 0.11-0.44). Having only the gun accessible, but ammunition locked, had an OR of 0.47 (95% CI, 0.19-1.16) for a shooting event.

The practice of locking guns with more than 1 device was not associated with any additional protective effect beyond that observed for use of a single device. The association of different extrin-

sic locking devices with involvement in shooting events was also assessed. Fewer case guns (32.4%) were stored at the reference date using some sort of locking device compared with control guns (57.7%). Relative to use of no device, the use of a box or safe (alone or in combination with another device) was associated with an OR of 0.26 (95% CI, 0.08-0.84) (Table 3). Use of individual devices relative to nonuse of that specific device was also assessed after adjustment for use of other devices, gun loading status, and type of reference firearm. Although ORs for use of all of the specific devices evaluated were less than 1, only the use of a lockbox/safe was associated with a statistically significant decreased OR for a firearm injury.

Although the use of different devices may vary by type of firearm, our findings related to the 4 main gun storage ex-

posures were generally similar when analyses were stratified by whether the subject gun was a long gun or handgun (TABLE 4). The practices of keeping the reference firearm unloaded, locked, and the ammunition locked were all associated with significantly decreased risks of a shooting event for both types of firearms. With respect to use of different devices, there were no apparent differences between devices. The ORs associated with the use of safes or lockboxes were 0.18 (95% CI, 0.04-0.81) for long guns and 0.17 (95% CI, 0.07-0.45) for handguns (data not shown).

Regardless of whether the injury was unintentional or a suicide attempt (TABLE 5), case guns were less likely to be stored locked or unloaded, and case ammunition was less likely to be locked.

Our findings remained essentially unchanged when stratified by the pur-

**Table 2.** Characteristics of Case and Control Firearms*

| Characteristic | No. (%) | |
| --- | --- | --- |
| | Cases (n = 106) | Controls (n = 480) |
| **Status of owner** | | |
| Male HOH | 66 (62.9) | 372 (77.7) |
| Female HOH | 6 (5.7) | 55 (11.5) |
| Male child | 22 (21.0) | 22 (4.6) |
| Other male relative | 7 (6.7) | 15 (3.1) |
| Male + female HOH joint ownership of gun | 0 | 10 (2.1) |
| Other | 4 (3.8) | 5 (1.0) |
| **How reference firearm acquired** | | |
| Purchased new | 47 (49.0) | 230 (50.8) |
| Purchased used | 24 (25.0) | 89 (19.6) |
| Gift | 12 (12.5) | 68 (15.0) |
| Inherited | 8 (8.3) | 62 (13.7) |
| Other | 5 (5.2) | 4 (0.8) |
| **Primary reason for reference firearm** | | |
| Protection | 32 (31.4) | 90 (19.1) |
| Sport shooting | 20 (19.6) | 78 (16.6) |
| Hunting | 26 (25.5) | 212 (45.1) |
| Collecting | 2 (2.0) | 11 (2.3) |
| Inherited/gift | 13 (12.7) | 61 (12.9) |
| Job | 8 (7.8) | 11 (2.3) |
| Other | 1 (1.0) | 7 (1.5) |
| **No. of years owned reference firearm** | | |
| <2 | 8 (8.2) | 46 (10.0) |
| 2-4 | 30 (30.9) | 77 (16.7) |
| 5-9 | 20 (20.6) | 105 (22.7) |
| 10-19 | 17 (17.5) | 109 (23.6) |
| ≥20 | 22 (22.7) | 125 (27.1) |

Abbreviation: HOH, head of household.
*Numbers may not add to totals because of missing values.

©2005 American Medical Association. All rights reserved.

