# Exhibit 86

# State Gun Safe Storage Laws and Child Mortality Due to Firearms

Peter Cummings, MD, MPH; David C. Grossman, MD, MPH; Frederick P. Rivara, MD, MPH; Thomas D. Koepsell, MD, MPH

**Context.**—Since 1989, several states have passed laws that make gun owners criminally liable if someone is injured because a child gains unsupervised access to a gun. These laws are controversial, and their effect on firearm-related injuries is unknown.

**Objective.**—To determine if state laws that require safe storage of firearms are associated with a reduction in child mortality due to firearms.

**Design.**—An ecological study of firearm mortality from 1979 through 1994.

**Setting.**—All 50 states and the District of Columbia.

**Participants.**—All children younger than 15 years.

**Main Outcome Measures.**—Unintentional deaths, suicides, and homicides due to firearms.

**Results.**—Laws that make gun owners responsible for storing firearms in a manner that makes them inaccessible to children were in effect for at least 1 year in 12 states from 1990 through 1994. Among children younger than 15 years, unintentional shooting deaths were reduced by 23% (95% confidence interval, 6%-37%) during the years covered by these laws. This estimate was based on within-state comparisons adjusted for national trends in unintentional firearm-related mortality. Gun-related homicide and suicide showed modest declines, but these were not statistically significant.

**Conclusions.**—State safe storage laws intended to make firearms less accessible to children appear to prevent unintentional shooting deaths among children younger than 15 years.

*JAMA.* 1997;278:1084-1086

IN THE UNITED STATES in 1994, 902 children younger than 15 years were killed by firearms; 185 deaths were unintentional, 188 were suicides, 499 were homicides, and 30 were of undetermined intent.[1] For every child in this age group who dies from a firearm-related injury, an estimated 4.2 children suffer a nonfatal wound.[2] Some of these deaths may be related to the availability of firearms in the homes of many children. It has been estimated that about half of households

in the United States have a gun.[3,4] In a 1994 national survey of gun owners, 14% of owners with a child younger than 18 years reported having a gun that was kept loaded and unlocked.[5]

In 1989, Florida passed a law to encourage gun owners to store loaded firearms in such a way that children could not readily obtain access to them.[6] If an unsupervised child younger than 16 years obtains a firearm and shoots himself or herself or another person or threatens someone, the gun owner may be prosecuted.

Similar laws were adopted in 11 additional states by the end of 1993.[7-17] All of these laws make it a criminal offense to store a firearm in such a way that a reasonable person would know that a child could gain access to the weapon. Violators can be prosecuted as felons in Florida, Connecticut, and California, while in the other states, the crime is classified as a misdemeanor. Most statutes declare that use of a locked box or

container[6-11,13,14] or a trigger lock[8,9,11,13] constitutes legal storage.

Safe storage laws were enacted to reduce unintentional shootings involving children. Some have argued that these laws are an unnecessary intrusion on gun owners, that they may cruelly subject a grieving parent to criminal prosecution, and that they are not likely to reduce injuries due to firearms.[18,19] To assess the effectiveness of these laws, we examined whether unintentional firearm mortality among children younger than 15 years was reduced in states after these laws took effect. Limiting children's access to firearms might also reduce firearm suicide and homicide among children, and these outcomes were examined as well.

## METHODS

Numbers of deaths and population data were obtained from the Compressed Mortality Files of the National Center for Health Statistics via the Internet.[20] We obtained data by sex for each available year (1979 to 1994) for each state and the District of Columbia for categories of age (<1, 1-4, 5-9, 10-14, 15-19, and 20-24 years) and race (white, black, or other). Deaths were identified using the *International Classification of Diseases, Ninth Revision (ICD-9)*[21] external cause of death codes as follows: accident caused by a firearm missile (E922 to E922.9), firearm suicide (E955.0 to E955.4), other suicide (E950 to E954, E955.5 to E958.9), firearm homicide (E965.0 to E965.4), other homicide (E960 to E964, E965.5 to E968.9), shooting by a law officer (E970), and shooting of uncertain intent (E985.0 to E985.4).

Within each state, the time period affected by a safe storage law was considered to start with the first calendar year in which the law was in effect for at least 6 months. Incidence rate ratios were estimated using Poisson regression[22] to compare time periods that had a storage law in effect with time periods without

From the Harborview Injury Prevention and Research Center, University of Washington (Drs Cummings, Grossman, Rivara, and Koepsell); the Departments of Epidemiology (Drs Cummings, Rivara, and Koepsell) and Health Services (Drs Grossman and Koepsell), School of Public Health and Community Medicine, University of Washington; and the Department of Pediatrics, School of Medicine, University of Washington (Drs Grossman and Rivara), Seattle.

Corresponding author: Peter Cummings, MD, MPH, Harborview Injury Prevention and Research Center, Box 359960, 325 Ninth Ave, Seattle, WA 98104-2499 (e-mail: peterc@u.washington.edu).

Downloaded from jama.ama-assn.org at George Washington University on September 16, 2011

such a law within the same state; therefore, 50 indicator variables were included to represent each state and the District of Columbia. To control for national trends over time in firearm mortality rates, all states were included in the analysis, and 15 indicator variables were used to represent each calendar year. Categories of age, sex, and race were examined as potential confounders. To allow for possible overdispersion that might violate the restrictive assumptions of the Poisson distribution, final results were estimated using negative binomial regression.[23,24]

Inequality of effects between different states or among age categories was tested using the likelihood ratio statistic.[25] Because rates within a state might be serially correlated over time, we calculated autocorrelation coefficients for the deviance residuals of each state in every regression model using lags of 1 through 5 years.[23,26]

## RESULTS

Over the 16 years of this study, there were 11 918 deaths due to firearms among children younger than 15 years in the United States; 4173 were unintentional, 2139 were suicides, and 5280 were homicides. Eleven fatal shootings by law enforcement and 315 shootings of uncertain intent were not analyzed further. In this age group, the unintentional gunshot mortality rate was 0.72 per 100 000 person-years in 1979; it fell to 0.32 in 1994. Suicide firearm mortality increased during the same interval from 0.16 to 0.33 per 100 000 person-years, and homicide firearm mortality increased from 0.45 to 0.81. Adjusting for changes in the age and sex distribution of the population, unintentional gunshot mortality decreased by 50% (95% confidence interval [CI], 36%-60%), suicide firearm mortality increased 111% (95% CI, 77%-151%), and homicide firearm mortality increased 71% (95% CI, 43%-104%).

From 1989 through 1993, gun safe storage laws were adopted in 12 states (Table). When the mortality rate in years affected by state safe storage laws was compared with the rate expected based on previous years within the same state and adjusted for secular trends, the incidence rate ratio for unintentional gun-related deaths was 0.77 (95% CI, 0.63-0.94) among children younger than 15 years. For gun-related suicide deaths and homicide deaths in the same age group, the associations with state safe storage laws were weaker and were not statistically significant. The rate ratio for gun suicides was 0.81 (95% CI, 0.66-1.01) and for gun homicides, 0.89 (95% CI, 0.76-1.05). For suicides by means other than a gun, the rate ratio was 0.95

(95% CI, 0.75-1.20), and for homicides by means other than a gun, the rate ratio was 0.96 (95% CI, 0.86-1.06). Further adjustment for sex, race, or age had no important effect on these ratios.

After safe storage laws were in effect, the decrease in unintentional firearm deaths was greater for children younger than 10 years and less for children aged 10 to 14 years (rate ratios, 0.68 [95% CI, 0.50-0.94] and 0.86 [95% CI, 0.67-1.09], respectively). The difference in these rate ratios, however, was not statistically significant (P=.20). We also examined the change in unintentional firearm mortality in older teenagers and young adults during the intervals affected by state safe storage laws. Using the same analytic method, we found that for teenagers aged 15 to 19 years, the incidence rate ratio was 0.91 (95% CI, 0.77-1.08), and for adults aged 20 to 24 years, it was 0.84 (95% CI, 0.68-1.03).

There was statistical evidence that the association between safe storage laws and unintentional shooting mortality among children younger than 15 years was not the same in each of the 12 states (P=.01). We classified state laws by whether they allowed for a felony prosecution. The overall mortality rate ratio fell to 0.59 (95% CI, 0.45-0.77) in California, Connecticut, and Florida, the states that allowed felony prosecutions, but did not change significantly in the 9 states that only provided for misdemeanor prosecutions (rate ratio, 1.14 [95% CI, 0.85-1.52]). With states classified by severity of penalty, the test for heterogeneity of effect was no longer statistically significant (P=.30). We also classified states by whether their statutes mentioned locked containers or trigger locks as suitable storage methods; the rate ratios were not statistically different between these 2 groups (P=.08), and this classification did not remove evidence of heterogeneity from the data.

Within a state, unintentional shooting death rates vary from year to year. If a state were to have a period of unusually

high rates as part of this expected variation, lawmakers might be stimulated to pass a safe storage law. Any subsequent mortality decline could be due partly to the tendency of rates to regress to their mean value.[27] To assess this, we calculated the unintentional gun mortality rate among children younger than 15 years in the 2-year period before a safe storage law went into effect compared with previous years in the same state and adjusted for national mortality trends. Little difference was found (rate ratio, 0.99 [95% CI, 0.81-1.21]).

There was no statistically significant evidence of serial correlation in any of our regression models.

## COMMENT

From 1989 through 1993, a dozen states enacted gun safe storage laws. Once these statutes took effect, unintentional firearm-related deaths among children younger than 15 years were 23% (95% CI, 6%-37%) lower than expected in these states.

A study of the effect of a law is necessarily an ecological study that compares groups of people.[28] It is always difficult to be certain that the analysis has accounted for all differences between groups that might distort the measured association. However, the apparent impact of state storage laws on unintentional shooting deaths is plausible for several reasons. First, the effect was strongest among the young people who are specifically covered by the law. Second, the effect was strongest for the outcome that the laws were designed to prevent—unintentional shootings. Third, the states that passed these laws came from all regions of the country, and they do not appear to share a common set of other features, aside from safe storage laws, that could account for the decline in mortality that was found. Finally, the overall estimate of change in mortality was based on a comparison within each state, before and after the law took effect, so that differences between these

Table. States With Gun Safe Storage Laws in Effect for at Least 6 Months, 1979-1994

| State | Year Law Passed | Date Law Went Into Effect | Period of Law Effectiveness for This Study | Age of Children for Whom Access Must be Restricted, y |
|---|---|---|---|---|
| Florida | 1989 | 10/1/89 | 1990-1994 | <16 |
| Iowa | 1990 | 4/5/90 | 1990-1994 | <14 |
| Connecticut | 1990 | 10/1/90 | 1991-1994 | <16 |
| Nevada | 1991 | 10/1/91 | 1992-1994 | <14 |
| California | 1991 | 1/1/92 | 1992-1994 | <14 |
| New Jersey | 1991 | 1/17/92 | 1992-1994 | <16 |
| Wisconsin | 1991 | 4/16/92 | 1992-1994 | <14 |
| Hawaii | 1992 | 6/29/92 | 1992-1994 | <16 |
| Virginia | 1991 | 7/1/92 | 1992-1994 | <12 |
| Maryland | 1992 | 10/1/92 | 1993-1994 | <16 |
| Minnesota | 1993 | 8/1/93 | 1994 | <14 |
| North Carolina | 1993 | 12/1/93 | 1994 | <18 |

Downloaded from jama.ama-assn.org at George Washington University on September 16, 2011

12 states and other states cannot account for the results; information from other states was only used to control for any national trend in mortality.

Regression to the mean can sometimes explain an apparent decrease in incidence. This is an unlikely explanation in this study, however, because within states that passed safe storage laws, the incidence of unintentional shooting deaths among children was not elevated in the 2-year period before the laws went into effect.

Our analysis was limited to laws passed by states. Some large cities have adopted their own gun safe storage laws.[29] Thus, within some states, some persons were subject to municipal statutes that encouraged safe storage at a time when no state law was in effect. It is possible that some municipal statutes were effective in reducing unintentional gunshot mortality in states that later passed a statewide law. If this occurred, then our analysis, which compared time periods after a state law went into effect with earlier time periods, would tend to underestimate the effectiveness of safe storage laws.

We are not aware that any large cities or counties passed gun safe storage laws after a state law was in effect. If this happened, it is conceivable that some of the effect that we have attributed to state laws was due in part to a local safe storage ordinance.

Safe storage laws were associated with a modest decrease in both suicides and homicides among young children, as well as some decline in unintentional shooting deaths among older teenagers and young adults. None of these changes were statistically significant, but they are all in the same direction, raising at least the possibility that safe storage laws might have some impact on these outcomes. Since 1993, additional states have passed safe storage laws, and future analyses may clarify this issue.

Safe storage laws with felony penalties appeared to have a stronger effect on unintentional gun-related mortality than laws with only misdemeanor penalties. It may be that felony penalties make these laws more effective, but it is also possible that other characteristics of the states with felony penalties account for the differences that we found.

