# Exhibit 88

**U.S. Department of Justice**

Bureau of Alcohol, Tobacco, Firearms and Explosives

*Office of Enforcement Programs and Services*



# ATF
# Safety and Security Information
# for Federal Firearms Licensees

For Theft/Loss Reporting Procedures,
See Back Cover



ATF Publication 3317.2
(Revised February 2010)



# Working for a Safer and More Secure America through Innovation and Partnerships to Prevent Firearms Thefts.

# Safety and Security Information for Federal Firearms Licensees

## *Table of Contents*

**IMPORTANT: If a crime has occurred or if inventory cannot be located, turn this booklet over and follow the directions on the back.**

**ATF OFFICE/HOTLINE TELEPHONE NUMBERS**..............................................**ii**

**ATF OFFICE ADDRESSES**.........................................................................**ii**

**ATF STOLEN FIREARMS PROGRAM**..........................................................**1**
    History.............................................................................................1
    Statutory and Regulatory Provisions.......................................................1
    The Three Program Areas....................................................................2
        **THEFT:** Firearms Stolen from Inventory......................................2
        **LOSS:** Firearms Missing from Inventory......................................3
        **INTERSTATE THEFT/LOSS:** Firearms Lost or Stolen from Interstate Shipments..........3
    Licensee Responsibility......................................................................4
    Trends..........................................................................................4
    Definitions.....................................................................................6
    Federal Stolen Firearms Laws...............................................................7

**SAFETY AND SECURITY: Steps for Reducing Your Vulnerability
        to Theft/Loss and Personal Injury**...........................................**8**
    Structural Security............................................................................8
    Inventory Security...........................................................................10
    Employee Screening.........................................................................11
    Safe Business Practices.....................................................................12
    Customer Safety.............................................................................14
    Disaster Preparedness......................................................................15
    Your Local ATF Office......................................................................15

**PROPERLY IDENTIFYING AND RECORDING FIREARMS**...........................**16**
    Firearms Inventory Diagram...............................................................17
    Basic Firearms Safety.......................................................................19
    Non-Licensed Firearms Sales..............................................................20
    Personal Firearms Record...................................................................21
    FFL Theft Warning..........................................................................23

**GUIDE TO RECORDING SUSPICIOUS PERSON DESCRIPTION**...................**25**

**HOW TO REPORT A THEFT/LOSS**.................................................*Back Cover*
    Burglary, Larceny or Robbery.............................................................A1
    Missing Inventory...........................................................................A2
    Interstatement Shipment Theft.............................................................A3
    ATF F 3310.11, Federal Firearms Licensee Theft/Loss Report.......................A4
    ATF F 3310.6, Interstate Firearms Shipment Theft/Loss Report.....................A6

**i**

U.S. Department of Justice · Bureau of Alcohol, Tobacco, Firearms and Explosives · *Office of Enforcement Programs and Services*

 # ATF OFFICE/HOTLINE TELEPHONE NUMBERS

STOLEN FIREARMS HOTLINE……………..........................................TOLL FREE  888-930-9275

STOLEN FIREARMS PROGRAM FAX……………….......................................304-260-3676

ATF 24-HOUR HOTLINE……………….............................................TOLL FREE  800-800-3855

LOCAL ATF OFFICE TELEPHONE NUMBER _____

**ATF WEB SITE (FOR UPDATES AND TO DOWNLOAD FORMS):**

**www.atf.gov**

**ATF DISTRIBUTION CENTER** (FOR FORMS AND PUBLICATIONS)...................301-583-4696

ATF DISTRIBUTION CENTER
1519 CABIN BRANCH DRIVE
LANDOVER, MD 20785

**STOLEN FIREARMS PROGRAM MAILING ADDRESS:**

ATF STOLEN FIREARMS PROGRAM MANAGER
244 NEEDY ROAD
MARTINSBURG, WEST VIRGINIA 25405

**ATF HEADQUARTERS MAILING ADDRESS:**

BUREAU OF ALCOHOL, TOBACCO, FIREARMS and EXPLOSIVES
99 NEW YORK AVENUE, NE
WASHINGTON, DC  20226

**IMPORTANT TELEPHONE NUMBERS:**

| CONTACT | TELEPHONE | FAX |
|---|---|---|
| | | |
| | | |
| | | |
| | | |

# ATF STOLEN FIREARMS PROGRAM

## HISTORY

The Bureau of Alcohol, Tobacco, Firearms and Explosives' Stolen Firearms Program was formally established on September 13, 1994, with the passage of the Violent Crime Control and Law Enforcement Act of 1994. For more than 20 years before this Act, ATF had been accepting voluntary reports of firearms lost/stolen from interstate shipments. This law created a statutory requirement for Federal firearms licensees (FFLs) to report the theft/loss of firearms from their inventories or collections.

Pursuant to the 1994 legislation, federally-licensed firearms dealers are required to report the theft/loss of a firearm(s) from inventory or collection within 48 hours of the discovery of the theft or loss. In order to manage this new reporting, to support law enforcement efforts to recover these firearms, and to develop strategies to prevent future thefts/losses, the Stolen Firearms Program was created. ATF staff, utilizing innovative databases, manage thousands of reports of theft/loss containing the records of more than 200,000 firearms reported lost/stolen since 1994.

Although the 1994 law did not address firearms lost/stolen from interstate shipments, ATF continues to maintain a program for the voluntary reporting of these thefts/losses. Under the ATF Stolen Firearms Program, a new database was also created specifically to manage the information from these incidents.

In the years following the Act, ATF has used the information generated by the program to identify, apprehend, and convict hundreds of firearms thieves. Thousands of stolen firearms have been taken from the hands of criminals and returned to their lawful owners. In addition, the program has highlighted the vital role that dealer security and sound inventory practices play in protecting licensed dealers and in keeping firearms out of the hands of criminals. Licensed firearms dealers are the first line in maintaining the security and lawful transfer of firearms.

The ATF Stolen Firearms Program is one of the means that licensees and law enforcement agencies use to protect our communities. ATF has developed individual programs to focus on three distinct problem areas: the criminal taking of firearms from Federal firearms licensees (theft); firearms in the inventories of Federal firearms licensees whose disposition cannot be determined (loss); and, firearms lost/stolen from interstate shipments. The operations of each of these programs, and the unique issues they address, are explained in detail in this document.

## STATUTORY AND REGULATORY PROGRAM PROVISIONS

The statutory requirement for reporting theft or loss of a firearm from inventory or collection can be found in 18 U.S.C. 923(g)(6) and states: "Each licensee shall report the theft or loss of a firearm from the licensee's inventory or collection, within 48 hours after the theft or loss is discovered, to the Attorney General and to the appropriate local authorities."

The procedures for reporting are set forth in ATF Regulations, Part 478-Commerce in Firearms and Ammunition, 478.39a, Reporting Theft or Loss of Firearms. An expansive source of information on Federal firearms laws and regulations is the Federal Firearms Regulations Reference Guide, ATF Publication No. 5300.4, which can be obtained from your local ATF office or by calling the ATF Distribution Center at 301-583-4696. This publication and many ATF forms are also available on ATF's web site www.atf.gov.

U.S. Department of Justice · Bureau of Alcohol, Tobacco, Firearms and Explosives · *Office of Enforcement Programs and Services*

---

The ATF Stolen Firearms Program is limited to firearms as defined by 18 U.S.C. 921(a)(3). Although property other than firearms (i.e., pellet and BB guns, black powder rifles, etc.) may be lost or stolen from an FFL, the reporting requirements apply only to firearms as defined in the above-cited law.

# THE THREE PROGRAM AREAS

The Violent Crime Control and Law Enforcement Act of 1994 did not provide specific definitions for the terms "theft" and "loss" as applied to firearms in the inventories and collections of Federal firearms licensees. In order to administer the law and regulations, ATF recognizes a clear distinction between firearms taken in a crime and firearms whose dispositions are unknown due to administrative/record keeping errors. The actions taken by ATF and by other law enforcement agencies are also distinctly different when there is evidence or lack of evidence of a crime.

For this reason, ATF has recognized the Act's distinction between theft and loss as the distinction between the presence or absence of criminal taking of firearms. In the following paragraphs, the meanings of "theft" and "loss" under the Stolen Firearms Program are clearly set forth in two distinct program areas.

The third program area has no enabling regulation. The interstate theft program addresses the many difficulties faced when firearms that are being shipped fail to arrive at their intended destination. Because the circumstances of their disappearance are so often unknown, it is not immediately clear whether they were stolen or misplaced. For this reason, this program area addresses both theft and loss under a uniform procedure, which is described in detail in the ensuing paragraphs.

## THEFT (FROM A LICENSEE): Firearms Stolen from Inventory

Under the program, a "theft" of firearms occurs when one or more firearms are stolen from the inventory of a Federal firearms licensee (FFL). The term "stolen firearm" is used to refer to a firearm, or firearms, taken in a theft from a licensee. Under ATF's program, theft is divided into three distinct categories: burglary, larceny, and robbery.

The legal definitions of these three categories of crime can vary from State to State. They do have a common tie in that they all generally refer to the criminal taking of another's property. For program purposes, ATF recognizes each State's respective legal definitions for these terms. Reporting licensees should follow the State or local law enforcement authority's guidance in selecting which term applies.

