**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

| | | |
|---|---|---|
| ILLINOIS ASSOCIATION OF FIREARMS RETAILERS, ET AL., | ) ) ) | |
| Plaintiffs, | ) ) | Case No: 10-CV-4184 Judge Edmond E. Chang |
| v. | ) ) | |
| THE CITY OF CHICAGO, ET AL., | ) ) | |
| Defendants. | ) | |

**PLAINTIFFS' MEMORANDUM IN SUPPORT OF THEIR MOTION FOR
SUMMARY JUDGMENT AND IN OPPOSITION TO DEFENDANTS' MOTION FOR
<u>SUMMARY JUDGMENT</u>**

Stephen Kolodziej
FORD & BRITTON, P.C.
33 N. Dearborn St., Suite 300
Chicago, IL 60602
Tel: (312) 924-7500
Fax: (312) 924-7516
Email: skolodziej@fordbritton.com

Charles J. Cooper*
David H. Thompson*
Peter A. Patterson*
COOPER & KIRK, PLLC
1523 New Hampshire Ave., NW
Washington, DC 20036
Tel: (202) 220-9600
Fax: (202) 220-9601
Email: ccooper@cooperkirk.com

*Admitted *pro hac vice*.

*Attorneys for Plaintiffs*

# TABLE OF CONTENTS

**Page**

TABLE OF AUTHORITIES ...................................................................................... iii

INTRODUCTION ..................................................................................................1

STANDARD OF REVIEW ......................................................................................3

ARGUMENT ......................................................................................................4

I.  FRAMEWORK FOR REVIEW. ......................................................................4

    A.  *Heller* Mandates a Textual and Historical Analysis of Second
        Amendment Claims. ...............................................................................4

    B.  Text and History Resolves this case Under *Ezell*. ..................................5

    C.  At a Minimum, the Laws Challenged Here Must be Subject
        to Exacting Judicial Scrutiny. ..................................................................6

    D.  Laws That Impinge Upon The Second Amendment Right Cannot
        Be Justified Through Application Of An "Undue Burden" Test. ...........7

    E.  Chicago Must Bear a Heavy Burden to Meet any Form of
        Heightened Scrutiny...............................................................................8

II.  CHICAGO'S BAN ON FIREARMS TRANSFERS IS UNCONSTITUTIONAL...................10

    A.  Chicago's Ban On Acquiring Firearms Is Categorically Unconstitutional. ..........10

    B.  History Confirms That The Right To Keep And Bear Arms Necessarily
        Includes The Right To Acquire Them. ..................................................10

    C.  Chicago's Transfer Ban Fails Constitutional Scrutiny. .........................13

        1.  *Chicago's transfer ban must satisfy judicial review far more
            stringent than the City's proposed "undue burden" test.*...........13

        2.  *Chicago's transfer ban fails heightened constitutional scrutiny.* ..............14

        3.  *Chicago's attempt to justify the sales ban fails.* .......................16

III.  CHICAGO UNCONSTITUTIONALLY RESTRICTS POSSESSION AND CARRIAGE
      OF FIREARMS. ...................................................................................22

A.      Chicago Infringes Upon Defense Of The Home..................................................22

B.      Chicago's Ban On Handguns In A Place Of Business Cannot Be Reconciled
With *Heller*. ........................................................................................................24

C.      Text And History Demonstrate That The Right To Keep And Bear Arms
Is Not Confined To The Home. ...........................................................................24

D.      Chicago Fails To Establish That The Right To Keep And Bear Arms Is
Limited To The Home. .........................................................................................29

E.      Chicago Cannot Justify Its Restrictions On Keeping And Carrying Firearms. .....32

IV.    CHICAGO UNCONSTITUTIONALLY LIMITS RESIDENTS TO A SINGLE OPERABLE
FIREARM IN THE HOME. ....................................................................................38

A.      The Single-Operable-Firearm Limitation Burdens The Second
Amendment Right................................................................................................38

B.      The Single-Operable-Firearm Limitation is Unconstitutional..............................39

CONCLUSION.................................................................................................................42

# TABLE OF AUTHORITIES

**Cases**                                                                                                              **Page**

*Andrews v. State*, 50 Tenn. 165 (1871) .................................................................................10, 31

*Annex Books, Inc. v. City of Indianapolis*, 624 F.3d 368 (7th Cir. 2010) .......................................9

*Annex Books, Inc. v. City of Indianapolis*, 581 F.3d 460 (7th Cir. 2009) .......................................9

*Ashcroft v. American Civil Liberties Union*, 542 U.S. 656 (2004) ...............................................8

*Bliss v. Commonwealth*, 2 Litt. 90 (Ky. 1822) .............................................................................27

*Carey v. Population Serv., Int'l*, 431 U.S. 678 (1977) .................................................................10

*Citizens United v. FEC*, 130 S. Ct. 876 (2010) ............................................................................10

*City of Los Angeles v. Alameda Books, Inc.*, 535 U.S. 425 (2002)............................................9, 14

*Craig v. Boren*, 429 U.S. 190 (1976) ..........................................................................................10

*District of Columbia v. Heller*, 554 U.S. 570 (2008) ............................................................. passim

*Dred Scott v. Sandford*, 60 U.S. 393 (1857) ................................................................................27

*Ezell v. City of Chicago,* 651 F.3d 684 (7th Cir. 2011) .......................................................... passim

*Foley v. City of Lafayette*, 359 F.3d 925 (7th Cir. 2004)................................................................3

*Free v. Peters*, 12 F.3d 700 (7th Cir. 1993)..................................................................................3

*G.M. Enterprises, Inc. v. Town of St. Joseph*, 350 F.3d 631 (7th Cir. 2003)................................14

*Gratz v. Bollinger*, 539 U.S. 244 (2003)........................................................................................8

*Heller v. District of Columbia*, 670 F.3d 1244 (D.C. Cir. 2011)............................................ passim

*Houston v. City of New Orleans*, No. 11-30198, 2012 WL 834099 (5th Cir. Mar. 15, 2012) ........5

*Indiana Harbor Belt R.R. Co. v. American Cyanamid Co.*, 916 F.2d 1174 (7th Cir. 1990)............3

*Martin v. Harrington & Richardson, Inc.*, 743 F.2d 1200 (7th Cir. 1984)...................................10

*McDonald v. City of Chicago*, 130 S. Ct. 3020 (2010)......................................................... passim

*Menora v. Illinois High Sch. Ass'n*, 683 F.2d 1030 (7th Cir. 1982)...............................................3

*New Albany DVD, LLC v. City of New Albany*, 581 F.3d 556 (7th Cir. 2009)...............................9

*Oliver v. United States*, 466 U.S. 170 (1984) ..............................................................................23

*Parker v. District of Columbia*, 478 F.3d 370 (D.C. Cir. 2007)...................................................39

*Perry Educ. Ass'n v. Perry Local Educators' Ass'n*, 460 U.S. 37 (1983)......................................6

*Prentis v. Atlantic Coast Line Co.*, 211 U.S. 210 (1908)...............................................................3

*Reliable Consultants, Inc. v. Earle*, 517 F.3d 738 (5th Cir. 2008) ...............................................10

*Rex v. Knight*, 90 Eng. Rep. 330 (1686) ......................................................................................29

*Rubin v. Coors Brewing Co.*, 514 U.S. 476 (1995) .......................................................................9

*San Antonio Indep. Sch. Dist. v. Rodriguez*, 411 U.S. 1 (1973) ...................................................6, 8

*Semayne's Case*, 77 Eng. Rep. 194 (1572)...........................................................................................23

*Seminole Tribe of Fla. v. Florida*, 517 U.S. 44 (1996)........................................................................24

*Simpson v. State*, 13 Tenn. 356 (1833) ................................................................................................30

*Sir John Knight's Case*, 87 Eng. Rep. 75 (K.B. 1686) .........................................................................29

*State v. Huntly*, 25 N.C. (3 Ired.) 418 (1843).......................................................................................30

*State v. Reid*, 1 Ala. 612 (1840) ..........................................................................................................27

*State v. Schoultz*, 25 Mo. 128 (1857) ..................................................................................................27

*Turner Broad. Sys., Inc. v. FCC*, 520 U.S. 180 (1997)..............................................................6, 9, 10

*Turner Broad. Sys., Inc. v. FCC*, 512 U.S. 622 (1994)................................................................9, 10

*United States v. Bloom*, 149 F.3d 649 (7th Cir. 1998)........................................................................24

*United States v. French*, 291 F.3d 945 (7th Cir. 2002).......................................................................28

*United States v. Marzzarella*, 614 F.3d 85 (3d Cir. 2010)..................................................................10

*United States v. Miller*, 307 U.S. 174 (1939).......................................................................................12

*United States v. Skoien*, 614 F.3d 638 (7th Cir. 2010)..........................................................................5

*United States v. Virginia*, 518 U.S. 515 (1996) ...............................................................................8, 9

*United States v. Weaver*, No. 2:09-cr-00222, 2012 WL 727488 (S.D. W. Va. Mar. 6, 2012) ......24

*Woollard v. Sheridan*, Civil No. L-10-2068, 2012 WL 695674 (D. Md. Mar.2, 2012) ....14, 24, 32

*Wright v. United States*, 302 U.S. 583 (1938) ....................................................................................25

*Zauderer v. Office of Disciplinary Counsel*, 471 U.S. 626 (1985) ......................................................6

## Statutes and Legislative Materials

18 U.S.C. § 922(g) .................................................................................................................................35

18 U.S.C. § 922(g)(1)(B) .......................................................................................................................21

27 C.F.R. § 478.51 .................................................................................................................................21

430 ILCS 65/2(a)(1) ..............................................................................................................................35

430 ILCS 65/4 ........................................................................................................................................35

430 ILCS 65/8 ........................................................................................................................................35

720 ILCS 5/24-1(a)(4) ...........................................................................................................................22

720 ILCS 5/24-1(a)(10) .........................................................................................................................22

720 ILCS 5/24-1.6(a) .............................................................................................................................22

720 ILCS 5/24-10 ..................................................................................................................................38

MCC 8-20-010 .......................................................................................................................................22

MCC 8-20-020 ........................................................................................................22

MCC 8-20-030 ........................................................................................................22

MCC 8-20-040 .................................................................................................38, 40

MCC 8-20-050 ........................................................................................................41

MCC 8-20-110 ........................................................................................................35

MCC 8-20-110(a)(7) ...............................................................................................36

MCC 8-20-110(b) ...................................................................................................35

MCC 8-20-110(b)(3) ...............................................................................................35

MCC 8-20-120(a) ...................................................................................................35

MCC 8-20-120(b) ...................................................................................................35

MCC 8-20-140 ........................................................................................................35

FED. R. CIV. P. 56(a) ...............................................................................................3

## **Other**

BLACKSTONE COMMENTARIES ...................................................................... 2, 23, 26, 29

BLACKSTONE COMMENTARIES (Christian ed., 1794) ....................................................26

BLACKSTONE COMMENTARIES (St. George Tucker ed., 1803) ......................................27

C. Kevin Marshall, *Why Can't Martha Stewart Have a Gun?*,
    32 HARV. J.L. & PUB. POL'Y 695 (2009) ................................................................30

CHARLES HUMPHREYS, A COMPENDIUM OF THE COMMON LAW IN FORCE IN KENTUCKY 482
    (1822) ..................................................................................................................30

3 COKE, INSTITUTES OF THE LAWS OF ENGLAND 161 (Brooke, ed. 1797)......................30

CURWEN, SOME CONSIDERATIONS ON THE GAME LAWS 54 (1796) ...............................11

Ex. Doc. No. 70, House of Representatives, 39th Cong., 1st Sess. (1866) ...................27

