**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

| | | |
|---|---|---|
| ILLINOIS ASSOCIATION OF FIREARMS RETAILERS, KENNETH PACHOLSKI, KATHRYN TYLER, and MICHAEL HALL, | ) ) ) | |
| | ) | |
| Plaintiffs, | ) | |
| | ) | Case No: 10-CV-4184 |
| v. | ) | Judge Edmond E. Chang |
| | ) | |
| THE CITY OF CHICAGO and RAHM EMANUEL, Mayor of the City of Chicago, | ) ) | |
| | ) | |
| Defendants. | ) | |

**PLAINTIFFS' RESPONSE TO DEFENDANTS'
LOCAL RULE 56.1(a)(3) STATEMENT OF MATERIAL FACTS**

Pursuant to Local Rule 56.1(b), Plaintiffs hereby submit their response to Defendants' Local Rule 56.1(a)(3) statement of material facts. Plaintiffs responses consists of (a) numbered paragraphs corresponding to the paragraphs in Defendants' Statement, followed by Plaintiffs' response thereto (beginning immediately below); and (b) Plaintiffs' statement of additional facts that require the denial of summary judgment (beginning on page 158).[1] With respect to the former, we note that several of Defendants' paragraphs contain facts that call for separate responses. We have thus responded accordingly by breaking down such paragraphs into sub-paragraphs.

---

[1] Plaintiffs' responses and Plaintiffs' additional facts cite Chicago's summary judgment exhibits as "Chicago Exhibit __"; Plaintiffs' exhibits are cited as "Exhibit __."

## RESPONSE TO DEFENDANTS' STATEMENT

1.      Plaintiff Kathryn Tyler ("Tyler") resides at 2620 West Jerome Street in Chicago with her husband, Plaintiff Kenneth Pacholski ("Pacholski"). Exhibit 1 (Deposition of Kathryn Tyler) at 5:1-2, 7:15-18, 14:24-15:5; Exhibit 2 (Deposition of Kenneth Pacholski) at 14:16-22, 15:4-20. Plaintiff Michael Hall ("Hall") resides at 11254 South Bell Avenue in Chicago with his wife and two children, one of whom is under 17 years old. Exhibit 3 (December 14, 2010 Deposition of Michael Hall) at 5:2-5, 20:22-21:15; Exhibit 4 (May 27, 2011 Deposition of Michael Hall) at 34:7-22. Plaintiff Illinois Association of Firearms Retailers ("ILAFR") is an organization existing under the laws of Illinois and represents firearm retailers and the retail firearms industry in Illinois. Exhibit 5 (Deposition of Whitney O'Daniel) at 21:13-18; Exhibit 6 (Plaintiffs' Second Amended Complaint), ¶ 4. The City of Chicago is a municipal corporation existing under the laws of Illinois. Rahm Emanuel is the Mayor of Chicago.

**RESPONSE:** Admitted, except dispute that two of Plaintiff Michael Hall's children live with him. While that was true at the time of his deposition, currently only one of his children live with him. That child is 16 years old. *See* Exhibit 1 (Hall Decl.) ¶ 2.

2.      Plaintiffs' Second Amendment Complaint seeks redress for alleged violations of the Second and Fourteenth Amendments to the United States Constitution. This court has jurisdiction over these claims pursuant to 28 U.S.C. §§ 1331 and 1343(a)(3). Venue is proper under 28 U.S.C. § 1391(b) because Defendants reside in this district and a substantial part of the events giving rise to the Plaintiffs' claims occurred in this district.

**RESPONSE:** Admitted.

3.       In 2010, there were:

    a.   436 reported murders in Chicago; 81% (353) were committed with a firearm. Of

        those committed with a firearm, 348 (99%) were committed with a handgun.

    b.   14,271 reported robberies in Chicago; 38% (5,371) were committed with a firearm.

        Of those committed with a firearm, 98% (5,275) were committed with a handgun.

    c.   5,060 reported aggravated assaults; 44% (2,216) were committed with a firearm.  Of

        those committed with a firearm, 96% (2,123) were committed with a handgun.

    d.   9,409 reported aggravated batteries; 20% (1,860) were committed with a firearm.  Of

        those committed with a firearm, 97% (1,812) were committed with a handgun.

        Exhibit 7 (Affidavit of Timothy Lavery), ¶ 2.

**RESPONSE:**  Admitted.

    **4.**      In 2009, Chicago had the second-highest murder and non-negligent manslaughter

rate (16.1 per 100,000 residents) of the 10 U.S. cities with the largest population.  Exhibit 8

(Uniform Crime Reporting Statistics – 10 cities).  That rate was nearly double that of Los

Angeles (8.1) and nearly triple that of New York City (5.6), the two cities with a higher

population than Chicago.  *Id.*  It was also more than three times the national average (5.0).

Exhibit 9 (Uniform Crime Reporting Statistics – Nation).

**RESPONSE:**  Admitted.

    **5.**      Joseph Gorman has been a sworn member of the Chicago Police Department

("CPD") for over 25 years and is the Commander of the CPD's Gang Investigations Unit.

Exhibit 10 (Affidavit of Joseph Gorman), ¶¶ 2-16, 31.  He testified that street gangs are a form of

urban terrorism in Chicago and that gang violence spearheads violent crime in Chicago.  *Id.*, ¶

30.  In 2010, 59% of Chicago murders were gang-involved, meaning that the murder was gang

related or that the victim and/or offender was a gang member.  Exhibit 11 (January – December

2010 Chicago Crime Summary) at 2. Approximately 55-60% of Chicago shootings are gang related. Exhibit 10, ¶ 27.

**RESPONSE:** Admitted

6. Chicago has at least 80 different street gangs, which operate in different neighborhoods throughout Chicago. *Id.*, ¶ 19. There are between 80,000 and 100,000 known members of those gangs. *Id.*, ¶ 21. That number does not include the many gang associates and affiliates who, while not members themselves, assist or facilitate criminal conduct by gang members. *Id.* Most Chicago gangs are subdivided into factions. *Id.*, ¶ 19. There are over 300 different gang factions within Chicago. *Id.* Each gang, and even many gang factions, has its own name and symbols, a hierarchy, a geographic territory ("turf"), a code of conduct, and an organized, continuous course of criminal activity. *Id.*, ¶ 20. Gang members routinely use violence and intimidation to advance their criminal interests, and they rely heavily on the use of firearms. *Id.*, ¶ 25. Handguns, rather than long guns, are predominantly used by gang members because they are easily concealed and readily accessible. *Id.*

**RESPONSE:** Admitted.

7. Gang factions arose, in some part, from the demolition of Chicago public housing projects such as the Robert Taylor Homes by 2007 and Cabrini-Green by 2011. *Id.*, ¶ 19. Gangs based in those residences were forced to relocate, in many instances moving to neighborhoods where rival gangs had been long-established. *Id.* This relocation disrupted the structure and hierarchy of these gangs; groups of relocated gang members split off into their own factions and now often operate within a street or a block of another faction. *Id.* This destabilization of the gang structure in Chicago has fomented violent interactions not only between gangs, but also between factions of the same gang, as leaders try to expand or protect their turf. *Id.*

4

**RESPONSE:** Admitted.

**8.** A U.S. Department of Justice study of 22 cities indicates that Chicago and Los Angeles "have unusually high rates of gang membership" and "are outliers . . . with respect to gang activity." Exhibit 12 (Philip J. Cook, et al., Underground Gun Markets, The Economic Journal, 117 (2007)), at F573, F576. Around 20% of arrestees in these two cities reported membership in a gang at the time of their arrest, which is "about eight times the median value [in the study] and about twice as high as the rate reported in the next-highest city, Birmingham." *Id.* at F576. In addition, 45% of Chicago arrestees, and 34% of Los Angeles arrestees, reported having been in a gang at some point; the next highest rate (Birmingham) was 20%. *Id.* at F577 (Table 4). Gangs have operated within Chicago for decades and are well-entrenched criminal enterprises. Exhibit 10, ¶ 22. It is not uncommon for multiple generations of a family to be members of the same gang. *Id.*

**RESPONSE:** Admitted.

**9.** In 2007, there were 31,224 firearms deaths in the U.S., 12,632 of which were homicides and 17,352 of which were suicides. Exhibit 13 (Declaration of Philip J. Cook), Exhibit A thereto, at 3. Of the 536 law enforcement officers feloniously killed nationally between 2000-2009, 490 (91%) were assaulted with a firearm. *Id.* at 4.

**RESPONSE:** Admitted.

**10.** Dr. Philip J. Cook is the ITT/Sanford Professor of Public Policy, Professor of Economics and Sociology, and Senior Associate Dean of the Sanford School of Public Policy at Duke University. Exhibit 13, ¶ 1. He has studied firearm violence since 1975 and has published scholarly books and articles on a number of related topics, including the economic costs of gun violence, the illicit markets for guns, the consequences of weapon choice in robbery and assault,

5

the influence of gun availability on gun use in crime, the use of guns in self-defense, and the

effectiveness of gun control regulations.  *Id.*, Exhibit A thereto, at 1.  Dr. Gary Kleck, a

criminologist at Florida State University and Plaintiffs' proffered rebuttal expert, agrees that Dr.

Cook has "contributed consistently to the serious literature on gun control."  Exhibit 14

(Deposition of Gary Kleck) at 19:24-20:3.

**RESPONSE:**  Admitted.

**11-A.**  Dr. Cook estimates that, in the U.S. as a whole, the medical costs of gun violence

are approximately 2% of the total social cost of gun violence.  Exhibit 13, Exhibit A thereto, at 5;

Exhibit 15 (Deposition of Philip J. Cook) at 43:16.

**RESPONSE:**  Admit that Dr. Cook so estimates, but dispute that his estimates accurately

capture the costs of gun violence.  "Cook reports enormous estimates of the 'cost of gun

violence' . . ., but none of the data he cites in any way establishes that the costs of violence

would be any lower if the violence were instead committed with knives or other weapons.

Cook's 'costs of gun violence' are not really gun-specific - they largely reflect the costs of

violence in general, rather the costs of gun violence in particular.  Nothing in this section can be

legitimately construed to establish that the costs of violence in the U.S. or in Chicago would be

even slightly lower if guns were less common."  Exhibit 2 (Kleck Decl.), Exhibit I thereto, at 25.

**11-B.**  These social costs entail "a variety of costly measures" that residents take to

reduce the risk of being shot, such as "moving to safer neighborhoods that may be less

conveniently located."  Exhibit 13, Exhibit A thereto, at 5.  "Furthermore, the threat of gun

violence is in some neighborhoods an important disamenity, causing residents to be fearful and

take special precautions to protect themselves and their children.  That threat depresses property

values and puts a drag on economic development."  *Id.*

6

**RESPONSE:** Admit that this is Professor Cook's opinion, but dispute that Professor Cook has meaningfully accounted for potential social costs and benefits of firearms restrictions. *See* Exhibit 2 (Kleck Decl.), Exhibit I thereto, at 26 ("Cook is conspicuously one-sided as to which intangible costs and benefits he chooses to measure. . . . [He] has done nothing to quantify the *loss* in felt sense of security that would arise from gun restrictions, including bans on gun carriage and limits on the number of operable guns allowed in the home."); Exhibit 3 at 166:5-20 (Cook Dep.) (admitting that there are people who are "motivated to carry a firearm"; that he "suppose[s] that the motivation is about security and self-protection"; and that he has not "made any effort to try to quantify the value of individuals feeling more secure by virtue of their ability to lawfully carry a handgun").

**12-A.** "In J. Ludwig & P.J. Cook, The Benefits of Reducing Gun Violence: Evidence from Contingent-Valuation Survey Data, 22 Journal of Risk and Uncertainty 207-26 (2001), Dr. Cook and Dr. Jens Ludwig (currently the McCormick Foundation Professor of Social Service Administration, Law, and Public Policy at the University of Chicago) estimated that the total social cost of firearms assault and homicide was approximately $1 million per gunshot wound. Exhibit 13, Exhibit A thereto, at 5; Exhibit 16 (Jens Ludwig June 29, 2010 Written Testimony for Chicago City Council Committee on Police and Fire) at CITY 000400; Exhibit 17 (Ludwig & Cook Report).

**RESPONSE:** Admit that Drs. Cook and Ludwig so estimated. Dispute that this is a credible estimate of the actual social cost of firearm violence. *See* Exhibit 2 (Kleck Decl.), Exhibit I thereto, at 25 ("the vast majority of these supposed costs are intangible costs that are not easily measured, and indeed may not be measurable at all."); *id.* (citing critiques of the contingent-valuation method in publication based on the proceedings of a panel chaired by Nobel laureate

Kenneth Arrow, and concluding that the method "produces estimates that are illogical, internally inconsistent, and wildly inconsistent across studies" and thus that Dr. Cook's estimates of the costs of gun violence "cannot be regarded as credible"); *id.* ("Cook reports enormous estimates of the 'cost of gun violence' . . ., but none of data he cites in any way establishes that the costs of violence would be any lower if the violence were instead committed with knives or other weapons . . . . Nothing in this section can be legitimately construed to establish that the costs of violence in the U.S. or in Chicago would be even slightly lower if guns were less common."). Cook and Ludwig themselves acknowledge several limitations of their study and the contingent-valuation method. *See* Chicago Exhibit 17 at 211-12, 220-22 (*e.g.*, "Whether even high-quality [contingent-valuation or] CV studies produce reliable estimates of [what people are willing to pay] remains the topic of ongoing debate"; "[t]he most fundamental issue is whether . . . respondents take the CV questions seriously and provide thoughtful answers and, if so, whether these responses reflect underlying preferences about a given quantity of violence reduction rather than  social desirability bias, moral satisfaction or some other motivation.").

**12-B.**  This study also found that "murder rates have a direct effect on the rate of population growth or decline, with each murder associated with a reduction of 70 residents." Exhibit 13, Exhibit A thereto, at 5.  Testimony submitted by Dr. Ludwig during the City Council's hearings on Chicago's Responsible Gun Ownership Ordinance ("Ordinance") indicates that "if Chicago's homicide rate for the past 8 or 9 years had been more like New York City's, which has a homicide rate that is around one-third of [Chicago's], then Chicago's population would have actually increased by several hundred thousand residents, rather than declined."  Exhibit 16 at CITY 000399.

**RESPONSE:** Admit that Dr. Ludwig offered the cited testimony. Dispute that Drs. Cook and Ludwig's research found that each murder is associated with a population reduction of 70 residents. *See* Exhibit 3 at 65 (Cook Dep.) ("assumption that each murder causes a reduction of 70 residents . . . is actually based on analysis that was done . . . not by Ludwig or myself"); Chicago Exhibit 16 at CITY 000399 ("Previous research has found that every homicide reduces a city's population by around 70 people.").

**12-C.** Dr. Ludwig's calculations also suggest that "eliminating gun involvement in crime in Chicago might increase total property values in the city by perhaps $30 billion or so, and increase property tax revenues by around $30 million per year." *Id.*

**RESPONSE:** Admit that Dr. Ludwig so testified. Dispute the validity Dr. Ludwig's calculations. Dr. Ludwig's calculations were based on his "assum[ptions]," "guess[es]," and "approximat[ions]." Chicago Exhibit 16 at CITY 000399-400 n.5. They are also based on the assertion that "[e]liminating gun involvement in crime in Chicago would have the equivalent impact on property values (and hence taxes) as cutting the violent crime rate in half," which appears to be based on the implausible assumption that criminals would not substitute other weapons for guns or would not commit crimes in the first place if they did not access to a gun. *Id*. *See* Exhibit 2 (Kleck Decl.), Exhibit I thereto, at 25.

**12-D.** Dr. Ludwig estimates that "the total social cost of gun violence for Chicago annually is around $2.5 billion, or $2,500 per year for each Chicago household." *Id.* at CITY 000400.

**RESPONSE:** Admit that Dr. Ludwig so estimated. Dispute that this is a credible estimate of the actual cost of gun violence for Chicago. The estimate is based on his and Dr. Cook's

research on the social cost of gun violence, *see* Chicago Exhibit 16 at CITY 000400, and is thus

subject to the same critiques recounted in our response to Chicago's SOF 11.

**13.**     Dr. Kleck testified that requiring "a factual basis" for "being certain" about a

proposition is an "unreasonable standard" in criminology.  Exhibit 14 at 355:2-6.  "You're never

certain about anything in science."  *Id.* at 355:5-6.  "Everything is uncertain in science."  *Id.* at

356:19-25.  The appropriate question is whether there is "a factual basis" for "drawing

conclusions one way or another."  *Id.* at 355:6-7.  Researchers must work with the data they have

and try to "draw rational and reasonable conclusions from the results, taking into account the fact

that there are certain unknowns."  *Id.* at 460:6-14.  "No study is perfect."  *Id.* at 460:15-16.

"[Y]ou draw your conclusions on the best available evidence, not based on perfect evidence."

*Id.* at 353:7-8.

**RESPONSE:**  Admitted.

**14-A.**   No provision of the Ordinance has prevented or restrained Tyler, Pacholski, or

Hall from engaging in self defense in response to a threat.  Exhibit 1 at 168:17-19; Exhibit 2 at

215:17-216:10; Exhibit 3 at 234:11-14.

**RESPONSE:**  Admitted.

**14-B.**   Dr. Cook opines that MCC 8-20-020(a) and -030(a), to the extent that they "limit

possession of a handgun to the owner's home and a long gun to the owner's home or fixed place

of business . . . serves to promote public safety, and in particular to reduce gun use in violence."

Exhibit 13, Exhibit A thereto, at 2-3.

**RESPONSE:**  Admit that Dr. Cook so opined, but dispute the validity of his opinion.  *See*

Exhibit 2 (Kleck Decl.), Exhibit I thereto, at 35-46; Exhibit 4 at 1082 (Philip J. Cook, et al., *Gun*

*Control After Heller*, 56 UCLA L. REV. 1041 (2009)) ("Based on available empirical data,

therefore, we expect relatively little public safety impact if courts invalidate laws that prohibit gun carrying outside the home, assuming that some sort of permit system for public carry is allowed to stand."); Exhibit 3 at 184:8-185:12 (Cook Dep.) (admitting that the "net effect" of eliminating the City's ban on carriage "is not something we can study right now or draw an empirical conclusion to.").

**15-A.**  Dr. Cook opines that "whether the victim of an assault or robbery dies is not just a reflection of the offender's intentions."  *Id.*, Exhibit A thereto, at 7.  For "[t]he bulk of people who are shot and killed," the killing results from "a spontaneous encounter and not a sustained clear intent to kill."  Exhibit 15 at 188:11-15.

**RESPONSE:**  Admit that Dr. Cook so opined, but dispute to the extent he suggests that offenders who shoot their victims generally do not intend to kill them.  *See* Exhibit 5 at 57 (Philip J. Cook, *The Influence of Gun Availability on Violent Crime Patterns*, 4 CRIME & JUST. 49 (1983)) ("[T]he assailants' intent is a major determinant of his choice of weapon.  The assailant who clearly intends for his victim to survive will not fire a gun at him."); Exhibit 3 at 189-90 (Cook Dep.) (admitting that "by and large" if someone had the intent to kill they would use a firearm if it was available to them); Exhibit 2 (Kleck Decl.), Exhibit I thereto, at 26 ("the attackers who use guns are also likely to be more lethal in their intentions"); Exhibit 6 at 166 (GARY KLECK, POINT BLANK, Chapter 5 (1991)) ("when a gun is used in an attack, it is almost always the result of a choice, however hastily made, among weapon alternatives"); *id.* at 168-69.

**15-B.**  "The type of weapon used in an assault or robbery affects the likelihood that the victim will be killed."  Exhibit 13, Exhibit A thereto, at 2.  "In particular, with other things being equal, violent crimes committed with firearms are far more likely to result in the death of the victim than violent crimes committed with knives, blunt objects, or bare fists."  *Id.*  "In other

11

words, the likelihood that an assault or a robbery 'converts' to a homicide is much higher if a gun is involved." *Id.* at 10. This is known as the "instrumentality effect." *Id.* at 6.

**RESPONSE:** Admit that Dr. Cook so opined, but dispute to the extent he suggests that the use of a gun, rather than an offender's intentions, causes an assault or robbery to be more likely to end in the victim's death. *See* Exhibit 5 at 57 (Philip J. Cook, *The Influence of Gun Availability on Violent Crime Patterns*, 4 CRIME & JUST. 49 (1983)); Exhibit 2 (Kleck Decl.), Exhibit I thereto, at 26; Exhibit 6 at 166 (GARY KLECK, POINT BLANK, Chapter 5 (1991)); *see generally id.* at 161-70. Indeed, Dr. Cook admitted that, to the best of his recollection, none of the studies cited in his report "purport to hold constant for an attacker's intent to kill." Exhibit 3 at 191:13-25 (Cook Dep.).

**15-C.** Dr. Kleck "tentatively" agrees that, if the user's intent to inflict lethality is controlled for, and all other things being equal, guns are more lethal than other weapons. Exhibit 14 at 388:12-16.

**RESPONSE:** Admit that Dr. Kleck so testified, but this tentative agreement was based on "weak evidence" because studies have not been successful in attempting to control for an attacker's intent. Exhibit 7 at 388 (Kleck Dep.); *see also* Exhibit 2 (Kleck Decl.), Exhibit I thereto, at 26 (conceding that while it "might be true to some extent" that "guns are intrinsically more lethal than other commonly available weapons," Dr. Cook "overstates the difference, and overstates the degree of support for this assertion").

**15-D.** "As a result, while only a small fraction (5 percent) of criminal assaults are perpetrated with guns, over two-thirds of fatal assaults (murders and nonnegligible homicides) are perpetrated with guns." Exhibit 13, Exhibit A thereto, at 6.

**RESPONSE:** Admit that Dr. Cook so opined, but based on the evidence cited in response to this Statement of Fact, dispute that this statistic is based on inherent lethality of guns rather than offenders' intent. *See also* Exhibit 2 (Kleck Decl.), Exhibit I thereto, at 26 (opining that Dr. Cook's "claims about weapon lethality have no sound scientific foundation").

    **16-A.** Dr. Cook bases this conclusion on "two seminal articles" by Franklin Zimring: *Is Gun Control Likely to Reduce Violent Killings?*, 35 University of Chicago L. Rev. 721 (1968) and *The Medium Is The Message: Firearm Caliber As A Determinant Of Death From Assault*, 1 Journal of Legal Studies 97 (1972). Exhibit 13, Exhibit A thereto, at 6; Exhibits 18 & 19 (Zimring Studies).

**RESPONSE:** Admit that Dr. Cook relied on the Zimring studies. However, "[n]one of the studies that Cook cites to support his claim that guns are 'more intrinsically lethal' measured or controlled for attacker lethality and thus none can establish to what degree the higher fatality rate of gun attacks is due to the weapon's lethality rather than the attacker's more lethal intentions." Exhibit 2 (Kleck Decl.), Exhibit I thereto, at 26. *See also* Exhibit 3 at 191:13-25 (Cook Dep.).

    **16-B.** Dr. Cook also relies on his own prior research: *The Technology of Personal Violence* in 14 Crime and Justice: An Annual Review of Research (M. Tonry ed. 1991); *Robbery Violence*, 78 Journal of Criminal Law & Criminology 366 (1987). Exhibit 13, Exhibit A thereto, at 6-7; Exhibits 20 & 21 (Cook Studies).

**RESPONSE:** Admit that Dr. Cook relied on his own prior research. However, "[n]one of the studies that Cook cites to support his claim that guns are 'more intrinsically lethal' measured or controlled for attacker lethality and thus none can establish to what degree the higher fatality rate of gun attacks is due to the weapon's lethality rather than the attacker's more lethal intentions." Exhibit 2 (Kleck Decl.), Exhibit I thereto, at 26. *See also* Exhibit 3 at 191:13-25 (Cook Dep.).

**17-A.**   Dr. Cook opines that "the incidence of gun carrying contributes directly to gun use in assault."  Exhibit 13, Exhibit A thereto, at 13.  Dr. Kleck agrees that Dr. Cook is "probably correct . . . that the prevalence of firearms has a positive effect on gun use" – i.e., the percent of violent crimes in which guns are used.  Exhibit 14 at 414:8-24.

**RESPONSE:**   Admit that Dr. Cook so opined and that Dr. Kleck is quoted correctly, but dispute that this indicates that permitting law-abiding citizens to carry guns will lead to an increase in criminal violence.  *See* Exhibit 2 (Kleck Decl.), Exhibit I thereto, at 36 ("It would have been more informative for Cook to also conclude that where there is more gun carrying by crime victims, there are more injury-preventing defensive uses of guns by crime victims"); Exhibit 3 at 184-85 (Cook Dep.) (admitting that the "net effect" of eliminating the City's ban on carriage "is not something we can study right now or draw an empirical conclusion to"); *id.* at 186 (admitting that "it has not been possible . . . to isolate any kind of consistent result or to document what might be thought of as a causal average result" regarding the impact of right to carry laws).

**17-B.**   Dr. Cook opines that "[i]f the fraction of assaults or robberies involving guns increases, then the death rate (i.e., the criminal homicide rate) will also increase."  Exhibit 13, Exhibit A thereto, at 7.

**RESPONSE:**   Admit that Dr. Cook so opined but, based on the evidence cited in response to Statements of Fact 15 and 16, dispute any implication that such an increase would be due to any inherent lethality of guns rather than the intentions of the offenders using them.

**17-C.**   Dr. Cook's study of annual Uniform Crime Reports data for the 200 largest counties over 20 years "found that the homicide rate increased with the prevalence of gun ownership.  On average, a 10 percent increase in the prevalence of gun ownership increased the

14

homicide rate by about 2 percent." *Id.* at 10; Exhibit 22 (The Social Costs of Gun Ownership, 90 Journal of Public Economics 379 (2006).

**RESPONSE:** Admit that Dr. Cook's study so found. Dispute that the study provides insight into whether higher prevalence of gun ownership causes an increase in the homicide rate. *See* Exhibit 2 (Kleck Decl.), Exhibit I thereto, at 30-31 & Table 3 (comprehensively reviewing research on gun prevalence and homicide rates, and concluding that "no methodologically competent studies have found that gun ownership levels have a significant positive effect on total homicide rates"); *id.* at 31 (explaining that Dr. Cook's study "is so technically flawed that I used it as an exemplar of poor research in this area, in an expository article I published a few years ago," and concluding that this "crude study therefore cannot be relied upon to provide a meaningful estimate of the effect of gun rates on homicide rates"). *See also* Exhibit 3 at 168 (Cook Dep.) (admitting that it is only his "best guess" that a 10% increase in the prevalence in gun ownership would increase the homicide rate by two percent in Chicago); *id.* at 169 (admitting that he did not consider the distinction between legally and illegally possessed firearms in making this calculation); *id.* at 171 (admitting that he does not know whether "there would be a different causal impact on homicide rates" between an increase in legal and illegal firearms).

Indeed, "competently conducted research on the effect of gun ownership rates on homicide rates has found either *no* significant effect (Kleck and Patterson 1993) or a modest *negative* homicide-reducing) effect (Kovandzic et al. 2008). *See* Exhibit 8 at 272 (Gary Kleck & E. Britt Patterson, *The Impact of Gun Control and Gun Ownership Levels on Violence Rates*, 9 J. QUANT. CRIM. 249 (1993)); Exhibit 9 at 41 (Tomislav Kovandzic et al., *Estimating the Causal Effect of Gun Prevalence on Homicide Rates* (2008)).

15

**18.** Dr. Cook opines that the City's restrictions on carrying firearms outside the home "are plausibly supported" by "the association between gun carrying and the increased lethality of crime." Exhibit 13, Exhibit A thereto, at 18. "Carrying firearms away from home contributes directly to the use of guns in violent crime and is associated with increases in violence and lethality." *Id.* at 3. "That is to say, where there is more gun carrying, we should expert more" firearms injuries and deaths. *Id.* at 13. "[E]ven if there was no change in the overall rate of violence" in Chicago, "[a] program or regulation that was effective in reducing gun use in violent crime would save lives (by reducing the case-fatality rate)." *Id.* at 6.

**RESPONSE:** Admit that Dr. Cook so opined, but dispute the validity of that opinion. As an initial matter, see our response to Statement of Fact No. 15. Furthermore, for the reasons explained by Dr. Kleck, Dr. Cook's conclusions do not flow from the premises that "the prevalence of firearms has a positive effect on gun use" and that "gun use affects the death rate in assault and robbery," even if those premises were true. *See* Exhibit 2 (Kleck Decl.), Exhibit I thereto, at 29-30. In addition, Dr. Cook has admitted that the "net effect" of eliminating the City's ban on carriage "is not something we can study right now or draw an empirical conclusion to." Exhibit 3 at 184-85 (Cook Dep.); *id.* at 182-83 (admitting that "I cannot tell you that I have direct evidence that proves . . . or that supports" the statement that Chicago's ban on carrying, coupled with police enforcement targeted on illegal carrying, in fact reduced the misuse of guns outside of the home in Chicago"); Chicago Exhibit 13, Exhibit A thereto, at 18 ("quantitative valuation methods *do not* provide a reliable basis for determining whether [right to carry] laws increase or reduce crime and violence"). Indeed, in the wake of *Heller*, Dr. Cook admitted that he expected "relatively little public safety impact if courts invalidate laws that prohibit gun carrying outside the home, assuming that some sort of permit system for public carry is allowed

to stand." Exhibit 4 at 1082 (Philip J. Cook, et al., *Gun Control After Heller*, 56 UCLA L. Rev. 1041 (2009)). At any rate, the scholarly debate about right-to-carry laws generally is about whether or not empirical evidence sufficiently supports the view that they *reduce* violence. *Compare* Exhibit 10 at 2 (National Research Council, Firearms and Violence (Wellford, et al., eds. 2005)) ("the committee found no credible evidence that the passage of right-to-carry laws decreases or increases violent crime"); *with id.* at 270, 271 (Dissent by James Q. Wilson) ("the best evidence we have is that [right-to-carry laws] impose no costs but may confer benefits"; "the evidence . . . suggests that [right-to-carry] laws do in fact help drive down the murder rate"); Exhibit 11 at 64 (John R. Lott, Jr. & David B. Mustard, *Crime, Deterrence, and Right-to-Carry Concealed Handguns*, 26 J. Legal Studies 1 (1997)) ("Allowing citizens without criminal records or histories of significant mental illness to carry concealed handguns deters violent crimes and appears to produce an extremely small and statistically insignificant change in accidental deaths. . . . Our evidence implies that concealed handguns are the most cost-effective method of reducing crime thus far analyzed by economists.").

19.     A high pulse rate and shaking hands during a crime "would" affect "the accuracy with which the [victim] can wield the gun or use the gun," it "might" affect the shooter's judgment, and it "possibl[y]" could lead to the accidental shooting of a person who does not actually present a threat. Exhibit 14 at 114:3-17. Tyler testified that when an attacker is confronting you, "your adrenalin is flowing," and that "I don't know what I'd do." Exhibit 1 at 119:17-20. It is possible that she would shoot "the first person that I think is threatening me." *Id.* at 120:18-121:1.

**RESPONSE:** Admit that Dr. Kleck and Dr. Tyler provided the quoted testimony. Deny that the snippets of Dr. Tyler's testimony convey the substance of her testimony. She also testified that if

she sensed a threat, "I would try my very best to get away from it, first and foremost, if I could," Exhibit 12 at 118 (Tyler Dep.); that "[s]hooting someone is the very last thing on my list," so if she could simply "say 'I have a gun' and they'll turn the corner and leave you alone, amen," *id*. at 118:13-16; that her intention would be to "do everything I could not ever to have to shoot anybody," *id.* at 119:21-23; and that her "intention would not be to shoot the first person that I think is threatening me," *id.* at 120:18-20.

20.     A study of gunshot victims in Philadelphia who possessed a firearm at the time of getting shot reported that "gun possession by urban adults was associated with a significantly increased risk of being shot in an assault."  Exhibit 23 (C. Branas, et al., *Investigating the Link Between Gun Possession and Gun Assault*, 99 American Journal of Public Health 1-7 (2009)) at 4.  It found that persons in possession of a gun were 4.46 times more likely to be shot in an assault than those not in possession.  *Id.*  It concluded that "[o]n average, guns did not protect those who possessed them from being shot in an assault."  *Id.* at 6.

**RESPONSE:**  Admit that the Branas study includes the quoted findings.  Dispute, however, that the Branas study found that possessing a gun *caused* a greater likelihood of being shot in an assault.  The study simply found that "gun possession by urban adults was *associated* with a significantly increased risk of being shot in an assault."  Chicago Exhibit 23 at 4.  Indeed, the authors acknowledged that there were potential confounding variables that they did not control for.  *Id.* at 6.  The study "also did not account for the potential of reverse causation between gun possession and gun assault," *id*., *i.e.*, it did not account the fact that the likelihood of being assaulted may cause people to carry a gun, not *vice versa*.  *See* Exhibit 2 (Kleck Decl.), Exhibit I thereto, at 14-15.

18

21.     Currently, CPD is able to arrest and prosecute gang members (or other criminals) when those members are detected carrying or possessing firearms in the spaces outside of a home, because that activity is unlawful in Chicago.  Exhibit 24 (Declaration of Eugene Williams), ¶ 11; see also Exhibit 10, ¶ 34.  Eugene Williams, Acting Chief of Patrol for the CPD testified that this is an important tool that CPD uses to combat the gang problem in Chicago. Exhibit 24, ¶ 11; see also Exhibit 10, ¶¶ 34-35. It allows CPD to take gang members, and/or their firearms, "off the street" before they commit a violent act with the firearm.  Exhibit 24, ¶11; see also Exhibit 10, ¶ 34.  "The existence of a regulation prohibiting [gun carrying] allows police officers to intervene and remove the weapon before it can be used in the commission of a crime." Exhibit 13, Exhibit A thereto, at 14.  Dr. Kleck agrees that "if you could arrest people for simply having a gun, it is easier to prevent people from using the gun criminally than having to wait until after they commit the crime."  Exhibit 14 at 445:23-446:4.

**RESPONSE:**  Dispute to the extent it is meant to imply that striking down the challenged laws on carrying firearms outside of the home would interfere with Chicago's law enforcement efforts targeted at taking guns away from gang members and criminals before they can use them in a crime, because a person would still have to get a FOID card and a CFP and register a firearm with the City before he or she could possess it legally.  Chicago has identified no evidence to indicate that any significant number gang members or other criminals, even if qualified to own a firearm (itself a dubious proposition, *see* Response to Statement of Fact 27), would choose to register a weapon with the City before carrying it outside the home.  It has not, for example, identified any evidence that gang members or criminals have registered handguns now that they are legal to possess in the home.  Indeed, Commander Gorman testified that because registering a firearm with the City "puts that particular person on the radar as potentially having a weapon," a

fact they "wouldn't want law enforcement to know," many gang leaders, members, and associates do not register their weapons even if legally they are able to. *See* Exhibit 13 at 23-24, 77 (Gorman Dep.); *see also* Exhibit 2 (Kleck Decl.), Exhibit I thereto, at 38 ("[Those criminals without an officially recorded criminal conviction might be *eligible* to get a carry permit if they applied for one, but actual experience indicates that hardly any do, perhaps because they do not want to be officially identified by authorities as a gun possessor, or maybe just because they . . . do not care that much about conforming with the law."). For example, to obtain a CFP (a prerequisite for registering a gun), a person must submit his name, address, phone number and current photographs and must submit to fingerprinting. *See* MCC §§ 8-20-120(a)&(b). A CFP application must be submitted in person at police headquarters. *See* Exhibit 14 (City of Chicago, Department of Police, Rules and Regulations, Firearms-Chapter 8-20). And to register a particular gun, an applicant must indicate where it will be stored and the source from which it was obtained. *See* MCC § 8-20-140(c). Commander Gorman's testimony is also consistent with the fact that "the available data about [concealed-carry] permit holders imply that they are at a fairly low risk of misusing guns, consistent with the relatively low arrest observed to date for permit holders." Exhibit 4 at 1082 (Philip J. Cook, et al., *Gun Control After Heller*, 56 UCLA L. REV. 1041 (2009)); *see also* Chicago Exhibit 31 at xxxii (a study analyzing FBI data found that "less than 0.2% of crimes committed with firearms are committed with by citizens licensed to carry a concealed weapon"); Exhibit 15 at 29 (Williams Dep.) (conceding that he has no "evidence that firearms that are lawfully possessed present a risk of increased violence in the city"); Exhibit 13at 73:7-15 (Gorman Dep.) (in his experience as a Chicago law enforcement officer, Commander Gorman could not recall "any instances in which a person has committed a

20

crime with a firearm while lawfully possessing that firearm"); Exhibit 2 (Kleck Decl.), Exhibit I

thereto, at 36-38.

22.     The value of this tool is magnified when combined with targeted policing efforts

(where CPD focuses resources on areas of high gang activity), because it creates a disincentive

for gang members to carry or possess firearms.  Exhibit 24, ¶ 11; see also Exhibit 10, ¶ 34.

Targeted policing entails "a large volume of police contacts with suspicious individuals who are

stopped for questioning and frisked if there is reason to believe that they are carrying a weapon."

Exhibit 13, Exhibit A thereto, at 14.  The CPD has "a tradition" of "targeted enforcement

directed at confiscating guns that are being carried illegally," in an "effort to reduce gun misuse."

Exhibit 15 at 181:5-12; Exhibit 13, Exhibit A thereto, at 14.  This "high priority" is known to

residents of Chicago neighborhoods with high gang activity.  Exhibit 15 at 182:3-21.

Consequently, when CPD officers are frequently patrolling a gang area or neighborhood, gang

members know that they stand a higher chance of being detected (and arrested) if they have a

firearm outside of a home.  Exhibit 24, ¶ 11; see also Exhibit 10, ¶ 34.  Chief Williams testified

that, as a result, the gang member will be less likely to carry or possess the gun outside the home,

which benefits both public and officer safety by removing a key driver of the crime problem in

Chicago – namely, a gun in the hand of a gang member in public.  Exhibit 24, ¶ 11; see also

Exhibit 10, ¶ 33.

**RESPONSE:**  For the reasons cited in response to Statements of Fact 21 and 23-28, dispute that

striking down the challenged laws will make it more likely for Chicago gang members to carry

guns outside the home.

23-A.  Dr. Cook opines that this "enhanced probability that if you're armed in public that

you'll end up being detected and arrested . . . reduces the incentive to carry a gun by creating a

21

deterrent." Exhibit 15 at 161:9-15. Dr. Cook testified that it is "plausible" that Chicago's ban on carrying outside the home, coupled with police enforcement targeted at illegal carrying, has reduced the misuse of guns outside the home, given that "large sections of the active criminal community . . . do not have a gun and do not carry a gun." *Id.* at 182:23-183:14.

