# EXHIBIT 1

**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

| | | |
|---|---|---|
| ILLINOIS ASSOCIATION OF FIREARMS RETAILERS, ET AL., | ) ) ) | |
| Plaintiffs, | ) ) | Case No: 10-CV-4184 |
| | ) | Judge Edmond E. Chang |
| v. | ) ) | |
| THE CITY OF CHICAGO, ET AL., | ) ) | |
| Defendants. | ) | |

**DECLARATION OF MICHAEL HALL**

I, Michael Hall, make the following declaration pursuant to 28 U.S.C. § 1746:

1.      I am a resident of Chicago, Illinois and a citizen of the United States.  I am over eighteen years of age.  My statements herein are based upon personal knowledge and experience.

2.      I own a two-story, five-bedroom house, located in Chicago at 11254 South Bell Avenue. The house has front and side porches and a detached garage.  I live there with my wife and one of my children, who is 16.  I have three grown children between the ages of 25 and 28 who no longer live at home, and I have a 21-year-old who is currently away at school.

3.      I was a Corpsman in the Marine Corps and during my military service I received "expert" ratings for firearms marksmanship.  I am currently employed in the telecommunications industry and often work from my home office.

4.      I have an Illinois Firearm Owners Identification Card and a Chicago Firearm Permit ("CFP").  I keep two firearms in my home, a Stoeger Cougar 9 millimeter handgun and a Remington 12-gauge shotgun.  Both of these weapons are registered with the City of Chicago.

1

5.      If it were lawful for me to do so, I would sometimes carry a firearm on my property for protection outside the four walls of my home.  The City's law prohibiting me from doing so impairs my ability to protect myself and my family.  People in my neighborhood have been killed on their own balcony.  In separate incidents, my wife's minivan and my truck have been burglarized while parked in my driveway.  Thieves attempted to steal my son's go-kart from my garage.  But for Chicago's ban on carriage, I would carry my firearm in my garage and yard at times for self-defense.

6.      If it were lawful, I would sometimes possess a firearm as a guest on another person's property.  For example, I would like to be able to help if a law-abiding friend or neighbor felt threatened and asked me to come over with a gun.  Chicago law, however, prohibits me from doing so.

7.      I believe the Second Amendment guarantees me the right to purchase a firearm.  Because Chicago bans firearms sales in the City, I am prohibited from exercising this right in the City of Chicago.  If gun sales were lawful in Chicago, I would shop for guns in the City.

I DECLARE UNDER PENALTY OF PERJURY THAT THE FOREGOING IS TRUE AND

CORRECT.

Executed on April _2v_, 2012

Michael Hall

3

# EXHIBIT 2

**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

| | | |
|---|---|---|
| ILLINOIS ASSOCIATION OF FIREARMS RETAILERS, ET AL., | ) ) ) | |
| Plaintiffs, | ) ) | Case No: 10-CV-4184 Judge Edmond E. Chang |
| v. | ) ) | |
| THE CITY OF CHICAGO, ET AL., | ) ) | |
| Defendants. | ) | |

**<u>DECLARATION OF GARY KLECK</u>**

I, Gary Kleck, make the following declaration pursuant to 28 U.S.C. § 1746:

1.      My current academic appointment is at Florida State University, where I am David J. Bordua Professor of Criminology.  For over 30 years, my research has focused on the impact of firearms and gun control on violence, and I have been called "the dominant social scientist in the field of guns and crime."

2.      My scholarly research has been published in the leading professional journals in my field. I have also published comprehensive reviews of evidence concerning guns and violence.

3.      My research and writings have addressed, among other topics, the impact of guns on homicide, suicide, crime, and gun accidents; the impact of gun control laws on homicide, suicide, crime, and gun accidents; the measurement of aggregate gun ownership levels; the defensive use of guns by crime victims; the carrying of firearms for self-protection; gun trafficking, and the use of gun trace data for exploring how criminals get guns; and methodological problems in research on guns and violence.

4.      In addition to my other teaching responsibilities, I teach doctoral students how to do research and evaluate the quality of research evidence, and I have taught graduate courses on statistical techniques and survey research methodology.

5.      I have been retained by Plaintiffs in the above-captioned matter as a rebuttal expert witness.

6.      On September 30, 2011, I disclosed a rebuttal expert report attached as Exhibit I.  My report rebuts the criminological claims made in the expert reports of Joseph J. Vince, Jr., Daniel W. Webster, and Philip J. Cook.  After September 30, I supplemented my disclosure by making corrections to Table 4 of my rebuttal report.  Attached as Exhibit II is the final, corrected Table 4, disclosed on October 27, 2011.

7.      I attest that the attached report, as corrected by my supplemental disclosure, is a true and correct representation of my expert opinions in this matter and I incorporate Exhibits I and II as if they were set out here in full.

I DECLARE UNDER PENALTY OF PERJURY THAT THE FOREGOING IS TRUE AND

CORRECT.

Executed on April 21, 2012

Gary Kleck

# EXHIBIT I

## Expert Rebuttal Report of Gary Kleck

### I.     Background and Qualifications

I am a Professor of Criminology and Criminal Justice at Florida State University.  I received my doctorate in Sociology from the University of Illinois in 1979, where I received the University of Illinois Foundation Fellowship in Sociology.  I am the David J. Bordua Professor of Criminology at Florida State University, where I have been on the faculty since 1978, and previously served as its Director of Graduate Studies.   My research has focused on the impact of firearms and gun control on violence, and I have been called "the dominant social scientist in the field of guns and crime" (Vizzard, 2000, p. 183).

I have published the most comprehensive reviews of evidence concerning guns and violence in the scholarly literature, which inform and serve as part of the basis of my opinions.  I am the author of Point Blank: Guns and Violence in America, which won the 1993 Michael J. Hindelang Award of the American Society of Criminology, awarded to the book of the previous several years which "made the most outstanding contribution to criminology."  More recently, I authored Targeting Guns (1997) and, with Don B. Kates, Jr., co-authored The Great American Gun Debate (1997) and Armed: New Perspectives on Gun Control (2001).

I have also published scholarly research in all of the leading professional journals in my field.  Specifically, my articles have been published in the American Sociological Review, American Journal of Sociology, Social Forces, Social Problems, Criminology, Journal of Criminal Law and Criminology, Law & Society Review, Journal of Research in Crime and Delinquency, Journal of Quantitative Criminology, Law & Contemporary Problems, Law and Human Behavior, Law & Policy Quarterly, Violence and Victims, Journal of the American Medical Association, and other scholarly journals.  My research and writings have addressed, among other topics, the impact of guns on homicide, suicide, crime, and gun accidents; the impact of gun control laws on homicide, suicide, crime, and gun accidents; the measurement of aggregate gun ownership levels; the defensive use of guns by crime victims; the carrying of firearms for self-protection; gun trafficking, and the use of gun trace data for exploring how criminals get guns; and methodological problems in research on guns and violence.  A list of my writings, including those authored in the previous 10 years, is included in my *curriculum vitae*, attached as Exhibit A to this report.

I have testified before Congress and state legislatures on gun control issues, and worked as a consultant to the National Research Council, National Academy of Sciences Panel on the Understanding and Prevention of Violence and as a member of the U.S. Sentencing Commission's Drugs-Violence Task Force.  I am a referee for over a dozen professional journals, and serve as a grants consultant to the National Science Foundation.

Finally, I teach doctoral students how to do research and evaluate the quality of research evidence, and have taught graduate courses on statistical techniques and survey research methodology.

I have not testified as an expert at trial or by deposition during the previous four years.  I am being compensated for my work at the rate of $350 per hour.

## II.    Materials Considered

In addition to the materials referenced in this report and, more generally, the studies of guns and violence that I have authored, which are listed in my *curriculum vitae*, I also considered and reviewed the materials listed in Exhibit B in writing this report.

## III.    Rebuttal of Expert Witnesses

This report rebuts the criminological claims made in the expert witness reports of Joseph J. Vince, Jr., Daniel W. Webster, and Philip J. Cook.

## A.    REPORT OF JOSEPH J. VINCE, JR.

My rebuttal is organized to follow the sequence of Mr. Vince's report, using his section divisions, starting with his education and experience and continuing to evaluate his substantive claims.

### Education and Experience

Mr. Vince has undoubted expertise in the enforcement of federal gun control laws, in connection with his employment with the federal Bureau of Alcohol, Tobacco, and Firearms. This expertise, however, has no relevance to the factual issues involved in this case. He has never done any research on the effects of firearms availability on crime, suicide, or gun accidents, or the impact of gun control laws or firearms storage practices on these forms of violence, and shows no evidence of being familiar with research done by others. He also has no training in research methods or statistics that would enable him to distinguish methodologically sound research from unsound, unreliable research on these topics. In general, he simply mentions his "experience" in law enforcement, and asks the reader to take on faith that this somehow enables him to judge the effects of key elements of Chicago gun law. By itself, experience in law enforcement cannot provide expertise on issues like the impact of restricting gun sales, the effects of requiring guns to be maintained in an inoperable condition, or the other factual issues at stake in this case. One cannot directly observe effects of gun control provisions, in connection with law enforcement experience or any other kind of personal experience, since one cannot directly observe, in the course of professional experience, crimes or other acts of violence <u>not</u> occurring. Likewise, knowledge of violence that does occur can tell us nothing, by itself, about whether the same or similar acts would have occurred in the absence of guns or gun control provisions. These effects can only be indirectly detected using scientific research methods, and Mr. Vince lacks the training and knowledge that would enable him to either conduct such research himself, or be able to judge the relative technical merits of research done by others. The arguments and evidence Mr. Vince cites are anecdotal (e.g., pp. 3-4 citations of individual incidents of violent crime) and unscientific, and can reveal nothing about the consequences of Chicago's restrictions on guns.

### Section A – Firearms-related Violence in Chicago

Mr. Vince asserts that firearms-related violence "is a systemic and epidemic problem in the City of Chicago" (p. 3). He does not explain what he means by "systemic" in this context, and I am not aware of any relevant commonly understood meaning. Use of the term "epidemic" to describe a problem commonly implies that the problem is spreading or becoming worse, but Vince proffers no evidence to indicate upward trends in gun violence; the anecdotes he derives

from scattered news stories about gun violence are just as compatible with declining rates as with increasing rates. Vince's poorly labeled Figure 9b (p. 5; the horizontal axis does not properly denote the year to which each pair of columns pertains) reports raw counts of murders, not rates, and even this material does not support Vince's implied claim that firearms violence is increasing in Chicago, since even raw counts of firearms homicides declined from period "2" (apparently 2001) to period 5 (apparently 2004), from period 7 (2006?) to period 8 (2007?), and most recently, from period 9 (2008?) to period 10 (2009?).

## Section B – Chicago's Firearm-Storage Restrictions and the Use of Firearms for Self-Defense.

Mr. Vince asserts that Chicago's gun restrictions do "not prohibit (sic) individuals from effectively utilizing a firearm for self-defense."  Of course the ordinance does not prohibit effective defensive gun use (DGU) (it is silent on the matter) – but I assume that Vince meant that the restrictions do not *prevent* people from effectively using guns effectively for self-defense, and will assess his claims in this light.  Nothing presented by Vince in this section actually bears on whether some effective DGUs are prevented by the ordinance's ban on Chicago Firearms Permit (CFP) holders keeping more than one gun "assembled and operable" in their homes.

Vince cites the firearms handling and storage practices of law enforcement officers, but fails to note that none of his sources indicate that officers maintain their guns in a locked status while they are on-duty and thus at risk of being attacked.  He notes that officers face more danger than the average civilian, but fails to note that civilians are no more able to anticipate attacks and other criminal threats than police officers.  Not knowing when a threat will arise, civilians must have their guns ready for use much or all of the time, just as on-duty police officers keep their duty weapons operable, loaded, and ready for immediate use.  Mr. Vince also reports that law enforcement agencies keep guns they have seized locked, and that many retail gun dealers keep their guns secured by trigger locks or other locking devices (pp. 6-8).  Neither category of information is relevant to guns kept for defensive purposes, since law enforcement officers do not expect to use confiscated guns for self-protection (they have their own duty weapons for that purpose), nor do gun dealers expect to use any of their guns for sale in self-defense.  Thus, these storage practices have no bearing on whether keeping guns locked or otherwise inoperable reduces their utility for self-defense.

Vince cites instances of various parties distributing gun locking devices or urging their use (pp. 8-10), but fails to cite any evidence bearing on what fraction of the recipients actually made regular use of the locking devices, whether their use prevented harmful gun discharges, or whether their use impaired DGU.  The fact that those distributing the locks *hoped* to thereby prevent violence is not evidence that distribution actually had such effects.

Perhaps the closest Vince ever comes to presenting evidence bearing on whether some effective DGUs are prevented by the ordinance's ban on CFP holders keeping more than one gun "assembled and operable" in their homes is when he relates his visits to sporting goods stores and his informal tests of how long it takes to disengage trigger locks (p. 14).  Even this material, however, can tell us nothing about whether some effective DGUs are prevented by the use of trigger locks, since the exercise  was unscientific in that it did not simulate the most important elements of situations where a gun is likely to be used or needed for self-defense in the home.  A

well-lighted sporting goods store does not simulate the conditions of darkness that prevail during many crimes, and darkness is surely related to how quickly a prospective defender can place a key in a lock or enter a combination. Likewise, the calm circumstances of Mr. Vince's informal exercise do not simulate the high stress and physiological arousal experienced by a victim during a crime. When a person's pulse rate and blood pressure are elevated and his or her hands are shaking, this surely affects the person's ability to disengage a locking device. In sum, none of the evidence Vince presents contradicts the hypothesis that requiring a gun to be secured by a locking device will sometimes prevent effective defensive use of the gun.

Mr. Vince also cites the opinions of store clerks as to the merits of various locking devices sold in their stores. He shows no awareness of the possibility that store employees might have a vested interest in overstating the virtues of the products they sell.

Vince asserts (p. 13) that law enforcement officers almost always carry only a single firearm. This is not quite true, since most officers patrol in vehicles, and it is commonplace for vehicles to also contain a shotgun, in addition to sidearms that officers keep on their persons. This is one form of gun carrying, albeit not carrying on the person. Further, many officers carry a small back-up gun on their person in addition to their standard service weapon. More specifically, the Chicago Police Department allows its uniformed sworn officers to carry "two exposed firearms" (Chicago Police Department 2007). Indeed, under some circumstances, if CPD officers elect to carry an auxiliary subcompact semiautomatic pistol, they generally *must* also carry another weapon (Chicago Police Department 2010). Leaving these issues aside, however, the fact that many officers usually carry only one gun on their person does not support Vince's claim that civilians gain no defensive benefit from having more than one operable gun per CHP holder in their home. Police officers usually do not need more than one operable gun because while on duty they always carry that one gun on their person, and thus it is always immediately available for use. It is a cumbersome, but required condition of police work that they always carry a gun. In contrast, civilians in their homes do not ordinarily carry their guns on their person as they move from room to room, nor do they sleep with a gun on their person. They can only use a gun for protection in their home if one is located near enough to them at the time a crime occurs that they can retrieve the gun in a timely fashion, and the gun is in a relatively operable ready condition, i.e. ready for use before a criminal attacks or otherwise victimizes the resident or another occupant. Thus, the fact that many police officers carry only one gun on their person is of no relevance to whether Chicago's limits on number of operable guns impair effective DGU.

Vince claims (p. 14) that since Chicago citizens may own as many additional guns (in addition to the one gun per permit holder kept operable) as they like, the safe storage requirements pertaining to these other guns (keeping them in an inoperable condition) does "not impair the effective utilization of that firearm for self-defense." This is a *non sequitur*. None of the evidence Vince cites or the arguments he offers justify the notion that a gun kept in an inoperable condition (unloaded and locked or disassembled) is just as usable for self-defense as one kept in an operable condition. This assertion appears to be nothing more than an unsupported personal opinion of Mr. Vince. It also ignores the legal fact that the instant a second gun is made operable in a Chicago home (i.e. is unlocked and loaded), it constitutes a violation of the Chicago gun ordinance and cannot be legally used for self-defense.

Mr. Vince nowhere offers any explanation of how Chicago's restriction on the number of operable guns could have violence-reduction benefits by limiting access to guns among those who would misuse the weapons, yet not also limit access among household members to guns for purposes of lawful self-defense.

**Section C – Oversight and Regulations of Gun Sores by the Bureau of Alcohol, Tobacco, Firearms and Explosives (ATF).**

On pp. 15-20, Vince addresses Chicago's ban on handgun sales, but somehow links it with ATF's supposed inability to provide sufficient regulation of gun stores. The idea seems to be that this inability is a good reason why gun sales ought to be banned altogether. There are two problems with this argument: (1) the premise that ATF lacks the resources and authority to regulate gun stores is false, and (2) there is no sound evidence that banning gun sales, for whatever reason, has the benefits that Vince claims for the measure.

Vince leans heavily on one source to justify his claim that ATF lacks the resources and authority to regulate gun stores – a 2004 report by the Office of Inspector General (OIG) of the Department of Justice (p. 18, and Exhibit 5). He mischaracterizes the findings of this report. The OIG did not conclude that ATF lacked the resources and authority to regulate gun stores or otherwise enforce federal gun laws, but rather that ATF did not make effective use of the resources and authority that they did possess. In any case, Vince's assertion that ATF is overwhelmed by the magnitude of their regulatory duties is not supported by relatively recent data. Vince cites parts of the OIG report that refer to 104,000 federal firearms licensees (FFLs), and only 4,581 FFL compliance inspections. These data, however, pertain to FY 2002. More recent data available on the ATF website indicate that in FY 2007, there were only about 60,000 FFLs (U.S. Bureau of Alcohol, Tobacco, Firearms and Explosives 2011), greatly reducing the regulatory burden on ATF. Further, earlier research by ATF indicated that only a tiny fraction of all FFLs actually sell a significant number of guns. Operation Snaphot, a survey of FFLs, revealed that 46% of them sold *no* guns in the preceding year, and another 34% sold between one and ten guns. Only 7% sold over 50 guns and thus could potentially be a source of significant numbers of guns flowing into illegal channels (U.S. Bureau of Alcohol, Tobacco, Firearms 1993). Since 7% of 60,000 FFLs is just 4,200 gun dealers, even if ATF could do no more compliance inspections than they did back in FY 2002, they would still be able to do one *every* year for *every* single FFL selling significant numbers of guns. The OIG report, however, concluded that ATF should in fact be able to do far more compliance inspections with existing resources, if they used them more wisely. And in fact, an ATF report states that in FY 2007 "ATF conducted approximately 10,000 compliance inspections" (U.S. Bureau of Alcohol, Tobacco, Firearms and Explosives 2008) – a number sufficient to inspect all "real" gun dealers (those annually selling more than 50 guns) *every* year, plus a sample of low-volume dealers. Thus, it is not true that ATF lacks the resources and authority to regulate gun stores, in Chicago or elsewhere, and this cannot be used to justify totally banning gun sales within the city of Chicago. Vince also implies that banning gun sales in Chicago will reduce gun possession among the city's criminals and thereby reduce firearms crime, but does not cite any research indicating that local sales bans have such effects. Existing evidence indicates that they do not (Kleck and Patterson 1993; Britt, Kleck, and Bordua 1996).

Vince notes that 1% of FFLs account for "the vast majority of crime guns" (p. 17) and implies that knowing the identity of these dealers should, if ATF did not suffer from an "enforcement gap," enable it to go after these dealers and thereby reduce the number of guns used by criminals. Contrary to Mr. Vince's interpretation, it is now well-established that this concentration of traced crime guns among relatively few FFLs is almost entirely attributable to (1) the fact that those dealers also account for a similarly large fraction of all gun sales, which leads to large numbers of these dealers' lawfully sold guns eventually being stolen and falling into criminal hands, even if the dealers' sales were all completely lawful and ethical, and to (2) the fact that some dealers do business in higher crime areas, which increases the fraction of their lawfully sold guns that are eventually stolen. Thus the citation of this concentration of traced crime guns is misleading and likely to lead a reader to believe in the unsupported notion that the tracing of large numbers of crime guns to a few dealers is due to FFL misconduct. "Bad" FFLs are of virtually no significance in supplying guns to criminals, directly or indirectly (see the summary of evidence in Kleck and Wang 2009).

**Recommendations**

Vince's report ends with a series of recommendations for changes in local policies and enforcement activities that have nothing to do with the challenged elements of Chicago's current gun ordinances, and nothing whatsoever to do with empirical evidence on which gun control policies reduce crime and violence. Mr. Vince does not cite any evidence that similar measures have proven effective elsewhere, or even that the measures logically follow from what is known about how criminals acquire guns. Instead the list of proposed measures appears to be little more than a series of policies that Mr. Vince personally favors.

**B.      REPORT OF DANIEL W. WEBSTER**

My rebuttal is organized to follow the sequence of Professor Webster's report, using his section divisions, and focusing on his substantive research-based sections, V to X. The full citations for studies that Webster relies on may be found in his report.

**Section V-A - Effects of Guns on Suicide**

Professor Webster confidently asserts that availability of firearms increases the risk of suicide, citing studies that purportedly demonstrate this effect (pp. 2-7). He explicitly links this discussion with "Chicago's limitation to a single operable firearm in the home" (p. 1), but it should first be noted that none of the studies he cites assess the effects of having more than one operable gun vs. having just one – the "household" studies (better known as case-control studies) assess the effects of having any guns, operable or otherwise, vs. having none. Indeed, Webster does not even offer an explanation of why multiple guns might raise suicide risks more than a single gun would. In light of the obvious fact that people who commit suicide by shooting themselves use only *one* gun, it is unclear why Webster thinks that having more than one would have any effect not produced by having just one. Since the current Chicago gun ordinance does not ban home possession of guns, but only restricts the number that may be kept in an "assembled and operable" condition, the entire body of evidence cited on guns and suicide has no relevance to whether this element of the ordinance could reduce suicides.

I will nevertheless evaluate the merits of Dr. Webster's general claims as to whether firearms possession affects suicide. Webster is highly selective as to which studies he chooses to

cite, excluding those that failed to support his conclusions. For example, in his section on "household studies" and suicide, he discusses just five case-control studies, all of which support his thesis that guns in the household cause a higher risk of a household member killing themselves. He even goes so far as to explicitly assert that "nearly all of the case-control studies have shown a positive relationship between gun ownership and suicides" (p. 3). The "weasel word" "nearly" renders his claim vague, since he does not state what fraction "nearly all" constitutes, or how many studies did not support his thesis. In fact, as the review summarized in my Table 1 shows, at least *six* out of 16 published case-control studies of suicides found no significant association between gun ownership and suicide:

(1) Miller (1978) found no guns/suicide association whatsoever in his sample of elderly men.

(2) Brent et al. (1988) found no significant guns/suicide association once suicidal intent was controlled.

(3) Bukstein et al. (1993) found no significant guns/suicide association in a sample of adolescent substance abusers.

(4) Brent et al. (1994) found no significant guns/suicide association in a sample of "affectively ill" adolescents.

(5) Beautrais et al. (1996) found no significant guns/suicide association among 499 suicides (and 1,225 control subjects), using what at the time was the largest sample of suicides ever used to study this association.

(6) Conwell (2002) found no significant guns/suicide association among females.

It is unlikely that most people would interpret Webster's claim that "nearly all" studies find a gun effect on suicide to be consistent with six out of 16 studies *not* supporting the thesis. It is easy enough to cherry-pick favorable findings in a controversial field, if there are a large enough studies, but this does not help readers understand the field.

As it happens, it would scarcely matter even if "nearly all" of the case-control studies really had found a positive guns/suicide association, since this body of research is far too weak to support any conclusions. The primary problem facing researchers trying to discover whether gun ownership actually causes an increased risk of suicide is to separate the effects of guns from the effects of other factors, called "confounders" or confounding variables, correlated with guns. In this context, a confounder is a factor that affects suicide risk, but also has a significant correlation with gun ownership. Unless the researcher measures and statistically controls for all the likely confounders, s/he will confuse the purported effects of gun ownership with the effects of the uncontrolled confounders. Unfortunately, as Table 1 indicates, the people who have done case-control studies on this topic have generally devoted little or no effort to controlling for likely confounders. Fourteen of the 16 studies controlled for no more than four confounders, and eight of them conducted analyses in which *no* confounders were controlled, giving the researchers no ability whatsoever to separate the effects of gun ownership from the effects of other factors that affect the likelihood of committing suicide and are associated with gun ownership. A partial list of likely confounders typically not controlled would include (1) alcoholism or heaving drinking, (2) illicit drug use, (3) urban vs. rural location, (4) residence in a

high crime neighborhood, (5) experience as a victim of crime (e.g. rape), (6) gang membership, (7) drug dealing, (8) perception of the world as a hostile place, (9) a personality that emphasizes self-reliance and consequently self-blame for problems, and (10) strength of suicidal intent.

To illustrate how important controlling for confounders is, consider the last confounder mentioned, suicidal intent (SI). No one disputes that having a stronger desire or motivation to kill one's self makes it more likely that the person will actually do so. A stronger SI, however, is also likely to induce some people to acquire a gun for the purpose of carrying out the suicide attempt. Even if possessing or using a gun did not actually influence whether a person attempted suicide or whether an attempt was fatal, one would still find higher gun ownership among those who killed themselves, i.e. one would find a positive guns/suicide association. Indeed, one would find an especially strong positive association between suicide and a *recent* gun purchase, a finding Webster himself notes (p. 5, in connection with the California "cohort study"). But this would be a noncausal "spurious" association between guns and suicide. Having a gun did not necessarily cause a higher risk of suicide; rather, having a stronger SI caused the higher risk of suicide, and also caused a higher likelihood of gun ownership, creating a noncausal association between gun ownership and suicide.

In Table 1, the strength of association between gun ownership and suicide is measured with an odds ratio (OR), which expresses how much higher or lower the odds of committing suicide are for persons with a gun in their household. For example, if OR=3.4, it means that the odds of a person committing suicide are 3.4 times higher if there is a gun in the household than if there is not, and the guns/suicide association is positive – suicide risk is higher for gun owners. On the other hand, if OR were 0.2, it would mean that the odds of suicide for persons with a household gun are only 0.2 or 20% of the odds for persons without a household gun, and the association is negative – suicide risk is lower for gun owners. An OR of 1 would represent no relationship in either direction – the odds of suicide are the same for persons with a gun and for a person without one.

The crude OR is the simple bivariate odds ratio, without any controls for confounding variables, and thus is not meaningful as a measure of the causal effect of gun ownership on suicide. The adjusted OR ("adj OR") is the odds ratio when controlling for other possible confounding variables. If the variables controlled truly are confounders, the adjusted OR generally gives a better picture of the causal effect of gun ownership on suicide. Finally, the numbers under p in Table 1 are levels of statistical significance. They represent the probability that the observed association could be entirely the product of random chance factors, such as which subjects happened to be selected for a study, rather than being reflective of an actual causal effect. Customarily, a p under .05 is considered acceptably significant. When the authors only reported that the association was nonsignificant, this is denoted in Table 1 with "n.s."

If an association is spurious, and thus *not* reflective of an actual causal effect, controlling for confounding variables will cause the odds ratio to weaken to the point where it is no longer significantly different from one, the value representing no association. We need not speculate what happens to the guns/suicide association once suicidal intent (SI) is controlled, because Brent and his colleagues (1988) measured SI and controlled for it while estimating the suicide/guns association. Before controlling for SI, there was a strong, significant association (crude odds ratio=4.5, p<.025). Once the researchers introduced a control for SI, the association

was no longer significantly different from one. The finding was later replicated in another analysis of a somewhat larger overlapping sample by the same group of researchers. When they introduced the control for SI, the guns/suicide association was halved, dropping from an odds ratio of 4.5 to 2.1 (Brent et al. 1991).

To take another example, *no* researchers have controlled for self-reliance/self-blame, yet this too could be a powerful confounder. Surveys have established that gun owners are more self-reliant than other people – for example people who believe they must rely on their own efforts to protect themselves and their families are more likely to own guns (Feagin 1970). Unfortunately, people who see themselves as master of their own fate are also more likely to hold themselves responsible for their troubles, rather than blaming other people – a disposition that could make suicide more likely. Thus, if self-blame is the dark side of self-reliance, it would both increase gun ownership and increase the risk of suicide, creating a spurious guns/suicide association. We have no direct empirical test of this hypothesis, however, since no researcher in this area has measured and controlled for self-blame/self-reliance.

All but the last two studies summarized in Table 1 controlled for four or fewer likely confounders. Most variables that were controlled were not likely confounders, either because the study did not present any evidence that they had a significant effect on suicide or because they have no known association with gun ownership. Controlling for such variables does not help isolate the effect of gun ownership on suicide. For example, Kellermann et al (1992) controlled for ten variables, but only six of these were significantly related to suicide risk, and of these six, only four have a documented significant association with gun ownership, and thus were actual confounders.

In sum, Webster's review of household (case-control) studies is highly selective, fails to acknowledge studies that contradict his conclusions, covers studies that are not relevant to any element of Chicago's gun ordinance, and relies on studies that are far too methodologically weak to sustain even the (irrelevant) conclusions that Webster draws.

Webster says virtually nothing about exactly *why* gun ownership would increase the risk of suicide, perhaps because he regards it as self-evident. He does not, for example, assert that gun possession makes people depressed or puts the idea of suicide into the minds of people previously disinclined to consider it. He does, however, at one point refer to firearm suicide as "the most lethal means of self-harm" (p. 5). He does not cite any evidence supporting this claim, or compare the fatality rates of suicide attempts by shooting with those of suicide attempts using other methods that are likely to be substituted if guns were not available. As it happens, shooting is no more lethal than the method most likely to be substituted, hanging.

Hanging is already the second-most common method of suicide after shooting, and is similarly lethal and thus likely to be perceived as a feasible substitute method by prospective suicide attempters who were seriously motivated enough to have put a loaded gun to their head and pull the trigger, were a gun available. It also uses materials (rope and a sturdy support) much more widely available that guns (Kleck 1997, Chapter 8). Table 2 reviews research comparing the fatality rates (completed [fatal] suicides / total suicide attempts) of suicide attempts by hanging and those by shooting. The research indicates that there is little or no difference in fatality rates between hanging attempts and shooting attempts. Indeed, some studies have even indicated that hanging attempts were slightly more likely to be fatal than

shooting attempts. The most recent and extensive data, covering the entire U.S. in recent years, indicates that shooting attempts are only 5.7% more likely to end in death than hanging attempts. This small a difference is not statistically reliable, since estimates of nonfatal suicide attempts – a component in the denominator of fatality rates - are very imprecise. For example, the last study shown in Table 2, covering the entire U.S., used estimates of nonfatal suicide attempts derived from injury reports from a probability sample of emergency rooms, and thus is subject to random sampling error. The 95% confidence interval for estimates of nonfatal suicide attempts for 2001-2007 was 10,193-18,632 for hanging attempts and 5,563-42,764 for shooting attempts, implying a range of fatality rates of 72.7 to 82.9% for hanging and 73.5 to 95.5% for shooting (CDCP 2011). Since these ranges overlap, this difference in fatality rates is not statistically significant. Further, it is possible that the only reason there is even this slight 5.7% difference in fatality rates between shooting and hanging attempts is because people who choose to use shooting as a suicide method were more intent on dying than persons who choose hanging. Thus, there may be no difference at all in the lethality of the methods themselves, as distinct from the "lethality" of their users' intentions. In sum, there is no sound foundation to expect that suicide attempts would become less lethal if restrictions on gun availability caused suicide attempters to substitute hanging as their method. And certainly there is no foundation for a claim that the purported greater lethality of shooting could raise the risk of suicide by a factor of 4.7, as one of Webster's cited studies concluded (see p. 3 re. the Kellermann et al. study). As Professor Philip Cook concluded regarding guns and suicide: "if a gun is not available for some reason, then there are always alternatives that are nearly as lethal, including hanging and jumping from a high place" (Cook 1991, p. 25).

Webster's review of "ecological studies" (studies of macro-level aggregates like the populations of states or cities) (pp. 5-7) is likewise both highly selective and irrelevant to the Chicago gun ordinance. Chicago's gun ordinance does not prohibit gun ownership (though permit requirements continue pre-existing limits on gun possession by high-risk subsets like convicted felons). Consequently, studies of the impact of variation in overall gun ownership levels are not relevant to the ordinance.

In any case, Webster only cites "several" studies that assert that higher gun ownership rates cause higher suicide rates. He does not reveal how many studies did *not* support this hypothesis, or whether those studies that failed to support a guns/suicide association were technically sounder than the studies he cites. In fact, there are more studies that do *not* support the hypothesis, including some that are methodologically sounder than the ones he cites, than studies that do support it. For example, 10 of the 11 studies in this area published before 1996 found no significant effect of higher gun ownership rates on total suicide rates. The standard finding in the field is that gun rates have no effect on how many people kill themselves; rather they only affect how many of those who do kill themselves do so with guns. Thus, gun rates affect rates of *gun* suicide, but not the *total* suicide rate (Kleck 1997, Chapter 8, esp. p. 291).

Further, the handful of "ecological" studies that Webster does cite are conspicuously flawed. It is not possible to assess the impact of gun levels on suicide rates unless the analyst has a valid measure of gun prevalence, which usually has to be measured indirectly, with a "proxy" measure. Webster claims that the study by Miller et al. (2006) used a valid proxy for gun ownership (the percent of suicides committed with guns, or PSG), and cites a study (Azrael et al. 2004; see Webster's fn. 17) to support his claim that PSG was "a validated surrogate measure of

firearm ownership." Professor Webster apparently misread the Azrael article, since the authors clearly did not endorse the use of PSG for tracking changes in gun levels. Instead, Azreal et al. found that PSG (which they labeled FS/S, firearms suicides over total suicides) had a very weak correlation over time with survey measures of gun ownership, stating that "the intertemporal correlation between FS/S and gun prevalence…is quite weak" (p. 54) and reporting a correlation of r=0.21 (r$^2$=0.0441). This means that this proxy shares only 4% of its variation with gun prevalence as directly measured in surveys. PSG is therefore worthless for use in longitudinal studies like the panel study by Miller et al., which examined *changes over time* in gun ownership and suicide. Technically superior tests of the validity of PSG have likewise shown that there is no correlation over time between changes in PSG and changes in gun prevalence (Kleck 2004; Kovandzic, Schaffer, and Kleck 2008). Since Miller et al. did not have a valid measure of changes in gun prevalence over time, their findings can tell us nothing about what effects such changes may have on suicide rates. The same problem afflicts all other longitudinal studies of guns and violence that use PSG as the measure of gun prevalence.

Further, similar to the case-control studies, the ecological studies in this area do a notably poor job controlling for confounders – many of them do not control for any at all. Other studies control for some variables, but few of them are actually confounders. For example, the Miller et al. (2007) study cited in Webster's fn. 15 controlled for six variables, but when I reanalyzed their data I found that *none* of the six were confounders. Five of the six did not have any significant effect on suicide rates, and the one that did (rates of illicit drug use) was uncorrelated with gun prevalence. Thus, Miller et al. made an entirely arbitrary and inappropriate choice of confounders. They *seemed* to address the confounders problem but actually did nothing whatsoever to help isolate the effect of gun availability. By way of demonstrating how much the findings would change if a more appropriate selection of variables were controlled, I re-estimated the models but included just five other variables that *were* confounders. As a result, 69% of the guns/suicide association disappeared (Kleck 2007). Thus, the guns/suicide association is "fragile," meaning that it is highly unstable, subject to huge changes when the analysis is done slightly differently (in this case, using a different set of control variables).

The Miller et al. (2002) article that Webster cites in fn. 16 has the same problem – an arbitrary, unjustified selection of control variables. Only six variables were controlled, three of which were the same as in the authors' 2007 article, just discussed. Of the remaining three, only one, the divorce rate, is likely to be a confounder. Thus, the authors in this study did *almost* nothing to control confounding variables.

Indeed, all of the ecological studies of suicide rates cited in Webster's footnotes 15-20 suffer from the exact same problem – the analysts controlled for few variables, selected those few control variables arbitrarily, without regard to whether they actually affect suicide rates or are correlated with gun prevalence rates, and as a result controlled for few or no confounders. Thus, they fail to separate the effects of gun ownership rates from the effects of other variables that affect suicide rates. For example, it is well established that African-Americans are less likely to commit suicide than whites, and are also less likely to own guns. Thus, it is important to control for percent African-American in an ecological study of guns and suicide, since this variable reduces suicide rates but is also negatively correlated with gun prevalence. Failing to control for it biases the guns/suicide association positively, i.e. it artificially makes the estimated effect of gun prevalence seem more positive than it really is. The same observations apply to the

percent foreign born, since foreign born persons are both less likely to own guns and less likely to commit suicide. *None* of the studies cited by Webster controlled for percent African-American or percent foreign born, and thus all of their findings were biased – making the effect of gun prevalence look stronger than it really is.

Professor Webster then cites some scattered statistics on gun prevalence and suicide rates in just three states. This is a further step back from the state-level analyses cited in fn. 15-20, because those analyses at least incorporated information on the full set of all 50 states. Webster suggests that because these three states had discretionary purchase permit systems, their suicide rates were lower. He offers no evidence that these laws actually reduce gun availability, nor any theory as to how they could reduce suicide rates without reducing gun prevalence. In any case, the display of numbers in his Table 1 has no relevance to the present legal case, since the Chicago ordinance did not involve either the introduction of, or challenges to, a discretionary purchase permit system.

Webster also notes (p. 3) that the share of Chicago's suicides that were committed with guns was lower "when the city's handgun ban was in force" than in the U.S. as a whole or in other large metro areas. He likewise notes that Chicago's suicide rate was lower than in the rest of the U.S. in 2005 - an obvious attempt to suggest this low suicide rate was at least partially *caused by* the handgun ban. He fails to tell the reader that these facts also prevailed *before* Chicago's "handgun ban was in force" beginning in 1982. For example, Chicago's suicide rate in 1980 was 7.4 suicides per 100,000, while it was 11.8 in the U.S. as a whole. Likewise, the percent of suicides committed with guns in 1980 was 41.9 percent in Chicago, compared to 57.3 percent of suicides in the U.S. as a whole (analysis of Mortality Detail File data – U.S. Department of Health and Human Services 1984). It is obviously impossible for the effects of the city's gun laws to operate backwards in time, so other factors must have brought about the city's lower pre-1982 suicide rate and its lower gun share of suicides.

**Section V-B - Effects of Guns on Homicide**

Pp. 7-11 of the Webster report concern homicides, and addresses the same categories of research addressed in the suicide section. The homicide section suffers from the same problems as the suicide section – the research reviewed is largely irrelevant to the factual issues at stake in this case, Webster is extremely selective about which studies he reviews, favoring those that find a positive guns/homicide association, and the studies he does stress are of very poor quality.

The "household studies" (case-control studies) of homicide that Webster reviews have the same previously discussed problems as the suicide case-control studies, especially the possibility of a spurious association. The same factors that put people at greater risk of being murdered also motivate many of them to acquire guns for self-protection. Thus, if murder victims are more likely to own guns than nonvictims, this cannot, by itself, be used to infer that gun ownership caused the higher risk of murder, since one would expect a positive association between gun possession and homicide victimization even if the former had no effect whatsoever on the latter. For example, being a street gang member or a drug dealer increases both the likelihood of being murdered and the likelihood of possessing a gun, so even if owning a gun had no effect on the probability of being murdered, one would still expect a positive association between gun ownership and homicide victimization.

The homicide studies, however, also have their own unique problems.  In suicide research, it is usually a reasonable assumption that if a person uses a gun to commit suicide, the gun belongs to either the suicidal person or to someone else in his or her household.  Thus, there is some reasonable connection between household gun ownership and suicide; although the suicide might well have occurred even without guns (e.g., hanging could be substituted), one can at least be fairly confident that a "household gun" was used to kill the decedent.  With homicide, this is not a reasonable assumption, and indeed it is nearly always wrong – murder victims are almost never killed with a gun belonging either to themselves or to some other member of their household (Kleck 2001a).  Even those who are killed in their own homes are typically killed by outsiders who bring their own guns with them.  Based largely on Kellermann's own data, revealed in a later study, less than two percent of homicides in the areas he studied were committed with a gun belonging to the victim or another member of the victim's household (Kleck 2001a, pp. 69-70).  Thus, if people with guns in their homes are more likely than those without guns to be murdered, there is no reason to infer from this fact that their household gun ownership somehow caused gun owners' elevated risk of being murdered – the household gun is simply not involved.  Webster appears to be unaware of this problem, and fails to note that *none* of the homicide studies on which he relies established that even a single one of the homicide victims studied had been killed with a household gun.

The more likely explanation of the guns/homicide association is that a variety of confounding factors increase the risk of homicide victimization, but also cause many of those exposed to these factors to acquire guns for self-protection.  Webster stresses the findings of Kellermann et al. (his fn. 24), but those authors perfectly exemplify the failure to control for important likely confounders.  As previously noted, drug dealers and members of street gangs are at extremely high risks of being murdered, and are also far more likely to possess guns – acquired largely for protection against those high risks (Kleck and Hogan 1999; Kleck 2001).  Thus, it is essential that researchers control for gang membership and for status as a drug dealer if they are to properly estimate the effect of gun ownership on homicide victimization.  Otherwise, the researcher will obtain a spurious (noncausal) positive association between guns and homicide.  Kellermann et al. did not control for either of these obvious confounders, nor did any of the other researchers cited by Webster (see studies cited in fn. 24-28).  More generally, researchers in this area also fail to control for numerous other confounders (Kleck and Hogan 1999).  Thus, Webster has no sound basis for interpreting the guns/homicide associations he cites as indicative of actual causal effects, rather than as spurious associations.

Webster notes (p. 8) the long average time interval between "the first family handgun purchase and any homicide death" and draws the *non sequitur* conclusion that it is therefore unlikely that the guns-homicide association "could be due to homicide risks prompting gun ownership."  This is illogical, for multiple reasons.  First, even though the family's *first* handgun may have been purchased many years before a family member was murdered, other handguns might have been acquired shortly before the homicide, in direct response to the factors that precipitated the killing.  Second, many of the same risk factors that placed family members at greater risk at the time of the homicide would also have prevailed years before, and thus could have motivated acquisition of a gun at that earlier time.  For example, people who are poor and who must live in a high-crime neighborhood today are very likely to have also lived in a low-income, high-crime neighborhood years earlier.  Thus, the fact that guns were acquired years

before a family member was killed does not mean that the gun acquisition was not prompted by exposure to homicide risk factors such as a high neighborhood crime rate or association with dangerous people.

Webster cites a study by Kleck and Hogan (1999) to the effect that gun ownership has a weak (OR=1.36) positive association with the risk of committing a homicide (p. 8), but fails to note a crucial qualifier that Kleck and Hogan were careful to state: "the failure to control confounding variables known to positively affect both violent behavior and gun acquisition, however, is probably at least partly responsible for the positive guns-homicide association. Therefore an association this weak could be entirely spurious" (p. 288).

In the single cohort study cited by Webster, in connection with a study by Wintemute (p. 8), Webster notes that the risk of being murdered was higher among handgun purchasers than among others, but fails to note that this is precisely what one would expect if handgun purchase did *not* increase homicide risk, since being exposed to a variety of risk factors (living in high crime neighborhoods, associating with dangerous people, drug dealing, etc.) other than gun ownership would increase the risk of being murdered but also motivate many people to purchase a handgun for self-protection. One would still expect a higher murder rate among gun purchasers, even if gun purchase did not *cause* any increase in risk.

Webster also fails to recognize patterns in Wintemute's findings that are inconsistent with the view that gun ownership causes an increased risk of being murdered. Webster notes that handgun purchase appeared to increase the risk of homicide for women but not for men. This is not consistent with the view that these associations reflect the effect of gun possession on homicide risk, since a genuine causal effect should be *weaker* for women than for men. Because women are smaller and physically weaker than men, guns are less necessary for killing women than for killing men, and consequently are much less likely to be used in the killing of women than of men (Kleck 1991, p. 204). Therefore, the availability of a gun should have *less* effect on the homicide risk of women than of men – exactly the opposite of the pattern observed in the Wintemute study. On the other hand, the pattern makes perfect sense if the gun/homicide is interpreted as spurious. When women purchase handguns, it is especially likely to be for purposes of self-defense, whereas men are more likely to purchase handguns for a variety of purposes, including recreational activities like hunting and target shooting, unrelated to self-defense (Kleck 1997, Chapter 3). Thus, among recent handgun purchasers, women are more likely than men to have been responding to factors raising their risk of homicide, and for this reason are more likely to be murdered after buying the handgun. In short, the guns-homicide associations observed in the Wintemute study are better interpreted as spurious associations than as evidence that handgun purchases increase the risk of homicide.

The "ecological" homicide studies discussed by Webster (pp. 9-11) have essentially the same problems that afflicted the "ecological" suicide studies – use of invalid measures of gun prevalence (such as the use in longitudinal studies of the proportion of suicides committed with a firearm) and a failure to control for confounding variables, but they also suffer from an additional problem - failing to properly address causal order. Homicide rates can affect gun ownership, as well as gun ownership possibly affecting homicide rates, so a positive guns/homicide association may merely indicate that higher murder rates cause more people to acquire guns for self-protection. And indeed, the best available evidence indicates that is exactly

what happens (Kleck and Patterson 1993; Kovandzic et al. 2008). None of the studies on which Webster relies applied any accepted research methods that can differentiate the effect of guns on homicide from the effect of homicide rates on gun rates. In particular, merely relating this year's homicide rate to the previous year's gun ownership rate does not solve the problem (Kleck 2009). One simple reason for this method's ineffectiveness is that it simply *assumes*, rather than demonstrating, that gun ownership has no immediate effect on homicide, and that gun possession begins to have an effect on homicide only after a year has passed – a patently implausible, and certainly unsupported, assumption.

Table 3 summarizes a considerably more complete and representative set of macro-level studies (referred to as "ecological studies" by Webster) of the effect of gun ownership rates on homicide rates. The table shows which studies met the minimal methodological criteria for properly estimating a gun effect: (1) using a valid measure of gun ownership levels, (2) controlling for a substantial number of possible confounding variables, and (3) using accepted procedures for establishing causal order (that is, distinguishing the effect of gun levels on homicide rates from the effect of homicide rates on gun ownership). A number of patterns are clearly evident. First, most of the research is of very poor quality, and *all* of the studies cited by Webster are of especially poor quality, failing to meet these minimal criteria. Second, there are only a few good quality studies, *none* of which were cited by Webster. While there were other studies that met two of the three conditions, the only studies that meet all three criteria are Kleck and Patterson (1993) and Kovandzic et al. (2008). Finally, and most significantly, these two studies found *no* significant positive effect of gun ownership levels on homicide rates. In sum, Webster's conclusions concerning "ecological" studies of homicide are the product of "cherry picking" studies that support his position, ignoring fatal flaws in those studies, and ignoring better quality studies that obtained findings contrary to those conclusions.

Methodological quality is of vital significance in this field, and Webster fails to use the most critical criteria of quality in deciding which studies can be relied upon to provide meaningful estimates of the effect of gun levels on homicide rates. Indeed, Webster devotes an entirely uncritical discussion (p. 11) to a study by Cook and Ludwig (2006) that I used as the chief example bad research in a paper titled "How Not to the Study the Effect of Gun Levels on Violence Rates" (Kleck 2009). I used this study as my exemplar of poor research because the authors failed on all three methodological criteria. This was a longitudinal study, but the authors used a measure of gun ownership known to be invalid for use in longitudinal studies (Kleck 2004; Kovandzic et al. 2008), they used an inappropriate method for addressing the causal order problem (relating the current homicide rate to the previous year's gun rate), and they explicitly controlled for only four control variables that were significantly related to homicide rates, while failing to control for important, well-known, and easily measured determinants of homicide rates such as the poverty rate, the divorce rate, the percent of the population born in the South, and the percent of the population in prison (see Kleck 2009 for details and discussion of other flaws). Webster shows no awareness of any of these fatal flaws.

## Section V-C - Effects of Guns on Unintentional Shootings

Once again, the research cited by Webster is largely irrelevant to the factual issues involved in this case, since he focuses on either (1) the effects of having a gun in the household, or, in the ecological studies, (2) the effects of higher gun ownership rates on rates of accidental

shootings.  These studies are irrelevant because the Chicago handgun ordinance does not ban gun ownership (or handgun ownership) and thus does not prevent anyone from having a gun in their household.  The research would be relevant only if it assessed the effects of limiting operable guns to one per permitted occupant, or the effects of a local sales ban, but these topics were not addressed in the cited studies.

The study cited by Webster that comes closest to being relevant is the Wiebe article cited on p. 12, but Webster inaccurately describes the only findings in that study that were somewhat relevant to the Chicago gun ordinance.  Wiebe compared fatal gun accident (FGA) risks between households with guns and households without guns, but the findings from that comparison are irrelevant because the Chicago ordinance does not mandate that households be without guns.  Wiebe, however, also compared (a) households with multiple guns with (b) households with just one gun, and with (c) households with no guns.  (He did not, however, compare households with multiple guns kept in *operable* condition with households with a single gun kept in operable condition.)  Webster only reports those findings in a later section (Section VI), separated from his main discussion of the Wiebe study, and then the discussion is misleading.

Wiebe's results indicated that there was no significant additional risk from having multiple firearms versus having only one firearm in the home.  The relative risk (RR) was 3.9 for multiple firearms, indicating that the risk of an FGA was 3.9 times larger for persons living in a household with multiple guns than for persons living in a household with no guns (Table 3 in Wiebe, p. 714).  The RR for persons in households with just one firearm, however, was a statistically indistinguishable 3.4.  The 95% confidence interval (CI) for the multiple firearms RR was 2.0-7.8, meaning that one can be 95% confident that the RR is somewhere between 2.0 and 7.8 – a very wide range.  Thus, this is a very imprecise estimate, subject to a large amount of random sampling error.  The 95% CI for the single-firearm RR was 1.5-7.6, another very wide range, which largely overlaps the CI for the multiple-firearms RR.  Webster concedes this, but does not make it clear that this means *there is no statistically reliable basis for concluding that persons in households with multiple guns are at even slightly higher risk of suffering an unintentional gunshot injury.*  Even this finding, however, is not entirely relevant to the present legal case since Wiebe never made any comparisons of risk with regard to the number of guns kept in *operable* condition.

In any case, these RRs cannot be taken at face value as estimates of causal effects because Wiebe controlled for only one actual confounding variable.  He controlled for three other predictors of FGA risk, but only two of them were significantly related to FGA risk at the .05 level (income was not).  As with the suicide and homicide household studies, estimates of risk associated with gun ownership are not reliable unless researchers control for a substantial number of confounding variables.  In particular, it is important to control for the subject's willingness to take risks, since this clearly will increase the likelihood of experiencing any kind of accident.  There are indirect indications that handgun owners in particular are more likely to be risk takers.  For example, handgun owners are more likely than other people to have an arrest record, indicating that they have committed crimes serious enough to merit arrest (Kleck 1991, p. 57).  Since committing serious crimes is a highly risky activity, this is an indication of greater willingness of handgun owners to take risks.  Supporting this, Waller and Whorton (1973) found that criminals are more likely than noncriminals to be involved in gun accidents.

This observation is important in interpreting Wiebe's pattern of findings regarding the purported effects of types of guns. Higher rates of death from FGA could reflect either (1) an actual causal effect (having a gun genuinely causes a higher risk of a FGA), or a (2) spurious, noncausal association attributable to the facts that (a) having a risk-prone personality is more common among gun owners, and that (b) taking risks causes an increased likelihood of experiencing an FGA. If the guns/FGA association reflected a causal effect, one would expect a stronger association of death from a fatal gun accident with *long gun* ownership than with handgun ownership, because (1) long guns are mechanically easier to accidentally discharge than handguns (due to a lighter trigger pull than with handguns and the frequent absence of an integral safety), and because (2) long guns are more lethal than handguns, so that an accidentally inflicted wound from a long gun is more likely than one inflicted with a handgun to result in the victim's death (due to the higher average muzzle velocity of rifle ammunition, the greater average length of rifle bullets, and the larger number of projectiles fired by shotguns) (Kleck 1991, Chapter 3). Wiebe, however, found that *handgun* ownership was more strongly related than long gun ownership to FGA risk, a pattern contrary to the hypothesis that the guns/FGA correlation is a due to a causal effect of gun ownership, but consistent with the view that it is a spurious association attributable at least partly to the greater tendency of some handgun owners to take risks, rather than any actual risk-increasing effects of owning guns.

Webster claims he could find only one ecological study (Miller at al. 2001, see Webster's fn. 43) of the relationship between firearm availability and rates of death due to unintentional shootings (p. 12), but this is incorrect. Kleck and Patterson (1993) conducted an ecological study of this very topic, finding no significant effect of gun ownership rates on the FGA rate (p. 270). Webster was clearly aware of this study, since he cites it in detail on p. 9 of his report. This is an unfortunate omission since the Kleck and Patterson study that Webster ignored was methodologically superior to the Miller et al. study that Webster discussed at length. Miller and his colleagues conducted a longitudinal study but used a measure of gun ownership levels that is known to be invalid for use in longitudinal studies (Kleck 2004), while Kleck and Patterson used a measure that was valid for use in their cross-sectional (non-longitudinal) analysis of large cities. Once again, Webster's review of research was selective, and unjustifiably excluded research with findings that contradicted his conclusions.

**Section VI – The Effect of Number of Household Firearms on Suicide, Homicide, and Gun Accidents.**

I have already addressed the "case-control" studies that claimed that household gun ownership increases the risk of suicide and homicide. Regarding the risk of gun accidents, the only study that Webster relied on was the Wiebe study already discussed in connection with Section V-C. The Wiebe study (whose findings were misleadingly described by Webster) found that there was no statistically significant difference in the risk of gun accidents between a household having multiple guns versus a household having only one gun. Likewise, the Cummings et al. study cited by Webster obtained the same findings with respect to the risk of homicide. Although Cummings et al. did not analyze data on number of guns owned, they measured the number of handguns purchased by family members at some time in the past. Since people frequently get rid of guns, this is not a good measure of the number of guns owned at any one time, but in any case the findings did not support Webster's conclusions. Cummings et al. found that there was no significant difference in homicide risk between households that had

purchased multiple handguns and those that had purchased just one.  This is the actual meaning of Webster's somewhat obscure concession that "the confidence intervals of these point estimates overlap" (p. 12).  The statement means that there was no statistically reliable difference in risk of homicide.

**Section VII – The Effects of "Safe" Storage on Suicide, Homicide and Unintentional Shootings**

The feature that is most conspicuous in Webster's discussion of "safe" storage is the absence of any discussion of how keeping guns locked away and unloaded affects their readiness for use in self-defense.  Webster avoids acknowledging a logical inconsistency in advocacy for "safe storage" practices – the idea that securing guns would make them less available to household members intent on committing homicides or suicides, or likely to accidentally shoot someone, yet *not* make them less available to household members who need to use the guns for self-defense.  He offers no evidence or argument in response to the complaint of gun owners that keeping guns in an inoperable condition makes those guns less ready for use in lawful self-defense (even if a single gun is allowed to be kept in an operable condition).  This is a critical matter, since if keeping guns locked and unloaded substantially reduced the number of life-saving defensive uses of guns, but had little or no effect on harmful uses, it could hardly be reasonably argued that keeping guns locked and unloaded is "safe" storage.

Webster's discussion of research is irrelevant to the Chicago ordinance, and specifically its limits on the keeping of operable guns, since none of the studies he cites assessed the impact of having (a) one gun kept in operable condition versus (b) having *more than one* gun in operable condition.  Instead, the studies, at best, compared (a) households with all guns locked up with (b) households with one or more guns kept in operable condition.  That is, the studies attempted to assess the effect of having *any* guns in operable condition, not the effect of having one operable gun versus multiple operable guns (see studies cited in Webster's fn. 44-49).  Since people who use guns to commit suicide or homicide only need to use one gun to do so, it is not at all obvious why it would make any difference whether there were multiple guns in operable condition or just one – one is all that is needed to commit suicide or homicide.

The case-control studies cited by Webster also cannot sustain the conclusion that keeping guns locked and unloaded reduces the risk of homicide, suicide, and unintentional shootings, since none of the studies made a serious effort to control for confounding variables, i.e. gun-correlated factors that affect the likelihood of people suffering these harms – as was previously documented in the preceding segments of this rebuttal report (see Table 1 with respect to suicide studies and Table 3 with respect to homicide studies).

Webster misleadingly hints (p. 13) that the National Rifle Association supports keeping all guns locked up and unloaded.  In fact, the NRA specifically exempts guns kept for self-defense from this general recommendation: "A gun stored primarily for personal protection must be ready for immediate use.  It may be kept loaded as long as local laws permit …" (National Rifle Association 1990, p. 37).  Since self-defense is virtually the only reason a gun owner would want to keep a gun loaded and unlocked, this is a fairly consequential exemption, and to not mention it when describing the NRA's storage recommendations is seriously misleading.

Webster's review of research on Child Access Prevention (CAP) laws is grossly misleading, since the results of the best available research, including Webster's own work, indicate that the laws were a failure. They were intended to reduce gun accidents among young people by requiring that gun owners keep their guns secured in a way that prevented unauthorized youths (usually defined as persons under 15) from gaining access. Webster reports statistically significant reductions in FGAs with young victims following passage of CAP laws in Florida and California, but fails to mention that these were just two of *fifteen* states' CAP laws that were evaluated, and that the other 13 states showed no effects of the laws (see studies cited in fn. 50 and 51). If the underlying rationale for these laws was sound, all the laws, or at least a majority of them, should have reduced FGAs. Webster correctly notes that Florida, the first state to pass such a law, experienced a huge wave of publicity concerning the law and the topic of child-involved gun accidents, but fails to appreciate the significance of this fact: the drop in the rate of FGAs with young victims in Florida may have been due to the publicity and presumably heightened awareness of the potential for unauthorized access to guns among young people, not to the provisions of the CAP law. The fact that a drop in accidents occurred in Florida where there was huge publicity due to the uniqueness of the nation's first CAP law, but not in 13 other states, where CAP laws were passed with little fanfare, supports this interpretation. Webster suggests (p. 14) that beneficial effects occurred in Florida and California because these states defined some violations as felonies, but this is inconsistent with (a) the fact that Connecticut, which also provides for felony penalties, did not experience a significant decline in FGAs among young people (Hepburn et al. 2006, cited in fn. 51), (b) the enormous body of research indicating that more severe penalties for crime do not reduce crime any more than less severe penalties (Doob and Webster 2003), and (c) the fact that neither Webster nor anyone else known to me has established that felony penalties have *ever* actually been imposed for violation of CAP laws, in either Florida or California.

Setting aside the historically unique (and nonreproducible) experience of Florida as the first state to have a CAP law, California is the only state to experience significant declines in youth FGAs following passage of a CAP, of 15 state laws evaluated. Finding a single seemingly supportive finding out of 15 findings is about what one would expect to occur as a result of random chance alone even if CAP laws had no effect. That is, if 15 bodies of meaningless numbers were randomly generated by a computer, and one set of numbers was arbitrarily labeled the "FGA rate" and another one "CAP status," one would expect to find a statistically "significant" association between the two in one of those bodies of data, by random chance alone, merely because one had searched for the association so many times.

## Section VIII – Effects on Guns on Burglary

Webster asserts (p. 14) that "firearm availability within homes increases the risk of home burglaries." The sole basis for this claim is a single study by Cook and Ludwig (2003; see Webster's fn. 52). While Cook and Ludwig did indeed draw this conclusion, their methods cannot actually sustain it, and some of their findings directly contradict it. It is common for researchers to find a significant positive association between gun rates and crime rates, but the best-supported explanation for this statistical pattern is that higher crime rates motivate many people to acquire guns for self-protection, not that higher gun rates cause higher crime rates (Kleck 1984; Kleck and Patterson 1993; Southwick 1997; Southwick 1999; Kovandzic et al. 2008). The only studies that find a supposed positive effect of gun rates on crime rates are,

*without exception*, those that failed to use appropriate methods to distinguish the effect of guns on crime rates from the effect of crime rates on guns (see Table 3 with regard to homicide). The study by Cook and Ludwig is no exception, as they too failed to use appropriate methods to resolve this causal order problem. One of their analyses (pp. 88-91) simply ignores the issue, effectively assuming that burglary rates have no immediate effect on gun ownership rates. They used an ineffective method for determining causal order, merely relating burglary rates in a given year to gun prevalence in the previous year. In any case, what Webster does not share with the readers is that this analysis found *no* significant effect of gun ownership levels on burglary rates (Table 3-4, p. 92), contrary to the Cook and Ludwig's (and Webster's) claim that higher gun ownership rates cause higher burglary rates by increasing the average "take" in burglaries, and thereby boosting the incentive to commit burglaries.

In another analysis (pp. 91-93), Cook and Ludwig attempted to apply instrumental variables analysis to their data, a potentially effective method for dealing with simultaneous two-way relationships. This method, however, does not work unless the analysts use one or more relevant and valid "instrumental" variables. In this case, the authors needed to measure a variable that affects gun ownership but does not affect burglary rates. Cook and Ludwig used the percent of the population living in rural areas in this role, claiming (probably correctly) that it has a significant positive effect on gun ownership rates, but also assuming (incorrectly) that it has *no* effect on burglary rates (p. 91). There is a wealth of evidence indicating that burglary rates are lower in rural areas than in metropolitan areas (e.g., U.S. FBI 2010), so percent rural is an invalid instrumental variable because it cannot be assumed that rural conditions have no effect on burglary rates. As a consequence, the models of burglary rates estimated by Cook and Ludwig were "underidentified," a statistical condition under which estimates are meaningless (see Kovandzic et al. 2008 for a technical explanation). Rather than the observed positive guns/burglary associations reflecting an effect of gun availability on burglary rates, it is more likely that the association merely reflected the well-established fact that higher crime rates motivate many people to acquire guns for protection (Kleck 1997).

In addition to being unsupported by the empirical evidence, the argument that higher gun rates increase burglary rates by increasing the "incentives" for committing burglary is highly implausible on logical and theoretical grounds. Guns claim only about two percent of the dollar value of stolen property in the U.S., an amount too small to even be perceptible to the average burglar (U.S. FBI 2010). Further, the argument contradicts simple economic theory. The higher the gun ownership rate, the fewer nonowners there are, and thus the fewer willing customers there will be for stolen guns, and the lower the price those customers would be willing to pay. If everyone already has all the guns they want, why would they take the risks associated with buying a stolen gun? In sum, as the gun ownership rate goes up, the opportunity for stealing may go up, but the need for stolen guns and their prices go down, and thus the incentive for burglars to steal them goes down.

Webster is also very selective in reporting the findings of this study, failing to report those that supported the hypothesis that gun ownership rates do *not* increase burglary. For example, when Cook and Ludwig applied instrumental variables analysis to data from the National Crime Victimization Survey on whether individuals had been burglarized, they found *no* significant effect of gun ownership rates in a person's area on whether they were burglarized, contrary to the authors' incentive theory (Table 3-7 and accompanying text, p. 101).

Webster does briefly cite another similar finding, but misstates its relevance to the issues addressed by Cook and Ludwig, who claimed that higher gun rates caused more burglary. In fact, their analysis focusing just on burglary while a resident was at home ("hot burglaries") found that such burglaries were *less* likely for people who lived in areas with higher gun ownership rates, though the bivariate association was not quite statistically significant (t=1.60, 1-tailed significance = .0548; see top row of Table 3-8 and accompanying text, pp. 102-103). Estimates based on procedures controlling for other variables likewise produced gun effects that were negative but nonsignificant. These findings clearly contradicted the Cook/Ludwig hypothesis, but all Webster could perceive in the results is a supposed failure to find a significant negative deterrent effect of higher gun ownership rates.

The results, however, are probably irrelevant to whether guns deter criminals from committing burglaries, since it is unclear whether deterrent effects of guns, even if they exist, should be higher in areas with higher gun ownership rates. There is no evidence that criminals are aware of such differences across areas or time periods (Kleck 2001c). Instead, what criminals *are* aware of is the fact many Americans own guns. Thus, they may frequently be deterred by considering the general fact of widespread gun ownership, but are no more deterred from crime in areas or time periods with high gun ownership rate than in areas or time periods with low rates.

On the other hand, while the Cook-Ludwig tests were irrelevant to whether guns deter burglary, they are relevant to their hypothesis that higher gun rates increase burglary rates. Their findings indicate that the hypothesis is wrong, since people living in areas with more guns are *less* likely (albeit not significantly so) to be burglarized.

Webster briefly address the issue of gun theft (p. 15), and correctly notes that there are a large number of guns stolen each year – at least 500,000. He misunderstands, however, the significance of this fact and its relevance to the Chicago ordinance. It is precisely because there are so many gun thefts that criminals who want a gun can already obtain one, either by stealing one themselves or buying a stolen gun from others. Under current conditions, gun ownership among criminals is already "saturated" – everyone who wants one has one. Even Chicago's officials concede this state of affairs, stating that it is easy for the city's criminals to get guns despite the current gun ordinance. For example, Carol Brown, Chief of Policy for the Chicago Mayor's Office agreed that "it's fairly easy for criminals in the City of Chicago to obtain a gun illegally if they want to" (Brown 2011, p. 34), while Sgt. Kevin Johnson of the Chicago Police Department's Chicago Anti-Gun Enforcement (CAGE) team stated in his deposition that it is "not difficult at all" for a Chicago criminal to get a handgun (Johnson 2011, p. 87). Consistent with these assessments, interviews with arrestees in 1997 indicated that even when the far stricter pre-*McDonald* gun controls were in force, Chicago criminals paid less for guns in the illegal market than their retail prices – a state of affairs that would not prevail if guns were scarce or hard to obtain. The average price paid by Chicago criminals for a handgun was just $190, even though a conservative estimate of the average retail price of handguns recovered from criminals in the city was $237 (Kleck and Wang 2009, pp. 1248-1251). If it was already easy for criminals to get guns under the older, much stricter gun controls, it is implausible that the less strict post-*McDonald* controls have made it harder. Chicago's officials are correct – it is already easy for criminals to get guns, even with the current gun ordinance in force. When there is already an oversupply of guns available to criminals, marginal reductions in gun thefts would at best reduce

this oversupply, not prevent criminals from obtaining a gun. In any case, there is no evidence of even a modest effect on the gun theft rate of the city's limits on the number of operable guns allowed in households. In this light, there is no logical reason to believe that the city's existing ordinance reduces the number of criminals with guns.

**Section IX – The Defensive Value of Guns**

In section IX of his report (pp. 15-16), Webster cites one study, as if it bears on the issue of whether "increasing the number of operable firearms in homes makes occupants safer," but the study actually did not even address the number of operable guns in homes or whether their use makes their owners safer. Oddly enough, Webster seems to concede the irrelevance of the study he cites, at the end of Section IX (p. 16: "No prior study …."), raising the question "why discuss this study?" This one cited study (Kleck and Gertz 1995) merely estimated the number of times Americans used guns for self-defense, either in their homes or elsewhere, but did not address the issue of numbers of guns kept in homes, whether they were kept in an operable status, or whether having the guns made their possessors safer.

Webster appears to believe that legitimate doubt has been cast on the estimates of the frequency of defensive gun uses (DGUs) generated by Kleck and Gertz, citing other, poorer quality surveys done by Hemenway et al. (cited fn. 57). As in the rest of his report, he reviews only a small and unrepresentative subset of the relevant studies. A considerably more complete and representative review of survey estimates of DGU frequency is shown in Table 4. The full body of studies strongly supports the conclusion that Americans use guns for self-defense an enormous number of times each year. Many of the early surveys were not very useful because they did not ask the DGU question of everyone in the sample, so estimates of DGUs in the entire population could not be computed (e.g., the Cambridge Reports, Time/CNN, and Gallup 1991 and 1993 surveys). Among more recent surveys, however, results have consistently indicated a million or more DGUs per year – excepting the two survey done by Hemenway and his colleagues. Thus, Webster has selectively cited the only two recent surveys generating estimates under one million.

Webster failed to recognize, however, that even the poor quality surveys done by Hemenway implied huge estimates of DGU frequency (Table 4). More specifically, those estimates, like the DGU estimates generated by every other national survey, are larger than the highest estimates of the number of *crimes* committed by offenders using guns (about 550,000 in 1992, for example – Kleck and Gertz 1995) . In short, defensive uses of guns by crime victims are more common than offensive uses by criminals – a conclusion supported even by the deviant findings of the surveys done by Hemenway on which Webster selectively relied (for details on why these were poor quality surveys, see Kleck 2001b, pp. 227-229).

Webster also appears to believe that estimates of DGU frequency in the Kleck and Gertz survey were somehow cast in doubt by the fact that their survey supposedly indicated that there were over 200,000 assailants wounded in DGUs, while other evidence from hospital emergency rooms indicates fewer than 100,000 *treated* for gunshot wounds (GSWs). It should first be noted that Webster has failed to take account of random sampling error in the survey-based GSW estimates. The percent of defensive gun users who believed that they wounded their adversary (7%) was based on just 194 sample cases of DGUs, so the 95% confidence interval estimate of this percentage is 3.41-10.59%. Thus, as few as 3.41% of the estimated 2.5 million defensive

gun users in 1992 would claim, if asked, that they had wounded their adversary, or as few as 85,250 defensive woundings. Thus, simple random sampling error, present in all survey estimates, is sufficient all by itself to explain the supposed discrepancy between the Kleck-Gertz estimates and emergency room data on GSWs.

There is, however, no actual discrepancy, since Webster made an erroneous apples-and-oranges comparison. The number of persons *treated* for GSWs is only a subset, and probably a fairly small subset, of the *total* wounded. Most gunshot wound victims are criminals. Because medical personnel are legally required to report treatment of GSWs to police, this means that wounded criminals who seek professional medical care of their injuries can expect to be subjected to a police interrogation as to how they came to be wounded. Those wounded by victims while attempting a crime would be understandably reluctant to reveal this to police and thereby risk a prison term for the crime. Since most gunshot wounds are survivable without professional medical treatment, many criminals choose not to seek such treatment, instead self-treating or seeking treatment from associates (Kleck 1997, pp. 3-5 and sources cited therein). Consequently the lower number of professionally *treated* gunshot victims implies nothing about whether survey DGU estimates of *total* gunshot victims are too high. In short, the GSW estimates implied in the Kleck-Gertz survey were perfectly compatible with the emergency room data on the number of GSWs medically treated that were cited by Webster.

Webster also claims that the Kleck-Gertz estimate of DGU frequency is inconsistent with a DGU estimate based on the National Crime Victimization Survey (NCVS). There is in fact no such estimate, since the NCVS has *never* directly asked even a single respondent about DGU. Instead, the NCVS only asks a general open-ended question about self-protective strategies that a victim might have employed during a crime incident. Thus, no one is asked specifically about DGU – respondents are merely given the opportunity to volunteer the information that they used a gun for self-protection. This is not an effective way to elicit reports of DGUs. Since the NCVS is a nonanonymous survey (the identity of respondents is known to surveyors) conducted by the federal government on behalf of the Justice Department, it is not surprising that few respondents volunteer the information that they threatened or attacked another person with a deadly weapon (Kleck 2001b). In sharp contrast, Webster does not mention that *every other survey* (at least 18 national surveys) indicates far more DGUs than the NCVS supposedly implies – most indicating over a million annual DGUs (Table 4). Thus, it is the NCVS "estimate" that is deviant, not the Kleck-Gertz estimate.

Most problematic of all, Webster completely ignores the well-known and sophisticated body of research that actually does bear on the question of whether guns make their owners safer – research on the effectiveness of actual defensive uses of guns by crime victims. It is understandable that Webster does not mention this body of research, since it unanimously indicates that victims who use guns for self-protection are less likely to be injured or lose property, compared to either victims who did not to resist, or to those who adopted other self-protective strategies.

The most authoritative information on the effectiveness of DGU comes from analyses of crime incidents reported in the NCVS. Respondents in this survey are asked if they have been victims of a crime in the previous six months, and if they say they have, they are asked about what actions they took to protect themselves during the incident. They are also asked whether

they were injured or whether they lost property, along with many other questions about a host of other factors that might affect the outcome of crimes.

Findings from these analyses have unanimously indicated that, even after controlling for many possible confounding variables, crime victims who used guns to protect themselves were found to be *less* likely to suffer injure after taking their self-protective actions, and *less* likely to lose property, than victims who did not resist at all, victims who resisted by force but not with a gun, or victims who resisted in nonforceful ways. Of special importance, gun-using victims were less likely to suffer *serious* injury (more serious than just cuts or bruises) than victims using any other self-protection strategy. The effectiveness of DGU is all the more impressive in light of the fact that gun users were typically facing more dangerous circumstances than victims using other defensive strategies – gun users were more likely to be outnumbered, already injured before using the gun, and to be facing armed offenders (Kleck 1988; Kleck and DeLone 1993; Southwick 2000; Kleck 2001c; Tark and Kleck 2004). Some early studies indicated that some gun-using victims were injured, supposedly as a result of using their guns, but after the NCVS was modified to establish whether injury occurred before or after protective actions were taken, it was found that nearly all injuries to gun-using victims had occurred *before* they used their guns (Kleck 2001c). Thus, gun use could not have provoked offenders into hurting the victims. In short, defensive gun use is not only extremely frequent in the U.S., but it is also effective in making crime victims safer. Webster created the contrary impression simply by excluding any mention of the relevant research.

The relevance of the DGU effectiveness research to the present case is straightforward. Limiting the number of operable guns in Chicago homes is likely to reduce the number of occasions when residents can get to their guns in time to use them against criminals, and these defensive uses would, based on this body of research, generally reduce the victim's chances of being killed, raped, otherwise injured, or of losing property. Thus, the restrictions are likely to reduce the number of beneficial uses of guns by crime victims in their homes.

### Section X – The Likely Effects of Chicago's Limitation on Number of Operable Guns in the Home

In this brief section, Webster draws conclusions that seem to come out of nowhere, having no logical connection with any of the research previously discussed, and even directly contradicting it. He belatedly addresses the relevant issue of the difference in effects between having one operable gun in the home versus multiple operable guns, but then falsely claims that the research he reviewed supports the existence of an effect of having multiple operable guns in the home: "there also appears to be a dose-response relationship in which risks increase with the number of guns kept in the home" (p. 16). He does not state which specific studies support such a relationship, but in fact only two studies that he reviewed even addressed the difference between having one gun vs. having multiple guns, and they did *not* support Webster's conclusion. As previously noted, Wiebe found no significant difference in the risk of a fatal gun accident between persons in households with a single gun and those in households with multiple guns, and this one study did not address the number of *operable* guns. Likewise, the Cummings et al. study found no significant difference in the risk of homicide between having purchased multiple handguns and having purchased only one.

## C.      REPORT OF PHILIP J. COOK

My response to Professor Cook's report is confined to his Sections IV to VI (pp. 3-18), which include his claims as to what research has to say about the links among guns, violence, and gun control.  My response follows the same sequence of sections that Cook used.

## SECTION IV-A – Consequences of Gun Violence

In Section IV-A, Professor Cook recites a series of statistics about the frequency of gun violence, but does not establish or provide any reasons to believe that the number of homicides, suicides, injuries, or crimes would be any lower if fewer guns were available.  On that point, he is very selective as to which of his own research findings he includes in his report.  He does not, for example, mention that he, like dozens of other researchers, has found the criminal offenders who possess guns while committing a crime are *less* likely to attack and injure their victims (Kleck 1991, pp. 161-162 and the sources cited therein).  Specifically, Cook found that robbers with guns were less likely than other robbers to injure their victims (Cook and Nagin 1979).  This repeatedly confirmed, though surprising, finding implies that injuries would increase if gun-armed robbers had instead been without guns.

Cook notes that the homicide rate in Chicago is far above the national average, but does not mention in this context that gun ownership in Chicago is far *below* the national average (Cook et al. 2007).  Regardless of whether one believes that gun ownership by prospective crime victims prevents crime, this pair of facts certainly does not support Cook's later claim that higher gun levels cause higher homicide rates, and thus that lower gun rates should produce lower homicide rates.

Cook reports enormous estimates of the "cost of gun violence" (pp. 4-5), but none of the data he cites in any way establishes that the costs of violence would be any lower if the violence were instead committed with knives or other weapons.  Cook's "costs of gun violence" are not really gun-specific - they largely reflect the costs of violence in general, rather the costs of gun violence in particular.  Nothing in this section can be legitimately construed to establish that the costs of violence in the U.S. or in Chicago would be even slightly lower if guns were less common.

The total cost figures are also dubious because the vast majority of these supposed costs are intangible costs that are not easily measured, and indeed may not be measurable at all.  Cook estimated these intangible costs using a "contingent-valuation survey," which he claims is "the accepted procedure in economics for estimating subjective costs" (p. 5).   The contingent valuation (CV) method has most often been used to assess the cost of environmental damage.  A blue-ribbon panel chaired by Nobel laureate Kenneth Arrow assessed the CV method, and how CV studies should best be done.   The concluding chapter of the collection of papers based on the panel's proceedings had this to say: "the basic conclusion of all the papers is that CV should be discarded as a public policy tool for determining economic damages to the environment" (Hausman 1993, p. 467).  This extremely negative assessment was based on the fact the CV method produces estimates that are illogical, internally inconsistent, and wildly inconsistent across studies.  Thus, Cook's CV-based estimates of the mostly intangible "cost of gun violence" cannot be regarded as credible.

Further, Cook is conspicuously one-sided as to which intangible costs and benefits he chooses to measure. He has acknowledged in his deposition that carry permit holders are motivated by a desire for security and self-protection, but also frankly acknowledges that he has never made any effort to quantify the value of the subjective feelings of safety and security produced by ownership or carrying of firearms (Cook 2011, p. 166), and thus has done nothing to quantify the *loss* in felt sense of security that would arise from gun restrictions, including bans on gun carriage and limits on the number of operable guns allowed in homes.

## Section IV-B – Lethality of Guns Used in Crime

In section IV-B, Cook asserts that "guns are intrinsically more lethal than other commonly available weapons" (p. 6). Although this might be to be true to some extent, Cook overstates the difference, and overstates the degree of support for this assertion. He has previously acknowledged that an attacker's intent to kill also affects the likelihood that he will inflict a fatal wound, that "the assailant's choice of weapon is a good indicator of his intent in assault offenses," and that "the assailant who is determined to kill the victim probably will use a gun, if one is available" (Cook 1982, p. 248). Consequently, by Cook's own logic, the attackers who use guns are also likely to be more lethal in their *intentions*, a factor that has its own independent effect of whether the victim is killed. This means that one cannot judge the lethality of weapons unless one somehow also measures and controls for the lethality of the attacker's intentions, since the two will be highly correlated. None of the studies that Cook cites to support his claim that guns are "more intrinsically lethal" measured or controlled for attacker lethality, and thus none can establish to what degree the higher fatality rate of gun attacks is due to the weapon's lethality rather than the attacker's more lethal intentions (Kleck 1991, pp. 163-170). Therefore, his claims about weapon lethality have no sound scientific foundation.

## Section IV-C – Criminal Weapon Choice and Gun Prevalence

In section IV-C-1, p. 8. Cook claims that higher gun ownership rates cause higher burglary rates, relying for support entirely on a book chapter he co-authored with Jens Ludwig. Unfortunately, Professor Cook misreports the results of his own study. While Cook and Ludwig did indeed draw this *conclusion*, their methods cannot actually sustain it, and many of their findings directly contradicted it. The authors speculated that gun ownership rates could boost burglary rates by increasing the average "take" in burglaries, and thereby increasing the incentive to commit burglaries.

It is common for researchers to find a significant positive association between gun rates and crime rates, but the best-supported explanation for this statistical pattern is that higher crime rates motivate many people to acquire guns for self-protection, *not* that higher gun rates cause higher crime rates (Kleck 1984; Kleck and Patterson 1993; Southwick 1997; Southwick 1999; Kovandzic et al. 2008). Unless researchers use appropriate methods to establish which is cause and which is effect, they risk misinterpreting (a) the effect of crime on gun acquisition for self-protection with (b) the effect of guns on crime. The only studies that find a supposed crime-increasing effect of gun rates are, *without exception*, those that failed to use scientifically acceptable methods to resolve this causal order issue. This is documented in Table 3, summarizing studies on the impact of gun levels on homicide rates.

The burglary study by Cook and Ludwig was no exception, as they too failed to use appropriate methods to resolve this causal order problem. Thus, there is no methodologically sound basis for interpreting the positive burglary/guns association as reflecting the effect of gun rates on burglary rates. One of the authors' state-level analyses (their pp. 88-91) simply ignored the issue, by effectively assuming that burglary rates have *no* immediate effect on gun ownership rates. The unstated assumption underlying this analysis was that if burglaries motivated any people to get guns for protection, this would only happen after at least a one year delay – a highly implausible assumption. They used an unsuitable and professionally unacceptable method for determining causal order, merely relating burglary rates in a given year (the dependent variable or effect) to gun prevalence in the previous year (the independent variable or purported cause). They did not cite any textbook or other authority that this is an acceptable method for resolving causal order, because there are no supporting authorities. In any case, this analysis found *no* significant effect of gun ownership levels on burglary rates (their Table 3-4, p. 92), contrary to Cook's claim that higher gun ownership rates cause higher burglary rates. Cook does not mention this unsupportive finding in his expert witness report.

In another state-level analysis (pp. 91-93), Cook and Ludwig attempted to apply instrumental variables analysis to their data, a potentially effective method for dealing with simultaneous two-way relationships. This method, however, does not work unless the researchers include one or more relevant and valid "instrumental" variables (Wooldridge 2009, Chapter 15). In this case, the needed instrumental variable was a variable that affects gun ownership but does not directly affect burglary rates. Cook and Ludwig used the percent of the population living in rural areas in this role, claiming (probably correctly) that it has a significant positive effect on state gun ownership rates, but also assuming (incorrectly) that it has *no* effect on state burglary rates (p. 91). There is a wealth of evidence indicating that burglary rates are much lower in rural areas than in metropolitan areas (e.g., U.S. FBI 2010), so percent rural is an invalid instrumental variable because it cannot be assumed that rural conditions have no effect on burglary rates. As a consequence, the models of burglary rates estimated by Cook and Ludwig were "underidentified," a statistical condition under which estimates are meaningless (see Wooldridge 2009, Chapter 15; Kovandzic et al. 2008 for a technical explanation). In sum, Cook and Ludwig did nothing that was methodologically appropriate to address the causal order issue, and thus had no sound basis that concluding from this analysis that higher gun ownership rates cause higher burglary rates. Rather than the observed positive guns/burglary associations reflecting an effect of gun availability on burglary rates, it is more likely that the association merely reflected the well-established fact that higher crime rates motivate many people to acquire guns for protection, i.e. that higher crime rates cause higher gun rates (Kleck 1997, pp. 75-81; Kleck et al. 2011).

Cook also fails to mention still other unsupportive findings of this study, findings that indicated that gun ownership rates do *not* increase burglary. When Cook and Ludwig applied instrumental variables analysis to individual-level data from the National Crime Victimization Survey on whether the households in which the individuals lived had been burglarized, they found *no* significant effect of the gun ownership rates in an individual's area on whether they were burglarized, contrary to the authors' incentive theory (see their Table 3-7 and accompanying text, p. 101).

Likewise, in yet another individual-level analysis using the NCVS data, Cook and Ludwig focused their analysis just on burglaries committed while a resident was at home ("hot burglaries"), and found that such burglaries were *less* likely for people who lived in areas with higher gun ownership rates, though the bivariate association was not quite statistically significant (1-tailed significance = .0548; see top row of Table 3-8 and accompanying text, pp. 102-103). Estimates based on procedures controlling for other variables likewise produced estimated gun effects that were *negative,* though nonsignificant. These findings also contradicted the Cook/Ludwig hypothesis that more guns cause higher burglary rates.

In sum, Cook's characterization of the findings of this study can, at best, be described as highly selective, at worst misleading. His own research did not support the claim that higher gun ownership rates cause higher burglary rates.

In addition to being unsupported by the empirical evidence, the argument that higher gun rates increase burglary rates by increasing the "incentives" for committing burglary is dubious on both commonsensical and theoretical grounds. First, guns claim less than one percent of the dollar value of stolen property in the U.S., an amount so small that it is not likely to not even be perceptible to the average burglar (U.S. FBI 2010, Table 24). Second, the Cook/Ludwig argument contradicts simple economic theory. The higher the gun ownership rate, the fewer nonowners there are, and thus the fewer people there are who want a gun but do not already have one. Thus, there are fewer customers for stolen guns, that is, is less demand. Where almost everyone who wants a gun already has one, it is harder for a gun thief to find buyers, and the prices customers are willing to pay will be lower. In sum, as the gun ownership rate goes up, the opportunity for stealing may go up, but the need for stolen guns, and thus the prices at which they can be sold goes down. Consequently, the incentive for burglars to steal them for purposes of sale goes *down*, not up. It might be thought that a major part of the incentive for burglars to steal guns would also be so that they could keep the guns for their own use, rather than selling them for profit. Research on gun theft, however, indicates that criminals who steal guns usually already possessed guns, and therefore usually do not keep the guns for their own use (Wright and Rossi 1986, Chapter 10).

In Section IV=C-1, p. 7 Cook discusses how criminals get guns, but relies on a source of information that is not relevant to this question (his fn. 17 source, *Following the Gun*). He relies on this source to describe how criminals typically get guns, but fails to note that the set of crime guns covered in this study was not a representative sample of all crime guns, but rather was only a tiny and unrepresentative set of guns associated with criminal investigations conducted by the Bureau of Alcohol, Tobacco and Firearms (ATF). As the principle federal agency charged with enforcing federal gun laws and regulating the gun industry, ATF investigates the "diversion" of guns from legal to illegal channels, especially from licensed dealers to criminals. The agency does not routinely investigate burglaries of private residences, private transfers between friends and family members, or other common sources of crime guns. Instead, it narrowly focuses its enforcement efforts on those channels of gun movement that it is charged with regulating and that it is capable of effectively investigating. Consequently, data concerning the guns that ATF comes across in the course of its investigations cannot legitimately be considered to be in any way representative of all crime guns or even those recovered by police.

Likewise, the share of crime guns linked with ATF investigations that moved through a particular channel cannot legitimately be regarded as providing even an approximate estimate of the share of crime guns that moved through that channel on the way to criminals' possession. ATF even explicitly acknowledged this, cautioning readers that their investigations "do not necessarily reflect typical criminal diversions of firearms" (U.S. ATF 2000, p. 53). Professor Cook apparently did not understand the significance of this caveat, since it means that the data presented in his report cannot be used to draw conclusions about the typical ways that firearms get into criminals' possession.

Likewise, Cook draws conclusions about "typical transactions" involving guns ending up in criminals' hands that were based on data pertaining only to a sample of guns that law enforcement agencies chose to submit for tracing by ATF and that ATF was able to successfully trace. Such samples are not randomly chosen samples of crime guns, and cannot legitimately be regarded as representative of either all crime guns or even of crime guns that were recovered by police. Rather than describing crime guns and the ways they typically get into criminal possession, samples of traced guns reflect police preferences as to which crime guns they choose to submit for tracing and which ones are easier for ATF to trace (Kleck 1999). Thus, they are not merely unrepresentative of crime guns, but systematically distort the picture of typical gun diversions, for example, by exaggerating the share of guns that moved through more easily traced channels, such as purchases of newer guns (Kleck and Wang 2009). As the Congressional Research Service concluded, "the firearms selected for tracing do not constitute a random sample and cannot be considered representative of the larger universe of all firearms used by criminals, or of any subset of the universe" (U.S. Congressional Research Service 1992, p. 65). Likewise, Cook relies on trace data to draw conclusions about the paths that guns take when they are diverted from legal channels to criminal possession (p. 8, sources cited in his fn. 17 and 18), but trace data cannot legitimately be used for this purpose. As a National Academy of Sciences panel flatly stated, "trace data cannot show whether a firearm has been illegally diverted from legitimate firearms commerce" (National Academy of Sciences 2004, p. 40).

At the end of Section IV-C-2, p. 10, Cook claims that higher gun ownership rates cause higher rates of criminal homicide, an assertion that is erroneous for two reasons. First, his argument leading to this conclusion is logically fallacious, in that his premises, even if accepted, do not logically lead to his conclusion. Second, the empirical evidence that directly bears on this question, which was completely ignored by Prof. Cook, directly contradicts his assertion. Competently conducted research on the effect of gun ownership rates on homicide rates has found either *no* significant effect (Kleck and Patterson 1993), or a modest *negativ*e (homicide-reducing) effect (Kovandzic et al. 2008).

Consider first Cook's flawed logic. He begins with two premises: (1) the prevalence of firearms has a positive effect on gun use (by which Cook meant the percent of violent crimes in which guns are used), and (2) gun use affects the death rate in assault and robbery. From these two premises, he concludes that the prevalence of firearms therefore has a positive effect on the criminal homicide rate (p. 10). The first premise is probably correct, while the second one is more dubious, but even if both were correct, they would not logically lead to Cook's conclusion. The inference is fallacious for at least two reasons. First, it ignores the possibility that a higher prevalence of guns among prospective victims makes crimes more dangerous for offenders, and can deter some prospective offenders from attempting to assault or rob victims in the first place.

This deterrent effect would reduce the overall number of attempted assaults and robberies. Thus, even if a higher fraction of victims did die (a higher "death rate" in Cook's terms) as a result of a higher gun prevalence, the number of deaths could still go down because the number of assaults and robberies to which this purportedly elevated death rate applied went down.

Second, Cook's reasoning is fallacious because he ignores the effects of more assault and robbery victims actually using guns for self-protection during the criminal attempts. Offender gun use might increase the fraction of injuries inflicted by the offender that were fatal, but it is also now well-established that victim defensive use of guns during criminal attempts *reduces* the probability of the offender injuring the victim (Kleck 1988; Kleck and DeLone 1993; Southwick 2000; Kleck 2001c; Tark and Kleck 2004) - a point Cook does not deny. Thus, increased gun prevalence among crime victims would tend to reduce the number of victims injured, so that even if increased gun prevalence among offenders did increase the *fraction* of wounded victims who died, this fraction would apply to a smaller number of victims who were wounded. Consequently, it is impossible to tell, from Cook's premises, whether increased gun prevalence would, on net, increase or decrease the criminal homicide rate.

The actual net effect of gun prevalence on the homicide rate can therefore only be established empirically, i.e. through systematic observations of the covariation of the two phenomena in the real world. Cook does not review the huge body of empirical research directly bearing on this issue, perhaps because so much of it indicates that his claims are wrong. Table 3 presents a systematic review of every published study in the English language of which I am aware addressing the effect on gun ownership rates on homicide rates. The results of this heterogeneous set of 39 studies have been decidedly mixed, with 22 studies finding a significant positive association between gun levels and homicide rates, 16 failing to find such an association, and one with both supportive and unsupportive findings. There are nevertheless clear patterns in this body of research. The earlier, more technically primitive studies tended to find a purported effect of gun rates on homicide rates, but as the methodological quality of research improved, such findings became less common. It is essential that one make careful distinctions between good and bad quality research if one wants to make sense of the full body of research.

Table 3 provides information concerning the chief methodological flaws that characterized each study, and makes it clear that few studies can be considered even minimally satisfactory, in that nearly all studies made at least one of the three most consequential errors. *All* studies whose authors purported to have found a significant positive effect of gun ownership on homicide rates made at least one (and usually more) of three fatal errors: (1) they used an invalid measure of gun ownership (in which case the observed associations did not even pertain to actual gun ownership levels), (2) they failed to control for a significant number of possible confounding variables (in which case the observed associations were likely to be "spurious," noncausal associations), or (3) they failed to properly address causal order (in which case, observed positive guns/homicide associations could reflect the effects of homicide rates on gun levels, rather than the reverse).

Conversely, *no* methodologically competent studies have found that gun ownership levels have a significant positive effect on total homicide rates. The only two studies that avoided all three of these critical flaws both found that gun ownership levels do *not* have a

significant positive effect on total homicide rates (Kleck and Patterson 1993; Kovandzic et al. 2008). The pattern could not be clearer – poor quality research sometimes (about half the time) suggests that the prevalence of gun ownership increases the homicide rate, while good quality research indicates that it does not.

To support his claim that higher gun rates cause higher homicide rates, Cook relies on just one study, which he conducted with Jens Ludwig (Cook and Ludwig 2006, cited in Cook's fn. 23). This study is so technically flawed that I used it as an exemplar of poor research in this area, in an expository article I published a few years ago, titled "How Not to Study the Effect of Gun Levels on Violence Rates" (Kleck 2009). Lest it be thought this is an unduly harsh assessment, it should be noted that Cook and Ludwig managed to make *all three* fatal errors: (1) they used a measure of gun levels that is invalid for judging changes in gun ownership levels (their's was a longitudinal study), (2) they did not use any methodologically approved or effective method for addressing causal order, and (3) they did not explicitly control for a substantial number of confounding variables, instead controlling only for a limited and arbitrarily selected set of variables, half of which turned out to be unrelated to homicide rates (Kleck 2009). This crude study therefore cannot be relied upon to provide a meaningful estimate of the effect of gun rates on homicide rates.

Cook's discussion in this section is also conspicuous for its lack of attention paid to an issue of central significance to Chicago's stricter gun control measures – whose gun possession contributes to violence? If criminal use of guns were confined to a small subset of the population, while beneficial, violence-reducing uses occurred among a larger segment of the population, would it be wise public policy to discourage gun possession among both groups equally? Would it be wise to ban gun sales or gun carrying to everyone, not just those in well-defined high risk groups, such as convicted criminals? Gun laws in most states routinely distinguish between two kinds of resident adults – those with a criminal conviction on their record and those without. The distinction is presumably based on the simple premise that gun possession by some people is a significant risk to public safety, while gun possession by others is not. Cook makes no distinction between criminal gun possession and noncriminal gun possession.

There is sound reason to believe that gun possession among noncriminal crime victims is beneficial, since methodologically competent research has established that actual defensive use of guns by crime victims reduces the likelihood that the crime will result in injury or property loss to the victim (Kleck 1988; Kleck and DeLone 1993; Southwick 2000; Wang and Kleck 2004). Thus, there are good reasons to expect that noncriminal gun possession reduces the number of people injured or killed in crimes. There are also violence-increasing effects of gun possession among criminals (Kleck 1997, Chapter 7). This combination of effects may account for why the best available research has not found a net violence-elevating effect of gun ownership rates (Table 3) – violence-decreasing effects of noncriminal gun ownership cancel out violence-increasing effects of criminal gun ownership. If this is true, it means that restricting guns equally among both criminals and noncriminals – such as banning gun sales to all prospective buyers or completely banning gun carriage - is unwise policy, since it would reduce beneficial gun uses by noncriminals, while only reducing harmful uses by criminals to the extent that criminals obeyed or were otherwise affected by the restrictions.

**Section V-A – Purported Public Safety Rationales for Chicago's Sales Ban**

In Section V-A, p. 10, Cook claims that Chicago's gun control efforts have made guns scarce for youth and criminals, supporting this claim by asserting that guns purchased "on the street" by criminals and youth in Chicago are (a) expensive, and (b) take a long time to acquire. He relies entirely on a study he conducted with colleagues (cited in his fn. 24), based mostly on interviews with criminals in a single high-crime Chicago neighborhood. The authors of this study claimed that there was a "substantial" price markup in the underground gun market. Their own interviews, however, actually indicated that even among the more naïve, less well-connected youth in this area (among whom prices should be relatively high), prices actually paid for handguns were almost exactly the same as their retail prices in stores. The authors reported that prices paid "on the street" for handguns ranged from $250 to $400. Assuming that the average price paid by these youth was around the midpoint between $250 and $400, we can tentatively guess that the average was somewhere around $325 (the authors did not report an average). As it happens, this is virtually identical to the average *retail* price of handguns confiscated from criminals in that same area, which was about $316 according to the authors' own data (Cook et al. 2007, p. F564, F586). Ignoring uncertainty about the exact average price paid in the illegal market, the authors' figures imply an average markup of just three percent over the average retail price of $316. By no stretch of the imagination could a markup of three percent be accurately described as "substantial." Indeed, it is far less than the 15 percent markup over cost that legal gun retailers typically charge (Cook et al. 1995, p. 71). Thus, even in a low gun ownership city with very restrictive gun laws, among more naïve young gun buyers lacking extensive criminal connections, criminals were not paying prices substantially over retail. Although prices for used guns sold by licensed retailers would not be as high as the new-gun retail prices used by Cook et al. (2007, p. F 586), the differences in prices charged by gun dealers between new guns and relatively newer used guns is slight, and Cook himself has asserted that most crime guns are relatively new (Cook and Braga 2001).

These data, however, pertained only to an unrepresentative sample of one small segment of the population in just one unrepresentative neighborhood of Chicago. Cook and his colleagues also reported considerably more generalizable city-wide data on prices paid by Chicago arrestees who were interviewed in 1996-97, as part of the U.S. Justice Department's Drug Use Forecasting program. This more systematic body of data indicated that the median price paid for handguns by Chicago criminals was just $150 (Cook et al. 2007, p. F573), *less than half* the average new-gun retail price of the guns confiscated from Chicago criminals of $331 (computed from data in their Table A4, p. F586). That is, Chicago criminals were able to buy guns "on the street" at bargain prices, well *below* what a person would pay in a gun store for the same guns.

In short, the authors' evidence consistently contradicted Cook's claims that criminals pay high prices for "street guns," and do even support a claim that criminals pay amounts even slightly over retail prices. Even in Chicago, where handgun sales had been banned for the fifteen years preceding the Cook et al. study (and where gun ownership was quite low even before the ban), the prices paid by criminals by the time of Cook's study were generally at or below retail prices. In sum, Cook's own data on prices paid for guns by Chicago's criminals directly contradict his claim that guns are scarce for criminals or hard to get.

Cook also cited data from the survey of Chicago arrestees done by the Justice Department in 1996-1997 (p. 11), and claimed that these data indicate that the city's criminals take a long time to acquire handguns, implying that it was hard for criminals to get them. In fact, this survey did not ask *any* criminals how long it had taken them to actually acquire their handguns, since the relevant question was asked only of arrestees who had never owned a handgun, and thus *had never actually obtained one*. That is, Cook relied for his conclusions as to acquisition time entirely on the *guesses* of arrestees who had no personal experience whatsoever with how long it takes to obtain a handgun in Chicago. Cook has presented no other type of evidence, either in his expert witness report or in any publication, that Chicago's gun enforcement efforts have made it hard for criminals in the city to obtain handguns. Thus, he has no reliable evidence that indicates that Chicago criminals take a long time to get guns.

In sum, the price data indicate that Chicago criminals can easily get handguns at bargain prices, well below retail price, while Cook's evidence on how long it takes criminals to get guns do not provide any reliable information on the topic. Thus, Cook has no reliable foundation for his claim the Chicago's gun enforcement efforts (or any other forces) have made it hard for the city's criminals and youth to get guns.

## Section V-B – The Effect of Banning Gun Dealers

In Section V-B, on p. 11 Cook hints that corrupt licensed gun dealers account for a large share of guns that get into criminal hands, and that this therefore justifies Chicago's ban on local handgun sales. He misleadingly cites two bits of supposedly relevant information to suggest that corrupt dealers are important in supplying criminals' guns. First, he notes that a small share of licensed dealers account for most of the crime guns traced by ATF. He did not make explicit why this is relevant, but when read in context, it is clear that he was hinting that all, most, or at least a large share, of these dealers with high "trace counts" had many crime guns traced back to them because they were corrupt or "scofflaw" dealers who knowingly or negligently sold guns to criminals, gun traffickers or straw purchasers working for traffickers. In fact, the large share of traced crime guns is known to be attributable to either of two factors that have nothing to do with dealer misconduct. First, a small share of licensed dealers account for most of lawful gun sales. Higher sales volume means that a larger number of a given dealer's lawfully sold guns will eventually be stolen, usually in residential burglaries, and traced by ATF. In short, the disproportionately large share of crime guns being traced back to a given dealer is a reflection of the dealer's larger share of sales volume, i.e. business success, not dealer misconduct. Second, some dealers do business in areas with higher crime rates, and thus higher rates of residential burglary and gun theft. This means that no matter how closely they follow laws and ethical practices in selling guns, a higher fraction of their lawfully sold guns will eventually be stolen. To date, there is no research whatsoever that indicates that, once one accounts for sales volume and local crime rates, dealer misconduct is responsible for any nonnegligible part of the disproportionate share of traced crime guns for which a few dealers account (Kleck and Wang 2009). Consequently, this pattern does not support Cook's belief that corrupt licensed dealers are a significant part of the problem of guns getting into criminals' hands.

The second fact cited by Cook to support this claim is an ATF report indicating that "corrupt FFLs [federal firearms licensees] accounted for nearly half of all guns" involved in 1,470 ATF investigations. There appears to be no point to Cook citing this fact except to suggest

that corrupt FFLs account for a large share of crime guns. The report in fact supports no such assertion. The figures cited by Cook merely reflect where ATF focused its investigative efforts. Since ATF is charged with regulating FFLs, but can do little about transfers of guns from private parties (friends, family) and criminals, or about gun thefts resulting from residential burglaries, their investigations generally focus on the few FFLs who do engage in misconduct. Regardless of how rare "scofflaw" gun dealers are, and how few guns they supply to criminals, such dealers will claim a large share of the guns *linked with ATF investigations* simply because FFLs are where ATF directs a large share of their investigative efforts. In fact, corrupt ("scofflaw") FFLs are extremely rare, and are unimportant as sources of crime guns (Kleck and Wang 2009).

Cook cites (p. 11) the cases of "several" FFLs in the suburbs of Chicago who were found, as a result of police "sting" operations, to be willing to make illegal gun sales. Since citing "several" anecdotal cases cannot support a claim that such misconduct is common among FFLs, the relevance of these cases to Chicago's ban on local handgun sales is unclear. There is no doubt that every occupation has at least a few unethical practitioners, but this is not usually considered a justification for entirely banning the practice of that occupation. On the other hand, if Cook was suggesting that a complete ban on sales was the only way that occasional misconduct could be prevented, that is obviously a *non sequitur.* Indeed, the fact that police investigations were able to successfully identify the few corrupt FFLs operating in the Chicago area could be regarded as evidence that sales bans are *not* necessary and that ordinary regulation and law enforcement activities can effectively regulate gun commerce in Chicago.

Cook falsely claims that (a) "ATF provides little oversight of FFLs" and (b) is rarely *able* to revoke a dealer license (p. 12), in an attempt to suggest that the agency would be unable to effectively regulate gun commerce in Chicago if its sales ban were repealed. Cook cites a 2004 report (his fn. 29) to support the former claim, but this report merely criticized how ATF uses its resources – it did not conclude that ATF provides "little oversight" over FFLs. In any case, this report, which was based on data no more recent than 2002), is outdated. Partly in response to this report, ATF substantially increased its inspections of FFL premises after the period covered by the report, and the number of FFLs has greatly declined since 2002, allowing far more ATF oversight per FFL. More recent data available on the ATF website indicate that by FY 2007, there were only about 60,000 FFLs, compared to 104,000 in 2002 (U.S. Bureau of Alcohol, Tobacco, Firearms and Explosives 2011), greatly reducing the regulatory burden on ATF. Further, earlier research by ATF indicated that only a tiny fraction of FFLs actually sell a significant number of guns. Operation Snapshot, a survey of FFLs, revealed that 46 percent of them sold *no* guns in the preceding year, and another 34 percent sold between one and ten guns. Only 7 percent sold over 50 guns and thus could potentially be a source of significant numbers of guns flowing into illegal channels (U.S. Bureau of Alcohol, Tobacco, Firearms 1993). Applying this 7 percent figure to the 2007 number of FFLs, there were actually only about 4,200 gun dealers selling any significant number of guns. In FY 2007 "ATF conducted approximately 10,000 compliance inspections" (U.S. Bureau of Alcohol, Tobacco, Firearms and Explosives 2008) – a number sufficient to inspect all "real" gun dealers (those annually selling more than 50 guns) *every* year, plus a sample of low-volume dealers. Thus, it is not true that ATF lacks the resources and authority to regulate gun stores, in Chicago or elsewhere, and a claim to this effect cannot be used to justify totally banning gun sales within the city of Chicago.

As to Cook's claims about dealer license revocations, there is no evidence whatsoever that ATF is rarely *able* to revoke licenses; instead, the evidence merely indicates that ATF, for whatever reasons, rarely *does* so. All the extant evidence of which I am aware is consistent with the view that few FFLs' licenses are revoked because few engage in misconduct serious enough (that is, more serious than sloppy record-keeping) to merit license revocation (Kleck and Wang 2009). Indeed, ATF itself has never even claimed that a large share of FFLs engage in any serious misconduct. Critics sometimes note how long it takes for FFL to revoke licenses, suggesting that these delays somehow make it impossible to revoke licenses, but such delays should only result in time lags in revocations (e.g., proceedings initiated in 2008 might not result in revocation until 2010), but should not prevent revocations from occurring at all (Kleck and Wang 2009). In sum, ATF is currently well able to regulate licensed gun dealers in the U.S., and Cook offers no reason why it would not be able to do likewise in Chicago if gun sales were permitted within the city limits.

Cook nevertheless argues that banning gun sales in Chicago can make it "more difficult" (to an unstated degree) for criminals and youths in Chicago to obtain guns, despite the fact that gun dealers continue to legally operate in the suburbs just outside the city. He claims that the Chicago criminals he studied rarely obtained guns from these stores because they "rarely left their own neighborhood" (p. 12). Of course, if Cook's assertion is true of low-income Chicago residents in general, he should have noted that the city's ban on gun sales places an especially significant burden on law-abiding low-income residents who want a gun for purposes of lawful self-defense.

In any case, Cook fails to acknowledge the fact that the sales ban must also increase the trouble for getting a gun at least as much for law-abiding residents of Chicago as for criminals, and fails to take account of the harm that comes from crime victims not being able to defend themselves with guns. Every single study of the effectiveness of crime victims' use of gun for protection during crimes has found such use to be effective in reducing both injury (especially serious injury) and property loss (Kleck 1988; Kleck and DeLone 1993; Southwick 2000; Kleck 2001c; Tark and Kleck 2004). Thus, any reduction in gun possession among crime victims would increase the fraction of crimes resulting in injury or property loss.

Cook concedes that 12 percent of traced Chicago crime guns were purchased within Cook County (p. 11), but does not seem to recognize that this supports the view that many of Chicago's criminals did indeed evade the city's old gun sales ban by buying guns in suburban Cook County gun stores, and presumably would evade the new sales ban as well. He offers no reason why this will not continue to be so in the future if the new gun sales ban continues in force.

## Section VI – Purported Public Safety Rationales for Chicago's Carriage Ban

Cook's Section VI-A addresses effects of gun carriage away from offenders' homes. This discussion is conspicuous primarily for its one-sidedness, focusing only on the effects of gun carriage by offenders, and ignoring the effects of carriage by crime victims and prospective victims. Chicago's ban on gun carriage applies to all civilian residents, criminals and noncriminals alike, and thus would presumably discourage carriage by *both* offenders and victims. Indeed, given that offenders are not permitted to possess firearms in Chicago (a law not challenged in this suit), the ban on carriage can be expected to have little incremental effect on

their behavior.  Indeed, convicted felons are, by definition, law-breakers so it is safe to assume that rates of compliance with the carriage ban will be even higher among noncriminal victims than among criminal offenders.  Thus, discussion of the likely effects of the ban on *non*criminal victims and prospective victims would have been even more relevant to any balanced assessment of the ban's likely impact.

The best available evidence indicates that instances of gun carriage by members of the general public for purposes of self-defense that do *not* involve  the commission of gun crimes are far more common than instances of carriage in which a violent gun crime was committed (the only kind of incident Cook chose to focus on).  In a survey of a nationally representative sample of U.S. adults, results indicated that, in 1993, 7.1 million adults carried a gun on their person for self-defense, 12.4 million carried guns for self-protection in a vehicle, and 4.0 million did both.  Since those who carried on their person did so an average of 138 days per year, while those who carried in their vehicles did so an average of 146 days, the total number of person-days of defensive carriage was 1.8 to 2.8 *billion*, depending on how much overlap there was between these two kinds of defensive carrying.  In comparison, the annual number of crimes committed by offenders using guns, even in peak crime years, is well under a million (Kleck 1997), so even if all of them involved gun carriage (i.e. we ignored all gun crimes committed in or near the offender's home), the number of harmful instances of gun carriage are far less than a *tenth of one percent* of the number of instances of gun carriage for defensive purposes (Kleck and Gertz 1998, p. 208).

Further, the National Self-Defense Survey indicated that 63 percent of defensive gun uses occur in locations other than the defender's home, and thus presumably required carriage away from home (Kleck and Gertz 1995, p. 185).  That survey indicated that in 1993 there were about 2.5 million defensive gun uses (p. 184), so about 1.6 million defensive gun uses required carriage of the gun to the scene.  This number likewise dwarfs the number of crimes committed by offenders who used guns and who carried the guns away from home.  In combination with the unanimous research finding that defensive gun use reduces the likelihood of injury or property loss (sources are cited elsewhere in this report), this means there are enormous numbers of injury-reducing defensive uses of guns involving gun carriage, all of them ignored by Cook.

This is why it was singularly one-sided for Cook to conclude (p. 13) that "where there is more gun carrying, we should expect more of the harms outlined in Part IV.A [i.e., gun crimes]."  It would have been more informative for Cook to also conclude that where there is more gun carrying by crime victims, there are more injury-preventing defensive uses of guns by crime victims in public places.  Conversely, less carrying by prospective crime victims, due to Chicago's gun carriage ban, will mean fewer injury-preventing defensive gun uses by victims, and thus a larger share of crime incidents resulting in injury.

Cook's Section VI-B discussion of targeted law enforcement patrol activities is entirely unrelated to the issues in this case, including the ban on carrying guns in public places.  If Chicago allowed gun carrying with a city-issued permit (and Illinois repealed its ban on gun carriage), instead of completely banning gun carriage, police would not in any way be impaired in their efforts to suppress gun carrying by criminals.  They would still have the legal authority to stop and frisk, upon reasonable suspicion, any persons believed to be unlawfully carrying firearms, and would still retain the authority to seize any unlawfully possessed firearms they

found.  We can be certain of this because this is precisely the situation that prevails elsewhere in the U.S., where police have no difficulty arresting suspects for unlicensed gun carriage, even though at least 40 states allow relatively easy access to carry permits.  Carrying a gun in a public place without a license, in a jurisdiction that requires a permit for carrying, is just as much a crime as carrying a gun in a jurisdiction that completely forbids gun carriage.  Indeed, the targeted patrol efforts that Cook believes were effective, in Pittsburgh and Indianapolis (see Cook's fn. 36, 37) were carried out in states that did not ban carriage as Chicago does, but that merely require a permit.  He seems unaware if his assessment of these efforts is correct, it shows that you do *not* need a complete Chicago-style ban on carriage to carry out effective targeted patrol programs.

In section VI-D, Cook  describes Illinois' carry laws as if they were squarely in the national mainstream, when in fact they are restrictive to a unique degree.  The way Cook phrases it is: "All but three states currently either ban carrying a concealed firearm or restrict carry to those who have obtained a license or permit for that purpose" (p. 15).  That eccentric phrasing conceals more than it reveals, since it conceals the fact that Illinois is the *only* state that bans concealed carriage of guns.  Most of the states that Cook lumps in with Illinois, i.e. that require a permit or license, issue such permits on a relatively lenient "shall issue" basis – that is, virtually any noncriminal adult resident who follows the application procedures is issued the permit.  Only eight states have restrictive carry permit systems in which it is difficult for noncriminal adult residents to get a permit (National Rifle Association 2011; Brady Campaign 2011), and thus have gun carriage laws even remotely as restrictive as those of Illinois.

Cook concedes that he has no evidence for claims in section VI-C (p. 15), so I have no comments, other than to point out that once again Cook ignores the issue of defensive gun use (DGU), in this case DGU linked with gun carriage or possession in places immediately outside homes.  Banning gun carriage in such places would discourage lawful and justified defensive uses of guns in those places, and as noted elsewhere, defensive gun use by crime victims is effective in preventing injury or property loss (Kleck 1988; Kleck and DeLone 1993; Southwick 2000; Kleck 2001c; Tark and Kleck 2004).  Significantly, this is a point that Cook never disputes.

In Section VI-D, Cook claims that "it is sometimes alleged that most gun crimes are committed by active criminals *who can be readily identified as such*" (p. 16, emphasis added), but does not cite any specific persons or organizations that make such a claim.  I am not aware of any significant participants in the gun control debate who make such a claim.  Rather, the claim that is typically made is that most gun crimes, and indeed most serious violent crimes regardless of weapon use, are committed by persons who have repeatedly committed crimes in the past – regardless of whether or not they can be readily identified as such in official records.  It is the their status as law breakers that is important because it bears on the claim that the kinds of people who commit violent crimes are also likely to ignore gun control laws.  For those making this claim, the relevant fact is that these are people prone to break laws, not that they are readily identifiable as such.  Thus, Cook is knocking down a straw-man version of his opponents' arguments.

He then goes on to claim that certain unstated parties assert that "issuing carry permits to persons not identified as criminals from public records pose no risk" (p. 16).  I am not aware of

any responsible party who has asserted there is *no* risk whatsoever from issuing permits to such persons, and Cook does not cite any. A more reasonable argument that is not a mere straw man is that this risk is quite small relative to the benefits of genuinely noncriminal persons having the legal right to carry guns in public places and therefore being in a position to use them defensively.

Cook cites a body of largely irrelevant research that establishes the obvious fact that not all criminals are recorded in public databases as persons who have been convicted of a crime, or specifically convicted of a felony (p. 16). What he does *not* cite is any evidence showing that any significant fraction of persons who are issued carry permits ever commit violent gun crimes as a result of possessing permits. This is presumably because there is no such evidence; in any case, I am not aware of any. Instead, the evidence indicates that criminal gun violence among carry permit holders is virtually nonexistent. Data are available from Florida that cover the longest documented period of time in which a lenient "shall-issue" carry law was in operation, from 1987 to 2011. Florida issued 2,047,928 concealed weapon licenses between October 1, 1987 (when their new "shall issue" carry law went into effect) and August 31, 2011, and still had 853,272 active licenses as of the latter date. Yet, over this entire 24-year period, the state revoked a grand total of just *168* licenses due to licensees committing a crime in which a firearm was utilized – an average of just seven per year (Florida Department of Agriculture and Consumer Services, 2011), in a state in which there were 113,641 violent crimes known to the police in 2009 (U.S. FBI 2010). In short, carry permit holders do not contribute more than a negligible share of violent crimes. Cook's concern was that, if Illinois and Chicago lifted their carry bans, many violent people would be issued carry permits, and as a result commit violent crimes. Based on extensive actual experience with a "shall issue" carry permit system, however, this concern has proven to be unwarranted. Those criminals without an officially recorded criminal conviction might be *eligible* to get a carry permit if they applied for one, but actual experience indicates that hardly any do, perhaps because they do not want to be officially identified by authorities as a gun possessor, or maybe just because they just do not care that much about conforming with the law.

Nevertheless, in Section VI-D, on p. 17, Cook cites a report on an advocacy group's website that claims that 370 homicides had been committed by concealed carry permit holders (his fn. 44). I have previously reviewed in detail an earlier version of this report concerning a subset of 50 homicides that occurred in the May 2007 to April 2009 period (Violence Policy Center [VPC] 2009). The VPC authors clearly implied that possession of a carry permit somehow contributed to these homicides or made their possessors more dangerous to the public, but did not make explicit the logic underlying this assertion, or explain exactly how carry permit holding contributed to the violence. Likewise, Cook does not explicitly state the relevance of the VPC claims to the Chicago case or Chicago's ban on carriage – he just allows unwary readers to infer that granting carry permits somehow contributed to the occurrence of these homicides.

In fact, most of the homicides identified by VPC do not support an argument that possession of a carry permit makes criminal homicides more likely. Most conspicuously illustrative, one of the killings cited by VPC did not even involve use of a gun, but rather was committed by strangling (see p. 11, regarding the 3-5-09 Florida case). The VPC authors did not explain how having the legal authority to carry a gun in public places could contribute to a murder committed by strangling.

Other homicides cited in the VPC report did at least involve use of a gun, but were committed on the killer's property - that is, a place where gun possession does not require a carry permit (e.g., Pennsylvania case that occurred on 11-19-08, p. 6). A person without a carry permit is just as entitled to possess a gun on his own property as a person with such a permit, so the killer's possession of a carry permit could not have made his possession of a gun in the time and place of the killing any more likely or contributed to the commission of the homicide.

In other VPC-cited killings the gun was carried to the crime scene in the killer's vehicle, in a state where such carrying did not require a carry permit for gun possession in a vehicle to be lawful – again, possession of a carry permit was irrelevant to whether the killer possessed a gun at the time of the killing. For example, the very first case cited in the VPC report (VPC 2009, p. 3 - homicide committed on 8-5-08) involved a killer who possessed a gun at the time of the shooting by virtue of carrying it to the scene in his vehicle, in Florida, a state that does not require a permit for carrying a gun in one's vehicle (Bird 2000). Thus, in these kinds of homicides, the fact that the killer happened to be a carry permit holder was irrelevant to whether he possessed a gun at the time of the killing.

Other killings cited by VPC did involve guns, and did occur in places where a carry permit would be required for lawful possession, or involved a killer who travelled to the homicide location through public spaces that would require a carry permit for gun possession to be legal, but nevertheless were killings where possession of a carry permit was almost certainly irrelevant to the commission of the crime. Many of the homicides cited by VPC were either premeditated murders, or were the by-product of other very serious planned crimes such as rape or robbery. To argue that being a carry permit holder somehow contributed to these sorts of killings requires one to envision people who were willing to plan to take another person's life (risking the death penalty), or to plan to commit a rape or robbery (risking a long prison sentence), yet were *not* willing to violate laws forbidding carrying guns in public places without a carry permit – a crime commonly punished with a sentence of probation (Kleck 1991).

The sort of homicide scenario that *would* support an argument that increasing the number of legally authorized gun carriers would increase criminal violence would be one that (a) involved unpremeditated violence, (b) was committed with a gun, and (c) occurred in a location away from the killer's home and thus required carrying a gun through public spaces. In such cases, one could at least plausibly argue that possession of a carry permit encouraged gun carrying in public without any prior intention of committing a criminal act with the gun, but that once the gun was made available in a situation where the carrier was motivated to commit an unplanned act of violence, use of the gun made it more likely the criminal act would result in the victim's death.

Of the 50 homicides covered in this report, however, only five killings fit this description (see the three Florida homicides committed on 2-29-08, February 2008, and 1-7-08; the Ohio killing committed on 8-6-07, and the South Carolina case committed on 5-10-07 – pp. 13-15, 19, 22). The rest of the cases involved planned violent felonies, or occurred in or near the offender's home, or were committed with a gun that was available to the offender because it had been carried to the scene in the killer's motor vehicle (plus the case committed by strangling). In sum, perhaps five of the 50 criminal homicides were committed by carry permit holders in

circumstances where possession of a carry permit *may* have contributed to the occurrence of the killing.

In Section VI-E, p. 17, Cook subtly alters the issue relevant to whether Chicago's ban on gun carriage would reduce crime rates, or perhaps homicide rates, below what they would be without the ban. He does not assert that he believes the ban will have this beneficial effect; instead he merely asserts that extant research is somehow not good enough to "provide a reliable basis for determining whether RTC ["Right-to-Carry"] laws increase or reduce crime and violence" (p. 18). A more straightforward way to rephrase Cook's assessment would be to say that there is no sound basis for believing that stricter controls over gun carriage, such as Illinois-style bans or near approximations like restrictive licensing systems, reduce crime or violence. That is, Cook's own carefully worded assessment implies that there is no sound scientific basis, in the large body of quantitative studies of carry law impact, for believing that Chicago's ban on gun carriage reduces crime or violence. This does not prevent him from nevertheless asserting that the city's carry ban is "plausibly supported" by the "preceding discussions" of his own research – presumably referring to the Section IV-B-2 (p. 10) discussion that was logically fallacious and empirically unsupported.

More importantly, Cook fails to address any of the intended effects of "shall issue" laws. They were not intended to reduce crime rates, but rather were intended to allow more law-abiding citizens to carry guns in public places and thereby make them available for self-protection in such places. Cook does not deny that the laws have such effects, nor deny that Chicago's carry ban reduces defensive gun uses by noncriminals in public places. Instead, he is merely silent on the issue.

Finally, in Section VI-E, on p. 18 of his report, Cook belatedly reaches the central issue underlying debates over gun controls, including Chicago's regulations – defensive use of guns and possible deterrent effects of gun ownership. His discussion of these topics is consistently misleading, superficial, and inaccurate. For example, he misunderstands the key methodological issues surrounding survey-based estimates of defensive gun use (DGU) frequency, and totally ignores the issue of the effectiveness of victim DGU.

Cook begins by hinting that there is something wrong about estimating the frequency of crime-related experiences with surveys: "these claims [of large numbers of DGUs] are based not on police records, but rather on responses to one-time surveys (typically by telephone) of a sample of adults." He hints but does not explicitly say that police-based counts of DGUs would be more reliable. This is not surprising, since no expert in the field has ever claimed that police-based counts of crime-related events are more complete than survey-based counts.

Cook then makes two patently false claims. First, he claims that the National Crime Victimization Survey (NCVS) provides an estimate of DGU frequency, and that private surveys yield DGU estimates that are not credible because they are "an order of magnitude higher" than these supposed NCVS estimates. In fact, the NCVS has never directly asked a single respondent whether they had a DGU experience, and thus cannot provide a meaningful estimate of the prevalence of such experiences. Instead, NCVS respondents can only report DGUs if they volunteer reports of such experiences in response to an open-ended question pertaining to self-protective actions in general (Kleck 2001b).

Second, Cook claims that the DGU estimates from private surveys are "far higher than would be logically compatible with other sources of data on crime and violence" (p. 18). This too is indisputably false, and is not supported by the source that Cook cites (Cook and Ludwig [1998], cited in his fn. 48). Reporting results from the National Survey of the Private Ownership of Firearms (NSPOF), Cook and Ludwig claimed to have established conflicts between their defensive gun use estimates and crime estimates drawn from other sources, concluding that the defensive gun use results must be erroneous because they implied (1) numbers of defensive gun uses that would claim implausibly large fractions of all crimes of a given type, and (2) implausibly large numbers of defensive woundings of criminals compared to other sources of data on the frequency of woundings (Cook and Ludwig 1998). Their reasoning was fallacious because it relied on the indisputably false premise that we can somehow know the true *total* number of crimes in a given category (e.g., the total number of sexual assaults or the total number of robberies), and know the true total number of gunshot woundings, whether medically treated or not. No responsible scholar claims that we know these things, and even Cook and Ludwig never dared to explicitly claim that we do. Yet without such knowledge, it is plainly impossible to assert that the number of survey-reported DGUs linked with a given type of crime was implausibly large compared to the total number of crimes of that type.

Cook and Ludwig also cited data on the number of people treated in emergency rooms for nonfatal gunshot wounds and asserted that their own survey's estimates of criminals wounded during defensive gun uses were implausibly high in comparison. In reality, the two sets of numbers are perfectly consistent. Cook and Ludwig effectively ignored the fact that the wounding figures they cited were only estimates of the frequency of gunshot woundings *treated in hospital emergency departments*, not the total number of gunshot woundings, treated or untreated. It is highly unlikely that most criminals wounded by gun-wielding victims seek professional medical treatment (as distinct from self-treatment or treatment by family or friends), since medical personnel are required by law to report gunshot wounds to the police (Lee et al. 1991). Because most gunshot woundings are survivable with no more sophisticated medical care than what can be administered by the average lay person, most wounded criminals can afford to choose self-treatment over professional treatment at a hospital (see Kleck 1997, pp. 1-5 and the medical sources cited therein). And wounded criminals have extremely strong legal reasons to do so, since seeking professional medical treatment would often be tantamount to surrendering to police for the crime in which they had been wounded, if the victim had reported it to the police. Cook and Ludwig disputed the claim that most such criminals would not seek emergency room treatment, but not by citing contrary evidence or pointing to some logical flaw in the evidence or arguments supporting this assertion. Instead, they simply issued the rather imperious pronouncement that "we find that possibility rather unlikely." They offered no further rationale for this remarkable assessment.

Cook and Ludwig claimed that the estimated numbers of defensive gun uses connected with particular types of crimes were inconsistent with the total number of crimes of that type, with or without defensive gun uses. For example, they claimed to have shown that the estimated number of defensive gun uses linked with rapes actually exceeded the *total* number of rapes, as estimated by the NCVS. This turned out to be incorrect, but the claim was irrelevant anyway, since we do not know the total number of rapes, from the NCVS or another other source. Alternate sources of information indicate that only a minority of all crime incidents get reported

to the NCVS, and thus it is far from complete in its estimates of crime frequency (Loftin and MacKenzie 1990). Therefore, no matter how large the estimated number of defensive gun uses are in the gun surveys, they could still be a plausibly small share of all crime incidents, including both those effectively covered by the NCVS and those not covered. Consequently, comparing defensive gun use estimates with NCVS estimates of crime, or with hospital-based estimates of medically treated gunshot woundings, can tell us nothing about whether defensive gun use estimates are plausible.

To give Cook and Ludwig's argument its strongest chance to appear credible, consider rape, the only crime category for which, according to those authors, the estimated number of crimes with a defensive gun use supposedly exceeded the total number of such crimes as estimated by the NCVS. The NSPOF results, according to Cook and Ludwig, implied 322,000 rapes and attempted rapes in which the victim used a gun defensively, while the NCVS for the same year indicated a total of only 316,000 rapes and attempted rapes, with or without defensive gun use. The number of rape-linked DGUs, however, exceeded the rape total only because Cook and Ludwig made a careless mistake. The NSPOF defensive gun use estimates actually pertained to defensive gun uses linked with "rape, attempted rape, *other sexual assault*" (emphasis added), while the supposedly corresponding number from the NCVS used by Cook and Ludwig (316,000) pertained only to "Rape/Attempted rape" - even though the NCVS also provides estimates for the separate category of "Sexual Assault." When the correct figures from properly corresponding categories are used, the NCVS figure is actually 432,750 rapes, attempted rapes, and sexual assaults, and thus the NSPOF estimate of 322,000 defensive gun uses linked with such crimes did not even come close to exceeding the NCVS estimate of the total number of such crimes. Therefore, Cook and Ludwig's only instance of a defensive gun use estimate that was supposed to be impossible (as distinct from subjectively "implausible") turned out to be the product of their own error.

Nevertheless, even correcting for this mistake, the rape defensive gun use estimate still looks implausibly high at first glance. Cook and Ludwig, however, also reported that their 95 percent confidence interval estimate (which reflects the possible effects of random error in selecting survey respondents) of rape-linked DGUs was 12,000 to 632,000 (Cook and Ludwig 1998, p. 123). Using the lower limit of this extremely imprecise estimate (12,000), the NSPOF estimate of rape-linked DGUs was not even mildly implausible compared with the NCVS estimate of 432,750 rapes, attempted rapes, and sexual assaults, since it implies that guns were used by victims in less than three percent of total rapes and sexual assaults. Therefore, even the appearance of "implausibility" could be the product of nothing more than random sampling error, which in turn was due to the NSPOF's relatively small sample size.

In any case, the Kleck-Gertz NSDS, which had twice the sample size of the Cook-Ludwig NSPOF and thus considerably more precise defensive gun use estimates, implied only 209,089 defensive gun uses linked with rapes or sexual assaults (Kleck and Gertz 1995). This is less than half the NCVS estimate of "total" crimes in this category. In no crime category were NSDS estimates of defensive gun uses even half the number of NCVS-estimated offenses in the corresponding category.

But, again to give Cook and Ludwig's argument every chance of appearing reasonable, ignore their invalid comparison, ignore sampling error due to an inadequate sample size, and

consider just their point estimate of 322,000 rape-linked defensive gun uses. The biggest problem still remains: the NCVS estimate of rape frequency is not complete or exhaustive, and the true total number of rapes is almost certainly far higher. Indeed, rape estimates derived from the present NCVS are themselves two and a half times the size of those derived from earlier versions of the same survey (U.S. Bureau of Justice Statistics 1996, p. 152). If the true number of rapes is actually far higher than the NCVS estimate of 316,000, there is nothing even mildly implausible about an estimate of 322,000 rapes, attempted rapes, and sexual assaults with DGU.

Reviewing the results of surveys specially designed to study rape, Loftin and MacKenzie (1990) found that the total number of rapes could be as much as *thirty-three* times as high as NCVS-based estimates. Thus, instead of there being only 316,000 total rapes per year, there could actually have been anywhere from 316,000 on up to a possible (albeit unlikely) 10.4 million rapes. In sum, there turns out to be no logical foundation whatsoever for the claim that 322,000 rape-linked defensive gun uses is implausibly high in comparison with the total number of rapes.

Cook's discussion of possible flaws in survey estimates of DGU frequency is conspicuously one-sided, in that he mentions only flaws that would make the estimates too high. For example, he alludes to the problem of forward telescoping (p. 18), without acknowledging that this is known to have only a slight effect on survey estimates and that its effects are completely counterbalanced by memory failure, which reduces the estimates (Kleck and Gertz 1995, pp. 171-172 and sources cited therein). Cook likewise mentions nothing about the well-established reluctance of survey respondents to admit to criminal behaviors, such as the unlicensed gun carrying that often accompanies DGUs in public places. If lacking a carry permit, a survey respondent who had used a gun defensively in a public place cannot report it to the surveyors without confessing to the crime of unlawful carriage.

Cook's exclusive and lop-sided emphasis on alleged sources of overestimation is in sharp contrast to more mainstream scholars' assessments of survey estimates of crime-related experiences, which are overwhelmingly concerned with flaws that make estimates of the frequency of these experiences too *low* (for overviews, see Cantor and Lynch 2000; Thornberry and Krohn 2000). There is no precedent of any kind for a survey of the general U.S. adult population to yield an overestimate of any crime-related phenomenon. If Cook's extraordinary claims about DGU estimates were correct, it would be the first instance in the history of survey research that a survey of the general adult population overstated the frequency of any crime-related experience (Kleck 2001b).

Leaving aside Cook's persistently one-sided speculations about possible survey flaws that might make DGU estimates too high, the actual empirical evidence has consistently and repeatedly indicated the DGU by crime victims is extremely common, and in particular is more common than criminal uses of guns by offenders (Kleck 2001b). Table 4 displays the full set of results that Cook's report omits, summarizing decades of empirical research on the frequency of DGU. Whether surveys were conducted or sponsored by scholars, federal government agencies like the Centers for Disease Control, pro-gun organizations like the National Rifle Association, or news outlets with antigun editorial polices (the *Washington Post*, *Time* magazine), the results always indicate huge numbers of DGUs – numbers that exceed the highest estimates of the number of crimes committed by gun-using offenders.

Cook claims that evidence concerning many alleged DGUs reported in surveys "suggests" that many of the reports "are about events that simply did not happen," citing his own article (Cook and Ludwig 1998) in support (p. 18). In fact, this article did not contain any information that showed that even one of the reported DGUs did not occur. This claim was nothing more than an unsupported speculation by the authors, based on the sort of minor inconsistencies that inevitably pop up in detailed accounts of complex but genuine events (a detailed analysis of these authors' claims concerning inconsistencies can be found in Kleck 2001b, pp. 250-252). As far as anyone can tell, all the reports of DGUs in the survey in question pertained to events that actually did happen.

Cook also cites a study (Hemenway et al. 2000, cited in Cook's fn. 51) that purported to have established that many alleged DGUs were actually criminal assaults. These assessments were, however, nothing more than guesswork by a small number of criminal courts judges, based on the fragmentary information with which the authors provided them. The willingness of judges to assess violent acts as defensive in nature varies radically across different areas of the country, with judges in some Northeastern parts of the nation being almost entirely unwilling to assess any homicides as justifiable, while judges elsewhere assess over twenty percent of homicides to be justifiable (Kleck 1991, pp. 111-114, 147). The authors of this study did not identify any of the judges, explain how they were chosen, or even say where they served as judges.

Finally, Cook hints (p. 18) that criminal uses of guns are more numerous than defensive uses, citing a pair of surveys done by Hemenway and his colleagues. These authors asked their respondents: "In the past five years, have you used a gun to protect yourself from a person or people?" The phrase "protect yourself" excludes defensive uses on behalf of others, artificially limiting the defensive use experiences that qualified for further inquiry. The authors appropriately excluded on-duty gun uses involving police, security guard, or military duties, but apparently also excluded off-duty uses as well.

Unfortunately, the resulting DGU estimates were tainted by the fact that this question had been preceded by the question "In the past five years, has anyone displayed or brought out a gun in a hostile manner, even if this event did not take place as part of commission of a crime?" This oddly worded question did not make it clear whether the respondent was being asked about defensive uses or offensive uses, since a person making genuinely defensive use of a gun certainly would be using the gun in a manner that was "hostile" to the criminal attempting to victimize them. In fact, the curious phrasing even obscures whether the respondent was being asked about something that they did, or something that was done to them.

As the authors acknowledged (Azrael and Hemenway, 2000, p. 290), an unknown share of the positive responses to this earlier, ambiguous question may have reflected defensive gun uses by the respondent, or experiences in which other people used guns defensively against the respondent. As a result, some defenders who answered "yes" to the ambiguous first "hostile manner" question might have thought it was unnecessary to answer affirmatively to the self-protection question, believing that they had already reported the relevant DGU. This would cause the DGU estimate to be too low, and indeed the estimate based on this survey was lower than those obtained in any other post-1991 survey (Table 4). When these authors conducted a second survey (Hemenway et al. 2000) in which this problem was partially fixed, the share

reporting a DGU jumped by 58 percent (compare the "Hemenway 1999" survey with the "Azrael and Hemenway" survey in Table 4), supporting the suspicion that the authors' procedures in the first survey had caused DGU frequency to be radically understated.

Professor Cook mentions none of this in his report, and ignores the results of all the other surveys shown in Table 4. Thus, his conclusions are based on a small, unrepresentative sample of the relevant research, on two surveys that were especially flawed and that yielded DGU estimates that deviated radically from those obtained in other, more methodologically sound studies. Since he relies on unreliable estimates of DGU frequency, he has no sound evidentiary foundation for drawing conclusions about the relative frequency of aggressive/criminal gun uses and defensive uses.

In any case, technically superior research directly contradicts Professor Cook's conclusions on this point. The best available estimates of criminal uses of guns are based on the NCVS and these were indicate that there were about 554,000 gun crimes in 1992, and generally smaller in other, less violent years. As indicated in Table 4, estimates of annual defensive uses of guns by crime victims are mostly in the one to three million range, varying depending on what year the data pertain to, and what subset of DGUs were being estimated (e.g., those involving any type of gun or just those involving handguns? all uses regardless of location, or only uses outside the home?). Regardless of these variations, however, the full body of evidence consistently indicates more defensive uses of guns by crime victims that criminal uses by offenders – directly contradicting Professor Cook's highly selective reading of the relevant research.

Cook's discussion in his final section also completely ignores the issue of crimes deterred by gun ownership and carrying. Actual defensive use of guns by victims during the commission of a crime serves to improve the victim's chances of coming out of the incident unscathed, but guns may also prevent prospective offenders from even attempting crimes in the first place. One cannot directly count up crimes that did *not* occur because would-be offenders feared running into armed victims, any more than one can count the number of murders not committed because would-be killers feared legal punishment. Nevertheless, there is a wealth of evidence suggesting that widespread ownership, carrying, and defensive use of guns by potential and actual crime victims has a deterrent effect on crime. Crime rates have been observed to go down after widely publicized instances of defensive gun use, after highly publicized programs in which civilians were trained in the safe use of firearms, and even after a town required home gun ownership. It has also been found that burglars in the U.S. are far less likely to commit burglaries of occupied homes than burglars in nations with lower gun ownership rates. More directly, surveys of incarcerated criminals indicate that they fear confronting armed victims and have personally refrained from committing crimes because they believed the victim was or might be armed (evidence summarized in Kleck 2001c, pp. 318-330).

In one survey of prison inmates in ten states, among felons who reported ever committing a violent crime or a burglary, 42 percent said they had run into a victim who was armed with a gun, 38 percent reported they had been scared off, shot at, wounded, or captured by an armed victim (these were combined in the original survey question), and 43 percent said they had at some time in their lives decided not to commit a crime because they knew or believed the victim was carrying a gun. Thus, 90 percent (38/42=.90) of the prisoners who had encountered an armed

victim had been scared off, shot, wounded or captured at least once by such a victim. Concerning the felons' attitudes toward armed victims, 56 percent agreed with the statement that "most criminals are more worried about meeting an armed victim than they are about running into the police," 58 percent agreed that "a store owner who is known to keep a gun on the premises is not going to get robbed very often," and 52 percent agreed that "a criminal is not going to mess around with a victim he knows is armed with a gun." (Wright and Rossi 1986, discussed in Kleck 2001c).

  In sum, many criminals may be deterred altogether from even attempting crimes, and the number of deterred crimes, though not directly countable, could be enormous.  Indeed, it is worth noting that it is a logical possibility that the number of crimes deterred by victim gun possession could easily exceed the number of crimes that actually occur.  Cook, however, does not address even the possibility of such deterrence occurring, or the possibility that Chicago's restrictions on gun ownership and carriage could reduce it.

# References

Azrael, Deborah, Philip J. Cook and Matthew Miller (2004) "State and Local Prevalence of Firearms Ownership Measurement, Structure and Trends" *Journal of Quantitative Criminology* 20(1) 43-62.

Azrael, Deborah, and David Hemenway. 2000. " 'In the safety of your own home.' " *Social Science & Medicine* 50:285-291

Bailey, James E., Arthur L. Kellermann, Grant Somes, Joyce G. Banton, Frederick P. Rivara, and Norman P. Rushforth. 1997. "risk factors for violent death of women in the home." *Archives of Internal Medicine* 157:777-782.

Beautrais, Annette L., Peter R. Joyce, and Roger T. Mulder. 1996. "Access to firearms and the risk of suicide." *Australian and New Zealand Journal of Psychiatry* 30:741-748.

Bird, Chris. 2000. *The Concealed Handgun Manual.* San Antonio, TX: Privateer.

Bordua, David J. 1986. "Firearms ownership and violent crime: a comparison of Illinois counties." Pp. 156-88 in *The Social Ecology of Crime*, edited by James M. Byrne and Robert J. Sampson. N.Y.: Springer-Verlag.

Brady Campaign. 2011. Website page describing state gun laws, at http://www.bradycampaign.org/xshare/stateleg/scorecard/2010/2010_scoring_system.pdf

Brearley, H.C. 1932. *Homicide in the United States*. Chapel Hill: University of North Carolina Press.

Brent, David A., Joshua A. Perper, Charles E. Goldstein, David J. Kolko, Marjorie J. Allan, Christopher J. Allman, and Janice P. Zelenak. 1988. "Risk factors for adolescent suicide." *Archives of General Psychiatry* 45:581-588.

Brent, David A., Joshua A. Perper, Christopher J. Allman, Grace M. Moritz, Mary E. Wartella, and Janice P. Zelenak. 1991. "The presence and accessibility of firearms in the homes of adolescent suicides." *Journal of the American Medical Association* 266:2989-2995.

Brent, David A., Joshua A. Perper, Grace Moritz, and Marianne Baugher. 1993a. "Suicides in adolescents with no apparent psychopathology." *Journal of the American Academy of Child and Adolescent Psychiatry* 32:494-500.

Brent, David A., Joshua A. Perper, Grace Moritz, Marianne Baugher, Joy Schweers, and Claudia Roth. 1993b. "Firearms and adolescent suicide: a community case-control study." *American Journal of Diseases of Children* 147:1066-1071.

Brent, David A., Joshua A. Perper, Grace Moritz, Marianne Baugher, Joy Schweers, and Claudia Roth. 1994. "Suicide in affectively ill adolescents: a case-control study." *Journal of Affective Disorders* 31:193-202.

Brill, Steven. 1977. *Firearm Abuse: A Research and Policy Report*. Washington, D.C.: Police Foundation.

Britt, Chester, Gary Kleck, and David J. Bordua. "A reassessment of the D.C. gun law: some cautionary notes on the use of interrupted time series designs for policy impact assessment." Law & Society Review 30(2):361-380.

Brown, Carol. 2011. Deposition of Carol Brown in Illinois Association of Firearms Retailers, et al, v. City of Chicago, et al, No. 10-cv-04184.

Bukstein, O. G., David A. Brent, Joshua A. Perper, Grace Moritz, Marianne Baugher, Joy Schweers, Claudia Roth, and L. Balach. 1993. "Risk factors for completed suicide among adolescents with a lifetime history of substance abuse: a case-control study." *Acta*

*Psychiatrica Scandanavia* 88:403-408.

Cantor, David, and James P. Lynch. 2000. "Self-report surveys as measures of crime and criminal victimization." Pp. 58-138 in *Criminal Justice 2000,* Volume 4. Available online at https://www.ncjrs.gov/criminal_justice2000/vol_4/04c.pdf

Card, Josefina Jayme. 1974. "Lethality of suicidal methods and suicide risk: two distinct concepts." Omega 5:37-45.

Centers for Disease Control and Prevention (CDCP). 2009. "National suicide statistics at a glance: Case fatality rate among persons ages 10 years and older, by mechanism, United States, 2002-2006." Downloaded 10-12-2009 from CDCP website at http://www.cdc.gov/violenceprevention/suicide/statistics/case_fatality.html.

Centers for Disease Control and Prevention (CDCP). 2011. Nonfatal injury estimates obtained via the WISQARS function, at http://webappa.cdc.gov/sasweb/ncipc/nfirates2001.html.

Chicago Police Department. 2007. Uniform and Property U04-02, Department Approved Weapons and Ammunition (effective July 24, 2007).

Chicago Police Department 2010. Uniform and Property U04-02-04, Department Approved Auxiliary Subcompact Semiautomatic Pistols and Ammunition (effective April 16, 2010).

Conwell, Yeates, Kenneth Connor, and Christopher Cox. 2002. "Access to firearms and risk for suicide in middle-aged and older adults." *American Journal of Geriatric Psychiatry* 10:407-416.

Cook, Philip J. 1979. "The effect of gun availability on robbery and robbery murder." Pp. 43-81 in *Policy Studies Review Annual*, edited by Robert Haveman and B. Bruce Zellner. Beverly Hills: Sage.

Cook, Philip J. 1982. "The role of firearms in violent crime." Pp.236-91 in *Criminal Violence*, edited by Marvin E. Wolfgang and Neil Alan Weiner. Beverly Hills: Sage.

Cook, Philip J. 1991. "Technology of Personal Violence." *Crime and Justice* 14:1-71.

Cook, Philip J. 2011. Deposition of Philip J. Cook in Illinois Association of Firearms Retailers, et al, v. City of Chicago, et al, No. 10-cv-04184.

Cook, Philip J., and Daniel Nagin. 1979. *Does the Weapon Matter?* Washington, D.C.: INSLAW.

Cook, Philip J., Stephanie Molliconi, and Thomas B. Cole. 1995. "Regulating gun markets." *Journal of Criminal Law and Criminology* 86(1):59-92.

Cook, Philip J., and Jens Ludwig. 1997. *Guns in America*. Report to the Police Foundation. Washington, D.C.: Police Foundation.

Cook, Philip J., and Anthony Braga. 2001. "Comprehensive firearm tracing: strategic and investigative users of new data on firearms markets." *Arizona Law Review* 43:277-309.

Cook, Philip J., and Jens Ludwig. 2006. "The social costs of guns." *Journal of Public Economics* 90 (1-2):379-391.

Cook, Philip J., Jens Ludwig, Sudhir Venkatesh, and Anthony A. Braga. 2007. "Underground gun markets." *The Economic Journal* 117:F558-F588.

Cummings, Peter, David C. Grossman, and Robert S. Thompson. 1997. "The association between the purchase of a handgun and homicide or suicide." *American Journal of Public Health* 87:974-978.

Dahlberg, Linda L., Robin M. Ikeda, and Marcie-jo Kresnow. 2004. "Guns in the home and risk of a violent death in the home." *American Journal of Epidemiology* 160:929-936.

Doob, Anthony, and Cheryl Webster. 2003. Sentence severity and crime: Accepting the null

hypothesis. In *Crime and Justice*, eds. Michael Tonry, Chicago: University of Chicago Press.

Duggan, Mark. 2001. "More guns, more crime." *Journal of Political Economy* 109:1086-1114.

Elnour, A. A., and J. Harrison. 2008. "Lethality of suicide methods." *Injury Prevention* 14:39-45.

Feagin, Joe R. 1970. "Home defense and the police: Black and white perspectives." *American Behavioral Scientist* 13:797-814.

Fisher, Joseph C. 1976. "Homicide in Detroit: the role of firearms." *Criminology* 14:387-400.

Florida Department of Agriculture and Consumer Services. 2011. Division of Licensing website at http://licgweb.doacs.state.fl.us/stats/cw_monthly.pdf, accessed 9-10-11.

Hausman, Jerry A. (ed.). 1993. *Contingent Valuation*. Amsterdam: North-Holland.

Hemenway, David, and Matthew Miller. 2000. "Firearm availability and homicide rates across 26 high-income countries." *Journal of Trauma* 49:985-988.

Hoskins, Anthony W. 2001. "Armed Americans." *Justice Quarterly* 18:569-592.

Johnson, Kevin. 2011. Deposition of Kevin Johnson in Illinois Association of Firearms Retailers, et al, v. City of Chicago, et al, No. 10-cv-04184.

Kellermann, Arthur L., Frederick P. Rivara, Grant Somes, Donald T. Reay, Jerry Francisco, Joyce Gillentine Banton, Janice Prodzinski, Corinne Fligner, and Bela B. Hackman. 1992. "Suicide in the home in relation to gun ownership." *New England Journal of Medicine* 327:467-472.

Killias, Martin. 1993. "Gun ownership, suicide, and homicide: an international perspective." Pp. 289-303 in *Understanding Crime: Experiences of Crime and Crime Control*, edited by Anna del Frate, Uglijesa Zvekic, and Jan J. M. van Dijk. Rome: UNICRI.

Killias, Martin, John van Kesteren, and Martin Rindlisbacher. 2001. "Guns, violent crime, and suicide in 21 countries." *Canadian Journal of Criminology* 43:429-448.

Kleck, Gary. 1979. "Capital punishment, gun ownership, and homicide." *American Journal of Sociology* 84:882-910.

_____. 1984. "The relationship between gun ownership levels and rates of violence in the United States." Pp. 99-135 in *Firearms and Violence: Issues of Public Policy*, edited by Don B. Kates, Jr. Cambridge, Mass.: Ballinger.

_____. 1988. "Crime control through the private use of armed force." Social Problems 35:1-21.

_____. 1991. *Point Blank: Guns and Violence in America.* Hawthorne, NY: Aldine de Gruyter.

_____. 1997. *Targeting Guns: Firearms and their Control.* Hawthorne, NY: Aldine de Gruyter.

_____. 1999. "BATF gun trace data and the role of organized gun trafficking in supplying guns to criminals." *St. Louis University Public Law Review* 18(1):23-45.

_____. 2001a. "Can owning a gun really triple the owner's chances of being murdered?" *Homicide Studies* 5:64-77.

_____. 2001b. "The frequency of defensive gun use." Chapter 6 in *Armed*, edited by Gary Kleck and Don B. Kates. Buffalo, NY: Prometheus.

_____. 2001c. "The nature and effectiveness of owning, carrying, and using guns for self-protection." Chapter 7 in *Armed*, edited by Gary Kleck and Don B. Kates. Buffalo, NY: Prometheus.

_____. 2004a. "Measures of gun ownership levels for macro-level crime and violence research." *Journal of Research in Crime and Delinquency* 41(1):3-36.

_____. 2004b. "The Great American Gun Debate: What Research Has to Say." Pp. 470-

487 in *The Criminal Justice System*, 9th Edition, edited by George F. Cole, Marc G. Gertz, and Amy Bunger. Belmont, CA: Wadsworth/Thompson Learning (2004).

_____. 2007. "Fragile Findings on the Guns-Suicide Link." Unpublished paper.

_____. 2009. "How not to study the effect of gun levels on violence rates." Journal on Firearms and Public Policy 21:65-93.

Kleck, Gary, and Miriam DeLone. 1993. "Victim resistance and offender weapon effects in robbery." *Journal of Quantitative Criminology* 9:55-82.

Kleck, Gary, and Marc Gertz. 1995. "Armed resistance to crime: the prevalence and nature of self-defense with a gun." Journal of Criminal Law and Criminology 86:150-187.

Kleck, Gary, and Marc Gertz. 1998. "Carrying guns for protection." *Journal of Research in Crime and Delinquency* 35:193-224.

Kleck, Gary, and Michael Hogan. 1999. "A national case-control study of homicide offending and gun ownership." *Social Problems* 46(2):275-293.

Kleck, Gary, and E. Britt Patterson. 1993. "The impact of gun control and gun ownership levels on violence rates." *Journal of Quantitative Criminology* 9:249-288.

Kleck, Gary, and Shun-Yung Wang. 2009. "The myth of big-time gun trafficking." *UCLA Law Review* 56(5):1233-1294.

Kleck, Gary, Tomislav Kovandzic, Mark Saber, and Will Hauser. 2011. "The effect of perceived risk and victimization on plans to purchase a gun for self-protection." *Journal of Criminal Justice* 39(4):312-319.

Kovandzic, Tomislav, Mark Schaffer, and Gary Kleck. 2008. "Estimating the causal effect of gun prevalence on homicide rates." Discussion paper available at <http://ftp.iza.org/dp3589.pdf> .

Kung, Hsiang-Ching, Jane L. Pearson, and Xinhua Liu. 2003. "Risk factors for male and female suicide decedents ages 15-64 in the United States." *Social Psychiatry and Psychiatric Epidemiology* 38:419-426.

Lee, Roberta K., Richard J. Waxweiler, James G. Dobbins, and Terri Taschetag. 1991. "Incidence rates of firearm injuries in Galveston, Texas, 1979-1981." *American Journal of Epidemiology* 134:511-521.

Lester, David. 1988. "Firearm availability and the incidence of suicide and homicide." *Acta Psychiatrica Belgium* 88:387-393.

_____. 1990. "Relationship between firearm availability and primary and secondary murder." *Psychological Reports* 67:490.

_____. 1996. "Gun ownership and rates of homicide and suicide." *European Journal of Psychiatry* 10:83-85.

Loftin, Colin, and Ellen J. MacKenzie. 1990. "Building national estimates of violent victimization." Paper presented at the National Research Council Symposium on the Understanding and Control of Violent Behavior, Destin, Florida, April 1-6, 1990.

Lott, John R., Jr. 2000. *More Guns, Less Crime.* 2nd edition. Chicago: University of Chicago Press.

Magaddino, Joseph P., and Marshall H. Medoff. 1984. "An empirical analysis of federal and state firearm controls." Pp. 225-58 in *Firearms and Violence*, edited by Don B. Kates, Jr. Cambridge: Ballinger.

McDowall, David. 1991. "Firearm availability and homicide rates in Detroit, 1951-1986." *Social Forces* 69:1085-1099.

McDowall, David, and Colin Loftin. 1983. "Collective security and the demand for handguns." *American Journal of Sociology* 88:1146-1161.

Miller, Marv. 1978. "Geriatric suicide." *The Gerontologist* 18:488-495.

Miller, Matthew, Deborah Azrael, and David Hemenway. 2002. "Firearm availability and unintentional firearm deaths, suicide, and homicide among 5-14 year olds." *Journal of Trauma Injury, Infection, and Critical Care* 52:267-275.

Miller, Matthew, Deborah Azrael, and David Hemenway. 2004. "The epidemiology of case fatality rates for suicide in the Northeast." *Annals of Emergency Medicine* 43(6):723-730.

Miller, Matthew, David Hemenway, and Deborah Azrael. 2007. "State-level homicide victimization rates in the US in relation to survey measures of household firearm ownership, 2001-2003." *Social Science & Medicine* 64:656-664.

Moody, Carlisle E. and Thomas B. Marvell (2005) "Guns and crime" *Southern Economic Journal*, 71: 720-36.

Moody, Carlisle E. 2009. "Firearms and homicide." Unpublished paper presented at the Critical Issues Symposium, Economics of Crime, Florida State University, Tallahassee, Florida, March 28, 2009.

Murray, Douglas R. 1975. "Handguns, gun control laws and firearm violence." *Social Problems* 23:81-92.

National Academy of Sciences. 2005. *Firearms and Violence.* National Research Council report, edited by Charles F. Wellford, John V. Pepper, and Carol V. Petrie. Washington, D.C.: National Academies Press.

National Rifle Association. 1990. *Home Firearm Safety*. Pamphlet. Washington, D.C.: National Rifle Association.

National Rifle Association. Institute for Legislative Action website at http://www.nraila.org/Issues/FactSheets/Read.aspx?ID=18, accessed 9-10-11.

Newton, George D., and Franklin Zimring. 1969. *Firearms and Violence in American Life*. A Staff Report to the National Commission on the Causes and Prevention of Violence. Washington, D.C.: U.S. Government Printing Office.

Phillips, Llad, Harold L. Votey, and John Howell. 1976. "Handguns and homicide." *Journal of Legal Studies* 5:463-78.

Seitz, Stephen T. 1972. "Firearms, homicides, and gun control effectiveness." *Law and Society Review* 6:595-614.

Sayer, Geoffrey, Gavin Stewart, Jennifer Chipps. 1996. "Suicide attempt in NSW: associated mortality and morbidity." *New South Wales Public Health Bulletin* 7(6):55-59, 63.

Shah, Seema, Richard E. Hoffman, Lane Wake, and Willaim M. Marine. 2000. "Adolescent suicide and household access to firearms in Colorado." *Journal of Adolescent Health* 26:157-163.

Shenassa, E. D., S. N. Catlin, and S. L. Buka. 2003. "Lethality of firearms relative to other suicide methods." *Journal of Epidemiology and Community Health* 57:120-124.

Shneidman, Edwin S., and Norman L. Farberow. 1961. "Statistical comparisons between attempted and committed suicides." Pp. 19-47 in *The Cry for Help*, edited by Norman L. Farberow and Edwin S. Shneidman. N.Y.: McGraw-Hill.

Sorenson, Susan B, and Richard A. Berk. 2001. "Handgun sales, beer sales, and youth homicide, California, 1972-1993." *Journal of Public Health Policy* 22:183-197.

Southwick, Lawrence, Jr. 1997. "Do guns cause crime?  Does crime cause guns?: a Granger test." *Atlantic Economic Journal* 25:256-273.

_____. 1999. "Guns and justifiable homicide: deterrence and defense." *Saint Louis University Public Law Review* 18:217-246.

_____. 2000. "Self-defense with guns: the consequences." *Journal of Criminal Justice* 28:351-370.

Spicer, Rebecca S., and Ted R. Miller. 2000.  "Suicide acts in 8 states." *American Journal of Public Health* 90(12):1885-1891.

Tark, Jongyeon, and Gary Kleck. 2004.  "Resisting crime." *Criminology* 42:861-909.

Thornberry, Terrence, and Marvin Krohn.  2000.  "The self-report method for measuring delinquency and crime."  Pp. 33-83 in *Criminal Justice 2000,* Volume 4.  Available online at https://www.ncjrs.gov/criminal_justice2000/vol_4/04b.pdf.

U.S. Bureau of Alcohol, Tobacco, Firearms. 1993.  *Operation Snapshot: Final Report*.  Report dated July 12, 1993. Washington, D.C.: U.S. Department of the Treasury.

U.S. Bureau of Alcohol, Tobacco, Firearms and Explosives (ATF).  "Fact Sheet: FFL Compliance Inspections."  Report dated June 2008.  Downloaded 8-17-11 form the ATF website at http://www.atf.gov/publications/factsheets/factsheet-ffl-compliance.html.

_____. 2011.  "ATF Snapshot 2008."  Downloaded 8-17-11 from the ATF website at http://www.atf.gov/publications/general/snapshots/atf-snapshot-2008.html.

U.S. Bureau of Justice Statistics 1996. *Criminal Victimization in the United States, 1993*. Washington, D.C.: U.S. Government Printing Office.

U.S. Congressional Research Service.  1992.  *'Assault Weapons': Military-style Semi-automatic Firearms Facts and Issues.*  Report 92-434 GOV.  Washington, D.C. Library of Congress.

U.S. Dept. of Health and Human Services, National Center for Health Statistics. 1986. MORTALITY DETAIL FILE, 1980: [UNITED STATES] [Computer file]. Hyattsville, MD: U.S. Dept. of Health and Human Services, National Center for Health Statistics [producer]. Ann Arbor, MI: Inter-university Consortium for Political and Social Research [distributor], 1986.

U.S. Federal Bureau of Investigation.  2010.  *Crime in the United States, 2009*.  Available at FBI website at http://www2.fbi.gov/ucr/cius2009/index.html.

Violence Policy Center.  2009.  *Law Enforcement and Private Citizens Killed by Concealed Handgun Permit Holders: An Analysis of News Reports, May 2007 to April 2009*. Washington, D.C.: Violence Policy Center.

Vizzard, William J. 2000.  *Shots in the Dark: The Policy, Politics, and Symbolism of Gun Control*.  NY: Rowman and Littlefield.

Waller, Julian A., and Elbert B. Whorton. 1973. "Unintentional shootings, highway crashes and acts of violence." *Accident Analysis and Prevention* 5:351-6.

Weibe, Douglas J.  2003.  "Homicide and suicide risks associated with firearms in the home." *Annals of Emergency Medicine* 41:771-782.

Wooldridge, Jeffrey M.  2009.  *Introductory Econometrics*, 4th edition.  Mason, OH: South-Western.

Wright, James D., and Peter H. Rossi.  1986. *Armed and Considered Dangerous.*  NY: Aldine.

**Table 1. Case-Control Studies of Access to Firearms and Suicide**

| Study | Sample/Dataset | n | Number of Suicides[a] | Control Vars Total | Signif[b] | Number of Likely Confounders[c] | Crude OR | p | Adj OR | p |
|---|---|---|---|---|---|---|---|---|---|---|
| Miller 1978 | Elderly white males | 60 | 30 | 0 | 0 | 0 | 1.0 | n.s. | - | - |
| Brent et al. 1988[d] | W. PA adolescents (A) | 65 | 27 | 3 | 3 | 2 (age, suicidal intent) | 2.7 | <.025 | n.s. | >.025 |
| | W. PA adolescents (B) | 83 | 27 | 2 | 2 | 1 (age) | - | - | 3.4 | <.025 |
| Brent et al. 1991[d] | W. PA adolescents (A) | 94 | 47 | 2 | 2 | 1 (suicidal intent) | 4.5 | .001 | 2.1 | <.0001 |
| | W. PA adolescents (B) | 94 | 47 | 1 | 1 | 0 | 4.2 | .001 | 2.2 | .001 |
| Kellermann et al 1992 | In-home suicides, 3 urban counties | 720 | 360 | 10 | 6 | 4 (sex, age, race, lives alone) | 3.2 | <.025 | 4.8 | <.025 |
| Brent et al. 1993a | W. PA adolescents | 45 | 7 | 0 | 0 | 0 | - | .04 | - | - |
| Brent et al. 1993b | W. PA adolescents | 134 | 67 | 3 | 3 | 0 | 3.3 | .004 | 4.4 | <.025 |
| Bukstein et al. 1993 | W. PA adolescents, substance abusers | 35 | 23 | 0 | 0 | 0 | Any guns: - | n.s. | | |
| | | | | | | | Handguns: - | <.001 | | |
| | | | | | | | Long guns: - | n.s. | | |
| Brent et al. 1994 | W. PA adolescents, affectively ill | 86 | 63 | 0 | 0 | 0 | - | .0001 | n.s. | >.025 |
| Beautrais et al. 1996 | Canterbury NZ adults | 1225 | 499 | 0 | 0 | 0 | 1.4 | >.05 | - | - |
| | | | | | | Males only: | 0.93 | >.90 | 1.00 | >.90 |
| Cummings et al. 1997 | WA handgun purchasers | 2109 | 353 | 4 | 0 | 3 (age, sex, Zip code) | - | | 1.9 | <.025 |
| Bailey et al. 1997 | Female subsample of Kellermann | 240 | 120 | 3 | 3 | 1 (living alone) | - | - | 4.6 | <.025 |
| Shah et al. 2000 | CO adolescents | 44 | 26 | 3 | 2 | 0 | 2.60 | <.05 | 3.91 | <.05 |
| Conwell et al. 2002 | Rochester area NY, age 50+ | 172 | 86 | 3 | 0 | 3 (age, sex, race) Males: | 4.17 | .0006 | 4.30 | .004 |
| | | | | | | Females: | 0.50 | .32 | 1.02 | .985 |

| | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|
| Kung et al. 2003 | 1993 Mortality Followback | 9855 | 1463 | 5 | 5 | 1 (race) | Males: | 2.59 | <.025 | 6.05 <.025 |
| | | | | | | | Females: | 2.71 | <.025 | 6.99 <.025 |
| Weibe 2003 | 1993 Mortality Followback | 3918 | 1959 | 8 | 5 | 8 (age, sex, race, region, marital status, income, live alone, pop. size) | | 3.32 | - | 3.44 <.025 |
| Dahlberg et al. 2004 | 1993 Mortality Followback | 1584 | 1049 | 13 | 1 | 6 (age, sex, race, education, marital status, region) | Males: | 10.4 | <.025 | |
| | | | | | | | Females: | *2.3* | =.025 | |

Notes:
a. Unweighted number of completed suicide victims in multivariate analysis. Sample size (n) includes cases (suicides) and controls.
b. Number of control variables documented as being significantly associated with suicide at .05 (1-tailed) level. If no significance levels were shown for control variables, they were classified as nonsignificant.
c. A likely confounder is a variable that affects suicide and is also significantly correlated with gun ownership.
d. The analyses labeled A involved a comparison of completers (cases) with attempters (controls), while those labeled B involved a comparison of suicide completers (cases) with psychiatric inpatients (controls).

Abbreviations: Crude OR = bivariate odds ratio (no controls for other variables), adj OR = adjusted (multivariate) odds ratio, p = 2-tailed significance

**Major Patterns Evident in the Review**:
- At least six studies have found no significant association between gun ownership and suicide:
   (1) Miller (1978) found no guns/suicide association whatsoever in his sample of elderly men.
   (2) Brent et al. (1988) found no significant guns/suicide association once suicidal intent was controlled.
   (3) Bukstein et al. (1993) found no significant guns/suicide association in a sample of adolescent substance abusers.
   (4) Brent et al. (1994) found no significant guns/suicide association in a sample of "affectively ill" adolescents.
   (5) Beautrais et al. (1996) found no significant guns/suicide association among 499 suicides and controls, using what at the time was the largest sample of suicides ever used to study this association.
   (6) Conwell (2002) found no significant guns/suicide association among females.
Thus, claims that "nearly all" case-control studies have found significantly higher risks of suicides among gun owners are extremely misleading.

- All but the last two studies controlled for four or fewer likely confounders.  Most variables that were controlled were not likely confounders, either because they showed no significant effect on suicide or because they have no known association with gun ownership.  Controlling for such variables does not help isolate the effect of gun ownership on suicide.  For example, Kellermann et al (1992) controlled for ten variables, but only six of these were significantly related to suicide risk, and of these six, only four have a documented significant association with gun ownership.  Likewise, mental illness (otherwise undifferentiated) is not a confounder.

- None of the studies were specifically designed to assess the effect of gun ownership on suicide, so authors could control only for variables that happened to be included in datasets created for other purposes.

- Only Brent et al. (1988) and Brent et al. (1991) controlled for suicidal intent, and one of these studies (Brent et al. [1988]) found *no* significant association between gun ownership and suicide, while the other found that controlling for suicidal intent halved the guns/suicide association (compare adjusted OR with crude OR).

- None of these studies controlled for the subject's predilection for self-reliance and self-blame, and none controlled for a perception of the world as a hostile, unsupportive place.  Both variables are known to be associated with gun ownership and are likely to affect suicide.

- Most of the pre-1996 case-control studies are based on very small samples, with correspondingly unstable results.

- All of the last three studies are based on various subsets of the exact same body of data, the 1993 Mortality Followback study, and thus should not be considered as independent studies showing a significant guns-suicide association.  Any flaws in the underlying dataset could distort the findings of all three studies in similar ways.  Likewise, the Bailey et al. (1997) study is based entirely on a subset of the sample used in Kellermann et al. (1992) study, while all five of the Brent studies and the Bukstein et al. study are all based on varying subsets of the same very small sample of 67 Western Pennsylvania adolescent suicides, compared with varying sets of control subjects.  Thus, what might appear to some readers to be 11 bodies of data supporting a guns-suicide association are actually just three independent bodies of data, repeatedly reanalyzed.  Discussions of these studies that do not make this point explicit can therefore give a highly misleading impression of how much support there is for this association.

- Although not shown in the table, all but one of the studies that separately assessed the guns-suicide association for handguns and for long guns, found the association to be stronger for handgun ownership.  Since long guns are much more lethal than handguns, and just as easily used for suicide, this pattern makes no sense if the associations are interpreted as estimates of

causal effects of gun ownership/access on suicide.  They do, however, make sense if the associations are interpreted as spurious, noncausal associations.  Handgun ownership is associated with a variety of pathologies that could increase suicide risk, such as crime victimization, crime offending, and heavy drinking.

**Table 2. Relative Lethality of Shooting and Hanging as Methods of Suicide**

| Study | Area | Years | % Attempts Fatal Hanging | Shooting | Ratio, fatality rates, Shooting/Hanging |
|---|---|---|---|---|---|
| Schneidman & Farberow (1961) | Los Angeles County | 1957 | 78.7 | 77.1 | 0.979 |
| Card (1974) | Allegheny County, PA | 1969-70 | 77.5 | 91.6 | 1.181 |
| Sayer et al. (1996) | New South Wales, Australia | 1991-1993 | 82 | 75 | 0.915 |
| Spicer and Miller[a] (2000) | 8 U.S. states | 1989-1997 | 61.4 | 82.5 | 1.344 |
| | | | 85.5 | 89.2 | 1.043 |
| Shenassa et al. (2003) | Illinois | 1990-1997 | 90 | 96 | 1.067 |
| Miller et al. (2004) | 7 NE U.S. states | 1996-2000 | 82.4 | 90.8 | 1.102 |
| Elnour & Harrison (2008) | Australia | 1993-2003 | 83.4 | 90.4 | 1.083 |
| CDCP (2009) | U.S. | 2002-2006 | 79.2 | 83.7 | 1.057 |

Note:
  a.  The figures in the upper row for this study are based on the full sample of nonfatal suicide attempts recorded in hospital discharge records (concerning persons admitted to hospitals, then discharged) and emergency department (ED) records (concerning persons with no injuries serious enough to merit admission to the hospital).  The figures in the lower row are confined to only nonfatal suicide attempts recorded in hospital discharge records, thereby excluding the less serious cases commonly found in ED records.

**Table 3.   Macro-Level Studies of the Impact of Gun Levels on Homicide Rates[a]**

| Study | Sample | Measure of Gun Levels[b] | Homicide Rates[c] | Valid Gun Measure? | Number of Control Variables[d] | Causal Order?[e] | Results[f] |
|---|---|---|---|---|---|---|---|
| Brearley (1932) | 2 states | PGH | THR | No | 0 | No | Yes |
| Newton and Zimring (1969) | 4 years, Detroit | NPP | THR | No | 0 | No | Yes |
| Seitz (1972) | 50 states | GHR, FGA | THR | No | 1 | No | Yes |
| Fisher (1976) | 9 years, Detroit | NPP, GRR, PGH | THR | No | 0 | (No) | Yes |
| Phillips et al., (1976) | 18 years, U.S. | PROD | THR | No | 1 | No | Yes |
| Brill (1977) | 11 cities | PGC | THR | No | 0 | No | Yes |
| Kleck (1979) | 27 years, U.S. | PROD | THR | No | 6 | (No) | Yes |
| Cook (1979) | 50 cities | PGH, PSG | RMR | Yes | 4 | No | Yes |
| Kleck (1984) | 32 years, U.S. | PROD | THR | No | 5 | (No) | No |
| Maggadino and Medoff (1984) | 31 years, U.S. | PROD | THR | No | 6 | (No) | No |
| Bordua (1986) | 102 counties | GLR, SIR | THR | Yes | 0-4 | No | No |
|  | 9 regions |  | GHR | Yes | 0-4 | No | No |
| Lester (1988) | 9 regions | SGR | THR | Yes | 0 | No | Yes |
| Lester (1990) | 48 states | PSG | THR | Yes | 0 | No | Yes/No |
| McDowall (1991) | 36 years, Detroit | PSG, PGR | THR | No | 3 | (No) | Yes |
| Killias (1993) | 16 nations | SGR | THR | Yes | 0 | No | Yes |
|  |  |  | GHR | Yes | 0 | No | Yes |
| Kleck and Patterson (1993) | 170 cities | 5-item factor including PSG[h] | THR, GHR | Yes | 4-6 | Yes | No |
| Lester (1996) | 12 nations | PGH, PSG | THR, GHR | Yes | 0 | No | Yes |
| Southwick (1997) | 48 years, U.S. | PROD | THR | No | 0 | (No) | No |
| Southwick (1999) | 34 years, U.S. | HGS | THR | No | 0-2 | No | No |
| Hemenway and Miller (2000) | 26 nations | PGH, PSG | THR | Yes | 0 | No | Yes |
| Lott (2000) | 2 years, 15 states[g] | SGR | THR | Yes | 5 | No | No |
| Duggan (2001) | 19 years, 50 states | GMR | THR | No | 0 | No | Yes |
| Hoskin (2001) | 36 nations | PSG | THR | No | 2 | (No) | Yes |

Table 3 (continued)

| Study | Sample | Measure of Gun Levels[b] | Homicide Rates[c] | Valid Gun Measure? | # Control Variables[d] | Causal Order?[e] | Results[f] |
|---|---|---|---|---|---|---|---|
| Killias et al. (2001) | 21 nations | SGR | THR, GHR | Yes | 0 | No | No |
| Sorenson and Berk (2001) | 22 years, California | HGS | THR | No | 0-3 | (No) | Yes |
| Miller et al. (2002) | 10 years, 50 states | PSG, PHG | THR | No | 0-3 | No | Yes |
|  | 10 years, 9 regions | SGR | THR | Yes | 0-3 | No | No |
| Azrael et al. (2004) | 49 states | PSG | THR | Yes | 1 | No | Yes |
| Moody and Marvell (2005) | 17 years, c. 29 states | PSG | THR | No | 6-10 | (No) | No |
| Cook and Ludwig (2006) | 20 years, 50 states | PSG | THR, GHR, NHR | No | 4 | (No) | Yes |
|  | 20 years, 200 counties | PSG | THR, GHR, NHR | No | 4 | (No) | Yes |
| Miller et al. (2007) | 50 states | SGR | THR, GHR, NHR | Yes | 5-6 | No | Yes |
| Kovandzic et al. (2008) | 1,456 counties | PSG | GHR, NHR | Yes | 18 | Yes | No |
| Moody (2009) | 27 years, 50 states | PSG | THR | No | 3 | (No) | No |
|  | U.S., 59 years | PROD | THR | No | 0 | (No) | No |

Notes:
a. Table includes only studies where the dependent variable was a homicide rate, as opposed to the fraction of homicides committed with guns, and where gun ownership levels were actually measured, rather than assumed. Studies that examined only gun violence rates (e.g. only gun homicides) were excluded (e.g., Murray 1975). The full citations for these studies can be found in Kleck (2009).
b. Measures of Gun Level: CCW = concealed carry permits rate; FGA = Fatal gun accident rate; GLR = Gun owners license rate; GMR = Gun magazine subscription rates; GRR = Gun registrations rate; GUNSTOL = % of the dollar value of stolen property due to guns; HGS = handgun sales (retail); HLR = Hunting license rate; NPP = Number of handgun purchase permits; PGA = % aggravated assaults committed with guns; PGC = % homicides, aggravated assaults and robberies (combined together) committed with guns; PCS = same as PGC, but with suicides lumped in as well; PGH = % homicides committed with guns; PGR = % robberies committed with guns; PSG = % suicides committed with guns; PROD= Guns produced minus exports plus imports, U.S.; SGR = Survey measure, % households with gun(s); SHR = Survey measure, % households with handgun(s); SIR = Survey measure, % individuals with gun(s) Only survey measures and PSG, when used in a cross-sectional study, were classified as valid measures of gun levels.
c. Homicide Rates: THR = Total homicide rate; GHR = Gun homicide rate; NHR = nongun homicide rate; RMR = Robbery murder rate.

d. Number of significant control variables in the most complete crime rate equations, excluding "fixed effects" variables (dummy variables denoting area or time period) and lagged dependent variables.

e. Did research use technically sound methods to establish the causal order between gun levels and homicide rates?  (No) means researchers took steps to address the issue, but used ineffective methods such as merely lagging the gun variable, or used models that were probably underidentified.

f. Yes=Study found significant positive association between gun levels and violence; No=Study did not find such a link.

g. Panel design, two waves.

h. Five-item factor composed  of PSG, PGH, PGR, PGA, and the percent of dollar value of stolen property due to stolen guns.

***General Pattern:*** No methodologically competent studies have found that general population gun ownership levels have a significant positive effect on total homicide rates.  Conversely, *all* studies that purport to have found such an effect made at least one of three fundamental errors – (1) using an invalid measure of gun ownership, (2) failing to control for a significant number of possible confounding variables, or (3) failing to properly address causal order.

**Table 4. National Surveys of Defensive Gun Use in the U.S.**[a]

| Survey: | Cambridge Reports | DMIa | DMIb | Hart | Time/CNN | Mauser |
|---|---|---|---|---|---|---|
| Time of Interviews: | April-May 1978 | May-June 1978 | December 1978 | October 1981 | December 1989 | March-April 1990 |
| Sample Size: | 1,500 | 1,500 | 1,010 | 1,228 | 605 | 344 |
| Population covered: | Adults | Registered voters | Registered voters | Registered voters | "Firearm owners" | Residents |
| Gun Type Covered: | Handguns | All guns | All guns | Handguns | All guns | All guns |
| Recall Period: | Ever | Ever | Ever | 5 years | Ever | 5 years |
| Excluded Uses No Against Animals? | No | Yes | Yes | No | Yes | |
| Excluded Military, Police Uses? | No | Yes | Yes | Yes | Yes | Yes |
| Defensive question asked of: | Protection hgun owners | All | All | All | Gun owners | All |
| Defensive question refers to: | R | Household | Household | Household | R | Household |
| Unadjusted % Adults with DGU[b] | 3 | 15 | 7 | 4 | 9 | 3.79 |
| Adj. % with DGU | 0.45 | 2.22 | 1.14 | 2.01 | 4.50 | 1.5 |
| Implied number of DGUs[d] | 0.7 m | 1.7 m | 0.9 m | 1.7 m | 2.6 m | 1.4 m |

Table 4.  National Surveys of Defensive Gun Use in the U.S. (continued)

| Survey: | **Gallup** | **Kleck & Gertz** | **Gallup** | **L.A. Times** | **Tarrance** | **CDC** |
|---|---|---|---|---|---|---|
| Time of Interviews: | May 1991 | Feb.-April 1993 | December 1993 | April 1994 | May 1994 | April-Sept. 1994 |
| Sample Size: | 1,002 | 4,997 | 1,014 | 1,682 | 1,000 | 5,238 |
| Population covered: | Adults | Adults | Adults | Adults | Adults | Adults |
| Gun Type Covered: | All guns | All guns | All guns | All guns | All guns | All guns |
| Recall Period: | Ever | 1 year | Ever | Ever | 5 years | 1 year |
| Excluded UsesNo Against Animals? | Yes | No | No | Yes | Yes | |
| Excluded Military, Police Uses? | No | Yes | Yes | Yes | Yes | Yes |
| Defensive question asked of: | Rs in handgun households | All | Gun owners | All | All | Rs in gun-owning households |
| Defensive question refers to: | R | R | R | R | R | R |
| Unadjusted % Adults with DGU[b] | 8 | 1.326 | 11 | 8[c] | 1 | 2.0 |
| Adj. % with DGU | 1.20 | 1.326 | 1.63 | 3.18 | 0.36 | 2.0 |
| Implied number of DGUs | 0.6 m | 2.5 m | 0.9 m | 6.1 m | 0.7 m | 3.0 m[d] |

Table 4.  National Surveys of Defensive Gun Use in the U.S. (continued)

| Survey: | NSPOF | Hemenway & Azrael | Hearst | Hemenway | Gallup | Washington Post |
|---|---|---|---|---|---|---|
| Time of Interviews: | Nov-Dec 1994 | May-June 1996 | August 1997 | Spring 1999 | May 2000 | June 2000 |
| Sample Size: | 2,568 | 1,906 | 2,016 | 2,474 | 1,031 | 1,068 |
| Population covered: | Adults | Adults | Adults | Adults | Adults | Adults |
| Gun Type Covered: | All guns | All guns | All guns | All guns | All guns | All guns |
| Recall Period: | 1 year | 5 years | Ever | 5 years | Ever | Ever |
| Excluded Uses Against Animals? | Yes | No | Yes | No | No | |
| Excluded Military, Police Uses? | Yes | Yes | No | Yes | No | No |
| Defensive question asked of: | All | All | All | All | All | All |
| Defensive question refers to: | R | R | R | R | R | R |
| Unadjusted % Adults with DGU[b] | 1.44 | 0.73 | 5 | 1.15 | 7 | 8 |
| Adj. % with DGU | 1.44 | 0.29 | 0.60 | 0.46 | 0.84 | 0.96 |
| Implied number of DGUs | 2.8 m | 0.6 m | 1.2 m | 0.9 m | 1.8 m | 2.0 m |

Abbreviations:
DMI = Decision Making Information; R = respondent; Hgun = handgun; m = million; DGU = defensive gun use; CDC = Centers for Disease Control and Prevention; NSPOF = National Survey of the Private Ownership of Firearms

Notes:
a. Table covers surveys of probability samples of the general U.S. population that directly asked Rs about DGU. It excludes the survey reported in McDowall et al. (2000), which was instead based on samples of "commercial lists of likely gun owners" (p. 8), and the NCVS, which never asks Rs specifically about DGU.
b. This percentage is the share of persons or households who reported a DGU for whatever recall period was used, for whatever subset of gun types or circumstances that happened to be specified in the survey's original question. Thus, these figures are generally not even minimally comparable across surveys.
c. This survey inquired only about DGUs outside the home.
d. Implied DGUs is for DGUs in connection with all types of crimes, projected from the survey's estimate for burglary-linked DGUs only.

Sources: Kleck (2001b); details on most of the surveys can be found in the Roper Center's iPoll Databank online database.

Adjustments Applied to Estimated Percent with DGU:
To make estimates from different surveys more meaningful and comparable, they were adjusted so as to produce standardized estimates of the share of U.S. adults who used any kind of gun defensively against a human (rather than an animal) in the preceding 12 months, not including uses in connection with military, police, or security guard duties. For each deviation from this standard, the following adjustments were applied:

| Deviation from Standard | Adjustment – multiply by: |
|---|---|
| 1. Use of 5 year recall period rather than 1 year | 0.40 |
| 2. Use of "ever" lifetime recall period rather than 1 year | 0.1628 |
| 3. Failure to exclude uses against animals | 0.90984 |
| 4. Failure to exclude uses linked with police, military, etc. | 125/155 |
| 5. Estimate covered only handguns | 100/79.7 |
| 6. Estimate covered only uses in the home | 100/37.3 |
| 7. Estimate covered only uses linked with burglary | 100/33.8 |

The rationales for adjustments 1-3 can be found in Kleck (2001b). Adjustment 4 was based on the finding in McDowall et al. (2000) that when Rs were not instructed to exclude incidents linked with military, police, or security guard duty, 30 of the 155 Rs who initially reported a DGU were found, after further questioning, to be reporting these kinds of duty-related experiences. Adjustments 5-7 are based on the findings in Kleck and Gertz (1995) that 79.7% of DGUs involved handguns, that 37.3% of DGUs occurred in the user's home, and that 33.8% of DGUs were linked with burglaries.

**September 30, 2011**

**Gary Kleck**

# EXHIBIT A

CURRICULUM VITAE

GARY KLECK

(Updated July 28, 2011)

PERSONAL

Place of Birth:          Lombard, Illinois

Date of Birth:          March 2, 1951

Address:                College of Criminology and Criminal Justice
                        306 Hecht House
                        The Florida State University
                        Tallahassee, Florida 32306-1127

Telephone Numbers:      Office:        (850) 644-7651
                        Office FAX:   (850) 644-9614
                        Home:          (850) 894-1628

e-mail Address:         gkleck@fsu.edu


CURRENT POSITION

   David J. Bordua Professor of Criminology, Florida State University

COURTESY APPOINTMENT

   Professor, College of Law, Florida State University

PROFESSIONAL MEMBERSHIPS

   American Society of Criminology

   Academy of Criminal Justice Sciences

EDUCATION

   A.B.        1973 - University of Illinois, with High Honors and with Distinction in
               Sociology

   A.M.        1975 - University of Illinois at Urbana, in Sociology

   Ph.D.       1979 - University of Illinois at Urbana, in Sociology

ACADEMIC HONORS

National Merit Scholar, 1969

Freshman James Scholar, University of Illinois, 1969

Graduated from University of Illinois with High Honors and with Distinction in
Sociology, 1973

University of Illinois Foundation Fellowship in Sociology, 1975-76

1993 Winner of the Michael J. Hindelang Award of the American Society of
Criminology, for the book that made "the most outstanding contribution to
criminology"   (for Point Blank: Guns and Violence in America).

TEACHING POSITIONS

| | |
|---|---|
| Fall, 1991 to present | Professor, College of Criminology and Criminal Justice, Florida State University |
| Fall, 1984 to Spring, 1991 | Associate Professor, School of Criminology, Florida State University. |
| Fall, 1979 to Spring, 1984 | Assistant Professor, School of  Criminology, Florida State University. |
| Fall, 1978 to Spring, 1979 | Instructor, School of Criminology, Florida State University. |

COURSES TAUGHT

Criminology, Applied Statistics, Regression, Introduction to Research Methods, Law
Enforcement, Research Methods in Criminology, Gun Control, Violence Theory Seminar, Crime
Control, Assessing Evidence, Survey Research.

DISSERTATION

Homicide, Capital Punishment, and Gun Ownership:  An Aggregate Analysis of U.S.
Homicide Trends from 1947 to1976.  Department of Sociology, University of
Illinois, Urbana.  1979.

PUBLICATIONS (sole author unless otherwise noted)

BOOKS

1991, Point Blank: Guns and Violence in America.  Hawthorne, N.Y.: Aldine de Gruyter.
2005      Winner of the 1993 Michael J. Hindelang award of the American Society of
          Criminology.   Republished in 2005 in paperback by Transaction Publishers.

          Reviewed in Contemporary Sociology, American Journal of Sociology,
          Social Forces, Journal of Criminal Law and Criminology, The
          Criminologist, The Public Interest, Criminal Law Forum, Social
          Science Review, Criminal Justice Abstracts, Crime, Criminal Justice and
          Law Enforcement, Newsletter of Public Policy Currents, Commonweal,
          Choice, and others.

1997 Targeting Guns: Firearms and their Control. Hawthorne, N.Y.: Aldine de Gruyter.

1997 The Great American Gun Debate: Essays on Firearms and Violence (with Don B.
          Kates, Jr.).  San Francisco: Pacific Research Institute for Public Policy.

2001 (with Don B. Kates) Armed: New Perspectives on Gun Control.  N.Y.:
          Prometheus Books.

          Selected to Choice: Current Reviews for Academic Libraries' 39th annual
          "Outstanding Academic Title List," awarded for "excellence in scholarship and
          presentation, the significance of their contribution to their field, and their value as
          an important treatment of their topic."

RESEARCH MONOGRAPH

1979 Bordua, David J., Alan J. Lizotte, and Gary Kleck. Patterns of Firearms
          Ownership, Use and Regulation in Illinois.  A Report to the Illinois Law Enforce-
          ment Commission, Springfield, Illinois.

ARTICLES IN PEER-REVIEWED JOURNALS

1979 "Capital punishment, gun ownership, and homicide."  American Journal of
          Sociology 84(4):882-910.

1981 "Racial discrimination in criminal sentencing: A critical evaluation of the
          evidence with additional evidence on the death penalty." American Sociological
          Review 46(6):783-804.

1982 "On the use of self-report data to determine the class distribution of criminal

behavior." <u>American Sociological Review</u> 47(3):427-33.

1983    (with David Bordua) "The factual foundation for certain key assumptions of gun control." <u>Law and Policy Quarterly</u> 5(3):271-298.

1985     "Life support for ailing hypotheses:  modes of summarizing the evidence on racial discrimination in criminal sentencing."  <u>Law and Human Behavior</u> 9(3):271-285.

1986     "Policy lessons from recent gun control research." <u>Law and Contemporary Problems</u> 49(1):35-62.

1986    "Evidence that 'Saturday Night Specials' not very important for crime." <u>Sociology</u>

and Social Research 70(4):303-307.

1987     "American's foreign wars and the legitimation of domestic violence." <u>Sociological Inquiry</u> 57(3):237-250.

1988    "Crime control through the private use of armed force." <u>Social Problems</u> 35(1):1-21.

1988    "Miscounting suicides." <u>Suicide and Life-Threatening Behavior</u> 18(3):219-236.

1990    (with Susan Sayles) "Rape and resistance." <u>Social Problems</u> 37(2):149-162.

1991    (with Karen McElrath) "The effects of weaponry on human violence." <u>Social Forces</u> 69(3):669-92.

1993    (with Miriam DeLone) "Victim resistance and offender weapon effects in robbery." <u>Journal of Quantitative Criminology</u> 9(1):55-82.

1993    (with E. Britt Patterson)  "The impact of gun control and gun ownership levels on violence rates." <u>Journal of Quantitative Criminology</u> 9(3):249-287.

1993    "Bad data and the 'Evil Empire': interpreting poll data on gun control." <u>Violence and Victims</u> 8(4):367-376.

1995    "Guns and violence: an interpretive review of the field." <u>Social Pathology</u> 1(1):12-47.

1995    "Using speculation to meet evidence." <u>Journal of Quantitative Criminology</u> 11(4):411-424.

1995    (with Marc Gertz) "Armed resistance to crime: the prevalence and nature of self-defense with a gun."   Journal of Criminal Law & Criminology 86(1):150-187.

1996    "Crime, culture conflict and sources of support for gun control: a multi-level application of the General Social Surveys."  American Behavioral Scientist 39(4):387-404.

1996    (with Chester Britt III and David J. Bordua) "A reassessment of the D.C. gun law: some cautionary notes on the use of interrupted time series designs for policy impact assessment." Law & Society Review 30(2):361-380.

1996    (with Chester Britt III and David J. Bordua) "Avoidance and misunderstanding." Law & Society Review 30(2):393-397.

1997    (with Marc Gertz) "The illegitimacy of one-sided speculation: getting the defensive gun use estimate down."  Journal of Criminal Law and Criminology 87(4):1446-1461.

1997    Tomislav Kovandzic and Marc Gertz) "Defensive gun use: vengeful vigilante imagery vs. reality: results from the National Self-Defense Survey." Journal of Criminal Justice 26(3):251-258.

1998    (with Marc Gertz) "Carrying guns for protection: results from the National Self-Defense Survey." Journal of Research in Crime and Delinquency 35(2):193-224.

1998    "What are the risks and benefits of keeping a gun in the home?"  Journal of the American Medical Association 280(5):473-475.

1998    (with Charles Crawford and Ted Chiricos) "Race, racial threat, and sentencing of habitual offenders."  Criminology 36(3):481-511.

1999    (with Michael Hogan) "A national case-control study of homicide offending and gun ownership." Social Problems 46(2):275-293.

1999    "BATF gun trace data and the role of organized gun trafficking in supplying guns to criminals."  St. Louis University Public Law Review 18(1):23-45.

2001    "Can owning a gun really triple the owner's chances of being murdered?" Homicide Studies 5:64-77.

2002    (with Theodore Chiricos) "Unemployment and property crime: a target-specific assessment of  opportunity and motivation as mediating factors." Criminology 40(3):649-680.

2004    "Measures of gun ownership levels for macro-level crime and violence research." Journal of Research in Crime and Delinquency 41(1):3-36.

2004    (with Jongyeon Tark) "Resisting crime: the effects of victim action on the outcomes of crimes." Criminology 42(4):861-909.

2005    (with Brion Sever, Spencer Li, and Marc Gertz) "The missing link in general deterrence research." Criminology 43(3):623-660.

2006    (with Jongyeon Tark and Jon J. Bellows) "What methods are most frequently used in research in criminology and criminal justice?" Journal of Criminal Justice 34(2):147-152.

2007    "Are police officers more likely to kill African-American suspects?" Psychological Reports 100(1):31-34.

2007    (with Shun-Yung Wang and Jongyeon Tark) "Article productivity among the faculty of criminology and criminal justice doctoral programs, 2000-2005." Journal of Criminal Justice Education 18(3):385-405.

2008    (with Jongyeon Tark, Laura Bedard, and Dominique Roe-Sepowitz) "Crime victimization and divorce." International Review of Victimology 15(1):1-17.

2009    "The worst possible case for gun control: mass shootings in schools." American Behavioral Scientist 52(10):1447-1464.

2009    (with Shun-Yung Wang) "The myth of big-time gun trafficking." UCLA Law Review 56(5):1233-1294.

2009    (with Tomislav Kovandzic) "City-level characteristics and individual handgun ownership: effects of collective security and homicide." Journal of Contemporary Criminal Justice 25(1):45-66.

2009    (with Marc Gertz and Jason Bratton) "Why do people support gun control?" Journal of Criminal Justice 37(5):496-504.

2010    (with James C. Barnes) "Article productivity among the faculty of criminology and criminal justice doctoral programs, 2005-2009." Journal of Criminal Justice Education 22(1):43-66.

2011    (with Tomislav Kovandzic, Mark Saber, and Will Hauser. "The effect of perceived risk and victimization on plans to purchase a gun for self-protection." Journal of Criminal Justice 39(4):312-319.

2011    (with James C. Barnes)  "Deterrence and macro-level perceptions of punishment risks: is there a "collective wisdom?"  <u>Crime and Delinquency</u> (forthcoming, c. November 2011).

2011    (with James C. Barnes)  "Do more police generate more crime deterrence?" <u>Crime and Delinquency </u>(forthcoming).

## OTHER PUBLISHED ARTICLES

1992    "Assault weapons aren't the problem."  <u>New York Times</u> September 1, 1992, p. A15.  Invited Op-Ed page article.

1993    "The incidence of violence among young people." <u>The Public Perspective</u> 4:3-6. Invited article.

1994    "Guns and self-protection."  <u>Journal of the Medical Association of Georgia</u> 83:42. Invited editorial.

1997    "Using speculation to meet evidence: reply to Alba and Messner."  <u>Journal on Firearms and Public Policy</u> 9:

1998    "Has the gun deterrence hypothesis been discredited?"  <u>Journal on Firearms and Public Policy</u> 10:65-75.

1999    "There are no lessons to be learned from Littleton."  <u>Criminal Justice Ethics</u> 18(1):2, 61-63.  Invited commentary.

1999    "Risks and benefits of gun ownership - reply."  <u>Journal of the American Medical Association</u> 282(2):136-136.

1999    "The misfire that wounded Colt's."  <u>New York Times </u>October 23, 1999.  Invited Op-Ed page article.

1999    "Degrading scientific standards to get the defensive gun use estimate down." <u>Journal on Firearms and Public Policy</u> 11:77-137.

2000    "Guns aren't ready to be smart."  <u>New York Times</u> March 11, 2000.  Invited Op-Ed page article.

2000   (with Chester Britt III and David J. Bordua) "The emperor has no clothes: Using interrupted time series designs to evaluate social policy impact."  <u>Journal on Firearms and Public Policy</u> 12:197-247.

2001    "School lesson: armed self-defense works."  <u>Wall Street Journal</u> March 27, 2001.

Invited opinion article.

2001    "Impossible policy evaluations and impossible conclusions: a comment on Koper and Roth." <u>Journal of Quantitative Criminology</u> 17(1):75-80.

2001    "Absolutist politics in a moderate package: prohibitionist intentions of the gun control movement." <u>Journal on Firearms and Public Policy</u> 13:1-43.

2002    "Research agenda on guns, violence, and gun control." <u>Journal on Firearms and Public Policy</u> 14:51-72.

2006    "Off target." <u>New York Sun</u> January 5, 2006. Invited opinion article.

2009    "How not to study the effect of gun levels on violence rates." <u>Journal on Firearms and Public Policy</u> 21:65-93.

2011    "Mass killings aren't the real gun roblem --- how to tailor gun-control measures to common crimes, not aberrant catastrophes." <u>Wall Street Journal</u> January 15, 2011. Invited opinion article.

2011    "The myth of big-time gun trafficking." <u>Wall Street Journal</u> May 21, 2011. Invited opinion article.

## BOOK CHAPTERS

1984    (with David Bordua) "The assumptions of gun control." Pp. 23-48 in Don B. Kates, Jr. (ed.) <u>Firearms and Violence: Issues of Regulation</u>. Cambridge, Mass.: Ballinger.

        (Also appeared in <u>Federal Regulation of Firearms</u>, report prepared by the Congressional Research Service, Library of Congress, for the Committee on the Judiciary, United States Senate, 1982).

1984    "The relationship between gun ownership levels and rates of violence in the U.S." Pp. 99-135 in Kates, above.

1984    "Handgun-only gun control: a policy disaster in the making." Pp. 167-199 in Kates, above.

1996    "Racial discrimination in criminal sentencing." Pp. 339-344 in <u>Crime and Society</u>, Volume III – Readings: Criminal Justice, edited by George Bridges, Robert D. Crutchfield, and Joseph G. Weis. Thousand Oaks, Calif.: Pine Forge Press.

1996    "Gun buy-back programs: nothing succeeds like failure."  Pp. 29-53 in <u>Under Fire:</u>
        <u>Gun Buy-Backs, Exchanges and Amnesty Programs</u>, edited by Martha R. Plotkin.
        Washington, D.C.: Police Executive Research Forum.

2000    "Firearms and crime."  Pp. 230-234 in the <u>Encyclopedia of Criminology and</u>
        <u>Deviant Behavior</u>, edited by Clifton D. Bryant.  Philadelphia: Taylor
        & Francis, Inc.

2001    (with Leroy Gould and Marc Gertz) "Crime as social interaction."  Pp. 101-114 in
        <u>What is Crime?: Controversy over the Nature of Crime and What to Do About It</u>,
        edited by Stuart Henry and Mark M. Lanier.  Lanham, Md.: Rowman and
        Littlefield.

2003    "Constricted rationality and the limits of general deterrence."  Chapter 13 in
        <u>Punishment and Social Control: Enlarged Second Edition</u>, edited by Thomas G.
        Blomberg.  New York: Aldine de Gruyter.

2004    "The great American gun debate: what research has to say."  Pp. 470-487 in <u>The</u>
        <u>Criminal Justice System: Politics and Policies</u>, 9th edition, edited by George F.
        Cole, Marc Gertz, and Amy Bunger.  Belmont, CA: Wadsworth-Thomson

2009    "Guns and crime." Invited chapter.  Pp. 85-92 in <u>21st Century Criminology: A</u>
        <u>Reference Handbook</u>, edited by J. Mitchell Miller. Thousand Oaks, CA: Sage.

2011    Kovandzic, Tomislav, Mark E. Schaffer, and Gary Kleck. "Gun Prevalence,
        Homicide Rates and Causality: A GMM Approach to Endogeneity Bias."
Chapter                  to appear in <u>The Sage Handbook of Criminological Research Methods</u>,
edited by
        David Gadd, Susanne Karstedt, and  Steven F. Messner.

## BOOK REVIEWS

1978    Review of <u>Murder in Space City: A Cultural Analysis of Houston Homicide</u>
        <u>Patterns,</u> by Henry Lundsgaarde.  <u>Contemporary Sociology</u> 7:291-293.

1984    Review of <u>Under the Gun</u>, by James Wright et al. <u>Contemporary Sociology</u>
        13:294-296.

1984    Review of <u>Social Control</u>, ed. by Jack Gibbs.  <u>Social Forces</u> 63: 579-581.

1988     Review of <u>Armed and Considered Dangerous</u>, by James Wright and Peter Rossi,
        <u>Social Forces</u> 66:1139-1140.

1988    Review of The Citizen's Guide to Gun Control, by Franklin Zimring and Gordon Hawkins, Contemporary Sociology 17:363-364.

1989    Review of Sociological Justice, by Donald Black, Contemporary Sociology 19:261-3.

1991    Review of Equal Justice and the Death Penalty, by David C. Baldus, George G. Woodworth, and Charles A. Pulaski, Jr.  Contemporary Sociology 20:598-9.

1999    Review of Crime is Not the Problem, by Franklin E. Zimring and Gordon Hawkins.  American Journal of Sociology 104(5):1543-1544.

2001    Review of Gun Violence: the Real Costs, by Philip J. Cook and Jens Ludwig. Criminal Law Bulletin 37(5):544-547.

2010    Review of  Homicide and Gun Control: The Brady Handgun Violence Prevention Act and Homicide Rates, by J. D. Monroe. Criminal Justice Review 35(1):118-120.


LETTERS PUBLISHED IN SCHOLARLY JOURNALS

1987    "Accidental firearm fatalities."  American Journal of Public Health 77:513.

1992    "Suicide in the home in relation to gun ownership." The New England Journal of Medicine 327:1878.

1993    "Gun ownership and crime."  Canadian Medical Association Journal 149:1773-1774.

1999    "Risks and benefits of gun ownership."  Journal of the American Medical Association 282:136.

2000    (with Thomas Marvell) "Impact of the Brady Act on homicide and suicide rates."

        Journal of the American Medical Association 284:2718-2719.

2001    "Violence, drugs, guns (and Switzerland)."  Scientific American 284(2):12.

2002    "Doubts about undercounts of gun accident deaths." Injury Prevention Online (September 19, 2002). Published online at http://ip.bmjjournals.com/cgi/eletters /8/3/252.

2005    "Firearms, violence, and self-protection."  Science 309:1674. September 9, 2005.

UNPUBLISHED REPORT

1987    Violence, Fear, and Guns at Florida State University: A Report to the President's Committee on Student Safety and Welfare. Reports results of campus crime victimization survey and review of campus police statistics on gun violence (32 pages).

RESEARCH FUNDING

1994    "The Impact of Drug Enforcement on Urban Drug Use Levels and Crime Rates." $9,500 awarded by the U.S. Sentencing Commission.

1997    "Testing a Fundamental Assumption of Deterrence-Based Crime Control Policy." $80,590 awarded by the Charles E. Culpeper Foundation to study the link between
        actual and perceived punishment levels.

PRESENTED PAPERS

1976    "Firearms, homicide, and the death penalty:  a simultaneous equations analysis." Presented at the annual meetings of the Illinois Sociological Association, Chicago.

1979    "The assumptions of gun control."  Presented at the Annual Meetings of the American Sociological Association, New York City.

1980    "Handgun-only gun control:  A policy disaster in the making."  Presented at the Annual Meetings of the American Society of Criminology, Washington, D.C.

1981    "Life support for ailing hypotheses:  Modes of summarizing the evidence on racial
        discrimination."  Presented at the Annual Meetings of the American Society of Criminology, Toronto.

1984    "Policy lessons from recent gun control research."  Presented at the Duke University Law School Conference on Gun Control.

1985    "Policy lessons from recent gun control research." Presented at the Annual Meetings of the American Society of Criminology, San Diego.

1986    "Miscounting suicides."  Presented at the Annual Meetings of the American Sociological Association, Chicago.

1987    (with Theodore G. Chiricos, Michael Hays, and Laura Myers) "Unemployment and crime: a comparison of motivation and opportunity effects."  Annual meetings of the American Society of Criminology, Montreal.

1988    "Suicide, guns and gun control."  Presented at the Annual Meetings of the Popular Culture Association, New Orleans.

1988    (with Susan Sayles)  "Rape and resistance."  Presented at the Annual Meetings of the American Society of Criminology, Chicago, Ill.

1989    (with Karen McElrath)  "The impact of weaponry on human violence." Presented
        at the Annual Meetings of the American Sociological Association, San Francisco.

1989    (with Britt Patterson)  "The impact of gun control and gun ownership levels on city violence rates."  Presented at the Annual Meetings of the American Society of
        Criminology, Reno.

1990    "Guns and violence: a summary of the field."  Presented at the Annual Meetings of the American Political Science Association, Washington, D.C.

1991    "Interrupted time series designs: time for a re-evaluation."  Presented at the Annual Meetings of the American Society of Criminology, New Orleans.

1993    (with Chester Britt III and David J. Bordua) "The emperor has no clothes: Using interrupted time series designs to evaluate social policy impact." Presented at the Annual Meetings of the American Society of Criminology, Phoenix.

1992    "Crime, culture conflict and support for gun laws: a multi-level application of the General Social Surveys."  Presented at the Annual Meetings of the American Society of Criminology, Phoenix.

1994    (with Marc Gertz) "Armed resistance to crime: the prevalence and nature of self-defense with a gun."   Presented at the Annual Meetings of the American Society of Criminology, Miami.

1995    (with Tom Jordan) "The impact of drug enforcement and penalty levels on urban drug use levels and crime rates."  Presented at the Annual Meetings of the American Society of Criminology, Boston.

1996    (with Michael Hogan) "A national case-control study of homicide offending and gun ownership." Presented at the Annual Meetings of the American Society of

Criminology, Chicago.

1997    "Evaluating the Brady Act and increasing the utility of BATF tracing data."
        Presented at the annual meetings of the Homicide Research Working Group,
        Shepherdstown, West Virginia.

1997    "Crime, collective security, and gun ownership: a multi-level application of the
        General Social Surveys."  Presented at the Annual Meetings of the American
        Society of Criminology, San Diego.

1998    (with Brion Sever and Marc Gertz) "Testing a fundamental assumption of
        deterrence-based crime control policy."  Presented at the Annual Meetings of the
        American Society of Criminology, Washington, D.C.

1998    "Measuring macro-level gun ownership levels." Presented at the Annual Meetings
        of the American Society of Criminology, Washington, D.C.

1999    "Can owning a gun really triple the owner's chances of being murdered?"
        Presented at the Annual Meetings of the American Society of Criminology,
        Toronto.

2000    "Absolutist politics in a moderate package: prohibitionist intentions of the gun
        control movement."  Presented at the Annual Meetings of the American Society
        of Criminology, San Francisco.

2001    (with Tomislav V. Kovandzic) "The impact of gun laws and gun levels on crime
        rates."  Presented at the Annual Meetings of the American Society of
        Criminology, Atlanta.

2001    "Measures of gun ownership levels for macro-level violence research."  Presented
        at the Annual Meetings of the American Society of Criminology, Atlanta.

2001    "The effects of gun ownership levels and gun control laws on urban crime rates."
        Presented at the Annual Meetings of the American Society of Criminology,
        Chicago.

2003    (with Tomislav V. Kovandzic) "The effect of gun levels on violence rates
        depends on who has them." Presented at the Annual Meetings of the American
        Society of Criminology, Denver.

2003    (with KyuBeom Choi) "Filling in the gap in the causal link of deterrence."
        Presented at the Annual Meetings of the American Society of
        Criminology, Denver.

2004    (with Tomislav Kovandzic) "Do violent crime rates and police strength levels in the community influence whether individuals own guns?"  Presented at the Annual Meetings of the American Society of Criminology, Nashville.

2004    (with Jongyeon Tark) "Resisting crime: the effects of victim action on the outcomes of crime."  Presented at the Annual Meetings of the American Society of Criminology, Nashville.

2004    (with Jongyeon Tark) "The impact of self-protection on rape completion and injury."  Presented at the Annual Meetings of the American Society of Criminology, Nashville.

2004    (with Kyubeom Choi) "The perceptual gap phenomenon and deterrence as psychological coercion." Presented at the Annual Meetings of the American Society of Criminology, Nashville.

2005    (with Jongyeon Tark) "Who resists crime?" Presented at the Annual Meetings of the American Society of Criminology, Toronto.

2005    (with Jongyeon Tark and Laura Bedard) "Crime and marriage."  Presented at the Annual Meetings of the American Society of Criminology, Toronto.

2006    (with Shun-Yang Kevin Wang)"Organized gun trafficking, 'crime guns,' and crime rates."  Presented at the Annual Meetings of the American Society of Criminology, Los Angeles.

2006    "Are police officers more likely to kill black suspects?"  Presented at the Annual Meetings of the American Society of Criminology, Los Angeles.

2007    (with Shun-Yang Kevin Wang) "The myth of big-time gun trafficking. "Presented at the Annual Meetings of the American Society of Criminology, Atlanta.

2007    (with Marc Gertz and Jason Bratton)  "Why do people support gun control?" Presented at the Annual Meetings of the American Society of Criminology, Atlanta.

2008    (with J.C. Barnes)  "Deterrence and macro-level perceptions of punishment risks: Is there a "collective wisdom?"  Presented at the Annual Meetings of the American Society of Criminology,  St. Louis.

2009    "The myth of big-time gun trafficking."  Presented at UCLA Law Review Symposium, "The Second Amendment and the Right to Bear Arms After DC v. Heller."  January 23, 2009, Los Angeles.

2009    (with Shun-Yung Wang) "Employment and crime and delinquency of working youth: A longitudinal study of youth employment."  Presented at the Annual Meetings of the American Society of Criminology, November 6, 2009, Philadelphia, PA.

2009    (with J. C. Barnes)  "Do more police generate more deterrence?"  Presented at the Annual Meetings of the American Society of Criminology, November 4, 2009, Philadelphia, PA.

2010    (with J. C. Barnes) "Article productivity among the faculty of criminology and criminal justice doctoral programs, 2005-2009."  Presented at the annual Meetings of the American Society of Criminology, November 18, 2010, San Francisco, CA.

2010    (with Will Hauser) "Fear of crime and gun ownership."  Presented at the annual Meetings of the American Society of Criminology, November 18, 2010, San Francisco, CA.

2010    "Errors in survey estimates of defensive gun use frequency: results from national Internet survey experiments."  Presented at the annual Meetings of the American Society of Criminology, November 19, 2010, San Francisco, CA.

2010    (with Mark Faber and Tomislav Kovandzic)  "Perceived risk, criminal victimization, and prospective gun ownership."  Presented at the annual Meetings of the American Society of Criminology, November 19, 2010, San Francisco, CA.

CHAIR

1983    Chair, session on Race and Crime.  Annual meetings of the American Society of Criminology, Denver.

1989    Co-chair (with Merry Morash), roundtable session on problems in analyzing the National Crime Surveys.  Annual meetings of the American Society of Criminology, Reno.

1993    Chair, session on Interrupted Time Series Designs. Annual meetings of the American Society of Criminology, New Orleans.

1993    Chair, session on Guns, Gun Control, and Violence. Annual meetings of the American Society of Criminology, Phoenix.

1994    Chair, session on International Drug Enforcement. Annual meetings of the American Society of Criminology, Boston.

1999    Chair, Author-Meets-Critics session, More Guns, Less Crime.  Annual meetings of the American Society of Criminology, Toronto.

2000    Chair, session on Defensive Weapon and Gun Use.  Annual Meetings of the American Society of Criminology, San Francisco.

2002    Chair, session on the Causes of Gun Crime. Annual meetings of the American Society of Criminology, Chicago.

2004    Chair, session on Protecting the Victim.  Annual meetings of the American Society of Criminology, Nashville.

DISCUSSANT

1981    Session on Gun Control Legislation, Annual Meetings of the American Society of Criminology, Washington, D.C.

1984    Session on Criminal Sentencing, Annual Meetings of the American Society of Criminology, Cincinnati.

1986    Session on Sentencing, Annual Meetings of the American Society of Criminology, Atlanta.

1988    Session on Gun Ownership and Self-protection, Annual Meetings of the Popular Culture Association, Montreal.

1991    Session on Gun Control, Annual Meetings of the American Statistical Association, Atlanta, Ga.

1995    Session on International Drug Enforcement, Annual Meetings of the American Society of Criminology, Boston.

2000    Session on Defensive Weapon and Gun Use, Annual Meetings of the American Society of Criminology, San Francisco.

2004    Author-Meets-Critic session on Guns, Violence, and Identity Among African-American and Latino Youth, by Deanna Wilkinson.  Annual meetings of the American Society of Criminology, Nashville.

2007    Session on Deterrence and Perceptions, University of Maryland 2007 Crime & Population Dynamics Summer Workshop, Aspen Wye River Center, Queenstown.
        MD, June 4, 2007.

2011    Session on Guns and Crime, at the DeVoe Moore Center Symposium On
        The Economics of Crime, March 26-28, 2009.


PROFESSIONAL SERVICE

        Editorial consultant -
                American Sociological Review
                American Journal of Sociology
                Social Forces
                Social Problems
                Law and Society Review
                Journal of Research in Crime and Delinquency
                Social Science Research
                Criminology
                Journal of Quantitative Criminology
                Justice Quarterly
                Journal of Criminal Justice
                Violence and Victims
                Violence Against Women
                Journal of the American Medical Association
                New England Journal of Medicine
                American Journal of Public Health
                Journal of Homicide Studies

Grants consultant, National Science Foundation, Sociology Program.

Member, Gene LeCarte Student Paper Committee, American Society of Criminology,
1990.

Area Chair, Methods Area, American Society of Criminology, annual meetings in Miami,
November, 1994.

Division Chair, Guns Division, American Society of  Criminology, annual meetings in
Washington, D.C., November, 1998.

Dissertation evaluator, University of Capetown, Union of South Africa, 1998.

Division Chair, Guns Division, American Society of  Criminology, annual meetings in
Washington, D.C., November, 1999.

Member of Academy of Criminal Justice Sciences selection committee for Editor of
Justice Quarterly, 2007.

UNIVERSITY SERVICE

Member, Master's Comprehensive Examination Committee, School of Criminology, 1979-1982.

Faculty Advisor, Lambda Alpha Epsilon (FSU chapter of American Criminal Justice Association), 1980-1988.

Faculty Senate Member, 1984-1992.

Carried out campus crime survey for President's Committee on Student Safety and Welfare, 1986.

Member, Strategic Planning and Budgeting Review Committee for Institute for Science and Public Affairs, and Departments of Physics and Economics, 1986.

Chair, Committee on Ph.D. Comprehensive Examination in Research Methods, School of Criminology, Summer, 1986.

Member, Committee on Ph.D. Comprehensive Examination in Research Methods, School of Criminology, Summer, 1986 to present.

Chair, Committee on Graduate Assistantships, School of Criminology, Spring, 1987.

Chair, Ad Hoc Committee on Computers, School of Criminology, Fall, 1987.

Member, Recruitment Committee, School of Criminology, Spring, 1988; Spring, 1989; and 1989-90 academic year.

Member, Faculty Senate Committee on Computer-Related Curriculum, Spring, 1988 to Fall, 1989.

Chair, Ad Hoc Committee on Merit Salary Distribution, School of Criminology, Spring, 1988.

Chair, Ad Hoc Committee on Enrollment Strains, Spring, 1989.

Member, Graduate Handbook Committee, School of Criminology, Spring, 1990.

Member, Internal Advisement Committee, School of Criminology Spring, 1990.

University Commencement Marshall, 1990 to 1993.

Member, School of Criminology and Criminal Justice Teaching Incentive Program award

committee.

Chair, Faculty Recruitment Committee, School of Criminology and Criminal Justice, 1994-1995.

Chair, Committee on Ph.D. Comprehensive Examination in Research Methods, School of Criminology and Criminal Justice, 1994-1995.

Member, University Computer and Information Resources  Committee, 1995-1998.

Member, University Fellowship Committee, 1995 to present.

Member, University Library Committee, 1996 to 1999.

Chair, Electronic Access Subcommittee, University Library Committee, 1998 to 1999.

Member, Ad Hoc Committee on Merit Salary Increase Allocation, School of Criminology and Criminal Justice, 1998-1999.

Member, Academic Committee, School of Criminology and Criminal Justice, 2000-present.

Member, Recruiting Committee, School of Criminology and Criminal Justice, 2000-2001.

Member, Promotion and Tenure Committee, School of Criminology and Criminal Justice, 2000-present.

Chair, Committee on Ph.D. Comprehensive Examination in Research Methods, School of Criminology and Criminal Justice, 2000-2002.

Chair, Promotion and Tenure Committee, School of Criminology and Criminal Justice, 2001-2002.

Faculty Adviser, School of Criminology and Criminal Justice Graduate Student Association, 2001-present.

Member, ad hoc committee on survey research, School of Criminology and Criminal Justice, 2002.

Coordinator of Parts 2 and 4 of the School of Criminology and Criminal Justice Unit Review, 2002.

Chair, Academic Committee, School of Criminology and Criminal Justice, 2002-2003.

Director, Honors Programs, School of Criminology and Criminal Justice, 2002-present.

Member, University Promotion and Tenure Committee, Fall, 2003 to present.

Member of University Graduate Policy Committee, Fall 2003 to present.

Director of Graduate Studies, School (later College) of Criminology and Criminal Justice, April 2004 to present.

Chair, Promotion and Tenure Committee, College of Criminology and Criminal Justice, 2005-2006

PUBLIC SERVICE

Television, radio, newspaper, magazine, and Internet interviews concerning gun control, racial bias in sentencing, crime statistics, and the death penalty. Interviews and other kinds of news media contacts include Newsweek, Time, U.S. News and World Report, New York Times, Washington Post, Chicago Tribune, Los Angeles Times, USA Today, Boston Globe, Wall Street Journal, Kansas City Star, Philadelphia Inquirer, Philadelphia News, Atlanta Constitution, Atlanta Journal, Arizona Republican, San Antonio Express-News, Dallas Morning News, Miami Herald, Tampa Tribune, Jacksonville Times-Union, Womens' Day,   Harper's Bazaar, Playboy, CBS-TV (60 Minutes; Street Stories) ABC-TV (World News Tonight; Nightline), NBC-TV (Nightly News), Cable News Network, Canadian Broadcasting Company, National Public Radio, Huffington Post, PolitiFact.com, and many others.

Resource person, Subcommittee on Crime and Justice, (Florida House) Speaker's Advisory Committee on the Future,  February 6-7, 1986, Florida State Capitol.

Testimony before the U.S. Congress, House Select Committee on Children, Youth and Families, June 15, 1989.

Discussant, National Research Council/National Academy of Sciences Symposium on the Understanding and Control of Violent Behavior, April 1-4, 1990, Destin, Florida.

Colloquium on manipulation of statistics relevant to public policy, Statistics Department, Florida State University, October, 1992.

Speech to faculty, students, and alumni at Silver Anniversary of Northeastern University College of  Criminal Justice, May 15, 1993.

Speech to faculty and students at Department of Sociology, University of New Mexico,

October, 1993.

Speech on the impact of gun control laws, annual meetings of the Justice Research and Statistics Association, October, 1993, Albuquerque, New Mexico.

Testimony before the Hawaii House Judiciary Committee, Honolulu, Hawaii, March 12, 1994.

Briefing of the National Executive Institute, FBI Academy,        Quantico, Virginia, March 18, 1994.

Delivered the annual Nettler Lecture at the University of Alberta, Edmonton, Canada, March 21, 1994.

Member, Drugs-Violence Task Force, U.S. Sentencing  Commission, 1994-1996.

Testimony before the Pennsylvania Senate Select Committee to Investigate the Use of Automatic and Semiautomatic Firearms, Pittsburgh, Pennsylvania, August 16, 1994.

Delivered lectures in the annual Provost's Lecture Series, Bloomsburg University, Bloomsburg, Pa., September 19, 1994.

Briefing of the National Executive Institute, FBI Academy,        Quantico, Virginia, June 29,
       1995.

Speech to personnel in research branches of crime-related State of Florida agencies, Research and Statistics Conference, sponsored by the Office of the State Courts Administrator, October 19, 1995.

Speech to the Third Annual Legislative Workshop, sponsored by the James Madison Institute and the Foundation for Florida's Future, February 5, 1998.

Speech at the Florida Department of Law Enforcement on the state's criminal justice research agenda, December, 1998.

Briefing on news media coverage of guns and violence issues, to the Criminal Justice Journalists organization, at the American Society of Criminology annual meetings in Washington, D.C., November 12, 1998.

Briefing on gun control strategies to the Rand Corporation conference on "Effective Strategies for Reducing Gun Violence,"  Santa Monica, Calif., January 21, 2000.

Speech on deterrence to the faculty of the Florida State University School of Law,

February 10, 2000.

Invited address on links between guns and violence to the National Research Council Committee on Improving Research Information and Data on Firearms, November 15-16, 2001, Irvine, California.

Invited address on research on guns and self-defense to the National Research Council Committee on Improving Research Information and Data on Firearms, January 15-16, 2001, Washington, D.C.

Invited address on gun control, Northern Illinois University, April 19, 2002.

Invited address to the faculty of the School of Public Health, University of Alabama, Birmingham, 2004.

Invited address to the faculty of the School of Public Health, University of Pennsylvania, March 5, 2004.

Member of Justice Quarterly Editor Selection Committee, Academy of Criminal Justice Sciences, Spring 2007

Testified before the Gubernatorial Task Force for University Campus Safety, Tallahassee, Florida, May 3, 2007.

OTHER ITEMS
Listed in:
Marquis Who's Who, 2009
Marquis Who's Who in the South and Southwest, 25th edition
Who's Who of Emerging Leaders in America, 1st edition
Contemporary Authors
Directory of American Scholars, 10th edition, 2002
Writer's Directory, 20th edition, 2004.

Participant in First National Workshop on the National Crime Survey, College Park, Maryland, July, 1987, co-sponsored by the Bureau of Justice Statistics and the American Statistical Association.

Participant in Second National Workshop on the National Crime Survey, Washington, D.C., July, 1988.

Participant, Seton Hall Law School Conference on Gun Control, March 3, 1989.

Debater in Intelligence Squared program, on the proposition "Guns Reduce Crime." Rockefeller University, New York City, October 28, 2008. Podcast distributed

through National Public Radio.  Further details are available at
 http://www.intelligencesquaredus.org/Event.aspx?Event=36.

Subject of cover story, "America Armed," in Florida State University Research in Review, Winter/Spring 2009.

Grants reviewer, Social Sciences and Humanities Research Council of Canada, 2010.

# EXHIBIT B

## MATERIALS REVIEWED

In addition to the materials referenced in my report and, more generally, the studies of guns and violence that I have authored, which are listed in my *curriculum vitae*, I also considered and reviewed the following materials in writing my report:

1. Second Amended Complaint, *Illinois Association of Firearms Retailers v. City of Chicago*, No. 10-CV-4184 (N.D. Ill.) (Doc. No. 80).

2. City of Chicago Ordinance of July 2, 2010.

3. Expert Report of Joseph J. Vince, Jr., *Illinois Association of Firearms Retailers v. City of Chicago*, No. 10-CV-4184 (N.D. Ill.).

4. Report by Daniel W. Webster, ScD, MPH on the Justification for Chicago's Limit on One Operable Firearm in the Home, *Illinois Association of Firearms Retailers v. City of Chicago*, No. 10-CV-4184 (N.D. Ill.).

5. Expert Report of Philip J. Cook, *Illinois Association of Firearms Retailers v. City of Chicago*, No. 10-CV-4184 (N.D. Ill.).

# EXHIBIT II

Table 4.  National Surveys of Defensive Gun Use in the U.S.[a]

| Survey: | Cambridge Reports | DMIa | DMIb | Hart | Time/CNN | Mauser |
|---|---|---|---|---|---|---|
| Time of Interviews: | April-May 1978 | May-June 1978 | December 1978 | October 1981 | December 1989 | March-April 1990 |
| Sample size: | 1,500 | 1,500 | 1,010 | 1,228 | 605 | 344 |
| Population covered: | Adults | Registered voters | Registered voters | Registered voters | "Firearm owners" | Residents |
| Gun type covered: | Handguns | All guns | All guns | Handguns | All guns | All guns |
| Recall Period: | Ever | Ever | Ever | 5 years | Ever | 5 years |
| Excluded uses against animals? | No | No | Yes | Yes | No | Yes |
| Excluded military, police uses? | No | Yes | Yes | Yes | Yes | Yes |
| Defensive question asked of: | Protection hgun owners | All | All | All | Gun owners | All |
| Defensive question refers to: | R | Household | Household | Household | R | Household |
| Unadjusted % adults with DGU[b] | 3 | 15 | 7 | 4 | 9 | 3.79 |
| Adjustments applied: | 2-5,12 | 2,3 | 2 | 1,5 | 2-4,8, 9 | 1 |
| Adj. % with DGU | 2.64 | 2.22 | 1.14 | 2.01 | 4.50 | 1.5 |
| Implied number of DGUs[d] | 1.1 m | 1.7 m | 0.9 m | 1.7 m | 3.7 m | 1.4 m |

Table 4.  National Surveys of Defensive Gun Use in the U.S. (continued)

| Survey: | **Gallup** | **Kleck & Gertz** | **Gallup** | **L.A. Times** | **Tarrance** | **CDC** |
|---|---|---|---|---|---|---|
| Time of interviews: | May 1991 | Feb.-April 1993 | December 1993 | April 1994 | May 1994 | April-Sept. 1994 |
| Sample size: | 1,002 | 4,997 | 1,014 | 1,682 | 1,000 | 5,238 |
| Population covered: | Adults | Adults | Adults | Adults | Adults | Adults |
| Gun types covered: | All guns | All guns | All guns | All guns | All guns | All guns |
| Recall period: | Ever | 1 year | Ever | Ever | 5 years | 1 year |
| Excluded uses against animals? | No | Yes | No | No | Yes | Yes |
| Excluded military, police uses? | No | Yes | Yes | Yes | Yes | Yes |
| Defensive question asked of: | Rs in handgun households | All | Gun owners | All | All | Rs in gun-owning households |
| Defensive question refers to: | R | R | R | R | R | R |
| Unadjusted % adults with DGU[b] | 8 | 1.326 | 11 | 8[c] | 1 | 2.0 |
| Adjustments applied: | 2-5,11 | none | 2,3,9 | 2,6 | 1,3 | 7,10 |
| Adj. % with DGU | 1.20 | 1.326 | 1.63 | 2.08 | 0.36 | 2.53 |
| Implied number of DGUs | 0.8 m | 2.5 m | 1.4 m | 4.0 m | 0.7 m | 3.7 m[d] |

Table 4.  National Surveys of Defensive Gun Use in the U.S. (continued)

| Survey: | NSPOF | Hemenway & Azrael | Hearst | Hemenway | Gallup | Washington Post |
|---|---|---|---|---|---|---|
| Time of interviews: | Nov-Dec 1994 | May-June 1996 | August 1997 | Spring 1999 | May 2000 | June 2000 |
| Sample size: | 2,568 | 1,906 | 2,016 | 2,474 | 1,031 | 1,068 |
| Population covered: | Adults | Adults | Adults | Adults | Adults | Adults |
| Gun type covered: | All guns | All guns | All guns | All guns | All guns | All guns |
| Recall period: | 1 year | 5 years | Ever | 5 years | Ever | Ever |
| Excluded uses against animals? | Yes | Yes | No | Yes | No | No |
| Excluded military, police uses? | Yes | Yes | No | Yes | No | No |
| Defensive question asked of: | All | All | All | All | All | All |
| Defensive question refers to: | R | R | R | R | R | R |
| Unadjusted % adults with DGU[b] | 1.44 | 0.73 | 5 | 1.15 | 7 | 8 |
| Adjustments applied: | none | 1 | 2-4 | 1 | 2-4 | 2-4 |
| Adj. % with DGU | 1.44 | 0.29 | 0.60 | 0.46 | 0.84 | 0.96 |
| Implied number of DGUs | 2.8 m | 0.6 m | 1.2 m | 0.9 m | 1.7 m | 2.0 m |

Abbreviations:
DMI = Decision Making Information; R = respondent; Hgun = handgun; m = million; DGU = defensive gun use; CDC = Centers for Disease Control and Prevention; NSPOF = National Survey of the Private Ownership of Firearms

Notes:
a. Table covers surveys of probability samples of the general U.S. population that directly asked Rs about DGU.  It excludes the survey reported in McDowall et al. (2000), which was instead based on samples of "commercial lists of likely gun owners" (p. 8), and the NCVS, which never directly asks Rs about DGU.
b. This percentage is the share of persons or households who reported a DGU for whatever recall period was used, for whatever subset of gun types or circumstances that happened to be specified in the survey's original question.  Thus, these figures are generally not even minimally comparable across surveys.
c. This survey inquired only about DGUs outside the home.
d. Implied DGUs is for DGUs in connection with all types of crimes, projected from the survey's estimate for burglary-linked DGUs. .

Sources: Kleck (2001); details on most of the surveys can be found in the Roper Center's iPoll Databank online database.

Adjustments Applied to Original (unadjusted) % with DGU to Compute Adjusted %:
To make estimates from different surveys more meaningful and comparable, they were adjusted so as to produce standardized estimates of the percent of U.S. adults who used any kind of gun defensively against a human (rather than an animal) in the preceding 12 months, not including uses in connection with military, police, or security guard duties. For each deviation from this standard, the following adjustment multipliers were applied to the unadjusted percent to compute the adjusted percent:

| Deviation from Standard | Adjustment – multiply by: |
|---|---|
| 1.  Use of 5 year recall period rather than 1 year | 0.40 |
| 2.  Use of "ever" lifetime recall period rather than 1 year | 0.1628 |
| 3.  Failure to exclude uses against animals | 0.90984 |
| 4.  Failure to exclude uses linked with police, military, etc. | 125/155 |
| 5.  Estimate covered only handgun DGUs | 100/79.7 |
| 6.  Estimate covered only uses outside the home | 100/62.7 |
| 7.  Estimate covered only uses linked with burglary | 100/33.8 |
| 8.  Estimate covered only uses involving gun being fired | 100/23.9 |
| 9.  Estimate covered only uses by those who reported personally (individually) owning guns at time of survey | 100/68.9 |
| 10. Estimate covered only persons in households that owned guns at time of survey | 100/79.0 |
| 11. Estimate covered only persons in households that owned handguns at time of survey | 100/62.2 |
| 12. Estimate covered only persons who reported personally (individually)  owning handguns at time of survey | 100/60.7 |

The rationales for adjustments 1-3 can be found in Kleck (2001).  Adjustment 4 was based on the finding in McDowall et al. (2000) that when Rs were not instructed to exclude incidents linked with military, police, or security guard duty, 30 of the 155 Rs who initially reported a DGU were found, after further questioning, to be reporting these kinds of duty-related experiences. Adjustments 5-8 are based on the findings in Kleck and Gertz (1995) that 79.7% of DGUs involved handguns, 37.3% of DGUs occurred in the user's home, 33.8% of DGUs were linked with burglaries, and 23.9% involved the defender firing a gun.  Adjustments 9-12 were based on findings in that same survey indicating that 68.9% of DGUs were by persons who personally owned a gun (as distinct from living in a household with a gun) at the time of the survey, that 79.0% were by persons in households that owned a gun at the time of the survey, that 62.2% of DGUs were by persons in handgun-owning households, and that 60.7% were by persons who personally owned handguns (pp. 185, 187 and unpublished tabulations).  It was not possible to adjust for some surveys covering only registered voters while others covered the entire adult population.

EXHIBIT 3

1

IN THE UNITED STATES DISTRICT COURT

FOR THE NORTHERN DISTRICT OF ILLINOIS

      EASTERN DIVISION

  CIVIL ACTION NO.:  10-CV-04184

X - - - - - - - - - - - - - - - - - - - - - X

ILLINOIS ASSOCIATION OF FIREARMS RETAILERS,  :

KENNETH PACHOLSKI, KATHRYN TYLER AND     :

MICHAEL HALL,                :

        Plaintiffs,     :

   vs.             :

THE CITY OF CHICAGO AND RAHM EMANUEL,    :

MAYOR OF THE CITY OF CHICAGO,       :

        Defendants.     :

X - - - - - - - - - - - - - - - - - - - - - X

          Durham, North Carolina

        Wednesday, September 28, 2011

  Videotaped Deposition of PHILIP J. COOK, Ph.D.,

a witness herein, called for examination by counsel

for the Plaintiffs in the above-entitled matter,

pursuant to notice, the witness being duly sworn by

Lisa A. DeGroat, RPR and Notary Public in and for

the State of North Carolina, taken at the law office

of Thomas, Ferguson & Mullins, L.L.P., 119 East Main

Street, Durham, North Carolina, at 8:07 a.m., on

Wednesday, September 28, 2011, and the proceedings

being taken down by Stenotype by Lisa A. DeGroat,

and transcribed under her direction.

64

1      A.   No.  The -- the analysis that he was

2      doing, which also is in our book, refers to the

3      fact that homicide is a disamenity.  It makes

4      living in a particular area less attractive when

5      there is a killing nearby.

6           And there is direct evidence that when

7      there are killings in the neighborhood people

8      move out or they don't move in.  And there have

9      been enough extra killings -- killings that were

10     the -- say the national homicide rate in the

11     City of Chicago that if we put that together

12     with the statistics on population decline, we

13     could say that that high homicide rate by itself

14     is sufficient to account.

15          So it's -- the thought experiment would

16     be suppose that the City of Chicago had a lower

17     homicide rate, and had it from 2000 to 2010.

18     Say it had the national homicide rate.  Then

19     what would have happened to the population

20     during that time?

21          And based on the numbers that we have in

22     our book, we ended up -- he ended up saying that

23     the population would not have declined.  It

24     would have increased.  And this -- this is --

25     again, it's his calculation, but I'm simply

65

1    telling you.

2        Q.   Do you agree with it?

3        A.   I think the key to doing this kind of

4    calculation is the assumption that each murder

5    causes a reduction of 70 residents.

6           And that assumption is actually based on

7    analysis that was done, looking in a study that

8    was -- the analysis was published in a refereed

9    study, not by Ludwig or myself, but -- but by

10   Steven Levin and an associate.

11          And we read that study and believe that

12   the result is sound, in terms of the method of

13   analysis that they were using.  So we ended up

14   accepting his estimate and using it.

15       Q.   If Chicago had had a murder rate equal to

16   the national average of major American cities, do

17   you have an opinion as to how much larger its

18   population would have been, holding everything else

19   constant?

20       A.   That -- that is the experiment.  It's

21   comparing the actual murder rate in Chicago to

22   another murder rate that they might aspire to,

23   whether it is the average for large cities or

24   whether it's the murder rate for New York City

25   or the murder rate for the nation as a whole.

66

1        That you can do the thought experiment

2    in any of those ways.  And that gives you the --

3    the basis for doing the arithmetic.  I can't do

4    the arithmetic while I sit here.  So --

5        Q.   But do you know what baseline Mr. Ludwig

6    used, whether it was the national average or the

7    average for large U.S. cities?

8        A.   My -- I'm sorry.  I'm not clear about

9    that.  I could certainly consult with that

10    testimony.  So --

11        Q.   Well, let me ask it this way:  What do you

12    think the right way analytically is to do that

13    analysis?

14        MR. WOODS:  Objection to the form; vague,

15    ambiguous.

16        BY MR. THOMPSON:

17        Q.   What's the proper benchmark to compare

18    Chicago's homicide rate to?

19        MR. WOODS:  Same objection.

20        THE WITNESS:  I think one benchmark that

21    makes sense, if what we're looking for is a

22    benchmark that is credible, would be to compare

23    Chicago to New York City, for example.

24        And -- so that we could say, suppose that

25    Chicago had achieved the same sort of decline in the

71

1   understanding of the special attributes of the

2   gun compared with other weapons.

3        Q.   Is there any weapon that is more effective

4   for self-defense than a gun in your opinion?

5        MR. WOODS:  Objection to the form; vague

6   and ambiguous.  It's also outside the scope of what

7   he's been asked to testify on.

8        THE WITNESS:  I think that it would be very

9   important to spell out the circumstances, in that

10  there's not going to be a generic answer to that

11  question.  So that we'd have to talk about specific

12  cases, about what might be done and what would be

13  appropriate or prudent to do.

14       BY MR. THOMPSON:

15       Q.   Are there some circumstances in which a gun

16  is the best method for self-defense?

17       MR. WOODS:  Same objections.

18       THE WITNESS:  I mean I'm -- I'm certainly

19  willing to believe that that's true, that if it's

20  possible for the intended victim to actually have a

21  gun and deploy it, and that it knows what -- how to

22  use it, and that the assailant gives them that

23  opportunity, and that there are -- there's no

24  opportunity to talk their way out of it or to flee

25  or -- or to respond in some other fashion, that

72

1      there may be instances in which that is correct.

2            But I -- I think that this is not an area

3      where you would want to make some blanket statement.

4      You'd have to be very careful about the details, and

5      the details matter.

6            BY MR. THOMPSON:

7        Q.   Now, you talk in the next paragraph about,

8      "The goal of separating guns from criminal violence

9      is somewhat distinct from the goal of reducing

10     overall rates of criminal violence."

11           Please, explain?

12       A.   It is my finding from the research I've

13     been doing, going back to the 1970's, that the

14     availability of guns in a jurisdiction does not

15     have an effect on the volume or the rate of

16     robbery or assault.

17           It does have an effect on the likelihood

18     that robberies and assaults involve guns.  That

19     is, that the perpetrator used guns instead of

20     one of the other weapons we've been talking

21     about.

22           So we can then talk about policies that

23     are designed to limit gun availability to

24     criminals and to dangerous people, with the

25     belief that what they will accomplish is

73

1    reducing the likelihood that assaults and

2    robberies will be committed with a gun, even if

3    we do not believe that they will affect the

4    overall number of robberies and assaults.

5        Q.   All right.  Now, what is an instrumentality

6    effect?

7        A.   The instrumentality effect is the causal

8    effect of using one type of weapon, rather than

9    another, on the likely outcome of an attack.

10   That's -- that's what it means in this context.

11           And so, in particular, the

12   instrumentality effect in connection with gun

13   violence would attribute the higher case

14   fatality rate in gun assaults and gun violence

15   when compared with knives.

16       Q.   What about as compared to ice picks?

17       A.   An ice pick I would put into the same

18   category as knives and other cutting

19   instruments.

20       Q.   Have you seen any empirical data on ice

21   picks and their instrumentality effects?

22       A.   I have never seen any special study of

23   ice picks.  No.

24       Q.   Now, you say later on in page six, in the

25   last full paragraph, second sentence, that victims

74

1    were more likely to die in larger caliber shootings.

2    Why is that true?

3        A.   Well, the author of the study, Franklin

4    Zimring, attributed that to the fact that a

5    larger caliber weapon is going to cause a more

6    grievous wound when used in the same fashion as

7    a small caliber weapon.

8            And that, in fact, that a larger caliber

9    weapon was more -- intrinsically more lethal.

10   So if it were used in the same fashion as a

11   small caliber weapon, the likelihood the victim

12   will die is going to be higher with a .45

13   caliber than with a .22 caliber, for example.

14       MR. THOMPSON:  All right.  I'd like to mark

15   as Cook Exhibit 5 the following book.

16           (DISCUSSION HELD OFF THE RECORD.)

17           (PLAINTIFFS' EXHIBIT 5 WAS MARKED FOR

18   IDENTIFICATION.)

19           BY MR. THOMPSON:

20       Q.   And would you, please, identify this

21   document for the record, sir?

22       A.   Well, on the top of the document is an

23   article entitled, "The Technology of Personal

24   Violence," which I wrote and published in 1991,

25   in a volume edited by Michael Tonry, called,

96

1    vague and ambiguous, overbroad.  It's beyond the

2    scope of what he's been tendered to speak on.

3            THE WITNESS:  I mean so suicide is yet

4    another example of a social phenomenon that has many

5    different causes, and the type of weapons that are

6    readily available to people who are inclined to

7    suicide is just one of those possible causes.

8            (DISCUSSION HELD OFF THE RECORD.)

9            THE VIDEOGRAPHER:  Five minutes.

10           MR. THOMPSON:  Why don't we take a break?

11           MR. WOODS:  I mean I don't think he's done

12   with his answer.

13           MR. THOMPSON:  Oh.

14           MR. WOODS:  So --

15           MR. THOMPSON:  Oh, I'm sorry.  Well,

16   then -- then, please, continue.

17           MR. WOODS:  Yeah.  If you -- I mean it's --

18           THE WITNESS:  Yeah.

19           MR. WOODS:  I didn't think he was done.  If

20   he is done, he's done.

21           THE WITNESS:  Right, right.

22           MR. WOODS:  You can ask the witness.

23           BY MR. THOMPSON:

24       Q.  I'm sorry.

25       A.  So all I'm -- all I'm saying is that,

97

1    given that there are other important influences

2    on -- on suicide behavior, besides weapon type,

3    it's not surprising that weapon type or weapon

4    availability by itself does not strictly predict

5    the suicide rate.

6          MR. THOMPSON:  Okay.

7          THE VIDEOGRAPHER:  This is the end of tape

8    number two.  The time is 10:29.

9          (RECESS FROM 10:29 A.M. TO 10:41 A.M.)

10         THE VIDEOGRAPHER:  This is tape number

11   three in the deposition of Philip J. Cook.  The time

12   is 10:41.

13         BY MR. THOMPSON:

14      Q.   All right.  Now, let's turn to page 52,

15   sir.  And you say at the end of the carryover

16   paragraph, "It is perhaps not surprising that the

17   District's" -- and you're talking about the District

18   of Columbia -- "restrictions on handgun transfers

19   have proven ineffective in stopping the tide of

20   drug-related lethal violence."

21         Why was that perhaps not surprising?

22         MR. WOODS:  And let me just, again, object

23   to beyond the scope of his opinions in this case.

24         THE WITNESS:  When -- when the District

25   first imposed its handgun ban in 1977, it was

98

1    followed by a drop in violence, and there was some

2    indication that it was somewhat effective in

3    reducing gun use in violent crime.

4         And, of course, what happened during the

5    late 1980's was that there was the crack epidemic

6    that swept over the District of Columbia, and so

7    that -- that city, like all of the large cities in

8    the country, experienced a surge in youth -- the

9    violence, including homicide, which was mostly

10   committed with guns.  That is, the -- the homicides

11   were mostly committed with guns.

12        So that the explanation for why it's not

13   surprising is that we're talking about a situation

14   where there was a city that was attempting to

15   control the distribution of handguns, but surrounded

16   by other jurisdictions very much nearby that did not

17   have those restrictions, that you had a -- the

18   epidemic that was coupled with the increase in gang

19   activity for drug-dealing purposes.

20        And under those circumstances it was hard

21   for the law enforcement authorities to prevent the

22   influx of guns.  It is possible, it is plausible

23   that for more routine violence that it was making a

24   difference, but for that particular area it would be

25   hard to say that -- that it was successful.

99

1          BY MR. THOMPSON:

2          Q.   Does Chicago have the same problem as D.C.,

3     of having surrounding jurisdictions that don't have

4     the same restrictions on purchases of firearms?

5          MR. WOODS:  Objection to the form; vague,

6     ambiguous.

7          THE WITNESS:  Chicago certainly has the

8     suburbs.  The Illinois suburbs are subject to

9     Illinois' regulations, which are some of the most

10    stringent in the country.

11         That anybody buying a gun from is required

12    to have a firearm owner's ID card, and there is a

13    background check that is done, and there's record

14    keeping associated with that.

15         So that there is some contrast between the

16    two situations.  Virginia is a more open state, with

17    lax of regulations than -- than would be true for

18    Illinois, outside of -- outside of Chicago.

19         But, on the other hand, it is true that it

20    is possible for a motivated person, of course, to

21    drive to the suburbs or get to the suburbs.  And if

22    they are -- have the proper identification, to

23    acquire a gun and even to do so legally.

24         MR. THOMPSON:  All right.  Now, let's put

25    this exhibit to the side and move on to Cook Exhibit

COMPRESSED COPY

115

1    about that relationship.  So we thought that we had

2    a topic that would provide -- be of interest to, not

3    only scholars, but also to everyone else, regardless

4    of what our findings turned out to be.

5          BY MR. THOMPSON:

6          Q.   What were the challenges you faced in

7    trying to draw causal conclusions as you did this

8    study?

9          MR. WOODS:  Objection to the form of the

10   question; assumes facts, vague, ambiguous.

11         THE WITNESS:  Let me say the greatest

12   challenge that we faced in doing this study was to

13   obtain abscess to the geo-coded national crime

14   victimization survey data.

15         And, as far as I know, we were the first

16   team ever to have access to those data that would

17   allow us actually to identify the county in which a

18   burglary occurred, which in turn allowed us to

19   associate burglaries and burglary rates and burglary

20   patterns with the prevalence of gun ownership in

21   that county.

22         So this study was unique at the time.  I

23   think it remains unique.  And I can only tell you

24   there was an enormous amount of red tape in getting

25   access to those data, but I think that the results

116

1    are worth it.

2        BY MR. THOMPSON:

3        Q.   Well, let's turn to page 76, first full

4    paragraph.  And in the third sentence you say,

5    quote, "The challenge to establishing a causal

6    interpretation to these results comes from the

7    possibility that gun ownership may be both cause and

8    effect of local burglary patterns."

9        Please, explain what you meant by that

10   statement?

11       A.   What I meant by the statement was that

12   there is a possibility that households might be

13   more likely to acquire a firearm if the burglary

14   rate in their neighborhood went up or was high

15   than if the reverse were true.

16       So that it is certainly possible that

17   people would believe that having a gun would be

18   more useful if they saw the likelihood of

19   burglary to be high than if they did not.  And I

20   say that without making any judgment about

21   whether it's true or not.

22       So if you observe an -- an association

23   between the rate of gun ownership in a

24   jurisdiction and the burglary rate in the

25   jurisdiction, then it can be perhaps the result

1    of the influence of gun ownership on burglars or

2    it could be the result of the influence of

3    burglars on gun ownership.

4        And so that became the statistical

5    challenge that we were faced with in doing this

6    analysis.  We were very much aware of it, and we

7    then proceeded to design the analysis with that

8    in mind.

9    Q.   But there's no entirely persuasive way to

10   rule out such competing explanations; correct?

11       MR. WOODS:  Objection to the form; vague,

12   ambiguous.

13       THE WITNESS:  The gold standard in this

14   area would be to conduct a randomized control field

15   trial, where guns were passed out in some

16   neighborhoods and not others by an experimenter.

17       And, no, that -- that is not available.

18   That would have probably provided them potentially

19   the most persuasive results, but certainly we could

20   not do that.  So that what we did do is use well

21   established statistical techniques to identify the

22   effect of gun ownership on burglary as opposed to

23   the reverse.

24       For example, for some of -- one analysis

25   that we did looked at the effect of the gun

118

1    ownership rate in a year on the burglary rate in the

2    following year, with the belief that the causality

3    only flows in one direction with respect to time.

4        BY MR. THOMPSON:

5        Q.   Is that -- I don't want to cut you off.

6        A.   No.

7        Q.   Okay.  Now, let's turn to page 77 of this

8    document.  And you say in the last sentence on this

9    page, "Based on a special tabulation of NCVS data by

10   the Bureau of Justice Statistics, Philip Cook

11   estimated that there were an annual average of just

12   32,000 instances a year for the period 1979 to 1987

13   in which a householder used a gun against someone

14   who broke into the house or attempted to do so."

15        Did your number of 32,000 a year take into

16   account crimes that were deterred outside of the

17   home as a result of an individual carrying a

18   firearm?

19        MR. WOODS:  Object to the form of the

20   question; vague, ambiguous.

21        THE WITNESS:  The 32,000 was a very

22   specific measure that came out of the national crime

23   victimization survey, which interviews respondents

24   every six months for three years and asks them a

25   series of questions about victimization in the

139

1    or not.  So --

2         THE WITNESS:  Does it routinely -- I -- I

3    don't know what you mean by, "routinely."  I think

4    in some cases there are ATF investigations that

5    include gun shows.

6         BY MR. THOMPSON:

7      Q.   Do you have any sense as to how frequently

8    the ATF investigates gun shows?

9      A.   No.  I have no idea.

10     Q.   Will you agree that ATF investigations do

11   not necessarily reflect a random sample of firearms

12   that are illegally trafficked?

13        MR. WOODS:  Objection to the form;

14   foundation.

15        THE WITNESS:  I'm sorry.  Could you say

16   that again?

17        BY MR. THOMPSON:

18     Q.   Do you -- well, let me say it this way:  Do

19   you agree that samples of traced firearms are not a

20   representative sample of the universe of all

21   firearms used by criminals in the United States?

22        MR. WOODS:  I'm going to object to the

23   question; vague, ambiguous, overbroad.  For what

24   purpose?

25        THE WITNESS:  So whether a crime gun is

140

1    ultimately successfully traced depends on a series

2    of events that have to take place, starting with the

3    fact that the gun has to be confiscated by the

4    police, the police has to submit it for tracing, and

5    the tracing has to be successful through the

6    national tracing center.

7            And there is then a variety of ways in

8    which those guns which are successfully traced might

9    not be representative.  If -- if they come from

10   jurisdictions where the police always trace the guns

11   that they obtain, then there's a higher chance than

12   if they come from a jurisdiction where the police

13   don't do that.

14           It would be true that if the gun is very

15   old or if it has had the serial number erased, then

16   it would be unlikely to be successfully traced, and

17   so the -- the answer is there's no perfect match

18   between those that are successfully traced and --

19   and the original population that you're talking

20   about, which is all guns used in crime.

21           BY MR. THOMPSON:

22      Q.   Does a trace analysis show whether a

23   firearm has been trafficked?

24           MR. WOODS:  Objection to the form; vague,

25   ambiguous, foundation.

141

1          THE WITNESS:  So a standard trace analysis

2    ends at the point where the first retail sale is

3    identified.  Trafficking would typically occur after

4    that event.

5          BY MR. THOMPSON:

6      Q.   So that's a no?

7      A.   That's a no.

8          MR. THOMPSON:  Okay.  All right.  Let's

9    take a break.

10          THE VIDEOGRAPHER:  This is the end of tape

11    number three.  The time is 12:00.

12          (RECESS FROM 12:00 P.M. TO 12:10 P.M.)

13          THE VIDEOGRAPHER:  This is tape number four

14    in the deposition of Philip J. Cook.  Time is 12:10.

15          MR. THOMPSON:  Okay.  Professor, I would

16    like to mark as Cook Exhibit 12 the following

17    document.

18          (PLAINTIFFS' EXHIBIT 12 WAS MARKED FOR

19    IDENTIFICATION.)

20          BY MR. THOMPSON:

21      Q.   And will you, please, identify this

22    document for the record?

23      A.   Exhibit 12 is an article called,

24    "Underground Gun Markets."  I am one of the four

25    authors.  It was published in the Economic

142

1    Journal in 2007.

2        Q.   Okay.  And was -- did you make an attempt

3    in connection with this study to gather a

4    representative sample of individuals who

5    participated in the underground gun market in

6    Chicago?

7            MR. WOODS:  Objection to the form of the

8    question; vague, ambiguous.

9            THE WITNESS:  One member of our team is an

10   ethnographer, very well-known sociologist, named

11   Sudhir Venkotesh, who has worked for many years as

12   an ethnographer in a particular neighborhood of

13   South Chicago.

14           And he interviewed a couple of hundred

15   people who were involved in the underground economy.

16   His samples were intended to be broad in terms of

17   covering a number of different kinds of actors in

18   that economy.  He wanted to talk to thieves and to

19   gang members and to people involved in the gun

20   market and to prostitutes, and succeeded in talking

21   to a number of each of them.

22           But I think he cannot say, and would not

23   say, that he had strictly a representative sample.

24   That these are samples of convenience, that were

25   built partly through the ability for him to make

COMPRESSED COPY

143

1    contact with individuals who were willing to talk to

2    him.

3            So that to some extent it was a snowball

4    technique or working with a person who would vouch

5    for him who knew some of these people.  His goal was

6    to have trusting sources, who would be willing to

7    open up to him and talk to him about their

8    activities.

9            BY MR. THOMPSON:

10       Q.   Did these people all come from the same

11   neighborhood?

12       A.   They did.  They all came from one

13   particular neighborhood in Chicago.

14       Q.   Do you believe that neighborhood is

15   representative of the overall market -- underground

16   gun market in Chicago?

17           MR. WOODS:  I'm going to object to the form

18   of the question; vague, ambiguous.  For what

19   purpose?  Overbroad.

20           THE WITNESS:  In the study we were

21   interested in that question, and we compared the

22   neighborhood, which is called Grand Boulevard,

23   Washington Park, with the city as a whole in a

24   number of respects.

25           And what is true about the neighborhood

COMPRESSED COPY

144

1    that he's working in is that it's one of the ones

2    that has a very high rate of homicide and a high

3    rate of poverty, a low rate of labor force

4    participation.

5         It is almost entirely -- unlike the rest of

6    the city, almost entirely black racially.  And so

7    what it is representative of is an area that has one

8    of the highest concentrations of violence in

9    homicide in the city, rather than being average or

10   representative in some way for the city as a whole.

11        On the other hand -- on the other hand, it

12   is true that in terms of the -- what we know about

13   the guns that are being used in crime in Grand

14   Boulevard, Washington Park is that in a number of

15   respects they are very similar to the guns that are

16   being used in the rest of Chicago that were

17   confiscated by the police and used in crime.

18        BY MR. THOMPSON:

19        Q.  Now, let's turn to page 559.

20        A.  Okay.

21        Q.  And you say in the carryover paragraph at

22   the top of the page, it's the second full sentence,

23   quote, "The fact that Chicago has unusually

24   restrictive regulations makes the city an

25   interesting case study of what difference government

145

1    regulations can make."

2        And why -- what do you mean, "an

3    interesting case study," and why was it an

4    interesting case study?

5        A.   Chicago at that time actually did have a

6    ban on the private possession of handguns by

7    ordinary people unless they had registered them

8    prior to 1982, and -- so that it represented a

9    jurisdiction, which was probably as -- had as

10   strict regulation as any in the country at that

11   time.

12       And what we point out in the rest of

13   that sentence is that in that respect it's

14   similar to some of the European countries.

15   Something that was especially interesting, since

16   we were -- this article was published by the

17   Royal Economic Society in England.

18       Q.   Now, you say, "It was an interesting case

19   study of what difference government regulations can

20   make."

21       What was the difference that Chicago's

22   regulations made?

23       A.   The problem with the study, it's fair to

24   say, is that it was a study limited to Chicago

25   for the most part, and so that we were not able

COMPRESSED COPY

146

1   to reproduce the ethnographic study for other

2   cities that had more relaxed regulations on guns

3   or less stringent regulations.

4       But we were able to do comparisons using

5   other kinds of data.  And, in particular, we

6   were using the data that were being generated by

7   surveys in a number of cities through the drug

8   use forecasting program at that time, where

9   samples of people arrested were interviewed

10   about a variety of subjects, including their

11   relationship to guns.  And we had access to

12   those data and were able to analyze them.

13     Q.   Okay.  But my question was:  What

14   difference did you find that the government

15   Chicago's regulations made?

16       MR. WOODS:  I'm going to object to the form

17   of the question; assumes facts and vague and

18   ambiguous.

19       THE WITNESS:  We were able to demonstrate

20   that Chicago had one of the lowest gun ownership

21   rates by people arrested and one of the higher --

22   highest rates of people who said that they -- that

23   as arrestees, who said that they would like to

24   obtain a gun, but that it would take them a long

25   time to do so, and they didn't know how.

COMPRESSED COPY

147

1          So there was evidence in those data, the

2    drug use forecasting data, that Chicago was not an

3    easy place for thieves and other criminals to obtain

4    guns.  And, in fact, relative to -- to other cities

5    it was one of the most difficult.

6          And that -- that fact is possibly related

7    to the regulations that were in place at that time

8    in the City of Chicago.  At the end of the day we

9    could not say with confidence that that was true.

10          BY MR. THOMPSON:

11    Q.  All right.

12    A.  So --

13    Q.  Do you expect that it will become an easier

14    place for criminals to obtain guns now that it is

15    lawful for individuals to own handguns, provided

16    they're properly permitted?

17          MR. WOODS:  Objection to the form; vague,

18    ambiguous.

19          THE WITNESS:  So what has changed in

20    Chicago that might be relevant is that it is

21    possible now again, as it was before 1982, for

22    private citizens to obtain a gun and to register it,

23    keep it in their home.

24          And so that we might, in fact, see that the

25    prevalence of gun ownership increases somewhat.  And

148

1    if we did, then that would, generally speaking,

2    increase the availability of guns within the city.

3          So I would say that the answer is, yes, but

4    with the proviso that given that the registration

5    requirement and the requirement about how guns are

6    to be stored in the home, that this is unlikely to

7    be a large change.

8          BY MR. THOMPSON:

9      Q.   Do you know how many individuals now

10   lawfully possess a handgun in the City of Chicago?

11     A.   I do not know the registration

12   statistics in Chicago.

13     Q.   Do you have even a ballpark sense of how

14   many individuals have a registered handgun in

15   Chicago?

16     A.   I'm sorry.  I don't.  No.

17     Q.   Okay.  Do you have any sense as to how many

18   people have -- or strike that.

19          Do you have a sense as to the rate of

20   increase in lawful handgun ownership in the City of

21   Chicago since the passage of the July 2010

22   ordinance?

23     A.   So I have been told that -- that not a

24   great many people have registered guns since it

25   became legal, but I don't know whether that

158

1          THE VIDEOGRAPHER:  We are now back on the

2    record.  The time is 1:02.

3          BY MR. THOMPSON:

4      Q.   Professor, let's look back to your report,

5    which is page nine.  And to the second full

6    paragraph, last sentence, where it says, "While the

7    prevalence of gun ownership is not the only

8    determinant of the fractions of assaults and

9    robberies in which the perpetrator uses a gun, it is

10   in my opinion" -- "it is my opinion that it is one

11   important causal influence."

12         What are the other important causal

13   influences?

14     A.   So one influence is going to be the mix

15   of robberies and assaults that we see in a

16   particular time and place that the statistics

17   refer to, and -- for example, if the robbery

18   pattern in a particular city is more about

19   commercial robbery, then there may be a higher

20   use of guns than there would be otherwise.

21         And in the case of assaults if the

22   assaults are more about, for example, gang

23   conflicts or organized crime conflicts, then

24   there's going to be quite likely a higher use of

25   guns.

159

1    Q.   Why is there a high use of guns for gangs?

2    A.   It's often the case that gangs have a --

3    and I understand this to be the case in Chicago,

4    that they often keep a -- guns and use them to

5    protect territory or to actually engage in

6    conflict with other gangs as part of the general

7    escalation among gangs that occurs when a city

8    has a high participation in -- in this -- in --

9    in gangs as part of their, for example, drug

10    scene.

11         So it is a combination of kind of a

12    professional organization, if that's the

13    appropriate term, and -- that translates into

14    unusual access and incentive to obtain guns and

15    use them.

16    Q.   Okay.  Now, what are the other important

17    causal influences on the fractions of assaults and

18    robberies in which the perpetrator uses a gun?

19    A.   So the -- another potential causal

20    influence would be, as I say, the -- for

21    example, in the case of robberies, it is a mix

22    of perpetrators and targets that you see, and --

23         But it would be hard to sort that out

24    since the availability of guns may influence the

25    mix of targets.  It's easier for a robber who

COMPRESSED COPY

160

1    has a gun to rob commercial targets, rather than

2    individuals on the street, but it is also true

3    that if you look at a jurisdiction where there's

4    more commercial robberies, you'd expect to see

5    more gun use, just because that's a weapon that

6    the gun has a particularly high payoff in a

7    situation like that than -- even more so than on

8    the street, in terms of producing a successful

9    encounter.

10          I mean the robbery picture is always one

11   of trying to control the situation and use the

12   weaponry as part of that.  And it is sometimes

13   harder to control a -- say a 7-Eleven store than

14   it would be to control a single individual in an

15   alley somewhere.

16       Q.   Are there any other important causal

17   influences on the fraction of assaults and robberies

18   in which the perpetrator uses a gun?

19       A.   What -- what we found in the study that

20   we referenced earlier about the underground gun

21   market was that the percentage of arrestees who

22   reported that they owned a gun or had a gun

23   differed widely among cities, and that -- that

24   certainly was being influenced by the general

25   prevalence of gun ownership, but that wasn't a

164

1    particular jurisdiction has an impact on any crime

2    rate?

3         A.   Yes.  I think that the number of guns is

4    going to be an important factor in availability

5    and in the supply of guns flowing to the

6    underground market, and, furthermore, it is my

7    best guess, but I have not confirmed this, that

8    the number of guns in private hands is going to

9    be closely related to the prevalence of gun

10   ownership.  Unfortunately, I can't test that

11   guess directly from the data.

12        Q.   And is it your understanding that the more

13   guns there are in a jurisdiction, and, therefore,

14   the more availability and the more crimes available

15   for criminal -- guns available for criminals there

16   will be an increase in gun-related violence?

17        A.   So my findings have been that, quite

18   consistent, really going back to that article

19   from 1979, and certainly the more recent work,

20   that the effect of gun prevalence and gun

21   availability is to increase the percentage of

22   robberies and the percentage of assaults that

23   involve guns.

24        So, yes, is the answer.  That other

25   things equal, a jurisdiction with a high

165

1    prevalence of guns will have a higher percentage

2    of their robberies and assaults committed with a

3    gun.

4        Q.   Other things equal, will a jurisdiction

5    with a larger number of guns, but the same

6    percentage of households that own guns, have a

7    higher murder rate?

8        A.  I --

9        MR. WOODS:  Object on the grounds of

10   incomplete hypothetical.

11       THE WITNESS:  So I am not able to answer

12   that question from the evidence that I've looked at,

13   because in none of the studies that I've done have I

14   been able to distinguish between the number of guns

15   in circulation and the prevalence of gun ownership.

16       It is logically possible that there's some

17   difference, that they're not perfectly correlated

18   with each other, but it is not possible for me to

19   measure the number of guns in circulation.

20       BY MR. THOMPSON:

21       Q.  So you don't have an opinion on the

22   question I asked?

23       A.  That's right.

24       Q.  Okay.

25       A.  Yeah.

166

1       Q.   Now, let's -- okay.  Are there some people

2   who feel more secure because they are permitted to

3   carry a firearm lawfully for self-defense?

4       MR. WOODS:  Objection; foundation.

5       THE WITNESS:  I think what we observe is

6   that there are people who are willing to not only go

7   through the trouble of carrying a firearm, but to

8   pay a fee for -- for the permit that allows them to

9   do that.

10      So that we know that they are motivated to

11  carry a firearm.  I suppose that the motivation is

12  about security and self-protection, though in some

13  cases it might be something else, like showing off

14  or having the opportunity to intimidate other

15  people.

16      BY MR. THOMPSON:

17      Q.   Have you made any effort to try to quantify

18  the value of individuals feeling more secure by

19  virtue of their ability to lawfully carry a handgun?

20      A.   No, I have not.

21      Q.   All right.  Now, you say on page ten, on

22  the top of the document -- let's see.  The very

23  first line, quote, "I conclude that an increase in

24  gun ownership has on balance neither a deterrent

25  effect on violent crime, nor does it augment

167

1    violence rates."

2           Are you making that statement as it applies

3    to Chicago?

4           A.   I am making the statement on the basis

5    of the conclusion that follows from research

6    that I've done, where I look simultaneously at a

7    large number of jurisdictions and the patterns

8    that I see there.

9           Those patterns that have shown up in my

10   research in reliable fashion have been just what

11   it says here, that if you look at either a

12   cross-section or even a panel data study where

13   you're -- you're looking at the effect of

14   changes over time in gun prevalence that there's

15   no indication that the overall rates of robbery

16   or assault are changing or influenced by the

17   prevalence -- the prevalence of gun ownership.

18          So, again, since that's true for the 200

19   counties we looked at and true generally, it was

20   a reasonable inference that would -- it would

21   also apply to Chicago.

22          Q.   And you're making that inference?

23          A.   Yes.

24          Q.   Okay.  And then if we look at the last

25   sentence in that paragraph, you say, "On average a

168

1    ten percent increase in the prevalence of gun

2    ownership increased the homicide rate by about two

3    percent."

4        Will you expect that to be true for

5    Chicago?

6        A.   That would be my first and best guess

7    about the effect.  Yes.

8        Q.   Do you think that a law requiring that guns

9    kept in houses with minors that those guns be

10   secured would have any impact on the relationship

11   you are positing between gun prevalence and homicide

12   rates?

13       MR. WOODS:  And I'm going to object on the

14   grounds that it's beyond the scope of his expert

15   opinions in the case, as well as being an incomplete

16   hypothetical.

17       THE WITNESS:  So I -- I have no research on

18   that question, and there hasn't been any opportunity

19   to investigate it in the case of Chicago.  So my

20   expert opinion has not been formed.

21       BY MR. THOMPSON:

22       Q.   And are you making a causal claim in this

23   sentence that says, "A ten percent increase in the

24   prevalence of gun ownership" -- "gun ownership"

25   increased the homicide rate by about two percent"?

169

1          MR. WOODS:  I'm going to object to the form

2     of the question; vague and ambiguous.

3          THE WITNESS:  In effect I am.  I'm saying

4     that if you see an -- a jurisdiction that

5     experiences an increase in the prevalence of gun

6     ownership, then it is a predictable result that its

7     homicide will be higher as a result than it would

8     have been otherwise.

9          BY MR. THOMPSON:

10         Q.   Okay.  Now, when you make the statement,

11    "On average a ten percent increase in the prevalence

12    of gun ownership increased the homicide rate by

13    about two percent," are you including in that

14    measure of gun -- prevalence of gun ownership

15    illegally-possessed guns and lawfully-possessed

16    guns?

17         A.   The -- the measure that I have, again,

18    is the percent suicide with guns.  That's the --

19    the proxy that I've been using for the

20    prevalence of gun ownership, and I would say

21    that that proxy does not make that distinction.

22         Q.   Do you know whether there is a stronger

23    causal relationship between a prevalence of

24    illegally-possessed guns and homicide rates than

25    there is between lawfully-possessed guns and

COMPRESSED COPY

170

1    homicide rates?

2        A.   From -- from my research there's no

3    distinction between those two.  It is really the

4    prevalence of gun ownership in households -- or

5    gun possession, if you want to be technical

6    about it.

7        Q.   What research have you done that bears on

8    that issue, as to whether there's a stronger causal

9    impact of illegally-possessed guns as opposed to

10   lawfully-possessed guns on homicide rates?

11       A.   I have not looked at that specifically.

12   I've looked at the question about how does the

13   prevalence of gun ownership influence outcomes

14   where prevalence is defined in a way that is not

15   going to distinguish between whether the guns

16   are owned legally or illegally.

17       Q.   Right.  And so, I guess, my question is:

18   Do you have an opinion as to if you had a measure

19   that looked and identified prevalence of

20   illegally-possessed guns --

21       A.   Okay.

22       Q.   -- and you had a measure that identified

23   prevalence of lawfully-possessed guns, do you have

24   an opinion as to whether there would be a different

25   causal impact on homicide rates between those two

COMPRESSED COPY

171

1    effects?

2        MR. WOODS:  Objection to the form of the

3    question; vague, ambiguous, incomplete hypothetical.

4        THE WITNESS:  Offhand I don't see any

5    reason why there would be, but -- so I don't have an

6    opinion, but -- yeah.  I guess the right answer is I

7    don't have an opinion.  No.

8        BY MR. THOMPSON:

9        Q.   Okay.  Now, in Chicago the handgun -- the

10   ban on buying new handguns went into effect in 1982;

11   is that right?

12       A.   Yes.  That's my understanding.

13       Q.   And then in the late 1980's there was a

14   spike in homicide rates in Chicago; correct?

15       A.   Yeah.

16       Q.   And that was at a time where the number

17   of -- the gun prevalence of lawfully-possessed

18   handguns was not going up; correct?

19       MR. WOODS:  I assume, David, you're talking

20   about guns in Chicago; right?

21       MR. THOMPSON:  Yes, sir.

22       MR. WOODS:  Lawfully-possessed guns in

23   Chicago?

24       MR. THOMPSON:  Yeah.

25       THE WITNESS:  Oh, come on.  So the

172

1    statistics that I'm using pertain to Cook County,

2    rather than to Chicago.  And what those indicate is

3    that the prevalence of gun ownership dipped in the

4    early 1980's and climbed a bit after that through

5    the end of the 90's.

6        BY MR. THOMPSON:

7        Q.  Well, do you have any data on Chicago

8    itself, leaving aside the rest of Cook County?

9        A.  I only have data on Chicago for one

10   year, and I don't have this long-time series.

11       Q.  So you don't know whether there was a

12   change in the prevalence of gun ownership within

13   Chicago in the 1980's?

14       A.  I do not.  So -- because Chicago is --

15   what?  A bit more than half of Cook County, but

16   it's not the whole thing.

17       Q.  Isn't it reasonable to assume that if it

18   was illegal after 1982 to acquire a handgun in

19   Chicago until 2010, that during that period of time

20   lawful gun prevalence went down in the City of

21   Chicago during that time period?

22       A.  I think that that is a reasonable

23   presumption, and it is not something that I

24   studied.  Now -- for two reasons.  So it's

25   because my data are for Cook County and not for

COMPRESSED COPY

177

1    simply because it was an illustration of a

2    larger phenomenon.

3        Q.   Isn't it true that there are some

4    law-abiding members of those poor communities who

5    also don't leave their neighborhoods very often?

6        A.   I'm sure that it is true.  I think that

7    there are shut-ins who are scared to go out or

8    don't have the mobility for -- for economic

9    reasons, you know, but for people who get up in

10   the morning and take the bus to work or -- and

11   have kind of a greater familiarity with the

12   city, then this would not be such a challenging

13   enterprise at all.

14       Q.   Now, do you cite to -- if you'd turn to

15   page 11 in your report, footnote 27.  Your second

16   citation is to a press release from Mayor Daley,

17   entitled, "Gun Industry Floods Chicago With Illegal

18   Weapons City and County Charge."

19           Do you agree that Chicago was flooded with

20   illegal weapons in the 1990's?

21           MR. WOODS:  I'll object to the form of the

22   question; vague, ambiguous, foundation, if you're

23   referring to this article as defining what flood

24   means.

25           THE WITNESS:  So I think that we can

COMPRESSED COPY

178

1      forgive the Mayor some hyperbole about what was

2      found in Operation Gunsmoke that basically what they

3      found was -- when they had an undercover kind of

4      sting operation against 12 gun dealers in the

5      suburbs that they found in some cases that the

6      clerks were willing to sell the gun to them, despite

7      the fact that they were making it clear that they

8      had illegal intention for the use of the guns.

9             And so that creates the image of the

10     possibility that guns are going to be available

11     to -- to criminals and to gang members from these

12     dealers, which is true, which is accurate.  I

13     think -- I think there probably is some of that.

14            What we found in our study, though, based

15     on our trace data was that that flow of guns from

16     the suburbs into the city is not accounting for a

17     large percentage of the guns that are being used in

18     crime.  So --

19            BY MR. THOMPSON:

20        Q.  Is it 12 percent?

21        A.  It was 12 percent had been sold in the

22     previous three years in one of the suburban

23     dealers, and the police gun unit was convinced

24     that gang members would often send their

25     girlfriends -- this was a common story -- to buy

COMPRESSED COPY

179

1    guns for them, but that seemed to be a very rare

2    event, indeed, along the way.  So, again, based

3    on the trace data.

4        Q.   Where did the other guns come from, if only

5    12 percent are coming from the suburbs?

6        MR. WOODS:  Well, object to the form of the

7    question, as being vague and ambiguous.

8        THE WITNESS:  So I think that it's

9    important to distinguish between where are the guns

10   coming from ultimately, when did they -- how did

11   they first arrive in the city and what has happened

12   to them since then.

13       There are -- is a flow of guns that are

14   trafficked or otherwise brought in to the city over

15   time.  There certainly is a possibility of

16   illegally-owned guns.  But once they're in the city

17   then they recirculate.

18       And if you look at how the youths and

19   criminals that Venkotesh talked to were actually

20   obtaining their guns, they weren't dealing directly

21   with traffickers.  They weren't dealing directly

22   with suburban dealers.

23       They were -- they were kind of tapping into

24   this underground market, where guns, whatever their

25   origins, were circulating from hand to hand and not

181

1    of guns outside of the home"?

2        A.   That means the use of guns to illegally

3    threaten another person for the purposes of

4    robbery, rape, assault or to actually shoot.

5        Q.   Over the last ten years has the Chicago

6    Police Department engaged in police enforcement

7    targeted on illegal carrying?

8        A.   It has, and in -- I think that you can

9    go back further than that.  There is a tradition

10   in the Chicago Police Department of targeted

11   enforcement directed at confiscating guns that

12   are being carried illegally.

13       Q.   When did they start that?

14       A.   Well, I interviewed one source, who was

15   in a position to know, who said that perhaps in

16   the 1950's.

17       Q.   Okay.  Who was your source?

18       A.   The source is cited in the underground

19   gun market paper, where we mention it.  I

20   could --

21       Q.   It's all right.  We'll check.

22       A.   Yeah.

23       Q.   Okay.  Now, what steps have been taken by

24   the Chicago Police Department to engage in

25   enforcement targeted on illegal carrying?

COMPRESSED COPY

182

1          MR. WOODS:  I'm going to object on

2     foundation grounds.  If he knows.

3          THE WITNESS:  So the steps are to

4     provide -- I don't know whether incentives are the

5     right way to put it, but that the police leadership

6     has adopted a view that confiscating guns is a high

7     priority, that stopping carrying and -- and illegal

8     possession of guns is a high priority.

9          And that the patrolmen know that and are

10    especially eager to -- to confront people they think

11    might be carrying a gun, whether it's in a car or on

12    their person, and to confiscate the gun.

13         And that this shows up not only in special

14    programs, like Operation Cease Fire that was going

15    on for awhile, but also just as a routine matter.

16    And what Sudhir Venkotesh found in his neighborhood

17    was that the -- his respondents, his sources that he

18    was talking to, knew about this.  And the gang

19    members knew about it and the other criminals

20    realized that the police put a very high priority on

21    getting guns off the street.

22         BY MR. THOMPSON:

23    Q.  Has Chicago's ban on carrying, coupled with

24    police enforcement targeted on illegal carrying, in

25    fact, reduced the misuse of guns outside of the home

183

1     in Chicago?

2         A.   So I think the answer is that it's

3     plausible that it has, and I cannot tell you

4     that I have direct evidence that proves that

5     point or that supports that point.

6         Q.   What's your indirect evidence?

7         A.   The indirect evidence is that the -- the

8     fact that for large sections of the active

9     criminal community, if you call it that, do not

10    have a gun and do not carry a gun.  So that that

11    was what he was finding out and what is evident

12    from the surveys of arrestees, compared with

13    other cities, that there's a fairly low gun

14    ownership rate.

15        Q.   How do you --

16        A.   That the other side of this is that

17    Chicago has a high murder rate, and the murders

18    they do have are to a very large extent

19    committed by -- with guns.  So it clearly is not

20    completely effective, far from it.

21            But what -- what I think is likely to be

22    the explanation is that there's another

23    tradition in Chicago, which is large,

24    well-organized criminal gangs, more so than in

25    other cities, except perhaps Los Angeles and a

184

1    couple of other places, which engage on a

2    routine matter in high levels of deadly

3    violence.

4         So I think Chicago starts with a couple

5    of strikes against it, because of the gangs, but

6    that things would be worse if there was an open

7    market in guns.

8         Q.   Well, in the absence of a ban on carriage,

9    how would you expect Chicago's murder rate to differ

10   from the current level?

11        A.   So if public carrying were accepted,

12   then -- and resulted in -- in more public

13   carrying, that I can talk about the -- some of

14   the consequences that are associated with that.

15        Q.   Well, my question is:  How much would you

16   expect the Chicago murder rate to go up or down?

17        A.   I --

18        MR. WOODS:  I'm going to object on the

19   grounds of incomplete hypothetical.

20        Go ahead.

21        THE WITNESS:  I wish I could quantify the

22   answer, and I certainly am not in a position to do

23   that.  I think that if there was widespread legal

24   carriage in public that it would quite possibly make

25   the current police tactics more problematic and more

185

1    difficult to execute, and that there would be more

2    guns on the street that would be available that

3    could be stolen.

4         Who knows?  I mean there's a variety of

5    consequences.  It might escalate kind of routine

6    confrontations that people have and induce still

7    further gun carrying, and -- and so forth.  We

8    could -- we could spell it out.

9         The net effect of all of that is,

10   unfortunately, it's something that has not -- is not

11   something we can study right now or draw an

12   empirical conclusion to.

13        BY MR. THOMPSON:

14   Q.   Well, why can't you?

15   A.   Well, we haven't tried it, but the --

16   the -- the problem is that even in the case

17   where we have something that looks like a good

18   basis for exploring the effect of more

19   permissive carrying laws, that is the -- the

20   spread of the right to carry laws to something

21   like 33 states in the country, even there it has

22   turned out to be very difficult to determine

23   statistically what effect they have had on the

24   amount of violence or the homicide rate or other

25   kinds of crime, for that matter.

186

1      Q.   There certainly hasn't been a spike in

2   those jurisdictions that have allowed right to

3   carry, correct, a spike in their murder rates?

4          MR. WOODS:  Objection to the form; vague,

5   ambiguous, vague as to time too.

6          THE COURT REPORTER:  Sorry?

7          MR. WOODS:  Oh, I said, vague as to time as

8   well.

9          THE WITNESS:  Certainly has not been a

10  spike.  The evidence is -- I guess a nice word would

11  be complicated.  There are jurisdictions.  There are

12  states that have adopted the right to carry law and

13  experienced an increase in homicide, and there's

14  also been the reverse.

15         And what it has not been possible to do is

16  to isolate any kind of consistent result or to

17  document what might be thought of as a causal

18  average result in this area, and it's not through

19  lack of trying.  A lot of economists and others have

20  worked away at this problem.

21         BY MR. THOMPSON:

22      Q.   If a ban on carriage were lifted within the

23  City of Chicago, would you expect there to be

24  widespread lawful carriage of firearms in the City

25  of Chicago?

188

1    clear and sustained intent, coupled with the

2    capability of killing, that the chances increase,

3    and so that there is --

4        BY MR. THOMPSON:

5        Q.   I'm sorry.  "There is" --

6        A.   There is certainly some cases where

7    there is a sustained attack with a coup de grace

8    shot to the head at the end of it or something

9    of that sort that have a very high probability

10   of resulting in death.

11       Those cases are unusual.  The bulk of

12   people who are shot and killed, there's only one

13   wound, or they -- in some other way it's clear

14   that -- that there was a spontaneous encounter

15   and not a sustained clear intent to kill.

16       Q.   Would you agree that an assailant's choice

17   of weapon is an indicator of his intent to inflict

18   harm?

19       MR. WOODS:  Objection; overbroad,

20   incomplete hypothetical, vague and ambiguous.

21       THE WITNESS:  I think that the assailant's

22   choice of weapon is most often an indicator of the

23   weapons he has immediately available, because such a

24   large percentage of the robberies and assaults

25   are -- occur spontaneously out in public, rather

189

1    than being a planned and deliberate attack.  So --

2    but is it a good statistical indicator of intent?  I

3    would say, no.

4            BY MR. THOMPSON:

5        Q.   Would you agree that an assailant who is

6    determined to kill his victim probably will use a

7    gun if it is available?

8            MR. WOODS:  Same objections.

9            THE WITNESS:  Yeah, I suppose I would say

10   if we're talking about a professional hit man, then

11   perhaps that -- that would be the likely choice of

12   weapon.  This is not the bulk of homicides that we

13   actually have.

14           BY MR. THOMPSON:

15       Q.   Well, why do you -- leaving professional

16   hit men to the side, if someone had an intent to

17   kill another person, why wouldn't they use a gun?

18       A.   If --

19           MR. WOODS:  Same objections.

20           THE WITNESS:  If they had one readily

21   available?

22           BY MR. THOMPSON:

23       Q.   Yeah.  If they had one available, which was

24   my -- my question.

25           Yeah.  If they had one available, why

190

1    wouldn't they use the gun?

2        A.   I mean I -- I think we could probably

3    come up with reasons, because we've all seen

4    enough detective shows and that sort of thing,

5    but I think by and large that -- that that may

6    be the choice, just as it's often the choice to

7    use a gun, because you want to control the

8    situation or -- for some other reason.

9        Q.   How does using a gun allow a person to

10   control the situation?

11       A.   Well, again, in the case of robbery,

12   which is something that I've studied

13   extensively, the weapon type determines whether

14   it's possible to get the victim or victims to

15   comply with the robber's demands and to do so

16   without resistance and to actually hand over the

17   wallet and watch, whatever they're after.

18           And -- and a gun provides the power and

19   authority that -- that a robber can use to gain

20   control in a way that other types of weapons

21   that are commonly available do not do.

22       Q.   And is the same true for a law-abiding

23   citizen protecting him or herself, does a gun

24   provide power and authority to gain control of the

25   situation in a way that other weapons would not?

COMPRESSED COPY

191

1          MR. WOODS:  Objection to the form;

2     incomplete hypothetical, calls for speculation,

3     vague and ambiguous.

4          THE WITNESS:  I -- I think I would agree

5     with that under the proviso that the citizen have

6     the opportunity to actually produce the gun and to

7     use it against whoever he considers to be the

8     assailant under the circumstance and that he knows

9     how to use it.  That this would be certainly a

10    scenario where you could imagine that it provided

11    effective self-defense.

12         BY MR. THOMPSON:

13    Q.   Do any of the studies you cite to in your

14    report purport to hold constant for an attacker's

15    intent to kill?

16         MR. WOODS:  Object to the form of the

17    question; vague and ambiguous as to what you mean by

18    hold constant or attempt to hold constant.  It's

19    also overbroad.

20         THE WITNESS:  But none of the studies

21    that -- to the best of my recollection, attempted to

22    do that.  Of course, it's not obvious what exactly

23    you would use as a measure of intent.  All you have

24    ordinarily is a very scanty amount of information

25    about the circumstances.

194

1    with a trigger lock to be available?

2        A.   I think that that would be an

3    intermediate case that has to do with the

4    question of how easy or difficult it is to cut

5    off the trigger lock and make the gun usable.

6        Q.   And when you talk about the availability of

7    guns, do you consider a gun secured by a cable lock

8    to be available?

9        A.   It is the same thing, but it should be

10   said that while these are relevant questions

11   to -- if what we're talking about is introducing

12   guns into the underground market through theft,

13   there is also a flow of guns to the underground

14   market through voluntary exchange.

15         So that members of the family might take

16   the gun, unlock it and then sell it or transfer

17   it to somebody else.  And if there are guns

18   available, even if some of the time they're

19   locked up, it's not -- does not mean that

20   they're not ultimately going to be available and

21   transferred.

22       Q.   In measuring the availability of guns in a

23   community, are you aware of any studies that have

24   attempted to ascertain the degree to which gun

25   owners in that community keep their firearms locked

**COMPRESSED COPY**

195

1    in a safe?

2        A.   Yes.  There are surveys of that sort.

3        Q.   Okay.  And have you utilized that

4    information in trying to assess -- that survey

5    information in trying to assess the degree to which

6    gun availability impacts crime rates?

7        A.  I have not used it.  No.  Because there

8    are -- while there are occasional one-time

9    surveys done that ask that question, that is not

10   available for the number of jurisdictions and

11   the number of years that would support the kind

12   of study that I'm doing.

13       Q.  Okay.  Now --

14       A.   Nonetheless, it should be pointed out

15   that my measure does well, and -- so that it's

16   -- you know, it's not as refined.  It's not as

17   it might be, but it is -- it certainly appears

18   to be predictive.

19       Q.   Isn't it true that it's easy for criminals

20   in Chicago to obtain a firearm illegally?

21       MR. WOODS:  Objection to form; vague,

22   ambiguous.

23       THE WITNESS:  So I -- I think that it is

24   possible that for some criminals it is easy to

25   obtain a gun for -- for criminal use.  For a member

COMPRESSED COPY

196

1    of a gang, for example, it might be that they can

2    get access to the gang's arsenal.

3        But what we found from our study in the

4    underground gun market from the variety of sources

5    of data we had, that most criminals do not have a

6    gun.  They don't own one themselves.  And if they

7    express an interest in obtaining a gun, often will

8    say that they would have difficulty, and it would

9    take them a long time.

10        Furthermore, that the prices in which guns

11    change hands are inflated in Chicago, well above

12    what they should be selling at by eBay prices or

13    other used gun prices, and these markets have a

14    great deal of friction.  So that there are high

15    transactions costs.

16        BY MR. THOMPSON:

17        Q.   When you say, "eBay prices," guns aren't

18    sold on eBay, are they?

19        A.   Guns are advertised on eBay.  They

20    officially are not sold on eBay.  So they have

21    to -- the transfer would have to go through an

22    FFL or person.

23        Q.   Have you compared the price of firearm --

24    of specific makes and models identified in the

25    underground market study that were being sold and

197

1    compare them to prices being advertised on eBay?

2       A.   We -- we used a comparison based on some

3    catalog, I believe, is what we were looking at,

4    but we did attempt to make an assessment of the

5    prices that Sudhir Venkotesh was recording based

6    on his conversations with prices of what you

7    might pay if you went to buy a used handgun at a

8    dealer's, for example.

9       Q.   Did you have the make and year of the

10   handgun that the criminals had used?

11      A.   Yeah.  In some cases we were able to get

12   that information.

13      Q.   Now, let's go to page 13 of your report,

14   and in the third full paragraph, under the heading

15   A, you say, the first sentence, "Of Chicago

16   robberies with a handgun in 2010, 68 percent

17   occurred in a location identified as an alley,

18   street, public park, sidewalk or public parking lot

19   or garage."

20          What is your source for that statement?

21      A.   This was -- the Chicago Police

22   Department had a tabulation -- detailed

23   tabulation of robberies by location.

24      Q.   Was this on their Web site?

25      A.   This was provided to me by Ranjit.

199

1    would have been necessary for the shooter to

2    actually carry the gun with them, and as they

3    move away from their own residence.

4         But it should be said that there is no

5    indication in the data whether these residential

6    locations are the residents of the shooter.  So

7    in many cases these might be somebody else's

8    residence or yard or whatever.

9         And so, in fact, this is another way in

10   which this was very conservative as a measure.

11   And the true percentage that would require

12   carriage in order to get the gun from the home

13   to the location of the attack would be more than

14   90 percent in the case of robberies and more

15   than 82 in the case of homicide.

16      Q.   All right.  Now, let's look at page 14.

17   You reference in the second paragraph a Pittsburgh

18   police department program.  Tell me how that worked,

19   that Firearm Suppression Patrol program?

20      A.   This was a program that was done on an

21   experimental basis in 1998 for a limited period

22   of time in two neighborhoods, both of them high

23   crime.  Where some days of the week there would

24   be the intervention, and the other days there

25   would be business as usual.

**COMPRESSED COPY**

200

1           The intervention in one of the

2    neighborhoods was focused on stopping cars that

3    had some kind of violation and then looking for

4    a gun, and on the -- the other neighborhood, it

5    was focused on pedestrians.

6           And involved given reasonable cause,

7    whatever the correct legal term is, a stop and

8    frisk, and then -- with the goal of -- of

9    confiscating guns.

10      Q.   In Pittsburgh at the time of this program

11   citizens who qualified could get a permit and carry

12   a gun lawfully; is that correct?

13      A.   I believe that's right.  Yeah.

14      Q.   And in Indianapolis at the time of the

15   program you referenced there, law-abiding citizens,

16   who are otherwise qualified to meet the criteria for

17   a permit, could lawfully carry a firearm; is that

18   correct?

19      A.   I -- I don't know the answer to that,

20   but I'm willing to believe it, if you tell me.

21      Q.   We'll sort that out later, but --

22      A.   Yeah.

23      Q.   -- I believe that is the case.

24          Now, in your next -- in your third

25   paragraph, first sentence, you reference an

201

1    unprecedented reduction in violent crime.  What do

2    you mean by the term violent crime?  How do you

3    define it?

4        A.   So violent crime would be, especially

5    robbery and murder or criminal homicide, but

6    would include aggravated assault and rape as

7    well.

8        Q.   Okay.  All right.  Now, let's turn to page

9    15 of your report.  And under heading C, in the

10   second sentence, you reference the phrase -- you use

11   the phrase, "Nominally private spaces."  Do you see

12   that?

13       A.   Yes, uh-huh.

14       Q.   What do you mean by the phrase, "nominally

15   private spaces"?

16       A.   That these are private property, but in

17   more public -- with direct public access.

18       Q.   Is a garage a nominally private space in

19   your opinion?

20          MR. WOODS:  Objection; overbroad, vague,

21   ambiguous.

22          THE WITNESS:  Yeah, I -- again, it's not a

23   technical term that has a precise definition, I

24   think.

25          BY MR. THOMPSON:

COMPRESSED COPY

202

1      Q.   But as you're using the term -- these are

2   your words.  You wrote them.

3      A.   Uh-huh.

4      Q.   Do you mean to include the term garage in a

5   nominally private space?

6         MR. WOODS:  Same objections.

7         THE WITNESS:  That -- I would say that my

8   reference was to open spaces, such as yards and

9   porches.

10        BY MR. THOMPSON:

11     Q.   So a garage would be actually a private

12  space?

13     A.   Something --

14        MR. WOODS:  Objection to the form; vague

15  and ambiguous.

16        BY MR. THOMPSON:

17     Q.   As opposed to a nominally private space;

18  correct?

19        MR. WOODS:  Same objections.

20        THE WITNESS:  I think that to the extent

21  that a garage does not have direct open access to

22  the street that I would consider it to be more,

23  strictly speaking, private.  Yes.

24        BY MR. THOMPSON:

25     Q.   Okay.  Now, when you talk about -- in the

203

1    last sentence, "If a bullet fired from one space

2    into the other would not respect the nominal change

3    in ownership status, there's no reason to expect

4    that outcomes which are true on the street would not

5    hold true just off of it."

6            What are you trying to say here?

7        A.   So the -- the notion here is that

8    somebody who is carrying a gun on their property

9    in the yard, whatever it is, is in a position in

10   these kinds of private spaces to threaten the

11   passing public using a gun.

12           And so that they could -- they could use

13   a gun if -- if the occasion arose to commit a

14   crime or to use an inappropriate threat to

15   somebody that was passing by in the same way

16   that they could if they were 100 yards away or

17   ten miles away.

18       Q.   Ten miles away?

19       A.   Right.  I mean that -- that this is an

20   open space with immediate access to the public

21   in the sense that people are driving and walking

22   past, and that this is the -- the issue that

23   arises in this case.

24       Q.   And what about people in their garages with

25   the garage door shut, is that a concern to you?

204

1        MR. WOODS:  Objection to the form; vague,

2    ambiguous.

3        THE WITNESS:  Yeah, I think -- personally I

4    would make a distinction with that.

5        BY MR. THOMPSON:

6        Q.   Distinction between a garage -- being in a

7    garage, with the garage -- all of the doors and the

8    garage doors shut and being in your house, you would

9    draw a distinction?

10       A.   Right.  I would see the garage with the

11   garage door shut is more similar to the house --

12       Q.   Okay.

13       A.   -- in that circumstance.  Yeah.

14       Q.   All right.  Now, let's turn to page 17 of

15   your report.  Actually, sorry.  Page 18, the last

16   paragraph.  You say, in this last paragraph,

17   "Finally, in judging the utility of widespread gun

18   carrying it is worth noting the results of two

19   surveys that use" -- excuse me -- "that gun use

20   against adults to threaten and intimidate is far

21   more common than self-defense gun use by them.  That

22   most self-reported self-defense gun uses are

23   probably illegal and may be against the interests of

24   society."

25            Were these nationally representative

205

1    surveys?

2         MR. WOODS:  Object to the form of the

3    question; vague and ambiguous.

4         THE WITNESS:  These were surveys conducted

5    by Harvard University in 1996 and 1999, national

6    samples.  To the best of my memory, I believe one of

7    them was just of gun owners, and the other was of

8    the public at large.

9         BY MR. THOMPSON:

10        Q.  And do you know who the judges were that

11   Professor Hemenway used to make these determinations

12   about legality?

13        A.  I do not know their identity.  No.

14        Q.  Do you know where they came -- what court

15   they served on?

16        A.  No.

17        Q.  Okay.

18        A.  No.

19        Q.  Is it true that the overwhelming majority,

20   over 99 percent, of those who have a concealed carry

21   permit do not use their guns in the commission of a

22   crime?

23        A.  That -- I certainly am not in a position

24   to say that that's true or -- simply because I

25   don't think we know what -- what people are

COMPRESSED COPY

218

1     Q.  Yes, and that wasn't a scientific study,

2   was it?

3        MR. WOODS:  Objection to the form; vague,

4   ambiguous.

5        THE WITNESS:  I think it was a study

6   conducted by the police as an undercover sting

7   operation where they did collect data on the

8   responses.

9        BY MR. THOMPSON:

10      Q.  But they weren't trying to create a

11   random -- they didn't go to a random set of dealers,

12   did they?

13      A.  I don't know how they selected the 12

14   dealers they went to.  No.  It was a proof of

15   concept.

16      Q.  The police generally don't try to

17   investigate a random sample of people, do they?

18       MR. WOODS:  Objection to the form;

19   foundation, overbroad, vague.

20       THE WITNESS:  I don't know what they did in

21   this case in selecting the dealers.

22       BY MR. THOMPSON:

23      Q.  But my question is, as a general police

24   practice are you familiar with any police department

25   anywhere that said, oh, we're going to conduct this

219

1   investigation by looking at a random sample of

2   potential criminal actors?

3        MR. WOODS:  Same objections.

4        THE WITNESS:  I mean the police have been

5   remarkably open to the idea of running experiments

6   in partnership with investigators like myself that

7   included random -- random assignment.

8        BY MR. THOMPSON:

9     Q.  For investigations?

10    A.   Not for investigations of individuals so

11  much as, for example, hot spots policing of for

12  patrol activity.  So I would not want to fault

13  the police for being unscientific in general.

14    Q.   We're not faulting them.  I'm just saying

15  can you point to any instance in which they've done

16  an investigation based on, you know, taking a random

17  sample of potential suspects?

18        MR. WOODS:  Same objection; asked and

19  answered.

20        (NO AUDIBLE RESPONSE WAS GIVEN BY THE

21  WITNESS.)

22        BY MR. THOMPSON:

23    Q.   All right.  Well, let's move on.

24        In any event, isn't it true that the fact

25  that a gun was traced to an FFL isn't proof that the

220

1    FFL did anything wrong?

2        A.   That -- that is true certainly in a --

3    for an individual case, that it could not be

4    convicted in court based just on that

5    observation.  Yes.

6        Q.   If you were trying to assess the

7    culpability of an FFL based solely on the incidence

8    at which the guns it sold ended up being traced,

9    would you want to hold constant for the income level

10   and the race and the urbanization of its customer

11   base and other variables that are highly correlated

12   with crime rates?

13       MR. WOODS:  Objection; assumes facts.

14       THE WITNESS:  So the question -- I'm

15   sorry -- is about if I want to do what with an FFL?

16       BY MR. THOMPSON:

17       Q.   Well, they are these studies that seem to

18   suggest this FFL is a bad actor --

19       A.   Uh-huh.

20       Q.   -- because look at all of these guns

21   that --

22       A.   Right, right.

23       Q.   -- end up being traced in the hands of

24   criminals.

25       A.   Right.

COMPRESSED COPY

221

1      Q.   And it's a disproportionate share.

2      A.   Yeah.

3      Q.   And what I'm suggesting is if you wanted to

4   look at that scientifically to determine whether

5   that FFL really was a bad actor, wouldn't you want

6   to try to hold constant for the variables that are

7   highly correlated with crime rates among its

8   customer base to see, you know, what is the race,

9   ethnicity, poverty level, urbanization of its

10   customer base?

11      MR. WOODS:  Objection to the form of the

12   question.  It's also compound.

13      THE WITNESS:  Yeah, I mean I think that we

14   would need to have a conversation about that, about

15   what the goal is.  Presumably the goal is not simply

16   to find fault with certain FFLs, but, rather, it is

17   to reduce the flow of guns to criminals.

18      And so that if you have FFLs operating in

19   high crime areas of town, it's quite reasonable that

20   you would hold them to a different standard, just

21   because they are exposing that neighborhood to more

22   gun crime than might be true for a rural dealer

23   somewhere that didn't have the same kind of flow.

24      The other thing is that, you know, if

25   you're going to investigate dealers, you want to

222

1    look at, not just traced guns, but also be alert to

2    the possibility of off-the-book sales and -- that

3    will never be traced back to -- to them in the first

4    place.

5         BY MR. THOMPSON:

6         Q.   Does the ATF have sufficient resources in

7    2011 to investigate and properly regulate the 1.2

8    percent of FFLs who are selling 50 percent of the

9    guns that get traced?

10        A.   I mean I think that what we have is the

11   results of the inspector general report from

12   several years ago that says that the ATF is

13   doing a poor job of regulating gun dealers right

14   now.

15        It is possible with the same resources

16   that they could do a somewhat better job, but,

17   for whatever reason, they seem like at the

18   moment they are not doing a good job.

19        Q.   You say, "at the moment."  Wasn't that

20   study based on --

21        A.   Several years ago.

22        Q.   Yeah.  Nine years ago.

23        A.   (WITNESS NODS HEAD UP AND DOWN.)

24        Q.   Do you know whether the Obama

25   administration has a greater commitment to the

223

1    mission of ATF than the Bush administration?

2         MR. WOODS:  Objection to the form of the

3    question; vague, ambiguous.

4         THE WITNESS:  I -- I don't know for a fact

5    about what has happened to the resources available

6    to the ATF or -- or to how they're deployed.

7         BY MR. THOMPSON:

8         Q.   If Chicago came to you and asked you for

9    advice based on your experience as to how to reduce

10   their murder rate, what do you think the most

11   effective things the City of Chicago could do to

12   reduce its murder rate?

13        MR. WOODS:  Objection to the form; beyond

14   the scope of what he's been asked to look at in this

15   case.

16        THE WITNESS:  No.  I certainly would enjoy

17   the chance to talk to the City of Chicago about that

18   issue, and that it probably is something quite

19   different than -- than this discussion, but whatever

20   I told them I think that I would certainly emphasize

21   the continuing importance of a gun focus and suggest

22   perhaps some ways to improve on that or to

23   strengthen it.

24        BY MR. THOMPSON:

25        Q.   What should they be doing differently about

224

1    guns from what they're doing now?

2         MR. WOODS:  So I'm going to object on the

3    grounds it's beyond the scope of what the Doctor has

4    been tendered to talk about in this case.

5         THE WITNESS:  Yeah, I would -- let me

6    just -- let me just say one thing.  I think that it

7    would be productive to have a -- a clear rewards

8    program for tips leading to the arrest and

9    confiscation of guns by high school kids and middle

10   school kids, and that that might be something that

11   would help with the grave problem of violence in the

12   Chicago schools, and -- that that -- that would

13   reduce the -- help reduce the grave problem about

14   violence in the Chicago schools and to and from

15   schools.

16        BY MR. THOMPSON:

17    Q.   Anything else?

18        MR. WOODS:  Same objection.

19        THE WITNESS:  Yeah, I don't think that

20   there's anything else that is in the context of the

21   current material.

22        BY MR. THOMPSON:

23    Q.   But anything else you can think of, even if

24   it's not in the context of the current material?

25        MR. WOODS:  Same objection.

COMPRESSED COPY

230

1    second sentence, it says, "The Kansas City results

2    show that removing illegal weapons from a high crime

3    neighborhood may be a key strategy in reducing

4    firearm-related violence."

5         Would you agree that removing illegal

6    weapons from a high crime neighborhood is a key

7    strategy in reducing firearm-related crime?

8         A.   I think that that certainly makes sense.

9         Q.   Okay.  And do you recall what the Kansas

10   City program was that was being described here?

11        A.   I am afraid I don't recall in detail.

12        Q.   That's fine.  We don't have to --

13        Do you know what percentage nationally of

14   people who commit murder have a prior felony

15   conviction?

16        A.   No.  I don't know nationwide what the

17   percentage is.  I did do a study several years

18   ago for the State of Illinois.

19        Q.   Okay.  And what did you find?

20        A.   We found that for adult defendants 42

21   percent had a felony conviction.

22        Q.   Of the remaining -- it may have been 43

23   percent, but --

24        A.   Maybe it was 43 percent.  Okay.

25        Q.   But of the remaining, let's call it 57

231

1    percent, do you know what percentage of them were

2    mentally ill and would have been disqualified from

3    lawfully purchasing a weapon due to mental illness?

4       A.  I don't know the answer to that.  To be

5    disqualified, of course, in -- as an operational

6    matter, they not only have to be mentally ill,

7    but they have to be in records that are

8    accessible in whatever background check as

9    having been adjudicated or involuntarily

10   committed.

11       MR. THOMPSON:  Okay.  And I'd like to ask

12   the court reporter to mark as Cook 17 --

13       (PLAINTIFFS' EXHIBIT 17 WAS MARKED FOR

14   IDENTIFICATION.)

15       BY MR. THOMPSON:

16      Q.  -- a document entitled, "Criminal Records

17   of Homicide Offenders."

18       From this study do you think it's possible

19   to infer the percentage of murderers in Chicago who

20   have a prior felony conviction?

21      A.  No.  We -- we did not break out Chicago

22   as a separate case from the Illinois' data.

23      Q.  Okay.  Do you have an opinion as to

24   approximately how many of the murders in Chicago are

25   committed by gang members?

COMPRESSED COPY

232

1          A.  I --

2               MR. WOODS:  And I'll object to the form as

3     being vague, overbroad.

4               THE WITNESS:  I -- I don't have the

5     statistic on that.  So I could not offer it.  I

6     think that the -- that's something that is

7     documented in the supplementary homicide reports

8     typically, but I don't -- I don't have access to

9     that.

10              BY MR. THOMPSON:

11         Q.   Okay.  Is it true that in Chicago homicide

12    offending is concentrated among individuals with a

13    criminal record?

14              MR. WOODS:  I'll object again.  It's

15    overbroad, vague, ambiguous.

16              THE WITNESS:  What we found for the State

17    of Illinois was that it -- that defendants in

18    homicide cases were far more likely to have a felony

19    conviction than an average person in the State of

20    Illinois.  And I am -- do not have direct

21    information on Chicago, but it must be true that

22    that is also true in Chicago.

23              BY MR. THOMPSON:

24         Q.   Now, you referenced earlier the Violence

25    Policy Center tabulation of homicides allegedly

237

1    speculative statement.  It is -- in the context of

2    critiquing case control studies and in the spirit

3    of -- of typical debates within social science about

4    methods and causation, they are saying, look, there

5    is a possibility that the people who become homicide

6    victims are different in this particular way, in

7    terms of their expectation.

8          There's no direct evidence on that.  So do

9    I agree that it's with the literal meaning of the

10   sentence that says, well, that may be true, it is --

11   sure.  I do.

12         BY MR. THOMPSON:

13     Q.   Okay.  Now, let's go down that page to the

14   last paragraph and the second sentence.  And it

15   says, "The issue of substitution of the means of

16   committing homicide or suicide has been almost

17   entirely ignored in the literature."

18         Do you agree with that statement?

19         MR. WOODS:  Well, let me just say that I

20   think this is -- well --

21         THE WITNESS:  Yeah, I mean --

22         MR. WOODS:  That's okay.  Go ahead.

23         THE WITNESS:  I -- I -- I would say that

24   this statement is very far from the truth.

25         BY MR. THOMPSON:

238

1     Q.   Okay.  By the way, of -- how many of the --

2     the people who were on this panel were

3     distinguished; correct?

4     A.   They are distinguished.  Yes.

5     Q.   And --

6     A.   And they were --

7     Q.   All of them signed off on this statement;

8     correct?

9          MR. WOODS:  I don't know if he was done

10    answering his last question.

11         THE WITNESS:  No.  That -- I am.

12         They were distinguished, and they were

13    selected for the most part, because they had not

14    been involved in research on this topic.

15         BY MR. THOMPSON:

16    Q.   Okay.  And they all signed off on the

17    statement I just read; correct?

18    A.   Yes.

19    Q.   All right.  Now, let's turn -- you'll be

20    glad to know -- to page 197.

21         (DISCUSSION HELD OFF THE RECORD.)

22         BY MR. THOMPSON:

23    Q.   And looking at the first paragraph, the

24    last independent clause, which reads, "The cross

25    national surveys do not reveal a consistent

239

1    association between gun ownership and overall

2    suicide rates."

3            Do you agree with that statement?

4            MR. WOODS:  Objection; foundation.

5            THE WITNESS:  I think it is true that in a

6    one time cross-section study of suicide that takes

7    this global perspective that there would -- there --

8    that reading here, about the lack of consistent

9    association, would be accurate.

10           BY MR. THOMPSON:

11       Q.   Okay.  And then the next sentence, it says,

12   quote, "Although, gun ownership rates in the

13   United States are much higher than in most other

14   developed countries, the rates of suicide in the

15   United States rank in the middle," close quote.

16           Is that an accurate statement?

17       A.   Yes, it is.  And I think what the

18   explanation is that the suicide rate in a

19   country is not influenced only by weapon

20   availability.

21       Q.   Okay.  Now, let's turn to page 199, and to

22   the second paragraph, "The ultimate sentence."

23           (DISCUSSION HELD OFF THE RECORD.)

24           BY MR. THOMPSON:

25       Q.   It says, "Gun ownership rates do not seem

240

1    to explain overall suicide trends across countries

2    or across time in the United States."

3         Do you agree with that statement?

4         MR. WOODS:  And let me just object to the

5    extent this goes beyond the subjects on which the

6    Professor has been retained to speak in this case.

7         THE WITNESS:  I -- I would disagree with

8    this in the sense that I think there is evidence

9    from the pattern of suicide -- suicides over time at

10   the state level in the United States in the study

11   done by Mark Duggan years ago that provided some

12   evidence that, in fact, gun ownership was

13   influencing the suicide rate.

14        BY MR. THOMPSON:

15     Q.   The Duggan report was available to the

16   authors of this document; correct?

17     A.   Yes, it was.

18        MR. WOODS:  Objection; foundation.

19        THE WITNESS:  It was, yeah.

20        MR. THOMPSON:  Okay.  Why don't we change

21   the tape.

22        THE VIDEOGRAPHER:  This is the end of tape

23   number five.  The time is 3:22.

24        (RECESS FROM 3:22 P.M. TO 3:24 P.M.)

25        THE VIDEOGRAPHER:  This is tape number six

COMPRESSED COPY

248

1             CERTIFICATE OF REPORTER

2      STATE OF NORTH CAROLINA  )

3      COUNTY OF PERSON        )

4           I, LISA A. DeGROAT, the officer before whom

5      the foregoing deposition was taken, do hereby

6      certify that the witness whose testimony appears in

7      the foregoing deposition was duly sworn by me; that

8      the testimony of said witness was taken by me to the

9      best of my ability and thereafter reduced to

10     typewriting under my direction; that I am neither

11     counsel for, related to, nor employed by any of the

12     parties to the action in which this deposition was

13     taken; and further, that I am not a relative or

14     employee of any attorney or counsel employed by the

15     parties hereto, nor financially or otherwise

16     interested in the outcome of the action.

17          This, the 30th day of September, 2011.

18

19     _____

20     LISA A. DeGROAT

21     Registered Professional Reporter

22     Notary Public in and for

23     County of Person

24     State of North Carolina

25     Notary Public Number 19952760001

EXHIBIT 4

# GUN CONTROL AFTER *HELLER*: THREATS AND SIDESHOWS FROM A SOCIAL WELFARE PERSPECTIVE

Philip J. Cook[*]

Jens Ludwig[**]

Adam M. Samaha[***]

*What will happen after* District of Columbia v. Heller? *We know that five justices on the Supreme Court now oppose comprehensive federal prohibitions on home handgun possession by some class of trustworthy homeowners for the purpose of, and maybe only at the time of, self-defense. Perhaps the justices will push further and apply* Heller's *holding to state and local governments via the Fourteenth Amendment. But the majority opinion in* Heller *offered limited guidance for future cases. It did not follow a purely originalist method of constitutional interpretation, nor did it establish a constraining doctrinal framework for evaluating firearms regulation—although the opinion did gratuitously suggest that much existing gun control is acceptable. There is significant room for judges to maneuver after* Heller. *In the absence of more information from the Supreme Court, we identify plausible legal arguments for the next few rounds of litigation and assess the stakes for social welfare.*

*Based on available data, we conclude that some salient legal arguments after* Heller *have little or no likely consequence for social welfare. For example, the looming constitutional fight over local handgun bans—an issue on which we present original empirical data—seems largely inconsequential. The same can be said for a right to carry a firearm in public with a permit. On the other hand, less prominent legal arguments could be quite threatening to social welfare. At some point judges might draw on free speech doctrine and presumptively disfavor taxation or regulation targeted especially at firearms. This could have serious*

\* ITT/Terry Sanford Professor of Public Policy Studies; Professor of Economics and Sociology and Associate Director, Terry Sanford Institute of Public Policy.

\*\* McCormick Foundation Professor of Social Service Administration, Law, and Public Policy, University of Chicago.

\*\*\* Assistant Professor of Law and Herbert & Marjorie Fried Teaching Scholar, The University of Chicago Law School.

We thank participants at the UCLA Law Review symposium on Second Amendment rights, for which this Article was written, and Hanna Chung and Aditi Paranjpye for their excellent research assistance.

*consequences. In addition, and perhaps most important, Second Amendment doctrine might deter innovative regulatory responses to the problem of gun violence. The threat of litigation may inhibit useful policy experimentation ranging from personalized firearms technology and the microstamping of shell casings, to pre-market review of gun design, social-cost taxation, gun-owner insurance requirements, and beyond.*

INTRODUCTION ..................................................................................................1042
I. GUNS, RISKS, AND REGULATION IN THE UNITED STATES ...................................1045
   A. Gun Ownership..........................................................................................1045
   B. Gun Violence..............................................................................................1047
   C. Gun Regulation by Ordinary Law ............................................................1050
      1. Interstate Transactions and Access Restrictions................................1050
      2. Gun Design.........................................................................................1052
      3. Gun Possession and Use .....................................................................1054
      4. Record Keeping ..................................................................................1054
      5. Mass Tort Litigation ..........................................................................1055
II. *HELLER* AND THE NEXT LITIGATION FRONTIER ................................................1057
   A. *Heller's* Demilitarized Message .................................................................1058
   B. *Heller's* Core Right and Suggested Limits ................................................1061
   C. Models for Judicial Review After *Heller* ..................................................1064
III. ON THREATS AND SIDESHOWS TO SOCIAL WELFARE.........................................1068
   A. Incorporation ............................................................................................1069
   B. Handgun Bans............................................................................................1071
      1. A Political Perspective ........................................................................1071
      2. A Policy Consequence Perspective .....................................................1073
         a. Gun Prevalence, Crime, and Public Health ...............................1073
         b. Will Handgun Prevalence Increase in the District?....................1076
   C. Public Places and Concealed Carry ..........................................................1079
   D. Gun-Targeted Taxes, Safety Programs, and Policing..................................1083
   E. Judicial Review and Innovation.................................................................1088
CONCLUSION......................................................................................................1093

## INTRODUCTION

Judicial opinions on supreme law, no matter how backward-looking their reasoning might appear, are occasions to look forward. They indicate the position of today's judges on issues faced by other institutions, and they signify commitments that these judges are most unwilling to revise. On the other hand, no opinion can fully chart the future path of judicial doctrine any more than regulatory, statutory, or constitutional text can provide undisputed guidance to all readers. Each of these texts must be used by decisionmakers in

the future. In fact, the identity of the relevant decisionmakers is bound to change over time, with no guarantee that the new group will mimic the judgments of the old.

Our goal is to consider the plausible future of gun regulation after *District of Columbia v. Heller*.[1] *Heller* actually decided little about the Second Amendment's scope or implementing doctrine. The majority opinion establishes that a certain class of trustworthy citizens has a judicially enforceable right to an operable handgun in the home for the purpose of self-defense—perhaps only at the time of self-defense—as against a flat federal ban on handgun possession.[2] The holding leaves many questions undecided. Nor was this case the best test of judicial courage. Opinion polls showed large national majorities opposing such bans.[3] Equally telling, majorities in the United States Senate and House signed an amicus brief arguing that the District's regulations were unconstitutional.[4] Thus the political environment intimated little resistance to the narrow outcome in *Heller*.[5] And after 50,000 words of argument, counterargument, and apparent compromise, the justices delivered not much more than a new beginning for Second Amendment arguments in court.[6]

Understanding the hazards of prediction under these circumstances, we attempt a realistic assessment from a social welfare perspective. Our interest is in policy that best serves the overall welfare of the public, including both gun owners and those at risk from gun-related crimes and accidents. We care about judicial decisions that may advance or retard such policymaking, but we are less interested in evaluating the Supreme Court's work according to conventional standards of legal argument or ideal theories of constitutional interpretation. We would investigate the social welfare consequences of judicially enforceable gun rights even if these rights

---

1.    128 S. Ct. 2783 (2008).

2.    *See infra* Part II.A (discussing readings of *Heller*'s holding).

3.    *See* Lydia Saad, *Shrunken Majority Now Favors Stricter Gun Laws*, GALLUP NEWS SERV., Oct. 11, 2007, *available at* http://www.gallup.com/poll/101731/Shrunken-Majority-Now-Favors-Stricter-Gun-Laws.aspx.

4.    *See* Brief for Amici Curiae 55 Members of United States Senate, the President of the United States Senate, and 250 Members of United States House of Representatives in Support of Respondent, at app. 1a–10a, District of Columbia v. Heller, 128 S. Ct. 2783 (2008) (No. 07-290) [hereinafter Brief for Amici Curiae]. Given their opposition to the District's regulation, one might ask why these legislators did not prefer to legislate. For a partial answer to this question, see *infra* note 250.

5.    Although neither major party candidate for president took issue with *Heller*'s outcome after the fact, *see* 2008central.net, McCain and Obama Statements on DC v. Heller, June 26, 2008, http://2008central.net/2008/06/26/mccain-and-obama-statements-on-dc-v-heller, it is worth noting that John McCain signed the aforementioned amicus brief while Barack Obama did not. *See* Brief for Amici Curiae, *supra* note 4, at app. 1a–3a.

6.    *See infra* notes 138–141 (collecting examples of litigation in *Heller*'s wake).

were plainly dictated by justified fidelity to the true meaning of the Constitution, and even if such rights ought to be understood as trumping any further cost-benefit analysis.[7]

Although this social welfare perspective is wide-ranging in some respects, it leads us to significant—and perhaps surprising—conclusions about the future of sound gun control policy. To be sure, some of the constitutional questions emerging after *Heller* will be relevant to good public policy. The majority's list of "presumptively" valid regulations will have to be confirmed,[8] and its view of Second Amendment rights might be extended to state and local governments. These legal questions are obvious and worth debating. But certain Second Amendment issues that are likely to be litigated in the near future might be largely irrelevant to social welfare. An example is the looming fight over state and local handgun bans—an issue on which we present some original empirical data—and the possibility of a qualified Second Amendment right to carry a firearm in public with a permit. On the other hand, some legal questions that have received less attention might have much higher stakes from a social welfare perspective. An example is the validity of firearms taxes or safety programs developed especially for firearms. Finally, *Heller* might be used to dampen enthusiasm for innovative responses to the ongoing clash of gun rights advocates and gun control proponents. We will briefly discuss this concern, along with a faint hope for a better result.[9]

Our analysis proceeds in three steps. Part I offers some data on gun ownership in the United States and a sketch of the country's gun control regime before *Heller*. Part II explains what was decided and left open by the majority's opinion, and discusses various models that the Supreme Court

---

7.    *See, e.g.,* Ronald Dworkin, *Rights as Trumps, in* THEORIES OF RIGHTS 153, 153, 158, 165–66 (Jeremy Waldron ed., 1984).

8.    District of Columbia v. Heller, 128 S. Ct. 2783, 2817 & n.26 (2008); *see infra* text accompanying note 130.

9.    This Article relies on many empirical studies. They will be unfamiliar to most lawyers, and some readers might wish to minimize the studies' value for constitutional decisionmaking. Indeed, the facial plausibility of the data might be influenced by the reader's feelings about gun control. *See, e.g.,* Dan M. Kahan & Donald Braman, *The Self-Defensive Cognition of Self-Defense,* 45 AM. CRIM. L. REV. 1, 18–19 (2008). But for our purposes, these empirical studies are essential. We have made best efforts to accurately recount the findings therein and to draw only logically supportable conclusions therefrom. The data will not, however, perfectly measure the psychological or emotional impact of gun rights and gun ownership. The happiness, satisfaction, fear, and distress arising from the prevalence of guns in America are difficult to measure precisely.

Note also that judicial understandings of constitutional rights can influence the rendering of ordinary law. Statutory interpretation may be influenced by constitutional doubt, and *Heller* might instigate new constitutional doubt when courts interpret statutes. We set aside the difficult project of predicting and estimating these effects after *Heller*.

has used to modulate supreme judicial review in other fields. Part III considers potential consequences of continued judicial oversight of firearms regulation. Much of the analysis is provisional, but we suggest danger zones where aggressive judicial intervention would most likely result in troubling consequences for social welfare. We also identify disputes that seem unimportant to social welfare based on current knowledge. The analysis closes with a brief discussion of the potentially complex relationship between judicial review and innovation in gun control.

## I. GUNS, RISKS, AND REGULATION IN THE UNITED STATES[10]

### A. Gun Ownership

In America, gun ownership is concentrated. Our best estimate is that there are 200–250 million firearms in private circulation,[11] meaning that there are nearly enough guns for every adult to have one. But about 75 percent of all adults do not own any guns.[12] Recent survey data suggests that about 42 percent of males, 9 percent of females, and 35 percent of all households have at least one gun.[13] It seems that the prevalence of gun ownership by

---

10. This Part draws on material from Philip J. Cook & Jens Ludwig, *The Social Costs of Gun Ownership*, 90 J. PUB. ECON. 379 (2006).

11. This estimate is based on two sources: federal tax records on sales and a survey. First, the number of new guns added each year is taken from tax data kept by the federal government on manufactures, imports, and exports. The annual count of net additions can be cumulated over, for example, the last century, with some assumption about the rate of removal through such mechanisms as off-the-books exports, breakage, and police confiscation. *See* GARY KLECK, TARGETING GUNS: FIREARMS AND THEIR CONTROL 63–64 (1997); Philip J. Cook, *The Technology of Personal Violence*, *in* CRIME AND JUSTICE: A REVIEW OF RESEARCH 1, 37–38 (Michael Tonry ed., 1991). The second basis for estimating the stock is the one-time National Survey of the Personal Ownership of Firearms (NSPOF), conducted in 1994. This is the only survey that has attempted to determine the number of guns in private hands. A number of other surveys, including the General Social Survey, provide an estimate of the prevalence of gun ownership among individuals and households but do not attempt to determine the average number of guns per gun owner. "The NSPOF estimate for the number of guns in 1994 was 192 million, a number that is compatible with the 'sales accumulation' method, assuming that just 15 percent of the new guns sold since 1899 have been discarded or destroyed." Philip J. Cook & Jens Ludwig, *Aiming for Evidence-Based Gun Policy*, 25 J. POL'Y ANALYSIS & MGMT. 691, 699 n.9 (2006). Since the NSPOF survey, the annual rate of net additions to the gun stock has been about 4–5 million per year, or 50–60 million by 2006. *See* BUREAU OF ALCOHOL, TOBACCO & FIREARMS, FIREARMS COMMERCE IN THE UNITED STATES exhibits 1–3 (2002). Given a continued removal rate of just 1 percent, the stock as of 2006 would be about 220 million.

12. *See* PHILIP J. COOK & JENS LUDWIG, GUNS IN AMERICA: RESULTS OF A NATIONAL COMPREHENSIVE SURVEY ON FIREARMS OWNERSHIP AND USE 12 tbl.2.3 (1996).

13. *See id.* at 14, 32.

56 UCLA LAW REVIEW 1041 (2009)

household has been in long-term decline,[14] partly because households are becoming smaller and less likely to include an adult male.  On the other hand, most people who own one gun own many.  In 1994, about 75 percent of all guns were owned by those who owned four or more, and this slice of gun owners amounted to only 10 percent of the adult population.[15]

Firearms ownership is not only concentrated but also associated with particular geographic locations and socioeconomic indicators.  The prevalence of gun ownership differs widely across regions, states, and localities, as well as across different demographic groups.  For example, while it appears that about 13 percent of Massachusetts households own a gun, a full 60 percent of Mississippi households own one.[16]  Residents of rural areas and small towns are far more likely to own a gun than residents of large cities, partly because of the importance of hunting and sport shooting in those communities.[17]  And this geographic skew is consistent with a concentration of ownership among middle-aged, middle-income households.[18]  These attributes are associated with relatively low involvement in criminal violence,[19] and it is reasonable to suppose that most guns are in the hands of people who are unlikely to misuse them.  Still, gun owners as a group are more likely than other adults to have a criminal record.[20]

Of the subset of Americans who own firearms, handguns are somewhat popular but by no means the dominant type of weapon.  Around 33 percent of America's privately held firearms are handguns, which are more likely than long guns to be kept for defense against crime.[21]  In the 1970s, about 33 percent of new guns were handguns, a figure which grew to nearly 50

---

14.  *See id.* at 9; TOM W. SMITH, PUBLIC ATTITUDES TOWARDS THE REGULATION OF FIREARMS fig.2 (2007).

15.  *See* COOK & LUDWIG, *supra* note 12, at 13–14, 32.

16.  *See* Deborah Azrael, Philip J. Cook & Matthew Miller, *State and Local Prevalence of Firearms Ownership: Measurement, Structure, and Trends*, 20 J. QUANTITATIVE CRIMINOLOGY 43, app. at 58–59 tbl.AIV (2004).

17.  *See* COOK & LUDWIG, *supra* note 12, at 31–32, 50 tbl.5.6.

18.  *Id.* at 32–35.

19.  *See* CRIMINAL JUSTICE SERVS. DIV., U.S. DEP'T OF JUSTICE, CRIME IN THE UNITED STATES 2007, tbl.38 (2008), http://www.fbi.gov/ucr/cius2007/data/table_38.html (indicating that only about 23 percent of violent crimes are committed by people between ages thirty and forty-nine); Ching-Chi Hsieh & M.D. Pugh, *Poverty, Income Inequality, and Violent Crime: A Meta-Analysis of Recent Aggregate Data Studies*, 18 CRIM. JUST. REV. 182, 198 (1993) (showing a correlation between poverty, income inequality, and violent crime).

20.  *See* COOK & LUDWIG, *supra* note 12, at 35.

21.  *See id.* at 13 (noting that, according to the NSPOF estimate, sixty-five million of the total 192 million privately owned firearms are handguns); *id.* at 39 tbl.4.6 (noting that 74.4 percent of handgun owners own a gun for self defense, while 14.9 percent of long gun owners own a gun for self defense).

percent by the early 1990s and then fell back to around 40 percent by the end of that decade.[22]  Despite the long-term increase in the relative importance of handgun sales, a mere 20 percent of gun-owning individuals have only handguns; 44 percent have both handguns and long guns, reflecting the fact that most people who have acquired guns for self-protection are also hunters and target shooters.[23]  Less than 50 percent of gun owners say that their primary motivation for having a gun is self-protection against crime.[24]

Most Americans get their guns from regulated dealers, but a significant number of acquisitions are either less regulated or criminal.  The majority of guns acquired in a recent two year period were obtained by their owners directly from a federally licensed firearm dealer (FFL).[25]  However, the 30 to 40 percent of all gun transfers that do not involve licensed dealers—the so-called secondary market[26]—accounts for most guns used in crime.[27]  Despite the prominence of gun shows in contemporary policy debates, the best available evidence suggests that such shows account for only a small share of all secondary market sales.[28]  Another important source of crime guns is theft.  Over 500,000 guns are stolen each year.[29]

### B.  Gun Violence

Including homicide, suicide, and accidental deaths, 30,694 Americans died by gunfire in 2005.[30]  This amounts to a gun-related mortality rate of 10.4 deaths per 100,000 people for the year.[31]  The mortality rate is down

---

22.    *See* BUREAU OF ALCOHOL, TOBACCO & FIREARMS, COMMERCE IN FIREARMS IN THE UNITED STATES 7 fig.5 (2000) (dating the decline at 1997).

23.    *See* COOK & LUDWIG, *supra* note 12, at 39 tbl.4.6.

24.    *See id.* at 38.

25.    *See id.* at 26.

26.    *See* Philip J. Cook, Stephanie Molliconi, & Thomas B. Cole, *Regulating Gun Markets*, 86 J. CRIM. L. & CRIMINOLOGY 59 (1995).

27.    *See* JAMES D. WRIGHT & PETER H. ROSSI, ARMED AND CONSIDERED DANGEROUS: A SURVEY OF FELONS AND THEIR FIREARMS 4 (expanded ed. 1994); Philip J. Cook & Anthony A. Braga, *Comprehensive Firearms Tracing: Strategic and Investigative Uses of New Data on Firearms Markets*, 43 ARIZ. L. REV. 277, 291–92 (2001); *see also* JOSEPH F. SHELEY & JAMES D. WRIGHT, IN THE LINE OF FIRE: YOUTH, GUNS, AND VIOLENCE IN URBAN AMERICA 46–50 (1995) (identifying non-dealer sources for acquisition of guns by juveniles).

28.    *See* COOK & LUDWIG, *supra* note 12, at 25 tbl.3.11.

29.    *See id.* at 41; KLECK, *supra* note 11, at 90.

30.    *See* Ctrs. for Disease Control & Prevention, Nat'l Ctr. for Injury Prevention & Control, WISQARS Injury Mortality Reports, 1999–2006, [hereinafter WISQARS], *available at* http://webappa.cdc.gov/sasweb/ncipc/mortrate10_sy.html (last visited May 23, 2009).

31.    *See id.*

substantially from 1990, when it was 14.9 per 100,000, but is still much higher than the observed rate in, say, 1950.[32]

Intentional violence is the major exception to the general decline in death by injury during the last fifty years.[33] More Americans die each year by gun suicide than gun homicide.[34] However, more people suffer nonfatal gun injuries from crime than from unsuccessful suicide attempts.[35] The case fatality rate, which is much higher for attempted suicide than for gunshot wounds from criminal assaults, accounts for this difference. In addition, about eight hundred people per year die from unintentional gunshot injuries, although this figure is heavily influenced by coroners' standards concerning what constitutes an accident as opposed to a homicide or suicide.[36]

Although everyone shares in the costs of gun violence to some extent, the shooters and victims are not a representative slice of the population. In 2005, the gun homicide victimization rate for Hispanic men ages 18–29 was six times the rate for non-Hispanic white men of the same age.[37] And the gun homicide rate for black men in this age group—99 per 100,000—was a remarkable twenty-four times the rate for white males in the same age group.[38] In addition, there appears to be considerable overlap between the populations of potential offenders and victims: The large majority of both groups have prior criminal records.[39] The demographics of gun suicide look somewhat different. While suicides and homicides both occur dispropor-

---

32. *See* NAT'L OFFICE OF VITAL STATISTICS, U.S. DEP'T OF HEALTH, EDUC. & WELFARE, VITAL STATISTICS OF THE UNITED STATES 1950, at 74–75 (1950), *available at* http://www.cdc.gov/ nchs/data/vsus/VSUS_1950_3.pdf; PHILIP J. COOK & JENS LUDWIG, GUN VIOLENCE: THE REAL COSTS 19 fig.2.2 (2000).

33. *See* COOK & LUDWIG, *supra* note 32 at 21–27.

34. *See* MELONIE P. HERON ET AL., U.S. DEP'T OF HEALTH AND HUMAN SERVS., NATIONAL VITAL STATISTICS REPORTS: DEATHS: PRELIMINARY DATA FOR 2006, at 20 (2008), *available at* http://www.cdc.gov/nchs/data/nvsr/nvsr56/nvsr56_16.pdf.

35. *See* Ctrs. for Disease Control & Prevention & Nat'l Ctr. for Injury Prevention & Control, WISQARS Nonfatal Injuries: Nonfatal Injury Reports, *available at* http://webappa.cdc.gov/sasweb/ ncipc/nfirates.html (last visited May 23, 2009).

36. *See* HERON ET AL., *supra* note 34, at 19 tbl.2 (reporting data); Ctrs. for Disease Control & Prevention, *Operational Criteria for Determining Suicide*, 37 MORBIDITY & MORTALITY WKLY. REP. 773, 773, 779 (1988), *available at* http://www.cdc.gov/mmwR/preview/mmwrhtml/00001318.htm (observing that coroner standards for identifying suicides vary and may be error-prone).

37. *See* WISQARS, *supra* note 30.

38. *See id.*

39. *See* Philip J. Cook, Jens Ludwig & Anthony A. Braga, *Criminal Records of Homicide Offenders*, 294 J. AM. MED. ASS'N 598 (2005); David M. Kennedy, Anne M. Piehl & Anthony A. Braga, *Youth Violence in Boston: Gun Markets, Serious Youth Offenders, and a Use-Reduction Strategy*, L. & CONTEMP. PROBS., Winter 1996, at 147, 191 tbl.2; Michael D. McGonigal et al., *Urban Firearm Deaths: A Five-Year Perspective*, 35 J. TRAUMA 532 (1993); Don B. Kates & Daniel D. Polsby, The Myth of the "Virgin Killer": Law-Abiding Persons Who Kill in a Fit of Rage 19 (2005) (unpublished manuscript), *available at* http://www.hoffmang.com/firearms/kates/Myth_of_the_Virgin_Killer-Kates-Polsby.pdf.

tionately among those with low incomes or educational attainment, gun suicides are more common among whites than blacks, and more common among the old than among young or middle-aged adults.[40]  Men are vastly overrepresented in all categories.

However, the costs of gun violence to society are more evenly distributed across the population than victimization statistics might suggest.  The threat of being shot prompts private citizens and public institutions to undertake a variety of costly measures to reduce this risk, and many people live with anxiety arising from the lingering chance that they or a loved one could be shot.  As one local district attorney notes, "Gun violence is what makes people afraid to go to the corner store at night."[41]  As a result, the threat of gun violence in some neighborhoods is an important disamenity that depresses property values and economic development.  Gun violence, then, is a multifaceted problem that has notable effects on public health, crime, and living standards.

While quantifying the magnitude of these social costs is difficult, one contingent-valuation (CV) survey estimate found that the costs of gun violence were on the order of $100 billion in 1995.[42]  Most of these costs ($80 billion) come from crime-related gun violence.[43]  Dividing by the annual number of crime-related gunshot wounds, including homicides, implies a social cost per crime-related gun injury of around $1 million.[44]

---

40.     *See* COOK & LUDWIG, *supra* note 32, at 23–24.

41.     J.M. Kalil, *New Approach: Prosecutors Take Aim at Gun Crimes*, LAS VEGAS REV.-J., Mar. 8, 2002, at 1B.

42.     *See* COOK & LUDWIG, *supra* note 32, at 11.

43.     *See id.* at 10.

44.     *See* Jens Ludwig & Philip J. Cook, *The Benefits of Reducing Gun Violence: Evidence From Contingent-Valuation Survey Data*, 22 J. RISK & UNCERTAINTY 207, 213–14 (2001).  This estimate is intended to capture the costs of gun misuse and so ignores the benefits to society of widespread gun ownership—in the same way that studies of the social costs of automobile accidents ignore the benefits of driving.  The figure comes, in part, from contingent-valuation (CV) responses about what people say they would pay to reduce crime-related gun violence by 30 percent.  One potential concern is that these estimates assume that societal willingness to pay to reduce gun violence is linear with the proportion of gun violence eliminated, which may not be the case.  And in practice there remains some uncertainty about the reliability of the CV measurement technology.  In any case, most of the estimated costs of gun violence in the United States appear to come from crime, insofar as suicide is treated as a private concern, and the estimated costs of gun crime fits comfortably next to more recent CV estimates for the social costs of crime more generally.  *See* COOK & LUDWIG, *supra* note 32, at 10–11; *see also* Mark A. Cohen et al., *Willingness-to-Pay for Crime Control Programs*, 42 CRIMINOLOGY 89, 105 (2004).

56 UCLA LAW REVIEW 1041 (2009)

C.    Gun Regulation by Ordinary Law

While far less stringent than regulation in other wealthy nations,[45] state and federal law in the United States regulates most aspects of firearms commerce and possession.  It should be noted here, however, that gun regulation in the United States is almost entirely a product of legislation rather than rulemaking processes in administrative agencies.  The latter would tend to place greater demands on the decisionmakers to solicit alternative viewpoints and to show a serious consideration of costs and benefits.  The legislative process tends to have no such formal requirements before enactment.

1.    Interstate Transactions and Access Restrictions

The balance between benefit and cost in gun possession and regulation differs widely across states.  Accordingly, a primary objective of federal gun regulation is to minimize policy spillover across state lines.  Federal law aims to ensure that stringent regulations on firearms commerce in some states are not undercut by relatively lax regulation in other states.[46]  The citizens of rural Montana understandably favor a more permissive system than those living in Chicago, and both can be accommodated if transfers between them are effectively limited.  In response to such concerns, the Gun Control Act of 1968[47] established the framework for the current system of controls on gun transfers.  All shipments of firearms, including mail-order sales, are limited to federally licensed dealers.  These dealers are required to obey applicable state and local ordinances and to observe certain restrictions on sales of guns to out-of-state residents.[48]

In addition to controlling regulatory spillover between states, federal law establishes a national regulatory floor of restrictions on the acquisition and possession of guns.  Thus, the Gun Control Act specifies several categories of people who are denied the right to receive or possess a gun, including: illegal aliens; people convicted of a felony or an act of domestic violence; people under indictment; illicit drug users; and those who have at some

---

45.    *See* DAVID HEMENWAY, PRIVATE GUNS, PUBLIC HEALTH 2–3 (2004).

46.    *See* Franklin E. Zimring, *Firearms and Federal Law: The Gun Control Act of 1968*, 4 J. LEGAL STUD. 133, 175 (1975).

47.    Pub. L. No. 90-351, § 902, 82 Stat. 226 (1968) & Pub. L. No. 90-618, § 102, 82 Stat. 1214 (1968) (codified at 18 U.S.C. §§ 921–930 (2006)).

48.    *See* 18 U.S.C. § 922(b)–(e) (2006).  The McClure-Volkmer Amendment of 1986 eased the restriction on out-of-state purchases of rifles and shotguns.  *Id.* §§ 922–923.  Such purchases are now legal as long as they comply with the regulations of both the buyer's state of residence and the state in which the sale occurs.

time been involuntarily committed to a mental institution.[49] In addition, federally licensed dealers may not sell handguns to people younger than age twenty-one, or long guns to those younger than eighteen.[50] Dealers are required to ask for identification from all would-be buyers, have them sign a form indicating that they are not within a proscribed category, and initiate a criminal history check.[51] Finally, dealers are required to keep a record of each completed sale and to cooperate with authorities when they need to access those records for gun-tracing purposes.[52]

Notably omitted from federal regulation are gun sales by people not in the business. Such sellers, whether at a gun show or elsewhere, may transfer a gun without keeping a record of sale or performing a background check.[53] This private sale loophole is a major gap in federal regulation and helps the used-gun market thrive.

State regulation provides another layer of restrictions on transfer, possession, and use of firearms. Twelve states require handgun buyers to obtain a permit or license before taking possession, a process that typically entails a fee and a waiting period.[54] All but a few of these transfer-control systems are permissive, however, in that most people are legally entitled to obtain a gun. In the few permitting and licensing jurisdictions that do not have permissive standards, including Massachusetts and New York City, it is difficult to obtain a handgun legally. Chicago and Washington, D.C. have largely prohibited handgun ownership as a matter of formal law since 1982 and 1976, respectively—although the District's handgun ban became unenforceable in at least some circumstances after *Heller*.[55] State legislatures have enacted a variety of more modest restrictions on firearms commerce as well. For example, California, Maryland, and Virginia bar dealers from selling more than one handgun a month to any one buyer.[56]

---

49.   *See id.* § 922(d)(1), (3), (4), (5)(A), (9).
50.   *See id.* § 922(b)(1).
51.   *See id.* § 922(s)(1)(A)(i)(I), (s)(3)(A)–(B), (t)(1).
52.   *See id.* § 923(g)(1)(A)–(B); Legal Cmty. Against Violence, Regulating Guns in America: An Evaluation and Comparative Analysis of Federal, State, and Selected Local Gun Laws 86 (2006) [hereinafter LCAV Report]; Jon S. Vernick & Stephen P. Teret, *A Public Health Approach to Regulating Firearms as Consumer Products*, 148 U. Pa. L. Rev. 1193, 1195–96 (2000).
53.   *See* 18 U.S.C. § 921(a)(21)(C) (2006).
54.   *See* LCAV Report, *supra* note 52, at 113–18.
55.   *See infra* Part II.A–II.B. On the District's revised rules, see *infra* note 118.
56.   *See* Cal. Penal Code §§ 12072(a)(9), (c)(6), 12071(b)(7)(F) (West Supp. 2009); Md. Code Ann., Pub. Safety § 5-128(a)-(b) (LexisNexis 2003); Va. Code Ann. § 18.2-308.2:2(P) (Supp. 2008); *see also* LCAV Report, *supra* note 52, at 140–41.

2.    Gun Design

Federal law also imposes some restrictions on gun design, and certain types of firearms are effectively prohibited.  The National Firearms Act of 1934 (NFA)[57] was intended to eliminate Prohibition-era gangster firearms, including sawed-off shotguns, hand grenades, and automatic weapons capable of continuous rapid fire with a single pull of the trigger.[58]  All such weapons had to be registered with the federal government and transfers were subject to a tax of $200,[59] which at the time of enactment was confiscatory.  While some of these weapons have remained in legal circulation, the NFA—now amended to ban the introduction of new weapons of this sort[60]—appears to have been quite effective at reducing the use of automatic weapons in crime.[61]

Furthermore, the Gun Control Act of 1968 included a ban on the import of small, cheap handguns,[62] sometimes known as "Saturday Night Specials."  This ban uses criteria to assign points to a gun model depending on its size and other qualities.[63]  Handguns that fail to achieve a minimum score on the factoring criteria, or that fail to meet size and safety criteria, cannot be imported.  However, domestic manufacturers may lawfully assemble guns, often from imported parts, that would fail the factoring criteria.  This market niche has been well supplied.  One study found that one-third of new domestically manufactured handgun models did not meet the size or quality requirements applied to imports.[64]

In 1994, Congress temporarily banned the importation and manufacture of certain assault weapons (military-style semi-automatic firearms).  The Crime Control Act[65] banned nineteen such weapons by name, and others were

---

57.    *See* 26 U.S.C §§ 5801–72 (2006).

58.    *See id.* § 5845.

59.    *See id.* § 5811.

60.    *See id.* § 5861.

61.    *See* GARY KLECK, POINT BLANK: GUNS AND VIOLENCE IN AMERICA 67–70 (1991).

62.    *See* Philip J. Cook, Mark H. Moore & Anthony A. Braga, *Gun Control*, *in* CRIME: PUBLIC POLICIES FOR CRIME CONTROL 291, 312 (James Q. Wilson & Joan Petersilia eds., 2002); Zimring, *supra* note 46, at 154–56.  "An important loophole allowed the import of parts of handguns that could not meet the 'sporting purposes' test of the Gun Control Act.  This loophole was closed by the McClure-Volkmer Amendment of 1986." Cook, Moore & Braga, *supra* at 291, 616 n.24.

63.    *See* Zimring, *supra* note 46, at 165; *see also* TRUDY A. KARLSON & STEPHEN W. HARGARTEN, REDUCING FIREARM INJURY AND DEATH: A PUBLIC HEALTH SOURCEBOOK ON GUNS 74 (1997) (listing some of the factoring criteria for imported guns).

64.    *See* John S. Milne et al., *Effect of Current Federal Regulations on Handgun Safety Features*, 41 ANNALS EMERGENCY MED. 1, 5 (2003); *see also* GAREN WINTEMUTE, RING OF FIRE: THE HANDGUN MAKERS OF SOUTHERN CALIFORNIA 11–17 (1994).

65.    Violent Crime Control and Law Enforcement Act of 1994, Pub. L. No. 103-122, 108 Stat. 1796 (repealed 2004).

outlawed if they possessed some combination of design features such as a detachable magazine, barrel shroud, or bayonet mount.[66] The Act also banned manufacture and import of magazines holding more than ten rounds.[67] However, then-existing assault weapons and large-capacity magazines were grandfathered.[68] And in 2004, the ban was allowed to expire.[69]

Aside from these design prohibitions, federal law has been permissive. It leaves unregulated those types of firearms that are not specifically banned. Furthermore, firearms and ammunition are excluded from the purview of the Consumer Product Safety Commission, and no federal agency is responsible for reviewing the design of firearms.[70] Nor is any mechanism in place for identifying unsafe models that could lead to a recall and correction.[71]

But some states have acted independently. In 2000, the Massachusetts Attorney General announced that firearms would henceforth be regulated by a state agency with jurisdiction over other consumer products, and firearms judged unacceptable would be taken off the market.[72] Massachusetts is unique in asserting broad state authority to regulate gun design and safety per se, though a handful of other state legislatures have restricted the design of new guns in more limited fashion. The first important instance occurred in Maryland, which enacted its own ban on Saturday Night Specials.[73] The legislature was responding to a successful suit against a gun manufacturer. In exchange for relieving manufacturers of small, cheap handguns from liability, the legislature created a process for reviewing handgun designs and specifying which models would be ruled out due to size and safety concerns.[74] As of 2008, eight states have some version of a ban on Saturday Night

---

66.   *See id*. § 110102.

67.   *See id*. § 110103(b)(31)(A).

68.   *See* Christopher S. Koper & Jeffrey A. Roth, *The Impact of the 1994 Federal Assault Weapon Ban on Gun Violence Outcomes: An Assessment of Multiple Outcome Measures and Some Lessons for Policy Evaluation*, 17 J. QUANTITATIVE CRIMINOLOGY 33, 36 (2001).

69.   *See* Violent Crime Control and Law Enforcement Act of 1994, Pub. L. No. 103-122, 108 Stat. 1796 § 110105.

70.   *See* Vernick & Teret, *supra* note 52, at 1196.

71.   *See* COMM. ON INJURY PREVENTION & CONTROL, DIV. OF HEALTH PROMOTION & DISEASE PREVENTION, REDUCING THE BURDEN OF INJURY: ADVANCING PREVENTION AND TREATMENT 126 (Richard J. Bonnie, Carolyn Fulco & Catharyn T. Liverman eds., 1999).

72.   The new rules effectively ban Saturday Night Specials and require that handguns sold in Massachusetts include childproof locks, tamper-proof serial numbers, and safety warnings. *See* 940 MASS. CODE REGS. 16.01-09 (2008).

73.   *See* MD. CODE ANN., PUB. SAFETY §§ 5-405 to -406 (LexisNexis 2003 & Supp. 2008).

74.   *See id*. § 5-405; *see also* Jon S. Vernick et al., *Effects of Maryland's Law Banning Saturday Night Special Handguns on Crime Guns*, 5 INJ. PREVENTION 259 (1999).

Specials.[75]  California has also been active in recent years, instituting a ban on assault weapons and establishing a number of handgun safety requirements.[76]

### 3.  Gun Possession and Use

States and some localities also specify the rules under which guns may be carried in public.  Every state except Alaska and Vermont places some restriction on carrying a concealed firearm.[77]  However, the trend over the past several decades has been to ease restrictions on concealed carry, replacing prohibition with a permit system and easing the requirements to obtain a permit. Currently, in most states adults who are entitled to possess a handgun can obtain a permit to carry after paying a fee.[78]

In addition, there has been some effort to regulate firearms storage. Since 2005, federal law has required all handguns sold by licensed dealers to come equipped with a secure storage device.[79]  Eleven states and the District of Columbia have laws concerning firearm locking devices.[80]  Massachusetts and the District require that all firearms be stored with a lock in place.[81]  And the Maryland legislature recently adopted a pioneering requirement: All handguns manufactured after 2003 and sold in the state must be "personalized" with a built-in locking device that requires a key or combination to release.[82]

### 4.  Record Keeping

Some gun regulations are designed to assist law enforcement in solving crimes.  In particular, federal law requires that all licensees in the chain of commerce—manufacturers, distributors, retail dealers—keep records of transfers and provide them to law enforcement for tracing purposes.[83]  For example, if a police department confiscates a firearm that may have been used in a crime, it can submit a trace request through the National Tracing Center of the Bureau of Alcohol, Tobacco, Firearms and Explosives (ATF).  The ATF will attempt to trace the chain of commerce using the serial number and other

---

75.     *See* LCAV REPORT, *supra* note 52, at 145 (listing states that require "design and/or safety standards" that serve to ban Saturday Night Specials).
76.     *See id.* at 17, 146–48.
77.     *See id.* at 136.
78.     *See id.* at 132; JOHN R. LOTT, JR., MORE GUNS, LESS CRIME: UNDERSTANDING CRIME AND GUN CONTROL LAWS 43 (2000).
79.     *See* Protection of Lawful Commerce in Arms Act, 18 U.S.C. § 922(z) (2006).
80.     *See* LCAV REPORT, *supra* note 52, at xiii.
81.     *See id.* at 152.
82.     *See* MD. CODE ANN., PUB. SAFETY § 5-132 (LexisNexis 2003).
83.     *See* 18 U.S.C. § 923(g)(1)(A)–(B) (2006).

characteristics of the gun.  If all goes well, the retail dealer who first sold the gun will be identified and will supply information from the form that the buyer filled out.  Unfortunately, this system is inefficient and error-prone, and even if successful it usually leaves the investigators far short of the information they really want: the identity of the most recent owner of the firearm.[84] But a more direct system of national registration has been politically impossible to implement—except in the case of Title II weapons regulated by the National Firearms Act of 1934,[85] which include machine guns, sawed-off shotguns, and grenades.[86]

A few states do have registration requirements, however.  California requires registration of handgun transactions, even if they occur between private parties.[87]  This requirement complements a new regulation that all semiautomatic pistols sold in the state after 2010 be designed with micro-stamp capability.  Microstamping means that the firearm will print the serial number, make, and model of the gun on the shell casing when the gun is fired.[88]  Shell casings are ejected from pistols and often left at the scene, where they can be collected by investigators and, under the new law, used to initiate a trace even when the gun itself is not in custody.

5.    Mass Tort Litigation

Thus far, our regulatory review shows a baseline of federal legislation with a second layer of state legislation which varies significantly across the country. If the gun policy process is functioning well, the policy diversity we see should reflect the different values and circumstances of different states.  Yet much differentiation in the cost-benefit balance for gun control occurs within states, at the local level.  Residents of heavily populated cities tend to suffer relatively high rates of violent crime and have little interest in gun sports, while the reverse is true in rural areas and small towns.  As a result, the most extreme gun control measures tend to be adopted by cities rather than states.[89]  But this

84.    *See* Cook & Braga, *supra* note 27, at 301.
85.    26 U.S.C. §§ 5801–72 (2006).
86.    *See id.*
87.    *See* CAL. PENAL CODE § 12072(d) (West 2008).
88.    *See id.* § 12126(b)(7).
89.    *See, e.g.*, Jon S. Vernick & Lisa M. Hepburn, *State and Federal Gun Laws: Trends for 1970–1999, in* EVALUATING GUN POLICY: EFFECTS ON CRIME AND VIOLENCE 345, 363, 367 (Jens Ludwig & Philip J. Cook eds., 2003) (comparing numbers of gun laws at different levels of government, and noting more restrictive regulation in certain Ohio cities than at the state level).

degree of decentralized policymaking is often thwarted by state law: Over forty states preempt at least some local laws affecting firearms.[90]

In the 1990s, several cities facing tremendous costs from gun-related crime tried an alternative. Frustrated by their inability to change gun regulations through legislation, they filed mass tort lawsuits that had the potential to impose higher standards of conduct on the gun industry. These suits asserted unsafe and defective gun design under state law,[91] or claimed that the industry was creating a public nuisance through failure to police the supply chain by which guns were marketed and often found their way into dangerous hands.[92] These suits were inspired by, and had parallels with, the lawsuits against the cigarette industry filed by state attorneys general. The cigarette manufacturers ultimately settled those suits, agreeing to restrictions on marketing practices and to $240 billion in damages paid out over twenty-five years.[93] One difference is that in the gun industry suits most of the plaintiffs were cities rather than states. Another difference is that the firearms industry is both smaller and more diffuse than the tobacco industry, so that the financial stakes were much lower. Indeed, the primary motivation for the municipal plaintiffs was probably not money damages, but to force the gun industry to assume greater responsibility for reducing the damage done with its products.

In any event, the cities' arguments did not fare well in court. A case brought by New Orleans, for instance, was halted by the Louisiana Supreme Court after that state's legislature enacted a statute barring such suits.[94] Of the city lawsuits, the "great majority have been dismissed or abandoned prior to trial, and of the few favorable jury verdicts obtained by the plaintiffs, all but one have been overturned on appeal. A handful of claims have been settled prior to trial."[95]

---

90. *See* James A. Beckman, *Preemption Laws*, *in* 2 GUNS IN AMERICAN SOCIETY: AN ENCYCLOPEDIA OF HISTORY, POLITICS, CULTURE, AND THE LAW 478, 478 (Gregg Lee Carter ed., 2002).

91. *See* Morial v. Smith & Wesson Corp., 785 So. 2d 1, 5–6 (La. 2001).

92. *See* City of Chicago v. Beretta U.S.A. Corp., 821 N.E.2d 1099 (Ill. 2004); Brian J. Siebel, *City Lawsuits Against the Gun Industry: A Roadmap for Reforming Gun Industry Misconduct*, 18 ST. LOUIS U. PUB. L. REV. 247, 248–49 (1999); *see also* Jon S. Vernick & Stephen P. Teret, *New Courtroom Strategies Regarding Firearms: Tort Litigation Against Firearms Manufacturers and Constitutional Challenges to Gun Laws*, 36 HOUS. L. REV. 1713, 1746–49 (1999). Thirty other cities and counties filed suits against the gun industry, claiming negligence in marketing practices, product design, or both. *See generally* Timothy D. Lytton, *Introduction: An Overview of Lawsuits Against the Gun Industry*, *in* SUING THE GUN INDUSTRY 1, 1–35 (Timothy D. Lytton ed., 2005).

93. *See* Milo Geyelin, *Forty-Six States Agree to Accept $206 Billion Tobacco Settlement*, WALL ST. J., Nov. 23, 1998, at B13.

94. *See Morial*, 785 So. 2d at 6.

95. Lytton, *supra* note 92, at 5.

Then, on October 26, 2005, President George W. Bush signed the Protection of Lawful Commerce in Arms Act (PLCAA).[96] It provided an important degree of legal immunity to the firearms industry, while preserving the possibility of traditional tort actions against the industry. For example, injuries from defects in design or manufacture can be compensated in private suits. But the industry is now exempt from liability for injuries resulting from criminal misuse of its product. While PLCAA might itself be subject to constitutional challenge,[97] efforts to enhance gun regulation through litigation have failed for the most part. And today the litigation opportunities are running in the opposite direction.

## II.   HELLER AND THE NEXT LITIGATION FRONTIER

As of 2007, there was little else to say about the general character and dynamics of gun control policy. Certainly federal constitutional litigation was a matter of minimal significance. For most of our country's history, the Second Amendment was absent from the Supreme Court's agenda. When arguments based on the amendment reached the Court, they were ineffectual. In the late 1800s, the Court confirmed that the amendment could not be used to challenge state regulation.[98] And in 1939, *United States v. Miller*[99] concluded that the federal government was free to restrict possession of sawed-off shotguns.[100] *Miller* seemed to link Second Amendment rights to state organized militias, rather than to individual preferences about gun ownership. Lower federal courts followed this notion and the amendment was a dead letter in litigation.[101]

Attraction to Second Amendment arguments gained strength in other contexts, however. The gun rights movement made the amendment a central rhetorical element in its organizing efforts.[102] Many lawmakers were

---

96.    18 U.S.C. § 922(z) (2006).
97.    *See* Timothy D. Lytton, *Afterword: Federal Gun Industry Immunity Legislation*, *in* SUING THE GUN INDUSTRY, *supra* note 92, at 339, 339–54.
98.    *See* Presser v. Illinois, 116 U.S. 252, 264–66 (1886); United States v. Cruikshank, 92 U.S. 542, 553 (1876).
99.    307 U.S. 174 (1939).
100.   *See id.* at 178 (seeking evidence that a sawed-off shotgun "has some reasonable relationship to the preservation or efficiency of a well regulated militia").
101.   *See, e.g.*, Gillespie v. City of Indianapolis, 185 F.3d 693, 710–11 (7th Cir. 1999). Results from litigation involving state constitutions were not dramatically different. State supreme courts invoked state gun rights to invalidate only a few state regulations after World War II. *See* Adam Winkler, *Scrutinizing the Second Amendment*, 105 MICH. L. REV. 683, 716–26 (2007).
102.   For a view of the gun rights movement, political institutions, and *Heller*, see Reva B. Siegel, *Dead or Alive: Originalism as Popular Constitutionalism in* Heller, 122 HARV. L. REV. 191 (2008).

56 UCLA LAW REVIEW 1041 (2009)

sympathetic. And by the late twentieth century, scholarship on the amendment was booming. Some legal academics supported an understanding of federal gun rights beyond anachronistic state militias.[103] There were also judicial rumblings. In 1997, Justice Thomas suggested that the amendment might have provided another basis for invalidating the Brady Act's mandate that local officials conduct background checks on handgun purchasers.[104] In 2001, a federal appeals court declared that the Second Amendment included a personal right to keep and bear arms unrelated to militia service, although the court upheld the regulation at issue.[105] The United States Department of Justice then amended its litigation position and endorsed the lower court's logic.[106]

A. *Heller*'s Demilitarized Message

In 2008, the Supreme Court changed its message, too. *District of Columbia v. Heller*[107] became the first successful Second Amendment challenge in the Court's history—a full 207 years after the amendment was ratified.[108] This time lag between ratification and adjudication must have influenced the Court's decision. Notwithstanding a lengthy discussion of legal meaning as it stood in 1791, crucial features of the majority opinion bend to develop-

---

103. *See, e.g.*, Randy E. Barnett & Don B. Kates, *Under Fire: The New Consensus on the Second Amendment*, 45 EMORY L.J. 1139 (1996); Robert J. Cottrol & Raymond T. Diamond, *The Second Amendment: Toward an Afro-Americanist Reconsideration*, 80 GEO. L.J. 309 (1991); Sanford Levinson, *The Embarrassing Second Amendment*, 99 YALE L.J. 637 (1989); Eugene Volokh, *The Commonplace Second Amendment*, 73 N.Y.U. L. REV. 793 (1998). For contrary views from historians, see, for example, SAUL CORNELL, A WELL-REGULATED MILITIA: THE FOUNDING FATHERS AND THE ORIGINS OF GUN CONTROL IN AMERICA 2–4, 7 (2006); Jack N. Rakove, *The Second Amendment: The Highest Stage of Originalism*, 76 CHI.-KENT L. REV. 103 (2000), *reprinted in* THE SECOND AMENDMENT IN LAW AND HISTORY 74, 113 (Carl T. Bogus ed., 2000) ("[I]t is completely anachronistic to expect the disputants of the eighteenth century to have comprehended, much less addressed, the problem of firearms regulation in its modern form."). On competing theories for the gist of the amendment's meaning, see MARK V. TUSHNET, OUT OF RANGE: WHY THE CONSTITUTION CAN'T END THE BATTLE OVER GUNS (2007).

104. *See* Printz v. United States, 521 U.S. 898, 938–39 (1997) (Thomas, J., concurring) (joining the majority opinion, which relied on federalism principles, but pointing to a Second Amendment argument).

105. *See* United States v. Emerson, 270 F.3d 203, 260–61 (5th Cir. 2001) (upholding a conviction for gun possession while the defendant was subject to a domestic violence restraining order), *cert. denied*, 536 U.S. 907 (2002).

106. *See* Memorandum from the Attorney General to All United States Attorneys (Nov. 9, 2001), *available at* http://www.usdoj.gov/ag/readingroom/emerson.htm. When Emerson sought review in the Supreme Court, the Solicitor General abandoned the militia-related view of the amendment. *See* Brief for the United States in Opposition at 20 n.3, United States v. Emerson, 536 U.S. 907 (2002) (No. 01-8780) (accepting, however, "reasonable restrictions designed to prevent possession by unfit persons or to restrict the possession of types of firearms that are particularly suited to criminal misuse").

107. 128 S. Ct. 2783 (2008).

108. For an analysis of such time lags, see Adam M. Samaha, *Originalism's Expiration Date*, 30 CARDOZO L. REV. 1295, 1308–10 (2008) (estimating the average lag between formal amendment and Supreme Court interpretation at forty years).

ments that occurred long after ratification. At the end of the day, the opinion begins the process of accommodating an individualistic gun rights vision to the modern tradition of gun regulation.

The case involved a police officer who wanted to keep an operable handgun in his home and to "carry it about his home in that condition only when necessary for self-defense."[109] But the District was an urban jurisdiction where the gun rights movement enjoyed little success in ordinary politics. One District law prohibited possession of handguns by private citizens, with only narrow exceptions.[110] A second regulation required all firearms to be either unloaded and disassembled or trigger-locked at all times.[111] Exceptions were made for law enforcement officers, places of business, and otherwise lawful recreational activities,[112] but the regulation reached people's homes. A third regulation involved firearms licensing by the chief of police.[113] The *Heller* majority left unaddressed the issue of firearms licensing, but it concluded that the first two regulations infringed the plaintiff's right to have a handgun in his home for self-defense.[114]

It is quite possible to read the majority opinion for very little. The justices did not commit to restraining state or local firearms laws,[115] which is where much of the regulatory action takes place. Furthermore, the plaintiff's position in *Heller* was relatively strong. The regulations under attack were fairly broad, the argument came down to a qualified right to handgun possession in the home, and the dissenting justices thought the amendment was not even implicated without a militia connection.[116] Even under these circumstances, the gun rights position only narrowly prevailed on a 5–4 vote. Perhaps a slightly different case would fracture the majority coalition. After all, it does not take special courage to oppose flat handgun bans.[117] One can easily imagine the 5–4 vote going the other way had the District permitted a law-abiding citizen to store one handgun in the home, but required

---

109. *Heller*, 128 S. Ct. at 2788 & n.2 (relating the lower court's understanding of the facts of the case).
110. *See* D.C. CODE ANN. § 7-2502.01 (LexisNexis 2008).
111. *Id.* § 7-2507.02.
112. *See id.*
113. *See* D.C. CODE ANN. § 22-4506 (LexisNexis 2001).
114. *See Heller*, 128 S. Ct. at 2819 (stating reasons for not addressing the issue of firearms licensing).
115. *See id.* at 2812–13 & n.23.
116. *See id.* at 2823 (Stevens, J., dissenting); *id.* at 2847 (Breyer, J., dissenting).
117. *See supra* notes 3–4 (citing polling and majority congressional opposition to flat handgun bans). There is a large empirical literature on the determinants of judicial behavior which we will not delve into here. *See, e.g.*, Barry Friedman, *The Politics of Judicial Review*, 84 TEX. L. REV. 257 (2005). For the classic view of the Court as sticking close to national governing coalitions, see Robert A. Dahl, *Decision-Making in a Democracy: The Supreme Court as a National Policy-Maker*, 6 J. PUB. L. 279 (1957).

handgun training, registration, and a trigger lock—except when and if self-defense became necessary.[118]

Nevertheless, more significant lessons might be drawn. The first notable feature of the majority opinion is the virtual irrelevance of militias to its view of gun rights. The text of the Second Amendment begins with the preface, "A well regulated Militia, being necessary to the security of a free State, . . . ." Whether or not this assertion is factually accurate, it could serve an important role in understanding the words that follow: "the right of the people to keep and bear Arms, shall not be infringed." But for the majority, the amendment's preface cannot be used to either limit or expand the meaning of the subsequent words when read separately.[119] Instead, the militia reference is supposed to indicate the purpose of codifying a preexisting right of "the people" in general to keep and bear arms.[120] Although the Amendment's ratification did follow a debate over standing armies and the ability of state militias to check centralized tyranny, the *Heller* majority contended that the codified right to keep and bear arms was also valued for self-defense.[121] This more personal self-defense function, not the prerequisites of a robust citizen militia, defines the scope of the right according to *Heller*.

Fencing off the amendment's judicially enforceable right from its militia-oriented preface is revealing—and it cuts in two directions. Some of the implications point toward judicial intervention. Private parties are now allowed to raise Second Amendment arguments in court without showing any relationship to a militia, state-run or otherwise. The content of the right is personal and nonmilitary. As well, incorporation of Second Amendment norms into the Fourteenth Amendment might seem easier once the content of the former is separated from the preservation of state militias. If the right is not about federal-state relations, it better resembles the individual rights the Court has been willing to enforce against state and local governments through the Fourteenth Amendment.[122]

---

118.    The District's first temporary legislative reaction to *Heller* allowed registration of handguns (excluding semi-automatics) for in-home self-defense (after a ballistics test), and allowed trigger locks to be removed when the owner reasonably feared imminent harm in the home. *See* Del Quentin Wilber & Paul Duggan, *D.C. Is Sued Again Over Handgun Rules*, WASH. POST, July 29, 2008, at B01. The District's second round of temporary legislation can be found at Second Firearms Control Emergency Act of 2008, *available at* http://mpdc.dc.gov/mpdc/frames.asp?doc=/mpdc/lib/mpdc/info/pdf/2ndFirearmsControl_Act.pdf.

119.    *See Heller*, 128 S. Ct. at 2792–97, 2789–90 nn.3–4.

120.    *See id*. at 2800–02.

121.    *See id*. at 2801–02.

122.    *See generally* ERWIN CHEMERINSKY, CONSTITUTIONAL LAW: PRINCIPLES AND POLICIES 499–507 (3d ed. 2006) (reviewing selective incorporation).

But another implication involves judicial restraint. Ignoring the practical needs of decentralized citizen militias allows courts to reject libertarian demands for exceptionally potent firepower and to preserve the modern role of government in law enforcement and national defense. The *Heller* majority is not about to enforce any asserted right to frighten the United States armed forces with overwhelming firepower. The majority's portrayal of the Second Amendment right seems, at most, tangentially related to people protecting themselves from the risks of centralized tyranny.[123] Instead, the majority's conception of the right is mainstreamed and demilitarized. In this respect, one can say that *Heller* defanged the Second Amendment for litigation purposes.

B. *Heller*'s Core Right and Suggested Limits

What, then, is the judicially enforceable right recognized in *Heller*? The answer is debatable. Different readers will see the matter differently in the absence of additional direction from the justices regarding what they meant (or mean) to do. To make progress, however, we can look for *Heller*'s minimum plausible content. We can attempt to describe the core right to which a majority of justices seem clearly committed.

Whatever else it might be made to include in the future, the majority's core right involves self-defense with a typical handgun in one's home. These justices were not interested in a right to carry arms "for *any sort* of confrontation,"[124] and declared that "self-defense . . . was the *central component* of the right" codified in the amendment.[125] And in explaining why the District's handgun ban was defective, the majority stressed the confluence of three factors: self-defense, handguns, and homes. It asserted that an inherent right of self-defense has been central to the understanding of the Second Amendment in American history, that handguns are now commonly chosen by Americans for lawful self-defense, and that people's homes are where "the need for defense of self, family, and property is most acute."[126] For similar reasons, the majority immunized the plaintiff's handgun from the District's requirement that firearms in the home be kept inoperable at all times.[127]

Hence the majority's core conception of the right seems to contemplate a law-abiding citizen with a functional handgun in his own home for the pur-

---

123.  *See Heller*, 128 S. Ct. at 2817.
124.  *Id.* at 2799.
125.  *Id.* at 2801.
126.  *Id.* at 2817.
127.  *See id.* at 2818 (referring to "the core lawful purpose" of self-defense).

pose of defense, and perhaps only at the time of attack.[128]  This notion of the right was strong enough to overcome an outright prohibition on possessing a functional handgun in one's home at any time.  And this description of the right matches the situation of the actual plaintiff in *Heller*, who asked to store an operable handgun in his home and to carry it there only when necessary for self-defense.

In fact, limits were a theme in the majority opinion.  These justices went out of their way to suggest insulation for several forms of gun control not at issue in the case.  They conceded that the Second Amendment right is "not unlimited,"[129] and offered a list of "presumptively lawful regulatory measures."[130]  In crude terms, this nonexhaustive list includes regulation aimed at (1) atypical weapons, (2) abnormal people, (3) sensitive locations, (4) sales conditions, (5) safe storage, and, perhaps, (6) concealed carry.  Although the matter is not free from doubt, it appears that these presumptively valid regulations would withstand a Second Amendment objection even to the extent that they apply to handgun possession in the home for self-defense.  Otherwise, *Heller*'s core right would seem "unlimited" in ways that the majority did not mean.

Thus the majority sought to protect weapons "*typically* possessed by law-abiding citizens" for self-defense in the home,[131] asserting that a limitation to weapons in common use is consistent with a tradition of restricting "dangerous and unusual weapons."[132]  Handguns are thereby covered in view of their current popularity in the market,[133] while the majority strongly suggested that machine guns, M-16s, and sawed-off shotguns are not.[134]  We do not know the extent to which regulation may validly influence which weapons become common.  Such influence was implicitly tolerated by the *Heller* majority because the mix of weapons purchased in contemporary America is partly a function of the tax and regulatory policies discussed in Part I.  In any event, a right restricted to the type of weapon owned by the mainstream of armed home-defenders fits with the majority's demilitarized vision of the amendment.

The discussion of other presumptively valid regulation was even more brief:

> [N]othing in our opinion should be taken to cast doubt on longstanding prohibitions on the possession of firearms by felons and the mentally ill,

---

128.  *See id.* at 2788, 2822.
129.  *Id.* at 2816.
130.  *Id.* at 2817 n.26.
131.  *Id.* at 2815–16 (emphasis added).
132.  *Id.* at 2817.
133.  *See id.* at 2817–18.
134.  *See id.* at 2815, 2817.

or laws forbidding the carrying of firearms in sensitive places such as schools and government buildings, or laws imposing conditions and qualifications on the commercial sale of arms.[135]

Later, in distinguishing founding era regulation of gun powder storage, the majority said its logic did not suggest problems with "laws regulating the storage of firearms to prevent accidents."[136] Finally, the majority observed that most nineteenth-century cases had upheld prohibitions on concealed weapons.[137]

The opinion is, nevertheless, a litigation magnet. On the same day that *Heller* was decided, suit was filed against the city of Chicago arguing that the *Heller* right must be enforced against state and local action.[138] In another suit that raises the incorporation question, gun show owners are using *Heller* to challenge Alameda County's law against guns on county property.[139] And New York City is now defending its handgun permit system, which critics argue is too demanding and grants excessive discretion to the police department.[140] Some criminal defendants are even objecting to the federal machine gun ban and felon in possession convictions, despite the list of presumptively valid regulations in *Heller*.[141] And some jurisdictions are avoiding the costs and risks of litigation by repealing their handgun bans without a fight over incorporation.[142] In early 2009, San Francisco followed this course. It settled a gun

---

135.   *Id.* at 2816–17.
136.   *Id.* at 2820.
137.   *See id.* at 2816. On unconcealed pistols, see *infra* Part III.C.
138.   The Second Amendment Foundation maintains a website dedicated to the case. *See* ChicagoGunCase.com, http://www.chicagoguncase.com (last visited May 23, 2009). Plaintiffs are challenging Chicago's handgun ban, *see* CHI., ILL., MUN. CODE §§ 8-20-040(a), 8-20-050(c) (2008) (noting exceptions), as well as the city's requirement that firearms be registered before acquisition and then re-registered annually, *see id.* §§ 8-20-090(a), 8-20-200. However, Chicago law seems to differ from the District of Columbia's regime at issue in *Heller*, in that Chicago does not appear to mandate a trigger lock on all firearms in the home at all times. Whether any such difference will influence the outcome of litigation remains to be seen.
139.   *See* Nordyke v. King, 563 F.3d 439, 457, 460 (9th Cir. 2009) (concluding that Second Amendment rights are incorporated into the Due Process Clause of the Fourteenth Amendment, but then upholding this regulation of firearms on county property and stating that "the Ordinance does not meaningfully impede the ability of individuals to defend themselves in their homes with usable firearms, the core of the right as *Heller* analyzed it").
140.   *See* Daniel Wise, *Defense Lawyers Fire First Shot in Challenge to State Gun Law*, N.Y. L.J., July 16, 2008, at 1.
141.   These arguments have not been successful in lower federal courts, however. *See, e.g.*, United States v. Gilbert, 286 F. App'x 383, 386 (9th Cir. 2008), *cert. denied*, 129 S. Ct. 613 (2008); United States v. Whisnant, No. 3:07-CR-32, 2008 WL 4500118, at *1 (E.D. Tenn. Sept. 30, 2008) (collecting cases); *see also* Adam Winkler, *Heller's Catch-22*, 56 UCLA L. REV. 1551, 1564–66 (2009) (analyzing post-*Heller* lower court cases).
142.   *See* Deborah Horan, *Gun Bans Erode Under Pressure: Evanston Is the Latest to Repeal Its Handgun Law*, CHI. TRIB., Aug. 13, 2008, *available at* http://www.chicagotribune.com/news/local/chi-gun-ban_13aug13,0,1421061.story. Prevailing plaintiffs may recover their attorney fees from state and local defendants in federal constitutional litigation, but prevailing defendants normally

rights lawsuit by agreeing to eliminate a lease provision for public housing ten-
ants that prohibited storage of firearms and ammunition.[143]  The question
remains how the legal uncertainty will shake out.

### C.    Models for Judicial Review After *Heller*

Even with the majority's laundry list of presumptively valid regulations
in hand, there is no obvious theory by which to better specify the listed
items—or to add new items.  Remember that the list is neither conclusive
nor exhaustive.  Is the list governed by historical analogies and traditional
police powers?  Can it be built into a general principle allowing "reasonable"
regulation?  This is unsettled.  Nor did the majority identify a generic test
that one should apply to determine whether the Second Amendment is
violated.  Providing such guidance is not a requirement for case law and can
be difficult to do well in a single decision, but the absence of a prescribed
test leaves regulators guessing.

One possibility is that the Court will fashion additional rules based on
history and analogy.  After all, the *Heller* majority devoted thousands of
words to an analysis of historical sources.  These justices indicated that they
were investigating the ordinary meaning of the amendment's words to ordinary
citizens in 1791.[144]  Whatever version of originalism was on display, it was the
predominant mode of argument for the majority.  In addition, the majority
rejected case-by-case balancing of competing interests within the perceived
"core protection" of the Second Amendment.[145]  In contrast, Justice Breyer's
dissent advocated judicial balancing and considered much more than founding
era firearms regulation.[146]  The majority responded, "[W]hatever else [the
amendment] leaves to future evaluation, it surely elevates above all other
interests the right of law-abiding, responsible citizens to use arms in defense
of hearth and home."[147]  There is no hint here of judges asking whether a chal-
lenged regulation is justified by cost-benefit analysis or supported by reliable data.

cannot.  *See* Harold S. Lewis, Jr. & Elizabeth J. Norman, Civil Rights Law and Practice 442,
462–63 (2001).

143.    *See* Stipulation Regarding Settlement and Dismissal of Defendants San Francisco
Housing Authority and Henry Alvarez III Without Prejudice, Doe v. S.F. Hous. Auth., No. CV-
08-03112 TEH (N.D. Cal. Jan. 12, 2009) (continuing, however, to prohibit unlawful firearms and
ammunition possession), *available at* http://volokh.com/files/sfpublichousingguns.pdf.

144.    *See* District of Columbia v. Heller, 128 S. Ct. 2783, 2788, 2810 (2008).  For a discussion of
different versions of originalism, see Samaha, *supra* note 108, at 1327–29.

145.    *See Heller*, 128 S. Ct. at 2821.

146.    *See id.* at 2847–68 (Breyer, J., dissenting).

147.    *Id.* at 2821 (majority opinion); *see also id.* ("Constitutional rights are enshrined with
the scope they were understood to have when the people adopted them . . . .").  Of course, a right's

But other facets of *Heller* indicate the Court is not locked into strong and rule-oriented originalism. As for hard-line rules over flexible standards, the majority's repudiation of case-specific interest balancing was done with reference to the "core protection" recognized in *Heller*.[148] Perhaps the majority's inflexibility begins and ends with this core right, while some brand of judicial cost-benefit analysis would be appropriate elsewhere, at least at the periphery of Second Amendment values. As for originalism, it was not the only form of analysis on display. Founding era historical sources were not used to explain and probably cannot explain certain critical junctures in the majority opinion.

Most notably, the majority's list of presumptively valid firearms regulation was not supported with serious originalist investigation. In fact, the list was not supported with much of any argument. It is quickly becoming one of the most important features in the majority opinion, yet its foundation is far easier to locate in contemporary political consensus or perhaps the necessity of pragmatic compromise in building a five-vote coalition on the bench than it is to support with eighteenth-century regulatory examples.

Equally important, the majority relied on sources far removed from 1791. *Heller*'s rendition of nineteenth-century characterizations of the Second Amendment stretched to include sources postdating ratification by nearly 100 years.[149] These citations help us understand postenactment traditions much better than they can reveal any settled meaning at the founding. Using tradition to inform constitutional doctrine is also consistent with the majority's reference to "longstanding" gun control in its preferred list,[150] with its claim that the District's ban was more burdensome than others in history,[151] and with its reliance on an extended practice of prohibiting unusual weapons.[152] While such analysis does involve history and analogy, it is a departure from strong and pure originalism.

Judge-centered traditions played a role in the majority opinion as well. For example, the majority claimed that the District's handgun ban flunked "any of the standards of scrutiny that we [judges] have applied to enumerated constitutional rights."[153] But no one asserts that these standards are dictated by

---

originally understood scope—to the extent that its meaning was determinate within the relevant population at the relevant time—could include consideration of circumstances that may change and authorize future decisionmakers to adjust in light of those changes.

148.     *See id.*
149.     *See, e.g., id.* at 2811–12.
150.     *See id.* at 2816–17.
151.     *See id.* at 2818.
152.     *See id.* at 2817.
153.     *Id.* at 2817–18.

originalism alone. They are tests that courts developed to implement constitutional norms.[154] The majority also made the effort to reconcile its historical conclusions with the Court's meager case law regarding the Second Amendment,[155] which was unnecessary if only originalist history mattered. And the majority cautioned that nineteenth-century precedent indicating that gun rights are not enforceable against state action "did not engage in the sort of Fourteenth Amendment inquiry required by our later cases."[156]

Hence neither strong originalism nor strict rule-like doctrine has been locked into place by *Heller*—surely not in the long run, possibly not for cases outside of the core right now recognized, and perhaps not for the process of defining limits on that core right. Only by word count is the *Heller* opinion dominated by originalism.

If we are correct, the majority exhibited dependence on history without prescribing any particular model for judicial review of Second Amendment claims over the long term. And there is no consensus model that judges could import from other fields of constitutional adjudication.

The truth is that judicial review is not a binary choice. Turning it on does not determine exactly how it should be performed. Instead, making judicial review operational requires choices along several dimensions, and it implicates fundamental questions about the judicial role.

The first choice is whether any judicial oversight will take place. Some clauses of the Constitution of the United States are never litigated (for example, many provisions involving the structure of Congress) or are not enforced by courts (for example, certain issues of impeachment).[157] Some clauses have been enforced against ordinary politics in one era only to be largely ignored in another (for example, the Contracts Clause).[158]

Among those constitutional norms that courts are comfortable enforcing, judges have developed a variety of practices. Some domains are filled with founding era history and analogical reasoning (for example, federal jury trial rights).[159] Other domains turn to longstanding tradition for guidance (for

---

154. For a catalog of doctrinal tests developed by courts in constitutional cases, see RICHARD H. FALLON, JR., IMPLEMENTING THE CONSTITUTION 76–101 (2001).

155. *See Heller*, 128 S. Ct. at 2812–16.

156. *Id.* at 2813 n.23; *see also id.* at 2791 ("Some have made the argument, bordering on the frivolous, that only those arms in existence in the 18th century are protected by the Second Amendment. We do not interpret constitutional rights that way.").

157. *See, e.g.*, Nixon v. United States, 506 U.S. 224, 233 (1993).

158. *See* Adam M. Samaha, *Dead Hand Arguments and Constitutional Interpretation*, 108 COLUM. L. REV. 606, 642 (2008).

159. *See, e.g.*, Curtis v. Loether, 415 U.S. 189, 193 (1974).

example, strands of substantive due process).[160] Many others are dominated by judicial precedent and analogical reasoning (for example, speech and abortion rights).[161] Some combine precedent, originalist history, and contemporary interest balancing (for example, search and seizure jurisprudence).[162]

Even when common law development of constitutional doctrine predominates, diversity reappears. Some justices value specific doctrinal rules over the flexibility of more open-ended standards, while others exhibit the opposite preference.[163] The intensity of judicial review also varies. Sometimes the Court organizes its thinking around several tiers of scrutiny (for example, equal protection doctrine). These tiers vary in how important the asserted regulatory interest must be, and in how tight the connection between that interest and the regulation under attack must be. Presumptively invalid regulatory classifications, such as race, receive nondeferential strict scrutiny;[164] a few others, including sex, receive intermediate scrutiny;[165] mere rational basis review with extreme deference to policymakers is applied elsewhere.[166] Much free speech precedent has a similar character.[167] But in other fields, this analytical structure is not apparent. In Eighth Amendment cases, the Court looks to policy trends across the country and then exercises its own judgment on whether the punishment in question is cruel under contemporary standards of decency.[168]

Whatever shape Second Amendment doctrine takes in this expanse of options, the country's experience with judicial review does suggest boundaries

---

160.    *See, e.g.*, Washington v. Glucksberg, 521 U.S. 702, 720–22 (1997).

161.    *See, e.g.*, Davis v. FEC, 128 S. Ct. 2759, 2770–74 (2008) (invalidating a campaign finance regulation by relying on free speech case law and not originalist history); Stenberg v. Carhart, 530 U.S. 914, 929–31 (2000) (invalidating a so-called partial birth abortion law). *Davis* was issued on the same day as *Heller* and was decided by the same 5–4 coalitions. The leading expositor of common law constitutionalism is David A. Strauss. *See* David A. Strauss, *Common Law Constitutional Interpretation*, 63 U. CHI. L. REV. 877 (1996).

162.    *See, e.g.*, Wyoming v. Houghton, 526 U.S. 295, 299–303 (1999).

163.    Compare the Court's general balancing test for due process violations, which is a form of cost-benefit analysis, *see* Mathews v. Eldridge, 424 U.S. 319, 332–35 (1976), and its "undue burden" test in abortion cases, *see* Planned Parenthood of Se. Pa. v. Casey, 505 U.S. 833, 874 (1992) (plurality opinion), with its rulings in some federalism cases, which may promote more specific rules such as a prohibition on "commandeering" state officers, *see* Printz v. United States, 521 U.S. 898, 925 (1997). *See generally* Kathleen M. Sullivan, *The Supreme Court, 1991 Term— Foreword: The Justices of Rules and Standards*, 106 HARV. L. REV. 22 (1992).

164.    *See, e.g.*, Grutter v. Bollinger, 539 U.S. 306, 326 (2003).

165.    *See, e.g.*, Miss. Univ. for Women v. Hogan, 458 U.S. 718, 723–24 (1982).

166.    *See, e.g.*, City of Cleburne v. Cleburne Living Ctr., 473 U.S. 432, 440 (1985).

167.    *See infra* Part III.D.

168.    In the same term that *Heller* was decided, Justice Kennedy assessed trends in state policies regarding the death penalty to adjudicate an Eighth Amendment claim. *See* Kennedy v. Louisiana, 128 S. Ct. 2641 (2008) (invalidating the death penalty for child rape).

56 UCLA LAW REVIEW 1041 (2009)

on its influence.  First, judicial review cannot be fully detached from politics.  If nothing else, the appointments process connects judicial personnel to organized interests and elected officials.  The course of Second Amendment litigation depends, in part, on who will judge these cases in the future.

Second, and related, the federal judiciary does not have an impressive track record in making major policy changes.[169]  Judges might resist the intense policy preferences of others for a time, but courts are not insulated in the long run.  Thus the Supreme Court could not effectively desegregate public schools alone, and it did not resist New Deal innovations forever.  It bears repeating that the gun rights movement began outside the courtroom, and that handgun bans were already quite unpopular at the national level.  As should be apparent from our discussion in Part I, *Heller* stepped into an existing regulatory and political structure built up over many years.  It did not discard that structure entirely.  As it turns out, the revolution probably will be televised, but it almost certainly will not be litigated.

We might then predict that Second Amendment litigation will probably dampen regulatory diversity to some degree, without eliminating existing gun control within the political mainstream.[170]  Surely the short-term impact of *Heller* is a reduction in policy variation by eroding the most assertive end of the regulatory spectrum.  If the case is extended to state and local law, this effect could be more serious.  Local outliers will not be able to sustain every local preference for strict gun control based on local conditions.

## III.    ON THREATS AND SIDESHOWS TO SOCIAL WELFARE

*Heller* establishes a limited core right to handgun possession in the home without necessarily meaning more.  Courts could push further, and they have models for relatively assertive judicial review in other fields.  But we doubt that constitutional litigation will radically change the character of firearms regulation in the United States.  There are few if any examples of judicial power effectively implementing major social change.  Courts tend to work at the margins of public policy, and *Heller* does not commit the Supreme Court to a more aggressive mission.  That said, courts could use the Second Amendment to shape the future of gun control policy in significant ways.

---

169.    *See, e.g.*, NEIL K. KOMESAR, IMPERFECT ALTERNATIVES: CHOOSING INSTITUTIONS IN LAW, ECONOMICS, AND PUBLIC POLICY 250–54 (1994) (noting that courts can address only a small fraction of significant policy disputes); GERALD N. ROSENBERG, THE HOLLOW HOPE: CAN COURTS BRING ABOUT SOCIAL CHANGE? (2d ed. 2008).

170.    A similar view is defended by Cass R. Sunstein, *Second Amendment Minimalism: Heller as Griswold*, 122 HARV. L. REV. 246, 263–65 (2008).

Our aim here is to speculate about the path of Second Amendment litigation to come. We attempt to identify issues that plausibly could be litigated and that could make a serious difference to social welfare based on current knowledge. It turns out that some hot topics destined for judicial resolution are of little or uncertain significance to sound and effective regulation of firearms, while possibly unappreciated constitutional arguments pose real concerns for social welfare over the longer term.

We begin with a short discussion of incorporation and an inquiry into whether the elimination of municipal handgun bans is truly a matter of major concern. We ask the same question regarding the looming litigation contest over a right to carry handguns in public. Then we turn to potential challenges that give us greater pause: attacks on a variety of laws and practices that treat guns as a special category, including excise taxes on firearms, gun design regulation, and even gun-oriented policing. Finally, we address the somewhat cloudy relationship between gun rights litigation and regulatory innovation.

A.   Incorporation

Incorporation of Second Amendment norms against state and municipal action has become a highly salient legal issue after *Heller*. The Court's majority mentioned the question,[171] and the city of Chicago is currently resisting incorporation in a lawsuit that challenges its handgun ban.[172] It is a virtual certainty that the Supreme Court will confront the incorporation issue in the near future.

The significance of incorporation, however, is open to a measure of debate. Clearly a judicial refusal to enforce Second Amendment norms against state or local regulation would seriously undercut any practical importance of *Heller* and its progeny. The federal government has not been the principal source of gun control. The political environment has been such that aggressive gun control efforts tend to occur in a select set of states and cities; the absence of incorporation would leave those jurisdictions untouched by Second Amendment norms.[173]

---

171.    *See* District of Columbia v. Heller, 128 S. Ct. 2783, 2813 n.23 (2008).
172.    *See supra* note 138.
173.    One caveat is the possibility that state courts' understanding of state constitutional gun rights could be influenced by the Supreme Court's understanding of the Second Amendment, regardless of incorporation, and that the latter understanding could turn out to be expansive. Assessing the likelihood of this possibility is difficult. Even if the Supreme Court does take an expansive view of the amendment, state courts need not follow. *See, e.g.*, State v. Parker, 987 P.2d 73, 77 n.1, 78 n.2 (Wash. 1999) (declining to conform state constitutional doctrine to a U.S. Supreme Court opinion on the

56 UCLA LAW REVIEW 1041 (2009)

The question is whether a judicial decision in favor of incorporation would have much greater consequences. But we cannot answer without knowing how Second Amendment doctrine itself will develop. If *Heller* is interpreted narrowly such that only flat handgun prohibitions are declared invalid, then the impact on gun policy will not be dramatic, regardless of whether states and municipalities are subject to suit.[174] Of course judges could easily expand on *Heller*'s core right, and the mere threat of litigation can influence policymaking. But the potential impact of incorporation heavily depends on the as-yet unsettled content of Second Amendment doctrine.

In any event, a fair guess is that the *Heller* majority is poised to incorporate. Those five justices reserved the issue, but they gratuitously observed that nineteenth-century precedents insulating state action had not employed the Court's more recent approach to incorporation.[175] In addition, the majority's rendering of the Second Amendment right was emphatically personal. This makes it difficult to resist application against the states with an argument that the amendment was written to protect the militias of those same states. Moreover, the majority's discussion of Reconstruction Era sources indicates a belief that those involved in creating the Fourteenth Amendment were concerned about the gun rights of freed slaves.[176] This version of history would allow the Court to link gun rights to an anti-subordination effort very different from another strut in the individual rights heritage: *Dred Scott v. Sandford*.[177] In addition, if the question is whether the right is sufficiently "fundamental" to warrant enforcement against all levels of government,[178] the *Heller* opinion intimates an affirmative answer.[179]

---

Fourth Amendment). *But cf.* FLA. CONST. art. 1, § 12 (linking state search and seizure guarantees to U.S. Supreme Court doctrine).

174. *See also infra* Part III.B (discussing the limited importance of handgun bans).

175. *See Heller*, 128 S. Ct. at 2813 n.23.

176. *See id.* at 2809–11.

177. 60 U.S. (19 How.) 393, 450 (1857) (opinion of Taney, C.J.) (dictum) (referring to the right to keep and bear arms in a list of unconstitutional federal "powers . . . in relation to rights of person" (*quoted in* Parker v. District of Columbia, 478 F.3d 370, 391 (D.C. Cir. 2007), *aff'd sub nom.* District of Columbia v. Heller, 128 S. Ct. 2783 (2008)).

178. *See* Duncan v. Louisiana, 391 U.S. 145, 148–49 (1968) (regarding jury trial rights in criminal cases). Note that the plaintiffs challenging Chicago's handgun ban are asking the courts to reconsider the narrow understanding of the Fourteenth Amendment's Privileges or Immunities Clause in the *Slaughter-House Cases*, 83 U.S. (16 Wall.) 36 (1873), in addition to arguing for incorporation under the Due Process Clause of the Fourteenth Amendment. *See* Plaintiffs' Motion to Narrow Legal Issues at 4–5, McDonald v. City of Chicago, No. 08-CV-3645 (N.D. Ill. Oct. 21, 2008), *available at* http://www.chicagoguncase.com/wp-content/uploads/2008/10/motionnarrowlegalissues.pdf.

179. *Cf. Heller*, 128 S. Ct. at 2798 ("By the time of the founding, the right to have arms had become fundamental for English subjects.").

Finally, the Court could incorporate without totally repudiating *Presser v. Illinois*,[180] a key precedent in this area. The case rejected a gun rights claim under the Second and Fourteenth Amendments, but it involved state restrictions on unauthorized military organizations parading as such.[181] This claim is far different from the demilitarized vision of gun rights endorsed in *Heller*. It seems that *Presser* comes out the same way under *Heller* regardless of the Court's position on incorporation—which is another reminder that the stakes of incorporation depend on the substance of the right to be enforced.

We cannot know with certainty how today's justices will respond to arguments on incorporation. The Court has seldom confronted the issue in recent decades, and it implicates critical judicial choices concerning federalism and constitutional jurisprudence more generally. But we can still conjecture as to the plausible substance and impact of Second Amendment rights after *Heller*, assuming that incorporation will happen.

B.   Handgun Bans

*Heller* establishes that the current Supreme Court will not tolerate comprehensive handgun bans when such laws are challenged by citizens that the Court believes are otherwise entitled to possess handguns for the purpose of self-defense in the home. The question for us is whether this judicial commitment matters much, even if it applies against state and local action and not only the federal government and its enclaves. There are at least two perspectives from which to respond. The first perspective is political: It considers the viability of proposed handgun bans among policymakers. The second perspective assumes the enactment of handgun bans, and considers the likely consequences of such bans. As far as we can discern from the available evidence, neither perspective does much to establish the significance of the handgun ban issue for social welfare.

1.   A Political Perspective

Of all the forms that gun control takes in America, comprehensive handgun bans are among the least popular. This policy has never been an element of federal law or, it seems, a realistic proposal at the national level. A handful of municipalities have enacted handgun prohibitions, including the major metropolises of Chicago and the District of Columbia. But these

---

180.   116 U.S. 252 (1886).
181.   *See id.* at 264–66.

56 UCLA LAW REVIEW 1041 (2009)

locations and their political settings are fairly unique. It is possible that the center of political gravity in other localities is such that handgun bans would be enacted but for state-level politics that prevent them. In any case, most states now have preemption legislation or precedent that allocates lawmaking authority over firearms to state legislatures rather than city councils.[182]

Of course, if handguns bans were generally popular, then elevating the level for gun control policymaking from cities to states would not necessarily lead to less territory being covered by such bans. But they are not popular, at least according to recent public opinion polling. In a 2007 Gallup Poll, 68 percent of respondents opposed a handgun ban.[183] Opposition reached across several demographic categories. Respondents with postgraduate education expressed opposition at a 60 percent level, and 57 percent of women over age fifty were also opposed.[184]

It is worth emphasizing that litigation threats are an unlikely explanation for the rarity of handgun bans. Until 2008, Second Amendment arguments were ineffectual in courts, and state constitutional adjudication was not radically more inhibiting.[185] Handgun bans have been unpopular with policymakers for other reasons. From what we can gather, the political resistance to handgun bans is not the result of a well-organized gun rights minority blocking the preferences of a dispersed majority. This public choice story might fit the resistance to other gun-control proposals—some of which show national majority support in polling[186]—but it is probably a weak explanation for the rarity of handgun prohibitions.[187]

There is a notable qualification here. Political environments are not stable over the long term and so there is no guarantee that popular preferences regarding handgun regulation are fixed. Demand for more aggressive legislation in urban areas could develop over time, at least in the absence of serious

---

182. *See* Beckman, *supra* note 90; *see also* Sippel v. Nelder, 101 Cal. Rptr. 89, 89–90 (Ct. App. 1972) (invalidating a San Francisco handgun permitting system in favor of state law).

183. *See* GALLUP POLL SOCIAL SERIES: CRIME 252 (2007) (question 21).

184. *See id.*; *see also* Sunstein, *supra* note 170, at 252 (asserting that "national opposition to a ban on handguns has been larger and more consistent in recent years").

185. *See, e.g.*, Quilici v. Village of Morton Grove, 695 F.2d 261, 271 (7th Cir. 1982) (upholding a local operative handgun ban against Second Amendment, Ninth Amendment, and state constitutional claims); Kalodimos v. Village of Morton Grove, 470 N.E.2d 266, 278–79 (Ill. 1984) (rejecting a claim under a qualified state constitutional right to keep and bear arms).

186. *See* SMITH, *supra* note 15, at 1 (showing support for a variety of gun regulations).

187. However, we cannot rule out the possibility that there is an unorganized majority in some states that would prefer greater decentralization in gun control policymaking, but that is blocked by a better organized gun rights movement.

litigation threats.[188]  Constitutional litigation has the potential to inhibit those political changes, certainly at the margins and possibly beyond.  For some observers, this lock-in effect is desirable.  But regardless of one's ideological predispositions on firearms regulation, *Heller* and its incorporation against municipal action might be important insofar as courts could drive a wedge between emerging political preferences and valid law.  We discuss the chilling effects on policy innovation below.

2.    A Policy Consequence Perspective

Even if judicial doctrine ultimately stands against handgun bans enacted by any level of government, one can ask whether these formal laws have much impact on social welfare.  An effective judicial campaign to eliminate certain types of legislation is not necessarily a matter of serious concern if the targeted legislation is ineffectual.  If, however, such legislation tends to reduce the prevalence of handgun ownership by raising the costs of acquisition, even if acquisition remains possible, then the question becomes how handgun ownership is related to crime and public health.  There has been considerable research on this relationship.

a.    Gun Prevalence, Crime, and Public Health

Firearms are the most lethal of the widely available weapons deployed in assaults, robberies, and self-defense.  They are the great equalizer.  With a gun, most anyone can threaten or inflict grave injury on another, even someone with greater skill, strength, and determination.  With a gun, unlike a knife, one individual can kill another quickly, at a distance, on impulse.

The logical and documented result is that, when a gun is present in an assault or robbery, the victim is more likely to die.  It is not only the assailant's intent that determines the outcome, but also the means of attack.  This conclusion regarding instrumentality has been demonstrated in a variety of ways and is no longer controversial among social scientists.[189]  Thus widespread

---

188.    The Village of Morton Grove, which apparently enacted the first comprehensive municipal handgun prohibition, repealed its law after opponents filed suit in the wake of *Heller*. *See* Robert Channick, *Morton Grove's Historic Gun Ban Ends: Village's Law Falls to High Court Ruling*, CHI. TRIB., July 29, 2008 ("Fighting in court to try to keep the law would cost money the village does not have, officials said.").

189.    *See* Cook, *supra* note 11, at 18–19; William Wells & Julie Horney, *Weapon Effects and Individual Intent to Do Harm: Influences on the Escalation of Violence*, 40 CRIMINOLOGY 265, 287–92 (2002); Franklin E. Zimring, *Is Gun Control Likely to Reduce Violent Killings?*, 35 U. CHI. L. REV.

56 UCLA LAW REVIEW 1041 (2009)

gun use in violent crime *intensifies* violence, increasing the case-fatality rate. The United States is exceptional with respect to violent crime not because we have so much more of it, but because widespread gun availability and use means that our violence is so much more deadly than that of other Western nations.[190]

The likelihood that a gun will be used in crime is closely linked to the general availability of guns, and especially handguns. In jurisdictions where handgun ownership is common, the various types of transactions by which youths and criminals become armed are facilitated. The list of transactions includes thefts from homes and vehicles, loans to family members and friends, and off-the-books sales. In an area with a high-prevalence of gun ownership, then, transactions in the secondary market are subject to less friction and may well be cheaper than in markets where gun ownership is rare.[191] While there is no evidence that gun prevalence affects the rate of violent crime, gun prevalence does have a demonstrable effect on the likelihood that the assailants in robbery and assault will be armed with guns, resulting in a higher case-fatality rate than would otherwise occur.[192]

Research on the effects of gun prevalence has been facilitated by the discovery of a useful proxy: the percentage of suicides committed with guns.[193] It allows us to analyze how gun use relates to the prevalence of gun ownership across states, or even counties. This proxy has been used to document a strong positive relationship between county gun prevalence and each of the following outcomes: the fraction of robberies involving guns; the fraction of homicides with guns; the likelihood that young men carry a gun; and, most important, the overall homicide rate.[194] Considerable care was taken in these studies to establish that the relationship was causal, although in the absence of experimental evidence there necessarily remains

---

721, 735–37 (1968); Franklin E. Zimring, *The Medium Is the Message: Firearm Caliber as a Determinant of Death From Assault*, 1 J. LEGAL STUD. 97 (1972).

190. *See* FRANKLIN E. ZIMRING & GORDON HAWKINS, CRIME IS NOT THE PROBLEM: LETHAL VIOLENCE IN AMERICA 51, 106–13 (1997) (comparing the United States with other developed nations in terms of violence, both life threatening and not).

191. *See* Philip J. Cook, Jens Ludwig, Sudhir Venkatesh & Anthony A. Braga, *Underground Gun Markets*, 117 ECON. J. F588, F589–90 (2007) (focusing on Chicago, emphasizing policing practices, and collecting survey data from other cities).

192. *See* COOK & LUDWIG, *supra* note 32, at 34, 35–36 (citing Philip J. Cook, *The Effect of Gun Availability on Robbery and Robbery Rates: A Cross Section Study of 50 Cities*, 3 POL'Y STUD. ANN. REV. 743, 743–81 (1979)).

193. *See* Azrael et al., *supra* note 16; Gary Kleck, *Measures of Gun Ownership Levels for Macrolevel Crime and Violence Research*, 41 J. RES. CRIME & DELINQ. 3, 8 (2004).

194. *See* Philip J. Cook & Jens Ludwig, *Does Gun Prevalence Affect Teen Gun Carrying After All?*, 42 CRIMINOLOGY 27, 36 (2004); Cook & Ludwig, *supra* note 10, at 387–88 (connecting the proxy for county-level gun prevalence to overall homicide rates).

some doubt. The bulk of the evidence at this point suggests more prevalent handgun ownership engenders more widespread use of guns in crime as well as higher social costs of crime.

From a public health perspective, a concern for the effects of gun prevalence on suicide is as important as the effect on homicide. In fact, gun suicide is more common than gun homicide, although it seems fair to say that the threat of suicide does not have the same broad effects on quality of life as does the threat of violent crime. The assertion that gun availability influences the suicide rate may be questioned on the grounds that, unlike in the case of assault, someone who wishes to commit suicide has a choice of alternative mechanisms that can be equally as effective as a gunshot. Nonetheless, in the United States a majority of suicides are committed with guns, while guns are involved in only a small fraction of unsuccessful suicide attempts. Those determined to kill themselves can find a way; but, for those attempting suicide on impulse, the lethality of readily available and psychologically acceptable weapons appears to matter. A recent review of the evidence by Matthew Miller and David Hemenway collects numerous case control studies comparing gun-owning households to observably similar households without guns, as well as ecological research pointing to the same conclusion.[195] While this empirical research helps make the case, it is the logic and descriptive information on suicide that is most compelling to us.

If an ultimate consequence of *Heller* is increased handgun ownership in some jurisdictions, these likely effects on violent crime and suicide may be viewed as tangential to the intended effect of the decision—to safeguard the right of trustworthy householders to defend their home against intruders. In that light, perhaps the most relevant consequences of increased gun prevalence are the effect on residential burglary rates and home-invasion rates. Unfortunately we have no reliable data on the frequency with which householders actually do use a gun to defend against home invasion, or with what degree of success. Certainly it happens, but how frequently remains a mystery. Survey data do not provide a reliable basis for finding the answer because self-reports of these events are unreliable. Moreover, the estimated frequencies differ by an order of magnitude, perhaps depending on how the questions are asked.[196]

---

195.    *See* Mark Duggan, *Guns and Suicide*, *in* EVALUATING GUN POLICY: EFFECTS ON CRIME AND VIOLENCE, *supra* note 89, at 41, 41; Matthew Miller & David Hemenway, *Guns and Suicide in the United States*, 359 NEW ENG. J. MED. 989, 990 (2008); Matthew Miller et al., *Household Firearm Ownership and Rates of Suicide Across the 50 United States*, 62 J. TRAUMA, INJ., INFECTION & CRITICAL CARE 1029 (2007).

196.    *See* HEMENWAY, *supra* note 45, at 66–69 (pointing to a large difference between assertions of some gun proponents and results from the National Crime Victimization Survey, which posed open questions to people who had actually reported an incident).

56 UCLA LAW REVIEW 1041 (2009)

However, we can estimate the influence of gun prevalence on burglary rates and patterns. One study, which used a variety of data sets and methods, concluded that the prevalence of gun ownership in a county is positively related to the burglary rate.[197] This association does not appear spurious, but rather most likely results from an inducement effect. Other things equal, residential burglary tends to be more profitable in communities where guns are likely to be part of the available loot. The rate of "hot" burglaries (break-ins of occupied homes) is also positively related to gun prevalence, although the effect is small.[198]

Let us review the chain of logic. To the extent that *Heller* and subsequent Court decisions make handguns cheaper and more readily available in some jurisdictions, those jurisdictions will likely experience an increase in demand for handguns and ultimately an increase in the prevalence of ownership. An increase in ownership prevalence will in turn make guns more readily available to criminals, thereby increasing gun use in violent crime and suicide, resulting in an increased death rate from intentional violence. Burglary rates are also likely to increase as burglary becomes more lucrative. But as it turns out, the first link in that chain—the connection between invalidating handgun bans and increased prevalence of handgun ownership—is the weakest empirically. It requires further discussion.

### b. Will Handgun Prevalence Increase in the District?

The District of Columbia's ban on handgun acquisitions was enacted in 1976. But, by the late 1980s, the notion that the ban had achieved anything useful seemed unlikely, given common references to the city as the "murder capital of the country."[199] Of course we do not know how high the homicide rate spike would have been in the absence of the ban. Yet there is good evidence that the ban was ineffective in preventing members of the public from arming themselves during the turbulence of the 1980s.

In fact, homicides and suicides declined by approximately 25 percent around the time of the ban, led by reductions in homicides and suicides with guns[200]—before the tsunami of violence stemming from the introduction

---

197. *See* Philip J. Cook & Jens Ludwig, *Guns and Burglary*, *in* EVALUATING GUN POLICY: EFFECTS ON CRIME AND VIOLENCE, *supra* note 89, at 74, 76.

198. *See id.* at 102–04.

199. Matthew Cella, *Murder Rate Raises Concern*, WASH. TIMES, Apr. 28, 2003, at B01. *But cf.* Vance Garnett, Op-Ed, *Homicide: Will the Shake-Up Help?*, WASH. POST, Sept. 28, 1997, at C08 (asserting that *Newsweek* coined the term with respect to D.C. in 1941).

200. *See* Colin Loftin et al., *Effects of Restrictive Licensing of Handguns on Homicide and Suicide in the District of Columbia*, 325 NEW ENG. J. MED. 1615, 1616–17 (1991).

of crack cocaine in the mid-1980s. Still controversial is the issue of how much of this decline can be attributed to the handgun ban rather than other factors.

In an influential article published in the *New England Journal of Medicine*, criminologist Colin Loftin and his colleagues showed that, following the ban, homicides and suicides declined in Washington, D.C., and by a greater margin than in the city's Maryland and Virginia suburbs.[201] A challenge to the use of affluent suburbs as a control group for the city[202] prompted additional research using Baltimore data. Like the District, Baltimore also experienced a decline in firearm homicides around 1976. But unlike the District, Baltimore experienced a reduction in *both* non-gun and gun homicides, suggesting some general change in Baltimore during this time period that was not specific to guns. Further, Baltimore did not experience a decline in gun *suicides*.[203]

It is interesting, then, to analyze gun-ownership rates in the District of Columbia and Baltimore during this period. Figure 1 tracks the proxy for gun ownership from the period before the District's ban was enacted until the end of the 1990s. The rate jumps up in the late 1980s, just as the crack epidemic was pushing up criminal violence—but Baltimore had quite a different trajectory during that time. Gun ownership has declined in the District since the early 1990s, and in recent years has dropped lower than when the ban was initiated in 1976 (and far lower than the national average). Perhaps the lesson from the early years is that a ban in a small jurisdiction with porous borders is difficult to enforce, especially in the face of broad concern caused by a major crime epidemic. Oddly, this may be good news for the District: It suggests that the removal of the handgun ban may have little effect, standing alone, on the prevalence of handgun ownership.

The data hint at a similar pattern in Chicago, home to the other notable handgun ban susceptible to legal challenge following *Heller*. In 1982, Chicago essentially banned private ownership of handguns, with a grandfather exception enabling those already in possession of handguns to register them with the city. Figure 2 shows that our proxy for gun ownership in all of Cook County declined somewhat during a brief period after the city's ban was enacted, but then reverted to pre-ban levels.[204] Whether the numbers

---

201. *See id.*

202. *See* Chester L. Britt et al., *A Reassessment of the D.C. Gun Law: Some Cautionary Notes on the Use of Interrupted Time Series Designs for Policy Impact Assessment*, 30 L. & SOC'Y REV. 361 (1996).

203. *See* David McDowall et al., *Using Quasi-Experiments to Evaluate Firearms Laws: Comment on Britt et al's Reassessment of the D.C. Gun Law*, 30 LAW & SOC'Y REV. 381 (1996).

204. *See also* Philip J. Cook & Jens Ludwig, *The Effects of the Brady Act on Gun Violence, in* GUNS, CRIME, AND PUNISHMENT IN AMERICA 283, 294 (Bernard E. Harcourt ed., 2003).

in Chicago proper followed the same pattern is unknown; the city has only about half of the county's suicides.[205]

In sum, the effect of these local handgun bans on the prevalence of gun ownership is uncertain, although there is some indication that it has not been large. This does not mean that these and other interventions have no effect on the prices and availability of guns. Fortunately, the underground gun market in Chicago does not work well, and young people and criminals tend to have a difficult time obtaining a gun if they are not gang members.[206] The handgun ban and the ban on licensed dealers in that city may contribute to these frictions. But available data leads us to question whether judicial invalidation of (weakly enforced) handgun bans would seriously threaten social welfare. The general political hostility to such prohibitions adds to our skepticism. It is therefore plausible that the most obvious implication of *Heller* for formal law has little significance for sound and politically feasible gun control.

FIGURE 1: PERCENTAGE OF SUICIDES COMMITTED WITH GUNS IN WASHINGTON, D.C., AND BALTIMORE, MARYLAND[207]



---

205. *See* ILL. CTR. FOR HEALTH STATISTICS, ILL. DEP'T OF PUB. HEALTH, VITAL STATISTICS ILLINOIS 2002, at 95, 127 (2006), *available at* http://www.idph.state.il.us/pdf/ 2002_Vital_Statistics_Illinois.pdf.

206. *See* Cook et al., *supra* note 191, at F598, F601–02.

207. Figure 1 presents five-year averages for the percentage of suicides committed with guns, a proxy for household gun ownership rates. *See supra* notes 193–194.

FIGURE 2: PERCENTAGE OF SUICIDES COMMITTED WITH GUNS IN COOK COUNTY
AND IN THE REST OF ILLINOIS[208]



C.   Public Places and Concealed Carry

      In addition to the issues of incorporation and municipal handgun bans,
Second Amendment litigation will likely address a right to carry weapons in
public places.  Whether otherwise qualified gun owners should be entitled
to carry firearms beyond their homes and into generally accessible locations,
including a right to carry concealed firearms, has been on the policy agenda
for more than a century.  The Supreme Court, in dicta from 1897, indicated
that the Second Amendment does not protect concealed carry.[209]

      But this suggestion might be reconsidered or left narrow by reliance on
*Heller*'s self-defense theme.  It could be argued that protecting oneself from
violence in high-crime areas is no more important within the home than
out in the open.  True, this argument runs into some of *Heller*'s hedging on
handgun rights.  During its discussion of limits on Second Amendment
rights, the majority opinion observed that nineteenth-century state court

---

      208.    Figure 2 presents five-year averages for the percentage of suicides committed with guns,
a proxy for household gun ownership rates. *See supra* notes 193–194.
      209.    *See* Robertson v. Baldwin, 165 U.S. 275, 281–82 (1897) ("Thus, the freedom of speech
and of the press (article 1) does not permit the publication of libels, blasphemous or indecent
articles, or other publications injurious to public morals or private reputation; the right of the
people to keep and bear arms (article 2) is not infringed by laws prohibiting the carrying of
concealed weapons . . . .").

56 UCLA LAW REVIEW 1041 (2009)

cases had usually rejected constitutional claims to a right of concealed carry.[210] Elsewhere, however, the majority noted some nineteenth-century judicial support for a right to *unconcealed* pistols.[211] Part of that jurisprudence is, to put it politely, unrelated to modern forms of public policy analysis, but it does suggest that gun rights can extend into public places without including concealed carry. Thus an 1850 decision from Louisiana lauded "a manly and noble defence" with unconcealed weapons while disparaging "secret advantages and unmanly assassinations" with concealed weapons.[212]

However the courtroom arguments about gun rights in public (or manliness) might play out in the twenty-first century, our question is whether one result would have significantly different consequences from another. It is certainly true that permit systems of some kind are a politically viable form of gun control in many jurisdictions. Indeed, almost all states require that legal gun owners obtain a permit to carry a concealed firearm in public, although over time a growing number of states have relaxed their requirements for issuing such permits.[213] What would it mean to social welfare if otherwise qualified citizens possessed a federal constitutional right to carry guns in public, whether openly in a holster or concealed on their person? What if this right were subject to approval through a permit system? There is no uncontroversial answer to these questions, especially in light of the different forms that a right to public carry might take. But we can present salient arguments and existing empirical data.[214]

---

210. *See* District of Columbia v. Heller, 128 S. Ct. 2783, 2816 (2008).
211. *See id.* at 2809, 2818.
212. State v. Chandler, 5 La. Ann. 489, 490 (1850).
213. *See* John A. Dvorak, *Concealed Weapons Laws Taking Hold, Broadening Across U.S.*, KAN. CITY STAR, Mar. 2, 2002 (Domestic News).
214. It is possible that law enforcement officers' stop-and-frisk authority would be curtailed if the courts established a right to carry concealed weapons in public. Police officers might have more difficulty establishing reasonable suspicion of criminal activity to support a stop. *See* Terry v. Ohio, 392 U.S. 1, 30–31 (1968); Lawrence Rosenthal, *Second Amendment Plumbing After* Heller: *Of Standards of Scrutiny, Incorporation, Well-Regulated Militias, and Criminal Street Gangs*, 41 URB. LAW. 1, 37–48 (2009) (raising concerns about the potential effects of an extension of *Heller*). However, *Terry* stops might often be justified on alternative grounds not necessarily related to illegal gun possession, such as suspicion of drug crimes or even curfew violations. Before confidently predicting the implications of extending *Heller* for stop-and-frisk tactics, we need to know how often alternative grounds for a stop are available, and whether substantive criminal law might be expanded to generate those grounds. These kinds of adjustments would not be shocking in the field of law enforcement. In any event, the officer safety justification for the stop-and-frisk doctrine seems adequate to preserve pat downs and weapons seizures during certain police-citizen encounters regardless of whether police suspect unlawful or lawful gun possession. *See* Terry, 392 U.S. at 23–24, 29–30. Nor should we assume that, if *Heller* were extended to public places, *Terry* doctrine will remain static. However, a remaining hitch for police officers might be their authority to keep seized weapons at the end of a street encounter if the citizen is not arrested, lawfully possesses the firearm, and asks for the weapon back on the spot. These interchanges

Those who wish to encourage gun carrying in public places by private parties argue that the increased likelihood of encountering an armed victim will deter criminals. This possibility receives some support from prisoner surveys: 80 percent of prisoners in one survey agreed with the statement that "a smart criminal always tries to find out if his potential victim is armed."[215] But the same data also raise the possibility that an increase in gun carrying could prompt an arms race. Two-thirds of prisoners incarcerated for gun offenses reported that the chance of running into an armed victim was very or somewhat important in their own choice to use a gun.[216] Currently, criminals use guns in only about 25 percent of noncommercial robberies and 5 percent of assaults.[217] If increased gun carrying among potential victims causes criminals to carry guns more often themselves, or become quicker to use guns to avert armed self-defense, the end result could be that street crime becomes more lethal.[218]

In a provocative series of research papers and books, economist John Lott has argued that the deterrent effects of moving from restrictive to permissive gun-carrying laws dominate.[219] On the other side economist John Donohue argues that, while Lott's analysis improves on previous research on this topic, Lott's findings cannot support the conclusion that ending restrictive concealed-carry laws reduces crime.[220] Donohue's re-analysis of the Lott data indicates that states that eventually ended restrictive concealed-carry laws had systematically different crime trends from the other states even before these law changes

---

might be risky for police officers, and yet a right to demand immediate return of the weapon could follow from a broad view of the Second Amendment.

215. WRIGHT & ROSSI, *supra* note 27, at 145.

216. *See id.* at 147.

217. *See* MICHAEL R. RAND, U.S. DEP'T OF JUSTICE, CRIMINAL VICTIMIZATION, 2007, at 6 (2008), *available at* http://www.ojp.usdoj.gov/bjs/pub/pdf/cv07.pdf (reporting, as well, that offenders used firearms in 7.1 percent of all violent crimes in 2007).

218. The policy analysis is complicated by the choice between rights to carry concealed as opposed to unconcealed weapons outside the home. If people have a right to carry handguns in public but the government mandates unconcealed carry for those who choose to do so, then potential aggressors would receive reliable information regarding which would-be victims are most vulnerable. Not seeing a handgun would be closer to knowing that a person is not carrying one. Of course, it could be that unconcealed carry mandates cannot be effectively enforced. Nevertheless, such a regime of rights and regulations (public carry with mandatory nonconcealment) could be meaningfully different from a regime in which people have a legal right to choose whether or not to conceal the handguns that they choose to carry in public (public carry with optional concealment)—or in which government mandates concealment for any person otherwise entitled to possess a handgun in public (public carry with mandatory concealment). Each combination probably has different informational effects.

219. *See* LOTT, *supra* note 78, at 115; John R. Lott & David B. Mustard, *Crime, Deterrence and Right-To-Carry Concealed Handguns*, 26 J. LEGAL STUD. 1 (1997).

220. *See* John J. Donohue, *The Impact of Concealed-Carry Laws*, *in* EVALUATING GUN POLICY: EFFECTS ON CRIME AND VIOLENCE, *supra* note 89, at 287, 289–90.

went into effect. The tendency to adopt the law under study following an unusual spike in crime—which would ordinarily be followed by a reduction regardless of whether a new law were passed—makes the analysis problematic. Indeed, Donohue finds much evidence in support of the view that these laws increased crime rates in the 1990s, when crime was generally declining.[221] Hence the estimated treatment effect may be attributable to whatever unmeasured factors caused crime trends to diverge before the laws were enacted.

Regardless of who gets the better of this particular debate, we want to stress the issue of magnitudes. Whether the net effect of relaxing concealed-carry laws is to increase or reduce the burden of crime, there is good reason to believe that the net is not large. One study found that in twelve of the sixteen permissive concealed-carry states studied, fewer than 2 percent of adults had obtained permits to carry concealed handguns.[222] And the actual change in gun-carrying prevalence will be smaller than the number of permits issued would suggest, because many of those who obtain permits were already carrying guns in public.[223] Moreover, the change in gun carrying appears to be concentrated in rural and suburban areas where crime rates are already relatively low, among people who are at relatively low risk of victimization—white, middle-aged, middle-class males.[224] The available data about permit holders also imply that they are at fairly low risk of misusing guns, consistent with the relatively low arrest rates observed to date for permit holders.[225]

Based on available empirical data, therefore, we expect relatively little public safety impact if courts invalidate laws that prohibit gun carrying outside the home, assuming that some sort of permit system for public carry is allowed to stand. The result would most likely be a modest change in gun carrying rates among a subset of the population that is itself at relatively low risk of either committing gun crimes or being victimized by them. Of course, we cannot confidently predict that a judicially enforceable right to public carry would not change the composition of those who carry guns in public; and the

---

221.   See id. at 312–13. See generally Ian Ayres & John J. Donohue, Shooting Down the "More Guns, Less Crime" Hypothesis, 55 STAN. L. REV. 1193 (2003).

222.   See Cook & Ludwig, supra note 11, at 725 (citing J.M. Hill, The Impact of Liberalized Concealed Weapon Statutes on Rates of Violent Crime (1997) (unpublished senior thesis, Duke University, Public Policy) (on file with authors)).

223.   See Gail Robuck-Mangum, Concealed Weapon Permit Holders in North Carolina: A Descriptive Study of Handgun-Carrying Behavior 40 (1997) (unpublished master's thesis, University of North Carolina, School of Public Health) (on file with authors).

224.   See Cook & Ludwig, supra note 11, at 726 (citing Hill, supra note 222).

225.   See H. STERLING BURNETT, NAT'L CTR. FOR POLICY ANALYSIS, TEXAS CONCEALED HANDGUN CARRIERS: LAW-ABIDING PUBLIC BENEFACTORS 1 (2000), available at http://www.ncpa.org/pdfs/ba324.pdf (reporting that concealed carry licensees in Texas had lower arrest rates than the rest of the population).

effects on public safety could vary depending on whether any such right includes the choice to conceal as opposed to openly carry a firearm outside the home. As well, our analysis would be different if a right to public carry were coupled with an enlargement of the class of people entitled to acquire firearms, or if government were not allowed to operate a permit system at all. Even if the test for issuance is fairly permissive, imposing a permit requirement might well affect the composition of gun carriers in positive ways. On the available data, however, the issue of public carry standing alone seems more likely to be a source of litigation than a serious threat to social welfare.

D.  Gun-Targeted Taxes, Safety Programs, and Policing

Given the discussion above and the *Heller* majority's apparent commitment to immunizing much of the existing gun control regime, the stakes of Second Amendment litigation seem low. But there might be greater threats to sound public policy in the future.

Our first concern is that courts might someday hold that special regulatory treatment of firearms is prima facie evidence of a constitutional violation. That is, judges might consider it presumptively problematic that government action singles out firearms or handguns, and then require a justification so demanding that reasonably reliable evidence and logic become insufficient for gun control to survive. Demanding anything resembling mathematical certainty that a regulation will enhance public safety at acceptable cost would jeopardize large swaths of existing gun control efforts, and thwart potential innovation in the future. Everything from gun taxes, to gun design requirements, to gun safety programs involving permits and licenses, to gun registration and information collection efforts, to gun-oriented policing in high-violence neighborhoods could be disrupted—unless regulators show analogous treatment of other products or otherwise survive skeptical judicial scrutiny of the program's value.

Nothing in *Heller* commits the Court to this path, but it would not be entirely novel in constitutional adjudication. Free speech and free exercise doctrines include this sort of anti-targeting structure.[226] In these fields the modern Court has often concentrated on government action that not only burdens behavior the justices believe constitutionally valued, but that singles out such behavior for special disfavor. To be clear, this anti-targeting approach

---

226.   *See* Adam M. Samaha, *Litigant Sensitivity in First Amendment Law*, 98 Nw. U. L. Rev. 1291, 1294 (2004).

does not fit all of First Amendment doctrine.[227] Nor is it easy to identify which forms of regulatory targeting ought to be problematic. This requires a theory. For instance, the Court has been relatively unconcerned when government regulates the time, place, or manner of speech without explicitly targeting speech content,[228] even though such choices can be crucial to speakers and audiences. Regardless, one must have a justifiable definition of "the freedom of speech" before one can tell whether regulation targets the phenomenon. It is not at all obvious how "the right to keep and bear arms" should be fully specified, and then how the doctrinal categories from free speech or free exercise litigation might be imported into the gun rights field. It is nevertheless worth raising the First Amendment analogy. The *Heller* majority did so in several places.[229]

Consider in this regard a tributary of speech doctrine that leans hard against special taxation of the traditional press. In 1983, the Court declared invalid a state tax on paper and ink used for producing publications, with exemptions for the first $100,000 worth—even though it appeared that the complaining newspapers would have paid more under the state's general sales tax.[230] On the other hand, the Court has repeatedly rejected press claims for exemption from regulation that reaches other industries, despite the real economic burdens that may be imposed on the media; the Court grants media operations no constitutional immunity from labor or antitrust laws that are applicable to other businesses.[231] This kind of logic might be exported to Second Amendment litigation. Indeed, regulatory cost concerns have already arisen after *Heller*. Plaintiffs challenging gun control in Chicago are not only objecting to the city's handgun ban, they also seek invalidation of a recurring firearms registration and fee requirement.[232]

Now consider the federal excise tax. Since 1919, the federal government has collected an excise tax on firearms.[233] This one-time tax on sales now

---

227. *See id.* at 1317–18, 1355–71 (identifying situations when claimant conduct matters to First Amendment doctrine and its functions).
228. *See, e.g.*, Ward v. Rock Against Racism, 491 U.S. 781, 791 (1989).
229. *See* District of Columbia v. Heller, 128 S. Ct. 2783, 2790–91, 2797, 2799, 2805, 2812, 2817 n.27, 2821 (2008) (connecting First and Second Amendment text, history, and judicial treatment).
230. *See* Minneapolis Star & Tribune Co. v. Minn. Comm'r of Revenue, 460 U.S. 575, 577–79, 588–91 (1983) (expressing concern that judges will not be able to calculate tax burdens); *id.* at 597–98 (Rehnquist, J., dissenting) (comparing liability under the sales tax). To be fair to the majority, the sales tax was not necessarily the correct baseline for comparison. Exemptions to the paper-and-ink tax meant that only a few large newspapers paid the tax.
231. *See* Cohen v. Cowles Media Co., 501 U.S. 663, 669–70 (1991); Associated Press v. NLRB, 301 U.S. 103, 132–33 (1937).
232. *See supra* note 138.
233. *See* Revenue Act of 1918, Pub. L. No. 254, § 900(10), 40 Stat. 1058, 1122 (codified as amended in scattered sections of 26 U.S.C.).

stands at 10 percent of the manufacturer's price for handguns and 11 percent for long guns.[234]  At least part of this tax is surely passed along to consumers. Even if a tax burden by itself will not trigger heightened judicial skepticism, a post-*Heller* judiciary might nevertheless ask whether a firearms tax law is special compared to other taxation schemes and whether the government can explain the differences persuasively.  If firearms are taxed like sporting goods, perhaps judges become passive; but if they are taxed in a unique way, perhaps judges become inquisitive.  It is of course possible for government lawyers to defend special treatment for firearms by linking their prevalence or misuse to social harm and to the level of taxation or other regulation in question.  But case outcomes would depend upon what kind of logic judges find most persuasive and how much evidence they demand to support the regulation. Taxation can be the product of political opportunity and demand elasticities, rather than distinctions that a judge deems principled.

If courts are sufficiently demanding of evidentiary support and if they are sufficiently sensitive to cost increases from firearms regulation, there could be major losses in social welfare.  Minimizing the cost of acquiring firearms obviously benefits those who sell or enjoy possessing them, but these gains have attendant threats.  One worrisome possibility is that concerned judges would invalidate experimental gun control efforts or targeted taxation that nevertheless have a reasonable chance of seriously improving public health and safety.  Furthermore, gun-targeted laws can be designed to offset negative externalities that empirical study associates with firearms.  By one estimate, keeping a handgun in the home is associated with at least $600 per year in externalities.[235]  On the usual logic of corrective taxation, it would make sense to raise the current firearms tax rate so that handgun owners internalize the full social costs of their choices.[236]  Attempts to tax or otherwise regulate

---

234.  *See* Alcohol & Tobacco Tax & Trade Bureau, Dep't of the Treasury, Tax and Fee Rate, http://www.ttb.gov/tax_audit/atftaxes.shtml (last visited May 23, 2009).  Ordinary wine is taxed at only 21¢/bottle. *See id.*
235.  *See* Cook & Ludwig, *supra* note 10, at 390.
236.  Liability insurance is an alternative mechanism for the internalization of externalities associated with gun ownership.  A standard homeowners' insurance policy ordinarily covers liability for accidents involving guns, but often has an exemption for intentional harms, or even for harms resulting from criminal acts.  *See* Tom Baker & Thomas O. Farrish, *Liability Insurance & the Regulation of Firearms, in* SUING THE GUN INDUSTRY, *supra* note 92, at 292, 299; Tom Baker, *Liability Insurance at the Tort-Crime Boundary, in* FAULT LINES: TORT LAW AND CULTURAL PRACTICE (D.M. Engle & M. McCann eds., forthcoming 2009) (manuscript at 7), *available at* http://papers.ssrn.com/sol3/papers.cfm?abstract_id=1314309.  It is not clear how far liability or liability coverage extends for cases in which the gun is transferred by the owner to someone else, or is stolen, and then misused.  To the best of our knowledge, no states or localities require gun owners to obtain such insurance.  The threat of litigation following *Heller* could stifle local experiments with such policies.

56 UCLA LAW REVIEW 1041 (2009)

firearms based on estimates of their social costs are threatened by constitu-
tional doctrine that flatly disfavors such special treatment absent conclusive
proof of those social costs. Even information collection systems could be at
risk of invalidation.[237]

To economists, the effect of taxation and other requirements on the
price of guns is not just an incidental detail, but rather may have an important
effect on gun sales, use, and misuse. It seems apparent that the most
important health-related outcome likely to come from the cigarette litigation
has been the increase in the price of cigarettes resulting from the financial
settlement with the states.[238] The tax on new guns, though much more
modest proportionally, should also have some effect on demand, reducing
the number of guns and the prevalence of gun ownership by some amount. The
economic logic here rests on the strong presumption that a tax on new guns
will be passed on to the secondary market by restricting the quantity
available from the primary market.[239] The same price effect can be achieved
by imposing permit fees or by establishing minimum quality standards—as
with the ban on imports of low-quality handguns—or by requiring special
features on new guns, such as locking devices or microstamp capability. But
these initiatives tend to make guns special from a regulatory perspective.

---

237. The public safety consequence of repealing licensing and registration systems is a bit
unclear based on available evidence. These systems do provide information regarding who owns
which guns, information that could prove useful to law enforcement investigations. The most vivid
example is in the future. The California law requiring pistols sold after 2010 to have micro-stamp
capability will be more useful if the state is allowed to continue handgun registration; the
regulatory combination should help investigators connect shell casings found at the scene of a
crime to the current or recent owner of the gun. Unfortunately, evaluation of existing state-level
licensing and registration systems is forced to rely on weak research designs, yielding evidence for
regulatory impact on immediate output measures but not on outcomes of more direct policy
interest. For example, D.W. Webster et al., *Relationship Between Licensing, Registration and Other
Gun Sales Laws and the Source State of Crime Guns*, 7 INJ. PREVENTION 184 (2001), finds some
effect of licensing and registration requirements on the fraction of confiscated crime guns that
were first purchased out of state. *See id.* at 188. How informative this is about the ease with
which criminals can obtain guns, or ultimately the overall rate of gun crime within a community,
is unclear. A study of the federal Brady Act suggests the ability of the secondary gun market to
shift, and at least partially offset, changes to the supply side of the market. After the Brady Act
was enacted, Chicago experienced a large drop in the share of crime guns first sold out of state, yet
the fraction of homicides committed with a gun did not seem to change at all. *See* Cook & Braga,
*supra* note 27, at 304–07; Philip J. Cook & Jens Ludwig, *Pragmatic Gun Policy, in* EVALUATING
GUN POLICY: EFFECTS ON CRIME AND VIOLENCE, *supra* note 89, at 1, 21–22.
238. *See* Frank J. Chaloupka & Kenneth E. Warner, *The Economics of Smoking, in* 1B
HANDBOOK OF HEALTH ECONOMICS 1539, 1546–56 (Anthony J. Culyer & Joseph P. Newhouse
eds., 2000) (reviewing studies for the proposition that monetary price increases tend to reduce cigarette
demand, despite the product's addictive qualities).
239. *See* Philip J. Cook & James A. Leitzel, *"Perversity, Futility, Jeopardy": An Economic Analysis of
the Attack on Gun Control*, LAW & CONTEMP. PROBS., Winter 1996, at 91, 104–05 fig.2.

We have reason to believe, however, that courts will not aggressively follow an anti-targeting theme in Second Amendment doctrine. First, for reasons noted above, judges are unlikely to radically uproot gun control regardless of the doctrinal forms they adopt. Second, an anti-targeting theme is not necessarily sensible for the Second Amendment as a matter of lawyers' logic. It depends on what motivates courts to single out singling out, so to speak.

Part of the motivation derives from a conclusion that an enormous variety of government action can negatively influence the exercise of constitutionally valued behavior, and that not every adverse effect can or should be policed by courts.[240] This limit on judicial ambition does seem equally applicable to Second Amendment litigation. If mass media must pay property taxes, and if the Constitution is no barrier to enforcing religiously-neutral drug laws against religious ritual,[241] then it is difficult to see why handguns cannot validly be subject to a general sales tax or to pre-market approval from a product safety commission, for example.

The complication arises from the necessity of identifying which forms of regulatory targeting might be constitutionally troubling. It is not enough for a court to recognize constitutional value in the private conduct at issue. Such value is jeopardized whether or not regulators single it out for special treatment. To enforce an anti-targeting theme while minimizing or ignoring other government-imposed burdens, judges ought to have a convincing reason for their skepticism of regulatory targeting itself.

In the free speech field, one might conclude that government regulation that isolates particular messages for uniquely burdensome treatment is presumptively problematic. This could be based on a theory that, say, government officials are especially likely to use such regulation to entrench their own power and to freeze the political environment against logical testing and innovation.[242] And we might believe that, in general, forcing the political system to treat communication more like other conduct provides a handy safeguard. Speakers will thereby have natural allies in the democratic process who are likewise threatened with regulatory burden.[243]

---

240. *See, e.g.*, Larry A. Alexander, *Trouble on Track Two: Incidental Regulations of Speech and Free Speech Theory*, 44 HASTINGS L.J. 921, 943 (1993).

241. *See* Employment Div. v. Smith, 494 U.S. 872, 889–91 (1990).

242. *See, e.g.*, FREDERICK SCHAUER, FREE SPEECH: A PHILOSOPHICAL ENQUIRY 43–44, 80–86 (1982) (suggesting regulation might be distrusted more than speech is especially valued).

243. *See, e.g.*, KATHLEEN M. SULLIVAN & GERALD GUNTHER, FIRST AMENDMENT LAW 204–05 (3d ed. 2007). There are other theories that might support anti-targeting themes and yet still weaken the case for substantial burdens tests; perhaps a targeted burden amounts to a special form of injury.

But we have doubts that courts could faithfully translate this logic into the gun rights domain. We are aware of no convincing theory of just political power that identifies the gun rights movement as in need of federal judicial assistance. This movement is anything but a perennial loser in ordinary politics, and a judicial attempt to multiply allies for the gun lobby would be hard to justify on a reasonable vision of equitably distributed political influence. One might believe that existing gun control is too onerous without believing that the political process is rigged in its favor.

Nor is it clear what special skepticism the judiciary should have when it comes to firearms regulation. If we focus on *Heller*'s reasoning, the majority's key concern was handgun possession for self-defense in the home. But it is doubtful that regulators surreptitiously harbor ill will toward those hoping to protect themselves against criminal intruders, or that they will often use firearms regulations as a method for squelching self-defense efforts. Had *Heller* emphasized the problem of centralized tyranny, our analysis would be different. But it did not. The majority's vision for the right was mainstreamed and demilitarized.[244] Once the rationale for gun rights moves away from fear of centralized tyranny and aligns with more mainstream values, such as preserving self-defense from private criminal assault, judges would seemingly have less reason to worry that specialized gun regulation is the first step toward an impermissible end.

This is not to claim that courts have no basis on which to invalidate firearms regulation beyond comprehensive handgun bans. Our point is that the path toward an anti-targeting theme in Second Amendment doctrine is logically challenging. And a substantial burden analysis would yield a pattern of outcomes that is not easy to predict. Our concern remains that, however controversial the legal logic, courts will borrow an anti-targeting theme from elsewhere in constitutional doctrine and then subject nearly all gun control efforts to substantial judicial review. While we hold to our sense that courts will not radically revise firearms law in the United States, confirming our prediction of judicial modesty might be possible only after much litigation—and with an additional cost in the form of regulatory stasis.

E.    Judicial Review and Innovation

This brings us to a more diffuse yet at least equally troublesome risk of Second Amendment litigation. The Supreme Court's willingness to inject the judiciary into the gun control arena could have a socially detrimental

---

244.    *See supra* Part II.A.

dampening effect on regulatory innovation. This should be of concern to anyone who believes that gun policy in America has come to an unfortunate stalemate, and that the future might open political opportunities for novel regulatory approaches that overcome current ideological cleavages and do more good than harm.

Granted, constitutional law does not necessarily kill innovation. The relationships among constitutionalism, judicial review, and regulatory innovation are actually quite complex. One description of constitutional law in the United States has emphasized entrenchment of old norms against change, but many observers now recognize that a constitutional order can generate institutions to make change.[245] Judicial review is no different. It might retard or instigate regulatory innovation, depending on how it is performed. For example, nonjudicial policymakers might respond to judicial invalidations with new regulatory approaches in an effort to respect both judicial judgments and public demands. Just as *Roe v. Wade* did not end the development of abortion law, *Heller* did not end the District of Columbia's gun control efforts.[246] In addition, the very substance of constitutional doctrine can mandate periodic updating in ordinary law. An illustration is Eighth Amendment doctrine's focus on evolving standards of decency.[247] We can imagine a Second Amendment doctrine that likewise calls for evaluation of gun control according to contemporary values and circumstances.

But the possibility of constitutional litigation certainly can deter novel government responses to old or new social problems—and passages in *Heller* seem crafted to have this dampening effect. Recall the majority's reliance on eighteenth- and nineteenth-century sources for guidance on the Second Amendment's meaning, its reference to a tradition of prohibiting dangerous or unusual weapons, and its apparent preference for longstanding gun control measures.[248] Even if these forays into originalist history and subsequent tradition leave readers uncertain about what counts as unacceptable novelty in gun control, and even if some type of interest balancing was operating in

---

245. *See, e.g.*, STEPHEN HOLMES, PASSIONS AND CONSTRAINT: ON THE THEORY OF LIBERAL DEMOCRACY 153 (1995) ("The American Constitution is an instrument of government, not an obstacle to government . . . ."); Samaha, *supra* note 158, at 631–33, 662–67 (discussing coordination theories of authority for our constitutional text). A provocative argument for valuing constitutional debate precisely for its ability to combat entrenchment is LOUIS MICHAEL SEIDMAN, OUR UNSETTLED CONSTITUTION: A NEW DEFENSE OF CONSTITUTIONALISM AND JUDICIAL REVIEW 55, 210–16 (2001). In this regard, consider that *Heller* effectively disrupted a status quo in judicial review against Second Amendment claims.

246. *See supra* note 118.

247. *See, e.g.*, Kennedy v. Louisiana, 128 S. Ct. 2641, 2664–65 (2008).

248. *See supra* text accompanying notes 144–152.

56 UCLA LAW REVIEW 1041 (2009)

the background, the Court's official rationale looks largely unsympathetic to policy experimentation. We cannot be certain at this point that fighting comprehensive handgun bans will exhaust judicial opposition to firearms regulation. There is now a substantial range of plausible litigation threats while the Court's position on gun control remains vague. These threats can prevent policy experiments before they begin.

It might be fair to ask whether the demand for innovative responses to gun risks is appreciable in the current political environment. One might believe that the policy rut is too deep for Second Amendment litigation threats to make much difference. But we believe that policy innovation is alive in some states and localities. Jurisdictions including California, Maryland, and Massachusetts have moved forward with new gun control policies in recent years.[249] Relatively innovative ideas include microstamping shell casings for the purpose of tracing crime guns, reviewing the design of new guns before they hit the market, and requiring personalized gun technology that attempts to restrict usage to owners only. Perhaps less mainstream—but nevertheless intriguing—is the possibility of taxing firearms according to their estimated social costs, or requiring firearms owners to maintain insurance to cover the costs of gun misuse by themselves or others. Some such innovation might be analogized to existing regulation of other commodities, but these ideas would be new with respect to firearms. A tradition-oriented Second Amendment doctrine would undercut efforts to introduce them.

Furthermore, the political environment for firearms regulation can change. Opportunities for new policy rise and fall with such factors as changing demographics and the salience of gun violence. If the decline in sporting uses of guns continues to sap NRA membership efforts, if gun crimes and visible street gang activity spike upward again, and if we witness another Virginia Tech-style massacre, the politics will likely change. But a tradition-enforcing form of judicial review can minimize these regulatory opportunities. In fact, this politically countercyclical role for judicial oversight helps explain the oddity of 305 members of Congress supporting constitutional litigation against the District of Columbia, rather than simply voting to override the District's regulations.[250] *Heller* could help freeze some existing political victories on the

---

249.    *See supra* Part I.C.1–I.C.4.

250.    *See supra* note 4. It is possible that the Senate's commitment to supermajority votes for cloture against filibusters led this simple majority of Congress members to prefer constitutional litigation to ordinary legislation. If so, the shift to litigation is a consequence of the legislators' own institutional design choices. On constitutional objections to the filibuster, see Adam M. Samaha, *Undue Process*, 59 STAN. L. REV. 601, 608–09, 667–68 (2006).

gun rights side, victories that kept gun control mild and that make *Heller* look unimportant at the moment.

*Heller* might put a brake on new gun control policy through two mechanisms. First, at least some proposals will be debated under a serious threat of constitutional litigation with its attendant costs for the government. These costs are not limited to financing an adequate legal defense; losing a Second Amendment challenge might mean paying damages or attorneys fees to the claimants. And litigation threats against innovative regulation will remain strong unless and until Second Amendment doctrine is clarified in relevant respects. Consider California's cutting edge rule that, beginning in 2010, semiautomatic pistols must be designed to stamp a serial number on the shell casing each time a round is fired.[251] Whether this requirement will pass constitutional muster is not fully known at the moment, and the issue may not be settled for many years. Meanwhile, legislators in other states who are attracted to this idea as a boon to police investigations will have to persuade the majority that it not only serves the public interest, but that it is worth the expected cost of defending it in the courts. Even if microstamping is somehow insulated from serious Second Amendment objections, in some cases the expected litigation costs will be prohibitive.

The second mechanism is more speculative, but it might be significant. *Heller* transformed the notion of personalized Second Amendment rights from contested to justiciable. The decision could therefore strengthen the rhetorical arsenal of gun rights supporters, even if these advocates go beyond *Heller*'s language.[252] It is hard to predict the political effect that this shift will have in practice, but it may be nontrivial. The hopeful view of gun control advocates, that *Heller* would open the door to moderate legislation by undercutting the rhetorical force of the slippery slope argument,[253] is yet to be confirmed and might be naïve.[254] On the other hand, the case could ultimately have no meaningful effect on constitutional argument outside the courts. Second Amendment objections to gun control predate *Heller* by decades, and the move-

---

251.    *See supra* note 88.

252.    *See* Nat'l Rifle Ass'n Inst. for Legislative Action, Supreme Court Declares That the Second Amendment Guarantees an Individual Right to Keep and Bear Arms (June 26, 2008), http://www.nraila.org/heller ("All law-abiding Americans have a fundamental, God-given right to defend themselves in their homes. Washington, D.C. must now respect that right.").

253.    *See* David M. Kennedy, Op-Ed., *After* Heller, *Reason Can Prevail*, NAT'L L.J., Sept. 23, 2008, *available at* http://www.law.com/jsp/scm/PubArticleSCM.jsp?id=1202424712957.

254.    *Cf.* Nat'l Ass'n for Gun Rights, The Ugly Truth About the *Heller* Decision (July 29, 2008), http://www.nationalgunrights.org/truthaboutheller.shtml (exhorting supporters to fuel pro-gun lobbying efforts because "liberals are using [*Heller*] to restrict our gun rights," and criticizing the decision for recognizing longstanding prohibitions on certain types of gun use).

ment behind those arguments helps explain the decision rather than the other way around. In addition, *Heller* demilitarized the amendment in a way that preserves key elements of modern gun control. Thus if judicial rhetoric influences nonjudicial debate, the influence might cut in two directions.

Even if *Heller* deters the implementation of some number of firearms policies that are worth trying, there is nevertheless a modest hope for improved policy quality in the regulation that does go forward. The Supreme Court intervened late in the development of gun regulation in the United States, and some might view the current system as dysfunctional. The less respect one has for gun politics today, the more one might hope that a dose of judicial oversight will prove net beneficial. The comparison is not between uninformed judges badly redrafting firearms law and an ideal world of policymaking. In the United States, authority over firearms regulation is often maintained within state legislatures responsive to the distribution of organized political power, not in localities sensitive to local conditions or administrative agencies building expertise on the potential and limits of gun control. And if Second Amendment doctrine beyond the core right recognized in *Heller* calls for sober consideration of rational argument and empirical data, the system of gun politics and regulation might make progress toward sound policy.

But this hope is no more than modest. The first problem is that we cannot guarantee that any improvement in policy quality will outweigh the value of foregone policy experiments. It almost goes without saying that we have more to learn about the characteristics of effective gun control that adequately account for the benefits of gun ownership. Second, judges are, at best, only marginally better at understanding the complexities of gun policy analysis than others involved in the system. They are not experts and they are unlikely to acquire the relevant expertise in short order, even if they act in good faith. Whether judges are able to incorporate values held by the general public rather than implement their own personal policy preferences is another serious question, if the goal is social welfare maximization.

Finally, the post-*Heller* litigation environment is decidedly asymmetrical. Gun rights proponents now have an additional method for achieving their goals, while gun control proponents will ordinarily lack conventional constitutional arguments to prompt gun regulation. Nonjudicial politics ultimately preempted many lawsuits against the gun industry, and now the Supreme Court has made it possible for the gun rights movement to press further in the other direction with supreme judicial review. To the extent that Second Amendment litigation prompts deeper and empirically driven evaluation of firearms regulation, it will come with gun control in a systematically

defensive posture. We have little confidence that this one-sided drag on policy innovation can produce sufficient gains to provide a net benefit.

For some, an additional opportunity to veto gun control in the courtroom will be a welcome change. But a libertarian presumption against government action is not self-evidently good policy from a social welfare perspective. And so we remain concerned that the greatest risk to sound public policy following *Heller* is among the least visible: an additional background pressure against novelty in the law of gun control at a time when experimentation and creative decisionmaking are crucial.

## CONCLUSION

*Heller* begins a new era in the history of gun control. It adds federal constitutional adjudication to the policymaking environment in a novel way, without determining much of the future for Second Amendment doctrine. We have attempted to understand the dimensions and underpinnings of the decision, and to evaluate its plausible consequences for social welfare. This perspective and the available data lead us to believe that some obvious constitutional issues, such as the validity of nonfederal handgun bans and the entitlement to concealed-carry permits, are not especially threatening. Yet other possible outcomes, such as judicial skepticism of gun-targeted regulation or litigation risks that chill regulatory innovation, ought to be matters of serious concern. Our analysis is itself only a beginning. But one important task after *Heller* is to separate true threats from sideshows in the continuing struggle to reduce crime and violence in America.

# EXHIBIT 5

*Philip J. Cook*

# The Influence of Gun Availability on Violent Crime Patterns

**ABSTRACT**

The spectacular increases in violent crime that began in the mid-1960s continue, and Americans are currently being murdered, robbed, and raped at historically unprecedented rates. Firearms are used in a minority of violent crimes but are of special concern because more than 60 percent of the most serious crimes—criminal homicides—are committed with firearms. This essay presents a variety of evidence to the effect that the widespread availability of firearms contributes to the criminal homicide rate and influences violent crime patterns in several other respects as well.

A gun is usually superior to other weapons readily available for use in violent crime; even in the hands of a weak and unskilled assailant, a gun poses a credible threat and can be used to kill quickly, from a distance, and in a relatively "impersonal" fashion. Guns are particularly valuable against relatively invulnerable targets. Hence, gun availability facilitates robbery of commercial places and lethal assaults on people who would ordinarily be able to defend themselves against other weapons. Some of the patterns of gun use in violent crime can be readily interpreted in terms of relative vulnerability of different types of victims.

Guns are also more dangerous than other weapons, in the sense that victims of robbery and assault are more likely to be killed if the assailant uses a gun. On the other hand, the victim is *less* likely to be injured in a gun robbery than in other robberies, since the gun robber usually does not feel the need to employ physical force.

This analysis suggests a number of predictions concerning the effects of gun availability on the number, distribution, and seriousness of violent crimes. In principle, these predictions could be tested directly by observing the effects of changes in gun availability on statistical characterizations of violent crime patterns. Not much research of this sort has been done,

Philip J. Cook is Associate Professor of Public Policy Studies and Economics at Duke University.

This essay is a substantial revision of my earlier paper entitled "The Role of Firearms in Violent Crime: An Interpretive Review of the Literature, with Some New Findings and Suggestions for Future Research." This revision owes a great deal to the editors of this volume.

49

50        Philip J. Cook

in part because it is difficult to find a suitable measure for gun availability. Future research should be directed toward remedying this problem. In the meantime, it seems fair to conclude from the available evidence that the type of weapon is not an incidental aspect of violent crime, but rather has a substantial influence on the nature of the encounter and its likely consequences.

Approximately 682,000 violent crimes were committed with firearms in 1977, including 11,300 criminal homicides, 367,000 assaults (ranging from criminal threats with a gun up to attempted murder), 15,000 rapes, and 289,000 robberies (Cook 1981b). This high volume of gun-related crime is a reflection of two unarguable facts: first, the rates at which people attacked and threatened each other with any and all types of weapons reached unprecedented levels during the 1970s; second, a large fraction of the United States public has ready access to firearms.

There are at present 100–140 million firearms in private possession, of which 30–40 million are handguns (Wright et al. 1981).[1] These numbers are the result of a decade of growth in the private inventory of firearms; the total volume of handgun import and manufacture for the past decade has exceeded the total volume for the preceding six decades combined, and new sales of long guns have also been high during recent years. Surprisingly, the fraction of households owning one or more firearms has remained constant (at about 50 percent) since 1959; the rapid influx of new guns is accounted for by the growth in the number of households during the 1970s and by a tendency for gun-owning households to increase their average inventory. The most important aspect of this tendency is the increase in the number of households that own handguns; by 1978 about half of all gun-owning households (24 percent of all households) possessed at least one handgun, whereas in 1959 only about one-quarter of gun-owning households possessed handguns.[2]

---

[1] The other statistics in this paragraph are also taken from Wright et al. (1981). Their calculations are based on careful analysis of both national survey data and data on manufacturing and import. Cook (1982) presents a more detailed analysis of the commercial flows of new handguns in a recent year.

[2] Some handguns are of course being sold to households that have never previously owned a gun, but this is the exception rather than the rule—75 percent of households that own handguns also own at least one rifle or shotgun (Cook 1982). Hobbyists and sportsmen continue to dominate the statistics with respect to firearms ownership: I estimate that the top one-third of handgun-owning households (about 7.5 percent of all households) own more than 60 percent of all handguns, and the top one-third of all long-gun-owning households (about 14 percent of all households) own more than 60 percent of all long guns (Cook 1982).

I believe that the widespread availability of firearms has a profound influence on violent crime patterns. The principal purpose of this essay is to explain and justify this highly controversial assertion. The secondary purpose is to summarize the descriptive statistical information concerning the role of firearms in violent crime. Section I presents a brief overview of trends and patterns in firearm use in the four major types of violent crime—criminal homicide, aggravated assault, robbery, and rape. Sections II–IV present and interpret some of the evidence suggesting that the type of weapon used in a violent crime is not an incidental or inconsequential aspect of the event, but rather one that influences the choices made by both criminal and victim and the likely consequences of these choices. First, section II sets out a conceptual framework for thinking about weapon use in violent crime. Major elements of this framework include the *vulnerability hypothesis* (firearms are more useful and more likely to be employed against relatively invulnerable targets) and the *objective dangerousness hypothesis* (the probability of death in an assault or robbery is greater if the assailant uses a gun than if he uses another weapon). These hypotheses, together with several others, provide a concise explanation for observed weapon-related patterns in violent crime and provide a basis for predicting the effects of changes in the availability of firearms. Sections III and IV present some of the statistical evidence relevant to evaluating the vulnerability and objective dangerousness hypotheses; most of this evidence is confirmatory, though much research remains to be done. The most direct approach to testing these hypotheses is systematic analysis of the effects of changes in gun availability on violent crime patterns. Section V presents a brief discussion of the problems entailed in conducting such tests, focusing on the preliminary problem of defining "gun availability" in an operational fashion. Finally, section VI suggests a modest agenda for future research.

It should be noted at the outset that the crime of rape is virtually ignored in this essay, even though it obviously deserves equal treatment with robbery and assault. The reason is simply the absence of pertinent information on the role of weapons in rape.

## I. Trends in Violent Crime Rates

The postwar "baby boom" cohorts have been responsible for an extraordinarily rapid increase in violent crime rates. Between 1965 and 1974, the police-reported rates of criminal homicide, rape, and aggravated assault each doubled, and the robbery rate tripled. After a brief

respite between 1975 and 1977, violent crime rates began increasing again, and the most recent data suggest that they reached an all-time high in 1980 and are continuing to increase.

A decade ago it was popular among criminologists to discount these trend data, primarily on the grounds that they might be reflecting an upward trend in the fraction of violent crimes reported to the police (and thence to the FBI) rather than an increase in the "true" crime rates. One problem with this argument is that it does not apply to the criminal homicide rate, which is believed to reflect nearly a 100 percent reporting rate. Since criminal homicides are *known* to have been increasing rapidly during the violent decade beginning in 1965, it seems entirely reasonable to take the trend data shown in table 1 on other violent crimes at near face value.

The effects of this incredible growth in violent crime are varied and surely profound, ranging from substantially reduced life expectancy and enhanced disability rates for some demographic groups to the widespread adoption of costly efforts to minimize victimization risk. Indeed, the effects are much more obvious than the ultimate causes. One possible cause is the increased availability of guns during the past fifteen years, an issue to which the data in table 2 are germane.

In recent years, firearms have been used in more than 60 percent of the criminal homicides, and in about two-fifths of the reported robberies and one-quarter of the reported aggravated assaults. (The *Uniform Crime Reports* offer no data on weapon use in rape.) Most of these gun-related crimes involve handguns. Since handgun ownership has become much more widespread over the past two decades, it is reasonable to suppose that increased gun availability has exacerbated the violent crime problem in recent years. Although I believe this conclusion is correct, it is far

TABLE 1
Percentage Increases in Violent Crime Rates

| Year | Nonnegligent Manslaughter and Murder | Aggravated Assault | Robbery | Rape | Burglary |
|------|--------------------------------------|--------------------|---------|------|----------|
| 1965–70 | 53 | 48 | 141 | 54 | 64 |
| 1970–75 | 23 | 40 | 27 | 44 | 43 |
| 1975–80 | 6 | 28 | 12 | 38 | 9 |
| 1965–80 | 100 | 165 | 242 | 206 | 156 |

Source: Computed from data in Federal Bureau of Investigation, *Crime in the United States*, 1970, p. 65; *Crime in the United States*, 1980, p. 41.

TABLE 2
Trends in Violent Crime Rates and Gun Use in Violent Crime

| Year | Nonnegligent Manslaughter and Murder | | | Aggravated Assault | | Robbery | |
|---|---|---|---|---|---|---|---|
| | Rate/100,000 (1) | Fraction with Firearms (2) | Fraction with Handgun (3) | Rate/100,000 (4) | Fraction with Firearms (5) | Rate/100,000 (6) | Fraction With Firearms (7) |
| 1965 | 5.1 | .57 | | 109.5 | .17 | 71.3 | |
| 1966 | 5.6 | .60 | | 118.4 | .19 | 80.3 | |
| 1967 | 6.1 | .64 | | 128.0 | .21 | 102.1 | .36 |
| 1968 | 6.8 | .65 | | 141.3 | .23 | 131.0 | |
| 1969 | 7.2 | .65 | | 151.8 | .24 | 147.4 | |
| 1970 | 7.8 | .65 | .52 | 162.4 | .24 | 171.5 | |
| 1971 | 8.6 | .65 | .51 | 178.8 | .25 | 188.0 | |
| 1972 | 9.0 | .66 | .54 | 188.8 | .25 | 180.7 | |
| 1973 | 9.4 | .67 | .53 | 200.5 | .26 | 183.1 | |
| 1974 | 9.8 | .68 | .54 | 215.8 | .25 | 209.3 | .45 |
| 1975 | 9.6 | .66 | .51 | 227.4 | .25 | 2.8.2 | .45 |
| 1976 | 8.8 | .64 | .49 | 228.7 | .24 | 195.8 | .43 |
| 1977 | 8.8 | .63 | .48 | 241.5 | .23 | 187.1 | .42 |
| 1978 | 9.0 | .64 | .49 | 255.9 | .22 | 191.3 | .41 |
| 1979 | 9.7 | .63 | .50 | 279.1 | .23 | 2.2.1 | .40 |
| 1980 | 10.2 | .62 | .50 | 290.6 | .24 | 243.5 | .40 |

Source: Federal Bureau of Investigation, *Crime in the United States*, various issues.
Note: Firearms use in robberies is not available between 1968 and 1973. Handguns were used in about 96 percent of firearms robberies in 1967.

from a complete explanation for the increase in violent crime. The data in table 2 indicate that gun crimes did increase faster than nongun crimes from 1965 to 1973, but that since 1973 nongun crimes have been increasing at least as fast as gun crimes. Taking the period 1965–80 as a whole, we see that gun-related criminal homicide increased 118 percent while nongun homicide increased 77 percent. The force behind the crime surge since 1965 pushed both gun and nongun rates up to unprecedented levels; increased gun availability probably played some role in the late 1960s and early 1970s, but apparently did not in subsequent years.

The propensity to use guns in violent crimes differs widely across geographic areas. For example, the 1973–74 gun fraction in assaultive homicides (i.e., homicides excluding felony-related murders) ranged among large cities between 42 percent (Newark) and 83 percent (Baton Rouge); the 1974–75 gun fraction in robberies ranged from 28 percent (Boston) to 72 percent (Houston).[3] Furthermore, these gun fractions for robbery and assaultive homicide are highly correlated with each other across the 49 largest cities; the correlation coefficient is .70. This geographic pattern in gun use is also reflected in the suicide statistics; the intercity correlation between gun fractions in criminal homicide and suicide was .82 in 1973–74. Cook (1979, table 5) presents evidence that these intercity differences in the propensity to use guns in killings and in robbery are clearly related to intercity gun ownership patterns. The cities with the lowest rate of firearms ownership are in New England and the mid-Atlantic region. The cities with the highest gun ownership rates are in the South Atlantic, South Central, and Mountain regions. The fractions of criminal homicides, suicides, and robberies involving guns follow this same regional pattern.

What can we conclude from this brief description of violent crime patterns? First, Americans are currently being murdered, robbed, and raped at greater per capita rates than at any time in the fifty years of national recorded crime statistics, owing to the spectacular increases in these rates that began in the mid-1960s. Second, firearms are used in a minority of violent crimes but are of special concern because more than 60 percent of the criminal homicides involve firearms. Third, cities differ widely with respect to the fraction of violent crimes (and suicides) that involve guns, and this geographic pattern is roughly congruent with the geographic pattern of gun ownership. These results serve to set the stage

[3] These and subsequent statistics in this paragraph are calculated from unpublished FBI data. A complete description of sources and methods is available from the author.

for the detailed exploration of gun use in violent crime presented in the next three sections.

## II. Conceptualization

The most important question considered in research on the criminal use of weapons is how the availability of dangerous weapons, especially firearms, influences the incidence and seriousness of violent crime. The observed patterns of weapon use in violent crime suggest a number of testable hypotheses concerning the potential effects of changes in gun availability. These hypotheses are motivated and stated in sections III and IV. The theoretical framework that guides this discussion is summarized here, without reference to sources or supporting evidence. This bare statement of the main ideas serves as a reader's guide to the more cluttered presentation of subsequent sections.

In addition to "gun availability" there are three basic elements to the theoretical framework, as depicted in figure 1: (1) the perpetrator's intent, or choice of task (e.g. which target to rob); (2) the type of weapon he uses in the crime; and (3) the outcome (Was the victim wounded, killed, or unharmed? Was the robbery successful?). There is some interrelation between the type of weapon used in a violent crime and the criminal's intent or choice of task; the causal process goes both ways. The actual outcome of the crime is of course influenced both by the perpetrator's intent and by his choice of weapon, as shown in figure 1. The fourth element of the theoretical framework, gun availability, influences weapon type and also has an effect on the quality of opportunities confronting the violent criminal.

A gun has a number of characteristics that make it superior to other readily available weapons for use in violent crime: even in the hands of a weak and unskilled assailant, a gun can be used to kill. The killing can be accomplished from a distance without much risk of effective counterat-



Fig. 1. The elements of a theoretical framework. The vulnerability pattern: relation between task and weapon type.

56        Philip J. Cook

tack by the victim, and the killing can be completed quickly without sustained effort and in relatively "impersonal" fashion. Furthermore, because everyone knows that a gun has these attributes, the mere display of a gun communicates a highly effective threat. In most circumstances, a gun maximizes the probability of success for a would-be robber, rapist, or murderer.

The value of a gun as a tool in violent crime is closely related to the vulnerability of the victim. A victim who is unarmed, alone, small, frail, or impaired by alcohol or drugs is highly vulnerable. Against a vulnerable victim, the probability of perpetrating a successful robbery or murder is only slightly affected by the type of weapon employed. But a gun is essential for murdering a policeman or robbing a bank. The value of a gun in a crime will influence the probability that a gun will be the weapon actually used in that crime. Hence we have the *vulnerability pattern*: the fraction of robberies involving guns is inversely related to the vulnerability of the victim. The same pattern is characteristic of murder.

A variety of possible explanations can be given for the vulnerability pattern. Two explanations are of special interest: (1) "The tool determines the task." A robber's choice of target will be influenced by the type of weapon immediately available to him. In robbery or other confrontations, the impulse to kill is more likely to be acted on if an adequate weapon is available. (2) "The task determines the tool." In robberies and murders that involve some planning and preparation, the perpetrator will have a chance to equip himself with an adequate weapon. What he considers "adequate" will depend on the vulnerability of the victim. There is no need to choose between these two explanations—both no doubt have some validity.

A gun is usually the most effective weapon for launching a deadly attack or for generating a convincing threat of deadly attack. But in most violent confrontations, the assailant's intent is not to kill (or threaten death), but rather to hurt or gain control over the victim. Casual observation suggests that schoolyard scuffles, routine family fights, even barroom brawls are typically completely lacking in homicidal intent and would not even be considered "crimes" by the participants or (in practice) the police and courts. In violent confrontations of this sort, the protagonists are unlikely to resort to deadly weapons even when they are readily available. Husband and wife may exchange punches or throw dishes any number of times, yet refrain from reaching for the carving knife or shotgun. These commonsense observations suggest that the assailant's choice of weapon is a good indicator of his intent in assault

offenses. The correlation between intent and weapon deadliness is by no means perfect, since weapon availability is an important intervening variable. Nevertheless, the assailant's intent is a major determinant of his choice of weapon. The assailant who clearly intends for his victim to survive will not fire a gun at him. The assailant who is determined to kill his victim probably will use a gun if one is available. Weapon choice in the intermediate case, in which the assailant's intent is ambiguous, may be governed by immediate availability.

A. *The Objective Dangerousness Pattern: Outcome*
   *as a Function of Intent and Weapon Type*

   The details of this causal process differ somewhat between assault and murder, on the one hand, and robbery and rape on the other. These two crime categories are hence treated separately here.

   *1. Assault and murder.* Whether the victim survives a serious assault with a deadly weapon depends in part on his ability to defend himself—his vulnerability relative to the nature of the attack. But in a large proportion of assaults with deadly weapons, the assailant ceases his attack by choice, rather than because of effective victim resistance. We can infer, in unsustained attacks of this sort, that the assailant's intent is to injure or incapacitate the victim—there is no deliberate, unambiguous intent to kill. Whether the victim does in fact die in such cases is largely a matter of chance—whether the first blow happens to strike a vital organ. Ambiguously motivated gun attacks are more dangerous than ambiguously motivated attacks with other weapons. This is the *objective dangerousness pattern*: gun attacks have a higher probability of killing the victim than do knife attacks in otherwise similar circumstances, and the difference is especially large when the intent of the assailant's attack is ambiguous.

   *2. Robbery violence.* In robberies in which the robber's intent is to complete the robbery successfully, using force only as necessary to forestall or overcome victim resistance, the likelihood of physical attack or victim injury will be inversely related to the lethality of the robber's weapon—victims are less likely to attempt resistance to a gun than to other weapons. I have labeled this inverse relation the *instrumental violence pattern* in robbery.

   While the instrumental violence pattern is evident in robbery statistics, it is nonetheless true that some robbers engage in unnecessary violence. They injure or kill victims who are cooperating with their demands. This *excess violence pattern* accounts for a large fraction of

58      Philip J. Cook

serious injuries and deaths for each of the weapon categories in robbery. The robber's intent in these cases is evidently to complete the robbery successfully *and*, as a separate matter, to injure or kill the victim.

The type of weapon employed has an important independent effect on the probability of victim death in robbery as well as assault. There is some evidence that most robbery murders are deliberate, and hence a reflection of the excess violence pattern. It may be that the type of weapon at hand influences the robber's decision making during the course of the robbery; the relative ease of executing a victim with a gun encourages this course of action when a gun is at hand.

### B. *Inferences concerning the Effects of Gun Availability*

As indicated above, the type of weapon used in a violent crime is closely related to a number of the observable characteristics of the crime, including the vulnerability of the victim, the likelihood that the crime will be successful, and the seriousness of injury to the victim. These statistical patterns are interesting primarily as a basis for generating hypotheses (predictions) concerning the likely effects of a change in the availability of guns to violent offenders.

Suppose a jurisdiction is successful in reducing gun availability to robbers and violence-prone individuals (or in increasing the cost of using guns in crime). I postulate two effects: a pure *weapon substitution* effect, and a *selective deterrence* effect.

1. Weapon substitution: Pure weapon substitution occurs when the criminal simply substitutes a knife or club for the gun he would have preferred to use, without modifying his basic decision of what target to rob, or whether to attack someone he wants to hurt or kill. As suggested by the objective dangerousness pattern, this type of substitution will reduce the fraction of violent attacks that result in the victim's death. By the instrumental violence pattern, substitution will increase the victim injury rate in robbery.

2. Selective deterrence: In addition to weapon substitution, we expect a reduction in gun availability to forestall some types of violent crime, as suggested by the vulnerability postulate. The commercial robbery rate should be reduced, since the probability of failure of a nongun robbery against a commercial target is high (hence the high fraction of gun use in commercial robbery). Since there may be some displacement to noncommercial targets, it is not clear whether the noncommercial robbery rate will fall or increase.

A reduction in gun availability should reduce the criminal homicide rate by discouraging some homicidal attacks. The vulnerability pattern suggests that the murder victimization rate will fall the most (proportionately) for the least vulnerable victims. Controlling for the vulnerability of the victim, the murder offense rate should fall the most for the weakest potential killers (women, youths, elderly people). These predictions are predicated on the assumption that the reduction in gun availability is uniform across relevant subgroups of the population.

These predictions, which follow from an analysis of the offenders' capabilities, may have to be modified somewhat if the intervention that deprives offenders of guns also reduces gun availability to potential victims. If there is a general reduction in gun availability, then potential victims will be less likely to be armed with guns and hence will be more vulnerable to robbery or assault. In effect, a general reduction in gun availability changes the quality of opportunities available to criminals. One effect may be to increase the rate of (nongun) assault; individuals will be more likely to give vent to violent impulses if they are confident that their intended victim lacks a gun. There may also be some effect on robbery patterns, although not enough is known about self-defense in robbery to permit specific predictions. In any event, it should be clear that some legal interventions will have little effect on general availability of guns (e.g. sentencing enhancements for criminals who use guns), and others will be very broad (e.g. an increase in the federal tax on handguns). Predictions should of course be tailored to the precise nature of the intervention.

In sum, we are concerned with the effect of gun availability on three dimensions of the violent crime problem: (1) the *distribution* of robberies, aggravated assaults, rapes, and criminal homicides across different types of victims—for example, commercial versus noncommercial robbery; (2) the *seriousness* of robberies, rapes, and aggravated assaults; and (3) the overall *rates* of each type of violent crime. Patterns in the violent crime data support a number of predictions concerning these effects.

### III. Evidence on the Vulnerability Hypothesis: Patterns of Gun Use in Robbery and Criminal Homicide

Firearms were used in 62 percent of the murders, 40 percent of the robberies, and 24 percent of the aggravated assaults reported to the police in 1980 (see table 2). These percentages have varied over time and differ across jurisdictions, as documented in section I. This section

focuses on the patterns of gun use across the different circumstances in which these crimes occur. What characteristics of the assailant, the victim, and the immediate environment of the criminal act influence the likelihood that a gun will be employed? Since this question has been more prominent in the literature on robbery than on murder, I begin with an analysis of gun use in robbery.

## A. *Robbery*

Robbery[4] is defined as theft or attempted theft by means of force or the threat of violence. The robber's essential task is to overcome through intimidation or force the victim's natural tendency to resist parting with his valuables. A variety of techniques for accomplishing this task are used in robbery, including actual attack (as in "muggings" and "yok-ings") and the threatening display of a weapon such as a gun, knife, or club. Whatever the means employed, the objective is to gain the victim's compliance quickly or render him helpless, thereby preventing him from escaping, summoning help, or struggling. The amount of what could be called "power" (capability of generating lethal force) the robber needs to achieve these objectives with high probability depends on the character-istics of the robbery target (victim), and in particular on the vulnerability of the target. The most vulnerable targets are people who are young, elderly, or otherwise physically weak or disabled (e.g. by alcohol), who are alone and without ready means of escape. The least vulnerable targets are commercial places, especially where there are several custom-ers and clerks and possibly even armed guards—a bank being one extreme example.

A gun is the most effective tool for enhancing the robber's power. Unlike other common weapons, a gun gives a robber the capacity to threaten deadly harm from a distance, thus allowing him to maintain a buffer zone between himself and the victim and to control several victims simultaneously. A gun serves to preempt any rational victim's inclina-tion to flee or resist.[5] Skogan (1978) documented the effectiveness of a gun in forestalling victim resistance in his analysis of a national sample of

---

[4]The perspective of this section was first developed in Conklin's (1972) seminal work on robbery in Boston. Cook (1976) dubbed it "strategic choice analysis" and was the first to employ large victimization survey data sets in documenting weapon use patterns of this sort. Other important contributions are cited in subsequent notes.

[5]Conklin (1972) analyzes the gun's usefulness in terms of the ability it provides the robber to (1) maintain a buffer zone; (2) intimidate the victim; (3) make good the threat, if necessary; and (4) ensure escape (pp. 110–11).

victim-reported robberies:[6] only 8 percent of gun robbery victims resisted physically in noncommercial robberies, compared with about 15 percent of victims in noncommercial robberies involving other weapons.[7] Other types of resistance (arguing, screaming, fleeing) were also less common in gun robbery than in robbery involving other weapons.

It seems reasonable to assume that, from the robber's viewpoint, the value of employing a gun tends to be inversely related to the vulnerability of the target. A gun will cause a greater increase in the likelihood of success against well-defended targets than against more vulnerable targets. A strong-arm technique will be adequate against an elderly woman walking alone on the street—a gun would be redundant with such a victim—but a gun is virtually a requirement for a successful bank robbery. Skogan (1978) provides evidence supporting this claim: he finds little relation between robbery success rates and weapon type for personal robbery but a very strong relation for commercial robbery. He reports that success rates in commercial robbery were 94 percent with a gun, 65 percent with a knife, and 48 percent with other weapons.[8]

In economic terms, we can characterize robbery as a production process (Cook 1979, pp. 752–53) with weapons, robbers, and a target as "inputs." The "output" of the production process can be defined as the probability of success. This probability increases with the number and skill of the robbers, the vulnerability of the target, and the lethality of the weapons. For given robber and target characteristics, the "marginal product" of a gun can be defined as the increase in probability of success if the robber(s) substitutes a gun for, say, a knife. The evidence pre-

[6]Skogan used incident reports collected from the National Crime Panel on robberies that occurred during calendar year 1973. This and subsequent citations to Skogan's work refer to an unpublished manuscript that was subsequently published in abbreviated form as Skogan (1978). It should be noted that any analysis of victim survey data relies on the victim's impression of the nature of the weapon that was employed in the robbery. In some cases the "gun" may be a toy, or simulated; Feeney and Weir (1974, p. 33) report that of fifty-eight "gun" robbers interviewed in Oakland, three claimed to have used toys and four to have simulated the possession of a gun.

[7]Block (1977) found from studying robbery police reports in Chicago that victims who resisted with physical force typically (68 percent) did so in response to the robber's use of force. Other types of resistance typically (70 percent) preceded the robber's use of force.

[8]McDermott (1979) presents evidence that there is a similar pattern in rape. She analyzed the National Crime Panel victimization survey data for twenty-six cities. From the statistics she presents on pages 20 and 21 of her report, it can be calculated that success rates in rape were 67 percent when the assailant used a gun, 51 percent when he used another weapon, and only 15 percent when he was unarmed. These percentages exclude rapes perpetrated by nonstrangers.

sented above suggests that the marginal product of a gun is small against vulnerable targets and relatively large against well-defended targets. We can go one step further and define the "value of a gun's marginal product" as its marginal product (increase in success probability) multiplied by the amount of loot if the robbery is successful. Since, for obvious reasons, targets with greater potential loot tend to be better defended against robbery,[9] the *value* of the gun's marginal product is even more strongly related to target vulnerability than is its marginal product. The conclusion can be put in the form of a proposition:

> The economic value of a gun in robbery tends to be greatest against commercial targets and other well-defended targets, and least against highly vulnerable targets.

It makes good economic sense, then, for gun use in robbery to be closely related to target vulnerability. Cook (1980a) demonstrates that this is indeed the case, on the basis of tabulating results of more than 12,000 robbery reports taken from victim survey data gathered in twenty-six large cities. These results are reproduced in table 3.

From table 3 (part A) we see that 55 percent of gun robberies committed by adults, but only 13 percent of other adult armed robberies, involve commercial targets. Those gun robberies that were committed against people on the street are concentrated on relatively invulnerable targets—groups of two or more victims or prime-age males—while street robbery with other weapons was more likely to involve women, children, or elderly victims. Skogan (1978) provides further detail for commercial robberies, reporting that the likelihood that a gun is present in such robberies is only 44 percent for commercial places that have only one employee, but 68 percent for commercial places with two or more employees.[10]

What is the process that produces these patterns in gun robbery? There are two plausible explanations, both compatible with the evidence presented above: (1) robbers who aspire to well-defended, lucrative targets equip themselves with guns to increase their chances of success; or (2) robbers who happen to have guns are more tempted to rob lucrative, well-defended targets than robbers who lack these tools.

[9]It is obvious that commercial targets tend to be more lucrative than noncommercial ones, and that a group of two or more victims will be more lucrative on the average than a single victim. Feeney and Weir (1974) report the not so obvious result that robberies of male victims resulted in a much higher median take ($50) than robberies of female victims (less than $20) (p. 24).

[10]Calculated from the statistics reported in table 3 of Skogan's article.

63        Gun Availability and Violent Crime

TABLE 3
Percentage Distributions of Robberies by
Location and Victim Characteristics

| | Gun | Knife or Other Weapon | Unarmed |
|---|---|---|---|
| A. All Robberies across Locations | | | |
| Commercial | 55.1 | 13.3 | 19.1 |
| Residence | 6.4 | 10.4 | 8.5 |
| Street, vehicle, etc. | 38.5 | 76.3 | 72.4 |
| Total | 100.0 | 100.0 | 100.0 |
| B. Street Robberies by Victim Characteristics | | | |
| Male victim aged 16–54 | 59.8 | 53.8 | 41.1 |
| Two or more victims | 10.5 | 5.8 | 3.7 |
| All others (young, elderly, and/or female victim) | 29.7 | 40.4 | 55.2 |
| Total | 100.0 | 100.0 | 100.0 |

Source: Adapted from Cook 1980a, p. 43. The distributions are calculated from
National Crime Panel victimization survey data on twenty-six cities.
Note: All incidents involved at least one male robber age 18 or over. Entries in the table
reflect survey sampling weights.

The first explanation suggests that the observed relation between gun
use and target choice is the result of differences between the kinds of
people who rob lucrative targets and those who commit relatively petty
street robberies—a difference reminiscent of Conklin's (1972) distinction
between "professionals" and "opportunists." Victim-survey evidence
does suggest that gun robbers as a group have more of the earmarks of
professionalism than other armed robbers: beside the fact that they make
bigger "scores," gun robbers are older, less likely to rob acquaintances,
and less likely to work in groups of three or more (Cook 1976; Skogan
1978). Cook and Nagin (1979, p. 25) demonstrated that the factors that
determine a robber's choice of weapon have some tendency to persist: a
cohort of adult men arrested for gun robbery in the District of Colombia
showed a greater propensity to use guns in subsequent robberies than a
corresponding cohort arrested for nongun robberies.[11]

[11]Based on 541 adult male gun robbery arrestees and 761 nongun robbery arrestees.
This cohort, which was arrested in 1973, was tracked through 1976 through PROMIS
(Prosecutor's Office Management Information System). The robbery rearrest rate for the
gun cohort was 0.43, of which 58 percent were gun robberies. The robbery arrest rate for
the nongun cohort was 0.45, of which 40 percent were gun robberies. The two cohorts had

64      Philip J. Cook

It seems reasonable to hypothesize, then, that robbers who engage in planning and who seek out big scores will take pains to equip themselves with the appropriate weapon—usually some type of firearm. The extent to which other less-professional robbers use guns, and hence the kinds of targets they choose, may be more sensitive to the extent to which such people have access to guns and are in the habit of carrying them, for whatever reason. Increased availability of guns may then result in some target switching by this group—substitution of more lucrative, better-defended targets for more vulnerable targets. Increased gun availability may also result in weapon substitution for a given type of target, imply-ing an increase in the fraction of street robberies committed with a gun; that is, guns will be put to less valuable uses as they become "cheaper." These hypotheses can be stated more precisely as follows.

An increase in gun availability in a city will have the following effects:
—increase the fraction of noncommercial robberies committed with a gun;
—increase the fraction of robberies committed against commercial and other well-defended targets.

B. *Criminal Homicide and Assault*

The qualities of a gun that make it the most effective robbery weapon, particularly against well-defended targets, are also of value to a killer. A decision to kill is easier and safer to implement with a gun than with other commonly available weapons—there is less danger of effective victim resistance during the attack, and the killing can be accomplished more quickly and impersonally, with less sustained effort than is usually required with a knife or blunt object. As in robbery, a gun has greatest value against relatively invulnerable victims, and the vulnerability of the victim appears to be an important factor in determining the probability that a gun will be used as the murder weapon.

The least vulnerable victims are those who are guarded or armed. All presidential assassinations in United States history were committed with handguns or rifles. Almost all law enforcement officers who have been murdered in recent years were shot: between 1970 and 1979, 94 percent of the 1,078 murdered policemen were killed by firearms (FBI, *Crime in the United States* 1979, p. 312).

---

the same rearrest rate for burglary (0.13), but the nongun cohort was much more likely to be rearrested for assaultive crimes (0.22, as opposed to 0.13 for the gun cohort). See table 9 of Cook and Nagin (1979).

Physical size and strength are also components of vulnerability. In 1977, 68.5 percent of male homicide victims were shot, compared with only 51.0 percent of female homicide victims (*Statistical Abstract* 1978). The age pattern, shown in figure 2, is strikingly regular: about 70 percent of victims aged 20–44 are shot, but this fraction drops off rapidly for younger and older—more vulnerable—victims.

Vulnerability is, of course, a relative matter. We would expect that the lethality of the murder weapon would be directly related to the *difference* in physical strength between the victim and killer, other things being equal. To investigate this hypothesis, I used the FBI data coded from the supplemental homicide reports submitted for 1976 and 1977 by police departments in fifty large cities. These data include the demographic characteristics of the victim and (where known) the offender, as well as the murder weapon, immediate circumstances, and apparent motive of the crime. Tables 4 and 5 display some results that tend to confirm the relative vulnerability hypothesis. First, from table 4 we see that women tend to use more lethal weapons than men to kill their spouses: 97 percent of the women, but only 78 percent of the men, used guns or knives. The gun fractions alone are 67 and 62 percent—admittedly not a large difference, but one that is in the predicted direction. This result is especially notable since women typically have less experience than men in handling guns and are less likely to think of any guns kept in the home as their personal property. Table 4 also shows that women who kill their "boy-



Fig. 2. The fraction of murder victims killed by firearms, 1978, by age of victim. From *Uniform Crime Reports*, 1978.

66      Philip J. Cook

TABLE 4

Weapon Choice in Homicides Involving
Spouses and Intimates

| | Identity of Victim | | | |
|---|---|---|---|---|
| Weapon | Husband | Wife | Boy Friend | Girl Friend |
| Gun | 67.1% | 61.6% | 58.4% | 53.5% |
| Knife | 29.8 | 16.3 | 38.0 | 19.1 |
| Blunt object | 1.6 | 4.9 | 1.4 | 5.3 |
| Other | 1.4 | 17.2 | 2.3 | 22.0 |
| N | 553 | 547 | 216 | 209 |

Source: FBI Supplemental Homicide Reports, fifty cities, 1976 and 1977 combined.
Note: "Husband" and "wife" classifications include common-law relationships. Arson cases are omitted.

friends" are more likely to use a gun than men who kill their "girl friends."

Table 5 focuses on killings that resulted from arguments and brawls in which both the killer and the victim were males. The gun fraction increases with the age of the killer and is inversely related to the age of the victim: the highest gun fraction (87 percent) involves elderly killers and youthful victims; the lowest gun fraction (48 percent) involves youthful killers and elderly victims. Since age is highly correlated with strength and robustness, these results offer strong support for the relative vulnerability hypothesis.

Why are less vulnerable murder victims more likely to be shot than relatively vulnerable victims? A natural interpretation of this result is that intended victims who are physically strong or armed in some fashion are better able to defend themselves against homicidal assault than are more vulnerable victims—unless the assailant uses a gun, the "great equalizer." The "vulnerability pattern" can then be explained as resulting from some combination of three mechanisms: (1) homicidal attacks are more likely to fail against strong victims than against weak ones, and the difference in the likelihood of failure is greater for nongun attacks than for attacks with a gun. (2) The likelihood that an individual will act on a homicidal impulse depends in part on the perceived probability of success. The intended victim's ability to defend himself acts as a deterrent to would-be killers—but this deterrent is much weaker if the killer has a gun. (3) In the case of a planned murder, the killer will have

67    Gun Availability and Violent Crime

TABLE 5

Gun Use in Murders and Nonnegligent Homicides
Resulting from Arguments or Brawls,
Male Victim and Male Offender

| Age of Victim | Age of Offender | | |
|---|---|---|---|
| | 18–39 | 40–59 | 60+ |
| 18–39 | 68.0% | 79.6% | 87.2% |
| N | 1,906 | 368 | 47 |
| 40–59 | 54.5% | 64.1% | 66.7% |
| N | 398 | 245 | 57 |
| 60+ | 48.3% | 49.2% | 63.3% |
| N | 58 | 61 | 30 |

Source: FBI Supplemental Homicide Reports, fifty cities, 1976 and 1977 combined (unpublished data).

Note: The sample size (the denominator of the fraction) is given in each cell. Cases in which the age of the killer is not known are excluded.

the opportunity to equip himself with a tool that is adequate to the task. Against well-defended victims, the tool chosen will almost certainly be a gun, if one can be obtained without too much difficulty.

Each of these mechanisms is compatible with the prediction that a reduction in gun availability will cause a reduction in murder, a reduction that will be concentrated on killings that involve a victim who is physically stronger than the killer. A number of specific hypotheses are suggested by this observation, including the following.

A reduction in gun availability will:
—reduce the male/female victimization ratio in murders of spouses and other intimates;
—reduce the fraction of murder victims who are youthful males;
—reduce the fraction of murderers who are elderly.

A number of similar hypotheses can be generated from the same perspective.

For a large percentage of violent crimes, it is in the assailant's interest to take care to *avoid* killing the victim. Robbery murder, for example, is a capital crime in many jurisdictions—even if the killing was an "accident" or a spontaneous reaction to victim resistance. Conklin (1972, p. 111) interviewed several robbery convicts who used an unloaded gun for fear they might end up shooting their victims. In other violent confrontations, such as fights between family members, this same concern may

deter the combatants from reaching for a gun—even when there is one readily available. A loaded gun is not an appropriate weapon when the assailant's intent is to hurt, not kill, the victim. Phillips (1973) reasoned on the basis of such considerations that weapon choice in aggravated assault will be influenced by the probability and severity of punishment for criminal homicides; controlling for gun availability, the fraction of assaults committed with a gun should be inversely related to the perceived severity of sanctions. The results of his regression analysis of state level data is compatible with this prediction.[12]

## IV. Evidence on the Objective Dangerousness Hypothesis

A. *The Role of Weapon Type in Determining the*
   *Outcome of Violent Attacks*

The main lessons from the previous section are common sense. Guns are more lethal than other readily available weapons. Killing with a gun requires less skill, strength, energy, and time than killing with a knife or club. A gun attack is harder to escape from or otherwise defend against than are attacks with other weapons. For these reasons, guns are the most effective weapons in robbery and murder and are especially valuable (from the assailant's viewpoint) against victims who are relatively invulnerable. It is not surprising, then, that the likelihood that a gun will be used to commit robbery and murder is systematically related to the vulnerability of the victim. The task is chosen to suit the tool, or the tool is chosen to suit the task. Either way, the "vulnerability pattern" is the result.

These observations are reasonable and fit the data, but they do not tell the whole story, especially for murder. A large proportion of serious attacks are ambiguously motivated—the "task" is not clearly defined in the mind of the assailant. The outcome of such attacks appears to be largely a matter of chance. The probability that the victim will die as a result of such attacks (in my interpretation) reflects conscious choices made by violent criminals—the "objective dangerousness" pattern, on the other hand, is a probabilistic phenomenon.

I begin the discussion of objective dangerousness with a discussion of aggravated assault and murder. The use of violence in robbery needs a separate treatment, which is presented subsequently.

---

[12]One flaw in Phillips's analysis is that he omitted from his regression specification of sanction severity for aggravated assault. Deterrence theory suggests that it is not the absolute severity of sanctions for criminal homicide that is salient to the choice of weapon, but rather the *difference* between sanction severity in assault and murder.

*1. Intent and the probability of death in serious attacks.* The fraction of serious gun assaults that result in the victim's death is much higher than for assaults with other weapons. Block (1977, p. 33), for example, found that of all aggravated assaults resulting in injury to the victim (and reported to the Chicago police), 14 percent of the gun cases, but only 4 percent of the knife cases, resulted in the victim's death.

One explanation for this result is that an assailant who intends to kill his victim is more likely to equip himself with a gun than an assailant who merely intends to hurt his victim. While this explanation may be valid for those murders in which there is some planning and preparation,[13] it is not a plausible explanation for the large proportion of deadly attacks that occur as the immediate result of an altercation or other provocation.

Zimring (1972) has demonstrated that a large proportion of murders are similar to serious assaults in that the attacks are unsustained—the assailant does not administer the coup de grace, the blow that would ensure the death of his victim. Indeed, the victim was shot only once in about two-thirds of the gun murders in Zimring's Chicago samples. These cases differ very little from serious assaults: for every death resulting from a single wound in the head or chest, Zimring found 1.8 victims with the same type of wound who did not die[14]—victims who were apparently saved not by any differences in the gunman's intent, but rather just by good luck with respect to the precise location of the wound.

Evidently, some proportion of gun murders are not the result of a clear intent to kill; given that the majority of murders are the immediate result of altercations, often involving alcohol and rarely much thought, it seems unlikely that many killers have *any* clearly formulated "intent" at the time of their attack. The assailant's mental state is characterized by an impulse—to punish, avenge an insult, stop a verbal or physical attack—backed by more or less cathexis. The immediate availability of a gun makes these circumstances more dangerous than would a less lethal weapon, because an unsustained attack with a gun—a single shot—is more likely to kill.

Zimring buttressed the conclusions from his first study, which compared knife and gun attacks, with a later (1972) study comparing attacks with large- and small- caliber guns. Even after controlling for the num-

[13]Wolfgang (1958) concludes from his study of homicide in Philadelphia: "The murderer who carefully plans his felonious, willful, and malicious assault is more likely to employ a weapon that performs his intended task quickly and efficiently. In such a situation a pistol or revolver probably will be used. During a drunken brawl, or in the white heat of passion, an offender uses whatever weapon is available" (pp. 80–81).
[14]Computed from Zimring (1972), table 7, p. 104.

70      Philip J. Cook

ber and location of wounds, he found that attacks with .38 caliber guns were more than twice as likely to kill as attacks with .22 caliber guns. It appears, then, that weapon dangerousness has a substantial independent influence on the death rate from serious assaults.

Zimring's seminal work in this area supports several important propositions, including two testable hypotheses:

—A restrictive gun control policy that caused knives and clubs to be substituted for guns would reduce the death rate in serious assault.[15]
—A gun control policy focused on handguns may increase the death rate from gun assault if shotguns and rifles are substituted for handguns as a result.[16]

There is also an important normative proposition: In setting prosecution and sentencing priorities for aggravated assault cases, gun assaults should be viewed as more serious than assaults with other weapons, ceteris paribus, since there is a higher probability of the victim's dying in the gun assaults. This is Zimring's "objective dangerousness" doctrine.[17]

Block (1977) extended Zimring's work on instrumentality by comparing death rates in aggravated assault and robbery cases. He concludes that "the relative fatality of different weapons in violent crime may be a technological invariant . . . the probability of death given injury and a particular weapon remains relatively constant and unrelated to the type of crime committed" (p. 32). The notion that the number of deaths per hundred criminal attacks is a "technical" constant, largely determined by the lethality of the weapon, is not supportable, however. Zimring demonstrated that the type of weapon was *one* important determinant of the outcome of serious attacks but did not claim it was the only determinant. Presumably the weapon-specific death rates in such attacks will differ

---

[15]Zimring (1967) titled his original article "Is Gun Control Likely to Reduce Violent Killings?" His work was a response to a view espoused by Wolfgang (1958): "It is the contention of this observer that few homicides due to shootings could be avoided merely if a firearm were not immediately present, and that the offender would select some other weapon to achieve the same destructive goal (p. 83)"—a viewpoint expressed more succinctly by the bumper sticker: "Guns don't kill people; people kill people."

Seitz (1972) attempts to test Wolfgang's substitution hypothesis directly by calculating the correlation coefficient between total homicide rates and firearms homicide rates across states. For 1967 this correlation coefficient is .98. Seitz claims that the substitution hypothesis predicts that this correlation should be about zero. The problem with Seitz's inference, of course, is that he makes no attempt to control for the underlying etiological factors that largely determine both the gun and the nongun homicide rates in a state—indeed, these are highly positively correlated with each other.

[16]This implication has been pointed out by Kleck and Bordua (1981).

[17]"In the generality of cases, how likely is it that conduct such as that engaged in by the offender will lead to death?" (Zimring 1972, p. 114).

across jurisdictions and vary over time depending on the mix of circumstances, the quality of medical care, and so forth. Swersey (1980) presents an interesting case in point.

Swersey reports that the number of assaultive (as opposed to felony) gun homicides in Harlem increased from nineteen in 1968 to seventy in 1973, and then fell back to forty-six in 1974. Much of the change between 1968 and 1973 was due to an increase in intentional killings resulting from disputes involving narcotics activities. The importance of changes in the intent of violent perpetrators during this period is indicated by the fact that the death rate in gun attacks more than doubled between 1968 and 1973, then fell back in 1974. He shows that these changes reflect changes in murder—changes in intent to kill, rather than changes in the availability and quality of weapons and their spontaneous use. This conclusion is supported by observations on the circumstances and apparent motives of the murders.[18] Swersey concludes that more than 80 percent of the rise and fall in Harlem homicides was due to changes in the number of deliberate murders. He finds a similar pattern for the rest of New York City.

Swersey's findings do not undermine Zimring's position. Zimring did not deny that some killings were unambiguously motivated, or that the importance of intent in murder was subject to change over time, or that intent might be more important in Harlem than in Chicago. In any event, Swersey's results are useful in documenting these possibilities.

Calculations from the FBI's supplemental homicide reports file confirm that death rates in gun assault often vary over time by enough to have a substantial effect on the overall homicide rate. Table 6 reports death rates from gun assault for selected cities. Atlanta and Detroit exhibit the most extreme fluctuations during the period 1965–75. The death rate drops in all of these cities between 1972 and 1975, which is interesting given the widely noted reductions in big-city homicide rates during this period.

My conclusions can be briefly stated. The likelihood of death from a serious assault is determined, inter alia, by the assailant's intent and the lethality of the weapon used. The type of weapon is especially important when the intent is ambiguous. The fraction of homicides that can be viewed as deliberate (unambiguously intended) varies over time and

---

[18]Swersey also notes several other indications of an increasing fraction of deliberate murders in the homicide statistics for New York City as a whole. During the 1970s, the clearance rate declined for homicide, as did the fraction of homicides occurring on the weekend and the fraction involving family members.

72        Philip J. Cook

TABLE 6
Percentage of Gun Assaults Resulting in Death,
Selected Cities

| City | 1965 | 1970 | 1972 | 1975 |
|------|------|------|------|------|
| Atlanta | 15.8 | 22.4 | 15.1 | 7.4 |
| Chicago | 13.2 | 12.5 | 12.2 | 10.6 |
| Cleveland | 14.7 | 14.1 | 15.4 | 10.7 |
| Detroit | 8.4 | 17.4 | 18.4 | 13.6 |
| New York | 9.4 | 9.2 | 9.7 | 7.5 |
| Philadelphia | 15.2 | 13.4 | 11.9 | 10.0 |

Source: FBI Supplemental Homicide Reports (unpublished data file) and unpublished
FBI data on assaults.
Note: The numerator of each entry is the number of gun murders and nonnegligent
manslaughters, excluding felony or suspected felony-type murders. The denominators are
the sum of this murder count and the number of aggravated assaults with guns reported to
the police.

space but is probably fairly small as a rule. The fraction of gun assaults
that result in the death of the victim is one indication of the relative
prevalence of deliberate gun murders.

2. *Weapon dangerousness in robbery.* The principal role of a weapon in
robbery is to aid the robber in coercing the victim (either by force or by
threat) to part with his valuables. If the threat is sufficiently convincing,
physical force is not necessary. For this reason it is hardly surprising that
the use of force is closely related to the weapon type in robbery, being
very common in unarmed robbery and relatively rare in gun robbery.
Table 7 documents this pattern for both commercial and noncommercial
robberies committed by adult males. As shown in this table, gun rob-
beries are less likely than other armed robberies to involve physical
violence, and furthermore are less likely to injure the victim.[19] These
patterns are compatible with the notion that violence plays an in-
strumental role in robbery—that it is employed when the robber believes
it is needed to overcome or forestall victim resistance, and that this need
is less likely to arise when the robber uses a gun.

There is evidence, however, that this "instrumental violence" pattern
can account for only a fraction of the injuries and deaths that result from
robbery (Cook 1980a). Three observations are relevant in this respect:
first, more than two-thirds of the victims injured in noncommercial gun
robberies do not resist in any way—even after the attack (Cook 1980a,

[19]Other sources on this pattern include Conklin (1972), Cook (1976), and Skogan (1978).

TABLE 7
Likelihood of Physical Attack and Injury in Robbery

| | Gun[a] | Knife | Other Weapon | Unarmed |
|---|---|---|---|---|
| Noncommercial robbery[b] | | | | |
| Victim attacked | 22.1% | 39.4% | 60.4% | 73.5% |
| Victim required medical treatment[c] | 7.2 | 10.9 | 15.5 | 11.1 |
| Victim hospitalized overnight | 2.0 | 2.6 | 2.7 | 1.6 |
| N | 892 | 841 | 1,06C | 1,259 |
| Commercial robbery | | | | |
| Victim required medical treatment | 4.8% | 10.8% | 17.9% | 5.1% |
| Victim hospitalized overnight | 1.5 | 3.5 | 6.0 | 0.4 |
| N | 2,307 | 288 | 117 | 570 |

Source: National Crime Panel victimization surveys of twenty-six cities. This table is excerpted from Cook 1980a, table 2.

Note: All incidents included in this table involved at least one male robber age 18 or over. Entries in the table do not reflect the survey sampling weights (which differed widely among the twenty-six cities).

[a]Many robberies involve more than one type of weapon. Incidents of that sort were classified according to the most lethal weapon used.

[b]Robberies occurring on the street, in a vehicle, or near the victim's home.

[c]Only about one-third of the injured gun robbery victims were actually shot. Two-thirds of the injured knife robbery victims were stabbed.

p. 36); similarly, twenty out of thirty victims killed in gun robberies in Dade County, Florida, between 1974 and 1976 did not resist the robber (p. 29); second, the likelihood that the victim will be injured in an armed robbery is much higher if the robbery is committed by a gang of three or more than otherwise; since victims are *less* likely to offer resistance to a group of three or four robbers than to a lone robber, this result is clearly incompatible with the "instrumental violence" hypothesis; and, third, judging from rearrest statistics for a large cohort of adults arrested for robbery in Washington, D.C., it appears that robbers who injure their victims tend to be more violence-prone than other robbers (Cook and Nagin 1979, p. 39).[20] These findings are different aspects of an "excess violence" pattern: much of the violence in robbery is not "necessary," in the sense of being an instrumental response to anticipated or actual

[20]The subset of the robbery arrest cohort that had injured their victims were less likely to be rearrested for robbery than the remainder of the cohort—but members of this subset were much more likely to be rearrested for assault and for murder.

resistance by the victim. Rather, it is motivated by objectives or impulses that have little to do with ensuring successful completion of the theft. In particular, street robberies committed by large groups (which typically have a low "take") are best viewed as a form of recreation, and the high incidence of gratuitous violence against victims may be just part of the fun.

Given these findings, it is useful to attempt a distinction between robbery with intent to injure or kill, and robbery without such intent (in which violence would be used only to overcome victim resistance). The latter form of robbery dominates the statistics—most victims are not in fact injured, and the likelihood of injury is less with guns than with other weapons. However, the more vicious strain of robbery, involving an intent to injure, apparently accounts for a high percentage of the serious injuries and deaths that do occur in the robbery context. Furthermore, the incidence of excess violence in robbery is subject to change over time, as Zimring (1977) demonstrated in his study of robbery murder in Detroit. He found a sharp discontinuity in 1972 in the fraction of victims killed in armed robbery: after ten years of stable weapon-specific death rates, this fraction doubled between 1971 and 1973 for gun robberies and increased even more during this period for other armed robberies.

Are gun robberies more dangerous than other armed robberies, in the sense of being more likely to result in the victim's death? Victims are killed in a higher fraction of gun robberies than others: based on victim survey and homicide data in eight cities, I calculated that there are 9.0 victim fatalities for every 1,000 gun robberies, compared with 1.7 victim fatalities per 1,000 nongun armed robberies (Cook 1980a, p. 39). Furthermore, it appears that the type of weapon plays an independent role in determining the likelihood of robbery murder; in a cross-section analysis of fifty cities, I found that the fraction of robberies resulting in the victim's death is closely related to the fraction of robberies that involve firearms (Cook 1979, p. 775).[21] Thus the objective dangerousness pattern

[21]The regression equation is as follows:
Robbery murders/1,000 robberies = 1.52 + 5.68 Gun robberies/1,000 robberies.
(1.16)   (2.38)

A closely related result uses the per capita (rather than "per robbery") murder rate:
Robbery murders/100,000 = − .284 + .907 Gun robberies/1,000 + .136
Nongun robberies/1,000.
(.232)   (.089)                                              (.072)
(Numbers in parentheses are the standard errors of the ordinary least-squares regression coefficients.) The data for fifty cities are 1975–76 averages.

The second question has an $R^2 = .82$, suggesting that robbery murder is very closely

applies to robbery as well as assault, for reasons that remain a bit obscure.

Why does the presence of a (loaded, authentic) gun in robbery increase the probability of the victim's death? My studies of robbery murder in Atlanta (Cook and Nagin 1979) and Dade County, Florida (Cook 1980a), indicated that in at least half of the cases the killing was deliberate: for example, the victim was tied and then executed or shot several times from close range. But insofar as intent could be ascertained from police reports, it appears that these intentional killings were not premeditated, but rather decided on during the course of the robbery. Perhaps the explanation for why these spontaneous decisions are more likely to occur when the robber is holding a gun is related to Wolfgang's (1958) suggestion: "the offender's physical repugnance to engaging in direct physical assault by cutting or stabbing his adversary, may mean that in the absence of a firearm no homicide occurs" (p. 79).

The principal testable hypothesis derived from the discussion above is this:

A reduction in gun availability will increase the robbery injury rate (Skogan 1978) but reduce the robbery murder rate.

The evidence also supports a normative proposition: given the excess violence pattern in robbery, the robbery cases in which the victim is injured should be allocated special emphasis in establishing criminal prosecution and sentencing priorities (Cook 1980a). In a high proportion of these crimes, the attack that caused the injury was not instrumental to the robbery, but rather was a distinct act. A relatively severe judicial response to such cases might act as a deterrent to excess violence in robbery.

*3. Coercion and assault.* Does the instrumental violence pattern in robbery have any parallel in assault? I suspect the answer is yes, but I know of no empirical evidence.

Some (unknown) fraction of assault cases are similar to robbery in that the assailant's objective is to coerce the victim's compliance—the assailant wants the victim to stop attacking him (physically or verbally), or stop dancing with his girl friend, or get off his favorite barstool, or turn down the stereo. And, as in the case of robbery, the probability of a

---

linked to robbery. Including the assaultive murder rate in this equation as an independent variable does not affect the other coefficients much—and the coefficient on the murder variable is not statistically significant. I conclude that robbery murder is more robbery than murder.

76    Philip J. Cook

physical attack in such cases may be less if the assailant has a gun than otherwise, because the victim will be less inclined to ignore or resist a threat enforced by the display of a gun. (It may also be true that the assailant would be more hesitant to use a gun than another weapon to make good his threat.) If this reasoning is correct, it supports the following:

A general increase in gun availability will reduce the number of assault-related injuries.

## B. *Conclusion*

Sections II–IV have described and labeled several patterns that have been discovered in the violent crime data. These patterns, interpreted in the context of what we know or suspect about the nature of violent encounters and the motives of criminals, suggest a number of hypotheses about the effects of a change in gun availability on the distribution, incidence, and seriousness of violent crime. While these hypotheses are plausible extrapolations from the data, our confidence in them would be increased if they were supported by direct evidence—observations on changes in gun use patterns associated with changes in gun availability. A few direct tests of this sort have been conducted, and the next section discusses some of these studies. They have all confronted the initial problem of developing a suitable operational definition of "availability." Section V begins with an analysis of the alternatives in this regard.

## V. Gun Availability

Casual discussions of gun availability usually begin and end with statistics on the number of guns (or handguns) in private hands. The numbers are impressive—perhaps 40 million handguns and as many as 100 million long guns. Nevertheless, guns are nowhere near as prevalent as, say, kitchen knives. Only a quarter of all households possess a handgun, and the prevalence of handguns is even less in urban areas, where most of the violent crime occurs. Most handguns are expensive,[21] and someone seeking to obtain one may have to overcome or circumvent fairly substantial legal barriers. The point is that despite the vast arsenal of guns in private hands, guns remain a scarce commodity. This scarcity surely prevents some criminals from obtaining them or using them in violent

---

[21]For example, among the cheapest of the popular handgun models is the Ruger Standard, which retailed at a suggested price of $92 in 1980 (Cook 1982, table 3).

crime—why else would two-fifths of the criminal homicides and three-fifths of the reported robberies be committed with less effective weapons? Furthermore, it is reasonable to suppose that the terms on which guns are available to potential criminals vary over time and differ rather widely among jurisdictions at any point in time. These variations and differences in gun availability provide a potential basis for testing hypotheses concerning the effects of gun availability on violent crime patterns. The first problem in conducting such tests is to develop one or more statistical indicators of gun availability.

Defining "availability" for an individual is easier than defining this concept for a group. For any single individual, "availability" denotes the amount of money, effort, legal risk, and delay entailed in acquiring a gun. In economic terms, availability is the sum of money price and transactions cost: what Moore (1977) calls the "effective price." Transactions costs are a more important consideration for guns than for other commodities because gun transactions are extensively regulated by law, and a number of important groups (youths, convicted felons, etc.) are legally prohibited from purchasing guns. Within a single jurisdiction, then, the effective price of obtaining a gun will range from near zero (for those who already possess a suitable gun) to some large number (for those who are legally proscribed from buying a gun and lack ready access to people who would be willing to lend or sell them one). The notion of availability when applied to an entire group denotes some sort of average of the effective prices for the individuals who make up the group. This average effective price is closely related to the prevalence of gun ownership. In areas where gun ownership is relatively widespread, individuals who "need" a gun for use in a violent crime are comparatively likely to own one or be able with relative ease to buy, borrow, or steal one from a friend or family member. Furthermore, prevalent gun ownership is likely to be associated with an active black or gray market supported by hand-to-hand transfers and guns stolen in burglaries (Moore 1981).

The prevalence of gun ownership is not the sole determinant of average effective price, however. Legal restrictions designed to discourage gun transfers to certain population subgroups, or to raise the money price of a gun through, for example, taxes or minimum quality requirements, may increase the average effective price associated with a given prevalence of gun ownership.

These indicators of gun availability—prevalence of gun ownership and stringency of legal restrictions on gun commerce—are discussed in detail in the next two sections.

78        Philip J. Cook

A. *The Prevalence of Gun Ownership*

One rather surprising finding from national surveys is that the fraction of United States households owning guns has remained roughly constant for two decades. Gallup polls in 1959, 1965, 1966, and 1972 and the National Opinion Research Center (NORC) General Social Surveys in 1973, 1974, 1976, and 1977 all found that about half of United States households own at least one gun. This statistic differs a bit from poll to poll but shows no discernible trend over this twenty-year period. Reported *handgun* ownership rates increased slightly (from 12.6 percent in 1959 to 15.4 percent in 1972) in the Gallup polls; the NORC General Social Surveys find a higher, untrended rate of about 20 percent between 1973 and 1977.[23] Two large national surveys conducted in 1978 by Decision Making Information, Inc. (DMI) and Cambridge Reports, Inc., found virtually identical handgun ownership rates of 23 percent (DMI) and 24 percent (Cambridge Reports).[24] Reasonable conclusions from these polls are: (1) About half of United States households own guns, and this fraction has not changed much since 1958. (2) About half of the gun-owning households currently own handguns, and this fraction appears to have increased considerably since 1959. (3) The increase in the total stock of guns has been absorbed without an increase in the fraction of households that own guns by (*a*) an increase in the average number of guns per gun-owning household and (*b*) an increase in the number of households (Wright et al. 1981).[25]

One implication of the survey-based estimates of the private gun inventory is that there are more than three guns for every gun-owning household. Table 8 summarizes the results of the DMI survey in 1978 on number of guns owned by the 47 percent of all households who reported they owned at least one gun. These data permit a rough estimate of the degree of ownership concentration. A conservative estimate[26] is that the top one-third of handgun-owning households (about 7.5 percent of all households) own more than 60 percent of all handguns; the top one-third of all long-gun-owning households (about 14 percent of all households) own more than 60 percent of all long-guns.

[23] These results were provided by James Wright in private correspondence.
[24] See Wright (1981) for a discussion of these two polls.
[25] Wright et al. (1981) give evidence that some substantial portion of the increase in the handgun sales was the result of increased demand by local police departments.
[26] I assume that household respondents that admit owning guns of the specified sort but refuse to say how many are distributed similarly to other households. I also assume that the average number of guns in the open-ended category is twelve. Both of these assumptions are highly conservative, in the sense that they probably lead to an underestimate of the degree of concentration in ownership.

TABLE 8

Number of Guns Owned by Gun-Owning Households, 1978

| Number | Handguns | Rifles and Shotguns |
|--------|----------|---------------------|
| None | 46% | 14% |
| One | 30 | 29 |
| Two | 8 | 21 |
| 3-4 | 4 | 16 |
| 5-9 | 1 | 5 |
| 10+ | 1 | 2 |
| Yes only | 8 | 9 |
| Refused | 4 | 4 |

Source: "Attitudes of the American Electorate toward Gun Control 1978," by Decision Making Information, Inc., Santa Ana, California, as reported in James D. Wright, "Public Opinion and Gun Control: A Comparison of Results from Two Recent National Surveys" (University of Massachusetts, Amherst, 1979).

Another inference from the statistics in table 8 is that about three-quarters of the households that own handguns also own long guns. It seems likely, then, that much of the recent growth in handgun ownership has involved households that already owned rifles or shotguns.

In each of the years 1975 through 1979, the annual sum of handgun imports and domestic manufacture has been between 2.0 and 2.3 million units (Cook and Blose 1981). The total volume of import and manufacture for the past decade has exceeded the total volume for the preceding six decades combined (Wright et al. 1981), and there is ample reason to believe that the current volume is supporting a continuing buildup in the private inventory of handguns. However, the increase in the private inventory in any one year is substantially less than the number of units manufactured and imported. For example, approximately 2,224,000 handguns were manufactured or imported in 1975. Of these, fewer than 1,750,000 were sold to private (household and business) domestic buyers. Furthermore, these new additions to the private inventory were compensated for by the loss of more than 150,000 handguns to the police (i.e., handguns confiscated by the police and not returned) and probably larger (but unknown) numbers that were lost through normal attrition. There may also be a significant number of illegal (and hence uncounted) exports associated with the international trade in illegal drugs, in which handguns are sometimes the medium of exchange. My conclusion is that we lack the data necessary to develop

80      Philip J. Cook

good estimates of year-to-year changes in the private inventory of hand-
guns.

The incidence of firearms ownership is not uniform across society.
Wright and Marston (1975) found that the fraction of households owning
guns increased with income, decreased with city size, and was higher in
the South than elsewhere. The same patterns are observed when the
analysis is limited to handguns only. I (Cook 1979) analyzed regional
patterns of ownership for residents of large cities, using NORC polls
taken in the mid-1970s and found a range for handgun ownership from 5
percent for residents of large cities in New England and the Mid-Atlantic
region up to 34 percent for residents of the Mountain region cities
(Denver, Tucson, Phoenix). The southern region cities were relatively
high—about 24 percent—and the Pacific and North Central cities low—
about 13 percent. Similar regional patterns were also obtained for long-
gun ownership by urban residents in these regions: only 10 percent of
urban households in Boston and the Mid-Atlantic cities owned any type
of firearm, compared with about half of urban households in the Moun-
tain cities.

This brief review suggests that gun "availability," in the sense of the
extent of ownership, has not been increasing over the past twenty years.
Handgun ownership has become more widespread over this period,
however. The private inventory of firearms is perhaps as high as 140
million, but this inventory is highly concentrated in the relatively small
fraction of households that own three or more guns. Finally, gun
"availability" differs widely across regions and by-city size.

These results are interesting as a global overview of gun availability
patterns, but they lack the detail and precision needed for statistical
analysis of the relation between gun availability and violent crime pat-
terns. Several researchers have attempted to develop statistical proxies
for gun availability, which, unlike manufacturing or survey data, can be
measured for a number of jurisdictions. Of these, the only validated
proxy measure is that developed in Cook (1979).

In constructing this index, I first calculated the gun fractions for
suicide and assaultive homicide for each of fifty large cities, combining
1973 and 1974 data for each. The distributions of suicides and murderers
differ from each other rather dramatically in terms of race, age, socio-
economic status, and so forth, and of course the immediate circum-
stances in which these acts occur are very different. Nevertheless, the
gun fractions for suicide and assaultive homicide are highly correlated
across these fifty cities (.82), suggesting that environmental determinants

of weapon choice for both types of violent acts are similar. I assumed that the underlying environmental determinant was gun availability (prevalence of ownership) and constructed an index of gun availability by averaging these two fractions in each city. The validity of this index was tested by the following technique: the fifty cities were divided into eight regional subsets and an "urban regional index" was constructed by combining the indexes for each city. This urban regional index was then compared with the fraction of urban households in each region that reported owning a gun in three of the recent NORC General Social Surveys (three surveys were combined to achieve sufficiently large sample sizes).[27] My index proved completely compatible with the survey results.

This index was then used as a measure of gun availability in a regression analysis of robbery rates.[28] Controlling for other variables important in explaining intercity differences in robbery, the principal results were as follows: (1) a 10 percent reduction in the number of handguns in a city is associated with about a 5 percent reduction in the robbery rate; (2) the overall robbery rate is not discernibly influenced by gun availability in a city; and (3) a 10 percent reduction in the number of handguns in a city is associated with about a 4 percent reduction in the number of robbery murders. Thus gun density influences weapon choice in robbery but not the overall robbery rate. Weapon choice is important because it influences the likelihood that a robbery victim will be killed. These results are compatible with the discussion in sections II–IV and tend to confirm two of the hypotheses stated there.[29]

### B. *Regulation of Handgun Commerce*

Restrictions on handgun transfers have become more stringent in some states and cities since the mid-1960s. The overall effective price of a handgun may have increased in these jurisdictions as a result.

The federal Gun Control Act of 1968 imposed a national ban on mail-order purchases of firearms except by federally licensed dealers, and it restricted interstate commerce in other ways as well. The intended effect of these regulations was to insulate the states from each other, so

[27] Survey-based estimates of this sort are not strictly valid, since the sampling frame is not constructed to produce representative samples in these regional city clusters.

[28] This index has also been used by Moore (1980) and by Sherman (private communication). Sherman finds a high correlation between this measure of gun availability and the number of police killed in a city.

[29] A number of other proxies for gun availability that have appeared in the literature are summarized and analyzed in Cook (1982).

82        Philip J. Cook

that the stringent regulations on firearms commerce adopted in some states would not be undercut by the greater availability of guns in other states.

A number of states have adopted significant restrictions on commerce in firearms, especially handguns. About half the states, including two-thirds of the United States population, currently require that handgun buyers obtain a permit or license (or at least send an application to the police) before taking possession of the gun (Cook and Blose 1981). In most of these states, the objective of the permit or application system is to prevent felons and other undesirables from obtaining handguns without infringing substantially on the majority's ability to purchase and possess them. These state systems differ with respect to the fee, the waiting period, the involvement of state (as opposed to local) agencies, the thoroughness of the criminal record check, and so forth. Perhaps more important in practice are differences among states with respect to law enforcement efforts aimed at plugging the inevitable "leaks" between the entitled and proscribed sectors: thefts, black-market sales, illegal sales by licensed dealers, and so forth. A transfer system that appears stringent on paper may be quite lax in practice if law enforcement officials view enforcement activities in this area as being of low priority.

All but a few state transfer control systems are "permissive," in the sense that most people are legally entitled to be issued a permit and obtain a handgun. In a few jurisdictions, however—New York, Boston, Washington, D.C.—it is very difficult to obtain a handgun legally. Washington, D.C., is the most restrictive jurisdiction in this respect; only law enforcement officers and security guards are legally entitled to obtain handguns there under current law (Jones 1981).

The effect of a transfer control system is to increase the effective price of a legally purchased handgun by requiring a permit fee, a waiting period, or both, and by requiring applicants to do some paperwork and submit to a criminal record check. A number of states and cities adopted or strengthened requirements of this sort during the 1970s. A transfer control system may discourage some people from purchasing handguns and motivate others to evade the transfer regulations by purchasing from nondealers. (Transfer requirements usually apply to purchases from nondealers but are very difficult to enforce for such transactions.) While it is certainly possible to evade transfer requirements and the costs thereof, purchase from a nondealer may be costly in other ways— nondealer sources are typically less reliable and less accessible than dealers.

Major changes in gun regulations, or in the effort devoted to enforcing such regulations, are "natural experiments" that may be analyzed for evidence concerning the effect of gun availability on violent crime patterns. Such changes can be evaluated even in the absence of a valid measure of gun availability: if introducing a stringent restriction on gun sales results in a reduction in the gun robbery rate, then it can be assumed that the effect was transmitted through a reduction in gun availability, even if there is no direct statistical evidence on availability. A case in point is Operation DC, a short-lived experiment by the Bureau of Alcohol, Tobacco, and Firearms (BATF) to interdict the illegal flow of firearms into the District of Columbia. BATF enforcement staff in the District was increased from seven to between thirty-five and fifty special agents for the first six months of 1970. According to Zimring (1975), the gun murder rate dropped significantly during this period and rebounded thereafter, while the nongun murder rate remained roughly constant throughout. This result is highly supportive of the claim that gun availability is sensitive to law enforcement efforts, and further, that gun availability influences the gun murder rate and the overall murder rate. However, this picture is clouded somewhat by the fact that the gun assault pattern shows no corresponding pattern during the period when Operation DC was in effect.

Other important innovations in gun regulation that have been evaluated include the Gun Control Act of 1968 (Zimring 1975) and Massachusetts' Bartley-Fox Amendment (Pierce and Bowers 1981; Deutsch and Alt 1977).

## C. *Conclusion*

A major stumbling block in testing the effect of gun availability on violent crime patterns is developing an operational measure of gun availability that can be implemented from existing data. Several proxies for gun availability have been utilized by researchers, but only one meets normal standards for measurement validity—and that only for cross-sectional comparisons. It is possible to circumvent this measurement problem by taking advantage of "natural experiments"—policy innovations that are designed to change gun availability. Any observed changes in violent crime patterns resulting from the policy innovation can then be attributed to the resulting change in gun availability. Several published evaluations of major policy innovations support the hypotheses developed in preceding sections, although the evidence is not conclusive for any one of these changes in law or enforcement policy.

84      Philip J. Cook

VI. Notes on a Research Agenda

It is my impression that social scientists tend to ignore each other's suggestions for future research unless they are funded and come in the form of a request for proposals. Rather than suggest specific research projects, my objective in this review has been to demonstrate that the technology of violent crime is an interesting and important topic—a topic that is eminently researchable and yet has been largely neglected by social scientists qua scientists. The choice of weapon by the assailant in a violent criminal encounter is not just an incidental aspect of this encounter, but may be every bit as important in shaping the encounter and determining the outcome as the underlying motivation and state of mind of the assailant, the relation between assailant and victim, the location of the attack, and so forth. More generally, the extent to which firearms are available to violent criminals may have a profound influence on the nature and seriousness of violent crime. I submit the following list of propositions as a credible summary of the likely effects of gun availability on violent crime:

—Gun availability does not have much effect on the rates of robbery and aggravated assault, but it does have a direct effect on the fractions of such crimes that involve guns.

—Since gun attacks are intrinsically more deadly than attacks with other weapons, gun availability is directly related to the homicide rate.

—Increased gun availability promotes a relative increase in robberies and homicidal attacks on relatively invulnerable targets.

There is some evidence available supporting these propositions, which I have reviewed above. More work is needed.

If funding were available for research in this general area, I would recommend that highest priority be given to three types of projects:

1. Analysis of the victim survey and homicide data to determine if the crime of rape is characterized by the same weapon-related patterns as robbery (e.g. the vulnerability, objective dangerousness, and instrumental violence patterns).

2. Fine-grained evaluations of the effect of gun regulations.

3. Interviews with violent criminals to gain greater insights into the notion of gun availability:

—Where and how do criminals obtain guns? How do state and local ordinances affect the distribution of sources of guns?

85        Gun Availability and Violent Crime

—Do violent criminals who use other weapons have ready access to guns? If so, why do they not use them? In particular, why are fewer than half of all robberies committed with guns?

—Why are handguns used in such a high percentage of gun-related crime, given that long guns are more widely available and generally more effective?

—What is the mix of motives that results in the decision of many criminals to carry a gun?

This is enough of a "shopping list," given the current austerity of funding for criminal justice research.

I have not emphasized the policy relevance of research in this area, in part because I thought it was important to stress that the role of weapons in violent crime should be of as much interest to criminologists as to policy analysts and polemicists. Ultimately, however, the policy implications cannot be ignored. It is not too far-fetched to hope that the accumulation of knowledge in this area will encourage the adoption of wiser and more effective policies.

## REFERENCES

Beha, James A., III. 1977. "'And Nobody Can Get You Out': The Impact of a Mandatory Prison Sentence for the Illegal Carrying of a Firearm on the Use of Firearms and the Administration of Criminal Justice in Boston," parts I and II, *Boston University Law Review* 57: 96–146, 289–333.

Block, Carolyn, and Richard Block. 1980. *Patterns of Change in Chicago Homicide: The Twenties, the Sixties, and the Seventies.* Chicago: Law Enforcement Commission.

Block, Richard. 1977. *Violent Crime.* Lexington, Mass.: Lexington Books.

Brearly, Harrington C. 1932. *Homicide in the U.S.* Chapel Hill: University of North Carolina Press.

Brill, Steven. 1977. *Firearm Abuse: A Research and Policy Report.* Washington, D.C.: Police Foundation.

Bruce-Briggs, B. 1976. "The Great American Gun War," *Public Interest* 45 (fall): 1–26.

Bureau of Alcohol, Tobacco, and Firearms. 1976. *Project Identification: A Study of Handguns Used in Crime.* ATF P 3310.1 (5/76). Washington, D.C.: Bureau of Alcohol, Tobacco, and Firearms.

Burr, D. E. Scott. 1977. "Handgun Regulation." Final report to the Bureau of Criminal Justice Planning and Assistance, Florida.

86        Philip J. Cook

Campbell, Donald, and Julian C. Stanley. 1966. *Experimental and Quasi-Experimental Designs for Research.* Chicago: Rand McNally.

Clotfelter, Charles T. 1982. "Crime, Disorders, and the Demand for Handguns: An Empirical Analysis," *Law and Policy Quarterly,* in press.

Conklin, John E. 1972. *Robbery and the Criminal Justice System.* Philadelphia: J. B. Lippincott.

Cook, Philip J. 1976. "A Strategic Choice Analysis of Robbery." In *Sample Surveys of the Victims of Crimes,* ed. Wesley Skogan. Cambridge, Mass.: Ballinger.

———. 1979. "The Effect of Gun Availability on Robbery and Robbery Murder: A Cross Section Study of Fifty Cities." In *Policy Studies Review Annual,* vol. 3, ed. Robert H. Haveman and B. Bruce Zellner. Beverly Hills, Calif.: Sage.

———. 1980a. "Reducing Injury and Death Rates in Robbery," *Policy Analysis* 6(1):21–45.

———. 1980b. "Research in Criminal Deterrence: Laying the Groundwork for the Second Decade." In *Crime and Justice: An Annual Review of Research,* vol. 2, ed. Norval Morris and Michael Tonry. Chicago: University of Chicago Press.

———. 1981a. "The Effect of Gun Availability on Violent Crime Patterns," *Annals of the American Academy of Political and Social Science* 455 (May):63–79.

———. 1981b. "Guns and Crime: The Perils and Power of Long Division," *American Journal of Public Policy and Management,* in press.

———. 1982. "The Role of Firearms in Violent Crime: An Interpretive Review of the Literature, with Some New Findings and Suggestions for Future Research." In *Criminal Violence,* ed. Marvin Wolfgang and Neil Weiner. Beverly Hills, Calif.: Sage.

Cook, Philip J., and James Blose. 1981. "State Programs for Screening Handgun Buyers," *Annals of the American Academy of Political and Social Science* 455 (May):80–91.

Cook, Philip J., and Daniel Nagin. 1979. *Does the Weapon Matter?* Washington, D.C.: Institute for Law and Social Research.

Curtis, Lynn A. 1974. *Criminal Violence.* Lexington, Mass.: Lexington Books.

Deutsch, Stuart Jay, and Francis B. Alt. 1977. "The Effect of Massachusetts' Gun Control Law on Gun-Related Crimes in the City of Boston," *Evaluation Quarterly* 1(4):543–68.

Etzioni, Amitai, and Richard Kemp. 1973. "A Technology Whose Removal 'Works': Gun Control." In *Technological Shortcuts to Social Change,* pp. 103–51. New York: Russell Sage Foundation.

Feeney, Floyd, and Adrianne Weir. 1974. *The Prevention and Control of Robbery: A Summary.* Davis: University of California, Center on Administration of Criminal Justice.

Fisher, Joseph. 1976. "Homicide in Detroit: The Role of Firearms," *Criminology* 14(3):387–400.

Geisel, Martin S., Richard Roll, and R. Stanton Wettick, Jr. 1969. "The Effectiveness of State and Local Regulation of Handguns: A Statistical Analysis," *Duke Law Journal* 1969:647–76.

Gendreau, Paul, and C. Thomas Surridge. 1978. "Controlling Gun Crimes: The Jamaican Experience," *International Journal of Criminology and Penology* 6(1): 43–60.

Heumann, Milton, and Colin Loftin. 1979. "Mandatory Sentencing and the Abolition of Plea Bargaining: The Michigan Felony Firearm Statute," *Law and Society Review* 13:393–430.

Hindelang, Michael J., Michael R. Gottfredson, and James Garofalo. 1978. *Victims of Personal Crime: An Empirical Foundation for a Theory of Personal Victimization.* Cambridge, Mass.: Ballinger.

Hoffman, Frederick L. 1925. *The Homicide Problem.* Newark, N.J.: Prudential Press.

Jones, Edward D., III. 1980. "Handguns, Gun Control Laws, and Firearm Violence: A Comment." Mimeographed. U.S. Department of Justice, Office for Improvements in the Administration of Justice.

———. 1981. "The District of Columbia's 'Firearms Control Regulations Act of 1975': The Toughest Handgun Control Law in the United States—Or Is It?" *Annals of the American Academy of Political and Social Science* 455 (May):138–49.

Kleck, Gary, and David Bordua. 1981. "The Assumptions of Gun Control." Unpublished manuscript. School of Criminology, Florida State University.

Krug, Alan S. 1968. *The True Facts of Firearm Legislation—Three Statistical Studies.* Washington, D.C.: National Shooting Sports Foundation.

Loftin, Colin. 1980. "'One with a Gun Gets You Two': Mandatory Sentencing and Firearms Offenses in Detroit." Unpublished manuscript. Center for Research on Social Organization, University of Michigan, Ann Arbor.

Loftin, Colin, and David McDowall. 1981. "'One with a Gun Gets You Two': Mandatory Sentencing and Firearms Violence in Detroit," *Annals of the American Academy of Political and Social Science* 455 (May):150–67.

Lundsgaarde, Henry P. 1977. *Murder in Space City.* New York: Oxford University Press.

McDermott, M. Joan. 1979. *Rape Victimization in Twenty-six American Cities.* Washington, D.C.: U.S. Government Printing Office.

Magaddino, J. P. n.d. "Towards an Economic Evaluation of State Gun Control Laws." Unpublished manuscript. California State University, Long Beach.

Moore, Mark. 1977. "Managing the Effective Price of Handguns: A Conceptual Basis for the Design of Gun Control Policies." Unpublished manuscript. Kennedy School of Government, Harvard University.

———. 1979. "The Supply of Handguns: An Analysis of the Potential and Current Importance of Alternative Sources of Handguns to Criminal Offenders." Unpublished manuscript. Kennedy School of Government, Harvard University.

———. 1980. "The Police and Weapons Offenses," *Annals of the American Academy of Political and Social Science* 452 (November):22–32.

———. 1981. "Keeping Handguns from Criminal Offenders," *Annals of the American Academy of Political and Social Science* 455 (May):92–109.

Murray, Douglas R. 1975. "Handguns, Gun Control Laws, and Firearm Violence," *Social Problems* 23(1):81–93.

88        Philip J. Cook

Newton, George D., Jr., and Franklin E. Zimring. 1969. *Firearms and Violence in American Life*. Washington, D.C.: U.S. Government Printing Office.

Phillips, Llad. 1973. "Crime Control: The Case for Deterrence." In *The Economics of Crime and Punishment*, ed. Simon Rottenberg. Washington, D.C.: American Enterprise Institute.

Phillips, Llad, Harold L. Votey, Jr., and John Howell. 1976. "Handguns and Homicide: Minimizing Losses and the Costs of Control," *Journal of Legal Studies* 5(2):463–78.

Pierce, Glenn L., and William J. Bowers. 1979. "The Impact of the Bartley-Fox Gun Law on Crime in Massachusetts." Unpublished manuscript. Northeastern University, Center for Applied Social Research.

————. 1981. "The Bartley-Fox Gun Law's Short-Term Impact on Crime in Boston," *Annals of the American Academy of Political and Social Science* 455 (May):120–37.

Rushforth, Norman B., A. B. Ford, C. S. Hirsh, N. M. Rushforth, and L. Adelson. 1977. "Violent Death in a Metropolitan County: Changing Patterns in Homicide (1958–74)," *New England Journal of Medicine* 297(10):531–38.

Seitz, Steven Thomas. 1972. "Firearms, Homicides, and Gun Control Effectiveness," *Law and Society Review* 6 (May):595–611.

Silberman, Charles E. 1978. *Criminal Violence, Criminal Justice*. New York: Random House.

Skogan, Wesley G. 1978. "Weapon Use in Robbery: Patterns and Policy Implications." Unpublished manuscript. Northwestern University, Center for Urban Affairs.

Swersey, Arthur J. 1980. "A Greater Intent to Kill: The Changing Pattern of Homicide in Harlem and New York City." Unpublished manuscript. Yale School of Organization and Management.

U.S. Conference of Mayors. 1980. "The Analysis of the Firearms Control Act of 1975: Handgun Control in the District of Columbia." Mimeographed.

Verkko, Veli. 1967. "Static and Dynamic 'Laws' of Sex and Homicide." In *Studies in Homicide*, ed. Marvin Wolfgang. New York: Harper and Row.

Weber-Burdin, Eleanor, P. H. Rossi, J. D. Wright, and K. Daly. 1981. *Weapons Policies: A Survey of Police Department Practices and Related Issues*. Amherst: University of Massachusetts, Social and Demographic Research Institute.

Wolfgang, Marvin E. 1958. *Patterns in Criminal Homicide*. Philadelphia: University of Pennsylvania Press.

Wright, James D. 1979. "Public Opinion and Gun Control: A Comparison of Results from Two Recent National Surveys." Unpublished manuscript. University of Massachusetts, Amherst.

————. 1981. "Public Opinion and Gun Control: A Comparison of Results from Two Recent National Surveys," *Annals of the American Academy of Political and Social Science* 455 (May):24–39.

Wright, James D., and Linda L. Marston. 1975. "The Ownership of the Means of Destruction: Weapons in the United States," *Social Problems* 23(1):81–107.

Wright, James D., P. H. Rossi, K. Daly, and E. Weber-Burdin. 1981. *Weapons, Crime, and Violence in America: A Literature Review and Research Agenda*.

Amherst: University of Massachusetts, Social and Demographic Research Institute.

Zimring, Franklin. 1967. "Is Gun Control Likely to Reduce Violent Killings?" *University of Chicago Law Review* 35:721–37.

———. 1968. "Games with Guns and Statistics," *Wisconsin Law Review* 1968:1113–26.

———. 1972. "The Medium Is the Message: Firearm Calibre as a Determinant of Death from Assault," *Journal of Legal Studies* 1(1):97–124.

———. 1975. "Firearms and Federal Law: The Gun Control Act of 1968," *Journal of Legal Studies* 4(1):133–98.

———. 1976. "Street Crime and New Guns: Some Implications for Firearms Control," *Journal of Criminal Justice* 4:95–107.

———. 1977. "Determinants of the Death Rate from Robbery: A Detroit Time Study," *Journal of Legal Studies* 6(2):317–32.

HeinOnline -- 4 Crime & Just. 90 1983

# EXHIBIT 6

# Gary Kleck

# POINT BLANK

## Guns and Violence in America



**ALDINETRANSACTION**
A Division of Transaction Publishers
New Brunswick (U.S.A.) and London (U.K.)



Second paperback printing 2009
Paperback edition published 2005 by AldineTransaction, New Brunswick,
New Jersey. Copyright © 1991 by Transaction Publishers.

All rights reserved under International and Pan-American Copyright Conven-
tions. No part of this book may be reproduced or transmitted in any form or by
any means, electronic or mechanical, including photocopy, recording, or any
information storage and retrieval system, without prior permission in writing
from the publisher. All inquiries should be addressed to Transaction Publishers,
Rutgers—The State University of New Jersey, 35 Berrue Circle, Piscataway,
New Jersey 08854-8042. www.transactionpub.com

This book is printed on acid-free paper that meets the American National
Standard for Permanence of Paper for Printed Library Materials.

Library of Congress Catalog Number: 91-16780
ISBN: 978-0-202-30762-6
Printed in the United States of America

Library of Congress Cataloging-in-Publication

Kleck, Gary, 1951-
    Point blank : guns and violence in America / Gary Kleck.
        p. cm. — (Social institutions and social change)
        Includes bibliographical references and index.
        ISBN 0-202-30419-1 (cloth); 0-202-30762-X (paper)
    1. Violence—United States.  2. Firearms—Social aspects—United
States.  3. Gun control—United States. I. Title.  II. Series.

HN90.V5K56  1991
303.6'0973—dc20                              91-16780

*To my wife Diane and my children Matthew and Tessa*
*To my parents, William and Joyce Kleck*
*and to my mentor, David Bordua*

CHAPTER

# 5

## Guns and Violent Crime

Several facts about violent crime in America are indisputable. The United States has a high level of violence, it has a large number of guns, and a very high share of its homicides are committed with guns. Further, relative to other industrialized nations, the United States has more violence, more guns per capita, and a higher fraction of its violent acts committed with guns. From these simple facts, some draw a simple conclusion: America's higher level of gun ownership causes its higher rate of violence (for an example of this reasoning, see Sloan et al. 1990). This conclusion is a non sequitur. Even if 100% of violent acts were committed with guns, it would be a logical possibility that every single gun death and crime would have occurred by other means even if there were no guns, and that high gun ownership levels had no impact on violence rates. Further, it is possible that there is a causal connection between the two, but that it is high violence rates that cause high gun ownership levels, rather than the reverse.

Whether guns in some sense cause violence cannot be inferred from these facts; this inference requires more complicated analysis of a considerably larger set of facts. Two approaches to the question are used here, one at the level of individual incidents of violence and the other at the level of city rates of violent crime. Two questions are addressed. First, are incidents of violence in which the aggressor possesses a gun more likely than otherwise similar incidents to result in an attack on the victim, injury to the victim, or the victim's death? Second, do areas with higher rates of gun ownership have, as a result, higher rates of violence? It should be emphasized that this chapter addresses the effects of the aggressor's possession and use of weapons on the outcomes of violent incidents and on rates of violence; the effects of the victim's possession or use were addressed in the last chapter.

153

### Guns and Power

Individual power has primarily been conceptualized by social scientists as deriving from lasting attributes of persons and from their position in the social structure, e.g., from social class position, gender, age, and race (e.g., Wrong 1988, Chapters 6–8). For example, in the family violence literature (e.g., Strauss et al. 1980), power is typically viewed as deriving from family role and gender. All of these sources of power, however, ultimately derive to some extent from a capacity to use physical force and violence, either exercised by the actor or by agents the actor can call upon. And capacity to use force in turn often relies partly on a rather transitory attribute of the person, the possession of weaponry.

Indeed, the single most important factor that sets human violence apart from aggression among lower animals is arguably man's greater technological capacity to inflict harm. The tools of death available to humans are vastly more lethal than even the most deadly natural equipment of animals. Whereas interpersonal conflict of some sort is inevitable and universal, it may be factors such as use of weaponry that determine whether verbal conflict escalates to violence, whether physical attacks are completed by reaching their target, and whether they inflict serious injury or death when they do.

The power that weaponry confers has been conventionally treated as exclusively violence-enhancing—it was commonly assumed that weapon possession and use act only to increase the likelihood of the victim's injury and death (e.g., Newton and Zimring 1969). This is an unduly restrictive conceptualization of the significance of weaponry. A broader perspective starts with a recognition of weapons as sources of power, used instrumentally to achieve goals by inducing compliance with the user's demands. The ultimate goal behind an act of violence is not necessarily the victim's death or injury, but rather may be money, sexual gratification, respect, attention, or the humiliation and domination of the victim. Power can be, and usually is, wielded so as to obtain these things without inflicting injury. Threats, implied or overt, usually suffice and are often preferred to physical attack. The inflicting of injury may even be an indication that the preferred mode of exercising power failed.

Weapons are an important source of power, especially so in a nation such as the United States, where half of the households possess a gun. As such, they are frequently wielded to achieve some emotional or material goal—to obtain sexual gratification in a rape or money in a robbery, or, more frequently, to frighten and dominate victims in some

other assault. All of these things can be gained without an attack, and indeed the possession of a gun can serve as a substitute for attack, rather than its vehicle.

### Issues of Assault Outcomes

Violent crimes occur within hostile or threatening situations, which can be categorized into the "hierarchy of violence" illustrated in Figure 5.1. A "threatening situation" is an encounter in which one person (the "victim") is either physically attacked or perceives that another person



*Figure 5.1.* The hierarchy of violence. Percentages are weighted. Those below INJURY are from the 1979–1985 NCS stranger violent incident sample. Those above INJURY are from the merged 1982 NCS and SHR dataset.

(the "aggressor") is threatening them with physical harm in some way, including verbal threats, menacing gestures, or other actions. Most threatening situations never proceed beyond mere threat. Aggressors obtain what they want from a threatening speech or gesture, or limit their aggression to words out of fear of the consequences of doing more. (In the common law, to threaten to hurt another person is assault, regardless of whether any actual attempt to physically injure is made.)

In the 1979–1985 National Crime Surveys (NCS), half of assaults were mere threats, without any attack. And of those assaults involving an attack, only about half were completed, i.e., resulted in an injury. Finally, based on combined NCS and FBI Supplementary Homicide Reports (SHR) data for 1983, only about 1% of those attacks that caused injury resulted in death. Each of these possible outcomes of threats is separately addressed, with subsequent sections assessing the impact of weaponry on attack, injury, given that an attack occurred, and death, given that an injury was inflicted.

## Attack

An attack could be the throwing of a punch, swinging of a club, thrusting of a knife, or firing of a gun. Does possession of guns or various other common weapons encourage or discourage attack? The principal possible effects of weapons on attack are conceptualized as facilitation, triggering, inhibition, and redundancy.

### Facilitation

An Old West saying asserted that "God created men—Colonel Colt made them equal," or alternatively, "Colonel Colt made all men six feet tall." Just as a gun can serve as an "equalizer" for victims of attacks (Chapter 4), it can do the same for aggressors. It has long been argued that firearms give some people the courage to attempt aggressive acts they would otherwise be afraid to attempt. In particular, a weapon may be especially important in facilitating the aggression of weaker aggressors against stronger victims.

There is some empirical support for this argument. For example, Cook (1982, p. 257) used police data from 50 cities to show that guns are more commonly used in homicides in which the victim was older and presumably weaker, and the victim younger and presumably stronger. Likewise, wives or girlfriends killing their husbands or boyfriends were

more likely to use guns. Table 5.1 furthers this analysis by using national data and examining three different measures of attacker–victim power differentials. The data indicate that gun use in homicides is more common when (1) the victim is male rather than female, (2) the victim is male and the attacker is female, compared to the reverse situation, (3) the attacker is outside the "physical prime" ages of 16–39, compared to other ages, (4) the attacker is outside the "prime" age span and the victim is in that age span, compared to the reverse situation, (5) there is a single attacker, compared to a group of attackers, and (6) there is a single attacker and multiple victims, compared to the reverse situation. In each of these comparisons, gun use was more likely when the attacker(s), if not armed with a gun, would usually be less powerful than the victim, due to gender, age, or numbers. These findings do not conclusively prove that guns facilitate attacks that would not otherwise have occurred. It is possible that the minority of attackers who choose guns are so strongly motivated that, although they would prefer to use a gun, they would still attack without a gun, even with the odds against them. Nevertheless, the results are quite consistent with the equalizer hypothesis.

Unlike other common personal weapons, guns permit effective attack from a great distance. As one gun control advocate put it, "a gun may not be necessary to kill another, but at fifty yards it's certainly a help." Guns therefore can facilitate long-range attacks. However, few assaults occur at ranges longer than the length of the average barroom or kitchen. Studies of general samples of gun attacks do not report ranges, but inferences can be made from attack locations. In a 17-city study of crimes known to police, 61% of criminal homicides and 49% of aggravated assaults (with or without guns) occurred in indoor locations (Curtis 1974, p. 176). Given the dimensions of most rooms, virtually all of these must have involved ranges no greater than 20–30 feet.

Information on attack ranges is available for a near-complete national sample of one special type of gun attack. FBI data on the gunshot killings of 960 police officers killed in 1970–1987 indicated that 72% of the attacks involved a range of 10 feet or less, and 87% a range of 20 feet or less (U.S. FBI 1971–1988; e.g., the 1984 issue, p. 14). Generally speaking, then, gun attacks usually occur at ranges short enough that other weapons could have been used had the attacker been willing to close the distance and make physical contact with the victim.

However, for some attackers, maintaining a distance of just a few feet or even inches from their victim may be essential to carrying out an attack. It has been hypothesized that guns may facilitate attack by per-

sons too squeamish to come into physical contact with their victims or to use messier methods to injure them (Wolfgang 1958, p. 79). Some prospective attackers may be psychologically incapable of doing something as distasteful and ugly as plunging a knife into another human being's chest cavity or bashing in their skull with a blunt instrument, yet are perfectly capable of shooting their victim. Guns provide a more impersonal, emotionally remote, and even antiseptic way of attacking others and could allow some attackers to bypass their inhibitions against close contact with their victims. There is some experimental evidence that people are less willing to inflict pain on others if it requires physical contact with the victim (Bandura 1973, p. 177). However, these acts of laboratory aggression were done on the orders of experimenters and directed at "victims" against whom the subjects had no serious grievances. Whether the phenomenon can be generalized to serious real-world violence, and how many attackers need a gun for this psychological facilitation, are both unknown.

*Triggering*

Experimental psychologists Berkowitz and LePage (1967) proposed the "weapons effect" hypothesis, which stated that the sight of a weapon could elicit aggression from angered persons, due to the learned association between weapons and aggressive behavior. Thus, they believed that weapons can trigger attacks by angry persons. The "weapons effect" studies all used experimental designs and most were conducted in laboratories. In a typical study, subjects (Ss) were led to believe they were participating in some sort of learning experiment in which they supposedly administered painful electric shocks to another S each time this person failed to respond properly. Some Ss were exposed to weapons, others were not. Experimenters tested to see if Ss exposed to weapons aggressed more than the controls.

There were many variations on this basic pattern. Some researchers conducted experiments in natural settings. In one especially imaginative study conducted by Turner and his associates (1975), a confederate of the experimenters intentionally stopped a pickup truck at an intersection and refused to move when the light turned green, even though it was clear he was capable of doing so. The Ss were the drivers stuck behind the truck and their aggression was measured by whether they honked their horns. The experimental stimulus was whether or not the truck had a rifle in a gun rack visible to Ss.

Table 5.2 summarizes the results of 21 studies of the "weapons effect" hypothesis, emphasizing the way in which findings relate to how real-

istic the conditions of the experiments were. Overall, the findings are extremely mixed—studies have been almost evenly divided between those that were supportive and those that were unsupportive. The degree of realism of the experiments, and their relevance to real-world conditions of weapons-linked violence in the United States, varied widely, and this appears to have influenced the results. For example, whereas some studies exposed Ss to real weapons, others exposed them only to toy weapons or pictures or films of weapons. In some studies Ss believed they were inflicting physical pain in the form of electric shocks to another person, whereas in others they engaged in play "aggression," honked car horns, or were merely asked how much aggression they would *like* to inflict on the target. Some studies used adults and adolescents as Ss, i.e., persons in age groups likely to commit serious acts of violence and to be exposed to guns in an aggressive context. Others used children. Some studies were conducted in the United States, where both gun ownership and gun violence are common, whereas others were conducted in foreign nations where both are rare. The general pattern of findings, summarized in Part B of Table 5.2, is that the more closely the experiments simulated real-world situations of weapons-linked aggression in the United States, the less likely they were to support the weapons hypothesis. Supportive findings seem to be heavily dependent on various artificial experimental conditions prevailing.

Nevertheless, there were a few moderately realistic studies that yielded some support for the "weapons effect" hypothesis, and several substantive findings from this literature are worth noting. First, some studies indicated that weapons elicited aggression only if Ss assigned an aggressive meaning to them. For example, in the pick-up truck experiment, the gun was sometimes paired with a bumper sticker that read "vengeance," and at other times with one that read "friend." The sight of the gun elicited more horn-honking only when paired with the violent meaning (Turner et al. 1975). Other scholars interpreted a failure to discover a weapons effect to the rural setting of their study—where hunting was common, more positive meanings were attributed to guns, reducing their aggressive cue value (Halderman and Jackson 1979).

Second, some studies found that guns could inhibit aggression among some subjects, as well as elicit it. Fisher et al. (1969) found inhibiting effects for women. Turner et al. (1975) found inhibiting effects for both men and women under a variety of conditions. Fraczek and Macaulay (1971) found inhibiting effects for highly emotional Ss, speculating that such persons had learned to be especially fearful of the consequences of their aggression.

One study found the "weapons effect" occurred only among people

who had no prior experience with guns (Buss et al. 1972). This is especially important for a number of reasons. First, the Ss in most of these studies were college students, commonly in psychology classes. College students and college-educated persons are less likely to own guns, and therefore less likely to have real-world contact with them (see Table 2.5). Thus, the unrepresentative nature of the student subject pool may have artificially increased support for the hypothesis.

This finding also helps explain another pattern evident in Table 5.2—studies with foreign Ss were much more likely to support the hypothesis than those with U.S. Ss. There is little tradition of recreational ownership and use of guns among the mass of Europeans, and far less gun ownership of any kind than in the United States.

The findings can be tied together to provide a straightforward explanation for these patterns. The "weapons effect" has been detected only among people with no prior experience with guns. Persons with direct experience have gained it largely in nonaggressive, recreational contexts. Persons without such experience know guns only through the aggression-laden contexts of military service or gunplay in television and films. Members of the inexperienced group, which would include most children, college psychology students, and Europeans, are therefore more likely to attribute an aggressive meaning to guns, which apparently is essential for the "weapons effect" to occur.

The relevance of this body of research to real-life gun violence is further cast in doubt by the fact that the weapons to which Ss were exposed were either associated with the victims of the aggression, or with no one at all; they were almost never associated with the S whose aggression was being assessed. In the only study that actually associated a weapon with Ss, no weapons effect was observed [Buss et al. (1972) had some Ss fire a BB gun before being assessed for aggression]. Consequently, none of the studies provided any evidence directly supporting the idea that possessing a gun encourages physical aggression, or that the "trigger pulls the finger."

At best, some of the studies inadvertently concerned the effect of gun possession by *victims* of aggression on the behavior of aggressors. The analysis of victim survey data in Chapter 4 indicated that aggressor attack was *less* likely when the victim used a gun in self-defense. How can the conflict between real-world experience and the findings of half of the experimental studies be reconciled? One way would be to hypothesize that the sight of a gun in the possession of a prospective target of aggression increases the aggressor's aggressive *arousal*, i.e., it stimulates anger, but that it inhibits actual physical attack because the would-be

aggressor fears a dangerous counterattack by the victim. Since no such counterattack was likely in the experiments, aggressors were free to act on their aggressive impulses in a way that would be unlikely in real life.

### Inhibition

In an early study of victim survey data from eight cities, Hindelang (1976, p. 263) concluded that "when a gun is involved in a victimization, both the victim and the offender appear to be more restrained and interested in avoiding an attack with the weapon." Thus, not only does victim defensive use of a gun inhibit aggressor attacks (Chapter 4), but even the aggressor's possession of a gun can inhibit his own aggression, as well as that of his victim. In many assaults the aggressor not only lacks an intent to kill, but specifically wants to *avoid* killing his victim. Instead, he may want only to frighten or to hurt without killing. Possession of a lethal weapon gives such an assaulter more killing power than he needs or wants, and to attack would risk inflicting more harm than the assaulter wanted. The possession of deadly weapons raises the stakes into what may seem to be an all-or-nothing situation—kill or do not attack at all. Assuming the intentions of assaulters as a group cluster predominantly at the less deadly end of the continuum, one effect of aggressor possession of guns and other deadly weapons could therefore be inhibition of attack behavior. As previously noted, a number of "weapons effect" experiments indicated that the sight of weapons could inhibit aggression under some conditions.

### Redundancy

A deadly weapon empowers its possessor to terrify, coerce compliance with demands, deter another's aggression, nonfatally injure, or kill. Power increases the likelihood its user will get what he wants, whatever that may be. If most assaulters do not want to kill, then a lethal weapon enables its user to achieve other goals. In robberies, the robber's use of a gun ensures compliance with his demands for money and deters the victim from resisting, convincing the victim that the robber has the capacity to inflict death or serious injury (Luckenbill 1982). Without a gun it would often be impossible for the robber to achieve this without actually attacking. Threat with a gun can thereby serve as a substitute for actual attack, rather than its vehicle. In short, possession of a gun can make a physical attack *unnecessary*. Supporting this idea, at least nine prior studies found that robbers armed with guns are less likely to injure their victims than robbers without guns (Normandeau

who had no prior experience with guns (Buss et al. 1972). This is especially important for a number of reasons. First, the Ss in most of these studies were college students, commonly in psychology classes. College students and college-educated persons are less likely to own guns, and therefore less likely to have real-world contact with them (see Table 2.5). Thus, the unrepresentative nature of the student subject pool may have artificially increased support for the hypothesis.

This finding also helps explain another pattern evident in Table 5.2—studies with foreign Ss were much more likely to support the hypothesis than those with U.S. Ss. There is little tradition of recreational ownership and use of guns among the mass of Europeans, and far less gun ownership of any kind than in the United States.

The findings can be tied together to provide a straightforward explanation for these patterns. The "weapons effect" has been detected only among people with no prior experience with guns. Persons with direct experience have gained it largely in nonaggressive, recreational contexts. Persons without such experience know guns only through the aggression-laden contexts of military service or gunplay in television and films. Members of the inexperienced group, which would include most children, college psychology students, and Europeans, are therefore more likely to attribute an aggressive meaning to guns, which apparently is essential for the "weapons effect" to occur.

The relevance of this body of research to real-life gun violence is further cast in doubt by the fact that the weapons to which Ss were exposed were either associated with the victims of the aggression, or with no one at all; they were almost never associated with the S whose aggression was being assessed. In the only study that actually associated a weapon with Ss, no weapons effect was observed [Buss et al. (1972) had some Ss fire a BB gun before being assessed for aggression]. Consequently, none of the studies provided any evidence directly supporting the idea that possessing a gun encourages physical aggression, or that the "trigger pulls the finger."

At best, some of the studies inadvertently concerned the effect of gun possession by *victims* of aggression on the behavior of aggressors. The analysis of victim survey data in Chapter 4 indicated that aggressor attack was *less* likely when the victim used a gun in self-defense. How can the conflict between real-world experience and the findings of half of the experimental studies be reconciled? One way would be to hypothesize that the sight of a gun in the possession of a prospective target of aggression increases the aggressor's aggressive *arousal*, i.e., it stimulates anger, but that it inhibits actual physical attack because the would-be

aggressor fears a dangerous counterattack by the victim. Since no such counterattack was likely in the experiments, aggressors were free to act on their aggressive impulses in a way that would be unlikely in real life.

## Inhibition

In an early study of victim survey data from eight cities, Hindelang (1976, p. 263) concluded that "when a gun is involved in a victimization, both the victim and the offender appear to be more restrained and interested in avoiding an attack with the weapon." Thus, not only does victim defensive use of a gun inhibit aggressor attacks (Chapter 4), but even the aggressor's possession of a gun can inhibit his own aggression, as well as that of his victim. In many assaults the aggressor not only lacks an intent to kill, but specifically wants to *avoid* killing his victim. Instead, he may want only to frighten or to hurt without killing. Possession of a lethal weapon gives such an assaulter more killing power than he needs or wants, and to attack would risk inflicting more harm than the assaulter wanted. The possession of deadly weapons raises the stakes into what may seem to be an all-or-nothing situation—kill or do not attack at all. Assuming the intentions of assaulters as a group cluster predominantly at the less deadly end of the continuum, one effect of aggressor possession of guns and other deadly weapons could therefore be inhibition of attack behavior. As previously noted, a number of "weapons effect" experiments indicated that the sight of weapons could inhibit aggression under some conditions.

## Redundancy

A deadly weapon empowers its possessor to terrify, coerce compliance with demands, deter another's aggression, nonfatally injure, or kill. Power increases the likelihood its user will get what he wants, whatever that may be. If most assaulters do not want to kill, then a lethal weapon enables its user to achieve other goals. In robberies, the robber's use of a gun ensures compliance with his demands for money and deters the victim from resisting, convincing the victim that the robber has the capacity to inflict death or serious injury (Luckenbill 1982). Without a gun it would often be impossible for the robber to achieve this without actually attacking. Threat with a gun can thereby serve as a substitute for actual attack, rather than its vehicle. In short, possession of a gun can make a physical attack *unnecessary*. Supporting this idea, at least nine prior studies found that robbers armed with guns are less likely to injure their victims than robbers without guns (Normandeau

1968; Conklin 1972; Feeney and Weir 1973; MacDonald 1975, p. 138; Hindelang 1976, p. 213; Block 1977; Cook and Nagin 1979, p. 35; Luckenbill 1981; U.S. Bureau of Justice Statistics 1986b).

This pattern need not be limited to acquisitive crime such as robbery. Aggressors in ordinary anger-instigated assaults have their own peculiar goals whose attainment can, if they have a weapon, be achieved without attacking. Those who want to frighten, humiliate, or dominate their victims can do so by merely pointing a gun, without firing it. On the other hand, without a gun, nothing short of attack may suffice. The same qualities of weapons that make them dangerous if used to attack can preclude the necessity of actually doing so. Simple percentage analysis of early National Crime Survey (NCS) victimization survey data indicated that the fraction of assaults resulting in attack and the fraction resulting in injury were both lower in those involving gun-armed offenders than for those with either offenders armed with other weapons or unarmed offenders (Hindelang 1976; U.S. Bureau of Justice Statistics 1986b, p. 4). Likewise, King (1987), using analysis of variance on later NCS data, also found lower rates of injury for gun-armed offenders in assault as well as robbery.

A combatant may also regain a favorable situational identity through the use of a weapon to control others and to compel their unwilling obedience. He can demonstrate to his victim, to himself, and to any bystanders that he cannot be pushed around, and that he must be granted respect, or at least fear. The weapon can be used to place its possessor into a superordinate position in situations in which this might otherwise be impossible to achieve without an actual attack.

One combatant's use of a lethal weapon may also give his opponent a socially acceptable excuse for not retaliating for an insult or other challenge to his self-image: "only a fool attacks someone with a gun." The failure to retaliate, which might otherwise be regarded by witnesses as evidence of cowardice, is instead viewed as mere prudence in the face of greatly unequal power. The extreme imbalance of power can thus prevent an escalation to physical violence by exacting from the weaker opponent some gesture of deference or an exit from the scene.

## Injury

If an attack does occur, it may or may not be completed, i.e., result in injury by a bullet reaching its target, a knife penetrating skin, or a fist or club bruising flesh or smashing bone. The attributes of weapons that can

facilitate attack may also reduce the attack completion rate by encouraging attacks at a longer range, against more formidable opponents or under more difficult conditions. It is possible to shoot a victim from a great distance, but the rate at which this is achieved is likely to be far lower than the rate at which thrown punches land. Concerning the more common close range gun attacks, those unfamiliar with firearms marksmanship might assume that shooters are virtually certain to hit their target. This assumption is not born out by the real-life experiences of persons shooting under conditions of emotional stress. NCS data covering the United States from 1979 to 1987 indicate that only 19% of incidents where an attacker shot at a victim resulted in the victim being hit, i.e., suffering a gunshot wound (U.S. Bureau of Justice Statistics 1990a, p. 5). In contrast, corresponding data on NCS-reported knife attacks indicated that about 55% resulted in a knife wound [U.S. Bureau of Justice Statistics 1986b, p. 4; 9.8% of knife attacks involved a knife wound, while another 7.9% involved an attempted knife attack without injury—$9.8/(9.8 + 7.9) = 0.55$].

Even individuals trained and presumably mentally prepared to shoot under stressful conditions, such as police officers, commonly have difficulty hitting their targets. A study of shots fired by New York City police officers, who unambiguously intended to shoot their adversaries (warning shots were excluded), found that of 2303 shots fired "in defense of life" or to "prevent or terminate crime," only 39% wounded the opponent (computed from Fyfe 1979, pp. 318, 320). One would expect this rate to be even lower among the mass of civilians lacking the training and relative emotional preparedness of police officers, and the NCS data supported this expectation. Thus, there is reason to expect that the net effect of gun use would be to decrease the fraction of attacks resulting in injury.

## Death

Only about one in seven gunshot woundings known to the police results in death (Cook 1985, p. 96). Because many minor nonfatal gunshot woundings never come to the attention of authorities, the true death rate is almost certainly lower than this. Most gunshot wound victims probably do not seek medical treatment. Even among those willing to report such incidents to the NCS, only half reported receiving any kind of medical treatment (U.S. Bureau of Justice Statistics 1986b, p. 5). Since unreported crime incidents tend to be either less serious or

regarded by victims as private or embarrassing matters, the fraction of unreported gunshot woundings that resulted in medical treatment is probably even lower than half. Consequently, large numbers (probably a majority) of nonfatal gunshot wounds never result in medical treatment and consequently never come to the attention of either doctors or the police. This results in overstated fatality rates in gunshot woundings. Cook's review of the evidence suggested that about 15% of gunshot woundings known to police result in death. If it is assumed that only half of nonfatal woundings (and all fatal woundings) are reported or known to police, the true fatality rate would be about 8% (based on a doubling of nonfatal woundings counted).

Nevertheless, gunshot wounds are more likely to result in death than those inflicted by a knife, the weapon generally assumed to be the next most lethal, among those that could be used in the same circumstances as guns. Although widely cited data from a single city indicated the gun attack death rate to be five times that of knife attacks (Zimring 1968, p. 728), other police-based and medical studies limited to woundings indicate a ratio of gun and knife wounding death rates of about 3–1 or 4–1 (Wilson and Sherman 1961, pp. 640–2; Ryzoff et al. 1966, p. 652; Block 1977). Further, figures in Table 5.3, based on national homicide data and NCS-based estimates of nonfatal woundings, also support a 4–1 ratio.

In Chapter 3, it was fairly simple conceptually to compare long guns with handguns, especially rifles with handguns. Both categories of weapons produce injury in very similar ways—by propelling small objects at high velocity. Likewise, Zimring's (1972) comparisons of smaller caliber guns with higher caliber guns, despite some empirical problems, was understandable at a conceptual level. On the other hand, knives (or clubs, hands, feet, etc.) produce injury in ways very different from guns. It is harder to get a handle on what people mean when they say guns are more lethal than knives, since this is very much an "apples and oranges" comparison. Cook (1982, p. 249) describes the "objective dangerousness pattern" to define what he means by gun–knife lethality differences, stating that "Gun attacks have a higher probability of killing the victim than knife attacks in otherwise similar circumstances." However, this defines lethality or "objective dangerousness" in a somewhat circular way—we want to know how weapon lethality affects assault outcomes, yet Cook uses assault outcome to define weapon lethality. The definition also does not explain why guns should more often produce lethal outcomes. It is not self-evident, from the point of view of either physics or medicine, that very small fast-moving objects such as bullets should produce more serious injury than much larger but slower-moving

objects such as knives. Finally, it is not in fact known that gun attacks have a higher probability of killing the victim in otherwise similar circumstances, since the available evidence indicates that gun and knife attacks rarely occur in genuinely "similar circumstances," thus affording few opportunities for making the necessary comparisons in any direct or simple way.

Zimring (1968) compared a set of handgun attacks with a heterogeneous sample of attacks involving a miscellany of stabbing and cutting instruments, finding that the fatality rate was five times higher in the latter sample than in the former. However, as Kates (1979b, p. 18) and Wright and his colleagues (1983, p. 199) have pointed out, Zimring was lumping presumably serious attacks using heavy, long-bladed knives in with fairly trivial cases of people scratched with pen knives and possibly even forks and beer can openers! It would be far-fetched to suppose that people who attack with a fork are, on average, comparable in motives, intentions, or strength of aggressive drive with people who shoot others with a handgun.

Wright et al. (1983) argued that a more informative comparison would have been between handgun attacks and just those "knife" attacks committed with long-bladed cutting instruments. As it happened, such research had already been done, long before Zimring's work. At least one medical study compared very similar sets of wounds (all were "penetrating wounds of the abdomen"), and found that the mortality rate in pistol wounds was 16.8%, while the rate was 14.3% for ice pick wounds and 13.3% for butcher knife wounds (Wilson and Sherman 1961, p. 643). This is far from Zimring's 5–1 ratio, yet is based on a study that met Cook's "similar circumstances" condition far better than the work by Zimring on which Cook relied.

Clearly, only some of the difference in death rates of attacks with different weapons, however large or small that may be, is attributable to the technical properties of the weapons themselves. Part of the difference is due to the greater "lethality" of the users of the more deadly weapons. Those with more lethal intentions, a greater willingness to hurt others, or a stronger instigation to aggress choose more serious weaponry, regardless of how vague their intentions are, or how impulsively and even unconsciously these might be arrived at. Thus, weapon lethality and attacker lethality should be closely associated (Cook 1982, pp. 247–8), and thus can easily be confused with one another.

A gun does not get used in an assault simply because it "happened to be there." Although it is rare that an aggressor obtains a gun to commit a

specific act of violence, more seriously violent people are more likely to have acquired guns in the past (usually for "defensive" purposes) and are more likely to keep them available for use, e.g., by carrying them on their person (Wright and Rossi 1986). Further, when the gun is actually used in an attack, it is almost always the result of a choice, however hastily made, among weapon alternatives. It surely is a rare gun homicide that occurs where a knife or blunt instrument is not also available. And certainly every gun killer also has hands and feet with which to attack the victim. For a variety of reasons, then, guns are *chosen* by aggressors.

Furthermore, this choice is not made randomly. The people who choose to use guns are different from those who choose other modes of attack. Reanalysis of data from a prison survey by Wright and Rossi (1986) indicates that as aggressor "seriousness" increases, weapon seriousness increases—killers and other assaulters with more extensive records of prior violence were more likely to have been armed in their attacks, more likely to have used guns, and even somewhat more likely to have used long guns (Table 5.4). This suggests that on average, a criminal gun user's willingness to do violence and inflict serious injury is greater than that of criminals who do not use guns. In addition, those who, at the time of the attack, intend to inflict serious, possibly lethal harm on their victim would presumably be more likely to select a weapon perceived to be more lethal.

If the wounding fatality rate of guns is four times higher than that of knives when the attackers are not matched regarding their lethality, then this ratio would necessarily be less than 4–1, though probably higher than 1–1, if attacker lethality were somehow controlled. Perhaps a reasonable, tentative "guesstimate" of the true guns-vs.-knives lethality ratio might be the average of these two ratios, or about 2.5–1.

Attackers who choose guns over other weapons, then, are more violent people, apart from the weapons they use. Consequently, unless one can somehow control for "attacker seriousness" in assaults, it is logically impossible to use data on the frequency of fatal outcomes in assaults to separate the effects of a weapon's technical properties from the closely associated effects of the attacker's willingness to seriously hurt the victim. Prior research has not measured or controlled for attacker seriousness, so it is impossible to tell from prior studies of assault fatality rates (e.g., Zimring 1968, 1972; Block 1977) whether fewer people would die if nongun weapons such as knives were substituted for guns by the same highly motivated attackers who currently use guns. Since attackers who use guns and those who use knives are likely to be quite different at

the time of the attacks, the fact that gun attacks are more likely to result in death by itself says nothing about whether it was the weapon that was responsible for the more frequent fatal outcomes of gun attacks. Consequently, it is impossible to tell from such data whether fewer assault victims would die if attackers were somehow induced to substitute knives for guns.

It is impossible to directly measure strength of an aggressor's motivation at the time of a real-life assault or to do experiments with serious, armed violence. It would also be pointless to ask attackers about their intentions after the fact, even if they were capable of recalling them. For an aggressor to admit that he intended to kill his victim would constitute a giant step toward a death sentence, or at least a very long prison term. Likewise, one cannot measure or control for attacker motivation by noting the location of wounds inflicted (e.g., Zimring 1972), especially for gun attacks. Given the difficulty of aiming guns accurately, the exact location of gunshot wounds is to a great extent a product of chance rather than aggressor intent (Cook and Nagin 1979, p. 7).

Therefore, to isolate the effects of weaponry itself on assault outcomes one cannot directly control for offender motivation, but only for presumed correlates of motivation. In the analysis of individual violent incidents reported later, the efforts of previous researchers are improved on in this respect only to the extent that the controls introduced are indeed correlated with an attacker's aggressive drive or the lethality of his intentions.

Another issue must be distinguished from that of the relative motivation strengths of gun and knife attackers. To what degree is the motivation of gun attackers strong and unambiguous? If every gun killer had, even for just a few minutes, a very strong aggressive drive and a single-minded intent to kill regardless of the risks and effort needed, then it would do no good to deprive them of guns—they would do whatever was necessary to kill their victims by other means in those few minutes. Arguing against this contention in a 1968 article, Zimring concluded (p. 736) that "a *substantial proportion* of all homicides can be thought to be ambiguously motivated" (emphasis added). By 1972, he had upgraded the weak "substantial proportion" to a majority. Summarizing the 1968 article, he asserted that "*most* homicide is not the result of a single-minded intention to kill at any cost" (emphasis added) (p. 97). Either in its weak or strong forms, the claim was not supported by the evidence Zimring presented; all of it was either irrelevant to the ambiguity claim, unclear as to whether it was supportive, or contrary to the claim.

Guns and Violent Crime

Before assessing Zimring's evidence, it is worth noting that the killer's cognitive ambiguity may not be all that pertinent to an assessment of whether gun control could prevent homicide. It is possible that most gun killers are ambiguously motivated in the sense that they do not, at the moment of attack, have a clear mental image of their victim dead. On the other hand, they may have a very strong aggressive drive and a willingness to seriously hurt their victim, without regard for exactly how serious an injury they inflict. Under such circumstances, killers deprived of guns could still be sufficiently angry, for a long enough time, to inflict lethal injuries at just as high a rate as they would have with guns. The key concept is the emotional one of strength and persistence of aggressive drive, rather than the cognitive concept of ambiguity of motives. If gun killers typically have a very strong drive to hurt their victims, then they might well not be satisfied until they had inflicted very serious injury, even if it took greater energy and a few more seconds of time to do so with a knife or club.

Zimring (1968) presented four kinds of evidence intended to support his "ambiguous motives" thesis: (1) killers and victims usually know each other before the killing, (2) most killings result from altercations, (3) most gun homicide victims are killed with a single wound, and (4) in most homicides, the killer or victim had been drinking. (It should be noted that most of Zimring's evidence pertained to all homicides, not just gun killings, even though it is only the traits of gun killers that are relevant to the issue of whether gun scarcity would reduce homicides.) Taking Zimring's points in order:

1. There is no evidence that fights between people who know each other before are less likely to involve a strong, persistent or unambiguous intent to kill than conflicts between strangers. Indeed, a prior relationship could provide the basis for the development of intense hatred and an accumulation of long-standing grievances. As Wright (1990) has noted, prior relationships tell us nothing about how ambiguous aggressors' motives are.

2. Altercations are unpremeditated and therefore allow less time for an aggressor to rethink his intentions, or to consider the long-term costs of an act of violence. This might well *reduce* aggressor ambivalence. Further, in conflicts in which time passes before the prospective aggressor decides to attack, the strength of the aggressive drive should dissipate. Consequently, the frequency of altercation homicides could easily be seen as *supportive* of the view of killers as unambiguously motivated, rather than the reverse.

3. Similarly, alcohol consumption could reduce ambivalence and inhibit the operation of an aggressor's conscience, strengthening rather than weakening his "single-mindedness."

4. Finally, the fact that a single shot was fired in most homicides may reflect little more than the fact that a single shot sometimes suffices to kill, and that even lethally minded killers stop shooting once the victim is dead. Consequently, there is no reason, on the basis of Zimring's evidence, for believing that all, most, or even a large minority of gun killings are ambiguously or weakly motivated. (For good critiques of the ambiguity thesis, see Hardy and Stompoly 1974, pp. 103–10; Wright et al. 1983, pp. 191–7).

For all one can tell at this point, the majority of gun killers are, at the time of the attack, strongly motivated enough to kill even if no guns were available. On the other hand, the opposite could also be true. Existing evidence does not permit any strong conclusions one way or the other. Nevertheless, it is not ordinarily assumed that the outcomes of intentional human actions are other than what the actors intended. It would seem a reasonable, though rebuttable, assumption that most aggressors who kill their victims intended to do so, and most aggressors who do not kill their victims did *not* intend to do so. If this assumption were generally correct, then it could well be the case that most gun killers have a fairly unambiguous intent to kill and therefore would be likely to kill their victims even if deprived of guns.

Closely related to the "ambiguous motives" thesis is another proposition with even less empirical support. This one can be called the "average Joe" thesis, which states that even though hardened felons cannot be denied guns through gun control, most killers are basically law-abiding citizens who lost their tempers and killed someone only because a gun was there. Such individuals could be effectively denied guns with the right gun laws; these laws could therefore have a significant impact on murder rates, even if they had little impact on rape, robbery, and other violent crimes supposedly committed by "hard-core" criminals. The evidence advanced by gun control advocates in support of this thesis overlaps the evidence Zimring used to support his "ambiguous motives" thesis: (1) killers and victims often knew each other before the killing, and (2) murders are commonly impulsive "acts of passion" (Shields 1981, p. 124; other examples cited in Kates 1990, p. 46). As with the ambiguity evidence, both of these factual claims are accurate, yet neither implies anything about whether most, or many, gun killers are basically "average Joes" who would obey gun laws—even hardened

felons willing to violate gun laws often kill people they know, and frequently commit crimes impulsively.

More to the point, the average killer has a long history of criminal conduct in his or her past (see studies reviewed in Kleck and Bordua 1983, pp. 291–4). This is true not only for killings by professional robbers and Mafia hit men, but also for the perpetrators of domestic "crime-of-passion" homicides. To be sure, only a portion of this history is recorded in police files—most violence goes undetected by the police, and this is particularly true of domestic violence (Strauss et al. 1980). Nevertheless, even if one examines only information known to the police, it is clear that the typical domestic homicide is preceded by many previous acts of serious violence. For example, in 90% of domestic homicides in a Kansas City study, police had responded to a disturbance call at the same address during the previous 2 years, with a median of 5 previous calls (Wilt et al. 1977). This is not to say that everyone who kills with a gun has a prior record of serious criminal conduct. There is a first time for every criminal, and no doubt there have been a few individuals who committed a gun homicide as their first serious act of violence. However, this appears to be a rare exception to the general rule that most people who are seriously violent now, with or without guns, have been seriously violent in the past. On the other hand, this does not prove that there are no gun killers who could be prevented from getting a gun by the right gun laws. Even gun killers fall along a continuum of willingness and motivation to break laws, and a sizable number of them may fall far enough toward the low end of the scale that gun laws could work, by making acquisition or possession of a gun difficult or risky enough for them to refrain from doing so.

## Guns in Robbery and Rape

Only about 20% of robberies and less than 10% of rapes involve offenders armed with guns, and in many of these cases guns were incidental to the crime—they happened to be there, but were not actually used to threaten or harm the victim (U.S. Bureau of Justice Statistics 1986b). Further, of the 31,606 gun-related deaths in 1985 (Chapter 2), less than 7% were homicides linked with robbery or "sex offenses" (computed from U.S. FBI 1986, pp. 12, 41). Nevertheless, guns do sometimes play a role in these crimes and this role is worth some discussion.

*Robbery*

The following generalizations are consistent with, though certainly not proven by, the best available evidence on guns and robbery.

1. Gun ownership levels have no effect on total robbery rates (Murray 1975; Brill 1977; Cook 1979; McDowall 1986). Note, however, that this does not necessarily mean that the immediate availability of guns for robbery, and the rate of gun carrying, does not have an impact on total robbery rates.

2. Gun ownership levels positively affect the rate of gun robberies, but negatively affect the rate of nongun robberies, thereby increasing the fraction of robberies involving guns (Cook 1979; 1987).

3. Injuries are more common in nongun robberies; therefore decreases in gun use among robbers would increase the fraction of robberies resulting in injury (Cook 1980).

4. Victims of gun robberies are less likely than victims of nongun robberies to resist the robber; resisting victims are in turn generally (excepting those who resist with guns—Chapter 4) more likely to be injured than nonresisting victims (Hindelang 1976; Cook and Nagin 1979, p. 37).

Analysts typically attribute the lower injury rate among gun robbery victims to their lower rates of resistance. Although this may be part of the explanation, it should also be noted that gun robbers are less likely to attack or injure their victims, compared to unarmed robbers or those using nongun weapons, even controlling for resistance (Cook and Nagin 1979, p. 37). Further, since resistance often follows injury (Chapter 4; Block 1977), it is not clear that the resistance-injury association indicates that resistance provokes robber attack. To the extent that injury precedes resistance, one cannot explain the lower injury rates of gun robberies by victim resistance patterns.

5. When injuries are inflicted on robbery victims, those inflicted by gun-armed robbers are no more likely to result in hospital treatment of some kind than those inflicted by other robbers. Injuries inflicted by gun-armed robbers are more likely to result in hospitalization *overnight* than those inflicted by unarmed robbers, but they are about the same in this respect as injuries in knife robberies and somewhat *less* likely to result in overnight hospitalization than those inflicted by robbers armed with weapons other than guns or knives (Table 5.6 concerning hospitalization in all violent crimes; Cook 1987, p. 361, concerning hospital treatment and hospitalization overnight among robbery victims). Thus,

Guns and Violent Crime

if knives were substituted for guns, there is currently no empirical basis for believing that the fraction of injuries requiring hospital treatment or overnight hospitalization would decrease. On the other hand, for the 3% of robbery victims who received overnight hospitalization (Cook 1987, p. 361), the average length of stay is longer for robbery victims wounded by guns (Table 5.6).

6. Murder of the victim is more likely in gun robberies than nongun robberies (Cook 1987). However, it is unclear whether it is the lethality of guns or the greater lethality of robbers who use guns that is responsible for this pattern, for reasons previously discussed. Gun reductions may or may not produce any reduction in robbery murders, depending on the impact of gun scarcity on the number of robberies, how much of an increase in the number of injuries occurs, and how much the injury fatality rate declines, assuming it declines at all (Wright et al. 1983, pp. 209–12). Further, almost all of those robber murders were committed with handguns, and gun control efforts usually cover only handguns (Chapter 8). Most incarcerated felons say they would substitute the more lethal long guns if they could not carry handguns (Wright and Rossi 1986, p. 217), suggesting that laws inducing handgun scarcity would increase the fraction of robbery attacks resulting in death by inducing substitution of long guns (Chapter 3).

7. Guns enable robbers to tackle more lucrative and risky targets such as businesses rather than more vulnerable ones like women, children, the elderly, and so on (Hindelang 1976; Cook 1976). Reducing gun availability could cause robbers to switch from the former to the latter, shifting the burden of robbery to those most vulnerable to injury and least able to absorb the financial losses. Injuries to more vulnerable victims could well result in death more often.

8. Finally, the data in Table 5.5 indicate that robbers armed with guns are more likely to complete their crimes, i.e., get away with the victim's valuables. This is presumably at least partly due to the aforementioned fact that victims are less likely to resist gun-armed robbers; although the impact of victim resistance on injury is uncertain, resistance clearly reduces the likelihood of robbery completion. Thus, if fewer robbers were armed with guns, more victims would probably manage to retain their valuables.

In sum, gun control policies that managed to reduce gun possession among robbers would have the desirable effects of increasing the rate at which robbers failed to get their victims' property and *possibly* reducing the number of robbery victims killed. On the other hand, gun scarcity

would also probably increase the number of robbery injuries and shift the burden of victimization to victims less able to bear the burden, without reducing the number of robberies. Therefore, it is difficult to say whether the overall set of social consequences of gun scarcity would make an effective gun control policy a success with regard to robbery.

### Rape

In the typical male offender–female victim rape, the rapist has a substantial power advantage over the victim even without a weapon. Therefore, use of a weapon by most rapists is probably redundant. It is unknown how large a subset of the 10% of rapes committed by rapists armed with guns actually required a gun to attempt or complete the crime. However, the data in Table 5.5 do indicate that rapists with guns are more likely than unarmed rapists to complete the crime. The differences between rapes by rapists armed with guns and those armed with knives, the weapon most likely to be substituted in the absence of guns, is fairly small (6.8 percentage points). In a multivariate analysis, Kleck and Sayles (1990, p. 155–6) found that armed rapists were more likely to complete their rapes than unarmed rapists, but they could not establish that gun-armed rapists differed from those with knives or other weapons. On the other hand, they found no effect of rapist weapon possession on injury beyond the rape itself.

With this previous research in mind, the impact of guns on violence is now addressed in two ways. First, a nationally representative sample of individual violent incidents is analyzed to see how the aggressor's possession or use of weapons relates to attack, injury and death of victims. Then aggregate level data on cities are used to estimate the net impact of gun ownership levels on violence rates.

## Individual-Level Analysis

### Problems in Previous Research

Previous studies of weapon effects in violent incidents have all suffered from one or more of four problems. First, all studies using incidents known to the police or treated by physicians have analyzed samples that were biased regarding the dependent variable, i.e., some measure of assault outcome, including death. Police-based or hospital-based studies examined samples in which incidents of minor violence

had been systematically selected out because they were not regarded as serious enough to bother reporting to the police or did not require medical treatment. Alternatively, other studies bias the sample by excluding the most serious cases, homicides. Second, the studies typically analyzed local samples, usually limited to a single city. Weaponry varies sharply across localities, not only in general availability (e.g., fewer guns in urban areas than rural areas, more in the South than elsewhere), but also in its distribution across weapon subcategories (a higher fraction of guns owned being handguns in urban areas, etc.) and in reasons for ownership (more crime-oriented ownership, either for criminal or defensive purposes, in urban areas) (Chapter 2). Consequently, there may be very limited generalizability of findings from urban-only or single-jurisdiction studies (e.g., Zimring 1968; Wilson and Sherman 1961; Felson and Steadman 1983). Third, analysis in these studies has commonly been unsophisticated, relying on simple percentage table methods, and often bivariate analysis at that. This is particularly a problem because there were no controls for any correlates of assaulter motivation or aggressive drive levels. Fourth, with few exceptions (e.g., Cook and Nagin 1979), prior research on real-life violence has ignored the distinction between weapons' effects on whether the aggressor attacks the victim (rather than merely threatening) and their effects on whether an attack is completed, i.e., produces an injury. Either only the attack outcome is studied, or the two are lumped together into a combined attack-and-injury variable, usually labeled "injury" (e.g., King 1987; Block 1977).

The present study (adapted from Kleck and McElrath 1991) goes beyond the work of others by using nationally representative samples of violent incidents covering the full range of seriousness from very minor threats to homicides, covering both incidents reported to the police and those not reported, using multivariate analytic techniques, distinguishing between attack, injury, and death as outcomes of violent situations, and controlling for a number of likely correlates of offender motivation strength. The present study is unique in combining nationally representative samples of both fatal and nonfatal violent incidents in a single analysis.

Before describing the multivariate analysis, it is worth noting the bivariate association between offender weapon possession and use and the outcomes of violent incidents. The figures in Table 5.6 are based on all violent crime victimizations lumped together, from the 1973–1982 National Crime Surveys. The main interest focusses on the comparison between guns and knives. The data indicate that offenders who possess guns are less likely to attack victims than offenders with knives, or any other weapon for that matter. Gun users are also less likely to injure

their victims, and this is true both for all aggressors and just among those who attacked their victims. If one interprets receiving medical care as an indication the victim was seriously injured, victims of gun users are less likely to be seriously wounded than knife victims. Most of this is due to the low rate of attack and injury in gun incidents, but even just among incidents with injury, gun victims are slightly less likely to receive medical care than knife victims. If hospital care is indicative of an even more serious injury, then the preceding pattern is repeated, except that hospital care is slightly more likely among those injured by guns than among those injured by knives. Finally, among the small share of victims who received hospital care, victims of gun injuries had a median hospital stay about 2 days longer than those hospitalized for knife injuries. In sum, even at the bivariate level, there is little evidence in the NCS that gun possession and use make serious outcomes more likely in violent incidents.

## Problems in Analyzing Violent Incidents

The National Crime Surveys (NCS) cover a representative sample of the noninstitutionalized U.S. population age 12 and over. Respondents (Rs) are asked whether they have been a victim of crime in the previous 6 months and are questioned about the details of the crime incidents they recall. At least three "reverse record checks" studies have found that Rs' ability or willingness to recall crimes is worse for assaults than for any other crime type—as few as 36% of assaults known to police were reported to NCS interviewers (Dodge 1981; Murphy and Dodge 1981; Turner 1981). These studies indicated that it was violent incidents among persons who knew one another that were most likely to go unreported. For example, only 22% of assaults involving relatives were reported, compared to 54% of those involving strangers (Turner 1981). This problem is addressed by limiting analysis to stranger cases, where there is less room for underreporting to bias results.

Other known patterns of bias concern R's race and education. Blacks appear to underreport violent incidents, especially less serious incidents, more than whites. And less educated persons consistently report fewer incidents, especially minor ones, than more educated persons (Skogan 1981). By recalling (or defining as assaults) a larger number of assaults without attack or injury, better educated Rs make it seem that their assaults are less likely to result in these outcomes, with an opposite, equally artificial pattern for blacks compared with whites. The result is that the measured fraction of assaults resulting in attack or

injury may be artificially elevated for blacks and for less educated people. These effects were roughly controlled for by including education and race of victim in all initial versions of equations.

Some minor assaults may be recalled only because they were repeated, i.e., part of an ongoing pattern. Although serious assaults are generally recalled in any case, minor assaults, i.e., those without attack or injury, may be more likely to be recalled if they were repeated than if they were isolated. This could make it artificially appear that repeated incidents are less likely to involve an attack or injury. In NCS terminology, a "series" incident is an incident that was one of three or more incidents occurring in the 6-month recall period, which were so similar that the R could not separately describe them. Although not all repeated assaults are "series" incidents, all series incidents are repeated crimes. This effect is controlled by including a measure of whether an incident was a series case.

What is the relationship between these biases and weapon involvement in violence? Could the fraction of assaults involving attack or injury be distorted by response biases that vary across weapon categories? Certainly the NCS coverage of nonfatal assaults is incomplete for both assaults involving attack and/or injury and those involving neither. Although the NCS covers minor assaults better than police records, Cook (1985) has shown that the NCS covers the most serious assaults, such as gunshot woundings, *less* completely than do police records. That is, these gun cases, involving both injury and more serious weaponry, are frequently missed in the NCS. However, whether this is more true for serious-weapon assaults than for minor-weapon assaults is unknown, since minor-weapon assaults may be covered in the NCS at just as low a rate as the more serious ones. The undercoverage of the NCS may simply have been more easily detected with gun assaults because of unusually complete police knowledge of assaults requiring medical treatment—physicians are commonly required by law to report gunshot wounds to the police. Consequently, it is unclear whether the relative average seriousness levels of NCS assaults are distorted by these underreporting problems more in some weapons categories than in others.

## Methods of the Present Analysis

### Samples

Two datasets are analyzed. The first, used to analyze the attack and injury outcomes, is the set of all NCS violent incidents that occurred in the United States in 1979–1985 and that involved victims and offenders

who were strangers to one another. The NCS covers only victims age 12 or over. The present sample is as inclusive as possible, to avoid introducing additional sample bias by needlessly excluding relevant cases. The only exception was the decision to exclude nonstranger cases, motivated by a judgment that the advantages of reducing the response bias associated with violence among intimates outweighed the sample-biasing effects of this exclusion. This NCS sample includes incidents, as well as incidents with multiple victims or offenders. All cases involve at least a threat of violence, although they may also involve the elements of other crimes besides assault. Thus, the sample includes incidents classified as rape or robbery in the NCS Type-of-Crime classification. Dummy variables measure whether the elements of rape, robbery (theft plus force), or burglary (illegal entry) were also involved in an incident.

The second dataset, used to analyze the death outcome, is a merger of all NCS stranger violence incidents for 1982 and all Supplementary Homicide Reports (SHR) intentional stranger homicides of victims age 12 and over for 1982, including both civilian and police justifiable homicides. The year 1982 was used simply because it was in the middle of the time span covered in the first dataset. The SHR program, run by the Federal Bureau of Investigation and based on police offense reports, records information on the victim, offender (when known), and circumstances of about 90% of U.S. homicides. To maintain comparability between the NCS and SHR datasets, homicides of victims under age 12 were excluded, and negligent (unintentional) manslaughters were excluded because the NCS is intended to cover only intentional acts. NCS incidents occurring outside the United States were also excluded because the SHRs cover only homicides occurring within U.S. police jurisdictions. All other relevant cases were retained, including incidents involving multiple offenders or multiple victims, and civilian or police justifiable homicides. All variables that existed in some form in both sources were identified and given a common coding scheme. A weight was computed that equalled the NCS incident weight for NCS cases and a number slightly larger than one for SHR cases (see Appendix 6). The resulting merged dataset was a national sample of intentional stranger assault incidents, both fatal and nonfatal, weighted up to represent national totals.

### Estimation Techniques

All three dependent variables were binary, so some form of probit was generally used to estimate equations. Ordinary least squares (OLS) regression was used for preliminary screening with the ATTACK and INJURY models before applying the more computationally expensive max-

imum likelihood estimation techniques. A very liberal significance level ($p < .30$) was used in the screening, to avoid prematurely excluding a relevant variable. Because of the extreme distribution of the DEATH variable, even preliminary screening had to be done with probit.

All final versions of the INJURY and DEATH equations were estimated with bivariate probit with a correction for nonrandom sample selection (Van de Ven and Van Praag 1981; Greene 1985). This correction was necessary because of the way the samples were subdivided into increasingly serious subsets. First, all assaults were examined to determine why some involved an attack and others did not. Then analysis was limited to cases with an attack, to analyze why only some attacks resulted in injury. Finally, cases with injury were analyzed to explore why only some injuries resulted in death.

To estimate INJURY equations on the full assault sample would muddle the distinction between attack and injury—estimated models of the INJURY variable would reflect processes affecting ATTACK, as well as those affecting INJURY, given attack. However, selecting only cases with an attack for estimation of the INJURY equation is a nonrandom selection that could bias the coefficient estimates (Berk 1983). To correct for this bias, a "selection" equation was estimated that modeled the inclusion of cases into the sample on which the "substantive" equation was estimated. The ATTACK equation predicts whether an incident will involve an attack. The INJURY equation was estimated only on cases that involved an attack, since those without an attack obviously could not result in injury. Therefore the ATTACK equation in effect predicts whether a case will be "selected" for inclusion in the sample on which the INJURY equation was estimated. A similar procedure was used to estimate the substantive DEATH equations, with an INJURY equation being used as the selection equation, since only cases involving injury were "eligible" to result in death. The sample selection correction procedure works by including a measure of the predicted probability of a case not being selected for the sample as a variable in the substantive equation (Heckman 1979; Van de Ven and Van Praag 1981).

*Definitions of Key Variables*

Table 5.7 lists the variables included in the individual-level analyses, with their means and standard deviations. Most of the variables are binary, representing the presence or absence of an attribute. Because some incidents involve more than one offender, the offender dummies indicate whether there was at least one offender with the indicated trait. Thus, when MALEOFF is 1, it means there was at least one male of-

fender; there could also have been female offenders. To avoid near-perfect collinearity, at least one dummy variable representing a category of some larger variable was always excluded from each equation. For example, both MALEOFF and FEMOFF, dummies representing the two possible categories of offender sex, could not both be included in an equation, since if there was no male offender, it would always indicate the presence of a female offender, and vice versa.

The dependent variables, ATTACK, INJURY, AND DEATH, are necessarily generic—they reflect attack, injury, or death involving *any* weapon (or no weapon). Therefore, an incident with a gun present and involving an attack and/or injury did not necessarily involve a gunshot wound. Rather, a gun-armed assaulter may have fired the gun and missed, used it only to threaten, used it as a blunt instrument, or not used it all, instead attacking and/or injuring the victim with fists or feet or with some other nongun weapon. Table 5.7 lists three different versions of each gun variable. In the ATTACK analyses, the gun variables measure whether guns were present, i.e., whether the offender possessed them in a way evident to the victim. In the INJURY analyses, the gun variables measure whether a gun was actually used to *attack* the victim, i.e., whether the victim was shot or shot at. And in the DEATH analyses, the variables indicate whether the victim actually suffered a gunshot wound. In all cases, a victim could be confronted with an offender with more than one type of weapon, and be attacked or injured in more than one way. However, less than 0.1% of assaults involve more than one weapon type being used in an attack.

Equations were estimated not only for the full sample of stranger violent incidents, but also for each of three subsets. First, to see whether results were distorted by lumping robbery, rape, and confrontational burglary incidents in with "pure" assaults, estimates were obtained for the "nonfelony" subset of violent incidents that did not have the elements of theft, rape, or illegal entry. Second, it might be argued that victim recall is poor for series incidents since the information obtained refers to the average features of multiple incidents, rather than any one specific incident. Therefore, estimates were obtained for the "nonseries" subset excluding series incidents. Finally, one could argue that some assaults involve "victims" who were really aggressors and that variables referring to the "victim" were actually describing the offender, and vice versa (see Appendix 6). On the assumption that victims reporting incidents to the police were more likely to regard themselves as true victims, cases in which the victim or a member of the victim's household reported to the police were separately analyzed.

Most of the variables in each equation were included as likely correlates of offender "motivation," broadly conceived as how willing and able (apart from weaponry possession) aggressors were to attack, injure, or kill victims. Offender attributes (MALEOFF, AOLE11, AOGE30, BLACKOFF) were included because they reflect differing levels of willingness to aggress—males, persons age 12–29, and blacks commit serious violent acts more frequently than others. Victim attributes (MARRIED, GUNOCC) were included because they reflect differing levels of difficulty or risk to the aggressor in attacking and trying to injure the victim—married victims are more likely to have a spouse nearby, while victims employed as a security guard or police officer are more likely to possess a gun. (On the other hand, people in gun-carrying occupations are also more likely to encounter more seriously violent persons.) ROBBERY, RAPE, and BURGLARY were included on the assumption that robbers, burglars, and rapists have longer and more serious records of prior violence than simple assaulters and are therefore more willing to use violence in a sample incident. (On the other hand, these types of aggressors also have goals other than hurting the victim, which could reduce attacks and injuries.) The power differential variables (AGEDIF, SEXDIF, and NUMDIF) were included on the assumption that aggressors with a power advantage would be more willing to attack and injure because they were at less risk of effective counterattack from the victim. (On the other hand, they would also have less need to attack or injure to get what they wanted.) SUMMER was included on the assumption that people are more easily and strongly angered when the weather is hot. Finally, DARK and INSIDE were included because darkness and an inside location should make witness identification or interruption of the crime less likely and thus could reduce situational inhibitions against attack.

### Findings

In Tables 5.8–5.10, the excluded weapon category was "no weapon present" (or "no weapon used"), so coefficients reflect the effect of each weapon category relative to weaponless assaults, i.e., those involving only hands, feet, etc. All equations were significant at a level less than .001.

### Attack

The findings in Table 5.8 indicate that the net effect of the presence of deadly weaponry in threatening situations is to *reduce* the probability of

attack by the possessors of the weapons. The negative association is significant for handguns, "other" guns (mostly rifles and shotguns), and knives. The apparent effect of the presence of less lethal "other" weapons (blunt objects, broken bottles, etc.) is to increase the probability of attack. Thus, as lethality of the weapons present increases, the probability of attack decreases. Equation 1 shows the ordinary least-squares estimates for the full sample of stranger violent incidents, while Eq. 2 presents the full sample probit estimates. The findings are substantively identical and hence not dependent on the estimation procedure used. The findings also hold regardless of whether felony-linked assaults are excluded (Eq. 3), series incidents are excluded (Eq. 4), or the analysis is restricted just to those cases reported to the police (Eq. 5). Since the "weapons effect" thesis is intended to apply only to angry persons, the present findings are relevant to the extent that it can be assumed that aggressors in the sample incidents were angry. If the "weapons effect" does exist, the findings indicate that the conditions necessary for it to produce a net assault-triggering effect are rarely met in real-life violent incidents, or if the effect does operate, its impact is outweighed by attack-reducing effects of deadly weaponry.

Notice that the education and series variables have the expected negative signs. Better educated respondents are more likely to report assaults in which an actual attack did not occur, and the reported series incidents were more likely to be threats without attack than nonseries incidents. Victim race, on the other hand, was unrelated to ATTACK.

### Injury

The findings in Table 5.9 indicate that, given an attack, the use of guns has a statistically significant net negative association with victim injury. The use of knives and "other weapons" in an attack was positively associated with injury. The general pattern of findings is that the more lethal the weapon used in an attack is, the less likely it is that it will be used to actually inflict an injury. These findings hold regardless of the estimation procedure used (Eqs. 6–8). This is important because the correction for sample selection bias used in the bivariate probit estimates will improve estimates only if the sample selection equation models the selection process reasonably well, something of which one can not be certain. Since the procedure corrects for the probability of a case being included in the sample, if the selection process cannot be accurately modeled, it amounts to the same thing as either failing to include a relevant variable in the equation (sample selection bias as a specification error—Heckman 1979) or including a poor measure of that needed control variable.

### Death

The findings in Table 5.10, based on analysis of the merged SHR/NCS assault and homicide dataset, indicate that, given a wounding, the wound is more likely to be fatal if it is a gunshot wound. The results suggest the existence of a clear hierarchy of weapon lethality, with gun woundings the most likely to result in death, then injuries produced by knives, then "other weapons," then blunt objects, and finally, hands and feet. These findings are largely independent of estimation procedure used (Eqs. 12–14) and data subsamples analyzed (Eq. 14 vs. Eqs. 15 and 16).

The only missing data indicator variable (see Appendix 6) with a coefficient significantly different from zero in any of the equations was UNDRACEO, indicating that missing data patterns were random with respect to DEATH, except that incidents where the offender's race was unknown were more likely to be fatal.

### Discussion of the Individual-Level Findings

These findings support a more complex picture of the significance of firearms in American violence than has commonly been a part of the debate over gun control. The possession of guns appears to both inhibit attack and reduce the probability of attack, while also increasing the probability of death, given an injury. What would be the net effect on deaths of a reduction in aggressor possession of guns in threatening situations? To answer this question, a DEATH equation was estimated on the full sample of stranger violent incidents, not just those with injuries. The equation included all variables that were available in the combined SHR/NCS dataset and that appeared in any of the three equations for attack, injury, or death. It was estimated with OLS and probit. The results are shown in the last two columns of Table 5.11, which summarizes the sizes of the effects of the weapon variables on each of the assault outcomes.

Note that OLS coefficient estimates are unbiased when the dependant variable is binary, and their values can be interpreted as linear probability coefficients (Aldrich and Nelson 1984, pp. 13, 18). The linear probability interpretation is most meaningful when the predictors, as a group, take on average values, since this is where OLS slopes are essentially identical to slopes estimated with methods assuming nonlinear relationships, such as probit or logit.

The aggressor's possession of a handgun in a violent incident apparently exerts a very slight net positive effect on the likelihood of the

victim's death. The linear probability interpretation of the OLS coefficient implies that the presence of a handgun increases the probability of the victim's death by 1.4%. Thus, the violence-increasing and violence-suppressing effects of gun possession and use almost exactly cancel each other out. This small an association is statistically significant, however, because of the very large ($n = 14,922$) sample size.

The effects of aggressor weaponry are quite substantial when taken stage by stage, i.e., when separately examining attack, injury, and death. This is why impressive-appearing results can be obtained when researchers examine, for example, only the last stage, looking solely at the impact of guns on the likelihood of the victim's death, among those wounded. Guns probably do substantially increase the probability that a wounding will result in death. The effects of guns, however, are very small when one assesses the overall net impact of all of their effects, both positive and negative, at all stages of violent incidents. The explanation for this apparent contradiction is simple: gun possession and use have opposite sign effects at the various stages, which largely cancel each other out.

Note also the effect of omitting any direct measure of aggressor motivation. More seriously violent people use more serious weaponry (Table 5.2), and it seems reasonable to assume that, on average, the intensity of the aggressor's desire to seriously hurt the victim, at the moment of attack, would also be positively correlated with the presence of "serious" weaponry. Since aggressor motivation is almost certainly positively associated with the probability of a victim being killed, this means that omitting direct measures of motivation tends to bias the gun coefficients in a positive direction, making it seem that gun use has more of a positive effect than it really does. Consequently, the slight apparent net positive effect of guns on the death outcome would be reduced, and could easily disappear altogether, if motivation could be properly measured and controlled.

Nevertheless, at this point it seems that there may be some slight net effect on the likelihood of the victim's death that could be attributed to guns. Taken at face value, the results suggest that aggressor possession of guns may increase the net probability of the victim dying in a violent incident by about 1%. This would lead to the expectation that laws that were effective in reducing gun possession among aggressors in violent incidents could slightly reduce the homicide rate. On the other hand, gun possession among potential victims may deter some aggressors from initiating violent incidents in the first place. Any laws that reduced gun possession among potential victims, including those who are also

Guns and Violent Crime

sometimes aggressors, could thereby encourage assaults. The net impact on the homicide rate of these opposite effects could be positive, negative, or zero, depending on their relative magnitudes. These conclusions help explain the findings of prior research, which indicated that trends in aggregate gun levels had no net effect on homicide rates (Kleck 1984a).

The findings also imply that if gun possession were reduced among aggressors in violent situations, total assault injuries would increase, the fraction of injuries resulting in death would decrease, and the total number of homicides would remain about the same. This appears to be precisely what happened in Boston after implementation of the Bartley-Fox law. After gun carrying, and thus the immediate availability of guns in some violent situations, was reduced, total assault injuries increased substantially, but with no significant change in homicides, implying a drop in the fraction of injuries resulting in death (see Chapter 10).

Three limitations of this analysis are important to note. First, it is unclear what response biases may be affecting NCS data. It is possible that a large fraction of gun assaults, even those not involving attack or injury, are remembered just because they involved guns, with many minor nongun assaults going unremembered or unreported. The result would be that an artificially higher fraction of nongun assaults would appear to have resulted in attack, injury, or death, relative to gun assaults, making the gun–nongun differences appear smaller than they really are. Second, the NCS and SHR provide data on only a few of the variables that may influence assault outcomes, having no direct measures of assaulters' motives or the strength of their aggressive drives. This increases the possibility of the models being misspecified due to the exclusion of variables associated with both weapon variables and assault outcomes. Finally, the findings are based on violent incidents between strangers. Whether weapons effects are different in violence among nonstrangers is unknown.

Although the individual-level analysis has the merit of getting closer to the phenomenon, it cannot show what the net overall effect of gun ownership levels on total rates of violence. For example, even if the net effect of gun possession among aggressors in violent incidents is to increase the probability of the victim's death, there are still other gun effects related to gun possession among prospective victims. As indicated in Chapter 4, not only does the victim's possession of a gun often disrupt a criminal attempt and prevent injury, but the fact of mass gun ownership might deter some prospective aggressors from making criminal attempts in the first place. Therefore, the overall net impact of gun ownership levels on violence rates is assessed using data on cities.

## Aggregate-Level Analysis of Gun Ownership and Violence Rates

### *Previous Research on Gun Ownership Levels and Crime Rates*

What is the impact of widespread gun availability on crime rates? Do areas with more guns have, as a result, more crime? Do increases in gun ownership over time increase crime rates? At least 18 previous studies have addressed these questions and are summarized in Table 5.12. The table covers only studies in which there was an attempt to actually measure gun ownership levels, rather than merely assuming differences across cases.

The first thing that is apparent from this table is that there have been an enormous variety of ways of measuring aggregate gun levels—over a dozen of them—with few researchers using the same measures. The survey measures are the most direct ones and would seem to have the highest face validity; yet, as was noted in Chapter 2, there are reasons to question the validity even of survey responses. Whether these problems affect comparisons across aggregate cases, however, is unknown. Further, survey measures are available only for the nation as a whole or for broad regions of the nation.

Other measures are less direct, relying on the relative frequency with which guns are used to commit acts of violence, such as the percentage of homicides committed with guns. Studies using these measures all relied on just one or two indicators. Further, with the exception of Cook (1979), researchers using these measures failed to validate them in any way, such as establishing that they correlate well with more direct survey measures. The "% gun use" measures also raise the possibility of artifactual associations with crime rates. For example, the number of gun homicides is a component in the numerators of both the percentage of homicides committed with guns and either the gun homicide rate or the total (gun plus nongun) homicide rate. This would tend to create a positive association between the gun ownership measure and the crime rate, even if there were no causal relationship. Whereas a few like Cook (1979) took steps to avoid this problem, most other researchers did not.

Even more critically, these kinds of measures reflect not only the availability of guns but also the preference of the criminal population for using guns (Brill 1977, pp. xvi, 20). Whereas availability certainly affects how often criminals choose guns, it has also been seen that offender seriousness affects this choice as well. Consequently, these measures, if used by themselves, tend to confound gun availability with what might be called the "average lethality of the criminal population." In short, the same problem of separating gun effects from associated effects of crimi-

nals' lethality that afflicted individual-level research also plagues aggregate-level research.

Even some of the more sophisticated researchers in the field have failed to adequately appreciate this problem. For example, Cook (1987, pp. 372–3) found that city rates of robbery murder were more strongly associated with the gun robbery rate than with the nongun robbery rate, and concluded that this was "strong evidence that gun robberies are . . . intrinsically more dangerous than other robberies." In fact, such findings are not necessarily even weakly supportive of this conclusion, since one would expect precisely this pattern even if gun use had no causal impact on the likelihood of a robbery resulting in the victim's death. If gun use is a good indicator of robber willingness to kill, then the gun robbery rate would be a better indicator of average robber lethality than the nongun robbery rate; the rate of robberies by more "lethally minded" robbers should obviously relate more strongly to robbery murder rates than the rate of robberies by less "lethally minded" robbers. Whether this explanation completely accounts for Cook's findings is unknown. The point is, analyses using aggregate data cannot resolve the matter.

Miscellaneous other gun measures are unsatisfactory. As the empirical results reported later in the chapter will show, the fatal gun accident rate does not correlate significantly with survey gun ownership measures (see also Cook 1979), nor do rates of gun magazine subscriptions. The hunting license rate is marginally significantly correlated with the total gun ownership rate but its association with the handgun rate is not quite statistically significant. This suggests that it serves best as an indicator of long gun ownership, consistent with the fact that most hunting is done with rifles and shotguns. Gun owner license or registration rates are satisfactory as measures of legal gun ownership, but not of total ownership. Similarly, gun magazine subscription rates might serve, at best, as indirect measures of legal long gun ownership. Subscription rates are probably best regarded as indicators of the prevalence of a mostly noncriminal "gun sporting culture" (Bordua and Lizotte 1979) rather than a measure of gun ownership per se. It would be preferable to have separate measures of criminal and noncriminal ownership; however, if only one can be measured, then for purposes of assessing the impact of gun ownership on violence rates, it is criminal ownership that is more relevant. Counts of the number of gun purchase permits also tap only legally acquired guns, and measure only additions to the stock of guns, rather than the total stock.

For time series analyses, a measure that is both very direct and avoids

the possibility of artifactual associations is available. Researchers can cumulate the total number of guns domestically manufactured, minus exports, plus imports, up to a given year, thereby measuring trends in the available stock of guns. However, as noted in Chapter 2, this measure fails to count some additions and deletions of guns from the stock and its use necessitates assuming that these errors are roughly equal and cancel each other out.

The findings of previous aggregate studies are summarized in Table 5.12. Their findings are almost exactly evenly split between 12 findings that support the idea that higher gun levels increase crime and 11 findings that do not. All but a handful of the studies are technically very weak. They rely on small samples, sometimes including as few as nine, or even four cases; only Bordua (1986) had more than 50 cases. In combination with the multicollinearity that typically characterizes aggregate data, this implies very unstable results. Eight of the studies did not control for any other factors that might be associated with gun ownership and could affect crime rates, making it impossible to check whether any observed associations between gun and violence levels were spurious; 11 studies controlled for no more than two other variables.

The most critical flaw is the failure to model the two-way relationship between crime rates and gun levels. As shown in Chapter 2, higher crime rates can cause more people to acquire guns for self-defense, whether or not this effect is mediated by the experience of fear. Consequently, any significant positive associations generated in studies failing to model the possible two-way relationship will at least partially reflect the effect of crime rates on gun rates. Whether there is also any effect of guns on violence is impossible to detect from these findings. Of 18 studies, the problem was statistically addressed in only four, and one of these almost certainly did not succeed in modeling the relationship. McDowall and Loftin (1988) used a simultaneous equation model of a Detroit homicide time series, a model that assumed that homicide rates could affect gun rates. However, their model was underidentified unless a single exclusion restriction was valid (see Johnston 1972 for an explanation of simultaneous equation techniques). They assumed that the Detroit riot of 1967 increased the gun ownership rate, but did *not* otherwise affect homicide rates. In view of Daniel Glaser's (1978, pp. 230–1) strong theoretical rationale for a major impact of ghetto riots on subsequent black violence, this critical assumption lacked a priori plausibility.

Of the three studies that may have adequately modeled the reciprocal causation, two found no impact of gun levels on total violence levels

Guns and Violent Crime

(Kleck 1984a; McDowall 1986); the third (Kleck 1979) found an impact. However, the second Kleck study was a replication of the first, with a longer time series; the second study's findings therefore should be given greater weight. Note that the robbery findings in the second Kleck study were based on a model that did *not* test for reciprocal causation, so it shares the same flaw as other studies that found a supposed positive impact of gun levels on crime rates. McDowall (1986, pp. 141–3) interpreted his panel design results to indicate that the gun robbery rate positively affected gun ownership levels in the general public, but that the total robbery rate did not have such an effect. He did not provide any explanation for this combination of effects. He also did not report any results assessing Cook's (1979) claim that higher gun levels increase the robbery murder rate. In sum, the best one can say is that the literature fails to make a consistent or convincing case for an impact of guns on violence rates. Put more negatively, one could say that the literature has little of a persuasive nature to say on the matter, and that the few studies that adequately addressed the key technical problems have generally found no impact of gun levels on violence levels.

## International Comparisons

One of the least productive lines of inquiry in the gun control debate has been to compare the United States with other nations. It is unproductive because the game has been played in such a way that either side can win regardless of whether there is any merit to their claims. Gun control supporters like to selectively contrast the high gun ownership/high violence United States with nations having both low gun ownership and low violence rates (homicide data are usually cited), such as Great Britain or Japan, concluding that low gun ownership must have contributed to the low violence rates. Opponents selectively cite high gun/low violence nations such as Switzerland or low gun/high violence nations such as Mexico, and conclude that gun ownership either has no impact on violence, or actually reduces it. Obviously, pairwise comparisons of two selected cases is useless for establishing causal connections, or the lack thereof [see Sloan et al. (1988) for a particularly egregious example]. Out of any large number of possible pairings, it is safe to say that at least a few pairs can be found to appear to support either side.

In some cases the comparisons of nations are patently ridiculous. To do no more than compare homicide rates in Japan and the United States

and claim to know whether any of the huge difference in homicide rates is attributable to differences in gun ownership levels is far-fetched. The two nations differ enormously on almost all hypothesized determinants of homicide rates, including degree of social solidarity, cultural and ethnic homogeneity, history of racial conflict, hierarchical rigidity, obedience to authority, subjective sense of unjust deprivation, and so on. Further, most of these differences are not currently measured, making it impossible to empirically disentangle effects of these other variables from effects of gun ownership on homicide.

One way one might crudely and partially control for United States–Japan cultural differences is to compare homicide rates among Japanese-Americans, who live where guns are plentiful, with the homicide rates of their presumably culturally similar brethren in Japan, where private gun ownership is nearly nonexistent. Certainly this pair of populations is more comparable than the population of Japan compared with the entire U.S. population. Up through 1979, the FBI reported homicide arrests sorted by racial breakdowns which included "Japanese." For the period 1976–1978, 21 of 48,695 arrests for murder and nonnegligent manslaughter were of Japanese-Americans, or 0.04% (U.S. FBI 1977–1979). Applying this fraction to the total of 57,460 homicides yields an estimate of 24.78 killings by Japanese-Americans for 1976–1978, or about 8.26 per year. With 791,000 persons of Japanese ancestry in the United States in 1980 (U.S. Bureau of the Census 1984), this translates into an annual rate of 1.04 homicides per 100,000 population. For the same 1976–1978 period, the annual homicide rate in Japan averaged 2.45 (United Nations 1982, pp. 192, 718). Thus, crudely controlling for Japanese culture in this way indicates that in Japan, where civilian gun ownership is virtually nonexistent and gun control laws are extremely strict, the homicide rate is 2.3 times as high as it is among Japanese-Americans living where guns are easily available and gun laws are far less restrictive.

It is possible that the Japanese-American homicide rate was underestimated due to a failure of police officers to consistently note Japanese ancestry of homicide arrestees. However, even if the true Japanese-American share of U.S. homicide arrests were doubled to adjust for this hypothetical data flaw, the homicide rate in Japan would still be higher. A critic could object that there are still many uncontrolled differences between these two populations, and such a critic would be quite correct. These sorts of primitive cross-national comparisons tell us little about the guns–violence link. One would hope, however, that this criticism would be even-handedly applied to all such comparisons, whether used

to spuriously buttress either progun or antigun arguments. The preceding exercise merely served to demonstrate that one simple "control" can make an entire cross-national violence rate difference disappear altogether, and even reverse its direction.

The reasoning used in cross-national comparisons is also very selective. Great Britain is often compared with the United States and it is noted that the former not only has a much lower total homicide rate, but also a lower *gun* homicide rate. This fact is supposed to nail down the claim that it is gun ownership that causes the homicide rate differences. However, the absurdity of the logic becomes evident once it is applied to nongun homicides. Britain's rates of knife homicide and of killings with hands and feet are also far lower than the corresponding rates in the United States, but no one is foolish enough to infer from these facts that the lower violence rates were caused by a lower rate of knife ownership in Britain, or to the British having fewer hands and feet than Americans (Greenwood, 1972, p. 37).

In earlier research, a major obstacle to judging whether gun ownership accounts for any of the homicide rate differences between nations was the absence of any actual data on gun ownership levels in the foreign nations compared to the United States. Some previous comparisons had to rely on very indirect indicators of gun levels, such as the gun homicide rate. Curtis (1974, pp. 110–1) compiled data on a miscellany of nations, foreign cities, tribes, and groups of cities, and found a high correlation between the *gun* homicide rate and the *total* homicide rate, similar to the intra-U.S. state-level analysis of Seitz (1972). Apparently both authors believed the association somehow bore on the issue of whether homicide rates were causally affected by gun ownership levels. As previously noted, this association is at least partly an artifact of the presence of gun homicides as a component in the numerator of both the gun homicide rate and the total homicide rate. Curtis did note that the size of the correlation fluctuated wildly, from $+0.96$ to $-0.92$, depending on which exact set of cases was included.

What Curtis did not report was another interesting correlation. If one uses his data to compute the correlation (across 25 cases) between the total homicide rate and the *percentage* of homicides committed with guns, it is 0.065, not significantly different from zero. One would think the percentage of homicides committed with guns would be at least a rough indicator of gun availability, at least among violence prone people; this is certainly how many researchers have previously used it (e.g., Brearly 1932; Fisher 1976; Brill 1977; Cook 1979). Thus, Curtis' data indicated that, cross-nationally, there was not even a bivariate associa-

tion between the homicide rate and an indirect indicator of gun ownership.

Recently, international data based on a more direct measure of gun ownership have become available. Telephone surveys asking about gun ownership were conducted in early 1989 in 14 countries, including the United States. The percentage of households with guns in 11 of these countries was reported by Killias (1990, p. 171), along with their homicide rates. Killias did not statistically analyze his data beyond noting pairwise cross-national comparisons. Generally speaking, nations with higher gun ownership levels had higher total homicide rates—secondary analysis of the published figures yielded a correlation coefficient of 0.774 for the nine nations on which Killias had complete data. Further, the correlation between gun prevalence and the *gun* homicide rate was 0.74. Killias concluded that higher gun ownership levels cause higher homicide rates.

However, what Killias did not note was the fact that countries with higher gun ownership had higher *nongun* homicide rates as well—that correlation was 0.74, just as high as the correlation with gun homicides. This pattern of findings strongly suggests either of two interpretations. (1) Gun ownership levels are a *response* to high violence rates, rather than a cause (as found in Kleck 1984a). The data make more sense from this perspective than from Killias', since one would expect both gun and nongun homicides to increase fear and motivate the acquisition of guns for defense, but one would not expect gun ownership levels to increase nongun homicide rates. (2) Alternatively, gun ownership levels, along with the percentage of homicides committed with guns, may serve as indicators of the population's willingness to inflict lethal violence on others. This too would explain why both gun and nongun homicides should be equally correlated with gun ownership levels—both are influenced by the same "population lethality" variable. Either explanation accords more closely with the full set of associations than the assertion that higher gun ownership levels cause higher homicide rates.

At this point it is safe to say that cross-national comparisons do not provide a sound basis for assessing the impact of gun ownership levels on crime rates.

## A City-Level Study of Gun Levels and Violent Crime Rates

The following analysis is a city-level cross-sectional study of the impact of gun ownership levels on violent crime rates (and is adapted from Kleck and Patterson 1991). Data were gathered on all 170 U.S. cities that

had a population of 100,000 or larger in 1980. Cities are the smallest, most homogeneous unit or area for which crime data are nationally available. A majority of the reported violent crimes in the United States occurred in these 170 cities (U.S. FBI 1981, p. 173), so the following analysis covers the areas in which most of the violent crime problem is located. Cities smaller than 100,000 could not be included in the sample because person-level vital statistics mortality data, including homicide and suicide data, do not identify locations of deaths for cities with populations smaller than 100,000 (U.S. NCHS 1983, p. 8). These data were needed to obtain city counts of specific subcategories of deaths, such as gun homicides and gun suicides. These counts were essential as components in dependent variables and important as indirect indicators of gun ownership.

Table 5.13 lists the variables used in the city-level analysis of the impact of gun ownership levels. The dependent variables are the rates per 100,000 resident population of homicide, aggravated assault, robbery, rape, and burglary. For the first three of these categories, data were available that allowed separate analyses of rates of violence with guns, without guns, and gun and nongun crimes combined. The analysis covers all of the major categories of crime in which firearms are involved with any significant frequency.

Burglary is rarely committed with guns (Yeager et al. 1976, p. 7). Guns are seldom of much utility to burglars because they rarely confront victims. However, burglary was analyzed for two reasons. First, since residential burglaries occur in the location where a gun-owning householder usually keeps his gun, widespread gun ownership could have a deterrent effect on burglars. However, it has also been argued that the main effect of gun ownership may be to displace burglars from occupied homes to unoccupied homes (Chapter 4; Kleck 1988). Although this would be beneficial in reducing confrontations between burglars and victims, thus reducing burglary-linked injuries, it would not necessarily result in a net reduction in the total burglary rate. Second, analyzing burglary serves as a useful test in detecting spurious or coincidental associations between gun ownership levels and violence rates. For example, if it were found that gun ownership has more of an apparent positive effect on burglary than it does on crimes that frequently involve guns, it would suggest that rather than having a causal effect on violence rates, gun ownership may merely be associated with some other factor that affects crime rates but that was omitted from the models.

The violence rates were averaged over the 3 years, 1979 to 1981, thus bracketing the Census year of 1980 for which data on many of the con-

trol variables were available. Three years were covered rather than a single year to minimize the potential measurement error produced by misclassification. Some of the smaller cities had fewer than a half dozen homicides per year; thus misclassification of just one or two homicides as other kinds of deaths could substantially alter a single year's official count. This should reduce error variance. The dependent variables were expressed in natural logs. This transformation made the initially skewed distribution of the dependent variable (and therefore of the residuals) more nearly normal, and stabilized the variance of the residuals, reducing heteroscedasticity.

Models of violence rates were estimated using LISREL methods (Joreskog 1973; Joreskog and Sorbom 1981a,b), primarily because the gun ownership level was not directly measured and was treated as a latent construct. Also, LISREL was appropriate for estimating models in which a simultaneous reciprocal relationship was specified between violence rates and gun levels, based on the idea that higher violence rates could motivate gun acquisition, in addition to gun ownership increasing violence rates.

The structural models therefore each contain two endogenous variables: the crime rate and gun ownership. For purposes of estimation, crime rates were assumed to be perfectly measured, whereas gun ownership was treated as a latent construct with multiple indicators (i.e., four to five indicators or manifest variables—see Smith and Patterson 1985). For purposes of scaling the latent construct, in each measurement model one loading was constrained to the value of 1.00 (Stapleton 1977; Joreskog and Sorbom 1981a).

Exogenous variables presented in the models represent only a subset of variables that were initially hypothesized as affecting violence rates. Exogenous variables remaining represent those that showed a significant association with violence rates below the .10 level of significance using OLS. In the models these variables were treated as if they were perfectly measured.

Measuring aggregate levels of gun availability for cities is problematic. One fairly direct method would be to use survey data. Although many national surveys have asked gun ownership questions, the surveys do not provide sufficient cases for single-city estimates for most of the cities, even when many surveys are combined. Instead gun availability was measured using multiple indirect indicators. For cities, Cook (1979) used a simple index consisting of the average of two indicators: the percentage of suicides committed with guns and the percentage of nonfelony-related homicides committed with guns. He showed this mea-

sure to be highly correlated with survey measures of urban household gun prevalence aggregated over nine census regions, indicating validity for purposes of cross-sectional analyses. Earlier researchers had used similar indirect measures (Brearley 1932, p. 71; Seitz 1972; Curtis 1974, p. 110; Brill 1977, p. 20). These measures were improved by using a total of as many as five indicators of city gun ownership levels: (1) percentage of suicides committed with guns, 1979–1982, (2) percentage of homicides committed with guns, 1979–1982, (3) percentage of aggravated assaults known to the police committed with guns, 1979–1980, (4) percentage of robberies known to the police committed with guns, 1979–1980, and (5) percentage of the dollar value of all stolen property reported to the police that was due to firearms thefts, 1979–1981. Four other indicators were also evaluated: the fatal gun accident rate, the rate of subscriptions to gun/outdoor sport magazines, the rate of National Rifle Association members, and the rate of contributors to the Second Amendment Foundation, another gun owners group. However, in a factor analysis these did not load with the other indicators.

## Validation of the Gun Ownership Measure

Following Cook (1979), the validity of the gun indicators was assessed by measuring their associations with survey-based measures of gun ownership. As previously noted, there are insufficient cases in national surveys for the gun prevalence of most cities to be measured. Instead, the results of three national surveys, the General Social Surveys for 1980, 1982, and 1984, were combined to compute reported gun ownership prevalence figures for the nine major U.S. census regions, among persons living in places of 100,000 or larger population. Comparable measures were computed for each of the gun indicator variables, weighting each city measure by the city's population and calculating a weighted big city regional measure for each of the nine regions.

All but one of the five indirect gun indicators were strongly correlated with the survey measures of gun availability in the nine regions, and the indicators were highly correlated among themselves. The only indicator about which there is some doubt is one of the two used by Cook (1979)— the percentage of homicides committed with guns. It was correlated only 0.38 with the survey-based percentage of households reporting a gun, over the nine regions, an association not significantly different from zero. The other indicators showed the following correlations with the percentage of households reporting a gun: 0.69 for percentage of aggravated assaults committed with a gun, 0.83 for percentage of robberies committed with a gun, 0.86 for percentage of suicides committed

with guns, and 0.90 for percentage of the value of reported stolen property attributable to guns. The stolen guns measure, not previously used in gun research, was the best single indicator of gun ownership. These results were confirmed using survey-based measures of respondent (as opposed to household) gun ownership and both household and respondent ownership of handguns.

All of the indicators were more strongly associated with survey measures of handgun ownership than with gun ownership in general. Thus the measure may mainly tap handgun ownership. This is not surprising, since most of the indicators seem to be oriented to measuring gun availability among criminals, and handguns are the predominant gun type involved in crime. On the other hand, the indicators are also less strongly associated with gun ownership among self-reported arrestees than with gun ownership among nonarrestees. Thus, the indicators seem to most strongly reflect noncriminal handgun ownership. In any case, these distinctions are a bit tenuous, since survey-measured ownership among self-reported arrestees and among nonarrestees are highly correlated with each other, indicating that criminal and noncriminal ownership are highly correlated. This would mean that if they could be separately measured for cities, each could serve as a good surrogate for the other, but also that it would be hard to empirically distinguish their separate effects. Consequently, it would seem prudent to interpret the indicators as reflecting general gun ownership, i.e., ownership in the entire population, without distinguishing ownership among criminals from ownership among noncriminals (see Kleck and Patterson 1990 for further details of the validation.)

In each model, when the dependent variable could bear an artifactual association to one of the gun ownership indicators, that indicator was deleted. Thus, the percentage of homicides involving guns was omitted from the homicide model, the gun percentage of assaults was omitted from the aggravated assault model, and the gun percentage of robberies was omitted from the robbery model.

Most of the violence predictors besides the gun ownership indicators were simply measures of the relative sizes of population groups that have especially high or low violence rates, of the prevalence of statuses that frequently give rise to violence, such as divorce, alcoholism, and unemployment, or of social integration, isolation, or transience. They were chosen on the basis of a review of prior studies of violence and crime rates done at the city or metropolitan area level—those that had been consistently found to be significant predictors were specified in initial versions of the corresponding models.

A few of the predictors are sufficiently uncommon to require com-

ment. College enrollment was specified as a predictor of violence rates as a way of controlling for prevalence of city residents with low current income but predominantly middle class origins, culture, and economic prospects, a group both low in violence and high in support for gun control (Wright et al. 1983). Mortality data were used to roughly control for the size of substance-abusing segments of city populations. Alcoholic liver disease deaths per capita served as an indicator of alcohol abuse, whereas per capita deaths due to nonmedical accidental poisoning by opiates served as an indicator of opiates abuse. Since it is questionable how consistently substance abuse-linked deaths are recorded as such on death certificates, estimates for these variables should be interpreted cautiously.

As with nearly all aggregate analyses of violence, the present study uses ratio variables, with city population being the denominator in many variables, both exogenous and endogenous. Many critics have argued that the presence of common components in ratio variables can lead to biased, tautological, or artifactual associations. Firebaugh and Gibbs (1985, p. 715) recommended that if one seeks unbiased coefficient estimates in a regression model containing both endogenous and exogenous variables with a common component (commonly population size) in the denominator, one should also include the variable divided by the common component as another predictor. Thus all models include one common component as another predictor divided by resident population (in 100,000s) as a predictor of violence rates, in addition to those predictors that were computed by dividing some number by the population in 100,000s.

There is another problem related to use of population figures. Computing aggregate crime variables as per capita rates is conventionally done to control for the size of the population at risk of either committing crimes or being victimized in crime. Standard city resident population figures, however, are not completely adequate for this purpose because they do not count nonresident persons at risk, including daily commuters and visitors such as tourists and business travelers. The omission of commuters was controlled by including as a separate predictor the city population as a fraction of the surrounding metropolitan area, on the assumption that cities located in much larger metropolitan areas are likely to have more commuters, in which case resident population would be a more serious underestimate of the population at risk. The contribution of short-term visitors was controlled by including as a separate predictor a "visitors index": the per capita total receipts for hotels, motels, and other lodging places, for the metropolitan area in which a city is located, for 1977. This is an especially important control for cities

with large numbers of tourists relative to resident population, such as Las Vegas, Orlando (Disney World), and Miami.

The relationships between gun ownership and crime levels were treated as reciprocal, based on the assumption that although gun levels may affect violence levels, crime and violence may also motivate gun acquisitions (Kleck 1984a). The rate of subscriptions to gun-related magazines and the state hunting license rate were used as indicators of recreational interest in firearms and the prevalence of a gun sporting subculture. They served as instruments that should have a direct effect on gun ownership but not on violence or crime rates, thereby permitting identification of the model.

Tables 5.14 and 5.15 present the main statistical results. In each model the value of PSI represents the unexplained variance in the endogenous variables, since these coefficients come from a standardized solution in which the variance of the latent variable, gun ownership, has been scaled to 1.0. Thus, for example, the proportion of the variance explained in total homicide rates is $1 - .256 = .744$ (Joreskog and Sorbom 1981a). The tables also present the degrees of freedom, chi-square, and goodness of fit index for each of the models (see Wheaton 1988; Bollen and Liang 1988; Bollen 1989 for discussions of overall model fit).

Because the estimated models are quite large, estimates are reported in two tables, one covering estimated effects of control variables and the other covering estimated effects of gun laws and gun ownership. Table 5.14 reports standardized LISREL parameter estimates for the control variables used in each of the five models. These estimates indicate, for example, that city assault rates are significantly higher in cities in which poverty (RPOV), alcohol abuse (ALCHLSM), and divorce (CNTDIVRT) are high but significantly lower in areas with large college enrollment rates (COLLEGE) and areas in which the city population makes up a smaller percentage of the metropolitan area population (PCTSMSA). Because these effects are secondary to this book's concerns, the remainder of these findings are left to the interested reader.

Table 5.15 presents standardized LISREL solutions for estimated effects of gun ownership on the five total crime rates as well as the rates for gun and nongun violence rates for three of the types of violence (homicide, assault, and robbery). In addition, the estimated effects of violence rates on gun ownership are shown.

With two exceptions, levels of general gun ownership had little apparent effect on violence rates (see coefficients in Gun ownership row of each panel). One exception is the homicide model where gun ownership appeared to have a significant *negative* effect on the violence rate. The

only result in Table 5.15 that supports the view that gun levels have a net positive effect on crime or violence is for burglary, a crime that rarely involves guns. Because it is implausible that gun ownership would increase the frequency of crimes that do *not* involve guns, and not increase crimes that *do* involve guns, the association is probably due either to a coincidental association of gun ownership with an omitted variable that affects burglary rates, or to a positive effect of burglary rates on gun ownership that has not been adequately modeled.

Based on the individual-level findings, a reasonable prediction about aggregate rates would be that gun availability would have a negative effect on rates of assaults resulting in attack and on rates of assaults with injury, whereas the overall net effect on the homicide rate should be essentially zero, or perhaps slightly positive. Unfortunately, FBI data count total aggravated assaults, which include both threats and actual attacks, and both attacks with injury and those without. The city-level data indicate that gun levels have no net impact on aggravated *assault* rates, i.e., on the total rate of both threats and attacks combined, but they cannot tell us the net impact of gun levels on rates of attack or of assault injury. The city data also indicate that gun levels have no net effect on the total homicide rate, as would be expected based on the results of the individual-level analysis.

Note that it is possible that having a gun emboldens some people to enter into situations, settings, and confrontations likely to result in violence. Once in such a situation, the net effect of an aggressor having a gun on the probability of inflicting a death may be zero, yet gun availability could still increase the total homicide rate by increasing the rate at which people enter into such "assault-prone" situations. This possibility cannot be directly assessed because there are no data on the frequency of such encounters.

As expected, homicide and rape rates appear to have a positive effect on gun ownership, confirming national time series findings (Kleck 1979, 1984a), and supporting those survey studies that found gun ownership to be related to crime rates in surrounding areas (Chapter 2). However, results did not support such an effect for assault, robbery, or burglary (Table 5.15).

Although the measurement of gun availability is probably superior to any previously used in aggregate-level research, it is not adequate for the purpose of distinguishing gun ownership among more violence-prone subsets of the population from ownership levels in the general public. Also, some of the indicators of gun ownership can each also be interpreted as indicators of the seriousness of violent motivations of a

city's residents. If a large fraction of a city's aggressors selects serious weapons such as guns to carry out their intentions, this may indicate that a large fraction of them was seriously intent on producing a death. Note, however, that this problem would tend to positively bias the apparent effect of "gun ownership" on violence, i.e., make it seem there was more of an effect than their really was, since weapon effects would be confounded with the effects of aggressor "seriousness." Thus, correcting this flaw would tend only to strengthen the present conclusions that gun ownership levels have no net positive effect on violent crime rates.

Analysts always need to be skeptical about restrictions used to achieve identifiability in structural equation models. The key identification restrictions needed to model the assumed reciprocal relationship between gun ownership and violence rates were the exclusion of gun magazine subscription rates and hunting license rates from the crime equations. Interest in hunting and other gun-related sports was assumed to affect gun ownership rates but to not directly affect crime rates. Some have argued that such interests may reflect, or even generate, proviolent attitudes, but Krug (1968), Eskridge (1986), and Bordua (1986) have all found hunting license rates to have small-to-moderate *negative* associations with violence rates.

Why do gun ownership levels have no apparent net positive effect on violent crime rates, either in the present study or in many previous ones? For burglary and rape, guns are rarely involved (U.S. Bureau of Justice Statistics 1987a), and rarely necessary or helpful in committing those crimes. Thus there was no strong a priori reason to expect a positive effect of gun ownership on these crimes.

There was also no support for the idea that gun ownership deters burglars in a way that produces a net negative effect on the total burglary rate, since the apparent effect was positive. However, the deterrence hypothesis received only a partial test, since home gun ownership should mainly affect residential burglary, whereas the published FBI data cover nonresidential burglaries as well. Since another effect of victim gun ownership might be displacement of burglars from occupied homes to unoccupied homes and nonresidential targets (Chapter 4; Kleck 1988), it is not clear what the net effect would be on total burglary rates. A more relevant test will have to focus on residential burglaries separately, with an attempt to measure occupancy of burglary targets.

The lack of any apparent effect of gun levels on the crime rates could be due to counterbalancing effects of opposite sign, with criminal ownership increasing violence and noncriminal ownership decreasing it due to deterrent effects of ownership among prospective victims. If this

were so, it might still be useful to reduce gun levels among criminals if measures used to accomplish this did not also reduce gun levels among noncriminals to an equal or greater degree.

As previously noted, robber gun possession can have a mixture of both positive and negative effects on robbery rates. Also, gun ownership by prospective victims, especially retail store owners, may deter some robbery attempts (Chapter 4; Wright and Rossi 1986, pp. 141–59; Kleck 1988). The present results confirm the findings of the two best previous studies of city gun ownership and robbery rates, which also found no evidence of a net impact of gun ownership levels on the total robbery rate (Cook 1979; McDowall 1986). They are consistent with an interpretation that effects of opposite sign cancel each other out so as to produce no net effect on the total robbery rate. The findings also indicate that gun ownership levels increase gun robbery and decrease nongun robbery, producing no net effect on total robbery rates (Table 5.15, third panel), just as Cook (1979) and McDowall (1986) found. Because gun robberies are less likely to involve injury, the results are consistent with the hypothesis that higher gun levels reduce robbery injury rates.

In assaultive crimes such as homicide and aggravated assault, gun availability also seems to have a mixture of positive and negative effects. The present aggregate level findings are consistent with a claim that the negative, violence-reducing effects of gun availability, noted in the individual-level analysis, may outweigh the violence-increasing lethality effect, since the findings indicate a net negative association of gun ownership with city homicide rates. It certainly is possible that gun ownership among prospective victims could deter some homicidal attacks. Nevertheless, this surprising result is not emphasized, partly because it contradicts the findings of time series research indicating no net effect, positive or negative, of gun ownership levels on the homicide rate (Kleck 1984a).

It might be argued that positive effects of gun ownership levels are not evident in a sample of U.S. cities because there is little meaningful variation in gun ownership, all U.S. cities supposedly being awash in guns. Empirical evidence indicates otherwise. There is great cross-city variation in all of the indirect indicators of gun ownership (Table 5.12). Surveys have likewise always indicated tremendous variation across U.S. regions. For example, only 24% of New England households reported a gun, compared to 61% in Rocky Mountain states (Table 2.5). Likewise, variation within states, across counties is very large, whether measured with surveys or gun license data (Bordua et al. 1979). Further,

if one cumulates results from 11 national General Social Surveys (GSS) conducted between 1973 and 1989, direct survey measures of gun prevalence can be computed for very large cities, with reasonably large sample sizes. These data indicate enormous cross-city variation in gun ownership within the United States, from very high rates greater than any known to exist outside the United States, to very low rates below those common in the Western European nations often compared with the United States. For example, while the percentage of households reporting a gun was about 61% in Houston and 56% in Birmingham (and probably still higher in many smaller cities), it was only 6% in New York City and 7% in Boston (author's analysis of GSS data).

Nevertheless, one might argue that all of this variation is at a relatively high level, and that one could observe the lower crime rates that would result from lower gun ownership rates only if the latter got down to *very* low levels—levels that are not only lower than those commonly observed in the United States, but are also lower than the 9–33% household gun prevalence levels found in Western European nations (see Killias 1990). Therefore, data from another nation with indisputably low levels of gun ownership are now analyzed.

## An English Test of the Link between Guns and Crime Rates

The leading study of English gun control was conducted by Colin Greenwood, who compiled tables of data on gun crimes and rates of legal gun owners in all 47 English police force areas, as of 1969 (1972, pp. 220–23). Greenwood performed no statistical analysis of these data, but informally concluded that "the rate of armed crime is in no way connected with the density of firearms in the community. Indeed, if anything, the reverse appears to be true. The legitimate use of firearms is largely a rural pursuit, and crime is largely a city pursuit" (p. 219).

It is worth analyzing Greenwood's data, both to more rigorously confirm his null finding, and to test his urban/rural explanation. His counts of crimes were translated into per capita crime rates and correlation coefficients between the rate of legal gun owners (firearms or shotgun certificate holders per 100 households) and the rates of "robberies involving firearms" and rates of "indictable offenses firearms" were computed. It was not possible to do more extensive multivariate analyses because Greenwood's police areas do not correspond to the areas for which other data are available.

Greenwood was correct: the legal gun owner rate correlated −.17 with

Guns and Violent Crime

both crime rates. However, although legal gun ownership rates are indeed higher in rural areas, this does not account for the absence of a positive association between gun ownership and crime. Greenwood classified each of the 47 areas of England into four urban–rural types: (1) Rural, (2) Rural/Urban, (3) Urban/Rural, and (4) City or Urban (these two have been combined together, as only one area was "Urban"). Correlations of the legal gun ownership rate even *within* these areas (i.e., controlling for urbanness) were all nonsignificant and were negative in two of the four area types (correlations with the indictable firearms offenses rate were $-.12$, $-.47$, .48, and .05 within the four types of areas, respectively). This corresponds with the results of similar county-level multivariate analyses performed on Illinois legal gun-owner data by David Bordua and his colleagues (Bordua 1986; Bordua and Lizotte 1979; Bordua et al. 1979). Legal gun ownership is generally either unrelated or negatively related to gun crime rates, even controlling for urbanness. Note that this is true of *gun* crime rates—if legal gun ownership levels are unrelated to gun crime rates, they are even less likely to be related to total crime rates (Table 5.15). Note also that there were no controls for the possible positive effect of crime rates on gun ownership; doing so would presumably reduce even further any impression of a positive effect of gun ownership on crime rates.

It should not be thought that gun ownership did not vary across English areas—the rate of certificate holders per 100 households varied from an extremely low 0.4 in Liverpool to a surprisingly high 16.7 in rural Suffolk. In the latter area, legal gun ownership was higher than all self-reported gun ownership, legal and illegal, is in some areas of the United States. Therefore, considerable variation in legal gun ownership rates at a generally very low level was unrelated to variation in crime rates, just as was true with considerable gun variation at higher levels in the United States. On the other hand, if criminal gun ownership could somehow have been separately measured, results might have been different.

## Conclusions

When aggressors possess guns, this has many effects on the outcome of violent incidents, some tending to make harmful outcomes more likely, some making them less likely. Gun possession probably facilitates some attacks by less powerful aggressors against more powerful victims, and may elicit aggression in at least some circumstances, whereas gun

*Conclusions*

use probably increases the probability of death if a wound is inflicted. On the other hand, possession of guns has the overall effect of reducing the likelihood of attack, probably because it often makes attack unnecessary, and of reducing the probability of an injury being inflicted, perhaps due to the difficulty of aiming guns accurately. The aggregate level analysis of violent crime rates indicated that the net impact of all the various individual effects of gun possession, among prospective victims and aggressors combined, was not significantly different from zero.

Consequently, the assumption that general gun availability positively affects the frequency or average seriousness of violent crimes is not supported. The policy implication is that there appears to be nothing to be gained from reducing the general gun ownership level. Nevertheless, one still cannot reject the possibility that gun ownership among high-risk subsets of the population may increase violence rates. Likewise, the immediate availability of guns produced by gun carrying might increase violence rates even if gun ownership levels do not. Further, gun controls might also be justified on the basis of their potential for reducing deaths from suicides and gun accidents. These last two topics are addressed in Chapters 6 and 7.

Table 5.1.  Guns and the Facilitation of Homicide[a]

| | % of Homicides Involving Guns (Base Frequencies in Parentheses) | |
|---|---|---|
| | Sex of Attacker | |
| | Male | Female |
| Sex of victim | | |
| Male | 68.4 (9096) | 63.5 (1779) |
| Female | 59.6 (2737) | 39.2 (268) |
| | Age of Attacker | |
| | 16–39 | Other |
| Age of victim | | |
| 16–39 | 68.3 (7529) | 72.5 (3758) |
| Other | 49.5 (2919) | 61.9 (3155) |
| | Number of Attackers | |
| | 2 or more | One |
| Number of victims | | |
| 2 or more | 70.3 (91) | 69.4 (301) |
| One | 60.7 (1492) | 66.0 (12035) |

[a] Cases are murders or nonnegligent manslaughters that occurred in the United States in 1980 and were reported to the FBI's SHR program.
Source: 1980 Supplementary Homicide Reports (ICPSR 1984a).

Table 5.2.  Summary of "Weapons Effect" Experimental Studies
A. Results of Individual Studies[a]

| Studies | Measure of Aggression | Real Weapon? | Subjects | Weapon Linked with Aggressor? |
|---|---|---|---|---|
| Supportive | | | | |
| Berkowitz and LePage (1967) | M | M | M | L |
| Boyanowsky and Griffiths (1982) | L | M | L | L |
| Caprara et al. (1984) | M | L | L | L |
| Frodi (1973) | L | M | L | L |
| Leyens and Parke (1975) | L | L | L | L |
| Mendoza (1972) | L | L | L | L |
| Page and O'Neal (1975) | M | L | M | L |
| Simons et al. (1975) | L | M | M | L |
| Simons and Turner (1975) | M | M | M | L |
| Turner and Goldsmith (1976) | L | L | L | L |
| Mixed Findings | | | | |
| Fraczek and Macaulay (1971) | M | M | M | L |
| Turner et al. (1975) | L | M | M | L |
| Contrary | | | | |
| Buss et al. (1972) | M | L | M | M |
| Cahoon and Edwards (1984) | L | M | M | L |
| Cahoon and Edwards (1985) | L | M | M | L |
| Ellis et al. (1971) | M | M | M | L |
| Fisher et al. (1969) | M | M | M | L |
| Halderman and Jackson (1979) | L | M | M | L |
| Page and Scheidt (1971) | M | M | M | L |
| Tannenbaum (1971) | M | L | M | M |
| Turner and Simons (1974) | M | M | M | L |

[a] M, study was more relevant to real-world gun violence in United States; L, study was less relevant or realistic. In Panel B, the first study condition listed, of each pair, is considered to be the more relevant and realistic one.

(continued)

*Table 5.2.* (*Continued*)
B. Patterns of Findings in Studies

| Characteristic | Condition | Results[a] |
|---|---|---|
| Type of aggression Ss believed they were inflicting | Painful electric shocks | 4/1/6 |
| | Play aggression, horn honking, hypothetical aggression, etc. | 6/1/3 |
| Weapon stimulus | Real weapons | 5/2/7 |
| | Toy weapons, pictures, etc. | 5/0/2 |
| Subjects | U.S. adults, adolescents | 4/2/9 |
| | Non-U.S. or children | 6/0/0 |
| Weapon associated with aggressor? | Yes | 0/0/1 |
| | No | 10/2/8 |
| Overall relevance to real violence in United States | High[b] | 2/1/4 |
| | Low | 8/1/5 |
| All studies | | 10/2/9 |

[a] Number of studies with findings generally (1) supportive of / (2) mixed / (3) contrary to "weapons effect" hypothesis.
[b] "High" overall relevance means Ss were U.S. adults or adolescents, believed they were inflicting physical pain on another person, and were exposed to real weapons; "Low" means all other studies. (There were no studies with all three of these attributes and the weapon was also associated with the aggressor.)

*Table 5.3.* Assault Wound Death Rates by Weapon Type, U.S. 1988

| | Total | Gunshot Wound | Knife Wound | Injury from Other Weapon | No Weapon |
|---|---|---|---|---|---|
| Simple assaults | 860000 | 0 | 0 | 0 | 860000 |
| Aggravated assaults[a] | 571000 | 22190 | 40062 | 325956 | 33118 |
| Homicides[b] | 18901 | 11869 | 3744 | 2069 | 1220 |
| Assaults + homicides | 1449901 | 34059 | 43806 | 328025 | 894338 |
| Death rate[c] | 0.0130 | 0.3485 | 0.0855 | 0.0063 | 0.0014 |

Ratio of gunshot death rate over knife death rate = 4.08

[a] Aggravated assaults completed with injury—gunshot and knife wound figures reflect the fact that only some injuries inflicted by attackers possessing guns or knives actually involved injuries inflicted by those weapons.
[b] Murders and nonnegligent manslaughters, excluding those linked with robbery or rape. Killings involving guns of unknown type were allocated across gun type categories according to the distribution among cases with known gun type. Killings where weapon type was among cases with known gun type. Killings where weapon type was not stated at all were similarly allocated.
[c] Homicides/(assaults + homicides). The absolute size of these death rates is far too high, due to a serious undercount of woundings in the NCS (Cook 1985). They are computed only for purposes of comparing the gun rate with the knife rate, on the assumption that gun and knife woundings are roughly equally undercounted.
*Sources:* Assaults: U.S. Bureau of Justice Statistics (1989a) for total number of assaults, U.S. BJS (1989b, p. 64) for assault distribution by weapon type. Homicides: U.S. FBI (1989, pp. 12–14, 47). Fraction of gun and knife assaults with injury that involved gunshot or knife wounds: U.S. BJS (1986b).

*Table 5.4.* Offender "Seriousness" and Weapon "Seriousness"[a]

| | Self-Reported Lifetime Arrests | | | |
|---|---|---|---|---|
| Weapons Used[b] | 1 | 2–5 | 6 or More | Total |
| No weapon | 21 | 55 | 29 | 105 |
| Nongun weapon | 20 | 69 | 92 | 191 |
| Handgun only | 37 | 166 | 173 | 376 |
| Long gun only | 9 | 44 | 35 | 88 |
| Long gun and handgun | 7 | 25 | 36 | 68 |
| Total | 94 | 369 | 365 | 828 |
| % Armed | 78 | 85 | 92 | 87 |
| % Armed with gun | 56 | 64 | 67 | 64 |
| % Armed with long gun | 17 | 19 | 19 | 19 |

| | Self-Reported Lifetime Assaults | | | |
|---|---|---|---|---|
| Weapons Used[b] | Never or Once | A few | 10 or More | Total |
| No weapon | 21 | 41 | 17 | 79 |
| Nongun weapon | 31 | 94 | 54 | 179 |
| Handgun only | 47 | 141 | 117 | 305 |
| Long gun only | 13 | 46 | 22 | 81 |
| Long gun and handgun | 3 | 35 | 32 | 70 |
| Total | 115 | 357 | 242 | 714 |
| % Armed | 82 | 89 | 93 | 89 |
| % Armed with gun | 55 | 62 | 71 | 64 |
| % Armed with long gun | 14 | 23 | 22 | 21 |

[a] Table covers all felons in 10 state survey who reported being incarcerated for an assaultive crime—murder, manslaughter, attempted murder, aggravated assault, or simple assault—and who indicated how they were armed when they committed the crime.
[b] Weapons with which felons were armed when they committed the offense for which they had been imprisoned.
*Source:* Secondary analysis of ICPSR (1986).

*Table 5.5.* Weapons and Crime Completion in Rape and Robbery

| | Rape | | Robbery | |
|---|---|---|---|---|
| Offender Weapon(s) | % with Weapon | % Completed | % with Weapon | % Completed |
| Gun | 9.5 | 48.7 | 20.0 | 78.8 |
| Knife | 10.7 | 41.9 | 16.7 | 60.6 |
| Other weapons | 4.1 | 19.8 | 10.0 | 55.5 |
| Weapons, type unknown | 1.1 | 42.3 | 2.4 | 67.7 |
| Unarmed | 63.9 | 28.1 | 39.7 | 56.6 |
| Unknown if armed | 3.8 | 22.0 | 11.2 | 60.8 |

*Source:* U.S. Bureau of Justice Statistics (1986b, pp. 3–4; adapted from Tables 5 and 10). Covers violent crime victimizations reported in National Crime Surveys, 1973–1982.

*Table 5.6.* Rates of Attack, Injury, and Medical Treatment in Violent Crimes, by Weapon Type

| | Offender Weapon(s) | | | | | |
|---|---|---|---|---|---|---|
| | Gun | Knife | Other Weapon | Combination | Weapon, Type Unknown | No Weapon |
| % Attacked | 36.6 | 42.7 | 62.8 | 58.2 | 56.1 | 52.1 |
| % Injured | 14.0 | 24.9 | 45.0 | 37.9 | 42.5 | 29.9 |
| % Injured, among those attacked | 38.3 | 58.3 | 71.7 | 65.1 | 75.8 | 57.4 |
| % Received medical care | 7.5 | 13.6 | 22.0 | 21.1 | 18.9 | 10.4 |
| % Got medical care, among injured | 53.6 | 54.6 | 48.9 | 55.7 | 44.5 | 34.8 |
| % Received hospital care | 6.2 | 10.1 | 15.5 | 14.5 | 13.3 | 5.6 |
| % Hospital care, among injured | 44.3 | 40.6 | 34.4 | 38.3 | 31.3 | 18.7 |
| Median days of hospital care | 7.3 | 5.0 | 4.1 | — | — | 3.5 |

*Source:* U.S. Bureau of Justice Statistics (1986b, pp. 4, 6; computed from data in Table 12). Table covers violent crime victimizations reported in the 1973–1982 National Crime Surveys.

Table 5.7. Variables in the Individual-Level Analysis

| | | Dataset | | | | | |
|---|---|---|---|---|---|---|---|
| | | NCS Assaults, 1979–85 | | NCS Attacks, 1979–85 | | NCS/SHR Injuries 1982 | |
| Name | Interpretation | Mean | SD | Mean | SD | Mean | SD |
| ATTACK | Victim attacked | .495 | .500 | 1.000 | 0.000 | 1.000 | 0.000 |
| INJURY | Victim injured | .258 | .438 | .522 | .500 | 1.000 | 0.000 |
| DEATH | Victim killed | 0.000 | 0.000 | .061 | .239 | .014 | .119 |
| HGUNPRES | O[a] had handgun | .114 | .318 | | | | |
| OGUNPRES | O had other gun | .022 | .147 | .014 | .120 | | |
| KNIFPRES | O had knife | .122 | .328 | .107 | .309 | | |
| OWEPPRES | O had other weapon | .136 | .343 | .170 | .376 | | |
| HANDGUN | Handgun used in attack (shot or shot at) | .011 | .103 | .022 | .146 | .021 | .144 |
| OTHERGUN | Other gun used in attack (shot or shot at) | .004 | .065 | .009 | .093 | .004 | .060 |
| KNIFE | Knife used in attack | .021 | .144 | .043 | .202 | .056 | .230 |
| OTHRWEAP | Other weapon used | .061 | .239 | .123 | .329 | .168 | .374 |
| UNDTWEAP | Undetermined weapon used in attack | .010 | .099 | .018 | .133 | .000 | .016 |
| HGSHOT | V shot with handgun | | | | | .021 | .144 |
| OGSHOT | V shot with other gun | | | | | .004 | .060 |
| KNIFED | V wounded with knife | | | | | .056 | .230 |
| CLUBBED | V injured with blunt object | | | | | .223 | .416 |
| OWEPINJ | V injured with other weapon | | | | | .017 | .131 |
| SERIES | Series incident | .057 | .232 | .037 | .189 | | |
| INCOME | V household income | 8.120 | 3.947 | 8.005 | 3.962 | | |
| EDUCATN | Victim's years of formal schooling | 15.790 | 6.475 | 15.260 | 6.420 | | |
| MARRIED | Victim married | .329 | .470 | .286 | .452 | | |
| GUNOCC | V in gun-carrying occupation | .038 | .192 | .040 | .195 | | |
| BLAKVICT | Black victim | .136 | .343 | .136 | .343 | .119 | .324 |
| MALEVICT | Male victim | .703 | .457 | .698 | .459 | .730 | .444 |
| AOLE11 | O age 11 or under | .010 | .099 | .014 | .116 | .004 | .062 |
| AOGE30 | O age 30 or over | .236 | .425 | .197 | .398 | .202 | .402 |
| MALEOFF | Male offender | .942 | .233 | .936 | .244 | .941 | .236 |
| UNDRACEO | O race undetermined | .021 | .143 | .022 | .146 | .025 | .156 |
| AGEDIF | Age advantage to O | .210 | .407 | .209 | .407 | .269 | .444 |
| SEXDIF | Sex advantage to O | .257 | .437 | .257 | .437 | .228 | .420 |
| NUMDIF | Number offenders minus number of victims | .767 | 2.787 | .910 | 3.219 | .814 | 1.928 |
| ROBBERY | Robbery involved | .286 | .452 | .317 | .465 | .335 | .472 |
| BURGLARY | Burglary involved | .038 | .192 | .030 | .170 | .032 | .176 |
| RAPE | Rape involved | .029 | .166 | .037 | .189 | .042 | .202 |
| POPGE250 | Occurred in city of 250K+ population | .324 | .468 | .331 | .471 | .307 | .461 |
| SUMMER | Occurred June–August | .279 | .448 | .283 | .450 | .270 | .444 |
| DARK | Dark at the time | .542 | .498 | .578 | .494 | | |
| INSIDE | Occurred indoors | .267 | .442 | .241 | .428 | | |

[a] V, victim; O, offender. Blank spaces indicate variable did not exist in that dataset.

Table 5.8. ATTACK Equations

| | Coefficients (Ratio, Coefficient/Standard Error) | | | | |
|---|---|---|---|---|---|
| Variable | 1[a] OLS[b] All[c] | 2[a] Probit[b] All[c] | 3[a] Probit[b] Nonfelony[c] | 4[a] Probit[b] Nonseries[c] | 5[a] Probit[b] Reported to Police[c] |
| HGUNPRES | −.2836 (−22.40) | −.7704 (−21.64) | −.6084 (−12.74) | −.7769 (−21.57) | −.9310 (−17.00) |
| OGUNPRES | −.1579 (−5.90) | −.4223 (−5.76) | −.3040 (−3.60) | −.4451 (−5.93) | −.6650 (−6.02) |
| KNIFPRES | −.1246 (−10.53) | −.3259 (−9.94) | −.2264 (−5.07) | −.3392 (−10.16) | −.3860 (−7.05) |
| OWEPPRES | .0961 (8.27) | .2545 (8.14) | .2702 (7.59) | .2422 (7.54) | .1614 (2.89) |
| AOLE11 | .1681 (4.22) | .4654 (4.17) | .5135 (3.95) | .4385 (3.78) | .1804 (0.87) |
| AOGE30 | −.0632 (−6.68) | −.1668 (−6.56) | −.2092 (−7.21) | −.1746 (−6.67) | −.0709 (−1.59) |
| EDUCATN | −.0053 (−8.53) | −.0741 (−8.44) | −.0179 (−8.92) | −.0141 (−8.23) | −.0074 (−2.52) |
| MARRIED | −.0640 (−7.49) | −.1658 (−7.41) | −.1799 (−6.64) | −.1658 (−7.01) | −.1617 (−4.12) |
| GUNOCC | .0769 (3.69) | .2081 (3.71) | .2162 (3.69) | .2528 (4.05) | .2647 (2.93) |
| ROBBERY | .0895 (9.70) | .2391 (9.60) | — | .2391 (9.47) | .3112 (7.30) |
| BURGLARY | −.0785 (−3.60) | −.2056 (−3.49) | — | −.1963 (−3.27) | −.1917 (−2.32) |
| INSIDE | −.0293 (−3.05) | −.0820 (−3.18) | −.0966 (−3.42) | −.0751 (−2.81) | −.1759 (−3.51) |
| SERIES | −.1885 (−10.98) | −.5075 (−10.72) | −.5032 (−10.10) | — | −.3922 (−4.45) |
| DARK | .8418 (10.46) | .2256 (10.44) | .2609 (10.09) | .2222 (9.98) | .1786 (4.65) |
| Constant | .5987 | .2592 | .2900 | .2627 | .3031 |
| Log-likelihood | (0.08)[d] | −9704.3 | −6830.5 | −9167.6 | −3030.6 |
| Sample (n) | 14,922 | 14,922 | 10,420 | 14,040 | 4,772 |

[a] Equation.
[b] Estimation method.
[c] Sample.
[d] Adjusted R[2].

211

*Table 5.9.* INJURY Equations

| | Coefficients (Ratio, Coefficient/Standard Error) | | | | | |
|---|---|---|---|---|---|---|
| | $6^a$ OLS[b] | $7^a$ Probit[b] | $8^a$ Bivariate[b] | $9^a$ Bivariate[b] | $10^a$ Bivariate[b] | $11^a$ Bivariate[b] Reported to Police[c] |
| Variable | All[c] | All[c] | All[c] | Nonfelony[c] | Nonseries[c] | |
| HANDGUN | −.3136 (−8.03) | −.9267 (−7.75) | −.9257 (−7.85) | −1.1858 (−8.22) | −.9391 (−7.77) | −1.3116 (−5.88) |
| OTHERGUN | −.3506 (−5.72) | −1.1619 (−5.40) | −1.1619 (−7.10) | −1.1912 (−6.67) | −1.1386 (−6.82) | −1.2612 (−4.37) |
| KNIFE | .1357 (4.81) | .3625 (4.72) | .3625 (4.56) | .1674 (1.70) | .3704 (4.53) | .3418 (2.33) |
| OTHRWEAP | .2058 (11.81) | .5597 (11.64) | .5597 (11.18) | .4623 (7.95) | .5770 (11.15) | .5747 (6.56) |
| EDUCATN | −.0043 (−4.76) | −.1142 (−4.78) | −.0113 (−4.42) | −.0187 (−5.50) | −.0116 (−4.39) | −.0070 (−1.62) |
| INCOME | −.0035 (−2.40) | −.0094 (−2.43) | −.0095 (−2.43) | −.0152 (−3.17) | −.0104 (−2.62) | −.0090 (−1.27) |
| GUNOCC | −.0799 (−2.73) | −.2133 (−2.73) | −.2133 (−2.87) | −.0851 (−1.07) | −.1943 (−2.41) | −.1524 (−1.24) |
| SEXDIF | −.0537 (−3.82) | −.1403 (−3.79) | −.1403 (−3.79) | −.2623 (−5.41) | −.1618 (−4.32) | −.1494 (−2.43) |
| AGEDIF | .5592 (3.95) | .1482 (3.95) | .1482 (3.96) | .1113 (2.26) | .1503 (3.93) | .0377 (0.63) |
| RAPE | .1324 (4.19) | .3428 (4.09) | .3428 (3.87) | | .3544 (3.95) | .2227 (1.61) |
| ROBBERY | .0615 (4.85) | .1647 (4.90) | .1647 (4.57) | | .1602 (4.39) | .2454 (4.05) |
| DARK | .1121 (9.60) | .2943 (9.54) | .2942 (8.95) | .2503 (5.67) | .2940 (8.67) | .1953 (3.54) |
| Constant | .5104 | .0298 | .0298 | .3079 | .0576 | .0775 |
| Log-likelihood | (0.06)[d] | −4800 | −14542 | −10062 | −13796 | −4623 |
| Sample (n) | 7300 | 7300 | 7300 | 4937 | 7007 | 2400 |

[a] Equation.
[b] Estimation method.
[c] Subsample.
[d] Adjusted $R^2$

*Table 5.10.* DEATH Equations

| | Coefficients (Ratio, Coefficient/Standard Error) | | | | |
|---|---|---|---|---|---|
| | $12^a$ OLS[b] | $13^a$ Probit[b] | $14^a$ Bivariate[b] | $15^a$ Bivariate[b] | $16^a$ Probit[b,d] Reported to Police[c] |
| Variable | All[c] | All[c] | All[c] | Nonfelony[c] | |
| HGSHOT | .3782 (35.28) | 2.964 (12.49) | 2.602 (13.53) | 3.093 (2.97) | 3.282 (17.59) |
| OGSHOT | .3948 (15.41) | 2.773 (7.29) | 2.531 (4.63) | 2.654 (2.58) | 7.261 (0.28) |
| KNIFED | .0438 (6.53) | 1.397 (6.41) | 1.679 (14.37) | 1.728 (11.01) | 1.264 (8.07) |
| CLUBBED | −.0051 (−1.36) | 0.013 (0.05) | 0.160 (2.13) | 0.106 (1.11) | 0.054 (0.28) |
| OWEPINJ | .0048 (0.41) | .336 (0.62) | .531 (2.72) | .381 (1.69) | .555 (1.42) |
| AGEDIF | .0054 (1.53) | .419 (2.29) | .507 (6.57) | .372 (3.85) | .234 (1.70) |
| NUMDIF | −.0027 (−3.33) | −.158 (−2.63) | −.066 (−3.16) | −.052 (−1.94) | −.017 (−0.33) |
| ROBBERY | −.0137 (−4.10) | −.560 (−2.80) | −.199 (−2.74) | | −.537 (−3.62) |
| BLAKVICT | .0165 (3.37) | .716 (3.65) | .264 (2.45) | .318 (2.15) | .626 (4.18) |
| UNDRACEO | .0880 (8.80) | 1.139 (4.13) | 1.425 (8.73) | 1.316 (6.26) | .961 (4.50) |
| MALEOFF | −.0353 (−5.38) | −.723 (−2.89) | .018 (0.11) | .193 (0.96) | −1.056 (−5.24) |
| Constant | .0379 | −2.485 | 0.064 | −0.112 | −1.702 |
| Log-likelihood | (0.29)[e] | −144.81 | −3893.5 | −2480.6 | −252.1 |
| Sample (n) | 4322 | 4322 | 4322 | 2868 | 3914 |

[a] Equation.
[b] Estimation method.
[c] Sample.
[d] Bivariate probit estimates could not be estimated because the correction for sample selection created a near-singular estimated variance matrix.
[e] Adjusted $R^2$.

*Table 5.11.* Summary of Weapon Effects in Violent Incidents (OLS Coefficients)[a]

| Weapon | Attack | | Injury, Given Attack | | Death, Given Injury | | Net Effects, All Incidents, Death | |
|---|---|---|---|---|---|---|---|---|
| | b | B | b | B | b | B | b | B |
| HGUNPRES[b] | −.284 | −.181 | −.314 | −.092 | .378 | .459 | .014 | .079 |
| OGUNPRES[c] | −.158 | −.046 | −.351 | −.065 | .395 | .199 | .016 | .038 |
| KNIFPRES[d] | −.125 | −.082 | .136 | .055 | .044 | .085 | .003[e] | .018 |
| OWEPPRES[f] | .096 | .066 | .206 | .135 | −.005[g] .005[h] | −.018[g] .005[h] | −.000[e] | −.002 |

[a] Omitted weapons category—incidents in which no weapons were present or used. b, unstandardized OLS regression coefficient; B, standardized OLS regression coefficient.
[b] HANDGUN in Injury equations, HGSHOT in Death (given injury) equation.
[c] OTHERGUN in Injury equations, OGSHOT in Death (given injury) equation.
[d] KNIFE in Injury equations, KNIFED in Death (given injury) equation.
[e] Not significant at .05 level.
[f] OTHRWEAP in Injury equation, CLUBBED and OWEPINJ in Death (given injury) equation.
[g] Coefficient for CLUBBED.
[h] Coefficient for OWEPINJ.

*Table 5.12.* Prior Studies of the Impact of Aggregate Gun Levels on Violent Crime Rates[a]

| Study | Sample | Two-Way Relationship ? | Measure of Gun Level[b] | Crime Rates[c] | Results[d] |
|---|---|---|---|---|---|
| Brearley (1932) | 42 states | No | PGH | THR | Yes |
| Krug (1967) | 50 states | No | HLR | ICR | No |
| Newton and Zimring (1969) | 4 years, Detroit | No | NPP | THR, TRR, AAR, GHR | Yes |
| Seitz (1972) | 50 states | No | GHR, FGA, AAR | THR | Yes |
| Murray (1975) | 50 states | No | SGR, SHR | GHR, AAR, TRR | No |
| Fisher (1976) | 9 years, Detroit | No | NPP, GRR, PGH | THR | Yes |
| Phillips et al. (1976) | 18 years, U.S. | No | PROD | THR | Yes |
| Brill (1977) | 11 cities | No | PGC | ICR THR TRR | No Yes No |

*(continued)*

*Table 5.12.* (Continued)

| Study | Sample | Two-Way Relationship ? | Measure of Gun Level[b] | Crime Rates[c] | Results[d] |
|---|---|---|---|---|---|
| Kleck (1979) | 27 years, U.S. | Yes | PROD | THR | Yes |
| Cook (1979) | 50 cities | No | PGH, PGS | TRR RMR | No Yes |
| Kleck (1984a) | 32 years, U.S. | Yes No | PROD | THR TRR | No Yes |
| Maggadino and Medoff (1984) | 31 years, U.S. | No[e] | PROD | THR | Yes |
| Lester (1985) | 37 cities | No | PCS | VCR | No |
| Bordua (1986) | 102 counties | No[f] | GLR, SIR | HAR, THR | No |
| McDowall (1986) | 9 regions | Yes | PGH, PGS | GHR | No |
| | 48 cities, 2 years[g] | | | TRR | No |
| Lester (1988b) | 9 regions | No | SGR | THR | Yes |
| McDowall and Loftin (1988) | 36 years, Detroit | No[h] | PGR, FGA | THR | Yes |
| Linsky et al. (1988) | 50 states | No | GMR | GHR | Yes[i] |

[a] Table covers only studies and findings in which the dependent variable was a crime rate, as opposed to the fraction of crimes committed with guns.
[b] Measures of Gun Level: FGA, fatal gun accident rate; GLR, gun owners license rate; GMR, gun magazine subscription rates; GRR, gun registration rate; HLR, hunting license rate; NPP, number of handgun purchase permits; PGA, % aggravated assaults committed with guns; PGC, % homicides, aggravated assaults, and robberies (combined together) committed with guns; PCS, same as PGC, but with suicides lumped in as well; PGH, % homicides committed with guns; PGR, % robberies committed with guns; PGS, % suicides committed with guns; PROD, guns produced minus exports plus imports, U.S.; SGR, survey measure, % households with gun(s); SHR, survey measure, % households with handgun(s); SIR, survey measure, % individuals with gun(s).
[c] Crime Rates: AAR, aggravated assault rate; GHR, gun homicide rate; HAR, homicide, assault, and robbery index (factor score); ICR, index crime rate; RMR, robbery murder rate; THR, total homicide rate; TRR, total robbery rate; VCR, violent crime rate.
[d] Yes, study found significant positive association between gun levels and violence; No, study did not find such a link.
[e] Authors modeled two-way relationship, but only report gun impact results for model where this was not done.
[f] A few gun-violence associations were positive and significant, but almost all involved female gun ownership or male long gun ownership. Author interpreted pattern to indicate effect of violence on gun ownership. See text.
[g] Panel design, two waves.
[h] Attempt to model two-way relationship probably failed due to an implausible identification restriction. See text.
[i] Only established an association with *gun* homicide. No result for total homicide rate reported.

*Table 5.13.* Variables Used in City-Level Analysis[a] (*n* = 170 cities)

| | | Mean | SD | Sources[b] |
|---|---|---|---|---|
| **Violence rates (1979–1981 average, rates per 100,000 resident population, natural logs)** | | | | |
| LNMR | Homicides | 2.47 | .78 | a |
| LNASLT | Aggravated assaults | 5.90 | .58 | b |
| LNROB | Robberies | 5.79 | .75 | b |
| LNRAPE | Forcible rapes | 4.04 | .54 | b |
| LNBURG | Burglaries | 7.77 | .35 | b |
| LNSUICID | Suicides | 2.63 | .35 | a |
| LNGUNMR | Homicides with gun | 1.98 | .88 | a |
| LNNGMR | Homicides without gun | 1.42 | .72 | a |
| LNGNASLT | Assaults with gun | 4.55 | .75 | b, c |
| LNNGASLT | Assaults without gun | 5.55 | .60 | b, c |
| LNGNROB | Robberies with gun | 4.87 | .76 | b, c |
| LNNGROBR | Robberies without gun | 5.22 | .84 | b, c |
| LNGNSUIC | Suicides with gun | 1.94 | .56 | a |
| LNNGSUIC | Suicides without gun | 1.81 | .47 | a |
| LNFGA | Fatal gun accidents | 0.50 | 1.35 | a |
| **Gun ownership indicators** | | | | |
| PGH7982 | % gun, homicide, 1979–1982 | 61.48 | 11.89 | d |
| PCTGNAST | % gun, aggravated assault, 1979–1980 | 28.31 | 11.39 | c |
| PCTGNROB | % gun, robbery, 1979–1980 | 42.00 | 13.11 | c |
| PGS7982 | % gun, suicide, 1979–1982 | 53.37 | 14.91 | a |
| GUNSTOL | Dollar value, stolen guns/$ value, all stolen property | 1.20 | .75 | e |
| **Instrumental variables** | | | | |
| RGUNMAG | Subscriptions/100K respop, *Guns & Ammo, Sports Afield, Field & Stream, Outdoor Life,* county | 6564.74 | 8656.41 | f |
| HUNTERS | Hunting license holders/100K respop, state | 6985.58 | 4252.36 | g |
| **Control variables** | | | | |
| PCTBLACK | % respop, black | 19.27 | 16.69 | h |
| PCTHISP | % respop, Spanish origin | 8.82 | 12.23 | h |
| PCTM1524 | % respop, male, age 15–24 | 10.05 | 2.30 | i |
| PCTOLD | % respop, age 65+ | 11.20 | 3.53 | h |
| RUNM1624 | Unemployment rate males, age 16–24 | 13.18 | 6.12 | i |

*Table 5.13.* (Continued)

| | | Mean | SD | Sources[b] |
|---|---|---|---|---|
| RPOV | % respop < poverty line 1979 | 13.97 | 5.16 | h |
| MFI | Median family income, $s, 1979 | 19435.52 | 3592.01 | h |
| INEQUALT | % hshlds w. income <$10k or >$50k | 35.51 | 6.91 | h |
| OWNEROCC | % housing units owner-occupied | 54.14 | 11.19 | h |
| COLLEGE | College enrollment/100K respop | 7619.66 | 4267.42 | i |
| PCTMOVE | % respop age 5+ not in same house as 5 years before | 51.01 | 8.44 | h |
| TRNSIENT | % respop, born out of state | 42.74 | 15.79 | h |
| PCTFOREN | % respop, foreign born | 7.68 | 8.25 | i |
| POPCHANG | % pop change 1970 to 1980 | 7.32 | 20.37 | h |
| CNTDIVRT | Divorces per 100K respop, county | 639.20 | 245.25 | h |
| FEMHEAD | % families headed by females | 21.21 | 10.93 | h |
| CHRCHMEM | Church membership per 100 respop, county | 20.38 | 12.02 | j |
| ALCHLSM | Alcoholic liver disease deaths per 100K respop | 7.77 | 4.45 | a |
| ADDICTION | Deaths due to nonmedical accidental poisoning by opiates per 100K respop | .22 | .52 | a |
| PCTSMSA | City respop as a % of SMSA respop | 34.58 | 22.73 | i |
| VISITORS | Lodging receipts in dollars/100K respop, SMSA | 111.00 | 269.38 | k |
| INVPOP | Inverse population 1/(respop in 100,000s) | .56 | .29 | h |
| HSACTRAT | Household activity ratio—fraction of households not of husband–wife, wife not working type | .71 | .05 | i |
| PCRM80 | Property crime except burglary per 100K respop, 1980 | 6072.55 | 1805.93 | b |
| HOSPITAL | Hospital beds per 100K respop | 1013.90 | 661.20 | h |

*(continued)*

*Table 5.13.* (Continued)

| | | Mean | SD | Sources[b] |
|---|---|---|---|---|
| LIVLONE | % households with 1 person | 10.18 | 2.91 | h |
| STORES | Retail establishments/100K respop | 851.72 | 167.09 | h |
| MAXTEMP | Average daily maximum temperature, July | 87.16 | 6.64 | h |
| CROWDING | Percent of occupied housing units with 1.01+ persons/room | 4.89 | 3.23 | h |
| DENSITY | Persons per square mile | 4334.26 | 3375.96 | h |
| STHNBORN | Percent respop born in South | 12.93 | 6.33 | i |
| SOUTH | South region dummy | .32 | .47 | h |
| WEST | West region dummy | .28 | .45 | h |
| STHNNESS | Gastil "Southernness Index" | 20.24 | 7.43 | l |
| POLEXP | Police expenditures per capita | 70.65 | 24.92 | h |
| COPS | Sworn police officers/100K respop | 207.57 | 82.40 | b |
| STPRISRT | State prisoners/100K respop | 157.90 | 164.58 | m |

[a] Unless otherwise noted, each variable refers to a city, as of 1980. In variable descriptions, "county" indicates variable refers to county in which city was located, and "state" indicates variable refers to state in which city is located. Methods of estimating missing values may be obtained from author. respop, resident population.

[b] Sources: a. U.S. NCHS (1983); b. U.S. FBI (1980–1982); c. ICPSR (1983); d. ICPSR (1984a); e. ICPSR (1984b); f. Audit Bureau of Circulation (1979–1981); g. U.S. Fish and Wildlife Service (1982b); h. U.S. Bureau of the Census (1983a); i. U.S. Bureau of the Census (1983b); j. Quinn et al. (1982); k. U.S. Bureau of the Census (1981); l. Gastil (1971); m. U.S. Bureau of Justice Statistics (1982).

*Table 5.14.* Total Violence Rates and Gun Ownership Levels: Effects of Control Variables

(continued)

| | LNMR | Gun Ownership[a] | LNASLT | Gun Ownership[b] | LNROB | Gun Ownership[c] | LNRAPE | Gun Ownership[d] | LNBURG | Gun Ownership[e] |
|---|---|---|---|---|---|---|---|---|---|---|
| PCTHISP | -.083[a] | | | | | | | | | |
| PCTBLACK | | | | | .260* | .420* | .231 | | | |
| MFI | | | | | -.096* | | -.252* | .163 | -.091 | |
| PCTM1524 | .420* | | | | | | | | | |
| RPOV | | | .453* | | .424* | | | | | |
| INEQUALT | | | | | -.249* | | -.016 | | .331* | |
| OWNEROCC | .333* | | .190 | | -.181* | .348* | -.428* | .508* | | |
| COLLEGE | | -.161* | | | .107* | | | | -.176* | |
| TRNSIENT | -.352* | | -.183* | | | | | | | |
| PCTMOVE | .207* | | | | | | | | .262* | |
| POPCHANG | | | | | -.110* | | | | -.240* | |
| PCTROREN | | | | | | | .016 | | | |
| CNTDIVRT | | | .228* | .217* | .063 | .440* | .120 | | .021 | |
| PCRM80 | | | | .192* | -.142* | | | | .574* | .371* |
| CHRCHMEM | | | .145 | | .089* | | | | | |
| ADDICTRT | | | .225* | | | | | | | |
| ALCHLSM | | | -.141* | | -.173* | .205* | | | | |
| PCTSMSA | -.096 | | .134* | | | | | | | |

## Table 5.14. (Continued)

| | LNMR | Gun Ownership[b] | LNASLT | Gun Ownership[c] | LNROB | Gun Ownership[d] | LNRAPE | Gun Ownership[e] | LNBURG | Gun Ownership[f] |
|---|---|---|---|---|---|---|---|---|---|---|
| VISITORS | −.333* | | | | | −.221* | | | | |
| INVPOP | | | .065 | | .180* | | −.093 | | .036 | |
| WEST | | | | | −.157* | | −.268* | | | |
| MAXTEMP | .611* | | .113 | | .047 | | −.206 | | | |
| CROWDING | | | | | | | −.164 | −.220* | | |
| DENSITY | −.099 | | | .250* | | | | .266* | | |
| STHNNESS | .357* | −.394* | | | | | | | | |
| HOSPITAL | | .478* | | | | | | | | |
| LIVLONE | | | | | | | | | | |
| PCTOLD | | | | | | | | | | |
| RGUNMAG | | .125* | | .017 | | .118* | | .037 | | −.033 |
| HUNTERS | | .203* | | .113 | | .039 | | .063 | | .128 |

[a] Standardized coefficients.
[b] Latent construct with indicators: PCTGNAST, PCTGNROB, PGS7982, GUNSTOL.
[c] Latent construct with indicators: PGH7982, PCTGNROB, PGS7982, GUNSTOL.
[d] Latent construct with indicators: PGH7982, PCTGNAST, PGS7982, GUNSTOL.
[e] Latent construct with indicators: PGH7982, PCTGNAST, PCTGNROB, GUNSTOL.
[f] Latent construct with indicators: PGH7982, PCTGNAST, PCTGNROB, PGS7982, GUNSTOL.
*$p < .05$.

---

Table 5.15. Effects of Gun Ownership on Violence Rates[a]

| | LNMR | Gun Ownership[b] | LNGUNMR | Gun Ownership | LNNGMR | Gun Ownership |
|---|---|---|---|---|---|---|
| LNMR | | .226* | | | | |
| LNGUNMR | | | | .164* | | |
| LNNGMR | | | | | | .232* |
| Gun ownership | −.604* | | −.121 | | −.673* | |
| PSI | .256 | .076 | .239 | .088 | .310 | .117 |
| PSI (2, 1) | | .054 | | −.004 | | −.046 |
| df | | 104 | | 104 | | 104 |
| $x^2$ | | 244.30 | | 227.07 | | 224.43 |
| GOF | | .939 | | .940 | | .941 |

| | LNASLT | Gun Ownership[c] | LNGNASLT | Gun Ownership | LNNGASLT | Gun Ownership |
|---|---|---|---|---|---|---|
| LNASLT | | .073 | | | | |
| LNGNASLT | | | | .048 | | |
| LNNGASLT | | | | | | .088 |
| Gun ownership | −.085 | | .604* | | −.401 | |
| PSI | .492 | .272 | .423 | .239 | .524 | .281 |
| df | | 102 | | 102 | | 102 |
| $x^2$ | | 227.65 | | 249.50 | | 226.70 |
| GOF | | .939 | | .934 | | .938 |

| | LNROB | Gun Ownership[d] | LNGNROB | Gun Ownership | LNNGROBR | Gun Ownership |
|---|---|---|---|---|---|---|
| LNROB | | −.051 | | | | |
| LNGNROB | | | | −.099 | | |
| LNNGROBR | | | | | | −.013 |
| Gun ownership | .006 | | .535* | | −.308* | |
| PSI | .147 | .172 | .193 | .174 | .157 | .147 |
| df | | 120 | | 120 | | 120 |
| $x^2$ | | 273.31 | | 286.89 | | 273.10 |
| GOF | | .937 | | .934 | | .937 |

(continued)

Table 5.15. (Continued)

| | LNRAPE | Gun Ownership[c] | LNBURG | Gun Ownership[e] |
|---|---|---|---|---|
| LNRAPE | | .809* | | −.114 |
| LNBURG | | | | |
| Gun ownership | .586 | | .267* | |
| PSI | .527 | .494 | .319 | .375 |
| PSI (2, 1) | | | | |
| df | | 139 | 133 | |
| $x^2$ | | 356.83 | 287.01 | |
| GOF | | .909 | .919 | |

Summary of Effects of Gun Ownership on Total Violence Rates

| | Murder | Assault | Model Robbery | Rape | Burglary |
|---|---|---|---|---|---|
| Significant positive effect of gun ownership on crime rates? | No | No | No | No | (Yes)—see text |

[a] Coefficients for control variables were reported in Table 5.14. Gun law dummies were also included in these models but their estimated coefficients are not reported until Chapter 10.

[b] Latent construct with indicators: PCTGNAST, PCTGNROB, PGS7982, GUNSTOL.

[c] Latent construct with indicators: PGH7982, PCTGNROB, PGS7982, GUNSTOL.

[d] Latent construct with indicators: PGH7982, PCTGNAST, PGS7982, GUNSTOL.

[e] Latent construct with indicators: PGH7982, PCTGNAST, PCTGNROB, PGS7982, GUNSTOL.

*$p < .05$.

CHAPTER

# 6

# Guns and Suicide

Suicide reduction has not traditionally been regarded as a major object of legal control, although many psychiatrists and public health specialists have argued that it should be (e.g., Browning 1974; Seiden 1977). Although some suicide scholars have proposed gun control measures as an indirect method of controlling suicide through law (e.g., Boyd 1983; Markush and Bartolucci 1984), general studies of gun control usually give only the most cursory attention to suicide (e.g., Cook 1982).[1] Arguments in favor of strict gun control typically place far more stress on anticipated reductions in homicide than on suicide, despite the fact that, in recent years, guns have been involved in more suicides than homicides. For example, in 1985 there was 17,369 gun suicides (representing 55% of all gun deaths) and only 11,621 gun homicides (Table 2.8).

In the United States, guns are by far the most common method for committing suicide, accounting for 57% of U.S. suicides in 1985, compared to only 14% for the next most popular method, hanging (U.S. Bureau of the Census 1989, p. 84). To assess the potential for controlling suicide through gun control it is necessary to first gain some understanding of this extraordinary predominance of gun use among suicide methods. As will become clear, none of the obvious explanations suffices.

## Why Do Suicides Use Guns?

When people contemplate suicide, what characteristics of the possible methods influence their choice?[2] Simple availability of the necessary tools of a given method is an obvious logical prerequisite. One must have access to drugs to commit a drug suicide, access to a high place to commit suicide by jumping, and access to a gun to commit a gun suicide. However, the prevalence of gun use in suicide relative to other

# EXHIBIT 7

1

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION
CASE NO. 10-CV-4184
Judge Edmond E. Chang

ILLINOIS ASSOCIATION OF
FIREARMS RETAILERS, KENNETH
PACHOLSKI, KATHRYN TYLER, and
MICHAEL HALL,
          Plaintiffs,
vs.                                    Volume 1
                                       Page 1 - 327
THE CITY OF CHICAGO and
RICHARD M. DALEY, Mayor of the
City of Chicago,
          Defendants.
_____


VIDEOTAPED
DEPOSITION OF:          GARY KLECK


TAKEN AT INSTANCE OF:   The Defendants


DATE:                   October 28, 2011


TIME:                   Commenced at  9:03 a.m.
                        Concluded at 12:11 a.m.


LOCATION:               200 North Monroe Street
                        Tallahassee, Florida


REPORTED BY:            L. DANIELLE FREEZE
                        Certified Realtime Reporter
                        Lfreeze37@comcast.net

ACCURATE STENOTYPE REPORTERS, INC.
2894 REMINGTON GREEN LANE
TALLAHASSEE, FL  32308   850.878.2221
asreporters@nettally.com



Toll Free: 800.708.8087
Facsimile: 312.704.4950

Suite 1200
311 West Monroe Street
Chicago, IL 60606
www.esquiresolutions.com

Gary Kleck                                      October 28, 2011

9

1          probably won't use more than half of that anyway.

2                  MR. WOODS:  That's right.

3                  MR. COOPER:  But -- but anyway, I just want

4          to make sure we're on the same page on that score.

5                  MR. WOODS:  Yeah.  Well, if the witness gives

6          only yes or no answers, I'm sure we can be out of

7          here even more quickly.

8                  MR. COOPER:  As he's been admonished.

9                  MR. WOODS:  So we're happy with that.  Yeah.

10    BY MR. WOODS:

11         Q     Did you do anything, Doctor, to prepare for the

12    deposition today?

13         A     Yes, I reviewed my report, rebuttal report.

14         Q     Anything else?

15         A     I spoke with Chuck.

16         Q     Okay.  And what was the nature of your

17    discussions with Chuck?

18                 MR. COOPER:  I would like to object.  I

19         recall, I guess, that we had a stipulation that

20         that -- that -- in which we agreed that

21         conversations between the expert witness and

22         counsel would not be inquired into.

23                 MR. WOODS:  Okay.

24                 MR. COOPER:  Is that right?

25                 MR. WOODS:  I know we have an agreement as to



ESQUIRE
an Alexander Gallo Company

Toll Free: 800.708.8087
Facsimile: 312.704.4950

Suite 1200
311 West Monroe Street
Chicago, IL 60606
www.esquiresolutions.com

Gary Kleck                                        October 28, 2011

                                                              10

1       draft reports.  I wasn't aware that we had an

2       agreement about conversation with counsel.

3            MR. COOPER:  I think it does cover

4       conversations and communications between counsel

5       and the expert.

6            MR. WOODS:  Okay.  Is there anything in

7       writing to this regard --

8            MR. COOPER:  It's --

9            MR. WOODS:  -- as you're aware of?

10           MR. COOPER:  Yeah, it's in the stipulation.

11           MR. WOODS:  All right.  Well, why don't we --

12      I'll reserve asking those questions, and we'll

13      take a look at the stipulation.  I just want to

14      make sure.  And I understand.  I'm certainly not

15      trying to violate a stipulation.

16           MR. COOPER:  Of course not.  May -- may I --

17      I have the stipulation here.  I've just called it

18      up.

19           MR. WOODS:  Okay.  Sure.

20           MR. COOPER:  If it would be helpful.

21           MR. WOODS:  Sure.

22           MR. COOPER:  It stipulates that discovery of

23      witnesses disclosed pursuant to Federal Rule of

24      Civil Procedure 26(a)(2)(a), blah, blah, blah,

25      one, for communications taking place after the



ESQUIRE
an Alexander Gallo Company

Toll Free: 800.708.8087
Facsimile: 312.704.4950

Suite 1200
311 West Monroe Street
Chicago, IL 60606
www.esquiresolutions.com

11

1       date of the filing of this lawsuit, no party is

2       entitled to discover the contents of

3       communications that involve counsel for any party

4       and any witness disclosed pursuant to Rule

5       26(a)(2)(a) as a witness that may present evidence

6       pursuant to Rule of Evidence 702, '03 and '05.

7       And it goes on but...

8              MR. WOODS:  Okay.

9              MR. COOPER:  It's --

10             MR. WOODS:  Yeah.  And the reason why I

11      thought those were fair game is I had a

12      conversation with David Thompson outside of our

13      experts, and he specifically asked me whether

14      conversations with experts were off limits or not.

15      And I said I assumed they were on limits, but I

16      did not have the stipulation in front of me.

17             MR. COOPER:  Okay.  And well, I -- my

18      conversation with David and, obviously, I wasn't

19      -- I wasn't involved in that, but there -- there

20      may have been a miscommunication there because he,

21      to my knowledge, is -- is on the same page as I am

22      here on this.

23  BY MR. WOODS:

24      Q    Did you make any notes in preparation for your

25  deposition today?



ESQUIRE
an Alexander Gallo Company

Toll Free: 800.708.8087
Facsimile: 312.704.4950

Suite 1200
311 West Monroe Street
Chicago, IL 60606
www.esquiresolutions.com

33

1    very unstable, that simply adding five more years of

2    data altered the conclusion.  So it revealed the fact

3    that there was a very fragile basis for the initial

4    conclusion that more guns lead to more homicide.

5          Q    Your initial study was from '47 to '76.  Is

6    that correct?

7          A    No -- well, in a way.  1947 to 1973 was the

8    period on which most of the results were based.  And then

9    I took a few additional years as a way of testing the

10   adequacy of the statistical model.  And then the later

11   study, 1984 study, extended it up through 1978.  So the

12   findings were based on 1947 through 1978.

13         Q    All right.  And that 1984 study, did you

14   publish that?

15         A    Yes.

16         Q    Where is that published in?

17         A    It was published in an edited collection edited

18   by Don Kates called Armed, I think.

19         Q    Okay.  And when was that published?

20         A    1984.

21         Q    Okay.  Do you personally have any law

22   enforcement experience?

23         A    No.

24         Q    Have you ever inspected a gun dealer or other

25   FFL --



ESQUIRE
an Alexander Gallo Company

Toll Free: 800.708.8087
Facsimile: 312.704.4950

Suite 1200
311 West Monroe Street
Chicago, IL 60606
www.esquiresolutions.com

Gary Kleck                                    October 28, 2011

                                                            34

1        A      No.

2        Q      -- for compliance with federal law?

3        A      No.

4        Q      Have you ever been involved in licensing of a

5    gun dealer?

6        A      No.

7        Q      Have you seen the paperwork that's needed to

8    fill out, to apply for a license?

9        A      Possibly.

10       Q      Have you ever audited an FFL?

11       A      No.

12       Q      And you've never had any experience or

13   involvement with enforcement of federal gun laws, I

14   assume; correct?

15       A      That's correct.

16       Q      Never worked for ATF?

17       A      Yes, that's correct.

18       Q      Yeah.  Okay.  Not even as -- have you ever

19   consulted with ATF before?

20       A      I have never had any formal consulting

21   relationship with ATF.

22       Q      Have you ever conducted any research on behalf

23   of ATF?

24       A      No.

25       Q      Are you a gun owner?



Toll Free: 800.708.8087
Facsimile: 312.704.4950

Suite 1200
311 West Monroe Street
Chicago, IL 60606
www.esquiresolutions.com

ESQUIRE
an Alexander Gallo Company

Gary Kleck                                    October 28, 2011

                                                            35

1        A     Yes.

2        Q     Currently?

3        A     Yes.

4        Q     How long have you owned guns?

5        A     Since the early 1980s.

6        Q     And do you typically carry a weapon on your

7   person?

8        A     No.

9        Q     Now, in Florida, if I'm right, there's a right

10  to carry a concealed carry; is that correct?

11       A     Yes.

12       Q     Do you have a permit for a concealed carry?

13       A     No.

14       Q     Do you need a permit for a concealed carry in

15  Florida?

16       A     Yes.  And -- if you were going to carry on the

17  person.

18       Q     How do you store -- how many weapons do you

19  have?

20       A     Two.

21       Q     Are they both handguns?

22       A     Yes.

23       Q     And how do you store them at home?

24       A     I keep them stored with a trigger lock on each

25  one.



ESQUIRE
an Alexander Gallo Company

Toll Free: 800.708.8087
Facsimile: 312.704.4950

Suite 1200
311 West Monroe Street
Chicago, IL 60606
www.esquiresolutions.com

Gary Kleck                                        October 28, 2011

36

1      Q    Do you have a -- a gun safe in your house?

2      A    No.

3      Q    Do you consider a trigger lock to be a safe

4    method of storing those guns?

5      A    Yes.

6      Q    In your home, do you typically have a gun in --

7    loaded at all times?

8      A    Yes.

9      Q    Do you have a trigger lock on the gun when it

10    is loaded?

11     A    Yes.

12     Q    Why do you do that?

13     A    At this point, there's probably not much

14    rational reason because my kids are out of the house.

15    But at the time I had kids, my primary concern was that

16    the kids not get ahold of a loaded gun.  Now it's a

17    matter of habit, I guess.

18     Q    Have you ever discharged those weapons before?

19     A    Yes.

20     Q    Have you gone through training at all?

21     A    I've never gone through any formal training.

22     Q    Have you ever used your gun in a defensive

23    manner?  Have you ever discharged your gun in a defensive

24    manner before?

25     A    No.



ESQUIRE
an Alexander Gallo Company

Toll Free: 800.708.8087
Facsimile: 312.704.4950

Suite 1200
311 West Monroe Street
Chicago, IL 60606
www.esquiresolutions.com

37

1      Q      Have you ever discharged it accidentally

2  before?

3      A      No.  Well, let me -- let me elaborate on that a

4  little bit.

5             I shouldn't inter -- I shouldn't guess what

6  you mean -- mean by that.  If I were at a target range

7  and I was aiming at a target very carefully and I

8  pulled the trigger a little bit earlier than I intended

9  to and the shot was off, I suppose you could call that

10  an accidental discharge so probably I've --

11      Q      You've done that?

12      A      On many -- on many occasions, I've done that.

13      Q      But you've never discharged the gun when you

14  were -- had no intention of discharging the gun in the

15  immediate time period in which it was discharged?

16      A      That's correct.

17      Q      Have you ever been a victim of a crime?

18      A      Yes.

19      Q      What crime?

20      A      My wife and I were driving in a car in a rural

21  area outside of Tallahassee and what we think was a

22  bullet hit the passenger side window on my wife's side.

23  It was the very start of hunting season, so it could have

24  been an accident except that we were in a depressed road

25  where probably the likeliest trajectory that could have



Toll Free: 800.708.8087
Facsimile: 312.704.4950

Suite 1200
311 West Monroe Street
Chicago, IL 60606
www.esquiresolutions.com

ESQUIRE
an Alexander Gallo Company

Gary Kleck                                          October 28, 2011

79

1      Q      -- Dr. Kleck?

2             When did you meet him?

3      A      I think I might have met him at that meeting in

4   West Virginia.

5      Q      That we spoke about earlier with the ATF?

6      A      Correct.

7      Q      And is that the only time that you recall

8   meeting him?

9      A      That's the only one I recall but...

10     Q      Have you ever attended a conference on fire --

11  of firearm academics at Mr. Vince's request or

12  invitation?

13     A      Well, unless it was that West Virginia one, I'm

14  not sure.  Not that I know of, other than that West

15  Virginia meeting.

16     Q      Do you know if -- if Mr. Vince is a

17  well-respected individual in the area of law enforcement?

18     A      I have no idea.

19     Q      Do you know anything about his professional

20  credentials other than what you've read in Exhibit No. 3?

21     A      No.

22     Q      Have you ever read ATF's youth crime gun

23  interdiction reports?

24     A      Yes.

25     Q      Do you know if Mr. Vince was involved at all in



Toll Free: 800.708.8087
Facsimile: 312.704.4950

Suite 1200
311 West Monroe Street
Chicago, IL 60606
www.esquiresolutions.com

80

1    those publications?

2         A    No.

3         Q    Or involved in that work?

4         A    No.

5         Q    Or -- or do you consider those reliable

6    research pieces on youth crime, guns?

7         A    It's deeply flawed information.

8         Q    Why do you say that?

9         A    It -- it's heavily based on trace data, and the

10   trace data, in turn, concern samples of crime guns that

11   are not representative of crime guns in general that have

12   been basically selected samples.  People have used that

13   report to draw conclusions as if they were representative

14   of crime guns in general.

15        Q    Have you ever used the youth crime gun

16   interdiction reports for any purposes in your research?

17        A    Yes.

18        Q    What have you used them for?

19        A    I used them in a study of gun trafficking, and

20   I took gun trace indicators of trafficking as measures of

21   the possible levels of trafficking in a set of cities,

22   the YCGII cities.

23        Q    So there -- there's at least some valid uses of

24   gun trace data in conducting criminology research;

25   correct?



ESQUIRE
an Alexander Gallo Company

Toll Free: 800.708.8087
Facsimile: 312.704.4950

Suite 1200
311 West Monroe Street
Chicago, IL 60606
www.esquiresolutions.com

81

1      A      Actually, I -- I took a -- a nuanced position

2   on that in -- in the study.  I said:  Here's the results.

3           If you believe the YCGII data are valid, here

4   is what the results say.  They say that gun trafficking

5   is unimportant in supplying guns to criminals and has

6   little impact on crime rates.

7           On the other hand, I also said there's strong

8   reason to doubt that they're valid, in which case they

9   shouldn't have been used either by me or anyone else as

10  reflecting the prevalence of gun trafficking.

11     Q      You thought it was, at least, worthwhile to

12  publish results based on that data with that caveat;

13  correct?

14     A      Yes.

15     Q      And which paper was that?

16     A      (Views document.)

17           That is the one on page 6 of my vita in the

18  appendix to the rebuttal report:  2009, the article

19  with Shun-Yang Wang, The Myth of Big-Time Gun

20  Trafficking published in the UCLA Law Review.

21     Q      Now, the UCLA Law Review is that a

22  peer-reviewed publication?

23     A      No, I don't think law reviews are typically

24  considered typically peer-reviewed.  I -- I can't say

25  that that article was not peer-reviewed because I'm not



Toll Free: 800.708.8087
Facsimile: 312.704.4950

Suite 1200
311 West Monroe Street
Chicago, IL 60606
www.esquiresolutions.com

Gary Kleck                                          October 28, 2011

84

1      Q     That's not scientific either; correct?

2      A     No, not by itself; although, when you

3   accumulate the experiences of many people who have been

4   carefully selected, using probability sampling

5   procedures, then it becomes scientific.

6      Q     But falling short of that, all anecdotal and

7   experiential information is unscientific; correct?

8      A     It's -- it's of limited -- it's of more limited

9   value.  Often what an anecdote account establishes is

10  that such and such a thing can occur because it has

11  occurred.  And so there's some value in that.

12        It's just not -- it doesn't establish that

13  that happens frequently or that's the typical way

14  things happen.  It simply establishes that if you

15  accept the accuracy of the anecdote, it did happen, at

16  least, once, which is not of no significance; it's just

17  not of great significance.

18     Q     All right.  You can't use anecdotal or

19  experiential information to infer causality, for

20  instance; correct?

21     A     That is correct.

22     Q     You need statistical analyses and sampling to

23  do that?

24     A     You would almost always have statistical

25  analysis, but as to sampling, not necessarily.  Sometimes



ESQUIRE
an Alexander Gallo Company

Toll Free: 800.708.8087
Facsimile: 312.704.4950

Suite 1200
311 West Monroe Street
Chicago, IL 60606
www.esquiresolutions.com

85

1    people will study full populations, so there is no

2    sample.

3        Q    Okay.  But you -- in order to test causality,

4    you need some measure of statistical analysis to do so;

5    correct?

6        A    If you don't have random assignment methods

7    combined with a very large sample size.  In a way, if you

8    had those advantages, it renders the need for statistical

9    controls unnecessary.

10       Q    Okay.  Let's go to page 2 of the report

11   under -- where you're talking about Mr. Vince's education

12   and experience.

13            Is it your opinion that Mr. Vince's

14   experience in law enforcement actually has no relevance

15   at all to the factual issues in this case?

16       A    I'm not aware of any relevance.

17       Q    So none of the issues in this litigation relate

18   to anything having to do with law enforcement?

19       A    I'm not aware of any expertise that -- or

20   experience that Mr. Vince has that bears on the

21   enforcement of Chicago gun laws.

22       Q    You understand that he does have experience

23   at -- at the ATF; correct?

24       A    Yes.

25       Q    And so I assume you would agree he has more



Toll Free: 800.708.8087
Facsimile: 312.704.4950

Suite 1200
311 West Monroe Street
Chicago, IL 60606
www.esquiresolutions.com

86

1    experience and knowledge about the operation of ATF than

2    you do; correct?

3        A    Yes.

4        Q    And he would have more information and

5    expertise in the ability of ATF to enforce gun laws than

6    you would; correct?

7        A    Federal gun laws.

8        Q    Yes.

9        A    Yes.

10       Q    Okay.  You mention, then, in the next sentence

11   on page 2 that he has never done any research on the

12   effects of firearms availability on crime, suicide or gun

13   accidents or the impact of gun control laws or firearms

14   storage practice on these forms of violence.

15            You aren't suggesting that Mr. Vince

16   suggested that he had expertise on any of those issues

17   in his report; correct?

18       A    He draws conclusions that don't make any sense

19   unless you're implying some kind of expertise; otherwise,

20   why would your opinions be regarded seriously?

21       Q    Well, Mr. Vince doesn't say that he has that

22   expertise in his report anywhere; correct?

23       A    No.  Does not directly say that.

24       Q    You can't point to me anywhere in his report

25   where he makes the assertion that he's done studies



Toll Free: 800.708.8087
Facsimile: 312.704.4950

Suite 1200
311 West Monroe Street
Chicago, IL 60606
www.esquiresolutions.com

87

1   relating to firearms availability on crime, suicide or --

2   or gun accidents; correct?

3       A    No, he just draws conclusions that don't make

4   any sense unless one had a knowledge of those bodies or

5   relevant information.

6       Q    Now, if you look down at the bottom of page 2,

7   the last -- well, the last clause on the -- we'll just go

8   to the last sentence on the bottom of page 2.  You say:

9   Use of the term "epidemic" -- well, actually why don't we

10  just go to the first part of that paragraph so we can do

11  it in context:

12          Mr. Vince asserts that firearms-related

13  violence "is a systemic and epidemic problem in the

14  City of Chicago."  And you go on to say:  He does not

15  explain what he means by "systemic" in this context,

16  and I'm not aware of any relevant commonly understood

17  meaning.

18          Do you not know what the term systemic means?

19      A    In this context, I have no idea what he means.

20      Q    Do you know what the word "systemic" means in

21  any context?

22      A    It could mean a lot of things in different

23  contexts.

24      Q    What could it mean in other contexts?

25      A    Well, for example, if you had a systemic



ESQUIRE
an Alexander Gallo Company

Toll Free: 800.708.8087
Facsimile: 312.704.4950

Suite 1200
311 West Monroe Street
Chicago, IL 60606
www.esquiresolutions.com

Gary Kleck                                    October 28, 2011

103

1      Q     And how does that lead to that conclusion?

2      A     As I recall, it described the carry practices

3   that were required by the Chicago Police Department.

4      Q     So do you know if, given those carry practices,

5   that police officers, in fact, do carry two weapons?

6      A     I don't recall if it said they do.  It said

7   they could --

8      Q     Okay.

9      A     -- or they were permitted to do so.

10     Q     So is it your assumption that just because they

11  could that they do, that many of them do?

12     A     I assume, yes, many of them do, that they take

13  advantage of that.

14     Q     And why do you believe that they take advantage

15  of that?

16     A     Again, I would suspect, but not know from

17  personal knowledge, that they believe that they might be

18  disarmed of one of those weapons; and they'd like to have

19  another weapon available to them.

20     Q     Do you have any basis for believing that

21  Chicago -- many Chicago police officers think that?

22     A     No, other than what I've inferred from the

23  reports I mentioned before, like that review of police

24  use of force and the -- the two FBI reports that

25  concerned...



Toll Free: 800.708.8087
Facsimile: 312.704.4950

Suite 1200
311 West Monroe Street
Chicago, IL 60606
www.esquiresolutions.com

104

1      Q     Does that mean it's your position that when
2   someone is permitted to do something, that they typically
3   do or many people do take advantage of that?
4      A     It would be a combination of being allowed to
5   do that by departmental regulations, plus having a strong
6   motive to do so.
7      Q     But you don't know how many officers actually
8   take advantage of that; correct?
9      A     No, I do not.
10     Q     I assume since you use trigger locks on your
11  gun, that you would agree that they do have a safety
12  benefit?
13     A     Yes.
14     Q     And that's pretty much undisputed?
15     A     No, I -- I'd say almost any assertion you make
16  in the gun area has been disputed by somebody.  It's not
17  disputed by me but...
18     Q     Okay.  So, for instance, Mr. Vince references
19  that confiscated guns are secured with safety locks;
20  right?
21     A     Are you asking did he say that?
22     Q     Something -- he said that guns that are
23  confiscated in crimes are secured with some kind of
24  safety lock or trigger lock to prevent --
25     A     I think he did say something like that, yes.



ESQUIRE
an Alexander Gallo Company

Toll Free: 800.708.8087
Facsimile: 312.704.4950

Suite 1200
311 West Monroe Street
Chicago, IL 60606
www.esquiresolutions.com

Gary Kleck                                    October 28, 2011

105

1        Q     And do you know why that is?

2        A     No, I -- I don't know what the motives of

3   police departments that do that are.  I could guess, but

4   I -- I don't have any documentary evidence on it.

5        Q     I mean, you would -- what -- what would be your

6   guess; it would be for safety purposes, to prevent

7   unauthorized use?

8        A     It -- it -- yes, it provides some assurance

9   against somebody firing the guns who didn't have a -- a

10  key to the lock.  That certainly would be part of it.

11       Q     And is that a similar reason to why retailers

12  put safety locks on guns that they have on display?

13       A     Very likely.

14       Q     And that's because they -- they actually do

15  prevent unauthorized use; correct?

16       A     It's because they make a -- they seem a

17  sensible step to take in order to prevent unauthorized

18  use.

19       Q     Now, do you know -- you're familiar with the

20  organization NSSF?

21       A     Yes.

22       Q     What is that?

23       A     It's a -- it's a foundation advancing the

24  interests of the gun industry, National Shooting Sports

25  Foundation, I think is what that stands for.



ESQUIRE
an Alexander Gallo Company

Toll Free: 800.708.8087
Facsimile: 312.704.4950

Suite 1200
311 West Monroe Street
Chicago, IL 60606
www.esquiresolutions.com

106

1      Q     And Mr. Vince references one of their

2   publications in his report?

3      A     Yes.

4      Q     And you're aware that NSSF recommends actually

5   giving away trigger locks with guns; correct?

6      A     Yes.  I think they did at one time, anyway.

7      Q     Do you know why they do that?

8      A     I think their motive might have been political,

9   basically, you know.

10      Q     Do you think there was a --

11      A     It was a public relations thing.

12      Q     That could be, obviously.  Do you think that

13   one reason they did it is to promote safety in connection

14   with guns?

15      A     That's possible.

16      Q     And that's because they believe that trigger

17   locks actually are effective in securing guns and using

18   them more safely; correct?

19      A     Yes, very likely.

20      Q     I mean, you have no reason to believe that

21   NSF -- SSF would recommend a safety device be used with a

22   gun that actually didn't work for its intended purpose?

23      A     Where the device didn't work?

24      Q     Yeah.

25      A     No, I don't think they would do that.  I think,



Toll Free: 800.708.8087
Facsimile: 312.704.4950

ESQUIRE
an Alexander Gallo Company

Suite 1200
311 West Monroe Street
Chicago, IL 60606
www.esquiresolutions.com

Gary Kleck                                    October 28, 2011

107

1    rather, they would -- they would have many motives for

2    adopting this policy, one of might -- which might be a

3    sincere belief that this was an effective way of

4    preventing unauthorized use of guns.

5              Another motive of which might be good public

6    relations for the gun industry.

7         Q    Right.  Now, on page 4 of the report, if you

8    want to flip back, first bold paragraph, you say:

9    Mr. Vince also cites the opinions of store clerks as to

10   the merits of locking devices sold in their stores.  He

11   shows no awareness of the possibility that store

12   employees might have a vested interest in overstating the

13   virtues of the products they sell; do you see that?

14        A    Yes.

15        Q    And so do you believe that the store clerks'

16   opinions are tainted by their own self-interest in this

17   regard?

18        A    Yes.

19        Q    Okay.  Do you think the gun industry has an

20   interest in portraying gun possession as having a net

21   safety benefit?

22        A    Yes.

23        Q    Do gun manufacturers, retailers, and those

24   portraying or purporting to represent their interests

25   have an interest in suggesting that customers who have a



Toll Free: 800.708.8087
Facsimile: 312.704.4950

Suite 1200
311 West Monroe Street
Chicago, IL 60606
www.esquiresolutions.com

108

1    gun buy a second gun or a third gun?

2        A    Yes.

3        Q    Are you aware of any person or entity in the

4    gun industry who asserts that the use of a trigger lock

5    or other safety mechanism impairs defensive gun use?

6        A    I'm not aware one way or another on that issue.

7        Q    And the same would be true for anyone outside

8    the gun industry?

9        A    Well, actually, could you ask the original

10   question again?

11       Q    Sure.  We'll have her read it back.

12            Two questions ago.

13            (The record was read by the reporter.)

14       A    In that case, the answer to your last question

15   would be yes --

16   BY MR. WOODS:

17       Q    Who --

18       A    -- for persons outside of the gun industry,

19   undoubtedly, there have been many people who have

20   asserted this.

21       Q    And who are -- do you know who they are?

22       A    I wouldn't be able to identify individuals,

23   only it would be a commonplace assertion.

24       Q    Okay.

25       A    Virtually anything that secures the gun,



ESQUIRE
an Alexander Gallo Company

Toll Free: 800.708.8087
Facsimile: 312.704.4950

Suite 1200
311 West Monroe Street
Chicago, IL 60606
www.esquiresolutions.com

Gary Kleck                                          October 28, 2011

109

1     somebody has argued that it impairs its usefulness for

2     self-defense.

3          Q    Are you taking the position that the use of

4     trigger locks does impair the ability to use that gun in

5     self-defense?

6          A    Yes.

7          Q    Do trigger locks deter theft at all?

8          A    We don't know for sure.  It seems reasonable

9     that it does that.  It depends on the extent to which

10    thieves are aware of how hard it is to get a trigger lock

11    off of a gun you've stolen.

12         Q    Is it hard to get a trigger lock off a gun

13    you've stolen?

14         A    Yes, very hard.

15         Q    And how do you know that?

16         A    Just because I'm familiar with the

17    construction.  It's really hard steel.  It's curved.  You

18    can't easily get a hacksaw blade on it.  There's no angle

19    by which you can cut it so as to remove it.

20              So, in fact, I've never even heard of a

21    criminal successfully getting a trigger lock off.

22         Q    That was going to be my next question.

23              Okay.  So just common sense would tell you

24    that a trigger lock would deter theft?

25         A    Probably.  Again, with the qualifier to the



ESQUIRE
an Alexander Gallo Company

Toll Free: 800.708.8087
Facsimile: 312.704.4950

Suite 1200
311 West Monroe Street
Chicago, IL 60606
www.esquiresolutions.com

110

1    extent criminals are aware of that or think about it.

2    The problem being criminals often don't think much into

3    the future, and they often are not very knowledgeable

4    about a wide variety of things so.

5         Q    But even if -- even if the criminals aren't

6    aware of the problem with getting the trigger lock off,

7    the fact that it has a trigger lock on it would prevent

8    the gun from being used in the future if it was stolen in

9    a criminal enterprise or -- or as a crime gun; correct?

10        A    Correct.  Well -- well, let me -- let me

11   qualify it.  I don't know if this is an important

12   qualifier.  Even an inoperable gun can be used in a

13   threat.

14             So if you concealed the fact that there was a

15   trigger lock on it by holding your hand over it, I

16   suppose it could be used in a criminal threat.  And

17   most gun crimes are threats so...

18        Q    How big are the trigger locks that are on the

19   gun?

20        A    Oh, when it's in position, it's probably about

21   2 to 3 inches wide.  Like if you were the crime victim

22   looking at a person holding the gun --

23        Q    That was kind of my question.

24        A    -- it would be about 2 to 3 inches wide.

25        Q    Could you see the trigger lock from 10 feet?



ESQUIRE
an Alexander Gallo Company

Toll Free: 800.708.8087
Facsimile: 312.704.4950

Suite 1200
311 West Monroe Street
Chicago, IL 60606
www.esquiresolutions.com

111

1       A     If the criminal was concealing, was holding his

2    hand in front of it, no, you wouldn't.  So it's small

3    enough that a person who was thinking in those terms

4    could easily conceal it.

5       Q     Are you aware of any study indicating that

6    trigger locks do not prevent accidental or impulsive

7    discharge?

8       A     No, I'm not aware of any study of that sort.

9       Q     Are you aware of any study that demonstrates

10   the use of a trigger lock prevents effective defensive

11   gun use?

12      A     No, I don't think the -- the topic has ever

13   been studied.

14      Q     Now, if you go to page 4 again, in your expert

15   report, the last sentence of the first paragraph on the

16   page there, it says:  In sum, the half paragraph, the

17   carryover paragraph:  In sum, do you see that?

18      A     Yes.

19      Q     In sum, none of the evidence Vince presents

20   contradicts the hypothesis that requiring a gun to be

21   secured by a locking device will sometimes prevent

22   effective defensive gun use.

23            You agree that that's just a hypothesis?

24      A     Well, I wouldn't say just a hypothesis.  It's a

25   highly plausible hypothesis.  Some hypotheses have more



ESQUIRE
an Alexander Gallo Company

Toll Free: 800.708.8087
Facsimile: 312.704.4950

Suite 1200
311 West Monroe Street
Chicago, IL 60606
www.esquiresolutions.com

112

1    plausibility than others.

2            And in this case, I'm relying on the

3    commonsensical notion that you can't have a way of

4    securing a gun that secures unauthorized use, which

5    doesn't also make it harder to have authorized use of

6    the gun.

7            None of the locking devices, none of the

8    devices for securing guns, that I'm aware of, can

9    effectively prevent unauthorized access without, at

10   least, to some degree impairing authorized access.

11        Q    But you would agree that even under the

12   assumption that it does impair authorized access, it

13   impairs unauthorized access a lot more than it impairs

14   authorized access; correct?

15        A    Correct.

16        Q    And that hypothesis has never been tested in

17   any scientific manner; correct?

18        A    No, not that I can think of right now.

19        Q    But you -- you still believe that that

20   conclusion --

21        A    Yes.

22        Q    Yeah, I was not quite done.

23        A    Sorry.

24        Q    You still believe that the conclusion that

25   requiring a gun to be secured by a locking device will



an Alexander Gallo Company

Toll Free: 800.708.8087
Facsimile: 312.704.4950

Suite 1200
311 West Monroe Street
Chicago, IL 60606
www.esquiresolutions.com

113

1    sometimes prevent effective defensive gun use of the gun

2    is a scientifically reliable conclusion, even though

3    there's been no study to substantiate it; is that your

4    opinion?

5        A    No, I didn't say anything about it being

6    scientifically reliable.  I'm relying on common sense

7    here.

8        Q    Okay.  But it hasn't been scientifically

9    established; you just think as a matter of common sense,

10   it makes sense?

11       A    That's correct.

12       Q    Now, in the sentence before that, it says:

13            When a person's pulse rate and blood pressure

14   are elevated and his hands are shaking, this surely

15   affects the person's ability to disengage a locking

16   device.

17            Now, is your basis for that sentence just

18   common sense as well?

19       A    Yes.

20       Q    No study that has established that; correct?

21       A    Correct.

22       Q    Have you ever tried to remove a locking device

23   under those kind of conditions --

24       A    No.

25       Q    -- when your pulse rate was high or blood



ESQUIRE
an Alexander Gallo Company

Toll Free: 800.708.8087
Facsimile: 312.704.4950

Suite 1200
311 West Monroe Street
Chicago, IL 60606
www.esquiresolutions.com

Gary Kleck                                    October 28, 2011

116

1    one, then, yeah, it probably was pretty safe.  But on the

2    other hand, it would have been less useful for the

3    intended purpose of self-defense because it would have

4    taken longer to get to it.

5         Q    All right.  You wouldn't do that in your home,

6    have guns all over the home?

7         A    No, I live in a very safe neighborhood.

8    There's virtually no serious crime.

9         Q    Yeah, why wouldn't you do it?

10        A    Because there's a very little threat.

11        Q    Okay.  Have you ever performed a test to see

12   how quickly you can remove a trigger lock from a gun?

13        A    I believe I have, but I've never written up any

14   report on that.  So I couldn't really recollect what my

15   results were.

16        Q    Do you -- you've reviewed the results of the

17   studies --

18        A    I mean, I've -- let me revise that answer a

19   little bit.

20             I've obviously removed a trigger lock many

21   times, so I have that foundation for judging how long

22   it takes.  But, you know, 99.9 percent of those times I

23   wasn't timing myself on it.

24        Q    Do you have a sense for how long it takes to

25   remove a trigger lock?



ESQUIRE
an Alexander Gallo Company

Toll Free: 800.708.8087
Facsimile: 312.704.4950

Suite 1200
311 West Monroe Street
Chicago, IL 60606
www.esquiresolutions.com

Gary Kleck                                          October 28, 2011

117

1      A      Well, you know, if you're not stressed and, you

2   know, you're under calm conditions, probably under --

3   from the time you already have the key to the time the

4   gun is operable, probably about five seconds.  Again,

5   assuming calm conditions.

6      Q      Right.

7      A      But you also had to retrieve the key and so

8   that's a highly variable element.  It will depend on

9   things like how close to the gun did you keep the key?

10  If you keep it too close, it doesn't have much value in

11  securing it because an unauthorized user might find the

12  key.

13            On the other hand, if you increase safety by

14  putting the key in a remote location, then that's part

15  of the time that it will take to disengage the trigger

16  lock.  You have to retrieve the key, get back to the

17  gun location and then take those five seconds to

18  disengage the trigger lock.

19     Q      And if you have the key on your person, then

20  it's always with you whenever you want to use it to

21  unlock the trigger; right?

22     A      If you did.  I can't imagine a lot of people

23  sleep with a key, for example, but...

24     Q      They might have pockets on their pajamas?

25     A      I suppose.  I suppose.



ESQUIRE
an Alexander Gallo Company

Toll Free: 800.708.8087
Facsimile: 312.704.4950

Suite 1200
311 West Monroe Street
Chicago, IL 60606
www.esquiresolutions.com

                                                            118

 1      Q      You could put the key around -- on a chain
 2   around your check?
 3      A      You might.
 4      Q      If you were very concerned about being able to
 5   get the trigger lock on --
 6      A      You might.
 7      Q      -- off, you could certainly do that; correct?
 8      A      Yeah.
 9      Q      Nothing illegal about doing that for sure?
10      A      To my knowledge, no.
11      Q      Do you -- do you quibble with the results of
12   Mr. Vince's test for the conditions under which he
13   tested?
14      A      Yes.  I more than quibble with it.  I think
15   it's totally unrealistic.  It's irrelevant to the issues
16   at hand.
17      Q      Yeah, now, maybe I should reask the question,
18   which is for the conditions that he tested under, do you
19   disagree with the results that he got?
20      A      Well, I have no opinion on that.  I...
21      Q      Okay.  I mean, the numbers that he -- how long
22   he says it takes to remove the locks, that's not wildly
23   inconsistent with what you just told me; correct?
24      A      No, it's not wildly inconsistent under those
25   conditions.



ESQUIRE
an Alexander Gallo Company

Toll Free: 800.708.8087
Facsimile: 312.704.4950

Suite 1200
311 West Monroe Street
Chicago, IL 60606
www.esquiresolutions.com

Gary Kleck                                    October 28, 2011

119

```
 1       Q     Are you aware of anyone else who has performed
 2    tests to see how fast trigger locks can be removed from
 3    guns other than what you've seen in Mr. Vince's report?
 4       A     I can't recall any specific instances, no.
 5    Very likely they have been done.  It's kind of an obvious
 6    topic, but I can't recall any specific instances and
 7    certainly didn't rely on any in my opinions.
 8       Q     Now, if you go to the bottom of page 3 and it's
 9    carryover to page 4 of your report, Exhibit 1.  It says:
10    A well-lighted sporting goods store does not simulate the
11    conditions of darkness that prevail during many crimes.
12    A couple of questions about that part of the sentence.
13           One is, is it your understanding that
14    Mr. Vince conducted his test in a well-lighted sporting
15    goods store?
16       A     Yes.
17       Q     Do you know -- your second statement there was
18    that:  Conditions of darkness prevail during many crimes?
19       A     Yes.
20       Q     What's your basis for saying that?
21       A     We have data on the times that crimes occur.
22           And, of course, you can infer the lack of
23    sunlight as one source of light from the times.  So
24    lots of crimes are committed at night and, therefore,
25    there's no sunlight.  We can also infer it from the
```



ESQUIRE
an Alexander Gallo Company

Toll Free: 800.708.8087
Facsimile: 312.704.4950

Suite 1200
311 West Monroe Street
Chicago, IL 60606
www.esquiresolutions.com

120

1    fact that lots of crimes are committed while victims

2    are sleeping and people ordinarily would sleep under

3    conditions of darkness.

4         Q     But it could also be light inside the home --

5         A     Might.

6         Q     -- because people have lights in their homes;

7    correct?

8         A     Might be.

9         Q     You would agree with me that darkness could

10   also affect how quickly someone could retrieve a gun from

11   a biometric safe too?

12        A     Yes.

13        Q     And it could also affect how long it takes to

14   retrieve a gun from a hiding place in the home?

15        A     Yes.

16        Q     Do you know of any study that has looked at the

17   effect of darkness on retrieving a gun to use in

18   self-defense?

19        A     No.

20        Q     Can training reduce the physiological

21   impairments from the stress that you mention here, the

22   effects they have on the ability to disengage a locking

23   device?

24        A     I think it could.

25        Q     Do -- have you engaged in any training to try



ESQUIRE
an Alexander Gallo Company

Toll Free: 800.708.8087
Facsimile: 312.704.4950

Suite 1200
311 West Monroe Street
Chicago, IL 60606
www.esquiresolutions.com

121

1    to maximize your ability to remove a trigger lock quickly

2    on your guns?

3         A    No.

4         Q    Is there any reason why you haven't?

5         A    Didn't see the need.

6         Q    You agree that an unauthorized user can't use a

7    trigger-locked gun; correct?

8         A    It's virtually impossible.

9         Q    Unless they have the key on themselves or -- or

10   they know the combination.

11        A    Now, are you -- you're asking about

12   unauthorized users?

13        Q    Yes.

14        A    Okay.  Or unless they went to -- went to

15   extraordinary efforts to remove the lock forcibly.  I

16   mean, I can envision using an acetylene torch, for

17   example, not that I know of any real world instances,

18   but, you know, it's hypothetically possible.

19        Q    You would agree that there's a difference in

20   the amount of training that officers receive, law

21   enforcement officers receive, in firearms handling; is

22   that correct?

23        A    Yes.  Well, difference between them and

24   civilians you're asking about?

25        Q    Yes.



ESQUIRE
an Alexander Gallo Company

Toll Free: 800.708.8087
Facsimile: 312.704.4950

Suite 1200
311 West Monroe Street
Chicago, IL 60606
www.esquiresolutions.com

Gary Kleck                                      October 28, 2011

122

1       A     Yes.

2       Q     Now, back on page 3, you mentioned -- I'll

3   direct you to where it is.

4             This is back on the first paragraph, the

5   second sentence where after you said:  He notes that

6   officers face more danger than average civilians.  Then

7   you go on to say:  But fails to note that civilians are

8   no more able to anticipate attacks and other criminal

9   threats than police officers.

10      A     (Views document.)

11      Q     What's your basis for that statement?

12      A     The basis is that criminal attacks and other

13  criminal threats would be initiated by a person other

14  than the victim, so it would be -- the criminal would

15  determine the time and place of the -- the attack or

16  threat.

17      Q     You're not saying that civilians couldn't

18  anticipate at all attacks; right, or threats?

19      A     No, I'm just saying they wouldn't have any more

20  ability to do that than police officers.

21      Q     And is that just based on your common sense?

22      A     It's based on the fact that what I just

23  described is the same for civilians and police officers,

24  that in both cases, the time and place of the attack or

25  threat is determined by the offender.  And, thus, short



ESQUIRE
an Alexander Gallo Company

Toll Free: 800.708.8087
Facsimile: 312.704.4950

Suite 1200
311 West Monroe Street
Chicago, IL 60606
www.esquiresolutions.com

140

1          that applied to discussions before the deposition

2          started, but I had forgotten what the stipulation

3          actually said, so I'm fine with your

4          understanding.

5               MR. COOPER:  Okay.  Let's proceed on those

6          grounds, then.

7     BY MR. WOODS:

8          Q     All right.  I wanted to go back to one point

9     about the impairment of defensive gun use associated with

10    gun trig -- trigger locks.

11               You would certainly agree with me that there

12    is some scenario where if you're in your home and

13    you're assaulted -- someone assaults you with a gun and

14    wakes you up immediately out of sleep and has a gun to

15    your head, it's not going to matter whether you --

16    your -- the guns you have in your house have trigger

17    locks or not, you aren't going to be able to use them

18    defensively regardless?

19          A     There certainly are some scenarios like that.

20          Q     And then on the other end of the spectrum, if

21    you are in your home and you hear someone breaking and

22    entering your home and but -- but you are on the third

23    floor and you have a gun right next to you, you have

24    plenty of time to disable a trigger lock in order to use

25    that gun to defend yourself.  That's certainly a



Toll Free: 800.708.8087
Facsimile: 312.704.4950

Suite 1200
311 West Monroe Street
Chicago, IL 60606
www.esquiresolutions.com

1    plausible scenario too; correct?

2         A    Yes.

3         Q    And your point is that somewhere between those

4    two time periods where you have a lot of time and when

5    you have zero time, there's going to be a time where the

6    fact that you have a trigger lock will make a difference

7    about whether you could use a gun defensively or not;

8    correct?

9         A    Yes.

10        Q    And you don't know exactly what that time is;

11   right?

12        A    No.

13        Q    And you don't know how often that scenario

14   might occur; correct?

15        A    Correct.

16        Q    And you haven't done anything to try to

17   determine either of those two points; correct?

18        A    No, I have not.

19        Q    And your basis that there exists such a time is

20   just based on common sense; correct?

21        A    Well, I'd call it logic because there has to be

22   intermediate points between having lots of time and

23   having little time.  I mean, that's -- that's logic.

24   It's not exact -- I wouldn't call it common sense.  It's

25   not a matter of common understandings among people.



ESQUIRE
an Alexander Gallo Company

Toll Free: 800.708.8087
Facsimile: 312.704.4950

Suite 1200
311 West Monroe Street
Chicago, IL 60606
www.esquiresolutions.com

142

1   It's -- it's indisputable logic.

2       Q    Okay.  Do you consider carrying a wallet in

3   your pocket to be a burden?

4       A    A minor burden, yes.

5       Q    What about women carrying a purse, is that a

6   major burden?

7       A    A more major burden, yeah.

8       Q    How would carrying a purse compare to carrying

9   a handgun on your person?

10      A    Less of a burden.

11      Q    And what is that based on?

12      A    Well, it's based on the gun having elements

13  that the purse doesn't have, such as the possibility of

14  arousing a shocked reaction among any who would detect

15  it, bystanders, for example.  Also, depending on the size

16  of the purse and the gun, the gun might be heavier.

17      Q    The purse could be heavier too?

18      A    It's possible.  And it's also a matter of the

19  hardness of the object.  I mean, part of the burden would

20  be if you've got something that's very hard and

21  inflexible banging against a part of your body, there's a

22  certain amount of discomfort associated with that.

23      Q    Okay.  I'm going to ask you, if you would, to

24  turn to page 5 of your report.

25      A    (Views document.)



Toll Free: 800.708.8087
Facsimile: 312.704.4950

Suite 1200
311 West Monroe Street
Chicago, IL 60606
www.esquiresolutions.com

Gary Kleck                                          October 28, 2011

143

1      Q    Now, have you ever done anything to study the

2   resources that the ATF has for regulating gun laws or

3   enforcing federal government -- or federal gun laws?

4      A    Only what I've read in the -- the cited reports

5   like the office of Inspector General's report.

6      Q    Any other report other than that that you've

7   reviewed that relates to its resources?

8      A    I think in the past, in the UCLA Law Review

9   article, I probably cited something to the effect that

10  they had ample resources for doing large numbers of

11  inspections.  And I cited data on numbers of inspections

12  versus how many dealers there were to inspect.  So that

13  would be relevant as well.

14     Q    Okay.  Is that part of what you are relying on

15  in connection with your opinions in -- in this matter?

16     A    Yes.

17     Q    Do you know where that data came from?

18     A    Bureau of Alcohol, Tobacco & Firearms reports.

19     Q    Okay.  But you don't know which reports?

20     A    It would be cited in the UCLA Law Review and

21  also in the 1999 St. Louis Law Journal article.

22     Q    Okay.

23     A    So some of them are, like, their annual

24  reports; some of them are online documents that show a

25  number of FFLs, federal firearms licensees.



Toll Free: 800.708.8087
Facsimile: 312.704.4950

Suite 1200
311 West Monroe Street
Chicago, IL 60606
www.esquiresolutions.com

Gary Kleck                                          October 28, 2011

144

1      Q    Okay.  On -- on page 5 of your report, if you

2   look at the second paragraph, where you say -- I guess,

3   this is the second sentence, where you say:  Mr. -- He,

4   Mr. Vince, mischaracterizes the findings of this report?

5      A    (Views document.)

6      Q    Do you see that?

7      A    Yes.

8      Q    Okay.  In what way does he mischaracterize the

9   findings?

10     A    He mischaracterizes them as suggesting that the

11  ATF did not have adequate resources for regulating retail

12  gun dealers.

13     Q    So it's your position that the OIG report does

14  not indicate that ATF had inadequate resources?

15     A     No, my reading of that report is that they were

16  misapplying the resources they had.  More than an overall

17  lack of resources, they were misapplying them at less

18  productive activities.

19     Q    Okay.  Why don't we get a copy of the report.

20          (Exhibit No. 5 was marked for

21          identification.)

22  BY MR. WOODS:

23     Q    Dr. Kleck, the court reporter has handed you

24  what has been marked as Exhibit No. 6 -- no, excuse me,

25  exhibit No. 5; can you identify that, please.



ESQUIRE
an Alexander Gallo Company

Toll Free: 800.708.8087
Facsimile: 312.704.4950

Suite 1200
311 West Monroe Street
Chicago, IL 60606
www.esquiresolutions.com

165

1    unethical.  In other cases, it's ambiguous.  And the

2    critics were sort of reading something into it that isn't

3    there.

4         Q    So there -- there -- I mean, there's certainly

5    some activity that the FFLs were engaging in that could

6    be considered illegal?

7         A    Every once in a while, there are bad dealers do

8    bad things; and undoubtedly these sting operations

9    detected a little bit of that.

10        Q    Do you know how much of that kind of illegal

11   activity exists among FFLs?

12        A    Very little that results in official action in

13   terms of revocation by ATF.

14        Q    Right.  So is the basis for your saying that

15   very little of this activity occurs the fact that ATF

16   rarely revokes licenses or penalizes FFLs?

17        A    That's part of the foundation.  The other

18   foundation would be knowing the other channels by which

19   guns get into criminals' hands and them being documented

20   as very large.

21        Q    Does the fact that there are a lot of drivers

22   in Tallahassee or, let's say, does the fact that the

23   revocation rate of driver's license for drivers in

24   Tallahassee mean -- if it's a low rate, does that mean

25   that most drivers in Tallahassee are good?



Toll Free: 800.708.8087
Facsimile: 312.704.4950

Suite 1200
311 West Monroe Street
Chicago, IL 60606
www.esquiresolutions.com

ESQUIRE
an Alexander Gallo Company

166

```
 1        A    No.
 2        Q    So just because an FFL has not had their
 3   license revoked doesn't necessarily mean that they are
 4   not engaging in illegal activity?
 5        A    Not necessarily.  But the difference is you
 6   would rarely have traffic enforcement efforts focusing on
 7   individual drivers, whereas you often have that with
 8   suspect FFLs.  So you'd have a much higher probability of
 9   detection of their violations.
10        Q    But we have already seen from the OIG report
11   that FFLs that -- that ATF, just to use your assumptions,
12   is not properly using its resources to monitor FFLs;
13   correct?
14        A    Is that my view, that they're not doing that?
15   Is that what you are asking?
16        Q    That was certainly your view of the OIG;
17   correct?
18        A    Yeah, yes.
19        Q    And you disagree with that?
20        A    I have no basis for disagreeing or agreeing.  I
21   have no independent knowledge of that.
22        Q    You haven't studied that?
23        A    No, I haven't independently studied the use of
24   resources by ATF other than the fact that I know how many
25   compliance inspections they do relative to the number of
```



ESQUIRE
an Alexander Gallo Company

Toll Free: 800.708.8087
Facsimile: 312.704.4950

Suite 1200
311 West Monroe Street
Chicago, IL 60606
www.esquiresolutions.com

167

1    FFLs.

2        Q    A crime gun that is stolen from a lawful

3    purchaser from an FFL or a crime gun that was obtained

4    illegally from an FFL, they're not any more or less

5    dangerous than the other; correct?

6        A    The gun itself, no, but depending on who

7    acquired it, obviously, by definition, a person who

8    acquired the gun as a result of theft is a criminal.  So

9    the gun is more likely to be used for some dangerous

10   purpose for that reason.

11       Q    Right.  And I was suggesting that the

12   alternative to that person who acquired the gun from

13   stealing it from someone's home was someone who acquired

14   the gun from illegally obtaining it via an FFL.  They are

15   also a criminal; correct?

16       A    Illegally obtaining it?

17       Q    Yes.

18       A    Well, yeah.  What do you mean by -- you know,

19   like what kind of transaction are you talking about?

20       Q    I'm talking about either stealing it from

21   the -- from the -- straight from the FFL or reaching some

22   agreement with the FFL owner to sell the gun to that

23   person, even though they wouldn't qualify under the

24   federal law to get that gun.

25       A    Yeah, under the theft scenario, again,



Toll Free: 800.708.8087
Facsimile: 312.704.4950

Suite 1200
311 West Monroe Street
Chicago, IL 60606
www.esquiresolutions.com

Gary Kleck                                      October 28, 2011

168

1    definitely, it's more likely that person would use the

2    gun for a dangerous purpose.  I'm not really so sure

3    about the latter reason, the latter scenario.  I wouldn't

4    have a strong opinion on that.

5         Q    Would you agree with me that the number of

6    crime guns in circulation would decrease if the FFL sold

7    less guns?

8         A    In the very, very long run, like, you know,

9    over a century, undoubtedly, because eventually if

10   there's no new flow of guns, which are all channeled

11   through FFLs being put into the gun stock, then

12   eventually the existing guns would wear out or be

13   destroyed or whatever.  And so the number of guns in

14   circulation would eventually go down.

15            In the short run, even in a matter of

16   decades, it probably would be virtually undetectable,

17   any difference.

18        Q    And is that because guns are fairly durable,

19   they last for a long time?

20        A    Yes.

21            THE VIDEOGRAPHER:  Nineteen minutes.

22   BY MR. WOODS:

23        Q    All right.  Why don't we go ahead, now, and

24   shift gears again.  And now we're going to start talking

25   about Dr. Webster, your opinions regarding Dr. Webster.



ESQUIRE
an Alexander Gallo Company

Toll Free: 800.708.8087
Facsimile: 312.704.4950

Suite 1200
311 West Monroe Street
Chicago, IL 60606
www.esquiresolutions.com

169

1       A    (Views document.)

2           MR. WOODS:  Do you have a copy of his report?

3       Why don't we get that out just in case.

4           (Exhibit No. 7 was marked for

5       identification.)

6           MR. COOPER:  Dr. Webster has a great name.

7           THE WITNESS:  Yeah.

8           MR. WOODS:  There you go.

9    BY MR. WOODS:

10      Q    Okay.  Dr. Kleck, I've handed you what has been

11   marked as Exhibit No. 7, I believe, which is the expert

12   report of Dr. Daniel Webster in this case.  I assume

13   you're read that before?

14      A    Yes.

15      Q    Okay.  And I'm just giving you that for

16   reference in case you need to look at it in the course of

17   discussing his opinions.

18           What I'd like you to first do is turn back

19   over to your report on page 6.  And if you'd look under

20   Section V-A - Effects of Guns on Suicide, the second

21   sentence.

22      A    (Views document.)

23      Q    It says:  He explicitly links this discussion

24   with "Chicago's limitation to a single operable firearm

25   in the home," but it should be first noted that none of



ESQUIRE
an Alexander Gallo Company

Toll Free: 800.708.8087
Facsimile: 312.704.4950

Suite 1200
311 West Monroe Street
Chicago, IL 60606
www.esquiresolutions.com

Gary Kleck                                          October 28, 2011

170

```
 1     the studies he cites assessed the effects of having more

 2     than one operable gun versus having just one.

 3             Is that correct?

 4     A      Correct.

 5     Q      Are you familiar with the Cummings study 1997?

 6     A      Yes.

 7     Q      And did that study look at the effect of having

 8     one gun versus multiple guns on various end points?

 9     A      One gun versus multiple guns, yes.  One

10     operable gun versus multiple operable guns, no.

11     Q      Okay.  So your -- your quibble with

12     Mr. Webster's analysis was that his -- his analysis

13     didn't involve -- didn't -- or the Cummings study, at

14     least, didn't state whether the gun was in operable

15     condition versus non-operable conditions --

16     A      I wouldn't charac --

17     Q      -- just how many guns were in the home?

18     A      I wouldn't characterize it as a quibble.  It's

19     a -- it's a substantively important distinction --

20     Q      Now --

21     A      -- since it's what makes that Cummings study

22     finding irrelevant to the Chicago case because the

23     Chicago ordinance pertains only to number of operable

24     guns.

25     Q      Now, is it your position that in order to be
```



ESQUIRE
an Alexander Gallo Company

Toll Free: 800.708.8087
Facsimile: 312.704.4950

Suite 1200
311 West Monroe Street
Chicago, IL 60606
www.esquiresolutions.com

171

1    relevant to the Chicago gun ordinance, the research has

2    to involve precisely the conditions of the Chicago gun

3    ordinance, that being one operable weapon versus the rest

4    in storage, in particular?

5         A    Yes, in order to be strongly relevant, it would

6    certainly have to pertain to number of operable guns.

7         Q    Is there any relevance to studies, such as the

8    Cummings study, to -- can -- can you infer anything from

9    the Cummings study that may be relevant to the Chicago --

10        A    Yes, there's some relevance.

11             It doesn't -- it's not quite on point with

12   respect to the Chicago ordinance because that concerns

13   number of operable guns.  But there's an underlying

14   premise of the Chicago ordinance, which is that the

15   number of guns presumably has an effect, but it's going

16   to be most pronounced with operable guns.

17        Q    And could you make at least an argument that if

18   a gun is not operable, that is, at least, similar in

19   effect to not having the gun at all in the home?

20        A    For some purposes, yes, like for -- for

21   purposes that require quick access, yes.

22        Q    Now, would that be true in terms of suicides?

23        A    Rarely.

24        Q    Well, you're -- you're familiar that -- or

25   you're aware that many suicides are -- are done very



ESQUIRE
an Alexander Gallo Company

Toll Free: 800.708.8087
Facsimile: 312.704.4950

Suite 1200
311 West Monroe Street
Chicago, IL 60606
www.esquiresolutions.com

Gary Kleck                                      October 28, 2011

172

1    impulsively?

2        A    Very impulsively but not impulsively to the

3    extent that we have any reason to believe the impulse to

4    commit suicide lasts under a few minutes; that is, the

5    time it would take to access an inoperable firearm and

6    make it operable.

7        Q    How -- how -- have you studied the literature

8    relating to how impulsive suicide attempts typically are?

9        A    Yes; although, I couldn't cite any specific

10   citation -- sources on that point, because I haven't

11   reviewed that issue since I wrote Point Blank in 1991.

12       Q    You certainly didn't review it in connection

13   with your opinions in this matter?

14       A    No, I did not.

15            THE VIDEOGRAPHER:  Watch your mic.

16            THE WITNESS:  Oh, sorry.  I've just got to

17       get some water.

18            THE VIDEOGRAPHER:  Off the record.

19            (Discussion off the record.)

20            THE VIDEOGRAPHER:  Back on the record at

21       2:03.

22   BY MR. WOODS:

23       Q    Okay.  Dr. Kleck, I want to -- I want to direct

24   your attention to a couple sentences now down in your

25   expert report on page 6 where you say:  Indeed, Webster



ESQUIRE
an Alexander Gallo Company

Toll Free: 800.708.8087
Facsimile: 312.704.4950

Suite 1200
311 West Monroe Street
Chicago, IL 60606
www.esquiresolutions.com

173

1    does not even offer explanation of why multiple guns

2    might raise suicide risks more than a single gun would.

3          Can you think of any reason why multiple

4    guns, having multiple guns in the home might raise

5    suicide risk more than having a single gun?

6          A    (Views document.)

7          Not the sheer number, no.  But it could make

8    a difference as to whether -- the number of secured --

9    secured versus unsecured guns.

10         Q    If there -- if there was more access to guns.

11         So let me give you an example.  If -- if you

12   had the Chicago ordinance where you had one operable

13   weapon and no additional weapons in one scenario and in

14   the other scenario, you had one operable weapon and two

15   additional weapons, but those were secured with trigger

16   locks, I think what you are saying is in that scenario,

17   because those two extra guns wouldn't necessarily be

18   accessible, say, by a family member, teenage son, that

19   there wouldn't be any real distinction why or any

20   reason why a suicide risk would go up because you had

21   more guns in the house if those guns were trigger

22   locked; is that what you are saying?

23         A    That's correct.  I don't think the additional

24   number of secured guns would make any difference to the

25   likelihood of a gun suicide occurring.



ESQUIRE
an Alexander Gallo Company

Toll Free: 800.708.8087
Facsimile: 312.704.4950

Suite 1200
311 West Monroe Street
Chicago, IL 60606
www.esquiresolutions.com

174

1      Q    However, if you had additional unsecured guns,
2    would you agree that it's, at least, plausible that that
3    may increase the risk of suicide due to gun?
4      A    If the additional number is one rather than
5    zero, yes.  If it's two or more versus one, probably no.
6      Q    And why do you say that?
7      A    Because you can only use one gun to commit
8    suicide.  You only need one gun to commit suicide.
9      Q    Does the fact that you have more than one gun
10   make it easier to find a gun that you can use in the home
11   as opposed to if you only had one gun?
12     A    Hypothetically, if finding the gun was
13   relevant, yeah, it's a logical possibility.
14     Q    You would have to actually find the gun before
15   you could use it; right?
16     A    Correct.
17     Q    So if you had three guns in the house, at least
18   it could be easier to locate one of those to commit
19   suicide than if you only had one?
20     A    Hypothetically, yes.
21     Q    That's a possible scenario?
22     A    It's a logical possibility, yeah.
23     Q    And you could test the scenario about whether
24   having multiple guns in the home could lead to a greater
25   risk of suicide over having a fewer number; correct?



ESQUIRE
an Alexander Gallo Company

Toll Free: 800.708.8087
Facsimile: 312.704.4950

Suite 1200
311 West Monroe Street
Chicago, IL 60606
www.esquiresolutions.com

Gary Kleck                                    October 28, 2011

175

1          A     Yes.

2          Q     And that's what -- one of the things that

3    Cummings attempted to do; right?

4          A     Correct.  He did.

5          Q     And in the Cummings study, when he attempted to

6    do that, he found that there was a positive trend for

7    risk of suicide associated between zero, one, and two or

8    two or more guns in the home that was almost

9    statistically significant; correct?

10         A     That's the way he chose to interpret it, as a

11   positive trend.  But the point is, there wasn't any

12   statistical association between having more than one gun

13   versus having just one and suicide risk.

14         Q     Well, there was a statistical analysis that was

15   done on the trend; correct?

16         A     Yes.

17         Q     And that statistical analysis showed a P value

18   of about .06?

19         A     Yep.

20         Q     Correct?  And that's plenty close to

21   statistical significance; correct?

22         A     Yeah, it's pretty close, but to a 5 percent

23   significance level, sure.

24         Q     Right.  It's pretty close to a 5 percent

25   significance level.



ESQUIRE
an Alexander Gallo Company

Toll Free: 800.708.8087
Facsimile: 312.704.4950

Suite 1200
311 West Monroe Street
Chicago, IL 60606
www.esquiresolutions.com

176

1        A     Uh-huh.

2        Q     In fact, it's only one in 100 times less likely

3    or more likely due to chance than a 5 percent

4    significance level?

5        A     Correct.

6        Q     Now, is it -- is it your assertion that

7    firearms purchases are not a good proxy for firearms

8    ownership?

9        A     Yes, it's not a good proxy.

10       Q     And why is that?

11       A     Partly because you can acquire guns in ways

12   other than purchasing, partly because gun status is

13   something that changes over the life course.  You could

14   have purchased it and no longer have it later on.

15       Q     Let's talk about the latter.

16             Do you have any evidence or studies that

17   indicate how long people typically keep guns?

18       A     Yes.  Some of the data from the NSPOF survey

19   bears on that issue.

20             Some of these other surveys that I cited in

21   connection with defensive venues asked the question:

22   How long have you had the -- the gun?  And I've also

23   recently done a study that I didn't rely on for this

24   particular report, which was a panel study where we had

25   observations of gun ownership at different points in



ESQUIRE
an Alexander Gallo Company

Toll Free: 800.708.8087
Facsimile: 312.704.4950

Suite 1200
311 West Monroe Street
Chicago, IL 60606
www.esquiresolutions.com

177

1    time.  And they were only separated by about, I think,

2    a year or so, fairly brief period of time.  And a fair

3    number of people who owned guns at the first point in

4    time didn't have them at the second point in time.

5         Q    Do you know what a fair number of people are --

6    is?

7         A    Oh, it could have been like in the ballpark of

8    10 percent, 15 percent, something like that.  So gun

9    ownership was kind of unstable among this sample.  It was

10   an Illinois sample.

11        Q    And this was a panel survey that you did?

12        A    Yes.

13        Q    And is this in a published paper?

14        A    No -- well, I stand corrected.  It's in -- it's

15   in press.

16        Q    Okay.

17        A    And it's published online, but it has not come

18   out in its print version yet.

19        Q    And what is the journal that it's being

20   published in?

21        A    I think that one is in -- let me see.

22             (Views document.)

23             No, I can't tell you because my vita only

24   lists published stuff, so I'd have to consult my

25   computer in order to know that.



ESQUIRE
an Alexander Gallo Company

Toll Free: 800.708.8087
Facsimile: 312.704.4950

Suite 1200
311 West Monroe Street
Chicago, IL 60606
www.esquiresolutions.com

178

1      Q     Do you know when it was published online?

2      A     No.

3      Q     Do you know what the title is?

4      A     Probably couldn't even tell you the exact title

5    either.  It's something about -- I think the title starts

6    out:  Is fear and gun ownership a one-way street,

7    something like that was the title.

8      Q     And who were the authors, you and who else?

9      A     Will Hauser is the coauthor.

10     Q     Okay.  And is that -- that's not a study that

11   you've relied on in connection with your report in this

12   case?

13     A     No, it is not.

14           MR. WOODS:  Can you get me the Cummings

15     paper?

16   BY MR. WOODS:

17     Q     Now, is one of your criticisms about the

18   Cummings paper that they used firearms purchases as a

19   proxy for gun ownership?

20     A     I'm not sure if I explicitly mentioned that in

21   any written critique, but that certainly would be a valid

22   criticism.

23     Q     Is that one of your opinions that you intend to

24   offer in this case?

25     A     I don't recall making any reference to that



Toll Free: 800.708.8087
Facsimile: 312.704.4950

Suite 1200
311 West Monroe Street
Chicago, IL 60606
www.esquiresolutions.com

Gary Kleck                                           October 28, 2011

1    issue in -- or, I mean, in connection with Cummings.

2        Q    Okay.  I mean, my -- I guess my question was a

3    little broader; is that something you intend to -- to --

4    is that a basis that you intend to criticize the Cummings

5    study in this case?

6        A    At this point, no.

7        Q    Okay.

8        A    I mean, I'm just pointing out it's another flaw

9    you could validly point to.

10       Q    Right.  I understand.  Let me go ahead and mark

11   it.

12            (Exhibit No. 8 was marked for

13            identification.)

14   BY MR. WOODS:

15       Q    Dr. Kleck, I've handed you what's been marked

16   as Exhibit No. 8, which is a published study by Cummings,

17   et al. in the American Journal of Public Health,

18   June 1997.

19       A    (Views document.)

20       Q    And I think you mentioned to me earlier that

21   American Journal of Public Health was the -- one of the

22   premier journals in the area of public health; is that

23   correct?

24       A    I think the term I used was "prestigious,"

25   emphasizing the subjective nature of prestigious.



Toll Free: 800.708.8087
Facsimile: 312.704.4950

Suite 1200
311 West Monroe Street
Chicago, IL 60606
www.esquiresolutions.com

ESQUIRE
an Alexander Gallo Company

180

1        Q    Okay.  If you'll turn over to table No. 2.

2        A    (Views document.)

3             Okay.

4        Q    And table No. 2, the title of this is Handgun

5    Purchase History and Relative Risk Estimates for Matched

6    Suicides and Controlled Subjects; do you see that?

7        A    Yes.

8        Q    It goes down to number of family purchases and

9    it lists one, two, and greater than three?

10       A    Uh-huh.

11       Q    And then over on the right, it gives a P value

12   and that's for the whole trend; correct?

13       A    Correct.

14       Q    So according to these authors, the P value for

15   the trend was .06?

16       A    That is correct.

17       Q    Now, if they would have done a one-tailed

18   P value, would -- what would the P value have been or

19   maybe I should ask you first, was that one-tailed or

20   two-tailed?

21       A    I don't know.  You -- you can't tell just from

22   looking at the numbers.  Let me see if there's anything

23   in the footnotes.

24            (Views document.)

25            Yeah, there's -- there's nothing that jumps



ESQUIRE
an Alexander Gallo Company

Toll Free: 800.708.8087
Facsimile: 312.704.4950

Suite 1200
311 West Monroe Street
Chicago, IL 60606
www.esquiresolutions.com

Gary Kleck                                    October 28, 2011

181

1   out at me that indicates whether it was one-tailed or

2   two-tailed.  But you really don't need that information

3   anyway because just from the confidence intervals

4   themselves, you can tell they're not significantly

5   different because they overlap.

6           Basically there's no significant difference

7   in the risk of suicide dependent on the number of gun

8   -- of family purchases of guns.

9       Q   So if they overlap at all, it's your testimony

10  that there's -- that means there's no statistical

11  significance between them?

12      A   It means there's a substantial probability that

13  the result was -- the difference was attributable to

14  chance.

15      Q   Don't you have to have a certain amount of

16  overlap before it can destroy statistical significance to

17  the .05 level?

18      A   Well, any amount of overlap, but the more

19  overlap you have, the less confidence you have that it's,

20  you know, a real difference rather than a product of

21  chance.

22      Q   Okay.

23      A   Okay.  And, in this case, there's substantial

24  overlap.  So there's substantial reason to believe that

25  it's not a statistically significant difference and could



ESQUIRE
an Alexander Gallo Company

Toll Free: 800.708.8087
Facsimile: 312.704.4950

Suite 1200
311 West Monroe Street
Chicago, IL 60606
www.esquiresolutions.com

182

1    well be due to chance factors.

2        Q    However, the test for trend was very close to

3    statistically significant; are you saying that that's

4    wrong?

5        A    I have no way of independently judging whether

6    the statistic was wrongly computed or its associated

7    significance level.

8        Q    Okay.  At the top, if you --

9        A    But I -- I'm relying on their confidence

10   intervals being correct.  That's the basis of my opinion.

11       Q    Okay.  So on page 976, if you look up at the --

12   in the text, first full paragraph at the top, it says:

13   The association between handgun purchase and suicide

14   tended to become stronger as the number of handguns

15   purchased increased.  Test for trend across categories,

16   P equals .06.

17       A    (Views document.)

18       Q    Do you see that?

19       A    I see that.

20       Q    Now, if -- if that would have said P equals

21   .05, you would agree that the trend is statistically

22   significant to the .05 level?

23       A    Well, it's kind of meaningless because the

24   statement he makes is incorrect.  It -- it simply isn't

25   consistent with what the numbers say.  I mean, he says



Toll Free: 800.708.8087
Facsimile: 312.704.4950

Suite 1200
311 West Monroe Street
Chicago, IL 60606
www.esquiresolutions.com

ESQUIRE
an Alexander Gallo Company

Gary Kleck                                    October 28, 2011

183

1    that.  That is a -- you are correct in quoting him, but

2    it's not what the numbers say.

3              MR. WOODS:  Okay.  Why -- well, I think we

4         need to change the tape.

5              THE VIDEOGRAPHER:  Off the record, please.

6              (Brief recess was taken.)

7              THE VIDEOGRAPHER:  We're back on the record

8         with tape No. 5.  The time is 2:26.

9    BY MR. WOODS:

10        Q    Dr. Kleck, any answers that you'd like to

11   change?

12        A    No.

13        Q    I'd like to go back to the Cummings article,

14   '97 article that we were just discussing.  And let me see

15   if I understand what your testimony is.  Is it your

16   testimony that if have you -- in this case, we have

17   number of family purchases one, two, and greater than

18   three.

19              If the confidence intervals associated with

20   any of those -- any of the number of family purchases,

21   one, two, or three overlap with each other, you would

22   not expect the P value for trend to be statistically

23   significant?

24        A    It would be less likely that that would be

25   statistically significant.



Toll Free: 800.708.8087
Facsimile: 312.704.4950

Suite 1200
311 West Monroe Street
Chicago, IL 60606
www.esquiresolutions.com

184

1       Q     Could it ever be statistically significant if

2    you had overlap?

3       A     It's possible if you had overlap between --

4    let's say, a small amount of overlap between some of the

5    categories and not others, then the overall trend could

6    be statistically significant.

7       Q     So, in this case, just so I understand, and

8    can put on the record what we mean by overlap, if you

9    look at number of family purchases for one gun, the

10   95 percent confidence interval spans between 1.1 and 2.2;

11   right?

12      A     Correct.

13      Q     And that's actually statistically significant

14   increase in its own right; correct?

15      A     If --

16      Q     Compared to what?  Compared to a --

17      A     Yeah, yeah, it's barely --

18      Q     It's just --

19      A     It's barely significantly different from one,

20   correct.

21      Q     So the P value for that would be less than .05

22   --

23      A     Correct.

24      Q     -- on its own.  Then if you look at the number

25   of purchases for two guns, you see a 95 percent



Toll Free: 800.708.8087
Facsimile: 312.704.4950

Suite 1200
311 West Monroe Street
Chicago, IL 60606
www.esquiresolutions.com

                                                              185

1     confidence interval between 1 and 3.4.

2          A    So that's right on the edge of being

3     significant.

4          Q    In and of itself; right?

5          A    Correct.

6          Q    But it does overlap with the confidence

7     interval for purchasing one gun; right?

8          A    Yes, it --

9          Q    That would --

10         A    -- substantially overlaps it.

11         Q    Right.  It goes up to 3.4 but it goes down to

12    one, which overlaps the number of purchasers -- overlaps

13    the 95 percent confidence interval for one family

14    purchase.

15         A    Yes, there could scarcely be more overlap

16    because the interval for one is entirely within the

17    interval for two so --

18         Q    Well, there's some interval --

19         A    -- there's total overlap.

20         Q    Yeah, there's some interval for two that

21    doesn't overlap, though.  It goes all the way up to --

22         A    That much is correct.  But all of one's

23    interval is within two's interval.

24         Q    Now, and then the third, the number of family

25    purchases greater than three, the 95 percent confidence



ESQUIRE
an Alexander Gallo Company

Toll Free: 800.708.8087
Facsimile: 312.704.4950

Suite 1200
311 West Monroe Street
Chicago, IL 60606
www.esquiresolutions.com

1    interval span between 1.7 and 4.4, and that overlaps the

2    confidence intervals from one and two?

3        A    Yes, it substantially overlaps both of those.

4             MR. COOPER:  May I ask a point of

5        clarification, Counsel?  I think you've been

6        saying for that last category greater than three.

7             MR. WOODS:  I should say greater than or

8        equal to.

9             MR. COOPER:  Or equal to.

10            MR. WOODS:  Yes.

11            MR. COOPER:  I just want to make sure that --

12            MR. WOODS:  That's clear on the record.

13            MR. COOPER:  Okay, thanks.

14            MR. WOODS:  No problem.

15   BY MR. WOODS:

16       Q    And yet even though there's overlap between

17   these three categories, the P value they report is .06;

18   right?

19       A    That is the one they report, yes.

20       Q    And are you claiming that that's incorrect?

21       A    I have no idea whether it's correct or not.

22       Q    I mean, this is published in one of the most

23   prestigious journals, as you've indicated in public

24   health; correct?

25       A    Yes, but that really means nothing with regard



Toll Free: 800.708.8087
Facsimile: 312.704.4950

Suite 1200
311 West Monroe Street
Chicago, IL 60606
www.esquiresolutions.com

Gary Kleck                                      October 28, 2011

187

1     to the issue of whether this particular paper was

2     carefully reviewed.  The problem is public health

3     journals don't have a lot of expert reviewers to draw on

4     that are expert in this area.  So I think --

5          Q    You mean expert in statistics?

6          A    No, expert in what statistics would be relevant

7     to this substantive topic, in this case, handgun

8     ownership and suicide.  And so they wouldn't be familiar

9     with the critical issues and, therefore, wouldn't be

10    familiar with the appropriate statistical tests.

11          But, in any case, they would not be doing

12    recomputations of people's statistics.  That would

13    require access to the original data set, and that would

14    virtually never happen as a part of a routine journal

15    review.

16          Q    Do you know if they did any recalculation of

17    these statistics at all?

18          A    No, I do not know one way or another.

19          Q    So that's just speculation on your part that

20    they wouldn't do that?

21          A    No, that's not speculation.  It's common

22    practice.  It would be extraordinarily difficult and time

23    consuming for journals to routinely do that.  So I can

24    say with great confidence that journals do not routinely

25    reanalyze data for articles submitted to them.



ESQUIRE
an Alexander Gallo Company

Toll Free: 800.708.8087
Facsimile: 312.704.4950

Suite 1200
311 West Monroe Street
Chicago, IL 60606
www.esquiresolutions.com

                                                                188

1          Q    Well, you questioned that value of .06.

2          A    No, I said I didn't know one way or another

3    whether it was accurate.

4          Q    Okay.  We can put that exhibit aside.

5               And I want to return you to page 7 of your

6    report or actually ask you to turn over to page 7.

7          A    (Views document.)

8          Q    And you state that -- let me see if I can find

9    the sentence in here.  I'm going to direct you to the

10   last sentence of the first half paragraph there before at

11   least the indent, where it says:  In fact, as the review

12   summarized in my Table 1 shows, at least six out of 16

13   published case-control studies of suicides found no

14   significant association between gun ownership and

15   suicide; do you see that?

16         A    Yes.

17         Q    So ten case control studies did find a

18   significant association between gun ownership and

19   suicide?

20         A    Yes.

21         Q    And of the six -- and you list the six here on

22   this page that did not find a statistical significant

23   increased association between gun ownership and suicide;

24   right?

25         A    Yes.



Toll Free: 800.708.8087
Facsimile: 312.704.4950

Suite 1200
311 West Monroe Street
Chicago, IL 60606
www.esquiresolutions.com

ESQUIRE
an Alexander Gallo Company

190

1        A     But we don't know afterwards.

2        Q     We just know it was greater than .025?

3        A     We just know it was nonsignificant, and we know

4    nothing about the direction of the association.  In

5    Buckstein, et al. 1993, well, again, the same problem, it

6    was just reported as not significant; and we don't know

7    the direction of the association.

8        Q     Well, let me stop you right there.

9              For handguns, doesn't it actually show that

10   it is highly significant, the Buckstein article?

11       A     Right, contrasting just handgun ownership

12   versus not handgun ownership.

13       Q     Okay.  They're not -- they're not contrasting

14   handgun ownership to no gun ownership?

15       A     I think it was handgun, not handgun.  My

16   recollection is not perfect about that one, but I think

17   that's what they were contrasting.

18       Q     And was any guns, regardless of the guns,

19   versus no guns?

20       A     Yes, they did do that comparison, and that's

21   the one where we don't know the direction of the

22   association.  We only know that it was not significant.

23       Q     Okay.

24       A     And then for Brent, et al. 1994, it is same

25   issue.  It's exactly the same, nonsignificant but no



ESQUIRE
an Alexander Gallo Company

Toll Free: 800.708.8087
Facsimile: 312.704.4950

Suite 1200
311 West Monroe Street
Chicago, IL 60606
www.esquiresolutions.com

191

1    direction known.  For Beautrais, et al. 1996, well, for

2    the males, it was exactly zero association.  The adjusted

3    odds ratio was one.

4         Q    Right.

5         A    And it was -- without the adjustment, it was a

6    little under one; although, again, neither of these are

7    statistically significant.

8         Q    Okay.

9         A    And then I don't have any other recorded for

10   the full sample for the adjusted odds ratio so it

11   couldn't address that question.

12        Q    The crude odds ratio is positive, but we -- we

13   don't know if they controlled or not or reported an

14   adjusted odds ratio for the whole sample.

15        A    Well, we know they didn't for that odds ratio.

16   They didn't control for anything.  So it's not a very

17   meaningful measure of risk.

18        Q    Well, it depends on if the controls had a

19   confounding effect or if there were confounding effects

20   by those variables?

21        A    Right.  But I don't know of anybody who

22   disputes the question that there are confounders in this

23   area.

24        Q    Okay.

25        A    And then for the last one, Conwell 2002,



Toll Free: 800.708.8087
Facsimile: 312.704.4950

Suite 1200
311 West Monroe Street
Chicago, IL 60606
www.esquiresolutions.com

192

1    basically for females, the association is zero.  It's

2    essentially nothing.  And then it's 1.02 odds ratio.  And

3    then for males, it's positive significant association.

4    But I was referring to the female --

5         Q    Okay.

6         A    -- sample in that statement No. 6.

7         Q    So actually Conwell did show a statistically

8    significant increased risk associated with gun ownership

9    for males; right?

10        A    Right.  But it's one that really doesn't make

11   sense if it's interpreted as a causal effect of gun

12   ownership because there's no reason why females would be

13   impervious to the effect of guns.

14            They might have a lower level of gun

15   ownership; but given gun ownership, the effect should

16   be the same.  So it suggests you are really seeing the

17   effect of a confounder that's correlated with gun

18   ownership.

19        Q    Well, couldn't it just be that because there

20   are less females that have guns that you just don't have

21   enough power to see the effect with respect to females,

22   but you can see with respect to males?

23        A    It -- it might have an effect on the power, but

24   it's not going to affect the size of -- the size of the

25   association.  And that's what I'm contrasting here, the



Toll Free: 800.708.8087
Facsimile: 312.704.4950

Suite 1200
311 West Monroe Street
Chicago, IL 60606
www.esquiresolutions.com

Gary Kleck                                    October 28, 2011

193

1    fact that there's an association for males and not for

2    females.

3         Q    Do you know what the confidence limit or

4    intervals are for the female breakdown?

5         A    Not right now.  I'd have to see the original

6    studies, but I didn't incorporate that into that table.

7         Q    Well, what -- what is the -- the P value is

8    .985?

9         A    (Views document.)

10            Which study are we talking about?

11        Q    We're talking about Conwell for females.

12        A    (Views document.)

13            Okay.  And what was your question again?

14        Q    My question is wasn't the P value .985?

15        A    Yes, for the adjusted odds ratio for females.

16        Q    Yeah.  And does that tell you anything about

17   the width of the confidence interval, the likely width of

18   the confidence interval?

19        A    No, it can't.  The -- the odds ratio itself,

20   the point estimate is virtually identical to no

21   association.

22            So regardless of the width of the confidence

23   interval, that's almost certainly not going to be

24   statistically significant unless you had immense sample

25   sizes.  And if you look over to the end column, the



Toll Free: 800.708.8087
Facsimile: 312.704.4950

Suite 1200
311 West Monroe Street
Chicago, IL 60606
www.esquiresolutions.com

Gary Kleck                                    October 28, 2011

318

1      A    Yes.  For example, arrests for fighting, you

2  know, that's risky activity; traffic violations, drunk

3  driving, clearly risky activities were more common among

4  those involving gun accidents than the rest of the

5  population.

6      Q    Would an infant or child who accidentally shot

7  himself with a gun, would they be characterized as more

8  of a risk-taker?

9      A    If such events had occurred, but they don't

10 occur.  It's a purely -- it's an empty category.

11     Q    You're saying children don't get involved in

12 gun accidents?

13     A    I thought you said infants.  Did I

14 misunderstand that?

15     Q    I said infants or children.

16     A    Infants or children?

17          Yes, probably, if instead of infants you were

18 talking about older children, yes, very likely.

19     Q    What about under four?

20     A    It's just that the ways that risky activity

21 would manifest itself wouldn't be drunk driving,

22 obviously; but it might well be fighting with other kids

23 and so on.

24     Q    Are criminals more likely to own guns than

25 noncriminals?



ESQUIRE
an Alexander Gallo Company

Toll Free: 800.708.8087
Facsimile: 312.704.4950

Suite 1200
311 West Monroe Street
Chicago, IL 60606
www.esquiresolutions.com

319

1       A     A little bit more likely, yeah.

2       Q     So if criminals are more likely to have gun

3   accidents than noncriminals, isn't it true that in

4   general, gun owners are more likely to have gun accidents

5   than non-gun owners with guns?

6       A     Certainly, yes.

7       Q     Yeah, now, in your -- I believe on page 17,

8   you're discussing the Weibe paper, and you suggest that

9   Weibe 2003 should have found greater association for long

10  gun firearm accidents than handgun accidents.

11      A     Yes, I do say that.

12      Q     And that's based on your belief that it's

13  easier to have an accident with a long gun than a

14  handgun?

15      A     Yes.

16      Q     Are there other factors that affect -- well,

17  what -- why is it easier?  Let's start there.

18      A     It's easier to have the accident, an accidental

19  discharge of a long gun because it requires less trigger

20  pressure; and there's less likely to be some kind of a

21  safety controlling the trigger.  But if you're talking

22  specifically about fatal gun accidents, then that's more

23  likely with a long -- and that's, I think, what was

24  involved in the Weibe study, that's what the FGA stands

25  for, fatal gun accidents.



ESQUIRE
an Alexander Gallo Company

Toll Free: 800.708.8087
Facsimile: 312.704.4950

Suite 1200
311 West Monroe Street
Chicago, IL 60606
www.esquiresolutions.com

320

1          It's also more likely with a long gun because

2    long guns are more lethal firearms than handguns, and

3    that's because they fire bullets at higher velocity or

4    in the case of a shotgun, they fire a much larger

5    number of projectiles.

6         Q    Are there relatively more accidents with long

7    guns than short guns in the United States?

8         A    No.

9         Q    There's more accidents with short guns;

10   correct?

11        A    Correct.

12        Q    So doesn't that undermine your principle here?

13        A    No.

14        Q    Why not?

15        A    Well, because the only kind of gun that can

16   result in a fatal gun accident is a loaded one.  And

17   relative to the rate at which they're kept loaded,

18   handguns are less likely to be involved in accidents.

19          But mechanically speaking, if you had a long

20   gun and a handgun load -- both loaded, it would be the

21   long gun that would be easier to accidentally

22   discharge.  It's just that we don't often have long

23   guns loaded except when they are, you know, being used

24   for recreational purposes and so on.  Handguns are much

25   more likely to be kept loaded and thus at risk of a gun



ESQUIRE
an Alexander Gallo Company

Toll Free: 800.708.8087
Facsimile: 312.704.4950

Suite 1200
311 West Monroe Street
Chicago, IL 60606
www.esquiresolutions.com

321

1   accident.

2        Q     Aren't there other factors that affect whether

3   a gun is likely to be involved in an accident other than

4   the ease of trigger pull and the lethality?

5        A     Yes.

6        Q     Like caliber of the gun?

7        A     That would be related to the occurrence of a

8   fatal gun accident, yes.

9        Q     Right.  Fatal gun accident, like the number of

10  rounds discharged?

11       A     Probably not, no.  It's highly unlikely that

12  would have any relevance.

13       Q     The carriage practice, would that affect it,

14  like how you would carry a long gun versus how you would

15  carry a handgun?

16       A     I haven't given that any thought.  I really

17  don't have a position that.

18       Q     Would it be -- would it be easier to drop a

19  handgun than a long gun?

20       A     Again, I really have no opinion on that one way

21  or another.

22       Q     More likely to be a long gun -- or a handgun

23  more likely to be jostled than a short gun?  I'm sorry, a

24  long gun.

25       A     No, I really don't have any basis for answering



ESQUIRE
an Alexander Gallo Company

Toll Free: 800.708.8087
Facsimile: 312.704.4950

Suite 1200
311 West Monroe Street
Chicago, IL 60606
www.esquiresolutions.com

322

1    that either.

2         Q    But you had mentioned that, for instance,

3    storage practices affect this question significantly,

4    fatal gun accidents, because as you said, long guns

5    typically aren't kept loaded, but handguns are kept

6    loaded; and that's why they are involved in so many more

7    accidents?

8         A    They -- they are kept -- they are more likely

9    to be kept loaded than long guns, yes, that's true.  But

10   they are not more likely to be involved in accidents

11   relative to long guns if you control for whether they are

12   kept loaded or not.  They're actually less likely to

13   result in a fatal gun accident, loaded handguns compared

14   to compared to loaded long guns.

15        Q    And guns with trigger locks are much less

16   likely to be involved in accidents than guns without

17   trigger locks; correct?

18        A    Yes, they're virtually not involved in

19   accidents at all if there's trigger lock on them.

20             MR. WOODS:  Can we take a short break?

21             MR. COOPER:  That might be a good idea.

22             THE VIDEOGRAPHER:  Are we off the record?

23             MR. WOODS:  Yes.

24             (Brief recess was taken.)

25             (The proceedings adjourned at 6:09 p.m.)



ESQUIRE
an Alexander Gallo Company

Toll Free: 800.708.8087
Facsimile: 312.704.4950

Suite 1200
311 West Monroe Street
Chicago, IL 60606
www.esquiresolutions.com

Gary Kleck                                        October 28, 2011

323

1                          CERTIFICATE OF OATH

2

3

4

5      STATE OF FLORIDA             )

6      COUNTY OF LEON               )

7

8

9

10

11              I, the undersigned authority, certify that

12     said designated witness personally appeared before me

13     and was duly sworn.

14

15

16              WITNESS my hand and official seal this 10th

17     day of November, 2011.

18

19

20

21     _____

22     LISA D. FREEZE, CRR, NOTARY PUBLIC
       1-800-934-9090
23     850-878-2221

24

25



Toll Free: 800.708.8087
Facsimile: 312.704.4950

Suite 1200
311 West Monroe Street
Chicago, IL 60606
www.esquiresolutions.com

387

1    Q    Oh, you don't know whether or not?

2    A    No, no, you asked me do I know whether or not

3  he addressed them.  And I said yes, I know whether or not

4  he addressed them.

5    Q    And, in fact, he did address those criticisms;

6  correct?

7    A    No.

8    Q    Which criticisms did he not address?

9    A    Well, he didn't address the issue of yielding

10 internally inconsistent estimates, for example.  He

11 didn't have any tests one way or another on that.

12   Q    Anything else?

13   A    He did not address whether there would be

14 results that are inconsistent across studies because he

15 only did one study.  And so he wasn't in a position to

16 discover the problems that the Arrow panel had discovered

17 with the use of contingent valuation methods in other

18 areas.

19   Q    Anything else?

20   A    Not that occurs to me right now.

21   Q    And doing contingent value studies is not an

22 area within your expertise; correct?

23   A    Correct.  I'm relying on the expertise of the

24 Arrow panel.

25   Q    If you control for intent of the user of a gun,



Toll Free: 800.708.8087
Facsimile: 312.704.4950

Suite 1200
311 West Monroe Street
Chicago, IL 60606
www.esquiresolutions.com

388

1    would you -- or other weapon, would you agree that guns

2    are more lethal than other weapons?

3         A    Intent to do what?

4         Q    The intent -- whatever the intent is, whether

5    it's lethality or not, the intent of -- to harm.

6         A    Okay.  Well, then, lethality intent?

7         Q    Yes.

8         A    Discuss that?  Probably.  Although, I suspect

9    it's an issue we'll never really have solid evidence on.

10   But based on the weak evidence we're going always to be

11   stuck with, my -- my view is yes, probably.

12        Q    So just to make sure I understand, if you

13   control for the intent of the user for lethality, you

14   would agree, all other things being equal, guns would be

15   more lethal than other weapons?

16        A    I would tentatively say yes.

17        Q    And are you aware of any studies that have

18   actually attempted to control for the intent of the

19   attacker and found that weapon choice affected lethality?

20        A    Attempted, yes.  Unsuccessfully attempted, yes.

21        Q    Do you agree that controlling for lethality for

22   intent of lethality, that some guns are more lethal than

23   others?

24        A    Yes.

25        Q    So doesn't it also hold that controlling for



Toll Free: 800.708.8087
Facsimile: 312.704.4950

Suite 1200
311 West Monroe Street
Chicago, IL 60606
www.esquiresolutions.com

Gary Kleck                                      October 29, 2011

389

1    intent of lethality, guns are more lethal than other

2    types of weapons?

3         A    Not necessarily.  The problem is that

4    comparisons between guns and, say, knives as an

5    alternative weapon involves an apples and oranges

6    comparison.

7              They are fundamentally different in how they

8    produce harm to the human body, whereas if you compare

9    one gun type with another, they are extremely similar

10   in how they inflict injury and harm on the human body

11   and they are more much comparable.

12        Q    Are you suggesting that controlling for intent

13   of lethality that knives are more lethal than guns?

14        A    No.

15        Q    Why don't you turn, if you would, to page 27.

16             And I want to talk to you about your critique

17   here on 27, going on to page 28 of a study by Cook and

18   Ludwig from 2003.  And I'm going to go ahead and pull

19   the study so we can refer to the specifics.

20             (Exhibit No. 20 was marked for

21        identification.)

22   BY MR. WOODS:

23        Q    All right.  Dr. Cook, we're handing you what

24   has been marked as Exhibit No. 20.

25        A    Kleck, you mean?



Toll Free: 800.708.8087
Facsimile: 312.704.4950

Suite 1200
311 West Monroe Street
Chicago, IL 60606
www.esquiresolutions.com

ESQUIRE
an Alexander Gallo Company

433

1    guns?

2        A    My dispute there was with the -- the issue of

3    degree.  My position would be that it would make it only

4    slightly more difficult.  And so Cook was vague about how

5    much more difficult it would make it:  Well, you know,

6    it's -- it's somewhat more difficult, but...

7        Q    Okay.  And have you done anything to try to

8    quantify or -- or classify how much more difficult it

9    would be?

10       A    Well, I was a resident of the Chicago area for

11   a long time, so I have a sense of how long a distance

12   we're talking about, and you can judge how long it would

13   take to drive from, let's say, the middle of Chicago to

14   the -- the nearest suburb where gun sales are legal.  So

15   that's a quantification.

16       Q    Okay.  And about how long is that?

17       A    It's probably 30 minutes, if you were driving;

18   maybe two hours if you were using public transportation,

19   something like that.

20       Q    Did you attempt to -- okay.  And -- and is that

21   your only basis for saying that it would be more

22   difficult for criminals and youths to obtain handguns if

23   the sale was banned in Chicago versus not?

24       A    Well, it's my only basis for why getting a gun

25   from a suburb, suburban gun store would be more difficult



Toll Free: 800.708.8087
Facsimile: 312.704.4950

Suite 1200
311 West Monroe Street
Chicago, IL 60606
www.esquiresolutions.com

434

1    or the degree to which it would be more difficult.

2        Q    Okay.  If they actually went to a suburban gun

3    store to get the gun?

4        A    Yes.

5        Q    Now, you say in the last sentence there of that

6    paragraph:  Of course, if Cook's assertion is true --

7    well, let's look at the sentence before that first.

8             He says -- you say:  He claims that the

9    Chicago criminals he studied rarely obtained guns from

10   these stores because they "rarely left their own

11   neighborhood"; do you see that?

12       A    Yes.

13       Q    And you say:  Of course, if Cook's assertion is

14   true of low-income Chicago residents in general, he would

15   have noted that the city's ban on gun sales places an

16   especially significant burden on law-abiding low-income

17   residents who want a gun for purposes of law -- lawful

18   self-defense.

19            Now, you don't believe that the ban places an

20   especially significant burden on law-abiding low-income

21   residents; correct?

22       A    Not correct.  I -- I do believe it does produce

23   -- it does impose a more significant burden, in

24   particular, on law-abiding low-income residents.

25       Q    And your burden is based on what you just told



Toll Free: 800.708.8087
Facsimile: 312.704.4950

Suite 1200
311 West Monroe Street
Chicago, IL 60606
www.esquiresolutions.com

435

 1    me before, that they have to drive 30 minutes in a car or

 2    take two hours of transportation; is that right?

 3        A    Right.  And there's probably other factors,

 4    like you'd have to know how to do that as a -- in

 5    addition to the time you'd spend.  Public transportation

 6    can be pretty complicated.

 7        Q    How of -- how frequent --

 8        A    I can't figure a lot of it out, so I suspect --

 9        Q    How frequently does a civilian, law abiding

10    civilian, need to go to a gun store to have a -- to get a

11    gun for self-defense?

12        A    How frequently?

13        Q    Yeah.

14        A    In all likelihood, once, if they have the kind

15    of gun the person wanted.

16        Q    So the burden placed on Chicago residents to

17    get a gun for self-defense is one trip to the suburbs; is

18    that correct?

19        A    That -- that would be some -- one -- one common

20    burden.  And it would basically be the same for the

21    criminal and noncriminal.

22        Q    But Cook is asserting -- Cook is asserting that

23    criminals rarely leave their neighborhood and, therefore,

24    would not be traveling to the suburbs to get a gun; is

25    that correct?



ESQUIRE
an Alexander Gallo Company

Toll Free: 800.708.8087
Facsimile: 312.704.4950

Suite 1200
311 West Monroe Street
Chicago, IL 60606
www.esquiresolutions.com

Gary Kleck                                          October 29, 2011

470

1                    CERTIFICATE OF OATH

2

3

4

5    STATE OF FLORIDA              )

6    COUNTY OF LEON                )

7

8

9

10

11          I, the undersigned authority, certify that

12   said designated witness personally appeared before me

13   and was duly sworn.

14

15

16          WITNESS my hand and official seal this 11th

17   day of November, 2011.

18

19

20

21          _____

22          LISA D. FREEZE, CRR, NOTARY PUBLIC
            1-800-934-9090
23          850-878-2221

24

25



Toll Free: 800.708.8087
Facsimile: 312.704.4950

Suite 1200
311 West Monroe Street
Chicago, IL 60606
www.esquiresolutions.com

# EXHIBIT 8

*Journal of Quantitative Criminology, Vol. 9, No. 3, 1993*

# The Impact of Gun Control and Gun Ownership Levels on Violence Rates

**Gary Kleck[1] and E. Britt Patterson[2]**

What effects do gun control restrictions and gun prevalence have on rates of violence and crime? Data were gathered for all 170 U.S. cities with a 1980 population of at least 100,000. The cities were coded for the presence of 19 major categories of firearms restriction, including both state- and city-level restrictions. Multiple indirect indicators of gun prevalence levels were measured and models of city violence rates were estimated using two-stage least-squares methods. The models covered all major categories of intentional violence and crime which frequently involve guns: homicide, suicide, fatal gun accidents, robbery, and aggravated assaults, as well as rape. Findings indicate that (1) gun prevalence levels generally have no net positive effect on total violence rates, (2) homicide, gun assault, and rape rates increase gun prevalence, (3) gun control restrictions have no net effect on gun prevalence levels, and (4) most gun control restrictions generally have no net effect on violence rates. There were, however, some possible exceptions to this last conclusion—of 108 assessments of effects of different gun laws on different types of violence, 7 indicated good support, and another 11 partial support, for the hypothesis of gun control efficacy.

**KEY WORDS:** gun control; violence.

## 1. INTRODUCTION

Crime is widely viewed by the public as one of the most important problems facing our society, and violent crime is regarded as the most serious and fearful kind of crime. While violence is often regarded as an intractable problem difficult to reduce through deliberate governmental effort, many have argued that it, nonetheless, may be reduced through the regulation of weapons, especially firearms.

[1]School of Criminology and Criminal Justice, The Florida State University, Tallahassee, Florida 32306.
[2]Department of Criminal Justice, Shippensburg University, Shippensburg, Pennsylvania 17257.

0748-4518/93/0900-0249$07.00/0 © 1993 Plenum Publishing Corporation

**Kleck and Patterson**

The rationale for gun control, of course, includes the assumption that the availability of guns has a significant net positive effect on violence rates. This assumption has not yet been consistently supported by a credible body of evidence, partly because evidence from better studies has largely been negative or mixed regarding the assumption and partly because so much of the evidence is too weak to be credible one way or the other (see overviews by Wright *et al.*, 1983, pp. 129–137; Kleck and McElrath, 1991). There are a number of possible effects which gun availability could have on violence rates. If a gun is available, it could encourage attacks, especially by weaker attackers on stronger victims, and could facilitate attacks from a distance or attacks by persons too squeamish to attack with messier weapons such as knives or too timid to attack at close quarters. Similarly, guns may enable some people to attempt robberies they could not complete unarmed (Newton and Zimring, 1969; Cook, 1976). The sight of a gun might "trigger" attacks by angered persons, due to the learned association between guns and violence (Berkowitz and LePage, 1967). On the other hand, research also indicates that the presence of guns usually inhibits the expression of aggression, reducing the likelihood of attack (Kleck and McElrath, 1991; Kleck and DeLone 1993). There is support for the claim that once an injury is inflicted, it is more likely to result in death if a gun was used, due to the weapon's greater lethality (Newton and Zimring, 1969; Block, 1977; Kleck and McElrath, 1991), although part of the higher fatality rates of gun attacks is probably due to greater seriousness of intent on the part of those using guns, rather than just the weapon itself (Wright *et al.*, 1983). Regarding suicide, some authors argue that guns provide a uniquely quick, easy, and sure means of self-destruction which reduces the chances of successful outside intervention (Newton and Zimring, 1969). On the other hand, many highly lethal and otherwise satisfactory means for committing suicide are even more widely available than guns, and can easily be substituted where guns are not available.

Prior studies of the aggregate relationship between gun availability and violence rates have used a variety of measures, none entirely satisfactory (Cook, 1982, pp. 264–272). These studies have failed to generate consistent evidence of a net positive effect of gun availability on violent crime rates (Kleck, 1984a, 1991, Chap. 5). The present study measures gun levels through the use of multiple indirect indicators, for two purposes: (1) to assess the impact of gun availability on violence rates and (2) to assess the effects of gun laws on violence rates, including both direct effects and indirect effects operating through the impact of gun control on gun availability. The study addresses every major form of gun control and every major form of violence involving firearms, including not only the violent crimes of homicide, robbery, assault and rape, but also suicides and fatal gun accidents.

## 2. METHODS OF PRIOR RESEARCH

Two general strategies have been used to assess the impact of gun control laws on violence rates: interrupted time series designs and cross-sectional designs. In the typical time series design, monthly violence rates for a single jurisdiction are analyzed with ARIMA or regression time series methods to see if there is a significant downward shift in crime around the time a new gun law goes into effect. Cross-sectional designs compare legal jurisdictions, usually states, with each other to see if those having a given type of gun law have lower levels of violence than those lacking the law.

Studies of gun control's impact on violence have been characterized by a variety of methodological flaws. The first is the failure to control adequately for other determinants of violence rates besides gun control laws, before attributing crime reduction effects to gun regulation. This is at least as much of a problem for time series studies as for cross-sectional ones. Careful modeling of preintervention trends in violence is required in time series studies, rather than simple before-and-after comparisons, because the time when an intervention is most likely to be implemented is at, or shortly after, the time when the target problem peaks, i.e., when it is most likely to stimulate attempts to combat it. Thus, one would expect to find decreases in the problem after an intervention even if the intervention were ineffective, due to this simple timing issue—the problem was peaking and thus was going to decline at the time of intervention anyway, even if nothing was done about it. Unfortunately, if this reasoning applies to the intervention being evaluated, it also applies to other "interventions" as well. Other efforts, public or private, collective or individual, to reduce the target problem would also be most likely to start (or peak) at about the same time. Time series modelers attempting to isolate the impact of gun laws necessarily assume that the evaluated intervention was the only new element in the causal structure generating trends in violence rates. This is, at best, a convenient simplification; at worst, an implausible one.

Cross-sectional designs can take advantage of considerable data in census years for cities, metropolitan areas, or states on extraneous determinants of crime rates, while time series data on most such variables, except at the national level, are nonexistent. Consequently, time series designs usually do not explicitly control for any other important determinants of crime which might show changes coincident with changes in gun laws. Thus, they do not allow the analyst to rule out explicitly any alternative explanations of violence decreases. Instead they, at best, make do with comparisons to "control" jurisdictions which, it is assumed, would show crime trends similar to those in the intervention jurisdiction, were it not for the impact of the gun law changes. This was the strategy followed by Pierce and Bowers (1981). Other time series studies use trends in

*non*gun violence rates within the impact jurisdiction as internal controls, relying on the implicit, and implausible, assumption that gun and nongun rates would follow similar trends were it not for changes in gun regulation (e.g., Loftin and McDowall, 1981, 1984). Evidence from the present study (Table III) indicates that gun violence and nongun violence rates are driven by different sets of exogenous variables (apart from gun laws and gun prevalence), suggesting that they are likely to show divergent trends even in the absence of new gun laws.

Cross-sectional studies of a large number of jurisdictions offer clear advantages over longitudinal designs if one wants to identify which specific features of gun regulation are likely to generally produce violence reductions. The former tests the average effect of many specific instances of a form of regulation, while the latter tests only the effects of a single new gun law in a single jurisdiction, allowing little generalizability. With the former design it is possible to separate the effects of different types of gun controls which are sometimes lumped together in a single new law, while this is impossible in the latter.

Further, it is impossible to state for certain, a priori, *when* the effect of a new law should become evident, rendering the gun law efficacy hypothesis difficult to falsify with a time series design. For example, some analysts have assumed that any impact should begin at the law's "effective date," while others assert that effects can begin earlier, due to an "announcement effect" (Pierce and Bowers, 1981). Loftin and his colleagues (1991) even concluded that local handgun bans reduced homicide in the District of Columbia, even though the declines in both gun homicides and total homicides began *2 years* before the law went into effect! One could just as easily argue that effects would only become evident after a lag of indeterminate length. In contrast, with a cross-sectional design the corresponding question is *where* the law would have its effects, and there is little doubt that the effects should be most pronounced in the jurisdiction which implemented the regulation.

The principal weakness of cross-sectional studies is one shared by time series studies—the difficulty of meeting the *ceteris paribus* condition by correctly specifying a model of how crime rates are generated. It should, however, be noted that the cross-sectional design does *not* require, as Wright *et al.* (1983, p. 285) assert, that "the investigator have a fairly complete understanding of how the particular crime rates are generated." This is an impossible standard to meet and fortunately, an unnecessary one. Instead, unbiased estimates of the impact of a gun control measure can be obtained if one includes in the model only those extraneous variables which affect crime rates *and* which also have nontrivial correlations with the gun control measures. It turns out that none of the known

causes of variation in violence rates are strongly correlated with gun laws, making this a less crucial empirical issue than it seemed.

With only two exceptions (Geisel *et al.*, 1969; Cook, 1979), prior cross-sectional studies have exclusively used states as their unit of analysis. This exacerbates the problem of aggregation bias. States are larger units than cities and, also, more heterogeneous with regard to levels of violence and variables affecting violence rates. Consequently, the best level of aggregation to use would be the lowest and most homogeneous one at which gun law is made—the city level.

Another problem with state-level analyses is that they cannot incorporate measures of local gun controls. Only one prior study has measured gun regulation at both the state level and the city level (Geisel *et al.*, 1969), yet the most restrictive gun laws in the nation are at the local level. Many, even most, of the residents of a given state might be subject to very strong gun laws, at the city level, yet be subject to little or no state regulation. Consequently, studies failing to measure local ordinances seriously mismeasure the degree of gun control to which much of the population is subject.

For some gun laws, one presumed reason for any effects on violence they may have is that they reduce levels of gun prevalence or availability, which in turn affects violence rates. Indeed, regardless of the way the laws were designed to work, almost any restriction on guns could in practice discourage gun ownership, by reinforcing public perceptions of guns as dangerous objects. Conversely, most gun laws could hypothetically reduce violence in ways other than by reducing gun ownership, e.g., by making carrying or criminal use more risky or reducing the immediate availability of guns in violence-prone situations. Only three of the studies published to date explicitly measured gun prevalence or availability (see column 5 in Table I). Thus it was usually impossible to tell whether observed effects were produced through reductions in gun ownership or through some other causal mechanism. Further, if high gun prevalence makes it harder to pass gun laws, and also contributes to higher violence rates, failing to control for gun prevalence could result in a spurious negative association between gun laws and violence rates.

None of the three gun law studies which measured gun levels treated the gun–violence relationship as a simultaneous reciprocal one. This is problematic because there is both individual-level and aggregate-level evidence that violence rates can motivate gun acquisition and increase aggregate gun ownership levels (Lizotte and Bordua, 1980; Lizotte *et al.*, 1981; Kleck, 1984a; McDowall, 1986; Smith and Uchida, 1988). If the relationship were a simultaneous reciprocal one, failing to model it properly would result in biased and inconsistent estimates of the gun coefficient, and

254                         **Kleck and Patterson**

**Table I.** Previous Studies of the Impact of Gun Control on Violent Crime Rates[a]

| Study | Weakness | | | | | | | Gun control effective? |
|---|---|---|---|---|---|---|---|---|
| | 1 | 2 | 3 | 4 | 5 | 6 | 7 | |
| Wisconsin (1960) | × | × | × | × | × | | | No |
| Krug (1967) | × | × | × | × | × | × | | No |
| Geisel et al. (1969) | | | (×) | × | × | × | | No |
| Olin Mathieson (1969?) | × | × | × | × | ? | × | | No |
| Seitz (1972) | × | × | × | (×) | × | × | | Yes |
| Murray (1975) | × | × | × | (×) | × | | | No |
| Zimring (1975) | × | — | — | | — | — | × | Mixed |
| Beha (1977) | × | | × | (×) | — | — | × | Mixed[b] |
| Deutsch and Alt (1977) | × | | — | × | — | — | × | Mixed[b] |
| Cook (1979) | | | × | | ? | | | No |
| Hay and McCleary (1979) | × | | — | × | — | — | × | No[b] |
| Nicholson and Garner (1980) | × | | — | × | — | — | × | Mixed |
| Sommers (1980) | × | × | × | × | × | | × | Mixed |
| Jones (1981) | × | — | — | × | — | — | × | Mixed |
| Lester and Murrell (1981) | × | | × | × | × | × | | No |
| Pierce and Bowers (1981) | × | | — | × | — | — | × | Mixed[b] |
| Lester and Murrell (1982) | × | × | × | × | × | × | | Mixed |
| Magaddino and Medoff (1982) | × | × | × | × | × | | | No |
| DeZee (1983) | | × | × | × | × | | | No |
| Loftin et al. (1983) | × | | | × | | | × | No |
| Loftin and McDowell (1984) | × | | | × | | | × | No |
| Magaddino and Medoff I (1984) | | × | × | × | × | | | No |
| Magaddino and Medoff II (1984) | | — | — | | — | — | × | No |
| McPheters et al. (1984) | × | — | — | × | — | — | × | Yes |
| Lester and Murrell (1986) | × | × | × | × | × | × | | No |
| Lester (1987) | × | × | × | × | × | × | | No |
| Lester (1988) | (×) | × | × | | × | × | | Yes |
| Jung and Jason (1988) | × | | — | × | — | | × | No |
| Loftin et al. (1991) | × | | | × | | | × | Yes |

[a]Summary: 4 yes, 8 mixed, 17 no. "Gun control effective?" means "Did gun laws appear to reduce significantly total (gun plus nongun) rates of violence or crime?" Weakness codes: ×, problem existed; blank, no problem; —, problem is irrelevant; (×), partial presence of problem or problem inadequately dealt with. Weaknesses: (1) included no, or very few, control variables; (2) state level of analysis used, rather than city; (3) no measure of local gun control laws; (4) no measure of gun ownership included; (5) only one source of information on gun control laws used; (6) lumped heterogeneous mixture of gun laws together, without separate measures of impact of different types of gun laws; (7) studied just one specific law; little generalizability.

[b]These four studies are not independent since they are all evaluations of the same law (the Massachusetts Bartley–Fox law) in the same time period, using the same general methods. They contributed three of the eight studies classified as "mixed." Their findings are classified this way because, taken as a whole, they indicate that the law had no effect on homicide, may have reduced robbery (two studies indicated this, one did not), and reduced gun assaults by a moderate amount, while increasing nongun assaults by a larger amount.

the positive effects of violence on gun levels would be confused with the possible positive effects of gun levels on violence rates.

Finally, close examination of the various surveys and compilations of gun laws reveals significant differences between sources, indicating in many instances that at least one source was in error. Consequently, studies using a single source of information are especially vulnerable to error in measurement of the key variables. This was true of all prior studies of multiple laws.

## 3. RESULTS OF PRIOR RESEARCH

The Table I summary of prior research on gun law effects indicates that most of the 29 studies found no impact of gun laws on total violence rates. [Throughout this paper, the term "total violence rate" refers to rates of gun violence plus nongun violence in a given violence category. For example, the term could refer to total homicide (gun homicide plus nongun homicide) or to total robbery (gun robbery plus nongun robbery), and so on. It does not refer to homicide plus robbery plus assault and so on.] Of the 12 studies yielding favorable or mixed results, 3 were time series evaluations of the same law, the Bartley–Fox carrying law. Of these three, the Pierce and Bowers (1981) study found a drop in violence which *preceded* the law's effective date, casting doubt on the authors' favorable assessment of the law. Further, a fourth study of this same law concluded that evidence regarding the law's impact was inconsistent and that the optimistic conclusions of previous researchers were premature (Hay and McCleary, 1979). The middle columns in Table I indicate that most of the rest of the studies offering at least mixed support for gun control efficacy are seriously flawed. Taking prior research as a whole, it would be fair to say at this point that a consistent, credible case for gun control efficacy in reducing violence has not yet been made.[3] [For reviews of research on the impact of gun

---

[3]Assessments of the studies' implications regarding gun control efficacy are based on their empirical findings, not necessarily on their authors' conclusions. As an example of conclusions diverging from data, Geisel *et al.* (1969) concluded that increased gun control severity would save lives, based on analyses using an index which lumped together all forms of gun control. Construction of this index involved a weighting scheme which, contrary to the author's claims, biased results in favor of finding a stronger correlation with violence rates (see p. 659). Even so, the results of analyses using the index did not generally support the author's conclusions. Of the seven violence rates studied, only two showed a significant negative association with the index: gun suicides (but not total suicides, indicating nothing more than a substitution effect) and accidental death by firearm (p. 663). Further, buried in the last page of their Appendix was a one-paragraph summary of the results of their more appropriate analysis (which even the authors described as "more refined"), using separate dummy variables for each type of gun control: "We could obtain no significant or even meaningful results" (p. 676).

prevalence on crime, suicide, and gun accident rates, see Kleck (1991, pp. 187–188, 214–214, 248–250, 265, 303–304).]

## 4. METHODS OF THE PRESENT STUDY

The present study is a city-level cross-sectional study. Data were gathered on all 170 U.S. cities which had a population of 100,000 or larger in 1980, i.e., all large cities. Cities were chosen as the unit of analysis because they are the smallest, most homogeneous unit or area to which gun laws apply, and analyses which use larger units necessarily must ignore laws passed by smaller constituent areas. A majority of the reported violent crimes in the United States occurred in these 170 cities [U.S. Federal Bureau of Investigation (FBI), 1981, p. 173]. Smaller cities could not be included because person-level vital statistics mortality data do not identify locations of deaths for cities with populations smaller than 100,000 [U.S. National Center for Health Statistics, (NCHS), 1983, p. 8]. These data were needed to obtain city counts of gun homicides and gun suicides, data which were essential both as components in dependent variables and as indirect indicators of gun prevalence.

The dependent variables are the rates per 100,000 resident population of homicide, suicide, aggravated assault, robbery, rape, and fatal gun accidents. For all but the last two of these, we had data allowing separate analyses of rates of violence with guns, without guns, and with gun and nongun events combined.

The violence rates were averaged over 3 years, 1979 to 1981, thus bracketing the Census year of 1980 for which data on most of the control variables were available. Some of the smaller cities had fewer than a half-dozen homicides or suicides per year; thus, misclassification of just one or two homicides or suicides as other kinds of deaths could substantially alter a single year's official count. Therefore, 3 years were covered, to minimize the potential measurement error produced by misclassification and to minimize the instability due to year-to-year fluctuations.

The dependent variables were expressed as natural logs. The transformation produced more normal distributions on the violence rate variables. (Without exception, skewness and kurtosis statistics moved closer to zero after the transformation.) It also helped to stabilize the variance of the residuals, reducing heteroscedasticity.

Models of violence rates were estimated using two-stage least-squares procedures because a simultaneous reciprocal relationship was specified between violence rates and gun prevalence levels, based on the assumption that higher violent crime rates could motivate gun acquisition, in addition to gun prevalence increasing violence rates. No effect of suicide and fatal

gun accident rates on gun acquisition was expected, so models of these violence rates were specified as recursive and estimated using ordinary least-squares methods. Figure 1 illustrates the general form of the models estimated. This is the general causal structure assumed for all models estimated, except that we assumed there was no effect of suicide and gun accidents on gun prevalence. There was a total of 14 models (one for each type of violence rate listed in Table II), and each model consisted of two equations, one for the violence rate and one for the gun prevalence level.

The initial choice of possible control variables to include in the models was based on a review of previous city-level and metro area-level studies. An effort was made to include all predictors which had frequently and consistently been found to significantly predict the violence rates examined here. Most of the violence predictors besides the gun law dummies and gun prevalence indicators were measures of the relative sizes of population groups which have especially high or low violence rates, or were measures of social integration, isolation, or transience, or measured the prevalence of statuses which can give rise to violence, such as divorce, alcoholism, and unemployment. Theoretical rationales for including these variables, and relevant empirical evidence, can be found in numerous sources (e.g., Byrne, 1986; Sampson, 1986; Land et al., 1990, and studies reviewed therein). Exogenous variables which remained in the final models were those whose coefficients in the violence rate equations were significant at the 0.10 level in preliminary screening using OLS.



**Fig. 1.** General causal diagram of violence rate models.

**Table II.** Descriptive Statistics for Variables Used in Analysis ($N = 170$ Cities)[a]

| | Mean | SD | Source[b] |
|---|---|---|---|
| Violence rates (1979–1981 average, rates per 100,000 resident population, in natural logs) | | | |
| LNMR, Homicides (total) | 2.47 | 0.78 | a |
| LNASLT, Aggravated assaults (total) | 5.90 | 0.58 | b |
| LNROB, Robberies (total) | 5.79 | 0.75 | b |
| LNRAPE, Forcible rapes (total) | 4.04 | 0.54 | b |
| LNSUICID, Suicides (total) | 2.63 | 0.35 | a |
| LNFGA, Fatal gun accidents (total) | 0.50 | 1.35 | a |
| LNGUNMR, Homicides with gun | 1.98 | 0.88 | a |
| LNNGMR, Homicides without gun | 1.42 | 0.72 | a |
| LNGNASLT, Assaults with gun | 4.55 | 0.75 | b, c |
| LNNGASLT, Assaults without gun | 5.55 | 0.60 | b, c |
| LNGNROB, Robberies with gun | 4.87 | 0.76 | b, c |
| LNNGROBR, Robberies without gun | 5.22 | 0.84 | b, c |
| LNGNSUIC, Suicides with gun | 1.94 | 0.56 | a |
| LNNGSUIC, Suicides without gun | 1.81 | 0.47 | a |
| Gun prevalence indicators | | | |
| PGH7982, % gun, homicide, 1979–1982 | 61.48 | 11.89 | d |
| PCTGNAST, % gun, aggr. assault, 1979–1980 | 28.31 | 11.39 | c |
| PCTGNROB, % gun, robbery, 1979–1980 | 42.00 | 13.11 | c |
| PGS7982, % gun, suicide, 1979–1982 | 53.37 | 14.91 | a |
| GUNSTOL, ($ value, stolen guns/$ value, all stolen property) × 100 | 1.20 | 0.75 | e |
| Instrumental variables | | | |
| RGUNMAG, Subscription rate top 4 gun/hunting magazines, county | 6,564.74 | 8,656.41 | f |
| HUNTERS, Hunting License holder rate per 100K pop., state | 6,985.58 | 4,252,36 | g |
| NRA, NRA members per 100K pop. | 870.90 | 634.59 | t |
| LIBERAL, % 1972 presidential vote for McGovern, county | 38.46 | 9.90 | u |

[a]Unless otherwise noted, each variable refers to a city, as of 1980. In variable descriptions, "county" indicates variable refers to county in which city was located, and "state" indicates variable refers to state in which city is located. Methods of estimating missing values may be obtained from senior author.

[b](a) Tabulations from Mortality Detail Files (U.S. NCHS, 1983); (b) U.S. FBI (1980–1982); (c) ICPSR (1983); (d) ICPSR (1984a); (e) ICPSR (1984b); (f) Audit Bureau of Circulations (1979–1982); (g) U.S. Fish and Wildlife Service (1980); (h) Blose and Cook (1980); (i) U.S. Bureau of Alcohol, Tobacco and Firearms (1980); (j) Ronhovde and Sugars (1982); (k) Jones and Ray (1980); (l) Wright *et al.* (1983); (m) U.S. Bureau of the Census (1983a); (n) U.S. Bureau of the Census (1983b); (o) Quinn *et al.* (1982); (p) U.S. Bureau of the Census (1981); (q) Gastil (1971); (r) U.S. Bureau of Justice Statistics (1982); (s) U.S. Federal Bureau of Investigation (undated); (t) unpublished membership counts supplied to senior author by National Rifle Association; (u) Scammon (1972).

**Table II.** Continued

|  | Mean | SD | Source[b] |
|---|---|---|---|
| Gun control variables |  |  |  |
| LICENSE, License to possess gun in home | 0.11 | 0.32 | h, i, j |
| BYPERMIT, Permit to purchase or acquire | 0.34 | 0.47 | h, i, j |
| WAITPER, Waiting period to buy, receive, etc | 0.44 | 0.50 | h, j |
| CRIMINAL, Prohibit possession (poss.)—criminals | 0.82 | 0.38 | i, j, k |
| MENTAL, Prohibit poss., mentally ill, incomp. | 0.25 | 0.43 | i, j, k |
| ADDICT, Prohibit poss., drug addicts, users | 0.41 | 0.49 | i, j, k |
| ALCOHOLIC, Prohibit poss., alcoholics, etc. | 0.19 | 0.40 | i, j, k |
| MINORS, Prohibit purchase by minors | 0.98 | 0.15 | i, j |
| REGISTER, Registration of guns | 0.47 | 0.50 | h, i |
| DEALER, State or city license, gun dealers | 0.61 | 0.49 | h, i, j |
| CARYHIDN, Concealed handgun carrying forbidden or permit hard to get | 0.88 | 0.33 | j, k |
| CARYOPEN, Open handgun carrying forbidden or permit hard to get | 0.56 | 0.50 | j |
| MANDPEN, Mandatory penalty, illegal carrying | 0.12 | 0.33 | j |
| ADDONDIS, Additional penalty for committing crimes with gun, discretionary | 0.58 | 0.50 | j |
| ADDONMND, Additional penalty for committing crimes with gun, mandatory | 0.61 | 0.49 | j |
| RTBRARMS, State constitutional provision—individual right to bear arms | 0.43 | 0.50 | j |
| HGBAN, De facto ban on handgun possession | 0.01 | 0.11 | i |
| SNSBAN, Saturday Night Special sales ban | 0.04 | 0.20 | i |
| HGBYBAN, Ban on handgun sales | 0.01 | 0.11 | i |
| Control variables |  |  |  |
| PCTBLACK, % respop, black | 19.27 | 16.69 | m |
| PCTHISP, % respop, Spanish origin | 8.82 | 12.23 | m |
| PCTM1524, % respop, male, age 15–24 | 10.05 | 2.30 | n |
| PCTOLD, % respop, age 65+ | 11.20 | 3.53 | m |
| RUNM1624, Unemployment rate males, age 16–24 | 13.18 | 6.12 | n |
| RPOV, % respop < poverty line 1979 | 13.97 | 5.16 | m |
| MFI, Median family income, $s, 1979 | 19,435.52 | 3,592.01 | m |
| INEQUALT, % hshlds w. income >$10K or >$50K | 35.51 | 6.91 | m |
| OWNEROCC, % housing units owner-occupied | 54.14 | 11.19 | m |
| COLLEGE, College enrollment/100K respop | 7,619.66 | 4,267.42 | n |
| PCTMOVE, % respop age 5+ not in same house as 5 yr before | 51.01 | 8.44 | m |
| TRNSIENT, % respop, born out of state | 42.74 | 15.79 | m |
| PCTFOREN, % respop, foreign born | 7.68 | 8.25 | n |
| POPCHANG, % pop change 1970 to 1980 | 7.32 | 20.37 | m |
| CNTDIVRT, Divorces per 100K respop, county | 639.20 | 245.25 | m |
| FEMHEAD, % families headed by females | 21.21 | 10.93 | m |
| CHRCHMEM, Church membership per 100 respop, county | 20.38 | 12.02 | o |

**Kleck and Patterson**

**Table II.** Continued

|  | Mean | SD | Source[b] |
|---|---|---|---|
| ALCHLSM, Alcoholic liver disease deaths per |  |  |  |
| 100K respop | 7.77 | 4.45 | a |
| ADDICTRT, Deaths due to nonmedical accidental |  |  |  |
| poisoning by opiates per 100K respop | 0.22 | 0.52 | a |
| PCTSMSA, City respop as a % of SMSA respop | 34.58 | 22.73 | n |
| VISITORS, Lodging receipts in dollars/100K |  |  |  |
| respop, SMSA | 111.00 | 269.38 | p |
| INVPOP, Inverse population, 1/(respop in 100,000s) | 0.56 | 0.29 | m |
| HSACTRAT, Household activity ratio—fraction of |  |  |  |
| households not of husband–wife, wife not working type | 0.71 | 0.05 | n |
| HOSPITAL, Hospital beds per 100K respop | 1,013.90 | 661.20 | m |
| LIVLONE, % households with 1 person | 10.18 | 2.91 | m |
| STORES, Retail establishments/100K respop | 851.72 | 167.09 | m |
| MAXTEMP, Avg. daily max temperature, July | 87.16 | 6.64 | m |
| CROWDING, Percent of occupied housing units with |  |  |  |
| 1.01+ persons/room | 4.89 | 3.23 | m |
| DENSITY, Persons per square mile | 4,334,26 | 3,375.96 | m |
| STHNBORN, Percent respop born in South | 12.93 | 6.33 | n |
| SOUTH, South region dummy | 0.32 | 0.47 | m |
| WEST, West region dummy | 0.28 | 0.45 |  |
| STHNNESS, Gastil "Southernness Index" | 20.24 | 7.43 | q |
| POLEXP, Police expenditures per capita | 70.65 | 24.92 | m |
| COPS, Sworn police officers/100K respop | 207.57 | 82.40 | b |
| STPRISRT, State prisoners/100K respop | 157.90 | 164.58 | r |
| WEAPARST, Weapons arrests, avg. for 1979–1981, |  |  |  |
| per 100 sworn police officers | 58.26 | 30.83 | s |
| ACCIDENT, Accidental deaths, excl. gun accidents/ |  |  |  |
| 100K respop | 46.43 | 15.45 | a |

It is important to stress at this point that the exact combination of control variables included in each model was not critical with respect to the gun control results. Gun law coefficient estimates were not sensitive to the choice of control variables to include because correlations between the gun law variables and the control variables were almost all weak. Of 290 bivariate correlations between gun law variables and control variables, none exceeded 0.4, and only 7 even reached 0.3. Multicollinearity involving the gun law variables was generally minor. In the final violence rate equations, variance inflation factors (VIF) for each of the 19 gun law variables were under 10, and all but two were under 4. [Kennedy (1985, p. 153) suggests that a VIF over 10 incidates harmful collinearity.] Thus, regardless of which theoretical perspectives might be used to inform the specification of control variables, the key coefficient estimates were not

substantially affected by specification decisions concerning which control variables to include in the models.

A few of the control variables are sufficiently uncommon to require comment. Like nearly all aggregate analyses of violence, the present study uses ratio variables, with city population being the denominator in many variables, both exogenous and endogenous. Some critics have argued that the presence of common components in ratio variables can lead to biased or artifactual associations. Firebaugh and Gibbs (1985, p. 715) recommended that if one seeks unbiased coefficient estimates in a regression model containing both endogeneous and exogenous variables with a common component (commonly population size) in the denominator, one should also include one divided by the common component as another predictor. Thus we have included, in all models, one divided by resident population (in 100,000's) as a predictor.

Computing aggregate crime variables as per capita rates is conventionally done to control for the size of the population at risk of either committing crimes or being victimized in crime. Standard city resident population figures, however, are not completely adequate for this purpose because they do not count nonresident persons at risk, including daily commuters and visitors such as tourists and business travelers. We roughly controlled for the omission of commuters by including as a separate predictor the city population as a fraction of the surrounding metropolitan area, on the assumption that cities located in much larger metro areas are likely to have more commuters, in which case resident population would be a more serious underestimate of the population at risk [see Gibbs and Erickson (1976) for a fuller rationale]. We controlled for the contribution of short-term visitors by including as a separate predictor a "visitors index": the per capita total receipts for hotels, motels, and other lodging places, for the metropolitan area in which a city is located, in 1977. This is an especially important control for cities with large numbers of tourists relative to resident population, such as Las Vegas, Orlando (Disney World), and Miami.

### 4.1. Measurement of Gun Laws

Table II lists all of the variables which are included in later tables, as well as control variables which were evaluated but found to be unrelated to violence rates, along with the sources of the data. The following four sources were used for gun law coding, in descending order of importance: U.S. Bureau of Alcohol, Tabacco, and Firearms (BATF) (1980), Jones and Ray (1980), Blose and Cook (1980), and Ronhovde and Sugars (1982). Multiple sources were used wherever possible because each source provided

some information the others did not, and each served as a reliability check on the others. When sources conflicted, state statute books were consulted.

Both state laws and city ordinances were coded. Nineteen major categories of existing gun laws which could affect violence rates were included in the analysis. The philosophy guiding coding of the gun law variables was to code them so that each variable would measure the presence or absence of a given form of regulation, regardless of what other elements might have accompanied it in a given law, and regardless of what governmental level imposed the restriction. Thus a gun law variable was coded 1 if the form of regulation applied in 1980 to a given city, either due to a city ordinance or because the city was located in a state with such a law, whether the law applied to all types of guns or, as was usually the case, only to handguns; the city was coded 0 otherwise. A single law therefore might result in a city being coded 1 on two or three different gun control variables.

The gun law variables were constructed in such a way that any city subject to a gun license law was also subject to purchase permit requirements, since existing license laws all include as a component a requirement that a license be presented in order to buy guns from licensed dealers, in addition to requiring a license for home possession of guns. On the other hand, a city could be subject to a purchase permit requirement without requiring a license for home possession of firearms.

The gun registration variable was coded 1 if gun sales were recorded in such a way that a governmental agency received a record of a specific gun being sold to a specific person or if all persons currently possessing a gun were required to record their ownership of each gun with an agency.

The codings for most gun law variables were simply 1 for the regulation being present at either the state or the local level and 0 if they were absent. However, for the gun carrying law variables (CARYHIDN, CARYOPEN), 1 indicated that gun carrying (concealed or open, respectively) was either completely unlawful or required a license which was hard to get and rarely issued, while 0 indicated that the city was located in a so-called "shall issue" state—carry permits are fairly easy to get because they must be granted to applicants unless they have certain specified disqualifying attributes (Blackman, 1985).

## 4.2. Measurement of Gun Prevalence

We measured gun prevalence using a principal-components factor based on multiple indirect indicators. For cities, Cook (1979) used a simple index consisting of the average of two indicators: the percentage of suicides committed with guns and the percentage of nonfelony homicides com-

mitted with guns. He showed this measure to be highly correlated with survey measures of urban household gun prevalence, aggregated over eight regions, indicating validity for purposes of cross-sectional analyses. Earlier researchers had used similar indirect measures (Brearley, 1932, p. 71; Seitz, 1972; Curtis, 1974, p. 110; Brill, 1977, p. 20).

We improved on these measures by using as many as five indicators of city gun prevalence levels: (1) percentage of suicides committed with guns, 1979–1982; (2) percentage of nonfelony homicides committed with guns, 1979–1982; (3) percentage of aggravated assaults known to the police committed with guns, 1979–1980; (4) percentage of robberies known to the police committed with guns, 1979–1980; and (5) percentage of the dollar value of all stolen property reported to the police which was due to firearms thefts, 1979–1981. We also evaluated three other indicators: the fatal gun accident rate, the rate of National Rifle Association members, and the rate of contributors to the Second Amendment Foundation, another gun owners' group. However, in a factor analysis these did not load with the other indicators. A simple explanation would be that the latter group of indicators reflects mainly gun prevalence among noncriminals, while the first five measures reflect mainly gun prevalence among criminals.

In each model, when the dependent variable could have an artifactual association with one of the gun prevalence indicators, that indicator was deleted. Thus, for example, the percentage of homicides involving guns was omitted from the homicide model, the gun percentage of assaults was omitted from the assault model, etc.

All these indicators but the suicide item relate on their face to criminal gun possession. Therefore, we interpret the gun index as an indirect measure of gun prevalence among criminals. For conceptual and theoretical purposes, and at the individual level of empirical analysis, it is important to maintain the distinction between criminal and noncriminal gun possession. However, at the city level it is doubtful whether the two can be distinguished, as we suspect they are highly correlated. One simple reason would be the high rate of illegal gun transfers (Wright and Rossi, 1986)—cities with high noncriminal gun ownership will also have high criminal gun ownership because criminals steal guns from noncriminals. Therefore, as a practical matter, our indicators probably necessarily serve as indicators of noncriminal gun prevalence, as well as gun prevalence among criminals.

## 4.3. Validation of the Gun Prevalence Measure

Following Cook (1979), we assessed the validity of our gun indicators by measuring their associations with survey-based measures of gun

prevalence. We combined the results of three national surveys, the General Social Surveys for 1980, 1982 and 1984, to compute reported gun prevalence figures for the nine major U.S. census regions, among persons living in places of 100,000 or larger population. Comparable measures were computed for each of our gun indicator variables by weighting each city measure by the city's population and calculating a weighted average for our cities in each of the nine regions.

All but one of the indirect indicators was strongly correlated across regions with the regional survey measures of gun prevalence, and the indicators were highly correlated among themselves. The only indicator about which there was some doubt was one of the two used by Cook (1979) —the percentage of homicides committed with guns. It was correlated only 0.38 with the survey-based percentage of households reporting a gun, over the nine regions, which was not significantly different from zero. The other indicators showed the following significant correlations with the percentage of households reporting a gun: 0.69 for percentage of aggravated assaults committed with a gun, 0.83 for percentage of robberies committed with a gun, 0.86 for percentage of suicides committed with guns, and 0.90 for the percentage of the value of reported stolen property attributable to guns. This last measure, not previously used in gun research, appeared to be the best single indicator of gun prevalence. These same results were confirmed using survey-based measures of respondent (as opposed to household) gun prevalence and both household and respondent prevalence of handguns. An important finding of this validity test was that all of the indicators were more strongly associated with survey measures of handgun prevalence than with gun prevalence in general. Thus our indicators may reflect handgun prevalence more strongly than longgun prevalence. This is probably advantageous, since handguns are the predominant gun type involved in crime (U.S. Bureau of Justice Statistics, 1987).

### 4.4. Reciprocal Effects

Levels of violence might influence how much gun control a city has, as well as the reverse. If violence levels and the presence of gun laws had a simultaneous reciprocal relationship, a nonrecursive model would be called for, using an appropriate estimation procedure. However, gun laws were not passed frequently enough for violence levels in 1979–1981 to influence the passage of any significant number of gun laws during the same period [see Jones and Ray (1980, Appendix III) regarding the pace of gun law changes]. Rather, the level of gun control strictness in 1979–1981 was almost entirely a cumulative product of legislative activity before 1979. Further, there is no evidence that actual or measured violence

rates have any impact on legislative decisions regarding gun controls. Nevertheless, the relationship was treated as a simultaneous one in supplementary estimations, and recursive models were specified.

We always treated the relationships between gun prevalence and violent crime rate as simultaneous reciprocal ones, expecting that while gun levels may affect crime levels, crime may also simultaneously stimulate gun acquisitions (Kleck, 1984a). We used the rate of subscriptions to gun-related magazines and the state hunting license rate as measures of recreational interest in firearms. They served as instruments which should have a direct effect on gun prevalence but not on violence or crime rates, allowing identification of the model. [For a good introduction to identification problems, see Maddala (1988, pp. 293–304).]

This study improves on previous work in the following ways: (1) we modeled the two-way relationship between gun levels and violence levels, (2) we measured gun prevalence, and used multiple, validated indicators of gun prevalence levels, instead of just one or two, (3) we used extensive controls for possible sources of spuriousness, (4) we used cities as the unit of analysis, a smaller, more homogeneous unit than states, (5) we took account of both city and state gun laws, (6) we used four different sources for measuring gun laws, (7) we assessed 19 different types of gun laws instead of just 1 or 2, (8) we assessed whether the effectiveness of gun laws depends on the level of enforcement of weapons laws, and (9) we used a large sample of 170 cases, rather than the 50 or fewer common in prior studies.

## 5. INFERENTIAL LOGIC

The conditions under which one could tentatively conclude that gun laws reduce violence are as follows: If gun laws are effective, they should have (1) a significant negative association with the *gun* violence rate (e.g., the rate of homicides committed with guns), (2) a significant negative association with the *total* violence rate [e.g., the total homicide (gun homicide plus nongun homicide) rate], and, preferably, (3) a weaker association with the *nongun* violence rate (e.g., the rate of homicides not committed with guns) than with the gun violence rate.

If 1 is true, but not 2, it would generally indicate that gun laws merely shift people from guns to nongun weapons, with no net reduction in deaths or crimes. If 2 is true, but 1 is not, it suggests that gun laws are merely associated with some omitted variables which have an effect on total violence rates but that gun laws themselves have no effect, since they should have their effects by, at minimum, reducing rates of violence committed with guns. Interpretation is ambiguous if 1 and 2 are true, but 3 is

not (i.e., gun laws are as strongly negatively associated with nongun rates as with gun rates). This would suggest that either (a) the gun control variable is simply a correlate of some omitted variable which affects the violence rate, since there is no strong a priori reason why gun controls should reduce the rate of violent acts without guns, or (b) the gun control does reduce acts of violence with guns but is also a correlate of some factor which reduces violent acts without guns as well. Interpretation is also ambiguous if 1 is true, 2 is not true, *and* the gun control was not significantly associated with the nongun violence rate. As noted, the first two circumstances would ordinarily suggest substitution of nongun means for guns, with no net effect on total violence. However, the fact that the gun law did not show any evidence of increasing the nongun violence rate would seem to contradict this interpretation, making a clear interpretation impossible.

Note that this logic is irrelevant to the analyses of rape and fatal gun accidents since there were no data available to separately measure gun and nongun rates of rape, and the inferential logic is irrelevant to gun accidents. For these two, interpretations had to be based entirely on findings concerning the total rape and fatal gun accident rates.

## 6. FINDINGS

Table III reports two-stage least-squares (2SLS) parameter estimates of the effects of gun laws, gun prevalence, and control variables on rates of total (gun plus nongun) violence, gun violence, and nongun violence. To clarify interpretation of Table III, consider A, pertaining to homicide rates. It reports estimates for three homicide models, with each pair of columns referring to a two-equation model of a given type of homicide. For example, the columns 2 and 3 present estimates of a two-equation model, column 2 pertaining to the total (gun plus nongun) homicide equation and column 3 pertaining to the gun prevalence equation.

Now consider estimates pertaining to a particular predictor variable. The row of numbers for BYPERMIT is estimates of coefficients reflecting the effects of laws requiring gun purchase permits on: (column 2) the total homicide rate, (column 3) gun prevalence in the total homicide model, (column 4) the rate of homicides committed with guns, (column 5) gun prevalence in the gun homicide model, (column 6) the rate of homicides not committed with guns, and (column 7) gun prevalence in the nongun homicide model, respectively. These estimates indicate that this type of gun control appears to have a significant negative effect on the total homicide rate, no significant negative effect on the gun homicide rate, and a significant negative effect on the nongun homicide rate. The interpreta-

Impact of Gun Control and Ownership Levels on Violence Rates                267

**Table III.** Two-Stage Least-Squares Estimates (Standardized Coefficients)

| | Total homicide | Gun prevalence | Gun homicide | Gun prevalence | Nongun homicide | Gun prevalence |
|---|---|---|---|---|---|---|
| (A) Homicide models | | | | | | |
| PCTHISP | −0.035 | −0.017 | −0.041 | −0.005 | −0.030 | −0.028 |
| RPOV | 0.762*** | −0.257 | 0.704*** | −0.298 | 0.746*** | −0.175 |
| COLLEGE | −0.299*** | 0.034 | −0.302*** | 0.068 | −0.254*** | −0.017 |
| CNTDIVRT | 0.243*** | | 0.164*** | | 0.325*** | |
| PCTSMSA | −0.135** | 0.030 | −0.132** | 0.033 | −0.121* | 0.022 |
| INVPOP | −0.223*** | | −0.213*** | | −0.232*** | |
| DENSITY | −0.037 | −0.266*** | −0.008 | −0.268*** | −0.056 | −0.275*** |
| STHNNESS | 0.253* | 0.472*** | 0.289** | 0.400*** | 0.129 | 0.582*** |
| RGUNMAG | | 0.150** | | 0.131** | | 0.174** |
| HUNTERS | | 0.247*** | | 0.237*** | | 0.255*** |
| LICENSE | −0.077 | −0.028 | −0.083 | −0.011 | −0.047 | −0.052 |
| BYPERMIT | −0.150** | −0.13 | −0.095 | −0.030 | −0.248*** | 0.012 |
| WAITPER | −0.060 | 0.049 | −0.041 | 0.046 | −0.088 | 0.055 |
| CRIMINAL | −0.035 | −0.150** | −0.026 | −0.138** | −0.032 | −0.167*** |
| MENTAL | −0.018** | 0.029 | −0.177*** | 0.046 | −0.020** | 0.021 |
| ADDICT | 0.112 | 0.072 | 0.114 | 0.053 | 0.092 | 0.099 |
| ALCOHOLIC | 0.037 | 0.028 | 0.035 | 0.020 | 0.033 | 0.040 |
| MINORS | 0.015 | 0.049 | 0.020 | 0.041 | −0.010 | 0.064 |
| REGISTER | 0.124* | 0.079 | 0.120* | 0.068 | 0.127* | 0.091 |
| DEALER | −0.065 | −0.133 | −0.079 | −0.117 | −0.039 | −0.155* |
| CARYHIDN | 0.077 | 0.075 | 0.033 | 0.078 | 0.143 | 0.070 |
| CARYOPEN | −0.056 | −0.078 | −0.058 | −0.064 | −0.023 | −0.105 |
| MANDPEN | −0.050 | 0.003 | −0.075 | 0.025 | −0.027 | −0.013 |
| ADDONDIS | −0.088 | −0.058 | −0.115** | −0.027 | −0.033 | −0.095 |
| ADDONMND | −0.023 | −0.071 | −0.030 | −0.054 | 0.019 | −0.094 |
| RTBRARMS | −0.047 | −0.003 | −0.038 | −0.005 | −0.031 | −0.012 |
| HHGBAN | 0.08 7 | 0.014 | 0.093 | −0.002 | 0.073 | 0.298 |
| SNSBAN | 0.083 | −0.086 | 0.089* | −0.094 | 0.088 | −0.082 |
| HGBYBAN | 0.001 | 0.005 | −0.013 | 0.011 | 0.028 | −0.003 |
| LNMR | | 0.487** | | | | |
| LNGUNMR | | | | 0.561** | | |
| LNMGMR | | | | | | 0.413* |
| Gun prevalence[a] | −0.283 | | −0.111 | | −0.525* | |
| Gun Law Index[b] | 0.409** | −0.775 | 0.408** | −0.714 | 0.324* | −0.799 |

**Table III.** Continued

| | Total assault | Gun prevalence | Gun assault | Gun prevalence | Nongun assault | Gun prevalence |
|---|---|---|---|---|---|---|
| | | | (B) Aggravated assault models | | | |
| RPOV | 0.626*** | | 0.487*** | | 0.591*** | |
| COLLEGE | −0.154*** | | −0.116* | | −0.132* | |
| CNTDIVRT | 0.247*** | 0.078 | 0.168*** | 0.079 | 0.264*** | 0.077 |
| ALCHLSM | 0.232*** | | 0.253*** | | 0.210*** | |
| PCTSMSA | −0.124* | | −0.111 | | −0.116 | |
| INVPOP | 0.087 | | −0.036 | | 0.128* | |
| STHNNESS | 0.103 | 0.640*** | 0.159 | 0.580*** | 0.109 | 0.659*** |
| RGUNMAG | | 0.133** | | 0.143*** | | 0.127** |
| GUNTERS | | 0.177*** | | 0.158*** | | 0.183*** |
| LICENSE | −0.040 | −0.083 | −0.029 | −0.075 | −0.068 | −0.083 |
| BYPERMIT | 0.114 | −0.064 | 0.129 | −0.069 | 0.072 | −0.056 |
| WAITPER | −0.014 | 0.013 | −0.028 | −0.021 | −0.033 | −0.003 |
| CRIMINAL | −0.028 | −0.105* | −0.167** | −0.079 | 0.051 | −0.114* |
| MENTAL | 0.109 | −0.118* | 0.112 | −0.125* | 0.093 | −0.112 |
| ADDICT | 0.093 | 0.050 | 0.161 | 0.026 | 0.049 | 0.057 |
| ALCOHOLIC | 0.082* | 0.130** | 0.017 | 0.128** | 0.019 | 0.132** |
| MINORS | −0.044 | 0.064 | −0.036 | 0.061 | −0.043 | 0.065 |
| REGISTER | 0.013 | 0.019 | 0.111 | −0.002 | 0.134 | 0.027 |
| DEALER | −0.167 | −0.086 | −0.225** | −0.056 | −0.137 | −0.096 |
| CARYHIDN | 0.045 | 0.025 | 0.040 | 0.020 | 0.017 | 0.028 |
| CARYOPEN | 0.118 | −0.060 | 0.004 | −0.049 | 0.166* | −0.061 |
| MANDPEN | −0.026 | −0.025 | −0.050 | −0.020 | −0.024 | −0.024 |
| ADDONDIS | −0.078 | −0.118** | −0.096 | −0.103* | −0.026 | −0.127** |
| ADDONMND | 0.014 | −0.109 | 0.068 | −0.111 | −0.011 | −0.111 |
| RTBRARMS | 0.098 | −0.008 | 0.046 | −0.007 | 0.122 | −0.009 |
| HGBAN | 0.022 | −0.026 | 0.045 | −0.037 | 0.017 | −0.024 |
| SNSBAN | 0.069 | −0.064 | 0.156** | −0.075 | 0.043 | −0.065 |
| HGBYBAN | −0.106 | 0.038 | −0.103 | 0.044 | −0.084 | 0.034 |
| LNASLT | | 0.126 | | | | |
| LNGNASLT | | | | 0.190** | | |
| LNNGASLT | | | | | | 0.107 |
| Gun prevalence[c] | −0.021 | | 0.277 | | −0.194 | |
| Gun Law Index[b] | 0.095 | −0.607** | 0.014 | −0.711*** | 0.107 | −0.531** |

Impact of Gun Control and Ownership Levels on Violence Rates                    269

### Table III. Continued

#### (C) Robbery models

|  | Total robbery | Gun prevalence | Gun robbery | Gun prevalence | Nongun robbery | Gun prevalence |
|---|---|---|---|---|---|---|
| PCTBLACK | 0.525* | 0.541** | 0.375 | 0.446*** | 0.610* | 0.550*** |
| PCTM1524 | −0.073 |  | −0.101 |  | −0.051 |  |
| INEQUALT | 0.458*** |  | 0.385*** |  | 0.438*** |  |
| COLLEGE | −0.197*** |  | −0.087 |  | −0.236*** |  |
| ADDICTRT | 0.082 |  | 0.096* |  | 0.070 |  |
| PCTSMSA | −0.201** | 0.085 | −0.311*** | 0.103 | −0.010 | 0.089 |
| VISITORS | 0.257*** | 0.042 | 0.278*** | 0.004 | 0.212*** | 0.046* |
| INVPOP | −0.277*** |  | −0.252*** |  | −0.276*** |  |
| WEST | 0.176 |  | 0.219** |  | 0.160 |  |
| RGUNMAG |  | 0.082 |  | 0.105 |  | 0.064 |
| HUNTERS |  | 0.100 |  | 0.108 |  | 0.085 |
| LICENSE | −0.013 | −0.078 | 0.012 | −0.085 | −0.029 | −0.072 |
| BYPERMIT | −0.089 | −0.143* | −0.081 | −0.132 | −0.077 | −0.129 |
| WAITPER | 0.033 | −0.175 | 0.066 | −0.227** | −0.024 | −0.150 |
| CRIMINAL | −0.070 | 0.034 | −0.107* | 0.031 | −0.033 | 0.038 |
| MENTAL | −0.142 | −0.292*** | −0.035 | −0.321*** | −0.234 | −0.273*** |
| ADDICT | 0.164 | 0.249** | 0.160 | 0.233** | 0.180 | 0.234** |
| ALCOHOLIC | 0.066 | 0.040 | 0.047 | 0.037 | 0.059 | 0.038 |
| MINORS | −0.002 | 0.013 | −0.008 | 0.016 | 0.004 | 0.012 |
| REGISTER | −0.007 | −0.126 | 0.020 | −0.145* | −0.065 | −0.122 |
| DEALER | −0.143* | −0.125 | −0.126* | −0.110 | −0.155 | −0.121 |
| CARYHIDIN | 0.063 | 0.094 | 0.088 | 0.077 | 0.049 | 0.089 |
| CARYOPEN | −0.032 | −0.112 | 0.008 | −0.126 | −0.082 | −0.106 |
| MANDPEN | −0.147** | −0.066 | −0.124** | −0.062 | −0.164** | −0.066 |
| ADDONDIS | −0.167** | −0.114 | −0.110* | −0.102 | −0.181** | −0.113 |
| ADDONMND | 0.018 | −0.003 | 0.054 | −0.011 | −0.017 | 0.000 |
| RTBRARMS | 0.032 | 0.137 | 0.014 | 0.119 | 0.062 | 0.138 |
| HGBAN | 0.104 | −0.031 | 0.194*** | −0.052 | 0.051 | −0.031 |
| SNSBAN | 0.060 | 0.019 | 0.070 | 0.020 | 0.074 | 0.019 |
| HGBYBAN | −0.105* | 0.007 | −0.095* | 0.034 | −0.095 | −0.003 |
| LNROB |  | −0.149 |  |  |  |  |
| LNGNROB |  |  |  | 0.012 |  |  |
| LNNGROBR |  |  |  |  |  | −0.206* |
| Gun prevalence[d] | −0.538 |  | 0.197 |  | −0.793* |  |
| Gun Law Index[b] | 0.140 | −0.216 | −0.062 | −0.538*** | −0.043 | −0.197*** |

**Kleck and Patterson**

**Table III.** Continued

| | Rape | Gun prevalence | Fatal gun accidents | Gun prevalence |
|---|---|---|---|---|
| (D) Rape and fatal gun accident models | | | | |
| PCTBLACK | 0.750*** | | 0.296*** | 0.384*** |
| CNTDIVRT | 0.249*** | | | |
| INVPOP | −0.242*** | | −0.117 | −0.064 |
| WEST | 0.340*** | −0.310* | | |
| DENSITY | −0.168 | | 0.088 | |
| MFI | | 0.340 | | |
| OWNEROCC | | 0.556** | | |
| ALCHLSM | | | −0.143 | |
| ACCIDENT | | | 0.217** | |
| RGUNMAG | | 0.187 | | 0.155*** |
| HUNTERS | | −0.065 | | 0.178*** |
| LICENSE | 0.079 | −0.191* | −0.101 | −0.129 |
| BYPERMIT | −0.109 | 0.079 | 0.025 | −0.189** |
| WAITPER | −0.061 | −0.050 | 0.053 | −0.248** |
| CRIMINAL | 0.053 | −0.106 | 0.123 | 0.023 |
| MENTAL | −0.045 | −0.076 | −0.157 | −0.287*** |
| ADDICT | 0.215 | −0.038 | 0.001 | 0.176* |
| ALCOHOLIC | 0.103 | −0.127 | 0.030 | 0.068 |
| MINORS | 0.087 | −0.057 | −0.062 | −0.033 |
| REGISTER | −0.097 | −0.059 | −0.018 | −0.039* |
| DEALER | −0.063 | 0.114 | 0.098 | −0.159* |
| CARYHIDN | 0.078 | 0.111 | | |
| CARYOPEN | −0.015 | −0.098 | | |
| MANDPEN | −0.096 | 0.113 | | |
| ADDONDIS | −0.066 | −0.038 | | |
| ADDONMND | 0.133 | −0.237* | | |
| RTBRARMS | 0.182** | −0.144 | | |
| HGBAN | −0.092 | 0.138 | 0.009 | −0.028 |
| SNSBAN | 0.084 | −0.128 | 0.063 | 0.000 |
| HGBYBAN | −0.112 | 0.055 | −0.099 | 0.061 |
| LNRAPE | | 1.088*** | | |
| Gun prevalence[e] | −0.249 | | 0.121 | |
| Gun Law Index[b] | −0.051 | −0.593 | 0.111 | −1.262*** |

Impact of Gun Control and Ownership Levels on Violence Rates                    271

### Table III. Continued

#### (E) Suicide models (OLS estimates)

|  | Total suicide | Gun suicide | Nongun suicide | Gun prevalence |
|---|---|---|---|---|
| TRNSIENT | 0.240*** | 0.098* | 0.286*** |  |
| CNTDIVRT | 0.159** | 0.165*** | 0.004 | 0.134 |
| ALCHLSM | 0.332*** | 0.255*** | 0.275*** |  |
| INVPOP | 0.020 | −0.071 | 0.125* |  |
| DENSITY | −0.237*** | −0.386*** | 0 .017 | −0.197* |
| HOSPITAL | 0.069 | 0.101* | 0.008 |  |
| LIVLONE | 0.183** | 0.065 | 0.257*** |  |
| PCTOLD | 0.138* | 0.064 | 0.113 |  |
| RGUNMAG |  |  |  | 0.065 |
| HUNTERS |  |  |  | 0.063 |
| LICENSE | −0.033 | −0.062 | 0.008 | −0.171* |
| BYPERMIT | −0.089 | −0.146** | 0.053 | −0.005 |
| WAITPER | 0.005 | −0.025 | 0.008 | −0.211* |
| CRIMINAL | 0.071 | 0.090 | −0.056 | −0.129 |
| MENTAL | −0.071 | −0.134* | 0.014 | −0.095 |
| ADDICT | 0.058 | −0.008 | 0.154 | 0.240*** |
| ALCOHOLIC | −0.038 | −0.010 | −0.087 | 0.041 |
| MINORS | −0.038 | −0.018 | −0.048 | 0.036 |
| REGISTER | −0.063 | −0.089 | 0.016 | −0.139 |
| DEALER | −0.229*** | −0.140** | −0.207** | 0.001 |
| CARYHIDN |  |  |  |  |
| CARYOPEN |  |  |  |  |
| MANDPEN |  |  |  |  |
| ADDONDIS |  |  |  |  |
| ADDONMND |  |  |  |  |
| RTBRARMS |  |  |  |  |
| HGBAN | −0.062 | −0.095 | −0.037 | 0.114 |
| SNSBAN | 0.094 | −0.014 | 0.148** | −0.013 |
| HGBYBAN | −0.066 | 0.051 | −0.093 | 0.107 |
| Gun prevalence[f] | 0.132** | 0.252*** | −0.101 |  |
| Gun Law Index[b] | −0.242 | −0.319* | 0.005 | −0.084 |

[a] Principal-components factor with indicators PCTGNAST, PCTGNROB, PGS7982, and GUNSTOL.

[b] Principal-components factor with indicators: all gun laws.

[c] Principal-components factor with indicators PGH7982, PCTGNROB, PGS7982, and GUNSTOL.

[d] Principal-components factor with indicators PGH7982, PCTGNAST, PGS7982, and GUNSTOL.

[e] Principal-components factor with indicators PCTGNAST, PCTGNROB, PGS7982, GUNSTOL, and PGH7982.

[f] Principal-components factor with indicators PGH7982, PCTGNROB, PCTGNAST, and GUNSTOL.

*$P < 0.10$.

**$P < 0.05$.

***$P < 0.01$.

tion of this pattern of results is that the law is ineffective in reducing
homicide, since it did not have a significant negative association with the
rate of gun homicide.

## 6.1. Effects of Gun Prevalence Levels on Violence Rates

Estimates of the impact of gun prevalence on violence rates can be
found in Table III in the penultimate row of each column referring to a
violence rate. For example, the 2SLS coefficient estimating the impact of
gun prevalence on the total murder rate is a nonsignificant $-0.283$
(column 2 in A).

Gun prevalence had an apparent significant positive effect on total
rates of suicide, but not on any of the other five types of violence. The
apparent effect of gun prevalence on suicide rates, however, is not entirely
stable, being evident only when the suicide models were estimated with
OLS. Some would argue that high suicide rates could discourage gun
acquisition among people living in households with a person they believed
to be suicide-prone. If this were true, then gun prevalence should be treated
as endogeneous in the suicide models, just as in the other models (though
for different reasons). When gun prevalence was treated as endogeneous,
and the model was estimated with 2SLS, the results indicated no significant
impact of gun prevalence on suicide. We tentatively conclude that gun
prevalence rates *may* increase total suicide rates but have no effect on total
rates of homicide, robbery, aggravated assault, rape, or fatal gun accidents.

## 6.2. Effects of Violence Rates on Gun Prevalence Levels

Coefficients estimating these effects can be found in the Gun Prevalence
columns in Table III, in the rows near the bottom of each panel labeled
with the names of the various violence rates. For example, in column 3
in A, the LNMR coefficient is a significant 0.487, indicating that the total
homicide rate appears to have a positive impact on gun prevalence.

Homicide (gun, nongun, and total), gun assault, and rape rates all had
significant positive coefficients in the gun prevalence equations. This
supports the hypothesis that some violence rates encourage the acquisition
of firearms for self-defense, accounting at least partially for bivariate
positive associations observed between gun prevalence levels and violence
levels. That rape in particular should have this effect is consistent with
survey evidence that women's gun ownership, while lower than men's, is
disproportionately likely to be motivated by self-defense concerns and with
county-level findings that female gun ownership rates are more responsive
to violence rates than men's ownership rates are (Bordua and Lizotte,

1979, p. 172). More generally, the results support the simple idea that rates of more serious violent crimes are more likely to increase gun acquisition.

## 6.3. Effects of Gun Controls on Gun Prevalence Levels

The effects of 19 types of gun regulations on gun prevalence levels are summarized in Table IVA. The effect of each gun restriction on gun prevalence was estimated multiple times, once in each of six violence rate models. Because the exact set of gun prevalence indicators used varied from one model to the next, it therefore was possible for estimated effects of gun controls on gun prevalence levels to vary somewhat from one violence rate model to the next. None of the gun controls appeared to have any impact on gun prevalence. Each law's effect on gun prevalence was initially estimated six times, but only bans on gun possession by criminals and mentally ill persons showed significant effects in even half of the initial tests.

**Table IV.** Summary of Effects of Gun Prevalence and Gun Controls on Violence Rates

(A) Significant negative impact of gun controls on gun prevalence?[a]

| | Violence rate model | | | | | |
|---|---|---|---|---|---|---|
| | Homicide | Aggrvtd. assault | Robbery | Rape | Gun accidents | Suicide |
| LICENSE | No | No/Yes | No/Yes | Yes | No/Yes | Yes |
| BYPERMIT | No | No/Yes | Yes | No | Yes | No |
| WAITPER | No | No | No | No | Yes | Yes |
| CRIMINAL | Yes | Yes | No | No | No | No/No/Yes |
| MENTAL | No | Yes | Yes | No | Yes | No |
| ADDICTS | No | No | No | No | No | No |
| ALCOHOLIC | No | No | No | No | No | No |
| MINORS | No | No | No | No | No | No |
| REGISTER | No | No | No/No/Yes | No | Yes | No |
| DEALER | No | No | No | No | Yes | No |
| CARYHIDN | No | No | No | No | | |
| CARYOPEN | No | No | No | No | | |
| MANDPEN | No | No | No | No | | |
| ADDONDIS | No | Yes | No | No | | |
| ADDONMND | No | No | No | Yes | | |
| RTBRARMS | No | No | No | No | | |
| HGBAN | No | No | No | No | No | No |
| SNSBAN | No | No | No | No | No | No |
| HGBYBAN | No | No | No | No | No | No |

274                                                                              **Kleck and Patterson**

**Table IV.** Continued

(B) Effects of gun prevalence and gun laws on violence rates

| | Violence rate model | | | | | |
|---|---|---|---|---|---|---|
| | Homicide | Aggrvtd. assault | Robbery | Rape | Gun accidents | Suicide |
| Significant positive effect of gun prevalence? | No | No | No | No | No | (Yes)[b] |
| Significant negative effect of gun laws?[a] | | | | | | |
| LICENSE | No/Yes/Maybe | No | No | No | No | No/Maybe/No |
| BYPERMIT | No/Maybe/No | No | No | No | No | Maybe |
| WAITPER | No | No | No | No | No | No |
| CRIMINAL | No | Maybe | Maybe | No | No | No |
| MENTAL | Yes | No | No | No | No | Maybe |
| ADDICT | No | No | No | No | No | No |
| ALCOHOLIC | No | No | No | No | No | No |
| MINORS | No | No | No | No | No | No |
| REGISTER | No | No | No | No | No | No |
| DEALER | No | Maybe | Yes | No | No | Maybe |
| CARYHIDN | No | No | No | No | | |
| CARYOPEN | No | No | No | No | | |
| MANDPEN | No | No | Maybe | No | | |
| ADDONDIS | Maybe/ /Yes | No | Maybe | No/ /Yes | | |
| ADDONMND | No | No | No | No | | |
| RTBRARMS | No | No | No | No | | |
| HGBAN | No | No | No | No/Yes/Yes | No | No/No/Maybe |
| SNSBAN | No | No | No | No | No | No |
| HGBYBAN | No | No | Yes | No | No | No |
| Gun Law Index | No | No | No | No | No | No |

[a]Where more than one interpretation appears in a cell, it means that interpretations became more supportive of the gun control efficacy hypothesis when different specifications were used. (1) The first (and usually the only) interpretation pertains to models containing all 19 gun laws and no provision for interactions; (2) the second one pertains to results when using a reduced set of four gun control variables; (3) the third one pertains to results when multiplicative terms testing for interactions between gun laws and enforcement levels were specified (see text). Unsupportive results which remained unsupportive (No) under the latter two alternative specifications are not shown, to simplify the table.

[b]An effect of gun prevalence on total suicide rates was evident only when the model was estimated with OLS. When gun prevalence was treated as endogenous and the model was estimated with 2SLS, results did not indicate an impact of gun prevalence.

We checked to see if gun control effects on gun prevalence would become evident if we used a reduced set of four of the stronger gun laws (listed in a later section). The results for just one type of gun control changed (indicated by Yes appearing after one slash in a given cell in Table IVA)—gun owner licensing appears to reduce gun prevalence in five of the six violence models. However, since this apparent effect is evident only when there are no controls for other gun laws, this result may reflect the cumulative, albeit apparently slight, effects of other, correlated, gun laws as well as the effects of licensing itself. Therefore, interpretation of this result must remain ambiguous.

We also checked for interactions between gun laws and police enforcement effort by adding to each gun prevalence equation a multiplicative term for each gun control variable, consisting of the gun control variable multiplied times the weapons arrest rate. Of 108 tests for interactions, only 2 suggested an effect of gun controls on gun prevalence which was contingent upon enforcement effort, where no impact of the controls had been evident in the additive analysis. These are denoted by Yes appearing after two slashes in any of the cells in Table IVA (see CRIMINAL in the Suicide model and REGISTER in the Robbery model). Given the large number of tests, we believe that these two deviant results could be the product of chance. Thus, our evidence generally fails to support the hypothesis that the impact of gun controls on gun levels depends on the level of police enforcement.

## 6.4. Effects of Gun Control Laws on Violence Rates

Table III contains detailed results on this issue, which are summarized in Table IV. The findings indicate that most gun restrictions appear to exert no significant negative effect on total violence rates, though some gun controls do seem to be effective. Of 102 possible effects tested, 7 were consistently supportive of, and 11 others were at least partially consistent with, a hypothesis of gun control effectiveness, albeit using fairly generous evaluative criteria. As described below, each gun law's effect on a given form of violence was estimated under three conditions: (1) with all gun law variables specified in the models but with no measure of enforcement effort included, (2) with all gun control variables specified in the models and with interactions of gun laws and enforcement effort included, and (3) with a reduced set of four especially strong gun control variables included in the models. In the subsequent discussion, each law is assessed based on the most supportive of the three sets of results, i.e., the results most supportive of a violence-reducing impact of the law. Thus, the gun control efficacy hypothesis was given 18 chances at confirmation for any one form of gun

control, with hypothesis tests in three sets of circumstances, in each of six violence rate models. (There were, however, no tests of the impact of carry laws, add-on penalties for committing a crime with a gun, or right-to-bear-arms provisions on suicide or gun accident rates, as these regulations were considered irrelevant to suicides or accidents. For example, nearly all gun suicides are committed in a private location and thus are unlikely to be affected by carry laws.)

### 6.4.1. Results with All 19 Gun Control Variables Included, No Enforcement Interactions

Because we could not know in advance which gun control measures affected violence rates, we initially specified all 19 gun control variables in each violence rate equation (with the exceptions described in the previous paragraph). As noted previously, collinearity among these variables was generally slight, so this was not a serious statistical problem. We first present interpretations based on these specifications, followed by discussion of any results which were modified when a reduced set of gun laws were used or when interactions with enforcement levels were specified.

Requiring permits to buy guns (BYPERMIT) may reduce rates of suicide. Bans on possession of guns by convicted criminals (CRIMINAL) may reduce rates of aggravated assault and robbery. Bans on possession of guns by mentally ill persons (MENTAL) appear to reduce homicide and may reduce suicide. Requiring a state or local license to be a gun dealer (DEALER) appears to reduce rates of robbery and may reduce aggravated assaults and suicides. Laws that provide mandatory penalties for unlawful gun carrying (MANDPEN) may reduce robbery. Laws providing discretionary additional penalties for committing crimes with a gun (ADDONDIS) may reduce murder and robbery. Finally, local bans on the purchase of handguns appear to reduce robbery rates.

### 6.4.2. Results Using a Reduced Set of Gun Law Variables

While the problem is mild, there is some collinearity among the gun law variables which could inflate standard errors somewhat and thereby bias hypothesis tests in favor of the null hypothesis. Therefore the violence rate models were reestimated with just four gun law variables thought to be especially likely to show effects, since they were fairly strong measures— licenses, purchase permits, handgun possession bans, and bans on sale of "Saturday Night Specials." When this was done, four of the previous results were altered so as to strengthen, to varying degrees, support for the hypothesis of gun control efficacy. (Two results changed mildly from No to Maybe, while two changed substantially from No to Yes.) With the reduced set of gun law variables, estimates indicated that owner licensing

appears to reduce homicides and may reduce total suicides. Purchase permits may reduce homicides (there was still, however, a stronger negative association of permits with nongun homicide than with gun homicide). These estimations also indicated that handgun bans appear (somewhat implausibly, given how rarely rapists use guns) to reduce rapes, but not any other forms of violence. The rest of the gun law assessments were unaffected. Gun prevalence still showed no positive effect on any of the violence rates except the gun suicide and total suicide rates, the same as with models including the full set of gun laws. (Results are summarized in Table IV; estimates are not reported here but are available from the senior author.)

### 6.4.3. Interactions with Enforcement Level

It could be argued that gun laws are not always given a fair chance to work because in many places they are not adequately enforced. We tested this idea by forming multiplicative interaction terms between each gun law variable and a measure of police enforcement effort, the number of weapons arrests per 100 sworn police officers (WEAPARTS), and adding these terms into our models of violence rates. The resulting estimates generally confirmed the previous results. The coefficients for the interaction terms were rarely negative and significant, indicating that the effects of gun laws apparently were not dependent on the level of police enforcement effort, at least not based on the measure of effort used and not within the range of enforcement effort currently exerted in large U.S. cities. Of 102 possible interaction effects tested, only 5 suggested possible gun law effectiveness contingent upon the level of law enforcement effort: (1) laws providing discretionary add-on penalties for committing crimes with a gun appear to reduce the total homicide rate when accompanied by sufficient enforcement effort, (2) the same appears to be true for rape, (3) owner licensing may have such a contingent effect on homicide (4) handgun bans appear to have a contingent effect on the rape rate, and (5) handgun bans may have such an effect on the suicide rate. Given the large number of tests for interaction effects, however, five "significant" results might be little more than a product of chance. (Interaction test results are summarized in Table IV; estimates are available from the senior author.)

### 6.5. Gun Control as a Single Endogenous Variable

As noted before, we consider it unlikely that there is a simultaneous reciprocal relationship between gun laws and violence rates. Nevertheless, we estimated models of violence rates which assumed that such a relationship was possible. To do this, a Gun Law Index (GLI) was created

from all 19 gun control variables, using principal components analysis. This variable was treated as endogenous, in a model which assumed that simultaneous relationships existed among the GLI, the violence rate, and gun prevalence. Two instrumental variables were assumed to affect directly the GLI but not violence rates or gun ownership: LIBERAL, the percentage of a city's voters who voted for George McGovern in the 1972 presidential election (a measure of political liberalism), and NRA, the city's rate of membership in the National Rifle Association.

Estimates of the GLI coefficient are reported near the bottom of each violence rate column in Table III. Note that these are estimates from separate models which did *not* include the individual gun control variables and, thus, are not a part of the models to which the rest of the coefficients in Table III correspond. These estimates indicate that the overall level of gun control in a city does not appear to exert a significant negative effect on any of the six violence rates. The only hint of a possible exception was with suicide. Although the GLI was not related to the total suicide rate, its coefficient was negative and marginally significant ($0.05 \leqslant P < 0.10$) in the gun suicide equation and nonsignificant in the nongun suicide equation. Thus, treating gun control as a single endogenous variable did not strengthen support for the gun control efficacy hypothesis.

## 7. DISCUSSION

These results generally support the view that (1) existing gun control laws do not reduce gun prevalence in U.S. cities, (2) gun prevalence does not have any measurable net positive effect on violence rates except for a possible effect on suicide rates, and (3) most gun control laws do not reduce violence rates, though a few may do so.

For many gun regulations, such as carry controls or add-on penalties, it is not surprising that they do not reduce gun ownership, since they were not intended to do so. Still other gun controls may operate to restrict ownership only among "high-risk" groups such as criminals or alcoholics. However, results indicated that most gun controls fail to reduce gun use in acts of violence, undercutting the idea that controls reduce gun prevalence even in criminally involved subsets of the population. One simple explanation for this failure would be the huge size of the U.S. gun stock. With over 200 million guns in private hands, it is hard to keep guns away from anyone who strongly desires one.

Few of the tests unambiguously supported the gun law efficacy hypothesis. However, it increases confidence in some of these few supportive findings to know that they correspond closely with similar results in past research. (1) The present study found partial support for the claim

that laws establishing additional penalties for committing felonies with a gun may reduce total robbery rates, and prior research by McPheters *et al.* (1984) indicated the same thing. (2) Bans on gun possession by mentally ill persons may reduce suicide, consistent with the findings of Sommers (1984). (3) Mixed evidence suggested that handgun bans *may* reduce suicide, though this weak result reflected such controls in only two cities (New York City and Washington, DC). This is consistent with results of Loftin *et al.* (1991). (4) Finally, a previous study indicated that a mandatory penalty carry law, the Bartley–Fox law, appeared to reduce robbery (Deutsch and Alt, 1977), and the present research also indicates that such laws may reduce robbery.

As actually administered, "mandatory penalty" carry laws do not impose penalties in a truly mandatory fashion but, rather, merely in a relatively less discretionary one (Beha, 1977). Rather than mandatory penalties being viewed as essential, a more plausible interpretation of these results is that the mandatory penalty provision serves as an indicator of strong support among court actors for relatively severe punishment of unlicensed gun carrying. Where such laws exist, prosecutors may devote more resources to prosecuting illegal weapons carriers, and may be more likely to seek stiff penalties, even though they could evade the mandatory provisions if they chose to do so.

One type of gun law which clearly appeared to have some beneficial effect was a somewhat surprising one. Laws requiring a state or local license to be a firearms dealer were negatively related to aggravated assault, robbery, and suicide rates, with the results being strong (i.e., a Yes conclusion) for robbery. Because dealers everywhere in the United States are required to have a federal gun dealer license, additional state or local licensing requirements might seem trivial. However, if these requirements are more stringent or require high licensing fees, they can reduce the number of retail gun outlets and possibly reduce casual acquisition of guns among persons not sufficiently motivated or persistent to seek out less convenient stores or nonretail sources (Blose and Cook, 1980, p. 20). Although results summarized in Table IVA do not support the idea that this law reduces aggregate gun prevalence levels, it may affect a subset of weakly motivated buyers.

### 7.1. Gun Prevalence Effects

Why do gun prevalence levels have no apparent net positive effect on violence rates, with the possible exception of suicide? The absence of any net effects of gun levels could be due to counterbalancing effects of opposite sign, with criminal ownership increasing the rates and noncriminal

ownership decreasing them, due to deterrent effects of ownership among prospective victims (Kleck, 1988). If this were so, it might still be useful to reduce gun levels among criminals if measures used to accomplish this did not also reduce gun levels among noncriminals by an equal or greater amount.

Ordinary least-squares results indicated that gun prevalence may influence the choice of method in suicides and also the overall frequency of suicide. Gun prevalence was positively associated with both total suicide rates and gun suicide rates and negatively (though nonsignificantly) related to the nongun suicide rate.

No impact of gun prevalence on fatal gun accident rates was detected. Given the random component in accident causation and the rarity of fatal gun accidents (one or two a year in most cities), the absence of a relationship is perhaps not that surprising. It may also be that many cities with a higher gun prevalence, especially smaller cities and those in the South and West, have gun owners more thoroughly socialized from childhood into safe handling of guns, as opposed to getting guns as adults, without training.

The present results confirm those of the two best previous studies of city gun ownership and robbery rates, which also found no evidence of a net impact of gun ownership levels on the total robbery rate (Cook, 1979; McDowall, 1986). The present findings indicate that gun ownership levels increase (albeit nonsignificantly) gun robbery and decrease nongun robbery, suggesting that where guns are not available, robbers substitute other weapons, with no net effect on total robbery rates. Gun ownership levels also may have no net effect on total robbery because they may have a mixture of both positive and negative effects. On the one hand, guns make it possible for larger numbers of people to rob, including those too timid to rob without a gun, and expand the number of targets a given robber can successfully tackle. On the other hand, guns also enable robbers to rob more lucrative targets, increasing the average "take" per robbery and allowing them to gain a given amount of income with fewer robberies (Cook, 1976; Wright et al., 1983). Also, gun ownership by prospective victims, especially retail store owners, may deter some robbers (Wright and Rossi, 1986, pp. 141–159; Kleck, 1988). The finding are consistent with an interpretation that these effects of opposite sign cancel each other out, with no net effect on the total robbery rate.

In assaultive crimes such as homicide and aggravated assault, gun availability also seems to have a mixture of positive and negative effects. In an individual-level analysis of violent incidents, Kleck and McElrath (1991) found that an aggressor's possession or use of a gun appears to reduce the probability of a physical attack (as opposed to a mere threat) on the victim

and appears to reduce the probability that the attack will result in a physical injury, while increasing the probability that an injury will be fatal. Further, possession of guns by prospective victims may exert a modest deterrent effect on would-be aggressors (Wright and Rossi, 1986; Kleck, 1988). The present aggregate level findings are consistent with a claim that the negative, violence-reducing effects of gun ownership may roughly cancel out the violence-increasing effects, consistent with the findings of previous time series research indicating no net effect, positive or negative, of gun ownership levels on the homicide rate (Kleck, 1984a).

## 7.2. Gun Law Effects

Why do most of 19 different major varieties of gun control laws appear to have no impact, with a few exceptions, on the types of violence which frequently involve guns? Many explanations are suggested by both our own results and those of prior research. First, some gun laws are intended to have their effects by reducing gun ownership levels, so some gun laws may fail because they do not achieve their proximate goal of reducing gun ownership (Table IVA). However, our results also generally indicate that gun prevalence levels do not have a net positive effect on violence rates (top row, Table IVB). Consequently, gun laws may fail simply because, even if they did reduce gun prevalence, this would not produce a reduction in violence rates.

On the other hand, the rationale for some gun regulations does not rely on an assumption that gun ownership levels affect violence. For example, carrying laws are intended to make guns less immediately available in public places rather than to reduce overall gun ownership levels; the rationale for such laws assumes only that the immediate availability of guns in public places is relevant to some violence rates, especially robbery. Likewise, add-on penalties are intended to discourage criminals from choosing guns to use in their crimes. It is also possible that gun laws have only a short-term effect on violence rates when they are passed and that the effect then fades. Most of the laws we have evaluated were implemented well in the past, so we cannot assess this idea.

Most gun laws regulate only handguns, or regulate handguns more stringently than the more numerous longguns such as rifles and shot-guns (Kleck, 1991, Chap. 8). This permits the substitution of relatively unregulated longguns for the more heavily regulated handguns. While longguns are larger than handguns, and thus not so easily concealed or conveniently carried on the person, such a limitation is rarely relevant for suicides and is also irrelevant for many violent crimes, because either (1) the crime is committed in or near a private place, in a way which

does not require carrying or concealment of the gun, or (2) the crime was committed after some advance planning, in a way which would require only short-term carrying or which could involve use of a longgun whose barrel and stock had previously been cut down to render it concealable. Longguns are generally more lethal than handguns. Thus, while restrictions on handgun availability could cause some violent persons to go without guns of any kind, they may also have the undesirable effect of encouraging others to substitute more lethal longguns. The implication for the homicide rate would be that these effects would cancel out or, worse, produce a net increase in homicides (Kleck, 1984b).

No matter how severe current measures are, it is always possible that stronger measures are needed. However, even fairly strong measures such as banning sales of "Saturday Night Specials" and de facto bans on handgun possession appear generally to exert no negative effect on violence rates. Nevertheless, the findings reported herein cannot inform us about the effectiveness of gun control measures not yet tried.

It has been argued that many gun laws fail because they are local and that guns from more lenient jurisdictions "leak" into the stricter jurisdictions. Thus, federal measures regulating acquisition of guns might work (Newton and Zimring, 1969). Research on existing federal regulations has failed to generate consistent evidence of their effectiveness (Zimring, 1975; Magaddino and Medoff, 1984), but these controls were very weak, loophole-ridden measures. Some of the few measures found in this study to be effective were controls which are not vulnerable to this "leakage" problem. "Leakage" is an issue relevant mainly to regulations aimed at the acquisition of guns, rather than their use. In contrast, laws forbidding possession of handguns, regulating the carrying of guns, or providing for add-on penalties for using guns in crimes are not affected by interjurisdictional leakage because the legal risks of possessing or carrying a gun or using it in a crime in a given jurisdiction are the same regardless of whether bordering areas have similar measures.

It cannot be argued that the effects of gun ownership and gun control could not be detected due to a lack of meaningful variation in these variables. It is clear from the standard deviations for the gun prevalence indicators and the means for the gun law dummies in Table II that levels of both gun prevalence and gun control strictness vary enormously across U.S. cities. Direct survey measures of gun prevalence in very large cities indicate that the fraction of households reporting a gun varies from extremely low levels, such as 6% in New York City and Washington, DC (lower than in many Western European nations), to high levels, such as 61% in Houston (unpublished tabulations from specially geocoded General Social Surveys for 1973–1989).

Three limitations of this study should be noted. First, we had no measures of how strictly permit and license laws are administered, e.g., how narrowly authorities interpret rules defining which applicants are qualified, as distinct from how much effort is put into apprehending and punishing violators. Second, analysts always need to be skeptical about restrictions used to achieve identifiability in structural equation models. The key identification restrictions needed to model the assumed reciprocal relationship between gun prevalence and violence rates were the exclusion of gun magazine subscription rates and hunting license rates from the violence equations. Interest in hunting and other gun-related sports was assumed to affect gun prevalence rates but to not directly affect violence rates. One might argue that such interests may reflect, or even generate, proviolent attitudes, but Eskridge (1986) and Bordua (1986) have found county hunting license rates to have small to moderate *negative* associations with violence rates. Finally, it is possible that we have failed to control for some confounding variable which suppresses a guns–violence or gun law–violence association, though we do not know what that variable might be.

## 8. CONCLUSIONS

While the results are generally negative for the violence control effectiveness of gun control, the significance of the few supportive results should not be overlooked. There do appear to be some gun controls which work, all of them relatively moderate, popular, and inexpensive. Thus, there is support for a gun control policy organized around gun owner licensing or purchase permits (or some other form of gun buyer screening), stricter local dealer licensing, bans on possession of guns by criminals and mentally ill people, stronger controls over illegal carrying, and possibly discretionary add-on penalties for committing felonies with a gun. On the other hand, popular favorites such as waiting periods and gun registration do not appear to affect violence rates.

## ACKNOWLEDGMENTS

The authors wish to thank the Inter-University Consortium for Political and Social Research for making available three datasets utilized in this research (ICPSR, 1983, 1984a, b). Neither the collectors of the original data nor the Consortium bear any responsibility for the analyses or interpretations presented here. The staff of the Florida State University Computing Center provided computer advice and data entry services, while Paul Hanna of the College of Social Sciences helped in acquiring many

datasets. We are also grateful to the National Technical Information Service for supplying the 1979–1982 Mortality Detail File datasets, to the National Rifle Association, and Mary Rose, for supplying unpublished city NRA membership figures, to the Federal Bureau of Identification for furnishing unpublished weapons arrest data for cities, and to William G. Kleck of the Audit Bureau of Circulations for providing county-level gun magazine subscription counts. Finally, the senior author would like to thank his research assistants, who helped gather some of the data, including Byron Johnson, Tracy Griffith, Susan Sayles, Wesley Johnson, and Miriam DeLone. The first version of this paper was presented at the annual meetings of the American Society of Criminology, Reno, Nevada, November 10, 1989.

## REFERENCES

Audit Bureau of Circulations (1979–1982). *Supplementary Data Report*, covering county paid circulation figures for gun/hunting/outdoor magazines, ABC, Chicago.

Beha, J. (1977). And *nobody* can get you out. *Boston Univ. Law Rev.* 57: 96–146, 289–333.

Bendis, P., and Balkin, S. (1979). A look at gun control enforcement. *J. Police Sci. Admin.* 7: 439–448.

Berkowitz, L., and LePage, A. (1967). Weapons as aggression-eliciting stimuli. *J. Personal. Soc. Psychol.* 7: 202–207.

Blackman, P. (1985). Carrying handguns for personal protection. Paper presented at the annual meeting of the American Society of Criminology, San Diego, CA, Nov. 13–16.

Block, R. (1977). *Violent Crime*, Lexington Books, Lexington, MA.

Blose, J., and Cook, P. J. (1980). *Regulating Handgun Transfers*, Duke University, Institute of Policy Sciences and Public Affairs, Durham, NC.

Bordua, D. J. (1986). Firearms ownership and violent crime: A comparison of Illinois counties. In Byrne, J. M., and Sampson, R. J. (eds.), *The Social Ecology of Crime*, Springer-Verlag, New York, pp. 156–188.

Bordua, D. J., and Lizotte, A. J. (1979). Patterns of legal firearms ownership. *Law Policy Q.* 1: 147–175.

Bordua, D. J., Lizotte, A. J., and Kleck, G. (1979). *Patterns of Firearms Ownership and Regulation in Illinois*, A Report to the Illinois Law Enforcement Commission, Illinois Law Enforcement Commission, Springfield.

Brearley, H. C. (1932). *Homicide in the United States*, University of North Carolina Press, Chapel Hill.

Brill, S. (1977). *Firearm Abuse*, Police Foundation, Washington, DC.

Byrne, J. M. (1986). Cities, citizens, and crime. In Byrne, J. M., and Sampson, R. J. (eds.), *The Social Ecology of Crime*, Springer-Verlag, New York, pp. 77–101.

Cook, P. J. (1976). A strategic choice analysis of robbery. In Skogan, W. (ed.), *Sample Surveys of the Victims of Crime*, Ballinger, Cambridge, MA, pp. 173–187.

Cook, P. J. (1979). The effect of gun availability on robbery and robbery murder. Haveman, R., and Zellner, B. B. (eds.), *Policy Studies Review Annual.*, Sage, Beverly Hills, pp. 743–781.

Cook, P. J. (1982). The role of firearms in violent crime. In Wolfgang, M. E., and Werner, N. A. (eds.), *Criminal Violence*, Sage, Beverly Hills, pp. 236–291.

Cook, P. J., and Blose, J. (1981). State programs for screening handgun buyers. *Annals* 455: 80–91.

Curtis, L. (1974). *Criminal Violence*, Lexington Books, Lexington, MA.

Deutsch, S. J., and Alt, F. B. (1977). The effect of Massachusetts' gun control law on gun-related crimes in the city of Boston. *Evaluat. Q.* 1: 543–568.

DeZee, M. R. (1983). Gun control legislation: Impact and ideology. *Law Policy Q.* 5: 367–379.

Eskridge, C. W. (1986). Zero-order inverse correlations between crimes of violence and hunting licenses in the United states. *Sociol. Soc. Res.* 71: 55–57.

Firebaugh, G., and Gibbs, J. P. (1985). User's guide to ratio variables. *Am. Sociol. Rev.* 50:713–722.

Gastil, R. D. (1971). Homicide and a regional culture of violence. *Am. Sociol. Rev.* 36:412–427.

Geisel, M. S., Roll, R., and Wettick, R. S. (1969). The effectiveness of state and local regulations of handguns. *Duke Univ. Law J.* 4: 647–676.

Gibbs, J. P., and Erickson, M. L. (1976). Crime rates of American cities in an ecological context. *Am. J. Sociol.* 82: 605–620.

Hay, R., and McCleary, R. (1979). Box-Tiao time series models for impact assessment. *Evaluat. Q.* 3: 277–314.

Inter-university Consortium for Political and Social Research (ICPSR) 1983. *Uniform Crime Reports: National Time Series Community-level Database, 1967–1980*, ICPSR Study 8214 (machine readable dataset), Principal Investigators: Pierce, G. L., Bowers, W. J., Baird, J., and Heck, J. ICPSR, Ann Arbor, MI.

ICPSR (1984a). *Uniform Crime Reporting Program Data*, ICPSR Study 9028, Parts 3, 7, 11, 15, Supplementary Homicide Reports, 1979–1982, Federal Bureau of Investigation, ICPSR, Ann Arbor, MI.

ICPSR (1984b). *Uniform Crime Reporting Program Data*, ICPSR Study 9028, Parts 2, 6, 14, Property Stolen and Recovered, 1979–1981, Federal Bureau of Investigation, ICPSR, Ann Arbor, MI.

Jones, E. D., III (1981). The District of Columbia's "Firearms Control Regulations Act of 1975," *Annals* 455: 138–149.

Jones, E. D., and Ray, M. W. (1980). *Handgun Control: Strategies, Enforcement and Effectiveness*, Unpublished report, U.S. Department of Justice, Washington, D.C.

Jung, R. S., and Jason, L. A. (1988). Firearm violence and the effects of gun control legislation. *Am. J. Commun. Psychol.* 16: 515–524.

Kennedy, P. (1985). *A Guide to Econometrics*, Basil Blackwell, London.

Kleck, G. (1979). Capital punishment, gun ownership, and homicide. *Am. J. Sociol.* 84: 882–910.

Kleck, G. (1984a). The relationship between gun ownership levels and rates of violence in the United States. In Kates, D. B., Jr. (ed.), *Firearms and Violence: Issues of Public Policy*, Ballinger, Cambridge, MA., pp. 99—135.

Kleck, G. (1984b). Handgun-only gun control. In Kates, D. B., Jr. (ed.), *Firearms and Violence: Issues of Public Policy*, Cambridge, Ballinger, MA, pp. 167–199.

Kleck, G. (1988). Crime control through the private use of armed force. *Soc. Problems* 35: 1–21.

Kleck, G. (1991). *Point Blank: Guns and Violence in America*, Aldine de Gruyter, New York.

Kleck, G., and McElrath, K. (1991). The effects of weaponry on human violence. *Soc. Forces* 69: 669–692.

Kleck, G., and DeLone, M. (1993). Victim resistance and offender weapon effects in robbery. *J. Quant. Criminol.* 9: 55–81.

Krug, A. S. (1967). A statistical study of the relationship between firearms licensing laws and crime rates. *Congress. Record* 7-25-67, pp. H9366–H9370.

Land, K. C. (1990). Structural covariates of homicide rates. *Am. J. Sociol.* 95: 922–963.

Lester, D. (1987). An availability-acceptability theory of suicide. *Act. Nervosa Super.* 29: 164–166.

Lester, D. (1988). Gun control, gun ownership, and suicide prevention. *Suicide Life-threat. Behav.* 18: 176–180.

Lester, D., and Murrell, M. E. (1981). The relationship between gun control statutes and homicide rates: A research note. *Crime Just.* 4: 146–148.

Lester, D., and Murrell, M. E. (1982). The preventive effect of strict gun control laws on suicide and homicide. *Suicide Life-Threat. Behavior.* 12: 131–140.

Lester, D., and Murrell, M. E. (1986). The influence of gun control laws on personal violence. *J. Commun. Psychol.* 14: 315–318.

Lizotte, A. J., Bordua, D. J., and White, C. S. (1981). Firearms ownership for sport and protection: Two not so divergent models. *Am. Sociol. Rev.* 46: 499–503.

Loftin, C., Heumann, M., and McDowall, D. (1983). Mandatory sentencing and firearms violence: Evaluating an alternative to gun control. *Law Soc. Rev.* 17: 287–318.

Loftin, C., and McDowall, D. (1981). "One with a gun gets you two": Mandatory sentencing and firearms violence in Detroit. *Annals* 455: 150–167.

Loftin, C., and McDowall, D. (1984). The deterrent effects of the Florida Felony Firearm Law. *J. Crim. Law Criminol.* 75: 250–259.

Loftin, C., McDowall, D., Wiersema, B., and Cottey, J. (1991). Effects of restrictive licensing of handguns on homicide and suicide in the District of Columbia. *N. Engl. J. Med.* 325: 1615–1621.

Maddala, G. S. (1988). *Introduction to Econometrics*, Macmillan, New York.

Magaddino, J. P., and Medoff, M. H. (1982). Homicides, robberies and state "cooling-off" schemes. In Kates, D. B., Jr. (ed.), *Why Handgun Bans Can't Work*, Second Amendment Foundation, Bellevue, WA.

Magaddino, J. P., and Medoff, M. H. (1984). An empirical analysis of federal and state firearm controls. In Kates, D. B., Jr. (ed.), *Firearms and Violence*, Ballinger, Cambridge, MA.

McDowall, D. (1986). Gun availability and robbery rates: A panel study of large U.S. cities, 1974–1978. *Law & Policy* 8: 135–148.

McPheters, L. R., Mann, RT., and Schlagenhauf, D. (1984). Economic response to a crime deterrence program. *Econ. Inquiry* 22: 550–570.

Murray, D. R. (1975). Handguns, gun control laws and firearm violence. *Soc. Problems* 23: 81–92.

Newton, G. D., and Zimring, F. E. (1969). *Firearms and Violence in American Life: A Staff Report to the National Commission on the Causes and Prevention of Violence*, U.S. Government Printing Office, Washington, DC.

Nicholson, R., and Garner, A. (1980). *The Analysis of the Firearms Control Act of 1975*, U.S. Conference of Mayors, Washington, D.C.

Olin Mathieson Company (1969). Unpublished study summarized by Newton and Zimring (1969, p. 182).

Pierce, G. L., and Bowers, W. J. (1981). The Bartley–Fox gun law's short-term impact on crime in Boston. *Annals* 455: 120–137.

Quinn, B., *et al.* (1982). *Churches and Church Membership in the United States, 1980*, Glenmary Research Center, Atlanta, GA.

Ronhovde, K. M., and Sugars, G. P. (1982). Survey of select state firearm control laws. In Congressional Research Service, *Federal Regulation of Firearms*, a report prepared for the Senate Judiciary Committee, pp. 201–228.

Sampson, R. J. (1986). Crime in cities. In Reiss, A. J., Jr., and Tonry, M. (eds.), *Communities and Crime*, University of Chicago Press, Chicago, pp. 271–311.

Scammon, R. M. (ed.) (1972). *America Votes, Vol. 10*, Macmillan, New York.

Seitz, S. T. (1972). Firearms, homicides, and gun control effectiveness. *Law Soc. Rev.* 6: 595–614.

Shields, D. J. (1976). Two judges look at gun control. *Chicago Bar Record* 1976: 180–185.

Smith, D. A., and Uchida, C. D. (1988). The social organization of self-help. *Am. Sociol. Rev.* 53:94–102.

Sommers, P. M. (1980). Deterrence and gun control: An empirical analysis. *Atlantic Econ. J.* 8: 89–94.

Sommers, P. M. (1984). Letter to the Editor. *N. Engl. J. Med.* 310: 47–48.

U.S. Bureau of Alcohol Tobacco and Firearms (BATF) (1980). *State Laws and Published Ordinances, Firearms—1980*, U.S. Government Printing Office, Washington, D.C.

U.S. Bureau of the Census (1981). *1977 Census of Service Industries—Geographic Area Series—United States*, U.S. Government Printing Office, Washington , D.C.

U.S. Bureau of the Census (1983a). *County and City Data Book 1983*, U.S. Government Printing Office, Washington, DC.

U.S. Bureau of the Census (1983b). *1980 Census of the Population, Vol. 1. Characteristics of the Population, Chapter C, General Social and Economic Characteristics*, Table 118, U.S. Government Printing Office, Washington, DC.

U.S. Bureau of the Census (1986). *Statistical Abstract of the United States, 1987*, U.S. Government Printing Office, Washington, DC.

U.S. Bureau of Justice Statistics (1982). *Prisoners in State and Federal Institutions on December 31, 1980*, U.S. Government Printing Office, Washington, DC.

U.S. Bureau of Justice Statistics (1987). *Criminal Victimization in the United States, 1985*, U.S. Government Printing Office, Washington, DC.

U.S. Department of Justice (1989). Draft report on systems for identifying felons who attempt to purchase firearms; Notice and request for comments. *Fed. Register* June 26: 26901–26941.

U.S. Federal Bureau of Investigation (1980–1982). *Crime in the United States*, annual issues covering 1979–1981, U.S. Government Printing Office, Washington, DC.

U.S. Federal Bureau of Investigation (1984). *Uniform Crime Reporting Handbook*, U.S. Government Printing Office, Washington, D.C.

U.S. Federal Bureau of Investigation (undated). *AS&R Data by State and County (year)*, covering each of years 1979–1981, Computer printout supplied by FBI to senior author, reporting arrests for individual reporting police agencies.

U.S. Fish and Wildlife Service (1980). *Federal Aid in Fish and Wildlife Restoration, 1980*, U.S. Government Printing Office, Washington, DC.

U.S. National Center for Health Statistics (NCHS) (1983). *Public Use Data Tape Documentation: Mortality Detail 1980 Data*, U.S. Department of Health and Human Services, Hyattsville, MD.

Wisconsin (1960). *The Regulation of the Firearms by the States*, Research Bulletin 130, Wisconsin Legislative Reference Library, Wisconsin.

Wright, J. D., and Rossi, P. H. (1986). *Armed and Considered Dangerous*, Aldine, New York.

Wright, J. D., Rossi, P. H., and Daly, K. (1983). *Under the Gun: Weapons, Crime and Violence*, Aldine, New York.

Zimring, F. E. (1975). Firearms and federal law: The Gun Control Act of 1968. *J. Legal Stud.* 4: 133–198.

EXHIBIT 9



IZA DP No. 3589

**Estimating the Causal Effect of Gun Prevalence on Homicide Rates:**
**A Local Average Treatment Effect Approach**

Tomislav Kovandzic
Mark E. Schaffer
Gary Kleck

July 2008

Forschungsinstitut
zur Zukunft der Arbeit
Institute for the Study
of Labor

DISCUSSION PAPER SERIES

# Estimating the Causal Effect of Gun Prevalence on Homicide Rates: A Local Average Treatment Effect Approach

**Tomislav Kovandzic**
*University of Texas at Dallas*

**Mark E. Schaffer**
*CERT, Heriot-Watt University,
CEPR and IZA*

**Gary Kleck**
*Florida State University*

Discussion Paper No. 3589
July 2008

IZA

P.O. Box 7240
53072 Bonn
Germany

Phone: +49-228-3894-0
Fax: +49-228-3894-180
E-mail: iza@iza.org

Any opinions expressed here are those of the author(s) and not those of IZA. Research published in this series may include views on policy, but the institute itself takes no institutional policy positions.

The Institute for the Study of Labor (IZA) in Bonn is a local and virtual international research center and a place of communication between science, politics and business. IZA is an independent nonprofit organization supported by Deutsche Post World Net. The center is associated with the University of Bonn and offers a stimulating research environment through its international network, workshops and conferences, data service, project support, research visits and doctoral program. IZA engages in (i) original and internationally competitive research in all fields of labor economics, (ii) development of policy concepts, and (iii) dissemination of research results and concepts to the interested public.

IZA Discussion Papers often represent preliminary work and are circulated to encourage discussion. Citation of such a paper should account for its provisional character. A revised version may be available directly from the author.

IZA Discussion Paper No. 3589
July 2008

# ABSTRACT

## Estimating the Causal Effect of Gun Prevalence on Homicide Rates: A Local Average Treatment Effect Approach[*]

This paper uses a "local average treatment effect" (LATE) framework in an attempt to disentangle the separate effects of criminal and noncriminal gun prevalence on violence rates. We first show that a number of previous studies have failed to properly address the problems of endogeneity, proxy validity, or heterogeneity in criminality. We demonstrate that the time series proxy problem is severe; previous panel data studies have used proxies that are essentially uncorrelated in time series with direct measures of gun relevance. We adopt instead a cross-section approach: we use U.S. county-level data for 1990, and we proxy gun prevalence levels by the percent of suicides committed with guns, which recent research indicates is the best measure of gun levels for cross-sectional research. We instrument gun levels with three plausibly exogenous instruments: subscriptions to outdoor sports magazines, voting preferences in the 1988 Presidential election, and numbers of military veterans. In our LATE framework, the estimated impact of gun prevalence is a weighted average of a possibly negative impact of noncriminal gun prevalence on homicide and a presumed positive impact of criminal gun prevalence. We find evidence of a significant negative impact, and interpret it as primarily "local to noncriminals", i.e., primarily determined by a negative deterrent effect of noncriminal gun prevalence. The beneficiaries of the reduced level of violence may include substantial numbers of (urban) criminals, the murders of whom decrease via spillovers from noncriminal gun prevalence.

JEL Classification:    K42, C51, C52

Keywords:    crime, homicide, gun levels, endogeneity

Corresponding author:

Mark Schaffer
Centre for Economic Reform and Transformation
Department of Economics
Heriot-Watt University
Edinburgh EH14 4AS
United Kingdom
E-mail: m.e.schaffer@hw.ac.uk

---

[*] Seminar audiences at IZA, EERC-Moscow, and the Universities of Aberdeen, Bologna, Dundee, Edinburgh and Strathclyde provided useful comments and suggestions on earlier versions of this paper. We are grateful to John DiNardo, David Drukker, John Earle, Andrea Ichino, Austin Nichols, Steven Stillman, and Jeff Wooldridge for helpful comments and discussions on modeling and econometric issues. The usual caveat applies.

## 1.    Introduction

Guns are heavily involved in violence in America, especially homicide. In 2005, 68 percent of homicides were committed by criminals armed with guns (U.S. Federal Bureau of Investigation 2006). Probably an additional 100,000 to 150,000 individuals were medically treated for nonfatal gunshot wounds (Kleck, 1997, p. 5; Annest et al., 1995). Further, relative to other industrialized nations, the United States has higher rates of violent crime, both fatal and nonfatal, a larger private civilian gun stock, and a higher fraction of its violent acts committed with guns (Killias, 1993; Kleck, 1997, p. 64). These simple facts have led many to the conclusion that America's high rate of gun ownership must be at least partially responsible for the nation's high rates of violence, or at least its high homicide rate.[1] This belief in a causal effect of gun levels on violence rates, and not merely on criminals' choice of weaponry, has likewise inclined some to conclude that limiting the availability of guns would substantially reduce violent crime, especially the homicide rate (e.g., Clarke and Mayhew, 1988, p. 106; Duggan, 2001).

While gun possession among aggressors in violent incidents may serve to increase the probability of a victim's death, gun possession and defensive use among victims may reduce their chances of injury or death. Individual-level research (e.g., Kleck and McElrath, 1990; Kleck and DeLone, 1993; Tark and Kleck 2004) can assess such effects of gun use in crime incidents, but it is less useful for detecting deterrent effects of gun ownership among prospective victims. Criminals usually cannot visually distinguish people carrying concealed weapons from other people, or residences with gun-owning occupants from other residences, and so deterrent effects would not be limited to gun owners (Kleck, 1988; Kleck and Kates, 2001, pp. 153-154; Lott, 2000). Because the protective effects of gun ownership may spill over to nonowners, the aggregate net impact of homicide-increasing and homicide-decreasing effects of gun availability can be quantified only through macro-level research.

Such macro-level studies must, however, take account of a number of potential pitfalls. First, gun levels may affect crime rates, but higher crime rates may also increase gun levels, by stimulating people

---

[1]  See, e.g., Sloan et al. (1990), Killias (1993), and Zimring and Hawkins (1999). Detailed studies using cross-national data are, however, generally unsupportive of this conclusion, and suggest instead that there is no significant association between national gun ownership rates and rates of homicide, suicide, robbery, or assault (Kleck, 1997, p. 254; Killias et al, 2001, pp. 436, 440).

to acquire guns, especially handguns, for self-protection. The result is that empirical researchers face a classic problem of endogeneity bias: unless it is successfully addressed, what is asserted to be the impact of gun levels on crime rates will in fact also include the impact of crime rates on gun levels, and estimates of the former will typically be biased upwards. Second, measurement of gun levels is subject to well-documented problems (Kleck, 2004). Given the shortcomings in the available direct measures of gun levels, researchers have commonly used proxy measures instead. But proxies are also problematic. At the most basic level, a proxy for gun prevalence should be demonstrated to be "valid": correlated with direct measures of gun levels. Panel data studies face a particular problem here, since the time-series variation in the chosen proxy must be demonstrably correlated with the time-series variation in gun levels, a much tougher requirement than cross-sectional correlation.

A third problem that has hitherto been largely ignored in the empirical literature in this area is heterogeneity in criminality: the effect of gun prevalence depends on who holds guns, criminals or noncriminals, and this may vary across localities. This gap in the literature is particularly surprising given the policy debate. Empirical researchers have implicitly focused on estimating an "average treatment effect" (ATE) of gun prevalence on crime rates, i.e., the impact of a change in gun prevalence that is randomly distributed across the population. Policy interventions (e.g., gun control laws), however, will typically have different impacts on the prevalence of guns among criminals and noncriminals. Even if the first two problems can be addressed and an ATE estimated consistently, it would therefore be of limited use in helping to assess the net impact of a change in gun policy on crime rates. Separate estimates of the criminal and noncriminal effects of gun prevalence on crime would be more useful, since they could be combined with information on how a new policy would affect criminal vs. noncriminal gun prevalence.

This study uses a "local average treatment effect" (LATE) framework to try to disentangle the separate effects of criminal and noncriminal gun prevalence on violence rates. We first show that previous studies have not properly addressed the problems of endogeneity, proxy validity, or heterogeneity in criminality. We demonstrate that the time series proxy problem is severe – previous panel data studies have used proxies that are essentially uncorrelated in time series with direct measures of gun relevance. We adopt instead a cross-section approach: we use U.S. county-level data for 1990, and we proxy gun

2

prevalence levels by the percent of suicides committed with guns, which recent research indicates is the best measure of gun levels for cross-sectional research (Kleck 2004). We instrument gun levels with three plausibly exogenous instruments: subscriptions to outdoor sports magazines, voting preferences in the 1988 Presidential election, and numbers of military veterans. In our LATE framework, the estimated impact of gun prevalence is a weighted average of a possibly negative impact of noncriminal gun prevalence on homicide and a presumed positive impact of criminal gun prevalence. We find evidence of a significant negative impact, and interpret it as primarily "local to noncriminals", i.e., primarily determined by a negative deterrent effect of noncriminal gun prevalence. Our results also suggest that the beneficiaries of the reduced level of violence may include substantial numbers of (urban) criminals, the murders of whom decrease via spillovers from noncriminal gun prevalence.

The paper is organized as follows. Section 2 critically reviews previous research on the gun-homicide relationship. In Section 3 we set out how we model heterogeneity of criminality and discuss estimation and specification testing in an IV/GMM/LATE framework. Section 4 describes the data and model specification that we use. Estimation results are presented in Section 5, and Section 6 concludes.

## 2. Prior research

The basic model throughout this literature is one in which crime rates – here homicide, $h_i$ – in a locality i are a function of the level of gun prevalence $g_i$, $h_i=h(g_i)$. The key question is the sign and magnitude of the derivative $\partial h_i / \partial g_i$, i.e., the sign and size of the impact of gun prevalence on crime.

We distinguish between various channels through which gun prevalence could influence homicide rates:

(a) Criminality: guns are an offensive technology, and can be used by criminals to facilitate criminal activity. Even if gun prevalence had no effect on the frequency of criminal activity, it could still increase the fraction of crimes that resulted in death, due to the greater lethality of guns relative to other weapons. Increased general gun prevalence means, ceteris paribus, more criminals have more access to this technology, and hence commit more homicides. $\partial h_i / \partial g_i > 0$.

(b) Deterrence: guns are also a defensive technology, and can be used by noncriminals (or criminals) to deter crime. The more likely the potential victim is armed, the less likely a criminal is to attack. Increased general gun prevalence also means, ceteris paribus, more potential victims have access to this technology, and hence deter more homicides. $\partial h_i / \partial g_i < 0$.

3

(c) Self-defense: the more likely the potential victim is armed, the more likely the victim is to attempt to disrupt an attack. The impact of the self-defense effect is ambiguous: gun use by potential victims may simply disrupt attacks, or may lead to escalation and fatalities either because victims shoot their attackers or provoke their attackers into shooting them. $\partial h_i / \partial g_i >$ or $< 0$.

These effects can also interact: for example, the stronger the positive self-defense effect (c) because victims shoot their attackers, the stronger can be the negative deterrent effect (b). Whether the net effect of increased gun prevalence on homicide is positive, negative, or null, is therefore essentially an empirical question.

An estimating equation is obtained by linearizing the model and adding an error term, e.g., in a cross-section of localities, the data generating process (DGP) is typically modeled as

$$h_i = \beta_0 + \beta_1 g_i + u_i \tag{1}$$

Researchers also include a range of control variables $X_i$ as exogenous regressors, which we omit here for simplicity of exposition. The parameter of interest is $\beta_1$, the impact of gun levels on the homicide rate.

Macro-level studies of the impact of gun prevalence on crime rates number in the dozens.[2] The conclusions of these studies have been contradictory, with some (e.g., Duggan 2001, Cook and Ludwig 2004, 2006) finding a significant positive association between crime or violence rates and some measure of gun ownership, and others (e.g., Kleck and Patterson 1993, Moody and Marvell 2005) finding a null or negative relationship. All these studies, however, can be criticized on the methodological grounds mentioned earlier: endogeneity, proxy validity, and heterogeneity in criminality.

Numerous macro-level studies have found effects of crime rates on gun levels (e.g., Kleck, 1979, 1984; McDowall and Loftin, 1983; Kleck and Patterson, 1993; Duggan, 2001; Rice and Hemley, 2002), and individual-level survey evidence directly indicates that people buy guns in response to higher crime rates (Kleck, 1997, pp. 74-79). We can represent this in the simple model above by writing gun prevalence as an increasing function of homicide rates, $g_i = g(h_i)$, $\partial h_i / \partial g_i > 0$. This reverse causality creates a potential endogeneity bias: OLS estimation of (1) would generate an estimate of $\beta_1$ that is biased upwards. A similar problem arises when an unmeasured characteristic of locales (e.g., low "social capital"

---

[2] See our 2005 CEPR discussion paper for a discussion and list of 30 such studies, and Kleck (1997), Chapter 7 for a more extensive review of the pre-1997 research.

or a "violent culture") is associated with both high crime rates and high gun prevalence: if $sc_i$ denotes social capital, then $g_i=g(sc_i)$, $\partial g_i/\partial sc_i < 0$ and $h_i=h(sc_i)$, $\partial h_i/\partial sc_i < 0$. The effect is again to cause OLS estimates of $\beta_1$ to suffer from an upward endogeneity bias.

Like the endogeneity problem, the proxy problem is straightforward to state. Typically, data on gun levels are sparse, noisy, or simply unavailable. Researchers have responded by using a diverse set of proxy measures (Kleck, 2004). In cross-section, this gives a feasible estimating equation

$$h_i = b_0 + b_1 p_i + e_i \qquad (2)$$

where $p_i$ is the proxy for gun prevalence $g_i$. The relationship between $g_i$ and $p_i$ is given by

$$p_i = \delta_0 + \delta_1 g_i + v_i \qquad (3)$$

where $\delta_1$ is some positive parameter and $v_i$ is measurement error. Since a consistent estimate of $b_1$ will be a consistent estimate of the quantity $(\beta_1/\delta_1)$, estimates of $b_1$ can be used to make inferences about the sign of $\beta_1$, and after calibration (estimation of, or evidence on, the magnitude of $\delta_1$), of the magnitude of $\beta_1$.

The proxy problem is that the variable $p_i$ must be demonstrably valid, i.e., highly correlated with the true measure of gun prevalence $g_i$. Kleck (2004) shows, however, that most of the measures used in prior studies have poor validity. The main exception is the percent of suicides committed with guns (PSG), which correlates strongly in cross-section with direct survey measures across cities, states, and nations. Other authors (e.g., Azrael, Cook and Miller 2004; Moody and Marvell 2005; Cook and Ludwig 2004, 2006) have also concluded that PSG is currently the best available proxy. Proxies for time-series variation in gun levels, on the other hand, are particularly poor, a point we return to shortly.

The guns-crime studies that have tried to address the endogeneity problem have used one of two approaches: instrumental variables (IV) techniques on cross-section data, and panel data methods. These studies have relied primarily or exclusively on proxies for gun prevalence, and have not explicitly addressed the heterogeneity in criminality problem.

Critics of the IV approach have argued that it is difficult or impossible to find plausible instruments that are both correlated with the gun level measure and uncorrelated with the error term. The most-often cited such study, Kleck and Patterson (1993), used a sample of 170 cities and a proxy for gun levels, instrumented with the rate of subscriptions to gun-related magazines and the state hunting license

rate. Duggan (2001, p. 1095, n. 10) and Cook and Ludwig (2004, p. 10, n. 6) question the assumption that these instruments are exogenous, speculating that they may be correlated with unmeasured city-level correlates of violent crime. Kleck and Patterson did not report a test of instrument exogeneity in their study, and did not account for econometric problems such as heteroskedasticity that are common in cross-sectional analysis.

The second and more recent approach to dealing with the endogeneity problem – e.g., Duggan (2001), Moody and Marvell (2005), and Cook and Ludwig (2004, 2006) – has been to use panel data and the notion of Granger causality to try to establish whether past gun levels helps predict current crime rates. Panel data models allow the researcher to control for all time-invariant unobserved heterogeneity through the use of fixed effects or first-differences. For example, in

$$\Delta h_{it} \ = \ a_1 \Delta h_{it-1} \ + \ b_1 \Delta p_{it-1} \ + \ u_{it} \tag{4}$$

where $\Delta$ denotes the first-differences operator, the coefficient $b_1$ on $\Delta p_{it-1}$ indicates whether lagged changes in the gun prevalence proxy predict current changes in homicide rates. A significant $b_1$ is interpreted as evidence of a causal effect of gun prevalence on homicide rates.

Moody and Marvell (2005) use first-differences on state level panel data and a combination of a direct measure of gun levels derived from the General Social Survey (GSS) with interpolations using the percentage of suicides with a gun (PSG) as their proxy; they find no effect of gun levels on homicide rates. Duggan (2001) uses first-differences on county-level panel data and *Guns & Ammo* magazine subscription rates (GAR) as a proxy for gun levels; Cook and Ludwig (2004, 2006) use fixed effects on county-level panel data and PSG as their gun proxy. Both Duggan and Cook-Ludwig find a positive impact of gun levels on homicide rates.

Although using time-series variation helps address the endogeneity problem, it aggravates the proxy problem, for two reasons. First, panel data methods amplify the measurement error problem inherent in using a proxy for gun prevalence instead of a direct measure (see, e.g., Griliches and Hausman (1986) for a general discussion). Second and more directly, the three panel studies between them used two gun level proxies, PSG and GAR, that show little or no time series correlation with the best available direct survey measure of gun prevalence at the national level, the GSS.

6

This is readily demonstrated using the Moody and Marvell (2005) dataset, who have kindly made their data publicly available.[3] Moody and Marvell report a high overall correlation of PSG with the percent of households with a gun (HHG) from the GSS (Moody and Marvell 2005, Table 1, p. 723), but this is driven entirely by the cross-sectional correlation between PSG and the GSS gun measure; the intertemporal correlations are tiny. The left-hand panel of Figure 1 below shows that state-average PSG and state-average HHG are highly correlated – the $R^2$ is 69%. The right-hand panel, on the other hand, shows that the correlation of first-differences in state PSG and state HHG is essentially nil, with an $R^2$ of approximately zero. The estimations reported by Cook and Ludwig (2004, pp. 13-14 and Table 2, p. 43) are similar: when they regress various GSS gun level measures on PSG, fixed effects for 9 Census Divisions, and in some specifications, time dummies, the t-statistics on PSG correspond to low $R^2$s of about 3-7%.[4]

Figure 1: PSG and General Social Survey HHG, State-level Data 1977-98



---

[3] The data were downloaded from http://cemood.people.wm.edu/research.html.
[4] More precisely, these are "partial $R^2$s": the $R^2$ that would be obtained in a residual regression after partialing-out the fixed effects and time dummies. The t-statistics on PSG reported by Cook and Ludwig vary from 1.94 to 3.02 and refer to heteroskedastic-robust tests for a regression weighted by population. These can be converted into a partial-$R^2$-like statistics using the formula $R^2 = F/(df+F)$ where F is the F statistic (obtained as the square of the t-statistic) and df is the degrees of freedom of the test.

Figure 2: GAR and General Social Survey HHG, State-level Data 1980-98



The Moody-Marvell dataset also allows us to compare the cross-section and time-series validity of the proxy used by Duggan (2001), subscription rates to *Guns & Ammo* magazine. For consistency with Duggan's specification, we use logged values of HHG and GAR in mean-deviation form, i.e., with state-fixed effects partialed-out. The left-hand panel of Figure 2 shows that state-average log GAR and state-average log HHG are correlated, though not as strongly as were PSG and HHG (consistent with the consensus view that PSG is the superior proxy) – the $R^2$ is 26%. The right-hand panel, however, shows that the intertemporal variations in GAR and HHG are essentially uncorrelated, with an $R^2$ of approximately zero. The validation results reported by Duggan (2001, Table 3, column 4) are qualitatively similar: in a regression of log HHG on log GAR using state-level data for 1980-98, including both state and year fixed effects, and weighting observations by the number of GSS survey respondents, the t-statistic on log GAR is 3.10, which corresponds to an $R^2$ of about 2%.[5]

This problem of invalid time series proxies for gun levels can be attributed at least in part to the nature of the GSS. The GSS is available only annually or less since 1973, and has been shown to be affected by intertemporal variations in reporting bias, such as the artificial drop in gun prevalence in the

---

[5] This is also a "partial-$R^2$"; see note 4 above.

early 1990s following the enactment of the Brady laws. The intertemporal variation in GSS data disaggregated to the state level is extremely noisy, mostly because of the small number of observations: since only about 1,400 people are asked the gun questions in a typical year, GSS samples for any one state in any one year average only about 30 persons. This is apparent in Figures 1 and 2 above: in Figure 1, for example, the standard deviation for annual changes in GSS state-level HHG is 18 percentage points. The GSS survey data are, nevertheless, by consensus the best available direct data on gun prevalence in the US. The problem is therefore quite general. In a recent survey, Kleck (2004) shows that all ten proxies of aggregate measures of gun ownership in the US used in various studies show no significant intertemporal correlation with the GSS measures. The unfortunate consequence of this is that researchers using panel data and relying on intertemporal variation in gun level proxies have not demonstrated that the proxies provide valid identifying variation.

The "heterogeneity in criminality" problem follows from some widely accepted stylized facts about crime in general and homicide in particular. A relatively large fraction of homicides in the US is accounted for by a small portion of the population, namely criminals. Criminals also account for a disproportionately large share of homicide victims. Unlike the endogeneity and proxy problems, the complications posed by heterogeneity in the degree of criminality have been largely ignored in the empirical literature on gun prevalence and crime. In particular, all the studies cited above have implicitly attempted to estimate what is known in the program evaluation literature as the "average treatment effect" (ATE) or "average causal effect". In the next section, we use a simple model to show that estimation of (3) or (4) by least squares, as in Duggan (2001) and Cook and Ludwig (2004, 2006), does not in general produce a consistent estimate of the ATE even in the absence of endogeneity or proxy problems. Instrumental variables methods face a different but related problem: estimation of (3) or (4) by IV, as in Kleck and Patterson (1993), produces a consistent estimate, not of the ATE, but of the "local average treatment effect" or LATE (Imbens and Angrist, 1994; Angrist and Imbens, 1995).

More fundamentally, we believe that the implicit focus by previous studies on the ATE is misplaced. The ATE is of limited use in the context of gun policy, since policy interventions in this area – e.g., gun control measures – aim to have, by design, differential impacts on criminal and noncriminal gun

9

prevalence. More useful would be results about the signs and magnitudes of the separate criminal and noncriminal effects of gun prevalence on homicide, because this information could be combined with information about the likely impacts of a policy on criminal and noncriminal gun prevalence to forecast the overall impact of the policy on crime rates.

The approach we take in this paper is to return to the cross-section setting, where the basic validity of the proxy used – PSG – has been well established, and the problem of endogeneity bias is well understood. We expand the standard modeling framework in the literature to accommodate criminal/noncriminal heterogeneity, and adopt an instrumental variables/LATE approach to estimation and interpretation of our results. Our results provide evidence in particular about the sign and magnitude of the noncriminal effect of gun prevalence on homicide.

### 3.    Modeling criminal/noncriminal heterogeneity and LATE estimation

*Estimating strategy*

Our strategy is to use an IV/GMM/LATE framework to obtain and interpret point estimates of, and bounds on, the impact of gun prevalence on homicide rates. We use county data in levels with state fixed effects and we proxy gun prevalence by the percentage of suicides committed with a gun, PSG. In this section we first show that with an underlying population composed of a mixture of criminals and noncriminals and a continuous treatment variable, gun prevalence, OLS estimation does not generate a consistent estimate of the ATE or indeed an estimate that is readily interpretable, even in the ideal circumstances where the investigator can directly observe gun prevalence and there is no endogeneity problem. By contrast, IV estimation with a valid (exogenous) instrument has a straightforward interpretation: it identifies a LATE parameter that is a weighted average of the criminal and noncriminal impacts of gun prevalence on homicide, where the weights depend on the strength of the correlations between the instrument, on the one hand, and criminal and noncriminal gun prevalence, on the other.

Because we have more than one instrument for our gun level proxy, a test of overidentifying restrictions is available. This specification test has both a LATE interpretation (due to Angrist and Imbens 1995) as well as a traditional IV/GMM interpretation. These are, in fact, simply different interpretations:

10

as we discuss below, in both cases the test can be seen as a "vector-of-contrasts" test. The null hypothesis is that the instruments are all identifying the same parameter. Rejection of the null suggests either that the instruments are identifying different LATE parameters, and/or some or all of the instruments are not exogenous and are generating different (biased) parameter estimates. The vector-of-contrasts interpretation shows when the test will have power to detect specification problems, and how to interpret tests of the exogeneity of specific instruments.

We also present two possible "upper bound" arguments that may be available for interpreting our results. First, we discuss how to make use of priors about the possible failure of instrument exogeneity in making inferences about the impact of gun prevalence. If an instrument is positively correlated with the error term (and also with gun prevalence), the estimated coefficient will be biased upwards, making it an upper bound on the actual impact. Second, we consider the possibility that the identified LATE parameter could be driven primarily by noncriminal gun prevalence effects. We show that this gives us an upper bound for the noncriminal gun prevalence effect on homicide.

The LATE framework we develop has more general applications, and may be used where the researcher has grouped data, groups are composed of two types of individuals that respond differently to a treatment or policy, and the researcher observes variation across groups in the treatment and outcomes but not the composition of the groups. For example, a researcher may want to estimate the impact on educational outcomes of an intervention at the school level (say, use of a teaching method or technology, or a category of spending), where data are available at the school level, students at a school are naturally categorized into two groups (students who do/don't have learning difficulties or whose mother tongue is/isn't English), but the student composition by school is not observable to the researcher. Another example would be analysis of local labor markets where it is natural to dichotomize workers (e.g., skilled vs. unskilled or high school dropouts vs. others) but the composition of the local labor force is not directly observed.

*Modeling criminal/noncriminal heterogeneity*

In modeling heterogeneity of criminality in gun homicide, we need to accommodate several stylized facts about gun homicide in the US. These are:

- Empirical studies show that most murders are committed by a relatively small number of "extremely aberrant individuals" (Kates and Mauser 2007, p. 666, who provide a useful recent survey of the evidence). Criminal homicides by previously noncriminal persons are very rare.

- Criminals acquire guns to facilitate criminal activity. In particular, they may intend to use their guns to commit crimes, or to protect themselves. Thus in the interview study of convicted felons by Wright and Rossi (1986), self-protection was the single most important reason for owning a gun, cited by 58% as a "very important" reason for acquiring their most recent handgun; 28% cited the need to use a gun in committing crimes as "very important".

- Most homicide victims are "criminals" in the sense of having criminal records or being regularly engaged in illegal activity. For example, in a review of the 112 homicide cases that took place in St. Louis in 2002, the St. Louis Police Department stated that 90% of suspects and 79% of victims had a felony criminal history (Decker et al. 2005, pp. 88-89).

- A substantial minority of homicide victims are nevertheless not criminals, at least as far as one can tell from arrest records.

- Homicides by noncriminals of other noncriminals are relatively rare.[6] Most homicides of noncriminals are by criminals.

We begin our modeling by assuming that the population consists of two categories of people: criminals (C) and noncriminals (NC). Our unit of observation is a county, and we specify our model in shares or fractions of the population of the locality: $h_i^C$ and $h_i^{NC}$ are numbers of (gun) homicides of criminals and noncriminals, respectively, per member of the population of county i; $g_i^C$ and $g_i^{NC}$ are the

---

[6] We are distinguishing here between (a) "criminals" as a type of person, and (b) "criminality" or "criminal behavior". The terms 'criminal' and 'noncriminal' are, of course simplifications, and can be regarded as shorthand for "persons who commit serious crimes" and "persons who do not commit serious crimes.

numbers of criminals and noncriminals holding guns, respectively, per member of county i. We specify

two DGPs, one for homicides of criminals (5a) and one for homicides of noncriminals (5b):

$$h_i^C \; = \; \beta_0^C \; + \; \beta_1^{C\text{-}C} g_i^C \; + \; \beta_1^{NC\text{-}C} g_i^{NC} \; + \; u_i^C \tag{5a}$$

$$h_i^{NC} = \; \beta_0^{NC} \; + \; \beta_1^{C\text{-}NC} g_i^C \; + \; \beta_1^{NC\text{-}NC} g_i^{NC} \; + \; u_i^{NC} \tag{5b}$$

In both equations, changes in criminal and noncriminal gun prevalence have separate impacts on

homicide rates. Thus in equation (5a), the causal impact of criminal gun prevalence $g_i^C$ on homicides of

other criminals $h_i^C$ is given by $\beta_1^{C\text{-}C}$, and $\beta_1^{NC\text{-}C}$ is the causal impact of noncriminal gun prevalence $g_i^{NC}$

on homicides of criminals. In equation (5b), $\beta_1^{C\text{-}NC}$ and $\beta_1^{NC\text{-}NC}$ are the impacts on homicides of

noncriminals by criminal and noncriminal gun prevalence $g_i^C$ and $g_i^{NC}$, respectively.

The channels identified above through which gun prevalence influences homicide rates –

criminality, deterrence and self-defense – can operate in both equations. The stylized facts just cited

suggest that $\beta_1^{C\text{-}C}$ will be large and positive: criminals use guns on each other to commit crimes and to

defend themselves aggressively against other criminals if attacked, and these outweigh any possible

negative deterrent effects of criminal gun prevalence. We also expect $\beta_1^{C\text{-}NC}$ to be positive, though not as

large: criminals use guns to kill noncriminals, but not as often as they use them to kill each other.

The stylized facts tell us less about what to expect for $\beta_1^{NC\text{-}NC}$ and $\beta_1^{C\text{-}NC}$. The parameter $\beta_1^{NC\text{-}NC}$

includes the negative effect of deterrence of attacks by criminals; it also includes gun homicides of NCs

by NCs, a kind of "criminality" effect (a), though perpetrated by what we are designating as

"noncriminals". The stylized facts suggest that this last effect should be positive but quite small. As

discussed above, however, there has been considerable debate and no clear consensus in the literature on

the existence or size of the deterrent effects. Thus $\beta_1^{NC\text{-}NC}$ may be positive (gun homicide "crimes of

passion" dominate), negative (deterrence of criminal attacks dominates), or somewhere in between.

The sign of the parameter $\beta_1^{NC\text{-}C}$ is also ambiguous. The use of guns by noncriminals for self-

defense against attacks by criminals could lead to fewer or more homicides, depending on whether the

more likely result is disruption or escalation. However, there is also an interesting possibility that has not

received much attention in the literature: noncriminal gun prevalence may have a negative deterrent effect

on homicides of criminals by other criminals, either by making non-local criminals less willing to travel to a locality to operate, or by making indigenous local criminals more cautious and less violent.

We do not separately observe rates of homicide of criminals and noncriminals; like preceding studies, we investigate instead the impact of gun prevalence on the total homicide rate. Aggregating (5a) and (5b), we obtain

$$h_i \;=\; \beta_0 \;+\; \beta_1^C g_i^C \;+\; \beta_1^{NC} g_i^{NC} \;+\; u_i \tag{5c}$$

where

$$h_i \equiv (h_i^C + h_i^{NC})$$

$$u_i \equiv (u_i^C + u_i^{NC})$$

$$\beta_0 \equiv (\beta_0^C + \beta_0^{NC})$$

$$\beta_1^C \equiv (\beta_1^{C\text{-}C} + \beta_1^{C\text{-}NC})$$

$$\beta_1^{NC} \equiv (\beta_1^{NC\text{-}C} + \beta_1^{NC\text{-}NC})$$

We expect the overall impact of criminal gun prevalence on total homicide to be positive, i.e. $\beta_1^C > 0$, because of the positive criminality impacts of criminal guns on both criminal and noncriminal victims.[7] The impact of noncriminal gun prevalence $\beta_1^C$ is ambiguous, and depends on the relative magnitudes of negative deterrent effects of $g_i^{NC}$ on homicides of noncriminals and criminals vs. the possible positive effects on homicides of criminals (self defense) and the positive effects on homicides of noncriminals (gun crimes of passion).

*The Average Treatment Effect (ATE) and OLS Estimation*

The average treatment effect or ATE is, at first glance, a natural way to summarize the overall impact of gun prevalence. When, because localities are heterogeneous, the impact of the treatment (gun prevalence) varies by locality, the ATE $\beta_1^{ATE}$ is the average impact $E(\beta_{1i})$. In our model of heterogeneity in criminality, the ATE takes a very simple form (see Appendix 2): in a large sample it will be approximately the weighted average of the criminal and noncriminal impacts,

---

[7] The use of guns by criminals for self-defense against other criminals would reinforce this if it is a positive effect; if it is a negative effect, it would be insufficient to offset the positive criminality effects.

14

$$\beta_1^{ATE} \approx \text{plim}(\beta_{1i}) = \frac{\mu^C}{\mu^C + \mu^{NC}}\beta_1^C + \frac{\mu^{NC}}{\mu^C + \mu^{NC}}\beta_1^{NC} \qquad (6)$$

where $\mu^C$ and $\mu^{NC}$ are the county means of criminal and noncriminal gun prevalence, $E(g_i^C)$ and $E(g_i^{NC})$, respectively. The weights are the shares of guns in the population that are criminal and noncriminal.[8]

Unfortunately, separate gun prevalence measures for criminals and noncriminals are not available. Empirical researchers instead must make use of a measure of total gun prevalence $g_i \equiv g_i^C + g_i^{NC}$ or a proxy for it. Consider the case where we have data for total gun prevalence only, but otherwise the circumstances are the best possible: we have direct observations on gun prevalence rather than a proxy, and gun prevalence is exogenous. The model to be estimated is equation (1), repeated here for convenience:

$$h_i = \beta_0 + \beta_1 g_i + u_i \qquad (1)$$

Previous researchers have interpreted OLS and IV estimates of $\beta_1$ in (1) as, in effect, estimates of the ATE. Once we explicitly model the heterogeneity in criminality, however, we see that in fact neither method generates a consistent estimate of $\beta_1^{ATE}$. We consider first OLS. In Appendix 2 we show that

$$\hat{\beta}_1^{OLS} \xrightarrow{P} \frac{\{\text{var}(g_i^C) + \text{cov}(g_i^C, g_i^{NC})\}}{\text{var}(g_i^C) + \text{var}(g_i^{NC}) + 2\,\text{cov}(g_i^C, g_i^{NC})}\beta_1^C$$
$$+ \frac{\{\text{var}(g_i^{NC}) + \text{cov}(g_i^C, g_i^{NC})\}}{\text{var}(g_i^C) + \text{var}(g_i^{NC}) + 2\,\text{cov}(g_i^C, g_i^{NC})}\beta_1^{NC} \qquad (7)$$

OLS estimation does not generate an estimate of the ATE even in these most favorable circumstances. The OLS estimator is, like the ATE, a weighted average of the criminal and noncriminal effects, but the weights are determined by the variability, not the levels, of gun prevalence. High variability generates a larger weight (via the variance terms), and a large positive correlation between criminal and noncriminal guns tends to equalize the weights (via the covariance terms). We are not aware of evidence about the cross-sectional or time-series variation in criminal vs. noncriminal gun prevalence. There is some

---

[8] The equality is approximate because $E(g_i^C/(g_i^C + g_i^{NC})) \neq E(g_i^C)/(E(g_i^C) + E(g_i^{NC}))$ and similarly for $E(g_i^{NC})$. However, $\text{plim}(g_i^C/(g_i^C + g_i^{NC})) = \text{plim}(g_i^C)/(\text{plim}(g_i^C) + \text{plim}(g_i^{NC}))$, which gives us a large-sample justification for the approximation.

evidence to suggest that criminal and noncriminal gun prevalence will be correlated, because most criminals acquire guns as a direct or indirect result of thefts from noncriminals (Wright and Rossi 1986, p. 196). The covariances in equation (7) are therefore likely to be positive, but of unknown magnitude. The magnitude of the variances in (7) are also unknown. In short, OLS estimates of $\beta_1$ cannot be readily interpreted in terms of the average effect of gun prevalence. This argument applies to estimates of $b_1$ using the proxy $p$, to both the panel and cross-section studies mentioned above, and more broadly to studies in which the dependent variable is some measure of crime other than homicide, e.g., burglary (Cook and Ludwig 2003c).

Although the ATE appears to be a natural summary measure of the impact of gun prevalence, it is actually of limited use in the context of gun policy. Policy interventions in this area – e.g., gun control measures – aim to have, by design, differential impacts on criminal and noncriminal gun prevalence. That is, the measures typically aim to reduce gun prevalence only among criminals, or more among criminals than among noncriminals. More useful would be results about the sign and magnitude of $\beta_1^C$ or $\beta_1^{NC}$, because this information could be combined with information about the likely impacts of a policy on criminal and noncriminal gun prevalence to forecast the overall impact of the policy on crime rates. Such information can be obtained using a LATE framework, to which we now turn.

*Local Average Treatment Effect (LATE) estimation*

We now consider IV estimation of (1), when gun levels are directly observable. Say we have a single instrument $Z_i$ that is correlated with both criminal and noncriminal gun prevalence, but the strength of the correlations may differ:

$$g_i^C \;=\; \pi_0^C \;+\; \pi_1^C Z_i \;+\; \eta_i^C \tag{8}$$

$$g_i^{NC} \;=\; \pi_0^{NC} \;+\; \pi_1^{NC} Z_i \;+\; \eta_i^{NC} \tag{9}$$

We assume that $\pi_1^C, \pi_1^{NC} \geq 0$ and at least one is strictly greater than zero. If total gun prevalence $g_i$ were observable, then equation (1) could be estimated by IV. We show in Appendix 2 that IV estimation of (1) generates an estimator of $\beta_1$ that converges in probability to a weighted average of $\beta_1^C$ and $\beta_1^{NC}$:

$$\hat{\beta}_1^{IV} \xrightarrow{P} \frac{\pi_1^C}{\pi_1^C + \pi_1^{NC}} \beta_1^C + \frac{\pi_1^{NC}}{\pi_1^C + \pi_1^{NC}} \beta_1^{NC} \tag{10}$$

The IV estimate of $\beta_1$ is an estimate of the "local average treatment effect" or LATE. It is a weighted average of $\beta_1^C$ and $\beta_1^{NC}$, with weights given by the relative strength of the correlation of the instruments with criminal and noncriminal gun prevalence. Note that equation (10) illustrates a feature of a LATE estimator, namely that the *definition* of $\hat{\beta}_1^{IV}$ is dependent on the instrument used (Heckman 1997); a different instrument, say $Z^A$, would define a different LATE estimator and would converge to a different weighted average.

In the polar case of $\pi_1^C = 0$, when the instrument $Z$ is correlated only with noncriminal gun prevalence, the IV estimator $\hat{\beta}_1^{IV}$ is a consistent estimate of $\beta_1^{NC}$, the impact of gun prevalence on homicide "local to" noncriminals. Similarly, if $\pi_1^{NC} = 0$, $\hat{\beta}_1^{IV}$ consistently estimates $\beta_1^C$.

Gun prevalence $g_i$ is not observable; instead, we observe only the proxy $p_i$. The relationship between the gun proxy and unobserved criminal and noncriminal gun prevalence is given by

$$p_i = \delta_0 + \delta_1^C g_i^C + \delta_1^{NC} g_i^{NC} + v_i \tag{11}$$

where assume that $\delta_1^C, \delta_1^{NC} \geq 0$ and at least one is strictly greater than zero. The estimating equation, again repeated here for convenience, is

$$h_i = b_0 + b_1 p_i + e_i \tag{2}$$

and we use IV methods to obtain an estimate of $b_1$. In Appendix 2 we show that the IV estimator of $b_1$ also converges in probability to a weighted average of $\beta_1^C$ and $\beta_1^{NC}$:

$$
\begin{aligned}
\hat{b}_1^{IV} \xrightarrow{P} \; & \frac{\pi_1^C}{\delta_1^C \pi_1^C + \delta_1^{NC} \pi_1^{NC}} \beta_1^C + \frac{\pi_1^{NC}}{\delta_1^C \pi_1^C + \delta_1^{NC} \pi_1^{NC}} \beta_1^{NC} \\
= \; & \frac{\pi_1^C + \pi_1^{NC}}{\delta_1^C \pi_1^C + \delta_1^{NC} \pi_1^{NC}} \left\{ \frac{\pi_1^C}{\pi_1^C + \pi_1^{NC}} \beta_1^C + \frac{\pi_1^{NC}}{\pi_1^C + \pi_1^{NC}} \beta_1^{NC} \right\}
\end{aligned}
\tag{12}
$$

Equation (12) shows that $\hat{\beta}_1^{IV}$ and $\hat{b}_1^{IV}$ converge to quantities that differ only by a positive scaling factor. This is a useful result: it means we can interpret results for the sign of $\hat{b}_1^{IV}$ as results for the sign of the infeasible LATE estimator $\hat{\beta}_1^{IV}$.

17

*Specification testing in the LATE framework*

We have more than one instrument available for gun prevalence, and therefore our estimating equation is overidentified. The standard IV/GMM test of overidentifying restrictions is the Sargan-Hansen J test, distributed as $\chi^2$ with degrees of freedom equal to the number of overidentifying restrictions. In our LATE application, the test can reject the null for two reasons: either the different instruments are identifying different LATE parameters $b_1^{IV}$, or the instruments are correlated with the error $u$ in the data-generating process (5c).

Recall that a feature of the LATE estimator with a single instrument is that the weights on the criminal and noncriminal effects are given by the strength of the correlations between the instrument on the one hand, and criminal and noncriminal gun prevalence on the other (equation 10). Different instruments can therefore define different LATE parameters $b_1^{IV}$, depending on whether the strengths of the correlations with gun prevalence also differ. As Angrist and Imbens (1995, p. 437) point out, the J statistic provides a test of whether the different instruments are identifying the same local impact; in our application, whether they are identifying the same weighted average of criminal and noncriminal gun prevalence. Thus if the instruments identify different LATE parameters, the test will tend to reject the null. Note this will be so even if the instruments are orthogonal to the error in the DGP (5c), i.e., $E(Z'u)=0$. The second reason the null may be rejected is precisely because the orthogonality assumption $E(Z'u)=0$ may fail, i.e., because some or all instruments may fail to be exogenous.

Although these two interpretations of the J test appear quite different, they are in fact closely related. The LATE interpretation of the J statistic is as a "vector of contrasts" test: the test rejects if the instruments are identifying different parameters. The second interpretation of J test also has a "vector of contrasts" interpretation.[9] Intuitively, a failure of an instrument to be exogenous generates a bias in the estimate $\hat{b}_1^{IV}$ of the parameter $b_1^{IV}$. If other instruments are uncorrelated with the error $e$ and generate consistent estimates of $b_1^{IV}$, the invalid and valid instruments will effectively identify different

---

[9] This interpretation occasionally appears in textbooks and expositions of IV/GMM. Deaton (1997, p. 112) provides a good example: "the OID [overidentifying restrictions] test tells us whether we would get (significantly) different answers if we used different instruments or different combinations of instruments in the regression. … If we have only $k$ instruments and $k$ regressors, the model is exactly identified, … there is only one way of using the instruments, and no alternative estimates to compare."

parameters, and the contrast will be detected by the J test. Similarly, even if all the instruments are invalid in the sense that they are correlated with $e$, the test can detect this failure if the induced biases in the estimates of $b_1^{IV}$ differ across instruments.

The vector-of-contrasts interpretation also makes clear when the J test will lack the power to reject the null hypothesis when it is false. The J statistic will be small when the null hypothesis of a single LATE parameter and valid instruments is correct; but it will also be small if the biases induced in $\hat{b}_1^{IV}$ by invalid instruments coincide (i.e., the instruments all identify the same wrong parameter), or if the biases combine with different LATE parameters to generate a small contrast.

The interpretation of our exogeneity and overidentification tests is central to our results. It is important to stress, therefore, that the J test may still have power to detect these problems.[10] This point is easily illustrated by making use of the well-known relationship between the J and GMM distance statistics on the one hand and Hausman vector-of-contrasts tests on the other (Hayashi 2000, pp. 233-34; Newey 1985), for the case when there are only 2 instruments and the J test statistic is numerically identical to a Hausman test statistic that contrasts the estimator using both instruments with an estimator using just one instrument. The intuition is again straightforward: a Hausman test will reject the null hypothesis that the two estimators being contrasted are both consistent so long as the estimators converge to different values. It is not a requirement for one of the two estimators to be consistent for the Hausman test (and therefore the J test) to have power to reject the null.[11]

Note that it follows from this argument that the more unrelated the instruments are to each other, the more credible is a failure to reject the null that the instruments are exogenous, since a failure to reject would require that two unrelated instruments generate the same asymptotic bias in $\hat{b}_1$.

---

[10] Occasionally one finds in the literature the claim is that a test of overidentifying restrictions has power only if there is a subset of instruments that are all valid and identify the model. The claim is incorrect; the correct statement is that the test will have power if there is such a subset, and *might*, or might not, lack power, if there are not enough valid instruments to identify the model.

[11] White (1994) is very clear on this point, for example. "Nor is there any necessity for either estimator to retain consistency in the presence of misspecification. Power is achieved because the estimators chosen have differing probability limits under misspecified alternatives. These alternatives necessarily go beyond those that allow one of the estimators to retain consistency for a certain parameter value." White (1994), p. 274.

*Choice of instruments and signing bias*

We use four instruments for PSG in our estimations: (1) combined subscriptions per 100,000 county population to three of the most popular outdoor/sport magazines (*Field and Stream*, *Outdoor Life*, and *Sports Afield*) in 1993 (OMAG); (2) the percent of the county population voting for the Republican candidate in the 1988 Presidential election (PCTREP88); (3) military veterans per 100,000 county population (VETS); (4) subscriptions per 100,000 county population to *Guns & Ammo* magazine (G&A). We use all in log form. OMAG, PCTREP88 and VETS are theoretically important correlates of gun ownership that are plausibly exogenous and hence suitable instruments; prior research suggests that all three variables are important predictors of gun ownership (Kleck, 1997, pp. 70-72; Cook and Ludwig, 1997, p. 35). G&A has been shown by Duggan (2001) to be correlated with gun prevalence, but in our view it is less likely to be exogenous, for reasons we discuss below. Failures of exogeneity can, however, still be informative. In particular, if we can sign the direction of the induced bias in $\hat{b}_1^{IV}$, we may be able to sign or bound the impact of gun prevalence, as we now discuss before discussing our instruments in detail.

In the case of a single instrument $Z$, the asymptotic bias in the IV estimator of $\hat{b}_1^{IV}$ in both the simple case of no heterogeneity in criminality and in the extension to LATE is $cov(Z_i, u_i)/cov(Z_i, p_i)$ (see Appendix 2). If $Z$ is an exogenous instrument and hence uncorrelated with $u$, the numerator and hence the asymptotic bias are zero. If $Z$ is not exogenous, but we have priors about the likely correlation with the error, then we can sign the bias. For all the instruments used in this paper, $cov(Z_i, p_i)>0$, and so the sign of the bias will be given by $sign\{cov(Z_i, u_i)\}$. Evidence, for example, that the instrument will be either uncorrelated or positively correlated with the error means that the IV estimator using the instrument can be interpreted as providing an upper bound on a LATE estimate of $b_1$ (and vice-versa for a negative correlation/lower bound).[12] Note that a J test of instrument exogeneity could indicate that one or more instruments are not exogenous, but we may still be able to make inferences about $b_1$ if our priors allow us to sign the bias.

---

[12] For another example of signing bias in a criminological application, see the Cook and Ludwig (2003) study of burglary, Appendix B.

As noted above, different instruments may be uncorrelated with the error $u$ in the DGP (5c), but if they identify different LATE parameters $b_1$, the J test may indicate a failure of exogeneity. Again, we may be able to sign the effect on the estimated coefficient. In this case, we can use the reasonable assumption that $\beta_1^C > \beta_1^{NC}$ and prior beliefs about whether one instrument is identifying an effect more local to criminals when another is identifying one more local to noncriminals. Use of an instrument that is relatively more correlated with $g^C$ will tend to raise (make more positive) the estimated $\hat{b}_1^{IV}$, and *vice versa* for an instrument that is relatively less correlated with $g^C$ and more correlated with $g^{NC}$.

We now consider our instruments in detail. First, OMAG serves as a measure of interest in outdoor sports such as hunting and fishing, or perhaps as a measure of a firearms-related "sporting/outdoor culture" (Bordua and Lizotte, 1979). We are not aware of any evidence that pursuit of outdoor sports has a direct impact on homicide rates, nor that it is correlated with unobservables that affect homicide given that we will also condition on county measures of rurality and on population density. Similarly, we do not know of evidence that interest in outdoor sports is correlated more or less strongly with criminal or noncriminal gun levels. The best we can do is rely on a priori reasoning. The most plausible source of bias in the case of OMAG, in our view, is reverse causality: high crime rates may increase interest in gun-related activities. If so, the bias from using OMAG as an instrument will be upwards and the estimate of $b_1$ will be an upper bound on the LATE parameter. This suggestion is, however, admittedly speculative and we do not regard this bias as very likely, given that OMAG does not include subscriptions to any "gun magazines" per se.

PCTREP88 serves as a measure of political conservatism and hence should be positively correlated with gun ownership.[13] Again, we are not aware of any evidence that voting Republican should either be directly related to homicide rates or correlated more or less strongly with noncriminal or criminal gun prevalence. We note that Ayres and Donohue (2003, p. 1256) question the exogeneity of

---

[13] The 1988 election results were chosen in preference to the 1992 results because the date precedes the census year from which most our data are taken (and hence is more plausibly exogenous), and because the choice between the two main candidates in 1988 maps more closely to attitudes towards gun ownership: in the 1992 election, unlike the 1988 election, the politically less conservative candidate (negatively correlated with gun ownership) was also a southerner (positively correlated with gun ownership). The 1992 results are also less easily interpreted because of the significant share of the vote that went to the third-party candidate, Ross Perot.

voting Republican as an instrument for gun prevalence, based on the argument that it is positively correlated with wealth/income and hence negatively correlated with crime. This is not a powerful objection in our application, however. It is an "omitted variables bias" argument, but we will control for economic conditions using a wide range of economic variables (county median income, inequality, unemployment, poverty rate and vacant housing). Reverse causality again seems to us to be the most plausible source of bias in IV estimation: high crime rates may make residents more likely to vote for "law and order," i.e., Republican candidates. This would again generate an upward bias and make the estimate of $b_1$ an upper bound on the LATE parameter. Again, however, this is a speculative suggestion and we do not regard this potential bias to be very likely or very large.

Veterans are a subgroup of the population who are relatively more likely to have experience with or to own guns. There is, however, a modest literature indicating that military veterans are not only more likely to own guns in civilian life, but also are more likely to be violent after leaving the military.[14] VETS might therefore correlate more strongly with criminal gun prevalence than would either OMAG or PCTREP88 and hence identify a larger (more positive) LATE estimate of $b_1$. Thus if VETS is used as an instrument, it is likely to generate an estimate of $b_1$ that is either unbiased or that provides an upper bound on the LATE impact of gun levels.

The credibility of these three instruments for gun prevalence is enhanced by the fact that they come from different sources and are each capturing different aspects of a population's willingness to hold guns: outdoor sports culture, political conservatism, and prior experience with arms. As argued above, this strengthens the power of the J test to detect any failure of the assumption that one or more is exogenous.

Our fourth instrument, G&A, is less likely either to be exogenous or to identify the same local effect as the other three instruments. The distinct content of *Guns & Ammo* magazine suggests that it appeals to a segment of the population that is more interested in the application of guns in self-defense. This makes G&A a strong candidate for generating an upward reverse-causality bias in the estimated IV

---

[14] See, e.g., the case control study by Kleck and Hogan (1999, p. 285), who found that veterans are 2.8 times more likely than nonveterans to commit murder.

coefficient: the same mechanism that leads people to acquire guns in response to high local crime rates also leads to interest in the magazine. More speculatively, it may be correlated with the underlying "violence proneness" of the county population – subscribers may include people who have an interest in violence more generally – and hence relatively more strongly correlated with criminal gun prevalence than the either OMAG or PCTREP88, and possibly also VETS. This would cause G&A to identify a larger LATE estimate of $b_1$ than the other instruments. We include G&A in our analysis for three reasons. First, it can provide an upper bound for the estimated LATE effect. Second, it can provide a useful demonstration of whether our exogeneity tests have any power to reject the null when our prior beliefs suggest the null – in this case, the validity of G&A as an instrument – is implausible. Lastly, given the important and influential papers by Duggan (2001, 2003) that make extensive use of G&A as a proxy for gun prevalence, the variable is of interest in its own right.

*An "upper bound" argument for the impact of noncriminal gun prevalence*

A small J statistic will suggest that the different instruments are identifying the same weighted average of $\beta_1^C$ and $\beta_1^{NC}$, but will not indicate what these weights are. The only direct evidence we will have will be from the standard first-stage regression used to establish the relevance of instruments with the gun level proxy,

$$p_i = \theta_0 + \theta_1 Z_i + err_i \tag{13}$$

Because noncriminals greatly outnumber criminals in the general population, the strong correlation of PSG vis-à-vis the GSS survey data cited above is evidence that PSG is at least a good proxy for $g^{NC}$. This says little, however, about how well PSG correlates with $g^C$. Given the preponderance of noncriminals in the general population, a cautious interpretation of $\theta_1$ would be that it is driven primarily by $\pi_1^{NC}$. This applies to all our instruments, even VETS & G&A; although we have some prior suspicions that they might be relatively more correlated with $g^C$ than OMAG and PCTREP88, most veterans and most subscribers to *Guns and Ammo* are, of course, noncriminals.

23

Since we cannot rule out the possibility that $\pi_1^C$ is small or zero, it is therefore possible that our estimate of $\hat{b}_1^{IV}$ could be local to the noncriminal population, i.e., driven primarily by $\beta_1^{NC}$. In the polar case that the weight $\pi_1^C$ on the criminal effect in the LATE estimate is zero, equation (12) reduces to

$$\hat{b}_1^{IV} \xrightarrow{P} \frac{\pi_1^{NC}}{\delta^{NC}\pi_1^{NC}} \left\{ \frac{\pi_1^{NC}}{\pi_1^{NC}} \beta_1^{NC} \right\} = \frac{1}{\delta^{NC}} \beta_1^{NC} \qquad (14)$$

We can apply an upper bound argument here, should we find that $\hat{b}_1^{IV} < 0$. Note that the weight on $\beta_1^{NC}$ in equation (12) can be rewritten as:

$$\frac{1}{\delta^{NC}} * \frac{\pi_1^{NC}}{\frac{\delta^C}{\delta^{NC}}\pi_1^C + \pi_1^{NC}} \qquad (15)$$

The weight on $\beta_1^{NC}$ is greatest when $\pi_1^C = 0$; in this case, the weight on $\beta_1^C$ is zero, the weight on $\beta_1^{NC}$ is $1/\delta_1^{NC}$, and $\hat{b}_1^{IV}$ is an estimate of $(\beta_1^{NC} * 1/\delta_1^{NC})$ as in (14). As $\pi_1^C$ increases, (15) shows that the weight on $\beta_1^{NC}$ falls, and from (12) we see that the weight on $\beta_1^C$ increases. Since we expect a priori that $\beta_1^C > 0$, $\pi_1^C > 0$ means that $\hat{b}_1^{IV}$ will now exceed $(\beta_1^{NC} * 1/\delta_1^{NC})$, i.e., $\hat{b}_1^{IV}$ scaled by $\delta_1^{NC}$ provides an upper bound for $\beta_1^{NC}$.

## 4.    Data and model specification

*Data*

The dependent variables in our model are the gun and nongun homicide rates per 100,000 county population. Homicide rates are averages for the seven years 1987 to 1993, thus bracketing the census year of 1990 for which data on many of the control variables were available. Seven years were covered to reduce the influence of random year-to-year aberrations, e.g., misclassification of homicides as other kinds of deaths such as suicides or unintentional deaths. We separately assess rates of homicide with and without guns, to provide sharper tests of the hypothesis that gun levels affect homicide rates.

The estimations use cross-sectional data for U.S. counties which had a population of 25,000 or greater in 1990, and for which relevant data were available (N=1,456). These counties account for about

half of all U.S. counties but over 90% of the U.S. population in that year. County-level data were chosen for several reasons. The use of counties provides for a diverse sample of ecological units, including urban, suburban, and rural areas. Counties are more internally homogenous than nations, states, or metropolitan areas, thereby reducing potential aggregation bias. Counties also exhibit great between-unit variability in both gun availability and homicide rates, which is precisely what gun availability and homicide research is trying to explain. Finally, county data provide a much larger sample than was used in previous gun level studies that focused on nations, states, or large urban cities.

Although the simple model outlined in the previous section specifies untransformed homicide rates as the dependent variable, in our main estimations we specify homicide rates in logs. Figure 3 illustrates why: the distribution of the total homicide rate is skewed to the right with a number of outlier counties with high homicide rates, whereas the distribution of the log homicide rate is roughly normal and with fewer outliers. The distributions for gun and nongun homicide are similar. The use of logs poses some minor problems, however. Logs mean that the interpretation of the estimating equation (5c) as a simple additive aggregation of (5a) and (5b) is not available. There is also a "log of zero" problem, because even though we are using 7-year averages and excluding the smallest counties, a small number of counties have zero murders: of the 1,456 counties in the sample, 20 had no gun murders (about 1% of the sample) and 39 had no nongun murders (about 3%); 3 had no murders at all. Our approach is to report in detail the results using the logged crime rates and dropping the observations for which the dependent variable is undefined. To check the robustness of the results, we also estimate using untransformed homicide rates as the dependent variable, and using logged homicide rates where the zero murder counties are set to the lowest non-zero homicide rate instead of dropped.

Figure 3: Distributions of Total Homicide Rate and Log Total Homicide Rate





Note: 8 counties with homicide rates greater than 30 per 100,000 are omitted from the left-hand panel.

Figure 4: Distributions of PSG and Log PSG



Our proxy for gun availability in our main regressions is PSG in levels. Suicides in our sample of counties are roughly as prevalent as homicides (the mean county suicide rate is about 13 suicides per 100,000 persons, vs. a mean county homicide rate of about 6.5 per 100,000 persons), and so we again use the average over 1987-93 to calculate PSG. We use PSG in levels primarily because the treatment of criminal/noncriminal heterogeneity is very straightforward in our framework if we maintain the simplifying assumption that gun prevalence is measured in levels. Figure 4 shows histograms of our gun proxy PSG in levels and after logging. There are no problems of skewness or outliers with PSG in levels, but some moderate skewness to the left in the distribution of log PSG. Our approach is to report detailed results using PSG in levels, and to confirm robustness of the findings with regressions using log PSG.

In order to be able to say anything about the practical significance of any nonzero impact of guns on homicide, we need to calibrate our proxy to available survey-based measures of gun levels. The most convenient calibration is to the mean percentage of households with guns (HHG) according to the GSS. Inspection of the Moody-Marvell data in Figure 1 suggests that PSG ≈ HHG, and closer inspection of the available data confirms this. National gun survey prevalence figures have been available since 1959. The mean HHG for 1959-2003 is 44.2% while the mean PSG for 1959-2002 (the latest year available) is 54.9%. These figures imply a value of 54.9/44.2=1.24 for the calibration factor $\delta_1$. Neither PSG nor HHG varied greatly during this period, and the use of a different reference period would matter little. A second calibration is available using state-level cross-sectional data. We use survey data from the Centers for Disease Control (CDC) in 2002 (Okoro et al., 2005) and PSG data for 1995-2002 taken from CDC's WONDER service to calibrate PSG to HHG with a simple OLS regression, which yields $\delta_1$=0.706 (SE=0.07, $R^2$=0.79, N=50). Thus in our main estimations using the level of PSG as our proxy, the calibration factor $\delta_1$ by which we should inflate or deflate the estimated coefficient on PSG $b_1$ so as to obtain an estimate of $\beta_1$ should be in the neighborhood of 0.706 to 1.24. These are, however, only approximations based on limited data and simple linear calibrations. A cautious conclusion would be that PSG is already roughly calibrated to HHG.

We report results using PSG divided by 100 so that it is a proportion rather than a percentage, for reporting convenience and in order to ease interpretation with a logged dependent variable. Thus an estimated coefficient of $\hat{b}_1$ =0.5 on PSG/100 and treating PSG as already calibrated to HHG implies that an increase in 10 percentage points in PSG (a bit less than one standard deviation, and an increase of about 15% at the mean) will increase the log homicide rate by 0.10*0.5=0.05, i.e., the homicide rate would go up by about 5%.

Our homicide equation includes numerous county-level control variables. We paid particular attention to those that prior theory and research suggest are important determinants of *both* gun ownership levels and homicide rates. Decisions as to which control variables to include in the homicide equations were based on a review of previous macro-level studies linking homicide rates to structural characteristics

of ecological units (see Kleck, 1997, Chapter 3; Kovandzic et al., 1998; Land et al., 1990; Sampson, 1986; Vieraitis, 2000 and the studies reviewed therein).

We were particularly concerned to control for variables that had opposite-sign associations with gun levels and homicide rates because such variables could suppress evidence of any positive effect of gun levels on homicide rates. Thus, we controlled for the percent of the population that is rural because rural people are more likely to own guns, but less likely to commit homicide. Likewise, we controlled for the poverty rate, the share of the population in the high-homicide ages of 18 to 24 and 25 to 34, and the African-American share of the population because people in these groups are less likely to own guns, but more likely to commit homicide, than other people (Kleck, 1997; Cook and Ludwig, 1997; U.S. FBI, 2000). The other controls used were percent Hispanic, population density, average education level, unemployment rate, transient population (born out-of-state), vacant housing units, female-headed households with children, median household income, households earning less than $15,000, and inequality (ratio of households earning more than $75,000 to households earning less than $15,000). The sets of controls for rurality and age structure are used in percentage rather than log form. Because the raw percentages sum to 100, using them instead of logs has the appealing feature that the results are invariant to whichever percentage is the omitted category. We omit the percentage rural and the percentage aged 65+.

Table 1 lists and provides a brief description of each variable used along with their means and standard deviations. Further details on the data and sources are discussed in Appendix 1.

*Econometric framework*

We estimate equation (2) using county-level data with state fixed effects. Fixed effects are used to control for any unobserved or unmeasured county characteristics that vary at the state level and that could be expected to influence both gun levels and homicide rates. Examples of such confounders would be state laws and judicial practice relating directly or indirectly to homicide and gun ownership, state-level resources devoted to law enforcement, and incarceration rates in state prisons. The disadvantage of this

approach is that only variables available at the county level can be used in the estimations, because state-level measures would be perfectly collinear with the fixed effects.

It is common in this literature to weight observations by the population of the locality. One rationale for doing so is to correct for possible heteroskedasticity, although this will be the efficient feasible GLS procedure only if the heteroskedasticity takes a particular form (variance proportional to the square of the population). We report both weighted and unweighted results.

Our main results use two-step feasible efficient GMM estimator (see, e.g., Hayashi 2000). Since it is reasonable to suspect that observations on two counties in the same state are more likely to have correlated disturbance terms than two counties in different states, we use a "cluster-robust" GMM estimator that is efficient in the presence of both arbitrary heteroskedasticity and arbitrary within-state correlation of the error. Particularly important for our purposes is that inference and testing using this estimator will be similarly robust, including GMM tests of exogeneity.

## 5.    Estimation results

*Results treating gun prevalence as exogenous*

We focus on the impact of gun prevalence on *gun* homicide rates because if higher gun levels really do cause higher total homicide rates, it must surely operate through an effect on rates of homicides committed with guns. Estimation results for the benchmark regressions using the logged gun homicide rate as the dependent variable are in Table 2. Column 1 reports the results of population-weighted 2-step GMM estimations that are efficient in the presence of arbitrary heteroskedasticity and clustering, treating PSG/100 as exogenous. The estimator used is also known as "heteroskedastic OLS" (HOLS); it is the GMM estimator that uses the additional orthogonality conditions provided by the excluded instruments to improve efficiency. Coefficient estimates using OLS with robust standard errors were essentially identical, and we report HOLS results because we make use of the corresponding GMM test statistics.

Most of the parameter estimates for the 18 control variables are significant, and the significant coefficients have the expected sign in both specifications. High gun murder rates are associated with high population density, lower education levels, the various poverty, low-income and inequality measures, and

29

the percentage of the population that is black. Some readers might be surprised that the size of the 18-24 age group is negatively associated with gun homicide rates, but this is actually a common finding (Marvell and Moody, 1991), perhaps because persons in this physically vigorous age group are harder to victimize. The overall fit of the regressions is quite good, with the population-weighted PSG-exogenous specification explaining 79% of the within-state variation in county-level log gun homicide rates; in the unweighted specification, the $R^2$ is still quite high, at 44%.[15]

The main result of interest is the coefficient of PSG/100. Column 1 of Table 2 shows that when PSG/100 is treated as exogenous, the estimated coefficient is 0.968 and is statistically significant at the 1% level. The calibration exercise above implies this would be a significant effect in practical as well statistical terms: an increase of 10 percentage points (0.10) in gun prevalence would imply an increase in gun homicide of about 10%. This confirms the oft-reported result that, when endogeneity issues are ignored, gun levels are associated with higher gun crime rates. As we shall see, however, the picture changes considerably when we treat gun prevalence as endogenous.

*Results treating gun prevalence as endogenous*

We start with results using the three instruments that are most plausibly exogenous, PCTREP88, OMAG and VETS. We begin with the first requirement for an instrument, relevance. To test for the presence of weak instruments in our two-step GMM estimations, we use a heteroskedastic- and cluster-robust F statistic and the critical values compiled by Stock and Yogo (2005) for the IV estimator (on the grounds that the IV estimator is a special case of two-step GMM for homoskedastic and independent errors).[16] The Stock-Yogo test we report is the one for maximal size distortion, based on the performance of a Wald test for the significance of $\hat{b}_1$ at the 5% level. If instruments are weak, a Wald test rejects too often. The test is based on the rejection rate r (10%, 15%, 20%) that the researcher is willing to accept

---

[15] *Contra* Cook and Ludwig (2003b, p. 12): "the usual approach [to addressing heterogeneity in cross-sectional gun/crime studies] … has been to statistically control for the handful of local characteristics that are readily available in standard data sources, such as population density, poverty, and the age and racial composition of the population. But these variables never [sic] explain very much of the cross-sectional variation in crime rates, suggesting that the list of control variables is inadequate to the task." Our results suggest this view is too pessimistic about the feasibility of cross-sectional studies.

when the true rejection rate is 5%. The null hypothesis of the Stock-Yogo test is that the instruments are weak and r is unacceptably high; rejection of the null hypothesis means instruments are not weak in the sense that r is acceptable to the researcher.

The first-stage regressions corresponding to the log gun homicide equation are reported in Table 3. These are fixed effects OLS regressions with PSG as the dependent variable and all controls plus the specified excluded instruments as regressors; for brevity, only coefficients on the instruments are reported. Used together, two of the three instruments, log PCTREP and log OMAG, have coefficients that are, as expected, positive and statistically highly significant, whereas the third instrument, log VETS, has a positive coefficient but a large standard error and is insignificant at conventional levels. Used one at a time, however, all three instruments are positive and significant. Comparing the F statistics to the Stock-Yogo IV critical values suggests that we do not have weak instrument problems.

The estimation results for gun homicide when PSG is treated as endogenous are shown in column 2 of Table 2. We saw earlier that when PSG is treated as exogenous, the estimated impact on gun homicide, $\hat{b}_1$, was positive and statistically highly significant. When PSG is treated as endogenous and instrumented with log OMAG, log PCTREP88 and log VETS, however, the picture changes dramatically. Column 2 shows that PSG/100 has a *negative* coefficient of -2.08 that is significant at the 1% level.

We now apply the procedures outlined above for testing whether our gun proxy is endogenous and whether our instruments are exogenous. The J statistic in Table 2, column 1, when PSG is treated as exogenous, is 10.9 with a p-level of 1%. We therefore reject the null hypothesis that the orthogonality conditions in the PSG-exogenous estimation are satisfied, and take this as evidence that one or more variables – log PSG, log OMAG, log PCTREP88, and/or log VETS – are endogenous. When PSG is treated as endogenous in column 2, however, the J statistic drops to 2.31, with a corresponding p-value of 0.32. We therefore cannot reject the null that OMAG, PCTREP88 and VETS are all exogenous. Lastly, we test explicitly whether PSG is endogenous using a GMM distance test based on the J statistics for the

---

[16] Stock and Yogo do not tabulate critical values for the non-homoskedastic case. Using the simple alternative of the Staiger and Stock (1997) rule of thumb that the F statistic should be at least 10 to avoid weak instrument problems leads to similar conclusions as those we report below.

PSG-exogenous and PSG-endogenous estimations. The $\chi^2$ test statistic reported in column 2 is 7.72, significant at the 1% level.[17] In short, we have evidence that PSG is endogenous, and that OMAG, PCTREP88 and VETS are all exogenous and are identifying the same LATE parameter $b_1$.

Table 4 reports the results using all three instruments (column 1) and each of the instruments individually (columns 2-4). Our preferred estimator in column 1 uses all instruments simultaneously since this obtains efficiency gains over using them separately, and indeed the standard error for $\hat{b}_1$ is smallest when all three instruments are used. The small J statistic in column 1 obtained when using all three instruments suggests that we should get similar estimates of $\hat{b}_1$ when using the instruments separately, and this is in fact what we find. All three separate estimates of $\hat{b}_1$ in columns 2-4 are negative, though only two of the three (using OMAG and VETS) are significant at conventional levels, and, as noted, the precision of the estimates is higher than when the instruments are used together. These findings are consistent with the interpretation of the low J statistic that each of the instruments is identifying the same parameter $b_1$. Recall also that we had reasons to believe that each of the instruments, if invalid, would be positively correlated with the error term and hence generate estimates of the impact of guns on homicide that would be biased upwards. Since the instruments appear to be identifying the same parameter, any bias would be a shared upwards bias. This implies that the coefficient estimates using all three instruments provides an upper bound for $b_1$.

We now consider estimations using our fourth instrument, log G&A. Columns 5 and 6 of Table 3 show that, as expected, G&A is correlated with our gun level proxy PSG, though not as strongly as PCTREP88 and OMAG. Table 4, column 5 shows that when G&A is added to the instrument set, the estimated $\hat{b}_1$, while still negative, is smaller in absolute terms compared to column 1, and the J statistic jumps dramatically to 11.4 so that the null of valid instruments should now be rejected. The explanation is that G&A is identifying a $b_1$ that is significantly different from the one identified by the other three instruments. Column 6 shows that when G&A is used as the single instrument, $\hat{b}_1 = 1.90$, i.e., the estimated impact of gun prevalence is *positive* and comparable in magnitude to the $\hat{b}_1$ obtained when

---

[17] The test statistic differs slightly from the difference between the relevant J statistics because we use a version of the test that guarantees a positive test statistic in finite samples. See Hayashi (2000) or Baum et al. (2003) for details.

PSG is treated as exogenous.[18] The GMM distance test of the exogeneity of G&A reported in column 5 confirms this: the null hypothesis that G&A is exogenous (is identifying the same $b_1$ as the other three instruments) is strongly rejected.

The large positive estimate $\hat{b}_1$ obtained using G&A as an instrument is not helpful in providing an upper bound for the noncriminal impact of gun prevalence $\beta_1^{NC}$; our prior is that $\beta_1^{NC}$ is either close to zero or negative, and so as an upper bound a positive $\hat{b}_1$ is uninformative. It is also difficult to interpret it in terms of an estimate of $\beta_1^{C}$, i.e., as a LATE estimate that is local to criminals, for two reasons: first, as noted above, the correlation of G&A with our proxy for gun prevalence is probably dominated by the more numerous noncriminal subscribers; and second, as suggested earlier, a more plausible explanation for a positive $\hat{b}_1$ in this case is a large positive endogeneity bias generated by reverse causality. The results are still informative, however. In addition to demonstrating that our exogeneity tests can have the power to detect violations of the null, they suggest that use of *Guns and Ammo* magazine as either an instrument or a proxy for gun prevalence may be vulnerable to reverse causality problems. The results are also relevant for the interpretation of our results using OMAG and PCTREP98; the finding that G&A appears to be affected by reverse causality indirectly supports our suggestion that this is the most plausible source of potential bias in the LATE parameters identified by OMAG and PCTREP88.

To summarize, using our three main instruments for gun prevalence – subscriptions to outdoor sports magazines, voting patterns, and numbers of veterans – we obtain an estimate of a LATE parameter $\hat{b}_1$ that suggests a negative impact of gun prevalence on gun homicide. The low J statistic suggests that all three instruments are identifying the same weighted average of $\beta_1^{C}$ and $\beta_1^{NC}$. When gun prevalence is treated as exogenous, or instrumented with subscriptions to *Guns and Ammo* magazine, the estimated impact is positive and significantly different from the estimate obtained by instrumenting gun prevalence with our three main instruments, which we interpret as evidence of reverse causality affecting these two

---

[18] An exogeneity test of PSG using G&A as the sole instrument yields a $\chi^2(1)$ statistic of 1.40 with a p-value of 0.236. As noted earlier, this is equivalent to a test of the difference between an estimate of $b_1$ treating PSG as exogenous and an estimate using G&A as an instrument for PSG.

variables: high gun homicide rates lead people to acquire guns, and stimulate interest in a magazine that is directly gun-related.

We discussed in the previous section reasons why the LATE parameters identified by OMAG, PCTREP88 or VETS could either put a heavier weight on the impact of criminal gun prevalence (VETS) or possibly be biased upwards via a positive correlation with the error term (OMAG and PCTREP88) generated by reverse causality. In the case of VETS, this prior was supported by empirical evidence about involvement of veterans in violence after reentering civilian life. Our specification tests suggest that these three instruments are estimating approximately the same negative LATE impact of gun prevalence on gun homicide. This implies either that the instruments are all identifying the same underlying LATE parameter, and/or they are generating estimates that are biased upwards and to a similar degree via a correlation with the error term, or some combination of these two channels.

The two most plausible interpretations of our results are therefore as follows: (1) All three instruments are identifying primarily the LATE parameter local to noncriminals; the weight given to criminal effects in the estimated parameter $\hat{b}_1$ is small, and $\hat{b}_1$ can be interpreted as $\beta_1^{NC}$ scaled by $1/\delta_1^{NC}$. (2) Either because of upward bias, and/or weight put on the impact of criminal gun prevalence $\beta_1^{C}$, the estimated parameter $\hat{b}_1$ provides an upper bound to the noncriminal effect $\beta_1^{NC}$ scaled by $1/\delta_1^{NC}$. We conclude that our estimates of $\hat{b}_1$ provide evidence of a negative deterrent effect of noncriminal gun prevalence that is statistically significant. In the next section we consider whether this LATE estimate is significant in practical terms, and what we can say about the ATE.

*Calibration of the estimated impact of gun prevalence on gun homicide*

The calibration exercise earlier in the paper suggests that PSG is already approximately calibrated to HHG, i.e., $\delta_1$ is approximately 1. Our estimate for $\hat{b}_1$ therefore suggests a negative effect of noncriminal gun prevalence on gun homicide that is practically as well as statistically significant. If we use the 1:1 calibration of PSG to HHG, the point estimate of the upper bound for $\beta_1^{NC}$ is -2.1, implying that an increase of 10 percentage points in noncriminal gun prevalence would reduce gun homicide by at least ~20-25%. Estimates taken from the conservative end of the 95% confidence intervals for $\hat{b}_1$

combined with a conservative calibration of PSG to HHG would still generate important negative impacts; e.g., $b_1 = 1.2$ and $\delta_1 = 0.7$ implies an upper bound for $\beta_1^{NC}$ of about -0.8, so that a 10 percentage point increase in noncriminal gun prevalence would reduce gun homicide by ~8% or more.

The finding that noncriminal gun prevalence has a substantial negative impact on gun homicide is the result of this paper that is most relevant for policy purposes; we will return to this point in the conclusion. However, $\beta_1^{ATE}$ – the impact of an increase in overall gun prevalence randomly distributed across localities and across criminal and noncriminals – is of some interest, if only because this is the parameter on which previous studies have implicitly focused. We therefore consider here what our estimates suggest as a range of plausible values for the ATE.

The ATE in our model is a weighted average of $\beta_1^{NC}$ and $\beta_1^{C}$, where the weights are given by the relative prevalence of criminal and noncriminal guns (equation 6). Evidence is scarce, but plausible figures for the criminal gun stock in the US would be in the range of 10-25% of the total. Taking total gun prevalence as approximately 50% of households gives us a range for $\overline{g}^{C}$ of about 5-13%. We are not aware of any previous estimates of $\beta_1^{C}$ or, equivalently, of the elasticity of gun homicide with respect to criminal gun prevalence, which in our model evaluated at the mean would be $\beta_1^{C}\overline{g}^{C}$.[19]

One way to proceed is to use this range of weights and our estimates of $\beta_1^{NC}$ to calculate what the elasticity would have to be for $\beta_1^{ATE}$ to be approximately zero. A value of -2 for $\beta_1^{NC}$ and an assumed criminal gun prevalence of 5% (criminal share of total=5/50=10%) would require $\beta_1^{C}$ =18 for $\beta_1^{ATE}$ to be zero. This implies an elasticity of gun homicide with respect to criminal gun prevalence of about $\beta_1^{C}\overline{g}^{C}$ =18*0.05=0.9. Raising the assumed criminal gun prevalence to 13% (criminal share of total=13/50=25%) would require a value of 6 for $\beta_1^{C}$ if $\beta_1^{ATE}$ is to be zero; the implied elasticity $\beta_1^{C}\overline{g}^{C}$ is 6*0.13 or about 0.8. If we use a more conservative estimate of -1 for $\beta_1^{NC}$ and $\overline{g}^{C}$ =5%, $\beta_1^{ATE}$ =0 would require $\beta_1^{C}$ =9 which implies an elasticity of about 0.5. Raising the weight on criminal guns to 25% means that $\beta_1^{C}$ would have to be 3 for $\beta_1^{ATE}$ to be zero, and the implied elasticity is about 0.4. All of these implied elasticities appear plausible *a priori*.

---

[19] Obtained by differentiating equation (5) with respect to $g^{C}$, noting that $h$ is a log crime rate, and then multiplying both sides by $\overline{g}^{C}$ to obtain the elasticity at the mean.

Similar exercises suggest that an ATE that is positive and important in practical terms is about as plausible as one that is negative and important. For example, using a conservative estimate of $\beta_1^{NC} = -1$, $\beta_1^C = 7$, and $\overline{g}^C = 13\%$, the gun homicide-criminal gun prevalence elasticity would be 7*0.13 or about 0.9, and $\beta_1^{ATE} = (0.75*-1)+(0.25*7) = 1$, i.e., an X percentage point increase in general gun prevalence would raise gun homicides by about X%. Alternatively, using our point estimate of $\beta_1^{NC} = -2$, $\beta_1^C = 7$, and $\overline{g}^C = 5\%$, we get a gun homicide-criminal gun prevalence elasticity of about 0.4, and $\beta_1^{ATE} = (0.90*-2)+(0.10*7) = -1.1$, which is just the opposite result – an X percentage point increase in general gun prevalence reduces gun homicides by about X%.

In short, the possibilities that the ATE is positive, negative, or approximately zero, all appear plausible and consistent with our estimates of a significant negative impact of noncriminal gun prevalence.


*Gun homicide estimations: robustness checks*

We tested the robustness of our results in a number of ways. First, we estimated as above but without weighting by population. The key results were all unaffected by the change: the LATE estimate of $b_1$ was negative and statistically highly significant, and the specification testing generated the same results (OMAG, PCTREP88, VETS valid instruments; PSG endogenous; G&A an invalid instrument). The main differences vs. the weighted regressions were a more negative point estimate of $b_1$ when instrumented (-3.62, vs. -2.08 weighted), and first-stage regressions suggesting the instruments were weaker than in the weighted case.

We tried reestimating the gun homicide equation using log PSG instead of PSG as the proxy for gun levels, both with and without population weights. The qualitative results were essentially identical to those reported above: treated as exogenous, the coefficient on log PSG was positive and statistically significant; treated as endogenous, the coefficient became negative and significant at the 1% level; endogeneity tests of log PSG strongly rejected the null that log PSG could be treated as exogenous; and the J test of overidentifying restrictions safely failed to reject the null that the instruments were valid, with

p-values of 99% in the unweighted case and 41% in the weighted case. Log PCTREP, log OMAG and log VETS were about as relevant for log PSG as for the level of PSG.

We also estimated both the PSG and log PSG specifications using as the dependent variable the "one-sided winsorized" log gun homicide rate, so that the 20 zero gun homicide rate counties, instead of being dropped, had log crime rates set to the same value as the county with the lowest observed nonzero rate (-2.02, corresponding to 0.13 gun homicides per 100,000 population). The results were little changed from those that simply dropped the 20 counties.

The unweighted estimates using all three excluded instruments and PSG or log PSG bordered on being weakly identified, with first-stage F statistics of 12.4 (PSG) and 9.7 (log PSG). Recent research (see, e.g., Stock et al. 2002) suggests that there are various estimators that are at least partially robust to weak instruments. One such estimator is the GMM continuous-updating estimator (CUE) of Hansen et al. (1996). As a last robustness check, we estimated both our PSG and log PSG specifications with all three excluded instruments using CUE.[20] The estimates were essentially identical to those using 2-step efficient GMM. Moreover, the first-stage F statistics using all three excluded instruments are well in excess of the Stock-Yogo (2005) critical value of 6.5 for 10% maximal size for the LIML estimator (on the grounds that the LIML estimator is a special case of CUE for homoskedastic and independent errors). We conclude that weak instruments are not a major problem for the unweighted as well as the weighted results.

*Who benefits from noncriminal deterrence? Spillovers and urban crime*

The results above suggest that noncriminal gun prevalence has a negative impact on total gun homicide. One of the stylized facts cited in Section 3, however, is that most homicides victims are themselves criminals. Our results can be reconciled with this stylized fact if we also recall that noncriminal gun prevalence can deter homicides of criminals as well as noncriminals. It is possible that,

---

[20] We employ CUE after partialing out the exogenous regressors, on the grounds that the coefficient on the endogenous regressor is the only coefficient of interest and that the numerical optimization required by CUE is most reliable when only one parameter is being estimated.

in quantitative terms, noncriminal gun prevalence may prevent more homicides of criminals than of noncriminals. Note that this does not necessarily mean noncriminal gun prevalence would reduce the aggregate gun homicide rate. Total gun homicide would decrease if noncriminal gun prevalence made criminals more cautious or less willing to commit crimes, but not if it displaced criminal activity from areas of high gun prevalence to areas of lower prevalence.

We do not have separate county-level data on the numbers of homicides of criminals and noncriminals. However, we can indirectly test whether noncriminal gun prevalence is having a significant impact on homicides of criminals by looking separately at gun homicide in rural and urban areas. Gun homicide is found disproportionately in urban areas and is associated with drug crime, a primarily urban phenomenon. If noncriminal gun prevalence reduces significant numbers of homicides of criminals, it should be particularly apparent in primarily urban counties. This is, in fact, what we find.

We split our sample into two subsamples based on whether 50% or more of the county population reside in rural areas (using the U.S. Census Bureau definition). This gives us 771 largely-urban counties, with a total population of 195 million and an aggregate gun homicide rate of 6.9 per 100,000 persons, and 685 largely-rural counties, with a total population of 33 million and an aggregate gun homicide rate of 3.7 per 100,000. We estimate the same equations as reported in Tables 2 and 4, but for the two subsamples separately.

The results for the largely-urban counties are – predictably, given that we are weighting by population and this group accounts for about 85% of the population in the total sample – very similar to the results we report for the total sample. The estimated coefficient on PSG/100 is -1.91 and significant at the 5% level; the first-stage F statistic is 28.0, suggesting the equation is not weakly identified; the J statistic is 2.59 with a p-value of 0.27, evidence that again the instruments are valid and are identifying a single LATE parameter; and estimation with the three instruments separately generate three negative estimates of $\hat{b}_1$. The results for the largely-rural counties, however, are essentially null. They show no significant impact of gun prevalence on homicide, whether estimating with all three instruments or with the instruments separately. The J statistic again provides evidence that the instruments are valid (J=1.69, p-value=0.43). However, these results should be treated with caution because the equation shows

evidence of weak identification, particularly when estimating with all three instruments or with OMAG or LVETS.

*The impact of gun prevalence on nongun homicide*

The analysis of nongun homicide is somewhat simpler because of the three channels through which gun prevalence can affect homicide rates in general – criminality, deterrence and self-defense – the first, criminality, is not relevant because it would generate gun homicides rather than nongun homicides. Nevertheless, heterogeneity in criminality is an issue here as well, and we suggest that our IV/GMM results should be also interpreted as estimates that are primarily "local to noncriminals". For consistency with the gun homicide results, we continue to use PSG as our proxy for general gun prevalence.

The first-stage results are essentially identical to those reported in Table 3 and we do not report them here.[21] Panel B of Table 2 presents the results for the GMM estimations when the dependent variable is the log nongun homicide rate. The patterns in the coefficients on the covariates are similar to those for the gun homicide equations; the main exception is that rurality is now significantly associated with lower nongun homicide rates. The impact of gun prevalence, however, is rather different compared to the gun homicide case. When gun levels are treated as exogenous, the estimated coefficient on PSG is negative but insignificantly different from zero. When gun levels are treated as endogenous, the estimated coefficients become negative and significantly different from zero at the 10% level, suggesting a negative deterrent impact of gun levels on nongun homicide. The results are weaker, however, than they are in the gun homicide case. The standard errors are larger than the gun homicide estimations (about 3.5 vs. 0.8) and the point estimates, though large, bring with them large confidence intervals. The test of the endogeneity of PSG suggests it can be treated as exogenous, which implies a null impact on nongun homicide. Reestimating using log PSG as the gun level proxy provides a robustness check and reinforces the conclusion that a negative deterrent effect is either weak or nonexistent: in these estimations (not reported here), PSG is insignificantly different from zero, whether treated as exogenous or endogenous.

---

[21] The differences arise because of the non-overlap of the small number of missing values for the two dependent variables.

As noted earlier, however, there is a great deal of prior evidence and literature to suggest that the coefficient on gun levels in a crime equation should be biased upwards if the endogeneity problem is not addressed. This would again suggest regarding the estimated coefficient treating PSG as exogenous (column 3) as an upper bound, and modifying our conclusion to the statement that gun levels have no positive impact on nongun homicide.

If we take these estimates of gun effects seriously, they suggest that gun levels in the general public may have a net deterrent effect on gun homicide rates, but no such effect on nongun homicides. Deterrent effects would be stronger for gun homicides if their perpetrators were more likely to plan the killings (or crimes leading up to the attacks, such as robbery or a drug deal) than those who use less lethal weapons. The fact that an aggressor chose a lethal weapon, better suited to lethal purposes, rather than merely making use of whatever weapons happened to be available at the scene, may itself be an indication of premeditation. Thus, people who kill with guns, despite the tactical advantages of possessing a deadly weapon, may be more easily deterred by the prospect of confronting a gun-armed victim than those who kill with other weapons, because the former are more likely to think about the potential costs of their actions.

## 6.    Conclusions

Prior studies that have attempted to estimate the average treatment effect of gun prevalence on homicide have failed to properly address endogeneity bias or demonstrate that the chosen proxy for gun prevalence is correlated with time-series variation in gun levels. We show that recent studies attempting to address the endogeneity bias problem by applying Granger-type causality tests to panel data have exacerbated the proxy validity problem by relying on proxies that are essentially uncorrelated in time series with direct measures of gun prevalence. More importantly, however, we demonstrate that even if researchers could eliminate these problems, the estimation frameworks they have used would (1) still not produce a consistent estimate of the average treatment effect of gun prevalence, and (2) be of little value to policymakers as gun law restrictions are usually intended to have differential effects on criminal and

noncriminal gun prevalence. That is, an ATE approach cannot address the "heterogeneity in criminality" problem.

This paper used county-level cross-sectional data for 1990 data where the proxy (PSG) has been established by numerous researchers as having strong correlations across space (e.g., states, counties, nations) with direct survey measures of gun ownership. Our strategy is to use instrumental variables in a LATE framework to address the other problems of endogeneity bias and heterogeneity in criminality. The benefit of the LATE approach is that it enables the separation of the effects of criminal and noncriminal gun prevalence. In the context of our LATE framework, the estimated impact of gun prevalence is a weighted average of a possibly negative impact of noncriminal gun prevalence on homicide and a presumed positive impact of criminal gun prevalence. We find evidence of a significant negative impact, and interpret it as primarily "local to noncriminals", i.e., primarily determined by the homicide-reducing effects of noncriminal gun prevalence. We also demonstrate that an ATE for gun prevalence that is positive, negative, or approximately zero are all entirely plausible and consistent with our estimates of a significant negative impact of noncriminal gun prevalence. It is possible that the beneficiaries of the reduced level of violence may include substantial numbers of (urban) criminals who benefit via spillovers from noncriminal gun prevalence, but we have no direct evidence that would enable us to estimate the magnitude of these spillovers.

The policy implications of our findings are perhaps best understood in the context of two hypothetical gun ban scenarios, the first more optimistic, the second more pessimistic and realistic. First, gun prohibition might reduce gun ownership equiproportionately among criminals and noncriminals, and the traditional ATE interpretation therefore applies. Our results above suggest that plausible estimates of the causal impact of an average reduction in gun prevalence include positive, nil, and negative effects on gun homicide rates, and hence no strong evidence in favour of or against such a measure. But it is highly unlikely that criminals would comply with gun prohibition to the same extent as noncriminals; indeed, it is virtually a tautology that criminals would violate a gun ban at a higher rate than noncriminals. Thus,

under the more likely scenario that gun bans reduced gun levels more among noncriminals than criminals, the LATE interpretation of our results moves the range of possible impacts towards an increase in gun homicide rates because the decline in gun levels would primarily occur among those whose gun possession has predominantly negative effects on homicide.

In sum, the instrumental variables/LATE approach taken in this paper should prove useful to both researchers and policymakers by providing some preliminary estimates on the signs and magnitudes of the separate criminal and noncriminal effects of gun prevalence. Coupled with relevant information on the likely impacts of an existing or proposed gun law restriction, researchers will be able to more accurately assess the effects of such restrictions on violence rates. Future researchers should attempt to develop separate measures of criminal and noncriminal gun prevalence, so as to allow more direct tests of these differing "local" effects.

**Table 1: Descriptive Statistics**     (N=1456 except where noted)

| | | Mean | Std. Dev. | Min | Max |
|---|---|---|---|---|---|
| **Homicide variables and gun prevalence, 1987-93 average** | | | | | |
| CRMUR | Total homicides per 100,000 population | 6.48 | 5.57 | 0.00 | 55.89 |
| CRGMUR | Gun homicides per 100,000 population | 4.11 | 4.16 | 0.00 | 46.08 |
| Log CRGMUR | CRGMUR logged (N=1436) | 1.01 | 0.96 | -2.02 | 3.83 |
| CRNGMUR | Nongun homicides per 100,000 pop. | 2.37 | 1.82 | 0.00 | 11.83 |
| Log CRNGMUR | CRNGMUR logged (N=1417) | 0.62 | 0.77 | -1.66 | 2.47 |
| SRATE | Total suicides per 100,000 population | 12.95 | 3.62 | 3.34 | 31.82 |
| PSG | % suicides with guns | 66.67 | 13.44 | 15.28 | 100.00 |
| Log PSG | PSG logged | 4.18 | 0.23 | 2.73 | 4.61 |
| **Excluded instruments** | | | | | |
| PCTREP88 | % pres. vote Republican, 1988 (N=1455) | 56.55 | 9.90 | 14.83 | 81.40 |
| Log PCTREP88 | PCTREP88 logged (N=1455) | 4.02 | 0.19 | 2.70 | 4.40 |
| OMAG | Subscriptions to 3 top outdoor/sport magazines per 100,000 pop. (N=1450) | 2,259 | 928 | 220 | 6,296 |
| Log OMAG | OMAG logged (N=1450) | 7.63 | 0.45 | 5.39 | 8.75 |
| VETS | Veterans per 100,000 population | 11,448 | 2,072 | 2,745 | 20,429 |
| Log VETS | VETS logged | 9.33 | 0.19 | 7.92 | 9.92 |
| G&A | Subscriptions to *Guns & Ammo* per 100,000 pop. (N=1450) | 256.1 | 90.0 | 48.0 | 1,313 |
| Log G&A | G&A logged | 5.49 | 0.32 | 3.87 | 7.18 |
| **Controls** | | | | | |
| DENSITY | Persons per square mile | 413 | 2064 | 2 | 53,126 |
| Log DENSITY | DENSITY logged | 4.78 | 1.26 | 0.67 | 10.88 |
| PCTRURAL | % rural (farm+nonfarm) | 46.23 | 26.10 | 0.00 | 100.00 |
| PCTSUBURBAN | % suburban (outside urbanized area) | 25.48 | 22.15 | 0.00 | 100.00 |
| PCTURBAN | % urban (inside urbanized area) | 28.30 | 36.91 | 0.00 | 100.00 |
| PCT0T17 | % aged 17 and under | 26.33 | 3.22 | 15.10 | 41.70 |
| PCT18T24 | % aged 18-24 | 10.70 | 3.73 | 5.10 | 37.10 |
| PCT25T44 | % aged 25-44 | 30.91 | 2.98 | 20.30 | 45.30 |
| PCT45T64 | % aged 45-64 | 18.96 | 2.12 | 8.40 | 27.10 |
| PCT65PLUS | % aged 65 and over | 13.11 | 3.56 | 3.00 | 33.80 |
| PCTBLK | % African-American | 9.22 | 12.60 | 0.01 | 72.13 |
| Log PCTBLK | PCTBLK logged | 1.05 | 1.82 | -4.36 | 4.28 |
| PCTHISP | % Hispanic | 4.43 | 10.27 | 0.14 | 97.22 |
| Log PCTHISP | PCTHISP logged | 0.40 | 1.30 | -1.97 | 4.58 |
| PCTFEM18 | % female-headed HHs w/children < 18 | 58.48 | 7.02 | 33.40 | 80.90 |
| Log PCTFEM18 | PCTFEM18 logged | 4.06 | 0.12 | 3.51 | 4.39 |
| PCTEDUC | % aged 25+ with a BA degree or higher | 16.03 | 7.34 | 4.60 | 52.30 |
| Log PCTEDUC | PCTEDUC logged | 2.68 | 0.42 | 1.53 | 3.96 |
| PCTTRANS | % born out of state | 31.07 | 15.69 | 5.09 | 86.54 |
| Log PCTTRANS | PCTTRANS logged | 3.31 | 0.50 | 1.63 | 4.46 |
| Log MEDHHINC | Log median household income, 1989 | 10.17 | 0.24 | 9.23 | 10.99 |
| PCTINCLT15K | % households with income < $15,000 | 27.91 | 8.86 | 5.00 | 65.20 |
| Log PCTINCLT15K | PCTINCLT15K logged | 3.27 | 0.36 | 1.61 | 4.18 |
| INEQUALITY | % HHs w/income <$15k / % income >$75k | 0.32 | 0.49 | 0.02 | 6.74 |
| Log INEQUALITY | INEQUALTY logged | -1.65 | 0.88 | -4.08 | 1.91 |
| PCTPOOR | % persons below poverty line, 1989 | 14.28 | 6.90 | 2.20 | 60.00 |
| Log PCTPOOR | PCTPOOR logged | 2.55 | 0.48 | 0.79 | 4.09 |
| PCTUNEMP | % persons unemployed | 6.64 | 2.46 | 1.50 | 23.60 |
| Log PCTUNEMP | PCTUNEMP logged | 1.83 | 0.36 | 0.41 | 3.16 |
| PCTVACANT | % housing units vacant | 11.00 | 7.63 | 2.70 | 66.20 |
| Log PCTVACANT | PCTVACANT logged | 2.23 | 0.54 | 0.99 | 4.19 |

**Table 2: Log homicide estimations**
**Dependent variables: Log gun homicides per 100,000 population)**
**Estimation method: 2-step Efficient GMM**

| | A. Gun homicide | | B. Nongun homicide | |
|---|---|---|---|---|
| | (1) | (2) | (3) | (4) |
| | PSG-exogenous | PSG-endogenous | PSG-exogenous | PSG-endogenous |
| PSG/100 | 0.968*** | -2.078*** | -0.441 | -6.405* |
| | (0.217) | (0.791) | (0.774) | (3.504) |
| Log DENSITY | 0.266*** | 0.200*** | 0.686*** | 0.549*** |
| | (0.027) | (0.030) | (0.112) | (0.122) |
| PCTSUBURBAN | -0.000 | -0.003* | 0.013** | 0.009 |
| | (0.002) | (0.002) | (0.005) | (0.006) |
| PCTURBAN | 0.000 | -0.001 | 0.003 | 0.000 |
| | (0.001) | (0.001) | (0.004) | (0.004) |
| PCT0T17 | 0.034*** | 0.050*** | 0.056* | 0.106** |
| | (0.011) | (0.015) | (0.034) | (0.052) |
| PCT18T24 | -0.008 | 0.012 | -0.071** | -0.045 |
| | (0.007) | (0.010) | (0.029) | (0.035) |
| PCT25T44 | 0.022*** | 0.028*** | 0.036* | 0.045*** |
| | (0.007) | (0.008) | (0.021) | (0.017) |
| PCT45T64 | 0.053*** | 0.086*** | -0.050 | -0.001 |
| | (0.016) | (0.018) | (0.052) | (0.055) |
| Log PCTBLK | 0.234*** | 0.262*** | 0.493*** | 0.457*** |
| | (0.020) | (0.020) | (0.065) | (0.064) |
| Log PCTHISP | 0.032 | -0.021 | -0.090 | -0.155 |
| | (0.032) | (0.036) | (0.125) | (0.146) |
| Log PCTFEM18 | -0.296 | -0.004 | 0.718 | 1.173* |
| | (0.206) | (0.213) | (0.698) | (0.697) |
| Log PCTEDUC | -0.625*** | -0.755*** | -0.872*** | -1.086*** |
| | (0.107) | (0.133) | (0.296) | (0.378) |
| Log PCTTRANS | 0.045 | 0.050 | -0.036 | 0.056 |
| | (0.052) | (0.052) | (0.148) | (0.174) |
| Log MEDHHINC | 0.111 | 0.146 | 1.192 | 0.727 |
| | (0.341) | (0.404) | (1.148) | (1.184) |
| Log PCTINCLT15K | 0.750* | 0.657 | 2.701*** | 3.388*** |
| | (0.414) | (0.405) | (0.910) | (0.955) |
| Log INEQUALITY | 0.582*** | 0.488*** | 0.940** | 1.187** |
| | (0.118) | (0.138) | (0.429) | (0.482) |
| Log PCTPOOR | 0.903*** | 0.820*** | 1.356*** | 1.125*** |
| | (0.223) | (0.177) | (0.474) | (0.406) |
| Log PCTUNEMP | 0.076 | 0.085 | 0.780* | 0.876** |
| | (0.107) | (0.117) | (0.440) | (0.443) |
| Log PCTVACANT | 0.204*** | 0.193*** | 0.641*** | 0.627*** |
| | (0.059) | (0.051) | (0.135) | (0.119) |
| J statistic | $\chi^2(3)$=10.90 | $\chi^2(2)$=2.31 | $\chi^2(3)$=6.82 | $\chi^2(2)$=3.72 |
| p-value | 0.012 | 0.315 | 0.078 | 0.156 |
| Test of exogeneity of PSG | | $\chi^2(1)$=7.72 | | $\chi^2(1)$=1.47 |
| p-value | | 0.005 | | 0.226 |
| within-$R^2$ | 0.785 | n.a. | 0.768 | n.a. |
| N | 1429 | 1429 | 1449 | 1449 |
| Number of clusters/fixed effects | 49 | 49 | 49 | 49 |

Notes: * p<0.10, ** p<0.05, *** p<0.01. Standard errors in parentheses. Excluded instruments are log REP88, log OMAG and log VETS. All test statistics are robust to heteroskedasticity and clustering on state.

**Table 3: Tests of Instrument Relevance (first-stage regression results)**
**Dependent variable: PSG/100**
**Estimation method: OLS**

| | (1) | (2) | (3) | (4) | (5) | (6) |
|---|---|---|---|---|---|---|
| Log PCTREP88 | 0.109*** | 0.129*** | | | 0.105*** | |
| | (0.026) | (0.024) | | | (0.024) | |
| Log OMAG | 0.050*** | | 0.069*** | | 0.037*** | |
| | (0.010) | | (0.011) | | (0.012) | |
| Log VETS | 0.036 | | | 0.104*** | 0.036 | |
| | (0.027) | | | (0.026) | (0.028) | |
| Log G&A | | | | | 0.027 | 0.073*** |
| | | | | | (0.018) | (0.020) |
| F statistic | 22.9 | 28.0 | 37.3 | 16.1 | 16.3 | 13.8 |
| | | | | | | |
| Number of observations | 1429 | 1435 | 1430 | 1436 | 1429 | 1430 |
| Number of clusters/fixed effects | 49 | 49 | 49 | 49 | 49 | 49 |

Stock-Yogo (2005) critical values for F

| | (1) | (2) | (3) | (4) | (5) | (6) |
|---|---|---|---|---|---|---|
| 10% maximal IV size | 22.3 | | 16.4 | | 24.6 | 16.4 |
| 15% maximal IV size | 12.8 | | 9.0 | | 14.0 | 9.0 |
| 20% maximal IV size | 9.5 | | 6.7 | | 10.3 | 6.7 |

Notes: *p<0.10, ** p<0.05, *** p<0.01. Standard errors in parentheses. All regressions are fixed effects OLS estimations with the excluded instruments as specified plus the full set of controls as specified in Table 2; for brevity only the coefficients on the instruments are reported. The sample used corresponds to that for the log gun homicide estimations; results for the sample used for log nongun homicide are very similar. The F statistic is an F test of the joint significance of the instruments. See the main text for the interpretation of the Stock-Yogo test. All test statistics are robust to heteroskedasticity and clustering on state.

**Table 4: Gun homicide equation, various specifications of instruments**
**Dependent variable: Log CRGMUR (gun homicide per 100,000 population)**
**PSG treated as endogenous**

| Instruments | (1) Log PCTREP88 Log OMAG Log VETS | (2) Log PCTREP88 | (3) Log OMAG | (4) Log VETS | (5) Log PCTREP88 Log OMAG Log VETS Log G&A | (6) Log G&A |
|---|---|---|---|---|---|---|
| **Estimation method** | 2-step GMM | IV | IV | IV | 2-step GMM | IV |
| Coefficient on PSG/100 | –2.08*** | –0.727 | –3.25*** | –2.59† | –1.44* | 1.90* |
| Standard error | (0.791) | (1.19) | (1.16) | (1.59) | (0.783) | (0.977) |
| 95% confidence interval | [–6.25, –1.14] | [–3.06, 1.61] | [–5.52, –0.98] | [–5.70, 0.52] | [–2.89, 0.01] | [–0.01, 3.82] |
| J statistic | $\chi^2(2)$=2.31 p-value=0.315 | Just-identified | Just-identified | Just-identified | $\chi^2(2)$=11.4 p-value=0.010 | Just-identified |
| Test of exogeneity of G&A | | | | | $\chi^2(1)$=8.82 p-value=0.003 | |
| Number of observations | 1429 | 1435 | 1430 | 1436 | 1429 | 1430 |
| Number of clusters/fixed effects | 49 | 49 | 49 | 49 | 49 | 49 |

Notes: † p<0.15, * p<0.10, ** p<0.05, *** p<0.01. Standard errors in parentheses. All regressions are fixed effects estimations with the excluded instruments as specified plus the full set of controls as specified in Table 2; for brevity only the coefficient on PSG is reported. All test statistics are robust to heteroskedasticity and clustering on state.

**Appendix 1: Data and sources**

We use cross-sectional data for U.S. counties which had a population of 25,000 or greater in 1990, and for which relevant data were available (N=1,456). Alaska and Washington, DC were excluded from the analysis: the former, because we did not have compatible data for one of our instruments (voting in 1988); the latter, because it is itself a single county and thus drops out of a fixed-effects specification. Data for most county level variables were obtained from the U.S. Bureau of the Census, *County and City Data Book, 1994*. Other data sources were as follows:

Homicide rates are averages for the seven years 1987 to 1993 (bracketing the decennial census year of 1990). Data for each county were obtained using special Mortality Detail File computer tapes (not the public use tapes) made available by the National Center for Health Statistics (U.S. NCHS 1997). The data include all intentional homicides in the county with the exception of those due to legal intervention (e.g., killings by police and executions).

Similar to homicide, data for the percent of suicides committed with guns are also 1987-93 averages and were obtained using special Part III Mortality Detail File computer tapes made available by the NCHS. Unlike widely available public use versions, the tapes permit the aggregation of death counts for even the smallest counties (U.S. NCHS 1997).

Subscriptions per 100,000 county population to three of the most popular outdoor/sport magazines (*Field and Stream*, *Outdoor Life*, and *Sports Afield*) in 1993 were obtained from Audit Bureau of Circulations (1993). In the earlier version of this paper, we used a principal components index based on the three separate subscription rates; the measure we use here is more convenient and generates almost identical results.

The percent of the county population voting for the Republican candidate in the 1988 Presidential election is from ICPSR (1995). Rurality measures are from U.S. Census Bureau (2000).

The statistical package Stata was used for all estimations. The main IV/GMM estimation programs, *ivreg2* and *xtivreg2*, were co-authored by one of us, and can be freely downloaded via the software database of RePEc.[22] For further discussion of how the estimators and tests are implemented, see Baum, Schaffer and Stillman (2003; 2007; 2008), Schaffer (2007), and the references therein.

---

[22] http://ideas.repec.org/SoftwareSeries.html. *ivreg2* is a general-purpose IV/GMM estimation routine for linear models; *xtivreg2* supports fixed-effects panel data models.

**Appendix 2: The OLS and IV estimators with population heterogeneity**

*Model setup*

The "true model" is one with population heterogeneity (equation 5c in the main text):

$$h_i = \beta_0 + \beta_1^C g_i^C + \beta_1^{NC} g_i^{NC} + u_i \qquad (A2.1)$$

Criminal and noncriminal gun prevalence are not separately observable. A proxy for aggregate gun prevalence is available (equation 11 in the text):

$$p_i = \delta_0 + \delta_1^C g_i^C + \delta_1^{NC} g_i^{NC} + v_i \qquad (A2.2)$$

A single instrument $Z_i$ is available that is correlated with both criminal and noncriminal gun prevalence, but the strength of the correlation may differ (equations 8 and 9 in the text):

$$g_i^C = \pi_0^C + \pi_1^C Z_i + \eta_i^C \qquad (A2.3)$$

$$g_i^{NC} = \pi_0^{NC} + \pi_1^{NC} Z_i + \eta_i^{NC} \qquad (A2.4)$$

We assume that $\pi_1^C, \pi_1^{NC} \geq 0$ and at least one is strictly greater than zero, and similarly for $\delta_1^C$ and $\delta_1^{NC}$.

If gun prevalence is directly observable, the estimating equation is (equation 1 in the text):

$$h_i = \beta_0 + \beta_1 g_i + u_i \qquad (A2.5)$$

If only the proxy for gun prevalence is observable, the estimating equation is (equation 2 in the text):

$$h_i = b_0 + b_1 p_i + e_i \qquad (A2.6)$$

The derivations below follow the format of those in Stock and Watson (2007), Appendix 13.4.

*The Average Treatment Effect (ATE) of gun prevalence*

Rewrite equation (A2.1) as a "random coefficient" model:

$$h_i = \beta_0 + \beta_{1i} g_i + u_i \qquad (A2.7)$$

where

$$\beta_{1i} \equiv \frac{g_i^C}{g_i^C + g_i^{NC}} \beta_1^C + \frac{g_i^{NC}}{g_i^C + g_i^{NC}} \beta_1^{NC} \qquad (A2.8)$$

and by definition $g_i \equiv g_i^C + g_i^{NC}$, i.e., our measures of gun prevalence are in levels (rather than, say, logs). The average treatment effect of gun prevalence $\beta^{ATE}$ is $E(\beta_{1i})$. This does not have a simple expression because the quantities in (A2.8) are ratios, but the probability limit does take a simple form:

48

$$\text{plim}(\beta_{1i}) = \frac{\mu^C}{\mu^C + \mu^{NC}}\beta_1^C + \frac{\mu^{NC}}{\mu^C + \mu^{NC}}\beta_1^{NC} \tag{A2.9}$$

where $\mu^C \equiv E(g_i^C)$ and $\mu^{NC} \equiv E(g_i^{NC})$. Equation (A2.9) is equation (6) in the main text, and shows that, for a large sample of localities, the average treatment effect for a randomly distributed increase in gun prevalence is a weighted average of the criminal and noncriminal effects, with weights given by average criminal and noncriminal gun prevalence.

*OLS estimation*

We consider first estimation of equation (A2.5), when total gun prevalence is directly observable. The OLS estimator is

$$\hat{\beta}_1^{OLS} = \frac{s_{gh}}{s_g^2} \xrightarrow{P} \frac{\text{cov}(g_i, h_i)}{\text{var}(g_i)} \tag{A2.10}$$

where s denotes a sample covariance and $\xrightarrow{P}$ denotes convergence in probability. The numerator is

$$\begin{aligned}
\text{cov}(g_i, h_i) &= \text{cov}\left\{\left(g_i^C + g_i^{NC}\right), \left(\beta_0 + \beta_1^C g_i^C + \beta_1^{NC} g_i^{NC} + u_i\right)\right\} \\
&= \beta_1^C \text{var}(g_i^C) + \beta_1^C \text{cov}(g_i^C, g_i^{NC}) + \beta_1^C \text{var}(g_i^C) + \beta_1^C \text{cov}(g_i^C, g_i^{NC}) \\
&\quad + \text{cov}(g_i^C, u_i) + \text{cov}(g_i^{NC}, u_i) \\
&= \beta_1^C \left\{\text{var}(g_i^C) + \text{cov}(g_i^C, g_i^{NC})\right\} + \beta_1^{NC}\left\{\text{var}(g_i^{NC}) + \text{cov}(g_i^C, g_i^{NC})\right\} \\
&\quad + \text{cov}(g_i^C, u_i) + \text{cov}(g_i^{NC}, u_i)
\end{aligned} \tag{A2.11}$$

The denominator is simply

$$\begin{aligned}
\text{var}(g_i) &= \text{var}\left(g_i^C + g_i^{NC}\right) \\
&= \text{var}(g_i^C) + \text{var}(g_i^{NC}) + 2\text{cov}(g_i^C, g_i^{NC})
\end{aligned} \tag{A2.12}$$

and therefore

$$\begin{aligned}
\hat{\beta}_1^{OLS} = \frac{s_{gh}}{s_g^2} \xrightarrow{P} \quad & \frac{\left\{\text{var}(g_i^C) + \text{cov}(g_i^C, g_i^{NC})\right\}}{\text{var}(g_i^C) + \text{var}(g_i^{NC}) + 2\text{cov}(g_i^C, g_i^{NC})}\beta_1^C \\
& + \frac{\left\{\text{var}(g_i^{NC}) + \text{cov}(g_i^C, g_i^{NC})\right\}}{\text{var}(g_i^C) + \text{var}(g_i^{NC}) + 2\text{cov}(g_i^C, g_i^{NC})}\beta_1^{NC} \\
& + \frac{\text{cov}(g_i^C, u_i) + \text{cov}(g_i^{NC}, u_i)}{\text{var}(g_i^C) + \text{var}(g_i^{NC}) + 2\text{cov}(g_i^C, g_i^{NC})}
\end{aligned} \tag{A2.13}$$

49

The OLS estimator differs from the ATE (equation A2.9) for two reasons. First, if criminal or noncriminal guns are endogenous, then the third term in (A2.13) is nonzero. Second, even if gun prevalence is exogenous and the third term in (A2.13) drops out, the resulting OLS estimator is a weighted average of $\beta_1^C$ and $\beta_1^{NC}$, but the weights differ from those for the ATE in (A2.9); whereas the ATE weights are relative gun prevalence, the OLS weights are driven by the variances and covariances of gun prevalence, i.e., by gun variability. The intuition is that the identifying variation in the estimation of (A2.5) comes from the variation in criminal and noncriminal gun prevalence, and these may differ. To take an extreme example, if criminal and noncriminal gun prevalence are uncorrelated so that $\mathrm{cov}(g_i^{\,C}, g_i^{\,NC}) = 0$, and noncriminal gun prevalence varies little or not at all across localities so that $\mathrm{var}(g_i^{\,NC}) \approx 0$, then the OLS estimator $\hat{\beta}_1^{\mathrm{OLS}}$ will be approximately equal to the impact of criminal guns $\beta_1^C$, because the identifying variation in the data is driven by variation in criminal gun prevalence.

Next we consider OLS estimation of (A2.6), when only a proxy is available. To simplify the algebra, we assume that the homicide error $u_i$ and the proxy error $v_i$ are uncorrelated with gun prevalence and with each other. The OLS estimator is

$$\hat{b}_1^{\mathrm{OLS}} = \frac{s_{ph}}{s_p^2} \xrightarrow{\ P\ } \frac{\mathrm{cov}(p_i, h_i)}{\mathrm{var}(p_i)} \tag{A2.14}$$

The numerator is

$$
\begin{aligned}
\mathrm{cov}(p_i, h_i) &= \mathrm{cov}\left\{\!\left(\delta_0 + \delta_1^C g_i^{\,C} + \delta_1^{NC} g_i^{\,NC} + v_i\right)\!\!\left(\beta_0 + \beta_1^C g_i^{\,C} + \beta_1^{NC} g_i^{\,NC} + u_i\right)\!\right\} \\
&= \delta_1^C \beta_1^C \,\mathrm{var}(g_i^{\,C}) + \delta_1^{NC} \beta_1^{NC} \,\mathrm{var}(g_i^{\,NC}) + (\delta_1^C \beta_1^{NC} + \delta_1^{NC} \beta_1^C)\,\mathrm{cov}(g_i^{\,C}, g_i^{\,NC})
\end{aligned} \tag{A2.15}
$$

since we've assumed that the error terms are uncorrelated with gun levels. The denominator is

$$
\begin{aligned}
\mathrm{var}(p_i) &= \mathrm{var}\!\left(\delta_0 + \delta_1^C g_i^{\,C} + \delta_1^{NC} g_i^{\,NC} + v_i\right) \\
&= (\delta_1^C)^2 \,\mathrm{var}(g_i^{\,C}) + (\delta_1^{NC})^2 \,\mathrm{var}(g_i^{\,NC}) + 2\delta_1^C \delta_1^{NC} \,\mathrm{cov}(g_i^{\,C}, g_i^{\,NC}) + \mathrm{var}(v_i)
\end{aligned} \tag{A2.16}
$$

Thus

$$
\begin{aligned}
\hat{b}_1^{\mathrm{OLS}} \xrightarrow{\ P\ } \ & \frac{\delta_1^C \,\mathrm{var}(g_i^{\,C}) + \delta_1^{NC} \,\mathrm{cov}(g_i^{\,C}, g_i^{\,NC})}{(\delta_1^C)^2 \,\mathrm{var}(g_i^{\,C}) + (\delta_1^{NC})^2 \,\mathrm{var}(g_i^{\,NC}) + 2\delta_1^C \delta_1^{NC} \,\mathrm{cov}(g_i^{\,C}, g_i^{\,NC}) + \mathrm{var}(v_i)} \beta_1^C \\
& + \frac{\delta_1^{NC} \,\mathrm{var}(g_i^{\,NC}) + \delta_1^C \,\mathrm{cov}(g_i^{\,C}, g_i^{\,NC})}{(\delta_1^C)^2 \,\mathrm{var}(g_i^{\,C}) + (\delta_1^{NC})^2 \,\mathrm{var}(g_i^{\,NC}) + 2\delta_1^C \delta_1^{NC} \,\mathrm{cov}(g_i^{\,C}, g_i^{\,NC}) + \mathrm{var}(v_i)} \beta_1^{NC}
\end{aligned} \tag{A2.17}
$$

Equation (A2.17) shows the OLS estimator using a proxy for gun levels is a weighted average of the criminal and noncriminal effects. The weights sum to less than one because of the $\mathrm{var}(v_i)$ term; this is the attenuation bias attributable to the measurement error in the proxy. The weights on $\beta_1^C$ and $\beta_1^{NC}$ now depend not only on gun variability, but also on the relative strength of the correlations between the proxy and criminal/noncriminal gun levels: if $\delta_1^{NC} >> \delta_1^C$, then the OLS estimator will put a high weight on the noncriminal impact gun prevalence, and vice-versa if $\delta_1^{NC} << \delta_1^C$. Note that even if $\delta_1^C = 0$, the weight on $\beta_1^C$ may be positive if criminal and noncriminal gun prevalence are correlated. Note also that sign$\{\hat{b}_1^{OLS}\}$ is not in general a consistent estimator of sign$\{\hat{\beta}_1^{OLS}\}$.

*IV estimation*

Again we start with the case where gun levels are observable. The IV estimator can be written

$$\hat{\beta}_1^{IV} = \frac{s_{Zh}}{s_{Zg}} \xrightarrow{P} \frac{\mathrm{cov}(Z_i, h_i)}{\mathrm{cov}(Z_i, g_i)} \tag{A2.18}$$

Taking the numerator first,

$$
\begin{aligned}
\mathrm{cov}(Z_i, h_i) &= \mathrm{cov}\left\{Z_i, \left(\beta_0 + \beta_1^C g_i^C + \beta_1^{NC} g_i^{NC} + u_i\right)\right\} \\
&= \mathrm{cov}(Z_i, \beta_1^C g_i^C) + \mathrm{cov}(Z_i, \beta_1^{NC} g_i^{NC}) + \mathrm{cov}(Z_i, u_i) \\
&= \beta_1^C \mathrm{cov}(Z_i, g_i^C) + \beta_1^{NC} \mathrm{cov}(Z_i, g_i^{NC})
\end{aligned}
\tag{A2.19}
$$

since $Z$ is exogenous and orthogonal to the error term. Using equations (A2.3) and (A2.4), we have

$$
\begin{aligned}
\mathrm{cov}(Z_i, g_i^C) &= \mathrm{cov}(Z_i, \pi_0^C + \pi_1^C Z_i + \eta_i) = \pi_1^C \mathrm{var}(Z_i) \\
\mathrm{cov}(Z_i, g_i^{NC}) &= \mathrm{cov}(Z_i, \pi_0^{NC} + \pi_1^{NC} Z_i + \eta_i) = \pi_1^{NC} \mathrm{var}(Z_i)
\end{aligned}
\tag{A2.20}
$$

since $Z$ is also uncorrelated with $\eta$. Substituting (A2.20) into (A2.19), we have

$$\mathrm{cov}(Z_i, h_i) = \beta_1^C \pi_1^C \mathrm{var}(Z_i) + \beta_1^{NC} \pi_1^{NC} \mathrm{var}(Z_i) = \mathrm{var}(Z_i)\left\{\beta_1^C \pi_1^C + \beta_1^{NC} \pi_1^{NC}\right\} \tag{A2.21}$$

Now taking the denominator of (A2.18),

$$
\begin{aligned}
\mathrm{cov}(Z_i, g_i) &= \mathrm{cov}\left\{Z_i, \left(g_i^C + g_i^{NC}\right)\right\} = \mathrm{cov}(Z_i, g_i^C) + \mathrm{cov}(Z_i, g_i^{NC}) \\
&= \pi_1^C \mathrm{var}(Z_i) + \pi_1^{NC} \mathrm{var}(Z_i) = \mathrm{var}(Z_i)\left\{\pi_1^C + \pi_1^{NC}\right\}
\end{aligned}
\tag{A2.22}
$$

where we have made use of (A2.20). Substituting (A2.21) and (A2.22) into (A2.18), we obtain

$$\hat{\beta}_1^{IV} = \frac{s_{Zh}}{s_{Zg}} \xrightarrow{P} \frac{\mathrm{var}(Z_i)\left\{\beta_1^C \pi_1^C + \beta_1^{NC} \pi_1^{NC}\right\}}{\mathrm{var}(Z_i)\left\{\pi_1^C + \pi_1^{NC}\right\}} = \frac{\pi_1^C}{\pi_1^C + \pi_1^{NC}}\beta_1^C + \frac{\pi_1^{NC}}{\pi_1^C + \pi_1^{NC}}\beta_1^{NC} \tag{A2.23}$$

which is equation (10) in the text, the expression for the LATE estimator when gun levels are observable. The LATE estimator is a weighted average of $\beta_1^C$ and $\beta_1^{NC}$, where the weights are the relative strengths of the correlations between the instrument $Z$ and criminal/noncriminal gun prevalence. Note that, unlike the OLS estimator, the variation in gun prevalence does not affect the weights. LATE (A2.23) will be a consistent estimator of the ATE (A2.9) only in the special cases (a) the correlations of $Z$ with criminal/noncriminal gun prevalence are proportional to the levels of criminal/noncriminal gun prevalence, and (b) the impacts of criminal and noncriminal gun prevalence are equal, $\beta_1^C = \beta_1^{NC}$.

Now consider the case where gun levels are not observable and the IV estimator uses the proxy $p$:

$$\hat{b}_1^{IV} = \frac{s_{Zh}}{s_{Zp}} \xrightarrow{P} \frac{\text{cov}(Z_i, h_i)}{\text{cov}(Z_i, p_i)} \tag{A2.24}$$

The numerator is the same as in (A.5) above. The denominator is

$$\begin{aligned}
\text{cov}(Z_i, p_i) &= \text{cov}\left\{Z_i, \left(\delta_0 + \delta_1^C g_i^C + \delta_1^{NC} g_i^{NC} + v_i\right)\right\} \\
&= \delta_1^C \text{cov}(Z_i, g_i^C) + \delta_1^{NC} \text{cov}(Z_i, g_i^{NC}) \\
&= \delta_1^C \pi_1^C \text{var}(Z_i) + \delta_1^{NC} \pi_1^{NC} \text{var}(Z_i) = \text{var}(Z_i)\left\{\delta_1^C \pi_1^C + \delta_1^{NC} \pi_1^{NC}\right\}
\end{aligned} \tag{A2.25}$$

Substituting (A2.21) and (A2.25) into (A2.24) yields

$$\begin{aligned}
\hat{b}_1^{IV} = \frac{s_{Zh}}{s_{Zp}} \xrightarrow{P} \frac{\text{cov}(Z_i, h_i)}{\text{cov}(Z_i, p_i)} &= \frac{\text{var}(Z_i)\left\{\beta_1^C \pi_1^C + \beta_1^{NC} \pi_1^{NC}\right\}}{\text{var}(Z_i)\left\{\delta_1^C \pi_1^C + \delta_1^{NC} \pi_1^{NC}\right\}} \\
&= \frac{\pi_1^C}{\delta_1^C \pi_1^C + \delta_1^{NC} \pi_1^{NC}} \beta_1^C + \frac{\pi_1^{NC}}{\delta_1^C \pi_1^C + \delta_1^{NC} \pi_1^{NC}} \beta_1^{NC} \\
&= \frac{\pi_1^C + \pi_1^{NC}}{\delta_1^C \pi_1^C + \delta_1^{NC} \pi_1^{NC}} \left\{\frac{\pi_1^C}{\pi_1^C + \pi_1^{NC}} \beta_1^C + \frac{\pi_1^{NC}}{\pi_1^C + \pi_1^{NC}} \beta_1^{NC}\right\}
\end{aligned} \tag{A2.26}$$

which is equation (11) in the text, the expression for the LATE estimator when gun prevalence is proxied by $p$. Note that this a scaling parameter (assumed positive) times the probability limit of $\hat{\beta}_1^{IV}$ given in equation (A2.23). Thus sign$\{\hat{b}_1^{IV}\}$ is a consistent estimator of sign$\{\hat{\beta}_1^{IV}\}$, irrespective of the strength of the correlation between the proxy and criminal/noncriminal gun prevalence.

# REFERENCES

Angrist, Joshua and Guido Imbens. 1995. "Two-stage least squares estimates of average causal effects in models with variable treatment intensity." *Journal of the American Statistical Association* 90(430):431-442.

Annest, Joseph L., James A. Mercy, Delinda R. Gibson, and George W. Ryan. 1995. "National estimates of nonfatal firearm-related injuries." *Journal of the American Medical Association* 273:1749-54.

Audit Bureau of Circulations. 1993. Supplementary Data Report, covering county paid circulation for gun and related sports magazines. Schaumburg, IL: Audit Bureau of Circulations.

Ayres, Ian and John J. Donohue III. 2003. "Shooting Down the 'More Guns, Less Crime' Hypothesis." *Stanford Law Review*, 55:1193-1312.

Azrael, Deborah, Philip J. Cook and Matthew Miller. 2004. "State and local prevalence firearms ownership: measurement, structure, and trends." *Journal of Quantitative Criminology* (forthcoming).

Baum, Christopher F., Mark E. Schaffer, and Steven Stillman. 2003. "Instrumental variables and GMM: Estimation and testing." *The Stata Journal* 3:1-31.

Baum, Christopher F., Mark E. Schaffer, and Steven Stillman. 2007. "Enhanced routines for instrumental variables/generalized method of moments estimation and testing." *The Stata Journal* 7:465-506.

Baum, Christopher, Mark E. Schaffer and Steven Stillman. 2008. "IVREG2: Stata module for extended instrumental variables/2SLS and GMM estimation". http://ideas.repec.org/c/boc/bocode/s425401.html.

Bordua, David J., and Alan J. Lizotte. 1979. "Patterns of legal firearms ownership: a cultural and situational analysis of Illinois counties." *Law and Policy Quarterly* 1:147-75.

Clarke, Ronald V., and Pat Mayhew. 1988. "The British gas suicide story and its criminological implications." Pp 79-116 in *Crime and Justice*, Vol. 10, edited by Michael Tonry and Norval Morris. Chicago: University of Chicago Press.

Cook, Philip J., and Jens Ludwig. 1997. *Guns in America*. Washington, D.C.: Police Foundation.

Cook, Philip J., and Jens Ludwig (eds.). 2003a. *Evaluating Gun Policy*, edited by Jens Ludwig and Philip J. Cook. Washington, D.C.: Brookings Institution Press.

Cook, Philip J., and Jens Ludwig. 2003b. "Pragmatic gun policy." In Cook and Ludwig (2003a), *op. cit*.

Cook, Philip J., and Jens Ludwig. 2003c. "Guns and burglary." In Cook and Ludwig (2003a), *op. cit*.

Cook, Philip J., and Jens Ludwig. 2004. "The social costs of gun ownership." NBER Working Paper 10736. http://www.nber.org/papers/w10736.

Cook, Philip J., and Jens Ludwig. 2006. "The social costs of gun ownership." *Journal of Public Economics* 90:379-391.

Deaton, Angus. 1997. *The Analysis of Household Surveys: A Microeconometric Approach to Development Policy*. Washington, DC: World Bank/Johns Hopkins University Press.

Decker, Scott H., G. David Curry, Shannan Catalano, Adam Watkins. 2005. "Strategic Approaches to Community Safety Initiative (SACSI) in St. Louis. Final Report." Research report submitted to the U.S. Department of Justice, Document Number 210361, Award Number 2000-IJ-CX-K008, June. http://www.ncjrs.gov/pdffiles1/nij/grants/210361.pdf.

Duggan, Mark. 2001. "More guns, more crime." *Journal of Political Economy* 109:1086-1114.

Duggan, Mark. 2003. "Guns and Suicide." In Cook and Ludwig (2003a), *op. cit.*

Griliches, Zvi and Jerry Hausman. 1986. "Errors in variables in panel data." *Journal of Econometrics* 31(1): 93-118.

Hansen, L.P. J. Heaton and A. Yaron. 1996. "Finite Sample Properties of Some Alternative GMM Estimators." *Journal of Business and Economic Statistics*, 14(3): 262-280.

Hayashi, Fumio. 2000. *Econometrics*. Princeton: Princeton University Press.

Heckman, James. 1997. "Instrumental Variables: A Study of Implicit Behavioral Assumptions Used in Making Program Evaluations." *Journal of Human Resources*, 32(3): 441-462.

ICPSR. 1995. *General Election Data for the United States, 1950-1990* [Computer file]. ICPSR ed. Ann Arbor, MI: Inter-university Consortium for Political and Social Research [producer and distributor], 1995.

Imbens, Guido and Joshua Angrist. 1994. "Identification and estimation of local average treatment effects." *Econometrica* 62(2): 467-475.

Kates, Don B. and Gary Mauser. 2007. "Would Banning Firearms Reduce Murder and Suicide? A Review of International and Some Domestic Evidence." *Harvard Journal of Law and Public Policy* 30(2): 649-694.

Killias, Martin. 1993. "Gun ownership, suicide, and homicide: an international perspective." Pp. 289-303 in *Understanding Crime: Experiences of Crime and Crime Control*, edited by Anna del Frate, Uglijesa Zvekic, and Jan J. M. van Dijk. Rome: UNICRI.

Killias, Martin, John van Kesteren, and Martin Rindlisbacher. 2001. "Guns, violent crime, and suicide in 21 countries." *Canadian Journal of Criminology* 43:429-448.

Kleck, Gary. 1988. "Crime control through the private use of armed force." *Social Problems* 35:1-21.

Kleck, Gary. 1997. *Targeting guns: Firearms and their control*. N.Y.: Aldine.

Kleck, Gary and Michael Hogan. 1999. "A National Case-control Study of Homicide Offending and Gun Ownership." Social Problems 46(2):275-293.

Kleck, Gary. 2004. "Measures of gun ownership levels for macro-level crime and violence research." *Journal of Research in Crime and Delinquency* 41(1):3-36.

Kleck, Gary, and Miriam DeLone. 1993. "Victim resistance and offender weapon effects in robbery." *Journal of Quantitative Criminology* 9:55-82.

Kleck, Gary, and Don B. Kates. 2001. *Armed: New perspectives on gun control*. Amherst, NY: Prometheus.

Kleck, Gary, and Karen McElrath. 1991. "The effects of weaponry on human violence." *Social Forces* 69:669-92.

Kleck, Gary, and E. Britt Patterson. 1993. "The impact of gun control and gun ownership levels on violence rates." Journal *of Quantitative Criminology* 9:249-288.

Kovandzic, Tomislav, Lynne M. Vieraitis, and Mark R. Yeisley. 1998. "The structural covariates of urban homicide." *Criminology* 36:569-600.

Kovandzic, Tomislav, Mark E. Schaffer and Gary Kleck. 2005. "Gun Prevalence, Homicide Rates and Causality: A GMM Approach to Endogeneity Bias." CEPR Discussion Paper 5357. http://ideas.repec.org/p/cpr/ceprdp/5357.html.

Land, Kenneth, Patricia L. McCall, and Lawrence E. Cohen. 1990. "Structural covariates of homicide rates." *American Journal of Sociology* 95:922-963.

Lott, John R., Jr. 2000. *More Guns, Less Crime*. 2nd edition. Chicago: University of Chicago Press.

Marvell, Thomas B., and Carlisle E. Moody, Jr. 1991. "Age structure and crime rates: the conflicting evidence." *Journal of Quantitative Criminology* 7(3):237-273.

McDowall, David, and Colin Loftin. 1983. "Collective security and the demand for handguns." *American Journal of Sociology* 88:1146-1161.

Moody, Carlisle E., and Thomas B. Marvell. 2005. "Guns and crime." *Southern Economic Journal* 71:720-736.

Newey, Whitney K. 1985. "Generalized method of moments specification testing." *Journal of Econometrics* 29:229-256.

Okoro, Catherine A., David E. Nelson, James A. Mercy, Lina S. Balluz, Alex E. Crosby, and Ali H. Mokdad. 2005. "Prevalence of household firearms and firearm-storage practices in the 50 states and the District of Columbia." *Pediatrics* 116:e370-e376.

Rice, Douglas C., and David D. Hemley. 2002. "The market for new handguns." *Journal of Law and Economic*s 45:251-265.

Sampson, Robert J. 1986. "Crime in cities." Pp. 271-311 in Albert J. Reiss Jr. and Michael Tonry (eds.), *Communities and Crime*. Chicago: University of Chicago Press.

Schaffer, Mark E. 2007. "XTIVREG2: Stata module to perform extended IV/2SLS, GMM and AC/HAC, LIML and k-class regression for panel data models." http://ideas.repec.org/c/boc/bocode/s456501.html.

Staiger, Douglas, and James H. Stock. 1997. "Instrumental variables regression with weak instruments." *Econometrica* 65:557-586.

Sloan, John Henry, Arthur L. Kellermann, Donald T. Reay, James A. Ferris, Thomas Koepsell, Frederick P. Rivara, Charles Rice, Laurel Gray, and James LoGerfo. 1990. "Handgun regulations, crime, assaults and homicide." *New England Journal of Medicine* 319:1256-62.

Stock, James H. and Mark W. Watson. 2007. *Introduction to Econometrics.* 2nd edition. Pearson/Addison-Wesley.

Stock, James H., Jonathan H. Wright and Motohiro Yogo, 2002. "A survey of weak instruments and weak identification in generalized method of moments." *Journal of Business and Economic Statistics* 20(4):518:529.

Stock, J.H., and M. Yogo. 2005. "Testing for weak instruments in linear IV regression." In D.W.K. Andrews and J.H. Stock, eds. *Identification and Inference for Econometric Models: Essays in Honor of Thomas Rothenberg*. Cambridge: Cambridge University Press, pp. 80-108. Working paper version: NBER Technical Working Paper 284, 2002. http://www.nber.org/papers/T0284.

Tark, Jongyeon, and Gary Kleck. 2004. "Resisting crime: the effects of victim action on the outcomes of crimes." *Criminology* 42(4):861-909.

U.S. Bureau of the Census. 1990. "Census 1990 Summary File 3 (SF3) – Sample Data, Table P006 Urban and Rural". Retrieved 7 February 2005 from U.S. Census http://factfinder.census.gov.

U.S. Bureau of the Census. 1994. County and City Data Book, 1994. Washington, D.C.: U.S. Government Printing Office.

U.S. Federal Bureau of Investigation (FBI). 1990-2000a, 2006. Crime in The United States 1989 [-1999] Uniform Crime Reports. Washington, D.C.: U.S. Government Printing Office.

U.S. National Center for Health Statistics. 1997. Limited access versions of Mortality Detail Files, 1987-1993, with location detail, supplied to third author. Hyattsville, MD: U.S. Department of Health and Human Services.

Vieraitis, Lynne M. 2000. "Income inequality, poverty, and violent crime: A review of the empirical evidence." *Social Pathology* 6(1):24-45.

White, Halbert. 1994. *Estimation, inference and specification analysis*. Cambridge University Press.

Wooldridge, Jeffrey M. 2006. *Introductory econometrics: A modern approach*. Thomson/South-Western.

Wright, James D., and Peter H. Rossi. 1986. Armed *and Considered Dangerous*. New York: Aldine.

Zimring, Franklin E., and Gordon Hawkins. 1997. *Crime is Not the Problem*. N.Y.: Oxford.