# EXHIBIT 10



# FIREARMS
## AND
# VIOLENCE

## A CRITICAL REVIEW

Committee to Improve Research Information and Data on Firearms
Charles F. Wellford, John V. Pepper, and Carol V. Petrie, editors
Committee on Law and Justice
Division of Behavioral and Social Sciences and Education

NATIONAL RESEARCH COUNCIL
*OF THE NATIONAL ACADEMIES*

THE NATIONAL ACADEMIES PRESS
Washington, D.C.
**www.nap.edu**

Copyright © National Academy of Sciences. All rights reserved.

**THE NATIONAL ACADEMIES PRESS   500 Fifth STREET, N.W.   Washington, DC  20001**

NOTICE: The project that is the subject of this report was approved by the Governing Board of the National Research Council, whose members are drawn from the councils of the National Academy of Sciences, the National Academy of Engineering, and the Institute of Medicine. The members of the committee responsible for the report were chosen for their special competences and with regard for appropriate balance.

This study was supported by the National Academy of Sciences and Grant No. 2000-IJ-CX-0034 from the National Institute of Justice, Grant No. 200-2000-00629 from the Department of Health and Human Services, the Joyce Foundation (grant not numbered), Grant No. 200-8064 from the Annie E. Casey Foundation, and Grant No. 2001-16212 from the Packard Foundation. Any opinions, findings, conclusions, or recommendations expressed in this publication are those of the author(s) and do not necessarily reflect the views of the organizations or agencies that provided support for the project.

**Library of Congress Cataloging-in-Publication Data**

National Research Council (U.S.). Committee to Improve Research Information and Data on Firearms.
   Firearms and violence : a critical review / Committee to Improve Research Information and Data on Firearms ; Charles F. Wellford, John V. Pepper, and Carol V. Petrie, editors ; Committee on Law and Justice, Division of Behavioral and Social Sciences and Education.
     p. cm.
   Includes bibliographical references and index.
   ISBN 0-309-09124-1 (hardcover) — ISBN 0-309-54640-0 (pdf)
   1. Firearms and crime—United States. 2. Firearms and crime—Research—United States. 3. Firearms ownership—United States. 4. Violence—United States. 5. Violence—United States—Prevention.  I. Wellford, Charles F. II. Pepper, John, 1964- III. Petrie, Carol. IV. National Research Council (U.S.). Committee on Law and Justice. V. Title.
   HV6789.N37 2004
   364.2—dc22
                                                    2004024047

Additional copies of this report are available from National Academies Press, 500 Fifth Street, N.W., Lockbox 285, Washington, DC 20055; (800) 624-6242 or (202) 334-3313 (in the Washington metropolitan area); Internet, http://www.nap.edu.

Printed in the United States of America.
Copyright 2005 by the National Academy of Sciences. All rights reserved.

Suggested citation: National Research Council. (2005). *Firearms and Violence: A Critical Review*. Committee to Improve Research Information and Data on Firearms. Charles F. Wellford, John V. Pepper, and Carol V. Petrie, editors. Committee on Law and Justice, Division of Behavioral and Social Sciences and Education. Washington, DC: The National Academies Press.

Copyright © National Academy of Sciences. All rights reserved.

# THE NATIONAL ACADEMIES

*Advisers to the Nation on Science, Engineering, and Medicine*

The **National Academy of Sciences** is a private, nonprofit, self-perpetuating society of distinguished scholars engaged in scientific and engineering research, dedicated to the furtherance of science and technology and to their use for the general welfare. Upon the authority of the charter granted to it by the Congress in 1863, the Academy has a mandate that requires it to advise the federal government on scientific and technical matters. Dr. Bruce M. Alberts is president of the National Academy of Sciences.

The **National Academy of Engineering** was established in 1964, under the charter of the National Academy of Sciences, as a parallel organization of outstanding engineers. It is autonomous in its administration and in the selection of its members, sharing with the National Academy of Sciences the responsibility for advising the federal government. The National Academy of Engineering also sponsors engineering programs aimed at meeting national needs, encourages education and research, and recognizes the superior achievements of engineers. Dr. Wm. A. Wulf is president of the National Academy of Engineering.

The **Institute of Medicine** was established in 1970 by the National Academy of Sciences to secure the services of eminent members of appropriate professions in the examination of policy matters pertaining to the health of the public. The Institute acts under the responsibility given to the National Academy of Sciences by its congressional charter to be an adviser to the federal government and, upon its own initiative, to identify issues of medical care, research, and education. Dr. Harvey V. Fineberg is president of the Institute of Medicine.

The **National Research Council** was organized by the National Academy of Sciences in 1916 to associate the broad community of science and technology with the Academy's purposes of furthering knowledge and advising the federal government. Functioning in accordance with general policies determined by the Academy, the Council has become the principal operating agency of both the National Academy of Sciences and the National Academy of Engineering in providing services to the government, the public, and the scientific and engineering communities. The Council is administered jointly by both Academies and the Institute of Medicine. Dr. Bruce M. Alberts and Dr. Wm. A. Wulf are chair and vice chair, respectively, of the National Research Council.

**www.national-academies.org**

Copyright © National Academy of Sciences. All rights reserved.

## COMMITTEE TO IMPROVE RESEARCH INFORMATION AND DATA ON FIREARMS

CHARLES F. WELLFORD (*Chair*), Department of Criminology and Criminal Justice, University of Maryland, College Park

ROBERT F. BORUCH, Graduate School of Education, University of Pennsylvania

LINDA B. COTTLER, Department of Psychiatry, Washington University School of Medicine

ROBERT D. CRUTCHFIELD, Department of Sociology, University of Washington

JOEL L. HOROWITZ, Department of Economics, Northwestern University

ROBERT L. JOHNSON, Adolescent and Young Adult Medicine, New Jersey Medical School

STEVEN D. LEVITT, Department of Economics, University of Chicago

TERRIE E. MOFFITT, Department of Psychology, University of Wisconsin

SUSAN A. MURPHY, Department of Statistics, University of Michigan

KAREN E. NORBERG, Department of Psychiatry, Boston University, and Center for Health Policy at Washington University, St. Louis

PETER REUTER, School of Public Affairs, University of Maryland

RICHARD ROSENFELD, Department of Criminology and Criminal Justice, University of Missouri-St. Louis

JOEL WALDFOGEL, Public Policy and Management Department, The Wharton School, University of Pennsylvania

JAMES Q. WILSON, Department of Management and Public Policy (emeritus), University of California, Los Angeles

CHISTOPHER WINSHIP, Department of Sociology, Harvard University

JOHN V. PEPPER, *Study Director*
ANTHONY BRAGA, *Consultant*
BRENDA McLAUGHLIN, *Research Associate*
MICHELE McGUIRE, *Project Assistant*
RALPH PATTERSON, *Senior Project Assistant*

*iv*

Copyright © National Academy of Sciences. All rights reserved.

## COMMITTEE ON LAW AND JUSTICE
### 2003-2004

CHARLES F. WELLFORD (*Chair*), Department of Criminology and Criminal Justice, University of Maryland, College Park

MARK H. MOORE (*Vice Chair*), Hauser Center for Non-Profit Institutions and John F. Kennedy School of Government, Harvard University

DAVID H. BAYLEY, School of Criminal Justice, University of Albany, SUNY

ALFRED BLUMSTEIN, H. John Heinz III School of Public Policy and Management, Carnegie Mellon University

RICHARD BONNIE, Institute of Law, Psychiatry, and Public Policy, University of Virginia Law School

JEANETTE COVINGTON, Department of Sociology, Rutgers University

MARTHA CRENSHAW, Department of Political Science, Wesleyan University

STEVEN DURLAUF, Department of Economics, University of Wisconsin, Madison

JEFFREY FAGAN, School of Law and School of Public Health, Columbia University

JOHN FEREJOHN, Hoover Institution, Stanford University

DARNELL HAWKINS, Department of Sociology, University of Illinois, Chicago

PHILLIP HEYMANN, Harvard Law School, Harvard University

ROBERT L. JOHNSON, Adolescent and Young Adult Medicine, New Jersey Medical School

CANDACE KRUTTSCHNITT, Department of Sociology, University of Minnesota

JOHN H. LAUB, Department of Criminology and Criminal Justice, University of Maryland, College Park

MARK LIPSEY, Center for Crime and Justice Policy Studies, Vanderbilt University

DANIEL D. NAGIN, H. John Heinz III School of Public Policy and Management, Carnegie Mellon University

RICHARD ROSENFELD, Department of Criminology and Criminal Justice, University of Missouri-St. Louis

CHRISTY VISHER, Justice Policy Center, Urban Institute, Washington, DC

CATHY SPATZ WIDOM, Department of Psychiatry, New Jersey Medical School

CAROL V. PETRIE, *Director*

RALPH PATTERSON, *Senior Project Assistant*

*v*

Copyright © National Academy of Sciences. All rights reserved.

Firearms and Violence: A Critical Review
http://www.nap.edu/catalog/10881.html

Copyright © National Academy of Sciences. All rights reserved.

# Contents

Preface                                                              ix

Executive Summary                                                     1

1   Introduction                                                     11

2   Data for Measuring Firearms Violence and Ownership              19

3   Patterns of Firearm-Related Violence                            53

4   Interventions Aimed at Illegal Firearm Acquisition              72

5   The Use of Guns to Defend Against Criminals                    102

6   Right-to-Carry Laws                                            120

7   Firearms and Suicide                                           152

8   Firearm Injury Prevention Programs                             201

9   Criminal Justice Interventions to Reduce Firearm-Related
    Violence                                                       221

References                                                         242

*vii*

Copyright © National Academy of Sciences. All rights reserved.

*viii*                                                        *CONTENTS*

Appendixes

A   Dissent                                                    269
        *James Q. Wilson*
B   Committee Response to Wilson's Dissent                       272
C   Judicial Scrutiny of Challenged Gun Control Regulations:     276
        The Implications of an Individual Right Interpretation of the
        Second Amendment
        *Scott Gast*
D   Statistical Issues in the Evaluation of the Effects of        299
        Right-to-Carry Laws
        *Joel L. Horowitz*
E   Biographical Sketches of Committee Members and Staff          309

Index                                                            317

Copyright © National Academy of Sciences. All rights reserved.

# Preface

Few topics engender more controversy than "gun control." Large segments of the population express contradictory opinions and assert contradictory facts when they discuss the role of firearms in violence and especially how to reduce violent injuries and deaths that involve firearms. The report of the Committee on Improving Research Information and Data on Firearms was not intended to, nor does it reach any conclusions about the issue of gun control. Rather, we have addressed what empirical research tells about the role of firearms in violence. Our recommendations address how to improve the empirical foundation for discussions about firearms policy. Until that foundation is better established, little progress is likely in the ongoing public debate over firearms.

One theme that runs throughout our report is the relative absence of credible data central to addressing even the most basic questions about firearms and violence. As we often state in the report, without much better data, important questions will continue to be unanswerable. This is unacceptable when we see the impact that firearm-related violent injury and death have on American society and especially some of the most vulnerable segments of that population. The fact that little can be said about the prevention and control of these levels of death and injury—when for some segments of the population they are the leading causes of death and injury—is of concern to us as citizens and scientists.

Reaching consensus on a controversial topic for which research is limited and in conflict requires an exceptional committee and staff. The committee has spent the past two years learning about research and data on firearms and seeking to learn from each other how our disciplines evaluate

*ix*

Copyright © National Academy of Sciences. All rights reserved.

Firearms and Violence: A Critical Review
https://www.nap.edu/catalog/10881.html

and use this knowledge. It is only because committee members had diverse backgrounds, uncommon respect for each other, and a willingness to apply common scientific standards to our deliberations that we were able to complete our work in what I think is an exceptional manner. Some may disagree with our analysis, but none can question our effort to raise the science of firearms research so that it can begin to inform public policy. I thank committee members for their work and patience.

Needless to say, the staff for the committee carried a very heavy load. Without them we would have not been able to complete our work. John Pepper in particular deserves special recognition as the study director. John not only provided outstanding staff support but he also helped form the structure of our report, edited and contributed to many of the chapters, was the primary drafter of one chapter, and always managed to see a way forward when we seemed stymied. Carol Petrie, staff director of the Committee on Law and Justice, provided invaluable insight into the way we could deal with controversial topics, helped keep us on track, and edited every chapter. Brenda McLaughlin, research associate, provided valuable assistance, and Michelle McGuire, program assistant, and Ralph Patterson, senior project assistant, performed superbly.

The committee is grateful to Anthony Braga, Harvard University, whose work as a consultant to the committee throughout its period of operation was invaluable. And the committee wants to thank Christine McShane, of the Division on Social and Behavioral Sciences and Education, for her invaluable assistance in preparing the manuscript for review and publication. She provided clear and sensible guidance on chapter and appendix organization, and she did an outstanding job of editing the entire report, several times.

The committee could not have completed its work without the assistance of many scholars and policy officials who gave unstintingly of their time and shared their resources, their work, and their thinking. To gather information on a variety of subjects from a diversity of perspectives, we held four public workshops: the Workshop on Firearms Research and Data, August 30-31, 2001; the Workshop on Intentional Injuries and Firearms, November 15-16, 2001; the Workshop on Self-Defense, Deterrence and Firearm Markets, January 16-17, 2002; and the Workshop on Firearm Injury Prevention and Intervention, May 28-29, 2002. We thank all of the individuals who served as presenters and discussants at these meetings. They are listed here alphabetically, and with their affiliations at the time of each workshop: Roseanna Ander, Joyce Foundation; J. Lee Annest, Centers for Disease Control and Prevention; Arthur Berg, Harvard University; Paul Blackman, National Rifle Association; Alfred Blumstein, Carnegie Mellon University; David Bordua, University of Illinois-Urbana/Champaign; Anthony Braga, Harvard University; David Brent, University of Pittsburgh;

Copyright © National Academy of Sciences. All rights reserved.

Stephen Bronars, University of Texas, Austin; Philip Cook, Duke University; Patti Culross, David and Lucile Packard Foundation; Peter Cummings, University of Washington; Mike Dowden, Bureau of Alcohol, Tobacco, and Firearms; Jeffrey Fagan, Columbia University; Scott Gast, University of Virginia; Susan Ginsburg, Independent Consultant; Robert Hahn, Centers for Disease Control and Prevention; Marjorie Hardy, Eckerd College; Stephen Hargarten, Medical College of Wisconsin; David Hemenway, Harvard University; Sally Hillsman, Office of Research and Evaluation, National Institutes of Justice; David Kennedy, Harvard University; Gary Kleck, Florida State University; Christopher Koper, University of Pennsylvania; Colin Loftin, State University of New York-Albany; John Lott Jr., American Enterprise Institute; Jens Ludwig, Georgetown University; John Malone, Bureau of Alcohol, Tobacco, and Firearms; Michael Maltz, University of Illinois, Chicago; David McDowall, State University of New York-Albany; James Mercy, Centers for Disease Control and Prevention; Victoria Ozonoff, Massachusetts Department of Public Health; Glenn Pierce, Northeastern University; Jeffrey Roth, University of Pennsylvania; Eric Sevigny, Carnegie Mellon University; Lawrence Sherman, University of Pennsylvania; Kevin Strom, Research Triangle Institute; Stephen Teret, Johns Hopkins University; Robyn Thiemann, U.S. Department of Justice; Douglas Weil, The Brady Center to Prevent Gun Violence; Timothy Wheeler, Claremont Institute; Brian Wiersema, University of Maryland; Deanna Wilkinson, Temple University; James Wright, University of Central Florida; and Franklin Zimring, University of California.

This report has been reviewed in draft form by individuals chosen for their diverse perspectives and technical expertise, in accordance with procedures approved by the Report Review Committee of the National Research Council (NRC). The purpose of this independent review is to provide candid and critical comments that will assist the institution in making the published report as sound as possible and to ensure that the report meets institutional standards for objectivity, evidence, and responsiveness to the study charge. The review comments and draft manuscript remain confidential to protect the integrity of the deliberative process.

We thank the following individuals for their participation in the review of this report: Esther Duflo, Department of Economics, Massachusetts Institute of Technology; John A. Ferejohn, Hoover Institution, Stanford University; Arthur S. Goldberger, Department of Economics, University of Wisconsin; Lawrence Gostin, Georgetown University Law Center; Ken Land, Department of Sociology, Duke University; Steven Messner, Department of Sociology, University of Albany, State University of New York; Jeffrey Miron, Department of Economics, Boston University; Lee N. Robins, Department of Psychiatry, Washington University School of Medicine; Paul Rosenbaum, Department of Statistics, Wharton

Copyright © National Academy of Sciences. All rights reserved.

School, University of Pennsylvania; Arlene Rubin Stiffman, School of So-
cial Work, Washington University; and Michael Tonry, Institute of Crimi-
nology, University of Cambridge.

Although the reviewers listed above have provided many constructive
comments and suggestions, they were not asked to endorse the conclusions
or recommendations nor did they see the final draft of the report before its
release. The review of this report was overseen by Elaine Larson, School of
Nursing, Columbia University, and Christopher Sims, Department of Eco-
nomics, Princeton University. Appointed by the National Research Coun-
cil, they were responsible for making certain that an independent examina-
tion of this report was carried out in accordance with institutional
procedures and that all review comments were carefully considered. Re-
sponsibility for the final content of this report rests entirely with the
authoring committee and the institution.

> Charles F. Wellford, *Chair*
> Committee on Improving Research
> Information and Data on Firearms

Copyright © National Academy of Sciences. All rights reserved.

# Executive Summary

There is hardly a more contentious issue in American politics than the ownership of guns and various proposals for gun control. Each year tens of thousands of people are injured and killed by firearms; each year firearms are used to defend against and deter an unknown number of acts of violence; and each year firearms are widely used for recreational purposes. For public authorities to make reasonable policies on these matters, they must take into account conflicting constitutional claims and divided public opinion as well as facts about the relationship between guns and violence. And in doing so they must try to strike what they regard as a reasonable balance between the costs and the benefits of private gun ownership.

Adequate data and research are essential to judge both the effects of firearms on violence and the effects of different violence control policies. Those judgments are key to many important policy questions, among them: Should regulations restrict who may possess and carry a firearm? Should regulations differ for different types of firearms? Should purchases be delayed and, if so, for how long and under what circumstances? Should restrictions be placed on the number or types of firearms that can be purchased? Should safety locks be required? While there is a large body of empirical research on firearms and violence, there is little consensus on even the basic facts about these important policy issues.

Given the importance of these issues and the continued controversy surrounding the debate on firearms, the Committee to Improve Research Information and Data on Firearms was charged with providing an assessment of the strengths and limitations of the existing research and data on gun violence

*1*

Copyright © National Academy of Sciences. All rights reserved.

Firearms and Violence: A Critical Review
http://www.nap.edu/catalog/10881.html

and identifying important gaps in knowledge; describing new methods to put research findings and data together to support the design and implementation of improved prevention, intervention, and control strategies for reducing gun-related crime, suicide, and accidental fatalities; and utilizing existing data and research on firearms and firearm violence to develop models of illegal firearms markets. The charge also called for examining the complex ways in which firearm violence may become embedded in community life and considering whether firearm-related homicide and suicide have become accepted as ways of resolving problems, especially among youth. However, there is a lack of empirical research to address these two issues.

## MAJOR CONCLUSIONS

Empirical research on firearms and violence has resulted in important findings that can inform policy decisions. In particular, a wealth of descriptive information exists about the prevalence of firearm-related injuries and deaths, about firearms markets, and about the relationships between rates of gun ownership and violence. Research has found, for example, that higher rates of household firearms ownership are associated with higher rates of gun suicide, that illegal diversions from legitimate commerce are important sources of crime guns and guns used in suicide, that firearms are used defensively many times per day, and that some types of targeted police interventions may effectively lower gun crime and violence. This information is a vital starting point for any constructive dialogue about how to address the problem of firearms and violence.

While much has been learned, much remains to be done, and this report necessarily focuses on the important unknowns in this field of study. The committee found that answers to some of the most pressing questions cannot be addressed with existing data and research methods, however well designed. For example, despite a large body of research, the committee found no credible evidence that the passage of right-to-carry laws decreases or increases violent crime, and there is almost no empirical evidence that the more than 80 prevention programs focused on gun-related violence have had any effect on children's behavior, knowledge, attitudes, or beliefs about firearms. The committee found that the data available on these questions are too weak to support unambiguous conclusions or strong policy statements.

Drawing causal inferences is always complicated and, in the behavioral and social sciences, fraught with uncertainty. Some of the problems that the committee identifies are common to all social science research. In the case of firearms research, however, the committee found that even in areas in which the data are potentially useful, the complex methodological prob-

Copyright © National Academy of Sciences. All rights reserved.

Firearms and Violence:  A Critical Review
http://www.nap.edu/catalog/10881.html

lems inherent in unraveling causal relationships between firearms policy and violence have not been fully considered or adequately addressed.

Nevertheless, many of the shortcomings described in this report stem from the lack of reliable data itself rather than the weakness of methods. In some instances—firearms violence prevention, for example—there are no data at all. Even the best methods cannot overcome inadequate data and, because the lack of relevant data colors much of the literature in this field, it also colors the committee's assessment of that literature.

## DATA RECOMMENDATIONS

If policy makers are to have a solid empirical and research base for decisions about firearms and violence, the federal government needs to support a systematic program of data collection and research that specifically addresses that issue. Adverse outcomes associated with firearms, although large in absolute numbers, are statistically rare events and therefore are not observed with great frequency, if at all, in many ongoing national probability samples (i.e., on crime victimization or health outcomes). The existing data on gun ownership, so necessary in the committee's view to answering policy questions about firearms and violence, are limited primarily to a few questions in the General Social Survey. There are virtually no ongoing, systematic data series on firearms markets. Aggregate data on injury and ownership can only demonstrate associations of varying strength between firearms and adverse outcomes of interest. Without improvements in this situation, the substantive questions in the field about the role of guns in suicide, homicide and other crimes, and accidental injury are likely to continue to be debated on the basis of conflicting empirical findings.

### Emerging Data Systems on Violent Events

**The committee reinforces recommendations made by past National Research Council committees and others to support the development and maintenance of the National Violent Death Reporting System and the National Incident-Based Reporting System.** These data systems are designed to provide information that characterizes violent events. No single system will provide data that can answer all policy questions, but the necessary first step is to collect accurate and reliable information to describe the basic facts about violent injuries and deaths. The committee is encouraged by the efforts of the Harvard School of Public Health's Injury Control Research Center pilot data collection program and the recent seed money provided to implement a Violent Death Reporting System at the Centers for Disease Control and Prevention.

Copyright © National Academy of Sciences. All rights reserved.

Firearms and Violence: A Critical Review
http://www.nap.edu/catalog/10881.html

## Ownership Data

The inadequacy of data on gun ownership and use is among the most critical barriers to better understanding of gun violence. Such data will not by themselves solve all methodological problems. However, its almost complete absence from the literature makes it extremely difficult to understand the complex personality, social, and circumstantial factors that intervene between a firearm and its use. Also difficult to understand is the effect, if any, of programs designed to reduce the likelihood that a firearm will cause unjustified harm, or to investigate the effectiveness of firearm use in self-defense. We realize that many people have deeply held concerns about expanding the government's knowledge of who owns guns and what type of guns they own. We also recognize the argument that some people may refuse to supply such information in any system, especially those who are most likely to use guns illegally. **The committee recommends a research effort to determine whether or not these kinds of data can be accurately collected with minimal risk to legitimate privacy concerns.**

A starting point is to assess the potential of ongoing surveys. For example, efforts should be undertaken to assess whether tracing a larger fraction of guns used in crimes, regularly including questions on gun access and use in surveys and longitudinal studies (as is done in data from the ongoing, yearly Monitoring the Future survey), or enhancing existing items pertaining to gun ownership in ongoing national surveys may provide useful research data. To do this, researchers need access to the data. **The committee recommends that appropriate access be given to data maintained by regulatory and law enforcement agencies, including the trace data maintained by the Bureau of Alcohol, Tobacco, and Firearms; registration data maintained by the Federal Bureau of Investigation and state agencies; and manufacturing and sales data for research purposes.**

In addition, researchers need appropriate access to the panel data from the Monitoring the Future survey. These data may or may not be useful for understanding firearms markets and the role of firearms in crime and violence. However, without access to these systems, researchers are unable to assess their potential for providing insight into some of the most important firearms policy and research questions. Concerns about security and privacy must be addressed in the granting of greater access to these data, and the systems will need to be continually improved to make them more useful for research. Nevertheless, there is a long-established tradition of making sensitive data available with appropriate safeguards to researchers.

## Methodological Approaches

Difficult methodological issues exist regarding how different data sets might be used to credibly answer the complex causal questions of interest.

Copyright © National Academy of Sciences. All rights reserved.

Firearms and Violence: A Critical Review
http://www.nap.edu/catalog/10881.html

**The committee recommends that a methodological research program be established to address these problems.** The design for data collection and analysis should be selected in light of particular research questions. For example, how, if at all, could improvements in current data, such as firearms trace data, be used in studies of the effects of policy interventions on firearms markets or any other policy issue? What would the desired improvements contribute to research on policy interventions for reducing firearms violence? Linking the research and data questions will help define the data that are needed. **We recommend that the results of such research be regularly reported in the scientific literature and in forums accessible to investigators.**

## RESEARCH RECOMMENDATIONS

### Firearms, Criminal Violence, and Suicide

Despite the richness of descriptive information on the associations between firearms and violence at the aggregate level, explaining a violent death is a difficult business. Personal temperament, the availability of weapons, human motivation, law enforcement policies, and accidental circumstances all play a role in leading one person but not another to inflict serious violence or commit suicide.

Because of current data limitations, researchers have relied primarily on two different methodologies. First, some studies have used case-control methods, which match a sample of cases, namely victims of homicide or suicide, to a sample of controls with similar characteristics but who were not affected by violence. Second, some "ecological" studies compare homicide or suicide rates in large geographic areas, such as counties, states, or countries, using existing measures of ownership.

Case-control studies show that violence is positively associated with firearms ownership, but they have not determined whether these associations reflect causal mechanisms. Two main problems hinder inference on these questions. First and foremost, these studies fail to address the primary inferential problems that arise because ownership is not a random decision. For example, suicidal persons may, in the absence of a firearm, use other means of committing suicide. Homicide victims may possess firearms precisely because they are likely to be victimized. Second, reporting errors regarding firearms ownership may systemically bias the results of estimated associations between ownership and violence.

Ecological studies currently provide contradictory evidence on violence and firearms ownership. For example, in the United States, suicide appears to be positively associated with rates of firearms ownership, but homicide is not. In contrast, in comparisons among countries, the association between

Copyright © National Academy of Sciences. All rights reserved.

rates of suicide and gun ownership is nonexistent or very weak but there is a substantial association between gun ownership and homicide. These cross-country comparisons reflect the fact that the suicide rate in the United States ranks toward the middle of industrialized countries, whereas the U.S. homicide rate is much higher than in all other developed countries.

The committee cannot determine whether these associations demonstrate causal relationships. There are three key problems. First, as noted above, these studies do not adequately address the problem of self-selection. Second, these studies must rely on proxy measures of ownership that are certain to create biases of unknown magnitude and direction. Third, because the ecological correlations are at a higher geographic level of aggregation, there is no way of knowing whether the homicides or suicides occurred in the same areas in which the firearms are owned.

In summary, the committee concludes that existing research studies and data include a wealth of descriptive information on homicide, suicide, and firearms, but, because of the limitations of existing data and methods, do not credibly demonstrate a causal relationship between the ownership of firearms and the causes or prevention of criminal violence or suicide. The issue of substitution (of the means of committing homicide or suicide) has been almost entirely ignored in the literature. What sort of data and what sort of studies and improved models would be needed in order to advance understanding of the association between firearms and suicide? Although some knowledge may be gained from further ecological studies, the most important priority appears to the committee to be individual-level studies of the association between gun ownership and violence. Currently, no national surveys on ownership designed to examine the relationship exist. **The committee recommends support of further individual-level studies of the link between firearms and both lethal and nonlethal suicidal behavior.**

### Deterrence and Defense

Although a large body of research has focused on the effects of firearms on injury, crime, and suicide, far less attention has been devoted to understanding the defensive and deterrent effects of firearms. Firearms are used by the public to defend against crime. Ultimately, it is an empirical question whether defensive gun use and concealed weapons laws generate net social benefits or net social costs.

#### Defensive Gun Use

Over the past decade, a number of researchers have conducted studies to measure the prevalence of defensive gun use in the population. However, disagreement over the definition of defensive gun use and uncertainty over the

Copyright © National Academy of Sciences. All rights reserved.

Firearms and Violence: A Critical Review
http://www.nap.edu/catalog/10881.html

accuracy of survey responses to sensitive questions and the methods of data collection have resulted in estimated prevalence rates that differ by a factor of 20 or more. These differences in the estimated prevalence rates indicate either that each survey is measuring something different or that some or most of them are in error. Accurate measurement on the extent of defensive gun use is the first step for beginning serious dialogue on the efficacy of defensive gun use at preventing injury and crime.

**For such measurement, the committee recommends that a research program be established to (1) clearly define and understand what is being measured, (2) understand inaccurate response in the national gun use surveys, and (3) apply known methods or develop new methods to reduce reporting errors to the extent possible.** A substantial research literature on reporting errors in other contexts, as well as well-established survey sampling methods, can and should be brought to bear to evaluate these response problems.

## *Right-to-Carry Laws*

A total of 34 states have laws that allow qualified adults to carry concealed handguns. Right-to-carry laws are not without controversy: some people believe that they deter crimes against individuals; others argue that they have no such effect or that they may even increase the level of firearms violence. This public debate has stimulated the production of a large body of statistical evidence on whether right-to-carry laws reduce or increase crimes against individuals.

However, although all of the studies use the same basic conceptual model and data, the empirical findings are contradictory and in the committee's view highly fragile. Some studies find that right-to-carry laws reduce violent crime, others find that the effects are negligible, and still others find that such laws increase violent crime. The committee concludes that it is not possible to reach any scientifically supported conclusion because of (a) the sensitivity of the empirical results to seemingly minor changes in model specification, (b) a lack of robustness of the results to the inclusion of more recent years of data (during which there were many more law changes than in the earlier period), and (c) the statistical imprecision of the results. The evidence to date does not adequately indicate either the sign or the magnitude of a causal link between the passage of right-to-carry laws and crime rates. Furthermore, this uncertainty is not likely to be resolved with the existing data and methods. If further headway is to be made, in the committee's judgment, new analytical approaches and data are needed. (One committee member has dissented from this view with respect to the effects of these laws on homicide rates; see Appendix A.)

Copyright © National Academy of Sciences. All rights reserved.

Firearms and Violence: A Critical Review
http://www.nap.edu/catalog/10881.html

### Interventions to Reduce Violence and Suicide

Even if it were to be shown that firearms are *a* cause of lethal violence, the development of successful programs to reduce such violence would remain a complex undertaking, because such interventions would have to address factors other than the use of a gun. Three chapters in this report focus specifically on what is known about various interventions aimed at reducing firearms violence by restricting access, or implementing prevention programs, or implementing criminal justice interventions. These chapters focus largely on what is known about the effects of different interventions on criminal violence. Although suicide prevention rarely has been the basis for public support of the passage of specific gun laws, such laws could have unintended effects on suicide rates or unintended by-products. **Thus, in addition to the recommendations related to firearms and crime below, the committee also recommends further studies of the link between firearms policy and suicide.**

#### *Restricting Access*

Firearms are bought and sold in markets, both formal and informal. To some observers this suggests that one method for reducing the burden of firearm injuries is to intervene in these markets so as to make it more expensive, inconvenient, or legally risky to obtain firearms for criminal use or suicide. Market-based interventions intended to reduce access to guns by criminals and other unqualified persons include taxes on weapons and ammunition, tough regulation of federal firearm licensees, limits on the number of firearms that can be purchased in a given time period, gun bans, gun buy-backs, and enforcement of laws against illegal gun buyers or sellers.

Because of the pervasiveness of guns and the variety of legal and illegal means of acquiring them, it is difficult to keep firearms from people barred by law from possessing them. The key question is substitution. In the absence of the pathways currently used for gun acquisition, could individuals have obtained alternative weapons with which they could have wrought equivalent harm? Substitution can occur in many dimensions: offenders can obtain different guns, they can get them from different places, and they can get them at different times.

Arguments for and against a market-based approach are now largely based on speculation, not on evidence from research. It is simply not known whether it is actually possible to shut down illegal pipelines of guns to criminals nor the costs of doing so. Answering these questions is essential to knowing whether access restrictions are a possible public policy. The committee has not attempted to identify specific interventions, research strategies, or data that might be suited to studying market interventions, substitu-

Copyright © National Academy of Sciences. All rights reserved.

tion, and firearms violence. **Rather, the committee recommends that work be started to think carefully about possible research and data designs to address these issues.**

## *Prevention Programs and Technology*

Firearm violence prevention programs are disseminated widely in U.S. public school systems to children ages 5 to 18, and safety technologies have been suggested as an alternative means to prevent firearm injuries. The actual effects of a particular prevention program on violence and injury, however, have been little studied and are difficult to predict. For children, firearm violence education programs may result in *increases* in the very behaviors they are designed to prevent, by enhancing the allure of guns for young children and by establishing a false norm of gun-carrying for adolescents. Likewise, even if perfectly reliable, technology that serves to reduce injury among some groups may lead to increased deviance or risk among others.

The committee found little scientific basis for understanding the effects of different prevention programs on the rates of firearm injuries. Generally, there has been scant funding for evaluation of these programs. For the few that have been evaluated, there is little empirical evidence of positive effects on children's knowledge, attitudes, beliefs, or behaviors. Likewise, the extent to which different technologies affect injuries remains unknown. Often, the literature is entirely speculative. In other cases, for example the empirical evaluations of child access prevention (CAP) laws, the empirical literature reveals conflicting estimates that are difficult to reconcile.

**In light of the lack of evidence, the committee recommends that firearm violence prevention programs should be based on general prevention theory, that government programs should incorporate evaluation into implementation efforts, and that a sustained body of empirical research be developed to study the effects of different safety technologies on violence and crime.**

## *Criminal Justice Interventions*

Policing and sentencing interventions have had recent broad bipartisan support and are a major focus of current efforts to reduce firearms violence. These policies generally do not affect the ability of law-abiding citizens to keep guns for recreation or self-defense, and they have the potential to reduce gun violence by deterring or incapacitating violent offenders. Descriptive accounts suggest that some of these policies may have had dramatic crime-reducing effects: homicide rates fell dramatically after the implementation of Boston's targeted policing program, Operation Ceasefire, and Richmond's sentencing enhancement program, Project Exile.

Copyright © National Academy of Sciences. All rights reserved.

Firearms and Violence: A Critical Review
https://www.nap.edu/catalog/10881.html

Despite these apparent associations between crime and policing policy, however, the available research evidence on the effects of policing and sentencing enhancements on firearm crime is limited and mixed. Some sentencing enhancement policies appear to have modest crime-reducing effects, while the effects of others appear to be negligible. The limited evidence on Project Exile suggests that it has had almost no effect on homicide. Several city-based quasi-random interventions provide favorable evidence on the effectiveness of targeted place-based gun and crime suppression patrols, but this evidence is both application-specific and difficult to disentangle. Evidence on Operation Ceasefire, perhaps the most frequently cited of all targeted policing efforts to reduce firearms violence, is limited by the fact that it is a single case at a specific time and location. Scientific support for the effectiveness of the Boston Gun Project and most other similar types of targeted policing programs is still evolving.

The lack of research on these potentially important kinds of policies is an important shortcoming in the body of knowledge on firearms injury interventions. These programs are widely viewed as effective, but in fact knowledge of whether and how they reduce crime is limited. Without a stronger research base, policy makers considering adoption of similar programs in other settings must make decisions without knowing the true benefits and costs of these policing and sentencing interventions.

**The committee recommends that a sustained, systematic research program be conducted to assess the effect of targeted policing and sentencing aimed at firearms offenders.** Additional insights may be gained from using observational data from different applications, especially if combined with more thoughtful behavioral models of policing and crime. City-level studies on the effect of sentencing enhancement policies need to engage more rigorous methods, such as pooled time-series cross-sectional studies that allow the detection of short-term impacts while controlling for variation in violence levels across different areas as well as different times. Another important means of assessing the impact of these types of targeted policing and sentencing interventions would be to conduct randomized experiments to disentangle the effects of the various levers, as well as to more generally assess the effectiveness of these targeted policing programs.

Copyright © National Academy of Sciences. All rights reserved.

# 1

# Introduction

Here is hardly a more contentious issue in American society than the ownership of firearms and various proposals for their control. To make reasonable decisions about these matters, public authorities must take account of conflicting constitutional claims and divided public opinion as well as the facts about the relationship between firearms and violence. In performing these tasks, policy makers must try to strike a reasonable balance between the costs and the benefits of private firearm ownership.

The costs seem obvious. In 2000, over 48,000 victims suffered nonfatal gunshot wounds (Centers for Disease Control and Prevention, 2001) and over 10,000 were murdered with a firearm (Federal Bureau of Investigation, 2001). Many more people, though not shot, are confronted by assailants armed with a gun. Young people are especially affected by this, so much so that firearm fatalities consistently rank among the leading causes of death per capita for youth. In 2000, people ages 20 to 24 accounted for almost one-fourth of all victims of homicides with a firearm (Federal Bureau of Investigation, 2001). Moreover, there are more suicides than homicides that are committed with firearms. And firearm-related accidents result in many serious injuries.

These grim facts must be interpreted with caution. Firearms are involved in homicides and suicides, but determining how many would have occurred had no firearm been available is at best a difficult task. Between 1980 and 1984 there were more than three times as many nongun homicides per capita in America than in England (Zimring and Hawkins, 1998). There were over 41,000 nongun homicides and over 63,000 gun homicides in the United States during this period. New York City has had a homicide rate that is 8 to

*11*

Copyright © National Academy of Sciences. All rights reserved.

Firearms and Violence: A Critical Review
https://www.nap.edu/catalog/10881.html

15 times higher than London's for at least the last 200 years, long before either city could have had its rates affected by English gun control laws, the advent of dangerous drugs, or the supposedly harmful effects of the mass media (Monkkonen, 2001). Thus, the United States arguably has a high level of violence and homicide independent of firearm availability. Nonetheless, today homicides by a firearm occur in the United States at a rate that is more than 63 times that of England, so firearms, though not the sole source of violence, play a large role in it (Zimring and Hawkins, 1998).

The problem is the same with suicide. People often kill themselves with firearms. There is some evidence that states with the highest rates of private firearm ownership tend to be those with the highest proportion of suicides committed with firearms (Azrael et al., 2004), and there are studies suggesting that homes with firearms in them have more suicides than homes without firearms (Hardy, 2002). However, it is difficult to determine how many people would kill themselves by other means if no firearms were available.

Explaining a violent death is a difficult business. Personal temperament, mental health, the availability of weapons, human motivation, law enforcement policies, and accidental circumstances all play a role in leading one person but not another to inflict serious violence. Furthermore, the impact that a gun has on a situation depends critically on the nature of the interaction taking place. A gun in the hand of a robber may have different consequences than a gun in the hands of a potential robbery victim, a drug dealer, or someone who is suicidal. The relationship between the individuals may also be important in determining the impact of a gun. In a domestic dispute, for instance, both parties might be well informed as to whether the other person has a firearm. In a burglary or street robbery, the offender is less likely to know whether the victim is armed.

In addition, the presence or threat of a gun may influence an interaction along multiple dimensions. A firearm may increase or decrease the likelihood that a potentially violent situation will arise. For instance, an offender with a firearm may be more likely to attempt a robbery, but knowing the victim has a firearm may lead the offender to forgo the crime. The presence of a firearm may also affect the likelihood that an interaction ends in violence or death. For example, it might be that the presence of a gun in a robbery is associated with higher death rates, but lower injury rates.

The intent of the persons, the nature of their interaction and relationships, the availability of firearms to them, and the level of law enforcement are critical in explaining when and why firearm violence occurs. Without attention to this complexity it becomes very difficult to understand the role that firearms play in violence. Even if firearms are shown to be *a* cause of lethal violence, the development of successful prevention programs remains a complex undertaking, as such interventions would undoubtedly have to address the many factors other than the firearm that are involved in any violent situation.

Many people derive benefits from firearm ownership. Some people

Copyright © National Academy of Sciences. All rights reserved.

Firearms and Violence: A Critical Review
http://www.nap.edu/catalog/10881.html

hunt or shoot at target ranges without ever inflicting harm on any human. It is estimated that there are 13 million hunters in the United States (U.S. Department of the Interior, Fish and Wildlife Service, 2002) and more than 11,000 shooting tournaments sanctioned by the National Rifle Association each year (National Rifle Association, 2002). Others have firearms because they believe the weapons will help them defend themselves. Many people carry their weapons on their person or in their cars. We do not know accurately how often armed self-defense occurs or even how to precisely define self-defense. The available data are believed to be unreliable, but even the smallest of the estimates indicates that there may be hundreds of defensive uses every day (Cook, 1991; Kleck and Gertz, 1995).

## OUR TASK

Given the importance of this issue and the continued controversy surrounding the debate on firearms, the need was clear for an unbiased assessment of the existing portfolio of data and research. Accordingly, the National Academies were asked by a consortium of both federal agencies—the National Institute of Justice and the Centers for Disease Control and Prevention—and private foundations—the David and Lucile Packard Foundation, the Annie E. Casey Foundation, and the Joyce Foundation—to assess the data and research on firearms.

The Committee to Improve Research and Data on Firearms was charged with providing an assessment of the strengths and limitations of the existing research and data on gun violence and identifying important gaps in knowledge; describing new methods to put research findings and data together to support the design and implementation of improved prevention, intervention, and control strategies for reducing gun-related crime, suicide, and accidental fatalities; and utilizing existing data and research on firearms and firearm violence to develop models of illegal firearms markets. The charge also called for examining the complex ways in which firearm violence may become embedded in community life and whether firearm-related homicide and suicide become accepted as ways of resolving problems, especially among youth; however, there is a lack of empirical research to address these two issues.

The task of the committee was not to settle all arguments about the causes and cures of violence but rather to evaluate the data and research on firearms injury and violence. Over the past few decades, there have been many studies of the relationship between access to firearms and firearm violence, family and community factors that influence lethal behavior, the extent and value of defensive firearm use, the operation of legal and illegal firearms markets, and the effectiveness of efforts to reduce the harms or increase the benefits of firearm use. We have evaluated these data and studies. In doing so, we have:

Copyright © National Academy of Sciences. All rights reserved.

- Assessed current data bases so as to make clear their strengths and limitations.
- Assessed research studies on firearm use and the effect of efforts to reduce unjustified firearm use.
- Assessed knowledge of illegal firearms markets.

This report presents the committee's findings.

## GUN CONTROL AND THE SECOND AMENDMENT

Many people reading this report will ask whether the committee favors or opposes gun control, accepts or rejects the right of people to own guns, and endorses or questions the conflicting interpretations of the Second Amendment to the U.S. Constitution ("the right of the people to keep and bear arms shall not be infringed").

Resolving these issues, though important, is not the task the committee was given. We were asked to evaluate the data and research on firearm violence to see what is known about the causal connection, if any, between firearms on one hand and violence, suicide, and personal defense on the other. In carrying out this task, we have tried to do what scholars are supposed to do—namely, assess the reliability of evidence about the ownership of firearms and discern what, if anything, is known about the connection between firearms and violence. This involves looking at not only how many firearms are owned and who owns them but also the complex personality, social, and circumstantial factors that intervene between a firearm and its use and the effect, if any, of programs designed to reduce the likelihood that a firearm will cause unjustified harm.[1] It also includes investigating the effectiveness of firearm use in self-defense. It does not include making judgments about whether individuals should be allowed to possess firearms or whether specific firearm control proposals should be enacted.

Questions of cause-and-effect and more-or-less are not how many Americans think about firearms. Some individuals believe that firearm ownership is a right that flows directly from the Second Amendment or indirectly from every citizen's right to self-defense. Others believe that there is no right to bear arms, and that firearms play little or no role in self-defense.

---

[1]A harm is unjustified if it involves a homicide, an accident, or a suicide. It is justified if it involves the reasonable use of force by law enforcement personnel or by people defending themselves against crimes. It is difficult, of course, to count justified and unjustified harms accurately and even harder to discover whether a program intended to reduce unjustified harm has actually done so and, if it has, whether it did so in ways that have not inappropriately reduced justified harms. For a more detailed discussion of the definition of these terms, see *Black's Law Dictionary* (Gardner, 1999).

Copyright © National Academy of Sciences. All rights reserved.

Firearms and Violence: A Critical Review
https://www.nap.edu/catalog/10881.html

These competing beliefs are important and will inform the decisions political leaders have to make. America did not, after all, suddenly become a gun-owning nation. The private possession of weapons has been an important feature of American life throughout its history. But important as these beliefs are, they are not questions that can be easily resolved through scientific inquiry. Committee members have no special qualifications for deciding who has what rights or what the Second Amendment may mean. If the Supreme Court had spoken out clearly on this part of the Bill of Rights, the committee could assume something about what rights, if any, it confers. But the Court has not spoken so clearly. It has allowed Congress, for example, to ban the sale of sawed-off shotguns, but only on the narrow grounds that no one had shown that having a weapon with a barrel less than 18 inches long would contribute to the maintenance of a "well-regulated militia." And the Court has accepted restrictions on the sale of firearms to felons. But so far, the Court has held that the Second Amendment affects only federal action, presumably leaving states free to act as they wish. (For a review of holdings on the Second Amendment, see Appendix C.)

Our report is not for or against "gun control." (We put *gun control* in quotation marks because it is so vague: "gun control" can range from preventing four-year-old children from owning guns to banning their ownership by competent adults.) Knowing how strongly so many Americans feel about firearms and various proposals to control or prevent controls on their ownership, we here state emphatically that our task is to determine what can be learned from existing data and studies that rely on them and to make recommendations about how the knowledge base could be effectively improved. Readers of this report should not be surprised that the committee often concludes that very little can be learned. The committee was not called into being to make policy about firearms. Political officials, responding not only to data and studies but also to widely held (and often passionately opposed) public beliefs, will have to make policy. They should do so, however, with an understanding of what is known and not known about firearms and violence.

## SOURCES OF DATA FOR RESEARCH ON FIREARMS VIOLENCE

We may have some advantage, however, in understanding what consequences flow from current levels of firearm availability and from efforts by policy makers to alter those consequences. Or to state our task even more humbly, we may be better than many other people in understanding what the *studies* of these consequences may mean. A consequence of some action is the concrete, practical reality that is caused by that action. But in the field we address here, many if not most studies of consequences must make do,

Copyright © National Academy of Sciences. All rights reserved.

Firearms and Violence: A Critical Review
https://www.nap.edu/catalog/10881.html

not with direct knowledge of the altered reality, but with data that attempt to measure that alteration.

The quality of these data is highly variable. We explain in this report how limited is the knowledge of some of the basic facts. For example, we do not know exactly who owns what kinds of firearms or how the owners use them. Moreover, it may not be easy to improve this knowledge. Asking people whether they own a firearm, what kind it is, and how it is used is difficult because ownership is a controversial matter for one or more of several reasons: some people may own a firearm illegally, some may own it legally but worry that they may use it illegally, and some may react to the intense public controversy about firearm ownership by becoming less (or even more) likely to admit to ownership.

Of course these same problems accompany attempts to measure other behaviors (e.g., illicit use of drugs) and yet ways have been developed to address these problems in those instances (for a review see National Research Council, 2001). While not perfect, many substantial resources have been devoted to addressing the measurement issues that the collection of sensitive data raises. As we discuss in this report, this has not happened in the firearms area, in part, because of the substantial opposition to data collection by interest groups resulting in legal restrictions on collecting information about firearms ownership.[2]

## STANDARDS AND METHODS FOR FIREARMS RESEARCH

All research must follow some basic standards to be accepted by the community of scholars in a field—firearms research is no different. These standards are well known to scientists, although all of them are not achieved in every research effort and meeting these minimal standards does not guarantee that the completed research will be judged to be a contribution to knowledge. These are necessarily minimal standards. Meeting them does not guarantee a piece of research is sufficiently sound to warrant acceptance of its findings. Another National Research Council committee (2002) recently described the scientific process in terms of "six interrelated but not necessarily ordered, principles of inquiry" (pp. 3-5):

- Pose significant questions that can be investigated empirically.
- Link research to relevant theory.
- Use methods that permit direct investigation of the question.

---

[2]For example, the 1986 Firearms Owners Protection Act, also known as the McClure-Volkmer Act, forbids the federal government from establishing any "system of registration of firearms, firearm owners, or firearms transactions or distribution."

Copyright © National Academy of Sciences. All rights reserved.

Firearms and Violence: A Critical Review
http://www.nap.edu/catalog/10881.html

- • Provide a coherent and explicit chain of reasoning.
- • Replicate and generalize across studies.
- • Disclose research to encourage professional scrutiny and critique.

While any group of scholars might modify this list, it poses some commonly accepted standards that our committee used to begin its evaluation of the literature on firearm violence. In so doing we have sought to ensure that often controversial research issues are subjected to these minimum standards for research and to encourage future research in this area to strive for greater rigor.

The committee also noted that certain research strategies are very prevalent in firearms research. These include various interrupted time-series approaches (before-after studies) and the use of case-control techniques. Because these are so frequently utilized in this area of research, we provide an analysis of their use. In Appendix D there is a discussion of the difficulties of before-after type studies, and in Chapter 7 there is one on case-control designs. For advances to be made in firearm violence research, researchers must be careful to use these techniques and approaches with due recognition of their limitations and carefully consider the effect of research design on findings.

In our analysis of the use of these methods in firearms research, we found too often that the conclusions reached require the acceptance of assumptions that are at best implausible. For example, many studies (e.g., Duggan, 2001; Kaplan and Geling, 1998; Kleck and Patterson, 1993; Miller et al., 2002) of the relationship between the access to firearms and firearm violence are conducted with the state as the unit of analysis (a measure of the rate of firearm ownership is correlated with the rate of firearm violence). These results are used to advance the argument that an individual's probability of access to firearms explains that individual's probability of committing a violent crime with a weapon. While the problems associated with such cross-level interpretations are well known (the "ecological fallacy"; that is, inferences about individual behavior cannot be drawn from aggregate data about a group; Robinson, 1950), these authors and many who use their work to advance various firearms policies all too frequently draw inferences that cannot be supported by their analysis. Similarly in interrupted-time-series designs, the length of the series and the well-known problems associated with nonexperimental and quasi-experimental designs (see Campbell and Stanley, 1966) are frequently not given the attention required for the work to be judged acceptable. Throughout this report we hold all the research we reviewed to these reasonable standards. Especially in areas of research in which there is much public controversy, it is vital that such standards be maintained.

Copyright © National Academy of Sciences. All rights reserved.

Firearms and Violence: A Critical Review
http://www.nap.edu/catalog/10881.html

Using the conventional standards of science, we have reviewed the data and research on firearms and have suggested ways by which these data and studies can be improved. Our readers will judge how well we have done this. We hope they will bring to that assessment the same standards of evidence that we applied in our work.

## GUIDE TO THE REPORT

The chapters that follow review and analyze what is known about firearms and violence. Chapter 2 describes the major data sources for research on firearms and violence. This summary assesses the strengths and weaknesses of each system and suggests improvements necessary to make significant advances in understanding the role of firearms in violence. Chapter 3 is a summary of the data describing the extent of firearm violence, firearm ownership, the perpetrators and victims of firearm violence, and the context in which firearm violence occurs. Descriptive in form, it also identifies gaps in understanding of some of the basic facts about the role firearms play in intentional violence. Chapter 4 addresses how criminals and those who use firearms to commit suicide gain access to them. It includes an assessment of various attempts to limit access by everyone and by selected subsets of the population. Chapter 5 assesses the research on the use of firearms to defend against crime, and Chapter 6 examines the impact of laws that facilitate the carrying of weapons.

The committee paid close attention to these issues because they have been central to the recent scholarship on firearms and because they demonstrate many of the difficulties of doing research on firearms and violence. Committee member Joel Horowitz further discusses these issues in Appendix D. Committee member James Q. Wilson has written a dissent that applies to Chapter 6 only (Appendix A), and the committee has written a response (Appendix B).

Chapter 7 considers the role of firearms in suicide. While some of the issues are similar to those encountered in the study of violence, the differences are such that separate attention is required, especially for issues of motivation, firearm acquisition, and lethality. In Chapter 8 we analyze the research on the prevention of firearm violence, reviewing research on the effectiveness of primary, secondary, and tertiary prevention programs. Special attention is given to efforts to prevent gun use by youth. Chapter 9 examines the role criminal justice interventions can play in reducing firearm violence. While many of these efforts are new and have not been adequately evaluated, they are frequently thought to hold promise for immediate impact.

Copyright © National Academy of Sciences. All rights reserved.

# 2

# Data for Measuring Firearms Violence and Ownership

cientists in the social and behavioral sciences deal with many data-related obstacles in conducting empirical research. These include lack of relevant data, data that are error-ridden, and data that are not based on properly designed statistical samples (i.e., are unrepresentative) of the targeted population. These obstacles are particularly difficult in firearms research. In firearms and violence research, the outcomes of interest, although large in absolute numbers, are statistically rare events that are not observed with great frequency, if at all, in many ongoing national probability samples. Moreover, response problems are thought to be particularly severe in surveys of firearms ownership and violence. In the committee's view, the major scientific obstacle for advancing the body of research and further developing credible empirical research to inform policy on firearms is the lack of reliable and valid data.

This chapter summarizes some of the key data collection systems used to assess firearms policies, describes some of the key properties of useful research data, and offers some suggestions for how to begin to develop data that can answer the basic policy questions. There are no easy solutions to resolving the existing data-related problems. Often, we find that the existing data are insufficient, but how and whether to develop alternative data sources remain open questions. For these reasons the committee urges a significant increase in methodological work on measurement in the area of firearms ownership and violence.

The committee does not wish to paint an overly pessimistic picture of this research area. The existing body of research, as described in the other chapters of the report, has shed light on some of the most fundamental

Copyright © National Academy of Sciences. All rights reserved.

Firearms and Violence: A Critical Review
http://www.nap.edu/catalog/10881.html

questions related to firearms and violence. However, in key data areas—the availability of firearms, the use of firearms, and the role of firearms in injuries and death—critical information is absent.

## A PATCHWORK OF DATA SETS

To study firearms and violence, researchers and policy makers rely on a patchwork of data sources collected for more general purposes of monitoring the nation's health and crime problems. No authoritative source of information exists to provide representative, accurate, complete, timely, and detailed data on the incidence and characteristics of firearm-related violence in the United States. Rather, there are many different sources of data that researchers use to draw inferences about the empirical questions of interest. Some information on firearms and violence is found in probability samples of well-defined populations, such as the National Crime Victimization Survey (NCVS) and the General Social Survey (GSS). Other information comes from administrative data, such as the Uniform Crime Reports (UCR) and the trace data of the Bureau of Alcohol Tobacco and Firearms (BATF). Still other information comes from case studies, social experiments, and other one-time surveys conducted on special populations. Table 2-1 lists characteristics of some of the commonly used data sources.

Perhaps because these data sets serve many purposes, the strengths and limitations of each source have been generally well documented in the literature.[1] This section provides a brief description of the some of the key data sources used in the research literature on firearms injury and violence and discussed in the report. This summary is not an exhaustive treatment of the data sources listed in Table 2-1, nor is it complete in its assessment of the specific data sources considered. Rather, it is intended to provide relevant background material on the key data.

### Data on Violence and Crime

It is axiomatic that reliable and valid surveys on violence, offending, and victimization are critical to an understanding of violence and crime in the

---

[1]See, for example, Annest and Mercey (1998); Biderman and Lynch (1991); Maltz (1999); MacKenzie et al. (1990); Jarvis (1992); Wiersema et al. (2000); and Riedel (1999). The National Opinion Research Center (NORC) produces an ongoing series of methodological reports on the GSS, covering topics ranging from item order and wording, to nonresponse errors, and hundreds of other methodological topics. The reports are available directly from the NORC and are listed on http://www.icpsr.umich.edu:8080/GSS under "GSS Methodological Reports."

Copyright © National Academy of Sciences. All rights reserved.

Firearms and Violence: A Critical Review
https://www.nap.edu/catalog/10881.html

United States and for any assessment of the quality of activities and programs aimed at reducing violence (National Research Council, 2003). Detailed data on firearm-related death, injury, and risk behaviors are limited.

Most measurement of *crime* in this country emanates from two major data sources. The FBI's Uniform Crime Reports has collected information on crimes known to the police and arrests from local and state jurisdictions throughout the country for almost seven decades. The National Crime Victimization Survey, a general population survey designed to discover the extent, nature, and consequences of criminal victimization, has existed since the early 1970s. Other national surveys that focus on specific problems, such as delinquency, violence against women, and child abuse, also provide important data on crime, victims, and offenders. A variety of data sources have been used to assemble information on suicide and accidents, and the National Violent Death Reporting System (NVDRS) has been funded via the Centers for Disease Control and Prevention (CDC) to collect information on all violent deaths.

In this section, we describe four datasets used to monitor and assess firearms-related violence: the National Crime Victimization Survey, the Uniform Crime Reports, and two emerging systems, the National Incident-Based Reporting System and the National Violent Death Reporting System. The latter two are thought to hold some promise for improving the research information on firearms and violence. Many of the other data collection sources (listed in Table 2-1) have very limited information on firearms and have been assessed elsewhere (see, for example, Annest and Mercy, 1998; Institute of Medicine, 1999).

## National Crime Victimization Survey

The National Crime Victimization Survey, which relies on self-reports of victimization, is an ongoing annual survey conducted by the federal government (i.e., the Census Bureau on behalf of the Department of Justice) that collects information from a representative sample of nearly 100,000 noninstitutionalized adults (age 12 and over) from approximately 50,000 households. It is widely viewed as a "gold standard" for measuring crime victimization. The largest and oldest of the crime victimization studies, it uses a rotating panel design in which respondents are interviewed several times before they are "retired" from the sample. It uses a relatively short, six-month reporting period. Respondents are instructed to report only incidents that have occurred since the previous interview and are reminded of the incidents they reported then. The initial interview is done face-to-face to ensure maximum coverage of the population; if necessary, subsequent interviews are also conducted in person. The

Copyright © National Academy of Sciences. All rights reserved.

**TABLE 2-1** Selected Sources of Firearm Data

| Title of Data Set | Sponsoring Agency | Information Available |
|---|---|---|
| Firearm-Related Injury/Death | | |
| National Vital Statistics System—Final Mortality Data (NVSSF) | National Center for Health Statistics/ Centers for Disease Control and Prevention | Includes total numbers of firearm related deaths; death rates from homicide, suicide, unintentional, and undetermined shootings broken out by age, race, and sex |
| National Vital Statistics System—Current Mortality Sample (NVSS) | National Center for Health Statistics/ Centers for Disease Control and Prevention | Provides data on selected major causes of death, as well as sex, race, age, date of death, state in which death occurred |
| National Violent Death Reporting System (NVDRS) | Centers for Disease Control and Prevention | Data on violent deaths linked from medical examiners and coroners, police departments, death certificates, and crime labs; would include circumstances of firearm-related incidents |
| National Census of Fatal Occupational Injuries (CFOI) | Bureau of Labor Statistics | Complete count of all work-related injury fatalities; includes job-related homicides broken out by weapon |
| Survey of Occupational Injuries and Illnesses (SOH) | Bureau of Labor Statistics | Includes information on circumstances surrounding firearm-related injuries in the workplace |
| National Traumatic Occupational Fatality Surveillance System (NTOF) | National Institute for Occupational Safety and Health | Includes narrative text on industry, occupation, cause of death, and injury data on age, race, and sex; includes numbers and rates of firearm-related homicides, suicides, and other deaths occurring at work |
| National Electronic Injury Surveillance System All Injury Program (NEISS-AIP) | U.S. Consumer Products Safety Commission | Includes intentional and nonintentional nonfatal firearm-related injuries by gender, age, type of injury, type of gun, and nature of incident |
| National Hospital Ambulatory Medical Care Survey (NHAMCS) | National Center for Health Statistics | Injury visits to hospital emergency departments, including those caused by firearms |

Copyright © National Academy of Sciences. All rights reserved.

Firearms and Violence: A Critical Review
http://www.nap.edu/catalog/10881.html

| Population | Geographic Areas | Frequency/ Year Started |
|---|---|---|
| Deceased individuals (data from death certificates) | National | Annual/death registration for all states started 1933, detailed demographic data ftom 1989 |
| Deceased individuals (data from death certificates) | National | Annual death registration for all states started 1933 |
| Homicide, suicide, and unintentional firearm-related deaths, and deaths of undetermined causes | National | Under development |
| Employed civilians 16 years of age and older, plus resident armed forces | National | Annual/ started 1992 |
| Injuries reported by employers in private industry | National | Annual/ started 1992 |
| Workers age 16 and older certified on death certificate as injured at work | National | Data available from 1980 |
| Admissions to hospital emergency departments | National | Updated daily/ redesigned 1978; all injuries included starting in 2000 |
| Admissions to hospitals with emergency departments | National | Annual/ started 1992 |

*continued*

Copyright © National Academy of Sciences. All rights reserved.

Firearms and Violence: A Critical Review
https://www.nap.edu/catalog/10881.html

**TABLE 2-1** Continued

| Title of Data Set | Sponsoring Agency | Information Available |
| --- | --- | --- |
| National Ambulatory Medical Care Survey (NAMCS) | National Center for Health Statistics | Includes age, sex, race, ethnicity, source of payment, and circumstances of injury-related visits, including firearm involvement |
| National Health Interview Survey (NHIS) | National Center for Health Statistics | Demographic information, physician and hospital visits, and other health-related information; includes gunshot wounds and type of gun; 1994 supplement on firearm storage and safety |
| National Mortality Followback Survey (NMFS) | National Center for Health Statistics | 1993 survey included information on firearm access, and circumstances of homicide, suicide, and unintentional injury deaths |
| Data Elements for Emergency Department Systems (DEEDS) | National Center for Injury Prevention and Control (CDC) | Standardized data definitions, coding, and other specifications |
| International Classification of External Causes of Injury (CECI) | World Health Organization | External causes of injury in mortality and morbidity systems, including mechanism of injury |

Firearms Industry and Retail

| | | |
| --- | --- | --- |
| Annual Firearms Manufacturing and Exportation Report (AFMER) | Bureau of Alcohol, Tobacco, and Firearms | Number of firearms produced, by type |
| Census of Manufacturers | Bureau of the Census | Number of manufacturers, shipments, value, employment, payroll, and shipments by type of product for small arms manufacturing and small arms ammunition industries |
| Producer Price Index (PPI) | Bureau of Labor Statistics | Prices and price change at wholesale level for various categories of firearms, including "small arms" in general, "pistols and revolvers," "shotguns," and "rifles, centerfire" |

Copyright © National Academy of Sciences. All rights reserved.

| Population | Geographic Areas | Frequency/ Year Started |
|---|---|---|
| Patient visits to office-based, nonfederally employed physicians | National | Annual/ 1995—detailed injury questions added,1997-intent of injury added |
| Civilian, noninstitutionalized U.S. households | National | Annual/ 1996—detailed injury section added |
| Persons age 15 and older who died in the year of the survey | National | Irregular frequency/ started in 1960s |
| 24-hour, hospital-based emergency departments | National | Under development |
| Hospital emergency department records | International | Under development |

| | | |
|---|---|---|
| Firearms manufacturers | National | Annual |
| Manufacturers | National | |
| Producers in the mining and manufacturing industries | National | Monthly/ started 1902 |

*continued*

Copyright © National Academy of Sciences. All rights reserved.

**TABLE 2-1** Continued

| Title of Data Set | Sponsoring Agency | Information Available |
|---|---|---|
| Federal Firearms Licensee (FFL) List | Bureau of Alcohol, Tobacco, and Firearms | Licensee name, trade name, address, phone, and license number |

Criminal Use of Firearms

| | | |
|---|---|---|
| National Crime Victimization Survey (NCVS) | Bureau of Justice Statistics | Victimizations, involving a firearm, by type of crime |
| Uniform Crime Reporting Program (UCR): Monthly Return of Offenses Known to Police | Federal Bureau of Investigation | Total numbers of specific violent and property crimes, includes counts of weapon type used for robberies and aggravated assaults |
| Uniform Crime Reporting Program: National Incident-Based Reporting System (NIBRS) | Federal Bureau of Investigation | Incident, victim, property, offender, and arrestee data on each incident and arrest in 22 crime categories |
| Uniform Crime Reporting Program: Supplemental Homicide Reports (SHR) | Federal Bureau of Investigation | Detailed descriptions of homicides, including weapon used |
| Youth Crime Gun Interdiction Initiative (YCGII) | Bureau of Alcohol, Tobacco, and Firearms | Proportion of crime guns that are recovered from juveniles, youth, and adults; top source states; type of gun used; "time to crime" |
| BATF Firearms Trace Data | Bureau of Alcohol, Tobacco, and Firearms | Firearms transaction records kept by federal firearms licensees, including date of sale and name of purchaser |
| Law Enforcement Officers Killed and Assaulted (LEOKA) | Federal Bureau of Investigation | Duty-related deaths and assaults of law enforcement officers, by weapon used in incident |
| Federal Justice Statistics Program (FJSP) | Bureau of Justice Statistics | Data on federal criminal case processing from the receipt of a criminal matter or arrest of suspect to release from prison into supervision |

Copyright © National Academy of Sciences. All rights reserved.

Firearms and Violence: A Critical Review
https://www.nap.edu/catalog/10881.html

| Population | Geographic Areas | Frequency/ Year Started |
|---|---|---|
| Federal firearms licensees, except collectors of curios and relics | National | |
| Persons 12 years of age and older | National | Annual/ started 1973 |
| Crimes reported by city, county, and state law enforcement agencies | National | Monthly/ started 1930 |
| Criminal incidents reported by local, state, and federal law enforcement agencies | National | Started 1989, under development |
| Criminal incidents reported by police departments | National | Started 1976 |
| Guns recovered from juveniles and adult criminals | 55 cities in 2001 | Annual/ started 1997 |
| Firearms submitted by law enforcement for tracing | National | Record-keeping started 1968 |
| Local, state, and federal law enforcement officers | National | Annual |
| Defendants in criminal cases, suspects in investigative matters, and offenders under supervision | National | Annual |

*continued*

Copyright © National Academy of Sciences. All rights reserved.

**TABLE 2-1** Continued

| Title of Data Set | Sponsoring Agency | Information Available |
|---|---|---|
| Census of State and Federal Correctional Facilities | Bureau of Justice Statistics/ Bureau of the Census | Demographic, socioeconomic, and criminal history characteristics, including gun possession and use |
| National Violence Against Women Survey (NVAWS) | National Institute of Justice/ Centers for Disease Control and Prevention | Prevalence, incidence, characteristics, risk factors, circumstances, responses, and consequences of rape, intimate-partner assault and stalking; includes data on firearm use in these events |
| Arrestee Drug Abuse Monitoring (ADAM~-gun addendum | National Institute of Justice | Gun acquisition and use among arrestees, including gun carrying, reasons for owning a gun, being threatened with a gun, and drug use |

Firearms and Youth

| | | |
|---|---|---|
| Monitoring The Future (MTF) | National Institute on Drug Abuse | Range of behaviors and attitudes with focus on drug use; includes frequency of gun carrying at school |
| Youth Risk Behavior Surveillance System (YRBSS) | Centers for Disease Control and Prevention | Prevalence of health risk behaviors including gun-carrying, weapon carrying on school property, and weapon-related threats or injuries on school property |

Law and Enforcement

| | | |
|---|---|---|
| Firearm Inquiry Statistics (FIST) | Bureau of Justice Statistics | Handgun applications made to FFLs, applications rejected, and reasons for rejection |

Copyright © National Academy of Sciences. All rights reserved.

Firearms and Violence: A Critical Review
https://www.nap.edu/catalog/10881.html

| Population | Geographic Areas | Frequency/Year Started |
|---|---|---|
| State correctional facility inmates | National | Every 5 to 7 years/started 1974 |
| U.S. households | National | Unrepeated/conducted 1996 |
| Arrestees charged with felonies and misdemeanors | National (gun addendum includes 11 of the 35 sites) | 1996—gun addendum |
| 6th, 8th, 10th, and 12th graders and young adults up to age 19 | National | Annual/started 1972, gun question added in 1996 |
| School-age youth grades 9 through 12; also 12- to 21-year-olds in 1992 and college students in 1995 | National | Every two years/started 1990 |
| Chief law enforcement officers | States operating under the Brady Act and states with statutes comparable to the Brady Act | Started 1995 |

*continued*

Copyright © National Academy of Sciences. All rights reserved.

Firearms and Violence: A Critical Review
https://www.nap.edu/catalog/10881.html

**TABLE 2-1** Continued

| Title of Data Set | Sponsoring Agency | Information Available |
|---|---|---|
| Survey of State Procedures Related to Firearm Sales | Bureau of Justice Statistics | State laws, regulations, procedures, and information systems related to sales and other transactions of firearms |

| Firearms Ownership | | |
|---|---|---|
| General Social Survey (GSS) | National Opinion Research Center | Prevalence of ownership, type of gun owned, opinion on permit and control issues, and gun threat incidents |
| National Study of Private Ownership of Firearms in the U.S. | National Institute of Justice | Firearm ownership, acquisition, storage, and defensive use; size, number, and type of firearms owned |
| Survey of Gun Owners in the U.S. | National Institute of Justice | Characteristics of gun ownership, gun carrying, and circumstances of weapon-related incidents |

NCVS and its predecessor, the National Crime Survey, underwent lengthy development periods featuring record check studies and split-ballot experiments to determine the best way to measure crime victimization (Tourangeau and McNeeley, 2003).

Although the NCVS data do many things right, they are, like any such system, beset with methodological problems of surveys in general as well as particular problems associated with measuring illicit, deviant, and deleterious activities (see National Research Council, 2003). Such problems include nonreporting and false reporting, nonstandard definitions of events, sampling problems such as coverage and nonreponse, and an array of other factors involved in conducting surveys of individuals and implementing official data reporting systems. Measurement problems have been particularly controversial in using the NCVS to assess defensive gun uses (see Chapter 5 and National Research Council, 2003, for further details).

In contrast to the NCVS, many other data sources used to measure or monitor violence and crime are assembled as part of administrative records.

Copyright © National Academy of Sciences. All rights reserved.

Firearms and Violence: A Critical Review
http://www.nap.edu/catalog/10881.html

| Population | Geographic Areas | Frequency/ Year Started |
|---|---|---|
| Federal, state, and local agencies, including law enforcement, statistical analysis centers, and legislative research bureaus | National | Annual/ 1996 |
| Noninstitutionalized adults | National | Biannual/ started 1972 |
| U.S. households | National | Unrepeated/ conducted in 1994 |
| Adults age 18 and older | National | Unrepeated/ conducted in 1996 |

## *Uniform Crime Reports*

Every month, local law enforcement agencies are asked to record for their jurisdictions the total number of murders, rapes, robberies, aggravated assaults, burglaries, larcenies, motor vehicle thefts, and arsons on a form known as UCR Return A.[2] For robberies and aggravated assaults, counts broken down by type of weapon (firearms; knives or cutting instruments; other weapons; and personal weapons, such as hands, feet, fists, etc.) are requested. Participation in the UCR program is voluntary.

The UCR Return A data offer a relatively long monthly time series of robberies and assaults by firearms and other weapons occurring in local police jurisdictions across the country. However, administrative data such as UCR have a different set of problems than the NCVS. Foremost among them is that these data alone cannot be used to draw inferences about firearms use or victimization in the general population.[3] The UCR is a sample of crimes reported to and recorded by local law enforcement agen-

---

[2]The UCR program excludes jurisdictions covered by federal law enforcement agencies.

[3]In fact, the NCVS was created to address this problem by capturing data on both reported and unreported crimes, to develop a clearer picture of national crime trends.

Copyright © National Academy of Sciences. All rights reserved.

Firearms and Violence: A Critical Review
http://www.nap.edu/catalog/10881.html

cies in the United States. Ideally, they reveal the number of crimes per month for each of the reporting jurisdictions. Of course, many crimes are not reported to the police, so increases or decreases in reports for certain offenses, such as burglary and auto theft, can result in large differences in outcomes and misleading conclusions about crime trends.

Other reporting problems may further limit the usefulness of these data. First, the accuracy of UCR data can be compromised by differences in definitions of crimes and reporting protocols. Local authorities, for example, might choose criminal charges to achieve certain objectives (e.g., increasing plea bargains by downgrading what might otherwise be a charge of aggravated assault, armed robbery, or rape to a lesser charge that then gets reported in the UCR).

Second, participation in the UCR program is voluntary, with smaller, more rural police agencies less likely to submit reports than larger, urban departments. A review of the preliminary 2000 UCR data posted on the FBI's web site indicates that in one large midwestern state, only six cities with 10,000 and over population reported arrest data between January and June. In all, there were six states that could provide only limited data. For example, rape data were unavailable for two states because the state reporting agencies did not follow the national UCR guidelines (http://www.FBI.gov/ucr/99cius.htm). The committee is not aware of research that details how this nonresponse problem affects inferences in firearm-related research. Maltz and Targonski (2002) argue that underreporting in the UCR data may bias the results of research on right-to-carry laws, but they do not document the magnitude of these biases (see Chapter 6 for further details).

Finally, because these data are based on monthly counts and not on individual incidents, only limited detail is available regarding crime circumstances. There is no information, for example, on the nature or severity of the injuries inflicted. The Supplemental Homicide Report (which is part of the UCR program) provides limited information on the relationship between victim and offender and event circumstances (e.g., whether the homicide is related to an argument or the commission of another felony).

### National Incident-Based Reporting System

The National Incident-Based Reporting System (NIBRS) is designed to provide detailed incident-level information on crimes, including firearm-related crimes. It is administered through the FBI's UCR program and augments the crime reports of local law enforcement agencies in several key respects: offense categories are greatly expanded; attributes of individual crime incidents (offenses, offenders, victims, property, and arrests) can be collected and analyzed; arrests and clearances can be linked to specific inci-

Copyright © National Academy of Sciences. All rights reserved.

dents or offenses; and all offenses in an incident can be recorded and counted.[4] NIBRS is intended to replace the UCR as the nation's comprehensive, standardized crime data source based on crimes known to the police.

However, since its blueprint was published in 1985 (Poggio et al., 1985), only 16 percent of the U.S. population is covered by NIBRS data (Bureau of Justice Statistics, 2001), with few large cities or urban areas participating. Thus, at this time, NIBRS is not an effective data set for studying firearms violence.

### National Violent Death Reporting System

In 2002, Congress appropriated funds to the CDC to begin creating the NVDRS. This system builds on earlier pilot work sponsored by private foundations coordinated through the Harvard School of Public Health's Injury Control Research Center. The NVDRS aims to create a comprehensive individual-level data set in each state that links data from medical examiners and coroners, police departments, death certificates, and crime labs on each death resulting from violence (homicide, suicide, unintentional firearm-related deaths, and undetermined causes). A set of uniform data elements has been proposed that would allow a set of minimum plus desirable variables to be collected using standardized definitions and codes. The NVDRS is designed to provide detailed characteristics of the circumstances surrounding firearm-related deaths, including detailed descriptions of the firearms used. Because similar characteristics would be collected on nonfirearm-related violent incidents, a more complete picture of all violent incidents would be available for analysis than from any existing ongoing data collection effort. The prototype that CDC is implementing in the first six states (Maryland, Massachusetts, New Jersey, Oregon, South Carolina, and Virginia) is being carried out with an initial investment of $2.25 million. Expansion to the remaining states is estimated to cost approximately $20 million (http://www.aast.org/nvdrs).

The NIBRS and the NVDRS are emerging data sources designed to provide more information on the circumstances involved in violent events. The NIBRS would provide details on violent crimes. The NVDRS would provide details on violent deaths. Whether and to what extent these data, if fully implemented, could be effectively used to answer some of the complex firearms policy questions is an open question. Consistency of definitions and data protocols over many different administrative data sources is a highly

---

[4]This description is adapted from that provided by the Justice Research and Statistics Association (http://www.jrsa.org). Other useful information sources on NIBRS, including downloadable data sets and codebooks, are the FBI's Uniform Crime Reporting program (http://www.fbi/ucr/nibrs) and the National Consortium for Justice Information and Statistics (http://www.search.org/nibrs).

Copyright © National Academy of Sciences. All rights reserved.

Firearms and Violence: A Critical Review
https://www.nap.edu/catalog/10881.html

complex undertaking that is nearly certain to result in reporting errors. Even if the data are reliable and accurate, the NIBRS and the NVDRS, as with the UCR, are administrative data that by their nature provide information on events rather than people. Neither survey alone will provide information on the use of firearms in the general population, how firearms are acquired, or how they are used in noncriminal and nonfatal instances.

## Data on Firearms Ownership, Use, and Markets

Almost every empirical question about firearms and violence requires periodic, scientifically acceptable measures of firearms acquisition, availability, and use. The difficulty of measuring the extent of firearms possession, the ways in which firearms are acquired, and the myriad uses of firearms comes up in every chapter of the report.

Several types of ownership data are used in the literature: (1) surveys to measure acquisition, availability and use; (2) administrative data or other convenience samples providing information on possession and use among particular populations (e.g., arrestees) or associated with particular events (e.g., crime); or (3) proxies that indicate firearms possession and use.

### Surveys

Surveys would seem to be the most direct approach to measuring firearms possession, availability, and perhaps use. The *General Social Survey* is the primary source of information for tracking U.S. household firearms ownership over time since the early 1970s. The GSS is an ongoing, nationally representative set of sample surveys on a broad range of social issues conducted by the National Opinion Research Center (NORC). A total of 23 national surveys have been conducted since the inception of the GSS in 1972 (annually until 1993, biennially since 1994, with samples of approximately 1,500 subjects). As an omnibus survey, many topics are covered, but no topic area is treated with a great deal of depth. Because the GSS is designed to provide information on trends in attitudes and opinions, many questions are repeated from year to year. Pertinent to firearms research, the GSS includes questions on whether guns (handguns, rifles, shotguns) are owned by the respondent or other household members. Surveys prior to 1995 included an item on prevalence of being threatened by or shot at with a gun, but these questions have been omitted in recent years.[5]

[5]NORC incorporates methodological experiments into each year of the GSS data collection, involving item wording, context effects, use of different types of response scales, and other assessments of validity and reliability (see http://www.norc.uchicago.edu/projects/gensoc1.asp).

Copyright © National Academy of Sciences. All rights reserved.

Firearms and Violence: A Critical Review
https://www.nap.edu/catalog/10881.html

The GSS surveys provide basic information on household ownership in the United States and the nine census regions, but not much else specific to firearms policy. They cannot be used to infer ownership at finer geographic levels.[6] They do not inquire into the number of guns owned, the reasons for owning them, or how they are used in practice. As a household survey, the GSS sampling frame omits transients and others without a stable residence who may be at high risk for firearm violence. The data offer no direct indication of illicit firearms transfers.

Many other surveys of varying quality have been used to reveal possession or use of firearms. The NCVS, for example, has been used to study what victims of crime report about the weapons used in the crimes against them and to provide rough estimates of the characteristics of offenders using those weapons (Bureau of Justice Statistics, 1994). In 1994, the National Institute of Justice funded the Police Foundation to conduct a nationally representative telephone survey on private ownership and the use of firearms by adults in the United States. The study covered topics such as the size, composition, and ownership of the nation's private gun inventory; methods of and reasons for firearms acquisition, storage, and carrying of guns; and defensive use of firearms against criminal attackers. The study oversampled racial minorities and gun-owning households. The data provide greater detail about patterns of firearms ownership than the GSS, and they provide an estimate of the use of firearms for defense against perceived threats. Chapter 5 reviews other surveys used to elicit information on defensive gun use, such as the National Self-Defense Survey.

While surveys of firearms acquisition, possession, and use are of varying quality and scope, they all share common methodological and survey sampling-related problems. The most fundamental of these is the potential for response errors to survey questionnaires. Critics argue that asking people whether they own a firearm, what kind it is, and how it is used may lead to invalid responses because ownership is a controversial matter for one or more reasons: some people may own a firearm illegally, some may own it legally but worry that they may use it illegally, and some may react to the intense public controversy about firearm ownership by becoming less (or even more) likely to admit to ownership (Blackman, 2003).[7] Because only one member of the household is selected to respond, even well-intentioned

---

[6]Area identifiers permit use of the GSS survey data to assess household ownership prevalence across a representative sample of U.S. metropolitan areas and nonmetropolitan counties, although access to the area-identified data requires special permission from NORC.

[7]While in most surveys respondents are provided confidentiality, the concern is still expressed that violations of that confidentiality directly or through data mining could lead to the identification of specific respondents in a way that might allow the identification of firearms owners.

Copyright © National Academy of Sciences. All rights reserved.

Firearms and Violence: A Critical Review
http://www.nap.edu/catalog/10881.html

respondents may not know about household possession or use. In addition, critics of survey approaches have raised concerns about how survey data might be used to establish what would be close to a national registry of firearm possessors.

The committee is not aware of any research assessing the magnitude or impact of response errors in surveys of firearms ownership and use. Similar concerns have been expressed about other sensitive behaviors for which research evidence on misreporting may be relevant. Surveys on victimization, such as the NCVS, and on the prevalence of drug use, such as Monitoring the Future and the National Household Survey of Drug Abuse, have undergone continuing and careful research efforts to identify the sources of response error and to correct for them (see National Research Council, 2001, 2003; Harrison and Hughes, 1997). The large literature assessing the magnitude of misreporting self-reported drug use surveys, for example, reveals consistent evidence that some respondents misreport their drug use behavior and that misreporting depends on the social desirability of the drug (see National Research Council, 2001, and Harrison and Hughes, 1997, for reviews of this literature).[8] Moreover, the validity rates can be affected by the data collection methodology. Surveys that can effectively ensure confidentiality and anonymity and that are conducted in noncoercive settings are thought to have relatively low misreporting rates. Despite this large body of research, very little information exists on the magnitude or trends in invalid reporting in illicit drug use surveys (National Research Council, 2001).

While there is some information on reporting errors in surveys on other sensitive topics, the relevance of this literature for understanding invalid reporting of firearms ownership and use is uncertain. In many ways, the controversy over firearms appears exceptional. There is, as noted in the introduction, hardly a more contentious issue, with the public highly polarized over the legal and research foundations for competing policy options. Furthermore, the durable nature of firearms may arguably lead some respondents to provide invalid reports because of fears about future events (e.g., a ban on certain types of guns) even if they have no concerns about the legality of past events.

Nonresponse creates a similar problem. Response rates in the GSS are between 75 and 80 percent (Smith, 1995), less than 65 percent in the Police Foundation Survey, and even lower in some of the defensive gun use

---

[8]These studies have been conducted largely on samples of persons who have much higher rates of drug use than the general population (e.g., arrestees). A few studies have attempted to evaluate misreporting in broad-based representative samples, but these lack direct evidence and instead make strong, unverifiable assumptions to infer validity rates (National Research Council, 2001).

Copyright © National Academy of Sciences. All rights reserved.

Firearms and Violence: A Critical Review

surveys described in Chapter 5. Nonresponse rates make it difficult to draw precise inferences about ownership rates and use as the data are uninformative about nonrespondents. With nonreponse rates of 25 percent or more, the existing surveys alone cannot reveal the rates of ownership or use. Prevalence rates can be identified only if one makes sufficiently strong assumptions about the behavior of nonrespondents. Generally, nonresponse is assumed to be random, thus implying that prevalence among nonrespondents is the same as prevalence among respondents. The committee is not aware of empirical evidence that supports the view that nonresponse is random. Indeed, studies of nonresponse in surveys of drug consumption provide limited empirical evidence to the contrary (see National Research Council, 2001). These studies find differences between respondents and nonrespondents in terms of both drug use and other observed covariates (Caspar, 1992; Gfroerer et al., 1997).

Concerns about response errors in self-reported surveys of firearms possession and use require much more systematic research before surveys can be judged to provide accurate data to address critical issues in the study of firearms and violence. The many substantial resources that have been devoted to addressing the measurement issues in the collection of other sensitive data will almost certainly be useful, yet the issues surrounding firearms may be unique. The committee thinks that new research will extend and strengthen what is currently known about response errors on sensitive topics generally. Without systematic research on these specific matters, scientists can only speculate.

## Administrative and Convenience Samples

A number of administrative data sets have been used or suggested as a way to study the market for firearms possession and use. In this section, we describe the administrative data collected as part of the Bureau of Alcohol, Tobacco, and Firearms' tracing system, the trace data, and a proposed addendum on firearms to the National Institute of Justice survey of arrestees, the Arrestee Drug Abuse Monitoring (ADAM) survey.

**BATF Firearms Trace Data:** One federal source of information on firearms related to violence is the firearms trace data compiled by the Bureau of Alcohol, Tobacco, and Firearms of the U.S. Department of Justice. Because trace data are quite distinct from the other federal data sources, and because they have been subject to more criticism than most of the other systems, we provide a more extensive description of the regulatory background related to firearm tracing, the nature of the tracing process, and the uses and limitations of the resulting data.

The Gun Control Act of 1968 established the legal framework for regulating firearms transactions and the associated record-keeping. The act

Copyright © National Academy of Sciences. All rights reserved.

Firearms and Violence: A Critical Review

https://www.nap.edu/catalog/10881.html

was intended to limit interstate commerce in guns, so that states with strict regulations were insulated from states with looser regulations (Zimring, 1975). To that end, the act established a system of federal licensing for gun dealers, requiring that all individuals engaged in the business of selling guns must be a federal firearms licensee (FFL). The FFLs were established as the gatekeepers for interstate shipments: only they may legally receive mail-order shipments of guns, and they may not sell handguns to residents of another state. FFLs are required to obey state and local regulations in transacting their business.

The Gun Control Act established conditions on the transfer of firearms. FFLs may not sell handguns to anyone under the age of 21, or long guns to anyone under the age of 18, nor may they sell a gun of any kind to someone who is proscribed from possessing one. The list of those proscribed by federal law includes individuals with a felony conviction or under indictment, fugitives from justice, illegal aliens, and those who have been committed to a mental institution. FFLs must require customers to show identification and fill out a form swearing that they do not have any of the disqualifying conditions specified in the Gun Control Act. Beginning in 1994, the Brady Violence Prevention Act required that FFLs initiate a background check on all handgun purchasers through law enforcement records; in 1998 that requirement was expanded to include the sale of long guns as well.

The 1968 Gun Control Act also established requirements that allowed for the chain of commerce for any given firearm to be traced from its manufacture or import through its first sale by a retail dealer. Each new firearm, whether manufactured in the United States or imported, must be stamped with a unique serial number. Manufacturers, importers, distributors, and FFLs are required to maintain records of all firearms transactions, including sales and shipments received. FFLs must report multiple handgun sales and stolen firearms to BATF and provide transaction records in response to its trace requests. When FFLs go out of business, they are to transfer their transaction records to BATF, which then stores them for tracing (Bureau of Alcohol, Tobacco, and Firearms, 2000a). In essence, the 1968 act created a paper trail for gun transactions that can be followed by BATF agents.

The tracing process begins with a law enforcement agency's submission of a trace request to BATF's National Tracing Center (NTC). The form requires information regarding the firearm type (i.e., pistol, revolver, shotgun, rifle), the manufacturer, caliber, serial number, and importer (if the gun is of foreign manufacture), the location of the recovery, the criminal offense associated with the recovery, and the name and date of birth of the firearm possessor (Bureau of Alcohol, Tobacco, and Firearms, 2000a). This information is entered into BATF's Firearms Tracing Center at the NTC

Copyright © National Academy of Sciences. All rights reserved.

Firearms and Violence: A Critical Review
https://www.nap.edu/catalog/10881.html

and checked against the records of out-of-business FFLs that are stored by
BATF, as well as records of multiple handgun purchases reported on an
ongoing basis by FFLs. If the gun does not appear in these databases, NTC
contacts the firearm manufacturer (for domestic guns) or the importer (for
foreign guns) and requests information on the distributor that first handled
the gun. BATF then follows the chain of subsequent transfers until it iden-
tifies the first retail seller. That FFL is then contacted with a request to
search his or her records and provide information on when the gun was
sold and to whom.

In 1999, trace requests for 164,137 firearms were submitted by law
enforcement agencies to NTC. Of these, 52 percent (85,511) were suc-
cessfully traced to the first retail purchaser. The 48 percent of trace re-
quests that failed did so for a variety of reasons. Nearly 10 percent of the
guns (15,750) were not successfully traced because they were too old (pre-
1968 manufacture) and another 11 percent (17,776) failed because of
problems with the serial number (Pierce et al., 2002). The majority of the
remaining unsuccessful trace requests failed because of errors on the sub-
mission forms or problems obtaining the information from the FFL who
first sold the gun at retail. It is important to note that, even when a trace
is "successful," it provides limited information about the history of the
gun (Cook and Braga, 2001). Most successful gun traces access only the
data on the dealer's record for the first retail sale of the gun. Generally,
subsequent transactions cannot be traced from the sorts of records re-
quired by federal firearms laws.

Beginning in 1993, the Clinton administration was concerned about
the apparent ease with which criminals and juveniles obtained guns. BATF
was charged with initiating a concerted effort to increase the amount of
crime gun tracing, improve the quality of firearms trace data, increase the
regulation of gun dealers, educate law enforcement on the benefits of trac-
ing, and increase investigative resources devoted to gun traffickers. Com-
prehensive tracing of all firearms recovered by police is a key component of
BATF's supply-side strategy to reduce the availability of illegal firearms. In
1996, BATF initiated the Youth Crime Gun Interdiction Initiative with
commitments from 17 cities to trace all recovered crime guns (Bureau of
Alcohol, Tobacco, and Firearms, 1997). This program expanded to 38
cities in 1999 (Bureau of Alcohol, Tobacco, and Firearms, 2000a) and to 55
cities in 2001 (Bureau of Alcohol, Tobacco, and Firearms, 2002b). Other
jurisdictions have also expanded their use of gun tracing; six states, for
example, have recently adopted comprehensive tracing as a matter of state
policy, either by law (California, Connecticut, North Carolina, and Illi-
nois), by executive order (Maryland), or by law enforcement initiative (New
Jersey) (Bureau of Alcohol, Tobacco, and Firearms, 2000a).

Copyright © National Academy of Sciences. All rights reserved.

Firearms and Violence: A Critical Review
https://www.nap.edu/catalog/10881.html

Understandably, research studies based on analyses of firearms trace data have been greeted with a healthy dose of skepticism. Although the quality of firearms trace data has improved over the past decade (Cook and Braga, 2001), trace data analyses are subject to a number of widely recognized problems (see Kleck, 1999; Blackman, 1999; Congressional Research Service, 1992).[9] All are based on firearms recovered by police and other law enforcement agencies, which may not be representative of firearms possessed and used by criminals. Trace data are also influenced by which guns are submitted for tracing, a decision made by law enforcement agencies. Beyond that, not all firearms can be traced. The trace-based information that results is biased to an unknown degree by these factors.

Furthermore, trace data cannot show whether a firearm has been illegally diverted from legitimate firearms commerce. Trace studies typically contain information about the first retail sale of a firearm and about the circumstances associated with its recovery by law enforcement. These studies cannot show what happened in between: whether a firearm was legitimately purchased and subsequently stolen, sold improperly by a licensed dealer, or any other of a myriad of possibilities. As such, trace analysis alone cannot reveal the extent and nature of illegal firearms trafficking.

Ultimately, the validity of the conclusions drawn from these data depends on the application. In general, trace data are not informative about populations of interest, such as offenders, potential offenders, victims, and the general population.

Administered until recently by the National Institute of Justice, Arrestee Drug Abuse Monitoring (ADAM, formerly known as the Drug Use Forecasting program, or DUF) contains survey data and urine samples from samples of arrestees charged with felonies and misdemeanors at 35 sites across the county. Data collection occurred four times a year. Response rates were relatively high: about 85 percent of arrestees agreed to interview (http://www.adam-nij.net). ADAM focused on drug use patterns among criminal suspects and did not regularly collect data on firearms use. However, in 1996 researchers appended a "gun addendum" to the surveys in 11 sites to study patterns of gun acquisition and use among arrestees (Decker et al., 1997).

Decker and colleagues (1997) suggested how the addendum might be used to provide estimates of the frequency and characteristics of arrests in which the arrested persons owned and used firearms (National Research

---

[9]Comprehensive tracing of all firearm recoveries reduces some of the problems in trace data introduced by police decision making. Jurisdictions that submit all confiscated guns for tracing can be confident that the resulting data base of trace requests represents the firearms recovered by police during a particular period of time.

Copyright © National Academy of Sciences. All rights reserved.

Council, 2003).[10] Tracking firearms possession through arrest might also serve to detect emerging problems in high-risk populations. Quarterly data collection, such as that conducted by ADAM, permits monitoring of local trends over short time intervals.

Such data, however, may not be useful for answering many of the policy-related questions considered in this report. Although the ADAM samples are representative of the local arrestee populations for which the surveys were administered, the 35 data collection sites are not a representative sample of urban areas nationwide. Moreover, a survey of arrestees cannot be used to infer acquisition and use among criminals or the general population. The data are not representative of the relevant populations and can be influenced heavily by police priorities and procedures. Thus, these data alone cannot be used to infer the effects of guns on crime or the effects of interventions on gun use or the market for weaponry in general.

Suppose, for example, one found that the fraction of arrestees reported to possess firearms does not vary by the strength of local regulations. It may be, as suggested by the data, that regulation has no effect on the market. It may also be that regulation affects the crime and the ownership rates, but among the arrested populations the ownership and use rates are unchanged. And it may be that regulations influence policing and the accuracy of self-reporting in unknown ways. ADAM data do not reveal the association between regulation and the behavior of offenders, potential offenders, the crime rate, or policing. Thus, observing that the prevalence of gun ownership and use among arrestees changes after some interventions does not reveal how gun use or crime more generally changed in the population of interest.

## Proxy Measures of Ownership

Using proxy measures of ownership raises different issues and questions. In the proxy approach to measuring ownership (proxy approaches have not been developed as measures of firearms use) researchers have sought to find measures that would indicate whether firearms were available. A variety of these have been proposed, but it appears that the one the research community has settled on is the proportion of suicides committed with a firearm (Kleck, 1991; Cook, 1991). This measure has been found to

---

[10]This study, for example, reveals that 14 percent of arrestees carried firearms almost all of the time, that arrestees who tested positive for drugs were no more likely than others to own or use firearms, that the most frequently cited reason given for owning a gun was the need for protection or self-defense (two-thirds), that more than half of the arrestees (55 percent) said that guns are easy to obtain illegally, that 23 percent of arrestees who owned a gun reported using a gun to commit a crime, and that 59 percent of arrestees reported that they had been threatened with a gun.

Copyright © National Academy of Sciences. All rights reserved.

Firearms and Violence: A Critical Review
http://www.nap.edu/catalog/10881.html

correlate better than other possible proxies with measures of gun violence (homicide and gun assaults).

As we discuss in Chapter 7, proxies raise two somewhat related but distinct methodological issues. First, proxies have been used at aggregated levels, most often the state level, to infer something about the impact of availability at the individual level on violent outcomes. For example, if the proxy is correlated with gun homicides at the state level, then it is often assumed that availability at the individual level of analysis is associated with individual manifestations of violence. More generally, these studies are used to infer whether an individual's probability of access to firearms explains his or her probability of committing a violent crime or suicide. Aggregate measures of ownership, however, may or may not be related to actual availability in the households in which these rare events (homicides and suicides) occur.

A second issue with proxies is to what extent they are inaccurate indicators of firearms availability at the geographic level of interest. Proxies create biases, yet there is almost no research on these statistical problems in the firearms literature. Without more rigorous evaluations on the impact of proxies, it is difficult to assess the research on ownership and violence. Once these biases have been assessed, proxies may be useful because they are cheaper to collect, their collection is less intrusive, and for other reasons of economy or design. The research community in this area needs to focus more attention on assessing the biases created by proxies and on the development of better direct measures of availability and use.

## GENERAL OBJECTIVES FOR DEVELOPING USEFUL RESEARCH DATA

In this section, we discuss several basic features that data on firearm ownership and violence ought to exhibit, individually or in combination, in order for researchers, practitioners, and policy makers to better understand the role of firearms in violent injury and death, both self- and other-inflicted. In particular, the following qualities of data sets are minimally necessary for credible research and evaluation on firearm violence: representativeness, accuracy, comprehensiveness, standardization, and timeliness.

### Representativeness

A fundamental component of any scientific data set is that it represents some population of interest in a known way. The textbook scheme is to randomly sample from a known population, but other well-defined sam-

Copyright © National Academy of Sciences. All rights reserved.

pling schemes are also used to draw inferences about known populations. The NCVS uses a complex random sampling scheme. In Chapter 7, there is a detailed discussion of case-control schemes that can be especially useful for studying rare events like violence and crime.

Many of the data sets used to study firearms and violence are not random samples from well-defined populations of interest, nor are they exhaustive enumerations of any population. These types of data may provide some information, as described above, but using them to assess the effects of policy can be more complicated.

### Accuracy

Accuracy of measurement is an essential criterion for a data source to be useful for understanding firearms and violence. Two key features of accuracy are the *validity* and *reliability* of measurement. In general terms, a measure is valid to the degree that it represents the underlying phenomenon of interest, and it is reliable to the degree that it yields the same data over repeated applications. Many of the debates over the relationship between firearms and violence center on questions of validity and reliability. For example, some analysts question the validity of the NCVS for measuring the prevalence of defensive firearms use because, as a survey of crime victims, the NCVS may not fully capture crimes that are averted by the use of firearms. Other researchers question the reliability of one-time sample surveys for measuring rare events, such as defensive use of guns. The chief function of data standardization is to ensure reliability of measurement. The more comprehensive a system, the more likely it will yield valid measurements of the connection between firearms and violence.

Response errors are a vital component of the validity of any data. The validity of data that measure firearms ownership, use, and violence on the basis of respondent self-reports depends on the ability and willingness of persons to disclose highly personal and sometimes incriminating or traumatic information to interviewers. As discussed above, there are reasons to expect response errors in regard to questions about ownership and use, as elicited in the GSS and other gun use surveys. Although there is much speculation on the extent and nature of response errors (see Chapter 5), there is almost no relevant research. Likewise, validity is compromised by nonresponse rates ranging from 20 percent (in the GSS) to over 50 percent in some of the phone surveys used to measure ownership. Without making unsubstantiated assumptions about gun ownership among nonrespondents, the GSS data cannot reveal whether ownership is increasing or decreasing over time.

Copyright © National Academy of Sciences. All rights reserved.

Firearms and Violence: A Critical Review
http://www.nap.edu/catalog/10881.html

## Comprehensiveness

The criterion of comprehensiveness refers to both a data set's scope and richness of detail with respect to firearm-related violence.

### Scope

Scope can be subdivided into the types of events that are captured and the populations covered. The scope of the NCVS, for example, is restricted to nonfatal incidents and to the characteristics of crime victims rather than offenders. Vital statistics and hospital-based information on firearm violence is also limited to the victims. The UCR, by contrast, captures information on both crime victims and offenders, but they are limited to offenses that are known to and recorded by law enforcement agencies. The NCVS includes data on both crimes reported to the police and those that victims do not report. Household-based surveys such as the NCVS and the GSS are limited to the population of persons with stable residences, thereby omitting transients and other persons at high risk for firearm violence. Such persons are included in the ADAM program, which collects information on persons who come into contact with the criminal justice system.

Geographic coverage is another dimension of scope. The GSS, for example, is representative of the United States and the nine census regions, but it is too sparse geographically to support conclusions at finer levels of geographical aggregation. This lack of individual-level data from small geographical areas is a significant shortcoming in the firearms data. Presumably, we would like to be able to make statements about, for example, the probability that an individual commits suicide conditional on owning a gun (or having one available) and other covariates. This cannot be done if the smallest geographical unit that the data resolve is a multistate region. Similar statements can be made about other forms of gun violence.

Perhaps no better illustration of the patchwork character of information on firearms violence in the United States exists than the multiple and nonoverlapping or partially overlapping coverage of the data sets. That should come as little surprise, inasmuch as many of the data sets were expressly intended to provide information about crime, violence, or injury that was not available from other sources. The major impetus for the development of the NCVS, for example, was to gather information on crime incidents that do not come to the attention of law enforcement agencies. The collection of information on violence from hospitals and emergency departments is intended to reveal types of violence, such as partner abuse, thought to be underreported in crime data sources.

The patchwork of existing data sources, in other words, has been created with the best of intentions and has shed light on aspects of violence, including the role of firearms, that otherwise would have remained hidden

Copyright © National Academy of Sciences. All rights reserved.

Firearms and Violence: A Critical Review

https://www.nap.edu/catalog/10881.html

from view, such as the burden on hospital emergency departments of firearm injuries (Zawitz and Strom, 2000). However, insufficient attention has been devoted to linkages across data in population coverage and the types of firearm violence covered. Can data from the UCR, the NCVS, and emergency departments be effectively linked to draw inferences about the firearms violence in the population? As with data standardization, continuing assessments of remaining gaps in the scope of firearms data should be part of an ongoing program of methodological research on firearm violence.

*Context*

An often-highlighted limitation of existing data on firearms is the lack of detail regarding the context and circumstances of firearm violence. The Supplemental Homicide Report provides limited information on the relationship between victim and offender and event circumstances (e.g., whether the homicide is related to an argument or the commission of another felony). The National Incident-Based Reporting System extends such information to other crime types, but it covers less than 20 percent of the population more than 20 years after nationwide implementation began. Youth surveys, such as Monitoring the Future (MTF) and the Youth Risk Behavior Surveillance System, collect data on multiple attributes of respondents in addition to firearm behaviors, but little information on the situations in which youth carry and use firearms. The MTF survey also includes a longitudinal component that tracks respondents over time. These panel data might be especially useful for assessing firearms acquisition and use over time. However, citing agreements with respondents regarding confidentiality, the University of Michigan's Institute for Social Research has not made these data available to external researchers (see National Research Council, 2001). The most promising emerging data source with respect to information on the context and circumstances of firearm violence is the National Violent Death Reporting System, which will compile individual-level data from both criminal justice and public health sources on event circumstances, as well as detailed descriptions of the weapons used in violence. The NVDRS offers a model of a comprehensive data set that bridges existing data sources on individuals, events, and weapons.

**Standardization**

An essential quality of any measurement system is the collection of standard data elements from reporting units for purposes of reliable classification and comparison. Good examples of standardized data sets for measuring firearm violence are the FBI's UCR program, the National Crime Victimization Survey, and the mortality files available from the National

Copyright © National Academy of Sciences. All rights reserved.

Firearms and Violence: A Critical Review
https://www.nap.edu/catalog/10881.html

Vital Statistics System. Each of these data sets provides detailed formats and instructions for data collection, coding, and entry to ensure standard measurement of underlying data elements. For example, the UCR program regularly compiles information on eight serious "index offenses" (murder and nonnegligent manslaughter, rape, robbery, aggravated assault, burglary, larceny, vehicle theft, and arson) and requires local law enforcement agencies to use the same crime classification when compiling data on these offenses for reporting to the UCR. The National Vital Statistics System classifies deaths according to the International Classification of Diseases codes for cause of death.

Such standard classification and coding schemes, however, are necessary but not sufficient for ensuring valid and reliable measurement. Ultimately, all data must rely on the faithfulness of their reporting units in adhering to the standard protocols, which requires continuous monitoring of data collection and adequate training of data entry personnel. All of the federally sponsored data sets that collect information on firearm violence have procedures in place to maintain standard data collection, although they vary in the degree of compliance exhibited by reporting units. Generally speaking, systems with direct control over reporting units are able to maintain higher levels of standardization. The NCVS, administered by the Census Bureau in cooperation with the Bureau of Justice Statistics, is a good example of a data source with direct control over data collection. The UCR, in contrast, has no direct control over local data collection and must rely on data checks conducted by state UCR programs, as well as its own quality controls, to ensure adherence to standard coding and classification criteria. The National Vital Statistics System mortality series lie somewhere between the NCVS and the UCR with respect to direct control over local data collection.

We have limited our discussion thus far to standardization within data sets. However, because data on firearms violence comes from multiple sources and will continue to for the foreseeable future, we also must be concerned with standardization of data elements between data sources. Ongoing investigations of comparable data elements from different sources should constitute an essential part of a program of methodological research on firearm-related violence. Moreover, new and emerging data sets should be designed to ensure transparent linkages of data elements with existing data sources.

Two of the most important needs identified in public health and criminological research on violence and other injuries are for the standardization of data elements and the availability of detailed characteristics surrounding each event. Several efforts under way to address these concerns, if successful, may improve the usefulness and quality of data on firearm-related deaths and injuries: the National Incident-Based Reporting System, the

Copyright © National Academy of Sciences. All rights reserved.

Firearms and Violence: A Critical Review
http://www.nap.edu/catalog/10881.html

National Violent Death Reporting System, the Data Elements for Emergency Department Systems, and the International Classification of External Cause of Injury coding system. The NIBRS and the NVDRS have been discussed; the latter two systems are described below.

**Data Elements for Emergency Department Systems:** CDC's National Center for Injury Prevention and Control is coordinating an effort to develop uniform specifications for data entered into emergency department records. These specifications, known as DEEDS, are intended for use in 24-hour, hospital-based emergency departments throughout the United States. If the data definitions, coding conventions, and other recommended specifications were widely adopted, incompatibilities between emergency departments records would be substantially reduced. DEEDS does not specify an essential or minimum data set, but is designed to foster greater uniformity among individual data elements chosen for use. DEEDS also specifies standards for electronic data interchange so that data can be accessed for research purposes while maintaining confidentiality of patient records. DEEDS was first released in 1997 for testing and review. Systematic field studies, however, are still needed to assess the utility and practicality of the system.

**International Classification of External Causes of Injury:** An international effort, under the auspices of the World Health Organization, is currently under way to develop a new classification system for coding external causes of injury in mortality and morbidity systems. This system, known as the International Classification of External Causes of Injury (ICECI) is designed to capture details about the place of occurrence, activity at time of injury, alcohol and drug involvement, objects or substances involved, intent of injury, and mechanism of injury (e.g., firearms). Specific modules that focus on injuries related to violence, transportation, sports, and work are also under development. The first draft was released in 1998; the present version, ICECI 1.0, was released in 2001. A number of shortened versions have been tested for use as injury surveillance tools in places with limited resources for surveillance. CDC has tested its own short version as a means for capturing external cause of injury information from hospital emergency departments records in the United States with promising results. The European Union is also testing portions of ICECI as part of its efforts to create a minimum data set on injuries. ICECI is designed to replace the International Classification of Diseases coding system, which is thought to lack the scope and specificity needed to inform injury research. The present version of ICECI is undergoing formal review at the World Health Organization.[11]

---

[11]Details about ICECI 1.0, including the data dictionary, are available at http://www.iceci.org.

Copyright © National Academy of Sciences. All rights reserved.

Firearms and Violence: A Critical Review
http://www.nap.edu/catalog/10881.html

## Timeliness

One remarkable feature of all existing data sources on firearms violence is their lack of timeliness. Other social indicators, particularly those measuring economic activity and performance, are available on a quarterly or monthly basis. By contrast, researchers, practitioners, and policy makers concerned with violent injury and death must contend with data that are infrequently collected and made available at least a year or more after they have been collected. The result is that nearly all studies of firearms violence are, in a real sense, historical in nature. Lack of timeliness in the availability of data is not a problem for investigating behavioral phenomena that change slowly over time, but the risk of firearms violence in the United States is not necessarily such a phenomenon. For example, rates of firearms violence, especially among youth, rose very rapidly to unprecedented levels during the early 1990s, only to peak and turn downward just as rapidly over the next few years. The popular characterization of those changes as an epidemic was not a misnomer, at least with respect to the speed with which they took place. Needless-to-say, monitoring such rapid and abrupt changes requires timely information.

Technical barriers no longer stand in the way of the timely collection, coding, and dissemination of key indicators of firearms violence. Local law enforcement agencies report data on a monthly basis to the FBI on serious assaults, robberies, and homicides by weapon type. Emergency departments and hospitals collect information on violent injuries and death just as frequently. Electronic data entry, coding, and checking have greatly reduced the time required to compile data on firearms violence, and the Internet permits nearly instantaneous dissemination both to special access users and broader audiences.

To better monitor trends in firearms and violence, the committee thinks that an important implementation objective of emerging data sets, such as the NIBRS and the NVDRS, should be dissemination of data on firearms violence on a quarterly basis. In addition, monitoring capabilities might be greatly improved if firearm-related behaviors could be added to any proposed revision of the ADAM survey, perhaps on a rotating schedule with the more detailed questions on drug use, and disseminated regularly.

## CONCLUSION

None of the existing data sources, by itself or in combination with others, provides comprehensive, timely, and accurate data needed to answer many important questions pertaining to the role of firearms in violent events. Even some of the most basic descriptive questions cannot be an-

Copyright © National Academy of Sciences. All rights reserved.

Firearms and Violence: A Critical Review
https://www.nap.edu/catalog/10881.html

swered with existing data. For example, the existing data do not reveal information pertinent to answering the following questions: [12]

1. Where do youth who shoot themselves or others obtain their guns?

2. In what proportion of intimate-partner homicides committed with a gun does the offender also take his or her own life or the lives of the victim's children or protectors?

3. Did the number of people shot with assault weapons change after the passage of the 1994 ban on assault weapons?

4. What are the most common circumstances leading to unintentional firearm-related deaths? Are particular types or makes and models of firearms overrepresented in unintentional firearm-related deaths?

5. What proportion of suicide or homicide victims were under the care of a mental health professional? What proportion were intoxicated with alcohol or illicit drugs at the time of death? How do these proportions compare with those for suicides committed by other means?

There are many other such "unanswerable questions" about firearm-related violence, and even more that can be answered only with great ambiguity. Data for estimating firearm-related mortality lack timeliness and contain only limited information on key circumstantial and weapon-related variables. For firearm-related morbidity data, key circumstantial and weapon-related information is also limited, and no nationally representative data sources monitor firearm-related hospitalizations and disabilities. Data on firearm storage practices, weapon carrying, and gun safety training are not routinely collected. Data for studying noncriminal violence are lacking.

Significant gaps exist in the nation's ability to monitor firearm-related injury and assess firearm-related policies. In the committee's view, the most important step to improve understanding of firearms and violence is to assemble better data. In the absence of improved data, the substantive questions addressed in this report are not likely to be resolved.

Emerging data have the potential to make important advances in understanding firearms and violence. In particular, the National Incident-Based Reporting System and the National Violent Death Reporting System can provide a wealth of information for characterizing violent events. Whether these data will also be effective for evaluating the effects of firearms, injury reduction policies, or other firearm-related policy ques-

---

[12]We thank Catherine Barber and David Hemenway of the Harvard School of Public Health for providing these examples by personal communication.

Copyright © National Academy of Sciences. All rights reserved.

Firearms and Violence: A Critical Review
https://www.nap.edu/catalog/10881.html

tions is unknown and will almost certainly depend on the particular application. No one system will be effective at answering all questions, but it is important to begin by collecting accurate and reliable data to describe the basic facts about violent injury and death. Thus, we are encouraged by the efforts of the Harvard School of Public Health's Injury Control Research Center pilot data collection program, as well as the recent seed money devoted to implement such a system at the CDC. **We reiterate recommendations made by past National Academies committees (e.g., Institute of Medicine, 1999) and others to support the development and maintenance of the National Violent Death Reporting System and the National Incident-Based Reporting System.** We also recognize that these types of data systems have been the subject of great controversy and, in light of well-founded concerns, strongly urge that special care be taken to ensure the credibility of these data.

The design and implementation plans for these and other proposed data sets need to explicitly consider whether and how some of the more complex and important policy questions regarding firearms and violence might be resolved. There are many obstacles for developing better data:

• Methodological issues regarding how different data sets and prior information might be used to credibly answer the complex causal questions of interest.

• Survey sampling issues, including how to design surveys to effectively obtain information on rare outcomes, geographical aggregation, sample nonrepresentativeness, uncertain accuracy of self- and informant reports, lack of standardization in data elements, and uncertain reliability of cause-of-injury and fatality codes.

• Legal and political barriers that may make collecting important data difficult if not impossible. For example, the 1986 Firearms Owners Protection Act (the McClure-Volkmer Act) forbids the federal government from establishing any "system of registration of firearms, firearm owners, or firearms transactions or distribution."

All of these issues should be carefully considered before new data collection efforts are proposed or undertaken. The proliferation of firearm data sources, without basic efforts to evaluate their validity and reliability, to determine the possibility for linkages across data sets, and most importantly to assess exactly which questions can be addressed with a particular data set, will not lead to better policy research and violence prevention.

Thus, the committee urges that work be started to think carefully about the prospects for developing data to answer specific policy questions of interest. The design for collecting data and the analysis of that data should be selected in light of the particular research question. For example, what data are needed to support research on a causal model of the relation

Copyright © National Academy of Sciences. All rights reserved.

Firearms and Violence: A Critical Review
https://www.nap.edu/catalog/10881.html

between gun ownership or availability and suicide? Building such a model would presumably involve estimating the probability that an individual commits suicide conditional on gun ownership (or availability in some sense). What data are needed to do this? What data are needed to estimate the effects of policy interventions on the probability of suicide or on the substitution of other means of suicide for guns? What other prior information is relevant? What covariates should be included? Are data on them currently available? Do data on covariates exist in a form that could be combined with gun ownership or availability data? Is it necessary to construct a new data set that includes both ownership or availability data and the covariates?

If one is interested in answering the question of whether adolescents with a gun in the home are more likely to successfully commit suicide than adolescents who do not have a gun in their home, then home-level data on gun possession and adolescent suicide are needed rather than aggregate data concerning the numbers of guns in circulation. This type of information could be used to address the basic question of what proportion of the adolescents with a gun in their home eventually commit suicide with a gun. Answering causal questions about firearms and suicide may require additional information.

The same questions can be asked about the probability of committing a violent crime with a gun conditional on ownership or availability. Similarly, what data are needed to support improved research on firearms markets and how criminals or suicide victims obtain firearms? How, if at all, would improvements in trace data be used in studies of the effects of policy interventions on firearms markets or any other policy issue? What would the desired improvements contribute to research on policy interventions for reducing firearms violence? How can trace data be used, considering the deficiencies of these data?

Ultimately, linking the research and data questions will help define the data that are needed. For example, attempting to answer the seemingly basic research question, "How many times each year do civilians use firearms defensively?" by using samples of data collected from crimes reported to the police is a mismatch between the data source and the research question. These surveys cannot reveal successful forms of resistance that are not reported to the police.

This effort to think carefully about the data needed to answer some of the basic research questions should take place in collaboration with survey statisticians, social scientists, public health researchers, and representatives from the Bureau of Justice Statistics, the National Institute of Justice, the Centers for Disease Control and Prevention, the Bureau of Alcohol, Tobacco, and Firearms, and others. The research program should assess data limitations of the existing and proposed data sets, regularly report the results of that research both in the scientific literature and in forums acces-

Copyright © National Academy of Sciences. All rights reserved.

Firearms and Violence: A Critical Review

https://www.nap.edu/catalog/10881.html

sible to data users, and propose modifications to the data sources when needed.

Careful attention should be paid to ownership, and use data. As we demonstrate repeatedly in this report, the lack of credible data on gun ownership and limited understanding of the relationship between ownership and violence are among the most critical data barriers to better understanding firearm-related violence. **Thus, the committee recommends a research effort to identify ways in which firearms acquisition, ownership, and use data can be accurately collected with minimal risk to legitimate privacy concerns.**

A starting point is to assess the potential of ongoing surveys. For example, efforts should be undertaken to assess whether tracing a larger fraction of guns used in crimes, longitudinal data from the Monitoring The Future survey, or enhancement of items pertaining to gun ownership in ongoing national surveys may provide useful research data.

To do this, researchers need access to the data. **Thus, the committee recommends that appropriate access for research purposes be given to the Monitoring The Future survey, as well as to the data maintained by regulatory and law enforcement agencies, including the trace data maintained by BATF, registration data maintained by the FBI and state agencies, and manufacturing and sales data.**[13] These data may or may not be useful for understanding firearms markets and the role of firearms in crime and violence. However, without access to these systems, researchers are unable to assess their potential for providing insight into some of the most important firearms policy and other research questions. We realize that many have deeply held concerns about expanding the government's knowledge of who owns what type of guns and how they are used. We also recognize the argument that some may refuse to supply such information, especially those who are most at risk to use guns illegally. More generally, we recognize that data on firearms ownership and violence have been the subject of great controversy. Nevertheless, there is a long established tradition of making sensitive data available to researchers. **In light of these well-founded concerns, the committee strongly recommends that special care be taken to ensure the integrity of the data collection and dissemination process.** Concerns over security and privacy must be addressed in the granting of greater access to the existing data and in creating new data on acquisition, ownership, and use.

---

[13]Current law prohibits the FBI from retaining data from background checks. If these data were retained and provided in an individually identifiable form for research purposes, they might provide useful information on firearms markets and measures of known gun owners nationally. To determine the properties of these data, the FBI would need to retain the records and researchers would need access to test their utility for informing policy.

Copyright © National Academy of Sciences. All rights reserved.

# 3

# Patterns of Firearm-Related Violence

I n any given year, firearms accounted for over half of all known suicides, two-thirds of all reported homicides,[1] and less than 1 percent of known accidental fatalities. But firearms do not always cause injury and death. In fact, the vast majority of firearms uses do not result in personal injury and are highly valued by many citizens. Any effort to assess the overall costs and benefits of firearms needs to address the prevalence of the different circumstances in which firearms are used and not just focus on those uses that result in death or injury.

This chapter begins by placing firearm deaths in the United States in the context of how they compare with other countries and how firearm-related deaths in the United States compare to other causes of death. We then turn to data on the availability and ownership of firearms in the United States. Subsequent sections present some basic facts about firearms involvement in violent crime, self-harm and suicide, and unintentional injury in the United States.[2] Because homicides and suicides are not randomly distributed in the population, we describe the variations in these behaviors by gender and race. These variations further demonstrate the need for refined studies and explanations of the role of firearms in violence.

---

[1]We use the term *homicide* for the phrase *criminal homicide*. Criminal homicide is defined as the willful killing of one human being by another and the killing of another person through gross negligence (excluding traffic fatalities).

[2]In Chapter 2 we discussed the strength and weaknesses of some of the data systems we use to describe the patterns of firearm violence. For now we attempt to carefully use the data and to not overinterpret them, without reconsidering the strengths and weaknesses of the data.

Copyright © National Academy of Sciences. All rights reserved.

Firearms and Violence: A Critical Review
http://www.nap.edu/catalog/10881.html

## HOMICIDE RATES BY COUNTRY

Using international crime data the committee has attempted to compare per capita homicide rates and rates of firearm homicides in the United States with those in other countries. While we recognize that the measurement of these events is not entirely consistent, these data do provide rough but useful comparisons.

### International Comparisons

Table 3-1 displays the data on homicides, firearm-related homicides, and firearm availability for 36 countries. Krug et al. (1998) collected these data by surveying ministries of health or national statistical centers in each of these countries. Review of these data indicate that while the United States does not have the highest rate of homicide or firearm-related homicide, it does have the highest rates for these among industrialized democracies. Homicide rates in the United States are two to four times higher than they are in countries that are economically and politically similar to it. Higher rates are found in developing countries and those with political instability. The same is true for firearm-related homicides, but the differences are even greater. The firearm-related homicide rate in the United States is more like that of Argentina, Mexico, and Northern Ireland than England or Canada. While certainly not the highest homicide or firearm-related homicide rate in the world, these rates in the United States are in the upper quartile in each case.

Some researchers have used data like those summarized above to assess the relationship between firearm-related homicides and firearms availability. For the most part this research focuses on industrialized nations and uses various proxies for the measure of firearms availability. While the vast majority of these studies conclude that homicides and availability are closely associated (Lester, 1990; Killias, 1993a, 1993b; Hemenway and Miller, 2000), the methodological problems in this research (measurement of key variables is of questionable validity, the use of nation-states as the unit of analysis may mask subnational variability, and models tested are poorly specified) do not encourage us to place much weight on this research. However, as noted earlier, the level of nongun homicide is much higher in the United States than it is in other countries. A high level of violence may be a cause of a high level of firearms availability instead of the other way around. Further work with better measures and more complete samples might be useful; for now this literature can be considered suggestive but not conclusive.

Copyright © National Academy of Sciences. All rights reserved.

*PATTERNS OF FIREARM-RELATED VIOLENCE* 55

**TABLE 3-1** International Firearms Homicide and Suicide Rates

| Country | Year | Total Homicides (per 100,000) | Firearm Homicides (per 100,000) | Total Suicides (per 100,000) | Firearm Suicides (per 100,000) | Percentage Households with Firearms |
|---|---|---|---|---|---|---|
| Estonia | 1994 | 28.21 | 8.07 | 40.95 | 3.13 | 9 (UN) |
| Brazil | 1993 | 19.04 | 10.58 | 3.46 | .73 | 4.35 (UN) |
| Mexico | 1994 | 17.58 | 9.88 | 2.89 | .91 | N/A |
| United States | 1993 | 9.93 | 7.07 | 12.06 | 6.3 | 39 |
| Northern Ireland | 1994 | 6.09 | 5.24 | 8.41 | 1.34 | 8.4 (1989) |
| Argentina | 1994 | 4.51 | 2.11 | 6.71 | 2.89 | 3 |
| Hungary | 1994 | 3.53 | .23 | 35.38 | .88 | N/A |
| Finland | 1994 | 3.24 | .86 | 27.26 | 5.78 | 25.2 (1992) |
| Portugal | 1994 | 2.98 | 1.28 | 14.83 | 1.28 | N/A |
| Mauritius | 1993 | 2.35 | .00 | 12.98 | .09 | N/A |
| Israel | 1993 | 2.32 | .72 | 7.05 | 1.84 | N/A |
| Italy | 1992 | 2.25 | 1.66 | 12.65 | 1.11 | 16 |
| Scotland | 1994 | 2.24 | .19 | 12.16 | .33 | 4.7 (1989) |
| Canada | 1992 | 2.16 | .76 | 13.19 | 3.72 | 24.2 (1992) |
| Slovenia | 1994 | 2.01 | .35 | 31.16 | 2.51 | N/A |
| Australia | 1994 | 1.79 | .44 | 12.65 | 2.35 | 15.1 (1992) |
| Taiwan | 1994 | 1.78 | .15 | 6.88 | .12 | N/A |
| South Korea | 1994 | 1.62 | .04 | 9.48 | .02 | N/A |
| New Zealand | 1993 | 1.47 | .17 | 12.81 | 2.14 | 22.3 (1992) |
| Belgium | 1990 | 1.41 | .60 | 19.04 | 2.56 | 16.5 (1992) |
| Switzerland | 1994 | 1.32 | .58 | 21.28 | 5.61 | 27.2 (1989) |
| Sweden | 1993 | 1.30 | .18 | 15.75 | 2.09 | 15.1 (1992) |
| Hong Kong | 1993 | 1.23 | .12 | 10.29 | .07 | N/A |
| Denmark | 1993 | 1.21 | .23 | 22.33 | 2.25 | N/A |
| Austria | 1994 | 1.17 | .42 | 12.12 | 4.06 | 18-20 (1996) |
| Germany | 1994 | 1.17 | .22 | 15.64 | 1.17 | 8.9 (1989) |
| Singapore | 1994 | 1.17 | .07 | 14.06 | .17 | N/A |
| Greece | 1994 | 1.14 | .59 | 3.4 | .84 | .03 (UN) |
| France | 1994 | 1.12 | .44 | 20.79 | 5.14 | 22.6 (1989) |
| Netherlands | 1994 | 1.11 | .36 | 10.03 | .31 | 1.9 (1992) |
| Kuwait | 1995 | 1.01 | .36 | 1.66 | .06 | N/A |
| Norway | 1993 | .97 | .30 | 13.64 | 3.95 | 32. (1989) |
| Spain | 1993 | .95 | .21 | 7.77 | .43 | 13.1 (1989) |
| Ireland | 1991 | .62 | .03 | 9.81 | .94 | N/A |
| Japan | 1994 | .62 | .02 | 16.72 | .04 | .57 (UN) |
| England and Wales | 1992 | .55 | .07 | 7.68 | .33 | 4.4 |

SOURCES: Krug et al. (1998); United Nations (2000).

Copyright © National Academy of Sciences. All rights reserved.

Firearms and Violence: A Critical Review
http://www.nap.edu/catalog/10881.html

## U.S. Rates

Across the population as a whole, neither homicide nor suicide is one of the 10 leading causes of death in the United States. However, for 15- to 24-year-olds, homicide is the second leading cause of death, and suicide is the third. The rankings are reversed for 25- to 34-year-olds. Considering these data by race, homicide is the leading cause of death for blacks ages 15 to 24 and 25 to 34. And it is the sixth leading cause of death for blacks at all ages.

## FIREARM AVAILABILITY AND OWNERSHIP

To understand the relationship between gun violence and gun availability, it is important to have accurate information about gun ownership. How many firearms are there in the United States? How many households own firearms? How many handguns are there in the United States?

Because most states do not require registration or licensing of firearms and therefore have incomplete record-keeping, inaccessible data, and unobserved levels of illegal firearm ownership (Azrael et al., 2004), most firearm research must make use of alternative measures. The two principal methods for directly measuring the U.S. civilian stock of guns are (1) production-based estimates calculated from domestic manufacturing, export, and import data and (2) nationally representative surveys that ask respondents about gun ownership (Kleck, 1997).

Scholars have also used a varied list of indirect measures or proxies to measure firearms availability and ownership patterns, including the percentage of suicides or homicides committed with a firearm, the fatal firearm accident rate, gun magazine subscription rates, the National Rifle Association membership rate, the hunting license rate, and the number of federal firearm licenses (Miller et al., 2002; Azrael et al., 2004; Duggan, 2001; Corzine et al., 2000; Kleck, 1997). While all of these measures shed light on the relationship between gun ownership and violence, they also all suffer from measurement errors that are difficult to estimate.[3] In Chapter 2, the committee recommends a program of research to improve the ability to measure gun ownership. For this section we use production and sales data to give the reader a rough idea of gun ownership in the United States.

### Production-Based Estimates

Firearm production statistics are derived from reports of firearms manufacture, import, and export made to the Bureau of Alcohol, Tobacco, and Firearms. Estimates of firearm availability are derived by adding the net growth in the number of firearms (manufactures plus imports minus ex-

---

[3]For a thorough discussion of the limitations of these measures, see Chapter 7.

Copyright © National Academy of Sciences. All rights reserved.

**TABLE 3-2** Estimated Number and Per Capita Ownership (rate per 1,000) of Firearms in the United States, 1950 to 1999

| Year | Total Firearms | Handguns | Firearms per 1,000 Persons | Handguns per 1,000 Persons |
|------|---------------|----------|---------------------------|---------------------------|
| 1950 | 57,902,081 | 14,083,195 | 381.3 | 93.5 |
| 1960 | 77,501,065 | 18,951,219 | 430.6 | 105.4 |
| 1970 | 111,917,733 | 31,244,813 | 548.7 | 153.2 |
| 1980 | 167,681,587 | 51,707,269 | 737.9 | 227.5 |
| 1990 | 212,823,547 | 72,499,181 | 853.3 | 290.7 |
| 1999 | 258,322,465 | 93,742,357 | 925.8 | 336.0 |

SOURCES: Data for 1950 to 1990 are from Kleck (1997: Table 3.1). The 1999 estimate was derived by adding the annual net increase in the stock of total firearms and handguns (manufactures + imports – exports) to the 1990 estimate using data from U.S. Bureau of Alcohol, Tobacco, and Firearms (2002: Exhibits 1, 2, and 3).

ports) to a base measure of the firearms stock.[4] Table 3-2 presents production-based estimates of the size of the civilian firearms stock based on a cumulated total since 1999. As the table shows, in 1999 there were more than 258 million firearms in the United States, 36 percent of them handguns. For every 1,000 people in the United States in 1999 there were nearly 926 firearms, 336 of which were handguns.

From 1950 to 1999, the per capita rate of overall firearms availability increased 143 percent, while handguns alone increased 259 percent. These data suggest that in recent years the rate of increase has slowed: the annual number of new handguns introduced to market has declined since 1994, while annual introduction of other firearms has remained relatively stable.

#### Survey-Based Estimates

Although production-based estimates indicate a 25 percent increase in firearms availability since 1980, survey-based estimates indicate an 11 to 33 percent decrease in households reporting ownership. Three often-used surveys are the General Social Survey (GSS), the Gallup Poll, and the Harris Poll.[5] According to these surveys, the percentage of respondents reporting

---

[4]Production-based data have limitations in that they account for neither additions to the stock from illegal or other uncounted means nor losses from seized, lost, or nonworking firearms. These data also exclude firearms manufactured or exported for the military but include firearms purchased by domestic law enforcement agencies.

[5]Each survey asks a similar question about gun ownership. Gallup asks "Do you have a gun in your home?" Harris asks "Do you happen to have in your home or garage any guns or revolvers?" and the GSS asks "Do you happen to have in your home (or garage) any guns or revolvers?"

Copyright © National Academy of Sciences. All rights reserved.

Firearms and Violence: A Critical Review
https://www.nap.edu/catalog/10881.html

that they have a firearm in the home has been declining since the late 1950s. While the estimates vary from year to year, all three surveys indicate a decline in the percentage of households possessing firearms. From 1980, when the percentage of households owning a firearm was between 45 and 48 percent, ownership has decreased by 5 to 16 percentage points to a prevalence of 30 to 43 percent. In discussion with the committee, Cook has suggested that the decline in ownership per household while individual ownership remains constant may be due to the increase in female-headed households during this period. Despite these overall reductions in household ownership, the relative distribution of firearm ownership across attributes of gender, race, age, education, income, and region has been remarkably consistent over time (Maguire and Pastore, 2002: Table 2.70).

Of households owning a firearm, between 59 and 62 percent reported owning a handgun (Maguire and Pastore, 2002: Tables 2.69, 2.71, and 2.72). All three surveys indicate that gun owners are more likely to be male, white, and middle-aged or older. Furthermore, gun ownership was higher among those who live in the South, had less education than a college degree, and had a higher than average income. Among respondents reporting household gun ownership, the percentage of blacks reporting handgun ownership was 6 to 9 percent higher than for whites, and the percentage of blacks reporting long gun ownership was 11 to 29 percent lower than for whites (Maguire and Pastore, 2002: Tables 2.71 and 2.72).

### Aggregation of Individual Survey Responses

Recent research has aggregated the individual survey responses about firearms ownership across U.S. communities (Baumer et al., 2002; Rosenfeld et al., 2001). The GSS is based on a national area probability sample composed of 100 primary sampling units (PSUs) (in the 1990 sampling frame) designed to represent the population of people age 18 and older in the United States. Each PSU is a "self-representing" geographic unit, in the sense that the respondents are representative of the PSU adult population.

Aggregating the individual survey responses to the PSU level permits comparisons of the aggregated items, including firearms ownership, across a representative sample of U.S. geographic areas. Figure 3-1 shows the geographic distribution of household firearm ownership for the 100 PSUs in the 1990 GSS sampling frame, covering the period 1993 to 1998.

The figure shows substantial variability in firearm ownership in the United States. The prevalence of household ownership varies from roughly 10 to 80 percent. Most of the PSUs cluster around the mean ownership level of 43 percent, with fewer PSUs located near the extremes of the distribution.

Copyright © National Academy of Sciences. All rights reserved.

Firearms and Violence: A Critical Review
https://www.nap.edu/catalog/10881.html



**FIGURE 3-1** Distribution of firearms ownership across geographic regions, 1993-1998 (N = 100).
SOURCES: Baumer et al. (2002); Rosenfeld et al. (2001).

## FIREARM-RELATED HARM

The majority of firearm-related deaths are the result of murder and suicide, while the majority of nonfatal firearm-related injuries are the result of assaults and accidents. Firearm-related deaths constitute the majority of all homicides and suicides, but firearm-related injuries represent only a minority of nonfatal injuries.[6]

Table 3-3 shows overall and firearm-related deaths by intent based on National Vital Statistics System (NVSS) data. In 1999, there were 28,874 firearm-related reported deaths in the United States. Suicide and homicide accounted for the majority of these fatalities, representing 57 and 37 percent of total firearm-related deaths, respectively. Furthermore, firearm-

---

[6]In this section we use data from the National Vital Statistics System, the National Crime Victimization Survey, the Uniform Crime Reports, and the National Electronic Injury Surveillance System.

Copyright © National Academy of Sciences. All rights reserved.

Firearms and Violence: A Critical Review
http://www.nap.edu/catalog/10881.html

**TABLE 3-3** Overall Firearm-Related Deaths, 1999

| Category | Firearm-Related | | Total | | % Firearm-Related |
|---|---|---|---|---|---|
| | Number | Rate [a] | Number | Rate [a] | Percent |
| Suicide | 16,599 | 6.09 | 29,199 | 10.71 | 56.85 |
| Homicide | 10,828 | 3.97 | 16,899 | 6.19 | 64.07 |
| Accident | 824 | 0.30 | 97,860 | 35.89 | 0.84 |
| Legal intervention | 299 | 0.11 | 398 | 0.15 | 75.13 |
| Total | 28,874 | 10.59 | 148,286 | 54.30 | 19.47 |

[a]Rate per 100,000 population

SOURCE: National Vital Statistics System data compiled using Web-based Injury Statistics Query and Reporting System (WISQARS). National Center for Health Statistics (2002).

**TABLE 3-4** Number and Rate (per 100,000) of Overall and Firearm-Related Nonfatal Injuries by Intent, 2000

| | Firearm-Related | | Total | |
|---|---|---|---|---|
| | Number | Rate | Number | Rate |
| Assault | 48,570 | 17.64 | 1,672,117 | 607.37 |
| Legal intervention | 862 | 0.31 | 63,304 | 22.99 |
| Suicide attempt | 3016 | 1.10 | 264,108 | 95.93 |
| Accident | 23,237 | 8.44 | 27,550,181 | 10,007.10 |
| Total | 75,685 | 27.49 | 29,549,710 | 10,733.39 |

SOURCE: NEISS data compiled using WISQARS (National Center for Health Statistics, 2002).

related deaths accounted for the majority of the total number of deaths in each category except accidents. In that case, firearm-related deaths accounted for a tiny fraction of all deaths by accidental means.

Table 3-4 shows overall and firearm-related nonfatal injuries by intent based on National Electronic Injury Surveillance System (NEISS) data. In 2000, there were 75,685 nonfatal firearm-related injuries in the United States. Injuries from violent assault and accidents accounted for the majority of all firearm injuries—64 and 31 percent, respectively. In contrast to completed suicides, firearms account for a small proportion of self-inflicted nonfatal injuries.

How much violent crime involves the use of a firearm?[7] This question can be answered with varying degrees of certainty, depending on the crime and the data source consulted. In general, data on homicide are the

---

[7]By definition, firearm involvement in violent crime includes not only the discharge of a firearm but also the presence of a firearm during the commission of a violent crime.

Copyright © National Academy of Sciences. All rights reserved.

Firearms and Violence: A Critical Review
https://www.nap.edu/catalog/10881.html

most reliably reported and provide greater detail about the circumstances of the offense. Of crimes known to police in 2000, the most recent year for which Uniform Crime Reports (UCR) data are available, firearms were involved in 66 percent of the 15,517 murders, 41 percent of the 406,842 robberies, and 18 percent of the 910,744 aggravated assaults. Data from the National Crime Victimization Survey (NCVS) for 2000 indicate about 3 percent of the 260,950 rapes or sexual assaults involved the use of a firearm, although this estimate is based on 10 or fewer sample cases (Rennison, 2001).

## Firearms and Homicide

### *Weaponry in Homicide*

According to the UCR, 10,179 murders were committed with firearms in the United States in 2000, corresponding to a rate of 3.6 per 100,000.[8] This count is down from a historic high in 1993 of 17,046 firearm-related murders (6.6 per 100,000). Handguns were used to commit 52 percent of all homicides, and firearms of any kind were used to commit 66 percent of all homicides in that year; 14 percent were committed with knives or other cutting implements, and 7 percent were achieved with hands, feet, or other "personal weapons."

Trends in weapon-specific homicide rates from 1976 to 2000 are shown in Figure 3-2. Handgun homicides rose until 1993 and then fell, tracking closely the overall homicide rate, while the rates for other firearms, knives, and other weapons fell steadily and closely track each other. Thus, handgun homicides accounted for virtually all of the increase in the overall homicide rate between 1985 and 1993, the year the handgun homicide rate reached its 25-year peak of 5.4 per 100,000 (an estimated 14,005 handgun homicides).

The likely use of firearms varies dramatically from one type of homicide to another. For example, in the year 2000, about 17 percent of homicides were known to have occurred during the commission of other crimes; among these, 73 percent of robbery-related homicides were committed with a firearm, but only 9 percent of rape-related homicides were committed with a firearm.

---

[8]These UCR statistics differ slightly from those presented in Table 3-3. Since the UCR collects data from police sources and the NVSS from medical examiner records, the disparity between the two systems arises because of data collection differences. Despite these differences, the systems are highly concordant in their estimates of firearm-related murder. Here we present UCR-Supplemental Homicide Report data because they provide information about offenders, weaponry, and circumstances surrounding the offense—information not found in the NVSS.

Copyright © National Academy of Sciences. All rights reserved.

*62* *FIREARMS AND VIOLENCE*



**FIGURE 3-2** Murder rates by weapon type.
SOURCES: Fox (2001); U.S. Department of Justice (2001); U.S. Census Bureau (2001a, 2001b, 2002).

*Victims*

Males are more likely to be victims of homicide than females, and they are even more likely to be killed by firearms. In 1999, male victims accounted for 83 percent of firearm-related homicides and 64 percent of other homicides.[9] The male firearm-related homicide victimization rate was 6.71 deaths per 100,000, compared with a female rate of 1.35 (Bureau of Justice Statistics, 2002a, 2002b). From 1981 to 1999, trends in firearm-related homicides of males seem to explain much of the trends in the total homicide rate.

Young adults and adolescents are disproportionately victimized by firearm-related homicide. The rise and decline of the firearm-related homicide rate beginning in the mid-1980s was largely confined to the young adult and adolescent males (Wintemute, 2000). From 1981 to 1999, 20- to 24-year-olds were most likely to be victims of homicide, especially by firearms, but victimization rates among 15- to 19-year-olds rose and fell more dra-

---

[9]SHR data for 1999 are nearly identical for male involvement in firearm- and nonfirearm-related murder at 83 and 62 percent, respectively (calculated from Fox, 2001).

Copyright © National Academy of Sciences. All rights reserved.

Firearms and Violence: A Critical Review
http://www.nap.edu/catalog/10881.html



**FIGURE 3-3** Firearm-related murder victimization rates by race, 1981-1999.
SOURCE: National Vital Statistics System data compiled using Web-based Injury
Statistics Query and Reporting System (WISQARS). National Center for Health
Statistics (2002).

matically than other age groups between 1985 and 1999. Adolescent vic-
timization rates surpassed the rates for those 25 and older by 1990 and did
not fall back below the rate for persons in their late 20s until 1998.

Blacks have been at high risk of victimization by firearm-related homi-
cide. Figure 3-3 indicates that in 1999, for example, non-Hispanic blacks
accounted for 51 percent of the firearm-related homicide victims, while
representing only 13 percent of the total population (Bureau of Justice
Statistics, 2002a). The firearm-related homicide victimization rate was
16.64 per 100,000 for non-Hispanic blacks, 6.19 for Hispanics, 1.53 for
non-Hispanic whites, and 2.60 for other races. Blacks were also dispropor-
tionately affected by the rise and fall of firearm homicides in the 1980s and
1990s.[10]

---

[10]Race is presented in the figure regardless of Hispanic ethnicity, since Hispanic ethnicity is
not available in the Web-based Injury Statistics Query and Reporting System (WISQARS)
prior to 1990.

Copyright © National Academy of Sciences. All rights reserved.

*Offenders*

Young males are an even larger percentage of firearm-related homicide offenders than homicide victims. For example, cumulative data from the FBI's Supplementary Homicide Reports (SHR) for the years 1976 to 1999 reveal that males committed 90 percent of all firearm-related homicides (Bureau of Justice Statistics, 2002a). In 1999, 56 percent of the 10,969 offenders who used firearms to commit murder were between 14 and 24 years old. The rate of handgun murders by persons under age 18 nearly quadrupled from 1985 to 1993, and rates for 18- to 24-year-olds more than doubled, while homicides by persons over 24 declined steadily from 1985 on. The highest concentrations of recent involvement in handgun homicides have been among young blacks; the homicide offense rate among blacks ages 18 to 24 tripled between 1984 and 1993, while the combined offense rates for young whites and Hispanics did not begin to increase until 1987 and even then accounted for a relatively small proportion of the subsequent rise and fall in the handgun homicide rate (Blumstein, 2000).

Historically, firearm homicide rates have been higher than the national average in the southern states, about average in the mid-Atlantic and north central regions, and below average in the New England, mountain, and west north central states (Bureau of Justice Statistics, 2002a). Larger cities (more than 100,000) have had higher homicide and firearm homicide rates than smaller cities, towns, or rural areas.

## Firearms and Nonfatal Injuries

*Aggravated Assault*

Assaults are the most common type of nonfatal firearm injury in the United States, but firearms are not the most common method of nonfatal assault. Figure 3-4 shows trends in the rates of aggravated assault by firearm involvement. According to the UCR, the aggravated assault rate more than quadrupled from 1964 to 1992 and has been declining just as steeply since then.[11] Nonfirearm-related assaults accounted for 72 percent of the overall rise from 1964 to 1992 and 57 percent of the overall decline from 1992 to 2000; firearms were involved in only 18 percent of assaults in 2000; and assaults using blunt objects constituted the largest share of offenses.

---

[11]Recent trends in aggravated assault rates have dropped much more dramatically between 1993 and 2000 according to the NCVS than the UCR—53 versus 27 percent, respectively (Maguire and Pastore, 2002: Table 3.120; Rennison, 2001: Table 8).

Copyright © National Academy of Sciences. All rights reserved.

Firearms and Violence: A Critical Review
http://www.nap.edu/catalog/10881.html



**FIGURE 3-4** Rates of aggravated assault by firearm involvement.
SOURCES: Calculated from Zawitz (2001); Maguire and Pastore (2002).

### Robberies

In 2000, the NCVS and the UCR provided similar estimates for 157,623 firearm-related robberies in the United States—157,623 (NCVS) and 166,807 (UCR)—remarkably consistent estimates given the methodological and coverage differences between the two data sources. For all weapon categories besides firearms the NCVS reports higher estimates than the UCR. The close correspondence on firearms therefore suggests that most firearm-related robberies are reported to the police. The NCVS data indicate that 90 percent of firearm-related robberies in 2000 were committed with a handgun.

Figure 3-5 presents rates of robbery stratified by firearm involvement for the years 1974 to 2000. The robbery rate rose and fell several times before reaching its peak of 271.9 per 100,000 in 1991; the rate then decreased by nearly half to 144.6 per 100,000 in 2000. Firearms robberies accounted for 24 percent of the rise from 1974 to 1991 and 39 percent of the decline from 1991 to 2000. Like the trends for aggravated assault and in contrast to the trends for murder, the robbery rate was not much influenced by the rates of offenses committed with firearms.

Copyright © National Academy of Sciences. All rights reserved.

Firearms and Violence: A Critical Review
https://www.nap.edu/catalog/10881.html



**FIGURE 3-5** Rates of robbery by firearm involvement.
SOURCES: Calculated from Zawitz (2001); Maguire and Pastore (2002: Table 3.120); U.S. Census Bureau (2001a, 2001b, 2002).

*Rape and Sexual Assaults*

According to the NCVS, 84 percent of the rapes and sexual assaults reported in 2000 were committed without a weapon. There were an estimated 6,550 firearm-related rapes or sexual assaults in 2000; these constituted less than 3 percent of NCVS-reported rapes.

## Firearms and Self-Harm

Historically, the number of successful suicides in the United States has far exceeded the number of homicides. In 1999, the number of suicides was nearly double the number of murders. In contrast, nonfatal injuries resulting from suicide attempts are much less common than injuries caused by violent assaults, regardless of weapons used. In this section, we describe the patterns and trends for death and nonlethal injuries resulting from self-inflicted, firearm-related harm.

*Suicide*

In 1999, there were 29,199 suicides in the United States—57 percent of them involving the use of a firearm. Males of all ages are at higher risk of

Copyright © National Academy of Sciences. All rights reserved.

suicide; in 1999, males committed 14,479 (87 percent) of firearm-related suicides. Whites are at higher risk of suicide than blacks, but the suicide rate for young black males has been rising and by 1999 was nearly the same as the suicide rate for young white males. Figure 3-6 shows the number and rate of firearm-related suicides per 100,000 by five-year age groupings for 1999. As the figure shows, more firearm-related suicides were committed by those 35 to 39 years old than any other five-year age grouping, although those 80 to 84 years old committed suicide at the highest rate, 13.7 per 100,000.

The total suicide rate has remained relatively constant in the United States, but the proportion of suicides committed with a firearm increased steadily from the 1960s to the early 1990s before beginning a moderate decline. The age distribution of suicides over this period also changed, with a rise in suicide among the young and the old and a small decline among working-age adults. Figure 3-7 shows trends in the suicide rate



**FIGURE 3-6** Number and rate of firearm-related suicides, 1999.

Copyright © National Academy of Sciences. All rights reserved.

Firearms and Violence: A Critical Review
http://www.nap.edu/catalog/10881.html



**FIGURE 3-7** Suicide rates by firearm involvement.

stratified by firearm involvement from 1981 to 1999. Between 1986 and 1990, the firearm suicide rate plateaued at a rate of about 7.56 per 100,000; since then, firearm suicides have fallen by 18 percent to 6.19 per 100,000 in 1999.

Trends by race are presented in Figure 3-8. As the figure shows, whites have dominated the overall trend in firearm suicides. The firearm-related suicide rate for whites increased 9 percent from 1981 to a two-decade peak in 1990 before declining 19 percent over the past decade. For blacks, a similar pattern occurred, although the peak rate was in 1994. The rate for other races combined was relatively stable until 1994, then declined somewhat.

Trends by age are presented in Figure 3-9. Persons age 75 and older had the highest rates of firearm-related suicide during the previous two decades. The period from 1981 to 1990 saw the greatest change among this age group, increasing 48 percent to 16.37 per 100,000. Then, from 1990 to 1999, the firearm-related suicide rate for this age group decreased 21 percent to 13.05 per 100,000. Trends for

Copyright © National Academy of Sciences. All rights reserved.



**FIGURE 3-8** Suicide rates by race, 1981-1999.

persons ages 15 to 24 showed similar patterns, increasing until 1994, then declining to the present. By contrast, firearm-related suicide rates for those ages 25 to 74 have been declining steadily since the early 1980s. The rates for children ages 0 to 14 have remained relatively stable, increasing slightly from 1981 to 1990, then declining to the 1981 rate by 1999.

### Nonfatal Self-Harm

In 2000, there were only 3,016 nonfatal firearm-related injuries recorded by the NEISS—about 4 percent of all reported self-injuries. Because NEISS only records self-injury events that are screened in an emergency department, and because firearm injuries may be more likely to be treated in an emergency department than other kinds of self-injuries, the actual fraction of nonlethal self-injuries that occur by firearm is likely to be even lower. Furthermore, rates of nonfatal firearm-related injuries have been declining since 1993 (Gotsch et al., 2001).

Copyright © National Academy of Sciences. All rights reserved.

Firearms and Violence: A Critical Review
http://www.nap.edu/catalog/10881.html



**FIGURE 3-9** Firearm-related suicides by selected age groupings, 1981-1999.

## Firearms and Accidents

Firearm-related accidental deaths represent a small fraction of all firearm-related deaths, but unintentional injuries represent a sizable proportion of all nonfatal injuries resulting from firearms—behind only the number caused by violent assaults.

In 1999 there were 824 firearm-related accidental deaths—less than 1 percent of the 97,860 total accidental deaths for that year—corresponding to an accidental firearm-related death rate of 0.30 per 100,000.

Rates of firearm-related accidental deaths have been declining since the mid-1960s (Ikeda et al., 1997; Frattaroli et al., 2002). Since 1981, the firearm-related accidental death rate has declined 63 percent from 0.83 to 0.30 per 100,000. The male rate of firearm-related accidental deaths is much higher than the female rate. In 1999, males accounted for 88 percent of accidental firearm-related deaths; however, both males and females have contributed roughly proportionally to the declining trend. In 1999, the fatal

Copyright © National Academy of Sciences. All rights reserved.

Firearms and Violence: A Critical Review
http://www.nap.edu/catalog/10881.html

accident rate for blacks (0.47 per 100,000) was somewhat higher than the rate for whites (0.30 per 100,000). There are also substantial differences in trends in the rate firearm-related accidental deaths by age group. Although firearm-related accidental death rates have been on a downward trend for other age groups since the mid-1960s, rates for 15- to 24-year-olds rose from 1987 to 1993 and then declined.

Copyright © National Academy of Sciences. All rights reserved.

# 4

# Interventions Aimed at
# Illegal Firearm Acquisition

F irearms are bought and sold in markets, both formal and informal. To some observers this suggests that one method for reducing the burden of firearm injury is to intervene in these markets so as to make it more expensive, inconvenient, or legally risky to obtain firearms for criminal use. As guns become more expensive to acquire or hold, it is hypothesized that criminals will reduce the percentage of their criminal careers in which they are in possession of a gun. However, the pervasiveness of guns and the variety of legal and illegal means of acquiring them suggests the difficulty of keeping firearms from people barred by law from possessing them. The goals of this chapter are to provide a systematic analytic framework linking interventions to the outcomes of interest and to describe what is known about the effectiveness of those interventions. We also suggest a research agenda that addresses the major unanswered questions.

Market-based interventions intended to reduce criminal access to guns include taxes on weapons and ammunition, tougher regulation of federal firearm licensees, limits on the number of firearms that can be purchased in a given time period, gun bans, gun buy-backs, and enforcement of laws against illegal gun buyers or sellers. Other interventions that may have market effects—for example, storage requirements (such as trigger locks or the placement of firearms in secure containers) and mandating new technologies that personalize guns so only lawful owners can fire them—are dealt with in detail elsewhere in the report. While these new technologies may make new guns less attractive relative to older secondhand guns and thus reduce the attractiveness of guns in aggregate to offenders, the potential market effects are probably secondary to other mechanisms by which

72

Copyright © National Academy of Sciences. All rights reserved.

Firearms and Violence: A Critical Review
https://www.nap.edu/catalog/10881.html

these interventions may lower firearms injuries, such as preventing children from accidentally hurting themselves or others (see Chapter 8).

Little is known about the potential effectiveness of a market-based approach to reducing criminal access to firearms. Arguments for and against such an approach are based largely on speculation rather than research evidence. There is very little of an analytic or evaluative nature currently available in the literature on market interventions. Even on most descriptive topics (e.g., gun ownership patterns, types of guns used in crimes), there are only a few studies, often not well connected, that have been adequately summarized in existing papers (e.g., Braga et al., 2002; Hahn et al., 2005).

We begin with a brief discussion of legal and illegal firearms commerce, followed by a summary of what is known about the methods by which offenders acquire guns. We then present an analytic framework to understand the effects of specific interventions on gun markets. The next section reviews the literature evaluating various interventions. The final section presents the committee's views about high-priority research activities. The relationship of firearms acquisition and markets to suicide is quite different and is discussed in the chapter on suicide.

We note that the interventions discussed here may impose costs on legitimate users of firearms. A waiting period law inconveniences hunters and others who use firearms in legitimate fashion. In addition to delays, the system may generate errors, causing unnecessary embarrassment or worse. Some interventions putatively have no such effects and may even facilitate the activities of legitimate owners; for example, gun buy-backs can only help by providing another outlet for individuals wishing to dispose of existing weapons with minimal inconvenience. No research has explored these effects, although they may be important in forming attitudes toward gun control proposals.

## HOW OFFENDERS OBTAIN FIREARMS

### Legal and Illegal Firearms Commerce

In the United States, there are some 258 million privately owned firearms, including nearly 70 to 90 million handguns (Police Foundation, 1996; see also Table 3-2). Some 4.5 million new firearms, including about 2 million handguns (Bureau of Alcohol, Tobacco, and Firearms, 2000b) and about 2 million secondhand guns, are sold each year in the United States (Police Foundation, 1996). Legal firearms commerce consists of transactions made in the *primary* firearms market and in the largely unregulated *secondary* firearms market. Acquisitions (other than theft) of new and secondhand firearms from federal firearms licensees (FFLs), whether conducted properly or not, form the primary market for firearms (Cook et al.,

Copyright © National Academy of Sciences. All rights reserved.

Firearms and Violence: A Critical Review
https://www.nap.edu/catalog/10881.html

1995). Retail gun stores sell both new and secondhand firearms and, in this regard, resemble automobile sales lots. FFLs are required to ask for identification from all prospective gun buyers and to have them sign a form indicating that they are not prohibited from acquiring a firearm; the FFL must also initiate a criminal history background check of all would-be purchasers. FFLs are also required to maintain records of all firearms transactions, report multiple sales and stolen firearms to the Bureau of Alcohol, Tobacco, and Firearms (BATF), provide transaction records upon request to BATF; when they go out of business, they are required to transfer their records to BATF.

A privately owned gun can be transferred in a wide variety of ways not involving FFLs, such as through classified ads in newspapers, gun magazines, and at gun shows (which include both licensed and unlicensed dealers). Transfers of secondhand firearms by unlicensed individuals form the secondary market, for which federal law does not require transaction records or criminal background checks of prospective gun buyers (Cook et al., 1995). Using household survey data, Cook and Ludwig (1997) estimate that about 2 million transactions per year (30-40 percent of all gun transactions) occur in the secondary market. Primary and secondary firearms markets are closely linked because many buyers move from one to the other depending on relative prices and other terms of the transaction (Cook and Leitzel, 1996).

Since states vary greatly in their requirements on secondary firearms market transfers (see, e.g., Peters, 2000), another way to think about firearms commerce is to distinguish between regulated and unregulated transfers. In Massachusetts, for example, all firearms transfers must be reported to the state police, and secondary markets can be regulated through inspection of these transfer records (Massachusetts General Laws, Chapter 140). In neighboring New Hampshire, however, sales of guns by private citizens are not recorded, and even legitimate transfers in the secondary market cannot be monitored. In this report we use the primary/secondary distinction because it is standard, but regulation is probably the critical distinguishing feature.

Figure 4-1 presents a conceptual scheme of the flow of firearms to prohibited persons developed by Braga and his colleagues (2002). Through theft, firearms can be diverted to criminals and juveniles at any stage of commerce. Guns can be stolen from manufacturers, importers, distributors, licensed dealers, and private citizens. Cook et al. (1995) estimated that some 500,000 guns are stolen each year. This estimate, derived from National Crime Victimization Survey data for the years 1987 to 1992, suggests that 340,700 thefts occurred annually in which one or more guns were stolen; separate data from North Carolina suggest that on average 1.5 guns are stolen per theft (Cook et al., 1995). This figure is also consistent with a

Copyright © National Academy of Sciences. All rights reserved.

Firearms and Violence: A Critical Review
http://www.nap.edu/catalog/10881.html



**FIGURE 4-1** Firearms flows.
SOURCE: Braga et al. (2002).

similar estimate calculated for the Police Foundation (Cook and Ludwig, 1997), which used data from a telephone survey of a nationally representative sample of 2,568 adults in which those who were gun owners reported firearms theft and the number of firearms stolen per theft. Braga et al. (2002) also identify three broad mechanisms through which criminal consumers acquire firearms from licensees without theft: straw purchase, "lying and buying," and buying from a dealer who is willing to ignore regulations. A straw purchase occurs when the actual buyer, typically someone who is too young or otherwise proscribed, uses another person to execute the paperwork. Lying and buying refers to prohibited persons (e.g., felons and juveniles ) who purchase firearms directly by showing false identification and lying about their status. And in some cases the seller is knowingly

Copyright © National Academy of Sciences. All rights reserved.

Firearms and Violence: A Critical Review
https://www.nap.edu/catalog/10881.html

involved and may disguise the illegal transaction by falsifying the paper record of sale or reporting the guns as stolen.

The available research evidence suggests that gun-using criminals go through a number of guns during the course of their short careers. The population of active street criminals is characterized by brief careers (typically 5 to 10 years) and many interruptions through incarceration and injury (National Research Council, 1986). Each year a substantial fraction of current offenders are released from prison and may have to acquire new weapons in order to continue their criminal career; others will have just begun their careers and must obtain guns from somewhere. Survey research on criminally active populations suggests that gun offenders buy, steal, borrow, sell, and otherwise exchange guns quite frequently (Wright and Rossi, 1994; Sheley and Wright, 1993).

Young offenders have been noted as active in illegal markets both as sellers and buyers of guns through their informal networks of family, friends, and street sources. Using data from self-administered questionnaires completed by 835 male inmates in six correctional facilities in four states between November 1990 and February 1991, Sheley and Wright (1993) found that 86 percent of juvenile inmates had owned at least one firearm at some time in their lives, 51 percent reported having personally dealt with many guns before being incarcerated, and 70 percent felt that they could get a gun "with no trouble at all" upon release. Wright and Rossi (1994) found that 75 percent of incarcerated adult felons had owned at least one firearm at some time in their lives and, for those who did report ownership, the average number of guns owned prior to their current incarceration was approximately six. For incarcerated felons who reported stealing at least one gun, 90 percent also reported that they had sold or traded a stolen gun at least once in the past, and 37 percent had done so many times.

It is also important to recognize that guns have value in exchange as well as in use. Based on interviews with youth offenders, Cook and his colleagues (1995) suggest that guns were valuable commodities for youth to trade for services, money, drugs, or other items such as video games, VCRs, phones, and fax machines.

Guns are not costly when compared with other durable goods but may constitute a large asset in the portfolio of drug users or of youth. The retail prices of guns vary greatly based on the type, manufacturer, model, caliber, and age. For example, the suggested retail price of a new high-quality 9mm semiautomatic pistol is about $700, while a secondhand low-quality one can retail for as little as $50 (Fjestad, 2001). The proximate source of a gun can also influence its price for prohibited persons. Sheley and Wright's (1995) survey research suggests that juveniles paid less for guns acquired from informal and street sources than for guns acquired through normal retail outlets, such as gun stores and pawnshops: 61 percent of the juvenile

Copyright © National Academy of Sciences. All rights reserved.

Firearms and Violence: A Critical Review
http://www.nap.edu/catalog/10881.html

inmates and 73 percent of the high school students who acquired their guns from a retail outlet paid more than $100, while only 30 percent of the juvenile inmates and 17 percent of the high school students who acquired their most recent gun from an informal or street source paid more than $100 (Sheley and Wright, 1995:49). We do not know whether this is driven by differences in the quality of the guns purchased or in the costs of distribution in the two sectors.

## Gun Sources

There are three main types of evidence on the origins of guns for criminals and juveniles: survey research, BATF firearms trace data, and BATF firearms investigation data. Each provides different insights into the means by which offenders acquire firearms.

### Survey Research

A number of inmate surveys have documented the wide variety of sources of guns available to criminals and youth. Table 4-1 summarizes some of the basic findings from three of the most widely cited of these surveys. Precise patterns are sometimes difficult to discern because different definitions and questions are used to elicit similar information. Nevertheless, survey research has documented a wide variety of sources of guns and methods of firearm acquisition used by criminals and youth. Guns referenced in these surveys come from a variety of sources, including family members, friends, the black market, and direct theft.

Wright and Rossi's (1994) 1992 survey of 1,874 convicted felons serving time in 11 prisons in 10 states throughout the United States, for example, revealed a complex market of both formal and informal transactions, cash and noncash exchange, and new and used handguns. Felons reported acquiring a majority of their guns from nonretail, informal sources. Only 21 percent of the respondents obtained the handgun from a retail outlet, with other sources including family and friends (44 percent) and the street (that is, the black market), drug dealers, and fences (26 percent). Moreover, the majority of handguns were not purchased with cash. Of the surveyed felons, 43 percent acquired their most recent handgun through a cash purchase, while 32 percent stole their most recent handgun. The remainder acquired their most recent handgun by renting or borrowing it, as a gift, or through a trade. Finally, almost two-thirds of the most recent handguns acquired by felons were reported as used guns, and one-third were reported as new guns. Illicit firearms markets dealt primarily in secondhand guns and constituted largely an in-state, rather than out-of-state, market.

Copyright © National Academy of Sciences. All rights reserved.

**TABLE 4-1** Sources and Method of Handgun Acquisition by Criminals

| Study | Measure | Method of Firearm Acquisition as Reported by Prison Inmates | Source of Firearm as Reported by Prison Inmates |
|---|---|---|---|
| Bureau of Justice Statistics (1993) | Handgun possessed by inmate | 27% retail purchase<br>9% direct theft | 31% family/friends<br>28% black market/fence<br>27% retail outlet |
| Wright and Rossi (1994) | Most recent handgun—incarcerated felons | 43% cash purchase<br>32% direct theft<br>24% rent/borrow, trade, or gift<br>Estimated 40-70% directly or indirectly through theft | 44% family and friends<br>26% black market/fence<br>21% retail outlet |
| Sheley and Wright (1993) | Most recent handgun—incarcerated juveniles | 32% straw purchase<br>12% theft | 90% from friend, family, street, drug dealer, drug addict, house or car |

Copyright © National Academy of Sciences. All rights reserved.

*INTERVENTIONS AIMED AT ILLEGAL FIREARM ACQUISITION*          *79*

Results from a 1991 Bureau of Justice Statistics (BJS) survey of some 2,280 handgun-using state prison inmates support Wright and Rossi's observation that the illicit firearms market exploited by criminals is heavily dominated by informal, off-the-record transactions, either with friends and family or with various street sources (Bureau of Justice Statistics, 1993). The 1991 survey found that only 27 percent of the inmates who used a handgun in crime that led to their incarceration reported they obtained the handgun by purchase from a retail outlet. In contrast to the Wright and Rossi (1994) findings, the BJS survey found that only 9 percent of inmates who used a handgun in a crime had stolen it. More recently, Decker and colleagues' (1997) analysis of arrestee interview data (i.e., the Arrestee Drug Abuse Monitoring Survey) revealed that 13 percent of arrestees admitted to having a stolen gun. Among juvenile males, one-quarter admitted to theft of a gun (Decker et al., 1997).

Sheley and Wright's (1993) survey of high school students and incarcerated juveniles suggested that informal sources of guns were even more important to juveniles.[1] More than 90 percent of incarcerated juveniles obtained their most recent handgun from a friend, a family member, the street, a drug dealer, or a drug addict, or by taking it from a house or car (Sheley and Wright, 1993:6). Sheley and Wright (1995) found that 12 percent of juvenile inmates had obtained their most recent handgun by theft and 32 percent of juvenile inmates had asked someone, typically a friend or family member, to purchase a gun for them in a gun shop, pawnshop, or other retail outlet. When juveniles sold or traded their guns, they generally did so within the same network from which they obtained them—family members, friends, and street sources (Sheley and Wright, 1995).

### BATF Firearms Trace Data

BATF firearms trace data, described in Chapter 3, have been used to document that firearms recovered by law enforcement have characteristics suggesting they were illegally diverted from legitimate firearms commerce to criminals and juveniles (see, e.g., Zimring, 1976; Kennedy et al., 1996; Wachtel, 1998; Cook and Braga, 2001). Trace data, reflecting firearms recovered by police and other law enforcement agencies, have revealed that a noteworthy proportion of guns had a "time to crime" (the length of time from the first retail sale to recovery by the police) of a few months or a few years. For example, Cook and Braga (2001) report that 32 percent of traceable handguns recovered in 38 cities participating in BATF's Youth

---

[1]In addition to the incarcerated juvenile sample described above, Sheley and Wright also surveyed 758 students enrolled at 10 high schools in 5 large cities that were proximate to the juvenile correctional facilities they surveyed between 1990 and 1991.

Copyright © National Academy of Sciences. All rights reserved.

Firearms and Violence: A Critical Review
https://www.nap.edu/catalog/10881.html

Crime Gun Interdiction Initiative (YCGII) were less than 3 years old. Cook and Braga (2001) also report that only 18 percent of these new guns were recovered in the possession of the first retail purchaser, suggesting that many of these guns were quickly diverted to criminal hands. Recovered crime guns are relatively new when compared with guns in public circulation. Pierce et al. (2001) found that guns manufactured between 1996 and 1998 represented about 14 percent of guns in private hands, but they accounted for 34 percent of traced crime guns recovered in 1999.

Wright and Rossi (1994) found that criminals typically use guns from within-state sources, whereas the 1999 YCGII trace reports suggest that the percentage of crime guns imported from out of state is closely linked to the stringency of local firearm controls. While 62 percent of traced YCGII firearms were first purchased from licensed dealers in the state in which the guns were recovered (Bureau of Alcohol, Tobacco, and Firearms, 2000c), this fraction was appreciably lower in northeastern cities with tight control—for example, Boston, New York, and Jersey City—where less than half of the traceable firearms were sold at retail within the state. A noteworthy number of firearms originated from southern states with less restrictive legislation, for example, Virginia, North Carolina, Georgia, and Florida (Bureau of Alcohol, Tobacco, and Firearms, 2000c).

Moreover, by examining the time-to-crime of out-of-state handguns in the trace data, Cook and Braga (2001) concluded that the process by which such handguns reach criminals in these tight-control cities is not one of gradual diffusion moving with interstate migrants (as suggested by Blackman, 1997-1998, and Kleck, 1999); rather, the handguns that make it into these cities are imported directly after the out-of-state retail sale. In contrast, Birmingham (AL), Gary (IN), Houston (TX), Miami (FL), New Orleans (LA), and San Antonio (TX), had at least 80 percent of their firearms first sold at retail in the state in which the city was located (Bureau of Alcohol, Tobacco, and Firearms, 2000c). Kleck (1999) attempts to explain the interstate movement of crime guns by simply observing that, according to the U.S. Census Bureau, 9.4 percent of the United States population moved their residence across state lines between 1985 and 1990. These migration patterns, however, do not necessarily explain the big differences in import and export patterns across source and destination states as well as the overrepresentation of new guns that show up in tight-control cities from other loose-control states.

### BATF Investigation Data

While analyses of BATF trace data can document characteristics of crime guns that suggest illegal diversions from legitimate firearms commerce, trace data analyses cannot describe the illegal pathways through

Copyright © National Academy of Sciences. All rights reserved.

Firearms and Violence: A Critical Review
http://www.nap.edu/catalog/10881.html

**TABLE 4-2** Volume of Firearms Diverted Through Trafficking Channels

| Source | N(%) | Total Guns | Mean | Median |
|---|---|---|---|---|
| Firearms trafficked by straw purchaser or straw purchasing ring | 695 (47%) | 25,741 | 37.0 | 14 |
| Trafficking in firearms by unregulated private sellers[a] | 301 (20%) | 22,508 | 74.8 | 10 |
| Trafficking in firearms at gun shows and flea markets | 198 (13%) | 25,862 | 130.6 | 40 |
| Trafficking in firearms stolen from federal firearms licensees | 209 (14%) | 6,084 | 29.1 | 18 |
| Trafficking in firearms stolen from residence | 154 (10%) | 3,306 | 21.5 | 7 |
| Firearms trafficked by federal firearms licensees, including pawnbroker | 114 (8%) | 40,365 | 354.1 | 42 |
| Trafficking in firearms stolen from common carrier | 31 (2%) | 2,062 | 66.5 | 16 |

[a]As distinct from straw purchasers and other traffickers.

NOTE: N = 1,470 investigations. Since firearms may be trafficked along multiple channels, an investigation may be included in more than one category. This table excludes 60 investigations from the total pool of 1,530 in which the total number of trafficked firearms was unknown.

SOURCE: Adapted from Bureau of Alcohol, Tobacco, and Firearms (2000d).

which crime guns travel from legal commerce to its ultimate recovery by law enforcement. BATF also conducts numerous investigations both in the course of monitoring FFL and distributor compliance with regulations and following detection of gun trafficking offenses. Analyses of BATF firearms trafficking investigation data provide insights on the workings of illegal firearms markets (see, e.g., Moore, 1981; Wachtel, 1998). To date, the most representative look at firearms trafficking through a comprehensive review of investigation data was completed by BATF in 2000. This study examined all 1,530 investigations made between July 1996 and December 1998 by BATF special agents in all BATF field divisions in the United States[2] (Bureau of Alcohol, Tobacco, and Firearms, 2000d). They involved the diversion of more than 84,000 guns. As indicated in Table 4-2, the study revealed a variety of pathways through which guns were illegally diverted to criminals and juveniles.

_____

[2]This does not include simple Armed Career Criminal or Felon in Possession cases.

Copyright © National Academy of Sciences. All rights reserved.

Firearms and Violence: A Critical Review
https://www.nap.edu/catalog/10881.html

The BATF study found that 43 percent of the trafficking investigations involved the illegal diversion of 10 guns or fewer but confirmed the existence of large trafficking operations, including two cases involving the diversion of over 10,000 guns. Corrupt FFLs accounted for only 9 percent of the trafficking investigations but more than half of the guns diverted in the pool of investigations. Violations by FFLs in these investigations included "off paper" sales, false entries in record books, and transfers to prohibited persons. Nearly half of the investigations involved firearms trafficked by straw purchasers, either directly or indirectly. Trafficking investigations involving straw purchasers averaged a relatively small number of firearms per investigation but collectively accounted for 26,000 guns. Firearms were diverted by traffickers at gun shows and flea markets in 14 percent of the investigations, and firearms stolen from FFLs, residences, and common carriers were involved in more than a quarter of the investigations.

*Interpreting the Data*

Braga et al. (2002) suggest that the three sources of data on illegal gun markets are not directly comparable but broadly compatible. Each data source has its own inherent limitations and, as such, it is difficult to credit the insights provided by one source over another source.

None of the three sources of data contradicts the hypothesis that stolen guns and informal transfers (as opposed to transfers from legitimate sources) predominate in supplying criminals and juveniles with guns. However, they also clearly suggest that licensed dealers play an important role and that the illegal diversion of firearms from legitimate commerce is a problem. In their review of these three sources of data, Braga and his colleagues (2002) suggest that, in the parlance of environmental regulation, illegal gun markets consist of both "point sources"—ongoing diversions through scofflaw dealers and trafficking rings—and "diffuse sources"—acquisitions through theft and informal voluntary sales. As in the case of pollution, both point sources and diffuse sources are important (see also Cook and Braga, 2001). Braga and his colleagues (2002) also speculate that the mix of point and diffuse sources differs across jurisdictions depending on the density of gun ownership and the strictness of gun controls.

## ANALYTIC FRAMEWORK

### General Model

Real interventions in gun markets tend to target particular types of firearms or sources. If policy raises the difficulty (cost, time, risk) of obtaining a particular type of gun or using a particular type of source, the effect

Copyright © National Academy of Sciences. All rights reserved.

Firearms and Violence: A Critical Review

https://www.nap.edu/catalog/10881.html

might be mitigated by criminals' substitution across types of guns or sources. The following framework is helpful for organizing what is known, and what we would like to know, about whether access interventions can reduce harms from criminal gun use.

There are many types of guns; the term "type" encompasses both the literal firearm type (e.g., handguns versus long guns) and the source by which it is acquired (e.g., retail purchase, private sale, theft, loan, and other types of firearm transfers).[3] Furthermore, there are many types of individuals (legal possessors, juveniles, convicted felons and other persons prohibited from legal gun possession). Restrictions aim at reducing firearm possession or use by some of those groups. For analyzing the effects of these restrictions, consumer demand theory provides a useful conceptual framework, in which the use of each type of gun by each type of individual depends on the total cost that individual incurs in acquiring or retaining that gun. This generates a specific volume of use (possession or purchase) by each type of individual for each type of weapon. When the difficulty felons face in acquiring new guns rises, for example because of a targeted intervention, we assume that new gun use will decline among felons; whether that decline is substantial can be determined only empirically. Use of other kinds of guns may rise.

We use the term "cost" as broader than the money required for purchase of the item. Nonmonetary costs may be particularly important for gun acquisition by offenders, compared with purchases of unregulated legal goods; these costs include the time required to locate a reliable source or obtain information about prices, the risk of arrest by police (and sanction by a court), and the risk of violence by the seller. These are potentially important in any illicit market and have received some attention in the context of drug markets (Caulkins, 1998; Moore, 1973).

To make clear how this framework operates, consider an intervention that raises the costs criminals face to obtain new guns. The direct or "own" effect of this intervention is to reduce criminals' demand for new guns. Yet this is not the end of the story. The total effect of the policy intervention is the sum of the "own effect" and a "cross-effect" reflecting criminals' substitution of used guns for new ones as new guns become more costly. Even if the own effect is negative, the cross-effect might be sufficiently positive to render the overall effect close to zero.

---

[3]For discussion purposes, we are dramatically simplifying the large variety of guns available to consumers. Guns vary by type (revolvers, semiautomatic pistols, derringers, rifles, and shotguns), caliber and gauge (e.g., .22, .38, 9mm, .45, 12 gauge, 20 gauge, and dozens of other bullet calibers and shotgun gauges), and manufacturers (e.g., Smith & Wesson, Sturm Ruger, Colt, Glock, Sig Sauer, Lorcin, Bryco, and hundreds of other manufacturers). There is ample evidence suggesting that criminal consumers seem to prefer certain types of guns.

Copyright © National Academy of Sciences. All rights reserved.

Firearms and Violence: A Critical Review
http://www.nap.edu/catalog/10881.html

The patterns of substitution among sources may be different for different types of potential buyers. Adults without felony convictions or other disqualifications can presumably choose between buying new guns from retailers and used guns from legal private sellers. Juveniles, by contrast, cannot buy from retailers or law-abiding dealers in used guns. However, they can conceivably substitute by obtaining guns from a number of sources outside legal commerce, such as residential theft, informal transfers through their social networks, and scofflaw dealers; as one source becomes more difficult, youth may obtain more from another.

This framework is limited to an assessment of effects on the quantities of guns owned, which is not the final outcome of interest. Rather, it is crime or violence that ultimately interests policy makers. Whether changing the number and characteristics of firearms in the hands of persons of a given type increases harm is an additional question that requires different data and is considered at the end of the chapter.

We classify potential market interventions in two dimensions: market-targeted (primary or secondary) and supply or demand side programs. For example, consider police undercover purchases from unlicensed dealers. These aim to shift the supply curve in secondary markets by increasing the perceived risk of sale; dealers will be less willing to sell to unknown buyers and will charge a higher price when they do. Whether this has an influence on criminal possession of guns depends on many factors, such as the share of purchases that are made from nonintimate dealers and the price elasticity of demand (i.e., how much an increase in the price affects the purchase and retention of guns). Other interventions are focused on reducing demand, for example, taxes on FFL sales (primary market) and increasing sentences for purchasing from unlicensed dealers (secondary market).

### *Demand*

What determines the demand for guns? Offenders acquire firearms for a variety of reasons: self-protection, a means for generating income, a source of esteem and self-respect, and a store of value. For example a rise in violence in a specific city may shift the demand curve up because of the increased return to self-protection. We assume that the demand for guns for criminal purposes is negatively related to the price and other costs of acquisition; there is no research on the elasticity with respect to either price or any other cost component that would allow quantification of the importance of this effect. Note that individuals make two kinds of acquisition decisions, active and passive; passive refers to holding rather than selling a valuable asset. Most market interventions aim only at the acquisition decision; retention is affected only indirectly, in that an increase in the value of a gun may lead to a greater willingness to sell to others.

Copyright © National Academy of Sciences. All rights reserved.

Individual demand has an important time dimension to it, which makes inconvenience of acquisition a potentially valuable goal for an intervention. The value of a gun is partly situation-dependent; a perceived insult or opportunity to retaliate against a rival may make a firearm much more valuable if acquired now rather than in a few hours, when the opportunity or the passion has passed. Analytically and empirically that is a substantial complication; individuals are now characterized not only by their general risk of using a firearm for criminal purposes but also by their time-specific propensity of such use. This also allows for the possibility of positive effects from interventions that merely reduce the fraction of time an offender has a firearm.

*Supply*

The factors affecting the supply of firearms to offenders are comparably numerous. Guns used in crimes (crime guns) are obtained both from the existing stock in private hands (purchase in secondhand markets, theft, gifts) and from new production (sales by and thefts from FFLs, wholesalers, or manufacturers). In the aggregate these sources can be thought of as constituting a supply system; a higher money price will generate more guns for sale to high-risk individuals. Supply side interventions aim to shift the supply curve up, so that fewer guns are available at any given money price.

It may be useful to conceptualize each supply curve as independently determined. The factors that affect the costs of providing firearms through thefts (whether from households or stores) are likely to be distinct from those affecting provision of the same weapons through straw purchases. Raising penalties for stealing guns or expanding the burglary squad will raise the risk compensation (i.e., price) needed to induce burglars to undertake a given volume of gun theft. Those same measures are unlikely to have much effect on the risks faced in straw purchase transactions, which will be raised for example by tougher enforcement of FFL record-keeping requirements. While we will refer to a single supply curve for firearms to offenders, it is the sum of a number of components.

Markets may also be places; that is the guiding principle of much antidrug policing, since there are specific locations at which many sales occur on a continuing basis. It is unclear whether places are important for gun acquisition. Gun purchases are very rare events when compared with drug purchases; a few per year versus a few per week for those most active in the market (Koper and Reuter, 1996). The low frequency of gun purchases has two opposing effects. On one hand, it reduces the attraction to a seller of being in a specific place, since there will be a long period with no purchases but with potential police attention. On the other hand, buyers are less likely to be well informed because of the low rate of purchase and

Copyright © National Academy of Sciences. All rights reserved.

Firearms and Violence: A Critical Review
https://www.nap.edu/catalog/10881.html

may be willing to pay a substantial price premium to obtain a gun more rapidly, thus increasing the value of operating in a location that is known to be rich in firearms acquisition opportunities.

Gun shows are potential specific places where criminals acquire guns. Gun shows may be especially attractive venues for the illegal diversion of firearms due to the large number of shows per year, the size of the shows, the large volume of transactions, and the advertising and promotion of these events. Gun shows provide a venue for large numbers of secondary market sales by unlicensed dealers; they are exempted from the federal transaction requirements that apply to licensed dealers who also are vendors at these events. The Police Foundation (1996) estimated, from the National Survey of Private Gun Ownership, that gun shows were the place of acquisition of 3.9 percent of all guns and 4.5 percent of handguns. The 1991 BJS survey of state prison inmates suggests that less than 1 percent of handgun using inmates personally acquired their firearm at a gun show (Bureau of Justice Statistics, 1993). However, these data did not determine whether a friend, family member, or street dealer purchased the gun for the inmate at a gun show. While it is not known what proportion of crime guns come from gun shows or what proportion of gun show dealers act criminally, research suggests that criminals do illegally acquire guns at these venues through unlicensed dealers, corrupt licensed dealers, and straw purchasers (Braga and Kennedy, 2000). Certain states specifically regulate firearms sales at gun shows; otherwise, there have been no systematic attempts to implement place-based interventions to disrupt illegal transactions at gun shows.

Note that the market is partly a metaphor. For example, many guns are acquired through nonmarket activities, gifts or loans from friends with no expectation of a specific payment in return. These may take place "in the shadow" of the market, so that the terms are influenced by the costs of acquiring guns in formal transactions; when guns are more expensive to acquire in the market, owners are more reluctant to lend them. However there is no empirical basis for assessing how close these links are. An additional complication is that guns are highly differentiated and there is no single price. No agency or researcher has systematically collected price data over a sufficient length of time to determine the correlation of prices across gun types over time and thus whether they are appropriately treated as a single market or even a set of linked markets.

## Using the Framework

One value of this approach (demand, supply, and substitution) is in developing intermediate measures of whether an intervention might influence the desired outcome. For example, intensified police enforcement

Copyright © National Academy of Sciences. All rights reserved.

Firearms and Violence: A Critical Review
http://www.nap.edu/catalog/10881.html

against sellers in the informal market (through "buy-and-bust" stings), even though affecting the firearms market for offenders, may not be a large enough intervention to produce detectable changes in the levels of either violent crimes or violent crimes with firearms, given the noisiness of these time series and lags in final effects. However, if this enforcement has not affected the money price or the difficulty of acquisition in the secondary market, then it almost certainly has not had the intended effects; thus a cost measure provides a one-sided test. The ADAM (Arrestee Drug Abuse Monitoring) data system provided a potential source of such data at the local level.

Table 4-3 presents a list of hypothesized effects of the major interventions discussed in this chapter. This is more in the nature of a heuristic than a precise classification or prediction. It distinguishes between the two classes of markets and the two forms of acquisition cost (monetary and nonmonetary) in each market. Note again that the principal market for offenders is conceptualized as illegal diversions from retail outlets, such as convicted felons personally lying and buying or using false identification to acquire guns, straw purchasers illegally diverting legally purchased guns, and corrupt licensed dealers falsifying transaction paperwork or making off-the-book sales. The secondary market includes all other informal firearms transfers, such as direct theft, purchases of stolen guns from others, loans or gifts from friends and families, and unregulated sales among private sellers.

**TABLE 4-3** Intermediate Effects of Market Interventions

Outcomes

|  | Primary Market for Offenders | | Secondary Market for Offenders | |
|---|---|---|---|---|
|  | Price | Acquisition Difficulty | Price | Acquisition Difficulty |
| Intervention |  |  |  |  |
| Regulating federal firearms licensees | + | + |  |  |
| Limiting gun sales | + | + |  |  |
| Screening gun buyers |  | + |  |  |
| Buy-back programs |  |  | + |  |
| Sell and bust |  |  | − | + |
| Buy and bust |  |  | + | + |

NOTE: In cells with no entry, we assume no discernible effect.

Copyright © National Academy of Sciences. All rights reserved.

Firearms and Violence: A Critical Review
http://www.nap.edu/catalog/10881.html

## SUBSTITUTION

Suppose for the sake of discussion that policy interventions can raise the difficulty faced by some individuals in obtaining some types of guns. The question of whether such interventions reduce gun use (or crime or violence) depends on how readily the potential buyers could substitute alternative weapons or sources for those targeted by policy.

In our framework, the existing studies, summarized in the section on how offenders obtain firearms, describe the distribution of guns across acquisition sources for a particular type of buyers (felons or youthful offenders). These surveys cannot provide an estimate of the total number of guns held by the population of offenders.

Although the studies are conducted on nonrandom convenience samples of inmates, they show fairly consistently that many guns are stolen or borrowed, rather than purchased in the primary market. Many guns are obtained through informal networks. The fact that criminals acquire guns from a variety of sources suggests substitution. Indeed, some (see, e.g., Kleck, 1999; Wright and Rossi, 1994; Sheley and Wright, 1995) have taken these studies to suggest that substitution possibilities are so pervasive that interventions cannot control the amount of gun use or ensuing harm. Some observers draw similar inferences from the fact that many guns are stolen from the large stock of guns available to steal.

Our framework, though simple, suggests that there are limits to what one can infer about substitution from these data. First, the existing studies combine survey responses of inmates from a variety of cities. The fact that inmates from various places, taken collectively, get their guns from different sources does not mean that any particular criminal or criminals in any particular city have ready access to all these alternatives. Cities may differ in terms of the sources of guns. Furthermore, even if persons of a particular type in a locale obtain their guns through different channels, this does not imply that each person has a variety of channels if deprived of the channel he or she currently uses.

Another finding in the literature concerns the vintage of guns used in crime. Vintage enters the framework through type: new and old guns may be seen as different types with particular policy relevance because there are different interventions for each type. In spite of the vast numbers of used guns that could be stolen and then transferred to criminals, the trace data suggest that a disproportionate fraction of crime guns are quite new, although, as noted in Chapter 2, it cannot be determined how well the trace data represent the total population of crime guns. In our framework, we can interpret this information to mean that criminals favor new guns over used guns, given current acquisition costs; this reflects in part the fact that new guns lack a potential liability from use in a previous crime that is unknown to the current purchaser. Again, it is only information on the

Copyright © National Academy of Sciences. All rights reserved.

Firearms and Violence: A Critical Review
http://www.nap.edu/catalog/10881.html

distribution of types of guns used by criminals. Since criminals use new guns, some observers have taken this information to indicate that interventions targeting new guns can reduce crime. This is a possible but not a necessary consequence. If both new and old guns are available to criminals, and criminals are observed using new guns, we can infer that criminals prefer new guns to old ones, given the respective prices and difficulties of obtaining the two types of guns. But this fact provides no information about whether criminals would substitute old guns for new ones if they faced increased difficulty of getting new ones.

That different criminals get their guns from a variety of sources—and that many guns used in crime are recent guns—provides little evidence about whether interventions would affect the volume of gun use. This is information about the types of guns used, not about the volume of, or harm caused by, guns. By itself, these findings are consistent with any level of substitution. Suppose that, when local rules are loose, some criminals get guns locally while others get them from elsewhere. The locale then adopts tight rules and suppose that all guns seized thereafter turn out to be nonlocal. That is consistent with either of two contradictory stories. In one, the restriction is totally effective and those who were purchasing local firearms can find none. In the other, there is full substitution; all the local buyers are able to find nonlocal sources without much increase in cost. Any inference requires information about the change in the tendency for the targeted type of individual to purchase other guns relative to those targeted with restrictions. In the language of our framework, we need to know the effects of the restriction on costs and of own costs and other prices on the tendencies for each type of person to buy guns.

## INTERVENTIONS TO REDUCE CRIMINAL ACCESS TO FIREARMS

This section summarizes the existing literature on the effects of different kind of access interventions. We do not include taxes on firearms or ammunition because there are no evaluations of either kind of tax.

### Regulating Gun Dealers

As already noted, criminals can acquire guns in the primary market by personally making illegal purchases, arranging straw purchases, and by finding corrupt FFLs willing to ignore transfer laws. The available research evidence reveals that a very small number of FFLs generate a large number of crime gun traces (Pierce et al., 1995; Bureau of Alcohol, Tobacco, and Firearms, 2000b). Assuming it is possible to categorize dealers by risk of diversion per weapon, this concentration of crime gun traces suggests an opportunity to reduce the illegal supply of firearms to criminals by focusing limited regulatory and investigative resources on the relatively small group

Copyright © National Academy of Sciences. All rights reserved.

Firearms and Violence: A Critical Review
http://www.nap.edu/catalog/10881.html

of high-risk dealers. In theory, this approach would increase the cost of guns to criminals by restricting their availability through retail outlets. However, in order for this approach to be effective in reducing gun violence, there must be limited substitution from regulated primary markets to unregulated secondary markets.

In their analysis of trace data contained in BATF's Firearm Tracing System, Pierce et al. (1995) found that nearly half of all traces came back to only 0.4 percent of all licensed dealers. However, the concentration of trace data may simply reflect the very high concentration of firearms sales among FFLs. In California, the 13 percent of FFLs with more than 100 sales during 1996-1998 accounted for 88 percent of all sales (Wintemute, 2000). While handgun trace volume from 1998 was strongly correlated with handgun sales volume at the level of the individual dealer and highly concentrated among high-volume dealers, Wintemute (2000) also found that trace volume varied substantially among dealers with similar sales volumes, suggesting that guns sold by certain dealers were more at risk for generating crime guns than others. However, as Braga and his colleagues (2002) point out, Wintemute did not determine whether this variation was greater than could be explained by chance alone. It is possible that the variation of traces among dealers with similar trace volume was not significantly different from what would be expected from a normal distribution of crime gun traces among dealers.

The findings are important nonetheless. Even if only some high-volume dealers are high risk, the fact that most crime weapons come from high-volume dealers suggests that concentration of regulatory resources on this relatively small population may lead to more efficient enforcement, unless there is substitution across dealers by size category.

Due to concern that some FFLs were scofflaws who used their licenses to supply criminals with guns, the Clinton administration initiated a review of licensing procedures that led to their tightening (Bureau of Alcohol, Tobacco, and Firearms, 2000b). In 1993 and 1994, federal law was amended to provide more restrictive application requirements and a hefty increase in the licensing fee, from $30 to $200 for three years. After these provisions were put into place, the number of federal licensees declined steadily from 284,117 in 1992 to 103,942 in 1999 (Bureau of Alcohol, Tobacco, and Firearms, 2000b). With the elimination of some 180,000 dealers, BATF regulatory and enforcement resources became less thinly spread. In 2000, BATF conducted focused compliance inspections on dealers who had been uncooperative in response to trace requests and on FFLs who had 10 or more crime guns (regardless of time-to-crime) traced to them in 1999 (Bureau of Alcohol, Tobacco, and Firearms, 2000a). The inspections disclosed violations in about 75 percent of the 1,012 dealers inspected. While the majority of the discrepancies were resolved during the

Copyright © National Academy of Sciences. All rights reserved.

Firearms and Violence: A Critical Review
http://www.nap.edu/catalog/10881.html

inspection process, some 13,271 missing guns could not be accounted for by 202 licenses, and 16 FFLs each had more than 200 missing guns. More than half of the licensees had record-keeping violations only. The focused compliance inspections identified sales to more than 400 potential firearms traffickers and nearly 300 potentially prohibited persons, resulting in 691 referrals sent to BATF agents for further investigation (Bureau of Alcohol, Tobacco, and Firearms, 2000a). This reinforces the impression that a relatively small number of dealers systematically violate rules in ways that allow for leakage of guns to prohibited persons.

In a recent paper, Koper (2002) examined the effects of the nearly 70 percent reduction in FFLs following the 1993 and 1994 federal licensing reforms on the availability of guns to criminals. Using a data base of all active gun dealers in summer 1994 and the number of BATF gun traces to each dealer since 1990, Koper examined whether "dropout" dealers were more likely to be suppliers of crime guns than were "survivor" dealers. He concluded that it was not clear whether guns sold by the dropout dealers had a higher probability of being used in crime or moved into criminal channels more quickly when compared with active dealers. This study, however, used national BATF firearms trace data from 1990 through 1995, before the adoption of comprehensive tracing practices in most major cities and prior to BATF nationwide efforts to encourage law enforcement agencies to submit guns for tracing (Cook and Braga, 2001; Bureau of Alcohol, Tobacco, and Firearms, 2000c). National trace data from this time period are not representative of guns recovered by law enforcement, so it is difficult to interpret the findings of Koper's analysis of the impact of federal licensing reforms on the availability of guns to criminals.

Some states and localities have imposed additional regulations on gun dealers. In 1993, North Carolina found that only 23 percent of dealers also possessed its required state license (Cook et al., 1995). Noncomplying dealers were required to obtain a state license or forfeit their federal license. Alabama also identified FFLs who did not possess the required state license; 900 claimed not to know about the state requirements and obtained the license; another 900 reported that they were not currently engaged in the business of selling firearms; and 200 more could not be located (Cook et al., 1995). Alabama officials scheduled the licenses for these 1,100 dealers for cancellation. The Oakland (CA) Police Department worked with BATF to enforce a requirement for all licensed dealers to hold a local permit that required dealers to undergo screening and a criminal background check (Veen et al., 1997). This effort caused the number of license holders in Oakland to drop from 57 to 7 in 1997. Officials in New York found that only 29 of 950 FFLs were operating in compliance with local ordinances. In cooperation with BATF, all local license applications were forwarded to the New York Police Department, which assumed responsibility for screening

Copyright © National Academy of Sciences. All rights reserved.

Firearms and Violence: A Critical Review
http://www.nap.edu/catalog/10881.html

and inspections. The increased scrutiny reduced the number of license holders in New York from 950 to 259 (Veen et al., 1997).

These state-level and local initiatives have not been rigorously evaluated to determine whether they have affected criminal access to guns and rates of gun misuse.

### Limiting Gun Sales

Federal law requires FFLs to report multiple firearms sales to BATF. A few states, including Virginia, Maryland, and California, have passed laws that limit the number of guns that an individual may legally purchase from FFLs within some specified time period. Underlying this intervention is the idea that some individuals make straw purchases in the primary market and then divert these guns to proscribed persons or others planning to do harm. Trace data analyses conducted by BATF suggest that handguns that were first sold as part of a multiple sale are more likely than others to move rapidly into criminal use (Bureau of Alcohol, Tobacco, and Firearms, 2000c). If multiple sales were limited, then the volume of new guns available to criminals might decline. In the language of supply and demand, this is a supply-side intervention aimed at raising the price of new guns to criminals. In principle this sort of intervention holds promise. However, in order for this intervention to work—in the sense of reducing violence—not only must the intervention make it more difficult for criminals to get new guns but also the substitution possibilities must be limited; that is, comparably harmful guns cannot be available from comparably accessible sources.

In July 1993, Virginia implemented a law limiting handgun purchases by any individual to no more than one during a 30-day period. Prior to the passage of this law, Virginia had been one of the leading source states for guns recovered in northeast cities including New York, Boston, and Washington, DC (Weil and Knox, 1996). Using firearms trace data, Weil and Knox (1996) showed that during the first 18 months the law was in effect, Virginia's role in supplying guns to New York and Massachusetts was greatly reduced. For traces initiated in the Northeast, 35 percent of the firearms acquired before one-gun-a-month implementation took effect and 16 percent purchased after implementation were traced to Virginia dealers (Weil and Knox, 1996). This study indicates a change in the origin of traced crime guns following the change in the law. In this sense, the law change had an effect. However, the law may have been undermined by a substitution from guns first purchased in Virginia to guns first purchased in other states.[4] An important question not addressed by this study is whether the

---

[4]The Virginia legislature may nonetheless have achieved its goal of reducing the role of the state in the interstate illegal gun trade.

Copyright © National Academy of Sciences. All rights reserved.

*INTERVENTIONS AIMED AT ILLEGAL FIREARM ACQUISITION*     *93*

law change affects the ultimate outcome of interest—the quantity of criminal harm committed with guns—or even the intermediate questions of the law's effects on the number of guns purchased or owned.

## Screening Gun Buyers

Enacted in 1994, the Brady Handgun Violence Prevention Act required FFLs to conduct a background check on all handgun buyers and mandated a one-week waiting period before transferring the gun to the purchaser. A total of 32 states were required to implement the provisions of the Brady act. The remaining states[5] and the District of Columbia were exempted because they already required a background check of those buying handguns from FFLs. In 1998, the background check provisions of the Brady act were extended to include the sales of long guns and the waiting period requirement was removed when, as mandated by the initial act, it became possible for licensed gun sellers to perform instant record checks on prospective buyers. The policy intent was to make gun purchases more difficult for prohibited persons, such as convicted felons, drug addicts, persons with certain diagnosed mental conditions, and persons under the legal age limit (18 for long rifles and shotguns, 21 for handguns). In 1996, the prospective purchasers with prior domestic violence convictions were also prohibited from purchasing firearms from FFLs.

Theoretically, by raising the cost of acquisition, this procedure reduces the supply of guns to would-be assailants and to some persons who might commit suicide. Several BJS studies have demonstrated that Brady background checks have created obstacles for prohibited persons who attempt to purchase a gun through retail outlets (Bureau of Justice Statistics, 1999, 2002). The Bureau of Justice Statistics (2002) reported that, from the inception of the Brady act on March 1, 1994, through December 31, 2001, nearly 38 million applications for firearms transfers were subject to background checks and some 840,000 (2.2 percent) applications were rejected. In 2001, 66,000 firearms purchase applications were rejected out of about 2.8 million applications (Bureau of Justice Statistics, 2002). Prospective purchasers were rejected because the applicant had a felony conviction or indictment (58 percent), domestic violence misdemeanor conviction or restraining order (14 percent), state law prohibition (7 percent), was a fugitive from justice (6 percent), or some other disqualification, such as having a drug addiction, documented mental illness, or a dishonorable discharge (16 percent) (Bureau of Justice Statistics, 2002).

---

[5]The 19 remaining states include: California, Connecticut, Delaware, Florida, Illinois, Indiana, Iowa, Maryland, Massachusetts, Missouri, Nevada, New Jersey, New York, Ohio, Oklahoma, Oregon, South Carolina, South Dakota, and Virginia.

Copyright © National Academy of Sciences. All rights reserved.

Firearms and Violence: A Critical Review
http://www.nap.edu/catalog/10881.html

These figures suggest the possibility that the Brady act might be effective in screening prohibited purchasers from making gun purchases from FFLs. Based on descriptive studies revealing heightened risks of subsequent gun offending, some researchers suggest extending the provisions of the Brady act to a wider range of at-risk individuals, such as persons with prior felony arrests (Wright et al., 1999) and misdemeanor convictions (Wintemute et al., 1998). Wright et al. (1999) compared the gun arrest rates of two groups in California. The first consisted of persons who were denied purchases because they had been convicted of a felony in 1977. The second was purchasers who had a prior felony arrest in 1977 but no conviction. Even though the former group would reasonably be labeled as higher risk, they showed lower arrest rates over the three years following purchase or attempt to purchase. It is important to recognize that the group of convicted felons who attempt to purchase through legal channels may be systematically lower risk than the entire felony population, precisely because they did attempt to use the prohibited legitimate market; the finding is suggestive rather than conclusive

Wintemute et al. (1998) also recognize that extending the provisions of the Brady act would greatly complicate the screening process. Moreover, while this policy seems to prevent prohibited persons from making gun purchases in the primary market, the question remains what, if any, effect it has on purchases in the secondary market, on gun crimes, and on suicide.

Using a differences-in-differences research design and multivariate statistics to control for state and year effects, population age, race, poverty and income levels, urban residence, and alcohol consumption, Ludwig and Cook (2000) compared firearm homicide and suicide rates and the proportion of homicides and suicides resulting from firearms in the 32 states affected by Brady act requirements (the treatment group) compared with the 19 states and the District of Columbia (the control group) that had equivalent legislation already in place. Ludwig and Cook (2000) found no significant differences in homicide and suicide rates between the treatment and control groups, although they did find a reduction in gun suicides among persons age 55 and older in the treatment states. This reduction was greater in the treatment states that had instituted both waiting periods and background checks relative to treatment states that only changed background check requirements. The authors suggest that the effectiveness of the Brady act in reducing homicides and most suicides was undermined by prohibited purchasers shifting from the primary market to the largely unregulated secondary market.

While the Brady act had no direct effect on homicide rates, it is possible that it had an indirect effect, by reducing interstate gun trafficking and hence gun violence in the control states that already had similar laws. Cook and Braga (2001) document the fact that criminals in Chicago (a

Copyright © National Academy of Sciences. All rights reserved.

Firearms and Violence: A Critical Review
http://www.nap.edu/catalog/10881.html

high control jurisdiction) were being supplied to a large extent by illegal gun trafficking from south central states, in particular Mississippi, and that a modest increase in regulation—imposed by the Brady act—shut down that pipeline. However, this large change in trafficking channels did not have any apparent effect in gun availability for violent acts in Chicago, as the percentage of homicides with guns did not drop after 1994 (Cook and Braga, 2001). Moreover, the authors found that the percentage of crime handguns first purchased in Illinois increased after the implementation of the Brady act, suggesting substitution from out-of-state FFLs to in-state FFLs once the advantage of purchasing guns outside Illinois had been removed.

## Gun Buy-Backs

Gun buy-back programs involve a government or private group paying individuals to turn in guns they possess. The programs do not require the participants to identify themselves, in order to encourage participation by offenders or those with weapons used in crimes. The guns are then destroyed. The theoretical premise for gun buy-back programs is that the program will lead to fewer guns on the streets because fewer guns are available for either theft or trade, and that consequently violence will decline. It is the committee's view that the theory underlying gun buy-back programs is badly flawed and the empirical evidence demonstrates the ineffectiveness of these programs.

The theory on which gun buy-back programs is based is flawed in three respects. First, the guns that are typically surrendered in gun buy-backs are those that are least likely to be used in criminal activities. Typically, the guns turned in tend to be of two types: (1) old, malfunctioning guns whose resale value is less than the reward offered in buy-back programs or (2) guns owned by individuals who derive little value from the possession of the guns (e.g., those who have inherited guns). The Police Executive Research Forum (1996) found this in their analysis of the differences between weapons handed in and those used in crimes. In contrast, those who are either using guns to carry out crimes or as protection in the course of engaging in other illegal activities, such as drug selling, have actively acquired their guns and are unlikely to want to participate in such programs.

Second, because replacement guns are relatively easily obtained, the actual decline in the number of guns on the street may be smaller than the number of guns that are turned in. Third, the likelihood that any particular gun will be used in a crime in a given year is low. In 1999, approximately 6,500 homicides were committed with handguns. There are approximately 70 million handguns in the United States. Thus, if a different handgun were used in each homicide, the likelihood that a particular handgun would be

Copyright © National Academy of Sciences. All rights reserved.

used to kill an individual in a particular year is 1 in 10,000. The typical gun buy-back program yields less than 1,000 guns. Even ignoring the first two points made above (the guns turned in are unlikely to be used by criminals and may be replaced by purchases of new guns), one would expect a reduction of less than one-tenth of one homicide per year in response to such a gun buy-back program. The program might be cost-effective if those were the correct parameters, but the small scale makes it highly unlikely that its effects would be detected.

In light of the weakness in the theory underlying gun buy-backs, it is not surprising that research evaluations of U.S. efforts have consistently failed to document any link between such programs and reductions in gun violence (Callahan et al., 1994; Police Executive Research Forum, 1996; Rosenfeld, 1996).

Outside the United States there have been a small number of buy-backs of much larger quantities of weapons, in response to high-profile mass murders with firearms. Following a killing of 35 persons in Tasmania in 1996 by a lone gunman, the Australian government prohibited certain categories of long guns and provided funds to buy back all such weapons in private hands (Reuter and Mouzos, 2003). A total of 640,000 weapons were handed in to the government (at an average price of approximately \$350), constituting about 20 percent of the estimated stock of weapons. The weapons subject to the buy-back, however, accounted for a modest share of all homicides or violent crimes more generally prior to the buy-back. Unsurprisingly, Reuter and Mouzos (2003) were unable to find evidence of a substantial decline in rates for these crimes. They noted that in the six years following the buy-back, there were no mass murders with firearms and fewer mass murders than in the previous period; these are both weak tests given the small numbers of such incidents annually.

### Banning Assault Weapons

In 1994, Congress enacted the Violent Crime Control and Law Enforcement Act, which banned the importation and manufacture of certain military-style semiautomatic "assault" weapons and ammunition magazines capable of holding more than 10 rounds (National Institute of Justice, 1997). Assault weapons and large-capacity magazines manufactured before the effective date of the ban were grandfathered and thus legal to own and transfer. These guns are believed to be particularly dangerous because they facilitate the rapid firing of high numbers of shots. While assault weapons and large-capacity magazines are used only in a modest fraction of gun crimes, the premise of the ban was that a decrease in their use may reduce gunshot victimization, particularly victimizations involving multiple wounds or multiple victims (Roth and Koper, 1997).

Copyright © National Academy of Sciences. All rights reserved.

Firearms and Violence: A Critical Review
http://www.nap.edu/catalog/10881.html

A recent evaluation of the short-term effects of the 1994 federal assault weapons ban did not reveal any clear impacts on gun violence outcomes (Koper and Roth, 2001b). Using state-level Uniform Crime Reports data on gun homicides, the authors of this study suggest that the potential impact of the law on gun violence was limited by the continuing availability of assault weapons through the ban's grandfathering provision and the relative rarity with which the banned guns were used in crime before the ban. Indeed, as the authors concede and other critics suggest (e.g., Kleck, 2001), given the nature of the intervention, the maximum potential effect of the ban on gun violence outcomes would be very small and, if there were any observable effects, very difficult to disentangle from chance yearly variation and other state and local gun violence initiatives that took place simultaneously. In a subsequent paper on the effects of the assault weapons ban on gun markets, Koper and Roth (2001a) found that, in the short term, the prices of assault weapons in both primary and legal secondary markets rose substantially at the time of the ban, and this may have reduced the availability of the assault weapons to criminals. However, this increase in price was short-lived as a surge in assault weapon production in the months prior to the ban and the availability of legal substitutes caused prices to fall back to nearly preban levels. The ban is also weakened by the ease with which legally available guns and magazines can be altered to evade the intent of the ban. The results of these two studies should be interpreted with caution, since any trends observed in the relatively short study time period (24-month follow-up period) are unlikely to predict long-term trends accurately.

### District of Columbia Handgun Ban

Bans on the ownership, possession, or purchase of guns are the most direct means available to policy makers for reducing the prevalence of guns. The District of Columbia's Firearms Control Regulations Act of 1975 is the most carefully analyzed example of a handgun ban. This law prohibited the purchase, sale, transfer, and possession of handguns by D.C. residents other than law enforcement officers or members of the military. Note, however, that individuals who had previously registered handguns prior to the passage of this law were allowed to keep them under this law. Long guns were not covered by the ban.[6]

One would expect the passage of the District's handgun ban to have little impact on the existing stock of legally held handguns but to greatly reduce the flow of new handguns to law-abiding citizens. Over time, the number of legally held handguns will decline. It is less clear how the illegal

---

[6]For a more detailed discussion of the law and the politics surrounding its passage, see Jones (1981).

Copyright © National Academy of Sciences. All rights reserved.

Firearms and Violence: A Critical Review
http://www.nap.edu/catalog/10881.html

possession of guns will be affected. The flow of new guns to the illegal sector may be reduced to the extent that legal guns enter the illegal sector through resale or theft from the legal stock in the District. Theory alone cannot determine whether this handgun ban will reduce crime and violence overall. One would expect that the share of crimes in which guns are used should decline over time if the handgun ban is effective.

The empirical evidence as to the success of the Washington, DC, handgun ban is mixed. Loftin et al. (1991) used an interrupted-time-series methodology to analyze homicides and suicides in Washington, DC, and the surrounding areas of Maryland and Virginia before and after the introduction of the ban. They included the suburban areas around Washington, DC, as a control group, since the law does not directly affect these areas. Using a sample window of 1968-1987, they report a 25 percent reduction in gun-related homicides in the District of Columbia after the handgun ban and a 23 percent reduction in gun-related suicides. In contrast, the surrounding areas of Maryland and Virginia show no consistent patterns, suggesting a possible causal link between the handgun ban and the declines in gun-related homicide and suicide. In addition, Loftin et al. (1991) report that nongun-related homicides and suicides declined only slightly after the handgun ban, arguing that this is evidence against substitution away from guns toward other weapons.

Britt et al. (1996), however, demonstrate that the earlier conclusions of Loftin et al. (1991) are sensitive to a number of modeling choices. They demonstrate that the same handgun-related homicide declines observed in Washington, DC, also occurred in Baltimore, even though Baltimore did not experience any change in handgun laws.[7] Thus, if Baltimore is used as a control group rather than the suburban areas surrounding DC, the conclusion that the handgun law lowered homicide and suicide rates does not hold. Britt et al. (1996) also found that extending the sample frame an additional two years (1968-1989) eliminated any measured impact of the handgun ban in the District of Columbia. Furthermore, Jones (1981) discusses a number of contemporaneous policy interventions that took place around the time of the Washington, DC, gun ban, which further call into question a causal interpretation of the results.

In summary, the District of Columbia handgun ban yields no conclusive evidence with respect to the impact of such bans on crime and violence. The nature of the intervention—limited to a single city, nonexperimental, and accompanied by other changes that could also affect handgun homicide—make it a weak experimental design. Given the sensitivity of the results to alternative specifications, it is difficult to draw any causal inferences.

---

[7]Britt et al. (1996) do not report results for suicide.

Copyright © National Academy of Sciences. All rights reserved.

Firearms and Violence: A Critical Review
http://www.nap.edu/catalog/10881.html

## SUMMARY

We have documented what is known about how people obtain firearms for criminal activities and identified the weaknesses of existing evaluations of interventions. There is not much empirical evidence that assesses whether attempts to reduce criminal access to firearms will reduce gun availability or gun crime. Most research has focused on determining whether prohibited persons illegally obtain firearms from legitimate commerce (legal primary and secondary markets) or whether crime guns are stolen or acquired through informal exchanges. Current research evidence suggests that illegal diversions from legitimate commerce are important sources of guns and therefore tightening regulations of such markets may be promising. There also may be promising avenues to control gun theft and informal transfers (through problem-oriented policing, requiring guns to be locked up, etc.). We do not yet know whether it is possible to actually shut down illegal pipelines of guns to criminals or what the costs of such a shutdown would be to legitimate buyers. Answering these questions is essential.

We also provide an analytic framework for assessing interventions. Since our ultimate interest is in the injuries caused using guns and not how guns are obtained, the key question involves substitution. In the absence of the pathways currently used for gun acquisition, could individuals have obtained alternative weapons with which to wreak equivalent harm?

Substitution has many dimensions; time, place, and quality are just some of them. For example, that crime guns tend to be newer than guns generally indicates that criminals prefer new guns, even though old guns are generally as easy to get and are cheaper. This may be strictly consumer preference, or it may be to avoid being implicated, through ballistics imaging, in other crimes in which the gun was used. Would offenders currently using newer guns use older guns—or any guns—if access to newer guns became more limited? If particular dealers account for a disproportionate share of crime weapons, then we are left with yet another version of the substitution question: Would the criminals have obtained other guns, with similar harmful effects, from other sources, including other FFLs? How long would this process of substituting from new to old or from one source to another take?

What data are needed to determine the extent of substitution among firearms? Much could be learned from individual-level data from a general population survey on the number of guns owned by length of time, along with detailed individual characteristics of the individual (age, demographic characteristics, psychiatric history, other high-risk behaviors), along with type of gun owned (if any) and the method of acquisition (retail purchase, legal purchase of used gun, illegal purchase of stolen gun, borrowed through informal network). In addition, one would want measures of the availabil-

Copyright © National Academy of Sciences. All rights reserved.

ity of firearms of each type to potential buyers of each type in each locale. For adults without criminal records, for example, there are established, observable prices of new guns at retail outlets. Similarly, there are active markets in used guns, for which there are (at least in principle) prices. The prices are individual specific in the sense that, for example, juveniles and felons cannot purchase guns at Wal-Mart.[8] In effect, they face an infinite price of guns through this channel.

Beyond this information one would also need a source of exogenous variation on the difficulty of obtaining guns through different channels. While guns available to legal buyers through retail outlets have literal prices, the measures of the difficulty of gun acquisition through some other channels are prices only in a metaphorical sense. When a city undertakes an intervention at a particular point in time, for example to make it more difficult for juveniles to get guns from interstate traffickers in new guns, then (provided that the policy has some effect), it is as if the price of guns to juveniles has risen. Provided that the timing of the intervention is independent of the time pattern of local gun use, we could treat it as an exogenous increase in the metaphorical price of a gun to juveniles; money prices may fall as other costs rise because this increase in nonmoney costs shifts the demand curve down. What happens to the tendencies for juveniles to obtain guns; do they substitute purchases of guns stolen from homes for the new guns they had previously purchased from traffickers? Is the substitution complete? That is, is the volume of juvenile gun use as high in the presence of the intervention as it was in the absence of the intervention?

The biggest potential problem with this framework, however, is the assumption of an exogenous intervention. No real intervention is likely to be exogenous; that is, unrelated to changes in gun crimes. It might be more realistic to think about exogeneity conditional on some specified set of covariates, but the prospects for finding consensus on the correct set of covariates to credibly maintain this independence assumption are unknown. Alternatively, researchers may be forced to rely on other methodological approaches and data.

The committee has not attempted to identify specific interventions, research strategies, or data that might be suited for studying market interventions, substitution, and firearms violence. The existing evidence is of limited value in assessing whether any specific market-focused firearm restrictions would curb harm. **Thus, the committee recommends that work be started to think carefully about the prospects for achieving "conditional exogeneity," the kinds of interventions and covariates that are likely to**

_____

[8]We ignore for the moment corrupt agents at retail outlets, viewing them as the equivalent of straw purchasers.

Copyright © National Academy of Sciences. All rights reserved.

Firearms and Violence: A Critical Review
http://www.nap.edu/catalog/10881.html

**satisfy this independence requirement, how one could gather the data, the potential for building in evaluation at the stage of policy change, and other possible research and data designs.** Future work might begin by considering the utility of emerging data systems, described in this report, for studying the impact of different market interventions, This type of effort should be take place in collaboration with a group of survey statisticians, social scientists, and representatives from the Bureau of Justice Statistics and the National Institute of Justice.

Copyright © National Academy of Sciences. All rights reserved.

# 5

# The Use of Firearms to Defend Against Criminals

While a large body of research has considered the effects of firearms on injury, crime, and suicide, far less attention has been devoted to understanding their defensive and deterrent effects. Firearms are used to defend against criminals. For example, the presence of a gun may frighten a criminal away, thereby reducing the likelihood of loss of property, injury, or death.

In this chapter, we consider what is known about the extent and nature of defensive gun use (DGU). Over the past decade, researchers have attempted to measure the prevalence of defensive gun use in the population. This measurement problem has proved to be quite complex, with some estimates suggesting just over 100,000 defensive gun uses per year and others suggesting 2.5 million or more defensive gun uses per year.

A primary cause of this uncertainty is the disagreement over the definition of defensive gun use—in particular, whether it should be defined as a response to victimization or as a means to prevent victimization from occurring in the first place. There is also uncertainty regarding the accuracy of survey responses to sensitive questions and the related problems of how to effectively measure defensive gun use, the types of questions that should be asked, and the methods of data collection. These disagreements over definition and measurement have resulted in prevalence rates that differ by a factor of 22 or more. While even the smallest of the estimates indicates that there are hundreds of defensive uses every day, there is much contention over the magnitude and the details.

Since answers to this debate precede any serious investigation into other related questions, we focus our attention on summarizing and evalu-

*102*

Copyright © National Academy of Sciences. All rights reserved.

Firearms and Violence: A Critical Review
http://www.nap.edu/catalog/10881.html

ating the DGU estimates from the various gun use surveys. We find that fundamental problems in defining what is meant by defensive gun use may be a primary impediment to accurate measurement. Finally, after reviewing the literature that attempts to count the annual number of defensive gun uses in the United States, we then consider the small set of studies that evaluate the effectiveness of firearms for defense.

## COUNTING DEFENSIVE GUN USES

How many times each year do civilians use firearms defensively? The answers provided to this seemingly simple question have been confusing. Consider the findings from two of the most widely cited studies in the field: McDowall et al. (1998), using the data from 1992 and 1994 waves of the National Crime Victimization Survey (NCVS), found roughly 116,000 defensive gun uses per year, and Kleck and Gertz (1995), using data from the 1993 National Self-Defense Survey (NSDS), found around 2.5 million defensive gun uses each year.

Many other surveys provide information on the prevalence of defensive gun use. Using the original National Crime Survey, McDowall and Wiersema (1994) estimate 64,615 annual incidents from 1987 to 1990. At least 19 other surveys have resulted in estimated numbers of defensive gun uses that are similar (i.e., statistically indistinguishable) to the results founds by Kleck and Gertz. No other surveys have found numbers consistent with the NCVS (other gun use surveys are reviewed in Kleck and Gertz, 1995, and Kleck, 2001a).

To characterize the wide gap in the estimated prevalence rate, it is sufficient to consider the estimates derived from the NSDS and recent waves of the NCVS. These two estimates differ by a factor of nearly 22. While strikingly large, the difference in the estimated prevalence rate should, in fact, come as no surprise. As revealed in Table 5-1, the two surveys are markedly different, covering different populations, interviewing respondents by different methods, using different recall periods, and asking different questions.

The NCVS is an ongoing annual survey conducted by the federal government (i.e., the Census Bureau on behalf of the Department of Justice) that relies on a complex rotating panel design to survey a representative sample of nearly 100,000 noninstitutionalized adults (age 12 and over), from 50,000 households. To elicit defensive gun use incidents, the survey first assesses whether the respondent has been the victim of particular classes of crime—rape, assault, burglary, personal and household larceny, or car theft—during the past six months, and then asks several follow-up questions about self-defense. In particular, victims are asked:

Copyright © National Academy of Sciences. All rights reserved.

**TABLE 5-1** Comparing Sampling Design of the NCVS and NSDS

|  | National Crime Victimization Survey | National Self-Defense Survey |
|---|---|---|
| Coverage | • Noninstitutionalized U.S. population, age 12 and over, each year since 1973<br>• Defensive gun use questions to victims (self-reported) | • U.S population, age 18 and over, with phones, 1993<br>• DGU questions to all respondents |
| Sample design | • Rotating panel design<br>• Stratified, multistage cluster sample of housing units<br>• Telephone and personal contacts | • One-shot cross-section<br>• Stratified by region (South and West oversampled)<br>• Random digit dialing |
| Sample size | Approximately 50,000 households and 100,000 individuals | 4,997 individuals |
| Response rate | Approximately 95% of eligible housing units | 61% of eligible numbers answered by human beings |
| Sponsorship | U.S. Census Bureau for U.S. Bureau of Justice Statistics | Research Network |
| Estimated defensive gun use | 116,398 annual incidents using 1993-1994 data from redesigned survey | 2,549,862 annual incidents |

SOURCE: McDowall et al. (2000: Table 1). Used with kind permission of Springer Science and Business Media.

> Was there anything you did or tried to do about the incident while it was going on?
>
> Did you do anything (else) with the idea of protecting yourself or your property while the incident was going on?

Responses to these follow-up probes are coded into a number of categories, including whether the respondent attacked or threatened the offender with a gun.

The NSDS was a one-shot cross-sectional phone survey conducted by a private polling firm, Research Network, of a representative sample of nearly 5,000 adults (age 18 and over). The survey, which focused on firearms use, first assessed whether the respondent used a gun defensively during the past five years, and then asked details about the incident. In particular, respondents were first asked:

Copyright © National Academy of Sciences. All rights reserved.

Firearms and Violence: A Critical Review
http://www.nap.edu/catalog/10881.html

Within the past *five years*, have you yourself or another member of your household *used* a handgun, even if it was not fired, for self-protection or for the protection of property at home, work, or elsewhere? Please do *not* include military service, police work, or work as a security guard.

If the answer was yes, they were then asked:

Did this incident [any of these incidents] happen in the *past 12 months*?

The discrepancies in the prevalence estimates of defensive gun use can and should be better understood. Remarkably little scientific research has been conducted to evaluate the validity of DGU estimates, yet the possible explanations are relatively easy to categorize and study. The two surveys are either (1) measuring something different or (2) affected by response problems in different ways, or (3) both. Statistical variability, usually reflected by the standard error or confidence interval of the parameter, also plays some role but cannot explain these order of magnitude differences.

### Coverage

Perhaps the most obvious explanation for the wide variation in the range of DGU estimates is that the surveys measure different variables. In the NSDS, for example, all respondents are asked the gun use questions. In contrast, the NCVS inquires only about use among persons who claim to be victims of rape, assault, burglary, personal and household larceny, and car theft. The NCVS excludes preemptive uses of firearms, uses that occur in crimes not screened for in the survey (e.g., commercial robbery, trespassing, and arson), and uses for crimes not revealed by respondents.[1]

McDowall et al. (2000) found some evidence that these differences in coverage play an important role. In an experimental survey that overrepresents firearms owners, 3,006 respondents were asked both sets of questions about defensive gun use, with random variation in which questions came first in the interview. By holding the survey sampling procedures constant (e.g., consistent confidentiality concerns and recall periods), the authors focus on the effects of questionnaire content. Overall, in this experiment, the NCVS survey items yielded three times fewer reports of defensive gun use than questionnaires that ask all respondents about defensive uses.

The McDowall et al. (2000) crossover experiment is informative and is exactly the type of methodological research that will begin to explain the sharp divergence in gun use estimates and how best to measure defensive gun use. There remains, however, much work to be done. The sample used

---

[1]It is well known, for example, that incidents of rape and domestic violence are substantially underreported in the NCVS (National Research Council, 2003).

Copyright © National Academy of Sciences. All rights reserved.

in this survey is not representative, and the methods shed light on only one of the many competing hypotheses. Furthermore, this limited evidence is difficult to interpret. Even with a consistent sampling design, inaccurate reporting may still play an important role. For example, estimates from an NCVS type of question would be biased if victims were reluctant to report unsuccessful defensive gun use. Likewise, the estimates found using the NSDS-type survey would be biased if respondents report defensive gun uses based on mistaken perceptions of harmless encounters.

Even if we accept the notion of fully accurate reporting, or at least consistent inaccuracies across the surveys, details on the cause of these differences are especially important. If these discrepancies result because of incomplete reporting of victimization among the classes considered (e.g., rape and domestic violence) in the NCVS, then one must address the measurement error questions again. Certainly, we are interested in the behavior of all victims, not just those who self-report. If instead, the differences occur because the NSDS-type question includes preemptive uses, then the relevant debate might focus on which variable is of interest.

In any case, much of the confusion surrounding the debate seems to center on what is meant by defensive gun use. Self-defense is an ambiguous term that involves both objective components about ownership and use and subjective features about intent (National Research Council, 1993).[2] Whether one is a defender (of oneself or others) or a perpetrator, for example, may depend on perspective. Some reports of defensive gun use may involve illegal carrying and possession (Kleck and Gertz, 1995; Kleck, 2001b), and some uses against supposed criminals may legally amount to aggravated assault (Duncan, 2000a, 2000b; McDowall et al., 2000; Hemenway et al., 2000; Hemenway and Azrael, 2000). Likewise, protecting oneself against possible or perceived harm may be different from protecting oneself while being victimized.

Given this ambiguity, perhaps one of the more important and difficult problems is to develop a common language for understanding defensive and offensive gun use. Uniform concepts and a common language will serve to facilitate future survey work, guide scholarly discussions, and enhance understanding of the complex ways in which firearms are related to crime, violence and injury. More generally, a commonly understood language can also influence the development of firearms policy and violence policy more generally.

---

[2]This lack of a clear definition may also contribute to inaccurate response. If scholars who think about these issues have yet to come up with a clear definition for the behavior of interest, it may be unreasonable to rely on the accuracy of respondents whom, in some cases, may not understand or interpret the question as intended.

Copyright © National Academy of Sciences. All rights reserved.



**FIGURE 5-1** Stages and outcome of potential criminal encounters.
SOURCE: Adapted from Kleck (1997: Figure 7.1).

Although defining and measuring different types of gun use (both of-
fensive and defensive) is not a simple matter, a typology similar to the one
developed by Kleck may be a useful starting point (1997: Figure 7.1).
Figure 5-1 provides a rough summary of the development of a violent or
criminal encounter. Firearms and other weapons may be involved at differ-
ent points in the development of a crime, from threats to realized crimes
and injury. At each stage of a potentially threatening encounter, one may be

Copyright © National Academy of Sciences. All rights reserved.

Firearms and Violence: A Critical Review
http://www.nap.edu/catalog/10881.html

interested in learning about the basic circumstances, about firearms use and other actions, about the intent of the respondent, and about outcomes. The relatively subjective nature of threats, which may or may not develop into criminal events, may justify placing these uses in a separate category (Kleck, 2001b:236). More generally, it would seem useful to distinguish between the more objective and subjective features of firearms use. Eliciting and interpreting relatively objective questions about whether and how one uses a gun may be relatively simple and lead to consensus on these basic matters. Eliciting and interpreting relatively subjective questions on intent may be much more complex and less amenable to consensus conclusions.[3]

Ultimately, researchers may conclude that it is impossible to effectively measure many aspects of defensive gun use. As noted above, counting crimes averted before the threat stage, and measuring deterrence more generally, may be impossible. Successful deterrence, after all, may yield no overt event to count. Imagine, for example, measuring defensive gun use for a person who routinely carries a handgun in a visible holster. How many times has this person "used a handgun, even it was not fired, for self-protection?" (i.e., the NSDS definition of defensive gun use). In this regard, much of the debate on the number of defensive gun uses may stem from an ill-defined question, rather than measurement error per se.

## Response Problems in Firearms Use Surveys

Questions about the quality of self-reports of firearms use are inevitable. Response problems occur to some degree in nearly all surveys but are arguably more severe in surveys of firearm-related activities in which some individuals may be reluctant to admit that they use a firearm, and others may brag about or exaggerate such behavior.[4] If some sampled individuals give incorrect answers (inaccurate response) and others fail to answer the survey at all (nonresponse), investigators may draw incorrect conclusions from the data provided by a survey.

---

[3]A number of scholars have made explicit recommendations for collecting detailed narratives on the nature of the event. See, for example, recommendations made by Cook and Ludwig (1998), Smith (1997), and Kleck (2000). Hemenway and Azrael (2000) and Hemenway et al. (2000) collected and analyzed detailed narratives on gun use incidents that reveal that they are often complex and difficult to categorize.

[4]These same measurement problems were discussed in a report by the National Research Council (2001) that explored the data problems associated with monitoring illicit drug consumption.

Copyright © National Academy of Sciences. All rights reserved.

Firearms and Violence: A Critical Review
http://www.nap.edu/catalog/10881.html

*Inaccurate Response*

In fact, it is widely thought that inaccurate response biases the estimates of defensive gun use. Self-report surveys on possibly deviant behaviors invariably yield some false reports. Responses are miscoded, and respondents may misunderstand the questions or may not correctly remember or interpret the event. In addition to these unintentional errors, respondents may also exaggerate or conceal certain information.

The literature speculates widely on the nature of reporting errors in the firearms use surveys.[5] Some argue that reporting errors cause the estimates derived from the NCVS to be biased downward.[6] Kleck and Gertz (1995) and Kleck (2001a), for example, speculate that NCVS respondents doubting the legality of their behaviors or more generally fearing government intrusion may be inclined to provide false reports to government officials conducting nonanonymous interviews. Furthermore, Smith (1997) notes that NCVS respondents are not directly asked about firearms use but instead are first asked whether they defended themselves, and then they are asked to describe in what ways. Indirect questions may lead to incomplete answers.

Others argue that the estimates from the NSDS and other firearms use surveys are upwardly biased. Cook and Ludwig (1998), Hemenway (1997a), and Smith (1997), for example, suggest that the firearms use surveys do not effectively bound events that occur in prior interviews and thus may result in "memory telescoping." That is, respondents in the NSDS are more likely to report events that occurred prior to the observation window of interest. Furthermore, McDowall et al. (2000) speculate that preemptive uses recorded in the NSDS but not generally covered in the NCVS (which focuses on victims) are susceptible to a greater degree of subjectivity and thus inaccurate reporting.

A number of other general arguments have been raised as to why these surveys might be inaccurate. Some suggest that respondents may forget or conceal events that do not lead to adverse outcomes (Kleck and Gertz, 1995; Kleck, 2001a), while others suggest that respondents may exaggerate or conceal events due to social stigma. Some have even suggested that respondents may strategically answer questions to somehow influence the ongoing public debate (Cook et al., 1997). Finally, Hemenway (1997b) raises what amounts to a mechanical, rather than behavioral, concern

---

[5]See Kleck (2001a) for a detailed review of the various hypotheses about inaccurate reporting in gun use questionnaires.

[6]Kleck argues that the NCVS is well designed and uses state-of-the-art survey sampling techniques for measuring victimization, but for exactly those reasons it is not well designed for measuring defensive gun use.

Copyright © National Academy of Sciences. All rights reserved.

regarding why the DGU estimates may be generally biased upward. For any rare event, in fact for any event with less than 50 percent probability, there are more respondents who can give false positive than false negative reports. Suppose, for example, in a sample of 1,000 respondents, the true prevalence rate is 1 percent; that is, 10 respondents used a gun defensively. Then 990 may provide false positive reports, while only 10 may provide false negative reports. Even small fractions of false positive reports may lead to substantial upward biases. Cook et al. (1997) further suggest that by focusing on victims, the NCVS reduces the scope of the false positive problem.

Although the rare events problem may be well known and documented in epidemiological studies of disease, it is uncertain whether this same phenomena affects inferences on defensive gun uses as well. People may have reasons to conceal or exaggerate defensive gun uses that may not apply when studying rare diseases. In fact, what is known about accurate reporting of other crime-related activities provides some evidence to the contrary. Validation studies on the accuracy of self-reports of illicit drug use among arrestees, for example, suggest that for this somewhat rare but illegal activity, the numbers of false reports of use are far less than the numbers of false reports of abstinence: self-reports of drug use are biased downward (Harrison, 1995).

Although theories abound, it is not possible to identify the prevalence of defensive gun use without knowledge on inaccurate reporting. Kleck and Gertz (1995) and others suggest that estimates from the NCVS are biased downward, arguing that respondents are reluctant to reveal information to government officials, and that indirect questions may yield inaccurate reports. Hemenway (1997a) and others suggest that estimates from the NSDS are biased upward, arguing that memory telescoping, self-presentation biases, and the rare events problem more generally lead the numbers of false positive reports to substantially exceed the numbers of false negative reports. It is not known, however, whether Kleck's, Hemenway's, or some other assumptions are correct. The committee is not aware of any factual basis for drawing conclusions one way or the other about reporting errors.

### Nonresponse

While inaccurate response has received a great deal of speculative attention, the problem of nonresponse has hardly been noticed.[7] Nonresponse is a problem in survey sampling, but it is especially problematic in the firearms use phone surveys like the NSDS. Although not completely re-

---

[7]Both Duncan (2000b) and Hemenway (1997a) recognize the potential problems created by nonresponse in the firearms use surveys.

Copyright © National Academy of Sciences. All rights reserved.

Firearms and Violence: A Critical Review
http://www.nap.edu/catalog/10881.html

vealed by Kleck and Gertz (1995), the response rate in the NSDS appears to lie somewhere between 14 and 61 percent.[8] The response rate in the NCVS survey is substantially higher, at around 95 percent.

Survey data are uninformative about the behavior of nonrespondents. Thus, these data do not identify prevalence unless one makes untestable assumptions about nonrespondents. A simple example illustrates the problem. Suppose that 1,000 individuals are asked whether they used a firearm defensively during the past year but that 500 do not respond, so the nonresponse rate is 50 percent. If 5 of the 500 respondents used guns defensively during the past year, then the prevalence of defensive gun use among respondents is 5/500 = 1 percent. However, true prevalence among the 1,000 surveyed individuals depends on how many of the nonrespondents used a firearm. If none did, then true prevalence is 5/1,000 = 0.5 percent. If all did, then true prevalence is [(5 + 500)/1,000] = 50.5 percent. If between 0 and 500 nonrespondents used a firearm defensively, then true prevalence is between 0.5 and 50.5 percent. Thus, in this example, nonresponse causes true prevalence to be uncertain within a range of 50 percent.

Prevalence rates can be identified if one makes sufficiently strong assumptions about the behavior of nonrespondents. In the DGU literature, nonresponse is assumed to be random, thus implying that that prevalence among nonrespondents is the same as prevalence among respondents. The committee is not aware of any empirical evidence that supports the view that nonresponse is random or, for that matter, evidence to the contrary.

### External Validity

A number of scholars have suggested that results from the NSDS and other firearms use surveys are difficult to reconcile with analogous statistics

---

[8]Kleck and Gertz report that 61 percent of contacts with persons for the NSDS resulted in a completed interview. Presumably, however, there were also many households in the original sampling scheme that were not contacted. For example, using data from the National Study of Private Firearms Ownership (NSPFO), a national phone survey designed to elicit information about firearms ownership and use, Cook and Ludwig (1998) report that 29,917 persons were part of the original sampling scheme, of which 15,948 were determined to be ineligible (phones not working, not residential, etc.), 3,268 were determined to be eligible, and the remaining 10,701 were unknown (e.g., no answer, answering machine, busy, etc.). Of the 3,268 that were known to be eligible, 2,568 provided complete interviews, for a response rate of 79 percent among contacted households. The 10,701 with unknown eligibility status must also be accounted for. If none of these households was actually eligible, than the true response rate would be 79 percent. If, however, all of these are eligible, then the true rate would be 18 percent [2,568/(10,701 + 3,268)]. Thus, the response rate in the NSPOF lies between 18 and 79 percent. If the response rates are consistent across the two surveys, the lower bound response rate for the NSDS would be 14 percent [ (0.61/0.79)*0.18].

Copyright © National Academy of Sciences. All rights reserved.

on crime and injury found in other data. For example, Hemenway (1997a) points out that results from the NSDS imply that firearms are used defensively in every burglary committed in occupied households and in nearly 60 percent of rapes and sexual assaults committed against persons over 18 years of age; that defensive gun users thought they wounded or killed offenders in 207,000 incidents, yet only 100,000 people are treated in emergency rooms for nonfatal firearms injuries; and that hundreds of thousands of persons almost certainly would have been killed if they had not used a firearm defensively, implying that nearly all potentially fatal attacks are successfully defended against (Cook and Ludwig, 1998). Cook and Ludwig (1998), Hemenway (1997a), and others argue that these and other similar comparisons lead to "completely implausible conclusions" and go on to suggest that these inconsistencies "only buttress the presumption of massive overestimation" of defensive gun uses in the NSDS (Hemenway, 1997a:1444).

Although potentially troubling, the strong conclusion drawn about the reliability and accuracy of the DGU estimates seems premature. In some cases, it may be that the comparison statistic is subject to error. The reported prevalence of rape in the NCVS, for example, is believed to be biased substantially downward (National Research Council, 2003). More importantly, however, evidence on the apparent biases of the estimated incident rates, wounding rates, and counts of averted injuries does not directly pertain to the accuracy of the DGU estimates. Kleck and Gertz (1995), in fact, note that victimization estimates drawn using the NSDS, a survey designed to measure firearms use rather than victimization, are subject to potential reporting errors in unknown directions. Cook and Ludwig (1998) find evidence of reporting errors of crime in the firearms use surveys, with many respondents reporting that crime was involved on one hand, yet that no crime was involved on the other. Likewise, questions about whether a respondent thought he wounded or killed the offender and those eliciting subjective information on what would have happened had a gun not been used are also subject to substantial reporting biases. As noted by Kleck and Gertz (1998), respondents may be inclined to "remember with favor their marksmanship" and may tend to exaggerate the seriousness of the event.

In addition to invalid response errors, sampling variability may also play an important role in these conditional comparisons. Inferences drawn from the relatively small subsamples of persons who report using firearms defensively (N = 213 in the NSDS) are subject to high degrees of sampling error. Using data from the National Study of Private Firearms Ownership, a survey similar to the NSDS, Cook and Ludwig (1998), for example, estimate that firearms were used defensively in 322,000 rapes (rape, attempted rape, sexual assault) but report a 95 percent confidence interval of

Copyright © National Academy of Sciences. All rights reserved.

[12,000 to 632,000].[9] The lower bound interval estimate would imply that firearms are used defensively in less than 3 percent of all rapes and sexual assaults (Kleck, 2001a).

### *Replication and Recommendations*

As indicated above, the estimated numbers of defensive gun uses found using the NSDS have been reproduced (i.e., are statistically indistinguishable) in many other surveys. Kleck (2001a:270) suggests that replication provides ample evidence of the validity of the findings in the NSDS survey:

> The hypothesis that many Americans use guns for self-protection each year has been repeatedly subjected to empirical test, using the only feasible method for doing so, survey of representative samples of the populations. The results of nineteen consecutive surveys unanimously indicate that each year huge numbers of Americans (700,000 or more) use guns for self-protection. Further, the more technically sound the survey, the higher the defensive gun use estimates. The entire body of evidence cannot be rejected based on the speculation that all surveys share biases that, on net, cause an over estimation of defensive gun use frequency because, ignoring fallacious reasoning, there is no empirical evidence to support this novel theory. At this point, it is fair to say that no intellectually serious challenge has been mounted to the case for defensive gun use being very frequent.

Certainly, the numerous surveys reveal some phenomena. In light of the differences in coverage and potential response errors, however, what exactly these surveys measure remains uncertain. Ultimately, the committee found no comfort in numbers: the existing surveys do not resolve the ongoing questions about response problems and do not change the fact that different subpopulations are queried. Mere repetition does not eliminate bias (Rosenbaum, 2001; Hemenway, 1997a).

However, the committee strongly agrees with the main sentiment expressed by Kleck and others. Evidence from self-reported surveys will invariably be subject to concerns over reporting errors and other biases. Still, we can hope to have a greater degree of confidence in the survey results by relying on replications and survey sampling experiments that serve to effectively reduce the degree of uncertainty about the true prevalence rate. The objective of these experiments should be consistency of results in a variety of sampling designs. Replications and experiments should disrupt aspects of the original study to check whether the prevalence estimate is reproduced or altered under different survey designs. Effective replications will vary the

---

[9]Kleck and Gertz (1995) do not report confidence intervals for these conditional estimates.

Copyright © National Academy of Sciences. All rights reserved.

Firearms and Violence: A Critical Review
http://www.nap.edu/catalog/10881.html

nature of the potential biases in order to explicitly reduce, rather than increase, the prospects of reproducing the original results (Rosenbaum, 2001).

These ideas are not new to this controversial literature. McDowall et al. (2000) do exactly this type of experimental evaluation by holding certain factors constant—namely, the sampling methodology—but varying the content of the questionnaire. Other similar experiments or replications or both could be used to vary the nature of memory telescoping, social presentation bias, and other plausible factors that might influence reporting behaviors. In fact, Cook and Ludwig (1998), Smith (1997), Kleck (2000), and many others make numerous recommendations for experiments or replications.

The committee strongly believes that these types of studies can and should be undertaken. Without reliable information, researchers will continue to be forced to make unsubstantiated assumptions about the validity of responses and thus about the prevalence of defensive gun use.

**The committee recommends a systematic and rigorous research program to (1) clearly define and understand what is being measured, (2) understand inaccurate response in the national use surveys, and (3) develop methods to reduce reporting errors to the extent possible.** Well-established survey sampling methods can and should be brought to bear to evaluate the response problems. Understanding response will be useful for not only explaining the striking gap in DGU estimates but, more importantly, understanding defensive gun use.

## EFFICACY OF SELF-DEFENSE WITH A FIREARM

Accurate measurement on the extent of firearms use is the first step for beginning a constructive dialogue on how firearms are used in American society. Invariably, however, attention will turn to the more important and difficult questions about the consequences of using a firearm for self-defense. How effective are firearms at preventing injury and crime? Would gun users have been better off (on average) using alternative defensive strategies? How does the efficacy of self-defense vary by circumstance (e.g., abilities of victim and perpetrator, location of crime, weaponry)?

Answering these questions is essential for evaluating the costs and benefits of firearms to society. For example, if using a firearm defensively is no more effective than basic avoidance techniques, then defensive gun use would have no relative benefit. In contrast, if firearms are more effective at resisting crime and injury than alternative methods, then civilian ownership and the use of firearms may play a vital role in the nation's ability to deter and fight crime. Of course, the benefits of defensive gun use must ultimately be weighed against the potential costs that may arise if firearms are involved in the final stages of violent criminal encounters: defensive gun use may lead to relatively higher risks of injury and death to victims or offend-

Copyright © National Academy of Sciences. All rights reserved.

Firearms and Violence: A Critical Review
http://www.nap.edu/catalog/10881.html
e: 1:10-cv-04184 Document #: 179-2 Filed: 04/27/12 Page 128 of 714 PageID #:6

**TABLE 5-2** Probability of Injury and Loss Among Victims by Means of Self-Protection

| Method | Robbery | | Assault |
|---|---|---|---|
| | Injury | Loss | Injury |
| With gun | 12.8 | 15.2 | 27.9 |
| All self-protection | 34.0 | 52.8 | 58.1 |
| No self-protection | 23.6 | 83.6 | 55.2 |
| All incidents | 30.2 | 69.9 | 57.4 |

SOURCE: Adapted from Kleck (2001b:289, Table 7.1).

ers. Finally, both the benefits and costs must be evaluated within the context of offender weaponry. If criminals were not armed, would firearms be more or less useful for protecting potential victims? If the efficacy of self-defense depends on the number of firearms in society, then partial equilibrium analyses that hold offender weaponry fixed may not answer the right questions.

#### Empirical Evidence

While the literature on self-defense has been preoccupied with the basic measurement questions, a handful of studies assess the efficacy of defensive gun use.[10] Using data from the NCVS, Kleck (2001b) compares the probability of injury and crime by different defensive actions. The results, summarized in Table 5-2, suggest that respondents who use firearms are less likely to be injured and lose property than those using other modes of protection. For example, while the overall rate of injury in robbery is 30.2, only 12.8 percent of those using a firearm for self-protection were injured. Ziegenhagen and Brosnan (1985) draw similar conclusions about the efficacy of armed (although not firearm) resistance when summarizing 13 city victim surveys. Using a multivariate regression analysis, Kleck and DeLone (1993) confirm these basic cross-tabular findings.[11] Defense with a firearm is associated with

---

[10]A number of studies use samples of data collected from crimes reported to police. Police records are presumed to understate resistance in general and defensive gun use in particular (Kleck, 2001a; Kleck and DeLone, 1993). More importantly, these surveys cannot reveal successful forms of resistance that are not reported to the police at all.

[11]The committee is not aware of other multivariate analyses of the effects of resistance with a firearm on crime and injury. Researchers have, however, evaluated the effects of armed resistance. Using data from the NCVS, Kleck and Sayles (1990) conclude that rapes are less likely to be completed if the victim uses armed resistance. Lizotte (1986) draws similar conclusions using data from city victim surveys.

Copyright © National Academy of Sciences. All rights reserved.

Firearms and Violence: A Critical Review
http://www.nap.edu/catalog/10881.html

fewer completed robberies and less injury. Two forms of self-defense, namely using force without a weapon and trying to get help or attract attention, are associated with higher injury rates than taking no self-protective action.

The results suggest interesting associations: victims who use guns defensively are less likely to be harmed than those using other forms of self-protection. Whether these findings reflect underlying causal relationships or spurious correlations remains uncertain. Much of the existing evidence reports simple bivariate correlations, without controlling for any confounding factors. Kleck and DeLone (1993) rely on multivariate linear regression methods that implicitly assume that firearms use, conditional on observed factors, is statistically independent of the unobserved factors influencing the outcomes, as would be the case in a classical randomized experiment.[12] Is this exogenous selection assumption reasonable? Arguably, the decisions to own, carry, and use a firearm for self-defense are very complex, involving both individual and environmental factors that are related to whether a crime is attempted, as well as the outcomes of interest.[13] The ability of a person to defend himself or herself, attitudes toward violence and crime, emotional well-being, and neighborhood characteristics may all influence whether a person uses a firearm and the resulting injury and crime. Thus, in general, it is difficult to be confident that the control variables account for the numerous confounding factors that may result in spurious correlations. Furthermore, the committee is not aware of any research that considers whether the finding is robust to a variety of methodological adjustments. Without an established body of research assessing whether the findings are robust to the choice of covariates, functional form, and other modeling assumptions, it is difficult to assess the credibility of the research to date.

The most obvious and fundamental limitation, however, is that the data on defensive gun uses are, as described above, potentially error ridden. Without reliable information on the prevalence of defensive gun use, researchers are forced to make implausible and unsubstantiated assumptions about the accuracy of self-reported measures of resistance. For example, Kleck, one of the most vocal critics of DGU estimates derived from the NCVS, assumes these data are fully accurate when measuring the efficacy of resistance (Kleck, 2001b; Kleck and DeLone, 1993).

---

[12]Kleck and DeLone (1993) account for basic demographic characteristics of the victim (e.g., race, gender, age, income, and education) and some details on the event (e.g, whether the offender had a gun).

[13]Not only does the potential of unobserved factors create biases of unknown magnitude, but it is also difficult to determine the direction of these biases. If, as suggested by the National Research Council (1993:266), persons who use firearms were better prepared in general to defend against crime, then the estimated associations would be biased upward. In contrast, if firearms are used in more dangerous situations, then the estimated associations would be biased downward (Kleck, 2001b:292).

Copyright © National Academy of Sciences. All rights reserved.

The response problems described above, however, cannot be ignored. To the contrary, these measurement problems may lead to substantial biases in unknown directions. If, for example, respondents are inclined to report being victimized when a crime is "successful" but conceal unsuccessful crimes, the estimated efficacy of resistance will be biased downward. In contrast, if respondents, concerned about being perceived as inept, are inclined to report successful forms of resistance but conceal ineffective forms, the estimated efficacy of self-defense will be biased upward. Without better information on the nature and extent of response problems, it is impossible to know whether and how the estimated associations between defensive gun use, crime, and injury are biased. If, as Kleck and Gertz (1995) suggest, the NCVS misses over 2 million defensive uses per year, then biases caused by reporting errors may be substantial.

## Subjective Assessments

Subjective assessments on the efficacy of defensive gun use have been elicited in both the NCVS and the NSDS. Data from the 1994 NCVS, for example, reveal that 65 percent of victims felt that self-defense improved their situation, while 9 percent thought that it worsened their situation (Kleck, 2001a). More direct counterfactual questions were asked in the NSDS survey, in which respondents who reported using a firearm were asked (Kleck and Gertz, 1995:316):

> If you had *not* used a gun for protection in this incident, how likely do you think it is that you or someone else would have been *killed*? Would you say almost certainly not, probably not, might have, probably would have, or almost certainly would have been killed?

Nearly half of respondents perceived that someone might, probably, or almost certainly would have been killed.

Although intriguing, these assessments are of limited value. Certainly, there are obvious concerns about inaccurate reporting associated with subjective questions. Victims may be inclined to view their actions as effective regardless and may exaggerate counterfactual outcomes. Even if victims report truthfully, the existing questionnaires provide little guidance. What does a respondent mean when he states that someone might have been killed? Are all respondents using consistent criteria to interpret these questions?

## Firearms and Fatalities

A number of researchers have attempted to infer the defensive utility of firearms by examining the firearms deaths that occur in or near the victim's

Copyright © National Academy of Sciences. All rights reserved.

Firearms and Violence: A Critical Review
http://www.nap.edu/catalog/10881.html

home. Both Kellermann and Reay (1986) and Rushforth et al. (1974) compare fatalities caused by self-defense and other motivations. Both studies find that people using guns in self-defense account for a small fraction of fatalities in the home. Kellermann and Reay find that there were nearly 5 times as many homicides and 37 times as many suicides as perpetrators killed in self-defense. They go on to conclude, "The advisability of keeping a firearm in the home for protection must be questioned." Rushforth et al. (1974) found similar results and drew similar conclusions.

Although the facts are in no doubt, the conclusions do not seem to follow. Certainly, effective defensive gun use need not ever lead the perpetrator to be wounded or killed. Rather, to assess the benefits of self-defense, one needs to measure crime and injury averted. The particular outcome of an offender is of little relevance. It might be, as Kleck (2001b) suggests, that the ratio of firearm-caused fatalities to fatalities averted because of defensive gun use is a more relevant comparison. Answering this question, however, requires researchers to address the fundamental counterfactual questions regarding the effects of both defensive and offensive uses of firearms that have been the subject of much of this report and have generally proved to be elusive. Simple death counts cannot answer these complex questions.

Case-control sampling schemes matching homicide victims to nonvictims with similar characteristics have also been used to infer whether owning a firearm is a risk factor for homicide and the utility of firearms for self-defense (see Chapter 7 for a discussion of the case-control methodology). Kellermann et al. (1993) found that persons who had a firearm in the home were at a greater risk for homicide in their home than persons who did not have a firearm (adjusted odds ratio of 2.7). Cummings et al. (1997) found that persons who purchased a handgun were at greater risk for homicide than their counterparts who had no such history (adjusted odds ratio of 2.2).

In light of these findings, Kellermann et al. (1993) ultimately conclude that owning firearms for personal protection is "counterproductive," (p. 1087) and that "people should be strongly discouraged from keeping guns in the home" (p. 1090). This conclusion rests on the implicit assumption that the decision to own a firearm is random or exogenous with respect to homicide in the home (after controlling for various observed factors, including whether a household member has been hurt in a fight, has been arrested, or has used illicit drugs). Cummings and his colleagues (1997) do not draw such strong causal conclusions, but instead simply describe the observed positive association between firearms and homicide.

In the committee's view, the exogenous selection assumption and the resulting conclusions are not tenable. While these observed associations between firearms ownership and homicide may be of interest, they do little to reveal the impact of firearms on homicide or the utility of firearms for

Copyright © National Academy of Sciences. All rights reserved.

Firearms and Violence: A Critical Review
http://www.nap.edu/catalog/10881.html

self-defense. As noted by the authors, even small degrees of misreporting on ownership by either the cases or the controls can create substantial biases in the estimated risk factors (see Kleck, 1997, for an illustration of these biases). A more fundamental inferential problem arises from the fact that ownership is not likely to be random with respect to homicide or other forms of victimization. To the contrary, the decision to own a firearm may be directly related to the likelihood of being victimized. People may, for instance, acquire firearms in response to specific or perceived threats, and owners may be more or less psychologically prone toward violence. Thus, while the observed associations may reflect a causal albeit unspecified pathway, they may also be entirely spurious. As Kellermann and his colleagues note (1993:1089), "it is possible that reverse causation accounted for some of the association we observed between gun ownership and homicide."

Copyright © National Academy of Sciences. All rights reserved.

# 6

# Right-to-Carry Laws

$\mathbf{I}$ his chapter is concerned with the question of whether violent crime is reduced through the enactment of *right-to-carry-laws,* which allow individuals to carry concealed weapons.[1] In all, 34 states have right-to-carry laws that allow qualified adults to carry concealed handguns. Proponents of these laws argue that criminals are deterred by the knowledge that potential victims may be carrying weapons and therefore that the laws reduce crime. However, it is not clear a priori that such deterrence occurs. Even if it does, there may be offsetting adverse consequences. For example, increased possession of firearms by potential victims may motivate more criminals to carry firearms and thereby increase the amount of violence that is associated with crime. Moreover, allowing individuals to carry concealed weapons may increase accidental injuries or deaths or increase shootings during arguments. Ultimately, it is an empirical question whether allowing individuals to carry concealed weapons generates net social benefits or net social costs.

The statistical analysis of the effects of these laws was initiated by John Lott and David Mustard (1997) and expanded by Lott (2000) and Bronars and Lott (1998) (hereinafter referred to simply as Lott). Lott concludes that the adoption of right-to-carry laws substantially reduces the prevalence of violent crime. Many other researchers have carried out their own statistical analyses using Lott's data, modified versions of Lott's data, or expanded

---

[1]The laws are sometimes called *shall-issue* laws because they require local authorities to issue a concealed-weapons permit to any qualified adult who requests one. A qualified adult is one who does not have a significant criminal record or history of mental illness. The definition of a nonqualified adult varies among states but includes adults with prior felony convictions, drug charges, or commitments to mental hospitals.

*120*

Copyright © National Academy of Sciences. All rights reserved.

http://www.nap.edu/catalog/10881.html

data sets that cover the more recent time period not included in the original analysis.[2]

Because the right-to-carry issue is highly controversial, has received much public attention, and has generated a large volume of research, the committee has given it special attention in its deliberations. This chapter reviews the existing empirical evidence on the issue. We also report the results of our own analyses of the data. We conclude that, in light of (a) the sensitivity of the empirical results to seemingly minor changes in model specification, (b) a lack of robustness of the results to the inclusion of more recent years of data (during which there are many more law changes than in the earlier period), and (c) the imprecision of some results, it is impossible to draw strong conclusions from the existing literature on the causal impact of these laws. Committee member James Q. Wilson has written a dissent that applies to Chapter 6 only (Appendix A), and the committee has written a response (Appendix B).

## DESCRIPTION OF THE DATA AND METHODS

Researchers studying the effects of right-to-carry laws have used many different models. However, all of the analyses rely on similar data and methodologies. Accordingly, we do not attempt to review and evaluate each of the models used in this literature. Instead, we describe the common data used and

---

[2]Two other general responses to Lott's analysis deserve brief mention. First, some critics have attempted to discredit Lott's findings on grounds of the source of some of his funding (the Olin Foundation), the methods by which some of his results were disseminated (e.g., some critics have claimed, erroneously, that Lott and Mustard, 1997, was published in a student-edited journal that is not peer reviewed), and positions that he has taken on other public policy issues related to crime control. Much of this criticism is summarized and responded to in Chapter 7 of Lott (2000). The committee's view is that these criticisms are not helpful for evaluating Lott's data, methods, or conclusions. Lott provides his data and computer programs to all who request them, so it is possible to evaluate his methods and results directly. In the committee's view, Lott's funding sources, methods of disseminating his results, and opinions on other issues do not provide further information about the quality of his research on right-to-carry laws.

A second group of critics have argued that Lott's results lack credibility because they are inconsistent with various strongly held a priori beliefs or expectations. For example, Zimring and Hawkins (1997:59) argue that "large reductions in violence [due to right-to-carry laws] are quite unlikely because they would be out of proportion to the small scale of the change in carrying firearms that the legislation produced." The committee agrees that it is important for statistical evidence to be consistent with established facts, but there are no such facts about whether right-to-carry laws can have effects of the magnitudes that Lott claims. The beliefs or expectations of Lott's second group of critics are, at best, hypotheses whose truth or falsehood can only be determined empirically. Moreover, Lott (2000) has argued that there are ways to reconcile his results with the beliefs and expectations of the critics. This does not necessarily imply that Lott is correct and his critics are wrong. The correctness of Lott's arguments is also an empirical question about which there is little evidence. Rather, it shows that little can be decided through argumentation over a priori beliefs and expectations.

Copyright © National Academy of Sciences. All rights reserved.

Firearms and Violence: A Critical Review
http://www.nap.edu/catalog/10881.html

focus on the common methodological basis for all of them. In particular, we use the results presented in Tables 4.1 and 4.8 of Lott (2000) to illustrate the discussion. We refer to these as the "dummy variable" and "trend" model estimates, respectively. Arguably, these tables, which are reproduced in Table 6-1 and Table 6-2, contain the most important results in this literature.

## Data

The basic data set used in the literature is a county-level panel on annual crime rates, along with the values of potentially relevant explanatory variables. Early studies estimated models on data for 1977-1992, while more recent studies (as well as our replication exercise below) use data up to 2000. Between 1977 and 1992, 10 states adopted right-to-carry laws.[3] A total of 8 other states adopted right-to-carry laws before 1977. Between 1992 and 1999, 16 additional states adopted such laws.

The data on crime rates were obtained from the FBI's Uniform Crime Reports (UCR). Explanatory variables employed in studies include the arrest rate for the crime category in question, population density in the county, real per capita income variables, county population, and variables for the percent of population that is in each of many race-by-age-by-gender categories. The data on explanatory variables were obtained from a variety of sources (Lott, 2000: Appendix 3).

Although most studies use county-level panels on crime rates and demographic variables, the actual data files used differ across studies in ways that sometimes affect the estimates. The data set used in the original Lott study has been lost, although Lott reconstructed a version of the data, which he made available to other researchers as well as the committee. This data set, which we term the *"revised original data set,"* covers the period 1977-1992.[4] More recently, Lott has made available a data set covering the

---

[3]There is some disagreement over when and whether particular states have adopted right-to-carry laws. Lott and Mustard, for example, classify North Dakota and South Dakota as having adopted such laws prior to 1977, but Vernick and Hepburn (2003) code these states as having adopted them in 1985. Likewise, Lott and Mustard classify Alabama and Connecticut as right-to-carry states adopting prior to 1977, yet Vernick codes these states as not having right-to-carry laws. See Ayres and Donohue (2003a:1300) for a summary of the coding conventions on the adoption dates of right-to-carry laws.

[4]There are 3,054 counties observed over 16 years in the revised original data. In the basic specifications, there are a number of sample restrictions, the most notable of which is to drop all counties with no reported arrest rate (i.e., counties with no reported crime). This restricts the sample to approximately 1,650 counties per year (or approximately 26,000 county-year observations). In specifications that do not involve the arrest rate, Lott treats zero crime as 0.1 so as not to take the log of 0. Black and Nagin (1998) further restrict the sample to counties with populations of at least 100,000, which limits the sample to 393 counties per year. In some regressions, Duggan (2001) and Plassmann and Tideman (2001) estimate models that include data on the over 2,900 counties per year with nonmissing crime data.

Copyright © National Academy of Sciences. All rights reserved.

Firearms and Violence: A Critical Review
http://www.nap.edu/catalog/10881.html

period 1977-2000 that corrects acknowledged errors in data files used by Plassmann and Whitley (2003). We term this file the *"revised new data set."* [5] We make use of both of these data sets in our replication exercises.

## Dummy Variable Model

For expository purposes it is helpful to begin by discussing the dummy variable model without "control" variables.[6] The model (in Lott, 2000: Table 4.1) allows each county to have its own crime level in each category. Moreover, the crime rate is allowed to vary over time in a pattern that is common across all counties in the United States. The effect of a right-to-carry law is measured as a change in the level of the crime rate in a jurisdiction following the jurisdiction's adoption of the law. Any estimate of a policy effect requires an assumption about the "counterfactual," in this case what would have happened to crime rates in the absence of the change in the law. The implicit assumption underlying this simple illustrative dummy variable model is that, in the absence of the change in the law, the crime rate in each county would, on average, have been the county mean plus a time-period adjustment reflecting the common trend in crime rates across all counties.

Dummy variable models estimated in the literature are slightly more complicated than the above-described model. First, they typically include control variables that attempt to construct a more realistic counterfactual. For example, if crime rates vary over time with county economic conditions, then one can construct a more credible estimate of what would have happened in the absence of the law change by including the control variables as a determinant of the crime rate. Most estimates in the literature use a large number of control variables, including local economic conditions, age-gender population composition, as well as arrest rates.

Second, some estimates in the literature model the time pattern of crime differently. In particular, some studies allow each region of the country to have its own time pattern, thereby assuming that in the absence of the law change, counties in nearby states would have the same time pattern of crime rates in a crime category. We term this the "region-interacted time pattern model," in contrast to the "common time pattern" dummy variable model above.

---

[5]These data were downloaded by the committee from www.johnlott.org on August 22, 2003.

[6]This no-control model is often used as a way to assess whether there is an association between the outcome (crime) and the law change in the data. The committee estimates and evaluates this model below (see Tables 6-5 and 6-6, rows 2 and 3).

Copyright © National Academy of Sciences. All rights reserved.

Mathematically, the common time pattern dummy variable model takes the form

$$(6.1) \quad Y_{it} = \sum_{t=1977}^{1992} \alpha_t YEAR_t + \beta X_{it} + \delta LAW_{it} + \gamma_i + \varepsilon_{it} \ ,$$

where $Y_{it}$ is the natural logarithm of the number of crimes per 100,000 population in county $i$ and year $t$, $YEAR_t = 1$ if the year is $t$ and $YEAR_t = 0$ otherwise, $X_{it}$ is a set of control variables that potentially influence crime rates, $LAW_{it} = 1$ if a right-to-carry law was in effect in county $i$ and year $t$ and $LAW_{it} = 0$ otherwise, $\gamma_i$ is a constant that is specific to county $i$, and $\varepsilon_{it}$ is an unobserved random variable. The quantities $\alpha_t$, $\beta$, and $\delta$ are coefficients that are estimated by fitting the model to data. The coefficient $\delta$ measures the percentage change in crime rates due to the adoption of right-to-carry laws. For example, if $\delta = -0.05$ then the implied estimate of the adoption of a right-to-carry law is to reduce the crime rate by 5 percent. The coefficients $\alpha_t$ measure common time patterns across counties in crime rates that are distinct from the enactment of right-to-carry laws or other variables of the model.

The vector $X_{it}$ includes the control variables that may influence crime rates, such as indicators of income and poverty levels; the density, age distribution, and racial composition of a county's population; arrest rates; and indicators of the size of the police force. The *county fixed effect* $\gamma_i$ captures systematic differences across counties that are not accounted for by the other variables of the model and do not vary over time. The values of the parameters $\alpha_t$, $\beta$, and $\delta$ are estimated separately for each of several different types of crimes. Thus, the model accounts for the possibility that right-to-carry laws may affect different crimes differently.

## Trend Model

While the dummy variable model measures the effect of the adoption of a right-to-carry law as a one-time shift in crime rates, one can alternatively estimate the effect as the change in time trends. The following trend model, which generated the results in Lott's Table 4.8, allows right-to-carry laws to affect trends in crime:

$$(6.2) \quad Y_{it} = \sum_{t=1977}^{1992} \alpha_t YEAR_t + \beta X_{it} + \delta_B YRBEF_{it} + \delta_A YRAFT_{it} + \gamma_i + \varepsilon_{it}$$

In this model, $YRBEF_{it}$ is a variable equal to 0 if year $t$ is after the adoption of a right-to-carry law and the number of years until adoption if year $t$ precedes adoption. $YRAFT_{it}$ is 0 if year $t$ precedes adoption of a right-to-carry law and is the number of years since adoption of the law otherwise. The other variables are defined as in Model 6.1. The effect of adoption on the trend in crime is measured by $\delta_A - \delta_B$.

Copyright © National Academy of Sciences. All rights reserved.

The interpretation of the "trend" model is slightly complicated, since the model already includes year effects to accommodate the time pattern of crime common across all counties. To see what this model does, consider a more flexible model with a series of separate dummy variables, for each number of years prior to—and following—the law change for adopting states (see the figures illustrating the section later in the chapter called "Extending the Baseline Specification to 2000"). Thus, for example, a variable called *shall_issue_minus_1* is 1 if the observation corresponds to a county in a state that adopts the law in the following year, 0 otherwise. Similarly, *shall_issue_plus_5* is 1 if the observation corresponds to a county in a state that adopted five years ago, 0 otherwise. And so on.

The coefficient on each of these variables shows how adopting states' time patterns of crime rates move, relative to the national time pattern, surrounding the respective states' law adoption. Note that the time pattern in question is not calendar time but rather time relative to local law adoption, which occurs in different calendar years in different places.

The trend model in equation 6.2 constrains the adopting states' deviations to fall on two trend lines, one for years before and one for years after adoption. Thus, the model restricts the yearly movements in the deviations to fall on trend lines with break points at the time of law adoption.

## STATISTICAL ANALYSES OF RIGHT-TO-CARRY LAWS

In this section, we review the basic empirical findings on the effects of right-to-carry laws. We begin with a discussion of Lott's original estimates of Models 6.1 and 6.2 and the committee's efforts to replicate these findings. We then discuss results from other studies that estimate the effects of right-to-carry laws on crime.

### Lott's Results

Table 6-1 (first row) displays Lott's estimates from Model 6.1. Lott finds that where they have been adopted, right-to-carry laws have reduced homicide by about 8 percent, rapes by about 5 percent, and aggravated assaults by about 7 percent (Lott, 2000:51). Lott also finds that adoption of right-to-carry laws may increase the rates of nonviolent property crimes (burglary, larceny, auto theft). In theory, this is possible, as criminals substitute away from crimes that involve contact with victims toward crimes that do not involve encounters with victims.

Rows 2 and 3 of Table 6-1 report the results of the committee's replication of these estimates. In row 2, we use the *revised original data set* and Lott's computer programs. The committee was unable to replicate Lott's estimate of the reduction in the murder rate, although the estimates are

Copyright © National Academy of Sciences. All rights reserved.

**TABLE 6-1** Dummy Variable Model with Common Time Pattern, Original and Revised Data[a]

|  | Sample | Years | Violent Crime | Murder | Rape |
|---|---|---|---|---|---|
| 1. Lott (2000) | Original 1992 | 1992 | −4.9% | −7.7% | −5.3% |
| 2. Committee replication SE | Revised 1992[b] | 1992 | −4.91 (0.98)** | −7.30 (1.57)** | −5.27 (1.22)** |
| 3. Committee replication SE | Revised 2000[c] | 1992 | −1.76 (1.07) | −9.01 (1.70)** | −5.38 (1.33)** |

[a]The regressions use the covariates and specification from the original Lott and Mustard (1997) models that do not control for state poverty, unemployment, death penalty execution rates, or regional time trends. The controls include the arrest rate for the crime category in question (AOVIOICP), population density in the county, real per capita income variables (RPCPI RPCUI RPCIM RPCRPO), county population (POPC), and variables for the percentage of the population that is in each of many race x age x gender categories (e.g., PBM1019 is the percentage of the population that is black, male, and between ages 10 and 19). The "no

close and consistent with the conclusion that right-to-carry laws reduce the incidence of murder. Through communication with Lott, the committee learned that the data used to construct Table 4.1 of Lott (2000) were lost and that the data supplied to the committee are a reconstruction and not necessarily identical to the original data.

Row 3 displays estimates using the *revised new data set* restricted to period 1977-1992. The estimates from these revised data are substantially different from those originally reported by Lott (2000). In the dummy variable model, the magnitude of the estimated reduction in the rates of violent crime and aggravated assault was reduced, the estimated reduction in the murder rate increased, and the sign of the estimated effects of right-to-carry laws on robbery reversed. Moreover, the effects of right-to-carry laws on violent crime are no longer statistically significantly different from zero at the 5 percent significance level. Finally, the estimated increase in the rates of all property crimes increased substantially.

Table 6-2 presents estimates of the trend model. The first row displays Lott's estimates. Lott finds the passage of right-to-carry laws to be associated with changes in the crime trend. He finds a 0.9 percent reduction in the annual rate of growth of violent crime overall, and a 0.6 percent reduction in the rate of growth of property crimes. Row 2 of Table 6-2 shows the committee's attempt to replicate Lott's results using the *revised original data set*. The committee was unable to replicate most of the results in Lott's Table 4.8. Through communication with Lott, the committee learned that

Copyright © National Academy of Sciences. All rights reserved.

| Aggravated Assault | Robbery | Property Crimes | Auto Theft | Burglary | Larceny |
|---|---|---|---|---|---|
| –7.0% | –2.2% | 2.7% | 7.1% | 0.05% | 3.3% |
| –7.01 (1.14)** | –2.21 (1.33) | 2.69 (0.72)** | 7.14 (1.14)** | 0.05 (0.76) | 3.34 (0.89)** |
| –5.60 (1.25)** | 1.17 (1.45) | 5.84 (0.76)** | 10.28 (1.24)** | 4.12 (0.83)** | 6.82 (0.82)** |

controls" specification" includes county fixed effects, year dummies, and the dummy for whether the state has a right-to-carry law.

*b*Using Lott's reconstruction of his original 1977-1992 data.

*c*Using the revised new data set, which contains observations, 1977-2000, even though the estimates in this row use data only through 1992.

NOTE: All samples start in 1977. SE = standard error. Standard errors are in parentheses, where * = significant at 5% and ** = significant at 1%.

this is because there are many misprints in Table 4.8. Nonetheless, Lott's and the committee's results have the same signs for all crimes except aggravated assault. Row 3 displays estimates using the *revised new data set* restricted to the period 1977-1992. These new results tend to show larger reductions in the violent crime trends than those found using the revised original data.

## Other Statistical Evaluations of Right-to-Carry Laws

Researchers have estimated the effects of right-to-carry laws using Lott's or related data and models. Many of these studies have found that the use of plausible alternative data, control variables, specifications, or methods of computing standard errors, weakens or reverses the results. Tables 6-3 and 6-4 display estimates from selected studies that illustrate variability in the findings about the effects of right-to-carry laws. The committee does not endorse particular findings or consider them to provide better estimates of the effects of right-to-carry laws than do Lott's results. Moreover, the committee recognizes that several independent investigators have used alternative models or data to obtain results that are consistent with Lott's. These investigators include Bartley and Cohen (1998) and Moody (2001). We focus on the conflicting results in this section because they illustrate a variability of the findings that is central to the committee's evaluation of their credibility.

Copyright © National Academy of Sciences. All rights reserved.

**TABLE 6-2** Trend Model with Common Time Pattern, 1977-1992[a]

|  | Sample | Years | Violent Crime | Murder | Rape |
|---|---|---|---|---|---|
| 1. Lott (2000) | Original 1992 | 1992 | −0.9% | −3.0% | −1.4% |
| 2. Committee replication SE | Revised 1992[b] | 1992 | −0.50 (0.41) | −4.25 (0.65)** | −1.37 (0.51)** |
| 3. Committee replication SE | Revised 2000[c] | 1992 | −2.15 (0.39)** | −3.41 (0.62)** | −3.37 (0.48)** |

[a]The regressions use the covariates and specification from the original Lott and Mustard (1997) models that do not control for state poverty, unemployment, death penalty execution rates, or regional time trends. The controls include the arrest rate for the crime category in question (AOVIOICP), population density in the county, real per capita income variables (RPCPI RPCUI RPCIM RPCRPO), county population (POPC), and variables for the percentage of the population that is in each of many race × age × gender categories (e.g., PBM1019 is the percentage of the population that is black, male, and between ages 10 and 19).

### Control Variables and Specification

The most common modifications to Lott's original analyses of right-to-carry laws has been to assess the sensitivity of the findings to variation in the control variables or the specification of the model. Lott's basic model relies on dozens of controls, but concerns have been raised that some controls may be missing, others may be unnecessary, and still others may be endogenous (that is, related to the unobserved determinates of county crime rates).

Duggan (2001), for example, raises concerns that county-level control variables may not be precisely measured on an annual basis and that the arrest rate control variable, which includes the crime rate in the denominator, may bias the estimates. In response to these concerns, Duggan estimated a simple dummy variable model that controls only for year and county fixed effects.[7] Duggan drops all other covariates from the model. When estimated on all county-year observations with nonmissing crime

---

[7]Duggan also changed the coding of the dates of adoption of right-to-carry laws, although this had only a minimal effect on the estimates. According to Duggan (2001) and others (see, for example, Ayres and Donohue, 2003a), there is an inconsistency in the coding used by Lott and Mustard. Duggan finds that in 8 of the 10 right-to-carry states, the adoption date is defined as the year the law was passed, but in 2 states, Florida and Georgia, the adoption date is set to the calendar year after the law was passed. Lott, in personal communications, maintains that the dates are coded correctly. The committee does not take a stand on which coding is correct.

Copyright © National Academy of Sciences. All rights reserved.

| Aggravated Assault | Robbery | Property Crimes | Auto Theft | Burglary | Larceny |
|---|---|---|---|---|---|
| −0.5% | −2.7% | −0.6% | −0.1% | −0.3% | −1.5% |
| 0.46 (0.48) | −2.72 (0.56)** | −0.69 (0.30)* | −0.31 (0.48) | −1.58 (0.32)** | −0.11 (0.37) |
| −2.63 (0.45)** | −3.02 (0.53)** | −1.13 (0.27)** | 0.25 (0.45) | −1.80 (0.30)** | −0.84 (0.30)** |

[b]Using Lott's reconstruction of his original 1977-1992 data.

[c]Using the revised new data set, which contains observations, 1977-2000, even though the estimates in this row use data only through 1992.

NOTE: All samples start in 1977. SE = standard error. Standard errors are in parentheses, where * = significant at 5% and ** = significant at 1%.

data, this reduced the magnitude of the estimated reduction in the rates of murder and aggravated assault, and it reversed the signs of the estimated effects of right-to-carry laws on rape, robbery, and all violent crime. That is, according to Duggan's estimates, adoption of right-to-carry laws increases the frequencies of rape, robbery, and violent crime as a whole. Moreover, Duggan found there is no statistically significant effect of right-to-carry laws on violent crimes (at the 5 percent significance level).

Other researchers have varied the specification of the model, allowing for the effects of right-to-carry laws to be more heterogeneous. Black and Nagin (1998), for example, estimated a dummy variable model in which the effects of right-to-carry laws are allowed to vary among states (that is, the coefficient $\delta$ is allowed to take different values for different states). Plassmann and Tideman (2001) estimate a nonlinear Poisson regression model with a restricted set of covariates, but otherwise similar to Model 6.1. Ayres and Donohue (2003a) combined Models 6.1 and 6.2, thereby obtaining a hybrid model in which adoption of right-to-carry laws can affect both the level and the trend of crime. The results from these analyses, which vary the way in which right-to-carry laws can effect crime, are highly variable, with some suggesting that the laws increase crime, others suggesting that they decrease crime, and many being statistically insignificant.

In Black and Nagin (1998), for example, only Florida has a statistically significant decrease in the murder rate following adoption of a right-to-carry law, and only West Virginia has a statistically significant increase in

Copyright © National Academy of Sciences. All rights reserved.

**TABLE 6-3** Summary of Selected Studies: Dummy Variable Model (percentage) (shaded cells indicate a positive coefficient)

| Source | Modification | Violent Crime | Murder | Rape |
|---|---|---|---|---|
| Lott (2000) | Original specification and data | −5* | −8* | −5* |
| Moody | Unweighted | −6* | −4* | −5* |
|  | State-level analysis | −11 | 15 | −22* |
| Duggan[a] | County and time effects only | −1 | −6 | 3 |
|  | All counties | 0 | −1 | 6 |
| Black and Nagin | Large counties |  | −9* | −4 |
|  | Exclude Florida |  | −1 | 1 |
|  | Florida |  | −27.7* | −17* |
|  | Georgia |  | −5.2 | −5 |
|  | Idaho |  | −21 | −10 |
|  | Maine |  | 7.2 | 4 |
|  | Mississippi |  | 5.4 | 32* |
|  | Montana |  | −36.7 | −97* |
|  | Oregon |  | −5.9 | 4 |
|  | Pennsylvania |  | −8.9 | 4 |
|  | Virginia |  | 3.9 | −8 |
|  | West Virginia |  | 72* | −29* |
| Plassmann and Tideman | No control for arrest rate |  | −7* | −6* |
|  | All counties |  | −2 | −5 |
|  | Count model (Poisson) |  | −11* | −4* |
|  | Florida |  | −24* | −16* |
|  | Georgia |  | −8* | −16* |
|  | Idaho |  | −6 | 10* |
|  | Maine |  | 1 | −2 |
|  | Mississippi |  | 5 | 11* |
|  | Montana |  | −7 | −4 |
|  | Oregon |  | −10* | −2 |
|  | Pennsylvania |  | −5 | 14* |
|  | Virginia |  | 8* | −3 |
|  | West Virginia |  | 5 | −1 |
| Ayres and Donohue (2003a) | State trends | 0 | −9* | −2 |
|  | 1977-1997 data | 2 | 0 | 3 |
|  | State level analysis |  |  |  |
|  | State and time effects only | −3 | −8 | −1 |
|  | 1977-1999 data | 9* | −2 | 6* |
| Plassmann and Whitley[a,b] | Regional trend + others |  |  |  |
|  | 1977-2000 data | −3 | −6* | −7* |
| Ayres and Donohue (2003b)[a,b] | Regional trends + other controls |  |  |  |
|  | 1977-2000 corrected data | 0 | −4 | −5 |

Copyright © National Academy of Sciences. All rights reserved.

| Aggravated Assault | Robbery | Property Crimes | Auto Theft | Burglary | Larceny |
|---|---|---|---|---|---|
| –7* | –2 | 3* | 7* | 0 | 3* |
| –9* | –1 | 3* | 3 | 1 | 4* |
| –18* | –10 | 1 | –9 | 4 | 3 |
| –6 | 4 | 6* | 9* | 8* | 5 |
| –5 | 10 | 7* | 11* | 10* | 5 |
| –7* | –3 | | | | |
| –6* | –5 | | | | |
| –7 | 7 | | | | |
| –4 | 8 | | | | |
| –31* | –64* | | | | |
| –52* | –33* | | | | |
| –45* | 10 | | | | |
| –71* | –14 | | | | |
| –17* | –4 | | | | |
| 7* | –5 | | | | |
| –16* | –12 | | | | |
| –3 | 9 | | | | |
| | –1 | | | | |
| | 2 | | | | |
| | 6* | | | | |
| | –3* | | | | |
| | 1 | | | | |
| | –41* | | | | |
| | –22* | | | | |
| | 25* | | | | |
| | –27* | | | | |
| | –48* | | | | |
| | –14* | | | | |
| | –5* | | | | |
| | –9* | | | | |
| 3 | –8 | –1* | –1* | –4* | 1 |
| 7* | 0 | –1 | 4 | 1 | 4 |
| –10 | –5 | 7* | 9* | 9* | 7* |
| 4* | 16* | 16* | 23* | 14* | 16* |
| –2 | –5 | 4 | 9* | 0 | 6 |
| 1 | –3 | 6* | 11* | 2 | 8* |

*continued*

Copyright © National Academy of Sciences. All rights reserved.

**TABLE 6-3** Continued

| Source | Modification | Violent Crime | Murder | Rape |
|---|---|---|---|---|
| | Standard errors | | | |
| Lott (2000) | Unadjusted standard errors | 0.98 | 1.57 | 1.22 |
| Duggan | State clustered standard errors | 2.31 | 2.95 | 2.32 |
| Helland and Tabarrok | Placebo standard errors | 4.9 | 6.4 | 5.6 |

[a]Uses clustered sampling standard errors.

[b]Added covariates for state poverty, unemployment, death penalty execution rates, and regional time trends.

**TABLE 6-4** Summary of Selected Studies: Trend and Hybrid Variable Model (shaded cells indicate a positive coefficient)

| Source | Modification | Violent Crime | Murder | Rape |
|---|---|---|---|---|
| Lott (2000) | Original specification and data | 2* | –3* | –1* |
| Lott (2000)[a] | 1977-1996 | –2* | –2* | –3* |
| Ayres and Donohue (2003a) | Hybrid model: Level | 7* | 3 | 7* |
| | Trend | –2* | –5* | –3* |
| | 1977-1997 data: Level | 0 | 7* | 6* |
| | Trend | –2* | –4* | –3* |
| Plassmann and Whitley[a,b] | Regional trend + others 1977-2000 data | –1 | –2 | –3* |
| Ayres and Donohue (2003b)[a,b] | Regional trends + other controls 1977-2000 corrected data | 0 | –2 | –2 |

[a]Added covariates for state poverty, unemployment, death penalty execution rates, and regional time trends.

[b]Standard errors adjusted for state clustering.

its murder rate. The estimated changes in the murder rates of other states that adopted right-to-carry laws are sometimes positive (three cases) and sometimes negative (five cases) and are not statistically significantly different from zero. Black and Nagin also report variations in the directions and statistical significance of changes in the rates of rape and aggravated assault. They report no statistically significant increases in robberies, but only 2 of the 10 states that adopted right-to-carry laws had statistically signifi-

Copyright © National Academy of Sciences. All rights reserved.

| Aggravated Assault | Robbery | Property Crimes | Auto Theft | Burglary | Larceny |
|---|---|---|---|---|---|
| 1.14 | 1.33 | 0.72 | 1.14 | 0.76 | 0.89 |
| 2.77 | 3.34 | 1.89 | 2.59 | 2.29 | 2.27 |
| 6.6 | 7.5 | 5.1 | 6.5 | 5.7 | 5.7 |

NOTES: Shaded cells indicate a positive coefficient estimate and * indicates the estimate is statistically significant at the 5% significance level. Unless otherwise noted, the standard errors are not adjusted for state-level clustering. Exceptions: Duggan, Plassmann and Tideman, Ayres and Donohue.

| Aggravated Assault | Robbery | Property Crimes | Auto Theft | Burglary | Larceny |
|---|---|---|---|---|---|
| −1* | −3* | −1* | 0* | −2* | 0 |
| −3* | −3* | −2* | −3* | −1* | −2* |
| 10* | −3 | 0 | 0 | −3 | 0 |
| −2 | −1 | 0 | 0 | 0 | 1 |
| 6* | 4 | −1 | 9* | 4* | 5* |
| −3* | −4* | 0 | −2* | −3* | −2* |
| −2 | −3* | 0 | 0 | −2 | −1 |
| −1 | −2 | 0 | 0 | −1 | 0 |

NOTES: Shaded cells indicate a positive coefficient estimate and * indicates the estimate is statistically significant at the 5% significance level. Unless otherwise noted, the standard errors are not adjusted for state-level clustering. Exceptions: Duggan, Plassmann and Tideman, Ayres and Donohue.

cant decreases. In summary, according to Black and Nagin, adoption of a right-to-carry law may increase, decrease, or have no discernible effect on the crime rate depending on the crime and the state that are involved.[8]

---

[8]To avoid selection problems associated with using counties with positive crime rates, Black and Nagin also restricted their analysis to counties with populations of 100,000 or more. This was done to mitigate a possible bias arising from Lott's use of the arrest rate as an explanatory variable. The arrest rate is the number of arrests divided by the number of crimes

Copyright © National Academy of Sciences. All rights reserved.

Plassmann and Tideman (2001) document similar variability in the estimates. To account for the fact that county-level crime data include a large number of observations for which the outcome variable equals zero, Plassmann and Tideman estimate a nonlinear count data model. Using data from all counties with reported crime figures, the resulting estimates on murder and rape are consistent with Lott's findings, but the sign of the estimated effect of right-to carry laws on robbery is reversed. Furthermore, when the effects of right-to-carry laws are allowed to vary among states, Plassmann and Tideman found that adoption of a right-to-carry law may increase, decrease, or have no effect on the crime rate depending on the crime and state that are involved. Consider, for example, murder. Right-to-carry laws are estimated to have a statistically significant decrease in the murder rate in Florida, Georgia, and Oregon following adoption of a right-to-carry law. Virginia has a statistically significant increase in its murder rate. The changes in the murder rates of other states that adopted right-to-carry laws are not statistically significantly different from zero. Plassmann and Tideman conclude by noting the fragility in the estimated effects of right-to-carry laws: "While this ambiguous result is somewhat discouraging, it is not very surprising. Whenever the theoretically possible and in practice plausible effects of public policy are ambiguous, it can be expected that the effects of such a policy will differ across localities that are clearly different from each other" (p. 797).

Finally, the added flexibility of the hybrid model estimated by Ayres and Donohue (2003a) produces estimation results that are different from Lott's.[9] The results found when using the revised original data (1977-

---

and is undefined in counties that report no crimes of the types analyzed. Therefore, these counties are not included in Lott's analysis. Because the denominator of the arrest rate variable contains the dependent variable in Lott's models, it is possible that dropping no-crime counties biases the results of his analysis. Nearly all of the low-crime counties have populations below 100,000. Therefore, use of only counties with larger populations largely overcomes the problem of missing arrest rate data without creating a bias.

Lott (1999:8-9; 2000:142-143), however, has argued that Black's and Nagin's results are unreliable because they eliminated 85 percent of the counties in the nation (all the counties with populations of less than 100,000). In particular, they used only one county in West Virginia. Lott (2000: Table 4.9) presents his own estimation results according to which his findings are largely unaffected by disaggregating the right-to-carry effect by state. However, Lott does not report the details of his analysis or the statistical significance levels of his estimates. Moreover, his response does not explain why Black and Nagin found statistically significant increases in some crime rates for some states following passage of right-to-carry laws.

[9]The committee takes no position on whether the hybrid model provides a correct description of crime levels or the effects of right-to-carry laws. The important feature of the hybrid model is that it nests Models 6.1 and 6.2.

Copyright © National Academy of Sciences. All rights reserved.

Firearms and Violence: A Critical Review
http://www.nap.edu/catalog/10881.html



**FIGURE 6-1** Trend in the logarithm of the violent crime rate.

1992) are illustrated in Figure 6-1, which shows the "relative trend" in the logarithm of the violent crime rate obtained from the Ayres and Donohue model for a hypothetical county in which a right-to-carry law is adopted in year 8. The relative trend is the difference between the crime trend in the adopting county and the trend in a nonadopting county with the same values of the explanatory variables $X$. According to the figure, adoption of the law increased the level of violent crime but accelerated a decreasing (relative) trend. Ayres and Donohue obtained similar results for rape and aggravated assault. For murder, the shift in the level is not statistically significant, but there is a statistically significant downward shift in the trend. There is no statistically significant effect on either the level or the trend for robbery and property crimes. Ayres and Donohue also report estimates from an expanded data set that includes the years 1977-1999. The results found using these data, which are reported in Table 6-4, are similar.

### Updated Sample Endpoint

Several researchers, including Lott, have assessed whether the basic findings from Models 6.1 and 6.2 continue to hold when using more recent data. In the epilogue to the second edition of his book, Lott (2000: Table 9.1) analyzes data covering the period 1993-1996. Plassmann and Whitley (2003) use data through 2000. In addition to updating the data, these

Copyright © National Academy of Sciences. All rights reserved.

Firearms and Violence: A Critical Review
http://www.nap.edu/catalog/10881.html

researchers also change the model specification. In particular, these analyses include additional covariates (i.e., state poverty, unemployment and death penalty execution rates) and allow for region-interacted time patterns, as opposed to a common time trend used in the original Lott models (Lott 2000:170).

With these new models and the updated sample endpoints, Lott found that the basic conclusions from the trend model are robust to the additional years of data covering the periods 1977-1996. Likewise, Plassmann and Whitley (2003) found that when the data are updated to cover the period 1977-2000, the trend model estimates of the effects of right-to-carry laws on crime continue to be negative, but only the estimates for rape and robbery are statistically significant. In the dummy variable model, Plassmann and Whitley found negative coefficient estimates for the right-to-carry coefficient for each violent crime category and positive coefficients for each of the property categories.

Ayres and Donohue (2003b), however, document a number of errors in the data used by Plassmann and Whitley, and Lott's revised new data correct these errors. Plassmann, in communications with the committee, has agreed that the changes to these data are appropriate. Using the revised new data, the committee exactly replicated the results reported by Ayres and Donohue (2003b).

In particular, Ayres and Donohue (2003b) found that rerunning the dummy variable model regressions using the corrected data reduced the magnitude of the estimated reduction in the rates of violent crime, murder, rape, and robbery, and it reversed the sign of the estimated effects of right-to-carry laws on aggravated assault. Moreover, none of the negative estimates is statistically significant, while effects for larceny, auto theft, and property crime overall are positive and significant. Likewise, the changes in the crime trends are generally small in absolute value, and none of the changes is significantly different from zero (see Table 6-4).[10]

Maltz and Targonski (2002) do not update the data but instead assess the quality of the county crime data used in the empirical research on right-to-carry laws. In particular, they note that not all police jurisdictions report their crime levels to the FBI and argue that there is systematic underreporting in the UCR. Maltz and Targonski (2002:298) conclude that "county-level crime data, as they are currently constituted, should not be used, especially in policy studies." However, Maltz and Targonski do not estimate the magnitude of the effects of underreporting on the results obtained by Lott and others. Thus, it is not known whether correcting for underreporting, if it were possible, would change any of the results.

---

[10]Both Ayres and Donohue (2003b) and Plassmann and Whitley (2003) use standard errors that account for state clustering.

Copyright © National Academy of Sciences. All rights reserved.

Firearms and Violence: A Critical Review
http://www.nap.edu/catalog/10881.html

Lott and Whitley (2002: Figure 5) report estimates of the effects of right-to-carry laws that are obtained by dropping from the data counties with large fractions of missing UCR reports. Lott's and Whitley's figure shows estimated trends in crime levels before and after adoption of right-to-carry laws, and they claim that these trends support the conclusion that adoption of right-to-carry laws reduces crime. The committee disagrees. According to Figure 5b of Lott and Whitley (2002), the murder rate peaks and begins to decrease at an accelerating rate approximately 5 years before the adoption of right-to-carry laws. Aggravated assault decreases prior to adoption and then increases for approximately 3 years following adoption before starting to decrease again (Figure 5e). Adoption has no effect on rape (Figure 5c). The rate of violent crimes as a whole decreases up to the time of adoption and then remains unchanged until approximately 3 years after adoption before beginning a steeper decline (Figure 5a). Among violent crimes, only robbery displays a decrease immediately following adoption (Figure 5d). However, this followed a period during which the robbery rate first increased and then remained constant for approximately 5 years. In summary, the committee concludes that it is at least possible that errors in the UCR data may account for some of Lott's results.

### Standard Errors

A final point that has been argued in the literature is that conventional standard errors reported by Lott and others are not appropriate. The statistical analyses of dummy variable and trend models are conducted using a county-year pair as the unit of analysis. Right-to-carry laws, however, almost always vary only at the state level. Consequently, some investigators believe that treating the county-level observations as if they are statistically independent may lead to estimates of the standard errors that underestimate their true magnitude. These investigators make adjustments for state-level clustering that inflate their standard errors. For example, the standard error for the dummy variable model estimate of the effect of right-to-carry laws on violent crime increases from 0.98 when reporting the unadjusted standard error, to 2.31 when estimating clustered sampling standard errors (Duggan, 2001), to 4.9 when using the methods advocated by Helland and Tabarrok (2004) (see Table 6-3). The fact that the adjustments in most cases greatly increase the standard errors is a reason for concern. Once the standard errors have been adjusted for clustering, very few of the point estimates, in any of the models, using any of the data sets, are statistically different from zero.

However, investigators reporting cluster-adjusted standard errors do not formally explain the need for these adjustments. These adjustments, in fact, are not supported in the basic models specified in Equations 6.1 and

Copyright © National Academy of Sciences. All rights reserved.

*138* *FIREARMS AND VIOLENCE*

6.2. Instead, those who argue for presenting clustered standard errors often cite Moulton (1990) as the source of their belief that adjustments are needed. Moulton considered a model in which there is an additive source of variation (or additive effect) that is the same for all observations in the same cluster. He showed that ignoring this source of variation leads to standard errors that are too low. Investigators who make clustering corrections usually consider the counties in a state to constitute one of Moulton's clusters and appear to believe that the absence of state-level additive effects in their models causes standard errors to be too low. The models estimated in this literature, including those of Lott and his critics, typically contain county-level fixed effects (the constants $\gamma_i$ in equations 6.1 and 6.2). Every county is always in the same state, so, any state-level additive effect simply adds a constant to the $\gamma_i$'s of the counties in that state. The constant may vary among states but is the same for all counties in the same state. The combined county- and state-level effects are indistinguishable from what would happen if there were no state-level effects but each $\gamma_i$ for the counties in the same state were shifted by the same amount. Therefore, state-level effects are indistinguishable from county-level effects. Any state-level effects are automatically included in the $\gamma_i$'s. There is no need for adjustments for state-level clustering.

Other observationally equivalent but different models can support the use of adjusted standard errors. If, for example, the effects of right-to-carry laws (or other explanatory variables) vary across states, then the assumption of independence across counties would be incorrect. Adjustments to the standard errors can allow for uncertainty arising from the possibility that the coefficients of variables in the model that are not allowed to vary across states, in fact, vary randomly across states. The adjustments made by Duggan and Plassmann and Whitley, for example, can be used to correct estimated standard errors for this possibility (see Wooldridge, 2003).

These alternative models have not been discussed in the literature or by the committee. Thus, it is not clear whether the models that would support using clustered-sampling-adjusted standard errors are appropriate to evaluate the effects of right-to-carry laws. At the most basic level, researchers need to assess whether models that support clustering are of interest.[11] If, for example, coefficients can vary randomly among states, Models 6.1 and 6.2 reveal the mean coefficients. In other words, if different states have different coefficients, then researchers estimate an average over states. It is

---

[11]There are also important technical issues to consider. For example, a commonly used method for making these corrections is reliable only when the number of "clusters" (here states) is large, and there is reason to think that the 50 states do not constitute a large enough set of clusters to make these methods reliable.

Copyright © National Academy of Sciences. All rights reserved.

not clear why anyone should care about this average, which is not related in any obvious way to (for example) nationwide benefits of right-to-carry laws. If coefficients vary among states, then it may be much more useful to estimate the coefficients for each state. It is entirely possible that the effects of right-to-carry laws vary among states, even after controlling everything else that is in the model. If they do, it may be much more useful to know which states have which coefficients, to see the magnitude of the variation, and to have a chance of finding out whether it is related to anything else that is observable. Of course, a number of the studies summarized above have varied Lott's model by allowing the effect of right-to-carry laws to differ by states (see, for example, Black and Nagin, 1998, and Plassmann and Tideman, 2001). A model in which coefficients are estimated separately for each state does not require adjustment of standard errors.

In summary, whether adjustment of standard errors is needed depends on the details of the effects that are being estimated and the model that is used to estimate them. These issues have not been investigated in studies of right-to-carry laws to date. Adjusted standard errors are not needed for Models 6.1 and 6.2. The precision of estimates from these models should be evaluated using unadjusted standard errors.

## COMMITTEE'S ANALYSIS: ARE THE ESTIMATES ROBUST?

This section presents the results of the committee's own analysis of Lott's revised new data covering the period 1977-2000. The purpose of the analysis is to clarify and illustrate some of the causes of the conflicting results. The committee has not attempted to form our own estimates of the effects of right-to-carry laws. Rather, our analysis is directed toward gaining a better understanding of the fragility of the estimates. We begin by illustrating the sensitivity of the findings to extending the sample period to cover the years 1993-2000. We then demonstrate that the basic qualitative results are sensitive to variations in the explanatory variables. In all cases, we use the *revised new data set*. There is a consensus that these revised data, covering the periods 1977-2000, are correct.

Horowitz discusses this problem in further detail and provides a statistical explanation for the fragility in the estimates in Appendix D. This appendix describes two fundamental sources of difficulty in causal inference that are especially relevant to studies of right-to-carry laws. One is the difficulty of choosing the right explanatory variables for a statistical model. The second is the difficulty of estimating the relation among crime rates, a large number of potential explanatory variables, and the adoption of right-to-carry laws. Even if the correct explanatory variables were known, it would be hard to specify a model correctly, especially in high dimensional settings with many explanatory variables. The committee drew on some of

Copyright © National Academy of Sciences. All rights reserved.

**TABLE 6-5** Dummy Variable Model with Common Time Pattern, 2000 Data

|                                          | Years   | Controls[a] | Violent Crime | Murder | Rape |
|------------------------------------------|---------|-------------|---------------|--------|------|
| 0. Committee replication SE              | 1992[b] | Yes         | −1.76 (1.07)  | −9.01 (1.70)** | −5.38 (1.33)** |
| 1. Comm estimate w/ covariates SE        | 2000    | Yes         | 4.12 (0.71)** | −8.33 (1.05)** | −0.16 (0.83) |
| 2. Comm estimate w/o covariates SE       | 1992[b] | No          | −0.12 (1.29)  | −1.22 (2.65)   | 1.39 (2.24) |
| 3. Comm estimate w/o covariates SE       | 2000    | No          | 12.92 (0.78)** | −1.95 (1.48)  | 17.91 (1.39)** |

[a]The regressions use the covariates and specification from the original Lott and Mustard (1997) models that do not control for state poverty, unemployment, death penalty execution rates, or regional time trends. The controls include the arrest rate for the crime category in question (AOVIOICP), population density in the county, real per capita income variables (RPCPI RPCUI RPCIM RPCRPO), county population (POPC), and variables for the percentage of the population that is in each of many race × age × gender categories (e.g., PBM1019 is the percentage of the population that is black, male, and between ages 10 and 19). The "no

these ideas in our deliberations but did not adopt them in total as part of our consensus report. This statistical argument is presented to stimulate further discussion and dialogue on these issues.

### Extending the Baseline Specification to 2000

Extending the sample to cover the period 1977-2000 provides an important test of the robustness of the estimates for two reasons. First, the number of observations from states with right-to-carry laws in effect more than triples when the additional years are included. Second, 16 additional states enacted right-to-carry laws during the period 1993-1999, thereby providing additional data on the effects of these laws.

Another reason for the importance of the extended data is that aggregate crime trends differ greatly between the periods 1977-1992 and 1993-1997. The first period was one of rising crime, especially in large urban areas, which tend to be in states that did not adopt right-to-carry laws during 1977-1992. The period 1993-1997 was one of declining crime. Any differences in estimation results between the 1977-1992 and 1977-1997

Copyright © National Academy of Sciences. All rights reserved.

| Aggravated Assault | Robbery | Property Crimes | Auto Theft | Burglary | Larceny |
|---|---|---|---|---|---|
| −5.60 | 1.17 | 5.84 | 10.28 | 4.12 | 6.82 |
| (1.25)** | (1.45) | (0.76)** | (1.24)** | (0.83)** | (0.82)** |
| 3.05 | 3.59 | 11.48 | 12.74 | 6.19 | 12.40 |
| (0.80)** | (0.90)** | (0.52)** | (0.78)** | (0.57)** | (0.55)** |
| −4.17 | 9.18 | 8.47 | 11.98 | 8.53 | 8.56 |
| (1.54)** | (2.17)** | (0.79)** | (1.48)** | (0.94)** | (0.93)** |
| 12.34 | 19.99 | 21.24 | 23.33 | 19.06 | 22.58 |
| (0.90)** | (1.21)** | (0.53)** | (0.85)** | (0.61)** | (0.59)** |

controls" specification includes county fixed effects, year dummies, and the dummy for whether the state has a right-to-carry law.

$b$Using the revised new data set, which contains observations, 1977-2000, even though the estimates in this row use data only through 1992.

NOTE: All samples start in 1977. SE = standard error. Standard errors are in parentheses, where * = significant at 5% and ** = significant at 1%.

data constitute evidence of model misspecification (e.g., because the model cannot account for the change in the aggregate crime trend) and raise the possibility (although do not prove) that the estimated effects of right-to-carry laws are artifacts of specification errors. This is a particularly important concern because states that pass right-to-carry laws are not representative of the nation as a whole on important dimensions (e.g., percentage rural) that are correlated with rising crime in the 1977-1992 period and falling crime in the years 1993-2000.

The first row of Table 6-5 reports the results of extending the dummy variable model (6.1) to the new data covering the period 1977-2000. The specifications estimated are identical to the original model, with the only difference being that the number of years has been expanded. Compared with the model estimated on the original (1977-1992) sample period (see Table 6-5, Row 0), the results have now changed rather substantially. Only the coefficient on murder is negative and significant, while seven coefficients are positive and significant (violent crime overall, aggravated assault, robbery, property crime overall, auto theft, burglary, and larceny). The dummy variable results that were apparent with the earlier data set and

Copyright © National Academy of Sciences. All rights reserved.

**TABLE 6-6** Trend Model with Common Time Pattern, 2000 Data

|  | Years | Controls[a] | Violent Crime | Murder | Rape |
|---|---|---|---|---|---|
| 0. Committee replication | 1992[b] | Yes | −2.15 | −3.41 | −3.37 |
| SE |  |  | (0.39)** | (0.62)** | (0.48)** |
| 1. Comm estimate w/ covariates | 2000 | Yes | −0.95 | −2.03 | −2.81 |
| SE |  |  | (0.18)** | (0.26)** | (0.20)** |
| 2. Comm estimate w/o covariates | 1992[b] | No | −1.41 | −1.52 | −3.45 |
| SE |  |  | (0.47)** | (0.97) | (0.82)** |
| 3. Comm estimate w/o covariates | 2000 | No | −0.62 | 0.12 | −2.17 |
| SE |  |  | (0.17)** | (0.32) | (0.30)** |

[a]The regressions use the covariates and specification from the original Lott and Mustard (1997) models that do not control for state poverty, unemployment, death penalty execution rates, or regional time trends. The controls include the arrest rate for the crime category in question (AOVIOICP), population density in the county, real per capita income variables (RPCPI RPCUI RPCIM RPCRPO), county population (POPC), and variables for the percentage of the population that is in each of many race x age x gender categories (e.g., PBM1019 is the percentage of the population that is black, male,

earlier sample periods almost completely disappear with the extension of the sample to 2000. The committee views the failure of the original dummy variable model to generate robust predictions outside the original sample as important evidence of fragility of the model's findings.[12]

These results are also substantially different from those found when using the expanded set of control variables first adopted by Lott (2000: Table 9.1). As described above, Ayres and Donohue (2003b) estimate a dummy variable model using the revised new data (see Table 6-3). As in Lott (2000, Table 9.1) and Plassmann and Whitley (2003), they modify the original specification to include additional covariates (i.e., state poverty, unemployment, and death penalty execution rates) and region-interacted time patterns, as opposed to a common time trend used in the original Lott models (Lott 2000:170). These seemingly minor adjustments cause sub-

---

[12]In light of the variability in the estimates, statistical tests might aid in determining whether particular specifications can be rejected by the data. It is not possible to test empirically whether a proposed set of explanatory variables is the correct one. It is possible to test for specification, given a set of controls (see Horowitz, Appendix D). None of the models examined by the committee passes a simple specification test (i.e., Ramsey's 1969 RESET test).

Copyright © National Academy of Sciences. All rights reserved.

*RIGHT-TO-CARRY LAWS* *143*

| Aggravated Assault | Robbery | Property Crimes | Auto Theft | Burglary | Larceny |
|---|---|---|---|---|---|
| −2.63 (0.45)** | −3.02 (0.53)** | −1.13 (0.27)** | 0.25 (0.45) | −1.80 (0.30)** | −0.84 (0.30)** |
| −1.92 (0.20)** | −2.58 (0.22)** | −0.01 (0.13) | −0.49 (0.19)* | −2.13 (0.14)** | −0.73 (0.13)** |
| −2.02 (0.57)** | −0.44 (0.79) | −1.33 (0.29)** | 1.62 (0.54)** | −2.50 (0.34)** | −1.27 (0.34)** |
| −0.65 (0.20)** | −0.88 (0.26)** | −0.81 (0.11)** | 0.57 (0.19)** | −1.99 (0.13)** | −0.71 (0.13)** |

and between ages 10 and 19). The "no controls" specification includes county fixed effects, year dummies, and th dummy for whether the state has a right-to-carry law.

*b*Using the revised new data set, which contains observations, 1977-2000, even though the estimates in this row use data only through 1992.

NOTE: All samples start in 1977. SE = standard error. Standard errors are in parentheses, where * = significant at 5% and ** = significant at 1%.

stantial changes to the results. For example, right-to-carry laws are esti-
mated to decrease murder by about 4 percent using the revised specifica-
tion, but about 8 percent using the original specification. The estimated
effects for the eight other crime categories decrease between 2 and 6 points
when moving from the original to the revised specification.

We also estimate the trend model extending the sample to 2000 (row 1,
Table 6-6). Relative to the estimates in row 0 (using only data to 1992), the
estimates are mostly smaller but remain negative and statistically signifi-
cant. Thus, the trend specification continues to show reductions in the rate
of growth of crime following right-to-carry passage.

To explore why the updated dummy variable and trend models give
conflicting results, we do two things. First, we estimate a more flexible
year-by-year specification, a variant of Model 6.1, the dummy variable
model. Second, we reanalyze the trend model (Model 6.2) by varying the
number of years after the law's adoption to estimate its effects on crime. In
each of these cases, we use the revised new Lott data through 2000 and we
include the original controls used by Lott and Mustard (1997). In each of
these cases, except for sampling variability, the changes should not affect
the results if the trend model in equation 6.2 is properly specified.

Copyright © National Academy of Sciences. All rights reserved.

*144* *FIREARMS AND VIOLENCE*

In the first exercise, we replace the right-to-carry dummy with a series of dummies for each of the possible numbers of years prior to—and following—adoption. We summarize the estimated coefficients in three figures. These figures show the estimated coefficients normalized on the year of adoption and multiplied by 100 (so the y-axis is a percentage), and the associated 95 percentage confidence intervals.[13] The vertical line marks the adoption year, while the horizontal line marks 0.

Figure 6-2 shows the time pattern of coefficients from the violent crime model. For years preceding adoption, violent crime is increasing in ultimately adopting states (relative to the national time pattern). Following adoption, the increase relative to trend continues, reverses, then reverses twice again. For property crimes, in Figure 6-2, the upward trend for years prior to adoption continues following adoption.

Figure 6-3 and Figure 6-4 show graphs for individual violent and property crime categories, respectively. The obvious striking feature of these figures is that the big reductions in crime occur roughly 9 years after adoption. Otherwise, the postadoption estimates are generally small and sometimes positive and are, in general, both statistically insignificant and statistically indistinguishable from the preadoption estimates. The trend model essentially fits a line with constant slope through the postadoption portions of these graphs, and the line's slope is affected by years long after adoption. These time patterns raise serious questions about whether the reductions in crime documented in the trend model are reasonably attributed to the change in the law.

In the second exercise, to further explore the sensitivity of the trend model estimates, we reestimate the baseline trend model (Model 6.2) using revised new Lott data on the period 1977-2000. Table 6-7, row 1, repeats the estimates from Table 6-6, row 1 which includes all years for all states, regardless of the amount of time elapsed since the law change. Subsequent rows include observations that occur certain numbers of years after the law change. (Row 2, labeled "6 years," includes the year of the law change and the 5 following years, and so on.) These estimates show that including 5 years or fewer reverses the signs of the estimated effects of right-to-carry laws on murder and property crime (from negative to positive) and reduces the magnitude of the estimated reduction in the rates of rape, aggravated assault, robbery, and violent crime. Moreover, there are fewer statistically significant changes in crime trends. One needs to include at least 6 years following the prelaw-change period to find statistically significant reductions in the violent crime and murder trends.

The trend results rely on changes in crime trends occurring long after the law changes, again raising serious questions about whether one can

---

[13]That is, we subtract the year 0 coefficient from each year's coefficient.

Copyright © National Academy of Sciences. All rights reserved.





**FIGURE 6-2** Year-by-year estimates of the percentage change in aggregate crime (normalized to adoption date of right-to-carry law, year 0).
—— Estimate, —o— bottom of 95% confidence interval (CI), ——+—— Top of 95% CI

sensibly attribute the estimates from trend models in the literature to the adoption of right-to-carry laws.

## Are the Results Sensitive to Controls?

The final two rows of Table 6-5 present two sets of results obtained by the committee when estimating models identical to those of Model 6.1, but excluding socioeconomic and demographic controls. We include only the

Copyright © National Academy of Sciences. All rights reserved.





**FIGURE 6-3** Year-by-year estimates of the percentage change in disaggregate violent crimes (normalized to adoption date of right-to-carry law, year 0).
—— Estimate, —o— bottom of 95% confidence interval (CI), ——|—Top of 95% CI

right-to-carry variable, year dummies, and county fixed effects. These estimates tell us how crime has changed in states that have adopted the right-to-carry laws before and after the law change, relative to national time patterns in crime. It is important to stress that the committee is not arguing that excluding all socioeconomic and demographic covariates is an appropriate method of identifying the effects of right-to-carry laws. Rather, we are simply assessing whether such laws are associated with a decline in the level of crime. If not, then detecting the effect, if any, of right-to-carry laws

Copyright © National Academy of Sciences. All rights reserved.

Firearms and Violence: A Critical Review
http://www.nap.edu/catalog/10881.html





requires controlling for appropriate confounding variables and thereby re-
liance on a model such as those used by Lott and others.

The results without controls are quite different. Using the earlier sample
period and the new data, one finds three negative coefficients, only one of
them statistically significant. When the sample is extended to 2000, only
one of nine coefficients is negative, and it is insignificantly different from
zero. For example, the violent crime coefficient with controls is 4.1 percent,
while it is 12.9 percent without controls. These results show that states that

Copyright © National Academy of Sciences. All rights reserved.







**FIGURE 6-4** Year-by-year estimates of the percentage change in disaggregate property crimes (normalized to adoption date of right-to-carry law, year 0).
—— Estimate, —o— bottom of 95% confidence interval (CI), —+—Top of 95% CI

Copyright © National Academy of Sciences. All rights reserved.

Firearms and Violence: A Critical Review
http://www.nap.edu/catalog/10881.html

passed right-to-carry laws did not on average experience statistically significant crime declines relative to states that did not pass such laws.

There are two points to make about the no-controls results. First, the no-controls results provide a characterization of the data that shows that, if there is any effect, it is not obvious in the dummy variable model. What do estimates from that model mean? The model says that crime rates differ across counties and, moreover, that they change from one year to the next in the same proportionate way across all counties in the United States. Over and above this variation, there is a one-time change in the mean level of crime as states adopt right-to-carry laws. So these estimates indicate that, for the period 1977-1992, states adopting right-to-carry laws saw roughly no change in their violent crime rates and 8.5 percent increases in their property crime rates, relative to national time patterns. Estimating the model using data to 2000 shows that states adopting right-to-carry laws saw 12.9 percent increases in violent crime—and 21.2 percent increases in property crime—relative to national time patterns. The first-blush evidence provided by these no-controls models is thus not supportive of the theory that right-to-carry laws reduce crime.

A final lesson to draw from the no-controls dummy variable results is that the results are sensitive to the inclusion of controls. That is, whether one concludes that right-to-carry laws increase or decrease crime based on models of this sort depends on which control variables are included. Such laws have no obvious effect in the model without controls (and therefore no clear level effect in the raw data). Moreover, as demonstrated above, seemingly minor changes to the set of control variables substantially alter the estimated effects. Given that researchers might reasonably argue about which controls belong in the model and that the results are sensitive to the set of covariates, the committee is not sanguine about the prospects for measuring the effect of right-to-carry laws on crime. Note that this is distinct from whether such laws affect crime. Rather, in our view, any effect they have on crime is not likely to be detected in a convincing and robust fashion.

Estimates from the trend model are less sensitive to the inclusion of controls. While the no-control point estimates displayed in the third and fourth rows of Table 6-6 are smaller than in the model with controls, most of these estimates are negative and statistically significant. The trend model without controls shows reductions in violent and property crime trends following the passage of right-to-carry laws for both sample endpoints. For murder, however, the results are positive when using the 2000 endpoint, negative when using the 1992 endpoint, and statistically insignificant in both cases.

Copyright © National Academy of Sciences. All rights reserved.

**TABLE 6-7** Trend Model with Varying Postlaw Change Durations

| | Years | Controls[a] | Violent Crime | Murder | Rape |
|---|---|---|---|---|---|
| 1. Baseline comm estimate[b] from row 1 of Table 6-6 | 2000 | Yes | −0.95 | −2.03 | −2.81 |
| SE | | | (0.18)** | (0.26)** | (0.20)** |
| 2. 6 years | 2000 | Yes | −0.97 | −1.11 | −2.90 |
| SE | | | (0.29)** | (0.42)** | (0.33)** |
| 3. 5 years | 2000 | Yes | −0.65 | 0.05 | −2.45 |
| SE | | | (0.35) | (0.50) | (0.40)** |
| 4. 4 years | 2000 | Yes | −0.27 | 0.48 | −0.74 |
| SE | | | (0.44) | (0.63) | (0.50) |

[a]The regressions use the covariates and specification from the original Lott and Mustard (1997) models that do not control for state poverty, unemployment, death penalty execution rates, or regional time trends. The controls include the arrest rate for the crime category in question (AOVIOICP), population density in the county, real per capita income variables (RPCPI RPCUI RPCIM RPCRPO), county population (POPC), and variables for the percentage of the population that is in each of many race × age × gender categories (e.g., PBM1019 is the percentage of the population that is black, male, and between ages 10 and 19).

## CONCLUSIONS

The literature on right-to-carry laws summarized in this chapter has obtained conflicting estimates of their effects on crime. Estimation results have proven to be very sensitive to the precise specification used and time period examined. The initial model specification, when extended to new data, does not show evidence that passage of right-to-carry laws reduces crime. The estimated effects are highly sensitive to seemingly minor changes in the model specification and control variables. No link between right-to-carry laws and changes in crime is apparent in the raw data, even in the initial sample; it is only once numerous covariates are included that the negative results in the early data emerge. While the trend models show a reduction in the crime growth rate following the adoption of right-to-carry laws, these trend reductions occur long after law adoption, casting serious doubt on the proposition that the trend models estimated in the literature reflect effects of the law change. Finally, some of the point estimates are imprecise. Thus, the committee concludes that with the current evidence it is not possible to determine that there is a causal link between the passage of right-to-carry laws and crime rates.

Copyright © National Academy of Sciences. All rights reserved.

*RIGHT-TO-CARRY LAWS* *151*

| | Aggravated Assault | Robbery | Property Crimes | Auto Theft | Burglary | Larceny |
|---|---|---|---|---|---|---|
| | −1.92 | −2.58 | −0.01 | −0.49 | −2.13 | −0.73 |
| | (0.20)** | (0.22)** | (0.13) | (0.19)* | (0.14)** | (0.13)** |
| | −1.06 | −1.88 | 0.11 | 1.40 | −1.13 | 0.33 |
| | (0.32)** | (0.36)** | (0.21) | (0.31)** | (0.23)** | (0.22) |
| | −0.83 | −1.63 | 0.28 | 1.83 | −0.77 | 0.36 |
| | (0.39)* | (0.43)** | (0.25) | (0.37)** | (0.27)** | (0.26) |
| | −0.34 | −1.36 | 0.44 | 2.03 | −0.47 | 0.31 |
| | (0.49) | (0.55)* | (0.32) | (0.47)** | (0.35) | (0.33) |

[b]Using the revised new data set, for the full available time period (1977-2000).
NOTES: All samples start in 1977. All estimates use the trend model. Rows 2 through 4 of this table restrict the sample to include only years falling fixed numbers of years past the law change. For example, row 2 includes all the prelaw-change years, the year of the law change (year 0), plus 5 additional years, for a total of 6 years after the prelaw-change period. SE = standard error. Standard errors are in parentheses, where * = significant at 5% and ** = significant at 1%.

It is also the committee's view that additional analysis along the lines of the current literature is unlikely to yield results that will persuasively demonstrate a causal link between right-to-carry laws and crime rates (unless substantial numbers of states were to adopt or repeal right-to-carry laws), because of the sensitivity of the results to model specification. Furthermore, the usefulness of future crime data for studying the effects of right-to-carry laws will decrease as the time elapsed since enactment of the laws increases.

If further headway is to be made on this question, new analytical approaches and data sets will need to be used. For example, studies that more carefully analyze changes in actual gun-carrying behavior at the county or even the local level in response to these laws may have greater power in identifying the impact of such laws. Surveys of criminals or quantitative measures of criminal behavior might also shed light on the extent to which crime is affected by such laws.

Copyright © National Academy of Sciences. All rights reserved.

# 7

# Firearms and Suicide

While much attention surrounding the debate over firearms has focused on criminal violence in general, and homicide in particular, suicide is the most common cause of firearm-related death in the United States (National Center for Health Statistics, 2003; see Table 3-3). Do guns increase the lethality or frequency of suicide attempts? A large body of literature links the availability of firearms to the fraction of suicides committed with a gun. Yet, a central policy question is whether changes in the availability of firearms lead to changes in the overall risk of suicide.

Despite the clear associations between firearms and gun suicide, answering this broader question is difficult. Box 7-1 sketches out a conceptual framework describing various mechanisms by which firearms may be associated with rates of suicide. The fundamental issue is the degree to which a suicidal person would simply switch to using other methods if firearms were less available. On one hand, if substitutes were easily enough available, then gun restrictions might change the typical method of suicide yet have no effect on the overall risk of suicide at all. On the other hand, there are at least two mechanisms by which guns might directly cause an increase in the risk of completed suicide. First, guns may provide a uniquely efficient method of self-destruction so that access to a gun could lead to a higher rate of completed suicide. It is often stated, for example, that easy access to firearms could increase the rate of completed suicide among persons with transient suicidal feelings because such access might increase the likelihood of an attempt with a lethal outcome. Second, the induction hypothesis proposes that the le-

Copyright © National Academy of Sciences. All rights reserved.

---

**BOX 7-1**
**Conceptual Framework**

Why might firearms access be associated with rates of suicide?

**Direct Causality**: Firearms might directly increase the risk of suicide. The instrumentality hypothesis proposes that if guns were inherently more lethal than other methods, then access to a gun could lead to a higher rate of completed suicide. The method selection or induction hypothesis proposes that firearms might be preferred over other methods because their quickness and effectiveness might decrease some of the other "costs" of a suicide attempt.

**Spurious Correlation**: Firearms might be associated with suicide but have no direct effect. Instead, there may be unmeasured confounders associated with both access to firearms and the propensity to commit suicide. In this case, if substitutes were easily enough available, gun access restrictions might reduce the incidence of gun suicide yet have no effect on the overall risk of suicide. Two examples highlight this possibility:

• **Reverse Causality**: The risk of suicide might increase or decrease the likelihood of gun ownership. On one hand, some persons who are planning to commit suicide may seek out a gun specifically for this purpose (Cummings et al., 1997b; Wintemute et al., 1999). On the other hand, family members might remove firearms from the home of someone who has made suicide attempts in the past.
• **Other Confounders**: Finally, there could be unmeasured and confounding "third factors" associated with both suicide risk and gun ownership, which could lead to an apparent (but noncausal) association between guns and suicide. Individual-level confounders might include propensities for social isolation and mistrust of others. For example, if persons who are prone to own guns because of their mistrust of others were also at greater risk for suicide, whether or not they owned guns, there could be a noncausal statistical association between gun ownership and suicide. Community-level confounders could also explain a link between gun ownership and suicide risk. For example, high levels of "social capital" might be associated with lower rates of defensive gun ownership, as well as with higher levels of social support for individuals at risk for suicide (Hemenway et al., 2001). Defensive gun use may also be correlated with particular cultural attitudes toward mental health services and individual problem-solving strategies; for accidental historical reasons or for specific cultural reasons, communities with higher levels of defensive gun ownership might also be communities that invest less heavily in "safety net" public services or with less access to mental health services.

---

thality of a gun might itself increase the likelihood of a suicide attempt among gun owners: persons who would prefer the efficiency of a gun would be less likely to make an attempt if a gun were not available. Ultimately, it is an empirical question whether access restrictions lead to substantial reductions in the rates of suicide.

Copyright © National Academy of Sciences. All rights reserved.

Firearms and Violence: A Critical Review
http://www.nap.edu/catalog/10881.html

In this chapter we review studies of the relationship between household gun ownership and the risk of suicide.[1] We review both studies that assess the relationships at aggregated geographic levels and those that look at the relationship between access and suicide at the level of the individual or household. Many studies conducted at aggregate levels rely on proxy measures of gun ownership; because these are so widely used, we devote special attention to discussing the pros and cons of using proxies for household gun ownership in ecological studies. Many individual-level studies of suicide use retrospective, case-control study designs; because the strengths and limitations of such a study design may be unfamiliar to some readers, we also discuss this methodology in some detail, with an explanation of the measures of association used in case-control studies presented in an appendix to the chapter. We then summarize the handful of studies that have evaluated the effects of specific gun laws on suicide. The final section presents the committee's conclusions.

## ECOLOGICAL STUDIES OF GUN OWNERSHIP AND THE OVERALL RISK OF SUICIDE

The great majority of research on suicide and gun ownership has been "ecological," in which the unit of observation is the community rather than the individual, comparing measures of household gun ownership rates to the rates of completed suicide. In some cases, the comparisons are allowed to vary over time; in all cases, comparisons are made across several geographic regions. Ecological studies of gun ownership and suicide in the United States are summarized in Table 7-1.

### Cross-Sectional Associations

Almost all ecological studies using cross-sectional data, both within the United States and across countries, have found that both gun suicide rates and the fraction of suicides committed with a gun are higher in geographic areas with a higher prevalence of household gun ownership. This association has been reported by investigators across the spectrum of the gun control debate. It has been found across cities, states, regions, and nations (Kleck and Patterson, 1993; Azrael et al., 2004; Killias, 2001), and it contrasts with the more variable association between gun ownership rates and the fraction of homicides committed with a gun.

---

[1]Studies were identified using various search engines, by a search for book chapters and unpublished studies identified through personal communication with researchers in the field, and by review of the reference lists of previous publications. A particular effort was made to find studies in the firearms policy literature, reviewed for other chapters of this volume, which may have examined suicide as a secondary focus of the investigation.

Copyright © National Academy of Sciences. All rights reserved.

However, the most important policy question is not whether gun access increases the risk of gun suicide, but whether gun access increases the *overall* risk of suicide. Many cross-sectional studies have reported a positive, bivariate association between gun ownership rates and overall suicide rates across cities, states, and regions of the United States, but the relationship is much smaller and less precise than the association between gun ownership rates and gun suicide rates. The association between gun ownership and overall suicide also appears to be sensitive to the details of the measures and the statistical models being used.

## U.S. Studies

Several ecological studies by Birckmayer and Hemenway (2001) and by Miller et al. (2002a, 2002c) have focused on age-specific suicide rates by region and state. Their gun ownership measures include survey estimates of handgun and overall gun ownership from the GSS and, as a proxy measure, the fraction of suicides committed with a firearm. Before controlling for other social variables, Birckmayer and Hemenway find a positive association between regional GSS-reported rates of gun ownership and age-specific rates of suicide in every age group. After controlling for divorce, education, unemployment, urbanization, poverty, and alcohol consumption, they find a modest positive association between gun ownership and suicide risk for youth ages 15 to 24 (b = .35, 95% confidence interval .05 to .65) and for adults age 65 and over (b = .62, 95% C.I. .40-.84), but *not* for working-age adults between ages 25 and 64. Subsequent studies from the same research group use other model specifications, with varying results. For example, Miller et al. (2002a) do not incorporate control variables; they find a positive association between gun ownership and overall suicide rates in all age groups (incidence rate ratio 1.14; 95% CI 1.01-1.24) and a negative association between gun ownership and nongun suicide (IRR .87, 95% CI .77-.97) that is more pronounced for persons 45 years and older, suggesting greater substitution among methods in older age groups.

Duggan (2003) undertook a similar age-specific analysis, using subscriptions to the gun magazine *Guns & Ammo* as his proxy for gun ownership. Like Miller et al., Duggan did not include other covariates in his regression models and, like Miller et al., he found a positive and significant bivariate association between gun ownership and suicide across states. But Duggan also found a significant *positive* association between gun magazine subscription and *nongun* suicide for youth ages 10 to 19. The association between the gun proxy and nongun suicide shifts from positive to negative between ages 20 and 69 and becomes negative and statistically significant for persons over age 69. He concludes that the positive association between gun magazine subscriptions and nongun suicide among youth is evidence

Copyright © National Academy of Sciences. All rights reserved.

**TABLE 7-1** Ecological Studies of Associations Between Firearms
Prevalence and Suicide in the United States

| Source | Unit of Analysis | Gun Measure | Subjects; Strata |
|---|---|---|---|
| Duggan (2003) | 50 states 1996 | Proxy: *Guns & Ammo* | 10 yr. age groups |
| Hemenway and Miller (2002) | 9 regions 1988-1997 | Survey: GSS (household handgun ownership) | |
| Miller et al. (2002b) | 9 regions 50 states 1988-1997 | Survey: GSS, BRFSS Proxy: Cook index, FS/S (adult only) | Children 5-14 |
| Miller et al. (2002c) | 9 regions 50 states 1988-1997 | Survey: GSS, BRFSS Proxy: Cook index , FS/S | Adult women |
| Miller et al. (2002a) | 9 regions 50 states 1988-1997 | Survey: GSS, BRFSS Proxy: Cook index, FS/S | 10-yr. age groups |
| Birckmayer and Hemenway (2001) | 9 regions 1979-1994 | GSS | 10-yr age groups |
| Azrael et al. (2004) | 9 regions 50 states 1994-1998 | Survey: GSS, BRFSS, HICRC Proxies: FS/S, UFDR, *Guns & Ammo*, NRA membership | |

Copyright © National Academy of Sciences. All rights reserved.

| Control Variables | Results: Guns and Gun Suicides | Results: Guns and Nongun Suicides | Results: Guns and Overall Suicides |
|---|---|---|---|
| None | all ages + | 10-19: + <br> 20-69: 0 <br> 70+: − | all ages + |
| Major depression, suicidal thoughts, and urbanization, OR education, OR unemployment, OR alcohol consumption | + | − | + |
| Poverty, education, urbanization | + | 0 | + |
| Poverty, urbanization | + | BRFSS:+ <br> Others: 0 | + |
| None | all ages + | <45: 0 <br> 45+: − | all ages + |
| Divorce, education, unemployment, urbanization | 15-24: + <br> 25-44: 0 <br> 45-84: + | 0 | 15-24: + <br> 25-64:0 <br> 65+: + |
| None | + | n/a | n/a |

*continued*

Copyright © National Academy of Sciences. All rights reserved.

Firearms and Violence: A Critical Review
http://www.nap.edu/catalog/10881.html

**TABLE 7-1** Continued

| Source | Unit of Analysis | Gun Measure | Subjects; Strata |
|---|---|---|---|
| Kaplan and Geling (1998) | 9 regions 1989-1991 | Survey: GSS | Sex × race |
| Kleck and Patterson (1993) | 170 U.S. cities | OLS proxy: gun crimes IV proxy: gun sport | |
| Sloan et al. (1990) | 2 cities 1985-1987 | Registry: handguns Proxies: Cook index Strictness of gun laws | Two age groups, race, sex |
| Lester (1989) | 48 states 1980 | Proxy: gun magazines | |
| Lester (1988a) | 6 (of 7) Australian states | Survey-household gun ownership | |
| Lester (1988b) | 9 regions 1970 | Survey Proxy: gun laws | |
| Lester (1987a) | 48 states 1970 | Proxies: gun laws, UFDR Proxy: Cook index | |
| Duggan (2003) | 50 states | Proxy: guns ammo sales rate | All ages |

Copyright © National Academy of Sciences. All rights reserved.

| Control Variables | Results: Guns and Gun Suicides | Results: Guns and Nongun Suicides | Results: Guns and Overall Suicides |
|---|---|---|---|
| None | + | Male:- Female: 0 | n/a |
| Community traits: race, sex, age unemployment rate, poverty, income, home ownership, college enrollment, transience, population change, divorce, place of worship, etc. | + | 0 | OLS: + IV: 0 |
| None | + | – | 0 |
| None | + | 0 | + |
| None | 0 | – | 0 |
| % black, median age, % urban, divorce rate | + | 0 | 0 |
| None | + | UFDR:– Other: 0 | 0 |
| State, year fixed effects | 0 | 0 | 0 |

*continued*

Copyright © National Academy of Sciences. All rights reserved.

**TABLE 7-1** Continued

| Source | Unit of Analysis | Gun Measure | Subjects; Strata |
|---|---|---|---|
| Mathur and Freeman (2002) | 48 states | Gun dealers per capita | Adolescent suicide (15-19) |
| Azrael et al. (2004) | 9 regions 50 states | Survey: GSS Proxy: FS/S | |
| Clarke and Jones (1989) | Entire United States | Survey: Gallup poll, GSS | Type of gun |

NOTES: +, - indicate positive or negative effect (respectively), statistically significant at p < .05; 0 indicates not significant.

BRFSS = Behavioral Risk Factor Surveillance System; GSS = General Social Survey; FS/S = ratio of firearm suicide/total suicides; Cook Index = mean of firearm suicide/total suicide and firearm homicide/total homicide; HICRC = Harvard Injury Control Research Center; UFDR

for an omitted variable, because any plausible causal effect of gun owner-ship should be independent of, or negatively associated with, the nongun suicide rate. There are several other possible explanations for Duggan's results; most obviously, it may be that *Guns & Ammo* subscribers are not representative of all gun owners; his arguments about confounding would also have been strengthened by the inclusion of some observable covariates. All the same, both Miller's and Duggan's results support the view that different gun proxies may yield different results, and all of the age-stratified studies suggest that instrumentality effects, substitution, and omitted vari-ables may be playing different roles at different ages.

The most comprehensive effort to control for confounding factors was published a decade ago. Kleck and Patterson (1993) undertook a cross-sectional study of the effect of firearms prevalence on crime rates and firearm-related fatalities in 170 U.S. cities. Although the study did not consider differences by age, the models included a set of 38 control vari-ables previously identified as predictors of violence rates. Like other inves-tigators, these authors found that higher levels of the proxy for gun owner-

Copyright © National Academy of Sciences. All rights reserved.

| Control Variables | Results: Guns and Gun Suicides | Results: Guns and Nongun Suicides | Results: Guns and Overall Suicides |
|---|---|---|---|
| State, year fixed effects FLFP, divorce, alcohol consumption family & cohort size | Not stated | Not stated | + |
| Regional fixed effects | + | Not stated | Not stated |
| None | Handgun + All guns: 0 | n/a | All guns: 0 Handgun: + |

= unintentional firearm death rate; FLFP = female labor force participation; OLS = ordinary least squares; IV = instrumental variable (two-stage least squares); NRA = National Rifle Association.

When only one result is listed in column, all gun measures gave similar results. When reported results include models both with and without covariates, only results with covariates are presented.

ship predicted higher rates of suicide (b = .132, p < .05). Kleck and Patterson also found evidence that there might be a different association between suicide risk and sporting gun ownership and suicide risk and defensive gun ownership. In particular, they found no significant effect of sporting gun ownership on the risk of suicide.

## International Studies

Like the U.S. studies, the existing cross-national surveys have looked for an association between rates of household gun ownership, overall suicide rates, and the fraction of suicides committed with a gun. And, like the U.S. studies, cross-national studies have found a consistent association between gun ownership and the fraction of suicides committed with a gun across countries; but in contrast to the U.S. studies, the cross-national surveys do not reveal a consistent association between gun ownership and *overall* suicide rates.

Copyright © National Academy of Sciences. All rights reserved.

Although gun ownership rates in the United States are much higher than in most other developed countries, the rates of suicide in the United States rank in the middle. Killias (1993), Killias (2001), and Johnson et al. (2000) found that reported rates of household gun ownership were strongly correlated with the fraction of suicides committed with a gun in each country (Spearman's rho = .79 to .92, p < .001). But the cross-country correlations between household gun ownership and overall rates of suicide have proven to be smaller and statistically imprecise (Spearman's rho .25, p = .27) (Killias, 2001). Likewise, in an often-cited study, Sloan et al. (1990) compared the rates of gun and nongun suicides in Seattle, Washington, with suicide rates in Vancouver, British Columbia, between 1985 and 1987; they found higher rates of gun ownership are associated with higher rates of gun suicide, lower rates of nongun suicide, and no significant difference in the overall suicide rate between the two cities (relative risk .97, 95% CI .87 to 1.09).

**Associations Between Gun Ownership and Suicide Rates Across Time**

The fraction of suicides in the United States that are committed with a firearm has increased from just over 35 percent in the 1920s to about 60 percent in the 1990s. Four studies have attempted to link this change in the fraction of gun suicides with changes in gun ownership across time.

Three of these four studies have found positive associations between proxies for gun ownership and the fraction of suicides committed with a gun, but only one study, focusing on youth suicide, found an association between gun ownership and overall suicide rates. Clarke and Jones (1989), examined the national prevalence of household gun ownership reported in polls by Gallup and the National Opinion Research Center between 1959 and 1984, comparing these reports with aggregate U.S. suicide rates over the same period. This study found a positive association between the fraction of households owning a handgun and the fraction of suicides committed with a gun (b = .68, p = .001), but no association between household gun ownership and overall risk of suicide (b = .04, p = .85). Azrael et al. (2004) also report a strong linear association between individual and household rates of gun ownership within regions and the fraction of suicides committed with a gun between 1980 and 1998, with cross-sectional beta coefficients ranging from .55 (for individual handgun ownership) to 1.02 (for household gun ownership of any kind), and an inter-temporal coefficient between FS/S and household gun ownership of .905 (s.e. = .355). They did not report the association between gun ownership and overall risk of suicide. Mathur and Freeman (2002) used state-level per capita gun dealership rates to predict adolescent suicide rates from 1970 to 1997. After controlling for state and year fixed effects and number of other observed

Copyright © National Academy of Sciences. All rights reserved.

Firearms and Violence: A Critical Review
http://www.nap.edu/catalog/10881.html

covariates (e.g., divorce rates, per capital alcohol consumption, female labor force participation, family size, and cohort size), Mathur and Freeman found that increases in gun dealerships per capita predicted increases in the overall youth suicide rate. Finally, Duggan (2003) used two decades of gun magazine sales with controls for state and year fixed effects to explain the trends in suicide rates across all age groups. Duggan found no association between magazine subscription rates and either gun suicide or overall suicide rates across time (b = .046, s.e. = .064, and b = .004, s.e. = .051, respectively).

## Assessment of Ecological Studies

Overall, the body of ecological studies has firmly established that firearms access is positively associated with gun suicide, but the association between firearm access and overall suicide is less certain.

In particular, gun suicide rates are strongly correlated with gun prevalence across space and possibly across time, in the United States and across countries. Likewise, many ecological studies do report a cross-sectional association between gun ownership rates and *overall suicide* rates in the United States. However, gun ownership rates do not seem to explain overall suicide trends across countries or across time in the United States. Moreover, the results seem to vary according to the firearm measure used, the age group being studied, and the covariates included.

To further improve our understanding of the effects of firearms on suicide, researchers need to be increasingly sensitive to the possibility of confounding factors and substitution. Moreover, these ecological studies introduce two additional problems that must be considered. First, the analyses are conducted at the aggregate level, rather than at the individual level, and second, direct measures of access to firearms are often not available, thus forcing researchers to rely on proxies. We consider each of these issues in turn.

### Substitution and Confounders

As with all empirical analyses, researchers and policy makers must be sensitive to unobserved confounders when attempting to draw causal inferences (see Box 7-1). To what extent would suicidal persons substitute other methods if firearms were less available? Unmeasured and confounding factors associated with both suicide risk and gun ownership might lead to a spurious association between guns and suicide. For example, if persons who are prone to own guns because of their mistrust of others were also at greater risk for suicide, whether or not they owned guns, there could be a noncausal statistical association between gun ownership and suicide. Likewise, high levels of "social capital" might be associated with lower rates of

Copyright © National Academy of Sciences. All rights reserved.

*164* *FIREARMS AND VIOLENCE*

defensive gun ownership and lower suicide rates (Hemenway et al., 2001). Neighborhood levels of gun ownership could even conceivably be affected by neighborhood suicide rates: suicide rates might contribute to a community's perceived level of violence, whether people are aware of making such a link or not.

This concern is not unique to ecological studies, but has been generally ignored in this literature. There have been few systematic efforts to explore or model possible confounders of the association between gun ownership and suicide risk. Two studies by Hemenway and associates are suggestive. First, Hemenway et al. (2001) investigated the hypothesis that persons who live in communities with higher levels of mutual trust may be at lower risk of suicide (because of increased social support), and lower risk of gun ownership and less likely to own firearms (because of decreased motivation for defensive gun ownership). They found that, across U.S. states, lower levels of mutual trust and civic engagement, as reported on the General Social Survey and on the Needham Lifestyle Survey, were associated with a higher fraction of suicides committed with a gun. This study did not examine the association between social capital, firearm ownership, and overall suicide rates. Hemenway and Miller (2000) investigated the hypothesis that regions with higher rates of firearm ownership were characterized by higher rates of major depression, which is known to be an important independent risk factor for suicide. They found that the cross-sectional, regional association between firearm ownership and suicide rates was not explained by differences in the regional prevalence of major depression and serious suicidal thoughts.

*Proxy Measures of Ownership*

Research linking firearms to suicide (and violence more generally) is limited by the lack of detailed information on firearms ownership (see Chapter 2). The existing surveys cannot be used to link ownership to outcomes of interest and, for that matter, cannot generally be used to draw inferences about ownership in more precise geographic areas (e.g., counties) that are often of interest in ecological studies. The GSS, which collects individual and household information on firearms ownership over time, is representative of the nine census regions and the nation as whole. Other surveys—the Behavioral Risk Factor Surveillance System (BRFSS) and the Harvard Injury Control Research Center Survey (HICRC)—collect information on gun ownership prevalence rates representative of individual states in certain years.[2]

---

[2]The BRFSS included firearm ownership questions in the 1992-1995 surveys conducted in 21 states. The HICRC can be used to draw inferences on ownership by states in 1996 and 1999.

Copyright © National Academy of Sciences. All rights reserved.

**TABLE 7-2** Correlation Coefficient Between a Proxy and Gun Ownership Rates

| Proxy | GSS<br>N = 9 regions | BRFSS<br>N = 21 states | HICRC<br>N = 48 states |
|---|---|---|---|
| FS/S | 0.93 | 0.90 | 0.81 |
| FH/H | 0.52 | 0.19 | 0.02 |
| *Guns & Ammo* | 0.75 | 0.67 | 0.51 |

NOTE: GSS = Generalized Social Survey; BRFSS = Behavioral Risk Factor Surveillance Survey; HICRC = Harvard Injury Control Research Center.
SOURCE: Azrael et al. (2004: Table 3). Used with kind permission of Springer Science and Business Media.

As a result of these limitations, many ecological studies evaluating the relationship between firearms and suicide (and homicide) rely on proxies of ownership, rather than direct measures. Proxies have included the fraction of homicides committed with a firearm (FH/H), the fraction of suicides committed with a firearm (FS/S), subscription rates to *Guns & Ammo* (*G&A*), and other similar measures.[3]

The primary advantage of these proxies, as opposed to survey information, is that they can be readily computed at state, county, and other finer geographic levels. The disadvantage is that the proxy is not the variable of interest; ownership is. Thus, except in very particular circumstances, proxy measures result in biased estimates of the relationships of interest.

Several studies have explicitly evaluated different proxy measures of ownership. These assessments generally involve computing a correlation coefficient between the proxy and self-reported ownership measures from the GSS or other surveys.[4] Azrael et al. (2004), for example, systematically assess a number of commonly used proxies. Their basic results using the GSS and other ownership surveys are displayed in Table 7-2. The fraction of suicides committed with a firearm has the highest correlation among all of the measures considered, ranging from 0.81 in the state level data to 0.93 when using ownership data from the nine census regions. The fraction of homicides committed with a firearm has the lowest correlations, and *G&A* subscription rates lie between the two.

---

[3]See Azrael et al. (2001) for a summary of the different proxy measures used in the literature.

[4]These correlations are computed using both geographic and time-series variation in the ownership and proxy measures. Duggan (2003), in addition to comparing the *G&A* proxy to the GSS data, also uses other indicators that are thought to be highly correlated with ownership, such as the location of gun shows and community characteristics thought to be associated with ownership.

Copyright © National Academy of Sciences. All rights reserved.

Given this evidence, Azrael et al. conclude that "FS/S is a superior proxy measure for cross-section analysis, easily computed from available data for state and large local jurisdictions and valid against survey based estimates" (p. 50). They also find, using similar methods, that FS/S is a useful proxy for measuring intertemporal variation in ownership. This finding appears to share some consensus. Many other researchers have also accepted FS/S as the best and in fact a nearly ideal proxy for studying the cross-sectional relationship between firearms and violence. One notable exception is Duggan (2003), who argues that the FS/S is a poor proxy for studying suicide, even in cross-sectional analyses.

After reviewing the existing evidence, the committee urges more caution in using FS/S as a proxy for gun ownership. As Duggan points out, the most obvious statistical problems concern the circularity of using FS/S as a proxy in a study of suicide, but the properties of FS/S in other kinds of studies (e.g., homicide) have also not yet been well described.

There are three basic problems with the existing analysis of proxies of firearms access. First, there is the problem of the accuracy of self-reported measures of firearm access, the standard against which the proxies are being compared. The effects of nonresponse and erroneous response in the surveys of firearms ownership, and random sampling errors more generally, have not been investigated. Certainly, response errors alone—as described both in Chapters 2 and 5—may result in biased estimates of the true prevalence of gun ownership. Moreover, if persons who are at risk for attempting suicide are less likely to participate in a household survey than other persons, then household surveys may not reflect the true relationship between gun ownership and method choice among persons who are actually at risk of attempting suicide. Existing research does not yet shed much light on these possible biases.

Second, there is the problem of aggregation bias in the correlation analysis. The primary reason for using a proxy is that more direct gun ownership data may not be available at the appropriate level of aggregation. But even if the proxy is highly correlated with observed ownership rates at one geographic level, it need not be correlated with gun ownership in smaller areas or in subgroups of the population. To explore this possibility, the committee reexamined the correlation between FS/S and gun ownership levels using the individual GSS survey responses aggregated to the 100 primary sampling units rather than the 9 census regions. In this case, we estimated the correlation between the percentage of suicides committed with a firearm and ownership levels to be 0.646 for firearms of any type and 0.639 for handguns, substantially less than the correlations reported by Azrael et al. (2004).

A similar problem is presented in Figure 7-1, which displays the relationship between FS/S and household gun ownership by age and gender.

Copyright © National Academy of Sciences. All rights reserved.



**FIGURE 7-1** Changing relationship of fraction of suicides using a firearm (FS/S) to household gun ownership (GSS) in the US by age and sex.

This figure shows that the relationship between FS/S and household gun ownership (as reported in the GSS) varies by age and gender and appears to have changed between 1980 and 2000; for example, the difference in patterns of association between males and females has diminished substantially. Such changes suggest that the relationship between FS/S and other measures of gun ownership may be influenced by a number of social, political, and cultural factors that are not yet understood.

Third, even if the estimated correlation coefficients are valid, it is not clear how this confirms (or refutes) the utility of such a proxy as a measure of gun ownership. To the contrary, except in very specific circumstances, regressions with proxies result in biased estimators.[5] Under the best cir-

_____

[5]Maddala (1992) and Wooldridge (2000) illustrate the biases created by proxies measures in linear mean regression models.

Copyright © National Academy of Sciences. All rights reserved.

cumstances, proxies reveal the sign but not the magnitude of the relationship of interest (Krasker and Pratt, 1986; Maddala, 1992). Azrael et al. (2004) attempt to provide some insight into this scale problem by running a simple linear regression of the form:

$$\text{PREV} = \beta_0 + \beta_1 \text{FS/S} + U,$$

where PREV is the true ownership rate, FS/S is the observed proxy, $\beta_0$ and $\beta_1$ are unknown coefficients, and U is a mean zero unobserved random variable, conditional on FS/S. The estimated slope coefficient is near unity, suggesting that a one-unit increase in FS/S implies a one-unit increase in the expected prevalence rate. The authors take this result, coupled with the strong cross-sectional correlation coefficients, as evidence supporting the idea that the FS/S proxy leads to (nearly) unbiased estimators of both the sign and the magnitude of the relationships of interest.

This logic, however, could be misleading. In the classical omitted variable model described by Wooldridge (2000:284-286), a unit coefficient on $\beta_1$ is sufficient. In other models, however, unbiased estimators may not exist. It is difficult to assess whether these conditions result in an unbiased estimator since Azrael et al. (2004) do not clearly describe the model they have in mind.[6] This problem becomes particularly important when FS/S is being used as a proxy in the study of suicide, and it seems to be an important source of misunderstanding. For example, Miller et al. (2002a, 2002c) assess the potential biases created by the FS/S proxy in the study of suicide, using statistical simulations. These authors claim to demonstrate that FS/S is not, by construction, correlated with the overall suicide rate, so that FS/S may be appropriately used as a measure of gun ownership in such a study. However, they do not explicitly describe their statistical model, and their description of the Monte Carlo simulation does not provide enough information to understand much about what was done. Furthermore, it is not

---

[6]No one, as far as we can tell, has investigated the actual linear or nonlinear shape of the relation between FS/S and gun ownership. Furthermore, Azrael et al. do not consider issues associated with the statistical error of the model. Suppose instead that we consider another linear model, in which the gun suicide rate is a function of the gun ownership prevalence: $\text{FS/S} = g_0 + g_1 \text{PREV} + V$, with V being a mean zero unobserved random variable, conditional on PREV (see, for example, Duggan, 2003). Indeed, this model may be more plausible if one believes that gun ownership is a causal factor in firearm-related suicides. And, if this were correct, then in models of the relation between suicide and the FS/S proxy, the explanatory variable (FS/S) would be correlated with the regression "error," a well-known cause of bias in regression analysis. In any case, the two models are not the same and do not have the same implications for the effects of using FS/S as a proxy. In the first model, the measurement errors are mean-independent of the proxy but not of the variable of interest, prevalence. In the second model, the measurement errors are independent of prevalence but not of the proxy.

Copyright © National Academy of Sciences. All rights reserved.

obvious why the simulation is at all relevant: the basic finding that proxies create biases is an analytical result that cannot be resolved by a simulation. It is very easy to create other plausible simulations that lead to substantial correlations between FS/S and suicide and, more importantly, substantial biases in the estimated relations of interest.

In Box 7-2, for example, we present the results of a simulation conducted by the committee. In this Monte Carlo simulation, we study the relation between the suicide rate and FS/S as a proxy for gun ownership, but we derive very different results than those reported by Miller et al. (2002a, 2002c). In particular, we find a negative association between the suicide rate and FS/S: in this simulation, if FS/S is a good proxy for ownership, gun owners are *less* likely than nonowners to commit suicide.

This exercise illustrates at least two things: (1) the design of the Monte Carlo simulation matters and (2) having suicide-related variables on both sides of the regression can produce perverse results. In the end, the biases created by proxy measures are application specific. Duggan (2003), for example, highlights the potential problems caused by using FS/S as an explanatory variable in a model whose dependent variable is also suicide-related. As demonstrated in the simulation above, unobserved factors associated with

---

**BOX 7-2
Monte Carlo Experiment**

There is not enough information available from the published Monte Carlo design (Miller et al., 2002a, 2002b) to enable someone to replicate it. However, the committee did a Monte Carlo experiment that implied quite different results. The Monte Carlo simulates a study of the relation between the suicide rate and FS/S as a proxy for gun ownership. Let $Z1$, $Z2$, and $Z3$ denote unobserved independent standard normal variables, and let

$FS = 10 + Z1$;
$NFS = 6 + Z2$;
$FS/S = FS/(FS + NFS)$;
$POP = 50 + Z3$; and
$RATE = (FS + NFS)/POP$,

where FS is the number of firearm suicides, NFS is the number of nonfirearm suicides, POP is the population size, and RATE is the total suicide rate for the population. With 1,000 replications, this design gave a mean value of FS/S in the neighborhood of 0.6 (similar to the fraction of suicides currently committed with a firearm in the United States). The correlation coefficient of FS/S and RATE was $-0.29$. The linear regression of RATE on FS/S gave a slope coefficient of $-0.18$ with a t-statistic of 9.6. So, according to this simulation, there is a negative association between the suicide rate and FS/S. In other words, if FS/S is a good proxy for ownership, gun owners are less likely than nonowners to commit suicide.

Copyright © National Academy of Sciences. All rights reserved.

the measure of gun and nongun suicide (e.g., measurement error) may lead to purely spurious correlations between suicide and FS/S. Since suicide, S, is on both sides of the estimated equation, the implicit model is often a complicated, nonlinear relation between S and FS, not the linear model that is assumed in the literature. These issues may or may not be problematic when using FS/S to estimate the relationship between gun ownership and homicide.

Another important issue is how the proxy affects inference from specific models that may include other explanatory variables. This depends, among other things, on how true firearms prevalence and FS/S are related to the other observed and unobserved explanatory variables. These issues are complicated, and most of them have not been recognized, much less investigated, in the suicide and firearms literature.

### Ecological Bias

All empirical studies face difficulties with making causal inferences, but ecological studies face special sources of bias in dealing with exposures and confounders. These difficulties arise because of the aggregation of observations and because the data on exposures, confounders, and outcomes are from different sources. At the most basic level, the data on firearms ownership in these studies may not come from the persons who committed suicide. Thus, ecological studies cannot establish whether there is a relation between gun ownership by an individual or household and suicide by that individual or member of the household. This may seem like a small problem in the case of gun suicide; after all, the victims of a gun suicide have undeniably achieved access to a gun. But community-level rates of gun ownership may not reflect the rates of gun ownership among highly suicidal persons. If, for example, the relationship between gun access and gun suicide varies by age and sex or by psychiatric disorder, then the aggregate association may reflect differences in the prevalence of suicidal states among persons of different age and sex or psychiatric disorder in the population, rather than differences in access to firearms. The geographical level of aggregation in state-level or regional ecological studies may be so high that there is no way of knowing whether the gun homicides or gun suicides occurred in the same areas with high levels of gun ownership.

Thus, even if FS/S is found to be a valid proxy for state-level gun prevalence, something that is not yet established, ecological studies may lead to biased inferences. The proxy is not a substitute for good data on household-level ownership or even ownership at a smaller level of aggregation by age, sex, or geography. Rather, better individual-level studies exploring the relationship between gun ownership and suicide may be needed in order to further understanding of the overall relationship between firearms and the risk of suicide.

Copyright © National Academy of Sciences. All rights reserved.

## INDIVIDUAL-LEVEL STUDIES OF THE ASSOCIATION
## BETWEEN FIREARMS AND SUICIDE

Most individual-level studies use case-control or response-based study designs to study rare events, such as completed suicide. However, the strengths and weaknesses of this study design are not well understood by investigators outside the public health community, and in order to clarify the controversy surrounding some of these studies, it may be helpful to describe the most important features of the case-control study design. Studies of the rates and determinants of illness or behaviors can be classified as retrospective or prospective. Prospective studies usually select people on the basis of exposure and determine how many persons with the exposure, compared with persons without exposure, develop a certain outcome. In contrast, retrospective studies usually start by choosing persons according to whether an illness or behavior has already developed and seek to find the phenomena that might be associated with the development of the outcome. Intuitively, it makes sense that if one is studying a rare outcome, then a prospective design is inefficient because it may take a very large sample or a very long time to accumulate enough occurrences. In this case, the case-control sampling design is beneficial because it oversamples the behavior or outcome of interest.

To investigate suicide, for example, a case-control study might select as cases those persons who have committed suicide, and then randomly select as controls a certain predetermined number of subjects from the same population who did not commit suicide. The study design would seek to establish an association between the outcome (suicide) and an exposure (such as firearms or depression) by noting the proportions of cases and controls that have been exposed to the possible risk factor.

There are a number of important advantages to the case-control method that explain its common use in epidemiology. Because the outcomes have already happened, case-control studies require no costly follow-up waiting for the outcome to develop. Because case-control studies oversample the outcome of interest, they also require smaller samples sizes than prospective studies of comparable power; for this reason, the case-control sampling scheme is often the only feasible way to collect the information of interest. For example, although suicide is the most common cause of firearm-related deaths in the United States, the overall suicide rate is approximately 11 suicides per 100,000 persons per year. Very few prospectively collected data sets would be large enough to draw precise inferences about completed suicide.

Feasible and efficient as the case-control design may seem, it also suffers from important limitations arising from the nonrandom selection of cases or controls and from misclassification of the outcome or exposure.

Copyright © National Academy of Sciences. All rights reserved.

For example, case-control studies are particularly susceptible to recall bias—a bias resulting from differential recall among case respondents compared with control respondents. The likelihood of recall bias may be directly influenced by the respondent's motivation to explain the illness (or outcome) itself. In a study of suicide, the victim's past history of depression might be more salient to the relatives of a person who has committed suicide compared with the relatives of a control subject, so that case-control studies of completed suicide might overstate the risk of psychopathology or of gun ownership among persons who have committed suicide, compared with controls.

Furthermore, relatives may follow a "stopping rule": once the family has found a "sufficient" explanation for the occurrence of the suicide—whether it is a gun in the home or psychopathology—they may be less likely to admit the presence of other, less socially acceptable risk factors; such ascertainment bias can lead to the underreporting of co-morbidity among risk factors and could explain reports of a greater frequency of gun ownership among suicides with no reported history of psychopathology. In the case of gun suicides, ascertainment bias may also arise because the outcome itself provides evidence of access to a gun. For example, family members are not always aware that firearms are kept in the home. If a subject has killed himself with a gun, family members would not be able to deny the gun's existence, even if they have first learned of its existence because the suicide has occurred. In contrast, the relatives of a living control subject may not know with certainty whether a gun is present in the household (Ludwig et al., 1998). Family awareness of suicidal risks could lead them to take steps to prevent the suicide of family members known to be at risk. In this case, the absence of firearms would be a sign of appropriate family responsiveness, and a nonexperimental study design would be unable to distinguish the protective effects of gun removal from the protective effects of other steps that the family may have undertaken at the same time.

Other limitations of case-control studies include nonrandom selection of cases or controls; it is often difficult to design a sample selection procedure that ensures that controls are, in fact, representative of the same population from which the cases were drawn. Even if the data are accurate and the sampling scheme is well defined, case-control studies, like other nonexperimental study designs, have a limited ability to distinguish causal from noncausal connections. In the case of firearms, individuals who own guns might have unobserved attributes that are associated with increased suicide risk, or, just as important, some individuals may seek to purchase guns because of a specific plan to commit suicide. These possibilities have very different implications from the point of view of preventive intervention.

Copyright © National Academy of Sciences. All rights reserved.

Finally, the parameter reported in many case-control studies, termed the odds ratio, is often not the parameter of interest for policy. Presumably, policy makers are interested in the expected number of lives saved or lost because of firearms or other factors. The odds ratio, which is roughly the suicide probability with firearms divided by the suicide probability without firearms, can translate into many or few lives, depending on the suicide probabilities that are involved. Thus, a large odds ratio does not necessarily translate into a large number of lives, and a small odds ratio does not necessarily translate into a small number of lives. To see the problem, consider two populations, one in which the suicide probability conditional on owning a firearm is 0.02 per person per year and the suicide probability conditional on not owning a firearm is 0.01 per person per year, and another in which these two probabilities are 0.0002 and 0.0001, respectively. The odds ratio and the relative risk are the same in both scenarios, but if guns are causal, then removal of guns from the population might avert 0.01 deaths per person per year in the first scenario, but only 0.0001 deaths per person per year in the second. Policy makers would usually like to know the attributable risk, which can be defined as the difference between the incidence of the outcome among the exposed and the incidence of the outcome among the unexposed. For the odds ratio or relative risk to inform policy, it must therefore be considered in light of additional information. The appendix to this chapter provides a detailed discussion of the measures of association in case-control designs, illustrating the strengths and weaknesses of the odds ratio as a measure of association and explaining the information needed to estimate attributable risk.

## Psychological Autopsy Studies

A number of studies have now been published that compare the prevalence of firearms in the homes of suicide victims with the prevalence of firearms in the homes of living controls; these studies, most of which make use of a "psychological autopsy" case-control design, are summarized in Table 7-3. Psychological autopsy studies are retrospective studies using interviews with relatives, neighbors, coworkers, or other close contacts of a deceased person (or of a living control subject) seeking to reconstruct the presence or absence of behavioral or psychological risk factors that may have predisposed the death. All of the studies that the committee reviewed have found a positive association between household gun ownership and suicide risk, although the magnitude of the estimated association varies. Although more recent studies have used better data collection strategies and more appropriate study samples (e.g., Conwell et al., 2002; Beautrais et al., 1996), the earlier studies suffer from methodological problems—ranging from sample selection problems to measurement bias, small samples, and

Copyright © National Academy of Sciences. All rights reserved.

**TABLE 7-3** Psychological Autopsy Studies of Firearm Prevalence
and Suicide

| Source | Cases N | Controls n |
|---|---|---|
| Conwell et al. (2002) | Older adult suicides<br><br>N = 86 | Community controls<br><br>n = 86 |
| Shah et al. (2000) | Adolescent gun suicides<br><br>N = 36 | School-selected controls<br><br>n = 36 |
| Brent et al. (1999) | Adolescent suicides<br><br>N = 140[a] | Community controls<br><br>n = 131 |
| Bailey et al. (1997) | Female homicides and suicides in the home<br><br>N = 123 suicides; 143 homicides[a] | Community controls<br><br>n = 266 pairs |
| Beautrais et al. (1996) | Suicides<br><br>N = 197 | Community controls<br><br>n = 1,028 normal controls |
| Brent et al. (1994) | Adolescent suicides with affective disorder<br>N = 63[a] | Community controls with affective disorder<br>n = 23 |

Copyright © National Academy of Sciences. All rights reserved.

| Gun Measure | Covariates, Matching Factors | Result: Gun Access and Overall Suicide Risk |
|---|---|---|
| Firearm in home | Education, living situation, psychiatric illness<br><br>Matching: age, race, sex, county of residence | +: any gun, handgun<br>0: long gun |
| Firearm in the home | Previous mental health problems, alcohol use, conduct disorder<br><br>Matching: age, sex, school | n/a: no information about overall suicide<br><br>(although gun is + associated with risk of gun suicide) |
| Firearm in the home | Psychiatric diagnosis, family history, life stressors, history of abuse<br><br>Matching by sex; age, race, county of origin, socioeconomic status | +: any gun |
| Firearm in the home | Mental illness; history of domestic violence; alcohol use, alcohol problems, prior arrest; illicit drug use; home security<br><br>Matching: neighborhood, sex, race, age | +: any gun |
| Firearm in the home | Age, gender, ethnicity, psychiatric diagnosis | 0: gun not associated with overall risk of suicide<br>(although gun is associated with risk of gun suicide) |
| Firearm in the home | Psychiatric diagnosis, family history, stressful life events, past treatment<br><br>Matching: age, sex, county of origin, socioeconomic status | +: any gun, handgun<br>0: not long gun |

*continued*

Copyright © National Academy of Sciences. All rights reserved.

Firearms and Violence: A Critical Review
http://www.nap.edu/catalog/10881.html

**TABLE 7-3** Continued

| Source | Cases N | Controls n |
|---|---|---|
| Bukstein et al. (1993) | Adolescent suicides with substance abuse N = 23[a] | Community controls with substance abuse n = 12 |
| Brent et al. (1993a) | Adolescent suicides N = 67[a] | Community controls n = 67 |
| Brent et al. (1993b) | Adolescent suicides N = 67[a] | Community controls without psychiatric disorder n = 38 |
| Kellermann et al. (1992) | Suicides in the home N = 438[b] | Community controls n = 438 |
| Brent et al. (1991) | Adolescent suicides N = 47[a] | Inpatient controls n = 94 47 attempters, 47 never-suicidal |
| Brent et al. (1988) | Adolescent suicides N = 27 | Inpatient controls n = 56 |

[a]Overlapping samples, western Pennsylvania.

Copyright © National Academy of Sciences. All rights reserved.

*FIREARMS AND SUICIDE*                                                177

| Gun Measure | Covariates, Matching Factors | Result: Gun Access and Overall Suicide Risk |
|---|---|---|
| Firearm in the home | Psychiatric diagnosis, family history, stressful life events, past treatment<br><br>Matching: age, race, sex, socioeconomic status, county of residence | +: any gun, handgun<br>0: not long gun<br>0: not gun storage |
| Firearm in the home | Psychiatric diagnosis<br><br>Matching: age, sex, socioeconomic status, county of origin | +: any gun, handgun<br><br>•particularly when no psychiatric disorder is present |
| Firearm in the home | Psychiatric diagnosis, family history, stressful life events<br>Matching: age, sex, county of origin, socioeconomic status | +: any gun, loaded gun<br>•particularly when no psychiatric disorder is present |
| Firearm in the home | Alcohol use, illicit drug use, domestic violence, living alone, education, previous hospitalization due to alcohol, current psychiatric medication.<br>Matching: age, race, sex, neighborhood | +: any gun<br><br>•particularly when no psychopathology is reported |
| Firearm in the home | Psychiatric diagnosis, family history; female headed household, treatment history<br><br>Matching: age, sex, county of origin | +: any gun<br><br>0: Not gun storage |
| Firearm in the home | Precipitants, psychiatric diagnosis, family history, exposure to suicidal contact | +: any gun |

*b*Overlapping samples, King County, Washington, and Shelby County, Tennessee.

Copyright © National Academy of Sciences. All rights reserved.

failure to control for possible confounders—which raise doubts about the reliability and interpretation of the findings that have been reported to date.

By far the largest psychological autopsy studies of guns and suicide, homicide, and unintentional injury have been conducted by Kellerman et al. (1992, 1993, 1998; Bailey et al., 1997). Their 1992 study of firearms and suicide is representative of their approach. Cases occurred in King County, Washington, and Shelby County, Tennessee, and were selected for study if the suicide took place in or near the home of the victim, regardless of method of suicide used; out of 803 suicides occurring during the study period, 565 occurred in the home and 238 occurred elsewhere. Cases were matched with living controls of the same race, sex, and age range and residing in the same neighborhood; the team sought to interview proxy respondents for both cases and controls, but 50 percent of the control interviews were conducted with the (living) subjects themselves. The structured interviews screened for substance abuse, domestic violence, legal problems, current medications, and history of depression, as well as the presence or absence of a gun in the home, but the protocols did not make formal psychiatric diagnoses. The odds ratio associated with firearms ranked fifth among the seven variables that were included in the final conditional-logistic regression analysis; the seven measures, along with their adjusted odds ratios, included psychotropic medication prescribed (35.9), previous hospitalization due to drinking (16.4), active use of illicit drugs (10.0), lives alone (5.3), gun kept in household (4.8), failure to graduate from high school (4.1), and drinks alcohol (2.3). The adjusted odds ratio for gun access had a 95 percent confidence interval of 2.7 to 8.5. Guns were a stronger risk factor for suicide among the 63 case subjects with no history of depression or mental illness (odds ratio 32.8; 95 percent confidence interval 4.6 to 232.8). According to the proxy informants, only 3 percent of suicides in the sample had purchased a gun within two weeks before death.

This team's focus on suicide in the home would have been appropriate for a study of unintentional injuries. However, the element of intention leads to an important difference between a study of "suicide and guns in the home" (which would be the usual policy question) and a study of "guns and suicide in the home" (which is what the research group elected to study), because it is likely that decisions about method and location of suicide are made together. This means that a study of gun access in a study restricted to suicides that take place in the home may be no more informative than a study of bridge access in a study restricted to suicides that take place from a bridge.

The possibly biased sample selection strategy, as well as other problems in the execution of the study and reporting of results, provoked a storm of attacks on the research team, the federal funding agency, and the medical journal in which the reports were published. It is difficult to determine the

Copyright © National Academy of Sciences. All rights reserved.

Firearms and Violence: A Critical Review
http://www.nap.edu/catalog/10881.html

degree of bias that was actually introduced in these studies by the sample selection strategy. However, one does learn that 58 percent of suicides taking place in the victim's home occurred by firearm, as did 46 percent of suicides not in the home. An informal calculation using assumptions that are favorable to the investigators suggests that omission of suicides taking place outside of the home may have led to an overstatement of the true relative risk by about 20 percent.[7] There are other problems with the execution of this study that may have actually led to biases of larger magnitude. For example, after eliminating the suicides that occurred outside the home, the investigators collected complete data for only 360 of 565 eligible cases, so that the final results were based on only 64 percent of the sample of suicides in the home and only 40 percent of the total suicide sample.

Several psychological autopsy studies have now focused on the risk of suicide among adolescents. There are three important reasons for selecting adolescents as a population for special scrutiny. First, suicide is the third leading cause of death among adolescents; if reducing access to firearms were a feasible way to reduce adolescent suicide, this would have great public health importance. Second, it is likely that "impulsive" suicides are more common among the young, so that studies of youth suicide may generalize to the type of suicide for which preventive efforts seem most promising. And third, studies of adolescent suicide are less susceptible to problems of reverse causality: because adolescents under the age of 18 are not allowed to pur-

---

[7]We do not have enough information to calculate a matched odds ratio, but an unmatched ratio can give a rough idea of the possible sampling bias. The investigators tell us that 65 percent of case subjects had guns in their home, compared with 41 percent of matched controls. This basic information implies an unmatched odds ratio for suicides in the home of $2.67 = (65/35)/(41/59)$.

How might the results change if we consider all suicides, not just those in the home? There were 238 suicides occurring outside the home during the observation period; 109, or about 45.8 percent of these suicides were committed with a firearm (compared to 57.7 percent among suicides occurring in the home). We do not know the fraction of these suicide victims who owned firearms. Assume, however, that that gun suicide probability by ownership status does not depend on whether the suicide occurs inside or outside the home. Then, from Kellerman et al., we know that 86 percent of suicidal owners used a gun and 6 percent of suicidal nonowners used a gun. Using the law of total probability, we know that the fraction of suicides committed with a firearm (0.458) can be decomposed into a weighted average of the fraction committed by owners (0.86) and nonowners (0.06), where the weights depend on the unknown fraction of owners. This implies that about 50 percent of out-of-home victims owned firearms, and that 60 percent of all victims owned firearms. Under these assumptions, the unmatched odds ratio comparing total suicides with control group equals $2.16 = (60/40)/(41/59)$; if out-of-home suicides had been included in the sample, the crude odds ratio might have been reduced by nearly 20 percent. The results are clearly sensitive to the assumption that the rates of gun suicide by ownership do not vary by the location of the suicide. If instead, one-quarter of suicidal nonowners used a gun (rather than 6 percent), the odds ratio would equal approximately 1.83, about 31 percent less than that reported by the authors.

Copyright © National Academy of Sciences. All rights reserved.

chase long guns or handguns in any state, an association between household gun ownership and adolescent suicide cannot be attributed to the adolescent's suicidal plan. Six overlapping studies have been published by Brent and colleagues based on cases of adolescent suicide occurring in western Pennsylvania. The most recent report includes all of the adolescent suicides that have been investigated by this research team and can serve as a summary of the studies to date. Subjects were a consecutive series of 140 adolescent suicide victims from western Pennsylvania and 131 community controls who were matched to the group of suicide victims on age, race, gender, county of origin, and socioeconomic status. Family members were interviewed using a structured protocol concerning the circumstances of the suicide, stressors, and current and past psychopathology; parents were also interviewed regarding family history of psychopathology and availability of a firearm (Brent et al., 1999). Like Kellerman and his colleagues, this research group found an association between family gun ownership and the risk of suicide, with an odds ratio of 3.0 (with a 95 percent confidence interval = 1.3-6.8) for older adolescents and 7.3 (with a 95 percent confidence interval = 1.3-40.8) for younger adolescents. They found that firearms in the home appeared to be a stronger risk factor among subjects with no diagnosable psychiatric disorder.

The results that have been reported from these U.S. studies contrast with a large case-control study from New Zealand, reported by Beautrais and colleagues in 1996. This study compared a consecutive series of 197 persons of all ages who died by suicide, 302 individuals who made medically serious but nonlethal suicide attempts, and 1,028 randomly selected community controls. Suicide attempts by gunshot accounted for 13.3 percent of suicides and only 1.3 percent of serious but nonlethal suicide attempts. Access to a firearm was strongly associated with an increased risk that gunshot would be chosen as the method of suicide or suicide attempt (odds ratio = 107.9; 95 percent confidence interval 24.8 to 469.5), but this access was associated with a much smaller, and statistically nonsignificant increase in the overall risk of suicide (odds ratio = 1.4; 95 percent confidence interval = 0.96 to 1.99).

How can one reconcile the very different estimates from the United States and New Zealand? The Beautrais and Kellerman confidence intervals do not overlap, but of course one interpretation of the overall literature is that the estimate lies somewhere in the range between Beautrais, Brent, and Kellerman, with possible differences in effect size by age group and country. The U.S. and New Zealand studies together seem to suggest an odds ratio that may be above one, but is not much larger than two, if one thinks effects in the two countries are likely to be similar. However, the effects in the two countries may differ for reasons that we do not yet understand.

One possibility is that the cultural correlates of gun ownership are different in New Zealand and in the United States, and that, in one or both

Copyright © National Academy of Sciences. All rights reserved.

Firearms and Violence: A Critical Review
http://www.nap.edu/catalog/10881.html

countries, some of the association between household gun ownership and the risk of suicide is explained by an unobserved characteristic of the families or social networks of suicidal persons. This interpretation is supported by two individual-level studies based on the National Longitudinal Study on Adolescent Health (called AddHealth), which found that adolescents who reported that they had access to a gun in their homes also reported higher rates of nonlethal suicidal thoughts and behaviors (Resnick et al., 1997; Borowsky, et al., 2001). These results may reflect reporting bias on the part of the adolescents (if suicidal adolescents are more likely to admit, or even brag about, the presence of a gun), familial transmission of a mood disorder (if a single heritable trait increases the likelihood that a parent will own a gun, and that an adolescent will experience suicidal thoughts), or correlates of particular parenting styles or family constellations (if parents who are more likely to own a gun are also more likely to have a distant or rejecting relationship with an adolescent child). However, they indicate that the association between household gun ownership and risk of suicide may be due to factors beyond the relative lethality of firearms.

## Risk of Suicide Among Recent Gun Purchasers

Another way to clarify the causal relationship between suicidal intention and gun ownership is to study the risk of suicide among recent gun purchasers. Two record linkage studies have done this by using state gun registration systems to compare the risk of suicide among gun purchasers with the risk of suicide in a general population. Both of these studies suggest that a small but significant fraction of gun suicides are committed within days to weeks after the purchase of a handgun, and both also indicate that gun purchasers have an elevated risk of suicide for many years after the purchase of the gun. The first study, by Cummings et al. (1997a), linked the membership list of a large health maintenance organization (HMO) in Washington State with state handgun registration records and state death certificates. Cases were HMO members who died of suicide or homicide between 1980 and 1992; for each case subject, five control subjects matched by age, sex, and zip code were randomly selected from the HMO membership list. For each case and control subject, family members were identified, and computerized records of handgun purchasers in Washington State were searched for the first occurrence of a handgun purchase from 1940 until the case's date of death. About 52.7 percent of the suicides were committed with a gun; 24.6 percent of persons who committed suicide had a history of a handgun purchase by themselves or a family member, compared with 15.1 percent of controls, with an adjusted relative risk of 1.9 (95 percent confidence interval 1.4 to 2.5). About 3.1 percent of suicide victims or their family members had purchased a first handgun within a

Copyright © National Academy of Sciences. All rights reserved.

year of the suicide, compared with 0.7 percent of controls. After the first year, the relative risk of suicide persisted, but at a much lower level; the median interval from first handgun purchase to suicide with a gun was 10.7 years.

The second study, by Wintemute et al. (1999), reported similar findings in a population-based study of individuals purchasing handguns in California in 1991. This study did not investigate the risk of suicide among the family members of gun purchasers, but the changes in suicide risk over time were presented in more detail. Age and sex-standardized mortality ratios for handgun purchasers were compared with the mortality of the general adult population of California. The risk of suicide in the first week after purchase was 57 times the risk of suicide in the general population, and the risk within the first year was 4.31 times the risk of suicide of the general population. The rates of suicide by firearm within the first six years after handgun purchase are presented graphically in Figure 7-2.

Taken together, these two studies provide strong evidence that some guns are indeed purchased for the purpose of carrying out a planned suicide, but this seems to represent only a small fraction of completed suicides: handguns purchased within the past year were used in about 5 percent of suicides in California, and about 3 percent of suicides in the Washington HMO. However, the focus on legal handgun purchases provides only a lower-bound estimate of the fraction of gun purchases that have occurred



**FIGURE 7-2** Rates of suicide by firearm during the six years after purchase among persons who purchased in California in 1991.

NOTE: The horizontal line indicates the age- sex-adjusted average annual rate of suicide by firearms in California for 1991-1995 (10.7 per 100,000 persons per year).

SOURCE: Adapted from Wintemute et al. (1999).

Copyright © National Academy of Sciences. All rights reserved.

Firearms and Violence: A Critical Review
http://www.nap.edu/catalog/10881.html

for the purpose of suicide, and both studies concern the purchase of handguns in states with gun registration laws, so they do not indicate how many guns might be purchased for the purpose of suicide if gun registration did not occur. The most important limitation is that these studies do not indicate whether handgun purchasers would have substituted other methods of suicide if a gun were not available, and do not measure other factors, such as history of substance abuse, psychiatric illness, criminal activity, or domestic violence, which might explain or modify a link between gun ownership and propensity for suicide.

## Assessment of Individual-Level Studies

All of the individual-level studies reviewed here have found a strong association between gun access and the likelihood that a suicide, if it occurs, will take place by means of a gun. There is also strong evidence that some guns are specifically purchased for the purpose of suicide, suggesting that some individuals definitely prefer a firearm to commit suicide, if suicide is their intention. But such reverse causality does not entirely explain the link between gun access and overall risk of suicide, because several studies have found that adolescents (who are not eligible to purchase guns) are at higher risk of suicide if they live in a home with a gun.

It is not yet clear if the individuals who used a gun to commit suicide would have committed suicide by another method if a gun had not been available. Overall, the U.S. studies have consistently found that household gun ownership is associated with a higher *overall* risk of suicide, but the estimate of such an association was significantly smaller in a study from New Zealand. Although reverse causality cannot explain the association between guns and risk of suicide for adolescents, it remains possible that some other heritable or environmental family trait links the likelihood of gun ownership and suicide. For example, several studies have found that adolescents with access to firearms in their homes are also more likely to report *thoughts* of suicide, suggesting that it may be some unobserved characteristic of gun-owning families in the United States that places such adolescents at higher risk.

## Next Steps

Despite these concerns with the existing literature, it is the committee's view that individual level studies in general, and case-control studies in particular, have been underutilized in this literature. All empirical research in this area must be cognizant of the potential for substitution and confounders, but individual-level study designs allow researchers to avoid the biases introduced by aggregation and proxy measures of ownership and are

Copyright © National Academy of Sciences. All rights reserved.

particularly well suited to the exploration of "third variables" that could explain the link between firearms and suicide in the United States.

## WHAT DIFFERENCE COULD A GUN LAW MAKE?

While suicide has rarely been the basis for public support of the passage of specific gun laws, suicide prevention may be the unintended by-product of such laws. For example, federal ownership standards that have been set by the Brady Handgun Violence Prevention Act might reduce the risk of gun suicide among several high-risk groups, including persons with a history of violent behavior, substance abuse, and severe mental disorder. Gun storage laws might reduce the risk of suicide among children and adolescents; gun buy-backs might reduce the stock of infrequently used guns that might be used for suicide, and cooling off periods could reduce the use of guns in suicides motivated by transient suicidal states. But gun policies could also increase the risk of suicide. For example, mental health advocates have opposed the creation of registries of persons with a history of mental illness, arguing that the stigma of appearing in a state-sponsored registry could lead some persons to refuse needed mental health treatment, thus increasing rather than decreasing the risk of a lethal outcome.

Tables 7-4, 7-5, and 7-6 summarize studies of the effects of specific gun laws. Several cross-sectional and time-series studies do report a decline in firearm suicides in response to gun control legislation, but so far there is little evidence for an effect on the overall risk of suicide.

### Cross-Sectional Studies of Gun Laws and Suicide

We identified 14 cross-sectional studies of the association between strictness of gun control laws and rates of suicide; these studies are summarized in Table 7-4. Overall, most studies found that stricter gun laws were associated with lower gun suicide rates. For example, 8 out of 9 studies found that states or cities with stricter gun control laws have lower rates of gun suicide. These studies have used a variety of methods for classifying the types and strictness of gun laws; it is worth noting that many of them compare the same geographic areas over the same time intervals, so they should not be regarded as independent samples. In general, laws restricting the buying and selling of firearms have been associated with lower rates of firearm suicide, but laws governing the right to carry firearms seem to have no association.

Lower gun suicide rates have sometimes been associated with higher nongun suicide rates, and the findings regarding overall suicide rates have been less consistent: 5 out of 11 studies found an association between stricter gun laws and overall rates of suicide, another 5 studies found no significant association, and 1 study produced mixed results.

Copyright © National Academy of Sciences. All rights reserved.

## Time Series Studies of Gun Laws and Suicide

A number of studies have described the trends in gun suicides in one or two local or national jurisdictions before and after the passage of a gun control law. Studies using one or two jurisdictions are summarized in Table 7-5; most of these studies have also been reviewed in previous chapters. These studies present conflicting findings about the association between gun laws and suicide, depending on the model specification and time period under study. For example, several reports by Rich et al. (1990), Carrington and Moyer (1994), Leenaars and Lester (1999), and Lester (2000) reach different conclusions about the trends in gun suicide and overall suicide and homicide in Canada before and after the passage of restrictive gun control laws in 1977, compared with trends in the United States over the same period of time.

Another notable example in this literature is the study by Loftin et al. (1991) evaluating the District of Columbia's Firearms Control Regulations Act of 1975. This study has been prominently cited as showing a significant decline in gun suicides following the institution of a ban on handguns. However, overall suicides, not gun suicides, are the policy question of interest, and the investigators did not report whether there were significant differences in the estimates of the trend in *overall* suicide rates. Other concerns about the Loftin study were raised in Chapter 5 in relation to homicide, and they are likely to apply to the results pertaining to suicide as well.

The overall problem with the interrupted time-series study design is that simple comparisons cannot distinguish the effects of passage of a gun law from the effects of a myriad of other factors that may be changing over the same period of time. We identified four studies, summarized in Table 7-6, that improve on this research design by using "difference-of-differences" methods across many jurisdictions to evaluate the effect of gun policies on suicide rates. These studies compare the differences in outcomes before and after the introduction of a new policy in the various jurisdictions in which such policies have been introduced, with the differences in the outcomes over the same period of time among otherwise similar jurisdictions that have not been exposed to a change in policy. By making comparisons within the same jurisdiction at multiple points of time and across many jurisdictions at any single point in time, investigators hope to control for unobserved characteristics of the jurisdiction that do not change over time and for unobserved time trends that may be shared across jurisdictions. As with the simpler interrupted time-series design, the validity of the results depends on many assumptions about how and when the law was implemented, how long it might take for the law to have a discernible effect on the use of firearms, how long such an effect might last, and about the presence or absence of other factors that might affect the suicide rate during the time when the gun law came into effect.

Copyright © National Academy of Sciences. All rights reserved.

Firearms and Violence: A Critical Review
http://www.nap.edu/catalog/10881.html

**TABLE 7-4** Cross-Sectional Studies of Gun Laws and Suicide

| Source | Units of Analysis | Gun Law |
|---|---|---|
| Kleck and Patterson (1993) | 170 large cities, 1979-1981 | 10 types of law, or aggregate index |
| Yang and Lester (1991) | 48 states, 1980 | Strictness of state gun control laws (update of Sommers, 1984) |
| Boor and Bair (1990) | 50 states, DC 1985 | Three types of gun laws |
| Lester (1988c) | 9 regions, 1970 | Strictness of handgun control laws |
| Lester (1987a) | 48 states, 1970 | Strictness of handgun control laws |
| Lester and Murrell (1986) | 48 states, 1960, 1970 | Strictness of handgun control laws 1964-1970 |
| Sommers (1984) | | Nine types of laws |
| Medoff and Maggadino (1983) | 50 states, 1970 | (a) type of law (b) strictness of enforcement |
| DeZee (1983) | States 1978 | Individual and aggregated gun laws |

Copyright © National Academy of Sciences. All rights reserved.

| Controls and Strata | Results: Gun Suicide | Results: Nongun Suicide | Results: Overall Suicide |
|---|---|---|---|
| % black, % male, median age, unemployment rate, poverty, income, home ownership, college enrollment, transience, population change, divorce, church membership, etc. | Index: decrease Permit: decrease Mental: decrease | Index: 0 Permit: 0 Mental: 0 Dealer decrease Other: 0 | Index: 0 Mental: 0 Dealer decrease Other 0 |
| Gun ownership: various proxies | Dealer: decrease Other: 0 | | |
| Unemployment, divorce | Decrease | Increase | Decrease |
| % male, % 35-64, % black, % urban, population density; % population change, divorce rate, crime rate, unemployment rate | n/a | n/a | Decrease |
| % black, median age, % urban, divorce rate | 0 | 0 | 0 |
| Gun ownership: Wright survey None | Decrease | 0 | 0 |
| None | Decrease | "Other" increase | Overall: decrease male: decrease female: 0 |
| Divorce rate, unemployment rate | Wait: decrease Mental: decrease | n/a | n/a |
| White male suicide rates only: age, median income, unemployment rate, occupational prestige, % catholic, region | n/a | n/a | Decrease |
| % unemployed, % male, % youth, % white collar, % blue collar, % foreign born | n/a | n/a | 0 |

*continued*

Copyright © National Academy of Sciences. All rights reserved.

**TABLE 7-4** Continued

| Source | Units Of Analysis | Gun Law |
|---|---|---|
| Lester and Murrell (1982) | 48 states 1960, 1970 | Three types of gun laws |
| Lester and Murrell (1980) | States, 1959-1971 1969-1971 | Strictness of gun laws in 1968 |
| Murray (1975) | 50 states, 1969 | Seven types of gun laws, 1966 |
| Geisel et al. (1969) | 50 states; large cities, 1960, 1965 | Weighted index, handgun laws |

NOTE: Decrease/increase: gun law predicts fewer/more suicides; 0 = effect not significant at p =.05; n/a = not stated in report.

**TABLE 7-5** Interrupted-Time-Series Studies of Gun Laws and Suicide

| Source | Areas Compared | Time Periods Compared | Gun Law |
|---|---|---|---|
| Lester (2000) | Canada | 1970-1996 | 1978 Bill C-51 |
| Carrington (1999) | Canada | 1969-1976; 1978-1985 | 1978 Bill C-51 |
| Leenaars and Lester (1999) | Canada | 1969-1976; 1978-1985 | 1978 Bill C-51 |
| Cantor and Slater (1995) | Queensland (Australia) | 1990-1991; 1992-1993 | 1992 Weapons Act |
| Carrington and Moyer (1994) | Ontario | 1965-1977 1979-1989 | 1978 Bill C-51 |
| Lester and Leenaars (1993) | Canada | 1969-1976; 1978-1985 | 1978 Bill C-51 |

Copyright © National Academy of Sciences. All rights reserved.

Firearms and Violence: A Critical Review
http://www.nap.edu/catalog/10881.html

| Controls and Strata | Results: Gun Suicide | Results: Nongun Suicide | Results: Overall Suicide |
|---|---|---|---|
| None | Seller: decrease Buyer: decrease Carry: 0 | n/a increase Buyer: increase Carry: 0 | |
| None | n/a | n/a | Decrease |
| % unemployed, median education, % interstate migrants, % college grads, % white collar, median income, % foreign born, % young adult, log of population | n/a | n/a | 0 |
| Per capita income, median education, % male, police per capita, % nonwhite, population density, licensed hunters | Decrease | n/a | 0 |

| Change in Gun Suicide After Gun Law | Change in Nongun Suicide After Gun Law | Change in Overall Suicide After Gun Law |
|---|---|---|
| Decrease | Increase | Increase |
| Trend flattens for males | No change in trend for males | Trend flattens for males |
| Trend varies by age, sex | Trend varies by age, sex | Trend varies by age, sex |
| Trend varies by urban/rural, sex | Trend varies by urban/rural, sex | Trend varies by urban/rural, sex |
| Not significant | Trend downward | Trend downward |
| Decrease | Not significant | |
| | | Not significant |

*continued*

Copyright © National Academy of Sciences. All rights reserved.

**TABLE 7-5** Continued

| Source | Areas Compared | Time Periods Compared | Gun Law |
|---|---|---|---|
| Snowdon and Harris (1992) | Australian states | 1968-1979; 1980-1989 | 1980 gun law (South Australia) |
| Thomsen and Albrektsen (1991) | Denmark | 1984-1985; 1986-1987 | 1986 law |
| Loftin et al. (1991) | DC vs. suburbs (a) mean monthly rates (b) ARIMA with age-standardized annual rates | 1968-1976; 1977-1987 | 1976 handgun ban in DC |
| Rich et al. (1990) | Toronto | 1973-1977; 1979-1983 | 1978 Bill C-51 |
| Nicholson and Garner (1980) | DC vs. nation | Two selected years (1976; 1979) | 1976 handgun ban in DC |

NOTE: ARIMA = autoregressive, integrated, moving-average time series models.

In the first quasi-experimental study to examine effects of gun policy on adult suicide, Ludwig and Cook (2000) evaluated the impact of the 1994 Brady act in 32 "treatment" states that were directly affected by the act, compared with 19 "control" jurisdictions that had equivalent legislation already in place. The authors found a reduction in firearm suicides among persons age 55 and older of 0.92 per 100,000 (with a 95 percent confidence interval = –1.43 to –.042), representing about a 6 percent decline in firearm suicide in this age group. This decrease, however, was accompanied by an offsetting increase in nongun suicide, so that the net effect on overall suicide rates was not significant (–.54 per 100,000; with a 95 percent confidence interval = –1.27 to 0.19). Using a similar methodology, Reuter and Mouzos (2003) found no significant effect study of a large scale Australian gun buy-back program on total suicide rates.

Copyright © National Academy of Sciences. All rights reserved.

Firearms and Violence: A Critical Review
http://www.nap.edu/catalog/10881.html

| Change in Gun Suicide After Gun Law | Change in Nongun Suicide After Gun Law | Change in Overall Suicide After Gun Law |
|---|---|---|
| Decrease (SA males) | Increase (S.A. males) | No difference |
| No change | Not stated | Decrease (not qualified) |
| (a) Decrease | (a) Not significant | (a) Decrease (not quantified) |
| (b) Not significant | (b) Not stated | (b) Not stated |
| Decrease | Increase-jumping | Not significant |
| Decrease | Not significant | Decrease |

Two other studies have evaluated the effects of safe storage laws on child and adolescent suicide (see Chapter 8). Cummings et al. (1997a) evaluated the possible effect of state safe storage gun laws on child mortality due to firearms; they found an insignificant decline in gun suicides (rate ratio 0.81, with a 95 percent confidence interval = 0.66-1.01) and overall suicides (rate ratio 0.95, with a 95 percent confidence interval = 0.75-1.20) for children under age 15 in states that had instituted such a law. In a similar study, Lott and Whitley (2000) investigated the effects of safe storage laws introduced in various states between 1979 and 1996. They compared gun and nongun suicides among children in the age group most likely to be affected by the law, as well as gun suicides in the next older age group, which should have been unaffected by the law. Their models also controlled for state and year fixed effects and 36 other demographic variables. They, too, found some reduction in gun suicides among children in states with stricter gun storage laws, but no reduction of overall suicide rates.

Copyright © National Academy of Sciences. All rights reserved.

*192* *FIREARMS AND VIOLENCE*

**TABLE 7-6** Quasi-Experimental Studies of Gun Laws and Suicide

| Source | Areas and Time Period Compared | Gun Law | Population |
|---|---|---|---|
| Reuter and Mouzos | Australian states, 1979-1998 | 1996 gun buy-back | Whole population |
| Ludwig and Cook (2001) | 50 states + DC 1985-1997 | 1994 Brady act | 21-54 years |
| | | | 55+ |
| Lott and Whitley (2000) | 50 states + DC 1979-1996 | Safe storage laws | Children and adolescents 0-19 |
| | | Other gun laws | |
| Cummings, Grossman, Rivara, and Koepsell (1997a) | 50 states + DC 1979-1994 | Safe storage laws | Children under 15 |

## SUMMARY AND RECOMMENDATIONS

The committee draws the following conclusions on the basis of the present evidence:

1. States, regions, and countries with higher rates of household gun ownership have higher rates of gun suicide. There is also cross-sectional, ecological association between gun ownership and *overall* risk of suicide, but this association is more modest than the association between gun ownership and gun suicide; it is less consistently observed across time, place, and persons; and the causal relation remains unclear.

2. The risk of suicide is highest immediately after the purchase of a handgun, suggesting that some firearms are specifically purchased for the purpose of committing suicide.

3. Some gun control policies may reduce the number of gun suicides, but they have not yet been shown to reduce the overall risk of suicide in any population.

Copyright © National Academy of Sciences. All rights reserved.

| Change in Gun Suicide After Gun Law | Change in Nongun Suicide After Gun Law | Change in Overall Suicide After Gun Law |
| --- | --- | --- |
| Continuation of of decreasing trend | Continuation of increasing trend | Increase |
| No significant difference | No significant difference | No significant difference |
| Decrease | No significant difference | No significant difference |
| Mixed: Decrease with higher age limits | Not stated | No significant difference |
| mixed (see text) | Not stated | No significant differences |
| No significant difference | No significant difference | No significant difference |

There are several substantive differences between the research literature linking guns and crime and the research literature linking guns and suicide. First, there is a cross-sectional association between rates of household gun ownership and the number and fraction of suicides committed with a gun that appears to be much more consistent than, for example, the cross-sectional association between gun ownership and gun homicide. There also appears to be a cross-sectional association between rates of household gun ownership and *overall* rates of suicide, reported by investigators on both sides of the gun policy debate. However, the association is small, the findings seem to vary by age and gender, and results have been sensitive to model specifications, covariates, and measures used; furthermore, the association is *not* found in comparisons across countries. In the absence of a simple association between household gun ownership and crime rates within the United States, the literature on guns and crime has been forced to attend to some of the methodological problems of omitted variables and endogenous relationships inherent in studying complex social processes. The presence of a simple bivariate association between gun ownership and suicide may have prevented suicide investigators from pursuing study designs hav-

Copyright © National Academy of Sciences. All rights reserved.

ing a better hope of justifying a causal inference. The issue of substitution has been almost entirely ignored in the literature of guns and suicide.

Some of the problems in the suicide literature may also be attributable to the intellectual traditions of the injury prevention field, which has been strongly shaped by successes in the prevention of car crashes and other unintentional injuries. An unintentional injury prevention model can lead to misunderstandings when it is applied to the study of intentional injury; the investigation of intentional injury should take account of the complexities of preference, motivation, constraint, and social interaction among the individuals involved.

In addition to better addressing these fundamental problems associated with drawing causal inferences, this chapter has highlighted a number of other data and methodological obstacles. What sort of data and what sort of studies would be needed in order to improve the understanding of the association between firearms and suicide? Although some knowledge may be gained from further ecological studies, the most important priorities appear, to the committee, to be improved data systems, improved individual-level studies of the association between gun ownership and suicide, and a more systematic analysis of the effect of firearms laws and related interventions on the risk of suicide.

## Proxy Measures of Gun Ownership

The association between gun ownership and gun suicide has led to recommendations for the use of the fraction of suicides committed with a firearm (FS/S) as a proxy for household gun ownership when direct measures are unavailable. This means that a better understanding of the relationship between firearms and suicide may also make a technical contribution to the study of firearms and crime. However, investigators should be aware of the biases that can be introduced by any proxy measures, and they are warned that particularly serious artifacts can be introduced if FS/S is used as a proxy for gun ownership when suicide is also the outcome of interest.

## Data Systems

The absence of information about gun ownership has been a major stumbling block for ecological and individual-level studies of suicide as well as for studies of homicide and other gun-related crime. In order to better understand these associations, it would be useful to collect individual-level information about gun ownership in studies of suicidal behavior, as well as information about suicidal behavior in studies of legal and illegal gun use. Indeed, because FS/S should not be used as a proxy measure for gun owner-

Copyright © National Academy of Sciences. All rights reserved.

Firearms and Violence: A Critical Review
http://www.nap.edu/catalog/10881.html

ship in ecological studies of suicide, the further understanding of the association between firearms and suicide will be particularly dependent on the availability of direct information about gun ownership. Potentially valuable state-level information could be made available through the regular inclusion of gun ownership questions in the Behavioral Risk Factor Surveillance System, and a better understanding of the possible linkage between household gun ownership and adolescent risk-taking might come from the regular inclusion of household gun ownership questions, in addition to the existing adolescent gun use questions, in the Youth Risk Behavior Surveillance System.

At the moment, the U.S. vital statistics system is the only source of nationally representative information about lethal self-injuries. This system sets important limitations on present knowledge. The proposed National Violent Death Reporting System, now being piloted in six states with funding from the Centers for Disease Control and Prevention, could provide more information about demographic background, intent, circumstances, precipitants, method of injury, and source of the firearm (in the case of gun suicides) than is presently available. In this regard, it may be a much more significant improvement for the study of suicide than for the study of homicide, for which similar national data systems are already available.

But there are potential problems that should be considered in the planning of such a system, which might affect the overall usefulness of the final result (see Chapter 2 for further details). Data systems that collect information about a series of cases (such as the recording of injuries or deaths) cannot be used without an appropriate comparison group to make valid inferences about the association between exposures and outcomes. Will the data be collected in a way that would permit such comparisons? This might be accomplished by using the injury surveillance system in the way that cancer registries are now used, as a source of cases for case-control or record-linkage studies of the risk factors for the designated outcome. Will the data system collect sufficiently complete and reliable information about relevant exposures? It would be helpful to develop the NVDRS system with several specific research questions in mind, to ensure that the system will actually be usable, and will actually be used.

## Improved Individual-Level Studies

**The committee recommends further individual-level studies of the link between firearms and both lethal and nonlethal suicidal behavior.** It would be useful to have an ongoing, longitudinal study that determines both predictors of gun ownership and other known risk factors for suicidal thoughts, nonlethal suicidal behaviors, and completed suicide. Added detail about method choice and correlates of gun ownership would help to clarify

Copyright © National Academy of Sciences. All rights reserved.

the possible link between household gun ownership and intentional injury. In light of findings from previous case-control studies, sources of ascertainment bias, factors influencing impulsivity, and confounding and modifying factors other than psychiatric diagnosis should receive special attention. Several strategies might be used to overcome sources of reporting bias in psychological autopsy study designs. Administrative and medical records may be used to supplement individual interviews, and questionnaire designs and computer-assisted interview strategies developed to investigate sensitive topics, such as illegal drug use and adolescent sexual behavior, may serve as models.

## Further Policy Studies

Suicide prevention has rarely been the basis for public support of the passage of specific gun laws, but effects on suicide rates could be an unintended by-product of such laws, and the effects of different firearms policy interventions on suicide remain poorly understood. **Thus, the committee recommends further studies of the link between firearms policy and suicide.**

## APPENDIX
## MEASURES OF ASSOCIATION IN CASE-CONTROL STUDIES

The odds ratio is the principal measure of association in a case-control study. One of the most useful features of the odds ratio, and the reason for its use in case-control study designs, is that it can be estimated from a response-based sampling design, even if the incidence of the exposure and outcome in the underlying population remain unknown.

### Likelihood of Suicide and Gun Ownership

Suppose, for example, that one wishes to learn how the likelihood of suicide varies with gun ownership in a population of 1,000,000 persons for whom there were the following number of suicides among gun owners and nongun owners in the course of one year:

|               | Suicide = yes   | Suicide = no        | Total             |
|---------------|-----------------|---------------------|-------------------|
| Gun owner     | A = 60          | B = 399,940         | A + B = 400,000   |
| Not gun owner | C = 40          | D = 599,960         | C + D = 600.000   |
| Total         | A + C = 100     | B + D = 999,900     | 1,000,000         |

In this population, the incidence of suicide among gun owners is A/ (A+B), or 60 per 400,000 per year, and the incidence of suicide among

Copyright © National Academy of Sciences. All rights reserved.

Firearms and Violence: A Critical Review
http://www.nap.edu/catalog/10881.html

nongun owners is $C/(C+D)$, or 40 per 600,000 per year. To compare these two probabilities, we could calculate the relative risk, which can be defined as the incidence of the outcome in the exposed group divided by the incidence of the outcome in the unexposed group, namely:

$$(1) \ RR = \frac{\text{incidence of outcome in exposed group}}{\text{incidence of outcome in unexposed group}} = \frac{A/(A+B)}{C/(C+D)}$$

In our example, the relative risk of suicide among gun owners compared with nongun owners would be $(60/400,000)/(40/600,000)$, which equals 2.25.

However, another relative measure of association is the odds ratio. The odds in favor of a particular event are defined as the frequency with which the event occurs, divided by the frequency with which it does not occur. In our sample population, the odds of suicide among gun owners were 60/399,940, and the odds of suicide among nongun owners were 40/599,960. The odds ratio can then be defined as the odds in favor of the outcome in the exposed group, divided by the odds in favor of the outcome in the unexposed group.

$$(2) \ \text{odds ratio} = \frac{\text{odds of outcome in exposed group}}{\text{odds of outcome in unexposed group}} = \frac{A/B}{C/D}$$

In our example, the odds ratio of suicide for gun owners relative to nongun owners would be $(60/399,940) / (40/599,960)$, which is about 2.2502. As the outcome becomes more rare, (B) approaches $(A + B)$ and (D) approaches $(C + D)$, and the odds ratio approaches the risk ratio. As a rule of thumb, the odds ratio can be used as a direct approximation for the risk ratio whenever the incidence of the outcome falls below about 10 percent. This "rare outcome assumption" holds true in most studies of completed suicide. Although the rare outcome assumption is not required for the odds ratio to be a valid measure of association in its own right (Miettinen, 1976; Hennekens and Buring, 1987), the odds ratio does diverge from the risk ratio as the outcome becomes more common.

Of what use is this estimate? Why not just calculate the risk ratio directly? It turns out that the odds ratio has several attractive mathematical properties, but the most important property is that the ratio that we have just calculated as $(a/b)/(c/d)$, is equivalent to $(a/c)/(b/d)$. In our example, the odds ratio we calculated is therefore exactly equal to the ratio of gun owners to nonowners among the suicide victims (60/40) divided by the ratio of gun owners to nonowners among population members who have not committed suicide: (399,940/599,960). This sleight of hand means that the odds ratio of exposure, given the outcome, which is the measure of

Copyright © National Academy of Sciences. All rights reserved.

association obtained from a case-control study, can be used to estimate the odds ratio of the outcome, given exposure, which is usually the question of interest.

To see how this works, suppose that we now conduct a case-control study in the population in order to estimate the association between gun ownership and suicide. We might do this by selecting all 100 suicides that occurred during the study year, and by drawing a random sample of 100 control subjects who did not commit suicide during the study year. The results of the case-control study might be as follows:

|  | Outcome Present | Outcome Absent |
|---|---|---|
| Exposure Present | a = 60 | b = 40 |
| Exposure Absent | c = 40 | d = 60 |
|  | a + c = 100 = total cases | b + d = 100 = total controls |

Even though the control group in the case-control study now contains only 100 subjects, we have selected these subjects so that they are representative of the frequency of exposure to firearms in the population of nonsuicides from which the control sample was drawn. So the odds ratio for our case-control study is:

$$(3) \text{ odds ratio} = (a/c)/(b/d) = (60/40)/(40/60) \approx 2.25$$

Prospective studies can measure the frequency of the outcome among persons with different levels of exposure; retrospective case-control studies measure the frequency of exposure among persons with different levels of the outcome. But the symmetry of the odds ratio allows us to estimate the risk of the outcome, given exposure, from information about the odds of exposure, given the outcome.

## Attributable Risk

In fact, by themselves, neither the odds ratio nor the risk ratio can assist policy makers who need to compare the number of occurrences that could be altered through intervention with the costs of the intervention. Policy makers would prefer to know the attributable risk, which can be defined as the difference between the incidence of the outcome among the exposed and the incidence of the outcome among the unexposed:

Copyright © National Academy of Sciences. All rights reserved.

$$(4) \ AR = A/(A+B) \ - C/(C+D).$$

To see the problem with the odds ratio and the relative risk, consider two populations, one in which the suicide probability conditional on owning a firearm is 0.02 per person per year and that conditional on not owning a firearm is 0.01 per person per year, and another in which these two probabilities are 0.0002 and 0.0001, respectively. The odds ratio and the relative risk are the same in both scenarios, but if guns are causal, then removal of guns from the population might avert 0.01 deaths per person per year in the first scenario, but only 0.0001 deaths per person per year in the second.

In a case-control study, this limitation can be overcome by using information from other sources. When a case-control study is population based—that is, when all or a known fraction of cases in a particularly community are identified and a random sample of unaffected individuals are selected as controls—or when information about the incidence of outcome and exposure are available from other sources, it is possible to calculate the incidence rates and attributable risk from the information derived from the study (see, for example, Manski and Lerman, 1977; Hsieh et al., 1985).

In our example, suppose that we already know that the cases represent all of the suicides occurring in the population in a given year, and suppose that we know the size of the population. We know, from the case-control study itself, that 40 percent of control households in random sample own firearms, and the study has revealed an odds ratio of (about) 2.25 to 1. The "rare outcome" assumption is satisfied, which simplifies the calculations; we can treat the odds ratio as a risk ratio and calculate incidence rates and attributable risks as follows:

The total incidence of suicide in the population is equal to the incidence of suicide among gun owners, times the probability of being a gun owner, plus the incidence of suicide among nongun owners, times the probability of not being a gun owner, i.e.:

$$(5.1) \quad 10/100,000 = (A/(A+B))(.40) + (C/(C+D))(.60)$$

A, B, C, and D are the unobserved "true" frequencies of events in the population. But from the risk ratio of 2.25 we also know that:

$$(5.2) \quad A/(A+B) = 2.25(C/(C+D))$$

So: $(5.3) \quad 10/100,000 = (2.25)(C/C+D)(.40) + (C/C+D)(.60)$
$$= (.90+.60)(C/C+D)$$
$$= (1.50)(C/C+D)$$

Copyright © National Academy of Sciences. All rights reserved.

Firearms and Violence: A Critical Review
http://www.nap.edu/catalog/10881.html

Therefore, the probability of suicide among nongun owners = $C/(C+D)$ = $(10/100,000)/(1.50) \approx 6.67$ per 100,000 persons per year; and the probability of suicide among gun owners = $(2.25)(C/C+D)$ = 15 per 100,000 persons per year.

The attributable risk is the difference between the probability of suicide among gun owners, and the probability of suicide among nongun owners: $15 - 6.67 \approx 8.33$ suicides per 100,000 attributable to gun ownership. The interpretation of this attributable risk depends on the actual causal mechanism linking exposure and outcome. In our example, there would be about 8.33 suicides per 100,000 that might be preventable by restricting access to guns, if guns were to play a causal role in the risk of suicide.

Copyright © National Academy of Sciences. All rights reserved.

# 8

# Firearm Injury Prevention Programs

I n this chapter we review the research on the effectiveness of primary, secondary, and tertiary programs for the prevention of firearms injury. Special attention is given to efforts to prevent the use of firearms by youth. The first section summarizes behavioral interventions targeted toward reducing firearms injury. The second part considers what is known about technological interventions aimed at preventing firearms injury. In both cases, the existing research is very limited.

## BEHAVIORAL INTERVENTIONS

In this section we review two aspects of behavioral interventions that have been designed to prevent firearms injury: the structure and effectiveness of the program plans in each case and the quality of the associated outcomes research data.

The prevention of firearms violence has been addressed in a number of ways, from legislative reform, to media campaigns, to educational interventions. Educational interventions are typically employed in school settings, with a focus on modifying the attitudes, knowledge, or behavior of individual children. Other educational and media interventions have targeted parents and older youth with messages designed to increase their knowledge of the dangers of firearms as well as methods to ensure safe use and storage. Most of these interventions are developed by well-meaning groups or organizations whose concern for violence—or the potential of violence—among the children leads them to be proactive. However, these programs are rarely based on theoretical models or preliminary effectiveness data.

*201*

Copyright © National Academy of Sciences. All rights reserved.

Firearms and Violence: A Critical Review
http://www.nap.edu/catalog/10881.html

The implementation strategies lack structured evaluations and are not commonly informed by an appreciation of the limitations of children's developmental stages.

Table 8-1 is a summary of the targeted populations, program design, and evaluations of 11 selected interventions. This selection has been based on the popularity of the program and whether the program has been peer-evaluated using randomized control groups. Most of these programs are centered on educating children themselves about firearms and violence or through programs involving parents or health care providers. Other comprehensive programs, such as those listed by the Office of Juvenile Justice and Delinquency Prevention (e.g., Boston Strategy to Prevent Youth Violence) were not listed either because they incorporated suppression and

**TABLE 8-1** Firearms Prevention Programs

| Program | Developer, Sponsor and/or Publisher | Type of Program | Target Age or Grade |
|---|---|---|---|
| Eddie Eagle Gun Safety Program | National Rifle Association | "Just say no" | Pre-K to grade 6 |
| Steps to Prevent Firearm Injury (STOP 2) | Brady Center to Prevent Gun Violence | Physician-directed parent education | Parents |

Copyright © National Academy of Sciences. All rights reserved.

prevention strategies for many types of violence, or they were designed specifically to deter illegal gun possession and use.

## Outcome Measures

The impact of most of these types of behavioral interventions is measured in terms of changes in knowledge, attitudes, and behavior. Specific outcomes may include knowledge of the danger of guns and attitudes toward firearms and violence. Changes in behavior are detected by proximal and distal outcome measures for the individuals targeted. For example, if the program is designed to educate parents about firearms safety, a proximal behavior goal would be related to how a gun is stored in the home

| Description of Program | Evaluation |
| --- | --- |
| Motivational program for children in pre-K through grade 1, with easy-to-understand rhymes; activity books for grades 2-6; 7-minute video, reward stickers, parent letter, instructor guides, in-service video. The message: If you see a gun, stop, don't touch it, leave the area, and tell an adult. | Hardy et al. (1996) evaluated a similar program and in posttest found no difference between children's behavior toward firearms in both treated and control groups.<br>  Of three programs evaluated (STAR and STOP, see below), Howard (2001) ranks the Eddie Eagle program best based on educational material appropriate for developmental level and presentation appearance of printed material. |
| Kit prepares health care providers to talk with patients/clients and their families about the dangers of keeping a gun in the home. The fundamental goal is to assist the health care provider in incorporating gun violence prevention into routine injury prevention counseling. | Oatis et al. (1999) demonstrate in a pre- and post-randomized trial that there was not a statistically significant drop in gun ownership or improvement in gun storage after a practice-based intervention aimed to promote these behaviors. |

*continued*

Copyright © National Academy of Sciences. All rights reserved.

**TABLE 8-1** Continued

| Program | Developer, Sponsor and/or Publisher | Type of Program | Target Age or Grade |
|---------|-------------------------------------|-----------------|---------------------|
| Straight Talk About Risks (STAR) | Brady Center to Prevent Gun Violence | Skills-building | Pre-K to grade 12 |
| Safe Alternatives and Violence Education (SAVE) | San Jose Police Department (San Jose, CA) | Skills-building | Juvenile offenders ages 10-18 |
| Options, Choices, and Consequences (Cops and Docs) | Roy Farrell, M.D., Washington Physicians for Social Responsibility | Shock | Grades 7 and 8 |
| In a Flash | National Emergency Medicine Association | Shock | Middle school children (ages 10-14) |

Copyright © National Academy of Sciences. All rights reserved.

Firearms and Violence: A Critical Review
http://www.nap.edu/catalog/10881.html

| Description of Program | Evaluation |
| --- | --- |
| Straight talk about risks of firearm injury and death. Age-appropriate lessons help children identify trusted adults, deal with peer pressure, and recognize risks related to gun handling. | Using a randomized prospective study design with 600 students, the Education Development Center, Inc. (LeBrun et al., 1999) found STAR to be most effective for increasing gun safety knowledge and attitudes for children in grades 3-5 and only moderately effective for older children.<br><br>Hardy (2002b) in a randomized control study (34 children ages 4 to 7) concludes that STAR-like programs are ineffective in deterring children's play with guns. |
| One-day, 6-hour violence awareness class for juvenile offenders and their parents. | Arredono et al. (1999) demonstrate in pretest and posttest evaluations that recidivism rates declined at 2-year follow-up, but no comparison group was used. |
| Doctor and police officer give a 2-hour presentation of medical, legal, and emotional consequences of gun violence; students are shown photos of gunshot victims whose injuries are the result of gang and domestic violence and suicide attempts. | Health Partners Research Foundation (1999) observes that program improves students' knowledge about guns but does not change attitudes and behaviors. Detailed information about this evaluation is not available. |
| 20-minute video with graphic depiction and emotional impact of gun violence through interviews with children who have been paralyzed, disfigured, or blinded by gunshot wounds. | No evaluation of effectiveness as of 2002. |

*continued*

Copyright © National Academy of Sciences. All rights reserved.

Firearms and Violence: A Critical Review
http://www.nap.edu/catalog/10881.html

**TABLE 8-1** Continued

| Program | Developer, Sponsor and/or Publisher | Type of Program | Target Age or Grade |
|---|---|---|---|
| Calling the Shots | Michael McGonigal, M.D., Regions Hospital, St. Paul, Minnesota | Shock | Juvenile offenders ages 15-17 |
| The Living Classroom Foundation | The Living Classroom Foundation, Baltimore, MD, contact: John Dillow, Director of the Maritime Institute | Shock | Adjudicated middle school students with drug or gun offenses |
| Teens on Target (TNT) | Operated by Youth Alive! Oakland, CA | Peer-based education, intervention, and mentoring program | Urban youth at risk |

Copyright © National Academy of Sciences. All rights reserved.

*FIREARM INJURY PREVENTION PROGRAMS*          *207*

| Description of Program | Evaluation |
|---|---|
| Hospital-based 4-hour program. While children are being lectured on trauma resuscitation, a gunshot victim (teenage actor) is brought in, and children are asked to help resuscitate, but "patient" dies. Children are then directed to counselors to discuss their emotions and told that the situation was not real but a realistic rendering of what happens in emergency rooms every day | Health Partners Research Foundation (1999), in randomized treatment and control groups 2 weeks before and after the program, found that levels of discomfort with aggression increased after program. No changes in behavior around firearms were found in this evaluation. |
| The main purpose of this 9-week program is employment training and GED preparation. One section of one day is spent on gun violence prevention; students are shown a video depicting a violent scene of a juvenile shot in a drug dispute. After the video, children share personal experiences and think up behaviors that can prevent violent outcomes. | No evaluation of effectiveness as of 2002 |
| Peers meet with youth who have been suspended from school for carrying weapons or engaging in destructive behavior. Peers also visit adolescents recovering from violent injuries who convince them not to retaliate. | The National Council on Crime and Delinquency (2001) conducted a randomized prospective study of the program assessing attitudes and behavior toward guns and truancy rates following completion of the program, but results are not yet available. |

*continued*

Copyright © National Academy of Sciences. All rights reserved.

Firearms and Violence: A Critical Review
http://www.nap.edu/catalog/10881.html

**TABLE 8-1** Continued

| Program | Developer, Sponsor and/or Publisher | Type of Program | Target Age or Grade |
|---|---|---|---|
| Hands Without Guns | Office of Justice Programs, Education Fund to End Handgun Violence, Joshua Horwitz. Based in Washington, DC, but implemented in several U.S. cities | Peer-based education and outreach | Middle school and high school students |
| Child Development-Community Policing (CD-CP) Program | A collaborative effort by the New Haven, CT, Department of Police Services and the Child Study Center at the Yale University School of Medicine | Interrelated training and consultation focusing on sharing knowledge and developing ongoing collegial relationships between police and mental health workers. | Police officers and mental health professions |

(locked, loaded, etc.), whereas the distal behavior goal might be to reduce the rare acts of gun violence involving children. If the program is designed to educate young children about firearms, then a proximal behavior goal would be avoidance of a nearby gun, and a distal behavior goal would be the reduction of child gun accidents.

Copyright © National Academy of Sciences. All rights reserved.

| Description of Program | Evaluation |
| --- | --- |
| Public health and education campaign aimed at providing a forum for youth encouraging them to develop their own constructive responses to gun violence. | Internal evaluation of the program (1999) reports that pre- and post-campaign surveys with a sample of 400 Washington, DC, students show that kids who could identify the program were less likely to carry guns than those who had never heard of the program. |
| Police supervisors spend 3 full days in training activities to become familiar with developmental concepts, patterns of psychological disturbance, methods of clinical intervention, and settings for treatment.<br><br>   Mental health clinicians spend time with police officers in squad cars, at police stations, and on the street learning directly from officers about their day-to-day activities. | No evaluation of effectiveness as of 2002 |

The outcome data may come from a number of sources—self-report, proxy report (e.g., peers, teachers, parents) and direct observation using school records, and criminal records. Most of the programs described in this chapter assess children's knowledge or attitudes about firearms, and most used self-report and questionnaires to assess change in knowledge or attitudes.

Copyright © National Academy of Sciences. All rights reserved.

Firearms and Violence: A Critical Review
http://www.nap.edu/catalog/10881.html

A review of the literature reveals only one standardized measure of children's attitudes toward firearms and violence: the Attitudes Toward Guns and Violence Questionnaire (AGVQ), developed by Shapiro and his colleagues (1997) at the Applewood Centers in Cleveland, Ohio. The AGVQ demonstrates satisfactory internal consistency (Cronbach's alpha = .94) and concurrent validity, with 23 items relating to violence, guns, or conflict behavior answered on a 3-point Likert-type scale (disagree, not sure, agree). A factor analysis of the AGVQ revealed four factors associated with participants owning or wanting to own a gun: (1) aggressive response to shame: the belief that shame resulting from being insulted can be undone only through aggression; (2) comfort with aggression: general beliefs, values, and feelings about aggression and violence; (3) excitement: feelings of being excited and stimulated by guns; and (4) power/safety: feeling the need to carry a gun to be powerful and safe on the streets. Shapiro and his colleagues (1998), administering the AGVQ to 1,619 children and adolescents, found that the measure was useful for predicting gun ownership. Validity coefficients were lower for girls in elementary school.

Measuring *behavior* in the presence of firearms is more difficult and rarely done as part of the evaluation of firearm violence programs. When behavior is measured, one of two sources of information is typically obtained:

• Community-wide or school-wide measures of the consequences of gun-carrying or gun violence—for example, school suspensions, mortality and morbidity rates, arrest rates for firearm-related offenses, suicide attempts using firearms. The behaviors that firearm violence programs are typically designed to modify or prevent are often rare events (e.g., accidental firearm deaths), so from a program evaluation point of view it is difficult to assess the effectiveness of a program designed to keep something of low frequency from actually happening. This is because data must be collected from a large number of individuals and often over a long period of time to obtain adequate numbers for analysis.

• Program participants' description of their experiences around firearms through focus groups, class discussions, or questionnaires. Younger children may be asked if they have ever seen or touched a gun, and adolescents may be asked if they carry a gun or if they would use a gun in certain situations. While this information may be of interest, self-reports are subject to biases that may lead to underreporting, particularly when children and adolescents are asked about socially sensitive behaviors (Moskowitz, 1989).

The most direct outcome measure of behavior is an unobtrusive observation of children and adolescents when they encounter a gun. None of

Copyright © National Academy of Sciences. All rights reserved.

Firearms and Violence: A Critical Review
http://www.nap.edu/catalog/10881.html

the firearms safety programs we discuss has actually utilized this method of evaluation, however, usually because of policy regulations at schools prohibiting even disabled firearms on campus. Nonetheless, direct observation may be the most accurate method of discerning what a child or adolescent would do when confronted with a firearm. Researchers who have directly observed children's behaviors around firearms following an intervention have found high rates of gun play (see Hardy et al., 1996; Hardy, 2002b).

The best evaluation of a firearm violence prevention program should assess its impact on knowledge, attitudes, *and* behavior from a variety of sources, particularly since these variables are not highly correlated. Inconsistencies between children's knowledge and behavior following participation in more general violence prevention programs is well documented (Arcus, 1995). Moreover, Wilson-Brewer and colleagues (1991) found in a survey of 51 programs that fewer than half claimed to reduce actual violence levels. Those that did claim to do so had limited empirical data to support their claims.

The correlation between children's knowledge about guns and the likelihood that they will handle a gun is less well studied. However, a recent study by Hardy (2002b) suggests that the two outcomes following a firearm violence prevention program are unrelated. In this study, 70 children ages 4 to 7 were observed in a structured play setting in which they had access to a semiautomatic pistol. Observers coded several behaviors, including gun safety statements ("Don't touch that!") and gun touching. Assuming that children who say "Don't touch that gun!" to another child have some knowledge that guns are dangerous (or for some other reason should not be touched), one might expect that these children would themselves not touch the guns. Nonetheless, 15 of the 24 children who made such comments in the study subsequently touched the gun themselves during the 10-minute interval.

Another way Hardy (2002b) assessed the correlation between firearms safety knowledge and behavior was to examine the relationship between a child's belief that a gun is real and his or her behavior around that gun. Again, however, the evidence suggests no significant relationship. Specifically, the children who correctly identified the real gun as such were no less likely to play with the gun ($n = 19$) than were children who believed the gun was a toy ($n = 16$). These findings were later replicated in a study with children ages 9 to 15 (Hardy, 2002a).

## Study Design

Once the appropriate outcome measures are identified and operationally defined, program developers must decide on the design of the evalua-

Copyright © National Academy of Sciences. All rights reserved.

tion. Serious evaluations have the goal of excluding alternative explanations for the result; the goal is to ensure that any changes noted in the targeted knowledge, attitudes, and behaviors are due to the program and are not due to extraneous variables and events—environmental changes, developmental changes, practice effects, etc.

There are several steps that program developers can take so as to exclude such alternative explanations. First, depending on whether the program is individual-based, school-based or community-based, developers should identify the target population; for example, a school-based prevention program may be developed for grade schools, or a media-based campaign may be developed for rural communities. Next, the evaluation should be based on a sample of individuals, schools, or communities that are representative of the target population; otherwise the obtained results may depend in some unknown way on the sample and may not be generalizable to the population. For example, if the sample includes only grade schools with highly motivated teachers, then the results may not be generalizable to all grade schools. The key point is that the sample should be representative of an identified population; in the above example, the population is more accurately identified as grade schools with highly motivated teachers.

A second step that program developers can take to exclude alternative explanations is to assess the targeted knowledge, attitudes, and behaviors in a control or comparison group not exposed to the program. Ideally, the comparison group should differ from the treatment group only in the subsequent exposure to the program. Developers can compare baseline data concerning the knowledge, attitudes, or behaviors targeted for change to check that the groups do not differ in systematic ways prior to the intervention. Of course the comparison group and experimental group may differ in unmeasured ways. The ideal way to exclude alternative explanations, including explanations due to unmeasured differences between groups, is by random assignment of individuals or schools or communities to the experimental and comparison conditions. (See Weisburd and Petrosino, forthcoming; Flay, 2002; and Boruch et al., 2004, for discussions of the advantages of randomization in the field of criminology, for school-based prevention programs, and for place-based trials, respectively.) Randomized trials exclude alternative explanations for the estimated differences between the groups because, on average, randomization produces groups that differ only in terms of the prevention intervention. That is, the randomized trials produce defensible evidence because alternative explanations for outcome are spread evenly across the treatment and comparison groups. Even when we randomize to experimental and comparison conditions, it is useful to collect and compare baseline data concerning the knowledge, attitudes, or

Copyright © National Academy of Sciences. All rights reserved.

behavior(s) targeted for change to check that the groups do not, by chance, differ in systematic ways prior to the intervention.

## Quality of the Research

Firearm violence prevention programs are disseminated widely in U.S. public school systems to children ranging in age from 5 to 18. Every day children are taught to say "no" to guns and violence by educators who use a variety of methods to get the message across, from depicting the deadly consequences of firearm violence, to building skills needed to resist peer pressure, to using peer educators to reach students at risk. On the surface, this primary prevention approach to reducing firearm deaths and injuries among children and adolescents appears to be a worthwhile venture. A closer examination of these programs, however, suggests that present educational efforts may *not* be effective at reducing the risk of firearm morbidity and mortality among children, and in fact may have the opposite effect for some youth.

Only a few firearm prevention programs have been evaluated for outcome measures of attitudes and behavior using at least some of the criteria listed above: pretest data and randomized experimental and control groups. One of these is Straight Talk about Risks (STAR), a Brady Center to Prevent Gun Violence program designed to educate children (in pre-K to grade 12) on the risks of handling a firearm. Younger children are taught to identify a trusted adult, obey rules, and solve problems without fighting. Lessons for older children center on understanding emotions that may lead to conflict, identifying mixed messages from the media, dealing with peer pressure, and learning about implications for victims of gun violence. Evaluations of STAR have produced mixed results. In a randomized prospective study design with 600 students, the Education Development Center, Inc. (LeBrun et al., 1999) found STAR to be most useful for increasing gun safety knowledge and attitudes for children in grades 3 to 5 and only moderately helpful for older children. However, in a small randomized control study of 70 preschool children (mean age 4.77 years), Hardy (2002b) concludes that STAR-like programs are ineffective in deterring children's play with guns.

Of the more than 80 other programs described at least briefly in the literature, few have been adequately evaluated as to their effectiveness. Those that have been evaluated provide little empirical evidence that they have a positive impact on children's knowledge, attitudes, and beliefs. The field of firearm violence prevention is in its infancy and thus can draw lessons from the related fields of injury, violence, and substance abuse prevention. These fields have experienced the same kinds of developmental

Copyright © National Academy of Sciences. All rights reserved.

issues. For example, substance abuse scientists recognize that care must be taken in devising preventive interventions. In the early stages of substance abuse prevention, prevention programs sometimes increased knowledge about where to get and how to use drugs and cigarettes (Glasgow et al., 1981; Goodstadt, 1978; Thompson, 1978). Similarly, simplistic efforts to educate children about firearms safety and violence are likely to be ineffective and may be potentially counterproductive. For young children, firearm violence prevention curricula may be insufficient to overcome their natural curiosity about guns, impulsivity, and inability to generate preventive strategies in dangerous situations. For older children, the lessons may be unlikely to alter their perceptions of invulnerability and overcome the influence of peer pressure. Moreover, the lessons may result in *increases* in the very behaviors they are designed to prevent, by enhancing the allure of guns for young children and by establishing a false norm of gun-carrying for adolescents.

**In light of the lack of evidence, the committee recommends that existing and future firearm violence prevention programs should be based on general prevention theory and research and incorporate evaluation into implementation design.** Theory—that is, education, psychological and sociological theories—can be used to formulate prevention programs. This is widely the case in the field of preventive interventions (see Flay, 2002). Prevention scientists use a sequence of studies to test the utility of the theories for prevention and aid in the further refinement of the prevention program (Flay and Best, 1982). These studies are conducted prior to wide-scale evaluation of the prevention program (Flay, 1986, 2002). Similarly, the ideas and theories underlying firearm violence prevention programs should be tested and refined by a sequence of studies. These studies may include structured laboratory observations—that is, researchers working closely with the schools and community groups can recruit a representative sample of children and adolescents and randomize the children to experimental and comparison conditions, collect pretest and posttest behavior, and structure an experimental setting to elicit the targeted behavior.

## FIREARMS SAFETY TECHNOLOGY

Safety technologies have often been suggested as an alternative means of preventing injury and crime. Locking technology might be used to limit who can use a particular firearm. Protection technology might be used to shield vulnerable persons or reduce the lethality of weaponry. Sensor and tracking technology might be used to detect concealed weapons, provide situational awareness for law enforcement, detect lost or stolen firearms, limit when or where firearms can be discharged, or identify firearms that have been discharged. To varying degrees, these different classes of tech-

Copyright © National Academy of Sciences. All rights reserved.

Firearms and Violence: A Critical Review
http://www.nap.edu/catalog/10881.html

nologies are all being developed or considered by the National Institute of Justice, the Office of Science and Technology, and other public and private organizations.[1]

The potential of technology can be especially alluring. If widely adopted and effective, safety technologies may alter the rates of gun ownership, discharge, and mortality, as well as, more generally, the markets for weaponry and injury. The actual effects of a particular safety device on violence and injury, however, are difficult to predict. Even if perfectly reliable, technology that serves to reduce injury among some groups may lead to increased deviance or risk among others (Viscusi, 1992; Violence Policy Center, 1998; Leonardatos et al., 2001).

Many persuasive arguments have been made about the benefits and costs of different firearms safety technologies. Despite the rhetoric, however, there is almost no research that evaluates the efficacy and cost-effectiveness of different interventions. The numerous arguments on the potential benefits and costs of technology are largely speculative.

### Locking Technology

To illustrate both the complexities of the issue and the lack of evidence, it is useful to consider what is known about locking devices, perhaps the most widely debated, studied, funded, and utilized firearms safety technology. From simple trigger locks and gun safes to more sophisticated personalized and "smart" guns, the promise of this technology is to reduce the unauthorized transfer and use of firearms.[2] Unauthorized transfers occur in households, for example, from a parent to a child, in seizures from victims to assailants, in thefts from residences, vehicles, and commercial places, and in illicit transfers on the secondary market.

Much of the interest in locking technologies stems from the desire to decrease the number of injuries and fatalities involving children. Children under the age of 18 are not, in general, legally allowed to possess a handgun. Yet each year, hundreds of children are fatally shot or injured in firearms accidents and suicides. Juveniles also use handguns in criminal activities, including the inner-city gang wars associated with the steep rise in the juvenile homicide rate during the late 1980s and the highly publicized

---

[1]See the Office of Science and Technology web page, http://www.ojp.usdoj.gov/nij/sciencetech/welcome.html, for more details.

[2]Basic safety technologies have been around and widely used for over a century. Smith and Wesson, for example, manufactured more than 500,000 guns with grip safeties between 1886 and 1940 (Teret and Culross, 2002). Mechanical locks are available commercially at negligible cost. More sophisticated personalized guns, however, are either not yet developed or not widely distributed.

Copyright © National Academy of Sciences. All rights reserved.

mass school shootings in which, in many cases, the assailants obtained firearms from their own homes (National Research Council and Institute of Medicine, 2002).

While much of the attention and legislation regarding gun locks has focused on reducing juvenile fatalities, these locking technologies may also impact broader classes of unauthorized possession and discharge. The National Institute of Justice has been particularly interested in the potential of these technologies for reducing the handful of fatalities that occur each year when police officers are fatally shot with their own firearm. More generally, certain types of locking systems may decrease injuries that result from firearms seizures, theft, and illegal transfers on the secondary market.[3] While the specific numbers are unknown, the majority of criminals do not obtain handguns via licensed dealers, and a large fraction of violent handgun crimes are committed by proscribed users (see Chapter 5; Wright and Rossi, 1986; Pacific Research Institute for Public Policy 1997; Cook and Braga, 2001).

Locking technologies may also cause unintended injuries. In particular, locking devices may compromise the ability of authorized users to defend themselves. A lock may fail entirely or may take too much time for the weapon to be of use. In fact, Wirsbinski (2001) and Weiss (1996), in reviewing the engineering design of the different locks for the Sandia National Laboratories, concluded that the existing personalized locking technologies did not meet the reliability standards required for on-duty law enforcement officers.[4]

The interaction between gun safety technology and the behavior of users may also lessen the effectiveness of locking technologies. At the most basic level, authorized users may not lock their guns and unauthorized users may design ways to disable locks, access unlocked guns, or use different weaponry. Safety technology may also lead to less cautious behavior around firearms: authorized users may be careless in storing weapons, juveniles familiar with locked guns may not be cautious around unlocked guns, and so forth. Finally, these technologies may create new markets for firearms among consumers who otherwise would not be inclined to own a gun.

---

[3]Presumably, for locks to deter illegal transfers in the secondary market, the key must be maintained by a third party—for example, the authorized dealer—rather than the owner of the gun (Cook and Leitzel, 2002). This may be possible with some of the automated biomechanical technologies being developed (e.g., fingerprint technology) but may be more difficult with many of the manual technologies.

[4] Wirsbinski (2001) and Weiss (1996), and the New Jersey Institute of Technology (2001) evaluated the reliability of different locking technologies in laboratory settings. A workshop report of the National Academy of Engineering (2003) summarizes some of the key technological and practical barriers to developing personalized handguns.

Copyright © National Academy of Sciences. All rights reserved.

To evaluate the effect of locking technologies on injury, a number of researchers have laid out conceptual models linking technology interventions to injury. These models suggest that the efficacy of personalization technology depends on the type and reliability of the technology, the extent to which these technologies are integrated into the stock of firearms, and the behavioral response of consumers and producers of firearms. Different sets of assumptions about the nature of these factors lead to different qualitative conclusions about the efficacy of safety technologies. Assuming they are unreliable, not widely used, or result in unintended behavioral responses, many conclude that locking devices may increase injury (see, for example, Violence Policy Center, 1998; Leonardatos et al., 2001). Others, under different sets of assumptions, conclude that these technologies may decrease crime and injury (see, for example, Cook and Leitzel, 2002; Teret and Culross, 2002). It is not known, however, which assumptions are correct. Thus, without credible empirical evidence, the realized effects of different safety technologies are impossible to assess.

In the absence of direct empirical evidence, a number of researchers have appealed to the lessons learned from other product safety innovations and legislation, especially automobile safety technologies. These analogies, however, ultimately do not answer the question at hand—namely, how firearms safety technologies impact injury. While a review of the product safety literature is beyond the scope of this report, it seems clear that (1) the efficacy of product safety innovations varies by product and (2) there are ongoing and controversial debates on the effects of some of the most well-known innovations, including seat belts. In fact, scientists have long warned that safety innovations can lead to offsetting behavioral responses. Auto safety innovations may lead to increased recklessness (Peltzman, 1975); child safety caps may lead to unsafe storage behaviors (Viscusi, 1984); and low-tar cigarettes may lead to increased smoking (Benowitz et al., 1983; Institute of Medicine, 2001). There is hardly consensus on the effects of product safety innovations on injury. Furthermore, in contrast to most other consumer products, firearms safety technology invariably reduces the effectiveness of the weapon. Firearms, after all, are designed to injure. Other safety devices do not generally impair the primary function of the product. Seatbelts, for example, do not reduce the effectiveness of automobiles, and safety caps do not reduce the effectiveness of medication.

## Child Access Prevention Laws

Child access prevention (CAP) laws, sometimes referred to as "safe storage" or "gun owner responsibility" laws, make owners liable if a child uses an unlocked firearm. The first of these of laws was passed in Florida in 1989, and at least 17 other states and several cities have adopted similar

Copyright © National Academy of Sciences. All rights reserved.

provisions (Brady Campaign, 2002). State laws differ in what age children are covered, ranging from 12 to 18, in the penalty imposed, from civil to criminal liability, and what it means to safely store a gun. Effectively, however, CAP laws require gun owners with children to lock their firearms.

Two papers evaluate the effects of CAP laws on accidents, suicide, and crime. Lott and Whitley (2002), using the same basic data and methods as in the Lott and Mustard (1997) analysis of right-to-carry laws (see Chapter 6), conclude that CAP laws have no discernible effect on juvenile accidents or suicide, but they do result in a substantial increase in violent and property crime. In sharp contrast, Cummings et al. (1997) find that CAP laws reduce accidents and may reduce suicide and homicide among youth as well, although these are imprecisely estimated.[5] They conclude that during the five-year period from 1990 to 1994, these statutes prevented approximately 39 deaths of young children, and another 216 children might have lived had these laws been in effect in all states.

It is difficult to explain the conflicting estimates. Using state-level injury statistics, both analyses rely on interrupted-time-series designs that assume, after controlling for observed factors, that CAP laws were the only notable change in the environment. The formal models and specifications differ. Cummings et al. (1997) estimates a negative binomial count model with fixed state and time effects but an otherwise parsimonious specification of control variables. Lott and Whitley (2002) use Tobit and log-linear models with fixed state and time effects and a rich specification of 36 control variables to account for variation in demographics (e.g., age, race, income, education) and firearms laws. Lott and Whitley also evaluate different outcomes and assess the sensitivity of their findings more generally.

In both studies, it is unreasonable to assume that CAP laws were the only notable event that may have affected firearms related injury and crime. Time-series variation in crime is thought to be a highly complex process that depends on numerous economic, demographic, and social factors. Moreover, CAP laws and other local firearms legislation may be adopted in response to the local variation in the outcomes of interest. For example, a sharp increase in accidental injuries and fatalities spurred a Florida legislature that had previously turned down similar legislation to adopt the CAP law in 1989 (Morgan, 1989). If the 1988-1989 wave of accidental injuries would have naturally regressed back to some steady-state level, any observed correlations between Florida's CAP law and the injury rate would be spurious. Even if all the other factors that may influence injury or crime are time invariant, the dynamics that connect the law to the outcomes of inter-

---

[5]Webster and Starnes (2000), updating the Cummings et al. (1997) analysis, draw similar conclusions.

Copyright © National Academy of Sciences. All rights reserved.

est are likely to be complex. The impact of a CAP law adopted in a particular place and time will almost certainly depend on how the law is enforced and advertised over time, how this affects storage practices over time, and how this in turn affects injury and crime over time.

The problems with this research are compounded due to the lack of detailed data on the law, on ownership and storage, and on outcomes. The data do not reveal information on the storage practices of particular households or in the aggregate or how the laws are implemented and enforced. The data do not link ownership to outcomes. Rather, we simply observe aggregate correlations between injury and crime, and CAP law legislation (see the discussion of ecological associations in Chapter 7). It is not known whether the observed associations reflect changes in the behavior of firearms owners, whether changes in accidents are associated with juvenile shooters, or whether changes in victimization are associated with crimes committed in households. A final data related concern is the possibility of changes in reporting behavior. Webster and Starnes (2000) suggest that whether a death is coded as an accident, a suicide, or a homicide is "likely to vary across place and time." If the coding behaviors change in response to the legislation, for example, if after the law is passed accidental shootings are more likely to be classified as suicides or homicides, then the observed empirical results may be due to coding changes rather than the law.

Thus, in the committee's view, until independent researchers can perform an empirically based assessment of the potential statistical and data related problems, the credibility of the existing research cannot be assessed.

## Conclusions

In general, we find that the scientific bases for understanding the impact of different technologies on the rates of injury is sorely lacking. The existing research outlines a number of interesting hypotheses, but, in the end, the extent to which different technologies affect injury remains unknown.

We should note that this conclusion stands in contrast to a recently released report from the Institute of Medicine (2002). In particular, the report, *Reducing Suicide: A National Imperative*, recommends safety devices as an effective means of reducing injury associated with firearms. While this recommendation may (or may not) be justified for many reasons, we found no credible scientific evidence in the Institute of Medicine's report or elsewhere that demonstrates whether safety devices can effectively lower injury. Rather, the lack of research on this potentially important intervention is a major shortcoming in the body of knowledge on firearms. Without a much stronger research base, the benefits and harms of technology remain largely unknown.

Copyright © National Academy of Sciences. All rights reserved.

Firearms and Violence: A Critical Review
http://www.nap.edu/catalog/10881.html

**Thus, the committee recommends that a sustained body of empirical research be developed to study the effects of different safety technologies on violence and crime.** There are many obstacles to answering the key empirical questions, not the least of which is the lack of detailed individual-level data on firearms ownership, the use of safety devices and firearms, and the outcomes of interest that, in the case of accidents, are especially rare. Without better individual-level data, researchers will continue to be forced to rely on aggregated data that are subject to many different interpretations and strong assumptions that are rarely justified. Researchers may exploit the fact that many of these technologies have been used for over a century and, more recently, have been widely disseminated. Well-designed experimental evaluations that subsidize technologies in different locales may be an alternative approach to reveal the demand for these technologies as well as their effects on crime and violence.

Copyright © National Academy of Sciences. All rights reserved.

# 9

# Criminal Justice Interventions to Reduce Firearm-Related Violence

This chapter reviews the state of knowledge of the effectiveness of criminal justice interventions aimed at reducing deliberate or accidental injuries or deaths from firearms. The policies are: (1) gun courts, (2) enhanced sentences for criminal uses of firearms, and (3) problem-oriented policing to prevent firearm-related crimes. These interventions have had recent broad bipartisan support and are a major focus of the federal government's ongoing efforts to reduce firearm-related violence. In particular, over $500 million has been devoted to Project Safe Neighborhoods, a program designed to provide funds to hire new federal and state prosecutors, support investigators, provide training, and develop and promote community outreach efforts (for further details, see http://www.psn.gov/about.asp\). The research evidence, however, is mixed. In some cases, the committee found evidence that programs may be effective, in others the evidence suggests that programs may have negligible effects, and in others the evidence base is lacking.

## GUN COURTS

Gun courts, which are descendants of the drug court movement of the 1990s, generally target particular types of offenders for quicker, and sometimes tougher, processing in community-based courts. Gun courts operate differently across jurisdictions but typically feature small caseloads, frequent hearings, immediate sanctions, family involvement, and treatment services. Little research has been conducted on the operations and crime prevention effectiveness of gun courts. Most available knowledge comes

*221*

Copyright © National Academy of Sciences. All rights reserved.

from the Office of Juvenile Justice and Delinquency Prevention's examination of a juvenile gun court operating in Jefferson County, Alabama.

The Jefferson County Juvenile Gun Court in Birmingham, Alabama, focuses on first-time juvenile gun offenders. Its core components include a 28-day boot camp, a parent education program, a substance abuse program, intensive follow-up supervision, and community service (Office of Juvenile Justice and Delinquency Prevention, 2002). Birmingham's juvenile gun court is administered as part of the family court and provides services to offenders and their families. The juvenile gun court seeks to provide swift consequences by reviewing incoming cases within 72 hours and trying them within 10 working days. The court also attempts to provide certain consequences by providing judges with the authority to impose mandatory detention of juvenile offenders, with judicial discretion as to whether juvenile cases are eligible for diversion. All offenders attend the 28-day boot camp, and the court can add more time to a youth's stay for various infractions. While the juveniles attend boot camp, parents attend an education program that includes training on improving youth-parent communication skills and discussions of the impact of firearm-related violence on victims, perpetrators, and families. Parents who fail to complete the program may be arrested and jailed. After the youths return from boot camp, they are required to participate in substance abuse classes for six weeks, take mandatory weekly drug tests during this time period, and perform community service work, such as neighborhood and graffiti cleanup. Probation officers and transition aides provide intensive follow-up supervision, and parental involvement is required throughout the adjudication process.

An evaluation of the Birmingham juvenile gun court compared the case processing records and recidivism rates for three groups of juvenile gun offenders: a group of Birmingham juveniles with limited prior offenses who participated in the gun court's core components, a group of Birmingham juveniles with prior offenses who received short juvenile correction commitments and did not receive after-care monitoring, and a comparison group of juveniles from a nearby city who did not participate in a gun court program (Office of Juvenile Justice and Delinquency Prevention, 2002). The evaluation revealed that the Birmingham gun court group had significantly lower levels of recidivism (17 percent) than the Birmingham nongun court group (37 percent) and the comparison group (40 percent). The evaluators also found that having a prior gun offense (common to youth in the nongun court groups) increased the odds of recidivism (Office of Juvenile Justice and Delinquency Prevention, 2002). The evaluation did not provide an estimate of the extent to which the differences among the groups in prior gun offending could account for some of the observed recidivism reductions.

Copyright © National Academy of Sciences. All rights reserved.

Firearms and Violence: A Critical Review
http://www.nap.edu/catalog/10881.html

## ENHANCED SENTENCES FOR CRIMINAL USE OF FIREARMS

### Sentencing Enhancements for Firearm-Related Crimes

Firearms sentence enhancement laws mandate minimum sentences or extra prison time for felonies committed with firearms. Unlike most gun control measures, enhanced prison penalties for firearm-related crimes have widespread support from all sides of the firearms policy debate. Firearms sentence enhancements do not affect the ability of law-abiding citizens to keep firearms for recreation or self-defense and have the potential to reduce firearm-related violence by incapacitating those who have been convicted of firearm-related crimes and deterring future firearms crimes. Although a recent rigorous research study suggests that sentence enhancements can result in modest crime reductions (Kessler and Levitt, 1999), the evidence on the effects of sentencing enhancements on firearm-related crime is less clear.[1]

In their examination of the case for a gun-emphasis policy in the prosecution of violent offenders, Cook and Nagin (1979) conclude that firearms use in robbery and assault deserves stiffer punishment because it increases the chance of the victim's death. In their analysis of case information, Cook and Nagin found that, while there was little difference in recidivism rates between gun users and those using other weapons in Washington, DC, criminals who used a gun in one crime were more likely to be rearrested for a firearm-related crime. Finally, they also found that, in Washington during the mid-1970s, there was little distinction in prosecution and sentencing between firearm-related crime defendants and other-weapon-related defendants when controlling for other characteristics of the case. Apparently, prosecutors had a "weapons" emphasis, but not a "gun" emphasis.

Several small-scale studies suggest that sentencing enhancements for firearm-related crimes might reduce some types of crimes. The results of these studies, however, are sometimes difficult to interpret. For example, McPheters and his colleagues (1984) used interrupted-time-series analyses to evaluate the effects of Arizona's 1974 firearms sentencing enhancement law. They found highly significant reductions in firearm-related robberies in Pima and Maricopa counties and no significant firearm-related robbery reductions in five southwestern cities outside Arizona that did not pass similar laws during the study time period used as controls. This impact on firearm-related robberies, however, may have been due to regression to the mean, as Arizona experienced a 75 percent increase in firearm-related robberies in the two years prior to the passage of the law (McPheters et al., 1984).

---

[1]Two National Research Council reports (1978, 1993) explicitly address the deterrent effects of penalties. Both conclude that the likely effects of manipulations of the severity of penalties are fairly small.

Copyright © National Academy of Sciences. All rights reserved.

Loftin and McDowall (1981) examined the effects of a Michigan firearms law that required a 2-year mandatory sentence for felonies committed while in possession of a firearm on the certainty and severity of sentences and on the number of serious violent crimes in Detroit. A substantial media campaign announcing that "One With a Gun Gets You Two" preceded the law's going into effect in January 1977, and the Detroit prosecutor adopted a strict policy of not plea bargaining such cases down to lesser charges. Their examination of cases processed though the Detroit Recorder's Court between 1976 and 1978 found little change in the certainty or severity of sentences for firearm-related murders and armed robberies, but they did find that there was a significant increase in the expected sentence for firearms-related assault cases that could be attributed to the firearms law.

Similarly, in their examination of California's firearms sentencing enhancement law, Lizotte and Zatz (1986) found little difference in prison sentences given to firearm-related criminals in California, except when defendants had three or more prior arrests. Loftin and McDowall (1981) evaluated the crime control effects of the Michigan firearms law, again using time-series analysis, and found no significant reductions in armed robbery or firearm-related assaults in Detroit. They did find a significant reduction in firearm-related homicides but concluded that the overall results best fit a model in which the firearms law had no preventive effects on crime. A later analysis by Loftin et al. (1983) affirmed these conclusions.

The Florida Felony Firearm Law mandated a 3-year prison sentence for anyone possessing a firearm while committing or attempting to commit any of 11 specified felonies. Using time-series analysis models, Loftin and McDowall (1984) examined the effects of the October 1975 Florida firearms law on firearm-related homicides, armed robberies, and firearm-related assaults in Miami, Tampa, and Jacksonville. To reduce any historical effects, nonfirearm-related homicides, unarmed robberies, and knife assaults were used as control time series. Loftin and McDowall (1984) did not find any significant reductions in firearm-related crime in Jacksonville and Miami associated with the passage of the gun law. They did, however, find a significant decrease in firearm-related homicides and a significant increase in firearm-related assaults in Tampa. While they recommend further testing and examination of the data, Loftin and McDowall (1984) tentatively concluded that the Florida firearms law did not have a measurable deterrent effect on violent crime. In a later paper, McDowall et al. (1992) pooled the Detroit, Jacksonville, Tampa, and Miami time series with data collected from a study examining the effects of Pennsylvania's 1982 firearm sentencing enhancement law on violent crime in Pittsburgh and Philadelphia. They found that these two cities showed significant reductions in homicide associated with the passage of the law. The pooled results led McDowall and his colleagues (1992) to very different conclu-

Copyright © National Academy of Sciences. All rights reserved.

Firearms and Violence: A Critical Review
http://www.nap.edu/catalog/10881.html

sions from the city-level studies. The authors found that mandatory sentencing laws significantly reduced the number of homicides, but the effects of mandatory sentencing laws on assaults and robberies were inconclusive.

Nationwide studies have not found any crime prevention effects associated with firearms sentence enhancements. Kleck (1991) conducted a cross-sectional analysis of 1980 data for 170 cities and found that the existence of a firearms sentence enhancement law was not related to homicide, assault, or robbery rates. However, as Marvell and Moody (1995) observe, cross-sectional designs are not suitable for studying short-term impacts, and it is difficult to be confident that the control variables account for the numerous differences between cities that may mask the laws' impacts. In an attempt to mitigate the methodological problems in earlier research studies, Marvell and Moody (1995) conducted a comprehensive evaluation of the effects of firearms sentence enhancements on crime and prisons. The authors conducted a pooled time-series, cross-sectional design analysis for nearly all states over a period of 16 to 24 years such that, for each state, the other states served as controls. They found little evidence to suggest that firearms sentencing enhancements had any effects on crime rates or firearms use. Moreover, the authors did not find any indication that these laws increased prison admissions or prison populations.

Raphael and Ludwig (2003) observe that Richmond's well-known Project Exile program to deter illicit carrying of firearms by convicted felons is essentially a firearms sentence enhancement initiative, as firearms offenders are diverted from state to federal courts. At the heart of Project Exile, all Richmond felon-in-possession cases are prosecuted in federal courts, with the defendants facing a mandatory five-year prison sentence if convicted. Project Exile also includes training for local law enforcement on federal statutes and search and seizure procedures, a public relations campaign to increase community involvement in fighting firearm-related crime, and a massive advertising campaign intended to send the message of zero tolerance for gun crime and to inform potential offenders of the swift and certain federal sentence (Raphael and Ludwig, 2003). Advocates of the program claim success based on a 40 percent decrease in Richmond firearm-related homicides between 1997 and 1998.

In their evaluation of Project Exile, Raphael and Ludwig (2003) found that the decline in Richmond firearm-related homicides would have been likely to occur even in the absence of the program. The authors revealed that nearly all of the reduction in Richmond firearm-related homicides associated with Project Exile may be attributable to an unusually high level of and increase in firearm-related homicide prior to the implementation of the program. They also found little statistical evidence of an impact between felon-in-possession convictions and city-level homicide rates. Their null finding is robust to a variety of methodological adjustments, including

Copyright © National Academy of Sciences. All rights reserved.

Firearms and Violence: A Critical Review
http://www.nap.edu/catalogs/10881.html

an analysis of omitted variable bias that uses juveniles, who are generally exempt from federal felon-in-possession charges, as an additional in-city control group. In his subsequent analysis of the Raphael-Ludwig data, Levitt (2003) suggests that the expectations of a large decrease in crime associated with Project Exile were probably unrealistic, given the small number of additional felon-in-possession convictions per year (roughly 80) and the small increase in total punishment in Richmond (240 extra person-years of imprisonment that would be associated with an estimated 2.5 percent reduction in crime in Richmond). Greenwood (2003) also speculates that Project Exile did not focus sufficiently on the most dangerous offenders associated with the bulk of firearm-related crime in Richmond.

## Mandatory Penalties for Unlawful Carrying of Guns

Mandatory sentencing laws, which require a mandatory penalty for unlicensed or otherwise unlawful carrying of a firearm, seek to reduce gun use in unpremeditated crimes by deterring the casual carrying of firearms in public places. The best known example of laws that institute a mandatory penalty for unlawful carrying is the Massachusetts Bartley-Fox gun law.

The Massachusetts legislature enacted the Bartley-Fox gun law, which mandated a one-year minimum prison term for the unlicensed carrying of firearms and a two-year sentence for crimes committed while possessing a gun, to reduce the incidence of firearm-related crime as well as the illicit carrying of firearms (Beha, 1977). The amendment was adopted in July 1974 and became effective beginning in April 1975. Two months prior to the law's effective date, a concerted campaign was launched to characterize the impending consequences in the following terms, "If you are caught with a gun, you will go to prison for a year and nobody can get you out" (Pierce and Bowers, 1981:122).

While the mandatory sentence provision removed most judicial discretion in sentencing a defendant convicted of illegally carrying a gun, the defendant could in fact escape the 1-year sentence in a variety of ways (Deutsch and Alt, 1977). If someone was apprehended with a firearm on his person, the police could file a charge of illegal possession, which does not carry a mandatory minimum, rather than a charge of illegal carrying. Later in the process, prosecutors could also press for the lesser possession charge regardless of the initial police charge. Judges and juries could also find the defendant guilty of a lesser charge. As Zimring commented, "the one-year minimum will only invoke mandatory one-year jail terms for carrying without a license to the extent that police, prosecutors, and judges want it to produce such results. If there is strong resistance from any single link in this chain, the mandatory minimum can be avoided" (as quoted in Deutsch and Alt, 1977:545).

Copyright © National Academy of Sciences. All rights reserved.

Firearms and Violence: A Critical Review
http://www.nap.edu/catalog/10881.html

A series of studies examined the impact of the Bartley-Fox law on gun crime and the administration of justice in Boston. Beha (1977) examined the daily application of the Bartley-Fox law by police, prosecutors, and judges through simple before-after analyses of prosecutions for firearms violations and firearm-related crimes in Boston between 1974 and 1975. He analyzed two 6-month samples of all complaints relating to the illegal use, possession, or carrying of a firearm for 1974 and 1975 drawn from the dockets of Boston district courts and cross-checked against Boston Police Department records.

His analysis suggests that Bartley-Fox made it more likely for a prison sentence to be imposed in both firearm assault prosecutions and cases in which illegal carrying was the most serious charge, but the law did not affect the disposition of prosecutions for armed robbery and homicide. Beha (1977) also found that criminal justice officials did not systematically attempt to evade the mandatory sentence. In an analysis of yearly issuances of firearms identification cards and licenses to carry firearms between 1970 and 1975, Beha reported that the high degree of publicity attendant on the amendment's passage, some of which was inaccurate, increased citizen compliance with existing legal stipulations surrounding firearm acquisition and possession, some of which were not in fact addressed by the amendment. Using simple before-after analyses of percentage changes in reported crime rates between 1970 and early 1977, Beha notes that the law did not seem to affect armed robbery but produced definite reductions in firearm-related assaults and firearm-related assault-homicides. However, the total number of aggravated assaults remained constant over time, suggesting a shift from guns to less lethal weapons.

Other studies suggest that criminal justice practitioners may have hindered the implementation of the Bartley-Fox law. In interviews with Boston police officers, Carlson (1982) found that 89 percent of the officers interviewed reported becoming more selective about whom to frisk for weapons, as they did not want to arrest someone who was otherwise a law-abiding citizen. The National Institute of Justice also reports that, between 1974 and 1976, arrests in gun incidents decreased by 23 percent, while weapons seizures without arrest increased by 120 percent. While it is unclear whether the number of guns seized without arrest increased in tandem with all weapons seizures, these figures suggest that police may have made fewer gun-carrying arrests to evade the law.

Rossman et al. (1980) found that Bartley-Fox impeded the flow of cases through the criminal justice system, as defendants had no incentive to plead guilty. They found that the rate at which gun-carrying cases went to trial tripled, the conviction rate was halved, and the median time to disposition doubled. Dismissals and not-guilty verdicts doubled, suggesting that judges may have been avoiding the imposition of the mandatory sentence

Copyright © National Academy of Sciences. All rights reserved.

for some defendants. Rossman and his colleagues (1980) also found that, while a smaller fraction of gun-carrying defendants were convicted of felony gun-carrying, the fraction that received prison sentences did increase. These shifts in case processing and the discretionary actions of criminal justice practitioners in Massachusetts are common responses to the adoption of mandatory sentences (see, e.g., Alschuler, 1978).

Pierce and Bowers (1981) used interrupted-time-series techniques and multiple control group comparisons to examine the impact of Bartley-Fox on firearm-related and nonfirearm-related assaults, robbery, and homicide in Boston. They found a statistically significant reduction in gun assaults in March 1975, one month prior to the implementation of the Bartley-Fox law. The authors suggest that the vigorous publicity campaign influenced behavior before the law actually went into effect. The multiple control group comparison consisted of simple percentage change analyses of firearm-related crime rates in 1974 and 1975 for Boston relative to other New England cities, the United States without Massachusetts, the middle Atlantic states, the north central states, and selected cities within a 750-mile radius, including Washington, DC, Baltimore, New York, Philadelphia, Cleveland, and Detroit. Pierce and Bowers (1981) found that the law significantly reduced firearm-related assaults, but produced offsetting increases in nonfirearm-related armed assaults; there was some reduction in firearm-related robberies accompanied by a lesser increase in nonfirearm-related armed robberies; and firearm-related homicides were reduced with no increase in nonfirearm-related homicides. They conclude that the law, in the short term, may have deterred some individuals from carrying or using their firearms, but it did not prevent them from substituting alternative weapons.

Using similar methods, Deutsch and Alt (1977) analyzed police reports of firearm-related assaults, homicide (all types), and armed robbery (including other weapons) for the time period January 1966 through October 1975. The evaluation was designed to detect short-term impacts of the law, as it only included a six-month horizon after the enactment of the law. Deutsch and Alt found a statistically significant 18 percent decrease in gun assaults and a statistically significant 20 percent decrease in armed robberies, but no statistically significant changes in homicide incidents. Hay and McCleary (1979) reanalyzed Deutsch and Alt's data and suggest that the stochastic components of the time series were not specified correctly and the postintervention time series was too short to permit an accurate specification of the intervention component. Hay and McCleary suggest that the Deutsch and Alt findings are inconclusive. In a rejoinder, Deutsch (1979) critiques the ARIMA model specification choices made by Hay and McCleary in their reanalysis and comments that their research was "wrought with inconsistencies, inaccuracies, and half truths" (p. 327).

Copyright © National Academy of Sciences. All rights reserved.

In their analysis of the Deutsch and Alt data, Berk and his colleagues (1979) conclude that the law reduced armed robbery, had mixed effects on firearm-related assaults, and had no effects on homicides. In his later analysis, Deutsch (1981) expanded the time series through September 1977 and found that the Bartley-Fox law produced significant reductions in homicide, firearm-related assaults, and armed robbery. The broader methodological lesson learned from this exchange was that identifying appropriate models for evaluation purposes can be a very subjective exercise. As Kleck (1997) suggests, "Experts in [time series] modeling also commonly point out difficulties that even experienced practitioners have in specifying time series models. Specification is very much an art rather than a science, so that different researchers, using the same body of data, can make substantially different, even arbitrary, specification decisions, and, as a result, obtain sharply different results" (p. 354).

Indeed, with such dissimilar findings, it is difficult to specify the effects of the Bartley-Fox law on firearm-related crime. Collectively, this body of research seems to suggest a broad impact on gun crime in Boston. However, it is unclear whether the firearms sentencing enhancement or the mandatory sentence for illegal gun-carrying generated the impact. Kleck (1991) observes that, if one accepts that the Bartley-Fox law worked as a whole, it is risky to infer that other gun-carrying laws would also work, since it may have been a unique constellation of factors in the Boston setting that was responsible for the effect.

## Conclusion

Punishment enhancements for firearm-related crimes seem to be justified in sentencing by seriousness considerations, since firearms use in violent crimes increases the likelihood of the victim's death (Cook and Nagin, 1979). Moreover, there is some evidence to suggest that there should be an incapacitation effect, since gun offenders usually persist in their choice of using a firearm in subsequent crimes (Cook and Nagin, 1979). However, the available research evidence on the deterrent effects of firearms sentencing enhancements on firearm-related crime is mixed, with city-level studies suggesting reductions in firearm-related homicides and possibly other types of firearm-related crime in urban settings (McDowall et al., 1992), as well as nationwide studies suggesting no crime prevention effects at the state level (Marvell and Moody, 1995).

**The committee recommends more rigorous study of firearms sentencing enhancement laws at the city level.** As Kleck (1997) suggests, state-level analyses suffer from aggregation bias, and lumping heterogeneous jurisdictions into one area could conceal potentially important causal effects at lower levels of aggregation. City-level studies need to engage more rigorous

Copyright © National Academy of Sciences. All rights reserved.

methods, such as pooled time-series, cross-sectional studies that allow the detection of short-term impacts while controlling for variation in violence levels both across different areas and different times.

## PROBLEM-ORIENTED POLICING TO PREVENT FIREARM-RELATED CRIME

Problem-oriented policing may hold some promise for reducing firearm-related violence. Problem-oriented policing works to identify *why* things are going wrong and to frame responses using a wide variety of approaches. Using an iterative focus on problem identification, analysis, response, evaluation, and adjustment of the response, problem-oriented policing has been applied against a wide variety of crime, fear, and disorder concerns (Goldstein, 1990; Eck and Spelman, 1987; Braga et al., 1999). Our review emphasizes programs specifically aimed at reducing proscribed possession and firearm-related violence.[2] Problem-oriented policing programs to reduce firearm-related violence generally focus on reducing the illegal possession, carrying, and use of firearms in gun violence "hot spots" and among violent gun offenders.

While this section categorizes these types of police interventions by whether they are primarily focused on places or offenders, in practice these firearm-related crime prevention strategies overlap. For example, when the police are deployed to prevent gun violence in particular places, they often focus their attention on controlling the illegal gun behaviors of particular individuals in that location. When police efforts are focused on preventing gun violence by likely offenders, such as gang members, they sometimes focus their attention on places, such as gang turf and drug market areas frequented by these individuals. The distinction between a focus on offenders and a focus on places matters less than the idea that the police attempt to reduce crime and violence by strategically focusing on identifiable risks.

### Policing Gun Violence Hot Spots

Place-oriented crime prevention strategies have begun to occupy a central role in police crime prevention research and policy (Eck and Weisburd, 1995). This idea developed from the hot-spots crime perspective, which suggests that crime does not occur evenly across urban landscapes; rather, it is concentrated in a relatively few places that generate more than half of all observed criminal events (Pierce et al., 1988; Sherman

---

[2]For a recent review of problem oriented policing in general, see National Research Council (2004).

Copyright © National Academy of Sciences. All rights reserved.

Firearms and Violence: A Critical Review
http://www.nap.edu/catalog/10881.html

et al., 1989; Weisburd et al., 1992). Even in the most crime-ridden neighborhoods, crime appears to cluster at a few discrete locations, and other areas are relatively crime free (Sherman et al., 1989). A number of researchers have argued that many crime problems can be reduced more efficiently if police officers focus their attention on these deviant places (Sherman, 1995; Weisburd, 1997). Sherman and Rogan (1995) suggest three mechanisms through which hot-spots patrol may reduce firearm-related crime in a targeted beat: firearms seized in high firearm-related crime areas may have had significantly higher risk of imminent firearms use in crimes; illegal gun carriers who are arrested may be more frequent gun users; and the visibility of the intensive patrols coupled with increased contacts with citizens may deter gun-carrying by those who are not checked by the police.

Much attention has focused on using place-based policing to reduce gun crime (Sherman, 2001). In this section, we review the evidence from the Kansas City Gun Project and its subsequent replications in Indianapolis and Pittsburgh. All three of these evaluations used place-oriented policing strategies to attempt to confiscate proscribed firearms and prevent crime in gun violence hot spots. We also briefly summarize the anecdotal evidence on the New York Street Crime Unit.

### Kansas City Gun Project

The Kansas City Gun Project examined the gun violence prevention effects of proactive patrol and intensive enforcement of firearms laws via safety frisks during traffic stops, plain view searches and seizures, and searches incident to arrests on other charges (Sherman and Rogan, 1995). Over a 6-month period in 1992-1993, the targeted police patrols were conducted in a $10 \times 8$ block area of Kansas City with a homicide rate 20 times higher than the national average. Simple computer analyses of call and incident data were used to focus police interventions at hot-spot locations. A pair of two-officer cars, working overtime from 7 p.m. to 1 a.m. 7 days a week and not required to answer citizen calls for service, provided extra patrol in the targeted beat.[3] Data from the targeted area were compared with data from a beat with nearly identical numbers of drive-by shootings in 1991. The comparison beat received routine levels of police activities.

---

[3]The officers initiated a high volume of contact with the street population. During 29 weeks in 1992-1993, the directed patrols resulted in 1,090 traffic citations, 948 car checks, 532 pedestrian checks, 170 state or federal arrests, and 446 city arrests (Sherman and Rogan, 1995).

Copyright © National Academy of Sciences. All rights reserved.

*232* *FIREARMS AND VIOLENCE*

Comparing the differences in crime rates in the targeted and control communities both before and after the intervention, Sherman and Rogan (1995) assessed the impact of hot-spot policing on firearms seizures and crime. The evaluation concludes that proactive patrols focused on firearms recoveries resulted in a statistically significant 65 percent increase in firearms seizures (29 additional firearms seized) and a statistically significant 49 percent decrease in firearm-related crimes in the target beat area (83 fewer firearm-related crimes); firearms seizures and firearm-related crimes in the comparison beat area did not significantly change (Sherman and Rogan, 1995).[4] Furthermore, none of the contiguous beats showed significant increases in firearm-related crime, and two of the contiguous beats reported significant decreases in firearm-related crimes.

### Indianapolis Directed Patrol Project

During a 90-day period beginning in July 1997, the Indianapolis Police Department (IPD) implemented a police strategy similar to the Kansas City program (McGarrell et al., 2001). The Indianapolis program tested the effects of two types of directed patrol strategies on firearm-related crime. In the north district, the IPD pursued a directed patrol strategy that sought to prevent firearm-related violence by focusing on suspicious activities and locations. In the east district, the IPD pursued a general deterrence strategy that attempted to prevent firearm-related violence by maximizing the number of vehicle stops in the targeted area. In contrast to the Kansas City study, police activities were not guided by computer analyses of hot-spot locations in either of the targeted areas. Finally, IPD officials worked closely before and during the intervention to secure community support and address concerns (McGarrell et al., 2001). IPD officers were trained to treat citizens with respect and to explain the reasons for the stop.

The evaluation used a pre-post design to determine the effects of the two strategies on firearm-related crime. Both target areas were compared with the same comparison district as well as to citywide crime trends. During the 90-day intervention period, the number of firearms seized in the east district increased by 50 percent, while the north district experienced a modest 8 percent increase (McGarrell et al., 2001). The number of firearms seized in the comparison area decreased by 40 percent. The evaluation revealed that there were statistically significant decreases in firearm-related crime, homicide, aggravated assault with a firearm, and armed robbery in the north district. No statistically significant changes in firearm-related crime were noted in the east district. The evaluation did not reveal any

---

[4]Sherman and Rogan (1995) estimated that there were at least 100,000 handguns in Kansas City.

Copyright © National Academy of Sciences. All rights reserved.

evidence of immediate spatial displacement of firearm-related crime or significant diffusion of crime control benefits into surrounding areas. It is also noteworthy that not a single citizen complaint was tied to the directed patrol study (McGarrell et al., 2001).

### Police Gun Suppression Patrols in Pittsburgh

Over a 14-week period beginning in July 1998, the Pittsburgh Police Department focused on suppressing illegal guns on city streets through the implementation of a special Gun Suppression Patrol program (Cohen and Ludwig, 2003). Two patrol teams of four officers each were assigned to separate police zones experiencing high rates of illegal gun activity. With the aid of crime maps and activity reports on recent shots fired, the patrol teams focused on high-risk times and high-risk places in targeted areas. The patrol teams initiated citizen contacts through traffic stops and "stop and talk" activities with persons on foot. These contacts were used as an opportunity to solicit information and investigate suspicious activities associated with illegal carrying and use of guns. When warranted for officer safety reasons (usually suspicious actions or demeanor), pat-downs for weapons were conducted; when there was reasonable suspicion of criminal activity and an arrest made, these searches sometimes escalated to more thorough checks (Cohen and Ludwig, 2003).

The impact evaluation of the Pittsburgh program used a repeated-differences model. Shots-fired calls for service and firearm-related injuries in the two treatment zones were compared with those in the remaining four police zones in Pittsburgh. The 6-week period between June 7 and July 18, 1998, served as the pre-period, and the 14 weeks between July 19 and October 24 were the post-period. The evaluation found that shots-fired calls for service from residents were reduced by more than 50 percent in one target area, and gunshot injuries were down by nearly 70 percent in the other target area, representing a reduction of 2.5 gunshot injuries weekly in the latter target area (Cohen and Ludwig, 2003).

### New York Police Department's Street Crime Unit

Beginning in 1994, the New York Police Department (NYPD) maintained a special Street Crime Unit that targeted firearm-related violence hot spots and aggressively sought out sources of illegal firearms (Office of Juvenile Justice and Delinquency Prevention, 1999). Between 1994 and 1997, the NYPD made 46,198 gun arrests and confiscated 56,081 firearms. Nonfatal shootings declined by 62 percent between 1993 and 1997 and, in 1998, New York had only 633 homicides, its lowest since 1964 (Office of Juvenile Justice and Delinquency Prevention, 1999). At the same time, the

Copyright © National Academy of Sciences. All rights reserved.

aggressive policing tactics of the NYPD have been criticized as resulting in increased citizen complaints about police misconduct and abuse of force (Greene, 1999).[5] The aggressive gun-oriented policing strategies of the NYPD have not been formally evaluated.[6]

## *What Has Been Learned?*

The evidence from the three targeted place-based firearm and crime suppression patrols is compelling. All three evaluations are well designed and all reveal the same qualitative conclusion, namely, increased firearms seizures, reductions in crime, and little if any displacement. Moreover, these findings are supported by the larger literature on actual randomized policing experiments, which show place-based policing interventions as having substantial crime control effects (see the National Research Council, 2004).

Despite these encouraging findings, there are several shortcomings in the research information that create uncertainty about the potential efficacy of place-based targeted firearms patrols. At the most basic level, the credibility of the quasi-experimental statistical model rests with whether the underlying comparison group is in fact comparable (Meyer, 1995). In particular, the methodology rests on an assumption that the only important difference between the targeted and control patrol areas is in the intervention. In fact, however, the targeted areas were not chosen at random and were not identical to the comparison patrols. Even if the groups are comparable, these evaluations cannot reveal whether the findings reflect a change from general to targeted policing or a change in resource allocation. In all three evaluations, additional resources were explicitly devoted to the targeted areas. The Kansas City program, for example, included both targeted interventions and additional nighttime patrols. Finally, the interventions were of limited duration and scope, focusing on particular areas at particular points in time. As such, the evaluations may not provide insight into the long-term, large-scale potential of these targeted interventions.

Will hot-spot policing have long-term deterrent effects on gun violence? To what extent will there be geographic substitution of violence? How long will it take criminals to adapt to the new system? Will other forms of crime and violence emerge as police change the focus of their efforts? These are important questions for policy officials who must make decisions about whether and how widely to implement such programs.

---

[5]Others suggest that the increase in the number of citizen complaints is unremarkable; the NYPD's broader "broken windows" policing strategy significantly increased the number of police-resident contacts, resulting in an overall decrease in the rate of citizen complaints per police-resident contact.

[6]Other aspects of the New York City policing practices in the 1990s have been evaluated. For a review of this literature, see National Research Council (2004).

Copyright © National Academy of Sciences. All rights reserved.

Firearms and Violence: A Critical Review
http://www.nap.edu/catalog/10881.html

Given the early success of these three modest interventions and given the consistency of the basic finding, it would seem worthwhile to learn more about the longer term impacts. **Thus, the committee recommends that a sustained and systemic research program be devoted to studying the impact of different place-based gun suppression patrol and targeted policing approaches in general.** These evaluations should focus on replicating the existing evidence in different settings, running experimental evaluations, and formalizing and estimating behavioral models of policing and crime. Additional evaluations should assess the longer term impacts, paying particular attention to issues of substitution, adaptation, and deterrence.

## Policing Violent Gun Offenders

A small number of chronic offenders generate a disproportionate share of crime. In their seminal study of nearly 10,000 boys in Philadelphia, Wolfgang et al. (1972) revealed that the most active 6 percent of delinquent boys were responsible for more than 50 percent of all delinquent acts committed. The RAND Corporation's survey of jail and prison inmates in California, Michigan, and Texas revealed that, in all three states, the most frequent 10 percent of active offenders committed some 50 percent of all crimes and 80 percent of crimes were committed by only 20 percent of the criminals (Chaiken and Chaiken, 1982). Moreover, 1 percent of offenders committed crimes at the very high rate of more than 50 serious offenses per year (Rolph et al., 1981).

The observation that a small number of highly active offenders generates a large share of the crime problem is an important insight for law enforcement agencies with limited resources to prevent crime. Many serious urban crime problems, for example gang violence, are driven by groups of these criminally active individuals. Focusing criminal justice attention on a small number of high-risk offenders may be a promising way to control gun violence.

### St. Louis Youth Firearm Suppression Program

The Firearm Suppression Program (FSP) sought parental consent to search for and seize the guns of juveniles (Rosenfeld and Decker, 1996). While this program was not explicitly focused on dangerous offenders, it represents a police program to prevent firearm-related violence by disarming a very risky population of potential gun offenders—juveniles. The program was operated by the St. Louis Metropolitan Police Department's Mobile Reserve Unit, which is a police squad dedicated to responding to pockets of crime and violence throughout St. Louis (Rosenfeld and Decker, 1996). Home searches were initiated on the basis of resident requests for

Copyright © National Academy of Sciences. All rights reserved.

police service, reports from other police units, and information gained from other investigations. As Rosenfeld and Decker describe, "an innovative feature of the program is its use of a 'Consent to Search and Seize' form to secure legal access to the residence. Officers inform the adult resident that the purpose of the program is to confiscate illegal firearms, particularly those belonging to juveniles, without seeking criminal prosecution. The resident is informed that she will not be charged with the illegal possession of a firearm if she signs the consent form" (p. 204). While it was operating, the program generated few complaints from the persons who were subjected to the search, but it received criticism from local representatives of the American Civil Liberties Union, who questioned the possibility of receiving real consent to search when a person is standing face-to-face with two police officers (Rosenfeld and Decker, 1996).

A key component of the program was to respond to problems identified by residents, and the success of the program was reliant on effective police-community relationships. By seeking and acquiring community input into the process of identifying and confiscating guns from juveniles, the St. Louis Metropolitan Police Department developed a model of policing gun violence that put a premium on effective communication and trust with the community not found in most problem-oriented policing projects. As Rosenfeld and Decker (1996) observe, the Firearm Suppression Program was also designed to send a clear message that juvenile firearms possession will not be tolerated by the police or the community because it places individuals at risk and threatens public safety. However, while this program gained national attention for its innovative approach and seemed to be a promising route to disarming juveniles,[7] the Mobile Reserve Unit underwent a series of changes that caused the program to be stopped and restarted several times; the subsequent incarnations did not take the same approach as the original program. A rigorous impact evaluation of the original Firearm Suppression Program was not completed.

*Boston Gun Project and Operation Ceasefire*

The Boston Gun Project was a problem-oriented policing enterprise expressly aimed at taking on a serious, large-scale crime problem—homicide victimization among young people in Boston. Like many large cities in the United States, Boston experienced a large, sudden increase in youth homicide between the late 1980s and early 1990s. The Boston Gun Project proceeded by: (1) assembling an interagency working group of largely line-level criminal justice and other practitioners; (2) applying quantitative and

---

[7]Rosenfeld and Decker (1996) note that the officers involved in the program seized 402 firearms in 1996 and, during the first quarter of 1996, seized 104 firearms.

Copyright © National Academy of Sciences. All rights reserved.

qualitative research techniques to create an assessment of the nature of and dynamics driving youth violence in Boston; (3) developing an intervention designed to have a substantial, short-term impact on youth homicide; (4) implementing and adapting the intervention; and (5) evaluating the intervention's impact (Kennedy et al., 1996). The project began in early 1995 and implemented what is now known as the Operation Ceasefire intervention, which began in late spring 1996. While the Boston Gun Project initially focused on firearms and firearm-related violence, the focus evolved as it found that gangs and violent gang offending were central to Boston's youth gun violence problem. To trigger intervention, any serious violent offending by a gang (knives, blunt instrument beatings) was enough. In practice, however, it was mostly gun offending. Because much of the youth violence epidemic in the 1990s involved firearms and because the Boston Gun Project is cited as a highly effective way to reduce youth firearm-related violence, we devote attention to it in this report.

The project has been extensively described and documented (Kennedy et al., 1996; Kennedy et al., 1997; Kennedy, 1997). Briefly, a working group of law enforcement personnel, youth workers, and researchers diagnosed the youth violence problem in Boston as one of patterned, largely vendetta-like hostilities("beefs") among a small population of chronic criminal offenders, and particularly among those involved in some 60 loose, informal, mostly neighborhood-based groups (these groups were called "gangs" in Boston, but were not Chicago- or LA-style gangs, which are much larger and more formally organized). As this diagnosis developed, the focus of the project shifted from its initial framework of juvenile violence and firearm-related violence to gang violence. A central hypothesis of the working group was that a meaningful period of substantially reduced youth violence might serve as a firebreak and result in a relatively long-lasting reduction in future youth violence (Kennedy et al., 1996). The idea was that youth violence in Boston had become a self-sustaining cycle among a relatively small number of youth, with objectively high levels of risk leading to nominally self-protective behavior, such as gun acquisition and use, gang formation, tough street behavior, and the like: behavior that then became an additional input into the cycle of violence (Kennedy et al., 1996). If this cycle could be interrupted, a new equilibrium at a lower level of risk and violence might be established, perhaps without the need for continued high levels of either deterrent or facilitative intervention. The larger hope was that a successful intervention to reduce gang violence in the short term would have a disproportionate, sustainable impact in the long term.

The Operation Ceasefire "pulling-levers" strategy was designed to deter by reaching out directly to gangs, saying explicitly that violence would no longer be tolerated, and backing up that message by "pulling every lever" legally available when violence occurred (Kennedy, 1997). Simultaneously, youth

Copyright © National Academy of Sciences. All rights reserved.

workers, probation and parole officers, and later churches and other commu-
nity groups offered gang members services and other kinds of help. The Opera-
tion Ceasefire working group delivered this message in formal meetings with
gang members, through individual police and probation contacts with gang
members, through meetings with inmates of secure juvenile facilities in the city,
and through gang outreach workers and activist black clergy. The deterrence
message was not a deal with gang members to stop violence. Rather, it was a
promise to gang members that violent behavior would evoke an immediate and
intense response. If gangs committed other crimes but refrained from violence,
the normal workings of police, prosecutors, and the rest of the criminal justice
system dealt with these matters. As described below, Operation Ceasefire also
attempted to disrupt the illegal supply of firearms to youth by focusing enforce-
ment attention on firearms traffickers.

The evaluation of Operation Ceasefire used a basic one-group time-
series design to measure the effects of the intervention on youth homicide
and other indicators of nonfatal serious violence in Boston. Braga et al.
(2001a, 2001b) found that the Operation Ceasefire intervention was asso-
ciated with a 63 percent decrease in monthly number of Boston youth
homicides, a 32 percent decrease in monthly number of shots-fired calls, a
25 percent decrease in the monthly number of firearm-related assaults, and,
in one high-risk police district given special attention in the evaluation, a 44
percent decrease in monthly number of youth firearm-related assault inci-
dents. These reductions associated with Operation Ceasefire persisted when
control variables, such as changes in Boston's employment trends, youth
population, and citywide violence trends, were added to the regression
models. Furthermore, the basic qualitative results also remained when youth
homicide trends in Boston were compared with youth homicide trends in
other large U.S. cities. Boston's significant youth homicide reduction was
distinct when compared with youth homicide trends in most major U.S. and
New England cities (Braga et al., 2001a, 2001b).[8]

The dramatic drop in the youth homicide rate in Boston and the asso-
ciated analysis of Braga et al. (2001a, 2001b) are compelling. Youth homi-
cides in Boston were reduced just after the adoption of Operation
Ceasefire.[9] However, it is difficult to specify cause and effect. Braga and his

---

[8]Piehl et al. (1999) examined the youth homicide time series for exogenous structural
breaks; these analyses suggest that the maximal break in the series occurred in June 1996—
just after the Operation Ceasefire implementation date.

[9]Boston, like many other U.S. cities, experienced a sudden increase in firearm-related vio-
lence in 2001. Reported crimes involving firearms increased by over 10 percent between
2000 and 2001 and decreased moderately in 2002 (http://www.ci.boston.ma.us/police/pdfs/
dec2003.pdf). McDevitt and his colleagues (2003) suggest that the Boston youth violence
problems are dynamic, and the interventions designed to deal with youth violence need to be
adjusted appropriately. Since 2001, Boston has been expanding Operation Ceasefire to deal
with a wider range of violence problems.

Copyright © National Academy of Sciences. All rights reserved.

Firearms and Violence: A Critical Review
http://www.nap.edu/catalog/10881.html

colleagues compare youth homicide before and after the intervention. This type of methodology holds much appeal when an intervention is the only notable event occurring in the time period under study. Observational data from Boston, however, were not derived from an experimental evaluation. To the contrary, during this period of dramatic declines in youth crime throughout the country, there were potentially many levers being pulled in Boston, some controlled by the Operation Ceasefire group and some controlled by outside (and perhaps unobserved) forces. Furthermore, even if all of the determinants of violence except Operation Ceasefire were time invariant, the dynamics that connect enforcement to violence would be complex (these same issues are discussed in National Research Council, 2001). An activity undertaken at a specific place and time presumably does not generate an instant response in violence. And, to the extent that there is a response, it may merely reflect short-term acceleration in the rate of change but not in the steady-state levels in youth crime.

The existing research provides some insight into these potential statistical problems. Braga and his colleagues controlled for demographic shifts, drug market changes, and employment. Moreover, the evaluation shows that the Boston trend is very different from trends in other cities. Kennedy et al. (2001) provide an anecdotal account of the Boston story and Braga et al. (2001a, 2001b) survey the plausibility that other Boston interventions, most notably public health interventions, were associated with the sudden drop. Still, the primary evaluation does allow one to make direct links between key components of the intervention and the subsequent behavior of individuals subjected to the intervention. Many complex factors affect the trajectory of youth violence problems, and, while the there is a strong association between the youth homicide drop and the implementation of Operation Ceasefire, it is very difficult to specify the exact role it played in the reduction of youth homicide in Boston.

### Supply-Side Programs

In addition to preventing gun violence amongst gangs, Boston's Operation Ceasefire interagency problem-solving group sought to disrupt the illegal supply of firearms to youth by systematically (Braga et al., 2001a: 199):

• Expanding the focus of local, state, and federal authorities to include intrastate trafficking in Massachusetts-sourced guns, in addition to interstate trafficking;

• Focusing enforcement attention on traffickers of those makes and calibers of guns most used by gang members, on traffickers of guns showing short time-to-crime, and on traffickers of guns used by the city's most violent gangs;

Copyright © National Academy of Sciences. All rights reserved.

• Attempting restoration of obliterated serial numbers and subsequent trafficking investigations based on those restorations;

• Supporting these enforcement priorities through analysis of crime gun traces generated by the Boston Police Department's comprehensive tracing of crime guns and by developing leads through systematic debriefing of (especially) arrestees involved with gangs or involved in violent crime.

The Boston supply-side approach was implemented in conjunction with the pulling-levers demand-side strategy to reduce youth violence. The gun trafficking investigations and prosecutions followed the implementation of the pulling-levers strategy, so their effects on firearm-related violence could not be independently established (Braga et al., 2001a). However, the National Institute of Justice, in partnership with the Bureau of Alcohol, Tobacco, and Firearms, recently funded a demonstration program in Los Angeles to examine the effects of disrupting the illegal supply of firearms on the nature of the illegal market and on firearm-related violence (Tita et al., 2003). In addition to addressing the firearm-related violence problem in Los Angeles, this interagency law enforcement project was developed to provide other jurisdictions with guidance on how to analyze and develop appropriate problem-solving interventions to control illegal firearms markets.

## *Other Applications of the Pulling-Levers Focused Deterrence Approach*

After the well-publicized success of Boston's Operation Ceasefire, a number of jurisdictions began experimenting with these new problem-solving frameworks to prevent gang and group-involved violence. Braga et al. (2002) detail the experiences of Minneapolis (MN), Baltimore (MD), the Boyle Heights section of Los Angeles (CA), Stockton (CA), and Indianapolis (IN) in tailoring the approach to fit their violence problems and operating environments. Although specific tactics sometimes varied across the cities, these programs implemented the basic elements of the original Boston strategy, including the pulling-levers focused deterrence strategy, designed to prevent violence by and among chronic offenders and groups of chronic offenders; the convening of an interagency working group representing a wide range of criminal justice and social service capabilities; and jurisdiction-specific assessments of violence dynamics, perpetrator and victim characteristics, and related issues such as drug market characteristics and patterns of firearms use and acquisition. All were facilitated by a close, more or less real-time partnership between researchers and practitioners. Basic pretest/posttest analyses from these initiatives revealed that these new approaches to the strategic prevention of gang and group-involved violence were associated with reductions in violent crime (Braga

Copyright © National Academy of Sciences. All rights reserved.

et al., 2002). To date, these replication studies are mostly descriptive in nature.[10]

*What Has Been Learned?*

While broad support for the pulling-levers approach may be justified for many reasons, the committee found modest scientific evidence that demonstrates whether these types of targeted policing programs can effectively lower crime and violence. Clearly, there was pronounced and important change in the youth homicide rate in Boston over the period of the intervention, some of which was arguably due to Operation Ceasefire, some due to secular changes in youth homicide, and some due to other (and perhaps unknown) factors. The particular effects of this intervention, however, are unknown. Furthermore, in the committee's view, the existing data and methods make it difficult to assess how Operation Ceasefire and other similar policing programs affect crime. Researchers cannot hope to credibly control for the many confounders that influence violence and crime using simple time-series comparisons. With similar policing programs being adopted in a number of other areas, there may be opportunities to combine data from these sites to provide more persuasive estimates. Invariably, however, researchers will be confronted with the fact that the programs were not randomly adopted, the trends in violence are influenced by a multitude of factors, and the dynamics of crime and violence are highly complex.

The lack of research on this potentially important intervention is an important shortcoming in the body of knowledge on firearms injury interventions. These programs are widely viewed as effective, but in fact knowledge of how, if at all, they reduce youth crime is limited. Without a much stronger research base, the benefits and harms of these policing interventions remain largely unknown. **The committee recommends that a sustained and systematic research program should be conducted to assess the effect of targeted policing aimed at high-risk offenders.** Additional insights might be gained by using observational data from different applications, especially if combined with thoughtful behavioral models of policing and crime. An alternative means of assessing the impact of these types of targeted policing interventions would be to run randomized experiments, similar in spirit to those described above. Using this framework, one might hope to disentangle the effects of the various levers and more generally assess the effectiveness of these targeted policing programs.

———————
[10]McGarrell and Chermak (2003) recently completed an unpublished study of the Indianapolis pulling-levers intervention. Using time-series analyses, they found a 42 percent reduction in homicides associated with the implementation of the intervention and found that homicides were less likely to involve firearms, groups, and drugs.

Copyright © National Academy of Sciences. All rights reserved.

# References

## CHAPTER 1

Azrael, D., P.J. Cook, and M. Miller
  2004  State and local prevalence of firearms ownership: Measurement, structure and trends. *Journal of Quantitative Criminology* 20(1):43-62.

Campbell, D.T., and J.C. Stanley
  1966  *Experimental and Quasi-Experimental Design for Research*. Skokie, IL: Rand McNally.

Centers for Disease Control and Prevention
  2001  Statistics Query and Reporting System (WISQARS). National Center for Injury Prevention and Control, Centers for Disease Control and Prevention (producer). Available: http://www.cdc.gov/ncipc/wisqars. [Accessed 10/10/02].

Cook, P.J.
  1991  The technology of personal violence. *Crime and Justice: A Review of Research* 14:1-71.

Cook, T.D., and D.T. Campbell
  1979  *Quasi-Experimentation: Design & Analysis Issues for Field Settings*. Boston, MA: Houghton Mifflin Co.

Duggan, M.
  2001  More guns, more crime. *Journal of Political Economy* 109(5):1086-1114.

Federal Bureau of Investigation
  2001  *Crime in the United States, 2000.* U.S. Department of Justice. Available: http://www.fbi.gov/ucr/00cius.htm. [Accessed 1/10/03].

Gardner, B.A., editor
  1999  *Black's Law Dictionary*, 7th edition. Eagan, MN: West Group.

Hardy, M.S.
  1997a  The myth of millions of annual self-defense gun uses: A case study of survey overestimates of rare events. *Chance* 10(3):6-10.
  1997b  Survey research and self-defense gun use: An explanation of extreme overestimates. *Journal of Criminal Law and Criminology* 87(4):1430-1445.

*242*

Copyright © National Academy of Sciences. All rights reserved.

*CHAPTER 2* *243*

2002 Behavior oriented approaches to reducing youth gun violence. *The Future of Children* 12(2):101-115.

Kaplan, M.S., and O. Geling
1998 Firearm suicides and homicides in the United States: Regional variations and patterns of gun ownership. *Social Science and Medicine* 45:1227-1233.

Kleck, G., and M. Gertz
1995 Armed resistance to crime: The prevalence and nature of self-defense with a gun. *Journal of Criminal Law and Criminology* 86(1):150-187.

Kleck, G., and E.B. Patterson
1993 The impact of gun control and gun ownership levels on violence rates. *Journal of Quantitative Criminology* 9:249-287.

Miller, M., D. Hemenway, and D. Azrael
2002 Household firearm ownership levels and homicide rates across U.S. regions and states, 1988-1997. *American Journal of Public Health* 92:1988-1993.

Monkkonen, E.J.
2001 *Murder In New York City*. Berkeley: University of California Press.

National Research Council
2001 *Informing America's Policy on Illegal Drugs: What We Don't Know Keeps Hurting Us*. Committee on Data and Research for Policy on Illegal Drugs, C.F. Manski, J.V. Pepper, and C.V. Petrie, eds. Committee on Law and Justice and Committee on National Statistics. Washington, DC: National Academy Press.
2002 *Scientific Research in Education*. Committee on Scientific Principles for Education Research. R.J. Shavelson and L. Towne, eds. Center for Education. Division of Behavioral and Social Sciences and Education. Washington, DC: The National Academies Press.

National Rifle Association
2002 Competitive Shooting Programs. Available: http://www.nrahq.org/compete/ [Accessed 10/12/02].

Robinson, W.S.
1950 Ecological correlations and behaviors of individuals. *American Sociological Review* 15:351-357.

U.S. Department of the Interior, Fish and Wildlife Service and U.S. Department of Commerce, U.S. Census Bureau
2002 *2001 National Survey of Fishing, Hunting, and Wildlife-Associated Recreation*. Washington, DC: U.S. Government Printing Office.

Zimring, F., and G. Hawkins
1998 *The Citizen's Guide to Gun Control*. New York: Macmillan Publishing Company.

## CHAPTER 2

Annest, J.L., and J.A. Mercy
1998 Use of national data systems for firearm-related injury surveillance. *American Journal of Preventive Medicine* 15(3S):17-30.

Azrael, D., P.J. Cook, and M. Miller
2004 State and local prevalence of firearms ownership: Measurement, structure and trends. *Journal of Quantitative Criminology* 20(1):43-62.

Biderman, A.D., and J.P. Lynch
1991 *Understanding Crime Incidence Statistics: Why the UVR Diverges from the NCS*. New York: Springer-Verlag.

Copyright © National Academy of Sciences. All rights reserved.

Blackman, P.H.
   1999   The limitations of BATF firearms tracing data for policymaking and homicide research. *Proceedings of the Homicide Research Working Group Meetings, 1997 and 1998*. Washington, DC: National Institute of Justice, U.S. Department of Justice.
   2003   *Armed Citizens and Crime Control* (4 page leaflet). Fairfax, VA: National Rifle Association.

Bureau of Alcohol, Tobacco, and Firearms
   1997   *Crime Gun Trace Analysis Reports: The Illegal Firearms Market in 17 Communities*. Washington, DC: U.S. Department of the Treasury.
   2000a  *Crime Gun Trace Reports (1999): National Report*. Washington, DC: U.S. Department of the Treasury.
   2002b  *Crime Gun Trace Reports (2000): National Report*. Washington, DC: U.S. Department of the Treasury.

Bureau of Justice Statistics
   1994   *Criminal Victimization*. Washington, DC: U.S. Department of Justice.
   2001   UCR and NIBRS Participation: Level of Participation by States as of August 2001. Retrieved from the World Wide Web at http://www.ojp.usdoj.gov/bis/nibrsstatus.htm. [Accessed 11/30/02].

Caspar, R.
   1992   Followup of nonrespondents in 1990. In C.F. Turner, J.T. Lessler, and J.C. Gfroerer, eds., *Survey Measurement of Drug Use: Methodological Studies*. DHHS Publication No. (ADM) 92-1929. Washington, DC: U.S. Department of Health and Human Services.

Congressional Research Service
   1992   *Assault Weapons: Military-Style Semi-Automatic Firearms Facts and Issues*. Report 92-434. Washington, DC: U.S. Government Printing Office.

Cook, P.J.
   1991   The technology of personal violence: A review of the evidence concerning the importance of gun availability and use in violent crime, self defense, and suicide. *Crime and Justice* 14:1-71.

Cook, P.J., and A.A. Braga
   2001   Comprehensive firearms tracing: Strategic and investigative uses of new data on firearms markets. *Arizona Law Review* 43:277-309.

Decker, S.H., S. Pennell, and A. Caldwell
   1997   Illegal firearms: Access and use by arrestees. *NIJ Research in Brief* (January). National Institute of Justice. Washington, DC: U.S. Department of Justice.

Fagan, J., D. Wilkinson, and G. Davies
   2002   Social Contagion of Violence. Unpublished paper presented at the May 2002 meeting of the Committee to Improve Research and Data on Firearms, National Research Council, Washington, DC.

Gfroerer, J.T., J.C. Lessler, and T. Parsley
   1997   Studies of nonresponse and measurement error in the national household survey on drug abuse. In L. Harrison and Hughes, eds., *The Validity of Self-Reported Drug Use: Improving the Accuracy of Survey Estimates*. NIDA Research Monograph 167: 273-295. Washington, DC: U.S. Department of Health and Human Services.

Hall, M.J., and M.F. Owings
   2000   *Hospitalizations for Injury: United States, 1996*. Advance Data from Vital and Health Statistics; no. 318 (August 9). National Center for Health Statistics, Hyattsville, MD.

Copyright © National Academy of Sciences. All rights reserved.

Harrison, L., and A. Hughes

1997 *The Validity of Self-Reported Drug Use: Improving the Accuracy of Survey Estimates.* National Institute on Drug Abuse Research Monograph 167. Rockville, MD: National Institute on Drug Abuse.

Institute of Medicine

1999 *Reducing the Burden of Injury: Advancing Prevention and Treatment.* Washington, DC: National Academy Press.

Jarvis, J.

1992 The National Incident-Based Reporting System and its application to homicide research. Pp. 81-85 in C. Block and R. Block, eds., *Questions and Answers on Lethal and Non-Lethal Violence.* Proceedings of the first annual Workshop of the Homicide Research Working Group. HV 6529. H668a 1992. Washington, DC: National Crime Prevention Council.

Kleck, G.

1991 *Point Blank: Guns and Violence in America.* New York: Aldine de Gruyter.

1999 BATF gun trace data and the role of organized gun trafficking in supplying guns to criminals. *Saint Louis University Public Law Review* 18:23-45.

Loftin, C., and J.A. Mercy

1995 Estimating the incidence, causes, and consequences of interpersonal violence for children and families. Pp. 192-213 in *Integrating Federal Statistics on Children: Report of a Workshop.* National Research Council and Institute of Medicine. Washington, DC: National Academy Press.

MacKenzie, D., P. Baunach, and R. Roberg, eds.

1990 *Measuring Crime: Large Scale, Long Range Efforts.* Albany: State University of New York Press.

Maltz, M.D.

1999 *Bridging Gaps in Police Crime Data.* Discussion paper from the BJS Fellows Program. Bureau of Justice Statistics. BJS Clearinghouse (1 800 732-3277). Washington, DC: U.S. Department of Justice.

Maltz, M.D., and J. Targonski

2002 A note on the use of county-level UCR data. *Journal of Quantitative Criminology* 18(2):297-318.

Miller, M., D. Azrael, and D. Hemenway

2001 Household firearm ownership and suicide rates in the United States. *Epidemiology* 13:517-524.

National Research Council

2001 *Informing America's Policy on Illegal Drugs: What We Don't Know Keeps Hurting Us.* Committee on Data and Research for Policy on Illegal Drugs, C.F. Manski, J.V. Pepper, and C.V. Petrie, eds. Committee on Law and Justice and Committee on National Statistics. Washington, DC: National Academy Press.

2002 *Scientific Research in Education.* Committee on Scientific Principles for Education Research, R.J. Shavelson and L. Towne, eds. Center for Education, Division of Behavioral and Social Sciences and Education. Washington, DC: The National Academies Press.

2003 *Measurement Problems in Criminal Justice Research.* Committee on Law and Justice, J.V. Pepper and C.V. Petrie, eds. Washington, DC: The National Academies Press.

Pierce, G.L., A.A. Braga, R.R. Hyatt, and S.C.S. Koper

2002 The Characteristics and Dynamics of Illegal Firearms Markets: Implications for a Supply-Side Enforcement Strategy. Working Paper. Center for Criminal Justice Policy Research, Northeastern University.

Copyright © National Academy of Sciences. All rights reserved.

Poggio, E.C., S.D. Kennedy, J.M. Chaiken, and K.E. Carlson
  1985 *Blueprint for the Future of the Uniform Crime Reporting Program: Final Report of the UCR Study*. Bureau of Justice Statistics NCJ-98348. Washington, DC: U.S. Department of Justice.

Riedel, M.
  1999. Sources of homicide data: A review and comparison. Pp. 75-95 in M.D. Smith and M. Zahn, eds., *Homicide: A Sourcebook of Social Research*. Thousand Oaks, CA: Sage.

Robinson, W.S.
  1950 Ecological correlations and the behavior of individuals. *American Sociological Review* 15:351-357.

Smith, T.W.
  1995 Trends in non-response rates. *International Journal of Public Opinion Research* 7:157-171.

Tourangeau, R., and M.E. McNeeley
  2003 Measuring crime and crime victimization: Methodological issues. In J.V. Pepper and C.V. Petrie, eds*., Measurement Problems in Criminal Justice Research*. Committee on Law and Justice, National Research Council. Washington, DC: The National Academies Press.

Wiersema, B., C. Loftin, and D. McDowell
  2000 A comparison of supplementary homicide reports and national vital statistics system homicide estimates for U.S. counties. *Homicide Studies* 4:317-340.

Zawitz, M.W., and K.J. Strom
  2000 *Firearm Injury and Death from Crime, 1993-97*. Bureau of Justice Statistics NCJ 182992. Washington, DC: U.S. Department of Justice.

Zimring, F.
  1975 Firearms and federal law: The Gun Control Act of 1968. *Journal of Legal Studies* 4:133-198.

# CHAPTER 3

Alpers, P.
  2000 *Costa Rica: Diagnostico Armas de Fuego*. Max Loria for the Arias Foundation for Peace and Human Progress (translated by Greg Puley).
  2001 Harvard Injury Control Research Center and HELP networks. Arias Foundation for Peace and Human Progress, San José, Costa Rica.

Azrael, D., P.J. Cook, and M. Miller
  2004 State and local prevalence of firearms ownership: Measurement, structure and trends. *Journal of Quantitative Criminology* 20(1):43-62.

Barclay, G., C. Tavares, and A. Siddique
  2001 *International Comparisons of Criminal Justice Statistics 1999*. Research Development and Statistics Directorate, Home Office U.K.

Baumer, E.P., S.F. Messner, and R. Rosenfeld
  2002 *Homicide Rates and Support for Capital Punishment: A Multi-Level Analysis*. Annual Meeting of the Homicide Research Working Group, St. Louis, MO, May 30-June 2.

Bennett, W.J., J.J. DiIulio, and J.P. Walters
  1996 *Body Count: Moral Poverty and How to Win America's War Against Crime and Drugs*. New York: Simon & Schuster.

Copyright © National Academy of Sciences. All rights reserved.

*CHAPTER 3* *247*

Blumstein, A.
   1995    Youth violence, guns, and the illicit-drug industry. *Journal of Criminal Law and Criminology* 86:10-36.
   2000    Disaggregating the violence trends. In A. Blumstein and J. Wallman, eds., *The Crime Drop in America*. New York: Cambridge University Press.
Blumstein, A., and D. Cork
   1996    Linking gun availability to youth gun violence. *Law and Contemporary Problems* 59:5-24.
Braga, A.
   2003    Serious youth gun offenders and the epidemic of youth violence in Boston. *Journal of Quantitative Criminology* 19(1):33-54.
Bureau of Alcohol, Tobacco, and Firearms
   2002    *Firearms Commerce in the United States* 2001-2002. Washington, DC: U.S. Department of the Treasury.
Bureau of Justice Statistics
   2002a   Homicide Trends in the U.S. Available: http://www.ojp.usdoj.gov/bjs/homicide/htm. [Accessed 1/10/03].
   2002b   *Criminal Victimization in the United States, 2000: Statistical Tables*. Washington, DC: U.S. Department of Justice.
Cohen, J., and G. Tita
   1999    Diffusion in homicide: Exploring a general method for detecting spatial diffusion processes. *Journal of Quantitative Criminology* 15:379-406.
Cook, P.J.
   1998    The epidemic of youth gun violence. In *Perspectives on Crime and Justice: 1997-1998 Lecture Series*. Washington, DC: National Institute of Justice.
   1998    The unprecedented epidemic in youth violence. Pp. 27-64 in M. Tonry and M.H. Moore, eds., *Youth Violence, Crime and Justice: A Review of Research*. Volume 24. Chicago: University of Chicago Press.
   2002    After the epidemic: Recent trends in youth violence in the United States. In M. Tonry and M.H. Moore, eds., *Crime and Justice: A Review of Research*. Volume 29. Chicago: University of Chicago Press.
Cork, D.
   1999    Examining space-time interaction in city-level homicide data: Crack markets and the diffusion of guns among youth. *Journal of Quantitative Criminology* 15:379-406.
Corzine, J., L. Huff-Corzine, and G.S. Weaver
   2000    Using federal firearms licenses (FFL) data as an indirect measurement of gun availability. In *Proceedings of the Homicide Research Working Group: 1999*. Washington, DC: Federal Bureau of Investigation.
Donohue, J.J., III, and S.D. Levitt
   2001    The impact of legalized abortion on crime. *Quarterly Journal of Economics* 116:379-420.
Duggan, M.
   2001    More guns, more crime. *Journal of Political Economy* 109(4):1086-1114.
Fox, J.A.
   1996    *Trends in Juvenile Violence: A Report to the United States Attorney General on Current and Future Rates of Juvenile Offending*. Washington, DC: Bureau of Justice Statistics.
   2001    *Uniform Crime Reports Supplementary Homicide Reports 1976-1999*. Produced by Northeastern University, College of Criminal Justice. Ann Arbor, MI: Inter-University Consortium for Political and Social Research.

Copyright © National Academy of Sciences. All rights reserved.

Firearms and Violence: A Critical Review
http://www.nap.edu/catalog/10881.html

Frattaroli, S., D.W. Webster, and S.P. Teret
  2002 Unintentional gun injuries, firearm design, and prevention: What we know, what
       we need to know, and what can be done. *Journal of Urban Health* 79:49-59.
Gotsch, K.E., J.L. Annest, J.A. Mercy, and G.W. Ryan
  2001 Surveillance for fatal and nonfatal firearm-related injuries—United States, 1993-
       1998. Centers for Disease Control and Prevention. *Morbidity and Mortality Weekly
       Report* 50(SS-2).
Grogger, J., and M. Willis
  2000 The emergence of crack cocaine and the rise in urban crime. *Review of Economics
       and Statistics* 82:519-529.
Harris Interactive
  2002 Harris Poll 2002.http://www.harrisinteractive.com/harris_poll/index.asp?PID=234.
       [Accessed 3/16/04].
Hemenway, D., and M. Miller
  2000 Firearm availability and homicide rates across 26 high-income countries. *Journal of
       Trauma* 49(6):3.
Ikeda, R.M., R. Gorwitz, S.P. James, K.E. Powell, and J.A. Mercy
  1997 *Fatal Firearm Injuries in the United States, 1962-1994.* Atlanta: Centers for Dis-
       ease Control.
Kennedy, D.M., A.M. Piehl, and A. Braga
  1996 Youth violence in Boston: Gun markets, serious youth offenders, and a use-reduc-
       tion strategy. *Law and Contemporary Problems* 59:147-196.
Killias, M.
  1993a International correlations between gun ownership and rates of homicide and sui-
       cide. *Canadian Medical Association Journal* 148(10):1721-1725.
  1993b Gun ownership, suicide, and homicide: An international perspective. In A. Alvazi
       del Frate, U. Zvekic, and J.J.M. van Dijk, eds., *Understanding Crime: Experiences
       of Crime and Crime Control.* Rome: UNICRI.
Kleck, G.
  1997 Carrying Guns for Protection: Results from the National Self-Defense Survey. Un-
       published paper, School of Criminology and Criminal Justice, Florida State Univer-
       sity.
Krug, E.G, K.E. Powell, and L.L. Dahlberg
  1998 Firearm-related deaths in the United States and 35 other high- and upper-middle
       income countries. *International Journal of Epidemiology* 7:214-221.
Land, K., and P. McCall
  2001 The indeterminacy of forecasts of crime rates and juvenile offenses. In *Juvenile
       Crime, Juvenile Justice.* Panel on Juvenile Crime: Prevention, Treatment, and Con-
       trol, Committee on Law and Justice and Board on Children, Youth, and Families,
       National Research Council and Institute of Medicine. Washington, DC: National
       Academy Press.
Lester, D.
  1990 The availability of firearms and the use of firearms for suicide: A study of 20
       countries. *Acta Psychiatrica Scandinavia* 81:146-147.
Maguire, K., and A.L. Pastore
  2002 *Sourcebook of Criminal Justice Statistics.* Available: http://www.albany.edu/
       sourcebook/. [Accessed 1/10/03].
Miller, M., D. Hemenway, and D. Azrael
  2002 Household firearm ownership levels and homicide rates across U.S. regions and
       states, 1988-1997. *American Journal of Public Health* 92:1988-1993.

Copyright © National Academy of Sciences. All rights reserved.

National Center for Health Statistics
    2002    Web-based Injury Statistics Query and Reporting System. Available: http://
            www.cdc.gov/ncipc/wisqars/default.htm. [Accessed 3/16/04].
National Research Council
    1993    *Understanding and Preventing Violence*. Panel on the Understanding and Control
            of Violent Behavior, A.J. Reiss, Jr. and J. Roth, eds. Washington, DC: National
            Academy Press.
Rand, M.R., and C.M. Rennison
    2002    True crime stories? Accounting for differences in our national crime indicators.
            *Chance* 15(2):47-51.
Rennison, C.M.
    2001    *Criminal Victimization 2000: Changes 1999-2000 with Trends 1993-2000*. BJS
            National Crime Victimization Survey NCJ 187007. Washington, DC: U.S. Depart-
            ment of Justice.
Rosenfeld, R., T. Bray, and A. Egley
    1999    Facilitating homicide: A comparison of gang-motivated, gang-affiliated, and
            nongang youth homicides. *Journal of Quantitative Criminology* 15:495-516.
Rosenfeld, R., S.F. Messner, and E.P. Baumer
    2001    Social capital and homicide. *Social Forces* 80:283-309.
United Nations
    2000    United Nations International Study on Firearms Regulations. Available: http://
            www.ifs.unvie.ac.at/~uncjin/firearms/Default.htm. [Accessed 12/12/02].
U.S. Census Bureau
    2001a   *Statistical Abstract of the United States: 2001*, Table 2. Available: www.census.gov/
            statab/www/. [Accessed 7/2/02].
    2001b   Time Series of National Population Estimates: April 1, 2000 to July 1, 2001. Table
            US-2001EST-01.Population Division. Available: http://eire.census.gov/popest/data/
            national/populartables/table01.php. [Accessed 11/01/02].
    2002    Time Series of Intercensal State Population Estimates: April 1, 1990 to April 1,
            2000. Table CO-EST2001-12-00.Population Division. Available: http://eire.census.
            gov/popest/data/counties/tables/CO-EST2001-12/CO-EST2001-12-00.php.    [Ac-
            cessed 11/01/02].
Wilson, J.Q.
    2002    Crime: Public policies for crime control. In J.Q. Wilson and J. Petersilia, eds.,
            *Crime*, 2nd edition. Oakland, CA: Institute for Contemporary Studies Press.
Wintemute, G.
    2000    Guns and gun violence. Pp. 45-96 in A. Blumstein and J. Wallman, eds., *The Crime
            Drop in America*. Cambridge, UK: Cambridge University Press.
Zawitz, M.
    2001    Estimated Firearm Crime. Available: http://www.ojp.usdoj.gov/bjs/glance/tables/
            guncrimetab.htm. [Accessed 10/01/02].

# CHAPTER 4

Blackman, P.A.
    1997-   The limitations of BATF tracing for policy making and homicide. In *Proceedings*
    1998    *of the Homicide Working Group*. Washington, DC: National Crime Prevention
            Council.
Braga, A.A., and D.M. Kennedy
    2000    Gun shows and the illegal diversion of firearms. *Georgetown Public Policy Review*
            6(1):7-24.

Copyright © National Academy of Sciences. All rights reserved.

Braga, A.A., P.J. Cook, D.M. Kennedy, and M.H. Moore
  2002   The illegal supply of firearms. In M. Tonry, ed., *Crime and Justice: A Review of Research*. Volume 29. Chicago: University of Chicago Press.

Britt, C., III, G. Kleck, and D.J. Bordua
  1996   A reassessment of the DC gun law: Some cautionary notes on the use of interrupted time series designs for policy impact assessment. *Law & Society Review* 30:361-80.

Bureau of Alcohol, Tobacco, and Firearms
  2000a  *Commerce in Firearms in the United States*. Washington, DC: U.S. Department of the Treasury.
  2000b  *Crime Gun Trace Reports (1999): National Report*. Washington, DC: U.S. Department of the Treasury.
  2000c  *Following the Gun: Enforcing Federal Laws Against Firearms Traffickers*. Washington, DC: U.S. Department of the Treasury.
  2000d  *ATF Regulatory Actions: Report to the Secretary on Firearms Initiative*. Washington, DC: U.S. Department of the Treasury.

Bureau of Justice Statistics
  1993   *Survey of State Prison Inmates, 1991*. Washington, DC: U.S. Department of Justice.
  1999   *Presale Handgun Checks, the Brady Interim Period, 1994-1999*. Washington, DC: U.S. Department of Justice.
  2002   *Background Checks for Firearms Transfers, 2001*. Washington, DC: U.S. Department of Justice.

Callahan, C.M., F.P. Rivara, and T.D. Koepsell
  1994   Money for guns: Evaluation of the Seattle gun buy-back program. *Public Health Reports* 109:472-477.

Caulkins, J.
  1998   The cost-effectiveness of civil remedies: The case of drug control interventions. *Crime Prevention Studies* 9:219-237.

Cook, P.J., and A.A. Braga
  2001   Comprehensive firearms tracing: Strategic and investigative uses of new data on firearms markets. *Arizona Law Review* 43:277-309.

Cook, P.J., and J. Leitzel
  1996   Perversity, futility, jeopardy: An economic analysis of the attack on gun control. *Law and Contemporary Problems* 59:91-118.

Cook, P.J., and J. Ludwig
  1997   *Guns in America: Results of a Comprehensive Survey on Private Firearms Ownership and Use*. Washington, DC: Police Foundation.

Cook, P.J., S. Molliconi, and T. Cole
  1995   Regulating gun markets. *Journal of Criminal Law and Criminology* 86:59-92.

Decker, S.H., S. Pennell, and A. Caldwell
  1997    *Illegal Firearms: Access and Use by Arrestees*. Bureau of Justice Statistics. Washington, DC: U.S. Department of Justice.

Fjestad, S.P.
  2001   *22nd Edition of the Blue Book of Gun Values*. Minneapolis, MN: Blue Book Publications.

Hahn, R.A., O. Bilukha, A. Crosby, M.T. Fullilove, and A. Liberman
  2005   Firearms laws and the reduction of violence: A systematic review. Task Force on Community Preventive Services, E.K. Moscicki, S. Snyder, F. Tuma, and P.A. Briss. *American Journal of Preventive Medicine*. January.

Copyright © National Academy of Sciences. All rights reserved.

Jones, E.D., III
   1981   The District of Columbia's Firearm Control Regulations Act of 1975: The toughest handgun control law in the United States—or is it? *Annals of the American Academy of Political and Social Science* 455:138-149.

Kennedy, D.M., A.A. Braga, and A.M. Piehl
   1996   Youth violence in Boston: Gun markets, serious youth offenders, and a use-reduction strategy. *Law and Contemporary Problems* 59:147-196.

Kleck, G.
   1999   BATF gun trace data and the role of organized gun trafficking in supplying guns to criminals. *Saint Louis University Public Law Review* 18:23-45.
   2001   Impossible policy evaluations and impossible conclusions: A comment on Koper and Roth. *Journal of Quantitative Criminology* 17(1):75-80.

Koper, C.S.
   2002   Federal legislation and gun markets: How much have recent reforms of the federal firearms licensing system reduced criminal gun suppliers? *Criminology and Public Policy* 1(2):151-178.

Koper, C.S., and P. Reuter
   1996   Suppressing illegal gun markets: Lessons learned from drug enforcement. *Law and Contemporary Problems* 59:119-146.

Koper, C.S., and J. Roth
   2001a   The impact of the 1994 federal assault weapon ban on gun violence outcomes: An assessment of multiple outcomes measures and some lessons for policy evaluation. *Journal of Quantitative Criminology* 17(1):33-74.
   2001b   The impact of the 1994 federal assault weapon ban on gun markets: An assessment of short-term primary and secondary market effects. *Journal of Quantitative Criminology* 18(3):239-266.

Loftin, C., D. McDowall, B. Wiersema, and T. Cottey
   1991   Effects of restrictive licensing of handguns on homicide and suicide in the District of Columbia. *New England Journal of Medicine* 325(23):1615-1620.

Ludwig, J., and P.J. Cook
   2000   Homicide and suicide rates associated with the implementation of the Brady Handgun Violence Prevention Act. *Journal of the American Medical Association* 284:585-591.

Moore, M.H.
   1973   Achieving discrimination on the effective price of heroin. *American Economic Review* 63:270-277.
   1981   Keeping handguns from criminal offenders. *Annals of the American Academy of Political and Social Science* 455:92-109.

National Institute of Justice
   1997   *Crack, Powder Cocaine and Heroin: Drug Purchase and Use Patterns in Six Cities* Washington, DC: U.S. Department of Justice.

National Research Council
   1986   *Criminal Careers and "Career Criminals."* Panel on Research on Criminal Careers, A. Blumstein, J. Cohen, J.A. Roth, and C.A. Visher, eds. Washington, DC: National Academy Press.
   2001   *Informing America's Policy on Illegal Drugs: What We Don't Know Keeps Hurting Us.* Committee on Data and Research for Policy on Illegal Drugs, C.F. Manski, J.V. Pepper, and C.V. Petrie, eds. Committee on Law and Justice and Committee on National Statistics. Washington, DC: National Academy Press.

Peters, R.
   2000   *Gun Control in the United States: A Comparative Survey of State Gun Laws.* New York: Open Society Institute.

Copyright © National Academy of Sciences. All rights reserved.

Pierce, G.L., L. Briggs, and D. Carlson
  1995 *The Identification of Patterns in Firearms Trafficking: Implications for a Focused Enforcement Strategy.* Bureau of Alcohol, Tobacco, and Firearms. Washington, DC: U.S. Department of the Treasury.
Pierce, G.L., A.A. Braga, C. Koper, J. McDevitt, D. Carlson, J. Roth, and A. Saiz
  2001 *The Characteristics and Dynamics of Gun Markets: Implications for a Supply-Side Enforcement Strategy.* Final Report to the National Institute of Justice. Boston: Center for Criminal Justice Policy Research, Northeastern University.
Police Executive Research Forum
  1996 Gun buy-backs: Where do we stand and where do we go? In M.R. Plotkin, ed., *Under Fire: Gun Buy-Backs, Exchanges, and Amnesty Programs.* Washington, DC: Police Executive Research Forum.
Police Foundation
  1996 *Guns in America: Results of a Comprehensive National Survey on Firearms Ownership and Use.* Washington, DC: Police Foundation.
Reuter, P., and J. Mouzos
  2003 Australia's gun control: Massive buy-back of low risk guns. In J. Ludwig and P.J. Cook, eds., *Evaluating Gun Control.* Washington, DC: Brookings Institution.
Rosenfeld, R.
  1996 Gun buy-backs: Crime control or community mobilization? In M.R. Plotkin, ed., *Under Fire: Gun Buy-Backs, Exchanges, and Amnesty Programs.* Washington, DC: Police Executive Research Forum.
Roth, J., and C. Koper
  1997 *Impacts of the 1994 Assault Weapons Ban: 1994-1996.* Research in Brief. National Institute of Justice. Washington, DC: U.S. Department of Justice.
Sheley, J.F., and J.D. Wright
  1993 Motivations for gun possession and carrying among serious juvenile offenders. *Behavioral Sciences and the Law* 11:375-388.
  1995 In *the Line of Fire: Youth, Guns and Violence in Urban America.* New York: Aldine de Gruyter.
Taylor, B., N. Fitzgerald, D. Hunt, J. Reardon, and H. Brownstein
  2001 ADAM Preliminary Findings on Drug Use and Drug Markets: Adult Arrestees. National Institute of Justice. Available: http://www.adam-nij.net/files/2000_Preliminary_Findings.pdf.
Veen, J., S. Dunbar, and M. Stedman Ruland
  1997 *The BJA Firearms Trafficking Program: Demonstrating Effective Strategies to Control Violent Crime.* Bureau of Justice Assistance. Washington, DC: U.S. Department of Justice.
Wachtel, J.
  1998 Sources of crime guns in Los Angeles, California. *Policing: An International Journal of Police Strategies and Management* 21:220-239.
Weil, D.S., and R. Knox
  1996 Effects of limiting handgun purchases on interstate transfer of firearms. *Journal of the American Medical Association* 275:1759-1761.
Wintemute, G.J.
  2000 Relationship between illegal use of handguns and handgun sales volume. *Journal of the American Medical Association* 284:566-567.
Wintemute, G.J., C.M. Drake, J.J. Beaumont, M.A. Wright, and C. Parham
  1998 Prior misdemeanor convictions as a risk factor for later violent and firearm-related criminal activity among authorized purchasers of handguns. *Journal of the American Medical Association* 280:2083-2087.

Copyright © National Academy of Sciences. All rights reserved.

Wright, J.D., and P. Rossi
    1994    *Armed and Considered Dangerous: A Survey of Felons and Their Firearms.* Ex-
            panded edition. Hawthorne, NY: Aldine de Gruyter.
Wright, M.A., G.J. Wintemute, and F. Rivara
    1999    Effectiveness of denial of handgun purchase to persons believed to be at high risk
            for firearm violence. *American Journal of Public Health* 89:88-90.
Zimring, F.E.
    1976    Street crime and new guns: Some implications for firearms control. *Journal of
            Criminal Justice* 4:95-107.

## CHAPTER 5

Cook, P.J., and J. Ludwig
    1998    Defensive gun uses: New evidence from a national survey. *Journal of Quantitative
            Criminology* 14(2):111-131.
Cook, P.J., J. Ludwig, and D. Hemenway
    1997    The gun debate's new mythical number: How many defensive gun uses per year?
            *Journal of Policy Analysis and Management* 16(2):463-469.
Cummings, P., T.D. Koepsell, D.C. Grossman, J. Savarino, and R.S. Thompson
    1997    The association between purchase of a handgun and homicide or suicide. *American
            Journal of Public Health* 87(6):974-978.
Duncan. O.D.
    2000a   Gun use surveys: In numbers we trust? *Criminologist* 25(1):1-6.
    2000b   As Compared to What? Offensive and Defensive Gun Use Surveys, 1973-1994.
            National Institute of Justice, Working Paper 185056.
Harrison, L.D.
    1995    The validity of self-reported data on drug use. *Journal of Drug Issues* 25(1):91-
            111.
Hemenway, D.
    1997a   The myth of millions of annual self-defense gun uses: A case study of survey overes-
            timates of rare events. *Chance* 10(3):6-10.
    1997b   Survey research and self-defense gun use: An explanation of extreme overestimates.
            *Journal of Criminal Law and Criminology* 87(4):1430-1445.
Hemenway, D., and D. Azrael
    2000    The relative frequency of offensive and defensive gun uses: Results from a national
            survey. *Violence and Victims* 15(5):257-271.
Hemenway, D., D. Azrael, and M. Miller
    2000    Gun use in the United States: Results from two national surveys. *Injury Prevention*
            6:263-267.
Kellermann, A.L., and D.T. Reay
    1986    Protection or peril? An analysis of firearm-related deaths in the home. *New En-
            gland Journal of Medicine* 314(24):1557-1560.
Kellermann, A.L., F.P. Rivara, N.B. Rushforth, J.G. Branton, D.T. Reay, J.T. Francisco, A.B.
Locci, J. Prodzinski, B.B. Hackman, and G. Somes
    1993    Gun ownership as a risk factor for homicide in the home. *New England Journal of
            Medicine* 329(15):1084-1091.
Kleck, G.
    1997    *Targeting Guns.* New York: Aldine de Gruyter.
    2000    Research Agenda on Guns, Violence and Gun Control. Working Paper.

Copyright © National Academy of Sciences. All rights reserved.

2001a The frequency of defensive gun use: Evidence and disinformation. Chapter 6 in G. Kleck and D.B. Kates, eds., *Armed: New Perspectives on Gun Control.* New York: Prometheus Books.

2001b The nature and effectiveness of owning, carrying and using guns for self-protection. Chapter 7 in G. Kleck and D.B. Kates, eds., *Armed: New Perspectives on Gun Control.* New York: Prometheus Books.

Kleck, G., and M.A. DeLone

1993 Victim resistance and offender weapon effects in robbery. *Journal of Quantitative Criminology* 9(1):55-81.

Kleck, G., and M. Gertz

1995 Armed resistance to crime: The prevalence and nature of self-defense with a gun. *Journal of Criminal Law and Criminology* 86(1):150-187.

1998 Carrying guns for protection: Results from the national self-defense survey. *Journal of Research in Crime and Delinquency* 35:193-224.

Kleck, G., and S. Sayles

1990 Rape and resistance. *Social Problems* 37:149-162.

Lizotte, A.J.

1986 Determinants of completing rape and assault. *Journal of Quantitative Criminology* 2:203-217.

Ludwig, J.

1998 Concealed-gun-carrying law and violent crime: Evidence from state panel data. *International Review of Law and Economics* 18(2):239-254.

McDowall, D., and B. Wiersema

1994 The incidence of defensive firearm use by US crime victims, 1987 through 1990. *American Journal of Public Health* 84(12):1982-1984.

McDowall, D., C. Loftin, and B. Wiersema

1998 Estimates of the Frequency of Firearm Self-Defense from the Redesigned National Crime Victimization Survey. Violence Research Group Discussion Paper 20.

McDowall, D., C. Loftin, and S. Presser

2000 Measuring civilian defensive firearm use: A methodological experiment. *Journal of Quantitative Criminology* 16(2):1-19.

National Research Council

1993 *Understanding and Preventing Violence.* Committee on Law and Justice, A.J. Reiss and J. Roth, eds. Washington, DC: National Academy Press.

2001 *Informing America's Policy on Illegal Drugs: What We Don't Know Keeps Hurting Us.* Committee on Data and Research for Policy on Illegal Drugs, C.F. Manski, J.V. Pepper, and C.V. Petrie, eds. Committee on Law and Justice and Committee on National Statistics. Washington, DC: National Academy Press.

2003 *Measurement Problems in Criminal Justice Research.* Committee on Law and Justice, J.V. Pepper and C.V. Petrie, eds. Washington, DC: The National Academies Press.

Rosenbaum, P.R.

2001 Replicating effects and biases. *American Statistician* 55(3):223-227.

Rushforth, N.B., C.S. Hirsch, A.B. Ford, and L. Adelson

1974 Accidental firearm fatalities in a metropolitan county (1958-1974). *American Journal of Epidemiology* 100(6):499-505.

Smith, T.W.

1997 A call for truce in the DGU War. *Journal of Criminal Law and Criminology* 87(4):1462-1469.

Ziegenhagen, E.A., and D. Brosnan

1985 Victim response to robbery and crime control policy. *Criminology* 23:675-695.

Copyright © National Academy of Sciences. All rights reserved.

# CHAPTER 6

Ayres, I., and J.J. Donohue III
  2003a Shooting down the "more guns, less crime" hypothesis. *Stanford Law Review* 55:1193.
  2003b The latest misfires in support of the "more guns, less crime" hypothesis. *Stanford Law Review* 55:1371-1398.
Bartley, W.A., and M.A. Cohen
  1998 The effect of concealed weapons laws: An extreme bound analysis. *Economic Inquiry* 36(2):258-265.
Black, D.A., and D.S. Nagin
  1998 Do right-to-carry laws deter violent crime? *Journal of Legal Studies* 27:209-219.
Bronars, S., and J.R. Lott, Jr.
  1998 Criminal deterrence, geographic spillovers, and the right to carry concealed handguns. *American Economic Review* 88:475-479.
Donohue, J.J., III
  2002 Divining the Impact of State Laws Permitting Citizens to Carry Concealed Handguns. Unpublished manuscript, Stanford Law School.
Duggan, M.
  2001 More guns, more crime. *Journal of Political Economy* 109(4):1086-1114.
Helland, E., and A. Tabarrok
  2004 Using placebo laws to test "more guns, less crime." *Advances in Economic Analysis and Policy* 4(1):Article 1. http://www.bepress.com/bejeap/advances/vol4/iss1/art.
Lott, J.R., Jr.
  1999 More Guns, Less Crime: A response to Ayres and Donohue. Working paper no. 247, Program for Studies in Law, Economics and Public Policy, Yale Law School.
  2000 *More Guns, Less Crime: Understanding Crime and Gun-Control Laws.* Chicago: University of Chicago Press.
Lott, J.R., Jr., and D.B. Mustard
  1997 Crime, deterrence, and right-to-carry concealed handguns. *Journal of Legal Studies* 26(1):1-68.
Lott, J.R., Jr., and J.E. Whitley
  2002 A Note on the Use of County-Level UCR Data: A Response. Working paper.
Ludwig, J.
  1998 Concealed-gun-carrying law and violent crime: Evidence from state panel data. *International Review of Law and Economics* 18(2):239-254.
Maltz, M.D., and J. Targonski
  2002 A note on the use of county-level UCR data. *Journal of Quantitative Criminology* 18(2):297-318.
Moody, C.E.
  2001 Testing for the effects of concealed weapons laws: Specification errors and robustness. *Journal of Law and Economics* 44(3):799-813.
Moulton, B.R.
  1990 An illustration of a pitfall in estimating the effects of aggregate variables on micro units. *Review of Economics and Statistics* 72:334-338.
Olson, D.E., and M.D. Maltz
  2001 Right-to-carry weapon laws and homicide in large U.S. counties: The effect on weapon types, victim characteristics and victim offender relationships. *Journal of Law and Economics* 44(3):747-770.
Plassmann, F., and T.N Tideman
  2001 Does the right to carry concealed handguns deter countable crimes? Only a count analysis can say. *Journal of Law and Economics* 44(2:2):771-798.

Copyright © National Academy of Sciences. All rights reserved.

Plassmann, F., and J.E. Whitley
  2003   Comments: Confirming more guns, less crime. *Stanford Law Review* 55:1313-
         1369.
Ramsey, J.B.
  1969   Tests for specification errors in classical linear least squares regression analysis.
         *Journal of the Royal Statistical Society* Series B 31(2):350-371.
Vernick, J., and L.M. Hepburn
  2002   State and federal gun laws: Trends for 1970-1999. In J. Ludwig and P.J. Cook,
         eds., *Evaluating Gun Policy: Effects on Crime and Violence*. Washington, DC:
         Brookings Institution Press.
Wooldrige, J.M.
  2003   *Introductory Econometrics: A Modern Approach*. Second ed. Mason, OH:
         Thomson Southwestern.
Zimring, F., and G. Hawkins
  1997   Concealed handguns: The counterfeit deterrent. *The Responsive Community* 7:46-
         60.

# CHAPTER 7

Azrael, D., P.J. Cook, and M. Miller
  2004   State and local prevalence of firearms ownership: Measurement, structure and
         trends. *Journal of Quantitative Criminology* 20(1):43-62.
Bailey, J.E., A.L. Kellermann, G.W. Somes, J.G. Banton, F.P. Rivara, and N.P. Rushforth
  1997   Risk factors for violent death of women in the home. *Archives of Internal Medicine*
         157:777-782.
Beautrais, A.L, P.R. Joyce, and R.T. Mulder
  1996   Access to firearms and the risk of suicide: A case control study. *Australian and
         New Zealand Journal of Psychiatry* 30:741-748.
Birckmayer, J., and D. Hemenway
  2001   Suicide and firearm prevalence: Are youth disproportionately affected? *Suicide and
         Life Threatening Behavior* 31(3):303-310.
Boor, M., and J.H. Bair
  1990   Suicide rates, handgun control laws, and sociodemographic variables. *Psychologi-
         cal Reports* 66:923-930.
Borowsky, I.W., M. Ireland, and M.D. Resnick
  2001   Adolescent suicide attempts: risks and protectors. *Pediatrics* 107(3):485-493.
Brent, D.A., M. Baugher, J. Bridge, J. Chen, and L. Beery
  1999   Age and sex-related risk factors for adolescent suicide. *Journal of the American
         Academy of Child and Adolescent Psychiatry* 38:1497-1505.
Brent, D.A., J.A. Perper, and C.J. Allman
  1987   Alcohol, firearms, and suicide among youth: Temporal trends in Allegheny County,
         Pennsylvania, 1960 to 1983. *Journal of the American Medical Association*
         257:3369-3372.
Brent, D.A, J.A. Perper, C.J. Allman, G.M. Moritz, M. Wartella, and J.P. Zelenak
  1991   The presence and accessibility of firearms in the homes of adolescent suicides: A
         case-control study. *Journal of the American Medical Association* 266:2989-2995.
Brent, D.A., J. A. Perper, C.E. Goldstein, D.J. Kolko, M.J. Allan, C.J. Allman, and J.P.
Zelenak
  1988   Risk factors for adolescent suicide: A comparison of adolescent suicide victims with
         suicidal inpatients. *Archives of General Psychiatry* 45:581-588.

Copyright © National Academy of Sciences. All rights reserved.

Brent, D.A, J.A. Perper, G. Moritz, M. Baugher, J. Schweers, and C. Roth
    1993a  Firearms and adolescent suicide: A community case-control study. *American Jour-nal of Diseases of Children* 147:1066-1071.
    1994  Suicide in affectively ill adolescents: A case-control study. *Journal of Affective Dis-orders* 31(3):193-202.

Brent, D.A., J.A. Perper, G. Moritz, M. Baugher, and C. Allman
    1993b  Suicide in adolescents with no apparent psychopathology. *Journal of the American Academy of Child and Adolescent Psychiatry* 32:494-500.

Bukstein, O.G., D.A. Brent, J.A. Perper, G. Moritz, M. Baugher, J. Schweers, C. Roth, and L. Balach
    1993  Risk factors for completed suicide among adolescents with a lifetime history of substance abuse: A case-control study. *Acta Psychiatrica Scandinavia* 88:403-408.

Cantor, C.H., and P.J. Slater
    1995  The impact of firearm control legislation on suicide in Queensland: Preliminary findings. *Medical Journal of Australia* 162:583-585.

Carrington, P.J.
    1999  Gender, gun control, suicide and homicide in Canada. *Archives of Suicide Research* 5:71-75.

Carrington, P.J., and S. Moyer
    1994  Gun control and suicide in Ontario. *American Journal of Psychiatry* 151:606-608.

Clarke, R.V., and P.R. Jones
    1989  Suicide and increased availability of handguns in the United States. *Social Science and Medicine* 28:805-809.

Conwell, Y., P.R. Duberstein, K. Connor, S. Eberly, C. Cox, and E.D. Caine
    2002  Access to firearms and risk for suicide in middle-aged and older adults. *American Journal of Geriatric Psychiatry* 10:407-416.

Cummings P., D.C. Grossman, F.P. Rivara, and T.D. Koepsell
    1997a  State guns safe storage laws and child mortality due to firearms. *Journal of the American Medical Association* (October) 278(13):1084-1086.

Cummings, P., T.D. Koepsell, D.C. Grossman, J. Savarino, and R.S. Thompson
    1997b  The association between the purchase of a handgun and homicide or suicide. *Ameri-can Journal of Public Health* 87:974-978.

DeZee, M.R.
    1983  Gun control legislation: Impact and ideology. *Law and Policy Quarterly* 5:367-379.

Duggan, M.
    2003  Guns and suicide. Pp 41-67 in J. Ludwig and P. Cook, eds. *Evaluating Gun Policy: Effects on Crime and Violence.* Washington, DC: Brookings Institution Press.

Geisel, M.S., R. Roll, and R.S. Wettick
    1969  The effectiveness of state and local regulations of handguns. *Duke University Law Journal* 4:647-476.

Hemenway, D., and M. Miller
    2000  Firearm availability and homicide rates across 26 high income countries. *Journal of Trauma* 49:985-988.
    2002  The association of rates of household handgun ownership, lifetime major depres-sion and serious suicidal thoughts with rates of suicide across U.S. census regions. *Injury Prevention* 8:313-316.

Hemenway, D., B.P. Kennedy, I. Kawachi, and R.D. Putnam
    2001  Firearm prevalence and social capital. *Annals of Epidemiology* 11:484-490.

Hennekens C.H., and J.E. Buring
    1987  *Epidemiology in Medicine.* Boston: Little, Brown & Co.

Copyright © National Academy of Sciences. All rights reserved.

Hsieh, D., C.F. Manski, and D. McFadden
    1985    Estimation of response probabilities from augmented retrospective observations. *Journal of the American Statistical Association* 80:651-662.
Johnson, G.R., E.G. Krug, and L.B. Potter
    2000    Suicide among adolescents and young adults: A cross-national comparison of 34 countries. *Suicide and Life Threatening Behavior* 30:74-82.
Kaplan, M.S., and O. Geling
    1998    Firearm suicides and homicides in the United States: Regional variations and patterns of gun ownership. *Social Science Medicine* 46:1227-1233.
Kellermann, A.L, F.P, Rivara, G. Somes, D.T. Reay, J. Francisco, J.G. Banton, J. Prodzinski, C. Fligner, and B.B. Hackman
    1992    Special article: Suicide in the home in relation to gun ownership. *New England Journal of Medicine* 327:467-472.
Kellermann, A.L., et al.
    1993    Gun ownership as a risk factor for homicide in the home. *New England Journal of Medicine*, 329(15):1084-1091.
Kellermann, A.L., F.P. Rivara, R.K. Lee, J.G. Banton, P. Cummings, B.B. Hackman, and G. Somes
    1996    Injuries due to firearms in three cities. *New England Journal of Medicine* 335:1438-1444.
Kellermann, A.L., et al.
    1998    Injuries and deaths due to firearms in the home. *Journal of Trauma* 45 (2):263-267.
Killias, M.
    1993    International correlations between gun ownership and rates of homicide and suicide. *Canadian Medical Association Journal* 148:1721-1725.
    2001    Guns, violent crime, and suicide in 21 countries. *Canadian Journal of Criminology* 43:429-439.
Kleck, G.
    1997    *Targeting Guns.* New York: Aldine de Gruyter.
Kleck, G., and E.B. Patterson
    1993    The impact of gun control and gun ownership levels on violence rates. *Journal of Quantitative Criminology* 9:249-287.
Krasker, W.S., and J.W. Pratt
    1986    Bounding the effects of proxy variables on regression coefficients. *Econometrica* 54(3):641-656.
Leenaars, A.A., and D. Lester
    1999    Suicide notes in alcoholism. *Psychological Reports* 85:363-364.
Lester, D.
    1987a   Availability of guns and the likelihood of suicide. *Sociology and Social Research* 71:287-288.
    1987b   An availability-acceptability theory of suicide. *Activitas Nervosa Superior* 29:164-166.
    1988a   State laws on suicide and suicide rates. *Psychological Reports* 62(1):134-139.
    1988b   Restricting the availability of guns as a strategy for preventing suicide. *Biology and Society* 5:127-129.
    1988c   Gun control, gun ownership, and suicide prevention. *Suicide and Life-Threatening Behavior* 18:176-180.
    1989    Gun ownership and suicide in the United States. *Psychological Medicine* 19:519-521.

Copyright © National Academy of Sciences. All rights reserved.

2000 Gun availability and the use of guns for suicide and homicide in Canada. *Canadian Journal of Public Health* 91(3):186-187.

Lester, D., and A. Leenaars

   1993 Suicide rates in Canada before and after the tightening of firearm control laws. *Psychological Reports* 72:787-790.

Lester, D., and M.E. Murrell

   1980 The influences of gun control laws on suicidal behavior. *American Journal of Psychology* 137:121-122.

   1982 The preventive effect of strict gun control laws on suicide and homicide. *Suicide and Life-Threatening Behavior* 12:131-140.

   1986 The influence of gun control laws on personal violence. *Journal of Community Psychology* 14:315-318.

Loftin, C., D. McDowall, B. Wiersema, and T.J. Cottey

   1991 Effects of restrictive licensing of handguns on homicide and suicide in the District of Columbia. *New England Journal of Medicine* 325:1615-1620.

Lott, J.R., Jr., and J.E. Whitley

   2000 Safe Storage Gun Laws: Accidental Deaths, Suicides, and Crime. Working paper #237, Yale Law School, Program for Studies in Law, Economics, and Public Policy.

Ludwig, J., and P.J. Cook

   2000 Homicide and suicide rates associated with implementation of the Brady Handgun Violence Prevention Act. *Journal of the American Medical Association* 284(5):585-591.

   2001 The benefit of reducing gun violence: Evidence from contingent valuation survey data. *Journal of Risk and Uncertainty* 22(3):207-226.

Ludwig, J., P.J. Cook, and T. Smith

   1998 The gender gap in reporting household gun ownership. *American Journal of Public Health* 88:1715-1718.

Maddala, G.S.

   1992 *Introduction to Econometrics*. New York: Macmillan.

Manski, C.F., and S.R. Lerman

   1977 The estimation of choice probabilities from choice based samples. *Econometrica* 45(8):1977-1988.

Markush, R.E., and A.A. Bartolucci

   1984 Firearms and suicide in the United States. *American Journal of Public Health* 74:123-127.

Mathur, V.K., and D.G. Freeman

   2002 A theoretical model of adolescent suicide and some evidence from U.S. data. *Health Economics* 11(8):695-708.

McKeown, R.E., C.Z. Garrison, S.P. Cuffe, J.L. Waller, K.L. Jackson, and C.L. Addy

   1998 Incidence and predictors of suicidal behaviors in a longitudinal sample of young adolescents. *Journal of the American Academy of Child and Adolescent Psychiatry* 37(6):612-619.

Medoff, M.H., and J.P. Maggadino

   1983 Suicides and firearm control laws. *Evaluation Review* 7:357-372.

Mietinnen, O.S.

   1976 Estimability and estimation in case referent studies. *American Journal of Epidemiology* 103:226-235.

Miller, M., D. Azrael, and D. Hemenway

   2001 Firearm availability and unintentional firearm deaths. *Accident Analysis and Prevention* 33:477-484.

Copyright © National Academy of Sciences. All rights reserved.

2002a Firearm availability and unintentional firearm deaths, suicide and homicide among 5-14 year olds. *Journal of Trauma* 52(2):267-274.

2002b Household firearm ownership and suicide rates in the United States. *Epidemiology* 13:517-524.

2002c Firearm availability and suicide, homicide, and unintentional firearm deaths among women. *Journal of Urban Health* 79(1):26-38.

Murray, D.R.

1975 Handguns, gun control laws and firearm violence. *Social Problems* 23:81-92.

National Center for Health Statistics

2003 *National Vital Statistics Reports* 52(3).

Nicholson, R., and A. Garner

1980 *The Analysis of the Firearms Control Act of 1975*. Washington DC: U.S. Conference of Mayors.

Resnick, M.D., P.S. Bearman, R.W. Blum, K.E. Bauman, K.M. Harris, J. Jones, J. Tabor, T. Beuhring, R. Sieving, M. Shew, M. Ireland, L.H. Bearinger, and J.R. Udry

1997 Protecting adolescents from harm: Findings from the National Longitudinal Study on Adolescent Health. *Journal of the American Medical Association* 278(10):823-832.

Reuter, P., and J. Mouzos

2003 Australia's gun control: Massive buy-back of low risk guns. In J. Ludwig and P.J. Cook, eds., *Evaluating Gun Control*. Washington, DC: Brookings Institution.

Rich, C.L., J.G. Young, R.C. Fowler, J. Wagner, and A. Black

1986 San Diego suicide study: Young vs. old subjects. *Archives of General Psychiatry* 43:577-582.

1990 Guns and suicide: Possible effects of some specific legislation. *American Journal of Psychiatry* 147:342-346.

Shah, S., R.E. Hoffman, L. Wake, and W.M. Marine

2000 Adolescent suicide and household access to firearms in Colorado: Results of a case-control study. *Journal of Adolescent Health* 26:157-163.

Sloan, J.H., F.P. Rivara, D.T. Reay, J.A.J. Ferris, and A.L. Kellermann

1990 Firearm regulations and community suicide rates. A comparison of two metropolitan areas. *New England Journal of Medicine* 322:369-373.

Snowdon, J., and L. Harris

1992 Firearm suicides in Australia. *Medical Journal of Australia* 156:79-83.

Sommers, P.M.

1984 Letter to the editor. *New England Journal of Medicine* 310:47-48.

Thomsen, J.L., and S.B. Albrektsen

1991 An investigation of a pattern of firearm fatalities before and after introduction of new legislation in Denmark. *Medical Science and Law* 31:162-166.

Wintemute, G.J., C.A. Parham, J.J. Beaumont, M. Wright, and C. Drake

1999 Mortality among recent purchasers of handguns. *New England Journal of Medicine* 341:1583-1589.

Wooldridge, J.M.

2000 *Introductory Econometrics: A Modern Approach*. Cincinnati, OH: South-Western College Publishing.

Yang, B., and D. Lester

1991 The effect of gun availability on suicide rates. *Atlantic Economics Journal* 19:74.

Copyright © National Academy of Sciences. All rights reserved.

# CHAPTER 8

Arcus, M.
  1995  Family Life Education: What Works? Paper presented at the meeting of the National Council on Family Relations, November 18, Portland, OR.
Arredono, S., T. Aultman-Bettride, T.P. Johnson, et al.
  1999  *Preventing Youth Handgun Violence: A National Study for Trends and Patterns for the State of Colorado*. Boulder, CO: Center for the Study and Prevention of Violence.
Benowitz, N.L., S.M. Hall, R.I. Herning, P. Jacob, R.T. Jones, and A.L. Osman
  1983  Smokers of low-yield cigarettes do not consume less nicotine. *New England Journal of Medicine* 309(July 21):139-142.
Boruch, B., H. May, H. Turner, J. Lavenberg, A. Petrosino, D. de Moya, J. Grimshaw, and E. Foley
  2004  Estimating the effects of interventions that are deployed in many places: Place-randomized trials. *American Behavioral Scientist* 47(5):608-633.
Brady Campaign to Reduce Gun Violence
  2002  *Child Access Protection (CAP) Laws*. Available at: http://www.bradycampaign.org/facts/gunlaws/cap.asp. [Accessed 7/25/02].
Cook, P.J., and A. Braga
  2001  Comprehensive firearms tracing: Strategic and investigative uses of new data on firearms markets. *Arizona Law Review* 43(2):277-309.
Cook, P.J., and J.A. Leitzel
  2002  "Smart" guns: A technological fix for regulating the secondary market. *Contemporary Economic Policy* 20(1):38-49.
Cummings, P., D.C. Grossman, F.P. Rivara, and T.D. Koepsell
  1997  State gun safe storage laws and child mortality due to firearms. *Journal of the American Medical Association* 278:1084-1086.
Flay, B.R.
  1986  Efficacy and effectiveness trials (and other phases of research) in the development of health promotion programs. *Preventive Medicine* 15:451-474.
  2002  School-Based Randomized Trials for Evaluation Problem Behavior Prevention Programs. Prepared for Conference on Progress and Prospects for Place-based Randomized Trials, Rockefeller Foundation Study and Conference Center, Bellagio, Italy, November 11-15.
Flay, B.R., and J.A. Best
  1982  Overcoming design problems in evaluating health behavior problems. *Evaluation and the Health Professions* 5:43-69.
Glasgow, R.E., K.D. McCaul, V.B. Freeborn, and H.K. O'Neill
  1981  Immediate and long term health consequences information in the prevention of adolescent smoking. *Behavior Therapist* 4:15-16.
Goodstadt, M.
  1978  Alcohol and drug education: models and outcomes. *Health Education Monographs* 6:263-279.
Hardy, M.S.
  2002a  Behavior-oriented approaches to reducing youth gun violence. *Future of Children* 12(2):101-115.
  2002b  Teaching firearm safety to children: Failure of a program. *Journal of Developmental and Behavioral Pediatrics* 23(2):71-76.
Hardy, M.S., F.D. Armstrong, B.L. Martin, and K.N. Strawn
  1996  A firearm safety program for children: They just can't say no. *Journal of Developmental and Behavioral Pediatrics* 17:216-221.

Copyright © National Academy of Sciences. All rights reserved.

Health Partners Research Foundation

    1999    Calling the Shots: A Hospital Based Violence Prevention Program. Presented at the Centers for Disease Control Injury Prevention Forum, June 1999.

Howard, P.K.

    2000    An overview of a few well-known national children's gun safety programs and ENA's newly developed program. *Injury Prevention* 27(5):485-488.

    2001    An overview of a few well-known national children's gun safety programs and ENA's newly developed program. *Journal of Emergency Nursing* 27(5):485-488.

Institute of Medicine

    2001    *Clearing the Smoke: Assessing the Science Base for Tobacco Harm Reduction.* Committee to Assess the Science Base for Tobacco Harm Reduction, Board on Health Promotion and Disease Prevention. K. Stratton, P. Shetty, R. Wallace, and S. Bondurant, eds. Washington, DC: National Academy Press.

    2002    *Reducing Suicide: A National Imperative.* Committee on Pathophysiology and Prevention of Adolescent and Adult Suicide, Board on Neuroscience and Behavioral Health. S.K. Goldsmith, T.C. Pellmar, A.M. Kleinman, and W.E. Bunney, eds. Washington, DC: National Academy Press.

LeBrun, E., G. Naue, S. Naureckas, and M. Witwer

    1999    *School-Based Curricula to Prevent Gun Violence: A Review and Call for Evaluation of Programs.* Chicago: Handgun Epidemic Lowering Plan (HELP) Network.

Leonardatos, C., P.H. Blackman, and D.B. Kopel

    2001    Smart guns/foolish legislators: Find the right public safety laws, and avoiding the wrong ones. *Connecticut Law Review* 34(1):157-219.

Lott, J.R., Jr., and D.B.M. Mustard

    1997    Crime, deterrence and right-to-carry concealed handguns. *Journal of Legal Studies* 26(1):1-68.

Lott, J.R., Jr., and J.E. Whitley

    2002    Safe storage gun laws: Accidental deaths, suicide, and crime. *Journal of Law and Economics* 44(1):659-689.

Morgan, L.

    1989    Lawmakers pass gun bill: Governor promises to sign. *St. Petersburg Times* June 21, p. 1A.

Moskowitz, J.M.

    1989    Preliminary guidelines for reporting outcome evaluation studies of health promotion and disease prevention programs. In M.T. Braverman, ed., *Evaluating Health Promotion Programs: New Directions for Program Evaluation.* San Francisco: Jossey-Bass.

National Academy of Engineering

    2003    *Owner-Authorized Handguns: A Workshop Summary.* Steering Committee for NAE Workshop on User-Authorized Handguns. Lance A. Davis and Greg Pearson, eds. Washington, DC: The National Academies Press.

National Council on Crime and Delinquency

    2001    *Teens on Target Evaluation.* I. Arifuku, author. Oakland, CA: National Council on Crime and Delinquency.

National Research Council and Institute of Medicine

    2002    *Deadly Lessons: Understanding Lethal School Violence.* Case Studies of School Violence Committee. Committee on Law and Justice and Board on Children, Youth, and Families. M.H. Moore, C.V. Petrie, A.A. Braga, and B.L. McLaughlin, eds. Washington, DC: National Academy Press.

Copyright © National Academy of Sciences. All rights reserved.

New Jersey Institute of Technology
   2001   *Personalized Weapons Technology Project Progress Report with Findings and Rec-
          ommendations*, Vol. I and II. April 15. Newark, NJ: New Jersey Institute of Tech-
          nology.
Oatis, P.J., N.M. Fenn Buderer, P. Cummings, and R. Fleitz
   1999   Pediatrics practice based evaluation of the Steps to Prevent Firearm Injury pro-
          gram. *Injury Prevention* 5(1):48-52.
Office of Juvenile Justice and Delinquency Prevention
   1999   *Promising Strategies to Reduce Gun Violence*. Office of Juvenile Justice and Delin-
          quency Prevention. Washington, DC: U.S. Department of Justice.
Pacific Research Institute for Public Policy
   1997   Problematic arguments for banning handguns. Pp. 31-49 in D.B. Kates and G.
          Kleck, eds., *The Great American Gun Debate: Essays on Firearms and Violence*.
          San Francisco: Pacific Research Institute for Public Policy.
Peltzman, S.
   1975   The effects of automobile safety regulation. *Journal of Political Economy* 83(2):677-
          725.
Shapiro, J.P., R.L. Dorman, W.M. Burkey, C.J. Welker, and J.B. Clough
   1997   Development and factor analysis of a measure of youth attitudes toward guns and
          violence. *Journal of Clinical Child Psychology* 26:311-320.
Shapiro, J.P., R.D. Dorman, C.J. Welker, and J.B. Clough
   1998   Youth attitudes toward guns and violence: Relations with sex, age, ethnic group,
          and exposure. *Journal of Clinical Child Psychology* 27:98-108.
Teret, S.P., and P.L. Culross
   2002   Product-oriented approaches to reducing youth gun violence. *Future of Children*
          12(2):119-132.
Thompson, E.L.
   1978   Smoking education programs, 1960-1976. *American Journal of Public Health*
          68:257.
Violence Policy Center
   1998   *False Hope of Smart Guns*. Available at: http://www.vpc.org/fact_sht/smartgun.
          htm. [Accessed 7/24/02].
Viscusi, W.K.
   1984   The lulling effect: The impact of child resistant packaging on aspirin and analgesic
          ingestions. *American Economic Review* 74(2):324-327.
   1992   *Fatal Tradeoffs: Public and Private Responsibilities for Risk*. New York: Oxford
          University Press.
Webster, D.W., and M. Starnes
   2000   Reexamining the association between child access prevention gun laws and unin-
          tentional shooting deaths of children. *Pediatrics* 106(4):1466-1469.
Weisburd, D., and A. Petrosino
   forth-  Randomized experiments. In Richard Wright, ed., *Encyclopedia of Criminology*.
   coming  Chicago: Fitzroy Dearborn.
Weiss, D.R.
   1996   Smart Gun Technology Project Final Report. SAND96-1131. May. Prepared by the
          Sandia National Laboratories for the U.S. Department of Energy. Available:
          www.prod.sandia.gov/cgi-bin/techlib/access-control.pl/1996/961131.pdf [Accessed
          3/17/04].
Wilson-Brewer, R., S. Cohen, L. O'Donnell, and I. Goodman
   1991   Violence Prevention for Young Adolescents: A Survey of the State of the Art. Avail-
          able from the ERIC Clearinghouse, ED356442; 800-443-3742.

Copyright © National Academy of Sciences. All rights reserved.

Wirsbinski, J.W.
    2001    Smart Gun Technology Update. Sandia National Laboratories, Albuquerque, New
            Mexico.
Wright, J.D., and P.H. Rossi
    1986    *Armed and Considered Dangerous: A Survey of Felons and Their Firearms.* New
            York: Aldine de Gruyter.

## CHAPTER 9

Alschuler, A.W.
    1978    Sentencing reform and prosecutorial power: A critique of recent proposals for
            "fixed" and "presumptive sentencing." *University of Pennsylvania Law Review*
            126(3):550-577.
Beha, J.A.
    1977    "And nobody can get you out:" The impact of a mandatory prison sentence for the
            illegal carrying of a firearm on the use of firearms and on the administration of
            criminal justice in Boston. *Boston University Law Review* 57:96-146, 289-333.
Berk, R., D. Hoffman, J.D. Roma, and H. Wong
    1979    Estimation procedures for pooled cross-sectional and time-series data. *Evaluation
            Quarterly* 3(2):385-411.
Blumstein, A.
    1995    Youth violence, guns and the illicit-drug industry. *Journal of Criminal Law and
            Criminality* 86:10-36.
Boston Police Department
    2002    *Crime Reduction Strategies: Firearms Crime.* Boston: Boston Police Department.
Braga, A.A., D.M. Kennedy, E.J. Waring, and A.M. Piehl
    2001a   Problem-oriented policing, deterrence, and youth violence: An evaluation of
            Boston's Operation Ceasefire. *Journal of Research in Crime and Delinquency*
            38(3):195-225.
Braga, A.A., D.M. Kennedy, A.M. Piehl, and E.J. Waring
    2001b   Measuring the impact of Operation Ceasefire. In *Reducing Gun Violence: The
            Boston Gun Project's Operation Ceasefire.* National Institute of Justice. Washing-
            ton, DC: U.S. Department of Justice.
Braga, A.A., D.M. Kennedy, and G. Tita
    2002    New approaches to the strategic prevention of gang and group-involved violence.
            In C.R. Huff, ed., *Gangs in America*, 3rd edition. Newbury Park, CA: Sage Publi-
            cations.
Braga, A.A., D.L. Weisburd, E.J. Waring, L.G. Mazerolle, W. Spelman, and F. Gajewski
    1999    Problem-oriented policing in violent crime places: A randomized controlled experi-
            ment. *Criminology* 37(3):541-580.
Carlson, K.
    1982    *Mandatory Sentencing: The Experiences of Two States*. National Institute of Jus-
            tice. Washington, DC: U.S. Department of Justice.
Chaiken, J., and M. Chaiken
    1982    *Varieties of Criminal Behavior*. Santa Monica, CA: RAND Corporation.
Cohen, J., and J. Ludwig
    2003    Policing crime guns. Pp. 217-239 in J. Ludwig and P. Cook, eds., *Evaluating Gun
            Policy: Effects on Crime and Violence.* Washington, DC: Brookings Institution
            Press.

Copyright © National Academy of Sciences. All rights reserved.

Cook, P.J., and J.H. Laub
   1998 The unprecedented epidemic in youth violence. Pp. 27-64 in M. Tonry and M.H. Moore, eds., *Youth Violence. Crime and Justice: A Review of Research*. Volume 24. Chicago: University of Chicago Press.

Cook, P.J., and D. Nagin
   1979 *Does the Weapon Matter? An Evaluation of a Weapons-Emphasis Policy in the Prosecution of Violent Offenders*. Washington, DC: INSLAW.

Deutsch, S.J.
   1979 Lies, damn lies, and statistics: A rejoinder to the comment by Hay and McCleary. *Evaluation Review Quarterly* 3:315-328.
   1981 Intervention modeling: Analysis of changes in crime rates. In J.A. Fox, ed., *Methods in Quantitative Criminology*. New York: Academic Press.

Deutsch, S.J., and F.B. Alt
   1977 The effect of Massachusetts' gun control law on gun-related crimes in the city of Boston. *Evaluation Quarterly* 1:543-568.

Eck, J.E., and W. Spelman
   1987 *Problem-Solving: Problem-Oriented Policing in Newport News*. National Institute of Justice. Washington, DC: U.S. Department of Justice.

Eck, J.E., and D. Weisburd
   1995 Crime places in crime theory. In J. Eck and D. Weisburd, eds., *Crime and Place*. Monsey, NY: Criminal Justice Press.

Goldstein, H.
   1990 *Problem-Oriented Policing*. Philadelphia: Temple University Press.

Greene, J.A.
   1999 Zero tolerance: A case study of police practices and policies in New York City. *Crime and Delinquency* 45(2):171-181.

Greenwood, P.
   2003 Commentary on Raphael and Ludwig. Pp. 280-286 in J. Ludwig and P. Cook, eds., *Evaluating Gun Policy: Effects on Crime and Violence*. Washington, DC: Brookings Institution Press.

Hay, R.A., and R. McCleary
   1979 Box-Tiao time series models for impact assessment: A comment on the recent work of Deutsch and Alt. *Evaluation Quarterly* 3:277-314.

Kennedy, D.M.
   1997 Pulling levers: Chronic offenders, high-crime setting and a theory of prevention. *Valparaiso University Law Review* 31(2):449-484.

Kennedy, D.M., A.M. Piehl, and A.A. Braga
   1996 Youth violence in Boston: Gun markets, serious youth offenders, and a use-reduction strategy. *Law and Contemporary Problems* 59(1):147-197.

Kennedy, D.M., A.A. Braga, and A.M. Piehl
   1997 The (un)known universe: Mapping gangs and gang violence in Boston. In D. Weisburd and J.T. McEwen, eds., *Crime Mapping and Crime Prevention*. Monsey, NY: Criminal Justice Press.
   2001 Developing and implementing Operation Ceasefire. In *Reducing Gun Violence: The Boston Gun Project's Operation Ceasefire*. National Institute of Justice. Washington, DC: U.S. Department of Justice.

Kessler, D., and S. Levitt
   1999 Using sentence enhancements to distinguish between deterrence and incapacitation. *Journal of Law and Economics* 42:343-363.

Copyright © National Academy of Sciences. All rights reserved.

Kleck, G.
  1991  *Point Blank: Guns and Violence in America*. New York: Aldine de Gruyter.
  1997  *Targeting Guns: Firearms and Their Control*. New York: Aldine de Gruyter.
Levitt, S.
  2003  Commentary on Raphael and Ludwig. Pp. 277-279 in J. Ludwig and P. Cook, eds.,
        *Evaluating Gun Policy: Effects on Crime and Violence*. Washington, DC: Brookings
        Institution Press.
Lizotte, A., and M. Zatz
  1986  The use and abuse of sentence enhancement for firearms offenses in California.
        *Law and Contemporary Problems* 49(1):199-221.
Loftin, C., and D. McDowall
  1981  "One with a gun gets you two:" Mandatory sentencing and firearms violence in
        Detroit. *Annals of the American Academy of Political and and Social Science*
        455:150-167.
  1984  The deterrent effects of the Florida felony firearm law. *Journal of Criminal Law
        and Criminology* 75(1):250-259.
Loftin, C., M. Heumann, and D. McDowall
  1983  Mandatory sentencing and firearms violence. *Law and Society Review* 17(2):287-
        318.
Marvell, T., and C. Moody
  1995  The impact of enhanced prison terms for felonies committed with guns. *Criminol-
        ogy* 33(1):247-281.
McDevitt, J., A.A. Braga, D. Nurge, and M. Buerger
  2003  Boston's Youth Violence Prevention Program: A comprehensive community-wide
        approach. In Scott H. Decker, ed., *Policing Gangs and Youth Violence*. Belmont,
        CA: Wadsworth Publishing Company.
McDowall, D., C. Loftin, and B. Wiersema
  1992  A comparative study of the preventive effects of mandatory sentencing laws for gun
        crimes. *Journal of Criminal Law and Criminology* 83:378-394.
McGarrell, E., and S. Chermak
  2003  Strategic Approaches to Reducing Firearms Violence: Final Report on the India-
        napolis Violence Reduction Partnership. Final report submitted to the National
        Institute of Justice. School of Criminal Justice, Michigan State University.
McGarrell, E.F., S. Chermak, A. Weiss, and J. Wilson
  2001  Reducing firearms violence through directed police patrol. *Criminology and Public
        Policy* 1:119-148.
McPheters, L., R. Mann, and D. Schlagenhauf
  1984  Economic response to a crime deterrence program: Mandatory sentencing for rob-
        bery with a firearm. *Economic Inquiry* 22(2):550-570.
Meyer, B.D.
  1995  Natural and quasi-experiments in economics. *Journal of Business and Economic
        Statistics* 13(2):151-162.
National Research Council
  1978  *Deterrence and Incapacitation: Estimating the Effects of Criminal Sanctions on
        Crime Rates*. Panel on Deterrence and Incapacitation, Alfred Blumstein, Jacqueline
        Cohen, and Daniel Nagin, eds. Washington, DC: National Academy Press.
  1993  *Understanding and Preventing Violence*, Volume 1. Panel on the Understanding
        and Control of Violent Behavior, Albert J. Reiss, Jr. and Jeffrey A. Roth, eds.
        Washington, DC: National Academy Press.

Copyright © National Academy of Sciences. All rights reserved.

2001   *Informing America's Policy on Illegal Drugs: What We Don't Know Keeps Hurting Us.* Committee on Data and Research for Policy on Illegal Drugs, C.F. Manski, J.V. Pepper, and C.V. Petrie, eds. Committee on Law and Justice and Committee on National Statistics. Washington DC: National Academy Press.

2004   *Fairness and Effectiveness in Policing: The Evidence.* Committee to Review Research on Police Policy and Practices, W. Skogan and K. Frydl, eds. Washington, DC: The National Academies Press.

Office of Juvenile Justice and Delinquency Prevention

1999   *Promising Strategies to Reduce Gun Violence.* Washington, DC: U.S. Department of Justice.

2002   *Juvenile Gun Courts: Promoting Accountability and Providing Treatment.* Washington, DC: U.S. Department of Justice.

Piehl, A.M., S.J. Cooper, A.A. Braga, and D.M. Kennedy

1999   Testing for Structural Breaks in the Evaluation of Programs. Working paper #7226. Cambridge, MA: National Bureau of Economic Research.

Pierce, G.L., and W.J. Bowers

1981   The Bartley-Fox gun law's short-term impact on crime in Boston. *Annals of the American Academy of Political and Social Science* 455:120-137.

Pierce, G., S. Spaar, and L. Briggs

1988   *The Character of Police Work: Strategic and Tactical Implications.* Boston: Center for Applied Social Research, Northeastern University.

Raphael, S., and J. Ludwig

2003   Prison sentence enhancements: The case of Project Exile. Pp. 251-276 in J. Ludwig and P. Cook, eds., *Evaluating Gun Policy: Effects on Crime and Violence.* Washington, DC: Brookings Institution Press.

Rolph, J., J. Chaiken, and R. Houchens

1981   *Methods for Estimating the Crime Rates of Individuals.* Santa Monica, CA: RAND Corporation.

Rosenfeld, R., and S. Decker

1996   Consent to search and seize: Evaluating an innovative youth firearms suppression program. *Law and Contemporary Problems* 59(2):197-220.

Rossman, D., P. Froyd, G.L. Pierce, J. McDevitt, and W.J. Bowers

1980   Massachusetts' mandatory minimum sentence gun law. *Criminal Law Bulletin* 16(2):150-163.

Sherman, L.W.

1995   The police. In J.Q. Wilson and J. Petersilia, eds., *Crime.* San Francisco: ICS Press.

2001   Reducing gun violence: What works, what doesn't, what's promising. *Criminal Justice* 1(1):11-25.

Sherman, L.W., and D. Rogan

1995   Effects of gun seizures on gun violence: "Hot spots" patrol in Kansas City. *Justice Quarterly* 12(4):673-694.

Sherman, L.W., P. Gartin, and M. Buerger

1989   Hot spots of predatory crime: Routine activities and the criminology of place. *Criminology* 27(1):27-56.

Tita, G., K.J. Riley, G. Ridgeway, C. Grammich, A.F. Abrahamse, and P.W. Greenwood

2003   *Reducing Gun Violence: Results from an Intervention in East Los Angeles.* Prepared for the National Institute of Justice. Santa Monica, CA: RAND Corporation.

Weisburd, D.

1997   *Reorienting Criminal Justice Research and Policy: From the Causes of Criminality to the Context of Crime.* National Institute of Justice. Washington, DC: U.S. Department of Justice.

Copyright © National Academy of Sciences. All rights reserved.

Firearms and Violence:  A Critical Review
http://www.nap.edu/catalog/10881.html

Weisburd, D., L. Maher, and L. Sherman
   1992   Contrasting crime general and crime specific theory: The case of hot spots of crime.
       *Advances in Criminological Theory* 4(1):45-69.
Wolfgang, M., R. Figlio, and T. Sellin
   1972   *Delinquency in a Birth Cohort*. Chicago: University of Chicago Press.

Copyright © National Academy of Sciences. All rights reserved.

# Appendix A

# Dissent

*James Q. Wilson*

I he thrust of Chapter 6 of the committee's report is that studies purporting to show a relationship between right-to-carry (RTC) laws and crime rates are fragile. Though I am not an econometrician, I am struck by the fact that most studies of the effect of policy changes on crime rates are fragile in this sense: Different authors produce different results, and sometimes contradictory ones. This has been true of studies of the effect on crime rates of incapacitation (that is, taking criminals off the street), deterrence (that is, increasing the likelihood of conviction and imprisonment), and capital punishment. In my view, committees of the National Research Council that have dealt with these earlier studies have attempted, not simply to show that different authors have reached different conclusions, but to suggest which lines of inquiry, including data and models, are most likely to produce more robust results.

That has not happened here. Chapter 6 seeks to show that fragile results exist but not to indicate what research strategies might improve our understanding of the effects, if any, of RTC laws. To do the latter would require the committee to analyze carefully not only the studies by John Lott but those done by both his supporters and his critics. Here, only the work by Lott and his coauthors is subject to close analysis.

If this analysis of Lott's work showed that his findings are not supported by his data and models, then the conclusion that his results are fragile might be sufficient. But my reading of this chapter suggests that some of his results survive virtually every reanalysis done by the committee.

Lott argued that murder rates decline after the adoption of RTC laws even after allowing for the effect of other variables that affect crime rates.

*269*

Copyright © National Academy of Sciences. All rights reserved.

Firearms and Violence: A Critical Review
http://www.nap.edu/catalog/10881.html

The committee has confirmed this finding as is evident in its Tables 6-1, 6-2, 6-5 (first row), 6-6 (first row), and 6-7 (first two rows). This confirmation includes both the original data period (1977-1992) used by Lott and data that run through 2000. In view of the confirmation of the findings that shall-issue laws drive down the murder rate, it is hard for me to understand why these claims are called "fragile."

The only exceptions to this confirmation are, to me, quite puzzling. Tables 6-5 and 6-6 suggest that RTC laws have no effect on murder rates when no control variables are entered into the equations. These control variables (which include all of the social, demographic, and public policies other than RTC laws that might affect crime rates) are essential to understanding crime. Suppose Professor Jones wrote a paper saying that increasing the number of police in a city reduced the crime rate and Professor Smith wrote a rival paper saying that cities with few police officers have low crime rates. Suppose that neither Jones nor Smith used any control variables, such as income, unemployment, population density, or the frequency with which offenders are sent to prison in reaching their conclusions. *If* such papers were published, they would be rejected out of hand by the committee for the obvious reason that they failed to supply a complete account of the factors that affect the crime rate. One cannot explain crime rates just by observing the number of police in a city any more than one can explain them just by noting the existence of RTC laws.

It is not enough to say that it is hard to know the right set of control variables without calling into question the use of economics in analyzing public policy questions. All control variables are based on past studies and reasonable theories; any given selection is best evaluated by testing various controls in one's equations.

In addition, with only a few exceptions, the studies cited in Chapter 6, including those by Lott's critics, do not show that the passage of RTC laws drives the crime rates up (as might be the case if one supposed that newly armed people went about looking for someone to shoot). The direct evidence that such shooting sprees occur is nonexistent. The indirect evidence, as found in papers by Black and Nagin and Ayres and Donohue [cited in Chapter 6], is controversial. Indeed, the Ayres and Donohue paper shows that there was a "statistically significant downward shift in the trend" of the murder rate (Chapter 6, page 135). This suggests to me that for people interested in RTC laws, the best evidence we have is that they impose no costs but may confer benefits. That conclusion might be very useful to authorities who contemplate the enactment of RTC laws.

Finally, the committee suggests that extending the Lott model to include data through 2000 may show no effect on RTC laws on murder rates if one analyzes the data on a year-by-year basis (Table 6-7, rows three and four). I wish I knew enough econometrics to feel confident about this

Copyright © National Academy of Sciences. All rights reserved.

*DISSENT* *271*

argument, but I confess that at first blush it strikes me as implausible. To me, Lott's general argument is supported even though it is hard to assign its effect to a particular year. Estimating the effects of RTC laws by individual years reduces the number of observations and thus the likelihood of finding a statistically significant effect. It is possible that doing this is proper, but it strikes me that such an argument ought first to be tested in a peer-reviewed journal before it is used in this report as a sound strategy.

Even if the use of newer data calls into question the original Lott findings, a more reasonable conclusion is that Lott's findings depend on crime rate trends. The committee correctly notes that between 1977 and 1992 crime rates were rising rapidly while between 1993 and 1997 they were declining. Lott's original study was of the first time period. Suppose that his results are not as robust for the second period. The committee concludes that this shows that his model suffers from "specification errors" (page 141). Another and to me more plausible conclusion is that the effect of RTC laws on some crime rates is likely to be greater when those rates are rising than when they are falling. When crime rates are rising, public policy interventions (including deterrence, incapacitation, and RTC laws) are likely to make a difference because they create obstacles to the market and cultural forces that are driving crime rates up. But when crime rates are falling, such interventions may make less of a difference because they will be overwhelmed by market and cultural changes that make crime less attractive. This may or may not be a reasonable inference, but it is worthy of examination.

In sum, I find that the evidence presented by Lott and his supporters suggests that RTC laws do in fact help drive down the murder rate, though their effect on other crimes is ambiguous.

Copyright © National Academy of Sciences. All rights reserved.

# Appendix B
# Committee Response
# to Wilson's Dissent

I his response addresses Professor Wilson's dissent from one aspect of the committee report. It is important to stress at the outset that his dissent focuses on one part of one chapter of the report. Except for the effects of right-to-carry laws on homicide, the entire committee is in agreement on the material in Chapter 6 and the report overall. In particular, the committee, including Wilson, found that "it is impossible to draw strong conclusions from the existing literature on the causal impact" of right-to-carry laws on violent and property crime in general and rape, aggravated assault, auto theft, burglary, and larceny in particular.

The only substantive issue on which the committee differed is whether the existing research supports the conclusion that right-to-carry laws substantially reduce murder. The report suggests that the scientific evidence is inconclusive. Wilson disagreed, arguing that virtually every estimate shows a substantial and statistically significant negative effect of right-to-carry laws on murder.

While it is true that most of the reported estimates are negative, several are positive and many are statistically insignificant. In addition, when we use Lott's trend model but restrict the out years to five years or less (Table 6-7), the trends for murder become positive and those for other crimes remain negative. Therefore, the key question is how to reconcile the contrary findings or, conversely, how to explain why these particular positive, or negative, findings should be dismissed. Three sets of results discussed more fully in Chapter 6 provide support for the committee's conclusion: Published studies, the committee's analysis of control variables, and the committee's analysis extending the time period.

*272*

Copyright © National Academy of Sciences. All rights reserved.

Firearms and Violence: A Critical Review
http://www.nap.edu/catalog/10881.html

1. **Published studies.** There is no question that the empirical results on the effects of right-to-carry laws on murder (and other crimes) are sensitive to seemingly small variations in data and specification. Indeed, Wilson agrees that a few studies find positive effects of right-to-carry laws on murder. We cite four studies in Tables 6-3 and 6-4: Ayres and Donohue, Black and Nagin, Moody, and Plassmann and Tideman (cited in Chapter 6). There are almost certainly others not reported in these tables.

The rest of the committee and Wilson agree that fragility does not prove that the results of any specific paper are incorrect. However, some of the published results must be incorrect because they are inconsistent with one another. The important question, therefore, is whether the correct results can be identified. The rest of the committee thinks that they cannot. Contrary to Wilson's claim, the committee did assess the existing body of empirical literature on right-to-carry laws (see the section beginning on page 127 and Tables 6-3 and 6-4). As described in the report, all of the empirical research on right-to-carry laws relies on the same conceptual and methodological ideas (page 121). Relative to the basic models estimated by Lott, some researchers used data from more counties and some from fewer; some used hybrid linear models while others used nonlinear specifications; some provide state-specific estimates while most provide a single national estimate; some added control variables while others used relatively parsimonious specifications; and so forth. All of the studies described in the literature review made plausible cases for their choices of models and data. Wilson seems to argue that a careful evaluation of the literature would reveal which paper or papers obtained correct results, but he does not suggest the evaluation criteria. The rest of the committee does not think that application of any scientific criteria to existing papers would identify the effects of right-to-carry laws on crime.

2. **Committee control variable analysis.** Chapter 6 shows that when the trend and dummy variable models do not include demographic and socioeconomic covariates (but do include year and county dummy variables) the estimates are relatively small, positive in one case (Table 6-6, Row 3), and statistically insignificant in all cases. Contrary to Wilson's assertion, the chapter does not claim that this or any other specification is correct. Rather, this finding simply reveals that "detecting the effect, if any, of right-to-carry laws requires controlling for appropriate confounding variables." In light of the fragility revealed in the literature, the fundamental issue is which set of covariates is sufficient to identify the effects of right-to-carry laws on homicide and other crimes. The importance of controlling for the correct set of covariates is well known. In fact, much of the debate between Lott and his statistically oriented critics focuses on determining the correct set of control variables. Everyone (including Wilson and the rest of the committee) agrees that control variables matter, but there is disagree-

Copyright © National Academy of Sciences. All rights reserved.

*274* *APPENDIX A*

ment on the correct set. Thus, the facts that there is no way to statistically test for the correct specification and that researchers using reasonable specifications find different answers are highly relevant. Given the existing data and methods, the rest of the committee sees little hope of resolving this fundamental statistical problem.

Furthermore, the example of the relationship between crime rates and policing in the dissent raises another problem. The usual way one proceeds in research is to estimate the relationship between two variables and if a significant relationship is found controls are introduced to test the relationship. As the dissent notes, these controls are selected based on reasonable theories and research. In this case, the bivariate relationship (between right to carry laws and crime) is small, positive in one case, and insignificant in all. This is not like the hypothesized conflicting bivariate findings in Wilson's police example. Thus the selection of controls in the analysis of right-to-carry laws is as difficult as the committee contends

**3. Committee trend model analysis.** Wilson states that the trend model analysis in Table 6-7 estimates the effects of right-to-carry laws on a yearly basis, rather than a single trend.[1] This is incorrect. The estimates reported in Table 6-7 are found using Lott's trend model with restrictions on the number of postadoption years used in the analysis. If the model is correctly specified, this restriction should be inconsequential. However, we find substantial differences, especially for murder. In fact, when we restrict the number of postadoption years to five or fewer, the estimates switch from negative to positive. Thus, Model 6.2 appears to be misspecified. Moreover, despite Wilson's assertion, these types of sensitivity test are commonly used in peer-reviewed journals and are suggested by Rosenbaum (2001) as a way to assess the robustness of an empirical model. Of course, results like those reported in Chapter 6 might often lead a paper to be rejected from a peer-reviewed journal.

Wilson further suggests that Lott's findings may depend on the crime rate trends that changed dramatically over the course of the 1990s. All of the studies in this literature, however, attempt to control for trends in crime, and thus purport to reveal a time invariant effect of right-to-carry laws. If the effects vary by time, all of the existing models are misspecified.

In sum, we are encouraged that Professor Wilson agrees with the rest of the committee except for the specific conclusion regarding the effects of right-to-carry laws on murder. On this point, we find his arguments to be unconvincing and his summary of some parts of the chapter inaccurate. In our view the evidence on homicide is not noticeably different from that on other crimes evaluated in this literature and cannot be easily separated. If

---

[1]Contrary to Wilson's claim, the results in Table 6-7 all rely on models with covariates.

Copyright © National Academy of Sciences. All rights reserved.

Firearms and Violence: A Critical Review
http://www.nap.edu/catalog/10881.html

the effects of right-to-carry laws on violent and property crimes are ambiguous, as argued in Chapter 6, we see no reason why the same is not true of homicide. Professor Wilson may be correct on this matter—it is theoretically possible—but we maintain that the scientific evidence does not support his position.

## REFERENCE

Rosenbaum, P.R.
   2001   Replicating effects and biases. *American Statistician* 55(3):223-227.

Copyright © National Academy of Sciences. All rights reserved.

# Appendix C

# Judicial Scrutiny of Challenged Gun Control Regulations: The Implications of an Individual Right Interpretation of the Second Amendment

*Scott Gast* [*]

As part of a divorce proceeding, Timothy Joe Emerson was enjoined by a court from taking any action to threaten or injure his wife. Several months after the imposition of this injunction, Emerson was indicted under a federal law prohibiting any person subject to such a court order from possessing a firearm.[1] Emerson challenged his indictment in part on the ground that this federal law violated his Second Amendment right to keep and bear arms.[2] To the surprise of many in the legal community, the United States Court of Appeals for the Fifth Circuit was sympathetic to his claim, holding that the Second Amendment does, in fact, protect an *individual's* right to keep and bear arms.[3]

Emerson's victory, however, was not unqualified. While the Fifth Circuit held that the Second Amendment protects an individual right, it explained that the right is not absolute:

---

[*]J.D., University of Virginia School of Law, 2002. The author would like to thank Professor Richard Bonnie for his thoughtful comments during the preparation of this paper. The author is currently an attorney at Covington & Burling in Washington, DC; the views expressed in this paper are his own.

[1]18 U.S.C. § 922(g)(8) provides in part that "It shall be unlawful for any person . . . who is subject to a court order that . . . restrains such person from harassing, stalking, or threatening an intimate partner of such person or child of such intimate partner or person, or engaging in other conduct that would place an intimate partner in reasonable fear of bodily injury to the partner or child . . . to ship or transport in interstate or foreign commerce, or possess in or affecting commerce, any firearm or ammunition."

[2]The Second Amendment provides, "A well regulated Militia, being necessary to the security of a free State, the right of the people to keep and bear Arms, shall not be infringed."

[3]*United States v. Emerson*, 270 F.3d 203, 264, reh'g denied, reh'g en banc denied, 281 F.3d 1281 (5th Cir. 2001), cert. denied, 536 U.S. 907 (June 10, 2002) (No. 01-8780).

*276*

Copyright © National Academy of Sciences. All rights reserved.

Firearms and Violence: A Critical Review
http://www.nap.edu/catalog/10881.html

> Although, as we have held, the Second Amendment does protect individu-
> al rights, that does not mean that those rights may never be made subject
> to any limited, narrowly tailored specific exceptions or restrictions for
> particular cases that are reasonable and not inconsistent with the right of
> Americans generally to keep and bear their private arms as historically
> understood in this country.[4]

The court went on to hold that the deprivation of Emerson's right in this
case was reasonable, finding "the nexus between firearm possession by the
party so enjoined and the threat of violence, is sufficient, though likely
barely so, to support the deprivation."[5]

The Fifth Circuit's decision in *Emerson* was significant as the first time
a federal appellate court had recognized an individual right interpretation
of the Second Amendment.[6] Shortly thereafter, in early 2003, several judges
of the Ninth Circuit Court of Appeals, while ultimately adhering to that
court's standing interpretation of the Second Amendment as guaranteeing a
collective right, indicated their own affinity for the reasoning in *Emerson*.[7]

---

[4]Id. at 261.

[5]Id. at 264.

[6]The federal courts of appeals that have addressed the interpretation of the Second Amend-
ment have favored (and, with the exception of the Fifth Circuit, still do favor) a collective
right interpretation. See, e.g., *Silveira v. Lockyer*, 312 F.3d 1052, 1087 (9th Cir. 2002), reh'g
en banc denied, 328 F.3d 567 (9th Cir. 2003) ("[W]e are persuaded that we were correct in
*Hickman* [v. *Block*, 81 F.3d 98 (9th Cir. 1996)] that the collective rights view, rather than the
individual rights models, reflects the proper interpretation of the Second Amendment.");
*United States v. Napier*, 233 F.3d 394, 403 (6th Cir. 2000) ("It is well-established that the
Second Amendment does not create an individual right."); *Gillespie v. City of Indianapolis*,
185 F.3d 693, 710 (7th Cir. 1999) (Second Amendment protection "inures not to the indi-
vidual but to the people collectively, its reach extending so far as is necessary to protect their
common interest in protection by a militia."); *United States v. Wright*, 117 F.3d 1265, 1273
(11th Cir. 1997), vacated in part on other grounds, *United States v. Wright*, 133 F.3d 1412
(11th Cir. 1998) ("The concerns motivating the creation of the Second Amendment convince
us that the amendment was intended to protect only the use or possession of weapons that is
reasonably related to a militia actively maintained and trained by the states."); *Love v.
Pepersack*, 47 F.3d 120, 122 (4th Cir. 1995) ("[T]he Second Amendment preserves a collec-
tive, rather than individual, right."); *United States v. Hale*, 978 F.2d 1016, 1019 (8th Cir.
1992) ("[W]e cannot conclude that the Second Amendment protects the individual possession
of military weapons.").

[7]Other courts of appeals have taken note of the Fifth Circuit's interpretation of the Second
Amendment, without necessarily embracing it. See, e.g., *United States v. Price*, 328 F.3d 958,
961 (7th Cir. 2003) (acknowledging the Fifth Circuit's decision in Emerson, as well as the
Attorney General's position outlined in his letter to the NRA, but concluding that "even were
we inclined to, there is no need for us to wade into that Second Amendment quagmire
because, although it espouses an individual rights approach to the Second Amendment, the
Emerson court agrees with our conclusion that rights under the amendment can be restricted");
*United States v. Wilson*, 315 F.3d 972, 973 n.3 (8th Cir. 2003) (acknowledging the Emerson
decision but noting that the Fifth Circuit "nonetheless upheld the constitutionality" of the
challenged firearm law).

Copyright © National Academy of Sciences. All rights reserved.

*278* *APPENDIX C*

In *Nordyke v. King* (2003), a panel of three circuit judges wrote that, "if we were writing on a blank slate, we may be inclined to follow the approach of the Fifth Circuit in *Emerson*."[8] One judge went even further, writing a special concurrence to emphasize his view that the Ninth Circuit had gotten its interpretation of the Second Amendment wrong, and that the court should now embrace an individual right view of the Amendment.[9] Despite their disagreement with the earlier court decision, the judges acknowledged that they were bound by the precedent set in *Hickman v. Block* (1996)[10] to hold that the Second Amendment protects a collective right of the people of the state. Other judges on the Ninth Circuit were not as sympathetic to *Emerson*; on May 6, 2003, the full Ninth Circuit declined the opportunity to reconsider *Hickman* by rehearing en banc arguments in *Silveira v. Lockyer* (2003) another Second Amendment case[11] (the vote on rehearing came after the panel decision in *Nordyke*, which criticized *Silveira*, had been issued), but not without public dissent from several judges on the Second Amendment issue.[12] The Ninth Circuit's action leaves the Fifth Circuit alone—at least for the moment—among the federal appellate courts in maintaining an individual right view of the Second Amendment.

Growing support for an individual right interpretation of the Second Amendment has not been limited to the judicial branch of government. On May 17, 2001, United States Attorney General John Ashcroft wrote the executive director of the National Rifle Association's (NRA) Institute for Legislative Action to express his view that "the text and the original intent of the Second Amendment clearly protect the right of individuals to keep and bear firearms."[13] The Department of Justice put the Attorney General's words into action when it filed a brief in opposition to a grant of certiorari in *Haney v. United States* (2001).[14] In that case, the Tenth Circuit had held that 18 U.S.C. § 922(o), which prohibits the possession of machine guns, did not violate the Second Amendment, as that constitutional provision was intended only to preserve the effectiveness of state militias.[15] In its brief opposing Supreme Court review of the Tenth Circuit's decision, the Justice

---

[8]*Nordyke v. King*, 319 F.3d 1185, 1191 (9th Cir. 2003) (Alarcon, O'Scannlain, and Gould, JJ.).

[9]Id. at 1192-93 (Gould, J., concurring).

[10]81 F.3d 98 (9th Cir. 1996).

[11]*Silveira v. Lockyer*, 328 F.3d 567, 568 (9th Cir. 2003).

[12]See id. (Pregurson, J., dissenting); id. (Kozinski, J., dissenting); id. at 570 (Kleinfeld, J., dissenting); id. at 589 (Gould, J., dissenting).

[13]Letter from John Ashcroft, Attorney General, United States Department of Justice, to James Jay Baker, Executive Director, National Rifle Association, Institute for Legislative Action (May 17, 2001) (on file with author).

[14]264 F.3d 1161 (10th Cir. 2001); Brief for the United States in Opposition to Petition for Certiorari in *United States v. Haney*, No. 01-8272 (U.S., May 6, 2002).

[15]Haney, 264 F.3d at 1165.

Copyright © National Academy of Sciences. All rights reserved.

Department acknowledged that "[t]he government agrees with petitioner that the Fifth Circuit's decision in *Emerson* reflects a sounder understanding of the scope of purpose of the Second Amendment than does the court of appeals' decision in the instant case."[16] Nevertheless, the government supported the decision of the appellate court that the federal law was a valid restriction on this individual right.[17]

The individual right interpretation has also received recent support in Congress. On July 15, 2003, United States Senator Orrin Hatch of Utah introduced the District of Columbia Personal Protection Act, which would repeal the District of Columbia's ban on firearm ownership and restrict the authority of the District's council to prohibit such ownership in the future. In introducing the measure, Senator Hatch noted that "this bill goes a long way toward restoring the constitutionally guaranteed right of Americans who reside in the District of Columbia to possess firearms."[18] His bill was introduced with 21 cosponsors.[19] In a similar vein, two public policy organizations filed separate lawsuits challenging the District of Columbia's handgun ban, arguing that it violates the Second Amendment.[20]

These developments are remarkable in that they signal an apparent momentum toward the widespread acceptance of an interpretation of the Second Amendment that protects an individual right to possess a firearm. If these developments continue and an individual right interpretation becomes accepted by the courts, another important question closely follows: assuming that individuals do have the constitutionally guaranteed right to keep

---

[16]Brief of the United States, supra note 14. In addition, in its opposition briefs in both the Haney and Emerson cases, the United States included as an appendix a November 9, 2001 memorandum from the Attorney General to all United States' Attorneys. In that memo, the Attorney General notes that, "In my view, the Emerson opinion, and the balance it strikes, generally reflect the correct understanding of the Second Amendment." Id.; Brief for the United States in Opposition to Petition for Certiorari in *United States v. Emerson*, No. 01-8780 (U.S. May 6, 2002).

[17]The United States Supreme Court has denied certiorari in Haney and in the Emerson case. *United States v. Haney*, 264 F.3d 1161 (10th Cir. 2001), cert. denied, 536 U.S. 907 (June 10, 2002); *United States v. Emerson*, 270 F.3d 203, (5th Cir. 2001), cert. denied, 536 U.S. 907 (June 10, 2002).

[18]149 Cong. Rec. S9425 (daily ed. July 15, 2003) (statement of Sen. Hatch).

[19]The original cosponsors were Senators George Allen (R-VA), Conrad Burns (R-MT), Saxby Chambliss (R-GA), Larry E. Craig (R-ID), Pete V. Domenici (R-NM), Lindsey O. Graham (R-SC), Kay Bailey Hutchison (R-TX), Zell Miller (D-GA), Jeff Sessions (R-AL), Ted Stevens (R-AK), Craig Thomas (R-WY), Jim Bunning (R-KY), Ben Nighthorse Campbell (R-CO), John Cornyn (R-TX), Michael D. Crapo (R-ID), Michael B. Enzi (R-WY), Charles E. Grassley (R-IA), Jim Inhofe (R-OK), Don Nickles (R-OK), Richard C. Shelby (R-AL), and John E. Sununu (R-NH).

[20]Arthur Santana, Pro-Gun Groups Split on Tactics; Cato Institute, NRA Quarrel Over Challenges to D.C. Law, Wash. Post, July 21, 2003, at B5.

Copyright © National Academy of Sciences. All rights reserved.

and bear arms, how are courts to determine what restrictions on that right are permissible? Many gun control measures currently on the federal, state, and local books can be characterized as infringements on the right to keep and bear arms. If a gun control measure is challenged as violating an individual Second Amendment right, courts will be required to determine whether the regulation is consistent with that constitutional guarantee. An individual right interpretation of the Second Amendment thus raises a host of issues, including what the scope of the constitutionally protected activity is, whether a particular restriction on that activity is so substantial as to amount to an "infringement," and whether a given infringement is nonetheless "reasonable," given the government's justification.

This appendix attempts to identify and explore the issues that arise under an individual right interpretation of the Second Amendment, as well as to demonstrate the need for detailed empirical research on the efficacy of various gun control measures in advancing purported state interests in reducing gun-related crime and violence. Part I continues to trace the fairly recent rise of the individual right interpretation, demonstrating why such an interpretation is a distinct possibility in the future. Part II addresses some of the legal issues that arise under such an interpretation. First, this section explores efforts to define the precise scope of an individual Second Amendment right. Second, this section considers what it means to constitute an "infringement" of the right. Finally, Part II looks at the balancing involved in determining when infringements will be tolerated because they serve other important state interests. Part III briefly explains the contribution empirical research can make in the context of this balancing approach.

## I. THE RISE OF AN INDIVIDUAL RIGHT INTERPRETATION OF THE SECOND AMENDMENT

The meaning of the Second Amendment's "right to keep and bear arms" has been the subject of intense scholarly debate in recent decades. The peculiar wording of the Second Amendment[21] and different readings of the history behind that amendment have offered room for differing points of view over the character of the right protected. From this debate, two general views of the extent of the Second Amendment right have emerged.

---

[21]But see Eugene Volokh, The Commonplace Second Amendment, 73 N.Y.U. L. Rev. 793 (1998) (surveying contemporary state constitutional provisions and concluding that the phrasing of the Second Amendment was not peculiar, but rather commonplace, at the time of its drafting).

Copyright © National Academy of Sciences. All rights reserved.

First, the "states' rights" or "collective rights" view of the Second Amendment argues that the amendment guarantees only the right of the *states* to create and maintain armed militias.[22] Under this interpretation, there is no individual right of private firearm ownership, but rather a collective right of the people or the states to an armed militia. Advocates of this model focus on the amendment's prefatory clause—"A well regulated Militia, being necessary to the security of a free State"—as limiting the right granted in the operative clause—"the right of the people to keep and bear Arms, shall not be infringed." The framers intended, according to this theory, that states be free to maintain and arm the type of militias referenced in the fifteenth and sixteenth clauses of Article I, Section 8 of the Constitution,[23] which give Congress the power to organize, arm, discipline, and call forth state militias. Outside this limited context, the amendment provides no protection.

A related (yet distinct) interpretation of the Second Amendment has been called the "sophisticated collective rights" model.[24] Under this view, the right protected is an individual one, but only to the extent that the individual protected is a member of a state militia. That is, an individual has the right to keep and bear arms when the state does not itself provide the arms for its militia. Proponents of this model read the prefatory clause as qualifying the right granted by the operative clause. For many supporters of the states' rights or the sophisticated states' rights theories, the demise of the importance of and need for state militias in modern society has stripped the Second Amendment of any modern day relevance.[25]

The second general view of the Second Amendment provides that the right guaranteed by that provision is the right of an *individual* to keep and

---

[22]See, e.g., Symposium on the Second Amendment: Fresh Looks, 76 Chi.-Kent L. Rev. 1 (2000); John Dwight Ingram & Allison Ann Ray, The Right (?) to Keep and Bear Arms, 27 N.M.L. Rev. 491 (1997); Keith A. Ehrman & Dennis A. Henigan, The Second Amendment in the Twentieth Century: Have You Seen Your Militia Lately?, 15 U. Dayton L. Rev. 5 (1989).

[23]Article I, § 8, cl. 15-16 provide: "The Congress shall have Power . . . To provide for calling forth the Militia to execute the Laws of the Union, suppress Insurrections and repel Invasions; To provide for organizing, arming, and disciplining, the Militia, and for governing such Part of them as may be employed in the Service of the United States, reserving to the States respectively, the Appointment of the Officers and the Authority of training the Militia according to the discipline prescribed by Congress."

[24]See, e.g., Nelson Lund, The Ends of Second Amendment Jurisprudence: Firearms Disabilities and Domestic Violence Restraining Orders, 4 Tex. Rev. L. & Pol. 157, 184-86 (1999); Robert J. Cottrol & Raymond T. Diamond, Book Review: The Fifth Auxiliary Right, 104 Yale L. J. 995, 1003-1004 (1995).

[25]See David C. Williams, Civic Republicanism and the Citizen Militia: The Terrifying Second Amendment, 101 Yale L. J. 551, 554 (1991) ("As we today have no such universal militia and assurance that contemporary arms-bearers will be virtuous, the Second Amendment itself is—for now—outdated. . . . The militia was a precondition for the right to arms. Without a militia, the right is meaningless.").

Copyright © National Academy of Sciences. All rights reserved.

*282* *APPENDIX C*

bear arms.[26] Proponents of this model rely on several arguments in support of an individual right interpretation, including the history[27] and the text of the amendment (the operative clause grants the right, while the prefatory clause is simply "an observation, or perhaps a cautionary note"[28]). In addition, individual right supporters note that the amendment's text guarantees the right to "the people," not to the states.[29] This phrase, it is argued, has a unique meaning in the Constitution, as discussed in a recent opinion by the Supreme Court:

> "The people" seems to have been a term of art employed in select parts of the Constitution. . . . The Second Amendment protects "the right of the people to keep and bear Arms," and the Ninth and Tenth Amendments provide that certain rights and powers are retained by and reserved to "the people." . . . While this textual exegesis is by no means conclusive, it suggests that "the people" protected by the Fourth Amendment, and by the First and Second Amendments, and to whom rights and powers are reserved in the Ninth and Tenth Amendments, refers to a class of persons who are part of a national community.[30]

Giving "the people" different meanings in different contexts within the Constitution, proponents argue, would be inconsistent. These arguments lead many commentators to conclude that the Second Amendment guarantees an individual right to private ownership of firearms.

### Academic Support of the Individual Right Interpretation

Support for the individual right view of the Second Amendment is relatively new to academic literature, but in recent decades this interpretation has become widely embraced in the scholarship. One commentator has suggested that the collective rights model was the uncontroversial interpretation of the Second Amendment for well over a century; then, between 1970 and 1989, the balance began to tip: 25 law review articles supporting the collective rights model were published, while 27 articles supporting the individual

---

[26]See, e.g., Volokh, The Commonplace Second Amendment, 73 N.Y.U. L. Rev. 793; Nelson Lund, The Past and Future of the Individual's Right to Arms, 31 Ga. L. Rev. 1 (1996); William Van Alstyne, The Second Amendment and the Personal Right to Arms, 43 Duke L. J. 1236, (1994); Sanford Levinson, The Embarrassing Second Amendment, 99 Yale L. J. 637 (1989).

[27]For example, the history is said to suggest that the militia envisioned by the Framers was a "militia of the whole, or at least one consisting of the entire able-bodied male population . . . equipped with their own arms." Cottrol & Diamond, The Fifth Auxiliary Right, 104 Yale L. J. at 1001.

[28]Id. at 1002.

[29]Id.

[30]*United States v. Verdugo-Urquidez*, 494 U.S. 259, 265 (1990) (citations omitted).

Copyright © National Academy of Sciences. All rights reserved.

rights interpretation appeared in the legal journals.[31] During the 1990s, 58 law review articles were published supporting the individual rights model; only 29 favored the collective rights model.[32] In fact, some went so far as to suggest that "so great is the new 'consensus' about the Second Amendment that 'much as physicists and cosmologists speak of the Standard Model in terms of the creation and evolution of the Universe' the individual right model could now be renamed the standard model."[33] One commentator suggests that these three elements motivated the rise of the individual right interpretation: "the mass of individual right literature, the endorsement of five prominent scholars, and the use of the term standard model."[34]

Another commentator has summarized recent academic writing on the Second Amendment by noting that of the 34 law review articles substantially discussing the amendment published between 1980 and 1996, only 3 endorsed the states' rights theory.[35] He further noted that the three states' rights articles were prepared for symposia in which antigun groups were asked to provide their positions; two of these were written by "lobbyists for anti-gun groups" and one by a politician.[36] In contrast, that author observed that the individual right interpretation had attracted the support of the majority of academics, including some of the "major figures in constitutional law."[37] Another commentator pointed out, however, that a significant number of the articles supporting the individual right model published between 1970 and 1989 were written by lawyers who had either been employed by or who represented gun rights organizations, including the NRA.[38]

Of course, the dearth of collective rights scholarship may have been the result of the perceived lack of any need for a defense of this interpretation. According to one commentator, "Until recently, there was little reason for

---

[31]Carl T. Bogus, The History and Politics of Second Amendment Scholarship: A Primer, 76 Chi.-Kent L. Rev. 3, 8-10 (2000) (citing Robert J. Spitzer, Lost and Found: Researching the Second Amendment, 76 Chi.-Kent L. Rev. 349, 366 (2000)). But see David B. Kopel, The Second Amendment in the Nineteenth Century, 1998 B.Y.U.L. Rev. 1359, 1544-45 (1998) (arguing that nineteenth century commentators and courts agreed that "the core meaning of the Amendment was well-settled": that it protected an individual right to gun firearms).

[32]Id. at 14 (citing Sptizer, Lost and Found, 76 Chi.-Kent L. Rev. at 377).

[33]Id. at 22 (quoting Glenn Harlan Reynolds, A Critical Guide to the Second Amendment, 62 Tenn. L. Rev. 461, 462 (1995)).

[34]Id. at 23.

[35]See Scott Bursor, Note, Toward a Functional Framework for Interpreting the Second Amendment, 74 Tex. L. Rev. 1125, 1126 n.13 (1996).

[36]Id.

[37]Id.

[38]Bogus, The History and Politics of Second Amendment Scholarship: A Primer, 76 Chi.-Kent L. Rev. at 8-10 (noting that 16 of the 25 articles supporting the pro-individual right model published between 1970 and 1989—nearly 60 percent—were written by such lawyers).

Copyright © National Academy of Sciences. All rights reserved.

*284* *APPENDIX C*

scholars agreeing with the collective right model to address the topic."[39]
This observation came in an introduction to a Symposium on the Second
Amendment sponsored by the *Chicago-Kent Law Review* in 2000, which was
designed to "take a fresh look at the Second Amendment and, particularly, the
collective right theory. This is not, therefore, a balanced symposium."[40] The
perceived need for such a "fresh look" suggests that the supporters of the
collective rights interpretation are prepared to step up their involvement in the
debate over the interpretation of this constitutional provision.

### The Federal Courts of Appeals and the Second Amendment

Those federal courts of appeals that have addressed the proper inter-
pretation of the Second Amendment have generally taken the collective or
states' rights view.[41] Illustrative of this approach is the Seventh Circuit's
opinion in *Gillespie v. City of Indianapolis* (1999), a case in which a former
police officer challenged a federal law prohibiting persons convicted of
domestic violence from possessing a firearm as violating his Second Amend-
ment right.[42] The court of appeals upheld the law, noting: "The link that
the amendment draws between the ability 'to keep and bear Arms' and '[a]
well regulated Militia' suggests that the right protected is limited, one that
inures not to the individual but to the people collectively, its reach extend-
ing so far as is necessary to protect their common interest in protection by
a militia."[43]

The Fifth Circuit's decision in *Emerson* is a clear break with this trend
(and the Ninth Circuit's opinion in *Nordyke* suggests further dissatisfaction
within the federal courts with the perpetuation of a collective rights inter-
pretation). The *Emerson* decision creates an obvious split among the cir-
cuits on an important constitutional question, suggesting that the U.S. Su-
preme Court may wish to grant certiorari in a Second Amendment case at
some point to provide a definitive answer to this question that divides the
federal circuits. The Supreme Court's previous Second Amendment juris-
prudence provides little guidance as to how the Court will rule if and when
it undertakes to answer this question.

### The Supreme Court and the Second Amendment

As noted at the outset of this paper, the U.S. Supreme Court has re-
cently declined to hear argument in two cases that squarely presented the

---

[39]Id. at 24.
[40]Id.
[41]See supra note 6.
[42]185 F.3d 693 (7th Cir. 1999).
[43]Id. at 710.

Copyright © National Academy of Sciences. All rights reserved.

Firearms and Violence: A Critical Review
http://www.nap.edu/catalog/10881.html

question of the proper interpretation of the Second Amendment.[44] Many scholars find this unfortunate, as the Court has addressed the proper interpretation of the Second Amendment on only a few previous occasions—and commentators sharply disagree as to what the Court actually said in those instances.

In *United States v. Miller* (1939), the Court's most recent and most extensive discussion of the amendment, the Court upheld the National Firearms Act against a challenge that it unconstitutionally infringed upon the Second Amendment right to bear arms.[45] Noting that the Constitution granted Congress the power to regulate and call forth state militias, the Court stated that "With obvious purpose to assure the continuation and render possible the effectiveness of such [Militia] forces the declaration and guarantee of the Second Amendment was made. It must be interpreted and applied with that end in view."[46] In that light, the Court found that:

> In the absence of any evidence tending to show that possession or use of "a shotgun having a barrel of less than eighteen inches in length" at this time has some reasonable relationship to the preservation or efficiency of a well regulated militia, we cannot say that the Second Amendment guarantees the right to keep and bear such an instrument. Certainly it is not within judicial notice that this weapon is any part of the ordinary military equipment or that its use could contribute to the common defense.[47]

The Court thus seemed to read the Second Amendment as inextricably intertwined with the maintenance of state militias.

Many academic commentators share the view that *Miller* supports a collective right interpretation of the Second Amendment. As one article stated, "The *Miller* Court thus clarified three things regarding the protection afforded by the Second Amendment: [including,] the right to keep and bear arms is a collective right for the benefit of the people—it is not an individual right . . . [thus] only a federal attempt to disarm organized state militias could possibly constitute a violation of the Second Amendment."[48] Another scholar has examined *Miller* in light of the Supreme Court's subsequent jurisprudence, concluding that, "These decisions suggest that, without directly facing the question, the Supreme Court has come to understand *Miller* as standing roughly for the collective right view of the Second Amendment."[49]

Other commentators have argued that the Court's opinion in *Miller* does not preclude an individual right interpretation of the Second Amend-

---

[44]See supra note 17.

[45]307 U.S. 174 (1939).

[46]Id. at 178.

[47]Id. (internal citations omitted).

[48]Ingram & Ray, The Right (?) to Keep and Bear Arms, 27 N.M.L. Rev. at 501.

[49]Michael C. Dorf, Symposium on the Second Amendment: Fresh Looks: What Does the Second Amendment Mean Today?, 76 Chi.-Kent L. Rev. 291, 298 (2000).

Copyright © National Academy of Sciences. All rights reserved.

*286* *APPENDIX C*

ment. Professor Nelson Lund has advanced three reasons for a narrow reading of *Miller*: "First, the Court's statement of its holding invites a narrow construction. Second, the logic that appears to underlie some of the Court's reasoning would lead to manifest absurdities. Third, the Court heard arguments on only one side of the case."[50] Thus, "*Miller* should be read to approve restrictions only on weapons that have the special characteristics shared by those identified in the National Firearms Act of 1934— i.e., slight value to law abiding citizens and high value to criminals."[51]

Brannon P. Denning and Glenn H. Reynolds have argued that, at the least, *Miller* does not deny that the Second Amendment protects an individual right to firearm ownership—as many federal courts have read that decision.[52] Their article first notes that the Supreme Court did not deny that the defendants in *Miller* had standing to raise the Second Amendment's guarantee as a defense to the charges against them—thus casting doubt on the argument that the Supreme Court had adopted a collective rights interpretation of the amendment (a defense that could be raised only by members of a militia).[53] The authors further argue that the Court's decision to reject the government's primary argument, an iteration of the collective rights model, undermines any conclusion that *Miller* adopted a collective rights interpretation. Rather, the Court reasoned that, assuming the Second Amendment protects an individual's right to bear arms, that right only extended to weapons suitable for use in a militia.[54] They emphasize that the government's argument was the only one before the Court; the defendants neither filed briefs nor appeared at oral argument.[55]

Recent Supreme Court opinions and other writings by the justices may provide some indication as to where certain justices stand on the question of the Second Amendment. On one hand, one commentator has noted that two current justices have suggested that the Court should reconsider the Second Amendment.[56] Justice Clarence Thomas has written that "a growing body of scholarly commentary indicates that the 'right to keep and bear arms' is, as the Amendment's text suggests, a personal right."[57] Justice Antonin Scalia has written that it would be "strange" if the Second Amend-

---

[50]Lund, The Ends of Second Amendment Jurisprudence, 4 Tex. Rev. Law & Pol. at 166.
[51]Id. at 171.
[52]Brannon P. Denning & Glenn H. Reynolds, Enduring and Empowering: The Bill of Rights in the Third Millennium: Telling Miller's Tale: A Reply to David Yassky, 65 Law & Contemp. Prob. 113, 114 (Spring 2002).
[53]Id. at 116-17.
[54]Id. at 118.
[55]Id. at 116
[56]Bogus, The History and Politics of Second Amendment Scholarship, 76 Chi.-Kent L. Rev. at 22-23.
[57]Id. at 23 n.104 (citing *Printz v. United States*, 521 U.S. 898, 939 n.2 (1997)).

Copyright © National Academy of Sciences. All rights reserved.

ment were found not to grant an individual right.[58] On the other hand, Justice David Souter, joined in a dissenting opinion by Justices John Paul Stevens, Ruth Bader Ginsburg, and Stephen Breyer, "hinted" that the amendment might protect a collective right.[59]

At the very least, the degree of debate over the proper reading of the Supreme Court's decision in *Miller* suggests that the issue remains unsettled. Thus, it does not appear that the Supreme Court will feel bound by stare decisis to support a collective rights interpretation of the Second Amendment, if and when that issue comes before the Court again.

## The Incorporation Question

A separate but important question in the interpretation of the Second Amendment is its reach. The provisions of the Bill of Rights were originally intended to limit the powers of the federal government. Beginning in the early 20th century, however, the Supreme Court began to apply some, but not all, of the Bill of Rights limitations to the states, in a process known as incorporation.[60] If the Second Amendment is found to protect an individual right to keep and bear arms, the question arises as to whether that protection extends only to federal restrictions on the right or whether it will reach state law restrictions as well.

Opponents of incorporation point to the Supreme Court's decisions in *United States v. Cruikshank*[61] (1875) and *Presser v. Illinois*[62] (1886) for the proposition that the Second Amendment has not been incorporated to apply to the states. Concededly, the *Presser* Court did say that the Second Amendment "is a limitation only upon the power of Congress and the National government, and not upon that of the States."[63] Yet it would be unfair to consider these decisions relevant today, as the doctrine of incorporation has been completely transformed since those decisions were rendered.[64] Until 1897, the Supreme Court had consistently refused to apply

---

[58]Id. (citing Antonin Scalia, A Matter of Interpretation: Federal Courts and the Law 136-37 n.13 (1997)).

[59]Id. (citing *United States v. Morrison*, 120 S. Ct. 1740, 1765 n.11 (2000) (Souter, J., dissenting)).

[60]See, e.g., *Twining v. New Jersey*, 211 U.S. 78, 99 (1908) (It "is possible that some of the personal rights safeguarded by the first eight Amendments against National action may also be safeguarded against state action, because a denial of them would be a denial of due process of law.... If this is so, it is not because those rights are enumerated in the first eight Amendments, but because they are of such a nature that they are included in the conception of due process of law").

[61]192 U.S. 542 (1875).

[62]116 U.S. 252 (1886).

[63]Id. at 265.

[64]See Don B. Kates, Jr., Handgun Prohibition and the Original Meaning of the Second Amendment, 82 Mich. L. Rev. 204, 252-57 (1983).

Copyright © National Academy of Sciences. All rights reserved.

the Bill of Rights provisions to the states.[65] It was not until *Chicago, Burlington & Quincy Railroad v. Chicago*[66] (1897) that the Court first suggested that the Due Process Clause of the Fourteenth Amendment could be a vehicle for incorporation.

Since the early incorporation cases, the Supreme Court has followed a process of "selective incorporation"—not all provisions of the Bill of Rights are automatically made applicable to the states. Rather, individual provisions must pass the test for incorporation outlined in *Palko v. Connecticut* (1937): to qualify for incorporation, a right must be "implicit in the concept of ordered liberty."[67] In *Duncan v. Louisiana* (1968), the Court elaborated on this test: the question is "whether a right is among those 'fundamental principles of liberty and justice which lie at the base of all our civil and political institutions,' whether it is 'basic in our system of jurisprudence,' and whether it is a 'fundamental right, essential of a fair trial.'"[68]

Since outlining the modern incorporation test, the Supreme Court has not reexamined the issue of incorporating the Second Amendment's guarantee into the concept of due process.[69] Commentators have argued that a faithful application of the modern test, however, would require incorporation of the amendment.[70] These commentators suggest that the text of the Second Amendment's prefatory clause, remarking on the right being "necessary for the security of a free State," is strikingly similar to the current incorporation test: "implicit in the concept of ordered liberty."[71] If the Second Amendment is deemed to protect an individual right, resolution of the incorporation question will determine how far the guarantee reaches: which restrictions—federal only or state as well—will be affected.

## II. REVIEWING RESTRICTIONS ON AN INDIVIDUAL SECOND AMENDMENT RIGHT

As previously noted, an individual right interpretation of the Second Amendment raises a number of issues: how to delineate the scope of the individual right, identify infringements of that right, and determine which

---

[65]See, e.g., *Barron v. Baltimore*, 32 U.S. (7 Pet.) 243, 247 (1833) ("The constitution was ordained and established by the people of the United States for themselves, for their own government, and not for the government of the individual states").

[66]166 U.S. 226 (1897).

[67]302 U.S. 319, 325 (1937).

[68]391 U.S. 145, 148-49 (1968) (citations omitted).

[69]See Lund, The Past and Future of the Individual's Right to Arms, 31 Ga. L. Rev. at 48 (listing three cases in which the Court has declined to address the issue).

[70]See id. at 50 ("If the Court has the slightest regard for doctrinal consistency, it will have no choice except to incorporate the Second Amendment").

[71]See id. at 53.

Copyright © National Academy of Sciences. All rights reserved.

Firearms and Violence: A Critical Review
http://www.nap.edu/catalog/10881.html

infringements are reasonable. Resolution of each of these issues will impact the ultimate determination of what gun control regulations will be permissible under the Second Amendment. For example, the scope of the individual right could be defined to exclude certain weapons from protection; thus, regulations touching on those weapons would not impact the constitutional guarantee at all. In addition, the definition of an infringement will determine whether a challenged regulation triggers judicial scrutiny or not, and at what level. Finally, court balancing of the extent of an infringement against the state interests offered as a justification for the infringement will be critical in determining what regulations are reasonable.

## The Scope of the Second Amendment Right

Determining the scope of activity that comes within the protection of the Second Amendment is itself an undertaking that raises a number of questions. For example, what "arms" are protected? What does it mean to "keep" or "bear" a protected arm? By its very terms, the Second Amendment appears to protect the right to keep and bear arms from any restriction whatsoever: "the right of the people to keep and bear Arms, *shall not be infringed*."[72] Yet no one seriously argues that private citizens should be allowed to possess nuclear weapons or shoulder-fired antiaircraft rockets.[73] Determining what is protected and what is not, especially given the technological and societal changes since the amendment was adopted, presents a difficult task; some have lamented that the process of outlining the scope of the Second Amendment's protections with any precision may be impossible.[74] One commentator has argued that the failure to coherently outline the scope of the right has led to an "erratic and ill-defined pattern of adjudication" that can be solved only "by developing a final and conclusive interpretation" of the amendment.[75] Determining the scope of protection is important in answering the threshold question of when the right is infringed. A narrow interpretation provides more room for the operation of gun control measures that limit an individual's ability to own a firearm

---

[72]U.S. Const. amend. II (emphasis added).

[73]See Lund, The Past and Future of the Individual's Right to Arms, 31 Ga. L. Rev. at 41-42.

[74]See, e.g., *Cases v. United States*, 131 F.2d 916, 922 (1st Cir. 1942) ("Considering the many variable factors bearing on the question it seems to us impossible to formulate any general test by which to determine the limits imposed by the Second Amendment but that each case under it, like cases under the due process clause, must be decided on its own facts and the line between what is and what is not a valid federal restriction pricked out by decided cases falling on one side or the other of the line.").

[75]Michelle Capezza, Comment: Controlling Guns: A Call for Consistency in Judicial Review of Challenges to Gun Control Legislation, 25 Seton Hall L. Rev. 1467, 1475 (1995).

Copyright © National Academy of Sciences. All rights reserved.

without raising the difficult balancing issues discussed below. Conversely, a broad conception of the "right" will implicate a greater number of gun control regulations as potentially impinging on the right.

Commentators have proposed several means of demarcating the scope of the Second Amendment's protections. One of the most commonly advanced methods is based on looking to the history and antecedents of the amendment in an effort to construct an idea of what the Constitution's drafters had in mind when they ratified it.[76] Under this approach, individual restrictions on private firearms ownership are measured against a conception of what the framers thought the Second Amendment should protect.

For example, commentator Don Kates has suggested a tripartite test for determining what "arms" are protected, developed from his reading of the history and antecedents of the Second Amendment, as well as the limited Supreme Court jurisprudence on the subject:

> That weapon must provably be (1) "of the kind in common use" among law-abiding people today; (2) useful and appropriate not just for military purposes, but also for law enforcement and individual self-defense, and (3) lineally descended from the kinds of weaponry known to the Founders.[77]

Kates goes on to identify two further "limiting principles" on the scope of the amendment's protection.[78] First, since the amendment only protects those arms which one can "keep and bear," "weapons too heavy or bulky for the ordinary person to carry are apparently not contemplated."[79] Second, he argues that the common law right that predated the Second Amendment did not extend to "'dangerous or unusual weapons' whose mere possession or exhibition 'are apt to terrify the people.'"[80]

Another approach to defining the scope of the Second Amendment is a "functional" approach, which again relies on the history of the amendment

---

[76]For an examination of the history behind the Second Amendment, see, e.g., Paul Finkelman, Symposium on the Second Amendment: Fresh Looks: "A Well Regulated Militia": The Second Amendment in Historical Perspective, 76 Chi.-Kent L. Rev. 195 (2000); Carl T. Bogus, The Hidden History of the Second Amendment, 31 U.C. Davis L. Rev. 309 (1998); Nelson Lund, The Past and Future of the Individual's Right to Arms, 31 Ga. L. Rev. 1 (1996); David E. Vandercoy, The History of the Second Amendment, 28 Val. U. L. Rev. 1007 (1994).

[77]Kates, Handgun Prohibition and the Original Meaning of the Second Amendment, 82 Mich. L. Rev. at 259.

[78]Id. at 261.

[79]Id. But see Garry Wills, "To Keep and Bear Arms," New York Review of Books (Sept. 21, 1995) (arguing that the phrase "bear arms" was originally understood as meaning to serve in the military: "To bear arms is, in itself, a military term. One does not bear arms against a rabbit.")

[80]Id. (quoting 4 W. Blackstone, Commentaries 149; 1 W. Hawkins, Pleas of the Crown, 136 (5th ed. 1771)).

Copyright © National Academy of Sciences. All rights reserved.

Firearms and Violence: A Critical Review
http://www.nap.edu/catalog/10881.html

and its historical predecessors.[81] One commentator starts with the recognition that "the original understanding of the Second Amendment was based on the belief that arms should perform military, political, civil, and moral functions" and that therefore "we ought to interpret the Amendment in a way that proscribes interference with armed citizens' capacity to perform those functions. That is, the four functions should serve as benchmarks for measuring the constitutional limits of interference with the right to keep and bear arms."[82]

In attempting to draw the line between activity protected by the Second Amendment and activity that is not, a useful analogy can be made to First Amendment free speech jurisprudence.[83] That amendment provides in relevant part that "Congress shall make no law . . . abridging the freedom of speech. . . ."[84] Like the Second Amendment, this provision speaks in absolute terms, apparently barring any infringement on the right of free expression. The courts have, however, sought to define the scope of protected expression by identifying those classes of speech that do not merit protection. For example, incitements of illegal activity,[85] fighting words,[86] and obscenity[87] have been held by the Supreme Court to be outside the area of constitutionally protected speech.

In determining what is unprotected expression, the Supreme Court has on occasion looked to the history of the First Amendment.[88] But relying on the history of the amendment and the framers' intentions regarding the freedom of speech is problematic, as there is evidence that the framers did not intend the protection to reach very far; according to one constitutional scholar, "Supreme Court cases dealing with freedom of expression focus less on the framers' intent than do cases involving many other constitutional provisions. There is relatively little that can be discerned as to the drafters' views other than their desire to prohibit prior restraints . . . and their rejection of the crime of seditious libel."[89]

---

[81]Bursor, Note, Toward a Functional Framework for Interpreting the Second Amendment, 74 Tex. L. Rev. 1125 (1996).

[82]Id. at 1146.

[83]Nelson Lund has proposed using the First Amendment as a model for interpreting the Second Amendment. See Lund, The Past and Future of the Individual's Right to Arms, 31 Ga. L. Rev. at 5.

[84]U.S. Const. amend. I.

[85]See *Brandenburg v. Ohio*, 395 U.S. 444 (1969).

[86]See *Chaplinksy v. New Hampshire*, 315 U.S. 568 (1942).

[87]See *Roth v. United States*, 354 U.S. 476 (1957).

[88]See, e.g., id. at 484 ("[I]mplicit in the history of the First Amendment is the rejection of obscenity as utterly without redeeming social importance.").

[89]Erwin Chemerinsky, Constitutional Law: Principles and Policies, at 750 (1997). See also Rodney A. Smolla, Smolla and Nimmer on Freedom of Speech, at 1-18 (1994) ("One can keep going round and round on the original meaning of the First Amendment, but no clear consistent vision of what the framers meant by freedom of speech will ever emerge.").

Copyright © National Academy of Sciences. All rights reserved.

More often, the Court has focused on a functional method of determining the scope of the First Amendment's protections. In *Chaplinsky v. New Hampshire* (1942), the Court stated that:

> [I]t is well understood that the right of free speech is not absolute at all times and under all circumstances. There are certain well-defined and narrowly limited classes of speech, the prevention and punishment of which have never been thought to raise any constitutional problem . . . . such utterances are no essential part of any exposition of ideas, and are of such slight social value as a step to truth that any benefit that may be derived from them is clearly outweighed by the social interest in order and morality.[90]

This approach focuses on the purposes behind the amendment—to foster the "exposition of ideas" and the search for "truth"—in an approach similar to the functional approach toward defining the Second Amendment discussed above.

Defining the scope of the Second Amendment's protection is one way in which the permissibility of challenged gun control measures can be evaluated. For example, if one accepts the Kates test outlined above as an accurate measure of the scope of the right, it is easy to see why handguns are clearly protected, while weapons like Saturday Night Specials or switchblade knives are not.[91] It could be argued that the amendment was never intended by the framers to protect ownership of these weapons from government regulation, because these weapons are not necessary for military, law enforcement, or self-defense purposes. Similarly, private ownership of nuclear weapons would not be protected, as such weapons are not lineal descendants of the types of weapons known to the framers. Assault rifles present a more difficult question: if one sees such weapons as direct descendants of the type of weapons used by the framers, as well as useful for modern military or law enforcement purposes, ownership of such rifles may be entitled to some level of protection. In any case, using such a test to determine the scope of protection provided by the amendment, a court could determine whether regulations that ban or otherwise restrict ownership of certain weapons implicate the Second Amendment's guarantee at all.

### "Infringements" on the Second Amendment Right

Once a core of protected activity is identified, the question becomes when a particular gun control regulation impinges on that protected sphere. Answering that question is not as straightforward as it may seem: one

---

[90]Chaplinsky, 315 U.S. at 571-72.

[91]Kates, Handgun Prohibition and the Original Meaning of the Second Amendment, 82 Mich. L. Rev. at 259-60.

Copyright © National Academy of Sciences. All rights reserved.

Firearms and Violence: A Critical Review
http://www.nap.edu/catalog/10881.html

commentator has noted that determining whether an infringement has occurred is closely bound up with the doctrinal considerations involved in defining the scope of a right and whether an infringement is justified. "[C]losely examining the way that courts determine whether a right has been infringed may be very relevant to defining the scope of the right and to evaluating the state's justification for impairing the right."[92] This commentator goes on to observe that "often the Court does not isolate the issue of infringement, but rather implicitly subsumes it within an analysis that focuses on the scope of the right and the state's justification for any purported impairment."[93]

The Supreme Court has held that not every regulation that impacts a constitutional right rises to the level of an infringement: "As our jurisprudence relating to all liberties save perhaps abortion has recognized, not every law which makes a right more difficult to exercise is, *ipso facto*, an infringement on that right."[94] To qualify as an "infringement," a government regulation must place a significant burden on the exercise of the right; indirect or incidental burdens may not be considered to "infringe" on protected activity.[95] The Supreme Court has indicated that the key to determining whether a right has been infringed is the "directness and substantiality of the interference."[96]

Again, the Supreme Court's consideration of burdens placed on the exercise of the First Amendment right to free speech is illustrative. The critical factor in identifying whether a regulation constitutes "infringement" on speech—and the level of scrutiny the regulation will then receive—is whether the regulation is considered content-based or content-neutral. "Content-based regulations are presumptively invalid"[97] and will be permitted only if they meet the demands of strict scrutiny. Preventing all speech on a particular subject places a heavy burden on the exercise of the right (making it impossible to exercise with regard to that particular subject), clearly rising to the level of an infringement.

"In contrast, regulations that are unrelated to the content of speech are subject to an intermediate level of scrutiny."[98] Time, place, or manner

---

[92]Alan Brownstein, How Rights Are Infringed: The Role of Undue Burden Analysis in Constitutional Doctrine, 45 Hastings L.J. 867, 869 (1994) (internal citations omitted).

[93]Id. at 871 (internal citations omitted).

[94]*Planned Parenthood v. Casey*, 505 U.S. 833, 873 (1992).

[95]See Michael C. Dorf, Incidental Burdens on Fundamental Rights, 109 Harv. L. Rev. 1175, 1177-78 (1996) ("A law imposing a direct burden will be permitted to override a fundamental right only if the law is narrowly drawn to serve a compelling interest. In contrast, laws imposing incidental burdens trigger more deferential judicial scrutiny."). See also Brownstein, How Rights Are Infringed, 45 Hastings L.J. 867 (1994).

[96]*Zablocki v. Redhail*, 434 U.S. 374, 387 n.12 (1978).

[97]*R.A.V. v. City of St. Paul*, 505 U.S. 377, 382 (1992).

[98]*Turner Broad. Sys. v. Fed. Communications Comm'n*, 512 U.S. 622, 642 (1994).

Copyright © National Academy of Sciences. All rights reserved.

restrictions are familiar examples of permissible regulations on speech. Such regulations apply to all speech regardless of its content; they simply regulate the secondary effects of the exercise of the right. Nonetheless, limiting the time, place, or manner in which one can permissibly express one's ideas does make the exercise of the right more difficult. The key difference is that the burdens created by these regulations are not so significant as to cross the threshold to become an "infringement."

Many gun control regulations burden the exercise of an individual right to private firearm ownership in one way or another, but many of these regulations may nevertheless be permissible if the burdens they impose do not rise to significant levels. At one extreme, a federal or state law that bans the possession of *any* type of firearm by an individual would clearly constitute an infringement of an individual Second Amendment right. Laws that prohibit whole classes of individuals (e.g., felons, minors, the mentally ill) from possessing firearms would similarly seem to constitute an infringement of the right as to those individuals (albeit justifiable ones).[99] Laws that prohibit the possession of whole classes of weapons would appear to make the exercise of the right more difficult.[100] Other provisions like firearm licensing or registration requirements also arguably place burdens on an individual's exercise of the right to bear arms.[101] Whether such regulations amount to "infringements" will depend on the directness and substantiality of the burden.

As the foregoing discussion illustrates, a permissible gun control regulation could be characterized in a number of ways. The regulation could be permissible because it is considered to impact activity that falls outside the Second Amendment's sphere of protection. It could be permissible because it places only an incidental or insignificant burden on the exercise of the right, and therefore does not constitute an "infringement." Finally, as the next section discusses, the regulation could be an "infringement" on protected activity, but nonetheless permissible because the infringement is justified by serving a compelling government interest.

---

[99]Felons, infants, and those of unsound mind are permissibly prohibited from possessing a firearm. See Stephen P. Halbrook, What the Framers Intended: A Linguistic Analysis of the Right to "Bear Arms," 49 Law & Contemp. Probs. 151 (1986). The permissibility of such regulations is not because the regulations do not constitute "infringements" but rather because courts have found such infringements to be "reasonable." See Part II-C.

[100]The permissibility of some of these restrictions (e.g., a ban on assault weapons) may be addressed by a definition of the scope of the Amendment's protections. See Part II-A.

[101]Don Kates has argued that licensing or registration requirements do not infringe upon the Second Amendment because "the historical background of the second amendment seems inconsistent with any notion of anonymity or privacy insofar as the mere fact of one's possessing a firearm is concerned." Handgun Prohibition and the Original Meaning of the Second Amendment, 82 Mich. L. Rev. at 266.

Copyright © National Academy of Sciences. All rights reserved.

Firearms and Violence: A Critical Review
http://www.nap.edu/catalog/10881.html

### "Reasonable" Infringements on the Second Amendment Right

Even if a regulation is found to rise to the level of an "infringement" of the Second Amendment's sphere of protected activity, that regulation may still be permissible. The Supreme Court has made clear that constitutional rights are subject to "reasonable" restrictions. The Court has recognized that there may be legitimate and compelling reasons for a regulation that outweigh any minimal harm caused by the constitutional infringement. Determining when such infringements are "reasonable" requires courts to balance the extent of the alleged infringement against the state interest offered as a justification for that infringement.

This heightened judicial scrutiny comes in a several forms. The most demanding level of court examination is strict scrutiny, which is typically reserved for infringements on so-called fundamental rights.[102] Under the strict scrutiny regime, an infringement will be upheld only if it is narrowly drawn to serve a compelling state interest. In *Moore v. City of East Cleveland* (1977), the Supreme Court formulated the strict scrutiny test as follows: "When the government intrudes on a fundamental right, this Court must examine carefully the importance of the governmental interests advanced and the extent to which they are served by the challenged regulation."[103] In addition, the government action must be narrowly tailored: the governmental interests must not be attainable through any less restrictive means.[104]

Thus, the first question under strict scrutiny is whether the government can demonstrate a "compelling" interest that is served by the infringement of the right. Protecting the public from gun-related crime or gun-related accidents certainly seems compelling—even pro-individual right commentators have suggested that such state interests amount to "sufficiently wor-

---

[102]The Second Amendment, as an explicit provision of the Bill of Rights, may qualify as a fundamental right. The Supreme Court has indicated that the express provisions of the Bill of Rights should not be arranged in any "hierarchy." See, e.g., *Valley Forge Christian College v. Americans United for Separation of Church and State*, 454 U.S. 464, 484-85 (1982) ("[W]e know of no principled basis on which to create a hierarchy of constitutional values."); *Ullmann v. United States*, 350 U.S. 422, 428-29 (1956) ("As no constitutional guarantee enjoys preference, so none should suffer subordination or deletion. . . . To view a particular provision of the Bill of Rights with disfavor inevitably results in a constricted application of it. This is to disrespect the Constitution."). In addition, the incorporation test noted earlier provides guidance as to what rights are so "fundamental" as to require incorporation. Addressing this related question of incorporation, Professor Nelson Lund has argued, "The right protected by the Second Amendment meets the Court's test of what is 'fundamental' far more easily than other rights that have already been incorporated, some of which were never included in the fundamental documents of the English constitution." The Past and Future of the Individual's Right to Arms, 31 Ga. L. Rev. at 55.

[103]431 U.S. 494, 499 (1977).

[104]See Chemerinsky, Constitutional Law, at 643.

Copyright © National Academy of Sciences. All rights reserved.

*296* *APPENDIX C*

thy government purposes."[105] Once a compelling purpose is identified, a court must then determine whether that interest is furthered by the regulation in a narrowly tailored way. This prong of the test actually encompasses two related questions: first, whether the challenged regulation actually does further the achievement of the government interest, and second, whether the regulation furthers that interest in a manner that causes the least possible amount of infringement.

Lund has suggested that First Amendment principles are here again helpfully translated to the Second Amendment context: "In both cases, the Constitution establishes a rule that protects a human activity that its Framers regarded as a natural right. . . . In both cases, the Constitution reflects a determination that social benefits of giving legal protection to the instruments needed for the pursuit of those goals will outweigh the inconveniences arising from their misuse. In both cases, the erection of this barrier against the state governments will necessarily involve the courts in the business of balancing the public welfare against the interests of those individuals whose liberty the government wants to restrict."[106]

In the First Amendment context, different types of speech are subject to different levels of protection, based primarily on an assessment of the value or "hardiness" of the type of speech involved. For example, political speech is generally considered deserving of more protection than commercial speech. This differential treatment is implicit in the balancing process involved in reviewing restrictions on speech: "The categories of unprotected and less protected speech reflect value judgments by the Supreme Court that the justifications for regulating such speech outweigh the value of the expression."[107]

Heightened judicial scrutiny may also be applied through an "undue burden" standard. This standard was announced in *Planned Parenthood v. Casey* (1992), in which the Court held that restrictions on the right to decide whether to terminate a pregnancy were invalid if they placed an "undue burden" on the exercise of that right or, in other words, if a regulation "has the purpose or effect of placing a substantial obstacle in the path of a woman" seeking to exercise this right.[108] The "undue burden" standard, however, may be unique to the abortion context, and its applicability to the Second Amendment is unclear.

As noted above, laws that prohibit certain classes of individuals from possessing any firearms constitute an infringement of the individual Second

---

[105]Lund, The Ends of Second Amendment Jurisprudence, 4 Tex. Rev. Law & Pol. at 189.

[106]Lund, The Past and Future of the Individual's Right to Arms, 31 Ga. L. Rev. at 69.

[107]Chemerinsky, Constitutional Law, at 801 (Chemerinsky goes on to note, "For each of the categories . . . the Court's judgment can be questioned.").

[108]505 U.S. 833, 874, 877 (1992).

Copyright © National Academy of Sciences. All rights reserved.

*JUDICIAL SCRUTINY OF CHALLENGED GUN CONTROL REGULATIONS    297*

Amendment right. Nonetheless, courts have upheld such regulations as reasonable: the asserted state interest in protecting the public from individuals who may not have the capacity or judgment to possess and use a firearm properly clearly outweighs the extent of the infringement.

## III. THE CONTRIBUTION OF EMPIRICAL RESEARCH TO JUDICIAL SCRUTINY

The balancing common to the various methods of heightened judicial scrutiny discussed above is only enhanced by empirical analysis of how well a challenged regulation actually does or does not achieve its purported state interest. The alternatives to relying on empirical data are either to trust the intuitions of judges or to completely defer to the judgments of the legislatures that enact the gun control measures. Both alternatives are unsatisfactory.

The Supreme Court has noted the importance of empirical data in resolving challenges to First Amendment restrictions. In *Nixon v. Shrink Missouri Government PAC* (2000), the Court noted that "[t]he quantum of empirical evidence needed to satisfy heightened judicial scrutiny of legislative judgments will vary up or down with the novelty and plausibility of the justification raised. . . . We have never accepted mere conjecture as adequate to carry a First Amendment burden. . . ."[109] In *Renton v. Playtime Theatres* (1986) another First Amendment case, the Supreme Court noted that, "The First Amendment does not require a city, before enacting . . . an ordinance, to conduct new studies or produce evidence independent of that already generated by other cities, *so long as whatever evidence the city relies on is reasonably believed to be relevant to the problem that the city addresses.*"[110]

Empirical data are also important in the context of the dormant Commerce Clause balancing test. The Supreme Court has stated that state-imposed burdens on the free flow of interstate commerce cannot be justified by "simply invoking the convenient apologetics of the police power."[111] On another occasion the Court warned that "the incantation of a purpose to promote the public health or safety does not insulate a state law from Commerce Clause attack. Regulations designed for that salutary purpose nevertheless may further the purpose so marginally, and interfere with commerce so substantially, as to be invalid."[112] The Court has often re-

---

[109]528 U.S. 377, 391-92 (2000).

[110]475 U.S. 41, 51-52 (1986) (emphasis added).

[111]*Southern Pacific Co. v. Arizona ex rel. Sullivan*, 325 U.S. 761, 779-80 (1945) (quoting *Kansas City S. Ry. v. Kaw Valley Dist.*, 233 U.S. 75, 79 (1914)).

[112]*Kassell v. Consol. Freightways Corp.*, 450 U.S. 662, 670 (1981).

Copyright © National Academy of Sciences. All rights reserved.

*298*                                                          *APPENDIX C*

quired states defending challenged regulations to provide extensive empirical and statistical evidence to support their proffered justifications.[113]

Resorting to the mere "incantation of a purpose to promote the public health or safety" is an intellectually empty means for a government to justify its challenged gun control regulations. As the Supreme Court has made clear in other contexts, those justifications must and should be supported by scientifically verifiable empirical evidence. If the Second Amendment is ultimately given an individual right interpretation, studies exploring the efficacy of gun control regulations in reducing gun-related crime and violence (or in promoting other compelling state interests) will be needed to accurately balance the true benefits of the regulation against the costs imposed by infringements on the right.

## CONCLUSION

As demonstrated by the recent accumulation of academic support, as well as the Fifth Circuit's decision in *Emerson*, an individual right interpretation of the Second Amendment is a distinct possibility for the future. Such an interpretation would have many implications for the judicial review of challenged gun control regulations. This appendix has identified some of the issues raised by an individual right interpretation. First, courts and commentators will be required to attempt a more concrete delineation of the scope of an individual right. A comprehensive definition of the amendment's scope can be used to identify those regulations that impact constitutionally protected activity and those that do not. Second, once an area of protected activity is identified, criteria must be developed for determining when a regulation places so significant a burden on the exercise of the right as to amount to an "infringement." Finally, courts will be required to engage in fact-intensive balancing tests, weighing the cost of an infringement against the benefits to the compelling state interest in reducing gun-related crime and violence, to determine what infringements are "reasonable" and thus permissible.

With regard to the balancing of interests in making "reasonableness" determinations, courts as well as legislatures will be greatly aided by scientifically verified empirical studies that test the efficacy of various gun control measures in achieving their purported objectives. In other balancing contexts—including First Amendment and dormant Commerce Clause jurisprudence—the Supreme Court has emphasized the need for more than just appeals to the public interest. The availability of empirical data will make this balancing more accurate and reliable.

---

[113]See, e.g., Kassell, 450 U.S. at 672-75 (undertaking an extensive review of lower court findings regarding the economic impact and safety effects of state regulations restricting the length of vehicles operating on the state's roads); Southern Pacific, 325 U.S. at 770-79 (undertaking an extensive review of the lower court findings regarding the impact of train length regulations on safety and commerce).

Copyright © National Academy of Sciences. All rights reserved.

# Appendix D

# Statistical Issues in the Evaluation of the Effects of Right-to-Carry Laws

*Joel L. Horowitz*

ifferent investigators have obtained conflicting estimates of the effects of right-to-carry laws on crime. Moreover, the estimates are sensitive to relatively minor changes in data and the specifications of models. This paper presents a statistical framework that explains the conflicts and why there is little likelihood that persuasive conclusions about the effects of right-to-carry laws can be drawn from analyses of observational (nonexperimental) data. The framework has two main parts. The first relates to the difficulty of choosing the right explanatory variables for a model. The second relates to the difficulty of estimating the relation among crime rates, the explanatory variables, and the adoption of right-to-carry laws even if the correct explanatory variables are known.

## CHOOSING THE EXPLANATORY VARIABLES

The effect on crime of having a right-to-carry law in effect at a given time and place may be defined as the difference between the crime rate (or its logarithm) with the law in effect and the crime rate (or its logarithm) without the law. The fundamental problem in measuring the effect of a right-to-carry law (as well as in evaluating other public policy measures) is that at any given time and place, a right-to-carry law is either in effect or not in effect. Therefore, one can measure the crime rate with the law in effect or without it, depending on the state of affairs at the time and place of interest, but not both with and without the law. Consequently, one of the two measurements needed to implement the definition of the law's effect is

*299*

Copyright © National Academy of Sciences. All rights reserved.

always missing. To estimate the law's effect, one must have a way of "filling in" the missing observation.

The discussion of this problem can be streamlined considerably by using mathematical notation. Let $i$ index locations (possibly counties) and $t$ index time periods (possibly years). Let $Y_{it}^+$ denote the crime rate that county $i$ would have in year $t$ with a right-to-carry law in effect. Let $Y_{it}^-$ denote the crime rate that county $i$ would have in year $t$ without such a law. Then the effect of the law on the crime rate is defined as $\Delta_{it} = Y_{it}^+ - Y_{it}^-$ under the assumption that all other factors affecting crime are the same with or without the law. The fundamental measurement problem is that one can observe either $Y_{it}^+$ (if the law is in effect in county $i$ and year $t$) or $Y_{it}^-$ (if the law is not in effect in county $i$ and year $t$) but not both. Therefore, $\Delta_{it}$ can never be observed.

One possible solution to this problem consists of replacing the unobservable $\Delta_{it}$ by the difference between the crime rates after and before adoption of a right-to-carry law (in other words, carrying out a before-and-after study). For example, suppose that county $i$ (or county $i$'s state) adopts a right-to-carry law in year $s$. Then one can observe $Y_{it}^-$ whenever $t < s$ and $Y_{it}^+$ whenever $t > s$. Thus, one might consider measuring the effect of the law by (for example) $Y_{i,s+1}^+ - Y_{i,s-1}^-$ (the crime rate a year after adoption minus the crime rate a year before adoption). However, this approach has several serious difficulties.

First, factors that affect crime other than adoption of a right-to-carry law may change between years $s - 1$ and $s + 1$. For example, economic conditions, levels of police activity, or conditions in drug markets may change. If this happens, then $Y_{i,s+1}^+ - Y_{i,s-1}^-$ measures the combined effect of all of the changes that took place, not the effect of the right-to-carry law alone. Second, $Y_{i,s+1}^+ - Y_{i,s-1}^-$ can give a misleading indication of the effect of the law's adoption even if no other relevant factors change. For example, suppose that crime increases each year before the law's adoption and decreases at the same rate each year after adoption (Figure C-1). Then $Y_{i,s+1}^+ - Y_{i,s-1}^- = 0$, indicating no change in crime levels, even though the trend in crime reversed in the year of adoption of the right-to-carry law. Taking the difference between multiyear averages of crime levels after and before adoption of the law would give a similarly misleading indication. This has been pointed out by Lott (2000:135) in his response to Black and Nagin (1998). As a third example, right-to-carry laws might be enacted in response to crime waves that would peak and decrease even without the laws. If this happens, then $Y_{i,s+1}^+ - Y_{i,s-1}^-$ might reflect mainly the dynamics of crime waves rather than the effects of right-to-carry laws.

Finally, the states that have right-to-carry laws in effect in a given year may be systematically different from the states that do not have these laws in effect. Indeed, Lott (2000:119) found that in his data, "states adopting

Copyright © National Academy of Sciences. All rights reserved.

Firearms and Violence: A Critical Review
http://www.nap.edu/catalog/10881.html



**FIGURE D-1** Hypothetical crime rates by year.
NOTE: An increasing trend reverses in year 5, but the crime rate is the same in years 4 and 6. The average crime rate over years 5-9 is the same as it is over years 1-5.

[right-to-carry] laws are relatively Republican with large National Rifle Association memberships and low but rising rates of violent crime and property crime." Non-time-varying systematic differences among states are accounted for by the fixed effects, $\gamma_i$, in Models 6.1 and 6.2 in Chapter 6. However, if there are time-varying factors that differ systematically among states with and without right-to-carry laws and that influence the laws' effects on crime, then the effects of enacting these laws in states that do not have them cannot be predicted from the experience of states that do have them, even if the other problems just described are not present.

The foregoing problems would not arise if the counties that have right-to-carry laws could be selected randomly. Of course, this is not possible, but consideration of the hypothetical situation in which it is possible provides insight into the methods that are used to estimate the effects of real-world right-to-carry laws. If the counties that have right-to-carry laws in year $t$ are selected randomly, then there can be no systematic differences between counties with and without these laws in year $t$. Consequently, the average value of $Y_{it}^+$ is the same across counties in year $t$ regardless of whether a right-to-carry law is in effect. Similarly, the average value of $Y_{it}^-$ is the same across counties. It follows that the *average* effect on crime of the right-to-carry law is the average value of $Y_{it}^+$ in counties with the law

Copyright © National Academy of Sciences. All rights reserved.

minus the average value of $Y_{it}^-$ in counties that do not have the law. In other words, the average effect is the average value of the *observed* crime rate in counties with the law minus the average value of the *observed* crime rate in counties that do not have the law.[1]

In the real world, the counties that have right-to-carry laws cannot be selected randomly, but one might hope that the benefits of randomization can be achieved by "controlling" the variables that are responsible for "relevant" systematic differences between counties that do and do not have right-to-carry laws. Specifically, suppose that the relevant variables are denoted by $X$. Suppose further that the average value of $Y_{it}^+$ is the same across counties that have the same value of $X$, regardless of whether a right-to-carry law is in effect. Similarly, suppose that the average value of $Y_{it}^-$ is the same across counties that have the same value of $X$. If these conditions are satisfied, then the average effect on crime of adoption of a right-to-carry law in counties with a specified value of $X$ is the average of the observed crime rates in counties with the specified value of $X$ that have the law in place minus the average of the observed crime rates in counties with the specified value of $X$ that do not have the law. This is the idea on which all of the models of Lott and his critics are based.

The problem with this idea is that the variables that should be included in $X$ are unknown, and it is not possible to carry out an empirical test of whether a proposed set of $X$ variables is the correct one. This is because the answer to the question whether $X$ is a proper set of control variables depends on the relation of $X$ to the unobservable counterfactual outcomes ($Y_{it}^+$ in counties that do not have right-to-carry laws in year $t$ and $Y_{it}^-$ in counties that do have the laws in year $t$). Thus, it is largely a matter of opinion which set to use. A set that seems credible to one investigator may lack credibility to another. This problem is the source of the disagreement between Lott and his critics over Lott's use of the arrest rate as an explanatory variable in his models. It is also the source of other claims that Lott may not have accounted for all relevant influences on crime. See, for example, Ayers and Donohue (1999:464-465) and Lott's response (Lott, 2000:213-215).[2]

---

[1]This conclusion—but with measures of health status in place of crime rates—forms the justification for using randomized clinical trials to evaluate new drugs, medical devices, and medical procedures.

[2]Lott and his critics use panel data in which each county is observed in each of many years. Panel data provide a form of "automatic" control over unobserved factors that differ among counties but are constant within each county over time. There can, however, be no assurance that all unobserved factors that are relevant to the effectiveness of right-to-carry laws are constant over time within counties. Nor is there any assurance that the models used by Lott and his critics correctly represent the effects of such factors.

Copyright © National Academy of Sciences. All rights reserved.

*STATISTICAL ISSUES AND RIGHT-TO-CARRY LAWS* *303*

Lott is aware of this problem. In response, he argues that his study used "the most comprehensive set of control variables yet used in a study of crime, let alone any previous study on gun control" (Lott, 2000:153). There are two problems with this argument. First, although it is true that Lott uses a large set of control variables (his data contain over 100 variables, though not all are used in each of his models), he is limited by the availability of data. There is (and can be) no assurance that his data contain all relevant variables. Second, it is possible to control for *too many* variables. Specifically, suppose that there are two sets of potential explanatory variables, $X$ and $Z$. Then it is possible for the average value of $Y_{it}^+$ to be the same among counties with the same value of $X$, regardless of whether a right-to-carry law is in place, whereas the average value of $Y_{it}^+$ among counties with the same values of $X$ and $Z$ depends on whether a right-to-carry law has been adopted. The same possibility applies to $Y_{it}^-$. In summary, it is not enough to use a very large set of control or explanatory variables. Rather, one must use a set that consists of just the right variables and, in general, no extra ones.[3]

In fact, there is evidence of uncontrolled (or, possibly, overcontrolled) systematic differences among counties with and without right-to-carry laws in effect. Donohue (2002: Tables 5-6) estimated models in which future adoption of a right-to-carry law is used as an explanatory variable of crime levels prior to the law's adoption. He found a statistically significant relation between crime levels and future adoption of a right-to-carry law, even after controlling for what he calls "an array of explanatory variables." This result implies that there are systematic differences between adopting and nonadopting states that are not accounted for by the explanatory variables In other words, there are variables that affect crime rates but are not in the model, and it is possible that the omitted variables are the causes of any apparent effects of adoption of right-to-carry laws.[4]

---

[3]Bronars and Lott (1998) and Lott (2000) have attempted to control for confounding variables by comparing changes in crime rates in neighboring counties such that some counties are in a state that adopted a right-to-carry law and others are in a state that did not adopt the law. Bronars and Lott (1998) and Lott (2000) found that crime rates tend to decrease in counties where the law was adopted and increase in neighboring counties where the law was not adopted. The issues raised by this finding (and by any conclusion that differential changes in crime levels in neighboring counties are caused by adoption or nonadoption of right-to-carry laws) are identical to the issues raised by the results of Lott's main models, Models 6.1 and 6.2 in Chapter 6.

[4]If the explanatory variables accounted for all systematic differences in crime rates, then the average crime rate conditional on the explanatory variables would be independent of the adoption variable. Thus, future adoption of a right-to-carry law would not have any explanatory power.

Lott and Mustard (1997, Table 11) and Lott (2000:118) attempted to control for omitted variables affecting crime by carrying out a procedure called "two-stage least squares" (2SLS).

Copyright © National Academy of Sciences. All rights reserved.

*304* *APPENDIX D*

There is also evidence that estimates of the effects of these laws are sensitive to the choice of explanatory variables. See, for example, the discussion of Table 6-5 in Chapter 6. Thus, the choice of explanatory variables matters. As has already been explained, there is and can be no empirical test for whether a proposed set of explanatory variables is correct. There is little prospect for achieving an empirically supportable agreement on the right set of variables. For this reason, in addition to the goodness-of-fit problems that are discussed next, it is unlikely that there can be an empirically based resolution of the question of whether Lott has reached the correct conclusions about the effects of right-to-carry laws on crime.[5]

## ESTIMATING THE RELATION AMONG CRIME RATES, THE EXPLANATORY VARIABLES, AND ADOPTION OF RIGHT-TO-CARRY LAWS

This section discusses the problem of estimating the average crime rate in counties that have the same values of a set of explanatory variables $X$ and that have (or do not have) right-to-carry laws in effect. Specifically, let $Z_{it} = 1$ if county $i$ has a right-to-carry law in effect in year $t$, and let $Z_{it} = 0$ if county $i$ does not have such a law in year $t$. Let $Y_{it}$ denote the crime rate (or its logarithm) in county $i$ and year $t$, regardless of whether a right-to-carry law is in effect. The objective in this section is to estimate the average values of $Y_{it}$ conditional on $Z_{it} = 1$ and $Y_{it}$ conditional on $Z_{it} = 0$ for counties in which the explanatory variables $X$ have the same values, say $X = X_0$. Denote these averages by $E(Y_{it} \mid Z_{it} = 1, X_0)$ and $E(Y_{it} \mid Z_{it} = 0, X_0)$, respectively. $E(Y_{it} \mid Z_{it} = 1, X_0)$ is the average crime rate in year $t$ in counties that have right-to-carry laws and whose explanatory variables have the values

---

However, the 2SLS estimates of the effects of right-to-carry laws on the incidence of violent crimes differ by factors of 15 to 42, depending on the crime, from the estimates in Lott's Table 4.1 and are implausibly large. For example, according to the 2SLS estimates reported by Lott and Mustard (1997, Table 11), adoption of right-to-carry laws reduces all violent crimes by 72 percent, murders by 67 percent, and aggravated assaults by 73 percent. 2SLS works by using explanatory variables called instruments to control the effects of any missing variables. A valid instrument must be correlated with the variable indicating the presence or absence of a right-to-carry law but otherwise unrelated to fluctuations in crime that are not explained by the covariates of the model. In Lott and Mustard (1997) and Lott (2000), the instruments include levels and changes in levels of crime rates and are, by definition, correlated with the dependent variables of the models. Thus, they are unlikely to be valid instruments. It is likely, therefore, that Lott's and Mustard's 2SLS estimates are artifacts of the use of invalid instruments and other forms of specification errors.

[5]The problem of not knowing the correct set of explanatory variables is pervasive in evaluation of the effects of public policy measures. The sensitivity of estimated results to the choice of variables and the inability to resolve controversies over which variables should be used has led to the use of randomized experiments to evaluate social programs, such as job training and income maintenance.

Copyright © National Academy of Sciences. All rights reserved.

$X_0$. $E(Y_{it} | Z_{it} = 0, X_0)$ is the average crime rate in year $t$ in counties that do not have right-to-carry laws and whose explanatory variables have the values $X_0$. If the explanatory variables control for all other factors that are relevant to the crime rate, then $D_t(X_0) = E(Y_{it} | Z_{it} = 1, X_0) - E(Y_{it} | Z_{it} = 0, X_0)$ is the average change in the crime rate caused by the law in year $t$ in counties where the values of the explanatory variables are $X_0$.

The models of Lott and his critics are all aimed at estimating $D_t(X_0)$ for some set of explanatory variables $X$. This section discusses the statistical issues that are involved in estimating $D_t(X_0)$. The discussion focuses on the problem of estimating the function $D_t$ for a given set of explanatory variables. This issue is distinct from and independent of the problem of choosing the explanatory variables that was discussed in the previous section. Thus, the discussion in this section does not depend on whether there is agreement on a "correct" set of explanatory variables.

Estimating $D_t(X_0)$ is relatively simple if in year $t$ there are many counties with right-to-carry laws and the same values $X_0$ of the explanatory variables and many counties without right-to-carry laws and identical values $X_0$ of the explanatory variables. $D_t(X_0)$ would then be the average of the observed crime rate in the counties that do have right-to-carry laws minus the average crime rate in counties that do not have such laws. However, there are not many counties with the same values of the explanatory variables. Indeed, in the data used by Lott and his critics, each county has unique values of the explanatory variables. Therefore, the simple averaging procedure cannot be used. Instead, $D_t(X_0)$ must be inferred from observations of crime rates among counties with a range of values of $X$. In other words, it is necessary to estimate the relation between average crime rates and the values of the explanatory variables.

In principle, the relations between average crime rates and the explanatory variables with and without a right-to-carry law in effect can be estimated without making any assumptions about their shapes. This is called *nonparametric estimation*. Härdle (1990) provides a detailed discussion of nonparametric estimation methods. Nonparametric estimation is highly flexible and largely eliminates the possibility that the estimated model may not fit the data, but it has the serious drawback that the size of the data set needed to obtain estimates that are sufficiently precise to be useful increases very rapidly as the number of explanatory variables increases. This is called the *curse of dimensionality*. Because of it, nonparametric estimation is a practical option only in situations in which there are few explanatory variables. It is not a practical option in situations like estimation of the effects of right-to-carry laws, where there can be 50 or more explanatory variables.

Because of the problems posed by the curse of dimensionality, the most frequently used methods for estimation with a large number of explanatory

Copyright © National Academy of Sciences. All rights reserved.

*306* *APPENDIX D*

variables assume that the relation to be estimated belongs to a relatively small class of "shapes."[6] For example, Models 6.1 and 6.2 assume that the average of the logarithm of the crime rate is a linear function of the variables comprising $X$. Lott and his critics all restrict the shapes of the relations they estimate. Doing this greatly increases estimation precision, but it creates the possibility that the true relation of interest does not have the assumed shape. That is, the estimated model may not fit the data. This is called misspecification. Moreover, because the set of possible shapes increases as the number of variables in $X$ increases, the opportunities for misspecification also increase. This is another form of the curse of dimensionality. Its practical consequence is that one should not be surprised if a simple class of models (or shapes) such as linear models fails to fit the data.

Lack of fit is a serious concern because it can cause estimation results to be seriously misleading. An example based on an article that was published in the *National Review* (Tucker 1987) illustrates this problem. The example consists of estimating the relation between the fraction of a city's population who are homeless, the vacancy rate in the city, an indicator of whether the city has rent control, and several other explanatory variables. Two models are estimated:

$$(D.1) \qquad FRAC = \beta_0 + \beta_1 RENT + \beta_2 VAC + \alpha X$$
and
$$(D.2) \qquad FRAC = \beta_0 + \beta_1 RENT + \beta_2 (1/VAC) + \alpha X ,$$

where $FRAC$ denotes the number of homeless per 1,000 population in a city, $RENT$ is an indicator of whether a city has rent control ($RENT = 1$ if a city has rent control and $RENT = 0$ otherwise), $VAC$ denotes the vacancy rate, and $X$ denotes the other explanatory variables. The data are taken from Tucker (1987). The estimation results are summarized in Table D-1.

According to Model D.1, there is a statistically significant relation between the fraction of homeless and the indicator of rent control ($p < 0.05$) but not between homelessness and the vacancy rate ($p > 0.10$). Moreover, according to Model D.1, the fraction of homeless is higher in cities that have rent control than it is in cities that do not have rent control. This

---

[6]More precisely, the problem is to estimate a conditional mean function (e.g., the mean of the logarithm of the crime rate conditional on the explanatory variables and the indicator of whether a right-to-carry law is in effect). Nonparametric estimation places no restrictions on the specification or "shape" of this function but suffers from the curse of dimensionality. The estimation methods in common use, including those used by Lott and his critics, assume that the conditional mean function belongs to a relatively small class of functions, such as linear functions of the variables or functions that are linear in the original variables and products of pairs of the original variables.

Copyright © National Academy of Sciences. All rights reserved.

**TABLE D-1** Results of Estimating a Model of the Fraction of Homeless in a City (quantities in parentheses are standard errors)

| Model | Coefficient of RENT | Coefficient of VAC or 1/VAC |
|-------|---------------------|------------------------------|
| (D.1) | 3.17 | −0.26 |
|       | (1.51) | (0.16) |
| (D.2) | −1.65 | 18.89 |
|       | (3.11) | (8.15) |

result is consistent with the hypothesis that rent control is a cause of homelessness (possibly because it creates a shortage of rental units) and that the vacancy rate is unrelated to homelessness. However, Model D.2 gives the opposite conclusion. According to this model, there is a statistically significant relation between the fraction of homeless and the vacancy rate ($p < 0.05$) but not between homelessness and rent control ($p > 0.10$). Moreover, according to Model D.2, the fraction of homeless decreases as the vacancy rate increases. Thus, the results of estimation in Model D.2 are consistent with the hypothesis that a low vacancy rate contributes to homelessness but rent control does not. In other words, Model D.1 and Model D.2 yield opposite conclusions about the effects of rent control and the vacancy rate on homelessness. In addition, it is not possible for both of the models to fit the data, although it is possible for neither to fit. Therefore, misspecification or lack of fit is causing at least one of the models to give a misleading indication of the effect of rent control and the vacancy rate on homelessness.

It is possible to carry out statistical tests for lack of fit. None of the models examined by the committee passes a simple specification test called RESET (Ramsey, 1969). That is, none of the models fits the data. This raises the question whether a model that fits the data can be found. For example, by estimating and testing a large number of models, it might be possible to find one that passes the RESET test. This is called a *specification search*. However, a specification search cannot circumvent the curse of dimensionality. If the search is carried out informally (that is, without a statistically valid search procedure and stopping rule), as is usually the case in applications, then it invalidates the statistical theory on which estimation and inference are based. The results of the search may be misleading, but because the relevant statistical theory no longer applies, it is not possible to test for a misleading result. Alternatively, one can carry out a statistically valid search that is guaranteed to find the correct model in a sufficiently large sample. However, this is a form of nonparametric regression, and therefore it suffers the lack of precision that is an unavoidable consequence of the curse of dimensionality. Therefore, there is little likelihood of identi-

Copyright © National Academy of Sciences. All rights reserved.

*308* *APPENDIX D*

fying a well-fitting model with existing data and statistical methods.[7] In summary, the problems posed by high-dimensional estimation, misspecified models, and lack of knowledge of the correct set of explanatory variables seem insurmountable with observational data.

## REFERENCES

Ayers, I., and J.J. Donohue
1999  Nondiscretionary concealed weapons law: A case study of statistics, standards of proof, and public policy. *American Law and Economics Review* 1:436.

Black, D.A., and D.S. Nagin
1998  Do right-to-carry laws deter violent crime? *Journal of Legal Studies* 27:209-219.

Bronars, S., and J.R. Lott, Jr.
1998  Criminal deterrence, geographic spillovers, and the right to carry concealed handguns. *American Economic Review* 88:475-479.

Donohue, J.J.
2002  Divining the Impact of State Laws Permitting Citizens to Carry Concealed Handguns. Unpublished manuscript, Stanford Law School.

Härdle, W.
1990  *Applied Nonparametric Regression*. Cambridge: Cambridge University Press.

Lott, J.R.
2000  *More Guns, Less Crime: Understanding Crime and Gun-Control Laws*. Chicago: University of Chicago Press.

Lott, J.R., and D.B. Mustard
1997  Crime, deterrence, and right-to-carry concealed handguns. *Journal of Legal Studies* 26(1):1-68.

Ramsey, J.B.
1969  Tests for specification errors in classical linear least squares regression analysis. *Journal of the Royal Statistical Society* Series B 31(2):350-371.

Tucker, W.
1987  Where do the homeless come from? *National Review* Sept. 25:32-43.

---

[7]Much current research in statistics and econometrics is directed at "dimension reduction." This consists of imposing shape assumptions that are much weaker than those of models like 6.1 and 6.2 but strong enough to reduce the effective number of shapes that must be considered and thereby to increase estimation precision substantially. Although these techniques show considerable promise, they have not yet been developed sufficiently to be applicable to problems like estimation of the effects of right-to-carry laws.

Copyright © National Academy of Sciences. All rights reserved.

# Appendix E

# Biographical Sketches of Committee Members and Staff

CHARLES F. WELLFORD *(Chair)* is professor and formerly served as chair of the Department of Criminology and Criminal Justice at the University of Maryland. He also serves as director of the University of Maryland Center for Applied Policy Studies, the Maryland Justice Analysis Center, and a faculty mentor for the Gemstone Program. In Maryland he serves on the Maryland Sentencing Policy Commission, the Correctional Options Advisory Board, and the Criminal Justice Information Advisory Board. He also serves on the Advisory Commission on Sentencing for the Superior Court of the District of Columbia. He was chair of the National Research Council's (NRC) Committee on the Social and Economic Impact of Pathological Gambling and currently chairs the Committee on Law and Justice. His most recent research has focused on the determinants of sentencing, the development of comparative crime data systems, and the measurement of white-collar crime. He has a Ph.D. in sociology from the University of Pennsylvania (1969).

ROBERT F. BORUCH is university trustee chair professor of the Graduate School of Education and the Statistics Department at the Wharton School, University of Pennsylvania. He is an expert on research methods for evaluating programs and projects in the United States and other countries. In the United States, he serves on the board of trustees of the William T. Grant Foundation, the board of directors of the American Institutes for Research, the Advisory Council on Education Statistics and Evaluation Review Panel of the U.S. General Accounting Office. In his international work, he chaired the National Academy of Sciences education statistics delegation to China.

*309*

Copyright © National Academy of Sciences. All rights reserved.

Firearms and Violence: A Critical Review
http://www.nap.edu/catalog/10881.html

He has conducted seminars on program evaluation in Israel, Colombia, India, Cote D'Ivoire, and Kenya. He has been a consultant to the World Health Organization on AIDS prevention research and to UNESCO and the U.S. Agency for International Development on project evaluation. He has lectured in Poland, Germany, and the United Kingdom on special problems of survey research and randomized experiments for program evaluation. His work on the design of field experiments for planning and evaluating social and educational programs has received recognition form the American Educational Research Association (Research Review Award), the Policy Studies Association, and the American Evaluation Association (Gunnar and Alva Myrdal Award). He has been a fellow at the American Statistical Association, the Center for Advance Study in the Behavioral Sciences, and the Rockefeller Foundation. He is the author of about 150 articles in research journals and author or editor of over 10 books. He has a Ph.D. in psychology/statistics from Iowa State University (1968).

ANTHONY A. BRAGA (*Consultant*) is senior research associate in the Program in Criminal Justice Policy and Management of the Malcolm Wiener Center for Social Policy at Harvard University's John F. Kennedy School of Government. His research focuses on working with criminal justice agencies to develop crime prevention strategies to deal with urban problems, such as firearms violence, street-level drug markets, and violent crime hot spots. He has served as a consultant on these issues to a wide range of public agencies and private institutions, as well as numerous state and local law enforcement agencies. He was a key member of the Boston Gun Project/Operation Ceasefire working group. He has an M.P.A. from Harvard University and a Ph.D. in criminal justice from Rutgers University.

LINDA B. COTTLER is professor of epidemiology in the Department of Psychiatry at Washington University School of Medicine in St. Louis. Her work has been in the areas of methods of psychiatric epidemiological research, with emphasis on substance abuse and dependence (drugs and alcohol) and its co-morbidity with other disorders, and prevention research. Specifically, her contributions to the field include risk factors for substance abuse, assessment of substance use and psychiatric disorders, the public health consequences of substance use, including HIV, and peer-delivered prevention models to reduce HIV and substance abuse. She is director of a postdoctoral training program in epidemiology and biostatistics of the National Institute of Mental Health (NIMH), director of a pre- and postdoctoral training program in co-morbidity and biostatistics of the National Institute on Drug Abuse (NIDA), and a consultant to the World Health Organization's Mental Health Division. She is on the advisory board of the National Center for Responsible Gaming, a member of NIDA-K

Copyright © National Academy of Sciences. All rights reserved.

IRG, and a member of NIDA's editorial board. She served on the NRC Committee on the Social and Economic Impact of Pathological Gambling. She has an M.P.H. from the Boston University School of Public Health and a Ph.D. from Washington University, St. Louis.

ROBERT D. CRUTCHFIELD is professor of sociology and department chair at the University of Washington. He has written extensively on labor markets and crime, as well as on racial and ethnic disparities in prosecution, sentencing, and imprisonment. He is a past vice-president of the American Society of Criminology and is currently on the Council of the American Sociological Association and the American Sociological Association's Crime, Law, and Deviance Section. He served on the editorial board for the National Institute of Justice's CJ2000 project. He has been a deputy editor of *Criminology* and has served on the editorial board of the journal *Social Problems*. He is currently on the editorial boards of *Crime and Justice* and *Crime and Justice Research*. He served on the NRC's Ford Foundation minority predoctoral review panel on anthropology and sociology. He has M.A. (1976) and Ph.D. (1980) degrees in sociology fromVanderbilt University.

JOEL L. HOROWITZ is the Charles E. and Emma H. Morrison professor of economics at Northwestern University. He specializes in econometric theory, semiparametric estimation, bootstrap methods, discrete choice analysis, and inference with missing and incomplete data. He is currently working on projects involving adaptive testing, estimation of additive models with unknown links, bootstrap methods for nonsmooth models, and bandwidth selection in semiparametric estimation. He is co-editor of *Econometrica* and a member of the Econometric Society, the American Economic Association, the American Statistical Association, the American Association for the Advancement of Science, and the Transportation Research Board. He has served on several NRC ad hoc committees, including the Committee on Data and Research for Policy on Illegal Drugs, and is currently a member of the Committee on National Statistics. He has a Ph.D. from Cornell University (1967).

ROBERT L. JOHNSON is professor of pediatrics and clinical psychiatry and director of Adolescent and Young Adult Medicine at the University of Medicine and Dentistry of New Jersey, New Jersey Medical School. His research focuses on adolescent physical and mental health, adolescent HIV, adolescent violence, adolescent fatherhood and risk prevention/reduction programs with specific emphasis on substance and alcohol abuse, sexuality and sexual dysfunction, male sexual abuse, suicide, and AIDS. He currently serves on the National Institute of Mental Health's national advisory council, the board of

Copyright © National Academy of Sciences. All rights reserved.

Firearms and Violence: A Critical Review
http://www.nap.edu/catalog/10881.html

the Violence Institute of New Jersey, and the pediatric residency review committee of the Accreditation Council for Graduate Medical Education. He has previously been a member of the advisory committee on adolescent health of the Office of Technology Assessment, chair of the Board of Advocates for Youth, and president of the New Jersey State Board of Medical Examiners. He also serves on several Institute of Medicine (IOM) committees, including the Board on Health Care Services, and was a member of the Committee on Unintended Pregnancy. He has an M.D. from the New Jersey Medical School, University of Medicine and Dentistry of New Jersey (1972).

STEVEN D. LEVITT is professor of economics at the University of Chicago. He is a research fellow at the American Bar Foundation, a faculty research fellow at the National Bureau of Economic Research, and editor of the *Journal of Political Economy*. He has studied various aspects of crime and criminality, including the impact of police and prisons on crime, the economics of gangs, the juvenile justice system, and the link between legalized abortion and crime. He has a Ph.D. in economics from the Massachusetts Institute of Technology (1994).

TERRIE E. MOFFITT is professor of psychology at the University of Wisconsin at Madison and professor of social behavior and development at the Institute of Psychiatry in the University of London. She researches the developmental interplay between nature and nurture in the genesis of antisocial behavior. She is principal investigator of the Environmental-Risk Study of the Medical Research Council and is associate director of the Dunedin Multidisciplinary Health and Development Research Unit in New Zealand. She is a fellow of the United Kingdom's Academy of Medical Sciences and a recipient of the American Psychological Association's distinguished scientific award for early career contribution to psychology in the area of psychopathology. She has a Ph.D. in clinical psychology from the University of Southern California (1984).

SUSAN A. MURPHY is an associate professor of statistics and senior associate research scientist in the Institute for Social Research at the University of Michigan. Her present research interests concern causal inference and sequential decisions, sometimes called dynamic or adaptive or tailored treatment regimes. Other interests include profile and parametric likelihood models and the development of methodology for the area of drug prevention research—in particular the use of event history analysis. In 2000, she was elected a fellow of the Institute of Mathematical Statistics. She has been a member of the NRC's Office of Scientific and Engineering Personnel. She has a Ph.D. in statistics from the University of North Carolina, Chapel Hill (1989).

Copyright © National Academy of Sciences. All rights reserved.

KAREN E. NORBERG is assistant professor of psychiatry at Boston University and visiting research associate at the Center for Health Policy at Washington University in St. Louis. Her current research interests include economic and game theory models of parent-child interaction, social and economic factors affecting emotional and physical health of low income youth, adolescent suicide and self-injury, and social contagion. She is the principal investigator of a NIMH project to study social and economic factors in an adolescent suicide cluster. She has an M.D. from Harvard University (1978).

JOHN V. PEPPER (*Study Director*) is associate professor of economics at the University of Virginia. His current work reflects his wide range of interests in social program evaluation, applied econometrics, and public economics. He is an author of numerous published papers, conference presentations, and edited books. At the National Research Council, he has made important contributions to the work of panels of the Committee on Law and Justice, including reports on measurement problems in criminal justice research, policy on illegal drugs, and assessment of two cost-effectiveness studies on cocaine control policy. He has a Ph.D. in economics from the University of Wisconsin.

CAROL V. PETRIE is staff director of the Committee on Law and Justice at the National Research Council, a position she has held since 1997. Prior to her work there, she was the director of planning and management at the National Institute of Justice, responsible for policy development and administration. In 1994, she served as the acting director of the National Institute of Justice during the transition between the Bush and Clinton administrations. Throughout a 30-year career, she has worked in the area of criminal justice research, statistics, and public policy, serving as a project officer and in administration at the National Institute of Justice and at the Bureau of Justice Statistics. She has conducted research on violence, and managed numerous research projects on the development of criminal behavior, policy on illegal drugs, domestic violence, child abuse and neglect, transnational crime, and improving the operations of the criminal justice system. She has a B.S. in education from Kent State University.

PETER REUTER is professor in the School of Public Affairs and in the Department of Criminology at the University of Maryland. In July 1999 he became editor of the *Journal of Policy Analysis and Management.* He is currently also senior economist at RAND. He founded and directed RAND's Drug Policy Research Center from 1989 to 1993. Since 1985 most of his research has dealt with alternative approaches to controlling drug problems, both in the United States and in western Europe. He has been a

Copyright © National Academy of Sciences. All rights reserved.

Firearms and Violence: A Critical Review
http://www.nap.edu/catalog/10881.html

member of the NRC's Committee on Law and Justice and the IOM's Committee on the Federal Regulation of Methadone and its Panel on Assessing the Scientific Base for Reducing Tobacco-Related Harm. He testifies frequently before Congress and has addressed senior policy audiences in many countries, including Australia, Chile, Colombia and Great Britain. He has served as a consultant to numerous organizations in this country and abroad. He has a Ph.D. in economics from Yale.

RICHARD ROSENFELD is professor of criminology and criminal justice at the University of Missouri, St. Louis. His research areas are violence and social organization, crime statistics, and crime control policy. He has written extensively on the social sources of criminal violence, youth homicide, and violent crime trends. His current research investigates the role of networks in sustaining violence and the impact of incarceration on homicide rates. He is executive counselor of the American Society of Criminology. In 1994, he received the Chancellor's Award for Excellence in Teaching from the University of Missouri, St. Louis. He has a Ph.D. in sociology from the University of Oregon (1984).

JOEL WALDFOGEL is a business and public policy faculty member at the Wharton School of the University of Pennsylvania and a faculty research fellow of the National Bureau of Economic Research. Prior to arriving at Wharton in 1997, he served on the faculty of the Yale University Economics Department. His research interests span law and economics and industrial organization. Within law and economics, he has conducted research on criminal sentencing, labor markets for ex-offenders, civil litigation, and the measurement of discrimination. Within industrial economics, he has conducted empirical studies of price advertising, media markets and minorities, and the operation of differentiated product markets. He has a Ph.D. in economics from Stanford University (1990).

JAMES Q. WILSON is the James A. Collins professor of management and public policy (emeritus) at the University of California, Los Angeles. He is also the Ronald Reagan professor of public policy at Pepperdine University. Previously, he was a professor of government at Harvard University. He is the author or co-author of 14 books, has edited or contributed to books on urban problems, government regulation of business, and the prevention of delinquency among children, and has published many articles. He has served on several NRC committees, including the Committee on Law and Justice, the Panel on Research on Criminal Careers, and the Committee on Data and Research for Policy on Illegal Drugs. He has a Ph.D. from the University of Chicago (1959).

Copyright © National Academy of Sciences. All rights reserved.

Firearms and Violence: A Critical Review
http://www.nap.edu/catalog/10881.html

CHRISTOPHER WINSHIP is professor of sociology at Harvard University. He was previously at Northwestern University as director of the Program in Mathematical Methods in the Social Sciences, and as chair of the Department of Sociology. He was a founding member of Northwestern's Department of Statistics and held a courtesy appointment in economics. He also served as director of the Economics Research Center at the National Opinion Research Center at the University of Chicago. He is currently doing research on several topics: the Ten Point Coalition, a group of black ministers who are working with the Boston police to reduce youth violence; statistical models for causal analysis; the effects of education on mental ability; causes of the racial difference in performance in elite colleges and universities; and changes in the racial differential in imprisonment rates over the past 60 years. He is currently a member of the NRC-IOM's Committee on Adolescent Health and Development. He has a Ph.D. in sociology from Harvard University (1977).

Copyright © National Academy of Sciences. All rights reserved.



Copyright © National Academy of Sciences. All rights reserved.

# Index

## A

Academic support, of the individual right
    interpretation, 282–284
Access, restricting, 8–9
Accidents, firearms and, 70–71
Accuracy, of research data, 43
ADAM. *See* Arrestee Drug Abuse
    Monitoring
AddHealth. *See* National Longitudinal
    Study on Adolescent Health
Administrative samples, 37–41
Aggravated assault, 64–65
    rates of aggravated assault by firearm
        involvement, 65
Aggregate crime, estimates of percentage
        change in, 145
Aggregation, of individual survey responses,
        58–59
Aggregation bias, 166
AGVQ. *See* Attitudes Toward Guns and
        Violence Questionnaire
American Civil Liberties Union, 236
Analytic framework of illegal firearm
        acquisition, 82–87
    general model, 82–86
    intermediate effects of market
        interventions, 87
    using the framework, 86–87
Analyzing estimates for robustness, 139–150
    dummy variable model with common
        time pattern, 140–141

estimates of percentage change in
    aggregate crime, 145
estimates of percentage change in
    disaggregate property crimes, 148
estimates of percentage change in
    disaggregate violent crimes, 146–147
extending the baseline specification to
    2000, 140–145
sensitivity of the results to controls,
    145–150
trend model with common time pattern,
    142–143
trend model with varying postlaw
    change durations, 150–151
Annie E. Casey Foundation, 13
ARIMA model, 228
Arrestee Drug Abuse Monitoring (ADAM),
    37, 40–41, 44, 48, 87
Ashcroft, John, 278
Assault weapons, banning to reduce
    criminal access to firearms, 96–97
Assaults
    aggravated, 64–65
    sexual, with firearm involvement, 66
Assessment
    of individual-level studies, 183
    subjective, of self-defense with a firearm,
        117
Assessment of ecological studies, 163–170
    ecological bias, 170
    proxy measures of ownership, 164–170
    substitution and confounders, 163–164

*317*

Copyright © National Academy of Sciences. All rights reserved.

Attitudes Toward Guns and Violence
    Questionnaire (AGVQ), 210
Attributable risk, 198–200
Australia, gun buy-backs in, 96
Autopsies. *See* Psychological autopsy
    studies
Ayres and Donohue's results, 134–135, 136

## B

Background checks, conducted by FBI, 52n
Banning assault weapons, to reduce criminal
    access to firearms, 96–97
Bartley-Fox gun law (Massachusetts), 226–
    229
BATF. *See* Bureau of Alcohol, Tobacco, and
    Firearms
Behavioral interventions, 201–214
    firearms prevention programs, 202–209
    outcome measures, 203, 208–211
    quality of the research, 213–214
    study design, 211–213
Behavioral Risk Factor Surveillance System
    (BRFSS), 164, 195
BJS. *See* Bureau of Justice Statistics
Black and Nagin's results, 129, 132–133
Boston Gun Project, 10, 236–240
Brady Centers to Prevent Gun Violence, 213
Brady Handgun Violence Prevention Act,
    93–94
Breyer, Stephen, 287
BRFSS. *See* Behavioral Risk Factor
    Surveillance System
Bureau of Alcohol, Tobacco, and Firearms
    (BATF), 4, 51, 56, 74, 240
    firearms trace data, 79–80
    Firearms Tracing Center, 38
    investigation data, 80–82
    Youth Crime Gun Interdiction Initiative,
        39, 79–80
Bureau of Justice Statistics (BJS), 51, 79, 93,
    101
Buy-backs. *See* Gun buy-backs

## C

CAP. *See* Child access prevention laws
Carrying of guns, mandatory penalties for
    unlawful, 226–229

Case-control studies
    association of suicide and gun
        ownership, 196–200
    attributable risk, 198–200
Causality framework, 6
    direct, 153
Centers for Disease Control and Prevention,
    3, 13, 21, 51, 195
    National Center for Injury Prevention
        and Control, 47
Channels, for firearms trafficking, 81
*Chaplinsky v. New Hampshire,* 292
*Chicago, Burlington & Quincy Railroad v.
    Chicago,* 288
*Chicago-Kent Law Review,* 284
Child access prevention (CAP) laws, 9, 217–
    219
Clinton administration, 39
"Cluster" method, 138n
Commerce Clause attack, 297
Committee to Improve Research
        Information and Data on Firearms,
        1, 13, 139
    control variable analysis, 273–274
    "Response to Wilson's Dissent," 18,
        272–275
    trend model analysis, 274–275
Comprehensiveness in developing useful
        research data, 44–45
    context, 45
    scope, 44–45
Conceptual framework for firearms and
        suicide, 153
Conclusions, 2–3, 14, 234–235, 241. *See
    also* Recommendations
Control variables and specification
    committee control variable analysis,
        273–274
    in statistical analyses of right-to-carry
        laws, 128–135
Convenience samples, 37–41
Correlation coefficient, between a proxy
        and gun ownership rates, 165
Correlation framework, spurious, 153
Crime, hypothetical rates by year, 301
Criminal access to firearms
    handgun acquisition, 78
    interventions to reduce, 89–98
Criminal encounters, stages and outcome of
        potential, 107

Copyright © National Academy of Sciences. All rights reserved.

Criminal justice interventions
    enhanced sentences for criminal use of
        firearms, 223–230
    gun courts, 221–222
    problem-oriented policing to prevent
        firearm-related crime, 230–241
    to reduce firearm-related violence, 9–10,
        18, 221–241
Criminal use of firearms, 78
    sources of firearm data on, 26–29
Cross-sectional studies, 154–162
    of associations between firearms
        prevalence and suicide in the U.S.,
        156–161
    of gun laws and suicide, 184, 186–189
    international studies, 161–162
    U.S. studies, 155–161
Curse of dimensionality, 305

**D**

Data, 20–42, 122–123
    interpreting, 82
    observational, 299
    quality of, 16
    revised new sets of, 126–127, 139
    revised original sets of, 122, 125–126
Data Elements for Emergency Department
    Systems (DEEDS), 47
Data for measuring firearms violence and
    ownership, 18–52
    general objectives for developing useful
        research data, 42–48
    a patchwork of data sets, 20–42
    sources of, 15–16
Data on firearms ownership, use, and
    markets, 34–42
    administrative and convenience samples,
        37–41
    proxy measures of ownership, 41–42
    surveys, 34–37
Data on violence and crime, 20–34
    National Crime Victimization Survey,
        21, 30
    National Incident-Based Reporting
        System, 32–33
    National Violent Death Reporting
        System, 33–34
    selected sources of firearm data, 22–31
    Uniform Crime Reports, 31–32

Data recommendations, 3–5
    emerging data systems on violent events,
        3
    methodological approaches, 4–5
    ownership data, 4
Data systems, 194–195
David and Lucile Packard Foundation, 13
DEEDS. *See* Data Elements for Emergency
    Department Systems
Defensive gun use (DGU), 6–7, 103–114
    comparing sampling design of the NCVS
        and NSDS, 104
    coverage in, 105–108
    recommendations on, 6–7
    response problems in firearms use
        surveys, 108–114
Demand, for illegal firearm acquisition, 84–
    85
Denning, Brannon P., 286
Deterrence and defense recommendations,
    6–7
    defensive gun use, 6–7
    right-to-carry laws, 7
Deterrence approach, applications of
    pulling-levers focus, 240–241
DGU. *See* Defensive gun use
Dimension reduction, 308n
Dimensionality, curse of, 305
Direct causality framework, 153
Disaggregate property crimes, estimates of
    percentage change in, 148
Disaggregate violent crimes, estimates of
    percentage change in, 146–147
Dissent, 18, 269–271
    Committee's response to Wilson's, 18,
        272–275
Distribution of firearms ownership, 59
District of Columbia
    handgun ban to reduce criminal access
        to firearms in, 97–98
    Personal Protection Act, 279
Drug Use Forecasting (DUF) program, 40
Due Process Clause, of the Fourteenth
    Amendment, 288
DUF. *See* Drug Use Forecasting program
Duggan's results, 128–129
Dummy variable model, 123–124, 130–133
    with common time pattern, 123, 126–
        127, 140–141
    with "region-interacted time pattern
        model," 123
*Duncan v. Louisiana,* 288

Copyright © National Academy of Sciences. All rights reserved.

Firearms and Violence: A Critical Review
http://www.nap.edu/catalog/10881.html

## E

Ecological bias, 170
Ecological studies of associations between
        firearms prevalence and suicide in the
        U.S., 156–161
Ecological studies of gun ownership and the
        overall risk of suicide, 154–170
    across time, 162–163
    assessment of ecological studies, 163–
        170
    cross-sectional associations, 154–162
Efficacy of self-defense with a firearm, 114–
        119
    empirical evidence, 115–117
    firearms and fatalities, 117–119
    probability of injury and loss among
        victims by means of self-protection,
        115
    subjective assessments, 117
Emerson, Timothy Joe, 276
Empirical evidence, of self-defense with a
        firearm, 115–117
Empirical research, contribution to judicial
        scrutiny, 297–298
Endpoint. *See* Updated sample endpoint
Enforcement and law, sources of firearm
        data on, 28–31
Enhanced sentences for criminal use of
        firearms, 223–230
    mandatory penalties for unlawful
        carrying of guns, 226–229
    sentencing enhancements for firearm-
        related crimes, 223–226
Estimates
    analyzing for robustness, 139–150
    modeling of the fraction of homeless in a
        city, 307
    nonparametric, 305–306
    of relations among crime rates, the
        explanatory variables, and adoption
        of right-to-carry laws, 304–308
Explanatory variables
    choosing, 299–304, 308
    and hypothetical crime rates by year,
        301
External validity, in firearms use surveys,
        111–113

## F

Federal Bureau of Investigation (FBI), 4, 11,
        21
    background checks conducted by, 52n
    Supplemental Homicide Reports, 32, 64
Federal courts of appeals, and the Second
        Amendment, 284
Federal firearms licensees (FFLs), 38–39,
        73–74, 81–82, 85, 89–91
    scofflaws among, 90
Felons, and firearm possession, 77–78, 294n
FFLs. *See* Federal firearms licensees
Findings, 2–3, 14, 234–235, 241
Firearm availability and ownership, 56–59.
        *See also* Guns
    aggregation of individual survey
        responses, 58–59
    distribution of firearms ownership across
        geographic regions, 59
    estimated number and per capita
        ownership of firearms in the U.S., 57
    production-based estimates, 56–57
    survey-based estimates, 57–58
Firearm data
    criminal use of firearms, 26–29
    firearm-related injury/death, 22–25
    firearms and youth, 28–29
    firearms industry and retail, 24–27
    firearms ownership, 30–31
    law and enforcement, 28–31
    selected sources of, 22–31
Firearm injury prevention programs, 18,
        201–220
    behavioral interventions, 201–214
    firearms safety technology, 214–220
Firearm involvement
    rate of robbery by, 66
    rates of aggravated assault by, 65
Firearm possession, felons and, 77–78, 294n
Firearm prevalence, psychological autopsy
        studies of, 173–181
Firearm-related crimes, sentencing
        enhancements for, 223–226
Firearm-related harm, 59–71
    and accidents, 70–71
    murder victimization rates by race, 63
    and nonfatal injuries, 64–66
    nonfatal injuries by intent, 60
    overall firearm-related deaths, 60

Copyright © National Academy of Sciences. All rights reserved.

Firearm-related injury/death, 60
    criminal justice interventions to reduce
        violence in, 18, 221–241
    and self-defense, 117–119
    sources of firearm data on, 22–25
Firearm-related suicides, number and rate
    of, 67
Firearm Suppression Program (FSP), for St.
    Louis youth, 235–236
Firearms and homicides, 61–64
    firearm-related murder victimization
        rates by race, 63
    international, 55
    offenders, 64
    victims, 62–63
    weaponry in homicide, 61–62
Firearms and nonfatal injuries, 64–66
    aggravated assault, 64–65
    rape and sexual assaults, 66
    robberies, 65–66
Firearms and self-harm, 66–69
    nonfatal self-harm, 69
    suicide, 66–69
Firearms and suicide, 18, 66–69, 152–200
    conceptual framework, 153
    cross-sectional studies of gun laws and,
        184
    difference made by a gun law, 184–192
    ecological studies of gun ownership and
        the overall risk of suicide, 154–170
    individual-level studies of association
        between, 171–184
    international, 55
    interrupted-time-series studies of, 188–
        191
    interventions to reduce, 8–10
    likelihood of, 196–198
    measures of association in case-control
        studies, 196–200
    number and rate of firearm-related, 67
    recommendations, 192–196
    relationship with household gun
        ownership, 167
    by selected age groupings, 70
    time series studies of gun laws and
        suicide, 185–192
Firearms and youth, sources of firearm data
    on, 28–29
Firearms commerce, legal and illegal, 73–77
Firearms diverted through trafficking
    channels, volume of, 81

Firearms flows, 75
Firearms industry and retail, sources of
    firearm data on, 24–27
Firearms Owners Protection Act, 16n, 50
Firearms ownership
    distribution of, 59
    estimated number and per capita in the
        U.S., 57
    sources of data on, 30–31
Firearms prevention programs, 202–209
Firearms research, standards and methods
    for, 16–18
Firearms safety technology, 214–220
    child access prevention laws, 217–219
    locking technology, 215–217
Firearms trace data, BATF, 79–80
Firearms Tracing Center, 38
Firearms use surveys, replication and
    recommendations in, 113–114
Firearms violence
    and ownership, data for measuring, 18–
        52
    sources of data for research on, 15–16
First Amendment principles, 292, 296
Fourteenth Amendment, Due Process Clause
    of, 288
Frameworks. *See also* Analytic framework
    of illegal firearm acquisition;
    Conceptual framework for firearms
    and suicide; Direct causality
    framework; Reverse causality
    framework; Spurious correlation
    framework; "Third factor"
    confounder framework
    and illegal firearm acquisition, 86–87
FSP. *See* Firearm Suppression Program
Fundamental rights, 295n

## G

Gallup Poll, 57, 162
General Social Survey (GSS), 3, 34–35, 43–
    44, 57, 164
*Gillespie v. City of Indianapolis,* 284
Ginsburg, Ruth Bader, 287
GSS. *See* General Social Survey
Gun buy-backs
    in Australia, 96
    to reduce criminal access to firearms,
        95–96

Copyright © National Academy of Sciences. All rights reserved.

Firearms and Violence: A Critical Review
http://www.nap.edu/catalog/10881.html

Gun buyers, screening to reduce criminal
  access to firearms, 93–95
"Gun control," and the Second
  Amendment, 14–15
Gun Control Act of 1968, 37–38
Gun courts, 221–222
Gun dealers, regulation of, to reduce
  criminal access to firearms, 89–92
Gun laws. *See also* individual laws
  cross-sectional studies of, 184
  the difference made by, 184–192
  mandatory penalties for unlawful
    carrying of guns, 226–229
  quasi-experimental studies of, 192–193
Gun ownership
  associations with suicide rates across
    time, 162–163
  proxy measures of, 41–42, 164–170,
    194
Gun purchasers, recent, risk of suicide
  among, 181–183
Gun sources
  BATF firearms trace data, 79–80
  BATF investigation data, 80–82
  interpreting the data, 82
  for offenders obtaining firearms, 77–82
  survey research, 77–82
  volume of firearms diverted through
    trafficking channels, 81
Guns
  limitation of sales, to reduce criminal
    access to firearms, 92–93
  used to defend against criminals, 18,
    102–119
  vintage of, 88–89
*Guns & Ammo* (magazine), 155, 160, 165

**H**

Handgun acquisition by criminals, 292
  sources and methods of, 78
Harris Poll, 57
Harvard Injury Control Research Center
  Survey (HICRC), 164
Harvard School of Public Health, Injury
  Control Research Center, 3, 33, 50
Hatch, Orrin, 279
Helland and Tabarrok's results, 137
*Hickman v. Block,* 278
HICRC. *See* Harvard Injury Control
  Research Center Survey

Homeless people, estimating a model of the
  fraction of in a city, 307
Homicide rates by country, 54–56
  international comparisons, 54
  international firearms homicide and
    suicide rates, 55
  U.S. rates, 56
Homicides, firearms and, 61–64
Household gun ownership, relationship
  with suicides using a firearm, 167
Hunters, 12–13
Hybrid variable model, 132–133

**I**

ICECI. *See* International Classification of
  External Causes of Injury
Illegal firearm acquisition
  demand for, 84–85
  interventions aimed at, 18, 72–101
  model of, 82–86
  supply of, 85–86
Illegal firearms commerce, 73–77
Inaccurate response, in firearms use surveys,
  109–110
Incorporation question, 287–288
Indianapolis, Indiana, directed patrol
  project in, 232–233
Individual-level studies
  assessment of, 183
  improving, 195–196
Individual-level studies of association
  between firearms and suicide, 171–
    184
  assessment of, 183
  next steps, 183–184
  psychological autopsy studies of firearm
    prevalence, 173–181
  risk of suicide among recent gun
    purchasers, 181–183
Individual right interpretation of the Second
  Amendment, 280–288
  academic support of, 282–284
  the federal courts of appeals and, 284
  the incorporation question, 287–288
  the U.S. Supreme Court and, 284–287
Individual survey responses, aggregating,
  58–59
Infants, and firearm possession, 294n
"Infringements" on the Second Amendment
  right, 292–294

Copyright © National Academy of Sciences. All rights reserved.

Injury Control Research Center, 33, 50
Institute for Social Research, 45
Institute of Medicine, 219
International Classification of Diseases
coding system, 46–47
International Classification of External
Causes of Injury (ICECI), 47
International firearms homicide and suicide
rates, 55
International studies
comparisons in homicide rates, 54
cross-sectional associations, 161–162
Interrupted-time-series studies, of gun laws
and suicide, 98, 188–191, 228
Interventions to reduce criminal access to
firearms, 89–98. *See also* Behavioral
interventions; Criminal justice
interventions, to reduce firearm-
related violence; Market-based
interventions
banning assault weapons, 96–97
District of Columbia handgun ban, 97–
98
gun buy-backs, 95–96
in illegal firearm acquisition, 89–98
limiting gun sales, 92–93
regulating gun dealers, 89–92
screening gun buyers, 93–95
Interventions to reduce illegal firearm
acquisition, 18, 72–101
analytic framework, 82–87
offenders obtaining firearms, 73–82
substitution, 88–89
Interventions to reduce violence and suicide,
8–10
criminal justice interventions, 9–10
prevention programs and technology, 9
recommendations on, 8–10
restricting access, 8–9
Investigation data, BATF, 80–82

**J**

Joyce Foundation, 13
Judicial scrutiny
of challenged gun control regulations,
276–298
contribution of empirical research to,
297–298
restrictions on an individual Second
Amendment right, 288–297

rise of an individual right interpretation
of the Second Amendment, 280–288
Justice Research and Statistics Association,
33n

**K**

Kansas City Gun Project, 231–232

**L**

Law and enforcement, sources of firearm
data on, 28–31
Legal and illegal firearms commerce, 73–77
firearms flows, 75
Limitation of gun sales, to reduce criminal
access to firearms, 92–93
Locking technology, 215–217
Lott, John, 120, 269
Lott's results, 125–127, 269–275
dummy variable model with common
time pattern, 126–127
in statistical analyses of right-to-carry
laws, 125–127
trend model with common time pattern,
128–129

**M**

Mandatory penalties, for unlawful carrying
of guns, 226–229
Market-based interventions, 8
and illegal firearm acquisition, 87
intermediate effects of, 87
McClure-Volkmer Act, 16n, 50
Mental unsoundness, and firearm
possession, 294n
Methodological approaches, 4–5
description of, 121–125
for firearms research, 16–18
Methods, of handgun acquisition by
criminals, 78
Model of illegal firearm acquisition, 82–86.
*See also* Trend model analysis
demand, 84–85
supply, 85–86
Monitoring the Future (MTF) survey, 4, 36,
45
Monte Carlo design, 169
Moody's results, 127

Copyright © National Academy of Sciences. All rights reserved.

Firearms and Violence: A Critical Review
http://www.nap.edu/catalog/10881.html

*Moore v. City of East Cleveland,* 295n
MTF. *See* Monitoring the Future
Murder rates, by weapon type, 62
Mustard, David, 120

# N

National Center for Injury Prevention and
    Control, 47
National Crime Survey, 103
National Crime Victimization Survey
        (NCVS), 21, 30, 36, 43–46, 59n, 61,
        65–66, 74, 103–106, 109–112, 115–
        117
    sampling design of, 104
National Electronic Injury Surveillance
        System (NEISS), 59n, 60, 69
National Firearms Act of 1934, 286
National Household Survey of Drug Abuse,
        36
National Incident-Based Reporting System
        (NIBRS), 3, 21, 32–34, 45–46, 48–
        50
National Institute of Justice, 13, 51, 101,
        215, 227, 240
    ADAM survey, 37, 40–41, 44, 48, 87
National Longitudinal Study on Adolescent
        Health (AddHealth), 181
National Opinion Research Center
        (NORC), 34, 162
National Research Council, 3, 16, 108n,
        116n, 234, 239, 269
*National Review* (magazine), 306
National Rifle Association (NRA), 13, 278,
        301
National Self-Defense Survey (NSDS), 35,
        103–113, 117
    sampling design of, 104
National Study of Private Firearms
        Ownership (NSPFO), 111n, 112
National Survey of Private Gun Ownership,
        86
National Violent Death Reporting System
        (NVDRS), 3, 21, 33–34, 45, 47–50,
        195
National Vital Statistics System (NVSS), 45–
        46, 59
NCVS. *See* National Crime Victimization
        Survey
Needham Lifestyle Survey, 164
NEISS. *See* National Electronic Injury
        Surveillance System

New York Police Department's street crime
        unit, 233–234
NIBRS. *See* National Incident-Based
        Reporting System
*Nixon v. Shrink Missouri Government
        PAC,* 297
Nonfatal injuries
    firearms and, 64–66
    number and rate of overall and firearm-
        related, by intent, 60
Nonfatal self-harm, 69
Nongun suicide, 155
Nonparametric estimation, 305–306
Nonresponse, in firearms use surveys, 110–
        111
NORC. *See* National Opinion Research
        Center
*Nordyke v. King,* 278, 284
NRA. *See* National Rifle Association
NSDS. *See* National Self-Defense Survey
NSPFO. *See* National Study of Private
        Firearms Ownership
NVDRS. *See* National Violent Death
        Reporting System
NVSS. *See* National Vital Statistics System

# O

Observational data, 239, 299
Offenders, 64
Offenders obtaining firearms, 73–82
    gun sources, 77–82
    in illegal firearm acquisition, 73–82
    legal and illegal firearms commerce, 73–
        77
Office of Juvenile Justice and Delinquency
        Prevention, 202
Office of Science and Technology, 215
Operation Ceasefire, 9–10, 236–241
Outcomes
    measures of, 203, 208–211
    of potential criminal encounters, 107
Ownership data, 4, 41–42, 164–170, 194

# P

*Palko v. Connecticut,* 288
Patchwork of data sets, 20–42
    data on firearms ownership, use, and
        markets, 34–42
    data on violence and crime, 20–34

Copyright © National Academy of Sciences. All rights reserved.

Patterns of firearm-related violence, 18, 53–71
  firearm availability and ownership, 56–59
  firearm-related harm, 59–71
  homicide rates by country, 54–56
Penalties, mandatory, for unlawful carrying of guns, 226–229
Personal Protection Act, in the District of Columbia, 279
Pittsburgh, Pennsylvania, police gun suppression patrols in, 233
*Planned Parenthood v. Casey,* 296
Plassmann and Tideman's results, 134
Plassmann and Whitley's results, 135–136
Police Foundation, 75, 86
Police gun suppression patrols, in Pittsburgh, 233
Policing gun violence hot spots, 230–235
  Indianapolis, Indiana, directed patrol project, 232–233
  Kansas City Gun Project, 231–232
  lessons learned, 234–235
  New York Police Department's street crime unit, 233–234
  police gun suppression patrols in Pittsburgh, 233
Policing violent gun offenders, 235–241
  Boston Gun Project and Operation Ceasefire, 236–239
  lessons learned, 241
  other applications of the pulling-levers focused deterrence approach, 240–241
  St. Louis youth Firearm Suppression Program, 235–236
  supply-side programs, 239–240
Policy studies, recommendations for needed, 196
Potential criminal encounters, stages and outcome of, 107
*Presser v. Illinois,* 287
Prevalence rates, 37
Prevention laws, preventing child access, 217–219
Prevention programs, and technology, 9
Primary sampling units (PSU), 58
Probability, of injury and loss among victims by means of self-defense with a firearm, 115

Problem-oriented policing to prevent firearm-related crime, 230–241
  policing gun violence hot spots, 230–235
  policing violent gun offenders, 235–241
Production-based estimates, 56–57
Project Exile, 9–10, 225–226
Project Safe Neighborhoods, 221
Property crimes, disaggregate, 148
Proxy measures of gun ownership, 41–42, 164–170, 194
  correlation coefficient between a proxy and gun ownership rates, 165
  Monte Carlo design, 169
  and suicides using a firearm to household gun ownership, 167
PSU. *See* Primary sampling units
Psychological autopsy studies, of firearm prevalence, 173–181
"Pulling-levers" focused deterrence approach, applications of, 237, 240–241

**Q**

Quality
  of data, 16
  of the research, 213–214
Quasi-experimental studies of gun laws and suicide, 192–193

**R**

RAND Corporation, 235
Rape, with firearm involvement, 66
"Rare outcome assumption," 197
"Reasonable" infringements, on the Second Amendment right, 295–297
Recommendations, 3–5, 192–196
  data systems, 194–195
  defensive gun use, 6–7
  emerging data systems on violent events, 3
  on firearms, criminal violence, and suicide, 5–6
  on firearms use surveys, 113–114
  further policy studies needed, 196
  improved individual-level studies, 195–196
  methodological approaches, 4–5
  ownership data, 4

Copyright © National Academy of Sciences. All rights reserved.

Firearms and Violence: A Critical Review
http://www.nap.edu/catalog/10881.html

proxy measures of gun ownership, 194
research, 5–10
right-to-carry laws, 7
"Region-interacted time pattern model,"
dummy variable model with, 123
Regulation of gun dealers, to reduce
criminal access to firearms, 89–92
*Renton v. Playtime Theatres,* 297
Replication, in firearms use surveys, 113–114
Representativeness, of research data, 42–43
Research data. *See also* Empirical research;
Studies; Survey research
accuracy, 43
comprehensiveness, 44–45
general objectives for developing useful,
42–48
representativeness, 42–43
standardization in developing useful, 45–
47
timeliness, 48
Research recommendations, 5–10
deterrence and defense, 6–7
firearms, criminal violence, and suicide,
5–6
interventions to reduce violence and
suicide, 8–10
RESET test, 307
Response problems in firearms use surveys,
108–114
external validity, 111–113
inaccurate response, 109–110
nonresponse, 110–111
replication and recommendations, 113–
114
"Response" to Wilson's "Dissent," 18,
272–275
committee control variable analysis,
273–274
committee trend model analysis, 274–
275
published studies, 273
Restricted access, 8–9
Restrictions on an individual Second
Amendment right, 288–297
"infringements," 292–294
"reasonable" infringements, 295–297
scope of, 289–292
Reverse causality framework, 153
Revised new data sets, 126–127, 139
Revised original data sets, 122, 125–126
Richmond, Virginia, Project Exile, 9–10,
225–226

Right-to-carry (RTC) laws, 7, 18, 120–151,
269–271
analyzing estimates for robustness, 139–
150
description of the data and methods,
121–125
statistical analyses of, 125–139
statistical issues in the evaluation of
effects of, 18, 299–308
Risk
attributable, 198–200
of suicide among recent gun purchasers,
181–183
Robberies, 65–66
rate of, by firearm involvement, 66
Robustness, analyzing estimates for, 139–
150
RTC. *See* Right-to-carry laws

**S**

Safety technology, 214–220
Samples. *See also* Updated sample endpoint
administrative and convenience, 37–41
Sampling design, comparing the NCVS and
NSDS, 104
Scalia, Antonin, 286
Scofflaws, among FFLs, 90
Scope
in developing useful research data, 44–
45
of the Second Amendment right, 289–
292
Screening of gun buyers, to reduce criminal
access to firearms, 93–95
Second Amendment right, 276–298
the federal courts of appeals and, 284
"gun control" and, 14–15
individual right interpretation of, 280–
288
"infringements" on, 292–294
U.S. Supreme Court and, 284–287
Self-defense with a firearm, 18, 102–119
defensive gun uses, 103–114
efficacy of, 114–119
Self-harm, firearms and, 66–69
Sentencing enhancements, for firearm-
related crimes, 223–226
Sexual assaults, with firearm involvement, 66
Shall-issue laws, 120n
SHR. *See* Supplemental Homicide Reports

Copyright © National Academy of Sciences. All rights reserved.

*Silveira v. Lockyer,* 278
Souter, David, 287
Specification search, 307
Spurious correlation framework, 153
St. Louis youth Firearm Suppression Program (FSP), 235–236
Stages, of potential criminal encounters, 107
Standard errors, in statistical analyses of right-to-carry laws, 137–139
Standardization in developing useful research data, 45–47
    Data Elements for Emergency Department Systems, 47
    International Classification of External Causes of Injury, 47
Standards, for firearms research, 16–18
STAR. *See* Straight Talk about Risks
Statistical analyses of right-to-carry laws, 125–139
    control variables and specification, 128–135
    Lott's results, 125–127
    standard errors in, 137–139
    summary of selected studies, 130–133
    trend in the logarithm of the violent crime rate, 135
    updated sample endpoint, 135–137
Statistical issues in the evaluation of the effects of right-to-carry laws, 18, 299–308
    choosing the explanatory variables, 299–304
    estimating the relation to crime rates and the explanatory variables, 304–308
Stevens, John Paul, 287
"Stopping rule," 172
Straight Talk about Risks (STAR), 213
Studies
    design of, 211–213
    policy, 196
    published, 273
Subjective assessments, of self-defense with a firearm, 117
Substitution, 8
    and confounders, 163–164
    in illegal firearm acquisition, 88–89
Suicide rates. *See also* Firearms and suicide
    associations with gun ownership across time, 162–163
    by firearm involvement, 68
    quasi-experimental studies of, 192–193
    by race, 69

Supplemental Homicide Reports (SHR), 32, 64
Supply, of illegal firearms, 85–86
Supply-side programs, 239–240
Survey research, 34–37, 77–79, 113–114
    aggregation of individual responses, 58–59
    coverage of defensive gun use surveys, 105–108
    survey-based estimates, 57–58

T

Technology
    of firearms safety, 214–220
    of locking, 215–217
    and prevention programs, 9
"Third factor" confounder framework, 153
Thomas, Clarence, 286
Time series studies of gun laws and suicide, 185–192
    cross-sectional studies of gun laws and suicide, 186–189
    interrupted-time-series studies of gun laws and suicide, 188–191
    quasi-experimental studies of gun laws and suicide, 192–193
Timeliness, of research data, 48
Trafficking channels, volume of firearms diverted through, 81
Trend model analysis, 92, 132–133
    committee, 274–275
    with common time pattern, 128–129, 142–143
    with varying postlaw change durations, 150–151
Triad model, 124–125

U

UCR. *See* Uniform Crime Reports
Uniform Crime Reports (UCR), 21, 31–32, 44–46, 59n, 61, 65, 136–137
*United States v. Cruikshank,* 287
*United States v. Emerson,* 276–279, 284
*United States v. Miller,* 285–286
University of Michigan, Institute for Social Research, 45
Unlawful carrying of guns, mandatory penalties for, 226–229

Copyright © National Academy of Sciences. All rights reserved.

Firearms and Violence: A Critical Review
http://www.nap.edu/catalog/10881.html

Updated sample endpoint, in statistical
        analyses of right-to-carry laws, 135–
        137
U.S. Census Bureau, 46, 80
U.S. Constitution. *See* First Amendment
        principles; Fourteenth Amendment;
        Second Amendment right
U.S. cross-sectional associations, studies of,
        155–161
U.S. Department of Justice, 37
U.S. homicide rates, 56

### V

Victims, 62–63
Vintage, of guns, 88–89
Violence, interventions to reduce, 8–10
Violent Crime Control and Law
        Enforcement Act, 96
Violent crimes, disaggregate, 146–147
Violent events, emerging data systems on, 3
Volume of firearms diverted, through
        trafficking channels, 81

### W

Weaponry in homicide, 61–62
    murder rates by weapon type, 62
Web-based Injury Statistics Query and
        Reporting System (WISQARS), 63n
Wilson's "Dissent," 18, 269–271
    Committee response to, 18, 272–275
WISQARS. *See* Web-based Injury Statistics
        Query and Reporting System
World Health Organization, 47

### Y

YCGII. *See* Youth Crime Gun Interdiction
        Initiative
Youth, firearms and, 28–29
Youth Crime Gun Interdiction Initiative
        (YCGII), 39, 79–80
Youth Risk Behavior Surveillance System,
        45, 195

Copyright © National Academy of Sciences. All rights reserved.

# EXHIBIT 11

# CRIME, DETERRENCE, AND RIGHT-TO-CARRY CONCEALED HANDGUNS

*JOHN R. LOTT, JR., and DAVID B. MUSTARD\**

## Abstract

Using cross-sectional time-series data for U.S. counties from 1977 to 1992, we find that allowing citizens to carry concealed weapons deters violent crimes, without increasing accidental deaths. If those states without right-to-carry concealed gun provisions had adopted them in 1992, county- and state-level data indicate that approximately 1,500 murders would have been avoided yearly. Similarly, we predict that rapes would have declined by over 4,000, robbery by over 11,000, and aggravated assaults by over 60,000. We also find criminals substituting into property crimes involving stealth, where the probability of contact between the criminal and the victim is minimal. Further, higher arrest and conviction rates consistently reduce crime. The estimated annual gain from all remaining states adopting these laws was at least $5.74 billion in 1992. The annual social benefit from an additional concealed handgun permit is as high as $5,000.

## I. Introduction

W[ILL] allowing concealed handguns make it likely that otherwise law-abiding citizens will harm each other? Or will the threat of citizens carrying weapons primarily deter criminals? To some, the logic is fairly straightforward. Philip Cook argues that ''[i]f you introduce a gun into a violent encounter, it increases the chance that someone will die.''[1] A large number of murders may arise from unintentional fits of rage that are quickly regretted, and simply keeping guns out of people's reach would prevent deaths.[2] Us-

---

\* The authors would like to thank Gary Becker, Phil Cook, Clayton Cramer, Gertrud Fremling, Ed Glaeser, Hide Ichimura, Don Kates, Gary Kleck, David Kopel, William Landes, David McDowall, Derek Neal, Bob Reed, and Dan Polsby and the seminar participants at the Cato Institute, University of Chicago, Emory University, Fordham University, Harvard University, Northwestern University, Stanford University, Valparaiso University, American Law and Economics Association meetings, American Society of Criminology, and the Western Economic Association meetings for their unusually helpful comments. Lott would like to thank the Law and Economics program at the University of Chicago Law School for the funding that he receives as the John M. Olin Visiting Law and Economics Fellow.

[1] Editorial, Cincinnati Enquirer, January 23, 1996, at A8.

[2] See P. J. Cook, The Role of Firearms in Violent Crime, in Criminal Violence 236–91 (M. E. Wolfgang & N. A. Werner eds. 1982); and Franklin Zimring, The Medium Is the

[*Journal of Legal Studies,* vol. XXVI (January 1997)]
© 1997 by The University of Chicago. All rights reserved. 0047-2530/97/2601-0001$01.50

ing the National Crime Victimization Survey, Cook further states that each year there are "only" 80,000–82,000 defensive uses of guns during assaults, robberies, and household burglaries.[3] By contrast, other surveys imply that private firearms may be used in self-defense up to two and a half million times each year, with 400,000 of these defenders believing that using the gun "almost certainly" saved a life.[4] With total firearm deaths from homicides and accidents equaling 19,187 in 1991,[5] the Kleck and Gertz numbers, even if wrong by a very large factor, suggest that defensive gun use on net saved lives.

While cases like the 1992 incident where a Japanese student was shot on his way to a Halloween party in Louisiana make international headlines,[6] they are rare. In another highly publicized case, a Dallas resident recently became the only Texas resident so far charged with using a permitted concealed weapon in a fatal shooting.[7] Yet, in neither case was the shooting

Message: Firearm Caliber as a Determinant of Death from Assault, 1 J. Legal Stud. 97 (1972), for these arguments.

[3] P. J. Cook, The Technology of Personal Violence, 14 Crime and Justice: Annual Review of Research 57, 56 n.4 (1991). It is very easy to find people arguing that concealed handguns will have no deterrence effect. H. Richard Uviller, Virtual Justice 95 (1996), writes that "[m]ore handguns lawfully in civilian hands will not reduce deaths from bullets and cannot stop the predators from enforcing their criminal demands and expressing their lethal purposes with the most effective tool they can get their hands on."

[4] Gary Kleck & Marc Gertz, Armed Resistance to Crime: The Prevalence and Nature of Self-Defense with a Gun, 86 J. Crim. L. & Criminology 150, 153, 180, 180–82 (Fall 1995). Kleck and Gertz's survey of 10 other nationwide polls implies a range of 764,036–3,609,682 defensive uses of guns per year. Recent evidence confirms other numbers from Kleck and Gertz's study. For example, Annest et al. estimate that 99,025 people sought medical treatment for nonfatal firearm woundings. When one considers that many criminals will not seek treatment for wounds and that not all wounds require medical treatment, Kleck and Gertz's estimates of 200,000 woundings seems somewhat plausible, though even Kleck and Gertz believe that this is undoubtedly too high given the very high level of marksmanship that this implies by those shooting the guns. Yet, even if the true number of times that criminals are wounded is much smaller, it still implies that criminals face a very real expected cost from attacking armed civilians. See J. L. Annest, J. A. Mercy, D. R. Gibson, & G. W. Ryan, National Estimates of Nonfatal Firearm-Related Injuries: Beyond the Tip of the Iceberg, J. A.M.A. 1749–54 (June 14, 1995); and also Lawrence Southwick, Jr., Self-Defense with Guns: The Consequences (working paper, SUNY Buffalo 1996), for a discussion on the defensive uses of guns.

[5] U.S. Bureau of the Census, Statistical Abstract of the United States (115th ed. 1995).

[6] Japan Economic Newswire, U.S. Jury Clears Man Who Shot Japanese Student, Kyodo News Service, May 24, 1993; and Lori Sharn, Violence Shoots Holes in USA's Tourist Image, USA TODAY, September 9, 1993, at 2A.

[7] Dawn Lewis of Texans against Gun Violence provided a typical reaction from gun control advocates to the grand jury decision not to charge Gordon Hale. She said, "We are appalled. This law is doing what we expected, causing senseless death." Mark Potok, Texan says the concealed gun law saved his life: "I did what I thought I had to do," USA TODAY, March 22, 1996, at 3A. For a more recent evaluation of the Texas experience, see Few Problems Reported after Allowing Concealed Handguns, Officers Say, Fort Worth Star-Telegram, July 16, 1996. By the end of June 1996, more than 82,000 permits had been issued in Texas.

found to be unlawful.[8] The rarity of these incidents is reflected in Florida statistics: 221,443 licenses were issued between October 1, 1987, and April 30, 1994, but only 18 crimes involving firearms were committed by those with licenses.[9] While a statewide breakdown on the nature of those crimes is not available, Dade County records indicate that four crimes involving a permitted handgun took place there between September 1987 and August 1992, and none of those cases resulted in injury.[10]

The potential defensive nature of guns is indicated by the different rates of so-called hot burglaries, where residents are at home when the criminals strike.[11] Almost half the burglaries in Canada and Britain, which have tough gun control laws, are ''hot burglaries.'' By contrast, the United States, with laxer restrictions, has a ''hot burglary'' rate of only 13 percent. Consistent with this, surveys of convicted felons in America reveal that they are much more worried about armed victims than they are about running into the police. This fear of potentially armed victims causes American burglars to spend more time than their foreign counterparts ''casing'' a house to ensure that nobody is home. Felons frequently comment in these interviews that they avoid late-night burglaries because ''that's the way to get shot.''[12]

---

[8] In fact, police accidentally killed 330 innocent individuals in 1993, compared to the mere 30 innocent people accidentally killed by private citizens who mistakenly believed the victim was an intruder. John R. Lott, Jr., Now That the Brady Law Is Law, You Are Not Any Safer than Before, Philadelphia Inquirer, February 1, 1994, at A9.

[9] Clayton E. Cramer & David B. Kopel, ''Shall Issue'': The New Wave of Concealed Handgun Permit Laws, 62 Tenn. L. Rev. 679, 691 (Spring 1995). An expanded version of this paper dated 1994 is available from the Independence Institute, Golden, Colorado. Similarly, Multnomah County, Oregon, issued 11,140 permits over the period January 1990 to October 1994 and experienced five permit holders being involved in shootings, three of which were considered justified by grand juries. Out of the other two cases, one was fired in a domestic dispute and the other was an accident that occurred while an assault rifle was being unloaded. Bob Barnhart, Concealed Handgun Licensing in Multnomah County (photocopy, Intelligence/Concealed Handgun Unit, Multnomah County, October 1994).

[10] Cramer & Kopel, *supra* note 9, at 691–92.

[11] For example, David B. Kopel, The Samurai, the Mountie, and the Cowboy 155 (1992); and Lott, *supra* note 8.

[12] Wright and Rossi (p. 151) interviewed felony prisoners in 10 state correctional systems and found that 56 percent said that criminals would not attack a potential victim that was known to be armed. They also found evidence that criminals in those states with the highest levels of civilian gun ownership worried the most about armed victims. James D. Wright & Peter Rossi, Armed and Considered Dangerous: A Survey of Felons and Their Firearms (1986).

Examples of stories where people successfully defend themselves from burglaries with guns are quite common. For example, see Burglar Puts 92-Year-Old in the Gun Closet and Is Shot, New York Times, September 7, 1995, at A16. George F. Will, Are We ''a Nation of Cowards''? Newsweek, November 15, 1993, discusses more generally the benefits produced from an armed citizenry.

In his paper on airplane hijacking, William M. Landes, An Economic Study of U.S. Aircraft Hijacking, 1961–1976, 21 J. Law & Econ. 1 (April 1978), references a quote by Archie

The case for concealed handgun use is similar. The use of concealed handguns by some law-abiding citizens may create a positive externality for others. By the very nature of these guns being concealed, criminals are unable to tell whether the victim is armed before they strike, thus raising criminals' expected costs for committing many types of crimes.

Stories of individuals using guns to defend themselves has helped motivate 31 states to adopt laws requiring authorities to issue, without discretion, concealed-weapons permits to qualified applicants.[13] This constitutes a dramatic increase from the nine states that allowed concealed weapons in 1986.[14] While many studies examine the effects of gun control,[15] and a smaller number of papers specifically address the right-to-carry concealed firearms,[16] these papers involve little more than either time-series or cross-sectional evidence comparing mean crime rates, and none controls for variables that normally concern economists (for example, the probability of arrest and conviction and the length of prison sentences or even variables like personal income).[17] These papers fail to recognize that, since it is frequently only the largest population counties that are very restrictive when local authorities have been given discretion in granting concealed handgun permits, ''shall issue'' concealed handgun permit laws, which require permit requests be granted unless the individual has a criminal record or a history of significant mental illness,[18] will not alter the number of permits being issued in all counties.

─────────

Bunker from the television show ''All in the Family'' that is quite relevant to the current discussion. Landes quotes Archie Bunker as saying ''Well, I could stop hi-jacking tomorrow . . . if everyone was allowed to carry guns them hi-jackers wouldn't have no superiority. All you gotta do is arm all the passengers, then no hi-jacker would risk pullin' a rod.''

[13] These states were Alabama, Alaska, Arizona, Arkansas, Connecticut, Florida, Georgia, Idaho, Indiana, Kentucky, Louisiana, Maine, Mississippi, Montana, Nevada, New Hampshire, North Carolina, North Dakota, Oklahoma, Oregon, Pennsylvania, South Carolina, South Dakota, Tennessee, Texas, Utah, Vermont, Virginia, Washington, West Virginia, and Wyoming.

[14] These states were Alabama, Connecticut, Indiana, Maine, New Hampshire, North Dakota, South Dakota, Vermont, and Washington. Fourteen other states provided local discretion on whether to issue permits: California, Colorado, Delaware, Hawaii, Iowa, Louisiana, Maryland, Massachusetts, Michigan, Minnesota, New Jersey, New York, Rhode Island, and South Carolina.

[15] See Gary Kleck, Guns and Violence: An Interpretive Review of the Field, 1 Soc. Pathology 12–47 (January 1995), for a survey.

[16] For example, P. J. Cook, Stephanie Molliconi, & Thomas B. Cole, Regulating Gun Markets, 86 J. Crim. L. & Criminology, 59–92 (Fall 1995); Cramer & Kopel, *supra* note 9; David McDowall, Colin Loftin, & Brian Wiersema, Easing Concealed Firearm Laws: Effects on Homicide in Three States, 86 J. Crim. L. & Criminology 193–206 (Fall 1995); and Gary Kleck & E. Britt Patterson, The Impact of Gun Control and Gun Ownership Levels on Violence Rates, 9 J. Quantitative Criminology 249–87 (1993).

[17] All 22 gun control papers studied by Kleck, *supra* note 15, use either cross-sectional state or city data or use time-series data for the entire United States or a particular city.

[18] Cramer & Kopel, *supra* note 9, at 680–707.

Other papers suffer from additional weaknesses. The paper by McDowall *et al.,*[19] which evaluates right-to-carry provisions, was widely cited in the popular press. Yet, their study suffers from many major methodological flaws: for instance, without explanation, they pick only three cities in Florida and one city each in Mississippi and Oregon (despite the provisions involving statewide laws), and they use neither the same sample period nor the same method of picking geographical areas for each of those cities.[20]

Our paper hopes to overcome these problems by using annual cross-sectional time-series county-level crime data for the entire United States from 1977 to 1992 to investigate the effect of ''shall issue'' right-to-carry concealed handgun laws. It is also the first paper to study the questions of deterrence using these data. While many recent studies employ proxies for deterrence—such as police expenditures or general levels of imprisonment—we are able to use arrest rates by type of crime and for a subset of our data also conviction rates and sentence lengths by type of crime.[21] We also attempt to analyze a question noted but not empirically addressed in this literature: the concern over causality between increases in handgun usage and crime rates. Is it higher crime that leads to increased handgun ownership, or the reverse? The issue is more complicated than simply whether carrying concealed firearms reduces murders because there are questions over whether criminals might substitute between different types of crimes as well as the extent to which accidental handgun deaths might increase.

## II. Problems Testing the Effect of ''Shall Issue'' Concealed Handgun Provisions on Crime

Following Becker (1968), many economists have found evidence broadly consistent with the deterrent effect of punishment.[22] The notion is that the

[19] McDowall *et al., supra* note 16.

[20] Equally damaging, the authors appear to concede in a discussion that follows their piece that their results are highly sensitive to how they define the crimes that they study. Even with their strange sample selection techniques, total murders appear to fall after the passage of concealed weapon laws. Because the authors only examine murders committed with guns, there is no attempt to control for any substitution effects that may occur between different methods of murder. For an excellent discussion of the McDowall *et al.* paper, see Daniel D. Polsby, Firearms Costs, Firearms Benefits and the Limits of Knowledge, 86 J. Crim. L. & Criminology 207–20 (Fall 1995).

[21] Recent attempts to relate the crime rate to the prison population concern us (see, for example, Levitt). Besides difficulties in relating the total prison population with any particular type of crime, we are also troubled by the ability to compare a stock (the prison population) with a flow (the crime rate). Steven Levitt, The Effect of Prison Population Size on Crime Rates: Evidence from Prison Overcrowding Litigation, 144 Q. J. Econ. (1996).

[22] Gary S. Becker, Crime and Punishment: An Economic Approach, 76 J. Pol. Econ. 169-217 (March/April 1968). For example, Isaac Ehrlich, Participation in Illegitimate Activities: A Theoretical and Empirical Investigation, 81 J. Pol. Econ. 521–65 (1973); Michael K.

expected penalty affects the prospective criminal's desire to commit a crime. This penalty consists of the probabilities of arrest and conviction and the length of the prison sentence. It is reasonable to disentangle the probability of arrest from the probability of conviction since accused individuals appear to suffer large reputational penalties simply from being arrested.[23] Likewise, conviction also imposes many different penalties (for example, lost licenses, lost voting rights, further reductions in earnings, and so on) even if the criminal is never sentenced to prison.[24]

While this discussion is well understood, the net effect of ''shall issue'' right-to-carry concealed handguns is ambiguous and remains to be tested when other factors influencing the returns to crime are controlled for. The first difficulty involves the availability of detailed county-level data on a variety of crimes over 3,054 counties during the period from 1977 to 1992. Unfortunately, for the time period we study, the Federal Bureau of Investigation's (FBI) Uniform Crime Report includes only arrest rate data rather than conviction rates or prison sentences. While we make use of the arrest rate information, we will also use county-level dummies, which admittedly constitute a rather imperfect way to control for cross-county differences such as differences in expected penalties. Fortunately, however, alternative variables are available to help us proxy for changes in legal regimes that affect the crime rate. One such method is to use another crime category as an exogenous variable that is correlated with the crimes that we are studying but at the same time is unrelated to the changes in right-to-carry firearm laws. Finally, after telephoning law enforcement officials in all 50 states, we were able to collect time-series county-level conviction rates and mean prison sentence lengths for three states (Arizona, Oregon, and Washington).

The FBI crime reports include seven categories of crime: murder, rape, aggravated assault, robbery, auto theft, burglary, and larceny.[25] Two addi-

---

Block & John Heineke, A Labor Theoretical Analysis of Criminal Choice, 65 Am. Econ. Rev. 314–25 (June 1975); Landes, *supra* note 12; John R. Lott, Jr., Juvenile Delinquency and Education: A Comparison of Public and Private Provision, 7 Int'l Rev. L. & Econ. 163–75 (December 1987); James Andreoni, Criminal Deterrence in the Reduced Form: A New Perspective on Ehrlich's Seminal Study, 33 Econ. Inquiry 476–83 (July 1995); Morgan O. Reynolds, Crime and Punishment in America (Policy Report 193, National Center for Policy Analysis, June 1995); and Levitt, *supra* note 21.

[23] John R. Lott, Jr., Do We Punish High Income Criminals Too Heavily? 30 Econ. Inquiry 583–608 (October 1992).

[24] John R. Lott, Jr., The Effect of Conviction on the Legitimate Income of Criminals, 34 Econ. Letters 381–85 (December 1990); John R. Lott, Jr., An Attempt at Measuring the Total Monetary Penalty from Drug Convictions: The Importance of an Individual's Reputation, 21 J. Legal Stud. 159–87 (January 1992); and Lott, *supra* note 23.

[25] Arson was excluded because of a large number of inconsistencies in the data and the small number of counties reporting this measure. Murder is defined as murder and nonnegligent manslaughter.

tional summary categories were included: violent crimes (including murder, rape, aggravated assault, and robbery) and property crimes (including auto theft, burglary, and larceny). Despite being widely reported measures in the press, these broader categories are somewhat problematic in that all crimes are given the same weight (for example, one murder equals one aggravated assault). Even the narrower categories are somewhat broad for our purposes. For example, robbery includes not only street robberies, which seem the most likely to be affected by ''shall issue'' laws, but also bank robberies, where, because of the presence of armed guards, the additional return to having armed citizens would appear to be small.[26] Likewise, larceny involves crimes of ''stealth,'' but these range from pickpockets, where ''shall issue'' laws could be important, to coin machine theft.[27]

This aggregation of crime categories makes it difficult to separate out which crimes might be deterred from increased handgun ownership and which crimes might be increased as a result of a substitution effect. Generally, we expect that the crimes most likely to be deterred by concealed handgun laws are those involving direct contact between the victim and the criminal, especially those occurring in a place where victims otherwise would not be allowed to carry firearms. For example, aggravated assault, murder, robbery, and rape seem most likely to fit both conditions, though obviously some of all these crimes can occur in places like residences where the victims could already possess firearms to protect themselves.

By contrast, crimes like auto theft seem unlikely to be deterred by gun ownership. While larceny is more debatable, in general—to the extent that these crimes actually involve ''stealth''—the probability that victims will

---

[26] Robbery includes street robbery, commercial robbery, service station robbery, convenience store robbery, residence robbery, and bank robbery. (See also the discussion of burglary for why the inclusion of residence robbery creates difficulty with this broad measure.) After we wrote this paper, two different commentators have attempted to argue that ''[i]f 'shall issue' concealed carrying laws really deter criminals from undertaking street crimes, then it is only reasonable to expect the laws to have an impact on robberies. Robbery takes place between strangers on the street. A high percentage of homicide and rape, on the other hand, occurs inside a home—where concealed weapons laws should have no impact. These findings strongly suggest that something else—not new concealed carry laws—is responsible for the reduction in crime observed by the authors.'' (Doug Weil, Response to John Lott's Study on the Impact of ''Carry Concealed'' Laws on Crime Rates, U.S. Newswire, August 8, 1996.) The curious aspect about the emphasis on robbery over other crimes like murder and rape is that if robbery is the most obvious crime to be affected by gun control laws, why have virtually no gun control studies examined robberies? In fact, Kleck's literature survey only notes one previous gun control study that examined the issue of robberies (see Kleck, *supra* note 15). Yet, more importantly, given that the FBI includes many categories of robberies besides robberies that ''take place between strangers on the street,'' it is not obvious why this should exhibit the greatest sensitivity to concealed handgun laws.

[27] Larceny includes pickpockets, purse snatching, shoplifting, bike theft, theft from buildings, theft from coin machines, and theft from motor vehicles.

notice the crime being committed seems low and thus the opportunities to use a gun are relatively rare. The effect on burglary is ambiguous from a theoretical standpoint. It is true that if ''shall issue'' laws cause more people to own a gun, the chance of a burglar breaking into a house with an armed resident goes up. However, if some of those who already owned guns now obtain right-to-carry permits, the relative cost of crimes like armed street robbery and certain other types of robberies (where an armed patron may be present) should rise relative to that for burglary.

Previous concealed handgun studies that rely on state-level data suffer from an important potential problem: they ignore the heterogeneity within states.[28] Our telephone conversations with many law enforcement officials have made it very clear that there was a large variation across counties within a state in terms of how freely gun permits were granted to residents prior to the adoption of ''shall issue'' right-to-carry laws.[29] All those we talked to strongly indicated that the most populous counties had previously adopted by far the most restrictive practices on issuing permits. The implication for existing studies is that simply using state-level data rather than county data will bias the results against finding any effect from passing right-to-carry provisions. Those counties that were unaffected by the law must be separated out from those counties where the change could be quite dramatic. Even cross-sectional city data[30] will not solve this problem, because without time-series data it is impossible to know what effect a change in the law had for a particular city.

There are two ways of handling this problem. First, for the national sample, we can see whether the passage of ''shall issue'' right-to-carry laws

[28] For example, Arnold S. Linsky, Murray A. Strauss, & Ronet Bachman-Prehn, Social Stress, Legitimate Violence, and Gun Availability (paper presented at the annual meeting of the Society for the Study of Social Problems, 1988); and Cramer & Kopel, *supra* note 9.

[29] Among those who made this comment to us were Bob Barnhardt, manager of the Intelligence/Concealed Handgun Unit of Multnomah County, Oregon; Mike Woodward, with the Oregon Law Enforcement Data System; Joe Vincent with the Washington Department of Licensing Firearms Unit; Alan Krug, who provided us with the Pennsylvania Permit data; and Susan Harrell, with the Florida Department of State Concealed Weapons Division. Evidence for this point with respect to Virginia is obtained from Eric Lipton, Virginians Get Ready to Conceal Arms; State's New Weapon Law Brings a Flood of Inquiries, Washington Post, June 28, 1995, at A1, where it is noted that ''[a]nalysts say the new law, which drops the requirement that prospective gun carriers show a 'demonstrated need' to be armed, likely won't make much of a difference in rural areas, where judges have long issued permits to most people who applied for them. But in urban areas such as Northern Virginia—where judges granted few permits because few residents could justify a need for them—the number of concealed weapon permits issued is expected to soar. In Fairfax, for example, a county of more than 850,000 people, only 10 now have permits.'' Cramer & Kopel, *supra* note 9. An expanded version of this paper dated 1994, available from the Independence Institute, Golden, Colorado, also raises this point with respect to California.

[30] For example, Kleck & Patterson, *supra* note 16.

produces systematically different effects between the high and low population counties. Second, for three states, Arizona, Oregon, and Pennsylvania, we have acquired time series data on the number of right-to-carry permits for each county. The normal difficulty with using data on the number of permits involves the question of causality: do more permits make crimes more costly or do higher crimes lead to more permits? The change in the number of permits before and after the change in the state laws allows us to rank the counties on the basis of how restrictive they had actually been in issuing permits prior to the change in the law. Of course, there is still the question of why the state concealed handgun law changed, but since we are dealing with county-level rather than state-level data, we benefit from the fact that those counties which had the most restrictive permitting policies were also the most likely to have the new laws exogenously imposed on them by the rest of their state.

Using county-level data also has another important advantage in that both crime and arrest rates vary widely within states. In fact, as Table 1 indicates, the standard deviation of both crime and arrest rates across states is almost always smaller than the average within-state standard deviation across counties. With the exception of robbery, the standard deviation across states for crime rates ranges from between 61 and 83 percent of the average of the standard deviation within states. (The difference between these two columns with respect to violent crimes arises because robberies make up such a large fraction of the total crimes in this category.) For arrest rates, the numbers are much more dramatic, with the standard deviation across states as small as 15 percent of the average of the standard deviation within states. These results imply that it is no more accurate to view all the counties in the typical state as a homogenous unit than it is to view all the states in the United States as one homogenous unit. For example, when a state's arrest rate rises, it may make a big difference whether that increase is taking place in the most or least crime-prone counties. Depending on which types of counties the changes in arrest rates are occurring in and depending on how sensitive the crime rates are to changes in those particular counties, widely differing estimates of how increasing a state's average arrest rate will deter crime could result. Aggregating these data may thus make it more difficult to discern the true relationship that exists between deterrence and crime.

Perhaps the relatively small across-state variation as compared to within-state variations is not so surprising given that states tend to average out differences as they encompass both rural and urban areas. Yet, when coupled with the preceding discussion on how concealed handgun provisions affected different counties in the same state differently, these numbers strongly imply that it is risky to assume that states are homogenous units

TABLE 1

| | Standard Deviation of State Means | Mean of Within-State Standard Deviations |
|---|---|---|
| Crime rates per 100,000 population: | | |
| Violent crimes | 284.77 | 255.57 |
| Murder | 6.12 | 8.18 |
| Murder with guns (1982–91) | 3.9211 | 6.4756 |
| Rape | 16.33 | 23.55 |
| Aggravated assault | 143.35 | 172.66 |
| Robbery | 153.62 | 92.74 |
| Property crime | 1,404.15 | 2,120.28 |
| Auto theft | 162.02 | 219.74 |
| Burglary | 527.70 | 760.22 |
| Larceny | 819.08 | 1,332.52 |
| Arrest rates defined as the number of arrests divided by the number of offenses:* | | |
| Violent crimes | 23.89 | 112.97 |
| Murder | 18.58 | 88.41 |
| Rape | 19.83 | 113.86 |
| Robbery | 21.97 | 104.40 |
| Aggravated assault | 25.30 | 78.53 |
| Property crimes | 7.907 | 44.49 |
| Burglary | 5.87 | 25.20 |
| Larceny | 11.11 | 71.73 |
| Auto theft | 17.37 | 118.94 |
| Truncating arrest rates to be no greater than one: | | |
| Violent crimes | 11.11 | 25.40 |
| Murder | 10.78 | 36.40 |
| Rape | 10.60 | 31.59 |
| Robbery | 8.06 | 32.67 |
| Aggravated assault | 11.14 | 27.08 |
| Property crimes | 5.115 | 11.99 |
| Burglary | 4.63 | 14.17 |
| Larceny | 5.91 | 12.97 |
| Auto theft | 8.36 | 26.66 |

* Because of multiple arrests for a crime and because of the lags between when a crime occurs and an arrest takes place, the arrest rate for counties and states can be greater than one. This is much more likely to occur for counties than for states.

with respect to either how crimes are punished or how the laws which affect gun usage are changed. Unfortunately, this focus of state-level data is pervasive in the entire crime literature, which focuses on state- or city-level data and fails to recognize the differences between rural and urban counties.

However, using county-level data has some drawbacks. Frequently, because of the low crime rates in many low population counties, it is quite common to find huge variations in the arrest and conviction rates between years. In addition, our sample indicates that annual conviction rates for some counties are as high as 13 times the offense rate. This anomaly arises for a couple reasons. First, the year in which the offense occurs frequently differs from the year in which the arrests and/or convictions occur. Second, an offense may involve more than one offender. Unfortunately, the FBI data set allows us neither to link the years in which offenses and arrests occurred nor to link offenders with a particular crime. When dealing with counties where only a few murders occur annually, arrests or convictions can be multiples higher than the number of offenses in a year. This data problem appears especially noticeable for murder and rape.

One partial solution is to limit the sample to only counties with large populations. For counties with a large numbers of crimes, these waves have a significantly smoother flow of arrests and convictions relative to offenses. An alternative solution is to take a moving average of the arrest or conviction rates over several years, though this reduces the length of the usable sample period, depending on how many years are used to compute this average. Furthermore, the moving average solution does nothing to alleviate the effect of multiple suspects being arrested for a single crime.

Another concern is that otherwise law-abiding citizens may have carried concealed handguns even before it was legal to do so. If shall issue laws do not alter the total number of concealed handguns carried by otherwise law-abiding citizens but merely legalizes their previous actions, passing these laws seems unlikely to affect crime rates. The only real effect from making concealed handguns legal could arise from people being more willing to use handguns to defend themselves, though this might also imply that they will be more likely to make mistakes using these handguns.

It is also possible that concealed firearm laws both make individuals safer and increase crime rates at the same time. As Peltzman has pointed out in the context of automobile safety regulations, increasing safety can result in drivers offsetting these gains by taking more risks in how they drive.[31] The same thing is possible with regard to crime. For example, allowing citizens to carry concealed firearms may encourage people to risk entering more

---

[31] Sam Peltzman, The Effects of Automobile Safety Regulation, 83 J. Pol. Econ. 677–725 (August 1975).

dangerous neighborhoods or to begin traveling during times they previously avoided. Thus, since the decision to engage in these riskier activities is a voluntary one, it is possible that society still could be better off even if crime rates were to rise as a result of concealed handgun laws.

Finally, there are also the issues of why certain states adopted concealed handgun laws and whether higher offense rates result in lower arrest rates. To the extent that states adopted the law because crime was rising, ordinary least squares (OLS) estimates would underpredict the drop in crime. Likewise, if the rules were adopted when crime rates were falling, the bias would be in the opposite direction. None of the previous studies deal with this last type of potential bias. At least since Ehrlich,[32] economists have also realized that potential biases exist from having the offense rate as both the endogenous variable and the denominator in determining the arrest rate and because increasing crime rates may lower the arrest rate if the same resources are being asked to do more work. Fortunately, both these sets of potential biases can be dealt with using two-stage least squares (2SLS).

## III. The Data

Between 1977 and 1992, 10 states (Florida (1987), Georgia (1989), Idaho (1990), Maine (1985),[33] Mississippi (1990), Montana (1991), Oregon (1990), Pennsylvania (1989), Virginia (1988),[34] and West Virginia (1989)) adopted ''shall issue'' right-to-carry firearm laws. However, Pennsylvania is a special case because Philadelphia was exempted from the state law during our sample period. Eight other states (Alabama, Connecticut, Indiana, New Hampshire, North Dakota, South Dakota, Vermont, and Washington) effectively had these laws on the books prior to the period being studied.[35] Since the data are at the county level, a dummy variable is set equal to one for each county operating under ''shall issue'' right-to-carry laws. A Nexis

---

[32] Ehrlich, *supra* note 22, at 548–53.

[33] While we will follow Cramer and Kopel's definition of what constitutes a ''shall issue'' or a ''do issue'' state, one commentator has suggested that it is not appropriate to include Maine in these categories (Stephen P. Teret, Critical Comments on a Paper by Lott and Mustard (photocopy, Johns Hopkins University, School of Hygiene and Public Health, August 7, 1996)). Either defining Maine so that the ''shall issue'' dummy equals zero for it or removing Maine from the data set does not alter the findings shown in this paper. Please see note 49 *infra* for a further discussion.

[34] While the intent of the 1988 legislation in Virginia was clearly to institute a ''shall issue'' law, the law was not equally implemented in all counties in the state. To deal with this problem, we reran the regressions reported in this paper with the ''shall issue'' dummy both equal to 1 and 0 for Virginia. The results as reported later in footnote 49 are very similar in the two cases.

[35] We rely on Cramer & Kopel, *supra* note 9, for this list of states. Some states known as ''do issue'' states are also included in Cramer and Kopel's list of ''shall issue'' states though these authors argue that for all practical purposes these two groups of states are identical.

search was conducted to determine the exact date on which these laws took effect. For the states that adopted the law during the year, the dummy variable for that year is scaled to equal that portion of the year for which the law was in effect. Because of delays in implementing the laws even after they go into effect, we also used a dummy variable that equals one starting during the first full year that the law is in effect. The following tables report this second measure, though both measures produced similar results.

While the number of arrests and offenses for each type of crime in every county from 1977 to 1992 were provided by the Uniform Crime Report, we also contacted the state departments of corrections, state attorneys general, state secretaries of state, and state police offices in every state to try to compile data on conviction rates, sentence lengths, and right-to-carry concealed weapons permits by county. The Bureau of Justice Statistics also released a list of contacts in every state that might have available state-level criminal justice data. Unfortunately, county data on the total number of outstanding right-to-carry pistol permits were available for only Arizona, California, Florida, Oregon, Pennsylvania, and Washington, though time-series county data before and after a change in the permitting law were available only for Arizona (1994–96), Oregon (1990–92) and Pennsylvania (1986–92). Since the Oregon ''shall issue'' law passed in 1990, we attempted to get data on the number of permits in 1989 by calling up every county sheriff in Oregon, with 25 of the 36 counties providing us with this information. (The remaining counties claimed that records had not been kept.)[36] For Oregon, data on the county-level conviction rate and prison sentence length were also available from 1977 to 1992.

One difficulty with the sentence length data is that Oregon passed a sentencing reform act that went into effect in November 1989 causing criminals to serve 85 percent of their sentence, and thus judges may have correspondingly altered their rulings. Even then, this change was phased in over time because the law applied only to crimes that took place after it went into effect in 1989. In addition, the Oregon system did not keep complete records prior to 1987, and the completeness of these records decreased the further into the past one went. One solution to both of these problems is to interact the prison sentence length with year dummy variables. A similar problem exists for Arizona, which adopted a truth-in-sentencing reform during the fall of 1994. Finally, Arizona is different from Oregon and Pennsylvania in that it already allowed handguns to be carried openly before passing its concealed handgun law, thus one might expect to find a somewhat smaller response to adopting a concealed handgun law.

---

[36] The Oregon counties providing permit data were Benton, Clackamas, Coos, Curry, Deschutes, Douglas, Gilliam, Hood River, Jackson, Jefferson, Josephine, Klamath, Lane, Linn, Malheur, Marion, Morrow, Multnomah, Polk, Tillamook, Washington, and Yamhill.

TABLE 2

NATIONAL SAMPLE MEANS AND STANDARD DEVIATIONS

| Variable | N | Mean | S.D. |
|---|---|---|---|
| Gun ownership information: | | | |
| Shall issue dummy | 50,056 | .164704 | .368089 |
| Arrests rates (ratio of arrests to offenses) for a particular crime category: | | | |
| Index crimes | 45,108 | 27.43394 | 126.7298 |
| Violent crimes | 43,479 | 71.30733 | 327.2456 |
| Property crimes | 45,978 | 24.02564 | 120.8654 |
| Murder | 26,472 | 98.04648 | 109.7777 |
| Rape | 33,887 | 57.8318 | 132.8028 |
| Aggravated assault | 43,472 | 71.36647 | 187.354 |
| Robbery | 34,966 | 61.62276 | 189.5007 |
| Burglary | 45,801 | 21.51446 | 47.28603 |
| Larceny | 45,776 | 25.57141 | 263.706 |
| Auto theft | 43,616 | 44.8199 | 307.5356 |
| Crime rates are defined per 100,000 people: | | | |
| Index crimes | 46,999 | 2,984.99 | 3,368.85 |
| Violent crimes | 47,001 | 249.0774 | 388.7211 |
| Property crimes | 46,999 | 2,736.59 | 3,178.41 |
| Murder | 47,001 | 5.651217 | 10.63025 |
| Murder with guns (1982–91 in counties over 100,000) | 12,759 | 3.9211 | 6.4756 |
| Rape | 47,001 | 18.7845 | 32.39292 |
| Robbery | 47,001 | 44.6861 | 149.2124 |
| Aggravated assault | 47,001 | 180.0518 | 243.2615 |
| Burglary | 47,001 | 811.8642 | 1,190.23 |
| Larceny | 47,000 | 1,764.37 | 2,036.03 |
| Auto theft | 47,000 | 160.4165 | 284.5969 |
| Causes of accidental deaths and murders per 100,000 people: | | | |
| Rate of accidental deaths from guns | 23,278 | .151278 | 1.216175 |
| Rate of accidental deaths from sources other than guns | 23,278 | 1.165152 | 4.342401 |
| Rate of total accidental deaths | 23,278 | 51.95058 | 32.13482 |
| Rate of murders using handgun | 23,278 | .444301 | 1.930975 |
| Rate of murders using other guns | 23,278 | 3.477088 | 6.115275 |
| Real per capita income data (in real 1983 dollars): | | | |
| Personal income | 50,011 | 10,554.21 | 2,498.07 |
| Unemployment insurance | 50,011 | 67.57505 | 53.10043 |
| Income maintenance | 50,011 | 157.2265 | 97.61466 |
| Retirement payments per person over 65 | 49,998 | 12,328.5 | 4,397.49 |
| Population characteristics: | | | |
| County population | 50,023 | 75,772.78 | 250,350.4 |
| County population per square mile | 50,023 | 214.3291 | 1,421.25 |
| State population | 50,056 | 6,199,949 | 5,342,068 |
| State NRA membership per 100,000 state population | 50,056 | 1,098.11 | 516.0701 |
| % of votes Republican in presidential election | 50,056 | 52.89235 | 8.410228 |

TABLE 2 (*Continued*)

| Variable | N | Mean | S.D. |
|---|---|---|---|
| Race and age data (% of population): | | | |
| Black male 10–19 | 50,023 | .920866 | 1.556054 |
| Black female 10–19 | 50,023 | .892649 | 1.545335 |
| White male 10–19 | 50,023 | 7.262491 | 1.747557 |
| White female 10–19 | 50,023 | 6.820146 | 1.673272 |
| Other male 10–19 | 50,023 | .228785 | .769633 |
| Other female 10–19 | 50,023 | .218348 | .742927 |
| Black male 20–29 | 50,023 | .751636 | 1.214317 |
| Black female 20–29 | 50,023 | .762416 | 1.2783 |
| White male 20–29 | 50,023 | 6.792357 | 1.991303 |
| White female 20–29 | 50,023 | 6.577894 | 1.796134 |
| Other male 20–29 | 50,023 | .185308 | .557494 |
| Other female 20–29 | 50,023 | .186327 | .559599 |
| Black male 30–39 | 50,023 | .539637 | .879286 |
| Black female 30–39 | 50,023 | .584164 | .986009 |
| White male 30–39 | 50,023 | 6.397395 | 1.460204 |
| White female 30–39 | 50,023 | 6.318641 | 1.422831 |
| Other male 30–39 | 50,023 | .151869 | .456388 |
| Other female 30–39 | 50,023 | .167945 | .454721 |
| Black male 40–49 | 50,023 | .358191 | .571475 |
| Black female 40–49 | 50,023 | .415372 | .690749 |
| White male 40–49 | 50,023 | 4.932917 | 1.086635 |
| White female 40–49 | 50,023 | 4.947299 | 1.038738 |
| Other male 40–49 | 50,023 | .105475 | .302059 |
| Other female 40–49 | 50,023 | .115959 | .304423 |
| Black male 50–64 | 50,023 | .43193 | .708241 |
| Black female 50–64 | 50,023 | .54293 | .921819 |
| White male 50–64 | 50,023 | 6.459038 | 1.410181 |
| White female 50–64 | 50,023 | 6.911502 | 1.54784 |
| Other male 50–64 | 50,023 | .101593 | .367467 |
| Other female 50–64 | 50,023 | .11485 | .374837 |
| Black male over 65 | 50,023 | .384049 | .671189 |
| Black female over 65 | 50,023 | .552889 | .980266 |
| White male over 65 | 50,023 | 5.443062 | 2.082804 |
| White female over 65 | 50,023 | 7.490128 | 2.69476 |
| Other male over 65 | 50,023 | .065265 | .286597 |
| Other female over 65 | 50,023 | .077395 | .264319 |

In addition to using county dummy variables, other data were collected from the Bureau of the Census to try controlling for other demographic characteristics that might determine the crime rate. These data included information on the population density per square mile, total county population, and detailed information on the racial and age breakdown of the county (percentage of population by each racial group and by sex between 10 and 19 years of age, between 20 and 29, between 30 and 39, between 40 and 49, between 50 and 64, and 65 and over).[37] While a large literature

---

[37] See Table 2 for the list and summary statistics.

discusses the likelihood of younger males engaging in crime,[38] controlling for these other categories allows us to also attempt to measure the size of the groups considered most vulnerable (for example, females in the case of rape).[39] Recent evidence by Glaeser and Sacerdote confirms the higher crime rates experienced in cities and examines to what extent this arises due to social and family influences as well as the changing pecuniary benefits from crime,[40] though this is the first paper to explicitly control for population density. The Data Appendix provides a more complete discussion of the data.

An additional set of income data was also used. These included real per capita personal income, real per capita unemployment insurance payments, real per capita income maintenance payments, and real per capita retirement payments per person over 65 years of age.[41] Including unemployment insurance and income maintenance payments from the Commerce Department's Regional Economic Information System data set was an attempt to provide annual county-level measures of unemployment and the distribution of income.

Finally, we recognize that other legal changes in how guns are used and when they can be obtained can alter the levels of crime. For example, penalties involving improper gun use might also have been changing simultaneously with changes in the permitting requirements for concealed handguns. In order to see whether this might confound our ability to infer what was responsible for any observed changes in crimes rates we read through various editions of the Bureau of Alcohol, Tobacco, and Firearms' *State Laws and Published Ordinances—Firearms* (1976, 1986, 1989, and 1994). Excluding the laws regarding machine guns and sawed-off shotguns, there is no evidence that the laws involving the use of guns changed significantly when concealed permit rules were changed.[42] Another survey which ad-

---

[38] For example, James Q. Wilson & Richard J. Herrnstein, Crime and Human Nature 126–47 (1985).

[39] However, the effect of an unusually large percentage of young males in the population may be mitigated because those most vulnerable to crime may be more likely to take actions to protect themselves. Depending on how responsive victims are to these threats, it is possible that the coefficient for a variable like the percentage of young males in the population could be zero even when the group in question poses a large criminal threat.

[40] Edward L. Glaeser & Bruce Sacerdote, Why Is There More Crime in Cities? (working paper, Harvard Univ., November 14, 1995).

[41] For a discussion of the relationship between income and crime see John R. Lott, Jr., A Transaction-Costs Explanation for Why the Poor Are More Likely to Commit Crime, 19 J. Legal Stud. 243–45 (January 1990).

[42] A more detailed survey of the state laws is available from the authors. The findings of a brief survey of the laws excluding the permitting changes are as follows: Alabama: No significant changes in these laws during period. Connecticut: Law gradually changed in wording from criminal use to criminal possession from 1986 to 1994. Florida: Has the most

dresses the somewhat broader question of sentencing enhancement laws for felonies committed with deadly weapons (firearms, explosives, and knives) from 1970 to 1992 also confirms this general finding, with all but four of the legal changes clustered from 1970 to 1981.[43] Yet, controlling for the dates supplied by Marvell and Moody still allows us to examine the deterrence effect of criminal penalties specifically targeted at the use of deadly weapons during this earlier period.[44]

States also differ in terms of their required waiting periods for handgun purchases. Again using the Bureau of Alcohol, Tobacco, and Firearms' *State Laws and Published Ordinances—Firearms,* we identified states with waiting periods and did a Lexis search on those ordinances to determine exactly when those laws went into effect. Thirteen of the 19 states with waiting periods had them prior to the beginning of our sample period.[45]

---

extensive description of penalties. The same basic law (790.161) is found throughout the years. An additional law (790.07) is found only in 1986. Georgia: A law (16-11-106) that does not appear in the 1986 edition appears in the 1989 and 1994 issues. The law involves possession of a firearm during commission of a crime and specifies the penalties associated with it. Because of the possibility that this legal change might have occurred at the same time as the 1989 changes in permitting rules, we used a Lexis search to check the legislative history of 16-11-106 and found that the laws were last changed in 1987, 2 years before the change in permitting rules (O.C.G.A. 16-11-106 (1996)). Idaho: There are no significant changes in Idaho over time. Indiana: No significant changes in these laws during the period. Maine: No significant changes in these laws during the period. Mississippi: Law 97-37-1 talks explicitly about penalties. It appears in the 1986 version, but not in the 1989 or the 1994 versions. Montana: Some changes in punishments related to unauthorized carrying of concealed weapons laws, but no changes in the punishment for using a weapon in a crime. New Hampshire: No significant changes in these laws during the period. North Dakota: No significant changes in these laws during the period. Oregon: No significant changes in these laws during the period. Pennsylvania: No significant changes in these laws during the period. South Dakota: Law 22-14-13, which specifies penalties for commission of a felony while armed appears in 1986, but not 1989. Vermont: Section 4005, which outlines the penalties for carrying a gun when committing a felony, appears in 1986, but not in 1989 or 1994. Virginia: No significant changes in these laws during the period. Washington: No significant changes in these laws during the period. West Virginia: Law 67-7-12 is on the books in 1994, but not the earlier versions. It involves punishment for endangerment with firearms. Removing Georgia from the sample, which was the only state that had gun laws changing near the year that the ''shall issue'' law went into affect, so that there is no chance that the other changes in gun laws might affect our results does not appreciably alter our results.

[43] Thomas B. Marvell & Carlisle E. Moody, The Impact of Enhanced Prison Terms for Felonies Committed with Guns, 33 Criminology 247, 258–61 (May 1995).

[44] Using Marvell and Moody's findings shows that the closest time period between these sentencing enhancements and changes in concealed weapon laws is 7 years (Pennsylvania). Twenty-six states passed their enhancement laws prior to the beginning of our sample period, and only four states passed these types of laws after 1981. Maine, which implemented its concealed handgun law in 1985, passed its sentencing enhancement laws in 1971.

[45] The states with a waiting period prior to the beginning of our sample include Alabama, California, Connecticut, Illinois, Maryland, Minnesota, New Jersey, North Carolina, Pennsylvania, Rhode Island, South Dakota, Washington, and Wisconsin. The District of Columbia

## IV.  The Empirical Evidence

### A.  Using County Data for the United States

The first group of regressions reported in Table 3 attempts to explain the natural log of the crime rate for nine different categories of crime. The regressions are run using weighted ordinary least squares. While we are primarily interested in a dummy variable to represent whether a state has a ''shall issue'' law, we also control for each type of crime's arrest rate, demographic differences, and dummies for the fixed effects for years and counties. The results imply that ''shall issue'' laws coincide with fewer murders, rapes, aggravated assaults, and rapes.[46] On the other hand, auto theft and larceny rates rise. Both changes are consistent with our discussion on the direct and substitution effects produced by concealed weapons.[47] Rerunning these specifications with only the ''shall issue'' dummy, the ''shall issue'' dummy and the arrest rates, or simply just the ''shall issue'' dummy and the fixed year effects produces even more significant effects for the ''shall issue'' dummy.[48]

----

also had a waiting period prior to the beginning of our sample. The states which adopted this rule during the sample include Hawaii, Indiana, Iowa, Missouri, Oregon, and Virginia.

[46] One possible concern with these initial results arises from our use of an aggregate public policy variable (state right-to-carry laws) on county-level data. See Bruce C. Greenwald, A General Analysis of the Bias in the Estimated Standard Errors of Least Squares Coefficients, 22 J. Econometrics 323–38 (August 1983); and Brent R. Moulton, An Illustration of a Pitfall in Estimating the Effects of Aggregate Variables on Micro Units, 72 Rev. Econ. & Stat. 334 (1990). As Moulton writes: ''If disturbances are correlated within the groupings that are used to merge aggregate with micro data, however, then even small levels of correlation can cause the standard errors from the ordinary least squares (OLS) to be seriously biased downward.'' Yet, this should not really be a concern here because of our use of dummy variables for all the counties, which is equivalent to using state dummies as well as county dummies for all but one of the counties within each state. Using these dummy variables thus allows us to control for any disturbances that are correlated within any individual state. The regressions discussed in footnote 53 rerun the specifications shown in Table 3 but also include state dummies that are interacted with a time trend. This should thus not only control for any disturbances that are correlated with the states, but also for any disturbances that are correlated within a state over time. Finally, while right-to-carry laws are almost always statewide laws, there is one exception. Pennsylvania exempted its largest county (Philadelphia) from the law when it was passed in 1989, and it remained exempt from the law during the rest of the sample period.

[47] However, the increase in the number of property crimes is larger than the drop in the number of robberies.

[48] While we believe that such variables as the arrest rate should be included in any regressions on crime, one concern with the results reported in the tables is whether the relationship between the ''shall issue'' dummy and the crime rates still occurs even when all the other variables are not controlled for. Using weighted least squares and reporting only the ''shall issue'' coefficients, we estimated the following regression coefficients (absolute *t*-statistics are shown in parentheses):

The results are large empirically. When state concealed handgun laws went into effect in a county, murders fell by 7.65 percent, and rapes and aggravated assaults fell by 5 and 7 percent.[49] In 1992, there were 18,469 murders, 79,272 rapes, 538,368 robberies, and 861,103 aggravated assaults in counties without ''shall issue'' laws. The coefficients imply that if these counties had been subject to state concealed handgun laws, murders in the United States would have declined by 1,414. Given the concern that has been raised about increased accidental deaths from concealed weapons, it is interesting to note that, for the most recent year that such a breakdown is available, the entire number of accidental handgun deaths in the United States in 1988 was 200. Of this total, 22 accidental deaths were in states with concealed handgun laws and 178 were in those without these laws. The reduction in murders is as much as eight times greater than the total number of accidental deaths in concealed handgun states. Thus, if our results are accurate, the net effect of allowing concealed handguns is clearly to save lives. Similarly, the results indicate that the number of rapes in

| Endogenous Variables | Shall Issue Dummy Only | Shall Issue Dummy and Year Effects Only |
|---|---|---|
| Violent crimes | −.335  (22.849) | −.449 (30.092) |
| Murder | −.394  (19.095) | −.419 (19.829) |
| Rape | −.147  (8.030) | −.248 (13.34) |
| Aggravated assault | −.322  (21.932) | −.448 (30.356) |
| Robbery | −.485  (19.522) | −.561 (22.110) |
| Property crime | −.1603 (18.030) | −.186 (20.605) |
| Auto theft | −.268  (7.793) | −.358 (23.407) |
| Burglary | −.247  (26.381) | −.217 (22.739) |
| Larceny | −.101  (10.288) | −.136 (13.640) |

Regressing the crime rates on only the ''shall issue'' dummy and the year and county dummies produces a ''shall issue'' coefficient that equals −.021 (t-statistic = 1.66) for violent crimes and .051 (t-statistic = 6.52) for property crimes. The other estimates discussed in the text produce similar results and are available on request from the authors.

[49] While we adopt the classifications used by Cramer and Kopel (*supra* note 9), some are more convinced by other classifications of the states (for example, Weil, *supra* note 26; and Teret, *supra* note 33). Setting the ''shall issue'' dummy for Maine to zero and rerunning the regressions shown in Table 3 results in the following ''shall issue'' coefficients (t-statistics in parentheses): −.0295 (2.955) for violent crimes, −0.813 (5.071) for murder, −.0578 (4.622) for rape, −.0449 (3.838) for aggravated assault, −.0097 (0.714) for robbery, .029 (3.939) for property crimes, .081 (6.942) for automobile theft, .0036 (0.466) for burglary, and .0344 (3.790) for larceny. Similarly, setting the ''shall issue'' dummy for Virginia to zero results in the following ''shall issue'' coefficients (t-statistics in parentheses): −.0397 (3.775) for violent crimes, −0.868 (5.138) for murder, −.0527 (4.007) for rape, −.05426 (4.410) for aggravated assault, −.0011 (0.076) for robbery, .0334 (4.326) for property crimes, .091 (7.373) for automobile theft, .0211 (2.591) for burglary, and .0348 (3.646) for larceny. As a final test, dropping both Maine and Virginia from the data set results in the following ''shall issue'' coefficients (t-statistics in parentheses): −.0233 (2.117) for violent crimes, −0.9698 (5.519) for murder, −.0629 (4.589) for rape, −.0313 (2.436) for aggravated assault, 0.006 (0.400) for robbery, .0361 (4.436) for property crimes, .0977 (7.607) for automobile theft, .0216 (2.526) for burglary, and .03709 (3.707) for larceny.

TABLE 3

THE EFFECT OF "SHALL ISSUE" RIGHT-TO-CARRY FIREARMS LAWS ON THE CRIME RATE: NATIONAL COUNTY-LEVEL CROSS-SECTIONAL TIME-SERIES EVIDENCE

| EXOGENOUS VARIABLES | ENDOGENOUS VARIABLES (Natural Logs of the Crime Rate per 100,000 People) | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|
| | ln (Violent Crime Rate) | ln (Murder Rate) | ln (Rape Rate) | ln (Aggravated Assault Rate) | ln (Robbery Rate) | ln (Property Crime Rate) | ln (Burglary Rate) | ln (Larceny Rate) | ln (Auto Theft Rate) |
| Shall issue law adopted dummy | −.0490 (5.017) 1% | −.0765 (4.660) 2% | −.0527 (4.305) 1% | −.0701 (6.137) 1% | −.0221 (1.661) .3% | .0269 (3.745) 1% | .0048 (.063) .02% | .03342 (3.763) 1% | .0714 (6.251) 1% |
| Arrest rate for the crime category appropriate endogenous variable | −.00048 (77.257) 9% | −.00139 (37.139) 7% | −.00081 (47.551) 4% | −.000896 (69.742) 9% | −.00057 (88.984) 4% | −.000759 (96.996) 10% | −.0024 (90.189) 11% | −.00018 (77.616) 4% | −.00018 (74.972) 3% |
| Population per square mile | .00006 (3.684) 5% | −.00002 (.942) 1% | −.00002 (1.022) 1% | $5.76E-06$ (.320) .4% | .000316 (15.117) 17% | $4.83E-06$ (.428) 1% | −.00007 (5.605) 9% | .000037 (2.651) 4% | .00048 (26.722) 36% |
| Real per capita income data: Personal income | $7.92E-06$ (2.883) 1% | 0.0000163 (3.623) 2% | $-5.85E-06$ (1.669) 1% | $4.71E-06$ (1.467) 1% | $4.73E-06$ (1.244) 1% | −.0000102 (5.118) 3% | −.0000184 (8.729) 4% | −.0000123 (4.981) 2% | .000015 (4.689) 2% |
| Unemployment insurance | −.00022 (3.970) .07% | −.00046 (5.260) 1% | −.00047 (6.731) 1% | −.00019 (2.904) .05% | .00007 (.898) .01% | .00038 (9.468) 2% | .00060 (14.003) 3% | −.00019 (3.706) .08% | .00021 (3.316) .06% |
| Income maintenance | −.0000699 (.841) .3% | .00025 (1.928) 1% | −.00017 (1.634) .7% | .000139 (1.438) .7% | −.00032 (2.840) 1% | .00019 (3.107) 2% | .00039 (6.219) 4% | .0002 (.320) .1% | .00033 (3.452) 2% |
| Retirement payments per person over 65 | $-1.97E-06$ (.895) .5% | −.000013 (3.713) 3% | $-2.37E-06$ (.861) .4% | $-6.81E-06$ (2.651) 2% | $-5.50E-06$ (1.835) 1% | $-8.65E-06$ (5.371) 4% | −.0000106 (6.273) 7% | $-6.34E-06$ (3.186) 2% | $-9.27E-06$ (3.613) 2% |

| Population | 8.59E−08 (4.283) 1% | −3.44E−08 (1.109) .4% | −2.94E−07 (11.884) 3% | 4.54E−08 (1.947) .06% | −6.10E−08 (2.271) .06% | −2.18E−07 (15.063) 6% | −2.14E−07 (14.060) 5% | −3.10E−07 (17.328) 6% | −4.06E−09 (.177) .05% |
|---|---|---|---|---|---|---|---|---|---|
| **Race and age data (% of population):** | | | | | | | | | |
| Black male 10–19 | .05637 (1.293) | .1134 (1.515) | .04108 (.722) | .0900695 (1.767) | .10548 (1.752) | .1287 (4.068) | .074 (2.214) | .1710 (4.366) | .0513 (1.007) |
| Black male 20–29 | .0009 (.035) | .0663 (1.514) | .0794 (2.366) | −.0528 (1.749) | −.0060 (.168) | −.0143 (.759) | −.0203 (1.022) | −.0057 (.245) | .00665 (.220) |
| Black male 30–39 | .0419 (1.063) | .1085 (1.640) | −.0832 (1.617) | .2024 (4.424) | .0061 (.111) | .04126 (1.445) | −.0074 (.246) | .0044 (.124) | .14955 (3.254) |
| Black male 40–49 | −.0243 (.300) | −.33549 (2.498) | .9029 (8.562) | −.3654 (3.860) | −.00867 (.077) | −.02391 (.406) | −.03132 (.506) | .18939 (2.601) | −.6846 (7.235) |
| Black male 50–64 | .1816 (2.159) | −.34753 (2.518) | −.1509 (1.381) | .2861 (2.889) | −.00706 (.060) | −.0519 (.843) | .09135 (1.409) | −.1318 (1.730) | .05626 (.569) |
| Black male over 65 | .12165 (1.337) | −.14275 (.971) | .4373 (3.742) | .1053 (1.014) | .17053 (1.379) | −.0367 (.567) | .06132 (.900) | −.0965 (1.204) | −.3384 (3.254) |
| Black female 10–19 | −.00394 (.088) | .0374 (.490) | .0368 (.630) | −.0692 (1.321) | −.18307 (2.957) | .0836 (2.570) | .0217 (.631) | .1564 (3.883) | −.1766 (3.372) |
| Black female 20–29 | −.0993 (3.094) | −.2247 (4.312) | .1751 (4.280) | −.1938 (5.219) | −.2167 (4.986) | −.0996 (4.307) | −.1688 (6.936) | −.0075 (.264) | −.2481 (6.711) |
| Black female 30–39 | .1218 (3.383) | −.0828 (1.409) | .1489 (3.228) | .0947 (2.265) | .3808 (7.691) | .13409 (5.137) | .2721 (9.909) | .0944 (2.923) | .1701 (4.072) |
| Black female 40–49 | .0107 (.158) | .59197 (5.321) | −.7396 (8.431) | −.26946 (3.387) | −.06891 (.738) | .05958 (1.213) | −.05022 (.970) | −.0342 (.562) | .4816 (6.093) |
| Black female 50–64 | −.2105 (2.826) | .20188 (1.648) | .1044 (1.076) | −.0532 (.612) | .07078 (.684) | −.0241 (.443) | −.21799 (3.817) | .0100 (.149) | .1153 (1.321) |
| Black female over 65 | −.2035 (3.229) | .3071 (2.969) | −.5164 (6.278) | −.1557 (2.104) | −.36915 (4.212) | −.2035 (4.406) | −.3877 (7.968) | −.1234 (2.160) | .2433 (3.283) |
| White male 10–19 | −.0060 (.382) | −.0271 (.935) | .0056 (.265) | .03998 (2.208) | .0219 (.098) | −.0066 (.593) | −.0062 (.523) | .00027 (.020) | −.0568 (3.152) |
| White male 20–29 | .00842 (.729) | .0598 (3.023) | .03779 (2.528) | .0219 (1.623) | .0426 (2.636) | .00456 (.542) | .01738 (1.958) | .00377 (.362) | −.0200 (1.487) |
| White male 30–39 | −.006 (.322) | −.01289 (.371) | −.0376 (1.444) | .0739 (3.206) | −.0706 (2.507) | −.0520 (3.633) | −.0268 (1.779) | −.0579 (3.268) | −.0592 (2.583) |

TABLE 3 (*Continued*)

ENDOGENOUS VARIABLES (Natural Logs of the Crime Rate per 100,000 People)

| EXOGENOUS VARIABLES | ln (Violent Crime Rate) | ln (Murder Rate) | ln (Rape Rate) | ln (Aggravated Assault Rate) | ln (Robbery Rate) | ln (Property Crime Rate) | ln (Burglary Rate) | ln (Larceny Rate) | ln (Auto Theft Rate) |
|---|---|---|---|---|---|---|---|---|---|
| White male 40–49 | −.0095 (.375) | −.02078 (.462) | .0898 (2.685) | −.0406 (1.369) | −.11188 (3.099) | −.14626 (7.981) | −.0995 (5.147) | −.1271 (5.600) | −.0962 (3.265) |
| White male 50–64 | −.00575 (.236) | −.0458 (1.074) | .0397 (1.237) | −.0904 (3.184) | −.14195 (4.104) | −.1282 (7.309) | .0729 (3.942) | −.1071 (4.929) | −.2749 (9.771) |
| White male over 65 | −.1291 (6.065) | .02336 (.618) | .0441 (1.547) | −.1651 (6.627) | .0421 (1.370) | −.1442 (7.635) | −.1194 (8.887) | −.13975 (6.264) | −.1104 (5.651) |
| White female 10–19 | .02346 (1.410) | .0452 (1.473) | .0741 (3.307) | −.00863 (.448) | .0561 (2.359) | .0824 (6.907) | .0816 (6.474) | .0865 (5.863) | .0866 (4.513) |
| White female 20–29 | .0128 (.896) | −.0405 (1.673) | .0551 (2.999) | .03926 (2.348) | .01327 (.669) | −.0086 (.828) | −.0421 (3.832) | .02928 (2.272) | −.0289 (1.739) |
| White female 30–39 | .01878 (.890) | .0447 (1.209) | .14127 (5.092) | .0299 (1.215) | −.0079 (.265) | .0388 (2.545) | .0171 (1.065) | .06611 (3.502) | −.1017 (4.165) |
| White female 40–49 | −.0901 (3.553) | −.00077 (.017) | −.0689 (2.061) | −.0031 (.106) | −.02258 (.626) | .0584 (3.193) | −.0354 (1.833) | .0741 (3.270) | −.0172 (.585) |
| White female 50–64 | .00332 (.163) | .0119 (.335) | .0213 (.794) | .07882 (3.313) | .03094 (1.072) | .1044 (7.103) | .06396 (4.126) | .1100 (6.042) | .10687 (4.534) |
| White female over 65 | .0558 (3.719) | −.0681 (2.588) | .0578 (2.904) | .0836 (4.761) | −.0870 (4.046) | .02027 (1.867) | .0483 (4.218) | .03631 (2.701) | −.0459 (2.636) |
| Other male 10–19 | .2501 (2.179) | .6624 (3.022) | .5572 (3.546) | .1872 (1.389) | .5360 (3.124) | .1587 (1.917) | .2708 (3.100) | .1487 (1.451) | .6039 (4.532) |
| Other male 20–29 | −.1229 (1.966) | .14495 (1.367) | −.1656 (2.065) | −.0573 (.794) | .0129 (.149) | .0786 (1.748) | .0007 (.015) | .2037 (3.661) | −.4066 (5.667) |

| | (1) | (2) | (3) | (4) | (5) | (6) | (7) | (8) | (9) |
|---|---|---|---|---|---|---|---|---|---|
| Other male 30–39 | .23126 (1.866) | −.2958 (1.370) | −.1907 (1.161) | .4015 (2.777) | −.1021 (.572) | −.1779 (1.996) | −.4257 (4.532) | −.0415 (.376) | .64667 (4.525) |
| Other male 40–49 | .12678 (.824) | −.35775 (1.341) | −.2406 (1.180) | −.1903 (1.060) | .77753 (3.538) | .0287 (.261) | .2356 (2.027) | −.2320 (1.700) | .4640 (2.620) |
| Other male 50–64 | −.0904 (.605) | −.1572 (.623) | .2403 (1.240) | −.2829 (1.612) | −.39616 (1.869) | −.0211 (.194) | .2676 (2.330) | −.1952 (1.449) | −.4198 (2.411) |
| Other male over 65 | .3469 (2.222) | −.2585 (1.019) | .8709 (4.389) | 1.0193 (5.566) | −.267 (1.237) | −.0785 (.688) | .1863 (1.549) | −.2342 (1.659) | −.1792 (.985) |
| Other female 10–19 | −.0303 (.253) | −.7299 (3.185) | −.1095 (.670) | .1207 (.857) | −.3461 (1.936) | −.1769 (2.049) | −.2861 (3.140) | −.2304 (2.155) | −.2739 (1.971) |
| Other female 20–29 | −.1323 (1.253) | −.3293 (2.145) | .2093 (1.670) | .0933 (.557) | −.3033 (1.535) | −.1464 (1.849) | −.3243 (3.366) | −.3334 (2.435) | −.5646 (4.768) |
| Other female 30–39 | −.2187 (1.823) | −.1103 (.531) | .1556 (.988) | −.1674 (1.189) | −.2158 (1.253) | −.0874 (1.005) | .2703 (2.949) | −.2838 (2.638) | −.7516 (5.395) |
| Other female 40–49 | −.1413 (1.011) | .56562 (2.343) | .07877 (.429) | .1831 (1.116) | −.48132 (2.407) | .2452 (2.432) | −.2767 (2.600) | .6971 (5.574) | −.1461 (.901) |
| Other female 50–64 | −.0972 (.607) | .4354 (1.612) | −.6588 (3.184) | −.2700 (1.439) | .36585 (1.620) | −.0491 (.424) | −.4901 (4.006) | .1615 (1.125) | .3078 (1.659) |
| Other female over 65 | −.4376 (3.489) | .0569 (.277) | −.3715 (2.324) | −.4428 (3.012) | −.3596 (2.058) | −.1052 (1.148) | −.1408 (1.458) | −.0478 (.422) | −.587 (4.020) |
| Intercept | 5.8905 (15.930) | 2.0247 (3.326) | .4189 (.890) | 4.2648 (9.857) | 5.4254 (10.623) | 9.1613 (33.945) | 8.7058 (30.614) | 7.596 (22.751) | 8.332 (19.372) |
| $N$ | 43,451 | 26,458 | 33,865 | 43,445 | 34,949 | 45,940 | 45,769 | 45,743 | 43,589 |
| $F$-statistic | 115.11 | 37.95 | 44.93 | 70.47 | 131.75 | 87.22 | 82.16 | 59.33 | 116.35 |
| Adjusted $R^2$ | .8925 | .8060 | .8004 | .8345 | .9196 | .8561 | .8490 | .8016 | .8931 |

NOTE.—The absolute $t$-statistics are in parentheses, and the percentage reported below that for some of the numbers is the percent of a standard deviation change in the endogenous variable that can be explained by a 1 standard deviation change in the exogenous variable. Year and county dummies are not shown. All regressions use weighted least squares where the weighting is each county's population.

23

states without ''shall issue'' laws would have declined by 4,177, aggravated assaults by 60,363, and robberies by 11,898.[50]

On the other hand, property crime rates definitely increased after ''shall issue'' laws were implemented. The results are equally dramatic. If states without concealed handgun laws had passed such laws, there would have been 247,165 more property crimes in 1992 (a 2.7 percent increase). Thus, criminals respond substantially to the threat of being shot by instead substituting into less risky crimes.[51]

A recent National Institute of Justice study[52] estimates the costs of different types of crime based on lost productivity; out-of-pocket expenses such as medical bills and property losses; and losses for fear, pain, suffering, and lost quality of life. While there are questions about using jury awards to measure losses such as fear, pain, suffering, and lost quality of life, the estimates provide us one method of comparing the reduction in violent crimes with the increase in property crimes. Using the numbers from Table 3, the estimated gain from allowing concealed handguns is over $5.74 billion in 1992 dollars. The reduction in violent crimes represents a gain of $6.2 bil-

[50] Given the possible relationship between drug prices and crime, we reran the regressions in Table 3 by including an additional variable for cocaine prices. One argument linking drug prices and crime is that if the demand for drugs is inelastic and if people commit crimes in order to finance their habits, higher drug prices might lead to increased levels of crime. Using the Drug Enforcement Administration's STRIDE data set from 1977 to 1992 (with the exceptions of 1988 and 1989), Michael Grossman, Frank J. Chaloupka, & Charles C. Brown, The Demand for Cocaine by Young Adults: A Rational Addiction Approach (working paper, National Bureau of Economic Research, July 1996), estimate the price of cocaine as a function of its purity, weight, year dummies, year dummies interacted with eight regional dummies, and individual city dummies. There are two problems with this measure of predicted prices: (1) it removes observations during a couple of important years during which changes were occurring in concealed handgun laws and (2) the predicted values that we obtained from this ignored the city-level observations. The reduced number of observations provides an important reason why we do not include this variable in the regressions shown in Table 3. However, the primary impact of including this new variable is to make the ''shall issue'' coefficients in the violent crime regressions even more negative and more significant (for example, the coefficient for the violent crime regression is now $-.075$, $-.10$ for the murder regression, $-.077$ for rape, and $-.11$ for aggravated assault, with all of them significant at more than the .01 level). Only for the burglary regression does the ''shall issue'' coefficient change appreciably: it is now negative and insignificant. The variable for drug prices itself is negatively related to murders and rapes and positively and significantly related to all the other categories of crime at least at the .01 level for a one-tailed $t$-test. We would like to thank Michael Grossman for providing us with the original regressions on drug prices from his paper.

[51] By contrast, if the question had instead been what would the difference in crime rates have been between either all states or no states adopting right-to-carry handgun laws, the case of all states adopting concealed handgun laws would have produced 2,020 fewer murders, 5,747 fewer rapes, 79,001 fewer aggravated assaults, and 14,862 fewer robberies. By contrast, property crimes would have risen by 336,409.

[52] Ted R. Miller, Mark A. Cohen, & Brian Wiersema, Victim Costs and Consequences: A New Look (February 1996).

lion ($4.28 billion from murder, $1.4 billion from aggravated assault, $374 million from rape, and $98 million from robbery), while the increase in property crimes represents a loss of $417 million ($343 million from auto theft, $73 million from larceny, and $1.5 million from burglary). However, while $5.7 billion is substantial, to put it into perspective, it equals only about 1.23 percent of the total aggregate losses from these crime categories. These estimates are probably most sensitive to the value of life used (in the Miller *et al.* study this was set at about $3 million in 1992 dollars). Higher estimated values of life will increase the net gains from concealed handgun use, while lower values of life will reduce the gains.[53] To the extent that people are taking greater risks toward crime because of any increased safety produced by concealed handgun laws,[54] these numbers will underestimate the total savings from concealed handguns.

The arrest rate produces the most consistent effect on crime. Higher arrest rates imply lower crime rates for all categories of crime. A 1 standard deviation change in the probability of arrest accounts for 3–17 percent of a 1 standard deviation change in the various crime rates. The crime most responsive to arrest rates is burglary (11 percent), followed by property crimes (10 percent); aggravated assault and violent crimes more generally (9 percent); murder (7 percent); rape, robbery, and larceny (4 percent); and auto theft (3 percent).

For property crimes, a 1 standard deviation change in the percentage of the population that is black, male, and between 10 and 19 years of age explains 22 percent of these crime rates. For violent crimes, the same number is 5 percent. Other patterns also show up in the data. For example, more black females between the ages of 20 and 39, more white females between the ages of 10 and 39 and those over 65, and other race females between 20 and 29 are positively and significantly associated with a greater number of rapes occurring. Population density appears to be most important in ex-

---

[53] We reran the specifications shown in Table 3 by also including state dummies which were each interacted with a time trend variable. In this case, all of the concealed handgun dummies were negative, though the coefficients were not statistically significant for aggravated assault and larceny. Under this specification, adopting concealed handgun laws in those states currently without them would have reduced 1992 murders by 1,839, rapes by 3,727, aggravated assaults by 10,990, robberies by 61,064, burglaries by 112,665, larcenies by 93,274, and auto thefts by 41,512. The total value of this reduction in crime in 1992 dollars would have been $7.02 billion. With the exceptions of aggravated assault and burglary, violent crimes still experienced larger drops from the adoption of concealed handgun laws than did property crimes. Rerunning the specifications in Table 3 without either the percentage of the populations that fall into the different sex, race, and age categories or without the measures of income tended to produce similar though somewhat more significant results with respect to concealed handgun laws. The estimated gains from passing concealed handgun laws were also larger.

[54] Again see Peltzman, *supra* note 31.

plaining robbery, burglary, and auto theft rates, with a 1 standard deviation change in population density being able to explain 36 percent of a 1 standard deviation change in auto theft. Perhaps most surprising is the relatively small, even if frequently significant, effect of income on crime rates. A 1 standard deviation change in real per capita income explains no more than 4 percent of a 1 standard deviation change in crime, and in seven of the specifications it explains 2 percent or less of the change. If the race, sex, and age variables are replaced with variables showing the percentage of the population that is black and the percent that is white, 50 percent of a standard deviation in the murder rate is explained by the percentage of the population that is black. Given the high rates at which blacks are arrested and incarcerated or are victims of crimes, this is not unexpected.

Given the wide use of state-level crime data by economists and the large within-state heterogeneity shown in Table 1, Table 4 provides a comparison by reestimating the specifications reported in Table 3 using state-level rather than county-level data. The only other difference in the specification is the replacement of county dummies with state dummies. While the results in these two tables are generally similar, two differences immediately manifest themselves: (1) all the specifications now imply a negative and almost always significant relationship between allowing concealed handguns and the level of crime and (2) concealed handgun laws explain much more of the variation in crime rates while arrest rates (with the exception of robbery) explain much less of the variation.[55] Despite the fact that concealed handgun laws appear to lower both violent and property crime rates, the results still imply that violent crimes are much more sensitive to the introduction of concealed handguns, with violent crimes falling three times more than property crimes. These results imply that if all states had adopted concealed handgun laws in 1992, 1,592 fewer murders and 4,811 fewer rapes would have taken place.[56] Overall, Table 4 implies that the estimated gain from the lower crime produced by handguns was $8.3 billion in 1992 dollars (see Table 5). Yet, at least in the case of property crimes, the concealed handgun law coefficients' sensitivity to whether these regressions are run at the state or county level suggests caution in aggregating these data into such large units as states.

[55] Other differences also arise in the other control variables such as those relating the percentage of the population of a certain race, sex, and age. For example, the percentage of black males in the population between 10 and 19 is no longer statistically significant.

[56] By contrast, if the question had instead been what would the difference in crime rates have been between either all states or no states adopting right-to-carry handgun laws, the case of all states adopting concealed handgun laws would have produced 2,286 fewer murders, 9,630 fewer rapes, 50,353 fewer aggravated assaults, and 92,264 fewer robberies. Property crimes would also have fallen by 659,061.

TABLE 4

QUESTIONS OF AGGREGATING THE DATA: NATIONAL STATE-LEVEL CROSS-SECTIONAL TIME-SERIES EVIDENCE

| Exogenous Variables | ln (Violent Crime Rate) | ln (Murder Rate) | ln (Rape Rate) | ln (Aggravated Assault Rate) | ln (Robbery Rate) | ln (Property Crime Rate) | ln (Auto Theft Rate) | ln (Burglary Rate) | ln (Larceny Rate) |
|---|---|---|---|---|---|---|---|---|---|
| Shall issue law adopted dummy | −.1011 (3.181) 5.8% | −.0862 (2.297) 5.0% | −.0607 (1.955) 4.7% | −.1090 (3.365) 6.5% | −.1421 (3.071) 5.7% | −.0419 (1.907) 4.8% | −.0088 (.206) .43% | −.0825 (3.146) 7.6% | −.0314 (1.452) 3.8% |
| Arrest rate for the crime category corresponding to the appropriate endogenous variable | −.000802 (2.920) 1.5% | −.00073 (3.979) 5.3% | −.000205 (1.823) .69% | −.00153 (4.230) 3.9% | −.0105 (21.030) 14.4% | −.00599 (4.591) 8.1% | −.00145 (3.727) 6.5% | −.00715 (3.772) 7.6% | −.00657 (6.257) 10.4% |
| Intercept | 2.093 (1.089) | −.2715 (.121) | −1.2892 (.686) | 1.4156 (.728) | −1.4719 (.531) | 8.5370 (6.502) | 8.5195 (4.687) | 7.6149 (4.847) | 7.7438 (5.985) |
| N | 804 | 809 | 804 | 811 | 811 | 811 | 811 | 811 | 811 |
| F-statistic | 139.45 | 103.83 | 76.44 | 132.60 | 126.64 | 80.25 | 174.63 | 85.06 | 76.83 |
| Adjusted $R^2$ | .9490 | .9322 | .9103 | .9461 | .9437 | .9135 | .9586 | .9181 | .9100 |

NOTE.—Except for the use of state dummies in place of county dummies, the control variables are the same as those used in Table 3 including year dummies, although they are not all reported. Absolute $t$-statistics are in parentheses, and the percentage reported below that for some of the numbers is the percentage of a standard deviation change in the endogenous variable that can be explained by a 1 standard deviation change in the exogenous variable. All regressions use weighted least squares where the weighting is each state's population.

Table 6 examines whether changes in concealed handgun laws and arrest rates have differential effects in high- or low-crime counties. To test this, the regressions shown in Table 3 were reestimated first using the sample above the median crime rate by type of crime and then separately using the sample below the median. High crime rates may also breed more crime because the stigma from arrest may be less when crime is rampant.[57] If so, any change in apprehension rates should produce a greater reputational effect and thus greater deterrence in low-crime than high-crime counties.

The results indicate that the concealed handgun law's coefficient signs are consistently the same for both low- and high-crime counties, though for two of the crime categories (rape and aggravated assault) concealed handgun laws have only statistically significant effects in the relatively high-crime counties. For most violent crimes such as murder, rape, and aggravated assault, concealed weapons laws have a much greater deterrent effect in high-crime counties, while for robbery, property crimes, auto theft, burglary, and larceny the effect appears to be greatest in low-crime counties. The table also shows that the deterrent effect of arrests is significantly different at least at the 5 percent level between high- and low-crime counties for eight of the nine crime categories (the one exception being violent crimes). The results do not support the claim that arrests produce a greater reputational penalty in low-crime areas. While additional arrests in low- and high-crime counties produce virtually identical changes in violent crime rates, the arrest rate coefficient for high-crime counties is almost four times larger than it is for low-crime counties.

One relationship in these first three sets of regressions deserves a special comment. Despite the relatively small number of women using concealed handgun permits, the concealed handgun coefficient for explaining rapes is consistently comparable in size to the effect that this variable has on other violent crime rates. In the states of Washington and Oregon in January 1996, women constituted 18.6 and 22.9 percent of those with concealed handgun permits for a total of 118,728 and 51,859 permits, respectively.[58] The time-series data which are available for Oregon during our sample period even indicates that only 17.6 percent of permit holders were women in 1991. While it is possible that the set of women who are particularly likely to be raped might already carry concealed handguns at much higher rates

[57] Eric Rasmusen, Stigma and Self-Fulfilling Expectations of Criminality, 39 J. Law & Econ. 519 (1996).

[58] The Washington State data were obtained from Joe Vincent of the State Department of Licensing Firearms Unit in Olympia, Washington. The Oregon state data were obtained from Mike Woodward, with the Law Enforcement Data System, Department of State Police, Salem, Oregon.

TABLE 5

The Effect of Concealed Handguns on Victim Costs: What If All States Had Adopted "Shall Issue" Laws?

| Crime Category | Change in Number of Crimes If the States without "Shall Issue" Laws in 1992 Had Adopted the Law | | Change in Victim Costs If the States without "Shall Issue" Laws in 1992 Had Adopted the Law (in 1992 Dollars) | |
|---|---|---|---|---|
| | Estimates Using County-Level Data | Estimates Using State-Level Data | Estimates Using County-Level Data | Estimates Using State-Level Data |
| Murder | −1,414 | −1,592 | −4,281,608,125 | −4,820,594,155 |
| Rape | −4,177 | −4,811 | −374,277,659 | −431,086,861 |
| Aggravated assault | −60,363 | −93,860 | −1,405,042,403 | −2,184,737,007 |
| Robbery | −11,898 | −62,852 | −98,033,414 | −517,868,225 |
| Burglary | 1,052 | −180,813 | 1,516,890 | −260,716,190 |
| Larceny | 191,743 | −180,261 | 73,068,706 | −68,693,188 |
| Auto theft | 89,928 | −11,084 | 342,694,264 | −42,236,828 |
| Total change in annual victim costs | | | −5,741,681,741 | −8,325,932,454 |

Note.—The table uses 1996 estimates of the costs of crime in 1992 dollars from Ted R. Miller, Mark A. Cohen, & Brian Wiersema, Victim Costs and Consequences: A New Look (February 1996).

TABLE 6

QUESTIONS OF AGGREGATING THE DATA: DO LAW ENFORCEMENT AND "SHALL ISSUE" LAWS HAVE THE SAME EFFECT IN HIGH AND LOW CRIME AREAS?

| Exogenous Variables | ln (Violent Crime Rate) | ln (Murder Rate) | ln (Rape Rate) | ln (Aggravated Assault Rate) | ln (Robbery Rate) | ln (Property Crime Rate) | ln (Burglary Rate) | ln (Larceny Rate) | ln (Auto Theft Rate) |
|---|---|---|---|---|---|---|---|---|---|
| **A. Sample where county crime rates are above the median:** | | | | | | | | | |
| Shall issue law adopted dummy | −.0597 (7.007) | −.0988 (7.173) | −.0719 (7.415) | −.04468 (4.411) | −.0342 (3.012) | .0161 (2.943) | .0036 (.533) | .0296 (5.474) | .0524 (5.612) |
| Arrest rate for the crime category corresponding to the appropriate endogenous variable | −.000523 (−17.661) | −.00049 (11.472) | −.000326 (3.8130) | −.00063 (18.456) | −.00294 (9.381) | −.005354 (33.669) | −.00565 (27.390) | −.00596 (41.585) | −.00133 (11.907) |
| **B. Sample where county crime rates are below the median:** | | | | | | | | | |
| Shall issue law adopted dummy | −.0369 (1.934) | −.0436 (1.938) | −.0304 (.978) | −.0025 (.013) | −.0787 (2.978) | .0881 (5.801) | .0297 (2.110) | .0874 (5.246) | .07226 (3.276) |
| Arrest rate for the crime category corresponding to the appropriate endogenous variable | −.0005242 (30.302) | −.00123 (25.43) | −.000656 (31.542) | −.00068 (37.306) | −.0003699 (9.018) | −.001354 (39.101) | −.0027135 (41.603) | −.000998 (37.559) | −.0001412 (62.596) |

NOTE.—The control variables are the same as those used in Table 3 including year and county dummies, although they are not all reported. Absolute *t*-statistics are in parentheses. All regressions use weighted least squares where the weighting is each county's population.

than the general population of women, the results are at least suggestive that rapists are particularly susceptible to this form of deterrence. Possibly this arises since providing a woman with a gun has a much bigger effect on her ability to defend herself against a crime than providing a handgun to a man. Thus even if relatively few women carry handguns, the expected change in the cost of attacking women could still be nearly as great. To phrase this differently, the external benefits to other women from a woman carrying a concealed handgun appear to be large relative to the gain produced by an additional man carrying a concealed handgun. If concealed handgun use were to be subsidized to capture these positive externalities, these results are consistent with efficiency requiring that women receive the largest subsidies.[59]

As mentioned in Section II, an important concern with these data is that passing a concealed handgun law should not affect all counties equally. In particular, we expect that it was the most populous counties that most restricted people's ability to carry concealed weapons. To test this, Table 7 repeats all the regressions in Table 3 but instead interacts the shall issue law adopted dummy with county population. While all the other coefficients remain virtually unchanged, this new interaction retains the same signs as those for the original shall issue dummy, and in all but one case the coefficients are more significant. The coefficients are consistent with the hypothesis that the new laws produced the greatest change in the largest counties. The larger counties have a much greater response in both directions to changes in the laws. Violent crimes fall more and property crimes rise more in the largest counties. The bottom of the table indicates how these effects vary for different size counties. For example, passing a concealed handgun law lowers the murder rate in counties 2 standard deviations above the mean population by 12 percent, 7.4 times more than a shall issue law lowers murders for the mean population city. While the law enforcement officers we talked to continually mentioned population as being the key variable, we also reran these regressions using population density as the variable that we interacted with the shall issue dummy. The results remain very similar to those reported.

Admittedly, although arrest rates and county fixed effects are controlled for, these regressions have thus far controlled for expected penalties in a limited way. Table 8 reruns the regressions in Table 7 but includes either

<hr/>

[59] Unpublished information obtained by Kleck and Gertz, *supra* note 4, in their 1995 National Self-Defense Survey implies that women were as likely as men to use handguns in self-defense in or near their home (defined as in their yard, carport, apartment hall, street adjacent to home, detached garage, and so on), but that women were less than half as likely to use a gun in self-defense away from home.

TABLE 7

Controlling for the Fact That Larger Changes in Crime Rates are Expected in the More Populous Counties Where the Change in the Law Constituted a Bigger Break with Past Policies

| Exogenous Variables | ln (Violent Crime Rate) | ln (Murder Rate) | ln (Rape Rate) | ln (Aggravated Assault Rate) | ln (Robbery Rate) | ln (Property Crime Rate) | ln (Burglary Rate) | ln (Larceny Rate) | ln (Auto Theft Rate) |
|---|---|---|---|---|---|---|---|---|---|
| Shall issue law adopted dummy *county population | −9.41E−08 (6.001) | −2.07E−07 (7.388) | −7.83E−08 (4.043) | −1.06E−07 (5.784) | −2.29E−08 (1.295) | 5.18E−08 (4.492) | 6.96E−09 (.572) | 4.90E−08 (3.432) | 1.40E−07 (7.651) |
| Arrest rate for the crime category corresponding to the appropriate endogenous variable | −.000475 (77.222) | −.00139 (37.135) | −.000807 (47.535) | −.000895 (69.663) | −.000575 (88.980) | −.000759 (97.027) | −.002429 (90.185) | −.000177 (77.620) | −.0001754 (75.013) |
| N | 43,451 | 26,458 | 33,865 | 43,445 | 34,949 | 45,940 | 45,769 | 45,743 | 43,589 |
| F-statistic | 115.15 | 38.02 | 44.92 | 70.46 | 131.74 | 87.23 | 82.16 | 59.33 | 116.41 |
| Adjusted $R^2$ | .8925 | .8062 | .8004 | .8345 | .9196 | .8561 | .8490 | .8016 | .8931 |

Implied percent change in crime rate: The effect of the ''shall issue'' interaction coefficient evaluated at different levels of county populations:

| | Violent Crimes | Murder | Rape | Aggravated Assault | Robbery | Property Crimes | Burglary | Larceny | Auto Theft |
|---|---|---|---|---|---|---|---|---|---|
| 1/2 Mean = 37,887 | −.36 | −.78 | −.3 | −.4 | −.1 | .2 | .2 | .03 | .5 |
| Mean = 75,773 | −.71 | −1.6 | −.6 | −.8 | −.2 | .4 | .4 | .05 | 1.1 |
| Plus 1 SD = 326,123 | −3.1 | −6.8 | −2.6 | −3.5 | −.7 | 1.7 | 1.6 | .23 | 4.6 |
| Plus 2 SD = 576,474 | −5.4 | −11.9 | −4.5 | −6.1 | −1.3 | 2.99 | 2.8 | .4 | 8.1 |
| % of a 1 standard deviation change in corresponding crime rate that can be explained by a 1 standard deviation change in the arrest rate for that crime | 9 | 7 | 4 | 9 | 4 | 10 | 4 | 11 | 3 |

NOTE.—The control variables are the same as those used in Table 3 including year and county dummies, although they are not reported since the coefficient estimates are very similar to those reported earlier. Absolute $t$-statistics are in parentheses. All regressions use weighted least squares where the weighting is each county's population.

32

TABLE 8

Using Other Crime Rates That Are Relatively Unrelated to Changes in "Shall Issue" Rules as a Method of Controlling for Other Changes in the Legal Environment: Controlling for Robbery and Burglary Rates

| Exogenous Variables | Endogenous Variables | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|
| | ln (Net Violent Crime Rate) | ln (Murder Rate) | ln (Rape Rate) | ln (Aggravated Assault Rate) | ln (Robbery Rate) | ln (Property Crime Rate) | ln (Burglary Rate) | ln (Larceny Rate) | ln (Auto Theft Rate) |
| **Controlling for robbery rates:** | | | | | | | | | |
| Shall issue law adopted dummy *county population | −1.03E−07 (6.318) | −1.72E−07 (7.253) | −7.73E−08 (4.049) | −1.03E−07 (5.777) | … | 5.61E−08 (5.206) | −3.50E−09 (.304) | 5.35E−08 (3.911) | 1.47E−07 (8.844) |
| Arrest rate for the crime category corresponding to the appropriate endogenous variable | −.0003792 (57.644) | −.0013449 (36.240) | −.00073 (42.672) | −.000776 (60.834) | … | −.0006448 (86.517) | −.0020339 (77.992) | −.0001547 (69.068) | −.0001382 (63.888) |
| ln(Robbery Rate) | .1083118 (46.370) | .116406 (24.616) | .0983088 (30.363) | .1196466 (47.469) | … | .1176149 (78.825) | .1135451 (70.826) | .1164045 (61.762) | .2173908 (92.212) |
| N | 43,197 | 26,458 | 33,865 | 43,445 | 34,949 | 45,940 | 45,769 | 45,743 | 43,589 |
| F-statistic | 81.93 | 39.19 | 46.55 | 75.09 | 159.18 | 101.83 | 93.39 | 65.82 | 143.54 |
| Adjusted R² | .8555 | .8111 | .8062 | .8433 | .9327 | .8744 | .8649 | .8179 | .9117 |
| **Controlling for burglary rates:** | | | | | | | | | |
| Shall issue law adopted dummy *county population | −9.52E−08 (6.937) | −1.73E−07 (7.434) | −8.03E−08 (4.356) | −1.03E−07 (6.072) | −1.47E−08 (.759) | 7.23E−08 (6.854) | … | 5.50E−08 (4.769) | 1.45E−07 (8.943) |
| Arrest rate for the crime category corresponding to the appropriate endogenous variable | −.00026 (44.982) | −.00128 (35.139) | −.00051 (30.010) | −.00054 (42.883) | −.000429 (69.190) | −.000469 (61.478) | … | −.000102 (53.545) | −.00116 (53.961) |
| ln(Burglary Rate) | .5667123 (110.768) | .4459916 (37.661) | .4916113 (56.461) | .5302516 (83.889) | .6719892 (78.531) | .5773792 (155.849) | … | .6009071 (150.635) | .6416852 (106.815) |
| N | 43,451 | 26,458 | 33,865 | 43,445 | 34,949 | 45,813 | … | 45,743 | 43,589 |
| F-statistic | 154.04 | 40.78 | 50.59 | 84.97 | 159.18 | 123.99 | … | 98.08 | 152.82 |
| Adjusted R² | .9176 | .8173 | .8191 | .8591 | .9327 | .8949 | … | .8706 | .9167 |

Note.—While not all coefficient estimates are reported, all the control variables are the same as those used in Table 3 including year and county dummies. Abs olute-statistics are in parentheses. All regressions use weighted least squares where the weighting is each county's population. Net violent and property crime rates are respectively net of robbery and burglary crime rates to avoid producing any artificial collinearity. Likewise, the arrest rates for those values subtract out that portion of the corresponding arrest rates due to arrests for robbery and burglary.

33

the burglary or robbery rates to proxy for other changes in the criminal jus-
tice system. Robbery and burglary are the violent and property crime cate-
gories that are the least related to changes in concealed handgun laws, but
they are still positively correlated with all the other types of crimes. One
additional minor change is made in two of the earlier specifications. In or-
der to avoid any artificial collinearity either between violent crime and rob-
bery or between property crimes and burglary, violent crimes net of robbery
and property crimes net of burglary are used as the endogenous variables
when robbery or burglary are controlled for.

Some evidence that burglary or robbery rates will proxy for other
changes in the criminal justice system can be seen in their correlations with
other crime categories. The Pearson correlation coefficient between robbery
and the other crime categories ranges between .49 and .80, and all are statis-
tically significant at least at the .0001 level. For burglary the correlations
range from .45 to .68, and they are also equally statistically significant. The
two sets of specifications reported in Table 8 closely bound our earlier esti-
mates, and the estimates continue to imply that the introduction of con-
cealed handgun laws coincided with similarly large drops in violent crimes
and increases in property crimes. The only difference with the preceding
results is that they now imply that the effect on robberies is statistically
significant. The estimates on the other control variables also essentially re-
main unchanged.

We also reestimated the regressions in Table 3 using first differences on
all the control variables (see Table 9). These regressions were run using a
dummy variable for the presence of ''shall issue'' concealed handgun laws
and differencing that variable, and the results consistently indicate a nega-
tive and statistically significant effect from the legal change for violent
crimes, rape, and aggravated assault. Shall issue laws negatively affect mur-
der rates in both specifications, but the effect is statistically significant only
when the shall issue variable is also differenced. The property crime results
are also consistent with those shown in the previous tables, showing a posi-
tive effect of shall issue laws on crime rates. Perhaps not surprisingly, the
results imply that the gun laws immediately altered crime rates, but that
an additional change was spread out over time, possibly because concealed
handgun use did not instantly move to its new steady-state level (for exam-
ple, in 1994, Oregon permits increased by 50 percent and Pennsylvania's
by 16 percent even though both ordinances had been in effect for at least 4
years). The annual decrease in violent crimes averaged about 2 percent,
while the annual increase in property crimes averaged about 5 percent.

The short and long term effects of these legal changes were further exam-
ined by reestimating the regressions in Tables 3 and 7 with a time trend for
the number of years after the law has been in effect and that time trend



FIGURE 1.—The effect of concealed handguns on violent crimes

squared. A similar set of time trends were also added for before the law went into effect to test whether there were systematic changes in crime leading up to the passage of the law. While not shown, these regression results provide consistent strong evidence that the deterrent impact of concealed handguns increases with time. For most violent crimes, the time trend leading up to the adoption of the laws indicates that crime was rising prior to the laws being enacted. Figure 1 shows how the violent crime rate varies before and after the implementation of these nondiscretionary permit laws. Using restricted least squares to compare whether the crime rate trends before and after the enactment of the laws were the same, $F$-tests reject that hypothesis at least at the 10 percent level for all the crime categories except aggravated assault and larceny, where the $F$-tests are only significant at the 20 percent level.

All the results in Tables 3, 6, and 7 were reestimated to deal with the concerns raised in Section II over the ''noise'' in arrest rates arising from the timing of offenses and arrests and the possibility of multiple offenders. We reran all the regressions in this section first by limiting the sample to those counties over 10,000, 100,000, and then 200,000 people. Consistent with the evidence reported in Table 7, the more the sample was limited to

TABLE 9

Rerunning the Regressions on Differences

| | Endogenous Variables (in Terms of First Differences) | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|
| Exogenous Variables | Δln (Violent Crime Rate) | Δln (Murder Rate) | Δln (Rape Rate) | Δln (Aggravated Assault Rate) | Δln (Robbery Rate) | Δln (Property Crime Rate) | Δln (Burglary Rate) | Δln (Larceny Rate) | Δln (Auto Theft Rate) |
| All variables except for the "shall issue" dummy differenced: | | | | | | | | | |
| Shall issue law adopted dummy | −.021589 (1.689) | −.025933 (.841) | −.052034 (2.761) | −.0456251 (2.693) | −.0331607 (1.593) | .0526532 (4.982) | .0352582 (3.16) | .0522435 (4.049) | .128475 (5.324) |
| First differences in the arrest rate for the crime category corresponding to the appropriate endogenous variable | −.0004919 (75.713) | −.0015482 (25.967) | −.0008641 (46.509) | −.0009272 (67.782) | −.0005725 (82.38) | −.0007599 (91.259) | −.0024482 (88.38) | −.0001748 (75.969) | −.0001831 (53.432) |
| Intercept | −.073928 (6.049) | −.0402018 (1.554) | −.014342 (.904) | −.0522417 (3.68) | −.1203331 (6.925) | −.0952347 (10.8) | −.0770997 (8.312) | −.1062443 (9.872) | −.2604944 (13.009) |
| N | 37,611 | 20,420 | 26,269 | 37,694 | 27,999 | 40,901 | 40,686 | 40,671 | 37,581 |
| F-statistic | 3.80 | .69 | 2.56 | 4.03 | 4.05 | 4.36 | 6.62 | 3.1 | 10.34 |
| Adjusted $R^2$ | .1867 | −.0379 | .1389 | .1972 | .2283 | .2047 | .3018 | .1386 | .4338 |

36

| | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|
| All variables differenced: | | | | | | | | | |
| First differences in the shall issue law adopted dummy | −.026959 (2.57) | −.0363798 (1.826) | −.0394318 (2.887) | −.0540946 (4.414) | .0071132 (.471) | .0481937 (6.303) | .0072487 (.898) | .0623146 (6.676) | .2419118 (13.884) |
| First differences in the arrest rate for the crime category corresponding to the appropriate endogenous variable | −.0004919 (75.728) | −.0015481 (25.968) | −.0008642 (46.519) | −.0009275 (67.819) | −.0005724 (82.371) | −.0007598 (91.266) | −.002448 (88.362) | −.0001748 (75.978) | −.0001829 (53.495) |
| Intercept | −.0758797 (6.241) | −.042305 (1.642) | −.0188927 (1.196) | −.056264 (3.983) | −.1176478 (6.801) | −.0907433 (10.341) | −.0742121 (8.038) | −.1016434 (9.494) | −.248623 (12.506) |
| $N$ | 37,611 | 20,420 | 26,269 | 37,694 | 27,999 | 40,901 | 40,686 | 40,671 | 37,581 |
| $F$-statistic | 3.8 | .69 | 2.56 | 4.04 | 4.05 | 4.37 | 6.62 | 3.11 | 10.45 |
| Adjusted $R^2$ | .1868 | −.0378 | .1389 | .1975 | .2282 | .205 | .3016 | .1393 | .4365 |

Note.—The variables for income, population, racial, sex, and age compositions of the population and density are all in terms of first differences. While not all the coefficient estimates are reported, all the control variables used in Table 3 are used here, including year and county dummies. Absolute $t$-statistics are in parentheses. All regressions use weighting where the weighting is each county's population.

larger population counties the stronger and more statistically significant was the relationship between concealed handgun laws and the previously reported effects on crime. The arrest rate results also tended to be stronger and more significant. We also tried rerunning all the regressions by redefining the arrest rate as the number of arrests over the last 3 years divided by the total number of offenses over the last 3 years. Despite the reduced sample size, the results remained similar to those already reported.

Two of the most common laws affecting the use of handguns are increased sentencing penalties when crimes are committed using a gun and waiting periods before a citizen can obtain a gun. To test what role these two types of laws may have played in changing crime rates, we reran the regressions in Tables 3 and 4 by adding a dummy variable to control for state laws that increase sentencing penalties when deadly weapons are used and variables to measure the impact of waiting periods.[60] Because we have no strong prior beliefs about whether the effect of waiting periods on crime is linear with respect to the length of the waiting period, we included not only a dummy variable for when the waiting period is in effect but also variables for the length of the waiting period in days and the length in days squared. In both sets of regressions, the dummy variable for the presence of ''shall issue'' concealed handgun laws remains generally consistent with the results reported earlier, though the ''shall issue'' coefficients for robbery in the county-level regressions and for property crimes using the state levels are no longer statistically significant. While the coefficients for arrest rates are not reported, they remain very similar to those shown previously.

With respect to the other gun laws, the pattern shown in Table 10 is less clear. The county-level data imply that increased sentencing penalties when deadly weapons are used reduce violent crimes (particularly, aggravated assault and robbery), but this effect is not statistically significant for violent crimes using state-level data. The state-level data also indicate no statistically significant nor economically consistent relationship between either the presence of waiting periods or their length and crime. While the county-level data frequently imply a relationship between murder, rape, aggravated assault, and robbery, the coefficients imply quite inconsistent effects for these different crimes. For example, simply passing the law appears to raise murder and rape rates but lower aggravated assaults and robbery. These differential effects also apply to the length of the waiting periods, with longer periods at first lowering and then raising the murder and rape rates; the reverse is true for aggravated assaults. However, these results make it very

---

[60] Marvell & Moody, *supra* note 43, at 259–60. With the exception of only one state, the adoption of waiting periods corresponds to the adoption of background checks.

difficult to argue that waiting periods (particularly long ones) have an over-all beneficial effect on crime.

In concluding this section, not only does this initial empirical work provide strong evidence that concealed handgun laws reduce violent crime and that higher arrest rates deter all types of crime, but the work also allows us to evaluate some of the broader empirical issues concerning criminal deterrence discussed in Section II. The results confirm some of our earlier discussions on potential aggregation problems with state-level data. County-level data imply that arrest rates explain about six times the variation in violent crime rates and eight times the variation in property crime rates that arrest rates explain when we use state-level data. Breaking the data down by whether a county is a high- or a low-crime county indicates that arrest rates do not affect crime rates equally in all counties. The evidence also confirms the claims of law enforcement officials that ''shall issue'' laws represented more of a change in how the most populous counties permitted concealed handguns. One concern that was not borne out was over whether state-level regressions could bias the coefficients on the concealed handgun laws toward zero. In fact, while state- and county-level regressions produce widely different coefficients for property crimes, seven of the nine crime categories imply that the effect of concealed handgun laws was much larger when state-level data were used. However, one conclusion is clear: the very different results between state- and county-level data should make us very cautious in aggregating crime data and would imply that the data should remain as disaggregated as possible.

## B. The Endogeneity of Arrest Rates and the Passage of Concealed Handgun Laws

The previous specifications have assumed that both the arrest rate and the passage of concealed handgun laws are exogenous. Following Ehrlich,[61] we allow for the arrest rate to be a function of the lagged crime rates; per capita and per violent and property crimes measures of police employment and payroll at the state level (these three different measures of employment are also broken down by whether police officers have the power to make arrests); the measures of income, unemployment insurance payments, and the percentages of county population by age, sex, and race used in Table 3; and county and year dummies.[62] In an attempt to control for political influences,

---

[61] Ehrlich, *supra* note 22, at 548–51.

[62] See also Robert E. McCormick & Robert Tollison, Crime on the Court, 92 J. Pol. Econ. 223–35 (April 1984), for a novel article testing the endogeneity of the ''arrest rate'' in the context of basketball fouls.

TABLE 10

Controlling for Other Laws Regulating Gun Use

| Exogenous Variables | ln (Violent Crime Rate) | ln (Murder Rate) | ln (Rape Rate) | ln (Aggravated Assault Rate) | ln (Robbery Rate) | ln (Property Crime Rate) | ln (Burglary Rate) | ln (Larceny Rate) | ln (Auto Theft Rate) |
|---|---|---|---|---|---|---|---|---|---|
| A. County-level regressions: | | | | | | | | | |
| Shall issue law adopted dummy | −.04171 (3.976) | −.08747 (5.173) | −.06113 (4.660) | −.05462 (4.452) | −.01817 (1.272) | .03633 (4.717) | .0133 (1.636) | .045018 (4.723) | .08206 (6.695) |
| Enhanced sentencing law dummy | −.04171 (3.976) | −.00284 (.230) | .01128 (1.165) | −.01528 (1.680) | −.028832 (2.694) | −.0000151 (.003) | −.01992 (3.340) | .01219 (1.733) | −.0182 (2.021) |
| Waiting law dummy | .02297 (.601) | .23386 (3.663) | .2534 (5.213) | −.0937 (2.071) | −.09307 (1.704) | .02023 (.718) | .02012 (.679) | −.003398 (.098) | −.08302 (1.853) |
| Waiting period in days | −.000829 (.075) | −.0943 (5.112) | −.1363 (9.726) | .06447 (4.966) | −.1121 (7.349) | −.01477 (1.812) | −.04533 (5.279) | −.011885 (1.175) | −.0100 (.772) |
| Waiting period in days squared | −.0008046 (1.182) | .00546 (4.864) | .00802 (9.363) | −.00498 (6.248) | .00731 (7.836) | .0001884 (.376) | .002268 (4.297) | −.001706 (2.751) | .0009851 (1.237) |
| N | 43,451 | 26,458 | 33,865 | 43,445 | 34,949 | 45,940 | 45,769 | 45,743 | 43,589 |
| F-statistic | 115.06 | 37.96 | 45.24 | 70.51 | 132.58 | 87.30 | 84.99 | 59.34 | 116.32 |
| Adjusted $R^2$ | .8926 | .8062 | .8018 | .8348 | .9202 | .8564 | .8499 | .8018 | .8932 |

B. State-level regressions:

| | (1) | (2) | (3) | (4) | (5) | (6) | (7) | (8) | (9) |
|---|---|---|---|---|---|---|---|---|---|
| Shall issue law adopted dummy | −.1005 (3.030) | −.0810 (2.068) | −.05746 (1.799) | −.10189 (3.013) | −.1332 (2.770) | −.0342 (1.499) | −.0761 (2.785) | −.0219 (.976) | −.0079 (.178) |
| Enhanced sentencing law dummy | .0347 (1.491) | .0303 (1.103) | .02725 (1.209) | −.0283 (1.192) | .0073 (.217) | .0287 (1.798) | .0054 (.282) | .0369 (2.354) | .0175 (.564) |
| Waiting law dummy | .1010 (.809) | .0684 (.464) | .2173 (1.805) | .02613 (.205) | .1524 (.842) | .0325 (.378) | .0647 (.628) | .0233 (.276) | −.0307 (.184) |
| Waiting period in days | −.02988 (.854) | −.03066 (.744) | −.1049 (3.109) | −.0065 (.183) | −.1000 (1.978) | −.0095 (.397) | −.0220 (.765) | −.0053 (.223) | −.0238 (.509) |
| Waiting period in days squared | .00117 (.576) | −.00132 (.553) | .0059 (3.004) | −.00041 (.200) | .0059 (2.017) | −.000207 (.149) | .0005 (.302) | −.00059 (.435) | −.00248 (.921) |
| $N$ | 804 | 809 | 804 | 811 | 811 | 811 | 811 | 811 | 811 |
| $F$-statistic | 134.75 | 100.20 | 76.15 | 127.93 | 123.66 | 78.29 | 82.33 | 75.57 | 168.47 |
| Adjusted $R^2$ | .9491 | .9322 | .9129 | .9461 | .9443 | .9144 | .9183 | .9116 | .9586 |

NOTE.—The control variables are the same as those used in Table 3 including year and county dummies. Absolute $t$-statistics are in parentheses. All regressions use weighting where the weighting is each county's population.

41

we also included the percentage of a state's population that are members of the National Rifle Association and the percentage of the vote received by the Republican presidential candidate at the state level. Because presidential candidates and issues vary between elections, the percentage voting Republican is undoubtedly not directly comparable across years. To account for these differences across elections, we interacted the percentage voting Republican with dummy variables for the years immediately next to the relevant elections. Thus, the percentage of the vote obtained in 1980 is multiplied by a year dummy for the years 1979–82, the percentage of the vote obtained in 1984 is multiplied by a year dummy for the years 1983–86, and so on, through the 1992 election. A second set of regressions explaining the arrest rate also includes the change in the natural log of the crime rates to proxy for the difficulty police forces face in adjusting to changing circumstances.[63] However, the time period studied in all these regressions is more limited than in our previous tables because state-level data on police employment and payroll are only available from the U.S. Department of Justice's Expenditure and Employment data for the Criminal Justice System from 1982 to 1992.

There is also the question of why some states adopted concealed handgun laws while others did not. As noted earlier, to the extent that states adopted the law because crime was either rising or was expected to increase, OLS estimates underpredict the drop in crime. Similarly, if these rules were adopted when crime rates were falling, the bias is in the opposite direction. Thus, in order to predict whether a county would be in a state with concealed handgun laws we used both the natural logs of the violent and property crime rates and the first differences of those crime rates. To control for general political differences that might affect the chances of these laws being adopted, we also included National Rifle Association membership as a percentage of a state's population; the Republican presidential candidate's percentage of the statewide vote; the percentage of a state's population that is black and the percentage white; the total population in the state; regional dummy variables for whether the state is in the South, Northeast, or Midwest; and year dummy variables.

While the 2SLS estimates shown in the top half of Table 11 again use the same set of control variables employed in the preceding tables, the results differ from all our previous estimates in one important respect: concealed handgun laws are associated with large significant drops in the levels of all nine crime categories. For the estimates most similar to Ehrlich's

[63] We would like to thank Phil Cook for suggesting this addition to us. In a sense, this is similar to Ehrlich's specification, *supra* note 22, at 557, except that the current crime rate is broken down into its lagged value and the change between the current and previous periods.

study, five of the estimates imply that a 1 standard deviation change in the predicted value of the shall issue law dummy variable explains at least 10 percent of a standard deviation change in the corresponding crime rates. In fact, concealed handgun laws explain a greater percentage of the change in murder rates than do arrest rates. With the exception of robbery, the set of estimates using the change in crime rates to explain arrest rates indicates a usually more statistically significant but economically smaller effect from concealed handgun laws. For example, concealed handgun laws now explain 3.9 percent of the variation in murder rates compared to 7.5 percent in the preceding results. While these results imply that even crimes with relatively little contact between victims and criminals experienced declines, the coefficients for violent crimes are still relatively more negative than the coefficients for property crimes.

For the first-stage regressions explaining which states adopt concealed handgun laws (shown in the bottom half of Table 11), both the least square and logit estimates imply that the states adopting these laws are relatively Republican with large National Rifle Association memberships and low but rising violent and property crime rates. The other set of regressions used to explain the arrest rate shows that arrest rates are lower in high-income, sparsely populated, Republican areas where crime rates are increasing.

We also reestimated the state-level data using similar 2SLS specifications. The coefficients on both the arrest rates and concealed handgun law variables remained consistently negative and statistically significant, with the state-level data again implying a much stronger effect from concealed handguns and a much weaker effect from higher arrest rates. Finally, in order to use the longer data series available for the nonpolice employment and payroll variables, we reran the regressions without those variables and produced similar results.

Ehrlich also raises the concern that the types of 2SLS estimates shown in Table 11, part A, might still be affected by spurious correlation if the measurement errors for the crime rate are serially correlated over time. (The potential difficulties for part B are much more serious.) To account for this, we reestimated the first stage regressions predicting the arrest rate without the lagged crime rate. Doing this makes the estimated results for the Shall Issue Law dummy even more negative and statistically significant than those already shown.

Finally, using the predicted values for the arrest rates allows us to investigate the significance of another weakness with the data. The arrest rate data experience not only some missing observations but also instances where it is undefined when the crime rate in a county equals zero. This last issue is really only a concern for murders and rapes in low population counties. In

## TABLE 11

### REGRESSION ESTIMATES OF THE CAUSES AND EFFECTS OF THE ADOPTION OF CONCEALED HANDGUN LAWS

A. ALLOWING THE CHANGE IN THE "SHALL ISSUE" LAW AND THE ARREST RATE TO BE ENDOGENOUS USING TWO-STAGE LEAST SQUARES (2SLS)*

| EXOGENOUS VARIABLES | Endogenous Variables (in Crimes per 100,000 Population) | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|
| | ln (Violent Crime Rate) | ln (Murder Rate) | ln (Rape Rate) | ln (Aggravated Assault Rate) | ln (Robbery Rate) | ln (Property Crime Rate) | ln (Auto Theft Rate) | ln (Burglary Rate) | ln (Larceny Rate) |
| **1. Using the predicted values of arrest rates similar to Ehrlich's 1973 study:** | | | | | | | | | |
| Shall issue law adopted dummy | -1.262 | -1.1063 | -1.059 | -1.3192 | -.8744 | -1.1182 | -.7668 | -.7603 | -1.122 |
| | (21.731) | (5.7598) | (-4.4884) | (18.5277) | (7.4979) | (15.3716) | (11.435) | (19.328) | (25.479) |
| | 10.5% | 7.5% | 6.4% | 10.1% | 4.9% | 7.67% | 11.4% | 10.6% | 13.5% |
| Arrest rate for the crime category corresponding to the appropriated endogenous variable | -.002324 | -.00094 | -.0359 | -.002176 | -.00241 | -.01599 | -.002759 | -.01783 | -.0124 |
| | (9.6892) | (1.8436) | (9.667) | (7.1883) | (4.481) | (33.26) | (2.989) | (14.36) | (31.814) |
| | 60.7% | 5.2% | 60.1% | 44.6% | 36.9% | 80.1% | 21.3% | 79.6% | 80.6% |
| $N$ | 31,129 | 31,129 | 31,129 | 31,129 | 31,129 | 31,129 | 31,129 | 31,129 | 31,129 |
| $F$-statistic | 61.97 | 19.07 | 22.3 | 39.81 | 63.71 | 60.78 | 84.21 | 46.48 | 38.37 |
| Adjusted $R^2$ | .8592 | .644 | .6807 | .7953 | .8626 | .8568 | .8893 | .8199 | .7891 |
| **2. Including the change in crime rates when estimating the predicted values of the arrest rates:** | | | | | | | | | |
| Shall issue law adopted dummy | -.26104 | -.5732 | -.1992 | -.29881 | -.0054 | -.20994 | -.2774 | -.1153 | -.2623 |
| | (20.12) | (18.21) | (9.6317) | (15.4465) | (.2935) | (29.4242) | (32.5051) | (13.397) | (32.4253) |
| | 2.2% | 3.9% | 1.2% | 2.3% | 0.3% | 3.3% | 2.1% | 1.6% | 3.2% |

44

Arrest rate for the crime category corresponding to the appropriate endogenous variable

| | In (Violent Crime Rate) | Δ In (Violent Crime Rate) | In (Property Crime Rate) | Δ In (Property Crime Rate) | NRA Membership as % of State Population | % Rep. Pres. in State Vote 80 * Year Dummy 79–82 | % Rep. Pres. in State Vote 84 * Year Dummy 83–86 | % Rep. Pres. in State Vote 88 * Year Dummy 87–90 | % Rep. Pres. in State Vote 92 * Year Dummy 91–92 | % Population Black for State | % Population White for State |
|---|---|---|---|---|---|---|---|---|---|---|---|
| | | | −.007827 (746.74) 104% | −.024 (687.7) 95% | −.02626 (1,047) 117% | −.01028 (582) 88% | −.00716 (901.8) 109% | −.00933 (820.7) 95% | −.01233 (1,242.7) 95.1% | −.03839 (796.8) 71% | −.0101 (956.14) 101% |
| N | | | 31,129 | 31,129 | 31,129 | 31,129 | 31,129 | 31,129 | 31,129 | 31,129 | 31,129 |
| F-statistic | | | 1,723 | 1,260.9 | 4,909.6 | 797.5 | 3,614.86 | 1,671.49 | 6,424 | 1,389 | 1,625.8 |
| Adjusted $R^2$ | | | .9942 | .9921 | .9980 | .9876 | .9972 | .9941 | .9984 | .9929 | .9939 |

B. First-Stage Estimates of Shall Issue Law†

Exogenous Variables

| Endogenous Variables | In (Violent Crime Rate) | Δ In (Violent Crime Rate) | In (Property Crime Rate) | Δ In (Property Crime Rate) | NRA Membership as % of State Population | % Rep. Pres. in State Vote 80 * Year Dummy 79–82 | % Rep. Pres. in State Vote 84 * Year Dummy 83–86 | % Rep. Pres. in State Vote 88 * Year Dummy 87–90 | % Rep. Pres. in State Vote 92 * Year Dummy 91–92 | % Population Black for State | % Population White for State |
|---|---|---|---|---|---|---|---|---|---|---|---|
| **Least squares estimate:** | | | | | | | | | | | |
| Shall issue law | −.01817 (9.710) | .00825 (5.031) | −.02889 (8.748) | .0094 (2.577) | .000107 (19.383) | .0061 (5.485) | .0034 (4.986) | .01702 (22.844) | .0299 (27.317) | .00518 (13.06) | .0031 (8.470) |
| N | | | | | | 31,137 | | | | | |
| F statistic | | | | | | 209.85 | | | | | |
| Adjusted $R^2$ | | | | | | .1436 | | | | | |
| **Logit:** | | | | | | | | | | | |
| Shall issue law | −.0797 (6.003) | .038249 (3.294) | −.2095 (8.657) | .08119 (3.121) | .0004344 (10.329) | .0567 (6.227) | .01456 (2.437) | .09976 (16.203) | .12249 (16.273) | .0409 (10.090) | .0364 (9.131) |
| N | | | | | | 31,137 | | | | | |
| $\chi^2$ | | | | | | 5,007.44 | | | | | |
| Pseudo-$R^2$ | | | | | | .1687 | | | | | |

45

TABLE 11 (*Continued*)

C. First-Stage Estimates of the Probability of Arrest: Violent and Property Crime Rates‡

| | | | | | EXOGENOUS VARIABLES | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|
| ENDOGENOUS VARIABLES | In (Violent Crime Rate Lagged) | In (Property Crime Rate Lagged) | No. of Police in State Employed with Power of Arrest/State Population | No. of Police in State Employed without Power of Arrest/State Population | NRA Membership as % of State Population | Population Density per Square Mile | % Rep. Pres. in State Vote 80 * Year Dummy 79–82 | % Rep. Pres. in State Vote 84 * Year Dummy 83–86 | % Rep. Pres. in State Vote 88 * Year Dummy 87–90 | % Rep. Pres. in State Vote 92 * Year Dummy 91–92 |
| 1. The predicted values of arrest rates that most closely correspond to Ehrlich's 1973 2SLS estimates: | | | | | | | | | | |
| Arrest rate for violent crimes | −2.224 (1.441) | ... | −14,093.61 (3.065) | 95.085 (2.206) | .01463 (1.940) | .0739 (6.418) | −6.936 (9.975) | −4.293 (8.270) | −3.3467 (5.865) | −3.4316 (4.967) |
| $N$ | | | | | 28,954 | | | | | |
| $F$-statistic | | | | | | 1.83 | | | | |
| Adjusted $R^2$ | | | | | | .0814 | | | | |
| Arrest rate for property crimes | ... | .90203 (.738) | −2,805.2 (1.173) | −1.3057 (.059) | .01045 (1.305) | .00415 (.697) | −1.5931 (4.434) | −.9155 (3.420) | −1.1778 (4.004) | −1.2009 (3.416) |
| $N$ | | | | | 30,814 | | | | | |
| $F$-statistic | | | | | | 1.08 | | | | |
| Adjusted $R^2$ | | | | | | .0084 | | | | |

|  | EXOGENOUS VARIABLES | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|
|  | ln (Violent Crime Rate Lagged) | Δ ln (Violent Crime Rate) | ln (Property Crime Rate Lagged) | Δ ln (Property Crime Rate) | No. of Police in State Employed with Power of Arrest/State Population | No. of Police in State Employed without Power of Arrest/State Population | NRA Membership as % of State Population | Density per Square Mile | County Population |
| 2. Including the change in crime rates in addition to those already noted when estimating the predicted values of arrest rates (the coefficients on the percentage of the state voting Republican in presidential elections is similar to those reported above): | | | | | | | | | |
| Arrest rate for violent crimes | −128.4 (39.86) | −123.64 (44.17) | ... | ... | −12,194 (2.750) | 96.3244 (2.317) | .0009 (.060) | .0646 (5.284) | −.0000726 (4.877) |
| N | | | | | 28,954 | | | | |
| F-statistic | | | | | 2.59 | | | | |
| Adjusted $R^2$ | | | | | .1458 | | | | |
| Arrest rate for property crimes | ... | ... | −109.69 (49.342) | −106.92 (58.21) | −1,394 (.618) | −1.9891 (.095) | −.0072 (.949) | .0083 (1.473) | −.0000111 (1.522) |
| N | | | | | 30,814 | | | | |
| F-statistic | | | | | 2.30 | | | | |
| Adjusted $R^2$ | | | | | .1165 | | | | |

SOURCE.—Isaac Ehrlich, Participation in Illegitimate Activities: A Theoretical and Empirical Investigation, 81 J. Pol. Econ. 521–65 (1973).

* While not all coefficient estimates are reported, all the control variables are the same as those used in Table 3, including year and county dummies. Absolute $t$-statistics are in parentheses, and the percentage reported below that for some of the numbers is the percent of a standard deviation change in the endogenous variable that can be explained by a 1 standard deviation change in the exogenous variable.

† Absolute $t$-statistics are in parentheses. The sample is limited because the data on police employment used in producing the predicted arrest rates were available only for 1982–92. While the estimates from the first specification were used in the above regressions, the logit estimates are provided for comparison. Not all the variables that were controlled for are shown. These additional variables included year and regional dummies (South, Northeast, and Midwest) and the state's population. NRA = National Rifle Association. % Rep. Pres. = percentage of the vote received by the Republican presidential candidate.

‡ Absolute $t$-statistics are in parentheses. The sample is limited because the data on police employment were available only for 1982–92. Not all the variables that were controlled for are shown. These additional variables included the number of police with arrest powers divided by the number of violent crimes; the number of police with arrest powers divided by the number of property crimes; the number of police without arrest powers divided by the number of violent crimes; the number of police without arrest powers divided by the number of property crimes; these preceding variables using payrolls; the breakdown of the county's population by age, sex, and race used in Table 3; year and county dummies; the measures of income reported in Table 3; and the state's population. The estimates also using the change in crime rates are available from the authors. NRA = National Rifle Association. % Rep. Pres. = percentage of the vote received by the Republican presidential candidate.

these cases both the numerator and denominator in the arrest rate are equal to zero, and it is not clear whether we should count this as an arrest rate equal to 100 or 0 percent, neither of which seems very plausible. The previously reported evidence where regressions were run only on the larger counties sheds some light on this question since these counties do not exhibit this problem. In addition, if the earlier reported evidence that the movement to nondiscretionary permits largely confirmed the preexisting practice in the lower population counties, one would expect relatively little change in these counties with the missing observations.

However, the analysis presented in this section also allowed us to try another approach to deal with this issue. We created predicted arrest rates for these observations using the regressions that explain the arrest rate in Table 11, and then we reestimated the second-stage relationships shown there for murder and rape with the new larger samples. While the coefficient on murder declines, implying a 5 percent drop when ''shall issue'' laws are adopted, the coefficient for rape increases, now implying over a 10 percent drop. Both coefficients are statistically significant. The effect of arrest rates also remains negative and statistically significant.

## C. Concealed Handgun Laws, the Method of Murder, and the Choice of Murder Victims

Do concealed handgun laws cause a substitution in the methods of committing murders? For example, it is possible that the number of gun murders rises after these laws are passed even though the total number of murders falls. While concealed handgun laws raise the cost of committing murders, murderers may also find it relatively more dangerous to kill people using nongun methods once people start carrying concealed handguns and substitute into guns to put themselves on a more even basis with their potential prey. Using data on the method of murder from the Mortality Detail Records provided by the United States Department of Health and Human Services, we reran the murder rate regression from Table 3 on counties over 100,000 during the period from 1982 to 1991. We then separated out murders caused by guns from all other murders. Table 12 shows that carrying concealed handguns appears to have been associated with approximately equal drops in both categories of murders. Carrying concealed handguns appears to make all types of murders relatively less attractive.

There is also the question of what effect concealed handgun laws have on determining which types of people are more likely to be murdered? Using the Uniform Crime Reports Supplementary Homicide Reports we were able to obtain annual state-level data from 1977 to 1992 on the percentage of victims by sex, age, and race as well as information on whether the vic-

TABLE 12

Changes in Murder Methods for Counties over 100,000, 1982–91

| Exogenous Variables | Endogenous Variables (in Murders per 100,000 Population) | | |
|---|---|---|---|
| | ln(Total Murders) | ln(Murder with Guns) | ln(Murders by Nongun Methods) |
| Shall issue law adopted dummy | −.09074 | −.09045 | −.08854 |
| | (3.183) | (1.707) | (1.689) |
| Arrest rate for murder | −.00151 | −.00102 | −.00138 |
| | (26.15) | (6.806) | (7.931) |
| Intercept | .63988 | −8.7993 | −7.51556 |
| | (.436) | (2.136) | (2.444) |
| N | 12,740 | 12,759 | 8,712 |
| F-statistic | 21.40 | 6.60 | 4.70 |
| Adjusted $R^2$ | .8127 | .5432 | .5065 |

Note.—While not all the coefficient estimates are reported, all the control variables are the same as those used in Table 3, including year and county dummies. Absolute *t*-statistics are in parentheses. All regressions use weighting where the weighting is each county's population. The first column uses the Uniform Crime Reports numbers for counties over 100,000, while the second column uses the numbers on total gun deaths available from the Mortality Detail Records, and the third column takes the difference between the Uniform Crime Report's numbers for total murders and Mortality Detail Records of gun deaths.

tim and the offender knew each other (whether they were members of the same family, knew each other but were not members of the same family, strangers, or the relationship is unknown).[64] Table 13 implies no statistically significant relationship between the concealed handgun dummy and the victim's sex, race, or relationships with offenders. However, while they are not quite statistically significant at the .10 level for a two-tailed *t*-test, two of the point estimates appear economically important and imply that in states with concealed handgun laws the percent of victims who know their nonfamily offenders rose by 2.6 percentage points and that the percentage of victims where it was not possible to determine whether a relationship existed declined by 2.9 percentage points. This raises the question of whether concealed handguns cause criminals to substitute into crimes against those whom they know and presumably are also more likely to know whether

[64] While county-level data were provided in the Supplementary Homicide Report, matching these county observations with those used in the Uniform Crime Report (UCR) proved unusually difficult. A unique county identifier was used in the Supplementary Homicide Report. In addition, some caution is suggested in using both the Mortality Detail Records and the Supplementary Homicide Report since the murder rates reported in both sources have relatively low correlations of less than .7 with the murder rates reported in Uniform Crime Reports. This is especially surprising for the Supplementary Report, which is derived from the UCR.

TABLE 13

CHANGES IN COMPOSITION OF MURDER VICTIMS USING ANNUAL STATE-LEVEL DATA FROM THE UNIFORM CRIME REPORTS SUPPLEMENTARY HOMICIDE REPORTS, 1977–92

| | ENDOGENOUS VARIABLES (in Percentage Points) | | | | | | | | | |
| | By Victim's Sex | | | By Victim's Race | | | By Victim's Relationship with Offender | | | |
| EXOGENOUS VARIABLES | Male | Female | Unidentified | White | Black | Hispanic | Offender Is Known to Victim but Is Not in Family | Offender Is in the Family | Offender Is a Stranger | Relationship Is Unknown |
|---|---|---|---|---|---|---|---|---|---|---|
| Shall issue law adopted dummy | .3910 (.388) | −.4381 (.439) | .0476 (.399) | .0137 (.017) | .7031 (.575) | −.8659 (.609) | 2.5824 (1.567) | −.2503 (.210) | .5438 (.459) | −2.8755 (1.464) |
| Arrest rate for murder | .00068 (.141) | −.001385 (.289) | .000703 (1.227) | −.0202 (2.316) | .0132 (2.244) | .00327 (.478) | .0174 (2.198) | −.0145 (2.541) | .0079 (1.394) | −.0108 (1.141) |
| Intercept | 102.20 (1.718) | −3.2763 (.056) | 1.0558 (.150) | 152.19 (1.418) | −30.948 (.428) | −7.7863 (.093) | −73.4677 (.755) | 165.1719 (2.345) | 89.843 (165.17) | −81.55 (.703) |
| N | 804 | 804 | 804 | 804 | 804 | 804 | 804 | 804 | 804 | 804 |
| F-statistic | 14.27 | 14.51 | 1.06 | 45.47 | 125.09 | 35.94 | 14.96 | 12.87 | 7.84 | 26.06 |
| Adjusted $R^2$ | .6409 | .6450 | .0077 | .8568 | .9435 | .8245 | .6525 | .6150 | .4790 | .7712 |

NOTE.—While not all the coefficient estimates are reported, all the control variables are the same as those used in Table 4, including year and state dummies. Absolute $t$-statistics are in parentheses. All regressions use weighting where the weighting is each state's population.

they carry concealed handguns. While the effect of age (not shown in Table 13) is negative (consistent with the notion that concealed handguns deter crime against adults more than young people because only adults can legally carry concealed handguns), the effect is statistically insignificant. Possibly some of the benefits from adults carrying concealed handguns are conferred to younger people who may be protected by these adults.

The arrest rate for murder variable produces more interesting results. The percentage of white victims and the percentage of victims killed by family members both declined when states passed concealed handgun laws, while the percentage of black victims and the percentage of victims killed by nonfamily members that they know both increased. The results imply that higher arrest rates have a much greater deterrence effect on murders involving whites and family members. One explanation is that whites with higher incomes face a greater increase in expected penalties for any given increase in the probability of arrest.

### D. Arizona, Pennsylvania, and Oregon County Data

One problem with the preceding results was the use of county population as a proxy for how restrictive counties were in allowing concealed handgun permits before the passage of ''shall issue'' laws. Since we are still going to control county-specific levels of crime with county dummies, a better measure would have been to use the actual change in gun permits before and after the adoption of a concealed handgun law. Fortunately, we were able to get that information for three states: Arizona, Oregon, and Pennsylvania (see Table 14). Arizona and Oregon also provided additional information on the conviction rate and the mean prison sentence length. However, for Oregon, because the sentence length variable is not directly comparable over time, it is interacted with all the year dummies so that we can still retain any cross-sectional information in the data. One difficulty with the Arizona prison sentence and conviction data is that they are available only from 1990 to 1995 and that since the shall issue handgun law did not take effect until July 1994, it is not possible for us to control for all the other variables that we control for in the other regressions. Unlike Oregon and Pennsylvania, Arizona did not allow private citizens to carry concealed handguns prior to July 1994, so the value of concealed handgun permits equals zero for this earlier period. Unfortunately, however, because Arizona's change in the law is so recent, we are unable to control for all the variables that we can control for in the other regressions.

The results in Table 15 for Pennsylvania and Table 16 for Oregon provide a couple of consistent patterns. The most economically and statistically important relationship involves the arrest rate: higher arrest rates consis-

## TABLE 14
### OREGON, PENNSYLVANIA, AND ARIZONA SAMPLE MEANS AND STANDARD DEVIATIONS

| VARIABLE | Oregon | | | Pennsylvania | | | Arizona | | |
|---|---|---|---|---|---|---|---|---|---|
| | N | Mean | S.D. | N | Mean | S.D. | N | Mean | S.D. |
| **Gun ownership information:** | | | | | | | | | |
| Shall issue dummy | 576 | .1875 | .39065 | 1,072 | .24627 | .4310 | 90 | .33333 | .47404 |
| Change in the (number of right-to-carry pistol permits/population 21 and over) between 1988 and each year since the law was implemented, otherwise zero | 576 | .02567 | .13706 | 1,072 | .46508 | 1.2365 | 90 | 2.1393 | 15.02066 |
| **Arrest rates are the ratio of arrests to offenses for a particular crime category:** | | | | | | | | | |
| Violent crimes | 576 | 66.17437 | 49.2031 | 1,072 | 55.0738 | 21.1293 | | | |
| Murder | 368 | 100.8344 | 97.2253 | 801 | 92.2899 | 64.0169 | | | |
| Rape | 507 | 37.80920 | 37.8298 | 1,031 | 52.5967 | 32.8287 | | | |
| Aggravated assault | 558 | 76.37541 | 62.5568 | 1,070 | 57.4422 | 25.6491 | | | |
| Robbery | 490 | 50.98248 | 53.2559 | 999 | 53.5970 | 49.3320 | | | |
| Property crimes | 576 | 21.95107 | 7.90548 | 1,072 | 21.0539 | 7.12458 | | | |
| Auto theft | 566 | 57.17941 | 99.6343 | 1,069 | 36.6929 | 63.9266 | | | |
| Burglary | 576 | 18.99394 | 11.0296 | 1,072 | 18.8899 | 8.50639 | | | |
| Larceny | 576 | 21.71564 | 8.21388 | 1,072 | 22.0378 | 7.47778 | | | |
| **Conviction rates are the ratio of convictions to arrests for a particular crime category (for Arizona it is the ratio of convictions to offenses):** | | | | | | | | | |
| Violent crimes | 542 | 25.93325 | 40.5691 | | | | 90 | 16.0757 | 33.85482 |
| Murder | 358 | 94.42969 | 107.128 | | | | 90 | 111.8722 | 107.9311 |
| Rape | 444 | 161.7508 | 215.635 | | | | 90 | 47.4365 | 81.42314 |
| Aggravated assault | 536 | 2.505037 | 5.61042 | | | | 90 | 9.204778 | 13.66225 |
| Robbery | 420 | 38.51352 | 49.9308 | | | | 90 | 17.09185 | 39.17454 |
| Property crime | 555 | 6.530883 | 13.8484 | | | | 90 | 1.370787 | 1.432515 |
| Auto theft | 539 | 10.1805 | 14.3673 | | | | 90 | 1.175114 | 3.671085 |
| Burglary | 544 | 15.56064 | 17.7937 | | | | 90 | 2.534157 | 3.4627 |
| Larceny | 552 | 2.577337 | 11.3266 | | | | 90 | 1.070667 | 1.308081 |

52

**Prison sentence in months (Oregon) or years (Arizona):**

| | N | Mean | Std. Dev. | | | N | Mean | Std. Dev. |
|---|---|---|---|---|---|---|---|---|
| Murder | 327 | 301.6697 | 164.55 | | | 90 | 16.0557 | 7.31179 |
| Rape | 443 | 103.2212 | 50.4662 | | | 90 | 8.761905 | 5.974623 |
| Aggravated assault | 241 | 154.4647 | 79.7893 | | | 90 | 4.28876 | 1.874496 |
| Robbery | 364 | 106.8709 | 55.4847 | | | 90 | 6.852239 | 3.108169 |
| Auto theft | 405 | 43.40494 | 20.7846 | | | 90 | 1.415 | .3308054 |
| Burglary | 489 | 65.17791 | 32.2003 | | | 90 | 3.937647 | 1.03187 |
| Larceny | 424 | 46.42925 | 19.0075 | | | 90 | 66.64444 | 145.6599 |
| **Crime rates defined per 100,000 people:** | | | | | | | | |
| Violent crimes | 576 | 282.666 | 230.421 | 171.485 | 156.683 | 90 | 429.2972 | 254.1692 |
| Murder | 576 | 4.52861 | 6.67245 | 3.01319 | 4.12252 | 90 | 5.7787778 | 4.413259 |
| Rape | 576 | 31.4474 | 25.4623 | 15.9726 | 11.6156 | 90 | 23.5 | 18.90888 |
| Aggravated assault | 576 | 196.192 | 152.965 | 107.332 | 78.5966 | 90 | 339.2977 | 200.0264 |
| Robbery | 576 | 50.5625 | 89.5707 | 45.2030 | 86.7830 | 90 | 60.72056 | 71.75822 |
| Property crimes | 576 | 4079.07 | 1621.53 | 2281.56 | 967.430 | 90 | 4,147.692 | 2,282.633 |
| Auto theft | 576 | 228.403 | 157.204 | 160.831 | 162.572 | 90 | 351.3749 | 339.0281 |
| Burglary | 576 | 1,089.5 | 495.926 | 753.668 | 535.022 | 90 | 950.7187 | 563.3711 |
| Larceny | 576 | 2,761.17 | 1,098.06 | 1,367.06 | 569.563 | 90 | 2,845.597 | 1,569.837 |
| **Real per capita income data (in real 1983 dollars):** | | | | | | | | |
| Personal income | 576 | 11,389.39 | 1,630.47 | 11,525 | 2,099.44 | | | |
| Unemployment insurance | 576 | 108.8037 | 45.9864 | 130.560 | 64.0694 | | | |
| Income maintenance | 576 | 131.4323 | 40.3703 | 149.652 | 69.5516 | | | |
| Retirement payments per person over 65 | 576 | 12,335.17 | 1,278.18 | 13,398.9 | 2,253.29 | | | |
| **Population characteristics:** | | | | | | | | |
| County population | 576 | 74,954.98 | 112,573.3 | 177,039 | 274,289.9 | | | |
| County population per square mile | 576 | 77.46861 | 219.7100 | 453.549 | 1,516.16 | | | |
| **Race and age data (% of population):** | | | | | | | | |
| Black male under 10 | 576 | .051847 | .092695 | .2089 | .439286 | | | |
| Black female under 10 | 576 | .049275 | .089665 | .2018 | .434456 | | | |
| White male under 10 | 576 | 7.367641 | .683587 | 6.7258 | .808574 | | | |

TABLE 14 (*Continued*)

| Variable | Oregon | | | Pennsylvania | | | Arizona | | |
|---|---|---|---|---|---|---|---|---|---|
| | N | Mean | S.D. | N | Mean | S.D. | N | Mean | S.D. |
| White female under 10 | 576 | 7.012212 | .649409 | 1,072 | 6.3567 | .761709 | | | |
| Other male under 10 | 576 | .322532 | .437321 | 1,072 | .0525 | .040573 | | | |
| Other female under 10 | 576 | .307242 | .402487 | 1,072 | .0536 | .039637 | | | |
| Black male 10–19 | 576 | .052283 | .084658 | 1,072 | .2515 | .468536 | | | |
| Black female 10–19 | 576 | .047129 | .088479 | 1,072 | .2276 | .473586 | | | |
| White male 10–19 | 576 | 7.603376 | .952584 | 1,072 | 7.7274 | 1.155154 | | | |
| White female 10–19 | 576 | 7.140808 | .895257 | 1,072 | 7.37287 | 1.158130 | | | |
| Other male 10–19 | 576 | .308009 | .348147 | 1,072 | .05396 | .040844 | | | |
| Other female 10–19 | 576 | .295728 | .286703 | 1,072 | .05141 | .038375 | | | |
| Black male 20–29 | 576 | .064034 | .087570 | 1,072 | .24866 | .439191 | | | |
| Black female 20–29 | 576 | .042044 | .082821 | 1,072 | .22014 | .497373 | | | |
| White male 20–29 | 576 | 6.918945 | 1.613700 | 1,072 | 7.53233 | 1.416936 | | | |
| White female 20–29 | 576 | 6.767993 | 1.485155 | 1,072 | 7.56037 | 1.094322 | | | |
| Other male 20–29 | 576 | .280987 | .322992 | 1,072 | .05412 | .078002 | | | |
| Other female 20–29 | 576 | .273254 | .287497 | 1,072 | .05431 | .060281 | | | |
| Black male 30–39 | 576 | .048262 | .073100 | 1,072 | .19163 | .354741 | | | |
| Black female 30–39 | 576 | .032534 | .071081 | 1,072 | .17443 | .419096 | | | |
| White male 30–39 | 576 | 7.363739 | .883651 | 1,072 | 6.81373 | .850949 | | | |
| White female 30–39 | 576 | 7.333140 | .845647 | 1,072 | 6.87622 | .837649 | | | |
| Other male 30–39 | 576 | .227610 | .215892 | 1,072 | .04737 | .050606 | | | |
| Other female 30–39 | 576 | .248852 | .221020 | 1,072 | .05518 | .045324 | | | |
| Black male 40–49 | 576 | .030101 | .044355 | 1,072 | .12300 | .244123 | | | |
| Black female 40–49 | 576 | .022872 | .043869 | 1,072 | .12520 | .311716 | | | |
| White male 40–49 | 576 | 5.506716 | .817220 | 1,072 | 5.27656 | .727481 | | | |
| White female 40–49 | 576 | 5.456938 | .760387 | 1,072 | 5.43223 | .650546 | | | |
| Other male 40–49 | 576 | .148190 | .127731 | 1,072 | .03571 | .030029 | | | |
| Other female 40–49 | 576 | .157778 | .121413 | 1,072 | .03901 | .030711 | | | |
| Black male 50–64 | 576 | .028558 | .045301 | 1,072 | .13316 | .305455 | | | |
| Black female 50–64 | 576 | .024530 | .050093 | 1,072 | .15634 | .404990 | | | |
| White male 50–64 | 576 | 7.123300 | 1.164997 | 1,072 | 7.27097 | .814601 | | | |
| White female 50–64 | 576 | 7.396392 | 1.084129 | 1,072 | 8.08559 | 1.031230 | | | |
| Other male 50–64 | 576 | .135419 | .115337 | 1,072 | .02496 | .021059 | | | |
| Other female 50–64 | 576 | .158164 | .126546 | 1,072 | .03093 | .021638 | | | |

TABLE 15

Using Pennsylvania Data on the Number of Permits Issued to Measure the Differential Impact of Pennsylvania's 1989 "Shall Issue" Law on Different Counties: Data for Counties with Populations over 200,000

| Exogenous Variables | Endogenous Variables (in Crimes per 100,000 Population) | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|
| | ln (Violent Crime Rate) | ln (Murder Rate) | ln (Rape Rate) | ln (Aggravated Assault Rate) | ln (Robbery Rate) | ln (Property Crime Rate) | ln (Auto Theft Rate) | ln (Burglary Rate) | ln (Larceny Rate) |
| Change in the (number right-to-carry pistol permits/population over 21) between 1988 and each year since the law was implemented | -.0527 (1.653) 10% | -.267 (2.759) 21% | -.0567 (1.725) 6% | -.0481 (1.656) 9% | .0124 (.265) 2% | -.00116 (.060) 1% | .0146 (.337) 2% | -.0140 (.562) 4% | .0073 (.37) 2% |
| Arrest rate for the crime category corresponding to the appropriate endogenous variable | -.00785 (7.371) 25% | -.00365 (6.364) 15% | -.000804 (.668) 2% | -.00763 (6.413) 28% | -.000836 (7.031) 24% | -.0041 (2.057) 8% | -.00065 (1.185) 4% | -.0112 (5.138) 25% | .00126 (.641) 2% |
| Population per square mile | -.000386 (.832) | .00262 (1.991) | .000987 (1.087) | -.00039 (.600) | .0005395 (.835) | .00037 (1.283) | -.000171 (.275) | .000518 (1.442) | .00077 (2.601) |
| Real per capita personal income | .0000376 (1.074) | -.000016 (.156) | .000066 (1.071) | .0000197 (.452) | .000047 (1.055) | -.0000485 (2.611) | -.000067 (1.599) | -.000034 (1.396) | -.00004 (2.025) |
| Intercept | -15.352 (.348) | 118.93 (1.069) | -67.015 (.889) | 34.752 (.671) | -52.529 (.993) | -10.31 (.467) | 27.816 (.557) | -29.40 (1.016) | 6.2484 (.269) |
| N | 264 | 264 | 264 | 264 | 264 | 264 | 264 | 264 | 264 |
| F-statistic | 219.4 | 38.70 | 42.49 | 75.00 | 227.51 | 111.04 | 225.8 | 87.43 | 83.19 |
| Adjusted $R^2$ | .9841 | .9150 | .9221 | .9549 | .9848 | .9691 | .9846 | .9609 | .9591 |

Note.—Absolute $t$-statistics are in parentheses, and the percentage reported below is the percent of a standard deviation change in the endogenous variable that can be explained by a 1 standard deviation change in the exogenous variable. While not all the coefficient estimates are reported, all the control variables are the same as those used in Table 3, including year and county dummies. All regressions use weighted least squares where the weighting is each county's population. The use of SHALL*POPULATION variable that was used in the earlier regressions instead of the change in right-to-carry permits variable was tried here and produced very similar results. We also tried controlling for either robbery or burglary rates, but we obtained very similar results.

55

TABLE 16

Oregon Data on the Number of Permits Issued, the Conviction Rate, and Prison Sentence Lengths

| | Endogenous Variables (in Crimes per 100,000 Population) | | | | | | |
|---|---|---|---|---|---|---|---|
| Exogenous Variables | ln(Murder Rate) | ln(Rape Rate) | ln(Aggravated Assault Rate) | ln(Robbery Rate) | ln(Auto Theft Rate) | ln(Burglary Rate) | ln(Larceny Rate) |
| Change in the (number right-to-carry pistol permits/population over 21) between 1988 and each year since the law was implemented | −.3747 (1.598) 3% | −.0674 (.486) 1% | −.0475 (.272) .5% | −.04664 (.385) .28% | .1172 (1.533) 1% | .02655 (.536) 1% | −.0936 (2.328) 3% |
| Arrest rate for the crime category corresponding to the appropriate endogenous variable | −.00338 (6.785) 17% | −.00976 (9.284) 19% | −.00442 (7.279) 19% | −.00363 (4.806) 9% | −.00036 (1.481) 3% | −.00679 (4.458) 16% | −.00936 (6.764) 16% |
| Conviction rate conditional on arrest for the crime category corresponding to the appropriate endogenous variable | −.00208 (6.026) 11% | −.0093 (7.668) 10% | −.01511 (2.150) 6% | −.00190 (4.465) 4% | −.00373 (3.031) 4% | −.00274 (4.297) 10% | −.00859 (3.140) 20% |
| Population per square mile | −.00333 (.415) | .0063 (.059) | .01177 (2.430) | .0079 (2.551) | .00062 (.367) | .00425 (3.937) | −.00030 (.319) |
| Real per capita personal income | −.000138 (.769) | −.000038 (.463) | −.000162 (1.301) | −.000108 (1.542) | .000037 (.965) | .000021 (.816) | 8.29E−6 (.407) |
| Intercept | 6.1725 (.342) | 8.2432 (.496) | 84.464 (3.131) | −16.303 (1.114) | 2.6213 (.326) | −11.2489 (2.169) | 20.047 (4.748) |
| N | 250 | 393 | 239 | 337 | 403 | 487 | 422 |
| F-statistic | 5.74 | 16.61 | 38.79 | 97.94 | 156.02 | 89.90 | 86.81 |
| Adjusted $R^2$ | .6620 | .8113 | .9439 | .9677 | .9766 | .9522 | .9569 |

Note.—Absolute $t$-statistics are in parentheses, and the percentage reported below that is the percent of a standard deviation change in the endogenous variable that can be explained by a 1 standard deviation change in the exogenous variable. We also controlled for prison sentence length, but the different reporting practices used by Oregon over this period makes its use somewhat problematic. To deal with this problem the prison sentence length variable was interacted with year dummy variables. Thus while the variable is not consistent over time it is still valuable in distinguishing penalties across counties at a particular point in time. While not all the coefficient estimates are reported, all the remaining control variables are the same as those used in Table 3, including year and county dummies. The categories for violent and property crimes are eliminated because the mean prison sentence data supplied by Oregon did not allow us to use these two categories. All regressions use weighted least squares where the weighing is each county's population.

tently imply lower crime rates, and in 12 of the 16 regressions the effect is statistically significant. Five cases for Pennsylvania (violent crime, murder, aggravated assault, robbery, and burglary) show that arrest rates explain more than 15 percent of a standard deviation change in crime rates. Automobile theft is the only crime for which the arrest rate is insignificant in both tables.

For Pennsylvania, murder and rape are the only crimes where a 1 standard deviation change in per capita concealed handgun permits explains a greater percentage of a standard deviation in crime rates than it does for the arrest rate. However, increased concealed handgun usage explains more than 10 percent of a standard deviation change in murder, rape, aggravated assault, and burglary rates. For six of the nine regressions, the concealed handgun variable for Pennsylvania exhibits the same coefficient signs that were shown for the national data. Violent crimes, with the exception of robbery, show that higher concealed handgun use lowers crime rates, while property crimes exhibit very little relationship. Concealed handgun use only explains about one-tenth the variation for property crimes that it explains for violent ones.[65] The regressions for Oregon weakly imply a similar relationship between concealed handgun use and crime, but the effect is only statistically significant in one case: larceny, which is also the only crime category where the negative concealed handgun coefficient differs from our previous findings.

The Oregon data also show that higher conviction rates consistently result in significantly lower crime rates. A 1 standard deviation change in conviction rates explains 4–20 percent of a 1 standard deviation change in the corresponding crime rates. However, increases in conviction rates appear to produce a smaller deterrent effect than increases in arrest rates for five of the seven crime categories.[66] The biggest differences between the deterrent effects of arrest and conviction rates produce an interesting pat-

[65] Running the regressions for all Pennsylvania counties (and not just those over 200,000 population) produced similar coefficients and signs for the change in concealed handgun permits coefficient, though the coefficients were no longer statistically significant for violent crimes, rape, and aggravated assault. Alan Krug, who provided us with the Pennsylvania handgun permit data, told us that one reason for the large increase in concealed handgun permits in some rural counties was because people used the guns for hunting. He told us that these low population rural counties tended to have their biggest increase in people obtaining permits in the fall around hunting season. If people were in fact getting a large number of permits in low population counties which already have extremely low crime rates for some reason other than crime, it will make it more difficult to pick up the deterrent effect on crime from concealed handguns that was occurring in the larger counties.

[66] We reran these regressions taking the natural logs of the arrest and conviction rates, and they continued to produce statistically larger and even economically more important effects for the arrest rates than they did for the conviction rates.

tern. For rape, increasing the arrest rate by 1 percentage point produces more than 10 times the deterrent effect of increasing the conviction rate conditional on arrest by 1 percent. The reverse is true for auto theft, where a 1 percentage point increase in arrests reduces crime by about 10 times more than the same increase in convictions. These results are consistent with arrests producing large shaming or reputational penalties.[67] In fact, the existing evidence shows that the reputational penalties from arrest and conviction can dwarf the other legally imposed penalties.[68] However, while the literature has not separated out whether these drops are occurring because of arrest or conviction, these results are consistent with the reputational penalties for arrests alone being significant for at least some crimes.

One possible explanation for these results is that Oregon simultaneously passed both the ''shall issue'' concealed handgun law and a waiting limit. Given the very long waiting period imposed by the Oregon law (15 days), the regressions in Table 10 imply that such a waiting period increases murder by 4.8 percent, rape by 2 percent, and robbery by 5.9 percent. At least in the case of murder, which is almost statistically significant in any case, combining the two sets of regressions implies that the larger drop in murder that would have been observed in the absence of the Oregon waiting period would have produced a *t*-statistic for murder of 1.8.

The results for the prison sentences are not shown, but the *t*-statistics are frequently near zero and the coefficients indicate no clear pattern. One possible explanation for this result is that all the changes in sentencing rules produced a great deal of noise in this variable not only over time but also across counties. For example, after 1989 whether a crime was prosecuted under the pre- or post-1989 rules depended on when the crime took place. If the average time between when the offense occurred and when the prosecution took place differs across counties, the recorded prison sentence length could vary even if the actual time served was the same.

Finally, the much more limited data set for Arizona used in Table 17 produces no significant relationship between the change in concealed handgun permits and the various measures of crime rates. In fact, the coefficient signs themselves indicate no consistent pattern, with the 14 coefficients being equally divided between negative and positive signs, though six of the specifications imply that a 1 standard deviation change in the concealed handgun permits explains at least 8 percent of a 1 standard deviation change in the corresponding crime rates. The results involving either the mean

---

[67] For example, see Dan M. Kahan, What Do Alternative Sanctions Mean? 63 U. Chi. L. Rev. 591–653 (1996).

[68] Lott, *supra* note 23; Lott, The Effect of Conviction; and An Attempt at Measuring the Total Monetary Penalty from Drug Convictions, both *supra* note 24.

prison sentence length for those sentenced in a particular year or the actual time served for those ending their sentences also imply no consistent relationship between prison and crime rates. While the coefficients are negative in 11 of the 14 specifications, they provide weak evidence of the deterrent effect of longer prison terms: only two coefficients are negative and statistically significant. Since the Brady Law also went into effect during this sample period, we reran Table 17 using a dummy variable for the Brady Law. Both the coefficients for the change in permits and the Brady Law dummy variable are almost always insignificant, except for the case of aggravated assault, where the Brady Law is both positive and significant, implying that it increased the number of aggravated assaults by 24 percent.

Overall, the Pennsylvania results provide more evidence that concealed handgun ownership reduces violent crime, murder, rape, and aggravated assault, and in the case of Oregon larceny decreases as well. While the Oregon data imply that the change in handgun permits is statistically significant at 11 percent level for a one-tailed $t$-test, the point estimate is extremely large economically, implying that a doubling of permits reduces murder rates by 37 percent. The other coefficients for Pennsylvania and Oregon imply no significant relationship between the change in concealed handgun ownership and crime rates. The evidence from the small sample for Arizona implies no relationship between crime and concealed handgun ownership. All the results also support the claim that higher arrest and conviction rates deter crime, though, possibly in part due to the relatively poor quality of the data, no systematic effect appears to occur from longer prison sentences.

Combining these individual state estimates with the National Institute of Justice's measures of the losses that victims bear from crime allows us to attach a monetary value to the marginal social benefit from an additional concealed handgun permit and to compare this with the private costs of gun ownership. While the results for Arizona imply no real savings from reduced crime, the estimates for Pennsylvania indicate that potential victims' costs are reduced by $5,079 for each additional concealed handgun permit, and for Oregon the savings are $3,439 per permit. As with the discussion in Table 5, the results are largely driven by the effect that concealed handguns have in lowering the murder rate (with savings of $4,986 for Pennsylvania and $3,202 for Oregon).

These estimated gains appear to far exceed the private costs of owning a concealed handgun. The purchase price of concealed handguns ranges from $25 for the least expensive .25-caliber pistols to $719 for the newest ultracompact 9 millimeter models; the permit filing fees can range from $19 every 5 years in Pennsylvania to a first-time $65 fee with subsequent 5-year renewals at $50 in Oregon; and several hours of supervised safety training are required in Oregon. Assuming a 5 percent real interest rate and the abil-

## TABLE 17

ARIZONA DATA ON THE NUMBER OF PERMITS ISSUED, THE CONVICTION RATE, AND PRISON SENTENCE LENGTHS, 1990–95

| | ENDOGENOUS VARIABLES (in Crimes per 100,000 Population) | | | | | | | | | | | | | |
| | ln(Murder Rate) | | ln(Rape Rate) | | ln(Aggravated Assault Rate) | | ln(Robbery Rate) | | ln(Auto Theft Rate) | | ln(Burglary Rate) | | ln(Larceny Rate) | |
| EXOGENOUS VARIABLES | (1) | (2) | (3) | (4) | (5) | (6) | (7) | (8) | (9) | (10) | (11) | (12) | (13) | (14) |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Change in the (number right-to-carry pistol permits/population) from the zero allowed before the law and each year since the law was implemented; the numbers for 1994 were multiplied by .5 | .0016 (.209) 1.7% | .0025 (.311) 2.7% | −.0803 (1.397) 8% | −.0095 (.334) 2% | .0051 (1.265) 9% | −.00516 (1.291) 9% | .0037 (.574) 3% | .0039 (.551) 3% | −.0019 (.222) 2% | −.0076 (.940) 9% | .0006 (.210) 8% | .0007 (.225) 9% | −.0003 (.094) 1% | −.0005 (.185) 1% |
| Conviction rate for the crime category corresponding to the appropriate endogenous variable | −.0039 (7.677) 29% | −.00399 (6.798) 30% | −.0055 (7.558) 27% | −.0053 (7.014) 26% | −.0453 (13.51) 72% | −.0429 (12.18) 67% | −.0111 (9.553) 21% | −.0110 (9.391) 20% | −.1373 (1.678) 37% | −.1605 (1.879) 43% | −.10032 (14.44) 28% | −.1037 (14.62) 29% | −.325 (12.1) 60% | −.3298 (13.80) 60% |

60

| | | | | | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Mean prison sentence length for those sentenced to prison in that year | −.01033 (1.457) 5% | ... | .0052 (.364) 2% | ... | −.0261 (1.155) 6% | ... | −.0095 (.629) 1% | ... | −.0087 (.055) .2% | ... | −.0084 (1.759) .7% | ... | −.018 (.936) 3% | ... |
| Time served for those ending their prison terms in that year | ... | .0041 (.18) 4% | ... | −.0178 (.602) 2% | ... | −.0170 (.464) 2% | ... | −.0221 (.871) 2% | ... | .0317 (.463) 2% | ... | −.0119 (.405) .8% | ... | −.0952 (3.479) 11% |
| Population per square mile | −.1014 (.826) | −.0791 (.569) | −.4748 (3.595) | −.4459 (3.274) | −.1424 (2.164) | −.1361 (1.942) | −.1411 (1.288) | −.1514 (1.477) | −.413 (2.603) | −.4019 (2.433) | −.0835 (1.759) | −.0798 (1.670) | −.0313 (.631) | −.00030 (.319) |
| Intercept | 1.208 (3.594) | .926 (1.765) | 1.4750 (5.095) | 1.477 (5.262) | 4.341 (28.46) | 4.365 (26.30) | 1.838 (5.157) | 1.753 (4.203) | 3.432 (5.061) | 2.5099 (7.094) | 5.467 (38.66) | 5.4296 (5.430) | 6.621 (53.03) | 6.873 (57.475) |
| N | 74 | 70 | 78 | 75 | 89 | 86 | 64 | 68 | 60 | 89 | 84 | 84 | 85 | 84 |
| F-statistic | 17.26 | 14.50 | 27.64 | 24.86 | 56.48 | 38.79 | 81.33 | 76.67 | 32.12 | 39.60 | 109.61 | 101.18 | 99.75 | 118.24 |
| Adjusted $R^2$ | .8367 | .8182 | .8925 | .8856 | .9380 | .9439 | .9656 | .9629 | .9239 | .9330 | .9691 | .9666 | .9658 | .9713 |

NOTE.—Absolute $t$-statistics are in parentheses, and the percentage reported below that is the percent of a standard deviation change in the endogenous variable that can be explained by a 1 standard deviation change in the exogenous variable. All variables, except for the county's population and the year and county dummies, have been reported. The categories for violent and property crimes are eliminated because the mean prison sentence data supplied by Oregon did not allow us to use these two categories. All regressions use weighting where the weighting is each county's population. Odd-numbered columns control for mean prison sentence, while even-numbered columns control for time actually served for those leaving prison.

61

ity to amortize payments over 10 years, purchasing a $300 handgun and paying the licensing fees every 5 years in Pennsylvania implies a yearly cost of only $43, excluding the time costs incurred. The estimated expenses for Oregon are undoubtedly higher because of both the higher fees and the time costs and fees involved in obtaining certified safety instruction, but even if these annual costs double, they are still quite small compared to the social benefits. While any ammunition purchases and additional annual training would increase annualized costs, the very long life span of guns and the ability to resell them work to reduce the above estimate. The results imply that permitted handguns are being obtained at much lower than optimal rates, perhaps because of the important externalities not directly captured by the handgun owners themselves.

## V.   Accidental Deaths from Handguns

Even if "shall issue" handgun permits lower murder rates, the question of what happens to accidental deaths still remains. Possibly, with more people carrying handguns, accidents may be more likely to happen. Earlier we saw that the number of murders prevented exceeded the entire number of accidental deaths. In the case of suicide, carrying concealed handguns increases the probability that a gun will be available to commit suicide with when an individual feels particularly depressed, and thus it could conceivably increase the number of suicides. As Table 2 showed, while only a small portion of accidental deaths are attributable to handgun laws, there is still the question whether concealed handgun laws affected the total number of deaths through their effect on accidental deaths.

To get a more precise answer to this question, Table 18 uses county-level data from 1982 to 1991 to test whether allowing concealed handguns increased accidental deaths. Data are available from the Mortality Detail Records (provided by the United States Department of Health and Human Services) for all counties from 1982 to 1988 and for counties over 100,000 population from 1989 to 1991. The specifications are identical to those shown in all the previous tables with the exceptions that we no longer include variables related to arrest or conviction rates and that the endogenous variables are replaced with a measure of the number of either accidental deaths from handguns or accidental deaths from all other nonhandgun sources.

While there is some evidence that the racial composition of the population and the level of income maintenance payments affect accident rates, the coefficient of the shall issue dummy is both quite small economically and insignificant. The point estimates for the first specification imply that accidental handgun deaths rose by about .5 percent when concealed hand-

TABLE 18

DID CARRYING CONCEALED HANDGUNS INCREASE THE NUMBER OF ACCIDENTAL DEATHS? COUNTY-LEVEL DATA, 1982–91

| | ENDOGENOUS VARIABLES (in Deaths per 100,000 Population) | | | |
| | Ordinary Least Squares | | Tobit | |
| EXOGENOUS VARIABLES | ln(Accidental Deaths from Handguns) | ln(Accidental Deaths from Nonhandgun Sources) | Accidental Deaths from Handguns | Accidental Deaths from Nonhandgun Sources |
|---|---|---|---|---|
| Shall issue law adopted dummy | .00478 (.096) | .0980 (1.706) | .574 (.743) | 1.331 (.840) |
| Population per square mile | −.0007 (6.701) | .000856 (7.063) | −.0000436 (.723) | −.0001635 (1.083) |
| Real per capita personal income | .0000267 (1.559) | −.000057 (2.882) | .0000436 (1.464) | −.009046 (6.412) |
| Intercept or ancillary parameter | −3.376 (1.114) | −8.7655 (2.506) | 7.360841 (44.12) | 29.36 (201.7) |
| N | 23,271 | 23,271 | 23,271 | 23,271 |
| F-statistic | 3.98 | 3.91 | | |
| Adjusted $R^2$ | .2896 | .2846 | | |
| Log likelihood | | | −7,424.6 | −109,310.6 |
| Left-censored observations | | | 21,897 | 680 |

NOTE.—While not all the coefficient estimates are reported, all the control variables are the same as those used in Table 3, including year and county dummies . Absolute t-statistics are in parentheses. All regressions weight the data by each county's population.

gun laws were passed. With only 156 accidental handgun deaths during 1988 (22 accidental handgun deaths occurred in states with ''shall issue'' laws), this point estimate implies that implementing a concealed handgun law in those states which currently do not have it would produce less than one more death (.851 deaths).

Given the very small number of accidental handgun deaths in the United States, the vast majority of counties have an accidental handgun death rate of zero, and thus using ordinary least squares is not the appropriate method of estimating these relationships. To deal with this, the last two columns in Table 18 reestimate these specifications using Tobit procedures. However, because of limitations in statistical packages we were no longer able to control for all the county dummies and opted to rerun these regressions with only state dummy variables. While the coefficients for the concealed handgun law dummy variable is not statistically significant, with 186 million people living in states without these laws in 1992,[69] the third specification implies that implementing the law across those remaining states would have resulted in about 9 more accidental handgun deaths. Combining this finding with the earlier estimates from Tables 3 and 4, if the rest of the country had adopted concealed handgun laws in 1992, the net reduction in total deaths would have been approximately from 1,405 to 1,583.

## VI. CONCLUSION

Allowing citizens without criminal records or histories of significant mental illness to carry concealed handguns deters violent crimes and appears to produce an extremely small and statistically insignificant change in accidental deaths. If the rest of the country had adopted right-to-carry concealed handgun provisions in 1992, at least 1,414 murders and over 4,177 rapes would have been avoided. On the other hand, consistent with the notion that criminals respond to incentives, county-level data provides evidence that concealed handgun laws are associated with increases in property crimes involving stealth and where the probability of contact between the criminal and the victim is minimal. The largest population counties where the deterrence effect from concealed handguns on violent crimes is the greatest also experienced the greatest substitution into property crimes. The estimated annual gain in 1992 from allowing concealed handguns was over $5.74 billion.

The study provides the first estimates of the annual social benefit from private expenditures on crime reduction, with an additional concealed hand-

---

[69] In 1991, 182 million people lived in states without these laws, so the Tobit regressions would have also implied nine more accidental handgun deaths in that year.

gun permit reducing total victim losses by up to $5,000. The results imply that permitted handguns are being obtained at much lower than optimal rates in two of the three states for which we had the relevant data, perhaps because of the important externalities that are not captured by the individual handgun owners. Our evidence implies that concealed handguns are the most cost-effective method of reducing crime thus far analyzed by economists, providing a higher return than increased law enforcement or incarceration, other private security devices, or social programs like early educational intervention.[70]

The data also supply dramatic evidence supporting the economic notion of deterrence. Higher arrest and conviction rates consistently and dramatically reduce the crime rate. Consistent with other recent work,[71] the results imply that increasing the arrest rate, independent of the probability of eventual conviction, imposes a significant penalty on criminals. Perhaps the most surprising result is that the deterrent effect of a 1 percentage point increase in arrest rates is much larger than the same increase in the probability of conviction. Also surprising is that while longer prison lengths usually implied lower crime rates, the results were normally not statistically significant.

This study incorporates a number of improvements over previous studies on deterrence, and it represents a very large change in how gun studies have been done. This is the first study to use cross-sectional time-series evidence for counties at both the national level and for individual states. Instead of simply using cross-sectional state- or city-level data, our study has made use of the much bigger variations in arrest rates and crime rates between rural and urban areas, and it has been possible to control for whether the lower crime rates resulted from the gun laws themselves or other differences in these areas (for example, low crime rates) which led to the adoption of these laws. Equally important, our study has allowed us to examine what effect concealed handgun laws have on different counties even within the same state. The evidence indicates that the effect varies both with a county's level of crime and with its population.

---

[70] For a comparison with the efficiency of other methods to reduce crime, see John Donohue and Peter Siegelman, Is the United States at the Optimal Rate of Crime? Stanford University School of Law (1996); and Ian Ayres and Steven Levitt, Measuring Positive Externalities from Unobservable Victim Precaution: An Empirical Analysis of Lojack (Yale University working paper, October 1996). For a discussion of what constitutes true externalities (both benefits and costs) from crime, see Kermit Daniel and John R. Lott, Jr., Should Criminal Penalties Include Third-Party Avoidance Costs? 24 J. Legal Stud. 523–34 (June 1995).

[71] Kahan, *supra* note 67; and Lott, The Effect of Conviction; and An Attempt at Measuring the Total Monetary Penalty from Drug Convictions, both *supra* note 24.

## DATA APPENDIX

The number of arrests and offenses for each crime in every county from 1977 to 1992 were provided by the Uniform Crime Report (UCR). The UCR program is a nationwide, cooperative statistical effort of over 16,000 city, county, and state law enforcement agencies to compile data on crimes that are reported to them. During 1993, law enforcement agencies active in the UCR Program represented over 245 million U.S. inhabitants, or 95 percent of the total population. The coverage amounted to 97 percent of the U.S. population living in metropolitan statistical areas (MSAs) and 86 percent of the population in non-MSA cities and in rural counties.[72] The Uniform Crime Reports Supplementary Homicide Reports supplied the data on the victim's sex and race and whatever relationship might have existed between the victim and the offender.[73]

The regressions report results from a subset of the UCR data set, though we also ran the regressions with the entire data set. The main differences were that the effects of concealed handgun laws on murder were greater than what is shown in this paper and the effects on rape and aggravated assault were smaller. Observations were eliminated because of changes in reporting practices or definitions of crimes (see *Crime in the United States* (1977–92)). For example, from 1985 to 1994 Illinois adopted a unique ''gender-neutral'' definition of sex offenses. Another example involves Cook County, Illinois, from 1981 to 1984 where there was a large jump in reported crime because there was a change in the way officers were trained to report crime. The additional observations that either were never provided or were dropped from the data set include Arizona (1980), Florida (1988), Georgia (1980), Kentucky (1988), and Iowa (1991). The counties with the following cities were also eliminated: violent crime and aggravated assault for Steubenville, Ohio (1977–89); violent crime and aggravated assault for Youngstown, Ohio (1977–87); violent crime, property crime, aggravated assault, and burglary for Mobile, Alabama (1977–85); violent crime and aggravated assault for Oakland, California (1977–90); violent crime and aggravated assault for Milwaukee, Wisconsin (1977–85); all crime categories for Glendale, Arizona (1977–84); violent crime and aggravated assault for Jackson, Mississippi (1977–83); violent crime and aggravated assault for Aurora, Colorado (1977–82); violent crime and aggravated assault for Beaumont, Texas (1977–82); violent crime and aggravated assault for Corpus Cristi, Texas (1977–82); violent crime and rape for Macon, Georgia (1977–81); violent crime, property crime, robbery, and larceny for Cleveland, Ohio (1977–81); violent crime and aggravated assault for Omaha, Nebraska (1977–81); all crime categories for Little Rock, Arkansas (1977–79); all crime categories for Eau Claire, Wisconsin (1977–78); all crime categories for Green Bay, Wisconsin (1977).

For all of the different crime rates, except for the Supplementary Homicide Data, if the true rate equals zero, we added .1 before we took the natural log of those

---

[72] Federal Bureau of Investigation, Crime in the United States (Uniform Crime Reports 1994). We also wish to thank Tom Bailey at the FBI and Jeff Maurer at the U.S. Department of Health and Human Services for answering questions concerning the data used in this article.

[73] The Intercensal Estimates of the Population of Counties by Age, Sex and Race (ICPSR) number for this data set was 6,387, and the principal investigator was James Alan Fox of Northeastern University College of Criminal Justice.

values. For the accident rates and the Supplementary Homicide Data, if the true rate equals zero, we added .01 before we took the natural log of those values.[74]

The original Uniform Crime Report data set did not have arrest data for Hawaii in 1982. These missing observations were supplied to us by the Hawaii Uniform Crime Report program. In the original data set, a few observations also had two listings for the same county and year identifiers. The incorrect observations were deleted from the data.

The number of police in a state, which of those police have the power to make arrests, and police payrolls for a state by type of police officer are available for 1982–92 from the U.S. Department of Justice's Expenditure and Employment Data for the Criminal Justice System.

The data on age, sex, and racial distributions estimate the population in each county on July 1 of the respective years. The population is divided into 5-year segments, and race is categorized as white, black, and neither white nor black. The population data, with the exception of 1990 and 1992, were obtained from the Bureau of the Census.[75] The estimates use modified census data as anchor points and then employ an iterative proportional fitting technique to estimate intercensal populations. The process ensures that the county-level estimates are consistent with estimates of July 1 national and state populations by age, sex, and race. The age distributions of large military installations, colleges, and institutions were estimated by a separate procedure. The counties for which special adjustments were made are listed in the report.[76] The 1990 and 1992 estimates have not yet been completed by the Bureau of the Census and made available for distribution. We estimated the 1990 data by taking an average of the 1989 and 1991 data. We estimated the 1992 data by multiplying the 1991 populations by the 1990–91 growth rate of each county's populations.

Data on income, unemployment, income maintenance, and retirement were obtained by the Regional Economic Information System. Income maintenance includes Supplemental Security Insurance, Aid to Families with Dependent Children, and food stamps. Unemployment benefits include state unemployment insurance compensation, Unemployment for Federal Employees, unemployment for railroad employees, and unemployment for veterans. Retirement payments include Old Age, Survivors, and Disability Insurance, federal civil employee retirement payments,

[74] Dropping the zero crime values from the sample made the shall issue coefficients larger and more significant, but doing the same thing for the accident rate regressions did not alter those shall issue coefficients. (See also the discussion at the end of Section IV*B*.)

[75] For further descriptions of the procedures for calculating intercensus estimates of population, see U.S. Department of Commerce, Bureau of the Census, Intercensal Estimates of the Population of Counties by Age, Sex, and Race (United States): 1970-1980 (ICPSR No. 08384, ICPSR, Ann Arbor, Mich., Winter 1985); also see U.S. Department of Commerce, Bureau of the Census, Intercensal Estimates of the Population of Counties by Age, Sex and Race: 1970–1980 Tape Technical Documentation. U.S. Bureau of the Census, Current Population Reports, Series P-23, No. 103, Methodology for Experimental Estimates of the Population of Counties by Age and Sex: July 1, 1975. U.S. Bureau of the Census, Census of Population, 1980: County Population by Age, Sex, Race and Spanish Origin (Preliminary OMB-Consistent Modified Race).

[76] U.S. Bureau of the Census, Current Population Reports, Series P-23, No. 103, Methodology for Experimental Estimates of the Population of Counties by Age and Sex: July 1, 1975. U.S. Bureau of the Census, Census of Population, 1980: County Population by Age, Sex, Race and Spanish Origin (Preliminary OMB-Consistent Modified Race), at 19–23.

military retirement payments, state and local government employee retirement payments, and workers compensation payments (both federal and state). Nominal values were converted to real values by using the consumer price index.[77] The index uses the average consumer price index for July 1983 as the base period. There were 25 observations whose county codes did not match any counties listed in the ICPSR code book. Those observations were deleted from the sample.

Data concerning the number of concealed weapons permits for each county were obtained from a variety of sources. The Pennsylvania data were obtained from Alan Krug. Mike Woodward of the Oregon Law Enforcement and Data System provided the Oregon data for 1991 and after. The number of permits available for Oregon by county in 1989 was provided by the sheriffs' departments of the individual counties. Cari Gerchick, deputy county attorney for Maricopa County in Arizona, provided us with the Arizona county-level conviction rates, prison sentence lengths, and concealed handgun permits from 1990 to 1995. The National Rifle Association provided data on their membership by state from 1977 to 1992. Information on the dates at which states enacted enhanced sentencing provisions for crimes committed with deadly weapons was obtained from Marvell and Moody.[78] The first year where the dummy variable comes on is weighted by the portion of that first year that the law was in effect.

For the Arizona regressions, the Brady Law dummy for 1994 is weighted by the percentage (83 percent) of the year that it was in effect.

The Bureau of the Census provided data on the area in square miles for each county. The number of total and firearm unintentional injury deaths was obtained from annual issues of *Accident Facts* and *The Vital Statistics of the United States.* The classification of types of weapons is in *International Statistical Classification of Diseases and Related Health Problems, Tenth Edition, Volume 1.* The handgun category includes guns for single-hand use, pistols, and revolvers. The total includes all other types of firearms.

Finally, while our regressions use the ICPSR's estimates of arrest rates, after this paper was accepted we discovered that the ICPSR may have accidentally recorded some missing data on the number of arrests as zero. Working with the ICPSR and the FBI we attempted to correct this problem, and doing so tends to usually increase the significance and size of the shall issue dummies.

---

[77] U.S. Bureau of the Census, Statistical Abstract of the United States, Table No. 746, at 487 (114th ed. 1994).

[78] Marvell & Moody, *supra* note 43, at 259–60.

# EXHIBIT 12

1

IN THE UNITED STATES DISTRICT COURT

FOR THE NORTHERN DISTRICT OF ILLINOIS

EASTERN DIVISION

| | | |
|---|---|---|
| BRETT BENSON, RAYMOND SLEDGE, | ) | |
| KENNETH PACHOLSKI, KATHRYN TYLER, | ) | |
| MICHAEL HALL, SR., RICK PERE, | ) | |
| and the ILLINOIS ASSOCIATION OF | ) | Civil Action |
| FIREARMS RETAILERS, | ) | No. 10-04184 |
| Plaintiffs, | ) | |
| -vs- | ) | Judge Guzman |
| THE CITY OF CHICAGO and RICHARD | ) | Mag Judge |
| M. DALEY, Mayor of the City of | ) | Soat Brown |
| Chicago, | ) | |
| Defendants. | ) | |

The deposition of KATHRYN JEAN TYLER, DVM,
called for examination, taken pursuant to the Federal
Rules of Civil Procedure of the United States District
Courts pertaining to the taking of depositions, taken
before V. LINDA BOESCH, a Notary Public within and
for the County of DuPage, State of Illinois, and a
Certified Shorthand Reporter, CSR No. 84-3108, of
said state, at Suite 1230, 30 North LaSalle Street,
Chicago, Illinois, on December 16, 2010, at 10:35 a.m.



Toll Free: 800.708.8087
Facsimile: 312.673.8138

Suite 1200
311 West Monroe Street
Chicago, IL 60606
www.esquiresolutions.com

51

1    questions about this.

2            And, Dr. Tyler, do you have an

3    understanding as to what this Count I is about --

4       A.    Yes.

5       Q.    -- what it is that it's complaining

6    about?

7       A.    Yes.

8       Q.    And what is your understanding?

9       A.    Just the restrictive definition of home,

10   meaning my home is my property, my garage.  It's

11   other than just the four walls that we live in,

12   so....

13      Q.    How does the City's definition of home

14   infringe your Second Amendment rights?

15      MR. PANUCCIO:  I'll object.  Calls for a legal

16   conclusion.

17           When I object like that, unless I

18   instruct you not to answer, just wait for my

19   objection and then you can give your answer.

20      THE WITNESS:  Okay.

21   BY THE WITNESS:

22      A.    Well, I mean, my home is my property.  We

23   have a house, we have a fenced-in backyard that we

24   spend a lot of time in, we have a detached garage.



Toll Free: 800.708.8087
Facsimile: 312.673.8138

Suite 1200
311 West Monroe Street
Chicago, IL 60606
www.esquiresolutions.com

52

1          Those are all places that things can

2   happen, and why shouldn't I be able to have my

3   firearm whenever I'm on my property?  Yeah, I guess

4   that's enough.

5   BY MR. WORSECK:

6          Q.    Basically, you want to be able to take

7   your firearm wherever you want to on your property?

8          A.    Right.

9          Q.    Is there any other aspect of the City's

10  definition of home that you take issue with?

11         A.    No.

12         MR. WORSECK:  Can you mark this as 6, please?

13         MR. PANUCCIO:  Did you bring a Sharpie?  It was

14  really helpful for the other one.

15         MR. WORSECK:  I did not, but I can go get one.

16         MR. PANUCCIO:  And even -- well, black is fine

17  but if you have a red one, that would be even better,

18  not to be too particular.

19         MR. WORSECK:  No.  That's a fine suggestion.

20                      (WHEREUPON, a certain document

21                      was marked Tyler Deposition

22                      Exhibit No. 6, for identification,

23                      as of 12/16/2010.)

24                      (WHEREUPON, the document was



ESQUIRE
an Alexander Gallo Company

Toll Free: 800.708.8087
Facsimile: 312.673.8138

Suite 1200
311 West Monroe Street
Chicago, IL 60606
www.esquiresolutions.com

53

```
 1                   tendered to the witness.)
 2         MR. WORSECK:  Back on the record.
 3   BY MR. WORSECK:
 4         Q.    Dr. Tyler, you've been handed what's been
 5   marked was Exhibit 6, and I'll represent for the
 6   record, that is a printout from our computers when we
 7   typed in 2620 West Jerome into Google Maps and this
 8   is the satellite photo that it provided of that
 9   address.
10              Based on your knowledge of your home and
11   your neighborhood, and what's depicted on the
12   satellite photo, is it fair to say that this is a
13   satellite photo of your house and some of the
14   immediately adjacent houses in your neighborhood?
15         MR. PANUCCIO:  I'll object as to questions
16   about this document as to foundation, authenticity,
17   and personal knowledge.
18              I realize you're trying to get to that,
19   but I want that on the record.
20   BY THE WITNESS:
21         A.    So, yes, this is my neighborhood.
22   BY MR. WORSECK:
23         Q.    Could you, first, just point to your
24   house?
```



ESQUIRE
an Alexander Gallo Company

Toll Free: 800.708.8087
Facsimile: 312.673.8138

Suite 1200
311 West Monroe Street
Chicago, IL 60606
www.esquiresolutions.com

72

1    little slab and you are on the sidewalk.

2          Q.    And that's on the east side of your home?

3          A.    On the east side, yeah.

4          Q.    You mentioned earlier that you keep your

5    handgun in a safe?

6          A.    Yes.

7          Q.    Within the safe, how do you keep that

8    handgun?  Is it fully assembled and loaded or is it

9    something less than that?  How exactly do you store

10   it inside the safe?

11         MR. PANUCCIO:  And just to be clear, the time

12   frame is the present?

13   BY MR. WORSECK:

14         Q.    Presently, since you've gotten your

15   Chicago permits and certificates and so forth.

16         A.    It's in the safe.  It's got the clip in

17   it.  No round chambered, so....

18         Q.    How long have you had experience with

19   firearms?  When did you start using firearms?

20         MR. PANUCCIO:  The witness may answer the

21   question to the extent it is experience fully

22   consistent with all applicable laws and took place

23   outside of Chicago prior to obtaining a CFP and

24   registration certificate.



ESQUIRE
an Alexander Gallo Company

Toll Free: 800.708.8087
Facsimile: 312.673.8138

Suite 1200
311 West Monroe Street
Chicago, IL 60606
www.esquiresolutions.com

KATHRYN TYLER                                    December 16, 2010

73

 1   BY THE WITNESS:

 2        A.    Not real long.  I mean, maybe -- well,

 3   it's mostly since I met my husband.  He's the one

 4   that's kind of introduced me to it.

 5   BY MR. WORSECK:

 6        Q.    When did you meet your husband?

 7        A.    In 1994.

 8        Q.    When was the first time you shot a gun?

 9        MR. PANUCCIO:  The witness may answer the

10   question to the extent the answer deals with lawful

11   shooting of a gun outside the City of Chicago prior

12   to obtaining a CFP or registration certificate.

13   BY THE WITNESS:

14        A.    Probably I guess in the -- sorry.  I'm

15   just thinking.

16   BY MR. WORSECK:

17        Q.    Sure.

18        A.    I guess I'd probably say in the late

19   '90's we did some target shooting.

20        Q.    How long does it take you to open your

21   safe that you keep this gun in?

22        A.    As quick as I can put the combination in.

23   Five seconds.

24        Q.    And after you open the safe, how long



ESQUIRE
an Alexander Gallo Company

Toll Free: 800.708.8087
Facsimile: 312.673.8138

Suite 1200
311 West Monroe Street
Chicago, IL 60606
www.esquiresolutions.com

74

1    would it take you to make the handgun fully operable,

2    loaded, and ready for use?

3         A.    It's as quick as I can slide the --

4    (indicating).  I don't know.  Two seconds, three

5    seconds.

6         Q.    Aside from opening the safe and --

7         A.    Chambering the round.

8         Q.    -- chambering the round, are there any

9    other steps you would need to take to make your

10   handgun ready for use?

11        A.    No.

12        Q.    Are there any other weapons kept in that

13   safe?

14        A.    No.

15        Q.    Where does your husband store the weapons

16   that he has in his home?

17        A.    He's basically got them in three

18   different places.  There's a gun safe in the

19   basement, there's a display cabinet upstairs in our

20   library room, and then he has some on display in the

21   basement as well.

22        Q.    Do you know how many of your husband's

23   weapons are operable as opposed to being completely

24   inoperable or antiques or outmoded or obsolete or



ESQUIRE
an Alexander Gallo Company

Toll Free: 800.708.8087
Facsimile: 312.673.8138

Suite 1200
311 West Monroe Street
Chicago, IL 60606
www.esquiresolutions.com

1    what have you?

2          A.    He only has one operable gun.

3          Q.    How long would it take him to make that

4    particular weapon fully operable, loaded, and

5    otherwise ready for use?

6          MR. PANUCCIO:   Objection, calls for

7    speculation.

8    BY THE WITNESS:

9          A.    Probably the same as me.  I mean, I

10   guess, depending on where he's at.  It's in a case,

11   and he'd have to open the case and chamber the round.

12   BY MR. WORSECK:

13         Q.    What type of weapon is that weapon?

14         A.    It's a handgun.  The Springfield XD 40.

15         Q.    If, while you were in your house, you had

16   reason to think that a crime was being committed

17   against your property, be it a theft in your garage

18   or someone trying to break into your house, what

19   would your response be?

20               Would you call the police first?  Would

21   you go for your weapon first?  Would you do something

22   else first?

23         MR. PANUCCIO:   Object.  It's a vague question.

24   BY MR. WORSECK:



ESQUIRE
an Alexander Gallo Company

Toll Free: 800.708.8087
Facsimile: 312.673.8138

Suite 1200
311 West Monroe Street
Chicago, IL 60606
www.esquiresolutions.com

77

```
 1   routine basis?

 2        MR. PANUCCIO:  Can I just have that read back?

 3        MR. WORSECK:  Sure.

 4                      (WHEREUPON, the record was read

 5                      by the reporter as requested.)

 6        MR. PANUCCIO:  Thank you.

 7   BY THE WITNESS:

 8        A.    I don't know I guess.  It would be nice

 9   if I could.

10   BY MR. WORSECK:

11        Q.    But you haven't made the decision in your

12   mind, as we sit here today, that you would start

13   doing that if you could or you would not start doing

14   that if you could?

15        A.    I guess I hadn't thought about it because

16   I can't.

17        Q.    Meaning you hadn't thought about it

18   because you currently are not permitted to take a gun

19   into those places?

20        A.    Exactly.

21        Q.    Not because it's impossible for you to

22   game plan if you think about what you might do if

23   this law were struck down?

24        A.    Yeah, I haven't thought about it because
```



ESQUIRE
an Alexander Gallo Company

Toll Free: 800.708.8087
Facsimile: 312.673.8138

Suite 1200
311 West Monroe Street
Chicago, IL 60606
www.esquiresolutions.com

KATHRYN TYLER                                    December 16, 2010

78

1  I can't do it.  I'd like to be able to do it and I

2  would probably do it.  But I haven't thought about

3  how often or if I would carry it all the time, so....

4       Q.    And what are the reasons that you would

5  like to do it?

6       A.    Well, especially if I'm home alone, I do

7  spend a lot of time in that backyard because it's a

8  totally -- I mean, there's no grass or anything.

9  It's like extra rooms in our house.  I garden a lot.

10           Ken's not always around.  It's very

11  accessible to that alley.  Would be very nice to have

12  protection out there because I have a firearm and I

13  know how to use it and why not be protected.

14       Q.    Aside from -- well, I should ask you.

15  Have you ever gone hunting with a firearm?

16       MR. PANUCCIO:  I'll instruct the witness not to

17  answer to the extent it would be information about

18  hunting in the City of Chicago -- hunting activities

19  inside the City of Chicago prior to obtaining a CFP

20  and registration certificate.

21       MR. WORSECK:  And Fifth Amendment is the basis

22  again?

23       MR. PANUCCIO:  Yes.

24  BY THE WITNESS:



ESQUIRE
an Alexander Gallo Company

Toll Free: 800.708.8087
Facsimile: 312.673.8138

Suite 1200
311 West Monroe Street
Chicago, IL 60606
www.esquiresolutions.com

79

```
 1          A.    So hunting outside the City?

 2                We have gone hunting.

 3     BY MR. WORSECK:

 4          Q.    And you've shot at shooting ranges?

 5          A.    Yes.

 6          Q.    And have you ever been in the military?

 7          A.    No.

 8          Q.    Aside from handling a firearm in

 9     connection with going hunting or going to a shooting

10     range or being in a gun store and trying out

11     different weapons or handling your firearm within the

12     four corners of your house, have you ever aimed a gun

13     at a person?

14          A.    No.

15          Q.    Have you ever shot a gun at a person?

16          A.    No.

17          Q.    Have you ever drawn a gun when, in your

18     mind, you were being threatened by another person?

19          A.    No.

20          Q.    Are you familiar with the phrase,

21     defensive gun use?

22          A.    Well, I guess I hadn't heard that before.

23          Q.    It's a term -- I'm not sure of its

24     origins, but it's a term that's used in gun
```



ESQUIRE
an Alexander Gallo Company

Toll Free: 800.708.8087
Facsimile: 312.673.8138

Suite 1200
311 West Monroe Street
Chicago, IL 60606
www.esquiresolutions.com

KATHRYN TYLER                                    December 16, 2010

86

1       Q.      Would you feel comfortable leaving it in
2   your house, off of your person, say leaving it on
3   your dining room table or in your den or something
4   like that?  Or is your view you always want that in
5   your safe?
6       A.      Well, I guess I want it in my safe but --
7   yeah, I usually just have it in the safe up there.
8       Q.      Would you not leave it in places in your
9   house other than your safe?
10      A.      I wouldn't -- you know, not when I leave
11  my home or something like that.  If I was home and I
12  was feeling nervous for some reason or something,
13  yeah, I mean, I'm perfectly willing to carry it
14  around.
15              But I would never leave it out when I
16  left the home or something like that.
17      Q.      And aside from instances in your home
18  when you were feeling nervous or threatened or what
19  have you and you might want to have the weapon on you
20  at that time, would you otherwise take it out of your
21  safe and leave it someplace else in the house, for
22  instance, the dining room table or the kitchen
23  cabinet?
24      A.      I don't.



ESQUIRE
an Alexander Gallo Company

Toll Free: 800.708.8087
Facsimile: 312.673.8138

Suite 1200
311 West Monroe Street
Chicago, IL 60606
www.esquiresolutions.com

87

```
 1        Q.    And why not?
 2        A.    Well, I just think it's -- I mean, it's a
 3   safe place for it where it's at.  I know where it's
 4   at.  I don't know what else to say.
 5        Q.    Why would it not be safe to keep it
 6   elsewhere in your house?
 7        A.    Oh, it would be.  I mean, it would be
 8   fine.  But when it's locked up, then when I leave the
 9   house, it's locked up there, yeah.  But I would have
10   no problems -- I mean, I don't have any problem
11   carrying it around with me if I was -- you know, if I
12   felt like it.
13              But when I leave, I think it's good to
14   have a firearm secured somewhere, so I leave it in
15   the safe.
16        Q.    And is there a reason why if you're not
17   feeling threatened, you don't carry it around with
18   you inside your house?
19        A.    I don't know how to answer that.  I mean,
20   it's -- we move around in the house.  I don't always
21   carry a gun with me when I'm just moving about my
22   house on a daily basis.
23        Q.    And my question is why?  Why don't you do
24   that?
```



ESQUIRE
an Alexander Gallo Company

Toll Free: 800.708.8087
Facsimile: 312.673.8138

Suite 1200
311 West Monroe Street
Chicago, IL 60606
www.esquiresolutions.com

KATHRYN TYLER                                    December 16, 2010

88

1          A.     I don't have a holster.  I mean, I
2    just -- it would be -- it would be difficult for me
3    just to carry it around all the time, so....
4          Q.     And why don't you leave it on a table
5    somewhere else in your house if you're not feeling
6    threatened -- when you're not feeling threatened?
7          A.     I don't think that's what we usually do
8    with firearms.  You know, you shouldn't just leave
9    them laying around.  I -- you know -- I think I'll
10   just be quiet.  I'm done.
11         Q.     Well, why don't you just leave them
12   laying around?
13         A.     Because we don't.  I mean --
14         Q.     There's no particular reason why?
15         A.     No.  It's in its location.  I know where
16   it's at.  That's where it stays.
17         Q.     If you came across your gun being -- say
18   your husband got your gun for whatever reason, to
19   clean it or, I don't know, whatever reason and he
20   left it out on the dining room table and you saw it
21   sitting there, what would you do with it?
22         MR. PANUCCIO:  This is a hypothetical, correct?
23   We are not testifying that this has actually
24   happened.



ESQUIRE
an Alexander Gallo Company

Toll Free: 800.708.8087
Facsimile: 312.673.8138

Suite 1200
311 West Monroe Street
Chicago, IL 60606
www.esquiresolutions.com

92

1        Q.      And why is that?

2        A.      Well, like I said, I'm not super crazy

3    about that Makarov.  It's an old gun.  It's an

4    antique gun.  There's some really nice, beautiful,

5    sexy weapons available that I look at all the time,

6    but....

7        Q.      Is it your view that your Makarov is not

8    sufficient for self-defense in the home?

9        A.      No, it's sufficient.  It's just old

10   school, you know, the way the clips come out of it

11   and everything.  It's not -- it's not -- there's so

12   much nicer stuff out there.

13       Q.      And why haven't you already gone out and

14   bought a newer, nicer firearm and used that as your

15   primary assembled weapon and taken apart the Makarov

16   and stored it somewhere else?

17       A.      You mean since this?  Since the summer?

18       Q.      Well, I mean, since the new Ordinance

19   came into place in July.  It allows you to have

20   multiple weapons in the home, correct?

21               The requirement that you're taking issue

22   with is that you're allowed only to have one of those

23   weapons assembled and operable and ready for use.

24   The additional weapons need to be broken down or



ESQUIRE
an Alexander Gallo Company

Toll Free: 800.708.8087
Facsimile: 312.673.8138

Suite 1200
311 West Monroe Street
Chicago, IL 60606
www.esquiresolutions.com

93

1    otherwise rendered inoperable?

2         A.    Right.

3         Q.    And it sounded like you were saying that

4    you actually have identified newer, nicer weapons

5    that you would prefer to be your primary weapon?

6         A.    Right.

7         Q.    And my question is, why haven't you

8    already gone and gotten whatever new weapon it is

9    that you prefer, bring that home, use that as your

10   primary weapon, your assembled and operable weapon,

11   and stored the Makarov in a fashion that would

12   otherwise comply with the Ordinance?

13        A.    Well, mostly, because it's a time

14   constraint.  I mean, we have to go quite a ways to go

15   shopping for guns.  It's just -- it's not that

16   convenient.  We've been busy.

17             I will do that, but I haven't.  I want to

18   try these guns before I buy them and then we have to

19   get out of the City, and we have to go make a big day

20   of it to get something.  I've been busy, so....

21        Q.    Is that something you will do when you

22   have time regardless of the status of the case or

23   whether you prevail on any of your claims or are you

24   just going to wait and see what happens with the case



ESQUIRE
an Alexander Gallo Company

Toll Free: 800.708.8087
Facsimile: 312.673.8138

Suite 1200
311 West Monroe Street
Chicago, IL 60606
www.esquiresolutions.com

94

1    before you go out and buy any additional guns?

2         A.    Well, I think for the time being, we are

3    going to wait and see what happens.  I have a

4    self-defense gun that's perfectly effective, but it's

5    not the gun that I want, you know, so I will get

6    something different, but....

7         Q.    And if you prevailed in the case, would

8    you buy your new gun, your preferred gun, and use

9    that as your primary weapon and take apart the

10   Makarov or if you had your druthers, would you

11   acquire multiple new guns and keep all of those in a

12   fully assembled and operable state?

13        A.    Oh, if we were allowed to have them all

14   fully assembled and operable, of course I would.

15        Q.    And would you keep those all in your

16   safe, your bedroom safe, or would you disperse them

17   throughout the house?

18        A.    I think I'd keep them in different

19   locations so they were handier.

20        Q.    Would you store them in a safe in each of

21   those various locations?

22        A.    I don't have to.

23        Q.    No.  I'm just asking, would you?

24        A.    I mean, if it was accessible.  I mean,



ESQUIRE
an Alexander Gallo Company

Toll Free: 800.708.8087
Facsimile: 312.673.8138

Suite 1200
311 West Monroe Street
Chicago, IL 60606
www.esquiresolutions.com

95

1   our gun safe in the basement if there was room for

2   it, especially when we left the house, I might have

3   one there.  But I have an office space that I might

4   just keep one in my desk or if it was -- if we could.

5        Q.    How many guns would you go out and buy if

6   you won your case?

7        A.    I don't know.

8        Q.    Have you given any thought to that?

9        A.    No.

10       Q.    Is the gun that you currently have

11  sufficient for your self-defense needs in your home?

12       A.    It's a good self-defense gun.  You know,

13  accessibility is -- there's a question there.  I

14  mean, if I'm in the basement and I'm doing my laundry

15  and someone breaks in the house, right now I can't

16  get to my gun.  I'd have to go by the bad guy to get

17  upstairs, so....

18            I mean, I'd like to have -- I don't think

19  I want to just, you know, carry a gun around all day

20  long, but it would be nice if I had guns in different

21  locations that were accessible to use.

22            I mean, I'm not allowed to use my

23  husband's gun, either.  Even if it was right there,

24  it would be against the Ordinance for me to do so.



Toll Free: 800.708.8087
Facsimile: 312.673.8138

Suite 1200
311 West Monroe Street
Chicago, IL 60606
www.esquiresolutions.com

100

1   of personal knowledge.  The witness has testified

2   that she has no experience with using trigger locks.

3   BY THE WITNESS:

4        A.    So, no, I don't know.

5   BY MR. WORSECK:

6        Q.    You don't know.

7              Does your husband have any weapons that

8   have trigger locks?

9        A.    Yes.

10       Q.    Have you seen him operate the trigger

11  locks on those weapons?

12       A.    I actually haven't.

13       Q.    Do you know through either talking with

14  him or otherwise how long it takes him to unlock his

15  trigger locks?

16       A.    I guess we haven't had that specific

17  conversation.

18       Q.    That's fair enough.

19             It's fair to say that one of the claims

20  in the lawsuit is taking issue with the storage

21  requirements for the additional weapons that you

22  might have in your home.

23             Is this the additional firearms?

24       MR. PANUCCIO:  It calls for a legal conclusion.



Toll Free: 800.708.8087
Facsimile: 312.673.8138

Suite 1200
311 West Monroe Street
Chicago, IL 60606
www.esquiresolutions.com

101

1   BY THE WITNESS:

2        A.    Say that again now.

3   BY MR. WORSECK:

4        Q.    I'm just asking, to your understanding,

5   one of the pieces of your lawsuit is a claim that the

6   City's firearms storage requirements as they relate

7   to the firearms that you might own beyond that one

8   operational firearm you're entitled to have.

9        A.    You're meaning that if I have one

10  operational, and then beyond that, they have to be

11  trigger locked or rendered somehow otherwise

12  unusable, broken down, trigger locked.

13       Q.    You're familiar with that being an aspect

14  of your case?

15       A.    Yes.

16       Q.    Are there any safety concerns, personal

17  safety concerns, that you have about carrying around

18  a weapon on your person as a routine matter inside

19  your house?

20       A.    No.

21       Q.    It's just the fact that it's cumbersome,

22  bulky, and you've got to take it on and off when you

23  leave the front door, that kind of thing?

24       A.    Yes.



ESQUIRE
an Alexander Gallo Company

Toll Free: 800.708.8087
Facsimile: 312.673.8138

Suite 1200
311 West Monroe Street
Chicago, IL 60606
www.esquiresolutions.com

102

1          Q.     If you can look back at Exhibit 5, and

2    turn to Page 15 of the Amended Complaint which

3    contains Count 4.  And that's the count that deals

4    with this issue that I just asked you about, the

5    storage requirements.

6                 If you'd like, take a second to read that

7    over.  Let me know when you've finished.

8          A.     Oh, I'm finished.

9          Q.     And you see in Count 4 there that it

10   mentions Section 8-20-040 of the Ordinance?

11         A.     Uh-huh.

12         Q.     And if I can then direct you to Exhibit A

13   to Exhibit 5 of the deposition.  Exhibit A is just a

14   copy of the Ordinance that was attached to the

15   Amended Complaint.

16         A.     Oh, okay.

17         Q.     And if you can turn to the bottom of

18   Page 9, and there we find Section 8-20-040 of the

19   Ordinance.  And if you like, feel free to read the

20   whole thing but I just want to ask you about the last

21   sentence.

22         A.     Yes.

23         Q.     The last sentence reads,

24                      "All other firearms kept



Toll Free: 800.708.8087
Facsimile: 312.673.8138

Suite 1200
311 West Monroe Street
Chicago, IL 60606
www.esquiresolutions.com

117

1    That's not my understanding.

2        Q.    When transporting a firearm in your

3    vehicle in a manner that complies with these

4    requirements that you've just mentioned, how long

5    does it take to access the weapon, assemble it, and

6    otherwise render it operable?

7        A.    Well, it would take quite a while.  I

8    mean, you're driving.  You got to get pulled over to

9    the side.  You got to get out of your car.  You got

10   to go to the back.  You got to get it out of the

11   case.  You got to find your ammunition.

12            I mean, that's certainly not quick enough

13   to make it a very good self-defense thing.  I think

14   it will be over with by then.

15       Q.    If you were allowed to carry weapons on

16   your person and/or in your handbag -- and going

17   forward, if I could just use the phrase "on your

18   person" as encompassing the handbag carry.

19       A.    Right.

20       Q.    If you were permitted to do that, what

21   would your response be if you were confronted or

22   attacked in public?  Would your response be first to

23   try to get your weapon and respond or would it be to

24   flee or would it be to call for help or something



ESQUIRE
an Alexander Gallo Company

Toll Free: 800.708.8087
Facsimile: 312.673.8138

Suite 1200
311 West Monroe Street
Chicago, IL 60606
www.esquiresolutions.com

118

1    else?  What would it be?

2         A.    I think that would be entirely dependent

3    on the situation.  If you've sensed there's a threat,

4    I would try my very best to get away from it, first

5    and foremost, if I could.

6              If the threat was real and imminent and I

7    had to use my weapon, it certainly wouldn't be the

8    first choice, but if I had to, I would.

9         Q.    Would you use it only for purposes of

10   shooting an attacker or would you use it in the hope

11   that, for instance, merely drawing it and brandishing

12   it would be enough to scare away an attacker?

13        A.    Shooting someone is the very last thing

14   on my list so, yes, if it was a deterrent, you could

15   say, "I have a gun" and they'll turn the corner and

16   leave you alone, amen.  If I can get to my cell phone

17   and I can call the police for help, they're

18   wonderful, but they may be three minutes away.  It

19   could all be over with by then.

20             Every situation is different.  I think

21   that's -- I can't make a general conclusion.  I mean,

22   it just depends on the place and the time and what

23   the threat is.

24        Q.    Would there be instances where you would



ESQUIRE
an Alexander Gallo Company

Toll Free: 800.708.8087
Facsimile: 312.673.8138

Suite 1200
311 West Monroe Street
Chicago, IL 60606
www.esquiresolutions.com

119

1    draw the weapon and aim it but not shoot it?

2         A.    Oh, I'm sure there would be.  If that's

3    what it takes to make the person change their mind

4    about what their intentions are, that would be an

5    ideal situation.

6         Q.    Before drawing the weapon, would you, in

7    your mind, decide whether you were going to shoot or

8    not, or would you wait until you saw what happened as

9    a result of simply drawing the weapon before you then

10   decided whether you needed to shoot it?

11        A.    Well, under these very calm circumstances

12   where we can sit here and ponder, I would say I would

13   always try -- you know, I would be thinking, I'm

14   going to use this to see if I can make this guy

15   change his mind, or girl, or whatever.  I would never

16   be thinking shooting.

17             But, you know, it's all very different

18   when that person is confronting you and your

19   adrenalin is flowing and, you know.  I don't know

20   what I'd do.  I've never been in that position.  So

21   you're asking me something I don't know, but I would

22   like to think that I would do everything I could to

23   not ever have to shoot anybody.

24        Q.    But it's possible, under the heat of the



ESQUIRE
an Alexander Gallo Company

Toll Free: 800.708.8087
Facsimile: 312.673.8138

Suite 1200
311 West Monroe Street
Chicago, IL 60606
www.esquiresolutions.com

120

1   moment, that, you know, you may not be thinking

2   clearly, you may be reacting rather than thinking,

3   and a nice protocol that we are talking about here in

4   this conference room may not be something that you

5   could actually follow or even draw up in your mind

6   before you have to react?

7         A.    Yeah, I don't -- there's just -- you

8   know, and that's part of why you do training, too,

9   because you try to practice, you know, thinking about

10  some of these things.  But I don't think I could

11  answer that until I was in the situation.

12              I maintain what I said.  I would do

13  everything I could to escape, to not -- I'm not

14  confrontational.  I would try to get the hell out of

15  there.  I would try to get some help.  I would

16  scream.  Who knows?  I might use my firearm to hit

17  the guy with, you know.

18              But I would -- certainly, my intention

19  would not be to shoot the first person that I think

20  is threatening me.

21        Q.    But --

22        A.    It might happen.

23        Q.    But it might happen, just based on how

24  the circumstances unfold?



Toll Free: 800.708.8087
Facsimile: 312.673.8138

Suite 1200
311 West Monroe Street
Chicago, IL 60606
www.esquiresolutions.com

121

```
 1        A.    Of course.
 2        Q.    Have you ever shot long guns?
 3        MR. PANUCCIO:  I'm going to instruct the
 4   witness not to answer that question pursuant to the
 5   Fifth Amendment to the extent it calls for
 6   information regarding facts occurring inside the City
 7   of Chicago.  That's the instruction.
 8        THE WITNESS:  So I'm not answering?
 9        MR. PANUCCIO:  Can you repeat the question?
10   BY MR. WORSECK:
11        Q.    Have you ever shot long guns?
12        MR. PANUCCIO:  And I'm just instructing you, if
13   that deals with shooting long guns inside the City of
14   Chicago, I'm instructing you not to answer.
15             But if it's outside the City of Chicago
16   where it was fully lawful, you may answer the
17   question.
18   BY THE WITNESS:
19        A.    Well, certainly, never inside the City.
20   So, yes, I have shot a long gun.
21   BY MR. WORSECK:
22        Q.    How many times have you shot a long gun?
23        A.    Oh, well, quite a few.  I mean, we do
24   trap shooting, did a lot of target shooting practice.
```



ESQUIRE
an Alexander Gallo Company

Toll Free: 800.708.8087
Facsimile: 312.673.8138

Suite 1200
311 West Monroe Street
Chicago, IL 60606
www.esquiresolutions.com

139

1    and you go up to Metropolis, so I guess I should take

2    out like one little tiny corner because there's a

3    stairwell there that goes upstairs (indicating).

4         Q.    So you're saying the very northwest

5    corner of the building is actually a stairwell?

6         A.    Yeah, there's another entrance door right

7    up there in the corner and there's a little stairway

8    that takes you up to Metropolis.  And off of that

9    little hallway into their stairs, we have another

10   door.  But we don't use that.  People don't come in

11   that way.

12        Q.    Okay.  Is that usually kept locked?

13        A.    Yes.

14        Q.    So that people don't wander in?

15        A.    Right.

16        Q.    Any member of the public coming into your

17   clinic comes through that door, that main door

18   leading to the vestibule of the building?

19        A.    Exactly.

20        Q.    You have an alarm system at your clinic,

21   correct?

22        A.    Correct.

23        Q.    And that's something you mentioned in the

24   complaint.  Paragraph 45 of Exhibit 5.



ESQUIRE
an Alexander Gallo Company

Toll Free: 800.708.8087
Facsimile: 312.673.8138

Suite 1200
311 West Monroe Street
Chicago, IL 60606
www.esquiresolutions.com

140

1     A.    Okay.

2     Q.    For the record, Paragraph 45 of the

3  Amended Complaint references an instance where your

4  alarm at your clinic went off in the middle of the

5  night and you had to respond.

6          Can you describe that instance?

7     A.    I'm the first person on the call list

8  from the monitoring system, so when the alarm goes

9  off, they just call me and let me know that there's

10  been an alarm, and that's it.  That's all the

11  information I get.

12          They can't tell us if there's been a

13  break in or anything.  Then, of course, I can't

14  sleep, so I have to go over and check and make sure

15  everything is okay.  And that's pretty scary when you

16  go over there at night.

17     Q.    Does your alarm system, your alarm

18  company, contact the police when they get the signal

19  that the alarm has been tripped?

20     A.    Yes.

21     Q.    Did the police come that night?

22     A.    I'm assuming they did.  They were gone by

23  the time I got there.  They don't wait for you and

24  enter the building or anything like that.  I think



ESQUIRE
an Alexander Gallo Company

Toll Free: 800.708.8087
Facsimile: 312.673.8138

Suite 1200
311 West Monroe Street
Chicago, IL 60606
www.esquiresolutions.com

141

1    they just drive by and make sure that the windows are

2    intact.

3          Q.    Were you able to determine why the alarm

4    was set off that night?

5          A.    That night I wasn't.  I mean, at the time

6    I wasn't.  I think it turned out to be a young man

7    that comes in in the middle of the night to clean for

8    us, but I couldn't get ahold of him.  He must have

9    done something wrong when he left.  But I don't know

10   that from home, so....

11         Q.    Did you detect any evidence of a break-in

12   or a theft?

13         A.    I did not.

14         Q.    And I take it you didn't file any police

15   reports?

16         A.    No.

17         Q.    The decision to go to your clinic in the

18   middle of the night when that alarm went off, that

19   was your personal decision, correct?

20         A.    Correct.

21         Q.    Even though the police were called by

22   your alarm company, you still decided on your own

23   that you wanted to go, right?

24         A.    Yes.



Toll Free: 800.708.8087
Facsimile: 312.673.8138

Suite 1200
311 West Monroe Street
Chicago, IL 60606
www.esquiresolutions.com

ESQUIRE
an Alexander Gallo Company

KATHRYN TYLER                                    December 16, 2010

142

1      Q.     Was there anything you could have done to

2   neutralize a crime at your clinic that the police

3   could not have done?

4      MR. PANUCCIO:  Calls for speculation.

5   BY THE WITNESS:

6      A.     Yeah, I -- if there was a crime, you

7   know, the police would be there and, you know, I

8   would meet them.  But, you know, the way the building

9   is set up, you know, even if they drive in the alley

10  and that door in the back there is closed, that

11  doesn't mean someone's not in our animal hospital.

12         They could come in from outside, close

13  the door, and everything.  There's no windows,

14  there's no nothing back there.  But I have to make

15  sure that that back door is secure and somebody

16  hasn't come in that way.

17     Q.     Did you try to contact the police that

18  night to see, you know, if they had checked the site

19  before you got there or what they had found or what

20  response they had taken?

21     A.     No.

22     Q.     Did you ask your husband to accompany you

23  that night?

24     A.     He didn't accompany me that particular



Toll Free: 800.708.8087
Facsimile: 312.673.8138

Suite 1200
311 West Monroe Street
Chicago, IL 60606
www.esquiresolutions.com

143

1   instance.  I don't remember why.  It was a couple

2   years ago.  If he was not feeling well or what.  But

3   I'm just like I got to go over there and make sure

4   everything is okay.

5            If somebody did break in, I want to make

6   sure that it gets boarded up and, you know, make the

7   police report and all that stuff, so....

8        Q.    Did you fear for your safety when you

9   decided to respond?

10       A.    Well, I guess I would say yes.  I mean,

11  it makes me very nervous to go over there in the

12  middle of the night.

13       Q.    And why was it necessary that you go in

14  the middle of the night?

15       A.    Because it's my property, and I'm blank.

16  I don't know if something's happened over there, so I

17  go.

18       Q.    It wasn't necessary for you to go, was

19  it?

20       A.    Nobody made me go.

21       Q.    I mean, it was -- you were not there when

22  the alarm went off, correct?

23       A.    Correct.

24       Q.    Your personal safety was not being



ESQUIRE
an Alexander Gallo Company

Toll Free: 800.708.8087
Facsimile: 312.673.8138

Suite 1200
311 West Monroe Street
Chicago, IL 60606
www.esquiresolutions.com

144

1    threatened when the alarm went off?

2         A.    Correct.

3         Q.    To your knowledge, was anyone inside the

4    clinic, any workers or employees when the alarm went

5    off?

6         A.    I don't think so.

7         Q.    You had no reason to think that there was

8    anyone in the clinic when the alarm went off?

9         A.    You mean employeewise?

10        Q.    Yeah.

11        A.    No one works -- except for the cleaning

12   kid, but I didn't know when he comes in.  He would be

13   the only one that would be there in the middle of the

14   night.

15        Q.    Did you have reason to think that he was

16   there at that particular time when the alarm went

17   off?

18        A.    You know, I didn't know.  He comes on his

19   own schedule and as long as the place is clean by the

20   time we start in the morning.  He's there at 5:00

21   o'clock.  He's there at midnight.  When we close, he

22   does it on his own.

23        Q.    Is it safe to say that if you thought

24   that your personal safety was threatened, you would


ESQUIRE
an Alexander Gallo Company

Toll Free: 800.708.8087
Facsimile: 312.673.8138

Suite 1200
311 West Monroe Street
Chicago, IL 60606
www.esquiresolutions.com

145

1    not have driven out to the clinic that night?

2          A.    I would have driven out there no matter

3    what I thought.  I just would have been more

4    comforted if I had some protection with me, because I

5    walked through and made sure everything was all right

6    and in its place.

7          Q.    But you didn't call the police to ask

8    them to meet you there and just watch while you

9    walked in there --

10         A.    I did not.

11         Q.    -- and took stock of the site?

12               Does your alarm company send someone out

13   from the company when the alarm goes off?

14         A.    No.

15         Q.    What are the business hours of your

16   clinic?

17         A.    We are open from 8:00 until 6:00 Monday,

18   Tuesday, Thursday, Friday and 8:00 until 1:00 on

19   Wednesday and 8:00 until 2:00 on Saturdays.

20         Q.    Is the main doorway locked during

21   business hours or is that left open?

22         A.    Everything is open.

23         Q.    On the average day, how many customers do

24   you have come to your clinic?



ESQUIRE
an Alexander Gallo Company

Toll Free: 800.708.8087
Facsimile: 312.673.8138

Suite 1200
311 West Monroe Street
Chicago, IL 60606
www.esquiresolutions.com

146

1      A.    A lot.  I don't know.  70, 80, something
2  in that range.
3      Q.    And is it fair to say that most of them
4  are bringing a pet?
5      A.    Most of them.  Unless they're coming to
6  pick something up.
7      Q.    Pick up a pet?
8      A.    Pick up drugs.
9      Q.    Have you had any discussions with your
10 landlord about your wanting to bring weapons onto the
11 premises?
12     A.    Uh-uh.
13     MR. PANUCCIO:  Say yes or no.
14 BY THE WITNESS:
15     A.    Oh, I'm sorry.  No.
16 BY MR. WORSECK:
17     Q.    Do you know if that's something your
18 landlord would permit?
19     A.    I have no idea.
20     Q.    Do you know if your landlord has the
21 right to bar you from bringing firearms onto the
22 premises even if the City's ordinances otherwise
23 allowed you to do that?
24     A.    I don't know.



ESQUIRE
an Alexander Gallo Company

Toll Free: 800.708.8087
Facsimile: 312.673.8138

Suite 1200
311 West Monroe Street
Chicago, IL 60606
www.esquiresolutions.com

164

1  BY THE WITNESS:

2       A.    I don't know.  I don't know how many guns

3  I want.  I mean, until you find the one you want, you

4  don't know if you want it or not.  So I don't know

5  how to answer that.

6  BY MR. WORSECK:

7       Q.    How long do guns last?

8       A.    A long time.

9       THE WITNESS:  Well, I'm sorry.

10      MR. PANUCCIO:  I'll put my objection on the

11  record.  Vague.  And you've answered.

12  BY THE WITNESS:

13      A.    Well, it is quite vague.  I mean,

14  obviously, they can last for a long time because

15  there's a lot of antique weapons around.  That's what

16  I'm basing that on, so I don't know.

17  BY MR. WORSECK:

18      Q.    How long do firearms last in the sense of

19  being functional devices for self-defense?

20      MR. PANUCCIO:  One more objection that this

21  line calls for expert opinion.

22  BY THE WITNESS:

23      A.    I really don't know.  I don't know how to

24  answer that question.



ESQUIRE
an Alexander Gallo Company

Toll Free: 800.708.8087
Facsimile: 312.673.8138

Suite 1200
311 West Monroe Street
Chicago, IL 60606
www.esquiresolutions.com

165

1  BY MR. WORSECK:

2       Q.    In your various visits to gun stores,

3  have you observed anything that to your mind struck

4  you as being unsafe in terms of how they ran their

5  business or how they handled their guns?

6       A.    Never.

7       Q.    And same question for shooting ranges

8  that you've visited,

9       A.    No.  They're pretty safe establishments.

10      Q.    What if a gun store wanted to open up on

11 your block?

12      A.    I would love it.  That would be like

13 heaven on earth.

14      Q.    What if a shooting range wanted to open

15 on your block?

16      A.    I would just love that.  Please, can I

17 have that?

18      Q.    What if a shooting range wanted to open

19 next door to you?

20      A.    I would love that.

21      Q.    Why would you love all of those things?

22      A.    Because they would be so much more

23 accessible.  I really do love to shoot, but it's very

24 inconvenient to have to go as far as, you know, we



ESQUIRE
an Alexander Gallo Company

Toll Free: 800.708.8087
Facsimile: 312.673.8138

Suite 1200
311 West Monroe Street
Chicago, IL 60606
www.esquiresolutions.com

166

1    potentially have to go, so....

2         Q.    How frequently do you go shoot at ranges?

3         A.    Not very often.

4         Q.    But how frequently?

5         A.    Once or twice a year, maybe.

6         Q.    What are the reasons that you visit

7    shooting ranges?

8         A.    Practice, shopping.

9         Q.    I'm sorry if my question was vague, but

10   I'm talking now just about shooting ranges.

11        A.    Well, it would only be for practice.

12        Q.    Do you view shooting a weapon at a range

13   as a form of recreation or is it strictly something

14   you do for practice?

15        A.    Well, yeah, it would be, I guess,

16   recreation as well.  It's fun.

17        Q.    Based on your experience with using

18   firearms, how often do you need to shoot at a range

19   in order to maintain your skills?

20        MR. PANUCCIO:  Can I ask for a clarification?

21   Are you asking the witness personally or are you

22   asking -- is the "you" --

23        MR. WORSECK:  No, I'm asking about the witness

24   personally, based on her experience.



ESQUIRE
an Alexander Gallo Company

Toll Free: 800.708.8087
Facsimile: 312.673.8138

Suite 1200
311 West Monroe Street
Chicago, IL 60606
www.esquiresolutions.com

KATHRYN TYLER                                    December 16, 2010

178

1    STATE OF ILLINOIS )

2                     )  SS:

3    COUNTY OF DU PAGE )

4            I, V. LINDA BOESCH, a Notary Public within

5    and for the County of DuPage, State of Illinois, and

6    a Certified Shorthand Reporter of said state, do

7    hereby certify:

8            That previous to the commencement of the

9    examination of the witness, the witness was duly

10   sworn to testify the whole truth concerning the

11   matters herein;

12           That the foregoing deposition transcript

13   was reported stenographically by me, was thereafter

14   reduced to typewriting under my personal direction

15   and constitutes a true record of the testimony given

16   and the proceedings had;

17           That the said deposition was taken before

18   me at the time and place specified;

19           That I am not a relative or employee or

20   attorney or counsel, nor a relative or employee of

21   such attorney or counsel for any of the parties

22   hereto, nor interested directly or indirectly in the

23   outcome of this action.

24                   IN WITNESS WHEREOF, I do hereunto set my

179

1    hand of office at Chicago, Illinois, this 20th day of

2    December, 2010.

3

4

5

6

7                Notary Public, DuPage County, Illinois

8                My commission expires 8-14-2013.

9

10

11   CSR Certificate No. 84-3108.

12

13

14

15

16

17

18

19

20

21

22

23

24

# EXHIBIT 13

Joseph Gorman                                                    October 6, 2011
                                Chicago, IL

```
                                                          Page 1

  1           IN THE UNITED STATES DISTRICT COURT
                  NORTHERN DISTRICT OF ILLINOIS
  2                     EASTERN DIVISION

  3   ILLINOIS ASSOCIATION OF        )
      FIREARMS RETAILERS, KENNETH    )
  4   PACHOLSKI, KATHRYN TYLER,      )
      and MICHAEL HALL,              )
  5                                  )
                  Plaintiffs,        )
  6                                  )   Civil Action
           vs.                       )   10-cv-04184
  7                                  )
      THE CITY OF CHICAGO and RAHM   )
  8   EMANUEL, Mayor of the City     )
      of Chicago,                    )
  9                                  )
                  Defendants.        )
 10

 11

 12         The deposition of JOSEPH GORMAN, called

 13   by the Plaintiffs for examination, taken

 14   pursuant to the Federal Rules of Civil Procedure

 15   of the United States District Courts pertaining

 16   to the taking of depositions, taken before

 17   Marianne Nee, a Certified Shorthand Reporter of

 18   the State of Illinois, CSR License No. 84-2341,

 19   taken at 33 North Dearborn Street, Suite 300,

 20   Chicago, Illinois, on October 6, 2011, at 9:03

 21   a.m.

 22

 23                      # # # # #

 24

 25
```

Joseph Gorman                                                    October 6, 2011
                              Chicago, IL

1   variety of means.  Gangs are innovative on their

2   ability to get firearms.

3       Q    And in your experience is it difficult

4   for gang members in Chicago to acquire firearms?

5       A    I think with the laws that we have in

6   place that it makes it more difficult, and

7   through my experience in being in the field and

8   attempting to purchase firearms, I've learned

9   that they've had to go through obstacles in

10  order to obtain firearms because, what I

11  believe, of the laws that we have in place in

12  the City of Chicago.

13          So I think it's a deterrent.  However,

14  gang members do come in possession of firearms

15  which end up in the City of Chicago.

16      Q    In your experience are there any -- is

17  is there any indication to believe there are

18  gang members in Chicago that would desire to

19  possess a firearm but because of the city's laws

20  are not able to obtain one?

21      A    Can you repeat that?

22      Q    Yes.  In your experience --

23          MR. PATTERSON:  Well, can you read the

24  question back?

25                     (Record read.)

Joseph Gorman                                                    October 6, 2011
                              Chicago, IL

1        MR. AGUIAR:  I'm going to object to the

2    form.  You may answer.

3    BY THE WITNESS:

4        A    I believe that the laws that we have in

5    place, similar to that of a traffic signal,

6    gangs will violate the laws to get firearms

7    within the City of Chicago, just like, you know,

8    there is instances when law-abiding citizens may

9    violate a red light or a stop sign, but I think

10   it's a deterrent to get firearms in the City of

11   Chicago by gang members, what we have in place.

12   BY MR. PATTERSON:

13       Q    So my question is, does that deterrent

14   actually work to prevent any gang members from

15   acquiring firearms, that it is harder to acquire

16   one?

17       A    Absolutely.

18       Q    And what instances are you aware where

19   that has happened?

20       A    There has been numerous instances when

21   we've attempted to buy firearms and the gang

22   members that were attempting to buy firearms had

23   a hard time contacting somebody that may

24   lawfully with an FOID card be able to go and buy

25   a firearm for them, so it would be difficult for

Joseph Gorman                                          October 6, 2011
Chicago, IL

Page 18

```
 1    them, unless they were able to facilitate buying
 2    a firearm by getting somebody with an FOID card.
 3            There has been instances where I've
 4    been privy to on the street where somebody with
 5    an FOID card would refuse to purchase a firearm
 6    for a gang because they knew that the guy was a
 7    convicted felon or that it was illegal, so it
 8    would -- it prevented a person who had a lawful
 9    FOID card from buying a gun for a gang member.
10        Q    And in those instances if the gang
11    member was unable to find someone to essentially
12    I guess do a straw purchase for him -- is that
13    what you're describing basically?
14        A    That's what I described.
15        Q    (Continuing) -- is there any indication
16    that a gang member couldn't obtain a gun either
17    by -- through burglary or through an illegal
18    transaction with someone else?
19            MR. AGUIAR:  I'm going to object to the
20    form.  You may answer.
21    BY THE WITNESS:
22        A    They could, but the laws in place -- if
23    they are going to go commit a burglary, in the
24    back of their mind they are going to commit a
25    crime, so I think that is a deterrent to the
```

Joseph Gorman                                                    October 6, 2011
Chicago, IL

Page 20

1    more, but it fluctuates.

2        Q    And how do you assess the value of what

3    the firearm is worth?

4        A    How do I assess?

5        Q    Yeah.  In saying that the gang members

6    pay more than the firearm is worth, what do you

7    base your assessment on for the worth of the

8    firearm?

9        A    I don't understand the question.

10       Q    I'm just trying to get at the basis for

11   your statement that gang members, in these

12   transactions you've been involved in, the price

13   that's been paid is higher than what the firearm

14   is worth.  So what is your basis for assessing

15   the underlying value of the firearm that you're

16   using to make that comparison?

17       A    We look at the retail sale value and

18   then there is instances where, you know, markup

19   would be minimal and there has been instances

20   where the markup would be remarkable, and it

21   would -- it was almost unrealistic, the price

22   that they would be asking --

23       Q    Okay.

24       A    -- in the process of us purchasing

25   firearms.

Joseph Gorman                                                      October 6, 2011
                                 Chicago, IL

                                                               Page 21

1       Q    Okay.  And have you -- you've never

2    reviewed any research, empirical research on the

3    price that gang members in Chicago pay for

4    firearms?

5       A    Have I reviewed research?

6       Q    Any empirical research.

7       A    I don't understand the question.

8       Q    Have you reviewed any type of study

9    that has attempted to determine, say, the

10   average amount that a gang member in Chicago

11   pays for a firearm?

12      A    No.  My answer is based on my

13   experience of working with gangs.

14      Q    And I believe you said that Chicago's

15   laws have decreased the number of guns on the

16   street or something of that nature, is that what

17   you --

18      A    In my opinion.

19      Q    Okay.  You said you've talked to some

20   of your peers in cities such as Los Angeles and

21   New York, possibly other cities.  Do you have

22   any basis to believe that Chicago's laws --

23   strike that question.

24           Have you ever talked to your peers in

25   cities that permit sales of firearms within the

Page 22

1    city about how that contributes to a criminal's

2    ability to obtain firearms?

3            MR. AGUIAR:  Object to the form and the

4    foundation.  You may answer.

5    BY THE WITNESS:

6        A    Pertaining to that subject, no.

7    BY MR. PATTERSON:

8        Q    Okay.  And what are Chicago's laws that

9    are in place that, in your opinion, deter

10   criminals from obtaining firearms?

11       A    The registration of firearms, that we

12   have stringent laws on registration of firearms.

13   Prior to the recent decision by the Supreme

14   Court, firearms weren't allowed to be purchased

15   within the City of Chicago.

16       Q    So other than the registration of

17   firearms, what other laws does Chicago have in

18   place that deter criminals from obtaining

19   firearms?

20           MR. AGUIAR:  I'm going to object.  Do

21   you mean criminals in general or do you mean

22   gang members?

23           MR. PATTERSON:  Well, let's start with

24   --

25           MR. AGUIAR:  I just want a

Joseph Gorman                                    October 6, 2011
                      Chicago, IL

1    clarification.

2             MR. PATTERSON:  Right.  Let's start

3    with gang members.

4    BY THE WITNESS:

5        A    What was the question again?

6    BY MR. PATTERSON:

7        Q    What laws other than the -- does the

8    registration of firearms in your opinion

9    deter -- Chicago's registration requirements

10   deter gang members from obtaining firearms?

11       A    If a gang member has a lawful FOID

12   card, he can purchase a firearm.

13       Q    Right.  So would you -- go ahead.

14       A    And that gang member, because there are

15   a number of gang members, gang leaders that have

16   FOID cards or have the ability to obtain an FOID

17   card, I think there is a deterrent in that they

18   have to register it because now that puts that

19   particular person on the radar potentially of

20   having a weapon.

21       Q    So the registration --

22       A    I think there is a deterrent among gang

23   members to do that.

24       Q    So gang members don't want to register

25   with the authorities that they have firearms, is

Page 24

1    that what you're saying?

2        A    That would potentially be a deterrent

3    because they wouldn't want law enforcement to

4    know, you know, what they're doing or what their

5    involvement is.  They try to stay away from the

6    criminal element.  Some of the gang leaders

7    don't have backgrounds.

8        Q    Right.  So in your experience is it

9    fair to say that even gang leaders that don't

10   have backgrounds and could potentially qualify

11   for a Chicago firearm registration license

12   nevertheless don't obtain those or go through

13   the registration process?

14       A    There is probably a great number that

15   don't.

16       Q    Would you say that it's a majority that

17   don't?

18       A    Based on my experience, I would say

19   that -- I couldn't quantify if it's a majority

20   but I would think that it would be a deterrent

21   for gang leaders to lawfully register a firearm.

22       Q    And other than the registration

23   requirements, are there any other laws that

24   Chicago has in place that deter gang members

25   from obtaining firearms?

Joseph Gorman                                                    October 6, 2011
Chicago, IL

1      A     Ordinances, I believe the ordinances

2   that -- about weapons outside the residence, the

3   sale of firearms within the City of Chicago.

4      Q     How do the ordinances dealing with

5   weapons outside the residence deter gang members

6   from obtaining firearms?

7      A     I don't understand the question.

8      Q     You said Chicago's ordinances -- my

9   understanding of what you said was that

10  Chicago's ordinances dealing with the possession

11  of weapons outside the residence deter gang

12  members from obtaining firearms.  My question is

13  just how do those ordinances do that?

14     A     Well, the gang members that may

15  lawfully be able to purchase firearms, in

16  numerous instances their associates would have

17  criminal backgrounds, and the gang member and

18  the associates with criminal backgrounds which

19  -- gangs are territorial.  If a gang leader,

20  gang member lives in a particular area and there

21  is instances where gangs potentially sell drugs

22  on the street or congregate in particular areas,

23  and it would be a deterrent because the -- it

24  may deter a gang member from purchasing a weapon

25  and registering a weapon because of whom that

Page 45

1   BY THE WITNESS:

2       A    Based on my experience, they are

3   opportunists, and potentially if they didn't

4   have the ability -- if they knew somebody was

5   armed and if they did not have the ability to,

6   as I would call it, put that person down at a

7   residence so they could surveil it, I think

8   they're opportunists and they wouldn't care one

9   way or the other whether that person was armed

10  or not.

11  BY MR. PATTERSON:

12      Q    Okay.  So in your experience gang

13  members don't care whether persons that they

14  criminally assault have -- are armed or not

15  armed?

16      A    I think there is an unknown factor and

17  I don't -- you know, we talked about the gang

18  members breaking into the residence of somebody

19  that they knew that there was firearms in the

20  residence.  I don't understand the line of

21  questioning on this one.  I'm sorry.

22      Q    So --

23      A    It's an unknown factor.  A gang member

24  to assault somebody, he may not know if that

25  person has a firearm or not.

Joseph Gorman                                                    October 6, 2011
                              Chicago, IL

                                                                  Page 46

 1      Q     Right, right.  In your experience if a

 2   gang member knows that a person has a firearm,

 3   is that ever a deterrent from a gang member

 4   assaulting that person?

 5      A     Oh, yes, it is.  Yes.

 6      Q     And why is that?

 7      A     Just from personal experience and in my

 8   capacity as a law enforcement officer, I carry a

 9   firearm.  It's concealed and potentially -- I

10   don't know.  You're calling for speculation.  I

11   don't know if that has deterred anything.  It's

12   a speculative question so I really can't give a

13   definitive answer, but I can -- just from

14   personal experience I don't know if it has

15   deterred a crime, and I don't know what's in the

16   back of the mind of a gang member.

17      Q     Right.  In your experience does

18   carrying a firearm increase your sense of safety

19   and security?

20           MR. AGUIAR:  Objection to the form and

21   to the relevance of the question.

22   BY THE WITNESS:

23      A     That calls for speculation because

24   there is numerous times where I don't carry a

25   firearm and I feel the same sense of security as

Joseph Gorman                                                          October 6, 2011

Chicago, IL

1    if I had my firearm.  There is numerous

2    occasions that I don't carry my firearm.

3    BY MR. PATTERSON:

4        Q    Okay.  Why do you carry a firearm on

5    some occasions?

6             MR. AGUIAR:  I'll object to the form of

7    the question as relevancy.  Why he carries a

8    firearm is irrelevant to this case.

9             MR. PATTERSON:  He brought up his

10   firearm carrying practices.  I'm just trying to

11   follow up on it.

12            MR. AGUIAR:  That does not make it

13   relevant to the case.  However, you may answer

14   his question.

15   BY THE WITNESS:

16       A    I carry a firearm because I'm a law

17   enforcement officer, and if I see a crime, I'm

18   required to take action, and that's the reason I

19   carry my firearm.

20   BY MR. PATTERSON:

21       Q    In your experience as a --

22       A    I'm on call 24 hours a day, and that's

23   the reason I carry my firearm.

24       Q    In your experience is using a firearm

25   sometimes more effective than other methods of

Joseph Gorman                                              October 6, 2011
                            Chicago, IL

                                                          Page 50

1    question.

2        A    Repeat the question.

3        Q    In your experience as a Chicago police

4    officer, is it ever appropriate for civilians to

5    use firearms to protect life?

6            MR. AGUIAR:  I'm going to again object

7    to the form of the question, to the relevancy of

8    the question and to the extent that it calls for

9    a legal conclusion.  The law establishes whether

10   it is okay for a citizen to use a firearm in

11   defense of him or herself.

12           What Commander Gorman may think about

13   that is wholly irrelevant to this case.  I

14   strenuously object to this line of questioning.

15           That said, you may answer the question.

16   BY THE WITNESS:

17       A    In my opinion, there is provisions of

18   the law that allow a citizen at times to use

19   deadly force.

20   BY MR. PATTERSON:

21       Q    Okay.  In your opinion, those are the

22   only occasions where it's appropriate for a

23   citizen to use deadly force?

24       A    Under the provisions in the law.

25       Q    Now, earlier in your testimony you

Joseph Gorman                                          October 6, 2011
Chicago, IL

1   referred to a change in the Chicago law in 2010

2   on the basis of a court decision, is that

3   correct?

4       A    Yes.

5       Q    And that law happened -- that change of

6   law occurred in July of 2010, is that your

7   understanding?

8       A    I don't recall exactly when that was.

9       Q    I'll represent to you that was in July

10  of 2010.  Since July of 2010 have you seen any

11  -- in your experience, any change in the ability

12  of gang members to acquire firearms in Chicago?

13      A    Since -- it calls for speculation and I

14  think --

15      Q    Right.

16      A    It calls for speculation and I'm -- can

17  you repeat the question?

18      Q    Yeah.  I'm not asking you to speculate.

19          I'm just saying in your experience has

20  there been any change in the ability of gang

21  members to acquire firearms since July of 2010

22  in the City of Chicago?

23      A    Not to my knowledge.  It's been

24  consistent.

25      Q    Okay.

Joseph Gorman                                                          October 6, 2011
Chicago, IL

 1              MR. AGUIAR:  Pete, we've been going for

 2      a little over an hour.  Can we take a break?

 3              MR. PATTERSON:  Yes.

 4                      (Recess had from 10:12 to

 5                      10:16 a.m.)

 6              MR. PATTERSON:  Back on the record.

 7      BY MR. PATTERSON:

 8          Q    Commander, you've said that your

 9      testimony in this case is based on your

10      experience as a Chicago police officer.

11              Do you have any experience in a

12      jurisdiction that permitted the sale of firearms

13      within that jurisdiction?

14          A    Any jurisdictional, no.

15          Q    And do you have any experience working

16      in a jurisdiction that allowed persons to

17      possess firearms outside of their home?

18          A    Working in jurisdictions, no.

19          Q    And we've talked about provisions of

20      Chicago law that limit the ability --

21      potentially limit the ability of gang members to

22      acquire firearms and in particular the

23      limitation on weapons outside of a residence and

24      the sale of firearms within the city.

25              You also touched briefly on some in

Joseph Gorman                                        October 6, 2011
Chicago, IL

                                                     Page 62

 1      Q    In your experience how long does it
 2   take first responders on average to respond to
 3   an emergency call?
 4      A    In my experience as an officer, as a
 5   gang specialist, as a sergeant in the detective
 6   division, as a detective in the gang
 7   investigation unit, as a commander in the gang
 8   investigation unit, I applaud the response of
 9   the patrolmen and I think they are there
10   instantaneously and the bravery of the calls.
11   As opposed to John Q. Citizen running away from
12   danger, they are going into the fire so...
13      Q    You know, I don't have any quarrel with
14   that.  I guess my question is how -- you know,
15   presumably it takes them some period of time to
16   arrive at an emergency scene, and I'm just
17   wondering in your experience what is the typical
18   response time?
19      A    I don't think there is a typical.
20           MR. AGUIAR:  I'm going to object to
21   foundation and to the form.
22           You may answer if you can.
23   BY THE WITNESS:
24      A    Depending on the distance that the
25   officer, the closest officer to the scene is.

Joseph Gorman                                                    October 6, 2011
Chicago, IL

Page 63

1    It could be a block away.  It could be a matter

2    of ten seconds.  It could be a minute.  It

3    fluctuates.  It's not a science.

4    BY MR. PATTERSON:

5        Q    There are some instances where first

6    responders aren't able to arrive quickly enough

7    to avert a violent attack, is that correct?

8            MR. AGUIAR:  I'm going to object to the

9    form and the foundation and the relevance of the

10   question.

11   BY THE WITNESS:

12       A    Yes.

13   BY MR. PATTERSON:

14       Q    Okay.  And do you have any opinion with

15   respect to whether the costs of having firearms

16   outside of the home outweigh the benefits of

17   having a firearm outside the home to the person

18   carrying that firearm for civilians?

19       A    I think there is a risk.  I think the

20   risk is that they may become a target

21   potentially because someone possibly could see

22   that they possess firearms.  They could be at

23   risk for a burglary.  They could be at a risk

24   for a first responder, and I think there is a

25   risk for -- in the event there was a neighborly

Page 64

 1    domestic-type dispute potentially, if a person

 2    possessed a firearm outside his residence, there

 3    could be a possibility that that person could

 4    pull that firearm and utilize it to cause

 5    violence as opposed to having to run into his

 6    residence and getting it.

 7           I think there would be a cooling off

 8    period.  I think definitely the risks outweigh

 9    the benefit of having a firearm outside the

10    residence.

11        Q    And have you ever considered whether

12    there are any benefits to a civilian to carrying

13    a firearm outside the home?  Acknowledging that

14    you think there are some risks, have you

15    considered whether there are any benefits?

16        A    I don't believe there is any benefits

17    that would -- I don't believe there are

18    benefits, no.

19        Q    And what have you done to assess

20    whether there are benefits to civilians to

21    carrying a firearm outside the home, if

22    anything?

23        A    I think just from personal experience.

24    I think the risk far outweighs the benefit.

25        Q    Right.

Page 65

1      A     Any benefit.

2      Q     So it's your testimony, if I understand

3  it, that there is no benefit, no potential

4  benefit for a civilian carrying a firearm

5  outside the home?

6      A     Nothing that would outweigh the risk.

7      Q     But you never looked at any research

8  that looks at how often individuals use firearms

9  defensively outside the home, have you?

10     A     No, I haven't.

11     Q     And you've never looked at any research

12 that compares the frequency with which civilians

13 use firearms outside the home with the frequency

14 with which they're victimized by individuals

15 with weapons outside the home, have you?

16     A     No, I haven't.

17     Q     And you've never looked at any research

18 that considers whether locations where firearms

19 are sold and the areas around those locations

20 have greater problems with gun violence than

21 other locations, have you?

22     A     I can say with personal experience that

23 there is a risk.

24     Q     But you never looked at research that

25 attempts to evaluate or quantify that risk?

 1      A     Only in the form of my experience as a

 2   law enforcement officer looking at data, looking

 3   at reports that my CAGE unit prepares and

 4   looking at several instances where gun stores

 5   have been burglarized.

 6      Q     But you've never looked at anything

 7   that attempts to compare gun stores and the

 8   areas around gun stores to areas where they are

 9   not present to determine which one has greater

10   problems with firearm violence, have you?

11      A     No, sir, I haven't.

12      Q     And you've never looked at whether

13   cities that prevent sales of firearms have

14   greater problems with gun violence than cities

15   that do not permit the sale of firearms?

16          MR. AGUIAR:  Objection; I believe asked

17   and answered.  You may answer.

18   BY THE WITNESS:

19      A     No, sir.

20   BY MR. PATTERSON:

21      Q     Okay.  You've been identified by the

22   city as someone who may testify in this

23   litigation.  Other than what we've discussed

24   today, at this time do you have any -- are there

25   any subjects that you anticipate your testimony

Joseph Gorman                                                    October 6, 2011
                              Chicago, IL

                                                              Page 67

1    will address?

2        A     Other than what we discussed?

3        Q     Yeah.

4        A     I don't -- I know I was called to a

5    deposition here.  I don't know what the intent

6    is in the future.

7        Q     Okay.  So you don't know what your

8    testimony at trial is going to be?

9        A     No.

10       Q     And we started talking about your

11   employment history with the city and then got

12   sidetracked.  So if you could -- you said you

13   graduated from college in 1985.

14             Did you go directly to the Chicago

15   Police Department after that?

16       A     No.  I joined the police department in

17   August of 1986.

18       Q     And what did you do between that time?

19       A     When I got out of college I applied to

20   numerous agencies, took tests.  I actually

21   graduated in the summer of '85 from Northern

22   Illinois and roughly for a year I roofed to

23   supplement my income and while applying for

24   agencies, and sometime in the three months prior

25   to joining the police department in August I was

Page 70

1            We do all the technical, electronics.

2    We do all the -- they do all the workup for the

3    areas on pulling video, restoring video.  In

4    addition to that, they are responsible for doing

5    -- maintaining numerous electronic surveillance

6    equipment which is under my control.

7            I have five area teams, Area 1, 2, 3,

8    4, 5, with five sergeants attached to that.  I

9    have two violent crime teams, the north and the

10   south.  I have a CAGE team, Chicago Anti-Gang

11   Enforcement unit falls under my purview.

12           In addition to that, I have an incident

13   team north and an incident team south.  In

14   addition to that, I have an animal crimes team

15   which is a small group that investigates

16   complaints of animal abuse, and I have two

17   officers that are assigned at the Cook County

18   jail, intelligence officers, and our group works

19   with all the different federal agencies; FBI,

20   DEA, ATF, IRS, ICE, Immigration and Customs, and

21   we do long and short-term investigations

22   targeting gang leaders, gang conflicts.

23       Q    Okay.  In your position as commander,

24   you're focused on combatting gang activity in

25   Chicago, is that correct?

Joseph Gorman                                                    October 6, 2011
Chicago, IL

Page 71

```
 1      A     Gang activity and we have a CAGE team
 2   that looks at the gun violence and we have an
 3   animal crime team that conducts investigations
 4   on animal abuse and at times that goes towards
 5   gangs because gangs at times use it as a tool of
 6   dogfighting and what have you.
 7      Q     What tools do you have in the
 8   organization that you would have at your
 9   disposal to combat gang activity in Chicago?
10      A     As far as operational?
11      Q     Yeah.
12      A     I have -- as I said, I have a technical
13   lab that handles all the -- our electronic
14   surveillance equipment.  We have numerous
15   monitoring rooms, and some of this due to the
16   confidentiality I can't go into.
17           MR. PATTERSON:  And would it be okay if
18   we took a break for a few minutes?  I think I'm
19   close to wrapping up.
20           MR. AGUIAR:  Sure.
21                (Recess had from 10:47 to
22                11:06 a.m.)
23   BY MR. PATTERSON:
24      Q     Commander Gorman, in your experience
25   are licensed firearms dealers knowingly engaging
```

Joseph Gorman                                                    October 6, 2011
                              Chicago, IL

1    in illegal transactions a significant source of

2    guns for criminals in Chicago?

3             MR. AGUIAR:  I'll object to the form of

4    the question.  You may answer.  And the

5    foundation.  You may answer.

6    BY THE WITNESS:

7        A    Licensed dealers?

8    BY MR. PATTERSON:

9        Q    Yes.

10       A    No.

11       Q    Do you have any opinion based on your

12   experience with respect to whether Chicago has

13   relatively more illegal guns than other cities

14   such as Los Angeles and New York?

15            MR. AGUIAR:  Objection; foundation.

16   You can answer if you can.

17   BY THE WITNESS:

18       A    Yes.  Chicago exceeds 10,000 gun

19   recoveries every year, well above New York and

20   well above Los Angeles.  In my experience, I

21   believe that's attributed to the gang situation

22   that we have in the Chicago area.

23   BY MR. PATTERSON:

24       Q    Okay.  And the illegal gun activity in

25   your experience is driven by gang activity, is

Joseph Gorman                                                                    October 6, 2011
                                    Chicago, IL

 1    that correct?

 2        A    Did you say legal or --

 3        Q    Illegal.

 4        A    I would say that the majority of crime,

 5    of violent crime in the City of Chicago is

 6    attributed to gang organizations.

 7        Q    Okay.  And in your experience as a City

 8    of Chicago law enforcement officer, are you

 9    aware of any instances in which a person has

10    committed a crime with a firearm while lawfully

11    possessing that firearm?

12        A    Nothing comes off the top of my head,

13    but then again, you know, there may have been,

14    but at this moment nothing comes off the top of

15    my head.

16        Q    Okay.  And would you agree that there

17    is a greater risk to public safety from

18    unlawfully possessed firearms than lawfully

19    possessed firearms based on your experience?

20            MR. AGUIAR:  Objection to the form and

21    the foundation and the relevance of the

22    question.

23    BY THE WITNESS:

24        A    I think there is a greater risk for

25    unlawfully possessed firearms.  However, there

Page 74

1    is a potential for legally possessed firearm

2    people to commit a crime.

3              MR. PATTERSON:  That's all I have.

4              MR. AGUIAR:  Give me a few seconds.

5              MR. PATTERSON:  Sure.

6              MR. AGUIAR:  A couple quick follow-up

7    questions.

8                        EXAMINATION

9    BY MR. AGUIAR:

10       Q    Commander Gorman, you first testified

11   that there are approximately 80,000 known gang

12   members in the City of Chicago, is that correct?

13       A    Yes, sir.

14       Q    Is it possible there are more unknown

15   gang members in the City of Chicago?

16       A    Absolutely.  There is 80 --

17   approximately 80,000 that have been identified

18   through self-admission, through investigation,

19   and that's documented within the Chicago Police

20   Department.

21       Q    But your department suspects there are

22   more that are unknown?

23       A    Absolutely.

24       Q    And your 80,000 number does not include

25   the associates of gang members?

Page 76

1    you wouldn't be able to stop that gang member

2    from -- you wouldn't be able to make that arrest

3    unless that gang member unlawfully possessed a

4    firearm, is that correct?

5            MR. PATTERSON:  Objection; leading

6    question.

7            MR. AGUIAR:  It's cross.

8    BY MR. AGUIAR:

9        Q    You may answer.

10       A    That's correct.

11       Q    And Mr. Patterson asked you today a

12   number of questions about your experiences and

13   you've testified based on those experiences

14   today, haven't you?

15       A    Yes, I have.

16       Q    And those experiences are the best you

17   can recall as you sit here today?

18       A    As I sit here today, yes.

19       Q    There may be other experiences you've

20   had which inform your opinions but those you

21   just can't recall as you sit here today?

22       A    Yes, sir.

23           MR. AGUIAR:  I have nothing further.

24

25

Joseph Gorman                                                    October 6, 2011
                              Chicago, IL

                                                              Page 77

 1                      EXAMINATION

 2   BY MR. PATTERSON:

 3        Q    Okay.  Just one or two questions.

 4             You testified earlier that gang members

 5   may not register their firearms because they

 6   don't want to come -- they don't want the police

 7   to know that they have possession of firearms,

 8   is that correct?

 9        A    That's correct.

10        Q    Does that same logic and reasoning

11   apply to associates of gang members?

12        A    Yes, it does.  There are instances

13   where, through experience and through

14   investigations, that the associates tend not to

15   register a firearm.

16             MR. PATTERSON:  Okay.  That's all I

17   have.

18             MR. AGUIAR:  We reserve signature.

19             THE COURT REPORTER:  And do you want to

20   order this written?

21             MR. PATTERSON:  Yes.

22             THE COURT REPORTER:  Is two weeks okay?

23             MR. PATTERSON:  Yes, that's fine.

24             THE COURT REPORTER:  And full sized or

25   mini?

Joseph Gorman                                                    October 6, 2011
                              Chicago, IL

                                                               Page 78

 1            MR. PATTERSON:  I'll do a full sized.

 2            THE COURT REPORTER:  And Bill?

 3            MR. AGUIAR:  A full and a mini.

 4                 (Proceedings adjourned at

 5                 11:16 a.m.)

 6

 7                 FURTHER DEPONENT SAITH NOT.

 8

 9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

Joseph Gorman                                                    October 6, 2011

Chicago, IL

Page 80

```
 1    STATE OF ILLINOIS   )

 2                        )SS:

 3    COUNTY OF C O O K   )

 4           I, MARIANNE NEE, a Certified Shorthand

 5    Reporter of the State of Illinois, C.S.R. No.

 6    84-2341, do hereby certify:

 7           That previous to the commencement of

 8    the examination of the witness, the witness was

 9    duly sworn to testify to the whole truth

10    concerning the matters herein;

11           That the foregoing deposition

12    transcript was reported stenographically by me,

13    was thereafter reduced to typewriting under my

14    personal direction and constitutes a true record

15    of the testimony given and the proceedings had;

16           That the said deposition was taken

17    before me at the time and place specified and

18    was recessed/adjourned as stated herein;

19           That the reading and signing by the

20    witness of the deposition transcript, if

21    applicable, was agreed upon as stated herein;

22           That I am not a relative or employee or

23    attorney or counsel, nor a relative or employee

24    of such attorney or counsel for any of the

25    parties hereto, nor interested directly or
```

Joseph Gorman                                                    October 6, 2011
                                Chicago, IL

                                                                    Page 81

1    indirectly in the outcome of this action.

2            I further certify that this certificate

3    applies to the original signed IN BLUE and

4    certified transcripts only.  I assume no

5    responsibility for the accuracy of any

6    reproduced copies not made under my control or

7    direction.

8            IN WITNESS WHEREOF, I do hereunto set

9    my hand at Chicago, Illinois, this_____day

10   of_____2011.

11

12

13                                    `

14                   _____

15                   Marianne Nee

16                   Certified Shorthand Reporter

17

18

19   C.S.R. Certificate No. 84-2341

20

21

22

23

24

25

EXHIBIT 14

**CITY OF CHICAGO**
**DEPARTMENT OF POLICE**

**RULES AND REGULATIONS**
**FIREARMS- CHAPTER 8-20**

These rules shall be effective on July 12, 2010.

The Superintendent, pursuant to Chapter 8-20 of the Municipal Code of Chicago, hereby promulgates the following the Rules and Regulations.

**RULE I      DEFINITIONS**

**1.1** "Chicago Firearm Permit" or "CFP" means the permit issued by the City which allows a person to possess a firearm.

**1.2** "FOID" means the Firearm Owner's Identification Card issued pursuant to the Illinois Firearm Owners Identification Card Act, 430 ILCS 65/1 et seq., as amended.

**1.3** "Department" means the Chicago Police Department.

**1.4**. "Police Headquarters" means the Chicago Police Headquarters, located at 3510 South Michigan Avenue, Chicago, Illinois, 60653

**1.5** "State certified firearms instructor" means a person approved by the Illinois Department of Financial and Professional Regulation to instruct firearm safety and training courses.

**RULE 2      TRAINING**
**2.1**   Every applicant for a CFP shall submit an affidavit signed by a state certified firearms instructor, attesting that the applicant has completed a firearm safety and training course which complies with rule 2.2.

A copy of the affidavit to be completed by the firearms instructor may be downloaded from the department's web site at www.chicagopolice.org.

**2.2**   The firearm safety and training course shall consist of 1 hour of range training and 4 hours of classroom training, which shall include all of the following:
      (a) instruction in the dangers of and misuse of firearms, and their care, cleaning and storage and safety rules;
      (b) practice firing on a range with live ammunition;
      (c) instruction in the legal use of firearms; and
      (d) a presentation of the ethical and moral considerations necessary for any person who possesses a firearm.

**RULE III   CHICAGO FIREARM PERMITS**
**3.1**   A person applying for a CFP shall file the application in person at Police Headquarters, Monday through Friday (closed on holidays) between the hours of 8:30 a.m. and 3:30 p.m..

A copy of the CFP application may be downloaded from the department's web site

at www.chicagopolice.org.

**3.2** When submitting the CFP application, the applicant shall bring the following:

(a)   the applicant's Illinois firearm owner's identification number and a copy of the applicant's FOID card;

(b)   two identical photographs of the applicant taken within 30 days immediately prior to the date of filing the application, equivalent to passport size, showing the full face, head and shoulders of the applicant in a clear and distinguishing manner;

(c) the applicant's Illinois driver's license number or Illinois identification card, and a copy of the applicant's driver's license or Illinois identification card;

(d) an affidavit signed by a state certified firearms instructor to provide firearm training courses which includes the following information:

(1) the name and signature of the applicant;
(2) the name, address and phone number of the instructor;
(3) the location where the training occurred;
(4) a statement that the training provided at least one hour of range training and four hours of classroom instruction that is in compliance with rule 2.2;
(5) a statement that the applicant successfully completed the training; and
(6) a statement attesting to the correctness of the information provided in the affidavit.

(e), if the applicant does not have a valid Illinois driver's license, a letter signed by a licensed optometrist or ophthalmologist, attesting that the applicant has vision better than or equal to that required to obtain a valid Illinois driver's license under the standards established in the Illinois Vehicle Code.

**3.3**   For an application of a person 18 years or older but less than 21 years old, the applicant shall submit an affidavit from the applicant's parent or legal guardian.   The affidavit shall include the following:

(a) the applicant's age;
(b) a statement that the applicant has never been convicted of a misdemeanor, other than a traffic offense or been adjudged a delinquent;
(c) a statement that the parent or legal guardian consents to the applicant possessing a firearm;
(d) a statement that the parent or legal guardian is not an individual prohibited from having a FOID or CFP; and
(e) an attestation as to the correctness of the information on the affidavit.

If consent is given by a legal guardian, the applicant shall submit a certified copy of the guardianship court order.

**3.4**   After submitting a complete application, the applicant shall submit to fingerprinting.

**3.5**   An application shall not be considered complete until all the required information and fingerprints are submitted.

**RULE IV    Firearm Registration Certificates**

   **4.1**   An applicant shall submit a complete firearm registration application.   The application may be obtained either in person at Police Headquarters, Monday through Friday (closed holidays) between the hours of 8:30 a.m. and 3:30 p.m., or may be downloaded from the Department's web site at www.chicagopolice.org.

   **4.2**   The firearm registration application may be either submitted in person at Police Headquarters, or may be mailed to:

> Chicago Police Headquarters
> Gun Registration Program, Unit 163
> Room 1027SE
> 3510 South Michigan Avenue
> Chicago, Illinois 60653

   **4.3**    Any applicant who is exempt from obtaining a CFP shall submit evidence, as required by the superintendent, demonstrating the basis for the exemption.   Such evidence may include, but is not limited to, an identification card or license issued by a governmental agency in the United States.

   **4.4**   An annual registration report shall be submitted either in person at Police Headquarters or mailed to the address listed in Rule 4.2.

   **4.5**   Any applicant who has recently moved into the city shall provide evidence of such recent relocation, which may include, but not be limited to, a driver's license, utility bills, a lease, and any other information requested by the superintendent.

**RULE V        90 day grace period-calculation**

   **5.1**   For purposes of calculating the 90-day grace period pursuant to section 8-20-140(d)(2), with respect to any applicant who submits an application for a CFP prior to October 12, 2010, and such application is subsequently approved, the applicant shall be eligible to register each firearm possessed by the applicant prior to July 12, 2010; provided that the firearm meets the requirements of the ordinance.

   **5.2**   An applicant who submits an application for a registration certificate for a firearm owned by the applicant prior July 12, 2010 shall submit evidence that the firearm was owned by the applicant prior to July 12, 2010.   Such evidence may include, but is not limited to, a receipt showing the date the firearm was purchased, or an affidavit in which the applicant attests that the applicant owned the firearm prior to July 12, 2010.

   **5.3**   For any registration certificate issued prior to July 12, 2010 and expiring on or before October 12, 2010, if the person issued the registration certificate submits an application for a CFP prior to October 12, 2010, the expiration date of the registration certificate shall be deemed to be extended until the superintendent either approves or denies the person's CFP application, and if applicable, the person's application for a registration certificate.   If the CFP application is denied, the person shall immediately dispose of the firearm in accordance with the provisions of the ordinance.

**RULE VI    Destruction and disposal of firearms**

   **6.1**   If a CFP or registration certificate is lost, stolen or destroyed, the person shall file a police report within 72 hours of the discovery of such loss, theft or destruction.

**6.2** If a firearm is lost, missing or stolen, the person shall file a police report immediately.

**6.3** If a person sells, transfers, permanently removes from the city, or otherwise disposes of a firearm, the person shall submit a firearms disposition form. The form shall be submitted either in person at Police Headquarters, or mailed to the address listed in Rule 4.2.

**6.4** Any person whose CFP or firearm registration certificate is revoked shall immediately dispose of the firearm in accordance with the ordinance, and submit a firearm disposition form in accordance with Rule 6.3.

## RULE VII Change of information

**7.1** Every person issued a CFP or registration certificate shall keep all information required by the ordinance current.   Any change in such information shall be reported to the superintendent by submitting an amended CFP or registration certificate application either in person at Police Headquarters, or by mailing an amended application to the address listed in Rule 4.2.

## RULE VIII Revocation of a CFP or registration certificate

**8.1** Every person whose CFP or registration certificate has been revoked shall immediately return the revoked CFP or registration certificate to the department either in person at Police Headquarters, or by mailing the revoked CFP or registration certificate to the address listed in Rule 4.2.

**8.2** Any CFP or registration certificate that is revoked shall be seized by the department.

## RULE IX Surrender of firearms

**9.1** Any person issued a CFP or registration certificate who wishes to surrender the firearm to the Chicago Police Department may do so by calling 911.

# EXHIBIT 15

1

IN THE UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF ILLINOIS

EASTERN DIVISION


ILLINOIS ASSOCIATION OF FIREARMS)

RETAILERS, KENNETH PACHOLSKI,   )

KATHRYN TYLER, and MICHAEL HALL,)

     Plaintiffs,      )

     -vs-       ) No. 10 CV 04184

THE CITY OF CHICAGO and    )

RICHARD M. DALEY, Mayor    )

of the City of Chicago,     )

     Defendants.     )

     The deposition of EUGENE WILLIAMS called

for examination pursuant to Notice and the Rules of

Civil Procedure for the United States District

Courts pertaining to the taking of depositions,

taken before Jana E. Cox, a notary public within

and for the County of Cook and State of Illinois,

at 33 North Dearborn Street, Chicago, Illinois, on

the 29th day of April, 2011, at the hour of 9:03 a.m.


Reported By: Jana E. Cox, CSR

License No.: 084-004399

14

1        Q.   And I'm going to go through several of

2    those provisions and just ask you if you have any

3    information regarding that particular provision;

4    and then if you do, we'll follow up on that some.

5    Are you aware that Chicago's firearm ordinance

6    limits residents to the possession of one operable

7    firearm per person?

8        A.   I am.

9        Q.   Do you have any information regarding the

10   governmental justifications for governmental

11   purposes or interests in that limitation in the

12   ordinance?

13       A.   If I could just back up and correct it.

14       Q.   Sure.

15       A.   In their home.

16       Q.   In their home, yes.  Anywhere including in

17   their -- okay.

18       A.   Would you mind repeating?

19       Q.   Yes.  Do you have any information

20   regarding the governmental justifications for or

21   governmental purposes or interests in the

22   limitation of one operable firearm per person per

23   home?

24       MR. WORSECK:  Objection, vague.

15

1      THE WITNESS:  You know, based on my

2   understanding, my knowledge, and experience of, you

3   know, 30 plus years, you know, I look at things

4   such as the reduction of violence as being one of

5   the key reasons why we would want to limit the

6   number of handguns in the City of Chicago.

7   BY MR. PATTERSON:

8      Q.   How does limiting persons to one operable

9   firearm in the home limit the number of handguns in

10   the City of Chicago?

11      A.   You know, essentially from my knowledge

12   and experience, the more handguns there are, the

13   more likelihood there is for incidents of violence.

14   Also, you know, it endures itself in my opinion to

15   escalating situations which may have been as simple

16   as an assault to becoming aggravated assault and an

17   aggravated assault to become aggravated batter and

18   aggravated battery to become, you know, shooting or

19   homicide.

20      Q.   I understand that.  I guess my question is

21   how does the limitation of one operable firearm per

22   person in the home advance that interest when it is

23   my understanding that individuals can have as many

24   firearms as they would like, but only one of them

16

1    can be operable?

2       A.   I think that goes to based on my

3    experience to the fact that the fewer guns there

4    are, again, the fewer guns there are in terms of

5    whether there are children in the home or whether

6    there's a domestic incident in the home or whether

7    there is a break-in in the home or using the weapon

8    against the resident, the fewer guns there are

9    available in the home, again, limit the amount of

10   violence that are associated with guns.

11      Q.   So is it your position then that by

12   limiting individuals to one operable firearm per

13   home, it renders any additional inoperable firearms

14   unavailable for use?

15      MR. WORSECK:  Objection, vague.

16      THE WITNESS:  I didn't understand the question.

17   BY MR. PATTERSON:

18      Q.   I understood your answer to be that by

19   limiting the number of firearms or handguns in the

20   home, it reduces the opportunity for, you know,

21   accidents with children, domestic violence, other

22   types of criminal situations; is that correct?

23      A.   Yes, correct.

24      Q.   So how does -- is your understanding of

21

1    certifications, the permit to have a weapon and

2    FOID card and so forth, only the people in that

3    house, and each one of them would have one weapon

4    that's operable.

5    BY MR. PATTERSON:

6        Q.   There is no limitation on the number of

7    people that could live in the home, is there?

8        A.   No.

9        MR. WORSECK:  Objection, calls for speculation

10   and a legal opinion.

11   BY MR. PATTERSON:

12       Q.   So do you have any objection that would

13   justify -- strike that.

14           So it is the case then that there could be

15   several operable firearms lawfully possessed in a

16   single home if there are multiple people living in

17   the home; is that correct?

18       A.   That's correct.

19       Q.   So how does the limitation of one operable

20   firearm per person advance an interest in reducing

21   violence when there can be multiple firearms

22   operable in the home if there are several people

23   living in the home?

24       A.   The fact of the matter is, to my

22

1    understanding and my knowledge, is that the law as

2    enacted allows a person to have a weapon, and

3    that's basically what, you know, I know.  I don't

4    have any independent knowledge of how or why there

5    would be multiple people in there and that would

6    move forward, but the fact they have a right to

7    have a weapon, that's what pretty much directs me.

8        Q.   You've given a general explanation about

9    why you think having fewer firearms in the arm

10   could lead to reduction of violence.  Do you have

11   any evidence that would support that explanation

12   that you've given?

13       MR. WORSECK:  Objection, vague.

14       THE WITNESS:  I don't have any other than my

15   understanding, my knowledge, and my experience as a

16   police officer for 30 years plus.

17   BY MR. PATTERSON:

18       Q.   Are there any specific experiences that

19   you can recall that support your conclusion that

20   limiting the number of firearms to one operable

21   firearm in the home lead to a reduction of

22   violence?

23       MR. WORSECK:  Objection, vague.

24       THE WITNESS:  Nothing specific that I can refer

23

1    to.

2    BY MR. PATTERSON:

3        Q.   Is it your understanding that the City's

4    firearm ordinance limits the possession of a

5    handgun on a person's property to that person's

6    home and does not include other parts of the

7    property such as the garage, porches, or yard

8    areas?

9        A.   That is my understanding.

10       Q.   And do you have any information regarding

11   the policy interests that this limitation can

12   serve?

13       MR. WORSECK:  Objection, vague.

14       THE WITNESS:  I can give my -- --

15       MR. WORSECK:  To the extent you understand.

16       THE WITNESS:  You know, I would be concerned

17   about any time a weapon is outside of the house.  I

18   would be concerned about the escalation.  I would

19   be concerned about the intimidation that that

20   presents and the potential for additional violence

21   once outside of the house.

22   BY MR. PATTERSON:

23       Q.   And why is that?

24       A.   Because in my experience and knowledge as

24

1     a police officer it's my understanding that when

2     people are involved in -- when they have firearms

3     and they would more likely be willing to take

4     measures that they would not have otherwise taken

5     if they didn't have a firearm.

6          Q.   Is it your opinion that the risks

7     associated with a person possessing a firearm are

8     greater when people have firearms on their own

9     property but outside of their home than when they

10    have firearms on their own property but inside of

11    their home?

12         MR. WORSECK:  Objection, vague, calls for

13    speculation.

14         THE WITNESS:  I'm not sure I understand that

15    question.

16    BY MR. PATTERSON:

17         Q.   I guess I'm trying to understand how the

18    City makes a distinction between and says you can

19    possess a handgun inside your home, but on other

20    areas of your property you cannot possess a

21    handgun.  So I guess I'm asking do you have any

22    information that the threats presented by

23    possession of a firearm are greater in areas on a

24    person's property outside of their home than they

27

1    guns into the City.

2        Q.   So is it your position that any increase

3    in the number in the City presents a risk of

4    increased gun violence in the City?

5        MR. WORSECK:  Objection, vague.

6        THE WITNESS:  In my experience, yes.

7    BY MR. PATTERSON:

8        Q.   And are you aware that the City's firearms

9    ordinance bans the sale of firearms within the

10   city?

11       A.   I am.

12       Q.   What governmental interest does that ban

13   on firearm sales serve in your opinion, if you

14   know?

15       A.   I would go back to what I just indicated.

16   In any situation that brings more weapons into the

17   City, the easy acquisition, the acquiring of

18   firearms, multiple people at the store purchasing

19   weapons, any time in my experience any time that

20   situation exists, there is greater increase for

21   potential for violence.

22       Q.   What in your experience causes you to come

23   to that conclusion?

24       A.   You know, I've seen -- strike that.

28

1    I've known that there have been cases --

2    and I don't have the specific information -- where

3    gang members would go up and -- for lack of a

4    better word -- stake out gun stores and see who's

5    purchasing weapons and the potential for them to

6    follow them back to their home or whatever.  I

7    think that's made much more easier for them to do

8    that when the store is located in the City.

9        Q.   Those instances you described, did those

10   occur in the City of Chicago?

11       A.   No, they didn't.

12       Q.   Do you know where they occurred?

13       A.   In -- I'm not sure if it's Riverdale, but

14   a south suburb of the City.

15       Q.   Do you have any evidence that lawfully

16   possessed firearms present a risk of increased

17   violence in the City of Chicago?

18       MR. WORSECK:  Objection, vague.

19       THE WITNESS:  I don't have any evidence other

20   than personal experience.

21   BY MR. PATTERSON:

22       Q.   I guess I'm trying to get at is

23   distinction between firearms that are possessed

24   lawfully and firearms that are possessed

29

1    unlawfully.  Do you have any evidence that firearms

2    that are possessed lawfully as opposed to

3    unlawfully present a risk of increased violence in

4    the city?

5        MR. WORSECK:  Objection, same objection.

6        THE WITNESS:  No.

7    BY MR. PATTERSON:

8        Q.   It's true, as you've said, that a regular

9    citizen of Chicago cannot go anywhere in the City

10   to buy a firearm; is that correct?

11       A.   That's correct.

12       Q.   Yet isn't it also true that the police

13   department has been recovering an average of 10,000

14   firearms a year for over a decade?

15       MR. WORSECK:  Objection, calls for speculation.

16       THE WITNESS:  I believe that's correct.

17   BY MR. PATTERSON:

18       Q.   And isn't it that -- so even though over

19   that period of time there was a complete ban in

20   place on the possession of handguns?

21       MR. WORSECK:  Objection to the extent it

22   mischaracterizes the prior law and calls for a

23   legal opinion.

24       You can answer if you understand.

30

1      THE WITNESS:  I'm not clear when you say a

2      complete ban.

3      BY MR. PATTERSON:

4      Q.  I'll move on.  Isn't it true you can't

5      arrest your way out of the gun violence problem in

6      the Chicago?

7      MR. WORSECK:  Objection, vague, calls for

8      speculation.

9      THE WITNESS:  I agree.

10     MR. PATTERSON:  Introduce an exhibit here.  Can

11     we mark this as Williams Exhibit 1.

12              (Whereupon, Williams Deposition

13              Exhibit No. 1 was marked

14              for identification.)

15     BY MR. PATTERSON:

16     Q.  I just handed you what the court reporter

17     has marked as Williams Exhibit 1.  This is an

18     article that is entitled "Look Beyond the Handgun

19     Ban."  Have you seen this article before?

20     MR. WORSECK:  Take as much time as you need to

21     look it over.

22     THE WITNESS:  (Reviewing document.)  Yes, I do

23     recall.

24     MR. WORSECK:  Have you had a chance to look at

37

1      the desire of young people to pick up a gun?

2          MR. WORSECK:  Objection, vague, calls for

3      speculation.

4          THE WITNESS:  Given that it does call for

5      speculation, especially in the home where people

6      have guns and store weapons this way, I think it's

7      important that there's -- other than the one weapon

8      there, that other weapons are inoperable or have a

9      trigger lock on it.  You know, people are known to

10     ramble and go through the house and find firearms.

11     And if they were find one, certainly would want it

12     to be one with the inoperable or trigger lock.

13     BY MR. PATTERSON:

14         Q.   And other than those things that you just

15     mentioned, to the extent that you know, does

16     anything else in Chicago's firearms ordinance serve

17     the interest of reducing the desire of young people

18     to pick up a gun?

19         MR. WORSECK:  Same objections.

20         THE WITNESS:  Other than what I already

21     indicated, simply the lack of availability of guns

22     in general.

23     BY MR. PATTERSON:

24         Q.   In your experience are you aware of any

38

1    situation in which a police officer has been

2    injured by a firearm that was lawfully possessed?

3        MR. WORSECK:  Objection, calls for speculation.

4        THE WITNESS:  Repeat -- could you repeat that?

5    BY MR. PATTERSON:

6        Q.   In your experience are you aware of any

7    incident in which a police officer has been injured

8    by the use of a firearm that was lawfully possessed

9    by the person using the firearm?

10       MR. WORSECK:  Same objection.

11       THE WITNESS:  I'm not -- I'm not certain.  I'm

12   not certain.

13   BY MR. PATTERSON:

14       Q.   You don't recall any particular incident?

15       A.   At this time, no.

16       Q.   You're the president of the Chicago

17   Chapter of the National Organization of Black Law

18   Enforcement Executives; is that correct?

19       A.   That's correct.

20       Q.   How long have you held that position?

21       A.   Since 2007 I want to say.

22       Q.   What are your responsibilities as

23   president of that organization?

24       A.   My job as president is to oversee the

39

1    chapter which consists of law enforcement officials

2    primarily African-American, but others as well from

3    federal, state, and local.  A large part of what we

4    do is giving back to the communities, going out and

5    mentoring young people.  We have a huge HIV and

6    Aids component of it.  Primarily mentoring young

7    people and working in inner city communities to

8    give back and to show positive role model.

9        Q.   Is one thing -- I'll refer to the

10   organization NOBLEE.  Is that how it's generally

11   referred to?

12       A.   Yes, Chicago Chapter.

13       Q.   Chicago Chapter?

14       A.   There's 50 plus chapters throughout.  They

15   have a parent organization that's NOBLEE, and then

16   Chicago is the Chicago Chapter.

17       Q.   Does the Chicago Chapter of NOBLEE, is one

18   thing that it does recommend legislation?

19       A.   No.

20       Q.   No?

21       A.   No.  No.

22       Q.   Does it recommend solutions for combatting

23   gun violence in Chicago?

24       A.   Yes.

46

1      MR. PATTERSON:  Object to the question as

2  leading.

3      THE WITNESS:  That's correct.

4  BY MR. WORSECK:

5      Q.   And obviously arresting gun offenders is

6  one way of approaching the problem, correct?

7      MR. PATTERSON:  Objection, leading.

8      THE WITNESS:  It is.

9  BY MR. WORSECK:

10      Q.   Another approach is things along the lines

11  of intervention with gun offenders and other forms

12  of intervention within the community of the sort

13  that you talked about earlier?

14      MR. PATTERSON:  Objection, leading.

15      THE WITNESS:  That's correct.

16  BY MR. WORSECK:

17      Q.   And another approach is to reduce the

18  number of firearms that are available for misuse in

19  Chicago?

20      MR. PATTERSON:  Same objection.

21      THE WITNESS:  I agree.

22  BY MR. WORSECK:

23      Q.   And the police department would like to

24  have all of those tools on its table in attempting

47

1    to address the gun violence in problem in Chicago?

2        MR. PATTERSON:  Same objection.

3        THE WITNESS:  Yes.

4    BY MR. WORSECK:

5        Q.   Another tool on that table would be trying

6    to reduce the number of firearms that would be

7    available in public for people to misuse?

8        MR. PATTERSON:  Same objection.

9        THE WITNESS:  Absolutely.

10   BY MR. WORSECK:

11       Q.   Firearms that are in public could be

12   misused in various ways?

13       MR. PATTERSON:  Same objection.

14       THE WITNESS:  Yes.

15   BY MR. WORSECK:

16       Q.   One way of misuse would be the possessor

17   using it for an improper purpose --

18       A.   Correct.

19       Q.   -- such as to shoot somebody?

20       MR. PATTERSON:  Same objection.  Drew, I don't

21   want to -- can I have a standing objection to

22   leading?

23       MR. WORSECK:  I'll give you that standing

24   objection.

48

1          MR. PATTERSON:  Okay.  Thanks.

2          THE WITNESS:  Yes.

3     BY MR. WORSECK:

4          Q.   Another way it could be used improperly

5     would be for purposes of intimidation?

6          A.   Yes.

7          Q.   Another way it could be used improperly is

8     if someone steals the gun from the possessor?

9          A.   Yes.

10          Q.   It also could be used to resist law

11     enforcement officers or other first responders who

12     might be called upon an incident occurring in

13     public?

14          A.   Yes.

15          Q.   Then directing you again to the second

16     page of Exhibit 1 about two-thirds down the page.

17     That one-line sentence Mr. Patterson asked you

18     about, quote/unquote, We need to do here what we

19     did there, reduce the desire of young people to

20     pick up a gun.  Do you remember that?

21          A.   Yes, I do.

22          Q.   And you would agree reducing the desire of

23     people to improperly acquire or use guns is one

24     tool that the police department would like to be

49

1    able to pursue to reduce gun violence?

2        A.   Yes.

3        Q.   Another tool would be to reduce the

4    availability of guns to be accessed by those people

5    who maintain the desire to acquire those guns?

6        A.   Yes.

7        Q.   Again, it's a multi-pronged approach, and

8    you would like all of the prongs to be available to

9    best address the gun violence problem in Chicago?

10       A.   Correct.

11       Q.   Earlier Mr. Patterson asked you about the

12   provision in the ordinance that states that

13   basically a homeowner is entitled to have one

14   operable firearm in the home and any additional

15   firearms need to be stored or rendered inoperable

16   in a certain way.  Do you remember that line of

17   questioning in general?

18       A.   I do.

19       Q.   And one of the purposes served by that

20   provision is reducing the ability of a burglar or

21   intruder to use a gun they might come across in the

22   course of breaking into a house against the home

23   owner?

24       A.   Yes.

50

1     Q.   If that gun is broken down or secured with

2   a trigger lock, the intruder won't be able to use

3   it at all or at least quickly against the

4   homeowner?

5     A.   Correct.

6     Q.   And another purpose served by that

7   provision is reducing the number of firearms

8   accidents or suicides or domestic violence

9   shootings that would occur in the home by reducing

10   the number of operable firearms that could be

11   misused in those sorts of situations?

12     A.   Correct.

13     Q.   And do you remember a line of questioning

14   about first responders coming to homes that may

15   have guns in them?

16     A.   Yes.

17     Q.   And there was some questioning about the

18   assumptions that officers have regarding whether

19   firearms are in that home?

20     A.   Yes.

21     Q.   There were some questions about whether

22   first responders are made aware of whether that

23   home may or may not have guns in it?

24     A.   Yes.

51

1        Q.   And would you agree regardless of whatever

2    assumptions a responding officer brings to bear and

3    regardless of whether they have actual knowledge

4    regarding the presence of firearms in that home,

5    public safety is nonetheless enhanced by reducing

6    the number of firearms in that home that they be

7    misused as against a first responder?

8        A.   I would agree.

9        Q.   One way of serving that end is by reducing

10   the number of operable weapons that would be in

11   that home?

12       A.   I agree.

13       Q.   Have Chicago police officers ever been

14   harmed by guns in the course of responding to

15   emergency calls at residences in Chicago?

16       A.   Yes.  I don't have the specifics, but yes,

17   they have.

18       Q.   That's something you're familiar with in

19   your 30 years of experience on the force?

20       A.   Yes.  And if I could -- I remember the

21   question that had to do with had a legally

22   possessed gun been used to hurt a police officer.

23   And just trying to remember, you know, things as

24   they come back.  I remember a police officer's gun

52

1    was taken from him in the parking lot of a police

2    station.  It was a legally possessed gun, and he

3    was shot to death -- Officer Thor Soderberg -- in

4    the parking lot of the Targeted Response Unit.  You

5    know, that just goes to even police officers or

6    even people who have firearms, they can be taken

7    from them and they can be shot.  So we had a

8    officer shot and killed because a weapon was taken.

9    I just wanted to correct that point.

10       Q.   And CPD officers who have responded to

11   calls at residences have been harmed by guns being

12   possessed by people in those residences, correct?

13       A.   Correct.

14       Q.   And regular civilian citizens of Chicago

15   have been harmed by guns that are possessed by

16   people in their residences, correct?

17       A.   Correct.

18       Q.   That's something that you've become

19   familiar with in your 30 plus years on the force?

20       A.   Yes.

21       Q.   Do you remember a line of questioning

22   about the definition of home that's in the Chicago

23   gun ordinance?

24       A.   Yes.

53

1    Q.   And generally about the requirement that

2    while you're allowed to have an operable firearm

3    within the four corners of your home, you're not

4    permitted to bring that weapon out into your yard

5    or your porch, etc. --

6    A.   Yes.

7    Q.   -- garage?

8        Those areas of one's property are

9    generally less secured than the home?

10    A.   Yes.

11    Q.   Those areas are easier to access by

12    criminals or other people with improper

13    motivations?

14    A.   Yes, they are.

15    Q.   It's easier for a criminal to steal a gun

16    from someone if they're standing out in their yard

17    as opposed to if they're in their home?

18    A.   I would say yes.

19    Q.   And garages are a feature of homes in

20    Chicago that in your experience on the force are

21    generally much less secure than the home and the

22    target of break-ins or other crime to a much

23    greater degree than is a home?

24    MR. PATTERSON:  Objection, speculation.

54

1    THE WITNESS:  In my experience, yes.

2    BY MR. WORSECK:

3       Q.   In your experience on the force, are you

4    aware of instances in which a homeowner or other

5    citizen on private property, private residential

6    property, for instance standing out in a yard or

7    standing on a porch has used a firearm to

8    intimidate others or to shoot others?

9       A.   Yes.

10      Q.   That sort of intimidation and shooting is

11   very much the same as has and could occur on a

12   public street or public sidewalk?

13      A.   Yes.

14      Q.   You indicated earlier I believe that when

15   a person steps out of their home, whether into

16   their front yard, out into the public way, a

17   sidewalk or a street, they become a much greater

18   target of theft of that firearm being taken from

19   them?

20      A.   I would agree.

21      Q.   And would that concern also exist in the

22   context of people congregating at gun stores or at

23   shooting ranges, say, for instance, in the parking

24   lot of that kind of establishment?

55

1      A.   Definitely possible.

2      Q.   And the kinds of intimidation, escalation

3   and other deadly gun use that you talked about

4   earlier, all of those concerns could exist in the

5   context of a parking lot or other gathering place

6   associated with a gun store or a gun range in

7   Chicago?

8      A.   Yes, it could.

9      Q.   And in your 30 years of experience on the

10   force, you've become aware of instances where

11   intimidation, escalation, and other deadly gun use

12   have occurred out on the public way in Chicago?

13      A.   Yes, I have.

14      Q.   Those same sorts of things could occur --

15   even though Chicago hasn't had gun stores or gun

16   ranges open to the public, those same sorts of

17   things could occur in public meeting spaces or

18   congregation spaces around those establishments?

19      A.   I believe they could.

20      Q.   Are you aware of any instances in which

21   the homes of Chicago police officers have been

22   targeted for the theft of the guns that are

23   expected to be in those homes?

24      A.   I am aware that in the briefing some gang

57

1      Q.   Would you agree that if criminals are

2   willing to break into a law enforcement agent's

3   shooting range to steal guns belonging to a law

4   enforcement agency, criminals would be willing to

5   break into a civilian shooting range and steal

6   weapons that would be stored at that range?

7      A.   Yes.

8      Q.   They would be willing to break into a

9   civilian gun store and steal guns that are stored

10  within that store?

11     A.   Yes.

12     Q.   Chief Williams, the answers you've given

13  here, is it fair to say those are based on your

14  best recollection as you sit here today?

15     A.   Yes, they are.

16     Q.   It's possible that there could be other

17  instances or other evidence or other information

18  that would relate to and support the various

19  answers you've given today or the various subjects

20  you've talked about today that you can't recall or

21  that you're not aware of as you sit here today?

22     A.   That's correct.

23     MR. WORSECK:  I have nothing further.

24

58

1        FURTHER EXAMINATION

2    BY MR. PATTERSON:

3        Q.   I'm going to have few questions here.  You

4    recall Mr. Worseck asked you a number of questions

5    about instances in which gun possession either in

6    the public or in the home could lead to negative

7    consequences including violence, intimidation,

8    escalation of situations.  Do you recall that --

9        A.   Yes.

10       Q.   -- general line of questioning?

11       A.   Yes, I do.

12       Q.   Are you aware of instances in your

13   experience in which -- other than the Chicago

14   police officer that had his gun taken from him that

15   you mentioned where lawfully possessed firearms led

16   to those negative consequences that you described?

17       A.   I cannot recall any others at this time.

18       Q.   And the officer who had his gun taken from

19   him and was unfortunately killed, the person that

20   shot him did not lawfully possess that firearm, did

21   he?

22       A.   No.

23       Q.   And after that situation police officers

24   still carried firearms; is that correct?

59

1    A.   Correct.

2    Q.   And do you recall that you testified that

3    the limitation of one operable firearm per home

4    could reduce the number of suicides, reduce the

5    number of firearms that are used in domestic

6    violence situations and otherwise used for criminal

7    violence within the home?

8    A.   Yes.

9    Q.   Is an assumption of that -- of your

10   testimony that a person who otherwise would want to

11   commit suicide with a firearm or engage in domestic

12   violence or other criminal activity because of the

13   law limiting an individual to one operable firearm

14   per home would abide by that law and not use

15   another firearm that may be in the home?

16   MR. WORSECK:  Objection, vague.

17   THE WITNESS:  That wasn't my assumption.

18   BY MR. PATTERSON:

19   Q.   Okay.

20   A.   Simply the fact that there would be fewer

21   firearms available, and perhaps that person would

22   not know where the one firearm was and that was

23   operable and any other firearm that may have been

24   found would be inoperable which --

60

1    Q.  For a person --

2    MR. WORSECK:  I'm sorry.  Were you finished?

3    THE WITNESS:  -- which would prevent the person

4  from being shot or committing suicide.

5  BY MR. PATTERSON:

6    Q.  For a person that knows where the firearm

7  is and knows the method to render it operable, a

8  firearm that is rendered temporarily inoperable, in

9  your experience would the law limiting an

10  individual to one operable firearm per home deter

11  the person from using that inoperable firearm?

12    MR. WORSECK:  Objection, vague.

13    THE WITNESS:  In my experience and in my

14  training we talk about distance and time.  And so

15  to the extent that if a person was looking for a

16  weapon and trying to render it operable, that might

17  give an opportunity to call 911, give an

18  opportunity to get out of the house.  So, you know,

19  my position would be if those weapons are

20  inoperable, that's valuable time.  That's valuable

21  distance for them to, you know, exit themselves

22  from the situation potentially.  So that's where I

23  was going with that.

24

61

1    BY MR. PATTERSON:

2        Q.   So by rendering a firearm inoperable, your

3    testimony is that it extends the amount of time

4    that would take place between a time would want to

5    use that firearm and when a person could use that

6    firearm?

7        A.   If I'm not mistaken, I think you said the

8    person who knows where the gun is?

9        Q.   Yeah.

10       A.   Okay.  Right.

11       Q.   Okay.  You testified that Chicago police

12   officers have been harmed by guns possessed by

13   people in residences; is that correct?

14       A.   Yes.

15       Q.   I think the record is already clear on

16   this.  I just want to make sure.  You're not aware

17   of any instances in Chicago police officers have

18   been harmed by guns that were lawfully possessed by

19   people in residences, are you?

20       MR. WORSECK:  Objection, vague, calls for

21   speculation.

22       THE WITNESS:  Not that I can recall.

23   BY MR. PATTERSON:

24       Q.   You testified I believe that the risk of

62

1    theft of firearms is greater when a person is

2    carrying a firearm outside the home versus when

3    they are carrying it within their home; is that

4    correct?

5        A.   No, I don't think that's -- would you

6    repeat that.

7        Q.   Did you testify that the risk of a firearm

8    being stolen or firearm theft is greater when the

9    person carrying that firearm is outside their home

10   than when they're inside of their home?

11       A.   I believe that's correct.

12       Q.   And what do you base that testimony on?

13       A.   The availability of the firearm being

14   outside of the house, being on the public way.  And

15   I don't want to keep harping on, you know,

16   instances with police officers, you know, but when

17   people are willing -- willing to take weapons from

18   police officers and you're putting more weapons in

19   the hands of people on the street, there is greater

20   chance for intimidation, escalation, and there's

21   nothing to keep bad guys from overcoming someone,

22   targeting someone, stalking someone to the point

23   they can get the drop on them just as they did with

24   the police officer.

1      Q.   Do you have any empirical evidence that

2    the risk of theft of a firearm is greater outside

3    of the home than it is inside of the home?

4      MR. WORSECK:  Objection, vague.

5      THE WITNESS:  No.

6    BY MR. PATTERSON:

7      Q.   Have you ever studied that question about

8    where the risk of theft of a firearm from a person

9    carrying a firearm outside the home is greater than

10   the risk of theft of a firearm from a person

11   carrying a firearm inside their home?

12     A.   I don't believe so.

13     Q.   You mentioned in your testimony of theft

14   of firearms from the Harvey Police Department

15   shooting range; is that correct?

16     A.   Correct.

17     Q.   After that incident did the Chicago Police

18   Department still operate shooting ranges?

19     A.   Shooting ranges?

20     Q.   Firearms training ranges?

21     A.   Within the police department facilities?

22     Q.   Yes.

23     A.   Yes.

24     Q.   Are you aware in your experience as a

64

1    Chicago police officer of any instance when a

2    citizen has used a firearm to avert an attempted

3    crime against that person's person or property?

4        MR. WORSECK:  Objection, vague.

5        THE WITNESS:  I believe so, yes.

6    BY MR. PATTERSON:

7        Q.   So you are aware of such instances?

8        A.   Yes.

9        Q.   Isn't it true that police officers will

10   not always be able to respond to a situation in

11   order to prevent violence or injury to a person,

12   person's person or property?

13       MR. WORSECK:  Objection, vague.

14       THE WITNESS:  A little bit more clarity?

15   BY MR. PATTERSON:

16       Q.   Yeah.  Isn't it true that the Chicago

17   Police Department cannot always respond to a

18   situation quickly enough to prevent injury to a

19   person's person or property?

20       MR. WORSECK:  Same objection.

21       THE WITNESS:  Yes.

22       MR. PATTERSON:  I think that's all I have.

23       I did want to ask, Drew, is the City prepared

24   to go forth with a 30(b)(6) deposition we have

65

1    noticed for today?

2        MR. WORSECK:  We are not in a position to do

3    that as I indicated yesterday via my email to you.

4    We are not in a position to do that.

5        MR. PATTERSON:  I just wanted to put on the

6    record that the City agreed to produce a witness on

7    that topic in January.  The City proposed a date

8    for that topic to be today.  We agreed, traveled

9    here in reliance on that proposal by the City,

10   issued a notice over ten days ago that is still

11   valid that the City is unilaterally informed us

12   that they're not going to fulfill.  We have not

13   revoked that notice.  I just wanted to put that on

14   the record.

15       MR. WORSECK:  And as I indicated yesterday,

16   Pete, we were perfectly willing to produce

17   Chief Williams pursuant to his individual notice

18   which we did today.  I assume that plaintiffs still

19   would want to have taken his deposition.  So unless

20   you're saying you wouldn't have traveled here to

21   take his deposition at all, then I don't know that

22   the travel issue is germane.

23       MR. PATTERSON:  Okay.

24       MR. WORSECK:  We'll reserve signature.

68

1    STATE OF ILLINOIS )

2               ) SS:

3    COUNTY OF C O O K )

4         I, Jana E. Cox, a Notary Public within and

5    for the County of Cook and State of Illinois, do

6    hereby certify that heretofore, to-wit, on the

7    29th day of April, 2011, personally appeared before

8    me EUGENE WILLIAMS, a witness in a certain cause

9    now pending and undetermined in the United States

10   District Court, Northern District of Illinois,

11   Eastern Division, wherein ILLINOIS ASSOCIATION OF

12   FIREARMS is the Plaintiff and CITY OF CHICAGO is

13   the Defendant.

14        I further certify that the said EUGENE

15   WILLIAMS was by me first duly sworn to testify the

16   truth, the whole truth, and nothing but the truth

17   in the cause aforesaid; that the testimony then

18   given by said witness was reported stenographically

19   by me in the presence of said witness and

20   afterwards reduced to typewriting by Computer-Aided

21   Transcription, and the foregoing is a true and

22   correct transcript of the testimony so given by

23   said witness as aforesaid.

24        I further certify that the signature to

69

1    the foregoing deposition was not waived by counsel

2    for the respective parties.

3        I further certify that the taking of this

4    deposition was pursuant to Notice and that there

5    were present at the deposition the attorneys

6    hereinbefore mentioned.

7        I further certify that I am not counsel

8    for nor in any way related to the parties to this

9    suit, nor am I in any way interested in the outcome

10   thereof.

11       IN TESTIMONY WHEREOF:  I have hereunto set

12   my hand and affixed my notarial seal this 17th day

13   of May, 2011.

14

15

16

17   ------------

18   NOTARY PUBLIC, COOK COUNTY, ILLINOIS

19

20

21

22

23

24

# EXHIBIT 16

# WOULD BANNING FIREARMS REDUCE MURDER AND SUICIDE?

## A REVIEW OF INTERNATIONAL AND SOME DOMESTIC EVIDENCE

### DON B. KATES* AND GARY MAUSER**

INTRODUCTION ............................................................650
I.   VIOLENCE: THE DECISIVENESS OF
     SOCIAL FACTORS...................................................660
II.  ASKING THE WRONG QUESTION ..........................662
III. DO ORDINARY PEOPLE MURDER?.......................665
IV.  MORE GUNS, *LESS* CRIME?...................................670
V.   GEOGRAPHIC, HISTORICAL AND DEMOGRAPHIC
     PATTERNS..............................................................673
     A.  Demographic Patterns ..................................676
     B.  Macro-historical Evidence: From the
         Middle Ages to the 20th Century .................678
     C.  Later and More Specific Macro-Historical
         Evidence..........................................................684
     D.  Geographic Patterns within Nations ..........685

    * Don B. Kates (LL.B., Yale, 1966) is an American criminologist and constitutional lawyer associated with the Pacific Research Institute, San Francisco. He may be contacted at dbkates@earthlink.net; 360-666-2688; 22608 N.E. 269th Ave., Battle Ground, WA 98604.

    ** Gary Mauser (Ph.D., University of California, Irvine, 1970) is a Canadian criminologist and university professor at Simon Fraser University, Burnaby, BC Canada. He may be contacted at www.garymauser.net, mauser@sfu.ca, and 604-291-3652. We gratefully acknowledge the generous contributions of Professor Thomas B. Cole (University of North Carolina at Chapel Hill, Social Medicine and Epidemiology); Chief Superintendent Colin Greenwood (West Yorkshire Constabulary, ret.); C.B. Kates; Abigail Kohn (University of Sydney, Law); David B. Kopel (Independence Institute); Professor Timothy D. Lytton (Albany Law School); Professor William Alex Pridemore (University of Oklahoma, Sociology); Professor Randolph Roth (Ohio State University, History); Professor Thomas Velk (McGill University, Economics and Chairman of the North American Studies Program); Professor Robert Weisberg (Stanford Law School); and John Whitley (University of Adelaide, Economics). Any merits of this paper reflect their advice and contributions; errors are entirely ours.

  E.  Geographic Comparisons: European
      Gun Ownership and Murder Rates ..........687
  F.  Geographic Comparisons: Gun-Ownership
      and Suicide Rates ...........................................690
CONCLUSION ...............................................................693

## INTRODUCTION

International evidence and comparisons have long been offered as proof of the mantra that more guns mean more deaths and that fewer guns, therefore, mean fewer deaths.[1] Unfortunately, such discussions are all too often been afflicted by misconceptions and factual error and focus on comparisons that are unrepresentative. It may be useful to begin with a few examples. There is a compound assertion that (a) guns are uniquely available in the United States compared with other modern developed nations, which is why (b) the United States has by far the highest murder rate. Though these assertions have been endlessly repeated, statement (b) is, in fact, false and statement (a) is substantially so.

Since at least 1965, the false assertion that the United States has the industrialized world's highest murder rate has been an artifact of politically motivated Soviet minimization designed to hide the true homicide rates.[2] Since well before that date, the Soviet Union

---

1. *See, e.g.*, JOHN GODWIN, MURDER USA: THE WAYS WE KILL EACH OTHER 281 (1978) ("Areas with the highest proportion of gun owners also boast the highest homicide ratios; those with the fewest gun owners have the lowest."); N. PETE SHIELDS, GUNS DON'T DIE, PEOPLE DO 64 (1981) (quoting and endorsing an English academic's remark: "We cannot help but believe that America ought to share the basic premise of our gun legislation—that the availability of firearms breeds violence."); Janice Somerville, *Gun Control as Immunization*, AM. MED. NEWS, Jan. 3, 1994, at 9 (quoting public health activist Katherine Christoffel, M.D.: "Guns are a virus that must be eradicated . . . . Get rid of the guns, get rid of the bullets, and you get rid of the deaths."); Deane Calhoun, *From Controversy to Prevention: Building Effective Firearm Policies*, INJ. PROTECTION NETWORK NEWSL., Winter 1989–90, at 17 ("[G]uns are not just an inanimate object [sic], but in fact are a social ill."); *see also* WENDY CUKIER & VICTOR W. SIDEL, THE GLOBAL GUN EPIDEMIC: FROM SATURDAY NIGHT SPECIALS TO AK-47S (2006); Susan Baker, *Without Guns, Do People Kill People?* 75 AM. J. PUB. HEALTH 587 (1985); Paul Cotton, *Gun-Associated Violence Increasingly Viewed as Public Health Challenge*, 267 J. AM. MED. ASS'N 1171 (1992); Diane Schetky, *Children and Handguns: A Public Health Concern*, 139 AM. J. DIS. CHILD. 229, 230 (1985); Lois A. Fingerhut & Joel C. Kleinman, *International and Interstate Comparisons of Homicides Among Young Males*, 263 J. AM. MED. ASS'N 3292, 3295 (1990).

2. *See* William Alex Pridemore, *Using Newly Available Homicide Data to Debunk Two Myths About Violence in an International Context: A Research Note*, 5 HOMICIDE STUD. 267 (2001).

possessed extremely stringent gun controls[3] that were effectuated by a police state apparatus providing stringent enforcement.[4] So successful was that regime that few Russian civilians now have firearms and very few murders involve them.[5] Yet, manifest success in keeping its people disarmed did not prevent the Soviet Union from having far and away the highest murder rate in the developed world.[6] In the 1960s and early 1970s, the gun-less Soviet Union's murder rates paralleled or generally exceeded those of gun-ridden America. While American rates stabilized and then steeply declined, however, Russian murder increased so drastically that by the early 1990s the Russian rate was three times higher than that of the United States. Between 1998-2004 (the latest figure available for Russia), Russian murder rates were nearly four times higher than American rates. Similar murder rates also characterize the Ukraine, Estonia, Latvia, Lithuania, and various other now-independent European nations of the former U.S.S.R.[7] Thus, in the United States and the former Soviet Union transitioning into current-day Russia, "homicide results suggest that where

---

3. *See* GEORGE NEWTON & FRANKLIN ZIMRING, FIREARMS AND VIOLENCE IN AMERICAN LIFE: A STAFF REPORT SUBMITTED TO THE NATIONAL COMMISSION ON THE CAUSES AND PREVENTION OF VIOLENCE 119 & n.3 (1970).

4. Russian law flatly prohibits civilian possession of handguns and limits long guns to licensed hunters. *Id.* For more on the stringency of enforcement, see Raymond Kessler, *Gun Control and Political Power*, 5 LAW & POL'Y Q. 381, 389 (1983), and Randy E. Barnett & Don B. Kates, *Under Fire: The New Consensus on the Second Amendment*, 45 EMORY L. J. 1139, 1239 (1996) (noting an unusual further element of Soviet gun policy: the Soviet Army adopted unique firearm calibers so that, even if its soldiers could not be prevented from returning with foreign gun souvenirs from foreign wars, ammunition for them would be unavailable in the Soviet Union).

5. *See* Pridemore, *supra* note 2, at 271.

6. Russian homicide data given in this article (for years 1965–99) were kindly supplied us by Professor Pridemore from his research in Russian ministry sources (on file with authors). *See also infra* Table 1 (reporting Russian homicide data for 2002).

7. The highest U.S. homicide rate ever reported was 10.5 per 100,000 in 1980. *See* Jeffery A. Miron, *Violence, Guns, and Drugs: A Cross-Country Analysis*, 44 J.L. & ECON. 615, 624–25 tbl.1 (2001). As of 2001, the rate was below 6. *Id.* The latest rates available for the Ukraine, Belarus, and other former Soviet nations in Europe come from the mid-1990s, when all were well above 10 and most were 50% to 150% higher. *Id.*

Note that the U.S. rates given above are rates reported by the FBI. There are two different sources of U.S. murder rates. The FBI murder data is based on reports it obtains from police agencies throughout the nation. These data are significantly less complete than the alternative (used in this article unless otherwise explicitly stated) rates of the U.S. Public Health Service, which are derived from data collected from medical examiners' offices nationwide. Though the latter data are more comprehensive, and the Public Health Service murder rate is slightly higher, they have the disadvantage of being slower to appear than the FBI homicide data.

guns are scarce other weapons are substituted in killings."[8] While American gun ownership is quite high, Table 1 shows many other developed nations (e.g., Norway, Finland, Germany, France, Denmark) with high rates of gun ownership. These countries, however, have murder rates as low or lower than many developed nations in which gun ownership is much rarer. For example, Luxembourg, where handguns are totally banned and ownership of any kind of gun is minimal, had a murder rate nine times higher than Germany in 2002.[9]

*Table 1: European Gun Ownership and Murder Rates*
(rates given are per 100,000 people and in descending order)

| Nation | Murder Rate | Rate of Gun Ownership |
|--------|-------------|----------------------|
| Russia | 20.54 [2002] | 4,000 |
| Luxembourg | 9.01 [2002] | c. 0 |
| Hungary | 2.22 [2003] | 2,000 |
| Finland | 1.98 [2004] | 39,000 |
| Sweden | 1.87 [2001] | 24,000 |
| Poland | 1.79 [2003] | 1,500 |
| France | 1.65 [2003] | 30,000 |
| Denmark | 1.21 [2003] | 19,000 |
| Greece | 1.12 [2003] | 11,000 |
| Switzerland | 0.99 [2003] | 16,000 |
| Germany | 0.93 [2003] | 30,000 |
| Norway | 0.81 [2001] | 36,000 |
| Austria | 0.80 [2002] | 17,000 |

Notes: This table covers all the Continental European nations for which the two data sets given are both available. In every case, we have given the homicide data for 2003 or the closest year thereto because that is the year of the publication from which the gun ownership data are taken. Gun ownership data comes from GRADUATE INSTITUTE OF INTERNATIONAL STUDIES, SMALL ARMS SURVEY 64 tbl.2.2, 65 tbl.2.3 (2003).

The homicide rate data comes from an annually published report, CANADIAN CENTRE FOR JUSTICE STATISTICS, HOMICIDE IN CANADA, JURISTAT, for the years 2001–2004. Each year's report gives homicide statistics for a dozen or so foreign nations in a section labeled "Homicide Rates for Selected Countries." This section of the reports gives no explana-

---

8. GARY KLECK, TARGETING GUNS: FIREARMS AND THEIR CONTROL 20 (1997) (discussing patterns revealed by studies in the United States).

9. Our assertions as to the legality of handguns are based on COMM'N ON CRIME PREVENTION & CRIM. JUSTICE, U.N. ECON. & SOC. COUNCIL, UNITED NATIONS INTERNATIONAL STUDY ON FIREARMS REGULATION 26, tbl. 2-1 (1997 draft).

tion of why it selects the various nations whose homicide statistics it covers. Also without explanation, the nations covered differ from year to year. Thus, for instance, murder statistics for Germany and Hungary are given in all four of the pamphlets (2001, 2002, 2003, 2004), for Russia in three years (2001, 2002, and 2004), for France in two years (2001 and 2003), and for Norway and Sweden in only one year (2001).

The same pattern appears when comparisons of violence to gun ownership are made within nations. Indeed, "data on firearms ownership by constabulary area in England," like data from the United States, show "a *negative* correlation,"[10] that is, "where firearms are most dense violent crime rates are lowest, and where guns are least dense violent crime rates are highest."[11] Many different data sets from various kinds of sources are summarized as follows by the leading text:

> [T]here is no consistent significant positive association between gun ownership levels and violence rates: across (1) time within the United States, (2) U.S. cities, (3) counties within Illinois, (4) country-sized areas like England, U.S. states, (5) regions of the United States, (6) nations, or (7) population subgroups . . . .[12]

A second misconception about the relationship between firearms and violence attributes Europe's generally low homicide

---

10. JOYCE LEE MALCOLM, GUNS AND VIOLENCE: THE ENGLISH EXPERIENCE 204 (2002).

11. Hans Toch & Alan J. Lizotte, *Research and Policy: The Case for Gun Control, in* PSYCHOLOGY & SOCIAL POLICY 223, 232 (Peter Suedfeld & Philip E. Tetlock eds., 1992); *see also id.* at 234 & n.10 ("[T]he fact that national patterns show little violent crime where guns are most dense implies that guns do not elicit aggression in any meaningful way. . . . Quite the contrary, these findings suggest that high saturations of guns in places, or something correlated with that condition, inhibit illegal aggression.").

Approaching the matter from a different direction, the earliest data (nineteenth century on) reveals that the American jurisdictions with the most stringent gun controls are in general the ones with the highest murder rates. Conversely, American states with homicide rates as low as Western Europe's have high gun ownership, and impose no controls designed to deny guns to law-abiding, responsible adults. Many possible reasons may be offered for these two facts, but none suggests that gun control reduces murder.

For examination of a wide variety of studies finding little evidence in support of the efficacy of gun controls in reducing violence, see JAMES B. JACOBS, CAN GUN CONTROL WORK? 111–20 (2002); KLECK, *supra* note 8, at 351–77; JOHN R. LOTT, JR., MORE GUNS, LESS CRIME: UNDERSTANDING CRIME AND GUN CONTROL LAWS 19–20 (1998); JAMES D. WRIGHT ET AL., UNDER THE GUN: WEAPONS, CRIME AND VIOLENCE IN AMERICA 307–08 (1983); Matthew R. DeZee, *Gun Control Legislation: Impact and Ideology*, 5 LAW & POL'Y Q. 367, 369–71 (1983).

12. KLECK, *supra* note 8, at 22-23.

rates to stringent gun control. That attribution cannot be accurate since murder in Europe was at an all-time low *before* the gun controls were introduced.[13] For instance, virtually the only English gun control during the nineteenth and early twentieth centuries was the practice that police patrolled without guns. During this period gun control prevailed far less in England or Europe than in certain American states which nevertheless had—and continue to have—murder rates that were and are comparatively very high.[14]

In this connection, two recent studies are pertinent. In 2004, the U.S. National Academy of Sciences released its evaluation from a review of 253 journal articles, 99 books, 43 government publications, and some original empirical research. It failed to identify any gun control that had reduced violent crime, suicide, or gun accidents.[15] The same conclusion was reached in 2003 by the U.S. Centers for Disease Control's review of then-extant studies.[16]

Stringent gun controls were not adopted in England and Western Europe until after World War I. Consistent with the outcomes of the recent American studies just mentioned, these strict controls did not stem the general trend of ever-growing violent crime throughout the post-WWII industrialized world including the United States and Russia. Professor Malcolm's study of English gun law and violent crime summarizes that

---

13. Barnett & Kates, *supra* note 4, at 138–42.

14. In the period between 1900 and 1935, Arkansas, Hawaii, Michigan, Missouri, New Jersey, New York, North Carolina, Oregon, and South Carolina adopted laws variously requiring a license to own or buy a handgun or banning handgun purchase altogether, and "Saturday Night Special"-type bans existed in Tennessee, Arkansas, and various other Southern states. Don B. Kates, Jr., *Toward a History of Handgun Prohibition in the United States*, *in* RESTRICTING HANDGUNS: THE LIBERAL SKEPTICS SPEAK OUT 7, 14–15 (Don B. Kates, Jr. ed., 1979).

15. CHARLES F. WELLFORD ET AL., NAT'L RESEARCH COUNCIL, FIREARMS AND VIOLENCE: A CRITICAL REVIEW 6–10 (2004). It is perhaps not amiss to note that the review panel, which was set up during the Clinton Administration, was composed almost entirely of scholars who, to the extent their views were publicly known before their appointments, favored gun control.

16. Task Force on Community Preventive Servs., Ctrs. for Disease Control, *First Reports Evaluating the Effectiveness of Strategies for Preventing Violence: Firearms Laws*, 52 MORTALITY & MORBIDITY WKLY. REP. (RR-14 RECOMMENDATIONS & REP.) 11, 16 (2003), *available at* http://www.cdc.gov/mmwr/preview/mmwrhtml/rr5214a2.htm. The CDC is vehemently anti-gun and interpreted its results to show not that the "more guns equal more death" mantra is erroneous, but only that the scores of studies it reviewed were inconclusively done.

nation's nineteenth and twentieth century experience as follows:

> The peacefulness England used to enjoy was not the result of strict gun laws. When it had no firearms restrictions [nineteenth and early twentieth century] England had little violent crime, while the present extraordinarily stringent gun controls have not stopped the increase in violence or even the increase in armed violence.[17]
>
> Armed crime, never a problem in England, has now become one. Handguns are banned but the Kingdom has millions of illegal firearms. Criminals have no trouble finding them and exhibit a new willingness to use them. In the decade after 1957, the use of guns in serious crime increased a hundredfold.[18]

In the late 1990s, England moved from stringent controls to a complete ban of all handguns and many types of long guns. Hundreds of thousands of guns were confiscated from those owners law-abiding enough to turn them in to authorities. Without suggesting this caused violence, the ban's ineffectiveness was such that by the year 2000 violent crime had so increased that England and Wales had Europe's highest violent crime rate, far surpassing even the United States.[19] Today, English news media headline violence in terms redolent of the doleful, melodramatic language that for so long characterized American news reports.[20] One aspect of England's recent ex-

---

17. MALCOLM, *supra* note 10, at 219.

18. *Id.* at 209.

19. *See* Esther Bouten et al., *Criminal Victimization in Seventeen Industrialized Countries*, *in* CRIME VICTIMIZATION IN COMPARATIVE PERSPECTIVE: RESULTS FROM THE INTERNATIONAL CRIME VICTIMS SURVEY, 1989–2000 at 13, 15–16 (Paul Nieuwbeerta ed., 2002). The surveys involved were conducted under the auspices of the governments of each nation and the general supervision of the University of Leiden and the Dutch Ministry of Justice.

20. *See, e.g., Gun Crime Growing "Like Cancer,"* BBC NEWS, May 21, 2003, http://news.bbc.co.uk/1/hi/England/3043701.stm; David Bamber, *Gun Crime Trebles as Weapons and Drugs Flood British Cities*, TELEGRAPH ONLINE (London), Feb. 27, 2002, http://www.telegraoh.co.uk/news/main.jhtml?xml=/news/2002/02/24/nguns24.xml; Jason Bennetto, *Firearms Amnesty to Tackle Surge in Gun Crime*, INDEPENDENT (London), Dec. 27, 2002, at 1; Ian Burrell, *Police Move to Tackle Huge Rise in Gun Crime*, INDEPENDENT (London), Jan. 15, 2001, at 3; Daniel Foggo & Carl Fellstrom, *"We Are Reeling with the Murders, We Are in a Crisis with Major Crime,"* SUNDAY TELEGRAPH (London), Mar. 13, 2005, at 4; Johann Hari, *The British Become Trigger Happy*, NEW STATESMAN (London), Nov. 5, 2001, at 35; Philip Johnston, *Gun Crime Rises Despite Dunblane Pistol Ban*, DAILY TELEGRAPH (London), Jul. 17, 2001, at 05; David Leppard & Rachel Dobson, *Murder Rate Soars to Highest for a Century*, SUNDAY TIMES (Lon-

perience deserves note, given how often and favorably advocates have compared English gun policy to its American counterpart over the past 35 years.[21] A generally unstated issue in this notoriously emotional debate was the effect of the Warren Court and later restrictions on police powers on American gun policy. Critics of these decisions pointed to soaring American crime rates and argued simplistically that such decisions caused, or at least hampered, police in suppressing crime. But to some supporters of these judicial decisions, the example of England argued that the solution to crime was to restrict guns, not civil liberties. To gun control advocates, England, the cradle of our liberties, was a nation made so peaceful by strict gun control that its police did not even need to carry guns. The United States, it was argued, could attain such a desirable situation by radically reducing gun ownership, preferably by banning and confiscating handguns.

The results discussed earlier contradict those expectations. On the one hand, despite constant and substantially increasing gun ownership, the United States saw progressive and dramatic reductions in criminal violence in the 1990s. On the other hand, the same time period in the United Kingdom saw a constant and dramatic increase in violent crime to which England's response was ever-more drastic gun control including, eventually, banning and confiscating all handguns and many types of long guns.[22] Nevertheless, criminal violence rampantly increased so that by 2000 England surpassed the United States to become one of the developed world's most violence-ridden nations.

---

don), Oct. 13, 2002, at 1; Adam Mitchell, *Gun Killings Double as Police Claim Progress*, DAILY TELEGRAPH (London), Aug. 17, 2001, at 13; John Steele, *Police Fear a New Crime Wave as School-Age Muggers Graduate to Guns*, DAILY TELEGRAPH (London), Jan. 3, 2002, at 04; Jon Ungoed-Thomas, *Killings Rise as 3m Illegal Guns Flood Britain*, SUN-DAY TIMES (London), Jan. 16, 2000; Peter Woolrich, *Britain's Tough Gun Control Laws Termed Total Failure: Land of Hope and Gunrunning*, PUNCH MAG., May 3, 2000.

21. *See, e.g.*, CARL BAKAL, THE RIGHT TO BEAR ARMS 10–11, 31, 279 (1966); RAMSEY CLARK, CRIME IN AMERICA 104–05, 109 (1970); AMITAI ETZIONI & RICHARD REMP, TECHNOLOGICAL SHORTCUTS TO SOCIAL CHANGE 136 (1973); Nat'l Coalition to Ban Handguns, A Shooting Gallery Called America (undated, unpaginated pamphlet); SHIELDS, *supra* note 1, at 63–64; Irwin Bloch, *Gun Control Would Reduce Crime*, *reprinted in* Would Gun Control Reduce Crime 197 (David Bender ed., 1989); Robert S. Drinan, *Banning Handguns Would Reduce Crime*, *reprinted in* GUNS & CRIME 45–46 (Tarara Roleff ed., 1999).

22. MALCOLM, *supra* note 10, at 164–216. We should clarify that the twin trends toward more violent crime and more gun control began long before the 1990s. *See id.*

To conserve the resources of the inundated criminal justice system, English police no longer investigate burglary and "minor assaults."[23] As of 2006, if the police catch a mugger, robber, or burglar, or other "minor" criminal in the act, the policy is to release them with a warning rather than to arrest and prosecute them.[24] It used to be that English police vehemently opposed the idea of armed policing. Today, ever more police are being armed. Justifying the assignment of armed squads to block roads and carry out random car searches, a police commander asserts: "It is a massive deterrent to gunmen if they think that there are going to be armed police."[25] How far is that from the rationale on which 40 American states have enacted laws giving qualified, trained citizens the right to carry concealed guns? Indeed, news media editorials have appeared in England arguing that civilians should be allowed guns for defense.[26] There is currently a vigorous controversy over proposals (which the Blair government first endorsed but now opposes) to amend the law of self-defense to protect victims from prosecution for using deadly force against burglars.[27]

The divergence between the United States and the British Commonwealth became especially pronounced during the

---

23. Daniel Foggo, *Don't Bother About Burglary, Police Told*, SUNDAY TELEGRAPH (LONDON), Jan. 12, 2003, at 1 ("Police have been ordered not to bother investigating crimes such as burglary, vandalism and assaults unless evidence pointing to the culprits is easily available, The Sunday Telegraph can reveal. Under new guidelines, officers have been informed that only "serious" crimes, such as murder, rape or so-called hate crimes, should be investigated as a matter of course. In all other cases, unless there is immediate and compelling evidence, such as fingerprints or DNA material, the crime will be listed for no further action.").

24. Steve Doughty, *Let Burglars Off With Caution Police Told*, DAILY MAIL (London), Apr. 3, 2006, at 4.

25. Matthew Beard, *Armed Police to Man Checkpoints in London as Drug-Related Crime Soars*, INDEPENDENT (London), Sept. 7, 2002, at 2.

26 *See* Simon Heffer, *If the State Fails Us, We Must Defend Ourselves*, TELEGRAPH ONLINE (London), Feb. 24, 2002, http://www.telegraph.co.uk/opinion/main.jhtml?xml=/opinion/2002/02/24/do2401.xml; *see also* Ian Bell, *Dublane Made Us All Think About Gun Control . . . So What Went Wrong?*, SUNDAY HERALD (Scotland), Feb. 24, 2007, http://www.sundayherald.com/oped/opinion/display.var.1217778.0.dunblane_made _us_all_think_about_gun_control_so_what_went_wrong.php; Comment, *The Night My Daughter Was Stabbed—And My Liberal Instincts Died*, DAILY MAIL (London), Mar. 5, 2007, http://www.dailymail.co.uk/pages/live/femail/article.html?in_ar-ticle_ id=440318&in_page_id=1766&ito=1490.

27. *See* Melissa Kite, *Tories Launch Bill to Give Householders the Power to Tackle Intruders*, SUNDAY TELEGRAPH (London), Dec. 26, 2004, at 4; *see also* Renee Lerner, *The Worldwide Popular Revolt Against Proportionality in Self-Defense Law*, 2 J.L. ECON. & POL'Y (2007).

1980s and 1990s. During these two decades, while Britain and the Commonwealth were making lawful firearm ownership increasingly difficult, more than 25 states in the United States passed laws allowing responsible citizens to carry concealed handguns. There are now 40 states where qualified citizens can obtain such a handgun permit.[28] As a result, the number of U.S. citizens allowed to carry concealed handguns in shopping malls, on the street, and in their cars has grown to 3.5 million men and women.[29] Economists John Lott and David Mustard have suggested that these new laws contributed to the drop in homicide and violent crime rates. Based on 25 years of correlated statistics from all of the more than 3,000 American counties, Lott and Mustard conclude that adoption of these statutes has deterred criminals from confrontation crime and caused murder and violent crime to fall faster in states that adopted this policy than in states that did not.[30]

---

28. In March 2006, Kansas and Nebraska became the 39th and 40th states, respectively, to pass "shall issue" concealed carry legislation. In Kansas, the state legislature voted to overturn the governor's veto of the bipartisan legislation. *Kansas House Overrides Concealed-Guns-Bill Veto*, DESERET MORNING NEWS, Mar. 24, 2006. In Nebraska, the governor signed the bill as passed by the state legislature. Kevin O'Hanlon, *Concealed-Weapons Bill Adopted*, LINCOLN JOURNAL STAR, Mar. 31, 2006.

29. Don Kates, *The Limited Importance of Gun Control from a Criminological Perspective, in* SUING THE GUN INDUSTRY: A BATTLE AT THE CROSSROADS OF GUN CONTROL AND MASS TORTS 62, 64 (Timothy D. Lytton ed., 2005).

30. *See* John R. Lott Jr. & David B. Mustard, *Crime, Deterrence, and Right-to-Carry Concealed Handguns*, 26 J. LEGAL STUD. 1, 1 (1997); *see also* JOHN R. LOTT, JR., MORE GUNS, LESS CRIME 19 (2d. ed. 2000). This conclusion is vehemently rejected by anti-gun advocates and academics who oppose armed self-defense. *See, e.g.,* Albert W. Alschuler, *Two Guns, Four Guns, Six Guns, More Guns: Does Arming the Public Reduce Crime?*, 31 VAL. U. L. REV. 365, 366 (1997); Ian Ayres & John J. Donohue III, *Shooting Down the 'More Guns, Less Crime' Hypothesis*, 55 STAN. L. REV. 1193, 1197 (2003); Dan A. Black & Daniel S. Nagin, *Do Right-to-Carry Laws Deter Violent Crime?*, 27 J. LEGAL STUD. 209, 209 (1998); Franklin Zimring & Gordon Hawkins, *Concealed Handguns: The Counterfeit Deterrent*, RESPONSIVE COMMUNITY, Spring 1997, at 46; Daniel W. Webster, *The Claims That Right-to-Carry Laws Reduce Violent Crime Are Unsubstantiated* (Johns Hopkins Center for Gun Policy and Research, 1997).

Several critics have now replicated Lott's work using additional or different data, additional control variables, or new or different statistical techniques they deem superior to those Lott used. Interestingly, the replications all confirm Lott's general conclusions; some even find that Lott *under*estimated the crime-reductive effects of allowing good citizens to carry concealed guns. *See* Jeffrey A. Miron, *Violence, Guns, and Drugs: A Cross-Country Analysis*, 44 J.L. & ECON. 615 (2001); David B. Mustard, *The Impact of Gun Laws on Police Deaths*, 44 J.L. & ECON. 635 (2001); John R. Lott, Jr. & John E. Whitley, *Safe-Storage Gun Laws: Accidental Deaths, Suicides, and Crime*, 44 J.L. & ECON. 659 (2001); Thomas B. Marvell, *The Impact of Banning Juvenile Gun Possession*, 44 J.L. & ECON. 691 (2001); Jeffrey S. Parker, *Guns, Crime, and Academics: Some Reflections on the Gun Control Debate*, 44 J.L. & ECON. 715 (2001); Bruce L. Benson &

As indicated in the preceding footnote, the notion that more guns reduce crime is highly controversial. What the controversy has obscured from view is the corrosive effect of the Lott and Mustard work on the tenet that more guns equal more murder. As previously stated, adoption of state laws permitting millions of qualified citizens to carry guns has not resulted in more murder or violent crime in these states. Rather, adoption of these statutes has been followed by very significant reductions in murder and violence in these states.

To determine whether this expansion of gun availability caused reductions in violent crime requires taking account of various other factors that might also have contributed to the decline. For instance, two of Lott's major critics, Donohue and Levitt, attribute much of the drop in violent crime that started in 1990s to the legalization of abortion in the 1970s, which they argue resulted in the non-birth of vast numbers of children who would have been disproportionately involved in violent crime had they existed in the 1990s.[31]

The Lott-Mustard studies did not address the Donohue-Levitt thesis. Lott and Mustard did account, however, for two peculiarly American phenomena which many people believed may have been responsible for the 1990s crime reduction: the dramatic increase of the United States prison population and the number of executions. The prison population in the United States tripled during this time period, jumping from approximately 100 prisoners per 100,000 in the late 1970s to more than 300 per 100,000 people in the general population in the early 1990s.[32] In addition, executions in the United States soared

---

Brent D. Mast, *Privately Produced General Deterrence*, 44 J.L. & ECON. 725 (2001); David E. Olson & Michael D. Maltz, *Right-to-Carry Concealed Weapon Laws and Homicide in Large U.S. Counties: The Effect on Weapon Types, Victim Characteristics, and Victim-Offender Relationships*, 44 J.L. & ECON. 747 (2001); Florenz Plassmann & T. Nicolaus Tideman, *Does the Right to Carry Concealed Handguns Deter Countable Crimes? Only a Count Analysis Can Say*, 44 J.L. & ECON. 771 (2001); Carlisle E. Moody, *Testing for the Effects of Concealed Weapons Laws: Specification Errors and Robustness*, 44 J.L. & ECON. 799 (2001); *see also* Florenz Plassman & John Whitley, *Confirming 'More Guns, Less Crime,'* 55 STAN. L. REV. 1313, 1316 (2003). In 2003, Lott reiterated and extended his findings, which were subsequently endorsed by three Nobel laureates. *See* JOHN R. LOTT, JR., THE BIAS AGAINST GUNS (2003).

31. *See* John J. Donohue III & Steven D. Levitt, *The Impact of Legalized Abortion on Crime*, 116 Q. J. ECON. 379 (2001).

32. *See* Bureau of Justice Statistics, Key Facts at a Glance: Incarceration Rate, 1980–2004 (Oct. 23, 2005), http://www.ojp.usdoj.gov/bjs/glance/tables/incrttab.htm, citing ALLEN BECK & PAIGE HARRISON, BUREAU OF JUSTICE STATISTICS, CORRECTIONAL POPULATIONS IN THE UNITED STATES 1997 (2000), *available at*

from approximately 5 per year in the early 1980s to more than 27 per year in the early 1990s.[33] Neither of these trends is reflected in Commonwealth countries.

Although the reason is thus obscured, the undeniable result is that violent crime, and homicide in particular, has plummeted in the United States over the past 15 years.[34] The fall in the American crime rate is even more impressive when compared with the rest of the world. In 18 of the 25 countries surveyed by the British Home Office, violent crime increased during the 1990s.[35] This contrast should induce thoughtful people to wonder what happened in those nations, and to question policies based on the notion that introducing increasingly more restrictive firearm ownership laws reduces violent crime. Perhaps the United States is doing something right in promoting firearms for law-abiding responsible adults. Or perhaps the United States' success in lowering its violent crime rate relates to increasing its prison population or its death sentences.[36] Further research is required to identify more precisely which elements of the United States' approach are the most important, or whether all three elements acting in concert were necessary to reduce violent crimes.

## I. VIOLENCE: THE DECISIVENESS OF SOCIAL FACTORS

One reason the extent of gun ownership in a society does not spur the murder rate is that murderers are not spread evenly throughout the population. Analysis of perpetrator studies shows that violent criminals—especially murderers—"*almost*

---

http://www.ojp.usdoj.gov/bjs/pub/pdf/cpus97.pdf, and ALLEN BECK & PAIGE HARRISON, BUREAU OF JUSTICE STATISTICS, PRISONERS IN 2004 (2005), *available at* http://www.ojp.usdoj.gov/bjs/pub/pdf/p04.pdf.).

33. THOMAS BONCZAR & TRACY L. SNELL, BUREAU OF JUSTICE STATISTICS BULLETIN, CAPITAL PUNISHMENT 2003, (2004), *available at* http://www.ojp.usdoj.gov/bjs/pub/pdf/cp03.pdf.

34. *See generally* FBI, VIOLENT CRIME, http://www.fbi.gov/ucr/05cius/offenses/violent_crime/index.html; FBI, CRIME IN THE UNITED STATES BY VOLUME AND RATE PER 100,000 INHABITANTS, 1986–2005, http://www.fbi.gov/ucr/05cius/data/table_01.html.

35. *See* Gordon Barclay et al., *International Comparisons of Criminal Justice Statistics 1999*, HOME OFFICE STAT. BULL. (Research Development and Statistics, U.K. Home Office, London, U.K.), 2001, *available at* http://www.homeoffice.gov.uk/rds/pdfs/hosb601.pdf.

36. Several recent studies by economists calculate that each execution deters the commission of 19 murders. *See* Cass R. Sunstein & Adrian Vermuele, *Is Capital Punishment Morally Required? Acts, Omissions, and Life-Life Tradeoffs*, 58 STAN. L. REV. 703 (2005).

*uniformly* have a long history of involvement in criminal behavior."[37] So it would not appreciably raise violence if all lawabiding, responsible people had firearms because they are not the ones who rape, rob, or murder.[38] By the same token, violent crime would not fall if guns were totally banned to civilians. As the respective examples of Luxembourg and Russia suggest,[39] individuals who commit violent crimes will either find guns despite severe controls or will find other weapons to use.[40]

Startling as the foregoing may seem, it represents the crossnational norm, not some bizarre departure from it. If the mantra "more guns equal more death and fewer guns equal less death" were true, broad based cross-national comparisons should show that nations with higher gun ownership per capita consistently have more death. Nations with higher gun ownership rates, however, do not have higher murder or suicide rates than those with lower gun ownership. Indeed many high gun ownership nations have much lower murder rates. Consider, for example, the wide divergence in murder rates among Continental European nations with widely divergent gun ownership rates.

The non-correlation between gun ownership and murder is reinforced by examination of statistics from larger numbers of nations across the developed world. Comparison of "homicide and suicide mortality data for thirty-six nations (including the United States) for the period 1990–1995" to gun ownership levels showed "no significant (at the 5% level) association between gun ownership levels and the total homicide rate."[41] Consistent with this is a later European study of data from 21 nations in which "no significant correlations [of gun ownership levels] with total suicide or homicide rates were found."[42]

---

37. *See* Delbert S. Elliott, *Life-Threatening Violence is* Primarily *a Crime Problem: A Focus on Prevention*, 69 COLO. L. REV. 1081, 1089 (1998) (emphasis added).

38. *See infra* Part III.

39. *See supra* notes 3–9 and Table 1.

40. *See supra* Table 1 and *infra* Tables 2–3.

41. KLECK, *supra* note 8, at 254. The study also found no correlation to suicide rates. *Id.*

42. Martin Killias et al., *Guns, Violent Crime, and Suicide in 21 Countries*, 43 CAN. J. CRIMINOLOGY & CRIM. JUST. 429, 430 (2001). It bears emphasis that the authors, who are deeply anti-gun, emphasize the "very strong correlations between the presence of guns in the home and *suicide committed with a gun*"—as if there were some import

## II.   ASKING THE WRONG QUESTION

However unintentionally, the irrelevance of focusing on weaponry is highlighted by the most common theme in the more guns equal more death argument. Epitomizing this theme is a World Health Organization (WHO) report asserting, "The easy availability of firearms has been associated with higher *firearm* mortality rates."[43] The authors, in noting that the presence of a gun in a home corresponds to a higher risk of suicide, apparently assume that if denied firearms, potential suicides will decide to live rather than turning to the numerous alternative suicide mechanisms. The evidence, however, indicates that denying one particular means to people who are motivated to commit suicide by social, economic, cultural, or other circumstances simply pushes them to some other means.[44] Thus, it is not just the murder rate in gun-less Russia that is four times higher than the American rate; the Russian suicide rate is also about four times higher than the American rate.[45]

---

to the death being by gun rather than by hanging, poison, or some other means. *Id.; see also infra* Part III.

43. WORLD HEALTH ORGANIZATION, SMALL ARMS AND GLOBAL HEALTH 11 (2001) (emphasis added). This irrelevancy is endlessly repeated. *See, e.g.*, Wendy Cukier, *Small Arms and Light Weapons: A Public Health Approach*, 9 BROWN J. WORLD AFF. 261, 266, 267 (2002) ("Research has shown that rates of *small arms* death and injury are linked to small arms accessibility . . . . In industrialized countries, studies have shown that accessibility is related to *firearm* death rates . . . . Other approaches have examined the rates of death *from firearms* across regions, cities, high income countries, and respondents to victimization surveys." (emphasis added) (internal citations omitted); *see also* Neil Arya, *Confronting the Small Arms Pandemic* 324 BRITISH MED. J. 990 (2002); E.G. Krug et al., *Firearm-Related Deaths in the United States and 35 Other High and Upper-Middle-Income Countries*, 27 INT'L J. EPIDEMIOLOGY 214 (1988).

44. *See* JACOBS, *supra* note 11, at 120 ("[I]f the Brady Law did have the effect of modestly reducing firearms suicides . . . this effect was completely offset by an increase of the same magnitude in nonfirearm suicide" resulting in the same number of deaths); *see also* KLECK, *supra* note 8, at 265–92 (summarizing and reviewing studies regarding guns and suicide). Indeed, though without noting the significance, the WHO report states that out of sample of 52 countries, "firearms accounted for only one-fifth of all suicides, just ahead of poisoning . . . . [Self-] strangulation, [i.e. hanging] was the most frequently used method of suicide." WORLD HEALTH ORGANIZATION, *supra* note 43, at 3.

45. In 1999, the latest year for which we have Russian data, the American suicide rate was 10.7 per 100,000 people, while the Russian suicide rate was almost 41 per 100,000 people. William Alex Pridemore & Andrew L. Spivak, *Patterns of Suicide Mortality in Russia*, 33 SUICIDE & LIFE-THREATENING BEHAVIOR 132, 133 (2003); Donna L. Hoyert et al., *Deaths: Final Data for 1999*, NAT'L VITAL STAT. REP., Sept. 21, 2001, at 6.

There is no social benefit in decreasing the availability of guns if the result is only to increase the use of other means of suicide and murder, resulting in more or less the same amount of death. Elementary as this point is, proponents of the more guns equal more death mantra seem oblivious to it. One study asserts that Americans are more likely to be shot to death than people in the world's other 35 wealthier nations.[46] While this is literally true, it is irrelevant—except, perhaps to people terrified not of death per se but just death by gunshot. A fact that should be of greater concern—but which the study fails to mention—is that per capita murder *overall* is only half as frequent in the United States as in several other nations where *gun* murder is rarer, but murder by strangling, stabbing, or beating is much more frequent.[47]

Of course, it may be speculated that murder rates around the world would be higher if guns were more available. But there is simply no evidence to support this. Like any speculation, it is not subject to conclusive disproof; but the European data in Table 1 and the studies across 36 and 21 nations already discussed show no correlation of high gun ownership nations and greater murder per capita or lower gun ownership nations and less murder per capita.[48]

To reiterate, the determinants of murder and suicide are basic social, economic, and cultural factors, not the prevalence of some form of deadly mechanism. In this connection, recall that the American jurisdictions which have the highest violent crime rates are precisely those with the most stringent gun controls.[49] This correlation does not necessarily

---

46. *See* Krug et al., *supra* note 42, at 218–19.

47. *Id.* at 216. Two of those nations, Brazil and Estonia, had more than twice the overall murder rates of the United States. David C. Stolinsky, *America: The Most Violent Nation?*, 5 MED. SENTINEL 199, 200 (2000). Readers may question the value of comparing the United States to those particular nations; however, this comparison was first suggested by Krug. Krug et al., *supra* note 43, at 215 (using thirty-six countries, having among the highest GNP per capita as listed in the World Bank's 1994 World Development Report). All we have done is provide full murder rate information for these comparisons.

48. KLECK, *supra* note 8, at 254; Killias et al., *supra* note 41, at 430.

49. *See infra* notes 128-30 and accompanying text. For at least thirty years, gun advocates have echoed in more or less identical terms the observation that twenty percent of American homicide is concentrated in four cities with the nation's most restrictive gun laws. *See Firearms Legislation: Hearing Before the Subcomm. on Crime of the H. Comm. on the Judiciary*, 94th Cong. 2394 (1975) (statement of Neal Knox). In October 2000, the head of a gun advocacy group ridiculed a Handgun Control

prove gun advocates' assertion that gun controls actually encourage crime by depriving victims of the means of self-defense. The explanation of this correlation may be political rather than criminological: jurisdictions afflicted with violent crime tend to severely restrict gun ownership. This, however, does not suppress the crime, for banning guns cannot alleviate the socio-cultural and economic factors that are the real determinants of violence and crime rates.[50]

*Table 2: Murder Rates of European Nations that Ban Handguns as Compared to Their Neighbors that Allow Handguns*
(rates are per 100,000 persons)

| Nation | Handgun Policy | Murder Rate | Year |
|---|---|---|---|
| **A. Belarus** | banned | 10.40 | late 1990s |
| [Neighboring countries with gun law and murder rate data available] | | | |
| Poland | allowed | 1.98 | 2003 |
| Russia | banned | 20.54 | 2002 |
| **B. Luxembourg** | banned | 9.01 | 2002 |
| [Neighboring countries with gun law and murder rate data available] | | | |
| Belgium | allowed | 1.70 | late 1990s |
| France | allowed | 1.65 | 2003 |
| Germany | allowed | 0.93 | 2003 |
| **C. Russia** | banned | 20.54 | 2002 |
| [Neighboring countries with gun law and murder rate data available] | | | |
| Finland | allowed | 1.98 | 2004 |
| Norway | allowed | 0.81 | 2001 |

Notes: This table covers all the European nations for which the information given is available. As in Table 1, the homicide rate data comes from an annually published report, CANADIAN CENTRE FOR JUSTICE STATISTICS, HOMICIDE IN CANADA, JURISTAT.

Once again, we are not arguing that the data in Table 2 shows that gun control *causes* nations to have much higher

---

"scorecard" for its misleading attempts to inversely correlate violent crime rates to the extent of the various states' gun controls. He points out that, in fact, the states with the most restrictive gun laws consistently have higher murder rates than states with less restrictive laws, while those with the least controls had the lowest homicide rates. Larry Pratt, HCI Scorecard (2000), http://gunowners.org/op0042.htm; *see also infra* note 131.

50. It is noteworthy that the correlation between more gun control and more crime seems to hold true in other nations, though much less strikingly than in the United States. *See* Miron, *supra* note 30, at 628.

murder rates than neighboring nations that permit handgun ownership. Rather, we assert a political causation for the observed correlation that nations with stringent gun controls tend to have much higher murder rates than nations that allow guns. The political causation is that nations which have violence problems tend to adopt severe gun controls, but these do not reduce violence, which is determined by basic socio-cultural and economic factors.

The point is exemplified by the conclusions of the premier study of English gun control. Done by a senior English police official as his thesis at the Cambridge University Institute of Criminology and later published as a book, it found (as of the early 1970s), "Half a century of strict controls . . . has ended, perversely, with a far greater use of [handguns] in crime than ever before." [51] The study also states that:

> No matter how one approaches the figures, one is forced to the rather startling conclusion that the use of firearms in crime was very much less [in England before 1920] when there were no controls of any sort and when anyone, convicted criminal or lunatic, could buy any type of firearm without restriction.[52]

Of course the point of this analysis is not that the law should allow lunatics and criminals to own guns. The point is that violence will be rare when the basic socio-cultural and economic determinants so dictate; and conversely, crime will rise in response to changes in those determinants—without much regard to the mere availability of some particular weaponry or the severity of laws against it.

### III.   DO ORDINARY PEOPLE MURDER?

The "more guns equal more death" mantra seems plausible only when viewed through the rubric that murders mostly involve ordinary people who kill because they have access to a firearm when they get angry. If this were true, murder might well increase where people have ready access to firearms, but the available data provides no such correlation. Nations and

---

51. COLIN GREENWOOD, FIREARMS CONTROL: A STUDY OF ARMED CRIME AND FIREARMS CONTROL IN ENGLAND AND WALES 243 (1972).

52. *Id.*

areas with more guns per capita do not have higher murder rates than those with fewer guns per capita.[53]

Nevertheless, critics of gun ownership often argue that a "gun in the closet to protect against burglars will most likely be used to shoot a spouse in a moment of rage . . . . *The problem is you and me—law-abiding folks;*"[54] that banning handgun possession only for those with criminal records will "fail to protect us from the most likely source of handgun murder: ordinary citizens;"[55] that "most gun-related homicides . . . are the result of impulsive actions taken by individuals *who have little or no criminal background* or who are known to the victims;"[56] that "the majority of firearm homicide[s occur] . . . not as the result of criminal activity, but because of arguments between people who know each other;"[57] that each year there are thousands of gun murders "by law-abiding citizens who might have *stayed law-abiding* if they had not possessed firearms."[58]

These comments appear to rest on no evidence and actually contradict facts that have so uniformly been established by homicide studies dating back to the 1890s that they have become "criminological axioms."[59] Insofar as studies focus on perpetrators, they show that neither a majority, nor many, nor virtually any murderers are ordinary "law-abiding citizens."[60] Rather, almost all murderers are extremely aberrant individuals with life histories of violence, psychopathology, substance abuse, and other dangerous behaviors. "The vast majority of persons involved in life-threatening violence have a long criminal record with many prior contacts with the justice system."[61] "Thus homicide—[whether] of a

---

53. *See supra* Tables 1–2 and notes 10–15; *see infra* Table 3 and notes 125–127.

54. David Kairys, *A Carnage in the Name of Freedom*, PHILADELPHIA INQUIRER, Sept. 12, 1988, at A15 (emphasis added), *quoted in* Frank J. Vandall, *A Preliminary Consideration of Issues Raised in the Firearms Sellers Immunity Bill*, 38 AKRON L. REV. 113, 118 n.28 (2005).

55. Nicholas Dixon, *Why We Should Ban Handguns in the United States*, 12 ST. LOUIS U. PUB. L. REV. 243, 265–66 (1993) (emphasis added), *quoted in* Vandall, *supra* note 54, at 119, n.32.

56. ROBERT J. SPITZER, THE POLITICS OF GUN CONTROL 147 (3rd ed. 1995) (emphasis added).

57. Violence Policy Center, Who Dies? A Look at Firearms Death and Injury in America, http://www.vpc.org/studies/whointro.htm (last visited Nov. 17, 2006).

58. Natl Coalition to Ban Handguns, *supra* note 21 (emphasis added).

59. *See* David M. Kennedy & Anthony J. Braga, *Homicide in Minneapolis: Research for Problem Solving*, 2 HOMICIDE STUD. 263, 267 (1998).

60. *See* Elliott, *supra* note 37, at 1093.

61. *Id.*

stranger or [of] someone known to the offender—'is usually part of a pattern of violence, engaged in by people who are known . . . as violence prone.'"[62] Though only 15% of Americans over the age of 15 have arrest records,[63] approximately 90 percent of "*adult* murderers have *adult* records, with an average adult criminal career [involving crimes committed as an adult rather than a child] of six or more years, including four major *adult* felony arrests."[64] These national statistics dovetail with data from local nineteenth and twentieth century studies. For example: victims as well as offenders [in 1950s and 1960s Philadelphia murders] . . . tended to be people with prior police records, usually for violent crimes such as assault."[65] "The great majority of both perpetrators and victims of [1970s Harlem] assaults and murders had previous [adult] arrests, probably over 80% or more."[66] Boston police and probation officers in the 1990s agreed that of those juvenile-perpetrated murders where all the facts were known, virtually all were committed by gang members, though the killing was not necessarily gang-directed.[67] One example would be a gang member who stabs his girlfriend to death in a fit of anger.[68] Regardless of their arrests for other crimes, 80% of 1997 Atlanta murder arrestees had at least one earlier drug offense with 70% having 3 or more prior drug offenses.[69] A *New York Times* study of the 1,662 murders committed in that city in the years 2003–2005 found that "[m]ore than 90 percent of the killers had criminal records."[70] Baltimore police figures show that "92 percent of murder suspects had [prior] criminal records in 2006."[71] Several of the more recent homicide studies just reviewed

---

62. GERALD D. ROBIN, VIOLENT CRIME AND GUN CONTROL 48 (1991) (quoting Gary Kleck, *The Assumptions of Gun Control, in* FIREARMS AND VIOLENCE 23, 43 (Don B. Kates ed., 1984)).

63. Mark Cooney, *The Decline of Elite Homicide*, 35 CRIMINOLOGY 381, 386 (1997).

64. GARY KLECK & DON B. KATES, ARMED: NEW PERSPECTIVES ON GUN CONTROL 20 (2001).

65. ROGER LANE, MURDER IN AMERICA: A HISTORY 259 (1997).

66. A. SWERSKEY & E. ENLOE, HOMICIDE IN HARLEM 17 (1975).

67. Anthony A. Braga et al., *Youth Homicide in Boston: An Assessment of Supplementary Homicide Report Data*, 3 HOMICIDE STUDIES 277, 283–84 (1999).

68. *See id.*

69. Dean G. Rojek, *The Homicide and Drug Connection, in* THE VARIETIES OF HOMICIDE AND ITS RESEARCH: PROCEEDINGS OF THE 1999 MEETING OF THE HOMICIDE RESEARCH WORKING GROUP 128 (P.H. Blackman et al. eds., 2000) [hereinafter THE VARIETIES OF HOMICIDE].

70. Jo Craven McGinty, *New York Killers, and Those Killed, by the Numbers*, N.Y. TIMES, April 28, 2006, at A1.

71. Gus G. Sementes, *Patterns Persist in City Killings*, BALTIMORE SUN, Jan. 1, 2007, at A1.

were done at the Kennedy School of Government at Harvard and found almost all arrested murderers to have earlier arrests.[72]

That murderers are not ordinary, law-abiding responsible adults is further documented in other sources. Psychological studies of juvenile murderers variously find that at least 80%, if not all, are psychotic or have psychotic symptoms.[73] Of Massachusetts domestic murderers in the years 1991–1995, 73.7% had a "prior [adult] criminal history," 16.5% had an active restraining order registered against them at the time of the homicide, and 46.3% of the violent perpetrators had had a restraining order taken out against them sometime before their crime.[74]

This last study is one of many exposing the false argument that a significant number of murders involve ordinary people killing spouses in a moment of rage. Although there are many domestic homicides, such murders do not occur frequently in ordinary families, nor are the murderers ordinary, law-abiding adults. "The day-to-day reality is that most family murders are prefaced by a long history of assaults."[75] One study of such murders found that "a history of domestic violence was present in 95.8%" of cases.[76] These findings are a routine feature of domestic homicide studies: "[domestic] partner homicide is most often the final outcome of chronic women battering";[77] based on a study from Kansas City, 90% of all the family homi-

---

72. Anthony A. Braga et al., *Understanding and Preventing Gang Violence: Problem Analysis and Response Development in Lowell, Massachusetts*, 9 POLICE Q. 20, 29–31 (2006) ("Some 95% of homicide offenders, 82% of aggravated assault offenders, 65% of homicide victims, and 45% of aggravated gun assault victims were arraigned at least once in Massachusetts courts before they committed their crime or were victimized. Individuals that were previously known to the criminal justice system were involved in a wide variety of offenses and, on average, committed many prior crimes . . . . On average, aggravated gun assault offenders had been arraigned for 12 prior offenses, homicide offenders had been arraigned for 9 prior offenses . . . .").

73. Wade C. Myers & Kerrilyn Scott, *Psychotic and Conduct Disorder Symptoms in Juvenile Murderers*, 2 HOMICIDE STUD. 160, 161–62 (1998).

74. Linda Langford et al., *Criminal and Restraining Order Histories of Intimate Partner-Related Homicide Offenders in Massachusetts, 1991-1995, in* THE VARIETIES OF HOMICIDE, supra note 69, at 51, 55, 59.

75. Murray A. Straus, *Domestic Violence and Homicide Antecedents*, 62 BULL. N.Y. ACAD. MED. 446, 454 (1986); *see also* Murray A. Straus, *Medical Care Costs of Intrafamily Assault and Homicide*, 62 BULL. N.Y. ACAD. MED. 556, 557 (1986).

76. Paige Hall Smith et al., *Partner Homicide in Context*, 2 HOMICIDE STUD. 400, 410 (1998) (reporting cases only where there was sufficient background information on the parties).

77. *Id.* at 411.

cides were preceded by previous disturbances at the same ad-
dress, with a median of 5 calls per address."[78]

The only kind of evidence cited to support the myth that
most murderers are ordinary people is that many murders
arise from arguments or occur in homes and between acquaint-
ances.[79] These bare facts are only relevant if one assumes that
criminals do not have acquaintances or homes or arguments.
Of the many studies belying this, the broadest analyzed a
year's national data on gun murders occurring in homes and
between acquaintances. It found "the most common victim-
offender relationship" was "where both parties . . . knew one
another because of prior illegal transactions."[80]

Thus the term "acquaintance homicide" does not refer solely
to murders between ordinary acquaintances. Rather it encom-
passes, for example: drug dealers killed by competitors or cus-
tomers, gang members killed by members of the same or rival
gangs, and women killed by stalkers or abusers who have bru-
talized them on earlier occasions, all individuals for whom fed-
eral and state laws already prohibit gun possession.[81]

Obviously there are certain people who should not be al-
lowed to own any deadly instrument. Reasonable as such pro-
hibitions are, it is unrealistic to think those people will comply
with such restrictions any more readily than they do with laws
against violent crime.[82] In any event, studies analyzing ac-

---

78. ROBIN, *supra* note 62, at 47–48; *see also* Kathryn E. Moracco et al., *Femicide in
North Carolina, 1991-1993*, 2 HOMICIDE STUD. 422, 441 (1998).

79. *See, e.g.*, SPITZER, *supra* note 56; Jeremiah A. Barondess, Letter to the Editor,
*Firearm Violence and Public Health*, 272 J. AM. MED. ASS'N 1406, 1409 (1994) (respond-
ing to criticism of his article, Karl P. Adler et al., *Firearm Violence and Public Health:
Limiting the Availability of Guns*, 271 J. AM. MED. ASS'N 1281 (1994)); Kairys, *supra*
note 54.

80. KLECK, *supra* note 8, at 236 (analyzing the U.S. Bureau of Justice Statistics data
on murder defendants being prosecuted in 33 U.S. urban counties).

81. Current federal law prohibits gun possession by minors, drug addicts, and
persons who have been involuntarily committed to mental institutions or convicted
of felonies or domestic violence misdemeanors. 18 U.S.C. § 922(g) (2000). As to state
gun laws, see, for example, CAL. PENAL CODE §§ 12021, 12072, 12101, 12551 (Deer-
ing 2006). For a summary of the general patterns of federal and state gun laws, see
JACOBS, *supra* note 11, at 19–35.

82. *See* WRIGHT ET AL., *supra* note 11, at 137–38 ("[T]here is no good reason to sup-
pose that people intent on arming themselves for criminal purposes would not be
able to do so even if the general availability of firearms to the larger population were
sharply restricted. Here it may be appropriate to recall the First Law of Economics, a
law whose operation has been sharply in evidence in the case of Prohibition, mari-
juana and other drugs, prostitution, pornography, and a host of other banned arti-

quaintance homicide suggest there is no reason for laws pro-
hibiting gun possession by ordinary, law-abiding responsible
adults because such people virtually never murder. If one ac-
cepts that such adults are far more likely to be victims of vio-
lent crime than to commit it, disarming them becomes not just
unproductive but counter-productive.[83]

### IV.    MORE GUNS, *LESS* CRIME?

Anti-gun activists are not alone in their belief that widespread
firearm ownership substantially affects violent crime rates. The
same understanding also characterizes many pro-gun activists. Of
course, pro-gun activists' belief leads them to the opposite conclu-
sion: that widespread firearm ownership reduces violence by de-
terring criminals from confrontation crimes and making more
attractive such nonconfrontation crimes as theft from unoccupied
commercial or residential premises. Superficially, the evidence for
this belief seems persuasive. Table 1, for instance, shows that Den-
mark has roughly half the gun ownership rate of Norway, but a
50% higher murder rate, while Russia has only one-ninth Norway's

---

cles and substances—namely, that demand creates its own supply. There is no evi-
dence anywhere to show that reducing the availability of firearms *in general* likewise
reduces their availability to persons with criminal intent, or that persons with crimi-
nal intent would not be able to arm themselves under any set of general restrictions
on firearms.").

83. This Article will not discuss the defensive use of firearms beyond making the
following observations: while there is a great deal of controversy about the subject,
it is a misleading controversy in which anti-gun advocates' deep ethical or moral
objections to civilian self-defense are presented in the guise of empirical argument.
The empirical evidence unquestionably establishes that gun ownership by prospec-
tive victims not only allows them to resist criminal attack, but also deters violent
criminals from attacking them in the first place. *See* JOSEPH F. SHELEY & JAMES D.
WRIGHT, IN THE LINE OF FIRE: YOUTHS, GUNS, AND VIOLENCE IN *urban* AMERICA 63
(1995), and JAMES D. WRIGHT & PETER H. ROSSI, ARMED AND CONSIDERED
DANGEROUS: A SURVEY OF FELONS AND THEIR FIREARMS 154 (1986) for a discussion
of Dept. of Justice-funded surveys of incarcerated adult and juvenile felons. *See also*
LOTT, THE BIAS AGAINST GUNS, *supra* note 30, at 8–11, 227–40; David B. Kopel, *Law-
yers, Guns, and Burglars*, 43 ARIZ. L. REV. 345 (2001); Lawrence Southwick, Jr., *Self-
Defense with Guns: The Consequences*, 28 J. CRIM. JUST. 351 (2000).

The legitimate question is not *whether* victim gun possession allows for self-
defense and deters criminal violence, but how extensive and important these bene-
fits are. *See* KLECK & KATES, *supra* note 64, at 213–342; LOTT, *supra* note 11; Philip J.
Cook & Jens Ludwig, *Defensive Gun Uses: New Evidence from a National Survey*, 14 J.
QUANTITATIVE CRIMINOLOGY 111 (1998); Philip J. Cook & Jens Ludwig, *Guns in
America: National Survey on Private Ownership and Use of Firearms*, Nat'l Inst. Just.:
Research in Brief (U.S. Dep't of Justice, Washington, D.C., 1997); Marvin E. Wolf-
gang, *A Tribute to a View I Have Opposed*, 86 J. CRIM. L. & CRIMINOLOGY 188 (1995).

gun ownership rate but a murder rate 2500% higher. Looking at Tables 1–3, it is easy to find nations in which very high gun ownership rates correlate with very low murder rates, while other nations with very low gun ownership rates have much higher murder rates. Moreover, there is not insubstantial evidence that *in the United States* widespread gun availability has helped reduce murder and other violent crime rates. On closer analysis, however, this evidence appears uniquely applicable to the United States.

More than 100 million handguns are owned in the United States[84] primarily for self-defense,[85] and 3.5 million people have permits to carry concealed handguns for protection.[86] Recent analysis reveals "a great deal of self-defensive use of firearms" in the United States, "in fact, more defensive gun uses [by victims] than crimes committed with firearms."[87] It is little wonder that the

> National Institute of Justice surveys among prison inmates find that large percentages report that their fear that a victim might be armed deterred them from confrontation crimes. "[T]he felons most frightened 'about confronting an armed victim' were those from states with the greatest relative number of privately owned firearms." Conversely, robbery is highest in states that most restrict gun ownership.[88]

Concomitantly, a series of studies by John Lott and his coauthor David Mustard conclude that the issuance of millions of permits to carry concealed handguns is associated with drastic declines in American homicide rates.[89]

Ironically, to detail the American evidence for widespread defensive gun ownership's deterrent value is also to raise questions about how applicable that evidence would be even to the other nations that have widespread gun ownership but low violence. There are no data for foreign nations comparable to the American data just discussed. Without such data, we cannot know whether millions of Norwegians own handguns and carry them for protec-

---

84. Kates, *supra* note 29, at 63.

85. KLECK, *supra* note 8, at 74 (collecting survey responses).

86. Kates, *supra* note 29, at 64.

87. JACOBS, *supra* note 11, at 14 (collecting studies).

88. Kates, *supra* note 29, at 70 (collecting studies).

89. LOTT, *supra* note 11; John R. Lott & David B. Mustard, *Crime, Deterrence, and Right-to-Carry*, 26 J. LEGAL STUD. 1 (1997); David B. Mustard, *Culture Affects Our Beliefs About Firearms, But Data are Also Important*, 151 U. PENN. L. REV. 1387 (2003). These studies are highly controversial. See Kates, *supra* note 29, at 70–71, for discussion of critics and criticisms.

tion, thereby deterring Norwegian criminals from committing violent crimes. Nor can we know whether guns are commonly kept for defense in German homes and stores, thus preventing German criminals from robbing them.

Moreover, if the deterrent effect of gun ownership accounts for low violence rates in high gun ownership nations other than the United States, one wonders why that deterrent effect would be amplified there. Even with the drop in United States murder rates that Lott and Mustard attribute to the massive increase in gun carry licensing, the United States murder rate is still eight times higher than Norway's—even though the U.S. has an almost 300% higher rate of gun ownership. That is consistent with the points made above. Murder rates are determined by socio-economic and cultural factors. In the United States, those factors include that the number of civilian-owned guns nearly equals the population— triple the ownership rate in even the highest European gun-ownership nations—and that vast numbers of guns are kept for personal defense. That is not a factor in other nations with comparatively high firearm ownership. High gun ownership may well be a factor in the recent drastic decline in American homicide. But even so, American homicide is driven by socio-economic and cultural factors that keep it far higher than the comparable rate of homicide in most European nations.

In sum, though many nations with widespread gun ownership have much lower murder rates than nations that severely restrict gun ownership, it would be simplistic to assume that at all times and in all places widespread gun ownership depresses violence by deterring many criminals into nonconfrontation crime. There is evidence that it does so in the United States, where defensive gun ownership is a substantial socio-cultural phenomenon. But the more plausible explanation for many nations having widespread gun ownership with low violence is that these nations never had high murder and violence rates and so never had occasion to enact severe anti-gun laws. On the other hand, in nations that have experienced high and rising violent crime rates, the legislative reaction has generally been to enact increasingly severe antigun laws. This is futile, for reducing gun ownership by the law-abiding citizenry—the only ones who obey gun laws—does not reduce violence or murder. The result is that high crime nations that ban guns to reduce crime end up having both high crime and stringent gun laws, while it appears that low crime nations that do not significantly restrict guns continue to have low violence rates.

Thus both sides of the gun prohibition debate are likely wrong in viewing the availability of guns as a major factor in the incidence of murder in any particular society. Though many people may still cling to that belief, the historical, geographic, and demographic evidence explored in this Article provides a clear admonishment. Whether gun availability is viewed as a cause or as a mere coincidence, the long term macrocosmic evidence is that gun ownership spread widely throughout societies consistently correlates with stable or declining murder rates. Whether causative or not, the consistent international pattern is that more guns equal *less* murder and other violent crime. Even if one is inclined to think that gun availability is an important factor, the available international data cannot be squared with the mantra that more guns equal more death and fewer guns equal less death. Rather, if firearms availability does matter, the data consistently show that the way it matters is that more guns equal *less* violent crime.

## V.   GEOGRAPHIC, HISTORICAL AND DEMOGRAPHIC PATTERNS

If more guns equal more death and fewer guns equal less death, it should follow, all things being equal, (1) that geographic areas with higher gun ownership should have more murder than those with less gun ownership; (2) that demographic groups with higher gun ownership should be more prone to murder than those with less ownership; and (3) that historical eras in which gun ownership is widespread should have more murder than those in which guns were fewer or less widespread. As discussed earlier, these effects are not present. Historical eras, demographic groups, and geographic areas with more guns do not have more murders than those with fewer guns. Indeed, those with more guns often, or even generally, have fewer murders.

Of course, all other things may not be equal. Obviously, many factors other than guns may promote or reduce the number of murders in any given place or time or among particular groups. And it may be impossible even to identify these factors, much less to take account of them all. Thus any conclusions drawn from the kinds of evidence presented earlier in this paper must necessarily be tentative.

Acknowledging this does not, however, blunt the force of two crucial points. The first regards the burden of proof. Those who assert the mantra, and urge that public policy be based on it, bear the burden of proving that more guns do equal more death and fewer guns equal less death. But they cannot bear that burden because there simply is no large number of cases in which the widespread prevalence of guns among the general population has led to more murder. By the same token, but even more importantly, it cannot be shown consistently that a reduction in the number of guns available to the general population has led to fewer deaths. Nor is the burden borne by *speculating* that the reason such cases do not appear is that other factors always intervene.

The second issue, allied to the burden of proof, regards plausibility. On their face, the following facts from Tables 1 and 2 suggest that gun ownership is irrelevant, or has little relevance, to murder: France and neighboring Germany have exactly the same, comparatively high rate of gun ownership, yet the French murder rate is nearly twice the German; France has infinitely more gun ownership than Luxembourg, which nevertheless has a murder rate five times greater, though handguns are illegal and other types of guns sparse; Germany has almost double the gun ownership rate of neighboring Austria yet a similarly very low murder rate; the Norwegian gun ownership rate is over twice the Austrian rate, yet the murder rates are almost identical.

And then there is Table 3, which shows Slovenia, with 66% more gun ownership than Slovakia, nevertheless has roughly one-third less murder per capita; Hungary has more than 6 times the gun ownership rate of neighboring Romania but a lower murder rate; the Czech Republic's gun ownership rate is more than 3 times that of neighboring Poland, but its murder rate is lower; Poland and neighboring Slovenia have exactly the same murder rate, though Slovenia has over triple the gun ownership per capita.

*Table 3: Eastern Europe Gun Ownership and Murder Rates*
(rates given are per 100,000 people and in descending order)

| Nation | Murder Rate | Rate of Gun Ownership |
|---|---|---|
| Russia | 20.54* [2002] | 4,000 |
| Moldova | 8.13** [2000] | 1,000 |
| Slovakia | 2.65** [2000] | 3,000 |
| Romania | 2.50** [2000] | 300 |
| Macedonia | 2.31** [2000] | 16,000 |
| Hungary | 2.22† [2003] | 2,000 |
| Finland | 1.98‡ [2004] | 39,000 |
| Poland | 1.79† [2003] | 1,500 |
| Slovenia | 1.81** [2000] | 5,000 |
| Cz. Republic | 1.69** [2000] | 5,000 |
| Greece | 1.12† [2003] | 11,000 |

Notes: This table covers all the Eastern European nations for which we have data regarding both gun ownership and murder rates. Gun ownership data comes from GRADUATE INSTITUTE OF INTERNATIONAL STUDIES, SMALL ARMS SURVEY (2003).

* CANADIAN CENTRE FOR JUSTICE STATISTICS, HOMICIDE IN CANADA, 2002, JURISTAT at 3.

** United Nations Office on Drugs and Crime, *The Seventh United Nations Survey on Crime Trends and the Operations of Criminal Justice Systems (1998–2000)*, Mar. 31, 2004, at 82, 260, 287, 370, 405, 398.

† CANADIAN CENTRE FOR JUSTICE STATISTICS, HOMICIDE IN CANADA, 2003, JURISTAT at 3.

‡ CANADIAN CENTRE FOR JUSTICE STATISTICS, HOMICIDE IN CANADA, 2004, JURISTAT at 3.

On their face, Tables 1, 2, and 3 and the comparisons gleaned from them suggest that gun ownership is irrelevant, or has little relevance, to murder. Historical and demographic comparisons offer further evidence. Again, all the data may be misleading. It is conceivable that more guns do equal more murder, but that this causation does not appear because some unidentifiable extraneous factor always intervenes. That is conceivable, but ultimately unlikely. As Hans Toch, a senior American criminologist who 35 years ago endorsed handgun prohibition and confiscation, but then recanted based on later research, argues "it is hard to explain that where firearms are most dense, violent crime rates are lowest and where guns are least dense, violent crime rates are highest."[90]

90. Toch & Lizotte, *supra* note 11, at 232. Professor Toch was a consultant to the 1960s Eisenhower Commission, and until the 1990s he endorsed its conclusions that

*Harvard Journal of Law & Public Policy* [Vol. 30

### A. Demographic Patterns

Contrary to what should be the case if more guns equal more death, there are no "consistent indications of a link between gun ownership and criminal or violent behavior by owners;" in fact, gun ownership is "higher among whites than among blacks, higher among middle-aged people than among young people, higher among married than among unmarried people, higher among richer people than poor"—all "patterns that are the reverse of the way in which criminal behavior is distributed."[91]

These conclusions are reinforced by focusing on patterns of African-American homicide. Per capita, African-American murder rates are much higher than the murder rate for whites.[92] If more guns equal more death, and fewer guns equal less, one might assume gun ownership is higher among African-Americans than among whites, but in fact African-American gun ownership is markedly lower than white gun ownership.[93]

---

widespread handgun ownership causes violence and that reducing ownership would reduce violence. Franklin Zimring, one of the architects of those conclusions, has admitted that they were made speculatively and essentially without an empirical basis. FRANKLIN E. ZIMRING & GORDON HAWKINS, THE CITIZEN'S GUIDE TO GUN CONTROL xi-xii (1987) ("In the 1960s after the assassinations of President John F. Kennedy, Dr. Martin Luther King, Jr., and Senator Robert F. Kennedy, it [gun control] became a major subject of public passion and controversy . . . [sparking a debate that] has been heated, acrimonious and polarized . . . . It began in a factual vacuum [in which] . . . neither side felt any great need for factual support to buttress foregone conclusions. *In the 1960s, there was literally no scholarship on the relationship between guns and violence and the incidence or consequences of interpersonal violence, and no work in progress.*" (emphasis added)).

As for the findings of the subsequent body of research, Professor Toch has written:

> [W]hen used for protection firearms can seriously inhibit aggression and can provide a psychological buffer against the fear of crime. Furthermore, the fact that national patterns show little violent crime where guns are most dense implies that guns do not elicit aggression in any meaningful way . . . . Quite the contrary, these findings suggest that high saturations of guns in places, or something correlated with that condition, inhibit illegal aggression.

*Id.* at 234 & n.10.

91. KLECK, *supra* note 8, at 71.

92. *See* MALCOLM, *supra* note 10, at 232–33; Alfred Blumstein, *Youth Violence, Guns, and the Illicit-Drug Industry*, 86 J. CRIM. L. & CRIMINOLOGY 10, 21 (1995).

93. *See* LOTT, *supra* note 11, at 39 ("[W]hite gun ownership exceed[ed] that for blacks by about 40 in 1996"); *see also* KLECK, *supra* note 8, at 71.

Particularly corrosive to the mantra are the facts as to rural African-Americans gun ownership. Per capita, rural African-Americans are much more likely to own firearms than are urban African-Americans.[94] Yet, despite their greater access to guns, the firearm murder rate of young rural black males is a small fraction of the firearm murder rate of young urban black males.[95]

These facts are only anomalous in relation to the mantra that more guns equal more death and fewer guns equal less death. In contrast, these facts accord with the earlier point regarding the aberrance of murderers. Whatever their race, ordinary people simply do not murder. Thus preventing law-abiding, responsible African-Americans from owning guns does nothing at all to reduce murderers, because they are not the ones who are doing the killing. The murderers are a small minority of extreme antisocial aberrants *who manage to obtain guns whatever the level of gun ownership in the African American community.*

Indeed, murderers generally fall into a group some criminologists have called "violent predators," sharply differentiating them not only from the overall population but from other criminals as well.[96] Surveys of imprisoned felons indicate that when not imprisoned the ordinary felon averages perhaps 12 crimes per year.[97] In contrast, "violent predators" spend much or most of their time committing crimes, averaging at least 5 assaults, 63 robberies, and 172 burglaries annually.[98] A National Institute of Justice survey of 2,000 felons in 10 state prisons, which focused on gun crime, said of these types of respondents:

> [T]he men we have labeled Predators were clearly omnibus felons . . . [committing] more or less any crime they had the opportunity to commit . . . . The Predators (handgun and shotgun combined) . . . amounted to about 22% of the sample and yet accounted for 51% of the total crime [admitted by the 2,000 felons] . . . . Thus, when we talk about "control-

---

94. *See* LOTT, *supra* note 11, at 39; *see also* KLECK, *supra* note 8, at 71.

95. The murder rate of young urban African Americans is roughly 600% higher than that of their rural counterparts. *See* Lois A. Fingerhut et al., *Firearm and Nonfirearm Homicide Among Persons 15 Through 19 Years of Age*, 267 J. AM. MED. ASS'N 3048, 3049 tbl.1.

96. JAN M. CHAIKEN & MARCIA R. CHAIKEN, VARIETIES OF CRIMINAL BEHAVIOR 62–63 (1982).

97. *Id.* at 65.

98. *Id.* at 123, 125, 219 tbl.A.19.

ling crime" in the United States today, we are talking largely about controlling the behavior of these men.[99]

The point is not just that demographic patterns of homicide and gun ownership in the African-American community do not support the more guns equal more death mantra. More importantly, those patterns refute the logic of fewer guns equal less death. The reason fewer guns among ordinary African-Americans does not lead to fewer murders is because that paucity does not translate to fewer guns for the aberrant minority who do murder. The correlation of very high murder rates with low gun ownership in African-American communities simply does not bear out the notion that disarming the populace as a whole will disarm and prevent murder by potential murderers.

### B.    Macro-historical Evidence: From the Middle Ages to the 20th Century

The Middle Ages were a time of notoriously brutal and endemic warfare. They also experienced rates of ordinary murder almost double the highest recorded U.S. murder rate.[100] But Middle Age homicide "cannot be explained in terms of the availability of firearms, which had not yet been invented."[101] The invention provides some test of the mantra. If it is true that more guns equal more murder and fewer guns equal less death, murder should have risen with the invention, increased efficiency, and greater availability of firearms across the population.

Yet, using England as an example, murder rates seem to have fallen sharply as guns became progressively more efficient and widely owned during the five centuries after the invention of firearms.[102] During much of this period, because the entire adult male population of England was deemed to constitute a militia, every military age male was required to possess arms for use in militia training and service.[103]

---

99. WRIGHT & ROSSI, *supra* note 83, at 76.

100. LANE, *supra* note 65, at 14.

101. *Id.* at 151. *See generally id.* ch. 1.

102. MALCOLM, *supra* note 10, at 19–20.

103. *See generally* JOYCE LEE MALCOLM, TO KEEP AND BEAR ARMS: THE ORIGINS OF AN ANGLO-AMERICAN RIGHT 1–15 (1994); STEPHEN P. HALBROOK, THAT EVERY MAN BE ARMED: THE EVOLUTION OF A CONSTITUTIONAL RIGHT 37–53 (1984); Don B. Kates, *Handgun Prohibition and the Original Meaning of the Second Amendment*, 82 MICH. L. REV. 204, 214–16 (1983).

The same requirement was true in America during the period of colonial and post-colonial settlement. Indeed, the basic English militia laws were superceded by the colonies' even more specific and demanding legal requirements of *universal* gun ownership. Under those laws, virtually all colonists and every household were required to own guns. Depending on the colony's laws, male youths were deemed of military age at 16, 17, or 18, and every military age man, except for the insane, infirm, and criminals, had to possess arms. They were subject to being called for inspection, militia drill, or service, all of which legally required them to bring and present their guns. To arm those too poor to afford guns, the laws required that guns be purchased for them and that they make installment payments to pay back the cost.[104]

It bears emphasis that these gun ownership requirements were not limited to those subject to militia service. Women, seamen, clergy, and some public officials were automatically exempt from militia call up, as were men over the upper mili-

---

104. MALCOLM, *supra* note 103, at 138–41; Kates, *supra* note 102, at 214–16. Typical laws (quoted with original spelling and punctuation) appear from the following sources: ARCHIVES OF MARYLAND 77 (William Hand Browne ed., Baltimore, Maryland Historical Society 1883) ("[T]hat every house keeper or housekeepers within this Province shall have ready continually upon all occasions within his her or their house for him or themselves and for every person within his her or their house able to bear armes one Serviceable fixed gunne of bastard muskett boare" along with a pound of gunpowder, four pounds of pistol or musket shot, "match for match locks and of flints for firelocks"); NARRATIVES OF EARLY VIRGINIA 273 (Lyon Gardiner Tyler ed., photo. reprint 1974) (1907) (requiring that everyone attend church on Sunday, further providing that "all suche as beare armes shall bring their pieces swordes, poulder and shotte" with them to church on penalty of a fine); RECORDS OF THE GOVERNOR AND COMPANY OF THE MASSACHUSETTS BAY IN NEW ENGLAND 84 (Nathaniel B. Shurtleff ed., Boston, William White 1853) (ordering towns to provide their residents with arms if they could not provide their own "for the present, & after to receive satisfaction for that they disburse when they shall be able"); RECORDS OF THE COLONY OF RHODE ISLAND AND PROVIDENCE PLANTATIONS, IN NEW ENGLAND 79-80, 94 (John Russell Bartlett ed., Providence, A. Crawford Greene & Brother, 1856) (requiring, respectively: "[T]hat every man do come armed unto the meeting upon every sixth day," and also that militia officers go "to every inhabitant [in Portsmouth and] see whether every one of them has powder" and bullets; and "that noe man shall go two miles from the Towne unarmed, eyther with Gunn or Sword; and that none shall come to any public Meeting without his weapon."); THE CODE OF 1650, BEING A COMPILATION OF THE EARLIEST LAWS AND ORDERS OF THE GENERAL COURT OF CONNECTICUT 72 (Hartford, Silas Andrus 1822) ("That all persons that are above the age of sixteene yeares, except magistrates and church officers, shall beare arms . . . and every male person within this jurisdiction, above the said age, shall have in continuall readines, a good muskitt or other gunn, fitt for service, and allowed by the clark of the band.").

tary age, which varied from 45 to 60, depending on the colony. But every household was required to have a gun, even if all its occupants were otherwise exempt from militia service, to deter criminals and other attackers. Likewise, all respectable men were theoretically required to carry arms when out and abroad.[105]

These laws may not have been fully enforced (except in times of danger) in areas that had been long-settled and peaceful. Nevertheless, "by the eighteenth century, colonial Americans were the most heavily armed people in the world."[106] Yet, far from more guns equaling more death, murders in the New England colonies were "rare," and "few" murderers in all the colonies involved guns "despite their wide availability."[107]

America remained very well armed yet homicide remained quite low for over two hundred years, from the earliest settlements through the entire colonial period and early years of the United States. Homicide in more settled areas only began rising markedly in the two decades before the Civil War.[108] By that time the universal militia was inoperative and the universality of American gun ownership had disappeared as many people in long-settled peaceful areas did not hunt and had no other need for a firearm.[109]

---

105. For collections of many of the relevant laws, see Clayton E. Cramer, Gun Control in Colonial New England, (unpublished manuscript, available at http://www.claytoncramer.com/GunControlColonialNewEngland.PDF) (last visited Nov. 19, 2006); Clayton E. Cramer, Gun Control in Colonial New England, Part II (unpublished manuscript, available at http://www.claytoncramer.com/GunControlColonialNewEngland2.PDF) (last visited Nov. 19, 2006); Clayton E. Cramer, Gun Control in the Middle & Southern Colonies, (unpublished manuscript, available at http://www.claytoncramer.com/MiddleSouthernColonialGunControl.PDF) (last visited Nov. 19, 2006); Clayton E. Cramer, Militia Statutes, http://www.claytoncramer.com/primary.html#MilitiaLaws (last visited Nov. 19, 2006).

106. JOHN MORGAN DEDERER, WAR IN AMERICA TO 1775, at 116 (1990).

107. LANE, *supra* note 64, at 48, 59–60.

108. *Id.* at 344.

109. The enthusiasm modern gun advocates express for the ancient militia far exceeds the enthusiasm felt by the Englishmen and Americans who were actually subject to the obligations involved. Guns were expensive items even for those owners who were supplied them by the colonies since they were required to pay the colonies back over time. And the duty of militia drill was a constant source of irritation to men who had little time for leisure and urgent need to devote their time to making a living for themselves and their families. By the turn of the nineteenth century, at the earliest, the universal militia was in desuetude and replaced in the 1840s

The Civil War acquainted vast numbers of men with modern rapid-fire guns, and, in its aftermath, provided a unique opportunity to acquire them. Before the Civil War, reliable multi-shot rifles or shotguns did not exist and revolvers (though they had been invented in the 1830s) were so expensive they were effectively out of reach for most of the American populace.[110] The Civil War changed all that. Officers on both sides had to buy their own revolvers, while sidearms were issued to noncommissioned officers generally, as well as those ordinary soldiers who were in the artillery, cavalry, and dragoons.[111] The fact that over two million men served in the Union Army at various times while the Confederates had over half that number suggests the number of revolvers involved.[112]

---

by colorfully garbed volunteer formations whose activities were more social than military.

110. Revolver inventor Samuel Colt's first business failed in 1840. It revived itself only with sales to officers and the military during the Mexican-American War (1846–1848), and sustained itself through the 1850s with sales to wealthy Americans and Europeans. *See* JOSEPH G. BILBY, CIVIL WAR FIREARMS 157 (1996); LEE KENNETT & JAMES LAVERNE ANDERSON, THE GUN IN AMERICA 90 (1975); LANE, *supra* note 65, at 109. Colt's sales flourished as foreign armies adopted his revolver and wide sales took place in the commercial market across Europe, KENNETT & ANDERSON, *supra*, at 90, especially after Colt's prize-winning exhibit at the 1851 Great Industrial Exhibition in London. *See generally* JOSEPH G. ROSA, COLONEL COLT LONDON 13–29 (1976).

111. *See generally* BILBY, *supra* note 110, at 157–72. The revolvers involved were by no means all Colts: "[T]he Federal government also purchased large numbers of Remington, Starr and Whitney revolvers, as well as the guns of other [American] makers, including the bizarre looking Savage, with its second 'ring trigger' which cocked the arm, and the sidehammer Joslyn." *Id.* at 158. Vast numbers of guns were also purchased in Europe where, in the first 15 months of the war, the Union bought over 738,000 firearms (including long arms as well as revolvers). ALLAN R. MILLETT & PETER MASLOWSKI, FOR THE COMMON DEFENSE: A MILITARY HISTORY OF THE UNITED STATES OF AMERICA 216 (1984). Some Union infantry units were issued revolvers and many enlisted infantrymen in other units bought their own. BILBY, *supra* note 110, at 160.

112. These figures are just estimates. While at least somewhat reliable figures exist for how many men served at any one time in the Union Army, that number is not co-extensive with how many served in total. Some Union soldiers served throughout the war, re-enlisting when their original enlistments were up. Others mustered out and were replaced with new recruits. Still others deserted long before their terms were up, again requiring replacements. Some scoundrels enlisted just for the enlistment bonus, and deserted as soon as they could; some of these went through the enlistment and desertion process multiple times, collecting a new bonus under a new name time after time. THE WORLD ALMANAC AND BOOK OF FACTS 2006, at 77 (2006) gives figures of 2,128,948 for the Union Army and 84,415 for the Marines; it estimates that the Confederate Army's size was between 600,000 to 1,500,000.

At war's end, the U.S. Army and Navy were left with vast numbers of surplus revolvers, both those they had purchased and those captured from Confederate forces. As the Army plummeted to slightly over 11,000 men,[113] hundreds of thousands of military surplus revolvers were sold at very low prices. In addition, when their enlistments were up, or when they were mustered out at war's end, former officers and soldiers retained hundreds of thousands of both revolvers and rifles. These commandeered arms included many of the new repeating rifles the Union had bought (over the fervent objections of short-sighted military procurement officers) at the command of President Lincoln, who had tested the Spencer rifle himself. After his death the Army reverted to the single-shot rifle, disposing of all its multi-shots at surplus and thereby ruining Spencer by glutting the market.[114]

Thus over the immediate post-Civil War years "the country was awash with military pistols" and rifles of the most modern design.[115] The final three decades of the century saw the introduction and marketing of the "two dollar pistol," which were very cheap handguns manufactured largely out of pot metal.[116] In addition to being sold locally, such "suicide specials" were marketed nationwide through Montgomery Ward catalogs starting in 1872 and by Sears from 1886.[117] They were priced as low as $1.69, and were marketed under names like the "Little Giant" and the "Tramp's Terror."[118]

---

113. RUSSELL F. WEIGLEY, HISTORY OF THE UNITED STATES ARMY 262 (1967) ("The names of 1,000,516 officers and men were on the [Union Army's] rolls on May 10, 1865; by [the end of 1866, the draft had ended and] . . . only 11,043 volunteers remained . . . .").

114. KENNETT & ANDERSON, *supra* note 110, at 92–93.

115. DAVID T. COURTWRIGHT, VIOLENT LAND: SINGLE MEN AND SOCIAL DISORDER FROM THE FRONTIER TO THE INNER CITY 42 (1996).

116. KENNETT & ANDERSON, *supra* note 110, at 99.

117. *Id.* at 98–99.

118. *Id.* at 98–100. An 1879 issue of *Scientific American* contains an advertisement for COD purchasing of the $2.75 "Czar" revolver, presumably an attempt to capitalize on the Smith & Wesson "Russian," a very high quality weapon that Smith & Wesson manufactured for the Russian government and sold through the 1870s. SCI. AM., June 14, 1879, at 381. The 1884 Price List-Firearms Catalog for N. Curry & Brother, arms dealers of San Francisco, lists prices from $2.00 for the 7 shot "Fashion" and "Blue Jacket" revolvers to $2.50 and $3.50 for the "Kitemaug" and "Ranger" revolvers to various Colt and Smith & Wesson revolvers selling at from $15.00 to $17.00. KENNETT & ANDERSON, *supra* note 110, at 98–100.

Thus, the period between 1866 and 1900 saw a vast diffusion of commercial and military surplus revolvers and lever action rifles throughout the American populace. Yet, far from rising, homicide seems to have fallen off sharply during these thirty years.

Whether or not guns were the cause, homicide steadily declined over a period of five centuries coincident with the invention of guns and their diffusion throughout the continent. In America, from the seventeenth century through the early nineteenth century, murder was rare and rarely involved guns, though gun ownership was universal by law and "colonial Americans were the most heavily armed people in the world."[119] By the 1840s, gun ownership had declined but homicide began a spectacular rise through the early 1860s. From the end of the Civil War to the turn of the twentieth century, however, America in general, and urban areas in particular, such as New York, experienced a tremendous spurt in ownership of higher capacity revolvers and rifles than had ever existed before, but the number of murders sharply declined.[120]

In sum, the notion that more guns equal more death is not borne out by the historical evidence available for the period between the Middle Ages and the twentieth century. Yet this conclusion must be viewed with caution. While one may describe broad general trends in murder rates and in the availability of firearms, it is not possible to do so with exactitude. Not until the late 1800s in England, and the mid-1900s in the United States were there detailed data on homicide. Information about the distribution of firearms is even more sparse. For instance, Lane's generalizations about the rarity of gun murders and low American murder rates in general are subject to some dispute. Professor Randolph Roth, for example, has shown that early American murder rates and the extent to which guns were used in murder varied greatly between differing areas and time periods.[121]

---

119. DEDERER, *supra* note 106, at 116.

120. *See* LANE, *supra* note 65, at 181, 307; ERIC H. MONKKONEN, MURDER IN NEW YORK CITY 21, 30–31, 38 (2001).

121. Randolph Roth, *Guns, Gun Culture, and Homicide: The Relationship Between Firearms, the Uses of Firearms, and Interpersonal Violence*, 59 WM. & MARY Q. 223, 234–40 (2002).

### C.  *Later and More Specific Macro-Historical Evidence*

Malcolm presents reliable trend data on both gun owner-ship and crime in England for the period between 1871 and 1964. Significantly, these trend data do not at all correlate as the mantra would predict: violent crime did not increase with increased gun ownership nor did it decline in periods in which gun ownership was lower.[122]

In the United States, the murder rate doubled in the ten-year span between the mid-1960s and the mid-1970s. Since this rise coincided with vastly increasing gun sales, it was viewed by many as proof positive that more guns equal more death. That conclusion, however, does not follow. It is at least equally possible that the causation was reversed: that is, the decade's spectacular increases in murder, burglary, and all kinds of violent crimes caused fearful people to buy guns.[123] The dubiousness of assuming that the gun sales caused the rise in murder rather than the reverse might have been clearer had it been known in this period that virtually the same mur-der rate increase was occurring in gun-less Russia.[124] Clearly there is little basis to assume guns were the reason for the American murder rate rise when the Russian murder rate ex-hibited the same increase without a similar increase in the number of guns.

Reliable information on both gun ownership and murder rates in the United States is available only for the period commencing at the end of World War II. Significantly, the decade from the mid-1960s to the mid-1970s is a unique ex-ception to the general pattern that, decade-by-decade, the number of guns owned by civilians has risen steadily and

---

122. *See* MALCOLM, *supra* note 10, app. at 258. The handgun ownership data cited are tax data and so doubtless fail to count the pistols owned by criminals and others who failed to pay taxes. The extremely low numbers of gun crimes, however, do not support the notion that there were numerous criminal owners of guns, or at least that they used the guns for crime.

123. In contrast to the more guns equal more death mantra, studies suggest that crime rate increases fuel gun buying, rather than the other way around. *See, e.g.,* Douglas C. Bice & David D. Hemley, *The Market for New Handguns: An Empirical Investigation*, 45 J.L. & ECON. 251, 253, 261–262 (2002); Lawrence Southwick, Jr., *Do Guns Cause Crime? Does Crime Cause Guns? A Granger Test*, 25 ATLANTIC ECON. J. 256, 256, 272 (1997); KLECK, *supra* note 8, at 79–81.

124. In 1965, the Russian homicide rate stood at 5.9 per 100,000 population while the American rate was 5.4. As of 1975, both Russian and American rates had nearly doubled, the Russian to 10.3 and the American to 9.7. *See* Pridemore, *supra* note 2, at 272 fig.2; *see also supra* note 6 and accompanying text.

dramatically but murder rates nevertheless have remained stable or even declined. As for the second half of the twentieth century, and especially its last quarter, a study comparing the number of guns to murder rates found that during the 25-year period from 1973 to 1997, the number of handguns owned by Americans increased 160% while the number of all firearms rose 103%. Yet over that period, the murder rate declined 27.7%.[125] It continued to decline in the years 1998, 1999, and 2000, despite the addition in each year of two to three million handguns and approximately five million firearms of all kinds. By the end of 2000, the total American gunstock stood at well over 260 million—951.1 guns for every 1,000 Americans—but the murder rate had returned to the comparatively low level prior to the increases of the mid-1960s to mid-1970s period.[126]

In sum, the data for the decades since the end of World War II also fails to bear out the more guns equal more death mantra. The per capita accumulated stock of guns has increased, yet there has been no correspondingly consistent increase in either total violence or gun violence. The evidence is consistent with the hypothesis that gun possession levels have little impact on violence rates.[127]

### D.   Geographic Patterns within Nations

Once again, if more guns equal more death and fewer guns equal less death, areas within nations with higher gun ownership should in general have more murders than those with less gun ownership in a similar area. But, in fact, the reverse pattern prevails in Canada,[128] "England, America, and Switzerland, [where the areas] with the highest rates of gun ownership were in fact those with the lowest rates of violence."[129]

---

125. Don B. Kates & Daniel D. Polsby, *Long-Term Nonrelationship of Widespread and Increasing Firearm Availability to Homicide in the United States*, 4 HOMICIDE STUD. 185, 190–91 (2000).

126. *See* communication from Gary Kleck, Professor, Florida State University, to Don B. Kates and Gary Mauser (Feb. 26, 2003) (on file with Authors).

127. KLECK, *supra* note 8, at 17–19.

128. *See* Philip C. Stenning, *Gun Control: A Critique of Current Policy*, POL'Y OPTIONS, Oct. 1994, at 13, 15.

129. MALCOLM, *supra* note 10, at 204; *see also* BBC News, *Handgun Crime 'Up' Despite Ban*, July 16, 2001, http://news.bbc.co.uk/2/hi/uk_news/1440764.stm (noting that English areas with very low numbers of firearms have higher than average gun crime while areas with the highest levels of legally held guns do not).

A recent study of all counties in the United States has again demonstrated the lack of relationship between the prevalence of firearms and homicide.[130]

This inverse correlation is one of several that seems to contradict more guns equal more death. For decades the gun lobby has emphasized that, in general, the American jurisdictions where guns are most restricted have consistently had the highest violent crime rates, and those with the fewest restrictions have the lowest violent crime rates.[131] For instance, robbery is highest in jurisdictions which are most restrictive of gun ownership.[132] As to one specific control, the ban on carrying concealed weapons for protection, "violent-crime rates were highest in states [that flatly ban carrying concealed weapons], next highest in those that allowed local authorities discretion [to deny] permits, and lowest in states with nondiscretionary" concealed weapons laws under which police are legally required to license every qualified applicant.[133] Also of interest are the extensive opinion surveys of incarcerated felons, both juvenile and adult, in which large percentages of the felons replied that they often feared potential victims might be armed and aborted violent crimes because of that fear.[134] The felons most frightened about confronting an armed victim were those "from states with the greatest relative number of privately owned firearms."[135]

---

130. Tomislav Kovandzic, Mark E. Schaffer, & Gary Kleck, *Gun Prevalence, Homicide Rates and Causality: A GMM Approach to Endogeneity Bias* 39–40 (Ctr. for Econ. Policy Research, Discussion Paper No. 5357, 2005) *available at* http://ssrn.com/abstract=878132.

131. *See e.g.*, National Rifle Association Institute for Legislative Action (NRA-ILA), More Guns, Less Crime (Sept. 26, 2006), http://www.nraila.org/Issues/FactSheets/Read.aspx?idequals206&issueequals007; NRA-ILA, The War Against Handguns (Feb. 15, 2001), www.nraila.org/Issues/FactSheets/Read.aspx?idequals17; NRA-ILA, Right-to-Carry 2006 (Oct. 3, 2006), www.nraila.org/Issues/FactSheets/Read.aspx?idequals18; NRA-ILA, The Brady Handgun Violence Prevention Act, Does it Live Up to its Name? (July 28, 1999), www.nraila.org/Issues/FactSheets/Read.aspx?idequals73.

132. *See, e.g.*, Philip J. Cook, *The Effect of Gun Availability on Robbery and Robbery Murder: A Cross Section Study of Fifty Cities*, 3 POL'Y STUD. REV. ANN. 743, 770 (1979).

133. LOTT, *supra* note 11, at 43.

134. WRIGHT & ROSSI, *supra* note 83, at 147, 150.

135. *Id.* at 151.

### E. Geographic Comparisons: European Gun Ownership and Murder Rates

This topic has already been addressed at some length in connection with Tables 1–3, which contain the latest data available. Tables 4–6, contain further, and somewhat more comprehensive, data from the early and mid-1990s.[136] These statistics reinforce the point that murder rates are determined by basic socio-cultural and economic factors rather than mere availability of some particular form of weaponry. Consider Norway and its neighbors Sweden, the Netherlands, and Denmark. Norway has far and away Western Europe's highest household gun ownership rate (32%), but also its lowest murder rate. The Netherlands has the lowest gun ownership rate in Western Europe (1.9%), and Sweden lies midway between (15.1%) the Netherlands and Norway. Yet the Dutch gun murder rate is higher than the Norwegian, and the Swedish rate is even higher, though only slightly.[137]

*Table 4: Intentional Deaths: United States vs. Continental Europe Rates*

In order of highest combined rate; nations having higher rates than the United States are indicated by asterisk (suicide rate) or + sign (murder rate).

| Nation | Suicide | Murder | Combined rates |
|---|---|---|---|
| Russia | 41.2* | 30.6+ | 71.8 |
| Estonia | 40.1* | 22.2+ | 62.3 |
| Latvia | 40.7* | 18.2+ | 58.9 |
| Lithuania | 45.6* | 11.7+ | 57.3 |
| Belarus | 27.9* | 10.4+ | 38.3 |
| Hungary | 32.9* | 3.5 | 36.4 |
| Ukraine | 22.5* | 11.3+ | 33.8 |
| Slovenia | 28.4* | 2.4 | 30.4 |
| Finland | 27.2* | 2.9 | 30.1 |
| Denmark | 22.3* | 4.9 | 27.2 |
| Croatia | 22.8* | 3.3 | 26.1 |
| Austria | 22.2* | 1.0 | 23.2 |
| Bulgaria | 17.3* | 5.1 | 22.4 |
| France | 20.8* | 1.1 | 21.9 |
| Switzerland | 21.4* | 1.1‡ | 24.1 |

136. Tables 4–6 were previously published as appendices to Kates, *supra* note 81, app. at 81 tbl.1, 82 tbl.2, 83 tbl.3.

137. *See infra* Table 5.

| | | | |
|---|---|---|---|
| Belgium | 18.7* | 1.7 | 20.4 |
| United States | 11.6 | 7.8 | 19.4 |
| Poland | 14.2* | 2.8 | 17.0 |
| Germany | 15.8* | 1.1 | 16.9 |
| Romania | 12.3* | 4.1 | 16.4 |
| Sweden | 15.3* | 1.0 | 16.3 |
| Norway | 12.3* | 0.8 | 13.1 |
| Holland | 9.8 | 1.2 | 11.0 |
| Italy | 8.2 | 1.7 | 9.9 |
| Portugal | 8.2 | 1.7 | 9.9 |
| Spain | 8.1 | 0.9 | 9.0 |
| Greece | 3.3 | 1.3 | 4.6 |

Notes: Data based in general on U.N. DEMOGRAPHIC YEARBOOK (1998) as reported in David C. Stolinsky, *America: The Most Violent Nation?* 5 MED. SENTINEL 199–201 (2000). It should be understood that, though the 1998 Yearbook gives figures for as late as 1996, the figures are not necessarily for that year. The Yearbook contains the latest figure each nation has provided the U.N., which may be 1996, 1995, or 1994.

‡ The Swiss homicide figure that Stolinsky reports is an error because it combines attempts with actual murders. We have computed the Swiss murder rate by averaging the 1994 and 1995 Swiss National Police figures for actual murders in those years given in RICHARD MUNDAY & JAN A. STEVENSON, GUNS AND VIOLENCE: THE DEBATE BEFORE LORD CULLEN 268 (1996).

*Table 5: European Gun/Handgun Violent Death*

| Nation | Suicide with handgun | Murder with handgun | Percent of households with guns | Percent of households with hand-guns |
|---|---|---|---|---|
| Belgium | 18.7 | 1.7 | 16.6% | 6.8% |
| France | 20.8 | 1.1 | 22.6% | 5.5% |
| West Germany | 15.8 | 1.1 | 8.9% | 6.7%* |
| Holland | 9.8 | 1.2 | 1.9% | 1.2% |
| Italy | 8.2 | 1.7 | 16.0% | 5.5% |
| Norway | 12.3 | 0.8 | 32%% | 3.8% |
| Sweden | 15.3 | 1.3 | 15.1% | 1.5% |
| Switzerland | 20.8 | 1.1** | 27.2% | 12.2% |

Notes: For derivation of the homicide rates, see notes to Table 4. The data on household firearms ownership come from British Home Office figures printed in RICHARD MUNDAY & JAN A. STEVENSON, GUNS AND VIOLENCE: THE DEBATE BEFORE LORD CULLEN 30, 275 (1996).

* Note that the data here are for *West* Germany and were obtained when that nation still existed as an independent entity. See *infra* Tables 1 & 4 for later (but differently derived) data for the current nation of Germany.

** Again, the Swiss homicide figure that Stolinsky reports is an error because it combines attempts with actual murders. *See* notes for Table 4.

### Table 6: European Firearms-Violent Deaths

| Nation | Suicide | Suicide with gun | Murder | Murder with gun | Number of guns per 100,000 population |
|---|---|---|---|---|---|
| Austria | N/A | N/A | 2.14 | 0.53 | 41.02[*] |
| Belarus | 27.26 | N/A | 9.86 | N/A | 16.5 |
| Czech Rep. | 9.88 | 1.01 | 2.80 | 0.92 | 27.58 |
| Estonia | 39.99 | 3.63 | 22.11 | 6.2 | 28.56 |
| Finland | 27.28 | 5.78 | 3.25 | 0.87 | 411.20[**] |
| Germany | 15.80 | 1.23 | 1.81 | 0.21 | 122.56 |
| Greece | 3.54 | 1.30 | 1.33 | 0.55 | 77.00 |
| Hungary | 33.34 | 0.88 | 4.07 | 0.47 | 15.54 |
| Moldova | N/A | N/A | 17.06 | 0.63 | 6.61 |
| Poland | 14.23 | 0.16 | 2.61 | 0.27 | 5.30 |
| Romania | N/A | N/A | 4.32 | 0.12 | 2.97 |
| Slovakia | 13.24 | 0.58 | 2.38 | 0.36 | 31.91 |
| Spain | 5.92 | N/A | 1.58 | 0.19 | 64.69 |
| Sweden | 15.65 | 1.95 | 1.35 | 0.31 | 246.65 |

Notes: It bears emphasis that the following data come from a special U.N. report whose data are not fully comparable to those in Tables 4 and 5 because they cover different years and derive from substantially differing sources.[138] This special report is based on data obtained from the governments of the nations set out below, especially data on gun permits or other official indicia of gun ownership in those nations.[139] The data on suicide and murder in those

---

138. The data derive from a much more extensive survey of legal firearms ownership in numerous nations which was carried out by researchers provided by the Government of Canada under the auspices of the United Nations Economic and Social Council, Commission on Crime Prevention and Criminal Justice in 1997. The entire survey is published as a report to the Secretary General on April 25, 1997 as E/CN.15/1997/4. That report is analysed in some detail in an unpublished paper ("A Cross Sectional Study of the Relationship Between Levels of Gun Ownership and Violent Deaths") written by the leading English student of firearms regulation, retired Chief Superintendent of English police Colin Greenwood of the Firearms Research and Advisory Service. We are indebted to Chief Superintendent Greenwood for the opportunity to review his paper. Note that in the table which follows we have focused only on European nations.

139. The gun ownership data in Table 4 derive from a random telephone survey on gun ownership in various nations. Chief Superintendent Greenwood's paper is contemptuous of such data, in part because people may be unwilling to acknowledge owning guns to telephoning pollsters. For similar doubts see Don B. Kates & Daniel D. Polsby, *Long Term Non-Relationship of Firearm Availability to Homicide*, 4 HOMICIDE STUD. 185–201 (2000). But that was in the context of comparing survey data on the number of guns owned to production and important data that are unquestionably more comprehensive and superior in every way. Chief Superintendent Greenwood himself admits that the special U.N. report data are not necessarily

nations also come from their governments as do the similar data in Tables 4 and 5, but for later years, and also include data on the number of firearm homicides and firearm suicides which are not available from the U.N. source used in Tables 4 and 5.

* This may well be an undercount because an Austrian license is not limited to a single firearm but rather allows the licensee to possess multiple guns.

** The source from which Table 5 derives also gives figures for Finland, which we have omitted there because they are earlier and closely similar except in one respect: instead of official ownership figures for guns, they give a survey-based figure for households having a gun: 23.2%.

These comparisons are reinforced by Table 6, which gives differently derived (and non-comparable) gun ownership rates, overall murder rates, and rates of gun murder, for a larger set of European nations.[140] Table 6 reveals that even though Sweden has more than double the rate of gun ownership as neighboring Germany, as well as more gun murders, it has 25% less murder overall. In turn, Germany, with three times the gun ownership rate of neighboring Austria, has a substantially lower murder rate overall and a lower gun murder rate. Likewise, though Greece has over twice the per capita gun ownership rate of the Czech Republic, Greece has substantially less gun murder and less than half as much murder overall. Although Spain has over 12 times more gun ownership than Poland, the latter has almost a third more gun murder and more overall murder than the former. Finally, Finland has 14 times more gun ownership than neighboring Estonia, yet Estonia's gun murder and overall murder rates are about seven times higher than Finland's.

*F.    Geographic Comparisons: Gun Ownership and Suicide Rates*

The mantra more guns equal more death and fewer guns equal less death is also used to argue that "limiting access to firearms could prevent many suicides."[141] Once again, this assertion is di-

---

comprehensive and are problematic in various other respects. Even assuming they are clearly superior to the survey data, the latter cover multiple nations that the special U.N. report does not. Given that neither source is indubitable, it seems preferable to have such information on those nations as the survey data reveal, rather than no data at all.

140. Table 6 covers different years from Table 5, its comparative gun ownership figures derive from government records rather than survey data, and it gives rates for gun murders, data that are not available in the sources from which Table 5 is taken. See the explanatory note that precedes Table 6.

141. Arthur L. Kellermann et al., *Suicide in the Home in Relation to Gun Ownership*, 327 NEW ENG. J. MED. 467, 467, 471–72 (1992); *see also* Antoon Leenaars, et al., *Controlling the Environment to Prevent Suicide: International Perspectives*, 45 CAN. J. PSYCHIATRY 639 (2000).

rectly contradicted by the studies of 36 and 21 nations (respectively) which find no statistical relationship. Overall suicide rates were no worse in nations with many firearms than in those where firearms were far less widespread.[142]

Consider the data about European nations in Tables 5 and 6. Sweden, with over twice as much gun ownership as neighboring Germany and a third more gun suicide, nevertheless has the lower overall suicide rate. Greece has nearly three times more gun ownership than the Czech Republic and somewhat more gun suicide, yet the overall Czech suicide rate is over 175% higher than the Greek rate. Spain has over 12 times more gun ownership than Poland, yet the latter's overall suicide rate is more than double the former's. Tragically, Finland has over 14 times more gun ownership than neighboring Estonia, and a great deal more gun-related suicide. Estonia, however, turns out to have a much higher suicide rate than Finland overall.

There is simply no relationship evident between the extent of suicide and the extent of gun ownership. People do not commit suicide because they have guns available. In the absence of firearms, people who are inclined to commit suicide kill themselves some other way.[143] Two examples seem as pertinent as they are poignant. The first concerns the 1980s increase in suicide among young American males, an increase that, although relatively modest, inspired perfervid denunciations of gun ownership.[144] What these denunciations failed to mention was that suicide of teenagers and young adults was increasing throughout the entire industrialized world, regardless of gun availability, and often much more rapidly than in the United States. The only unusual aspect of suicide in the United States was that it involved guns. The irrelevancy of guns to the increase in American suicide is evident because suicide among English youth actually increased 10 times more

---

142. *See* Killias et al., *supra* note 42, at 430 (study of 21 nations); *see generally* KLECK, *supra* note 8.

143. *See* KLECK, *supra* note 8, at ch. 8; *see also* World Health Organization, *supra* note 43, at 3 (showing that around the world "firearms accounted for only one-fifth of all suicides, just ahead of poisoning . . . . [s]trangulation, i.e. (hanging) was the most frequently used method of suicide").

144. *See, e.g.,* Jeffrey H. Boyd & Eve K. Moscicki, *Firearms and Youth Suicide*, 76 AM. J. PUB. HEALTH 1240 (1986); James A. Mercy et al., *Public Health Policy for Preventing Violence*, 12 HEALTH AFF. 7 (1993); Daniel W. Webster & Modena E. H. Wilson, *Gun Violence Among Youth and the Pediatrician's Role in Primary Prevention*, 94 PEDIATRICS 617 (1994); Lois A. Fingerhut & Joel C. Kleinman, *Firearm Mortality Among Children and Youth*, NAT'L CTR HEALTH STAT. ADVANCE DATA, Nov. 3, 1989, at 1.

sharply, with "car exhaust poisoning [being] the method of suicide used most often."[145] By omitting such facts, the articles blaming guns for increasing American suicide evaded the inconvenience of having to explain exactly what social benefit nations with few guns received from having their youth suicides occur in other ways.

Even more poignant are the suicides of many young Indian women born and raised on the island of Fiji. In general, women are much less likely to commit suicide than are men.[146] This statistic is true of Fijian women overall as well, but not of women in the large part of Fiji's population that is of Indian ancestry. As children, these Indian women are raised in more-or-less loving and supportive homes. But upon marriage they are dispersed across the island to remote areas where they live with their husbands' families, an often overtly hostile situation the husbands do little to mitigate. Indian women on Fiji have a suicide rate nearly as high as that of Indian men, a rate many times greater than that of non-Indian Fijian women.[147] It also bears emphasis that the overall Fijian suicide rate far exceeds that of the United States.

The method of suicide is particularly significant. Fijian women of Indian ancestry commit suicide without using guns, perhaps because guns are unavailable. About three-quarters of these women hang themselves, while virtually all the rest die from consuming the agricultural pesticide paraquat. The recommendation of the author whose article chronicles all these suicides is so myopic as to almost caricature the more guns equal more death mindset: to reduce suicide by Indian women, she recommends that the Fijian state stringently control paraquat.[148] Apparently she believes de-

---

145. Keith Hawton, *By Their Own Young Hand*, 304 BRIT. MED. J. 1000 (1992); *see also Teenage Deaths Increasing Across Europe*, CRIM. & JUST. INT'L, Nov.–Dec. 1991, at 4.

146. World Health Organization, Suicide Rates by Country, http://www.who.int/mental_health/prevention/suicide/country_reports/en/index.html (follow hyperlinks to specific countries) (last visited Jan. 18, 2007). For example, in the United States, suicide rates for males exceed those for females by a 17.9-4.2 margin (2002 data). In Denmark, the margin is 19.2-8.1 (2001 data); in Austria, the margin is 27.0-8.2 (2004 data); and in Belgium, the margin is 31.2-11.4 (1997 data).

147. *See* Ruth H. Haynes, *Suicide in Fiji: A Preliminary Study*, 145 BRIT. J. PSYCHIATRY 433 (1984).

148. *Id.* at 437. More or less the same situation seems to prevail in the substantially Indian-populated nation of Sri Lanka (formerly Ceylon). It "has one of the highest suicide rates in the world . . . . Suicides are especially frequent among young adults,

creased access to a means of death will reconcile these women to a life situation they regard as unendurable. At the risk of belaboring what should be all too obvious, restricting paraquat will not improve the lives of these poor women. It will only reorient them towards hanging, drowning, or some other means of suicide.

Guns are just one among numerous available deadly instruments. Thus, banning guns cannot reduce the amount of suicides. Such measures only reduce the number of suicides by firearms. Suicides committed in other ways increase to make up the difference. People do not commit suicide because they have guns available. They kill themselves for reasons they deem sufficient, and in the absence of firearms they just kill themselves in some other way.

CONCLUSION

This Article has reviewed a significant amount of evidence from a wide variety of international sources. Each individual portion of evidence is subject to cavil—at the very least the general objection that the persuasiveness of social scientific evidence cannot remotely approach the persuasiveness of conclusions in the physical sciences. Nevertheless, the burden of proof rests on the proponents of the more guns equal more death and fewer guns equal less death mantra, especially since they argue public policy ought to be based on that mantra.[149] To bear that burden would at the very least require showing that a large number of nations with more guns have more death and that nations that have imposed stringent gun controls have achieved substantial reductions in criminal violence (or suicide). But those correlations are not observed when a large number of nations are compared across the world.

---

both male and female. Compared to the U.S., the suicide rate for males ages 15 to 24 years in Sri Lanka is nearly four times greater; the female rate nearly 13 times greater. *The most common mode of suicide is ingestion of liquid pesticides.*" Lawrence R. Berger, *Suicides and Pesticides in Sri Lanka*, 78 AM. J. PUB. HEALTH 826 (1988) (emphasis added).

149. (1) Those who propose to change the status quo bear the burden of proving that change is a good idea; (2) those who propose a new policy bear the burden of proving that the policy is a good idea; and (3) in a free society those who propose to abolish a personal liberty passionately valued by millions bear the burden of proving that abolishment is a good idea.

Over a decade ago, Professor Brandon Centerwall of the University of Washington undertook an extensive, statistically sophisticated study comparing areas in the United States and Canada to determine whether Canada's more restrictive policies had better contained criminal violence. When he published his results it was with the admonition:

> If you are surprised by [our] finding[s], so [are we]. [We] did not begin this research with any intent to "exonerate" handguns, but there it is—a negative finding, to be sure, but a negative finding is nevertheless a positive contribution. It directs us where not to aim public health resources.[150]

---

150. Brandon S. Centerwall, *Author's Response to "Invited Commentary: Common Wisdom and Plain Truth,"* 134 AM. J. EPIDEMIOLOGY 1264, 1264 (1991).

# EXHIBIT 17

U.S. Department of Justice　　Federal Bureau of Investigation　　*Criminal Justice Information Services Division*

FEEDBACK　CONTACT US　DATA QUALITY GUIDELINES　UCR HOME

*CIUS* Home　Offenses Known to Law Enforcement　Violent Crime　Property Crime　Clearances　Persons Arrested　Police Employee Data　About *CIUS*

Return to Previous Page

# Table 16

## Rate: Number of Crimes per 100,000 Inhabitants
by Population Group, 2007

Data Declaration　　Download Excel

| Population group | Violent crime | | Murder and nonnegligent manslaughter | | Forcible rape | | Robbery | | Aggravated assault | |
|---|---|---|---|---|---|---|---|---|---|---|
| | Number of offenses known | Rate | Number of offenses known | Rate | Number of offenses known | Rate | Number of offenses known | Rate | Number of offenses known | Rate |
| **TOTAL ALL AGENCIES:** | 1,310,062 | 484.3 | 15,872 | 5.9 | 81,398 | 30.1 | 421,286 | 155.7 | 791,506 | 292.6 |
| **TOTAL CITIES** | 1,042,793 | 570.5 | 12,426 | 6.8 | 60,193 | 32.9 | 366,962 | 200.7 | 603,212 | 330.0 |
| GROUP I (250,000 and over) | 482,214 | 893.8 | 6,440 | 11.9 | 19,577 | 36.3 | 198,421 | 367.8 | 257,776 | 477.8 |
| 1,000,000 and over (Group I subset) | 209,784 | 831.8 | 2,790 | 11.1 | 6,985 | 27.7 | 94,385 | 374.2 | 105,624 | 418.8 |
| 500,000 to 999,999 (Group I subset) | 158,406 | 989.3 | 2,195 | 13.7 | 6,876 | 42.9 | 61,177 | 382.1 | 88,158 | 550.6 |
| 250,000 to 499,999 (Group I subset) | 114,024 | 896.6 | 1,455 | 11.4 | 5,716 | 44.9 | 42,859 | 337.0 | 63,994 | 503.2 |
| GROUP II (100,000 to 249,999) | 177,852 | 635.6 | 2,396 | 8.6 | 10,619 | 37.9 | 63,376 | 226.5 | 101,461 | 362.6 |
| GROUP III (50,000 to 99,999) | 138,044 | 467.6 | 1,432 | 4.9 | 9,440 | 32.0 | 45,208 | 153.1 | 81,964 | 277.6 |
| GROUP IV (25,000 to 49,999) | 94,816 | 377.0 | 880 | 3.5 | 7,571 | 30.1 | 27,957 | 111.2 | 58,408 | 232.3 |
| GROUP V (10,000 to 24,999) | 81,046 | 319.5 | 746 | 2.9 | 7,040 | 27.8 | 20,306 | 80.1 | 52,954 | 208.8 |
| GROUP VI (under 10,000) | 68,821 | 330.3 | 532 | 2.6 | 5,946 | 28.5 | 11,694 | 56.1 | 50,649 | 243.1 |
| METROPOLITAN COUNTIES | 213,529 | 338.4 | 2,630 | 4.2 | 14,870 | 23.6 | 50,286 | 79.7 | 145,743 | 231.0 |
| NONMETROPOLITAN COUNTIES1 | 53,740 | 218.4 | 816 | 3.3 | 6,335 | 25.7 | 4,038 | 16.4 | 42,551 | 172.9 |
| SUBURBAN AREA2 | 360,216 | 318.5 | 3,871 | 3.4 | 26,443 | 23.4 | 90,648 | 80.1 | 239,254 | 211.5 |

[1] Includes state police agencies that report aggregately for the entire state.

[2] Suburban area includes law enforcement agencies in cities with less than 50,000 inhabitants and county law enforcement agencies that are within a Metropolitan Statistical Area. Suburban area excludes all metropolitan a

Back to Top

## Data Declaration
Provides the methodology used in constructing this table and other pertinent information about this table.

U.S. Department of Justice — Federal Bureau of Investigation

*Crime in the United States, 2007*

September 2008

# EXHIBIT 18

*CIUS* Home    Offenses Known to Law Enforcement    Violent Crime    Property Crime    Clearances    Persons Arrested    Police Employee Data    About *CIUS*

Return to Previous Page

# Table 16

### Rate: Number of Crimes per 100,000 Inhabitants
by Population Group, 2008

Data Declaration    Download Excel

| Population group | Violent crime | | Murder and nonnegligent manslaughter | | Forcible rape | | Robbery | | Aggravated assault | |
|---|---|---|---|---|---|---|---|---|---|---|
| | Number of offenses known | Rate | Number of offenses known | Rate | Number of offenses known | Rate | Number of offenses known | Rate | Number of offenses known | Rate |
| **TOTAL ALL AGENCIES:** | 1,292,693 | 470.6 | 15,282 | 5.6 | 80,797 | 29.4 | 423,023 | 154.0 | 773,591 | 281.6 |
| **TOTAL CITIES** | 1,034,427 | 552.8 | 11,883 | 6.4 | 60,017 | 32.1 | 369,124 | 197.3 | 593,403 | 317.1 |
| GROUP I (250,000 and over) | 489,839 | 866.5 | 6,502 | 11.5 | 19,909 | 35.2 | 203,730 | 360.4 | 259,698 | 459.4 |
| 1,000,000 and over (Group I subset) | 206,447 | 808.2 | 2,670 | 10.5 | 6,900 | 27.0 | 93,467 | 365.9 | 103,410 | 404.8 |
| 500,000 to 999,999 (Group I subset) | 162,302 | 956.4 | 2,151 | 12.7 | 6,720 | 39.6 | 63,351 | 373.3 | 90,080 | 530.8 |
| 250,000 to 499,999 (Group I subset) | 121,090 | 863.7 | 1,681 | 12.0 | 6,289 | 44.9 | 46,912 | 334.6 | 66,208 | 472.3 |
| GROUP II (100,000 to 249,999) | 170,997 | 599.2 | 2,000 | 7.0 | 10,438 | 36.6 | 62,536 | 219.1 | 96,023 | 336.5 |
| GROUP III (50,000 to 99,999) | 135,012 | 451.3 | 1,347 | 4.5 | 9,324 | 31.2 | 43,601 | 145.7 | 80,740 | 269.9 |
| GROUP IV (25,000 to 49,999) | 89,737 | 357.0 | 803 | 3.2 | 7,219 | 28.7 | 26,421 | 105.1 | 55,294 | 220.0 |
| GROUP V (10,000 to 24,999) | 81,012 | 313.7 | 684 | 2.6 | 7,077 | 27.4 | 20,595 | 79.7 | 52,656 | 203.9 |
| GROUP VI (under 10,000) | 67,830 | 320.5 | 547 | 2.6 | 6,050 | 28.6 | 12,241 | 57.8 | 48,992 | 231.5 |
| METROPOLITAN COUNTIES | 206,994 | 324.5 | 2,548 | 4.0 | 14,998 | 23.5 | 49,706 | 77.9 | 139,742 | 219.1 |
| NONMETROPOLITAN COUNTIES[1] | 51,272 | 215.3 | 851 | 3.6 | 5,782 | 24.3 | 4,193 | 17.6 | 40,446 | 169.8 |
| SUBURBAN AREAS[2] | 352,062 | 306.2 | 3,745 | 3.3 | 26,592 | 23.1 | 89,847 | 78.1 | 231,878 | 201.7 |

[1] Includes state police agencies that report aggregately for the entire state.

[2] Suburban areas include law enforcement agencies in cities with less than 50,000 inhabitants and county law enforcement agencies that are within a Metropolitan Statistical Area. Suburban areas exclude all metropolitan a

Back to Top

## Data Declaration
Provides the methodology used in constructing this table and other pertinent information about this table.

*Crime in the United States, 2008*

U.S. Department of Justice — Federal Bureau of Investigation
September 2009

# EXHIBIT 19

CIUS Home   Offenses Known to Law Enforcement   Violent Crime   Property Crime   Clearances   Persons Arrested   Police Employee Data   About CIUS

Return to Previous Page

# Table 16

### Rate: Number of Crimes per 100,000 Inhabitants
by Population Group, 2009

Data Declaration   Download Excel

| Population group | Violent crime Number of offenses known | Rate | Murder and nonnegligent manslaughter Number of offenses known | Rate | Forcible rape Number of offenses known | Rate | Robbery Number of offenses known | Rate | Aggravated assault Number of offenses known | Rate |
|---|---|---|---|---|---|---|---|---|---|---|
| TOTAL ALL AGENCIES: | 1,254,358 | 441.9 | 14,604 | 5.1 | 81,992 | 28.9 | 396,169 | 139.6 | 761,593 | 268.3 |
| TOTAL CITIES | 999,151 | 518.4 | 11,308 | 5.9 | 60,421 | 31.4 | 345,030 | 179.0 | 582,392 | 302.2 |
| GROUP I (250,000 and over) | 459,141 | 801.6 | 5,868 | 10.2 | 19,886 | 34.7 | 186,587 | 325.8 | 246,800 | 430.9 |
| 1,000,000 and over (Group I subset) | 193,765 | 748.9 | 2,369 | 9.2 | 6,860 | 26.5 | 85,436 | 330.2 | 99,100 | 383.0 |
| 500,000 to 999,999 (Group I subset) | 150,834 | 877.8 | 1,960 | 11.4 | 6,698 | 39.0 | 57,457 | 334.4 | 84,719 | 493.0 |
| 250,000 to 499,999 (Group I subset) | 114,542 | 805.4 | 1,539 | 10.8 | 6,328 | 44.5 | 43,694 | 307.2 | 62,981 | 442.9 |
| GROUP II (100,000 to 249,999) | 166,260 | 563.5 | 1,947 | 6.6 | 10,283 | 34.9 | 57,595 | 195.2 | 96,435 | 326.9 |
| GROUP III (50,000 to 99,999) | 131,238 | 425.8 | 1,278 | 4.1 | 9,152 | 29.7 | 41,808 | 135.7 | 79,000 | 256.3 |
| GROUP IV (25,000 to 49,999) | 91,893 | 343.1 | 879 | 3.3 | 7,405 | 27.6 | 27,192 | 101.5 | 56,417 | 210.7 |
| GROUP V (10,000 to 24,999) | 82,221 | 307.0 | 724 | 2.7 | 7,234 | 27.0 | 20,160 | 75.3 | 54,103 | 202.0 |
| GROUP VI (under 10,000) | 68,398 | 317.3 | 612 | 2.8 | 6,461 | 30.0 | 11,688 | 54.2 | 49,637 | 230.3 |
| METROPOLITAN COUNTIES | 202,235 | 307.6 | 2,393 | 3.6 | 15,207 | 23.1 | 46,772 | 71.1 | 137,863 | 209.7 |
| NONMETROPOLITAN COUNTIES1 | 52,972 | 208.4 | 903 | 3.6 | 6,364 | 25.0 | 4,367 | 17.2 | 41,338 | 162.6 |
| SUBURBAN AREAS2 | 346,293 | 291.3 | 3,609 | 3.0 | 26,612 | 22.4 | 86,048 | 72.4 | 230,024 | 193.5 |

[1] Includes state police agencies that report aggregately for the entire state.

[2] Suburban areas include law enforcement agencies in cities with less than 50,000 inhabitants and county law enforcement agencies that are within a Metropolitan Statistical Area. Suburban areas exclude all metropolitan a

Back to Top

## Data Declaration

Provides the methodology used in constructing this table and other pertinent information about this table.

*Crime in the United States, 2009*     U.S. Department of Justice — Federal Bureau of Investigation
September 2010

# EXHIBIT 20



Uniform Crime Reports



Criminal Justice Information Services Division     Feedback | Contact Us | Data Quality Guidelines | UCR Home

CIUS Home    Offenses Known to Law Enforcement    Violent Crime    Property Crime    Clearances    Persons Arrested    Police Employee Data    About CIUS

## Table 16

**Rate: Number of Crimes per 100,000 Inhabitants**
by Population Group, 2010

Data Declaration     Download Excel

| Population group | Violent crime | | Murder and nonnegligent manslaughter | | Forcible rape | | Robbery | | Aggravated assault | | Property crime | | Burglary | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | Number of offenses known | Rate | Number of offenses known | Rate | Number of offenses known | Rate | Number of offenses known | Rate | Number of offenses known | Rate | Number of offenses known | Rate | Number of offenses known | Rate |
| TOTAL ALL AGENCIES | 1,180,839 | 410.9 | 13,941 | 4.9 | 80,031 | 27.8 | 352,613 | 122.7 | 734,254 | 255.5 | 8,544,651 | 2,973.3 | 2,025,747 | 704 |
| TOTAL CITIES | 941,873 | 481.7 | 10,735 | 5.5 | 59,648 | 30.5 | 308,033 | 157.5 | 563,457 | 288.2 | 6,673,837 | 3,413.3 | 1,479,919 | 756 |
| GROUP I (250,000 and over) | 424,782 | 751.4 | 5,677 | 10.0 | 19,192 | 34.0 | 166,024 | 293.7 | 233,889 | 413.7 | 2,166,752 | 3,833.0 | 502,925 | 889 |
| 1,000,000 and over (Group I subset) | 184,009 | 712.6 | 2,316 | 9.0 | 6,809 | 26.4 | 78,293 | 303.2 | 96,591 | 374.0 | 810,287 | 3,137.7 | 172,991 | 669 |
| 500,000 to 999,999 (Group I subset) | 133,818 | 806.6 | 1,759 | 10.6 | 6,430 | 38.8 | 47,898 | 288.7 | 77,731 | 468.5 | 761,275 | 4,588.7 | 178,963 | 1,078 |
| 250,000 to 499,999 (Group I subset) | 106,955 | 757.7 | 1,602 | 11.3 | 5,953 | 42.2 | 39,833 | 282.2 | 59,567 | 422.0 | 595,190 | 4,216.6 | 150,971 | 1,069 |
| GROUP II (100,000 to 249,999) | 153,984 | 519.6 | 1,691 | 5.7 | 9,799 | 33.1 | 50,371 | 170.0 | 92,123 | 310.8 | 1,140,095 | 3,846.8 | 267,891 | 903 |
| GROUP III (50,000 to 99,999) | 122,835 | 394.6 | 1,211 | 3.9 | 8,839 | 28.4 | 37,534 | 120.6 | 75,251 | 241.8 | 1,001,762 | 3,218.5 | 221,656 | 712 |
| GROUP IV (25,000 to 49,999) | 91,298 | 326.3 | 913 | 3.3 | 7,923 | 28.3 | 25,104 | 89.7 | 57,358 | 205.0 | 848,255 | 3,031.6 | 179,255 | 640 |
| GROUP V (10,000 to 24,999) | 80,752 | 285.4 | 711 | 2.5 | 7,223 | 25.5 | 18,593 | 65.7 | 54,225 | 191.7 | 814,729 | 2,879.7 | 169,757 | 600 |
| GROUP VI (under 10,000) | 68,222 | 310.6 | 532 | 2.4 | 6,672 | 30.4 | 10,407 | 47.4 | 50,611 | 230.5 | 702,244 | 3,197.6 | 138,435 | 630 |
| METROPOLITAN COUNTIES | 187,381 | 284.1 | 2,357 | 3.6 | 14,322 | 21.7 | 40,447 | 61.3 | 130,255 | 197.5 | 1,444,787 | 2,190.2 | 397,131 | 602 |
| NONMETROPOLITAN COUNTIES[1] | 51,585 | 199.3 | 849 | 3.3 | 6,061 | 23.4 | 4,133 | 16.0 | 40,542 | 156.6 | 426,027 | 1,645.7 | 148,697 | 574 |
| SUBURBAN AREA[2] | 330,785 | 271.0 | 3,612 | 3.0 | 26,437 | 21.7 | 76,755 | 62.9 | 223,981 | 183.5 | 2,958,589 | 2,423.8 | 692,827 | 567 |

[1] Includes state police agencies that report aggregately for the entire state.

[2] Suburban areas include law enforcement agencies in cities with less than 50,000 inhabitants and county law enforcement agencies that are within a Metropolitan Statistical Area. Suburban areas exclude all metropolitan agencies associated with a principal city. The agencies associated with suburban areas also appear in other groups within this table.

## Data Declaration

Provides the methodology used in constructing this table and other pertinent information about this table.

Accessibility | eRulemaking | Freedom of Information Act | Legal Notices | Legal Policies and Disclaimers | Links | Privacy Policy | USA.gov | White House
FBI.gov is an official site of the U.S. Federal Government, U.S. Department of Justice

Close

# EXHIBIT 21

IN THE UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF ILLINOIS

EASTERN DIVISION

ILLINOIS ASSOCIATION OF        )

FIREARMS RETAILERS,            )

KENNETH PACHOLSKI,             )

KATHRYN TYLER, and             )

MICHAEL HALL,                  )

        Plaintiffs,    )

  vs.                          )    No. 10 CV 04184

THE CITY OF CHICAGO,           )

        Defendant.     )

      The deposition of VANCE HENRY, called for
examination pursuant to the Rules of Civil
Procedure for the United States District Courts
pertaining to the taking of depositions, taken
before Johnetta Stafford Taylor, a notary public
within and for the County of Cook and State of
Illinois, at 33 North Dearborn Street, Chicago,
Illinois, on May 24, 2011, at the hour of
10:00 o'clock a.m.


Johnetta Stafford Taylor

License No:  084-001583

1

1                    I N D E X

2    WITNESS                        EXAMINATION

3    VANCE HENRY

4       By Mr. Patterson                    4

5       By Mr. Worseck                     72

6       By Mr. Patterson (Further)         79

7

8

9              E X H I B I T S

10   NUMBER                      MARKED FOR ID

11   Henry Deposition Exhibit

12      No. 1                             38

13      No. 2                             49

14      No. 3                             54

15      No. 4                             67

16

17

18

19

20

21

22

23

24

                                              3

1                    (Whereupon, the witness was

2                    duly sworn.)

3                    VANCE HENRY,

4    called as a witness herein, was examined and

5    testified as follows:

6                    EXAMINATION

7    BY MR. PATTERSON:

8        Q.    Sir, could you please state your name

9    for the record.

10       A.    Vance Henry.

11       Q.    And what is the address of your place

12   of business?

13       A.    121 North LaSalle.

14       Q.    And what is your position with the City

15   of Chicago?

16       A.    Service Deputy Chief of Staff,

17   Community and Faith Based Partnerships.

18       Q.    And have you been deposed before?

19       A.    Yes.

20       Q.    How many times have you been deposed?

21       A.    Once.

22       Q.    And what was the case in which you were

23   deposed?

24       A.    A personnel matter.

4

1          MR. PATTERSON:  And just a few ground rules

2     before we start.

3          THE WITNESS:  Uh-huh.

4          MR. PATTERSON:  The first is I'll try to wait

5     until you've finished answering a question until

6     I ask another one.  And I would just like that

7     you do the same.  Wait until I finish asking

8     before you answer so that the court reporter can

9     get down what we're saying.

10              And also, if you could give a verbal

11     response in answer to questions so that the

12     court reporter can take those down, that would

13     be great as well.

14              And finally, if you need a break at any

15     time, just let me know.  If we have a question

16     pending, I would just ask that you answer the

17     question first, and then I'd be happy to

18     accommodate you.

19              Chief Henry, do you understand that

20     you've been identified by the City as someone

21     who may have information about the interests

22     served by certain provisions of the City's

23     firearms ordinance?

24          A.    Yes.

5

1        MR. WORSECK:  Objection.  Vague.

2             But you can answer the question.

3        THE WITNESS:  Yes.

4   BY MR. PATTERSON:

5        Q.   And when I talk about the City's

6   firearms ordinance, I'm discussing the ordinance

7   that was passed in July of 2010.

8             Are you familiar with that ordinance?

9        A.   Yes.

10       Q.   Okay.  And what in your experience with

11  the City has given you information about

12  government interests that may be served by the

13  firearms ordinance?

14       A.   I work primarily with many of the

15  City's faith and community based partners that

16  work providing direct service.  I work very

17  closely with families and communities that have

18  been impacted by gun violence.

19       Q.   Okay.  And that is in your current

20  position as deputy chief of staff in the mayor's

21  office.

22             Are there any other positions you've

23  held with the City that also have given you any

24  insight into problems relating to gun violence?

6

1      A.   With respect to your first question,

2   yes, in my present capacity.  Also with respect

3   to a previous responsibility, when I served as

4   the director of the City's community -- the

5   police department's community policing program.

6      Q.   And how long did you work in the City's

7   community policing program?

8      A.   Nine years or more.

9      Q.   Okay.  And how long have you been in

10   your current position?

11      A.   Two years.

12      Q.   Okay.  Are there any other positions

13   that you've held that have given you any insight

14   into the problems of gun violence in the City of

15   Chicago?

16      MR. WORSECK:  Do you understand the question?

17      THE WITNESS:  Uh-huh.

18          I'm also an ordained minister.  So in

19   that capacity have seen firsthand the way that

20   gun violence has ripped families apart.

21   BY MR. PATTERSON:

22      Q.   So members of your congregation and

23   members of the community have gun violence with

24   respect to them?

7

1    A.    Yes.

2    Q.    And are you aware that one provision of

3    the City's firearms ordinance limits individuals

4    to one operable firearm in their homes?

5    A.    Yes.

6    Q.    Do you know of any governmental

7    interests that are served by that provision of

8    the ordinance?

9    A.    Could you restate the question.

10    Q.    Yes.  Do you know of any governmental

11    interests that are served by that provision of

12    the ordinance?

13    A.    Public safety.

14    Q.    And how does that serve public safety?

15    A.    I think guns -- I've seen firsthand the

16    way that gun violence and irresponsible gun

17    ownership, use, has negatively and adversely

18    impacted families.

19         I can think of one occasion in

20    particular where a young man had gotten into an

21    altercation down the street from one of our

22    churches that we work with.  And he knew his

23    father had the gun, went back in the house, went

24    under his father's bed, and in his efforts to

8

1     Q.    How does that advance public safety?

2     A.    More guns in our city is a recipe for

3   disaster.  My work in the community, you know,

4   tragically there are too many more incidents I

5   would want to recall and remember that

6   demonstrate that.

7           One incident that comes to mind is

8   Blair Holt, a very high-profile case.  A young

9   man who was going home on a bus, a student at

10  Julian High School.  And an offender got on that

11  bus and in his efforts to shoot what he thought

12  was an offender shot a high school student.

13    Q.    Uh-huh.

14    A.    And many other people could have been

15  tragically wounded or killed as a result of

16  that.

17          So more guns from my experience will

18  result in more tragedies like that.

19    Q.    Okay.  And more guns in your

20  experience, do they result in more tragedies

21  regardless of whether the people that own those

22  guns are law abiding or not?

23    MR. WORSECK:  Objection.  Vague.

24    THE WITNESS:  You know, more guns is a recipe

25

1    for disaster.  You know, it -- more guns are a

2    recipe for disaster.  We need to depend upon the

3    police department to ensure the safety and

4    security of our citizens.  And to add to the

5    equations more guns, you know, they wind you in

6    the hands of people who are not responsible.

7    They wind up in the hands of gang members.  They

8    wind up in the hands of offenders who kill

9    people.  And regretfully, we see it as

10   tragically as this past weekend.  A 12-year-old

11   boy was shot --

12        MR. PATTERSON:  Yes.

13        THE WITNESS:  -- in the back.

14        MR. PATTERSON:  Okay.

15        THE WITNESS:  30 people on the street.  That

16   could have resulted in so many more people

17   killed or wounded.  And that's an illustration

18   of what happens when guns are added in the mix

19   of a community that already struggles with

20   violence.

21        MR. PATTERSON:  Okay.

22   BY MR. PATTERSON:

23        Q.    There are already quite a few guns in

24   the City of Chicago, correct?

26

1          MR. WORSECK:  Objection.  Vague.

2          THE WITNESS:  I don't know how many guns

3     there are in the City.

4          MR. PATTERSON:  You don't know?

5          THE WITNESS:  No.

6     BY MR. PATTERSON:

7          Q.   Do gang members and other criminal

8     individuals have difficulty obtaining a gun

9     currently in the City of Chicago?

10         MR. WORSECK:  Objection.  Vague.  Calls for

11    speculation.

12         THE WITNESS:  I don't know how they get guns.

13    BY MR. PATTERSON:

14         Q.   Are they able to get guns?

15         A.   They're able to get guns.  Yes.  We

16    know that.

17         Q.   So how would in your opinion permitting

18    the sale of guns in the City of Chicago --

19         A.   You said permit.

20         Q.   Permitting the sale of guns in the City

21    of Chicago increase the number of guns that are

22    owned by gang members and others disposed to use

23    them criminally?

24         A.   Straw purchasing.  Gang members and

27

1    criminals who get in people's homes and steal

2    those guns.

3         We see that all the time.

4    Q.    And currently there are gun stores just

5    outside of the City of Chicago, correct?

6    MR. WORSECK:  Objection.  Vague.  Calls for

7    speculation.

8    THE WITNESS:  Yes.

9    BY MR. PATTERSON:

10   Q.    So how would permitting gun sales

11   actually within the City of Chicago, given that

12   there are gun stores outside the City, make the

13   problems that you've described worse?

14   A.    Access.

15        Gun stores, more gun stores inside the

16   City would give people greater access to guns

17   and greater access to guns could result in

18   criminals breaking into the homes of gun owners,

19   getting those guns and those guns get on the

20   street and we know what happens when guns get on

21   the street.  People are shot.  People are

22   victimized.  Intimidation.

23   Q.    So in your view is one of the interests

24   served by prohibiting the sales of guns in the

28

1    City of Chicago limiting the access of even law

2    abiding citizens to guns?

3        MR. WORSECK:  Objection.  Vague.

4        THE WITNESS:  Yes.

5    BY MR. PATTERSON:

6        Q.   And how does that provision limit the

7    access of even the law abiding to guns?

8        A.   How does --

9        Q.   How does that provision do that?  How

10   does it limit access of even law abiding

11   citizens to guns?

12       MR. WORSECK:  Objection.  Vague.

13       THE WITNESS:  It puts a restriction on it.

14   BY MR. PATTERSON:

15       Q.   Okay.  So law abiding citizens would

16   have to take the burden of traveling outside of

17   the City currently to purchase a gun; is that

18   correct?

19       A.   Yes.

20       MR. WORSECK:  Objection.  Vague.

21   BY MR. PATTERSON:

22       Q.   So that limits their access to guns,

23   correct?

24       A.   Yes.

29

1    Q.    You mentioned a Blair Holt incident.

2          The person that was the criminal

3    perpetrator in that tragedy was not lawfully

4    possessing the firearm at that time, was he?

5    A.    No.

6    Q.    Is there a potential that if someone on

7    that bus that was a law abiding citizen had a

8    gun, could have used that gun to avert the

9    situation before Blair Holt was tragically shot?

10        MR. WORSECK:  Objection.  Vague calls for

11   speculation.  Calls for a legal conclusion.

12        THE WITNESS:  I don't know.

13   BY MR. PATTERSON:

14   Q.    Could you imagine a hypothetical

15   situation in which an individual could use a gun

16   to avert a criminal incident that otherwise

17   would happen?

18        MR. WORSECK:  Objection.  Vague.  Calls for

19   speculation.

20        THE WITNESS:  Okay.

21        MR. PATTERSON:  Okay.

22   BY MR. PATTERSON:

23   Q.    Are you aware that the firearms

24   ordinance bans firearms ranges from operating in

30

1   have knowledge about and other matters.

2        Is it fair to say that your testimony

3   this morning is based on your best recollection

4   and information in matters relating to the

5   issues in the case and the governmental purposes

6   served by the ordinance?

7     A.   Yes.

8     Q.   And there may be others out there that

9   you are either not aware of or you just can't

10   remember here this morning?

11     A.   Yes.

12     MR. WORSECK:  Okay.  I have no further

13   questions.

14     MR. PATTERSON:  I just have a few to follow

15   up here.

16         EXAMINATION (Further)

17   BY MR. PATTERSON:

18     Q.   Mr. Henry, you testified that in your

19   experience you're aware that there may be some

20   gang members who have basically a clean criminal

21   record and thus, may be legally permitted to

22   possess guns if the law allowed; is that

23   correct?

24     A.   Yes.

79

1    Q.   In your experience are you aware of any

2    gang members who have desired to own a gun or to

3    possess a gun but have declined to do so because

4    of the law making it illegal to do so?

5    A.   I don't know.

6    Q.   In your experience with gang members,

7    do they typically respect and follow provisions

8    of the law?

9    MR. WORSECK:  Objection.  Vague.  Calls for

10   speculation.

11   THE WITNESS:  No.  I don't know.

12   MR. PATTERSON:  You don't know.

13   BY MR. PATTERSON:

14   Q.   In your experience, do gang members

15   typically attempt to avoid committing crimes or

16   otherwise transgress provisions of the criminal

17   law?

18   MR. WORSECK:  Same objections.

19   THE WITNESS:  I know them to be people who

20   terrorize communities, who because of their

21   enterprises take innocent lives, like the

22   incidents that I mentioned and so many more that

23   we don't have time enough to discuss today.

24   That's what I know gang members to do, is to

80

1    terrorize and to destroy the fabric of our City

2    by destroying neighborhoods and blocks and

3    corners where they traffic narcotics and

4    intimidate people and destroy families by the

5    kind of violence that they're involved in.

6        MR. PATTERSON:  Okay.

7        THE WITNESS:  Whether that be gang,

8    narcotics, or otherwise.

9        MR. PATTERSON:  Okay.

10   BY MR. PATTERSON:

11       Q.   And you recall testifying, discussing

12   with Mr. Worseck that you're not aware of any

13   law abiding citizen that has been unable to

14   travel outside the City of Chicago to obtain a

15   handgun?

16       A.   I'm not aware.

17       MR. WORSECK:  Objection.  Misstates the

18   testimony.

19   BY MR. PATTERSON:

20       Q.   Have you done any study -- or strike

21   that.

22           Have you ever endeavored to try to find

23   out whether a law abiding citizen of Chicago who

24   is otherwise entitled to possess a handgun has

81

1    had difficulty traveling outside the City of

2    Chicago to obtain one?

3        A.   No.

4        Q.   You've never done any study of that

5    issue, have you?

6        A.   No.

7        Q.   Okay.  You also testified that the

8    threat -- or the threat to public safety posed

9    by firearms can lead to other effects such as

10   the degradation of a community, including

11   economic degradation, people not willing to use

12   public spaces, and things of that nature.

13   Correct?

14       A.   Yes.

15       Q.   Are you aware of any evidence that

16   would support the idea that increased gun

17   ownership in a community leads to those negative

18   effects that you testified about?

19       MR. WORSECK:  Objection.  Vague.

20       THE WITNESS:  No.

21       MR. PATTERSON:  Okay.

22       THE WITNESS:  But I can tell you that gun

23   violence in our City has resulted in people

24   moving, because I've talked to them.

                                              82

1    STATE OF ILLINOIS   )

2                        )   SS:

3    COUNTY OF C O O K   )

4      I, JOHNETTA STAFFORD TAYLOR, a notary public

5    within and for the County of Cook County and

6    State of Illinois, do hereby certify that

7    heretofore, to-wit, on May 24, 2011 personally

8    appeared before me, at 33 North Dearborn Street,

9    Chicago, Illinois, VANCE HENRY, in a cause now

10   pending and undetermined in the U.S. District

11   Court, Northern District of Illinois, Eastern

12   Division, wherein ILLINOIS ASSOCIATION OF

13   FIREARMS RETAILERS, KENNETH PACHOLSKI, KATHRYN

14   TYLER, and MICHAEL HALL are the Plaintiffs, and

15   THE CITY OF CHICAGO is the Defendant.

16     I further certify that the said witness was

17   first duly sworn to testify the truth, the whole

18   truth and nothing but the truth in the cause

19   aforesaid; that the testimony then given by said

20   witness was reported stenographically by me in

21   the presence of the said witness, and afterwards

22   reduced to typewriting by Computer-Aided

23   Transcription, and the foregoing is a true and

24   correct transcript of the testimony so given by

86

1    said witness as aforesaid.

2      I further certify that the signature to the

3    foregoing deposition was reserved by counsel for

4    the respective parties.

5        I further certify that the taking of this

6    deposition was pursuant to Notice, and that

7    there were present at the deposition the

8    attorneys hereinbefore mentioned.

9        I further certify that I am not counsel for

10   nor in any way related to the parties to this

11   suit, nor am I in any way interested in the

12   outcome thereof.

13       IN TESTIMONY WHEREOF:  I have hereunto set my

14   hand and affixed my notarial seal this 15th day

15   of June, 2011.

16

17

18   _____

19   NOTARY PUBLIC, COOK COUNTY, ILLINOIS

20

21

22

23

24
                                                    87

EXHIBIT 22

IN THE UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

ILLINOIS ASSOCIATION OF       )
FIREARMS RETAILERS,           )
KENNETH PACHOLSKI,            )
KATHRYN TYLER, and            )
MICHAEL HALL                  )
          Plaintiffs,         )
     vs.                      )  No. 10 CV 04184
THE CITY OF CHICAGO and       )
RICHARD M. DALEY, Mayor       )
of the City of Chicago,       )
          Defendants.         )

The deposition of KEVIN JOHNSON, called
for examination pursuant to the Rules of Civil
Procedure for the United States District Courts
pertaining to the taking of depositions, taken
before JENNIE MODI, a notary public within and for
the County of Cook and State of Illinois, at 33
North Dearborn Street, Suite 300, Illinois, on the
19th day of April, 2011, at the hour of 9:12
o'clock a.m.

1

---

1           I N D E X
2   WITNESS                    EXAMINATION
3   KEVIN JOHNSON
4     By MR. PATTERSON           4,   120
5     By MR. AGUIAR              117
6
7
8
9
10
11          E X H I B I T S
12  NUMBER               MARKED FOR ID
13  JOHNSON Deposition Exhibit
14    Nos. 1 and 2             35
15    No. 3                    48
16    No. 4                    56
17    No. 5                    60
18    No. 6                    103
19    No. 7                    107
20
21
22
23
24

3

---

1   APPEARANCES:
2
3       COOPER & KIRK, by
4       MR. PETER A. PATTERSON,
5         1523 New Hampshire Avenue Northwest,
6         Washington, D.C. 20036,
7         202-220-9600,
8           Representing the Plaintiffs;
9
10      MR. WILLIAM MACY AGUIAR,
11      ASSISTANT CORPORATION COUNSEL,
12      DEPARTMENT OF LAW,
13        30 North LaSalle Street, Suite 1230,
14        Chicago, Illinois 60602,
15        312-744-4216,
16          Representing the Defendants.
17
18
19
20
21
22
23
24

2

---

1            (Whereupon, the witness was
2             duly sworn.)
3            KEVIN JOHNSON,
4   having been first duly sworn, was examined and
5   testified as follows:
6            EXAMINATION
7   BY MR. PATTERSON:
8     Q.  Would you like to state your name for the
9   record?
10    A.  Sergeant Kevin Johnson.
11    Q.  Sergeant Johnson, I'm Pete Patterson.  I'm
12  going to be asking you some questions today about
13  the case, Illinois Association of Firearms
14  Retailers v. The City of Chicago.
15           And first of all, have you been deposed
16  before?
17    A.  Yes.
18    Q.  How many times have you been deposed?
19    A.  Once.
20    Q.  And when was -- what was the occasion of
21  that deposition?
22    A.  It was about a year ago, and it was a
23  personal injury lawsuit.
24    Q.  Okay.  And so that was in your -- was that

4

---

1 (Pages 1 to 4)

1    in your personal capacity or your capacity as a
2    police officer with Chicago?
3        A.   Personal capacity.
4        Q.   Okay.  And so you're probably somewhat
5    familiar, but just to go over a few ground rules,
6    there aren't many really.  The main thing is just,
7    you know, I'll ask questions, and for the sake of
8    the court reporter if you try to wait until I
9    finish to answer, and I'll try to do the same.  I'm
10   not always the best at that, but just so we're not
11   talking over each other.
12        And also if at any time you don't
13   understand a question or need it to be clarified,
14   just let me know.  And if you need a break at any
15   time, I'm happy to accommodate you.  But just if
16   there's a question pending, I just ask that we
17   finish that question before taking a break.
18       A.   Understood.
19       Q.   All right.  So to begin, I understand you
20   are a -- with the Chicago Anti-Gun Enforcement
21   Program; is that correct?
22       A.   That is correct.
23       Q.   Okay.  And could you just describe a
24   little bit more about your position?

                                                    5

1        A.   I am sergeant of the Chicago Anti-Gun
2    Enforcement team, the CAGE team.  It is assigned to
3    the Gang Investigations Unit of the Chicago Police
4    Department.
5        Q.   Okay.  Okay.  And so if we refer to that
6    as the CAGE team throughout this deposition, we'll
7    understand that to mean the Chicago Anti-Gun
8    Enforcement Program.  Is that okay?
9        A.   Yes.
10       Q.   So how long have you been with the CAGE
11   team?
12       A.   I've been with the CAGE team since April
13   of 2008.
14       Q.   Okay.  And before that, were you with the
15   police department in another capacity?
16       A.   Yes.
17       Q.   And what was that?
18       A.   I was a sergeant in the narcotics section
19   of the organized crime division.
20       Q.   Okay.  And how long were you -- did you
21   have that role?
22       A.   Approximately four years.
23       Q.   Four years, so back until 2004?
24       A.   Yes.

                                                    6

1        Q.   Okay.  And then before 2004, what job did
2    you have previously to that?
3        A.   I was assigned to patrol division of the
4    Chicago Police Department as a sergeant in the 15th
5    district and with the PSN gun team.
6        Q.   And what is the PSN gun team?
7        A.   Project Safe Neighborhoods.
8        Q.   Okay.
9        A.   It's a federal program to combat gun
10   violence in the inner cities.
11       Q.   Okay.  And what type of activities would
12   you do to combat gun violence?
13       A.   Search warrants, gun investigations.
14       Q.   Okay.  And when did you begin in that
15   position?
16       A.   In 2002.
17       Q.   And before that?
18       A.   I was a sergeant in the 15th district in
19   neighborhood relations.
20       Q.   Okay.  And was that your first position in
21   the police department or --
22       A.   No.
23       Q.   Okay.  So instead of doing it this way,
24   let's just go through from the beginning if you

                                                    7

1    could just say all the different -- when you
2    started with the police department and what
3    different positions you had?
4        A.   Okay.  I started with the Chicago Police
5    Department in 1991 as a patrolman.  I was assigned
6    to the 7th district, which is known as the
7    Englewood district.  In 1998 I was promoted to the
8    rank of sergeant and assigned to the 15th district.
9        Q.   Okay.  Okay.  And so then after 1998 and
10   2002, you went to the narcotics program, is that
11   correct, or did I mess that up?
12       A.   It's a little bit off.
13       Q.   Okay.
14       A.   In 1998 I was assigned to the 15th
15   district as a sergeant.  And then approximately
16   2002, I was with the PSN team.  And then beyond
17   that, went to narcotics.
18       Q.   Right.  Okay.  And then before joining the
19   police department, what sort of work did you do
20   before that?
21       A.   I was a adult probation officer with Cook
22   County.
23       Q.   Okay.  And how about before that time, did
24   you have any jobs before then?

                                                    8

                                2  (Pages 5 to 8)

1    you're -- when you're talking about the illegal
2    market, you primarily mean people are not entitled
3    to possess weapons under state and federal law; is
4    that correct?
5        A. No, that's not correct. I was more
6    speaking along the lines of convicted felons.
7        Q. Okay.
8        A. And people with criminal -- persons with
9    violent criminal backgrounds.
10       Q. Okay.
11       A. Who would be prohibited from possessing
12   any weapons.
13       Q. Okay. How about a person who was, for
14   example, you know, mentally ill, and thus
15   prohibited from possessing a firearm under state or
16   federal law, would that be someone who you would
17   also, you know, mean to come into the -- a person
18   not entitled to possess firearms?
19       MR. AGUIAR: Objection to the form. I don't --
20   you could answer the question.
21       THE WITNESS: Let me see.
22       MR. AGUIAR: Do you understand the question?
23       THE WITNESS: No, I don't understand the
24   question.

33

1    BY MR. PATTERSON:
2        Q. Okay. So I guess my question is: There
3    are various categories of people who under state or
4    federal law are not entitled to possess firearms?
5        A. Yes.
6        Q. Okay. So are -- so does your -- the CAGE
7    unit, does it focus primarily on felons and other
8    violent persons; is that correct?
9        A. Yes, that's correct.
10       Q. Okay. Okay. Now, is there a way that --
11   so is the CAGE unit concerned with legitimate law
12   abiding citizens purchasing firearms for, you know,
13   lawful reasons?
14       A. Not at all.
15       Q. Okay. And is it concerned with firearms
16   dealers, law abiding firearms dealers selling them
17   for lawful purposes?
18       A. Not at all.
19       Q. And what is the city's -- you know, what
20   is the CAGE team's strategy for combatting firearms
21   getting into illegal markets?
22       MR. AGUIAR: Objection, foundation. You can
23   answer.
24       THE WITNESS: We coordinate with state and

34

1    federal law enforcement agencies. We conduct
2    investigations to combat illegal firearms
3    trafficking.
4    BY MR. PATTERSON:
5        Q. Okay. And do you know whether or not the
6    CAGE team -- does it receive any funding from
7    federal sources?
8        A. Not that I'm aware of, no.
9        Q. Okay. From state sources?
10       A. No.
11       MR. PATTERSON: Okay. I want to introduce
12   actually two exhibits.
13              (Whereupon, JOHNSON Deposition
14              Exhibit Nos. 1 and 2 were
15              marked for identification.)
16   BY MR. PATTERSON:
17       Q. So we've marked Johnson Exhibit 1 as a
18   page from the Chicago Police Department 2009 Annual
19   Report, and Exhibit 2 is a copy of a page from the
20   Chicago Police Department 1999 to 2000 Biennial
21   Report.
22       So if we take a look -- and these pages on
23   both of these basically detail the number of
24   firearms recoveries. In Exhibit 2, it goes from

35

1    1991 to 2000. And Exhibit 1 goes from 2000 until
2    2009.
3        MR. AGUIAR: May I just ask we do one at a time
4    if you don't mind.
5        MR. PATTERSON: Okay. Okay. Some of my
6    questions may span both of them.
7        MR. AGUIAR: That's fine.
8    BY MR. PATTERSON:
9        Q. We'll start with Exhibit 2.
10       A. Okay.
11       Q. Which starts in 1991, it shows that in
12   1991, 22,660 firearms were recovered, and then goes
13   to -- remains pretty much steady, from 1991 through
14   1994, around between 20,000 and 23,000, and then
15   drops to 16,232 in 1995.
16       Are you aware of any explanation for that
17   drop between 1994 and 1995 and the number of
18   firearms recovered?
19       A. No, I'm not.
20       MR. AGUIAR: Objection. You may answer.
21       THE WITNESS: No, I'm not.
22   BY MR. PATTERSON:
23       Q. And then there's a, you know, downward
24   trend from 1995 through 2000. In 2000 the number

36

9 (Pages 33 to 36)

1  is 10,007.
2       So, you know, are you aware of any reason
3  for that downward trend in firearms recovery?
4       MR. AGUIAR: Objection, foundation. You may
5  answer.
6       THE WITNESS: No, I'm not.
7  BY MR. PATTERSON:
8       Q. Okay. And do you know of the -- or is --
9  strike that. Let's start over.
10      What is the relationship, if you know of
11 one, between the number of firearms recovered and
12 the -- and the size of the illegal firearms market
13 as a whole?
14      MR. AGUIAR: Objection, foundation. You may
15 answer.
16      THE WITNESS: Could you repeat the question
17 again, please.
18 BY MR. PATTERSON:
19      Q. Yeah. My question is what -- what
20 relationship is there, if you know of any, between
21 the number of firearms recovered and the size of
22 the firearms -- illegal firearms market as a whole?
23      A. Are you asking me as a direct relationship
24 between the two?

                                                    37

1       Q. If you know of any, yes.
2       A. I can't speak on these statistics. I
3  mean, I --
4       Q. I'm not -- you know, I'm not asking
5  specifically about these statistics.
6       I'm just asking in general, you know, is
7  there a relationship between the number of firearms
8  recovered in any particular year and, you know, the
9  size of the illegal market as a whole for that
10 particular year?
11      A. No.
12      Q. No. Okay. And of the firearms recovered,
13 do you know how many of them -- or does the city
14 keep records of how many were lawfully possessed
15 versus --
16      A. I don't understand what you mean by
17 lawfully possessed.
18      Q. For the firearms that are recovered, are
19 there some number of them that were possessed
20 legally by the person who they were recovered from
21 and some number that were possessed illegally?
22      A. I think that -- I don't have those stats.
23 I wouldn't know those statistic offhand, not a
24 number.

                                                    38

1       Q. But do you know, are there some that were
2  legally possessed by the person from whom they were
3  recovered?
4       A. Yes.
5       Q. Do you know just as a ballpark figure how
6  many of them are legally possessed?
7       MR. AGUIAR: Objection, asked and answered.
8  You can answer.
9       THE WITNESS: I would say a low percentage.
10 BY MR. PATTERSON:
11      Q. A low percentage, so less than 10 percent?
12      A. Yes.
13      Q. Okay. And do you have any sense of what
14 the total size of the illegal firearms market in
15 the City of Chicago is?
16      MR. AGUIAR: Objection, foundation. You can
17 answer.
18      THE WITNESS: In terms of the number of guns
19 or --
20 BY MR. PATTERSON:
21      Q. Yes. Just a rough estimate of the number
22 of guns that are, you know, exchanged in the
23 illegal market on, let's say, an annual basis in
24 Chicago?

                                                    39

1       MR. AGUIAR: Again, objection, foundation.
2  This witness doesn't have information as to the
3  size of the market. He can only testify as to what
4  has been recovered.
5       MR. PATTERSON: Okay.
6       MR. AGUIAR: You can answer if you can.
7       THE WITNESS: I can't answer.
8  BY MR. PATTERSON:
9       Q. Would it be larger than the number of
10 firearms that are recovered would you think?
11      A. I can't say for sure.
12      Q. You can't say for sure?
13      A. No.
14      Q. So it's possible that the department
15 seizes every firearm that's in the illegal market
16 in a particular year?
17      A. No.
18      Q. It's not possible?
19      A. What do you consider to be illegal
20 firearm?
21      Q. Any firearm that is -- I think I asked
22 earlier what you meant by the illegal firearms
23 market. You said -- I'm paraphrasing, but the
24 acquisition of a firearm by someone who is not

                                                    40

10 (Pages 37 to 40)

1   Q. And so do those six, do they focus
2  exclusively on outside of Illinois investigations?
3   A. Yes.
4   Q. Okay. And those six, they would work with
5  law enforcement officials in other states?
6   A. Yes.
7   Q. And in addition to those investigations,
8  does the CAGE team work with law enforcement
9  officials in other states on developing strategies
10  for combating the illegal gun market?
11   MR. AGUIAR: You can answer if you can.
12   THE WITNESS: I think the CAGE team responds to
13  any new strategy, and we work with other agencies
14  when needed.
15  BY MR. PATTERSON:
16   Q. Okay. Okay. On Page 3, it has A National
17  Problem at the top. In the second paragraph,
18  starting with the second sentence, it says: With
19  the support of the community, in 2008 alone, the
20  Chicago Police Department recovered 13,065 guns.
21  In the past three years, gun recoveries have
22  increased compared to previous years; an indication
23  that more guns than ever are making their way onto
24  the streets.

65

1  you know when this document was published?
2   A. 2009.
3   Q. Okay. So as of 2009 in your experience
4  were there more guns than ever making their way
5  onto the Chicago city streets?
6   MR. AGUIAR: Objection, the document speaks for
7  itself. You can answer.
8   THE WITNESS: Yes, I agree with the document.
9  BY MR. PATTERSON:
10   Q. You do agree with the document. Okay.
11  And was there any change in local law to your
12  knowledge and in your experience with the CAGE team
13  that would have lead to that increase that's
14  reflected in the document?
15   A. Not that I'm aware of.
16   Q. Okay. Are you aware of any particular
17  reason why that increase would have taken place?
18   MR. AGUIAR: Objection, foundation. You can
19  answer.
20   THE WITNESS: No.
21  BY MR. PATTERSON:
22   Q. Okay. Now, is it -- in your experience,
23  are the number of guns that are making their way
24  onto the city streets responsive to changes in

67

1   Did you have any role in drafting this
2  particular part of the document here that we just
3  read?
4   MR. AGUIAR: You could answer.
5   THE WITNESS: No, I did not.
6  BY MR. PATTERSON:
7   Q. You did not. Okay. So do you know who
8  was responsible for drafting this?
9   MR. AGUIAR: If you know, you could answer.
10   THE WITNESS: I couldn't tell you who
11  personally drafted it. I would say that it
12  probably came on combination between Research and
13  Development and the Bureau of Investigative
14  Services.
15  BY MR. PATTERSON:
16   Q. Okay. So in addition to the CAGE team
17  Research and Development and the Bureau of
18  Investigative Services, is there anyone else who
19  worked on drafting this document?
20   A. Not that I'm directly aware of.
21   Q. Okay. And would you agree that in your
22  experience with the CAGE team, that there were more
23  guns as of the time this document was published,
24  which I don't know that we have on the records. Do

66

1  local law?
2   MR. AGUIAR: Objection to the form of the
3  question. You could answer.
4   THE WITNESS: No.
5  BY MR. PATTERSON:
6   Q. So local law in your experience does not
7  have an impact in the number of guns that are on
8  the city streets?
9   A. I didn't understand the question.
10   Q. Okay. I'll actually move on. Could you
11  turn to Page 4, the second paragraph. It says:
12  The Chicago Police Department's focus on illegal
13  gun sales by licensed dealers is another strategy
14  used to address the challenge. These types of
15  sales have proven to be a primary means for
16  introducing guns to illegal markets through straw
17  purchases.
18   In your experience with the CAGE team, if
19  you know, when licensed dealers make a sale to a
20  straw purchaser, is it typical that the licensed
21  dealer knows that the person is the straw
22  purchaser?
23   MR. AGUIAR: Objection, foundation. You can
24  answer if you can.

68

17 (Pages 65 to 68)

1    THE WITNESS: I can't speak for the actual
2   dealer, whether they knew that person or the straw
3   purchaser.
4   BY MR. PATTERSON:
5    Q.  Okay.
6    A.  But Chicago Police Department ATF is very
7   vigilant in educating the firearm licensed dealer
8   what to look for in terms of straw purchasing.
9    Q.  Okay.  Okay.  And how does the CAGE team
10  educate licensed dealers what to look for in straw
11  purchasing?
12   A.  That's in conjunction with ATF, again
13  that's ATF programs.
14   Q.  Okay.  That's a taskforce program or
15  that's an ATF program?
16   A.  That's under ATF's purview, and I can't
17  speak of it
18   Q.  So it's not a taskforce program?
19   A.  No, not directly.
20   Q.  And does the taskforce have a role in that
21  program?
22   A.  If they're participating with ATF, then
23  they have a role with it.
24   Q.  Okay.  And what -- what would their role

69

be?
2    A.  Again, that's with ATF.  I can't really
3   speak on that.
4    Q.  Okay.  But do members of the CAGE team
5   participate in educating licensed dealers on what
6   to look for in straw purchasers?
7    MR. AGUIAR:  You can answer if you can.
8    THE WITNESS:  No, not directly.  Again, that's
9   an ATF program.  They would -- ATF was responsible
10  for educating the dealers directly.
11  BY MR. PATTERSON:
12   Q.  Okay.  But I guess I'm asking if any CAGE
13  team officers participate in that directly or
14  indirectly?
15   A.  No.
16   Q.  No.  Okay.  Okay.  On Page 6, it talks
17  about training and the CAGE team conducts certain
18  types of training.
19       And you know, just in general, what is
20  your understanding of the type of training that the
21  CAGE team conducts?
22   A.  We conduct a roll call training at the
23  district level.  We've assisted in developing the
24  daily bulletins to inform officers in the field

70

1   what to look for in terms of firearm recoveries.
2    Q.  Okay.  And what is roll call training?
3    A.  It's when -- in patrol division when the
4   officers prepare to leave out and go on -- go out
5   into the street, they're given a briefing by their
6   watch commander as to things to look out for and
7   information that's provided at the beginning of the
8   shift.
9    Q.  Okay.  Okay.  Now, does the CAGE team
10  participate in the -- you know, kind of on the
11  street law enforcement?
12   MR. AGUIAR:  Objection to the form of the
13  question.  What do you mean by on the street law
14  enforcement?
15  BY MR. PATTERSON:
16   Q.  Does the CAGE steam respond to crime
17  scenes?
18   MR. AGUIAR:  Objection, the question is still
19  vague.  You can answer if you can.
20   THE WITNESS:  What do you consider to be a
21  crime scene?
22  BY MR. PATTERSON:
23   Q.  Well, I guess -- okay.  Let me formulate
24  this question.

71

1       So the CAGE team gets involved in a case
2   when a firearm is recovered; is that correct?
3    A.  That's correct.
4    Q.  Does the CAGE team go to the location
5   where the firearm is recovered?
6    A.  No.
7    Q.  No?
8    A.  No.
9    Q.  Okay.  So the firearm is brought back to
10  the police department or to the CAGE team and
11  that's when the CAGE team gets involved; is that
12  correct?
13   MR. AGUIAR:  You can answer.
14   THE WITNESS:  The firearm is recovered in the
15  field by the Chicago Police Department via the
16  personnel.
17  BY MR. PATTERSON:
18   Q.  Right.
19   A.  That gun is inventoried in evidence and
20  recovered property.  The CAGE team operates off of
21  the actual copy of the inventory sheet of that
22  weapon.
23   Q.  So the weapon is never actually in the
24  possession of the CAGE team?

72

18  (Pages 69 to 72)

1 changes to the FOID Act, amendments to the FOID
2 Act.
3    Q.   And is there other -- other than recently,
4 you know, since you've taken on your position in
5 2008 as sergeant on the CAGE unit, was there other
6 legislation that was pending, you know, at the time
7 that you've been asked about?
8    A.   Lost or stolen firearms.
9    Q.   Okay.  Anything else?
10    A.   There's a lot, but those are the only ones
11 I can think of off the top of my head.
12    Q.   So there were some other ones, but those
13 are the ones you can think of?
14    A.   Yes.
15    Q.   Okay.  When you're asked your opinion
16 about a pending legislation, what -- what do you do
17 to respond to those inquiries in general?
18    MR. AGUIAR:  I'm sorry.  Have you finish your
19 question?
20    MR. PATTERSON:  Yes, I'm finished.
21    MR. AGUIAR:  I object to this line of
22 questioning.  This is going to the legislative
23 process.  First of all, it is wholly irrelevant to
24 the questions raised by plaintiffs in this lawsuit.

81

1    A.   There have been no gun sales in Chicago.
2    Q.   So is the answer to that question no?
3    A.   No.
4    Q.   Okay.  Has Chicago done any studies that
5 compare Chicago with other jurisdictions that
6 permit gun sales to determine whether such, you
7 know, Chicago's ban has any impact on the size of
8 the illegal market?
9    MR. AGUIAR:  Objection, foundation.  You can
10 answer to the extent you know.
11    THE WITNESS:  It's not within my knowledge.
12 BY MR. PATTERSON:
13    Q.   Okay.  So it's safe to say the CAGE team
14 has not done any such studies?
15    A.   That is correct.
16    Q.   Okay.  So does the CAGE team have any
17 empirical evidence whatsoever that banning gun
18 sales reduces the size of the illegal gun market?
19    A.   No.
20    MR. AGUIAR:  Objection, foundation.  You can
21 answer to the extent you know.
22    THE WITNESS:  No.
23 BY MR. PATTERSON:
24    Q.   Okay.  Does banning gun sales in the City

83

1    Second of all, Judge Chang's orders have
2 been very clear that legislative processes are not
3 proper scopes of discovery in this case.  I'm going
4 to instruct you not to answer questions about
5 legislative process.
6    MR. PATTERSON:  Okay.
7 BY MR. PATTERSON:
8    Q.   In your experiences, you know, with the
9 CAGE team -- well, strike that question.  Okay.
10    So we -- we were talking about the illegal
11 gun market.  In your experience with the CAGE team,
12 does banning retail sales within the City of
13 Chicago advance the interest of reducing the size
14 of the illegal gun market?
15    A.   Yes.
16    Q.   And how does it do that?
17    A.   It prevents the opportunity for guns to
18 reach the illegal market in Chicago.
19    Q.   Okay.  And has the CAGE team done any
20 studies on that question?
21    A.   No.
22    Q.   Does the CAGE team have any empirical
23 evidence that banning gun sales in Chicago actually
24 does reduce the size of the illegal market?

82

1 of Chicago, you know, in your experience as a
2 member of the CAGE team, make it more difficult for
3 someone who wants to acquire a firearm that is not
4 entitled to inquire a firearm to get one?
5    MR. AGUIAR:  Objection, foundation, and outside
6 this witness' scope of information.  You're asking
7 him if it makes it more difficult for other people
8 to buy firearms?
9    MR. PATTERSON:  I'm asking if it makes it more
10 difficult for people who are not entitled to
11 possess firearms to acquire them.
12    MR. AGUIAR:  If the ban makes it more
13 difficult?
14    MR. PATTERSON:  Yes.
15    MR. AGUIAR:  Okay.  That question is fine.  Do
16 you need that question rephrased or repeated?
17    MR. PATTERSON:  I can rephrase it.
18    MR. AGUIAR:  Or repeat it.  I'm sorry.
19 BY MR. PATTERSON:
20    Q.   Does the ban on gun transfers in the City
21 of Chicago make it more difficult for people who
22 are not entitled to possess firearms to acquire
23 them?
24    A.   Yes.

84

21 (Pages 81 to 84)

1    Q.  And how does it do that?
2    A.  People can't -- I mean, there are no
3  purchases in Chicago, so therefore --
4    Q.  Right.
5    A.  Are you speaking of degree of difficulty?
6    Q.  Well, yes.  Does it make it more -- does
7  it place a greater burden on them if they, you
8  know, desire to obtain a firearm?
9    A.  If we didn't have the ban, it would make
10  it easier for them to obtain firearms illegally in
11  Chicago.
12    Q.  Okay.  Would it make it easier for them to
13  obtain firearms, period, if you didn't have a ban?
14    A.  Would it make it easier for them to obtain
15  firearms if we didn't have the ban?
16    Q.  Yes.  Not just in the City of Chicago, but
17  just -- just for Chicago residents who wish -- that
18  are not entitled to possess firearms, does having
19  the ban -- would not having the ban make it easier
20  for them to obtain firearms generally?
21    MR. AGUIAR:  I'm going to object to the form of
22  the question.  I don't understand the question.
23    MR. PATTERSON:  Okay.
24    MR. AGUIAR:  I mean, do you understand the

85

1  question?
2    THE WITNESS:  No.
3    MR. PATTERSON:  Okay.  Let me back up.
4    MR. AGUIAR:  There was too many negatives, too
5  many --
6    MR. PATTERSON:  Okay.  That's fair.  That's
7  fair.
8  BY MR. PATTERSON:
9    Q.  Are you aware that there are gun stores in
10  locations close to the City of Chicago?
11    A.  Yes.
12    Q.  Okay.  Does having the ban in place with
13  the understanding that there are those gun stores
14  make it -- place a burden on individuals who --
15  Chicago residents who desire to possess a handgun
16  illegally to acquire a handgun?
17    A.  I'm sorry.  You're going to have to
18  rephrase that for me.
19    Q.  Okay.  So how difficult is it -- how hard
20  is it for, you know, a criminal that wants to get a
21  handgun in your experience -- based on your
22  experience with the CAGE unit, how difficult is it
23  for the criminal who wants to get a handgun in the
24  City of Chicago today to get a handgun?

86

1    A.  Not difficult at all.
2    Q.  Okay.  And what -- what would that
3  criminal do to get one?
4    A.  They would engage in one of the
5  activities, the straw purchasing, illegal transfer.
6  They will recruit someone who is authorized to have
7  a weapon in the State of Illinois, they would
8  engage them to or recruit them to obtain that
9  weapon from one of these gun stores that are around
10  the Chicago area.
11    Q.  Okay.  Okay.  So regardless of the laws
12  Chicago has in place, it's not difficult at all for
13  them to obtain the weapon that they want to obtain?
14    A.  No, it's not difficult.
15    Q.  Okay.  Does -- does Chicago's ban on --
16  well, first let me ask:  You understand that
17  Chicago bans the operations of firearms ranges
18  within the city?
19    A.  Yes.
20    Q.  Does that ban on firearms ranges advance
21  the interest in reducing the size of the illegal
22  firearms market from your perspective as a member
23  of the CAGE unit?
24    A.  Does the ban on firearm ranges assist in

87

1  reducing illegal weapons?
2    Q.  Yes.
3    A.  Yes.
4    Q.  And how does it do that?
5    A.  Again, it goes back to an opportunity.
6    Q.  Okay.
7    A.  If -- it goes back to opportunity.  If
8  weapons are available in Chicago or are being
9  stored in Chicago, the chance for theft, burglary
10  increases; therefore, putting guns illegally into
11  the Chicago market.
12    Q.  Okay.  Does the CAGE unit have any
13  empirical evidence that banning firearms ranges in
14  Chicago reduces the size of the illegal firearms
15  market?
16    A.  No, we do not.
17    Q.  Okay.  And now are you aware that Chicago
18  limits residents to one operable firearm per
19  registered firearm owner?
20    MR. AGUIAR:  You could answer if you can.
21    THE WITNESS:  Yes.
22  BY MR. PATTERSON:
23    Q.  Okay.  And does that limit advance the
24  interest in reducing the illegal firearms

88

22  (Pages 85 to 88)

1    trafficking in Chicago?  Let me rephrase that.
2        Does that limit advance the interest in
3    reducing the size of the illegal firearms market in
4    Chicago?
5        A.  Yes.
6        Q.  And how so?
7        A.  If there's only one handgun available
8    to -- per residents for that home, and then if
9    there's -- hypothetically, say there's a burglary,
10   they're not taking 15 guns out of the house.
11   They're only taking one that's unloaded and --
12       Q.  My understanding is that Chicago residents
13   can own as many guns as they want in their home,
14   but only one can be operable.
15       Is that your understanding as well?
16   MR. AGUIAR:  I just want to correct that.  The
17   way you phrased the question made I think the
18   witness believe that they can only have one firearm
19   in the home, period.
20   MR. PATTERSON:  Okay.  I meant to put operable
21   in there.
22   MR. AGUIAR:  I don't know if you did or not.
23   MR. PATTERSON:  I'm not sure.
24   THE WITNESS:  I'm lost.

89

1    MR. PATTERSON:  Okay.
2    BY MR. PATTERSON:
3        Q.  Okay.  So let's back up.  So my
4    understanding of Chicago law is that residents can
5    own -- you know, provided they can apply with all
6    applicable rules and regulations, as many firearms
7    as they want.  But they can only have one that is
8    operable in their home.
9        Is that your understanding as well?
10       A.  Are you saying all firearms or handguns or
11   rifles or shotguns?
12       Q.  All legal firearms.
13       A.  They can only have one?
14       Q.  I'm saying they can have as many as they
15   want, but only one can be operable.  The rest have
16   to be rendered temporarily inoperable.
17       A.  I can't answer that question.
18       Q.  Okay.  We may come back to that, but let
19   me move on from that now.
20       And it's my understanding that Chicago law
21   limits residents to guns that they have lawfully
22   registered in Chicago, that they can only possess
23   them within their home, if they're lawfully
24   transporting them and if it's a -- not a handgun in

90

1    their fixed place of business.
2        Is that an accurate representation of
3    Chicago law from your understanding?
4    MR. AGUIAR:  I'm going to object.  The law
5    speaks for itself.  You can speak to your
6    understanding of the law.
7    THE WITNESS:  That's paraphrasing the law and
8    that sounds correct.
9    BY MR. PATTERSON:
10       Q.  And you understand that the limitation of
11   home does not include, for example, a garage or a
12   yard or other parts of a person's property other
13   than the home itself?
14       A.  That's beyond my scope.
15       Q.  That's beyond your scope.  Okay.  So you
16   wouldn't know if that ban on possessing a firearm,
17   say in a person's garage, would advance the
18   interest in reducing the size of the illegal
19   firearms market?
20       A.  I wouldn't know.
21       Q.  Okay.  Another topic that the city has
22   indicated that you have knowledge about is theft of
23   firearms or commissions of other crimes or injury
24   against patrons or operators of firearms stores or

91

1    patrons or operators of firearms ranges.
2        Is that something that you have knowledge
3    about?
4        A.  Yes.
5        Q.  Okay.  And what is your experience with
6    that topic of -- let's start with theft of firearms
7    by patrons of firearms stores.  What experience do
8    you have with that subject?
9        A.  Just -- we handled an investigation not
10   too long ago whereas there were 167 guns that were
11   taken that were going to Gander Mountain here, from
12   Bill Hicks in Minnesota, were being transported to
13   Gander Mountain, Illinois.  During transport in
14   Indiana, 167 guns were taken off of the trailer and
15   found in the streets of Chicago, and they were
16   transported to different areas of Chicago.
17       Q.  Okay.  So that would be theft of firearms
18   from, you know, an operator of a firearms store, is
19   that what --
20       A.  Well, transport of firearms.
21       Q.  Transport of firearms.  Okay.  So in your
22   experience, is there a risk that firearms stores
23   lead to a greater theft of firearms?
24       A.  Yes.  Just recently, a few weeks ago they

92

23  (Pages 89 to 92)

1   had a theft in Tinley Park of a gun store.
2       Q.   Okay.
3       A.   And they made off with approximately 26
4   firearms.
5       Q.   Okay.  And do you have any evidence that
6   the presence of firearms stores in a particular
7   community leads to an increase in the size of the
8   illegal firearms market?
9       A.   No, but it creates an opportunity
10  for theft.
11      Q.   Right.  But you don't have any evidence
12  that the illegal firearms market overall increases
13  based on the operations of firearms stores?
14      MR. AGUIAR:  Objection.  You're talking about
15  empirical evidence, correct?
16      MR. PATTERSON:  Empirical evidence.
17      MR. AGUIAR:  Okay.
18      THE WITNESS:  No, I don't have any empirical
19  evidence.
20  BY MR. PATTERSON:
21      Q.   Okay.  And the evidence that you do have
22  is anecdotal evidence or do you have -- well, let
23  me back up.
24      Do you have any evidence, empirical or

93

1   otherwise, that the stores selling firearms
2   operating in a particular community leads to an
3   increase in the size of the illegal firearms market
4   in that community?
5       A.   No, I do not have any direct evidence.
6       Q.   Okay.  Okay.  Do you have any evidence
7   that the operations of firearms stores is
8   associated with crimes against patrons of those
9   stores?
10      A.   I wouldn't have that information.
11      Q.   Okay.  Okay.  I'm going to ask that same
12  question with respect to firearms ranges, same set
13  of questions.
14      Do you have any evidence that operations
15  of firearms ranges leads to an increase in the size
16  of the illegal firearms market in a particular
17  community?
18      A.   No.  It just -- it goes back to what I
19  stated earlier.  The opportunity for crime is
20  created.  The increase potential for crime is
21  created.  Therefore, it becomes a public safety
22  hazard.
23      Q.   All right.  Okay.  And you also -- is it
24  correct that you do not have any evidence that the

94

1   operation of firearms ranges is associated with a
2   risk of crime to patrons of those ranges?
3       MR. AGUIAR:  You can answer if you can.
4       THE WITNESS:  Nothing empirical.
5   BY MR. PATTERSON:
6       Q.   Okay.  Anything not empirical?
7       A.   No.
8       Q.   You know, as a member of the CAGE unit,
9   are you aware of any firearms stores currently
10  operating in the City of Chicago?
11      A.   No.  There are no firearms stores
12  operating within the City of Chicago.
13      Q.   Okay.  Do you know when the last time
14  there was a firearms store operating in the City of
15  Chicago?
16      A.   I can't say offhand.
17      Q.   Okay.  And do you know if there are any
18  firearms ranges currently operating in the City of
19  Chicago?
20      A.   Not that I'm aware of.
21      Q.   Does the police department operate any
22  firearms ranges?
23      A.   Yes.
24      Q.   Okay.  Do you know how many firearms

95

1   ranges the police department operates?
2       A.   I would say a maximum -- I would say
3   around a number of six that I'm aware of.
4       Q.   Six.  Okay.  And are you aware of any
5   theft of firearms that have taken place from those
6   police firearms ranges?
7       A.   Not that I'm aware of.
8       Q.   Okay.  Are you aware of any crimes or
9   other injury that have been visited upon law
10  enforcement officers using those firearms ranges?
11      A.   No, I'm not.
12      Q.   Okay.  Do you know if -- are there any
13  firearms ranges operated by the federal government
14  in the City of Chicago?
15      A.   I wouldn't know.
16      Q.   You don't know.  Okay.  And are there any
17  firearms ranges operated by private individuals or
18  corporations in the City of Chicago?
19      A.   Not that I'm aware of.
20      Q.   Okay.  Do members of the CAGE team as part
21  of their duties use firearms ranges operated by the
22  City of Chicago?
23      MR. AGUIAR:  Objection.  We're getting far
24  afield of the testimony here today.  Mr. Johnson is

96

24  (Pages 93 to 96)

1    Q.  Is there anyone in the Chicago Police
2  Department to your knowledge who does have that
3  role?
4    A.  Research and Development Division.
5    Q.  Okay.  Any particular person in the
6  Research and Development Division?
7    A.  I can't say.
8    Q.  And so what does the Research and
9  Development Division do?
10    A.  They develop rules, procedure for the
11  Chicago Police Department.  And they're also --
12  they provide the statistical data that we deliver
13  to outside agencies regarding the Chicago Police
14  Department.
15    Q.  And you also testified that the ban on
16  carrying firearms outside of the home advances the
17  interest in reducing the number of firearms
18  entering the illegal market; is that correct?
19    A.  That's correct.
20    Q.  And you don't have any empirical evidence
21  that that's case, do you?
22    A.  No, I don't.
23    MR. PATTERSON:  Okay.  Nothing further.
24    MR. AGUIAR:  I think we're done, and we reserve

121

1      IN THE UNITED STATES DISTRICT COURT
2       NORTHERN DISTRICT OF ILLINOIS
3          EASTERN DIVISION
4  ILLINOIS ASSOCIATION OF   )
5  FIREARMS RETAILERS,    )
6  et al.,          )
7       Plaintiffs,  )
8  vs.          ) No. 10 CV 04184
9  THE CITY OF CHICAGO and   )
10  RICHARD M. DALEY, Mayor   )
11  of the City of Chicago,   )
12       Defendants.  )
13    I, KEVIN JOHNSON, being first duly sworn,
14  on oath say that I am the deponent in the aforesaid
15  deposition taken on the 19th day of April, 2011;
16  that I have read the foregoing transcript of my
17  deposition, consisting of pages 1 through 122
18  inclusive, and affix my signature to same.
19  _____
             KEVIN JOHNSON
20
21  Subscribed and sworn to
    before me this        day
22  of          , 2011
23
24  Notary Public

123

1  signature.
2        (FURTHER DEPONENT SAITH NOT.)
3        (Proceedings concluded at 11:44 a.m.)
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24

122

1  STATE OF ILLINOIS  )
2            )  SS:
3  COUNTY OF C O O K  )
4    I, JENNIE MODI, a notary public within and
5  for the County of Cook County and State of
6  Illinois, do hereby certify that heretofore,
7  to-wit, the 19th day of April, 2011, personally
8  appeared before me, at 33 North Dearborn Street,
9  Suite 300, Chicago, Illinois, KEVIN JOHNSON, in a
10  cause now pending and undetermined in the Circuit
11  Court of Cook County, Illinois, wherein ILLINOIS
12  ASSOCIATION OF FIREARMS RETAILERS, et al., are the
13  Plaintiffs, and THE CITY OF CHICAGO, et al., are
14  the Defendants.
15    I further certify that the said KEVIN
16  JOHNSON was first duly sworn to testify the truth,
17  the whole truth and nothing but the truth in the
18  cause aforesaid; that the testimony then given by
19  said witness was reported stenographically by me in
20  the presence of the said witness, and afterwards
21  reduced to typewriting by Computer-Aided
22  Transcription, and the foregoing is a true and
23  correct transcript of the testimony so given by
24  said witness as aforesaid.

124

31 (Pages 121 to 124)

1    I further certify that the signature to
2  the foregoing deposition was reserved by counsel
3  for the respective parties.
4    I further certify that the taking of this
5  deposition was pursuant to notice and that there
6  were present at the deposition the attorneys
7  hereinbefore mentioned.
8    I further certify that I am not counsel
9  for nor in any way related to the parties to this
10  suit, nor am I in any way interested in the outcome
11  thereof.
12    IN TESTIMONY WHEREOF:  I have hereunto set
13  my hand and affixed my notarial seal this 4th day
14  of May, 2011.
15
16
17
18
19
20  NOTARY PUBLIC, Cook County, ILLINOIS
21  LIC. NO. 084-004497.
22
23
24
                                                    125

1      McCorkle Court Reporters, Inc.
2        200 N. LaSalle Street Suite 300
         Chicago, Illinois 60601-1014
3
4  May 4, 2011
   MR. WILLIAM MACY AGUIAR
5  ASSISTANT CORPORATION COUNSEL
   DEPARTMENT OF LAW
6  30 North LaSalle Street, Suite 1230
   Chicago, Illinois  60602
7
   IN RE: ILAFR v. The City of Chicago
8  COURT NUMBER: 10-CV-04184
   DATE TAKEN: April 21, 2011
9  DEPONENT: Kevin Johnson
10  Dear Mr. Aguiar:
11  Enclosed is the deposition transcript for the
   aforementioned deponent in the above-entitled
12  cause.  Also enclosed are additional signature
   pages, if applicable, and errata sheets.
13
   Per your agreement to secure signature, please
14  submit the transcript to the deponent for review
   and signature.  All changes or corrections must be
15  made on the errata sheets, not on the transcript
   itself.  All errata sheets should be signed and all
16  signature pages need to be signed and notarized.
17  After the deponent has completed the above, please
   return all signature pages and errata sheets to me
18  at the above address, and I will handle
   distribution to the respective parties.
19
   If you have any questions, please call me at the
20  phone number below.
21
   Sincerely,
22  Margaret Setina        JENNIE MODI
   Signature Department        Court Reporter
23                (312)263-0052
   cc:  ALL COUNSEL OF RECORD
24
                                                    126

McCorkle Court Reporters, Inc.
Chicago, Illinois    (312) 263-0052

EXHIBIT 23

1

IN THE UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF ILLINOIS

EASTERN DIVISION

ILLINOIS ASSOCIATION OF          )

FIREARMS RETAILERS, KENNETH    )

PACHOLSKI, KATHRYN TYLER,     )  No. 10 CV 04184

and MICHAEL HALL,              )

    Plaintiffs,          )

  vs.                    )

THE CITY OF CHICAGO and      )

RICHARD M. DALEY, Mayor of    )

the City of Chicago,           )

    Defendants.          )

    The deposition of JUDITH G. MARTIN,

called for examination pursuant to the Rules of

Civil Procedure for the United States District

Courts pertaining to the taking of depositions,

taken before VICKI L. D'ANTONIO, a notary public

within and for the County of Cook and State of

Illinois, at 33 North Dearborn Street,

Suite 300, Illinois, on the 11th day of May,

2011, at the hour of 10:59 a.m.

10

1    activities by police officers.

2      Q.  Okay.

3      A.  In '98 I was promoted to sergeant, and

4    I went to the 12th District, which is Monroe

5    Street.  I was a beat sergeant and conducted

6    activities of a beat sergeant.  I was

7    responsible for monitoring those subordinates

8    that were under my supervision.

9          I spent a year there, and then I went

10   to Area 3 detective division, where I was in the

11   violent crimes unit as a supervisor for

12   detectives who were conducting investigations

13   into domestic-violence-related activities and

14   violent-crime-related activities.

15         In 2000 I was appointed as the domestic

16   violence coordinator for the Chicago Police

17   Department, where I spent three years from 2000

18   to 2003.  In the course of my duties there, I

19   was responsible for the department's response to

20   domestic violence, how we respond as a

21   department to calls of domestic disturbance, how

22   we relate with victims.  I did -- I was

23   responsible for a lot of grants, and I produced

24   a lot of training materials and videos.

11

1      Q.   Just to stop you.

2           These training materials and videos,

3      are those materials you provide to police

4      officers or to victims of domestic violence?

5      A.   Police officers.

6      Q.   Okay.

7      A.   But we also did some pamphlets and

8      brochures for victims.  The streaming videos we

9      did were for police officers.

10          In 2003 I was promoted to lieutenant of

11     police, and I was assigned to the 1st District,

12     which is where we're presently located.  I was

13     acting watch commander and performed the duties

14     of a lieutenant of police responsible for

15     sergeants and POs.

16          In 2004 I went down to the Bureau of

17     Patrol as an administrative lieutenant, and I

18     spent two years there from '04 to '06 where I

19     assisted the deputy chief and chief of patrol in

20     monitoring the actions of the 25 police

21     districts.

22          In 2004 I was promoted to captain, and

23     for two years from 2004 to 2006, I was captain

24     of police in the 10th District, which is at

12

1    3315 West Ogden.  I was the midnight watch

2    commander there.

3         The 10th District is compromised of

4    communities such as Lawndale, Little Village.

5    It was a very busy district.

6         I spent two years there until March of

7    '08, and in March of '08 I was promoted to

8    commander of the 13th Police District.

9         As a commander of a district, you are

10   responsible for the activities of not only your

11   police officers, but also of the community,

12   crime conditions.  It's basically like running a

13   little town.  I had 66,000 people living in the

14   13th District.  It compromised of communities

15   such as West Haven, Little Village, Ukrainian

16   Village, Humboldt Park -- part of Humboldt Park.

17        For three years, I was the commander of

18   13 until March of '11, and in March of '11, I

19   was asked to take over the position of commander

20   of special events, which is where I am presently

21   assigned.

22        The commander of special events, I've

23   only been there six weeks, so I'm not going to

24   tell you I know everything about being the

13

1    commander of special events.  But I do -- am

2    responsible for the planning of large-scale

3    events.  For example, the inauguration of the

4    mayor, which is coming up this coming weekend,

5    and Lollapalooza, any of the events, festivals,

6    parades that happen throughout the city, and

7    that is where I presently am working at.

8        Q.  Okay.  Great.

9            I wanted to follow up on a few things

10   that you said.  First, you said that the 10th

11   District while you were there was a very busy

12   district.  What did you mean by that?

13       A.  Well, there's 25 police districts.

14   Some of them are quieter in relation to crime

15   conditions, and some of them are busier.  Some

16   of them have more 911 calls to answer.  Some of

17   them have less.  So 10 is considered one of the

18   busier districts of the 25.

19       Q.  So does that mean 10 has more crimes,

20   more 911 calls, that type of thing?

21       A.  Yes.  It also has more citizens living

22   in it.  Because the population is higher, which,

23   population higher, more calls, more responses,

24   things like that.

14

1      Q.   So higher population is one thing that

2   leads to more calls and more responses.

3          Are there any other factors in your

4   experience that lead to those things?

5      A.   There's numerous gangs, gang issues in

6   the 10th District, which brings about a lot of

7   shootings, killings, things like that.

8      Q.   In your experience, what are the

9   factors that lead to one district versus another

10  having a gang problem?

11     A.   I think that goes beyond the scope of

12  me.  Okay?  I couldn't begin to answer that.

13  There's a whole ton of things I'm sure that goes

14  into it, but I'm not prepared to answer that.

15     Q.   So in your experience, you have not

16  thought about or studied what those factors

17  would be?

18     A.   I'm sure that at some point in my

19  career, I thought about it.  I definitely have

20  not studied it.

21     Q.   Okay.  You said in the 13th Police

22  District, did you say it's almost like you're

23  running a small town; is that what you were

24  saying?

1

IN THE UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF ILLINOIS

EASTERN DIVISION

ILLINOIS ASSOCIATION OF          )

FIREARMS RETAILERS, KENNETH   )

PACHOLSKI, KATHRYN TYLER,     )  No. 10 CV 04184

and MICHAEL HALL,             )

    Plaintiffs,          )

 vs.                    )

THE CITY OF CHICAGO and      )

RICHARD M. DALEY, Mayor of   )

the City of Chicago,          )

    Defendants.          )

    The deposition of JUDITH G. MARTIN,

called for examination pursuant to the Rules of

Civil Procedure for the United States District

Courts pertaining to the taking of depositions,

taken before VICKI L. D'ANTONIO, a notary public

within and for the County of Cook and State of

Illinois, at 33 North Dearborn Street,

Suite 300, Illinois, on the 11th day of May,

2011, at the hour of 10:59 a.m.

34

1      currently carry firearms?

2          A.   I would say some of them do.

3          Q.   Do you have any sense for what portion

4      of them do?

5          A.   No, I don't.

6          Q.   Would you say it's more than half of

7      them?

8          A.   I couldn't even begin to...

9          Q.   And in your experience, do you have any

10     basis for thinking that gang members and dope

11     dealers that were inclined to carry a weapon do

12     not do so because it's illegal?

13         A.   My belief is that it's a lot harder to

14     access numerous weapons because it is illegal.

15     And so therefore, if it's legal for them to

16     carry them, a lot more will carry them.

17         Q.   So let me understand how that works.

18     So because it's illegal to carry weapons, it's

19     harder for them to access numerous weapons.  Why

20     is that the case?

21         A.   Because the access to get them is not

22     there.

23         Q.   Okay.

24         A.   Are we confusing something here?

35

1      Q.   No.  I'm just trying to -- how does a

2      ban on carrying weapons reduce individual's

3      access to obtaining weapons?

4      A.   Well, I mean, let me just say this,

5      okay, because maybe I'm getting myself confused

6      here, and I'm thinking about -- I'm thinking

7      that gang members, if they can carry them, then

8      you're going to have a group of gang members

9      standing on the street, all potentially armed.

10     Would that be fair to say?

11     Q.   Yes.

12     A.   I'm thinking dope dealers, okay, dope

13     dealers could all potentially be out there

14     dealing dope with firearms, correct?  I think

15     that's a huge concern.

16     Q.   But in your experience, when you see a

17     group of gang members or dope dealers, are they

18     currently all potentially armed, regardless of

19     the law about carrying weapons?

20     A.   Well, they could be, yes.  But now they

21     could be legally.

22     Q.   Have you thought about what

23     requirements could be put in place before

24     someone would be permitted to carry a handgun

36

1    legally?

2        A.  No, I haven't thought about that.

3        Q.  So you don't know whether or not gang

4    members or dope dealers could meet those

5    requirements to carry a handgun legally?

6        MR. AGUIAR:  Objection, foundation.

7            You may answer.

8        THE WITNESS:  I think some of them probably

9    could.

10   BY MR. PATTERSON:

11       Q.  Why do you think that?

12       A.  Well, I mean, I'm just thinking that,

13   you know, if they haven't been convicted of

14   those -- that certain criteria, they would be

15   eligible to get a handgun.

16       Q.  Okay.  Beyond whether or not they have

17   been convicted, have you studied what

18   limitations other jurisdictions that permit

19   civilians to carry firearms put on who can

20   access those?

21       A.  I don't.  I haven't, no.

22       Q.  Have you ever studied or are you aware

23   of any studies that look at whether individuals

24   that are given a license to carry a firearm

56

1    STATE OF ILLINOIS   )

2              ) SS:

3    COUNTY OF C O O K   )

4

5        I, VICKI L. D'ANTONIO, a Notary Public

6    within and for the County of Cook and State of

7    Illinois, do hereby certify that heretofore,

8    to-wit, on the 11th day of May, 2011, personally

9    appeared before me JUDITH G. MARTIN, a witness

10   in a certain cause now pending and undetermined

11   in the United States District Court, Northern

12   District of Illinois, Eastern Division, wherein

13   ILLINOIS ASSOCIATION OF FIREARMS RETAILERS,

14   et al., are the Plaintiffs and THE CITY OF

15   CHICAGO, et al., are the Defendants.

16        I further certify that the said JUDITH G.

17   MARTIN was by me first duly sworn to testify the

18   truth, the whole truth, and nothing but the

19   truth in the cause aforesaid; that the testimony

20   then given by said witness was reported

21   stenographically by me in the presence of said

22   witness and afterwards reduced to typewriting by

23   Computer-Aided Transcription, and the foregoing

24   is a true and correct transcript of the

57

1    testimony so given by said witness as aforesaid.

2        I further certify that the signature to

3    the foregoing deposition was reserved by counsel

4    for the respective parties.

5        I further certify that the taking of this

6    deposition was pursuant to notice and that there

7    were present at the deposition the attorneys

8    hereinbefore mentioned.

9        I further certify that I am not counsel

10   for nor in any way related to the parties to

11   this suit, nor am I in any way interested in the

12   outcome thereof.

13       IN TESTIMONY WHEREOF:  I have hereunto

14   set my hand and affixed my notarial seal this

15   23rd day of May, 2011.

16

17

18

19   _ _ _ _____

20   NOTARY PUBLIC, COOK COUNTY, ILLINOIS

21

22

23

24

EXHIBIT 24

**U.S. Department of Justice**
Office of Justice Programs

Revised 2/04/02, th



<div style="background:green">

## Bureau of Justice Statistics
# Special Report

</div>

November 2001, NCJ 189369

*Survey of Inmates in State and Federal Correctional Facilities*

# Firearm Use by Offenders

By Caroline Wolf Harlow, Ph.D.
BJS Statistician

Approximately 203,300 prisoners serving a sentence in a State or Federal prison in 1997 were armed when they committed the crime for which they were serving time. An estimated 18% of State prison inmates and 15% of Federal inmates reported using, carrying, or possessing a firearm during the crime for which they were sentenced. In 1991, 16% of State inmates and 12% of Federal inmates said they were armed at the time of their offense.

Among all inmates in 1997, 9% of those in State prisons and 2% of those in Federal prisons said they fired a gun while committing their current offense. Of violent offenders, 18% of State inmates and 9% of Federal inmates discharged a firearm. Less than 2% of inmates serving time for a drug, property, or public-order offense fired a gun during the crime that resulted in their prison sentence.

Among prisoners who carried a firearm during the offense for which they were serving time in 1997, 14% had bought or traded for the gun from a store, pawnshop, flea market, or gun show. The 1997 percentage who had acquired their firearm at a retail outlet represented a significant drop from 21% in 1991. The percentage of inmates receiving their gun from family or friends rose from 34% in 1991 to 40% in 1997.

## Highlights

| Type of firearm | Percent of prison inmates | |
| --- | --- | --- |
| | State | Federal |
| Total | 18.4% | 14.8% |
| Handgun | 15.3 | 12.8 |
| Rifle | 1.3 | 1.3 |
| Shotgun | 2.4 | 2.0 |

| Characteristic of inmates who carried firearms | Percent of prison Inmates possessing a firearm | |
| --- | --- | --- |
| Offense | State | Federal |
| Violent | 30.2% | 35.4% |
| Property | 3.1 | 2.9 |
| Drug | 8.1 | 8.7 |
| Public-order | 19.1 | 27.3 |
| Gender | | |
| Male | 19.1% | 15.5% |
| Female | 7.3 | 6.2 |
| Age | | |
| 24 or younger | 29.4% | 19.1% |
| 25-34 | 16.5 | 15.5 |
| 35 or older | 14.8 | 13.6 |
| Criminal history | | |
| First-time offender | 22.3% | 9.5% |
| Recidivist | 17.2 | 18.4 |

| Source of gun | Percent of State inmates possessing a firearm | |
| --- | --- | --- |
| | 1997 | 1991 |
| Total | 100.0% | 100.0% |
| Purchased from – | 13.9 | 20.8 |
| Retail store | 8.3 | 14.7 |
| Pawnshop | 3.8 | 4.2 |
| Flea market | 1.0 | 1.3 |
| Gun show | 0.7 | 0.6 |
| Friends or family | 39.6 | 33.8 |
| Street/illegal source | 39.2 | 40.8 |

| Use of firearm | Percent of prison inmates possessing a firearm | |
| --- | --- | --- |
| | State | Federal |
| Total | 100.0% | 100.0% |
| Fired | 49.1 | 12.8 |
| Killed/injured victim | 22.8 | 5.0 |
| Other | 26.3 | 7.8 |
| Brandished to – | 73.2 | 46.2 |
| Scare someone | 48.6 | 29.3 |
| Defend self | 41.1 | 24.9 |

• During the offense that brought them to prison, 15% of State inmates and 13% of Federal inmates carried a handgun; about 2% had a military-style semiautomatic gun or machine gun.

• Among inmates in prison for homicide, a sexual assault, robbery, assault or other violent crime, 30% of State offenders and 35% of Federal offenders carried a firearm when committing the crime. Almost a fourth of State inmates and almost a third of Federal inmates serving a sentence for a violent crime had carried a handgun during the offense.

• 29% of State inmates under age 25 at the time of the survey were carrying a gun when they committed their current offense compared to 15% of those 35 or older.

• In 1997 among State inmates possessing a gun, fewer than 2% bought their firearm at a flea market or gun show, about 12% from a retail store or pawnshop, and 80% from family, friends, a street buy, or an illegal source.

• On average, State inmates possessing a firearm received sentences of 18 years, while those without a weapon had an average sentence of 12 years.

• Among prisoners carrying a firearm during their crime, 40% of State inmates and 56% of Federal inmates received a sentence enhancement because of the firearm.

Revised 2/04/02

Data for this report are based primarily on personal interviews with large nationally representative samples of State and Federal prison inmates. In the 1997 and 1991 Surveys of Inmates in State and Federal Correctional Facilities, inmates were questioned about any firearms they may have used when committing a crime and asked to specify the type of weapon, its source, and its use in committing crimes. In addition, inmates were queried about the types of current and past offenses for which they were sentenced, including any weapons offenses.

**Almost a fifth of prison inmates carried a gun during their crime**

An estimated 18% of State prison inmates and 15% of Federal inmates reported that they used, carried, or possessed a firearm when they committed the crime for which they were serving a sentence to prison (table 1).[1]

When asked if they had ever been armed while committing a crime, about a quarter of State prison inmates and a fifth of Federal inmates reported that they had carried a gun while committing at least one crime.

Almost half of both State and Federal inmates said that they had owned or possessed a firearm at some time in their lives. Equivalent measures for lifetime gun ownership among adults in the general population are difficult to find. Personal or telephone interviews and polls provide estimates for persons in the general population owning a firearm at the time of the survey. An estimated 25% to 29% of the adult population reported currently owning a firearm when surveyed.[2] According to public opinion polls, members of 4 in every 10 U.S. households have access to a gun.

**Less than 2% of inmates reported carrying a fully automatic or military-style semiautomatic firearm**

Fewer than 1 in 50 State and Federal inmates used, carried, or possessed a

military-style semiautomatic gun or a fully automatic gun during their current offense (table 2). These guns, as used in the questions and definitions for the personal interviews with prison inmates, include the following:

• *military-style semiautomatic pistol* — similar to a conventional semiautomatic pistol except that the magazine or clip is visible[3]

• *military-style semiautomatic rifle* — a semiautomatic rifle with military features such as a pistol grip, folding stock, flash suppressor, or bayonet mount

• *military-style semiautomatic shotgun* — a semiautomatic shotgun with military features such as a pistol grip, folding stock, flash suppressor, or bayonet mount

• *machine gun* — a fully automatic gun which, if the trigger is held down, will fire rapidly and continuously.

[3]The survey interview included in the operational definition of a military-style semiautomatic pistol the phrase "can hold more than 19 bullets."

Some examples of these firearms are the UZI, TEC-9, and MAC10 for handguns; the AR-15 and AK-47 for rifles; and the "Street Sweeper" for shotguns. Possession of these models meeting criteria specified in Federal statutes can be unlawful.

To be understood by inmate respondents who were asked about their gun use, the questions and definitions in the survey reflect terminology commonly used by prisoners to describe types of weapons. If questioned by respondents, interviewers read to them the definitions included on pages 14 and 15 of this report. Of necessity, this language is similar in concept but may differ in wording from technical descriptions in Federal statutes pertaining to firearms.

The Violent Crime Control and Law Enforcement Act of 1994 made it unlawful, with certain exceptions, to manufacture, transfer, or possess military-style semiautomatic weapons,

**Table 1. Possession of firearms by State and Federal prison inmates, by type of firearm, 1997**

| | Percent of prison inmates — | | | | | |
| | Armed during current offense | | Ever armed while committing offense | | Ever used or possessed firearm | |
| Type of firearm | State | Federal | State | Federal | State | Federal |
|---|---|---|---|---|---|---|
| Total | 100.0% | 100.0% | 100.0% | 100.0% | 100.0% | 100.0% |
| Firearm | 18.4% | 14.8% | 25.1% | 20.0% | 46.9% | 48.9% |
| Handgun | 15.3 | 12.8 | 21.3 | 17.2 | 36.0 | 38.6 |
| Rifle | 1.3 | 1.3 | 2.0 | 1.9 | 12.4 | 14.6 |
| Shotgun | 2.4 | 2.0 | 3.5 | 3.0 | 13.7 | 15.6 |
| Other | 0.5 | 0.6 | 1.1 | 0.9 | 2.7 | 2.3 |
| No firearm | 81.6% | 85.2% | 74.9% | 80.0% | 53.1% | 51.1% |

Note: Detail do not add to total because inmates may have had more than one firearm.

**Table 2. Possession of firearms by State and Federal prison inmates, by whether the firearm was single shot, conventional semiautomatic, or military-style semiautomatic or fully automatic, 1997**

| | Percent of prison inmates — | | | | | |
| | Armed during current offense | | Ever armed while committing offense | | Ever used or possessed firearm | |
| Specific type of firearm | State | Federal | State | Federal | State | Federal |
|---|---|---|---|---|---|---|
| Single shot | 9.9% | 7.3% | 14.2% | 10.6% | 31.0% | 31.4% |
| Conventional semiautomatic | 7.9 | 7.7 | 10.9 | 9.8 | 22.6 | 26.0 |
| Military-style semiautomatic or fully automatic | 1.5 | 1.7 | 2.5 | 2.3 | 5.6 | 5.6 |

Note: Columns do not add to total percent with firearms because inmates may have possessed more than one firearm. See text above and pages 14 and 15 for definitions.

[1]For definitions of firearms, see *Methodology* on pages 14 and 15.
[2]Phillip J. Cook and Jens Ludwig, *Guns in America: Summary Report*, Washington, DC, Police Foundation, 1996, table 2.3.

if not lawfully possessed on September 13, 1994.[5]

**Of inmates who carried a firearm during their offense, 8 in 10 had a handgun**

Inmates reported that a handgun was their preferred firearm; of those carrying a firearm, 83% of State inmates and 87% of Federal inmates said that they carried a handgun during the offense for which they were serving their longest sentence. About 8% of State inmates who had carried a firearm during the commission of their crime reported having a military-style semiautomatic (7%) or fully automatic (2%) firearm, with some carrying both.

| Type of firearm | Percent of prison inmates carrying a firearm during current offense | |
|---|---|---|
| | State | Federal |
| Handgun | 83.2% | 86.7% |
| Rifle | 7.3 | 8.9 |
| Shotgun | 13.1 | 13.7 |
| Single shot | 53.9% | 49.2% |
| Conventional semiautomatic | 43.2 | 51.8 |
| Military-style semiautomatic | 6.8 | 9.3 |
| Fully automatic | 2.4 | 3.8 |
| Number of inmates | 190,383 | 12,936 |

Note: Inmates could report carrying more than one type of firearm. For definitions of weapon categories, see pages 2, 14, and 15.

**Firearm use during crimes increased from 1991 to 1997**

Over the 6 years between surveys of inmates, 1991-97, possession of a firearm during a crime increased from 16% to 18% of State inmates and from 12% to 15% of Federal inmates (table 3). Because of the growth in the prison population, the estimated number of inmates carrying a firearm increased dramatically — from 114,100 in 1991 to 190,400 in 1997 in State prisons and from 6,300 in 1991 to 12,900 in 1997 in Federal prisons. These estimates were based on inmates who reported carrying a firearm during the offense for which they received their longest sentence.

[5]See P.L. 103-22 and *Commerce in Firearms in the United States*, Department of the Treasury, Bureau of Alcohol, Tobacco and Firearms, February 2000, page C-5.

**Table 3. Possession of firearms, by type of offense, by State and Federal prison inmates, 1997 and 1991**

| | Prison inmates | | | |
|---|---|---|---|---|
| | 1997 | | 1991 | |
| Current offense | Number | Percent who possessed a firearm during current offense | Number | Percent who possessed a firearm during current offense |
| **State** | | | | |
| All inmates | 1,037,241 | 18.4% | 700,050 | 16.3% |
| Violent offense | 483,713 | 30.2 | 323,653 | 29.1 |
| Property offense | 227,726 | 3.1 | 171,749 | 3.2 |
| Drug offense | 213,974 | 8.1 | 148,743 | 4.1 |
| Public-order offense | 99,396 | 19.1 | 47,001 | 16.1 |
| **Federal** | | | | |
| All inmates | 87,466 | 14.8% | 53,348 | 11.8% |
| Violent offense | 12,604 | 35.4 | 9,113 | 38.0 |
| Property offense | 5,811 | 2.9 | 7,011 | 2.1 |
| Drug offense | 54,561 | 8.7 | 30,788 | 3.9 |
| Public-order offense | 12,708 | 27.3 | 4,964 | 28.5 |

**Table 4. Firearm possession during current offense, by type of offense, for State and Federal prison inmates, 1997**

| | Prison inmates | | | |
|---|---|---|---|---|
| | State | | Federal | |
| Current offense | Number | Percent who possessed a firearm during current offense | Number | Percent who possessed a firearm during current offense |
| Violent offense | 483,713 | 30.2% | 12,604 | 35.4% |
| Homicide | 135,493 | 42.9 | 1,273 | 39.3 |
| Sexual assault | 87,687 | 2.9 | 679 | 0.0 |
| Robbery | 145,318 | 34.5 | 8,554 | 40.3 |
| Assault | 95,756 | 31.2 | 1,108 | 26.0 |
| Other violent | 19,459 | 27.1 | 989 | 22.4 |
| Property offense | 227,726 | 3.1% | 5,811 | 2.9% |
| Burglary | 111,198 | 4.0 | 279 | 10.1 |
| Other property | 116,528 | 2.3 | 5,531 | 2.5 |
| Drug offense | 213,974 | 8.1% | 54,561 | 8.7% |
| Possession | 91,511 | 7.8 | 9,959 | 7.0 |
| Trafficking | 116,578 | 8.6 | 39,769 | 9.1 |
| Other drug | 5,885 | 3.1 | 4,834 | 8.7 |
| Public-order offense | 99,396 | 19.1% | 12,708 | 27.3% |
| Weapons | 25,257 | 64.9 | 5,905 | 51.9 |
| Other public-order | 74,139 | 3.5 | 6,803 | 5.9 |

**8% of drug offenders and 3% of property offenders armed while committing their crimes**

Fewer than 1 in 10 offenders serving a sentence for selling or carrying illegal drugs and 1 in 30 inmates in prison for a property crime — burglary, larceny, fraud, or destruction of property — had a firearm with them while committing their current offense (table 4).

Inmates who had been sentenced for violent crimes used firearms more often than other prisoners. They were more likely than property, drug, or public-order offenders to have used or possessed a gun during their crime. An estimated 30% of violent offenders in State prisons and 35% in Federal prisons had a firearm at the time of the offense.

Offenders sentenced for homicide or for robbery reported the most extensive use of firearms. Among inmates sentenced for homicide, about 43% in State prisons and 39% in Federal prisons said they were carrying a firearm when they committed the offense. About 35% serving time for robbery in State prisons and 40% in Federal prison had a gun.

**Table 5. Possession of a firearm during current offense, by selected characteristics for State and Federal prison inmates, 1997**

| | State | | Federal | |
| | Prison inmates | | | |
| Selected characteristic | Number | Percent who possessed a firearm during current offense | Number | Percent who possessed a firearm during current offense |
|---|---|---|---|---|
| **Gender** | | | | |
| Male | 972,572 | 19.1% | 81,102 | 15.5% |
| Female | 64,669 | 7.3 | 6,364 | 6.2 |
| | | | | |
| **Race/Hispanic origin** | | | | |
| White | 346,188 | 14.8% | 25,977 | 16.7% |
| Black | 482,302 | 21.1 | 33,100 | 17.7 |
| Hispanic | 176,089 | 17.6 | 24,040 | 8.1 |
| Other | 32,662 | 19.3 | 4,349 | 17.9 |
| | | | | |
| **Age** | | | | |
| 20 or younger | 61,663 | 35.5% | 935 | 23.0% |
| 21-24 | 143,533 | 26.8 | 6,865 | 18.6 |
| 25-34 | 396,166 | 16.5 | 31,970 | 15.5 |
| 35-44 | 305,765 | 13.3 | 26,636 | 12.8 |
| 45-54 | 100,133 | 17.4 | 14,393 | 15.3 |
| 55 or older | 29,980 | 21.7 | 6,667 | 13.0 |
| | | | | |
| **Educational attainment** | | | | |
| Some high school or less | 445,479 | 16.8% | 25,642 | 13.9% |
| GED | 260,743 | 23.6 | 17,150 | 19.2 |
| High school diploma | 190,805 | 16.7 | 21,292 | 14.5 |
| Some college | 110,122 | 16.5 | 15,233 | 15.1 |
| College graduate | 27,649 | 12.1 | 7,963 | 8.3 |
| | | | | |
| **Citizenship** | | | | |
| United States | 983,876 | 18.5% | 71,307 | 16.9% |
| Latin America | 47,257 | 14.5 | 14,638 | 5.7 |
| Other | 4,609 | 22.0 | 1,376 | 2.4 |
| | | | | |
| **Military service** | | | | |
| Served | 129,913 | 16.4% | 12,746 | 17.2% |
| Did not serve | 907,142 | 18.6 | 74,676 | 14.4 |

## Male inmates and young inmates carried firearms

Male State and Federal offenders were more likely than their female counterparts to have carried a firearm when committing their offense. About 19% of men in State prison and 16% in Federal prison reported using or possessing a firearm when committing their most serious offense, compared to 7% of women in State prison and 6% in Federal prison (table 5).

An estimated 21% of black non-Hispanic inmates in State prison, 18% of Hispanics, and 15% of white non-Hispanics said they had a gun with them while committing their most serious offense. About 18% of black and white inmates in Federal facilities and 8% of Hispanics had carried a firearm.

Young State inmates were more likely than older inmates to use firearms. About 29% of inmates under the age of 25 at the time of the survey were carrying a gun when they committed their current offense, compared to 15% of those 35 or older. Among Federal inmates, about 19% under age 25 and 14% age 35 or older said they had a gun with them.

## Weapon offenses and offenders

Weapon offenses include unlawful distribution, sale, manufacture, alteration, transport, possession, or use of a deadly or dangerous weapon or accessory. In 1998 an estimated 195,000 persons were arrested by State or local law enforcement or referred to a U.S. attorney for prosecution for a weapon offense — counting only the most important offense and no secondary offenses. Over 35,000 persons were convicted of a weapon offense. About 49,000 persons were in a local jail or State or Federal prison for a weapon offense in 1998. An additional 100,000 were serving a sentence in the community on probation, parole, or supervised release.

An estimated 12% of State prison inmates and 19% of Federal inmates were either currently serving a sentence for a weapon offense or had been sentenced for a weapon offense in the past.

**Weapons as the most serious offense or charge in the criminal justice system, 1998**

| | Number | Percent of total |
|---|---|---|
| **State/local jurisdictions** | | |
| Arrested | 190,600 | 1.3% |
| Defendants at initial filing | -- | 2.8 |
| Convicted of a felony | 31,904 | 3.4 |
| In local jails | 13,630 | 2.3 |
| In State prisons | 26,730 | 2.4 |
| On probation/parole | 100,440 | 2.3 |
| **Federal jurisdiction** | | |
| Received by U.S. attorneys as suspects | 4,907 | 4.3% |
| Prosecuted | 3,347 | 5.1 |
| Convicted | 3,413 | 5.6 |
| In Federal prison | 8,742 | 8.0 |
| On probation/supervised release/parole | 4,038 | 4.4 |

Note: The weapon offense is the offenders' most serious offense. Statistics on persons in Federal jurisdiction are for fiscal year 1998.
--Not available.

Sources: Data on weapon offenders come from the FBI's *Crime in the United States, 1998,* table 29; from BJS' *Compendium of Federal Justice Statistics, 1998;* from BJS' Survey of Inmates in Local Jails, 1996, and Survey of Inmates in State and Federal Correctional Facilities, 1997, and from the following BJS reports available through <www.ojp.usdoj. gov/pubalp2.htm>: *Felony Defendants in Large Urban Counties, 1998; Felony Sentences in the United States, 1998; Prisoners in 1999;* and the press release for probation and parole surveys 2000.

**Current and past sentences for a weapon offense, for State and Federal prison inmates, 1997**

| Any current or past offense | Percent of prison inmates | |
|---|---|---|
| | State | Federal |
| Total | 100.0% | 100.0% |
| | | |
| Current or past weapon offense | 12.2% | 18.6% |
| Current and past weapon offenses | 1.3 | 2.2 |
| Current weapon/past other offenses | 4.1 | 8.5 |
| Current weapon/no past offenses | 1.1 | 2.7 |
| Current other/past weapon offenses | 5.8 | 5.1 |
| | | |
| Other current and/or past offenses | 87.8% | 81.4% |

**Table 6. State and Federal prison inmates possessing a firearm during their most serious offense, by characteristics of their family and background, 1997**

| Inmates' family of origin and other background characteristics | Prison inmates | | | |
|---|---|---|---|---|
| | State | | Federal | |
| | Number | Percent who possessed a firearm during current offense | Number | Percent who possessed a firearm during current offense |
| Lived with growing up | | | | |
| Both parents | 455,313 | 16.3% | 47,279 | 13.2% |
| Single parent | 438,741 | 19.7 | 30,146 | 16.2 |
| Other | 137,253 | 20.7 | 9,452 | 18.8 |
| Parent ever incarcerated | 188,166 | 22.7% | 9,843 | 18.0% |
| Parent never incarcerated | 833,005 | 17.4 | 76,382 | 14.5 |
| Parent received welfare | 374,340 | 20.8% | 20,328 | 20.0% |
| Parent did not receive welfare | 634,795 | 17.0 | 65,146 | 13.2 |
| Inmate lived in public housing | 186,847 | 21.1% | 11,807 | 17.9% |
| Inmate did not live in public housing | 835,540 | 17.8 | 74,656 | 14.5 |
| Parent abused alcohol or drugs | 327,404 | 18.5% | 18,041 | 17.6% |
| Alcohol | 241,521 | 16.6 | 14,541 | 17.8 |
| Drugs | 18,618 | 27.5 | 735 | 17.7 |
| Both | 66,986 | 22.9 | 2,752 | 17.0 |
| Parent did not abuse alcohol or drugs | 698,716 | 18.3 | 68,424 | 14.1 |
| Peers engaged in illegal activity while growing up | 780,234 | 19.6% | 49,941 | 19.0% |
| Used drugs | 688,497 | 19.7 | 42,764 | 18.5 |
| Damaged/stole/sold property* | 616,874 | 21.1 | 33,793 | 22.6 |
| Drug trafficking | 395,042 | 24.3 | 20,731 | 22.4 |
| Robbery | 203,745 | 30.4 | 8,400 | 32.5 |
| Peers did not engage in any illegal activity | 249,739 | 14.6 | 36,718 | 9.3 |

*Includes vandalism, shoplifting, stealing motor vehicles or parts, selling stolen property, and breaking and entering.

## Background characteristics account for relatively small differences in firearm use

When inmates were interviewed for the 1997 Surveys, they were asked about their family background and experiences they had when growing up. Characteristics about which the inmates reported include parental upbringing, parental incarceration, welfare assistance to their family, parental use of alcohol and drugs, and peer participation in criminal behavior.

Inmates who grew up living with both parents were less likely to be using or carrying a firearm than those who grew up primarily living with one parent, grandparents, other relatives, friends, or a foster family. An estimated 16% of State inmates and 13% of Federal inmates living with both parents had a gun with them, compared to 20% of State inmates and 17% of Federal inmates living in some other arrangement while growing up (table 6).

A higher percentage of State inmates with a parent who had served a sentence to incarceration carried a gun (23%) than those whose parents had never been in prison or jail (17%). For Federal inmates, 18% of inmates who had incarcerated parents and 15% of those who did not carried a firearm.

Inmates who lived in families receiving welfare or living in publicly-subsidized housing while growing up were more likely than those who did not live under these types of government programs to be carrying a weapon. About 1 in 5 inmates whose family received welfare or who lived in publicly financed housing carried a firearm. About 1 in 6 State inmates and 1 in 7 Federal inmates whose parents were not receiving welfare benefits or living in publicly-financed housing had a gun.

A quarter of State inmates who said they had a parent who had abused drugs reported that they were carrying a gun while committing their current offense. In contrast, less than a fifth of those whose parents did not abuse substances had a firearm.

About 20% of State and Federal inmates whose friends while growing up used or traded drugs, stole, destroyed or damaged property, broke or entered private property, or robbed someone reported that they had a firearm with them when they committed their controlling offense. An estimated 15% of State inmates and 9% of Federal inmates who did not have friends involved in illegal activities

---

## Inmates who had ever been shot at

As one measure of violence in inmates' lives, inmates were asked if they had ever been shot at. This experience could have been at any time in their lives, including when they were committing the crime for which they were in prison. About half of State prisoners reported that in the past they had been shot at by someone, and more than a fifth had actually been wounded by gunfire. A quarter of State and Federal inmates who had been shot at were carrying a firearm during their current offense, compared to a tenth of those who had never been shot at.

| | State prison inmates | | Federal prison inmates | |
|---|---|---|---|---|
| | Number | Percent carrying a firearm | Number | Percent carrying a firearm |
| Ever shot at with a gun | 516,194 | 24.6% | 30,064 | 24.0% |
| Wounded | 213,429 | 26.7 | 12,933 | 24.4 |
| Shot at but not wounded | 302,765 | 23.1 | 17,131 | 23.6 |
| Never shot at | 514,676 | 12.1 | 56,679 | 10.1 |

used or possessed a firearm during their current offense.

**Violent recidivists were as likely as first time violent offenders to have carried a gun**

Recidivism does not appear to be related to whether inmates were carrying guns when the type of current offense is taken into account. Violent offenders who had served a prior sentence and first time violent offenders were about equally likely to be carrying a firearm when committing their current offense — about 30% of violent offenders in State prisons carried a firearm (table 7). About a third of violent Federal offenders, whether recidivist or first time, carried a firearm.

Less than 10% of both first time and repeat State offenders serving time for property, drug, and public-order offenses carried a gun. Drug offenders who were recidivists were more likely to be carrying a firearm than first-time drug offenders (9% versus 6% of State inmates and 11% versus 5% of Federal inmates).

Inmates who had served prior sentences as a juvenile were more likely to have had a gun than those who did not have a juvenile record. For State offenders 22% who had a juvenile record and 13% with only an adult record had a firearm while committing their current offense; for Federal offenders 27% with a juvenile record and 14% with only an adult record possessed a firearm.

**Inmates' retail purchase of firearms fell between 1991 and 1997**

In 1997, 14% of State inmates who had used or possessed a firearm during their current offense bought or traded for it from a retail store, pawnshop, flea market, or gun show (table 8). Nearly 40% of State inmates carrying a firearm obtained the weapon from family or friends. About 3 in 10 received the weapon from drug dealers, off the street, or through the black market. Another 1 in 10 obtained their gun during a robbery, burglary, or other type of theft.

From 1991 to 1997 the percent of State inmates with guns who acquired them at a retail outlet fell from 21% to 14%. At the same time the percentage reporting that they used firearms furnished by family or friends increased from 34% to 40%. Between the two surveys the Brady Handgun Violence Prevention Act of 1993 was enacted. The act requires background checks for persons purchasing firearms from federally licensed firearm dealers. Changes in how inmates obtained firearms, when the two surveys are compared, may or may not reflect the requirements in the Brady Act. Inmates may have procured their firearm or entered prison before the Brady Act became effective in 1994.

**Table 8. Source of firearms possessed during the current offense of State prison inmates, 1997 and 1991**

| Source of firearms | Percent of State prison inmates who possessed a firearm during current offense | |
|---|---|---|
| | 1997 | 1991 |
| Total | 100.0% | 100.0% |
| Purchased or traded from retail outlet | 13.9% | 20.8% |
| Retail store | 8.3 | 14.7 |
| Pawnshop | 3.8 | 4.2 |
| Flea market | 1.0 | 1.3 |
| Gun show | 0.7 | 0.6 |
| Family or friend | 39.6% | 33.8% |
| Purchased or traded | 12.8 | 13.5 |
| Rented or borrowed | 18.5 | 10.1 |
| Other | 8.3 | 10.2 |
| Street/illegal source | 39.2% | 40.8% |
| Theft or burglary | 9.9 | 10.5 |
| Drug dealer/off street | 20.8 | 22.5 |
| Fence/black market | 8.4 | 7.8 |
| Other | 7.4% | 4.6% |

**Table 7. Possession of firearm during current offense, by criminal history, prior sentences, and criminal justice status at arrest, for State and Federal prison inmates, 1997**

| | Prison inmates | | | |
|---|---|---|---|---|
| | State | | Federal | |
| Criminal justice characteristic | Number | Percent who possessed a firearm during current offense | Number | Percent who possessed a firearm during current offense |
| **Criminal history** | | | | |
| No previous sentence | 247,287 | 22.3% | 33,731 | 9.5% |
| Current offense | | | | |
| Violent | 155,195 | 31.1 | 3,952 | 31.8 |
| Drug | 44,744 | 5.8 | 20,425 | 4.8 |
| Other | 47,347 | 9.1 | 9,354 | 10.2 |
| Recidivists | 783,178 | 17.2 | 52,619 | 18.4 |
| Current offense | | | | |
| Violent | 360,564 | 28.4 | 9,866 | 38.4 |
| Drug | 177,922 | 9.0 | 32,706 | 11.2 |
| Other | 244,692 | 6.5 | 10,047 | 22.3 |
| **Prior sentences** | | | | |
| Juvenile only | 66,742 | 34.4% | 2,835 | 25.8% |
| Adult only | 404,646 | 12.7 | 34,294 | 13.5 |
| Both juvenile and adult | 309,002 | 19.4 | 15,897 | 27.3 |
| **Criminal justice status at arrest** | | | | |
| New court commitment | 543,238 | 21.8% | 63,320 | 13.7% |
| On status | 489,320 | 14.6 | 23,628 | 17.8 |
| Probation | 229,952 | 15.0 | 11,644 | 14.0 |
| Parole | 252,355 | 14.1 | 11,736 | 21.3 |
| Escape | 7,013 | 17.9 | 248 | 32.9 |

## Victims of violent offenders possessing firearms

About 30% of State inmates and 35% of Federal inmates sentenced for a violent offense — homicide, sexual assault, robbery, or assault — used or possessed a firearm when committing their current offense. A quarter of violent State prisoners and almost a third of Federal prisoners carried a handgun. Fewer than 1 in 10, however, carried a long gun — a rifle or shotgun — or a military-style semiautomatic or fully automatic weapon.

Inmates serving time for violent crimes were more likely to use a firearm when their victims were male rather than female, 18 or older rather than under age 18, and strangers, known by sight, or known casually rather than persons the inmates knew well.

• About 40% of violent State offenders who victimized a male had a gun compared to 17% of offenders when the victim was female.

• 39% of violent State inmates with a black victim and 33% of those with a Hispanic victim used a firearm, significantly more than the 25% with a white victim.

### Possession of a firearm, by type of firearm, for State and Federal prison inmates sentenced for a violent offense, 1997

| Type of firearm | Percent of prison inmates who possessed a firearm during current violent offense | |
| | State | Federal |
| --- | --- | --- |
| Total | 100% | 100% |
| **Any firearm** | 30.2% | 35.4% |
| Handgun | 24.7 | 30.4 |
| Rifle | 2.0 | 2.4 |
| Shotgun | 4.1 | 3.6 |
| Other | 0.7 | 1.2 |
| Type of firearm | | |
| Single shot | 17.0% | 18.0% |
| Conventional semiautomatic | 12.1 | 16.3 |
| Military-style semi-automatic or fully automatic | 2.1 | 4.0 |

• Less than 10% of those who victimized persons 17 or younger, compared to over 33% of those who victimized persons 18 or older, possessed a firearm.

• Over a third of violent offenders used guns when their victims were strangers and casual acquaintances, compared to a fifth who used guns against persons they knew.

• 27% of offenders who victimized a current or former spouse, boyfriend, or girlfriend were armed while committing the crime. About 8% used guns against other relatives, including children, siblings, and other family members.

### Characteristics of victims of violent crime, by whether the State prison inmate possessed a firearm, 1997

| Characteristics of victim | Percent of violent State prison inmates who possessed a firearm during current offense |
| --- | --- |
| Gender | |
| Male | 39.8% |
| Female | 16.8 |
| Race/Hispanic origin | |
| White | 25.4% |
| Black | 38.6 |
| Hispanic | 32.8 |
| Other | 29.1 |
| Age | |
| 17 or younger | 8.2% |
| 18-24 | 40.9 |
| 25-34 | 37.0 |
| 35 or older | 33.8 |
| Relationship to offender | |
| Stranger | 35.6% |
| Known by sight or casually | 36.2 |
| Well known | 20.6 |
| Intimate* | 27.0 |
| Other relative | 8.2 |
| Friend | 26.3 |
| Other | 23.9 |

*Includes spouse, ex-spouse, boyfriend, girlfriend, ex-boyfriend, and ex-girlfriend.

**Recidivists less likely than first timers to buy their gun from a retail establishment**

Although existence of a prior record did not change inmates' likelihood of having carried a gun while committing their current crime, it did influence where they acquired their gun. Recidivists were less likely than those who were first time offenders to have purchased their gun from a retail store, pawnshop, flea market, or gun show. About a tenth of recidivists and a fifth of first timers purchased their gun from a retail establishment (table 9).

A larger percentage of recidivists than first time offenders obtained their weapon through illegal activities or from the street or a black market source — 42% of recidivists and 31% of first timers.

Recidivists with firearms were as likely as first time offenders to obtain their gun from a family member or friends in 1997— about 40% acquired their guns from either family or friends.

The percentage of inmates who purchased or traded from a retail outlet, such as a store or pawnshop, fell during this period for both those with prior sentences and those without them. For repeat offenders, purchasing from retail fell from 17% to 11%, and for first time offenders from 33% to 20%.

For recidivists the percentage of inmates with firearms who obtained them from family or friends rose from 1991 to 1997 — for recidivists from 33% in 1991 to 39% in 1997 and for first timers from 36% in 1991 to 41% in 1997.

| Table 9. Source of firearms possessed during current offense, by criminal history, for State prison inmates, 1997 and 1991 | | | | |
|---|---|---|---|---|
| | Percent of State prison inmates possessing a firearm who were — | | | |
| | First timers | | Recidivists | |
| Source of firearms | 1997 | 1991 | 1997 | 1991 |
| Total | 100.0% | 100.0% | 100.0% | 100.0% |
| Purchased or traded from a retail outlet | 20.1% | 32.9% | 11.4% | 16.8% |
|   Retail store | 14.2 | 25.5 | 6.0 | 11.0 |
|   Pawnshop | 4.2 | 5.4 | 3.7 | 3.9 |
|   Flea market | 0.9 | 1.0 | 1.1 | 1.4 |
|   Gun show | 0.8 | 1.0 | 0.7 | 0.4 |
| Family or friend | 40.5% | 36.1% | 39.2% | 33.1% |
|   Purchased or traded | 11.0 | 11.5 | 13.5 | 14.0 |
|   Rented or borrowed | 20.0 | 12.9 | 17.9 | 9.3 |
|   Other | 9.5 | 11.6 | 7.8 | 9.9 |
| Street/illegal source | 30.9% | 26.7% | 42.4% | 45.7% |
|   Theft or burglary | 7.6 | 4.7 | 10.9 | 12.4 |
|   Drug dealer/off street | 15.7 | 14.7 | 22.8 | 25.2 |
|   Fence/black market | 7.6 | 7.3 | 8.8 | 8.1 |
| Other | 8.5% | 4.4% | 6.9% | 4.3% |
|   Number of prison inmates | 51,152 | 22,444 | 127,664 | 70,728 |

---

**Victim, police, and inmate reports of gun use during violent crime**

The FBI reports that over two-thirds of homicide victims were killed with a firearm. About 4 in 10 inmates serving a sentence for murder or manslaughter in State and Federal correctional facilities said that they had used a gun in committing the crime.

About 23% of robbery victims and 28% of aggravated assault victims told the National Crime Victimization Survey that the offender used a gun.

**Possession of firearms during violent crime, as reported by victims, police, and prison inmates, 1997**

| Violent crime | Percent of victimizations in the National Crime Victimization Survey | Percent of offenses in the FBI's Supplemental Homicide Reports/ Uniform Crime Reports | Percent of offenders possessing a firearm during a violent crime | |
|---|---|---|---|---|
| | | | Survey of Inmates in State Correctional Facilities | Survey of Inmates in Federal Correctional Facilities |
| Homicide | | 67.8% | 42.9% | 39.3% |
| Sexual assault | 2.4% | | 2.9 | 0.0 |
| Robbery | 23.0 | 39.7 | 34.5 | 40.5 |
| Aggravated assault | 28.4 | 20.0 | 31.2 | 26.0 |

**Table 10. Source of firearms possessed during current offense, by whether the firearm was single shot, conventional semiautomatic, or military-style semiautomatic or fully automatic, for State prison inmates, 1997**

| | Percent of State prison inmates who possessed a firearm | | |
|---|---|---|---|
| Source of firearms | Military-style semiautomatic or fully automatic | Conventional semiautomatic | Single shot |
| Total | 100.0% | 100.0% | 100.0% |
| | | | |
| Purchased or traded | | | |
| from a retail outlet | 19.3% | 16.5% | 12.2% |
|   Retail store | 10.6 | 9.2 | 7.5 |
|   Pawnshop | 6.7 | 4.7 | 3.4 |
|   Flea market | 0.0 | 1.2 | 0.9 |
|   Gun show | 1.9 | 1.4 | 0.4 |
| | | | |
| Family or friend | 25.2% | 35.6% | 43.8% |
|   Purchased or traded | 11.1 | 13.0 | 12.7 |
|   Rented or borrowed | 10.6 | 15.7 | 21.5 |
|   Other | 3.5 | 6.9 | 9.5 |
| | | | |
| Street/illegal sources | 48.5% | 42.1% | 36.4% |
|   Theft or burglary | 9.8 | 8.0 | 11.4 |
|   Drug dealer/off street | 23.4 | 23.6 | 18.4 |
|   Fence/black market | 15.4 | 10.6 | 6.7 |
| | | | |
| Other | 7.0% | 5.8% | 7.6% |
| | | | |
|   Number of prison inmates | 14,896 | 79,031 | 96,531 |

Note: See note on table 2 and definitions on page 14.

**Table 11. Source of firearms possessed during current offense, by gender and age, for State prison inmates, 1997**

| | Percent of State prison inmates who possessed a firearm during their current offense, by gender and age | | | | |
|---|---|---|---|---|---|
| Source of firearms | Male | Female | 24 or younger | 25-34 | 35 or older |
| Total | 100.0% | 100.0% | 100.0% | 100.0% | 100.0% |
| | | | | | |
| Purchased or traded | | | | | |
| from a retail outlet | 13.8% | 16.5% | 6.6% | 12.7% | 21.9% |
|   Retail store | 8.3 | 10.6 | 2.6 | 7.0 | 15.0 |
|   Pawnshop | 3.8 | 5.5 | 2.9 | 4.0 | 4.5 |
|   Flea market | 1.0 | 0.4 | 0.1 | 0.9 | 1.9 |
|   Gun show | 0.8 | 0.0 | 0.9 | 0.8 | 0.4 |
| | | | | | |
| Family or friend | 39.4% | 46.4% | 40.1% | 38.9% | 39.8% |
|   Purchased or traded | 12.9 | 5.9 | 13.0 | 12.1 | 13.3 |
|   Rented or borrowed | 18.3 | 28.4 | 20.3 | 18.8 | 16.6 |
|   Other | 8.2 | 12.1 | 6.8 | 8.1 | 9.9 |
| | | | | | |
| Street/illegal sources | 39.4% | 30.5% | 46.8% | 41.2% | 29.9% |
|   Theft or burglary | 9.9 | 13.1 | 10.0 | 9.8 | 10.1 |
|   Drug dealer/off street | 21.0 | 13.0 | 27.8 | 22.9 | 12.1 |
|   Fence/black market | 8.5 | 4.3 | 9.0 | 8.6 | 7.8 |
| | | | | | |
| Other | 7.4% | 6.6% | 6.5% | 7.1% | 8.5% |
| | | | | | |
|   Number of prison inmates | 174,488 | 4,421 | 57,194 | 60,818 | 60,897 |

**1 in 5 military-style semiautomatic or fully automatic guns bought from retail store**

About a fifth of inmates with a military-style semiautomatic or fully automatic weapon bought it retail — at a store, flea market, or gun show (table 10). About a sixth of inmates with a conventional semiautomatic weapon and an eighth with a single-shot gun also had made a retail purchase.

While family and friends provided a quarter of military-style semiautomatic or fully automatic firearms, they gave inmates over a third of the conventional semiautomatic weapons and just under half of the single-shot guns.

Almost half of inmates possessing military-style semiautomatic or fully automatic weapons, about two-fifths of those with conventional semiautomatic firearms, and over a third of offenders having single-shot guns had got their firearm in a theft or burglary, or from a drug dealer, fence, or black market.

**Young offenders less likely than older ones to have bought a firearm from a retail source**

Young offenders were less likely than older inmates to have bought their gun from a retail outlet (table 11). About 7% of inmates 24 or younger and 22% of those 35 or older obtained their gun from a retail outlet.

About half of inmates who were 24 or younger, compared to less than a third of those 35 or older, acquired their gun through illegal activities, a drug dealer, or a black market.

Among those possessing a firearm during their current offense, an estimated 17% of women and 14% of men purchased their guns from a retail establishment. About 3 in 10 women offenders and 4 in 10 male inmates acquired their firearms from a theft, burglary, drug dealer, fence, or black market. Family and friends provided guns to about 46% of female inmates with firearms and 39% of male inmates.

**Federal law may have disqualified over 8 in 10 inmates from buying a firearm**

The Gun Control Act of 1968, as amended, and other Federal statutes list conditions which disqualify an individual from possessing a firearm or purchasing it from a licensed dealer. Some of these conditions include a prior felony conviction or indictment, current illegal drug use or addiction, dishonorable discharge from the Armed Forces, or being a fugitive from justice, a mental incompetent, or a nonresident alien. The Brady Act,

effective in 1994, mandated that federally licensed firearm dealers obtain background checks of potential purchasers, based on the conditions of eligibility.

A slightly lower percentage of State prisoners who had a gun, compared to those who did not, reported having a characteristic which may have disqualified them, as defined by Federal law. About 84% of State inmates who had possessed a gun and 88% who did not have a gun may have met at least one of the conditions, as measured in the inmate survey (table 12).

Among State inmates, those with and without guns answered differently on only two conditions. About 50% of those with a firearm and 56% without had a prior sentence to incarceration; about 37% with a gun and 49% without were on probation or parole. On other factors, about the same percentages reported meeting a condition that could have made them ineligible to purchase a firearm. Almost 6 in 10 said they had used illegal drugs before their controlling offense, about 1 in 10 had stayed in a mental health facility overnight, and 1 in 20 was a noncitizen.

Higher percentages of Federal inmates with guns than without them reported meeting at least one of the conditions of the Federal laws. About 83% with a firearm and 78% without one may have been disqualified from purchasing a gun. Higher percentages of inmates using guns compared to those without a gun had a prior incarceration (55% versus 37%), were on probation or parole when arrested (32% versus 26%), or had used illegal drugs shortly before committing their current offense (56% versus 43%).

**9% of all State prison inmates and 2% of all Federal inmates shot a gun while committing their current offense**

In total, about 1 in 10 State inmates and 1 in 50 Federal inmates fired their gun while committing their current offense (table 13). Among inmates serving a sentence for a single violent crime incident, 18% of State inmates and 9% of Federal inmates said they fired the gun they were carrying.

**Table 12. Selected characteristics that may make a gun purchase illegal under Federal law, by possession of firearm during current offense, for State and Federal prison inmates, 1997**

| | Percent of inmates during current offense | | | |
| | State inmates | | Federal inmates | |
| Selected characteristic | Possessed firearm | Did not possess firearm | Possessed firearm | Did not possess firearm |
|---|---|---|---|---|
| Total meeting at least one condition which may have made inmates ineligible to purchase a firearm | 84.1% | 87.7% | 83.1% | 77.7% |
| Prior incarceration for serious offense | 49.8 | 55.9 | 55.1 | 36.9 |
| On probation or parole when arrested | 37.0 | 48.9 | 32.0 | 26.0 |
| On escape when arrested | 0.7 | 0.7 | 0.6 | 0.2 |
| Illegal drug use in month before or at time of offense | 58.8 | 56.3 | 56.0 | 43.0 |
| Ever treated overnight in mental health facility | 10.7 | 10.7 | 6.7 | 4.2 |
| Not a U.S. citizen | 5.2 | 6.0 | 7.8 | 22.6 |
| Dishonorable discharge from U.S. military | 0.3 | 0.3 | 0.7 | 0.2 |

**Table 13. Extent of weapon use during current offense, for State and Federal prison inmates, 1997**

| | Percent of prison inmates | | | | | |
| | All inmates | | Violent offenders | | Other offenders | |
| Firearm use | State | Federal | State | Federal | State | Federal |
|---|---|---|---|---|---|---|
| Total | 100.0% | 100.0% | 100.0% | 100.0% | 100.0% | 100.0% |
| Used firearm | 20.4% | 8.9% | 38.5% | 35.1% | 4.3 | 3.5 |
| Discharged | 8.9 | 2.0 | 17.7 | 8.5 | 1.1 | 0.6 |
| Did not discharge | 11.5 | 6.9 | 20.7 | 26.6 | 3.2 | 2.9 |
| Possessed but did not use | 3.6 | 8.2 | 3.0 | 7.2 | 4.1 | 8.4 |
| Possessed other weapon | 1.0 | 0.5 | 1.4 | 2.7 | 0.6 | 0.1 |
| Did not possess weapon | 75.0 | 82.4 | 57.2 | 55.0 | 91.0 | 88.0 |
| Number | 993,305 | 71,325 | 468,757 | 12,249 | 515,532 | 58,266 |

Note: Table excludes prison inmates serving a sentence for multiple incidents.

**Table 14. Extent of firearm use during current offense for State and Federal prison inmates possessing a firearm, 1997**

| Firearm use | Percent of prison inmates possessing a firearm | |
| | State | Federal |
|---|---|---|
| Total | 100.0% | 100.0% |
| Used firearm | 80.2% | 48.6% |
| Discharged | 49.1 | 12.8 |
| Killed victim | 14.6 | 3.0 |
| Injured victim | 15.4 | 3.5 |
| Neither killed nor injured | 26.3 | 7.8 |
| Brandished/displayed | 73.2 | 46.2 |
| To scare someone | 48.6 | 29.3 |
| To defend self | 41.1 | 24.9 |
| To "get away" | 18.9 | 11.6 |
| Did not actively use firearm | 19.8% | 51.4% |
| Number | 178,646 | 11,250 |

Note: Percents of subtotals do not add to totals because inmates may have used a firearm in more than one way. Table excludes prison inmates serving a sentence for multiple incidents.

About 1% of inmates serving a sentence for a single property, drug, or public-order incident discharged a gun.

Fewer than 1 in 20 State inmates and 1 in 10 Federal inmates, regardless of type of offense, said they possessed a firearm but did not use it. Another 2% reported they had another weapon, including a knife, scissors, ax, rock, club or other sharp or blunt object.

**Table 15. Extent of firearm use during current offense, for State prison inmates possessing a firearm, 1997**

| Firearm use | Percent of State prison inmates possessing a firearm | | |
| | Military-style semiautomatic or fully automatic | Conventional semiautomatic | Single-shot |
|---|---|---|---|
| Total | 100.0% | 100.0% | 100.0% |
| Used firearm | 74.6% | 78.9% | 80.8% |
| Discharged | 42.9 | 46.3 | 50.6 |
| Killed victim | 11.2 | 13.5 | 15.7 |
| Injured victim | 14.2 | 15.1 | 15.3 |
| Neither killed nor injured | 23.4 | 24.0 | 27.3 |
| Brandished/displayed | 70.5 | 72.1 | 73.2 |
| To scare someone | 45.3 | 48.0 | 49.6 |
| To defend self | 39.7 | 42.4 | 39.9 |
| To "get away" | 20.4 | 18.5 | 18.7 |
| Did not actively use firearm | 25.4% | 21.1% | 19.2% |
| Number | 14,280 | 76,010 | 96,810 |

Note: Percents of subtotals do not add to totals because inmates may have used a firearm in more than one way. Table excludes prison inmates serving a sentence for multiple incidents. See pages 2, 14, and 15 for definitions of firearms.

**About half of inmates carrying a gun during their offense fired it and half of those injured or killed someone**

If inmates carried a firearm, they tended to use it. Among inmates possessing a firearm and committing only one incident, four-fifths of State inmates and half of Federal inmates either fired the weapon or brandished or displayed it while committing the crime (table 14).

An estimated 23% of State inmates and 5% of Federal inmates with a gun either killed or injured their victim. Another 26% of State inmates and 8% of Federal inmates with a gun discharged the gun but did not injure or kill anyone with it.

Besides firing their weapon, inmates used their guns for other purposes. About half of State inmates said they used it to scare someone, about two-fifths to defend themselves, and a fifth to "get away."

About 81% of State inmates with a single-shot gun, 79% with a conventional semiautomatic, and 75% with a military-style semiautomatic weapon or a fully automatic weapon either fired or brandished it (table 15). About 51% with a single-shot gun, 46% with a conventional semiautomatic firearm, and 43% with a military-style semiautomatic weapon or a fully automatic weapon discharged their firearm. About a fifth either injured or killed their victim, regardless of the type of firearm.

About a quarter of inmates carrying military-style semiautomatic weapon or a fully automatic weapon and a fifth of those with a conventional semiautomatic or single-shot weapon did not actively use the gun in any way, discharging it or displaying it to scare someone, defend oneself, or "get away."

**Table 16. Sentence length and time to be served, by possession of a firearm and type of offense, for State prison inmates, 1997**

| | Sentence length in months | | | | Time expected to be served | | | |
|---|---|---|---|---|---|---|---|---|
| | Possessed firearm | | Did not possess firearm | | Possessed firearm | | Did not possess firearm | |
| Current offense | Mean | Median | Mean | Median | Mean | Median | Mean | Median |
| Total | 220 mo | 180 mo | 150 mo | 96 mo | 126 mo | 91 mo | 83 mo | 52 mo |
| Violent offense | 252 | 240 | 216 | 180 | 147 | 115 | 126 | 87 |
| Homicide | 330 | 480 | 352 | 600 | 196 | 172 | 209 | 182 |
| Sexual assault | 444 | 480 | 232 | 180 | 212 | 206 | 131 | 97 |
| Robbery | 232 | 180 | 192 | 120 | 125 | 94 | 102 | 72 |
| Assault | 177 | 120 | 133 | 96 | 101 | 75 | 83 | 59 |
| Property offense | 177 | 120 | 123 | 72 | 87 | 72 | 64 | 44 |
| Drug offense | 143 | 108 | 107 | 60 | 60 | 48 | 49 | 36 |
| Public-order offense | 98 | 60 | 78 | 48 | 55 | 40 | 46 | 28 |

**Possession of a firearm during an offense increased sentences and expected time served of inmates**

On average, inmates possessing a firearm had longer sentences and expected to serve a longer time than those who had not used or possessed a firearm while committing their offense. Sentences for State inmates with firearms had an average of about 18 years, while those for inmates without a firearm were about 12 years (table 16). Those who had carried a firearm expected to serve about 10 years on their sentence, and those without a firearm, 7 years.

Violent offenders with firearms had on average a sentence of over 20 years and those without firearms, about 18 years. Violent offenders who had carried a gun also expected to serve 12 years on average and those who did not carry them, 10 years.

Significantly higher percentages of inmates who possessed firearms, compared to those who did not, received a sentence enhancement, generally for possessing a firearm. About 40% of State inmates who carried a firearm during their current offense and 6% who were not carrying a firearm were given an enhancement to their sentence because of a firearm offense (table 17). About 56% of Federal inmates who carried a firearm and 14% who did not carry one received a weapons offense enhancement.

**Methodology**

The U.S. Census Bureau conducted the 1997 Survey of Inmates in State Correctional Facilities (SISCF) for the Bureau of Justice Statistics (BJS) and the 1997 Survey of Inmates in Federal Correctional Facilities (SIFCF) for BJS and the Bureau of Prisons. From June through October, 1997, inmates were interviewed about their current offense and sentences, criminal histories, family and personal backgrounds, gun possession and use, prior drug and alcohol use and treatment, educational programs, and other services provided while in prison. Similar surveys of State prison inmates were conducted in 1974, 1979, 1986, and 1991. Federal inmates were surveyed for the first time in 1991.

*Sample design*

The samples for the SISCF and SIFCF were taken from a universe of 1,409 State prisons and 127 Federal prisons enumerated in the 1995 Census of State and Federal Adult Correctional Facilities or opened between completion of the census and June 30, 1996. The sample design for both surveys was a stratified two-stage selection; first, selecting prisons, and second, selecting inmates in those prisons.

In the first stage correctional facilities were separated into two sampling frames: one for prisons with male inmates and one for prisons with female inmates. Prisons holding both genders were included on both lists.

**Table 17. Sentence enhancements, by possession of a firearm during current offense, for State and Federal prison inmates, 1997**

| | Percent of inmates during current offense | | | |
|---|---|---|---|---|
| | State inmates | | Federal inmates | |
| Enhancements to sentence | Possessed firearm | Did not possess firearm | Possessed firearm | Did not possess firearm |
| Total | 100.0% | 100.0% | 100.0% | 100.0% |
| No enhancement | 49.6% | 70.3% | 31.1% | 57.7% |
| Any enhancement | 50.4% | 29.7% | 68.9% | 42.3% |
| Firearm offense | 39.9 | 5.5 | 55.7 | 13.7 |
| 2nd or 3rd strike | 16.4 | 20.0 | 26.0 | 18.5 |
| Type of drug offense* | 7.0 | 9.8 | 23.3 | 25.7 |

*Type of drug offense includes type of drug, quantity of drug, or activity involved with the drug offense.

In the sampling of State facilities, the 13 largest male prisons and 17 largest female prisons were selected with certainty. The remaining 1,265 male facilities and 261 female facilities were stratified into 14 strata defined by census region (Northeast except New York, New York, Midwest, South except Texas, Texas, West except California, and California). Within each stratum facilities were ordered by facility type (confinement and community-based), security level (maximum, medium, minimum, and none), and size of population. A systematic sample of prisons was then selected within strata with probabilities proportionate to the size of each prison.

For the sample of Federal prisons, one male prison and two female prisons were selected with certainty. The remaining 112 male facilities were classified into 5 strata defined by security level (administrative, high, medium, low, and minimum). The 20 remaining female facilities were stratified into 2 strata by security level (minimum and not minimum). Within security level, facilities were ordered by size of population and then selected with probability proportionate to size.

For the State survey 280 prisons were selected, 220 male facilities and 60 female facilities. Of the 280 facilities 3 refused to allow interviewing and 2 closed before the survey could be conducted. Overall, 32 male facilities and 8 female facilities were selected for the Federal survey, and all participated.

In the second stage, inmates were selected for interviewing. For State facilities interviewers selected the sample systematically using a random start and a total number of interviews based on the gender of the inmates and the size of the facility. For Federal facilities, a sample of inmates was selected for each facility from the Bureau of Prisons central list, using a random start and predetermined sampling interval.

All selected drug offenders were then subsampled so that only a third were eligible for interview. As a result, approximately 1 in every 75 men and 1 in 17 women were selected for the State survey, and 1 in every 13 men and 1 in every 3 women were selected for the Federal survey.

A total of 14,285 interviews were completed for the State survey and 4,041 for the Federal survey, for overall response rates of 92.5% in the State survey and 90.2% in the Federal survey.

The interviews, about an hour in length, used computer-assisted personal interviewing (CAPI). With CAPI, computers provide questions for the interviewer, including follow-up questions tailored to preceding answers. Before the interview, inmates were told verbally and in writing that participation was voluntary and that all information provided would be held in confidence. Participants were assured that the survey was solely for statistical purposes and that no individual who participated could be identified through use of survey results.

*Estimates of prisoner counts*

Based on the completed interviews, estimates for the entire population were developed using weighting factors derived from the original probability of selection in the sample. These factors were adjusted for variable rates of nonresponse across strata and inmates' characteristics and offenses. The sample for the State survey was adjusted to midyear custody counts for June 30, 1997, from data obtained in the National Prisoner Statistics series (NPS-1A). The sample from the Federal facilities was weighted to the total known sentenced custody population at midyear 1997.

Excluded from the estimate of Federal inmates were unsentenced inmates and those prisoners under Federal jurisdiction but housed in State and private contract facilities. Those prisoners who were under State jurisdiction, yet held in local jails or private-facilities, were excluded from the estimated number of State prisoners. As a result, the estimated prisoner counts do not match those in other BJS data series. The estimated prisoner counts vary according to the particular data items analyzed. Estimates are based on the number of prisoners who provided information on selected items.

*Accuracy of the estimates*

The accuracy of the estimates presented in this report depends on two types of error: sampling and nonsampling. Sampling error is the variation that may occur by chance because a sample rather than a complete enumeration of the population was conducted. Nonsampling error can be attributed to many sources, such as nonresponses, differences in the interpretation of questions among inmates, recall difficulties, and processing errors. In any survey the full extent of the nonsampling error is never known. The sampling error, as measured by an estimated standard error, varies by the size of the estimate and the size of the base population.

Estimates of the standard errors have been calculated for the 1997 surveys. (See appendix tables 1 and 2.)  For example, the 95-percent confidence interval around the percentage of State inmates who carried a firearm during current offense is approximately 18.4% plus or minus 1.96 times 0.42% (or 17.6% to 19.2%).

These standard errors may also be used to test the significance of the difference between two sample statistics by pooling the standard errors of the two sample estimates.  For example, the standard error of the difference between violent and drug offenders carrying firearms when committing their current offense would be 1.0% (or the square root of the sum of the squared standard errors for each group).  The 95%-confidence interval around the difference would be 1.96 times 1.0% or 1.9%.  Since the difference, 22.1% (30.2% - 8.1%) is greater than 1.9%, the difference would be considered statistically significant.

The same procedure can be used to test the significance of the difference between estimates from the two surveys.  For example, the standard error of the difference between Federal and State prison inmates carrying a firearm would be 0.9%.  The 95-percent confidence interval around the difference would be 1.96 times .9% (or 1.7%).  Since the difference of 3.6% (18.4% minus 14.8%) is greater than 1.6%, the difference would be considered statistically significant.

All comparisons discussed in this report were statistically significant at the 95-percent confidence level.

## Definitions

The survey questionnaire used the following definitions in language and terms familiar to the respondents. Interviewers read the definitions to the inmates when needed.

**Handguns** include both pistols and revolvers.  They are firearms held and fired with one hand and include the following:

— *Revolver* is a handgun with a revolving cylinder with several cartridge chambers.  The chambers are successively lined up with the barrel and then discharged. (Classified as *single shot* for analysis.)

— *Derringer* is a short-barreled, single shot pocket pistol.  A pistol has a chamber integral with the barrel. (Classified as *single shot* for analysis.)

— A *conventional semiautomatic pistol* uses a shell which is ejected and the next round of ammunition is loaded automatically from a magazine or clip internal to the pistol grip or handle. The trigger must be pulled for each shot.[5] (Classified as *conventional semiautomatic* for analysis.)

— *Military-style semiautomatic pistol* is similar to a conventional semiautomatic pistol except that the magazine or clip is visible.[5]  Primary examples are the UZI, TEC-9, and MAC-10.

[5]The survey interview included in the operational definition of a conventional semiautomatic pistol "can hold a maximum of 19 bullets" and of a military-style semiautomatic pistol "can hold more than 19 bullets."

(Classified as *military-style semiautomatic* for analysis.)

A **rifle** is a firearm intended to be shot from the shoulder.  It has a long barrel which shoots bullets.  Types include:

— *Bolt-action, pump-action, lever-action, or single-shot rifles* require physical movement by the operator of some part of the rifle — a bolt, lever, or pump — to reload.  A single shot rifle must be loaded after each shot. (Classified as *single shot* for analysis.)

— *Semiautomatic hunting-style rifle* is a rifle in which a shell is ejected and the next round of ammunition is loaded automatically from a magazine or clip. The trigger must be pulled for each shot. (Classified as *conventional semiautomatic* for analysis.)

— *Semiautomatic military-style rifle* has the characteristics of a semiautomatic hunting-style rifle.  It also has military features such as a pistol grip, folding stock, flash suppressor, and bayonet mount.  (Classified as *military-style semiautomatic* for analysis.)

A **shotgun** is a firearm intended to be shot from the shoulder with either a single- or double-barrel for firing shot

**Appendix table 1.  Standard errors for type of firearm during current offense, for State and Federal prison inmates, 1997**

| Type of firearm | Standard error for estimated percent armed during current offense | |
| --- | --- | --- |
| | State | Federal |
| Any firearm | 0.42% | 0.75% |
| Handgun | 0.39 | 0.70 |
| Rifle | 0.12 | 0.24 |
| Shotgun | 0.17 | 0.29 |
| Single shot | 0.33 | 0.55 |
| Semiautomatic | | |
| Conventional | 0.30 | 0.56 |
| Military-style | 0.13 | 0.27 |

Note:  See tables 1 and 2 for survey estimates.

**Appendix table 2.  Standard errors for firearm possession during current offense, for State and Federal prison inmates, 1997**

| Current offense | Standard error for estimated percent armed during current offense | |
| --- | --- | --- |
| | State | Federal |
| Violent offense | 0.74% | 2.66% |
| Homicide | 1.50 | 8.52 |
| Sexual assault | 0.63 | 0.00 |
| Robbery | 1.39 | 3.31 |
| Assault | 1.67 | 8.21 |
| Other violent | 3.55 | 8.26 |
| | | |
| Property offense | 0.41% | 1.37% |
| Burglary | 0.66 | 11.23 |
| Other property | 0.49 | 1.31 |
| | | |
| Drug offenses | 0.65% | 0.73% |
| Possession | 0.98 | 1.59 |
| Trafficking | 0.90 | 0.86 |
| Other drug | 2.52 | 2.52 |
| | | |
| Public-order offenses | 1.39% | 2.46% |
| Weapons | 3.35 | 4.05 |
| Other public-order | 0.75 | 1.78 |

Note:  See table 4 for survey estimates.

(a concentration of small pellets) at short ranges.  Types include:

— *Bolt-action, pump-action, lever-action, or single shot shotgun* requires physical movement by the operator of some part of the shotgun — a bolt, lever, or pump — to reload.  A single shot shotgun must be loaded after each shot.  (Classified as *single-shot* for analysis.)

— *Semiautomatic hunting-style shotgun* is a shotgun in which a shell is ejected and the next round of ammunition is loaded automatically from a magazine or clip. The trigger must be pulled for each shot. (Classified as *conventional semiautomatic* for analysis.)

— *Semiautomatic military-style shotgun* has the characteristics of a semiautomatic hunting-style shotgun.

In addition, the shotgun has military features, such as a pistol grip, folding-stock, and detachable magazine or clip.  It looks like a semiautomatic military-style rifle. (Classified as *military-style semiautomatic* for analysis.)

A **semiautomatic gun** is a firearm in which a shell is ejected and the next round of ammunition is loaded automatically from a magazine or clip. The trigger must be pulled for each shot.  Semiautomatic guns may be classified as handguns, rifles, or shotguns.

A **machine gun** is an automatic gun which, if the trigger is held down, will fire rapidly and continuously.  It is not a semi-automatic gun for which the trigger must be pulled for each shot.  (Classified as *fully automatic* for analysis.)

A **BB gun** shoots a single pellet, using air rather than an explosive to propel the pellet. (Excluded from analysis, as were toy guns.)

This report in portable document format and in ASCII, its tables, and related statistical data are available at the BJS World Wide Web Internet site:

**http://www.ojp.usdoj.gov/bjs/**

The data for this report may be obtained from the National Archive of Criminal Justice Data at the University of Michigan.  The archive may be accessed through the BJS website.

The Bureau of Justice Statistics is the statistical agency of the U.S. Department of Justice.  Lawrence A. Greenfeld is the acting director.

BJS Special Reports address a specific topic in depth from one or more datasets that cover many topics.  Caroline Wolf Harlow wrote this report.

Tom Bonczar and Lara Reynolds provided statistical assistance and verification.  Terry Austin, Chief, National Tracing Center Division of the Bureau of Alcohol, Tobacco and Firearms, provided comments.  Tom Hester and Tina Dorsey edited the report.  Jayne Robinson administered final production.

November 2001, NCJ 189369

# EXHIBIT 25

1

1              IN THE UNITED STATES DISTRICT COURT

2           FOR THE NORTHERN DISTRICT OF ILLINOIS

3                      EASTERN DIVISION

4      -------------------------------)

5      ILLINOIS ASSOCIATION OF FIREARMS )

6      RETAILERS, KENNETH PACHOLSKI,    )

7      KATHRYN TYLER, and MICHAEL HALL, )

8               Plaintiffs,            ) Civil Action No.:

9      vs.                            ) 10-cv-04184

10     THE CITY OF CHICAGO and         )

11     RAHM EMANUEL, Mayor of the      )

12     City of Chicago,               ) `

13              Defendants.            )

14     -------------------------------)

15              Washington, D.C.

16              Wednesday, September 21, 2011

17              Videotaped Deposition of DANIEL W.

18     WEBSTER, Sc.D., MPH, a Witness herein, called for

19     examination by Counsel for Plaintiffs, in the

20     above-entitled matter, the witness being duly sworn

21     by MELISSA GILCREST, RDR, CRR, a Notary Public in and

22     for the District of Columbia, taken at the offices of

Daniel W. Webster, Sc.D., MPH                     September 21, 2011
Washington, D.C.

43

1    that that has been asked -- the professor has

2    answered it.

3    BY MR. THOMPSON:

4        Q.    Go ahead.

5        A.    Probably.

6        Q.    Okay.

7        A.    Um -- you know, you're asking me to

8    speculate and that's what I'm doing.  That's

9    speculation, probably.

10       Q.    Well, you say that I'm asking to you

11   speculate.  Let's just be clear.  Do you have an

12   expert opinion that you're offering `in this case as

13   to whether there is an association between suicidal

14   intent and -- leaving aside measurement problems --

15   and suicide rates?

16       A.    I don't want to put aside measurement

17   problems, because that's -- what I'm trying to do,

18   sir, is to draw upon research; and important in my

19   understanding and belief in that research is whether

20   something is accurately measured.  I'm not convinced

21   of the ability to accurately measure intensity of

22   desire to kill oneself.

Daniel W. Webster, Sc.D., MPH                                    September 21, 2011
Washington, D.C.

44

1       Q.    Have you seen any study that you are

2    comfortable has actually measured suicidal intent in

3    a way that you believe is scientifically reliable?

4       A.    Not that I can think of.

5       Q.    Now, let's talk about lethality.  Isn't it

6    true that people who choose to kill themselves by

7    hanging are almost as successful as those who choose

8    to kill themselves by shooting?

9       A.    Yes, it's close.

10      Q.    Would you agree that African-Americans are

11   less likely to commit suicide than whites living in

12   the United States?

13      A.    Yes.

14      Q.    Would you agree that African-Americans are

15   less likely than whites to own guns?

16      A.    Yes.

17      Q.    Do you have an opinion on whether the

18   racial demographics of Chicago's population play any

19   role in its relatively low suicide rate as compared

20   to the United States as a whole?

21      A.    Yes.

22      Q.    What's your opinion?

Daniel W. Webster, Sc.D., MPH                                    September 21, 2011
Washington, D.C.

45

1        A.     Yes, it does play a role.

2        Q.     Okay.  Do you agree that foreign born

3   persons living in the United States are less likely

4   to commit suicide than those born in this country?

5        A.     I'm not sure.  It depends on a lot of

6   cultural differences, where they're foreign born and

7   such.

8        Q.     Do you agree that foreign born persons

9   living in the United States are less likely to own

10  guns than those born in this country?

11       A.     Yes.

12       Q.     What do the studies show `about the

13  association between gender and suicide?  Are men more

14  likely to commit suicide than women?

15       A.     Um-hm, yes.

16       Q.     And what do the studies show about the

17  association between suicide and age?

18       A.     The period of adolescence and young

19  adulthood is a relatively high risk time.  The risk

20  goes down into, you know -- after the mid 20s, it

21  starts to go down.  It increases again in the 60s,

22  and continues to elevate.

Daniel W. Webster, Sc.D., MPH                                    September 21, 2011
Washington, D.C.

50

```
 1   reviewed?

 2        A.    No.

 3        Q.    Okay.  Why not?

 4        A.    I don't talk about them.

 5             MR. THOMPSON:  Okay.  I would like to ask

 6   the court reporter to mark the following document as

 7   Webster Exhibit 2.

 8                  (Webster Deposition Exhibit No. 2

 9                  was marked for identification.)

10   BY MR. THOMPSON:

11        Q.    Sir, this is an excerpt.  We've reproduced

12   the executive summary and then a chapter from the

13   National Research Council publication entitled

14   Firearms and Violence.  Are you familiar with this

15   document?

16        A.    Yes.

17        Q.    You've read it before?

18        A.    Yes.

19        Q.    Okay.  Let's turn to page 6, if you would

20   be so kind.  Turning to the second full paragraph,

21   the first sentence reads, "In summary, the committee

22   concludes that existing research studies and data
```

51

```
 1     include a wealth of descriptive information on

 2     homicide, suicide and firearms, but because of the

 3     limitations of existing data and methods, do not

 4     credibly demonstrate a causal relationship between

 5     the ownership of firearms and the causes or

 6     prevention of criminal violence or suicide."

 7             Do you agree with that statement in this

 8     National Research Council report?

 9        A.   No.

10        Q.   All right.  What articles would you point

11     to that establish a causal connection between gun

12     ownership and suicide rates?              `

13        A.   Well, as I was mentioning earlier, there

14     are a number of aspects of determining or inferring

15     cause.  One of which is association.  There also has

16     to be other supporting data and a plausible theory

17     behind that.

18             I don't think that the question of whether

19     gun ownership causes increases in homicide and

20     suicide can be determined through some type of

21     randomized control trial.  Any -- any study or set of

22     studies is going to rely upon nonexperimental data.
```

52

 1    And so that will always leave some degree of

 2    uncertainty about inferring cause and effect from any

 3    single study.

 4         Q.    What do you mean by nonexperimental data?

 5         A.    I guess I would answer the question first

 6    by just explaining what experimental is, and

 7    nonexperimental is everything else.

 8         Q.    Sure.

 9         A.    So experimental means that you are

10    randomly assigning one group of individuals to get

11    some treatment, exposure of interest -- to use the

12    example of relevance here, it's guns -- to one group

13    and randomly give -- take away any guns that another

14    group might have.

15              It's not practical nor legal to do that,

16    I don't believe.  So researchers rely upon

17    nonexperimental research to examine this question

18    and the degree to which data support or do not

19    support causal inferences.

20         Q.    Now, but don't social scientists all the

21    time draw causal inferences based on nonexperimental

22    data by building regressions --

Daniel W. Webster, Sc.D., MPH                                    September 21, 2011
Washington, D.C.

53

1        A.     Yes.

2        Q.     -- to the point that they feel that they

3    have enough independent variables, explanatory

4    variables and a strong enough statistical showing,

5    low enough P value, that then they do make claims of

6    causation?

7        A.     Yes.  And each social scientist will --

8    it's hard to know exactly the degree to which they

9    will present that association, the certainty with

10   which that might be causal.

11            I think again it depends not only upon

12   one given study and the statistical analyses from

13   that, but from a broader set of data and theory and

14   understanding of the phenomenon of study.

15       Q.     Can you point to any study that makes for

16   itself a claim of demonstrating a causal connection

17   between firearms and suicide rates?

18       A.     Makes a causal claim?

19       Q.     Yes, sir.

20       A.     I mean, I can thumb through some of these

21   right now.  Clearly the language in the discussion

22   from many authors indicate support for the idea of

Daniel W. Webster, Sc.D., MPH                    September 21, 2011

Washington, D.C.

56

1    you know what studies they're referring to.

2              THE WITNESS:  I would like to add, I would

3    have to look at each study.

4    BY MR. THOMPSON:

5        Q.    Okay.  So as you sit here, you're not

6    familiar with what studies they're talking about?

7        A.    They're not referenced right here.

8              MR. THOMPSON:  We, I think just have a

9    couple of minutes left on the tape.  Why don't we

10   take a five-minute break, if that's acceptable.

11             THE VIDEOGRAPHER:  This concludes tape one

12   in the video deposition of Dr. Daniel Webster.  The

13   time on the video is 10:04 a.m.  We are off the

14   record.

15             (Recess.)

16             THE VIDEOGRAPHER:  This begins tape number

17   two in the video deposition of Dr. Daniel Webster.

18   The time on the video is 10:16 a.m.  We are on the

19   record.

20   BY MR. THOMPSON:

21       Q.    At this point, I would like to ask the

22   court reporter to mark the following document at

Daniel W. Webster, Sc.D., MPH                    September 21, 2011
Washington, D.C.

57

1    Webster 3.

2                    (Webster Deposition Exhibit No. 3

3                    was marked for identification.)

4    BY MR. THOMPSON:

5         Q.    And sir, would you please identify this

6    document for the record?

7         A.    Sure.  It's an article by Arthur

8    Kellermann and colleagues entitled Suicide in the

9    Home in Relation to Gun Ownership, published in the

10   New England Journal of Medicine.

11        Q.    And this study looked at two counties, one

12   in Tennessee and one in Washington state, is that

13   correct?

14        A.    That's correct.

15        Q.    Is it fair to say that the data from these

16   two counties is not generalizable to Chicago?

17        A.    What do you mean by generalizable?

18        Q.    Well, we talked earlier today about

19   generalizable.  You defined that term.  So --

20             MR. HAKIM:  I'm going to interject.

21   That's not a question.

22   BY MR. THOMPSON:

                                                                    58

 1        Q.    All right.  We can go back.  Why don't you

 2   redefine generalizable, if your counsel wants you to.

 3        A.    It's the degree to which a sample and

 4   population that you want to infer to are similar.

 5        Q.    Okay.

 6        A.    Or representative.  Excuse me.

 7        Q.    Okay.  So do you have an expert opinion on

 8   whether these two counties are generalizable to

 9   Chicago?

10        A.    I would say not entirely.

11        Q.    Okay.

12        A.    When -- these types of things don't

13   always lend themselves to clear, you know, yes, it

14   is, no, it isn't.  There are similarities in that

15   most of the population are urban, but differences in

16   Chicago being a far denser populated area than the

17   counties here.

18        Q.    And there might be differences in racial

19   demographics, is that right?

20        A.    Yes.

21        Q.    And there might be differences in culture,

22   is that correct?

Daniel W. Webster, Sc.D., MPH                                    September 21, 2011
Washington, D.C.

59

1        A.      Yep.

2        Q.      And there might be differences in

3   religiosity, correct?

4            MR. HAKIM:   I'm just going to object to

5   these to the extent they're vague.  To the extent you

6   know what differences or what religiosity or what

7   demographics he's speaking of.

8   BY MR. THOMPSON:

9        Q.      Go ahead.  And there might be differences

10  between those counties and the City of Chicago in

11  terms of incidence of mental illness, correct?

12       A.      There might be.          `

13       Q.      Okay.  And you haven't examined that?

14       A.      No.

15       Q.      Okay.  Now, let's turn to page 470 and

16  look at table 4.  The adjusted odds ratio for keeping

17  a gun in the home is 4.8, is that right?

18       A.      Yes.

19       Q.      And which other factors have a higher odds

20  ratio?

21       A.      Psychotropic medication prescribed,

22  previous hospitalization due to drinking, active use

Daniel W. Webster, Sc.D., MPH                                    September 21, 2011
Washington, D.C.

60

```
 1    of illicit drugs.

 2         Q.    And living alone, correct?

 3         A.    And living alone, yes, sorry.

 4         Q.    And does this mean that those four

 5    variables are more tightly associated with suicide

 6    than firearm ownership?

 7         A.    They are more strongly associated with

 8    suicide risk, yes.  In comparison to a gun in the

 9    home.

10         Q.    In your expert opinion, were you surprised

11    to see that living alone was more highly correlated

12    with suicide than owning a firearm?`

13         A.    Not particularly.  If you actually look

14    at the point estimates and confidence intervals,

15    they're pretty close.  But living alone is a known

16    risk factor for suicide, sure.

17         Q.    Okay.  Now, let's look at discussion on

18    that same page.  The first sentence under that says,

19    "Our study was restricted to suicides occurring in

20    the victim's home, because a previous study has

21    indicated that most suicides committed with guns

22    occur there, because almost half the homes in America
```

Daniel W. Webster, Sc.D., MPH                                        September 21, 2011
Washington, D.C.

62

```
 1    have to be in a closed location, correct?

 2         A.    Correct.

 3         Q.    Now, let's turn back just for a moment to

 4    Exhibit 2, which is the National Research Council

 5    document.  And let's look at page 179.

 6               And in particular, footnote 7 -- take a

 7    moment to get your bearings and look at this and then

 8    let me know if -- when you've had a chance.

 9               If you look at 178, sir, you'll see that

10    this is talking about these studies in King County

11    and Shelby County, Tennessee and then I have a

12    question about footnote 7.  If you take a moment.

13         A.    So you want me to reads what they wrote

14    there on 78?

15         Q.    Yes.

16         A.    And then the footnote, is that --

17         Q.    Well, however much you need -- you want to

18    read to get the context.  I just wanted you to be

19    clear that footnote 7 was relating to the studies

20    we're talking about, and you can read it to yourself

21    and just let me know when you're ready to talk about

22    footnote 7.
```

63

 1       A.     Okay.   Okay.

 2       Q.     So just at the end of footnote 7, a couple

 3  of lines from the bottom of that, it says, "If out of

 4  home suicides had been included in the sample, the

 5  crude odds ratio might have been reduced by nearly 20

 6  percent.  The results are clearly sensitive to the

 7  assumption that the rates of gun suicide by ownership

 8  do not vary by the location of the suicide."  Do you

 9  agree with that statement?

10       A.     Yes.

11       Q.     Okay.  Now, on page 178 in the final

12  carryover paragraph it says, "The possibly biased

13  sample selection strategy as well as other problems

14  in the execution of the study and reporting of

15  results provoked a storm of attacks on the research

16  team, the federal funding agency and the medical

17  journal in which the reports were published."  Do you

18  recall that storm of attack?

19       A.     Somewhat, yeah.

20       Q.     Okay.  And do you recall what other

21  problems were referenced?  You know, it says other

22  problems, do you know what they're talking about?

Daniel W. Webster, Sc.D., MPH                                    September 21, 2011
Washington, D.C.

64

1        A.     Well, what is mentioned in here has to do

2    with the response rate, or their ability to get data

3    for all subjects was one concern.

4        Q.     And why is that -- as a general matter,

5    leaving aside this study, why would response rates be

6    a potential concern?

7        A.     It's a concern, if you think there could

8    be something uniquely different about those who

9    decide to participate in a study and those who

10   decide not to.

11       Q.     Now, this also references though other

12   problems in the execution of the study.  Do you

13   recall what those other problems were?

14       A.     Off the top of my head, no.

15       Q.     All right.  Now, let's go back to the

16   actual study itself and look at page 469.  And

17   turning to the first column under univariate

18   analysis.  It says, "Univariate comparisons reveal

19   that alcohol was more commonly consumed in the

20   households of case subjects than in those of

21   controls.  Alcohol was also more commonly consumed by

22   case subjects than by matching controls."

Daniel W. Webster, Sc.D., MPH                                        September 21, 2011

Washington, D.C.

65

```
 1          Is alcoholic consumption positively

 2    correlated with suicide rates?

 3        A.    Yes.

 4        Q.    And --

 5        A.    At least overconsumption, abuse.

 6        Q.    Okay.  And then if we go down a couple of

 7    sentences, two sentences forward, it says, quote,

 8    "Illicit drug use was reported by 19.2 percent of

 9    case proxies, but by only 3.12 percent of matched

10    controls."  Is illicit drug use positively correlated

11    with suicide rates?

12        A.    Yes.

13        Q.    And then if we turn to page 470, the next

14    page, it says in the first full sentence, "A history

15    of depression or mental illness was reported for 83.5

16    percent of the case subjects, but for only 6.4

17    percent of the controls."  Is a history of depression

18    or mental illness positively correlated with suicide

19    rates?

20        A.    Yes.

21        Q.    Isn't it possible that one of these

22    factors, alcohol assumption, illicit drug use, or a
```

66

```
 1    history of depression or other mental illness,

 2    explains the differential in suicide rates that we

 3    see in this study?

 4              MR. HAKIM:  Object to the form of the

 5    question.

 6              THE WITNESS:  I'm sorry?

 7    BY MR. THOMPSON:

 8         Q.    Go ahead.

 9         A.    The regression analyses control for the

10    differences between the case and control subjects

11    with respect to the risk factors discussed.

12         Q.    Well, it tried to control for depression

13    or mental illness by looking at prescription

14    medication utilization rates, is that right?

15         A.    Yes.

16         Q.    But isn't one of the real problems, if the

17    person isn't taking their medicine, right?

18         A.    Not taking your medicine is a risk

19    factor, correct.

20         Q.    And in fact, if we compared the

21    associations between mental illness for those taking

22    medicine and those not taking their medicine, those
```

67

1    not taking their prescribed medicine would have a

2    higher positive association with suicide rates than

3    those taking their medicine, isn't that right?

4         A.    I'm sorry, could you just say that again?

5         Q.    Sure.  If we were comparing the suicide

6    rates of those with mental illness who were taking

7    their medicine, and compared it to those with the

8    same mental illness but not taking their medicine, we

9    would expect a higher suicide rate in those not

10   taking their medicine, is that correct?

11        A.    Yes.

12        Q.    Okay.  This study doesn't control for

13   racial demographics, does it?

14        A.    What the authors of this study did was

15   that they perform logistic regression analyses to

16   control for a number of factors.

17             Some of those factors are correlated with

18   one another, and including many correlated variables

19   together causes a problem called multi-colinearity

20   that reduces, sometimes quite substantially, the

21   precision of the estimates.

22             What the authors report is that once you

Daniel W. Webster, Sc.D., MPH                                    September 21, 2011
Washington, D.C.

68

1    controlled for factors noted in table 4, those other

2    variables, including the demographic variables that

3    you mentioned, do not independently explain suicide

4    risk.

5         Q.    Did they do that for suicidal intent?  Did

6    they even attempt to measure suicidal intent in this

7    paper?

8         A.    No, they did not.  May I just sort of add

9    something to that?

10        Q.    Sure, please, yes.

11        A.    It would be -- I don't consider that a

12   flaw in the study, because you can't measure suicide

13   intent for a group that hasn't committed suicide.

14             I mean, there are measures, have you ever

15   thought about suicide and things of that nature,

16   that I noted earlier, that I know of no solid

17   evidence that those are actually valid for true

18   suicidality.

19        Q.    Just to be clear, the case studies were

20   people who actually killed themselves, is that right?

21        A.    That's correct.

22        Q.    Okay.  So you could, though, who had

Daniel W. Webster, Sc.D., MPH                                    September 21, 2011
Washington, D.C.

69

1    people who tried to kill themselves and didn't, they

2    weren't successful, right?

3          A.    Yeah.

4          Q.    And that could be in the control group,

5    right?

6          A.    Yeah.  However, one mechanism by which

7    firearms availability might elevate risk is that

8    someone may not attempt a suicide unless the

9    presence of a firearm might prompt them to do so.

10         Q.    Are there any studies that demonstrate

11   that?

12         A.    No one has examined it to my knowledge.

13         Q.    Okay.  Now, let's turn to page 4 of your

14   report and in the first full paragraph, you reference

15   a study by Cummings.

16               And then in the second sentence, you say,

17   "One advantage to this study over the one by

18   Kellermann and colleagues is that it does not rely on

19   data from proxy respondents for the cases but uses

20   preexisting administrative data to measure risk

21   factors, including handgun purchases."  Why is this

22   an advantage?

Daniel W. Webster, Sc.D., MPH                                    September 21, 2011
                              Washington, D.C.

                                                                          70

 1        A.     Any time you measure something

 2   consistently, you're more confident that any

 3   difference between two groups is not due to the way

 4   you collected the data.

 5        Q.     Did this study look at the association

 6   between long guns and suicide rates?

 7        A.     No.

 8        Q.     Did this study do anything to try to

 9   control for mental illness?

10        A.     Bear with me for a second.

11        Q.     Oh, here -- let me mark it for the record.

12   I'll get it for you.  I'm sorry.       `

13             MR. THOMPSON:  Okay.  So I would like to

14   ask the court reporter to mark this next document as

15   Webster 4.

16                    (Webster Deposition Exhibit No. 4

17                    was marked for identification.)

18             THE WITNESS:  Okay.  Can you say the

19   question again, please?

20   BY MR. THOMPSON:

21        Q.     Sure.  Did this study attempt to control

22   for mental illness?

Daniel W. Webster, Sc.D., MPH                                    September 21, 2011
Washington, D.C.

71

1       A.      No.

2       Q.      Given that we know that mental illness is

3   a key causal contributor to suicide rates, isn't it

4   true that we really cannot draw a causal inference

5   from a study such as this that doesn't try to control

6   for that factor?

7       A.      I would not agree with that.  And I'll

8   tell you the reason why.

9               You can have factors that are associated

10  with the outcome of interest that you don't control

11  for and that had no bearing on whether an estimate

12  of an association between the variable of interest,

13  in this case handgun purchase -- if the thing you

14  are not measuring is not associated with handgun

15  ownership.

16              Research by Hemenway and colleagues have

17  shown that there is no -- that gun owners do not

18  have a higher rate of mental illness than

19  non-gun-owners; therefore, I would not expect that

20  you would find that failure to control for mental

21  illness substantially affected the estimates that

22  Cummings and his colleagues found in this study.

Daniel W. Webster, Sc.D., MPH                    September 21, 2011
Washington, D.C.

72

1      Q.    Do you have any idea as to roughly what

2   percentage of people who commit suicide are mentally

3   ill?

4      A.    I don't know that off the top of my head.

5      Q.    Do you know whether it's more than 50

6   percent?

7      A.    I don't know for sure.

8      Q.    Now, later in your report in that same

9   paragraph in describing the study, you say, and

10   I'm --

11      A.    What page are we on?

12      Q.    Sorry, page 4.              `

13      A.    Okay.

14      Q.    It's the paragraph that starts Cummings,

15   and it's about six or seven lines from the bottom.

16   It's a line that starts, "And risks were greatest

17   when a handgun had been purchased less than a year

18   before."  Do you see that?

19      A.    Oh, yes.  Sorry, yes.

20      Q.    Okay.  Is that finding consistent with the

21   notion that at least some individuals purchase a

22   handgun for the purpose of killing themselves?

Daniel W. Webster, Sc.D., MPH                                    September 21, 2011
Washington, D.C.

73

1        A.    Yes.

2        Q.    Do you have any idea as to approximately

3   what percentage of those who kill themselves with a

4   firearm do so after having purchased the gun for the

5   purpose of killing themselves?

6        A.    I know of no one who has been able to

7   measure the intent of the purchase of a firearm,

8   whether it was purchased for the sole purpose of

9   committing suicide.

10       Q.    So you don't have an opinion on that

11  subject?

12       A.    I'm saying I don't have data to answer

13  that question.

14       Q.    Okay.  Well, I just think we're saying the

15  same thing, but we just need to make sure the record

16  is clear.  Since you don't have data on that subject,

17  you don't have an expert opinion on that subject, is

18  that correct?

19       A.    Yes.

20       Q.    Now, let's go back to this Exhibit 4, the

21  Cummings study.  And I would like to direct your

22  attention to page 974, the first page.  And under the

Daniel W. Webster, Sc.D., MPH                                                   September 21, 2011
Washington, D.C.

74

1    section Methods, it says that, in the second

2    sentence, "Compared with the 1984 adult population of

3    the United States, a random sample of 1,133 adult

4    group health members in 1984 were more often female,

5    55 versus 52 percent, more likely to have completed

6    high school, 91 percent versus 70 percent, less often

7    African-American, 3 percent versus 11 percent, and

8    less likely to have a family income below $15,000."

9            Is high school, graduating from high

10   school correlated with suicide rates?

11       A.   I'm not sure.

12       Q.   Is living below the poverty line

13   associated with suicide rates?

14       A.   In some studies.  I'm not sure if it's in

15   every one.

16       Q.   Would you agree that the sample used in

17   this study is not representative of the United States

18   as a whole?

19       A.   Yes.

20       Q.   And would you agree that it is not

21   representative of the populace of the City of

22   Chicago?

Daniel W. Webster, Sc.D., MPH                                    September 21, 2011
Washington, D.C.

75

 1        A.    That's correct.

 2        Q.    All right.  Now, let's turn to on page

 3   975, if we look at Results, second column, the very

 4   bottom of the page, the last carryover sentence in

 5   that column says, "Case subjects were more likely

 6   than control subjects to have no family members, 33.7

 7   percent, versus 25.4 percent for suicides."  Are you

 8   familiar with any scientific literature addressing

 9   the benefits of being married?

10        A.    Yes.

11        Q.    And does that scientific literature

12   indicate that there are positive benefits to mental

13   health of being married?

14        A.    Yes.  Sometimes it's difficult to

15   disentangle sort of the chicken/egg kind of thing.

16   If you have mental health problems, you may not be

17   the most attractive marriage partner.

18        Q.    But there are studies that have tried to

19   hold constant for that and have nevertheless

20   concluded that there is a benefit, a mental health

21   benefit to being married, is that right?

22        A.    Yes.

Daniel W. Webster, Sc.D., MPH                                September 21, 2011
Washington, D.C.

77

1       Q.      In your opinion, are purchases at gun

2    shows a source of concern?

3       A.      Yes.

4               MR. HAKIM:   I'm going to object just to

5    the vagueness of a phrase like concern.

6    BY MR. THOMPSON:

7       Q.      Are there special dangers associated with

8    firearms purchased at gun shows, in your opinion?

9       A.      Yeah, I don't know that they have much to

10   do with suicidality.   The concern has more to do

11   with criminal involvement with those guns.

12      Q.      Okay.  So your concern is more that there

13   is a greater risk in your opinion that a gun

14   purchased at a gun show would be used in a criminal

15   act than in a suicide, is that right?

16      A.      That's correct.  Assuming again that the

17   gun show purchase is not regulated without a

18   background check.  There are some states that

19   require even purchases at gun shows to go through in

20   essence the same process of a purchase from a

21   licensed firearms dealer.

22      Q.      Do you know how common that is?

Daniel W. Webster, Sc.D., MPH                                    September 21, 2011
Washington, D.C.

78

1       A.      How many states that's the case?

2       Q.      Yes.

3       A.      Roughly about a dozen states, I believe.

4       Q.      Okay.  Now, if we look in your paragraph

5   where you are discussing the Cummings report on page

6   4 of your report -- keep the Cummings report out, if

7   you don't mind.

8       A.      I've got it.

9       Q.      You say in the penultimate sentence, you

10  say, "The median interval between the most recent

11  handgun purchase by a household member and a suicide

12  is 10.7 years."  It would be more accurate to say the

13  median interval between the most recent handgun

14  purchased from a licensed dealer, is that correct?

15      A.      Yes.

16      Q.      Okay.  The study by Cummings did not even

17  check to confirm that the original legally purchased

18  handgun was still in the home, did it?

19      A.      No.

20      Q.      Now, let's turn to page 975.  In the

21  right-hand column, it says suicide and handgun

22  purchase.  And then if we look in the third sentence,

Daniel W. Webster, Sc.D., MPH                                    September 21, 2011
Washington, D.C.

79

1    it says, "The relative risk for suicide given a

2    personal or family member handgun purchase were also

3    elevated.  Although the elevated risk for family

4    member purchase was not statistically significant."

5    What are they saying there?

6         A.    They're saying that in instances in which

7    a firearm was purchased by someone other than the

8    decedent, the person who committed suicide, the risk

9    was not statistically different from no added risk.

10        Q.    Okay.  Now, if we look at table 2 on the

11   next page, 976, it talks about a 95 percent

12   confidence interval.  Does that implicitly assume a

13   level of statistical significance of a P value of

14   .05?

15        A.    Yes.

16        Q.    Okay.  And then if we look in the

17   right-hand column, we see in the first full

18   paragraph, the first sentence, it says, "The

19   association between handgun purchase and suicide

20   tended to become stronger as the number of handguns

21   purchased increased.  Tests for trend across

22   categories, P equals .06."  So by the author's own

Daniel W. Webster, Sc.D., MPH                                    September 21, 2011
Washington, D.C.

80

1    measure of statistical significance, this was not a

2    statistically significant result, is that correct?

3         A.    It was not statistically significant,

4    again at the .05 level.

5         Q.    And this study didn't in any way look at

6    the number of operable guns in a home, did it?

7         A.    No.  They looked at handgun purchases.

8         Q.    All right.  Now, let's look at page 977.

9    In the second column, in the first full sentence, it

10   says, "Although chance could explain this finding,"

11   and they're talking about -- well, let me back up and

12   just give you the context.                    `

13         It says in the prior sentence, quote, "For

14   death by homicide by means other than a gun, the

15   relative risk was 2.0, 95 percent confidence interval

16   equals .9, 4.7), closed parentheses, among those with

17   a history of family handgun purchase.  Although

18   chance could explain this finding, another

19   explanation may be that handgun purchasers were more

20   inclined toward violence or lived in more dangerous

21   surroundings and these factors induced them to

22   purchase handguns.  This violent personality or

Daniel W. Webster, Sc.D., MPH                                    September 21, 2011
                            Washington, D.C.

81

1    environment may have increased the risk for both

2    gun-related and other homicide death regardless of

3    exposure to handgun purchase.  If this theory is

4    true, then the apparent association between handgun

5    purchase and all homicide deaths may be due to

6    uncontrolled confounding."  Do you agree with that

7    statement?

8         A.   Yes, that it may be due to uncontrolled

9    confounding.

10        Q.   This study did not look at alcohol

11   utilization rates, did it?

12        A.   No.                              `

13        Q.   It didn't look at illicit drug use, did

14   it?

15        A.   No.

16        Q.   And it didn't try to measure for suicidal

17   intent, did it?

18        A.   No.

19             MR. THOMPSON:  All right.  I would like to

20   ask the court reporter to mark as Webster Exhibit 5

21   the following document.

22                       (Webster Deposition Exhibit No. 5

Daniel W. Webster, Sc.D., MPH                                    September 21, 2011
Washington, D.C.

82

1                       was marked for identification.)

2    BY MR. THOMPSON:

3         Q.    And sir, would you please identify what's

4    been marked as Webster 5 for the record?

5         A.    Sure.  This is an article entitled

6    Homicide and Suicide Risk Associated With Firearms

7    in the Home:  A National Case-Control Study.  This

8    is an article appearing in the journal Injury

9    Prevention by Douglas Wiebe.

10        Q.    Okay.  And let's turn to page 777.  Under

11   Discussion, if we look at the right-hand column, the

12   last complete sentence in this -- on that page, it

13   says, "Nevertheless, it would be unwanted to infer

14   that such a limited body of research conclusively

15   linked gun availability to gun-related mortality."

16   Do you agree with that statement?

17        A.    I'm sorry, I was trying to find the

18   sentence and I'm not finding it.

19        Q.    That's fine.

20        A.    Oh, got it.  Okay, sorry.

21              No.

22        Q.    So you disagree with what -- with the

85

1               THE VIDEOGRAPHER:  We're going off the

2     record.  The time on the video is 10:59 a.m.

3               (Recess.)

4               THE VIDEOGRAPHER:  We're back on the

5     record.  The time on the video is 11:04 a.m.

6     BY MR. THOMPSON:

7         Q.    All right.  Professor, let's turn to page

8     5 of your report.

9               The first full paragraph, the last

10    sentence, you state, quote, "Local studies have found

11    that about two-thirds of adolescents who commit

12    suicide with a firearm obtained the gun from within

13    their own homes or the home of a relative or friend

14    and where the gun was typically left unlocked."

15              Is locking a gun an effective strategy for

16    reducing the risk of adolescent suicide?

17              MR. HAKIM:  I'm just going to object to

18    the vagueness of effective strategy.  You're free to

19    answer.

20              THE WITNESS:  If you mean by effective,

21    does it lower risk, I would say yes.

22    BY MR. THOMPSON:

Daniel W. Webster, Sc.D., MPH                                    September 21, 2011
Washington, D.C.

86

1        Q.     Would it actually lower the suicide rate,

2    all other things being equal, if individuals locked

3    their firearms in a gun safe, for example?

4        A.     Yes.

5        Q.     Do you have an expert opinion as to

6    whether you would have a lower suicide rate if an

7    individual kept multiple operable firearms locked in

8    a gun safe in their house as opposed to carried one

9    firearm on their person at all times?

10            MR. HAKIM:  I'm just going to object in

11   general to the incomplete hypothetical and calling

12   for a degree of speculation.  There `may be more

13   details you could give that would put a finer grain

14   on that.

15            THE WITNESS:  So, there is a lot to

16   speculate on there.  You know, who is the individual

17   and how frequently they would carry the gun with

18   them, and --

19   BY MR. THOMPSON:

20       Q.     Well, but all other things being equal, so

21   it's -- you know, other variables aren't affected,

22   would you expect a higher suicide rate for someone

Daniel W. Webster, Sc.D., MPH                           September 21, 2011
Washington, D.C.

87

1     who carries their gun on their person when they're

2     awake and in their home as opposed to someone who

3     keeps two loaded operable firearms in a gun safe in

4     their house?

5           A.    What I would expect would be that the

6     individual in very frequent contact -- carriage of

7     their firearm might be at higher risk.  However,

8     someone else in the household might be at lower

9     risk.

10          Q.    Okay.  Now, in your report, you reference

11    a study entitled Youth Suicide Insights From Five

12    Years if Arizona.  Do you recall that study?

13          A.    I do.

14          Q.    Why did you cite that study?

15                MR. HAKIM:  I'm going to object there just

16    to foundation.  You may want to point him to where

17    he's cited it and in what context?

18                THE WITNESS:  Yes, tell me where --

19    BY MR. THOMPSON:

20          Q.    Oh, sure.  Yeah.  It's -- I believe

21    footnote 5 of your -- let's see.

22          A.    The principal reason for citing that

Daniel W. Webster, Sc.D., MPH                                   September 21, 2011
Washington, D.C.

88

1    particular study has to do with it demonstrating how

2    impulsive many of these suicides were, no notes

3    given, the act appearing to be a very impulsive type

4    of act.

5         Q.    Do you think the results of that study and

6    the behaviors that were observed have any relevance

7    to Chicago?

8              MR. HAKIM:  I'm going to object again,

9    just speculation of relevance in what context,

10   relevance regarding to what topic.

11             THE WITNESS:  Yeah.  If you clarify that?

12   BY MR. THOMPSON:

13        Q.    Yes.  Any relevance whatsoever to the

14   topics that you're opining on in this case.

15        A.    Yes.

16        Q.    What is it?

17        A.    Adolescents, whether -- and many young

18   adults as well -- whether they live in Arizona,

19   Alaska, Kentucky or Chicago, developmentally tend to

20   be more impulsive in their decision-making, and that

21   is something that is noted in a very broad range of

22   studies of child and adolescent development of

Daniel W. Webster, Sc.D., MPH                    September 21, 2011
Washington, D.C.

125

1        A.     It's not statistically significant.  If

2    you look at the odds ratio, it is 2.5, and again,

3    due to small sample size, it's not statistically

4    significant, but I don't completely dismiss the

5    elevated risk inferred there.

6               I also want to note that it relates to

7    gun -- loaded gun.  The fact that there were no

8    individuals in this group in the other column where

9    there was a loaded gun made it impossible to

10   calculate an odds ratio.  So it's impossible for it

11   to be significant or not significant.  So --

12       Q.     Is that a methodological`flaw to have a

13   control group that doesn't even manifest the

14   phenomenon you're trying to study?

15       A.     It's a flaw to report statistical

16   significance of it.  I think it's relevant to report

17   the data as they are.  I think it's a flaw to

18   suggest that there is meaning to no significance for

19   this particular test.

20       Q.     Now, if we look at the bottom of this

21   page, it says in the last sentence, quote -- well,

22   actually let's start with the second to the last

126

1    sentence.

2            It says, "No increased risk of suicide was

3    associated with having more than one long gun in the

4    home."  Is that consistent with your understanding

5    that as a general matter, there is not a positive

6    correlation between suicide rates and having more

7    than one long gun in the home?

8        A.    That's correct.

9        Q.    Okay.  And then it says in the next

10   sentence, it says, "The odds of suicide with more

11   than one handgun in the home were greatly increased

12   relative to having just one handgun `in the home."

13   This study did not look at whether these handguns

14   were operable, correct?

15       A.    That's correct.

16       Q.    Okay.  And it also didn't try to measure

17   the incremental increase in suicide rate from having

18   one handgun in a house as opposed to two, is that

19   correct?

20       A.    It compared one versus multiple.

21       Q.    Okay.

22       A.    So that to be two to a hundred.

Daniel W. Webster, Sc.D., MPH                                   September 21, 2011
Washington, D.C.

127

1       Q.    All right.  Now, if you could turn your

2   attention to page 1067.

3             And then under the section called

4   Psychiatric Symptoms and Diagnoses, it says -- and

5   this is maybe two-thirds of the way down right after

6   footnotes 21 and 22.

7             It says, "As would be expected suicide

8   completers compared with matched controls showed much

9   higher current rates of probable or definite major

10  depression, substance abuse, conduct disorder and

11  previous suicide attempt."  Does it surprise you that

12  they found a strong positive correlation between

13  major depression and suicide rates?

14      A.    No.

15            MR. THOMPSON:  I am happy to keep going.

16  I know we've gotten to the noon hour.  So if you guys

17  want to break for lunch, we can, or we can --

18            THE WITNESS:  Well, before we break, can

19  -- just on the matter here that we're discussing.

20  BY MR. THOMPSON:

21      Q.    Please, yes.

22      A.    Just so we can --

Daniel W. Webster, Sc.D., MPH                                   September 21, 2011
Washington, D.C.

133

1        Q.    Okay.  Now, let's turn to page 1587.  It

2    says in the right-hand column, top of the page, it

3    says, "The handgun purchasers in our cohort also

4    passed a background check.  None had a conviction for

5    any felony or violent misdemeanor or were known to

6    have been judged mentally ill or to be addicted to

7    controlled substances.  The absence of such potential

8    risk factors for death by homicide means that our

9    estimates may be subject to a 'good boy' bias."  Do

10   you agree that there is a good boy bias in these

11   results?

12            MR. HAKIM:  Objection to vagueness.

13            THE WITNESS:  I'm not one hundred percent

14   sure of the meaning of the good boy bias.

15   BY MR. THOMPSON:

16       Q.    Well, you cited this.  What do you

17   understand it to mean?

18       A.    What this -- I believe this is alluding

19   to the point I was making just a minute ago.  That

20   individuals who purchase handguns legally, met all

21   qualifications, may generally be healthier and

22   otherwise lower risk than, again, a group of

Daniel W. Webster, Sc.D., MPH                                    September 21, 2011
Washington, D.C.

134

1    demographically matched individuals as a whole.

2         Q.    Let me ask you.  Is there a difference

3    between the effects of lawfully purchased guns and

4    illegally obtained guns in terms of violence?

5         A.    Yes.

6         Q.    Okay.  And what is that difference?

7         A.    The risk is greater among individuals who

8    obtain guns illegally.  There is, generally the

9    pattern of results that you see is the greater the

10   risk of the individual, the more guns elevate that

11   risk for the bad outcome.  That's the general

12   pattern in the results.                       `

13        Q.    Do you have a sense as to the degree of

14   difference between those risks, between an illegally

15   obtained gun and a lawfully purchased gun?

16        A.    I would not be able to quantify that.

17        Q.    Okay.  This study refers to a good boy

18   bias.  Is it reasonable to assume that those who go

19   through a background check, who do not have a prior

20   criminal record, who do not have manifestations of

21   mental illness likely to be responsible in the use of

22   their firearm?

Daniel W. Webster, Sc.D., MPH                                    September 21, 2011
Washington, D.C.

                                                                        135

1              MR. HAKIM:  I'm going to object to the

2    characterization of whether it is reasonable.

3    Vagueness of what that term is for this purpose.

4              THE WITNESS:  My response is that it's

5    compared to what?

6              So what this reference, that Wintemute and

7    co-authors are making, is that in comparison to those

8    who would be disqualified because of some of these

9    other risk factors, yes, their risks are lower.  If

10   that was what you were asking me.  I'm not one

11   hundred percent sure.

12             MR. THOMPSON:  All right.  Let's turn to

13   the next exhibit.  I would like to ask the court

14   reporter to mark this as Webster Exhibit 15.

15                  (Webster Deposition Exhibit No. 15

16                   was marked for identification.)

17   BY MR. THOMPSON:

18      Q.   Sir, will you please identify this

19   document for the record?

20      A.   It's an article entitled Household

21   Firearm Ownership and Rates of Suicide Across 50

22   States.  Authors are Matthew Miller, Steven

Daniel W. Webster, Sc.D., MPH                                    September 21, 2011
Washington, D.C.

152

1    the last paragraph, it states:  "Four limitations

2    warranty comment.  First, our study was restricted to

3    homicides occurring in the home of the victim, the

4    dynamics of homicides occurring in other locations

5    may be quite different."  Do you agree with that?

6              MR. HAKIM:  Where are you?

7              MR. THOMPSON:  Oh, sure.

8              THE WITNESS:  The bottom.

9              MR. HAKIM:  I'm in the wrong column.

10             MR. THOMPSON:  No, that's fine.

11   BY MR. THOMPSON:

12        Q.    "The dynamics of homicides occurring in

13   other locations such as bars, retail establishments

14   or the street may be quite different."  Would you

15   agree with that?

16        A.    Yes.

17        Q.    Okay.  Second, "our research was conducted

18   in three urban counties that lack a substantial

19   percentage of Hispanic citizens.  Our results may

20   therefore may not be generalizable to more rural

21   communities or to Hispanic households."  Would you

22   agree with that statement?

Daniel W. Webster, Sc.D., MPH                                    September 21, 2011

Washington, D.C.

153

1              MR. HAKIM:  I'm objecting, agreeing for

2    what purpose?

3              THE WITNESS:  I would agree.

4    BY MR. THOMPSON:

5         Q.    Okay.  Third, "It is possible that reverse

6    causation accounted for some of the association we

7    observed between gun ownership and homicide, i.e., in

8    a limited number of cases people may have acquired a

9    gun in response to a specific threat."  Do you agree

10   with that statement?

11        A.    Yes.

12        Q.    Okay.  Do you have any way to quantify the

13   number of people who may have acquired a gun in

14   response to either a specific or a general threat?

15        A.    Do I have an ability to quantify it in

16   this study, is that the question?

17        Q.    Yes, sir.

18        A.    No.

19        Q.    How about in any study, have you seen a

20   study that quantifies to your satisfaction the

21   problem of reverse causation, namely that people who

22   live in really dangerous neighborhoods may feel the

154

1    need to buy a firearm at a higher rate than someone

2    who lives in a safe neighborhood?

3         A.    In this particular study that you're

4    referring to, the cases and controls come from the

5    same neighborhood.

6         Q.    Okay.

7         A.    So it seems unlikely to me that there

8    would be a different perceived neighborhood threat,

9    since they're both in the same neighborhood.

10        Q.    All right.  And is that really the only

11   way to try to control for that problem of reverse

12   causation, to get people who are in the same

13   neighborhood?

14        A.    No.

15             MR. HAKIM:  I'm going to object to that,

16   It mischaracterizes the plaintiff's -- or the

17   witness's testimony.

18             THE WITNESS:  There are other ways.  And

19   the authors attempt to do that.  They gather

20   information about other types of risk factors that

21   are relevant to risk of homicide.

22   BY MR. THOMPSON:

Washington, D.C.

162

```
 1      A.    No.

 2            MR. THOMPSON:  I would like to ask the

 3   court reporter to mark as Webster 21 the following

 4   document.

 5                  (Webster Deposition Exhibit No. 21

 6                   was marked for identification.)

 7   BY MR. THOMPSON:

 8      Q.    And sir, would you please identify this

 9   document for the record?

10      A.    An article entitled Risk Categories for

11   Femicide in Abusive Relationships:  Results From a

12   Multisite Case-Control Study, authors Jacqueline

13   Campbell, Daniel Webster, a cast of other authors,

14   published in American Journal of Public Health, July

15   2003.

16      Q.    And if we look under methods, we see that

17   it says an 11-city case study control design was

18   used; femicide victims were cases and randomly

19   identified abused women residing in the same

20   metropolitan area were controlling.  Is that right?

21      A.    That's correct.

22      Q.    And so this study speaks to women in
```

Daniel W. Webster, Sc.D., MPH                    September 21, 2011
Washington, D.C.

163

1    abusive relationships, is that right?

2         A.    That's correct.

3         Q.    Is it generalizable to other populations?

4         A.    It's generalizable to women in abusive

5    relationships.

6         Q.    Right.  But not to others?

7         A.    Correct.

8         Q.    All right.  Now, if we look at page 1090,

9    which is the second page of this document, and we

10   look under the middle column results, and we go to

11   the second full paragraph and the penultimate

12   sentence, and it reads, "Although the abuser's access

13   to a firearm increased femicide risk, the victim's

14   risk of being killed by their intimate partner was

15   lower when they lived apart from the abuser and had

16   sole access to a firearm."  Do you see that?

17        A.    Hm-hm.

18        Q.    And do you have an understanding of why it

19   is that when women lived apart from the abuser and

20   had sole access to a firearm they had a reduced risk

21   of being killed?

22        A.    Do I have an understanding why that's the

Daniel W. Webster, Sc.D., MPH                                    September 21, 2011
                          Washington, D.C.

                                                                          164

 1    case?

 2          Q.    Yes, sir.

 3          A.    No.

 4          Q.    Is it possible that one of the reasons why

 5    is because they were able to use a firearm to defend

 6    themselves, either by brandishing it or their abusive

 7    partner knew they've got a gun, I'm not going to go

 8    attack her?

 9                MR. HAKIM:  I'm going to object, just

10    calling for speculation.

11                THE WITNESS:  Is it possible?  Yes.  It

12    also could reflect differences in sort of

13    resourcefulness among women who had a firearm versus

14    those who did not, and that at least part of the

15    protective effect could be due to resourcefulness.

16          Q.    Did you try to research what the

17    explanation was for the phenomenon we've just

18    identified?

19          A.    Did I -- no.

20          Q.    Does this study look at the impact of

21    keeping a gun locked?

22          A.    No.

165

1        Q.      And does this study control for the mental

2    illness of the abuser?

3        A.      We did ask questions about the mental

4    health status of the abuser.   We found that that did

5    not independently predict risk for femicide.

6        Q.      All right.   Then if we turn to page 1092,

7    the first full paragraph, the second sentence, it

8    says, "Our analysis and those of others suggest that

9    increase in employment opportunities, preventing

10   substance abuse and restricting abuser's access to

11   guns can potentially reduce both overall rates of

12   homicide and rates of intimate partner femicide."

13          Why did you use the word potentially?   Why

14   did you have to caveat it that way?

15       A.      Again, this is not an experimental

16   design, there is always uncertainties about causal

17   connections, and I believe we were just using

18   cautious language, given that it's a nonexperimental

19   study.

20       Q.      Now, why did you suggest that increasing

21   employment opportunities might reduce overall

22   homicide rates and femicide rates?

166

1        A.      Unemployment was one of the strongest

2    independent risk factors for femicide in our study,

3    also shown to be associated with homicide rates more

4    broadly.

5        Q.      Right.  And what about preventing

6    substance abuse?  Why did you indicate that reducing

7    that might reduce homicide rates?

8        A.      Again, there is an association between

9    substance abuse and homicide.

10       Q.      In your opinion, does unemployment cause

11   people to commit homicide?

12       A.      That's very difficult to `determine.

13       Q.      Do you have an opinion or not?

14       A.      I think that being unemployed could cause

15   a variety of bad outcomes, that again, obviously not

16   everyone who becomes unemployed commits murder or is

17   victimized, but it could lead -- it could lead to a

18   set of circumstances that could increase risk and

19   that's probably those, you know, not completely

20   studied, what we would call mediating variables,

21   result in a homicide.

22       Q.      All right.  Now, if we look at your table

Daniel W. Webster, Sc.D., MPH                           September 21, 2011
                        Washington, D.C.

                                                              169

1           Now, variables that are shown to be not

2    significant in earlier models aren't carried over

3    into the subsequent models as you go from models 1,

4    2, 3, and so on.

5           Again, this gets to the issue that I

6    raised earlier about concerns about multi

7    colinearity, that if you have too many variables

8    that are so closely correlated with each other, you

9    run into problems with multi colinearity and

10   imprecision in your estimates.

11       Q.    Is the reason that you included all of

12   these variables in at least one of your seven models

13   is that you and your co-authors concluded that there

14   was a possibility of association between these

15   variables and homicide rates?

16       A.    Yes.

17       Q.    And if you were going to redo this

18   analysis today, would you again run these variables

19   at least through one of the seven models?

20       A.    Yes.

21           MR. THOMPSON:  I would like to ask the

22   court reporter to mark as Webster 28 the following

Daniel W. Webster, Sc.D., MPH                    September 21, 2011
                        Washington, D.C.

                                                              170

1    document -- I'm sorry, Webster 22.

2                    (Webster Deposition Exhibit No. 22

3                    was marked for identification.)

4    BY MR. THOMPSON:

5        Q.    And sir, would you please identify this

6    document for the record?

7        A.    It's an article entitled Firearms in U.S.

8    Homes As a Risk Factor For Unintentional Gunshot

9    Fatality, by Douglas J. Wiebe in the journal called

10   Accident Analysis and Prevention, published in 2003.

11       Q.    All right.  And then if we look at page

12   712, it says in the very last sentence on that page,

13   full sentence:  Data were missing for the variable --

14   maybe I should back up and say, the context of this

15   sentence is it's talking about -- well, this

16   sentence, I'll just read it.

17              It says, "Data were missing for the

18   variable indicating the presence of a firearm for 3

19   percent of controls and 21 percent of the cases."  Is

20   that a possible problem?

21       A.    Yes.

22       Q.    Okay.  Why might that be a problem?

Daniel W. Webster, Sc.D., MPH                              September 21, 2011
Washington, D.C.

171

1        A.    It could be a problem if the cases for

2   which you have missing information are different in

3   important ways from the cases that you do have

4   information on.

5        Q.    All right.  Now, this study looked at

6   family income.  You can see that on page 713 in table

7   1?

8             MR. HAKIM:  I object.  It's not a

9   question.

10            MR. THOMPSON:  I'm just directing him to

11  where it is.

12  BY MR. THOMPSON:                          `

13       Q.    And my question is do you think it was

14  appropriate for the authors to measure family income?

15            MR. HAKIM:  Objection to the vagueness and

16  appropriateness.

17            THE WITNESS: Is it appropriate in a study

18  of this type to study income?

19  BY MR. THOMPSON:

20       Q.    Yes, sir.

21       A.    Or examine income?

22       Q.    Yes.

Daniel W. Webster, Sc.D., MPH                    September 21, 2011

Washington, D.C.

172

1        A.     To be honest, I'm not sure.  I don't -- I

2    don't know of previous data relevant to income and

3    unintentional gunshot fatalities, so I'm not sure.

4        Q.     Okay.  What about with homicide rates, are

5    you familiar with any data suggesting there is a

6    positive correlation or a negative correlation

7    between income levels and homicide rates?

8        A.     There is an association.

9        Q.     Okay.  And what is the association?

10       A.     It's most pronounced at the lowest end of

11   the income continuum.  There is a slight

12   relationship at other levels, but what's really

13   pronounced is that if you're very poor, your risks

14   are relatively higher than people who aren't very

15   poor.

16       Q.     And you say your risk, your risk of

17   killing someone else?

18       A.     On both sides of that, both victimization

19   and --

20       Q.     Yes.  Yeah.

21              MR. THOMPSON:  All right.  Let's turn to

22   Webster Exhibit 23.

Daniel W. Webster, Sc.D., MPH                                    September 21, 2011

Washington, D.C.

190

1      between storage practices of firearms and homicide

2      rates?

3          A.    Do I have an opinion whether there is an

4      association between firearm storage practices and

5      homicide rates?

6          Q.    Yes.

7          A.    I have an opinion that there is not a lot

8      of data to know for certain about whether those

9      practices are associated with homicide.

10         Q.    Well, even if you don't know for certain,

11     do you have an opinion as to whether it is associated

12     or not?

13         A.    I have an opinion about general

14     availability of firearms and the degree to which

15     storage practices limit that availability.  I would

16     believe my opinion is that it would reduce risk

17     within the home and perhaps outside the home with

18     respect to theft of guns.

19         Q.    Is there any empirical support for that,

20     that storage practices impact homicide rates?

21         A.    Again, I'm drawing upon my knowledge of

22     the broader literature about firearm availability

Daniel W. Webster, Sc.D., MPH                                    September 21, 2011

Washington, D.C.

191

1    and stating my opinion that I believe that they are

2    associated.

3         Q.    Okay.  And I guess just to close out this

4    line of questioning, can you point to any study that

5    has examined that and found a positive association

6    between homicide rate and storage practices?

7              MR. HAKIM:  Object as vague.

8              THE WITNESS:  I can't point to a study

9    right now.

10   BY MR. THOMPSON:

11        Q.    Okay.  Now, let's go to our next study,

12   which is going to be Webster 27.        `

13                  (Webster Deposition Exhibit No. 27

14                  was marked for identification.)

15   BY MR. THOMPSON:

16        Q.    And would you please identify this

17   document for the record?

18        A.    It's an article entitled Firearm

19   Availability and Suicide, Homicide, Unintentional

20   Firearm Deaths Among Women, published in the Journal

21   of Urban Health in 2002, authors Matthew Miller,

22   Deborah Azrael and David Hemenway.

Daniel W. Webster, Sc.D., MPH                    September 21, 2011
Washington, D.C.

192

1        Q.    All right.  And did this study look at

2    women in different areas of the country?

3        A.    Yes.

4        Q.    Are there regional variations in terms of

5    patterns of violence?

6        A.    Yes.

7        Q.    And did this -- what are those regional

8    variations, if you know?

9        A.    The most strongest regional variation is

10   the higher rates of homicide in the South, in the

11   southern states.

12       Q.    Do you have an opinion as to why that

13   pattern persists?

14       A.    No.

15       Q.    Do you know whether this study held

16   constant for that regional variation?

17       A.    Give me a moment and I'll look.  No, they

18   did not control for southern region.  I believe that

19   was your question?

20       Q.    Yes, sir.

21             MR. THOMPSON:  Okay.  Let's move on to

22   Webster 28.

Daniel W. Webster, Sc.D., MPH                                    September 21, 2011

Washington, D.C.

225

1                THE WITNESS:  It's -- I don't know.  It's

2    very speculative, I don't know.

3    BY MR. THOMPSON:

4        Q.    As a general matter, if the field of --

5    that you operate in, do people tend to confess to

6    crimes in response to surveys?

7                MR. HAKIM:  Objection as to vagueness.

8                THE WITNESS:  They answer affirmatively on

9    illegal drug use, a variety of illegal things that

10   people will report.

11   BY MR. THOMPSON:

12       Q.    But is there a sense that there is an

13   underreporting of illegal drug use, for example?

14       A.    That's a concern, yes.

15       Q.    Okay.  And that same concern would apply

16   to illegal possession of firearms, correct?

17       A.    It could.  I would also say that there is

18   the possibility of the reverse issue at play.  It's

19   certainly possible that some individuals who do not

20   possess firearms will report that they do, if they

21   believe -- if they're at least concerned that the

22   person asking the question is considering, you know,

226

1    is this someone I want to victimize.

2              It's possible.  I don't know.

3              THE VIDEOGRAPHER:  This concludes tape

4    number five in the video deposition of Dr. Daniel

5    Webster.  The time on the video is 3:39 p.m.  We're

6    off the record.

7              (Recess.)

8              THE VIDEOGRAPHER:  This begins tape number

9    six in the video deposition of Dr. Daniel Webster.

10   The time on the video is 4:12 p.m.  We are on the

11   record.

12   BY MR. THOMPSON:

13        Q.    Have any of the studies you've analyzed in

14   connection with this case addressed the effects of a

15   regime that allow only one operable gun for each

16   licensed individual in the house?

17        A.    No.

18        Q.    Have any of the studies you've analyzed in

19   connection with this case addressed the effects of a

20   regime in which there is only one operable gun

21   allowed in the house?

22             MR. HAKIM:  I'm going to make just an

Daniel W. Webster, Sc.D., MPH                          September 21, 2011
Washington, D.C.

227

1    objection of vagueness in terms of what you mean by

2    addressing.

3    BY MR. THOMPSON:

4         Q.    Go ahead.

5         A.    There are no studies that I can cite that

6    evaluate what happens when someone has a policy of

7    that nature that you describe.  The research that I

8    cite and describe and synthesize has relevance to

9    what I believe would be the outcome of such -- of

10   Chicago's policy.

11        Q.    Is it true that murder victims are almost

12   never killed with a gun belonging to themselves or to

13   some other member of their household?

14             MR. HAKIM:  I object to the vagueness of

15   almost never.  It's imprecise.

16             THE WITNESS:  Do you want to say that

17   again?

18   BY MR. THOMPSON:

19        Q.    Sure, I'll try to again.

20             Is it true that murder victims are rarely

21   killed with a gun belonging to themselves?

22             MR. HAKIM:  Again, I'm just going to

Daniel W. Webster, Sc.D., MPH                                                September 21, 2011

Washington, D.C.

228

1    object to rarely being vague.

2              THE WITNESS:  Yeah, if you just -- you

3    want to be more specific about rarely?

4    BY MR. THOMPSON:

5        Q.    Well, is -- maybe I'll try -- is -- are

6    murder victims -- well, strike that.

7              Do you have any knowledge of the murder

8    rate for individuals being killed with their own gun?

9        A.    No.

10       Q.    Now, we talked a little bit about trying

11   to hold constant for religion in some context.  But

12   do you know whether religious affiliation is

13   negatively correlated with gun crimes?

14             MR. HAKIM:  Object to vagueness of gun

15   crimes.

16             THE WITNESS:  I don't know specifically

17   where that has been examined.  Religious -- how did

18   you say it again, religious --

19       Q.    Affiliation.

20       A.    -- affiliation and commission of gun

21   crimes.  I can't think of a study that has examined

22   that specifically.

232

1        Q.    Would you agree that women are more likely

2    than men to purchase a handgun for purposes of

3    self-defense?

4             Are men more likely to purchase a handgun

5    for self-defense than women?

6             MR. HAKIM:  Object.

7             THE WITNESS:  I want to be clear about

8    what it is you're asking and so that I can --

9    BY MR. THOMPSON:

10        Q.    Sure.

11        A.    -- accurately answer what it is.

12             So do men more commonly -- do more men

13    purchase a gun for self-defense than women, I would

14    say yes.  But when someone does purchase a gun,

15    women would be more inclined for self-protection

16    reasons than the men who own guns.  So I just want

17    to be clear about that.

18        Q.    That's a helpful clarification and I

19    appreciate that.

20        A.    Yes.

21        Q.    Do you own a firearm?

22        A.    I do not.

Daniel W. Webster, Sc.D., MPH                                    September 21, 2011

Washington, D.C.

233

1      Q.    Have you ever owned a firearm?

2      A.    No.

3      Q.    Have you ever fired a firearm?

4      A.    Yes.

5      Q.    Would you agree that long guns are more

6   lethal than handguns?

7            MR. HAKIM:  Object to the vagueness.

8            THE WITNESS:  Some long guns can be more

9   lethal than some handguns.

10   BY MR. THOMPSON:

11     Q.    Is it harder to pull the trigger of a

12   handgun or a long gun?

13     A.    There is likely --

14           MR. HAKIM:  Objection.

15           THE WITNESS:  -- to be variability between

16   each depending on the kind.  So -- but generally

17   speaking, it's harder to handle a longer gun than a

18   smaller gun.

19   BY MR. THOMPSON:

20     Q.    How many guns do you need to commit

21   suicide?

22           MR. HAKIM:  Object to vagueness, again,

Daniel W. Webster, Sc.D., MPH                    September 21, 2011
                        Washington, D.C.

                                                            234

1     what conditions, incomplete hypothetical, it calls

2     for speculation.

3     BY MR. THOMPSON:

4          Q.    How many operable guns do you need to

5     commit suicide?

6              MR. HAKIM:  The same objections.

7              THE WITNESS:  One would do it.

8     BY MR. THOMPSON:

9          Q.    Do you have any idea how many CPD holders

10    live in the same residence in Chicago on average?

11             MR. HAKIM:  I object to

12    mischaracterization -- what is a CPU holder?

13    BY MR. THOMPSON:

14         Q.    Chicago permit holder, you know.

15         A.    Okay.

16         Q.    So let me ask it this way.  Do you have

17    any idea how many duly licensed handgun owners live

18    in residences in which there are handguns on average

19    in Chicago?

20         A.    Currently, no, I do not.

21         Q.    Is a willingness to take risk positively

22    correlated with experiencing accidents?

Daniel W. Webster, Sc.D., MPH                          September 21, 2011
Washington, D.C.

235

1              MR. HAKIM:  I object to the vagueness of

2      willingness to take risks leading to accidents.

3              THE WITNESS:  Yeah, accidents is very

4      broad.  So what --

5      BY MR. THOMPSON:

6          Q.    Well, don't you use that term in your

7      report?

8          A.    Actually, I probably don't.

9          Q.    Some of the literature you cite certainly

10     uses it, don't they?

11         A.    Most of the literature that examines what

12     I believe you're referring to refers to as

13     unintentional firearm deaths; is that what you mean?

14         Q.    That would be fine, we could use that.  So

15     why don't I ask the question again.

16              Is willingness to take risk positively

17     correlated with an unintentional firearm injuries?

18         A.    It might be, but I don't know of

19     empirical evidence that support that.

20         Q.    Would you agree that handgun owners are

21     more likely than the general public to be risk

22     takers?

Daniel W. Webster, Sc.D., MPH                                    September 21, 2011

Washington, D.C.

251

```
 1              CERTIFICATE OF NOTARY PUBLIC

 2

 3        I, Melissa Gilcrest, a Notary Public of the

 4   District of Columbia, do hereby certify that the

 5   within-named witness personally appeared before me at

 6   the time and place herein set out, and after having

 7   been duly sworn by me, was examined by counsel.

 8        I further certify that the examination was

 9   recorded stenographically by me and this transcript

10   is a true record of the proceedings.

11        I further certify that I am not of counsel to

12   any of the parties, nor related to any of the

13   parties, nor in any way interested in the outcome of

14   this action.

15

16                        _____

17                        Melissa J. Gilcrest

18                        Notary Public

19                        District of Columbia

20                        My commission expires: 10/14/2014

21

22
```