# EXHIBIT 27

ORIGINAL

IN THE UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

ILLINOIS ASSOCIATION OF        )
FIREARMS RETAILERS,            )
KENNETH PACHOLSKI,             )
KATHRYN TYLER, and             )
MICHAEL HALL                   )
        Plaintiffs,            )
    vs.                        )  No. 10 CV 04184
THE CITY OF CHICAGO and        )
RICHARD M. DALEY, Mayor        )
of the City of Chicago,        )
        Defendants.            )

    The deposition of CAROL BROWN, called for
examination pursuant to the Rules of Civil
Procedure for the United States District Courts
pertaining to the taking of depositions, taken
before JENNIE MODI, a notary public within and for
the County of Cook and State of Illinois, at 33
North Dearborn Street, Suite 300, Illinois, on the
21st day of April, 2011, at the hour of 9:03
o'clock a.m.

1

---

                    I N D E X
WITNESS                        EXAMINATION
CAROL BROWN
  By MR. THOMPSON            6,   128
  By MR. WORSECK             113, 167


                  E X H I B I T S
NUMBER                       MARKED FOR ID
BROWN Deposition Exhibit
  No. 1              8

3

---

APPEARANCES:

    COOPER & KIRK, by
    MR. DAVID THOMPSON,
      1523 New Hampshire Avenue Northwest,
      Washington, D.C. 20036,
      202-220-9600,
        Representing the Plaintiffs;

    MR. ANDREW WORSECK,
    ASSISTANT CORPORATION COUNSEL,
    DEPARTMENT OF LAW,
    30 North LaSalle Street, Suite 1230,
    Chicago, Illinois 60602,
    312-744-7129,
        Representing the Defendants.

2

---

        (Whereupon, the witness was
         duly sworn.)
    MR. THOMPSON:  Good morning, Ms. Brown.  I'm
David Thompson of the law firm of Cooper & Kirk.
And I represent the plaintiffs in ILAFR, et al. v.
Chicago.
    And would counsel for the city like to
introduce himself?
    MR. WORSECK:  Sure.  My name is Andrew Worseck.
I'm an attorney for the defendants in this case.
    And before we go any further, David, I
would just like to put on the record that we're
producing Ms. Brown here today subject to various
limitations with respect to the scope of the
30(b)(6) that the parties have agreed to previously
in correspondence.  We're also producing her
subject to various objections that defendants have
raised in that same correspondence and among other
pieces of correspondence in my letter of December
8th, 2010 and in my letters of January 25th and
April 13th of this year.
    And, of course, Judge Chang last month
made a significant ruling with respect to the scope
of permissible discovery in the case, that of

4

1 (Pages 1 to 4)

McCorkle Court Reporters, Inc.
Chicago, Illinois   (312) 263-0052

1   course we trust will be followed this morning.
2       MR. THOMPSON: All right. And just so the
3   record is clear, we've also issued a notice of
4   deposition for Ms. Brown in her individual
5   capacity. And with the exception of Judge Chang's
6   ruling, we know of no limitation. And we don't
7   agree to abide by any limitation, other than his
8   ruling.
9       MR. WORSECK: And in our correspondence, we
10  have indicated that Ms. Brown's name was supplied
11  in connection with an interrogatory asking for city
12  people with knowledge of the governmental purposes.
13      That is the basis upon which she was
14  identified. That is the basis upon which she is
15  being produced. We'll see how the questioning
16  unfolds, but that's the city's position.
17      MR. THOMPSON: Sure. I understand. I just
18  didn't want you to think I was acceding to your
19  position.
20      MR. WORSECK: No. I understand. I just wanted
21  all of this to be clear on the record.
22      MR. THOMPSON: That sounds fine.
23          CAROL BROWN,
24  having been first duly sworn, was examined and

5

1   convenience.
2       It's my understanding that under the rules
3   of this court, you're not permitted to discuss your
4   testimony with your lawyer until the end of the
5   deposition.
6       MR. THOMPSON: And Mr. Worseck, is that your
7   understanding?
8       MR. WORSECK: I would have to verify that.
9       MR. THOMPSON: Okay. Well, that is my
10  understanding. And if you're going to deviate from
11  that, I guess, you know, I would ask that you let
12  me know.
13  BY MR. THOMPSON:
14      Q. I guess the other way to go about it is I
15  can ask you after every break if you discussed your
16  testimony with your lawyer. But that's my
17  understanding of the rules of this court.
18      And as you know from our colloquy just a
19  moment ago, you're here in two capacities. First
20  as a so-called 30(b)(6) witness, and then also
21  we've issued a notice of deposition in your
22  individual capacity. And I would like to start
23  with the 30(b)(6) portion of the deposition.
24      MR. THOMPSON: And I would like to ask the

7

1   testified as follows:
2           EXAMINATION
3   BY MR. THOMPSON:
4       Q. So without further ado, Ms. Brown, would
5   you please state your full name for the record?
6       A. Sure. My name is Carol, C-a-r-o-l, Brown,
7   B-r-o-w-n.
8       Q. And what is your address for your place of
9   business?
10      A. It's 121 North LaSalle Street, Room 509,
11  Chicago, Illinois, 60602.
12      Q. Excellent. Have you been deposed before?
13      A. No.
14      Q. Okay. Well, then why don't we go over
15  some of the rules of the road. As you can see, we
16  have a court reporter here who is trying to make an
17  accurate transcription of today's events. So let's
18  try to talk one at a time. If I cut you off at
19  some point, let me know. I want to get your full
20  testimony.
21      And also if you want to take a break at
22  any point today, just let me know. I would ask
23  that you answer whatever question is pending. But
24  that would be fine, take a break at your

6

1   court reporter to mark as Brown Exhibit 1 this
2   document.
3           (Whereupon, Brown Deposition
4           Exhibit No. 1 was marked for
5           identification.)
6   BY MR. THOMPSON:
7       Q. Okay. So, Ms. Brown, before we get into
8   the topics that you've been designated as to, I
9   wanted to just get a little bit of background about
10  your education and professional experiences.
11      So if you would start by briefly
12  describing your educational background.
13      A. I have an undergraduate degree in
14  economics from the University of Wisconsin,
15  Madison. And I have a law degree from Chicago Kent
16  College of Law, Illinois Institute of Technology.
17      Q. And what was your major at Wisconsin,
18  University of Wisconsin?
19      A. Economics.
20      Q. You said that. Sorry. And when did you
21  graduate?
22      A. 1988.
23      Q. And after you graduated, what did you do?
24      A. I worked for one -- a little over one year

8

2 (Pages 5 to 8)

1    at a bank.
2    Q.  Okay.  And after the year at a bank, then
3    what did you do?
4    A.  I went to law school.
5    Q.  Okay.  And so then you would have
6    graduated in '92; is that right?
7    A.  That's correct.
8    Q.  Okay.  And after graduation, then what did
9    you go on to?
10    A.  After graduation, I worked at a -- I
11    worked for the State of Illinois for approximately
12    a year and a half.
13    Q.  And what were you doing for the State of
14    Illinois?
15    A.  I worked for an agency called the Office
16    of Public Counsel.
17    Q.  Okay.  Did your responsibilities have
18    anything to do with firearms?
19    A.  Nothing.
20    Q.  And after that 18 months, what did you go
21    on to?
22    A.  I worked for a public private partnership
23    between the City of Chicago and several private
24    entities called the Central Area Circulator

9

1    A.  1996.
2    Q.  Okay.  And what were your responsibilities
3    with the Department of Environment?
4    A.  I worked primarily on legislative and
5    regulatory issues related to the environment and
6    energy.
7    Q.  How long were you in that department?
8    A.  Five years.
9    Q.  And did your responsibilities have
10    anything to do with firearm laws?
11    A.  No.
12    Q.  Okay.  And then what did you do after that
13    five-year period?
14    A.  I worked for the mayor's office -- for the
15    City of Chicago mayor's office based in Washington
16    D.C.
17    Q.  Okay.  How big an office is that?
18    A.  At the time I worked there, there were six
19    people.
20    Q.  Okay.  And for how many -- how long were
21    you in D.C.?
22    A.  Four years.
23    Q.  Okay.  And what was your portfolio of
24    issues that you were responsible for?

11

1    Project, which was an initiative to build a transit
2    system in downtown Chicago.
3    Q.  Okay.  And how long were you there?
4    A.  Approximately two years.
5    Q.  And did that have anything to do with
6    firearms?
7    A.  No.
8    Q.  All right.  And then what did you do?
9    A.  Then I worked for a real estate law firm.
10    Q.  Okay.  And how long were you there?
11    A.  About six months.
12    Q.  Okay.  I understand.  Then what did you
13    do?
14    A.  Then I worked for a nonprofit consumer
15    advocacy organization.
16    Q.  Okay.  What was the name of that?
17    A.  Citizens Utility Board.
18    Q.  Okay.  Did that have anything to do with
19    firearms?
20    A.  No.
21    Q.  Okay.  Then what did you go on to?
22    A.  Then I worked for the City of Chicago,
23    Department of Environment.
24    Q.  And when did you start with Chicago?

10

1    A.  My portfolio of issues included, but was
2    not limited to, environment, energy, public
3    infrastructure, water, education, housing,
4    justice -- some justice issues and appropriations
5    on all issues.
6    Q.  Okay.  And did you have any responsibility
7    for public policy issues relating to firearms?
8    A.  I had -- I'm sorry.  Can you repeat the
9    question?
10    Q.  Well, yes.  You've listed all these
11    various issues that you were responsible for.
12    Were you responsible for any issues that
13    related to firearms?
14    A.  I had limited involvement in advocacy on
15    some firearm issues.
16    Q.  For which issues, if you can recall?
17    A.  At the time that I was in Washington, the
18    assault weapons ban was expiring.  Someone else in
19    my office really had primary responsibility for
20    that issue.  I was more in a supportive role.
21    And to the extent that there were
22    firearms' issues related to appropriations bills, I
23    had some involvement in that.  Again, there was --
24    a colleague of mine who -- who had the predominant

12

1  responsibility on firearms. I was more in a
2  supportive role.
3      Q. Okay. And was the city's position at that
4  time that the ban should be extended?
5      A. Yes.
6      Q. And so then what happened after you left
7  D.C.?
8      A. I returned to Chicago and took my current
9  position, which is chief of policy in the mayor's
10  office.
11     Q. Is that a political position or a career
12  position?
13     MR. WORSECK: Objection, vague.
14  BY MR. THOMPSON:
15     Q. And what I mean by that -- and maybe this
16  is my Washington, D.C. centric view of the world.
17  But in D.C. we have political appointees and then
18  we have career appointees. I don't know if you
19  have that in Chicago.
20     A. It does not work the same in local
21  government, or at least not for the City of
22  Chicago, as it does in the federal government. But
23  in the context of -- of our local government, I
24  guess you would consider me a political appointee.

13

1  firearms who -- by people who are not legally
2  prohibited by having them.
3  BY MR. THOMPSON:
4      Q. Okay.
5      A. The impact of firearms on public safety in
6  Chicago, the impact of firearms on public safety
7  nationwide, the penalties associated with -- with
8  firearm use, regulation of the gun industry at the
9  state and federal levels and other -- I guess just
10  generally, gun legislation, gun regulation on a
11  range of topics.
12     Q. And why do you look at the impact of
13  firearms nationwide if you're the chief of policy
14  for Chicago?
15     A. Firearms are a national issue. The guns
16  that are in Chicago are not all from Chicago. So
17  gun laws from across the country, either on the
18  federal level or gun laws state by state matter.
19  Gun trafficking among the various states is also
20  highly relevant.
21         And I guess -- can I go back to answering
22  my other question when you asked about the scope of
23  issues that I look at? That was certainly not an
24  exhaustive scope. It's what I could think of while

15

1  I serve at the pleasure of the mayor, as do many
2  other positions in the city.
3      Q. Okay. And has Mayor Emanuel been sworn
4  in?
5      A. No.
6      Q. Okay. So as chief of policy, that would
7  include policy relating to firearms; is that
8  correct?
9      A. Correct, uh-huh.
10     Q. And so what issues with respect to
11  firearms have you analyzed in your capacity as
12  chief of policy?
13     MR. WORSECK: Objection, vague.
14  BY MR. THOMPSON:
15     Q. And you probably know this, but your
16  lawyer has the right to interpose objections. But
17  if you understand the question, you should go ahead
18  and answer.
19     MR. WORSECK: Are you asking for a list of the
20  portfolio of issues within firearms?
21     MR. THOMPSON: Yes.
22     THE WITNESS: Okay. So access to firearms by
23  people who are -- access to firearms by people who
24  are legally prohibited from having them, access to

14

1  I'm sitting here. I just want to make sure that
2  that's captured.
3      Q. I understand. All right. Now, how many
4  people are in your office?
5      A. In the mayor's office?
6      Q. Yes.
7      A. The number of people in the mayor's office
8  has varied over time. As you might imagine right
9  now, because we're coming up to a transition, there
10  are fewer people in the office than there may be --
11  than there may have been a year ago or two years
12  ago.
13         So do you want to know how many people are
14  routinely in the mayor's office or --
15     Q. Yes, yes. Thank you.
16     A. Okay. I would say approximately 100. But
17  it has varied dramatically over time with the
18  budget situation so...
19     Q. Okay. All right. And do any of those
20  people report to you?
21     A. Yes.
22     Q. How many people report to you?
23     A. That has also varied over time.
24     Q. What's the range?

16

4 (Pages 13 to 16)

1      A. Yes.
2      Q. And crooked dealer is one major source; is
3   that right?
4      A. Yes.
5      Q. Gun shows is another major source?
6      A. Yes.
7      Q. Straw purchases is another major source?
8      A. Yes.
9      Q. And then theft is another source?
10     A. Yes.
11     Q. Are those the main sources from which
12  criminals get their guns, and friends and family?
13     MR. WORSECK: Objection, vague and speculation.
14     THE WITNESS: Can you repeat your four
15  categories?
16  BY MR. THOMPSON:
17     Q. Sure. And I should have added a fifth,
18  friends and family.
19     But crooked dealers, gun shows, straw
20  purchases, thefts and friends and family?
21     A. I would say those are probably the major
22  manners in which criminals get guns. There may be
23  some other ones that I just cannot recall off the
24  top of my head.

                                              33

1      Q. Okay. Is it fair to say that it's fairly
2   easy for criminals in the City of Chicago to obtain
3   a gun illegally if they want to?
4      MR. WORSECK: Objection, calls for speculation,
5   vague. But you can answer if you know.
6      THE WITNESS: Okay. Yes, I would say the
7   answer to the question is yes. And I think it -- I
8   think it is just as easy for a criminal to get a
9   gun anywhere. I don't think it has anything to do
10  with Chicago.
11  BY MR. THOMPSON:
12     Q. Okay. Does the city undertake a cost
13  benefit analysis when it formulates its policy
14  relating to firing ranges?
15     MR. WORSECK: Objection, vague, overbroad. But
16  to the extent the policy would -- to the extent
17  your question would be asking about what the City
18  Council does, that is not within the permissible
19  scope of the case.
20     To the extent your question is asking
21  about what executive departments do, that raises
22  issues of executive privilege. Subject to all
23  those objections, I'll let the witness answer this
24  question.

                                              34

1      THE WITNESS: And I'm sorry, would you mind
2   repeating the question.
3      MR. WORSECK: And without divulging any
4   privilege or confidential information.
5   BY MR. THOMPSON:
6      Q. Yeah, and I'm not asking you for any of
7   your communications with Mr. Worseck or his
8   colleagues.
9      But does the city undertake a cost benefit
10  analysis? We've talked about all the costs of
11  allowing firing ranges.
12     What I'm wondering is: Are there any
13  benefits from having a firing range, and were those
14  considered in reaching your policy determination?
15     MR. WORSECK: Objection. Which policy
16  determination are you speaking of?
17     MR. THOMPSON: That there's a governmental
18  interest that is served by the ordinance.
19     MR. WORSECK: Wait for a second. I mean, it
20  sounds like you're asking what was the basis for
21  the City Council's determination. And that's not
22  within the permissible scope of discovery.
23     MR. THOMPSON: I'm not asking about the
24  legislative process and when the ordinance was sat

                                              35

1   down and was drafted, you know, who said what in
2   the room about the legislation. But as I
3   understand it, you're saying Chicago has several
4   policy reasons why it is in favor of banning
5   ranges.
6      And what I'm -- and you've identified the
7   reasons why Chicago was. And what I'm probing
8   further is okay, I understand that logic.
9      Now I want to know: Do you also consider
10  whether there were any other offsetting benefits to
11  the five things you've identified?
12     MR. WORSECK: I'm going to reassert the
13  objections I just made. I'll let her answer the
14  question, but is she aware of a cost benefit
15  analysis having been conducted by someone?
16     MR. THOMPSON: Yes.
17     MR. WORSECK: Okay. To that question, you can
18  respond.
19     THE WITNESS: There was no formal cost benefit
20  analysis conducted on this issue.
21  BY MR. THOMPSON:
22     Q. Okay.
23     A. If -- if your question is, you know, did
24  we retain an expert and hire someone to do a cost

                                              36

1  getting asked. Again, you know, we're getting
2  close to the scope of the 30(b)(6). You know, as
3  we set forth, this is limited to the city's
4  experience.
5      It's not limited to what some researcher
6  on the East Coast or West Coast or Midwest might
7  have done a study on. If Ms. Brown is familiar
8  with the literature, like I said, she's free to
9  answer it.
10      But I want to make sure that the record is
11  clear that this is, in my view, getting beyond the
12  scope of the 30(b)(6), which is limited to the
13  city's experience of events taking place in the
14  city.
15  BY MR. THOMPSON:
16      Q. Well, let me ask about the homicides. Is
17  it true that of most of the people who commit
18  homicides with a firearm in the City of Chicago
19  illegally possess a firearm?
20      A. Yes, I would say that that is probably an
21  accurate statement.
22      Q. Okay. And so one enforcement tool
23  available to you in your policy position would be
24  to try to keep guns out of the hands of people who

77

1      A. Within our own authority?
2      Q. Yes.
3      A. Well, I mean, I think we had a handgun ban
4  available to us prior to the McDonnell decision.
5  And short of that, our policy position has really
6  been focused on keeping guns out of the hands of
7  people who should not have them.
8      Q. Okay. All right. Now --
9      A. People who are legally prohibited from
10  having them and where state or federal law is not
11  adequate, keeping them out of the hands of other
12  people who should not be legally prohibited to have
13  them -- I'm sorry -- who should not be legally
14  allowed to have them.
15      Q. Okay. Have you -- in arriving at the
16  conclusion that you've stated, that more guns
17  equals more crime, have you looked and analyzed
18  whether there are ways in which more guns in the
19  hands of those lawfully possessing might at least
20  in some instances prevent a crime from occurring?
21      A. The city is generally familiar with
22  studies that have argued that, you know, on a
23  national level, that more guns equal less crime I
24  guess.

79

1  shouldn't lawfully possess them; is that correct?
2      A. Absolutely, yes.
3      Q. Okay. Is there any policy tool or
4  priority that would be more effective in reducing
5  the level of gun homicides than keeping guns out of
6  the hands of those who are not permitted to have
7  them?
8      MR. WORSECK: Objection, calls for speculation,
9  calls for testimony intruding into the matters
10  barred by Judge Chang's order. It calls for
11  potentially expert testimony. Subject to those
12  objections, the witness can answer if she knows.
13      THE WITNESS: I just want to make sure I
14  understand your question. Could you repeat it.
15  BY MR. THOMPSON:
16      Q. Sure. Is there any enforcement mechanism
17  you have available to you that would be more
18  effective to reduce gun homicides than to take guns
19  out of the hands of convicted felons and others who
20  cannot lawfully possess them?
21      A. And when you say a tool that we have
22  available, are you talking about the City of
23  Chicago specifically?
24      Q. Right.

78

1      Based on my own experience, based on
2  people I have spoken with, whether it's experts or
3  law enforcement personnel, members of the
4  community, I think the instances are far and few in
5  which a gun has been successfully used to prevent a
6  crime on -- on balance, it's a -- it's a blip on
7  the radar screen compared to the converse situation
8  in which guns are used involving crime.
9      Q. Now, when you say it's far and few between
10  when a gun is used, what about an instance where a
11  gun isn't used, but a crime doesn't occur because
12  the criminal knows or begins to suspect that the
13  intended victim doesn't have a gun -- excuse me --
14  has a gun; and therefore, aborts the criminal
15  activity?
16      Have you considered whether that
17  phenomenon takes place?
18      MR. WORSECK: Objection, calls for
19  speculation -- can I just have a standing objection
20  here incorporating a lot of what I talked about. I
21  mean, we're talking about hypotheticals and
22  speculation about things occurring outside of
23  Chicago that is beyond the second of this 30(b)(6)
24  notice.

80

1    MR. THOMPSON: You can have your standing
2 objection. I'm not saying that we agree with the
3 objection or characterization, but you can have the
4 standing objection.
5    MR. WORSECK: All right. And I find this
6 particular question to be very vague as well.
7    THE WITNESS: Yes, I can't answer the question.
8 BY MR. THOMPSON:
9    Q. Okay. It's have you considered the extent
10 to which there is a phenomenon in which some
11 criminals abort criminal activities because they
12 form a belief that their intended victim has a gun
13 even though that gun is never used?
14    A. I would imagine that that situation
15 occurs. I am not familiar with any literature on
16 that point.
17    Q. Okay. Now, let's see. In terms of --
18 let's see here. We talked about suicide.
19    Okay. Now, you've referenced your belief
20 that higher level of gun ownership increases crime,
21 correct?
22    A. I think I said -- and you're talking about
23 legal gun ownership?
24    Q. Well, why do you draw that distinction?

81

I'm not saying you're wrong. But why are you
2 drawing that distinction?
3    A. I think it's relevant because where a --
4 where you have a person who's willing to possess an
5 illegal gun, that person is clearly showing a
6 propensity to ignore the law and would potentially,
7 you know, lead to the use of that gun in other
8 crimes. So that's why I'm drawing the distinction.
9    Q. Okay. Well, let me break that down
10 because maybe this will move things along. Would
11 you agree that a higher incident of illegal gun
12 ownership leads to a higher crime rate?
13    A. Yes.
14    Q. Okay. Would you agree that a higher level
15 of gun ownership by law abiding citizens, properly
16 trained does not necessarily lead to a higher crime
17 rate?
18    MR. WORSECK: Objection, vague, speculation,
19 expert testimony, beyond the scope.
20    THE WITNESS: Well, and I think this goes back
21 to what I -- to the conversation that we already
22 had; which was that in a vacuum if you're looking,
23 you know, at sort of the raw situation and holding
24 other external factors constant, and assuming that

82

every legal gun owner keeps their handgun in their
2 home only for the purpose of self defense and keeps
3 it properly stored -- keeps other guns properly
4 stored, does not take the gun out of their home,
5 then I could see where you could say that that
6 might not lead to an increase in crime.
7 BY MR. THOMPSON:
8    Q. Have you --
9    A. But beyond that, I'm not willing to
10 speculate on the impact of crime.
11    Q. Okay. Now, in analyzing this issue, have
12 you encountered the concept of reverse causation?
13    MR. WORSECK: Objection, vague.
14    THE WITNESS: I don't know what you're talking
15 about.
16 BY MR. THOMPSON:
17    Q. Okay. What I mean by that is the concept
18 that there may be a correlation between higher
19 levels of gun ownership and higher crime, but there
20 may not -- the cause might be the higher crime
21 causes people to go out and buy guns.
22    So for example, you live in a
23 neighborhood. It starts getting more and more
24 dangerous, more and more crime. Let's say drug

83

dealers move in.
2    A. Okay.
3    Q. You go out and you by a handgun to defend
4 yourself and your home. You know, the causal
5 could -- you know, if you're just looking at the
6 next year of gun levels, so that's what I mean by
7 reverse causation.
8    Does that ring a bell? Is that something
9 you've considered?
10    A. So you're asking me if I'm aware of that
11 phenomenon?
12    Q. Yes.
13    A. I'm aware that that could be a reason why
14 a person may go out and buy a gun. I'm not
15 familiar with any studies that show a specific
16 correlation or specific numbers.
17    Q. Okay. You referenced that crimes with
18 guns, you know, are worse or more aggravated if a
19 gun is involved.
20    A. Uh-huh.
21    Q. Are you aware any social science
22 literature that looks at the lethality of guns, as
23 opposed to ice picks or butcher knives or, you
24 know, other types of weapons?

84

21 (Pages 81 to 84)

1  many people. Some garages are used by one person.
2     Just as -- as a way to minimize the impact
3  on public safety and public health -- as a way to
4  minimize the adverse impacts on public safety and
5  public health and protect the residents of Chicago,
6  the city made a decision to allow a gun in the
7  home, not in the garage.
8     Q.  Yeah.  And I'm saying what governmental
9  purpose is served?
10    A.  Protecting public health and public
11 safety.
12    Q.  How does it protect public health or
13 safety to tell someone they can't defend themselves
14 in their garage?
15    MR. WORSECK: Objection, argumentative.
16 BY MR. THOMPSON:
17    Q.  Defend themselves with a firearm.
18    A.  A garage may or may not be someone's home.
19    Q.  I understand that definitional point. My
20 question is:  How does telling a citizen they
21 cannot use a gun in their garage to defend
22 themselves promote public safety or health?
23    MR. WORSECK: Objection, argumentative,
24 mischaracterizes prior testimony, vague.

93

1     THE WITNESS: It is reducing the -- the -- I'm
2  sorry.  Reducing the opportunity for more handgun
3  violence in the same way that the banning guns on
4  public streets does.
5  BY MR. THOMPSON:
6     Q.  Okay.  Are you aware of any evidence to
7  support the notion that telling law abiding
8  citizens they can't possess a firearm in their
9  garage promotes public safety or welfare?
10    MR. WORSECK: Same objections as to the prior
11 question.
12    THE WITNESS: To the extent that reducing the
13 number of guns in circulation and reducing the use
14 of guns by people who shouldn't have them protects
15 public safety, it -- limiting the ability to use
16 guns in a garage meets that same purpose.
17 BY MR. THOMPSON:
18    Q.  I'm sorry.  How does -- I understand your
19 arguments about the number of guns in a society
20 leads to adverse consequences.
21    How does telling someone that they can't
22 bring their gun into their garage affect the number
23 of guns in society?
24    MR. WORSECK: Same objections.

94

1     THE WITNESS: I'm not saying it affects the
2  number of guns in society.  And I'm sorry if I said
3  that.  That was not correct.
4     But a -- it's difficult to make a
5  distinction between -- for purposes of protecting
6  the public safety, it's difficult to make a
7  distinction between a sidewalk and a garage.  I
8  don't know if that answers your question.  I'm --
9  BY MR. THOMPSON:
10    Q.  Well --
11    A.  We want to limit the number of guns that
12 are in circulation.  We want to limit the
13 opportunities to use guns for reasons for which
14 they should not be used.
15    Q.  Okay.  And so how does --
16    A.  For reasons for which they are not legally
17 permissible to be used.
18    Q.  Okay.  But what we're talking about is
19 why, you know, is the line that was drawn and the
20 policies that it serves, and so --
21    Let me ask it this way:  Are you aware of
22 any social science literature that suggests that
23 disallowing an individual from possessing a gun in
24 his or her garage promotes public safety?

95

1     MR. WORSECK: Same objections.
2     THE WITNESS: Not any more so than social
3  science literature that would talk about
4  disallowing a gun in any other place promotes
5  public safety.
6  BY MR. THOMPSON:
7     Q.  Let's speak about invitees under Chicago's
8  law -- well, actually, before we get to invitees,
9  would you give the same testimony about front yards
10 and backyards and porches that -- well, strike
11 that.
12    Let me ask it this way:  Are you aware of
13 any social science literature or any other evidence
14 that suggests that prohibiting a person from
15 possessing a firearm in his or her front or
16 backyard promotes public safety?
17    MR. WORSECK: Same objections.
18    THE WITNESS: Generally, yes.
19 BY MR. THOMPSON:
20    Q.  Okay.  What -- in the -- you've seen
21 studies about violence in yards?
22    A.  Well, so in a -- in a very densely
23 populated urban environment like Chicago, it is
24 very hard to distinguish between a sidewalk, which

96

McCorkle Court Reporters, Inc.
Chicago, Illinois    (312) 263-0052

1   it may be hard after the fact to figure out whether
2   the consent was actually given, is that the main
3   concern the city has that leads it to have this
4   prohibition on having a gun in someone else's home?
5     A.  Well, the other concern that the city
6   would have is the fact that the person -- the
7   invitee would be carrying their gun from wherever
8   they were coming from to the invitee's home.
9     Q.  Now, that could be done lawfully in
10   Chicago, correct, if the gun were disassembled and
11   locked away in a storage case, isn't that right?
12     A.  Possibly.
13     Q.  Okay. So if -- so -- that's fine.
14     A.  I just don't know that we want people
15   walking around with their storage cases, you know,
16   in their hands with their gun.
17     Q.  But they're allowed to, right?
18     A.  Yes, but not for the purpose of going to
19   somebody's house and visiting.
20     Q.  I see. Now, are you aware of evidence
21   including, but not limited to, social science
22   literature that bears on this question of public
23   safety as it relates to invitees coming into
24   someone else's home with a gun?

101

1     A.  I am aware -- the city is aware of the
2   social science literature connecting the presence
3   of a gun or guns in the home and lethal
4   consequences.
5     Q.  All right. Now, fixed place of business,
6   what governmental purpose is served by prohibiting
7   an individual from having a gun in his or her fixed
8   place of business?
9     MR. WORSECK:  Objection, argumentative,
10   mischaracterizes the ordinance.
11   BY MR. THOMPSON:
12     Q.  Handgun in his or her fixed place of
13   business.
14     A.  That is a -- it's the governmental
15   purposes protection of public safety. And handguns
16   are the tool of choice for crimes in Chicago,
17   homicides and other crimes. And the city is not
18   disallowing certain other types of weapons at a
19   fixed place of business.
20     Q.  What's the relevance of -- why are the
21   long guns permitted, but the handguns aren't?
22     MR. WORSECK:  Objection, beyond the scope,
23   intrudes into matters barred by Judge Chang's
24   order, asking the witness to speculate as to why

102

1   the City Council did what it did.  If the witness
2   is aware of a governmental purpose served by what
3   the City Council did, she could testify as to --
4   BY MR. THOMPSON:
5     Q.  Okay. So what governmental purpose is
6   served by allowed long guns, but disallowing
7   handguns in a fixed place of business?
8     A.  It reduces the incident of -- I'm sorry.
9   It reduces the probability of adverse public safety
10   consequences in that business.
11     Q.  And what evidence do you have to support
12   that statement?
13     A.  The fact that in Chicago handguns are
14   the -- the primary source of gun violence and
15   adverse impacts associated with gun violence,
16   handguns in particular.
17     Q.  Any other evidence?  I just want the
18   record to be complete.
19     A.  At the moment, I don't have other evidence
20   to cite.
21     Q.  All right. What governmental purpose is
22   served by the ban on one operable gun in the home?
23     A.  That is serving the purpose of protecting
24   public health, safety and welfare.

103

1     Q.  Any other governmental purpose?
2     A.  Limiting access to guns by persons who
3   either are legally prohibited or should be legally
4   prohibited from having them.
5     Q.  Did you say who are legally prohibited or
6   should be legally --
7     A.  Yes, I'm sorry. I -- I need to rephrase
8   that. Who are legally prohibited from having them.
9     Q.  Okay. Other than limiting access to those
10   who are legally prohibited from gaining access,
11   we'll leave that governmental purpose to decide it.
12   And that may explain and be the answer to the
13   question I'm about to ask.
14     But how else is public safety served, if
15   at all, by this regime which limits gun owners to
16   one operable gun?
17     A.  The reason that I just gave is the primary
18   reason.
19     Q.  Are there any secondary reasons?
20     A.  At this moment I cannot think of a
21   secondary reason.
22     MR. THOMPSON:  Okay. What I would like to do
23   is take a five-minute break, and we may be five
24   minutes away after that from finishing.  So let's

104

26 (Pages 101 to 104)

1 go off the record.
2         (Whereupon, a short recess was
3         taken.)
4 BY MR. THOMPSON:
5     Q. We are done with the 30(b)(6). And now I
6 have a few questions, but not many, for you in your
7 individual capacity.
8         Now, in your job as chief of policy, do
9 you regard studies by the federal government as
10 presumptively reliable?
11     MR. WORSECK: Objection, vague, overbroad. You
12 mean gun studies?
13     MR. THOMPSON: Gun studies.
14     MR. WORSECK: Still vague.
15     THE WITNESS: Yes. I guess I would have to say
16 it depends.
17 BY MR. THOMPSON:
18     Q. Okay. Some studies by the federal
19 government are reliable, and you have found others
20 that are not reliable?
21     A. Well, I would want to look at a specific
22 study before I could answer that question. I mean,
23 I guess I would look at it on a study-by-study
24 basis, depending on who financed it, what the

105

1 that be consistent with your understanding of
2 statistical significance?
3     A. Generally.
4     Q. Okay. Now, in formulating the policy for
5 the city, when you encounter correlations that are
6 not statistically significant, do you disregard
7 them?
8     MR. WORSECK: Objection, vague, overbroad,
9 intrudes into privileged matters, policy
10 formulation, executive privilege. And I fail to
11 see the relevance.
12         Subject to all of that, if you could
13 understand it, you can answer the question.
14     THE WITNESS: Could you repeat the question.
15 BY MR. THOMPSON:
16     Q. Yes. If you encounter a study that shows
17 a correlation between the two phenomenon, but it's
18 not a statistically significant one, do you
19 disregard the correlation or do you still take it
20 into account as you're formulating gun control
21 policy in Chicago?
22     MR. WORSECK: I'm going to add another
23 objection, argumentative and mischaracterizes prior
24 testimony, also presumes that the witness is

107

1 agenda for why the study was done and some other
2 factors.
3     Q. Why would you look at who financed it?
4     A. Because I think sometimes that is relevant
5 to the conclusion of the study.
6     Q. In your capacity as the chief of policy,
7 have you encountered the term statistical
8 significance?
9     A. Yes.
10     Q. Okay. And what does that mean, that term?
11     A. I could tell you what it means to me. I
12 don't know if there's a textbook definition of it.
13 So what I'm going to say is not what I understand
14 to be the textbook definition or how any other
15 person might define it.
16     Q. All right.
17     A. But it means that the statistics are --
18 the statistics show a -- a significance to whatever
19 statistics are being used to prove I guess. I
20 don't know if that was the right definition.
21     Q. Okay. And maybe we're saying the same
22 things.
23         If I were to say that the statistics are
24 not likely to be the result of random chance, would

106

1 speaking for or acting for the legislature.
2 Subject to those objections, the witness can
3 answer.
4     THE WITNESS: So the city would consider that
5 as -- as part of acquiring a broad base of
6 knowledge on which to make a final decision.
7 BY MR. THOMPSON:
8     Q. All right. Now, if you could set the
9 policy for the city without regard to politics or
10 the Second Amendment --
11     A. Yes.
12     Q. -- or any other constraint, just what you
13 thought would be best for the city, what policy
14 would you adopt vis-à-vis guns?
15     MR. WORSECK: Objection, totally irrelevant.
16 It's beyond the scope. Hold on a second. It's
17 overbroad. And I'm going to instruct the witness
18 not to answer that question.
19     MR. THOMPSON: Well, no way. Okay. That's not
20 going to stand. Okay.
21 BY MR. THOMPSON:
22     Q. So let's try it this way: What is your
23 personal view as to, based on your experience at
24 the City of Chicago, with what the best policy

108

27 (Pages 105 to 108)

Q. And would you agree that an additional interest served is reducing the instances in which someone who is not lawfully entitled to possess firearms in the home does so?

A. Yes, without question.

Q. For instance, the restriction on the number of operable firearms reduces the likelihood that a child would acquire an operable firearm in the home?

A. That's correct.

Q. Or a non-CFP holder would acquire an operable firearm in the home?

A. That's correct.

Q. And it reduces the number of accidental shootings that might take place in the home?

A. That's correct.

MR. THOMPSON: Objection, leading.

THE WITNESS: That's correct.

BY MR. WORSECK:

Q. And it limits the number of suicides that might be committed with those guns in that home?

MR. THOMPSON: Objection, leading.

THE WITNESS: That's correct.

BY MR. WORSECK:

125

Q. And it reduces the number of firearms that might be used in a domestic violence situation taking place within that home?

MR. THOMPSON: Objection, leading.

THE WITNESS: Definitely. And I think that there are a number of studies that the city is aware of on each of those points to show that the presence of firearms in the home increases the probability of any of those instances occurring.

BY MR. WORSECK:

Q. Do you remember at the very end of Mr. Thompson's line of questioning, his question about looking at other jurisdictions in the country, about how they approach gun violence issues or gun violence regulation?

A. Yes.

Q. And you mentioned the fact that -- the unsurprising fact that jurisdictions vary by jurisdiction and demographics and economic factors and things of that sort?

A. That is correct across the board on every issue.

Q. Nonetheless, in light of that diversity across jurisdictions, could it be the case that

126

some jurisdictions are more similar to other jurisdictions than they might be to yet other jurisdictions?

MR. THOMPSON: Objection, leading.

THE WITNESS: That is absolutely correct.

BY MR. WORSECK:

Q. And in certain situations it could be appropriate for the City of Chicago to take guidance from or direction from or at least use in some way or another the experience of other jurisdictions if those jurisdictions would have certain characteristics in common with Chicago?

A. Yes.

Q. That being said, that's based on your personal experience. You're not an expert on the creation and execution of social science studies relating to gun violence?

A. That's correct. I'm not.

Q. Are -- and I think that this is my last question.

Is it fair to say here today that the answers you gave both in response to Mr. Thompson's questions and in response to my questions are based on your recollection as you sit here today?

127

A. Yes, that's correct.

Q. The best recollection that you can bring here today?

A. Yes, that's correct.

MR. WORSECK: I have nothing further.

MR. THOMPSON: Okay. Well, we have some new governmental interests. So that obviously requires some follow up.

FURTHER EXAMINATION

BY MR. THOMPSON:

Q. Let's do this in reverse order. The last -- one of the last questions was about whether it could be appropriate to take guidance or to look at the experience of other jurisdictions.

Has Chicago ever done that during your time in the office of policy with respect to firearms, looked to the experience of another city, thinking gee, that city looks pretty similar to ours?

MR. WORSECK: Objection, vague, overbroad.

THE WITNESS: In general, yes.

BY MR. THOMPSON:

Q. Okay. And which cities has it looked to for -- at their experience?

128

32 (Pages 125 to 128)

1    A.  In general cities that have similar
2  characteristics to Chicago in one way or another.
3  And that list would include, but is not limited to,
4  New York, Philadelphia, Los Angeles, Milwaukee,
5  Washington D.C  And at this moment, that's my
6  list.  But again, that's not an exclusive list
7  necessarily.
8    Q.  What about Boston, is that one you looked
9  to?
10    A.  Possibly.
11    Q.  And what about Atlanta?
12    A.  Georgia has very different state laws.  I
13  don't know -- I can't say specifically as I sit
14  here right now if -- how extensively, or even
15  whether Atlanta was -- was something that we looked
16  at.  I just don't remember.
17    Q.  Okay.  Now, with respect to the one
18  operable gun, you identified several governmental
19  purposes.  One of them was a reduction in domestic
20  violence.
21    Isn't it true that most domestic violence
22  doesn't start with a gun fight, there's a series of
23  physical assaults that occur before that?
24    MR. WORSECK:  Objection, speculation.

129

1    THE WITNESS:  Yeah.  I am not an expert on
2  domestic violence.  I'm not necessarily arguing
3  with your hypothesis.  But I don't know enough to
4  say whether it's true.
5  BY MR. THOMPSON:
6    Q.  Has the City of Chicago considered whether
7  preventing those who engage in domestic abuse from
8  obtaining firearms would be an effective strategy
9  for reducing domestic violence homicides?
10    MR. WORSECK:  Objection, and instruction not to
11  answer based on the previous colloquy we've had
12  about the scope of Judge Chang's ruling.
13  BY MR. THOMPSON:
14    Q.  Well, have you ever considered, as the
15  head of the office of policy, whether preventing
16  those who engage in domestic abuse from obtaining
17  firearms would be an effective strategy for
18  reducing domestic violence homicides?
19    MR. WORSECK:  Same objection and instruction.
20    MR. THOMPSON:  This is -- I have her in both
21  her personal and her individual capacity.  What
22  possible objection do you have for me asking her
23  whether she has in fact ever done this over the
24  last five years?

130

1    I'm not asking about this in connection
2  with the legislation per se.  I'm saying is this
3  something she's considered.
4    MR. WORSECK:  No, Judge Chang's ruling was not
5  limited to the 30(b)(6) context.  It was limited --
6  it extends generally to the scope of issues in the
7  case.  And individual policy preferences or
8  considerations by individual city officials are
9  outside the scope of discovery.
10    MR. THOMPSON:  I'm not asking her about her
11  policy preferences.  And you know that, right?
12    MR. WORSECK:  You're asking her about what she
13  has done.
14    MR. THOMPSON:  Considered in her capacity as
15  office of --
16    MR. WORSECK:  That's not relevant.
17    MR. THOMPSON:  Okay.  But I'm not asking about
18  policy preferences, right?  Would you concede that
19  this question doesn't go to her policy preferences?
20    MR. WORSECK:  It goes to policy formulation,
21  policy considerations that are not within the
22  legislative record and the legislative action
23  that's at issue in this case.  And Judge Chang has
24  ruled that that line of inquiry is not properly

131

1  within the scope of discovery.
2    MR. THOMPSON:  So your position is we are not
3  allowed to ask anyone from the City of Chicago how
4  they arrived at these policy views?
5    MR. WORSECK:  You are entitled to ask the
6  witness about the bases supporting the governmental
7  purposes served by this ordinance.
8    MR. THOMPSON:  Yes.  And one of the bases is to
9  say hey, here's an alternative.  We're also
10  entitled to ask about less restrictive
11  alternatives.  Because under strict scrutiny, that
12  would be highly relevant.
13    And Judge Chang was crystal clear, that
14  just as you're allowed to take discovery and to --
15  you know, the Casey, under the Casey standard,
16  because that's your theory, we're entitled to take
17  discovery under strict scrutiny.  And one of the
18  theories is less restrictive alternative.
19    And so I'm asking have you considered in
20  your capacity as the head of the office of policy
21  this alternative?  And I'm absolutely entitled to
22  ask that.  He was crystal clear on that.
23    MR. WORSECK:  That question as to her
24  individual experience, I will let her answer.

132

33 (Pages 129 to 132)

1     Q.  Isn't it possible that a law abiding
2  homeowner possessing a gun in his or her garage
3  could be attacked and robbed while in the garage,
4  and the gun stolen from that person?
5     A.  Yes.
6     Q.  And the city has an interest in reducing
7  the number of instances where that might occur?
8     A.  Yes.
9     Q.  And this is a general question basically
10  going to all your answers. Mr. Thompson at various
11  times in his questioning asked you about the basis
12  or evidence relating to various points of your
13  testimony.
14        Is it fair to say that the answers you
15  gave to that line of questions is based on your
16  knowledge and recollection as you sit here today?
17     A.  Yes.
18     Q.  It's possible that there might be other
19  evidence or bases supporting the various
20  governmental purposes that we've been talking about
21  here today that you are not able to recall as you
22  sit here today?
23     A.  Yes.  That is true for everything I have
24  said today.

169

---

1         MR. WORSECK:  Nothing else.
2         MR. THOMPSON:  We're done.
3         (FURTHER DEPONENT SAITH NOT.)
4         (Proceedings concluded at 1:20 p.m.)

170

---

1         IN THE UNITED STATES DISTRICT COURT
2         NORTHERN DISTRICT OF ILLINOIS
3         EASTERN DIVISION
4  ILLINOIS ASSOCIATION OF    )
5  FIREARMS RETAILERS,        )
6  et al.,                    )
7         Plaintiffs,    )
8  vs.                        )
9  THE CITY OF CHICAGO and    )
10  RICHARD M. DALEY, Mayor    ) No. 10 CV 04184
11  of the City of Chicago,    )
12         Defendants.    )
13        I, CAROL Brown, being first duly sworn, on
14  oath say that I am the deponent in the aforesaid
15  deposition taken on the 21st day of April, 2011;
16  that I have read the foregoing transcript of my
17  deposition, consisting of pages 1 through 170
18  inclusive, and affix my signature to same.
19        _____
20              CAROL BROWN
21  Subscribed and sworn to
   before me this      day
22  of        , 2011
23
24  Notary Public

171

---

1  STATE OF ILLINOIS  )
2                     )  SS:
3  COUNTY OF C O O K  )
4        I, JENNIE MODI, a notary public within and
5  for the County of Cook and State of
6  Illinois, do hereby certify that heretofore,
7  to-wit, the 21st day of April, 2011, personally
8  appeared before me, at 33 North Dearborn Street,
9  Suite 300, Chicago, Illinois, CAROL BROWN, in a
10  cause now pending and undetermined in the Circuit
11  Court of Cook County, Illinois, wherein ILLINOIS
12  ASSOCIATION OF FIREARMS RETAILERS, et al., are the
13  Plaintiffs, and THE CITY OF CHICAGO, et al., are
14  the Defendants.
15        I further certify that the said CAROL
16  BROWN was first duly sworn to testify the truth,
17  the whole truth and nothing but the truth in the
18  cause aforesaid; that the testimony then given by
19  said witness was reported stenographically by me in
20  the presence of the said witness, and afterwards
21  reduced to typewriting by Computer-Aided
22  Transcription, and the foregoing is a true and
23  correct transcript of the testimony so given by
24  said witness as aforesaid.

172

---

43 (Pages 169 to 172)

1     I further certify that the signature to
2  the foregoing deposition was reserved by counsel
3  for the respective parties.
4     I further certify that the taking of this
5  deposition was pursuant to notice and that there
6  were present at the deposition the attorneys
7  hereinbefore mentioned.
8     I further certify that I am not counsel
9  for nor in any way related to the parties to this
10  suit, nor am I in any way interested in the outcome
11  thereof.
12     IN TESTIMONY WHEREOF: I have hereunto set
13  my hand and affixed my notarial seal this 28th day
14  of April, 2011.
15
16
17
18
19  _____
20  NOTARY PUBLIC, COOK COUNTY, ILLINOIS
21  LIC. NO. 084-004497.
22
23
24                 173

---

1     McCorkle Court Reporters, Inc.
       200 N. LaSalle Street Suite 300
2     Chicago, Illinois 60601-1014
3
4  April 28, 2011
   MR. ANDREW WORSECK
5  ASSISTANT CORPORATION COUNSEL
   DEPARTMENT OF LAW
6  30 North LaSalle Street, Suite 1230
   Chicago, Illinois 60602
7
   IN RE: ILAFR v. The City of Chicago
8  COURT NUMBER: 10 CV-04184
   DATE TAKEN: April 27, 2011
9  DEPONENT: Carol Brown
10  Dear Mr. Worseck:
11  Enclosed is the deposition transcript for the
   aforementioned deponent in the above-entitled
12  cause. Also enclosed are additional signature
   pages, if applicable, and errata sheets.
13
   Per your agreement to secure signature, please
14  submit the transcript to the deponent for review
   and signature. All changes or corrections must be
15  made on the errata sheets, not on the transcript
   itself. All errata sheets should be signed and all
16  signature pages need to be signed and notarized.
17  After the deponent has completed the above, please
   return all signature pages and errata sheets to me
18  at the above address, and I will handle
   distribution to the respective parties.
19
   If you have any questions, please call me at the
20  phone number below.
21
   Sincerely,
22  Margaret Setina     JENNIE MODI
   Signature Department   Court Reporter
23        (312)263-0052
   cc: ALL COUNSEL OF RECORD
24                 174

44 (Pages 173 to 174)

**McCorkle Court Reporters, Inc.**
**Chicago, Illinois   (312) 263-0052**

EXHIBIT 28

**Page 1**

IN THE UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

ILLINOIS ASSOCIATION OF )
FIREARMS RETAILERS, )
KENNETH PACHOLSKI, )
KATHRYN TYLER, and )
MICHAEL HALL )
    Plaintiffs, )
  vs. ) No. 10 CV 04184
THE CITY OF CHICAGO and )
RICHARD M. DALEY, Mayor )
of the City of Chicago, )
    Defendants. )

      The deposition of NORMA I. REYES, called for examination pursuant to the Rules of Civil Procedure for the United States District Courts pertaining to the taking of depositions, taken before JENNIE MODI, a notary public within and for the County of Cook and State of Illinois, at 33 North Dearborn Street, Suite 300, Illinois, on the 28th day of April, 2011, at the hour of 10:39 o'clock a.m.

**Page 2**

APPEARANCES:

    COOPER & KIRK, by
    MR. PETER A. PATTERSON,
      1523 New Hampshire Avenue Northwest,
      Washington, D.C. 20036,
      202-220-9600,
        Representing the Plaintiffs;

    MR. REBECCA ALFERT HIRSCH,
    ASSISTANT CORPORATION COUNSEL,
    DEPARTMENT OF LAW,
    30 North LaSalle Street, Suite 1230,
    Chicago, Illinois 60602,
    312-744-0260,
      Representing the Defendants.

**Page 3**

I N D E X

| WITNESS | EXAMINATION |
|---|---|
| NORMA REYES | |
| By MR. PATTERSON | 4, 125 |
| By MS. HIRSCH | 109 |

E X H I B I T S

| NUMBER | MARKED FOR ID |
|---|---|
| REYES Deposition Exhibit | |
| No. 1 | 60 |
| No. 2 | 68 |
| No. 3 | 102 |
| No. 4 | 106 |

**Page 4**

        (Whereupon, the witness was
        duly sworn.)

        NORMA I. REYES,
having been first duly sworn, was examined and
testified as follows:

        EXAMINATION
BY MR. PATTERSON:

  Q. Could you please state your name for the record?

  A. My name is Norma I. Reyes, R-e-y-e-s.

  Q. And Commissioner Reyes, I understand that you're an attorney. So you're probably familiar with how a deposition works. But anyway, I'll just go over a few ground rules.

    First of all is that when I ask a question, I just ask that you wait until I finish to begin speaking for virtue of the court reporter here. And I'll try to do the same when you're answering.

    And if you need a break at any time, just let me know. I just ask that if there's a question pending, just answer the question first. And then we will be happy to accommodate you with a break after that.

1    So to get started here, I understand you
2  are the Commissioner of the Department of Business
3  Affairs and Consumer Protection; is that correct?
4    A.  That is correct.
5    Q.  And you've held that position since 2009?
6    A.  That's true.
7    Q.  And could you just describe kind of in a
8  general sense what your department does?
9    A.  Well, my department is a result of a
10  consolidation of a couple departments, so there's a
11  lot that I do.
12    Q.  Okay.
13    A.  So stop me when you're finished hearing
14  what I do.
15    Q.  All right.
16    A.  We -- our department is charged with
17  licensing all city businesses, providing outreach
18  for businesses.
19    Q.  Okay.
20    A.  Resources and support.  We also are
21  charged with doing all consumer fraud and
22  protections, any kinds of complaints of deceptive
23  practices, false advertising.  I also oversee the
24  cable industry in Chicago.  So we have a

5

1  telecommunications component.
2    And in the area of business affairs, we
3  give licenses, and we also revoke licenses or
4  suspend licenses.  So we also have -- I have a
5  group of lawyers on the staff that prosecute.
6    I also oversee an administrative body.
7  And that is the body that if you deny a license,
8  you can appeal it to that body.
9    Q.  Okay.
10    A.  Or if we're going to go to revoke the
11  license, those cases are actually prosecuted there
12  before that adjudicatory body, the license
13  commission.
14    Q.  Okay.
15    A.  So I oversee some, you know, litigation.
16  We do some -- we handle complaints.  But we also do
17  some investigations ourselves.  We also -- when I
18  say we license businesses, it's anywhere from a
19  Fortune 500 company to a small ma and pa.
20    We regulate all public vehicles, which
21  would include taxis, limousines, charters,
22  ambulances, valet companies.  So it's really broad.
23    Q.  Okay.  And how many people do you oversee?
24    A.  About 200, a little over 200.

6

1    Q.  Okay.  And do you have a sense for how
2  many businesses are licensed in the City of
3  Chicago?
4    A.  We currently issue approximately 100,000
5  business licenses.
6    Q.  Okay.  So those are active business
7  licenses that are currently issued?
8    A.  I don't -- I can't say that -- I don't
9  know if I can answer that question that way.  What
10  I can say to you is that we issue when you --
11  because the other thing that we do is also issue
12  license of chauffeurs.  So, you know, if you take
13  all the licenses together, I would say we issue --
14  we have about 100,000 licenses that we issue.
15    Q.  Okay.
16    A.  Some businesses may have multiple
17  licenses.
18    Q.  And I'll come back some more to, you know,
19  currently responsibilities, but I just want to go
20  over some of your background.
21    I understand that prior to your current
22  position, from 2004 to 2008, you were Commissioner
23  of Consumer Services; is that correct?
24    A.  Correct.

7

1    Q.  Okay.  And what was that position?
2    A.  Consumer services in that position, you
3  know, I oversaw all consumer fraud and protection
4  in the City of Chicago.  We did also some licensing
5  because in that department, when it was free
6  standing, not combined with business affairs, we
7  licensed all public vehicles, as I explained.
8    Q.  Yes.
9    A.  And then we also -- I had a prosecutorial
10  section, attorneys that at the -- at an
11  administrative body would prosecute complaints of
12  consumer fraud and protection.  We did some
13  affirmative investigations, undercover
14  investigations that we would do ourselves to bring
15  actions to subject practices.  You know, we deal
16  with recalled items.
17    We also at -- sometimes we find in some
18  stores that they're selling what we call gray
19  market matter.  We had a situation where there
20  were, you know, Colgate toothpaste laced with
21  antifreeze that was shipped over from China and
22  made its way through markets around the country.
23  And so we go out, we confiscate those.  And I also
24  oversaw the cable industry.

8

2 (Pages 5 to 8)

1  noticed an increasing incidence of handgun violence
2  in murders in the 2001, 2002 time period; is that
3  correct?
4    A.  Yes.
5    Q.  And so my question is:  Did you ever
6  arrive at any explanations for why that was
7  occurring?
8    A.  Yes.
9    Q.  And what were those?
10   A.  Well, part of it is is that the gun
11  dealers are irresponsible.  And they don't
12  necessarily -- they don't -- they don't -- it is
13  my -- okay.  Wait.
14       If you go to a gun store, a gun dealer, I
15  mean, we have a lot of straw buyers, and the gun
16  dealers don't really care who they're selling to as
17  long as they're making a sale.  And it is their
18  business.
19       And it seems to me that it isn't just the
20  gun dealers, but it's also the distributors in
21  terms of how irresponsible they are in -- in having
22  something that potentially is so harmful and not,
23  you know, do their checks and balances just to make
24  sure that these guns don't end up in the hands
                                                    13

1    Q.  Right.
2    A.  And that absolutely is something that is
3  absolutely going on.  And that is illegal.  You're
4  supposed to be selling the gun, you know, to the
5  person and when you know, you know --
6    Q.  Right.  Yeah.  But in -- do you have
7  any -- did you have any recommendations at the time
8  about how to stem these practices of gun dealers?
9    A.  My recommendations were -- well, I would
10  say yes.
11   Q.  And what were those?
12   A.  My recommendations is that I really
13  believed that there had to be more controls in
14  terms of the sale of the guns, whether it was a
15  waiting period, whether it was a time.  If in fact
16  the person -- like for example, there was a lot of
17  gun shops that border around the city.
18       So if you're selling a gun, you know, to
19  someone who resides in the city, and you know that
20  at the time the city prohibited guns, that you
21  ended up notifying the owner -- I mean, the
22  would-be purchaser or, you know, have some kind of
23  restriction that way, looking at that way that that
24  was a possibility.
                                                    15

1  of -- I mean, it's really easy to go and buy a gun.
2  It's just really easy to go and buy a gun.
3    Q.  And these are dealers outside of the City
4  of Chicago; is that correct?
5    A.  Right, because -- yeah, around.
6    Q.  But close to the City of Chicago?
7    A.  Yes.
8    Q.  What are examples of some things gun
9  dealers did that -- well, strike that.
10       Were things gun dealers doing illegal?
11  MS. HIRSCH:  Objection, lack of foundation.
12  BY MR. PATTERSON:
13   Q.  You can answer the question if you --
14   A.  Okay.  What I would say is that some of
15  the things that they were doing is knowing that --
16  so for example, you would have two people go in.
17  And one person has the FOID card.
18       It is -- there is conversation going on.
19  It is very clear that the person who really is
20  getting the gun is not the person with the FOID
21  card, but it's the person that they're buying the
22  gun for.
23   Q.  Right.
24   A.  You know, the straw purchaser.
                                                    14

1       I think that it's really important to have
2  the ability to revoke licenses, so that if you, you
3  know, have a license and you're selling guns, and,
4  you know, the ability for the municipality to
5  revoke a license, which is very important.  So
6  recommendations like that.
7    Q.  Would you have preferred that those gun
8  stores not exist around Chicago?
9  MS. HIRSCH:  I'm going to just object to the --
10  to the extent that you're asking her like for her
11  personal opinion.  I don't know if you're asking
12  based on, you know, her professional experience,
13  but preferred --
14  BY MR. PATTERSON:
15   Q.  Yes, based on your professional
16  experience.
17   A.  I think actually what I would prefer is to
18  have a more responsible industry.
19   Q.  Okay.
20   A.  I think what anyone who, I think, works in
21  public safety, anyone who sees so many people be
22  killed and murdered with an instrument that should
23  be more difficult to obtain, you know, would want
24  an industry to be much more responsible about what
                                                    16

1  you just said, how this advanced public health,
2  safety and welfare, the ban on sales, is that other
3  jurisdictions allow the sale of firearms, and they
4  have basically a problem with an illegal firearm
5  market or people who are not supposed to possess
6  firearms?
7      A.  No, that's not what I said.
8      Q.  Okay.
9      A.  That's not what I said.  What I said is is
10  that if you look at some of the stores surrounding
11  Chicago currently, and you look at and you trace
12  back that gun that allegedly was sold to some law
13  abiding citizen, to use your term, ends up as a gun
14  that is used in a murder or is used in an
15  aggravated battery, an attempt murder in the City
16  of Chicago, you can trace back those guns to like
17  chock chucks (phonetic).
18      Q.  Yeah.
19      A.  To chuck gun shops.
20      Q.  Right.
21      A.  And I believe that the police department
22  has the data in terms of where these guns, or the
23  ATF.  At some point in time when I was involved in
24  the gun litigation, I know that that kind of data

85

1  was out there.
2      Q.  Okay.  Okay.  So I guess my question then
3  is:  How does Chicago banning sales of guns in the
4  city enhance public health, safety and welfare?
5      A.  You don't need any more guns.  I mean --
6      Q.  Do you have evidence that there would be
7  more guns if Chicago allowed the sale of guns in
8  the city?
9      A.  What I would say is common sense will tell
10  you if you're -- if people are selling guns,
11  someone is buying them.
12      Q.  Right.  But -- but there are gun stores
13  outside the City of Chicago currently, correct?
14      A.  Correct.
15      Q.  And quite nearby the City of Chicago,
16  correct?
17      A.  Correct.
18      Q.  So do you have any evidence that banning
19  sales on guns in Chicago reduces the number of guns
20  in Chicago?
21      A.  I would just say that, you know, banning
22  the sales of guns protects the public,
23  safety and welfare.
24      Q.  Right.  And is it -- is the way that it

86

1  does that by reducing in your -- you know, in your
2  view, reducing the number of guns in the city?
3      A.  It would reduce the number of guns in the
4  city.
5      Q.  And is that why it would advance public
6  health, safety and welfare?
7      A.  That's not the only reason.  But I would
8  just say that it would definitely -- it is for the
9  public health, safety and welfare.
10      Q.  Okay.  Right.  Other than reducing the
11  number of guns in the city, how else would it
12  promote public health, safety and welfare?
13      A.  I -- I mean, I have my own personal views.
14  I don't think that this is what it's about so -- I
15  mean, what this case is about so -- or your
16  questions, so I would be speculating.
17      Q.  I'm saying you've been produced as someone
18  that has information about governmental purposes
19  for these provisions.  And I'm just asking you
20  about that.
21          So if you don't know, that's fine.  You
22  can tell me you don't know.  But if you do know or
23  if you have views on it, I would like to know them.
24      A.  I don't know.

87

1      Q.  You don't know.  Okay.  Do you have any
2  empirical evidence that banning sales on firearms
3  in the city enhances the public health, safety and
4  welfare?
5      A.  You mean data?
6      Q.  Empirical evidence in the form of data,
7  studies, anything of that sort?
8      A.  No.  No, I don't.
9      Q.  Do you have any anecdotal evidence that
10  banning sales in the city -- and anecdotal is a
11  term that you've used.
12      A.  No.
13      Q.  Okay.  Other than promoting public health,
14  safety and welfare, are there any other policy
15  interests advanced by banning sales of firearms in
16  the city?
17      A.  Not that I recall at this time.
18      Q.  Okay.  And another code provision is
19  that -- obviously you know of is that firearms
20  ranges are banned in the city; is that correct?
21          Are you aware that the city bans the
22  operation of firearms ranges?
23      A.  Yes, yes, yes, yes.  I'm sorry.
24      Q.  Okay.  And what policy interest does that

88

22 (Pages 85 to 88)

1  ban on firearms ranges serve?
2      A.  Public health, safety and welfare.
3      Q.  And how does that ban on firearms ranges
4  serve public health, safety and welfare?
5      A.  From -- one, I would think it would be
6  the -- any environmental concerns.
7      Q.  Okay.
8      A.  Two, it would be -- you know, again I
9  mean, guns and the potential -- and the potential
10  of violence or the potential harm that can come
11  with guns.
12      Q.  Right.
13      A.  And having people, you know, coming in and
14  out, and people -- you know, if -- you know,
15  potentially people can know that there's a gun
16  range, know that people are coming there, do things
17  to try to get their arms, get their guns.  So, you
18  know, to steal their guns, all those things.
19          So I think that the potential that is
20  there is a great thing.  And part of what we do is
21  to not just look at and wait until something
22  happens.  But look at the potential and try to have
23  legislative schemes that would protect the public
24  health, safety and welfare.

89

1      Q.  Okay.  And one -- one of the things you
2  mentioned was environmental concerns.
3          Do you have any evidence that firearms
4  ranges cause environmental concerns?
5      A.  No, except for what I recent -- you know,
6  have read.  In terms of just the lead and making
7  sure that there's proper ventilation, so that the
8  people who are there using it or the people who are
9  there working, that there's the proper disposal of
10  the lead because you can't throw the lead in the
11  ground.
12          It seeps into the earth.  If you throw the
13  lead in water -- I mean, there's just -- lead is
14  not necessarily a very, you know, good thing to
15  just dispose of.  So that to me would be the
16  incremental.
17      Q.  Okay.  And do you know if -- of any
18  environmental problems that have been caused by the
19  operation of a firearms range?
20      A.  Recently I did learn that at -- that there
21  was a -- I think it was near Belmont Harbor.  There
22  was a gun, a shooting range or something.
23          And there was -- I believe that the
24  Illinois EPA brought a action against, I believe,

90

1  the Chicago Park District because they were --
2  the -- the -- the range or whoever was doing it,
3  was dumping the lead into the water.  And it was --
4  it caused, you know, obviously pollution.  And so
5  yes, that's something that I do know of.
6      Q.  And is that -- is that within the City of
7  Chicago?
8      A.  That was in the Chicago Park District,
9  which the Chicago Park District is in the City of
10  Chicago.
11      Q.  Okay.  And what sort of firearms range was
12  it that was operating there?
13      A.  I don't know if it was a range or if it
14  was like a shooting club or, you know, like skeet
15  shooting or something like that.
16      Q.  Okay.  Okay.  Do you know if that was
17  legally operating there?
18      A.  I don't know.
19      Q.  Okay.  Other than that instance, are there
20  any other instances that you know of where firearms
21  range has lead to environmental problems?
22      A.  No.
23      Q.  Okay.  Earlier I believe you testified
24  that requiring citizens to take a firearms training

91

1  course before possessing a firearm advances public
2  health, safety and welfare; is that correct?
3      A.  Yes.
4      Q.  If that's the case, then how does banning
5  firearms ranges, taking those things together, how
6  does taking those two things together advance the
7  public health, safety and welfare, requiring
8  firearm training and banning firearms ranges?
9      A.  The issue isn't that you're banning it.
10  It is do they have access.  I mean, look at --
11  there's plenty of firing ranges in and around the
12  metropolitan area where people can go and get that
13  training.
14          I mean, you know, if your -- if -- it's
15  not -- I mean, it -- people definitely have access.
16  If you had maybe -- if you had a situation where
17  in -- in all of the United States of America in
18  every municipality, there was no gun range at all,
19  that people have no access to a place to get
20  trained.
21          And you pass this ordinance, and so in
22  essence, you know, they can't have it.  But that's
23  not the case.  I mean, there are plenty of firearm
24  ranges well within --

92

23 (Pages 89 to 92)

1    cook. And the people then sell their, you know,
2    goods.
3        Q. Yes.
4        A. And some people are short term. Some
5    people are long term. And our fees were always all
6    the same. The license was just a retail food
7    license.
8        And then what would happen is is that all
9    the different triggers for retail food. So that it
10   appeared for some people that it was a barrier in
11   the way for them to get their business going, and
12   particularly at a time when someone is just trying
13   to figure out whether or not the food business is
14   what they want to be in.
15       Q. Yeah.
16       A. So what I do is I talk to people in the
17   industry, bring them in, find out, you know, look
18   at what it is that they're doing, talk to the
19   various departments that would be involved, bring
20   them all together, zoning, health, whatever, bring
21   people in. And then I try to work out with the
22   industry a -- sort of a licensing scheme that makes
23   sense, something that balances our regulatory
24   requirements or -- or public health safety or
                                                      97

1    whatever it is.
2        And, you know, make it make sense so it's
3    not burdensome. And so we sit, we have
4    conversations. For example, on this one, actually
5    it took us about a year, if not a little bit more,
6    to work out. So we start drafting. We share
7    drafts. I send drafts of the ordinance and get the
8    industry to respond.
9        And then talk -- talk maybe even with some
10   legislators who are maybe interested, or maybe
11   they're the ones who are coming forward. Talk with
12   the departments, make sure that we're not -- you
13   know, the ones that are impacted, that they can in
14   fact operationally handle what it is that is being
15   proposed.
16       Because if something is overburdensome to,
17   you know, operations, there's just something that
18   cannot be done.
19       Q. Yeah.
20       A. So discussions back and forth. And then
21   once I have a piece of legislation that I think is
22   ready for introduction, then I, you know, prepare
23   it and request that it be introduced.
24       Q. Okay. And then does one of the -- the
                                                      98

1    City Council members have to introduce it or --
2        A. No.
3        Q. Okay.
4        A. There are different kinds. There's -- we
5    call them administration pieces, or there are
6    pieces that we introduce ourselves, and then there
7    are pieces that legislators introduce.
8        Q. Okay. But the legislators are responsible
9    for enacting them, is that --
10       A. That's right.
11       Q. Okay.
12       A. So then there's a hearing. The way
13   it works is then there's a hearing on the
14   ordinance. And people who are for and against the
15   ordinance proposal come in and they testify before
16   the committee, whatever committee it's in. Whether
17   it's -- well, I do -- deal a lot with licensing,
18   but I deal with other ones.
19       But the licensing committee, there's
20   testimony. And then the -- if the committee
21   members are satisfied that they've heard all they
22   need to hear, then they take a vote that day. If
23   they feel that there's other information that's
24   needed, then they will continue it for another day
                                                      99

1    for further hearing. And then they vote whether to
2    pass it or not to pass it.
3        Q. Okay. Have you made any --
4        A. And then it goes to City Council for
5    approval
6        Q. Right. Sorry.
7        A. Sorry.
8        Q. Yeah. That's fine. I mean, have you made
9    any recommendations on amendments to the licensing
10   code regarding firearms?
11       A. In my whole career?
12       Q. Sure. Yes.
13       MS. HIRSCH: You know, I'm going to object just
14   to the extent if we're getting into the legislative
15   process for this, you know, ordinance, that's off
16   limits so --
17       MR. PATTERSON: Yes. I don't think it's off
18   limits to ask her what recommendation she's made in
19   her capacity as Commissioner so...
20       MS. HIRSCH: To the extent that it has to do
21   with this ordinance, I think Judge Chang has ruled
22   on that. But we can answer that.
23   BY MR. PATTERSON:
24       Q. Just in your -- not in your whole career,
                                                      100

25 (Pages 97 to 100)

1  but in your capacity as commissioner, have you made
2  any recommendations regarding license -- any
3  licensing recommendations regarding firearms?
4      A.  Yes.
5      Q.  And what would those be?
6      A.  Well, I -- one of my recommendations was
7  that we not sell handguns in the city or, you know,
8  firearms in the city.
9      MS. HIRSCH:  I'm going to state again that I'm
10  going to instruct the witness not to answer if it
11  comes to this piece of -- this ordinance.  You
12  know, the record is what it is.  And that's been
13  ruled on.  So I would instruct you not to answer
14  when it comes to this ordinance.
15      THE WITNESS:  Okay.
16  BY MR. PATTERSON:
17      Q.  Are there any recommendations you've made
18  other than this ordinance that regard firearms?
19      A.  Yes.
20      Q.  And what are those?
21      A.  I've made recommendations for state
22  legislation.
23      Q.  Okay.  And that is in your capacity as
24  commissioner --
                                                    101

1      A.  Oh, I'm sorry.
2      Q.  Yes.
3      A.  No.
4      Q.  No?  Okay.
5      MR. PATTERSON:  Okay.  I want to introduce the
6  next exhibit.
7              (Whereupon, REYES Deposition
8              Exhibit No. 3 was marked for
9              identification.)
10  BY MR. PATTERSON:
11      Q.  And what I've marked as Reyes Exhibit
12  No. 3, or what the court reporter has marked, is a
13  provision of the Chicago Municipal Code 4-4-020.
14          And are you familiar with this provision
15  of Chicago's code?  And you can take your time to
16  review it.
17      A.  Okay.
18      Q.  And this has to do with limited business
19  licenses.  After reviewing this provision, is it
20  your understanding that there -- the code does not
21  set forth any limitations on the types of
22  businesses, any specific limitations on the type of
23  businesses that can operate under a limited
24  business license; is that correct?
                                                    102

1      A.  Repeat your question to me.
2      Q.  Yeah.  Is it your understanding that the
3  municipal code does not contain any specific
4  limitations on the types of businesses that can
5  operate pursuant to a limited business license?
6      A.  I don't really think I understand your
7  question.
8      Q.  Okay.  Well, let me just read the first
9  sentence of this provision.
10          It says:  All persons who conduct, engage
11  in, maintain, operate, carry on or manage a
12  business or occupation for which a license is not
13  required under any other provision of this code,
14  other than those businesses or occupations which
15  are exempt from city licensing pursuant to law,
16  shall be required to register with the department
17  of business affairs and consumer protection of the
18  city and obtain a limited business license for such
19  business or occupation.
20      A.  Okay.
21      Q.  So is it your understanding that pursuant
22  to this provision, someone who -- whose business
23  does not fall under one of the 70 odd categories
24  that we talked about before, nevertheless
                                                    103

1  potentially obtained a limited business license to
2  carry on that business?
3      A.  That's not really how I understand this
4  provision.
5      Q.  Okay.  How do you understand this
6  provision?
7      A.  I understand this provision to read that
8  if the code does not require a license, then we can
9  require them still to get a limited business
10  license to register with the city.
11      Q.  Okay.  And who does the code require to
12  get a license?
13      A.  Well, the way I read this is if the code
14  had a section that said if you're conducting X, Y
15  and Z.
16      Q.  Uh-huh.
17      A.  You're not required to get a business
18  license.
19      Q.  Right.
20      A.  And so -- so there are -- you know, I
21  don't know all the -- I mean, the code is big.
22      Q.  Okay.
23      A.  So I don't know every single provision in
24  the code.  But the way I read this is that if the
                                                    104

1 people and industries are looking at us to work
2 with them on, because we have a lot of revocation
3 cases, because, you know, we don't have, you know,
4 unlimited staff. And then, you know, there's --
5    Q. Okay. And you don't know if the city
6 waited until after the final judgment in the
7 McDonnell case before beginning to plan a follow on
8 firearms ordinance, do you?
9    A. I don't know.
10    Q. Okay. In your view is your department
11 effective in enforcing the provisions of the
12 licensing code?
13    A. Are we effective?
14    Q. Yes.
15    A. In my view, we are effective in some.
16    Q. Okay.
17    A. I think that the area where it is the most
18 difficult are the areas that actually end up
19 causing the most issues. And that would be, you
20 know, liquor and public places of amusement. It
21 would be -- I mean, if we were the -- if it was
22 absolutely, you know, my decision, it would be
23 really effective.
24    Q. Okay.

129

1    A. But thank God we're here where we have due
2 process.
3    Q. Yeah.
4    A. And so sometimes that process that's due
5 takes a very long time.
6    MR. PATTERSON: Okay. That's all that I have.
7    MS. HIRSCH: We'll reserve signature.
8       (FURTHER DEPONENT SAITH NOT.)
9    (Proceedings concluded at 2:57 p.m.)
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24

130

1      IN THE UNITED STATES DISTRICT COURT
2        NORTHERN DISTRICT OF ILLINOIS
3             EASTERN DIVISION
4 ILLINOIS ASSOCIATION OF   )
5 FIREARMS RETAILERS,      )
6 et al.,                  )
7       Plaintiffs,   )
8    vs.          ) No. 10 CV 04184
9 THE CITY OF CHICAGO and   )
10 RICHARD M. DALEY, Mayor   )
11 of the City of Chicago,   )
12       Defendants.   )
13    I, NORMA I. REYES, being first duly sworn,
14 on oath say that I am the deponent in the aforesaid
15 deposition taken on the 28th day of April, 2011;
16 that I have read the foregoing transcript of my
17 deposition, consisting of pages 1 through 130
18 inclusive, and affix my signature to same.
19    _____
20          NORMA I. REYES
21 Subscribed and sworn to
   before me this      day
22 of          , 2011
23
24 Notary Public

131

1 STATE OF ILLINOIS  )
2             )  SS:
3 COUNTY OF C O O K  )
4    I, JENNIE MODI, a notary public within and
5 for the County of Cook County and State of
6 Illinois, do hereby certify that heretofore,
7 to-wit, the 28th day of April, 2011, personally
8 appeared before me, at 33 North Dearborn Street,
9 Suite 300, Chicago, Illinois, NORMA I. REYES, in a
10 cause now pending and undetermined in the Circuit
11 Court of Cook County, Illinois, wherein ILLINOIS
12 ASSOCIATION OF FIREARMS RETAILERS, et al., are the
13 Plaintiffs, and THE CITY OF CHICAGO, et al., are
14 the Defendants.
15    I further certify that the said NORMA I.
16 REYES was first duly sworn to testify the truth,
17 the whole truth and nothing but the truth in the
18 cause aforesaid; that the testimony then given by
19 said witness was reported stenographically by me in
20 the presence of the said witness, and afterwards
21 reduced to typewriting by Computer-Aided
22 Transcription, and the foregoing is a true and
23 correct transcript of the testimony so given by
24 said witness as aforesaid.

132

33 (Pages 129 to 132)

```
 1        I further certify that the signature to
 2   the foregoing deposition was reserved by counsel
 3   for the respective parties.
 4        I further certify that the taking of this
 5   deposition was pursuant to notice and that there
 6   were present at the deposition the attorneys
 7   hereinbefore mentioned.
 8        I further certify that I am not counsel
 9   for nor in any way related to the parties to this
10   suit, nor am I in any way interested in the outcome
11   thereof.
12        IN TESTIMONY WHEREOF:  I have hereunto set
13   my hand and affixed my notarial seal this 12th day
14   of May, 2011.
15
16
17
18
19   _____
20   NOTARY PUBLIC, Cook County, ILLINOIS
21   LIC. NO. 084-004497.
22
23
24
                                              133
```

McCorkle Court Reporters, Inc.
200 N. LaSalle Street Suite 300
Chicago, Illinois 60601-1014

May 12, 2011
MS. REBECCA HIRSCH
ASSISTANT CORPORATION COUNSEL
DEPARTMENT OF LAW
30 North LaSalle Street, Suite 1230
Chicago, Illinois  60602

IN RE: ILAFR v. The City of Chicago
COURT NUMBER: 10-CV-04184
DATE TAKEN: April 21, 2011
DEPONENT: Norma I. Reyes
Dear Ms. Hirsch:
Enclosed is the deposition transcript for the
aforementioned deponent in the above-entitled
cause.  Also enclosed are additional signature
pages, if applicable, and errata sheets.

Per your agreement to secure signature, please
submit the transcript to the deponent for review
and signature.  All changes or corrections must be
made on the errata sheets, not on the transcript
itself.  All errata sheets should be signed and all
signature pages need to be signed and notarized.
After the deponent has completed the above, please
return all signature pages and errata sheets to me
at the above address, and I will handle
distribution to the respective parties.

If you have any questions, please call me at the
phone number below.

Sincerely,
Margaret Setina          JENNIE MODI
Signature Department       Court Reporter
                    (312)263-0052
cc:  ALL COUNSEL OF RECORD
                                              134

34  (Pages 133 to 134)

# EXHIBIT 29

Journal of Urban Health: Bulletin of the New York Academy of Medicine
© 2002 The New York Academy of Medicine

Vol. 79, No. 1, March 2002

# How Delinquent Youths Acquire Guns: Initial Versus Most Recent Gun Acquisitions

Daniel W. Webster, Lorraine H. Freed, Shannon Frattaroli, and Modena H. Wilson

**ABSTRACT** *Background. Access to firearms among delinquent youths poses significant risks to community safety. The purpose of the study was to describe how a group of criminally involved youths obtained guns.*

*Methods. Youths were randomly selected from a juvenile justice facility to participate in a semistructured, anonymous interview. Transcripts were coded and analyzed with the aid of textual analysis software.*

*Results. Of the 45 participants, 30 had acquired at least 1 gun prior to their most recent incarceration, and 22 had acquired multiple guns. About half of the first gun acquisitions were gifts or finds. The first guns youths acquired were usually obtained from friends or family. The most recent acquisitions were often new, high-caliber guns, and they came from acquaintances or drug addicts. New guns often came from high-volume traffickers. Gun acquisitions from strangers or through "straw purchases" were rare. Though few obtained guns directly through theft, some youths believed their supplier had stolen guns. Youths rarely left their community to obtain a gun.*

*Conclusions. Guns were readily available to this sample of criminally involved youths through their social networks. Efforts to curtail high-volume, illegal gun traffickers and to recover discarded guns from areas in which illicit drug sales take place could potentially reduce gun availability to high-risk youth.*

## INTRODUCTION

Firearm mortality rates among males aged 15–24 years are eight times higher in the United States than in other high-income countries.[1] In the United States, young males also have the highest rates of homicide offending among age-gender subgroups,[2] and about three quarters of all homicides involving male offenders less than 25 years of age are committed with firearms.[3]

There is some evidence that the higher rate of gun homicide among youths in the United States is partly attributable to greater accessibility of guns.[4] Although youth gun carrying appears to have declined recently, 1 in 10 male high school students in 1997 reported having carried a gun during the past 30 days.[5] The preva-

Drs. Webster and Frattaroli are with the Center for Gun Policy and Research, Johns Hopkins University Bloomberg School of Public Health, Baltimore, Maryland; Drs. Freed and Wilson were formerly with the Department of Pediatrics, Johns Hopkins University School of Medicine, Baltimore, Maryland; Dr. Freed is currently with the Division of Adolescent/Young Adult Medicine, Children's Hospital, Boston, Massachusetts; Dr. Wilson is currently with the American Academy of Pediatrics, Elk Grove Village, Illinois.

Correspondence and reprints: Daniel W. Webster, ScD, MPH, Center for Gun Policy and Research, Johns Hopkins University, 624 North Broadway, Room 593, Baltimore, MD 21205-1996. (E-mail: dwebster@jhsph.edu)

lence of gun carrying is much higher in selected samples of incarcerated youth,[6–9] and was as high as 84% in the largest study of incarcerated youths.[9]

For many years, it was commonly assumed that little could be done about delinquent youths' access to firearms. But, there are recent, apparently successful, examples of law enforcement agencies using data from traces of recovered crime guns to strategically combat gun trafficking to youth.[10,11]

While gun tracing data provide some insight into the illicit gun market, tracing data are limited in their ability to describe how crime-involved youths obtain guns because traces typically end with the first retail purchase from a licensed gun dealer. Confidential, anonymous surveys of criminally involved youths provide perhaps the most complete source of information about how high-risk youths obtain guns. The largest previous study of this type used data from self-administered surveys in seven juvenile detention facilities and found that purchases were the most common means by which youths acquired their most recent handgun, followed by an "other" category and theft.[6] Friends were the most common source of guns obtained by incarcerated youths. "Street sources" and "drug-related sources" were the next most common sources; however, the relationship between the youths and these sources was unclear.

Previous research did not answer important questions about the sources of guns for high-risk youths, such as whether the source sold a lot of guns and how youths view different potential sources of guns. Many delinquent youths acquire multiple guns over the course of their adolescent years. However, with one exception,[7] previous studies only considered the most recently acquired firearm and ignored the important initial acquisition.

In our recent study, we examined factors that criminally involved youths reported prevented or postponed their acquisition and carrying of guns.[12] The current study used data from this same project to examine how criminally involved youths acquired guns and addressed the gaps in current research described above.

## METHODS

### Study Population

Youths were randomly selected from a residential juvenile justice facility for males in Maryland. Residents of the facility were enrolled in one of two programs: a short-stay program for youths who, for the most part, have not previously been incarcerated and a program for the most serious offenders in the Maryland juvenile justice system. To be eligible for the study, youths had to be 14 to 18 years of age, available at the time of interview, and able to provide informed assent/consent.

### Study Procedures

Youths selected for recruitment were told that their participation was voluntary, that their responses would be kept confidential and anonymous, and that their treatment at the facility would be unaffected by their decision about whether or not to participate. The researchers did not have access to the subjects' names at any point in the study.

In-depth, semistructured interviews were conducted from January to May 1998. Each interview involved one interviewer (L.F.), a note taker, and a youth respondent. The interviews were not audiotaped to maintain the anonymity of participants. The note taker transcribed the interview notes, usually within 24 hours

of the interview. The transcripts were then promptly proofread for accuracy and then coded using NUD*IST, a qualitative software package used for managing and analyzing textual data.[13]

### Instrument

The interview guide consisted of mostly open-ended questions about experiences and attitudes about guns. The items of particular interest for this study included questions about the source and manner of acquisition for the respondent's first gun and most recent gun and the characteristics of those guns. Questions were also asked about respondents' age, race, place of residence, and involvement in delinquent activities, such as drug dealing, exposure to violence, and weapon use. Given the qualitative nature of this study, the wording and order of the questions varied slightly as the interviews proceeded. As a result, not all questions were asked of each youth.

### Analysis

Two researchers read through the transcripts and independently assigned codes to each separate idea. Interrater differences were discussed and resolved. Portions of the text that contained the same codes were examined together, which aided the identification of recurrent themes. Analyses focused on responses that interviewees clearly indicated were based on actual experiences and excluded discussion of hypothetical situations.

### RESULTS

### Participant Characteristics

Of the 46 eligible youths who were selected, 45 agreed to participate in the study. Of these, 25 were from the short-term program, and 20 were from the longer-term program. Participant ages ranged from 14 to 18 years, with a mean of 16.2 years. Two thirds (30/45) of the respondents were black, 22% (10/45) were white, and 11% (5/45) were either of mixed or another race. These proportions are roughly representative of the racial distribution of the facility's residents. Of the respondents, 61% (27/44) lived in a large city prior to their incarceration. There were 43% (18/42) who reported using a gun to threaten or shoot at someone, and two thirds (30/44) had been threatened or harmed by a weapon.

Two thirds (30/45) of the respondents had acquired at least one firearm prior to their most recent incarceration, and nearly half (21/45) had acquired multiple guns (Table 1). (One respondent reported that his parents gave him a shotgun, but he returned it after firing it once. This respondent was excluded from subsequent analyses of youths who had acquired guns because his experience with guns was different from that of other youths.) Of those who had ever owned a gun, the average number of guns ever owned was 3.1, and one youth reported having owned 11 guns.

### Initial Gun Acquisition

The mean age of initial gun acquisition was 13.7 years and ranged from 11 to 16 years. Respondents usually acquired their first gun in one of three ways: purchases, gifts, and by finding them (Table 1). The most common manner of respondents' initial gun acquisition was a cash purchase or a trade for drugs (45%, 13/29). Only one youth reported that he stole his first gun.

TABLE 1.   Means of acquisition for initial and most recent guns by criminally involved youths

| Means of acquisition | Initial gun acquisition | | Most recent gun acquisition (n = 21) |
|---|---|---|---|
| | Total sample (n = 29) | Those with multiple acquisitions (n = 21) | |
| Means of acquisition | | | |
| Purchase or trade | 13 (45%) | 8 (38%) | 18 (86%) |
| Found | 7 (24%) | 5 (24%) | 1 (5%) |
| Gift | 8 (28%) | 8 (38%) | 1 (5%) |
| Stole | 1 (3%) | 0 (0%) | 1 (5%) |
| Youth's search for guns | | | |
| Passive | 14 (48%) | 10 (48%) | 7 (33%) |
| Probably passive | 2 (7%) | 2 (10%) | 1 (5%) |
| Mutual | 1 (3%) | 1 (5%) | 4 (19%) |
| Active | 9 (31%) | 5 (24%) | 7 (33%) |
| Question not asked | 3 (10%) | 3 (14%) | 2 (10%) |

In about half (14/29) of first gun acquisitions, the youth indicated that he was not in search of a gun when one came into his possession, and only 31% (9/29) clearly indicated that they were actively seeking a gun at the time (Table 1). In the remaining cases, the degree to which the youth was actively seeking a gun or passively accepted a gun was unclear, or the question was not asked. These passive gun acquisitions by youths were gifts or instances in which the gun was found. Youths reported finding guns in alleys, in parks, and behind liquor stores. As one youth recounted, "I found it [a revolver] in a park. It's this park where they're always finding bodies, guns. Someone gets chased in there by the police, so they dump the gun."

When youths were given their first gun, the gun usually came from a close family member or a friend who thought the youth needed it for protection. The following quotation describes how one respondent acquired his first gun:

> I got it [first gun] from my cousin. My cousin, he sells guns and he sells drugs on the side. I told him, "I got robbed." He was like, "Did you get 'em?" "No. I didn't have no gun or nothin." "I told you, you should've got a gun." He took me back inside the alley. He had a stash [of] about 15–20 guns and said, "Which ones you want?"

Although youths who were given their first gun reported that they did not seek out the guns that came into their possession, some indicated that they had contemplated getting a gun before their serendipitous acquisition. As one youth responded when asked whether he was looking for a gun when he first acquired one, "No. I just said if one comes across, I get it. I just liked it."

When a youth's first gun was purchased, friends and acquaintances were typically the source. Only two youths said they bought their first gun from a drug addict, and no respondent reported buying his first gun from a total stranger (Table 2).

Licensed gun dealers were not the most proximal source for any of the first gun acquisitions, nor did any of the first gun acquisitions involve a "straw purchase," in

**TABLE 2.**   Sources of guns youths received through purchases, trades, and gifts

| | Initial gun acquisition | | Most recent gun acquisition (n = 19) |
|---|---|---|---|
| | Total sample (n = 21) | Those with multiple acquisitions (n = 16) | |
| **From whom gun was acquired** | | | |
| Family | 4 (19%) | 4 (25%) | 0 |
| Friend | 7 (33%) | 6 (38%) | 6 (32%) |
| Acquaintance | 5 (24%) | 1 (6%) | 5 (26%) |
| Friend of friend or of family | 3 (14%) | 3 (19%) | 2 (11%) |
| Drug addict | 2 (10%) | 2 (13%) | 5 (26%) |
| Stranger | 0 | 0 | 1 (5%) |
| **Supplier sold a lot of guns** | | | |
| Yes | 6 (29%) | 5 (31%) | 5 (26%) |
| Probably | 3 (14%) | 2 (13%) | 3 (16%) |
| Probably not | 3 (14%) | 2 (13%) | 2 (11%) |
| No | 3 (14%) | 2 (13%) | 1 (5%) |
| Not asked/refused | 6 (29%) | 5 (31%) | 8 (42%) |

which a person proscribed from legally buying guns enlists an eligible buyer to purchase a gun for him. Nevertheless, many of the sources apparently had access to a large supply of guns. Of the respondents who bought or were given their first gun, 43% (9/21) reported that their gun source sold a lot of guns (Table 2).

Most of the first guns acquired by respondents fired low- or medium-caliber ammunition and were thought to be used guns (Table 3). Of those who purchased their first gun and reported the price paid, more than half (7/12) paid less than $100. Considering that more than half of all the first guns were found by the youth or were gifts, only 17% (5/29) of all initial gun acquisitions involved a youth paying more than $100 for a gun (data not shown).

**TABLE 3.**   Characteristics of guns acquired by criminally involved youths

| | Initial gun acquisition | | Most recent gun acquisition (n = 21) |
|---|---|---|---|
| | Total sample (n = 30)* | Those with multiple acquisitions (n = 22)* | |
| **Type of gun acquired** | | | |
| Small-caliber handgun (.22, .25, .32) | 13 (43%) | 10 (45%) | 1 (5%) |
| Medium-caliber handgun (.38, .380) | 12 (40%) | 9 (41%) | 10 (48%) |
| Large-caliber handgun (.357 magnum, 9 mm, .45) | 4 (13%) | 2 (9%) | 7 (33%) |
| Shotgun | 1 (3%) | 1 (5%) | 3 (14%) |
| **New versus used gun** | | | |
| New/probably new | 7 (23%) | 7 (32%) | 12 (57%) |
| Used/probably used | 16 (53%) | 11 (50%) | 7 (33%) |
| Not asked | 7 (23%) | 4 (18%) | 2 (10%) |

*One respondent acquired two guns at his first acquisition.

**Most Recent Gun Acquisition**

Used, small-caliber handguns that cost little or no money were generally acceptable to youths who had previously not owned a gun. But, many gun-involved youths eventually became more selective and sought new medium- and high-caliber, high-capacity semiautomatic pistols for their most recent acquisitions. Among youths who had acquired more than one gun (n = 22), only 1 of the most recently obtained firearms was a low-caliber gun compared with 10 of the first guns. A third (7/21) of the most recently acquired guns were high-caliber handguns compared with just 9% (2/22) of first guns (Table 3).

Respondents believed the gun they acquired was new in 57% (12/21) of the most recent acquisitions, in contrast with 32% (7/22) of the first acquisitions. The preference for new guns was reflected in the higher street prices paid for new guns compared with used guns. As one youth explained when discussing his purchase of a 9-mm Ruger pistol from someone who sold lots of guns, "It was fresh out of the box. On the corner that would sell for about $100 if fired, but since it was fresh out of the box, it would be $200 to $300." As a result of the shift to new, high-caliber guns, 38% (8/21) of the most recent gun acquisitions involved purchases in excess of $200, compared with only 7% (2/29) of the initial gun acquisitions (data not shown).

New guns tended to be sold by individuals who the youth believed to be a gun trafficker, that is, someone who sells a lot of guns. Some youths sought out gun traffickers for their most recent guns if they were looking for a particular type of gun. A youth who was looking for a Ruger semiautomatic pistol that "looked like Robocop's gun" explained, "Some people have got connections. You can order them [guns]."

Consistent with the increased selectivity of youths in their most recent gun acquisitions, these recent acquisitions were less likely than the initial acquisitions to be gifts or finds (2/21 vs. 12/21), and were more likely to involve gun-seeking behavior on the part of the youth (11/21 vs. 6/21). Youths seeking guns were usually able to obtain guns directly from sources in or near the communities in which they lived. In only a few instances did youths report going out of state or purchasing from a source who went out of state to get a gun. One youth reported that his friend buys guns in another state to decrease the likelihood that Maryland authorities can trace the gun to him. Another youth reported driving to another state to obtain an assault pistol that was banned for sale in Maryland.

**Other Findings**

Some youths reported paying amounts that were likely to be well below retail for what they believed to be new guns. Drug addicts were often the source of discounted guns, and some youths talked about bargaining with drug addicts to obtain a significant discount. One youth said he paid a junkie $20 for an apparently new and powerful .45-caliber handgun. Another said he had paid a drug addict $30 for a new .25-caliber handgun. In these and other transactions with drug addicts, the youths reported that the addicts approached them with enticing guns at very low prices rather than the youths seeking out the addicts.

In contrast, guns acquired from individuals who youths believed sold a lot of guns were likely to sell the guns at much higher prices ($250 to $900). Many youths were willing to pay higher prices because these illegal gun traffickers could usually provide the new, high-powered guns that were in high demand.

Although straw purchases are believed to be a common manner by which juve-

niles and criminals obtain guns, only 3 of the more than 50 gun acquisitions described by respondents in the study involved the juvenile instigating a straw purchase from a licensed gun dealer.

Although theft was rarely a direct means of acquisition for the first gun or the most recently acquired gun, several youths described incidents in which guns were stolen in street robberies, home burglaries, and thefts from cars. In addition, some youths mentioned that their gun source had acquired guns through theft. Two youths mentioned a source who had reputedly stolen large quantities of guns and was trafficking the stolen guns.

## DISCUSSION

Consistent with previous research,[6–10] we found firearms were readily accessible, although not always instantaneously, among the crime-involved youths in our study. Of every 10 respondents, 7 had possessed a gun at one time, and half had owned multiple guns.

The youths in our study typically obtained their guns from people they knew, either directly or indirectly through a mutual friend. Some youths reported that they would only buy or borrow a gun from a small circle of trusted friends and family members.[12] As more law enforcement agencies begin to question youths arrested on gun charges about where they obtained their guns,[11] this research serves as a potential reality check. If our data are reasonably generalizable, police should be suspicious of claims that a youth acquired a gun from a total stranger.

Some youths reportedly paid as little as $20 for their first gun, and most paid less than $100. In their study of incarcerated youth, Sheley and Wright[6] also found street prices for handguns to be low relative to retail prices. Based on these low prices and their finding that more than half of the delinquent youths had ever stolen a firearm, Sheley and Wright inferred that a large share of guns acquired by delinquent youths had previously been stolen. Yet, we found relatively low prices paid for many guns despite theft being a much less common method of direct gun acquisition in the sample of incarcerated youths we studied.

The low price paid for many of the youths' first guns may also reflect relatively low demand for low-caliber, used handguns. In discussing their most recent gun purchases, many youths indicated a strong preference for new, medium- and high-caliber, high-capacity pistols and were willing to pay significantly more and tolerate additional inconveniences (e.g., longer waits, more extensive search for suppliers) to obtain these guns. The most common reason respondents offered for their preference for new guns was to avoid the risk of having a gun that could be linked to other crimes.[12] New guns were also perceived to be less likely to jam than used guns, a factor that was very important to some youths.

This strong preference for new guns has important policy implications. First, new guns are much easier than older guns to trace to individuals potentially responsible for illegally selling guns to juveniles.[11] Furthermore, newer guns were often obtained from individuals who sold a lot of guns. While there is uncertainty about what youths perceived as "a lot of guns" and whether those perceptions are accurate, interdiction efforts that focus on the newest guns may be more likely to lead to sources that supply relatively large quantities of guns used in crime. After new guns are diverted to the illegal market, they can subsequently be transferred to juveniles and criminals multiple times via private transactions, theft, or finds and thus may be used in multiple shootings over time. Therefore, concentrating criminal

justice resources on the sources of crime guns that are relatively new may have a greater long-term impact on public safety due to the longer "life span" of new guns within the illicit market as compared with older guns.

Recent longitudinal research indicates that once an adolescent begins to carry a concealed handgun, this practice tends to persist throughout the high-risk period of adolescence and young adulthood.[14] Thus, preventing early acquisition of firearms among high-risk youths could decrease the rate of firearm violence perpetrated by youths throughout adolescence and young adulthood. We found that initial gun acquisitions differed from the most recent acquisitions in many respects. While the most recent gun acquisitions generally involved youths seeking new guns, about half of the initial gun acquisitions were passively accepted as gifts and finds. Some youths reported finding their first gun in or near drug markets. This is not surprising because individuals involved in illicit drug sales commonly have guns.[15] Youths often reported stashing their guns close to where they were selling drugs to avoid enhanced prison sentences for possessing a gun during the commission of a drug crime.[12] Therefore, police searches in and around open-air drug markets, or in other areas where suspects have been pursued by the police, may lead to many gun seizures from high-risk settings.

The qualitative nature of this study helped deepen our understanding of the sources and methods used by delinquent youths to acquire guns. However, the relatively small sample drawn from a single facility and the semistructured nature of the data collection limit the generalizability of the findings beyond the population studied. Police data on the types of guns recovered from youths in Baltimore,[16] however, are consistent with the types of guns reported in this sample. Our findings concerning the source and manner of gun acquisition, prices paid, and strong preferences for new, high-powered guns are generally consistent with previous research.[6–9]

While we believe the findings accurately reflect the experiences of the delinquent youths we interviewed, access to firearms among nondelinquent youths living in the same communities may be quite different.[6] Many youths in our study acquired guns through their contacts with others involved in illegal activities, and several stated that they would only buy a gun from someone they knew and trusted.[12] Nondelinquent youths who want a gun but are not part of such networks may not be able to obtain a gun as easily as did the criminally involved youths in our study.

Most research on adolescent gun acquisition is limited to the most proximate source of guns for youths. This can mask the importance of intermediaries who are key to the supply of guns to juveniles and criminals in the illegal gun market. While our study also has this limitation, we did gather data on whether the gun acquired was new or used and whether the direct supplier sold a lot of guns. As explained above, this new information is important for formulating gun policies and enforcement strategies. To more fully understand the workings of illicit gun markets that supply guns to youths, additional research is needed that traces guns from their initial retail sales through any intermediaries and ultimately to youth possession and crime involvement.

This study was conducted of youths in Maryland, a state with moderately high levels of regulations on gun sales, several of which were introduced less than 2 years prior to the period of data collection. Recent research indicates that states with the most restrictive gun sales laws have a much larger proportion of their crime guns that originate from out-of-state gun dealers than do states with less

restrictive laws.[17] Street prices for firearms in places with very restrictive gun sales laws are also higher than in places with weaker laws.[18] Thus, costs and difficulty of obtaining illegal guns may be significantly different in places with very strict gun sales laws, with interstate gun traffickers playing a more significant role. Further research is needed to determine whether restrictive gun laws and law enforcement initiatives to combat illegal gun trafficking successfully reduce gun availability to high-risk youth.

## ACKNOWLEDGEMENT

We would like to acknowledge the Maryland Department of Juvenile Justice for their assistance with this project. Dr. Webster's and Dr. Frattaroli's work on this project was supported by a grant from the Joyce Foundation to the Johns Hopkins Center for Gun Policy and Research. Dr. Freed's work was supported by grants from the Robert Wood Johnson Foundation and the Annie E. Casey Foundation.

## REFERENCES

1.  Krug EG, Powell KE, Dahlberg LL. Firearm-related deaths in the United States and 35 other high- and upper-middle-income countries. *Int J Epidemiol.* 1998;27:214–221.
2.  Bureau of Justice Statistics. *Homicide Trends in the US: Age, Gender, and Race Trends.* Washington, DC: US Dept of Justice; 2000. Available at: www.ojp.usdoj.gov/bjs/homicide/ageracesex.htm. Accessed July 1, 2001.
3.  Bureau of Justice Statistics. *Homicide Trends in the US: Weapons Used.* Washington, DC: US Dept of Justice; 2000. Available at: www.ojp.usdoj.gov/bjs/homicide/weapage.txt. Accessed July 1, 2001.
4.  Zimring FE, Hawkins G. *Crime Is Not the Problem.* London: Oxford University Press; 1997.
5.  Brewer ND, Simon TR, Krug EG, Lowry R. Recent trends in violence-related behaviors among high school students in the United States. *JAMA.* 1999;282:440–446.
6.  Sheley JF, Wright JD. *In the Line of Fire: Youth, Guns, and Violence in Urban America.* New York: Aldine de Gruyter; 1995.
7.  Ash P, Kellermann AL, Fuqua-Whitley D, Johnson A. Gun acquisition and use by juvenile offenders. *JAMA.* 1996;275:1754–1758.
8.  Calahan CM, Rivara FP, Farrow, JA. Youths in detention and handguns. *J Adolesc Health.* 1993;14:350–355.
9.  Smith D. Sources of firearm acquisition among a sample of inner-city youths: research results and policy implications. *J Criminal Justice.* 1996;24:361–367.
10. Kennedy DM, Piehl AM, Braga AA. Youth violence in Boston: gun markets, serious youth offenders, and a use-reduction strategy. *Law Contemp Probl.* 1996;59:147–196.
11. Office of Juvenile Justice and Delinquency Prevention. *Promising Strategies to Reduce Gun Violence.* Washington DC: US Dept of Justice; 1999.
12. Freed LR, Webster DW, Longwell JJ, Carrese J, Wilson MH. Factors preventing gun acquisition and carrying among incarcerated adolescent males. *Arch Pediatr Adolesc Med.* 2001;155:335–341.
13. Qualitative Solutions and Research Pty., Ltd. *QSR NUD*IST.* Thousand Oaks, CA: Sage; 1997.
14. Lizotte AJ, Krohn MD, Howell JC, Tobin K, Howard GJ. Factors influencing gun carrying among young urban males over the adolescent-young adult life course. *Criminology.* 2000;38:811–834.
15. Blumstien A. Youth violence, guns, and the illicit-drug industry. *J Criminal Law Criminol.* 1995; 86:10–36.

16. Bureau of Alcohol, Tobacco, and Firearms. *The Youth Crime Gun Interdiction Initiative: Crime Gun Trace Analysis Reports: The Illegal Youth Firearms Markets in 27 Communities*. Washington, DC: US Dept of the Treasury; February 1999.

17. Webster DW, Vernick JS, Hepburn LM. Relationship between licensing, registration, and other gun sales laws and the source state of crime guns. *Injury Prev*. 2001;7:184–189.

18. Cook PJ, Molliconi S, Cole TB. Regulating gun markets. *J Criminal Law Criminol*. 1995;86:59–92.

Reproduced with permission of the copyright owner. Further reproduction prohibited without permission.

# EXHIBIT 30

# THE MYTH OF BIG-TIME GUN TRAFFICKING AND THE OVERINTERPRETATION OF GUN TRACING DATA

Gary Kleck[*]

Shun-Yung Kevin Wang[**]

In recent years the gun control movement has increasingly shifted its efforts from lobbying for new gun-control legislation to facilitating lawsuits against the gun industry, especially those based on claims of negligent distribution of firearms. These lawsuits are based on the premise that organized gun trafficking, much of it involving corrupt or negligent licensed dealers, plays an important role in supplying guns to criminals. This paper first assesses the extant evidence bearing on this claim, as well as on underlying assertions as to how one can tell whether a crime gun has been trafficked or whether a licensed dealer is involved in trafficking. Law enforcement evidence indicates that high-volume trafficking is extremely unusual, and that average "traffickers" handle fewer than a dozen guns. The aggregate volume of guns moved by known traffickers is negligible compared to even low estimates of the number of guns stolen.

City-level data on crime guns recovered in fifty large U.S. cities in 2000 are then analyzed to investigate (a) whether supposed indicators of gun trafficking are valid, (b) what factors affect trafficking levels, (c) the impact of gun trafficking on gun possession levels among criminals, and (d) the impact of gun trafficking on crime rates. The findings suggest that most supposed indicators that a crime gun has been trafficked have little validity. One possible exception is whether a gun has an obliterated serial number (OSN). Using the share of crime guns with an OSN as a city-level indicator of the prevalence of gun trafficking, the analysis showed that trafficking is more common where guns are scarcer. The analysis also showed that laws regulating the purchase of guns, including one-gun-a-month laws specifically aimed at trafficking, show no effect on trafficking activity. Finally, the research indicates that trafficking levels show no measurable effect on gun possession among criminals (measured as the share of homicides committed with guns), and generally show no effect on violent-crime rates.

---

[*]    Professor of Criminology and Criminal Justice, Florida State University.
[**]   Doctoral student in Criminology and Criminal Justice, Florida State University.

INTRODUCTION ....................................................................................................1234
I.    GUN TRAFFICKING AND THE FLOW OF GUNS TO CRIMINALS ...................1237
      A.   Contrasting Models of the Movement of Guns to Criminals .........................1238
      B.   The Scale of the Total Flow of Guns to Criminals .......................................1242
      C.   Law Enforcement Evidence on the Prevalence and Volume
           of Gun Trafficking .......................................................................................1244
      D.   The Involvement of Licensed Dealers in Trafficking ...................................1246
      E.   The Significance of the Prices Criminals Pay for Guns .................................1248
II.   HOW DO CRIMINALS GET GUNS? .............................................................1252
      A.   The Survey Evidence ....................................................................................1252
      B.   Evidence from Traced Crime Guns ..............................................................1253
      C.   Putative Gun-Trafficking Indicators ...........................................................1254
           1.   Shorter Time-to-Recovery (TTR) ......................................................1257
           2.   Out-of-State (OOS) Origins ................................................................1263
           3.   Criminal Possessor Was Not the Gun's First Retail Purchaser ...............1266
           4.   Guns Part of a Multiple-Handgun Sale ................................................1267
           5.   Guns Sold by a Dealer With a High Trace Count .................................1268
           6.   Obliterated Serial Number (OSN) .......................................................1270
      D.   Biases in Samples of Traced Guns ................................................................1271
III.  A TENTATIVE ESTIMATE OF THE TRAFFICKING SHARE OF CRIME GUNS .............1276
IV.   NEW CITY-LEVEL EVIDENCE ON GUN TRAFFICKING ..............................1278
      A.   Methods of the Present Study ......................................................................1278
      B.   Findings ........................................................................................................1279
CONCLUSION .......................................................................................................1291

## INTRODUCTION

In recent decades the gun control movement has found it increasingly difficult to persuade legislatures to enact new restrictions on firearms. Republican dominance of state legislatures has reduced the chances of getting new state gun laws passed, and no new federal restrictions on guns of any significance have been enacted since the Brady Act was signed into law in 1994.[1] Shifts in the political winds have become so unfavorable that even previously pro-control political figures such as Barack Obama have deemphasized this issue and moved to assert their support for the Second Amendment and their belief in an individual right to keep and bear arms.[2]

---

1.    U.S. BUREAU OF ALCOHOL, TOBACCO & FIREARMS, FEDERAL FIREARMS REGULATIONS REFERENCE GUIDE 2005 (2005), *available at* http://www.atf.gov/pub/fire-explo_pub/2005/p53004/index.htm.

2.    Robert D. Novak, *Obama's Second-Amendment Dance*, WASH. POST, Apr. 7, 2008, at A17; Organizing for Am., Urban Policy, http://origin.barackobama.com/issues/urban_policy/#crime-and-law-enforcement (last visited May 24, 2009).

As a result, the gun control movement has increasingly invested its efforts in alternative, nonlegislative strategies for advancing its cause. These include facilitating lawsuits by both governments and private parties against the gun industry in an attempt to gain in the courts what could not be gained in the legislature. In particular, the nation's leading gun control advocacy group, the Brady Center to Prevent Gun Violence, has through its Legal Action Project supported dozens of lawsuits by both private and public plaintiffs against the gun industry.[3] The suits are grounded in numerous legal rationales, but arguably the most important one, especially in suits aimed at manufacturers and distributors, is the claim that the industry engages in negligent distribution of firearms. For example, twenty-two of the first twenty-five suits brought by city, county, or state governments against manufacturers invoked claims of negligent distribution—the most common single claim in such suits.[4] Negligent distribution is presented by plaintiffs as an enabling tort in which noncriminal gun industry defendants cause third-party criminals to acquire guns and do harm with them. It is claimed that distributors and manufacturers are aware of widespread dealer misconduct, know who the bad dealers are, and could restrain their misconduct by denying them guns to sell or by forcing changes in the way they do business, if they chose to do so. Specifically, advocates assert that manufacturers and distributors could refuse to sell guns to "kitchen table" dealers who do not have stores, to those who sell guns at gun shows, or to those who sell multiple handguns at a time and who could train their employees to recognize attempts at straw purchases by gun traffickers or their confederates.[5] Advocates of these suits argue that they can motivate reform within the firearms industry, while opponents see them as a way of bankrupting the industry through ruinous legal expenses and damages.[6]

Lawsuits based on claims of negligent distribution, as well as those based on public nuisance theories, adopt a particular model of how guns move from lawful channels of commerce into the possession of criminals. According to this model, the prototypical movement of guns involves a gun trafficker, or a

---

3.  Brady Ctr. to Prevent Gun Violence, Legal Action Project, Gun Distribution & Sales, http://www.gunlawsuits.org/reform/distribution.php (last visited May 24, 2009).

4.  Nat'l Rifle Ass'n Inst. for Legislative Action, Reckless Lawsuits: Taxpayer Funded Reckless Lawsuits Against the Firearms Industry, http://www.nraila.org/Issues/FactSheets/Read.aspx?id=147&issue=022 (last visited May 24, 2009).

5.  *See, e.g.*, Mark Geistfeld, *Tort Law & Criminal Behavior (Guns)*, *in* GUNS, CRIME, AND PUNISHMENT IN AMERICA 384, 387 (Bernard E. Harcourt ed., 2003); David Kairys, *The Cities Take the Initiative*, *in* GUNS, CRIME, AND PUNISHMENT IN AMERICA *supra* at 363, 365.

6.  *Compare* Brady Ctr. to Prevent Gun Violence, *supra* note 3, *with* Nat'l Rifle Ass'n Inst. for Legislative Action, *supra* note 4.

56 UCLA LAW REVIEW 1233 (2009)

straw purchaser working for the trafficker, buying many or all of his guns from corrupt or negligent licensed gun dealers. Many traffickers supposedly purchase guns, especially handguns, in large batches from corrupt or irresponsible dealers, especially those operating in states with relatively weak controls over gun selling and buying. These guns are then moved to places with stricter local and state gun laws, where they are sold—supposedly at high markups—to criminal buyers.[7]

This image of illicit guns being smuggled from low-control states to high-crime cities with stricter controls is not put forward solely by gun control advocacy organizations. For example, at a 2007 NAACP presidential primary forum in Detroit, presidential candidate Barack Obama told his audience: "We've got to make sure that unscrupulous gun dealers aren't loading up vans and dumping guns in our communities, because we know they're not made in our communities. There aren't any gun manufacturers here, right here in the middle of Detroit."[8] Likewise, New York City mayor Michael Bloomberg clearly believes that corrupt or negligent out-of-state licensed gun dealers are substantially responsible for his city's gun violence problem.[9]

The federal Bureau of Alcohol, Tobacco, Firearms and Explosives (ATF), the Brady Campaign to Prevent Gun Violence, and some scholars have argued that gun traffickers are responsible for a significant share of the movement of guns into the hands of criminals, and that disrupting trafficking operations can therefore have a substantial impact on rates of criminal gun possession and gun violence.[10] This position depends for empirical support almost entirely on analyses of ATF gun-tracing data. So many tracing-based studies claiming to find support for this view have been published in recent

---

7. *See, e.g.,* BRADY CAMPAIGN TO PREVENT GUN VIOLENCE, LARGE VOLUME GUN SALES: THE ILLEGAL GUN TRAFFICKER'S BEST FRIEND, http://www.bradycampaign.org/pdf/faq/large-volume-sales.pdf (last visited May 24, 2009).

8. On the Issues, Barack Obama on Gun Control, http://www.ontheissues.org/Domestic/Barack_Obama_Gun_Control.htm (last visited May 24, 2009).

9. *See* Alan Feuer, *Gun Dealer and Mayor Face Showdown,* N.Y. TIMES, May 22, 2008, at B1.

10. *See, e.g.,* Anthony A. Braga & Glenn L. Pierce, *Disrupting Illegal Firearms Markets in Boston: The Effects of Operations Ceasefire on the Supply of New Handguns to Criminals,* 4 CRIMINOLOGY & PUB. POL'Y 717 (2005); Anthony A. Braga et al., *The Illegal Supply of Firearms,* 29 CRIME & JUST. 319 (2002); Philip J. Cook et al., *Regulating Gun Markets,* 86 J. CRIM. L. & CRIMINOLOGY 59 (1995); David M. Kennedy et al., *Youth Violence in Boston: Gun Markets, Serious Youth Offenders, and a Use-Reduction Strategy,* LAW & CONTEMP. PROBS., Winter 1996, at 147; Christopher S. Koper, *Purchase of Multiple Firearms as a Risk Factor for Criminal Gun Use: Implications for Gun Policy and Enforcement,* 4 CRIMINOLOGY & PUB. POL'Y 749 (2005); Mark H. Moore, *Keeping Handguns From Criminal Offenders,* 455 ANNALS AM. ACAD. POL. & SOC. SCI. 92 (1981); Glenn L. Pierce et al., *Characteristics and Dynamics of Illegal Firearms Markets: Implications for a Supply-Side Enforcement Strategy,* 21 JUST. Q. 391 (2004); Franklin E. Zimring, *Street Crime and New Guns: Some Implications for Firearms Control,* 4 J. CRIM. JUST. 95 (1976).

decades that casual readers of the literature might conclude that a scholarly consensus has developed that organized gun trafficking is vital to the arming of America's criminals.[11]

We think that this notion deserves closer scrutiny. The goals of this paper are (1) to critically examine the existing evidence on the extent of organized or high-volume gun trafficking, (2) to evaluate the validity of using city-level traced-gun indicators to measure the prevalence of gun trafficking, and (3) to assess the effects of gun trafficking on criminal gun possession and crime rates.

## I. GUN TRAFFICKING AND THE FLOW OF GUNS TO CRIMINALS

The oft-stated assertion that gun traffickers supply many guns to criminals is trivial in the absence of any precise definition of a "gun trafficker." As used by ATF, the term refers to anyone who has ever unlawfully sold at least one gun.[12] Similarly, Anthony Braga and Glenn Pierce use the term "gun trafficking enterprises" to encompass operations that have unlawfully sold even a single gun.[13] The claim that there are many gun traffickers in this legalistic sense is unquestionably true, but largely devoid of policy implications. There is no doubt that unlawful selling of guns is commonplace in America, since gun theft is common, and most stolen guns are sold rather than kept by the thief.[14] Every thief who sells some of the guns he steals is a trafficker in this legalistic sense, even if he sells no more than one gun a year. James Wright and Peter Rossi estimate, from the sample of prisoners they interviewed, that felons who had ever stolen a gun had stolen an average of about thirty-nine guns in their lives[15]—fewer than four per year of their active criminal careers. As will be shown later, even the traffickers investigated by ATF sell, on average, fewer than fifteen guns over the entire course of their documented careers. Stopping even thousands of such occasional traffickers is unlikely to have much effect on the flow of guns to criminals, both because the share of "crime guns"[16] that any one of these criminals is responsible for is so small, and because such small-scale operators are so easily replaced. In any case, a policy redirecting significant law

---

11. See sources cited *supra* note 10.
12. U.S. BUREAU OF ALCOHOL, TOBACCO & FIREARMS, CRIME GUN TRACE ANALYSIS REPORTS: THE ILLEGAL YOUTH FIREARMS MARKETS IN 27 COMMUNITIES 14 (1997).
13. Braga & Pierce, *supra* note 10, at 726.
14. *See* JAMES D. WRIGHT & PETER H. ROSSI, ARMED AND CONSIDERED DANGEROUS 199–204 (1986).
15. *Id.* at 198.
16. Crime guns are guns used to commit violent crimes, either in an attack or a threat.

enforcement resources to such an effort probably could not be implemented in the first place—a point acknowledged even by advocates of greater efforts aimed at disrupting illegal gun markets.[17]

The issue of volume is crucial—the greater the number of guns sold by a trafficker, the more likely it is that stopping his activities will reduce the availability of guns to criminals. In this Article, we will use the term "high-volume gun trafficker" to denote a person who unlawfully and persistently sells substantial numbers of guns for profit. Any numerical threshold would be arbitrary—the underlying reality is that the more that flows of guns to criminals are concentrated in relatively few high-volume trafficking channels, the more impact one could realistically expect from a strategy of disrupting illicit suppliers. If pressed to state a number, however, we would regard a person who sold one hundred or more guns annually as a "large-scale" trafficker.

A.   Contrasting Models of the Movement of Guns to Criminals

It is critical for policy purposes to determine the degree to which the flow of guns to criminals is highly concentrated, moving through the hands of a relatively small number of high-volume illicit dealers (including both unlicensed dealers and corrupt or negligent licensed dealers). Such traffickers may be harder to quickly replace than occasional illicit sellers of guns, especially if the former make use of unusually rich criminal resources, including extensive contacts with a large customer base, organizations with large numbers of confederates, greater working capital, and greater skill in avoiding arrest. If such a trafficker were arrested and imprisoned, it would be less likely that he would be immediately replaced by an equally active substitute, such as a competitor or an associate in his own organization. On the other hand, if high-volume traffickers are rare and account for only a small share of illicit gun flow, such efforts are likely to be relatively unproductive because occasional illicit gun sellers are likely to be far more numerous and more quickly replaced.

ATF often states in its publications that gun traffickers supply a "significant" share of guns to criminals, without defining what "significant" really means. Many scholars have likewise claimed that criminals regularly involved in gun trafficking play an "important" role in channeling guns to criminals. These scholars have presented an image of relatively organized gun markets with significant numbers of high-volume traffickers, often oper-ating in concert with corrupt or irresponsible licensed dealers who provide

---

17.    Pierce et al., *supra* note 10, at 420.

the traffickers with their supply of guns.[18]  Typical of such scholars, Philip Cook and Anthony Braga concede that diffuse (low-volume) sources channel many guns to criminals, but nevertheless insist that point sources (high-volume traffickers) are important in supplying guns to criminals.[19]

This concentrated gun trafficking model holds that a significant share of guns are diverted from lawful commerce into the hands of criminals by the illegal activities of corrupt or negligent federal firearms licensees (FFLs) and unlicensed, criminal gun traffickers.  A prototypical point-source trafficker, according to this model, obtains many or all of his guns from corrupt or careless FFLs, who either sell guns directly to the trafficker in unrecorded transfers or make recorded sales to straw purchasers—legally qualified persons who purchase guns on behalf of another person.  Many traffickers, according to this model, purchase guns—especially handguns—in large batches from corrupt or irresponsible dealers, especially those operating in states with relatively weak controls over gun selling and buying.  This model is preferred by advocates of supply-side gun control strategies, since it promises significant reductions in criminal gun possession if high-volume traffickers or corrupt dealers can be stopped.[20]

The case for the concentrated model relies heavily on vague claims about the significant amount of illegal diversion of guns by gun traffickers (very broadly defined) operating in illicit gun markets.  Pierce and his colleagues provide a good example: "Our results indicate that a noteworthy percentage of the guns recovered in crime come rather directly from licensed dealers; in effect criminals are being supplied by dedicated 'pipelines' as well as the extant pool of guns."[21]  Nothing in the authors' results points to even an approximation of what this noteworthy percentage might be.  The only percentages the authors cite pertain to the share of crime guns that possess

---

18.     Braga et al., *supra* note 10, at 319–52; Philip J. Cook & Anthony A. Braga, *Comprehensive Firearms Tracing: Strategic and Investigative Uses of New Data on Firearms Markets*, 43 ARIZ. L. REV. 277–309 (2001); Cook et al., *supra* note 10, at 59–92; Kennedy et al., *supra* note 10, at 147–96; Moore, *supra* note 10, at 92–109; Koper, *supra* note 10, at 749–78; Pierce et al., *supra* note 10, at 391–422; Zimring, *supra* note 10, at 95–107.

19.     Cook & Braga, *supra* note 18, at 308.

20.     U.S. BUREAU OF ALCOHOL, TOBACCO & FIREARMS, COMMERCE IN FIREARMS IN THE UNITED STATES—FEBRUARY 2000, at 11–12, 17–25 (2000); U.S. BUREAU OF ALCOHOL, TOBACCO & FIREARMS, CONCENTRATED URBAN ENFORCEMENT (1977) [hereinafter CONCENTRATED URBAN ENFORCEMENT]; U.S. BUREAU OF ALCOHOL, TOBACCO & FIREARMS, FOLLOWING THE GUN: ENFORCING FEDERAL LAWS AGAINST FIREARMS TRAFFICKERS, 10–22 (2000) [hereinafter FOLLOWING THE GUN]; U.S. BUREAU OF ALCOHOL, TOBACCO & FIREARMS, GUN SHOWS: BRADY CHECKS AND CRIME GUN TRACES, JANUARY 1999 (1999); Braga et al., *supra* note 10; Cook & Braga, *supra* note 18; Cook et al., *supra* note 10; Kennedy et al., *supra* note 10; Pierce et al., *supra* note 10.

21.     Pierce et al., *supra* note 10, at 419.

various ambiguous characteristics believed to be indicators of trafficking, such as rapid movement of guns from first retail sale to recovery by police in connection with a crime. The authors report that "nearly a third" of their traced guns had two or more of ten purported indicators of gun trafficking, and hint that guns with this many indicators were likely to have been trafficked, but provide no evidence of this.[22] They do not explain why having just two of these ambiguous indicators should be regarded as strong evidence that a gun was trafficked. None of their findings suggest that even 1 percent of crime guns had as many as half of the ten indicators that they considered.[23]

Pierce and his colleagues assert that "a supply-side gun market disruption strategy focused on quick diversions of guns from federally licensed dealers may prove to be particularly fruitful" in some cities.[24] It becomes evident how vague this assertion is once one realizes that quick diversions from FFLs include not only purchases by traffickers and straw purchasers, but also relatively new guns stolen from their lawful buyers, one or two at a time, in burglaries—diversions beyond the control of either FFLs or ATF. The authors do not provide any specific examples of gun market disruption strategies that would reduce the rate of burglary-linked gun thefts, nor do they provide any evidence to contradict the hypothesis that nearly all quick diversions are the result of gun thefts from lawful buyers rather than of organized gun trafficking.

Advocates of the concentrated gun trafficking model have never stated, in even the most approximate terms, what they mean by a significant share of crime guns being trafficked. They have never explicitly claimed, for example, that even as much as a tenth of crime guns are trafficked. They only assert that high-volume point sources are important in supplying guns to criminals,[25] and they make it clear that they believe the trafficked share is large enough to justify the investment of more law enforcement resources focused on high-risk retail dealers and unlicensed traffickers.[26]

The contrasting dispersed-gun-flow model assumes a highly dispersed market in which criminals obtain guns from a wide variety of largely interchangeable nontrafficker sources. In this view, criminals most commonly (1) obtain guns (directly or indirectly) as a by-product of thefts, primarily

---

22.    *Id.* at 419.
23.    *Id.* at 417.
24.    *Id.* at 418.
25.    *E.g.*, Cook & Braga, *supra* note 18, at 308.
26.    Braga et al., *supra* note 10; Pierce et al., *supra* note 10; D.W. Webster et al., *Effects of Undercover Police Stings of Gun Dealers on the Supply of New Guns to Criminals*, 12 INJ. PREVENTION 225 (2006).

residential burglaries, that were not committed specifically for the purpose of obtaining guns; (2) buy guns one at a time from friends and relatives who neither regularly sell guns nor act as straw purchasers; or (3) (if they have no criminal convictions) lawfully purchase guns from licensed dealers, to whom they are indistinguishable from noncriminal buyers.  According to this model, high-volume or persistent traffickers are rare, and in the aggregate are of little significance in the arming of criminals.  Those who sell guns illegally are not professionals, specialists, or part of criminal organizations devoted to gun trafficking, and they do not sell guns persistently or in large numbers.  Illicit gun sellers are instead more likely to be thieves who sell a few guns (typically fewer than a half-dozen per year) along with all the other saleable property they steal, drug dealers who occasionally sell guns as a sideline to their drug business, or friends and relatives of the criminal recipient who do not regularly sell guns.[27]

Thus, while many crime guns are supplied by black market or street sources, almost all of these are casual low-volume suppliers rather than high-volume point sources.  Those holding to this model recognize that some criminals acquire guns legally from licensed dealers through legal purchases (because the criminals are not convicted felons, and do not show up as hits in background checks), while others may use straw purchasers to illegally buy guns from licensed retailers who have no way of recognizing the putative buyers as straws.  But the model denies that either intentional criminal conduct or carelessness on the part of licensed retailers contributes significantly to such diversion of guns to criminals, or that such acquisitions are typically part of repeated efforts by traffickers to acquire guns to resell for profit.  Instead, the dispersed flow model implies that people who act as straws for ineligible buyers do so only once or very rarely, rather than repeatedly on behalf of traffickers intent on accumulating a supply of guns to sell for profit.

William Vizzard, a political scientist who also served for twenty-seven years as an ATF agent, summarized his view of gun trafficking:

> Nothing in the available studies supports an assumption of a well-structured illicit market in firearms.  Transactions appear to be casual and idiosyncratic.  My own experience, and that of most other agents I have interviewed, supports an assumption that the majority of sources is very dispersed and casual, and regular traffickers in firearms to criminals are few.[28]

---

27.    *See* JOSEPH SHELEY & JAMES D. WRIGHT, IN THE LINE OF FIRE 46–51 (1996); WRIGHT & ROSSI, *supra* note 14, at 184–87, 196, 198, 202–04; Gary Kleck, *BATF Gun Trace Data and the Role of Organized Gun Trafficking in Supplying Guns to Criminals*, 18 ST. LOUIS U. PUB. L. REV. 23, 39–40 (1999).

28.    WILLIAM VIZZARD, SHOTS IN THE DARK 31 (2000).

Vizzard attributed the rarity of "regular traffickers in firearms" to the huge reservoir of guns in the United States, and the concomitant fact that criminals can easily draw on many different sources for guns.  The existence of these conditions suggests that "there is little economic incentive for persons to specialize in the illegal gun trade."[29]  His discussion, however, leaves open the possibility that there could be such specialists in a few exceptional places, such as New York City, where gun laws are exceptionally restrictive and alternative sources of guns are unusually limited.  It further leaves open the possibility that some criminals, such as drug dealers, might illegally sell a fairly large number of guns even though they do not specialize in the activity.[30]

B.    The Scale of the Total Flow of Guns to Criminals

It is impossible to meaningfully judge whether the volume of guns moved into criminal hands through a given channel is significant without at least a rough sense of the total volume of guns acquired by criminals.  A conservative estimate of the number of guns acquired by criminals can be obtained by beginning with estimates of the number of guns stolen each year, and then extrapolating that number to the total number of guns obtained by all methods, based on the share of their guns that criminals say they obtain by theft.[31]  The best available estimate of the number of annual gun theft incidents comes from the National Crime Victimization Survey (NCVS), which collects data on thefts, including incidents not reported to the police.  The survey indicated that in the calendar year 2000 there were 174,680 gun theft incidents that people were willing to report to its interviewers,[32] while the figure for 1993—a higher crime year—was 291,820.[33]  These estimates are almost certainly conservative because people are reluctant to report thefts of guns that they possess illegally, or whose legal status they are unsure of.  The NCVS does not establish the number of guns stolen per incident.  The largest national survey to estimate this parameter found that there were 2.2 guns

---

29.    *Id.*
30.    WRIGHT & ROSSI, *supra* note 14, at 203–04.
31.    Kleck, *supra* note 27, at 40–41.
32.    BUREAU OF JUSTICE STATISTICS, U.S. DEP'T OF JUSTICE, CRIMINAL VICTIMIZATION IN UNITED STATES, 2000 STATISTICAL TABLES, tbl.84, *available at* http://www.ojp.gov/bjs/pub/pdf/cvus00.pdf (last visited May 27, 2009).
33.    BUREAU OF JUSTICE STATISTICS, U.S. DEP'T OF JUSTICE, CRIMINAL VICTIMIZATION IN UNITED STATES, 1993 STATISTICAL TABLES, tbl.84, *available at* http://www.ojp.usdoj.gov/bjs/pub/pdf/cvus935.pdf (last visited May 27, 2009).

stolen per gun theft incident.[34] Thus, a conservative estimate of the number of guns stolen in 2000 would be 384,296, while the figure for 1993 would be 642,000. The NCVS's data indicate that about 53 percent of stolen guns are handguns,[35] and thus imply that at least 203,677 handguns were stolen in 2000, and 340,260 in 1993.

The most extensive questioning of criminals on the sources of their guns indicated that felons had personally stolen 32 percent of their most recently acquired handguns.[36] This implies that the total number of handguns acquired by criminals is about 3.125 times larger than the number of handguns stolen, and thus that about 636,490 handguns were acquired by criminals by all methods in 2000, and about 1.1 million in 1993. If the percent of all types of guns acquired by theft was the same as for handguns, these figures would imply that criminals acquired about 1.2 million guns of all types 2000 and about 2.0 million in 1993. On the other hand, if one accepts at face value, as some scholars apparently do,[37] the results of a 1997 federal survey of prison inmates who used or possessed a firearm during their current offense, which indicated that only 10 percent of criminals' handguns were acquired by theft,[38] then the total number of guns acquired by criminals each year would necessarily be ten times as large as the number they stole—about 3.8 million in 2000 and 6.4 million in 1993. We regard such huge figures as implausible, and believe it is unlikely that inmates were fully reporting their gun theft activity to the federal government interviewers. If the ten-percent figure is a product of underreporting, then the theft share would be over ten percent, and the total number acquired by all means would be less than ten times the number stolen. In any case, even conservative estimates indicate that the number of handguns annually obtained by criminals by all methods exceeds 600,000 even in low-crime years. And since handguns claim only half of the guns obtained by criminals via theft, if the same applies to all methods of acquisition, criminals obtain, by all methods, at least 1.2 million guns of all types each year.

---

34. PHILIP J. COOK & JENS LUDWIG, GUNS IN AMERICA 30 (1996).
35. BUREAU OF JUSTICE STATISTICS, U.S. DEP'T OF JUSTICE, GUNS AND CRIME 2 (1994).
36. WRIGHT & ROSSI, *supra* note 14, at 184.
37. *See, e.g.*, Braga et al., *supra* note 10, at 328.
38. BUREAU OF JUSTICE STATISTICS, U.S. DEP'T OF JUSTICE, FIREARM USE BY OFFENDERS 6 (2001).

### C. Law Enforcement Evidence on the Prevalence and Volume of Gun Trafficking

The most direct, albeit limited, evidence on the extent of significant organized gun trafficking is law enforcement information gathered in connection with the investigation of traffickers. As with many other types of criminals, much of what we know about gun traffickers is based on those who are arrested. Christopher Koper and Peter Reuter uncritically cite the assessment of unnamed federal officials that a gun running operation that handled 116 guns was "typical of the size of most gun running operations."[39] However, traffickers handling this many guns are extremely rare among those caught by law enforcement, and a more typical volume would be fifteen or fewer guns sold per year.[40] Although ATF places a high priority on catching high-volume traffickers,[41] the agency was able to identify, over a two-and-a-half-year period (1996–1998), just thirty-seven trafficking operations in the United States in which over 250 guns were trafficked. Thus, on average, there were fewer than fifteen high-volume trafficking operations uncovered by ATF per year in the entire nation.[42] Further, ATF uncovered only 104 trafficking operations that handled over a hundred guns, or about forty-two such operations per year.[43] Thus, by any reasonable standard, ATF rarely uncovers large-scale gun trafficking operations.

It is possible, however, that local law enforcement agencies uncover many additional high-volume dealers, especially in places where political leaders prioritize going after gun trafficking. If big-time traffickers operate anywhere, one would expect to find them in New York City, given its huge size (and correspondingly large number of potential customers), its low level of legal handgun ownership, and its strict gun laws, which reduce the availability of legal handguns. Assuming that law enforcement agencies like to publicize their major successes, higher-volume trafficking cases should be reported in local newspapers once investigations are complete. However, an examination of all New York City daily papers over a 17-year period from 1990 through 2006 uncovered just six cases of trafficking operations purportedly involving a hundred or more guns, or about one such operation

39. Christopher S. Koper & Peter Reuter, *Suppressing Illegal Gun Markets: Lessons From Drug Enforcement*, LAW & CONTEMP. PROBS., Winter 1996, at 119, 127.

40. U.S. BUREAU OF ALCOHOL, TOBACCO & FIREARMS, DEP'T OF THE TREASURY, CRIME GUN TRACE REPORTS (2000): NATIONAL REPORT 53 (2002) *available at* http://www.atf.gov/firearms/ycgii/2000/index.htm.

41. U.S. BUREAU OF ALCOHOL, TOBACCO & FIREARMS, *supra* note 12, at 2.

42. FOLLOWING THE GUN, *supra* note 20, at 7, 24.

43. *Id.*

reported every three years in the nation's largest city.[44]  Only two of these operations were alleged to have trafficked over 140 guns.[45]

Likewise, in Chicago, which like New York City bans the private possession of handguns, the police catch virtually no high-volume gun traffickers.  A newspaper story clearly intended to convey the idea that interstate gun traffickers were important in supplying guns to Chicago criminals nevertheless identified only two traffickers who dealt in even modest numbers of guns—ninety-five and thirty-five guns, respectively.[46]  To put this in perspective, these two traffickers were arrested in a year (2003) in which the Chicago police seized over 10,000 guns from criminals.[47]  If high-volume gun traffickers are almost never uncovered in the nation's largest cities with the strictest controls on handguns, it is highly unlikely that local police in areas with weaker gun controls discover significant numbers of such traffickers, where there would be less need for their services.

These few high-volume operations are clearly the well-publicized exceptions, since average trafficking operations involve far fewer guns.  In 2000, ATF initiated 1,319 trafficking investigations and estimated that the targeted operations had trafficked a total of 19,777 firearms, for an average of just fifteen guns per trafficking operation.[48]  Arithmetic means, however, are misleading, with highly skewed distributions such as these in which a handful of operations handling extremely large numbers of guns drive up the average.  It follows that the median number of guns trafficked per operation is less than half the average,[49] so a typical operation (one with a median volume) investigated in 2000 probably handled fewer than seven guns.  Further, the average gun volume among *all* trafficking operations, including those not important enough to merit ATF investigation, would almost certainly be lower still.  Although investigators may underestimate the number of the guns trafficked, the number that has been documented is clearly small.  It also should be kept in mind that traffickers sell to virtually anyone with money, not just criminals, so the number of guns going to criminals is necessarily smaller than the total number trafficked.[50]

---

44.    This result was drawn from a LexisNexis search of all New York City daily papers for "gun trafficking," "gun smuggling," or "gun running."

45.    *Id.*

46.    David Heinzmann, *Gangs Run Gun Pipeline From Delta to Chicago—Lenient Laws Make Buying Weapons Easier in South*, CHI. TRIB., Feb. 5, 2004, at 1.

47.    *Id.*

48.    U.S. BUREAU OF ALCOHOL, TOBACCO & FIREARMS, *supra* note 40, at 53.

49.    FOLLOWING THE GUN, *supra* note 20, at 13.

50.    VIZZARD, *supra* note 28, at 31.

What share of all guns acquired by criminals is supplied, then, by known traffickers? As noted above, the total number of guns known to have been trafficked by all traffickers investigated by ATF in 2000 was 19,777. We have estimated that in that same year, criminals acquired a total of at least 1.2 million guns.[51] Thus, even if one unrealistically assumed that all of the 19,777 guns known to have been trafficked by ATF-investigated traffickers were sold to criminals, and if all of these were trafficked in a single year, then at most this comprised 1.6 percent of the guns acquired by criminals in that year. More realistically, if traffickers sell indiscriminately to whoever will pay, and if they therefore sold only half of their guns to criminals, then these trafficked guns would comprise less than 1 percent of the guns acquired by criminals.

There are, however, traffickers unknown to police, and there may even be high-volume traffickers who are never caught. Law enforcement evidence, the best evidence available, cannot prove a negative, such as the assertion that virtually no high-volume traffickers operate. One can only say that the law enforcement agencies charged with uncovering such trafficking have discovered few large-scale operations, have not generated affirmative evidence of widespread high-volume trafficking, and have not supplied evidence that would support an affirmative claim that traffickers supply more than a tiny share of criminals' guns.

D.    The Involvement of Licensed Dealers in Trafficking

Do corrupt or negligent FFLs contribute significantly to the flow of illicit guns to criminals? Compared to criminals who commit offenses like burglary or auto theft, illicit gun dealers should be especially easy for investigators to uncover, for the same reason that street dealers of illicit drugs are easy to identify: It must be possible for prospective customers to find the sellers. And if buyers can find them, then the police or their informants can do so as well. Licensed but corrupt dealers should be even easier to detect than unlicensed traffickers because all FFLs are known to authorities as gun dealers, required to maintain detailed records of every acquisition or disposition of a gun, and subject to close inspection of those records. Audits of these records can uncover suspicious patterns, and even if the required records are not maintained, this failure can itself serve as the basis for regulatory action, more intensive investigation, and in some cases, revocation of a dealer's license or criminal charges. Because FFL misbehavior is easier to detect, and because FFLs may

---

51.    *See infra* Part I.C.

be targeted for investigation more frequently for this very reason, the FFLs' share of trafficking is likely to be overstated by law enforcement data.

Despite the relative ease of doing so, ATF discovered so little serious misconduct among FFLs that in all of fiscal year 1999 they revoked the licenses of only 20 FFLs in the entire United States—less than a fiftieth of one percent of the 103,942 total FFLs operating at that time.[52] Even when ATF selectively focused extensive compliance inspections on 1,700 dealers thought to be more likely to be involved in gun trafficking because they displayed "a range of indicators of potential firearms trafficking,"[53] few of these were found to be involved in misconduct serious enough to merit revocation of their licenses. Of the 1,700 suspect dealers inspected in 1998, ATF revoked the licenses of just thirteen, in addition to seventy-five who surrendered their licenses, were placed out of business, or were denied renewal of their licenses.[54]

Conversely, among 1,530 trafficking operations investigated by ATF during 1996–1998, only 8.7 percent involved trafficking by any FFLs.[55] Thus, few FFLs are involved in trafficking, and few trafficking operations involve FFLs. Those who believe in the importance of high-volume trafficking involving FFLs, however, stress that, on those rare occasions that an FFL is involved in trafficking, the numbers of guns trafficked are much larger than in other trafficking operations—an understandable result given an FFL's easy access to large supplies of guns.[56] Indeed, ATF figures indicate that 32 percent of guns trafficked by the operations investigated by the agency were handled by operations in which FFLs were implicated.[57] These data, however, cannot establish the share of all guns going to criminals that were moved by trafficking operations involving FFLs. ATF cautions that their investigations "do not necessarily reflect typical criminal diversions of firearms."[58] And this percentage almost certainly overstates the FFL share of trafficked guns given

---

52. U.S. Bureau of Alcohol, Tobacco & Firearms, Commerce in Firearms in the United States—February 2000 A-21, A-22 (2000).

53. *Id.* at 30.

54. *Id.* at 31.

55. Following the Gun, *supra* note 20, at 11.

56. *See, e.g., id.*; Braga et al., *supra* note 10.

57. Following the Gun, *supra* note 20, at 13 tbl.3 (2000). This report indicates that 40,365 firearms were "trafficked by licensed dealer[s], including pawnbroker[s]," from among a total of 84,128 trafficked firearms identified in 114 investigations of trafficking by licensed dealers. *Id.* at 13. It is, however, inappropriate to calculate the FFL share as 40,365 out of 84,128, because ATF double-counted both its investigations and trafficked firearms in multiple "trafficking channel" categories. The sum of the firearms attributed to each separate category was 125,928, indicating that each trafficked gun was counted about 1.5 times (125,928 / 84,128 = 1.5). Using the proper base total, a more correct FFL share would be 32 percent (40,365 / 125,928 = 0.321).

58. *Id.* at 53.

the greater ease of detecting criminal activity within a group that Cook and Braga rightly characterize as "vulnerable to ATF's capacities for regulation and enforcement."[59]

ATF's caveat is more than merely pro forma—the agency clearly focuses disproportionately on more vulnerable investigative targets. To illustrate, 13.9 percent of ATF's 1996–1998 trafficking investigations were aimed at "gun shows and flea markets,"[60] even though the Census Bureau's 1997 Survey of State Prison inmates found that only 1.7 percent of gun criminals had obtained their crime guns from a gun show or a flea market.[61] ATF was clearly not focusing its investigations on gun show trafficking because this activity supplies a large share of crime guns. Rather, because gun shows are advertised, legal events, they may simply be easier to investigate than trafficking rings that operate secretly.

E.    The Significance of the Prices Criminals Pay for Guns

Data on prices paid for illegal guns also strongly suggest that FFL involvement in trafficking, whether knowing or negligent, is rare. Traffickers who buy guns, new or used, from FFLs at retail prices can only make a profit if they sell the guns at prices substantially higher than retail price. Further, given the need to pay straw purchasers for their services, when employed, and to cover transportation and other expenses, it is unlikely that traffickers could begin to turn a profit unless they sold guns for amounts well above—perhaps at least double—the retail price. Thus, if many criminals obtain guns through the efforts of traffickers working in this way, we should find that a large share of criminals buy guns at prices well above retail price. Interviews with criminals, however, indicate that the vast majority instead generally pay *less* than retail price for their guns. Joseph Sheley and James Wright found that 65 percent of inmates of juvenile correctional facilities and 74 percent of high school students paid less than $100 for their most recently acquired handgun,[62] at a time (about 1990) when only a handful of handguns had a retail price under $100.[63] Similarly, Wright and Rossi concluded, based on interviews with adult inmates, that even though criminals often possessed higher quality guns, they typically paid much less than retail, because "prices in the informal, gray, and black markets are heavily discounted, in all

---

59.    Cook & Braga, *supra* note 18, at 300.
60.    FOLLOWING THE GUN, *supra* note 20, at 11.
61.    BUREAU OF JUSTICE STATISTICS, *supra* note 38, at 6.
62.    SHELEY & WRIGHT, *supra* note 27, at 49–50.
63.    KEN WARNER, GUN DIGEST 1990 *passim* (1989).

likelihood because of the predominance of stolen weapons in these markets."[64] Thus, even though virtually all guns are sold at or near full retail price when they are new, by the time their ultimate criminal consumers acquire the guns, they generally are sold for much less. This evidence strongly suggests that traffickers were not responsible for moving the retail-priced guns from licensed dealers to criminals.

Occasional claims that criminals pay substantially above-retail prices for guns are supported only by isolated, unsubstantiated anecdotes, typically fed to uncritical reporters by ATF agents. For example, Philip Cook and his colleagues cite a newspaper article in which an ATF agent was quoted as asserting that for illegal handguns purchased in New York City there was a markup of "five times or more over the price in Virginia."[65] These authors likewise cite unsubstantiated claims by journalists that handguns purchased for $50 in Ohio were sold for $250 in Philadelphia.[66] The evidence for such journalistic claims usually turns out to be unverified anecdotes supplied by ATF agents.[67]

Some scholars even insist that criminals pay a premium over retail for illicit guns in the face of their own contradictory evidence. For example, Philip Cook and his colleagues, based on interviews with criminals in one high-crime area of Chicago, claimed at one point that there was a substantial price markup in the underground gun market.[68] Their own interviews, however, indicated that even among the more naïve, less well-connected youth in the area of their study, prices actually paid ranged from $250 to $400.[69] Assuming that the mean price paid by these youth was around the midpoint between $250 and $400, then the average price paid was $325. This is very close to the mean retail price of handguns confiscated from criminals in that same area, which was about $316.[70] This implies an average markup of just 3 percent over the average retail price, which cannot be accurately described as substantial considering that it is far less than the 15 percent markup over cost that *legal* gun retailers typically charge.[71] Thus, in a low-gun-ownership city with very

---

64.     WRIGHT & ROSSI, *supra* note 14 at 233.
65.     Cook et al., *supra* note 10, at 72 n.56.
66.     *Id.*
67.     *E.g.*, Richard Lacayo, *Running Guns Up the Interstate*, TIME, Feb. 6, 1989, at 24; Howard Schneider, *Gun-Control Fusillade Heats Up; Rally in Annapolis Backs Bill's Foes*, WASH. POST, Mar. 8, 1991, at C5; John F. Harris, *Gunrunning Alleged in Indictment—Trail Said to Run From VA. to N.Y.*, WASH. POST, Jan. 6, 1993, at D1.
68.     Philip J. Cook et al., *Underground Gun Markets*, 117 ECON. J. F588, F592–96 (2007).
69.     *Id.*
70.     Cook et al., *supra* note 68, at F594, F616.
71.     Cook et al., *supra* note 10, at 71 n.54.

restrictive gun laws, even more naïve young gun buyers lacking extensive criminal connections were not paying prices substantially over retail. Although prices for used guns sold by licensed retailers would not be as high as the new-gun retail prices used by Cook and his colleagues,[72] the differences in prices charged by gun dealers between new guns and near-new used guns is slight, and Cook himself has asserted that most crime guns are relatively new.[73]

Moreover, these data pertain only to an unrepresentative sample of a small segment of the population in just one unrepresentative area of Chicago.[74] Cook and his colleagues also reported considerably more statistically meaningful city-wide data on prices paid by Chicago arrestees who were interviewed in 1996–1997 as part of the U.S. Justice Department's Drug Use Forecasting program. This more systematic body of data indicated that the median price paid for handguns by Chicago criminals was just $150,[75] less than half the $331 mean new-gun retail price of the guns confiscated from Chicago criminals during that time frame.[76]

It is certainly possible that traffickers served only a segment of the criminal market covered by Cook's study, and that criminal customers in this segment do indeed pay large markups over retail. Cook and his colleagues' data, however, indicate that only 6.8 percent of Chicago arrestees paid $500 or more for their guns,[77] a price that, based on Cook's claims in 1995, should have been commonplace in areas with a relative scarcity of guns and restrictive gun laws.[78] Since some of these arrestees may have been buying guns with retail prices only modestly above $500, the share of Chicago arrestees paying markups of three or four times retail price ($900–$1200) necessarily must have been quite small.

Thus, Cook's evidence consistently contradicts his earlier claims of huge price markups, as large as four- or five-to-one,[79] and does not even support his claim that criminals pay amounts even slightly more than retail prices. Even in Chicago, where handguns have been banned since 1982 and where gun ownership was quite low even before the ban, the prices paid by criminals are generally comparable with or below retail, and thus provide no support for the theory that gun traffickers buy guns at retail prices from licensed gun

---

72. *See* Cook et al., *supra* note 68, at F616.
73. Cook & Braga, *supra* note 18.
74. *See* Cook et al., *supra* note 68, at F561–62.
75. *Id.* at F573.
76. Computed from the data provided in *id.* at F616 tbl.A4.
77. *Id.* at F603.
78. *See* Cook et al., *supra* note 10, at 72.
79. *Id.* at 72 n.56.

dealers and then sell them at moderate-to-huge markups to criminals in areas with strict gun laws.

Perhaps Chicago is unrepresentative of high-control cities, and perhaps traffickers realize higher profit margins in other places with stringent controls. To provide comparative perspective, we analyzed Drug Use Forecasting data from interviews conducted in 1997 with arrestees in New York City and Washington, D.C., where handgun ownership is likewise banned. The mean price paid by arrestees for their most recently acquired handgun was $259 in New York, $219 in D.C., and $190 in Chicago.[80]

A rough estimate of the retail prices of handguns used by criminals in those cities can be obtained from published ATF data on guns recovered and submitted for tracing. The ten most frequently recovered types of guns, classified by manufacturer, caliber, and general gun type (revolver, semi automatic pistol, and so forth) are listed in ATF reports.[81] We looked up the suggested retail price of the least expensive model within each category (for example, the least expensive Ruger nine millimeter semiautomatic pistol) in the 1997 edition of *Gun Digest*, and conservatively assumed that this was the average retail price of guns in each category.[82] We weighted these prices by the number of crime guns in that category that were recovered and traced, in order to obtain an average retail price of the most popular crime guns recovered from criminals in each city. Even assuming conservatively that the least expensive handgun was used in each category, the average retail price of crime guns recovered in 1998 was $260 in New York City, $374 in Washington, D.C., and $237 in Chicago.

Thus, even in these exceptional urban areas with stringent gun controls, where traffickers are supposed to flourish, criminals pay *under* the retail price for handguns. Consequently, the notion that criminals could make significant profits by selling guns purchased at retail prices from FFLs is not plausible even in cities with unusually low gun ownership rates and unusually strict gun laws, such as New York, Washington, D.C. or Chicago. Traffickers who purchase guns at retail prices can, at best, profit only by selling to unusually ill-informed or poorly connected criminals, that is, the handful willing to pay far more than the average criminal in their city. The idea of such a trafficker profiting is even less plausible with regard to places where controls over gun sales

80. U.S. DEP'T OF JUSTICE, NAT'L INST. OF JUSTICE, DRUG USE FORECASTING IN 24 CITIES IN THE UNITED STATES, 1987–1997 (1998) [GUN ADDENDUM DATA, 1997] (restricted version of ICPSR Study 9477 obtained from the National Archive of Crim. Just. Data, on file with author).

81. U.S. BUREAU OF ALCOHOL, TOBACCO & FIREARMS, *supra* note 12, at 33.

82. KEN WARNER, GUN DIGEST 1997 (1996).

are weaker, gun ownership (and thus gun theft) rates are higher, and traffickers therefore face more competition from legal dealer sales and from stolen guns.

## II.     HOW *DO* CRIMINALS GET GUNS?

### A.     The Survey Evidence

The richest sources of information on gun acquisition by criminals are surveys of incarcerated criminals.[83] The findings from direct questioning of felons are consistent with the "dispersed" model of the movement of guns to criminals, which hypothesizes that offenders most commonly steal their own guns or buy them from friends, relatives, or acquaintances. The most detailed questioning of criminals about their methods of gun acquisition was conducted by James Wright and Peter Rossi, who found that theft was an especially important method.[84] When asked how they had obtained their most recently acquired handgun, 32 percent of felons reported that they personally stole the gun. The prisoners were also asked if they believed that their most recently acquired handgun was stolen, and 46 percent stated that the weapon was "definitely stolen" (these inmates presumably included the 32 percent who reported having personally stolen the gun). Another 24 percent indicated the weapon was "probably stolen."[85] Thus, the criminals believed that 46–70 percent of their handguns were stolen.

This study also found that criminals do not typically seek out guns to steal, but rather steal those they happen to come across in the course of criminal activity,[86] most commonly thefts from homes or vehicles.[87] Criminals usually sell the guns they steal, but most gun thieves have also retained at least one gun for their own use. They typically kept the gun because the stolen weapon was a "nice piece," rather than because they did not already have one.[88] Thus, the criminals evidently used theft as a way of upgrading the quality of their weaponry, rather than as a way of becoming armed. Surveys also indicate that

---

83.     *See, e.g.*, SHELEY & WRIGHT, *supra* note 27; U.S. BUREAU OF JUSTICE STATISTICS, SURVEY OF STATE PRISON INMATES 1991 (1993); U.S. BUREAU OF JUSTICE STATISTICS, *supra* note 38; WRIGHT & ROSSI, *supra* note 14; *cf.* DAVID C. MAY & G. ROGER JARJOURA, ILLEGAL GUNS IN THE WRONG HANDS 8–9 (2006).

84.     WRIGHT & ROSSI, *supra* note 14, at 198–204.

85.     *Id.* at 196.

86.     *Id.* at 200.

87.     *Id.* at 206.

88.     *Id.* at 201–02.

offenders believe that they can get guns from multiple types of sources; therefore, eliminating a single channel would likely not prevent the acquisition of a gun.[89]

Wright and Rossi also found that 16 percent of the felons' handguns had been purchased from retail (presumably licensed) sources,[90] although their questions did not differentiate between a felon buying the gun directly and a felon using a straw purchaser. The authors did not ask whether the felon had any disqualifying criminal convictions at the time of the purchase, so it is impossible to tell whether any of these guns were acquired unlawfully, were straw-purchased, or involved unlawful behavior or negligence on the part of the retail seller.[91] Nevertheless, even some scholars who have adopted the theory that traffickers use straw purchasers to acquire guns from FFLs concede that criminals rarely use straw purchases from FFLs to obtain guns for themselves.[92]

Although the surveys provide little direct support for the concentrated flow model or the organized trafficking model, this at least partly reflects the limits of the method. Criminals typically know only the proximate source of their guns—the person from whom they directly obtained a gun. They usually would not know whether traffickers were involved in earlier movements of the gun, further back in the chain of possession. A buyer also would not always know whether the proximate source was regularly engaged in illicit gun sales. In any case, the questions asked in past studies have not been framed in a way that allows researchers to distinguish sources who regularly and persistently sold illicit guns from those who did so only on a few occasions. Thus, while the survey evidence does not support the view that traffickers channel a significant share of the guns obtained by criminals, neither does it rule it out.

B.    Evidence from Traced Crime Guns

The belief in the importance of persistent, organized, or high-volume gun trafficking is largely based on indirect inferences from information on guns that are seized or recovered from apprehended criminals and then traced by ATF. The process of tracing a gun works as follows: When a criminal is arrested and found to possess a gun, or when a gun is otherwise recovered by police

---

89.    *Id.* at 210–15; SHELEY & WRIGHT, *supra* note 27, at 47; MAY & JARJOURA, *supra* note 83, at 37, 47 tbl.3.1.

90.    WRIGHT & ROSSI, *supra* note 14, at 185.

91.    *Id.*

92.    Cook et al., *supra* note 68, at F566–F567; Daniel W. Webster et al., *How Delinquent Youths Acquire Guns*, 79 J. URB. HEALTH 60, 65–66 (2002).

and it is known or suspected to be a crime gun, law enforcement officers may submit a request to ATF for that gun to be traced. This means that its history is established, as officially recorded on various legal forms, hopefully up to the point of first retail sale—when it was first sold as a new gun. ATF typically does this by first contacting the manufacturer or importer (or, equivalently, by consulting a manufacturer's computer database supplied to ATF) in order to identify the distributor (wholesaler) to whom the gun was sold by the manufacturer or importer. ATF then contacts this distributor to establish the identity of the licensed retail dealer to whom the gun was sold. Finally, ATF contacts the retail dealer who sold the gun, in order to establish who first purchased the new gun. If all necessary records were completed and remain available, the gun can be traced as far back as its first private owner, at which point the paper trail ends, since ATF typically does not have access to records of transfers (including thefts) that occur after the first retail sale.[93] A criminal who uses a gun to commit a violent crime is rarely the weapon's first retail purchaser, so tracing alone rarely identifies a previously unknown suspect. Indeed, most crime guns become available for tracing only because they were recovered from criminal possessors at the time of their arrest. ATF and local law enforcement agencies more commonly use trace data for the purpose of identifying unlicensed traffickers or high-risk potentially corrupt FFLs.[94]

C.    Putative Gun-Trafficking Indicators

ATF has identified a number of indicators that it believes are correlated with a heightened probability that a given crime gun was trafficked.[95] If indicator data are aggregated up to the dealer level, high risk dealers may be identified. In other words, FFLs who sell many guns with these traits, or who have many crime guns traced back to them, may be engaged in criminal or irresponsible gun selling. Further, if the data on crime guns are aggregated up to the city level, some of these indicators may also be useful measures of the relative prevalence of gun trafficking among cities.

ATF has not directly validated any of these indicators, for example, by demonstrating that it can efficiently differentiate trafficked guns from nontrafficked guns, or that it can identify dealers who were later found, through law enforcement investigation or inspection of dealer records, to be traffickers. Nor has ATF made any specific claims as to what share of trafficked

---

93.    U.S. Bureau of Alcohol, Tobacco & Firearms, *supra* note 40, at 68 (2002).
94.    *Id.* at 64.
95.    *E.g.*, *id.* at ix.

guns or corrupt dealers are characterized by any given indicator. Scholars who use ATF's indicators have generally simply assumed their validity, based largely on ATF arguments as to why they should be associated with trafficking.[96]

An effective indicator of trafficking would have two attributes: (1) it would be substantially more common among trafficked guns than among nontrafficked guns, and (2) a large share of guns with this trait would be trafficked guns. If a potential indicator possessed the first attribute but not the second, it would be an inefficient tool for identifying trafficked guns, since a large share of guns characterized by the indicator would be false positives. In other words, they would be predicted to be trafficked guns when they were not. For example, suppose that 5 percent of guns possessing trait X were trafficked, while only 1 percent of guns without trait X were trafficked. Guns with the indicator are then five times more likely to have been trafficked than guns without the indicator, yet trait X would still have little value for identifying trafficked guns, because 95 percent of guns with trait X were not trafficked. It would be wasteful to direct investigative resources at FFLs who sold guns with this trait. Thus, the absolute prevalence of trafficking among guns with a given indicator is essential in assessing the indicator's utility. Nonetheless, ATF makes no claims about the approximate share of guns with any of its preferred indicators that it believes were trafficked, or about the share of trafficked guns characterized by a given indicator. For example, ATF has never asserted that even as much as 10 percent of crime guns recovered by police within three years of first retail sale (sometimes loosely described as "new" guns) were trafficked. Nor, conversely, has ATF asserted that at least 10 percent of trafficked guns are recovered within three years.

The Brady Center to Prevent Gun Violence is among those entities who have misunderstood this limitation, claiming that ATF believes that crime guns with a "time-to-crime" (which is more accurately described as "time-to-recovery," or TTR) of under three years "*likely* were trafficked out of licensed dealers into the criminal market."[97] That is, the Brady Center asserted that ATF believes that most new crime guns were trafficked. However, ATF merely states, in its characteristically ambiguous way, "To the investigator, the short time from retail sale to crime, known as 'time-to-crime,' *suggests* illegal diversion or criminal intent associated with the retail purchase from

---

96. *See, e.g.*, Cook et al., *supra* note 10; Pierce et al., *supra* note 10; Daniel W. Webster et al., *Effects of a Gun Dealer's Change in Sales Practices on the Supply of Guns to Criminals*, 83 J. URB. HEALTH 778 (2006).

97. BRADY CTR. TO PREVENT GUN VIOLENCE, WITHOUT A TRACE: HOW THE GUN LOBBY AND THE GOVERNMENT SUPPRESS THE TRUTH ABOUT GUNS AND CRIME 11 (2006), *available at* http://www.bradycenter.org/xshare/pdf/reports/giw.pdf (emphasis added).

the FFL."[98]  ATF thus does not claim that even 1 percent of new crime guns were trafficked, much less a majority or even many of them.

    The most common logical fallacy that appears to underlie misinterpretation of tracing-based indicators is that of "affirming the consequent."[99] An analyst accurately notes that a large share of trafficked guns possesses attribute X, but then draws conclusions that follow only if the converse was true—if a gun has attribute X, it is certain or likely that it has been trafficked. Perhaps the most extreme example of this misinterpretation was by Daniel Webster, Jon Vernick, and Maria Bulzacchelli, who labeled all guns with a time-to-crime of under one year, and whose criminal possessor was not the original retail purchaser, as "new trafficked crime guns."[100]  In fact, virtually all of these guns may simply have been stolen from their lawful buyers within a year of purchase.

    In other research, this logical fallacy is implicit rather than overt. Glenn Pierce and his colleagues carried out a long series of statistical analyses exploring what traits of crime guns were associated with a short TTR.[101] Their key underlying assumption was that a short TTR is an indicator of trafficking or illegal diversion of guns.  The authors inferred that other traits that were correlated with short TTR were also indicators that the gun had been trafficked.  They did not explicitly assert that all or even most guns with a short TTR are trafficked or illegally diverted, but instead merely repeated the vague ATF claim that guns with this trait, in combination with other indicator traits, "may have been illegally diverted from legal commerce."[102] Obviously one can always infer that any given crime gun *may* have been trafficked, even without making use of any supposed trafficking indicators. This weak assertion leaves open the possibility that nearly all guns with a short TTR are *not* trafficked guns, in which case most or nearly all variation in TTR across crime guns is likely to be unrelated to whether the guns were trafficked.  Consequently, any associations discovered between short TTR (or any other weak indicator) and other variables may tell us nothing about the correlates of trafficking history.  The conclusions drawn by Pierce and his colleagues therefore embody the fallacy of affirming the consequent, by assuming that a large share of guns with short TTRs had been trafficked—an assumption with no empirical support.

    98.    U.S. BUREAU OF ALCOHOL, TOBACCO & FIREARMS, *supra* note 40, at ix (emphasis added).
    99.    This fallacy is committed if one starts with the premise: If P, then Q.  Upon observing that Q is true, one then (wrongly) concludes: Therefore, P is true.
    100.    Webster et al., *supra* note 96, at 779.
    101.    Pierce et al., *supra* note 10, 391–422.
    102.    *Id.* at 402.

We consider below the most commonly discussed trafficking indicators, including dealer-level traits of FFLs that may point to their involvement in trafficking (for example, a large number of crime guns being traced back to a dealer). We do not consider measures of the thoroughness or effectiveness of ATF enforcement actions, such as number of compliance inspections conducted, because the corresponding data are not available for use at the city level.

1. Shorter Time-to-Recovery (TTR)

Like legitimate businesses, gun traffickers likely seek to make sales quickly and avoid accumulating large unsold inventories, so they work to move their guns quickly from first retail sale (in which the trafficker or a straw-purchaser associate buys a gun) to a sale by the trafficker to his customer. The more quickly this happens, the sooner a gun is likely to end up in a criminal's possession, be used in a crime, recovered by police (usually in connection with the criminal possessor's arrest), and traced. Thus, ATF has long regarded a short TTR as an indicator that a gun has been trafficked.[103] However, firearms stolen by thieves who steal (and sell) a few relatively new guns each year are also likely to have a short TTR. Anyone who wants to profit from an illicit sale would prefer to do it quickly, and thieves also want to minimize the time they are in possession of stolen property. As will be explained, newer guns are disproportionately likelier to be stolen, and then purchased by other criminals. Thus, like trafficked guns, newer stolen guns will move quickly into the hands of criminals, and a short TTR does not imply anything about how a gun came into a criminal's possession.

Many guns move quickly into criminal hands because they were stolen from their owners shortly after retail purchase. A short average TTR among traced crime guns in a given area therefore may serve more as an indirect indicator of rates of property crime, especially burglary, in that area than of widespread firearms trafficking. Anthony Braga and Glenn Pierce reported data on the percent of recovered handguns in Boston that had a TTR less than three years, for the period 1996–2003, and interpreted declines in this percentage as evidence of declining gun trafficking in Boston.[104] We computed the cross-temporal Pearson's correlation between their figures for the percent of crime guns with TTRs under three years and Boston's burglary

---

103. CONCENTRATED URBAN ENFORCEMENT, *supra* note 20; U.S. BUREAU OF ALCOHOL, TOBACCO & FIREARMS, *supra* note 40; Zimring, *supra* note 10.
104. Braga & Pierce, *supra* note 10, at 740–42.

rate, as reported in the Uniform Crime Reports (1997–2004),[105] and found it to be an extremely strong 0.89. The higher an area's crime rate, the shorter the time before the next crime occurs and thus the sooner any given firearm will be stolen from its lawful owner and used to commit a crime. In the absence of any direct evidence of a correlation between TTR trends and actual trafficking rates, it appears to be more likely that short-TTR guns are the result of thefts of relatively new guns than the result of high-volume, FFL-involved trafficking. Thus, it is likely that the share of a city's crime guns with short TTRs serves as an indirect indicator of the gun theft rate in that city.

Consequently, licensed dealers whose traced guns have shorter TTRs cannot be assumed to be involved in trafficking. Shorter TTRs would characterize guns sold by dealers located in or near high-crime neighborhoods, regardless of whether the dealers were operating in an unlawful or irresponsible fashion. One would likewise expect a shorter average TTR among those models or types of guns, such as inexpensive handguns, that are especially popular as self-defense weapons in high-crime areas, since they would be more likely to be stolen.

Gun thieves, of course, steal older guns as well as new ones, but are more likely to retain the better ones (presumably the newer ones) for their own use.[106] Criminals presumably prefer newer guns to old ones, just as criminals and noncriminals alike generally prefer new varieties of almost any consumer good to older ones. Among noncriminals, new guns would, on average, cost more to buy than their used counterparts, but among criminals who obtain their guns by theft, a preference for new guns costs nothing to indulge. For this reason alone one would expect a larger share of guns to be new among criminals than among noncriminals. Criminals who steal guns are presumably

---

105. *See* FEDERAL BUREAU OF INVESTIGATION, U.S. DEP'T OF JUSTICE, CRIME IN THE UNITED STATES 2004, at 100 (2005); FEDERAL BUREAU OF INVESTIGATION, U.S. DEP'T OF JUSTICE, CRIME IN THE UNITED STATES 2003, at 96 (2004); FEDERAL BUREAU OF INVESTIGATION, U.S. DEP'T OF JUSTICE, CRIME IN THE UNITED STATES 2002, at 92 (2003); FEDERAL BUREAU OF INVESTIGATION, U.S. DEP'T OF JUSTICE, CRIME IN THE UNITED STATES 2001, at 90 (2002); FEDERAL BUREAU OF INVESTIGATION, U.S. DEP'T OF JUSTICE, CRIME IN THE UNITED STATES 2000, at 88 (2001) [hereinafter FBI 2000]; FEDERAL BUREAU OF INVESTIGATION, U.S. DEP'T OF JUSTICE, CRIME IN THE UNITED STATES 1999, at 85 (2000) [hereinafter FBI 1999]; FEDERAL BUREAU OF INVESTIGATION, U.S. DEP'T OF JUSTICE, CRIME IN THE UNITED STATES 1998, at 85 (1999) [hereinafter FBI 1998]; FEDERAL BUREAU OF INVESTIGATION, U.S. DEP'T OF JUSTICE, CRIME IN THE UNITED STATES 1997, at 90 (1998) [hereinafter FBI 1997]. Burglaries per 100,000 population for 1996–2003 were (in chronological order): 914, 775, 645, 612, 710, 713, 642, and 737 (computed from City of Boston crime counts and population estimates), while the percent of crime guns with a TTR under three years was 53.8, 36.6, 24.9, 15.6, 15.1, 19.3, 15.5, and 22.3 (derived from Braga and Pierce, *supra* note 10, at 740).

106. *See* WRIGHT & ROSSI, *supra* note 14, at 200–01 (noting that 68 percent of gun thieves who kept a stolen gun for personal use did so because it was "nicer" than the one they were currently carrying).

likely to retain, and later use in crimes, the newer guns. Among those stolen guns sold by the thief, the newer ones are also likely to be the most attractive to the gun thief's customers, and the first sold, other things being equal. This would help to explain why guns with a short TTR comprise a disproportionately large share of recovered crime guns.

In addition, biases in samples of guns submitted for tracing are likely to exaggerate the share of short-TTR guns. Because newer guns are likely to have changed hands fewer times between retail sale and recovery in a crime, they have more value for the investigation of gun trafficking, since it is more likely that authorities can link such a crime gun to a trafficker or to a corrupt licensee. Consequently, police are likely to prefer to submit trace requests on newer guns, which would result in short-TTR guns claiming a larger share of traced crime guns than of all recovered guns.

Pierce and his colleagues disputed the idea that a large share of crime guns had been stolen, reasoning that "if most crime guns were stolen or were sold . . . as part of legal private transactions, we would expect to have an age distribution of crime guns that closely resembles the age distribution of firearms produced for sale in [the] United States."[107] They found that traced guns do not show such an age distribution, and concluded that most crime guns had not been stolen or sold in legal private transfers. However, this age distribution of traced guns is partly an artifact of the biased nature of traced-gun samples—they over-represent newer guns. But even ignoring this problem, the authors' reasoning is itself fallacious, because it implicitly assumes that, unlike virtually everyone else, criminals have no preference for newer guns, and in effect randomly choose, from among the available pool of stolen weapons, the guns they keep for themselves and later use in crime. Thus, the fact that newer guns are disproportionately involved in crime is not at all inconsistent with the proposition that most crime guns are obtained directly or indirectly by theft. Rather, the age distribution of crime guns suggests that, even though most of the firearms obtained by criminals may have been stolen, and many of these stolen weapons were older guns, gun thieves and other criminals prefer to retain, and use in crimes, the newer weapons.

There are still other reasons why one would expect relatively new guns to comprise a large share of crime guns, even if few were purchased by traffickers and quickly sold to criminals. First, crime victims are disproportionately

---

107. GLENN A. PIERCE ET AL., THE CHARACTERISTICS AND DYNAMICS OF CRIME GUN MARKETS: IMPLICATIONS FOR SUPPLY-SIDE FOCUSED ENFORCEMENT STRATEGIES 38 (2003), *available at* http://www.ncjrs.gov/pdffiles1/nij/grants/208079.pdf.

56 UCLA LAW REVIEW 1233 (2009)

young,[108] and the property owned by younger people tends to be relatively new. For example, among a randomly selected sample of 339 handguns reported in the 1994 National Survey of the Private Ownership of Firearms, the mean number of years that 18–24-year-old respondents had owned the gun was 2.7 years, compared to 4.8 years among those aged 25–39, 11.8 years among those aged 40–64, and 20.7 years among those aged 65 or older.[109] Thus, the higher rate of victimization among younger people implies that newer guns have a greater chance of being stolen, and thereby comprise a disproportionately large share of the guns possessed by criminals. Further, crime guns that were directly and lawfully purchased from FFLs by criminal users will be disproportionately new when used in crimes simply because criminals are themselves disproportionately young and thus likely to have been gun owners for shorter periods of time.

At the city level, if one interpreted the prevalence of guns with a short TTR among recovered crime guns as an indicator of the involvement of gun traffickers in supplying guns to criminals, one would be forced to draw some very dubious conclusions about where gun trafficking is most common. The consensus among scholars is that organized or systematic illicit trade in guns will be more profitable and thus more common in places where the acquisition of guns is more strictly regulated and gun ownership levels are lower.[110] Table 1 shows that all of the cities where gun trafficking is thought to be commonplace—due to strict local gun laws and low noncriminal gun ownership levels—actually have *longer*-than-average TTRs than other cities. In New York, Boston, and Chicago, three cities with some of the strictest controls in the nation, crime guns on average actually take longer to reach criminals' hands than crime guns in other cities. Therefore, if one views shorter-than-average TTR as an indicator of the prevalence of gun trafficking, one would have to conclude that there is less gun trafficking taking place in these cities with relatively strict gun controls. Conversely, crime guns recovered in many cities with higher gun ownership rates, weaker gun laws, and thus little need for the services of gun traffickers, have very short average TTRs. Such cities include Albuquerque, Atlanta, Greensboro, Memphis, Nashville, New Orleans, Phoenix, Richmond, and Tucson. This observed pattern makes

---

108.    *See* BUREAU OF JUSTICE STATISTICS, U.S. DEP'T OF JUSTICE, CRIMINAL VICTIMIZATION IN UNITED STATES, 1994 STATISTICAL TABLES, tbl.84.

109.    *See* POLICE FOUND., NATIONAL STUDY OF PRIVATE OWNERSHIP OF FIREARMS IN THE UNITED STATES, 1994, ICPSR version, (1998), *available at* http://www.icpsr.umich.edu/access/ index.html.

110.    *See, e.g.*, Cook & Braga, *supra* note 18, at 308; Braga et al., *supra* note 10, at 333; Cook et al., *supra* note 10, at 72; D.W. Webster et al., *Relationship Between Licensing, Registration, and Other Gun Sales Laws and the Source State of Crime Guns*, 7 INJ. PREVENTION 184 (2001).

sense if a shorter average TTR mostly reflects high rates of gun theft, and if crime guns that move quickly into criminal hands are more prevalent in cities with high rates of gun ownership and high rates of gun theft. We empirically test this hypothesis later.

TABLE 1. DOES A SHORT AVERAGE TIME-TO-RECOVERY (TTR) INDICATE A HIGH LEVEL OF GUN TRAFFICKING?[111]

| City | % Traced Guns with TTR < 3 years | Median TTR (in years) |
|------|------|------|
| Albuquerque, NM | 43 | 4.7 |
| Anaheim/Long Beach, CA | 14 | 8.8 |
| Atlanta, GA | 49 | 3.1 |
| Austin, TX | 33 | 6.2 |
| Baltimore, MD | 26 | 6.8 |
| Baton Rouge, LA | 43 | 6.1 |
| Birmingham, AL | 29 | 3.0 |
| Boston, MA | 19 | 7.9 |
| Buffalo, NY | 30 | 6.6 |
| Camden, NJ | 27 | 6.1 |
| Charlotte-Mecklenburg, NC | 41 | 4.4 |
| Chicago, IL | 29 | 6.2 |
| Cincinnati, OH | 38 | 5.4 |
| Cleveland, OH | 33 | 6.5 |
| Dallas, TX | 29 | 6.6 |
| Denver-Aurora, CO | 38 | 4.9 |
| Detroit, MI | 26 | 6.9 |
| Gary, IN | 53 | 2.6 |
| Greensboro, NC | 39 | 4.6 |
| Houston, TX | 26 | 7.1 |
| Indianapolis, IN | 49 | 3.1 |
| Jacksonville, FL | 24 | 6.7 |
| Jersey City, NJ | 31 | 6.4 |
| Las Vegas, NV | 39 | 4.5 |

111.    U.S. BUREAU OF ALCOHOL, TOBACCO & FIREARMS, *supra* note 40 (drawing figures from each corresponding city report pertaining to 2000).

| | | |
|---|---|---|
| Los Angeles, CA | 17 | 8.0 |
| Louisville, KY | 38 | 5.5 |
| Memphis, TN | 35 | 5.1 |
| Miami, FL | 28 | 6.5 |
| Milwaukee, WI | 41 | 4.6 |
| Minneapolis, MN | 34 | 5.3 |
| Nashville, TN | 33 | 5.4 |
| New Orleans, LA | 39 | 5.0 |
| New York City | 21 | 7.4 |
| Newark, NJ | 28 | 6.5 |
| Oakland, CA | 19 | 8.0 |
| Oklahoma City, OK | 25 | 6.5 |
| Philadelphia, PA | 44 | 3.8 |
| Phoenix, AZ | 35 | 5.1 |
| Pittsburgh, PA | 16 | 7.8 |
| Portland, OR | 30 | 6.0 |
| Richmond, VA | 38 | 4.6 |
| Salinas, CA | 24 | 6.7 |
| San Jose, CA | 19 | 9.0 |
| San Antonio, TX | 26 | 6.9 |
| Seattle, WA | 46 | 4.1 |
| St. Louis, MO | 18 | 7.6 |
| Stockton, CA | 17 | 9.2 |
| Tampa, FL | 25 | 6.7 |
| Tucson, AZ | 43 | 4.0 |
| Washington, D.C. | 31 | 5.7 |
| **U.S.** | 31 | 6.1 |

In sum, though trafficked guns are likely to have a short TTR, this does not imply that guns with a short TTR are likely to have been trafficked. New York City (NYC) is commonly regarded as a place where gun traffickers are especially important as suppliers of criminals' guns, since there are virtually no sales of handguns to the general public by licensed dealers within the city.[112] If the ATF's view of TTR were accurate, one would expect to find that a large share of NYC crime guns move quickly from retail sale to recovery by NYC law enforcement. In fact, among NYC guns traced in 2000, only 11 percent had

---

112.    Vizzard, *supra* note 28, at 31.

a TTR under one year,[113] even lower than the comparable 15-percent share that prevailed in nationwide.[114] That is, looking only at TTR, only about a tenth of the city's traced guns moved quickly enough into criminals' possession to look like trafficked guns. Even fewer crime guns possessed multiple indicators.

2.    Out-of-State (OOS) Origins

Some traffickers or their straws buy significant numbers of guns in batches from sources in states with weaker gun control laws, and then sell the guns in high-control states.[115] A significant volume of interstate gun smuggling would suggest that substantial numbers of crime guns were first purchased in a state different from the one in which police recovered them. It certainly is true that many guns used in crimes had previously been moved across state lines. Some scholars, however, have overinterpreted this fact as signaling something about the prevalence of interstate gun smuggling. For example, Jeremy Travis and William Smarrito asserted that guns were being supplied to NYC criminals by "a highly effective interstate black market," based almost entirely on the fact that a large share of those guns were originally purchased in a different state.[116] An out-of-state (OOS) origin, however, is not necessarily an indicator of the involvement of gun-smuggling traffickers, since there are mundane alternative explanations for cross-state movement, such as the gun being moved by its owner upon a change of residence and then being stolen.

NYC provides a useful extreme case study, since an unusually large share of its crime guns have OOS origins—84.5 percent of those traced in 2000, compared to 38 percent of guns recovered nationwide.[117] Given that virtually no private citizen may legally buy handguns in NYC, it is scarcely surprising that few crime handguns were first purchased in NYC. Does interstate gun smuggling into NYC, however, account for this cross-state movement of guns, or could routine migration of gun owners produce the same result? Census Bureau data indicates that in 2000, 798,565 of NYC's residents had been born in a different state, 368,388 of them in the South. All of these NYC residents necessarily lived in a different state, and then moved to New York. Still other residents were born in New York, moved to another state, and then moved

---

113.    U.S. BUREAU OF ALCOHOL, TOBACCO & FIREARMS, *supra* note 40, New York Section, at 5.

114.    *Id.* at ix.

115.    BRADY CTR. TO PREVENT GUN VIOLENCE, *supra* note 97, at 14.

116.    Jeremy Travis & William Smarrito, *A Modest Proposal to End Gun Running in America*, 19 FORDHAM URB. L.J. 795, 802 (1992).

117.    *See* U.S. BUREAU OF ALCOHOL, TOBACCO & FIREARMS, *supra* note 40, at 16 tbl.F (noting that only 15.5 percent of traced crime guns recovered in New York City were originally sold within the state of New York).

56 UCLA LAW REVIEW 1233 (2009)

back to New York. In just the five-year period between 1995 and 2000, 301,243 people moved from a different state to NYC.[118] These migrants presumably moved their possessions with them. If handgun ownership among these migrants was equal to U.S. average (at least 0.325 handguns per person),[119] migrants born in other states would have moved about 260,000 handguns from other states into NYC, and recent migrants alone would have moved around 98,000 handguns just in the preceding five-year period, about 20,000 per year. At this rate, over a period of a single seventy-year human life span, 1.4 million OOS handguns would have been moved into the city, lending some credence to the admittedly extreme guess by the Intelligence Division of the New York Police Department that there were two million illegal handguns in the city in 1980.[120] While some migrants who are both law-abiding and aware of New York's strict gun laws no doubt leave their handguns behind, others surely do not, either due to ignorance, or due to a judgment that retaining their handguns is more important than obeying gun laws. Among migrants, criminals would be especially likely to move their handguns with them, both because they are more willing to violate gun laws, and because they expect to need them for criminal activity and for self-protection.

As a standard of comparison, in 2003 a total of 3,666 violent crimes (homicides, robberies, and assaults) known to the police were committed with guns in NYC.[121] Even if one implausibly assumed that each gun crime involved a different gun, thereby maximizing the number of crime-involved guns, the criminal population needed at most 3,666 guns to commit all of the known violent gun crimes in NYC.

These numbers do not suggest either that all of NYC's crime handguns actually do arrive through people moving to the city, or that 1.4 million handguns have actually arrived in the city in this way over the course of the past seventy years. But these numbers do establish that all handguns used in crime in a given year easily could have been arrived in this way, without any organized gun smuggling. Thus, routine cross-state migration of gun owners provides a credible alternative explanation for cross-state movement of the city's crime guns. Further, still other mechanisms besides interstate gun-running

---

118. U.S. CENSUS BUREAU, TABLE 2, NET MIGRATION FOR THE POPULATION 5 YEARS AND OVER FOR THE UNITED STATES, REGIONS, STATES, COUNTIES, NEW ENGLAND MINOR CIVIL DIVISIONS, AND METROPOLITAN AREAS: 2000, CENSUS 2000, *available at* http://www.census.gov/population/www/cen2000/briefs/phc-t22/tables/tab02.pdf (county-level data from New York section of Table 2).

119. GARY KLECK, TARGETING GUNS: FIREARMS AND THEIR CONTROL 97 tbl.3.1 (1997).

120. *Illegal Guns By the Millions Filling City*, N.Y. TIMES, Mar. 31, 1980, at B1.

121. Memorandum From Joe Pascarella to Commanding Officer, Office of Management Analysis and Planning, Police Department, City of New York (Mar. 18, 2005).

move guns across state lines. Any NYC resident can get a handgun if she or he has a friend or relative in another state who is willing to buy a handgun for them. A one-time straw purchase of this sort would be unlawful, but it would be misleading to label either participant a trafficker.

After arrival in the city, many guns will inevitably move into criminal possession through residential burglary, vehicle theft, and other thefts. The last large-scale victimization survey conducted in NYC estimated that there were 184,100 household burglaries in 1972,[122] at a time when the city had about 2,832,036 occupied housing units.[123] Thus, assuming no repeat victimization within a year, an average NYC residence had a 6.5 percent chance of being burglarized. Homes in high-crime neighborhoods, where handgun possession for self-protection may be higher, had a still higher risk of burglary. At this rate, a home containing a handgun would have about a 49 percent chance of being burglarized within a decade.[124]

To be sure, gun smuggling does move at least a few handguns into NYC, given that law enforcement agencies occasionally uncover gun smuggling operations, albeit typically small-scale ones. There are evidently a few criminals who do not appreciate the difficulties of making a living from gun-running, particularly the risks associated with contacting large numbers of paying customers without coming to the attention of police. And the frequent news stories of guns being purchased "down South" for $100 and sold "on the streets" of NYC for $600[125] may inadvertently encourage occasional attempts at high-volume gun-running by especially naïve criminals. Nevertheless, as previously noted, over the period from 1990 to 2006, only six trafficking operations that moved a hundred or more guns were reported in NYC newspapers—about one every three years. There is no evidence that the total

---

122. U.S. DEP'T OF JUSTICE, CRIMINAL VICTIMIZATION SURVEYS IN THE NATION'S FIVE LARGEST CITIES: NATIONAL CRIME PANEL SURVEYS OF CHICAGO, DETROIT, LOS ANGELES, NEW YORK, AND PHILADELPHIA 44 (1975).

123. Interpolated from 1970 and 1980 Census data, in BUREAU OF THE CENSUS, U.S. DEP'T OF COMMERCE, COUNTY AND CITY DATA BOOK, 1977 at 723; BUREAU OF THE CENSUS, U.S. DEP'T OF COMMERCE, COUNTY AND CITY DATA BOOK, 1983 at 753.

124. $1-(1-0.065)10=0.49$ (The probability of any one NYC household suffering a burglary over a ten year period would be one minus the probability of not being burglarized over that period. The probability of not being burglarized in any of the ten years would equal the probability of not being burglarized in any one year, raised to the tenth power, i.e. multiplied times itself ten times. The probability of burglary in any one year was 0.065, so the probability of not experiencing a burglary in any one year was 1–.065 or 0.935, and the probability of not being burglarized in any of ten years would be 0.935 raised to the tenth power, or 0.51. Thus, the probability of being burglarized at least once over the ten year period would be 1–0.51=0.49, or 49 percent).

125. *See, e.g.*, Patrice O'Shaughnessy, *Students Major in Running Guns*, N.Y. DAILY NEWS, Sept. 29, 2002, at 4, *available at* https://www.nydailynews.com/archives/news/2002/09/29/2002-09-29_students_major_in_running_gu.html.

number of guns trafficked into the nation's largest city in a typical year is more than a few hundred—a tiny number compared to the 20,000 or so handguns that could move into the city annually as a byproduct of the routine migration of gun owners.

If ordinary migration followed by gun theft, rather than gun smuggling, accounts for the vast majority of cross-state movement of crime guns, one would expect that crime guns with OOS origins would be especially likely to originate in states with high gun ownership rates, since a higher share of migrants from such states would own guns in the first place. ATF trace data indicate that this is indeed the observed pattern. For example, among NYC crime guns recovered in 2000, the leading source states were New York (15.5 percent), Virginia (14.0 percent), North Carolina (9.4 percent), and Georgia (9.2 percent).[126] Based on 2001 state-level surveys, all of the three leading originating states had rates of household gun ownership higher than the national average.[127] While some scholars have interpreted such patterns as indicating that OOS crime guns tend to originate in places with weaker gun laws,[128] there is no evidence that weakness of gun laws in source states has any impact on the patterns of interstate movement of guns, independent of the higher gun-ownership levels that tend to prevail in those same states.

3. Criminal Possessor Was Not the Gun's First Retail Purchaser

If a trafficker was involved in moving a gun into the possession of another criminal, it follows that the criminal found by police to possess the gun is different from the person recorded on the initial purchase form (ATF Form 4473). This logic, however, cannot be reversed; it cannot be assumed that a large share of crime guns found in the possession of a person other than the first purchaser are trafficked guns. There are an enormous number of private transfers of used guns among noncriminal Americans. A national survey in 1994 found that 36 percent of guns and 31 percent of handguns acquired by the general public were acquired used.[129] Likewise, anytime a thief steals a gun and sells it to another criminal there is an intermediate possessor (the thief) even if no trafficker ever possessed the gun. Because it is so commonplace

---

126.　U.S. BUREAU OF ALCOHOL, TOBACCO AND FIREARMS, *supra* note 40, at 16 tbl.F.

127.　*See* Catherine A. Okoro et al., *Prevalence of Household Firearms and Firearms-Storage Practices in the 50 States and the District of Columbia*, 116 PEDIATRICS e370, e372 (2005).

128.　*E.g.*, Braga et al., *supra* note 10, at 333 (stating that many crime guns recovered in cities with tight firearm controls originated in southern states with less restrictive controls); Pierce et al., *supra* note 10, at 401 (stating that because New York and Boston have relatively strict gun controls, "a higher percentage of guns are imported into these cities from dealers in states with weaker controls").

129.　*See* COOK & LUDWIG, *supra* note 34, at 25 tbl.3.11.

that nontrafficked guns come to be possessed by people other than the first retail purchaser, this trait is likely to be at best a weak indicator that a gun was trafficked. It may also be an indirect indicator of out-of-state origins, if one accepts the premise that the further an object travels, the more likely it is that it was possessed by more than one person.

4.   Guns Part of a Multiple-Handgun Sale

Based on the theory that traffickers acquire substantial numbers of guns by buying them in relatively large batches from corrupt or negligent licensed dealers, ATF equivocally states that "the acquisition of handguns in multiple[-handgun] sales *can* be an important trafficking indicator."[130]   Philip Cook and Jens Ludwig even interpret trace data as indicating that handguns sold as part of a multiple-handgun sale (MHS) "are much more likely than others to move quickly into criminal use."[131]   However, more recent evidence indicates that this conclusion is wrong; it is not true that a large share of MHS guns are trafficked, or that MHS handguns are more likely to end up in criminal hands.[132]   If the typical MHS involved the purchase of dozens or hundreds of handguns, it would be reasonable to regard a MHS as highly suspect.   But if MHS transfers more commonly involve just two or three handguns, this inference is weak.   In fact, lawful concurrent purchases of small numbers of handguns are quite common.   To illustrate, Christopher Koper found that 27 percent of all handguns sold by licensed dealers (not just those later used in crimes) in Maryland in 1990–1995 were sold as part of a MHS.[133]

Likewise, few MHS guns show signs of having been trafficked.   As will be discussed later, there is good reason to view an obliterated serial number (OSN) as the strongest indicator that a gun has been trafficked.   Yet, hardly any traced crime handguns that were originally sold in multiples have an OSN.   Even when ATF examined a sample of handguns biased to over-represent handguns with OSNs (by analyzing only handguns from eight cities that requested traces on large numbers of guns with OSNs), it found that only 2.2 percent of MHS handguns had an OSN.[134]

---

130.   U.S. BUREAU OF ALCOHOL, TOBACCO & FIREARMS, *supra* note 40, at ix (emphasis added).
131.   Braga, *supra* note 18, at 300.
132.   Koper, *supra* note 10, at 760.
133.   *Id.* at 758.
134.   U.S. BUREAU OF ALCOHOL, TOBACCO & FIREARMS, *supra* note 40, at 52.   The OSN data came from just the eight cities (of forty-six total cities contributing to the 2000 national tracing report) that requested traces from ATF on at least eighty-five crime guns with OSNs.   *Id.* at 50.

Further, it does not appear to be true that MHS guns are more likely to be used in crimes. Koper studied guns sold in Maryland and found that handguns sold as part of a MHS were slightly less likely to end up being used in a crime than those sold separately from other handguns. Even ten years after initial sale, only 4.1 percent of MHS handguns had been recovered by police in connection with a crime—slightly less than the 4.7 percent of single-purchase handguns linked with crimes.[135] This pattern directly contradicts the claim that MHS handguns are more likely than other handguns to be trafficked and later used in crime. Even though some traffickers do buy guns in multiples, very few guns sold in multiples show signs of being trafficked.[136] Likewise, a dealer-level study by Garen Wintemute and his colleagues found no significant relationship between a dealer's volume of MHS transactions and the rate at which crime guns were traced to the dealer.[137] The fact that a handgun was sold as part of a MHS is consequently unlikely to have much utility for identifying trafficked guns, and it is unlikely that geographic areas with more MHS transactions host more gun trafficking activity.

5.    Guns Sold by a Dealer With a High Trace Count

Another possible indicator that a gun has been trafficked is if it was sold by a licensed dealer to whom many other crime guns have been traced.[138] The underlying rationale is that many dealers who sell a disproportionately large number of guns that end up in criminal hands are corrupt dealers who knowingly or negligently sell guns to criminal consumers, unlicensed traffickers, or straw purchasers. The Attorney General of New York, Andrew Cuomo, made it clear during his 2006 election campaign that his planned policies for dealing with illegal guns were based on the belief that high trace counts indicate illegal behavior by gun dealers: "A wave of illegal guns has been breaking over New York for years. Incredibly, 1 percent of gun dealers account for the majority of illegal guns [that is, traced guns]. We need to crack down on their illegal behavior and put them out of business."[139]

---

135.    Koper, *supra* note 10, at 758.
136.    Koper nevertheless asserted that MHS handguns were "at elevated risk for criminal use." *Id.* at 769. But this was true only within the tiny share (less than 1 percent) of all handguns that were recovered by police within one year of first retail sale, and the even smaller share of Maryland-sold guns that were recovered in nearby Washington, D.C. *Id.* at 761, 767.
137.    Garen J. Wintemute et al., *Risk Factors Among Handgun Retailers for Frequent and Disproportionate Sales of Guns Used in Violent and Firearm Related Crimes*, 11 INJ. PREVENTION 357, 361 (2005).
138.    *E.g.*, Pierce et al., *supra* note 10.
139.    Andrew Cuomo, The Role of the Attorney General, N.Y. L.J., Nov. 1, 2006, at 7.

The fact that many crime guns are traced back to a licensed dealer may appear damning, but for most such dealers, there are perfectly legitimate explanations for their high trace counts. First, if a dealer has a higher sales volume, it necessarily implies a larger number of guns at risk of coming into criminal possession through channels (such as theft from the owner) that are beyond the dealer's control. Thus, merely operating a successful business will increase the chances that a dealer will register a high trace count. A study of California FFLs found that just 11.7 percent of dealers accounted for 85.5 percent of traced crime handguns. This might suggest, as Mr. Cuomo apparently believed, that many of these FFLs must be criminal or irresponsible dealers—until one learns that these same dealers also accounted for 81.5 percent of all handgun sales.[140] That is, their share of crime guns was only slightly higher than one would expect if the FFLs were lawful and responsible dealers, and sheer sales volume accounted for their high trace counts. A dealer-level analysis likewise found that sales volume alone accounted for most of the variation in dealers' trace counts.[141]

Second, some FFLs do business in areas with higher crime rates, which leads to a larger share of the dealer's guns being stolen from their lawful purchasers, used in crimes, recovered by police, and traced by ATF. Thus, some or all of the variation in dealer trace counts that is not due to variation in sales volume may be attributable to variation in gun theft rates in the areas served by the FFLs. A recent dealer-level study imperfectly tested this idea. Wintemute and his colleagues analyzed predictors of dealer trace rates, but tested the effects only of types of crimes that rarely involve gun theft; the authors did not report any findings for the impact of rates of burglary, a crime that does often result in the theft of firearms. Among the crime types that they tested, the one that came closest to a property crime was robbery, and this was the one crime rate found to be significantly related to dealer trace rates—dealers in cities with higher robbery rates had higher trace rates.[142]

Consonant with these observations, ATF has long acknowledged that most licensed dealers to whom crime guns have been traced have been found to have been "operating within the confines of Federal law, and the vast majority of the illegal acts relating to these firearms occurred on the part of the individual purchasers" and not the dealers.[143] Even Philip Cook and

---

140. *See* Wintemute et al., *supra* note 137, at 360.
141. Garen J. Wintemute, Research Letter, *Relationship Between Illegal Use of Handguns and Handgun Sales Volume*, 284 JAMA 566, 567 (2000).
142. *See* Wintemute et al., *supra* note 137, at 360 tbl.4.
143. CONCENTRATED URBAN ENFORCEMENT, *supra* note 20, at 62.

56 UCLA LAW REVIEW 1233 (2009)

Anthony Braga,[144] who strongly favor using tracing to uncover trafficking, conceded that "the number of traces to a particular FFL is only a rough indicator of the likelihood that the FFL is engaging in negligent or criminal sales practices."[145]  Even this weak endorsement of trace counts as an indicator of trafficking, however, cannot be justified, since the ability of high trace counts to efficiently identify corrupt FFLs has never been empirically demonstrated.

6.    Obliterated Serial Number (OSN)

ATF is typically circumspect in its claims about the validity of the trafficking indicators it employs, for example, stating that short TTR "*suggests* illegal diversion" or that "acquisition of handguns in multiple sales *can* be" a trafficking indicator.  In sharp contrast, ATF flatly states that "the obliteration of the serial number on a crime gun *is* a key criminal indicator of trafficking,"[146] and that "crime guns with obliterated serial numbers are *likely* to have been trafficked."[147]  Braga and Pierce echo this assessment, unequivocally describing OSN as "a clear indicator of gun trafficking."[148]  An OSN probably is the strongest available indicator of trafficker involvement in a gun's movement, since there are powerful motives for traffickers to efface serial numbers, while few people who are not traffickers have equally strong reasons for doing so.  Obliteration not only definitively establishes that a criminal possessed the gun at some time (effacing a serial number is itself a crime), but also constitutes strong evidence that some past possessor wanted to obstruct the tracing of the gun, and thereby prevent it from being linked with past, presumably illegal, transfers.  Traffickers would clearly want to impede tracing that could link them with their criminal associates, such as straw purchasers or a corrupt licensed dealer who supplied their guns.  High-volume traffickers would be especially strongly motivated to impede tracing, since the more guns that one sells, the higher the risk that some of them can be traced back to the trafficker after being used in a crime.

144.    *See* Cook & Braga, *supra* note 18, at 277–309.
145.    *Id.* at 302.
146.    U.S. BUREAU OF ALCOHOL, TOBACCO & FIREARMS, CRIME GUN TRACE REPORTS (1999): NATIONAL REPORT IX (2000).
147.    U.S. BUREAU OF ALCOHOL, TOBACCO & FIREARMS, *supra* note 12, at 8 (emphasis added).
148.    Cook & Braga, *supra* note 18, at 737; *see also* Koper, *supra* note 10, at 753 (noting that obliterated serial numbers are "an obvious flag for potential trafficking").

D.    Biases in Samples of Traced Guns

Experts have repeatedly concluded that the guns traced by ATF are not a representative sample of crime guns, and cannot provide a reliable picture of the modes of acquisition most frequently used by criminals or the paths of distribution that crime guns most often follow.[149]  For example, the National Research Council's Committee to Improve Research Information and Data on Firearms flatly concluded that "trace data cannot show whether a firearm has been illegally diverted from legitimate firearms commerce."[150]  It further concluded that studies based on this data "cannot show what happened in between [the first retail sale and recovery by law enforcement]: whether a firearm was legitimately purchased and subsequently stolen, sold improperly by a licensed dealer, or any other of a myriad of possibilities."[151]  Even ATF has never explicitly claimed that traced guns are representative of crime guns or that they show the typical ways that guns are diverted to criminals. Unfortunately, many scholars have not taken these caveats sufficiently seriously, and have repeatedly drawn conclusions about the trafficking of crime guns, when their supporting data pertained only to nonrandomly selected subsets of guns that were traced.[152]

The problem is not merely that traced guns do not constitute a random sample of crime guns, and thus might be unrepresentative of crime guns generally.  Rather, the processes by which guns are selected for tracing are known to systematically bias samples of crime guns in ways that tend to exaggerate the share of guns characterized by putative trafficking indicators. The biased selection occurs at two stages: (1) when police choose to request ATF traces for some guns and not others, and (2) when ATF is able to successfully trace some guns submitted for tracing but not others.[153]  When police recover crime guns, their primary motive for submitting the guns for tracing is to help identify possible traffickers (and occasionally other types of criminals).  It therefore is sensible for law enforcement officers to favor tracing guns that

---

149.    U.S. CONG. RESEARCH SERV., "ASSAULT WEAPONS": MILITARY-STYLE SEMIAUTOMATIC FIREARMS FACTS AND ISSUES, H.R. REP. NO. 92-434 at 65 (1992); COMM. ON LAW & JUSTICE, NAT'L RESEARCH COUNCIL, FIREARMS AND VIOLENCE: A CRITICAL REVIEW 40 (Charles F. Wellford et al. eds., 2004) [hereinafter FIREARMS AND VIOLENCE]; Kleck, *supra* note 27, at 29–32.

150.    FIREARMS AND VIOLENCE, *supra* note 149, at 40.

151.    *Id.*

152.    *See, e.g.*, Christopher S. Koper, *Federal Legislation and Gun Markets: How Much Have Recent Reforms of the Federal Firearms Licensing System Reduced Criminal Gun Suppliers?*, 1 CRIMINOLOGY & PUB. POL'Y 151, 155, 175 (2002); Pierce et al., *supra* note 10; Travis & Smarrito, *supra* note 116, at 800.

153.    U.S. CONG. RESEARCH SERV., *supra* note 149; FIREARMS AND VIOLENCE, *supra* note 149.

show initial indications of trafficker involvement. For example, if the gun's serial number was obliterated, trafficker involvement is more likely. Likewise, if the criminal who possessed the gun when it was seized had an out-of-state driver's license, it is more likely that the gun also originated out of state. This in turn could suggest that the gun was moved across state lines by a gun smuggler. There might also be a preference for tracing newer models of guns, or guns that, based on limited wear, look newer, since tracing older guns has less investigative value—it is unlikely that identifying the person who bought a gun when it was new ten or twenty years ago would help identify a current trafficker. ATF has explicitly acknowledged that there is more law enforcement value in tracing newer guns: "[S]hort time-to-crime guns have the most immediate investigative potential for law enforcement officials because they are likely to have changed hands less frequently."[154]

One implication of this bias in favor of guns with a short TTR is that unwary analysts may misinterpret data on samples of traced guns as indicating that a large percentage of crime guns move directly from retail sale as new guns into the hands of criminals, even if the large share of guns with a short TTR is largely a reflection of the fact that police see little value in tracing older guns. Even sophisticated consumers of trace data have fallen into this trap. Although in other ways skeptical about the value of trace data, the members of National Research Council's Committee to Improve Research Information and Data on Firearms were convinced that one could somehow infer from trace data that crime guns that moved from other states into cities with tight gun regulations "are imported directly after the out-of-state retail sale"[155] (uncritically citing the conclusions of Cook and Braga[156]). In fact, trace data can neither establish that such guns were deliberately imported for purposes of illegal sale (rather than merely moved along with their owner's other possessions), nor that a large share of them were moved immediately after retail sale.

Samples of guns submitted for tracing may also under-represent guns with in-state origins because law enforcement personnel in states with their own gun-registration systems can use those systems to trace in-state guns, turning to ATF mostly for tracing of out-of-state guns along with a few in-state guns that were not successfully traced by the state's databases. Such a systematic bias would artificially inflate the out-of-state share.[157] Police may

---

154. U.S. Bureau of Alcohol, Tobacco & Firearms, *supra* note 40, at xii.
155. Firearms and Violence, *supra* note 149, at 80.
156. Cook & Braga, *supra* note 18.
157. *See* Kleck, *supra* note 27, at 32; Jeffrey A. Roth & Christopher S. Koper, Impact Evaluation of the Public Safety and Recreational Firearms Use Protection Act of

also prefer to trace guns that they suspect came from another state simply because they believe, correctly or not, that a large share of crime guns in their city were smuggled from out-of-state, and they want to identify the sources.

Further, types of guns that are of especially strong political interest and subject to heightened media attention may also be overrepresented among guns selected by police for tracing. Failure to fully appreciate this bias in traced-gun samples has lead to unwarranted conclusions in past research. For example, Travis and Smarrito claimed that assault weapons (AWs) were "disproportionately involved in criminal activity," based entirely on samples of traced guns,[158] which over-represent AWs.[159] Likewise, Christopher Koper and Jeffrey Roth concluded that national trends in trace requests suggest that criminal use of AWs declined after the federal assault weapons ban was passed.[160] In sharp contrast, Koper's and Roth's data on all AWs recovered by police (not just those submitted to ATF for tracing) indicated that there were no significant declines in the AW share of crime guns in the wake of the federal ban.[161] Thus the decline in AW trace requests may merely have been an artifact of a decline in police interest in tracing AWs once the AW problem was "solved" by passage of the federal AW ban and once news media interest in the issue declined. Although this hypothesis was dismissed by Koper and Roth, it is perfectly consistent with the authors' own observation that the decline was weaker in states that already had their own AW laws,[162] where passage of the largely redundant federal ban would presumably have been of less significance or popular interest.

In addition to police preferences for submitting trace requests on guns with certain traits, ATF has its own policies concerning which guns it will trace, and these policies further bias samples of traced guns. At various times in the past, ATF would not routinely trace guns more than five (or ten, or twenty) years old, which skewed the distribution so that nearly all traced guns were relatively new, no matter how common older guns were in the entire population of recovered crime guns. For example, in a 1999 report, ATF

---

1994, at 59 (1997); Eleanor Weber-Burdin et al., Weapons Policies: A Survey of Police Department Practices Concerning Weapons and Related Issues 4–9 (1981) (unpublished report to the U.S. Department of Justice, University of Massachusetts, Amherst); Zimring, *supra* note 10, at 105 n.2.

158.    Travis & Smarrito, *supra* note 116, at 800.

159.    *See* KLECK, *supra* note 119, at 112.

160.    The assault weapons ban was Title XI of the Violent Crime Control and Law Enforcement Act of 1994, Pub. L. No. 103-322, 108 Stat 1796 (codified as amended in scattered sections of 42 U.S.C.). *See* Christopher S. Koper & Jeffrey A. Roth, *The Impact of the 1994 Federal Assault Weapons Ban on Gun Markets*, 18 J. QUANTITATIVE CRIMINOLOGY 239, 256–59 (2002).

161.    *See id.* at 260–61.

162.    *See id.* at 257–59.

stated that their National Tracing Center's "policy was not to trace firearms manufactured before 1990, unless specifically requested by a law enforcement management official"[163]—that is, no tracing of guns more than nine years old. Despite widespread, decades-old awareness of this censoring of older guns from trace samples, scholars have continued to insist, based solely on firearms tracing data, that few crime guns are older guns,[164] or that crime guns are "imported [into tight control cities] directly after the out-of-state retail sale."[165]

In sum, the process of selecting guns for tracing results in data that over-represent guns that are relatively new (and therefore have a shorter TTR), have out-of-state origins, or have other traits that are associated with these characteristics. That is, samples of guns successfully traced or submitted for tracing overrepresent guns that look like they were trafficked. This problem is routinely ignored by those who use trace data to support a claim that trafficking is important in supplying guns to criminals. For example, Glenn Pierce and his colleagues conclude that crime guns are disproportionately new compared to the total stock of guns, as judged by manufacture and importation data.[166] Their data, however, pertained only to samples of traced guns, which systematically excluded nearly all of the older crime guns.

It has been hinted (though never explicitly stated) that the unrepresenta-tive nature of traced gun samples was, beginning around 1997, largely eliminated in cities participating in the ATF Youth Crime Gun Interdiction Initiative (YCGII) program, because these cities promised to trace "comprehensively" (i.e. request traces on all the guns that their police recovered). Some scholars appear to have taken it on faith that all police departments that promised to perform comprehensive tracing actually did so.[167] However, these scholars typically do not consider whether YCGII cities do actually submit trace requests on all, or nearly all, recovered crime guns. Rather, they draw conclusions about

---

163.    U.S. BUREAU OF ALCOHOL, TOBACCO & FIREARMS, *supra* note 12, at 19.

164.    *See, e.g.*, Braga et al., *supra* note 10, at 331–33 (favorably listing studies that use firearms trace data to conclude that "recovered crime guns tend to be quite new"); Cook et al., *supra* note 10, at 62–63 ("[W]e conclude that *most* guns used in crime . . . have been acquired relatively recently.") (citing Zimring, *supra* note 10); Zimring, *supra* note 10, at 95–96 (supporting the "new guns" hypothesis with a study of "federally initiated traces."). Both Braga et al. and Cook et al. note some limitations of trace data, but then proceed to draw precisely the same conclusions that would follow in the absence of their caveats.

165.    FIREARMS AND VIOLENCE, *supra* note 149, at 80.

166.    Pierce et al., *supra* note 10, at 394.

167.    *See, e.g.*, Cook & Braga, *supra* note 18, at 286; Koper, *supra* note 10, at 759 (stating that because Baltimore and Washington, D.C. have a comprehensive tracing policy, the cities can provide "complete data on guns recovered in those jurisdictions"); Pierce et al., *supra* note 10, at 397; Wintemute et al., *supra* note 137, at 361 ("Most traced guns in California come from cities with mandatory tracing policies, so within-jurisdiction selection bias should be minimal.").

crime guns in general based solely on analyses of traced guns—conclusions that logically follow from the evidence only if one assumes that YCGII cities actually do trace comprehensively, thereby guaranteeing that traced gun samples accurately represent the population of all recovered crime guns.[168]

This assumption, however, is clearly false for many of the YCGII cities, and remains unsubstantiated for the rest. ATF has repeatedly acknowledged that "the effort to achieve comprehensive tracing has not been fully institutionalized,"[169] that it "cannot determine definitively whether all recovered guns are being traced,"[170] that "the tracing of guns with obliterated serial numbers is not conducted consistently by law enforcement agencies,"[171] and that "the extent of program implementation varies from one jurisdiction to another"[172]—something that obviously could not be true if implementation was 100 percent in all participating cities.

In 1999 ATF conducted a survey of YCGII police departments in order to determine the completeness of tracing, and "about half" of the thirty-eight cities participating at the time in the YCGII program did not even respond to the survey. ATF explicitly acknowledged that ten of the remaining nineteen (or so) cities were tracing less than 100 percent of recovered guns.[173] ATF has not repeated this evaluation effort since 1999. Even the figures on tracing rates provided to ATF by these reporting agencies were not substantiated by ATF. ATF did not perform any independent assessments of tracing levels for any of the YCGII agencies, for example by performing their own audits of police department gun files in order to establish the share of recovered guns that matched up with trace requests submitted to ATF. Thus, the actual completeness of tracing remains unknown for most YCGII cities. In addition, there is still no firm evidentiary basis for the claim that YCGII eliminated or even substantially reduced the sample bias due to the preferences of police officers for requesting traces on guns displaying various presumed signs of trafficking.

Even if police really did submit all recovered guns for tracing, only an unrepresentative subsample could be successfully traced to the point where the presence or absence of various potential indicators of trafficking can be established. For example, a gun must be successfully traced to its first retail

---

168. *See, e.g.,* Braga et al., *supra* note 10, at 331; Cook & Braga, *supra* note 18, at 303–07; Koper, *supra* note 10, at 759; Pierce et al., *supra* note 10, at 397.
169. U.S. BUREAU OF ALCOHOL, TOBACCO & FIREARMS, *supra* note 12, at A1.
170. U.S. BUREAU OF ALCOHOL, TOBACCO & FIREARMS, *supra* note 40, at 67.
171. *Id.* at 50.
172. U.S. BUREAU OF ALCOHOL, TOBACCO & FIREARMS, *supra* note 12, at B3.
173. U.S. BUREAU OF ALCOHOL, TOBACCO AND FIREARMS, DEP'T OF THE TREASURY, CRIME GUN TRACE REPORTS (1999): NATIONAL REPORT B4, B5 (2000).

sale in order to establish whether this sale occurred in a state different from the one in which it was recovered, or to determine how long ago the sale occurred, thereby establishing TTR. ATF, however, will not even initiate traces on older guns unless a law enforcement executive makes a special request, or the dealer that sold the gun has gone out of business and the records of their transfers can be found in ATF's out-of-business dealer files.[174] Thus, among the 88,570 guns for which police in forty-four YCGII cities requested a trace in 2000, ATF did not even begin a trace for 12.8 percent of them, in most cases because the gun was too old. Among the guns for which ATF did initiate a trace, another 33.6 percent could not be successfully traced to their first retail purchaser. And for at least 10.7 percent of all trace requests, a trace could not be completed to the first retail purchaser for reasons clearly related to the gun being older (it had been produced or imported by a manufacturer or importer no longer in business, the twenty-year record retention period had expired, or records were otherwise no longer available).[175]

Thus, even after the advent of YCGII, it was still impossible to successfully trace about half of the guns submitted for tracing. In addition, unknown numbers of other guns recovered by police were never submitted for tracing. As such, there remained ample reasons to suspect systematic bias in the data obtained from samples of successfully traced guns. In particular, the percent of recovered guns that appeared to be fairly new (have a short TTR), is overstated as a result of the systematic exclusion of older guns from those submitted for tracing, and from those for which a trace successfully was completed. On the other hand, because this problem is inherent in the national ATF tracing system, the inability to trace older guns operates to a similar degree in all localities. Thus, although traced gun samples overstate the absolute prevalence of supposed trafficking indicators among crime guns, use of such samples does not necessarily distort comparisons across different areas. Trace data may still provide a basis for macro-level indicators of the relative prevalence of trafficking between cities.

III.    A TENTATIVE ESTIMATE OF THE TRAFFICKING SHARE OF CRIME GUNS

As previously noted, the guns known to have been trafficked as a result of law enforcement investigations comprise only a tiny share (probably under

---

174.    U.S. BUREAU OF ALCOHOL, TOBACCO & FIREARMS, *supra* note 40, at 68.
175.    *See id.* at 25–27, 68.

1 percent) of the guns acquired by criminals.[176]   This clearly establishes that ATF enforcement efforts impact only a tiny share of the flow of guns to criminals.  However, it cannot establish the trafficker-supplied share of crime guns since some traffickers are not caught, and the authorities may underestimate the number of guns trafficked by those who are apprehended. One can instead approach this issue by considering the prevalence of stronger trafficking indicators among traced guns.  Suppose, for the sake of argument, that all trafficked guns had OSNs, and all guns with OSNs had been trafficked.  National tracing data indicate that less than 1.6 percent of traced guns have OSNs, suggesting that few crime guns were trafficked.  When ATF examined a sample of recovered handguns from all 46 YCGII cities that was limited to just those with an extremely short time-to-recovery (TTR) of one year or less—which, according to ATF doctrine are especially likely to have been trafficked—only 1.6 percent of these handguns had an OSN.[177]   If one takes into account the fact that some guns with OSNs were not trafficked, then the estimated trafficked share would be still lower than 1.6 percent— probably under one percent.

Moreover, if one only labeled as "trafficked" guns that possess other indicators in addition to an OSN and an extremely short TTR, the trafficking share would be lower still.  For example, ATF found that only 0.4 percent of crime handguns with a TTR under one year that were traced in 2000 had an OSN and were purchased as part of a multiple handgun sale (MHS).[178]   Because this sample was limited to those with TTRs under one year, it was biased in favor of guns with supposed trafficking indicators.  Further, since crime guns with a TTR under one year comprised only 15 percent of all traced guns,[179] and just 0.4 percent of these fast-TTR handguns had an OSN and were part of a MHS, only about 0.06 percent, or one in 1,667, traced guns had all three of these putative indicators of having been trafficked.

In any case, trace data are fully consistent with the hypothesis that traffickers supply less than one percent of crime guns.  Certainly, there is no affirmative evidence that traffickers supply even this large a share of crime guns.  Nevertheless, since it is possible that substantial numbers of trafficked guns never had their serial numbers obliterated, the trafficked share could be larger than OSN prevalence suggests.  Further, even small numbers of trafficked guns might influence the share of criminals with guns, if the trafficking was

---

176.   *See supra* Part I.C, at 1245–46.
177.   U.S. BUREAU OF ALCOHOL, TOBACCO & FIREARMS, *supra* note 40, at 50, 52.
178.   *Id.* at 50, 52 tbl.21.
179.   *Id.* at 30.

56 UCLA LAW REVIEW 1233 (2009)

concentrated in areas where significant numbers of criminals had no satis-factory alternative sources of guns. Thus, it remains an open question whether trafficking levels affect crime rates—a question that can be tested with an analysis of empirical data. This analysis, however, requires valid measures of trafficking.

## IV. NEW CITY-LEVEL EVIDENCE ON GUN TRAFFICKING

### A. Methods of the Present Study

We wanted to first evaluate the utility of ATF trace data for measuring the prevalence of gun trafficking activity in cities, so we tested various indicators of whether (1) individual crime guns had been trafficked, or (2) individual FFLs were involved in trafficking, in order to determine which, if any, could be used as city-level indicators of the prevalence of gun trafficking. Then, assuming that some of the indicators were valid, we sought to explore (1) the conditions that favor higher trafficking levels, (2) the impact of gun trafficking on gun possession among criminals, and (3) the impact of gun trafficking on violent crime rates.

Either of two likely possibilities regarding the validity of gun trace-based indicators of gun trafficking may be true. First, all of these indicators might be invalid, including even the one in which the most faith is placed, the prevalence of OSNs. If this is so, this means that the case for the concentrated gun trafficking model, which relies almost entirely on trace data, is fundamentally unsound and therefore cannot be taken seriously. Alternatively, some trace-based indicators—in particular, the prevalence of OSNs among recovered crime guns—might be relatively valid and useful as measures of the prevalence of gun trafficking. If this is the case, the concentrated gun traf-ficking model still fails, because our analysis of patterns among putative trafficking indictors shows (1) that most of them have little correlation with each other (suggesting that, even if some are valid indicators of gun trafficking, they are mostly measuring different things), and (2) that even the best indicators show no significant positive association with measures of gun availability among criminals or crime rates (suggesting that even if some sort of gun trafficking is being validly measured, it has no measurable effect on criminal gun possession or crime rates).

ATF has released detailed reports on fifty YCGII cities, describing the guns submitted by their police departments for tracing in 2000.[180] Our tentative working assumption was that the larger the share of these guns that displayed putative trafficking indicators, the larger the share of local crime guns that was supplied by traffickers. That is, we initially assumed that biases in samples of traced guns are sufficiently similar across YCGII cities to permit meaningful comparisons of the relative prevalence of putative trafficking indicators across those cities. We began by examining bivariate correlations among the indicators. If the measures all reflect levels of trafficking, they should have strong bivariate correlations with each other. Then we conducted a principle components analysis to see if the indicator variables all reflect, to varying degrees, a single underlying factor. Finally, we estimated regression models to estimate the impact of apparent trafficking levels (based on putative trace-based indicators) on criminal gun possession and on violent crime rates.

B.   Findings

Table 2 lists the variables in the analysis, including the potential city-level indicators of the prevalence of gun trafficking, while Table 3 displays the weighted correlations among the trafficking indicators. Each YCGII city is weighted by the number of trace requests it submitted to ATF, since this quantity purportedly equals the total number of crime guns recovered by the police in that city. Table 3 also includes the percent of suicides committed with guns (PSG), which has been shown to be a highly valid proxy for measuring differences in gun ownership levels across areas.[181] PSG is used to test the hypothesis that there will be less trafficking in cities where local, predominantly lawful gun ownership is already high, and criminal demand can therefore be met by guns stolen from local residents. If this hypothesis is correct, PSG should be negatively related to any variables that are valid indicators of trafficking prevalence. Table 3 also includes a gun theft rate variable derived from the Stolen Gun Files of the FBI's National Criminal Information Center.[182] These data were available only at the state level, so they pertain to the state in which each city is located. The gun theft counts are for a two-year period from 1999 to 2000, so they were divided in

---

180.   These data are available on the Web at BUREAU OF ALCOHOL, TOBACCO, & FIREARMS, *supra* note 40.

181.   COOK & LUDWIG, *supra* note 34; Gary Kleck, *Measures of Gun Ownership Levels for Macro-Level Crime and Violence Research*, 41 J. RES. CRIME & DELINQUENCY 3, 8–19 (2004).

182.   *See* AMS. FOR GUN SAFETY FOUND., STOLEN FIREARMS: ARMING THE ENEMY 16, 17 tbl.3 (2002) (report based on NAT'L CRIME INFO. CTR., FEDERAL BUREAU OF INVESTIGATION, U.S. DEP'T OF JUSTICE, STOLEN GUN FILE RECORDS (1999–2000)).

half to produce an annual average, and then divided by the state's population (in 100,000s). No gun theft data was available for the District of Columbia (D.C.), but since D.C. has lower-than-average gun ownership but higher-than-average crime rates, it was assigned the national average gun theft rate as a reasonable approximation.

TABLE 2. VARIABLES IN THE CITY ANALYSIS
(Consolidated data from 50 cities, weighted by number of trace requests)

| Variable | Description | Mean | Standard Deviation |
|---|---|---|---|
| OSN | Percent recovered guns with obliterated serial number | 4.86 | 4.51 |
| OUTSTATE | Percent recovered guns first sold in another state | 32.97 | 19.94 |
| DLR250ML | Percent recovered guns first sold by FFL ≥ 250 miles away | 24.02 | 17.74 |
| POSNOTBY | Percent recovered guns possessed by person not 1st buyer | 88.84 | 5.93 |
| TTRU1YR | Percent recovered guns with time-to-recovery under 1 year | 14.46 | 5.26 |
| TTRU3YR | Percent recovered guns with time-to-recovery under 3 years | 30.96 | 8.86 |
| TTRMEDN | Median time-to-recovery among recovered guns | 6.00 | 1.42 |
| DELR5PTR | Percent recovered guns traced to FFL with 5+ traces | 52.45 | 16.27 |
| DLR10PTR | Percent recovered guns traced to FFL with 10+ traces | 42.67 | 18.91 |
| DLR25PTR | Percent recovered guns traced to FFL with 25+ traces | 29.53 | 18.70 |
| DISTANCE | Distance in miles, city center to nearest state border | 74.39 | 89.19 |
| BURGRATE | Burglaries known to police per 100,000 people | 1269.15 | 498.51 |
| PSG9498 | Percent of suicides committed with guns, 1994-1998 | 51.51 | 13.16 |
| TRAFVOLU | Number of traced guns with OSN per 100,000 people | 15.01 | 14.82 |

| MURDRATE | Murders, nonnegligent manslaughters per 100,000 people | 19.57 | 11.78 |
|---|---|---|---|
| ASLTRATE | Aggravated assaults per 100,000 people | 756.21 | 324.57 |
| ROBRATE | Robberies per 100,000 people | 534.83 | 222.04 |
| PGH9902 | Percent of homicides committed with guns | 70.25 | 7.98 |
| COPRATE | Sworn officers per 100,000 people | 6027.13 | 9860.19 |
| POVERTY | Percent population below poverty line | 19.95 | 4.74 |
| MFI | Median family income (dollars) | 40950.40 | 7580.97 |
| UNEMPLOY | Percent labor force unemployed | 5.11 | 1.81 |
| EDUC | Percent population age 25+ with high school diploma or higher | 73.96 | 6.67 |
| BLACK | Percent population African-American | 34.99 | 21.46 |
| HISP | Percent population Hispanic | 19.31 | 17.66 |
| AGE1824 | Percent population age 18–24 | 11.20 | 1.52 |
| OWNEROCC | Percent housing units occupied by owners | 48.66 | 9.16 |
| FEMHEAD | Percent of households headed by females | 18.63 | 4.97 |
| POPCHANG | Percent change in population from 1990 to 2000 | 5.85 | 13.60 |
| POPCITY | Resident population of city (in 100,000s) | 15.08 | 19.18 |
| DENSITY | Persons per square mile | 7112.03 | 6319.20 |
| SOUTH | City located in former slave-owning state | 0.43 | 0.50 |
| STORES | Retail establishments per 100,000 people | 375.62 | 100.64 |
| ONEGUN | State law limiting handgun purchases to one per month (0=no, 1=yes) | 0.06 | 0.23 |
| REGISTER | State law requiring registration of handgun purchases (0 = no, 1 = yes) | 0.28 | 0.12 |

56 UCLA LAW REVIEW 1233 (2009)

| PERMIT | State law requiring permit to purchase handgun  (0 = no, 1 = yes) | 0.31 | 0.47 |
| WAITPER | Days buyer must wait before taking delivery of handgun | 1.71 | 3.02 |

The correlations in Table 3 indicate that many of the potential trafficking indicators are not significantly correlated with each other, and some are even negatively correlated.  For example, if one tentatively assumes that the percent of crime guns that have an OSN is a strong indicator of trafficking, as both ATF and scholars agree, one finds that cities where many crime guns can be traced back to retail dealers with high trace counts actually have less trafficking, as measured by the percent of recovered guns with OSNs.  This is not what one would expect if one assumed that many high trace count dealers were involved in trafficking.  On the other hand, these findings are fully compatible with the hypothesis that high trace counts primarily reflect high sales volume, since there is a strong positive correlation between the share of crime guns sold by dealers with high trace counts and the city's gun ownership rate, and thus its volume of gun sales to the noncriminal public.  That is, these correlations suggest that indicators based on high dealer trace counts are more likely to reflect higher volumes of lawful gun sales than the involvement of corrupt licensees in trafficking.

Consistent with this idea, one of the strongest (and highly significant) correlations in the table is between PSG and OSN.  This supports the hypothesis that the higher a city's local gun ownership level, the less its gun trafficking activity.  Where more guns are owned, more guns will be stolen, other things being equal, which results in more guns circulating among criminals.  A large volume of stolen guns competes with guns sold by traffickers and depresses black market prices, reducing both the profit incentive for traffickers and the need for their services.  This interpretation is directly supported by the significant ($r= -0.517$) correlation between the gun theft rate and OSN prevalence among traced crime guns; where more guns are stolen, there is less trafficking.  These correlations can also be viewed as indications of the construct validity of the OSN indicator as a measure of trafficking activity: it correlates strongly with variables (gun ownership levels and gun theft rates) with which it should be correlated if our hypothesis is correct.[183]

---

183.    *See* JUM C. NUNNALLY, PSYCHOMETRIC THEORY 86–87 (1967).

TABLE 3. CORRELATIONS AMONG POTENTIAL GUN TRAFFICKING INDICATORS—
PERCENT OF RECOVERED GUNS WITH INDICATED TRAIT
(Consolidated data from 50 cities, weighted by number of trace requests)

| | 1 | 2 | 3 | 4 | 5 | 6 | 7 | 8 | 9 | 10 | 11 | 12 | 13 |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| **1** Obliterated Serial Number | 1 | .689 .000 | .660 .000 | .442 .001 | −.183 .102 | −.151 .148 | .158 .136 | −.310 .014 | −.290 .021 | −.200 .082 | −.425 .001 | −.517 .006 | −.695 .000 |
| **2** Out of State Origin | | 1 | .918 .000 | .656 .000 | −.376 .004 | −.342 .008 | .354 .006 | −.674 .000 | −.635 .000 | −.544 .000 | −.492 .000 | −.442 .001 | −.684 .000 |
| **3** Dealer 250+ Miles Away | | | 1 | .575 .000 | −.426 .001 | −.419 .001 | .456 .000 | −.651 .000 | −.615 .000 | −.531 .000 | −.258 .035 | −.560 .000 | −.729 .000 |
| **4** Possessor Not 1st Purchaser | | | | 1 | −.370 .004 | −.350 .006 | .300 .017 | −.510 .000 | −.512 .000 | −.472 .000 | −.484 .000 | −.254 .037 | −.336 .008 |
| **5** Time-to-Recovery Under 1 Years | | | | | 1 | .968 .000 | −.936 .000 | .505 .000 | .477 .000 | .436 .001 | −.102 .241 | .481 .000 | .381 .003 |
| **6** Time-to-Recovery Under 3 Year | | | | | | 1 | −.975 .000 | .496 .000 | .484 .000 | .447 .001 | −.177 .109 | .526 .000 | .374 .004 |
| **7** Median Time-to-Recovery | | | | | | | 1 | −.522 .000 | −.513 .000 | −.478 .000 | .188 .096 | −.588 .000 | −.398 .002 |
| **8** Dealer Has 5+ Traces | | | | | | | | 1 | .979 .000 | .927 .000 | .193 .089 | .370 .004 | .404 .002 |
| **9** Dealer Has 10+ Traces | | | | | | | | | 1 | .956 .000 | .168 .122 | .358 .005 | .357 .005 |
| **10** Dealer Has 25+ Traces | | | | | | | | | | 1 | .096 .255 | .256 .036 | .226 .057 |
| **11** Distance from City to State Border | | | | | | | | | | | 1 | .035 .406 | .189 .094 |
| **12** State Gun Theft Rate | | | | | | | | | | | | 1 | .660 .000 |
| **13** % Suicides With Gun (PSG) | | | | | | | | | | | | | 1 |

The OSN measure is moderately correlated with measures of the share of crime guns that traveled into the jurisdiction from distant locales—the percent first sold out of state, and the percent sold by FFLs over 250 miles from the city where the crime gun was recovered. These two "distant-origin" variables are almost perfectly correlated with each other, and are basically two ways of measuring the same underlying trait. The distant-origin measures, however, are ambiguous because they also reflect the geographical location of

the city. We measured the distance from each city's center to the nearest state border, and found significant negative correlations between this distance and the percent of crime guns first sold out of state or by a distant FFL. In other words, a city may have a larger share of its crime guns coming from another state simply because it is located closer to that state. Other things being equal, the closer a city is to a given state, the more of its migrants originate from that state. Migrants bring their possessions, including their guns, with them, and some of the migrants are burglarized in their new homes. Consequently, a city with many residents who moved there from state X is likely to have more guns that had been lawfully purchased in state X show up among the guns recovered from criminals in that city. Consistent with this, ATF trace data indicate that, among crime guns originating out of state, the state that guns are most likely to have come from is, other things being equal, the nearest state among those with larger populations.[184] Thus, the distant-origin indicators may reflect both a city's proximity to other states and trafficking prevalence. Nevertheless, distant origins of crime guns may be the next-best trafficking indicator, after OSN prevalence.

Among the remaining potential trafficking indicators, only one measure showed even a modest correlation with the OSN measure. The percent of guns whose criminal possessor was not the original retail buyer had a significant (r=0.44) correlation with OSN. It was also significantly correlated with the distant-origin measures. This is consistent with the expectation that the further a gun traveled to a city, the more likely it is that the gun passed through the hands of multiple possessors.

The measures of the prevalence of fast-TTR (TTR less than one year) guns had *no* significant correlation with OSN. Excluding their correlations with each other, they also were not strongly related to any other indicators. Indeed, many of their correlations were even negative. Thus, even if one rejected the validity of the OSN indicator, one would still have to conclude that there is little support for TTR as a trafficking indicator. The only indicators with which the TTR variables were moderately (0.4<r<0.6) and significantly correlated were those reflecting the share of crime guns linked to dealers with high trace counts. Both of these types of indicators appear to be poor measures of trafficking prevalence. Instead, fast-TTR and high-FFL trace counts are more likely to be indicators of higher gun theft rates, since the correlation between the state gun theft rate and median TTR was significant (r=−.588). It is all the more remarkable that this correlation is as strong as it is given the considerable error in the measurement of gun theft;

184.    *See* U.S. Bureau of Alcohol, Tobacco, & Firearms, *supra* note 40.

most thefts are not reported to the police,[185] and this rate pertained to theft in the surrounding state rather than just the city itself. In any case, the rapid movement of guns into criminal hands is far more strongly correlated with gun theft rates than with putative gun trafficking indicators.

TABLE 4. PRINCIPLE COMPONENTS ANALYSIS OF POTENTIAL
TRAFFICKING INDICATORS
(Factor loadings of rotated solutions)[186]

| | Exploratory Analysis | | | Confirmatory Analysis |
|---|---|---|---|---|
| Analysis | (No Constraints on number of factors) Component | | | (Constrained to one factor) |
| | 1 | 2 | 3 | 1 |
| OSN | .011 | −.030 | .898 | −.505 |
| OUTSTATE | −.405 | −.150 | .851 | −.807 |
| DLR250ML | −.365 | −.249 | .815 | −.816 |
| POSNOTBY | −.353 | −.184 | .630 | −.671 |
| TTRU1YR | .208 | .944 | −.171 | .743 |
| TTRU3YRS | .214 | .962 | −.137 | .738 |
| TTRMDN | −.249 | −.942 | .136 | −.748 |
| DELR5PTR | .886 | .272 | −.324 | .885 |
| DLR10PTR | .912 | .254 | −.287 | .870 |
| DLR25PTR | .933 | .226 | −.183 | .811 |

Next, we performed an exploratory factor analysis of all the potential indicators. We initially did not restrict the number of factors that could be extracted because we wanted to know whether all the items were indicators of a single underlying construct, presumably the prevalence of gun trafficking, and thus loaded on a single factor. The left side of Table 4 displays the results of a principle components factor analysis with varimax rotation. This analysis extracted three factors with eigenvalues greater than one, indicating that a single underlying factor was not sufficient to adequately explain the observed correlations among potential indicators. The first factor primarily reflects the prevalence of crime guns with fast TTRs, the second primarily reflects the prevalence of guns originating with dealers with high trace counts, and the third mainly reflects the prevalence of guns with OSNs

---

185. BUREAU OF JUSTICE STATISTICS, *supra* note 33 at tbl.93a.
186. Principal component analysis, using varimax rotation with Kaiser normalization.

and guns that originated in distant locales. Whatever these indicators are measuring, they do not appear to be measuring the same thing. Prior research suggests that the third factor is the relatively more valid measure of trafficking of the three because it reflects the prevalence of a reputedly strong indicator, OSN prevalence, and other indicators correlated with OSN.[187] The first factor may simply be measuring higher sales volumes in some cities, which would lead to higher average trace counts among FFLs even in the absence of trafficking activity. The second factor may be an indirect measure of high gun theft rates, since the more often gun thefts occur, the faster guns move into criminal hands. Results were substantially the same when oblimax rotation, which does not assume that factors are orthogonal, was used: three factors were extracted, with the same clusterings of items.

The right side of Table 4 displays the results of a factor analysis in which the solution was constrained to a single factor, based on the a priori assumption that all the items were valid indicators of a single unmeasured trait, such as trafficking prevalence. These results also suggest that the items are measuring different concepts, since about half of the supposed trafficking indicators load positively on the factor and about half load negatively. Whatever the single underlying concept might be, the individual items do not measure this concept in the same direction. Cities with more of this underlying concept have, on the one hand, more guns with fast TTR and more guns from dealers with high trace counts, but, on the other hand, have fewer guns with an OSN, a possessor different from the original buyer, or distant origins. These results are hard to reconcile with the idea that all of these variables are indicators of gun trafficking. A few of them might be indicators, but most of them probably are not.

Another approach to assessing measurement validity is to select a criterion measure thought, on a priori grounds, to be the best measure available, and then measure correlations between this criterion and other potential measures.[188] If one tentatively accepted the a priori reasoning that pointed to OSN prevalence as the best available measure of the prevalence of trafficking, as well as the rather definitive endorsement by ATF and scholars of the validity of this trait as an indication that a gun had been trafficked, it could be treated as a criterion measure. Table 3 correlations indicated that, by this standard, the only other indicators with even moderate validity are the distant-origins measures—the percent of crime guns originating out-of-state and the percent originating with dealers from over 250 miles away. But even these

---

187.    *See* Part II.C.6 at 1269.
188.    NUNNALLY, *supra* note 183, at 77–78.

variables share less than half their variation in common with OSN ($r^2 < .5$), suggesting that they mostly measure something other than what OSN measures, and therefore should not be regarded as strong indicators of trafficking levels.

Because the validity of even OSN as a trafficking measure is debatable, the Table 5 multivariate analyses making use of this measure must be regarded as strictly exploratory. ATF states that police in YCGII cities do not consistently request traces on crime guns with OSNs,[189] though the same could probably be said of crime guns in general in these cities. These analyses are performed for the purpose of exploring the causes and consequences of higher trafficking levels if one accepts the validity of OSN as a measure of the prevalence of gun trafficking in a city.

Thus, we tentatively assumed that OSN prevalence among traced guns in a city measures the prevalence of gun trafficking, and we estimated weighted least squares models to investigate some of the possible determinants of gun trafficking levels, and the impact of gun trafficking on criminal gun ownership and crime rates. As in the previous analyses, cities were weighted by the number of crime guns for which traces were requested. Of course, if even this reputedly strong indicator of trafficking is not valid, it is highly unlikely that any of the other putative indicators are similarly valid. Therefore, the case for the importance of organized or high-volume gun trafficking collapses, since it is almost entirely based on analyses that assume the validity of these indicators.

TABLE 5. THE DETERMINANTS OF GUN TRAFFICKING LEVELS AND THEIR EFFECTS ON CRIMINAL GUN POSSESSION LEVELS AND CRIME RATES[190]

|  | Coefficients (Ratio of coefficient/standard error) | | | | |
|---|---|---|---|---|---|
|  | (1) | (2) | (3) | (4) | (5) |
| Dependent Variable: | OSN | PCTGHOM | Murder Rate | Robbery Rate | Assault Rate |
| Independent Variables: |  |  |  |  |  |
| OSN (Gun Trafficking) |  | .366 (1.28) | –.006 (–0.53) | .022 (1.88) | .008 (0.54) |

189.    *See* U.S. BUREAU OF ALCOHOL, TOBACCO & FIREARMS, *supra* note 40, at 50.

190.    Cities were weighted by number of trace requests. Variables present in some crime rate models but not others were omitted because they were found to be unrelated to that specific crime rate.

| | | | | | |
|---|---|---|---|---|---|
| PSG9498 | −0.207 (−4.23) | 0.253 (2.05) | | | |
| PCTGHOM | | | 0.034 (6.07) | 0.009 (1.45) | 0.001 (0.15) |
| Murder Rate | | 0.501 (5.14) | | | |
| Burglary Rate | | −0.005 (−2.28) | | | |
| ONEGUN | 4.171 (1.94) | 14.435 (−3.11) | 0.843 (3.97) | 0.588 (2.54) | 0.309 (1.07) |
| REGISTER | 0.653 (0.48) | −4.029 (−1.57) | −0.224 (−2.00) | −0.346 (−2.83) | 0.309 (1.07) |
| WAITPER | −0.221 (−1.21) | 0.311 (0.93) | 0.015 (0.94) | 0.015 (0.86) | 0.044 (2.04) |
| PERMIT | 1.338 (1.02) | 0.394 (0.15) | 0.180 (1.72) | 0.254 (2.22) | 0.236 (1.66) |
| POVERTY | | | 0.029 (2.78) | 0.042 (3.78) | |
| BLACK | | | 0.012 (4.61) | 0.005 (1.65) | 0.011 (2.83) |
| HISPANIC | | | | | 0.008 (1.88) |
| Constant | 14.999 | 53.735 | −0.626 | 4.404 | 5.778 |
| $R^2_A$ | 0.493 | 0.477 | 0.828 | 0.646 | 0.300 |
| Alternate trafficking proxy results: DLR250ML[191] | | −0.050 (−0.58) | −0.004 (−1.16) | −0.004 (−0.95) | −0.007 (−1.39) |

The resulting estimates are shown in Table 5. Column 1 displays estimates of a model of the percent of a city's crime guns recovered by police that had an OSN, treated here as a proxy for the prevalence of gun trafficking in the city. That is, the estimates address the question: What conditions

---

191.    These are estimates from models including the same variables in each model that are shown in this table, but using DLR250ML as the trafficking proxy instead of OSN.

favor higher gun trafficking levels? They indicate, first, that the higher the gun ownership rate that prevailed in a city in the late 1990s, the lower the share of the city's crime guns recovered in 2000 that were supplied by traffickers. Second, none of four types of state laws regulating the purchase of firearms influence trafficking prevalence: laws limiting handgun purchases to one a month, laws requiring the registration of handgun purchases, laws requiring a permit to purchase guns, nor laws specifying a minimum number of days that a buyer must wait before taking delivery of a gun. All showed no relationship with the share of crime guns that were trafficked. When the gun theft rate was included in the model instead of the gun ownership measure, its coefficient was also significant and negative (b=–0.054, p<.01), indicating that where gun theft was more common, trafficking was less prevalent. Because gun ownership and the gun theft rate were highly correlated (r=0.66), however, both could not be included in the same model and still retain significant coefficients.

Column 2 of Table 5 reports estimates of a model of the prevalence of gun possession among criminals, measured as the share of homicides committed with guns.[193] The results indicate that trafficking, as measured by OSN, has no significant effect on the share of criminals in possession of guns. We also created a measure of the volume of trafficking, computed as the number of trace requests (purportedly the number of crime guns recovered by police), multiplied by the percent with an OSN. When this was included in the model instead of OSN, the results (not shown) were even less supportive (1-tailed, p =.438) of the hypothesis that trafficking levels affect gun possession levels among criminals.

The murder rate appears to have a significant positive effect on criminal gun possession, suggesting that more dangerous environments motivate more criminals to acquire guns for protection. This association, however, could also reflect a positive effect of criminal gun levels on murder rates. Laws regulating gun sales generally show no effect on criminal gun possession, with one notable exception: Laws limiting citizens to one handgun purchase per month, which are explicitly intended to reduce gun trafficking, appear to have a significant negative effect on gun possession among criminals. It is unlikely, however, that this reflects an actual effect of one-gun-a-month laws via their effects on trafficking, since these laws showed no effect on levels of trafficking (see Column 1). This negative association may instead reflect a negative

---

193.    For a recent example of this measure's use as a measure of access to guns among criminals, *see* Cook & Braga, *supra* note 18, at 306–07.

effect of gun ownership on the enactment of gun control laws. Gun levels among noncriminals are highly correlated with gun levels among criminals, and larger numbers of gun-owning voters discourage legislators from supporting new gun laws.[194]

Columns 3 through 5 report estimates of the parameters of models of rates of murder, robbery, and aggravated assault. All crime rates were expressed in terms of their natural logs, to reduce the skewness of their distributions. Because the Column 2 results indicated that trafficking levels have no effect on criminal gun possession levels, there is no obvious reason why trafficking should affect crime rates. The PCTGHOM (percent of homicides committed with guns) variable, however, is only an imperfect indicator of gun possession among criminals, so it remains possible that trafficking has some undetected impact on criminal gun possession, and thus on crime rates. The crime rate results nevertheless indicate that trafficking has no effect on rates of either murder or assault, but may have a marginally significant (1-tailed, p=.034) positive effect on robbery. Given the evidence that trafficking does not affect criminal gun levels or homicide or assault rates, this borderline-significant association with robbery may be nothing more than a product of random chance and a large number of hypothesis tests. The weakness of the associations between trafficking and either criminal gun possession or crime rates could, however, also be partly attributable to random error in measuring trafficking.

It might be argued that OSN data are unusually poor compared to other trace-based indicators, due to police inconsistency in requesting traces of guns with OSNs despite the stated commitment of YCGII cities to submit *all* such crime guns for tracing. Therefore, as a robustness check, we re-estimated the equations for criminal gun possession and violent crime rates using an alternative, though probably inferior, indicator of trafficking prevalence. Our correlation and principle component analysis results suggested that the percent of crime guns traced to dealers 250 or more miles from the city where they were recovered (DLR250ML) was the next-best trafficking indicator after OSN. When this was used as the proxy for trafficking prevalence, results were even less supportive of the hypotheses that trafficking affects criminal gun possession, or violent crime rates. The estimates for this alternate proxy are shown in the last row of Table 5. The coefficients are all negative, though nonsignificant. Thus, even if one believed that OSN data were more problematic than data for other indicators, the results still lead to the conclusion

---

194.     *See* John M. Bruce & Clyde Wilcox, *Gun Control Laws in the States: Political and Apolitical Influences, in* THE CHANGING POLITICS OF GUN CONTROL 139, 150 (John M. Bruce & Clyde Wilcox eds., 1998).

that the prevalence of gun trafficking, measured using the two best proxies, is not significantly related to criminal gun possession or violent crime rates.

## CONCLUSION

The model of criminal gun acquisition underlying lawsuits based on claims of negligent distribution is largely a myth, composed in part of rare and unrepresentative anecdotes about a handful of genuinely corrupt licensed gun dealers and misinterpreted ATF trace data. In contrast, the following conclusions are supported by the strongest prior research on the movement of guns to criminals, and the results of the empirical research reported in this paper:

1. Time-to-recovery (TTR, or "time-to-crime") measures are not trafficking indicators. They more likely are indirect indicators of the gun theft rate, with which they are far more strongly correlated.

2. High trace counts for FFLs are not indicators of trafficking by FFLs. They are, first, indirect measures of gun dealer sales volume and of local gun ownership levels. In places where there are more gun owners, there are more guns sold by licensed dealers, and eventually more guns stolen and found in the possession of criminals. Second, high trace counts are indirect measures of the rates of gun theft prevailing in the areas served by the FFLs. No research has ever shown high trace counts to be even weakly correlated with a dealer's identification as a trafficker once one holds constant the dealer's sales volume and gun theft rates prevailing in the areas served by the dealer.

3. The only variable that is likely to be a strong city-level measure of gun trafficking activity is the prevalence of obliterated serial numbers (OSNs) among recovered crime guns.

4. Illicit gun selling is almost all done at a very low volume. Typical trafficking operations uncovered by law enforcement authorities handle fewer than seven guns each, and ATF uncovers fewer than fifteen high-volume (greater than 250 guns) operations in the entire nation each year.

5. High-volume trafficking, with or without the involvement of corrupt or negligent FFLs, probably supplies less than 1 percent of criminals' guns.

6. Trafficking, if validly measured by OSN prevalence, has no measurable effect on levels of gun possession among criminals, as measured by the percent of homicides committed with guns, and has no effect on violent crime rates. One likely explanation would be that nearly all traffickers' potential criminal customers have other sources of guns (especially the pool of locally stolen guns) and are not dependent on traffickers.

7. These specific conclusions logically lead to the broad policy conclusion that even the best-designed strategies aimed at reducing gun trafficking are

unlikely to have any measurable effect on gun possession among criminals or on violent crime rates. In particular, lawsuits intended to make the firearms industry rein in gun trafficking involving the knowing complicity or negligence of licensed dealers are unlikely to have such effects.

We can learn something about the potential of such strategies by considering evaluations of existing programs aimed at reducing trafficking. Perhaps the best known effort to reduce gun violence by going after traffickers was the Boston Gun Project, implemented in 1996–1999. The academic architects of the Project have conceded that criminal gun possession probably did not decline in Boston, and that much-touted short-term drops in gang homicide could not be attributed to the "law enforcement attack on illicit firearms traffickers," since criminal cases against traffickers were made only after the drops in gang homicide had already occurred.[195] They also conceded that they had no firm evidence that "supply-side enforcement strategies have any measurable impacts on gun violence," though they nevertheless argued that these efforts somehow "increased the 'effective price' for new handguns."[196]

Their basis for this last claim was that the share of Boston's crime guns that were new (recovered within three years of initial sale) declined during the Project's implementation from 1996 to 1999, a drop that they interpreted as a decline in the trafficking of new handguns. In fact, this decline paralleled a 50 percent decline in the city's burglary rate over the same period, a decline that began years before the Project started. As soon as the burglary decline ended in 1999,[197] the decline in the new gun share of Boston's crime guns also promptly stopped.[198] Thus, the decline in new handguns that the authors perceived as evidence of a decline in one type of gun trafficking was more likely due to a drop in the burglary rate, and thus the gun theft rate.

Similarly dubious interpretations of trends in short-TTR guns afflicts the efforts of Webster, Bulzacchelli, Zeoli, and Vernick to assess the impact of police stings directed at suspect FFLs in Chicago, Detroit, and Gary, Indiana in the late 1990s.[199] The authors concluded that the stings caused a decline in Chicago in corrupt FFLs channeling guns to criminals, based on the declining share of traced crime guns that were recovered from a criminal who was not the original possessor, and that had a short TTR (this share

---

195.   *See* Braga & Pierce, *supra* note 10, at 722–23.
196.   *Id.* at 741.
197.   *See* Federal Bureau of Investigation, U.S. Dep't of Justice, Uniform Crime Reports for the United States 1996, at 87 (1997) [hereinafter FBI 1996]; FBI 1997, *supra* note 105, at 90; FBI 1998, *supra* note 105, at 85; FBI 1999, *supra* note 105, at 85; FBI 2000, *supra* note 105, at 88.
198.   *See* Braga & Pierce, *supra* note 10, at 740 tbl.3.
199.   *See* Webster et al., *supra* note 26, at 229.

increased nonsignificantly in Gary).[200] The authors failed to note, however, that over the period studied, 1996–2001, the burglary rate declined by 39 percent in Chicago and 62 percent in Detroit,[201] implying similarly huge drops in gun thefts, which would in turn result in fewer crime guns with a short TTR. Thus, the patterns among traced crime guns that the authors observed could be entirely due to the decline in gun theft rather than stings of licensed dealers.

Theft is central to criminal gun acquisition.[202] Interviews with incarcerated felons indicate that most guns acquired by criminals were probably stolen at some time in the past.[203] Most gun theft is a by-product of residential burglary and other thefts from private owners. Less than two percent of stolen guns are stolen from dealers and other licensees. Only 12,302 gun thefts from FFLs were reported in 1997,[204] compared to about 618,000 total gun thefts, based on victim survey estimates.[205] Unlike gun sales by traffickers, every gun theft by definition places a gun directly and immediately into criminal hands. Further, the known volume of gun theft is many times higher than any evidence-based estimate of the volume of trafficked guns.

One could speculate that even though virtually all known traffickers handle very small numbers of guns, there are many high-volume dealers who are too smart or lucky to be caught. One might also speculate that even though trafficked guns known to authorities are few in number, traffickers actually sell large numbers of undiscovered guns. One could also speculate that, unknown to criminal buyers, a large share of the guns they bought had been moved by professional traffickers further back in the chain of possession. There is, however, no affirmative evidence to support any of these speculations. The view that organized or large-scale trafficking is important in arming American criminals is based not on strong evidence but rather on

---

200.  *Id.*

201.  *See* FBI 1996, *supra* note 197, at 123, 128; FEDERAL BUREAU OF INVESTIGATION, U.S. DEP'T OF JUSTICE, UNIFORM CRIME REPORTS FOR THE UNITED STATES 2001, at 130, 137 (2002).

202.  *See* Cook et al., *supra* note 10, at 80–84.

203.  *See* WRIGHT & ROSSI, *supra* note 14, at 17 (reporting that 70 percent of felons surveyed reported their most recent handgun acquisition had either been directly stolen by them, definitely stolen by someone else, or probably stolen by someone else).

204.  U.S. BUREAU OF ALCOHOL, TOBACCO & FIREARMS, DEP'T OF THE TREASURY, ATF ANNUAL REPORT 1997, at 19 (1997).

205.  There were about 281,080 gun theft incidents in 1997, times 2.2 guns stolen per incident. *See* BUREAU OF JUSTICE STATISTICS, U.S. DEP'T OF JUSTICE, CRIMINAL VICTIMIZATION IN UNITED STATES, 1997 STATISTICAL TABLES, tbl.84, *available at* http://www.ojp.gov/bjs/pub/pdf/cvus97.pdf (last visited May 27, 2009); COOK & LUDWIG, *supra* note 34, at 30 (dividing number of guns stolen in noncommercial theft in 1994 by total number of gun-owning households that experienced the theft of at least one firearm that year).

(1) claims phrased in terms so vague and ill-defined as to render the assertions meaningless or trivial, (2) isolated anecdotes about unrepresentative, extremely rare large-scale trafficking operations uncovered by law enforcement authorities, and (3) dubious interpretations of highly ambiguous gun trace data. These are not sound bases for making public policy.

Virtually everyone believes that unicorns are mythical creatures. This belief is not, however, attributable to some scientific demonstration that unicorns do not exist. It is logically impossible to prove a negative, and previously unknown species are discovered all the time. Rather, unicorns are regarded as mythical because there is no reliable affirmative evidence that they do exist. Likewise, though a handful of large-scale gun trafficking enterprises are uncovered each year, there is at present no reliable evidence to affirmatively support the view that such traffickers are common enough to be important in supplying firearms to criminals, either in the nation as a whole or in any major local jurisdiction. Nor is there any reliable affirmative support for the theory that corrupt or negligent dealers play a significant role in supplying guns to traffickers. It is in this sense that the belief that big-time traffickers, or corrupt licensed gun dealers, significantly contribute to the arming of America's criminals is a myth. Indeed, there is no sound empirical foundation for the belief that any type of gun trafficker, as distinct from burglars and other thieves who occasionally sell guns they have stolen, has a substantial effect on the share of criminals who are armed with guns.

# EXHIBIT 31

ORIGINAL

1

1   CITY OF CHICAGO
    COMMITTEE ON POLICE AND FIRE

2

3

RE:   HEARING TO DISCUSS GUN VIOLENCE AND
4         FIREARM REGISTRATION REGULATION

5

6

7

8            REPORT OF PROCEEDINGS of a

9   meeting of the City of Chicago, Committee on Police

10  and Fire, taken on June 18th, 2010, 10:00 a.m.,

11  City Council Chambers, Chicago, Illinois, and

12  presided over by ALDERMAN ANTHONY A. BEALE,

13  Chairman.

14

15          Reported by:   Bernice Betts, C.S.R.

16

17

18

19

20

21

22

1    ALDERMAN BEALE:  It's 10:08, and the

2  Committee on Police and Fire will now come to

3  order.  We have a public hearing today to discuss

4  gun violence and firearm registration regulation.

5  And we have quite a few people that want to

6  testify.  If there's anyone who wishes to testify,

7  if you can please fill out the appropriate paper

8  work and get it turned in.

9        We're going to try to move this

10  hearing along as quickly as possible, because we

11  have a lot of testimony.

12        First, we want to bring Mara Georges

13  up from Corporation Counsel to discuss the

14  importance of having gun registration, and to

15  discuss some gun violence.

16    CORPORATION COUNSEL GEORGES:  For the record,

17  my name is Mara Georges G-e-o-r-g-e-s.  I'm the

18  Corporation Counsel for the City of Chicago.

19  Mr. Chair, Members of the City Council's Police and

20  Fire Committee and honored guests.

21        After a dully noted finding that

22  firearms, and especially handguns, play a major

CITY 000002

3

```
 1  role in the commission of homicides, aggravated

 2  assaults and armed robberies on March 19th of 1982,

 3  Alderman Edward M. Burke moved to pass, and the

 4  Chicago City Council enacted, by a vote of 30 yeas

 5  and 11 nays a firearms ordinance, which renders

 6  most handguns unregistrable in the city of Chicago.

 7              The ordinance, still in effect today

 8  with modification, allows for the registration of

 9  rifles and shotguns that are not sawed off, short

10  barreled or assault weapons.  It requires

11  registrable firearms to be registered before being

12  possessed in Chicago and registration must be

13  renewed annually.  Failure to renew shall "cause

14  the firearm to become unregistrable."  The

15  ordinance provides that no person may possess "any

16  firearm which is unregistrable" within the city

17  confines.

18              On June 26th of 2008, 26 years after

19  the enactment of that handgun ban the Illinois

20  State Rifle Association and various other

21  Plaintiffs in the McDonald case filed in the

22  Federal District Court for the Northern District of
```

CITY 000003

4

1  Illinois a challenge to the city's handgun ban and

2  certain registration requirements contained in the

3  ordinance.

4          The Plaintiffs in the McDonald case

5  alleged in pertinent part that Chicago's handgun

6  ban violates the Second Amendment as allegedly

7  incorporated into the 14th Amendment's due process

8  clause and privileges or immunities clause.

9          The following day, June 27th of

10  2008, the National Rifle Association filed two

11  similar lawsuits. One challenging Chicago's

12  handgun ban, and the other Oak Park's. McDonald

13  and the two NRA cases proceeded before the same

14  District Court Judge, and on December 18th of 2008,

15  Judge Milton I. Schader (phonetic) entered judgment

16  on the pleadings in favor of the city and Oak Park

17  in all three cases on the basis that the Second

18  Amendment does not apply to the states.

19          The Seventh Circuit Court of Appeals

20  consolidated the cases and affirmed the District

21  Court's decisions on June 2nd of 2009. The Court

22  held that it was bound by previous decisions of the

CITY 000004

5

1　United States Supreme Court refusing to apply the

2　Second Amendment to the states.

3　　　　　　The Supreme Court granted certiorari

4　in the McDonald case on September 30th of 2009 and

5　heard oral argument on March 2nd of 2010.  The

6　issue of incorporation of the Second Amendment to

7　the states is the issue being considered by the

8　United States Supreme Court.

9　　　　　　The Supreme Court has publicized

10　that opinions will be issued on Monday, June 21st

11　and Monday, June 28th, and experts believe the

12　court will also release opinions on Thursday,

13　June 24th, and Wednesday, June 30th.

14　　　　　　When the Supreme Court issued its

15　opinion in the Heller case involving Washington,

16　D.C.'s handgun ban, the opinion was issued on the

17　last day of the term.  If the Supreme Court were to

18　follow suit, that day would be June 30th of this

19　year.

20　　　　　　If the Supreme Court were to find

21　incorporation of the Second Amendment, the city's

22　handgun ban would be invalidated.  As the Court's

6

1  decision in Heller has already found a right to

2  possess a handgun in the home for self-defense

3  purposes.

4           Assuming hypothetically that the

5  city's handgun ban were to be invalidated, the city

6  could seek approval from the City Council for a new

7  ordinance regulating firearms.  The Council could

8  consider limitations on number of firearms,

9  insurance and training requirements, ballistics

10 testing, and minimum qualifications for handgun

11 eligibility.

12          In today's hearing a number of

13 individuals who have spent years studying various

14 aspects of the firearms industry will testify.

15 These individuals have specific recommendations

16 regarding potential aspects of a new ordinance.

17 They realized that of the 412 homicides caused by

18 firearms in the city of Chicago during 2008, 98

19 percent of those or 402 resulted from handguns.

20 Thank you.

21     CHAIRMAN BEALE:  Thank you.  Any questions?

22 I'm sorry, not so fast.  Alderman Rugai.

1      ALDERMAN RUGAI:  Thank you, Mr. Chairman.  I

2   am not familiar with the Heller case.  What was the

3   basis of the invalidation in that situation?  Is it

4   the same as --

5      CORPORATION COUNSEL GEORGES:  That is a

6   situation where Washington, D.C. is considered a

7   Federal jurisdiction, and as a Federal jurisdiction

8   the Second Amendment applies to D. C.  If the right

9   to bear arms is a constitutional right afforded by

10  the constitution, then the Federal government has

11  to recognize that right and not unduly limit that

12  right, although the Heller case said that

13  governments can impose reasonable regulations on

14  the exercise of the right.  But they did find that

15  there is a constitutional right to bear arms in the

16  home for self-defense purposes.

17            So the thought is here, though, we

18  stand in a much better position, because as the

19  lower Courts have already said, there is U. S.

20  Supreme Court precedent that the Second Amendment

21  does not apply to the states and its political

22  subdivisions, like the city of Chicago.

1       ALDERMAN RUGAI:  But the difference is that,

2  in fact, Washington, D.C. is a Federal

3  jurisdiction?

4       CORPORATION COUNSEL GEORGES:  Correct.

5       ALDERMAN RUGAI:  Thank you.

6       CORPORATION COUNSEL GEORGES:  You're welcome.

7       ALDERMAN RUGAI:  I just didn't know.

8       CHAIRMAN BEALE:  Alderman Lyle.

9       ALDERMAN LYLE:  Good morning.

10      CORPORATION COUNSEL GEORGES:  Good morning,

11  Alderman.

12      ALDERMAN LYLE:  Could you explain for Members

13  of the Council the -- well, not exceptions.  I

14  understand that McCormick said that there is no

15  right to -- for anyone to carry any time, any

16  place.  So there's some existing -- two states have

17  existing laws, and could you tell us about those?

18  I think it's Washington -- not Washington -- yeah,

19  maybe it is.

20           The two existing guns -- California,

21  they have some gun legislation, and what are we

22  looking at?  Have we looked at the other

1  jurisdictions to see what they have that is -- that

2  has been -- that is still standing that we could

3  import, add to, amend, and possibly use here in

4  Chicago?

5      CORPORATION COUNSEL GEORGES:  We certainly

6  have been engaged in a lot of discussions.  We've

7  talked with our counterparts in other municipalities.

8  We've looked at various ordinances adopted by other

9  municipalities, so we have been doing that.

10      We are hopeful, though, of our

11  chances in the case pending before the Supreme

12  Court, and we're hopeful that the Supreme Court

13  will not invalidate our handgun ban.

14      I think, though, if -- you know, if

15  the Supreme Court were to invalidate our handgun

16  ban though, we would be possibly coming back to the

17  City Council to ask the City Council to kind of

18  beef up our current ordinance to include things

19  like training, like insurance requirements, like

20  ballistics testing.  Things that we have found in

21  the ordinances of other municipalities which our

22  current ordinance doesn't contain.

1          So we do currently have this

2  registration requirement, so even if the handgun

3  ban in our ordinance were invalidated, our current

4  ordinance would stand and would require that

5  firearms be registered within the city of Chicago.

6  But there are other things that I think the Council

7  would be interested in doing in expanding on that

8  ordinance.  Limitations on numbers.

9          You know, currently that ordinance

10  doesn't have such a limitation, and we would look

11  to other municipalities as to what they have done,

12  especially Washington, D.C., who has now withstood

13  a challenge to a revised ordinance.

14  ALDERMAN LYLE:  Well, I am not hopeful

15  regarding the Supreme Court.  Over the last 15, 20

16  years we've seen them pack the court with jurists

17  that ascribe to a particular political persuasion,

18  and so I'm not -- I'm never confident of what

19  they're going to do up there.

20          So I would hope that you can get to

21  the Council some information about the other D.C.

22  and California, any other ordinances you've looked

CITY 000010

1   at, so that we could begin looking and thinking of

2   changes that we would like to make as a plan B.

3         CORPORATION COUNSEL GEORGES:  I am absolutely

4   happy to provide you with the ordinances from other

5   municipalities, and especially, as I said, I think

6   that of Washington, D.C. is particularly pertinent,

7   in that it has now been challenged and withstood a

8   challenge.

9         ALDERMAN LYLE:  Thank you.

10         CORPORATION COUNSEL GEORGES:  You're welcome.

11         CHAIRMAN BEALE:  Mara, what's the difference

12   between what we currently have in place and what

13   they have in place in D.C. now?

14         CORPORATION COUNSEL GEORGES:  Well, in D.C.

15   they have now imposed additional requirements on,

16   say handgun ownership, things like that -- you

17   know, that really offer some vital protection for

18   our municipality.  Things like insurance, things

19   like training requirements, things like ballistics

20   testing, so just to kind of take those in order.

21            You know, insurance, if you

22   require -- if the Council were to require

CITY 000011

1  insurance, say for owners of handguns, then when

2  the city is called upon to respond to a dispute

3  involving handguns, there would be some financial

4  backing for any expenditures that the city has.

5           So if the city were to make a claim

6  on a homeowner for extraordinary police and fire

7  response, that homeowner could then seek to recover

8  that amount from an insurance company.

9           For training, I would think that

10 there would be some interest in some levels of

11 training before individuals are allowed to have

12 firearms in the city of Chicago.  D.C. has kind of

13 four hours of classroom training, one hour of range

14 training, where you're actually firing the weapon.

15 You know, and that is something that seems to make

16 sense.

17           Ballistics testing, things like

18 that, have been a little more controversial in that

19 it kind of provides a fingerprint for that weapon,

20 the firing of that weapon, so that a bullet fired

21 by that weapon can be traced to that owner.  You

22 know, there are various experts who will say that

CITY 000012

1   certain procedures available now are more or less

2   reliable.  So, you know, that's -- but it is

3   another consideration.

4            So there are a lot of things like

5   that that are -- that have been utilized by other

6   municipalities which seemed very reasonable and

7   make a lot of sense.

8        CHAIRMAN BEALE:  Well, in the event that we

9   did require insurance and things of that nature,

10   what could we put in place to notify the first

11   responders that if they're going to a household,

12   they potentially could have the firearm in the

13   house?

14        CORPORATION COUNSEL GEORGES:  That's a very

15   good question, Alderman, because it's first

16   responders that I think would have substantial and

17   significant interest in knowing what they're

18   being -- going to confront when they respond to a

19   call at a particular house.

20            And this idea of a gun registry is

21   another idea that is out there that other munici-

22   palities have used, so that, you know, you've got

CITY 000013

14

1   to register the make and model of any firearm that

2   you possess within your home, and then that

3   information is provided to first responders as they

4   get a call to approach that home, and it allows

5   them to go in with other additional vital

6   information.

7       CHAIRMAN BEALE:  Okay.  And I don't know if

8   you can answer this, but does the police department

9   have that capability now?

10      CORPORATION COUNSEL GEORGES:  They certainly

11  have the computers in the cars, and you could

12  envision kind of setting up a procedure where if a

13  registry is maintained by the police department,

14  and it is maintained on an address by address basis

15  as information came up on the in car computer

16  saying that an officer should respond to a

17  particular address, it could trigger information

18  about whether or not the owners of that address

19  maintained any firearms.

20      CHAIRMAN BEALE:  Thank you.  Alderman Balcer.

21      ALDERMAN BALCER:  Mara, how many people did

22  you say died of gun violence in, was it 2008?

15

1    CORPORATION COUNSEL GEORGES:  412, and of the

2  412, 98 percent were caused by handguns.

3    ALDERMAN BALCER:  And that's 2008?

4    CORPORATION COUNSEL GEORGES:  2008, yes.

5    ALDERMAN BALCER:  Can we go back five years

6  from there, and how many people have -- is there an

7  average of how many people died from gun violence

8  every year?

9    CORPORATION COUNSEL GEORGES:  There is.

10  Those statistics are certainly maintained, and

11  others will be speaking on that who will be

12  testifying after I do.  So I think you'll be

13  provided with a lot of that information.

14    ALDERMAN BALCER:  Thank you.

15    CHAIRMAN BEALE:  Any other questions?

16  Alderman Lane.

17    ALDERMAN LANE:  Good morning, Mara.

18    CORPORATION COUNSEL GEORGES:  Good morning.

19    ALDERMAN LANE:  In 1976 some people bought

20  some guns.  They registered them here; they had

21  FOID card, they did their registration, are they

22  grandfathered in?

1     CORPORATION COUNSEL GEORGES:  Our current --

2  the current ordinance, the handgun ban that was

3  enacted in 1982 did have a grandfathering

4  provision.  An ordinance can have a grandfather

5  provision to grandfather those people who possess

6  certain firearms or it could not.

7          So if you're talking about kind of

8  what it would look like under a potential new

9  ordinance, that would just depend on what the

10  Council were to draft and pass.

11     ALDERMAN LANE:  Are those people still legal

12  if they have the gun now and they registered it

13  then and they kept the registration up?

14     CORPORATION COUNSEL GEORGES:  Well, it's hard

15  to opine on a limited set of facts.  But if it was

16  a firearm that was registered at the time that the

17  person obtained the firearm and the registration

18  was updated annually and is current, there is a

19  possibility that that is still a legal weapon.

20          I mean, I don't hear anything you're

21  saying that would lead me to believe it is no

22  longer legal, but it's just hard to make an

17

1  absolute conclusion on a limited set of facts

2  without further exploring, kind of all the facts

3  surrounding the situation.

4        ALDERMAN LANE:  Okay.  Thank you.

5        CORPORATION COUNSEL GEORGES:  You're welcome.

6        CHAIRMAN BEALE:  Any other questions?  Thank

7  you.

8        CORPORATION COUNSEL GEORGES:  Thank you,

9  Mr. Chair.

10       CHAIRMAN BEALE:  Next we have Robyn Thomas.

11       MS. THOMAS:  Good morning.  Can you hear me?

12       CHAIRMAN BEALE:  Can you identify yourself?

13       MS. THOMAS:  My name is Robyn Thomas.  I am

14  the Executive Director of the Legal Community

15  Against Violence.  We're a public interest law firm

16  in San Francisco, California, and we work exclusively

17  to provide legal support to jurisdictions seeking

18  common sense ways to prevent gun violence.

19              I think Ms. Georges already spoke a

20  bit about the McDonald decision, which we are still

21  waiting on.  What we do know from the Heller

22  decision of 2008 is that it simply protected an

1  individual's rights to have a gun, a gun in their

2  home for self-defense.

3             That's all that the Heller decision

4  actually required, and that's really all that is

5  going to be at issue in this McDonald decision as

6  to incorporation of that Heller decision.

7             What that means is that we have a

8  wide range of opportunities as to what kinds of

9  regulations are permissible following Heller and

10 following whatever the McDonald decision is.

11            The Heller decision itself actually

12 gave a relatively good list of regulations that

13 would be presumptively valid within the context of the

14 decision, and then as Ms. Georges suggested, the

15 city of Washington, D.C., who we worked closely

16 with, put in place a wide comprehensive range of

17 gun regulations following the Heller decision.

18            Those regulations were immediately

19 challenged and every single one of the regulations

20 that was challenged stood up to scrutiny.  On the

21 one hand the Court actually evaluated certain

22 provisions, including registration provisions and a

19

1  few others, and found that it withstood scrutiny as

2  being necessary to public safety.

3           Several other provisions that were

4  challenged, including an assault weapon ban and

5  large capacity ammunition ban, the Court actually

6  said that those provisions fell outside the scope

7  of the protection afforded by Heller, the Second

8  Amendment protection that Heller enumerated.

9           So those types of restrictions

10 didn't even fall within the realm of protection in

11 the home for self-defense.  So they didn't even

12 evaluate those restrictions under their standards.

13 They simply said they would be valid, and furthermore,

14 even went on to say if we had chosen to evaluate

15 these restrictions, they would have been held valid

16 as well.

17           So that's the first decision post

18 Heller by an Appellate Court, the D.C. Circuit

19 decided that case, that looked at specific

20 provisions enacted following the decision and held

21 them all to be valid.  So that's sort of one of the

22 small things we do know following the Heller

1    decision.

2              What I would like to suggest today

3    is that there are a huge range of potential types

4    of regulations that the city is able to consider,

5    regardless of the outcome of McDonald, and I'm

6    going to talk about them in four separate

7    categories.  I don't have time for a lot of

8    details, so if you have additional questions, I'm

9    happy to answer them.

10             The first area I want to mention is

11   licensing.  Now, licensing provisions serve a

12   number of good goals.  One is to reduce unintentional

13   shootings, because it insures that gun owners know

14   how to safely use guns, store firearms, that they

15   understand what the laws are regarding firearms,

16   and what is needed for compliance, and what the

17   consequences of noncompliance would be.

18             Licensing laws exist across the

19   country in a variety of ways and strengths, and in

20   the State of Illinois you do need to have a FOID

21   card, the FOID card.  However, the card does not

22   require any safety training to go along with it,

1   and it is valid for 10 years.

2              So if you look just at what is

3   already in place under the FOID card, we know that

4   there is a number of measures that could be

5   implemented that would enhance the usability of the

6   FOID card as a licensing requirement.

7              There could be safety training,

8   hands-on safety training, you could do live firing

9   safety training, classroom training, you could have

10  testing, written or oral, you could have classroom

11  hands-on training, and those are the types of

12  training mechanisms that exist in a number of

13  states, including now Washington, D.C., as well as

14  California, and surprisingly, actually in states

15  across the country.

16             And I think that the licensing

17  requirements that encourage safety is a way to

18  really insure that to the extent there are going to

19  be any firearms at all in the city that they will

20  be used with the appropriate care and caution and

21  knowledge that you would want in a situation like

22  that.

1        The second area that I want to
2  briefly mention is registration.  I think licensing
3  and registration requirements go very well hand in
4  hand.  Licensing are the requirements that apply to
5  the person that insure that we're doing everything
6  we can to know that the people who are acquiring
7  guns know how to use them properly.
8        Registration applies to the guns
9  itself.  So with good registration requirements we
10  can insure that the wrong types of guns are not out
11  in the public arena, that all of those guns are
12  properly registered, which is a great protection
13  for law enforcement and first responders, as was
14  mentioned earlier, and to insure that everyone who
15  has a firearm is, in fact, eligible to have that
16  firearm.
17        When these provisions go hand in
18  hand, I think they work extremely well, because in
19  order to procure a firearm part of the registration
20  process could be to insure compliance with all of
21  the licensing requirements.  And so you have this
22  sort of hand in hand system that protects the city

CITY 000022

1  from people knowing how to use them properly and

2  from guns being handled properly, and properly

3  managed by the city.

4           So registration and licensing,

5  again, is a good system, and the city does already

6  have in place very good registration requirements,

7  very relatively comprehensive registration require-

8  ments.  Although there's always an opportunity to

9  strengthen and look more closely at those

10 registration requirements.

11          You know, one example could be to

12 increase waiting periods on acquiring firearms,

13 another could be limitations on multiple purchases,

14 which was mentioned earlier.

15          So, again, it's a very strong

16 provision, but there's always ways to consider if

17 there's ways to make it even stronger, and we

18 certainly keep track of the best practices that

19 exist in cities and states across the country, so

20 we know the kinds of limitations that exist

21 elsewhere and how well they -- how effective they

22 are there.

CITY 000023

24

```
 1              I also want to briefly mention

 2  dealer regulations.  You know, one of the ways in

 3  which firearms can be regulated and insure that

 4  they don't get into the wrong hands is buy good

 5  regulations on gun dealers.

 6              What was mentioned earlier with

 7  regard to liability insurance is something that can

 8  also be applied to gun dealers.  I think more

 9  importantly there's a lot of safety provisions that

10  can be put in place with regard to gun dealers.

11              You could have dealers maintain

12  liability insurance, you could have them keep

13  records on ammunition sales, we could have detailed

14  security and safe storage requirements for gun

15  dealers themselves, employee background checks, and

16  even limiting the location of gun dealers.  Keeping

17  them away from sensitive areas, schools, government

18  buildings, parks, keeping them a certain distance

19  from each other.

20              So there's a variety of ways to

21  approach regulating gun dealers to insure that

22  they're operating as safely as possible and to
```

1   insure that guns are not making their way out onto

2   the street from gun dealers as well.  So gun dealer

3   regulation is another area of potential regulation.

4   Finally, I want to talk for a minute

5   about the types of weapons and accessories that can

6   be regulated.  Already there is an assault weapons

7   ban that exists here, and that certainly is

8   something that is an excellent start.

9   However, there is no ban in Illinois

10  on 50 caliber rifles.  For those of you who haven't

11  seen one, they are very big, very scary and very

12  accurate at a long distance.  There is a 50 caliber

13  rifle ban in place in California and has been for

14  sometime.  So there certainly is good practices and

15  precedent with regard to 50 caliber bans.

16  Large capacity ammunition magazines

17  could also be further regulated.  Currently there's

18  a limitation to 12 rounds of ammunition.  That

19  could be reduced further to 10 rounds, and that's a

20  limitation that exists in many, many states and

21  cities.

22  And the assault weapon ban, which

CITY 000025

1   already is in place, and, again, we think that's an

2   excellent start, could be further broadened.  Right

3   now it is defined using a list of weapons.  In our

4   experience using characteristics based limitations

5   is sometimes a little broader, it's a little harder

6   to get around by manufacturers changing the name of

7   a weapon or some small styling on the weapon.  So

8   that's a way that an assault weapon ban could be

9   further improved.

10              And finally, I just want to mention

11  junk guns.  Sometimes they're called Saturday night

12  specials.  They are -- intend to be inexpensive,

13  less safe guns that oftentimes can lead to

14  unintentional injuries.

15              Junk gun bans or legislation that is

16  very particular about the safety requirements that

17  all guns need to contain, which includes trigger

18  locks, melting point restrictions, magazine

19  detachment methodology, load chamber indicators.

20              There's a number of requirements

21  that can be put even on any handguns to insure that

22  the handguns that are sold meet with the best

1 possible safety.

2      So I know that's a lot of dense

3 information. Again, I've talked about four

4 possible areas where there is not a wide range of

5 regulation already in place in Illinois or Chicago.

6 There is already a fair amount of regulation, but

7 these are just areas where we noticed that there

8 are gaps and tremendous opportunities for the city

9 to look at where regulation is possible.

10      In each of these areas I have not

11 mentioned any areas where there isn't already

12 regulation in place with regard to one of these in

13 another city or state that has been upheld. So

14 these are all the types of regulations that have

15 withstood challenge and have been enacted in other

16 cities and sometimes in states.

17      So with that, I will just offer

18 forth our expertise, both today and going forward,

19 as far as providing information about existing

20 legislation and about potentially common sense and

21 indefensible legislation here. Thank you.

22     CHAIRMAN BEALE: Robyn, first let me thank

CITY 000027

28

1 you for making the trip.

2     MS. THOMAS:  Sure.

3     CHAIRMAN BEALE:  That goes to show that this

4 is very dear to you and your organization, and we

5 do appreciate that.  But I do have one question for

6 you before we open it up.

7          In your expertise, have you seen

8 anything in place or that could be put in place if

9 a person has a registered firearm and they commit a

10 crime that they will void their registration, and

11 then they would have to, you know, give up their

12 firearms?

13     MS. THOMAS:  Well, technically even the

14 Federal law, which is very limited, but does

15 require that, you know, felons, anyone whose been

16 convicted of a felony is not eligible to possess a

17 firearm.  So technically that exists both at the

18 Federal level and in Illinois where you've

19 basically required background checks at gun shows

20 as well.

21          It's much more difficult for someone

22 who can't pass that check to get a gun, but when

29

1  somebody is convicted of a crime after they have a

2  gun, obviously a good registration system would be

3  a great way to insure that law enforcement is aware

4  of who owns guns, so that when someone is convicted

5  they can seek to have those guns relinquished.

6             You know, there are states that have

7  various ways of addressing it.  We even have in

8  Washington, D.C. they passed a gun offender

9  registry, so that even though someone may not still

10  have a gun, law enforcement is aware that this is a

11  person who has convicted -- has been convicted of a

12  crime with a gun, and so they know if they're

13  called to that location, that that is the case.

14  But that doesn't exist.  That is sort of one of the

15  newer, more interesting approaches.  And as I said,

16  it exists in D.C. and is still in place.

17             But certainly relinquishment, you

18  know, using the registration system to create a

19  relinquishment system, which is something that

20  we're working on in California, I think would be an

21  excellent addition for exactly the reason you

22  state.

30

1      CHAIRMAN BEALE:  Any questions?

2  alderman Rugai.

3      ALDERMAN RUGAI:  Thank you, Mr. Chairman.

4  Good morning.  You obviously have reviewed various

5  ordinances throughout the country, and I wondered

6  if your law firm came across anything dealing with

7  gun manufacturer regulations?  I know we talked

8  about it here in the city of Chicago.  The Mayor

9  has talked about it, but I don't know that there

10  has been anything at all that's been able to put

11  any limitations or restrictions or regulations, I

12  should say?

13      MS. THOMAS:  You know, in California, I know

14  that when junk guns were banned and when there was

15  serious regulation around quality of guns, there

16  was a whole number of gun manufacturers in the

17  State of California that were manufacturing what I

18  will shorthand refer to as junk guns, low quality

19  guns.

20        And following that legislation in

21  California banning those guns, not only did some of

22  the manufacturers immediately go out of business,

1  but I do believe that eventually there was some

2  restrictions on the manufacturer of those guns in

3  the state, and I'd be happy to provide you with

4  specific legislation to the extent that that exists

5  in California.

6          ALDERMAN RUGAI:  Just another aspect of --

7          MS. THOMAS:  Absolutely.

8          ALDERMAN RUGAI:  -- in the larger picture.

9          MS. THOMAS:  Absolutely.

10         ALDERMAN RUGAI:  Thank you, Mr. Chairman.

11         CHAIRMAN BEALE:  Alderman Lyle.

12         ALDERMAN LYLE:  Do you have or has your

13  office prepared a synopsis of the various

14  regulations basically comparing Washington to the

15  other cities or other states that you could provide

16  us?  Provide through the Chair to us, at some

17  point, as we begin to look at this?

18         MS. THOMAS:  Absolutely.  We have a very

19  comprehensive manual.  It's very thick and heavy,

20  and it's called Regulating Guns in America, and it

21  details the guns in all 50 states and all the

22  cities that, you know, have local rule and have the

1  ability to pass regulations.  And it's -- as I

2  said, it's very comprehensive and dense, and we

3  would be more than happy not only to provide that,

4  but to provide you with a more tailored analysis.

5       ALDERMAN LYLE:  A Synopsis?

6       MS. THOMAS:  Synopsis and analysis of where

7  the gaps are, because I think that's also important

8  is to know what is in place, where are their gaps

9  in the existing law, and what are the most

10 effective ways to fill those spaces, and we would

11 be more than happy to give you a concise outline of

12 all of that.

13      ALDERMAN LYLE:  Well, I think it's important

14 as we begin to discuss this for two reasons.  One

15 is for our own deliberations on this issue.  But

16 also to begin to have this dialogue with our

17 constituencies and the general public.

18           I think there is a misbelief out in

19 the general public that the Supreme Court is going

20 to do whatever it is they're going to do, and then

21 tomorrow morning, if they do it on Friday, on

22 Saturday everyone has a right to not only possess a

CITY 000032

1   firearm, but to carry firearms.

2                   And I think we need to begin to

3   explain to them that, A, everybody does not have a

4   right to carry.  There are some reasonable

5   limitations you can put on, and we need to have

6   those in a manner that we can begin educating our

7   constituents.

8                   And, that B, you don't get to carry

9   them around with you to school and to church and,

10  et cetera, et cetera, et cetera.  Because people

11  get their news in these sound bites, and they're

12  not paying any attention to the details.  And we

13  really need to make sure, before we just impose

14  penalties on people, that we educate them.

15                  And so this is all a part of the

16  process to getting them to understand, that, no,

17  it's not going to be -- we're not having Dodge city

18  tomorrow morning simply because the Supreme Court

19  decides something today.  That's not what the law

20  was intended to do, so ...

21      MS. THOMAS:  Absolutely.  And just something,

22  because of something you said I wanted to

34

1   additionally mention that one of the ways licensing

2   and registration can be used by the city would be

3   to enhance or expand the list of prohibitions,

4   prohibited purchaser categories to include certain

5   types of violent crimes or domestic violence or

6   other violations that aren't currently included in

7   the list of prohibited purchasers.

8              So there's certainly ways for the

9   city to consider how they might like to expand that

10  as a way to keep guns out of the hands of people

11  that they don't think should have them.

12       ALDERMAN LYLE:  Thank you.

13       CHAIRMAN BEALE:  Alderman Balcer.

14       ALDERMAN BALCER:  How do you get around the

15  argument with the NRA when they say the Second

16  Amendment provides for the right to bear arms?

17  How ...

18       MS. THOMAS:  I mean, right up until 2008, the

19  Supreme Court had never actually said that that --

20  that the Second Amendment, which says, "A well

21  regulated militia," you know, as the first clause,

22  "ever applied to an individual."  So in other

1   words, right up until 2008, the court had never

2   held that you had an individual right to have a

3   gun.

4           And it was only in the Heller

5   decision that the Court for the first time even

6   said that there is any individual right, and that

7   right, even in this Heller decision, was extremely

8   limited.  They only applied it to your right to

9   have a gun in your home for self-defense.

10          So to the extent the NRA is out

11  saying the Second Amendment gives you all these

12  rights, that, in fact, is not an accurate statement

13  of what the law entails.  The law entails only a

14  very, very narrow allowance, and, you know, with

15  regard to that -- and this is even a decision

16  written by Scalia, who we certainly know has a

17  broad view of guns.

18          And even in that decision he talks

19  specifically about the fact that this does not mean

20  that anyone has a right to a gun at any time and

21  any place.  That it's very limited, and that

22  there's a wide range of regulation that would be

CITY 000035

1 even, again, in Scalia's decision, absolutely

2 presumptively valid. And he gives a pretty good

3 list, including regulation on commercial sales and

4 a variety of other limitations on guns.

5 So even though the NRA likes to wave

6 the Second Amendment flag, and we now know what

7 that actually means according do the Supreme Court,

8 it doesn't usually mean what they like to in their

9 sounds bites say that it means. And we try to be

10 accurate about -- we're not overstating what the

11 decision says.

12 The decision is on the books, and

13 this is what it actually says, and this is how it

14 restricts, thus we can't -- the Federal government

15 can't have an absolute ban. That's the only thing

16 that that Heller decision said about the Second

17 Amendment.

18 ALDERMAN BALCER: Are there previous Second

19 Amendment cases?

20 MS. THOMAS: The last case, I believe was in

21 1939. It was the Miller case, and the Miller case

22 was on a very, kind of different subject. But in

CITY 000036

1 that case the Court actually talked about the

2 Second Amendment being related to militia purposes.

3 So right up -- we believe that Heller actually

4 overturned precedent, which had not held that the

5 Second Amendment referred to an individual right,

6 but rather referred to sort of collective militia

7 related rights.

8          So this was a huge sea change in the

9 way that the Second Amendment had been addressed by

10 the Supreme Court.

11      ALDERMAN BALCER: And what is a militia?

12      MS. THOMAS: Well, the Heller decision --

13      ALDERMAN BALCER: And I'm just -- I'm not

14 toying with you.

15      MS. THOMAS: No. Fair enough.

16      ALDERMAN BALCER: I'm just trying to ferret

17 this information out. I'd like to know what

18 qualifies a militia?

19      MS. THOMAS: I mean, back at the time that

20 the constitution was written, the Second Amendment

21 was written, which is what I assumed they must have

22 been referring to, militias were the, you know,

CITY 000037

38

1　local standing Armies made up of citizens.  A

2　citizens militia was much of what was in place to

3　help defend the United States.  And this -- we

4　believe that this militia related right to keep and

5　bear arms had to do with the government trying to

6　keep the citizens engaged in the citizens militia.

7　　　　　　　Obviously, today, we do not have

8　citizens militias, nor do we really want them.

9　That's not how we operate any longer.  We have an

10　Army, and we have a police force, and that is who

11　protects us.  But certainly we know that there's a

12　lot of controversy about that interpretation, which

13　is exactly why we're in the situation we are.

14　　　　　　　But we believe if you look

15　historically accurately at the drafters and what

16　they were intending to say, they certainly did not

17　intend to have the kind of broad access to firearms

18　that we have in our society today.

19　　　　ALDERMAN BALCER:  That's all.  Thank you.  I

20　was just curious.

21　　　　MS. THOMAS:  Yeah, sure, no problem.  It's

22　like a, you know, 200 page decision, so it's a lot

1  of detail.

2     CHAIRMAN BEALE:  Any other questions?  We

3  want to thank you, and we appreciate you making the

4  trip.  Next we have David Hemenway.

5     DR. HEMENWAY:  Good morning.

6     CHAIRMAN BEALE:  State your name.

7     PROFESSOR HEMENWAY:  My name is David

8  Hemenway.  I'm a Professor at Harvard University.

9  I'm Director of the Harvard Youth Violence

10 Prevention Center, and I've worked on the issues of

11 guns in public health for more than two decades,

12 and I wrote a book trying to summarize the

13 literature, the scientific literature on guns in

14 public health.

15     And I'm going to spend a few minutes

16 just trying to summarize that summary.  And I want

17 to make sure you understand that of the scores of

18 public health gun researchers, I think virtually

19 everyone would completely endorse my summary of the

20 literature.

21     The overwhelming evidence, the

22 scientific evidence is that where there are more

1　guns, there's more death, more homicide, more

2　suicide, more firearm accidents, and this is

3　disproportionately handguns rather than long guns.

4　　　　　　　Now, all the conclusions here that

5　I'm going to talk about are sort of trying to make

6　sure that all else is equal, trying to compare

7　rural areas to rural areas, urban areas to urban

8　areas, troubled youth to troubled youth, and so

9　forth.

10　　　　　　　And what the evidence shows is that

11　when there's more guns in the community, this

12　increases the risk of adolescent gun carrying.  It

13　increases the risk of gun robbery.  It doesn't

14　really change the amount of robbery, but it

15　increases the amount of robbery that's gun robbery,

16　it increases the number of gun homicides, and

17　because gun homicides are the, of course, two

18　thirds of all homicides, when there are more guns

19　in the community, there are more total homicides.

20　　　　　　　How about, though, having your own

21　gun in the home, because that's just about other

22　people.  What about you?  Is a gun in the home

CITY 000040

1  beneficial to you?  And what the evidence indicates

2  is that having a gun in the home is a risk factor

3  for having a gun accident.  Not surprisingly.

4          It's also a risk factor for suicide,

5  and here the evidence is overwhelming that there's

6  an increased likelihood of completed suicide for

7  every member of the family if there's a gun in the

8  home.

9          It's not that there's an increased

10 likelihood of attempting suicide, but there's an

11 increased likelihood that people will die.

12         And, finally, where there's good

13 evidence about a gun in a home is about femicide.

14 A gun in the home is a real risk factor for the

15 woman in the home being killed.  Intimate partner

16 violence is far more likely to lead to death if the

17 batterer has easy access to a firearm.

18         What about the benefits of guns, the

19 public health benefits.  Well, it's hard to find a

20 lot.  It was once said that guns might deter a

21 burglary, but then there was a good study and it

22 indicated that where there are more guns, there are

CITY 000041

42

1  actually more burglaries, rather than fewer

2  burglaries, seemingly because burglars tend to like

3  guns to steal, just like they like jewelry,

4  cameras, laptops and so forth.

5              How about thwarting crime once it

6  starts.  Are good guns good for self-defense?

7  Well, one of the things we do know is that there's

8  far, far more criminal gun uses than self-defense

9  uses, and what are often called self-defense uses,

10  when you look at them carefully, they turn out to

11  be a little more than escalating arguments, and

12  which are both illegal and detrimental to the

13  public health.  Legitimate public health,

14  legitimate self defense use is not common, though,

15  there are instances.

16              Finally, are good guns good to

17  thwart crime?  Are guns used in self-defenses more

18  likely or less likely that you're going to get

19  hurt?  Well, there's not a lot of good evidence,

20  but the best evidence indicates that using a gun in

21  self-defense is no better than most other forms of

22  "resistance," which include running away or calling

CITY 000042

43

1    the police in terms of not getting hurt.

2                The one thing -- so self defense --

3    so guns -- there's lots of other things you can do

4    for self-defense.  But the one thing that guns seem

5    to do better than other forms of self-defense is it

6    reduces, not your likelihood of being injured, but

7    your likelihood of losing property to a burglar.

8    You're less likely to lose your wrist watch, or

9    your whatever.

10                Finally, I was asked to talk,

11   because I'm an economist, briefly about the cost of

12   gun violence, and there's been a number of studies.

13   We know that the costs of firearm violence are very

14   large, but they are very difficult to measure.  One

15   of the big problems is that only a small part of

16   the total costs involve market transactions.

17                We now notice how much the medical

18   care costs are.  We can say -- estimate pretty good

19   the criminal justice costs, but the main costs of

20   firearm violence, the real costs are pain, the

21   grief people feel, the fear of violence, the trauma

22   caused by violence leading to PTSD and other

1  issues, things, the neighborhood disintegration.

2  And none of those things are easily measurable, and

3  they have to at best be roughly estimated.

4          The best estimate, and it's a very,

5  very crude estimate, was made a decade ago by Phil

6  Cook and Jens Ludwig, and that is that gun violence

7  costs the United States something on the order of

8  $100 billion each year, which is very, very roughly

9  about $1,000 per handgun per year in $2,000.

10          To finish, let me just read four

11  consensus statements from experts who reviewed the

12  literature and come up with exactly the same

13  conclusions that I do about different aspects of

14  the literature.  34 injury prevention experts were

15  asked to prioritize home health hazards for

16  children.  They rated access to firearms in the

17  home is the most significant health hazard to

18  children.

19          The American Association of

20  Suicidology issued a consensus statement.  They got

21  a lot of experts together to look at the literature

22  on youth suicide.  They concluded that guns in the

CITY 000044

1  home are associated with an increased risk for

2  suicide by youth, youth both with and without

3  identifiable health problems or suicidal risk

4  factors.  So it's a risk factor for everybody.

5              Again, 23 international suicide

6  experts were asked what measures to prevent suicide

7  work, and they said the literature only shows two

8  that we know definitely work.  And one of the two

9  was restricting access for lethal means, such as

10  firearms.

11              And, finally, the American Academy

12  of Pediatrics reviewed all the literature about

13  guns and came out with recommendations, and one of

14  them is that it urges parents who possess guns to

15  remove them, especially handguns from the home.

16  Thank you.

17       CHAIRMAN BEALE:  Any questions?  Alderman

18  Rugai.

19       ALDERMAN RUGAI:  Thank you, Mr. Chairman.

20  Good morning, Dr. Hemenway.  Did your studies

21  include registered and legal handguns, as well as

22  the illegal ones?

1          PROFESSOR HEMENWAY:  These studies -- there's

2    so many different studies, and there's case control

3    studies and ecological studies, and a lot of times

4    it's just like measures of guns in the area, so --

5    and they're measured a whole variety of ways.

6    Sometimes it's just illegal guns by asking people,

7    you know, is there a gun in your household?  That's

8    one measure of gun ownership.

9               Other measures are a good proxy

10   measure.  It turns out the percent of suicides in

11   the region or the area that are gun suicides.  It

12   turns to out be an excellent proxy for whether

13   there's a gun in the household.  But we don't --

14   nobody really knows, like, how many illegal guns.

15      ALDERMAN RUGAI:  And I think that's the

16   elephant in the room, you know, that it's the NRA

17   proffers that -- in fact, you know, the responsible

18   people get theirs registered -- illegal ones.

19      DR. HEMENWAY:  Well, all the illegal guns

20   were once legal.  It's not like they're -- you

21   know, very, very few guns are manufactured

22   illegally.  They're all legal to start with, and

CITY 000046

47

1  somehow they get into improper hands.  And, you

2  know, we also know that a lot people who are legal

3  gun owners do terrible things.

4       ALDERMAN RUGAI:  And your studies and the

5  experts point to some of the severe impacts of this

6  as well.

7       DR. HEMENWAY:  That's right, that's right.

8       ALDERMAN RUGAI:  Thank you.

9       CHAIRMAN BEALE:  Alderman Balcer.

10      ALDERMAN BALCER:  You just made a statement

11 and caught my attention.  All guns were legal at

12 one time?  All?

13      PROFESSOR HEMENWAY:  Almost all, yeah.

14 Virtually every gun that, you know, is

15 manufactured, is manufactured legally.  Not every

16 gun, but in the United States.

17      ALDERMAN BALCER:  And it was bought legally,

18 and it ended up --

19      PROFESSOR HEMENWAY:  We don't know if it was

20 bought legally.  It may have been stolen from the

21 manufacturer.

22      ALDERMAN BALCER:  So it was manufactured

48

1  legally?

2      PROFESSOR HEMENWAY:  Yes.

3      ALDERMAN BALCER:  And in some way --

4      PROFESSOR HEMENWAY:  In some way it got into

5  the illegal market.

6      ALDERMAN BALCER:  It got -- right, okay.  So

7  it might not have been registered?

8      PROFESSOR HEMENWAY:  No.  Most guns in the

9  United States are not registered to start with,

10  even legal guns.

11      ALDERMAN BALCER:  Okay.  One of the other

12  arguments, and I -- you touched on it, and I'd like

13  your opinion, expand on it, is, look, if I've got a

14  gun in my house, I'm going to detour that criminal

15  from coming in my house.  If he or she thinks I

16  have a gun in my house, they won't come into my

17  house, they won't rob my house.  I'll protect

18  myself.

19      PROFESSOR HEMENWAY:  That's sort of the

20  claim, and there's not a lot of good evidence, but

21  the one piece of evidence that there's a really

22  careful study trying to look at different states,

CITY 000048

49

1  different counties where there are more guns and

2  controlling for whether it's urban or rural and how

3  much, you know, that there tended to be more

4  burglaries and more hot burglaries when someone was

5  at home when there was a gun -- when there were

6  more guns in the households.

7      ALDERMAN BALCER:  And then there's the --

8      PROFESSOR HEMENWAY:  Well, most burglars, you

9  have to realize, you know, they are the least

10  violent of all criminals probably, and they

11  typically want to go into your house when there's

12  nobody's there.

13      ALDERMAN BALCER:  All right.  Thank you.

14      CHAIRMAN BEALE:  Alderman Lyle.

15      ALDERMAN LYLE:  Professor, have you in your

16  studies analyzed any impact, any recent impact, any

17  change in your data since the several of the states

18  began this -- the carry law, for instance, Florida?

19      PROFESSOR HEMENWAY:  Yes.

20      ALDERMAN LYLE:  How has that ...

21      DR. HEMENWAY:  So there have been, I would

22  say at least two dozen econometric studies about

1   conceal carry laws.  And I think the National

2   Economy of Science has sort of summed up the

3   evidence saying that there's no evidence of any

4   beneficial effect or detrimental effect.

5           One of the reasons is that not that

6   many people are kept -- you know, a lot of people

7   were probably carrying illegally and now are

8   carrying legally, so there's not a huge change in

9   carrying.  The people who got licenses typically

10  were people at very low risk for anything.  You

11  know, they were rural older adult males, and that's

12  not where most of the crime and violence is going

13  on.

14          So it's very hard to see any net

15  effect, because most of the crime and violence are

16  in the cities, and it didn't have much effect on

17  what was going on in the cities, most cities.

18      ALDERMAN LYLE:  But in those cities that did

19  have that, these conceal carry laws, they have not

20  had any reduction in the public health costs for

21  gunshot victims or anything else?

22      PROFESSOR HEMENWAY:  Yeah.  Well, as I said,

1  there are these 24 studies, and I feel bad being an

2  economist, because they are just -- they are sort

3  of -- you know, there are some that say there's

4  some little benefit, there's some say there's some

5  costs, there's some say that there's no large

6  effect, and most of them, though, if you really

7  look at the aggregate effect.

8           And, again, what you'd have to do is

9  a really careful study about the people who are

10  carrying, who weren't carrying in the past then to

11  see if that benefits them. But there's certainly

12  you can't see a huge effect in the data one way or

13  the other. That's what the bottom line is.

14      ALDERMAN LYLE: So to the extent that people

15  believe that having the right to bear arms is going

16  to reduce any of these things, that has not reduced

17  the cost, it is not borne out in those states that

18  do actually carry?

19      DR. HEMENWAY: No. There are -- there was an

20  early -- one of the very first studies of this

21  claim that had a very great beneficial effect and

22  other people looked at it and showed that the data

CITY 000051

1 that was being used was very bad data, and when you

2 use better -- the correct data, you've got very

3 different results.  People use different models,

4 and there is -- the consensus in the literature is

5 that there's clearly no big effect.

6      ALDERMAN LYLE:  Thank you.

7      CHAIRMAN BEALE:  Dr. Hemenway, how does the

8 United States compare to other countries in terms

9 of gun violence, and is there anything that we can

10 learn from other countries?

11      PROFESSOR HEMENWAY:  One of the things we do

12 know is when you can compare us to the other high

13 income countries, the other industrialized

14 democracies -- the gun lobbyists likes to compare

15 us to Mexico and Guatemala and Jamaica and Estonia.

16 But when you compare us to Japan and Australia, and

17 New Zeland, and Canada, and Italy, and Scandinavia,

18 how do we look?

19      And the answer is in terms of the

20 crime and violence, we have very similar crimes and

21 violence rates.  We have similar bullying rates to

22 these other industrialized democracies.  We have

1   similar carjack -- you know, car theft rates.  We

2   have similar burglary rates.

3               We're an average country, except in

4   one area, and that's guns.  We are -- as you know,

5   we have lots more guns, particularly handguns, Lots

6   weaker gun control laws than these every -- of

7   these other 25 industrialized democracies.  And

8   what we have is just lots, lots more gun accidents

9   and murder with guns.

10  CHAIRMAN BEALE:  Is there any documentation

11  to compare, percentage-wise, how the United States

12  compares to other countries?

13  PROFESSOR HEMENWAY:  In terms of -- I mean,

14  we have -- you know, like for a teenager, we have,

15  like sort of 49 times the rate of firearm death.

16  If you look at women in the United States where our

17  women are being killed, like, compared to these

18  other countries, I have the data here; I could look

19  it up, but it's not even close in terms of, like,

20  gun accidents, but particularly gun homicide and

21  thus overall homicide.

22              A child -- if you looked -- we did a

1   study just looking at all the women in every

2   developed country who had been murdered, and so

3   this is German women.  If you lined them all up,

4   all the dead women, German women, and French women,

5   and Japanese women, and English women, and American

6   women.  Basically, about 70 -- over 70 percent of

7   these people would be American women.

8           If you just looked up women who were

9   murdered with guns, 85 percent would have been

10  America women.  The evidence is overwhelming that

11  our guns are not protecting our women, they're not

12  protecting our children, they're not protecting

13  our -- I mean, criminologists in every other

14  developed country just cannot understand the United

15  States, how, you know, we allow such easy access to

16  firearms to anybody, and how you could ever talk

17  about -- if you're talking about homicide in the

18  United States, how you could ever talk about

19  anything else, besides firearms, since that is what

20  makes us just such an out liar compared to the

21  other 25 industrialized democracies.

22          CHAIRMAN BEALE:  Any other questions?  All

1  right.  Again, we want to thank you, Mr. Hemenway,

2  also, for making the trip.  We appreciate your

3  expertise.  Next, Thomas Mannard.

4      MR. MANNARD:  Good morning, Mr. Chairman,

5  Members of the Committee.  My name is Tom Mannard,

6  and I have served for the last 10 years as the

7  Executive Director of the Illinois Council against

8  Handgun Violence.  I want to thank you for the

9  opportunity to be here today.

10      The topics that I am going to

11  discuss briefly have already been touched on by a

12  couple of previous speakers, so I'll just try and

13  put a little more context to that.

14      The first is the need for mandatory

15  training, both in the classroom and in the firing

16  range for handgun owners.  Before a person can

17  drive a car, they're required to spend time behind

18  the wheel and in the classroom.

19      We believe the same type of rule

20  should apply to handgun owners.  Not only is it

21  important for handgun owners to know how to

22  properly use a handgun, but it's also important to

CITY 000055

56

1  know things like how to safely store a handgun,

2  particularly if there are children in the home.

3  Currently there is no requirement for mandatory

4  training for handgun owners at the state level.

5          The second area is the need for

6  stringent regulations on handgun dealers.  For

7  example, if handgun dealers are licensed by the

8  city of Chicago, it would potentially allow the

9  Chicago Police Department to inspect and monitor

10 handgun dealers.  Particularly those that might be

11 sources of an inordinate amount of crime guns.

12         Now, while the Bureau of Alcohol,

13 Tobacco, Firearms and Explosives does everything

14 they can to monitor licensed firearm dealers, the

15 fact of the matter is, is that the ATF simply does

16 not have adequate resources or staff to monitor the

17 over 100,000 federally licensed firearm dealers in

18 the United States of America.

19         There is already precedent for

20 dealers to be licensed at the local level, as many

21 communities around the Chicago area have

22 requirements for a local license before a dealer

CITY 000056

57

1  can sell or transfer handguns.

2           In addition, it is critical that
3  employees and handgun dealers are subject to
4  mandatory and regular criminal and mental health
5  background checks.  This is not a requirement at
6  the state level, and it seems absolutely ridiculous
7  that somebody who's working at a licensed firearm
8  dealer could potentially be somebody who has a
9  felony on their record.

10          Finally, as was touched on earlier,
11 the city could consider a potential prohibition on
12 handgun dealers or at a minimum prohibiting handgun
13 dealers in sensitive areas, such as your schools,
14 parks, or in residential areas.

15          Finally, the Council should consider
16 mandatory liability insurance for handgun owners.
17 Clearly, there are potential liability issues
18 involved with handgun ownership, and insurance
19 could cover damages resulting from negligent or
20 willful lax (phonetic) involving a handgun.

21          I know there's a lot that you have
22 to consider in the coming weeks with the Supreme

58

```
1   Court decision, and I thank you, again, for the

2   opportunity to be here today.

3        CHAIRMAN BEALE:  Alderman Balcer.

4        ALDERMAN BALCER:  I was -- you made a

5   statement about handgun dealers, not owners.

6   You're talking about handgun dealers in the city of

7   Chicago?

8        MR. MANNARD:  No.  There are no handgun

9   dealers in the city of Chicago.

10        ALDERMAN BALCER:  Right.  The way I took what

11   you were saying is that the possibility of handgun

12   dealers?

13        MR. MANNARD:  Correct.

14        ALDERMAN BALCER:  I understand about owning a

15   weapon in the city, an individual, but I know --

16   Mr. Chairman, if we -- is there anything about

17   allowing handgun dealers in the city of Chicago?

18   Would this open us up to a handgun dealer?

19        CHAIRMAN BEALE:  Mara, do you have any input

20   on that?

21        CORPORATION COUNSEL GEORGES:  Again, for the

22   record, Mara Georges.  The city does issue a deadly
```

1  weapons license, and there have been five such

2  deadly weapons licenses issued.  None of the places

3  to which such a license has been issued, though,

4  sells handguns.

5            In fact, there is an ordinance in

6  the city that makes it illegal to display handguns

7  for sale.  So if anyone were to display handguns in

8  an attempt to sell them, that would be illegal.

9            Further complicating the issue is

10  that any of these holders of this particular

11  license would need a Federal firearms license in

12  order to sell handguns, and none of these

13  particular places have such a license.  So there

14  are currently no weapons dealers within the city of

15  Chicago.

16            I think the point Mr. Mannard was

17  making was that if we wanted to look at a

18  comprehensive firearms ordinance, the issue of

19  dealers may have to be addressed, and any issue

20  that may have to be addressed is whether there

21  would be an outright ban of such dealers or whether

22  there would be an allowance of such dealers with

CITY 000059

1    very significant and substantial regulation

2    involved.

3            And, you know, that's just kind of a

4    policy decision which would have to be made, kind

5    of how is that issue going to be addressed by the

6    Council.

7       ALDERMAN BALCER: Thank you.

8       CORPORATION COUNSEL GEORGES: You're welcome.

9       CHAIRMAN BEALE: Alderman Lane.

10      ALDERMAN LANE: Thank you, Mr. Chairman.

11          Mr. Mannard, you mentioned mental

12    stability in carrying a gun. I think on the FOID

13    card it asks you and has boxes if you've been

14    arrested, you check that, or if you had some type

15    of mental --

16      MR. MANNARD: Correct.

17      ALDERMAN LANE: -- incompetency or whatever,

18    you check that box also?

19      MR. MANNARD: Right, but the FOID card, as I

20    think was mentioned earlier, is issued for a 10-

21    year-period, and so when somebody is issued a FOID

22    card perhaps there are no mental health issues or

CITY 000060

1 perhaps they've never been convicted of felony, but

2 unfortunately over the course of 10 years the

3 possibility of that situation changing with a

4 particular person who has a FOID card can certainly

5 change.

6     ALDERMAN LANE:  Thank you.

7     CHAIRMAN BEALE:  One question for you.  Do

8 you have any idea on the amount of insurance, what

9 it would cost if a person did have to purchase

10 liability insurance after their homeowner's

11 insurance?

12         The question is, is there any dollar

13 amount of what it would cost to purchase liability

14 insurance to own a handgun?

15     MR. MANNARD:  Well, there are no exact

16 figures, Alderman.  However, based upon, for

17 example, experience that I have in running my

18 organization, liability insurance for my board of

19 directors, that insurance is approximately, for our

20 organization, about $1500 a year.  Of course it

21 would depend on the amount of liability insurance

22 that the Council would potentially require for

1  handgun owners if that was considered.

2          There was a measure actually

3  introduced in the general assembly, in this general

4  assembly by Representative Duncan to require a

5  million dollars of liability insurance for handgun

6  owners.  That bill did not move forward in the

7  current general assembly, but that was the piece --

8  the amount of liability insurance that was required

9  within that bill.

10     CHAIRMAN BEALE:  Any other questions?

11  Alderman Lyle.

12     ALDERMAN LYLE:  To the extent that we were

13  creating, revising our registration requirements,

14  which of course we would be doing invigorously

15  should the Supreme Court come down and rule

16  adversely to us.  There would be requirements that

17  the state would have to also amend theirs.

18          Particularly, as you indicated, the

19  FOID card is a 10-year statute.  So we would -- I

20  would think that one of the proposals that we would

21  be making to our state legislators would be to

22  shorten that period of time.

CITY 000062

1          What would be -- since you are

2  working with the Springfield body, what is the --

3  what are the likelihood that any attempt that we

4  would have to revise or strengthen the FOID

5  requirements would be passed?

6       MR. MANNARD:  Well, I think because the FOID

7  is a state issued card in terms of the City

8  Council's ability to get the state to change that,

9  I think there, you know, would probably be some

10  difficulty there.

11          However, because the city, of course

12  is a home ruled unit of government, while the FOID

13  card is valid for 10 years, the city could also

14  require that if you are a registered handgun owner

15  that you have to go through a criminal and mental

16  health background check on an annual basis.

17          So you could at least put certain

18  protections in in addition to what the FOID does

19  for handgun owners in the city of Chicago.  And

20  certainly, once again, you know, a lot can happen

21  in 10 years.  And it used to be a five-year-period.

22          The state police, because they were

64

1  having problems in processing FOID card applications,

2  supported increasing the time that it's valid from

3  five to 10 years within the last couple of years.

4          ALDERMAN LYLE:  Based on their problems,

5  they'd want to make it 20 years now.  But thank

6  you.

7          MR. MANNARD:  You're welcome.  Thank you.

8          CHAIRMAN BEALE:  Any other questions?  We

9  want to thank you.

10         MR. MANNARD:  Thank you, Alderman.  Thank

11 you, Members of the Committee.

12         CHAIRMAN BEALE:  Next we have Mark Walsh.

13         MR. WALSH:  Thank you, Mr. Chairman and

14 Members of the Committee.  My name is Mark Walsh,

15 and I'm the Campaign Director for the Illinois

16 Campaign to Prevent Gun Violence.  A position I

17 have held for the last three years.

18             The campaign is a project of the

19 Illinois Council Against Handgun Violence, and is a

20 research based public education campaign to promote

21 meaningful gun policy reform in Illinois.

22             Two of the issues I'd like to

1 address today on the issue are requiring that when

2 a firearm is lost or stolen that it be reported

3 upon discovery to law enforcement.   That sounds

4 like a common sense provision.   Unfortunately under

5 Illinois law, that does not exist.

6            The city of Chicago does require

7 that when a firearm is lost or stolen that it be

8 reported to law enforcement.   Nationally surveys

9 have shown that approximately 500,000 firearms are

10 stolen each year from private citizens.

11            Requiring that an owner promptly

12 report the lost or theft gives law enforcement the

13 tools to disrupt the source of illegal gun flow and

14 make gun trafficking more difficult for criminals.

15            The last numbers that the Bureau of

16 Alcohol, Tobacco and Firearms reported in 2000 is

17 that 88 percent of firearm -- excuse me -- firearms

18 traces for crimes committed, the person in possession

19 of that gun at the time of the crime is not the

20 original possessor of the firearm.   Obviously,

21 disrupting this flow is vital to protecting our

22 communities.

CITY 000065

1           Another area that goes into -- that

2    I think we need to have attention on is stiffer

3    penalties for the use of an unregistered firearm.

4    Whether to stiff fine a stronger penalty,

5    increasing sentencing provisions, law enforcement

6    both locally and on the state level must have and

7    use that threat of an increased penalty as a

8    deterrent to illegal gun possession and use.  If

9    there's any questions?

10        CHAIRMAN BEALE:  Any questions from the

11   committee?  All right.  We want to thank you.

12        MR. MANNARD:  Thank you.  Thank you, very

13   much.

14        CHAIRMAN BEALE:  Next we have Bishop Peecher.

15        BISHOP PEECHER:  My name is Bishop Edward

16   Peecher.  I'm the Pastor of Chicago Embassy Church

17   on the corner of 59th and Princeton.  I want to

18   thank you for allowing the community to be heard on

19   this important matter.

20           It is painfully clear that the

21   parents who have buried children due to handgun

22   violence, that this nation's gun laws do not fit a

1    one size fit all scenario.  I believe that regions

2    and population centers affected by social variables

3    have the responsibility to modify gun laws to fit

4    the dynamics of their population centers.

5                    There is something unrighteous when

6    hundreds and hundreds of children have access to

7    handguns and handguns that they did not get at

8    home, but handguns they acquired on the streets.

9    There is something ominous about a society that

10   will protect their right to bear arms, but not

11   protect the right of their children to have a life.

12                    I applaud the city of Chicago for

13   pushing back against the gun industry.  If the gun

14   industry members buried their children at the same

15   rate we buried our children due to handgun

16   violence, they wouldn't be so anxious to put more

17   guns on the streets.

18                    We should be allowed in this

19   population center to put modifications on the right

20   to bear arms and to maintain the righteous act of

21   protecting our children.

22                    I think that we should have the

68

1   strictest and the hardest gun laws in the nation.

2   We should be a model for keeping guns out of the

3   hands of the people in this population center.   And

4   I thank you for your allowing me to share that.

5        CHAIRMAN BEALE:   Thank you.   Any questions

6   from the Committee?   Thank you, Pastor.

7        BISHOP PEECHER:   Thank you.

8        CHAIRMAN BEALE:   Next we have Diane Latiker,

9   and also we have Annette Holt, if you all could

10  come at the same time.

11       MS. LATIKER:   Good afternoon, Alderman.   I

12  just wanted to say that --

13       CHAIRMAN BEALE:   State your name for the

14  record.

15       MS. LATIKER:   Oh, I'm sorry.   My name is

16  Diane Latiker, and I'm President of Kids Off the

17  Block.   I just wanted to state that I am for any

18  public safety that will help our communities.   I do

19  not believe that we should eliminate any gun bans,

20  that we should eliminate anything that will protect

21  and be for the safety of our young people in our

22  communities.

1         Whatever we have to do to protect

2    the people who live in each neighborhood, there

3    should be no -- any -- I don't know how I would say

4    this, but there should be no anything.  We should

5    just not even think about it.  We should just do

6    it.

7         I am definitely with Mayor Daley

8    regarding the gun ban, and I know that people say

9    it's not working now, but we don't know the

10   consequences if it's not in place.  So that's what

11   we have to think about.

12        So -- and as far as the young people

13   are concerned, definitely everything should be in

14   place to protect them from birth until adulthood.

15   Thank you.

16        CHAIRMAN BEALE:  Any questions?  Thank you,

17   Ms. Latiker.

18        MS. NANCE-HOLT:  Good morning, my name is

19   Annette Nance-Holt, and I'm a member of Purpose

20   over Pain.  An organization that was founded on

21   behalf of the children that we lost to gun

22   violence.  A group of parents who got together, who

1 took their pain and turned it into a purpose to

2 change the city, and just save youth in the city of

3 Chicago.

4          We actually operate on three

5 principles.  One is common sense gun legislation.

6 So we've actually been to Springfield to talk to

7 them about changing the gun laws.

8          The other thing is going out into

9 the schools and into the community, talking to

10 parents about the violence, the gun violence issue

11 and what guns do to lives.  Especially the

12 survivors who are left behind when they lose their

13 children.

14          And the third thing that we do is we

15 go out and actually reach out to parents of gun

16 violence who have no hope and try to give them some

17 hope, and give them some direction and some

18 counseling and support so that they can make it,

19 like we try to make it every day.

20          But I'm here today to tell you that

21 I live in the Victory Heights neighborhood, and my

22 Alderman is Alderman Carrie Austin.  I actually

1    work in the ward of Ginger Rugai, Alderman Rugai.

2    I've been with her quite a few times.

3              But I'm here today because I lost my

4    son, of course, Blair Holt, May 10th of 2007 to gun

5    violence.  He was doing all the right things.  He

6    was coming home from school, going to help his

7    grandparents at their store in Roseland, and he was

8    shot, along with five other children.  He was the

9    only one to die that day.  So my mission has been

10   fight to keep my son's name alive, that he will not

11   die in vain.

12             And the other thing that -- I'm a

13   captain in the fire department, and actually by

14   working on the streets and seeing so many victims

15   of gun violence, a couple things that we come

16   across every day, a lot of people may not know is,

17   the fact that when we go to fires, we actually go

18   into homes where people have guns, and, you know,

19   when that ammunition heats up, it can explode and

20   go off on us like anything else.

21             We also respond to homes where there

22   are domestic violence cases.  The police respond as

1 well with us sometimes, and we can go into those

2 positions where people are in a hostile environment

3 and they become angry, and they will actually pull

4 out guns or have guns.

5         I have actually been fortunate, in

6 the fact that before this happened to me with

7 losing Blair, I responded to a call in the Morgan

8 Park area, which is Alderman Carrie Austin's area,

9 and it was on the east side of Morgan Park, and,

10 actually, we came up on a scene of -- they told us

11 a person was shot. It's 50 members -- neighbors on

12 the street.

13         We turned the corner, police are not

14 on the scene. When we pull up, we see a man

15 sitting on the porch, and he's just sitting down,

16 kind of like this (indicating), and we noticed --

17 the neighbors said, that's him, that's him, you

18 know, he's hurt.

19         We walk up on him, we find him with

20 a Glock in his hand. He has a Glock fully loaded

21 in his hand, and he has another clip in his pocket,

22 we find out later from a police sergeant. We

CITY 000072

1 managed to get the gun away from him. We found out

2 he was not the victim. He was the one who shot his

3 brother point blank. He opened fire on him, eight

4 rounds direct into him. He killed his brother.

5          I could have been a victim of gun

6 violence that day doing my job as a lieutenant on

7 the fire department at that time. But in addition

8 to that, I had to go to court to testify that this

9 man had killed his brother and that he told me he

10 killed his brother.

11          So these are the things that we face

12 every day when we're trying to serve the public and

13 keep the public safe and help them and assist them.

14 We have people with guns in their hands that don't

15 deserve them. People don't need guns anyway to

16 solve their problems. It's up to communities to

17 solve problems. Not guns. Guns will never solve

18 any problems we've had in life.

19          So I'm here today to say, you know,

20 on behalf of Officer Eric Lee, who is a family

21 member of ours, who was a Chicago Police Officer

22 who was gunned down in Englewood trying to do his

74

1  job, please keep us safe as we dedicate our lives

2  to the city and the citizens of Chicago by helping

3  enact some gun laws that will keep us safe as well.

4          Not only I lost my child, I could

5  lose my life.  Ron is a police officer, he could

6  lose his life.  How many more police officers will

7  we see, and firefighters?  We had one firefighter

8  who was doing an arson investigation, he had to go

9  off the fire department because he was shot by a

10 gang while he was doing his job.

11         So I ask that we actually consider

12 what are we going to do if this passes?  Do we have

13 something in place to protect us so that we can

14 help others?  Otherwise it's going to be a

15 lose-lose all the way around.  Thank you.

16     CHAIRMAN BEALE:  Thank you.  I just have one

17 question for you.  You mentioned being a first

18 responder if someone has ammo in the house.

19         Have you or anybody in the

20 department, that you know of, have walked into a

21 situation where, you know, some artillery has gone

22 off because it has gotten hot?

75

1          MS. NANCE-HOLT:  Well, actually we had a

2     fire, it will be like 105th and Morgan where we had

3     a fire over there, and we actually found the

4     ammunition before it went off.  So before the fire

5     impinged on it, we were actually able to get it, we

6     turned it over to our battalion chief.

7               So I've never been in a fire where

8     it's gone off, but I could assure you, you don't

9     know what's going to happen when that does happen.

10         CHAIRMAN BEALE:  And I think that's one of

11    the important things that we're really looking at

12    is making sure the first responders have notification

13    that there may be a firearm or ammunition in the

14    home, so we can protect our first responders,

15    because I think that's extremely important.

16              So we want to thank you.  If there's

17    any other questions from the Committee?  Again, we

18    would like to thank you so much, and we want to

19    encourage you to keep up the good fight.  All

20    right.  We really appreciate you.

21         MS. NANCE-HOLT:  Thank you.

22         CHAIRMAN BEALE:  Pamela Bosley and Tom Vanden

CITY 000075

1  Berk.

2      MS. BOSLEY:  Good morning.  My name is Pam

3  Bosley, and I'm here on behalf of Purpose over Pain

4  also, and my son was murdered, Terrell Bosley,

5  while he was coming outside of the church, getting

6  drums outside of the -- out of a car with his

7  friends and somebody came by shooting with a

8  handgun and took my son's life.

9          So the reason I'm here is after the

10  death of Terrell Bosley, who was murdered April 4th

11  2006, he was only 18 years old, his brother is

12  suffering from depression.  So by him suffering

13  from depression he talks about suicide so usually --

14  my husband and myself, we usually can talk to him

15  when he in that state mind of not wanting to be

16  here because he don't have his brother, or when

17  he's talking about, you know, taking his own life.

18          And if you have the guns inside your

19  home that would open the door, an opportunity for

20  instead of him calling us, him taking his life.

21  And Terrell's brother is not the only one in this

22  situation.  We have a lot of kids that's suffering

```
 1   from depression.

 2                So you have to keep in mind that if

 3   the gun is there, they're going to use it.  They're

 4   not going to reach out and try to talk to somebody

 5   to help them save them -- you know, to help save

 6   them.  They're going to reach out and take their

 7   lives, because at that state they're thinking about

 8   why I'm here?  You know, the kids at school picking

 9   with me.

10                My son, an instance, he talked about

11   not having his brother.  Other kids are suffering

12   from different things, so they're going to reach

13   and take that gun and take their lives.  So that's

14   going to increase the suicide rate for kids, for

15   youth that's in the ages of 10 through 19.

16                Because that's a subject that people

17   do not talk about, how these young people are

18   taking their lives, and if you give them the

19   opportunity and put the gun in their -- you know,

20   there for them, they're going to do it, they're

21   going to take their life and that's going to

22   increase the suicide, because we already got the
```

1  homicide on the streets.  They're taking our kids

2  now, but that's going to increase the home, of

3  youth taking their lives.

4          So I'm asking that if the gun ban is

5  lifted, that we put a strict law in place as far as

6  a lock on the guns, the guns have to be locked up,

7  and if the parents don't do that, they have to, you

8  know, be charged with some type of penalty, strict

9  penalty.  Thank you.

10  CHAIRMAN BEALE:  Any questions from the

11  Committee?  Again, we would like to thank you.

12  MR. VANDEN BERK:  Hi, my name is Tom Vanden

13  Berk.  I also lost a loved one, a 15-year-old son

14  to gun violence back in 1992.  I've done many

15  things since; I'm also President CEO of UCAN, a

16  child welfare agency, prominent child welfare

17  agency in the city of Chicago.  I'm also a member

18  of the Brady campaign, Sarah and Jim National

19  campaign against gun violence.  I'm also Chairman

20  of the Brady Pact Illinois.

21          My belief is that Chicago stood up

22  to the bullies, which are the NRA, a long time ago,

1  and we have an opportunity to do it again by having

2  a very tight restrictive registration and licensing

3  act.  All guns at one point were legally

4  manufactured.  It is the lack of adequate

5  registration from that point of manufacture to

6  where they get in the hands of criminals and youth.

7           They are very afraid -- the gun

8  industry is very afraid of that type registration

9  to prevent this kind of gun violence.  The

10  marketplace is our youth, our gang bangers, and our

11  criminals.  But it can be stopped.  If Chicago has

12  a precedent of a strong registration and licensing,

13  that is one step.

14           The next step is to then make sure

15  that this is done on a statewide basis to better

16  protect Chicago.  Chicago cannot protect itself, as

17  we've experienced from the gun ban.  We can do it

18  here in Chicago and start the ball rolling.

19           The Brady Pact Illinois has gotten

20  support from some of your fellow colleagues.

21  Alderman Fioretti, Alderman Mell have contributed

22  very generously for this pact, which is a political

1  strategy to get rid of individuals who vote on

2  behalf of the NRA, as opposed to voting for our

3  children.

4           Again, Chicago, you have an

5  opportunity here to make a strong statement, and I

6  welcome that statement.  Thank you for taking the

7  leadership, as you have in the past, and, please,

8  continue to do it.  Again, Mayor Daley and this

9  body has taken on the NRA, and we've won, but let's

10  keep it going.

11      CHAIRMAN BEALE:  Thank you.  Any questions?

12  All right.  Thank you, again, Tom.  All right.

13  Next we have Willie Cade and Reverend McKay.  Is it

14  Cade or Cad?

15      MR. CADE:  Cade.  I'm not a Cad.  Though some

16  people suggest I am.  Hi, my name is Willie Cade,

17  I'm the President of PC Rebuilders and Recyclers.

18  There are two particular elements that bring me

19  here today.

20           10 days ago within 300 yards of my

21  front door of my office a man was murdered at

22  9:00 o'clock at night on a -- who lived in the

1  building directly across the street from us.  For

2  six months we had been trying to work with the

3  police department to get them out of that

4  particular house that they were squatting in, and

5  surprisingly enough, the next day it was boarded

6  up.

7          The other issue that brings me here

8  is is that one of my employees' brothers has been

9  charged with first degree murder because he was in

10  the room when another man killed another person.

11  So handgun violence is very personal to me.

12          One of the things that I -- in

13  volunteering in the last couple of years in the gun

14  turn-ins have realized is that we need to be able

15  to give people a way to get guns out of their

16  homes.  We can't -- we have to create a legal

17  stream or way that these guns can be taken out of

18  the homes.

19          The example that comes to my mind

20  is, a widow of a sheriff's deputy who had two

21  handguns in the home.  She'd had them there since

22  her husband had died.  She didn't know what to do

82

1  with them.  Thank God no one had broken in and

2  stolen them at that point.  It would be perfectly

3  appropriate for her or anyone else in the community

4  to come and sell those guns and get rid of them.

5          So I would recommend that we -- that

6  you create or consider in your legislation the

7  ability for what I would call a non profit gun

8  buying shop that would be able to buy guns off the

9  street and actually get rid of them in the

10 neighborhoods.

11         I would actually put them deep in

12 the heart of the neighborhood so that we can

13 incentivize people to come and bring those guns in.

14 I would then take those guns, if I owned that shop,

15 and take and do the ballistics testing on them.

16         I would also mark the gun as it has

17 been ballistic tested, and then I would be happy to

18 sell it to Texas or any other state, any other

19 place that responsible gun owners would want these

20 guns, then I would want to bring that money back to

21 the city and buy more guns.

22         I think if you just look at the

1  rationale, and I think it was presented by the

2  Professor from Harvard, that where there are more

3  guns, there are more murders.  I would suggest to

4  you that the corollary of that is true, is because

5  there are so many murders in the city of Chicago,

6  there are likely to be many more guns.

7            And so I think we need to figure out

8  how to get them out of the city, along with

9  regulating and all the other issues that people

10 have represented.

11      CHAIRMAN BEALE:  Any questions?  Thank you,

12 so much.

13      MR. CADE:  Thank you.

14      CHAIRMAN BEALE:  Again, Reverend McKay?  Next

15 we have Tom Bosley and Aisha Latiker.

16      MR. BOSLEY:  First of all, good afternoon.

17 I'm Tom Bosley, Vice President of Purpose over

18 Pain, and also father of Terrell Bosley, a young

19 Gospel musician who was shot and killed coming out

20 of the church April 4th 2006.  And I just want to

21 thank you for giving us the opportunity to speak,

22 my Alderman, Alderman Anthony Beale.

1           And I heard a lot of very

2    interesting information today, but I think one

3    thing that we really have to focus on, that if this

4    gun ban is lifted, we really have to hope the City

5    Council can really look at legislating stringent

6    laws and penalties if and when gun shops may try to

7    set up in our city.  We really have to be on

8    vigilance with that.

9           Also, I think we must consider

10   stricter penalties for those who are caught with

11   illegal guns as well, and I just think that the

12   city should be on notice that I was listening to

13   the information presented, we will have a rise in

14   suicides, domestic violence situations, and I'm

15   only concerned that the city may not have the

16   resources to respond to these situations.

17           We already have a lack of police in

18   the communities, and if we have an up-spike in

19   domestic violence situations, because when people

20   get mad what they're going to do most likely is

21   turn to the legal handgun that they now have in the

22   home, and that is going to create another

85

 1  situation, and in addition to the increase in

 2  suicides.

 3          So I just want to, again, let the

 4  City Council know that this may be a -- probably a

 5  potential problem that we -- that you all should

 6  look at.

 7      CHAIRMAN BEALE:  All right.  Thank you, Tom.

 8      MR. BOSLEY:  Thank you.

 9      CHAIRMAN BEALE:  Is there any questions?  All

10  right, again, we want to thank you and the whole

11  organization.  You know, we look to you all for

12  guidance, and we want to continue to support you

13  all, and hopefully we can prevent any other members

14  joining your organization.

15      MR. BOSLEY:  Thank you.

16      CHAIRMAN BEALE:  Thank you.  Aisha Latiker,

17  Sandra Reed, and is this Ms. Robinson -- Claude

18  Robinson.

19      MR. ROBINSON:  Good morning.  My name is

20  Claude Robinson, Executive Vice President for

21  External Affairs and Diversities at UCAN.  I'm here

22  to talk about the work we have been doing over the

86

1  past 12 years with a number of city departments.

2  Our job has been trying to create a visible and a

3  viable voice for youth throughout the Greater

4  Chicagoland area.

5         And our nationally valid teen gun

6  survey of a thousand young people from around the

7  country is a way to get young people's honest

8  opinions about how gun violence and community

9  safety has impacted them.

10         I'd like to share just a few points

11 on behalf of America's youth as it relates to the

12 survey.  60 percent of the young people surveyed

13 stated that they believe that America will be a

14 safer place without handguns.  83 percent believe

15 that they will benefit from more violence

16 prevention programs in their communities and their

17 schools.

18         70 percent believe that government

19 officials weren't doing enough to create adequate

20 common sense gun laws.  Another 34 percent said

21 that they could get a handgun if they really wanted

22 .to, and when we extrapolated the data and looked at

1   young men between the ages of 16 and 18, the number

2   went from 34 percent, up to 46 percent.

3                   And the last stat that I wanted to

4   share with you is that 89 percent of the young

5   people surveyed stated that child proofing guns and

6   having safe storage was vitally important to safety

7   in their homes.

8                   And in 2000 there were about 230

9   young people that were killed by handguns under the

10  age of 19 here in the state of Illinois, and there

11  was a safe storage law that was passed in the year

12  of 2000.

13                  In 2005 there was another study of

14  young people under the age of 19, and because of

15  the -- partly the safe storage law, the young

16  people killed under age 19 from 230 went down to

17  130 here in the state of Illinois.

18                  So as we're considering what

19  ordinances will go into effect, if the Heller case

20  passes, I think it's vitally important that the

21  state law of young people being -- you have to be

22  14, that we raise that up to about 18 or 19 if

1   you're going to have a gun in your home that is

2   stored for young people in that regard.

3              And I also wanted to say that that

4   there has to be some discussion around where

5   liability goes.  If an adult in your home and a

6   young person gets access to a gun and commits a

7   crime or a suicide, there has to be some degree of

8   liability placed on that parent for allowing that

9   to happen.

10             The last thing I wanted to say is

11  this is America's problem, and although Chicago is

12  the spotlight right now, I've been in a number of

13  conversations at the White House with the Attorney

14  General and the Secretary of State.

15             Nobody is touching this issue,

16  except for the Mayor and the city of Chicago, and I

17  think as a Governing Board here in the city of

18  Chicago, young people are looking for you as

19  leaders.

20             Yesterday I had an opportunity to

21  present at Robeson High School, and also on Tuesday

22  at Al Raby High School, and I can tell you

1  emphatically from the bottom of my heart that young

2  people are still hopeful that Government officials

3  and parents in the community can do something about

4  turning this around.  We can't continue to fail

5  young people at the level that we have at this

6  point in time.  Thank you.

7      CHAIRMAN BEALE:  Any questions?  Again, we

8  thank you.  Again, Sandra Reed.  Next we have Tonya

9  Burch and Pamela Williams.  Can you state your

10  name.

11      MS. BURCH:  Hello, my name is Tonya Burch,

12  and I live in the Englewood community.  I'm also

13  here on behalf of Purpose over Pain.  My son was

14  killed at a block party, due to gun violence.  I

15  oppose for the gun ban being lifted.  If the

16  Supreme Court allow our homes to have guns, I

17  believe we need to implement a stronger gun law in

18  place to protect our kids and family.

19          In case the finding of guns in the

20  home is lifted, we need for them to enforce

21  stronger laws.  We already know that the statistic

22  is high in Chicago as gun laws, the kids are being

CITY 000089

1  murdered.

2            Allowing guns in the home will

3  result in more kids death, and family kids being

4  killed, or just more suicide rates, people getting

5  angry with others or just going into the homes to

6  get they gun to shoot someone else.

7            If guns is allowed to be kept in our

8  homes, they should be required to have stricter

9  guidelines on safe keeping and stronger penalties.

10 Thank you.

11        CHAIRMAN BEALE:  Any questions?  Thank you.

12 State your name for the record.

13        MS. WILLIAMS:  My name is Camella Williams.

14 I am a peer educator for the Blair Holt Peace

15 Alliance.  I have lost 15 friends all under the age

16 of 23 to different acts of violence, most over gun

17 violence.

18            I am asking that if the handgun ban

19 is overturned that more gun laws will be in place,

20 stricter gun laws, and I'm also asking for a plan

21 that will keep my peers and myself safe because we

22 will be the ones that is affected by it, because we

CITY 000090

1  can't protect ourselves.  Thank you.

2      CHAIRMAN BEALE:  Thank you.  Alderman Lyle.

3      ALDERMAN LYLE:  It's interesting, as I sit

4  here and listen to the comment from the community.

5  I just received an e-mail that advises me that

6  there's going to be a Right to Carry Town hall

7  meeting to be held in Touhy Park on June 30th.

8          So while we are talking -- this

9  event is being sponsored by the Illinoiscarry.com,

10  an on-line action group and discussion forum

11  dedicated to seeing legislation passed that will

12  put Illinois citizens on an equal footing with

13  residents in 49 other states.

14          And so I mention that because all of

15  the advocates here in this room need to join the

16  city -- let me just say that if I can predict

17  anything, I predict that if the Supreme Court

18  strikes down our gun ban, we will on the next day

19  or the next day that's available file an amendment

20  and another begun ban -- not ban -- restrictions on

21  licensing, on registration, and training, and

22  everything you can possibly think of.  That's how

1  serious we are.

2          However, as the Doctor talked about

3  our view of -- the way the rest the world views us

4  as the United States of America being this gun

5  crazy legis- -- body, that has been -- it is passed

6  down to our constituents, and so you, and you, and

7  all of those out that needs to -- you need to start

8  talking to your neighbors, and to your churches,

9  and to your friends, and they need to talk about it

10 at block club meetings, and they need to talk about

11 it at Bingo meetings, on the boat, every where.

12          Because there is another set of

13 people -- and this is my whole point -- there's

14 another set of people out here who are trying to

15 mobilize so that Illinois will have a concealed

16 carry law right now while we're in this room.

17 That's what I wanted to say.

18      CHAIRMAN BEALE:  Thank you, so much.  Okay.

19 Next we have Irma Alba, Alba, is it, and Charlene

20 Davis.

21          (spanish translator -- young girl).

22      MS. ALBA:  My name is Irma Alba.  I am part

93

1  of --

2       CHAIRMAN BEALE:  Okay.  We need you to talk

3  up a little bit.

4       MS. ALBA:  I'm part of NCLB and No Child Left

5  Behind in the school.  I am involved in many

6  things, such as the community and schools.  I

7  participate in marches, such as anti-violence,

8  drugs and gangs.

9            My reason is that I hope that my

10  daughter or another student will be in the day

11  after tomorrow be such involved with a gun.  That's

12  all.

13       CHAIRMAN BEALE:  Thank you, so much.  Any

14  questions?  Thank you.  All right.  Ms. Davis?  All

15  right.  And we have Reverend DeJesus.

16       REVEREND DEJESUS:  Good afternoon.

17  Basically, I'm here --

18       CHAIRMAN BEALE:  Can you state your name,

19  Reverend.

20       REVEREND DEJESUS:  Reverend Wilfredo DeJesus,

21  Pastor of New Life Covenant Church in Chicago, in

22  Humboldt Park.  I have marched in the city against

1  violence.  I have marched to funerals, buried young

2  people, and buried my brother-in-law due to gun

3  violence.

4           If this is overturned, the city of

5  Chicago, the City Council, the Mayor has a right to

6  defend the Chicagoans as it pertains to guns.  If

7  the Supreme Court overturns this, then the city of

8  Chicago should be able to defend the citizens.

9           Heck, if Arizona can do it, then the

10  city of Chicago can do laws as well.  I think there

11  need to be tougher laws, in the event that we're

12  overturned, as it pertains to background checks,

13  whether it be -- if it's within 48 hours, we

14  believe -- I believe that should be longer than

15  that to be able to look at the background of an

16  individual.

17           I believe that one gun is too many,

18  but if we're overturned, then one gun should be

19  sufficient.  Not one gun a month.  If we're

20  overturned, then there should be also safety

21  training classes that a gun person or a person who

22  carries his arm should be able to go through a

95

1  class training, whether it be 48 hours, a day, two

2  days, but whatever we need to do in the city of

3  Chicago to get stricter laws, the City Council

4  should have the right to defend its citizens.

5          And so I'm here to express my

6  concern.  If the Supreme Court overturns us, then

7  we need to act immediately.  Thank you.

8     CHAIRMAN BEALE:  Thank you.  Any questions?

9  All right.  We have Dr. Crandall.

10     DR. CRANDALL:  Hi, I'm Marie Crandall.  I'm a

11  trauma surgeon at Northwestern.  And you've heard a

12  lot of testimony today.  I can mostly give

13  expertise to the cost and burden of gun violence on

14  our communities in terms of the medical perspective.

15          I could tell you that there are over

16  5,000 gunshot wounds that present to Chicagoland

17  emergency rooms and trauma bays every year.  Of

18  course, about 600 of those individuals die.  This

19  has taken a devastating toll on our disadvantaged

20  communities.

21          And I can tell you the average cost

22  of caring for someone who has been shot is

1 approximately $100,000. If that person is then

2 disabled from a spinal cord injury or a head

3 injury, you're looking at $100,000 to $200,000 for

4 the initial admission, and then up to $100,000 a

5 year thereafter.

6        This is incalculably traffic for our

7 communities and families and the patients, as well

8 as ourselves as a society. And I can tell you

9 those things, but in the last few seconds I'll tell

10 you about last night.

11        So last night we had a young man who

12 was walking his sister home from school so she

13 would feel safe, and he was struck by a stray

14 bullet in the neighborhood and was immediately

15 paralyzed. This is one of those people that will

16 be paralyzed from the waist down for life, will

17 have $100,000 admission, will have an increased

18 risk of pneumonia and urinary tract infections, and

19 he was just walking his sister home from school.

20        We also had kids who were beating

21 each other up with led pipes and who informed us

22 out in the waiting room that there was going to be

CITY 000096

97

1  a gang war tonight.  So if any of you live in

2  affected communities, keep that in mind.

3           We know that community violence is

4  difficult to address.  It is multi-factorial, and

5  we are doing all that we can to help decrease it,

6  both at a community level, at hospital based

7  interventions and school based interventions.

8           I am concerned, as you all are, if

9  the Supreme Court overturns our gun ban, if so, I

10  agree we need to act immediately.

11    CHAIRMAN BEALE:  Any questions?  Thank you.

12  Christopher Prucnal.  And if there is anyone who

13  has not filled out a slip, if you would like to

14  come forward.

15    MR. PRUCNAL:  Good afternoon, my name is

16  Christopher Prucnal, I am member of CAPS (phonetic)

17  Local 2411, and my family probably owns a couple of

18  businesses in the West Rogers Park area, and I come

19  today, not because I've lost a loved one.  Thank

20  God that I've never had that experience.

21           But as a business leader and very

22  much like this Council and the committee, you know,

1   when we have a leadership role, we have a

2   responsibility to take care of everything that we

3   effect.  You know, our shadow is cast upon all the

4   people that we deal with.

5           And my concern is that while it's

6   impending that the Supreme Court will likely strike

7   down the city law, we can look at this as an

8   opportunity to revamp the legislation that we

9   passed back in '82, and come up with something

10  better and more effective.

11          I think that it was spoken earlier

12  today that the conceal and carry laws is impending,

13  and that's a very scary possibility.  And what I

14  would like to encourage is that we -- when we

15  propose -- when the City Council proposes the

16  reenactment or the re-legislation of this bill,

17  that we include very strong legislation against

18  open air and conceal and carry policies.

19          As a business owner, and I service

20  thousands of customers every week and every month,

21  I like the feeling that I can provide a safe

22  environment for them.  That we have nothing to be

99

1  concerned about.  And I know other municipalities,

2  like New York, legislate that it's a much greater

3  offence to have loaded firearms in public places,

4  and that is an issue that I would like the Council

5  to also consider when they recreate the legislation.

6          Lastly, I would definitely encourage

7  the Council when they discuss and prepare their new

8  legislation, that they lean on some of the new

9  Technologies for registration of guns.  Specifically,

10 the, like, micro -- I apologize.  There's a

11 technology out there right now, microstamping, I

12 believe it's called where they on the pin, the

13 firing pin of the gun, they can stamp on

14 ammunition, on guns, so that everything is

15 traceable.

16          Now there's ways around it.  I

17 understand.  But if we can take things that

18 California has done to make gun ownership, legal

19 gun ownership more effective in tracing when it

20 happens in a crime, these are things that the city

21 can do.  I work every day fighting fires at my

22 business, and that drives me crazy, and I can only

100

```
 1  imagine for the Council that that's a similar
 2  problem, and it's when I get to the point where I
 3  can predict the problems and prevent them from
 4  happening in the future that I feel that I'm doing
 5  my service as a business leader.
 6              And then I would like to ask that as
 7  the Council and Committees do this that they take
 8  the same approach, will they look further at what
 9  this new world we're living in with our -- the gun
10  ban overturning in the city of Chicago to try to,
11  not only just fight the fire that happens to you
12  when this happens, but predict what some of the
13  problems will be in the future and try to do
14  everything we can to prevent them.  Thank you, very
15  much.
16       CHAIRMAN BEALE:  Thank you, Mr. Prucnal.  And
17  I want to apologize.  You were one of the first to
18  fill out a sheet, but as you can see here
19  (indicating) --
20       MR. PRUCNAL:  Yes.
21       CHAIRMAN BEALE:  -- you omitted your name,
22  so ...
```

1     MR. PRUCNAL:  I apologize.  Thank you, very

2  much.

3     CHAIRMAN BEALE:  All right.  If there are no

4  questions from the Committee, is there anybody else

5  that wishes to testify?  I have a motion by

6  Alderman Lane to adjourn the public hearing.

7  Motion?  All in favor?  All opposed?  The Ayes have

8  it.

9                 (WHICH WERE ALL THE PROCEEDINGS HAD

10                  IN THE ABOVE-ENTITLED MATTER.)

11

12

13

14

15

16

17

18

19

20

21

22

102

```
1   STATE OF ILLINOIS   )
                        )
2   COUNTY OF WILL      )

3

4                       I, BERNICE BETTS, a
5   Certified Shorthand Reporter, doing business in
6   the County of Will and State of Illinois, do
7   hereby certify that I reported in machine
8   shorthand the proceedings in the above entitled
9   cause.
10                      I further certify that the
11  foregoing is a true and correct transcript of
12  said proceedings as appears from the
13  stenographic notes so taken and transcribed by
14  me, this 22nd day of June, 2010.
15

16

17

18  _____
                    BERNICE BETTS
19                  CSR #084-003788

20

21

22
```

# EXHIBIT 32

1

IN THE UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF ILLINOIS

EASTERN DIVISION

ILLINOIS ASSOCIATION OF FIREARMS )
RETAILERS, KENNETH PACHOLSKI,    )
KATHRYN TYLER, and MICHAEL HALL, )
                              )
     Plaintiffs,        )
                              )
  -vs-                   ) No. 10 CV 04184
                              )
THE CITY OF CHICAGO and RICHARD M.)
DALEY, Mayor of the City of     )
Chicago,                    )
                              )
     Defendants.         )
_____)


     The Rule 30(b)(6) deposition of PATRICIA A.
SCUDIERO, taken before Judith T. Lepore, Certified
Shorthand Reporter in the and State of Illinois, at,
200 North LaSalle Street, Suite 300, Chicago,
Illinois, commencing at the hour of 8:56 a.m., and
terminating at the hour of 10:04 a.m., on the 21st day
of March, A.D., 2011.


Reported by:  Judith T. Lepore, CSR

License No.:   084-0040409

16

1     hearing, which is a monthly hearing, to hear testimony

2     on whether or not the special use would be proper at

3     that location.

4         Q.   Just so I understand, make sure I understand,

5     say if I want to open a grocery store in a district

6     where that's a permitted use, do I need to do anything

7     with the zoning department before I open that grocery

8     store?

9         A.   Yes.

10        Q.   What is it that I would need to do?

11        A.   There would be a vehicular use area required

12    for a grocery store.  You would need to come into the

13    zoning department and have your vehicular use area or

14    your parking lot approved by our department, our area

15    before you proceeded with your licensing of that

16    grocery store.

17        Q.   But assuming I met all the Code requirements,

18    is there any discretion that the zoning department has

19    over whether or not to issue an approval of that?

20        A.   Just of the vehicular use area.

21        Q.   And how long has the current Zoning Ordinance

22    been in place?

23        A.   The Zoning Code was written in 1957.  It was

24    rewritten in 2004.  It's amended numerous times a

17

1    year.  So there's been amendments just as recent as

2    last month.

3        Q.   If a use is not permitted, is not listed as a

4    use that's allowed in the district, is there any

5    process for getting a variance or some type of special

6    approval to engage in such a use?

7        A.   No.

8        Q.   So the zoning department has no discretionary

9    authority to allow uses that aren't permitted by the

10   Code?

11       A.   No.

12       Q.   And does the Zoning Ordinance permit the

13   operation of a business selling firearms?

14       A.   No.

15       Q.   And why not?

16       A.   It's not specifically called out.  It would

17   be reviewed likely as a retail sale.  If it's a retail

18   business, the Zoning Code would lump it into a

19   category of retail sales and make a determination at

20   that point.

21       Q.   And what sort of determination would it make

22   at that point?

23       A.   I think a question would be asked if there

24   was wholesale, any wholesaling going on or any mass

18

1    producing.  Those fall into a different category of

2    the Zoning Code.  But if it was a retail sale, in

3    general, the Zoning Code is blind to what is sold.

4    You can sell water.  You can sell computers.  You can

5    sell ammunition.  You can sell firearms.  Retail sales

6    are pretty general.

7        Q.   So if I was going to open a store that just

8    sold firearms, are you saying that would be permitted

9    under the Zoning Code?

10       A.   Under the Zoning Code, it would be considered

11   retail sales, yes.

12       Q.   And it would be permitted in a district where

13   retail sales were permitted?

14       A.   That is correct.

15       Q.   And the same goes for a business selling

16   ammunition?

17       A.   That is correct.

18       Q.   And has that been the same under the Zoning

19   Code since, you know, the current Zoning Code has been

20   in place?

21       A.   Yes.  Retail sales have been permitted in the

22   Zoning Code.

23       Q.   So do you know if before the -- well, do you

24   know if there are any businesses selling firearms in

19

1    the city operating currently?

2         MR. AGUIAR:  Objection, beyond the scope of

3    the Rule 30(b)(6) deposition.  Instruct you not to

4    answer.

5         MR. PATTERSON:  What's your grounds for

6    instructing her not to answer?

7         MR. AGUIAR:  It's beyond the scope of the

8    30(b)(6).  We're here to talk about the Zoning Code on

9    the operation of firearms, ranges, or businesses that

10   would sell firearms.  Whether they actually are

11   selling them is not something this witness is

12   competent to testify to.

13   BY MR. PATTERSON:

14        Q.   Would the zoning department know whether or

15   not there are businesses currently selling firearms?

16        A.   No.

17        Q.   So if someone wanted to start a business

18   selling firearms, are there any steps they would need

19   to take with the zoning department before doing that?

20        A.   No.

21        Q.   And how does the Zoning Code impact, say, a

22   convention center that holds periodic events?

23        MR. AGUIAR:  I'm going to object.  This is

24   again beyond the scope of the Rule 30(b)(6).  I'm not

20

1    instructing her not to answer, but I'm not going to

2    let this go too far.  You may answer.

3        THE WITNESS:  I was going to ask you if you

4    could explain.

5    BY MR. PATTERSON:

6        Q.   For instance, say that a convention center or

7    similar facility wanted to host an event where people

8    would be selling firearms as part of that event, would

9    the Zoning Code have any impact on that?

10       A.   No.

11       Q.   The same for an existing business, say if I

12   had ran a Wal-Mart in Chicago and I decided to start

13   selling firearms, would the Zoning Code have any

14   impact on that?

15       A.   No.

16       Q.   The same goes for selling ammunition; is that

17   correct?

18       A.   That is correct.

19       Q.   Does the Zoning Code permit the operation of

20   firearms ranges in the City of Chicago?

21       A.   No.

22       Q.   And why is that?

23       MR. AGUIAR:  Objection, beyond the scope

24   of -- withdraw my objection.

21

1          THE WITNESS:  I couldn't answer that

2     question.  That would be up to the City Council.

3     BY MR. PATTERSON:

4          Q.   I guess my question is an unartful question.

5     What in the Zoning Code prohibits the operation of

6     firearms ranges?

7          A.   The Code does not call it out as a permitted

8     use.  So if it's not called out as a permitted use,

9     it's a prohibited use.

10         Q.   And it's not specifically mentioned in the

11    Code; is that correct?

12         A.   Not anymore.

13         Q.   It used to be mentioned in the Code?

14         A.   Yes.

15         Q.   And what mention was made of that?

16         A.   From 1957 until 2003, shooting galleries were

17    listed as a permitted use in the C1, 2, 3, and C5

18    districts.

19         Q.   And could you explain to me a little more

20    about each of those districts and what those

21    designations mean?

22         A.   Sure.  The C district indicates it was a

23    commercial district.  There are different categories

24    of commercial districts based on the level of

53

1    NORTHERN DISTRICT OF ILLINOIS  )

     EASTERN DIVISION            )

2    STATE OF ILLINOIS           )

                      )  SS:

3    COUNTY OF COOK              )

4          I, Judith T. Lepore, Certified Shorthand

5    Reporter in the State of Illinois, do hereby certify

6    that on the 21st of March, A.D., 2011, the deposition

7    of the witness, PATRICIA A. SCUDIERO, called by the

8    Plaintiffs, was taken before me, reported

9    stenographically and was thereafter reduced to

10   typewriting through computer-aided transcription.

11         The said witness, PATRICIA A. SCUDIERO, was

12   first duly sworn to tell the truth, the whole truth,

13   and nothing but the truth, and was then examined upon

14   oral interrogatories.

15         I further certify that the foregoing is a

16   true, accurate and complete record of the questions

17   asked of and answers made by the said witness, at the

18   time and place hereinabove referred to.

19         The signature of the witness was not waived

20   by agreement.

21         Pursuant to Rule 30(e) of the Federal Rules

22   of Civil Procedure for the United States District

23   Courts, if deponent fails to read and sign this

24   deposition transcript within 30 days or make other

54

1      arrangements for reading and signing thereof, this

2      deposition transcript may be used as fully as though

3      signed, and the instant certificate will then evidence

4      such failure to read and sign this deposition

5      transcript as the reason for signature being waived.

6          The undersigned is not interested in the

7      within case, nor of kin or counsel to any of the

8      parties.

9          Witness my official signature on this 4th day

10     of April, A.D., 2011.

11

12

13

14

15     Judith T. Lepore, CSR

16

17

        License No. 084-004040

18

19

20

21

22

23

24

53

1    NORTHERN DISTRICT OF ILLINOIS  )

     EASTERN DIVISION              )

2    STATE OF ILLINOIS             )

                              )  SS:

3    COUNTY OF COOK                )

4         I, Judith T. Lepore, Certified Shorthand

5    Reporter in the State of Illinois, do hereby certify

6    that on the 21st of March, A.D., 2011, the deposition

7    of the witness, PATRICIA A. SCUDIERO, called by the

8    Plaintiffs, was taken before me, reported

9    stenographically and was thereafter reduced to

10   typewriting through computer-aided transcription.

11        The said witness, PATRICIA A. SCUDIERO, was

12   first duly sworn to tell the truth, the whole truth,

13   and nothing but the truth, and was then examined upon

14   oral interrogatories.

15        I further certify that the foregoing is a

16   true, accurate and complete record of the questions

17   asked of and answers made by the said witness, at the

18   time and place hereinabove referred to.

19        The signature of the witness was not waived

20   by agreement.

21        Pursuant to Rule 30(e) of the Federal Rules

22   of Civil Procedure for the United States District

23   Courts, if deponent fails to read and sign this

24   deposition transcript within 30 days or make other

54

1    arrangements for reading and signing thereof, this

2    deposition transcript may be used as fully as though

3    signed, and the instant certificate will then evidence

4    such failure to read and sign this deposition

5    transcript as the reason for signature being waived.

6          The undersigned is not interested in the

7    within case, nor of kin or counsel to any of the

8    parties.

9          Witness my official signature on this 4th day

10   of April, A.D., 2011.

11

12

13

14   _____

15        Judith T. Lepore, CSR

16

17

     License No. 084-004040

18

19

20

21

22

23

24

# EXHIBIT 33

IN THE UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF ILLINOIS

EASTERN DIVISION

ILLINOIS ASSOCIATION OF        )

FIREARMS RETAILERS,            )

KENNETH PACHOLSKI,             ) Case No.

KATHRYN TYLER, and             ) 10-CV-04184

MICHAEL HALL,                  ) Judge Edmond E.

           Plaintiffs,   ) Chang

   -vs-                       )

THE CITY OF CHICAGO, and       )

RICHARD M. DALEY, Mayor        )

of the City of Chicago,        )

           Defendants.   )

 

 

    The deposition of HENRY P. RUSH, III, called

for examination, taken pursuant to the Federal

Rules of Civil Procedure of the United States

District Courts pertaining to the taking of

depositions, taken before LORIANNE McGUIRE, CSR No.

84-4269, a Notary Public within and for the County

of Cook, State of Illinois, and a Certified

Shorthand Reporter of said state, at Suite 1230, 30



Toll Free: 800.708.8087
Facsimile: 312.673.8138

Suite 1200
311 West Monroe Street
Chicago, IL 60606
www.esquiresolutions.com

Henry Rush                                    March 29, 2011

17

1    sales receipts.

2         Q.    You get those printed things?

3         A.    On the back.

4         Q.    I think you brought some advertising

5    material.  Let's get this.

6         MS. HIRSCH:  Can you mark this, all of it, as

7    Exhibit 2.

8                    (WHEREUPON, a certain document was

9                    marked Rush Deposition Exhibit

10                   No. 2, for identification, as of

11                   03/29/2011.)

12   BY MS. HIRSCH:

13        Q.    Mr. Rush, I'm handing you what's been

14   marked as Exhibit 2.  Can you just look through

15   that for a moment.

16        A.    Okay.

17        Q.    Can you just -- it looks like it's

18   advertising material.  Can you just kind of go

19   through it and explain it to me?

20        A.    This one is a photocopy of the back of a

21   sales receipt from a grocery store.

22        Q.    Are those grocery stores in the City of

23   Chicago as well as Elmwood Park?

24        A.    Yes.  To my knowledge, yes.



ESQUIRE
an Alexander Gallo Company

Toll Free: 800.708.8087
Facsimile: 312.673.8138

Suite 1200
311 West Monroe Street
Chicago, IL 60606
www.esquiresolutions.com

Henry Rush                                    March 29, 2011
18

1          This next one is the front and rear view

2     of a postcard that goes out to a general mailing

3     that goes throughout the City of Chicago and the

4     general area.

5          This is a handout flyer that's used in

6     the store for inquiries regarding training classes

7     and availability of training.

8          This is -- the following one is a

9     printout from our website that includes all the

10    training for both civilian, security, and the

11    Chicago Firearms Permit.

12    Q.    Have you ever had any -- has Gun Works

13    ever had any break-ins or robberies?

14    A.    I don't know.  I have heard of one that

15    happened years ago but that was before I -- I mean,

16    literally ten years ago or something there was a

17    break-in -- longer than ten years ago there was a

18    break-in.

19    Q.    Nothing in the last ten years?

20    A.    Oh, no.

21    Q.    What security system -- you know what, I

22    don't want you to have to --

23    A.    There is a security system both motion

24    sensor, door breaks, door glass.  Plus there's a



ESQUIRE
an Alexander Gallo Company

Toll Free: 800.708.8087
Facsimile: 312.673.8138

Suite 1200
311 West Monroe Street
Chicago, IL 60606
www.esquiresolutions.com

19

1   security system that's under -- the whole premises

2   is under camera.

3        Q.    I'm going to ask you now about the

4   range.

5              Has Gun Works always had a shooting

6   range?

7        A.    To my knowledge, yes.

8        Q.    You said it was indoors, correct?

9        A.    Yes.

10       Q.    How many -- I don't know if it's called

11  stalls or spots?

12       A.    We refer to them as points.  There are

13  ten points or booths.

14       Q.    Are they separated by any type of

15  barrier?

16       A.    Yes, there's a hard thermal plastic

17  partition in between each of the little stations,

18  the points, where you would be shooting from.

19       Q.    You already gave me the hours of the

20  range.

21             Can anybody in the general public come

22  and just come in and use the range?

23       A.    No.  You have to be an FOID holder as

24  per state law.  And state law also mandates that,



ESQUIRE
an Alexander Gallo Company

Toll Free: 800.708.8087
Facsimile: 312.673.8138

Suite 1200
311 West Monroe Street
Chicago, IL 60606
www.esquiresolutions.com

50

1    STATE OF ILLINOIS     )

2                          )  SS:

3    COUNTY OF C O O K     )

4              I, LORIANNE McGUIRE, CSR No. 84-4269 a

5    Notary Public within and for the County of Cook,

6    State of Illinois, and a Certified Shorthand

7    Reporter of said state, do hereby certify:

8              That previous to the commencement of the

9    examination of the witness, the witness was duly

10   sworn to testify the whole truth concerning the

11   matters herein;

12             That the foregoing deposition transcript

13   was reported stenographically by me, was thereafter

14   reduced to typewriting under my personal direction

15   and constitutes a true record of the testimony

16   given and the proceedings had;

17             That the said deposition was taken

18   before me at the time and place specified;

19             That I am not a relative or employee or

20   attorney or counsel, nor a relative or employee of

21   such attorney or counsel for any of the parties

22   hereto, nor interested directly or indirectly in

23   the outcome of this action.

24             IN WITNESS WHEREOF, I do hereunto set my



ESQUIRE
an Alexander Gallo Company

Toll Free: 800.708.8087
Facsimile: 312.673.8138

Suite 1200
311 West Monroe Street
Chicago, IL 60606
www.esquiresolutions.com

Henry Rush                                          March 29, 2011

51

1   hand of office at Chicago, Illinois, this 12th day

2   of April, 2011.

3

4

5

6

7           Notary Public, Cook County, Illinois.

8           My commission expires 2/24/10.

9

10  LORIANNE McGUIRE, CSR No. 84-4269

11

12

13

14

15

16

17

18

19

20

21

22

23

24



ESQUIRE
an Alexander Gallo Company

Toll Free: 800.708.8087
Facsimile: 312.673.8138

Suite 1200
311 West Monroe Street
Chicago, IL 60606
www.esquiresolutions.com

# EXHIBIT 34

John Riggio                                    March 24, 2011

1

IN THE UNITED STATES DISTRICT COURT

FOR THE NORTHERN DISTRICT OF ILLINOIS

EASTERN DIVISION


BRETT BENSON, et al.,               )

                    Plaintiffs,     )

          vs.                       ) No. 10 CV 4184

CITY OF CHICAGO,                    )

                    Defendant.      )

          The deposition of JOHN RIGGIO, called

for examination, taken pursuant to the Federal Rules

of Civil Procedure of the United States District

Courts pertaining to the taking of depositions,

taken before JOY ISBELL, CSR No. 084-003616, a

Notary Public within and for the County of Cook,

State of Illinois, and a Certified Shorthand

Reporter of said state, at Suite 1020, 30 North

LaSalle Street, Chicago, Illinois, on the 24th day

of March, 2011, at 1:30 p.m.



ESQUIRE
an Alexander Gallo Company

Toll Free: 800.708.8087
Facsimile: 312.673.8138

Suite 1200
311 West Monroe Street
Chicago, IL 60606
www.esquiresolutions.com

John Riggio                                    March 24, 2011

7

1    purchase firearms that live in Illinois, and they

2    either live in Chicago or they live outside of

3    Chicago.  If they live in the City of Chicago, we

4    give them this and refer them to S&D Associates so

5    they can take the CFP course if they plan to keep

6    their firearm in the City of Chicago.  So I can give

7    you this.

8    BY MS. HIRSCH:

9         Q.    Yes.  I'll probably get back to this in a

10   second.

11        A.    And that's the company we refer them to.

12        Q.    Okay.  Thank you.  And then we can, when

13   I get into specifics --

14        A.    Sure.

15        Q.    -- if you want to refer to the numbers, I

16   might want to see a copy of that.  I don't know.

17        A.    Gotcha.

18        Q.    Did you review any documents in advance

19   of being here today?

20        A.    Yes.  We looked through three months of

21   documents to give you some of the numbers that you

22   requested in the subpoena.

23        Q.    Okay.  And did you speak with anybody

24   else other than your attorney about your deposition



ESQUIRE
an Alexander Gallo Company

Toll Free: 800.708.8087
Facsimile: 312.673.8138

Suite 1200
311 West Monroe Street
Chicago, IL 60606
www.esquiresolutions.com

John Riggio                                           March 24, 2011

8

1    here today?

2         A.    No.

3         Q.    Okay.  How long have you been the

4    secretary -- have you been a secretary and manager

5    for the same amount of time at Chuck's Guns?

6         A.    Yes.  This corporation started in 2003.

7    I've been in the business since, I don't know, 1967,

8    '68.

9         Q.    Okay.  Can you just tell me briefly when

10   you say "in the business" what that means?

11        A.    My dad started the store in 1968, I

12   believe, and we've been in business ever since,

13   retail store.  We've been at this location since '71

14   with the range.

15        Q.    And retail?

16        A.    Retail firearms.

17        Q.    Firearms store.  You've been at this

18   location since two thousand --

19        A.    Since '71.

20        Q.    Since '71.

21        A.    Yeah.

22        Q.    But you said that the corporation started

23   in 2003?

24        A.    This corporation, yes, ERP, Incorporated,



ESQUIRE
an Alexander Gallo Company

Toll Free: 800.708.8087
Facsimile: 312.673.8138

Suite 1200
311 West Monroe Street
Chicago, IL 60606
www.esquiresolutions.com

John Riggio                                    March 24, 2011

9

1    yes.

2         Q.    So who owns Chuck's Guns?

3         A.    Who owns it?  You mean the stock you

4    talking about?

5         MR. NICKL:  Is Chuck's an assumed name maybe or

6    doing business as?

7    BY THE WITNESS:

8         A.    It's ERP, Incorporated doing business as

9    Chuck's Gun Shop.

10   BY MS. HIRSCH:

11        Q.    Okay.

12        A.    The name of the corporation.

13        Q.    And who's the owner of ERP?

14        A.    Patrice Riggio.

15        Q.    Is that your father?

16        A.    My wife.

17        Q.    Your wife.

18        A.    Yeah.

19        Q.    So in your many years of working IN

20   firearms retail, have you served in all aspects of

21   running the store, sales and managing or --

22        A.    Yes.

23        Q.    And can you briefly describe to me what

24   you do on a day-to-day basis as a secretary and



ESQUIRE
an Alexander Gallo Company

Toll Free: 800.708.8087
Facsimile: 312.673.8138

Suite 1200
311 West Monroe Street
Chicago, IL 60606
www.esquiresolutions.com

John Riggio                                March 24, 2011

37

1   STATE OF ILLINOIS  )

2                      ) SS:

3   COUNTY OF C O O K  )

4          I, JOY ISBELL, a Notary Public within and for

5   the County of Cook, State of Illinois, and a

6   Certified Shorthand Reporter of said state, do

7   hereby certify:

8          That previous to the commencement of the

9   examination of the witness herein, the witness was

10  duly sworn to testify the whole truth concerning the

11  matters herein;

12         That the foregoing deposition transcript was

13  reported stenographically by me, was thereafter

14  transcribed under my personal direction and

15  constitutes a true, complete and correct record of

16  the testimony given and the proceedings had;

17         That the said deposition was taken before me

18  at the time and place specified;

19         That I am not a relative or employee or

20  attorney or counsel, nor a relative or employee of

21  such attorney or counsel for any of the parties

22  hereto, nor interested directly or indirectly in the

23  outcome of this action.

24

Toll Free: 800.708.8087
Facsimile: 312.673.8138

ESQUIRE
an Alexander Gallo Company

Suite 1200
311 West Monroe Street
Chicago, IL 60606
www.esquiresolutions.com

John Riggio                                    March 24, 2011

38

1          IN WITNESS WHEREOF, I do hereunto set my hand

2     this 8th day of April, 2011.

3

4

5

6

7                    Notary Public,

8                    Cook County, Illinois.

9                    My commission expires 4/01/12

10

11    CSR No. 084-003616

12

13

14

15

16

17

18

19

20

21

22

23

24



ESQUIRE
an Alexander Gallo Company

Toll Free: 800.708.8087
Facsimile: 312.673.8138

Suite 1200
311 West Monroe Street
Chicago, IL 60606
www.esquiresolutions.com