Downloaded from jama.ama-assn.org by guest on December 12, 2011

GUN STORAGE PRACTICES AND RISK OF YOUTH SUICIDE AND UNINTENTIONAL INJURIES

**Table 3.** Storage Devices and Practices Used for Case and Control Firearms at Reference Date*

| Storage Device/Practice at Reference Date | No. (%) | | Odds Ratio (95% Confidence Interval) |
| | Cases (n = 106) | Controls (n = 480) | |
|---|---|---|---|
| Storage practice† | | | |
| Gun unloaded | 64 (66.0) | 429 (90.7) | 0.30 (0.16-0.56) |
| Gun locked | 34 (32.4) | 274 (57.7) | 0.27 (0.17-0.45) |
| Ammunition locked | 24 (24.2) | 222 (48.2) | 0.39 (0.23-0.66) |
| Gun, ammunition different locations | 41 (41.4) | 304 (65.2) | 0.45 (0.34-0.93) |
| Access to gun and ammunition‡ | | | |
| Both accessible | 54 (56.3) | 129 (28.0) | 1.00 |
| Gun locked/ammunition accessible | 18 (18.8) | 109 (23.7) | 0.34 (0.17-0.66) |
| Gun accessible/ammunition not accessible | 8 (8.3) | 61 (13.3) | 0.47 (0.19-1.16) |
| Neither accessible | 16 (16.7) | 161 (35.0) | 0.22 (0.11-0.44) |
| No. of extrinsic device types used‡ | | | |
| 0 | 71 (67.6) | 201 (42.3) | 1.00 |
| 1 | 28 (26.7) | 233 (49.1) | 0.28 (0.16-0.48) |
| 2-3 | 6 (5.7) | 41 (8.6) | 0.32 (0.12-0.84) |
| Extrinsic device combinations‡ | | | |
| No device | 71 (67.6) | 201 (42.3) | 1.00 |
| Trigger lock only | 9 (8.6) | 36 (7.6) | 0.56 (0.23-1.36) |
| On-gun device only | 2 (1.9) | 7 (1.5) | 0.22 (0.04-1.27) |
| Lockbox/gun safe only | 9 (8.6) | 101 (21.3) | 0.17 (0.08-0.39) |
| Gun rack only | 1 (1.0) | 24 (5.1) | 0.17 (0.11-1.35) |
| Gun cabinet only | 7 (6.7) | 55 (11.6) | 0.43 (0.17-1.08) |
| Lockbox/gun safe + any other | 4 (3.6) | 27 (5.7) | 0.26 (0.08-0.84) |
| Trigger lock + any other nonbox/safe | 1 (1.0) | 9 (1.9) | 0.33 (0.04-2.96) |
| Other combination | 1 (1.0) | 15 (3.2) | 0.20 (0.02-1.77) |
| Any use of specific devices§ | | | |
| Trigger lock | 13 (12.4) | 61 (12.8) | 0.84 (0.40-1.78) |
| Lockbox/gun safe | 13 (12.4) | 127 (26.7) | 0.33 (0.16-0.69) |
| On-gun device | 3 (2.9) | 18 (3.8) | 0.34 (0.09-1.32) |
| Gun rack | 3 (2.9) | 31 (6.5) | 0.52 (0.14-1.86) |
| Gun cabinet | 6 (7.6) | 67 (14.1) | 0.89 (0.35-2.25) |

*Numbers may not add to totals because of missing values.
†Adjusted for region, ages of children at home, and type of reference firearm.
‡Adjusted for region, ages of children at home, and type of reference firearm.
§Risks associated with use of this device, relative to nonuse of this device, adjusted for region, ages of children at home, type of reference firearm, and any use of other device types. Estimates for trigger lock, box/safe, and cabinet also adjusted for whether gun stored unloaded and ammunition stored locked.

**Table 4.** Gun Storage Practices Among Case and Control Households at Reference Date by Type of Reference Firearm*

| Storage Device Type at Reference Date | Odds Ratio (95% Confidence Interval)† | |
| | Long Guns | Handguns |
|---|---|---|
| No. of cases/No. of controls | 37/336 | 67/137 |
| Practices† | | |
| Gun unloaded | 0.14 (0.04-0.46) | 0.38 (0.18-0.77) |
| Gun locked | 0.30 (0.14-0.63) | 0.24 (0.12-0.48) |
| Ammunition locked | 0.44 (0.20-0.94) | 0.28 (0.13-0.61) |
| Gun, ammunition different locations | 0.52 (0.25-1.07) | 0.54 (0.27-1.07) |
| Access to gun and ammunition† | | |
| Both accessible | 1.00 | 1.00 |
| Gun locked/ammunition accessible | 0.39 (0.14-1.07) | 0.31 (0.13-0.75) |
| Gun accessible/ammunition not accessible | 0.56 (0.19-1.69) | 0.25 (0.05-1.13) |
| Neither accessible | 0.25 (0.09-0.68) | 0.17 (0.07-0.43) |