Any effect of safe storage laws would be more credible if there were data to show that gun storage actually changed after these statutes took effect. The Be-

havioral Risk Factor Surveillance System of the Centers for Disease Control and Prevention, Atlanta, Ga, now has supplementary questions on gun storage.[30] If these questions are used in enough states before and after the passage of safe storage laws, useful data relating the enactment of these laws to gun storage practices may become available.

During the years 1990 through 1994, 129 children younger than 15 years died in unintentional shootings in states that had a safe storage law in effect during the years the children died. Assuming that the mortality rate ratio of 0.77 best represents the effect of state safe storage laws on unintentional shooting deaths among children, then approximately 129(1.0−0.77)/0.77 = 39 deaths of young children were prevented by these statutes. During the same 5 years, 940 children died in similar shootings in states when no safe storage law was in effect; 940(1.0−0.77) = 216 children might have lived had these laws been in effect in all states.

This work was supported by grant R49/CCR002570 from the Centers for Disease Control and Prevention, Atlanta, Ga.

## References

1. Singh GK, Kochanek KD, MacDorman MF. Advance report of final mortality statistics, 1994. *Monthly Vital Statistics Report*. Hyattsville, Md: National Center for Health Statistics; 1996: 55.
2. Annest JL, Mercy JA, Gibson DR, Ryan GW. National estimates of nonfatal firearm-related injuries: beyond the tip of the iceberg. *JAMA*. 1995;273: 1749-1754.
3. Kleck G. *Point Blank: Guns and Violence in America*. Hawthorne, NY: Adline de Gruyter; 1991: 51-52.
4. Maguire K, Pastore AL, eds. *Sourcebook of Criminal Justice Statistics, 1993*. Washington, DC: US Dept of Justice, Bureau of Justice Statistics; 1994:203.
5. Hemenway D, Solnick SJ, Azrael DR. Firearm training and storage. *JAMA*. 1995;273:46-50.
6. Fla Stat §784.05, 790.174, 790.175.
7. Conn Gen Stat §29-37i, 29-37b.
8. Cal Penal Code §12035.
9. Iowa Code §724.22.
10. Nev Rev Stat §202.300.
11. New Jersey Stat §2C:58-15, 2C:58-16.

12. Code of Virgina §18.2-52.2.
13. Wis Stat §948.55.
14. Hawaii Rev Stat §134-10.5.
15. Code of Maryland article 27, §36K.
16. Minn Stat §609.666.
17. Gen Stat of North Carolina §14-315.1, 14-315.2.
18. White A-M. A new trend in gun control: criminal liability for the negligent storage of firearms. *Houston Law Rev*. 1993;30:1389-1431.
19. Maute ML. New Jersey takes aim at gun violence by minors: parental criminal liability. *Rutgers Law J*. 1995;26:431-468.
20. Center for Disease Control and Prevention. CDC WONDER Website. Available at: http://wonder.cdc.gov. Accessed January 1997.
21. World Health Organization. *International Classification of Diseases, Ninth Revision (ICD-9)*. Geneva, Switzerland: World Health Organization; 1977.
22. Breslow NE, Day NE. *Statistical Methods in Cancer Research, II: The Design and Analysis of Cohort Studies*. Lyon, France: International Agency for Research on Cancer; 1987:131-133.
23. McCullagh P, Nelder JA. *Generalized Linear

Models*. 2nd ed. New York, NY: Chapman & Hall; 1989:39-40,198-199.
24. Gardner W, Mulvey EP, Shaw EC. Regression analyses of counts and rates: Poisson, overdispersed Poisson, and negative binomial models. *Psychol Bull*. 1995;118:392-404.
25. Breslow NE, Day NE. *Statistical Methods in Cancer Research, I: The Analysis of Case-Control Studies*. Lyon, France: International Agency for Research on Cancer; 1980:207-209.
26. Gaynor PE, Kirkpatrick RC. *Introduction to Time-Series Modeling and Forecasting in Business and Economics*. New York, NY: McGraw-Hill Book Co; 1994:410-411.
27. Fisher LD, van Belle G. *Biostatistics: A Methodology for the Health Sciences*. New York, NY: John Wiley & Sons Inc; 1993:389-390.
28. Morgenstern H. Ecologic studies in epidemiology: concepts, principles, methods. *Annu Rev Public Health*. 1995;16:61-81.
29. Baltimore City Code article 19, §117A.
30. Forjuoh SN, Coben JH, Dearwater SR. Firearm ownership and storage practices in Pennsylvania homes. *Inj Prev*. 1996;2:278-282.

Downloaded from jama.ama-assn.org at George Washington University on September 16, 2011

# Exhibit 87



# TAKING A STAND:
## REDUCING GUN VIOLENCE IN OUR COMMUNITIES

A REPORT FROM THE INTERNATIONAL ASSOCIATION OF CHIEFS OF POLICE
2007 GREAT LAKES SUMMIT ON GUN VIOLENCE

with support from
**The Joyce Foundation**



CITY 000598

# TAKING A STAND:
## REDUCING GUN VIOLENCE IN OUR COMMUNITIES

A REPORT FROM THE INTERNATIONAL ASSOCIATION OF CHIEFS OF POLICE 2007
GREAT LAKES SUMMIT ON GUN VIOLENCE





CITY 000600

# TABLE OF CONTENTS



Acknowledgements:...................................................................................................5

Executive Summary:.................................................................................................6

Summit Recommendations:

Section One: Keeping Communities Safe........................................................11

Section Two: Preventing and Solving Gun Crime...........................................19

Section Three: Keeping Police Officers Safe...................................................26

Appendices:

Appendix A: Summit Planning and Proceedings.............................................30

Appendix B: Summit Participant List...............................................................32

Appendix C: Summit Advisors.........................................................................38

Appendix D: Report Writers and Report Contributors...................................40

Appendix E: Special Guests/Speakers............................................................41

Appendix F: IACP Staff and Consultants........................................................42

CITY 000601

CITY 000602

# ACKNOWLEDGEMENTS



The IACP is grateful to a number of individuals who lent their time and talent to summit planning and execution. Their efforts were instrumental in creating a successful summit and this report, containing the results and recommendations of that summit. We thank:

- IACP President Joseph Carter for his vision and leadership, and in particular for his guidance as IACP and the Joyce Foundation took on this critical public safety issue.

- IACP 2nd Vice President and Chief of the Algonquin Police Department in Illinois, Russell Laine for his continuing and insightful guidance throughout the entire summit effort.

- We are grateful to several key staff at the Joyce Foundation; President Ellen Alberding for her leadership, passionate concern for quality of life in our communities, and particularly for her interest in partnering with the IACP to address gun violence, Program Officer Roseanna Ander for her dedication to reducing gun violence in the Great Lake States and the nation, and her relentless enthusiasm as she worked with IACP staff to make the summit a reality and Communications Director Mary O'Connell, who has aided in highlighting and supporting the vision of our summit participants through her editing, writing and consistent work to produce this report.

- Each of the members of the Great Lakes States Summit Advisory Committee (listed in Appendix C) who worked tirelessly to help us design and accomplish a powerful policy summit by attending many meetings and events and by voicing their invaluable counsel as we moved forward with this important initiative.

Most importantly, we thank each of the more than 180 summit participants (listed in Appendix B) for coming to the summit ready to serve, and for bringing with them the many excellent ideas that are now reflected in the recommendations in this report.

# EXECUTIVE SUMMARY



Nearly 30,000 American lives are lost to gun violence each year—a number far higher than in any other developed country. Since 1963, more Americans died by gunfire than perished in combat in the whole of the 20th century.

The impact goes far beyond the dead and injured. Gun violence reaches across borders and jurisdictions and compromises the safety of everyone along the way. No other industrialized country suffers as many gun fatalities and injuries as the United States. And no community or person in America is immune.

Law enforcement understands and embraces its leadership role in combating gun violence. When Federal Bureau of Investigation data for 2006 showed gun violence rates rising for the second year in a row with many Midwest cities leading the trend, the International Association of Chiefs of Police (IACP) convened law enforcement leaders and others concerned with gun violence from around the Midwest in Chicago in April 2007 at the Great Lakes Summit on Gun Violence, with support from the Joyce Foundation. Attendees reviewed the research, listened to experts, shared information and worked hand in hand to draft recommendations. This report comes from a regional group, but addresses a national problem, and it demands national attention.

The recommendations focus on three main areas:

***Keeping Communities Safe*** by improving public understanding about the risks of gun violence, working with community leaders, and reducing easy access to firearms, especially for at-risk individuals.

***Preventing and Solving Gun Crime*** by stopping the flow of illegal guns, sharing information among jurisdictions, and training officers to respond to gun crimes, including tracing all guns.

***Keeping Police Officers Safe*** by reducing the firepower available to criminals, providing protective technologies, and improving training and support for officers in handling guns and situations involving guns and their aftermath.

Specific recommendations include:

- Requiring judges and law enforcement to remove guns from situations of domestic violence, as well as from people whose adjudicated mental illness, drug use, or previous criminal record suggests the possibility of violence

- Requiring that all gun sales take place through Federal Firearms License (FFL) holders with mandatory background checks

- Enacting an effective ban on military-style assault weapons, armor-piercing handgun ammunition, .50 caliber sniper rifles and other weapons that enable criminals to outgun law enforcement

- Restoring COPS funding to provide vital resources to state, local and tribal law enforcement

- Repealing the Tiahrt Amendment, which hinders investigation of illegal gun trafficking

CITY 000604

- Destroying guns that come into police possession once their law enforcement use has ended

- Improving officer training in debriefing suspects and handling crime guns, including tracing all guns

- Training police officers in tactics that can lessen the possibility that a hostile situation will erupt in violence

- Mandating safe storage of firearms by private citizens and providing safe facilities where gun owners can store their weapons

- Mandating reporting of lost and stolen firearms

Many of these recommendations call on law enforcement to improve the way it responds to and investigates gun crimes, protects officers, and fosters gun violence prevention while protecting communities.

But one of the most important insights that came out of the summit was the realization that law enforcement and the IACP cannot fight this battle alone. Law enforcement leaders need public support; they need partners in every community; and they need elected officials, in Congress and in state legislatures, to stop catering to special interests and instead act in the public interest to reduce the terrible, and escalating, risk of gun violence in America.

As discouraging as today's gun violence statistics are, they can, and must, prompt public officials to take firm action. The tragic assassinations of leaders like John and Robert Kennedy and Martin Luther King, Jr. moved Congress to enact the Gun Control Act of 1968. Now, the American public appears ready for action once again.

In poll after poll, an overwhelming majority supports common-sense laws and stricter enforcement of the laws that are now on the books. Notably, a majority of gun owners voice support for laws that would reduce illegal gun trafficking and require background checks for all gun purchases.

The recommendations offered here, if implemented, will prevent many of the senseless killings that wreak havoc in our communities, end so many lives prematurely and put law enforcement officers at unrelenting risk.

Implementation, however, will require the support of everyone: not just law enforcement, but the public, community leaders, elected officials, the court system, public health officials, and many others.

Summit participants and the IACP believe Americans are ready to take that step.

CITY 000605

# INTRODUCTION



A troubled student goes on a rampage at a university and by early afternoon 33 people are dead. An angry father shoots his wife and then himself, leaving his children orphans in an instant. A 13-year-old boy, the son of a police officer and a firefighter, is shot and killed on a bus riding home from school. A lonely old man, mourning the loss of his wife, uses a rifle and kills himself.

Nearly 30,000 American lives are lost to gun violence each year—a number far higher than in any other developed country. Two to three times that many suffer non-fatal injuries. Since 1963, more Americans died by gunfire than perished in combat in the whole of the 20th century (statistics cited in *Private Guns, Public Health*, University of Michigan Press, 2004). And the overall impact goes much farther. Gun violence reaches across borders and jurisdictions and compromises the safety of everyone along the way.

To understand its impact, recall the events of 2002 in the region surrounding the nation's capital. For 23 days, the citizens of the Washington, D.C. metropolitan area lived in a state of growing fear because of the random and senseless violence wreaked by an anonymous and elusive sniper.

Many, if not most, outdoor activities and weekend sporting events were canceled. Schoolchildren were no longer allowed to go outside during their afternoon recess. It was not uncommon to see parents escorting their children into their school buildings and trying to ensure that their bodies were between their children and any potential sniper locations.

Citizens waiting for buses could be seen crouching behind automobiles trying to limit their exposure. Some gas stations and other commercial businesses erected large screens to shield their customers from view so that they could complete their transactions without fear. Some businesses even reported a sudden increase in customers after a shooting; people who had been "hiding" in their homes felt that it was now safe to make a quick trip. An entire region of our country was brought to a virtual standstill—all due to one gun and two men.

Far too many of our citizens live with similar fear each day. They live in communities where the level of violence means they cannot sit on their porches at night. Many have reason to be afraid even inside their own homes because of the real possibility that bullets may come flying through their windows. All too often innocent children are the victims of drive-by shootings and retaliatory gunfire.