The theft of firearms is a critical event and must be reported to the local enforcement authorities. Although the law allows the FFL 48 hours to make the report, ATF recommends that FFLs contact ATF and local law enforcement immediately upon the discovery that a crime has occurred. Expeditious reporting can make the difference in law enforcement's ability to catch the criminals and recover the firearms.

When submitting a report of stolen firearms to ATF, both the local police department that was notified and the resulting police report number must be identified on the ATF report. Remember that it is important to ensure individual safety and to preserve the crime scene for investigators.

(For reporting procedures turn to page A1)

## LOSS (BY A LICENSEE): Firearms Missing from Inventory

A "loss" of a firearm occurs when a licensee cannot determine the disposition of a firearm and cannot locate it. The licensee's records will generally reflect an acquisition but no disposition. These "lost" firearms are distinctly different from stolen firearms because, although they are "missing from inventory," there is no indication that they were stolen. The Stolen Firearms Program includes the statutory requirement that licensees must report any firearms missing from inventory to ATF.

Licensees must make the notification of firearms missing from inventory to ATF and to local law enforcement within 48 hours of becoming reasonably certain that the firearms are missing. In many instances, the licensee may be able to determine the disposition of firearms by conducting a thorough inventory. If a complete inventory has been conducted, the FFL will be directed to conduct an exhaustive review of all acquisition and disposition records, shipping records, and if applicable, all ATF Forms 4473.

When all means available are exhausted, the licensee will be directed to submit a loss report to the Stolen Firearms Program Manager.

(For reporting procedures turn to page A2)

## INTERSTATE THEFT/LOSS: Firearms Lost or Stolen from Interstate Shipments

An interstate "theft/loss" occurs when a firearm that was shipped through a common carrier, including shipping and moving companies and the U.S. Postal Service, is lost or stolen while in transit. The reporting of these incidents is not required by regulation but is strongly recommended as a best business practice. ATF accepts voluntary reporting of the theft or loss of firearms from interstate shipments completed by a licensee or non-licensee. ATF provides ATF Form 3310.6, Interstate Firearms Shipment Theft/Loss Report, to assist in reporting. Under the program, ATF receives reports on hundreds of firearms "lost" or "stolen" from interstate shipments each year.

Licensees are reminded that when shipments of firearms are received, it is a best practice to review the shipment to ensure that it contains all of the expected firearms documented. It is also a best practice, upon receipt of firearms, that their acquisition be recorded immediately. The acquisition of firearm(s) must be recorded not later than the close of the next business day following the date of acquisition. Limited exceptions to this requirement can be found at 27 CFR, Part 478.125 Record of receipt and disposition.

ATF provides this program to protect the public and to assist law enforcement in locating and recovering stolen firearms and in prosecuting thieves. Since its inception in 1975, the program has proven to be effective and successful in helping to solve numerous crimes and recover thousands of firearms. ATF's Interstate Theft Program fills a gap in law enforcement jurisdiction that is created by the interstate nature of these shipments.

That gap is created because the movements of these shipments make the point of theft/loss difficult to determine. State and local law enforcement agencies often lack the jurisdiction or authority to investigate these interstate movements, particularly when the point of loss has not been determined.

Most commercial carriers have established procedures under which they conduct a search for missing items, including firearms. These internal searches are often extensive, and in many instances the firearms are located and delivered to their intended destinations. When a firearm cannot be located, it is considered stolen.

A smaller number of firearms fall into the "interstate loss" classification. If a cargo ship carrying firearms sinks or a truck carrying firearms is destroyed, the firearms are considered "lost." Although there is no indication of theft, an accident has occurred and as a result the firearms cannot be located.

Interstate Theft/Loss Reports may be filed by the shipper, by the carrier, and/or by the intended recipient (consignee). It is not uncommon for an individual theft or loss to be reported by more than one party. Reporting is not limited to licensed dealers. There are several scenarios under which non-licensed persons may lawfully ship firearms in interstate commerce. A report may be filed by any person who lawfully ships a firearm and experiences a theft or loss. For example, this would include the theft/loss of a firearm during a change in residence wherein the firearm was being carried by a moving company.

The most active participants in the program are the carriers themselves. Commercial carriers do not require a Federal firearms license to ship firearms, and many carriers actively participate in the program. This close working relationship between ATF and the carriers has resulted in the recoveries of thousands of firearms over the years.

Licensees who ship firearms are encouraged to amend their disposition record upon learning of a non-receipt of a firearm by the receiving entity or consignee. (For reporting procedures turn to page A3)

# LICENSEE RESPONSIBILITY
## Lost or Stolen Firearms Pose a Threat to Public Safety

### Report Theft/Loss within 48 Hours
Federal firearms licensees who discover the theft or loss of a firearm or firearms are required by law to report the incident to the local law enforcement authority and to ATF within 48 hours. The distinction between theft and loss is explained in depth in the preceding chapters, and the procedures to report a theft or loss can be found by following the directions on the back of this brochure.

### Protect Inventory
ATF recommends that Federal firearms licensees take every precaution available to protect their firearms from theft or loss. This includes conducting periodic and thorough, physical inventories, then reconciling the count to the book inventory. At a minimum, an annual inventory or its equivalent is highly recommended. Physical security including alarm systems and safe business practices are also highly recommended and in some cases may be required by State or local law. The following chapter contains many tips and ideas that the licensee can utilize to enhance the safety of their inventory.

### Report Firearms Violations
Federal firearms licensees may not knowingly transport, ship, or receive firearms with serial numbers that have been altered, removed, or obliterated. Licensees also may not knowingly receive or sell stolen firearms. Firearms taken on pawn or for resale that are determined to be stolen must also be surrendered to the appropriate law enforcement authority. In all circumstances, licensees should immediately report violations to the appropriate law enforcement agency.

# TRENDS
Thefts of firearms from federally licensed firearms manufacturers, importers, dealers, and collectors continue to be a significant concern for law enforcement and for the general public. The ATF Stolen Firearms Program is at the center of efforts by licensees to protect their inventories and by law enforcement to capture and prosecute firearms thieves. These initiatives are greatly assisted when

**4**

licensees maintain accurate inventories and records and fulfill their legal responsibility to provide timely and accurate notifications regarding any thefts or losses of firearms.

At the center of any effort to protect firearms from theft is the process of accurate and reliable inventories. When a firearm theft occurs, the records maintained by the owner are pivotal to the recovery of those firearms and the prosecution of the thieves. Failure to conduct periodic inventories and maintain accurate records leads to confusion regarding the true dispositions of firearms and can result in false arrests and/or seizures of firearms mistakenly reported stolen. Law enforcement is greatly assisted when Federal firearms licensees maintain accurate records of firearms inventories.

However, an accurate determination of the full extent of all firearm thefts and losses in America is not possible. One of the leading factors is that there is no requirement that non-licensees report stolen firearms. A second is that among those non-licensees that want to report firearms thefts and losses, there is frequently an inability to accurately identify the firearms. Because of factors like these, there is no law enforcement database or statistical collection protocol that was designed to track, or which can accurately track, the numbers and types of firearms stolen outside of the regulated firearms industry.

Without accurate identification of these firearms, law enforcement officials face considerable obstacles in investigating these firearms thefts. In contrast, firearms that are under the control of federally licensed firearms importers, manufacturers, dealers, and collectors must be carefully inventoried and identified. In 1968, Congress established specific marking requirements for firearms, so that they could be identified and distinguished by law enforcement (see Properly Identifying Firearms, page 15).

Specifically, firearms manufactured after 1968 must be identified by make, model, caliber, serial number, and other features that generally allow each individual firearm to be definitively identified and uniquely distinguished from all other firearms (more information on required markings is available in ATF Publication 5300.4, Federal Firearms Regulations Guide). Because the firearms industry utilizes and records these required markings, if they experience a theft or loss, it can be accurately reported to law enforcement and the firearms readily identified when recovered. Firearms taken in residential and industrial burglaries, stolen from shipments, and otherwise taken illegally or simply lost, frequently go unreported or cannot be fully documented because the firearms' individual descriptions were not fully documented by their owners.

ATF has reintroduced ATF Publication 3312.8, Personal Firearms Record (see page 21), to assist firearms owners and law enforcement in correctly documenting and identifying lost or stolen firearms. These pamphlets are available at no cost from the ATF Distribution Center (301-583-4696). Whenever a firearm is sold to a non-licensee, we recommend that the FFL provide the buyer with a copy of this publication. If a copy of the publication is not available, we recommend that the purchaser be encouraged to keep a record in some form, including a full description of the firearm, separate from the firearm's storage location.

ATF also works closely with the interstate carriers who ship and transport firearms, including the U.S. Postal Service, to ensure that lost or stolen firearms can be identified and reported. A number of these carriers have developed sophisticated protocols to ensure the safety of firearms shipments and to accurately report any thefts or losses.

Although only Federal firearms licensees are required to report firearms thefts, the information being received makes it clear that thefts are not declining. This trend underscores the need for licensees and non-licensees to continue efforts to properly record firearm inventory and identification information, and to safeguard firearms from theft or loss.

5

U.S. Department of Justice · Bureau of Alcohol, Tobacco, Firearms and Explosives · *Office of Enforcement Programs and Services*

# DEFINITIONS USED IN THIS PUBLICATION

**NOTE:** Although the following terms may have many definitions, their meanings within the Stolen Firearms Program are provided here.

**Appropriate local authorities.** These authorities are either the local police department, sheriff's office or the State police agency having primary law enforcement responsibility for the licensee's business premises.