JAMES PARKER, CONDUCTOR GENERALIS 11 (1788).....................................................30

JAMES WILSON, WORKS OF THE HONOURABLE JAMES WILSON (1804).........................23

1 JOEL PRENTISS BISHOP, COMMENTARIES ON THE CRIMINAL LAW § 172 (2d ed. 1858) .............23

2 JOEL PRENTISS BISHOP, COMMENTARIES ON THE CRIMINAL LAW § 569 (2d ed. 1858) .............23

Joyce Lee Malcolm, *The Right of the People to Keep and Bear Arms: The Common Law
    Tradition*, 10 HASTINGS CONST. L.Q. 285 (1983)...................................................11

JOYCE LEE MALCOLM, TO KEEP AND BEAR ARMS 139 (1994)......................................27

Laws of Virginia, February, 1676-77, VA. STAT. AT LARGE, 2 HENING 403 (1823) ....................11

*Legality of the London Military Foot-Association* (1780), *reprinted in* William Blizzard,
    Desultory Reflections on Police 59 (1785)..............................................................26

STEPHEN P. HALBROOK, THE FOUNDER'S SECOND AMENDMENT: ORIGINS OF THE RIGHT
TO BEAR ARMS 329-30 (2008) ............................................................................... 11

Stephen P. Halbrook, *What the Framers Intended:  A Linguistic Analysis of the Right
to Bear Arms*, 49 L. & CONTEMP. PROBS. 151 (1986) ............................................................. 1

Thomas Jefferson, 6 Writings 252-53 (P. Ford ed. 1895) ............................................................. 11

1 W. HAWKINS, A TREATISE OF THE PLEAS OF THE CROWN (1716) ................................... 23, 26, 29

## INTRODUCTION

In a passage Thomas Jefferson copied into his personal quotation book, the influential Italian criminologist Cesare Beccaria reasoned that laws forbidding the "wear[ing] of arms … disarm[] those only who are not disposed to commit the crime which the laws mean to prevent. Can it be supposed, that those who have the courage to violate the most sacred laws of humanity, and the most important of the code, will respect the less considerable and arbitrary injunctions, the violation of which is so easy, and of so little comparative importance? … [Such a law] certainly makes the situation of the assaulted worse, and of the assailants better, and rather encourages than prevents murder." *See* Stephen P. Halbrook, *What the Framers Intended: A Linguistic Analysis of the Right to Bear Arms*, 49 L. & CONTEMP. PROBS. 151, 153-54 (1986).

Perhaps no place better illustrates this principle than the City of Chicago. Beginning in 1982, the City "effectively bann[ed] handgun possession by almost all private citizens who reside in the City." *McDonald v. City of Chicago*, 130 S.Ct. 3020, 3026 (2010). As Chicago's expert Dr. Cook recognizes, the handgun ban "was ineffective in reducing the prevalence of gun ownership in the City." *See* RSOF 26.[1] Over the last 20 years, Chicago's murder rate consistently has been among the highest when compared to other cities of comparable size. AF 7; *see also* RSOF 4. By 2009, "more guns than ever were making their way onto Chicago city streets," RSOF 51, and in mid-2010 the Superintendent of Police testified that Chicago "average[s] more weapon recoveries than any other city in the United States," *id*. "The plight of Chicagoans living in high crime areas was … highlighted when two Illinois legislators

---

[1] Citations to "RSOF" refer to Plaintiffs' response to Defendants' statement of facts, and citations to "AF" refer to the additional facts included in Plaintiffs' response to Defendants' statement of facts.

representing Chicago districts called on the Governor to deploy the Illinois National Guard to patrol the City's streets." *McDonald*, 130 S.Ct. at 3049 (plurality).

After the Supreme Court struck down the handgun ban, the City doubled down on the same failed model of infringing the rights of the law-abiding in a futile and counterproductive attempt to reduce gun violence by criminals, crafting a new firearms ordinance based on the understanding that "limiting the number of handguns in circulation is essential to public safety." AF 1. Qualified residents may now possess a handgun in the home, but it cannot be taken anywhere else on the homeowner's property, much less in public. Long guns may be possessed only in the home or a place of business. Residents are limited to a single operable firearm in the home, and all firearm sales are banned. Corporation Counsel Georges boasted that the City had "gone farther than anyone else ever has." *Id*.

The results have been predictable. Chicago officials confirm that the City's criminals do not have difficulty obtaining guns. *See* AF 6. Gangs continue to prowl Chicago's streets and inflict "a form of urban terrorism" on the City. RSOF 5. These gangs "engage in extensive criminal activity," "routinely use violence and intimidation to advance their criminal interests," and rely heavily on the use of firearms." RSOF 40.

The Second Amendment was designed to ensure that citizens be able to defend themselves from such lawlessness. The fundamental right to keep and bear arms is "a public allowance … of the natural right of resistance and self-preservation; when the sanctions of society and laws are found insufficient to restrain the violence of oppression." 1 BLACKSTONE COMMENTARIES *139. Chicago's laws interfering with the exercise of this right must be struck down.

## STANDARD OF REVIEW

"The Court shall grant summary judgment if the movant shows there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." FED. R. CIV. P. 56(a). The Court must "construe the facts and draw all reasonable inferences in the light most favorable to the nonmoving party." *Foley v. City of Lafayette*, 359 F.3d 925, 928 (7th Cir. 2004).

To the extent this case turns on whether Chicago's alleged interest in public safety can justify the challenged provisions, nothing precludes the Court from disposing of it at the summary judgment stage. "[A] fact that goes to the reasonableness of a rule or other enactment is a classic example of a legislative fact." *Menora v. Illinois High Sch. Ass'n*, 683 F.2d 1030, 1036 (7th Cir. 1982). And "trials are to determine adjudicative facts rather than legislative facts." *Indiana Harbor Belt R.R. Co. v. American Cyanamid Co.*, 916 F.2d 1174, 1182 (7th Cir. 1990); *see also Prentis v. Atlantic Coast Line Co.*, 211 U.S. 210, 227 (1908) (Holmes, J.). "The distinction is between facts germane to the specific dispute, which are often best developed through testimony and cross-examination, and facts relevant to shaping a general rule, which … more often are facts reported in books and other documents not prepared specially for litigation or refined in its fires." *Indiana Harbor Belt*, 916 F.2d at 1182.

Given that this Court is authorized to decide questions of legislative fact, and given that the parties have had the opportunity to develop a record of such facts, nothing would be gained by denying summary judgment and insisting on an evidentiary hearing. Indeed, because appellate courts give *de novo* consideration to findings of legislative fact, *see Menora*, 683 F.2d at 1036; *Free v. Peters*, 12 F.3d 700, 706 (7th Cir. 1993), foregoing judgment on the merits now

will only serve to delay a final determination of Plaintiffs' fundamental constitutional rights and

unnecessarily consume the resources of the parties and the Court.

## ARGUMENT

## I. FRAMEWORK FOR REVIEW.

### A. *Heller* Mandates a Textual and Historical Analysis of Second Amendment Claims.

In *Heller,* the Supreme Court decided the case solely "on the basis of both text and

history," without applying a tiers of scrutiny approach. *District of Columbia v. Heller*, 554 U.S.

570, 595 (2008). *See also id*. at 626-27. The historical inquiry involves "examination of a

variety of legal and other sources to determine *the public understanding* of [the] legal text," *id.* at

605 (original emphasis), with particular stress on the understanding of the Second Amendment

during "the founding period." *Id*. at 604.[2] "Constitutional rights are enshrined with the scope

they were understood to have *when the people adopted them*, whether or not future legislatures

or (yes) even future judges think that scope too broad." *Id*. at 634-35 (emphasis added).

Therefore, as the Seventh Circuit has noted, "*Heller* focused almost exclusively on the original

public meaning of the Second Amendment, consulting the text and relevant historical materials

to determine how the Amendment was understood at the time of ratification." *Ezell v. City of

Chicago,* 651 F.3d 684, 700 (7th Cir. 2011).

Similarly, in *McDonald v. City of Chicago*, 130 S.Ct. 3020 (2010), the controlling

opinion reaffirmed that the original public meaning of the text of the Amendment controls, not

any judicially created "interest-balancing test," by expressly rejecting the suggestion that

incorporating the Second Amendment against the States "will require judges to assess the costs

---

[2] The Chief Justice remarked during oral argument that the focus should be on "restrictions that existed at the time the [Second] Amendment was adopted" and "lineal descendants" of such restrictions. *See* Tr. of Oral Argument at 77, *Heller*, No. 07-290.

4

and benefits of firearms restrictions and thus to make difficult empirical judgments." *Id.* at 3050 (plurality).

### B.     Text and History Resolves this case Under *Ezell*.

Text and history also suffices to resolve this case under *Ezell*, which establishes a two-step framework for reviewing Second Amendment claims.  The first step consists of "textual and historical inquiry into original meaning" to determine whether a challenged law restricts activity within the Second Amendment's scope.  *Ezell*, 651 F.3d at 701.[3]  The second step consists of "evaluat[ing] the regulatory means the government has chosen and the public-benefits end it seeks to achieve."  *Id.* at 703.

*Ezell*'s second step, however, is unnecessary here.  Indeed, the Seventh Circuit recognized that "[b]oth *Heller* and *McDonald* suggest that broadly prohibitory laws restricting the core Second Amendment right … are categorically unconstitutional."  *Id.* Thus, under *Heller*, *McDonald*, and *Ezell* judicial review of the broadly prohibitory laws at issue here will not require exploration of the " 'levels of scrutiny' quagmire." *United States v. Skoien*, 614 F.3d 638, 641-42 (7th Cir. 2010) (*en banc*).[4]

---

[3] *Ezell* states that "the Second Amendment's scope as a limitation on the States depends on how the right was understood when the Fourteenth Amendment was ratified" in 1868.  *Id.* at 702.  But *McDonald* held "that the Second Amendment right is *fully applicable* to the States," *McDonald v. City of Chicago*, 130 S.Ct. 3020, 3026 (2010) (emphasis added), and *Heller* instructs that the scope of this right was established when it was ratified in 1791, *see District of Columbia v. Heller*, 554 U.S. 570,  634-35 (2008).  Chicago agrees with us on this point.  *See* Chi. Br. 2 n.2.  Regardless, both in 1791 and in 1868 the provisions challenged here would have been understood to infringe the right to keep and bear arms.

[4] Under *Heller* and *McDonald* all Second Amendment cases, not just those involving broadly prohibitory laws, are to be resolved on the basis of text and history and without recourse to means-ends scrutiny.  *See Heller v. District of Columbia*, 670 F.3d 1244,1271-85 (D.C. Cir. 2011) (Kavanaugh, J., dissenting); *Houston v. City of New Orleans*, No. 11-30198, 2012 WL 834099, at *6 (5th Cir. Mar. 15, 2012) (Elrod, J., dissenting).  But to the extent this case *does* concern broadly prohibitory laws, any tension between the Supreme Court's approach and *Ezell*'s second step is immaterial here.

### C.     At a Minimum, the Laws Challenged Here Must be Subject to Exacting Judicial Scrutiny.

If this Court deems it necessary to apply *Ezell*'s second step, its scrutiny must be exacting.  *Ezell* directs that "a severe burden on the core Second Amendment right of armed self-defense will require an extremely strong public-interest justification and a close fit between the government's means and its end."  651 F.3d at 708.