**RESPONSE:** See response to Statement of Fact 21. Also dispute Dr. Cook's statement to the extent he suggests that Chicago's carriage ban has contributed significantly to a reduction in the incidence of gun ownership or carrying by criminals in Chicago. Indeed, Dr. Cook has previously written that "Chicago's [former] handgun ban . . . was ineffective in reducing the prevalence of gun ownership in the City. The frictions we observe in the underground market are more likely due to the general scarcity of guns in the city (gun ownership rates are quite low, a fact that predates the ban) and on Chicago's emphasis on anti-gun policing." Chicago Exhibit 12 at F560; *see also id.* at F573 ("To the extent to which Chicago's gun market works less well than in other places, the most likely explanations are the city's low rate of household gun ownership and police emphasis on guns, rather than the city's ban on private possession of handguns."); Exhibit 3 at 147:1-9 (Cook Dep.) (admitting that "at the end of the day we could not say with confidence" that "the regulations that were in place at that time in the City of Chicago" were responsible for difficulty criminals encountered in obtaining guns); *id.* at 182-83 (admitting that "I cannot tell you that I have direct evidence that proves . . . or that supports" the statement that Chicago's ban on carrying, coupled with police enforcement targeted on illegal carrying, in fact reduced the misuse of guns outside of the home in Chicago"); *id.* at 183 (admitting that "Chicago has a high murder rate, and the murders they do have are to a very large extent committed . . . with guns. So [the ban on carriage coupled with targeted policing] clearly is not completely effective, far from it").

**23-B.**   Dr. Cook opines that "[t]argeted patrol against illicit gun carrying has been shown to be effective," citing J. Cohen & J. Ludwig, Policing Crime Guns in Evaluating Gun Policy: Effects on Crime and Violence 217-250 (J. Ludwig & P.J. Cook eds. 2003) and E.F. McGarrell, et al., Reducing Gun Violence: Evaluation of the Indianapolis Police Department's Directed Patrol Project, National Institutes of Justice (2002).  Exhibit 13, Exhibit A thereto, at 14; Exhibits 25 & 26 (studies).

**RESPONSE:**  Admit that Dr. Cook so opined, and that he cited the two referenced studies.

**24.**   Policing Crime Guns studied targeted patrols in Pittsburgh that were undertaken in certain areas of the city on certain days ("on days") but not on others ("off days").  Exhibit 25 at 219.  The patrols involved police contacts with citizens "initiated mainly through traffic stops and 'stop-and-talk' activities with pedestrians in public areas."  *Id.* at 221.  "When warranted for reasons of officer safety (usually because of suspicious actions or demeanor), these stops sometimes moved to the types of pat-downs on the outside of clothing to check for weapons that are allowed" as Terry stops.  *Id.*  The study "suggest[s] that Pittsburgh's targeted policing program against illegal gun carrying may have reduced shots fired by 34 percent and gunshot injuries by as much as 71 percent in the targeted areas."  *Id.* at 238.  The study reported that since the "number of actual arrests and guns confiscated as a result of these patrols was fairly modest. .. [t]hese reductions are likely to occur because of deterred gun carrying or criminal behavior."  *Id.* at 220.

**RESPONSE:**  Admit that Policing Crime Guns made these findings, but dispute that these findings support the flat carriage bans at issue here.  As Dr. Cook admits, "in Pittsburgh at the time of [their successful firearm suppression patrol program] citizens who qualified could get a permit and carry a gun lawfully."  Exhibit 3 at 200 (Cook Dep.); *see also* Exhibit 2 (Kleck

Decl.), Exhibit I thereto, at 36-37. Indeed, if Dr. Cook's assessment of this program is correct, "it shows that you do *not* need a complete Chicago-style ban on carriage to carry out effective targeted patrol programs." *Id.* Furthermore, in the Pittsburgh program "police contacts were initiated mainly through traffic stops and 'stop-and-talk' activities with pedestrians in public areas," Chicago Exhibit 25 at 221, not through apprehending individuals on their own property.

**25.** Reducing Gun Violence evaluated an Indianapolis policing strategy of focusing on "specific suspicious behavior and individuals" in a particular area. Exhibit 26 at 2. It "reduced gun crime, homicide, aggravated assault with a gun, and armed robbery." *Id.* "[T]otal gun crimes declined 29 percent" and "aggravated assaults with a gun and armed robberies declined 40 percent" in the area. *Id.* at 10.

**RESPONSE:** Admit that Reducing Gun Violence made these findings, but dispute that these findings support the flat carriage bans at issue here. The Indianapolis program took place in 1997. *See* Chicago Exhibit 26 at 5. At that time, Indiana issued licenses that permitted qualified citizens lawfully to carry handguns in public. *See* IC 35-47-2-1 *et seq.* (1997) (West); *see also* Exhibit 2 (Kleck Decl.), Exhibit I thereto, at 36-37. Indeed, if Dr. Cook's assessment of this program is correct, "it shows that you do *not* need a complete Chicago-style ban on carriage to carry out effective targeted patrol programs." *Id.* Furthermore, the Indianapolis program focused on a "selective approach to vehicle and pedestrian stops" in a certain part of the city, Chicago Exhibit 26 at 8, not on apprehending people on their own property.

**26-A.** "Targeted patrol against guns has been a prominent feature of New York City policing for the last two decades, a period during which that city has enjoyed an unprecedented reduction in violent crime." Exhibit 13, Exhibit A thereto, at 14.

**RESPONSE:** Admit that Dr. Cook so opined, but dispute that this in any way supports Chicago's flat carriage ban. As an initial matter, Dr. Cook conceded that "analysts have found it difficult to identify the precise contribution of targeted patrol to the crime drop." Chicago Exhibit 13, Exhibit A thereto, at 14. Furthermore, New York does not have a flat ban on carrying firearms in public. *See* N.Y. PENAL LAW §§ 265.20(a)(3) & 400.00.

**26-B.** Further, Dr. Cook's 2007 study of disadvantaged neighborhoods and criminal access to guns in Chicago ("2007 Chicago Study") found that "[p]olice pressure against guns . . . does discourage participation in the gun trade in Chicago." Exhibit 12 at F570.

**RESPONSE:** Admit that Dr. Cook's study so found, but dispute any implication that the study found that the City's legal restrictions against possessing and carrying guns themselves contributed to frictions in the underground gun market. To the contrary, the study found that "Chicago's [former] handgun ban . . . was ineffective in reducing the prevalence of gun ownership in the City. The frictions we observe in the underground market are more likely due to the general scarcity of guns in the city (gun ownership rates are quite low, a fact that predates the ban) and on Chicago's emphasis on anti-gun policing." Chicago Exhibit 12 at F560; *see also id.* at F573 ("To the extent to which Chicago's gun market works less well than in other places, the most likely explanations are the city's low rate of household gun ownership and police emphasis on guns, rather than the city's ban on private possession of handguns."); Exhibit 3 at 147 (Cook Dep.) (admitting that "at the end of the day we could not say with confidence" that "the regulations that were in place at that time in the City of Chicago" were responsible for difficulty criminals encountered in obtaining guns). At any rate, the data from the 2007 Chicago Study indicates that "the median price paid by for handguns by Chicago criminals was . . . *less*

*than half* the average new-gun retail price of the guns confiscated from Chicago criminals."
Exhibit 2 (Kleck Decl.), Exhibit I thereto, at 32.

**27-A.**  Dr. Cook opines that if "stop-and-frisk tactics (or other targeted patrol tactics)
became unavailable for any reason (including because the legal basis for conducting them was
eliminated through the striking down of strict carrying restrictions), then the reductions of gun
misuse resulting from these tactics would be lost," and there "would be more guns on the street."
Exhibit 13, Exhibit A thereto, at 15; Exhibit 15 at 184:23-185:3.

**RESPONSE:**  Admit, but for the reasons cited in responses to Statements of Fact 21 through 26,
dispute the basis for any claim by Dr. Cook that striking down the carriage limitations at issue in
this case would interfere with targeted patrol tactics.

**27-B.**  Many Chicago gang members and affiliates may not have a recorded criminal
history that would disqualify them from receiving a gun permit.  Exhibit 24, ¶ 10.  Chief
Williams testified that if it became legal to possess guns in the spaces outside a home, CPD
would not be able to arrest CFP-holding gang members or their acquaintances for possessing
guns in these spaces, and they would be more likely to do so.  *Id.,* ¶¶ 10-11; see also Exhibit 10,
¶¶ 33-34.  And because, many times, firearms possession is the only crime being committed
during an encounter between police and a gang member, there would be no other basis for an
arrest.  Exhibit 24, ¶ 11; Exhibit 10, ¶ 34.  Instead, rather than being able to arrest the gang
member before a violent firearm act occurs, law enforcement will have to wait until after the
gang member actually commits a violent act with the gun.  Exhibit 24, ¶ 11; Exhibit 10, ¶¶ 34-
35.

**RESPONSE:**  Admit that Chief Williams so testified, but dispute at least two premises of his
testimony:  (1) that any significant number of gang members and their affiliates are eligible to

qualify for a CFP, and (2) that any significant number of qualified gang members and their affiliates actually would obtain a CFP and register their guns. With respect to the first premise, Chief Williams has presented no empirical evidence relating to the number of Chicago gang members and their affiliates who are not disqualified from obtaining a CFP by virtue of their criminal history. And he completely ignores the fact that criminal history is not the only factor that can make a person ineligible for a CFP. *See* MCC § 8-20-110(b). For example, to obtain a CFP a person must not be an unlawful drug user. *See* MCC § 8-20-110(b)(5); 18 U.S.C. § 922(g)(3). Given that criminals are very likely to use drugs (and given that Chicago's gangs are criminal enterprises), it is likely that this qualification would make many Chicago gang members and affiliates ineligible for a CFP. *See* Chicago Exhibit 10, ¶ 24 (Chicago's "[g]angs engage in extensive criminal activity, including but not limited to the sale of illegal drugs . . . ."); Chicago Exhibit 31 at 53 (survey of convicted felons finding that "27% said they only took drugs from time to time. . ., 12%, used drugs only on the weekends, and . . . nearly two-fifths, used drugs just about every day"). Other factors that would make a person ineligible for a CFP but that Chief Williams ignores include mental disability illegal alien status. *See* MCC § 8-20-110(b)(2); 430 ILCS 65/8(g)&(i). With respect to the second premise, see our response to Statement of Fact 21.

**28.** Further, "by providing an independent basis for arrest and prosecution, the illegality of firearms outside the home allows CPD to take gang members off the street without disclosing evidence of larger criminal gang activity in which that gang member is involved (or the sources of that evidence, such as confidential informants) that the CPD may be currently investigating. If this basis did not exist, CPD would have to make a choice between letting the armed gang member remain free or risk compromising a larger investigation." Exhibit 10, ¶ 35.

**RESPONSE:** Admit that Commander Gorman so opines. Dispute that Chicago has established that striking down the challenged laws would eliminate the basis for taking an armed gang member off the street without disclosing evidence of larger criminal gang activity in which that member is involved. *See* Responses to Statements of Fact 21 and 27. Additionally, Plaintiffs are not challenging Chicago's carriage ban to the extent it prohibits carriage on "the street."

      **29-A.** "An ex ante permitting regime for carry is not sufficient to screen out all potential bad actors because many people who commit gun crimes do not, in fact, have a prior record that would disqualify them from carrying under typical prescreening regimes." Exhibit 13, Exhibit A thereto, at 3. "[A] majority of criminal homicides and other serious crimes committed are committed by individuals who have not been convicted of a felony." *Id.* at 16. A study of Illinois data published by Dr. Cook in Criminal Records of Homicide Offenders, 294 Journal of the American Medical Association 598-601 (2005), found that "just 43 percent of adults arrested for criminal homicide . . . had a felony conviction on their record." *Id*.; Exhibit 27 (Cook study).

**RESPONSE:** Admit that Dr. Cook so opines, but dispute his conclusion that "a majority of criminal homicides and other serious crimes committed are committed by individuals who have not been convicted of a felony." He relies on his cited study for this assertion, but it is misleading to state that this study found that "just 43 percent of adults arrested for criminal homicide had a felony conviction on their record." Rather, it found that 43 percent of adults arrested for criminal homicide in Illinois had a felony conviction *in Illinois in the decade prior to their arrest*. *See* Chicago Exhibit 27 at 599; *compare* 430 ILCS 65/8(c); 18 U.S.C. § 922(g)(1). *See also* Chicago Exhibit 31 at xxxii ("70-80% of firearms offenders have criminal records with an average of four major felony arrests prior to the commission of a homicide"). The study also has other shortcomings. *See* Chicago Exhibit 27 at 600 (*e.g.*, "the identification of homicide

offending with homicide arrest," because "an unknown fraction of homicide arrestees in Illinois in 2001 was not factually guilty"). Additionally, Dr. Cook has admitted that this study of Illinois cannot be used to "infer the percentage of murderers in Chicago who have a prior felony conviction." Exhibit 3 at 231 (Cook Dep.). And he has also written that "most gun crime in the U.S. is accounted for by people not legally allowed to have guns." Chicago Exhibit 12 at F561.

We also dispute the implication that a felony is the only type of criminal conviction that disqualifies a person from possessing a firearm under governing law. For example, federal law additionally prohibits firearms possession by those convicted of a misdemeanor crime of domestic violence. 18 U.S.C. § 922(g)(9). Illinois similarly denies eligibility for a license to possess a firearm for domestic abusers. *See* 430 ILCS 65/8(l). This likely has implications for the effectiveness of prescreening regimes because, according Dr. Cook, "most domestic homicides are preceded by a history of assaults." Chicago Exhibit 27 at 600.

And, as we explained in response to Statement of Fact 27, other factors in addition to a person's criminal record, such as drug use and mental disability, can also disqualify a person from possessing a firearm.

Finally, we dispute that Dr. Cook's opinion to the extent it implies that "bad actors" would obtain a license to carry a handgun even if eligible for one. See our Response to Statement of Fact 21.

**29-B.** Dr. Kleck agrees that under a permitting system, "some criminals will be able to carry guns" and "some people who have permits will commit crimes with those guns." Exhibit 14, at 446:5-11.

**RESPONSE:** Admit. Dr. Kleck "is not aware of any responsible party who has asserted that there is *no* risk whatsoever from issuing permits to [persons not identified as criminals from

29

public records] . . . . A more reasonable argument that is not a mere straw man is that this risk is quite small relative to the benefits of genuinely noncriminal persons having the legal right to carry guns . . . .").

**29-C.** Data compiled by the Violence Policy Center indicates that between May 2007 and August 2011, concealed-carry permit holders killed 370 people (net of justifiable homicide killings). Exhibit 13, Exhibit A thereto, at 17.

**RESPONSE:** Admit, but dispute that this data does anything to undermine the fact that "the available data about [concealed-carry] permit holders imply that they are at a fairly low risk of misusing guns, consistent with the relatively low arrest observed to date for permit holders." Exhibit 4 at 1082 (Philip J. Cook, et al., *Gun Control After Heller*, 56 UCLA L. REV. 1041 (2009)); *see also* Response to Statement of Fact 21.

Even taking the 370 figure at face value, the VPC report simply confirms that concealed carry permit holders are more likely to be law-abiding than the average citizen. In 2007 there were approximately 3.5 million concealed-carry permits in the United States. *See* Exhibit 16 at 671 (Don B. Kates & Gary Mauser, *Would Banning Firearms Reduce Murder and Suicide? A Review of International and Some Domestic Evidence*, 30 HARV. J. L. & PUB. POL'Y 649 (2007)). If we make the conservative assumption that this number did not increase after 2007, that means that a mere one-ten-thousandth of one percent of concealed-carry permit holders committed homicide over the approximately four-year time span covered by VPC's report. That works out to a homicide commission rate of about 2.6 per 100,000 per year. By contrast, the national homicide rate between 2007 and 2010 (the latest year for which we have data), varied from 5.9 per 100,000 (in 2007) to 4.9 per 100,000 (in 2010). *See* Exhibits 17, 18, 19, and 20 (Federal Bureau of Investigation, Crime in the United States (2007 - 2010) (Available at

http://www2.fbi.gov/ucr/cius2007/data/table_16.html,

http://www2.fbi.gov/ucr/cius2008/data/table_16.html,

http://www2.fbi.gov/ucr/cius2009/data/table_16.html, http://www.fbi.gov/about-us/cjis/ucr/crime-in-the.u.s/2010/crime-in-the.u.s.-2010/tables/10tbl16.xls)).  And note that this actually overstates the homicide rate of carry-permit holders, because the 370 deaths cited by the VPC include not just murder, but also suicides (over 100) and all types of manslaughter and even firearm accidents, whereas the FBI's figure includes only murder and non-negligent manslaughter.

Further, Dr. Kleck examined an earlier report by the same organization and concluded that "most of the homicides identified by VPC do not support an argument that possession of a carry permit makes criminal homicide more likely" because a carry permit did not in any way facilitate many of the reported murders.  Exhibit 2 (Kleck Decl.), Exhibit I thereto, at 38-40.

**30.**     Dr. Cook opines that "if it could be established by a witness" that the "nominally private spaces . . . outside of the main dwelling structure of a residence such as yards or porches . . . were no different than public spaces in terms of the ability of people in those spaces to inflict public gun violence or be the victim of public gun violence, then [his] opinions on the carry regulations set out in [his] report would apply equally to those private spaces. If a bullet fired from one space into the other would not respect the nominal change in ownership status, there is no reason to expect that outcomes which are true 'on the street' would not hold true just off of it." *Id.* at 15.

**RESPONSE:**  Admit that Dr. Cook so opined.

**31.**     The Tyler/Pacholski home lies between Jerome Street to the south and an alley to north; the front of the home faces Jerome Street and the rear faces the alley.  Exhibit 2 at 120:4-

9; Exhibit 1 at 57:4-9 and Exhibit 6 thereto. The front of the property line extends to a sidewalk that runs parallel to Jerome Street, and the rear property line extends to the alley. Exhibit 2 at 120:23-121:20; Exhibit 1 at 57:7-10. The parcel contains a detached two-and-a-half car garage behind the house; the garage opens into the alley. Exhibit 2 at 122:10-19; Exhibit 1 at 51:24, 54:19-55:5, and Exhibit 6 thereto. The garage is used to store cars and other items; it is not used for residential purposes. Exhibit 1 at 57:15-58:5; Exhibit 2 at 125:7-15. The garage is 5 to 6 feet away from the neighboring residential parcels on either side of the Tyler/Pacholski parcel. Exhibit 1 at 60:7-22, and Exhibit 6 thereto. The parcel has a back yard which extends all the way to the alley on either side of the garage. *Id.* The backyard is "very accessible" to the alley. Exhibit 1 at 78:6-11. A fence with three gates encloses the back yard, but there is no fence in the front yard. Exhibit 1 at 64:17-24. The home has three porches: a second-storey balcony that is accessible from the bedroom; a two foot by three foot exterior landing attached to the house's rear door; and a two foot by four foot slab attached to the house's front door. Exhibit 1 at 61:3-62:21. The porch outside the front door is 30 feet from the Jerome Street sidewalk. Exhibit 2 at 129:20-130:11.

**RESPONSE:** Admitted, with the understanding that the statement that Dr. Tyler and Mr. Pacholski's garage is not used for "residential purposes" simply means that no one lives in the garage. They keep items such as cars and gardening equipment there and are in the garage "every day." Chicago Exhibit 1 at 57:11-58:8.

32. Hall's home is on a corner, 90 by 100 foot parcel on the northwest corner of West 113th Street and Bell Avenue. Exhibit 3 at 94:9-11; Exhibit 28 (PLMH 000017). Immediately west of the home is a driveway leading into West 113th Street. Exhibit 3 at 97:4-15, 105:3-10, and Exhibit 4 thereto. The parcel has a detached two-car garage, which is used to store various

items, such as tools, bikes, and toys.  Exhibit 3 at 94:15-16, 99:21-100:1. No cars are kept in the garage, nor does anyone live there.  *Id.* at 100:2-9. The garage is about 18 inches from the western neighbor's property line, and between 12 and 18 inches from the northern neighbor's property line.  *Id.* at 105:11-21. There is an 8 by 20 feet porch on the east side of the home, which faces Bell Avenue.  *Id.* at 97:16-23, 101:21-102:1, Exhibit 4 thereto. It is about 15 feet from the sidewalk that runs parallel to Bell Avenue, and 20 feet from the sidewalk that runs parallel to West 113th Street.  *Id.* at 103:5-8, 104:23-105:2, Exhibit 4 thereto. There is also a side porch on the south side of the house that is 15 feet from the sidewalk that runs parallel to West 113th Street.  *Id.* at 104:12-22.  The property also contains a 3 and a half to four foot high fence. *Id.* at 106:16-23. A baseball diamond belonging to Morgan Park Academy, a K-12 school, lies to the east of his home on the western side of Bell Avenue.  *Id.* at 105:22-106:10.

**RESPONSE:**  Admitted.

**33.**     The dimensions and layouts of the Tyler/Pacholski and Hall residential parcels are typical of those commonly found in Chicago.  Exhibit 24, ¶¶ 5,6. In a typical Chicago neighborhood, "the lots are 25 by 125 [feet] and people live very closely to each other." Exhibit 29 (Deposition of Vance Henry) at 11:19-12:3. Much of the space on a typical residential parcel is taken up by the residential building containing the dwelling unit(s), for instance, a home or a condominium building.  Exhibit 24, ¶ 4. Thus, spaces outside this structure, such as porches, stairways, yards, or common areas, are typically a short distance away from the public way (i.e., adjacent streets, sidewalks, or alleys).  *Id.* An even shorter distance typically separates these spaces from neighboring parcels.  *Id.* Yards, driveways, and garages in particular typically directly abut sidewalks, streets, alleys, and/or neighboring parcels.  *Id.*

**RESPONSE:**  Admitted.

**34.** Chief Williams testified that "given these compact dimensions, private spaces outside the home, such porches, yards, stairs, garages, and common areas, are essentially 'public' when it comes to committing firearms violence. The shootings, gunshot injuries, and intimidation that can occur in these places are virtually identical to those that can take place in purely public areas." *Id.*, ¶ 7. Chief Williams testified that a person with a gun on his porch, in his yard, or on his staircase can use the firearm to intimidate or shoot a person on the sidewalk, or in neighboring yard, in virtually the same way that he could if he were standing on the sidewalk or neighboring yard itself. *Id.* The person on the sidewalk or neighboring yard can see the possessor's gun, can hear threatening speech by the possessor, and can be targeted and shot by the possessor. *Id.* These risks befall not only members of the public, but law enforcement officers as well. *Id.*, ¶ 6; Exhibit 30 (Deposition of Dana Alexander) at 33:8-20.

**RESPONSE:** Admit that Chief Williams so testified, but dispute his suggestion that all areas on a person's property outside of the main dwelling unit are "essentially 'public'" when it comes to committing firearms violence." Chief Williams bases his conclusion on the "compact dimensions" of property in Chicago. "Compact dimensions" do not convert the inside of a garage with the door closed, for example, into an "essentially public" space. *See* Exhibit 3 at 202:11-23, 204:6-13 (Cook Dep.) (admitting that he would consider a garage that "does not have direct open access to the street" to be "strictly speaking, private"; admitting that "the garage with the garage door shut is more similar to the house"). Furthermore, according to Chief Williams' logic, a home with an open door or window would be just as "essentially public" as a front porch or a yard.

**35.** Further, Chief Williams testified that escalation of disputes can happen in these areas in just the same way that an encounter between two people on a sidewalk or on opposite

sides of the street when guns are present. Exhibit 24, ¶ 7. And even if the gun is not initially used to intimidate or shoot, a firearm possessed in these spaces outside the home will embolden the possessor to be more aggressive than he or she otherwise would. *Id.* This can cause otherwise conventional disputes or arguments between neighbors or neighborhood residents to escalate into serious confrontations where the gun would be used to intimidate or shoot. *Id.*

**RESPONSE:** Admit that Chief Williams so testified, but for the reasons explained in response to Statement of Fact 34, dispute that his reasoning applies to all areas of a person's property outside of the main dwelling unit. Also dispute his contention that possessing a firearm causes a person to be more aggressive. He has offered no evidence other than his bare assertion to support that statement. And it is inconsistent with evidence that "the number of harmful instances of gun carriage are far less than a *tenth of one percent* of the number of instances of gun carriage for defensive purposes." Exhibit 2 (Kleck Decl.), Exhibit I thereto, at 36. It is also inconsistent with evidence that concealed-carry permit holders are more likely to be law-abiding than members of the general public. *See* Response to Statement of Fact 21.

    **36.** Chief Williams also testified that these same interactions and misuses can take place in the common areas inside residential buildings, such as elevators, hallways, stairwells, and lobbies. *Id.*, ¶ 8. In fact, they could be magnified in these areas because they are not private. *Id.* For instance, unlike a homeowner who can control who and how many people are allowed onto his property, any number of people living in a high-rise residential building could congregate in hallways and lobbies. *Id.*

**RESPONSE:** Admit that Chief Williams so testified.

    **37.** Chief Williams testified that requiring guns to be kept within the confines of the home reduces these risks. *Id.*, ¶ 9. Before a gun can be misused outside the home, it must first

be taken outside the home. *Id.* In the case of a dispute, in the time it takes for a resident to go back inside the home to retrieve a gun before bringing it outside, the resident may "cool down" and decide against getting the firearm and/or to call the police. *Id.* Similarly, the other disputant may flee the scene or call the police. *Id.* Further, the walls and roof of a home makes it much more secure than the spaces outside the home. *Id.* They can stop a misdirected bullet from exiting the home and hitting innocent victims outside. *Id.* These benefits are lost when firearms are taken outside the home. *Id.* In the dense neighborhoods of Chicago, a misdirected bullet fired from outside the home stands a much greater risk of injuring an innocent bystander on a nearby sidewalk or parcel. *Id.*

**RESPONSE:** Admit that Chief Williams so testified, but for the reasons explained in response to Statements of Fact 35 and 36, dispute his conclusions regarding the "risks" of not requiring guns to be kept within the confines of the home.

**38-A.** Illegal gang activity in Chicago occurs not only in public places (such as streets, playgrounds, alleys), but also in spaces such as yards, porches, hallways, and stairwells on private property. Exhibit 10, ¶¶ 24, 32. Chief Williams further testified that gang members seeking to protect their turf or criminal operations (such as narcotics dealing or other vice activities) would be especially prone to engage in the these abuses discussed above. Exhibit 24, ¶ 20; *see also* Exhibit 10, ¶ 25. Gang members (as well as non-gang members) have done so when in the private spaces outside a home in the past. Exhibit 24, ¶ 10; Exhibit 10, ¶ 32.

**RESPONSE:** Admitted.

**38-B.** In Chief Williams's opinion, they would be more prone to do so if it became legal for them to possess guns in those spaces. Exhibit 24, ¶ 10; *see also* Exhibit 10, ¶ 33. Qualified members would therefore be free to possess firearms in places like a lobby or stairwell of a

36

residential high-rise, or on the porch or in the front yard of a three-flat.  Exhibit 24, ¶ 10; Exhibit 10, ¶ 33.

**RESPONSE:**  Admit that Chief Williams so opined, but dispute the validity of his opinion for the reasons explained in response to Statements of Fact 21 and 27.  Furthermore, dispute Chief Williams' opinion to the extent it implies that gang members and other lawbreakers decline to carry weapons because Chicago's firearms ordinance makes it illegal.  *See* Chicago Exhibit 10 ¶ 22 ("Gangs engage in extensive criminal activity, including but not limited to the sale of illegal drugs, assaults, shootings, and homicides, in furtherance of their interests. . . . Gangs and their members routinely use violence and intimidation to advance their criminal interests, and they rely heavily on the use of firearms."); Exhibit 21 at 4, 6-7, 80-81 (Henry Dep.) (Deputy Chief of Staff in Mayor's office and Former Director of Chicago Police Department's community policing program:  "Q.  In your experience, do gang members typically attempt to avoid committing crimes or otherwise transgress provisions of the criminal law?  . . . A.  I know them to be people who terrorize communities, who because of their enterprises take innocent lives, like the incidents that I mentioned and so many more that we don't have time enough to discuss today.  That's what I know gang members to do, is to terrorize and to destroy the fabric of our City by destroying neighborhoods and blocks and corners where they traffic narcotics and intimidate people and destroy families by the kind of violence that they're involved in."); Exhibit 22 at 6, 67-68 (Johnson Dep.) (Sergeant of the Chicago Anti-Gun Enforcement Team:  "the number of guns that are making their way onto the city streets" is not "responsive to changes in local law"); Exhibit 23 at 11-13, 35 (Martin Dep.) (Commander in Chicago Police Department:  "Q.  But in your experience, when you see a group of gang members or dope dealers, are they currently all potentially armed, regardless of the law about carrying weapons?  A.  Well, they

37

could be, yes."); Exhibit 13 at 17:4-7 (Gorman Dep.) ("I believe that … gangs will violate the laws to get firearms within the City of Chicago ….").

**38-C.** From those spaces they could easily use guns to oversee drug dealing taking nearby, or just feet away on a sidewalk or street corner. Exhibit 24, ¶ 10; Exhibit 10, ¶ 33. From those spaces, they could also easily use guns to intimidate or shoot at rival gang members or other people viewed as threats, or other members of the public that they merely wished to intimidate. Exhibit 24, ¶ 10; Exhibit 10, ¶ 33.

**RESPONSE:** Admitted.

**39.** Dr. Cook's 2007 Chicago Study reported that "[j]ust showing rather than actually firing guns is usually sufficient" for the possessor to be taken seriously or intimidate. Exhibit 12 at F563. It found that even for older gang members and professional criminals regularly engaged in crime, "gun use was typically limited to simply brandishing the weapon." *Id.* Simply drawing a gun on a person can be enough to "make the person change their mind about what their intentions are." Exhibit 1 at 118:24-119:4. Dr. Cook's study further reported that sometimes it is not even necessary to explicitly show the gun, as "it's all about the bulge." Exhibit 12 at F563.

**RESPONSE:** Admitted.

**40-A.** Chief Williams testified that even if the gun is not overtly used to intimidate or shoot, it will embolden the gang member to be more aggressive, which will lead to more violent gang altercations. Exhibit 24, ¶ 10; see also Exhibit 10, ¶ 33.

**RESPONSE:** Admitted that Chief Williams so testified.

**40-B.** Similarly, this increased gun possession would provide an incentive to rival gang members to carry guns, even if it remained illegal for them to do so, in order to protect themselves. Exhibit 24, ¶ 10. Research published in J. Wright & P. Rossi, Armed and

Considered Dangerous (new 2nd ed. 2008) found that 62% of criminals who carried guns said that the chance their victim might be armed was a "very" or "somewhat important" factor in their decision to carry a gun. Exhibit 31 (Wright & Rossi study) at 150. Chief Williams testified that this proliferation of guns will further inflame the violent crime problem in Chicago. Exhibit 24, ¶ 10.

**RESPONSE:** Admit that Chief Williams so testified, but dispute that gang members currently lack an "incentive" to carry firearms, and thus dispute that striking down the laws at issue here will cause a "proliferation" of guns in the hands of gang members or "further inflame" Chicago's problem with violent crime. Chicago gangs already "rely heavily on the use of firearms." *See* Chicago Exhibit 10 ¶ 22 ("Gangs engage in extensive criminal activity, including but not limited to the sale of illegal drugs, assaults, shootings, and homicides, in furtherance of their interests. . . . Gangs and their members routinely use violence and intimidation to advance their criminal interests, and they rely heavily on the use of firearms."); Exhibit 3 at 159:14-15 (Cook Dep.) (gangs have "unusual access and incentive to obtain guns and use them"). *See also* Response to Statement of Fact 38. This is illustrated by the Wright & Rossi survey. The chance that the victim would be armed was just one of *nine* reasons that at least 50% of gun offenders identified as a very or somewhat important reason for carrying a gun. *See* Chicago Exhibit 31 at 128, Table 6.1; *see also id* at 134 ("most men who were able to cite any reason to carry a gun would often be able to cite numerous reasons").

41.     People possessing firearms in the spaces outside their home are more prone to having the firearm stolen from them. *Id.*, ¶ 12. These areas are generally less secure than the home and are easier for criminals to access. *Id.* This includes garages, which are generally less secure than the home and are the target of break-ins or other crime to a greater degree than

homes.  *Id.*; Exhibit 1 at 84:14-21.  In 2010, Chicago Police Officer Thor Soderberg was

accosted in the parking lot of a CPD station and his firearm was wrestled away from him and

used to shoot and kill him.  Exhibit 24, ¶ 12.  Chief Williams testified that "[i]f criminals are

willing to take firearms from CPD officers on CPD grounds, they would not hesitate to take guns

from private residents on the residents' private property."  *Id.*

**RESPONSE:**  Disputed.  Chicago cites no empirical evidence to permit an evaluation of the

relative probability of a person having a firearm stolen while possessing the firearm in the home

versus possessing the firearm in the spaces outside the home.  Chicago relies on the testimony of

Chief Williams, but he admitted that he has no "empirical evidence that the risk of theft of a

firearm is greater outside of the home than it is inside the home."  Exhibit 15 at 63:1-5 (Williams

Dep.).  His experience in law enforcement alone does not allow him to answer this empirical

question.  *See* Exhibit 2 (Kleck Decl.), Exhibit I thereto, at 2, and his "anecdotal" evidence

regarding Officer Soderberg is "unscientific, and can reveal nothing about the consequences of

Chicago's restrictions on guns," *id.*  Furthermore, empirical evidence demonstrates that most

criminals prefer to *avoid* victims possessing firearms, not to target them.  *See* Chicago Exhibit 31

at 146 (56% of convicted felons agreed or strongly agreed that "a criminal is not going to mess

around with a victim he knows is armed with a gun"; 74% agreed or strongly agreed that "one

reason burglars avoid houses when people are at home is that they fear being shot").

Commander Gorman likewise admitted that gang members are deterred from attacking a person

if they know that the person has a firearm.  Exhibit 13 at 46 (Gorman Dep.).  It is also not the

case that garages are broken into more often than residences.  *See* Exhibit 61 at CITY 001415 (in

Chicago from 1999 to 2010, there were 112,268 reported incidents of residences being

burglarized versus 60,836 reported instances of garages being burglarized).

42.     Tyler is the only Plaintiff identified as having a "desire to possess a handgun for armed self-defense at her place of business."  Exhibit 6, ¶ 31.  Tyler is a veterinarian and part owner of Uptown Animal Hospital, a clinic located at 5545 North Clark Street in Chicago that is amidst a pedestrian shopping district.  Exhibit 1 at 5:16-18; 6:9-14, 134:1-10. The clinic is on the first floor of a building that contains two other business, one of which is a coffee shop.  *Id.* at 131:7-16.  The clinic can be accessed from the outside by three different doorways: One in the front that is accessed through a small vestibule that is accessed from the sidewalk, one in the back, and one that is accessed via a common interior hallway in the building that leads to the coffee shop.  *Id.* at 138:5-139:11; Exhibit 32 at PLKPKT 000038.  The front, "main," doorway is unlocked during business hours.  *Id.* at 145:20-22.  The clinic has an alarm system.  *Id.* at 139:20- 22.

**RESPONSE:**  Admitted.

43-A.   There are relatively more accidents with short guns than with long guns in the United States.  Exhibit 14 at 320:6-11.  "[T]he only kind of gun that can result in a fatal gun accident is a loaded one," and "[h]andguns are much more likely to be kept loaded [than long guns] and thus at risk of a gun accident."  *Id.* at 320:15-321:1.  Long guns "often" are loaded only when they are "being used for recreational purposes and so on."  *Id.* at 320:22-24.

**RESPONSE:**  Admit that there are relatively more accidents with short guns than with long guns due to the fact that short guns are kept loaded more often.  *See* Exhibit 7 at 322:9-14 (Kleck Dep.) (handguns "are not more likely to be involved in accidents relative to long guns if you control for whether they are kept loaded or not").

43-B. Compared to long guns, handguns are generally less accurate and more prone to accidental discharge.  Exhibit 24, ¶ 14.

41

**RESPONSE:** Disputed. *See* Exhibit 7 at 320 (Kleck Dep.) ("And relative to the rate at which they are kept loaded, handguns are less likely to be involved in accidents. But mechanically speaking, if you had a long gun and a handgun . . . both loaded, it would be the long gun that would be easier to accidentally discharge."); *id.* at 319:12-320:5 (testifying that "it's easier to have an accident with a long gun than a handgun," because a long gun "requires less trigger pressure" to fire and because "long guns are more lethal firearms than handguns"); Exhibit 25 at 233 (Webster Dep.) (admitting that, "generally speaking, it's harder to handle a longer gun than a smaller gun"); *see also* Exhibit 2 (Kleck Decl.), Exhibit I thereto, at 17.

**43-C.** Like the spaces outside a person's home, a place of business is generally less secure than a home. *Id.* There is generally more foot traffic in a place of business than in a home, and a place of business is generally open to members of the public and/or to other employees, all of whom cannot be controlled by the person wishing to possess a handgun there. *Id.*

**RESPONSE:** Admitted.

**43-D.** Chief Williams testified that, consequently, allowing handguns to be maintained in a person's fixed place of business increases the risk of hitting an innocent bystander when the gun is discharged. *Id.*

**RESPONSE:** Admit that Chief Williams so testified. Dispute that allowing handguns rather than long guns in a person's fixed place of business increases the risk of hitting an innocent bystander when the gun is discharged. We have disputed above Chief Williams' claim that handguns are generally less accurate and more prone to accidental discharge than long guns.

**44.** Compared to long guns, handguns are much more likely to be used in a crime in Chicago. *Id.*; Exhibit 7, ¶ 2. Chief Williams testified that "because a handgun is concealable, a

person possessing a handgun in the workplace would be more likely to use it as a tool of intimidation or other crime in the workplace." Exhibit 24, ¶ 14.

**RESPONSE:** Admit that handguns are more likely to be used in a crime in Chicago than long guns in the sense that more crimes in Chicago are committed with handguns than with long guns. Also admit that Chief Williams gave the quoted testimony, but dispute that his conclusion (a handgun would be more likely used for intimidation or crime in the workplace) follows from his premise (a handgun is concealable). Chief Williams does not explain why this is so, and as a matter of logic it is not apparent why it would be.

**45-A.** Chicago's restriction on gun sales and transfers does not prevent Plaintiffs from acquiring firearms; they have purchased firearms outside of Chicago, including in the Chicago suburbs. Exhibit 1 at 150:23-151:1; Exhibit 3 at 208:8-14; Exhibit 2 at 94:20-95:9.

**RESPONSE:** Admit that Chicago's restriction on gun sales does not prevent Plaintiffs from acquiring firearms *outside of Chicago*.