*Numbers may not add to totals because of missing values.
†Adjusted for region and ages of children at home.

pose of gun ownership, the sex of the respondent, or when the analyses excluded control guns that had never been fired. For the storage practices of keeping the gun unloaded and locked, the risk estimates were identical regardless of whether the primary purpose of the reference firearm was protection or recreation. The greatest difference observed was for the practice of keeping the gun and ammunition separate when the purpose was recreational (OR, 0.84; 95% CI, 0.42-1.71) vs when the purpose was protection (OR, 0.37; 95% CI, 0.14-0.98 [data not shown]).

The risk estimates for storage practices remained 0.5 or less when analyses were stratified by respondent sex with 1 exception: when the respondent included a male, the OR for keeping ammunition locked was 0.60 (95% CI, 0.27-1.31). When firearms that had never been discharged were excluded, the greatest change occurred for the practice of keeping the gun and ammunition separate (OR, 0.59; 95% CI, 0.36-0.97). Finally, of the households where case guns were stored, 23 respondents reported that a child was the primary owner of the gun. Because parental supervision of gun use may not be as complete in these instances, we also performed subanalyses restricted to only guns owned by adults. This restriction had no appreciable effect on the direction or magnitude of these findings, with the greatest change occurring for the practice of storing the gun and ammunition separately (OR, 0.64; 95% CI, 0.37-1.11). All of these subanalyses, however, were limited by small numbers.

## COMMENT

Safe storage practices, including keeping firearms stored unloaded, in a locked place, separate from ammunition, and/or secured with an extrinsic safety device, were shown to be protective for unintentional firearm shootings and suicide attempts among adolescents and children. The 4 specific practices of keeping a gun locked, unloaded, and storing ammunition locked and in a separate location were each as-

©2005 American Medical Association. All rights reserved.

Downloaded from jama.ama-assn.org by guest on December 12, 2011

sociated with a protective effect and suggest feasible strategies to reduce these types of injuries in homes with children and adolescents where guns are stored. These findings appear to be consistent for both long guns and handguns, as well as for suicides and unintentional firearm injuries.

We are unaware of any other case-control studies that sought primarily to examine the potential protective effects of firearm storage practices for either adults or children. Several investigators, however, have reported on these associations as subanalyses of case-control studies designed to investigate the association between household ownership and the risk of suicide in the home.[1,3] However, those studies were not designed to explore these specific associations. Our findings support several ecological studies of the effect of child (firearm) access prevention laws that showed an association between the law implementation and a reduction in the rate of youth suicides.[13,14]

We are unaware of any controlled analytic studies of firearm storage practices and unintentional firearm injuries among children and adolescents. Wintemute and colleagues[16] reported several case series of unintentional shootings and documented a high rate of accessible and loaded household firearms from these homes.

There are a number of limitations to our study. Our findings may not be generalizable to firearm injuries resulting from homicides and criminal assaults with firearms and may not be generalizable to geographic regions not included in the study. Our study may also not be generalizable to adults or to adolescents living outside of the supervision of their parent. Our narrowly framed case definition only encompassed situations in which a supervising adult lived in the same household where the gun was stored and was aware of the presence of a gun in the household. We were unable to validate the storage status of the reference firearm; however, none of the states involved in the study had laws mandating secure storage and we

found respondents rarely refused or were hesitant to disclose the storage status of guns. Furthermore, the findings of storage practices among our control households were similar to those reported in other studies of homes with children.[9,10,17-19]

Recall bias is a potential threat to the validity of studies retrospectively collecting exposure data. Although we used photographs to aid identification of locking devices and few respondents appeared to have difficulty recalling this information, it is possible that memory of past storage practices may have been less accurate. When evaluated separately by whether respondents were interviewed within 1 year, or longer than 1 year from the reference date, risk estimates for storage practices were less than or equal to 0.5 with 1 exception: storing the gun separately from ammunition among those interviewed within 1 year of the reference date (OR, 0.78; 95% CI, 0.40-1.53).