Beyond the personal tragedies and emotional wreckage, gun violence also imposes extraordinary societal burdens and financial costs. It results in more than $2.3 billion in medical costs every year—of which taxpayers pay $1.1 billion. There are other costs as well: the money we pay for law enforcement to combat gun violence; the lost productivity of the killed and wounded; the lost economic opportunity in communities plagued by gun violence; and the devastation to the fabric of civil society.

That is why, when FBI 2006 data showed gun violence rates rising for the second year in a row, with many Midwest cities leading the trend, the IACP convened approximately 200 law enforcement executives and other regional leaders in gun violence reduction in Chicago in April 2007 at the Great Lakes Summit on Gun Violence.

With support from the Joyce Foundation, the summit participants reviewed the research, listened to experts, shared what they knew from their own jurisdictions and, ultimately, drafted recommendations.

CITY 000606

This report is the product of that summit. It comes from a regional group, but it addresses a national problem, and it demands national attention.

Law enforcement leaders understand and embrace their leadership role in combating gun violence. Every time a shooting happens, law enforcement gets the call: to stop the shooter; solve the murder; deal with the suicide; and put their own lives on the line to protect the community. When an officer is assaulted or killed by gunfire, it is an assault on justice and on society as a whole.

Law enforcement leaders know that they and the officers they lead have signed up to serve on the front lines of this fight. Many of the recommendations here address law enforcement officials and institutions, with the goal of improving the way police respond to and investigate gun crimes, protect officers and protect communities from gun violence.

Other recommendations address elected officials, community partners and the public. That is because one of the most important insights that arose from the summit was the realization that law enforcement cannot fight this battle alone. Law enforcement leaders need community partners. They need public support. And, they need elected officials to act in the public interest to reduce the terrible, and escalating, risk of gun violence in America.

CITY 000607

# KEEPING COMMUNITIES SAFE



Contrary to popular belief, gun violence is not simply an urban problem, a gang problem or a criminal problem. The yearly toll of deaths includes more than 16,000 suicides by firearms, plus shootings involving young children, the mentally ill and domestic violence—all the tragic situations that turn lethal because of the easy availability of firearms.

The United States is the most highly armed country in the world. There are 90 guns for every 100 citizens, according to 2007 figures from the Small Arms Survey; in the rest of the world, the rate is ten firearms for every 100 citizens. The U.S. rate of lethal violence is correspondingly higher than other developed countries. A study of crime in the 1990's by the Centers for Disease Control and Prevention (CDC) put the U.S. firearm homicide rate for children at 16 times that of other developed countries.

This section focuses on a range of strategies aimed at keeping communities safe by reducing the overall threat of gun violence. Specific recommendations for preventing and solving gun crime are in Section II. Recommendations for keeping police officers safe are in Section III.

# INCREASE PUBLIC AWARENESS OF THE IMPACT OF GUN VIOLENCE

The first step to solving a problem is understanding it. Despite alarming statistics, many Americans have not grappled with basic issues of gun violence. As one chief who participated in the summit said, "safety issues concerning a weapon in the home, the danger to families and friends experiencing mental health problems or in abusive relationships, the types of weapons available to criminals on the street, the absence of regulations— the average citizen is unaware of all this. When you talk to them, they're somewhat amazed."

To protect themselves, and to work with law enforcement on behalf of more effective public policies and practices to protect their communities, the public needs to become better informed. People need to know more about the prevalence of guns in their communities; they need to become aware of the troubling prominence of guns in all types of street crime, domestic violence and suicide, and the insidious influence of illegal gun trafficking.

Law enforcement executives and their agencies should ensure that these educational efforts extend not only to every adult, but also to every youth through every appropriate forum.

**1. The Joyce Foundation and the International Association of Chiefs of Police should develop research-based campaigns to educate policy makers and the public regarding the causes, costs, risks, and effects of gun violence, and strategies for preventing it.**

These education campaigns should be tailored to the needs of individual communities, but drawn from sound academic research being developed at such leading institutions as the Injury Control Research Center at the Harvard School of Public Health, the Firearm and Injury Center at the University of Pennsylvania, the Violence Prevention Research Program at the University of California, Davis, the Project Safe Neighborhoods (PSN) studies at Michigan State University and many others.

CITY 000608

As first responders and investigators of gun violence, law enforcement executives and their agencies possess a uniquely informed perspective on the ways in which gun violence affects communities. They must work with others to get that message across.

By partnering with other sectors and spearheading public and policy maker education efforts, law enforcement executives and their officers can ensure that the community and policy makers have an accurate understanding not only of the causes, costs, risks, and effects of gun violence, but also an accurate understanding of the role law enforcement plays in combating it. Furthermore, such campaigns will help community members and policy makers understand the role that they too must play if we are to turn the tide on gun violence.

Law enforcement executives and their officers should continue to make public appearances and participate in gun violence workshops at community councils, churches, businesses, schools, after-school programs and neighborhood gatherings. Where possible, they should testify at local, state and national legislative hearings on gun violence prevention legislation. They should invest in outreach efforts through public service announcements, mail campaigns, educational literature, billboard advertisements, press releases, newspaper and magazine articles and crime prevention toolkits. The more diverse the outreach efforts, the more community members and policy makers it will be possible to educate.

A campaign that presents gun violence as a national crisis and a major public health concern also must confront the seeming acceptance of gun violence as a normal part of life in the United States. Therefore, law enforcement also should look for ways to partner with the entertainment and news media to inform the public of the devastating consequences of gun violence and possible strategies to prevent it.

**2. Law enforcement agencies and their partners should work to identify and implement effective education and prevention programs focused on youth at risk of gun violence.**

Research shows significant overlap between youth at risk of being perpetrators, and those who become victims of gun violence. Broad-based partnerships with the public health, medical, faith, education, community groups, social service community and philanthropic sectors should work to establish gun violence prevention programs in a wide range of settings where young people gather.

Gun violence prevention should be included as a part of the regular health education curriculum, added to existing drug and gang prevention programs, and incorporated into after-school and out-of-school programs, faith-based programs and youth leadership development initiatives.

A particularly determined effort should be made to reach youth already engaged in criminal activity, because research shows they are at greater risk of engaging in gun violence than their non-criminally involved peers. To reach young people already involved in the criminal justice system, the partnerships described above should work with corrections officials to ensure that education on preventing gun violence is a mandatory part of juvenile detention and diversion programs.

**3. Law enforcement agencies and their partners should work to develop and implement education campaigns targeted at gun owners.**

The 2006 General Social Survey, conducted by the National Opinion Research Center at the University of Chicago, found that 35 percent of the nation's households and 21 percent of individuals reported owning at least one firearm. This is a decline from a few decades ago, when the rates were around 50 percent and 30 percent respectively. However, the United States still has rates of household firearm ownership that are considerably higher than rates in any other high-income country.

Research summarized in *Private Guns, Public Health* has demonstrated that gun owners are disproportionately at risk for gun injuries and gun suicide. Other research, including a 2003 study by economists at Duke University and Georgetown University, published by the Brookings Institution, effectively disputes the argument that gun ownership deters crime.

CITY 000609

Law enforcement agencies and the public health, medical and philanthropic sectors should work together to identify, develop and promote public education materials that explain to gun owners and potential purchasers the known risks of gun ownership. Every community member should hear about the risks before purchasing a gun; if they proceed with the purchase, that information should help shape their determination to follow best practices on safe storage and gun access to reduce the risks.

# ENGAGE COMMUNITY SUPPORT IN REDUCING GUN VIOLENCE

Beyond taking steps to protect themselves and their families, the public also needs to work to prevent gun violence on a broader scale. They must do so both by working with law enforcement and by demanding stronger public policies to reduce the threat.

Public support means more than passive acceptance of law enforcement's presence in the community. The public must become an active partner with law enforcement officers to secure the safety of their communities and make sure that public officials hear and respond to their concerns.

**4. Law enforcement leaders should devote resources and personnel to establishing and sustaining partnerships with community leaders to combat gun violence.**

Community partnerships are the key to many aspects of successful policing. These partnerships foster a greater understanding of the roles that community members and law enforcement each play in preventing and solving crime. Regular communication and sustained partnerships with community members provide the support law enforcement officers need to combat gun violence, and can also help develop information that can be critical in solving, or preventing violent incidents.

Law enforcement executives should make community relations officers, line officers and staff members available to the public through hotline calls, interactions with community groups or beat patrols and other street level communications.

In addition, the IACP and other law enforcement leadership organizations should work with the philanthropic sector to identify and promote successful law enforcement/community partnership models in the Great Lakes region and across the nation. Successful models should be shared with local agencies through law enforcement leadership websites, publications and conferences.

**5. Congress should restore funding for Community Oriented Policing Service (COPS) to strengthen community/police partnerships for combating gun violence.**

Putting more police officers in our communities is one of the most cost-effective ways to reduce crime. Repeated funding cuts, however, have undermined the power of a federally funded program, Community Oriented Policing Service (COPS), to ensure that law enforcement officers become intimately familiar with their communities and build relationships with people who live there.

Between 1995 and 1999, COPS provided nearly $1 billion annually in hiring grants to state and local police. In 2000, its peak year, the program funded approximately 17,000 additional sworn officers across the country. This period also witnessed a dramatic drop in the nation's homicide rate. Research recently published by the Brookings Institution indicates that the COPS program played a role in that decrease; the researchers called COPS "one of the most cost-effective options available for fighting crime."

In 2001, the COPS program and many other law enforcement assistance grants suffered significant budget reductions. This was both unfortunate and shortsighted, because these programs have consistently

CITY 000610

demonstrated that they provide critical resources to state, local and tribal law enforcement communities. By reducing, and in some cases eliminating, funding for these successful programs, Congress and the Administration have significantly reduced the ability of law enforcement agencies to combat both crime and terrorism. The result is that police departments throughout the nation have far fewer officers and resources today than they did in 1990s.

Despite the best efforts of our nation's law enforcement officers, the disturbing truth is that each year in the United States, well over a million of our fellow citizens are victims of violent crime. The rate of such crimes has increased steadily over the last two years. According to the FBI Uniform Crime Report, violent crime rose at a rate of 2.5 percent during 2005. To put that statistic in perspective, the increase represents an additional 31,479 victims. Unfortunately, this increase in the crime rate appears to be accelerating. It seems to be no coincidence that it comes at a time of severe cuts in resources and funding.

Specifically, funding for COPS dropped to $541 million in 2007, from $756 million in 2004. In 2008, a scant $32 million is budgeted for COPS—a reduction of 94 percent. IACP, in its Law Enforcement Agenda for the 110th Congress, expressed great concern over these severe cuts to programs that create safer neighborhoods. Summit participants echoed this concern and demanded that Congress fully fund the COPS program at $1.05 billion.

# REDUCE EASY ACCESS TO GUNS

Research at the Harvard School of Public Health, the Firearm Injury Center at Penn, and other leading research centers makes clear that the wide availability of guns is correlated with the high levels of lethal violence that distinguish the United States from other high income nations.

Similarly, regions of the United States with higher gun availability have higher firearm homicide and suicide rates, as well as higher *overall* homicide and suicide rates. Children in those states with higher gun ownership are about twice as likely to be victims of homicide and suicide as their peers in states with fewer guns.

In part because guns are so effective at ending life compared to other common suicide methods, research consistently shows that the presence of a gun in the home substantially increases the risk of suicide, especially among youth. Reducing easy access to guns is one important way to keep communities safe.

**6. IACP should develop a best practices protocol for voluntary gun surrender programs.**

People who wish to dispose of firearms should have a clear, consistent and convenient process for doing so. When possible, voluntary firearm surrender programs should be implemented by state, local and tribal law enforcement agencies within their jurisdictions. In conjunction with its members, IACP should survey the field for best practices and programs for other agencies to implement in their jurisdictions.

**7. Law enforcement executives should develop and implement policies to ensure the secure storage of guns temporarily in the department's possession. Procedures including a criminal background check for returning firearms and for third party transfers should also be implemented.**

Gun surrender programs require a system for securely storing and managing confiscated firearms. Law enforcement executives should design and implement clear and enforceable agency policies for storage of confiscated or surrendered weapons.

Agencies should also require a criminal background check be conducted prior to returning any firearms to their owners or allowing any third-party transfers. All third parties should be informed by law enforcement of the legal consequences of allowing a prohibited party access to the firearm.

CITY 000611

**8. Law enforcement agencies should mandate destruction of all firearms that come into their possession once any law enforcement use for them is completed.**

Law enforcement is in the unique position of acquiring tens of thousands of firearms a year either though confiscation, recovery or surrender. These weapons should be destroyed, in keeping with IACP's *Mandatory Destruction of Firearms* resolution.

The resolution calls for all law enforcement agencies to adopt a mandatory destruction policy, which includes surrendered guns as well as agency-issued service weapons. Once a gun has become clear of evidentiary and court procedures it should be destroyed. This action helps to keep officers and residents alike safe from re-circulated weapons.