**Collection.** Curio and relic firearms acquired by and in the inventory of a federally licensed collector of firearms. For more information on curio and relic firearms, see ATF Publication 5300.11, Firearms Curios and Relics List and ATF Regulation 27 CFR 478.93.

**Common or contract carrier.** The term "common or contract carrier" refers to any individual or organization engaged in the business of transporting passengers or goods.

**Consignee.** The term "consignee" means the business or individual to whom the firearm(s) was shipped, even if the firearm(s) is lost or stolen and never delivered to such business or individual.

**Federal Firearms Licensee.** A Federal firearms licensee (FFL) is any person, partnership, or business entity holding a valid license issued under the authority of 18 U.S.C. 923, which allows them to "engage in the business" of dealing (manufacturing, importing, selling retail or wholesale, repairing, or pawn brokering) firearms. It also refers to collectors licensed under 18 U.S.C. 923. By law, all FFLs must keep records of their firearms transactions. (See 18 U.S.C. 921(a)(21) for a definition of "engaged in the business.")

**Firearm.** As defined under Federal law, 18 U.S.C. 921(a)(3), the term "firearm" refers to (A) any weapon (including a starter gun) which will or is designed to or may readily be converted to expel a projectile by the action of an explosive; (B) the frame or receiver of any such weapon; (C) any firearm muffler or firearm silencer; or (D) any destructive device. Such term does not include an antique firearm.

**Licensee.** The term "licensee" refers to a Federal firearms licensee, also abbreviated "FFL."

**Loss.** The term "loss" refers to firearms whose disposition is unknown but for which there is no evidence of theft.

**Shipper.** The term "shipper" refers to the business or individual who delivers the firearm(s) to the common or contract carrier.

**Stolen firearm.** A firearm that has been taken from its lawful owner by the act of burglary, larceny, or robbery.

**Theft.** The term "theft" refers to a specific criminal act or event in which a firearm, or firearms, are stolen.

6

# FEDERAL STOLEN FIREARMS LAWS

Individual States, and localities, often have laws and ordinances that apply to the theft of firearms, possession of stolen firearms, and the sale of stolen firearms. Be sure to familiarize yourself and your employees with those laws that apply to your business.

Federal law also addresses stolen firearms and prescribes penalties for violations of those laws. The following briefly sets forth some of the laws that apply specifically to federally licensed firearms dealers:

**Unlawful to transport or ship stolen firearms.** "It shall be unlawful for any person to transport or ship in interstate or foreign commerce, any stolen firearm or stolen ammunition, knowing or having reasonable cause to believe that the firearm or ammunition was stolen." 18 U.S.C. 922(i).

**Unlawful to possess, store, sell or pawn stolen firearm.** "It shall be unlawful for any person to receive, possess, conceal, store, barter, sell, or dispose of any stolen firearm or stolen ammunition, or pledge or accept as security for a loan any stolen firearm or stolen ammunition, which is moving as, which is a part of, which constitutes, or which has been shipped or transported in, interstate or foreign commerce, either before or after it was stolen, knowing or having reasonable cause to believe that the firearm or ammunition was stolen." 18 U.S.C. 922(j).

**Unlawful to steal a firearm from a federally licensed firearms dealer.** "It shall be unlawful for a person to steal or unlawfully take or carry away from the person or premises of a person who is licensed to engage in the business of importing, manufacturing or dealing in firearms, any firearm in the licensee's business inventory that has been shipped or transported in interstate or foreign commerce." 18 U.S.C. 922(u).

**Fines and imprisonment up to 10 years for stealing a firearm.** "A person who steals any firearm which is moving as, or is a part of, or which has moved in, interstate or foreign commerce shall be imprisoned for not more than 10 years, fined under this title, or both." 18 U.S.C. 924(l).

**Fines and imprisonment for stealing a firearm from a licensed dealer.** "A person who steals any firearm from a licensed importer, licensed manufacturer, licensed dealer, or licensed collector shall be fined under this title, imprisoned not more than 10 years, or both." 18 U.S.C. 924(m).

Contact your local ATF Field Office for more information on these and other laws and regulations that apply to the theft of firearms.

7

U.S. Department of Justice · Bureau of Alcohol, Tobacco, Firearms and Explosives · *Office of Enforcement Programs and Services*

# SAFETY AND SECURITY
## STEPS FOR REDUCING YOUR VULNERABLILITY TO THEFT/LOSS AND PERSONAL INJURY

Each year ATF receives thousands of reports of theft/loss from federally licensed firearms dealers. These reports document more than 25,000 firearms that are stolen or whose disposition is unknown to these businesses. It is clear that criminals target businesses that sell firearms. Experience has shown that in many instances, the thieves spend a considerable amount of time evaluating these businesses to determine and capitalize on their vulnerabilities.

Although it may be impossible to balance an impenetrable security system with the requirements of a business that receives and transfers property openly to the public, there are many steps that can be taken to diminish risk. The following text sets forth six areas available to the licensed firearm dealer for guidance and assistance in avoiding theft/loss and preventing personal injury. Some of these ideas can be implemented at no cost while others may involve considerable investment. If circumstances warrant it, obtaining sufficient security may cause you to consider moving to a more secure building or location. Read through the following text, think about how each point may apply to your business, and determine which steps are right for you.

## STRUCTURAL SECURITY

o  Structural security is a combination of the physical characteristics of your business facility and its location. A thorough evaluation of your structural security should be done on a regular basis. Look at the physical structure of your building and consider the position your business occupies within the context of adjoining businesses. Can the roof of your establishment withstand an attempted break in? Does poor or absent structural security make your establishment an attractive target, and consequently, the most likely victim of criminals or criminal opportunity?

o  **Evaluate your business location.** Have property crimes been recurring or increasing in your area? Is your business in a rural area in which a crime is unlikely to be witnessed and in which police response time may be slow? Have you already been a victim of theft/loss? If so, your business location may require you to increase your security measures by following some of the ideas below:

o  **Evaluate your door and window locks.** Can any door or window be opened from the outside without keys? Do any former or non-employees have access to keys? Are keys stored or kept near the container or door for which they are used? Have any of your business keys been lost or stolen? If so, it is time to replace, re-key, improve locks, and improve procedures for storing and tracking keys.

o  **Evaluate your windows and doorjambs.** Can any of these be opened or broken through from the outside with minimal force? Is it time to reinforce or replace windows and/or doors? It may be important to invest in burglar bars or roll-down security gates on windows, doors, and vents. Barriers such as concrete filled posts or large cement planters may deter thieves who would consider using a vehicle to smash into the building to gain access. Consider replacing any exterior hollow core doors with solid metal or sheet metal faced solid wood doors. Also consider

8

steel doorframes, long throw dead bolts, and welding or preening any hinge pins to prevent their easy removal.

o  **Evaluate other unsecured openings.**  Does your premises have air conditioning units in open windows or a hole in an exterior wall?  These units are easily removed, and many theft entries are made in this way.  Are chimneys and other vents blocked or narrowed sufficiently to prevent entry?

o  **Evaluate the walls and ceilings.**  In many instances of theft, criminals have ignored doors and windows and cut through adjoining walls or the ceiling to gain access.  In some cases, the wall next to the doorway was simply pushed through.  Poorly protected adjoining businesses also provide an easy entry point for criminals who choose to go through unreinforced walls.  This form of entry may have a second unintended negative effect in that it may avoid triggering the alarm system.  A common precaution is the installation of floor to ceiling steel mesh in the gun vault and in exterior walls.  If circumstances warrant it, consider moving to a more secure building.

o  **Evaluate exterior lighting and surrounding structures, shrubs, and trees.**  Is your business and the surrounding area well lit at night?  Are there areas in which criminals can conceal themselves to monitor your business and by which they could enter/leave the building unseen or under the cover of darkness?  Are there structures or objects such as trash cans or dumpsters next to the building that may provide cover or easy access to the roof or windows?

o  **Evaluate the front windows and entrance.**  Can employees see persons approaching the store or vehicles parked outside?  Can passersby see into the store or are persons inside the store concealed from public view so that a robbery would be undetected while it was being committed?

o  **Obtain an alarm system.**  There is no logical justification for a firearms business to be unalarmed.  Most alarm companies will evaluate your needs and make recommendations at no cost.  A simple system is far less expensive than the cost of replacing inventory.  Many States require an alarm system on specific types of businesses, particularly firearms dealers.  Are you in compliance with State and local law on your alarm system and other security requirements?

o  **Evaluate your existing alarm system.**  Is it sufficient for the nature and size of your business?  Are all points of entry protected?  Do you have, or need, a panic button?  Tamper alarm?  Cellular backup (cellular backup is considered an industry standard to protect during power failures and/or if power/phone lines are cut)?  Have you tested the system on a regular basis?  Who is on the call list and are the phone numbers correct and current?  Have you met with the local authorities to agree on protocols when the alarm is tripped?  Have you had a series of apparent false alarms?  If so, is the problem in the system, or is your response procedure being studied by a savvy criminal?

o  **Protect your alarm codes.**  Have you limited the number of people who know the codes?  Are your codes unrelated to family names, numbers, and other easily recognizable names and number sequences?  Do you change the codes on a regular basis and whenever there is employee turnover?  Have you written the codes where they are easily accessible to thieves or unauthorized employees?