Nothing less would accord with the Second Amendment's status as a fundamental right, for "strict judicial scrutiny" is required" if a law "impinges upon a fundamental right explicitly or implicitly protected by the Constitution."  *San Antonio Indep. Sch. Dist. v. Rodriguez*, 411 U.S. 1, 17 (1973).  *See also, e.g.*, *Perry Educ. Ass'n v. Perry Local Educators' Ass'n*, 460 U.S. 37, 54 (1983); *Zauderer v. Office of Disciplinary Counsel*, 471 U.S. 626, 651 n.14 (1985).

Nothing less would accord with *Ezell*, which applied a standard "more rigorous" than intermediate scrutiny, "if not quite 'strict scrutiny,' " to Chicago's since-repealed ban on firearm shooting ranges, which encroached upon an "important corollary" to the core Second Amendment right.  651 F.3d at 708.  Each of the provisions at issue here strikes even more directly at the Second Amendment's core.  At a minimum, this Court's review must be as stringent as that applied in *Ezell*, which reserved intermediate scrutiny for "laws restricting activity lying closer to the margins of the Second Amendment right, laws that merely regulate rather than restrict, and modest burdens on the right."  *Id*.

Finally, nothing less would accord with *Heller*, which forecloses application of intermediate scrutiny here.  In dissent, Justice Breyer argued that the proper standard of review should be drawn from "cases applying intermediate scrutiny" in the First Amendment context, such as *Turner Broad. Sys., Inc. v. FCC*, 520 U.S. 180 (1997).  *Heller*, 554 U.S. at 704 (Breyer, J., dissenting); *see also id.* at 689-90, 696.  He contended that "[t]here is no cause here to depart

6

from the standard set forth in *Turner*." *Id.* at 705. Justice Breyer called his test "interest-balancing," rather than intermediate scrutiny, not because he was adopting a less demanding test, but because of his view that the government's interest in promoting public safety would always be sufficiently important. Application of the test thus would involve a search for the appropriate degree of fit—that is, interest-balancing. *See Heller*, 554 U.S. at 689 ("I would simply adopt such an interest-balancing inquiry explicitly."). Therefore, Justice Breyer's proposed interest-balancing test was essentially intermediate scrutiny, and the Supreme Court rejected it, however it might be labeled. *See id.* at 634-35; *see also McDonald*, 130 S.Ct. at 3050 (plurality).

**D.** **Laws That Impinge Upon The Second Amendment Right Cannot Be Justified Through Application Of An "Undue Burden" Test.**

As it did in *Ezell*, Chicago "urges [this Court] to import the 'undue burden' test from the [Supreme] Court's abortion cases." 651 F.3d at 706. But the Seventh Circuit has already expressly "decline[d] this invitation," *id.*, and this Court is accordingly bound to do the same. As the Seventh Circuit explained, "[b]oth *Heller* and *McDonald* suggest that First Amendment analogues are more appropriate, and on the strength of that suggestion, we and other circuits have already begun to adapt First Amendment doctrine to the Second Amendment context." *Id.* at 706-07 (internal citations omitted).

Indeed, the *dissent* in *Heller* proposed the very sort of analysis of burdens that the City urges here: "The ultimate question is whether the statute imposes burdens that, when viewed in light of the statute's legitimate objectives, are disproportionate." *Heller,* 554 U.S. at 695 (Breyer, J., dissenting). Asking whether a law "*disproportionately* burden[s] Amendment-protected interests," *id.* at 715, is, of course, the same as asking whether the law imposes an *undue* burden. The *Heller* majority considered the dissent's approach of analyzing the "proportion[ality]" of the "burden" on Second Amendment rights, 554 U.S. at 631—and flatly rejected it, *id.* at 634-35.

7

**E.      Chicago Must Bear a Heavy Burden to Meet any Form of Heightened Scrutiny.**

Any form of heightened scrutiny places a heavy burden of justification on Chicago.  "To withstand . . . strict scrutiny analysis," the City "must demonstrate" that the challenged regulations are " 'narrowly tailored measures that further compelling governmental interests.' " *Gratz v. Bollinger*, 539 U.S. 244, 270 (2003).  In addition, Chicago must demonstrate that no less restrictive alternative is available to achieve its purposes.  *See Ashcroft v. American Civil Liberties Union*, 542 U.S. 656, 665-66 (2004); *San Antonio Indep. Sch. Dist. v. Rodriguez*, 411 U.S. at 51.  Because strict scrutiny will not tolerate "any but the most exact connection between justification and classification," *Gratz*, 539 U.S. at  270, this Court's "review of whether such requirements have been met must entail a most searching examination," *id.* (quotation marks omitted).

Under *Ezell*-type scrutiny, "the City bears the burden of establishing a strong public-interest justification" for the challenged restrictions.  *Ezell*, 651 F.3d at 708.  "The City must establish a close fit between [each restriction] and the actual public interests it serves, and also that the public's interests are strong enough to justify so substantial an encumbrance on individual Second Amendment rights."  *Id.* at 708-09.  To carry its burden, Chicago "must supply actual, reliable evidence to justify [its laws] based on secondary public-safety effects." *Id.*  Chicago has not even attempted to justify its laws under strict scrutiny or *Ezell* scrutiny.

Even under intermediate scrutiny, Chicago "must demonstrate an 'exceedingly persuasive justification' " for its restrictive gun laws.  *United States v. Virginia*, 518 U.S. 515, 531 (1996).  "The burden of justification is demanding and it rests entirely" on Chicago.  *Id.* at 533.  Any justification Chicago attempts to offer "must be genuine, not hypothesized or invented post hoc in response to litigation."  *Id.*  It must be supported by "persuasive evidence," *id.* at 539, and may

not "rely on overbroad generalizations," *id*. at 533, "speculation[,] or conjecture," *Rubin v.*

*Coors Brewing Co.*, 514 U.S. 476, 487 (1995).

To meet its burden under intermediate scrutiny, Chicago "must show 'at least' " that its

gun laws "serv[e] 'important governmental objectives'" and "are substantially related to the

achievement of those objectives." *Virginia*, 518 U.S. at 533. This means that Chicago "carries

the burden of showing that the challenged regulation advances [its] interest 'in a direct and

material way.' " *Rubin*, 514 U.S. at 487. Where, as here, Chicago argues that the regulation

serves to avert harms, "[i]t must demonstrate that the recited harms are real, not conjectural, and

that the regulation will in fact alleviate those harms in a direct and material way." *Turner v.*

*FCC*, 512 U.S. 622, 664 (1994). In addition, Chicago must show that its laws are "no more

extensive than necessary to serve that interest," *Rubin*, 514 U.S. at 486, or at least that these laws

do not "burden substantially more [protected conduct] than necessary" to further its interests.

*Turner*, 520 U.S. at 189.[5]

---

[5] Relying on cases such as *City of Los Angeles v. Alameda Books, Inc*., 535 U.S. 425 (2002), and *Turner v. FCC*, 520 U.S. 180 (1997), Chicago attempts to minimize the evidentiary burden it must meet to satisfy intermediate scrutiny. But these cases involved special circumstances and have little application here. In *Alameda Books*, for example, the Supreme Court held that a study and precedents relating to a different, though closely related, type of ordinance provided sufficient support for the City to *survive* a motion for summary judgment *against* an ordinance subject to intermediate scrutiny. 535 U.S. at 453 (Kennedy, J. concurring). But the moving parties there failed to "provid[e] any reason to question the city's theory." 535 U.S. at 437 (plurality). In particular, they failed to "offer any competing theory, let alone data" that would have supported a distinction between the challenged ordinance and those addressed by the City's study. *Id*. Certainly "*[n]one* of the Justices thought that summary judgment could be granted *in [a] municipality's favor* when the strength of, and the appropriate inferences from, the studies were contested." *Annex Books, Inc. v. City of Indianapolis*, 581 F.3d 460, 464 (7th Cir. 2009) (discussing *Alameda Books*) (second emphasis added); *Alameda Books*, 535 U.S. at 438-439. Not surprisingly, in ordinary circumstances, a City must present evidence "about the sort of law it enacted." *Annex Books, Inc. v. City of Indianapolis*, 624 F.3d 368, 369 (7th Cir. 2010); *see also New Albany DVD, LLC v. City of New Albany*, 581 F.3d 556, 559-560 (7th Cir. 2009). Similarly, though the Court in *Turner Broad. Sys., Inc. v. FCC* ultimately accorded deference to Congress's "predictive judgments," 512 U.S. at 666, it made clear that this

## II. CHICAGO'S BAN ON FIREARMS TRANSFERS IS UNCONSTITUTIONAL

### A. Chicago's Ban On Acquiring Firearms Is Categorically Unconstitutional.

"Supreme Court cases hold that … restricting the ability to purchase an item is tantamount to restricting that item's use." *Reliable Consultants, Inc. v. Earle*, 517 F.3d 738, 743 (5th Cir. 2008). This principle has been applied in contexts as diverse as free speech, sex discrimination, and substantive due process.[6] Chicago can thus no more ban the acquisition of firearms than it can ban their use for self-defense. *See United States v. Marzzarella*, 614 F.3d 85, 92 n.8 (3d Cir. 2010) (it would be "untenable under *Heller*" to find "no constitutional defect in prohibiting the commercial sale of firearms"). Indeed, the Seventh Circuit has already equated shutting down the commercial handgun market with a "handgun ban." *Martin v. Harrington & Richardson, Inc.*, 743 F.2d 1200, 1204 (7th Cir. 1984). Chicago's prohibitory transfer ban is therefore flatly unconstitutional. *See Heller*, 554 U.S. at 628-29; *Ezell*, 651 F.3d at 703.

### B. History Confirms That The Right To Keep And Bear Arms Necessarily Includes The Right To Acquire Them.

History, not to mention common sense, confirms that "the right to keep arms, necessarily involves the right to purchase them," *Andrews v. State*, 50 Tenn. 165, 178 (1871), for it is replete

---

deference did " 'not foreclose [the Court's] independent judgment of the facts bearing on an issue of constitutional law,' " *id.*, let alone that Congress's predictions were not "insulated from meaningful judicial review," *id.* Significantly, the Court in *Turner* initially *reversed* a grant of summary judgment for the government because "[o]n the state of the record developed thus far" it was "unable to conclude that the Government has satisfied" its burden under intermediate scrutiny. *Id.* at 665. Only after "[t]he District Court oversaw another 18 months of factual development on remand 'yielding a record of tens of thousands of pages of evidence,' " *Turner*, 520 U.S. at 187, was the Court able to determine whether the challenged law was "designed to address a real harm" and whether it would "alleviate [that harm] in a material way," *id.* at 195.

[6] *See, e.g.*, *Carey v. Population Serv., Int'l*, 431 U.S. 678, 687-88 (1977) ("A total prohibition against the sale of contraceptives … would intrude upon individual decisions in matters of procreation and contraception as harshly as a direct ban on their use."); *Citizens United v. FEC*, 130 S.Ct. 876, 898 (2010) (equating "prohibition on independent expenditures" with "a ban on speech … for effective public communication requires the speaker to make use of the services of others"); *Craig v. Boren*, 429 U.S. 190 (1976) (striking down law that discriminated on the basis of sex in establishing minimum age to purchase beer).

with examples of governments attempting to disarm their citizens by imposing restrictions on the acquisition or purchase of arms. "Between the Restoration and the Glorious Revolution, the Stuart Kings" used disarmament as a means of "suppress[ing] political dissidents." *Heller*, 554 U.S. at 592. One such measure employed by Charles II was a restriction on the trade in arms. Joyce Lee Malcolm, *The Right of the People to Keep and Bear Arms: The Common Law Tradition*, 10 HASTINGS CONST. L.Q. 285, 299-300 (1983).