**45-B.** Within 6 miles of Chicago, there are six stores that sell firearms to the public; within 25 miles, there are 29 stores; within 50 miles, there are 46 stores. Exhibit 33 (June 3, 2011 Stipulation); Exhibit 34 (Map of Chicago Area Gun Stores). Chuck's Guns ("Chuck's") is a retail gun store located at 14310 South Indiana in Riverdale, Illinois, approximately 7 blocks from the Chicago border. Exhibit 35 (Deposition of John Riggio) at 10:5-10. Approximately 53% of Chuck's customers who purchase firearms are Chicago residents. *Id.* at 16:18-24, 26:6-9. Illinois Gun Works is retail gun store located at 7229 West Grand Avenue in Elmwood Park, approximately 500 feet from the Chicago border. Exhibit 36 (Deposition of Henry Rush) at 9:15-20. Dr. Kleck asserts that a law-abiding, low income Chicago resident wanting a gun for self-defense would have to spend 30 minutes driving, or 2 hours taking public transportation

43

(and perhaps more time learning how to take public transportation), to a suburban gun store. Exhibit 14 at 434:25-435:8.

**RESPONSE:** Admitted.

46. "[G]uns are fairly durable [and] they last for a long time." *Id.* at 168:18-20. "In all likelihood" a law-abiding civilian needs to go to a gun store to get a gun for self defense only "once," if the store has the kind of gun the person wants. *Id.* at 435:9-15. Tyler's firearms have never needed maintenance or repairs, and she has never taken a firearm to a store for that purpose. Exhibit 1 at 162:14-19. Hall has never needed to take a firearm to a dealer for maintenance or repair. Exhibit 3 at 220:7-9, 221:17-21.

**RESPONSE:** Disputed to the extent it implies that a person needs or is entitled to only a single firearm for self-defense. Dr. Kleck, in the cited testimony, was plainly addressing how often a person would need to go to a gun store to get a *particular* weapon for self-defense. *See* Exhibit 7 at 435:9-15 (Kleck Dep.) ("Q. How frequently does a . . . law abiding civilian, need to go to a gun store to . . . get a gun for self-defense? . . . A. In all likelihood, once, *if they have the kind of gun the person wanted.*").

47. Since 2005, Tyler has visited gun stores in the Chicago suburbs at least 14 times. She has visited Maxon Shooter's Supply ("Maxon's") in Des Plaines, Illinois, a 45 minute drive, three or four times. Exhibit 1 at 153:5-17. She has visited Bass Pro Shops ("Bass") in Gurnee, Illinois, an hour drive, five or six times. *Id.* at 158:5-15. She has visited Dick's Sporting Goods ("Dick's") in Niles, Illinois, "just" a 20 minute drive, five times. *Id.* at 159:18-160:2. She has visited The Adventure Store ("Adventure") in Waukegan, Illinois one time. *Id.* at 160:3-6.

**RESPONSE:** Admitted.

44

**48.**    Pacholski has been to Maxon's "numerous" times and goes up to 10 times a year. Exhibit 2 at 193:22-194:5. He drives to Dick's 8 to 10 times a year. *Id.* at 199:1-10. He goes to Bass three or four times a year. *Id.* at 110:12-16. He visits GAT Guns in Dundee, Illinois once a year. *Id.* at 197:23-198:4. He has also visited Adventure. *Id.* at 199:23-200:6. Pacholski has purchased firearms in Wisconsin; Waukegan, Illinois; Oak Lawn, Illinois; Rosemont, Illinois; Champaign/Urbana, Illinois; Gurnee, Illinois. *Id.* at 77:16-19, 83:14-84:18, 94:20-95:2, 98:3-19, 104:2-12, 105:21-106:4.

**RESPONSE:**  Admitted.

**49.**    Hall has bought three firearms from Chuck's. Exhibit 3 at 72:20-24, 74:8-16, 80:10-14; Exhibit 28 at PLMH 0000116-117. Chuck's is about a 25 minute drive from Hall's home, and he has visited it at least 10 times since 2005. Exhibit 3 at 73:24-74:2, 76:12-13, 210:15-17. Since 2005, Hall has visited gun stores in the Chicago suburbs at least 24 times. He visited Sporting Arms & Supply in Posen, Illinois, a 45 minute drive, one time; Cabela's in Hammond, Indiana, a 30 minute drive, ten times; Cabela's in Hoffman Estates, Illinois, a 90 minute drive, two times; Bass, a 90 minute drive, one or two times; Dick's Sporting Goods in Highland, Indiana, a 40 minute drive, one time; and various Walmart locations in Illinois, ten to twenty times. *Id.* at 211:16-214:21, 215:23-216:8, 229:8-230:1.

**RESPONSE:**  Admitted.

**50.**    Tyler lives "right on the City limits" and "pop[s] into Evanston quite frequently." Exhibit 1 at 151:5-13. She also goes to the suburbs once or twice a month for dinner or shopping. *Id.* at 151:14-16. Pacholski drives three times a week to Gary, Indiana, a 50 minute drive from his home, for work at his aircraft hangar. Exhibit 2 at 28:18-29:7. Once a month, Hall drives 40 miles to his employer's office in Highland Park. Exhibit 3 at 6:2-16. He drives to

client locations in the suburbs 5 times month. *Id.* at 9:18-10:3, 11:9-15. Hall also travels to the suburbs once every two weeks during basketball season to referee. *Id.* at 13:4-7,13:22-14:7.

**RESPONSE:** Admitted.

51. Dr. Cook opines that "it is plausible that legal restrictions on sales and other transfers of firearms, such as those in the current Chicago ordinance, have the effect of reducing the prevalence and availability of firearms to people who may be inclined to use them in violent crime." Exhibit 13, Exhibit A thereto, at 2.

**RESPONSE:** Admit that Dr. Cook so opined, but dispute the validity of his opinion. Dr. Cook himself has acknowledged that Chicago regulations have *not* been responsible for reducing firearms prevalence in Chicago: "Chicago's handgun ban . . . was ineffective in reducing the prevalence of gun ownership in the City. The frictions we observe in the underground market are more likely due to the general scarcity of guns in the city (gun ownership rates are quite low, a fact that predates the ban) and on Chicago's emphasis on anti-gun policing." Chicago Exhibit 12 at F560; *see also id.* at F573 ("To the extent to which Chicago's gun market works less well than in other places, the most likely explanations are the city's low rate of household gun ownership and police emphasis on guns, rather than the city's ban on private possession of handguns."); Exhibit 3 at 147:1-9 (Cook Dep.) (admitting that "at the end of the day we could not say with confidence" that "the regulations that were in place at that time in the City of Chicago" were responsible for difficulty criminals encountered in obtaining guns); *id.* at 97-98 (admitting that it wasn't surprising that the D.C.'s ban on handgun transfers failed to reduce the murder rated because the "city was attempting to control the distribution of handguns, but surrounded by other jurisdictions very much nearby that did not have those restrictions"); *see also* Exhibit 22 at 67-68 (Johnson Dep.) ("the number of guns that are making their way onto the

46

city streets" is not "responsive to changes in local law"); *id.* at 67 (admitting that as of 2009 (i.e., when the City's handgun freeze was still in place), there were "more guns than ever making their way onto Chicago city streets"); Exhibit 26 at CITY 000176 – CITY 000177 (City of Chicago, Committee on Police & Fire, June 29, 2010 Tr. of Hr'g) ("we average more weapon recoveries than any other city in the United States") (Testimony of Jody Weis, Superintendent of the Chicago Police Department). Dr. Cook also admits that "it is possible that for some criminals it is easy to obtain a gun," and that this is particularly so for gang members because they may be able to "get access to the gang's arsenal." *See* Exhibit 3 at 195:23-196:2 (Cook Dep.); *see also id.* at 159:14-15 (gangs have "unusual access and incentive to obtain guns and use them"). Chicago officials also testified that criminals are already able to obtain guns in Chicago without difficulty. *See* Exhibit 22 at 87 (Johnson Dep.) (it's "not difficult at all" for a criminal to get a handgun in Chicago); Exhibit 27 at 13:8-9, 14:6-9, 34:1-10 (Brown Dep.) (agreeing that "it's fairly easy for criminals in the City of Chicago to obtain a gun illegally if they want to"); Exhibit 21 at 27: 7-16 (Henry Dep.) (agreeing that "Yes. We know that" gang members and other criminals are able to get guns in the City of Chicago.); Exhibit 28 at 14: 1-2 (Reyes Dep.) (admitting that "it's just really easy to go and buy a gun."). This evidence is consistent with Wright & Rossi's survey of convicted felons: "Every man in this sample has at least one felony conviction and is therefore legally prohibited from acquiring a handgun upon release .... This aside, three quarters also reported that it would be little or no trouble for them to obtain a handgun once they were released from prison, that they could arm themselves in a matter of a few hours or, at most, a few days, and that the out-of-pocket cost to do so would be approximately $100. Since the sample averages three prior imprisonments, one may assume that many of these men will have been in the same situation in question at some prior time; we

47

suspect, therefore, that these data reflect prior experience as much as judgments about future possibilities." Chicago Exhibit 31 at 16; *see also* Exhibit 29 at 66 (Daniel W. Webster et al., *How Delinquent Youths Acquire Guns*, 79 J. URBAN HEALTH 60 (March 2002)) ("Consistent with prior research, we found firearms were readily accessible, although not always instantaneously, among the crime-involved youths in our study."). In sum, "there is no logical reason to believe that the city's existing ordinance reduces the number of criminals with guns." Exhibit 2 (Kleck Decl.), Exhibit I thereto, at 21-22.

**52-A.** "[T]he private transfer of guns in the informal, illegal market is the proximate source of most guns that end up being used in crime." *Id.* at 10.

**RESPONSE:** Admit, with the understanding that "private transfer . . . in the informal, illegal market" includes theft. *See* Chicago Exhibit 13 (Cook Decl.), Exhibit A thereto, at 8 ("Typical transactions include . . . thefts . . . .").

**52-B.** While "[a]lmost all firearms used in crime in the United States were first sold at retail by a federally licensed dealer . . . in most cases [of crime] the firearm is not purchased directly by the ultimate perpetrator, but rather goes through a series of transactions first." *Id.* at 8. A nationwide study of traced guns found that "just 11 percent" were confiscated from the individual who had first purchased them from a federally licensed firearm dealer ("FFL"). *Id.* ATF data indicates that for the 3,054 Chicago crime gun traces in 2000 in which both the possessor and purchaser could be identified, the possessor purchased the gun directly from an FFL only 2.8% of the time. Exhibit 37 (July 2002 ATF Crime Gun Trace Reports - Chicago) at 8.

**RESPONSE:** Admit, except dispute any implication that traced guns are representative of guns used in crime. *See* Exhibit 7 at 80 (Kleck Dep.) (ATF trace data "concern samples of crime guns

48

that are not representative of crime guns in general that have been basically selected samples"); Exhibit 3 at 140 (Cook Dep.) (admitting that "there is then a variety of ways in which those guns which are successfully traced might not be representative"); *id*. at 140 (admitting that "there's no perfect match between those that are successfully traced … and the original population that you're talking about, which is all guns used in crime").

53. The 2007 Chicago Study found that the underground gun market in Chicago "[does] not work smoothly." Exhibit 13, Exhibit A thereto, at 10. The study found that the market is "characterized by substantial transaction costs, by which we mean large mark-ups over legal prices, substantial search times, uncertainty about product quality, and the physical risk associated with the exchange." Exhibit 12 at F561. The study reported that these transaction costs "stand in contrast to conventional wisdom in the sociology and criminology literatures, which in the context of the US has emphasized the ease with which criminals can access guns in the informal market, as well as the inelasticity of demand by criminals." *Id*. at F580.

**RESPONSE:** Admit that the study so found, but dispute the validity of its conclusions. Dr. Kleck has thoroughly critiqued the study and the conclusions Dr. Cook has drawn from it. *See* Exhibit 2 (Kleck Decl.), Exhibit I thereto, at 32-33. Indeed, he concluded that Dr. "Cook's *own data* on prices paid for guns by Chicago's criminals directly contradict his claim that guns are scarce for criminals or hard to get." *Id*. at 32; *see also* Exhibit 30 at 1248-52 (Gary Kleck et al., *The Myth of Big-Time Gun Trafficking*, 56 UCLA L. REV. 1233 (2009)). At any rate, the study *did not* attribute any difficulty in criminals obtaining guns to the City's gun regulations. *See* Chicago Exhibit 12 at F560 ("Chicago's handgun ban . . . was ineffective in reducing the prevalence of gun ownership in the City. The frictions we observe in the underground market are more likely due to the general scarcity of guns in the city (gun ownership rates are quite low,

49

a fact that predates the ban) and on Chicago's emphasis on anti-gun policing."); *id.* at F573 ("To the extent to which Chicago's gun market works less well than in other places, the most likely explanations are the city's low rate of household gun ownership and police emphasis on guns, rather than the city's ban on private possession of handguns."); *id.* at F571, F581 ("The general rule is that [gang] members can only own gun *if authorised by gang leaders*." "Gang leaders control a stash of guns and regulate their distribution and use by members."). *See also* Exhibit 3 at 142-144 (Cook Dep.) (acknowledging that study was not based on a representative sample of participants or Chicago neighborhoods).

Chicago officials also testified that criminals are already able to obtain guns in Chicago without difficulty. *See* Exhibit 22 at 87 (Johnson Dep.) (it's "not difficult at all" for a criminal to get a handgun in Chicago); Exhibit 27 at 13:8-9, 14:6-9, 34:1-7 (Brown Dep.) (agreeing that "it's fairly easy for criminals in the City of Chicago to obtain a gun illegally if they want to" *see also* Exhibit 2 (Kleck Decl.), Exhibit I thereto, at 21-22 (concluding that "there is no logical reason to believe that the city's existing ordinance reduces the number of criminals with guns"). This testimony is consistent with Wright & Rossi's survey of convicted felons: "Every man in this sample has at least one felony conviction and is therefore legally prohibited from acquiring a handgun upon release . . . . This aside, three quarters also reported that it would be little or no trouble for them to obtain a handgun once they were released from prison, that they could arm themselves in a matter of a few hours or, at most, a few days, and that the out-of-pocket cost to do so would be approximately $100. Since the sample averages three prior imprisonments, one may assume that many of these men will have been in the same situation in question at some prior time; we suspect, therefore, that these data reflect prior experience as much as judgments about future possibilities." Chicago Exhibit 31 at 16.

50

54. The study examined Chicago's Grand Boulevard/Washington Park neighborhood, "a large contiguous swatch of poor and working-class neighbourhoods in the South Side of Chicago" whose homicide rate is about 75% higher than that of Chicago as a whole and whose residents "are much more disadvantaged than other residents of Chicago or the US as a whole" according to education, employment, and poverty statistics. *Id.* at F562, F563. This area is of "particular interest given that gun crime in America is disproportionately concentrated in large cities and within these cities occurs disproportionately in highly disadvantaged neighborhoods." *Id.* at F562.

**RESPONSE:** Admit that the study so found, but see our response to Statement of Fact 53 for a critique of the study's conclusions.

55-A. The study found that those who were able to obtain a gun "reported paying prices that tended to be substantially higher than in the legal market, despite the questionable quality of the guns that were changing hands." Exhibit 13, Exhibit A thereto, at 10.

**RESPONSE:** Admit that this is how Dr. Cook characterized the study's findings, but dispute the validity of Dr. Cook's characterization. *See* Response to Statement of Fact 53.

55-B. Three manufacturers' guns frequently turn up as Chicago crime guns, and while most pistols from these manufacturers listed in excellent condition are offered on websites for between $50 - $100, guns from these manufacturers sell in the Chicago underground market for between $150 - $400. Exhibit 12 at F564. In addition, local brokers who facilitate exchanges in the underground Chicago market were found to typically charge $30 to $50 per transaction, "a large percentage of the sales price." *Id.* at F565.

**RESPONSE:** Admit that the study so found, but see our response to Statement of Fact 53 for a critique of the study's conclusions.

**55-C.**   Further, Commander Gorman testified that guns sold in the underground Chicago market often sell above retail, and that guns have been sold to undercover CPD officers in sting operations for between $100 to $200 above the retail price.  Exhibit 10, ¶ 29.

**RESPONSE:**  Admit that Commander Gorman so testified, but dispute that his testimony establishes that criminals in Chicago have a difficult time obtaining guns.  Commander Gorman acknowledged that he has not reviewed any studies on this topic, and that he has also had experiences where any markup was "minimal."  Exhibit 13 at 20:10-21:13 (Gorman Dep.).  *See also* Response to Statement of Fact 51.

**56.**   The study further found that, "[s]ince gun transactions are illegal in Chicago, communication between potential buyers and sellers is made difficult."  Exhibit 12 at F581. "The illegality of the gun market in Chicago creates information problems in matching prospective buyers and sellers.  Neither side of the market can take advantage of the well-developed infrastructure for legal advertising. In addition the illegality of the market means that participants do not have recourse to the courts to enforce transactions."  *Id.* at F568.  The study reported that "[e]ven local gun brokers report that a large share of their transaction attempts fall – around 30-40%.  Reasons included the inability to get a gun from a supplier; the customer and broker could not agree on the location for the transaction; and the broker either did not trust the customer's intentions or thought he or she was an undercover police officer."  *Id.* at F565.  The study reported that "reliable 'connections' appear to be scarce," and "executing transactions with strangers is surely a risky business."  *Id.* at F566.

**RESPONSE:**  Admit that the study so found, but dispute that the study attributed frictions in Chicago's underground gun market to the City's laws.  *See* Chicago Exhibit 12 at F560 ("Chicago's handgun ban . . . was ineffective in reducing the prevalence of gun ownership in the

City.  The frictions we observe in the underground market are more likely due to the general

scarcity of guns in the city (gun ownership rates are quite low, a fact that predates the ban) and

on Chicago's emphasis on anti-gun policing."); *id.* at F573 ("To the extent to which Chicago's

gun market works less well than in other places, the most likely explanations are the city's low

rate of household gun ownership and police emphasis on guns, rather than the city's ban on

private possession of handguns."); Exhibit 3 at 147:1-9 (Cook Dep.) (admitting that "at the end

of the day we could not say with confidence" that "the regulations that were in place at that time

in the City of Chicago" were responsible for difficulty criminals encountered  in obtaining guns).

Furthermore, because criminals rarely obtain guns directly from retail sources even where gun

sales are legal, these findings have little implication for analyzing the effect of Chicago's ban on

gun sales.  *See* Chicago Exhibit 31 at xxxvi ("[T]he large majority of criminal firearms

transactions do not involve conventional over-the-counter retail transactions . . . . That being the

case, restrictions imposed at the point of retail sale cannot possibly have much of an effect."); *id.*

at xxxv ("most of the methods through which criminals acquire guns and virtually everything

they ever do with those guns are already against the law"); Exhibit 24 at 1 (Bureau of Justice

Statistics, *Firearm Use by Offenders* (Nov. 2001)).

> **57-A.**  Dr. Cook testified that guns are "quite scarce 'on the street' " in Chicago, that
"most criminals in Chicago currently lack a gun and have difficulty obtaining one," and that "it
is unusual for criminals in Chicago to be in possession of a gun."  Exhibit 13, Exhibit A thereto,
at 10; Exhibit 15 at 173:3-22.

**RESPONSE:**  Admit that Dr. Cook so opined, but dispute the validity of his opinion.  *See*
Response to Statement of Fact 51.

**57-B.**  U.S. Department of Justice data [discussed in] the 2007 Chicago Study indicates that only 21% of Chicago arrestees said they had ever owned a handgun.  Exhibit 13, Exhibit A thereto, at 11; Exhibit 12 at F573.  The study reported that of 17 regular thieves interviewed, only one said that they could find a gun in less than a week.  Exhibit 12 at F566.  The study further reported that the U.S. Department of Justice data indicates that, of Chicago arrestees who never owned a gun but indicated that they might want one someday, about 70% reported that it would take them at least a week or that they would simply be unable to obtain one.  *Id.* at F574; Exhibit 13, Exhibit A thereto, at 11.  This number was roughly 60% for arrestees surveyed in other cities.  Exhibit 12 at F574.  That same data indicated that the percentage of Chicago arrestees who reported owning a gun (21%) "is much lower than" the mean and median values for other surveyed cities (31% and 33% respectively).  *Id.*  This data is evidence that "Chicago was not an easy place for thieves and other criminals to obtain guns;" in fact, relative to other cities, "it was one of the most difficult."  Exhibit 15 at 146:19-147:5.

**RESPONSE:**  Admit that the 2007 Chicago Study discussed the cited U.S. Department of Justice data, but dispute that this data establishes that it is unusually difficult for criminals in Chicago to obtain guns, much less that any such difficulty is attributable to Chicago's gun laws. The study acknowledged that it is "difficult" to draw "reliable inferences" from the Department of Justice data, that "sample characteristics [in several cities] appear far out of line with what we learn from other sources," and that gun ownership levels of arrestees in certain cities was "implausibly low."  Chicago Exhibit 12 at F574.  *See also* Exhibit 2 (Kleck Decl.), Exhibit I thereto, at 33 (critiquing DOJ data on criminals obtaining firearms).  The study further acknowledged that "the underground gun market in the high-crime South Side Chicago neighbourhood studied . . . is not unique," because "[o]ther data sources [*i.e.*, the DOJ data]

54

indicate that high transactions costs characterise the underground gun market elsewhere . . . in some other large cities." Chicago Exhibit 12 at F581. Indeed, "[t]o the extent to which Chicago's gun market works less well than in other places," the study concluded, "the most likely explanations are the city's low rate of household gun ownership and police emphasis on guns, rather than the city's ban on private possession of handguns." *Id.* at F573; *see also id.* at 576 ("The fact that Chicago and DC have low gun ownership rates may be more cause than consequence of restrictive local gun laws."). In sum, the Department of Justice data does not undercut the evidence we have cited elsewhere demonstrating that Chicago has conceded that it is not difficult for criminals in Chicago to obtain guns. *See* Response to Statement of Fact 51.

**58.** Dr. Cook concludes that "[b]y rendering sales and transfers illegal, the Chicago ordinance helps to maintain these transactions costs, which in turn, it is reasonable to suppose, depresses possession rates by criminals" and "help[s] preserve" the scarcity of guns in the illegal Chicago market. Exhibit 13, Exhibit A thereto, at 10, 11.

**RESPONSE:** Admit that Dr. Cook so concludes, but for all the reasons cited in response to Statements of Fact 51-57, dispute this conclusion. In sum, Dr. "Cook has no reliable foundation for his claim [that] Chicago's gun enforcement efforts (or any other forces) have made it hard for the city's criminals and youth to get guns." Exhibit 2 (Kleck Decl.), Exhibit I thereto, at 33.

**59.** Joseph J. Vince, Jr. is currently the Director of Criminal Justice Programs at Mount St. Mary's University in Emmitsburg, MD. Exhibit 38 (Declaration of Joseph J. Vince, Jr.), Exhibit A thereto, at 2. He is also President of Crime Gun Solutions LLC ("CGS"), a company that assists law enforcement in the collection, access, management, analysis, training, and dissemination of crime-gun information. *Id.* He is also a member of the International Association of Chiefs of Police ("IACP") and serves on the IACP's Firearms Committee, which

examines firearms-related violent crime and makes recommendations to the IACP's Executive

Committee. *Id.* He previously worked as a special agent at the ATF for 28 years. *Id.* at 1. His

tenure at ATF included the following positions: field agent in Detroit investigating crimes

concerning the firearms industry and federal firearms laws; resident agent in charge of the

Omaha office; operations officer in the Firearm Division at ATF headquarters in Washington,

D.C.; special agent in charge of the Firearm Tracing Branch; special agent in charge of the

Intelligence Branch; chief of the Firearm Enforcement Division; and chief of the Crime Gun

Analysis Branch. *Id.* at 2; Exhibit 39 (Deposition of Joseph Vince, Jr.) at 12:11-13:9. In his

career, Mr. Vince has visited firearms manufacturing facilities, audited FFLs, scrutinized

firearms industry safety and security procedures, and trained firearms industry personnel.

Exhibit 38, Exhibit A.

**RESPONSE:** Admit that these facts are true, but dispute to the extent they are meant to imply

that Mr. Vince has the expertise to comment on empirical issues presented by this case. *See*

Exhibit 7 at 85 (Kleck Dep.) (noting that Mr. Vince's experience in law enforcement has no

relevance to the factual issues in this case); *id.* at 86 (agreeing that Mr. Vince does not claim to

have "done any research on the effects of firearms availability on crime, suicide or gun

accidents or the impact of gun controls laws or firearms storage practices on these forms of

violence."); Exhibit 2 (Kleck Decl.), Exhibit I thereto, at 2. These shortcomings affect all of the

opinions Mr. Vince offers.

    **60-A.** Vince opines that "when firearms sales are allowed to occur, firearms frequently

fall into the hands of criminals or others who are not lawfully qualified to possess them." *Id.*

**RESPONSE:** Admit that Mr. Vince so opined, but dispute this opinion to the extent it is meant

to suggest that Chicago's law forbidding firearms sales causes firearms to fall into the hands of

criminals and others who are not lawfully required to possess them less frequently than they otherwise would. *See* Exhibit 2 (Kleck Decl.), Exhibit I thereto, at 5 ("Vince also implies that banning gun sales in Chicago will reduce gun possession among the city's criminals and thereby reduce firearms crime, but does not city any research indicating that local sales bans have such effects. Existing evidence indicates that they do not.") (citations omitted). *See also* Chicago Exhibit 31 at xxxvi ("[T]he large majority of criminal firearms transactions do not involve conventional over-the-counter retail transactions . . . . That being the case, restrictions imposed at the point of retail sale cannot possibly have much of an effect."); Exhibit 31 at CITY 000024 – CITY 000025 (City of Chicago Committee on Police and Fire, June 18, 2010 Tr. of Hr'g) ("So there's a variety of ways to approach regulating gun dealers to insure that they're operating as safely as possible and to insure that guns are not making their way out onto the street from gun dealers as well.") (testimony of Robyn Thomas, Legal Community Against Violence); Exhibit 26 at CITY 000247 (City of Chicago Committee on Police and Fire, June 29, 2010 Tr. of Hr'g) ("the combination of a permitting system for firearm purchasers, as well as a registration system for the firearms that they possess, appears to be the most prudent way, set of policies to try to keep guns from leaking into the hands of dangerous individuals") (Testimony of Daniel Webster); Exhibit 28 at 88:1-8 (Reyes Dep.) (admitting that she has no empirical evidence that the ban on sales will enhances the public health, safety, and welfare); Response to Statement of Fact 51.

**60-B.** New York City investigation demonstrated that suburban dealers supplying large numbers of crime guns to New York did not follow federal laws and regulations. *Id.* at 17-18.

**RESPONSE:** Admit that Mr. Vince so opined. Mr. Vince does not supply any research or other description of the New York City investigation to support his allegations. At any rate, we

dispute Mr. Vince's opinion to the extent it is meant to suggest that corrupt dealers contribute significantly to the stock of guns possessed by criminals.  *See* Exhibit 2 (Kleck Decl.), Exhibit I thereto, at 6 (" 'Bad' FFLs are of virtually no significance in supplying guns to criminals, directly or indirectly."); Exhibit 30 at 1294 (Gary Kleck et al., *The Myth of Big-Time Gun Trafficking*, 56 UCLA L. REV. 1233 (2009)) ("the belief that . . . corrupt licensed gun dealers . . . significantly contribute to the arming of America's criminals is a myth"); Exhibit 13 at 71-72 (Gorman Dep.) (admitting that "licensed firearms dealers knowingly engaging in illegal transactions" are not "a significant source of guns for criminals in Chicago").

**60-C.**  Further, in 1998, the CPD initiated "Operation Gunsmoke" to investigate the sales practices of suburban Chicago gun dealers who sold guns later identified as crime guns in Chicago.  *Id.* at 17.  Undercover officers posed as criminals or unqualified purchasers, and, "[r]epeatedly, [they] had minimal difficulty acquiring guns with little regard from dealers for the purchaser's ineligibility and/or nefarious reason or purpose." *Id.*  "Several dealers were willing to make the sale nonetheless and even provided advice to those acting as customers about how to make an illegal purchase."  Exhibit 13, Exhibit A thereto, at 11.

**RESPONSE:**  Admit that Mr. Vince and Dr. Cook gave the cited testimony regarding "Operation Gunsmoke," but dispute that this evidence establishes that corrupt dealers account for any significant share or crime guns, in Chicago or elsewhere.  "Since citing 'several' anecdotal cases cannot support a claim that such misconduct is common among FFLs, the relevance of these cases to Chicago's ban on local handgun sales is unclear."  Exhibit 2 (Kleck Decl.), Exhibit I thereto, at 34.  *See also* Exhibit 3 at 178 (Cook Dep.) (admitting that "based on our trace data . . . [the] flow of guns from the suburbs into the city is not accounting for a large percentage of the guns that are being used in crime"); Exhibit 13 at 71-72 (Gorman Dep.) (admitting that "licensed

firearms dealers knowingly engaging in illegal transactions" are not "a significant source of guns for criminals in Chicago").

**61.** For example, B&H Sports, Ltd., in Oak Lawn, Illinois ("B&H") sold guns to buyers even though the buyers lacked a FOID card and stated that they were otherwise ineligible to get one.  Exhibit 40 ("Operation Gunsmoke" documents) at CITY 006321-23, 6342-44. To complete the transaction, B&H fraudulently completed an ATF Form 4473, indicating that another individual was the purchaser of the firearm, even though B&H knew that another who could not legally buy the firearm was the actual purchaser. *Id.* at CITY 006342-44. B&H also sold a gun in violation of the waiting period required by 720 ILCS 5/24-3(g). *Id.* at CITY 006348-53, 006262-66.

**RESPONSE:**  The cited "Operation Gunsmoke" documents speak for themselves, and we dispute this finding to the extent it mischaracterizes those documents.  We further dispute this finding to the extent it suggests that corrupt dealers account for any significant share or crime guns, in Chicago or elsewhere.  "Since citing 'several' anecdotal cases cannot support a claim that such misconduct is common among FFLs, the relevance of these cases to Chicago's ban on local handgun sales is unclear."  Exhibit 2 (Kleck Decl.), Exhibit I thereto, at 34.  *See also* Exhibit 3 at 178 (Cook Dep.) (admitting that "based on our trace data . . . [the] flow of guns from the suburbs into the city is not accounting for a large percentage of the guns that are being used in crime."); Exhibit 13 at 71-72 (Gorman Dep.) (admitting that "licensed firearms dealers knowingly engaging in illegal transactions" are not "a significant source of guns for criminals in Chicago"); Response to Statement of Fact 60.  At any rate, even if these documents did demonstrate "that police investigations were able to successfully identify . . . corrupt FFLs operating in the Chicago area," it "could be regarded as evidence that sales bans are *not*

59

necessary and that ordinary regulation and law enforcement activities can effectively regulate gun commerce in Chicago." Exhibit 2 (Kleck Decl.), Exhibit I thereto, at 34.

62.     Undercover officers also visited Midwest Sporting Goods in Lyons, Illinois, Suburban Sporting Goods in Melrose Park, Illinois, Chicago Ridge Gun Shop & Range, Inc. in Chicago Ridge, Illinois, and Chuck's Gun Shop and Pistol Range in Riverdale, Illinois. Although the undercover officer purchasing the firearm made it clear that the firearm was for another person, these stores still made the sale without determining whether the actual purchaser had a FOID card and was otherwise qualified to possess the firearm. *Id.* at CITY 005459-62, 005212-14, 006070-72, 005027-29.

**RESPONSE:** See our response to Statement of Fact 61.

63.     On other occasions, store clerks would advise undercover agents seeking to purchase multiple firearms to stagger their purchases over a number of days so that the clerk would not have to notify the ATF of the sale of multiple firearms. *Id.* at CITY 005870-71, 005862-64, 005874-76, 005301-05.

**RESPONSE:** See our response to Statement of Fact 61.

64.     Suburban Sporting Goods sold a gun after the purchaser examined the serial numbers on numerous firearms asked the clerk if they could withstand "a little metal work." *Id.* at CITY 005164-67. He purchased a .380 caliber semi-automatic pistol, informing the clerk that it was the one with which he could work. *Id.* at CITY 005166.

**RESPONSE:** See our response to Statement of Fact 61.

65.     A 2004 report by the U.S. Department of Justice's Office of the Inspector General ("DOJ Report") indicated that, for FFLs discovered to have violated federal law in 2002, the average number of violations per FFL was almost 70, and FFLs in the ATF's Chicago Field Division had

the highest average number of violations – 178.2 per FFL. Exhibit 41 (U.S. Department of Justice, Office of the Inspector General, Inspections of Firearms Dealers by the Bureau of Alcohol, Tobacco, Firearms and Explosives, Report No. I-2004-005 (July 2004)) at vi.

**RESPONSE:** Admitted.

**66- A.** A study of handgun dealers in the 20 largest U.S. cities having more than 10 dealers reported that "more than half were willing to sell a handgun even when it would be illegal to do so." Exhibit 42 (S.B. Sorenson & K.A. Vittles, Buying a handgun for someone else: firearms dealer willingness to sell, 9 Injury Prevention 147 (2003)) at 148-149. It found that 53% of dealers were willing to sell when the purchaser indicated that the gun was for another person (his or her boyfriend/girlfriend) who "needs" it. *Id.* at 148.

**RESPONSE:** Admit that the study found that 53% of dealers were willing to sell when the purchaser indicated that the gun was for another person who needs it and admit that the study characterized these agreed-to sales as "illegal." Dispute that these were unambiguously illegal sales. As the study recognizes, federal law permits a person to purchase a firearm as a gift for another person. Chicago Exhibit 42 at 148 ("Under federal law, licensed firearm dealers may legally sell a firearm to any person who is not a prohibited purchaser . . . including guns that will be given as a gift."). And the "boyfriend/girlfriend needs it" question was designed to be "intentionally ambiguous." *Id.* The DOJ Report characterized the study as finding that "up to 20% of gun dealers exhibited a willingness to likely prohibited persons obtain guns through straw purchases." Chicago Exhibit 41 at 27. Furthermore, the study did not involve *actual* sales, but rather an expressed *willingness* to sell by dealers over the telephone. As the authors conceded, "dealers' stated intent may not correspond to their actual behavior." *Id*. at 149. And the authors did not even verify that the dealers they studied were licensed dealers. *Id.*

61

**66-B.** Even when the purchaser expressly indicated that the purchase was one prohibited by law – i.e., by saying "[m]y girl/boyfriend needs me to buy her/him a handgun because s/he isn't allowed to" – 4 out of 20 dealers agreed to the sale. *Id.* at 149-150.

**RESPONSE:** Admit in the sense that only 4 out of 20 dealers did not "respond[] with an unequivocal 'no' and comment[] about such a purchase being clearly illegal, a straw purchase, etc." Chicago Exhibit 42 at 150. As noted above, dispute that any illegal sales actually took place. The authors also noted that their findings ran counter to a GAO investigation finding that "almost all FFLs adhered to federal and state firearm purchase laws." *Id.*

**66-C.** The DOJ Report cited this study as "highlight[ing] . . . the need to better identify the potential universe of dealers involved in gun trafficking." Exhibit 41 at 27.

**RESPONSE:** Admitted.

**67.** A study of California handgun dealers that averaged at least 50 handgun sales annually reported that 20% of dealers "agreed to assist a potential handgun buyer with a transaction that had many attributes of an illegal surrogate or 'straw' purchase. Others, while saying no, offered the buyer concrete assistance in completing a purchase they appeared to understand was against the law." Exhibit 43 (G. Wintemute, Firearm Retailers' Willingness to Participate in an Illegal Gun Purchase, 87(5) Journal of Urban Health 865-78 (2010)) at 872. The study observed that this percentage is less than the 53% found in the Sorensen & Vittles study described in Paragraph 66, supra, but stated that California "regulates and polices gun commerce to a degree that is perhaps unique," noting that, in California, retailers must have state licenses, the state has its own retailer inspection program, and "enforcement is generally more active than elsewhere." *Id.* at 872, 876.

**RESPONSE:** Admit that the study described its findings in this manner. As with the prior study, however, these were not unambiguously illegal sales. *See* Chicago Exhibit 43 at 873, 876 (noting "ambiguity of the question we posed to retailers" and that "an unexpectedly high number of retailers understood the transaction to be a gift"). And as with the prior study, this study did not involve actual sales but rather telephone conversations. *See id.* at 867-68.

     **68-A.** The ATF has concluded that, "[c]learly, FFLs' access to large numbers of firearms makes them a particular threat to public safety when they fail to comply with the law." Exhibit 44 (June 2000 ATF Following the Gun: Enforcing Federal Laws Against Firearms Traffickers)), at ix, x. A 2000 ATF examination of 1,530 firearms trafficking investigations between July 1996 through December 1998 ("2000 ATF Report") found that "[a]lthough corrupt FFLs are relatively rare, they are associated with the diversion of large volumes of firearms." Exhibit 44 at 10, 28.

**RESPONSE:** Admit that cited ATF report includes the quoted language. Dispute that corrupt FFLs are a significant source of crime guns. *See* Exhibit 2 (Kleck Decl.), Exhibit I thereto, at 34 ("corrupt . . . FFLs are extremely rare, and are unimportant as sources of crime guns"); *id.* at 28 (the 2000 ATF Report "is not relevant" to the question of how criminals get guns); Exhibit 30 at 1294 (Gary Kleck et al., *The Myth of Big-Time Gun Trafficking*, 56 UCLA L. REV. 1233 (2009)) ("the belief that . . . corrupt licensed gun dealers . . . significantly contribute to the arming of America's criminals is a myth").

     **68-B.** Another ATF report found that in 2000, "[i]n all jurisdictions, many traceable crime guns were first purchased from a small number of Federally licensed gun dealers." Exhibit 45 (July 2002 ATF Crime Gun Trace Report - National) at 46. In general, less than 1% of firearms dealers contribute 60% of crime guns. Exhibit 39 at 55:15-19.

**RESPONSE:** Dispute that less than 1% of firearms dealers contribute to 60% of crime guns. Rather, "in 1998, 1.2 percent of dealers accounted for 57% of all guns that *were submitted by law enforcement agencies for tracing*" to the ATF, Chicago Exhibit 13, Exhibit A thereto, at 11, and traced crime guns are not a representative sample of all crime guns. *See* Exhibit 7 at 80 (Kleck Dep.) (ATF trace data "concern samples of crime guns that are not representative of crime guns in general"); Exhibit 3 at 140 (Cook Dep.) (admitting that "there is then a variety of ways in which those guns which are successfully traced might not be representative"); *id*. at 140 (admitting that "there's no perfect match between those that are successfully traced . . . and the original population that you're talking about, which is all guns used in crime"). Also dispute any implication that a high trace count evinces dealer involvement in trafficking or any other misconduct. *See* Exhibit 2 (Kleck Decl.), Exhibit I thereto, at 33 ("To date, there is no research whatsoever that indicates that, once on accounts for sales volume and local crime rates, dealer misconduct is responsible for any nonnegligible part of the disproportionate share of traced crime guns for which a few dealers account."); Exhibit 30 at 1268-70 (Gary Kleck et al., *The Myth of Big-Time Gun Trafficking*, 56 UCLA L. REV. 1233 (2009)); Exhibit 3 at 141 (Cook Dep.) (admitting that standard trace analysis does not show whether a firearm has been trafficked); *id.* at 219-20 (admitting that "the fact that a gun was traced to an FFL isn't proof that the FFL did anything wrong"). Indeed, the cited ATF report found that "few crime gun possessors bought their guns directly from federally licensed gun dealers . . . . About 88 percent of traced crime guns changed hands at least once before recovery by law enforcement as crime guns." Chicago Exhibit 45 at ix.