We addressed the possibility of differential nonresponse to questions concerning gun storage by conducting subanalyses in which cases with missing information were first categorized as having answered affirmatively to the

specific storage practices, and subsequently recategorized as having answered negatively. The largest difference between results given these 2 assumptions was 0.13, and the greatest OR observed was 0.64 (95% CI, 0.39-1.04) for the practice of keeping the gun and ammunition separate under the assumption that all unknown cases had responded affirmatively to this practice; the remainder were all significantly less than 1.

Sampling bias is a potential concern, given that overall response rates for cases and controls were lower than expected. An analysis of case nonresponders (both those who refused to participate and those we could not contact) did not reveal important differences in demographic variables. The only exception was if the case was prospectively or retrospectively identified. Stratification by this variable did not reveal differences. The overall response rate for control households was also below 50%, reflecting the increasing difficulty of conducting telephone surveys for surveillance purposes. Our rate was comparable to a recent report describing the response rates for the Behavioral Risk Factor Survey sponsored by the Cen-

**Table 5.** Gun Storage Devices and Practices by Injury Intention

| Storage Device/Practice at Reference Date | Odds Ratio (95% Confidence Interval) | |
|---|---|---|
| | Unintentional | Suicide |
| No. of cases/No. of controls | 24/480 | 82/480 |
| Practices* | | |
|   Gun unloaded | 0.19 (0.07-0.50) | 0.39 (0.19-0.78) |
|   Gun locked | 0.26 (0.10-0.64) | 0.27 (0.16-0.47) |
|   Ammunition locked | 0.35 (0.13-0.996) | 0.40 (0.22-0.72) |
|   Gun, ammunition different locations | 0.60 (0.24-1.48) | 0.56 (0.32-0.98) |
| Access to gun and ammunition* | | |
|   Both accessible | 1.00 | 1.00 |
|   Gun locked/ammunition accessible | 0.31 (0.09-1.00) | 0.31 (0.15-0.65) |
|   Gun accessible/ammunition not accessible | 0.45 (0.09-2.27) | 0.43 (0.16-1.21) |
|   Neither accessible | 0.15 (0.04-0.57) | 0.22 (0.11-0.47) |
| Any use of specific devices† | | |
|   Trigger lock | 1.18 (0.35-3.94) | 0.69 (0.29-1.62) |
|   Lockbox/gun safe | 0.34 (0.09-1.23) | 0.31 (0.14-0.72) |
|   On-gun device | – | 0.45 (0.11-1.75) |
|   Gun rack | 0.81 (0.09-6.99) | 0.45 (0.10-2.05) |
|   Gun cabinet | 0.27 (0.03-2.18) | 0.61 (0.25-1.47) |

*Risks relative to lack of this feature, adjusted for region, ages of children at home, and type of reference firearm.
†Risks associated with use of this device, relative to nonuse of this device, adjusted for region, ages of children at home, type of reference firearm, and use of other device types.

©2005 American Medical Association. All rights reserved.

Downloaded from jama.ama-assn.org by guest on December 12, 2011

GUN STORAGE PRACTICES AND RISK OF YOUTH SUICIDE AND UNINTENTIONAL INJURIES

ters for Disease Control and Prevention, in which the median national response rate for states in 2002 was 58% (range, 42%-83%), using reporting standards of the Council of American Survey Research Organizations.[20] The consequence of declining survey response rates has not been associated with increased bias for other public health risk factors.[21] Finally, since this study did not use suicides from all causes as the inclusion criteria for subjects, we cannot assess whether potential attempters who were thwarted from accessing a firearm would complete suicide by an alternate method, if their intent was sufficiently high.