**9. Congress, as well as state, local and tribal governments, should enact laws requiring that all gun sales and transfers proceed through a Federal Firearms License (FFL), thus ensuring that a mandatory background check will be conducted on the transferee.**

The federal Gun Control Act of 1968 stipulates that individuals "engaged in the business" of selling firearms must possess a Federal Firearms License (FFL). Holders of FFLs are required to conduct background checks and maintain a record of all their firearm sales. Certain gun sales and transfers between private individuals, however, are exempt from this requirement. This unregulated secondary market includes private sales, classified ads, flea markets, Internet sales and gun shows. Approximately 40 percent of all gun transfers currently fall into these categories.

Those who would fail a background check can access firearms through these sources. As a result, guns are far too easily acquired by prohibited possessors, and too often end up being used in gun crime and gun violence. Guns that are not sold or transferred through FFLs become more difficult to trace if lost, stolen or criminally misused, making crimes involving them more difficult to solve. These private sales and transfers also contribute to illegal gun trafficking because, unlike an FFL, the seller is not required to conduct a background check to determine whether the purchaser is prohibited from purchasing and possessing a gun.

Federal, state, local and tribal laws should be enacted to close these loopholes. If all gun sales proceed through an FFL, a single, consistent system for conducting gun sales, including background checks, will be established. In addition, the requirement that FFLs keep a record of gun sales would allow law enforcement to trace the gun to the last point of sale should it be criminally misused, lost or stolen.

**10. State and/or local governments should license all gun dealers.**

While all guns sales and transfers should be conducted through FFLs, state and local governments should also impose their own licensing requirements on gun dealers.

State and local requirements can respond to specific community concerns regarding gun commerce. State and local review of licenses would bring additional resources to identify and stop corrupt gun dealers. State-level regulations might include, for example, requiring background checks on all gun dealer employees, enhancing record keeping regarding gun sales within their jurisdictions, or heightening other security measures, including requiring that FFLs secure their inventory.

**11. State and local governments should regulate and/or limit the sale of multiple handguns as a measure to reduce gun trafficking.**

While federal law requires that gun dealers report to the federal Bureau of Alcohol, Tobacco, Firearms and Explosives (ATF) if multiple handgun sales are made to a single individual within a five-day period, state and local governments may impose restrictions of their own. Such restrictions would enhance public safety by guaranteeing that certain precautions, including the notification of state and local law enforcement agencies, are in place. Examples of current restrictions include laws in California, Maryland and Virginia limiting handgun sales to one per month.

CITY 000612

**12. State and local governments should mandate that a ballistic fingerprint is recorded for every gun sold.**

The distinctive markings left on projectiles and cartridge casings whenever a gun is fired comprise a ballistic fingerprint. Each gun produces a unique and unvarying ballistic fingerprint that becomes invaluable to law enforcement investigators should gun violence occur.

Ballistic fingerprints can prove that multiple crimes were committed by the same gun, and investigators can then trace those crimes to the exact gun used by determining to whom it was sold and when. These leads can potentially determine the identity of the shooter by allowing law enforcement officials to follow the "tale of the gun." Recording the ballistic fingerprint of every gun sold could enhance public safety and curtail gun violence.

# PROTECTING CHILDREN AND YOUTH FROM GUN VIOLENCE

From 2000-2004 in the United States, more than four children (aged 0-14) were murdered with a gun in an average week, and another three were unintentionally killed or committed suicide with a firearm. A CDC study of the 1990's put the U.S. firearm homicide rate for children at 16 times that of other developed countries.

Once children reach adolescence (aged 15-19), the death rates from firearms skyrocket. From 2000-2004, an average of 30 American adolescents were murdered with a gun each week, and another 15 committed suicide with a firearm. An average week saw 48 adolescents die from firearm wounds. (Statistics from the Harvard School of Public Health.)

The African-American community has seen the greatest toll on its youth. Young African-American males are killed by guns at a much higher rate than any other segment of the U.S. population, according to *Black Homicide Victimization in the United States* (Violence Policy Center, 2007).

Such events end young lives and devastate families. They also traumatize children who lose friends and classmates, and leave parents and communities unable to offer children the most basic assurance of safety.

A May 2007 investigation by the *Chicago Tribune* reported that 27 Chicago Public School students were murdered during the 2006-2007 school year, most of them by firearms. After one student (the son of a police officer and a firefighter) was shot on a city bus coming home from school, Chicago School Superintendent Arne Duncan reacted angrily to a remark that the student was in the wrong place at the wrong time. "He was in exactly the right place, on the bus, coming home from school!," Duncan said. "How can he not be safe there?"

Shootings on school grounds, while rare, are extremely disturbing. Nearly a decade after Columbine, we are still seeing deadly gun violence in our schools, including the shootings in the Amish school house, tribal school shootings in the Red Lakes area, and other tragedies.

Clearly, protecting young children from guns and addressing problems of youth violence must be major concerns for law enforcement, elected officials and communities across the country. In addition to the recommendations here, several recommendations in previous sections can also help reduce the risks to children and young people.

**13. State, local and tribal governments should mandate that every gun sold comes with a lock or security device that meets minimum safety standards to help protect against accidental discharge and misuse.**

As previously cited research shows, and as the American Academy of Pediatrics advocates, the safest home for a child is one without a firearm. However, many parents choose to own firearms and keep them in the home for a variety of reasons. Thousands of people, including many young children, are killed or injured every year

CITY 000613

by firearms that are left unsecured. Furthermore, millions of firearms are in the FBI stolen gun database, and many more firearms stolen every year are added to the file; many of these firearms are used in the commission of other crimes.

To protect against the criminal or accidental misuse of guns, every gun sold should come with an effective security device and educational information on safe storage of that gun.

**14. State, local and tribal governments should mandate safe storage of guns, provide voluntary off-site storage facilities, and prosecute those who fail to comply with safe storage laws.**

Recent studies reveal that many gun owners knowingly store their guns loaded and unlocked. Others in these households—primarily partners and mothers—may not know this. These families may not realize that their own households are at risk as a result of improper gun storage.

Safe gun storage should be a societal and legal imperative. Firearms owners should secure their firearms to help deter misuse and theft by using devices like safes, trigger locks and monitored alarm systems. Elected officials should mandate safe storage of guns and impose criminal penalties when individuals fail to comply and when improperly stored guns are criminally misused or result in accidental death or injury. State and local jurisdictions should develop voluntary off-site gun storage facilities to help gun owners reduce the risks to their families.

Professional law enforcement and philanthropic organizations should work with public health officials and medical personnel to identify, develop and promote public education materials on safe gun storage that law enforcement may use to educate gun owners within their communities.

# REMOVE GUNS FROM DOMESTIC VIOLENCE SITUATIONS

While all incidents of gun violence are unacceptable, incidents of domestic violence are particularly troubling.

Every year, more than 600,000 individuals are the victims of intimate partner violence; between three and ten million children witness some form of domestic abuse. Roughly 1,600 people—mostly women—die as a result of intimate partner violence each year. Over half of these deaths are firearm related.

New research seems to suggest that firearms are used by many domestic violence offenders to intimidate their victims. Threats during arguments include pointing the gun at the victim, cleaning it, shooting it outside or threatening to kill oneself, according to a 2004 study by the Harvard School of Public Health. Six percent of women in the United States report having been threatened with a gun; most of these threats were by intimate partners, according to a 1998 Department of Justice study.

Many of these occurrences might be prevented if strong state and federal laws were enacted and enforced prohibiting individuals with a history of domestic violence from possessing guns.

**15. All states should have laws that reinforce the federal laws prohibiting domestic violence misdemeanants and the subjects of domestic violence protection orders from purchasing or possessing firearms. The state laws should mandate that law enforcement remove all firearms and ammunition when responding to domestic violence incidents and when serving a domestic violence protective order. These important state and federal laws should be vigorously enforced by judges and law enforcement.**

A study conducted by Iowans for the Prevention of Gun Violence in 2005 revealed that of the domestic violence protective orders issued in Iowa district courts, only one in four prohibited the defendant from possessing a

CITY 000614

firearm. Anecdotal evidence indicates that Iowa is not unique in its failure to consistently enforce state and federal laws to protect victims of domestic violence from firearm violence.

State, local and tribal laws should be enacted to authorize law enforcement officers to remove all guns and ammunition from the scene of a domestic violence incident and at the time a domestic violence protective order is served. Judges should be required by law to order the removal of all guns and ammunition from domestic violence misdemeanants and the subjects of domestic violence protection orders. These laws must be vigorously enforced. First responders should be required (and trained) to ask victims and batterers about the presence of firearms in the home.

State laws should also mandate that judges ensure that defendants have complied with these orders by holding subsequent status hearings to determine whether all firearms have been surrendered or seized. In any instance of failure to comply, judges should then—as directed by state law—issue a warrant for law enforcement to seize all firearms and ammunition from individuals under domestic violence protection orders or convicted of domestic violence misdemeanors.

Finally, every state should maintain records of these actions so that courts, judges and law enforcement agencies may monitor compliance.

# PROHIBIT GUN POSSESSION BY AT-RISK INDIVIDUALS

In addition to people in situations of domestic violence, other classes of people are at special risk of using firearms in violent ways. These include people with certain kinds of qualifying mental health adjudications and commitments, people with a history of drug abuse and people who have been convicted of misdemeanors involving violence.

Strong laws and policies, along with vigorous enforcement efforts, are needed to keep guns away from those deemed ineligible to possess or purchase firearms.

**16. Federal, state, local and tribal governments should enact laws prohibiting persons with misdemeanor convictions involving violence, qualifying mental health adjudications and commitments, or a history of domestic violence and/or drug abuse from purchasing, possessing and transporting any guns or ammunition. These laws should be consistently and vigorously enforced.**

The federal government has laws, as do many states, prohibiting firearm purchase or possession by individuals at particular risk for committing firearm violence against others or themselves. Several states, however, have few or no such laws in addition to federal standards. State and local governments should review the laws they currently have on the books to see if stronger laws are needed.

To close the gap between policy and practice, federal, state, local and tribal governments in partnership with relevant law enforcement agencies, judicial bodies and prosecutors should establish and implement clear protocols regarding enforcement of these laws. Especially important are cross-jurisdictional collaboration, regular information sharing and cross-jurisdictional training. The roles of judges, prosecutors and law enforcement at different levels regarding enforcement of firearm prohibitions should be clearly defined.

**17. Law enforcement executives should create policies and protocols on the appropriate removal and seizure of firearms from prohibited persons and ensure that necessary training is provided.**

To ensure that their officers remove all guns from individuals prohibited from possessing them, law enforcement executives must establish policies and procedures governing the appropriate seizure of firearms and ensure

CITY 000615

that all officers receive training to implement them. Law enforcement executives must ensure that their officers act to the full extent of the law to remove guns from individuals prohibited from possessing them.

# FOCUS ON SUICIDE PREVENTION

According to figures from the federal Centers for Disease Control and Prevention (CDC), on an average day approximately 50 people in the United States kill themselves with a firearm. More people commit suicide by guns than by all other methods combined; guns are the most lethal means among common suicide methods.

Many suicides are impulsive acts, a response to a real but temporary crisis. This is particularly true among young people. According to data from the CDC's National Violent Death Reporting System (NVDRS), the interval from suicidal intent to attempt among young people is frequently less than one hour. Such patterns suggest that reducing access to firearms is an especially promising strategy for preventing suicide. Studies consistently show that firearms in the home are associated with increased risk of suicide.

**18. The CDC should work with law enforcement executives to standardize investigations into all violent deaths, including suicide, to improve the quality and comprehensiveness of National Violent Death Reporting System (NVDRS) data.**

NVDRS is a database covering every homicide, suicide and suspicious injury death that occurs in participating states. Its purpose is to assist local and national prevention efforts by providing detailed data on precipitating circumstances, victim and offender demographics, toxicological results and weapon information.

Law enforcement supplies vital data to the system, and not only in the area of homicide. With the exception of a few large urban police departments, most local agencies will respond to far more suicides than homicides. Many of the questions that the responding officer asks to establish whether a death was a suicide—e.g., whether the deceased had disclosed suicidal intent, left a note, previously attempted suicide, was in treatment for a substance abuse or mental illness or was experiencing a problem, such as a divorce or arrest—could provide critical information that suicide prevention groups need to better plan and evaluate their prevention strategies.

In order to prevent suicide, including firearm suicide, it is important to improve the quality and comprehensiveness of the NVDRS. The CDC should work with law enforcement executives to (1) improve the flow of data from local law enforcement to state NVDRS offices, and (2) standardize the information documented in death investigation summaries, particularly for suicides, where police may be unaware of the importance of the information they provide.