o **Evaluate the need for or condition of your video camera system.** Having video cameras can have a significant deterrent effect on crime. They can also be instrumental in solving thefts. Do your cameras face in a direction that will capture people's faces and features? Are you recording at all times? If your recorder is a VCR, do you have fresh videotapes, or have they been used hundreds of times? VCR tapes lose their integrity with repeated recording. It may be time to switch to a digital recorder whose picture quality is far superior and will not degrade over time. In some instances, insurance savings may offset updating obsolete or inferior equipment. Is your recording system in plain view or protected from view, tamper and/or theft?

o **Evaluate the installation of a remotely activated electronic security entrance.** Would there be value in screening customers to prevent access to suspicious persons? Businesses in or near high crime areas and those who have already been a victim of a crime may want to give this some serious consideration.

o **Evaluate the business-hours store layout.** Are unsecured firearms displayed within reach of customers? Does your business have blind spots in which customers can access inventory? Are display cases kept locked unless an employee is displaying a firearm or other item from that case? Are there times/situations wherein all employees have their backs to customers? Do any business activities require that employees enter the rear of the store/storage locations, leaving customers unattended?

o **Evaluate after-hours business layout.** Have firearms and ammunition been secured? If thieves break into the store, are firearms readily accessible or are secondary measures in place (i.e. firearms secured by locking cable, etc.)? The best business practice is to remove all firearms from display cases and racks and place them in a gun vault at night. As an alternative, some businesses utilize reinforced display cases with shatterproof glass.

o **Evaluate the level of security provided by an answering machine.** Avoid using the answering machine to announce weekends and other times when you will be out of town. When the message says you are closed so that you can attend a show, the underlying message is that your business is unprotected.

## INVENTORY SECURITY

Inventory security is the way in which business merchandise and equipment is accounted for from the date it is received (acquired) by the business to the date of its disposition (sale, trade, etc.). At the core of inventory security is the practice of complete and consistent documentation. For firearms inventory, accurately completed ATF Form 4473 forms and an up-to-date and accurately completed Acquisition and Disposition Record are required by law. The following additional steps are recommended practices to help protect inventory:

o **Conduct periodic physical inventories and reconcile to book inventory.** Complete physical inventory counts and reconciliation to book inventory enable an FFL to know which firearms have been transferred legally and which firearms may have been lost/stolen. This includes ensuring that all firearms in inventory are recorded in the Acquisition and Disposition book and that for all open entries in the book, there is a firearm. The frequency of inventories may be dictated by the nature of the business, but at a minimum, an annual "floor to ceiling" inventory is recommended. Without reliable records, it is impossible to determine if firearms have been transferred or are still in inventory. If this cannot be established and a crime occurs, the licensee will not be able to provide ATF and/or the local law enforcement authorities with an accurate list

of stolen firearms. An inaccurate report could result in the arrest of an honest citizen or freedom from prosecution for a criminal. Without reliable records, you may not even become aware that a crime has occurred.

o **Accurately record your physical inventory in your records.** Remove firearms from containers/boxes when recording acquisition. An accurate inventory must include physical comparison of firearms with the acquisition description. Many times firearms are shipped that do not match firearms listed in shipping manifests. The markings on firearms boxes can bear markings that are different than those which appear on the firearms. Do not rely on packaging or labeling to record firearms acquisition.

o **Require two-party inventories.** Never allow one person to have singular oversight of any part of your business, including sales transactions, handling monies and particularly the inventory process. Many internal thefts stem from situations in which a single person was in control of the physical firearms inventory and/or records. In addition to incorporating a second party in a regular review of the acquisition and disposition records, physical inventories should always be conducted by at least two persons.

o **Protect your inventory records.** Thefts of firearms often include the theft of records. Some criminals are aware that the records may be the only way to determine which firearms were stolen. Secure records after hours in a location separate from the firearms inventory.

o **Keep timely acquisition and disposition records.** Federal regulations generally require that acquisitions be recorded by the close of the next business day, and that dispositions be recorded within 7 days. However, it would be safer to record them at the time the firearms transaction occurs. If you are a victim of theft, having current records is essential.

o **Examine each shipment of firearms that you receive.** Federal law requires that common and contract carriers who deliver firearms in interstate commerce obtain written acknowledgement of receipt from the actual recipient. Before you sign, examine the shipment. Determine, at a minimum, that the number of firearms indicated on the carrier's documents is the number you received. A best practice would be to open each package to verify that the shipment matches the order exactly.

o **Keep display cases locked at all times.** This is a standard practice in the jewelry trade, another industry that is prone to shoplifting and internal theft.

## EMPLOYEE SCREENING

The same care that is given to the safe handling and storage of firearms should be given to the selection of the people whom the licensee authorizes to do that work. Reluctance to embarrass or offend strangers or acquaintances must be set aside to ensure the security of the business. It is neither lawful nor in the licensee's interest to knowingly allow a prohibited person to possess firearms or engage in firearms sales. The importance of conscientiousness and trustworthiness is underscored by the high level of responsibility placed upon persons who are in a position to transfer firearms.

o **Institute an employee screening process.** ATF recommends conducting background checks on all employees and applicants (even relatives). Many private companies are available to perform these checks on a fee basis. Background checks should be repeated after an established period of time has elapsed. Applicants/employees should also provide references. These references **11**

U.S. Department of Justice · Bureau of Alcohol, Tobacco, Firearms and Explosives · *Office of Enforcement Programs and Services*

should be contacted, interviewed, and asked to provide the names of other potential references, not listed by the applicant/employee.

o **Require proof of identity.** Require that each applicant/employee produce a government-issued identification card – a driver's license, for example – and a social security card.

o **Discuss questions with the local police or ATF.** If it appears that an applicant or employee may not be eligible to possess or transfer firearms, the local police or local ATF office should be contacted for guidance. (For assistance in locating the nearest ATF office, visit the Web site at http://www.atf.gov/field)

## SAFE BUSINESS PRACTICES

Safe business practices are the least expensive and perhaps the most immediately beneficial steps that the licensee can take to limit the risks of becoming a victim of crime. As with all of the recommendations in this pamphlet, the following methods and ideas have proven to be effective for many licensees. A structured training program is also recommended to implement and encourage safe business practices and procedures among employees.

o **Familiarize yourself with State and local ordinances.** Many jurisdictions have established security requirements for businesses, some specifically for businesses that sell firearms. Many jurisdictions require by law that a working alarm system be installed in your business.

o **Show only one firearm at a time to a customer.** If the customer requests to handle another firearm, secure the first firearm before displaying another. If the firearms are kept in a locking display case or other security device, ensure that only one firearm is unlocked or unsecured at a time.

o **Disable display firearms.** Use trigger locks or plastic ties to ensure that the firearms cannot be loaded or fired while being examined. In some situations, the best practice may be the removal of the firing pin. Another best practice to consider is placing display firearms in a safe at night, a protocol followed by most jewelry stores.

o **Do not leave a customer who is handling a firearm unattended.** If an employee leaves a customer who is handling a firearm, control of that firearm has been relinquished to the customer. To prevent this, instruct your staff to return a firearm to its storage location before leaving the customer unattended.

o **Keep ammunition stored separately from the firearms and out of the reach of customers.** This practice can help eliminate shoplifting of ammunition and help ensure that firearms remain unloaded while on display.

o **Do not meet with customers after hours or off site.** This is particularly important if the customer asks that some firearms be brought to the meeting. Advise your local ATF office of any such requests and provide them with the identity of the requestor.

o **Wipe down all countertops and doors each night.** A clean surface makes it easier to capture and preserve fingerprints. Those fingerprints could be the difference between an unsolved crime and capturing the criminals.

o **Do not keep large sums of cash on hand.** Keeping large sums of cash during business hours or at night creates an opportunity for your business to experience a substantial financial loss. Limit the amount of cash on hand by making regular deposits. You may want to consider recording the serial numbers on paper money left in the cash register at night. Store this record away from the cash so that if the money is taken, it can be more easily tracked.

o **Do not leave counter and safe keys in the cash register at night.** Many burglaries have been made worse by ready access to keys left in the cash register. The cash register is logically one of the first targets in a burglary.

o **Ship firearms in a way that requires signatures or recording of transfers.** In many cases, the most inexpensive means of shipping provide little accountability. Using a shipping method that includes some form of tracking is strongly encouraged. Ask the carrier if and how each point of transfer will be documented. Detailed documentation makes it easier to track a lost or damaged shipment. When shipping a firearm, using a method that is most reliable is suggested.

o **Provide safety and security training for your employees.** Ensure that they know what to do if a crime is committed or discovered. Prepare a specific procedure for them to follow. Post important telephone numbers and keep procedures where they can be readily utilized (this booklet, if opened from back to front, contains a recommended series of steps in the event of a theft or loss). Explain the importance of protecting keys, combinations, codes, alarm system features, and any other security plans or procedures you have. Advise your employees not to reveal this information to non-employees, including family members.

o **Familiarize your employees with firearms laws.** Sales personnel must be shown, understand, and be able to explain the firearms laws that apply to them and to your customers. Ensure that they understand how to make a lawful transfer and what transactions to avoid. For assistance with this type of training, you can request a "Don't Lie for the Other Guy" package from your local ATF office and visit the Internet learning theatre on the ATF Web site www.atf.gov . You can also contact your local ATF field office to inquire about FFL seminars (http://www.atf.gov/field).