"[O]f course, what the Stuarts had tried to do to their political enemies, George III had tried to do to the colonists." *Heller*. 554 U.S. at 594. King George's oppressions included a "ban on import of arms and ammunition," and "the patriots perceived that the right to bear arms [was] being infringed when British troops … used entrapment to ferret out persons seeking to obtain arms." STEPHEN P. HALBROOK, THE FOUNDER'S SECOND AMENDMENT: ORIGINS OF THE RIGHT TO BEAR ARMS 329-30 (2008). These measures, among others, "provoked polemical reactions by Americans invoking their rights as Englishmen to keep arms," and they show the scope of what the founding generation thought was protected under those rights. *Heller*, 554 U.S. at 594. The right to acquire firearms was thus seen as part and parcel of the right to keep and bear them. As Thomas Jefferson put it: "Our citizens have always been free to make, vend, and export arms. It is the constant occupation and livelihood of some of them." Thomas Jefferson, 6 Writings 252-53 (P. Ford ed. 1895).[7]

---

[7] *See also* CURWEN, SOME CONSIDERATIONS ON THE GAME LAWS 54 (1796) ("What law forbids the veriest pauper, *if he can raise a sum sufficient for the purchase of it*, from mounting his Gun on his Chimney Piece, with which he may not only defend his Personal Property from the Ruffian, but his Personal Rights, from the invader of them….") (emphasis added) (*quoted in Heller*, 554 U.S. at 583 n.7); Laws of Virginia, February, 1676-77, VA. STAT. AT LARGE, 2 HENING 403 (1823) ("It is ordered that all persons have hereby liberty to sell armes and ammunition to any of his majesties loyall subjects inhabiting this colony ....").

The early history of the militia is also instructive. The militia was made up of males capable of bearing arms, and membership in the militia presupposed private firearm possession. *See United States v. Miller*, 307 U.S. 174, 179 (1939) ("the Militia comprised all males physically capable of acting in concert for the common defense … [a]nd further … ordinarily when called for service these men were expected to appear bearing arms *supplied by themselves*") (emphasis added). If these men were required to arm themselves, it follows *a fortiori* that they had to have a means of doing so, and thus that a prohibition on regular commercial trade in firearms would not have been tolerated.

That the original understanding of the right to keep and bear arms would not tolerate Chicago's ban on acquiring firearms is also confirmed by negative implication. Chicago has not identified a single law that even *approaches* a flat ban on the transfer of all firearms. Rather, the City has cited three laws that banned the sale of certain pistols. But these isolated and aberrational laws seem to have been premised on the (mistaken) theory that there was simply no right even to *use* the affected weapons, not on the implausible notion that the government may prohibit law-abiding citizens from acquiring any and all arms they are entitled to keep and bear. This was certainly the case for the two laws Chicago has cited that predated the 20th century. The 1837 Georgia law not only banned the sale of pistols other than "horseman's pistols, etc.," but also prohibited even "*keep[ing]*" them. Chi. App'x 109. And less than two weeks after passing Tennessee's 1879 law banning the sale of pistols other than the "army or navy pistol," *id.* at 113, the Tennessee legislature reaffirmed the state's ban on carrying such weapons 'publicly *or privately*," *id.* at 64.

12

**C.     Chicago's Transfer Ban Fails Constitutional Scrutiny.**

     1.     *Chicago's transfer ban must satisfy judicial review far more stringent than the City's proposed "undue burden" test.*

The City's arguments for applying an "undue burden" test to the sales ban are utterly unpersuasive.[8]  The City argues that the transfer ban simply "regulates the place where acquisition [of firearms] may occur, requiring that it take place outside Chicago."  Chi. Br. 23. *Ezell* squarely rejected this reasoning, for it

> assumes that the harm to a constitutional right is measured by the extent to which it can be exercised in another jurisdiction.  That's a profoundly mistaken assumption. … It's hard to imagine anyone suggesting that Chicago may prohibit the exercise of a free-speech or religious-liberty right within its borders on the rationale that those rights may be freely enjoyed in the suburbs. That sort of argument should be no less unimaginable in the Second Amendment context.

*Ezell*, 651 F.3d at 697.  The Court thus held that "the pertinent question is whether the Second Amendment prevents the City Council from banning firing ranges everywhere in the city; *that ranges are present in neighboring jurisdictions has no bearing on this question*." *Id*. (emphasis added).

Chicago's attempt to distinguish *Ezell* establishes only that the infringement wrought by the transfer ban is, if anything, even more egregious than that imposed by the range ban. "[U]nlike in *Ezell*," the City explains, "this case does not involve a Chicago Firearms Permit ('CFP') precondition that Chicago prohibits residents from fulfilling within its borders."  Chi. Br. 24.  True enough.  Here Chicago cuts out the middleman of its CFP licensing system and simply bans the acquisition of firearms in the City directly.

---

[8] Of course, it is always inappropriate to apply an undue burden test to a restriction of Second Amendment rights.  *See supra* Part I.D.

13

2.     *Chicago's transfer ban fails heightened constitutional scrutiny.*

For these reasons, it is clear that if Chicago's transfer ban is not *categorically*

unconstitutional, it must *at a minimum* be subject to *Ezell*-type scrutiny, if not strict scrutiny.

Chicago cannot meet these standards, and it has not even attempted to do so.  Indeed, the sales

ban cannot be sustained even under intermediate scrutiny.

Legislative history and testimony by Chicago officials makes clear that the sales ban is

intended to limit the availability and number of firearms in the City, *regardless* of whether they

are possessed by responsible, law-abiding citizens or criminals. AF 1.  This is reflected in the

operation of the ban, for it is not targeted at criminals but rather enacts a flat prohibition.

Making matters worse, this broad restriction was enacted despite testimony that "there's a variety

of ways to approach regulating gun dealers to insure that they're operating as safely as possible

and to insure that guns are not making their way out into the street from gun dealers."  RSOF 60.

Dr. Webster likewise advocated a less restrictive approach, testifying that "the most effective

gun policies will … prohibit the sale, possession, and other use of *particular types of firearms*

that, by their design, present unacceptable risks *beyond other firearms*."  *Id.*

It is illegitimate for Chicago to attempt to combat gun violence by simply limiting the

number of guns in the City. . *Cf. G.M. Enterprises, Inc. v. Town of St. Joseph*, 350 F.3d 631, 638

(7th Cir. 2003) (applying intermediate scrutiny in the First Amendment context, and holding that

" 'the rationale of the ordinance must be that it will suppress secondary effects—*and not by*

*suppressing speech*' ") (quoting *City of Los Angeles v. Alameda Books, Inc.*, 535 U.S. 425, 449-

50 (2002) (controlling opinion of Kennedy, J., concurring in the judgment) (emphasis added)).

Even under intermediate scrutiny a law that indiscriminately "burdens the exercise of a

constitutional right by simply making that right more difficult to exercise cannot be considered

14

'reasonably adapted' to a government interest, no matter how substantial that interest may be."
*Woollard v. Sheridan*, Civil No. L-10-2068, 2012 WL 695674, at *11 (D. Md. Mar. 2, 2012).

At any rate, banning firearms sales does not benefit public safety. Existing empirical
evidence indicates that local sales bans do not reduce gun possession among criminals. AF 21.
And Sergeant Johnson of the Chicago Police Department's Chicago Anti-Gun Enforcement
(CAGE) Team, which investigates illegal firearms trafficking in Chicago, RSOF 72, admits that
"the number of guns that are making their way onto the city streets" *is not* "responsive to
changes in local law." AF 21. Indeed, Sergeant Johnson admitted that it currently is "not
difficult at all" for a criminal to get a gun in Chicago, testimony that was echoed by Carol
Brown, Chief of Policy in the Mayor's Office, testifying as a 30(b)(6) witness on behalf of the
City. AF 6. Ms. Brown agrees that "it's fairly easy for criminals in the City of Chicago to
obtain a gun illegally if they want to." *Id.* Dr. Kleck concluded that these "officials are
correct—it is already easy for criminals to get guns, even with the current ordinance in force."
*Id.*; *see also* AF 29 (describing Dr. Kleck's qualifications).

Furthermore, the evidence does not support the notion that more guns lead to more crime.
Indeed, a committee of the National Research Council ("NRC") concluded that "existing
research and data … *do not* credibly demonstrate a causal relationship between the ownership of
firearms and the causes or prevention of criminal violence." AF 30. Dr. Kleck testified that no
methodologically competent studies have found that gun ownership levels have a significant
positive effect on total homicide rate. AF 24. Even Dr. Cook admits that "the availability of
guns in a jurisdiction does not have an effect on the volume or rate of robbery or assault." *Id.*

For these reasons, the CAGE Team rightly is "not at all" concerned with "legitimate law
abiding citizens purchasing firearms for … lawful reasons" or with "law abiding firearms dealers

15

selling them for lawful purposes." AF 3. But worse than simply having no public safety *benefit*, banning firearms sales to law-abiding citizens imposes significant public safety *costs* by making it more difficult for law-abiding citizens to acquire firearms.

Dr. Kleck has found that Americans use guns defensively between 2.2 and 2.5 million times per year. AF 8. At least 19 other surveys support a similar estimate. *Id.* And defensive gun use makes crime victims safer. AF 12. Empirical research "indicate[s] that … crime victims who used guns to protect themselves were less likely to suffer injur[y] after taking self-protective actions, and less likely to lose property, than victims who did not resist at all, victims who resisted by force but not with a gun, or victims who resisted in nonforceful ways." *Id.*

Defensive gun use may also deter prospective offenders from even attempting crimes. AF 17. A wealth of evidence suggests that widespread ownership, carrying, and defensive use of guns by potential and actual crime victims has a deterrent effect on crime. *Id.* For example, one study found that "somewhere around 0.8 to 2.0 million violent crimes are deterred each year because of gun ownership and use by civilians." *Id.* And a survey of convicted felons found that 39% "had at some time in their lives decided not to do a crime because they 'knew or believed the victim was carrying a gun,' " and 8% "had this experience 'many times.' " *Id.*

        3.     *Chicago's attempt to justify the sales ban fails.*

The foregoing demonstrates that Chicago simply cannot justify its flat ban on firearm sales. Each of the three arguments offered by the City in support of its claim that the sales ban makes it more difficult for criminals to get guns lacks merit.

        a.     *Restricting criminals' access to licensed dealers*. It would be of little moment even if the sales ban did restrict criminals from accessing licensed dealers: the relevant issue is whether the sales ban restricts criminals' access to guns, not whether it restricts their access to

guns from a particular source.  *See* RSOF 78.  At any rate, the City's own evidence shows that criminals are very *unlikely* to acquire guns from licensed dealers.  A survey of felons proffered by Chicago, for example, found that "the large majority of criminal firearms transactions do not involve conventional over-the-counter retail transactions" and concluded that "restrictions imposed at the point of retail sale cannot possibly have much of an effect."  RSOF 60.

And Dr. Cook's 2007 Chicago Study, which examines the City's illegal gun market, actually *undermines* the City's defense of the sales ban.  First, the study pointedly concluded that "Chicago's handgun ban … was *ineffective* in reducing the prevalence of gun ownership in the City."  RSOF 77.  If a sweeping ban on possessing handguns failed to keep criminals from getting guns, there is no reason to suspect that the sales ban will.

Second, Dr. Cook's "own data on prices paid for guns by Chicago's criminals directly contradicts his claim that guns are scarce for criminals or hard to get."  RSOF 53.  Data reported in the 2007 Chicago Study indicates that the price paid for handguns by Chicago criminals was less than half of the average new-gun retail price of the guns confiscated from Chicago criminals. RSOF 77.