**69-A.** In 2000, 936 FFLs were identified through a gun trace as having sold a gun that was recovered in Chicago as a crime gun. Exhibit 37 at 17. 1.3% of those FFLs – 12 out of 936

– accounted for 41% of the traces (1,111 of 2,723), an average of 93 traces per FFL.  *Id.*  3.3% –

31 out of 936 – accounted for 51% of the traces (1,386 of 2,723), an average of 45 traces per

FFL.  *Id.*

**RESPONSE:**  Admit that the cited report so found, but dispute that this data evinces dealer

involvement in trafficking or other misconduct.  *See* Response to Statement of Fact 68.  Indeed,

the report found that "*more than 97%* of Chicago crime guns changed hands at least once before

reaching the crime gun possessor"; *i.e.*, "few crime gun possessors bought their guns directly

from federally licensed gun dealers."  Chicago Exhibit 37 at 5.

    **69-B.**  In 2000, 10 FFLs accounted for 70% of traceable crime guns in Indianapolis; 5

FFLs accounted for 65% of traceable crime guns in Gary; 4 FFLs accounted for 53% of traceable

crime guns in Milwaukee.  Exhibit 45 at 46.

**RESPONSE:**  Admit that the cited report so found, but dispute that this data evinces dealer

involvement in trafficking or other misconduct.  *See* Response to Statement of Fact 68.

    **70.**  The 2000 ATF Report found that "[t]he most frequent type of trafficking channel

identified . . . is straw purchasing from [FFLs]. Nearly 50 percent of the ATF investigations

involved firearms being trafficked by straw purchasers either directly or indirectly."  Exhibit 44

at 10.  A straw purchaser is "[a] person illegally purchasing a firearm from a [FFL] for another

person, including for unlicensed sellers, criminal users, juveniles, and other prohibited

possessors. Straw purchasers may be friends, associates, relatives, or members of the same

gang."  Exhibit 45 at A-6.

**RESPONSE:**  Admit that the cited ATF report so found, but dispute that this establishes that

straw purchases are a significant source of crime guns.  As an initial matter, figures such as these

"merely reflect where ATF focused its investigative efforts," and are not representative of all

crime guns. Exhibit 2 (Kleck Decl.), Exhibit I thereto, at 34. Furthermore, "even some scholars who have adopted the theory that traffickers use straw purchasers to acquire guns from FFLs concede that criminals rarely use straw purchases from FFLs to obtain guns for themselves." Exhibit 30 at 1253 (Gary Kleck et al., *The Myth of Big-Time Gun Trafficking*, 56 UCLA L. REV. 1233 (2009)). *See* Chicago Exhibit 12 at F567 n.19 (finding "that straw purchasing is rare in Chicago's underground gun market"); Exhibit 29 at 66 (Daniel W. Webster et al., *How Delinquent Youths Acquire Guns*, 79 J. URBAN HEALTH 60 (March 2002)) ("only 3 of the more than 50 gun acquisitions described by respondents in the study involved the juvenile instigating a straw purchase from a licensed gun dealer").

**71.** The 2000 ATF Report also documented trafficking by FFLs directly. It noted that "[l]icensed dealers, including pawnbrokers, have access to a large volume of firearms, so a corrupt licensed dealer can illegally divert large numbers of firearms. Although FFL traffickers were involved in the smallest proportion of ATF trafficking investigations, under 10 percent, FFL traffickers were associated with by far the highest mean number of illegally diverted firearms per investigation, over 350, and the largest total number of illegally diverted firearms, as compared to the other trafficking channels." *Id.* at ix, 12. The report found that 25,741 diverted firearms were trafficked by straw purchasers, and 40,365 were trafficked by licensed dealers. *Id.* at 13. Of the 133 investigations involving illegal diversion from an FFL, 26 percent (35 of 133) involved the FFL's transfer of firearms to prohibited persons, such as felons and juveniles, 24 percent (32 of 133) involved straw purchasing, and 19 percent (25 of 133) involved FFLs making false entries in their acquisition and disposition record book. *Id.* at 28, 29.

**RESPONSE:** Admit that the 2000 ATF report so found, but dispute that these findings represent documentation of "trafficking by FFLs directly." While these 133 cases are described

66

as involving "illegal diversion of firearms by a federally licensed firearm dealer," Chicago

Exhibit 44 at 28, the report does not indicate that the licensees intended to traffic in firearms.

For example, many of the investigations involved recordkeeping violations that are mere

"misdemeanor offenses." *Id*. And even in the cases that involved FFLs transferring firearms to

prohibited persons or straw purchasing, the report does not indicate that these transfers were

knowingly or intentionally made to a prohibited person or a straw purchaser. *Id*. These were

also not proven violations; as the report acknowledges they were "observed but not necessarily

presented as charges for prosecution." *Id*. at 29.

Furthermore, we dispute that the 2000 ATF report is relevant to the question of how criminals

generally get guns. *See* Exhibit 2 (Kleck Decl.), Exhibit I thereto, at 28 (critiquing Dr. Cook's

reliance on this study because "data concerning the guns that ATF comes across in the course of

its investigations cannot legitimately be considered to be in any way representative of all crime

guns or even those recovered by police" and thus that this source is not "relevant to th[e]

question" of "how criminals get guns"); Exhibit 30 at 1246-48 (Gary Kleck et al., *The Myth of

Big-Time Gun Trafficking*, 56 UCLA L. REV. 1233 (2009)).

    **72-A.** Sergeant Kevin Johnson of the CPD's Chicago Anti-Gun Enforcement ("CAGE")

Team, whose primary purpose is to investigate illegal firearms trafficking in Chicago, testified

that gun stores create an opportunity for guns to be stolen. Exhibit 47 (Deposition of Kevin

Johnson) at 11:13-15, 93:5-10.

**RESPONSE:** Admit that Sergeant Johnson so testified, that he is with the CAGE team, and tha

the CAGE team's primary purpose is to investigate illegal firearms trafficking in Chicago, but

dispute that his testimony supports any implication that permitting gun stores in Chicago would

increase the number of illegal firearms in the City. *See* Exhibit 22 at 67:22-68:4 (Johnson Dep.)

(admitting that "the number of guns that are making their way onto the city streets" is not "responsive to changes in local law"); *id.* at 83:16-19 (admitting that CAGE team does not "have any empirical evidence whatsoever that banning gun sales reduces the size of the illegal gun market"); *id.* at 93:24-94:5 (admitting that he does not have "any evidence, empirical or otherwise, that the stores selling firearms operating in a particular community leads to an increase in the size of the illegal firearms market in that community").

**72-B.** In January 2012, 195 handguns were stolen from Maxon's in Des Plaines, Illinois. Exhibit 10, ¶ 39. In December 2011, 33 firearms were stolen from Deb's Gun Range in Hammond, IN. Exhibit 48 (ATF News Release). In February 2011, 26 firearms were stolen in a break-in at Freddie Bear Sports, a Tinley Park, IL gun store. Exhibit 47 at 92:24-93:4; Exhibit 49 (Tinley Park police reports) at CITY 004921. A couple of years ago, Chuck's was the victim of an attempted break-in. Exhibit 35 at 10:5-10, 25:18-21. Illinois Gun Works has been the victim of a break-in. Exhibit 36 at 18:12-18. From 1998-1999, firearms were stolen from at least 9 dealers in Cook County. Exhibit 50 (Illinois - State, Local, ATF Report) at 18.

**RESPONSE:** With the exception of the Illinois Gun Works incident and the incidents reported in Chicago's Exhibit 50, admit that these incidents have taken place. The deposition testimony of Henry Rush on behalf of Illinois Gun Works included in Chicago's exhibit is from the *Ezell* litigation, and it does not have anything to do with break-ins. Mr. Rush was deposed in this case, and he testified that he did not know whether Illinois Gun Works has ever been the victim of a break-in or a robbery, although he has "heard" that "longer than ten years ago there was a break-in." Exhibit 33 at 18:12-18 (Rush Dep.).. The copy in the record of the cited page of Chicago's Exhibit 50 dealing with thefts from firearms dealers in Cook County is for the most part illegible; we can make out the partial name of only two firearms dealers. If the document does in fact

report that firearms were reported stolen from 9 dealers in Cook County, we do not dispute that

fact.

Also dispute that these incidents demonstrate that thefts from gun dealers are a significant source

of crime guns. These "anecdotal . . . and unscientific" examples "can reveal nothing about the

consequences of Chicago's restrictions on guns," nor about the degree to which thefts from gun

stores contribute to the number of guns possessed by criminals. *See* Exhibit 2 (Kleck Decl.),

Exhibit I thereto, at 2. Furthermore, in at least some of these cases no firearms were taken or

firearms that were taken were quickly recovered, *see* Chicago Exhibit 49 at CITY 004921 ("all

26 handguns that were stolen in reference to this incident were recovered and accounted for");

Chicago Exhibit 35 at 25:18-26:5 (recalling a single unsuccessful break-in at Chuck's Guns), and

this evidence hardly goes to show that robberies and break-ins at gun stores are common or a

significant source of crime guns, *see, e.g.*, Exhibit 34 at 8:9-14 (Riggio Dep.) (Chuck's Guns

opened in 1968); Exhibit 33 at 18:12-20 (Rush Dep.) (no break-ins or robberies at Illinois Gun

Works in the past 10 years); Chicago Exhibit 50 at 2 (Chicago PD submitted 18,763 crime gun

traces in 1999).

**73.** In February 2012, more than 80 firearms were stolen from an Ohio gun store.

Exhibit 51 (ATF and DOJ news releases). In December 2011, 43 firearms were stolen from a

Roanoke, VA gun store. *Id.* In November 2011, 90 firearms were stolen from a Pennsylvania

gun store. *Id.* In November 2011, a total of 17 firearms were stolen from two Lincoln, Nebraska

gun stores. Exhibit 52 (August 2011 Sacramento Bee article). In August 2011, 22 firearms were

stolen from a Henderson, Nevada gun store. Exhibit 51. In July 2011, 19 firearms were stolen

from a gun store in Raleigh, North Carolina. *Id.* In July 2011, 27 firearms were stolen from the

Fort Irwin Army Post in Fort Irwin, California. *Id.* In April 2011, firearms were stolen from a

Kentucky gun store. *Id.* March 2011, 12 firearms were stolen from a Florida gun store, the second time in 18 months the store had been burglarized. *Id.* In February 2011, 15 firearms were stolen from a Michigan gun store. *Id.* In December 2010, 73 firearms were stolen from a North Carolina gun store. *Id.* In August 2010, 58 firearms were stolen from an Ohio gun store. *Id.* In March 2010, 20 firearms were stolen from a Wisconsin gun store. *Id.*

**RESPONSE:** Admit that these incidents took place, but for the reasons cited in response to Statement of Fact 72 dispute that they demonstrate that thefts from gun dealers are a significant source of crime guns. Indeed, the incidents cited in this finding report a total of about 500 firearms stolen from dealers across the United States over a nearly two-year period of time. Each year from 2001 to 2010, members of the Chicago Police Department alone recovered at least 9,856 guns. Exhibit 35 at 22 (Chicago Police Department, 2010 Annual Report); Exhibit 22 at 38:18-39:12 (Johnson Dep.) (less than 10% of firearms recovered are recovered from lawful owners). And each year in the United States, more than 500,000 firearms are stolen in the United States from all sources. Chicago Exhibit 12 at F561. From 2008 to 2010, firearms dealers reported an average of about 20,700 firearms lost or stolen. *See* Exhibit 36 at 2 (ATF, Federal Firearms Licensee Statistics, Theft/Loss Reports, Calendar Years 2008 – 2010). Even if one were to assume that *all* of these lost or stolen firearms were stolen, this would still represent only about 4% of the total number of stolen guns.

74.    William Campion, a member of Plaintiff ILAFR and the owner and operator of Camco Sales and Service, a gun dealership, does not store firearms in his shop because the potential for burglary of the firearms presents a "safety concern." Exhibit 53 (Deposition of William Campion) at 7:13-22, 33:8-17, 35:2-6, 50:21-51:5, 67:22-68:12.

**RESPONSE:** Admit that Mr. Campion does not store firearms in his shop, but dispute that this is because storing firearms is necessarily unsafe. Mr. Campion does store firearms, but he stores them in a safe in an "adjacent building" rather than in his shop itself because the safe "is just too big" to put in the store; his "safety concern" is that he doesn't "have the safe in the store." Chicago Exhibit 53 at 33:12-34:8, 35:14-20. *See also id.* at 67:17-21. Also dispute that Mr. Campion's concerns about burglary are unique to firearms stores. *See id.* at 68:1-3 ("As with any business, the potential for burglary is there.").

**75.** In May 2010, at least 21 firearms were stolen from the Harvey, Illinois police department's shooting range. Exhibit 54 (Deposition of Eugene Williams) at 56:21-24; Exhibit 55 (Chicago Tribune article). Chief Williams testified that if criminals are willing to steal guns from a police department facility, they would be willing to steal guns from a civilian gun store. Exhibit 54 at 57:1-11.

**RESPONSE:** Admit that this incident took place. "Law enforcement sources said the shooting range wasn't a secure facility and isn't equipped for storing weapons." Chicago Exhibit 55. Days later, "most of the weapons that were stolen" were found in "a wooded area on the north side of town," where "it appeared someone had tried to bury the weapons." *See* Exhibit 37 (John Garcia, *Most guns stolen from Harvey gun range recovered*, abclocal.go.com, May 12, 2010). Further admit that Chief Williams gave the cited testimony in response to leading questioning. *See* Chicago Exhibit 54 at 57:1-11, Exhibit 15 at 47:20-22 (Williams Dep.). Dispute that this lone piece of anecdotal evidence establishes anything about the likely consequences of permitted gun sales in the City of Chicago, or that it supports banning firearms sales in the City. *See* Exhibit 2 (Kleck Decl.), Exhibit I thereto, at 2; Exhibit 15 at 63:13-23 (Williams Dep.) (admitting that the Chicago Police Department continues to operate shooting ranges); Exhibit 37

71

(John Garcia, *Most guns stolen from Harvey gun range recovered*, abclocal.go.com, May 12, 2010) (reporting that although some wanted to close the range, "the mayor says they will make changes to make it more secure in the future").

**76-A.** Chief Williams testified that the kinds of intimidation, escalation, and deadly gun use that has taken place in public in Chicago could take place in the parking lots or other gathering spaces around gun stores located in Chicago. *Id.* at 55:2-19.

**RESPONSE:** Admit that Chief Williams so testified in response to leading questioning. *See* Chicago Exhibit 54 at 55:2-19, Exhibit 15 at 47:20-22 (Williams Dep.). But, for the reasons cited in response to Chief Williams' testimony about gun use outside of the home, *see* Response to Statement of Fact 35, dispute that Chief Williams' concerns are well-founded. Indeed, even if Plaintiffs prevail in this case it will still be unlawful to carry an operable firearm in "gathering spaces around gun stores located in Chicago," so Chief Williams' concerns are even less supported in this context.

**76-B.** Commander Gorman testified that if gun stores were allowed in Chicago "patrons coming from gun stores would be targeted for theft and/or violent crime by gang members seeking to obtain a firearm. In addition to increasing violent crime in Chicago, it would increase the availability of guns for sale on the illegal market and would do so more quickly." Exhibit 10, ¶ 41.

**RESPONSE:** Admit that Commander Gorman so testified, but dispute his conclusions. Criminals tend to avoid, not target, potential victims who are armed. *See* Chicago Exhibit 31 at 146 (56% of convicted felons agreed or strongly agreed that "a criminal is not going to mess around with a victim he knows is armed with a gun"; 74% agreed or strongly agreed that "one reason burglars avoid houses when people are at home is that they fear being shot"); Exhibit 13

at 46:1-5 (Gorman Dep.) (admitting that in his experience, "if a gang member knows that a person has a firearm," it is "a deterrent from a gang member assaulting that person"). Steven Elliot, President of C&E Gun Shows, states that in 25 years of organizing gun shows he is not aware of a single patron or vendor being targeted for theft going to or from one of his shows. Exhibit 38 ¶ 13 (Elliot Decl.) Just last year, over 300,000 people attended shows put on by C&E Gun Shows. *Id.* ¶ 3. In addition, "the availability of guns in a jurisdiction does not have an effect on the volume or rate of robbery or assault." Exhibit 3 at 73 (Cook Dep.).

Further, even if a certain number of gun store patrons were targeted for theft by gang members, that fact, standing alone, does not establish that on balance violent crime in Chicago would increase or that more guns would be available for sale on the illegal market more quickly if gun stores were allowed. For example, Commander Gorman does not account for evidence that "gun ownership among criminals is already 'saturated'—everyone who wants one has one," and he "completely ignores the issue of crimes deterred by gun ownership and carrying," Exhibit 2 (Kleck Decl.), Exhibit I thereto, at 21, 45. In other words, Commander Gorman's conclusion is a *non sequitur*.

At any rate, Commander Gorman admitted that he has never reviewed research regarding whether "cities that prevent sales of firearms have greater problems with gun violence than cities that do not permit the sale of firearms." Exhibit 13 at 66 (Gorman Dep.).

77. Dr. Cook testified that "the fact that there are no FFLs within city limits [in Chicago] makes illegal transactions from an FFL somewhat more difficult for youths and criminals." Exhibit 13, Exhibit A thereto, at 12. Just like now, it was the case at the time of the 2007 Chicago Study that a Chicago resident "seeking to buy a firearm of any sort must travel outside of city limits." Exhibit 12 at F561. The study noted that "any Chicago resident can

73

identify the location of numerous licensed suburban gun dealers with a quick search of the local phone directory or the Internet." *Id.* at F566. The study reported, however, that guns recently purchased (i.e., within three years) at suburban Cook County dealers accounted for only 11% of confiscated crime guns. *Id.* at F566-67.

**RESPONSE:** Admit that Dr. Cook so testified and that the 2007 Chicago Study included the cited findings. Dispute, however, that the 2007 Chicago Study attributed inefficiencies in Chicago's underground gun market to the City's gun regulations. *See* Chicago Exhibit 12 at F560 ("Chicago's handgun ban . . . was ineffective in reducing the prevalence of gun ownership in the City. The frictions we observe in the underground market are more likely due to the general scarcity of guns in the city (gun ownership rates are quite low, a fact that predates the ban) and on Chicago's emphasis on anti-gun policing."); *id.* at F573 ("To the extent to which Chicago's gun market works less well than in other places, the most likely explanations are the city's low rate of household gun ownership and police emphasis on guns, rather than the city's ban on private possession of handguns."); Exhibit 3 at 147:1-9 (Cook Dep.) (admitting that "at the end of the day we could not say with confidence" that "the regulations that were in place at that time in the City of Chicago" were responsible for difficulty criminals encountered in obtaining guns).

Furthermore, Chicago's own evidence shows that the "time-to-crime" rate for crime guns in Chicago is nearly identical to the national rate. *See* Chicago Exhibit 37 at 5 ("The median time-to-crime for guns traced from Chicago, where time-to-crime could be determined was 6.2 years, as compared to the national median of 6.1 years.").

**78- A.** Dr. Cook testified that "[a] partial explanation for why active criminals do not acquire guns at suburban FFLs" is that, as found in the study, they rarely leave their own

neighborhood. Exhibit 13, Exhibit A thereto, at 12. The 2007 Chicago Study reported that the

studied neighborhoods "are notorious for having among the city's most powerful street gangs,"

and that the residents "are very parochial, perhaps because gang turf increases the risks of

travel[]ing to other areas." Exhibit 12 at F566, F572.

**RESPONSE:** Admit that Dr. Cook so testified, and that the 2007 Chicago Study includes the

cited findings. Dispute, however, any implication that the 2007 Chicago study found that "active

criminals" in particular rarely leave their own neighborhoods. Rather, it found that "the

*residents* of [the studied] neighborhoods are very parochial, perhaps because gang turf increases

the risks of traveling to other areas." Chicago Exhibit 12 at F566. Also admit that the study

offered this as a "partial" explanation. "Another possible explanation is that [FFLs] are by law

required to record the identity of the official purchaser, which increases the legal risk associated

with buying a gun from a dealer (even if one's girlfriend or wife makes a straw purchase)." *Id.*

at F566 n.18. At any rate, in the end the 2007 Chicago Study concluded that "neighbourhood-

specific factors cannot be a very important explanation for the transactions costs documented" by

the study. *Id.* at F573.

     **78 –B.** In fact, Dr. Kleck recognizes that being a gang member is "an obstacle" to a

person leaving their neighborhood. Exhibit 14 at 436:7-12. Other things being equal, an

individual who does not have a gang affiliation "probably would have an easier time . . . crossing

through other neighborhoods" than one who does. *Id.* at 436:2-6. Commander Gorman testified

that a gang member traveling to a suburban gun store involves "great risk because it involves

crossing gang and gang faction boundaries both in Chicago and its suburbs (because Chicago-

based gangs also operate in many surrounding suburbs)." Exhibit 10, ¶ 38. He testified that

therefore "trips by gang members to suburban gun stores require significant planning and

forethought" and that "the risks of making such a trip, and the preparation needed to alleviate those risks, cause some gang members, particularly those acting alone, sporadically, or in a small group, to forego making a trip to a suburban store." *Id.*

**RESPONSE:** Admit that Dr. Kleck and Commander Gorman so testified, but dispute any implication that individuals living low-income or crime-ridden neighborhoods that are not gang members do not face obstacles to traveling outside of the neighborhood. The 2007 Chicago Study, as we have explained, says that the residents of such neighborhoods potentially face risk in traveling outside the neighborhood. *See* Chicago Exhibit 12 at F566. And in addition to the cited testimony, Dr. Kleck also testified that sales ban places "a more significant burden, in particular, on law-abiding low-income residents." Exhibit 7 at 434:19-24 (Kleck Dep.).

**79-A.** Dr. Cook opines that "were FFLs free to operate in the City, these criminals would be more likely to acquire guns from an FFL." Exhibit 13, Exhibit A thereto, at 12.

**RESPONSE:** Admit that Dr. Cook so opined, but dispute the validity of his opinion, which is based on a single source interviewed in connection with the 2007 Chicago Study who said that "people like him rarely left their own neighborhood," which "suggests" that this would be the case. Chicago Exhibit 13, Exhibit A thereto, at 12. In the 2007 Chicago Study, Dr. Cook also offered "another possible explanation" for the low incidence of criminals purchasing guns at suburban gun stores: "[FFLs] are by law required to record the identity of the official purchaser, which increases the legal risk associated with buying a gun from a dealer." Chicago Exhibit 12 at F566 n.18. This explanation, of course, undermines the conclusion that more criminals would buy firearms from gun stores if they operated in the City. And this explanation is consistent with the evidence that criminals rarely acquire their guns by buying them from a retail outlet. *See* Chicago Exhibit 31 at xxxvi. At any rate, even if criminals would be more likely to acquire guns

76

from FFLs if they operated in the City, it does not follow that criminals would be more likely to acquire more guns, period. And Chicago admits that it is already easy for criminals to obtain guns. *See* Response to Statement of Fact 51; AF 6.

**79-B.** Commander Gorman testified that allowing gun stores in Chicago "would therefore increase the likelihood that a gang member will acquire a firearm or that stolen firearms will enter the illegal gun market" because "[a] gang member needing to travel only a few blocks or miles, all while in Chicago, would have less risk to visit a gun store compared to having to travel to a suburban store, and would need less time to prepare." Exhibit 10, ¶ 38.

**RESPONSE:** Admit that Commander Gorman so testified, but dispute his opinion that allowing gun stores in Chicago would entail any significant increase in the likelihood that a gang member will acquire firearms or that stolen firearms will enter the illegal gun market. Despite the sales ban, it is not difficult for gang members in Chicago to obtain firearms. *See* Response to Finding of Fact 51.

**80-A.** The DOJ Report observed that "the preponderance of crime guns are recovered in the same geographic area in which they were originally sold by an FFL." Exhibit 41 at 24.

**RESPONSE:** Admit that the DOJ report so observed, based on ATF data. Dispute that this ATF data—which is presumably based on trace data—is representative of all crime guns. *See* Exhibit 7 at 80 (Kleck Dep.) (noting that ATF trace data "concern samples of crime guns that are not representative of crime guns in general that have been basically selected samples."). Also dispute any implication that the undefined term "geographic area" is limited to the city in which an FFL is located. According to the ATF, at the national level "a majority of crime guns among all age groups . . . were first purchased from FFLs *in the State* where the guns were recovered by law enforcement." Chicago Exhibit 45 at 41. Indeed, more recovered crime guns were from

77

out-of-state sources ("more than 40 percent") than from sources in the same county ("35 percent"). *Id*.

**80-B.**    FFLs operating in a high-crime area "expos[e] that neighborhood to more gun crime than might be true for a rural dealer." Exhibit 15 at 221:18-23. Dr. Kleck testified that because "Chicago is a high crime area," "if there were FFLs in [Chicago] . . . a larger fraction of guns sold by [Chicago FFLs] would make it into the illegal market than for . . . FFLs that were not located in a high crime area." Exhibit 14 at 163:10-19.

**RESPONSE:**  Admit to the extent that, all other things being equal, guns sold by FFLs operating in high crime areas are more likely to eventually be stolen by criminals than guns sold by FFLs operating in low-crime areas. *See* Exhibit 2 (Kleck Decl.), Exhibit I thereto, at 33 ("[S]ome dealers do business in areas with higher crime rates, and thus higher rates of residential burglary and gun theft. This means that no matter how closely they follow laws and ethical practices in selling guns, a higher fraction of their lawfully stolen guns will eventually be stolen."). Dispute any further implications of this finding. *See* Exhibit 2 (Kleck Decl.), Exhibit I thereto, at 32-35.

**81.**    A study of California handgun dealers that averaged at least 50 handgun sales annually reported that a dealer's location in an urban setting is a risk factor "strongly associated with handgun retailers' risk of disproportionate sales of guns that are later used in crimes." Exhibit 56 (G. Wintemute, Disproportionate sales of crime guns among licensed handgun retailers in the United States: a case-control study, 15 Injury Prevention 291-299 (2009)) at 296-97. The study reported an odds ratio over 5 for dealers located in an urban setting. *Id.* at 297.

**RESPONSE:**  Admitted that the study made these findings, but dispute that the study supports Chicago's sales ban. Indeed, the study concluded that "screening and focused enforcement could

help disrupt illegal gun commerce without unduly affecting the legitimate gun market." Chicago

Exhibit 56 at 298.

82. A 2009 study of a county's per capita rate of licensed firearm dealers and its rate

of firearm homicide found that "the relation between FFLs and gun homicide was found to vary

significantly by urbanization" and that "in major cities, a disproportionately high prevalence of

FFLs was associated with significantly higher gun homicide rates." Exhibit 57 (D. Wiebe et al.,)

Homicide and geographic access to gun dealers in the United States, BMC Public Health 9:199

(2009)) at CITY 000592. It found that "major cities having the most FFLs per capita also have

the highest rates of gun homicide." *Id.* at CITY 000593. The study observed that "[i]n major city

areas with higher crime rates, there will be greater criminal demand for guns and, hence, a larger

illegal market for guns. It thus seems more likely that a weapon sold in a major city, as compared

to one sold in another county type, will end up in the hands of a criminal user through theft,

straw purchase, gun trafficking, or some other kind of transaction in the secondhand market." *Id.*

at CITY 000595.

**RESPONSE:** Admit that the study found an association between FFLs and gun homicide rates

(not overall homicide rates) in major cities, but dispute that it found any causal relationship

between those variables. Indeed, the study expressly acknowledged that "it may be that high

rates of homicide may lead to increased demand for firearms and hence additional FFLs, in

which case the results of the 'FFL as risk factor' hypothesis that our models have been designed

to test would be spurious." Chicago Exhibit 57 at CITY 000596; *see also id.* (acknowledging

that alternative approaches would be needed to "remove from the models the influence of

circularity that may exist"). Because the study did nothing to account for this "causal order"

issue, "it is more likely that the association merely reflected the well-established fact that higher

crime rates motivate many people to acquire guns for protection." Exhibit 2 (Kleck Decl.), Exhibit I thereto, at 27; *see also id.* at 14-15 (addressing "causal order"). In addition, the authors acknowledged other limitations in the study. *See* Chicago Exhibit 57 at CITY 000596 (*e.g.*, "we could not account for the actual volume of firearms introduced by each FFL into the community").

**83.** A 2007 study, sponsored by the United States Department of Justice, studied crime guns sold by Maryland dealers and recovered in Baltimore and Washington, D.C. Exhibit 58 (Christopher Koper, Crime Gun Risk Factors: Buyer, Seller, Firearm, and Transaction Characteristics Associated with Gun Trafficking and Criminal Gun Use, Report to the National Institute of Justice, U.S. Department of Justice (2007)). It found the following:

- A dealer's distance to a city was the "primary characteristic of importance" as to whether a dealer is likely to sell a gun recovered as a crime gun in the city. *Id.* at 82.

- Guns sold by dealers operating within 5 miles of either city were over twice as likely to be recovered as were guns sold by dealers operating further than 20 miles from both cities, and this risk declined as a dealer's distance from both cities increased. *Id.* at 72.

- As to Baltimore specifically, "proximity to Baltimore stood out as the most powerful predictor" of whether a gun sold from a dealer would be recovered as a crime gun in Baltimore. Sales made by dealers in or within 5 miles of the city were about 2.6 times as likely to be recovered as were guns sold by dealers located more than 20 miles from the city. Risk levels were also substantially elevated, ranging from 1.5 times to 2 times more likely, for other dealers operating within 20 miles of the city. *Id.* at 74 & Table 46.

- As to Washington, D.C. specifically, a dealer's proximity to the city was an "important" factor as to whether a gun it sold was recovered as a crime gun. Relative to dealers

operating more than 20 miles from the city, risk levels were nearly 2.5 times higher for

dealers within 10 miles of the city and about 1.7 times higher for dealers located 11-15

miles from the city. *Id.* at 77 & Table 47.

- Dealers located within 20 miles of Baltimore sold 90% of the Maryland guns recovered

    in Baltimore; dealers located within 20 miles of D.C. sold 75% of the Maryland guns

    recovered in D.C. *Id.* at 5.

**RESPONSE:** Admit that the study included the cited findings, but dispute that it supports

Chicago's ban on gun sales. The authors expressly stated that "we must . . . be cautious about

generalizing these findings to other states." Chicago Exhibit 58 at 85. Furthermore, the authors

give a number of policy recommendations but never suggest banning gun dealers from operating

in cities, *id.* at 85-87 (*e.g.*, "emphasis should be given to the *monitoring* of large volume dealers

in urban areas"), and there were a number of other factors that were also important to whether a

gun ended up being recovered by police: "Guns were more likely to be recovered by police

when the buyers were black . . ., young, female or living in or close to Baltimore or D.C," *id.* at

82; *see also id.* at 79 ("Overall, the strongest predictor's tended to be the buyer's race, buyer's

area of residence, and the dealer's location."). At any rate, the study certainly offers no support

for the proposition that "stringent gun controls" such as Chicago's sales ban are effective:

"Despite having a handgun ban in place since the mid-1970s, D.C. has high levels of gun

violence. During the 1990s, . . . the city's murder rate ranked first or near the top among the

nation's largest cities." *Id*. at 18.

**84-A.** The ATF conducts compliance inspections to examine whether an FFL is

complying with federal firearms laws. Exhibit 59 (William J. Krouse, The Bureau of Alcohol,

Tobacco, Firearms and Explosives (ATF): Budget and Operations for FY 2011, Congressional

Research Service (June 6, 2011)) at 5. FFLs are required by federal law to verify that customers are not prohibited from possessing a firearm and to verify that customers are residents of the state in which the FFL is located. Exhibit 41 at 2. FFLs also are prohibited from knowingly transferring a firearm to an individual known to be prohibited from possessing a gun. *Id.* at 27 n.56. FFLs must verify the identity of potential customers by examining a government-issued identification document, such as a driver's license, and have the customer complete a Form 4473, Firearms Transaction Record, which captures data related to the purchaser and firearm(s) purchased. *Id.* at 2. FFLs are also required to request a query of the National Instant Criminal Background Check System (NICS) to confirm that the potential customers are not prohibited from purchasing firearms. *Id.* Federal law requires that FFLs maintain completed Forms 4473 as well as a log of all firearms that they have acquired and sold, known as an Acquisition and Disposition Book (A&D Book). *Id.* The A&D Book must contain information including a description of the firearm, the name and address of the person from whom the firearm was acquired and, once sold, the name and address of the purchaser and the date the gun was sold. *Id.* at 2-3. Combined, these record-keeping requirements are intended to deter the illegal transfer of firearms to prohibited persons. *Id.* at 3. The records kept by FFLs enable the ATF to trace firearms recovered by law enforcement agencies to learn when those firearms were purchased and by whom. *Id.* Inspection of the records also allows the ATF to uncover evidence of corrupt FFLs transferring firearms "off the books," straw purchases, and other patterns of suspicious behavior. Exhibit 59 at 12.

**RESPONSE:** Admit, except dispute any implication that every record-keeping error or oversight is evidence of a corrupt dealer. Here is the quote from Chicago's cited source, which certainly does not make such an allegation: "by inspective these records, ATF investigators are

often able to uncover evidence of corrupt FFLs transferring firearms 'off the books,' straw purchases, and other patterns of suspicious behavior."  Chicago Exhibit 59 at 12.

**86.**     A report by the U.S. Department of Justice's Office of the Inspector General ("OIG") "assessed the effectiveness of [ATF's] program for inspecting [FFLs] to ensure that they are complying with federal firearms laws and regulations."  Exhibit 41 at i.  The DOJ Report concluded that "the ATF's inspection program is not fully effective for ensuring that FFLs comply with federal firearms laws because inspections are infrequent and of inconsistent quality, and follow-up inspections and adverse actions have been sporadic."  *Id.*  Among other numerous detailed findings, the Report noted that:

- The ATF faces significant shortfalls in resources. *Id.* at ii.

- While the ATF's goal is to inspect each FFL at least once every three years, "most FFLs are inspected infrequently or not at all." In FY 2002, the ATF inspected only 4.5% of the approximately 104,000 FFLs for compliance with federal firearms laws. "At that rate, it would take the ATF more than 22 years to inspect all FFLs." *Id.* at iii. *See also id*. at xi.

- A sample of 100 FFLs that had been in business for an average of 11.2 years revealed that: in 23 cases, the ATF had never conducted a full compliance, application, or renewal inspection; in 22 cases, the ATF had conducted an application inspection but no further inspection even though these FFLs had been active for an average of 5.1 years; in 29 cases, while the ATF had conducted at least one compliance inspection on the FFL, the inspections occurred on average once every 9.2 years and the FFLs had been active for an average of 14.8 years; in 26 cases, the ATF had never conducted a compliance inspection but had conducted at least one renewal inspection, which occurred, on average, once every 6.9 years. *Id.* at 20-21.

- Even though "[l]arge-scale retailers sell a higher volume of guns than small dealers" and present "the potential for large numbers of improper sales," such retailers "are not inspected on a routine basis. *Id.* at 21. ATF supervisors indicated that "they avoid selecting large FFLs for compliance inspections because the large volume of records makes the inspections more difficult and time-consuming." *Id.* The nine-large scale dealers in the DOJ's sample were inspected roughly once every 9.9 years. *Id.* at 22. Five of those nine had never received a compliance inspection. *Id.*

- Even though ATF "focuses its inspections on those FFLs that exhibit most severely the established indicators of trafficking . . . it does not identify all FFLs that exhibit those indicators. Instead, the ATF manipulates the criteria it uses to target FFLs for inspection so that it only identifies as many such FFLs as it has the resources to inspect." *Id.* at iiiiv. *See also id.* at 23-24.

- "[T]he ATF overall did not focus its resources to conduct more inspections in those Field Divisions that had more crime guns traced" and there was "little correlation between the number of traces and the number of compliance inspections conducted the next year." *Id. at 25.* In 2001, of the ATF's 21 Field Divisions for which it had discernable data, the Chicago Field Division had the highest number of trace requests in 2001; however, in 2002, it had only the 11th highest number of compliance inspections. *Id.*

- "The lack of standardized inspection procedures resulted in inconsistent inspections of FFLs and significant variation in the implementation of the inspection program by Field Divisions." *Id*. at 54. Compliance inspections averaged 24.5 hours in one Field Division and up to 90 hours in other Field Divisions, yet the report "found no operational reasons" for this discrepancy. *Id*. In fact, the report "found little or no correlation between

84

inspection times and enforcement activities, such as referrals of suspected criminal activity and adverse actions taken." *Id.*

- 14 of 18 Inspectors interviewed by the OIG indicated that they "only examine [Form 4473s] to see if they were filled out properly – not for indications that a purchaser may be part of a firearms trafficking ring or acting as a straw purchaser for someone else (*e.g.*, purchasing patterns, similarities in purchasers' addresses)." *Id.* at 30.

- Of the 1,530 firearms trafficking investigations conducted by the ATF from July 1996 to December 1998, just 43 - less than 3% – were initiated based on information found during ATF inspections of an FFL. *Id.* at 38.

- "Even when numerous or serious violations were found, the ATF did not uniformly take adverse actions, refer FFLs for investigation, or conduct timely follow-up inspections." *Id.* at i.

- In 2002, even though violations were found in 1,934 inspections, and such inspections found an average of almost 70 violations each, the ATF issued only 30 notice of license revocation. *Id.* at vi, 39.

- "[T]he process for revoking the licenses of FFLs that violated federal firearms laws, or clearing the FFL, is lengthy." *Id.* at vi.

- "Because the ATF does not conduct regular inspections of FFLs and lacks adequate resources to meet agency goals, it cannot effectively monitor the overall level of FFL compliance with federal firearms laws." *Id.* at 54.

**RESPONSE:** Admit that the OIG report included the cited findings, but dispute that the ATF lacks the ability to effectively monitor FFLs. Dr. Kleck analyzed more recent data and concluded that ATF conducts "a number [of compliance inspections] sufficient to inspect all 'real' gun

dealers (those annually selling more than 50 guns) *every year*, plus a sample of low-volume

dealers.  Thus, it is not true that ATF lacks the resources and authority to regulate gun stores."