In summary, storing household guns as locked, unloaded, or separate from the ammunition is associated with significant reductions in the risk of unintentional and self-inflicted firearm injuries and deaths among adolescents and chil-

dren. Programs and policies designed to reduce accessibility of guns to youth, by keeping households guns locked and unloaded, deserve further attention as 1 avenue toward the prevention of firearm injuries in this population.[22,23]

**Author Affiliations:** Departments of Health Services and Pediatrics (Dr Grossman), Department of Epidemiology (Dr Mueller), and Harborview Injury Prevention and Research Center (Drs Grossman, Mueller, Riedy, and Villaveces and Ms Prodzinski), University of Washington, Seattle; Medical Examiner Offices of King, Pierce, and Snohomish Counties, Washington (Drs Howard, Thiersch, and Harruff, and Mr Nakagawara); and Department of Pediatrics, Children's Mercy Hospital, Kansas City, Mo (Dr Dowd). Dr Grossman is now with the Department of Preventive Care and Center for Health Studies, Group Health Cooperative, Seattle, Wash.
**Author Contributions:** Dr Grossman had full access to all of the data in the study and takes responsibility for the integrity of the data and the accuracy of the data analysis.
*Study concept and design:* Grossman, Mueller, Villaveces, Howard.
*Acquisition of data:* Grossman, Mueller, Riedy, Dowd, Villaveces, Prodzinski, Nakagawara, Howard, Thiersch, Harruff.
*Analysis and interpretation of data:* Grossman, Mueller, Riedy, Dowd, Villaveces, Nakagawara.

*Drafting of the manuscript:* Grossman, Nakagawara, Howard.
*Critical revision of the manuscript for important intellectual content:* Grossman, Mueller, Riedy, Dowd, Villaveces, Prodzinski, Thiersch, Harruff.
*Statistical analysis:* Mueller, Villaveces.
*Obtained funding:* Grossman, Mueller.
*Administrative, technical, or material support:* Grossman, Dowd, Villaveces, Prodzinski, Howard, Thiersch, Harruff.
*Study supervision:* Grossman, Mueller, Dowd.
**Financial Disclosures:** None reported.
**Funding/Support:** Funding for this study was provided by the Centers for Disease Control and Prevention (grant R49/CCR015592).
**Role of the Sponsor:** The Centers for Disease Control and Prevention did not participate in the design and conduct of the study; in the collection, analysis, and interpretation of the data; or in the preparation, review, or approval of the manuscript.
**Acknowledgment:** We wish to acknowledge the dedicated efforts of Rosalie Ginnett, Sarah Parkhurst, RN, and Lori Thomas, RN, in the conduct of this study; Lynda Voigt, PhD, MN, for advice on study design; and Peter Cummings, MD, MPH, and Tom Koepsell, MD, MPH, for their thoughtful review and comments of earlier drafts. We are also deeply grateful to the following medical examiners, coroners, and trauma managers for their assistance with the study: Gina M Fino, MD; Nikolas Hartshorne, MD (deceased); Tammy Retzloff, RN; Ted Walkey, MD; Dennis Wickham, MD. Eve Adams provided expert assistance with the preparation of the manuscript.