**19. The philanthropic and public sectors should support the development, distribution and evaluation of curricula for healthcare providers, law enforcement and mental health providers regarding their role in reducing suicidal individuals' access to firearms.**

Surveys of patients and providers have indicated that many medical and mental health providers do not ask suicidal patients or their families about access to firearms at home and are not comfortable counseling families on the best methods to secure weapons or temporarily or permanently dispose of them. Many police departments do not have policies for responding to families' requests to temporarily remove or permanently dispose of firearms, and they may be unfamiliar with provisions of state and federal laws that prohibit suicidal individuals or mentally ill persons with certain mental health commitments and adjudications from obtaining or possessing a gun.

Selected jurisdictions have begun developing training in this area. The philanthropic and public sector should support efforts to develop and evaluate these programs, and, if they prove useful, to disseminate information broadly.

CITY 000616

IACP should develop a set of recommended best practices for preventing suicide by law enforcement ers.

Of particular concern to the IACP and law enforcement executives is the problem of police officer suicide.

Persons working in law enforcement have stressful jobs, encounter dangerous situations, and routinely deal with trauma. This stress can be exacerbated by a police culture that tells officers to "be strong" and keep feelings "inside." Alcohol and drug abuse can add to the risk. The scarce data that is available shows that police officers are at the same or even higher risk than the general population of committing suicide. Because law enforcement officials have ready access to firearms, tragic situations occur much more often than they should. Evidence offers that police officers stand a greater chance of being killed by their own hand than by someone else.

The IACP is developing a project that will result in recommendations for suicide prevention for law enforcement agencies. These will serve to reduce the tragedy of suicide among police officers by surveying the field for best practices regarding the prevention and response to police officer suicide, encouraging sound research on the issue and working to turn around a culture that has not successfully addressed prevention and stressed that suicide is not the only way out.

Police officers need assurance that if they do come forward with thoughts of suicide or patterns of depression, they will not be looked upon as weak, but will instead be given the assistance they need.

CITY 000617

# PREVENTING AND SOLVING GUN CRIME



The previous section detailed strategies for making it less likely that firearms turn everyday life situations into tragedy through suicide, domestic violence or the use of firearms by people who are mentally ill, using drugs or otherwise prone to violence.

This section concentrates on patterns of illegal gun distribution and criminal gun use.

## STOPPING THE FLOW OF ILLEGAL GUNS

To help prevent gun crime, keeping guns out of the hands of gangs and criminals is a critical imperative. Illegal gun trafficking is a serious problem, one that law enforcement agencies cannot combat on their own. Partnerships across jurisdictional and professional lines—ATF, judges, prosecutors, government officials and researchers, in collaboration with law enforcement are necessary to facilitate information sharing and to discover illegal gun trafficking patterns.

**21. Congress should restore funding for the Byrne Justice Assistance Grant Program for state, local and tribal agencies to investigate and prosecute cases of gun trafficking and gun violence.**

The federal Byrne grants were created two decades ago, originally to assist with drug enforcement, prosecution, and training. More recently, the scope of the program has been expanded to include gangs, guns, and gun trafficking. In 2004, Byrne Justice Assistance Grant Program (Byrne-JAG) grants allowed law enforcement at the state and local level to seize more than 54,000 weapons, thus reducing the impact of firearms traffickers.

Despite this expanded mandate, Byrne-JAG funding has decreased dramatically over the last several years, from $884 million in 2004 to $525 million in 2007, and it is currently targeted for elimination in FY 2008. Although the administration has proposed replacing Byrne-JAG funding through monies channeled through new law enforcement programs, the proposed levels of funding for these alternate programs are far below the FY 2007 levels.

Restoring Byrne grants to $900 million in FY2008—the FY2000 level—and increasing FY2009 funding to $1.1 billion would enable state and local law enforcement agencies to more effectively investigate and prosecute incidents of firearms violence and trafficking.

**22. The federal government should increase funding to ATF for personnel and technical assistance to combat gun violence.**

A demand for funding to combat gun violence cannot stop with the programs that direct funding specifically toward state, local and tribal law enforcement agencies. There must also be an increase in funding for the federal Bureau of Alcohol, Tobacco, Firearms and Explosives (ATF).

Efforts to combat gun violence must proceed through partnerships in order to succeed. Increased funding for ATF personnel and technical assistance acknowledges the critical importance of partnerships between state, local and tribal law enforcement agencies and their federal counterparts, and would enhance collaborative investigations and prosecutions of incidents of gun violence and gun trafficking.

CITY 000618

In addition, according to a Department of Justice Inspector General's report, ATF is "currently unable to even begin" to meet its own target schedule for inspecting federally licensed firearms dealers. At the current inspection rate, it would take 22 years to inspect all dealers. ATF needs additional resources to do its job.

**23. Law enforcement agencies should increase investments in technologies and strategies that facilitate intelligence-led investigations.**

While agencies see a vast majority of their funds going to personnel support, it is imperative that investments be made to acquire technologies that advance intelligence-led investigations, and that all agency employees, civilian, patrol, lab technicians, investigators and commanders are trained to use all resources at their disposal.

An in-depth, productive investigation begins when information is gathered at the initial reporting of a crime or crime scene. Protocols should be in place to establish a clear chain of command and identify agency personnel tasked with clearing the scene, collecting evidence, gathering suspect and witness information and identifying any patterns involving serial crimes.

Follow-up to initial reports and crime scenes should include all technology at an agency's disposal. If an agency does not have the resources to conduct a thorough investigation, other agencies can help move investigations forward. Investigators should use information databases such as the National Crime Information Center (NCIC), ATF's National Tracing Center (NTC), the National Integrated Ballistics Information Network/Integrated Ballistics Information System (NIBIN/IBIS), and any "rapid start" programs that alert surrounding jurisdictions of serious crimes that might have multi-jurisdictional implications.

The use of reporting and data systems such as CompStat, GIS mapping and monthly inter- and intra-agency reports will help investigators close unwanted gaps in cases and gain further intelligence. The use of ShotSpotter, in-car cameras and computers, as well as GPS systems will increase officer safety as well as productivity.

**24. Congress should repeal the Tiahrt Amendment, which restricts the sharing of gun trace data.**

The Tiahrt Amendment is contained in the federal legislation making appropriations for ATF. This is a provision that restricts the release of most information about guns traced to crime scenes contained in the agency's Firearms Tracing System database.

For many years, crime gun tracing data was made publicly available under the provisions of the Freedom of Information Act (FOIA). The information was routinely used by city officials and law enforcement agencies to identify patterns that help to determine the patterns and sources of illegally trafficked firearms and the types of guns most often traced to crime. Since 2004, the Tiahrt Amendment has prohibited ATF from releasing any data contained in the database, except on a case-by-case basis, to individual law enforcement agencies.

Proponents of the restrictions claim that the release of tracing data could interfere with ongoing law enforcement investigations. However, prior to implementation of the Tiahrt Amendment, exemptions to the FOIA enabled ATF to withhold any information that could interfere with law enforcement investigations. The FOIA explicitly protects from disclosure any information that could reasonably be expected to interfere with enforcement proceedings or disclose the identity of a confidential source, or that could reasonably be expected to endanger the life or physical safety of any individual.

The restrictions imposed by the Tiahrt Amendment should be repealed and the data contained in the Firearms Tracing System database should be released under the FOIA. The Tiahrt Amendment's restriction on the release of crime gun trace data serves only to withhold information that was historically available to law enforcement, policymakers, and the public under the FOIA.

These restrictions also appear to severely limit the ability of local law enforcement agencies to conduct critical investigations designed to identify and apprehend corrupt firearms dealers and the traffickers they supply. Law enforcement should work with policy makers and ATF to ensure they have access to the data they need to prevent, interdict and investigate gun crime.

CITY 000619

**25. State and local governments should mandate the reporting of lost and stolen firearms, and federal law in this area should be tightened.**

The federal government has already taken steps to protect citizens against the criminal misuse of lost and stolen guns. As of 1994, federal law requires FFLs to report their lost and stolen guns to ATF and local law enforcement within 48 hours of discovering that the gun is missing. This law should be strengthened to ensure that dealers keep track of their inventories by requiring them to report missing firearms within 48 hours after they know or should know that the gun is missing.

As a result of current federal policy, and in particular the work of ATF's Stolen Firearms Program at the National Tracing Center, many stolen guns have been recovered and instances of gun violence averted.

Every state and local government should mandate that gun owners report lost and stolen guns. Stolen guns represent a major risk to the community at large, because they have, by definition, entered criminal hands. Ensuring law enforcement's early awareness of every lost and stolen gun will enhance their ability to recover those guns and reduce gun violence.

# INCREASE RESOURCES FOR INFORMATION SHARING BETWEEN JURISDICTIONS

**26. Congress should fully fund the National Violent Death Reporting System, and it should be implemented in all 50 states.**

In 2002, the Centers for Disease Control and Prevention established the National Violent Death Reporting System (NVDRS). NVDRS calls upon law enforcement agencies, coroners and medical examiners, along with other involved parties, to deliver a detailed report on the circumstances surrounding every violent death. Such information helps in a wide variety of violence prevention activities. Implementing NVDRS in all 50 states would cost an estimated $20 million annually, a relatively small sum for such an important violence prevention tool.

Utilizing NVDRS can help reduce violence. Providing information such as whether drugs or alcohol were involved in an incident, the type of weapon used, the location of the incident, the age and demographics of the victim and perpetrator, and the circumstances preceding the incident helps law enforcement and other public safety officials better understand the patterns underlying violent deaths and improve violence prevention efforts. For example, the New Jersey Violent Death Reporting System has made it possible to identify patterns of gang homicide and develop strategies for addressing it.

Although only 17 states currently participate in NVDRS, the benefits that these states realize from this relatively low-cost program are substantial. Federal funding should be made available to implement NVDRS in every state.

**27. Congress should fund the National Integrated Ballistic Information Network (NIBIN) and law enforcement agencies should use it consistently; it should also be funded to become integrated nation-wide.**

Because each gun makes its own entirely distinct and unique markings on fired bullets and cartridge cases, these markings positively identify the gun involved in any particular crime.

Through NIBIN and in coordination with ATF, state, local and tribal law enforcement agencies can enter the fired bullets and cartridge cases recovered from crime scenes into the Integrated Ballistics Information System (IBIS) database to determine whether the ballistic evidence from that particular crime gun matches the evidence from any other crime scene. Matching ballistic evidence across crimes allows law enforcement to identify patterns of crime gun use, solve gun crimes (including crimes that have remained unsolved over several years) and disrupt illegal gun trafficking.

CITY 000620

NIBIN enables law enforcement to combat crimes—including gang crimes—where frequent incidents of gun violence may be conclusively linked and establish a case for prosecution. Ideally, NIBIN allows law enforcement to follow guns wherever the guns themselves are used and to connect crimes that might have never been connected, whether because of geography, jurisdictions with their own separate intelligence databases or other factors.

It is recommended that all law enforcement agencies partner with ATF to ensure that a robust forensic database is built and continuously maintained. In calling for the full funding, implementation and national integration of NIBIN and its use by law enforcement executives, summit participants echoed the IACP's 2006 resolution of "Support for the Department of Justice National Integrated Ballistics Information Network (NIBIN) Program."

**28. Law enforcement leaders should provide, and public and private funding should support, training for law enforcement agencies to use the necessary tools to investigate, share information about, and prosecute incidents of gun violence and illegal gun trafficking.**

Training on gun crime is crucial for all agencies, large or small, urban or rural. From the point that a gun is diverted out of legal commerce to the point of a crime and arrest, there are many prevention, intervention and enforcement techniques that officers must know.

Once an arrest has been made, it is crucial that law enforcement be trained to solidly document cases for state and federal prosecution, work in partnership with prosecutors, and learn the most effective techniques of interviewing and testifying in court.

Officers and investigators should also know how to best utilize resources such as ATF's National Tracing Center, the National Integrated Ballistics Information Network/Integrated Ballistics Information System (NIBIN/IBIS), and National Crime Information Center (NCIC). Many officers are not aware of the vast amount of information that can be gleaned from trace and ballistic reports, as well as by sharing information across jurisdictions.

Once an arrest has been made and a case has gone through the court system, it is also imperative that law enforcement agencies partner with probation and parole departments to prevent and or reduce recidivism to reduce further incidents of gun violence, which runs as high as two-thirds in some jurisdictions.

The IACP, through grant funding, has long provided no-cost training to law enforcement executives, investigators, and patrol officers in many issues surrounding violent crime, technology and partnerships. Using face-to-face learning, online resources, up-to-date publications and roll-call CD-Rom's, law enforcement can remain educated and focused on the goal of preventing and punishing crimes involving guns.

The federal government and the philanthropic community must continue to invest the necessary resources to provide agencies with the most up-to-date training possible.

**29. State, local and tribal agencies should forge partnerships with federal law enforcement, the U.S. Attorney's Office, researchers, and other relevant organizations and individuals to investigate and prosecute incidents of gun violence and patterns of illegal gun trafficking.**

Law enforcement executives and their agencies will be more successful in preventing gun violence and illegal gun trafficking if they coordinate and share resources with other criminal justice agencies. Establishing partnerships to share information across jurisdictional and professional divides can lead to the discovery of patterns of illegal gun use and gun trafficking. Law enforcement executives must ensure that their agencies are ready to play their part in the process.