o **Record the description of suspicious persons and their vehicles.** If an individual, or individuals, raise your suspicions or specifically ask you to assist them in subverting the law, record their identification, their physical description and the vehicle description and license plate, if you can safely do this (a suspicious person guide can be found on page 25). Criminals frequently visit the stores they intend to victimize before the crime in an effort to assess their target. Many crimes have been solved through physical and vehicle descriptions recorded by employees and witnesses who grew suspicious of a person or a customer's actions, questions, or activity.

o **Post the Theft Warning Notice in a conspicuous location.** This publication contains, on page 23, a theft warning notice that can be removed and placed in a window or other conspicuous location. A lunchroom or other area frequented by business staff should also be considered as a beneficial location for this warning.

o **Request the assistance of the local law enforcement authorities.** Contact your local police department and request a visit for safety and security advice. Ask if there have been any thefts in the area or patterns of theft to which you may be vulnerable. Develop a relationship with the law

U.S. Department of Justice · Bureau of Alcohol, Tobacco, Firearms and Explosives · *Office of Enforcement Programs and Services*

enforcement officers who work in the area that includes your business. Offer your parking lot to them at night. Obtain the best telephone numbers to use in emergency and non-emergency situations.

o **Strictly control firearms at gun shows.** Prepare an inventory of all firearms removed from the store for display or sale at a gun show and store the list separately. ATF recommends that you not take your acquisition/disposition record to the gun show if you will be returning to your premises in time to record your transactions as required by law. Thoroughly record all transfers and make those entries as soon as you return from the show (see 27 CFR 478.125(e) for guidance).

o **Do Not advertise that your business is unprotected.** Avoid leaving a sign in the window or a message on your answering machine announcing that you will be closed or are out of town. This only puts every friend and stranger who reads or hears it on notice that your store may be unattended for several days.

## CUSTOMER SAFETY

Purchasers of firearms inherit the significant responsibility of protecting themselves and the public from theft or loss of their firearms. Federal firearms licensees have an opportunity to provide information and products that can help purchasers with this responsibility. Please review the following suggestions:

o **Insist on complete firearms safety.** By demonstrating safe firearms handling, including clearing and unloading procedures, customers have the opportunity to learn and repeat these firearms safety procedures after they leave your store. This is the highest form of customer service. Include a copy of the Disposition of Firearms flier shown on page 20 to assist purchasers in complying with Federal laws relating to firearms ownership and transfer.

o **Recommend safe storage methods.** Federal law requires that firearms safety or locking devices be available for purchase and provided to anyone purchasing a firearm. We recommend that you advertise these to your customers for storing their firearms. Advise customers to take their firearms directly home rather than leave the firearms in their vehicle while taking care of other errands. Remind your customers that firearms should always be unloaded when being stored.

o **Personal Firearms Record.** Provide customers with a free copy of ATF Publication 3312.8, Personal Firearms Record. This pamphlet was developed to provide firearms owners an easy and complete way to maintain a record of their firearms. In the event of theft or loss, the firearm(s) can be fully identified for law enforcement and for insurance purposes. (A sample of this pamphlet can be found on page 21.)

## DISASTER PREPAREDNESS

Every business should have a disaster plan. Federal firearms licensees have a double interest in having a plan in place because they need to safeguard their business to facilitate a quick recovery, and they need to protect the public from the risk of theft/loss of firearms and ammunition in the event of a disaster. The following suggestions can form a guide for developing a plan to follow in the event of impending disaster:

- o Create and maintain a current set of records (and consider a second set maintained at a second, secure location) that includes: insurance policies; supplier and contact list; computer records backup; and a second set of business records.

- o Create a list of employee phone numbers and establish a plan under which, in the event of a disaster, they have a phone number to call to report that they are OK.

- o Secure your inventory. Utilize safes and cable locks that can retain and protect inventory.

- o Perform a full inventory and take Acquisition and Disposition records to a safe location until the threat has passed.

- o Make your disaster plan "multi-hazard" by taking into account each possibility: fire; tornado; hurricane; flooding; looting; etc.

- o ATF can approve variances to move business operations (including NFA firearms) in special circumstances, which can include impending natural disasters.

- o For more information on disaster preparedness, request a copy of ATF Publication 3317.7, <u>Disaster Preparedness for Federal Firearms Licensees</u> from the ATF Distribution Center by calling 301-583-4696.

## YOUR LOCAL ATF OFFICE

The local ATF office can be an invaluable resource for information and assistance in the safe and compliant operation of your business. This office should be your first point of contact with questions regarding anything associated with your Federal firearms license. The local office can also assist you in the preparation of the theft/loss reports that must be submitted to the Stolen Firearms Program Manager. (For assistance in locating the nearest ATF office, visit the Web site at http://www.atf.gov/field).

U.S. Department of Justice · Bureau of Alcohol, Tobacco, Firearms and Explosives · *Office of Enforcement Programs and Services*

# PROPERLY IDENTIFYING AND RECORDING FIREARMS

In order to conduct business, the FFL relies on the accurate description of firearms and the timely recording of acquisition and disposition. Without this, law enforcement agencies are forced to rely on inaccurate information when they endeavor to investigate firearms thefts. Inaccurate and missing records also impact the ability to determine ownership of recovered firearms and their return to the lawful owners.

In 1968, Congress established unique marking requirements for all firearms imported into or manufactured within the United States (see 27 CFR 478.92(a)(1) and 27 CFR 478.102). Unfortunately, marking requirements that existed before 1968 did not apply to all firearms and, in particular, allowed for duplication of serial numbers. Many thousands of firearms manufactured and imported prior to 1968 bear no serial numbers, product codes, patent numbers, or other markings that appear to be serial numbers. Some of these pre-1968 firearms bear virtually no markings at all. Licensees who receive these firearms should note in each descriptive column in the acquisition record the physical marking that appear on the firearms. If no serial number was placed on the firearm, it should be specifically noted that "Firearm has no serial number." Remember, however, it is illegal to remove a firearm's serial number, and a licensee should report such a firearm to the nearest ATF office.

Under the 1968 law, manufacturers and importers may not duplicate serial numbers. Both must utilize or place a serial number that they have not used before, and may not issue again, on the firearm's frame or receiver. The serial numbers themselves are generated by the licensee, and many are so unique that their appearance can readily identify the manufacturer or importer.

To accurately identify a firearm, FFLs receiving firearms must record the **Serial Number** in their A&D book. Be careful to use the number on the frame or receiver. Parts of the firearm, such as the slide or barrel, may be marked with a part or model number, different from the serial number.

The following additional information must be marked on the frame, receiver, or barrel of post-1968 firearms, and must be recorded in the A&D book: **model** (if such designation has been made); **caliber or gauge**; **name of the manufacturer** (or recognized abbreviation); and **importer** (if applicable). Although not required to be recorded in the A&D record, for domestically produced firearms, the **city and State** (or recognized abbreviation) of the manufacturer's place of business, and for imported firearms, the **country of manufacture** and the **city and State** (or recognized abbreviation) of the importer's place of business must also be marked on the frame, receiver, or barrel.

This description of the marking requirements is brief and concise and may not guide you in the identification of each firearm you examine. Refer to the diagram on the following page for more guidance and contact your local ATF office for further assistance.





# BASIC FIREARMS SAFETY

## FIREARMS HANDLING AND STORAGE

1. Treat every firearm as if it were loaded.

2. Always keep the muzzle of the firearm pointed in a safe direction.

3. Always keep your finger off the trigger and outside the trigger guard unless you intend to fire the weapon.

4. Wear appropriate ear and eye protection when discharging the firearm.

5. If you have children in your residence, use child safety locks or other commercially available locking mechanisms on your firearms and/or keep your firearms locked in a secure location accessible to adults only. Keep your ammunition locked in a secure location away from the firearms.

6. Become familiar with, and obey, all Federal, State, and local laws regarding the purchase, possession, carrying, use, storage, and disposition/sale of firearms.

## CLEARING/UNLOADING A FIREARM

1. Always keep the muzzle pointed in a safe direction AND always keep your finger off the trigger and outside the trigger guard while cleaning or unloading a firearm. (Consider obtaining a commercially made firearm clearing barrel for safe clearing/unloading purposes.)

2. Remove the magazine or other source of ammunition.

3. Open the breech and visually as well as physically inspect the chamber to ensure the firearm is completely unloaded. Repeat this step twice to be sure the firearm is completely unloaded.

U.S. Department of Justice · Bureau of Alcohol, Tobacco, Firearms and Explosives · *Office of Enforcement Programs and Services*

# NON-LICENSED FIREARMS SALES

If you do not have a Federal firearms license and you later decide to sell, trade, transfer, or otherwise dispose of the firearm(s) you have purchased, keep in mind the following basic guidelines contained within the Gun Control Act (GCA) of 1968 that may apply to such dispositions:

1. The GCA prohibits persons from engaging in the business of dealing in firearms without a license issued by ATF (18 U.S.C. 921(a)(11)(A)). A sentence of up to 5 years imprisonment and/or a fine of up to $250,000 may be imposed on anyone found guilty of dealing in firearms without a license. The GCA defines the term "dealer" in firearms as "a person who devotes time, attention and labor to dealing in firearms as a regular course of trade or business with the principle objective of livelihood and profit through the repetitive purchase and resale of firearms" (18 U.S.C. 921(a)(21)(C)). The term "dealer" in firearms does not include a person who makes occasional sales, exchanges, or purchases of firearms for the enhancement of a personal collection or for a hobby, or who sells all or part of a personal collection of firearms. In general, the following applies to an unlicensed person:

   ❑ You may occasionally acquire or dispose of firearms to, and from, residents of your State as long as this activity does not fall under the definition of "dealer" in firearms and as long as the intended receiver of the firearm may legally possess the firearm.