Third, citing the 2007 Chicago Study, Chicago defends the transfer ban on the theory that gang members do not now travel to the suburbs to buy guns, but would buy guns at a local store. But the study did not find that *criminals* were particularly unlikely to leave their own neighborhoods, but rather that "*residents* of [the studied] neighborhoods are very parochial, perhaps because gang turf increases the risks of traveling to other areas."  RSOF 78.  And the study concluded that "neighbourhood-specific factors *cannot* be a very important explanation for the transactions costs documented in the study."  *Id*.  The study's alternative explanation for its finding that criminals rarely obtained weapons from dealers in the suburbs is much more

17

plausible: licensed dealers "are by law required to record the identity of the official purchaser, which increases the legal risk associated with buying a gun from a dealer." *Id.*

Fourth, the study found that "the underground market in the high-crime South Side Chicago neighbourhood studied … is *not* unique," because "high transactions costs characterise the underground gun market elsewhere … in large cities." RSOF 57. And "to the extent to which Chicago's gun market works less well than other places," the study concluded, "the most likely explanations are the city's low rate of household gun ownership and police emphasis on guns, *rather than the city's ban on private possession of handguns*." *Id.* Indeed, the study posited that "the fact that Chicago … ha[s] low gun ownership rates may be more cause than consequence of restrictive local gun laws." *Id.*

Chicago also trumpets "a 2009 study [that] found that 'major cities having the most FFLs per capita also have the highest rates of gun homicide.' " Chi. Br. 30. But because the cited study failed to control for causal order, "it is more likely that the association merely reflect[s] the well-established fact that higher crime rates motivate many people to acquire guns for protection." RSOF 82. Indeed, the study's authors expressly acknowledged that "it may be that high rates of homicide may lead to increased demand for firearms and hence additional FFLs, in which case the results of the 'FFL as risk factor' hypothesis that our models have been designed to test would be spurious." *Id.*

Chicago additionally points to (a) Operation Gunsmoke, in which undercover officers posed as criminals or unqualified purchasers and tried to buy guns from suburban stores near Chicago, and (b) results of two studies purportedly finding that dealers were willing to make illegal sales.

The relevance of Operation Gunsmoke to Chicago's ban on gun sales is unclear, since citing several anecdotal cases cannot establish that dealer misconduct is common among FFLs. RSOF 60. Indeed, Commander Gorman testified that "licensed firearms dealers knowingly engaging in illegal transactions" are not "a significant source of guns for criminals in Chicago." RSOF 5, 60.

And the cited studies did not document a *single* illegal sale. Rather, they reported telephone conversations between dealers and potential buyers. RSOF 66, 67. As the authors of one of the studies conceded, "dealers' stated intent [in such conversations] may not correspond to their actual behavior." RSOF 66. Furthermore, many of the scenarios posed to the dealers were admittedly ambiguous rather than starkly illegal. RSOF 66, 67.

      b.     *Restricting gun acquisition in the illegal market.* Chicago next turns to Dr. Cook's opinion, based primarily on the 2007 Chicago Study, that guns are scarce in the illegal market in Chicago and that the sales ban helps preserve this scarcity. But criminals in Chicago do not have a difficult time obtaining guns, and the 2007 Chicago Study attributes any such difficulty to sources other than legal restrictions on firearms. *See generally* RSOF 51-58.

      c.     *Gun stores are dangerous and cannot be safely regulated.* In a retread of the tired and rejected argument that Second Amendment rights are simply too dangerous to be taken seriously, *see Heller*, 554 U.S. at 636, Chicago conjures "havoc wrought by gun stores" and asserts that "Chicago should not be saddled with the cost and burden of trying to bring [this] industry to heel." Chi. Br. 34, 37.

Chicago's jeremiad against the gun industry is unfounded. Indeed, Dr. Kleck and a colleague have thoroughly debunked the "myth" that "corrupt licensed dealers … significantly contribute to the arming of America's criminals," RSOF 60, and he has reiterated here that "

'bad' FFLs are of virtually no significance in supplying guns to criminals, directly or indirectly," *id*.

Chicago highlights various statistics showing that a small percentage of licensed dealers sell a disproportionate share of guns that end up being used in crimes. These statistics, however, are based on guns submitted for tracing analysis by law enforcement agencies, which even Dr. Cook acknowledges are not representative of all crime guns. RSOF 68. Even putting that serious analytical defect to the side, however, these statistics are no more surprising than would be a finding that a disproportionate share of deaths occur under the care of hospitals that treat the most and sickest patients. "To date, there is no research whatsoever that indicates that, once one accounts for sales volume and local crime rates, dealer misconduct is responsible for any nonnegligible part of the disproportionate share of traced crime guns for which a few dealers account." *Id*. Indeed, even Dr. Cook admits that "the fact that a gun was traced to an FFL isn't proof that the FFL did anything wrong." *Id*.

Chicago also insists that "when dealers violate the law, they do so with abandon." Chi. Br. 33. The ATF does not agree: only "on rare occasions" does the agency "encounter[] a licensee who fails to comply with the laws and regulations and demonstrates a lack of commitment to improving his or her business practices." RSOF 90. This explains why the ATF rarely initiates proceedings to revoke licenses or deny license renewals (it initiated 100 such proceedings based on over 11,000 inspections conducted in FY 2009, *see* RSOF 89, 90), not lax oversight.

Chicago emphasizes supposed shortcomings in the ATF's oversight of gun stores, relying principally on a Department of Justice report assessing compliance inspections conducted by the ATF a decade ago. But Dr. Kleck's analysis of more recent data demonstrates that the ATF

conducts "a number [of compliance inspections] sufficient to inspect all 'real' gun dealers (those annually selling more than 50 guns) every year, plus a sample of low-volume dealers." RSOF 86; *see also* RSOF 93.

Nor can Chicago sustain its assertion that "ATF's authority [is] virtually toothless." Chi. Br. 36. For example, the City's claim that ATF cannot inspect an FFL more than once a year is at best misleading. While it is true that federal law only allows for one routine annual inspection for compliance with record-keeping requirements, FFLs can also be inspected for other reasons, including "at any time with respect to records relating to a firearm involved in a criminal investigation that is traced to the licensee." RSOF 93 (quoting 18 U.S.C. § 923(g)(1)(B)).

And Chicago cites no provision of law for its claim that "if an FFL is convicted of a felony or discovered to have poor practices, the license can simply be passed to a relative or associate." Chi. Br. 36. We have been unable to find one supporting it. Federal regulations expressly provide that federal firearms licenses "are not transferable. In the event of the lease, sale, or other transfer of the operations authorized by the license, the successor must obtain the license required by this part prior to commencing operations." RSOF 94 (quoting 27 C.F.R. § 478.51).

Chicago's claim that "a gun store is a cache just waiting to be raided" by thieves is similarly specious. Chi. Br. 33. True, a few gun stores have been robbed, just as a few banks have been robbed. But the City presents no evidence that guns stolen from gun stores make any significant contribution to arming criminals. *See* RSOF 72, 73; *see also* RSOF 74. Chicago is also concerned that gun store patrons would be targeted for theft by gang members after their guns. But even if that were the case—despite the fact that criminals tend to avoid, not seek out,

armed victims, *see* RSOF 76—the Constitution requires that citizens of Chicago be allowed to determine for themselves whether they are willing to run that risk.

### III.  CHICAGO UNCONSTITUTIONALLY RESTRICTS POSSESSION AND CARRIAGE OF FIREARMS.

The right to carry a firearm in public for self-defense is not at issue in this case. The State of Illinois flatly (and unconstitutionally) bans public carriage. Yet Chicago is not content to rely on Illinois' uniquely restrictive regime. *See* AF 32. Chicago additionally bans the possession and carriage of (1) firearms on one's own property outside the four walls of one's home, (2) firearms on the property of another as an invitee with that person's permission, and (3) handguns in one's own fixed place of business. *Compare* MCC 8-20-010, -020, & -030 *with* 720 ILCS 5/24-1(a)(4)&(10) & 5/24-1.6(a). These restrictions are the subject of Plaintiffs' challenge.

#### A.  Chicago Infringes Upon Defense Of The Home.

Chicago's argument that the Second Amendment's "historical scope is limited to one's home" is erroneous. Chi. Br. 5. But erroneous or not, this argument cannot justify the City's restrictive definition of "home" or its prohibition on permitting guests to possess firearms in one's home, both of which strike at the heart of "the right of law-abiding, responsible citizens to use arms in defense of hearth and home." *Heller*, 554 U.S. at 635.

*Definition of "Home."* The need for an effective means of protection on one's own property but outside the four walls of one's home is particularly acute in Chicago, where "yards, driveways, and garages in particular typically directly abut sidewalks, streets, alleys, and/or neighboring parcels," RSOF 33, thus providing little buffer from outside threats. Indeed, from 1999 to 2010 nearly as many murder victims were found dead in yards, porches, garages, and driveways in Chicago as in houses. AF 4.

22

The founding generation would have recoiled from Chicago's narrow conception of home defense. At common law, a person had the right to defend his home against a burglar—and not just the main dwelling place, but also "the out houses adjoining to the principal house." 3 JAMES WILSON, WORKS OF THE HONOURABLE JAMES WILSON 84-85 (1804) (hereinafter, "WILSON WORKS"); *see also* 4 BLACKSTONE COMMENTARIES *225; 1 JOEL PRENTISS BISHOP, COMMENTARIES ON THE CRIMINAL LAW § 172 (2d ed. 1858) (hereinafter, "BISHOP COMMENTARIES"). The right to defend one's home also extended to defending it against arson, *see* 4 BLACKSTONE COMMENTARIES *180, and the common law crime of arson—"burning the house of another"—likewise included burning "the outhouses … which are parcel of the mansion house," 3 WILSON WORKS 62.[9]

*Invitees*. Chicago's ban on citizens enlisting the assistance of others in armed defense of the home also lacks historical justification. At least as far back as 16th century England, it was understood that "every one may assemble his friends and neighbors to defend his home against violence." *Semayne's Case*, 77 Eng. Rep. 194, 195 (1572); *see also* 1 W. HAWKINS, A TREATISE OF THE PLEAS OF THE CROWN 70 (1716) (hereinafter, HAWKINS TREATISE). The generations that enacted the Second and Fourteenth Amendments likewise understood that "one may assemble people together in order to protect and defend his house." *See* 3 WILSON WORKS 85; 2 BISHOP COMMENTARIES § 569 n.1.

---

[9] The Fourth Amendment's protection of "houses" also is not limited to the four walls of a person's home. *See Oliver v. United States*, 466 U.S. 170, 180 (1984) ("At common law, the curtilage is the area to which extends the intimate activity associated with the sanctity of a man's home and the privacies of life, and therefore has been considered part of home itself for Fourth Amendment purposes.") (quotation marks and citations omitted); *United States v. French*, 291 F.3d 945, 951 (7th Cir. 2002) (The Fourth Amendment's "protection is *not* limited to the four walls of one's home, but extends to the curtilage of the home as well.") (emphasis added).

**B.** **Chicago's Ban On Handguns In A Place Of Business Cannot Be Reconciled With *Heller*.**

Like a person inside a home, the owner of a business has a right to self-defense. Under *Heller* and *McDonald*, permitting proprietors to protect their businesses with long guns does not justify banning them from using handguns for that purpose. *See McDonald*, 130 S.Ct. at 3036 (*Heller* "concluded [that] citizens must be permitted to use handguns for the core lawful purpose of self-defense") (quotation marks and brackets omitted); *Heller*, 554 U.S. at 629 ("It is no answer to say … that it is permissible to ban the possession of handguns so long as the possession of … long guns … is allowed.").