Exhibit 2 (Kleck Decl.), Exhibit I thereto, at 5; *see also id.* at 33-34; Exhibit 39 at 6 (ATF,

Operation Snapshot Final Report (1993)) (finding that only "7% of dealers disposed of over 50

firearms" over the course of one year); Exhibit 3 at 223 (Cook Dep.) (admitting that he doesn't

"know for a fact about what has happened to the resources available to the ATF or - - or how

they're deployed" since the nine year old ATF report).

Further dispute any implication that cited revocation data indicates that ATF is either unwilling

or unable to revoke the licenses of any corrupt dealers.  Dr. Kleck testified that available

evidence indicates that "few FFLs' licenses are revoked because few engage in misconduct

serious enough . . . to merit license revocation." *Id.* at 34.  And any delays in revocation

proceedings "should only result in time lags in revocation . . ., but should not prevent revocations

from occurring at all." *Id.*; *see also* Exhibit 30 at 1244-48 (Gary Kleck et al., *The Myth of Big-

Time Gun Trafficking*, 56 UCLA L. REV. 1233 (2009)).

      87.    In FY 2002, the year reviewed in the DOJ Report, the ATF had 5,143

appropriated permanent positions.  Exhibit 59 at 7.  In FY 2010, ATF had 5,206 appropriated

permanent positions. *Id.* In FY 2002, ATF had an appropriated overall budget of $854,747,000.

*Id.* In FY 2010, the ATF had an appropriated overall budget of $1.158 billion.  *Id.* at 5, 7.

**RESPONSE:** Admitted.

      88.    ATF conducted the following number of compliance inspections from FY 2007 to

FY 2010:

| Year | Total Number of FFLs | FFLs Inspected | % of FFLs Inspected |
|---|---|---|---|

| | | |
|---|---|---|
| FY 2010: | 118,487 | 10,538 | 8.9 |
| FY 2009: | 115,101 | 11,375 | 9.9 |
| FY 2008: | 111,600 | 11,169 | 10.0 |
| FY 2007: | 109,000 | 10,106 | 9.3 |

Exhibit 60 (ATF Fact Sheet, Facts and Figures (FY 2010)) at 2; Exhibit 61 (ATF, Firearms

Commerce in the United States 2011) at 27; Exhibit 59 at 12-13.)

**RESPONSE:**  Admit that the number of FFLs inspected for FY 2009 and FY 2010.  For FY

2007 and FY 2008, Exhibit 61 at 30 reports slightly different figures than Exhibit 59 at 12-13;

the figures in the Statement are consistent with the latter.  Also admit that the total number of

FFLs for FY 2007 – FY 2009 are consistent with Exhibit 59 at 12-13; Exhibit 61 at 27 gives

slightly different numbers for those years.  Admit total number of FFLs for FY 2010.  The total

number of FFL figures from FY 2007 through FY 2010 is not limited to licensees permitted to

engage in the business of selling firearms.  For example, the total for each year includes between

47,690 and 56,680 licensed collectors.  *See* 28 C.F.R. § 478.41(d) ("The collector license

provided by this part shall apply only to transactions related to a collector's activity in acquiring,

holding or disposing of curios and relics. A collector's license does not authorize the collector to

engage in a business required to be licensed under the Act or this part."); Exhibit 40 (ATF Fact

Sheet – Compliance Inspections) ("There were approximately 65,000 FFLs engaged in business

in fiscal year 2011 (excluding persons holding collector licenses).  During that time, ATF

conducted more than 13,100 firearms compliance inspections.").

89.     As to the subset of Type 1 FFLs (retail dealers in firearms) and Type 2 FFLs(retail dealers in firearms who also receive firearms in pawn), ATF conducted the following numbers of compliance inspections in the following years:

| Year | Total Number of FFLs | FFLs Inspected | % of FFLs Inspected |
|------|---------------------|----------------|---------------------|
| FY 2009 | 54,184 | 11,375 | 21.0 |
| FY 2008 | 54,948 | 11,170 | 20.3 |

Exhibit 62 (October 21, 2010 letter from Ronald Weich, Assistant Attorney General, U.S. Department of Justice to the Honorable Mike Quigley, U.S. House of Representatives) at 1.

**RESPONSE:**  Admitted.

90.     Of these dealers inspected in FY 2009:

- 29% (3,260 dealers) had violated federal law and regulations; and

- 7% (745 dealers) had a total of 28,325 guns missing from inventory (after reconciliation), for an average of 38 guns per dealer. *Id.*

**RESPONSE:**  Admitted, but note that these inspections led to a total of just 100 "proceedings initiated by ATF to revoke licenses or deny renewals."  Chicago Exhibit 62 at 2.  *See* Exhibit 2 (Kleck Decl.), Exhibit I thereto, at 34 ("available evidence indicates that "few FFLs' licenses are revoked because few engage in misconduct serious enough . . . to merit license revocation"); Exhibit 40 (ATF Fact Sheet – Compliance Inspections) ("[O]n rare occasions ATF encounters a licensee who fails to comply with the laws and regulations and demonstrates a lack of commitment to improving his or her business practices"; such situations "may require revocation of the federal firearms license.").

88

**91.** Of the 10,538 FFL compliance inspections conducted by ATF in FY 2010, 35% resulted in a report of violations, a warning letter, a warning conference, license revocation, denial of license renewal, or the surrender of the license. Exhibit 60.

**RESPONSE:** Admitted. The total for each category was:

- Report of Violations: 1,366

- Warning Letter: 1,408

- Warning Conference: 820

- Revoke License or Denial of Renewal: 67

- Surrender of License: 33

*See* Exhibit 60 at 2.

**92.** For crimes committed between 1996 and 2000, Chuck's Guns in Riverdale, Illinois, had the highest number of crime guns traced to it – 2,370 – of any FFL in the U.S. Exhibit 63 (Selling Crime: High Crime Gun Stores Fuel Criminals, Americans For Gun Safety (Jan. 2004)) at 9. The next highest number traced to an Illinois dealer for that period was 738. *Id.* at 23. Chuck's Guns was not inspected by the ATF during that period. *Id.* Between 2003 and 2011, Chuck's was audited by the ATF only two times, with the second audit occurring approximately three years ago. Exhibit 35 at 33:24-34:11. Camco Sales and Service has never been investigated or inspected by the ATF. Exhibit 53 at 48:14-19.

**RESPONSE:** Admit except for the following:

Dispute that Chuck's Guns was not inspected by the ATF during the period 1996 to 2000. Rather, the cited source ("Selling Crime") claims that it was not inspected from January 1, 2000 to May 31, 2003. *See* Chicago Exhibit 63 at 11. Also dispute that the Selling Crime establishes

89

the truth of this claim.  *See id.* at 11 n.12 (ATF inspection records were obtained from the

Department of Justice, but "on occasion, ATF may inspect a dealer but fail to record the

licensee's name in its records").  Also dispute that Selling Crime supports any finding that

Chuck's Guns has not received law enforcement scrutiny:  it notes that undercover detectives

visited Chuck's Guns "so often that they were on a first name basis with the store clerks."  *Id.* at

16.

Dispute that a high trace count implies in any way that a dealer is "corrupt" or irresponsible.  *See*

Response to Statement of Fact 68.

> **93.**     Mr. Vince opines that the ATF "lacks the resources and statutory authority to

provide sufficient oversight and regulation of gun stores.  Exhibit 38, Exhibit A thereto, at 1.

Mr. Vince testified that the federal firearms laws governing dealers "have been gutted" and

"weakened" to the point that they "are not effective." Exhibit 39 at 168:20-169:2.  "Except in

very limited circumstances, the ATF is prohibited by law from inspecting an FFL more than once

a year."  Exhibit 41 at 5.  Moreover, the ATF routinely provides advanced notice of an inspection

to an FFL.  Exhibit 38, ¶ 8.  Dr. Kleck testified that this "make[s] it harder" for the ATF to detect

illegal activity by an FFL.  Exhibit 14 at 155:23-156:11.  Mr. Vince opines that "the lack of

proper inspection of gun dealers by ATF, as well as insufficient federal laws and ATF resources

to properly monitor these businesses, results in criminals and other ineligible purchasers being

able to easily acquire firearms from these businesses."  Exhibit 38, Exhibit A thereto, at 18.

**RESPONSE:**  Disputed.  Dr. Kleck has thoroughly rebutted Mr. Vince's opinion on these

matters.  Dr. Kleck testified that "there are two problems with Mr. Vince's argument:  (1) the

premise that ATF lacks the resources and authority to regulate gun stores is false, and (2) there is

no sound evidence that banning gun sales, for whatever reason, has the benefits Vince claims for

the measure." *See* Exhibit 2 (Kleck Decl.), Exhibit I thereto, at 5. On the first point, Mr. Vince

relies primarily on the 2004 OIG report that we addressed in response to Statement of Fact 86.

On the second point, "Vince . . . implies that banning gun sales in Chicago will reduce gun

possession among the city's criminals and thereby reduce firearms crime, but does not cite any

research indicating that local sales bans have such effects. Existing evidence indicates that they

do not." *Id.* (citations omitted). *See also* Response to Statement of Fact 59.

Furthermore, with respect to the frequency of permitted inspections, in addition to one routine

annual inspection for compliance with record-keeping requirements, Federal law also permits

unlimited inspections of FFLs (a) with a warrant based on "reasonable cause to believe a

violation of [chapter 18 of the United States Code] has occurred and that evidence thereof may

be found on such premises," (b) without a warrant "in the course of a reasonable inquiry during

the course of a criminal investigation of a person or persons other than the licensee," and (c)

without a warrant "at any time with respect to records relating to a firearm involved in a criminal

investigation that is traced to the licensee." *See* 18 U.S.C. § 923(g)(1)(A)&(B). *See also*

Chicago Exhibit 61 at 6. Finally, even if it is true that "ATF agents customarily provide at least

24 hours before conducting routine compliance investigations," Chicago Exhibit 38 ¶ 8, at most

this simply gives FFLs a short period of time to get their paperwork in order.

**94-A.** Further, Dr. Cook indicates that the ATF "provides little oversight and is rarely

able to revoke a license." Exhibit 13, Exhibit A thereto, at 12. "[I]t takes on average over six

years for ATF to revoke a license from [an FFL], even under the most egregious circumstances."

Exhibit 38, Exhibit A thereto, at 17.

**RESPONSE:** Admit that Dr. Cook and Mr. Vince gave the cited testimony. Dispute that ATF

is either unwilling or unable to revoke licenses when justified. Dr. Kleck testified that available

91

evidence indicates that "few FFLs' licenses are revoked because few engage in misconduct serious enough . . . to merit license revocation." *Id*. at 34. And any delays in revocation proceedings "should only result in time lags in revocation . . ., but should not prevent revocations from occurring at all." *Id*.; *see also* Exhibit 30 at 1244-48 (Gary Kleck et al., *The Myth of Big-Time Gun Trafficking*, 56 UCLA L. REV. 1233 (2009)).

**94-B.** In addition, even where an FFL is convicted of a serious felony or has poor business practices that allow criminals, terrorists, or minors to acquire firearms, the license can be passed to a relative or associate. *Id.*

**RESPONSE:** Disputed. Chicago & Mr. Vince cite no provision of law to support this assertion. And Federal regulations provide that federal firearms licenses "are not transferable. In the event of the lease, sale, or other transfer of the operations authorized by the license, the successor must obtain the license required by this part prior to commencing such operations." 27 C.F.R. § 478.51. There are limited rights of succession for "(1) The surviving spouse or child, or executor, administrator, or other representative of a deceased licensee, and (2) A receiver or trustee in bankruptcy, or an assignee for benefit of creditors." *Id*. § 478.56. This succession right only lasts "for the remainder of the term of . . . a current license." *Id.* The duration of a license is three years. *Id*. § 478.49. Indeed, even corporate licensees must file a new application following a change in corporate control once the existing license expires. *Id*. § 478.54.

**95.** Dr. Kleck has "no basis for disagreeing or agreeing" that the ATF "is not properly using its resources to monitor FFLs." Exhibit 14 at 166:10-20. He "ha[sn't] independently studied the use of resources by ATF other than the fact that I know how many compliance inspections they do relative to the number of FFLs." *Id.* at 166:23-167:1. He has never studied the effectiveness of the ATF's inspection procedures. *Id.* at 156:12-15.

**RESPONSE:** Admit that Dr. Kleck gave the cited testimony, but dispute to the extent this suggests that Dr. Kleck lacks a basis for his opinions with respect to the ATF's monitoring practices and capacities. Indeed, he has studied "the resources that the ATF has for regulating gun laws or enforcing federal . . . gun laws" by reviewing several ATF publications. Exhibit 7 at 143:1-25 (Kleck Dep.). *See* Exhibit 2 (Kleck Decl.), Exhibit I thereto, at 5, 33-34 (citing several ATF publications); Exhibit 30 at 1239 n.20, 1268-70 (Gary Kleck et al., *The Myth of Big-Time Gun Trafficking*, 56 UCLA L. REV. 1233 (2009)) (same).

**96- A.** Even with tracing data indicating that the majority of crime guns originate from less than 1% of FFLs, the ATF "has not been able to curtail the flow of firearms to [criminals] in major cities." Exhibit 38, Exhibit A thereto, at 17.

**RESPONSE:** Admit that some research has shown that a majority of *traced* crime guns originate from less than 1% of FFLs; dispute that this demonstrates that a majority of *all* crime guns so originate. *See* Response to Statement of Fact 52. Admit that criminals continue to obtain firearms.

**96-B.** The DOJ Report recommendations for enhancing regulation of FFLs include:

- Develop a standard, streamlined inspection process that includes in-person inspections of all FFL applicants; more efficient inventory and records reviews; automated inspection reporting; and consistent examination of indicators of firearms trafficking.

- Conduct a pilot program to test the streamlined inspection procedures and establish appropriate time standards for conducting these inspections.

- Update the inspection tracking system to accurately segregate and report on Inspector time spent preparing for inspections, in travel, on-site at FFLs, and conducting other administrative duties.

- Direct the National Licensing Center to develop an adverse action tracking system to monitor the progress and timeliness of FFL denials and revocations from the time an Inspector makes a recommendation until the proceedings are finalized. Exhibit 41 at 56.

**RESPONSE:** Admit that the DOJ Report included the cited recommendations.

**97-A.** Under MCC 8-20-040, every qualified Chicago resident is permitted to have a fully loaded and operable firearm in the home, to place it anywhere in the home, and to carry it anywhere in the home, including from room to room. Exhibit 1 at 86:13-14; 98:11-15; Exhibit 2 at 174:19-175:18; Exhibit 3 at 159:3-7; Exhibit 38, Exhibit A thereto, at 12-13.

**RESPONSE:** Admitted, with the understanding that Chicago law defines "home" in an artificially narrow way to exclude porches, garages, yards, and any other locations outside of the four walls of the dwelling unit. *See* MCC 8-20-010.

**97-B.** This allows the resident to have a firearm ready for self-defense at all times within the home. Exhibit 14 at 123:17-20.

**RESPONSE:** Admit that a qualified Chicago resident lawfully may carry a loaded, operable firearm with them in the home. Many "civilians in their homes," however , "do not ordinarily carry their guns on their person as they move from room to room, nor do they sleep with a gun on their person." Exhibit 2 (Kleck Decl.), Exhibit I thereto, at 4. *See also* Exhibit 41 ¶ 9 (Tyler Decl.); Exhibit 12 at 101 (Tyler Dep.). Thus dispute the extent to which, as a practical matter, the ordinance allows such residents to have a firearm ready for self-defense at all times within

94

the home. *See* Exhibit 25 at 86-87 (Webster Dep.) (admitting that someone who carried a firearm from room to room in their home would be at higher risk for suicide than someone who storied multiple firearms in safes throughout his home).

**98-A.** Jody Weis, then-Superintendent of the CPD, testified at the City Council hearings on the Ordinance that "[o]ne operable firearm is all a person should need for self-defense. This rule does not burden the right to self defense." Exhibit 64 (June 29, 2010 Chicago City Council hearing transcript) at 71.

**RESPONSE:** Admit that Mr. Weis so testified, but dispute that the limitation to one operable firearm does not burden the right to self-defense. *See* Exhibit 2 (Kleck Decl.), Exhibit I thereto, at 24 ("Limiting the number of operable guns in Chicago homes is likely to reduce the number of occasions when residents can get to their guns in time to use them against criminals, and these defensive uses would, based on this body of research [regarding defensive gun use], generally reduce the victim's chances of being killed, raped, otherwise injured, or of losing property. Thus, the restrictions are likely to reduce the number of beneficial uses of guns by crime victims in their homes."); *see also* Exhibit 41 at ¶ 9 (Tyler Decl.); Exhibit 12 at 94-95 (Tyler Dep.); Exhibit 42 at ¶ 6 (Pacholski Decl.); Exhibit 43 at 155-56 (Pacholski Dep.).

**98-B.** Mr. Vince opines that MCC 8-20-040 "does not prohibit individuals from effectively utilizing a firearm for self defense." Exhibit 38, Exhibit A thereto, at 1, 13. Mr. Vince bases this opinion in part on his law enforcement experience and training. *Id.* at 13. Mr. Vince indicates that even though "[l]aw enforcement officers face threats to their personal security much more frequently than the average citizen and are therefore much more likely to need to use a firearm as a defensive weapon," they "almost always carry only a single firearm"

and "do not need to have immediate access to multiple loaded and ready firearms to do their job." *Id.*

**RESPONSE:** Admit that Mr. Vince so opined, but dispute his opinion. In particular, even if it is true that on-duty law-enforcement officers typically carry only one firearm, *but see* Exhibit 2 (Kleck Decl.), Exhibit I thereto, it does not follow that civilians should be permitted only a single firearm in their homes. "Police officers usually do not need more than one operable gun because while on duty they always carry that one gun on their person, and thus it is always immediately available for use. It is a cumbersome but required condition of police work that they always carry a gun. In contrast, civilians in their homes do not ordinarily carry their guns on their person as they move from room to room, nor do they sleep with a gun on their person. . . . Thus, the fact that many police officers carry only one gun on their person is of no relevance to whether Chicago's limits on number of operable guns impair effective DGU." Exhibit 2 (Kleck Decl.), Exhibit I thereto, at 4.

      **99.**     Dr. Kleck is not aware of "any study or evidence that indicates that there is a defensive benefit to having more than one operable gun per Chicago firearms permit holder in the home." Exhibit 14 at 114:18-23.

**RESPONSE:** Admit that Dr. Kleck testified; to his knowledge "no one has ever studied that subject" directly. Chicago Exhibit 14 at 114:22-23. Dispute any implication that in Dr. Kleck's opinion no scholarly research bears on this question: "The relevance of the DGU effectiveness research to the present case is straightforward. Limiting the number of operable guns in Chicago homes is likely to reduce the number of occasions when residents can get to their guns in time to use them against criminals, and these defensive uses would, based on this body of research, generally reduce the victim's chances of being killed, raped, otherwise injured, or losing

96

property. Thus, the restrictions are likely to reduce the number of beneficial uses of guns by crime victims in their homes." Exhibit 2 (Kleck Decl.), Exhibit I thereto, at 24.

**100-A.** Dr. Daniel W. Webster is a professor at the Johns Hopkins Bloomberg School of Public Health and has studied gun-related injuries and violence for the past 22 years, serving as Co-Director of the Johns Hopkins Center for Gun Policy for the past 10 years. Exhibit 6 (Declaration of Daniel Webster), Exhibit A thereto, at 1. He teaches graduate courses in violence prevention and research and evaluation methods, and serves on the steering committee of a National Institutes of Health-funded pre- and post-doctoral training program in violence prevention research. *Id.* He has published 62 articles in scientific, peer-reviewed journals. *Id.*

**RESPONSE:** Admitted.

**100-B.** Dr. Webster opines that "no research [ ] supports the notion that increasing the number of operable firearms in homes makes occupants safer." *Id.* at 15.

**RESPONSE:** Admit that Dr. Webster so opined because, in his view, the subject has not been studied directly. *See* Chicago Exhibit 65, Exhibit A thereto, at 16 ("No prior study of civilian defensive gun use has examined questions most directly relevant to Chicago's regulations for keeping firearms in the home."). Dispute the implication that existing defensive gun use research does not support the notion that increasing the number of operable firearms in homes makes occupants safer. "The relevance of the DGU effectiveness research to the present case is straightforward. Limiting the number of operable guns in Chicago homes is likely to reduce the number of occasions when residents can get to their guns in time to use them against criminals, and these defensive uses would, based on this body of research, generally reduce the victim's chances of being killed, raped, otherwise injured, or losing property. Thus, the restrictions are

likely to reduce the number of beneficial uses of guns by crime victims in their homes." Exhibit 2 (Kleck Decl.), Exhibit I thereto, at 24.

**101.** Tyler is "perfectly willing to carry [her gun] around" in her house on her person and has no safety concerns with doing so. Exhibit 1 at 86:13-14, 98:11-15, 101:16-20. She doesn't carry it around in her house because she doesn't have a holster, but she thinks that its "not a bad idea" to get a holster and carry it from room to room. *Id.* at 87:16-88:1, 96:13-22. She does not have "any reason to think that [she is] less able to defend [herself] by carrying around a weapon on [her] person versus storing weapons around the house." *Id.* at 110:14-18.

**RESPONSE:** Admit that Dr. Tyler made the quoted statements, but dispute Chicago's characterization of her testimony. Dr. Tyler testified that she would like to keep operable guns "in different locations" throughout the house "so they were handier." Exhibit 12 at 94:7-19 (Tyler Dep.). And while she did testify that she is "perfectly willing to carry [her gun] around" if she's "feeling nervous for some reason," *id.* at 86:10-14, and that she does not have any safety concerns with carrying a gun on her person, *id.* at 101:16-20, she "would much prefer [to store guns in] different locations" than generally to carry one around the house, *id.* at 96:23-97:19. "[I]t's just cumbersome to have a gun strapped on you," and, because Dr. Tyler does not typically "stay in [her] house for hours and hours and hours and never leave the premises," she would have frequently have to "take it off" whenever she left the house. *Id.* at 97:13-19.

**102.** Dr. Kleck owns two handguns and uses a trigger lock on both. Exhibit 14 at 35:18-25.

**RESPONSE:** Admitted.

**103.** Pacholski keeps 18 guns in his home: thirteen rifles, three shotguns, one revolver, and one semiautomatic pistol. Exhibit 2 at 63:7-22; 64:23-65:6. It is "not a problem" for

98

Pacholski to keep his guns secured, "even with a trigger lock." *Id.* at 155:24-156:3. Pacholski has Franzen trigger locks, which prevent the firearm from being shot, on all of his firearms. *Id.* at 165:20-23, 168:16-169:4; Exhibit 66 (Plaintiffs' Response to Interrogatory 2 of City's 3rd Set of Interrogatories) at 9.

**RESPONSE:** Dispute that Mr. Pacholski does not have a problem with keeping his guns secured by a trigger lock. When giving the quoted testimony, he stated that he'd "like to have one [firearm] in each part of the house *sometimes*, concealed or locked, even with a trigger lock that is not a problem, *but I don't like that idea*." Exhibit 43 at 155:19-156:7 (Pacholski Dep.). He made clear why he does not like the idea: "I guarantee if I didn't have to unlock a gun and have it available, I could use it. It would take seconds instead of eight to ten seconds if I had an intruder." *Id.* at 180:1-9. *See also id.* at 170:11-171:9, 172:22-173:4. Admit the rest.

**104-A.** The Franzen lock contains two halves that cover each side of the trigger guard, lock together (thereby preventing access to the trigger), and offer a "[q]uick, easy release." Exhibit 32 at PLKTKP 000057. All of Pacholski's trigger locks use the same key, which he carries on his person. Exhibit 2 at 138:2-13; 139:8-10;140:23-24.

**RESPONSE:** Admit, but clarify that Mr. Pacholski carries the key to his trigger lock on his person *when he has his key chain with him*. *See* Exhibit 43 at 142:15-17 (Pacholski Dep.).

**104-B.** With the key present, Pacholski can unlock the locks in 8 to 10 seconds. *Id.* at 139:3-7, 142:18-22. When it comes to using a firearm for self-defense, Pacholski believes that time is "not really of the essence as much as you got to have your head together and kind of make sure you are doing the right thing." *Id.* at 171:20-24. Pacholski's only basis for believing that this 8 to 10 seconds impacts the use of a firearm for self defense is "stories [he] heard" when receiving firearms training. *Id.* at 171:6-11.

**RESPONSE:** Admit that Mr. Pachoslki gave the quoted testimony, but dispute the characterization of that testimony. Mr. Pacholski testified that his firearms courses have taught him that "time is critical"—including the course he was required to take to possess firearms in Chicago. Exhibit 43 at 171:14-19 (Pacholski Dep.). He believes that "in eight to ten seconds I could be dead." *Id.* at 170:21-22.

105. Hall keeps two firearms in his home: a 9 millimeter handgun, and 12 gauge shotgun. Exhibit 3 at 69:13-70:9; 71:6-14. He uses a Master Lock 94 Resettable Combination firearm lock ("Master Lock") on the handgun, and a Regal Model RETL06 firearm lock ("Regal") on the shotgun. Exhibit 4 at 13:8-20; 16:1-17:5; and Exhibit 1 thereto, at PLMH 000120, 125, 126. Both locks consist of two halves that cover either side of the trigger guard/trigger and lock together, thereby preventing access to the trigger. Exhibit 4 at 28:18-29:18, 31:11-32:1; and Exhibit 1 thereto, at PLMH 000120, 125, 126. The Master Lock is a combination lock; it has three numeric dials that must be set to the proper combination in order to open the lock. Exhibit 4 at 31:11-22; and Exhibit 1 thereto, at PLMH 000120, 125. The Regal requires use of a separate key. Exhibit 4 at 18:8-11; and Exhibit 1 thereto, at PLMH 000126. Both locks render the firearm inoperable and can be affixed without having to break down the gun. Exhibit 4 at 27:20-28:6, 31:11-32:15, 36:19-37:8. Hall has also secured the handgun with a cable lock supplied by Stroger, the gun's manufacturer, which ran through the open slide of the firearm; and secured the shotgun with a keyed padlock supplied by Ruger, the gun's manufacturer, which contained a 4 inch steel loop that ran through the weapon's chamber when the barrel was removed. Exhibit 4 at 7:10-23; 17:11-13; 26:18-21; Exhibit 66 at 9. Both devices rendered the weapons inoperable. Exhibit 4 at 7:17-23; 9:13-21.

**RESPONSE:** Admitted.

100

**106.** Hall does not have "much experience" or "much expertise" in unlocking devices that render firearms inoperable. *Id.* at 47:2-5. He has never unlocked the Regal and has no idea how long it takes to unlock. *Id.* at 47:7-23. He has unlocked the Master Lock three or four times; he believes that, each time, it took about 40 or 50 second to move the tumblers into the correct combination to unlock the lock. *Id.* at 48:11-49:3. Hall has not timed himself unlocking the device, nor has he practiced it. *Id.* at 66:14-67:7. Prior to buying the Master Lock, Hall did not find out how long it would take to unlock. *Id.* at 52:4-7. Hall has never tried to see whether other locks are available that would require less time to unlock. *Id.* at 50:4-12, 55:19-56:24.

**RESPONSE:** Admitted.

**107.** Tyler owns one firearm, a Makarov 9mm handgun. Exhibit 1 at 41:6-13. She keeps it in a locked safe that is attached to her bed in her bedroom. *Id.* at 42:1-3. The gun is stored with its ammunition clip inside it, but no round is chambered. *Id.* at 72:7-17. It takes five seconds to open the safe, and another 2 or 3 seconds to chamber a round and make the gun fully ready for use. *Id.* at 73:20-74:11.

**RESPONSE:** Admitted, except that Tyler now also owns a shotgun that she acquired in November 2011. *See* Exhibit 41 ¶ 4 (Tyler Decl.).

**108.** Tyler has no experience in using firearms that have trigger locks; she has never handled such a firearm, nor does she know how long it takes to unlock a trigger lock. *Id.* at 98:21-99:7; 99:22-100:4, 111:5-8. Nor has she ever tried to figure out how long it would take her to unlock a trigger lock. *Id.* at 110:19-23. She is not familiar with other devices that could be used to render a firearm temporarily inoperable under MCC 8-20-040. *Id.* at 105:18-106:13.

**RESPONSE:** Admit that this was true at the time of Tyler's deposition. She currently keeps a trigger lock on her newly acquired shotgun. *See* Exhibit 41 ¶ 4 (Tyler Decl.).

109.    "Mr. Vince's colleague, Gerald Nunziato ("Nunziato"), tested how long it takes to unlock two different types of trigger locks – a Bellock Keyed Trigger Lock and a Remington Trigger Block – purchased at Dick's Sporting Goods. Exhibit 38 , Exhibit A thereto, at 14. Mr. Nunziato was approximately 65 years old at the time and, having been retired from the ATF for approximately 10 years, was "rusty" in the handling of firearms. Exhibit 39 at 134:5-11. His test results include the time it takes to load the firearm after removing the lock. *Id.* at 136:5-14. The average time it took to unlock the Bellock lock and load the weapon was 4.30 seconds; the fastest was 2.79 seconds and the slowest was 6.62 seconds. Exhibit 38, Exhibit A thereto, at 14. The average time it took to unlock the Remington lock and load and weapon was 5.30 seconds; the fastest was 3.27 seconds and the slowest was 8.66 seconds, during which the key was dropped. *Id.*

**RESPONSE:** Admitted that this accurately describes what occurred. Disputed to the extent that it implies that a law-abiding citizen would exhibit the same performance when responding to a threat. *See* Exhibit 44 at 134 (Vince Dep.) (admitting that these tests were conducted in a well lit room); *id.* at 134-45 (admitting that Nunziato wasn't "woken out of a deep sleep right before he performed" these tests); *id.* at 135 (admitting that Nunziato was wearing his glasses while performing these tests); *id.* (admitting that Nunziato wasn't in a life threatening situation while performing these tests). *See also* Exhibit 2 (Kleck Decl.), Exhibit I thereto, at 3-4; Exhibit 7 at118 (Kleck Dep.) (describing Vince's tests regarding unlocking as "totally unrealistic" and "irrelevant to the issues at hand"); *id.* at 117 (noting that the amount of time it takes to retrieve

102

the key should be included in the amount of time required to unlock a gun and that "[i]f you keep it too close, it doesn't have much value in securing it").

**110.** Nunziato conducted the same test on trigger lock make and models used by Hall and Pacholski. Exhibit 38, ¶ 6. On a revolver, the average time to unlock the Franzen and load the weapon was 6.3 seconds; the fastest was 4.5 seconds and the slowest was 8.6 seconds. *Id.*, Exhibit B thereto. On a semi-automatic pistol, the average time to unlock the Franzen and load the weapon was 4.3 seconds; the fastest was 2.9 seconds and the slowest was 6.3 seconds. *Id.* On a revolver, the average time to unlock the Master Lock and load the weapon was 7.4 seconds; the fastest was 5.34 seconds and the slowest was 9.6 seconds. *Id.* On a semi-automatic pistol, the average time to unlock the Master Lock and load the weapon was 4.8 seconds; the fastest was 3.8 seconds and the slowest was 6.0 seconds. *Id.*

**RESPONSE:** See our response to Statement of Fact No. 109.

**111.** Mr. Vince opines that 10 seconds or less is "sufficient time to respond to the threat of a home intruder" and that a citizen who learns how to properly use the locks should be able to achieve times similar to those of Nunziato. *Id.*

**RESPONSE:** Admit that Mr. Vince so opined, but dispute the validity of his opinion. Mr. Vince asserts that 10 seconds or less is sufficient time to respond to the threat of a home intruder, but he offered no sound basis for this opinion. Dr. Kleck testified that "none of the evidence Vince presents contradicts the hypothesis that requiring a gun to be secured by a locking device will sometimes prevent effective defensive use of the gun." Exhibit 2 (Kleck Decl.), Exhibit I thereto, at 4; *see also* Exhibit 7 at 108 (Kleck Dep.) (stating that it is a "commonplace assertion" that the use of a trigger lock or other safety mechanism impairs defensive gun use). With respect to Mr. Vince's assertion that a citizen who learns how to properly use the locks should be able to

achieve times similar to those of Nunziato, we do not dispute that fact *to the extent the citizen is operating in circumstances similar to Nunziato*. *See* Response to Statement of Fact 109.

112. MCC 8-20-040's safe storage requirements are "in accord" with the practices of the United States Military and law enforcement. *Id.* at 14. Despite the extensive training they receive in using firearms, and their role as first responders to violent situations, both law enforcement and military personnel are required to lock and secure their weapons when not in use. *Id.* at 6. On military bases, aside from military law enforcement personnel, soldiers' firearms, when not in use, are generally secured via unloading, disassemblage, and secure storage, even though soldiers are highly-trained individuals who use firearms as a tool of the trade. *Id.* at 6; Exhibit 39 at 85:1-86:10. While law enforcement personnel may sometimes have multiple firearms present while on duty, the additional firearms are securely stored by, for instance, keeping them locked in police vehicles. Exhibit 38, Exhibit A thereto, at 13. Mr. Vince testified that law enforcement's following of these practices while operating in the face of "a more severe security threat than the average citizen is strong evidence that Chicago's requirements do not impose a hardship on using a firearm for self-defense in the home." *Id.*

**RESPONSE:** Dispute that Chicago's "safe storage" requirements are in accord with the practices of the U.S. Military. The military storage practices discussed by Mr. Vince apply "on military bases," not in the field where soldiers may be required to use their weapons. *See* Chicago Exhibit 38, Exhibit A thereto, at 6; *see also* Exhibit 44 at 184:6-17 (Vince Dep.); *id.* at 87:6-10 (admitting that soldiers are not even allowed to have firearms on base).

Also dispute that Chicago's "safe storage" requirements are in accord with the practices of law enforcement. As an initial matter, law enforcement personnel in Chicago are permitted to have multiple operable weapons. The Chicago Police Department allows its uniformed sworn officers

104

to carry "two exposed firearms." Exhibit 45 at IV.B.2 (Chicago Police Department, Uniform and Property U04-02, Department Approved Weapons and Ammunition). And if Chicago police officers elect to carry an auxiliary subcompact semiautomatic pistol, they generally must also carry another weapon. *See* Exhibit 46 at II.E-F. (Chicago Police Department, Uniform and Property UO4-02-04, Department Approved Auxiliary Subcompact Semiautomatic Pistols and Ammunition). At any rate, even if law enforcement officers generally only carry a single weapon, that has little bearing on storage practices for civilians who generally do not have a weapon on their person at all times. *See* Exhibit 2 (Kleck Decl.), Exhibit I thereto, at 4. Furthermore, while the Chicago police department requires members to secure their prescribed duty weapon when that weapon is not on their person, that requirement does not apply to other weapons the member may have. Exhibit 45 at XVI.A (Chicago Police Department, Uniform and Property U04-02, Department Approved Weapons and Ammunition) (members "strongly encourage[d]," but not required, to "secure any/all other firearms"). At any rate, how law enforcement officials store their duty weapons when off-duty (and hence when the weapons are not expected to be used) is of little relevance to how private citizens should store defensive weapons. Far more probative is the fact that when on-duty, police officers always have a weapon operable and ready for immediate use. *See* Exhibit 2 (Kleck Decl.), Exhibit I thereto, at 3; *see also* Exhibit 47 at XI.I (Chicago Police Department, Uniform and Property UO4-01-02) ("Sworn members will have in their possession the following items while on duty . . . . Prescribed firearm, fully loaded . . ."); Exhibit 44 at 12 (Vince Dep.) (admitting that he did not use a trigger lock while carrying a firearm on duty with the Trumbull County Sheriff's department).

**113.** Dr. Kleck's opinion that locking devices will "sometimes" prevent effective defensive gun use is a "hypothesis" that he bases on "common sense" and not his expertise in criminology. Exhibit 14 at 112:16-113:11,128:23-129:3. The proposition "hasn't been scientifically established," he has no scientific evidence supporting it, and it has never been tested in any scientific manner. *Id.* at 112:16-113:11, 131:16-22. He did not rely upon any tests of how long it takes to remove a trigger lock. *Id.* at 119:1-7. He is not aware of any study demonstrating that trigger locks prevent effective defensive gun use. *Id.* at 111:9-13. He is not aware of any study showing that keeping one operable firearm in a home but trigger locking a second, third, or fourth firearm reduces a person's ability to effectively resist crime versus not securing the additional firearms with a trigger lock. *Id.* at 345:17-24. He is not aware of anyone in the gun industry who asserts that trigger locks or other safety mechanisms impair defensive gun use. *Id.* at 108:3-6.

**RESPONSE:** Dispute that Dr. Kleck's opinion with respect to locking devices is without any scientific foundation: "The relevance of the DGU effectiveness research to the present case is straightforward. Limiting the number of operable guns in Chicago homes is likely to reduce the number of occasions when residents can get to their guns in time to use them against criminals, and these defensive uses would, based on this body of research, generally reduce the victim's chances of being killed, raped, otherwise injured, or losing property. Thus, the restrictions are likely to reduce the number of beneficial uses of guns by crime victims in their homes." Exhibit 2 (Kleck Decl.), Exhibit I thereto, at 24. The "common sense" "hypothesis" involved is that "you can't have a way of securing a gun that secures unauthorized use, which doesn't also make it harder to have authorized use of the gun." Exhibit 7 at 111:24-112:2-6 (Kleck Dep.). And although that hypothesis has not been scientifically established, it is "a highly plausible

hypothesis." *Id.* at 111:24-25; *see also id.* at 112:16-18; Exhibit 15 at 61 (Williams Dep.) (admitting that rendering a firearm inoperable "extends the amount of time that would take place between a time [a person] would want to use that firearm and when a person could use that firearm").

**114.** Dr. Kleck does not know and has never tried to determine how often "the fact that you have a trigger lock will make a difference about whether you could use a gun defensively," or at what point during a home intrusion or attack the owner will not have enough time to disengage a trigger lock in order to use a gun defensively. *Id.* at 140:20-141:18.

**RESPONSE:** Admit that Dr. Kleck so testified, but dispute that this renders his opinion that a trigger lock could impair defensive gun use unreliable. As Dr. Kleck testified, it is "indisputable logic" that "there has to be intermediate points between having lots of time and having little time" when having a gun trigger locked would make a difference in whether or not a person is able to defend themselves with a firearm. Exhibit 7 at 141:21-142:1 (Kleck Dep.). *See also* Response to Statement of Fact 113.

**115.** Dr. Kleck asserts that an owner's ability to disengage a locking device is affected when their pulse rate and blood pressure are elevated, and their hands are shaking, but he bases this belief only on "common sense." *Id.* at 113:12-19. No study has established this, and Dr. Kleck himself has never tried to remove a locking device under such conditions. *Id.* at 113:20-114:2. Dr. Kleck is not aware of any study that has examined the effect of darkness on retrieving a gun to use in self-defense. *Id.* at 120:16-19. While Dr. Kleck believes that training can reduce the physiological impairments from stress on being able to disengage a locking device on a gun, he has not "see[n] the need" to undertake such training. *Id.* at 120:20-121:5.