**REFERENCES**

1. Kellermann A, Rivara F, Somes G, et al. Suicide in the home in relation to gun ownership. *N Engl J Med.* 1992;327:467-472.
2. Brent DA, Perper JA, Allman CJ, Moritz GM, Wartella ME, Zelenak JP. The presence and accessibility of firearms in the homes of adolescent suicides: a case-control study. *JAMA.* 1991;266:2989-2995.
3. Brent DA, Perper JA, Moritz G, Baugher M, Schweers J, Roth C. Firearms and adolescent suicide: a community case-control study. *AJDC.* 1993;147:1066-1071.
4. Cummings P, Koepsell TD, Grossman DC, Savarino J, Thompson RS. The association between the purchase of a handgun and homicide or suicide. *Am J Public Health.* 1997;87:899-901.
5. Bukstein OG, Brent DA, Perper JA, et al. Risk factors for completed suicide among adolescents with a lifetime history of substance abuse: a case-control study. *Acta Psychiatr Scand.* 1993;88:403-408.
6. Brent DA, Perper JA, Goldstein CE, et al. Risk factors for adolescent suicide: a comparison of adolescent suicide victims with suicidal inpatients. *Arch Gen Psychiatry.* 1988;45:581-588.
7. Grossman DC, Reay DT, Baker SA. Self-inflicted and unintentional firearm injuries among children and adolescents: the source of the firearm. *Arch Pediatr Adolesc Med.* 1999;153:875-878.
8. Johnson RM, Coyne-Beasley T, Runyan CW. Firearm ownership and storage practices, U.S. house-

holds, 1992-2002: a systematic review. *Am J Prev Med.* 2004;27:173-182.
9. Schuster MA, Franke TM, Bastian AM, Sor S, Halfon N. Firearm storage patterns in US homes with children. *Am J Public Health.* 2000;90:588-594.
10. Stennies G, Ikeda R, Leadbetter S, Houston B, Sacks J. Firearm storage practices and children in the home, United States, 1994. *Arch Pediatr Adolesc Med.* 1999; 153:586-590.
11. Grossman DC, Cummings P, Koepsell TD, et al. Firearm safety counseling in primary care pediatrics: a randomized, controlled trial. *Pediatrics.* 2000;106:22-26.
12. Weil DS, Hemenway D. Loaded guns in the home: analysis of a national random survey of gun owners. *JAMA.* 1992;267:3033-3037.
13. Cummings P, Grossman DC, Rivara FP, Koepsell TD. State gun safe storage laws and child mortality due to firearms. *JAMA.* 1997;278:1084-1086.
14. Webster DW, Vernick JS, Zeoli AM, Manganello JA. Association between youth-focused firearm laws and youth suicides. *JAMA.* 2004;292:594-601.
15. Vernick JS, O'Brien M, Hepburn LM, Johnson SB, Webster DW, Hargarten SW. Unintentional and undetermined firearm-related deaths: a preventable death analysis for three safety devices. *Inj Prev.* 2003;9:307-311.
16. Wintemute GJ, Teret SP, Kraus JF, Wright MA, Bradfield G. When children shoot children: 88 unin-

tended deaths in California. *JAMA.* 1987;257:3107-3109.
17. Azrael D, Miller M, Hemenway D. Are household firearms stored safely? it depends on whom you ask. *Pediatrics.* 2000;106:E31.
18. Hemenway D, Solnick SJ, Azrael DR. Firearm training and storage. *JAMA.* 1995;273:46-50.
19. Senturia YD, Christoffel KK, Donovan M. Gun storage patterns in US homes with children: a pediatric practice-based survey. *Arch Pediatr Adolesc Med.* 1996;150:265-269.
20. Centers for Disease Control and Prevention. 2002 Behavioral Risk Factor Surveillance System Summary Data Quality Report. Available at: http: //www.cdc.gov/brfss/technical_infodata/pdf /2002SummaryDataQualityReport.pdf. Accessibility verified January 11, 2005.
21. Biener L, Garrett CA, Gilpin EA, Roman AM, Currivan DB. Consequences of declining survey response rates for smoking prevalence estimates. *Am J Prev Med.* 2004;27:254-257.
22. Coyne-Beasley T, Schoenbach VJ, Johnson RM. "Love Our Kids, Lock Your Guns": a community-based firearm safety counseling and gun lock distribution program. *Arch Pediatr Adolesc Med.* 2001;155:659-664.
23. Horn A, Grossman DC, Jones W, Berger LR. A community-based program to improve firearm storage practices in rural Alaska. *Inj Prev.* 2003;9:231-234.

©2005 American Medical Association. All rights reserved.

Downloaded from jama.ama-assn.org by guest on December 12, 2011