While "following the gun" may begin with law enforcement efforts to identify and trace a recovered crime gun, these efforts immediately demand that law enforcement officers move beyond their own agencies. ATF has taken the lead in collaborating with state, local and tribal agencies on gang violence and gun trafficking, and there are strong working partnerships in this area.

CITY 000621

In "Following the Gun: Enforcing Federal Laws against Firearm Traffickers," ATF estimates that a significant majority—68 percent—of their investigations involve local and state law enforcement agencies. A "close working relationship," their analysis suggests, "seems especially appropriate because 70 percent of the trafficking investigations involved intrastate trafficking and about 10 percent involved trafficking in firearms stolen from residences."

ATF, with its Violent Crime Impact Teams (VCIT), makes use of local knowledge but with federal resources. VCIT allows ATF agents to partner with state, local and tribal law enforcement to combat violence in areas that see the highest rates of crime. ATF allows the local jurisdiction to guide where and how federal resources should be distributed to prevent and respond to violent gun and gang crime. These teams, in their first year, showed a significant impact: the 15 pilot sites of VCIT saw crime rates drop by as much as 17 percent in just six months.

Initiatives such as VCIT, Project Safe Neighborhoods, and the FBI's Safe Streets Program all focus on partnerships between law enforcement at every level. These programs also stress the need to build solid cases once an arrest is made.

As cases develop in the courtroom, partnerships between law enforcement agencies, local and state prosecutors, and the US Attorney's Office become critical. Because state and federal laws impose different punishments for gun crimes, prosecutorial partnerships across the state-federal divide are invaluable in determining whether to pursue local or federal prosecution for a particular incident or pattern of gun violence.

Information-sharing partnerships with academic researchers enable law enforcement agencies to discover and respond to overarching trends in illegal gun trafficking and gun violence. Compelling private-sector research can also be useful in demonstrating a need for greater resources for departments and agencies, or to establish how much impact a new initiative is having on reducing gun violence in an area.

Initiatives designed to combat gun violence depend on information sharing partnerships between law enforcement, prosecutors and academic researchers. For instance, Project Safe Neighborhoods identifies partnerships as an essential element of success in combating gun violence. PSN task forces involve state, local, tribal and federal law enforcement, the U.S. Attorney's Office, academic researchers and community leaders. In forming and sustaining such partnerships, law enforcement agencies can contribute to broader preventive efforts.

Especially given limited resources, a multi-agency approach is the most effective and efficient means of investigating and prosecuting incidents of gun violence and patterns of illegal gun trafficking. Law enforcement executives and their agencies should take their own investment in such partnerships with seriousness and commitment.

# DEALING WITH GUN CRIME INCIDENTS

Despite law enforcement's best efforts to reduce gun violence by the means outlined in the previous section, incidents of gun violence will inevitably occur. Law enforcement executives must make sure their officers have the specialized training necessary to effectively handle these incidents and their aftermath.

Every law enforcement officer should know how to effectively recover and process a gun from a crime scene. Every law enforcement officer should know how to interact with the individuals involved in gun violence. And every law enforcement agency should know what to do with the information their officers gather.

Law enforcement executives who establish standard operating protocols and train their officers in these protocols will ensure the most effective response both to individual incidents and to patterns of gun violence that disrupt our communities.

CITY 000622

**30. Every law enforcement agency should use E-Trace, ensure that officers know how to properly recover and process crime guns and make sure that officers trace all firearms recovered.**

Handling a recovered gun is an exacting process. Officers must first guard their own safety by ensuring that the gun is unloaded, a potentially dangerous process in itself. Then they must generate a comprehensive description of the gun. This description should include serial number, manufacturer, type of firearm, caliber, model and any distinguishing features.

This description, entered into the National Crime Information Center (NCIC), may yield critical information including whether the gun has been reported lost or stolen or was used in a previous crime. Such information is invaluable to officers interacting with individuals at the scene of a crime, or investigating the crime long afterwards. Ensuring that officers are knowledgeable about NCIC and the way in which records must be submitted and received will ensure agency success in handling crime guns as tools for solving crimes.

The requirement, established by the Gun Control Act of 1968, that all guns manufactured or imported into the U.S. contain a serial number and the name, city and state of the gun's manufacturer assists law enforcement in tracing the gun's history. The accurate identification and tracing of recovered firearms is one of the most important steps in a criminal gun investigation. Tracing every recovered crime gun will eventually reveal previously unidentified persons or suspects, addresses and other critical associations.

Comprehensive tracing facilitates the development of a database that tracks each traced gun from manufacturer to the wholesaler and eventually to the FFL, who by law must identify the first known purchaser of that gun. In conjunction with ATF's Firearms Tracing System (FTS), which contains millions of records such as prior traces, lost or stolen guns, multiple handgun sales, and interstate firearms shipments, a trace can yield information that is critical in solving many crimes, such as firearms trafficking, straw purchases or an FFL who has falsified a sale or has failed to provide accurate information on purchasers, homicides and gang shootings.

When law enforcement recovers a gun with an obliterated serial number (which in itself is a crime that should result in arrest), it is quite likely that the serial number can be raised by a lab and the trace can still be completed. ATF and other agencies can provide critical information to help officers and lab technicians complete traces of guns with obliterated serial numbers. Agencies should also pay close attention to the number of guns recovered with obliterated serial numbers; this is one of the most telling signs that the gun in question has likely been trafficked.

Law enforcement executives should commit their agencies, through written policy, to tracing guns using the best means available, including E-Trace. Maintained by the National Tracing Center Division (NTC) of ATF, E-Trace allows law enforcement agencies to make trace requests and receive the results of those requests over the Internet. E-Trace, available only to accredited agencies, enables them to expedite traces, pursue multiple traces and review all trace results at once. It is imperative that agencies learn to trace all guns through NTC and also strive to become accredited to receive E-Trace.

**31. Law enforcement agencies should make sure that officers know how to debrief individuals involved in incidents of gun violence or arrested in possession of a gun.**

Expert debriefing of individuals involved in incidents of gun violence, or arrested in possession of a gun, is also critically important to solving crimes, revisiting unresolved crimes and preventing future crimes.

Such debriefing should involve questions about the crime, the role of guns and the role of the individual in relationship to the recovered gun. Questions about drug use, criminal convictions, domestic violence misdemeanors or restraining orders or the possession of ammunition may reveal whether the individual involved have committed firearm possession violations. Questions about gun sales, gun circulation and gun use may reveal how guns enter the community and help officers address local cycles of gun violence.

# KEEPING POLICE OFFICERS SAFE



Law enforcement officers on a daily basis respond to incidents of gun violence, confront individuals in criminal possession of guns and diffuse potentially violent situations. All of these situations have the potential to escalate and turn lethal if firearms are easily accessible.

Over one-third of law enforcement deaths that occur in the line of duty are the result of gunfire. For the first time in decades, more law enforcement officers are being feloniously killed with firearms than are being killed in car crashes. The National Law Enforcement Officers Memorial Fund (NLEOMF) and the Concerns of Police Survivors (COPS) report that the rate of officers killed in the first six months of 2007 skyrocketed by an astonishing 44 percent.

The entire law enforcement community is stricken over the sharp rise in gun-related deaths of police officers. The startling statistics make plain the need for more protection for our officers and more action from policy makers to keep them safe.

This section suggests steps to protect police officers operating on the front lines against gun violence.

# REDUCE THE AVAILABILITY AND LETHALITY OF FIREARMS TO CRIMINALS

### 32. Congress should enact legislation to allow federal health and safety oversight of the firearms industry.

Unlike other consumer products, domestically manufactured firearms are not subject to any design standards to reduce risk to the user or protect the safety of the general public and those sworn to protect them. Moreover, unlike other consumer products, no federal agency is empowered to require a remedy in the case of a defectively designed or manufactured firearm.

The lack of health and safety oversight is particularly worrisome given the manufacture and sale of firearms that pose a unique threat to law enforcement and the general public, such as high-caliber handguns that can penetrate bullet-resistant vests, anti-personnel military-style assault weapons and .50 caliber sniper rifles that can penetrate armor plating from a mile away.

### 33. Congress should enact an effective ban on military-style assault weapons.

A 2003 analysis of Federal Bureau of Investigation data found that at least 41 of the 211 law enforcement officers slain in the line of duty between January 1, 1998, and December 31, 2001, were killed with weapons that can be defined as or classified as assault weapons.

Anecdotal evidence from law enforcement leaders around the country suggests that military-style assault weapons are increasingly being used against law enforcement and by drug dealers and gang members; unfortunately, current restrictions on the release of ATF trace data make it impossible to know how often these firearms are being used in crimes.

CITY 000624

Law enforcement officials, municipal officials and public health and safety officials should support and promote an effective ban on military-style assault weapons.

### 34. Congress should enact an effective ban on .50 caliber sniper rifles.

Accurate to over a mile, .50 caliber sniper rifles can penetrate armor plating and destroy aircraft, but are sold with fewer federal controls than a standard handgun. The Government Accountability Office has reported that .50 caliber sniper rifles have been found in the armories of drug dealers in California, Missouri and Indiana.

### 35. Congress should enact an effective ban on armor-piercing handgun ammunition.

There is no sporting or other purpose for armor-piercing handgun ammunition, other than overwhelming the protections available to police officers in the course of their work. Such ammunition simply should not be available for civilian use.

Current federal law does not define "armor-piercing" in the practical terms of a handgun round's actual performance—i.e., whether it is capable of piercing ballistic armor—but in terms of content and weight. IACP should work with Congress to enact federal legislation that uses a penetration standard—gauging handgun ammunition's actual ability to penetrate body armor—to effectively ban all handgun ammunition that is, in fact, armor piercing.

# PROVIDE OFFICERS WITH THE MOST ADVANCED FIREARM PROTECTIVE TECHNOLOGIES AND INFORMATION

### 36. Local law enforcement agencies, policy makers and the federal government should increase investments in protective technologies that improve officer safety.

Full funding for a wide range of protective technologies that improve officer safety should rank among law enforcement's highest priorities in the fight against gun violence.

While some technologies are still in the development phase, many existing technologies would dramatically improve officer safety now. Body armor is a key example of available technology that should be widely deployed. Investments should also be made in technologies that improve individual officers' ability to share information and to work as part of a seamless network, as described earlier.

CITY  000625

# TRAIN OFFICERS TO BE EXPERTS IN HANDLING GUNS AND SITUATIONS INVOLVING GUNS

**37. State, local and tribal law enforcement agencies should establish agency standards for law enforcement officer firearm certification.**

Each year, not including suicides, an average of 55 officers are killed by firearms, and many more are injured in the line of duty. This includes an overwhelming number who are killed with their own firearms by an assailant. Today, in 2007, the number of officers killed in the line of duty is at its highest point in decades. It is imperative to promote the highest level of firearms training and enforce firearm certification at the highest standard possible to protect officers and prevent the staggering human and financial costs that result when they are lost. Rigorous firearm certification standards would greatly reduce the number of incidents in which firearms are accidentally or inappropriately discharged.

Firearms expertise cannot be taught in a single class, in an hour at the range, or by watching an educational video. Training should focus on the many real-life situations that an officer may face. Important concepts to include are night shooting, combat situations, active shooter situations and simulations of other specific scenarios that allow officers to learn in a controlled environment about behaviors that can be deadly on the street.

Every officer should be able to demonstrate proficiency in the proper use of firearms in the various situations in which they may find themselves. Similarly, every officer should demonstrate mastery of agency use-of-force policies and procedures.

Certification standards should ensure that every officer understands which firearms and ammunition are agency-authorized, how and when officers must and must not bear firearms, and how and where firearms may be safely stored. These standards should specify how the agency will respond should an officer fail to meet these demands.

Agencies should require on-going, in-service and supplemental training in gun safety and other firearms issues for all law enforcement officers.

In addition, states should establish their own independent standards for law enforcement officer firearm certification. By setting firearm proficiency standards, states acknowledge and reinforce the public's commitment to police officer safety.

Supporting professional organizations, including state associations of chiefs of police, should develop training tools on topics such as the prevalence of gun violence, safe gun storage and handling the emotional aftermath of encounters with gun violence. Such training tools should be produced in a variety of formats (web-based, CDs, brochures, etc). These materials should be used to supplement the physical training that officers receive throughout their career.

**38. Local law enforcement agencies should continue to enhance and promote training in less lethal tactics and officer safety for all officers.**

Weapons expertise should include proficiency in the use of less lethal force options such as electronic control devices, impact systems (e.g., bean bags, rubber bullets) and chemical irritants (e.g., pepper sprays).

Departmental policies and procedures should emphasize an officer's need for restraint, without limiting their ability to protect themselves and others in the event a situation escalates. The practical application of these policies and procedures using simulations and/or role playing exercises further reinforces the learning experience and conditions officers to select the appropriate use of force for any given situation.