   ❑ You may dispose of firearms to a licensed firearms dealer in any State.

   ❑ You may not acquire from or dispose of firearms to residents of any State other than your own.

   ❑ You may not engage in the business of dealing in firearms without being licensed.

2. In addition, the GCA prohibits any person from:

   ❑ Selling or disposing a firearm to any person the transferee knows or has reasonable cause to believe is under indictment for, or has been convicted of, a crime punishable by a term of imprisonment exceeding one year; is a fugitive from justice; is an unlawful user of or is addicted to any controlled substance; has been adjudicated as a mental defective or committed to any mental institution; is an alien unlawfully or illegally in the U.S. or is a nonimmigrant alien and no exception under 18 U.S.C. 922(y) applies; has a dishonorable discharge from the Armed Forces; has renounced their U.S. citizenship; is subject to a qualifying, court order for restraint; or has been convicted of a misdemeanor crime of domestic violence (18 U.S.C. 922(d)).

   ❑ Transferring a firearm to any person who intends to use the firearm in a crime of violence or serious drug trafficking offense (18 U.S.C. 924(h)).

   ❑ Transferring handguns or handgun ammunition to juveniles (persons under 18 years of age) except for purposes of employment, military, hunting, or a safety course provided the juvenile has a parent or guardian's prior written consent (18 U.S.C. 922(x)).

3. **General Advice for non-licensed seller/purchaser:** While it is not required by law, it is highly recommended that the purchaser provide some form of identification and that this information, along with the date, place of sale, and full firearms description be recorded. The purchaser should keep this information in a location separate from the firearm(s).

**U.S. Department of Justice**

Bureau of Alcohol, Tobacco, Firearms and Explosives

National Tracing Center

# Personal Firearms Record

Keep this list separate from your firearms to assist police in the event your firearms are ever lost or stolen.

P 3312.8 (12-03)

## Lost/Stolen Firearms Investigations

Each year, thousands of firearms are reported lost or stolen. The owners' ability to adequately identify these firearms is central to law enforcement's ability to investigate these crimes and losses. Insurance claims and reacquisition of recovered firearms will also hinge on the ability to correctly identify these firearms.

By completing this record and maintaining it in a safe location, separate from your firearms, you will be taking an important first step in the effort to prevent thefts and to keep firearms out of the hands of criminals.

Remember:

"A stolen gun threatens everyone."

# Personal Firearms Record

## Firearm Description and Origin

| Manufacturer/ Importer | Model | Serial Number | Type and Action | Caliber or Gauge | Date Acquired | Cost | Purchase Location (Name and Address) |
|---|---|---|---|---|---|---|---|
| | | | | | | | |
| | | | | | | | |
| | | | | | | | |
| | | | | | | | |
| | | | | | | | |
| | | | | | | | |
| | | | | | | | |
| | | | | | | | |
| | | | | | | | |
| | | | | | | | |

A complete description of each firearm is vitally important to law enforcement in the investigation and recovery of your firearms and to your ability to prove ownership. Immediately report any theft or loss of firearms to your local police.



# WARNING

THE THEFT OF FIREARMS FROM A FEDERALLY LICENSED FIREARMS DEALER IS A VIOLATION OF FEDERAL LAW (18 U.S.C. § 922 (u)) INVESTIGATED BY THE BUREAU OF ALCOHOL, TOBACCO, FIREARMS AND EXPLOSIVES (ATF) AND IS PUNISHABLE BY IMPRISONMENT FOR UP TO 10 YEARS AND A FINE OF $250,000. CALL 1-800-ATF-GUNS TO REPORT ALL VIOLATIONS.



*Remove for for Posting*

# Exhibit 89



# NATIONAL SHOOTING SPORTS FOUNDATION, INC.

11 Mile Hill Road • Newtown, CT 06470-2359 • Tel (203) 426-1320 • Fax (203) 426-1087

**www.nssf.org**

## PRESS RELEASE

To: ALL MEDIA
*For immediate release*

July 7, 2010

Media Only:

**Ted Novin**
Office: 203-426-1320
Cell: 202-253-1860

# Illinois Association of Firearms Retailers Launches Lawsuit Against Chicago

NEWTOWN, Conn. -- The Illinois Association of Firearms Retailers (ILAFR), a state affiliate of the National Shooting Sports Foundation (NSSF) – the trade association for the firearms industry -- has filed a lawsuit challenging the constitutionality of several recently adopted anti-gun laws designed to circumvent last week's Supreme Court ruling in McDonald v. Chicago. In that landmark decision, the Supreme Court reaffirmed the fundamental right of all law-abiding Americans to keep and bear arms, while outlawing the power of state and local governments to ban firearms.

In a complaint filed yesterday evening in federal Court, the ILAFR challenged a series of Chicago Mayor Richard Daley's anti-gun laws and regulations affecting the commerce of firearms in Chicago. This includes laws forbidding federally licensed firearms retailers from operating within the city, limiting the number of firearms a law-abiding citizen may purchase in a year and banning modern sporting rifles.

"The actions of Mayor Daley demonstrate a clear disregard for the rule of law and our nation's highest court," said ILAFR Executive Director Whitney O'Daniel.

In the aftermath of the McDonald decision, NSSF Senior Vice President and General Counsel Lawrence G. Keane noted that a new era of civil rights litigation was upon us as "laws and regulations that infringe upon and violate the individual right of law-abiding Americans to keep and bear arms, protected by the Second Amendment, are challenged." Today, with the filing of the ILAFR lawsuit, that prediction is being realized.

"Instead of being able to promote business in a city that desperately needs revenue, tax dollars will be spent trying to defend these unconstitutional ordinances that stand no chance of reducing crime," said Keane.

### ###

**About NSSF**
*The National Shooting Sports Foundation is the trade association for the firearms industry. Its mission is to promote, protect and preserve hunting and the shooting sports. Formed in 1961, NSSF has a membership of more than 6,000 manufacturers, distributors, firearms retailers, shooting ranges, sportsmen's organizations and publishers. For more information, log on to www.nssf.org.*

## PROMOTE     PROTECT     PRESERVE







**Project ChildSafe® is a nationwide program that helps ensure safe and responsible firearm ownership and storage.**

PUTTING A LOCK ON SAFETY IN YOUR HOME

Home
Program Overview
FAQs
Safety Curriculum
Lock Instructions
Contact Us
Press Room
Partner Support



Firearms safety kits include a safety brochure that covers a variety of options for firearms storage and a free cable-style gun lock.

**How to receive a free Safety Kit**

# Program Overview

Project ChildSafe is a nationwide program whose purpose is to promote safe firearms handling and storage practices among all firearms owners through the distribution of key safety education messages and free gun locking devices (safety kits).

Since 2003, Project ChildSafe has distributed more than 35 million safety kits to gun owners in all 50 states and five U.S. territories and continues to help its law enforcement partners promote firearms safety by providing educational materials and support services.

Project ChildSafe, a component of the Bush administration's "Project Safe Neighborhoods" gun violence prevention initiative, is supported by the firearms industry, U.S. Dept. of Justice (DOJ) grants, and the National Shooting Sports Foundation (NSSF), administrators of the program.

NSSF, with more than 6,000 members, is the shooting sports industry's largest and most diverse trade association. Formed in 1961, NSSF manages a variety of outreach programs with a special emphasis on efforts to promote firearm safety education to all gun owners. Project ChildSafe is an expansion of NSSF's Project HomeSafe program that was created in 1999 to educate gun owners about their responsibilities to safely handle and properly store firearms in the home with the goal of preventing tragic accidents among children.

Project ChildSafe's success is attributable to its partners --- law enforcement, elected officials, community leaders, state agencies, businesses and individuals. Through their efforts, Project ChildSafe's safety education message is reaching millions of gun owners across America, significantly raising awareness about the importance of practicing safe firearms ownership.

To get a Project ChildSafe safety kit, or to help promote the safe and responsible use and storage of firearms through Project ChildSafe, **please contact** a participating law enforcement agency in your state.

**Where to get a free safety kit**



**A firearms safety message from Doug Koenig, World Champion Marksman**



**A firearms safety message from Travis Tritt, country music celebrity.**

Watch a safety video

**Access NSSF Safety Materials**

Message to Firearms Retailers on "Child Safety Lock Act"

Project ChildSafe National Coordinator • 203-270-2360
e-mail: projectchildsafe@nssf.org

National Shooting Sports Foundation, Inc.
11 Mile Hill Road Newtown, CT 06470
203.426.1320 • FAX 203-426-1245








**Project ChildSafe®** is a nationwide program that helps ensure safe and responsible firearm ownership and storage.

PUTTING A LOCK ON
SAFETY IN YOUR HOME

| | |
|---|---|
| Home | Contact: Cari Crockett |
| Program Overview | Phone: 518/434-3582 |
| FAQs | Email: ccrockett@beanagency.com |
| Safety Curriculum | |
| Lock Instructions | |
| Contact Us | |
| Press Room | |
| Partner Support | |

## FOR IMMEDIATE RELEASE



Firearms safety kits include a safety brochure that covers a variety of options for firearms storage and a free cable-style gun lock.