The validity of Chicago's ban on possessing handguns in a place of business thus depends upon Chicago's assertion that the Second Amendment right is limited to the home, an assertion that as we demonstrate below lacks merit.

**C.** **Text And History Demonstrate That The Right To Keep And Bear Arms Is Not Confined To The Home.**

The City asks the Court to dismiss Plaintiffs' claims *without* addressing the scope of the right to arms outside of the home. This Court, however, is obliged to answer that question on the merits. *See Woollard*, 2012 WL 695674, at *5. And while the City insists that *Heller* "limited its holding to the home," Chi. Br. 4, *Heller* provides significant—and authoritative—guidance for answering the question of whether the Second Amendment right extends beyond the home. *See Seminole Tribe of Fla. v. Florida*, 517 U.S. 44, 67 (1996) ("When an opinion issues for the Court, it is not only the result but also those portions of the opinion necessary to that result" that are binding.); *United States v. Bloom*, 149 F.3d 649, 653 (7th Cir. 1998) (a statement that "explains the Court's rationale" is "part of the holding"). *See also United States v. Weaver*, No. 2:09-cr-00222, 2012 WL 727488, at *4 & n.7 (S.D. W. Va. March 6, 2012); *Bateman v. Perdue*, No. 5:10-cv-265-H, Doc. No. 87 at 9-11 (E.D.N.C. Mar. 29, 2012).

24

1.      The Second Amendment provides that "the right of the people to keep and bear Arms shall not be infringed."  Limiting Second Amendment rights to the home effectively would read the term "bear" out of the Constitution.  The most fundamental canons of construction forbid any interpretation that would relegate this language to the status of meaningless surplus. *See Wright v. United States*, 302 U.S. 583, 588 (1938).

"At the time of the Founding, as now, to 'bear' meant to 'carry,' " and "[w]hen used with 'arms,' ... the term has a meaning that refers to carrying for a particular purpose—confrontation." *Heller*, 554 U.S. at 584.  Consequently, *Heller* declared that the Second Amendment "guarantee[s] the individual right to … carry weapons in case of confrontation."  *Id*. at 592.  The plain language of the Second Amendment thus cannot be reconciled with the notion that it guarantees a right to keep and bear arms only within the walls of one's home.

2.      History confirms that the Second Amendment codified a pre-existing right to firearms for self-defense not limited to the home.  *Heller* established that the Second Amendment's core includes the right of law-abiding citizens to keep and carry firearms for their own protection:  "Self-defense is a basic right, recognized by many legal systems from ancient times to the present day, and in *Heller* [the Supreme Court] held that individual self-defense is 'the *central component*' of the Second Amendment right."  *McDonald*, 130 S.Ct. 3020, 3036 (quoting *Heller*, 554 U.S. at 599).  The Supreme Court thus "concluded [that] citizens must be permitted 'to use handguns for the core lawful purpose of self-defense.' "  *Id.* (quoting *Heller*, 554 U.S. at 630) (brackets omitted); *see also Ezell*, 651 F.3d at 689 ("*Heller* held that … the core component [of the Second Amendment right] is the right to possess operable firearms … for self-defense").  Because the need for self-protection extends beyond the home, the right to arms necessarily does as well.  History bears out this common-sense conclusion.

By the time our Constitution was written, the right to keep and bear arms "had become fundamental for English subjects" and was "understood to be an individual right protecting against both public and private violence." *Heller*, 554 U.S. at 593-94. The common law recognized that there is "no Reason why a Person, who without Provocation, is assaulted by another *in any Place whatsoever*, in such a Manner as plainly shews an Intent to murder him, … may not justify killing such an Assailant." 1 HAWKINS TREATISE 72 (emphasis added); 4 BLACKSTONE COMMENTARIES *184. The "lawful purposes, for which arms may be used," plainly were not limited to the home, for they included "immediate self-defence, … suppression of violent and felonious breaches of the peace, assistance of the civil magistrate in the execution of the laws, and the defence of the kingdom against foreign invaders." *Legality of the London Military Foot-Association* (1780), *reprinted in* William Blizzard, Desultory Reflections on Police 59, 63 (1785). Indeed, it was understood that "every one [was] at liberty to keep or carry a gun, if he does not use it for the destruction of game." 2 BLACKSTONE COMMENTARIES *411-12 n.2 (Christian ed., 1794).

Early State constitutions confirm that the right to bear arms extended beyond the home. For example, "Justice James Wilson interpreted the Pennsylvania Constitution's arms-bearing right … as a recognition of the natural right of defense 'of one's person *or* house,' " demonstrating that the right of "bearing arms" in defense of the person was understood to extend beyond the home. *Heller,* 554 U.S. at 585 (emphasis added). Indeed, "[n]ine state constitutional provisions written in the 18th century or the first two decades of the 19th … enshrined a right of citizens to 'bear arms in defense of themselves and the state' or 'bear arms in defense of himself and the state.' " *Heller*, 554 U.S. at 584-85 & n.8. Just as "it is clear from those formulations that 'bear arms' did not refer only to carrying a weapon in an organized military unit," *id*. at 585,

26

it is likewise clear that "bear arms" did not refer only to toting a weapon from room to room in one's house. Citizens could not effectively bear arms in defense of themselves or in defense of the state if they were not free to carry their weapons where they were needed for either purpose.[10] The practices of the Framers themselves confirm that the right to carry firearms was well-established in the early American republic. *See, e.g.,* 5 BLACKSTONE COMMENTARIES App. n.B, at 19 (St. George Tucker ed., 1803).

*This* is the pre-existing right that was codified in the Second Amendment and was understood by the founding generation to have not only public scope, but also a public purpose. Indeed, "[m]any colonial statutes *required* individual arms-bearing for public-safety reasons." *Heller*, 554 U.S. at 601 (emphasis added). Some colonies even required citizens to carry their firearms to church services and other public gatherings.[11]

Those who wrote and ratified the 14th Amendment understood the right to bear arms in the same way. An 1866 report to Congress from the Freedmen's Bureau stated: "There must be 'no distinction of color' in the right to carry arms, any more than in any other right." Ex. Doc. No. 70, House of Representatives, 39th Cong., 1st Sess., at 297 (1866). It was precisely this understanding of the Second Amendment right that caused Chief Justice Taney such alarm in *Dred Scott v. Sandford*, 60 U.S. 393 (1857). In 1857 the Chief Justice recoiled from recognizing freedmen and their descendants as part of "We the People of the United States," because if they were, then they too, just like white citizens, would be constitutionally entitled "to keep and carry arms wherever they went." *Id.* at 417.

---

[10] Antebellum courts interpreting these provisions did not understand them to be limited the home. *See Bliss v. Commonwealth*, 2 Litt. 90, 92 (Ky. 1822); *State v. Reid*, 1 Ala. 612, 616-17 (1840); *State v. Schoultz*, 25 Mo. 128, 155 (1857).

[11] *See* JOYCE LEE MALCOLM, TO KEEP AND BEAR ARMS 139 (1994) (citing several examples of laws that "required colonists to carry weapons").

The 14th Amendment rejected this legacy of prejudice. In *McDonald*, the Supreme Court cited as an example of a law that would be nullified by the 14th Amendment a statute providing that "no freedman, free negro or mulatto, not in the military service of the United States government, and not licensed so to do by the board of police of his or her county, shall keep or carry fire-arms of any kind." 130 S.Ct. at 3038.

3.     The Second Amendment's "prefatory" clause cements this interpretation of the Amendment's operative clause. The prefatory clause "announces the purpose for which the right was codified: to prevent elimination of the militia." *Heller*, 554 U.S. at 599. A right to bear arms limited to the home would be ill-suited to this purpose, for if citizens could be prohibited from carrying arms in public they would be disabled from acting as a militia at all. Of course, "the militia was not the only reason Americans valued the ancient right; most undoubtedly thought it even more important for self-defense and hunting." *Id.* Hunting, like self-defense from assailants at large, cannot be conducted by those bearing arms only within their homes.

4.     *Heller* noted that its decision should not "be taken to cast doubt on longstanding prohibitions on … laws forbidding the carrying of firearms in sensitive places such as schools and government buildings." *Id.* at 626. But it would make no sense for the Court to acknowledge this narrow exception if the Second Amendment allowed the government to ban the carrying of firearms *everywhere* outside the home.

The Court also observed that a "majority of the 19th-century courts to consider the question held that prohibitions on carrying concealed weapons were lawful under the Second Amendment or state analogues." *Heller*, 554 U.S. at 626. But the Court distinguished these prohibitions, which proscribed only *concealed* carry and *permitted* citizens to carry firearms *openly* in public, from laws that broadly prohibited carriage, whether open or concealed. The

latter, the Court said, "c[a]me close to the severe restriction of the District [of Columbia's] handgun ban" that *Heller* struck down. *Id*. at 629.

### D. Chicago Fails To Establish That The Right To Keep And Bear Arms Is Limited To The Home.

While the foregoing establishes that the Second Amendment is not limited to the home, *Chicago* bears the burden conclusively to establish, based upon a "textual and historical inquiry into original meaning," that a "challenged firearms law regulates activity outside the scope of the Second Amendment right." *Ezell*, 651 F.3d at 701, 702-03. But Chicago skips entirely over the Second Amendment's text and its express protection of a right to bear (i.e., to carry) firearms. And Chicago's historical presentation fails to establish the implausible conclusion that the right to carry firearms was understood to be bounded by the walls of a person's home.

1. Chicago's explication of the English arms right centers on the restriction on carrying dangerous and unusual weapons in a terrifying manner, a restriction that was reflected in the common law and codified in the Statute of Northampton. *See* 1 HAWKINS TREATISE 135; 4 BLACKSTONE COMMENTARIES *149; *Sir John Knight's Case*, 87 Eng. Rep. 75 (K.B. 1686). But the element of "terror" was key to this restriction, and it *did not* bar the ordinary carrying of common weapons in public for personal defense—as Chicago's own historical authorities demonstrate. *See* 1 HAWKINS TREATISE 136 ( "persons of quality are in no danger of offending against this statute by wearing common weapons … for their ornament or defence, in such places, and upon such occasions, in which it is the common fashion to make use of them," for "no wearing of arms is within the meaning of this statute, unless it be accompanied with such circumstances as are apt to terrify the people"); 4 BLACKSTONE COMMENTARIES *149 (crime consisted of "terrifying the good people of the land"); *Rex v. Knight*, 90 Eng. Rep. 330 (1686) (different reporter) ("there be a general connivance for gentlemen to ride armed for their

security").[12]  *See also* C. Kevin Marshall, *Why Can't Martha Stewart Have a Gun?*, 32 HARV. J.L. & PUB. POL'Y 695, 716-717 (2009).[13]

2.      Early American courts[14] and commentators[15] likewise evince a clear understanding that the traditional restriction embodied in Northampton and the common law reached only terror-inducing arms carrying, not the ordinary carrying of common weapons for self-defense.  It is thus of little moment that a handful of states "expressly adopted variants of the Statute of Northampton."  Chi. Br. 7.

It is also of little moment that Chicago has identified four additional laws that restricted certain types of carriage on a colony- or state-wide basis.  Chicago has not established that these laws were common or representative (the four laws were enacted over a period 213 years), and they mainly focus on carrying concealable weapons, not on carriage generally.  *See, e.g.,* Chi.

---

[12] Chicago also cites Coke's Institutes, but the violation recounted there was not simply carrying arms in public, but rather carrying them in a particular manner (concealed) and in a particularly sensitive location (a government building).  *See* 3 COKE, INSTITUTES OF THE LAWS OF ENGLAND 161 (Brooke, ed. 1797) \ ("Sir Thomas Figett knight went armed under his garments, as well in the palace, as before the justice of the kings bench; for both which upon complaint made, he was arrested … and charged therewith ….").