**RESPONSE:** Admitted.

**116.** Dr. Webster is not aware of research indicating that requirements like those in MCC 8-20-040 reduce the ability of a person to effectively use a firearm for self-defense in the home. Exhibit 65, Exhibit A thereto, at 16.

**RESPONSE:** Admit that Dr. Webster is not aware of such research, because in his view "no prior study of civilian defensive gun use has examined questions most directly relevant to Chicago's regulations for keeping firearms in the home." Chicago Exhibit 65, Exhibit A thereto, at 16. Dispute the implication that existing defensive gun use research does not support the notion that requirements like those in MCC 8-20-040 reduce the ability of a person to effectively use a firearm for self-defense in the home. "The relevance of the DGU effectiveness research to the present case is straightforward. Limiting the number of operable guns in Chicago homes is likely to reduce the number of occasions when residents can get to their guns in time to use them against criminals, and these defensive uses would, based on this body of research, generally reduce the victim's chances of being killed, raped, otherwise injured, or of losing property. Thus, the restrictions are likely to reduce the number of beneficial uses of guns by crime victims in their homes." Exhibit 2 (Kleck Decl.), Exhibit I thereto, at 24.

**117.** The price of trigger locks offered by two major firearms retailers operating in the Midwest (Gander Mountain and Dick's Sporting Goods) is slightly over $7. Exhibit 38, Exhibit A thereto, at 10. Hall found the two trigger locks he currently uses by doing a Google search online, and he purchased them online. Exhibit 4 at 18:23-19:24. He purchased the Master Lock for $14.99, which was "relatively inexpensive." *Id.* at 17:18-19; 19:1; 20:1-7. He purchased the Regal lock for $10.50. *Id.* at 20:1-7. Pacholski purchased a 12-pack of Franzen trigger locks for $69.99, plus $15.32 postage and tax, via the website of a gun store. Exhibit 32 at PLKTKP 000056.

**RESPONSE:**  Admitted.

**118-A.** Dr. Kleck asserts that "probably the strongest rationale for keeping guns stored in a secure manner of some sort is to reduce gun theft and thereby reduce acquisition of guns by criminals" since "most gun criminals acquire their guns directly or indirectly as a result of theft." Exhibit 14 at 132:16-23.

**RESPONSE:**  Admit that Dr. Kleck so asserted, but dispute any implication that he opines that this rationale justifies Chicago's one-operable-gun limitation:  "[T]here is no evidence of even a modest effect on the gun theft rate of the city's limits on the number of operable guns allowed in households.  In this light, there is no logical reason to believe that the city's existing ordinance reduces the number of criminals with guns."  Exhibit 2 (Kleck Decl.), Exhibit I thereto, at 22.

**118-B.** Over 500,000 guns are stolen each year in the United States.  Exhibit 12 at F561.

**RESPONSE:**  Admitted.

**118-C.** The average U.S. gun owner owns between 6 and 7 guns, many of which are not locked up.  Exhibit 65, Exhibit A thereto, at 15.

**RESPONSE:**  Admit that the study cited by Dr. Webster for this assertion found that, on average, respondent gun owners owned between 6 and 7 guns.  *See* Exhibit 48 at 17 (L. Hepburn, et al., *The US Gun Stock*, 13 INJURY PREVENTION 15 (2007)).  "On further examination, it seemed that individuals who owned >4 firearms . . . were greatly affecting the mean.  When outliers representing the top 3% of gun owners . . . were removed, the average number of working firearms per owner was 5.0."  *Id.*  Admit that "many" of these firearms are not "locked up," although Dr. Webster does not cite anything for this assertion.

**118-D.** Dr. Kleck asserts that it is "reasonable" to believe that trigger locks deter gun theft, because it is "very hard" to remove a trigger lock from a stolen gun; he has never heard of a criminal who has successfully done so. Exhibit 14 at 109:7-21.

**RESPONSE:** Admit that Dr. Kleck so testified, "with the qualifier to the extent criminals are aware of that or think about it. The problem being criminals often don't think much into the future, and they often are not very knowledgeable about a wide variety of things." Exhibit 7 at 109:25-110:4 (Kleck Dep.); *see also id.* at 109:8-11. And although Dr. Kleck stated that this belief is a reasonable one, he emphasized that "[w]e don't know for sure." *Id.* at 109:8. And again, his bottom-line conclusion is that "there is no logical reason to believe that the city's existing ordinance reduces the number of criminals with guns." Exhibit 2 (Kleck Decl.), Exhibit I thereto, at 22.

**119-A.** In prior research, Dr. Cook performed multiple analyses on multiple data sets and found that "residential burglary rates tend to increase with community gun prevalence." Exhibit 67 (P. Cook and J. Ludwig, Guns and Burglary, in Evaluating Gun Policy 74-107 (J. Ludwig & P. J. Cook, ed. 2003)) at 76. The authors employed statistical tools to address the potential of reverse causation – i.e., that high burglary rates induce homeowners to acquire guns for protection, rather than an increase in gun ownership causing higher burglary rates. *Id.* The authors' "preferred explanation" for why an increase in gun prevalence would lead to a higher burglary rate is that "guns are valuable loot because they are portable and readily sold or fenced." *Id.* at 98.

**RESPONSE:** Admit that the cited study purported to find that "residential burglary rates tend to increase with community gun prevalence," but dispute that the study supports any finding that increased gun prevalence *causes* an increase in residential burglary rates. According to the

110

authors, "the results reported here provide *suggestive* evidence that increases in gun ownership *may* lead to more burglaries." Chicago Exhibit 67 at 101 (emphasis added). "The challenge to establishing a causal interpretation to these results comes from the possibility that gun ownership may be both cause and effect of local burglary patterns or that variables may be driven by some unmeasured third factor" and "there is no entirely persuasive way to rule out such competing explanations." *Id.* at 76. *See also* Exhibit 3 at 116-17 (Cook Dep.) (admitting that "if you observe an - - association between the rate of gun ownership in a jurisdiction and the burglary rate in the jurisdiction, then it can be perhaps the result of the influence of gun ownership on burglars or it could be the result of the influence of burglars on gun ownership"). And while the authors did attempt to address the causal-order issue, they do not do so effectively—and some of their analyses *failed to find a statistically significant relationship between gun prevalence and burglary rate*. *See* Exhibit 2 (Kleck Decl.), Exhibit I thereto, at 19-21. Thus, "while Cook and Ludwig did indeed draw this conclusion [that firearm availability within homes increases the risk of home burglaries], their methods cannot sustain it, and some of their findings directly contradict it." *Id.* at 19. "In addition to being unsupported by the empirical evidence, the argument that higher gun rates increase burglary rates by increasing the 'incentives' for committing burglary is highly implausible on logical and theoretical grounds." *Id.* at 20 (*e.g.*, "Guns claim only about two percent of the dollar value of stolen property in the U.S., an amount too small to even be perceptible to the average burglar."). Indeed, the authors' "preferred explanation" for their findings (which, as we have shown, are not valid anyway), is tempered by their recognition that "the implied effect of gun prevalence on the overall profitability of residential burglary is not great." *See* Chicago Exhibit 67 at 98.

**119-B.** Dr. Webster opines that MCC 8-20-040 "will minimize the number guns available to criminals" because it "decrease[s] the number of operable guns in the home and the potential value of such guns to would-be thieves." Exhibit 65, Exhibit A thereto, at 15.

**RESPONSE:** Admit that Dr. Webster so opined, but dispute the validity of his opinion. As an initial matter, he primarily relies upon the Cook and Ludwig study we have critiqued in response to the first part of this finding. Webster also cites the large number of guns stolen each year, but he "misunderstands . . . the significance of this fact and its relevance to the Chicago ordinance." Exhibit 2 (Kleck Decl.), Exhibit I thereto, at 21. "It is precisely because there are so many gun thefts that criminals who want a gun can already obtain one . . . . Under current conditions, gun ownership among criminals is already 'saturated'—everyone who wants one has one." *Id.* "When there is already an oversupply of guns available to criminals, marginal reductions in gun thefts would at best reduce this oversupply, not prevent criminals from obtaining a gun. In any case, there is no evidence of even a modest effect on the gun theft rate of the city's limits on the number of operable guns allowed in households. In this light, there is no logical reason to believe that the city's existing ordinance reduces the number of criminals with guns." *Id.* at 21-22. *See also* Exhibit 13 at 51 (Gorman Dep.) (admitting that it has not become easier for criminals to obtain firearms since July 2010 (*i.e.*, when Chicago's prior freeze on handguns in the home was lifted)).

**120-A.** Chief Williams testified that MCC 8-20-040 "reduc[es] the ability of a burglar or intruder to use a gun they might come across in the course of breaking into a house against the home owner." Exhibit 54 at 49:19-24.

**RESPONSE:** Admit that Chief Williams so testified in response to leading questioning. *See* Exhibit 15 at 47:20-24, 49:19-24 (Williams Dep.). Even if this is true in the abstract (*i.e.*, that an

intruder coming across a locked gun will have a reduced ability to use that gun against the home owner than an intruder coming across an unlocked gun), dispute that this would translate into any meaningful public-safety benefit, as Chicago has not cited any evidence of criminals turning homeowners' guns against them.  Indeed, even when murders committed by members of a person's household are included, "murder victims are almost never killed with a gun belonging either to themselves or to some other member of their household."  Exhibit 2 (Kleck Decl.), Exhibit I thereto, at 13; *see also* Exhibit 49 at 68-71 (Gary Kleck, *Can Owning a Gun Really Triple the Owner's Chances of Being Murdered?*, 5 HOMICIDE STUDIES 64 (2001)).

**120-B.** Tyler believes that "[y]ou just don't leave firearms laying around in your house" because "that's not responsible," as someone could steal the gun, use it against the owner, or accidentally discharge it.  Exhibit 1 at 89:22-90:12.  Tyler generally keeps her gun in her safe because it prevents unauthorized users from accessing it.  *Id.* at 85:15-19.

**RESPONSE:**  Admit that Tyler so testified, but she made plain (a) that she keeps her gun assembled and operable, *see* Exhibit 12 at 73:24-74:11 (Tyler Dep.); (b) that she thinks it would be safe to keep her firearm "elsewhere in [her] house," *id.* at 87:5-8; (c) that she would like to be able to keep multiple "fully assembled and operable" guns, *id.* at 94:13-14; (d) that she would "keep [these weapons] in different locations so they were handier," *id.* at 94:18-19; and (e) that she would not necessarily store each weapon in a safe, *id.* at 95:3-4 (testifying that she may "just keep on in my desk" in her home office), although she would store an additional operable gun in a safe if she had to, *see* Exhibit 41 ¶ 9 (Tyler Decl.).

**121.**  One of the purposes served by MCC 8-20-040 is "reducing the number of firearms accidents or suicides or domestic violence shootings that would occur in the home by

reducing the number of operable firearms that could be misused in those sorts of situations."
Exhibit 54 at 50:6-12.

**RESPONSE:** Admit that Chief Williams so testified in response to leading questioning, but dispute the validity of that testimony. *See* Exhibit 15 at 47:20-24, 54:6-12 (Williams Dep.).

*Suicides*: "In light of the obvious fact that people who commit suicide by shooting themselves use only one gun, it is unclear why . . . having more than one would have any effect not produced by just having one." Exhibit 2 (Kleck Decl.), Exhibit I thereto, at 6. Further, "the standard finding in the field is that gun rates have no effect on how many people kill themselves; rather they only affect how many of those who do kill themselves do so with guns. Thus, gun rates affect rates of *gun* suicide, but not the *total* suicide rate." *Id.* at 10; *see also id.* ("there is no sound foundation to expect that suicide attempts would become less lethal if restrictions on gun availability caused suicide attempters to substitute hanging as their method"); Exhibit 10 at 192 (NATIONAL RESEARCH COUNCIL, FIREARMS AND VIOLENCE (Wellford, et al., eds. 2005)) ("Some gun control policies may reduce the number of gun suicides, but they have not yet been shown to reduce the overall risk of suicide in any population."); Exhibit 25 at 234:4-7 (Webster Dep.) (admitting that one operable firearm is sufficient for committing suicide); Exhibit 3 at 238-39 (Cook Dep.) (admitting that "the cross national surveys do not reveal a consistent association between gun ownership and overall suicide rates").

*Domestic violence*: Dr. Kleck's testimony with respect to suicide applies equally here: since it only takes a single gun to commit a domestic violence shooting, it is unclear why having more than one would have any effect not produced by just having one. *See* Exhibit 2 (Kleck Decl.), Exhibit I thereto, at 18. Furthermore, "even those who are killed in their own homes are typically killed by outsiders who bring their guns with them," Exhibit 2 (Kleck Decl.), Exhibit I

114

thereto, at 13, not with guns owned by members of the household.  At any rate, Dr. Kleck has

thoroughly demonstrated that there is no scientific foundation for the assertion that gun

ownership increases homicide risk.  *See id.* at 12-15.  Furthermore, the one-operable-firearm

limit may actually *increase* the number of domestic violence shootings by making it more

difficult for a victim to access a weapon to defend herself.  *See id.* at 23-24.

*Firearms accidents*.  Dr. Kleck and a colleague conducted a study finding "no significant effect

of gun ownership rates on the [Fatal Gun Accident] rate."  *Id.* at 17.  And a study cited by Dr.

Webster found no significant difference in the fatal gun accident rate for persons in households

with multiple guns versus persons in households with more than one gun.  *Id.* at 16.  And the

NRC "found no credible scientific evidence . . . that demonstrates whether [firearm] safety

devices can effectively lower injury."  Exhibit 10 at 219 (NATIONAL RESEARCH COUNCIL,

FIREARMS AND VIOLENCE (Wellford, et al., eds. 2005)).

**122-A.** Dr. Webster opines that the availability of firearms in the home increases the risks

for suicide, homicide, and deaths from unintentional shootings, and that these risks increase as

the number of firearms kept in the home increases, a phenomenon known as a "dose-response

relationship." Exhibit 65, Exhibit A thereto, §§ V, VI. In forming his opinion, Dr. Webster relied

upon more than 30 studies. *Id.*, Exhibit A thereto. Some of those studies found a relationship

between the number of firearms in the home and an increased risk of suicide, homicide, and/or

unintentional death.

**RESPONSE:**  Admit that Dr. Webster so opines, but dispute the validity of his opinion.

As an initial matter, see our response to Statement of Fact 121.  Furthermore, Dr. Kleck has

thoroughly and convincingly rebutted Dr. Webster's opinion.  *See* Exhibit 2 (Kleck Decl.),

Exhibit I thereto, at 6-18, 24. Dr. Kleck demonstrates that the studies Dr. Webster relies upon simply do not support his opinion. For example:

- "Webster's review of household (case-control) studies [on firearms ownership and suicide risk] is highly selective, fails to acknowledge studies that contradict his conclusions, covers studies that are not relevant to any element of Chicago's gun ordinance, and relies on studies that are far too methodologically weak to sustain even the (irrelevant) conclusions that Webster draws." *Id.* at 9.

- "Webster's review of 'ecological studies' [on firearms ownership and suicide risk] . . . is likewise both highly selective and irrelevant to the Chicago gun ordinance. . . . Further, the handful of 'ecological' studies that Webster does cite are conspicuously flawed." *Id.* at 10. For example, "they fail to separate the effects of gun ownership rates from the effects of other variables that affect suicide rates." *Id.* at 11.

- "The homicide section suffers from the same problems as the suicide section—the research reviewed is largely irrelevant to the factual issues at state in this case, Webster is extremely selective about which studies he reviews, . . . and the studies he does stress are of very poor quality." *Id.* at 12.

- "The homicide studies, however, also have their own unique problems." For example, "murder victims are almost never killed with a gun belonging either to themselves or to some other member of their household. . . . Webster appears to be unaware of this problem, and fails to note that *none* of the homicide studies on which he relies established that even a single one of the homicide victims studied had been killed with a household gun." *Id.* at 13.

116

- "None of the studies on which Webster relies applied any accepted research methods that can differentiate the effect of guns on homicide from the effect of homicide rates on gun rates." *Id*. at 15.

- With respect to firearms accidents, "once again, the research cited by Webster is largely irrelevant to the factual issues involved in this case. . . . The research would be relevant only if it assessed the effects of limiting operable guns to one per permitted occupant, or the effects of a local sales ban, but these topics were not addressed in the cited studies." *Id*. at 16.

- "Webster claims he could only find one ecological study of the relationship between firearm availability and rates of death due to unintentional shootings, but this is incorrect. Kleck and Patterson conducted an ecological study of this very topic, finding no significant effect of gun ownership rates on the FGA rate. . . . This is an unfortunate omission since the Kleck and Patterson study that Webster ignored was methodologically superior to the Miller et al. study that Webster discussed at length." *Id*. at 17. *See* Exhibit 8 at 280 (Gary Kleck & E. Britt Patterson, *The Impact of Gun Control and Gun Ownership Levels on Violence Rates*, 9 J. QUANT. CRIM. 249 (1993)) ("No impact of gun prevalence on fatal gun accident rates was detected. Given the random component of accident causation and the rarity of fatal gun accidents (one or two a year in most cities) the absence of a relationship is perhaps not that surprising.").

Indeed, in its comprehensive review of the literature (including many of the studies cited by Dr. Webster) a committee of the National Research Council similarly concluded that "existing research studies . . . do not credibly demonstrate a causal relationship between the ownership of firearms and the causes or prevention of criminal violence or suicide." Exhibit 10 at 6

117

(NATIONAL RESEARCH COUNCIL, FIREARMS AND VIOLENCE (Wellford, et al., eds. 2005); *see also id.* at 192 ("Some gun control policies may reduce the number of gun suicides, but they have not yet been shown to reduce the overall risk of suicide in any population."); *id.* at 119 ("[W]hile the observed associations between [firearms ownership and being murdered] may reflect a causal albeit unspecified path-way, they may also be entirely spurious.").

Dr. Webster has also admitted to many shortcomings in the research on which he relies. *See* Exhibit 25 at 44 (Webster Dep.) (admitting that he has not "seen any study that . . . actually measured suicidal intent in a way [he] believes is scientifically reliable") *id.* at 51-52 (admitting that "I don't think that the question of whether gun ownership causes increases in homicide and suicide can be determined through some type of randomized control trial. Any – any study or set of studies is going to rely upon non-experimental data. And so that will always leave some degree of uncertainty about inferring cause and effect from any single study"); *id.* at 226:13-227:10 (admitting that he has not looked at a single study regarding the effects of a regime that would allow only one operable gun per licensee or per household); *see also* Exhibit 3 at 165 (Cook Dep.) (admitting that he is unable to answer whether "a jurisdiction with a larger number of guns, but the same percentage of households that own guns, [will] have a higher murder rate, because "in none of the studies that I've done have I been able to distinguish between the number of guns in circulation and the prevalence of gun ownership").

**a.**     P. Cummings, et al., *The Association between the Purchase of a Handgun and Homicide or Suicide*, 87 American Journal of Public Health 974-978 (1997). Exhibit 68. This study found that "[t]he association between handgun purchase and suicide tended to become stronger as the number of handguns purchased increased," and reported an adjusted relative risk of 1.6 for one family purchase, 1.8 for two family purchases, and 2.7 for three or more family

purchases.  *Id.* at 976.  It further found that "[t]here was a stronger association between handgun purchase and death by homicide as the number of handguns purchased increased," and reported an adjusted relative risk of 1.1 for one family purchase, 2.1 for two family purchases, and 6.2 for three or more family purchases.  *Id.*  Dr. Kleck testified that this study has "some relevance" to MCC 8-20-040 and was published in a "leading journal" in the field of public health."  Exhibit 14 at 26:8-10, 171:7-10.

**RESPONSE:**  Admit that the Cummings study reported these findings, but dispute that they support the hypothesis that having more than one operable firearm in the home increases the risk for suicide or homicide by a member of the household.  As an initial matter, the variable the study used to measure firearms prevalence – the number of handguns purchased by family members from licensed dealers in the State of Washington (where the study subjects lived) – is dubious:  "Since people frequently get rid of guns, this is not a good measure of the number of guns owned at any one time,"  Exhibit 2 (Kleck Decl.), Exhibit I thereto, at 17, much less the number of *operable* guns kept in the home at any one time.  *See also* Chicago Exhibit 68 at 177 ("Some study subjects classified as exposed to handguns may have disposed of their handguns; others classified as not exposed may have possessed handguns that they purchased legally from sources other than a registered dealer, purchased out of state, or obtained illegally.")

More importantly, Chicago ignores the fact that the cited reported differences in relative risk were *statistically insignificant*.  Exhibit 2 (Kleck Decl.), Exhibit I thereto, at 17-18.  *See also* Chicago Exhibit 68 at 976, Tables 2 and 3 (showing overlapping confidence intervals for relative risk based on number of family handgun purchases for both suicide and homicide).  The study has a number of other shortcomings that limit its utility.  *See id.* at 977-78 (*e.g.*, "Inability to

measure and control for other differences between case and control subjects could have biased our relative risk estimates.")

"The most important limitation is that these studies [*i.e.,* Wintemute (1999) and Cummings (1997)] do not indicate whether handgun purchasers would have substituted other methods of suicide if a gun were not available, and do not measure other factors, such as history of substance abuse, psychiatric illness, criminal activity, or domestic violence, which might explain or modify a link between gun ownership and propensity for suicide."  Exhibit 10 at 183 (NATIONAL RESEARCH COUNCIL, FIREARMS AND Violence (Wellford, et al., eds. 2005)).

Dr. Webster has acknowledged many of these and other limitations.  *See* Exhibit 25 at 79-80 (Webster Dep.) (admitting that the study's finding that more guns purchased led to a higher rate of suicides was not statistically significant under the study's measure of statistical significance); *id.* at 79 (admitting that "in instances in which a firearm was purchased by someone other than the decedent, the person who committed suicide, the risk was not statistically different from no added risk" despite having a firearm in the home); *id.* at 70-71 (admitting that this study did not control for mental illness); *id.* at 74 (admitting that "the sample used in this study is not representative of the United States as a whole"); *id.* at 78 (admitting that "the study by Cummings did not even check to confirm that the original legally purchased handgun was still in the home" at the time of the homicide); *id.* at 80 (admitting that the study did not look at the number of operable guns in the home); *id.* at 80-81 (admitting that the study also found an elevated risk of non-firearm homicide among families who recently purchased a firearm and that this is an indication of the possibility that "handgun purchasers were more inclined toward violence or lived in more dangerous surroundings and these factors induced them to purchase handguns. This violent personality or environment may have increased the risk for both gun-

120

related and other homicide death regardless of exposure to handgun purchase. If this theory is

true, then the apparent association between handgun purchase and all homicide deaths may be

due to uncontrolled confounding").

Furthermore, the status of the journal "really means nothing with regard to the issue of whether

this particular paper was carefully reviewed. The problem is public health journals don't have a

lot of expert reviewers to draw on that are expert in this area." Exhibit 7 at 186-87 (Kleck Dep.).

  **b.**  D. Wiebe, Firearms in US homes as a risk factor for unintentional gunshot

fatality, 35 Accident Analysis and Prevention 711-716 (2003). Exhibit 69. This study found that

"the magnitude of the association" between gun availability and unintentional gunshot fatality

"increased with the availability of multiple guns." *Id.* at 713. Compared to homes where no

guns were present, the relative risk of death in a home with one gun was 3.4, and was 3.9 in a

home with multiple guns. *Id.* The study states that "[h]aving multiple guns appeared to

compound the hazard, as did having handguns in particular." *Id.* at 714. Dr. Kleck asserts that

while not "perfectly relevant," this study is the "closest to being relevant" to MCC 8-20-040.

Exhibit 14 at 315:4-1.

**RESPONSE:** Admit that the Wiebe study reported these findings, but dispute that they support

the hypothesis that having more than one firearm in the home increases the risk of a fatal gun

accident. The difference in relative risk between having one firearm and multiple firearms was

statistically insignificant—indeed the confidence intervals are strikingly similar. *See* Chicago

Exhibit 69 at 714, Table 3 (95% confidence interval for relative risk associated with one firearm:

1.5 – 7.6; multiple firearms: 2.0 – 7.8). "[T]his means *there is no statistically reliable basis for

concluding that persons in households with multiple guns are at even slightly higher risk of

suffering an unintentional gunshot injury.* Even this finding, however, is not entirely relevant to

121

the present legal case since Wiebe never made any comparisons of risk with regard to the number of guns kept in operable condition." Exhibit 2 (Kleck Decl.), Exhibit I thereto, at 16. "In any case, these [relative risks] cannot be taken at face value as estimates of causal effects because Wiebe controlled for only one actual confounding variable." *Id*. The authors of the study acknowledged a number of other shortcomings. *See* Chicago Exhibit 69 at 714 (*e.g.*, "These data . . . did not establish whether a gun used in a shooting had actually been kept in the decedent's home."; "Differential misclassification of cases and controls as either having or not having guns in the home could have biased the estimates."). *See also* Exhibit 25 at 170-71 (Webster Dep.) (admitting that missing data was a possible problem for this study); *id.* at 170 ("Data were missing for the variable indicating the presence of a firearm for 3 percent of controls and 21 percent of the cases").

> **c.** D. Brent, et al., Firearms and Adolescent Suicide: A Community Case- Control Study, 147 American Journal of Diseases of Children 1066-1071 (1993). Exhibit 70. This study reported that "the more guns in the home, the more likely suicide by firearms was to occur." *Id.* at 1068. Of suicide victims who used a firearm, 18.8% of those with no guns in the home committed suicide, 75% of those with one gun in the home committed suicide, and 91.2% of those with more than one gun committed suicide. *Id.* at 1068. It found that "[t]he odds of suicide with more than one handgun in the home were greatly increased relative to having just one handgun in the home," based on an estimated odds ratio of 17.1. *Id.*

**RESPONSE:** Dispute that this study demonstrates a methodologically sound, generalizable association between more firearms and more suicide. As an initial matter, most of the findings cited by Chicago merely find that having guns in the home is associated with a greater likelihood of committing suicide *with a gun*. The third sentence of the finding obscures this and does not

accurately describe the results of the study; it should read: Of suicide *victims*, 18.8% of those with no guns in the home committed suicide *with a gun*, 75% of those with one gun in the home committed suicide *with a gun*, and 91.2% of those with more than one gun committed suicide *with a gun*. *See* Chicago Exhibit 70 at 1068. In other words, suicides were more likely to use a gun versus another method of suicide when one or more guns were available in the home. This simply does not speak to the question whether more guns are associated with more suicides. The study did, as Chicago indicates, report that "the odds of suicide with more than one handgun in the home were greatly increased relative to having just one handgun in the home," with an estimated odds ratio of 17.1. *Id*. Chicago fails to mention, however, that the 95% confidence interval for this odds ratio includes 1.0, *id*., and an odds ratio of 1.0 "would represent no relationship in either direction," Exhibit 2 (Kleck Decl.), Exhibit I thereto, at 8. Furthermore, the study also found that "no increased risk of suicide was associated with having more than one long-gun in the home"; "having access to long guns was not associated with suicide in the total sample"; and "the association of suicide with having a loaded gun in the home also escaped statistical significance." Chicago Exhibit 70 at 1068. The study did not control for whether guns were kept in an operable condition. Indeed, the study did not control for *any* likely confounding variables. *See* Exhibit 2 (Kleck Decl.), Exhibit I thereto, at 53 Table 1; *see also id.* at 7-9 (discussing importance of controlling for potentially confounding variables). The study also has a number of other limitations. The study population was 67 adolescent suicide victims in Western Pennsylvania. *See* Chicago Exhibit 70 at 1067. Not only is this sample size small, but, as the authors caution, "it may be impossible to generalize these findings to other geographic locales." *Id*. at 1070. And "as a case-control study, one cannot simply draw causal inferences between firearms availability and risk for suicide." *Id*. *See also* Exhibit 10 at 181 (NATIONAL

RESEARCH COUNCIL, FIREARMS AND VIOLENCE (Wellford, et al., eds. 2005)) ("the association between household gun ownership and risk of suicide [found in this and other studies] may be due to factors beyond the relative lethality of firearms"). Also, since we are not challenging Chicago's child-safety storage restrictions, this study of adolescent suicides bears precious little relevance to this case. *See* MCC 8-20-050. Finally, Dr. Webster acknowledged a number of the shortcomings in this study. *See, e.g.*, Exhibit 25 at 126 (Webster Dep.) (admitting that the study did not look to see how many of the firearms in the home were operable); *id.* (admitting that the study did not look at the exact number of guns in the home, and merely looked at one gun vs. multiple, multiple could be "two to a hundred").

**123-A.** Dr. Webster also relied on studies and other data demonstrating an association between the availability of any firearm in the home and suicide, homicide, and unintentional death. Exhibit 65, Exhibit A thereto, § V. He opines that "if a variable is associated with an outcome, it is often the case that more of the variable will be associated with more of the outcome." *Id.* at 12. The studies differed in their design (e.g., case control study, cohort study, ecological study), samples, populations, or analytic methods. *Id.* at 3-12. The studies relied upon by Dr. Webster include the following:

**RESPONSE:** Admit that Dr. Webster relied on studies and other data examining the relationship between having *any* firearm in the home and suicide, homicide, and intentional death. But, because Chicago allows qualified citizens to keep an operable gun in the home, we dispute that these studies are particularly relevant to the case at hand. And while Dr. Webster opines that "if a variable is associated with an outcome, it is often the case that more of the variable will be associated with more of the outcome," dispute that Dr. Webster has shown that this is the case for the variable "number of firearms" and the outcomes of homicide, suicide, and

124

unintentional death.  Indeed, as we have shown in our response to Statement of Fact 122, the three studies Dr. Webster has cited that actually test this hypothesis provide very weak if any support for it.  Furthermore, Dr. Kleck thoroughly and convincingly rebutted the claim that the studies and other data Dr. Webster relies on support his conclusions.  *See* Response to Statement of Fact 122; Exhibit 2 (Kleck Decl.), Exhibit I thereto, at 6-18, 24.  We highlight certain limitations of the particular studies listed by Chicago below, although we refer the reader to Dr. Kleck's report for a more complete critique of Dr. Webster's reliance on this body of research.

   **a.**  A Kellerman, et al., Suicide in the Home in Relation to Gun Ownership, 327 New England Journal of Medicine 467-472 (1992).  Exhibit 71.  This case control study found an adjusted odds ratio of 4.8 for suicides in a home with one or more firearms compared to a home with no firearms, and concluded that its results "offer strong evidence that the ready availability of guns increases the risk of suicide in the home."  *Id.* at 470.

**RESPONSE:**

- This study controlled for only 4 likely confounding variables.  *See* Exhibit 2 (Kleck Decl.), Exhibit I thereto, at 53 Table 1; *id.* at 7-9 (discussing importance of controlling for confounders in this context).

- The study did not control for suicidal intent or self-reliance/self blame (none of Dr. Webster's studies controlled for the latter).  *Id.* at 8-9 (discussing confounding potential of these variables).  Indeed, the authors acknowledged that they could not "exclude the possibility that gun owners (and people who live in homes with guns) may be psychologically predisposed to commit suicide" because "one cannot readily control for 'psychological confounding' of this sort in a case-control study."  Chicago Exhibit 71 at 471.

125

- The study found a number of variables that had a higher adjusted odds ratio for suicide than having guns in the home: psychotropic medication prescribed (35.9), previous hospitalization due to drinking (16.4), active use of illicit drugs (10.0), and living alone (5.1).

- The study is also limited by its focus on suicide in the home, "because it is likely that decisions about method and location of suicide are made together. This means that a study of gun access in a study restricted to suicides that take place in the home may be no more informative than a study of bridge access in a study restricted to suicides that take place from a bridge." Exhibit 10 at 178 (NATIONAL RESEARCH COUNCIL, FIREARMS AND VIOLENCE (Wellford, et al., eds. 2005)). Indeed, this "possibly biased sample selection strategy, as well as other problems in the execution of the study and reporting of results, provoked a storm of attacks on the research team, the federal funding agency, and the medical journal in which the results were published." "An informal calculation using assumptions that are favorable to the investigators suggests that omission of suicides taking place outside of the home may have led to an overstatement of the true relative risk by about 20 percent. There are other problems with the execution of this study that may have actually let do biases of larger magnitude."

- Dr. Webster acknowledged a number of limitations of this study. *See, e.g.*, Exhibit 25 at 57-59 (Webster Dep.) (admitting that the sample in this study may not be generalizable to the city of Chicago due to differences relating to population density, racial composition, indices of mental illness, and religiosity); *id.* at 63 (agreeing that "the results are clearly sensitive to the assumption that the rates of gun suicide by ownership do not vary by the location of the suicide"); *id.* at 64-65 (admitting alcohol and drug

abuse, mental illness, and depression were more prevalent in the case group than the control groups and that those factors are associated with suicide); *id.* at 66-67 (admitting that the study's attempt to control for mental illness by controlling for prescription medication would only work if the people were taking their medication).

**b.** P. Cummings, et al., The Association between the Purchase of a Handgun and Homicide or Suicide, 87 American Journal of Public Health 974-978 (1997). Exhibit 68. This case control study found that, for members of households where a family member had legally purchased a handgun from a licensed dealer, the risk of suicide involving a firearm was 3.1 times higher, and the risk of homicide involving a firearm was 2.2 times higher, than for members of households with no purchase. *Id.* at 975-76. Further, the study found that the median interval between the first handgun purchase by the victim or any family member and any suicide with a gun was 10.7 years. *Id.* at 976. Dr. Webster opines that this indicates "that, in most instances, the suicide victim did not purchase a gun in order to complete a plan to commit suicide but rather used a firearm that had been purchased years ago, sometimes by individuals other than the one who committed suicide." Exhibit 65, Exhibit A thereto, at 4. Further, the study found that the median interval between the first family handgun purchase and any homicide death was 11.3 years and that "[t]he relative risk of death by homicide associated with family handgun purchase bore no statistically significant relationship to time since purchase." Exhibit 68 at 976. Dr. Webster opines that this indicates that "it seems unlikely" that the risk of being a homicide victim is what "prompt[ed] gun ownership." Exhibit 65, Exhibit A thereto, at 8.

**RESPONSE:**

- This study controlled for only 3 likely confounding variables. Exhibit 2 (Kleck Decl.), Exhibit I thereto, at 53 Table 1.

127

- It did not control for suicidal intent.

- "The most important limitation is that these studies [*i.e.,* Wintemute (1999) and Cummings (1997)] do not indicate whether handgun purchasers would have substituted other methods of suicide if a gun were not available, and do not measure other factors, such as history of substance abuse, psychiatric illness, criminal activity, or domestic violence, which might explain or modify a link between gun ownership and propensity for suicide." Exhibit 10 at 183 (NATIONAL RESEARCH COUNCIL, FIREARMS AND VIOLENCE (Wellford, et al., eds. 2005)).

- This study's "observed association[] between [firearms ownership and being murdered] may . . . be entirely spurious." *Id*. at 119.

- While the relative risk for suicide *involving a gun* was 3.1 times higher in households with firearms purchases, the relative risk for suicide *by any method* was only 1.9 times higher. *See* Chicago Exhibit 68 at 975, 976 Table 2.

- Furthermore, the results are consistent with suicidal intent being a confounding variable given that there was a statistically significant increased relative risk for suicide *for the purchaser* of a firearm in households with firearms purchases, *but not for other members of the household*. *See* Chicago Exhibit 68 at 975, 976 Table 2 ("The relative risks for suicide given a personal or family member handgun purchase were also elevated, although the elevated risk for family member purchase was not statistically significant."). Also consistent with suicidal intent being a confounding variable is the finding that "the relative risk for suicide given a family handgun purchase was greatest within the first year of purchase." *Id*. at 976.

- It is a "non sequitur" to conclude that a "long average time interval between 'the first family handgun purchase and homicide death' " means that it is "unlikely that the guns-homicide association 'could be due to homicide risks prompting gun ownership.' " Exhibit 2 (Kleck Decl.), Exhibit I thereto, at 13-14. Not only could the family have had more recent handgun purchases after the first one, but in addition "many of the same risk factors that placed family members at greater risk at the time of homicide would also have prevailed years before . . . . Thus, the fact that guns were acquired years before a family member was killed does not mean that the gun acquisition was not prompted by homicide risk factors such as a high neighborhood crime rate or association with dangerous people." *Id.*

- Furthermore, while the risk of being murdered with a firearm increased by 2.2 with a history of family handgun purchase, the risk of being murdered *by some other method* also increased by 2.0, and the two figures had almost identical 95% confidence intervals. Chicago Exhibit 68 at 176. "[I]f gun ownership in the study samples were merely a correlate of unmeasured risk factors that influence homicide in general, . . . gun ownership would be no more strongly associated with gun homicide than nongun homicide. [This] larger pattern is precisely what Cummings et al. found, supporting the view that gun ownership had no net causal effect on homicide risk but rather was correlated with uncontrolled factors that influenced both gun and nongun homicide victimization." Exhibit 49 at 75 (Gary Kleck, *Can Owning a Gun Really Triple the Owner's Chances of Being Murdered?*, 5 HOMICIDE STUDIES 64 (2001)).

- The study also does not support a hypothesis that persons purchased handguns for the purpose of killing other family members, as the relative risk that the purchaser or a non-purchasing family member was killed was nearly identical. *Id.*

- The study did not take into account whether the murders were even perpetrated with a household firearm.

- See our response to Statement of Fact 122 for additional limitations of this study.

**c.** D. Wiebe, Homicide and Suicide Risks Associated With Firearms in the Home: A National Case-Control Study, 41 Annals of Emergency Medicine 771-782 (2003). Exhibit 72. This case control study found that, "[c]ompared with persons living in a home with no firearms, the adjusted [odds ratio] for suicide was 3.44 . . . for persons living in a home where a gun was present." *Id.* at 776. It also concluded that "[h]aving a gun in the home was a strong risk factor for gun-related suicide," reporting an adjusted odds ratio of 16.89. *Id.* at 777. "The increased risk of suicide connected to guns in the home was exclusive to suicides committed with a firearm." Exhibit 65, Exhibit A thereto, at 4.

**RESPONSE:**

- This study did not control for suicidal intent and a number of other potentially confounding variables. *See* Exhibit 2 (Kleck Decl.), Exhibit I thereto, at 53 Table 1. Indeed, the authors acknowledged that "the greatest source of potential bias might be confounding from risk factors that were not measured or were controlled only partially." Chicago Exhibit 72 at 780. "Other potential factors that were not controlled were mental illness among subjects or family members and histories of violence, illicit drug and alcohol use, time spent (exposed) at home, and lifestyle factors like gang membership and drug dealing." *Id.*

130

- Indeed, the authors specifically recognized that "the association between having a gun at home and committing suicide with a gun could emerge because suicidal persons acquire a gun to take their own life." Chicago Exhibit 72 at 777.