CITY 000626

# PROVIDE ACCESS TO MENTAL HEALTH SUPPORT AND TRAINING

**39. Local law enforcement agencies should require training for officers to reduce stress and post-incident trauma.**

Even with the best training, gun violence will claim officers' lives. Nationally, an average of 55 officers are slain by gunfire every year. Moreover, every year even more officers commit suicide; nearly all of these suicides involve the use of a firearm.

Every law enforcement officer is impacted by these realities and other job stresses, and entire departments feel the loss when a police officer dies.

Federal, state, local and tribal governments should provide adequate resources for support and training to help with mental health issues affecting officers and require training in emotional survival and suicide prevention for all officers. Every law enforcement executive should have a plan in place to respond to an officer's death or injury by gunfire.

Providing officers with mental health support, preparing them for the emotional costs of violent confrontations, and responding effectively when they happen will save officers' lives.

CITY  000627

# APPENDIX A



# SUMMIT PLANNING & PROCEEDINGS

Since 1994, the IACP has hosted annual national policy summits focusing on critical issues confronting law enforcement agencies and the communities they serve. Each summit has brought together law enforcement executives, community leaders, policy experts, scholars and other stakeholders to share information, deliberate and discuss, and draft recommendations that form the basis of a national law enforcement policy on a select issue. In past years, this summit series has offered recommendations on the following issues:

| | |
|---|---|
| 1994 | Violence in the United States |
| 1995 | Murder in America |
| 1996 | Youth Violence |
| 1997 | Family Violence: Breaking the Cycle for Children Who Witness |
| 1998 | Hate Crime in America |
| 1999 | What do Victims Want?: Effective Strategies to Achieve Justice for Victims of Crime |
| 2000 | Improving Safety in Indian Country |
| 2001 | Building Partnerships that Protect Our Children |
| 2002 | Criminal Intelligence Sharing: Overcoming Barriers to Enhance Domestic Security |
| 2003 | DNA Evidence: Enhancing Law Enforcement's Impact From Crime Scene to Courtroom and Beyond |
| 2004 | Building Private Security/Public Policing Partnerships to Prevent and Respond to Terrorism and Public Disorder |
| 2005 | National Leadership Summit |
| 2006 | Offender Re-Entry: Exploring the Leadership Opportunity for Law Enforcement Executives and their Agencies |

The recommendations that emerged from these IACP national summits have been widely distributed to participants, law enforcement, the public and the media. The response has been very positive. In many instances, summit recommendations have served as a guide for program improvement in communities through the United States.

In 2007, the IACP departed from this national summit series model to collaborate with the Joyce Foundation on a regional summit, the Great Lakes States Summit on Gun Violence. This summit—like the ongoing IACP-Joyce Foundation collaboration on gun violence reduction from which it emerged—is the result of a shared concern regarding the recent increase in incidents of gun violence.

Although overall crime levels are at a historic low, gun crime itself is increasing. Nearly 30,000 individuals are killed by gun violence every year; an additional 65,000 individuals suffer non-fatal gun injuries; and a staggering 335,000 criminal misuses of guns occur every year. These levels of gun violence are simply unacceptable.

CITY 000628

The IACP and the Joyce Foundation have long pursued independent efforts to combat gun violence. The IACP's interest is the natural result of its concern over the costs that such violence imposes on law enforcement officers across the nation. Every year, incidents of gun violence claim the lives of an average of 55 law enforcement officers acting in the line of duty; many others die by their own hand.

For decades, the IACP has issued resolutions that identify potential legislative solutions to these tragedies. The Joyce Foundation's commitment to reducing gun violence emerges out of its stated interest in enhancing the quality of life in the Great Lakes region. Since 1993, the Joyce Foundation has dedicated more than $30 million in grants to organizations whose work contributes to the reduction of gun deaths and gun injuries.

The IACP and the Joyce Foundation jointly organized the 2007 Great Lakes States Summit on Gun Violence in the conviction that joining their efforts will enhance the ability of each to combat gun violence. The summit also called on the expertise of nearly 200 professionals, including law enforcement executives, criminal justice experts, public health officials, academic researchers, community leaders and elected officials to consider and confront all aspects of gun violence. Together, these experts called upon law enforcement executives to lead their agencies in the fight against gun violence.

Although the 2007 Great Lakes States Summit on Gun Violence embraced a regional focus, the IACP believes that the recommendations contained in this report have national implications. The impact of gun violence in the Great Lakes States mirrors that of gun violence in the nation at large; the recommendations address the concerns and challenges of law enforcement executives the nation over.

The value of these recommendations is the result, in large part, of the well-tested, deliberative process in which experts from various disciplines engaged during the summit itself. In this 2007 summit, participants were directed through the deliberative process by introductory remarks, keynote addresses, a panel presentation and a screening of the IACP/Joyce Foundation summit video on gun violence.

Introductory remarks were delivered by the president of the IACP; the president of the Joyce Foundation; the sheriff of Cook County, Illinois; the superintendent of the Chicago Police Department, and the mayor of Chicago. The keynote addresses, delivered by the president of the IACP and the acting director of ATF, both noted the disturbing upward trend in violent crime. The acting director of ATF argued that this trend necessitated the establishment of interagency partnerships to combat gun violence; the president of the IACP suggested that the trend made summit participants' efforts to craft realistic policy to reduce gun violence a law enforcement imperative.

The panel presentation—featuring a mayor, a public health researcher and an ATF special agent—addressed the barriers to common sense solutions to gun violence raised by America's distinctive gun culture. Finally, the IACP/Joyce Foundation summit video on gun violence demonstrated the terribly high costs that gun violence imposes on law enforcement officers through its examination of the experience of colleagues, families and friends of officers lost to gun violence in the line of duty.

Summit participants drew upon this information and their individual expertise as they separated into six working groups to discuss the challenges law enforcement executives and their agencies confront as they work to combat gun violence. These working groups dedicated the first day of the conference to sharing ideas, deliberating, and synthesizing differing viewpoints, then met the following morning in order to frame specific recommendations.

In a concluding plenary session, each working group presented its recommendations, thus offering all summit participants an opportunity to consider the emerging policy. This report was written on the basis of extensive documentation of the working group discussions. This documentation was taken by charts, laptop note-takers and facilitated, written recordings of group-driven agreements regarding final recommendations in their respective subject areas. Additionally, the final draft was reviewed by each of the 28 members of the Great Lakes States Summit Advisory Committee (see list at back of publication) to ensure its consistency with summit participant recommendations. The report reflects a thorough, genuine and energetic collaboration of experts and forms the basis of a national law enforcement agenda to combat the gun violence that cripples communities.

CITY 000629

# APPENDIX B



# SUMMIT PARTICIPANT LIST

**Ellen Alberding**
President
The Joyce Foundation

**Karen Aldridge-Eason**
Foundation Liaison
Office of Foundation Liaison State of Michigan

**Richard Allen**
Sergeant
City of Gary Police Department, MI

**Roseanna Ander**
Program Officer
The Joyce Foundation

**Dennis Angle**
Lieutenant
City of Waukesha Police Department, WI

**Kris Arneson**
Inspector
Minneapolis Police Department, MN

**Mark Atchinson**
Master Sergeant
Illinois State Police, Firearms and Information
Resources Bureau

**Edward Bailey**
Deputy Inspector
Milwaukee County Sheriff's Office, WI

**Catherine Barber**
Co-Director, NVISS
Harvard University School of Public Health

**Tom Barrett**
Mayor
City of Milwaukee, WI

**Patrick Berry**
Family Programs Manager
PAX/Real Solutions to Gun Violence

**William Biang**
Chief of Police
Waukegan Police Department, IL

**Al Blumstein**
Professor
Heinz School
Carnegie Melon University

**Jeri Bonavia**
Executive Director
WAVE Educational Fund

**Charles Bruggemann**
Colonel
Illinois State Police

**Ella Bully-Cummings**
Chief of Police
Detroit Police Department, MI

**Lawrence Burnson**
President
Illinois Association of Chiefs of Police

**Mike Carlson**
Inspector
Hennepin County Sheriff's Office

**Joseph Carter**
Chief of Police
Massachusetts Bay Transit Authority
President, IACP

**David Chipman**
Assistant Special Agent in Charge
Bureau of Alcohol, Tobacco, Firearms and Explosives,
Detroit Field Office   CITY  000630

**John Chisholm**
District Attorney
Milwaukee County District Attorney's Office

**Brenda Clack**
State Representative
Michigan House of Representatives

**Gerald Cliff**
Chief of Police
Saginaw Police Department, MI

**Philip Cline**
Superintendent
Chicago Police Department, IL

**Richard M. Daley**
Mayor
City of Chicago, IL

**Dina Dariotis**
Criminal Justice Coordinator
New York City Mayor's Office

**Tom Dart**
Sheriff
Cook County Sheriff's Department, IL

**Derrick Diggs**
Deputy Chief
Toledo Police Department, OH

**Heather Dorsey**
Senior State Council Coordinator
Illinois Family Violence Coordinating Councils

**Jimmie Dotson**
President
NOBLE

**Anne Egan**
Acting Deputy Superintendent
Chicago Police Department, IL

**Edward Egnatios**
Senior Program Officer
The Skillman Foundation

**Kevin Eide**
Judge
Minnesota State Courts

**Chet Epperson**
Chief of Police
Rockford Police Department, IL

**Michael Fisher**
President & CEO
Detroit Community Initiative

**Paul Fitzgerald**
Sheriff
Story County Sheriff's Office, IA

**Michael Flemming**
Executive Director
David Bohnett Foundation

**Larry Ford**
Assistant Director
Bureau of Alcohol, Tobacco, Firearms and Explosives,
Office of Public and Governmental Affairs