**How to receive a free Safety Kit**

### Nation's Largest Firearm Safety Program To Distribute 20 Million More Free Gun Locks

NEWTOWN, Conn. - Project ChildSafe, an expansion of Project HomeSafe, will distribute 20 million more free firearm safety kits as a part of a nationwide initiative to raise awareness about safe and responsible firearm ownership and storage. Designed to make homes with firearms safer, Project ChildSafe is funded by a $50 million grant from the U.S. Department of Justice and managed by the National Shooting Sports Foundation (NSSF).

"Project ChildSafe has become the most comprehensive firearm safety education program in America," said Doug Painter, president of the National Shooting Sports Foundation. "The combination of free gun locking devices, an in-depth safety education component and distribution efforts in all 50 states will significantly enhance public awareness of the importance of proper gun storage in the home."

Project ChildSafe will partner with governors and lieutenant governors, U.S. Attorneys, mayors and local law enforcement to encourage secure storage of firearms in homes, with the goal of helping to prevent firearm-related accidents, especially among children. The safety kits include a cable-style gun lock and a safety brochure that discusses safe handling and proper storage procedures. **Last year, Project HomeSafe distributed 2.4 million such firearm safety kits at local events in 43 states.**

Project ChildSafe is a component of Project Safe Neighborhoods, a gun-violence prevention initiative of the Bush Administration.

Project ChildSafe will utilize 15 education vehicles to bring safety tours to thousands of communities across America to distribute the free firearm safety kits. For more information about firearm safety and Project ChildSafe safety tour schedules, visit www.projectchildsafe.org.

About NSSF: The National Shooting Sports Foundation, with over 2,500 firearm industry members, was founded in 1961. The NSSF manages a variety of outreach programs with special emphasis on safety initiatives.

About Project Safe Neighborhoods: Project ChildSafe is a component of President Bush's Project Safe Neighborhoods (PSN) initiative to reduce gun-related crime and violence in America. PSN is administered by the U.S. Department of Justice. For more information go to www.psn.gov.

# # #



**Where to get your free Firearm Safety Kit**

**Where to get a free safety kit**

**A firearms safety message from Doug Koenig, World Champion Marksman**

**A firearms safety message from Travis Tritt, country music celebrity.**

Watch a safety video

Access NSSF Safety Materials

Message to Firearms Retailers on "Child Safety Lock Act"



**Project ChildSafe National Coordinator** . 203-270-2360
e-mail: projectchildsafe@nssf.org

National Shooting Sports Foundation, Inc.
11 Mile Hill Road Newtown, CT 06470
203.426.1320 . FAX 203-426-1245



You are here  Home > Attendees > Attendance Rules

# Attendance Rules

**(Attendees, Exhibitors, Media & Guests)**

- Attendance **RESTRICTED** to the shooting, hunting and outdoor trade and commercial buyers and sellers of military, law enforcement and tactical products and services **ONLY. NO** one under age 16 admitted (including infants).

- Admission to the show requires government issued photo identification **_plus_** documentation demonstrating trade affiliation. Show exhibitors and media subject to different credentialing requirements.

- This show badge constitutes a limited revocable license to attend the current SHOT Show. Badges **CANNOT** be reproduced, transferred or resold. There is a $100 fee to replace lost or stolen badges. Limit one (1) free reprint per person during the show. Badges are the property of the National Shooting Sports Foundation and may be revoked by show management at any time for any reason.

- **NO** Photography – **STRICTLY ENFORCED!** Photography or video recording at the show is prohibited except by those with valid media badges or other authorized individuals. Surveillance equipment is in use 24/7.

- **NO** Solicitation.

- **NO** personal firearms or ammunition allowed. Only firearms on display by exhibitors whose firing pins have been removed (and have been inspected by SHOT Show Safety Advisors) will be permitted on the show floor.

- **NO** loud, abusive, or defamatory language, harassment or other unprofessional or inappropriate behavior.

- Show management **NOT** responsible for injuries, property damage or loss of any kind, or for any other incidents, directly or indirectly connected with attending the show. Attendees assume all business and personal risks before, during and after the show.

- Attendees and their belongings may be searched at any time during the show. Attendees consent to such searches and waive any related claims that may arise. If an attendee refuses such searches, attendee may be denied entry or be removed from show premises without refund or other compensation.

- Attendees grant show management permission to utilize their image, likeness, actions and statements in any live or recorded audio, video, or photographic display or other transmission, exhibition, publication or reproduction made of, or at, the Shot Show in any medium or context without further authorization or compensation.

These attendance rules are applicable to all show "attendees" including regular attendees, exhibitors, media and guests. Show management shall have sole discretion over admission at all times and shall strictly enforce all show rules. Attendees agree to abide by these attendance rules, as well as all other rules applicable to their badge type, which may be updated at any time. Violators risk immediate confiscation of their show badge without refund and removal from the premises. Violators will not be allowed re-entry.

# Exhibit 90

1

IN THE UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF ILLINOIS

EASTERN DIVISION

ILLINOIS ASSOCIATION OF    )

FIREARMS RETAILERS,        )

KENNETH PACHOLSKI,         )

KATHRYN TYLER, and         )

MICHAEL HALL,              )

      Plaintiffs,   )

  vs.                      )      No. 10 CV 04184

CITY OF CHICAGO,           )

      Defendant.    )

    The deposition of MARC LEVISON, called

for examination pursuant to the Rules of Civil

Procedure for the United States District Courts

pertaining to the taking of depositions, taken

before Johnetta Stafford Taylor, a notary public

within and for the County of Cook and State of

Illinois, at 33 North Dearborn Street, Chicago,

Illinois, on May 23, 2011, at the hour of

1:00 o'clock a.m.


Johnetta Stafford Taylor

License No: 084-001583

2

1   APPEARANCES:

2   COOPER & KIRK, by

3   MR. PETER A. PATTERSON,

4   1523 New Hampshire Avenue, N.W.

5   Washington, D.C.  20036

6   (202) 470-5580

7       Representing the Plaintiffs;

8

9   HON. MARA S. GEORGES,

10  Corporation Counsel, by

11  MR. ANDREW WORSECK,

12  Assistant Corporation Counsel,

13  Department of Law

14  30 North LaSalle Street

15  Suite 1230

16  Chicago, Illinois  60602-2580

17  (312) 744-7129

18      Representing the Defendant.

19

20

21

22

23

24

1    A.   Yes.

2    Q.   Are they trained in any way with

3    respect to confronting -- potentially

4    confronting firearms in responding to an

5    emergency?

6    MR. WORSECK:  Objection.  Vague.

7    THE WITNESS:  Our training focuses on scene

8    safety.

9    MR. PATTERSON:  Okay.

10   THE WITNESS:  That is the paramount response

11   we take is scene safety.

12   BY MR. PATTERSON:

13   Q.   And what do you mean by scene safety?

14   A.   That the scene is safe in our opinion

15   and knowledge, that we can enter the building,

16   enter the scene, enter the street scene, go down

17   the block, reasonably safe.  Either the police

18   have secured the scene or that there seems to be

19   no apparent threat.

20   Q.   And how is a determination made whether

21   the scene is secure?

22   A.   It's a response call made by the

23   company officer and the responding team.  It

24   varies.

1     of firearms?

2         MR. WORSECK:  Objection.  Vague.

3         THE WITNESS:  Our training stresses scene

4     safety and how to respond safe using your common

5     sense.  And we have no duty to respond until

6     that person/responder feels it's safe.  That's a

7     judgment call.

8     BY MR. PATTERSON:

9         Q.   Does any part of that instruction that

10    you've described include instruction about the

11    potential presence of firearms at the site of a

12    response?

13        MR. WORSECK:  Objection.  Vague.

14        THE WITNESS:  If there's firearms at the site

15    of the response, it's not considered a safety

16    situation.

17        MR. PATTERSON:  Right.

18    BY MR. PATTERSON:

19        Q.   I guess what I'm trying to ask is:  Is

20    there any training given with respect to whether

21    or not firearms are at any particular location?

22        A.   Can you repeat that question.

23        Q.   Yes.

24            Is there any instruction, specific

1   have weather problems.  We have ice and snow on

2   the street.  We have road obstructions.  It's

3   going to increase our response time.

4       Q.  And you've mentioned the emphasis on

5   scene safety and securing scene safety.

6          So is it your testimony that the police

7   officers on the scene are responsible for

8   securing the safety of the scene?

9       A.  Yes.

10      Q.  So the fire department or EMS personnel

11  are not responsible for securing scene safety?

12      A.  That's correct.

13      Q.  Are you aware that in July of 2010 the

14  City passed a new firearms ordinance?

15      MR. WORSECK:  Objection.  Vague.

16      THE WITNESS:  I'm not sure.  I'm -- can you

17  be more specific?

18  BY MR. PATTERSON:

19      Q.  Well, are you aware that the subject of

20  the lawsuit, this lawsuit that we're here

21  regarding today, relates to provisions of the

22  City of Chicago's firearms ordinance?

23      A.  Yes.

24      Q.  Okay.  And are you aware that that

1      THE WITNESS:  I don't know.  I'm not sure if

2    it's affected by that.  We stress scene safety

3    on all responses.

4      MR. PATTERSON:  Okay.

5    BY MR. PATTERSON:

6      Q.  And would you consider the presence of

7    a firearm at a location to which EMS was called

8    to respond a threat to scene safety?