[13] The restrictions aimed at carriage in towns and cities cited by Chicago do not upset this understanding of Northampton or of permissible restrictions on scope of the English arms right.  Those restrictions were enacted nearly a century or more before adoption of the English arms right.  Given that the right was adopted in response to abuses of the Crown, including widespread disarmament, *see Heller*, 554 U.S. at 592, the utility of these earlier restrictions to the question at hand is questionable.

[14] *See Simpson v. State*, 13 Tenn. 356, 359-60 (1833) (because the State Constitution "hath said the people may carry arms," it would be impermissible to "impute to the acts thus licensed such a necessary consequent operation as terror to the people to be incurred thereby"); *State v. Huntly*, 25 N.C. (3 Ired.) 418, 422-23 (1843) ("[T]he carrying of a gun *per se* constitutes no offence," because "for any lawful purpose … the citizen is at perfect liberty to carry his gun. It is the wicked purpose—and the mischievous result—which essentially constitute the crime.").

[15] *See, e.g.*, JAMES PARKER, CONDUCTOR GENERALIS 11 (1788) ("no wearing of arms is within the meaning of this statute, unless it be accompanied with such circumstances as are apt to terrify the people"); CHARLES HUMPHREYS, A COMPENDIUM OF THE COMMON LAW IN FORCE IN KENTUCKY 482 (1822) (because "in this country the constitution guarantees to all persons the right to bear arms; then it can only be a crime to exercise this right in such a manner, as to terrify the people unnecessarily").

App'x 49 (New Jersey colonial law restricting carriage of "pocket pistols" and "other unusual or unlawful weapons"); *id*. at 57 (1821 Tennessee law restricting carriage of "belt or pocket pistols"). The inaptness of Chicago's presentation is perhaps best exemplified by Tennessee's 1879 restriction on carrying pistols, which did not apply to long guns, nor to "army or navy" pistols, *id*. at 64—an exclusion required by the Tennessee Supreme Court's decision striking down an earlier version of the statute to the extent it banned carrying weapons the court deemed protected by the State's arms right. *See Andrews v. State*, 50 Tenn. at 186-87; *see also Heller*, 554 U.S. at 629.

Chicago also cites two post-Civil War laws that applied in cities, but these outliers also do not demonstrate that the Second Amendment is limited to the home. Indeed, given that both these laws banned *all* carriage, not just public carriage, *see* Chi. App'x 69, 72, these laws are plainly among the "few … in the history of our Nation" that have imposed such severe restrictions, and others like them "have been struck down." *Heller*, 554 U.S. at 629; *see also id*. at 632 ("we would not stake our interpretation of the Second Amendment upon a single law … that contradicts the overwhelming weight of other evidence"); *Ezell*, 651 F.3d at 706.

3.    Historical restrictions on discharging firearms do not demonstrate that the right to keep and bear arms is limited to the home. Chicago counters its own claim that "these laws effectively prevented firearms from being used," Chi. Br. 8, by later arguing that "just showing rather than actually firing guns is usually sufficient to be taken seriously," *id.* at 18 (brackets and quotation marks omitted). And *Heller* dismissed the significance of discharge restrictions because it was "implausible" that they "would have been enforced against a citizen acting in self-defense." 554 U.S. at 633. Finally, many of the laws were not flat bans on discharge but simply amounted to a "licensing regime." *Heller*, 554 U.S. at 632-33 (discussing 1721 Philadelphia

31

restriction cited by Chicago); *see also Ezell*, 651 F.3d at 705-06. These "regulatory measures" are no precedent for Chicago's prohibitory laws. *Id*. at 705.

      **E.**       **Chicago Cannot Justify Its Restrictions On Keeping And Carrying Firearms.**

      1.       If the Second Amendment protects a right to bear an operable firearm outside of the four walls of the home, then it follows under *Heller*, *McDonald*, and *Ezell* that Chicago's broad prohibition of the practice is categorically unconstitutional. *Ezell*, 651 F.3d at 703. If this Court nevertheless determines that it must engage in some form of means-ends review, that review must be stringent. There is no question that the City imposes a "severe burden" on the right to an operable firearm outside of the home. *Id*. Review thus must be strict or, at a minimum, equivalent to that applied in *Ezell*. Chicago, however, cannot meet any form of heightened review, including intermediate scrutiny.[16]

      2.       Chicago cannot meet its burden because there is no reliable evidence that laws prohibiting firearms possession outside of the home have public safety benefits, and such laws prevent law-abiding citizens from using guns to defend themselves from criminals.

      Even Dr. Cook, writing after *Heller*, admitted that "based on available empirical data," he would expect "*relatively little public safety impact* if courts invalidate laws that prohibit gun carrying outside the home, assuming that some sort of permit system for public carry is allowed to stand." RSOF 14 (emphasis added). The NRC likewise concluded that "the evidence to date

---

[16] A federal district court recently struck down Maryland's law making the right to bear arms "more difficult to exercise" by requiring a citizen to show a "good and substantial reason" to obtain a permit to carry a handgun outside the home. *Woollard*, 2012 WL 695674, at *11-*12. The court held that the law could not satisfy even intermediate scrutiny because "[a] citizen may not be required to offer a 'good and substantial reason' why he should be permitted to exercise his rights. The right's existence is all the reason he needs." *Id*. at *12. Chicago's outright ban on bearing an operable firearm outside the home is, obviously, far more constitutionally suspect.

does not adequately indicate either the sign or the magnitude of a causal link between the passage of right-to-carry laws crime rates." AF 30.

The NRC's conclusion was not unanimous—the late James Q. Wilson believed that permitting public carriage is *beneficial* to public safety. Existing evidence, he concluded, "suggests that [right to carry] laws do in fact help drive down the murder rate" while "impos[ing] no costs" to public safety. *Id*.

This result is unsurprising. Citizens who obtain a license to possess or carry guns are disproportionately *unlikely* to misuse them. *See* AF 15. According to Dr. Cook, "the available data about permit holders … imply that they are at fairly low risk of misusing guns, consistent with the relatively low arrest rates observed to date for permit holders." *Id*. Indeed, empirical evidence indicates that the number of times guns are carried for defensive purposes dwarfs the number of times they are carried for unlawful or improper purposes. AF 11.

Chicago's arguments for the possession restrictions fail to justify them.

3.     **Carrying outside the home.** According to Chicago, "the density of Chicago neighborhoods means that the nominally private spaces outside the home are effectively 'public' when it comes to firearms violence." Chi. Br. 15. While this is not entirely true—surely the interior of a garage with the door closed, for example, is not an effectively public location, *see* RSOF 34—Chicago presents no reliable evidence that allowing public firearms carriage by licensed citizens harms public safety.

a.     *Reducing deaths from violent encounters involving a gun*. Chicago ominously warns that "when guns are taken outside of the home, encounters turn deadly." Chi. Br. 16. But in making this argument, Chicago unwittingly proves ours, by acknowledging that while "mere carrying alone" usually suffices to be taken seriously, Chi. Br. 18, "*law-abiding residents will*

*not carry a gun outside if it is illegal*." Chi. Br. 15. The carriage ban thus places law-abiding citizens at the mercy of emboldened violent criminals, who have no such reservations.

Chicago claims that the ban also reduces the incentive for criminals and gang members to carry firearms, but any such impact plainly is minimal. According to Commander Gorman, Chicago's gangs "routinely use violence and intimidation to advance their criminal interests, and they rely heavily on the use of firearms." RSOF 40. Dr. Cook likewise admits that gangs have "unusual access and incentive to obtain guns and use them." *Id.*; *see also* RSOF 21, 23.[17]

Chicago also has little basis to worry that allowing licensed law-abiding citizens to carry firearms on their own property will interfere with the City's anti-gun policing efforts. Indeed, the studies it cites show "that you do not need a complete Chicago-style ban on carriage to carry out effective targeted patrol programs," because the locations studied (*e.g.*, Pittsburgh and Indianapolis) did not have such bans. *See* RSOF 24-25. At any rate, those programs principally targeted *public* carriage, not carriage on private property. *Id.*

> b. *Reducing violence by gang members.* Chicago's presentation on this point necessarily is based on three implausible premises: (1) that banning carriage on one's property outside the four walls of one's home deters any significant number of gang members from carrying firearms, (2) that any significant number of gang members *could* qualify for a permit to carry a gun lawfully, and (3) that any significant number of gang members *would attempt* to qualify to carry a gun lawfully. We have already addressed the first point. With respect to the

---

[17] Chicago's worry about an "instrumentality effect" of guns, which explains the ordinance's myopic and incorrect focus on reducing gun violence rather than overall violence, *see* Chi. Br. 12, is misplaced for similar reasons. As Dr. Cook acknowledged, none of the studies he cited on this point "purport to hold constant for an attacker's intent to kill." RSOF 15. And according to Dr. Cook, "the assailants' intent is a *major determinant* of his choice of weapon. The assailant who clearly intends for his victim to survive *will not fire a gun at him*." *Id. See also generally* RSOF 15, 16, & 17.

second two points, it must be remembered that even if Plaintiffs prevail here and Chicago does *absolutely nothing* in response, before any person lawfully could take a firearm outside of the home he or she would have to do each of the following:

- Apply for and obtain an Illinois Firearm Owners' Identification ("FOID") Card. *See* 430 ILCS 65/2(a)(1). The application to the Department of State Police must demonstrate, among other things, that the applicant has never been convicted of a felony offense and is not addicted to drugs, intellectually disabled, or an illegal alien. *See* 430 ILCS 65/4 & 65/8.

- Apply for and obtain a CFP. *See* MCC 8-20-110. The application must be made in person at Chicago police headquarters. *See* RSOF 21. Applicants must be eligible to possess a firearm under federal, state, and local law. MCC 8-20-110(b). (Federal law prohibits firearms possession by, for example, felons, drug users, illegal aliens, and domestic violence misdemeanants. *See* 18 U.S.C. § 922(g).) A CFP will be denied to anyone who has been convicted of a violent crime, two or more offenses for driving under the influence of alcohol or other drugs, or an unlawful use of a firearm. MCC 8-20-110(b)(3). Applicants must provide a current photograph and must submit to fingerprinting. MCC 8-20-120(a) & (b).

- Register the firearm with the Chicago police. MCC 8-20-140. The registration application must list the source from which the firearm was obtained, when it was obtained, and where it will be kept. *Id.*

While Chicago argues that "many gang members and affiliates lack recorded criminal history that would prevent them from being able to lawfully carry guns," Chi. Br. 19, it fails to

account for the fact that a lack of recorded criminal history is far from the *only* requirement for lawfully carrying a gun.

Even with respect to criminal history, Chicago submits dubious evidence for the proposition that "a majority of criminal homicides and other serious crimes are committed by individuals who have no felony conviction on their record." Chi. Br. 19. The study cited by the City merely found that 43 percent of adults arrested for criminal homicide in Illinois had a felony conviction *in Illinois in the decade prior to their arrest*. *See* RSOF 29.