- The authors acknowledge that "the main contribution of the present findings might simply be their consistency with past results," but caution that it would be "unwarranted to infer that such a limited body of research conclusively links gun availability to gun-related mortality." *Id*. at 777. (The "body of research" from which such an inference is unwarranted consists of this study plus the two Kellerman et al. studies and the Cummings et al. study also cited in support of this finding. *See id.* & *id.* at 781 nn. 4, 5, & 8.)

- Further, "large proportions of responses were missing in the variable of interest: whether the firearm was in the home," and techniques used to address this problem "do not obviate the limitations of complete data." *Id*. at 779.

- Another "limitation comes from not knowing whether the gun used fatally had actually been kept in the victim's home." *Id*. at 780.

  **d.**  G. Wintemute, et al., Mortality among recent purchasers of handguns, 341 New England Journal of Medicine 1583-89 (1999). Exhibit 73. This cohort study found that "handgun purchasers, as compared with the general adult population during the same period, were at substantially greater risk for suicide in the first year after a handgun purchase (standardized mortality ratio, 4.31), and the increase was attributable entirely to the substantial excess mortality from suicide by firearm (standardized mortality ratio, 7.12)." *Id*. at 1585. A standardized mortality ratio is the ratio of the number of deaths among handgun purchasers to the number of deaths expected in the general population based on age and sex-specific death rates.

Exhibit 65, Exhibit A thereto, at 5.  In the 6-year period following the purchase, the risk for

suicide (standardized mortality ratio, 2.16) and suicide by firearm (standardized mortality ratio,

3.50) remained elevated.  Exhibit 73 at 1586.

**RESPONSE:**

- This study controlled for only two potential confounders (age and sex), and did not

  control for suicidal intent.  *See* Chicago Exhibit 73 at 1585.

- The authors acknowledged that "we cannot determine the extent to which increases or

  decreases in the risk of violent death are attributable specifically to the purchase of a

  handgun, since we lack information about other risk factors. . . . An increased risk of

  suicide by firearm might be due to an increased prevalence of these risk factors among

  handgun purchasers, and not due to the handgun purchase itself."  *Id*. at 1588.

- The study is consistent with suicidal intent being confounding, particularly the finding

  that "the rate of suicide by firearm among handgun purchasers was greatest immediately

  after the purchase and declined thereafter."  *Id*.; *id.* at 1586 Figure 1.  Indeed, the suicide

  rate "for the first week after purchase was . . . *57 times as high as the adjusted statewide*

  *rate*."  *Id*. at 1585.  "A stronger [suicidal intent] is also likely to induce some people to

  acquire a gun for the purpose of carrying out the suicide attempt.  Even if possessing or

  using a gun did not actually influence whether a person attempted suicide or whether an

  attempt was fatal, one would still find higher gun ownership among those who killed

  themselves, i.e. one would find a positive guns/suicide association.  *Indeed, one would*

  *find an especially strong positive association between suicide and a recent gun*

  *purchase*."  Exhibit 2 (Kleck Decl.), Exhibit I thereto, at 8.

- With respect to homicide, the study found that male handgun purchasers were at a *decreased* risk for homicide through up to six years after purchase, while female handgun purchasers experienced an *increased* risk. *See* Chicago Exhibit 73 at 1586, Table 4. This "pattern makes perfect sense if the gun/homicide [association] is interpreted as spurious. When women purchase handguns, it is especially likely to be for purposes of self-defense, whereas men are more likely to purchase handguns for a variety of purposes, including recreational activities like hunting and target shooting, unrelated to self-defense. . . . Thus, among recent handgun purchasers, women are more likely than men to have been responding to factors raising their risk of homicide, and for this reason are more likely to be murdered after buying the handgun." Exhibit 2 (Kleck Decl.), Exhibit I thereto, at 14.

- The authors also did "not know whether the handguns purchased by persons in our study cohort were actually involved in the deaths we analyzed." Chicago Exhibit 73 at 1588.

- "The most important limitation is that these studies [*i.e.,* Wintemute (1999) and Cummings (1997)] do not indicate whether handgun purchasers would have substituted other methods of suicide if a gun were not available, and do not measure other factors, such as history of substance abuse, psychiatric illness, criminal activity, or domestic violence, which might explain or modify a link between gun ownership and propensity for suicide." Exhibit 10 at 183 (NATIONAL RESEARCH COUNCIL, FIREARMS AND VIOLENCE (Wellford, et al., eds. 2005)).

   **e.**      M. Miller, et al., The association between changes in household firearm ownership and rates of suicide in the United States, 12 Injury Prevention 178-182 (2006). Exhibit 74. This longitudinal ecological study found that "changes in household firearm

ownership over time were associated with significant changes in rates of suicides for men, women, and children." *Id.* at 181. Each 10% decline in firearm prevalence was accompanied by "significant declines in suicide by firearm and suicide overall: firearm suicide rates dropped by 4.2% . . . and total suicide rates by 2.5%." *Id.* at 180. Further, "[t]he relation between changes in household firearm ownership and overall rates of suicide is due to the association of firearm ownership and suicide by firearms (that is, changes in non-firearm suicide are not related to changes in firearm ownership)." *Id.* at 181.

**RESPONSE:**

- The proxy this study used to track gun ownership, percentage of suicides with guns, is "worthless for use in longitudinal studies like [this one], which examined changes over time in gun ownership and suicide. . . . Since Miller et al. did not have a valid measure of changes in gun prevalence over time, their findings can tell us nothing about what effects such changes may have on suicide rates." Exhibit 2 (Kleck Decl.), Exhibit I thereto, at 11.

- The authors also acknowledged a "possible interpretive cost of assuming that group-level associations reflect individual risk factors. . . . The greatest threat to the validity of our findings in this respect is that we do not know whether firearm suicide victims actually lived in homes with guns." Chicago Exhibit 74 at 181.

- The authors also acknowledged that there "many . . . factors may affect suicide rates" that they did not control for—including "annual changes in suicidality over time." *Id.*

- The study also did not collect information "about many characteristics of firearm availability that may be related to the rate of suicide deaths," including "the number of

134

firearms in a gun owning household" and "firearm storage practices." *Id.* It is thus not well adapted to the Chicago law being challenged here.

**f.** A. Kellerman, et al., *Gun Ownership as a Risk Factor for Homicide in the Home*, 329 New England Journal of Medicine 1084-1091 (1993). Exhibit 75. This case control study found that "the presence of one or more firearms in the home was strongly associated with an increased risk of homicide in the home," reporting an adjusted odds ratio of 2.7, and that "[g]un ownership was most strongly associated with homicide at the hands of a family member or intimate acquaintance," reporting an adjusted odds ratio of 7.8. *Id.* at 1087. The study further noted that "[n]ot surprisingly, the link between gun ownership and homicide was due entirely to a strong association between gun ownership and homicide by firearms." *Id.*

**RESPONSE:**

- "Kellerman et al. (1993) . . . did not say why or how gun ownership by a given person or members of the person's household would increase that person's risk of being murdered. . . . The obvious, most direct, and perhaps the only plausible mechanism would be that attackers, especially those living in the same home as the victim, would use a gun kept in the victim's household to kill the victim. . . . Thus, the plausibility of the authors' interpretation of their findings depends heavily on what fraction of homicides are committed with a gun kept in the victim's home. The authors, however, were silent on this matter." Exhibit 49 at 67 (Gary Kleck, *Can Owning a Gun Really Triple the Owner's Chances of Being Murdered?*, 5 HOMICIDE STUDIES 64 (2001)).

- "Based largely on Kellerman's own data, revealed in a later study, *less than two percent of homicides in the areas he studied were committed with a gun belonging to the victim or another member of the victim's household.* Thus, if people with guns in their homes

135

are more likely than those without guns to be murdered, there is no reason to infer from this fact that their household gun ownership somehow caused gun owners' elevated risk of being murdered."  Exhibit 2 (Kleck Decl.), Exhibit I thereto, at 13 (citation omitted); *see also* Exhibit 49 at 69-70 (Gary Kleck, *Can Owning a Gun Really Triple the Owner's Chances of Being Murdered?*, 5 HOMICIDE STUDIES 64 (2001)).

- Furthermore, "the association discovered by Kellerman et al. (1993) looked like a spurious association attributable to confounding factors not controlled by the analysts, such as membership in a street gang or involvement in illicit drug dealing."  Exhibit 49 at 66 (Gary Kleck, *Can Owning a Gun Really Triple the Owner's Chances of Being Murdered?*, 5 HOMICIDE STUDIES 64 (2001)). *See also* Exhibit 2 (Kleck Decl.), Exhibit I thereto, at 13 ("Kellerman et al. . . . perfectly exemplify the failure to control for important likely confounders.").

- "A number of other flaws in this research have been identified, including the use of local samples that were not representative of any larger populations as well as errors in measurement of gun ownership that were sufficiently common to completely account for the observed association."  Exhibit 49 at 66 (Gary Kleck, *Can Owning a Gun Really Triple the Owner's Chances of Being Murdered?*, 5 HOMICIDE STUDIES 64 (2001)).

- *See also* Chicago Exhibit 75 at 1089 ("it is possible that reverse causation accounted for some of the association we observed between gun ownership and homicide"); Exhibit 25 at 153 (Webster Dep.) (admitting that reverse causation may have influenced the results).

- *See also* Exhibit 10 at 118 (NATIONAL RESEARCH COUNCIL, FIREARMS AND VIOLENCE (Wellford, et al., eds. 2005)) (discussing this study and stating that its conclusions are "not tenable").

136

      **g.**     J. Campbell, et al., Risk Factors for Femicide in Abusive Relationships: Results From A Multisite Case Control Study, 93 American Journal of Public Health 1089-1097 (2003). Exhibit 76. This case control study found that gun availability "had substantial independent effects that increased homicide risks" at the hands of an intimate partner, with at least a 5-fold increase in risk. *Id.* at 1092.

**RESPONSE:**

- The study reports the results of seven models testing hypothesized risk factors for intimate partner femicide among women involved in physically abusive intimate relationships.

- The study found that previous "physical violence against the victim is the primary risk factor for intimate partner femicide." Chicago Exhibit 76 at 1091.

- One of the models found that "victims' risk of being killed by their intimate partner was lower when they lived apart from the abuser and had sole access to a firearm." Chicago Exhibit 76 at 1090. Dr. Webster admitted that a possible explanation for this finding was that the women used firearms in self-defense. *See* Exhibit 25 at 163-64 (Webster Dep.).

- According to the authors, "the variables that remained significant . . . in model 7 are particularly important in prevention of the lethal incident itself." Chicago Exhibit 76 at 1094. "Abuser access to gun" was not a statistically significant risk factor in model 7. *Id.* at 1095, Table 3.

- As Dr. Kleck has testified, quoting Dr. Cook, an " 'assailant's choice of weapon is a good indicator of his intent in assault offenses' " and an " 'assailant who is determined to kill the victim probably will use a gun, if one is available.' . . . Consequently, by Cook's own logic, the attackers who use guns are also likely to be more lethal in their *intentions*."

Exhibit 2 (Kleck Decl.), Exhibit I thereto, at 26. It is thus noteworthy that model 7 of the study found that the abuser's use of a gun, as well as the abuser's having threatened the victim with a weapon, were statistically significant risk factors for femicide. *See* Chicago Exhibit 76 at 1096. Indeed, "abuser's use of a gun in the worst incident of abuse *was associated with a 41-fold increase in risk of femicide after control for other risk factors*." *Id.* at 1091. This study is thus consistent with the hypothesis that murderous abusers are simply more lethal in their intentions.

- The authors also noted several limitations in the study. *See id.* at 1093-94.

- Dr. Webster also acknowledged that the study was "not an experimental design" and that "there [are] always uncertainties about causal connections." Exhibit 25 at 165 (Webster Dep.).

**h.**     M. Miller, et al., State-level homicide victimization rates in the US in relation to survey measures of household firearm ownership, 2001-2003, 64 Social Science & Medicine 656-664 (2007). Exhibit 77. This ecological study of state-wide firearm ownership and homicide data found that "[s]tates with higher rates of household firearm ownership had significantly higher homicide victimization rates in multivariate analyses. The association between firearm prevalence and homicide victimization in our study was driven by gun-related homicide victimization rates; non-gun-related victimization rates were not significantly associated with rates of firearm ownership." *Id.* at 660-61. The study found that "each one percentage point difference in household firearm ownership was associated with a 3.3% difference in firearm homicide victimization . . . and a 2.2% difference in the rate of homicide victimization." *Id.* at 659.

**RESPONSE:**

138

- This study did not use a technically sound method for controlling for causal order. *See* Exhibit 2 (Kleck Decl.), Exhibit I thereto, at 59 Table 3. Thus, its "positive guns/homicide association may merely indicate that higher murder rates cause more people to acquire guns for self-protection." *Id*. at 14.

- Indeed, the authors plainly admit that "our study does not establish a causal relationship between guns and homicide," and that "the association we observe might have arisen because individuals in states with historically high homicide rates acquired more guns (than individuals in low-homicide states), as a defensive response to actual high homicide rates in their communities (i.e., 'reverse causation')." Chicago Exhibit 77 at 662.

- They also acknowledged that "other factors not included in the analysis may affect homicide rates," *i.e.*, may be confounders. *Id*.

- The study also suffers from the "ecologic fallacy," *i.e.*, "assuming group-level associations reflect individual risk factors." *Id*.

    **i.**    M. Miller, et al., Firearm Availability and Unintentional Firearm Deaths, Suicide, and Homicide among 5-14 Year Olds, 52 Journal of Trauma, Injury, Infection, and Critical Care 267-275 (2002). Exhibit 78. This ecological study of state-wide data found "a positive and statistically significant association between gun availability and state-level rates of unintentional firearm deaths, homicides, firearm homicides, suicides, and firearm suicides among children. The increased rate of homicide and suicide in states with high gun levels was accounted for by significantly elevated firearm (but not nonfirearm) suicide and homicide rates." *Id.* at 271. Further, in comparing data from the five states with the highest estimated gun availability levels (Louisiana, Alabama, Mississippi, Arkansas, and West Virginia) with the five states with the lowest (Hawaii, Massachusetts, Rhode Island, New Jersey, and Delaware), the study concluded

that children in the high-gun states "were 16 times as likely to die from unintentional firearm injury, 7 times as likely to die from firearm suicide, 3 times as likely to die from firearm homicide and, overall, twice as likely to die from suicide and homicide." *Id.*

**RESPONSE:**

- The study controlled for a small number of confounding variables. *See* Exhibit 2 (Kleck Decl.), Exhibit I thereto, at 59 Table 3. *See also* Chicago Exhibit 78 at 273 ("Another limitation of our study is that our analyses may not account for some reasons that states with higher household gun levels have higher violent death rates. Although we include some state-level confounders . . ., these represent only a small number of the characteristics likely to affect suicides, homicides, or unintentional firearm deaths.").

- This study did not use a technically sound method for controlling for causal order. *See* Exhibit 2 (Kleck Decl.), Exhibit I thereto, at 59 Table 3. Thus, its "positive guns/homicide association may merely indicate that higher murder rates cause more people to acquire guns for self-protection." *Id*. at 14. *See* Chicago Exhibit 78 at 273 ("A potentially more problematic issue is that of reverse causation . . . .").

- For its state-level analysis, the study did not use a valid measure of gun prevalence. *See* Exhibit 2 (Kleck Decl.), Exhibit I thereto, at 59 Table 3.

**j.** M. Miller, et al., Firearm Availability and Suicide, Homicide, and Unintentional Firearm Deaths Among Women, 79 Journal of Urban Health 26-38 (2002). Exhibit 79. This study found "positive and statistically significant associations between gun availability and state level rates of suicide, homicide, and unintentional firearm death among adult women. The increased rate of suicide in states with high gun levels was accounted for by elevated firearm suicide rates . . . [and] [t]he increased rate of homicide in states with high gun levels was

accounted for primarily by significantly elevated firearm homicide rates." *Id.* at 29-32. Further, in comparing data from the five states with the highest estimated gun availability to the five with the lowest, the study found that women living in the high gun states "were 1.5 times as likely to die from suicide, 2.7 times as likely to die from homicide, and 11.2 times as likely to die from an unintentional firearm injury." *Id.* at 33-34. Dr. Webster opines that, since women and children are rarely the ones who bring a firearm into the home, "positive associations between gun availability and homicide risks are unlikely to be due to individuals being motivated by their own risk of homicide to acquire a gun." Exhibit 65, Exhibit A thereto, at 9.

**RESPONSE:** This study employed a similar methodology as the study listed directly above, and is subject to the same criticisms.

**k.** D. McDowall, Firearm Availability and Homicide Rates in Detroit, 1951-1986, 69 Social Forces 1085-1101 (1991). Exhibit 80. This study of changes in gun availability and homicide rates in Detroit from 1951 to 1986 estimated that each 1% increase in gun availability was associated with an increase of more than 1% in homicides per 100,000 residents. *Id.* at 1090. It found that if the gun ownership rate (i.e., the gun density index) from 1964 is applied to 1986, and "all other explanatory variables were held at their 1986 levels," the homicide rate predicted for 1986 would be 21.4 per 100,000 residents, rather than the rate of 56.4 that was actually observed. *Id.* at 1091. The study reported that "[t]his is only 38% of the actual rate for 1986 and represents a difference of 379 lives." *Id.*

**RESPONSE:**

- This study used an invalid measure of gun prevalence, controlled for only 3 potential confounders, and did not use a technically sound method to establish the causal order between gun levels and homicide rates. Exhibit 2 (Kleck Decl.), Exhibit I thereto, at 58

141

Table 3.  It thus suffers from each of the three "fatal errors" Dr. Kleck has identified in

this body of research.  *Id.* at 30.

**l.**      M. Duggan, More Guns, More Crime, 109 Journal of Political Economy 1086-

1114 (2001).  Exhibit 81.  This study of state and county-level data found that "changes in

homicide and gun ownership are significantly positively related" and that its findings suggest

"that an increase in the number of guns leads to a substantial increase in the number of

homicides."  *Id.* at 1088.  It reported that its findings suggest that "a 10 percent increase in the

rate of gun ownership is associated with approximately a 2 percent increase in the homicide

rate."  *Id.* at 1096.

**RESPONSE:**

- This study used an invalid measure of gun prevalence, controlled for zero potential

  confounders, and did not use a technically sound method to establish the causal order

  between gun levels and homicide rates.  Exhibit 2 (Kleck Decl.), Exhibit I thereto, at 58

  Table 3.  It thus suffers from each of the three "fatal errors" Dr. Kleck has identified in

  this body of research.  *Id.* at 30.

**m.**      P. Cook, et al., The social costs of gun ownership, 90 Journal of Public

Economics 379-391 (2006).  Exhibit 22.

**RESPONSE:**

- This study used an invalid measure of gun prevalence and did not use a technically sound

  method to establish the causal order between gun levels and homicide rates.  Exhibit 2

  (Kleck Decl.), Exhibit I thereto, at 59 Table 3.  It thus suffers from "fatal errors" Dr.

  Kleck has identified in this body of research.  *Id.* at 30.

- Indeed, "this study is so technically flawed that [Dr. Kleck has] used it as an exemplar of poor research in this area . . . . This crude study therefore cannot be relied upon to provide a meaningful estimate of the effect of gun rates on homicide rates." *Id*. at 31. *See* Exhibit 50 at 71-80 (Gary Kleck, *How Not to Study the Effect of Gun Levels on Violence Rates*, 21 J. ON FIREARMS & PUB. POL'Y 65 (2009)).

**n.** D. Wiebe, Firearms in US homes as a risk factor for unintentional gunshot fatality, 35 Accident Analysis and Prevention 711-716 (2003). Exhibit 69. This case control study found that "the relative risk of death by an unintentional shooting, comparing subjects living in homes with and without at least one gun, was 3.7." *Id.* at 713.

**RESPONSE:** We have already addressed this study in our response to Statement of Fact 122.

**124–A.** The majority of firearm-related deaths that occur in U.S. homes are suicides. *Id*. at 2-3. Even within the most urban counties in the U.S., suicides account for more than one third of all firearm-related deaths. *Id.* at 3.

**RESPONSE:** Admit.

**124-B.** 10 of the 16 published case control studies of firearm ownership and suicide "found a significant relationship between gun ownership and suicide." Exhibit 14 at 188:17-20. An additional one of those 16 studies – Conwell (2002) – found statistically significant increased risk associated with gun ownership for males. *Id.* at 192:7-10.

**RESPONSE:** Admit, but dispute the significance of this fact; "it would scarcely matter even if 'nearly all' of the case-control studies really had found a positive guns/suicide correlation, since this body of research is far too weak to support any conclusions." Exhibit 2 (Kleck Decl.), Exhibit I thereto, at 7. Furthermore, the association for males "doesn't make sense if its interpreted as a causal effect of gun ownership because there's no reason why females would be

143

impervious to the effect of guns . . . . [I]t suggests you are really seeing the effect of a confounder that's correlated with gun ownership."  Exhibit 7 at 191-92 (Kleck Dep.).

**125.**  Dr. Kleck owns two handguns, uses a trigger lock on both, and considers trigger locks to be a safe method of storing those guns.  *Id.* at 35:18-25, 36:3-5.  He agrees that trigger locks "have a safety benefit," are a "sensible step to take in order to prevent unauthorized use," and provide "some assurance against somebody firing the guns who didn't have a key to the lock."  *Id.* at 104:10-13, 105:5-10, 105:14-18.  He agrees that "guns with trigger locks are much less likely to be involved in accidents than guns without trigger locks;" indeed, they are "virtually not involved in accidents at all" and it is "virtually impossible" for an unauthorized user to use a trigger-locked gun.  *Id.* at 121:6-8, 322:15-19.  Even under the assumption that the devices impair authorized access for defensive use, they impair unauthorized access "a lot more" than they impair authorized access.  *Id.* at 112:11-15.

**RESPONSE:**  Admitted.

**126.**  Dr. Webster opines that the safe storage of firearms reduces the risks of suicide, homicide, and deaths from unintentional shootings associated with keeping firearms in the home. Exhibit 65, Exhibit A thereto, §§ VII, X.  The sources relied upon by Dr. Webster in forming this opinion include:

**RESPONSE:**  Admit that Dr. Webster so opined, and that the sources below are among those he relied upon, but dispute Dr. Webster's opinion.  Dr. Kleck has thoroughly rebutted Dr. Webster's opinion with respect to "safe storage" of firearms.  *See* Exhibit 2 (Kleck Decl.), Exhibit I thereto, at 18-19.  For example, "[t]he feature that is most conspicuous in Webster's discussion of 'safe' storage in the absence of any discussion of how keeping guns locked away and unloaded affects their readiness for use in self-defense.  . . . This is a critical matter, since if keeping guns locked

144

and unloaded substantially reduced the number of life-saving defensive uses of gun, but had little

or no effect on harmful uses, it could hardly be reasonably argued that keeping guns locked and

unloaded is 'safe' storage." *Id.* at 18. *See also* Exhibit 10 at 216 (NATIONAL RESEARCH

COUNCIL, FIREARMS AND VIOLENCE (Wellford, et al., eds. 2005)) ("[L]ocking devices may

compromise the ability of authorized users to defend themselves. A lock may fail entirely or

may take too much time for the weapon to be of use."). Dr. Kleck also emphasized that Dr.

"Webster's discussion of research is irrelevant to the [challenged] Chicago ordinance . . . . [T]he

studies attempted to assess the effect of having *any* guns in operable condition, not the effect of

having one operable gun versus multiple operable guns." Exhibit 2 (Kleck Decl.), Exhibit I

thereto, at 18. Dr. Kleck continues to offer additional criticisms of the research relied on by Dr.

Webster, *see id.* at 18-19, and we highlight several points in response to the particular studies

listed below. Also, it bears noting that during his deposition Dr. Webster could not identify a

single study finding a positive association between homicide and firearm storage practices. *See*

Exhibit 25 at 191:3-9 (Webster Dep.).

Dr. Kleck's opinion on this subject is consistent with the findings of comprehensive literature

reviews concluding that research has not proven that locking devices or mandates reduce injury

from firearms. *See* Exhibit 51 at 56 (Robert Hahn, *et al.*, *Firearms Laws and the Reduction of*

*Violence: A Systematic Review*, 28 AM. J. PREV. MED. 40 (2005)) ("the small number of studies

of CAP laws, all of limited quality of execution and inconsistent findings, is insufficient to

determine the effectiveness of the laws in reducing violence or unintentional firearm-related

injury and other violent outcomes"); Exhibit 10 at 219 (NATIONAL RESEARCH COUNCIL,

FIREARMS AND VIOLENCE (Wellford, et al., eds. 2005)) ("we found no credible scientific

evidence . . . that demonstrates whether safety devices can effectively lower injury").

a.      A. Kellerman, et al., Suicide in the Home in Relation to Gun Ownership, 327

New England Journal of Medicine 467-472 (1992).  Exhibit 71.  This study concluded that

"[h]omes with handguns and homes where firearms were not locked up or were kept loaded were

even more likely to be the scene of a suicide than homes where firearms were kept securely

stored." *Id.* at 470. The study reported, as compared to a home with no firearms, the following

adjusted odds ratios: 2.4 for suicide by firearm where all guns were kept locked up; 5.6 where

any gun was kept unlocked; 3.3 where all guns were kept unloaded; and 9.2 where any gun was

kept loaded. *Id.* at 471. Dr. Webster opines that these figures "clearly show a progression of

increasing risk with increasing ease of access."  Exhibit 65, Exhibit A thereto, at 13.

**RESPONSE:**

- This study actually found *no statistically significant difference* in suicide risk based on
  method of storage.  While Chicago accurately reports adjusted odds ratios for various
  methods of storage, it fails to mention that the 95% confidence intervals for these odds
  ratios overlap.  *See* Chicago Exhibit 71 at 471 Table 6.  *See also* Exhibit 2 (Kleck Decl.),
  Exhibit I thereto, at 17-18 (discussing statistical significance and overlapping confidence
  intervals).

- See also our response to Statement of Fact 23 regarding this study.

b.      D. Grossman, et al., Gun Storage Practices and Risk of Youth Suicide and

Unintentional Firearm Injuries, 293 Journal of the American Medical Association 707-714

(2005).  Exhibit 82.  This case control study concluded that "[s]afe storage practices, including

keeping firearms . . . secured with an extrinsic safety device, were shown to be protective for

unintentional firearm shootings and suicide attempts among adolescents and children."  *Id.* at

712.  It further concluded that: "case guns" (those guns used in a suicide attempt or unintentional

146

injury) "were less likely to be stored locked" than control guns (those guns that had not been used in a suicide attempt or unintentional injury), reporting an odds ratio of .27; "[r]elative to firearms that were unlocked and loaded, those stored locked and unloaded were less likely to be involved in a shooting," reporting an odds ratio of .16; and that "[h]aving only the ammunition accessible (with the reference firearm locked) was associated with a reduced risk of a case shooting event . . . relative to having both the gun and ammunition unlocked," reporting an odds ratio of .34. *Id.* at 711. This study "indicate[s] that the risk of self-inflicted and unintentional firearm injuries was about 70 percent lower in gun-owning homes that stored their firearms locked up and unloaded compared with homes where guns were not stored locked up and unloaded. The relationship between gun storage practices and firearm deaths to adolescents was similar for suicide and unintentional shootings." Exhibit 65, Exhibit A thereto, at 13.

**RESPONSE:**

- Given that we are not challenging the "Protection of Minors" provision of Chicago's firearms ordinance, this study about the impact of firearm storage practices on risks to adolescents and children is not particularly relevant here. *See* MCC § 8-20-050. The authors expressly recognize that their findings "may . . . not be generalizable to adults." Chicago Exhibit 82 at 713.

- Furthermore, the use of a trigger lock was *not* associated with a statistically significant decreased risk for a firearm injury. *See id.* at 712 Table 3; *see also id.* at 711 (of the particular devices studied, "only the use of a lockbox/safe was associated with a statistically significant decreased OR for a firearm injury"). Indeed, the use of a trigger lock was associated with an *increased* risk for unintentional firearm injury, although not a statistically significant one. *See id.* at 713 Table 5.

147

- At any rate, the "case-control studies cited by Webster . . . cannot sustain the conclusion that keeping guns locked and unloaded reduces the risk of homicide, suicide, and unintentional shootings, since none of the studies made a serious effort to control for confounding variables." Exhibit 2 (Kleck Decl.), Exhibit I thereto, at 18.

**c.** M. Miller, et al., Firearm storage practices and rates of unintentional firearm deaths in the United States, 37 Accident Analysis and Prevention 661-667 (2005). Exhibit 83. This state-level analysis found that, on average, a 1% increase in the proportion of households that store firearms loaded is associated with a 4% increase in the rate of unintentional firearm deaths, and that this increase "appears to reside largely and significantly in those households in which at least one of the loaded firearms is also unlocked: the unintentional firearm death rate was 6% higher in states where an additional 1-percentage point of gun owning households stored firearms loaded and unlocked, compared to households in which all firearms were unloaded." *Id.* at 665. The study also compared the 6 states with the highest percentage of people living in homes with loaded firearms with the 10 states with the lowest percentage of people living in such homes. *Id.* Even though the 6 states had a smaller overall population, and a smaller number of people living in homes with loaded firearms, the 6 states had approximately twice as many unintentional firearm deaths than the 10 states. *Id.* Dr. Webster opines that, from this study, one "can infer . . . that generally in areas with safer storage practices of firearms, you will see lower risk and rates for unintentional firearm deaths." Exhibit 84 (Deposition of Daniel Webster) at 201:4-14.

**RESPONSE:**

- This study did not differentiate between keeping a gun trigger locked and, for example, locking it in a safe. *See* Chicago Exhibit 83 at 662 ("By unlocked, we mean you do not need a key or combination to get the gun *or* to fire it.").

- For loaded guns, there was no statistically significant difference in the rate of unintentional firearms deaths based on whether the gun was stored locked or unlocked. *See id.* at 664 Table 2 (reporting overlapping confidence intervals for these variables).

- The authors also acknowledged a number of limitations, including:

  o Gun storage data was from 2002, while mortality data pertained to years 1991-2000. "Nothing, however, is known about the cross sectional stability of firearm storage practices over time." *Id*. at 666.

  o The "findings are subject to the ecologic fallacy (i.e., drawing causal inferences from group data to individual risk factors)." *Id.*

**d.** D. Webster, et al., Association Between Youth-Focused Firearm Laws and Youth Suicides, 292 Journal of the American Medical Association 594-601 (2004). Exhibit 85. This study of states that have safe storage laws intended to keep firearms from youth ("Child Access Prevention" laws) found that the laws were associated with an 8.3% reduction in suicide rates for persons aged 14 to 17 years. *Id.* at 596. It found that "[a]s would be expected if these reductions were attributable to reduced access to firearms, the reductions were specific to suicides committed with firearms and to the age group principally targeted by [the] laws." *Id.* at 599. Dr. Webster opines that this reduction is "significant." Exhibit 65, Exhibit A thereto, at 14.

**RESPONSE:**

- Given that we are not challenging the "Protection of Minors" provision of Chicago's firearms ordinance, this study is not particularly relevant here. *See* MCC § 8-20-050.

149

- The "significance" of the findings depended upon "how national suicide trends were modeled," as certain models "found no statistically significant association between CAP laws and suicide rates in the group aged 14 to 17 years." *See* Chicago Exhibit 85 at 598.

- Furthermore, Dr. Webster's own research has found that "when Florida was excluded from the analysis, *there were no statistically significant aggregate of state-specific CAP law effects on childhood unintentional firearm death rates among the other 14 states that had adopted CAP laws*." *See* Exhibit 52 at 1468 (Daniel W. Webster et al., *Reexamining the Association between Childhood Access Prevention Gun Laws and Unintentional Shooting Deaths of Children*, 106 PEDIATRICS 1466 (Dec. 2000). (Another study has found a statistically significant effect in one additional state, California.) These results "indicate that the laws were a failure." Exhibit 2 (Kleck Decl.), Exhibit I thereto, at 19.

    **e.**    P. Cummings, et al., State Gun Safe Storage Laws and Child Mortality Due to Firearms, 278 Journal of the American Medical Association 1084-1086 (1997). Exhibit 86. This study of states that have safe storage laws intended to keep firearms from youth found that "unintentional firearm-related deaths among children younger than 15 years were 23% . . . lower than expected in these states." *Id.* at 1085.

**RESPONSE:** See our response to the prior study regarding safe storage laws intending to keep firearms from youth.

    **127.**    Dr. Webster opines that although MCC 8-20-040 allows each holder of a Chicago Firearm Permit to keep an operable firearm in their home at all times, the ordinance "should lead to reduced availability of operable firearms to household members when they become distraught, suicidal, angry, or otherwise lose control of their emotions and, thus, lead to fewer tragic deaths." Exhibit 65, Exhibit A thereto, at 16.

**RESPONSE:** Admit that Dr. Webster so opines, but dispute the validity of his opinion. *See* Exhibit 2 (Kleck Decl.), Exhibit I thereto, at 24. Indeed, under Webster's own logic—that increased availability to operable weapons leads to an increased number of tragic deaths— Chicago's law would have a perverse effect to the extent it provides an incentive for residents to carry their one operable firearm on their person within the home because they are not allowed to store multiple operable firearms throughout the home.

**128-A.** The International Association of Chiefs of Police recommends "[m]andating safe storage of firearms by private citizens." Exhibit 87 (2007 Taking a Stand Report) at 7.

**RESPONSE:** Admitted.

**128-B.** ATF guidelines recommend that FFLs "[d]isable display firearms" by using "trigger locks or plastic ties to ensure that the firearms cannot be loaded or fired while being examined," and that FFLs "[r]ecommend safe storage methods," including locking devices, to customers. Exhibit 38, Exhibit A thereto, at 7; Exhibit 88 (ATF Publication 3317.2, revised Feb. 2, 2010) at 12, 14. Those guidelines further recommend that FFLs should "[s]how only one firearm at a time to a customer. If the customer requests to handle another firearm, secure the first firearm before displaying another." *Id*. at 12. These recommendations are designed to prevent firearm theft and accidental discharge in gun stores, as well as the use of a retailer's firearm by a customer to rob the retailer. Exhibit 38, Exhibit A thereto, at 8; Exhibit 39 at 108:20-109:16. They were developed by Mr. Vince's staff at the ATF through consultation with firearms industry members. Exhibit 38, Exhibit A thereto, at 7. They were selected because they were found to work. *Id.* at 8. Mr. Vince testified that the reason firearms retailers use locking devices is also "applicable to your home" – i.e., "you want to make sure your visitors are safe there and you want to make sure that visitors don't inadvertently get ahold of a firearm." Exhibit

39 at 93:3-7.  Mr. Vince testified that the owner "can't be assured that [a visitor] going to the

bathroom . . . inadvertently seeing something won't pick it up and use it."  *Id.* at 110:13-16.

**RESPONSE:**  Dispute that guidelines for securing firearms displayed for sale are relevant to the

storage of self-defense weapons in the home.  *See* Exhibit 44 at 94 (Vince Dep.) (admitting that

firearms on display in gun shops are not intended to be used for self defense); Exhibit 2 (Kleck

Decl.), Exhibit I thereto, at 3 ("storage practices [by gun dealers] have no bearing on whether

keeping guns locked or otherwise inoperable reduces their utility for self-defense").

129.    An NRA publication entitled "Home Firearm Safety" states that a firearm kept in

the home "must be stored in a secure place, inaccessible to unauthorized users (children or

adults) and in accordance with local laws."  Exhibit 14 at 345:8-12; and Exhibit 17 thereto, at 4.

It further states that "there is one general rule that *must* be applied under all conditions:  Store

guns so they are not accessible to untrained or unauthorized persons."  Exhibit 14, Exhibit 17

thereto, at 37 (emphasis in original).

**RESPONSE:**  Admit that the publication so states, but dispute that it advocates keeping self-

defense weapons in an inoperable state.  Indeed, it specifically says that "a gun stored primarily

for personal protection must be ready for immediate use.  It may be kept loaded, as long as local

laws permit . . . ."  Exhibit 53 at 37 (NRA, Home Firearm Safety).

130.    The National Shooting Sports Foundation ("NSSF") is the largest trade group

representing the firearms industry as a whole, with a membership of more than 6,000 firearms

manufacturers, distributors, firearms retailers, shooting ranges, sportsmen's organizations and

publishers.  Exhibit 89 (NSSF webpages); Exhibit 5 at 60:4-9.  Plaintiff ILAFR is the Illinois

affiliate of the NSSF.  Exhibit 89; Exhibit 38, Exhibit A thereto, at 10.  NSSF guidelines state in

part that

152

- "[N]early all firearms accidents in the home can be prevented simply by making sure that guns are kept unloaded and locked up."

- Firearms owners "must make absolutely sure that guns in your home are stored so that they are not accessible to . . . unauthorized persons.  Hiding a gun in a closet, drawer or similar location is not safe storage."

- "If you must have quick access to a loaded firearm in your home, you need to take special safety measures.  Keeping a gun to defend your family makes no sense if that same gun puts your family members or visitors to your home at risk."

- Even as to a firearm owned "for home security," the "objective should be to create a situation in which the firearm is readily available to [the owner], yet inaccessible or inoperative to others."  Exhibit 38, Exhibit A thereto, at 31-33 (emphasis in original).

**RESPONSE:**  Admitted.

**131.**  The NSSF guidelines further references trigger and cable locks as "options for securely storing firearms."  *Id.* at 33-34. NSSF has distributed 35 million safety kits containing free gun locking devices.  Exhibit 89.

**RESPONSE:**  Admit, but dispute that NSSF recommends using trigger or barrel locks for self-defense weapons.  Indeed, the cited guidelines state that:  "If you must have quick access to a loaded firearm in your home, you need to take special safety measures.  . . . If you choose to keep a firearm for home security, your objective should be to create a situation in which the firearm is readily available to you, yet inaccessible or inoperative to others.  Special lockable cases that can be quickly opened only by authorized individuals are options to consider."  Chicago Exhibit 38, Exhibit A thereto, at 33.  Trigger locks, on the other hand, *should never be*

*used on a loaded gun because it can cause the gun to fire under certain circumstances.*"  *Id.* at

34.

**132.**    The NSSF owns and sponsors the Shooting, Hunting, Outdoor Trade Show, the

largest and most comprehensive trade show for law enforcement, hunting, and shooting sports

professionals.  Exhibit 38, Exhibit A thereto, at 11.  The show is not open to the public or

persons under 16 years of age.  *Id.* at 12; Exhibit 89.  Access is restricted to members of the

shooting, hunting, and outdoor trades and commercial buyers and sellers of military, law

enforcement and tactical products and services.  Exhibit 89.  No personal firearms are permitted

at the show, and only firearms whose firing pins have been removed are permitted on the show

floor for display.  *Id.*  In addition, persons wishing to sell guns at gun shows are required to have

a locking device affixed to the guns in order to ensure that they cannot be loaded or fired.