**Kerry Forestal**
Chief Deputy
Marion County Sheriff's Department

**Gary French**
Deputy Superintendent
Boston Police Department, MA

**Sue Fust**
Executive Director
Citizens for a Safer Minnesota

**J. Gregory Garlock**
Chief of Police
Lima Police Department, OH

**Greg Getty**
Inspector
Toronto Police Services, Canada

**Barry Getzen**
FSB West Region Commander
Michigan State Police

**James Gonzales**
Chief, Special Operations Division
Wayne County Prosecutor's Office

**Laura Goodman**
Director of Public Safety
College of Saint Catherine, Department of Public
Safety, MN

**Gary Hagler**
Chief of Police
City of Flint Police Department, MI

CITY 000631

**Raymond Hall**
Captain
Lansing Police Department, MI

**Stephen Hargarten**
Center for Firearm Injury, Medical College of Wisconsin

**Scott Harshbarger**
Senior Counsel to Firm
Proskauer Rose LLP

**Benjamin Hayes**
Special Agent
Bureau of Alcohol, Tobacco, Firearms and Explosives

**Rodger Heaton**
United States Attorney
United States Attorney's Office

**David Hemenway**
Professor
Harvard School of Public Health

**Tom Hendrickson**
Executive Director
Michigan Association of Chiefs of Police

**Kay Hoffman**
Chief of Police
President of the Michigan Chiefs of Police

**Audrey Honig**
Director
Los Angeles Sheriffs Department/ESSB

**Toby Hoover**
Executive Director
Ohio Coalition Against Gun Violence

**Joel Horowitz**
Professor
Northwestern University

**Steven Jansen**
Director
National Center for Community Prosecution
The National District Attorneys Association

**John Johnson**
Former Director
Iowans for the Prevention of Gun Violence

**Paul Johnson**
Chief of Police
Webb Lake & Scott Police Department, WI

**Renee Johnson**
Research Associate
Harvard Injury Control Research Center

**Sharnita Johnson**
Program Officer
The Skillman Foundation

**Mike Jones**
Neighborhood Service Association

**Quincy Jones**
National Community Development Institute

**Frank Kaminski**
Director of Safety
Evanston Township High School, School Dist. 202, IL

**Scott Knight**
Chief of Police
Chaska Police Department, MN

**Mark Kraft**
Deputy Director GangTECC
Bureau of Alcohol, Tobacco, Firearms and Explosives

**Fred LaFleur**
Assistant County Administrator for Criminal Justice
Hennepin County Community Corrections

**Michael Laage**
Chief of Police
Springdale Police Department, OH

**Russell Laine**
Chief of Police
Algonquin Police Department, IL
2nd Vice President, IACP

**Lewis Langham**
Deputy Legal Counsel, Policy Advisor
Office of the Governor, MI

**James Langtry**
Chief of Operations
Macomb County Prosecutor's Office

**Daniel Layber**
Special Agent in Charge
Wisconsin Department of Justice

CITY 000632

**Terry Lemming**
Lieutenant
Illinois State Police

**Tim Leslie**
Assistant Commissioner
Minnesota Department of Public Safety

**James Lewis**
Chief of Police
Appleton Police Department, WI

**Mark Lively**
Detective Sergeant
Saginaw Michigan Police Department, MI

**Gregory Lockhart**
US Attorney
Southern District of Ohio

**Tom Mahoney**
Deputy Supervisor, Gang Crimes
Cook County State's Attorneys Office

**Thom Mannard**
Executive Director
Illinois Council Against Handgun Violence

**Heather McCabe**
Indiana Partnership to Prevent
Violent Injury and Death

**Mary McFate**
Director of Federal Legislation
States United

**Frank McGhee**
Neighborhood Service Organization

**Michael McGrath**
Chief of Police
Cleveland Police Department, OH

**David Mitchell**
Cabinet Secretary
Delaware Department of Safety & Homeland Security

**Kathleen Monahan**
Project Director
Illinois Violent Death Reporting System

**Bill Morrow**
Chief of Police
Lac Courte Oreilles Tribal Police Department, WI

**Stephen Murphy, III**
United States Attorney
United States Attorney's Office
Eastern District of Michigan

**Michael Myszewski**
Director
Wisconsin Department of Justice - Narcotics Bureau

**Mallory O'Brien**
Associate Director
Harvard Injury Control Research Center

**Thomas Oetinger**
Chief of Police
Laconia Police Department, NH

**Brian O'Keefe**
Deputy Chief
Commander of the Criminal Investigation Bureau
Milwaukee Police Department, WI

**Joseph O'Neil**
Associate Medical Director
Indiana Partnership to Prevent Violent Injury and Death

**Nicholas Padilla**
Assistant United States Attorney
United States Attorney's office, Northern Indiana

**Giacomo "Jack" Pecoraro**
Executive Director
Illinois Association of Chiefs of Police

**Carl Peed**
Director
Office of Community Oriented Police Services (COPS)

**Terry Perry**
Legislative Coordinator
City of Milwaukee, WI

**Doug Pettit**
Chief of Police
Oregon Police Department, WI

**Carmen Pitre**
Executive Director
Task Force on Family Violence

**Robert Poikey**
Law Enforcement Coordinator
United States Attorney's Office-Eastern District of Michigan

CITY 000633

**Ervin Portis**
Chief of Police
Jackson Police Department, MI

**William Powell**
Chief of Police
Aurora Police Department, IL

**Gregory Reinhardt**
Lieutenant
Minneapolis Police Department, MN

**Matthew Rinka**
Assistant United States Attorney
United States Attorney's Office, IN

**Susan Riseling**
Chief of Police
UW-Madison Police Department
Vice President at Large, IACP

**John Risely**
Deputy Superintendent
Chicago Police Department, IL

**Scott Robinett**
Deputy Chief of Investigations
Indianapolis Police Department, IN

**Richard Ruminski**
Special Agent in Charge
Federal Bureau of Investigation

**Tony Russell**
Bishop
New Covenant of Peace Church, MI

**Valerie Russell**
New Covenant of Peace Church, MI

**Christopher Sadowski**
Special Agent in Charge
Bureau of Alcohol Tobacco, Firearms and Explosives,
Cleveland Field Division

**Daniel Samo**
Medical Director
ENH-OMEGA

**Bob Scales**
Senior Policy Analyst
City of Seattle

**Anthony Scarpelli**
Deputy Chief
Skokie Police Department, IL

**John Shanks**
Director
Brady Center, Law Enforcement Relations

**Leslie Sharrock**
Chief of Police
Waukesha Police Department, WI

**Ronald Shownes**
Law Enforcement Coordinator
United States Attorney's Office Southern District
Illinois

**Erick Slamka**
Director
Milwaukee HIDTA

**David Spakowicz**
WI Department of Justice
Milwaukee, HIDTA

**Rich Stanek**
Sheriff
Hennepin County Sheriff's Department

**Ted Street**
State President
Fraternal Order of Police Illinois State Lodge

**Michael J. Sullivan**
Acting Director
Bureau of Alcohol, Tobacco, Firearms and Explosives

**Jeannette Tamayo**
General Counsel
Chicago Crime Commission

**Frank Taylor**
Chief of Police
St. Croix Tribal Police Department, WI

**Robyn Thomas**
Executive Director
Legal Community Against Violence

**Alice Thompson**
Black Family Development, MI

CITY 000634

**Andrew Traver**
Special Agent in Charge
Bureau of Alcohol Tobacco, Firearms and Explosives,
Chicago Field Division

**Yamy Vang**
Assistant City Attorney
St. Paul City Attorney's Office

**Nina Vinik**
Legal Director
Legal Community Against Violence

**James Wagner**
President
Chicago Crime Commission

**Kurt Wahlen**
Chief of Police
Racine Police Department, WI

**James Walton**
Commander
Gary Police Department, IN

**Anthony Warr**
Deputy Chief
Toronto Police Service, Canada

**James Warren**
Administrator
Wisconsin Division of Criminal Investigation

**Michelle Waymire**
Supervisor-Community Prosecution Division
Marion County Prosecutor's Office

**Daniel Webster**
Co-Director
John Hopkins Center for Gun Policy and Research

**Charles Wellford**
Professor
University of Maryland, College Park

**Thomas Weyandt**
Assistant City Attorney
St. Paul City Attorney's Office

**Gregory A. White**
United States Attorney
United States Attorney's Office-Northern District of Ohio

**Maxine White**
Judge
Milwaukee County Circuit Court

**Douglas Wiebe**
Assistant Professor of Epidemiology
University of Pennsylvania

**Anthony Williams**
Nortown/WeCare, MI

**Bob Williamson**
Board Member
New England Coalition to Prevent Gun Violence

**Mary Ann Windham-Williams**
Nortown/We Care, MI

**Gary Wintemute**
Director, UC Davis
Violence Prevention Research Program

**Leah Woodward**
Executive Director
Iowans for the Prevention of Gun Violence

**Kym Worthy**
Prosecuting Attorney
Wayne County Prosecutor's Office

**Tou Yang**
Community Advocate
Skillman Foundation

**Bernard Zapor**
Special Agent in Charge
Bureau of Alcohol, Tobacco, Firearms and Explosives
St. Paul Field Division

**John Zaruba**
Sheriff, Third Vice President
National Sheriff's Association

# APPENDIX C



# SUMMIT ADVISORS

**Bill Blair**
Chief of Police
Toronto Police Service, Canada

**Jeri Bonavia**
Executive Director
WAVE Educational Fund

**Charles Bruggemann**
Colonel
Illinois State Police

**Ella Bully-Cummings**
Chief of Police
Detroit Police Department, MI

**John Chisholm**
District Attorney
Milwaukee County District Attorney's Office

**Philip Cline**
Superintendent
Chicago Police Department, IL

**Tom Dart**
Sheriff
Cook County Sheriff's Department, IL

**Tom Diaz**
Senior Policy Analyst
Violence Policy Center

**Paul Fitzgerald**
Sheriff
Story County Sheriff's Office, IA

**Fred Gebauer**
General Counsel
New York City Mayor's Office, NY

**Gary Hagler**
Chief of Police
City of Flint Police Department, MI

**Scott Harshbarger**
Senior Counsel to Firm
Proskauer Rose LLP

**Nannette Hegerty**
Chief of Police
Milwaukee Police Department, WI

**David Hemenway**
Professor
Harvard School of Public Health

**Steven Jansen**
Director
National Center for Community Prosecution
The National District Attorneys Association

**Frank Kaminski**
Director of Safety
Evanston Township High School, School Dist. 202, IL

**Scott Knight**
Chief of Police
Chaska Police Department, MN

**Russell Laine**
Chief of Police
Algonquin Police Department, IL
2nd Vice President, IACP

**Tom Mahoney**
Deputy Supervisor
Cook County States Attorney Office, IL

**Thom Mannard**
Executive Director
Illinois Council Against Handgun Violence

CITY 000636

**Matthew Miller**
Assistant Professor
Harvard University School of Public Health

**David Mitchell**
Cabinet Secretary
Delaware Department of Safety & Homeland Security

**Kathleen Monahan**
Project Director
Illinois Violent Death Reporting System

**Mallory O'Brien**
Associate Director
Harvard Injury Control Research Center

**Terry Perry**
Legislative Coordinator
City of Milwaukee, WI

**Ervin Portis**
Chief of Police
Jackson Police Department, MI

**Joy Rikala (ret.)**
Chief of Police
Minnetonka, MN

**John Risely**
Deputy Superintendent
Chicago Police Department, IL

**Leslie Sharrock**
Chief of Police
Waukesha Police Department, WI

**Ed Tomba**
Commander
Cleveland Police Department, OH

**Andrew Traver**
Special Agent in Charge
Bureau of Alcohol Tobacco, Firearms and Explosives,
Chicago Field Division

**Nina Vinik**
Legal Director
Legal Community Against Violence

**Douglas Wiebe**
Assistant Professor of Epidemiology
University of Pennsylvania

**Bernard Zapor**
Special Agent in Charge
Bureau of Alcohol, Tobacco, Firearms and Explosives
St. Paul Field Division

CITY 000637

# APPENDIX D



# REPORT WRITERS

Christine Allred

Valerie Denney

# REPORT CONTRIBUTORS

**Roseanna Ander**
Program Officer
The Joyce Foundation

**Kristen Beam**
Project Manager
IACP

**Tom Diaz**
Senior Policy Analyst
Violence Policy Center

**John Firman**
Director of Research
IACP

**Mark Glaze**
Principal
The Raben Group

**Amy Lightcap**
Training Coordinator
IACP

**Matthew Miller**
Assistant Professor
Harvard University School of Public Health

**David Mitchell**
Cabinet Secretary
Delaware Department of Safety & Homeland Security

**Mary O'Connell**
Director of Communications
The Joyce Foundation

**Kristen Rand**
Policy Advisor
Violence Policy Center

**Cynthia Schauman**
Project Assistant
IACP

**Gene Voegtlin**
Legislative Counsel/Manager, Public Affairs Activities
IACP

CITY 000638

# APPENDIX E



# SPECIAL GUESTS/SPEAKERS

**Ellen Alberding**
President
The Joyce Foundation

**Tom Barrett**
Mayor
City of Milwaukee, WI

**Joseph Carter**
Chief of Police
Massachusetts Bay Transit Authority
President, IACP

**Philip Cline**
Superintendent
Chicago Police Department, IL

**Richard M. Daley**
Mayor
City of Chicago, IL

**Tom Dart**
Sheriff
Cook County Sheriff's Department, IL

**David Hemenway**
Professor
Harvard School of Public Health

**Mark Kraft**
Deputy Director GangTECC
Bureau of Alcohol, Tobacco, Firearms and Explosives

**Russell Laine**
Chief of Police
Algonquin Police Department, IL
2nd Vice President, IACP

**Michael J. Sullivan**
Acting Director
Bureau of Alcohol, Tobacco, Firearms and Explosives

CITY 000639

 

# APPENDIX F

## IACP EXECUTIVE STAFF

**Dan Rosenblatt**
Executive Director

**James McMahon**
Deputy Executive Director/Chief of Staff

**Gene Voegtlin**
Legislative Counsel/Manager, Public Affairs Activities

**John Firman**
Director of Research

## IACP GUN VIOLENCE REDUCTION PROJECT STAFF

**Kristen Beam**
Project Manager, Gun Violence Reduction

**Cynthia Schauman**
Project Assistant, Joyce Foundation

**Amy Lightcap**
Training Coordinator, Project Safe Neighborhoods

CITY  000640

# IACP STAFF AND CONSULTANTS

**Laura Bell**
Training Coordinator
Technology Technical Assistance Program

**Tammy Berger**
Exhibits Manager
Conference Division

**Drew Brubaker**
IACP-Intern

**Wendy Clark**
Lieutenant
United States Capitol Police
IACP-Fellow

**Elaine Deck**
Program Manager
Services, Support and Technical Assistance for
Smaller Police Departments

**Chuck Everhart**
System Software Manager
Finance, Administration and Personnel

**Shannon Fahey**
IACP-Intern

**John Grant**
Senior Program Manager
Technology Applications Group

**Nicole Homan**
IACP-Intern

**Vinita Jethwani**
Project Manager
National Law Enforcement Leadership

**Suzanne Jordan**
Project Manager
Enhancing Police Response to Victims

**Kim Kohlhepp**
Manager
Center for Testing Services & Executive Search

**Aviva Kurash**
Project Manager
Police Response to Violence Against Women

**Safisha Mance**
President, Mance & Associates
IACP-Consultant

**James Martyn**
Lieutenant
Maryland State Police
IACP-Fellow

**Shellee Nickel**
Project and Events Assistant
National Law Enforcement Leadership

**Tamika Scott**
Technical Assistance Coordinator
Video Evidence Project

**Alison Terry**
IACP-Consultant

**Nancy Turner**
Senior Program Manager
Law Enforcement Leadership Initiative on Violence
Against Women

**The Raben Group**
Public Relations Firm
IACP-Consultants

**Maria Wagner**
IACP-Intern

**Lindsay Waldrop**
Policy and Training Coordinator
Police Response to Violence Against Women

**Serena Werner**
Project Assistant
Enhancing Police Response to Victims

CITY 000641



CITY 000642



For more information, please visit:

www.theiacp.org

www.joycefdn.org

CITY 000643