9      A.  Yes.

10     Q.  And why so?

11     A.  Because anytime there's a weapon, we

12    are not sure whether the user is going to use it

13    or how it's going to be used, a weapon on the

14    scene is dangerous.

15     Q.  And is there anything in your

16    experience, over 30 years' experience with the

17    fire department, that supports that view?

18     MR. WORSECK:  Objection.  Vague.

19     THE WITNESS:  There's so many responses that

20    we have with psychiatric patients, there's

21    battered patients, there's people that have been

22    shot that we're responding to.  Scene safety is

23    paramount on all responses.  A weapon on the

24    scene makes it very vague to make sure that the

1    scene is safe.  And that's what we've got to

2    look out for.

3    BY MR. PATTERSON:

4        Q.   How does a weapon on the scene make it

5    vague to determine whether the scene is safe?

6        A.   If the police aren't there to tell us

7    that it's secure and we've walked into a

8    nontrauma run or a psychiatric patient, we have

9    to be on our guard at all times and make sure

10   that there is no weapons there if the patient is

11   unstable.

12           Cardiac arrest -- we have to be aware

13   of our environment when we walk into everyone's

14   call to make sure that it's safe.  And a weapon

15   would make it unsafe for our responders to go to

16   work.

17       Q.   How would a weapon make it unsafe for a

18   responder to go to work?

19       A.   If one of the people at the scene had a

20   gun in their hand, that would be a very unsafe

21   scene, and we're aware of the gun.

22       Q.   Are there any other ways in which a

23   weapon could make the scene unsafe?

24       A.   Any weapon visually in our -- would

1    make it unsafe.  We don't know what the user is

2    going to do.  It's unpredictable.

3        Q.   Okay.  Other than when the weapon is in

4    the hand of someone at the scene, are there any

5    other ways in which a weapon could provide a

6    threat to responders at the scene?

7        A.   If it was locked in the box, it's not

8    going to be a threat.  If it's security in the

9    home, it's not a threat.  But if it's out in the

10   open, it's a threat.

11       Q.   Okay.  And earlier I think you

12   testified that the police were responsible for

13   securing the scene of an emergency; is that

14   correct?

15       A.   Scene safety.

16       Q.   For scene safety.

17           Just now you testified that sometimes

18   the EMS arrives before the police officers have

19   had a chance to ensure scene safety; is that

20   correct?

21       A.   There are certain calls where we don't

22   have the police responding ahead of us.  Medical

23   emergencies sometimes.  They respond sometimes

24   to psych patients, sometimes they don't.  But if

38

1    ordinance in 2010?

2        A.   No.

3        Q.   And in responding to emergency

4    situations, does the fire department sometimes

5    respond to situations in which a person has been

6    injured by virtue of criminal violence?

7        A.   Yes.

8        Q.   And in any of those situations have the

9    injured victims been located in the yard of the

10   home?

11       A.   Yes.

12       Q.   How about on the porch of a home?

13       A.   Yes.

14       Q.   How about in the garage?

15       A.   Yes.

16       MR. PATTERSON:  Drew, if I could just have a

17   few minutes to review my notes.

18       MR. WORSECK:  Sure.

19            (Short pause.)

20       MR. PATTERSON:  Just a couple more questions.

21   BY MR. PATTERSON:

22       Q.   So if I have your testimony correct,

23   it's your position that any time a firearm is

24   possessed by someone other than a police officer

1    at the scene of an emergency to which the fire

2    department is responding, that is a threat to

3    the scene safety and potentially a threat to

4    members of the fire department; is that correct?

5       A.  Yes.

6       Q.  Okay.  And your opinion on that does

7    not -- is not dependent in any way upon whether

8    that firearm is possessed lawfully or

9    unlawfully?

10      A.  No.

11      Q.  Have you ever done any study into the

12   frequency with which people who lawfully possess

13   firearms commit crimes with those firearms?

14      A.  No.

15      Q.  Are you aware of any empirical evidence

16   on that issue?

17      MR. WORSECK:  Objection.  Vague.

18      THE WITNESS:  No.

19      MR. PATTERSON:  I don't have any more

20   questions.

21      MR. WORSECK:  I have a few questions.

22              EXAMINATION

23   BY MR. WORSECK:

24      Q.  Chief Levison, following up on an

42

1    responding, does that present a threat to scene

2    safety?

3        A.  Yes, it does.

4        Q.  And it would follow that a provision of

5    law making it illegal for that owner to be in

6    that spot with his or her firearm would enhance

7    scene safety?

8        A.  Yes.

9        MR. PATTERSON:  Objection.  Calls for

10   speculation.

11   BY MR. WORSECK:

12       Q.  And would you agree that scene safety

13   is enhanced by measures that have the effect of

14   reducing the number of firearms, the number of

15   operable firearms present at a location?

16       A.  Yes.

17       Q.  When a fire department first responder

18   is responding to an emergency and there is no

19   police department presence on site, can the fire

20   department first responder sometimes try to

21   secure a weapon if there's a weapon on site, a

22   firearm?

23       A.  No, we're not trained to do that.

24       Q.  And so unless there's a police

43

1    department presence on the scene, the presence

2    of a firearm is an impediment to fire department

3    first responders trying to deliver emergency

4    care?

5        A.   Yes.

6        Q.   It's something that's in the way.  It's

7    something that gives them pause, it's something

8    that creates a threat.  And it's just something

9    that is in a more perfect world they would

10   rather not have to think about and worry about

11   and deal with when they're trying to save

12   someone's life?

13       MR. PATTERSON:  Objection.  Leading question.

14       THE WITNESS:  Yes.

15   BY MR. WORSECK:

16       Q.   Have you specifically tried to analyze

17   whether the frequency of instances where shots

18   are fired in connection with a fire department

19   first responder responding to a scene have

20   increased since the City's new firearms

21   ordinance was passed last July?

22       A.   No.

23       MR. WORSECK:  I have no further questions.

24       MR. PATTERSON:  Okay.  I just have a few

1    not Chicago's handgun ordinance is effective in

2    reducing the number of operable firearms at

3    scenes of emergencies?

4        MR. WORSECK:  Objection.  Vague.

5        THE WITNESS:  I'm not an expert on that, on

6    the number of weapons that are legal and

7    illegal.

8    BY MR. PATTERSON:

9        Q.   So is your answer, then, that you do

10   not know whether the City's current firearms

11   ordinance has the effect of reducing the number

12   of operable firearms at the scene of

13   emergencies?  Is that correct?

14       A.   Yes.

15       Q.   Okay.  And you also testified that the

16   presence of a firearm at the scene of an

17   emergency could be an impediment to the delivery

18   of services; is that correct?

19       A.   Yes.

20       Q.   And are you aware of situations in

21   which the presence of a firearm has prevented

22   the fire department from rendering necessary

23   medical services?

24       MR. WORSECK:  Objection.  Vague.

46

1      THE WITNESS:  We have a procedure at scene

2  safety.  If there's knowledge of a weapon on the

3  scene, we are going to stand back and stage out

4  until it's reasonably safe by the law

5  enforcement that we can proceed to render care.

6  That is our position.  That's our training.  If

7  we know there's a weapon on the scene, it's

8  stage out until it's secured.

9      MR. PATTERSON:  Okay.

10         Just give me a minute here.

11            (Short pause.)

12  BY MR. PATTERSON:

13      Q.   And you had testified that if there

14  aren't any members of the police department at

15  the scene, that members of the fire department

16  cannot do anything to secure firearms or

17  otherwise secure the scene; is that correct?

18      MR. WORSECK:  Objection.  I think it

19  misstates the record.

20      MR. PATTERSON:  If I did misstate the record,

21  would you clarify.

22  BY MR. PATTERSON:

23      Q.   When there's no member of the police

24  department present, can a member of the fire

52

1      STATE OF ILLINOIS  )

2                        )  SS:

3      COUNTY OF C O O K  )

4        I, JOHNETTA STAFFORD TAYLOR, a notary public

5      within and for the County of Cook County and

6      State of Illinois, do hereby certify that

7      heretofore, to-wit, on May 23, 2011 personally

8      appeared before me, at 33 North Dearborn Street,

9      Chicago, Illinois, MARC LEVISON, in a cause now

10     pending and undetermined in the U.S. District

11     Court, Northern District of Illinois, Eastern

12     Division wherein ILAFR is the Plaintiff, and

13     CITY OF CHICAGO is the Defendant.

14       I further certify that the said witness was

15     first duly sworn to testify the truth, the whole

16     truth and nothing but the truth in the cause

17     aforesaid; that the testimony then given by said

18     witness was reported stenographically by me in

19     the presence of the said witness, and afterwards

20     reduced to typewriting by Computer-Aided

21     Transcription, and the foregoing is a true and

22     correct transcript of the testimony so given by

23     said witness as aforesaid.

24       I further certify that the signature to the

53

1    foregoing deposition was reserved by counsel for

2    the respective parties.

3        I further certify that the taking of this

4    deposition was pursuant to Notice, and that

5    there were present at the deposition the

6    attorneys hereinbefore mentioned.

7        I further certify that I am not counsel for

8    nor in any way related to the parties to this

9    suit, nor am I in any way interested in the

10   outcome thereof.

11       IN TESTIMONY WHEREOF:  I have hereunto set my

12   hand and affixed my notarial seal this 13th day

13   of June, 2011.

14

15

16

17       NOTARY PUBLIC, COOK COUNTY, ILLINOIS

18

19

20

21

22

23

24