And apart from whether gang members *could* qualify lawfully to possess a firearm, Chicago has failed to show that any significant number *would* take the steps necessary to do so. Commander Gorman testified that because registering a firearm with the City "puts that particular person on the radar as potentially having a weapon," a fact they "wouldn't want law enforcement to know," many gang leaders, members, and associates *do not* register their weapons. *See* RSOF 21. Commander Gorman could not recall a single instance in which a person committed a crime with a lawfully possessed firearm, and Chief Williams conceded that he has no evidence that lawfully-possessed firearms pose a risk of increased violence in the City. *Id*.

       c.     *Reducing accidental injury and death.* Fatal gun accidents are rare. *See* AF 25. In 2008, for example, fatal gun accidents accounted for only about 0.5% of accidental deaths in the United States. *Id*. When fatal gun accidents do occur, they generally are committed by unusually reckless people with records of heavy drinking, repeated involvement in automobile crashes, many traffic citations, and prior arrests for assault. AF 26. And legal gun owners in Chicago must successfully complete a firearms safety and training course. MCC 8-20-110(a)(7).

It is thus implausible to conclude that permitting carriage by licensed, trained adults will lead to a spike in fatal gun accidents.

       d.    *Reducing gun theft*.  Chicago also posits that citizens carrying guns may be targeted for theft.  But Chicago has not submitted any reliable evidence that theft of a gun from a homeowner in his garage or on his curtilage is more likely than from within his home.  *See* RSOF 41.

       4.    **Prohibiting handguns in a fixed place of business.**  Chicago emphasizes that, compared to a home, a workplace "has more foot traffic, and is open to the public or other employees, all of whom cannot be controlled."  Chi. Br. 22.  But these are all reasons why possession of a firearm for self-defense is *particularly* important in the workplace.  And under *Heller*, "it is no answer to say, as [Chicago does], that it is permissible to ban the possession of handguns so long as the possession of other firearms (*i.e.*, long guns) is allowed," because "the American people have considered the handgun to be the quintessential self-defense weapon." *Heller*, 554 U.S. at 629.  *See* RSOF 43.  By making clear that it principally is concerned with handgun possession, however, Chicago does accomplish one thing:  it demonstrates that the other restrictions challenged in this case, which *are not* limited to handguns, are plainly overbroad.

       5.    **Restricting firearms in the home of another.**  Chicago here principally relies on the same risks it identifies in support of its one-operable handgun limitation, which we discuss below.  *See* Chi. Br. 22.  Chicago also raises the specter of "a house party with multiple guests drinking alcohol, or … a meeting of CFP-holding gang members."  *Id*. at 22-23.  But Chicago has offered no empirical evidence that these speculative scenarios present genuine threats to public safety.  Indeed, for the reasons we have explained above, Chicago's assertions that

meetings "of CFP-holding gang members" are likely to happen if Plaintiffs prevail in this case, or that the firearms ordinance effectively prevents gang members from congregating with guns, are fanciful, at best, on their face. *See also* RSOF 138, 139.

## IV. CHICAGO UNCONSTITUTIONALLY LIMITS RESIDENTS TO A SINGLE OPERABLE FIREARM IN THE HOME.

### A. The Single-Operable-Firearm Limitation Burdens The Second Amendment Right.

In a criminal invasion of the home, time is almost always of the essence. The passage of even a few seconds in accessing a weapon may mark the difference between life and death. Yet, Chicago makes it more difficult for law-abiding citizens to access a weapon to defend themselves, their families, and their homes by limiting each of them to a single operable firearm. With the exception of this single weapon, all others must be broken down or locked up at all times, even if they are kept in a safe. *See* MCC 8-20-040. An inoperable firearm kept on the first level of a person's home is thus useless against an intruder that comes through the front door if the person's one operable firearm is kept in a second-floor bedroom.

Chicago fails to demonstrate that its law does not impose a significant burden on the core Second Amendment rights to self defense in the home.

First, the law does not merely " 'regulat[e] the *storage* of firearms to prevent accidents,' " but also limits citizens to the *use* of a single firearm. Chi. Br. 38 (quoting *Heller*, 554 U.S. at 632) (emphasis added). This is plain from law's text: "*All* other firearms kept *or* possessed by [a] person in his home" must be disassembled or locked up. MCC 8-20-040 (emphasis added).

Chicago points to an Illinois law that provides an affirmative defense for a violation of a municipal gun control law "if the individual who is charged with the violation used the firearm in an act of self-defense or defense of another as defined in Sections 7-1 and 7-2 of this Code when on his or her land." ILCS 5/24-10. But because a Chicago homeowner apparently would have to

wait until the moment when defensive force is justified before rendering operable a second weapon, even with this exemption in place Chicago's law still delays a citizen's ability to use a firearm for self-defense. *See* AF 30. *See also Parker v. District of Columbia*, 478 F.3d 370, 400-01 (D.C. Cir. 2007), *aff'd by Heller*, 554 U.S. 570.

Second, the fact that trigger locks can be disengaged does not eliminate the "substantial obstacle to defensive gun use" imposed by Chicago's one-operable-firearm rule. Chi. Br. 39. When confronted with a home intruder every second may be crucial. Furthermore, "time trials" conducted in an antiseptic daytime setting provide little insight into unlocking a trigger lock in response to an imminent threat. *See* RSOF 109; Chi. Br. 20.

**B.    The Single-Operable-Firearm Limitation is Unconstitutional.**

Under *Heller*, *McDonald*, and *Ezell* the one-gun limitation of operable firearms is either flatly unconstitutional or, at a minimum, subject to *Ezell* scrutiny. And it cannot pass even intermediate scrutiny.

1.    Two findings of the NRC illustrate why Chicago cannot justify this limitation. First, "there is no credible scientific evidence … that demonstrates whether [firearm] safety devices can effectively lower injury." AF 30. Second, while the benefits are unproven, there is no doubt that "locking technologies may also cause unintentional injuries. In particular, locking devices may compromise the ability of authorized users to defend themselves. A lock may fail entirely or may take too much time for the weapon to be of use." *Id*. *See also* RSOF 113.

2.    Chicago's attempted justifications are meritless.

a.    *Reducing gun acquisition by criminals.* We have no quarrel with the proposition that locking up a gun may decrease the likelihood that it is of use to a criminal who steals it. Chicago's law, however, is not well-tailored to advancing this purpose. The law is both

39

*overinclusive*, for it requires even a second firearm that is locked in a biometric safe to be inoperable, *see* MCC 8-20-040, and *underinclusive*, for it does not require additional firearms to be locked up—they may also be broken down in a nonfunctioning state. *Id.* While Chicago extols trigger locks, it has not presented evidence that criminals cannot return broken-down guns to an operable condition.

More fundamental, of course, is the point we have already addressed at length: it is already easy for criminals in Chicago to get guns. When there is already an oversupply of guns available to criminals, marginal reductions in gun thefts would at best reduce this oversupply, not prevent criminals from obtaining a gun. *See* RSOF 119.

In any case, as Dr. Kleck has testified, "there is no evidence of even a modest effect on the gun theft rate of the City's limits on the number of operable guns allowed in households." *Id.*; *see also* RSOF 118. The evidence reviewed by Dr. Kleck to reach this determination includes Dr. Cook's 2003 study cited by Chicago. While the study did conclude that firearm availability within homes increases the risk of home burglaries, its methods "cannot sustain [that finding], and some of [its] findings directly contradict it." RSOF 119. And at any rate, Dr. Cook acknowledged that "the implied effect of gun prevalence on the overall profitability of residential burglary is not great," *id.*, thus dampening any "incentive" increased gun ownership would provide to burglars.

Chicago also claims that its laws prevent a homeowner's gun from being used by a criminal against the homeowner. So, of course, would locking a gun in a biometric safe. At any rate, because murder victims are almost never killed with a gun belonging either to themselves or to some other member of their household, any marginal benefit from the one-operable-firearm limit is surely negligible. *See* RSOF 120.

40

b.        *Reducing the risk of suicide, homicide, and accidental firearm death.*  It is not readily apparent why limiting qualified residents to one operable firearm in the home appreciably would reduce the risk of suicide and homicide—one operable firearm is all that is needed for either.  And requiring citizens who want a readily accessible means of defense throughout the home to carry "a fully loaded, operable firearm" on their person "from room to room," Chi. Br. 37, hardly seems well-tailored to avoiding gun accidents.[18]  *See also* RSOF 121, 127.

None of the studies cited by Chicago even purport to analyze the effects of allowing one operable gun per permit holder as compared to allowing more operable guns.  *See* RSOF 122, 123, 126.  Indeed, existing empirical evidence does not even support the notion that permitting *zero* operable guns would reduce the risk of suicide, homicide, and accidental firearm death.  The NRC concluded that "existing research studies … do not demonstrate a causal relationship between the ownership of firearms and the causes or prevention of criminal violence or suicide," and "found no credible scientific evidence … that demonstrates whether [firearm] safety devices can effectively lower injury."  AF 30.

The City also highlights statements published by the NRA and NSSF, but those statements do not support the City's restrictions.  The NRA advises that "a gun stored primarily for personal protection must be ready for immediate use.  It may be kept loaded, as long as local laws permit."  RSOF 129.  The NSSF likewise acknowledges that "quick access to a loaded firearm" may be necessary in the home, and it states that a trigger lock "*should never be used on a loaded gun because it can cause the gun to fire under certain circumstances*."  RSOF 131.

---

[18] Any concerns about children accessing firearms are not implicated here, for Plaintiffs do not challenge the City's law requiring *all* firearms to be stored in a secure manner if children under 18 are likely to gain access to them.  *See* MCC 8-20-050.

41

Practices of securing firearms displayed for sale are of even less relevance here because such firearms are not being kept for the purposes of self-defense. *See* RSOF 128, 132.

c.     *Reducing threats to first responders.*  While it may well be true that Chicago police officers and other first responders have been harmed by guns kept in homes when fielding emergency calls, Chicago has not shown that guns *lawfully possessed* by licensed homeowners pose a threat to first responders.  Indeed, Chief Williams could not identify *any* instance in which a police officer was injured by the use of a lawfully possessed firearm, and he did not have any evidence that lawfully possessed firearms present a risk of increased violence in Chicago. *See* RSOF 134.  And while scene safety is no doubt of paramount importance for paramedics, Chicago's witness on this point testified that he does not know how the goal of responding safely to emergency medical calls is affected by the City's firearms ordinance. *See* RSOF 136.  Nor is there any empirical evidence that a second operable gun per permit holder will pose any increased risk to first responders.

## CONCLUSION

For these reasons, the Court should GRANT Plaintiffs' motion for summary judgment and DENY Defendants' motion for summary judgment.

Dated:  April 27, 2012

Stephen Kolodziej
FORD & BRITTON, P.C.
33 N. Dearborn St., Suite 300
Chicago, IL 60602
Tel: (312) 924-7500
Fax: (312) 924-7516
Email: skolodziej@fordbritton.com

Respectfully submitted,

s/ Charles J. Cooper
Charles J. Cooper*
David H. Thompson*
Peter A. Patterson*
COOPER & KIRK, PLLC
1523 New Hampshire Ave., NW
Washington, DC 20036
Tel: (202) 220-9600
Fax: (202) 220-9601
Email: ccooper@cooperkirk.com

*Admitted *pro hac vice*.

*Attorneys for Plaintiffs*

## CERTIFICATE OF SERVICE

I, Charles J. Cooper, hereby certify that on this 27th day of April, 2012, I caused a copy

of the foregoing to be served by electronic filing on:

Michael A. Forti
Mardell Nereim
Andrew W. Worseck
William Macy Aguiar
Rebecca Alfert Hirsch
City of Chicago, Department of Law
Constitutional and Commercial Litigation
Division
30 N. LaSalle St., Suite 1230
Chicago, IL 60602

Craig Woods
Ranjit Hakim
MAYER BROWN LLP
71 S. Wacker Drive
Chicago, IL 60606-4637


s/ Charles J. Cooper
Charles J. Cooper

44