Exhibit 38, Exhibit A thereto, at 12.

**RESPONSE:**  Dispute that guidelines for securing firearms displayed for sale are relevant to the

storage of self-defense weapons in the home.  *See* Response to Statement of Fact 128.

**133.**    The manufacturer's documentation that came with Hall's Master Lock states in

part, under the heading "Firearm Safety Tips," "Store firearms unloaded under lock and key" and

"Store ammunition separately under lock and key."  Exhibit 28 at PLMH 000125.  The

manufacturer's documentation that came with Hall's Regal lock states "Store firearms and

ammunition separately and securely."  *Id.* at PLMH 000126.

**RESPONSE:**  Admitted.

**134-A.** Another purpose of MCC § 8-20-040 is "reducing the number of firearms in that

home that [may] be misused as against a first responder," which is achieved by "reducing the

number of operable weapons that would be in the home."  Exhibit 54 at 51:1-12, 59:2-8.

**RESPONSE:** Admit that Chief Williams gave the cited testimony in response to leading questioning, *see* Chicago Exhibit 54 at 51:1-11, 59:2-8, Exhibit 15 at 47:20-22 (Williams Dep.), but dispute the validity of his opinion. Indeed, Chief Williams testified that he was relying solely on his understanding, knowledge, and experience as a police officer, yet he could not identify any specific experiences supporting his conclusion that limiting the number of operable firearms in the home would lead to a reduction in violence. *See id.* at 22:8-23:1. He testified that he does not have any evidence that lawfully possessed firearms present a risk of increased violence in Chicago, *see id.* at 28:22-29:6, and he could not identify any instance when a police officer was injured by the use of a lawfully possessed firearm, *see id.* at 38:6-15. *See also id.* at 58:12-22.

**134-B.** In the course of responding to emergency calls at Chicago residences, Chicago police officers have been harmed by guns possessed by people in those residences. *Id.* at 51:13-17, 52:10-13.

**RESPONSE:** Admitted.

**135.** The "paramount" concern of Chicago Fire Department paramedics when responding to an emergency call is "scene safety." Exhibit 90 (Deposition of Marc Levison) at 15:2-11. A scene is considered safe for a paramedic to render emergency care when either Chicago police officers have secured the scene or when the paramedic does not perceive a threat. *Id.* at 15:13-19. A scene is not considered safe when a firearm is present (other than a firearm possessed by a police officer), as the firearm presents a threat to the paramedic and the paramedic does not know how it will be used. *Id.* at 17:14-16, 28:6-14, 29:22-30:2, 38:22-39:5.

**RESPONSE:** Admitted.

155

**136.** A firearm at the scene thereby impedes and prevents CFD paramedics from delivering emergency care. *Id.* at 42:24-43:5, 45:20-46:8. If paramedics know that a firearm is present, they "stand back and stage out" – i.e., refrain from rendering care – until the police secure the scene. *Id.* at 45:20-46:8. CFD paramedics are not responsible for securing the safety of a scene and are not trained to secure a firearm found at the scene; that is the responsibility of the CPD. *Id.* at 22:6-12, 42:17-23. If the firearm is secured in the home, it does not present a threat to scene safety; scene safety is enhanced by reducing the number of operable firearms at the scene. *Id.* at 30:3-10, 42:12-16.

**RESPONSE:** Dispute that the one-operable-firearm limitation appreciably enhances "scene safety" for CFD paramedics. Levison testified that:

- To his knowledge, passage of the challenged ordinance had no effect on emergency response practices, Exhibit 54 at 23 (Levison Dep.);

- He does not know of any circumstances in which the fire department would obtain information about whether a location has firearms registered, *id.* at 23-24;

- He does not know how the goal of responding safely to emergency medical calls is affected by the City's firearms ordinance, *id.* at 27-28;

- He does not know whether the City's firearms ordinance has the effect of reducing the number of operable firearms at the scene of emergencies, *id.* at 45;

- In the past 20 years, he is not aware of a single firefighter or paramedic being fatally shot responding to a scene, *id.* at 31-35; and

- He has never studied and has no empirical evidence on the issue of how often people commit crimes with lawfully possessed firearms, *id.* at 39.

Deputy Chief of Patrol Alexander similarly testified that:

- He is not aware of any different policies for first responders the City of Chicago has put in place that are attributable to the policy that says there can only be one operable gun. Exhibit 60 at 48-49 (Alexander Dep.).

- Police officers are not trained to access a database that lists persons with firearms registered in the City of Chicago.  *Id*. at 80.

- "If we have excellent intelligence to say that there are multiple weapons in the house, period, *operable and inoperable*, you would probably want to wait for additional officers."  *Id*. at 85.  He thus agreed that it would be safe to say that when officers "know that there are multiple firearms in [a] house, they assume that there are multiple operable firearms in the house when they enter it, if they enter it at all."  *Id*.

**137.**     Dr. Cook opines that Dr. Webster's expert testimony regarding the risks from increasing the number of unsecured firearms in the home "is relevant to judging the risks of introducing a gun, or an additional gun, into a home, even if permission is granted by a member of the household."  Exhibit 13, Exhibit A thereto, at 15.  Allowing a CFP holder (i.e., a guest) to take firearms to home of another person (i.e., a host) introduces at least one additional unsecured firearm to that house, and thereby presents the same risks that arise from increasing the number of unsecured firearms in any home.  Exhibit 24, ¶ 13.

**RESPONSE:**  Admit that Dr. Cook so testified.  That testimony, of course, is subject to the same criticisms as the testimony by Dr. Webster he relies on.  *See* Response to Statements of Fact 122-23, 126.

**138.**     Further, the guest cannot be controlled by the host and may use the firearm unlawfully despite the host's wishes.  *Id.*  These risks would only increase as the number of armed guests increased.  *Id.*  For instance, a house party where multiple guests are armed with

firearms and drinking, or a congregation of armed CFP-holding gang members in a single home

(say, a drug house), would present serious risks of intimidation, escalation, and potential

discharge. *Id.*

**RESPONSE:** Dispute that this has anything to do with allowing responsible, law-abiding

citizens to possess firearms as an invitee on another's property. And Chicago has produced no

remotely reliable evidence that the prospect of a "congregation of armed CFP-holding gang

members" is anything more than a figment of the City's imagination or that the City's firearms

ordinance currently does anything to discourage gang members from congregating with arms.

*See, e.g.,* Responses to Statements of Fact 21, 27, 38, and 40.

139.    In addition, it would allow a host who does not qualify for a CFP to effectively

evade the CFP requirement. *Id.* The host could simply claim that firearms in his or her home (or

in the spaces outside the home) belong to his or her CFP-holding guest, and these firearms would

be at risk of misuse by the host. *Id.*

**RESPONSE:** Dispute that this would allow a host who does not qualify for a CFP to effectively

evade the CFP requirement. Even if we prevail here, the host still would not be permitted

lawfully to possess the guest's firearm.

## PLAINTIFFS' STATEMENT OF ADDITIONAL FACTS

1.    One of the purposes of Chicago's firearms ordinance, including the provisions of

the ordinance challenged here, is to limit the number of firearms in the City, regardless of

whether they are possessed by responsible, law-abiding citizens or gang members and other

criminals. *See* Exhibit 55 at CITY 000312 (Committee on Police & Fire, July 1, 2010 Tr. of

Hr'g) ("Limiting the number of handguns in circulation is essential to public safety."); Exhibit

56 at CITY 000792 (Findings of the City Council Committee on Police and Fire, July 1, 2010)

158

(same); Exhibit 26 at City000109 (Committee on Police & Fire, June 29, 2010 Tr. of Hr'g)

("Reducing the number of handguns in Chicago is critical to public safety.") (Corporation

Counsel Georges); *id.* at CITY 000109 – City 000110 ("The same concerns that motivate a one

handgun per person, per residence limit, reducing the number of guns in circulation in Chicago

and the risk of illegal trafficking in guns motivates the gun dealer ban."); Exhibit 27 at 95

(Brown Dep.) ("We want to limit the number of guns that are in circulation."); Exhibit 21 at 26

(Henry Dep.) ("More guns are a recipe for disaster.  We need to depend upon the police

department to ensure the safety and security of our citizens."); *id*. at 28-29 (admitting that "one

of the interests served by prohibiting the sales of guns in the City of Chicago [is] limiting access

of even law abiding citizens to guns"); Exhibit 28 at 5:1-4; 86:24-87:4; 100:24-101:8 (Reyes

Dep.) (sales ban protects public health, safety, and welfare by "reducing the number of guns in

the city"); Exhibit 15 at 15 (Williams Dep.) (City "want[s] to limit the number of handguns in

the City of Chicago").  In introducing the ordinance to the public, Chicago Corporation Counsel

Mara Georges said that "we've gone farther than anyone else ever has."  Exhibit 57 (Don

Babwin, *Daley Introduces Strictest Handgun Ordinance*, AP, July 1, 2010).

    **2.**      The ordinance's legislative history is replete with examples of legislators

expressing hostility to Second Amendment rights and the Supreme Court's enforcement of those

rights.  *See, e.g.*, Exhibit 58 at 4 (Chicago City Council, July 2, 2010 Tr. of Hr'g[2]) ("We need to

pass this legislation to conform with the Supreme Court[.  B]ut Monday's decision was not a

good decision for law-abiding citizens, not only in this city, but in cities across this country.")

---

[2] We have created an unofficial transcript from the video recording of the July 2, 2010
City Council meeting.  The video recording is included as Exhibit 59(Special Meeting of the City
Council of the City of Chicago, July 2, 2010 (video recording)).

(Alderman Fioretti); *id.* at 5 ("we realized that the decision that has been made by the Supreme

Court is not really in the best interest of our citizens") (Alderman Solis); *id.* at 6 ("We're here

today because of [the Supreme Court's] poor judgment in my estimation of their understanding

of how life is in large urban settings and cities like the City of Chicago.") (Alderman

Maldonado); *id.* at 6 ("This really breaks my heart today that the City of Chicago is being forced

into this position.  I thank everyone who has worked to try to create as restrictive a tool as

possible.") (Alderman Smith); *id.* at 9 ("I think that 40 to 50 years from now, students are going

to study United States history just in shock and awe, and they are going to be amazed that in a

country that told itself to be of the leader of the free nation that we have such a reckless, love

affair with guns.") (Alderman Lyle); *id.* at 12 ("[T]he message that the Supreme Court is

sending, and I think that's the same message that the gang bangers are sending is that a life is not

valuable . . . . I think the Supreme Court is wrong just like they've been wrong before.")

(Alderman Hairston); *id.* at 16 ("I deeply regret that we're in a position where we have to

struggle to figure out how to devise a law that meets what I think is an unreasonable test set

before us by the Supreme Court.") (Alderman Preckwinkle).

    **3.**    Sergeant Johnson testified that the CAGE team is "not at all" concerned with

"legitimate law abiding citizens purchasing firearms for … lawful reasons" or with "law abiding

firearms dealers selling them for lawful purposes."  Exhibit 22 at 34 (Johnson Dep.).  Deputy

Chief Dana Alexander acknowledged that there has been no recognized "problem in the City of

Chicago with law abiding citizens defending themselves in their home against criminal intruders

with firearms."  Exhibit 60 at 6, 71 (Alexander Dep.).  And Dr. Webster testified that "the risk is

greater among individuals who obtain guns illegally. There is, generally the pattern of results that

you see is the greater the risk of the individual, the more guns elevate that risk for the bad

outcome. That's the general pattern in the results."  Exhibit 25 at 134 (Webster Dep.).  *See also*

Exhibit 27 at 81-83 (Brown Dep.) (drawing a distinction between legal and illegal gun ownership

because "where you have a person who's willing to possess an illegal gun, that person is clearly

showing a propensity to ignore the law and would potentially,  you know, lead to the use of that

gun in other crimes").

    **4.**    Criminal attacks in Chicago are not limited to victims' homes, and they have

taken place on or in porches, yards, garages, and other locations.  *See* Exhibit 61 at CITY 001376

– CITY 001470 (City of Chicago, Reported Incidents – By Offense Type, Location Description,

and Year (1999-2010)).  Indeed, from 1999 to 2010 nearly as many murder victims were found

dead in yards, porches, garages, and driveways in Chicago as were found in houses.  *Id.* at

CITY001376 – CITY001379.

    **5.**    Chicago's first responders do not always arrive at a scene quickly enough to avert

a violent attack.  *See* Exhibit 13 at 63 (Gorman Dep.); Exhibit 54 at 49-50 (Levison Dep.) (EMS

has an average response time of six to seven minutes, and frequently arrives before police).

    **6.**    Criminals in Chicago who want a gun generally do not have a difficult time

obtaining one.  Sergeant Johnson testified that it is "not difficult at all" for a criminal to get a

handgun in Chicago.  Exhibit 22 at 86- 87: 19-1 (Johnson Dep.) (admitting that "regardless of the

laws Chicago has in place, it's not difficult at all for [criminals] to obtain the weapon that they

want to obtain.").  His testimony was echoed by Carol Brown, Chief of Policy in the Mayor's

Office with responsibilities including policies relating to firearms.  Exhibit 27 at 13:8-9, 14:6-9

(Brown Dep.).  Testifying as a 30(b)(6) witness on behalf of the City, Ms. Brown agreed that and

"it's fairly easy for criminals in the City of Chicago to obtain a gun illegally if they want to."  *Id*.

at 7:18-23, 34:1-7; 104:5-7.  Dr. Kleck concluded that these "officials are correct—it is already

easy for criminals to get guns, even with the current ordinance in force." Exhibit 2 (Kleck

Decl.), Exhibit I thereto, at 21. *See also* Exhibit 30 at 1251 (Gary Kleck et al., *The Myth of Big-

Time Gun Trafficking*, 56 UCLA L. REV. 1233 (2009)) (concluding that "even in . . . exceptional

urban areas with stringent gun controls [including Chicago] . . . criminals pay under the retail

price for handguns").

      **7.**     Statistics maintained by the Federal Bureau of Investigation indicate that

Chicago's murder rate is consistently among the highest when compared to other cities of

comparable size. *See* Exhibit 62 (Uniform Crime Reporting Statistics, Murder Rate 1991-2010,

Agencies Serving Cities 1,000,000 or Over)). Even following enactment of the City's handgun

freeze in the early 1980's, "violent crime committed by the use of firearms continued to be a

challenge" for the City. Exhibit 26 at CITY 000166 – CITY 000167 (City of Chicago,

Committee on Police & Fire, June 29, 2010 Tr. of Hr'g) (Testimony of Jody Weis,

Superintendent of the Chicago Police Department).

      **8.**     Americans use guns for self-defense an enormous number of times each year. Dr.

Kleck's research indicates that "each year in the U.S. there are about 2.2 to 2.5 million

[defensive gun uses (DGUs)] of all types by civilians against humans." Exhibit 63 at 164 (Gary

Kleck & Marc Gertz, *Armed Resistance to Crime*, 86 J. CRIM. L. & CRIMINOLOGY 150 (1995)).

"At least 19 other surveys have resulted in estimated numbers of defensive gun uses that are

similar (i.e., statistically indistinguishable) to the results found by Kleck." Exhibit 10 at 103

(NATIONAL RESEARCH COUNCIL, FIREARMS AND VIOLENCE (Wellford, et al., eds. 2005)). *See*

*also* Exhibit 2 (Kleck Decl.), Exhibit II thereto; Exhibit 2 (Kleck Decl.), Exhibit I thereto, at 22-

24, 36, 45. Chief Williams is aware of instances in which a citizen has used a firearm to avert an

attempted crime against the citizen's person or property. Exhibit 15 at 63-64. (Williams Dep.).

9.      Americans frequently use guns defensively outside of the home.  Exhibit 2 (Kleck Decl.), Exhibit I thereto, at 36 ("[T]he National Self-Defense Survey indicated that 63 percent of defensive gun uses occur in a location other than the defender's home.  … That survey indicated that in 1993 there were about 2.5 million defensive gun uses …, so about 1.6 million defensive gun uses required carriage of the gun to the scene."); Exhibit 63 at 185 (Gary Kleck & Marc Gertz, *Armed Resistance to Crime*, 86 J. CRIM. L. & CRIMINOLOGY 150 (1995)).

10.     Crime victims use guns for defensive purposes more often than criminals use guns to commit crimes.  *Id*. at 170 ("DGUs are about three to five times as common as criminal uses, even using generous estimates of gun crimes."); Exhibit 2 (Kleck Decl.), Exhibit I thereto, at 45 ("the full body of evidence consistently indicates more defensive uses of guns by crime victims tha[n] criminal uses by offenders").

11.     The number of times guns are carried for defensive purposes dwarfs the number of times they are carried for harmful purposes.  *See* Exhibit 2 (Kleck Decl.), Exhibit I thereto, at 36 ("the number of harmful instances of gun carriage are far less than a tenth of one percent of the number of instances of gun carriage for defensive purposes"); Exhibit 64 at 218 (Gary Kleck & Marc Gertz, *Carrying Guns for Protection*, 35 J. RESEARCH IN CRIME & DELINQUENCY 193 (1998)) ("Carrying guns in public places is common in the United States, is primarily done for protection, and is rarely done for purposes of committing a violent crime.").

12.     Defensive gun use is effective in making crime victims safer.  *See* Exhibit 2 (Kleck Decl.), Exhibit I thereto, at 23-24.  *See also id.* ("Findings from [analyses of crime incidents reported in the National Crime Victimization Survey] have unanimously indicated that, even after controlling for many possible confounding variables, crime victims who used guns to protect themselves were found to be less likely to suffer injur[y] after taking their self-protective

163

actions, and less likely to lose property, than victims who did not resist at all, victims who resisted by force but not with a gun, or victims who resisted in nonforceful ways."); Exhibit 65 at 902 (Jongyeon Tark & Gary Kleck, *Resisting Crime: The Effects of Victim Action on the Outcomes of Crime*, 42 CRIMINOLOGY 861 (2004)) (concluding that "resistance with a gun appears to be most effective in preventing serious injury" and "the data strongly indicate that armed resistance is the most effective tactic for preventing property loss"); Exhibit 66 at 367-68 (Lawrence Southwick Jr., *Self-Defense With Guns: The Consequences*, 28 J. CRIM. JUSTICE 351 (2000)) (concluding that "the best choice for the victim is to use a gun" and that "potential victims who choose to carry guns provide an external benefit to the class of potential victims"); Exhibit 67 at 290 (GARY KLECK AND DON B. KATES, ARMED, Chapters 6 & 7 (2001)) ("The most effective form of self-protection is use of a gun."); Exhibit 68 at 16 (Gary Kleck, *Crime Control Through the Private Use of Armed Force*, 35 SOCIAL PROBLEMS 1 (1988)) ("Victim gun use in crime incidents is associated with lower rates of crime completion and of victim injury than any other defensive response, including doing nothing to resist.").

**13.**     For many law-abiding individuals who are properly trained in the use of firearms, an accessible, operable firearm adds to a subjective sense of safety and security. *See* Exhibit 2 (Kleck Decl.), Exhibit I thereto, at 26 (discussing "the *loss* in felt sense of security that would arise from gun restrictions, including bans on gun carriage and limits on the number of operable guns allowed in the home."); Exhibit 3 at 166:5-20 (Cook Dep.) (admitting that there are people who are "motivated to carry a firearm" and that he "suppose[s] that the motivation is about security and self-protection"). *See also* Exhibit 69 at 164 (Hall Dep.); Exhibit 43 at 176, 186-87 (Pacholski Dep.); Exhibit 12 at 78, 145 (Tyler Dep.).

14.     Successful defensive gun use often does not require actually firing a weapon.  *See* Exhibit 63 at 173 (Gary Kleck & Marc Gertz, *Armed Resistance to Crime*, 86 J. CRIM. L. & CRIMINOLOGY 150 (1995)) ("Only 24% of the gun defenders in the present study reported firing the gun, and only 8% report wounding an adversary.").

15.     Citizens who obtain a license to possess or carry guns are disproportionately unlikely to misuse guns.  *See* Exhibit 4 at 1082 (Philip J. Cook et al., *Gun Control After Heller*, 56 UCLA L. REV. 1041 (2009)) ("The available data about permit holders . . . imply that they are at fairly low risk of misusing guns, consistent with the relatively low arrest rates observed to date for permit holders."); Exhibit 70 at 1 (H. Sterling Burnett, Nat'l Ctr. for Policy Analysis, *Texas Concealed Handgun Carriers:  Law-Abiding Public Benefactors* (2000)) ("concealed carry licensees had arrest rates far lower than the general population for every category of crime"); Exhibit 2 (Kleck Decl.), Exhibit I thereto, at 38 ("carry permit holders do not contribute more than a negligible share of violent crimes").

16.     Measures that effectively reduce gun availability among the noncriminal majority reduce defensive gun uses that otherwise would save lives, prevent injuries, thwart rape attempts, drive off burglars, and help victims retain their property.  Exhibit 63 at 180 (Gary Kleck & Marc Gertz, *Armed Resistance to Crime*, 86 J. CRIM. L. & CRIMINOLOGY 150 (1995)); *see also id.* at 180-81 ("[A]s many as 400,000 people a year use guns in situations in where the defenders claim that they 'almost certainly' saved a life by doing so.  . . . If even one-tenth of these people are accurate in their stated perceptions, the number of lives saved by victim use of guns would still exceed the total number of lives taken with guns."); Exhibit 71 at 244 (Lawrence Southwick, Jr., *Guns and Justifiable Homicide:  Deterrence and Defense*, 18 ST. LOUIS U. PUB. L. REV. 217

(1999) (concluding that "there are almost certainly some two to four million fewer completed crimes each year as the result of civilian gun ownership").

17.     Actual defensive use of guns by victims during the commission of a crime serves to improve the victim's chances of coming out of the incident unscathed, but guns may also prevent prospective offenders from even attempting crimes in the first place.  There is a wealth of evidence suggesting that widespread ownership, carrying, and defensive use of guns by potential and actual crime victims has a deterrent effect on crime.  *See* Exhibit 2 (Kleck Decl.), Exhibit I thereto, at 45; Exhibit 71 at 244 (Lawrence Southwick, Jr., *Guns and Justifiable Homicide:  Deterrence and Defense*, 18 ST. LOUIS U. PUB. L. REV. 217 (1999) (concluding that "somewhere around 0.8 to 2.0 million violent crimes are deterred each year because of gun ownership and use by civilians"); Chicago Exhibit 31 at 146-47 & Table 7.1 (56% of convicted felons agreed or strongly agreed that "a criminal is not going to mess around with a victim he knows is armed with a gun"; 74% agreed or strongly agreed that "one reason burglars avoid houses when people are at home is that they fear being shot"; 58% agreed or strongly agreed that "a store owner who is known to keep a gun on the premises is not going to get robbed very often"; 39% "had at some time in their lives decided not to do a crime because they 'knew or believed the victim was carrying a gun' "); Exhibit 13 at 46 (Gorman Dep.) (admitting that gang members are deterred from attacking victims that they know are armed).

18.     Less gun carrying by prospective crime victims, including in areas around the victims' homes, will mean fewer injury-preventing defensive gun uses by victims, and thus a larger share of crime incidents resulting in injury.  Exhibit 2 (Kleck Decl.), Exhibit I thereto, at 36-37.

**19.** Securing a gun with a trigger lock or otherwise storing a gun in an inoperable condition may compromise the ability of an authorized user to use the gun for self-defense. *See* Exhibit 10 at 216 (NATIONAL RESEARCH COUNCIL, FIREARMS AND VIOLENCE (Wellford, et al., eds. 2005)) ("[L]ocking devices may compromise the ability of authorized users to defend themselves. A lock may fail entirely or may take too much time for the weapon to be of use."); Exhibit 53 at 37 (NRA, Home Firearm Safety) ("[A] gun stored primarily for personal protection must be ready for immediate use. It may be kept loaded, as long as local laws permit . . . .").

**20.** Limiting the number of operable guns in Chicago homes is likely to reduce the number of occasions when residents can get to their guns in time to use them against criminals, and these defensive uses would generally reduce the victim's chances of being killed, raped, or otherwise injured or of losing property. *See* Exhibit 2 (Kleck Decl.), Exhibit I thereto, at 24.

**21.** Existing empirical evidence indicates that local sales bans do not have the effect of reducing gun possession among criminals and thereby reducing firearms crimes. *See* Exhibit 2 (Kleck Decl.), Exhibit I thereto, at 5. Sergeant Johnson admitted that "the number of guns that are making their way onto the city streets" is not "responsive to changes in local law," Exhibit 22 at 67-68 (Johnson Dep.), and that he is not aware of any evidence that gun stores operating in a community leads to an increase in the size of the illegal firearms market in that community, *id.* at 93:24-94:5.

**22.** Once one accounts for sales volume and local crime rates, research does not indicate that dealer misconduct is responsible for any nonnegligible part of the disproportionate share of traced crime guns for which a few dealers account. *See* Exhibit 2 (Kleck Decl.), Exhibit I thereto, at 33; Exhibit 30 at 1268-70 (Gary Kleck et al., *The Myth of Big-Time Gun Trafficking*, 56 UCLA L. REV. 1233 (2009)).

23.     The best-supported explanation for some researchers finding a significant positive association between gun prevalence rates and crime rates is that higher crime rates motivate many people to acquire guns for self-protection, not that higher gun rates cause higher crime rates. *See* Exhibit 2 (Kleck Decl.), Exhibit I thereto, at 19; Exhibit 8 at 272-73 (Gary Kleck & E. Britt Patterson, *The Impact of Gun Control and Gun Ownership Levels on Violence Rates*, 9 J. QUANT. CRIM. 249 (1993)); Exhibit 9 at 33-34 (Tomislav Kovandzic et al., *Estimating the Causal Effect of Gun Prevalence on Homicide Rates* (2008)); Exhibit 72 at 272 (Lawrence Southwick, Jr., *Do Guns Cause Crime?  Does Crime Cause Guns?*, 25 ATL. ECON. J. 256 (1997).

24.     No methodologically competent studies have found that gun ownership levels have a significant positive effect on total homicide rate.  Exhibit 2 (Kleck Decl.), Exhibit I thereto, at 30-31.  And even Dr. Cook admits that "the availability of guns in a jurisdiction does not have an effect on the volume or rate of robbery or assault."  Exhibit 3 at 72 (Cook Dep.).

25.     Fatal gun accidents are rare.  In 2008, the most recent year for which the CDC has published final mortality data, a total of 592 deaths in the United States were attributed to accidental discharge of firearms.  *See* Exhibit 73 at 36 (National Vital Statistics Reports, Deaths: Final Data for 2008 (Dec. 7, 2011)).  Only sixty-two of those deaths involved children under the age of 15.  *Id.*; Exhibit 26 at CITY 000172 (City of Chicago, Committee on Police & Fire, June 29, 2010 Tr. of Hr'g) ("Researchers have found that millions of children live in homes with easily accessible guns.") (Testimony of Jody Weis, Superintendent of the Chicago Police Department).  For the sake of comparison, a total of 3,548 deaths were attributed to accidental drowning or submersion, 745 of which involved children under 15.  Exhibit 73 at 36 (National Vital Statistics Reports, Deaths:  Final Data for 2008 (December 7, 2011)).  And over 42,000 fatalities were attributed to motor vehicle accidents, over 1,600 of which involved children under

168

15. *Id.* Fatal gun accidents accounted for only about 0.5% of deaths from accidental injuries, and only about 2% of deaths attributed to discharge of firearms. *Id*. The Census Bureau estimates that the population of the United States in 2008 was about 304 million. *See* Exhibit 74 (U.S. Census Bureau, Annual Estimates of the Population of the United States). There were thus about 2 fatal gun accidents per million Americans in 2008. *See also* Exhibit 8 at 280 (Gary Kleck & E. Britt Patterson, *The Impact of Gun Control and Gun Ownership Levels on Violence Rates*, 9 J. QUANT. CRIM. 249 (1993)) ("No impact of gun prevalence on fatal gun accident rates was detected. Given the random component in accident causation and the rarity of fatal gun accidents (one or two a year in most cities), the absence of a relationship is perhaps not that surprising."); Exhibit 75 at 296 (GARY KLECK, TARGETING GUNS, Chapter 9 (1997)) (finding, among other things, that "the risk of a fatal accident among small children is over one hundred times higher for swimming pools than for guns"); *id.* at 322 ("it is doubtful whether, for the average gun owner, the risk of a gun accident could counterbalance the benefits of keeping a gun in the home for protection: the risk of an accident is quite low overall, and is virtually nonexistent for most gun owners").

**26.** Fatal gun accidents commonly involve unusually reckless behavior. They are generally committed by unusually reckless people with records of heavy drinking, repeated involvement in automobile crashes, many traffic citations, and prior arrests for assault. *See* Exhibit 75 at 321 (GARY KLECK, TARGETING GUNS, Chapter 9 (1997)); *see also id.* at 308-310, 312-13. One of the purposes of licensing requirements is to reduce accidental shootings by "insur[ing] that gun owners know how to safely use guns, store firearms, that they understand what the laws are regarding firearms, and what is needed for compliance, and what the consequences of noncompliance would be." Exhibit 31 at CITY 000017, CITY 000020 – CITY

000021(City of Chicago Committee on Police and Fire, June 18, 2010 Tr. of Hr'g) (testimony of

Robyn Thomas, Legal Community Against Violence); *see also* Exhibit 26 at CITY 000229 (City

of Chicago Committee on Police and Fire, June 29, 2010 Tr. of Hr'g) (Testimony of Juliet

Leftwich, Legal Community Against Violence).

27.      Research conducted by Dr. Kleck and a colleague did not detect any "impact of

gun prevalence on fatal gun accident rates."  Exhibit 8 at 280 (Gary Kleck & E. Britt Patterson,

*The Impact of Gun Control and Gun Ownership Levels on Violence Rates*, 9 J. QUANT. CRIM.

249 (1993)).

28.      An operable gun stored in a locked safe is at least as secure as an inoperable gun

secured by a trigger lock.  *See* Chicago Exhibit 82 at 711 ("only the use of a lockbox/safe was

associated with a statistically significant decreased [risk] for a firearm injury").  Indeed, the

provision of Chicago's firearms ordinance aimed at protecting children permits firearms to be

stored either secured by a trigger lock or in "a securely locked box or container."  MCC 8-20-

050(a).  According to the National Shooting Sports Foundation, "if you choose to keep a firearm

for home security, your objective should be to create a situation in which the firearm is readily

available to you, yet inaccessible or inoperative to others.  Special lockable cases that can be

quickly opened only by authorized individuals are options to consider."  Chicago Exhibit 38,

Exhibit A thereto, at 33.  A trigger lock, on the other hand, "should never be used on a loaded

gun because it can cause the gun to fire under certain circumstances."  *Id.* at 34.  A biometric

safe that opens upon recognition of an authorized user's fingerprint would be particularly

effective in denying access by a burglar or other unauthorized user.  *See, e.g.,* Exhibit 76

(Compact Biometric Gun Safe by Barska) ("Only the person or persons who have recorded a

fingerprint in the safe will be successful in opening it.").

**29.**   Dr. Gary Kleck is a Professor of Criminology and Criminal Justice at Florida State University, where he has been a member of the faculty since 1978.  Exhibit 2 (Kleck Decl.), Exhibit I thereto, at 1.  His research has focused on the impact of firearms and gun control on violence, and he has been called "the dominant social scientist in the field of guns and crime."  *Id.*  He has published comprehensive reviews of evidence concerning guns and violence in the scholarly literature, and he has also published scholarly research in the leading professional journals in his field.  *Id.*  His testimony rebuts the criminological claims advanced in defense of the provisions challenged here.  *See id.* at 2-46.

**30.**   The National Academies were asked by a consortium of federal agencies (the National Institute of Justice and the Centers for Disease Control and Prevention) and private foundations to assess the data and research on firearms.  *See* Exhibit 10 at 13 (NATIONAL RESEARCH COUNCIL, FIREARMS AND VIOLENCE (Wellford, et al., eds. 2005)).  The National Research Council's Committee to Improve Research and Data on Firearms was charged, among other things, with providing an assessment of the strengths and limitations of the existing research and data on gun violence.  *Id.*  According to the Committee:

- "[E]xisting research studies and data include a wealth of descriptive information on homicide, suicide, and firearms, but, because of the limitations of existing data and methods, do not credibly demonstrate a causal relationship between the ownership of firearms and the causes or prevention of criminal violence or suicide."  *Id.* at 6.

- "Some gun control policies may reduce the number of gun suicides, but they have not yet been shown to reduce the overall risk of suicide in any population."  *Id.* at 192.

- "[O]bserved associations between [firearms ownership and homicide victimhood] may … be entirely spurious."  *Id.* at 119.

171

- "The evidence to date does not adequately indicate either the sign or the magnitude of a causal link between the passage of right-to-carry laws and crime rates." *Id*. at 7. This was not a unanimous conclusion. James Q. Wilson dissented. He concluded that existing evidence "suggests that [right to carry] laws do in fact help drive down the murder rate, though their effect on other crimes is ambiguous" and that "the best evidence we have is that [right to carry laws] impose no costs but may confer benefits." *Id*. at 270-71.

- "[W]e found no credible scientific evidence … that demonstrates whether [firearm] safety devices can effectively lower injury." *Id*. at 219.

- "Locking technologies may also cause unintended injuries. In particular, locking devices may compromise the ability of authorized users to defend themselves. A lock may fail entirely or may take too much time for the weapon to be of use." *Id.* at 216.

**31.** The Task Force on Community Preventive Services is an independent body supported by the federal Centers for Disease Control and Prevention. *See* Exhibit 51 at 42 (Robert Hahn, *et al.*, *Firearms Laws and the Reduction of Violence: A Systematic Review*, 28 AM. J. PREV. MED. 40 (2005)). The Task Force conducted a systematic review of scientific evidence about the effectiveness of firearms laws in preventing violence. *Id*. at 40. The Task Force concluded that:

- "Further research is needed to assess the effects of shall issue laws on violence." *Id.* at 54.

- "Further research with longer follow-up periods is needed to assess effects of [child access prevention] laws on violence, unintentional injury, and other outcomes of interest." *Id*. at 56.

- "Based on findings from national law assessments, cross-national comparisons, and index studies, evidence is insufficient to determine whether the degree or intensity of firearms regulation is associated with decreased (or increased) violence." *Id.* at 59.

**32.**     Illinois is the only State that flatly bans the public carriage of firearms by all private, law-abiding citizens. *See* Exhibit 2 (Kleck Decl.), Exhibit I thereto, at 37. *See also* Ala. Code § 13A-11-75; Alaska Stat. §§ 11.61.220(a), 18.65.700(a); Ariz. Rev. Stat. Ann. §§ 13-3102(A), 13-3112(A); Ark. Code § 5-73-309; Cal. Penal Code § 26170; Colo. Rev. Stat. § 18-12-203(1); Conn. Gen. Stat. §§ 29-28(b), 29-35(a); Del. Code tit. 11 § 1441-42; Fla. Stat. § 790.06(2); Ga. Code § 16-11-129; Haw. Rev. Stat. § 134-9; Idaho Code § 18-3302(1); Ind. Code § 35-47-2-3(e), Iowa Code § 724.7; Kan. Stat. § 75-7c03; Ky. Rev. Stat. § 237.110; La. Rev. Stat S. 40:1379.3; Md. Code, Pub. Safety § 5-306; Mass. Gen. Laws ch. 140, § 131; Me. Rev. Stat. tit. 25, § 2003; Mich. Comp. Laws § 28.422(3); Minn. Stat. § 624.714, subdiv. 2(b); Miss. Code § 45-9-101(2); Mo. Stat. § 571.101; Mont. Code § 45-8-321(1); Neb. Rev. Stat. § 69-2430; Nev. Rev. Stat.§ 202.3657(2); N.H. Rev. Stat.§ 159.6; N.J. Stat. § 2C:58-4; N.M. Stat.§ 29-19-4; N.Y. Penal Law § 400.00(2)(f); N.C. Gen. Stat. § 14-415.1l(b); N.D. Cent. Code § 62.1-04-03; Ohio Rev. Code § 2923.125(D)(l); Okla. Stat. tit. 21, § 1290.12(A); Or. Rev. Stat § 166.291; 18 Pa. Cons. Stat. § 6109(e); R.I. Gen. Laws § 11-47-11(a); S.C. Code § 23-31-215(A); S.D. Codified Laws 23-7-7; Tenn. Code § 39-17-1351(b); Tex. Gov't Code § 411.177(a); Utah Code § 53-5-704(1)(a); Va. Code § 18.2-308(D); 13 Vermont Stat. Ann. § 4003; Wash. Rev. Code § 9.41.070(1); W.Va. Code § 61-7-4(f); WI. ST. § 175.60(2); Wyo. Stat. Ann. § 6-8-104(b).

**33.**     Researchers have estimated that there are over 200 million privately owned firearms in the United States. *See* Exhibit 77 at 94 (GARY KLECK, TARGETING GUNS, Chapter 3 (1997)) ("There were probably over 235 million guns in private hands in the United States at the

end of 1994."); Exhibit 48 at 17 (L. Hepburn, et al., *The US Gun Stock*, 13 INJURY PREVENTION

15 (2007)) (estimating 283 million or 218 million privately owned firearms, depending upon the

method of estimation used).

      **34.**    Chicago has looked to the experience of other cities when considering firearms

policy, including New York, Philadelphia, Los Angeles, Milwaukee, Washington, D.C., and

possibly Boston. *See* Exhibit 27 at 128-29 (Brown Dep.).


Dated: April 27, 2012                     Respectfully submitted,

Stephen Kolodziej                    s/ Charles J. Cooper
FORD & BRITTON, P.C.            Charles J. Cooper*
33 N. Dearborn St., Suite 300        David H. Thompson*
Chicago, IL 60602                 Peter A. Patterson*
Tel: (312) 924-7500               COOPER & KIRK, PLLC
Fax: (312) 924-7516               1523 New Hampshire Ave., NW
Email: skolodziej@fordbritton.com    Washington, DC 20036
                                          Tel: (202) 220-9600
                                          Fax: (202) 220-9601
                                          Email: ccooper@cooperkirk.com

                                          *Admitted *pro hac vice*.

                                    *Attorneys for Plaintiffs*

## CERTIFICATE OF SERVICE

I, Charles J. Cooper, hereby certify that on this 27th day of April, 2012, I caused a copy

of the foregoing to be served by electronic filing on:

Michael A. Forti
Mardell Nereim
Andrew W. Worseck
William Macy Aguiar
Rebecca Alfert Hirsch
City of Chicago, Department of Law
Constitutional and Commercial Litigation
Division
30 N. LaSalle St., Suite 1230
Chicago, IL  60602

Craig Woods
Ranjit Hakim
MAYER BROWN LLP
71 S. Wacker Drive
Chicago, IL  60606-4637

s/ Charles J. Cooper
Charles J. Cooper