# EXHIBIT 36

**U.S. Department of Justice**
Bureau of Alcohol, Tobacco, Firearms and Explosives
Office of Strategic Intelligence and Information



# Federal Firearms Licensee Statistics
## Theft / Loss Reports
### Calendar Years 2008 – 2010

Federal firearms licensees (FFLs) must report to ATF each missing, lost, or stolen firearm within 48 hours of discovery of the loss or theft by completing and forwarding a Federal Firearms Licensee Theft/Loss Report. In addition, the FFL must also report the firearm theft or loss to the appropriate local law enforcement agency.

A loss of a firearm occurs when an FFL cannot locate a firearm in inventory. A stolen firearm occurs when an FFL is the victim of a burglary, larceny or robbery.

FFLs filed more than 7,500 theft/loss reports with ATF in calendar years 2008, 2009, and 2010 reporting more than 74,000 firearms as lost or stolen.

The number of firearms reported by FFLs as stolen during a robbery, larceny, and burglary, and not located in inventory.









**U.S. Department of Justice**
Bureau of Alcohol, Tobacco, Firearms and Explosives
Office of Strategic Intelligence and Information



# Federal Firearms Licensee Statistics
## Theft / Loss Reports
### Calendar Years 2008 – 2010

FFL dealers (including pawnbrokers) accounted for more than 83 percent of the firearms lost/stolen and more than 90 percent of the FFL firearms theft/loss reports filed.

The number of firearms reported by FFLs as lost/stolen by license type.









**U.S. Department of Justice**
Bureau of Alcohol, Tobacco, Firearms and Explosives
Office of Strategic Intelligence and Information



# Federal Firearms Licensee Statistics
## Theft / Loss Reports
### Calendar Years 2008 – 2010

Of the more than 74,000 firearms that FFLs reported lost or stolen during the 3- year period 2008 to 2010, handguns and long guns were just about equal, more than 46 percent and 47 percent, respectively. In addition, nearly 23 percent were recovered.

The number of firearms reported by FFLs as lost/stolen by firearm type.







**U.S. Department of Justice**
Bureau of Alcohol, Tobacco, Firearms and Explosives
Office of Strategic Intelligence and Information



| Firearm Type | Number of Firearms Theft/Loss | Number of Firearms Recovered | Percentage Recovered |
|---|---|---|---|
| **Handguns** | 34,553 | 10,719 | 31.0% |
| **Long guns** | 35,137 | 5,761 | 16.4% |
| **Other** | 4,415 | 490 | 11.1% |
| | **74,105** | **16,970** | **22.9%** |

# Federal Firearms Licensee Statistics
## Theft / Loss Reports
### Calendar Years 2008 – 2010

The States of Georgia, New York, Pennsylvania, and Texas accounted for more than 25 percent of the total firearms FFLs reported as lost/stolen during the 3-year period 2008 to 2010.



Top Ten States for Firearms Reported Lost/Stolen By FFLs during CYs 2008-2010

**U.S. Department of Justice**
Bureau of Alcohol, Tobacco, Firearms and Explosives
Office of Strategic Intelligence and Information



| State | 2010 Number of Firearms Reported Lost/Stolen | 2009 Number of Firearms Reported Lost/Stolen | 2008 Number of Firearms Reported Lost/Stolen | 2008-2010 Number of Firearms Reported Lost/Stolen |
|---|---|---|---|---|
| Pennsylvania | 2,480 | 1,792 | 1,752 | 6,024 |
| Georgia | 3,051 | 615 | 1,489 | 5,155 |
| Texas | 1,383 | 1,759 | 1,457 | 4,599 |
| New York | 1,417 | 1,791 | 458 | 3,666 |
| Michigan | 421 | 773 | 2,101 | 3,295 |
| Washington | 929 | 393 | 1,784 | 3,106 |
| Massachusetts | 245 | 134 | 2,498 | 2,877 |
| Florida | 706 | 1,405 | 634 | 2,745 |
| Arizona | 1,343 | 716 | 534 | 2,593 |
| Illinois | 439 | 287 | 1,524 | 2,250 |

EXHIBIT 37

Local 

## Most guns stolen from Harvey gun range recovered

Wednesday, May 12, 2010

TAGS: local, john garcia

Comment Now   Email   Print   Report a typo

May 12, 2010 (HARVEY) (WLS) -- Federal agents Wednesday discovered most of the weapons that were stolen from the police department's gun range.

Nearly two dozen weapons were missing from a trailer there.

Police declined to give a number on how many guns they recovered, and they say their investigation is continuing. They say tips from the community helped them find the guns.

Authorities had been concerned the weapons may have made their way on to the street.

"I am very proud of the fact that the Harvey police department worked in a joint effort with other agencies to recover these very dangerous weapons that were on the streets of Harvey," said Harvey Mayor Eric Kellogg.

Harvey officers combed through a wooded area on the north side of town, which looked like a scrap heap or temporary camp site. They discovered a number of stolen guns, 20 weapons in all, including a number of assault rifles, were stolen on Monday. It appeared someone had tried to bury the weapons.

The guns include some service revolvers, as well as the personal guns of some of the officers. State police and sheriff's officers joined in the investigation, though the officers from the sheriff's office later withdrew.

Police say tips from the community led to the weapons. They are still looking for the rest as well as the burglar who stole them.

"We will continue to work on the leads that we're getting and the tips that we are getting," said acting Harvey Police Chief Denard Eaves. "Hopefully we will be successful in apprehending the persons responsible for this as well as all of the weapons."

Some want to close that shooting range. The mayor says they will make changes to make sure it is more secure in the future. It is equipped with an alarm. However it apparently failed to go off on Monday.

Officials would not say how many weapons were still missing.

(Copyright ©2012 WLS-TV/DT. All Rights Reserved.)

Get more Local »

TAGS: local, john garcia

Comment Now   Email   Print   Report a typo

Send    Be the first
of your

EXHIBIT 38

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF ILLINOIS**
**EASTERN DIVISION**

| | | |
|---|---|---|
| ILLINOIS ASSOCIATION OF FIREARMS RETAILERS, ET AL., | ) ) ) | |
| Plaintiffs, | ) ) | Case No: 10-CV-4184 Judge Edmond E. Chang |
| v. | ) ) | |
| THE CITY OF CHICAGO, ET AL., | ) ) | |
| Defendants. | ) | |

## <u>DECLARATION OF ROBERT STEVEN ELLIOT</u>

I, Robert Steven Elliot, make the following declaration pursuant to 28 U.S.C. § 1746:

1.      I am a resident of Virginia and am over eighteen years of age.  My statements herein are based upon personal knowledge and experience.

2.      I am the President of C&E Gun Shows, a Virginia-based company that organizes and promotes gun shows throughout the country.  I have been the president of C&E Gun Shows for over twenty-five years.

3.      I have personally organized thousands of gun shows and have attended thousands more. C&E Gun Shows organizes and promotes dozens of gun shows each year—usually one or two per week, each week of the year.  In total, these shows entail the display of over 1 million firearms for sale.  Last year, over 300,000 patrons attended our shows; over 150,000 have attended to date this year.

4.      From April 27 through the rest of this year, for example, C&E Gun Shows has over fifty

gun shows scheduled in states including Virginia, North Carolina, Ohio, Pennsylvania, South

Carolina and West Virginia.

5.      C&E Gun Shows does not itself display or sell firearms at the shows it organizes.  Rather,

it sells table space to vendors who do so.  Not all vendors sell firearms or sell firearms

exclusively; some sell other merchandise such as knives or hunting accessories.  The shows vary

in size, from smaller ones with approximately 300 tables to larger shows with approximately

1,000.  In addition to selling table space, C&E Gun Shows also charges an admission fee to

individuals who patronize its shows.

6.      Vendors who make arrangements for a table in advance of a show are guaranteed a table

at the show.  We generally will only deny a table to a vendor whose merchandise is insufficiently

related to guns, ammunition, hunting, etc. (e.g., if the vendor wants to sell Beanie Babies), if we

have had a problem with the vendor in the past, or if we do not have room for an additional

vendor.

7.      Based on my extensive experience organizing gun shows, including organizing gun

shows in major metropolitan areas, and based on research specific to the City of Chicago, I am

confident that C&E Gun Shows could organize and promote a large, successful, and profitable

show in Chicago.  I expect that such a show would consist of 1,000 to 1,200 tables.

8.      My and C&E Gun Shows' Chicago-specific research has included analyzing marketing

information, considering potential venues for a show, and examining population and

demographic data.

9.      While I desire to organize and promote a gun show in Chicago, I cannot do so at this time

because the City's firearms ordinance prohibits anyone from selling, acquiring, or otherwise

transferring a firearm within the City, with minor, irrelevant exceptions for transactions involving members of the police department at police facilities, transfers between peace officers, and inheritance.

10.     Were it legal to sell firearms in Chicago, I would organize and promote a gun show in the City.

11.     I require vendors and customers to adhere to strict safety requirements at the shows I organize. Neither vendors nor customers are allowed to have loaded firearms inside a show at any time. Members of the public entering the show have their firearms inspected to make sure they are unloaded and secured. I require that all firearms be secured with 14-inch polypropylene cables that prevent them from being loaded or discharged during the show. Anyone who violates these rules is expelled from the show. Each show is monitored by a security staff primarily made up of local and off-duty law enforcement officers who continuously circulate throughout the show to ensure that these rules are followed at all times.

12.     In 25 years of organizing gun shows, I have experienced approximately seven accidental discharges, only one of which resulted in an injury, and no intentional discharges.

13.     Thefts are very rare at my gun shows. In shows spanning more than one day, the building is locked at night and protected by an armed security guard. I am not aware of any patrons or dealers being targeted for theft going to or from one of my shows.

I DECLARE UNDER PENALTY OF PERJURY THAT THE FOREGOING IS TRUE AND

CORRECT.

Executed on April 23, 2012

Robert Steven Elliot

4

# EXHIBIT 39



**BUREAU OF ALCOHOL, TOBACCO AND FIREARMS
OFFICE OF COMPLIANCE OPERATIONS
FIREARMS AND EXPLOSIVES DIVISION**

# OPERATION SNAPSHOT

## Final Report



**July 12, 1993**

# OPERATION SNAPSHOT

## BACKGROUND

Since passage of the Gun Control Act of 1968 (GCA) there has been a steady increase in the population of Federal firearms licensees (FFL's) in the United States. In 1968 there were about 87,000 licensees. Today there are over 287,000. In 1968 we did not have sufficient resources to inspect all licensees; nor do we today. Given our current commitment of resources, we project that it would take over ten years to inspect each and every licensee.

Historically, we have based our inspection targeting on some assumptions that we have made about the entire FFL population. We assumed that the vast majority of licensees were residential dealers, but couldn't, with any degree of certainty, calculate how many there were. We suspected that a large number of dealers obtained their Federal firearms license but never engaged in the business contemplated by that license. It seemed that a significant number of dealers were found in violation of the GCA during our compliance inspections, but again, we couldn't quantify the results.

In an effort to bring the Federal firearms licensee population into perspective, Operation Snapshot was conceived. We needed to know who the average licensee was; what kinds of activities and how much of these activities he/she engaged in; and a whole host of other questions which, when answered, would provide us basic information relative to the firearms industry.

Given that our resources would not permit an inspection program that targeted each and every licensee, we developed a program that would provide us the information we needed based on a statistical sampling of the entire firearms dealer population. This program, when completed, would provide us information about Federal firearms licensees within defined degrees of accuracy.

July 12, 1993

# METHODOLOGY

In January of 1992 there were approximately 287,000 Federal firearms licensees, including manufacturers, importers, dealers, pawnbrokers, and collectors. Of that number, 244,042 licensees were dealers authorized to deal in firearms other than destructive devices. These dealers are commonly referred to as Type 01 dealers.

Using a software package designed for the task, ATF selected a random sample of 400 Type 01 dealers. Each dealer in the sample was inspected. ATF inspectors used a uniform workplan and questionnaire to ensure the accuracy of the information being gathered. In those instances where licensees had discontinued business, their records were examined at the ATF's Out of Business Records Center.

The rates of occurrence of specific findings, which are reflected in terms of percentages, can be projected to the entire Type 01 dealer population. The projections, based on a sample size of 400 dealers, will result in a precision rate of plus or minus 5%, with a confidence level of 95%. For example, Operation Snapshot inspections found that 26% of the dealers have commercial premises from which to conduct business. Therefore, we can project, with a 95% level of confidence, the true percentage rate of dealers having commercial premises will be between 21% and 31% of the total dealer population.


# CONCLUSION

As a result of the information gathered during the course of Operation Snapshot, we can now conclude, with a high degree of probability, certain characteristics about the Federal firearms licensee population in the United States.

July 12, 1993

# LOCATION AND BUSINESS CHARACTERISTICS

- THE TYPICAL FEDERAL FIREARMS DEALER
  - IS A SOLE OWNER
  - IS A 45-YEAR OLD MALE
  - HAS HELD A LICENSE FOR 7 YEARS AND 4 MONTHS

- 85% OF DEALERS HAVE OTHER SOURCES OF INCOME OR
  EMPLOYMENT OTHER THAN A FIREARMS BUSINESS

- 56% OF DEALERS HAVE THEIR BUSINESS LOCATION IN OR
  WITHIN 25 MILES OF A CITY HAVING A POPULATION OVER
  100,000 PEOPLE

- 74% OF DEALERS CONDUCT THE FIREARMS BUSINESS IN
  THEIR HOMES

- 18% OF DEALERS ARE LOCATED IN COMMERCIAL PREMISES
  WHERE OTHER GOODS ARE SOLD TO THE PUBLIC (e.g.,
  sporting, hardware and general merchandise)

- 8% OF DEALERS ARE LOCATED AT OTHER COMMERCIAL
  PREMISES NOT ASSOCIATED WITH SALE OF GOODS TO THE
  PUBLIC (e.g., medical, real estate, insurance office, auto repair,
  beauty shop, etc.)

July 12, 1993

-4-

# BUSINESS VOLUME AND ACTIVITY

DURING THE 12 MONTHS PRECEDING THE OPERATION SNAPSHOT
INSPECTIONS

- 7% OF DEALERS HAD MULTIPLE HANDGUN SALES (SALE OF
  2 OR MORE HANDGUNS TO THE SAME PERSON DURING A
  5-DAY PERIOD)

- 20% OF DEALERS DEALT IN HANDGUNS HAVING A RETAIL
  VALUE OF LESS THAN $200

- 3% OF DEALERS HAD DISPOSED OF FIREARMS AT
  GUNSHOWS

- 4% OF DEALERS DISPOSED OF FIREARMS ONLY TO
  THEMSELVES

- 8% OF DEALERS DID GUNSMITHING

- 2% OF DEALERS HAD THEFTS

July 12, 1993

# BUSINESS VOLUME AND ACTIVITY

# FIREARMS ACQUISITIONS

DURING THE 12 MONTHS PRECEDING THE OPERATION SNAPSHOT INSPECTIONS

- 45% OF DEALERS ACQUIRED NO FIREARMS

- 36% OF DEALERS ACQUIRED 1 TO 10 FIREARMS

- 13% OF DEALERS ACQUIRED 11 TO 50 FIREARMS

- 6% OF DEALERS ACQUIRED OVER 50 FIREARMS

July 12, 1993

# BUSINESS VOLUME AND ACTIVITY

## FIREARMS DISPOSITIONS

## DURING THE 12 MONTHS PRECEDING THE OPERATION SNAPSHOT INSPECTIONS

- **46% OF DEALERS DISPOSED OF NO FIREARMS**

- **34% OF DEALERS DISPOSED OF 1 TO 10 FIREARMS**

- **13% OF DEALERS DISPOSED OF 11 TO 50 FIREARMS**   *c. 37,310 dealers*

- **7% OF DEALERS DISPOSED OF OVER 50 FIREARMS**

    *1 of 287,000 total (p. 1), in 20,090 dealers*

July 12, 1993

-7-

# BUSINESS VOLUME AND ACTIVITY

## FIREARMS INVENTORY

**DURING THE 12 MONTHS PRECEDING THE OPERATION SNAPSHOT INSPECTIONS**

- 59% OF DEALERS MAINTAINED NO INVENTORY OF FIREARMS

- 25% OF DEALERS MAINTAINED AN INVENTORY OF 1 TO 10 FIREARMS

- 10% OF DEALERS MAINTAINED AN INVENTORY OF 11 TO 50 FIREARMS

- 6% OF DEALERS MAINTAINED AN INVENTORY OF OVER 50 FIREARMS

July 12, 1993

# INSPECTION HISTORY AND RESULTS

- 9% OF DEALERS HAD PREVIOUSLY BEEN THE SUBJECT OF AN APPLICATION INVESTIGATION BY ATF

- 10% OF DEALERS HAD PREVIOUSLY BEEN THE SUBJECT OF A COMPLIANCE INSPECTION BY ATF

- 34% OF DEALERS WERE FOUND TO HAVE FEDERAL FIREARMS VIOLATIONS

- 7% OF DEALERS WERE FOUND TO HAVE VIOLATIONS FOR WHICH A FOLLOWUP INSPECTION WAS REQUIRED

- 4% OF DEALERS COULD NOT ACCOUNT FOR THE DISPOSITION OF ONE OR MORE FIREARMS

- 12% OF DEALERS SURRENDERED THEIR LICENSE DURING THE ATF INSPECTION

- 3% OF DEALERS WERE OUT OF BUSINESS BEFORE THE ATF INSPECTION

July 12, 1993

# STATE AND LOCAL LICENSING

- 35% OF DEALERS ARE REQUIRED TO HAVE A STATE OR LOCAL FIREARMS LICENSE BUT ONLY 6 OF 10 COMPLY

- 65% OF DEALERS ARE NOT REQUIRED TO BE LICENSED FOR FIREARMS UNDER STATE OR LOCAL LAWS

July 12, 1993

# OPERATION SNAPSHOT

# FIREARMS ACQUISITIONS
## 1 Year Before Inspection



Over 50 Firearms

11 to 50 Firearms

1 to 10 Firearms

None

NOTE: Dealers whose records or business could not be located are included in the *None* category.

July 12, 1993

# EXHIBIT 40



Bureau of Alcohol, Tobacco, Firearms and Explosives

# ATF     Fact Sheet

At The Frontline Against Violent Crime          Public Affairs Division – Washington, DC

Contact: ATF Public Affairs Division                                    March 2012
(202) 648-8500                                                        www.atf.gov

## FFL COMPLIANCE INSPECTIONS

The Bureau of Alcohol, Tobacco, Firearms and Explosives (ATF), pursuant to the Gun Control Act (GCA) and the Federal firearms regulations, is responsible for licensing persons engaging in a firearms business (#) . With certain exceptions, the GCA allows ATF to conduct one warrantless, annual compliance inspection of a federal firearms licensee (FFL). The purpose of the inspection program is to educate the licensee about regulatory responsibilities and to evaluate the level of compliance. Compliance inspections also serve to protect the public in that they promote voluntary internal controls to prevent and detect diversion of firearms from lawful commerce to the illegal market.

During inspections, ATF industry operations investigators (IOI) review records, inventory, and the licensee's conduct of business. To assist in meeting and maintaining compliance, investigators also provide instructional and educational materials about the requirements of the law and regulations and best (#) business practices.

There were approximately 65,000 FFLs engaged in business in fiscal year 2011 (excluding persons holding collector licenses). During that time, ATF conducted more than 13,100 firearms compliance inspections. About 50 percent of the licensees inspected were determined to be in full compliance with the law and regulations and no violations were cited. Approximately 71 federal firearms licenses were revoked or were denied renewal due to willful violations of the GCA. This figure is approximately .54 percent of the number of licensees inspected.

Compliance failures, which constitute violations of law and regulation, commonly disclosed during the inspection process include failure to verify purchaser eligibility; inability to account for firearms received and disposed; failure to ensure firearms traceability due to improper recordation of firearms receipt and disposition; failure to properly document firearms transfers; and failure to report multiple sales (#) of handguns. These types of violations, among others, can hinder the FFL's ability to support law enforcement criminal investigation efforts.

Proper and timely recordkeeping by FFLs is critical to the success of a crime gun trace and is required for all firearms acquired and transferred by licensees. Failing to account (#) for firearms is a serious public safety concern because unaccounted for firearms cannot be traced. During compliance inspections conducted in fiscal year 2011, ATF investigators identified nearly 177,500 unaccounted for firearms, which FFLs could not locate in inventory or account for by sale (#) or other disposition. By working with industry members, IOIs reduced this number to about 18,500 unaccounted for firearms.

As such, ATF investigators improved the success rate of potential firearms traces of previously unaccounted firearms significantly. While this is a great improvement, with more than 18,500 firearms still missing a significant threat is posed to public safety.

When violations of the law and regulations are disclosed during an inspection, a Report of Violations is issued to the licensee that outlines the discrepancy and the requirements for corrective action. ATF also works to gain cooperation and compliance from FFLs by issuing warning letters and holding warning conferences. Despite these remedial actions, on rare occasions ATF encounters a licensee who fails to comply with the law and regulations and demonstrates a lack of commitment to improving his or her business practices. In such cases where willfulness is demonstrated, ATF's obligation to protect public safety may require revocation of the federal firearms license.

ATF investigators assist licensees in developing corrective actions when violations are identified, and encourage licensees to constructively engage in the remediation process. In this way, ATF attempts to bring licensees into compliance before it becomes necessary to take administrative action against the licensee. When an ATF inspection results in a warning conference or potential revocation, the licensee is provided an opportunity to develop a written plan that details the steps taken to correct the problems identified and measures implemented to ensure future compliance.

ATF's focus is to help licensees avoid violations of the law and its implementing regulations. The Bureau prides itself on partnering with the firearms industry, especially regarding voluntary internal controls, to better protect the public. To that end, ATF continues to work closely with the firearms industry at all levels to ensure compliance, understand concerns, and help resolve perceived obstacles to compliance. ATF strives to educate licensees concerning their obligations under the law through open letters mailed to FFLs, information posted on ATF's Web site, quarterly FFL newsletters, industry seminars, attendance at trade shows, and partnerships with industry associations. Licensees are provided the "Federal Firearms Regulations Reference Guide," which includes laws, regulations, and other information about conducting a firearms business under federal law, and other publications such as the "Safety and Security Information for Federal Firearms Licensees."

###

EXHIBIT 41

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF ILLINOIS**
**EASTERN DIVISION**

| | | |
|---|---|---|
| ILLINOIS ASSOCIATION OF FIREARMS RETAILERS, ET AL., | ) ) ) | |
| Plaintiffs, | ) ) | Case No: 10-CV-4184 |
| | ) | Judge Edmond E. Chang |
| v. | ) ) | |
| THE CITY OF CHICAGO, ET AL., | ) ) | |
| Defendants. | ) | |

## DECLARATION OF KATHRYN TYLER

I, Kathryn Tyler, make the following declaration pursuant to 28 U.S.C. § 1746:

1.      I am a resident of Chicago, Illinois and a citizen of the United States.  I am over eighteen years of age.  My statements herein are based upon personal knowledge and experience.

2.      I am married to Kenneth Pacholski, who is also a plaintiff in this case.  We own and live in a two-story, three-bedroom home, located in Chicago at 2620 West Jerome Street.  The property has a basement, a detached, two-car garage, and a fenced-in back yard.

3.      I am a veterinarian and the co-owner the Uptown Animal Hospital, an animal clinic located at 5545 North Clark Street in Chicago.

4.      I have an Illinois Firearm Owner's Identification Card and a Chicago Firearm Permit ("CFP").  I own a Makarov 9 mm handgun that is registered with the City of Chicago.  I keep this handgun in an operable condition in my home.  In November 2011, I acquired a second weapon, a shotgun, that is registered with the City.  I keep the shotgun in my home locked in a safe in inoperable condition, secured by a Franzen keyed trigger lock.

1

5.      I have demonstrated the ability to safely and effectively use firearms by successfully completing firearms safety and training courses, including the firearms safety and training course required to obtain a CFP.

6.      I would like to be able to carry a firearm for self-defense on parts of my property outside of the four walls of my home.  For example, I would like to be able to have a gun with me for protection while I am gardening in the yard or getting my gardening tools from the garage, particularly when my husband is not home.  Because of Chicago's restrictive firearms ordinance, however, I do not currently take a gun outside of my home.  If Chicago law allowed it, I would sometimes carry a firearm on my property outside of my home.

7.      I would also sometimes carry a handgun for self-defense at my veterinary clinic if it were lawful for me to do so under Chicago law.  For example, I am notified when my clinic's alarm system is activated. In the past the alarm has been activated at night and I have proceeded alone to investigate the situation.  I would like to have a handgun with me in my clinic for protection in such situations, but I currently cannot because Chicago's firearm ordinance prohibits me from doing so.  I desire to use a handgun for such purposes because a handgun is smaller and easier to carry than a long gun.

8.      If it were lawful, I would sometimes possess a firearm as a guest on another person's property, with that person's permission, and I would sometimes invite others to possess a firearm on my property.  For example, my friends and I enjoy looking at firearms.  If I purchased a new gun, I would like to be able to show it to a friend by taking it to his or her home, and I likewise would like to be able to invite a friend to bring a newly acquired weapon to my home.  Chicago's firearms ordinance, however, currently prohibits me from doing so.  Furthermore, my husband and I sometimes have someone stay at our home to housesit and watch our dogs when we are out

2

of town.  I would like to be able to invite such a person to bring a firearm for protection, but currently I cannot because Chicago law prohibits it.

9.      I would store additional firearms in operable condition around my home if Chicago law permitted me to have more than one operable firearm in the home.  For example, I worry about being able to access my handgun, which is stored in my second-floor bedroom, if an intruder were to enter my home while I was in the basement.  I would thus like to be able to store additional operable firearms in the house.  Because carrying a firearm can be cumbersome and inconvenient (particularly because I often am in and out of the house and Chicago law does not permit me to take it outside), I do not typically carry my handgun around the house.  While I would prefer to not be restricted in how I would store additional firearms, I would keep more than one operable firearm in the home even if the law required such additional firearms to be locked in a biometric or other type of safe.

10.     I enjoy shopping for guns, and I believe the Second Amendment guarantees me the right to purchase a firearm.  I would shop for guns more frequently if a gun store opened in my neighborhood, but because of Chicago's law banning transfer of firearms there are no gun stores in the City.

I DECLARE UNDER PENALTY OF PERJURY THAT THE FOREGOING IS TRUE AND

CORRECT.

Executed on April 20, 2012

Kathryn Tyler

# EXHIBIT 42

**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

| | | |
|---|---|---|
| ILLINOIS ASSOCIATION OF FIREARMS RETAILERS, ET AL., | ) ) ) | |
| Plaintiffs, | ) ) | Case No: 10-CV-4184 Judge Edmond E. Chang |
| v. | ) ) | |
| THE CITY OF CHICAGO, ET AL., | ) ) | |
| Defendants. | ) | |

**DECLARATION OF KENNETH PACHOLSKI**

I, Kenneth Pacholski, make the following declaration pursuant to 28 U.S.C. § 1746:

1.      I am a resident of Chicago, Illinois and a citizen of the United States.  I am over eighteen years of age.  My statements herein are based upon personal knowledge and experience.

2.      I am married to Kathryn Tyler, who is also a plaintiff in this case.  We own and live in a two-story, three-bedroom home, located in Chicago at 2620 West Jerome Street.  The property has a basement, a detached, two-car garage, and a fenced-in back yard.

3.      I own and operate an aircraft restoration business.

4.      I have an Illinois Firearm Owner's Identification Card and a Chicago Firearm Permit (CFP).  I own 18 firearms that are registered with the City of Chicago and that I keep in my home.  I have a Florida concealed carry permit that, through the operation of reciprocity rules, allows me lawfully to carry a concealed firearm in many states.  Illinois is not one of those states.

5.      I have successfully completed firearms safety and training courses, including the firearms safety and training course required to obtain a CFP.

6.      Because of Chicago's firearms ordinance, I keep only one of my firearms in operable condition, a Springfield Armory XD40 handgun.  I typically keep this firearm in my bedroom,

and I sometimes take it to other locations in the house. For example, I sometimes take it with me to the basement if I'm down there at night. I would like to be able to keep an operable firearm in each part of the house to provide me with a readily accessible means of defense in case of a criminal attack, and I would do so if Chicago's law limiting me to one operable firearm is struck down. While I would prefer to not be restricted in how I would store additional firearms, I would keep more than one operable firearm in the home even if the law required such additional firearms to be locked in a biometric or other type of safe.

7.      I would like to be able to carry a firearm for protection on my property outside of the walls of my home. For example, if I saw my wife being attacked by an assailant when walking from the garage to the house, I would like to be able to carry a firearm out of the house into the back yard to defend her. Chicago's firearms ordinance, however, prohibits me from carrying a firearm anywhere on my property outside of the house. But for the ordinance, I would sometimes carry a firearm on my property outside of my home.

8.      If it were lawful, I would sometimes possess a firearm as a guest on another person's property, with that person's permission, and I would sometimes invite others to possess a firearm on my property. For example, if I purchased a new gun, I would like to be able to show it to a friend at his or her home. Furthermore, my wife and I sometimes have someone stay at our home to housesit and watch our dogs when we are out of town. I would like to be able to invite such a person to bring a firearm for protection, but cannot because Chicago law prohibits it.

9.      I believe the Second Amendment guarantees me the right to purchase a firearm. Because Chicago bans firearms sales in the City, I currently have to travel outside of the City to purchase a firearm. I would prefer to shop for firearms in Chicago, and I would shop for firearms more often if there was a gun store nearby.

2

I DECLARE UNDER PENALTY OF PERJURY THAT THE FOREGOING IS TRUE AND

CORRECT.

Executed on April _20_, 2012

Kenneth Pacholski

3

# EXHIBIT 43

1

UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION


BRETT BENSON, et al.,              )
                                   )
          Plaintiffs,              )
                                   )
     vs.                           )No. 10-CV-4184
                                   )
CITY OF CHICAGO, et al.,           )
                                   )
          Defendants.              )

          The deposition of KENNETH PACHOLSKI, called for

examination, taken pursuant to the provisions of the Code

of Civil Procedure and the Rules of the Supreme Court of

the State of Illinois pertaining to the taking of

depositions for the purpose of discovery taken before

STACEY JOHN, CSR No. 84-003560, a Notary Public within and

for the County of Cook, State of Illinois, and a Certified

Shorthand Reporter of said state, at Suite 1230, 30 N.

LaSalle Street, Chicago, Illinois, on the 15th day of

December, A.D. 2010, at 9:30 a.m.



ESQUIRE
an Alexander Gallo Company

Toll Free: 800.708.8087
Facsimile: 312.673.8138

Suite 1200
311 West Monroe Street
Chicago, IL 60606
www.esquiresolutions.com

KENNETH PACHOLSKI                                    December 15, 2010

38

1  snowy day.  That's what happened.  I was able to

2  recover and keep on going.  I didn't stop.  I wanted

3  to get away from the guy.  I didn't want anything to

4  happen to my wife.

5      Q    So at no time did you get out of your

6  vehicle?

7      A    God no.

8      Q    When you took off in your car, did the

9  other car follow you?

10     A    I thought he made a U-turn but then I

11 never saw him again.

12     Q    At any time did you see the man in the

13 vehicle brandish or display a weapon of some kind?

14     A    I can't say he did.  It happened so fast.

15 I didn't know.

16     Q    Was it day or night when it happened?

17     A    It was day.

18     Q    How would you describe the driving

19 conditions that day?

20     A    It was clear, but there was snow on the

21 ground.  Luckily, we had a four-wheel drive vehicle.

22 So I was able to climb out of the ditch.

23     Q    Was the road in your opinion well-traveled

24 with other cars or were you alone on the road?



Toll Free: 800.708.8087
Facsimile: 312.673.8138

Suite 1200
311 West Monroe Street
Chicago, IL 60606
www.esquiresolutions.com

39

1      A      We were alone on the road.

2      Q      Was this early morning?

3      A      No, probably late morning.

4      Q      Do you recall what day of the week it was?

5      A      I can't remember.  We were going to her

6   parent's house.  So I know it had to be like a

7   Friday or Saturday or something like that.

8      Q      I have to ask.  Why would an incident in

9   Illinois cause you to obtain a Florida license?

10     A      Florida has the best -- my wife and I

11  travel quite a bit.  That really kind of perked me

12  up a little bit about driving.  I can carry in 31

13  states with the Florida permit.  So that's what made

14  me get the one from Florida.

15     Q      That was my next question for you.  Is it

16  your understanding that holding a Florida license

17  allows you to carry a weapon outside of Florida?

18     A      Yeah.

19     Q      What is your understanding based on?

20     A      I pulled up the website, and I saw the --

21  I am not going to say it right.  I am not a good

22  English person, reciprocity to 31 states.  That's

23  where we travel almost all the time and on the road.

24  I can carry a concealed weapon in those places.



ESQUIRE
an Alexander Gallo Company

Toll Free: 800.708.8087
Facsimile: 312.673.8138

Suite 1200
311 West Monroe Street
Chicago, IL 60606
www.esquiresolutions.com

KENNETH PACHOLSKI                                    December 15, 2010

                                                                    40

1          Q    Do you know whether Illinois is one of the

2     places you can carry a concealed weapon?

3          A    I can't.

4          Q    Your Florida license then does not allow

5     you to carry in Illinois?

6          A    Right.

7               MR. PANUCCIO:   To clarify, you are asking

8          whether the Florida concealed carry allows for

9          concealed and carry in Illinois as opposed to

10         lawful transportation?

11              MR. AGUIAR:   Correct.

12    BY MR. AGUIAR:

13         Q    Your answer is it does not?

14         A    I can't carry the gun, yeah, exactly.

15         Q    Do you happen to have any homes or

16    residences in Florida?

17         A    No.

18         Q    Do you have firearms in Florida?

19         A    No.

20         Q    If you could turn to the first page of

21    Exhibit No. 3, direct you to the top of the page

22    where it says Chicago firearms permit, and it's your

23    name handwritten there and your photograph.  Is this

24    a true and correct copy of your Chicago firearms



ESQUIRE
an Alexander Gallo Company

Toll Free: 800.708.8087
Facsimile: 312.673.8138

Suite 1200
311 West Monroe Street
Chicago, IL 60606
www.esquiresolutions.com

51

1    are.

2         Q    Who at Maxins knows you?

3         A    There was a kid there, I should not say a

4    kid, he's probably as old as I am.  He's there.  He

5    just knows who I am.  So he knows I collect guns.

6    So any time he gets anything that's fun, but rarely

7    do they have anything that I want.

8         Q    Do you happen to know this person's name?

9         A    No.  I can't recall.

10        Q    How often do you go to Maxins?

11        A    I know I been there three times this year.

12   Like I said, my family had a farm in Wisconsin.  We

13   use to go there frequently, and practice shooting up

14   there.  But recently here, just about three, four

15   times a year at the most.

16        Q    Does anybody else know you at Maxins in

17   the way you are describing?

18        A    I am sure they do.

19        Q    So you have been going there since you

20   were a kid?

21        A    No, not a kid.  Actually, probably within

22   the last four, five years.  The only reason, I was

23   always shooting up at my familys' farm up in

24   Wisconsin.  I didn't have to go to a range.  So we



Toll Free: 800.708.8087
Facsimile: 312.673.8138

Suite 1200
311 West Monroe Street
Chicago, IL 60606
www.esquiresolutions.com

52

```
1    used to shoot skeet and stuff like that.  That's
2    where all that came from.
3         Q    I misunderstood what you said before.
4              So you have been going for four
5    years?
6         A    Yes.
7         Q    Three or four times a year?
8         A    Yes.
9         Q    The three, four times you go every year,
10   did you have any difficulty going there?
11        A    No.  Just the time.  I'd rather somebody
12   was in my backyard type of thing, closer by.
13        Q    Okay.  You said you would rather have
14   someone closer by.
15             Is the location of a gun dealer or
16   gun store important to you?
17        A    Yes.
18        Q    Are there any other -- how is it important
19   to you and why?
20        A    For me to go to Maxins is almost an hour.
21   That's on a good day.  If it's rush hour, it's over
22   an hour and a half.  So I have a bit of a problem
23   with that, yes.
24        Q    You can get there?
```


ESQUIRE
an Alexander Gallo Company

Toll Free: 800.708.8087
Facsimile: 312.673.8138

Suite 1200
311 West Monroe Street
Chicago, IL 60606
www.esquiresolutions.com

KENNETH PACHOLSKI                          December 15, 2010

53

1        A    I can if I want to, but I'll tell you

2   what, I'd go more often if it was closer by, another

3   facility, yes.

4        Q    Are there any other factors that are

5   important to you in gun dealers and picking a gun

6   dealer or gun store to go to?

7             MR. PANUCCIO:  Object.  You have been

8        talking about ranges.  I don't know if it's

9        kind of compound.  It's fine.  You might want

10       to clarify here.

11            THE WITNESS:  I'll tell you what, I'm an

12       antiquer.  I love history.  I buy older guns.

13       There's no gun stores in Chicago.  I would

14       really like to see some antique dealers, you

15       know, antique guns.  That's the only thing.  I

16       have to tell you, I am running out of space in

17       my house.  I can't do much more.  But I'd

18       rather, if I can, I'd like to make it that way.

19   BY MR. AGUIAR:

20       Q    Mr. Panuccio raised a fair point; that we

21   were talking about ranges and segwayed to gun

22   stores.  I think I segwayed there based on a comment

23   you made.

24            I am talking about gun stores now.



Toll Free: 800.708.8087
Facsimile: 312.673.8138

Suite 1200
311 West Monroe Street
Chicago, IL 60606
www.esquiresolutions.com

54

```
 1     Those are my questions we're going towards.

 2                     Again, you are talking about location

 3     being important for gun stores or gun dealers, is

 4     that correct?

 5         A    Yes.

 6         Q    You were talking about other factors which

 7     would be important to you in selecting a gun store

 8     or gun dealer to go to.

 9                     Could you, again, elaborate what the

10     factors would be, if any.

11         A    The only place that even is close to me is

12     Dick's Sporting Goods.  They don't have the stuff I

13     want.  They have very modern firearms.  I am a

14     collector.  I am an antiquer, type of thing.

15                     I'd rather have a real true gun store

16     in the Chicago area, and I know we could support it,

17     because all my yuppie neighbors, type of thing, they

18     could afford a higher-end type weapon or collector.

19     They do what I do.  I collect.  I don't use it for

20     anything else.

21         Q    You talked about location of a gun store

22     being important to you and the fact you would like

23     something that has a more antique, something

24     designed for a collector, is that correct?
```



ESQUIRE
an Alexander Gallo Company

Toll Free: 800.708.8087
Facsimile: 312.673.8138

Suite 1200
311 West Monroe Street
Chicago, IL 60606
www.esquiresolutions.com

KENNETH PACHOLSKI                              December 15, 2010

                                                              55

1       A    Yes.

2       Q    Like Dick's Sporting Goods that has modern

3   weapons?

4       A    Yes.

5       Q    Do you know of a gun dealer that would

6   like to open in Chicago?

7       A    Yeah.  I know a bunch of them.

8       Q    Who?

9       A    Gat Guns in west Dundee, I know they would

10  like it.

11      Q    How do you know that?

12      A    I visit them every so often.

13      Q    Is that based on your speculation?

14      A    No.  They mentioned they would like to

15  have a store in Chicago.  It was one of the

16  employees.  I don't know their name.

17      Q    So your statement is based on the

18  statement of an employee?

19      A    Yes.  It might have been the owner, I

20  don't know.

21      Q    Do you recall when the statement was made

22  to you?

23      A    It had to be a year ago.

24      Q    Do you know of any other gun dealers or



ESQUIRE
an Alexander Gallo Company

Toll Free: 800.708.8087
Facsimile: 312.673.8138

Suite 1200
311 West Monroe Street
Chicago, IL 60606
www.esquiresolutions.com

56

1    gun stores, like the one you would like to see in

2    Chicago, that would like to open in Chicago?

3         A    I'll be honest with you, I have heard of

4    them, but I don't know who they are.

5         Q    How have you heard of them?

6         A    Newspaper reports, just word of mouth.

7    That really is it.

8         Q    You say word of mouth.  Do you recall from

9    who?

10        A    You have to understand, the gun group is a

11   tightly-knit group.  They talk to each other.  I

12   can't remember who would have told me it at this

13   time, but I know I heard it a number of times.

14        Q    Is Gat Guns a type of store you referenced

15   you would like to see as opposed to a Dick's?

16        A    Yeah.

17        Q    A store that offers the kind of weapons

18   you collect?

19        A    Yes.

20        Q    Any other factors which affect what type

21   of gun dealer or gun store you would go to?

22        A    The only reason is because of the

23   ammunition that I would have to use for my guns.

24   Since they're older weapons, nobody like Dick's



Toll Free: 800.708.8087
Facsimile: 312.673.8138

Suite 1200
311 West Monroe Street
Chicago, IL 60606
www.esquiresolutions.com

84

1          MR. PANUCCIO:  I believe the witness can

2     answer the list of questions you specified, but

3     wait until he asks the question.

4   BY MR. AGUIAR:

5     Q    Let me ask the questions.

6              How did you come into possession of

7   this firearm?

8     A    I bought it.  That's all I could tell you.

9     Q    Do you know where you bought it?

10    A    I had to get it through an FFL dealer.  I

11  believe it was in Waukegan.

12    Q    What is an FFL dealer?

13    A    Federal firearms licensed dealer.

14    Q    You obtained it in Waukegan?

15    A    I think Waukegan.  I don't remember the

16  name of the place.

17    Q    Was it a store?

18    A    Yes.

19    Q    Do you recall when you obtained this

20  firearm?

21    A    That I can't tell you.

22    Q    Was it this year?

23    A    No.

24    Q    Was it in the past five years?



ESQUIRE
an Alexander Gallo Company

Toll Free: 800.708.8087
Facsimile: 312.673.8138

Suite 1200
311 West Monroe Street
Chicago, IL 60606
www.esquiresolutions.com

KENNETH PACHOLSKI                                    December 15, 2010

85

1      A    You are pulling up stuff I can't remember.
2  I don't know.  I can't remember.
3      Q    Were you looking to buy this particular
4  type of firearm, or did you happen do choose to buy
5  it based on looking at it at a firearm store?
6      A    Almost everything I buy, if I ever brought
7  anything, I bought it for collectible reasons.  This
8  is a collectible.
9      Q    What makes this firearm a collectible?
10     A    It's rare.
11     Q    What about it makes it a rare firearm?
12     A    Ain't that many around.
13     Q    Do you know how old this firearm is?
14     A    If it's a 44, it was built in 1944.
15     Q    So were you in the market to purchase this
16  type of firearm when you went to Waukegan?
17     A    No.  I purchased it from the internet but
18  they had a ship it to a registered dealer.
19     Q    So you bought it from the internet.  Who
20  did you buy it from?
21     A    I can't tell you.  I can't remember.
22     Q    That was a private person or was it a
23  company?
24     A    A company.



ESQUIRE
an Alexander Gallo Company

Toll Free: 800.708.8087
Facsimile: 312.673.8138

Suite 1200
311 West Monroe Street
Chicago, IL 60606
www.esquiresolutions.com

86

1      Q    It had to be shipped to the place in

2   Waukegan?

3      A    Exactly.

4      Q    The Waukegan person has to be a

5   federally --

6      A    They ran a firearm check for me and

7   everything -- it was all on the up and up.

8      Q    How did you come to find this firearm was

9   available for sale?

10     A    I get publication called Shotgun News.

11  They have all kind of guns for sale and stuff like

12  that.

13     Q    That's how you learned it was available

14  for purchase?

15     A    Yes.

16     Q    So you weren't necessarily in the market

17  for this weapon until you learned it was available,

18  is that correct?

19     A    Yes.

20     Q    The company you purchased the firearm

21  from, they had an internet web page you went to, is

22  that correct?

23     A    I don't know if I went to it on the

24  internet.  I called it from the magazine.



ESQUIRE
an Alexander Gallo Company

Toll Free: 800.708.8087
Facsimile: 312.673.8138

Suite 1200
311 West Monroe Street
Chicago, IL 60606
www.esquiresolutions.com

KENNETH PACHOLSKI                              December 15, 2010

114

1    self-incrimination?

2        A    Yes, I would.

3                     (Whereupon, a short break was

4                     taken.)

5    BY MR. AGUIAR:

6        Q    I'd like to switch gears a little bit now

7    and talk a little bit about the claims that the

8    plaintiffs' have brought in this case.

9                I'll start at the beginning with

10   Count one.  In Count one of your complaint, which

11   would be, if you want to refer to it, would be

12   Exhibit 4.

13               If you look at page 13 of Exhibit 4.

14   In Count 1 of the complaint the plaintiff's are

15   essentially challenging the City's ordinances

16   definition of home, in that it excludes certain

17   areas including the garage, the porch or steps

18   leading to the front door, and thereby prevents

19   possession of a firearm in those areas.

20               Do you believe that the City's

21   definition of home in the City's Responsible Gun

22   Ordinance impacts your Second Amendment rights?

23       A    Yes.

24               MR. PANUCCIO:  Objection, calls for a



ESQUIRE
an Alexander Gallo Company

Toll Free: 800.708.8087
Facsimile: 312.673.8138

Suite 1200
311 West Monroe Street
Chicago, IL 60606
www.esquiresolutions.com

                                                          115

1          legal conclusion.  You may answer when I give

2          an objection.

3               MR. AGUIAR:  For clarification, I am

4          asking what he believes.  So that's the

5          difference.

6     BY MR. AGUIAR:

7          Q     Do you believe that this City's definition

8     of home in the Responsible Gun Owner's Ordinance

9     impact your Second Amendment rights?

10         A     I believe it does.

11         Q     Would you explain why you believe it does?

12         A     Okay.  If I am in my house, my wife is

13    coming home in the middle of the night, she's

14    walking in from the garage, we have a 6-foot high

15    fence, a burglar or someone that wants to harm her

16    could do so.  I couldn't defend her with my weapon,

17    because it would have to be under -- where I would

18    feel like her life was threatened, make it that way.

19    I am sorry.  I think I have a right to have a weapon

20    for that purpose.

21         Q     What you just described, are you talking

22    about where you could have the weapon or the manner

23    in which you can use the weapon?

24         A     I think I should be able to carry my



ESQUIRE
an Alexander Gallo Company

Toll Free: 800.708.8087
Facsimile: 312.673.8138

Suite 1200
311 West Monroe Street
Chicago, IL 60606
www.esquiresolutions.com

1    weapon out into my backyard if my wife is being

2    threatened.

3         Q    Okay.

4         A    Yeah.

5         Q    So it has more to do with -- your

6    challenge has to do with the prohibition of being

7    allowed to carry a firearm into your backyard?

8         A    Yes.

9         Q    Legally?

10        A    Yes.

11        Q    Do you have any other reasons why you

12   believe the City's definition of home in the gun

13   ordinance affects your Second Amendment rights?

14             MR. PANUCCIO:  Do you mind if my objection

15        is standing on the legal conclusion?

16             MR. AGUIAR:  Yes.

17             MR. PANUCCIO:  Thanks.

18             THE WITNESS:  I'll tell you what, to me my

19        home is all the property that I own, from the

20        front of the street to the back of the street.

21        To me that's my house.  That's my homestead.

22        To me, anybody that comes in there that

23        threatens my family, I am sorry, I'd like to

24        defend myself.



Toll Free: 800.708.8087
Facsimile: 312.673.8138

ESQUIRE
an Alexander Gallo Company

Suite 1200
311 West Monroe Street
Chicago, IL 60606
www.esquiresolutions.com

117

1          So I think that's where the problem lies

2      with this part in the ordinance.

3  BY MR. AGUIAR:

4      Q    Let's talk about your home at 2620 West

5  Jerome.

6      A    Okay.

7      Q    Why don't we put aside the complaint for a

8  second and quickly look at Exhibit No. 1.   I

9  apologize for all the paper shuffle but lawyers love

10  paper.

11          Exhibit 1, I believe is here, if you

12  could take a look at that, please.   I am going to

13  turn you to Page 32.   Again, these are your

14  responses to the City's interrogatories.

15          There you state, you describe what

16  your home is, you say it's a two-story,

17  three-bedroom home of approximately 2,000 square

18  feet located at 2620 West Jerome Street in Chicago.

19          Then you go on to say the property

20  has a basement, a detached two-car garage and a

21  backyard that is surrounded by a fence.   Is that all

22  true and correct?

23      A    Uh-huh.

24      Q    Okay.



Toll Free: 800.708.8087
Facsimile: 312.673.8138

Suite 1200
311 West Monroe Street
Chicago, IL 60606
www.esquiresolutions.com

118

1             MR. PANUCCIO:  Try to answer yes or no.

2             THE WITNESS:  I am sorry.  Yes.

3                      (Whereupon, Exhibit No. 5 was

4                      marked.)

5    BY MR. AGUIAR:

6        Q    Mr. Pacholski, I am handing you what the

7    court reporter marked Exhibit No. 5.  I will

8    represent to you that this is a search done using

9    Google maps.  What we did is type in the address you

10   provided in your interrogatory and this is what

11   Google maps generated.

12                 Based on what this map is, can you

13   identify where your home is on this map?

14             MR. PANUCCIO:  Before he answers any

15        questions on the map, for the record, I'll

16        object to authenticity.  The witness has no

17        foundation to know this is an accurate map.

18        But, again, to that extent...

19             MR. AGUIAR:  Certainly.

20   BY MR. AGUIAR:

21       Q    Can you identify your home on this

22   document?

23       A    I am pretty sure this is it right here.

24       Q    Are you identifying -- why don't you take



ESQUIRE
an Alexander Gallo Company

Toll Free: 800.708.8087
Facsimile: 312.673.8138

Suite 1200
311 West Monroe Street
Chicago, IL 60606
www.esquiresolutions.com

138

1      A    Yes.

2      Q    You are familiar with a trigger lock?

3      A    Yes.

4      Q    Would you explain what a trigger lock is?

5           MR. PANUCCIO:  Well, I would object to the

6      extent the witness cannot define a trigger lock

7      by law.  He cannot give a legal conclusion.

8           MR. AGUIAR:  I understand.  What he

9      understands a trigger lock to be.

10          THE WITNESS:  The ones I use are two-piece

11     shells.  You have to push them together and you

12     have to have a key.  All my trigger locks have

13     the same key.

14  BY MR. AGUIAR:

15     Q    So do you install the trigger lock on your

16  firearms?

17     A    Uh-huh.

18     Q    Do guns come made with a trigger lock?

19     A    No.

20     Q    It's something the owner does for the

21  firearm?

22     A    I had to buy them, yes.

23     Q    How long does it take you to affix a

24  trigger lock to a firearm?



Toll Free: 800.708.8087
Facsimile: 312.673.8138

Suite 1200
311 West Monroe Street
Chicago, IL 60606
www.esquiresolutions.com

KENNETH PACHOLSKI                              December 15, 2010

                                                                   139

 1        A    Probably about eight, ten seconds.  Not a

 2   big procedure.

 3        Q    How long does it take you to undo a

 4   trigger lock?

 5        A    About the same amount of time.

 6        Q    Eight to ten seconds?

 7        A    Yes.

 8        Q    You said all your firearms have the same

 9   key?

10        A    Yes.

11        Q    Where do you keep that key?

12        A    I have like a -- I don't want to say where

13   it's at.

14             MR. PANUCCIO:  Can we go off the record?

15             MR. AGUIAR:  Sure.

16                  (Discussion off the record.)

17   BY MR. AGUIAR:

18        Q    Back on the record.

19             Mr. Panuccio raised with me the

20   concern that the witness is now testifying to

21   details of his home and the manner in which weapons

22   are stored within his home, and was concerned that

23   information could be sensitive and if used in a

24   public filing, could give someone of the wrong



Toll Free: 800.708.8087
Facsimile: 312.673.8138

Suite 1200
311 West Monroe Street
Chicago, IL 60606
www.esquiresolutions.com

ESQUIRE
an Alexander Gallo Company

KENNETH PACHOLSKI                                    December 15, 2010

140

1    nature an opportunity to do something inappropriate.

2              So Mr. Panucci and I spoke off the

3    record.  I think we're in agreement.  The

4    conversation with has to do with the witness's home

5    and the manner in which the weapons are maintained

6    in his home will not be used in a public filing

7    without getting either filing under seal or getting

8    permission of the party first.

9              MR. PANUCCIO:  I might also add details

10        like the fact the alarm system is not monitored

11        or what the witness called a Jerry rigged way.

12             MR. AGUIAR:  Anything to do with the home

13        we talked about today, we would, if we were to

14        want to use that in a filing with the Court, we

15        would file it under seal.

16             MR. PANUCCIO:  I ask for the same

17        agreement with the other witnesses.  I know you

18        have to check with your colleague.

19             MR. AGUIAR:  I can't imagine that would be

20        a problem.

21             MR. PANUCCIO:  Thank you.

22   BY MR. AGUIAR:

23        Q    Do you carry it on your person?

24        A    I am almost sure I do, yes.



ESQUIRE
an Alexander Gallo Company

Toll Free: 800.708.8087
Facsimile: 312.673.8138

Suite 1200
311 West Monroe Street
Chicago, IL 60606
www.esquiresolutions.com

KENNETH PACHOLSKI                          December 15, 2010

                                                              141

1        Q    Do you have more than one copy of that

2    key?

3        A    Gosh, yes.

4        Q    Do you store that in your home?

5        A    Yes.

6        Q    Are they within the vicinity of your

7    firearms?

8        A    No, I don't think so.

9        Q    What I am trying to understand if in an

10   emergency situation you needed to get access to a

11   firearm that is secured by a trigger lock, would you

12   be easily able to undo the trigger lock?

13           MR. PANUCCIO:  I'll just object, of

14       course, the witness could only gain access to

15       one operable gun under the law.  If the

16       hypothetical, they were all inoperable, he is

17       gaining access to one, I'll allow him to answer

18       the question.  Go ahead.

19           THE WITNESS:  When he was talking about

20       asking these questions about where the key is,

21       stuff like that, I do have one other problem.

22       I know it sounds silly, but I don't like the

23       idea that my gun registrations are in these

24       files.  How secure are they?



Toll Free: 800.708.8087
Facsimile: 312.673.8138

Suite 1200
311 West Monroe Street
Chicago, IL 60606
www.esquiresolutions.com

142

1           MR. PANUCCIO:  Let Mr. Aguiar and I talk

2      about that at the next break.  We'll proceed

3      with the questioning.

4  BY MR. AGUIAR:

5      Q    That's for another day.

6               My question is in terms of if you

7  could under the law access one of these weapons,

8  which is secured by a trigger lock, would you be

9  able to undo the trigger lock in a quick and easy

10 manner?

11     A    Not quick, no.

12     Q    Why not quick?

13     A    Because I don't keep the keys close to the

14 guns.  So it's very difficult really.

15     Q    Okay.  You said you do carry one on you,

16 though, one of the keys on you?

17     A    It's on -- in my key chain, yeah.

18     Q    If you had your key chain with you and

19 went to access one of the firearms with a trigger

20 lock, would you be able to undo the trigger lock in

21 an expeditious manner?

22     A    Well, yeah.  But here's the other problem

23 is I don't leave the guns loaded or anything.  So I

24 have to go and get ammunition, I mean, it's a



ESQUIRE
an Alexander Gallo Company

Toll Free: 800.708.8087
Facsimile: 312.673.8138

Suite 1200
311 West Monroe Street
Chicago, IL 60606
www.esquiresolutions.com

143

1    project.  That's why we have the one operable

2    handgun in the house.  That's it.  So everything

3    else is under lock and key.

4        Q    So all of your -- is it true all your

5    other firearms, except for the one, are not only

6    secured by a trigger lock but also not loaded?

7        A    They're not loaded at all.  No, I don't

8    leave a loaded gun in the house except for the one.

9        Q    Why is that?

10       A    Dangerous.

11       Q    Why is it dangerous?

12       A    Well, you know, if somebody came into my

13   house and broke in, it would be conceivable if they

14   could break the trigger lock off and use the gun

15   with ammunition.  I don't leave them loaded.  My

16   guns are always unloaded except for the one.  Then

17   you have to find it.  One of those things.  I am

18   very careful about that.

19       Q    So you almost do a dual safety measure,

20   not only a trigger lock but they're not loaded?

21       A    They're not loaded, no.  I never leave a

22   loaded gun in the house.

23       Q    Except for the one?

24       A    Except for the one.



ESQUIRE
an Alexander Gallo Company

Toll Free: 800.708.8087
Facsimile: 312.673.8138

Suite 1200
311 West Monroe Street
Chicago, IL 60606
www.esquiresolutions.com

154

1    question with a baseball bat, do you have an

2    understanding whether the ordinance bans you from

3    using a baseball bat defensively?

4              MR. PANUCCIO:   Same objection.  I'll make

5         it standing to this line.

6    BY MR. AGUIAR:

7         Q    Do you have an understanding?

8         A    Yeah.

9         Q    What is that understanding?

10        A    My understanding is I have one in my

11   umbrella stand, yes.

12        Q    There's nothing in the ordinance that

13   prohibits you from using that in -- if you needed

14   to?

15        A    Yes.

16        Q    Why don't we look at the back of the

17   complaint, which is Exhibit 4.  Turn to Page 15 of

18   the complaint.  We're going to skip around a little

19   bit.  I am going to move next to Count 4 of the

20   complaint that you and your co-plaintiffs filed in

21   this case.

22              In Count 4 you are challenging the

23   ordinance of the provision that prohibits the

24   possession of more than one assembled and operable


ESQUIRE
an Alexander Gallo Company

Toll Free: 800.708.8087
Facsimile: 312.673.8138

Suite 1200
311 West Monroe Street
Chicago, IL 60606
www.esquiresolutions.com

KENNETH PACHOLSKI                                    December 15, 2010

155

1    firearm within the home by someone fully licensed

2    under the ordinance to possess a firearm.

3              That provision requires that any

4    other firearm is suppose to be disassembled or

5    otherwise have a trigger lock or mechanism designed

6    to render the firearm temporarily inoperable.

7              Do you believe that this provision of

8    the ordinance impacts your Second Amendment rights?

9         MR. PANUCCIO:  Objection, calls for a

10        legal conclusion.

11        THE WITNESS:  Yes.

12        MR. AGUIAR:  I am asking if he believes it

13        impacts his rights.

14   BY MR. AGUIAR:

15        Q    Do you believe it does?

16        A    Yes, it does.

17        Q    Would you explain why it impacts your

18   rights.

19        A    What if I am not in the area where I have

20   the one operable firearm, I am sorry, I might be in

21   the basement, my firearm is upstairs.  Somebody is

22   breaking into my house and may harm my family.  I

23   have a problem with that.  Yes.

24              We're so careful the way we handle



ESQUIRE
an Alexander Gallo Company

Toll Free: 800.708.8087
Facsimile: 312.673.8138

Suite 1200
311 West Monroe Street
Chicago, IL 60606
www.esquiresolutions.com

156

1    our firearms, that I'd like to have one in each part

2    of the house sometimes, concealed or locked, even

3    with a trigger lock that is not a problem, but I

4    don't like that idea.  I am sorry.  There should be,

5    I think, it's perfectly fine to have more than one

6    firearm in the house.

7         Q    Any other way you believe it impacts your

8    Second Amendment rights?

9         A    Right.

10        Q    How so?

11        A    I should be able to have more than one

12   firearm in the house.

13        Q    Any other reason?

14        A    That's the only thing I could think of.  I

15   am thinking about defense.  That's the only reason I

16   have -- I have a handgun.

17        Q    I believe you testified earlier your wife,

18   Ms. Tyler, has a valid CFP?

19        A    Yes.

20        Q    She has registered a firearm with the City

21   of Chicago?

22        A    Yes.

23        Q    But that weapon is not kept operable in

24   the home?



ESQUIRE
an Alexander Gallo Company

Toll Free: 800.708.8087
Facsimile: 312.673.8138

Suite 1200
311 West Monroe Street
Chicago, IL 60606
www.esquiresolutions.com

157

1      A      Correct.

2      Q      Why isn't that firearm operable within the

3  home?

4      A      We keep it in a safe.  That's it.

5      Q      Why is that weapon kept in a safe?

6      A      She likes the weapon, because it's a

7  smaller gun where my gun is a little bit more

8  impactfull.  And when we're together, I always have

9  the gun with me since the ordinance came into

10  affect, yes.  We only need one right there at that

11  time, but I would rather have it all over the house,

12  to be honest about it.

13      Q      If you could, let's pull out the

14  complaint.  I do want to look at the exhibit page

15  No. 9 of the exhibit.  Directing your attention to

16  the bottom of Page 9, which is Section 8-20-040

17  which is the provision being challenged in Count 4

18  of your complaint against the City.

19              I want to direct your attention to

20  the second sentence of the ordinance which reads; if

21  more than one person in the home has a valid CFP and

22  registration certificate, each person with a valid

23  CFP and registration certificate is entitled to have

24  one such firearm assembled and operable in the home.



ESQUIRE
an Alexander Gallo Company

Toll Free: 800.708.8087
Facsimile: 312.673.8138

Suite 1200
311 West Monroe Street
Chicago, IL 60606
www.esquiresolutions.com

169

1    inoperable.

2              You testified that your firearms all

3    have that trigger lock?

4        A    Yes.

5        Q    So would you agree with me under the

6    ordinance you could have a firearm in each room of

7    your home provided they all have trigger locks on

8    them?

9              MR. PANUCCIO:  Objection, calls for a

10        legal conclusion.

11             THE WITNESS:  I wouldn't enjoy that.

12   BY MR. AGUIAR:

13       Q    I am not asking if you enjoy it.  Could

14   you?

15             Could you, under the ordinance as you

16   understand the ordinance to read, place a firearm in

17   each room of your home, provided it is either broken

18   down or secured by a trigger lock?

19       A    I don't agree with the ordinance.

20       Q    I am not asking if you agree.  I am asking

21   could you under the ordinance, do you believe?

22       A    Yeah, I could do it.  I don't want to do

23   it, though.

24       Q    Why don't you want to do it?



Toll Free: 800.708.8087
Facsimile: 312.673.8138

Suite 1200
311 West Monroe Street
Chicago, IL 60606
www.esquiresolutions.com

                                                                        170

 1        A     Because if I have an inoperable handgun, I

 2    might as well throw a vase at the guy that comes in

 3    and tries to rape my wife or hurt me.  That's

 4    stupid.  A gun is suppose to be used for defensive

 5    purposes.  That's what I have the problem with.

 6        Q     Okay.  Again, you testified under your

 7    reading of the ordinance you could have a firearm in

 8    each room provided it's broken down or secured by a

 9    trigger lock, right?

10        A     Right.

11        Q     You talked earlier about if you had the

12    key on you, it's about eight to ten seconds to undo

13    the trigger lock.  So if you had to go into a room

14    to defend yourself and you had the key, eight to ten

15    seconds of time to undo the trigger lock and make

16    the weapon operable, correct?

17            MR. PANUCCIO:  Object.  It

18        mischaracterizes prior testimony.

19    BY MR. AGUIAR:

20        Q     Is that correct?

21        A     I'll tell you what, in eight to ten

22    seconds I could be dead.

23        Q     So you believe that would still impact

24    your ability to defend yourself?



ESQUIRE
an Alexander Gallo Company

Toll Free: 800.708.8087
Facsimile: 312.673.8138

Suite 1200
311 West Monroe Street
Chicago, IL 60606
www.esquiresolutions.com

171

1       A     You betcha.

2       Q     Articulate why you believe that to be so.

3       A     I have heard of cases where people are

4    just killed on a moments notice.  It could take

5    three seconds.  That's it.

6       Q     So the eight to ten seconds it takes to

7    undo the trigger lock, you believe would make a

8    difference?

9       A     Yes.

10      Q     This is based on what?

11      A     Just stories I heard.

12      Q     You haven't read any studies or anything

13   which talk about that amount of time being true?

14      A     No, but all this stuff that I had to go

15   through with my instruction and everything, it

16   sounded like it's critical.  Time is critical.

17      Q     Instruction where?

18      A     For my concealed carry course, my Chicago

19   course, and my other firearm courses that I took.

20      Q     You were instructed time is of the

21   essence?

22      A     Well, it's not really of the essence as

23   much as you got to have your head together and kind

24   of make sure you are doing the right thing.



Toll Free: 800.708.8087
Facsimile: 312.673.8138

Suite 1200
311 West Monroe Street
Chicago, IL 60606
www.esquiresolutions.com

ESQUIRE
an Alexander Gallo Company

172

```
 1        Q    Other than your instruction and stories
 2   you heard, you don't have any studies or anything
 3   like that which talk about that time?
 4        A    I heard stories.  That's all I could tell
 5   you.
 6        Q    Have you read scholarly literature?
 7        A    No.  No.
 8        Q    No empirical studies talking about that?
 9        A    Probably TV shows.  I can't tell you which
10   ones.
11        Q    Okay.  Looking at 820-040, is it your
12   understanding that this provision of the ordinance
13   does not prohibit you from carrying around your
14   house a fully operable firearm?
15             MR. PANUCCIO:  Objection, calls for a
16        legal conclusion.
17             MR. AGUIAR:  He may answer.
18             THE WITNESS:  It sounds kind of silly
19        really to be honest about it.  To me you carry
20        a firearm, you better know how to use it.
21        That's one thing.
22             The second thing is, I want an operable
23        firearm.  If I have to sit there and pull out
24        keys and do everything else, I think it's
```



ESQUIRE
an Alexander Gallo Company

Toll Free: 800.708.8087
Facsimile: 312.673.8138

Suite 1200
311 West Monroe Street
Chicago, IL 60606
www.esquiresolutions.com

KENNETH PACHOLSKI                    December 15, 2010

173

1          silly.  Like I said, I might as well have a

2          vase and throw it at the guy.  I think it's

3          really kind of dumb and, yeah, I think it does

4          prohibit me.

5              The other thing is it does prohibit me not

6          to have one in my backyard, which really upsets

7          me.  I'll tell you the reason is who -- I got a

8          6-foot high fence.  Who knows if somebody

9          jumped over that fence, standing there waiting

10         to grab me or my wife or anyone that came in

11         the room.  That's the reason why, yeah, I think

12         it's a stupid reason, yes.

13     BY MR. AGUIAR:

14         Q    I appreciate your passion for the topic,

15     but that wasn't my question.  I need you to listen

16     to what I am asking you.  I am not trying to trick

17     you here.

18         A    That's all right.

19         Q    Okay.  We just reviewed a few minutes ago

20     the provision of 820-040, which is the subject of

21     Count 4.  You are trying to invalidate this

22     provision of the ordinance.

23              What I am trying to get at, is there

24     anything in 820-040 that you see that prohibits you



ESQUIRE
an Alexander Gallo Company

Toll Free: 800.708.8087
Facsimile: 312.673.8138

Suite 1200
311 West Monroe Street
Chicago, IL 60606
www.esquiresolutions.com

KENNETH PACHOLSKI                              December 15, 2010

174

1    from carrying around your home if you so chose that

2    one firearm that you are allowed to have in an

3    operable condition?

4         A    Yes.

5         Q    What part of this ordinance do you think

6    does not allow you to do that?

7         A    I can carry one.  That's what you are

8    saying?

9         Q    Under this provision you can carry one

10   firearm around your home in an operable condition?

11        A    So I can't have a gun in -- I can't have

12   more than one gun operable per person.  My gun, my

13   wife's gun who carries the CFP, so that's all I can

14   do.  So I have to obtain that gun, I have to find

15   where it's at.  I have to go to the wall or go to

16   the safe or go to the other part, that's what you

17   are saying.  You are saying I am not going to carry

18   the gun around the house with me constantly?

19        Q    What I am trying to ask you is, let's say

20   for example you are in love with that one gun.  You

21   can't imagine not having it at your side 24/7 when

22   you are in your home.  You want it strapped to your

23   side when you are in your house, fully loaded, no

24   trigger lock, ready to go at a moments notice.



Toll Free: 800.708.8087
Facsimile: 312.673.8138

Suite 1200
311 West Monroe Street
Chicago, IL 60606
www.esquiresolutions.com

175

 1         Does anything in this ordinance
 2   prevent you from doing that that you believe?
 3         A    It doesn't really.  But I'll tell you
 4   what, it's prohibitive.
 5         Q    My question was, does it prohibit you from
 6   doing it.  You said, no.  Am I correct?
 7         A    Yes.
 8         Q    So you could, if you wanted to, I believe
 9   you testified earlier on those nights when you have
10   to leave the bedroom, you carry the gun down to the
11   basement, correct?
12         A    Correct.
13         Q    So you carry it with you, you are not
14   violating the ordinance, you can do that.  The
15   ordinance doesn't say you have to keep it in one
16   location.  You can have it anywhere in the house you
17   want it, correct?  You could have it on your person?
18         A    Correct.  But here's the other thing.
19         Q    I am asking the questions.  I don't mean
20   to shut you off.
21         MR. PANUCCIO:  If he has a correction or
22         qualification, I think he should be able to put
23         it on the record.
24         MR. AGUIAR:  He answered the question that



Toll Free: 800.708.8087
Facsimile: 312.673.8138

Suite 1200
311 West Monroe Street
Chicago, IL 60606
www.esquiresolutions.com

KENNETH PACHOLSKI                              December 15, 2010

176

1        I asked.

2    BY MR. AGUIAR:

3        Q     Here's my question, the next question is,

4    if the ordinance allows you to do that, you could

5    carry a firearm around your home in a fully operable

6    condition if you so chose to do that?

7        A     Yes.  But let me explain that, too.

8        Q     That's fine.

9        A     I don't want to have to be holding the one

10   gun that I could have in my hand and have to go up

11   and down the stairs.  I'd feel a lot more

12   comfortable with one gun downstairs, one gun

13   upstairs, one gun in the kitchen where I am always

14   spending my time and that is where my wife comes in,

15   through the kitchen.  Things like that.  I am sorry.

16   That's a part where I would rather be having a

17   weapon available to me, and I don't want to have to

18   be carrying around the house like it's a puppy dog

19   type of thing.  It seems silly especially since I

20   could afford to buy them.  It's one of those things.

21              It seems silly.  If I can have one

22   gun, what's the difference between three or four?

23   That's where I don't agree with that part of the

24   ordinance.



Toll Free: 800.708.8087
Facsimile: 312.673.8138

Suite 1200
311 West Monroe Street
Chicago, IL 60606
www.esquiresolutions.com

                                                                    177

1        Q    Is there any other reason why you don't

2    want to carry an operable firearm around your home?

3        A    I'd like to know where it's at.  I would

4    have it hidden.  I don't want the maid to get a hold

5    of anything.  I am careful about that stuff.  I want

6    to make sure that I have something close by if I

7    need to.

8             If I hear some windows breaking and

9    somebody is coming in through the back door and

10   beating my wife and beating me up and stuff like

11   that, I want to be able to have access to my

12   weapons.

13             I think the one gun is a stupid

14   thing.  Then, I am actually stuck strapped with this

15   thing going back and forth, back and forth.  I love

16   guns.  I'll tell you what, I don't feel like I

17   should have to carry it around like a puppy dog.

18   It's one of those kind of things.  That's why I want

19   multiple guns in the house available.  That's the

20   only reason.

21       Q    So it's a convenience issue?  Would that

22   be a fair statement?

23       A    I think it's a safety issue.

24       Q    How so?



ESQUIRE
an Alexander Gallo Company

Toll Free: 800.708.8087
Facsimile: 312.673.8138

Suite 1200
311 West Monroe Street
Chicago, IL 60606
www.esquiresolutions.com

KENNETH PACHOLSKI                          December 15, 2010

179

1       Q     Safety in that you want a firearm in each
2    home in each room of your home?
3       A     If somebody comes in my house and attempts
4    to hurt me, yes, I want to defend myself.
5       Q     Playing devil's advocate, if you had a
6    firearm on you, while you are in your home, would
7    you have a firearm wherever you are?  If you don't
8    have a safety concern of carrying it, what would be
9    the problem with doing that?
10      A     Run it by me again.
11      Q     I asked you a few moments ago if you would
12   have a safety concern with carrying a firearm around
13   your home in a fully operable condition.  You
14   testified you wouldn't because you know how to use
15   guns.
16      A     Yes.
17      Q     If you don't have a safety concern, and
18   you are carrying the firearm with you throughout the
19   home, you would be ready at a moments notice if you
20   needed to use it.  It would be on your person,
21   wouldn't it be?  Am I correct it would be on you,
22   correct?
23      A     Yeah, but I don't want to do that.
24      Q     Why?



ESQUIRE
an Alexander Gallo Company

Toll Free: 800.708.8087
Facsimile: 312.673.8138

Suite 1200
311 West Monroe Street
Chicago, IL 60606
www.esquiresolutions.com

180

1      A    Because I don't want to carry around that

2    weight all the time.  It's a silly thing to be

3    carrying all the time.  I would rather have it where

4    I know it's going to be at.  I guarantee if I didn't

5    have to unlock a gun and have it available, I could

6    use it.  It would take seconds instead of eight to

7    ten seconds, and I could be dead in eight to ten

8    seconds if I had an intruder.  I am very careful

9    about that.

10      Q    You don't want to carry the weight around?

11      A    Yeah.

12      Q    Would you agree if you did want to carry

13    the gun around, you would be prepared at a moments

14    notice to defend yourself in your home, because it

15    would be on your person?

16      A    That would be fine except I just -- I'll

17    have to find another weapon.  I'll have to buy one

18    of those plastic ones, something lighter.

19      Q    Let's go to Count 5 of your complaint,

20    which is on Page 15.

21            In Count 5, which I am asking you to

22    look at, this is plaintiffs' challenge to those

23    provisions of the ordinance which make it unlawful

24    for residents or people in the City of Chicago to



ESQUIRE
an Alexander Gallo Company

Toll Free: 800.708.8087
Facsimile: 312.673.8138

Suite 1200
311 West Monroe Street
Chicago, IL 60606
www.esquiresolutions.com

1    carry a firearm outside the home except under

2    certain conditions, okay.  You can carry a -- under

3    the ordinance you can lawfully have a firearm

4    outside the home provided it is broken down in a

5    nonfunctioning state, not immediately accessible,

6    and is unloaded and in a firearm case.

7            Do you believe that provision of the

8    ordinance violates your Second Amendment rights?

9            MR. PANUCCIO:  Objection, calls for a

10           legal conclusion.

11           MR. AGUIAR:  I am asking what he believes.

12           You can answer.

13           THE WITNESS:  I don't think it's a huge

14           problem, but the thing is is it seems stupid

15           though, once, again.  What is the good of

16           having a gun if you can't use it?  It's really

17           that simple.

18   BY MR. AGUIAR:

19       Q    You testified you didn't think it was a

20   huge problem.  Why don't you think it's a huge

21   problem?

22       A    I can break down the gun and stuff like

23   that, but it seems like it's dumb, because the

24   reason you have a firearm is you may have to use a



Toll Free: 800.708.8087
Facsimile: 312.673.8138

Suite 1200
311 West Monroe Street
Chicago, IL 60606
www.esquiresolutions.com

ESQUIRE
an Alexander Gallo Company

186

1    words, you could bring it to a movie theater with

2    you?

3         A    I can't imagine ever doing that, honestly.

4         Q    So what I was trying to get at, if you

5    wanted to be armed outside of the home, would you be

6    concealed about that, would it be concealed or would

7    it be something you would publicly display that you

8    have a weapon?

9         A    I don't think I would publicly display the

10   weapon ever any way.  I would have it concealed but

11   it better be legal.  Concealed carry, I'd like

12   concealed carry in Illinois.  That would be the

13   greatest thing in the world.

14        Q    Why so?

15        A    I worry about some of the places I go.

16        Q    What places do you go that worry you?

17        A    Here.

18        Q    What about coming here makes you wish you

19   had a firearm?  We're talking about the loop.

20        A    Not that I wish I had a firearm, but I

21   would feel safer about -- a lot of people I see on

22   the street look gnarly.  I am sorry.  I don't trust

23   everybody like I used to.  Some of the people that I

24   have seen out here, I don't care very much for that.



ESQUIRE
an Alexander Gallo Company

Toll Free: 800.708.8087
Facsimile: 312.673.8138

Suite 1200
311 West Monroe Street
Chicago, IL 60606
www.esquiresolutions.com

187

1   I would be worried for my own safety.

2        Q    Would you feel more safe if you had a

3   means of defending yourself if something were to

4   happen?

5        A    Yes.

6        Q    That's based on, people look gnarly?

7        A    Yes.

8        Q    You testified earlier you haven't had any

9   of these gnarly people do anything to you?

10       A    No, but as I am getting older, I worry

11  about it a little bit more.

12       Q    Let's look at Count 2 of the complaint,

13  which is on Page 13.

14                 In Count 2, the plaintiffs' are

15  challenging two provisions of the City's ordinance,

16  which combined prohibit the sale of firearms within

17  the City of Chicago.

18                 Do you believe the City's ban on the

19  sale of firearms in the City of Chicago impacts your

20  Second Amendment rights?

21            MR. PANUCCIO:  Objection, calls for a

22       legal conclusion.

23            MR. AGUIAR:  You may answer.

24            THE WITNESS:  Yeah, I think it does.



ESQUIRE
an Alexander Gallo Company

Toll Free: 800.708.8087
Facsimile: 312.673.8138

Suite 1200
311 West Monroe Street
Chicago, IL 60606
www.esquiresolutions.com

191

1       Q    But if there are firearms dealers in

2    stores on the outside of the City jurisdiction but

3    within a driving distance, citizens of Chicago can

4    still go purchase firearms?

5       A    But there are some people that don't have

6    a -- can't drive distances because they don't drive.

7    Sometimes there are people that are really dependent

8    on defending themselves, they might be in poor

9    areas.  So that kind of takes away Second Amendment

10   rights a little bit, in fact, quite a bit, I think.

11      Q    What about the notion that sometimes in

12   some parts of the City, it could be that you are

13   closer to a suburban gun range or gun store than you

14   would be if one opened up in another part of

15   Chicago.

16              For example, a resident of the south

17   side of Chicago who lives on the border of the city

18   and one of its suburbs which has a gun store, could

19   be within blocks of that gun store, whereas if a gun

20   store were to open up in the far northwest corner of

21   Rogers Park, they would be further from that store.

22   Does that change your analysis to why Chicago should

23   have gun stores?

24      A    No, it doesn't.



ESQUIRE
an Alexander Gallo Company

Toll Free: 800.708.8087
Facsimile: 312.673.8138

Suite 1200
311 West Monroe Street
Chicago, IL 60606
www.esquiresolutions.com

192

1          Q     Why not?

2          A     There should be gun stores in the City of

3     Chicago, yes, positive.  That's the way I feel about

4     it.  Only because, once again, you are looking at

5     it's a business.  Guns aren't illegal anymore.

6     They're still, unless you tell me you can't have a

7     gun anymore in Chicago, then, yeah, I could

8     understand that.

9                But now you can have a gun in

10    Chicago, and just by looking at my paperwork, you

11    could see I have a whole bunch of guns.  I think

12    it's wrong.  I think people should have the right to

13    buy weapons, yes, they deserve it.

14         Q     Would you want a gun store in your

15    neighborhood?

16         A     Yeah.

17         Q     Would you want a gun store on your block?

18         A     Yeah.

19         Q     No hesitation?

20         A     None.  I'd like a gun range on my block.

21         Q     Would you?

22         A     You bet.

23         Q     Would you use that gun range?

24         A     Yes.



Toll Free: 800.708.8087
Facsimile: 312.673.8138

Suite 1200
311 West Monroe Street
Chicago, IL 60606
www.esquiresolutions.com

193

1          Q    How often would you use it?

2          A    Twice a week.  If you are going to use

3     them, use them.

4          Q    If you could flip back to Exhibit No. 1

5     and ask you to look at Page 25.  At the bottom of

6     Page 25, you respond to a interrogatory from the

7     City where we asked you to identify all the

8     firearms, shooting ranges, stores that sell firearms

9     or other vendors you visited.  In your list, Maxin

10    Shooters in DesPlaines, JG Sales over the internet,

11    Bass Pro Shops in Gurnee, Gat Guns in Dundee, Dick's

12    Sporting Goods in Niles and the Adventure Store in

13    Waukegan.  I'd like to talk first about Maxins.  We

14    may have already covered a list, so I apologize for

15    going over something we already talked about.

16               How many times have you been to

17    Maxins?

18               MR. PANUCCIO:  Have you had a chance to

19         read through it?

20               THE WITNESS:  Yeah.

21    BY MR. AGUIAR:

22         Q    How many times have you been to Maxins?

23         A    I can't tell you.  It's been numerous

24    times, though.



ESQUIRE
an Alexander Gallo Company

Toll Free: 800.708.8087
Facsimile: 312.673.8138

Suite 1200
311 West Monroe Street
Chicago, IL 60606
www.esquiresolutions.com

KENNETH PACHOLSKI                                December 15, 2010

194

1        Q    How many times do you go a year?

2        A    I can't even tell you that.  Because

3    sometimes it might be like six or eight or ten

4    times, sometimes it might be two.  Depends on my

5    wife's schedule, my wife schedules her vacations.

6        Q    You testified they know you there?

7        A    Yes.

8        Q    Would you consider yourself to be a

9    frequent customer?

10       A    Yeah, mostly for the shooting range more

11   than buying guns there.

12       Q    So you use the shooting range there?

13       A    Yes, and I buy my ammo there.

14       Q    You buy all your ammunition at Maxins?

15       A    Most of the time, yeah, it's probably

16   them.

17       Q    How often do you buy ammunition?

18       A    It depends how much I shoot.  If I am

19   shooting, yeah.  Otherwise, no.  I always make sure,

20   I only have ammunition for the guns that I have so I

21   always carry something in case I go out shooting.  I

22   don't know how much I have, though, to be honest

23   about it.

24       Q    For the 18 firearms you posses in your



Toll Free: 800.708.8087
Facsimile: 312.673.8138

Suite 1200
311 West Monroe Street
Chicago, IL 60606
www.esquiresolutions.com

219

```
 1    STATE OF ILLINOIS )

 2                     ) SS:

 3    COUNTY OF C O O K )

 4            I, STACEY JOHN, a Notary Public within and for

 5    the County of Cook, State of Illinois, and a Certified

 6    Shorthand Reporter of said State, do hereby certify:

 7            That previous to the commencement of the

 8    examination of the witness, the witness was duly sworn to

 9    testify the whole truth concerning the matters herein;

10            That the foregoing deposition transcript was

11    reported stenographically by me, was thereafter reduced to

12    typewriting under my personal direction and constitutes a

13    true record of the testimony given and the proceedings had;

14            That the said deposition was taken before me at

15    the time and place specified;

16            That I am not a relative or employee or attorney

17    or counsel, nor a relative or employee of such attorney or

18    counsel for any of the parties hereto, nor interested

19    directly or indirectly in the outcome of this action.

20            IN WITNESS WHEREOF, I do hereunto set my

21

22

23

24
```



Toll Free: 800.708.8087
Facsimile: 312.673.8138

Suite 1200
311 West Monroe Street
Chicago, IL 60606
www.esquiresolutions.com

KENNETH PACHOLSKI                                December 15, 2010

220

1    hand and affix my seal of office at Chicago, Illinois

2    this 13th day of January, 2011.

3

4    _____

5                    Notary Public, Cook County, Illinois.

6

7    C.S.R. Certificate No. 84-003560.

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24



Toll Free: 800.708.8087
Facsimile: 312.673.8138

Suite 1200
311 West Monroe Street
Chicago, IL 60606
www.esquiresolutions.com

# EXHIBIT 44

1

 1            IN THE UNITED STATES DISTRICT COURT

 2          FOR THE NORTHERN DISTRICT OF ILLINOIS

 3                    EASTERN DIVISION

 4    --------------------------------)

 5    ILLINOIS ASSOCIATION OF FIREARMS )

 6    RETAILERS, KENNETH PACHOLSKI,    )

 7    KATHRYN TYLER, and MICHAEL HALL, )

 8            Plaintiffs,              ) Civil Action No.:

 9    vs.                             ) 10-cv-04184

10    THE CITY OF CHICAGO and          )

11    RAHM EMANUEL, Mayor of the       )

12    City of Chicago,                 ) `

13            Defendants.             )

14    --------------------------------)

15            Videotaped Deposition of JOSEPH J. VINCE,

16    JR., a Witness, herein, called for examination by

17    Counsel for Plaintiffs, in the above-entitled matter,

18    the witness being duly sworn by MELISSA GILCREST,

19    RDR, CRR, a Notary Public in and for the District of

20    Columbia, taken at the offices of Cooper & Kirk,

21    PLLC, 1523 New Hampshire Avenue, NW, Washington, DC,

22    at 9:06 a.m., on Friday, September 16, 2011, and the

11

1       A.     Yes, sir, that is correct.

2       Q.     All right.  And in terms of your

3  employment history, your first law enforcement

4  position was as a deputy sheriff with the Trumbull

5  County Sheriff's Department, is that right?

6       A.     In Warren, Ohio, yes, sir.

7       Q.     That was from 1969 to 1971, is that

8  correct?

9       A.     Yes, sir, that is correct.

10       Q.     Now, in that capacity, your job was as a

11  road deputy?

12       A.     Yes, sir.                    `

13       Q.     What were your responsibilities as a road

14  deputy?

15       A.     As a road deputy, you had responsibility

16  of patrolling, responding to calls from the

17  dispatcher.  You also -- we had warrants that we

18  executed for the court, we transported prisoners to

19  the state penitentiary.  The normal duties that

20  patrol officers have.

21       Q.     Okay.  And did you carry a firearm as a

22  road deputy?

Joseph J. Vince, Jr.                                    September 16, 2011
Washington, D.C.

12

1       A.      Yes, sir, I did.

2       Q.      Did you have a trigger lock on your

3  firearm?

4       A.      When I was on duty?

5       Q.      Yes.

6       A.      No, sir, I did not.

7       Q.      You worked there until you joined the

8  Bureau of Alcohol, Tobacco and Firearms in 1971, is

9  that right?

10      A.      Yes, sir, that is correct.

11      Q.      And your first job at the ATF was as a

12 special agent and field investigator in Detroit, is

13 that right?

14      A.      Yes, sir, that is correct.

15      Q.      And that lasted from 1971 to 1979, is that

16 right?

17      A.      Yes, sir.  I was transferred to another

18 post of duty in 1979.

19      Q.      And what were your responsibilities as a

20 field agent?

21      A.      As a field agent, I would be responsible

22 for investigating crimes within the jurisdiction

13

1    that ATF has, as well as testifying in court,

2    collecting evidence, effectuating arrests, executing

3    search warrants, et cetera.

4         Q.    What sort of crimes were within the

5    jurisdiction of your department at that time?

6         A.    Well, ATF regulates the firearms and

7    explosives industry, they also are responsible for

8    enforcing federal firearms and explosive laws,

9    alcohol laws, tobacco laws and arson.

10        Q.    And in 1979, you were transferred to

11   Nebraska and promoted to special agent in charge of

12   the Omaha office, is that right?      `

13        A.    Yes, sir, resident agent in charge, yes,

14   sir.

15        Q.    And you remained in that position until

16   1983, is that correct?

17        A.    Yes, sir.

18        Q.    And what were your responsibilities as the

19   special agent in charge of the Omaha office?

20        A.    Well, again, you have the same

21   responsibilities as special agent, but you're

22   supervising a group of agents to ensure not only

Joseph J. Vince, Jr.                                    September 16, 2011
Washington, D.C.

93

1    in here, we talked about gun shows, those premises

2    become your home and the people coming in as

3    customers are your visitors.  The same is applicable

4    to your home.  There really is no difference.

5              And so you want to make sure your visitors

6    are safe there and you want to make sure that

7    visitors don't inadvertently get ahold of a firearm.

8    Exactly what the NSSF says, I think it's exactly the

9    same thing that's in our -- that's in this

10   publication.

11        Q.    But at least Chicago allows people to have

12   an operable firearm, and your guideline doesn't say

13   oh, have some operable firearms or even one operable

14   firearm and the rest in display cases.  This is

15   saying all of them should be in display cases locked,

16   right?

17        A.    Well, I will say this.  Of the dealers

18   that I'm aware of, and I have been around a lot of

19   retail dealers, there are dealers that have operable

20   firearms, but I only know of them having them on

21   their person.  They don't have them laying around

22   anywhere, they have them where they have control of

94

1    them at all times.  They don't have 15 or 20 of them

2    like that.  Not even all clerks do that, because

3    some are not trained or they don't want them to have

4    that.  So in that respect, it's not an issue that we

5    went into, but I think it's very much followed.

6              And I think that the big point about

7    what's not only in the safety and security, but what

8    dealers follow, is the same thing that they

9    repeatedly say, why do we do this?  Because it works.

10       Q.    All right.  And those firearms that are in

11   the display cases are not intended for use in that

12   store for self-defense, correct?        `

13       A.    No, sir.

14       Q.    Now, if we look at page 8 of your report

15   in the second full paragraph, you reference, let's

16   see, say halfway through that first sentence, "And

17   even the National Shooting Sports Foundation, a

18   lobbying arm of the firearms industry, has a safety

19   program utilizing trigger locking devices."  Why do

20   you use the word even, you say even they have it?

21       A.    Well, I think for this purpose I thought

22   it was amazing that here you have a protocol by the

95

1    National Shooting Sports Foundation and the

2    Plaintiff in this case is an associate, the Illinois

3    Association of Firearms Retail Dealers.  I can't

4    believe it, they're partners in this, but they don't

5    agree with each other.  So I'm taking the premise

6    that the Illinois Association of Firearms Retailers

7    believes that this is the protocol that should be

8    followed.  Am I correct?

9         Q.    I don't have to answer your questions.

10        A.    Okay.

11             MR. WOODS:  I object to him not answering

12   a question.

13             MR. THOMPSON:  That is man bites dog.

14             MR. WORSECK:  It's beyond the scope of the

15   opinions you were asked to provide in this case.

16             MR. THOMPSON:  Exactly.

17   BY MR. THOMPSON:

18        Q.    So now if we look at these bullet points.

19        A.    Sure.

20        Q.    That are listed here.  It says under the

21   first bullet point, "It is the responsibility of the

22   firearms owner to know how to properly handle any

Joseph J. Vince, Jr.                                September 16, 2011
                        Washington, D.C.

                                                            133

1       A.      That has happened, yes, sir.

2       Q.      Sometimes they're able to deter an attack

3   by brandishing a weapon even without discharging a

4   weapon, is that correct?

5       A.      Yes, sir, that's occurred.

6       Q.      Okay.  Now, on page 14 you report the

7   number of times measured in seconds that your

8   colleague, I apologize, Mr. Nunziato.

9       A.      Yes, Nunziato, yes, sir.

10      Q.      That he performed in unlocking these

11  various mechanisms.  Now, what is your colleague's

12  background?                                `

13      A.      Mr. Nunziato was a special agent with

14  ATF, probably for a little longer than I was.  I

15  can't remember the exact years he had on the job.

16  He performed duties as a technician as well in

17  our -- I'm trying to remember the name of the

18  branch, technical branch, which had a lot to do with

19  procurement of firearms and other devices that

20  agents use.  He also was the special agent in charge

21  of the National Tracing Center for about ten years.

22      Q.      Do you consider him to be proficient in

Joseph J. Vince, Jr.                                    September 16, 2011
Washington, D.C.

134

1     the handling of firearms?

2          A.    You know, as much as a special agent

3     was -- I don't remember Mr. Nunziato being a hunter

4     or a sports shooter, but he carried a gun as an

5     agent and was trained as an agent.  And he retired

6     at the same time I did, so I would think that he

7     would be rusty, as I would, because we haven't

8     trained like we used to as agents.

9          Q.    Now, how old is he, approximately?

10         A.    I hope I'm not embarrassing him.  I think

11    it's 65.

12         Q.    Is it true that people's `reaction time

13    becomes slower as they become older?

14         A.    Do you really want an old guy like me to

15    admit that?  I think what happens is that if you

16    don't perform repetition actions that you need to,

17    you become unskilled at any age.

18         Q.    Mr. Nunziato was performing this exercise

19    in a well-lit room, is that right?

20         A.    I assume so.  I don't think he did it in

21    the dark.

22         Q.    Okay.  And he wasn't woken out of a deep

Joseph J. Vince, Jr.                                    September 16, 2011
                          Washington, D.C.

                                                                    135

1    sleep right before he performed this, was he?

2         A.    No, sir, he was not.

3         Q.    Okay.  And in fact, the test was taken

4    during the daytime, is that right?

5         A.    I'm not sure if it was or was at night,

6    but it was done indoors.

7         Q.    Does your colleague wear glasses?

8         A.    Yes, sir, he does.

9         Q.    Did he have his glasses on when he

10   performed the test?

11        A.    I assume.

12        Q.    Okay.  He didn't have to take time to

13   reach for his glasses, let alone find his glasses

14   case, did he?

15        A.    No, sir, I don't believe so.

16        Q.    Was he in a life-threatening situation

17   when he took the test?

18        A.    No, sir, he was not.

19        Q.    When some people are in a life-threatening

20   situation, do they perspire?

21        A.    Yes, sir.

22        Q.    Would you expect that to degrade

Joseph J. Vince, Jr.                                        September 16, 2011
Washington, D.C.

136

1     somebody's performance if they are sweating and

2     trembling while they're doing this?

3          A.     I wouldn't know that, sir.  We didn't

4     test for that.

5          Q.     Where was the ammunition during these

6     tests?  Was there ammunition in the guns?

7          A.     No, sir.  He took the trigger lock off

8     and we did the tests according to what the

9     manufacturers say to do, which is not -- put a

10    trigger lock on a loaded weapon, and then he loaded

11    the weapon as well.

12         Q.     Is the loading of the weapon included in

13    this time?

14         A.     Yes, sir.

15         Q.     And was the ammunition right next to him

16    or did he have to go to a different room or a

17    different safe to get the ammunition?

18         A.     No, sir, it was right there.

19         Q.     Is that best practices, in your opinion,

20    to have the ammunition right next to the firearm?

21         A.     If you're securing your weapon in your

22    house, that would be best practices to make sure

Joseph J. Vince, Jr.                                    September 16, 2011
Washington, D.C.

137

1    there aren't any inadvertent acquisition of a

2    firearm or accidents with the firearm.

3        Q.    I thought the best practices, according to

4    you, was to keep the ammunition separate from the

5    firearm?

6        A.    Well, you are saying this is what we did

7    for the test.  That's all I'm saying.  That's what

8    we did for the test, to time it.

9        Q.    Okay.  So now I'm switching gears.  I'm

10   saying to try to figure out how applicable this test

11   would be for a law-abiding citizen who read your

12   report, took it to heart and said that's what I'm

13   going to do.  You would tell that law-abiding citizen

14   don't keep that ammunition right next to the gun,

15   wouldn't you?

16       A.    That's what I do in my own house, sir, I

17   don't have ammunition next to my guns.

18       Q.    That's right.  Now, does your colleague

19   suffer from arthritis?

20       A.    I don't know.

21       Q.    Okay.  Does he suffer from Parkinson's

22   disease?

Joseph J. Vince, Jr.                                          September 16, 2011

Washington, D.C.

138

1       A.      Not that I'm aware of.

2       Q.      Are you aware some people with when they

3   have Parkinson's disease, they tremor?

4       A.      I'm aware of that.

5       Q.      Do you think someone with Parkinson's

6   disease could open these trigger locks as quickly as

7   your colleague did?

8       A.      I wonder if somebody that has problems

9   manipulating should have a loaded gun.

10      Q.      You don't think they should have a loaded

11  gun?

12      A.      I think at a certain age; myself, I know

13  I'm going to have to make a decision on whether I

14  should drive or not.  We all have to do that.  So I

15  don't know that particular circumstance.  Maybe

16  that's something we should look at.

17      Q.      Now, when you say he dropped the key for

18  one of the tests, was -- it was he could see where

19  the key went, right, he wasn't searching in the dark

20  for the key?

21      A.      I don't know one way or the other.  I

22  would assume that.

Joseph J. Vince, Jr.                                    September 16, 2011
                        Washington, D.C.

139

1        Q.     You say on page 14 that, "The safe storage

2    requirements" -- I'm looking at the last paragraph,

3    sir, and it's the third sentence.  And it reads in

4    part, "The safe storage requirements are in accord

5    with the guidelines, practices and recommendations of

6    firearm experts, the United States military, law

7    enforcement agencies, court safety rules and the gun

8    industry itself."  And you're only speaking about the

9    storage requirements, is that right?

10             And I ask it that way, because Chicago

11   allows individuals to have an operable firearm and

12   you're not allowed to have an operable firearm in

13   most courthouses, isn't that right?

14       A.     Yes, you're not in a courtroom, that's

15   correct.  Other than there is loaded firearms by

16   people that are trained to do that.  The same on a

17   military base.

18       Q.     And the reason there are these differences

19   between what Chicago permits and what courtrooms and

20   military bases permit is that there is a different --

21   there is a difference in the purpose?  What the

22   military and the courtrooms are looking at is storage

Joseph J. Vince, Jr.                                     September 16, 2011
                            Washington, D.C.

                                                                    140

1     and what an individual in a home is looking at is

2     self-defense?

3              MR. WOODS:  I object to the form of the

4     question.

5     BY MR. THOMPSON:

6         Q.    Let me ask it this way.  Aren't there

7     different purposes that serve the ban on guns in

8     courtrooms than the limit to one operable gun in a

9     house, aren't there different purposes at work?

10        A.    I would hope we have all the same objects

11    here -- objectives.  And that is the fact that the

12    protocols are in there to keep people safe from

13    firearms accidents and from people unauthorized to

14    get ahold of firearms, whatever, that's the

15    objective.

16             Now, how is there a difference between

17    what the court and the home, shouldn't that be the

18    same objective?

19        Q.    Isn't there at least one difference in

20    objectives, though?  Because Chicago is trying to

21    empower its citizens, if they choose, they go through

22    the licensing, to defend themselves with a firearm,

Joseph J. Vince, Jr.                                    September 16, 2011
                        Washington, D.C.

                                                              141

1    and the court is saying no, you can't do that?

2         A.    Again, I think the court says we will do

3    that, because we'll have that operable gun in there

4    by a trained expert.

5         Q.    Yes.  So that's a difference in the

6    regimes that you're talking about?

7              MR. WOODS:  Objection, mischaracterizes.

8         A.    And the person that is responsible for

9    making the responsibility is making that choice.

10   The city ordinance allows a person to make that

11   choice.

12             MR. THOMPSON:  I see, are we getting close

13   to lunch?

14             MR. WOODS:  Sure.

15             MR. THOMPSON:  I'm happy to go on, but I'm

16   sort of at a natural stopping point.  Let's go off

17   the record.

18             THE VIDEO OPERATOR:  We're going off the

19   record.  The time on the video is 12:11 p.m.

20             (Recess taken.)

21             THE VIDEO OPERATOR:  We're back on the

22   record.  The time on the video is 1:26 p.m.

Joseph J. Vince, Jr.                                        September 16, 2011
                          Washington, D.C.

                                                                142

1              MR. THOMPSON:  Mr. Vince, welcome back.

2     I'm going to ask the court reporter actually to mark

3     that as Vince Exhibit 2.

4              (Vince Deposition Exhibit 2 marked for

5     identification.)

6     BY MR. THOMPSON:

7        Q.   Let's turn to page -- this is a transcript

8     of a trial before Judge Weinstein in the Eastern

9     District of New York back in 1999, Hamilton V.

10    Accu-Tek.  Do you recall testifying in this trial,

11    sir?

12       A.   Yes, sir, I do.              `

13       Q.   Okay.  Let's turn to page 1610, which is

14    about halfway through.  And there was a Mr. Dorr, who

15    was asking you about an Exhibit 574 on line 9.  And

16    he asked you to identify the document.  You said,

17    "These are two copies of the summary and conclusion

18    from the Northeastern study."

19              And then he said, "I think to save time,

20    the jury heard the last paragraph, but that's the

21    paragraph which begins by saying the legal firearms

22    industry in the United States conducts business in

143

1   overwhelming compliance with federal rules and

2   regulations."  Actually that was the question.  "Is

3   that correct?"  And you answered, "That's correct."

4            Do you still agree with that sentiment?

5       A.    Well, I think I've already talked about

6   it and I have included that study in my references

7   here in this report.  And what I said earlier, and

8   I'll repeat again, is that 1 percent, really less

9   than 1 percent of the federal firearms dealers

10  account for 60 percent of all the crime guns.  And

11  however, that retail dealers are by far the biggest

12  source for crime guns.  And whether `it's through

13  being -- having poor business practices or doing

14  things illegally, that's an issue.  So looking at

15  that percentage, yeah, the majority do, but it's

16  still a really big concern.

17      Q.    And now I want to go back and just clean

18  up a few of the background issues before we polish

19  off going through the report.

20           What year did you found Crime Gun

21  Solutions?

22      A.    I believe it was 1999, sir.

Joseph J. Vince, Jr.                                              September 16, 2011
                            Washington, D.C.

                                                                        144

     1        Q.    Okay.  And who are your largest clients,

     2   or who have been since your founding?

     3        A.    Well, I would say primarily, if I looked

     4   at, you know, it would be victims of crime guns,

     5   crime -- gun crimes.

     6        Q.    And what services do you provide to them?

     7        A.    We provide support, consulting, expert

     8   reporting, expert witness for them.

     9        Q.    In litigation?

    10        A.    Yes, yes, sir.

    11        Q.    Okay.  I see.  And have you --

    12        A.    Now, let me just finish, though.  We also

    13   have had clients, as cities such as Chicago and New

    14   York, where we help law enforcement.  We also have

    15   worked as expert consultants to the International

    16   Association of Chiefs of Police and were considered

    17   expert trainers, instructors for them.  We've done

    18   that on and off.  I was looking at numbers.  But

    19   overall, it's both law enforcement as well as

    20   litigation.

    21        Q.    Okay.  And has Crime Gun Solutions ever

    22   done work for any entity you would consider part of

145

1    the anti-gun lobby?

2        A.    What do you mean by the anti-gun lobby?

3        Q.    All right.

4              MR. THOMPSON:  Let's mark as Vince Exhibit

5    3 this document.

6              (Vince Deposition Exhibit 3 marked for

7    identification.)

8    BY MR. THOMPSON:

9        Q.    And sir, this is a deposition from a case

10   called Niles Gun Show versus, I apologize for

11   mispronouncing this, Cuyahoga County.

12       A.    Cuyahoga.

13       Q.    Cuyahoga County, and in the Northern

14   District of Ohio.  It looks like this deposition took

15   place in Frederick back in 2001.  And directing your

16   attention to page 91 of the document, which again

17   would be about a third of the way through.

18             MR. WORSECK:  It's 91 of the mini?

19             MR. THOMPSON:  Yes, 91 of the mini, that's

20   correct, yes.

21   BY MR. THOMPSON:

22       Q.    Are you there, sir?

Joseph J. Vince, Jr.                                    September 16, 2011
                         Washington, D.C.

146

1       A.    Yes.

2       Q.    About line 9, there is a question:

3             "Question:  You had no -- I take it you

4   had no particular conversations with Handgun Control,

5   Inc.?

6             "Answer:  No, sir.

7             "Question:  Or with any other -- we will

8   call them anti-gun lobby?

9             "Answer:  No, sir.

10            "Question:  When I use that phrase, what

11  would you include within that phrase?"

12            Then the lawyers say, "What phrase?"

13  "Anti-gun lobby."  "If you know."  And then you said:

14            "Answer:  I guess it would be anyone of

15  the ilk of handgun control."

16            Handgun Control, Inc. is the predecessor

17  to the Brady Center, is that right?

18      A.    I believe that's correct, sir, yes.

19      Q.    And would you still consider Handgun

20  Control, Inc. and of the Brady Center to be part of

21  the anti-gun lobby?

22      A.    Well, I say that, because I know that the

183

1    itself that -- first of all, what I teach is what I

2    would do in this.  You have your mission, your

3    objectives, your projects and your due dates,

4    because you need an overall plan.  That's the

5    beginning of any task like this.  Just to come up

6    with the right plan to do this is an enormous task

7    that would take probably over a year to do in itself

8    to do it adequately.

9         Q.    Is there -- if you were advising the city

10   and thinking about the sorts of issues that are

11   reflected in these five bullet points, is there a

12   model jurisdiction that you would turn to where you

13   would think this city is doing it well?

14        A.    No, that's something I have not looked

15   at.  I am familiar with some of the things that New

16   York does, but I really haven't looked at their

17   regulatory scheme on it, and I couldn't say, nor

18   could I say one glove fits all.

19            MR. THOMPSON:  What I would like to do, if

20   it's acceptable, is take about a five-minute break.

21   I have a short video I want to play and I think I'm

22   probably about a half an hour away from being

184

1   finished.

2               MR. WOODS:   Okay.

3               THE VIDEO OPERATOR:   We're going off the

4   record.   The time on the video is 2:20 p.m.

5               (Recess taken.)

6               THE VIDEO OPERATOR:   We're back on the

7   record.   The time on the video is 2:31 p.m.

8   BY MR. THOMPSON:

9       Q.    Now, Mr. Vince, do you recall having

10  worked on a project called Disarming the Criminal?

11      A.    Yes.  I think that's a term that we used

12  in some publication at ATF, but -- `

13      Q.    And I think it's in fact referenced in

14  your report that maybe in 1997 you did it as part of

15  something with the Kennedy School.

16      A.    If you're referring to what we

17  participated in at the time was what we participated

18  in was a competition, so to speak, of the various

19  ways of tracing guns and using a technology software

20  at the time called Project Lead.  And the Kennedy

21  school at Harvard and the Ford Foundation put this

22  on for government about best practices, and we were

185

1    finalists in that competition, so to speak.

2        Q.    Okay.  Now, I would like to play a little

3    clip that we found on YouTube, I think this is you.

4    I will read you what you say afterwards, so if you

5    want hear it, it's okay.

6              (Playing YouTube Video.)

7              MR. THOMPSON:  Maybe I can do it this way

8    to speed things along.

9    BY MR. THOMPSON:

10       Q.    Is that a picture of you on the screen?

11       A.    Yes, sir, that's myself and that is

12   Special Agent Dale Armstrong.            `

13       Q.    Okay.  This is from 1997.  I can read the

14   HTML link into the record, if that is useful.

15             MR. WOODS:  Okay.

16   BY MR. THOMPSON:

17       Q.    In any event, it can be found on the

18   innovations dot Harvard dot EDU.

19       A.    Yes, sir.

20       Q.    It was working in my office a moment ago.

21             MR. WOODS:  Is that the URL for that

22   particular web page?

186

1              MR. THOMPSON:  Then you get, sorry, slash

2    M media, underline, preview dot HTML, question mark,

3    ID equals 1722364.  If you type that in, you will get

4    this.  Hopefully yours will work.

5              MR. WOODS:  Okay.

6              (Playing YouTube Video.)

7    BY MR. THOMPSON:

8        Q.    Okay.  So you said there that, "Any city

9    can work with ATF.  And if they reduce the amount of

10   illegally trafficked guns in their community, they

11   will bring down violent crime."  Do you still agree

12   with that statement?

13       A.    That if you reduce the illegal amount of

14   firearms to criminals, you will bring down violent

15   crime, yes, I believe that, because as I said

16   earlier, that using any other weapon, the criminal

17   can't be as destructive to the community.

18             THE VIDEO OPERATOR:  Mr. Vince, your

19   microphone, please.

20             THE WITNESS:  I apologize.  Would you like

21   me to repeat that?

22             THE VIDEO OPERATOR:  No, I got it.

Joseph J. Vince, Jr.                                    September 16, 2011
                         Washington, D.C.

                                                                    187

1            THE WITNESS:  Excuse me.

2    BY MR. THOMPSON:

3        Q.    Mr. Vince, do you also agree with the fact

4    that what you said at the beginning of that quote,

5    where you said any city can work with the ATF?

6        A.    Well, let's play the whole video and see

7    what exactly I said, instead of taking it out of

8    context, and seeing exactly what I'm saying about

9    working with ATF.

10       Q.    You want to watch the whole ten minutes?

11   I have plenty of time, I don't have a flight.

12            I'm less concerned with what you said in

13   1997, in any event, than what you believe today.  So

14   let me ask you this.

15            Do you believe that any city can work with

16   ATF and be effective at reducing the number of guns

17   going to criminals?

18       A.    I believe in law enforcement partnerships

19   and I believe that reducing the accessibility of

20   firearms to criminals is key.  And so what we're

21   talking about here at the time is looking at where

22   firearms were originating from and having the

188

1    ability to cut that off.  So we're saying if you

2    trace those firearms and you work with ATF and if

3    you're able to reduce the amount of guns going to

4    the criminal, you will reduce violent crime.  Yes, I

5    believe that.

6        Q.    Now, I would like to ask you a few

7    questions, Mr. Vince, about your deposition in the

8    Niles Gun Show, and that's been marked as an Exhibit

9    2.

10       A.    3.

11       Q.    3.  Yes, sir, thank you.  I'm going to

12   have a couple of questions about pages 69 and 70, but

13   you may want to take as much time as you need and you

14   might want to start on page 68.

15       A.    Yes, sir.

16       Q.    Okay.  So you were asked some questions

17   whether you had an unblemished record at the ATF.

18   And at least on page 70, you said, "Right, very good

19   record."  Do you stand by that statement that you

20   have an unblemished record at the ATF?

21       A.    Sir, at the end --

22            MR. WOODS:  Objection, it mischaracterizes

Joseph J. Vince, Jr.                                    September 16, 2011
                          Washington, D.C.

                                                              196

     1              CERTIFICATE OF NOTARY PUBLIC

     2

     3        I, Melissa Gilcrest, a Notary Public of the

     4   District of Columbia, do hereby certify that the

     5   within-named witness personally appeared before me at

     6   the time and place herein set out, and after having

     7   been duly sworn by me, was examined by counsel.

     8        I further certify that the examination was

     9   recorded stenographically by me and this transcript

    10   is a true record of the proceedings.

    11        I further certify that I am not of counsel to

    12   any of the parties, nor related to any of the

    13   parties, nor in any way interested in the outcome of

    14   this action.

    15

    16                   _____

    17                   Melissa J. Gilcrest

    18                   Notary Public

    19                   District of Columbia

    20                   My commission expires: 10/14/2014

    21

    22

# EXHIBIT 45

| | Chicago Police Department | **Uniform and Property   U04-02** |
|---|---|---|
| | **DEPARTMENT APPROVED WEAPONS AND AMMUNITION** | |

| **ISSUE DATE:** | 23 July 2007 | **EFFECTIVE DATE:** | 24 July 2007 |
|---|---|---|---|
| **RESCINDS:** | G07-01 | | |
| **INDEX CATEGORY:** | Uniform and Personal Equipment | | |

## I.   PURPOSE

This directive:

A.   provides specifications relative to prescribed revolvers, semiautomatic pistols, and ammunition for sworn members.

B.   introduces the firearm transition process for Department members hired:

   1.   on or before 01 December 1991 who elect to transition from a revolver to a Department-approved semiautomatic pistol as their prescribed firearm, or elect to carry a Department approved semiautomatic pistol as an alternate / auxiliary firearm.

   2.   after 01 December 1991 who elect to transition from their Department approved double-action only semiautomatic pistol, to a Department approved striker-fired pistol, or elect to carry a striker-fired pistol as an alternate / auxiliary firearm.

C.   delineates Department approved firearms.

D.   introduces a newly approved firing system, the striker-fired system.

E.   discontinues the:

   1.   Chicago Police – Special Weapons Certificate (CPD-63.337).

   2.   Chicago Police – Approved Handgun Certificate (CPD-63.336).

F.   introduces the Firearms Training and Certification available through ICLEAR.

G.   discontinues the Loan Receipt (CPD-20.012).

H.   introduces the Firearm Loan Receipt (CPD-63.344).

I.   Continues the use of:

   1.   Certifying Statement-Firearms Form (CPD-11.702).

   2.   Firearms Purchase Authorization/Sworn Members (CPD-31.220).

   3.   Firearms Registration Application (CPD-31.562).

   4.   Affidavit of Employment (CPD-31.563).

   5.   Equipment Control Log-Special Equipment Vehicle (CPD-23.175).

## II.   POLICY

A.   Sworn members may only arm themselves with the firearms, ammunition, aerosol devices, and Taser devices as specifically approved by this directive.

B.   Any other weapon as described in 720 ILCS 5/24-1 or 720 ILCS 5/33A-1 is strictly prohibited.

C.   While sworn members are permitted to carry firearms during nonduty hours, they are instructed to refrain from doing so when there is a likelihood that they will be consuming alcoholic beverages or medications which may impair their physical and/or mental abilities. Nothing in this policy statement is to be construed as diminishing a sworn member's responsibility to take appropriate police action, which can be as little as summoning the police for help, when observing a crime in progress.

D.  A sworn member will not lend his firearm to any other person nor will a sworn member possess or carry a firearm registered to another person except as provided by a Department directive. During an emergency situation, however, a sworn member may lend his firearm to another sworn member or person who has been summoned to assist him in the performance of his official duty.

E.  The Department will provide training to ensure that weapons are safely handled and used in accordance with local, state, and federal laws and Department policy.

F.  Department members must qualify with all prescribed, alternate prescribed, or auxiliary weapons prior to carrying the weapon on or off duty. The Education and Training Division will maintain a record of all weapons a Department member is approved to carry.

G.  Department members will possess a valid Firearm Owner's Identification Card (FOID).

> **NOTE:**  Members will provide proof of a valid FOID card during the annual prescribed weapon qualification.

## III.  GENERAL INFORMATION

A.  The prescribed firearm for all sworn members hired on or before 01 December 1991 is a Department approved revolver or semiautomatic pistol. Department members hired on or before 01 December 1991 electing to carry an approved semiautomatic pistol as their prescribed firearm must first successfully complete the transition process.

B.  The prescribed firearm for all sworn members hired after 01 December 1991 is a Department approved semiautomatic pistol.

C.  Department members hired after 01 December 1991 may transition to a Department approved striker-fired semiautomatic pistol. A transition to a revolver as a prescribed firearm will not be permitted for members hired after 01 December 1991.

D.  Department members will not be required to transition to a new firing system in order to comply with this directive.

E.  Authorized Department members can access current approved Firearms Training and Certification of all members by logging onto the ICLEAR system.

## IV.  AUTHORIZATIONS AND RESTRICTIONS FOR WEAPONS AND EQUIPMENT

The following provisions apply only to weapons intended to be used in the performance of police-related duties:

A.  Revolvers will not be cocked nor fired single action.

B.  Uniformed sworn members will:

   1.  carry their prescribed firearm or alternate prescribed firearm in a Department-approved holster.

   2.  not carry more than two exposed firearms.

C.  When in citizen's dress, members will carry their firearms and extra ammunition in Department-approved holsters and ammunition carriers.

D.  The appropriate deputy superintendent or the Commander, Department Administration may authorize the use of additional weapons / ammunition by specialized units within the Department. This authorization will be in the form of a To-From-Subject report. Copies of the authorization will be maintained in each bureau with one copy forwarded to the Education and Training Division.

> **NOTE:**  **The To-From-Subject report will provide justification for the use of the additional weapons/ammunition and a recommended certification procedure to be administered by the Education and Training Division**.

**V.** **INTERSTATE TRANSPORT OF FIREARMS OR AMMUNITION**

    A.    A sworn member whose duty assignment involves the interstate transport of a person in custody or otherwise requires them to be armed while traveling outside of the State of Illinois will conform to federal, state, and local laws.

    B.    A sworn member will ascertain and comply with the regulations governing the possession and transportation of firearms/ammunition while using a public common carrier.

    C.    Off duty sworn members will comply with all jurisdictional regulations pertaining to possession and transportation of firearms and ammunition when traveling outside the State of Illinois.

**VI.** **INSPECTION**

    A.    District/Unit commanders will designate a location within the police facility for loading and unloading revolvers and semiautomatic pistols.

        1.    This location will be provided with a Firearm Safety Center.

        2.    The Firearm Safety Center is a free-standing device constructed of ballistic panels and a removable compartment lining. The device is manufactured in such a way as to contain a fired projectile in the event of an unintentional or negligent discharge.

    B.    Supervising sworn members will ensure that:

        1.    firearms carried on duty are regularly inspected for cleanliness and serviceability.

        2.    only Department-approved ammunition is used and in serviceable condition.

    C.    Manual inspection of a semiautomatic pistol can only be performed by a supervisor who has completed the Roll Call Pistol Procedure Class offered by the Education and Training Division.

    D.    Roll call weapon's inspection will be conducted each Wednesday.

**VII.** **REVOLVERS**

    A.    Prescribed Revolver

        When on duty, sworn members hired on or before 01 December 1991 who choose not to transition to a semiautomatic pistol will be equipped with a Department-approved revolver which conforms to the following specifications:

        1.    Approved Manufacturers

            a.    Colt

                Prohibited Models: Diamondback and Police Positive.

            b.    Smith & Wesson

                Prohibited Models: L frame .357 magnum models 581, 586, 681, and 686 which do not have an "M" stamped above the model number or a "2" or higher number stamped after the basic three-digit model number, e.g., 581-2.

            c.    Sturm Ruger

                Prohibited Models: Those with serial numbers prefixed by the number 150.

        2.    Design and Calibers

            a.    A sworn member whose date of appointment is on or before 1 July 1991 will utilize a service revolver chambered in .38 Special or .357 Magnum caliber with double- and single-action capability and a solid-frame, swing-out cylinder with six cartridge chambers, hammer safety device, and hammer spur.

            b.    A sworn member whose date of appointment is after 01 July 1991 will utilize a service revolver chambered in .357 Magnum caliber, with double- and single-action

capability and a solid-frame, swing-out cylinder with six cartridge chambers, hammer safety device, and a hammer spur.

    c.    The frame, barrel, and cylinder will be carbon or stainless steel.

3.    Barrel length will be four inches and conform to the manufacturer's original specifications.

4.    After the effective date of this directive, all revolvers acquired by Department members will have all exterior parts such as the frame, barrel, cylinder, hammer, and trigger of one finish. Refinishing the entire handgun or any component part (s) in either chrome or nickel plate is prohibited. Manufacturer-applied "Industrial Hard Chrome" and "Electroless Nickel" type factory finishes are approved. Weapons will not be altered beyond the manufacturer's original specifications including the surface finish.

5.    Sights may be either fixed or adjustable. Electrical and optical sights are prohibited.

6.    Handgrips will be constructed of wood, rubber, or synthetic material, and be brown or black in color or a combination thereof. They may be plain or checkered and, except for a manufacturer's name or trademark, will be without ornamentation. Handgrip adapters, if used, will be of white or black metal, or black hard rubber or synthetic material.

7.    No member will carry a service revolver with:

    a.    the hammer spur removed unless so designed by the manufacturer.

    b.    the frame, barrel, cylinder, internal/external parts, safety mechanisms, and surface finish altered beyond the manufacturer's specifications.

    c.    a detachable trigger shoe.

    d.    the surface engraved, etched, or inlaid with other than a personal alpha/numeric identifier unless approved by the Department.

8.    Sworn members will qualify with their prescribed revolvers in accordance with the Department directive which describes the Prescribed Weapon In-Service Training and Qualification Program.

B.    Alternate Prescribed Revolver

Sworn members assigned to citizen's dress and in administrative duty or who are off duty may carry an alternate prescribed revolver in lieu of the prescribed revolver. The revolver must meet the same specifications as a prescribed revolver, but may be:

1.    chambered in either .38 Special or .357 Magnum calibers.

2.    constructed with a:

    a.    frame and/or cylinder of an aluminum alloy.

    b.    frame, cylinder, and barrel of steel that has an empty weight of less than 21 ounces with standard factory handgrips.

    c.    double- and single-action or double-action-only capability.

    d.    spurless hammer, designed and produced by the manufacturer.

    e.    fully or partially shrouded hammer, designed and produced by the manufacturer.

    f.    cylinder with a loading capacity of either five or six cartridges.

    g.    barrel length less than four inches.

C.    Revolver Ammunition

1.    .38 Special caliber +P, 125 through 135 grain, jacketed hollow-point ammunition or .38 Special caliber +P, 158 grain lead, semi-wad cutter, hollow point ammunition will be used in the following revolvers:

    a.    Prescribed revolvers chambered either in .38 Special caliber or .357 Magnum caliber.

       b.     Alternate prescribed revolvers:

          (1)     chambered in .357 Magnum caliber.

          (2)     chambered in .38 Special caliber having an empty weight with standard factory handgrips of 21 ounces or more.

2.     .38 Special caliber, non +P, 125 through 135 grain, jacketed hollow-point ammunition or .38 Special caliber, non +P, 158 grain lead, semi-wad cutter, hollow-point ammunition will be used in alternate prescribed revolvers chambered in .38 Special caliber which have an empty weight with standard factory handgrips of less than 21 ounces.

**NOTE:**     A non +P cartridge can be identified by the absence of the "+P" symbol stamped on the cartridge head.

       a.     Exceptions to this empty weight requirement are any approved revolver wherein manufacturer's specifications state that the revolver is compatible with high pressure +P cartridges. In such cases +P ammunition may be used.

       b.     Approved revolvers wherein manufacturer's specifications require jacketed ammunition will use .38 Special caliber, 125 through 135 grain, jacketed ammunition.

3.     Prescribed and/or alternate prescribed revolvers will be fully loaded with only one style of approved ammunition (same bullet type and grain weight).

4.     Reloaded or altered ammunition is prohibited unless approved by the Department.

D.    Auxiliary Revolvers

The Department has approved the use of large-bore revolvers chambered in .41, .44, and .45 calibers as an auxiliary firearm in accordance with the following provisions:

1.     A sworn member must have registered his revolver with the City of Chicago prior to 23 July 1990.

2.     No member will carry a large-bore revolver on or off duty unless the member has qualified with it as required in this directive.

3.     Approved auxiliary revolvers will be carried in Department-approved holsters.

4.     Department members will be required to re-qualify annually.

5.     Sworn members are reminded that the Department-issued body armor is not warranted to stop .41 and .44 caliber revolver ammunition.

6.     No member will carry an auxiliary revolver which has had:

       a.     the hammer spur removed unless so designed by the manufacturer.

       b.     the frame, barrel, cylinder, internal and/or external parts, or safety mechanism altered from the manufacturer's original specifications.

       c.     a detachable trigger shoe.

       d.     the surface engraved, etched, or inlaid with other than a personal alpha/numeric identifier unless approved in writing by the Department.

E.    Auxiliary Revolver Ammunition

The following ammunition is approved for use in Department approved auxiliary revolvers:

1.     .41 Magnum caliber: Lead, semi-wad cutter bullet only, not exceeding 210 grains with a velocity of 1000 feet per second or less.

2.     .44 Special caliber: Silver tip, jacketed hollow point or lead hollow-point bullet, not exceeding 200 grains with a velocity of 1000 feet per second or less.

3. .45 Colt caliber: Silver tip, jacketed hollow point or lead, hollow- point bullet not exceeding 225 grains with a velocity of 1000 feet per second or less.

4. Jacketed hollow point bullet, 185 through 230 grains with a velocity of 1000 feet per second or less is approved for use in revolvers chambered for .45 auto caliber cartridges.

5. Cartridges will be commercially manufactured. Reloaded or altered ammunition is prohibited unless approved in writing by the Department.

F. Uniformed members and civilian dressed Department members assigned to field duties will carry a minimum of one additional fully loaded dump pouch or speed loader.

## VIII. SEMIAUTOMATIC PISTOLS

A. Approved semiautomatic pistol manufacturers

1. Beretta

2. Glock

3. Sig-Arms*

   **NOTE:** **Only those Sig-Arms Pistols that have the breach block modified to what Sig-Arms,Inc., refers to as the "Chicago Block."**

4. Smith & Wesson

5. Springfield Armory USA

6. Sturm Ruger

B. A listing of Department-approved models and ammunition for semiautomatic firearms by date of hire is provided in an addendum to his directive.

C. Semiautomatic pistols will be:

1. chambered in 9mm Luger (Parabellum), .40 caliber S&W, or .45 ACP caliber, and utilize a firing system that is either:

   a. **Double-Action Only (DAO)** – each pull of the trigger manually cocks and releases the hammer. At no time does the hammer remain in the cocked position; or

   b. **Striker-Fired System (SFS)** – a semiautomatic pistol employing a hammerless internal springloaded striker whereby each pull of the trigger will release the striker to fire a cartridge; or

   c. **Conventional Firing System (CFS)** – a semiautomatic pistol in which the first shot is in double-action mode and the hammer remains cocked in single action in all subsequent shots. Semiautomatic pistols with a conventional firing system will be equipped with an external decocking lever.

2. equipped with an automatic firing pin safety blocking device.

3. fully loaded with only one manufacturer and style of prescribed ammunition (same bullet type and grain weight).

4. carried with a cartridge in the firing chamber and the pistol's hammer will be completely decocked.

D. Compensated or ported semiautomatic handguns are not approved for use either on or off duty.

E.   A member approved to use a conventional firing system pistol may replace that pistol with another of the **same manufacturer, model, and caliber** if that pistol is lost, stolen, or damaged so beyond repair that the manufacturer recommends the pistol be replaced.

**NOTE:**   **Department members hired before 01 December 1991 who elect to carry an approved conventional firing system (CFS) semiautomatic pistol, whether on or off duty, may only do so if the weapon was registered by that Department member with the City of Chicago prior to 01 September 1992.**

F.   A Department member approved to use a striker-fired pistol will not alter the trigger pull from the standard factory trigger. Competition triggers of less than five pounds are prohibited.

G.   Semiautomatic pistols acquired by sworn members for duty use after the effective date of this directive will only be double action or striker fired.

H.   Sights may be fixed or adjustable.

I.   Handgrips will be constructed of wood, rubber, or synthetic material and be brown or black in color or a combination thereof. They may be plain or checkered and, except for a manufacturer's name or trademark, will be without ornamentation.

J.   Magazine(s) will be secured in a Department-approved magazine pouch. The magazine(s) will conform to the manufacturer's original specifications and will not extend beyond the base of the butt of the frame. A magazine with a finger extension floorplate that is a part of the original magazine is authorized.

K.   Uniformed sworn members and citizen's dress sworn members assigned to field duties will carry a minimum of one additional fully loaded magazine.

L.   No sworn member will carry an approved semiautomatic pistol that has:

1.   a detachable trigger shoe or added trigger shoe.

2.   been altered beyond manufacturers' original specifications including the surface finish. Only black, blue steel, nickel, chrome, satin, stainless steel, or a two tone combination of manufacturers' finish is allowed.

3.   a polymer frame with any finish other than black.

4.   a barrel length that has been altered from the original manufacturer's specifications.

5.   the surface engraved, etched, or inlaid with other than a personal alpha/numeric identifier unless approved by the Department.

M.   Semiautomatic pistols will be carried in Department-approved holsters.

N.   All uniformed sworn members assigned to field duty who carry a semiautomatic pistol will utilize a Department-approved firearm with a minimum barrel length of 3.5 inches.

O.   All citizen's dress Department members assigned to field duty who carry a semiautomatic pistol will utilize a Department-approved firearm with a minimum barrel length of 3.0 inches.

P.   Auxiliary Weapons - Restrictions

1.   A sworn member assigned to administrative duty or who is off duty is approved to carry/use an auxiliary semiautomatic pistol, as appropriate, in lieu of the prescribed semiautomatic pistol or alternate prescribed semiautomatic pistol, with the following provisions:

a.   The firearm will be registered with the City of Chicago.

b.   The sworn member will be required to successfully complete a familiarization, testing, and qualification course or a transition course as outlined in this directive. In addition, the member will be required to annually re-qualify with the auxiliary firearm.

c.   Auxiliary firearms will be carried in Department-approved holsters.

2.     When assigned to uniform or citizen's dress field duties, the auxiliary firearm **will not** be carried in lieu of the member's prescribed duty firearm.

> NOTE:     **All Department members assigned or working administrative duties who elect to carry an approved auxiliary firearm will have their approved duty firearm available in the event that they are required to perform field duties.**

## IX.     FIREARM TRANSITION PROCESS

A.     Department members hired on or before 01 December 1991 who elect to transition from their prescribed revolver to a striker-fired or DAO semiautomatic firearm that they have not previously qualified with will be required to successfully complete a three-day transition course offered by the Education and Training Division.

B.     Department members hired on or before 01 December 1991 who transition from their prescribed revolver to a DAO semiautomatic firearm and then elect to transition to a striker-fired firearm will be required to successfully complete a two-day transition course offered by the Education and Training Division.

C.     Department members hired on or before 01 December 1991 who elect to transition from their prescribed revolver to a CFS weapon that has been registered with the City of Chicago prior to 01 September 1992 or to a DAO semiautomatic firearm and hold a current approved handgun certificate will be required to successfully complete a three-hour transition course offered by the Education and Training Division.

D.     Department members hired on or before 01 December 1991 who elect to transition from their prescribed revolver to a CFS or DAO weapon that has been registered with the City of Chicago prior to 01 September 1992 **and** have previously qualified with the weapon but do not possess a **current** approved handgun certificate will be required to successfully complete a three-day transition course offered by the Education and Training Division.

> NOTE:     **Department members hired on or before 01 December 1991 who elect to transition from their prescribed revolver to a semiautomatic firearm as their prescribed weapon will not be allowed to revert to the revolver as their prescribed weapon once they complete the transition process. However, Department members will be approved to utilize their revolver as an alternate prescribed weapon or auxiliary weapon upon completion of existing training.**

E.     Department members hired after 01 December 1991 who elect to transition to a striker-fired pistol as their prescribed semiautomatic pistol will be required to successfully complete a two-day transition course offered by the Education and Training Division.

F.     Department members hired after the effective date of this directive who complete training and qualification with the striker-fired pistol and later elect to carry a Department-approved DAO semiautomatic pistol as their prescribed, alternate, or auxiliary weapon will not be required to attend the transition course. However, Department members who change manufacturers will be required to complete a three-hour training and qualification course.

G.     Department members hired after the effective date of this directive who complete training and qualification with a DAO semiautomatic firearm and later elect to carry a striker-fired firearm as their prescribed, alternate, or auxiliary weapon will be required to complete a two-day course offered by the Education and Training Division.

H.  Department members who elect to carry a DAO, striker-fire, or CFS semiautomatic pistol as an auxiliary or alternate weapon but do not elect to transition from their prescribed weapon must comply with all the requirements of the transition process and attend the appropriate training.

    **NOTE:**  **The Education and Training Division will notify Department members when the Firearm Transition Process is available. All transition courses will be available on a voluntary basis during off-duty hours.**

## X.  REPLACEMENT, TRANSFER, AND REGISTRATION OF FIREARMS; REPORTING OF LOST OR STOLEN FIREARMS/WEAPONS

A.  LEGISLATION

    1.  Chapter 430, Article 65 of the Illinois Compiled Statutes, known as the Firearm Owners Identification Card Act, states that no person may acquire or possess any firearm or firearm ammunition without having in his or her possession a current Firearm Owner's Identification Card (FOID).

    2.  Provisions of this article do not apply to law enforcement officials while engaged in their official duties.

    3.  However, based upon the language of the statute and case law, a law enforcement officer violates the Firearm Owner's Identification Card requirements if he or she is in possession of a firearm without a Firearm Owner's Identification Card while performing a task not related to his or her duties.

        **NOTE:**  For example, a law enforcement official who is shopping for personal groceries, regardless of duty status, is not engaged in the operation of his or her official duties, and therefore would violate the Firearm Owner's Identification Card requirements of Section 65/2 of The Firearms Owner's Identification Card Act.

B.  The Gun Control Act of 1968 (GCA), as amended by the Omnibus Consolidated Appropriations Act of 1997, makes it unlawful for any person convicted of a misdemeanor crime of domestic violence to ship, transport, possess, or receive firearms or ammunition. The GCA further prohibits persons from selling or otherwise disposing of a firearm or ammunition to any person known to have been convicted of a misdemeanor crime of domestic violence, or to anyone who they have reasonable cause to believe has been convicted of a misdemeanor crime of domestic violence. This prohibition does apply to all law enforcement officers.

C.  Prescribed Firearms/Temporary Replacement

    1.  Temporary replacement of a prescribed firearm may be obtained if:

        a.  the sworn member's prescribed firearm is lost, stolen, unserviceable, or has failed to pass inspection. With the approval of the unit/watch commander or the firearms range officer, the affected member may submit a request for a temporary replacement firearm and ammunition by submitting a To-From-Subject report approved by his or her unit commanding officer and all related documentation (such as case reports, gunsmith's repair receipts, purchase orders, etc.) to the Assistant Deputy Superintendent, Education and Training Division.

        b.  the sworn member's prescribed firearm is to be examined by the Forensic Services Section. The member may request a temporary replacement of a prescribed firearm, if necessary, by:

            (1)  generating a To-From-Subject report requesting the temporary replacement and obtaining the unit/watch commander's written approval.

            (2)  submitting the approved To-From-Subject report, along with copies of the Tactical Response Report (CPD-11.377) and the Property Inventory Report

(CPD-34.523) listing the member's prescribed firearm, to the Assistant Deputy Superintendent, Education and Training Division.

2.      A sworn member who has been issued a temporary replacement firearm will be responsible for the proper care, maintenance, and return of the firearm to the Education and Training Division. If a member must retain the replacement firearm for more than thirty days, the member will appear in person at the Education and Training Division with the loaned firearm and submit a To-From-Subject report with the unit/watch commander's approval explaining the need for an extension.

3.      The Firearm Loan Receipt (CPD-63.344) will be prepared when a replacement firearm is issued.

D.      Replacement Ammunition

1.      Each district is supplied 200 of the following Department-approved duty ammunition cartridges:

    a.      .38 Special +P,

    b.      9 mm,

    c.      .40 caliber S&W,

    d.      .45 caliber ACP.

        **NOTE:**        Each district will be supplied with 50 rounds of OO Buck Shotgun Ammunition.

2.      The watch commander is responsible for the security and issuance of this ammunition. Additional cartridges will be requested from the Equipment and Supply Section on a Material Requisition form (CP-GS-6).

3.      Any member, regardless of assignment, may obtain replacement ammunition for Department-issued cartridges that are lost, stolen, damaged, defective, or expended in the line of duty.

4.      Whenever the replacement of ammunition is necessary, the requesting member will submit a copy of a Tactical Response Report and/or other related documentation to the watch commander from the district of occurrence.

5.      The watch commander will note the number and type of ammunition issued, sign his or her name, and enter his or her rank on the reverse side of the report(s). The report(s) will be forwarded to the issuing district commander.

6.      Members will follow established material requisition procedures and submit copies of the Tactical Response Report and/or related documentation when requesting replacement of expended, damaged, lost, stolen, or defective Department ammunition.

E.      Purchase of Firearms from a Dealer

1.      A sworn member who elects to purchase a duty-related revolver, semiautomatic firearm, or high-capacity magazine and does not possess a valid FOID card, or who possesses a valid FOID card and requests a waiver of the required waiting period, will complete one copy of the Certifying Statement - Firearms form (CPD-11.702) and present it to the firearms dealer at the time of purchase.

        **NOTE:**        Gun dealers are not obligated to waive the waiting period for members who do not possess a valid FOID card.

2.      The Certifying Statement - Firearms form will be obtained from the member's unit of assignment.

3.      The Certifying Statement - Firearms form will be retained by the firearm dealer as verification of the exempt status of the sworn member.

F.   Sale or Transfer of Firearms Between Sworn Members

1.   Department members must comply with all city, state, and federal laws before they sell, give, lend, or dispose of a firearm or other deadly weapon.

2.   The sale and transfer of duty-related firearms from one sworn member to another sworn member does not require the buyer to possess an FOID card. However, an FOID card is required for the sale and transfer of all non-duty-related firearms.

3.   A member buying or receiving a firearm will obtain a Firearms Purchase Authorization / Sworn Member form (CPD-31.220) from the Police Field Services Section, Records Inquiry: Customer Services Section, or Gun Registration Program.

G.   Duty-Related Firearms

1.   The Firearms Purchase Authorization / Sworn Member form, prepared in triplicate, authorizes the transfer of duty-related firearms between sworn members without an FOID card.

2.   The seller will complete the Dealer/Seller Section of the Firearms Purchase Authorization / Sworn Member form. The seller will retain the original and the buyer will retain a copy of this form for their records for a period of ten years from the date of transfer (430 ILCS 65/3).

3.   The buyer will complete a Firearms Registration Application (CPD-31.562)

4.   The buyer will forward one copy of the Firearms Purchase Authorization / Sworn Member form and a completed Firearms Registration Application to the Gun Registration Program.

H.   Non-Duty-Related Firearms

1.   The original Firearms Purchase Authorization / Sworn Member form along with the member's valid FOID card will be presented to the seller. The seller will complete the Dealer/Seller Section of the form. The seller will retain the original and the buyer will retain a copy of the form for their records for a period of ten years from the date of transfer (430 ILCS 65/3).

2.   The buyer will forward one copy of the Firearms Purchase Authorization / Sworn Member form and a completed Firearms Registration Application with the required **registration fee** to the Gun Registration Program.

3.   Department members will not transfer a firearm and/or ammunition to a resident of the City of Chicago except in accordance with the provisions of Section 8-20-170 of the Municipal Code of Chicago. All state and federal laws will be abided by when transferring firearms. A member who transfers a firearm and/or ammunition will submit a To-From-Subject report to the commanding officer of the Gun Registration Program. Members will retain a copy of the report for their records. The To-From-Subject report will include:

a.   the name and address of the person to whom the firearm and/or ammunition was transferred.

b.   the date the transfer was made.

I.   City of Chicago Firearm Registration

1.   All firearms located in the City of Chicago must be registered and, if appropriate, re-registered in accordance with the provisions of Chapter 8-20 of the Municipal Code of Chicago. It is the responsibility of the person owning or possessing a firearm to comply with these provisions.

2.   Sworn members will re-register non-duty-related firearms annually at least sixty days prior to the expiration date indicated on the certificate. Peace officers are not required to annually re-register duty-related firearms.

3.   Sworn members registering only duty-related firearms are exempt from the registration fee.

J.   Firearm Registration and Re-registration Procedures

A Firearm Registration Application must be completed for each firearm to be registered and/or re-registered.

1.  Duty-Related Firearms Procedures

    a.  When registering duty-related firearms, members will comply with all of the instructions stated on the reverse side of the Firearm Registration Application. In addition, a member registering only a duty-related firearm(s) will:

        (1)  enter "CPD" and his or her unit number of assignment on the "A" and "B" portions of the application in the box entitled "Business Address."

        (2)  submit the completed Firearm Registration Application to the member's unit/watch commander.

        (3)  submit an Affidavit of Employment (CPD-31.563) with the Firearms Registration Application if the member is a probationary police officer.

        (4)  upon the return of the approved application from the unit/watch commander, forward the application via intradepartmental mail to the Gun Registration Program, Room 1043, Central Police Headquarters.

    b.  The unit/watch commander will review Firearm Registration Applications for duty-related firearms only to verify that:

        (1)  the named applicant is a sworn member of the Department.

        (2)  all instructions have been followed and that the necessary attachments have been submitted.

        (3)  the firearm listed on the application is a Department approved duty-related firearm.

        (4)  attest to the above facts by signing his or her name, star number, and unit of assignment in the appropriate space of the "C" portion of the application.

2.  Non-duty-Related Firearms Procedures

    a.  When registering or re-registering non-duty-related firearms, members will comply with all of the instructions stated on the reverse side of the Firearm Registration Application.

    b.  Members registering a non-duty-related firearm will submit the completed Firearm Registration Application, a copy of their current FOID card, and the registration fee directly to the Gun Registration Section. Intradepartmental mail may be used. **Do not separate the Firearms Registration Application(s).**

    c.  Certificates of Registration for non-duty-related firearms will be returned directly to the registering member.

K.  Reporting Requirements – Loss or Theft of Firearms / Weapons

1.  Responsibilities of Members Reporting the Loss or Theft of Firearms / Weapons

    a.  If the loss or theft of a firearm or weapon occurs within the City of Chicago, the member will promptly report the incident to the Department. The member preparing the case report will:

        (1)  complete the appropriate case report in accordance with existing Department procedures.

        (2)  ensure that an Administrative Message Facsimile Network (AMFN) message is sent and that the AMFN message number is included in the narrative portion of the case report.

        (3)  mark the "Extra Copies Required" box with the notation "one copy to Gun Registration."

      b.    If the incident occurs outside the corporate boundaries of the City of Chicago, the member will:

          (1)    promptly report the incident to the law enforcement agency having jurisdiction.

          (2)    immediately notify the Office of Emergency Management and Communications (OEMC) upon return to the City of Chicago. The OEMC will assign a beat officer who will prepare a General Offense Case Report (CPD-11.380) using Offense Code 5081 (Other Non-Criminal Service Concerning Property) as the primary classification. The beat of occurrence will be shown as 3100 for incidents occurring outside the corporate boundaries of the City of Chicago. The beat of occurrence will be shown as 4100 for incidents occurring outside of the State of Illinois. The narrative portion of the case report will include:

               (a)    an account of the incident.

               (b)    the manufacturer, model, and serial number of the firearm / weapon.

               (c)    the responsible agency's incident or case report number and the LEADS/NCIC number.

               (d)    the notation in the "Extra Copies Required" box, "one copy to Gun Registration."

  2.    Responsibilities of Supervisory / Command Members

      Whenever an incident involves a firearm or weapon owned by the Department or a firearm or weapon for which the Department is responsible, supervisory / command members will ensure that:

      a.    Operations Command is notified.

      b.    a copy of the case report and related documentation is forwarded to both the Assistant Superintendent, Operations and the Assistant Deputy Superintendent, Education and Training Division.

      c.    if the member is unable to report the loss or theft of firearms/weapons, the first on-duty supervisor having knowledge of the occurrence will assume the initial reporting responsibility.

## XI.    DEPARTMENT SPECIAL WEAPONS OR EQUIPMENT

  A.    The Assistant Superintendent, Operations, the Deputy Superintendent, Bureau of Patrol; and the Deputy Superintendent, Investigative Services, may authorize the deployment of Department special weapons for use by selected units within their respective bureaus.

  B.    Special weapons will only be issued to sworn members who are certified by the Education and Training Division or the Mobile Strike Force in the use special weapons. Sworn members may be issued only those special weapons for which they are certified.

  C.    Department special weapons include, but are not limited to:

      1.    rifles, carbines, shotguns, and submachine guns;

      2.    chemical agents, smoke dispensing devices and their launchers, and distraction devices.

  D.    Department special weapons do not include revolvers, semiautomatic firearms, personal aerosol chemical devices, Taser devices, or batons.

  E.    The Mobile Strike Force, Special Weapons And Tactics (SWAT) Unit, will field Special Operations Response Teams (SORT).

F.    Special Weapons Equipment Availability - Operational Guidelines

   1.   Department special weapons are approved for use subject to the provisions of this and related directives.

   2.   The ranking officer at the scene of an incident requiring the use of Department special weapons and/or equipment will notify OEMC, give a brief summary of the situation, and request the type, number of weapons, and/or equipment required.

   3.   If the circumstances of the incident are identified by the ranking officer at the scene as being a possible Hostage / Barricaded / Terrorist SWAT incident, the procedures of the directive governing SWAT incidents will be followed.

   4.   If a Bureau of Patrol supervisor determines a situation requires the timely deployment of specialized weapons, and it is not a SWAT incident, he will request through OEMC that the Special Operations Response SORT Team respond. SWAT personnel are also governed by the established protocols and procedures of the SWAT program.

   5.   The Office of Emergency Management and Communications will:

      a.   notify Operations Command and the watch commander of the district of occurrence whenever a request is received for the assignment of special weapons and/or equipment.

      b.   notify the nearest operating unit(s) whose members are approved to use the types of weapons and/or equipment requested and describe the circumstances leading to the request.

      c.   request emergency service from the Special Operations Response SWAT Team if needed.

G.    Special-Weapons-Equipped Personnel

The commanding officer or the watch commander of the responding unit will:

   1.   ensure that certified and appropriately armed personnel are properly assigned.

   2.   notify OEMC of the radio call identification numbers and the primary radio frequency of the assigned personnel.

      a.   Assigned SWAT personnel will immediately respond to the scene and report to the ranking officer.

      b.   SWAT personnel will be under the supervision of a Mobile Strike Force supervisor and will engage in preventative patrol when not otherwise assigned. They will also monitor the citywide 1 radio frequency and may respond to any radio assignment for service. They may also respond to any request by the OEMC or a Bureau of Patrol supervisor.

         NOTE:      **If SWAT team personnel are requested to respond to a SWAT incident while processing an arrest, they will notify the watch commander in the district of arrest and secure their prisoner(s). A Mobile Strike Force car will then be requested to respond and complete the arrest.**

c.  Whenever possible, the ranking officer on the scene will notify the Chicago Fire Department prior to the anticipated use of chemical agents or a smoke device. Notifications will normally be made via OEMC.

   **NOTE:**  OEMC will inform the Chicago Fire Department that the notification is being made for the purpose of fire prevention, chemical decontamination, and/or medical emergency preparedness. This notification will normally not be required when the chemical agents are used during training programs.

H.  Shotguns Authorization

1.  Authorization for a sworn member to arm himself with a Department-owned shotgun will be given by the watch commander or unit commanding officer.

2.  In an extreme emergency situation, a shotgun-certified sworn member may be issued a Department-owned shotgun from the Special Equipment Vehicle with the authorization from the field lieutenant or a higher ranking member in charge at the scene. When a Department shotgun is issued from the Special Equipment Vehicle (SWAT truck), the Equipment Control Log-Special Equipment Vehicle (CPD-23.175) procedures will be followed.

3.  Procedures

   a.  District/unit commanders will designate a location in the police facility for the loading and unloading of shotguns. This location will be provided with a weapon's clearing device.

   b.  Shotguns will be carried with the firing chamber empty and the safety in the "on" position. When a shotgun shell is chambered, the safety will remain in the "on" position until the use of the shotgun.

      **NOTE:**  **A shotgun shell will not be chambered when the officer is transporting a shotgun inside of a vehicle.**

   c.  When transporting a shotgun in a Department vehicle other than the Special Equipment Vehicle (SWAT truck), only those members who are certified in the use of special weapons and not operating the vehicle can retain physical control of the weapon.

   d.  Both the Department shotgun (with its action open) and its ammunition will be issued and returned to the supervisor in charge of weapons storage or his designee.

   e.  The officer who has been issued a shotgun will be responsible for its security and proper care.

   f.  The supervisor in charge of weapons storage will be informed whenever a shotgun is fired, damaged, or malfunctions. This notification does not relieve the responsible officer from following existing procedures relative to weapon discharge incidents.

   g.  When a Department shotgun is lost or stolen while issued to a member, the member's immediate supervisor will be responsible for:

      (1)  notifying the unit supervisor in charge of weapons storage.

      (2)  ensuring that all appropriate reports are submitted with one copy forwarded to the Department Armorer.

   h.  While at the scene of a SWAT incident, the SWAT Incident Coordinator is authorized to modify procedures established in this directive relating to the shotgun loading and unloading as well as those relating to the preparation, use, and distribution of certain Department forms.

    i.    SWAT/SORT members responding to a SWAT/SORT incident will operate under the direct supervision of a SWAT supervisor. The handling or use of shotguns or other weapons will be governed by the established protocols of the SWAT program.

I.    Shotgun Storage and Issuance

1.    Department-owned shotguns will be stored in the following locations:

    a.    Each police district.

    b.    Each Detective Division area center.

    c.    Narcotics and Gang Investigation Section.

    d.    Education and Training Division.

    e.    Government Security Detail.

    f.    Airport Law Enforcement Unit.

    g.    Special Weapons Vehicle (a truck that contains specialized SWAT equipment and weapons).

    h.    Special Operations Response Team (SORT) vehicle.

    i.    The Chicago Police Marine Unit Safety Station and in secure safes aboard certain Marine Vessels.

2.    Department-owned shotguns will be issued only to those members of the above listed units who are shotgun certified.

3.    District or unit commanding officers will be responsible for ensuring that shotguns are stored unloaded and locked in the racks provided.

4.    The supervisor in charge of weapons storage on each watch will ensure that:

    a.    all shotguns assigned to the unit are accounted for at the beginning and end of the tour of duty.

    b.    the appropriate number of shotgun shells are issued with each shotgun.

    c.    a reserve supply of ammunition is maintained.

    d.    each shotgun is checked by a shotgun-certified member before being stored to ensure that the shotgun is unloaded and in a serviceable condition.

    e.    all shotguns, ammunition, and related equipment are secured and locked when not in use and the keys are readily available.

    f.    a Personal Radio / Handcuff / Shotgun Log (CPD-21.919) is prepared to record the issuance and receipt of shotguns and ammunition. The weapon's serial number or attached numerical tag will be recorded and the receiving officer will sign the Personal Radio / Handcuff / Shotgun Log upon issuance and return of the shotgun.

    g.    the Personal Radio / Handcuff / Shotgun Log is forwarded to the unit secretary for filing in accordance with the existing records-retention requirements.

    h.    arrangements are made with the Department Armorer for the replacement of expended or damaged ammunition.

5.    Shotguns which malfunction or are damaged during use will be immediately taken out of service and brought to the attention of the unit commanding officer and the Department Armorer. Unit commanding officers will initiate an investigation into the cause of the malfunction or damage and take appropriate action.

6.    District/unit commanding officers of command staff rank will establish schedules which will ensure that shotguns are cleaned and oiled by a shotgun-certified member at least once each police period or whenever discharged. A supply of cleaning equipment will be provided and maintained at each designated unit.

J.    Department Arsenal

1.    Department weapons and ammunition will be stored in the Department Arsenal. Exception: A limited quantity of Department special weapons will be maintained at each designated unit.

2.    The Department Armorer will:

a.    inspect all shotguns at least once every 90 days.

b.    provide for the repair and maintenance of all Department-owned weapons with the exception of routine cleaning and oiling.

c.    provide replacement shotguns when available for unit shotguns that are stolen, lost, or under repair.

d.    train Department members who are certified in the use of special weapons to fulfill basic weapon maintenance requirements.

e.    supply the firearm ranges with necessary firearms/weapons, ammunition, targets, or other related supplies and equipment.

f.    conduct and file an annual Department-wide inventory and maintenance inspection report of all Department firearms / weapons, equipment, and ammunition. This report will be submitted to the command staff member of the General Support Division.

g.    perform other designated technical duties.

## XII.    PERSONAL OLEORESIN CAPSICUM (OC) DEVICES

A.    While in the performance of their duties, all sworn members will carry the prescribed personal OC device in an approved device holder.

B.    The personal OC device and device holder will conform to the specifications referenced in Department Uniform Specification No.9161.148.

C.    The prescribed personal OC device will use a **NONFLAMMABLE** propellant and contain a ten percent solution of oleoresin capsicum (pepper agent) only. The rating shall **not** exceed 500,000 Scoville Heat Units.

NOTE:        All personal OC devices are under pressure and should be used with extreme caution.

D.    Members are **NOT** approved to carry or use any type of personal OC device different from that which is prescribed.

E.    The deputy superintendent of each bureau and the commanding officer of command staff rank for each unit within the Office of the Superintendent will issue written directives which designate, by duty assignment, those members under their command who are not required to carry a personal OC device.

F.    Sworn members who are not required to carry a personal OC device will have it readily available during duty hours.

G.    This equipment is classified as the member's personal equipment, and each member is responsible for the care and maintenance of these items.

H.    A member who discharges a personal OC device will receive a replacement device from the watch commander. Should this item become lost, stolen, damaged, or expired, the individual member will be responsible for its replacement.

I.    A personal OC device is approved for use by sworn members:

1.    in all instances in which a Department member is confronted by an active resister or an assailant.

2. in the following limited instances in which a Department member is confronted by a passive resister, as defined by the Department directive entitled "**Use of Force Guidelines**":

   a. extraction of an occupant from a motor vehicle who is engaged in passively resisting arrest, **only after obtaining authorization from an on-scene supervisor of the rank of sergeant or above**.

   b. removal of unresponsive groups or crowds (e.g., demonstrators, sports championship celebrations, New Year's Eve,), **only after obtaining authorization from an on-scene supervisor of the rank of lieutenant or above**.

J. Caution should be exercised when discharging a personal OC device in enclosed areas or in the presence of infant children or elderly persons.

K. The chemical agent OC does not require any special decontamination procedure other than flushing with cool water and normal ventilation.

L. After using a personal OC device on an individual, the member will:

   1. if possible, relocate the individual(s)to an area of uncontaminated air and face the subject(s)into the wind.

   2. provide an opportunity for the subject(s)to eliminate the effects of the OC by flushing the affected areas with cool water. This should take place as soon as feasible, to the extent that the subject can be controlled without possible injury to himself or others.

      **NOTE:** Subjects wearing contact lenses should remove them, if possible, before flushing the eyes with water.

   3. advise the subject to refrain from rubbing the affected area(s) or using creams, ointments, commercial eye washes, or bandages.

M. If it is practical, avoid transporting an individual who is wet with OC. Transporting a subject when dry will minimize the possibility of the officer becoming contaminated.

N. Under normal circumstances all symptoms of exposure to OC should disappear within 30 to 45 minutes. If symptoms persist, the subject will be transported for medical attention in accordance with the Department directive entitled "**Processing Persons Under Department Control**."

O. Clothing which becomes contaminated with OC can be laundered in the usual manner without fear of contaminating other laundry.

P. Special equipment or a special washing process is not required to decontaminate an enclosed area. The opening of doors and windows will normally result in the removal of OC from the environment within 45 minutes.

Q. Sworn Member's Responsibilities

   A sworn member discharging a personal OC device will:

   1. immediately notify the member's supervisor, the Office of Emergency Management and Communications (OEMC), and the desk sergeant in the district of occurrence.

   2. prepare a Tactical Response Report as directed in the Department directive entitled "**Use of Force Guidelines**."

R. Watch Commander's Responsibilities

   The watch commander of the district of occurrence will:

   1. notify the Independent Police Review Authority when a personal OC device has been discharged.

2.  investigate the incident and document the investigation in the "Watch Commander / ADS Review" section of the Tactical Response Report. The watch commander will indicate that the findings of the investigation of the member's use of force revealed that the conduct conformed to Department policy and guidelines or that further investigation is required. If the watch commander determines that further investigation is required or that the member's conduct other than the use of force failed to conform to Department guidelines, the watch commander will initiate that investigation consistent with the Department directive entitled "**Complaint and Disciplinary Procedures**."

3.  attach the original of the Tactical Response Report to the case report and forward through normal channels.

4.  forward packets containing photocopies of the TRR and appropriate reports, as indicated on the TRR in the box entitled "Distribution."

5.  receive the discharged personal OC device from the sworn member, provide a replacement device to the member, and notify the individual designated by the district commander that a replacement device has been issued.

S.  District Commander's Responsibilities

The district commander of the district of occurrence will:

1.  ensure that an individual is designated to order replacement canisters from the Equipment and Supply Section, using the Material Requisition form (CPD-34.622).

2.  establish a secure area in the district for the storage of replacement canisters and ensure that the replacement canisters are available to the watch commander on each watch.

## XIII. TASER DEVICES

A.  General Information

1.  The Taser is a device used to control and subdue a subject through the application of electrical impulses that override the central nervous system and cause uncontrollable muscle contractions. Two darts attached by thin wires are fired from a cartridge attached to the handheld device. When both darts attach to the subject, a timed electrical impulse is applied to the subject at the control of the operator.

2.  The Taser contains a computerized function which retains data of all discharges of the device.

3.  Tasers will be carried, handled, tested, and deployed by members who have completed Department-conducted training on their safe handling and deployment.

4.  Taser re-qualification will be completed annually at the same time as the annual Prescribed Weapons Qualification Program.

5.  A "test" of a Taser device is any instance in which, **to check the proper functioning of the device's operation, the member** removes the cartridge from the device **and then depresses the trigger.** Tests should be limited to one second in duration and should be performed by a Taser trained Department member.

B.  Department-Issued Taser Devices

1.  Watch commanders:

a.  must ensure that all available Tasers are issued to sworn members who are trained to use the devices.

b.  will designate a member on their watch who will be responsible for the issuance and safe storage of Taser devices.

2.  The designated member at the beginning of each tour of duty will:

a.  account for all Tasers assigned to the unit.

b.     prepare a Personal Equipment Log (CPD-21.919) to record the issuance and receipt of the Taser and their component parts. This log will:

    (1)     be prepared by each watch.

    (2)     contain the serial number of each Taser and all cartridges distributed with each Taser in the "Misc" column.

    (3)     be forwarded to the unit secretary for retention in accordance with records-retention requirements.

        **NOTE:**     The retention period for the Personal Equipment Log (CPD-21.919) is four police periods.

c.     issue a Taser, holster, and at least two cartridges to each Department member who has completed the Department Taser training.

    **NOTE:**     Department members assigned to field duties that have been trained in the use of Taser devices will request the issuance of a Taser and will be required to carry the Taser. The Taser will be carried in an approved holster on the support side. If there is an insufficient supply of Tasers, they will be issued at the watch commander's discretion.

d.     store Tasers and their component parts in the designated location within the police facility.

e.     upon the return of a signed-out Taser, check the power level of the digital power magazine.

f.     ensure that any Taser which malfunctions or whose digital power magazine indicates a power level less than twenty percent is, along with its holster and digital power magazine, hand-carried on the 2nd watch to the Department Armorer, located at the Equipment and Supply Section, and exchanged for a replacement device and/or component parts.

g.     ensure that Department members requesting the issuance of a Taser:

    (1)     sign the Personal Equipment Log to indicate receipt of the equipment.

    (2)     upon return of the items, record the time of the return on that same log.

C.     **Data Reconciliation**

1.     District/unit commanding officers will ensure that a Taser deployment data report is downloaded for each Taser assigned to the unit at three-month intervals.

    **NOTE:**     If necessary, this report may be generated more often.

2.     The Taser deployment data sheet for each Taser device will be reconciled with the Taser file and relevant Personal Equipment Logs to ensure that every Taser deployment has been appropriately documented. Lack of documentation for any recorded use of a Taser will be investigated and appropriate actions taken.

3.     The computer chip contained within the Taser is capable of holding data for 2000 usages of the device. Once all 2000 lines are filled, documentation of new usages will be added at the end of the data list while data from a corresponding number of usages are deleted from the beginning of the data field.

4.     On a daily basis, the watch commander on the 1st watch will ensure that a Department Taser-trained member tests all Taser devices for one second at the beginning of the watch. No

further testing is recommended by Taser International. Testing more than one second a day may compromise the digital power magazine.

> **NOTE:** Commanding officers for units not operational on a 24-hour basis will designate a watch to perform the daily Taser test.

D. Taser Deployment

    1. Field deployment of a Taser is:

        a. any probe discharged, including accidental discharges;

        b. the use of the device by physical contact to stun a subject; or

        c. the use of a spark action during a use-of-force incident.

    2. Non-field deployment of a Taser is:

        a. any deployment used strictly for the purpose of Department-conducted training or annual qualification.

        b. any test of the device at a time other than the first watch test.

    3. A Taser device is approved for field deployment by sworn members when both of the following circumstances are present:

        a. A Department member is confronted by an offender classified as an assailant or active resister; and

        b. The Taser device operator can safely approach the subject to within the eighteen-foot effective range of the device.

    4. A request for a Department member equipped with a Taser device will be made via the requesting member's radio zone or citywide frequency.

E. Deploying Member's Responsibilities

    1. A member who is about to discharge a Taser device will, when possible:

        a. inform all other Department members on the scene of the imminent deployment of the device.

        b. give verbal commands to the subject prior to, during, and after deployment of the Taser.

        c. for back shots, aim for the subject's back below the neck area; for frontal shots, aim for lower center mass.

> **NOTE:** It is recommended that Department members deploy the Taser to the subject's back whenever possible.

        d. after deployment of the initial Taser five-second cycle, members will:

            (1) give the subject an opportunity to comply with his or her demands.

            (2) assess the situation and, if the subject is still not under control, consider the following options:

                (a) drive stun,

> **NOTE:** A drive stun is utilized when a Taser, with or without a cartridge attached, is held against the subject and energy is applied.

        (b)     give additional five-second cycles,

        (c)     reload and redeploy another cartridge, or

        (d)     use another use of force option.

> **NOTE:** It is advisable to minimize the stress to the subject as much as possible. Multiple five-second cycles, cycles continuing longer than five seconds, and discharges by multiple Tasers will increase stress on the subject.

2. A member who deploys or anticipates the deployment of a Taser will request that a supervisor respond to the scene.

> **NOTE:** For all field deployments of a Taser, the watch commander assigned to the district of occurrence will ensure that a supervisor at least one rank higher than the deploying member responds to the scene of the Taser deployment.

3. The member who field-deployed the Taser will:

   a. immediately, upon gaining control and restraining the subject:

      (1) request that OEMC assign emergency medical personnel when:

        (a)     the Taser probes were discharged and penetrated a subject's skin.

        (b)     an electrical current from the Taser was applied to the subject's body.

        (c)     the subject appears to be in any sort of physical distress.

      (2) notify OEMC.

      (3) notify their supervisor, the desk sergeant, the watch commander assigned to the district of occurrence, and Operations Command.

      (4) if emergency medical personnel determine that the subject requires treatment at a medical facility, follow procedures listed in the:

        (a)     directive entitled "**Field Arrest Procedures**" for secured transportation and processing of injured arrestees.

        (b)     Department directive entitled "**Assisting Chicago Fire Department Paramedics**" for non-arrestees.

> **NOTE:** Subjects will be transported to a medical facility via a Chicago Fire Department vehicle.

   b. prepare a Tactical Response Report (TRR).

F. Responding Supervisor's Responsibilities

Responding supervisors will:

1. ensure that the scene of the Taser deployment is protected and processed in accordance with the Department directive entitled "**Crime Scene Protection and Processing**," as necessary.

   a. If the Taser deployment occurred in a residence, an evidence technician will be requested to process the scene.

        b.    If the Taser deployment occurred in an area other than a residence, whether indoors or outdoors, determine if an evidence technician is required.

        c.    Request the assignment of an evidence technician to photograph the locations where the probes penetrated the subject's skin and/or any other injuries incurred as a result of the TASER deployment.

   2.    inventory all evidence from the scene of the Taser deployment consistent with the Department directive entitled "**Phase 2-eTrack System For Property Taken Into Custody**." The discharged probes and used cartridge(s) will be inventoried in the following manner:

        a.    the probes will be detached from the wires and inserted, pointed ends first, back into the cartridge.

        b.    the cartridge will be wrapped with tape to secure the probes inside the cartridge.

   3.    take control of the Taser device and deliver it to the watch commander.

   4.    request the watch commander and/or the appropriate area deputy chief, Bureau of Patrol / On-Call Incident Commander respond to all Taser deployments that result in serious injury or death. When the appropriate area deputy chief, Bureau of Patrol / On-Call Incident Commander responds to the scene of a Taser deployment, he or she will be responsible for completing the watch commander / area deputy chief, Bureau of Patrol / ADS review section of the TRR.

   5.    if a death has occurred, ensure the Mobile Crime Lab and Detective Division personnel are requested.

   6.    review the deploying member's TRR and sign it to indicate that the TRR has been completed properly.

G.    Watch Commander's Responsibilities

   1.    The watch commander assigned to the district of occurrence will ensure that IPRA is notified and a log number is obtained. During the hours when IPRA is not available, Operations Command will be notified to obtain a log number.

   2.    The watch commander will download the deployment data consistent with the equipment and software procedures and print a copy of the deployment information. In districts which do not have the necessary equipment to perform the download of deployment data, the watch commander will follow the alternate procedures outlined in Item XIII-G-4 of this directive.

        a.    When printing a Taser deployment data sheet, only the date range containing the actual deployment information need be printed. If the watch commander does not manually select the specific date range, all 2000 lines of possible deployment data will be printed.

        b.    The data sheet will be reviewed for time discrepancies. A full download of the device is required if a 254 or a 257 discharge is indicated or the clock is off by several hours, days, months, or years. For additional information, refer to the Department's eLearning website and search keywords "X26 Taser Download."

   3.    The watch commander will prepare the "Watch Commander/ADS Review" section of the TRR for those cases which do not require the presence of an area deputy chief, Bureau of Patrol / On-Call Incident Commander consistent with the directive entitled "**Incidents Requiring the Completion of a Tactical Response Report**," of the Department directive entitled "**Use of Force Guidelines**," and ensure that:

        a.    the Taser deployment data sheet and a copy of the TRR are attached to a copy of the original case report and forwarded to IPRA.

        b.    the expended cartridge is replaced from the district/unit supply. When needed, additional cartridges may be requested from the Equipment and Supply Section through normal requisition procedures.

4.   If the watch commander in the district of a Taser deployment is unable to download the Taser deployment data (required equipment is inoperable or not installed), he or she will:

  a.   designate a Department member, preferably a supervisor, to report to an adjacent district or Operations Command with the involved Taser device for the purpose of downloading and printing the Taser deployment data sheet. The designated Department member will:

    (1)   transport the involved Taser device as directed and ensure that the device is not tampered with during transport.

    (2)   turn over the Taser device to the appropriate personnel and await the return of the device once the appropriate personnel download the Taser deployment data.

    (3)   upon return of the Taser device and receipt of the deployment data, immediately transport the Taser device and data sheet to the investigating watch commander.

      **NOTE:**   If alternate locations are unable to download the Taser deployment data, the watch commander investigating the incident will ensure that 2nd watch personnel hand-carry the Taser device to the Department Armorer, who is located at the Equipment and Supply Section.

  b.   not approve the involved member's TRR until he or she has received and reviewed the Taser device deployment data sheet.

  c.   ensure a copy of the Taser deployment data sheet is included in the TRR packet and forwarded as indicated in box 79 of the TRR entitled "Distribution."

H.   Operations Command Responsibilities

  Upon receiving a Taser device, the assigned Operations Command personnel will:

  1.   take control of the Taser device.

  2.   download the Taser deployment data consistent with the established equipment and software procedures.

  3.   print out the Taser device data sheet and distribute the original and copies of the data sheet as follows:

    a.   the original data sheet to the member designated by the watch commander to transport the device to Operations Command.

    b.   one copy of the data sheet will be retained at Operations Command.

    c.   one copy of the data sheet will be sent by facsimile message to the investigating watch commander.

I.   Area Deputy Chief / On-Call Incident Commander Responsibilities

  In all cases in which a subject has been seriously injured or a death has occurred in conjunction with a Taser deployment, the appropriate area deputy chief, Bureau of Patrol / On-Call Incident Commander will:

  1.   proceed to the scene, assume command of the scene, and ensure that a complete and thorough investigation is conducted of the incident.

  2.   ensure that all tasks delineated for subordinate personnel have been or are being performed.

  3.   personally conduct an investigation into the circumstances surrounding the incident and make a preliminary determination as to whether the conduct of the member conformed to Department guidelines.

4.　　prepare the "Watch Commanders / ADS Review" section of the TRR and return the completed TRR to the watch commander conducting the investigation.

5.　　determine if a Round Table Panel Session will aid in the investigation.

J.　　Non-Field-Deployment Responsibilities

1.　　A member who uses a Taser in a non-field deployment will:

a.　　complete a Taser Non-Field Deployment Report (CPD-11.379).

b.　　submit the report to the on-duty watch commander in the district of occurrence. The report will be submitted prior to the end of the member's tour of duty.

2.　　Upon receipt of a Taser Non-Field Deployment Report, the watch commander will:

a.　　review the report for the appropriate test use of the device.

b.　　ensure that the report is filed in the Taser file specific to that device.

K.　　Arsenal Committee Responsibilities

The Arsenal Committee will, upon request, provide equipment-related or technical information to command personnel or a Bureau of Patrol watch commander having questions following an actual field deployment of a Taser device.

## XIV.　FIREARM SAFETY CENTER

A.　　The Firearm Safety Center is a free-standing unit constructed of ballistic material with a compartment containing a removable ballistic lining. The safety center is manufactured and designed to contain a fired projectile and prevent potential injury or "ricochet" in the event of an unintentional discharge.

B.　　The Firearm Safety Center will be utilized by only one member at a time:

1.　　to load and unload personal duty-related firearms and/or revolvers during the weekly inspection of weapons.

2.　　whenever it becomes necessary for a member to load or unload his or her personal duty weapon while in a police facility equipped with a Firearm Safety Center.

3.　　to unload any handgun taken into custody. If a member is unable to render the weapon safe, the member will follow the procedures outlined in the Department directive entitled "**Firearms Taken Into Custody Or Turned In**."

C.　　All district stations and any other police facility designated by the Deputy Superintendent, Bureau of Administrative Services, will be equipped with a Firearm Safety Center.

D.　　The Firearm Safety Center **will not** be used to load and unload Department shotguns. The shotgun safety-clearing device will continue to be used for that purpose.

E.　　District/unit commanding officers will identify a location within the police facility for the placement of the Firearm Safety Center. The location will be readily accessible to sworn members (e.g., roll call rooms).

F.　　Inspection of the Firearm Safety Center will be conducted at the beginning of each tour of duty by the watch commander or designee.

G.　　In the event of an unintentional discharge inside the Firearm Safety Center, the documentation procedures enumerated in the Department directive entitled "**Weapon Discharge Incidents Involving Sworn Members**" will be followed.

1.　　The member responsible for the discharge will complete a Tactical Response Report (TRR) (CPD-11.377).

2.　　The member's supervisor will review the TRR for legibility and completeness and indicate approval of such by signing in the appropriate box.

3. The "Watch Commander / ADS Review" section of the TRR will be completed in the following manner:

    a. If no person is injured or killed as a result of the unintentional discharge, the watch commander will complete this section. The watch commander will:

        (1) indicate that further investigation is required.

        (2) ensure that:

            (a) A Complaint Register (CR) initiation report is prepared.

            (b) The original of the TRR is attached to the initiation report and forwarded directly to the Independent Police Review Authority.

    b. If a person is injured or killed as a result of the unintentional discharge:

        (1) the appropriate area deputy chief, Bureau of Patrol / On-Call Incident Commander, will complete "Watch Commander / ADS Review" section, return the completed TRR to the watch commander conducting the preliminary investigation, and ensure that a CR initiation report is prepared.

        (2) the watch commander will ensure that the original of the TRR is attached to the original of the case report documenting the firearm discharge and forwarded through normal channels

H. Any damage to the Firearm Safety Center which is not firearm related will be reported in accordance with existing procedures.

I. Regardless of the type of damage to the Firearm Safety Center, the watch commander will:

    1. immediately take the Firearm Safety Center out of service.

    2. notify the Department Armorer.

J. The Department Armorer will:

    1. conduct a thorough inspection of the Firearm Safety Center.

    2. determine whether repair or replacement of any damaged part(s) is necessary.

K. Members will refrain from using a damaged Firearm Safety Center until repairs have been completed and written authorization from the Department Armorer to resume use of the Safety Center has been received by the district commander or unit commanding officer. If necessary, a member requiring the use of a Firearm Safety Center will utilize a Safety Center in a nearby district or unit.

## XV. ARSENAL COMMITTEE

A. The Arsenal Committee will be composed of the following members:

    1. Assistant Deputy Superintendent, Education and Training Division;

    2. Command staff member of the Research and Development Division;

    3. Department Armorer, Equipment and Supply Section;

    4. Firearms Technician, Forensic Services Section;

    5. Range Master, Education and Training Division;

    6. A sworn member, Police Equipment Evaluation Team, Research and Development Division;

    7. A sworn member from the Special Weapons and Tactics Team (SWAT).

B. The Assistant Deputy Superintendent, Education and Training Division, will serve as Chairman of the Arsenal Committee.

C. The command staff member of the Research and Development Division, will serve as Vice-Chairman.

D.   Committee members who determine there is a need for a meeting will communicate with the Chairman. Committee meetings will convene upon notification from the Chairman during normal business hours where practicable.

E.   A sworn member of the Police Equipment Evaluation Team, Research and Development Division, will attend all meetings, serve as secretary to the committee, and provide official liaison between the committee and retailers, manufacturers, and other suppliers of weapons and related equipment.

F.   Committee affairs will be conducted only when a quorum of the membership is present. A quorum will consist of at least four committee members of which one will be the Chairman or Vice-Chairman. Issues will be voted upon by all the committee members.

G.   The Arsenal Committee functions as a subcommittee of the Uniform and Personal Equipment Policy Committee. The Chairman, Arsenal Committee, will report all committee affairs directly to the Chairman, Uniform and Personal Equipment Policy Committee.

Responsibilities of the Arsenal Committee include:

1.   development of weapon specifications for the Department.

2.   conducting research and evaluating weapons and/or ammunition for possible use by Department members.

3.   making recommendations to the Chairman, Uniform and Personal Equipment Policy Committee, relative to the adoption or discontinuation of weapons and/or ammunition for use by Department members.

## XVI.   PRESCRIBED DUTY WEAPON LOCKING DEVICE

A.   The Department:

1.   requires sworn Department members to secure their **prescribed duty weapon** when the prescribed duty weapon is not on their person.

2.   strongly encourages sworn members to secure any/all other firearms which may be in their possession or under their control as mandated by Illinois Compiled Statute (ILCS) entitled "Firearms; Child Protection" (720 ILCS 5/24-9).

B.   Effective 1 January 2000, 720 ILCS 5/24-9 "Firearms; Child Protection" was enacted.

NOTE:   In essence, the statue states that a firearm must be secured when the likelihood exists that a minor under the age of 14 could gain unlawful access to the firearm. Department policy regarding the securing of a sworn member's prescribed duty weapon is more restrictive.

C.   Sworn Department members not carrying their prescribed duty weapon on their person and not having an alternate means to secure the prescribed duty weapon will place the Department-issued locking device on their prescribed duty weapon.

NOTE:   Sworn Department members may secure their prescribed duty weapon in a locked box/container or secured in another location that a reasonable person would believe will prohibit access to the prescribed duty weapon by unapproved individuals and meets the requirements of 720 ILCS 5/24-9.

D.    The Assistant Deputy Superintendent, Education and Training Division, will ensure that Department members receive annual instruction during the Prescribed Weapon In-Service Training and Qualification Program on proper procedures for securing their prescribed duty weapon.

Authenticated by:

Philip J. Cline
Superintendent of Police

06-183 KD/SRM

**GLOSSARY TERMS:**

1.    **HBT (Hostage Barricade Team) Incident Coordinator**

A specially trained sworn member who is responsible for the coordination of administrative matters involving the HBT Incident Program, who responds to the scene of an HBT incident and functions as an aide and advisor to the officer in charge.

2.    **Active Resister**

Includes subjects who secret themselves and fail to comply with sworn members' orders to reveal themselves.

3.    **Police Carbine Operator Program**

The overall program developed by the Department for the approval, procurement, training, security, issuance, use, and maintenance of Department-approved carbines.

4.    **Carbine Operator Course**

A voluntary five-day course members must initially pass to be qualified to participate in the Police Carbine Operator Program.

5.    **Carbine Operator Requalification Course**

A block of training required for members in the Police Carbine Operator Program. This course is taken subsequent to the Carbine Operator Course and must be completed to maintain qualification.

6.    **Carbine Familiarization Course**

A block of instruction relative to the safe handling, loading, and unloading of the carbine as well as placement and removal from gun racks and locks.

7.    **Personal Carbine Operator Zeroing Course**

A block of instruction required for police carbine operators who own personal carbines that must be zeroed before approval for duty use.

8. **Carbine**

A short-barreled, lightweight semiautomatic rifle.

9. **Police Carbine Operator**

A member trained by the Department to be armed with a carbine while assigned to routine field duties.

10. **Arm/Arming**

Removing a carbine from a Department vehicle and chambering a round.

11. **Deployment**

The act of issuing / placing a carbine into a Department vehicle gun lock for duty.

12. **Tactical Sling**

A device used to carry the rifle in a hung position in front of the body.

13. **Zero/Zeroed**

At a prescribed distance, the point of aim is aligned with the point of bullet impact.

14. **ChamberSafe®**

A high-visibility device, normally orange in color, used to readily identify, from a distance, that a rifle chamber is empty and safe.

15. **Personal Carbine**

A duty carbine purchased, registered, and owned by a member participating in the Police Operator Carbine Program.

16. **Optical Sighting System**

A device mounted or attached to a rifle that assists a shooter with quick target acquisition. An optical sighting system is **NOT a laser sight**.

17. **Clearing Procedure**

A procedure designed to ensure a firearm is in an unloaded and safe condition.

**ADDENDA:**

1.  U04-02-01  -  Department Approved Semiautomatic Pistols and Ammunition
2.  U04-02-02  -  Police Carbine Operator Program
3.  U04-02-03  -  Semiautomatic Pistol-Mounted Lights
4.  U04-02-04  -  Department Approved Auxiliary Subcompact Semiautomatic Pistols and Ammunition

# EXHIBIT 46

Chicago Police Department

**Uniform and Property   U04-02-04**

**DEPARTMENT APPROVED AUXILIARY SUBCOMPACT SEMIAUTOMATIC PISTOLS AND AMMUNITION**

| ISSUE DATE: | 16 April 2010 | EFFECTIVE DATE: | 16 April 2010 |
|---|---|---|---|
| RESCINDS: | G07-01-04 | | |
| INDEX CATEGORY: | Uniform and Personal Equipment | | |

## I.    PURPOSE

This directive:

A.    provides a listing of Department approved:

    1.    auxiliary subcompact semiautomatic pistols.

    2.    ammunition for auxiliary subcompact semiautomatic pistols.

B.    provides procedures and requirements for the use of auxiliary subcompact semiautomatic pistols.

C.    introduces Uniform and Equipment Specification No. 8.1515 entitled "Holster—Auxiliary Subcompact Semiautomatic Pistols."

## II.    POLICY

A.    The auxiliary subcompact semiautomatic pistols authorized by the Department for on- and off-duty use by Department members are approved regardless of date of hire or time of registration with the City.

B.    The auxiliary subcompact semiautomatic pistol will be registered with the City of Chicago.

C.    Sworn members are required to successfully complete a familiarization, testing, and qualification course as specified by the Assistant Deputy Superintendent, Education and Training Division. In addition, members will be required to annually re-qualify with the auxiliary subcompact semiautomatic pistol.

D.    Auxiliary subcompact semiautomatic pistols will be carried in Department-approved holsters consistent with Uniform and Equipment Specification No. 8.1515 entitled "Holster—Auxiliary Subcompact Semiautomatic Pistols."

E.    When assigned to field duties, auxiliary subcompact semiautomatic pistols may only be worn in addition to a Department member's prescribed or alternate prescribed weapon.

    **EXCEPTION:**    Members assigned to specialized units granted written authorization by the appropriate bureau deputy superintendent, consistent with the section titled "Authorizations and Restrictions for Weapons and Equipment" of the Department directive entitled "**Department Approved Weapons and Ammunition**."

F.    When assigned to non-field duties, auxiliary subcompact semiautomatic pistols may only be worn in addition to a Department member's prescribed, alternate prescribed, or auxiliary weapon.

G.    When off duty, the auxiliary subcompact semiautomatic pistol may be worn alone.

H.    Auxiliary subcompact semiautomatic pistols will not have any type of laser sighting device.

## III.    DEPARTMENT APPROVED AUXILIARY SUBCOMPACT SEMIAUTOMATIC PISTOLS

A.    Kahr Arms

    1.    P380

      2.     PM9

      3.     MK9

B.    Kel-Tec P-3AT

C.    Ruger LCP

## IV.    APPROVED AMMUNITION FOR AUXILIARY SUBCOMPACT SEMIAUTOMATIC PISTOLS

A.    The below listed cartridges are authorized for use in auxiliary subcompact semiautomatic pistols:

      1.     9mm Luger (Parabellum) Caliber, 115 through 147 grain jacketed hollow point bullet.

      2.     .380 Caliber ACP, 80 through 102 grain.

B.    Reloaded or altered ammunition is prohibited unless authorized by the Department.


Jody P. Weis
Superintendent of Police

10-022 JAB

# EXHIBIT 47



Chicago Police Department

**Uniform and Property   U04-01-02**

**PERSONAL APPEARANCE, UNIFORM / CITIZEN'S DRESS AND EQUIPMENT SPECIFICATIONS**

| ISSUE DATE: | 10 February 2012 | EFFECTIVE DATE: | 10 February 2012 |
|---|---|---|---|
| RESCINDS: | 30 September 2011 Version | | |
| INDEX CATEGORY: | Uniform and Personal Equipment | | |

I.  **PURPOSE**

This directive sets forth uniform / equipment specifications for sworn and civilian members, and uniform, equipment, personal appearance and dress requirements.

II.  **PERSONAL APPEARANCE**

A.  Posters depicting Chicago Police Department Haircut Standards for male and female personnel are located throughout the Department. These posters are offered as a guide for interpreting the provisions of this directive. Supervisory personnel conducting inspections will ensure compliance with these standards.

B.  On duty sworn and uniformed civilian members will be well-groomed and meet the following standards:

  1.  Head hair will be neatly trimmed, shaped and arranged and will not interfere with the external design of the uniform cap. Forehead hair (bangs), pony tails, braids, etc., will not protrude from under the uniform cap's headband. The uniform cap will fit firmly and comfortably around the largest part of the head.

  2.  A male member's neck hair will not extend below the top edge of the uniform shirt collar nor cover any part of the ear. A female member's neck hair will not extend below the bottom edge of the uniform shirt collar.

  3.  Sideburns or hair worn in front of the ears will be neatly trimmed; not extend below the lowest part of the ear; not be flared; be of even width; and end with a horizontal line.

  4.  Head hair will **not** be adorned with any type of ornamentation nor be styled, sculpted or carved in radical fashions such as mohawk, dreadlocks, punk, new wave, etc.

  5.  Hair color will be limited to colors that are natural to the human species or conservative artificial variations.

  6.  Hairpins or barrettes will not be conspicuous. Hat pins, exposed clips and any other type of ornamentation is prohibited.

  7.  A member's face will be clean shaven. Mustaches are permissible and will be neatly trimmed; not be excessively bushy, rolled or curled. A mustache will not extend below the upper lip or beyond the outer points of the mouth.

      **EXCEPTION:**  Upon written approval from the Medical Administrator, beards may be worn in accordance with procedures outlined in the Department directive entitled "**Skin Conditions Aggravated by Shaving**."

  8.  A wig or hairpiece will conform to the same standards as stipulated for natural hair. The wearing of a wig or hairpiece to disguise normal appearance is prohibited.

C.  Cosmetics will be applied conservatively. Exaggerated, radical or unusual cosmetic styles are prohibited.

D.      Fingernails will not extend beyond the finger tips and will be kept clean. Fingernail colors are limited to natural, clear or conservative artificial tones. Multicolored or ornamentally decorated fingernails are prohibited.

E.      Members may be allowed to deviate from the above standards with prior written authorization from their *exempt commanding* officer. The written authorization will be forwarded to the members unit of assignment and maintained in the members personnel file; a copy will also be provided to the *station supervisor/designated unit supervisor*.

## III.    UNIFORM AND EQUIPMENT SPECIFICATIONS

A.      Uniform and personal equipment items are assigned a specification number. Each specification references the technical requirements of uniform and equipment items authorized for use by Department members.

B.      The Uniform and Equipment Specifications should be consulted for detailed technical specifications and additional information regarding authorizations and restrictions on uniform and equipment items described in this directive.

C.      Each unit is provided with a copy of the Uniform and Equipment Specifications. The specifications will be made available for reference purposes to any member of the Department.

D.      Should there be any contradiction in specifications between the Uniform and Equipment Specifications and this directive, this directive will take precedence.

## IV.    SEASONAL UNIFORM REQUIREMENTS

A.      Department members will use and/or maintain uniform and equipment items prescribed for their rank or position.

1.      Winter uniform garments and equipment will be worn/used from **1 November through 30 April**.

2.      Spring/fall uniform garments and equipment will be worn/used from **1 May through 31 May** and **1 October through 31 October**.

3.      During the period of **1 June through 30 September**, the authorized outer garment is the short sleeve shirt with an open collar. However, uniformed members may choose to wear the long sleeve shirt, which will be buttoned at the collar and worn with a uniform neck tie. When the short sleeve shirt is worn in conjunction with a uniform blouse / coat / jacket, the shirt collar will be buttoned and a uniform necktie will be worn.

4.      The removable checkerboard cap band will be worn from **1 November through 30 April**.

B.      Weather Exceptions for Field Uniforms - Sworn and Uniformed Civilian Members.

1.      A long sleeve shirt and necktie may be worn as an outer garment when the temperature reaches **60 degrees or above**.

2.      A short sleeve shirt, open collar, may be worn as an outer garment when the temperature reaches **70 degrees or above**.

3.      The spring/fall jacket is authorized when the temperature reaches **50 degrees or above**.

4.      The winter jacket / coat is authorized when the temperature falls **below 50 degrees**.

5.      The v-neck pull-over style sweater with windstopper fabric, referenced in Uniform Specification number 9161.212, may be worn as a field uniform outer garment at the member's discretion at any time of the year, unless the assignment of the member is governed by a directive which specifies a required uniform.

## V.     DEPARTMENT HELMET REQUIREMENTS

A.      Sworn members are required to posses a helmet, face shield, and carrying bag and to have these items readily available at all times.

B.  Sworn members are responsible for the care and maintenance of the helmet, face shield, and carrying bag.

C.  If the helmet is lost, stolen, or damaged, the member will submit a copy of the appropriate case report and other applicable reports to their unit commanding officer.

D.  The helmet will be worn when:

1.  operating a motorcycle or Police All Purpose Vehicle (PAPV).

2.  directed by a Department bureau or division order.

3.  directed by a ranking officer during an emergency situation.

**NOTE:**  The helmet will be worn with all straps properly fastened.

E.  The member's star number will be affixed to the helmet immediately above and following the contour of the points of the star emblem. Star numbers can be requisitioned from the Equipment and Supply Section.

F.  Members assigned to bicycle patrol duties will wear the Department issued bicycle safety helmet when engaged in mobile patrol. The helmet will be worn with all straps properly fastened.

G.  Head covers worn under the helmet for warmth will be black or navy blue in color.

## VI.  SOFT BODY ARMOR

A.  The wearing of soft body armor, **both the front and rear panels**, by all sworn members while in the performance of field duties is **MANDATORY**.

1.  The Department will provide the first issue of soft body armor to all sworn members. This equipment is classified as the member's personal equipment.

2.  Individually, members are responsible for the care and maintenance of their personal soft body armor. Should this item become lost, stolen, damaged or worn beyond serviceability, the individual officer will be responsible for replacement.

3.  The *chief* of each bureau and the *exempt commanding officer* for each unit within the Office of the Superintendent will issue written directives which designate, by duty assignment, which members under their command are not required to wear soft body armor.

4.  Sworn members who are not required to wear soft body armor will have it readily available during duty hours.

B.  Authorized Soft Body Armor

1.  Sworn members are authorized to use soft body armor that meets or exceeds ballistic Protection Threat Level II as prescribed in the National Institute of Justice (NIJ) Standard 0101.03, or the most current standard. Soft body armor will contain a manufacturer's label attesting to NIJ certification.

2.  A sworn member will **not** wear soft body armor which has sustained the impact of a gunshot; or when the ballistic panel is ripped, torn, punctured, creased or otherwise damaged.

C.  Replacement of Soft Body Armor

1.  A sworn member whose soft body armor is unavoidably damaged in the performance of duty may seek the temporary loan of soft body armor by submitting directly to *Crime Prevention and Information Center (CPIC)* a To-From Subject report addressed to the First Deputy Superintendent and approved by the member's *station supervisor/designated unit supervisor*, along with copies of related documents.

2.  A member issued temporary replacement soft body armor will be responsible for the proper care, laundering, maintenance and return of the soft body armor to *CPIC*.

3.  Temporary issue Department soft body armor will be returned to *CPIC* **within 14 days** from the date of issue. If the member must retain the soft body armor for more than 14 days, a To-

From-Subject report addressed to the First Deputy Superintendent, approved by the member's *station supervisor/designated unit supervisor*, requesting an extension will be submitted directly to *CPIC*. This report will contain an explanation of the need for an extension.

4. With the approval of the Superintendent, the Department will arrange for the replacement of any body armor which saved the officer from serious injury or death, at no cost to the member.

## VII. SOFT BODY ARMOR COVER / CARRIER

A. The polyester / cotton ballistic panel cover will **not** be worn exposed.

B. Effective 18 October 2010, the Department authorizes use of the following soft body armor carriers:

1. **Cordura Nylon Overshirt Carrier -** a carrier that resembles a uniform shirt without sleeves or a collar. The uniform overshirt carrier will be black in color, made of cordura nylon, and may be worn as an outer garment when the shirt is authorized as an outer garment.

2. **MOLLE Overshirt Carrier –** a carrier that allows for the attachment of MOLLE compatible pouches. The MOLLE overshirt carrier will black in color, made from cordura nylon, and may be worn as an outer garment when the shirt is authorized as an outer garment.

   **NOTE:** MOLLE overshirt carriers will display the embroidered star, name tag, unit designation attached by hook and loop, and back "POLICE" patch as described in Uniform Specification No. **06-04-03**, will only be worn with approved ballistic nylon duty gear as described in Uniform Specification No. 2.0515D, and will only be worn with approved cargo trousers or cargo shorts.

3. **Business Attire Carrier -** a carrier that resembles a conventional vest which may be worn with a suit or sport coat. The business attire carrier will be of a color and fabric which is compatible with conservative business attire. This carrier is authorized for use by members authorized to wear conservative business attire as defined in this directive.

   **NOTE:** Any soft body armor carrier purchased and worn prior to the effective date listed in Item VII-B will remain approved for the lifetime of that carrier.

## VIII. HANDCUFFS/RESTRAINING DEVICES

A. In accordance with the Department directive entitled "**Restraining Arrestees**" and related directives, sworn members, while performing field duties, are required to carry and use approved handcuffs / disposable restraining devices.

B. Sworn members whose date of appointment is **after 1 December 1991**, are required to own and carry Department approved handcuffs.

C. Handcuffs / disposable restraining devices will be carried concealed or within a prescribed carrying case.

## IX. UNIFORM INSIGNIA AND SERVICE TENURE

A. Insignia Display

1. Department sworn members of the rank of sergeant and above will wear the appropriate insignia of rank on their uniform outer garments, consistent with Item IX-C of this directive.

2. Lieutenants and above:

   a. will always wear the miniature insignia on both collar points of the short and long sleeved uniform shirt and the full size insignia on both epaulets of all other outer uniform garments excluding overshirt vest carriers.

b.  may wear their insignia of rank using the embroidered option described in **Uniform Specification No. 06-04-03.**

> **NOTE:** The wearing of embroidered *star, name tag, unit designation attached by hook and loop, back "POLICE" patch, and rank insignia* is required if the member wears a fleece jacket.

B.  Insignia of rank are as follows:

1.  Superintendent of Police - 4 silver-colored stars.

2.  First Deputy Superintendent - 3 silver-colored stars.

3.  Chief - 2 silver-colored stars.

4.  Deputy Chief - 1 silver-colored star.

5.  Commander, Coordinator, and Director - 1 silver-colored oak leaf.

6.  Captain - 2 silver-colored bars.

7.  Lieutenant - 1 silver-colored bar.

8.  Inspector - Inspectors will wear the uniform of captain of police with no insignia of rank and the appropriate Chicago Police gold-colored star on their uniform outer garment.

9.  Sergeant - 3 chevrons.

C.  Insignia Placement

1.  Stars

a.  Full-size insignia - will be centered on the epaulet and spaced evenly between the epaulet button and the shoulder seam. The bottom two points of the stars are to be directed toward the front of the uniform. Insignia will be 1" in size and have a smooth finish.

b.  Miniature insignia - will be centered on a horizontal line between the top and bottom edges of the collar. The leading or forward edge will be 1/2" from the front edge of the collar. The upper point of the insignia will point toward the top edge of the collar. Insignia for single and double stars will be 5/8" in size and have a smooth finish.

2.  Oak Leaves

a.  Full-size insignia - will be centered on the epaulet, with the bottom edge of the stem spaced 1/2" from the shoulder seam. Insignia will be 1" in size and have a fully embossed finish.

b.  Miniature insignia - will be centered between the top and bottom edges of the collar. The bottom of the oak leaf stem will be directed toward the collar point. The leading edge of the insignia will be spaced 1/2" from the front edge of the collar. Insignia will be 3/4" in size and have a fully embossed finish.

3.  Bars

a.  Full-size insignia - will be centered on the epaulet, with the length of the bar(s) parallel to the shoulder seam. The longer edge of the bar(s) will be spaced 1/2" from the shoulder seam. Insignia will be 1" in size and have a smooth finish.

b.  Miniature insignia - will be centered between the top and bottom edges of the collar. The longer edge of the bar(s) will be spaced 1/2" from, and parallel to, the front edge of the collar. Insignia will be 3/4" in size and have a smooth finish.

4.    Chevrons

    a.    Three chevrons, as specified in the Uniform and Equipment Specifications Manual, will be worn on all uniform shirts and outer garments, with the exception of rainwear, by members of the rank of sergeant. Chevrons points will face up.

    b.    Shirt placement - chevrons will be centered and sewn on both uniform shirt sleeves, with the upper point of the chevron 4 3/4" down from the shoulder seams.

    c.    Outer garments - chevrons will be centered and sewn on both sleeves of all outer garments, with the exception of rainwear, with the upper point of the chevron 5" down from the shoulder seams.

5.    Patch Insignia

    a.    A Field Training Officer patch insignia, as specified in the Uniform and Equipment Specifications, will be worn by sworn members appointed to the position of Field Training Officer on all uniform shirts and uniform outer garments, with the exception of rainwear.

    b.    The insignia will be centered and sewn on each sleeve. The point of the top of the insignia will be positioned between 4 3/4" and 5 1/2" from the shoulder seam for insignia sewn on uniform shirts and 5 1/2" for all other uniform outer garments.

6.    Cross - Department chaplains will wear the uniform of lieutenant of police with no insignia of rank. Department chaplains will wear a silver-colored cross on each lapel of the uniform blouse and overcoat. A cross will be worn near the collar points on all other uniform outer garments including the uniform shirt. The appropriate Chicago gold-colored star will be worn on the uniform outer garment.

D.    Unit Assignment Designator

1.    Each member will be issued two unit assignment designators indicating the member's current assignment (i.e., district, bureau or office).

2.    The unit assignment designator will be positioned so that it will be clearly visible below the member's nameplate. The combined nameplate/unit designator will be worn on the uniform outer garment (except rainwear).

3.    A sworn member who is transferred to another unit will return Department issued unit designators to the unit secretary of the unit from which the member is being transferred. Unit designators will be issued by the unit secretary of the new unit of assignment.

4.    Lost unit assignment designators will be replaced at the member's expense. Additional unit assignment designators may be purchased from local uniform retailers.

5.    Unit commanding officers will maintain a sufficient supply of unit assignment designators. Unit assignment designators may be requisitioned from the Equipment and Supply Section via a Material Requisition form (CPD-34.622).

E.    Prescribed Stars and Civilian Badges

Sworn members and authorized civilian members will wear the prescribed star/badge as specified in the Uniform and Equipment Specifications. The prescribed star/civilian badge will be positioned on the left breast of the uniform outer garment.

F.    Uniform Cap Shield/Insignia

1.    Uniformed personnel will affix the prescribed cap shield/insignia to the front of the round crown cap.

2.    Sworn *exempt* personnel, captains and lieutenants will wear a 1/2" wide gold braid encircling the front half of the round crown cap. In addition, *exempt* personnel caps will have the top front of the visor embroidered with two arcs of oak leaves with acorns in gold thread.

3.    Sergeants will wear a gold cord encircling the front half of the round crown cap.

U04-01-02   Personal Appearance, Uniform / Citizen's Dress and Equipment Specifications            Current as of 30 March 2012:1315 hrs

© Chicago Police Department, February 2012                      Page 6 of 12

4. Members authorized to wear the utility cap will affix the prescribed shoulder patch or an embroidered replica of the prescribed shoulder patch, commensurate with the member's rank, to the front of the cap.

G. Shoulder Patches

1. Unless otherwise specified, the Chicago Police Department shoulder patch and the City of Chicago flag patch will be sewn on sworn members shirts and all other uniform outer garments (with the exception of rainwear).

2. Uniformed civilian members will wear the shoulder patch prescribed for their job title as outlined in the Uniform and Equipment Specifications.

H. Service Tenure Insignia

1. Service bars and stars will be positioned as outlined in the Uniform and Equipment Specifications.

2. Upon completion of the below listed period of service, uniformed members are required to wear service bar(s) and/or star(s) on uniform outer garments with the exception of shirts, rainwear, leather jackets, wool overcoats and the pull-over style sweater authorized as an outer garment.

   a. 5 years - 1 bar.

   b. 10 years - 2 bars.

   c. 15 years - 3 bars.

   d. 20 years - 1 gold star.

   e. 25 years - 1 gold star and 1 bar.

   f. 30 years - 1 gold star and 2 bars.

   g. 35 years - 1 gold star and 3 bars.

   h. 40 years - 2 gold stars.

## X. BDU AND RIOT CONTROL EQUIPMENT

A. *BDUs and/or riot control equipment will only be worn:*

   1. *by sworn Department members.*

   2. *upon authorization by the chief of the appropriate bureau.*

B. *No other items will be worn by any Chicago Police officer with the BDU and/or riot control equipment unless authorized by the chief of the appropriate bureau.*

C. *No approved optional items will be worn with the BDU or riot control equipment so that it covers or obscures the wearing officer's name or star number.*

D. *Upon authorization from an incident commander, officers assigned to the incident who are wearing the riot control equipment may wear a protective balaclava provided that the balaclava is:*

   1. *black in color, and*

   2. *worn in such a manner that the face is not covered.*

E. *any garment worn under the BDU uniform that is exposed to view will be:*

   1. *white or black in color if a t-shirt, or*

   2. *black in color if a turtleneck, and*

   3. *free or any wording, lettering, or ornamentation.*

F. *Riot control equipment offers no ballistic protection.*

**XI.  MISCELLANEOUS AUTHORIZATION/EXEMPTIONS AND PROHIBITIONS**

A.  While on duty, members will carry the identification card issued by the Department, and a valid Illinois Drivers License.

B.  When assigned to uniform duty, members will wear a complete uniform, including the appropriate cap. Clothing and equipment will be properly buttoned, fastened, or zippered when in public view.

C.  During the period of 01 May through 30 September, uniformed members may choose **not** to wear the appropriate cap while assigned to routine patrol duties. However, all members will ensure that their appropriate cap is readily accessible during their tours of duty in the event a supervisor directs them to wear the cap.

D.  During the period of 01 May through 30 September, wearing of the appropriate cap is **mandatory** when a member is:

1.  standing roll call inspection.

2.  assigned to a preplanned event or attending a formal occasion such as a parade, rally, wake, or funeral.

3.  exposed to inclement weather and the wearing of rainwear is appropriate.

4.  directed by a supervisor when circumstances are such that immediate police recognition is necessary for public or officer safety.

E.  When an outer garment is removed, the prescribed star/badge, nameplate / unit designator and appropriate insignia of rank will be worn on the uniform shirt. Body insulators and the quilted, nylon or cordura soft body armor carriers will not be worn as outer garments unless the member is engaged in a temporary indoor assignment.

F.  Turtleneck / mock turtleneck shirts, colored undershirts and shirts with printed messages / illustrations which may be seen through a uniform shirt are **prohibited**. Uniform shirts will be completely buttoned with the exception of the top collar button of the short sleeve shirt.

G.  When assigned to administrative duties inside a police facility, regardless of seasonal uniform requirements, uniformed members may wear the prescribed short sleeve shirt without a necktie.

H.  Members will **not**:

1.  wear the prescribed star/badge, photo identification card, cap shield / insignia or any identifiable uniform garment while **off duty** unless authorized by the Superintendent of Police.

2.  wear the uniform while on suspension.

3.  wear exposed suspenders while in uniform.

4.  wear shoes that are not authorized, or are unshined, dirty or worn beyond serviceability.

5.  wear a uniform cap from which the grommet has been removed or altered.

6.  turn up or roll sleeves of their uniform or citizen's dress shirt.

7.  wear an exposed holster which extends **more than 10"** below the trouser belt line.

8.  conceal or alter the star, badge, cap shield / insignia, or nameplate / unit designator while in uniform.

9.  hold smoking paraphernalia or other items (e.g., gum, toothpicks, confections, etc.) in the mouth, exposed to public view while on duty.

10.  have in their possession or use personal radios, televisions, amusement games / devices, tape recorders/CD players, or cameras while on duty, unless otherwise authorized by their unit commanding officer. Personal cellular phones or other electronic telecommunications devices will be worn on the **belt** or carried **concealed**.

11.  wear shoulder holsters exposed.

12.  wear iridescent, brightly colored, or non-conservative personal items (e.g., eyeglass/sunglass frames, pens, watches, etc.) while in uniform.

13.    carry exposed billfolds, personal keys, etc.

14.    wear or use a personal Bluetooth-type earpiece while interacting with any person in an official capacity or during any organized Department detail, such as parades, rallies, etc.

I.    Sworn members will have in their possession the following items while on duty:

1.    Prescribed firearm, fully loaded with Department authorized ammunition.

2.    Prescribed holster.

3.    Authorized amount of extra ammunition.

4.    Authorized ammunition pouch and/or magazine case / speedloader.

5.    Handcuffs / disposable restraining device, when required by duty assignment.

6.    Department photo identification card.

7.    Valid Illinois Drivers License.

8.    Prescribed Chicago Police Star.

9.    Watch or other timekeeping device.

10.    Ball point pen with black ink.

11.    Department authorized baton.

12.    Personal aerosol OC chemical device, when required by duty assignment.

13.    Soft body armor, when required by duty assignment.

> **NOTE:**    **Unless otherwise modified by Department, bureau or division directive, items 1, 2, 3, 4, 5 and 12 listed in Item XI-I will be concealed, but carried in an accessible manner, by sworn members who are authorized to wear citizens dress.**

14.    Traffic safety vest.

a.    All Department members will wear their traffic safety vest when assigned to direct traffic, when any other assignment puts the member within the flow of traffic, or when so directed by a supervisor.

> **NOTE:**    Traffic safety vests are not required to be worn when a member is conducting a vehicle stop.

b.    Traffic safety vests will be worn fully zipped.

J.    Uniformed members will **not** wear any of the following items at any time while on duty. Sworn members assigned to citizen's dress will **not** wear any of following items while on duty, unless authorized in writing by the member's *exempt commanding* officer:

1.    any visible facial or ear ornamentation / jewelry, pierced or otherwise.

2.    any visible neck chains, medals, medallions or necklace.

3.    any visible ankle or wrist bracelet. A bracelet containing medical information is permissible.

4.    more than three finger rings.

5.    any unauthorized insignia or pin.

K.    Tie bars or tie tacks will be plain, white and/or yellow metal. A tie bar's vertical dimension will **not** exceed 1/4"; horizontal dimension will **not** exceed the width of the tie; tie tacks will **not** be larger than 3/4" by 3/4". Tie tacks will be centered, tie bars will be centered and at a right angle to the tie.

L.    A single, metal or plastic miniature replica of the flag of the United States of America or the City of Chicago may be worn as a collar or pocket pin, lapel pin, tie tack/bar. A single military pin or tie tack/

bar device may be worn if a member has served in the military forces of the United States. When the device is worn as a tie tack or pin, it will not exceed 3/4" in diameter. When a flag or military service pin is worn, it will have a clasp, button, pin or post-type fastening assembly.

1. Documentation of military service tenure must be on file with the Human Resources Division before a member is authorized to wear a military service pin.

2. Authorized military service pins will depict one of the following:

   a. specific branch, unit, or military occupational specialty.

   b. specific military branch with honorable discharge.

   c. American legion, Veteran of Foreign Wars, or Amvet logos.

3. An authorized flag or military service pin can be worn only on the lower right corner of the left pocket flap whenever the uniform shirt is worn as the outer garment. When the uniform necktie is worn in conjunction with the uniform shirt, an authorized flag or military service pin may be worn on the necktie. When the uniform outer garment is other than the uniform shirt, a flag or military service pin may be worn on the lower corner of the left collar.

4. Flags may be displayed as either waving or fully extended and will not be larger than 3/4" by 3/4". When worn, a flag or military pin will be displayed in its conventional upright position.

M. **During the entire month of May (only),** all Department members may elect to display the National Law Enforcement Officers Memorial Fund Citation Bar or Lapel Pin, in accordance with the restrictions detailed below.

1. Sworn Uniformed Members / Uniformed Civilian Members

   All uniformed members may elect to display the National Law Enforcement Officers Memorial Fund Citation Bar, Department Uniform Specification Number 13.1523. The following restrictions apply

   a. Uniform Shirt:

      (1) On shirts with pocket flaps the citation bar will be positioned centered on the left flap, approximately inch below the finished flap seam.

      (2) On shirts without flaps the citation bar will be positioned centered above the patch pocket, approximately inch above the pocket top.

   b. Outer Garment:

      (1) On outer garments with a breast pocket the citation bar will be positioned centered on the upper left flap, approximately inch below the finished flap seam.

      (2) On outer garments without a breast pocket, with a single exterior flapped patch pocket the citation bar will be positioned centered on the left flap, approximately inch below the finished flap seam.

      NOTE: **The citation bar is prohibited from being displayed upon rain wear or the Commando style sweater,** or any other garment which would require piercing of the outer shell or inner liner.

2. Civilian and Sworn Citizens Dressed Members

   a. All Department members assigned to duties in citizens dress may elect to wear the National Law Enforcement Officers Memorial Fund Lapel Pin, Department Uniform Specification Number 13.1524.

  b. The following restrictions apply. A Department member may elect to wear **one** pin in any of the following manners:

    (1) collar pin,

    (2) pocket pin,

    (3) lapel pin,

    (4) or as a tie tack.

## XII. CITIZEN'S DRESS

 A. Dress Requirements - **Sworn Members**

  1. Sworn members who are authorized to wear citizen's dress will wear conservative "business" attire. Articles of clothing will be clean and well pressed, conservative in color and design and will include the following:

   a. Male Members

    Suit or sport coat with trousers, shirt, necktie, shoes and socks. When in a police facility and **not** in public view, the sport coat or suit coat may be removed.

   b. Female Members

    A dress; suit; or blazer-type jacket with blouse and/or sweater in combination with slacks or skirt, shoes and socks/hose.

    **NOTE:** **Denim fabrics, leisure, and exercise styled apparel are prohibited unless otherwise authorized in writing by an _exempt commanding_ officer. Sworn members assigned to field duties are prohibited from wearing sandals, or shoes with a heel height higher than 2 inches.**

  2. When required or as directed by supervisory personnel, the prescribed star and/or photo identification card will be worn on outer garments. When in a Department facility, the identification card will be worn such that the member is readily identified.

  3. _Exempt commanding officers_ may modify, in writing, the provisions of citizen's dress requirements whenever a member's duty assignment so requires.

 B. Dress Requirements - **Civilian Members**

  Civilian members will present a "business-like" appearance. Denim fabrics, leisure, and exercise styled apparel are prohibited **unless** otherwise authorized in writing by their _exempt commanding_ officer. Articles of clothing will be clean and well pressed, conservative in color and design. When in a Department facility, the photo identification card will be worn such that the member is readily identified.

## XIII. CHICAGO POLICE DEPARTMENT MEMORIAL BAR PIN

 A. Sworn and civilian Department members are authorized to purchase and wear The Chicago Police Department Memorial Bar Pin (Uniform Specification No. 13.1525). Proceeds from the purchase will benefit the Chicago Police Memorial Fund.

 B. Members are authorized to wear the pin whether in uniform or civilian dress.

 C. Department members displaying the bar pin will do so in accordance with the following:

  1. Uniform shirt:

   a. On left shirt pocket flap centered approximately 1/2" from the top of the finished pocket flap seam.

      b.    On shirts without pocket flaps, the bar pin will be positioned centered above the patch pocket, approximately 1/2" above the pocket top.

   2.   Outer garments:

      a.    On outer garments with flapped breast pockets: The bar pin will be positioned on the upper-left flap, approximately 1/2" below the finished flap seam.

      b.    On outer garments with set-in breast pockets: The bar pin will be positioned centered approximately 1/2" below the top of the pocket.

D.   The Chicago Police Memorial Bar Pin is prohibited from being displayed upon rainwear, the authorized sweater, or any other garment that would require piercing both the outer and inner liners.

E.   **During the month of May only**, all Department members may display the National Law Enforcement Officers Memorial Fund Citation Bar or Lapel Pin instead of the Chicago Police Department Memorial Bar Pin. The two pins will not be worn simultaneously.

(Items indicated by *italics/double underline* have been added or revised)

Authenticated by: RMJ

Garry F. McCarthy
Superintendent of Police

10-181 JAB

# EXHIBIT 48

Downloaded from injuryprevention.bmj.com on April 12, 2012 - Published by group.bmj.com

## ORIGINAL ARTICLE

# The US gun stock: results from the 2004 national firearms survey

## L Hepburn, M Miller, D Azrael, D Hemenway

Injury Prevention 2007;13:15–19. doi: 10.1136/ip.2006.013607

See end of article for
authors' affiliations
........................

Correspondence to:
Dr D Hemenway,
Department of Health Policy
and Management, Harvard
School of Public Health, 677
Huntington Avenue, Boston,
Massachusetts, USA;
hemenway@hsph.harvard.
edu

Accepted 4 October 2006
........................

**Objectives:** To examine the size and composition of the privately held firearm stock in the US; and to describe demographic patterns of firearm ownership and motivations for ownership.

**Design, setting and participants:** A nationally representative household telephone survey of 2770 adults aged ≥18 years living in the US, conducted in the spring of 2004.

**Main outcome measure:** Responses to questions regarding firearm ownership, the number and types of guns owned, and motivations for ownership.

**Results:** 38% of households and 26% of individuals reported owning at least one firearm. This corresponds to 42 million US households with firearms, and 57 million adult gun owners. 64% of gun owners or 16% of American adults reported owning at least one handgun. Long guns represent 60% of the privately held gun stock. Almost half (48%) of all individual gun owners reported owning ≥4 firearms. Men more often reported firearm ownership, with 45% stating that they personally owned at least one firearm, compared with 11% for women.

**Conclusions:** The US population continues to contain at least one firearm for every adult, and ownership is becoming increasingly concentrated. Long guns are the most prevalent type of gun in the US but handgun ownership is widespread. Ownership demographic patterns support findings of previous studies.

The General Social Survey, a biannual survey of the US civilian population, has tracked household and personal firearm ownership over the past two and a half decades.[1] This survey reports the percentage of households with firearms and personal firearm ownership for the nation as a whole and for the nine major census regions. Over the past 4 years, information from the General Social Survey has been supplemented by information on household gun ownership at the state level from the National Behavioral Risk Factor Surveillance System.[2] A clear pattern that has emerged over the past several decades from these surveys is a persistent decline in household gun ownership. Although these surveys describe the demographic patterns of gun ownership in the US, they provide almost no information about the characteristics of or changes in the nation's gun stock.

We conducted a nationally representative household telephone survey in 2004 to explore the characteristics of privately owned firearms in the US. The last study to examine detailed questions like these, such as the types and numbers of working firearms in private homes, was conducted in 1994 by Cook and Ludwig.[3] In their comprehensive report, they found that 35% of households and 25% of individuals owned firearms, and estimated that there were 192 million working firearms in the US in private hands. In addition to describing demographic characteristics of firearm owners, they were able to determine that the ownership of private firearms was highly concentrated among a small percentage of owners. They also clearly identified a difference in the number of household firearms reported by married men and women, who, in theory, should report similar rates of household firearm ownership. Their findings, however, that married men reported a rate of 49% household firearm ownership compared with 36% reported by married women suggested that women were either unaware of their spouse's firearm ownership or were reluctant to report it. These results led the authors to believe that more complete survey responses would come from individuals who personally owned a firearm rather than the household responses.

All of these findings helped identify patterns of private firearm ownership in the US and provided health professionals, researchers and policy makers with information about the private gun stock that was previously unknown. Through our survey, we wished to investigate possible changes in the privately owned gun stock between 1994 and 2004 and provide additional information about firearm ownership patterns in the US.

## METHODS

The institutional review board at the Harvard School of Public Health approved this study in 2004. The random-digit-dial telephone sample (conducted by the survey research firm Fact Finders, St Louis, Missouri, USA) comprised 2770 randomly selected adults aged ≥18 years living in the 50 states and including the District of Columbia. The number of interviews designated for each of the states was proportional to that state's population relative to the total population of the US as given by the 2000 census. The methods used in composing this sample assured that each household with a telephone had an equal probability of being selected for inclusion in the sampling frame. One adult from each household was randomly selected to participate.

Interviews were completed between 17 March and 28 June 2004. Once a telephone number had been randomly selected for inclusion in the survey sample, as many as 10 repeat phone calls were made until a final disposition was assigned. Of the 31 302 telephone numbers called, 13 117 (42%) were non-responses, 11 065 (35%) were not eligible and eligibility was unknown for 4338 (14%). In total, 41% of the numbers were not residential, not in service or were for households in states where the interview quota had been reached. In addition, 39% of interviews could not be completed because the maximum number of calls had been made without an eligible respondent answering the phone. Only 19% (5421) of the non-interviews were refusals. According to calculations based on formulas from the American Association for Public Opinion Research,[4]

Downloaded from injuryprevention.bmj.com on April 12, 2012 - Published by group.bmj.com

our minimum response rate was 14%, assuming that all unknowns were eligible and counting partial interviews as respondents; and our maximum response rate was 18%, assuming that all unknowns were ineligible.

Demographic characteristics including age, sex, education, marital status, race, presence of children in the home, whether the area was urban or rural, and household size of our sample were compared with those from the 2000 census.[5] Although the demographic characteristics of our sample seemed similar overall to that of the census, our respondents had slightly higher educational levels (92% $v$ total US 85% had at least a high-school diploma) and single-family households were fewer (19% $v$ total US 26%). Our sample also under-represented adult men aged 18–34 years. For that reason, post-stratification weightings were applied to the data to reflect the age and sex distribution of the US population. Adjustments for the like-lihood of selection on the basis of the number of adults in the household were also included in the weightings.

Our study included 40 active duty military personnel, who represented 1.4% of the total study population. Eleven reported owning firearms; however, only one reported owning the firearm primarily for work. We therefore chose to keep all of the respondents in the sample.

Respondents were asked several questions regarding firearm ownership and use. In particular, they were asked, ''Do you or anyone you live with currently have any guns in your home or motor vehicles? Not including toys, models, air guns or starter pistols.'' If the response was affirmative, the respondent was then asked, ''In total, how many guns do you and anyone you live with currently have in your home or motor vehicle?'' All respondents who replied that there were guns in their house-hold were asked how many of each type of firearm was in their home (ie, revolvers, shotguns) and if they were in working order. To determine the proportion of adults who personally owned firearms, we asked those respondents who had replied that there were guns in their home, ''Do any guns in your home belong to you personally?''

### Statistical analyses

Descriptive and bivariate analyses were used to explore the relationships between firearm ownership, demographics, con-centration and motivations for ownership. As previously mentioned, research suggests that individuals who personally own firearms report firearm ownership more accurately than non-owners who live in households with firearms.[6–8] All of our reported analyses are therefore based on responses from individual gun owners rather than respondents living in households with guns, unless specifically noted that the calculation was performed using household responses.

To produce national estimates of the number of firearms in the US, we used population figures from the US census[9] to determine the number of adults aged ≥18 years and the number of households in the US. We then calculated the percentage of respondents in our survey who reported personally owning a firearm. This number was applied to the US population to create national estimates of the number of adults who owned firearms. To estimate the number of firearms in private hands, we multiplied the number of firearm owners by the average number of firearms reported by respondents in our survey. As firearm ownership is not normally distributed and our survey included some extreme outliers in terms of the number of firearms owned, we performed calculations exclud-ing the outliers. As a sensitivity analysis, similar calculations were performed using household reports of firearm ownership. We also conducted comparative analyses among men and women, and among respondents who lived alone and those living in multi-person households.

## RESULTS

Firearm owners reported that 60% of the firearms owned in the US in 2004 were long guns, primarily rifles and shotguns (fig 1); the remaining 40% were handguns. Among all firearms, rifles were the most common, representing 33% of the gun stock. Revolvers were the most common type of handgun. A small percentage of respondents (5%) reported owning other hand-guns, including derringers and antique handguns. Other long guns, which include muzzle loaders and antique long guns, represented 6%.

According to our survey, 38% of households reported at least one firearm in the home and 26% of adults reported owning at least one gun. This corresponds to 42 million households with firearms and 57 million adult gun owners. We found that 64% of gun owners or 16% of adults reported owning at least one handgun; 80% of gun owners or 20% of all adults owned a long gun (results not shown).

### Ownership demographics

Firearm ownership was more prevalent among middle-aged and older adults than among young adults aged 18–24 years (table 1). Ownership of any firearm was more common among men, those who were married or living with a partner, and respondents living in rural areas or the South. Ownership was strongly associated with whether the respondent grew up with guns in the home. Among gun-owning households in our survey, 46% had ≥1 adult gun owner.

### Reasons for ownership

When respondents were asked, ''What is the one most important reason that you own a handgun/long gun?'' the most common response among those who owned a handgun was for self-defense (46%), followed by sport shooting (hunting or target shooting) or collecting (25%). Owners of long guns overwhelmingly reported sport shooting as the ''most impor-tant'' reason to own a long gun (77%; data not shown).

### Concentration of ownership

Almost half (48%) of all individual gun owners, corresponding to 13% of the US adult population, reported owning ≥4 firearms. Household ownership followed a similar pattern, with 41% of firearm-owning households reporting ownership of ≥4 firearms (table 2). The 20% of gun owners who owned the most guns possessed about 65% of the nation's guns.



**Figure 1** Types of firearms owned in the US.

Downloaded from injuryprevention.bmj.com on April 12, 2012 - Published by group.bmj.com

**Table 1** Demographic characteristics of firearm owners

| | n | Owns any firearm, n=726 (%) | Owns both handguns and long guns, n=322 (%) | Owns handguns only, n=127 (%) | Owns long guns only, n=215 (%) |
|---|---|---|---|---|---|
| Total | 2770 | 26 | 12 | 5 | 8 |
| Age (years) | | | | | |
| <25 | 216 | 16 | 6 | 3 | 7 |
| 25–44 | 903 | 26 | 11 | 5 | 8 |
| 45–64 | 1058 | 30 | 15 | 5 | 8 |
| ≥65 | 545 | 27 | 12 | 5 | 7 |
| Sex | | | | | |
| Male | 1363 | 42 | 20 | 5 | 13 |
| Female | 1407 | 11 | 3 | 4 | 3 |
| Race | | | | | |
| White | 2178 | 30 | 14 | 4 | 9 |
| Non-white | 592 | 15 | 5 | 5 | 3 |
| Marital status | | | | | |
| Single | 953 | 18 | 7 | 4 | 6 |
| Married or living with partner | 1786 | 30 | 14 | 5 | 8 |
| Community | | | | | |
| Urban | 687 | 18 | 8 | 5 | 5 |
| Suburban | 1161 | 23 | 10 | 5 | 7 |
| Rural | 872 | 37 | 18 | 4 | 11 |
| Education | | | | | |
| High school or less | 920 | 26 | 10 | 3 | 10 |
| Some college/associated degree | 930 | 29 | 12 | 6 | 8 |
| Bachelors or higher | 904 | 23 | 12 | 4 | 5 |
| Annual income | | | | | |
| <US$40000 | 1120 | 21 | 8 | 4 | 8 |
| >US$40000 | 1282 | 30 | 15 | 6 | 8 |
| Military service | | | | | |
| Veteran | 404 | 53 | 27 | 8 | 12 |
| Current military | 40 | 31 | 14 | 4 | 8 |
| No | 2316 | 22 | 9 | 4 | 7 |
| Political views | | | | | |
| Liberal | 594 | 16 | 7 | 4 | 4 |
| Moderate | 861 | 26 | 11 | 5 | 9 |
| Conservative | 1019 | 32 | 16 | 6 | 8 |
| Region | | | | | |
| Northeast | 530 | 17 | 7 | 2 | 7 |
| Midwest | 635 | 27 | 12 | 3 | 10 |
| South | 986 | 32 | 14 | 7 | 8 |
| West | 619 | 24 | 10 | 5 | 6 |
| Child aged <18 years | | | | | |
| Yes | 1016 | 27 | 12 | 4 | 9 |
| No | 1749 | 26 | 12 | 5 | 7 |
| Parents had a gun at home | | | | | |
| Yes | 1647 | 40 | 18 | 6 | 12 |
| No | 1103 | 7 | 3 | 2 | 2 |

## Number of guns

The actual number of guns reported in our survey varied depending on how the question was asked and who answered the question. Individual firearm owners (n = 702) reported owning an average of 6.6 (95% confidence interval (CI) 5.2 to 7.9, median 3) working firearms. On further examination, it seemed that individuals who owned ≥4 firearms (with an average of 12 firearms per person) were greatly affecting the mean. When outliers representing the top 3% of gun owners (those owning >25 guns) were removed, the average number of working firearms per owner was 5.0 (95% CI 4.6 to 5.4). On the basis of estimates of 26% of adults in the US owning at least one firearm, we estimated that 57 million adults owned 283 million firearms (95% CI 260 to 305 million).

Estimates based on the number of household firearms were lower. We estimated that 42 million households in the US possessed at least one firearm in 2004, with an average of 5.2 (95% CI 4.9 to 5.6) guns per household, with outliers of >25 guns removed. The number of privately owned firearms in the US based on these estimates would be 218 million (95% CI 206 to 235 million).

## Reporting differences

Overall, men and women reported different rates of household firearm ownership. Among married respondents who lived in two-adult households, married men reported a household firearm ownership rate of 54% and an average of 8 firearms per household compared with a 40% ownership rate and an average of 4.6 guns as reported by married women (table 3).

## DISCUSSION

In general, our survey results are consistent with previous reports of firearm ownership demographics.[1 3 10] Firearms are most likely to be owned by white men who live in a rural areas, those who are middle-aged or older, with a middle to higher income, who grew up with guns in the home and who live in the southern or mid-western regions of the country. Long guns continue to be the most prevalent type of gun in the US. Our survey, however, reports a slightly higher percentage of firearms that are handguns than that reported in 1994[3] (40% v 34%). This shift to a greater proportion of handguns may be reflective of the decline in hunting and indicate a change in motivations and use of firearm ownership.[10] Similar to previous

Downloaded from injuryprevention.bmj.com on April 12, 2012 - Published by group.bmj.com

**Table 2** Distribution of firearm ownership in the US population

| Firearms owned | Percentage of US population | |
| --- | --- | --- |
| | Individuals* | Households* |
| 1 | 6 | 8 |
| 2 | 4 | 6 |
| 3 | 3 | 4 |
| ≥4 | 13 | 16 |
| Any firearm | 26† | 39† |

*Calculations based on the number of individuals who reported an actual number of firearms; 5% of households that reported owning a firearm did not report the number of firearms present in their home.
†These numbers are calculated using the affirmative response to owning a firearm.

**Table 3** Rates of household firearm ownership, median and average number of guns per household for men and women

| | Ownership rate | Average number of guns | Median |
| --- | --- | --- | --- |
| Men | 49 | 7.9 | 5 |
| Women | 30 | 4.1 | 3 |
| Married men | 54 | 8.0 | 4 |
| Married women | 40 | 4.6 | 3 |
| Men who live alone | 39 | 6.8 | 3 |
| Women who live alone | 12 | 2.5 | 2 |

surveys,[3][10] handgun owners were most likely to report owning their handguns for self-protection, whereas owners of long guns reported owning their guns for sporting purposes. Individuals who own only handguns are just as likely to live in an urban environment as a rural one and are demographically more diverse compared with owners of only long guns who are more likely to be men and live in a rural area.

Our findings diverge from those of previous studies on firearm ownership regarding the increase in the average number of guns per gun owner. Although the rate of individual (26%) and household (38%) ownership is similar to that in other recent surveys,[1–3][11] the number of guns reported per person is higher. When including outliers, gun owners reported an average of 6.9 guns per owner compared with 4.1 reported in 1994 (J Ludwig, personal communication, 12 January 2005). The higher average number of guns in our survey is attributable to the higher number of guns owned by those who owned ≥4 guns, as the percentage of gun owners in each category of gun ownership (those owning 1–3 or ≥4 guns) has stayed almost the same.

Cook and Ludwig[3] reported an estimate of 192 million working firearms in circulation in 1994. Although the population increased 11% between 1994 and 2004, population growth alone does not explain the differences in the number of guns reported. A recent report by the National Research Council, using national data on firearms manufactured, imported and exported, estimated that 258 million firearms were available in the US as of 1999.[12] This estimate does not account for firearm loss, breakage or those destroyed. When we calculated the number of guns in the same manner as in the National Research Council report, adding all available years, we calculated that about 275 million guns were manufactured or imported for private sale in the US by the end of 2003. As the US does not require firearms to be registered (although some individual states do), it is impossible to determine the exact number of privately owned firearms in this country.

Our estimates of 283 million firearms in the US may be higher than those that Cook and Ludwig established in 1994, even with the population growth kept in context, for many possible reasons. Our sample may have, by chance, captured more affluent firearm owners who own many guns. We adjusted for age and sex, but were unable to adjust for income because our income-related questions were not comparable with a standard such as the US census. Alternatively, respondents may have overestimated the number of guns they owned. Given that we are extrapolating from a survey of 2770 respondents to millions of Americans, small changes in the number of reported firearms results in a large difference in the national estimates.

The General Social Survey indicates that household gun ownership has been declining over time, from about 50% in the early 1970s to current estimates of 34%.[1] Although the exact number of firearms in the US may be debatable as a result of inclusion or exclusion of outliers, or whether individual or household responses are used, it seems that although the proportion of households with firearms is declining, the number of working firearms in the US is increasing, not decreasing, and increasing most among those who already own firearms.

We also found evidence to support earlier research showing that women report lower levels of household firearm ownership, and in particular report fewer guns per household than men.[6–8] Married women in our study reported an average of 3.4 fewer household guns than married men and a difference in ownership of 14% (54% in men v 40% in women). These findings reinforce earlier recommendations for surveys of firearm ownership and behavior,[6] to seek information from individual firearm owners rather than any person living in a household with a firearm.

### Limitations

We have considered some of the challenges faced when conducting telephone surveys, in particular those related to asking household members to respond to questions about topics, in this case firearm ownership, which may pertain to other members of the household. This self-reported data may also be subject to potential inaccuracies due to recall bias or the tendency to report socially desirably responses.[13] For example, when we asked respondents two different questions to determine how many firearms were in their households, one asking for the total number of guns in the home and one asking specifically how many of each type of gun were owned, we often received two different numbers. Given that this was a telephone survey, we were limited to adults with access to a working telephone. If households without telephones were more or less likely to own a firearm, then our findings could be biased in the respective directions. Finally, non-response can

### Key points

- Firearm ownership in the US is very common, with about one third of all households owning at least one firearm.
- Long guns are the most prevalent type of gun in the US, but 40% of the gun stock is handguns.
- Firearm ownership is highly concentrated, with a small number of adults owning a large proportion of the nation's firearms.
- Married men and women report different rates of household firearm ownership, supporting the proposal that researchers should seek information about firearm ownership from individual firearm owners.

Downloaded from injuryprevention.bmj.com on April 12, 2012 - Published by group.bmj.com

affect the validity of our findings if those choosing not to answer a question differed systematically from those who did.[14] The low response rate in this survey is similar to other random-digit-dial telephone surveys[15]; however, it still allows for potential bias if those who participated in the survey differed in terms of firearm ownership from those who did not.

## CONCLUSIONS

### Implications for prevention

In the US, about one in four adults owns at least one firearm. Although some other developed countries have similar rates of personal firearm ownership, what is unique in the US is the number of firearms privately owned. Researchers have estimated about 25 guns per 100 people in countries such as Canada, New Zealand, Germany, France and Sweden.[16] On the basis of current estimates from our survey, the US has 93 guns per 100 people.

The National Academy of Sciences recently issued a report on firearms and violence in which they called for improved data on firearm ownership and use to advance the empirical evaluations of programs and policies to reduce gun violence.[12] Our findings describe the current motivations for firearm ownership and also provide information on the similarities and differences among owners of different types of guns. This information can assist in designing a more appropriate firearm injury policy as well as understanding the denominator of exposure when evaluating injury prevention interventions.

## ACKNOWLEDGEMENTS

We thank Renee Johnson for her help in determining the response rate for this survey.

. . . . . . . . . . . . . . . . . . . . . . .

### Authors' affiliations

L Hepburn, M Miller, D Azrael, D Hemenway, Department of Health Policy and Management, Harvard School of Public Health, Boston, Massachusetts, USA

Funding: This research was supported in part by grants from the Joyce Foundation, the Robert Wood Johnson Foundation and the Soros Foundation.

Competing interests: None.

## REFERENCES

1 **National Opinion Research Center**. General Social Survey. 2004. http://www.norc.uchicago.edu/projects/gensoc.asp (accessed 2 Nov 2006).
2 **Centers for Disease Control and Prevention**. *Behavioral Risk Factor Surveillance System Survey Data*. Atlanta: CDC, 2002.
3 **Cook PJ**, Ludwig J. *Guns in America: results of a comprehensive national survey on firearms ownership and use*. Washington, DC: Police Foundation, 1997.
4 **American Association for Public Opinion Research**. *Standard definitions: final dispositions of case codes and outcome rates for surveys*. Ann Arbor, MI: American Association for Public Opinion Research, 2000.
5 **US Bureau of the Census**. Statistical abstract of the United States. http://www.census.gov/compendia/statab (accessed 2 Nov 2006).
6 **Ludwig J**, Cook PJ, Smith TW. The gender gap in reporting household gun ownership. *Am J Public Health* 1998;**89**:1715–18.
7 **Azrael D**, Miller M, Hemenway D. Are household firearms stored safely? It depends on whom you ask. *Pediatrics* 2000;**106**:31.
8 **Coyne-Beasley T**, Baccaglini L, Johnson R, *et al*. Do partners with children know about firearms in their home? Evidence of a gender gap and implications for practitioners. *Pediatrics* 2005;**115**:e662–7.
9 **Bureau of Labor Statistics**. *Current population survey*. Washington, DC: Bureau of Labor Statistics, 2004.
10 **Smith TW**. *2001 National Gun Policy Survey of the National Opinion Research Center: research findings*. Chicago: National Opinion Research Center, University of Chicago, 2001.
11 **Okoro C**, Nelson DE, Mercy JA, *et al*. Prevalence of household firearms and firearm-storage practices in the 50 states and the District of Columbia: findings from the Behavioral Risk Factor Surveillance System, 2002. *Pediatrics* 2005;**116**:370–6.
12 **National Research Council**. *Firearms and violence: a critical review*. Washington, DC: National Academics Press, 2004.
13 **Aday L**. *Designing and conducting health surveys*. San Francisco: Jossey-Bass, 1989.
14 **Frey J**. *Survey research by telephone*, 2nd edn. Newbury Park, CA: Sage, 1989.
15 **Johnson T**, Owens L. Survey response rate reporting in the professional literature. American Association for Public Opinion Research—Section on Survey Research Methods, Chicago, Illinois: 2004:127–33.
16 **Graduate Institutes of International Studies**. *Small Arms Survey: profiling the problem*. Geneva: Oxford University Press, 2001.

Downloaded from injuryprevention.bmj.com on April 12, 2012 - Published by group.bmj.com



# The US gun stock: results from the 2004 national firearms survey

L Hepburn, M Miller, D Azrael, et al.

*Inj Prev* 2007 13: 15-19
doi: 10.1136/ip.2006.013607

---

Updated information and services can be found at:
http://injuryprevention.bmj.com/content/13/1/15.full.html

---

*These include:*

| | |
|---|---|
| **References** | This article cites 4 articles, 3 of which can be accessed free at:<br>http://injuryprevention.bmj.com/content/13/1/15.full.html#ref-list-1<br><br>Article cited in:<br>http://injuryprevention.bmj.com/content/13/1/15.full.html#related-urls |
| **Email alerting service** | Receive free email alerts when new articles cite this article. Sign up in the box at the top right corner of the online article. |

---

| | |
|---|---|
| **Topic Collections** | Articles on similar topics can be found in the following collections<br><br>Editor's choice (24 articles) |

---

**Notes**

---

To request permissions go to:
http://group.bmj.com/group/rights-licensing/permissions

To order reprints go to:
http://journals.bmj.com/cgi/reprintform

To subscribe to BMJ go to:
http://group.bmj.com/subscribe/

# EXHIBIT 49

# Homicide Studies

http://hsx.sagepub.com/

## Can Owning a Gun Really Triple the Owner's Chances of being Murdered? : The Anatomy of an Implausible Causal Mechanism

GARY KLECK

Homicide Studies 2001 5: 64
DOI: 10.1177/1088767901005001005

The online version of this article can be found at:
http://hsx.sagepub.com/content/5/1/64

Published by:
**SAGE**

http://www.sagepublications.com

On behalf of:
Homicide Research Working Group

**Additional services and information for *Homicide Studies* can be found at:**

**Email Alerts:** http://hsx.sagepub.com/cgi/alerts

**Subscriptions:** http://hsx.sagepub.com/subscriptions

**Reprints:** http://www.sagepub.com/journalsReprints.nav

**Permissions:** http://www.sagepub.com/journalsPermissions.nav

**Citations:** http://hsx.sagepub.com/content/5/1/64.refs.html

Downloaded from hsx.sagepub.com by guest on April 12, 2012

# Can Owning a Gun Really Triple the Owner's Chances of Being Murdered?

## The Anatomy of an Implausible Causal Mechanism

GARY KLECK

*Florida State University*

*Using a case-control design comparing homicide victims with matched nonvictims, Kellermann et al. (1993) concluded that keeping a gun in one's home increased the risk of being murdered by a factor of 2.7. The authors' underlying assumption was that a significant elevation in homicide risk derived from the risk of being murdered with a gun kept in the victim's home. This article shows that homicides are rarely committed with guns belonging to members of the victim's home and that such killings could be responsible for no more than a 2.4% increase in the relative risk of being murdered. Guns in one's own home have little to do with homicide risk. Scholars need to attend more closely to the mechanisms by which an alleged causal effect is supposed to operate and to consider their plausibility before concluding that an association reflects a causal effect.*

*Criminologists have long been* interested in the impact of gun availability on homicide. Traditionally, the central hypothesis guiding research was that if Person X attacked and injured Person Y, Person X's possession and use of a gun would increase the probability that the injury inflicted was fatal (Kleck, 1997; Wright, Rossi, & Daly, 1983; Zimring, 1968). Thus, Person X's possession of a gun increases Person Y's risk of becoming a homicide victim. Recently, researchers publishing in medical journals and following a public health model of violence have radically altered this paradigm, asserting that Person X's possession of a firearm increases the likelihood of Person X becoming a homicide victim (Kellermann

AUTHOR'S NOTE: An earlier version of this article was presented at the annual meetings of the American Society of Criminology in Toronto, Canada, on November 20, 1999.

HOMICIDE STUDIES, Vol. 5 No. 1, February 2001 64-77
© 2001 Sage Publications, Inc.

64

Downloaded from hsx.sagepub.com by guest on April 12, 2012

from the SAGE Social Science Collections. All Rights Reserved.

et al., 1993; see also Cummings, Koepsell, Grossman, Savarino, & Thompson, 1997).

This change in emphasis was accomplished partly by shifting the focus from individual gun possession to household possession. That is, it has been hypothesized that persons who live in a household containing guns, regardless of which individual residents own them, are at greater risk of homicide victimization (Kellermann et al., 1993). The mechanism by which this causal effect is supposed to operate has not been explicitly described, but the most obvious candidate (perhaps so obvious that public health scholars thought it did not require explicit statement) would be that one resident of a gun-owning household would use a household gun to kill another resident of the household.

The shift in focus from homicide offending to homicide victimization under this paradigm may, however, be more apparent than real, because if household gun ownership increased the likelihood of one resident becoming a homicide victim, this would also necessarily imply that household gun ownership increased the likelihood of someone else committing a homicide.

## THE KELLERMANN ET AL. (1993) HOMICIDE STUDY

In one of the most frequently cited academic articles published in recent years on the link between guns and homicide (as of September 15, 2000, it had been cited 177 times in journals covered by the Web of Science database), Arthur Kellermann et al. (1993) concluded that keeping a gun in one's household increased the odds of becoming a homicide victim by a factor of 2.7. This conclusion was based on a case-control study of homicide victims in three urban counties in the 1987 to 1992 period, in which the victims were compared with controls who were matched on sex, race, approximate age, and neighborhood of residence. After controlling for five other possible risk factors, the authors' logistic regression estimates indicated that persons with a gun in their households were 2.7 times more likely to become homicide victims than persons without a gun. The authors stated their conclusions in strong terms and were explicit as to what they regarded as the implications of their findings: "People should be strongly dis-

Downloaded from hsx.sagepub.com by guest on April 12, 2012

couraged from keeping guns in their homes" (p. 1090). This con-
clusion would not make sense unless the authors were asserting
that keeping a gun in the home caused an increased risk of homi-
cide victimization.

Critics pointed out an obvious alternative explanation of the
results: Many of the same factors that place people at greater risk
of becoming a victim of violence also motivate people to acquire
guns, especially handguns, for self-defense. Thus, one would
expect a positive association between gun ownership, especially
handgun ownership, and homicide victimization even if the for-
mer had no effect on the latter (Kates, Schaffer, Lattimer, Murray, &
Cassem, 1995, pp. 588-589; Kleck & Hogan, 1999).

In short, the association discovered by Kellermann et al. (1993)
looked like a spurious association attributable to confounding
factors not controlled by the analysts, such as membership in a
street gang or involvement in illicit drug dealing (as distinct from
mere drug use). Although these two risk factors are common only
among adolescents and young adults, they nevertheless could
easily generate a large spurious association between homicide
victimization and gun ownership, because 52.1% of the victims in
the Kellermann et al. study were ages 15 to 39 (reanalysis of
Kellermann, Hackman, Rivara, Rushforth, & the University of
Tennessee, 1997).

A number of other flaws in this research have been identified,
including the use of local samples that were not representative of
any larger populations as well as errors in measurement of gun
ownership that were sufficiently common to completely account
for the observed association (Kleck, 1997, pp. 243-246; Kleck &
Hogan, 1999). This article, however, focuses on the plausibility of
the mechanism by which household gun ownership is presumed
to elevate the risk of being murdered.

## HOW IS THE GUN EFFECT
## SUPPOSED TO WORK?

It is common in epidemiological research for analysts asserting
a causal effect of a risk factor on a disease or other outcome to
describe some mechanism by which the causal effect could oper-
ate. A researcher might hypothesize, for example, that exposure to

Downloaded from hsx.sagepub.com by guest on April 12, 2012

swamplands could increase the risk of contracting malaria because swamp-bred mosquitos can bite a person carrying the disease and then infect a previously healthy person by biting him or her as well, transmitting infected blood from the first person.

Kellermann et al. (1993), however, did not say why or how gun ownership by a given person or members of the person's household would increase that person's risk of being murdered. The closest the authors came to saying anything at all on this matter was a single sentence citing a previous study that found that assaults with a gun are more likely to result in death than are assaults with other weapons (p. 1090). Many readers may not have noticed the omission of this element of the epidemiological argument, perhaps for the same reason the authors may not have provided it: The nature of the causal mechanism may have been regarded as too self-evident to need describing. The obvious, most direct, and perhaps the only plausible mechanism would be that attackers, especially those living in the same home as the victim, would use a gun kept in the victim's household to kill the victim. Note that it is unnecessary for what follows for any assumption to be made concerning the nature of this mechanism, other than that the higher homicide risk is somehow due to the risk of being killed with a gun kept in the prospective victim's home.

Thus, the plausibility of the authors' interpretation of their findings depends heavily on what fraction of homicides are committed with a gun kept in the victim's home (referred to hereafter as a "victim gun"). The authors, however, were silent on this matter, and some readers of their article noticed the omission. Soon after the article's publication, the *New England Journal of Medicine* published a series of letters commenting on the article, including one from a group of students in a college statistics class (The Students of Dr. Mark Ferris's Mathematical Statistics 460, 1994). The students pointed out that although Kellermann et al. (1993) were arguing that guns in the household raised one's risk of being murdered, the authors had not stated how many homicide victims in their sample had been killed with a victim gun rather than a gun that was brought to the scene by the perpetrator. Many others also noted this omission (e.g., Kates et al., 1995, pp. 586-587; Kleck, 1997, p. 245, 1998; Kleck & Hogan, 1999; Lott, 1998, p. 24).

The omission seemed very odd indeed, both because the information was crucial to establishing the plausibility of the analysts'

Downloaded from hsx.sagepub.com by guest on April 12, 2012

conclusions and because the researchers had gathered information from police offense reports on the homicides, precisely the source that would indicate where the murder weapon had come from. In their reply to the students' letter, Kellermann, Somes, and Rivara (1994) did allude to eight cases where "the gun involved had been kept in the home" (p. 368) but did not say whether these eight cases constituted all of the victim-gun cases or make it clear whether all of these eight guns had been kept in the victim's home rather than the offender's home. Indeed, they did not even state whether they had consistently tried to record the origins of homicide guns.

Nevertheless, even without this crucial datum, Kleck (1998) pointed out that less than 5% of the homicides in the area studied by these authors were likely to have involved guns kept in the victim's household, because reanalysis of Kellermann et al.'s (1993) data indicated that only about 88 of the 1,860 total homicides in the study area (a) occurred in or near the victim's home, (b) were committed with a gun, and (c) were committed by a killer whose relationship with the victim indicated that he or she was likely to live in the same household as the victim. Even when victims were killed in their own homes, most were killed by a person who, based on his or her relationship to the victim, probably lived elsewhere and thus presumably used a gun brought from elsewhere.

## HOW OFTEN ARE PEOPLE MURDERED WITH GUNS FROM THEIR OWN HOMES?

The inference that few of the victims in the Kellermann et al. (1993) sample were killed with guns kept in their own homes necessarily relied on the assumptions that (a) one could reliably tell whether the killer lived with the victim from their relationship and that (b) few killers from outside the victims' homes would use a victim gun to commit the killing. It would be better to have direct information on the number of home homicides committed with victim guns. Unfortunately, the version of the Kellermann et al. (1993) data set that was released to the Inter-university Consortium for Political and Social Research (ICPSR) data archive did not contain any information on where homicide guns came from (see Kellermann et al., 1997). In a registered letter sent to Kellermann,

Downloaded from hsx.sagepub.com by guest on April 12, 2012

the author asked Kellermann whether his team had gathered data on the origins of homicide guns in his case-control study and, if so, what share of homicide guns were victim guns. Kellermann did not reply.

Recently, however, Kellermann, Somes, Rivara, Lee, and Banton (1998) published a study based on a closely related data set, and these data provide a close approximation of the victim-gun share. They reported findings from a study of fatal and non-fatal gunshot wounds in Seattle, Washington; Memphis, Tennessee; and Galveston, Texas, from 1992 to 1994. Thus, the time span examined in the 1998 study immediately followed and even partially overlapped the 1987-1992 span covered in their homicide case-control study. Furthermore, two of the three cities studied in the 1998 study, Seattle and Memphis, and their surrounding counties had supplied about 70% of the homicides studied in the 1993 homicide case-control study (computed from homicide counts for the cities, in Federal Bureau of Investigation, 1988-1993) and 95% of the gunshot cases in the 1998 study (computed from data in another report based on the data in the 1998 study; see Kellermann et al., 1996, p. 1439). Patterns of gun violence in the homicide case-control study should therefore closely resemble patterns in the 1998 study.

The Kellermann et al. (1998) article reported analyses of 438 criminal assaults and homicides committed with a gun in or near a residence. The authors found that 49 of these incidents involved a gun "kept in the home where the shooting occurred" (p. 264), 295 involved a gun brought to the scene from elsewhere, and another 94 involved a gun whose origins were not noted by the police. Thus, among the 344 (49 + 295 = 344) residential shootings involving a gun with known origins, only 14.2% (49/344 = .142) involved a gun kept in the home where the shooting occurred.

Furthermore, many of these shootings almost certainly occurred in the home of the attacker and not of the victim and thus were more likely to have involved a gun belonging to the offender than to the victim or another member of the victim's household. For example, in Wolfgang's (1958, p. 123) classic study, 32% of home homicides occurred in the home of the offender only (i.e., not the victim's home) or the home of some third party. Thus, as few as 9.7% (14.2% × [1 − 0.32] = .097) of the in-home shootings were likely to have been committed with a victim gun. Never-

Downloaded from hsx.sagepub.com by guest on April 12, 2012

TABLE 1
Estimated Frequency of Homicides Committed
With the Victim's Gun (three urban counties, 1987-1992)

|  | Number | Percentage of Homicides |
|---|---|---|
| Total homicides | 1,860 | 100.0 |
| Homicides in victim's home | 444 | 23.7 |
| Gun homicides in victim's home | 221[a] | 11.9 |
| Gun homicides in victim's home, with gun kept in victim's home | 31[b] | 1.7 |

SOURCE: Kellermann et al. (1993, pp. 1085-1086); Kellermann, Somes, Rivara, Lee, and Banton (1998, p. 254).
a. This is 49.8% of 444; Kellermann et al. (1993, p. 1086) reported that 49.8% of home homicides in their sample died from gunshot wounds.
b. Approximately 31. Assumes that 14.2% of gun homicides committed in the victim's home were committed with a gun kept in the victim's home, the same as was true in a sample of in-home fatal and nonfatal gunshot wounds in an overlapping set of areas from 1992 to 1994.

theless, we will generously use the 14.2% figure as an upper limit estimate of the victim-gun share of home homicides.

In their article, Kellermann et al. (1993, pp. 1085-1086) reported that 1,860 total homicides were committed in the study area, 444 of which took place in or near the home of the victim, and that 49.8% of these 444 were committed with a gun, implying a total of 221 gun homicides committed in or near the victim's home. Applying the upper limit 14.2% victim-gun share figure to the homicides in the 1993 study, 31 (14.2% of 221), at most, involved a victim gun (see Table 1). These 31 cases would constitute just 1.67% of the 1,860 homicides committed in the study area of the 1993 study. This is an upper-limit estimate of the share of homicides involving a gun kept in the victim's home, assuming that no victims were killed with a gun from the victim's household but in a place other than in or near the victim's home.

The explanation for the extreme rarity of victim-gun homicides is simple. Even in samples confined to gun incidents occurring in or near the victim's home, few of the shooters lived in the victim's home. Only 12.6% of the shooters ($n = 79$) in criminal assaults and homicides in the 1998 study were a spouse, family member, or "intimate" of the victim (Kellermann et al., 1998, p. 254), and not all of these necessarily lived with the victim. The vast majority of

Downloaded from hsx.sagepub.com by guest on April 12, 2012

the shooters came from outside the home, so it is not surprising that most of them used guns brought from a location outside the victim's home.

Given the rarity of victim-gun homicides, how could keeping a gun in one's home increase the risk of homicide by a factor of 2.7? Is it even mathematically possible that victim-gun ownership could increase homicide victimization—via any mechanism involving use of a victim gun—by anything even remotely approaching 170% if less than 2% of homicides are committed with a victim gun? A simple numerical example using national data can illuminate this issue.

## THE IMPLICATIONS OF THE RARITY OF VICTIM-GUN HOMICIDE

The latest year covered in the Kellermann et al. (1993) case-control data set was 1992. In that year, there were 23,760 murders and nonnegligent manslaughters committed in the United States, in a population of 255,082,000, for an overall homicide victimization rate of 9.31 per 100,000 persons (Federal Bureau of Investigation, 1993, p. 59). A CBS/*New York Times* poll conducted in January 1992 indicated that 49% of U.S. households reported owning at least one gun (Kleck, 1997, p. 99). Assuming that households with guns and those without guns have the same average number of members, 124,989,200 (0.49 × 255,082,000) Americans lived in households with guns, and 130,090,800 lived in households without.

To give the guns-increase-homicide thesis its strongest form, assume that gun ownership is the only risk factor explaining differences in homicide risk. If the odds ratio of 2.7 were to be valid as a measure of actual causal impact of gun ownership prevailing in the national population, the annual homicide victimization rate would have to be 13.72 per 100,000 for persons living in households with guns (17,149 homicides among 124,989,200 people) and 5.08 per 100,000 for those in households without guns (6,611 homicides among 130,090,800 people). These are the only rates that can average out to the population-wide rate of 9.31 where the ratio of the gun household homicide rate over the no-gun household rate is 2.7.

Downloaded from hsx.sagepub.com by guest on April 12, 2012

Based on the data from the two Kellermann et al. (1993, 1998) studies, at most 1.67% of all homicides were committed with a victim gun. Applying this figure to the nation's 23,760 homicides yields an upper limit estimate that 396 killings were committed with a victim gun. These 396 homicides are by definition a subset of the estimated 17,149 homicides involving victims who live in households with guns, leaving 16,753 homicides of victims from gun-owning households who were not killed with guns kept in their own household. Thus, the estimated 396 killings committed with a victim gun would represent, at most, a 2.4% increase (17,149 / [17,149 − 396] = 1.024) over the number of killings of victims from gun-owning households that did not involve such a gun. Alternatively, the 396 victim-gun killings would represent an increment of just 1.7% over the total number of homicides in all households, regardless of gun ownership status (23,760 / [23,760 − 396] = 1.017).

Let us make two generous assumptions: (a) Every killing committed with a victim gun would not have occurred in the absence of that gun (i.e., none would have been committed either without a gun or with a gun from outside the victim's home); and (b) defensive gun use and gun ownership by potential homicide victims never deters or disrupts attacks that otherwise would have been fatal, and thus, there are no homicide-reducing effects of gun ownership by prospective victims to counterbalance homicide-increasing effects. Even under these extreme assumptions, the number of people living in households with guns who were murdered could be increased as a result of the use of victim household guns by a factor of no more than 1.024, whereas the number murdered in all U.S. households could be increased by a factor of no more than 1.017. Even the larger 1.024 ratio is only 1.4% as large an effect as that implied by the Kellermann et al. (1993) odds ratio of 2.70 ([1.023 − 1] / [2.7 − 1] = .014). Thus, the idea of a 2.7-fold increase in homicide risk due to use of guns kept in victims' homes is implausible even under the most favorable (and unrealistic) assumptions.

Recall, however, that Kellermann et al.'s (1993) conclusions actually applied only to homicides that occur in or near the victim's home. Homicides involving victim guns would be a larger share of home homicides than they would be of all homicides. If the distribution of U.S. homicides by location were the same as in

Downloaded from hsx.sagepub.com by guest on April 12, 2012

TABLE 2
Implications for Impact of a Gun in the Home on Homicide

Panel A

Homicide risks implied by the Kellermann et al. (1993) analysis if guns were the only risk factor for homicide in United States in 1992

|  | Population (in millions) | Number of Homicides | Homicides per 100,000 |
|---|---|---|---|
| All homicides |  |  |  |
| Persons in gun-owning households | 125.0 | 17,149 | 13.72 |
| Persons in nongun households | 130.1 | 6,611 | 5.08 |
| Total homicides | 255.1 | 23,760 | 9.31 |
| Ratio, homicide rates, gun-owning over nongun: 2.70 |  |  |  |
| Home homicides only |  |  |  |
| Home homicides in gun-owning households |  | 4,094 | 3.28 |
| Home homicides in nongun households |  | 1,578 | 1.21 |
| Total home homicides |  | 5,672 | 2.22 |

Panel B

Number of homicides under the assumption that all victim-gun homicides would not have occurred had there been no gun in the victim's home

|  | All Homicides | Home Homicides |
|---|---|---|
| Gun-owning households |  |  |
| Involving victim gun | 396 | 396 |
| Not involving victim gun | 16,753 | 3,698 |
| Total | 17,149 | 4,094 |
| All households |  |  |
| Involving victim gun | 396 | 396 |
| Not involving victim gun | 23,364 | 5,276 |
| Total | 23,760 | 5,672 |
| Relative increase in total homicides attributable to victim-gun homicides in gun-owning households | 1.024 (17,149/16,753) | 1.107 (4,094/3,698) |
| In all U.S. households | 1.017 (23,760/23,364) | 1.075 (5,672/5,276) |

the Kellermann et al. study area (i.e., 23.9% in the home), this would imply there were 5,672 U.S. homicides occurring in or near the victim's home in 1992, for a rate of 2.22 home homicides per 100,000. Applying the same computational procedures as before, the rates of home homicides would, for the 2.7 ratio to prevail, have to be 3.2755 per 100,000 (4,094 home homicides among

Downloaded from hsx.sagepub.com by guest on April 12, 2012

124,989,200 persons) among persons living in households with guns and 1.2130 (1,578 home homicides among 130,090,800 persons) among those living in households without guns.

If we assume that all of the 396 victim-gun killings occurred in the victim's home, this would leave 3,698 homicides of victims living in a gun-owning household who were not killed with a victim gun (see Table 2, Panel B). Therefore, even if one made the extreme assumptions that all victim-gun homicides were uniquely attributable to the presence of a gun in the household and that gun ownership never resulted in deterring an attack or disrupting a homicidal attempt, the 396 victim-gun homicides would still represent, at most, a 10.7% increase in homicides among persons living in gun-owning households. This is only 6% of the effect claimed by Kellermann et al. (1993) ([1.107 − 1] / [2.7 − 1] = .06).

## CONCLUSIONS

This analysis establishes that the most likely mechanism by which the effect posited by Kellermann et al. (1993) would operate is one that operates too rarely to have any substantial impact on the risk of being murdered. This effect is instead likely to be the product of a misinterpretation of an association that is mostly or entirely spurious.

This analysis does not, however, establish that there are no mechanisms by which some guns can increase homicide risks for some people. Kellermann and colleagues (1993) were merely mistaken in believing that gun ownership substantially increases the owner's risks of being murdered. A more reasonable approach to possible guns-homicide links would not focus exclusively on either the victim's home (where few gun homicides are committed, domestic homicides notwithstanding) or the victim's own guns. If some Americans are at greater risk of being murdered because of the availability of guns, it is primarily because of guns owned by people outside their household, fired at them in locations other than their own home.

Two more recent case-control studies of homicide both yielded findings indicating no effect of gun ownership on homicide victimization or homicide offending. Cummings et al. (1997) interpreted their findings as supporting the hypothesis that gun

Downloaded from hsx.sagepub.com by guest on April 12, 2012

ownership increases homicide risks, but their findings in fact strongly supported the view that the observed guns-homicide association was entirely spurious. If gun ownership really has the hypothesized effect on homicide risk, it must do so by increasing the risk of gun homicide in particular. On the other hand, if gun ownership in the study samples were merely a correlate of unmeasured risk factors that influence homicide in general—that is, both those homicides committed with guns and those not committed with guns—gun ownership would be no more strongly associated with gun homicide than with nongun homicide. The latter pattern is precisely what Cummings et al. found, supporting the view that gun ownership had no net causal effect on homicide risk but rather was correlated with uncontrolled factors that influenced both gun and nongun homicide victimization. These authors downplayed the significance of their findings, noting only that the association between gun ownership and homicide might be due to confounding, when in fact, the observed pattern of findings fitted perfectly with the hypothesis that the association was due to confounding.

Kleck and Hogan (1999) directly studied homicide offending, conducting a national case-control study that compared a nationally representative sample of imprisoned killers with the general adult population. The results of their logistic regression analysis, which was based on far larger and more representative samples and controlled for more potential confounders than was done in either the Kellermann et al. (1993) or the Cummings et al. (1997) studies, indicated that the likelihood of committing a homicide was only 1.36 times higher among those who owned a gun than among those who did not, which is an association that epidemiologists conventionally regard as "weak." Furthermore, the authors noted that because they, like previous researchers, did not control for known gun-associated risk factors such as street gang membership or drug dealing, even this weak association was at least partly spurious.

The larger lesson to be learned from this exercise is that scholars would benefit from attending more closely to the mechanisms by which supposed causal effects operate. The use of the vague term *risk factors*, common among public health scholars, encourages evasion of issues that a more straightforward confrontation of causation would force scholars to address. Had public health

Downloaded from hsx.sagepub.com by guest on April 12, 2012

researchers given more thought to the causal mechanisms that they apparently took for granted, they would have understood the crucial importance of information on how often (or how rarely) homicide victims are killed with guns from their own homes. And having acquired these crucial data, they would have more fully appreciated how implausible the causal effect they were assuming really was.

## REFERENCES

Cummings, P., Koepsell, T. D., Grossman, D. C., Savarino, J., & Thompson, R. S. (1997). The association between the purchase of a handgun and homicide or suicide. *American Journal of Public Health, 87,* 974-978.

Federal Bureau of Investigation. (1988-1993). *Crime in the United States: Uniform crime reports.* Washington, DC: Government Printing Office.

Kates, D. B., Jr., Schaffer, H. E., Lattimer, J. K., Murray, G. B., & Cassem, E. H. (1995). Guns and public health: Epidemic of violence or pandemic of propaganda. *Tennessee Law Review, 52,* 513-596.

Kellermann, A. L., Hackman, B. B., Rivara, F. P., Rushforth, N. B., & the University of Tennessee (Producer). (1997). Home Safety Project, 1987-1992 (ICPSR version) [Computer file]. Ann Arbor, MI: Inter-university Consortium for Political and Social Research (Distributor).

Kellermann, A. L., Rivara, F. P., Lee, R. K., Banton, J. G., Cummings, P., Hackman, B., & Somes, G. (1996). Injuries due to firearms in three cities. *New England Journal of Medicine, 335,* 1438-1444.

Kellermann, A. L., Rivara, F. P., Rushforth, N. B., Banton, J. G., Reay, D. T., Francisco, J. T., Locci, A. B., Prodzinski, J., Hackman, B. B., & Somes, G. (1993). Gun ownership as a risk factor for homicide in the home. *New England Journal of Medicine, 329,* 1084-1091.

Kellermann, A. L., Somes, G., & Rivara, F. P. (1994). The authors reply. *New England Journal of Medicine, 330,* 368.

Kellermann, A. L., Somes, G., Rivara, F. P., Lee, R. K., & Banton, J. G. (1998). Injuries and deaths due to firearms in the home. *Journal of Trauma, Injury, Infection, and Critical Care, 45,* 263-267.

Kleck, G. (1997). *Targeting guns: Firearms and their control.* New York: Aldine.

Kleck, G. (1998). What are the risks and benefits of keeping a gun in the home? *Journal of the American Medical Association, 280,* 473-475.

Kleck, G., & Hogan, M. (1999). A national case-control study of homicide offending and gun ownership. *Social Problems, 46,* 275-293.

Lott, J. R., Jr. (1998). *More guns, less crime.* Chicago: University of Chicago Press.

The Students of Dr. Mark Ferris's Mathematical Statistics 460. (1994). Letter to the editor. *New England Journal of Medicine, 330,* 366.

Wolfgang, M. E. (1958). *Patterns in criminal homicide.* Philadelphia: University of Pennsylvania Press.

Wright, J., Rossi, P., & Daly, K. (1983). *Under the gun.* New York: Aldine.

Zimring, F. E. (1968). Is gun control likely to reduce violent killings? *University of Chicago Law Review, 35,* 721-737.

Downloaded from hsx.sagepub.com by guest on April 12, 2012

*Gary Kleck is professor of criminology and criminal justice at Florida State University. His research focuses on violence, deterrence, and the impact of firearms and gun control on violence. He is the author of* Point Blank: Guns and Violence in America *(Aldine, 1991) and* Targeting Guns *(Aldine, 1997) and coauthor (with Don Kates) of* Armed: New Perspectives on Gun Control *(Prometheus Books, 2001) and* The Great American Gun Debate *(Pacific Research Institute, 1997). His recent research has been published in* Criminology, Journal of Criminal Law and Criminology, Law & Society Review, Journal of the American Medical Association, Journal of Quantitative Criminology, *and* Journal of Research in Crime and Delinquency.

Downloaded from hsx.sagepub.com by guest on April 12, 2012

# EXHIBIT 50

# How Not to Study the Effect of Gun Levels on Violence Rates

Gary Kleck

*Most research on the effects of rates of gun ownership on violence crime rates has little of a persuasive nature to say on the subject, because it is afflicted by the same simple methodological problems that have characterized this field of inquiry for decades: (1) the failure to properly model the possible two-way relationship between gun levels and violence rates; and/or otherwise confusing the effect of violence rates on gun levels with the effect of gun levels on violence rates, (2) the use of invalid measures of gun levels, and (3) the failure to control for a substantial number of (or any) possible confounding factors, i.e. factors that influence violent crime rates but are also associated with gun levels.*

*A recent article by Philip Cook and Jens Ludwig is used to illustrate these problems, since it suffers from all three flaws. A review of prior research demonstrates how consequential these problems are, showing that findings interpreted as indicating a violence-increasing effect of gun levels are entirely confined to research that did little or nothing to solve these problems. Finally, it is shown that it is perfectly possible to avoid the problems, and that very different findings are obtained when one does so. The handful of studies that have seriously addressed all three problems consistently find no significant positive effect of gun ownership levels on violence rates.*

*Gary Kleck is a Professor at the College of Criminology and Criminal Justice at Florida State University, in Tallahassee.*

Keywords: Gun ownership, violence, homicide, research methods

The central premise behind gun control as a policy to reduce crime or violence is that gun ownership levels affect rates of crime or violence. While most scholars conclude that gun levels do not affect rates of nonfatal crime such as robbery or aggravated assault, many assert that gun levels do affect homicide rates, primarily be-

cause use of a gun in attacks increases the likelihood that they will result in the victim's death.

Unfortunately, research on the effect of gun levels on homicide and other crime rates has generally been of poor quality. Even more discouraging is the fact that scholars keep making the exact same mistakes over and over again. While many other mistakes are made, probably the three most consequential are these:

> (1) the failure to properly model the possible two-way relationship between gun levels and violence rates, or otherwise confuse the effect of violence rates on gun levels with the effect of gun levels on violence rates,

> (2) the use of invalid measures of gun levels, and

> (3) the failure to control for a substantial number of (or any) possible confounding factors, i.e. factors that influence homicide/crime rates but are also associated with gun levels.

## I. ADDRESSING CAUSAL ORDER

Table 1 (at the end of this Article) summarizes 36 published English-language studies in this area, and shows that hardly any scholars in this area even made an attempt to address the chick-and-egg problem of whether

> (a) more guns cause more violent crime, or

> (b) more violent crime causes higher gun levels by motivating people to acquire guns for self-protection.

Researchers have typically adopted one of four unhelpful responses to this problem:

> (1) ignore the issue altogether (e.g., Lester 1988; Killias 1993; Hemenway and Miller 2000),

> (2) mention the issue but explicitly deny it is a problem (e.g., Stolzenberg and D'Alessio 2000; Miller, Hemenway and Azrael 2002),

(3) acknowledge it as a possible problem in a pro forma way but do nothing about it (e.g., Azrael, Cook and Miller 2004; Miller, Hemenway, and Azrael 2007), or

(4) acknowledge the problem but apply inappropriate solutions (see last column, labeled "Causal Order").

The most common variant of the last response is to simply relate the current crime rate to the previous year's gun levels (e.g., McDowall 1986; Southwick 1997; Duggan 2001; Sorenson and Berk 2001; Cook and Ludwig 2002; Moody and Marvell 2005). Its intuitive appeal is based on the obvious point that this year's violence rates cannot affect last year's gun ownership levels. Thus, the tactic seems to avoid the causal order problem. Unfortunately, the approach is basically an evasion of the causal order problem rather than a solution. It effectively "assumes away" the possibility of gun levels having an *immediate* (rather than lagged) effect on crime rates, and crime rates immediately affecting gun acquisition for self-defense.

This technical issue matters a great deal, because results have been radically different depending on how researchers responded to problem. The few studies that have applied potentially appropriate methodological responses to the causal order problem have found no positive effect of gun levels on crime rates (Kleck and Patterson 1993; Kovandzic et al. 2008).

## II. MEASUREMENT OF GUN LEVELS

Table 1 shows that researchers have used a wide variety of measures of gun prevalence (described in detail in endnote b), but direct evaluations of their validity indicate that nearly all of these measures are invalid (Kleck 2004a). Only the percent of suicides committed with guns (PSG) shows strong validity for purposes of measuring levels of gun ownership in different areas. Further, *none* of the measures, including PSG, are valid for purposes of judging trends over time.

Some scholars continue to insist that PSG is valid for measuring trends in gun ownership, but create a false appearance of support for this claim, using one of several techniques. One method is report the correlation of PSG with direct survey measures of gun ownership, combining both cross-sectional covariation and cross-temporal

covariation (e.g., Duggan 2001; Cook and Ludwig 2002; Miller et al. 2002; Azrael et al. 2004). This is wrong because it takes advantage of the genuinely strong correlation of PSG and survey measures *across areas* and lumps it in with the (nonexistent) correlation of PSG and survey measures *across time*. Kovandzic and his colleagues (2008) demonstrated that all of the correlation between PSG and survey measures of gun prevalence, when cross-area and cross-temporal data are mixed together is in fact due to cross-area correlation. Thus, the supposed validity tests of Duggan and the rest actually indicate nothing about the ability of PSG to track changes over time in gun prevalence.

Another technique for seeming to support the cross-temporal validity of PSG is to compute its correlations over time (as is proper), but correlate the levels of the two variables rather than year-to-year changes in the variables (apparently used by Cook and Ludwig 2006). The use of the levels of the variables will exaggerate the strength of the cross-temporal association merely because the magnitude of the variables tend to be of roughly the same size over a period of time, even if year-to-year movements of the two variables do not correlate with one another at all. The more appropriate test of the cross-temporal validity of PSG is to see if year-to-year changes in PSG are correlated with year-to-year changes in direct survey measures of gun prevalence, as are produced in the General Social Surveys.

The two methods were used in the analysis reported in Table 2 (at the end of this Article). Using all the GSS data available up through 2006, the cross-temporal correlations between PSG and the direct GSS measures of gun ownership prevalence were computed, first using the levels of the variables, then correlating year-to-year changes in the variables. The figures in the first column indicate that, contrary to Cook and Ludwig (2006), PSG does not significantly correlate with the GSS measures for four of the nine regions, even when the correlations are computed with the levels of the variables, and the five correlations that are significantly different from zero are far too weak to indicate that PSG is a good proxy for changes in gun prevalence. For example, even for the region with the strongest correlation, the West South Central region, the correlation of 0.694 implies that 48 percent ($0.694^2=0.48$) of the variation in PSG is shared

with variation in the GSS measure. Put another way, most of the variation (52%) in PSG is independent of variation over time in gun prevalence as measured in the GSS. By no stretch of the imagination can a proxy measure be regarded as having good validity if *most* of the variation in the proxy is independent of the target concept being measured. More significantly, the second column of numbers indicates that when the more appropriate year-to-year changes are analyzed, there is essentially *no* association over time between PSG and direct survey measures of gun prevalence. In sum, PSG is apparently useless for tracking changes in gun prevalence, despite its considerable ability to assess differences in gun prevalence across areas.

Consequently, the findings of nearly all studies that have attempted to relate changes over time in gun ownership to changes in violent crime rates are meaningless, because the researchers were not actually measuring changes in gun levels (e.g., Cook and Ludwig 2002; Miller et al. 2002; Moody and Marvell 2005; Cook and Ludwig 2006). The only potential exception to this generalization would be studies that used direct survey measures of gun ownership. The problem with the studies that have used this method so far, however, is that (a) the survey's sample sizes for the areas (typically Census regions) used in the study were too small to provide meaningful estimates of changes in gun prevalence (e.g., Miller et al. 2002), and (b) there apparently has not actually been any significant change in gun prevalence over the last several decades, so there has been no opportunity to estimate what effects on violent crime rates might be produced by changes in gun prevalence (Kleck 2004a). For example, Miller and his colleagues (2002) claimed that region-level changes in survey-measured gun prevalence caused changes in homicide rates, but they did not show that any of their survey-based year-to-year changes in regional gun prevalence were statistically significant. In fact, virtually none of them are significant, and the few that are significant are implausibly large—for example a change in New England in the percent of households with guns from 16.6 in 1982 to 42.9 percent in 1984, and then back down again to 25.1 in 1985 (author's analysis of GSS data—see source in note a of Table 2). Miller and his colleagues apparently were merely modeling statistical "noise," e.g. patterns in errors in survey measures of gun prevalence. In contrast, Killias and his colleagues (2001) also used survey measures of gun prevalence,

- 69-

but studied entire nations and consequently had ample sample sizes for estimating gun prevalence; they found *no* significant effect of gun prevalence on rates of homicide, robbery, or aggravated assault. It clearly matters whether survey-based studies had sufficient sample size for stable estimates of gun prevalence.

The general pattern evident in Table 1 is that nearly all studies claiming to find crime-increasing effects of gun levels either

> (1) used invalid gun measures, that is, those other than PSG used in a cross-sectional analysis or direct survey measures (e.g., McDowall 1991; Southwick 1997; Stolzenberg and D'Alessio 2000; Duggan 2001), or

> (2) used PSG inappropriately to measure changes in gun levels (McDowall 1991; Cook and Ludwig 2002; Miller et al. 2002; Moody and Marvell 2005; Cook and Ludwig 2006).

Of the handful that used PSG appropriately, in a cross-sectional context (i.e., comparing different areas with each other), only two took appropriate steps to address causal order (Kleck and Patterson 1993; Kovandzic, Schaffer, and Kleck 2008), and both of these found no significant positive effect of gun levels on homicide rates or other violent crime rates.

## III. CONTROLLING CONFOUNDING VARIABLES

It is also essential that researchers seeking to estimate the effect of gun levels on crime rates statistically control for "confounding variables"—those factors that affect crime rates, but also are associated with gun ownership rates. If this is not done, the supposed effects of gun levels will be confused with the effects of the confounding variables. The more of these likely confounding variables that the researcher controls, the less likely this problem will arise. Statisticians describe this as the "omitted variables" problem, because researchers failed to include confounding variables in their multivariate equations predicting violent crime rates. For example, if an area was characterized by a culture that encouraged violent behavior, but gun ownership was also common in that area, then that violent subculture would be a confounding variable because it affects violence rates but is also correlated with gun ownership. Because the

-70-

southern parts of the U.S. are thought to be characterized by a regional culture of violence, but also have higher gun ownership rates (Kleck 1997, p. 102), more careful analysts control for the regional location of states or cities as a way of indirectly controlling for a possible Southern subculture of violence whose effects on violence might be confused with effects of gun levels.

Table 1 indicates that the vast majority of studies of the effect on gun levels on crime rates did a very poor job of controlling for potential confounding variables. Of 36 studies, only eleven studies controlled for more than three significant control variables; fourteen studies controlled for *none* (e.g., McDowall 1986; Killias 1993; Hemenway and Miller 2000; Duggan 2001). Only two studies controlled for more than six significant control variables—Moody and Marvell (2005) and Kovandzic et al. (2008). Both found no significant positive effect of gun levels on violence rates. The pattern is clear—when researchers do a good job of controlling for potential confounding variables, they find no support for the hypothesis that more guns lead to more crime.

To summarize, the only research that supports the hypothesis that higher gun ownership rates cause higher crime rates is poor quality research that makes at least one, and usually all of, the three key methodological errors identified here. Conversely, research that minimizes these flaws consistently finds no support for the hypothesis.

## IV. AN EXAMPLE OF HOW NOT TO STUDY THE EFFECT OF GUN LEVELS ON CRIME RATES

A recent article by Philip Cook and Jens Ludwig (2006) nicely illustrates all three of these flaws. The authors used a county-level panel design to study homicide trends in the 200 largest U.S. counties over the period 1980-1999, and also performed a state-level version of the same analysis, measuring gun prevalence as the percent of suicides committed with a gun (which they label FSS). They attempted to deal with causal order problems by estimating the association between the previous year's (lagged) gun prevalence and the current year's homicide rate. They concluded that higher gun prevalence causes higher homicide rates.

-71-

### A. The Failure to Properly Address Causal Order Issues in the Relationship between Gun Levels and Homicide Rates

Higher gun levels may affect homicide rates, but higher homicide rates can also contribute to higher gun ownership rates. Homicide is the both the most frightening of crimes, and the most highly publicized, so the occurrence of homicides can encourage more gun acquisition, especially of handguns, for self-protection. This contributes to a thorny chicken-and-the-egg statistical problem—if one finds more gun ownership in places or times with more homicide, did higher gun ownership lead to higher homicide rates, or did higher homicide rates lead to higher gun ownership levels?

Statisticians refer to a problem of "simultaneity"—X affects Y, but Y simultaneously affects X. Although the strategy is intuitively appealing, one cannot solve a simultaneity problem merely by lagging one of the variables and treating it as the cause and the other variable as the effect. If you could, everyone would do it this simple way, and a lot of very complicated statistical analysis would not need to have been done. The obvious attraction of this simplistic strategy is that it seems to solve the causal order problem by ruling out the possibility of a two-way causal relationship between the key independent variable (gun prevalence in this case) and the dependent variable (the homicide rate). After all, this year's homicide rate clearly cannot affect last year's gun prevalence, or anything else in the past. The basic problem nevertheless remains because this year's homicide rate *can* affect the *current* year's gun prevalence, which can in turn affect the current year's homicide rate. Thus, homicides committed in 2003 could motivate some people to acquire guns in 2003, thereby affecting gun prevalence measured for the year 2003, and guns acquired in 2003 could be used to commit murders in 2003.

Changes in gun prevalence can have immediate effects on the homicide rate, notwithstanding Cook and Ludwig's misleading statements that "transfers that move guns from households to use by criminals will ordinarily take some time" (p. 382). The more pertinent observation would be that sometimes guns take very little time to make this "move," so gun acquisition by criminals can *immediately* affect the homicide rate. Cook and Ludwig included only the lagged gun prevalence variable as a predictor in their homicide rate

- 72 -

equation, and by doing so were implicitly assuming that gun prevalence can only affect the homicide rate after a period of at least a year has passed (their observations pertained to one-year units of time). That is, they assumed that guns have *only* a lagged effect on homicide, and *no* immediate (within one year) effect whatsoever.

While it is possible that increases in gun prevalence have some lagged effects, it is not plausible that they have no immediate effect. Violence-prone people who acquire guns do not all wait at least one year before committing a homicide with the gun. Thus, the authors misspecified their model of homicide by excluding the current year's gun prevalence level. They also thereby *evaded* the problem of simultaneity rather than solving it by properly modeling it, e.g., by using instrumental variables methods. If there really is a simultaneous two-way relationship between guns and homicide, the authors' estimates of the "effect" of guns were biased and inconsistent, and thus uninterpretable (Maddala 1992).

As a result, the significant positive coefficient that the authors obtained for their lagged gun prevalence variable may merely reflect the impact of previous years' homicides on previous years' gun prevalence levels, combined with the fact that the homicide rates for previous years are very highly correlated with the current homicide rate. The coefficient cannot be interpreted as an estimate of the effect of gun prevalence on homicide rates, as the authors claimed. As far as one can tell, the positive guns/homicide association that the authors obtained was entirely the result of the effect of homicide rates on gun prevalence.

### B. Use of an Invalid Measure of Trends in Gun Levels

The research was also afflicted by a familiar measurement problem. Cook and Ludwig explicitly conceded that (1) for their purposes, their measure of gun prevalence, the percent of suicides committed with guns (FSS), must reflect "variation over time" in gun prevalence, and that (2) validity for measuring cross-sectional differences in gun prevalence (which *has* been established—Kleck 2004a) is not the same as validity for purposes of measuring changes over time (Cook and Ludwig 2006, p. 380). They claimed that they did establish the cross-temporal validity of FSS by demonstrating a significant association over time between FSS and direct survey measures

- 73-

of gun ownership derived from the General Social Surveys (GSS). The GSS measure was used as the "criterion" variable—a measure already believed to be a relatively valid measure of the target concept being measured.

Their validity test, however, indicated nothing about how strongly correlated FSS is with those survey measures of gun ownership, because the authors merely found that the regression coefficient for FSS, in an equation where the GSS survey measure was the dependent variable, was statistically significant—i.e., significantly different from zero. As any beginning statistics student knows, the fact that an association is statistically significant does not mean it is a strong association. All the authors could legitimately conclude from this information was that the association was not likely to be *zero*—hardly a meaningful standard for measurement validity. To be a valid measure of gun levels, FSS must be *strongly* correlated with actual gun levels, and none of the findings presented by Cook and Ludwig supported such a correlation.

Further, an analyst cannot tell from a regression coefficient how close to a perfect association the association is between the independent variable and the dependent variable, because there is no specific upper limit to a regression coefficient. Consequently, the authors had no objective basis for their claim that the association of FSS with the GSS criterion measure was "especially strong" (p. 381). The authors did not even *report* these regression coefficients, never mind the far more relevant correlation coefficients, measuring the correlation of FSS with GSS over time. If FSS did have a strong association with GSS over time, the authors should have been happy to share this information with readers, since it would bolster their case. Certainly space limitations cannot account for this information—it would have taken a single line of text to say "The average cross-temporal correlation of FSS with the GSS measure across the nine regions was 0.93" or something of that sort.

In fact, the correlation between FSS and GSS over time is not just weak—it is basically zero. Kleck (2004a, pp. 18-25) showed that FSS is unrelated to the GSS survey-based criterion over time. Cook and Ludwig were clearly familiar with this study, since they cited it on p. 380. Depending on exactly which set of years one studies, the correlation of FSS with GSS over time may be weak positive or

weak negative, but it is never very different from zero. As previously noted (see Table 2 and accompanying text), FSS (aka PSG) is only significantly correlated with GSS over time if one inappropriately uses levels of the variables instead of year-to-year changes, and even then the correlations are far too weak to support the use of FSS to measure changes in gun levels.

The authors went to considerable effort to persuade readers that there really is a strong correlation between GSS and FSS, using the technique of shifting to a different level of analysis. In their footnote 6 (p. 382) they reported that the GSS/FSS correlation at the *national* level is r=.635. Even using levels of the variables, my computations indicate the national correlation was only 0.359 for the period 1973-2006 (Table 2, first column). The 0.635 correlation, however they obtained it, is in any case irrelevant since the authors' analysis was done at the level of counties and states, not the nation as a whole, and their main test of measurement validity was at the level of Census regions (their footnote 2). This raises the question - why report the national-level correlation? Why not just directly report the region-level correlations over time that were used in their validity tests? One possible explanation is that correlations at lower levels of aggregation (e.g., for regions rather than nations) are far lower, and are sometimes even negative—that is, year-to-year changes FSS are in the opposite direction to changes in the criterion measure (Table 2; Kleck 2004a, p. 20). Thus, the national-level .635 correlation tells us nothing about cross-temporal correlations at the level of regions, and certainly nothing about cross-temporal correlations at the level of counties or states.

In sum, the FSS measure of gun levels is invalid for measuring changes in gun levels, and it therefore is impossible to tell from this research whether changes in gun prevalence caused changes in homicide rates, since there is no basis for believing that the authors actually measured changes in gun prevalence.

## C. Arbitrary and Limited Specification of Control Variables

The authors implied that they controlled for possible confounding variables by controlling for burglary and robbery rates - because they "are a good reflection of criminogenic factors in the community

- 75 -

that influence homicide rates," and because their model "includes year and county/state fixed effects" (i.e., dummy variables for each year and county or state) (p. 382). These fixed effects dummy variables indirectly control for factors that may affect homicide rates but were not directly measured. Thus, year dummies indirectly control for homicide-relevant factors that vary across years but not across areas, while county or state dummy variables indirectly control for factors that vary across areas but not across years. They also explicitly controlled for a handful of other variables (p. 384), for a total of six explicitly controlled variables. These controls very likely did help isolate the effect of gun prevalence, but are not very extensive. Merely including fixed effects variables by itself does not control for the effects of all other potential causes—if that were true, none of the explicitly measured independent variables such as "percent urban" would have had significant coefficients, since all the variation in homicide rates would have already been explained by the fixed effects dummies.

As is unfortunately common in criminological research, the authors did not report trying out any other control variables, or justify why just these six variables were controlled and not others. And if they did try controlling other combinations of variables, as seems very likely, they did not report the results of these alternative specifications. Among the more conspicuous variables omitted from the authors' models, but commonly included in models of homicide rates, were:

> (1) some measure of Southern culture (such as percent of the population born in the South),
>
> (2) the poverty rate (e.g., percent of families under the poverty line),
>
> (3) the divorce rate (a measure of family disorganization), or
>
> (4) measures of CJS crime control efforts such as police officers per capita or the share of the population in prison.

The authors did not assert that these variables have no effect on homicide rates or are uncorrelated with gun prevalence—they were merely silent on the question. In fact, past research has found these

variables to affect homicide rates (e.g., Kleck and Britt 1993), and there are sound reasons to expect them to also be correlated with gun prevalence, in which case their omission will bias the estimated effects of gun prevalence. Thus, the authors' failure to control for known determinants of homicide rates that are likely to be correlated with gun levels provides misleading estimates of the effects of gun levels on homicide rates, because the guns/homicide association actually reflects, to an unknown degree, the effects of these omitted variables, rather than the effects of gun levels.

The authors' choice of control variables looks all the more arbitrary in light of the variables they *did* include in their model. For example, in their county-level model, they included two variables (mobility, percent female-headed households) that were not significantly related to homicide rates (p. 384). And although they did not report this in their paper, Moody (2009) replicated their state-level model and found that three of the variables in that model were not significantly related to homicide rates (percent urban, mobility, percent female-headed households). Thus, Cook and Ludwig included variables in their models that apparently did not belong, even though their own estimates indicated they were unrelated to homicide rates, while omitting variables that past research had shown *were* related to homicide rates.

This is not mere technical quibbling. The choice of control variables substantially affects the estimates of the effect of gun levels on homicide rates. Moody (2009) re-estimated Cook and Ludwig's state-level models with a different set of control variables, omitting the three nonsignificant variables, and adding in two variables related to homicide rates, an employment measure and the prison population per capita. With this less arbitrary set of control variables in the model, Moody found there was no significant relationship between gun ownership (as measured by PSG) and homicide rates.

There is no way to know if Cook and Ludwig estimated models with less arbitrary sets of control variables included, but it cannot be argued that it did not occur to them to include the prison rate variable. It not only has a highly significant negative relationship with state homicide rates (as demonstrated by Moody), but Cook and Ludwig themselves had previously used the variable in their own state-level crime rate analyses and found it to be significantly

-77-

related to burglary rates (2003, p. 105). It is hard to believe Cook and Ludwig did not estimate any homicide models with the prison rate included, and assuming they did so, hard to understand why they did not obtain the same significant negative association that Moody did. And even if they had somehow found no significant association, why omit the prison rate if they included three other variables that also had no significant association with homicide rates?

In sum, it is clear that estimates of the effect of gun levels on crime rates can differ radically depending on which control variables are included in the model, and researchers like Cook and Ludwig include arbitrary combinations of control variables without justifying either why they omit variables known to be related to the crime rates being analyzed, or why they include variables that their own results (as well as those or prior researchers) indicate are irrelevant. Needless to say, suspicious readers can only wonder whether some researchers try out different combinations of control variables until they get results to their liking. In the absence of theoretically and methodologically legitimate justifications for the choice of control variables, this suspicion is bound to arise.

### D. Sample Bias

While the aforementioned flaws are the three most common of the serious problems distorting research on the impact of gun levels on violence rates, the Cook-Ludwig study suffered from other serious problems as well. Sample bias in the county-level analysis was introduced by the authors' decision to confine the analysis to just the 200 counties with the largest populations, i.e. big urban counties. These are places where homicide rates are higher, and thus where guns are more likely to be used to commit homicides. In contrast, in smaller, less urban counties, homicide is lower, gun ownership is higher, and thus a much smaller share of guns are used to commit homicides or other violent crimes, or even to be owned for defense against violent crime (Kleck 2004b). In short, by studying only big urban counties, the authors were confining their analysis to places where there was likely to be a stronger connection between guns and violent crime. Cook and Ludwig offered a possible legitimate explanation for examining only large counties—that the number of suicides per year is large enough to reliably measure FSS only in

bigger population counties—but this does not alter the biased nature of the resulting sample, or mitigate the potentially distorting effects it might have on results. A better approach would have been to use both an all-counties sample and a big-counties sample, and see if results are the same.

If this hypothesis about sample bias is correct, the more one confines analysis to big urban counties, the larger the coefficient representing the effect of gun prevalence on homicide will be. This was directly confirmed in the authors' own results in their Table 3 (p. 385). The gun coefficient was 0.086 in the total homicide model (first column) when the estimate was based on the 200 biggest counties, increased to 0.131 when the sample was further limited to the 100 largest counties, and increased again to 0.223 when it was limited still further to the 50 biggest counties—a near-tripling of the estimated effect. The authors failed to see the sample bias implications of this pattern, instead merely regarding it as an indication that their estimates of gun effects were getting "better" as measurement error in their proxy for gun prevalence, FSS, went down (pp. 385-386). Their own results suggest that if the authors had studied all U.S. counties rather than just big urban counties, the estimated effect of gun levels on homicide rates would have been much lower, and possibly not significantly different from zero.

### E. Overinterpretation of the Patterns of Findings Regarding Gun vs. Nongun Homicide

Cook and Ludwig carried out a perfectly reasonable set of analyses in which the dependent variable was, successively, (1) the rate of *total* homicides, (2) the rate of *gun* homicides, and (3) the rate of *nongun* homicides, as many prior researchers have done. They reasoned that if gun prevalence was really contributing to higher homicide rates, rather than being spuriously related due to its association with other homicide-affecting variables, it should be related to the gun homicide rate but not the nongun homicide rate. And this was indeed what the authors found (Table 3), leading them to conclude that this supported their conclusion that higher gun prevalence increases homicide rates.

Unfortunately, this pattern of findings is also perfectly consistent with the opposite proposition—that gun prevalence has *no*

-79-

effect on homicide rates, but higher homicide rates motivate more people to acquire guns for protection. If causation runs from homicide rates to gun prevalence (a problem the authors did not solve by using lagged gun prevalence as their gun measure), the authors should have devoted some thought to the possibility that rates of *gun* homicide have a stronger motivating effect on gun acquisition for self-protection than rates of *nongun* homicide. This would be plausible if gun homicides were more frightening than nongun homicides, and more likely to motivate acquisition of guns for protection. This may be true simply because gun homicides involve guns, but it is also reasonable because gun homicides are more likely than nongun homicides to be stranger killings (29 percent vs. 23 percent; author's analysis of FBI Supplementary Homicide Reports data covering 1976-1998 U.S. homicides - Inter-university Consortium for Political and Social Research, 2001). Violence among strangers is more frightening because it is perceived as more random and unpredictable, and thus a risk that can affect anyone, not just those with relatives and other associates known to be violent. Gun homicides are also more likely than nongun homicides to be publicized in newspapers (Duwe 2000, p. 384), so people are more likely to hear about them and possibly be motivated to acquire guns for self-protection as a result. Consequently, one would expect gun ownership rates to be more strongly related to gun homicide rates than to nongun homicide rates because the occurrence of gun homicides is more likely to motivate people to acquire guns for self-protection than the occurrence of nongun homicides—even if gun ownership levels had no effect whatsoever on homicide rates. Thus, the meaning of this pattern of guns/homicide associations is much more ambiguous than Cook and Ludwig's one-sided discussion suggested.

## CONCLUSION

Research on the effect of gun levels on violence rates will not progress until researchers start taking these issues seriously. Competent research requires that analysts use accepted methods for modeling the possible two-way causal relationship between gun levels and violence rates, or otherwise sort out the difficult causal order problems involved. Merely relating the lagged gun ownership rate to the current crime rate is not a satisfactory method. Likewise,

they must use valid measures of gun prevalence, which at present means research studying changes over time is not feasible because there are no valid proxies for changes over time in gun prevalence. In particular, the percent of suicides committed with guns is not a valid indicator of trends in gun levels. Finally, researchers must make a conscientious effort to directly control for as many possible confounding variables as possible. The study examined in detail here is, unfortunately, not a conspicuously bad example of work in the area; quite the contrary, it is fairly typical. It was published in a reputable refereed journal, and presumably approved for publication by competent scholars. These anonymous reviewers, however, were evidently not very well-versed in the pitfalls specific to this area of research.

One might be tempted to assert that it is unreasonable to expect researchers to solve all three of these problems, because it is impossible to achieve. In fact, research approximating solutions to these problems has already been conducted (Kleck and Patterson 1993; Kovandzic, Schaffer and Kleck 2008). For example, Kovandzic and his colleagues used a valid measure of gun prevalence (the percent of suicides committed with guns, used in a cross-sectional study), controlled for a large number of potential confounding variables, and used statistically defensible methods for disentangling causal order. More specifically, they used instrumental variables methods to model the two-way relationship between guns and homicide, and carefully tested the relevance and validity of the instrument variables they used. They directly demonstrated how much difference it makes in the results whether one properly models the possible two-way relationship between gun levels and homicide rates. When this issue was ignored, and it was simply assumed that homicide rates could have no immediate effect on gun acquisition, the results seemed to indicate a significant homicide-increasing effect of gun prevalence. Once the model was modified to take account of the contemporaneous effects of homicide rates on gun ownership, however, these apparent effects completely disappeared, and even reversed slightly. That is, the prevalence of gun ownership showed a slight negative effect on homicide rates. Failing to properly treat gun prevalence as an "endogenous" variable (a variable affected by homicide rates) creates a misleading impression that higher gun prevalence leads to

- 81-

higher homicide rates, when in fact the reverse is true—higher violence rates cause higher gun ownership rates.

At minimum, the work by Kovandzic and his colleagues demonstrates that the problems identified herein are amenable to credible solutions, and that research that makes a serious effort to solve these problems arrives at conclusions diametrically opposed to those drawn in studies that do not make such efforts.

## REFERENCES

Azrael, Deborah, Philip J. Cook and Matthew Miller (2004) "State and Local Prevalence of Firearms Ownership Measurement, Structure and Trends" *Journal of Quantitative Criminology* 20(1) 43-62.

Bordua, David J. 1986. "Firearms ownership and violent crime: a comparison of Illinois counties." Pp. 156-88 in *The Social Ecology of Crime*, edited by James M. Byrne and Robert J. Sampson. N.Y.: Springer-Verlag.

Bordua, David J., and Alan J. Lizotte. 1979. "Patterns of legal firearms ownership: a cultural and situational analysis of Illinois counties." *Law & Policy Quarterly* 1:147-75.

Brearley, H.C. 1932. *Homicide in the United States*. Chapel Hill: University of North Carolina Press.

Brill, Steven. 1977. *Firearm Abuse: A Research and Policy Report*. Washington, D.C.: Police Foundation.

Clotfelter, Charles T. 1981. "Crime, disorders, and the demand for handguns." *Law & Policy Quarterly* 3:425-446.

Cook, Philip J. 1979. "The effect of gun availability on robbery and robbery murder." Pp. 4381 in *Policy Studies Review Annual*, edited by Robert Haveman and B. Bruce Zellner. Beverly Hills: Sage.

Cook, Philip J., and Jens Ludwig. 2003. "Guns and burglary." Pp. 74-107 in *Evaluating Gun Policy*, edited by Jens Ludwig and Philip J. Cook. Washington, D.C.: Brookings Institution.

_____ . 2006. "The cost of guns." *Journal of Public Economics* 90 (1-2):379-391.

Duggan, Mark. 2001. "More guns, more crime." *Journal of Political Economy* 109:1086-1114.

Duwe, Grant. 2000. "Body count journalism." *Homicide Studies* 4:364-399.

Fisher, Joseph C. 1976. "Homicide in Detroit: the role of firearms." *Criminology* 14:387-400.

Hemenway, David, and Matthew Miller. 2000. "Firearm availability and homicide rates across 26 high-income countries." *Journal of Trauma* 49:985-988.

Hoskins, Anthony W. 2001. "Armed Americans." *Justice Quarterly* 18:569-592.

Inter-university Consortium for Political and Social Research. 2001. *Uniform Crime Reporting Program Data [United States]: Supplementary Homicide Reports, 1976-1999* [Computer file]. Compiled by U.S Department of Justice, Federal Bureau of Investigation. ICPSR ed. Ann Arbor, MI: Interuniversity Consortium for Political and Social Research [producer and distributor], 2001.

Killias, Martin. 1993. "Gun ownership, suicide, and homicide: an international perspective." Pp. 289-303 in *Understanding Crime: Experiences of Crime and Crime Control*, edited by Anna del Frate, Uglijesa Zvekic, and Jan J. M. van Dijk. Rome: UNICRI.

Killias, Martin, John van Kesteren, and Martin Rindlisbacher. 2001. "Guns, violent crime, and suicide in 21 countries." *Canadian Journal of Criminology* 43:429-448.

Kleck, Gary. 1979. "Capital punishment, gun ownership, and homicide." *American Journal of Sociology* 84:882-910.

_____. 1984. "The relationship between gun ownership levels and rates of violence in the United States." Pp. 99-135 in *Firearms and Violence: Issues of Public Policy*, edited by Don B. Kates, Jr. Cambridge, Mass.: Ballinger.

_____. 2004a. "Measures of gun ownership levels for macro-level crime and violence research." *Journal of Research in Crime and Delinquency* 41(1):3-36.

_____. 2004b. "The Great American Gun Debate: What Research Has to Say." Pp. 470-487 in *The Criminal Justice System*, 9th Edition, edited by George F. Cole, Marc G. Gertz, and Amy Bunger. Belmont, CA: Wadsworth/ Thompson Learning (2004).

Kleck, Gary, and E. Britt Patterson. 1993. "The impact of gun control and gun ownership levels on violence rates." *Journal of Quantitative Criminology* 9:249-288.

Kovandzic, Tomislav, Mark Schaffer and Gary Kleck. 2008. "Estimating the causal effect of gun prevalence on homicide rates." Discussion Paper Number 3589. Institute for the Study of Labor (IZA), Bonn, Germany. Available at http://www.iza.org/index_html?lang=en&mainframe=http://www.iza.org/en/webcontent/publications/papers/viewAbstract%3Fdp_id%3D3589&topSelect=publications&subSelect=papers.

Krug, Alan S. 1967. "A statistical study of the relationship between firearms licensing laws and crime rates." *Congressional Record*, 7-25-67, pp. H9366-H9370.

Lester, David. 1985. "The use of firearms in violent crime." *Crime & Justice* 8:115-20.

_____. 1987. "An availability-acceptability theory of suicide." *Activitas Nervosa Superior* 29:164-6.

_____. 1988. "Firearm availability and the incidence of suicide and homicide." *Acta Psychiatrica Belgium* 88:387-393.

_____. 1990. "Relationship between firearm availability and primary and secondary murder." *Psychological Reports* 67:490.

_____. 1996. "Gun ownership and rates of homicide and          suicide." *European Journal of Psychiatry* 10:83-85.

Lott, John R., Jr. 2000. *More Guns, Less Crime.* 2nd edition. Chicago: University of Chicago Press.

Maddala, G.S. 1992. *Introduction to Econometrics.* 2nd edition. N.Y.: Macmillan.

Magaddino, Joseph P., and Marshall H. Medoff. 1984. "An empirical analysis of federal and state firearm controls." Pp. 225-58 in *Firearms and Violence*, edited by Don B. Kates, Jr. Cambridge: Ballinger.

McDowall, David. 1986. "Gun availability and robbery rates: a panel study of large U.S. cities, 1974-1978." *Law & Policy* 8:135-48.

_____. 1991. "Firearm availability and homicide rates in Detroit, 1951-1986." *Social Forces* 69:1085-1099.

McDowall, David, and Colin Loftin. 1983. "Collective security and the demand for handguns." *American Journal of Sociology* 88:1146-1161.

Miller, Matthew, Deborah Azrael, and David Hemenway. 2002. "Firearm availability and unintentional firearm deaths, suicide, and homicide among 5-14 year olds." *Journal of Trauma Injury, Infection, and Critical Care* 52:267-275.

HeinOnline -- 21 J. on Firearms & Pub. Pol'y 84 2009

Miller, Matthew, David Hemenway, and Deborah Azrael,. 2007. "State-level homicide victimization rates in the US in relation to survey measures of household firearm ownership, 2001-2003." *Social Science & Medicine* 64:656-664.

Moody, Carlisle E. and Thomas B. Marvell (2005) "Guns and crime" *Southern Economic Journal*, 71: 720-36.

Moody, Carlisle E. 2009. "Firearms and homicide." Unpublished paper presented at the Critical Issues Symposium, Economics of Crime, Florida State University, Tallahassee, Florida, March 28, 2009.

Murray, Douglas R. 1975. "Handguns, gun control laws and firearm violence." *Social Problems* 23:8192.

Newton, George D., and Franklin Zimring. 1969. *Firearms and Violence in American Life.* A Staff Report to the National Commission on the Causes and Prevention of Violence. Washington, D.C.: U.S. Government Printing Office.

Phillips, Llad, Harold L. Votey, and John Howell. 1976. "Handguns and homicide." *Journal of Legal Studies* 5:463-78.

Rice, Douglas C., and David D. Hemley. 2002. "The market for new handguns." *Journal of Law and Economics* 45:251-265.

Seitz, Stephen T. 1972. "Firearms, homicides, and gun control effectiveness." *Law and Society Review* 6:595-614.

Sorenson, Susan B, and Richard A. Berk. 2001. "Handgun sales, beer sales, and youth homicide, California, 1972-1993." *Journal of Public Health Policy* 22:183-197.

Southwick, Lawrence, Jr. 1997. "Do guns cause crime? Does crime cause guns?: a Granger test." *Atlantic Economic Journal* 25:256-273.

_____. 1999. "Guns and justifiable homicide: deterrence and defense." *Saint Louis University Public Law Review* 18:217-246.

Stolzenberg, Lisa, and Stewart J. D'Alessio. 2000. "Gun availability and violent crime." *Social Forces* 78:1461-1482.

JOURNAL ON FIREARMS & PUBLIC POLICY        VOLUME TWENTY-ONE

**Table 1. Macro-Level Studies of the Impact of Gun Levels on Crime Rates[a]**

| Study | Sample | Gun Levels[b] | Measure of Rates[c] | Number of Control Variables[d] | Causal Order?[e] | Results[f] |
|---|---|---|---|---|---|---|
| Brearley (1932) | 2 states | PGH | THR | 0 | No | Yes |
| Krug (1967) | 50 states | HLR | ICR | 0 | No | No |
| Newton and Zimring (1969) | 4 years, Detroit | NPP | THR, TRR, AAR | 0 | No | Yes |
| Seitz (1972) | 50 states | GHR, FGA | THR, AAR | 1 | No | Yes |
| Fisher (1976) | 9 years, Detroit | NPP, GRR, PGH | THR | 0 | (No) | Yes |
| Phillips et al., (1976) | 18 years, U.S. | PROD | THR | 1 | No | Yes |
| Brill (1977) | 11 cities | PGC | ICR | 0 | No | No |
|  |  |  | THR | 0 | No | Yes |
|  |  |  | TRR | 0 | No | No |
| Kleck (1979) | 27 years, U.S. | PROD | THR | 6 | (No) | Yes |
| Cook (1979) | 50 cities | PGH, PSG | TRR | 4 | No | No |
|  |  |  | RMR | 4 |  | Yes |

- 86 -

Table 1. Macro-Level Studies of the Impact of Gun Levels on Crime Rates[a] (continued)

| Study | Sample | Gun Levels[b] | Measure of Rates[c] | Number of Control Variables[d] | Causal Order?[e] | Results[f] |
|---|---|---|---|---|---|---|
| Kleck (1984) | 32 years, U.S. | PROD | THR | 5 | (No) | No |
|  |  |  | TRR | 2 |  | Yes |
| Maggadino and Medoff (1984) | 31 years, U.S. | PROD | THR | 6 | (No) | No |
| Lester (1985) | 37 cities | PCS | VCR | 0 | No | No |
| Bordua (1986) | 102 counties | GLR, SIR | HAR, THR | 0-4 | No | No |
|  | 9 regions |  | GHR |  |  | No |
| McDowall (1986) | 48 cities, 2 years[g] | PGH, PSG | TRR | 0 | (No) | No |
| Lester (1988) | 9 regions | SGR | THR | 0 | No | Yes |
| Lester (1990) | 48 states | PSG | THR | 0 | No | Yes/No |
| McDowall (1991) | 36 years, Detroit | PSG, PGR | THR | 3 | (No) | Yes |

Table 1. Macro-Level Studies of the Impact of Gun Levels on Crime Rates[a] (CONTINUED)

| Study | Sample | Gun Levels[b] | Measure of Rates[c] | Number of Control Variables[d] | Causal Order?[e] | Results[f] |
|---|---|---|---|---|---|---|
| Killias (1993) | 16 nations | SGR | THR, GHR | 0 | No | Yes |
| Kleck and Patterson (1993) | 170 cities | 5-item factor including PSGh | THR, GHR, TRR, GRR, AAR,GAR | 4-6 | Yes | No |
| Lester (1996) | 12 nations | PGH, PSG | THR, GHR | 0 | No | Yes |
| Southwick (1997) | 48 years, U.S. | PROD | THR ,TP R , TRR,AAR | 0 | (No) | No |
| Southwick (1999) | 34 years, U.S. | HGS | THR, TRR, AAR, TPR, VCR, BUR | 0-2 | No | No |
| Hemenway and Miller (2000) | 26 nations | PGH, PSG | THR | 0 | No | Yes |
| Lott (2000) | 2 years, 15 states[g] | SGR | THR, TPR, TRR, AAR, 3 others | 5 | No | No |

- 88-

Table 1. Macro-Level Studies of the Impact of Gun Levels on Crime Rates[a] (CONTINUED)

| Study | Sample | Gun Levels[b] | Measure of Rates[c] | Number of Control Variables[d] | Causal Order?[e] | Results[f] |
|---|---|---|---|---|---|---|
| Stolzenberg and D'Alessio (2000) | 4 years, 46 counties | CCW, GUNSTOL | VCR | 0-1 | No | Yes |
| Duggan (2001) | 19 years, 50 states | GMR | THR, TPR, TRR, AAR | 0 | No | Yes |
| Hoskin (2001) | 36 nations | PSG | THR | 2 | (No) | Yes |
| Killias et al. (2001) | 21 nations | SGR | THR, TRR, TAR, GHR, GRR, GAR | 0 | No | No |
| Sorenson and Berk (2001) | 22 years, California | HGS | THR | 0-3 | (No) | Yes |
| Miller et al. (2002) | 10 years, 50 states | PSG, PHG | THR | 0-3 | No | Yes |
| | 10 years, 9 regions | SGR | THR | 0-3 | No | No |
| Cook and Ludwig (2003) | 22 years, 50 states | PSG | BUR | 1 | (No) | Yes |

-89-

Table 1. Macro-Level Studies of the Impact of Gun Levels on Crime Rates[a] (continued)

| Study | Sample | Gun Levels[b] | Measure of Rates[c] | Number of Control Variables[d] | Causal Order?[e] | Results[f] |
|---|---|---|---|---|---|---|
| Azrael et al. (2004) | 49 states | PSG | THR | 1 | No | Yes |
| Moody and Marvell (2005) | 17 years, c. 29 states | PSG | THR, TRR, TAR, TPR,BUR | 6-10 | (No) | No |
| Cook and Ludwig (2006) | 20 years, 50 states | PSG | THR, GHR, NHR | 4 | (No) | Yes |
|  | 20 years, 200 counties | PSG | THR, GHR, NHR | 4 | (No) | Yes |
| Miller et al. (2007) | 50 states | SGR | THR, GHR, NHR | 5-6 | No | Yes |
| Kovandzic et al. (2008) | 1,456 counties | PSG | THR, GHR, NHR | 10 | Yes | No |
| Moody (2009) | 27 years, 50 states | PSG | THR | 3 | (No) | No |
|  | US, 59 years | PROD | THR | 0 | (No) | No |

**Notes for Table 1:**

a. Table covers only studies and findings where the dependent variable was a crime rate, as opposed to the fraction of crimes committed with guns, and where gun ownership levels were actually measured, rather than assumed. Studies that examined only gun violence rates (e.g. only gun homicides) were excluded (e.g. Murray 1975).

b. Measures of Gun Level: CCW = concealed carry permits rate; FGA = Fatal gun accident rate; GLR = Gun owners license rate; GMR = Gun magazine subscription rates; GRR = Gun registrations rate; GUNSTOL = % of the dollar value of stolen property due to guns; HGS = handgun sales (retail); HLR = Hunting license rate; NPP = Number of handgun purchase permits; PGA = % aggravated assaults committed with guns; PGC = % homicides, aggravated assaults and robberies (combined together) committed with guns; PCS = same as PGC, but with suicides lumped in as well; PGH = % homicides committed with guns; PGR = % robberies committed with guns; PSG = % suicides committed with guns; PROD= Guns produced minus exports plus imports, U.S.; SGR = Survey measure, % households with gun(s); SHR = Survey measure, % households with handgun(s); SIR = Survey measure, % individuals with gun(s).

c. Crime Rates: AAR = Aggravated assault rate; BUR = burglary rate; GAR = Gun aggravated assault rate; GHR = Gun homicide rate; GRR = Gun robbery rate; HAR = Homicide, assault and robbery index (factor score); ICR = Index crime rate; NHR = nongun homicide rate; RMR = Robbery murder rate; THR = Total homicide rate; TPR = Total rape rate; TRR = Total robbery rate; VCR = Violent crime rate.

d. Number of significant control variables in the most complete crime rate equations, excluding "fixed effects" variables (dummy variables denoting area or time period) and lagged dependent variables.

e. Did research use technically sound methods to establish the causal order between gun levels and crime rates? (No) means researchers took steps to address the issue, but used ineffective methods such as merely lagging the gun variable, or used models that were probably underidentified.

f. Yes=Study found significant positive association between gun levels and violence; No=Study did not find such a link.

g. Panel design, two waves.

h. Five-item factor composed of PSG, PGH, PGR, PGA, and the percent of dollar value of stolen property due to stolen guns.

- 91 -

**TABLE 2. The Percent of Suicides with Guns is Not a Valid Measure of Changes in Gun Prevalence**

**Correlations of Percent of Suicides with Guns, and General Social Surveys Measure of Household Gun Prevalence, Across the Years 1973-2006[aa]**

| Region | Levels | Year-to-year Change[b] |
|---|---|---|
| New England | 452* | -.118 |
| Middle Atlantic | .047 | .249 |
| East North Central | .381* | .061 |
| West North Central | .117 | .188 |
| South Atlantic | .572** | .093 |
| East South Central | .405* | .041 |
| West South Central | .694** | -.214 |
| Mountain | .117 | -.049 |
| Pacific | .252 | -.021 |
| U.S. | .359 | -.073 |

* .01 < p < .05
** p < .01

**Notes for Table 2:**

a. There were 21 General Social Surveys conducted during this period, in 1973, 1974, 1976, 1977, 1980, 1982, 1984, 1985, 1987, 1988, 1989, 1990, 1991, 1993, 1994, 1996, 1998, 2000, 2002, 2004, and 2006. The GSS data on percent of households reporting guns (excluding those who refused or otherwise failed to answer the question) were computed using the facilities of the University of California at Berkeley Survey Documentation & Analysis website at http://sda.berkeley.edu/cgi-bin/hsda?harcsda+gss06.

Data on the percent of suicides committed with guns were computed using the facilities on the CDC Wonder website at http://wonder.cdc.gov/mortSQL.html. Suicide data for 2006 were not yet available, so 2005 data were substituted.

b. Year-to-year changes in the percent of suicides committed with guns (PSG) in a given region were correlated with year-to-year changes in the percent of households reporting guns in the GSS. For example, the year-to-year change in PSG for New England in 1974 was PSG in 1974 minus PSG in 1973, divided by PSG in 1973. Thus, this figure represents the proportional change in PSG from 1973 to 1974.

HeinOnline -- 21 J. on Firearms & Pub. Pol'y 93 2009

EXHIBIT 51

# Firearms Laws and the Reduction of Violence
## A Systematic Review

Robert A. Hahn, PhD, MPH, Oleg Bilukha, MD, PhD, Alex Crosby, MD, MPH, Mindy T. Fullilove, MD, Akiva Liberman, PhD, Eve Moscicki, ScD, MPH, Susan Snyder, PhD, Farris Tuma, ScD, Peter A. Briss, MD, MPH, Task Force on Community Preventive Services

## Overview

The Task Force on Community Preventive Services (the Task Force) is conducting systematic reviews of scientific evidence about diverse interventions for the prevention of violence, and resulting injury and death, including, among others, early childhood home visitation,[1,2] therapeutic foster care,[3] the transfer of juveniles to the adult justice system, school programs for the teaching of prosocial behavior, and community policing. This report presents findings about the effectiveness of firearms laws in preventing violence. Studies of the following firearms laws were included in the review: bans on specified firearms or ammunition; restrictions on firearms acquisition; waiting periods for firearms acquisition; firearms registration; licensing of firearms owners; "shall issue" carry laws that allow people who pass background checks to carry concealed weapons; child access prevention laws; zero tolerance laws for firearms in schools; and combinations of firearms laws.

The Task Force found the evidence available from identified studies was insufficient to determine the effectiveness of any of the firearms laws reviewed singly or in combination. A finding that evidence is insufficient to determine effectiveness means that we do not yet know what effect, if any, the law has on an outcome—not that the law has no effect on the outcome. This report describes how the reviews were conducted, gives detailed information about the Task Force's findings, and provides information about research gaps and priority areas for future research.

## Introduction

Although rates of firearms-related[a] injuries in the United States have declined since 1993, they remained the second leading cause of injury mortality in 2001, the most recent year for which complete data are available.[4] Of 29,573 firearms-related deaths in 2001—an average of 81 per day—16,869 (57.0%) were suicide; 11,671 (39.5%) were homicide or legal intervention (e.g., homicide by police); 802 (2.7%) were unintentional; and 231 (0.8%) were of undetermined circumstances. In 1998, for each firearm-related death, 2.1 nonfatal firearm-related injuries were treated in emergency departments.[5] It is estimated that 24.3% of all violent crimes—murder, aggravated assault, rape, and robbery—committed in 1999 (a total of 1,430,693) were committed with a firearm.[6] Rates of firearm-related homicide, suicide, and unintentional death in the United States exceed those of 25 other high-income nations (i.e., 1996 GNP ≥US$9636 per capita) for which data are available (Figure 1).[7] The cost of firearm-related violence in the United States is estimated to be approximately $100 billion per year.[8]

Approximately 4.5 million new (i.e., not previously owned) firearms are sold each year in the United States, including 2 million handguns. In addition, estimates of annual secondhand firearms transactions range from 2 to 4.5 million.[9,10] Further, it is estimated that approximately 0.5 million firearms are stolen annually.[10] Thus, the estimated total number of firearms transactions ranges from 7 to 9.5 million per year, of which between 47% and 64% are new firearms.

New firearms can be sold legally only by federal firearms licensees (FFLs); FFL transactions comprise the primary market.[10] FFLs are required to comply with the Permanent "Brady Law" (P.L. 103-159, Title XVIII, Section 922(t)) and initiate background checks to investigate whether would-be purchasers violate federal or state purchasing requirements (e.g., people convicted of a felony must be excluded). In the "secondary market" of firearms not sold by FFLs, private citizens

From the Epidemiology Program Office (Hahn, Bilukha, Snyder, Briss) and National Center for Injury Prevention and Control (Crosby), Centers for Disease Control and Prevention, Atlanta, Georgia; Department of Psychiatry and Public Health, Columbia University (Fullilove), New York, New York; National Institute of Justice (Liberman), Washington, DC; National Institute of Mental Health (Moscicki, Tuma), Bethesda, Maryland

Address correspondence and reprint requests to: Robert A. Hahn, PhD, MPH, Senior Scientist, Violence Prevention Review, Community Guide Branch, Centers for Disease Control and Prevention, 1600 Clifton Road, MS E-90, Atlanta, GA 30333. E-mail: RHahn@cdc.gov.

[a] A firearm is a weapon (e.g., handgun, rifle, or shotgun) in which a shot is propelled by gunpowder.



**Figure 1.** Firearm-related mortality for high-income World Health Organization Member States (most recent year available between 1990 and 2000). (Note: A firearm is defined as a weapon [e.g., handgun, rifle, or shotgun] in which a shot is propelled by gunpowder.)

may sell their firearms without a license; firearms shows constitute an important segment of the secondary market.[10] Private citizens are not supposed to knowingly sell firearms to people in excluded categories, but, although several states require background checks for private sales,[9] private sales are not federally regulated.[11]

The 1994 National Survey of the Private Ownership of Firearms (NSPOF) indicated that adults in the United States owned approximately 192 million working firearms—an average of one per adult.[12] NSPOF also indicated that firearms ownership was unevenly distributed in the population: 24.6% of U.S. adults owned a firearm—41.8% of men and 9.0% of women. Another survey[6] found that 41% of (adult) respondents reported having a firearm in their home in 1994, as did 32% in 2000. A third survey[13] reported that 35% of homes with children aged <18 years had at least one firearm. Of the 192 million firearms owned in the United States in 1994, 65 million were handguns, 70 million rifles, 49 million shotguns, and the remainder, other firearms.[12] Approximately 40% of handguns and long firearms were semiautomatic. Among handgun owners, 34.0% kept their handguns loaded and unlocked. An estimated 10 million handguns—one sixth of the handguns owned—are regularly carried by their owners, about half in the owners' cars and the other half on the owners' persons.[10]

The NSPOF also found that, among adult firearm owners, 9.7 million owned more than an average of ten firearms each, whereas 34.4 million owned a mean of approximately 2.5 firearms each. Among owners who only owned handguns, 74.4% reported owning for self-defense, 0.5% for hunting, 10.8% for target or sport shooting, and the remaining 13.5% for other purposes. Among owners of long firearms only (i.e., rifles and shotguns), 14.9% reported owning for self-defense, 69.9% for hunting, 6.1% for target or sport shooting, and the remaining 9.1% for other purposes.

This review examines firearms laws as one of many potential approaches to the reduction of firearm-related violence.[14,15] The manufacture, distribution, sale, acquisition, storage, transportation, carrying, and use of firearms in the United States are regulated by a complex array of federal, state, and local laws and regulations. The focus of this review is on assessing the effects of selected federal and state laws on violence-related public health outcomes, including death and injury resulting from violent crimes, suicide, and unintentional incidents; we also note effects on other outcomes, such as property crime, the apprehension of criminals, and school expulsion.

Reviews of firearms laws and studies of their effects have been conducted by many others.[16–20] The present review of selected laws differs from those reviews in that

**Table 1.** Selected *Healthy People 2010*[21] objectives related to firearms legislation, and proposed health-related outcomes

**Injury prevention**
Reduce firearm-related deaths from 11:3 to 4.1 per 100,000 population[a] (Objective 15-3).
Reduce the proportion of persons living in homes with firearms that are loaded and unlocked from 19% to 16%[a] (Objective 15-4).
Reduce nonfatal firearm-related injuries from 24.0 (in 1997) to 8.6 per 100,000 population (Objective 15-5).

**Unintentional injury prevention**
Reduce deaths caused by unintentional injuries from 35.0 to 17.5 per 100,000 population[a] (Objective 15-13).
(Developmental) Reduce nonfatal unintentional injuries (Objective 15-14).

**Violence and abuse prevention**
Reduce homicides from 6.5 to 3.0 per 100,000 population[a] (Objective 15-32).
Reduce the rate of physical assault by current or former intimate partners from 4.4 (in 1998) to 3.3 per 1000 persons aged ≥12 years (Objective 15-34).
Reduce the annual rate of rape or attempted rape from 0.8 (in 1998) to 0.7 per 1000 persons aged ≥12 years (Objective 15-35).
Reduce sexual assault other than rape from 0.6 (in 1998) to 0.4 per 1000 persons aged ≥12 years (Objective 15-36).
Reduce physical assaults from 31.1 (in 1998) to 13.6 per 1000 persons aged ≥12 years (Objective 15-37).
Reduce weapon carrying by adolescents on school property from 6.9% (in 1999) to 4.9% (students in grades 9 through 12, carrying during the past 30 days) (Objective 15-39).

**Mental health and mental disorders**
Reduce the suicide rate from 11.3 to 5.0 per 100,000 population[a] (Objective 18-1).
Reduce the 12-month average rate of suicide attempts from 2.6% to 1% among adolescents in grades 9 though 12 (Objective 18-2).

[a]Baseline: 1998 data, age adjusted to the year 2000 standard population.

it is based on systematic epidemiologic evaluations and syntheses of all available literature meeting specified criteria.

## The *Guide to Community Preventive Services*

The systematic reviews in this report represent the work of the independent, nonfederal Task Force on Community Preventive Services (the Task Force). The Task Force is developing the *Guide to Community Preventive Services* (the *Community Guide*) with the support of the U.S. Department of Health and Human Services (DHHS) in collaboration with public and private partners. The Centers for Disease Control and Prevention (CDC) provides staff support to the Task Force for development of the *Community Guide*. A special supplement to the *American Journal of Preventive Medicine*, "Introducing the Guide to Community Preventive Services: Methods, First Recommendations and Expert Commentary," published in January 2000 (volume 18, supplement 1), presents the background and the methods used in developing the *Community Guide*. The *Community Guide* conducts reviews on a wide array of public health topics. The present review is part of a broader *Community Guide* review of violence prevention. The broader review focuses on youth as victims and perpetrators of violence, but this review addresses firearms laws affecting both adults and youth, since there are few laws directed specifically toward youth.

## *Healthy People 2010* Goals and Objectives

This review provides information on the state of knowledge about firearms laws interventions related to the violence prevention objectives in *Healthy People 2010*,[21] the disease prevention and health promotion agenda for the United States. These objectives identify some of the significant preventable threats to health and help focus the efforts of public health systems, policymakers, and law enforcement officials in their efforts to address those threats. Many of the proposed *Healthy People* objectives in Chapter 15, "Injury and Violence Prevention," include outcomes that might be affected by firearms laws (Table 1).

## Conceptual Approach and Analytic Framework

The general methods for conducting systematic reviews for the *Community Guide* have been described in detail elsewhere.[22–25] This section describes the conceptual approach, the selection of laws for review, review methods, and the determination of which outcomes to consider in assessing the effects of firearms laws on violence.

The logic model used by the review team to evaluate the effectiveness of firearms laws in reducing violence (Figure 2) depicts the flow of influences of firearms laws on firearms from their manufacture, through their distribution, acquisition, storage, carrying, and use, to violent acts (including self-defense) and physical or psychosocial injury to direct and indirect victims. Enforcement plays a role at several stages in this process. The enforcement of firearms laws may prevent violence by averting illegal firearms use and may also deter potential violence. Inadequate enforcement may diminish the effect of a law and make it difficult to assess the potential effect of a law.



**Figure 2.** Effects of firearms laws on violence.

We note (Figure 2) two ways in which the legal process may itself be limited by regulation restrictions: (1) through bans on firearms litigation, and (2) through preemption laws that prohibit lower-level legislative bodies (e.g., counties) from enacting stronger firearms laws than those enacted at a higher level (e.g., states). The model also indicates how violent outcomes may, in turn, affect the legislative process by means of several feedback loops (e.g., the effects of mass shootings on efforts to pass laws). The laws reviewed here were chosen to cover different facets of this model. Many other legal measures also merit study (e.g., laws requiring firearm safety training, allowing purchase of only one firearm per month, increasing taxes, and requiring background checks in private sales).[26]

The present review focuses on firearms laws as one means of preventing violence. Our approach is consistent with the preventive orientation of public health and with the general approach of the *Community Guide*. Prevention is regarded as a complement to, not a replacement for, law enforcement. Subsequent reviews will examine several aspects of the justice system in reducing violence.

The scientific evidence of effectiveness was reviewed for seven firearms laws and for combinations of firearms laws (including combinations of the other laws reviewed):

Bans on specified firearms or ammunition
Restrictions on firearms acquisition
Waiting periods between application to purchase and acquisition of firearm
Licensing of firearms users and registration of firearms
Shall issue concealed-weapons carry laws (which obligate issuing agencies to grant permits for carrying concealed weapons to applicants unless excluded by specific criteria)
Child access prevention laws requiring safe storage of firearms by owners
Zero tolerance of firearms in school
Combinations or systems of firearms laws

## Methods

In the *Community Guide*, evidence is summarized about (1) the effectiveness of interventions; (2) the applicability of findings (i.e., the extent to which available effectiveness data might

apply to diverse populations and settings); (3) other positive or negative effects of the intervention, including positive or negative health and nonhealth outcomes; (4) economic impact; and (5) barriers to implementation of interventions. In the present review, in which sufficient evidence to determine the effects of firearms laws on violence was not found, we rarely included comments on applicability or barriers to implementation, and no economic evaluations were conducted.

As with other *Community Guide* reviews, the process that was used to review evidence systematically and then translate that evidence into the conclusions presented in this article involved:

Forming a systematic review development team
Developing a conceptual approach to organizing, grouping, and selecting interventions
Selecting interventions to evaluate
Searching for and retrieving evidence
Assessing the quality of and abstracting information from each study
Assessing the quality of and summarizing/synthesizing the body of evidence of effectiveness
Translating the evidence about effectiveness into conclusions

## Systematic Review Development Team

Three groups of individuals served on the systematic review development team:

A coordination team drafted the conceptual framework for the reviews, coordinated the data collection and review process, and drafted evidence tables, summaries of the evidence, and the reports. This team consisted of a Task Force member, experts in the methods of systematic reviews and economics from the *Community Guide* and Prevention Effectiveness Branches, Division of Prevention Research and Analytic Methods, Epidemiology Program Office, CDC; and experts on violence prevention from the National Center for Injury Prevention and Control, CDC, the National Institutes of Health, and the National Institute of Justice, U.S. Department of Justice.

A consultation team set initial priorities for the reviews and reviewed and commented on materials developed by the coordination team. The consultants are experts on violence-related topics in state and local public health settings, academic organizations, federal agencies, and voluntary organizations. These experts have backgrounds in sociology, medicine, public health, economics, health promotion, intervention design and implementation, health education, health policy, and epidemiology.

An abstraction team collected and recorded data from studies for possible inclusion in the systematic reviews. (See Evaluating and Summarizing the Studies section.)

## Search for Evidence

Electronic searches for literature were conducted in MEDLINE, EMBASE, ERIC, NTIS (National Technical Information Service), PSYCHLIT, PAIS (Public Affairs Information Service), Sociological Abstracts, NCJRS (National Criminal Justice Reference Service), CJPI (Criminal Justice Periodicals Index), Gale Group Legal Research Index, and

ECONLIT. We also reviewed the references listed in all retrieved articles, and consulted with experts on the systematic review development team and elsewhere to find additional published reports of studies. We included journal articles, governmental reports, books, and book chapters. We also reviewed several papers that were in press at the time, identified in web searches and by consultants.

Articles were considered for inclusion in the systematic review if they had the following characteristics:

Evaluated the specified law
Assessed at least one of the violent outcomes specified
Were conducted in an established market economy[b]
Reported on a primary study rather than, for example, a guideline or review
Compared a group of people who had been exposed to the intervention with a group of people who had not been exposed or who had been less exposed (the comparisons could be concurrent or in the same group over a period of time)
Published between 1979 and March 2001.

We define a "study" as a research project conducted by a researcher or research group on a particular (study) population during a given time period, assessing specified research questions using specified methods. Some studies report analyses of a population at more than one time; multiple findings may thus be included within the study. A study may result in several "reports" on different aspects of the study (e.g., study theory or methods, study population, specific findings). We consider all reports together to constitute the study and use aspects of the reports that correspond to the topics of our review and our review criteria. In some cases, the distinction between studies and reports may be arguable—there is not always a clear line. When a research team completes a study, another team responds to it with a different analysis of the original population (a second study) and the original team then conducts yet a different version of their original study (e.g., using a new control population); we count the original team's new study as a different, third study, and note the connection to the original study and study team.

## Outcomes Reviewed

The outcome measures evaluated to determine the effect of the laws reviewed were specific violent crimes (i.e., murder, aggravated assault, robbery, and rape), suicide, and unintentional firearm injury. Aggravated assault is considered a health-related outcome insofar as it is "an unlawful attack by one person upon another for the purpose of inflicting severe or aggravated bodily injury."[6] Similarly, robbery is considered a health-related outcome insofar as it is "the taking or attempting to take anything of value from the care, custody, or control of a person or persons by force or threat of force or violence and/or by putting the victim in fear."[6]

---

[b]Established market economies as defined by the World Bank are Andorra, Australia, Austria, Belgium, Bermuda, Canada, Channel Islands, Denmark, Faeroe Islands, Finland, France, Germany, Gibraltar, Greece, Greenland, Holy See, Iceland, Ireland, Isle of Man, Italy, Japan, Liechtenstein, Luxembourg, Monaco, the Netherlands, New Zealand, Norway, Portugal, San Marino, Spain, St. Pierre and Miquelon, Sweden, Switzerland, the United Kingdom, and the United States.

Although some studies reported firearm-specific outcomes (e.g., firearm-related suicide), we preferred to use outcomes that did not specify a relationship to firearms, because of a concern that the reduction in the firearm-specific outcome might be accompanied by an increase in non–firearm-specific outcomes (e.g., suicide by hanging), thus possibly reducing or even outweighing the firearm-related benefit. Because violence is not reduced if those who intend to commit suicide with firearms find other means when firearms are no longer available, we measure the overall change in outcomes (e.g., the rate of suicide).

Some studies[27,28] assessed the numbers of firearms retrieved in the course of investigating crimes, including violent crimes, as outcome measures. For example, studies of firearms bans may have considered counts of firearms found at crime scenes before and after bans as an indication of the effects of the bans. The use of such evidence to assess the effects of interventions on violent outcomes rests on many assumptions, for example, that rates of firearms retrieval are similar over time for different kinds of firearms, in different settings. We use such studies only as secondary evidence unless the researchers provide evidence that a high proportion of crime firearms are recovered or other evidence that the recovery process does not bias the assessment of the violent outcomes of interest.

## Abstraction and Evaluation of Individual Studies

Two reviewers read each study that met the inclusion criteria, using standardized *Community Guide* criteria to assess the study evidence.[25] Disagreements between the reviewers were reconciled by consensus of the coordination team members. In addition, to ensure consistent assessment of study design suitability and limitations in execution quality within the body of evidence for each intervention, evaluated studies were discussed by the coordination team.

## Assessing Suitability of Study Design

Design suitability was assessed for every included study.[22] Our study design classifications, chosen to ensure consistency in the review process, sometimes differ from the classification or nomenclature used by study authors. Studies of "greatest design suitability" were those with a concurrent comparison group, in which data were collected prospectively; studies of "moderate design suitability" were retrospective studies or those with multiple pre- or post-intervention measurements, but no concurrent comparison group; studies of "least suitable design" were cross-sectional studies or those with no concurrent comparison group and only single pre- and post-intervention measurements. Noncomparative studies (i.e., those without before-and-after intervention comparison or distinct concurrent comparison populations) were not considered in our reviews.

## Assessing Study Quality and Summarizing the Body of Evidence of Effectiveness

Quality of study execution was systematically assessed using the published *Community Guide* methods.[22,25] Studies can have as many as nine limitations, including failure to describe the study population and intervention, measure exposures or outcomes effectively, demonstrate effective follow-up, use appropriate analytic methods, and control for confounding or other bias. Studies with zero or one limitation are reported to have "good execution"; studies with two to four limitations are reported to have "fair execution"; and studies with five or more limitations are reported to have "limited execution" and are not included in the body of evidence.

Unless otherwise noted, we represented results of each study as point estimates for the relative change in the rate of violent crime, suicide, or unintentional injury or death attributable to the interventions. We calculated percent changes and baselines using the following formulas for relative change:

For studies with before-and-after measurements and concurrent comparison groups:

$$(Ipost/Ipre)/(Cpost/Cpre) - 1$$

where

Ipost = last reported outcome rate in the intervention group after the intervention

Ipre = reported outcome rate in the intervention group immediately before the intervention

Cpost = last reported outcome rate in the comparison group after the intervention

Cpre = reported outcome rate in the comparison group immediately before the intervention

For studies with post-intervention measurements only and concurrent comparison groups:

$$(Ipost - Cpost)/Cpost$$

For studies with before-and-after measurements but no concurrent comparison:

$$(Ipost - Ipre)/Ipre$$

We report the effect as "desired" when, compared with the absence of such a law, the law is associated with a decrease in a violent outcome examined, and as "undesired" when the law is associated with an increase in the violent outcome. When effect measures reported by the authors could not be converted into percentage changes (e.g., when results were presented as absolute change in rates, without information on baseline rates), the reported findings are described in the text. In the reporting of study findings, we used the standard two-tailed $p$-value cut-off at the 0.05 level as a measure of statistical significance.

We often had to select among several possible effect measures for inclusion in our summary measures of effectiveness. When available, we used measures adjusted for potential confounders in multivariate analysis in preference to crude effect measures. Although no studies were excluded from evaluation strictly on the basis of an insufficient follow-up period, follow-up periods of <1 year were considered an execution flaw, and studies with longer follow-up were preferred.

The studies we examined did not always share our research goals; they examined or provided data to assess outcomes of interest to us, but may have focused on outcomes that differed from those we sought to examine. For example, one study[29] examined the effect of misdemeanor restrictions on firearms purchase on subsequent first arrests for firearms or violent crime. Because we were specifically interested in

violent, but not nonviolent, firearm-related crime, and in all subsequent arrests rather than only the first, we used only study findings on the outcomes of interest to our review, rather than those focused on by the authors.

As noted above, we often transformed the researcher's findings mathematically to make measures comparable across studies. For example, in one study[30] of the effects of shall issue concealed-weapons carry laws, the author focused on the difference in changes of rates for juveniles and adults, on the premise that the law should reduce homicide among adults at a greater rate than among juveniles (because the law does not directly apply to juveniles), and assuming that this comparison was an effective way to control confounding. We could not use the results of this analysis to compare with other studies that assessed changes in rates, so we used baseline information provided in this study, and calculated changes in adult and juvenile homicide rates associated with implementation of the law. Our modifications of study approaches are noted in the summary evidence tables available at the *Community Guide* website (*www.thecommunityguide.org/violence*).

In several firearms law reviews, two or more studies—most often conducted by different research teams—examined the same intervention (e.g., a specific law, in the same population, over the same time period) and reported on the same outcome(s), but differed in study design and execution quality. We characterize such studies as nonindependent because they represent a single experience of the assessed intervention. To avoid double counting of a single experience, we chose the study with the best combination of design suitability and quality of execution to represent the overlapping group of studies. We refer to separate analyses from one study, including distinct publications, as "reports." Some studies were only partially overlapping (e.g., providing overlapping national estimates but one or more unique state estimates). In those cases, we excluded the overlapping estimates but used the nonoverlapping ones. Some studies provided findings on several firearms laws and may thus be analyzed in two or more of our reviews.

We summarized the strength of the body of evidence based on numbers of available studies, strength of their design and execution, and size and consistency of reported effects using the *Community Guide* approach described in detail elsewhere.[22] When the number of studies and their design and execution quality were sufficient by *Community Guide* standards to draw a conclusion on effectiveness, results are summarized graphically and statistically. To summarize the findings about the effectiveness of an intervention across the studies in a body of evidence, we display results of individual studies in tables and figures and report median and interquartile range of effect measures. We note whether or not zero is included within the upper and the lower interquartile ranges. When the range includes zero, we infer that the results are inconsistent in direction; when the interquartile range does not include zero, we infer that the results are consistent in direction.

It is critical to note that when we conclude that evidence for the effectiveness of a given firearms law on an outcome is insufficient, we mean simply that we do not yet know what effect, if any, the law has on that outcome. We do not mean that the law has no effect on the outcome.

## Other Effects

We routinely sought information on other (i.e., not violence-related) effects of these population-based interventions, such as property crime and school expulsions. We sought evidence of potential harms or benefits if they were mentioned in the effectiveness literature or considered important by the coordination team. With the exception of property crime, additional outcomes were not specifically assessed in the papers that we reviewed.

## Economic Evaluations, Applicability of Interventions, and Barriers to Implementation

In *Community Guide* reviews, economic evaluations are summarized for each intervention found to have at least sufficient evidence of effectiveness.[22] Because we did not find sufficient evidence of effectiveness of any of the laws reviewed, no economic evaluations were performed.[24] The applicability of the intervention to populations and settings not specifically studied and the barriers to implementation of the intervention may be assessed whether or not the intervention is found to be effective.

## Summarizing Research Gaps

Many systematic reviews in the *Community Guide* identify existing information on which to base public health practice. Whether or not a sufficient evidence base supports practice recommendations, an important benefit of these reviews is identification of areas where information is lacking or of poor quality. For the topics reviewed here, evidence was insufficient to develop recommendations. We summarized remaining questions about effectiveness, and identified key issues that had emerged from the review, based on the informed judgment of the systematic review development team.

## Sources of Information for Firearms Law Effectiveness Studies

Studies of firearms law effectiveness have employed several sources of information, and the limitations of these sources should be understood. Information on laws—the "exposures" in these studies—are derived from federal government reports (e.g., Bureau of Alcohol, Tobacco and Firearms, 2000[11]) and published analyses (e.g., Cramer and Kopel, 1995[31]). There have been substantial discrepancies among sources in the specification of which jurisdictions have enacted which laws; this has led to differences in the classification of "exposure" to laws in evaluation studies and systematic reviews.

Evaluations of the effectiveness of firearms laws most often rely on two sources of information on violent outcomes: the Uniform Crime Report (UCR) from the Federal Bureau of Investigation (FBI), and Vital Statistics of the United States from the National Center for Health Statistics of the CDC. These record systems were initially developed for administrative uses and simple statistical monitoring, but have been widely used for research.

Most studies of the effects of firearms laws use the UCR to assess outcomes; the UCR documents reports of and arrests for violent crimes (i.e., murder, robbery, aggravated assault,

and rape) and property crimes (i.e., burglary, larceny, automobile theft, and arson) sent to the FBI by the 18,413 law enforcement reporting agencies in the United States.[32] There are several limitations of UCR data. First, crime reporting to the police is not complete.[6] A population-based survey, the National Crime Victimization Survey, indicates that, in 2001, U.S. adults reported to law enforcement agencies only 61.4% of their 1.8 million experiences of violent crime victimization (excluding murder).

In addition to incomplete reporting to police by victims, law enforcement agencies substantially under-report crime to the FBI. For example, during the 36-month period from 1992 to 1994, only 64% of these agencies reported crimes for each month, and 5% provided no data at all.[32] Moreover, quality of reporting varies substantially by time and by state: from the mid-1980s to the late 1990s, 12 states reported problems with their data (e.g., using definitions for specified crimes that differed from UCR definitions) for >1 year, and these data could not be used in the UCR.

When data are missing in the UCR, they are imputed, generally on the assumption that information not reported for given reporting areas at given times is similar to that reported in other places or time periods. Maltz and Targonski[33] recently argued that UCR crime data at the county level are currently too unreliable for use in research; however, because crime generally occurs at higher rates in cities, city-level crime data are regarded as sufficiently reliable for research use. The problems of police reporting described by Maltz[32] compound the under-reporting of crime by victims. Since nationally representative surveys of victims indicate that victims report only 43.9% of violent victimizations and since the UCR represents 87% of the U.S. population, UCR crime data are likely to represent approximately 38.2% (i.e., 0.87×0.439) of violent victimizations in the United States.[34] Under-reporting by itself might not result in bias, but if under-reporting differs systematically across times or places—a plausible scenario—it could result in biases in either direction. The UCR data source supplies a special population data set that is reduced in numbers in proportion to the under-reporting in each reporting area: use of standard, unreduced population estimates from the Bureau of the Census will underestimate rates in these circumstances.

In addition to under-reporting, UCR data present another challenge for research: They are aggregated, so that numbers of events are reported, but not information on the circumstances of each event. Aggregate reporting limits the analysis of social "mechanisms" by which firearms laws might work. Several studies of the effects of firearms laws on homicide have used the FBI's *Supplemental Homicide Reports*[35] in which individual record information is available, allowing fuller analysis of the circumstances of homicides. The implementation of the FBI's National Incident-Based Reporting System[36] and the development of the National Violent Death Reporting System[37] may substantially address this limitation of the UCR data system.

The other principal source of data for firearms law evaluation outcomes, Vital Statistics of the United States—a report of U.S. deaths prepared by CDC's National Center for Health Statistics—includes information on homicides, suicides, and unintentional deaths, including firearm-related deaths. Although virtually all U.S. deaths, including deaths in all counties, are counted in this system, some misclassification occurs by cause of death (particularly for causes such as suicide and unintentional injury)[38] as well as by demographic characteristics.[39,40] Unintentional firearm-related deaths appear to be substantially undercounted (i.e., misclassified as due to another cause).[41] Furthermore, there is a lack of circumstantial detail in vital statistics data, particularly about the perpetrators of homicide and the agents of unintentional injuries.

Finally, sources of information on potential confounders in firearms law effectiveness studies have presented a challenge. Major confounders include phenomena such as poverty, unemployment, gangs, drug cycles, intensity of law enforcement, and other existing laws. There have been disagreements about how best to conceptualize and measure these, and data for some have been difficult, if not impossible, to find. Information on arrests for crime has been used as an independent variable in firearms law studies to control for degree of enforcement activity. Yet FBI arrest data may be even more problematic than UCR crime data in terms of under-reporting and differential reporting by crime and other characteristics.[32] Arrest rates (i.e., number of arrests per number of crimes) have been used to control for potential confounding by degree of law enforcement; however, the use of arrest rates creates statistical problems, because crime is then both the dependent and an independent variable in these analyses. Taken together, all of these features of available data sources severely limit the ability to understand the effectiveness of firearms law in preventing violence.

## Results: Part I—Intervention Effectiveness
### Bans on Specified Firearms or Ammunition

Bans on specified firearms and ammunition prohibit the acquisition and possession of certain categories of firearms (e.g., machine guns or assault weapons) or ammunition (e.g., large-capacity magazines or hollow-point bullets). They can also include prohibitions on the importation or manufacture of the specified firearms. Bans may be adopted at the federal, state, or local level, and may be combined with additional firearms regulations, such as requirements for safe storage, age restrictions on acquisition, or restrictive licensing requirements for firearms dealers. Bans are intended to decrease the availability of certain types of firearms to potential offenders, and thus reduce the capacity of such offenders to perpetrate crime.[27]

Bans are usually imposed on the types of firearms or ammunition that are either thought to be particularly dangerous and not well suited for hunting or self-defense (e.g., semiautomatic and fully automatic assault weapons) or disproportionately involved in crime (such as cheap, low-quality, small-caliber handguns usually referred to as "Saturday night specials"). Sometimes, especially in high-crime urban settings, bans may include a broad spectrum of firearms (e.g., the ban enacted in Washington DC in 1976,[42] on purchase, sale, transfer, and possession of all handguns by civilians unless the handguns were previously owned and registered).

**Table 2.** Bans of gun acquisition or possession: descriptive information about included studies

|  | Studies (n) |
|---|---|
| Studies meeting inclusion criteria | 9[17,27,28,42–47] |
| Studies excluded, limited design or execution quality | 0 |
| Qualifying studies | 9[17,27,28,42–47] |
| Independent studies included in body of evidence[a] | 3[17,42,45–47b] |
| Studies assessing nonrecommendation outcomes | 2[27,28] |
| Nonindependent studies, not in body of evidence[a] | 2[43,44] |
| Designs of included studies |  |
| Time series with concurrent comparison group | 4[42,45–47] |
| Time series, no concurrent comparison group | 1[28] |
| Retrospective with concurrent comparison group | 1[27] |
| Cross-sectional | 1[17] |
| Outcomes reported in included studies |  |
| Homicide | 3[17,42,45–47b] |
| Aggravated assault | 1[17] |
| Robbery | 1[17] |
| Rape | 1[17] |
| Suicide | 3[17,42,47] |
| Unintentional firearm-related injury death | 1[17] |
| Gun counts or proportions | 2[27,28] |

[a]Studies are described as "independent" if they do not assess the same intervention in the same population for a similar follow-up period. Among nonindependent studies, the one with the longest follow-up or the best design or execution is chosen to represent this intervention experience.

[b]Three studies[42,46,47] are nonindependent, with no clear superiority of one study over the others in design or execution. All assessed the Washington DC handgun ban; each used a different control population.

Bans commonly exempt firearms in the banned category owned prior to implementation of the ban (i.e., they "grandfather" those weapons), although such bans may require the registration of grandfathered firearms. Grandfathering is a critical element in bans insofar as it could allow large stocks of the banned items to remain available after the ban goes into effect.

**Review of evidence: effectiveness.** Our search identified nine studies on the effects of bans on violent outcomes or on the use of the banned firearms.[17,27,28,42–47] Descriptive information about execution quality, design suitability, and outcomes evaluated in these studies is provided in Table 2. More detailed information on the studies used in this review are provided at the website (*www. thecommunityguide.org/violence*); Appendix A, which shows evidence used in the review of the effects of bans, is an example of the detailed tables for all firearms law evidence reviews available on the website.

Among the seven studies that evaluated violent outcomes, one[17] was of least suitable design; all seven

studies had fair execution quality. Five studies[42–44,46,47] evaluated the 1976 Washington DC handgun ban. Two of these were not considered because they assessed follow-up periods that were relatively short (2 years) compared with the remaining studies of the DC ban.

Because the three remaining studies[42,46,47] (two[42,47] conducted by the same team of researchers) assessed the effects of the DC handgun ban on homicide during a similar time period, they were counted as non-independent and as one study experience. They reached inconsistent conclusions about the effects of the law on homicide, principally because of methodologic differences and differences in comparison populations. Two found a decrease in homicide in Washington DC compared with surrounding regions,[42] and with Memphis and Philadelphia,[47] cities of comparable size. The third[46] found increases in homicide rates in Washington DC compared with Baltimore, a city with comparable crime rates. Because of the limitations of all the studies and inconsistent results and conclusions, and because there was no best study, we concluded that the evidence was insufficient to determine the effectiveness of the Washington DC handgun ban on reducing homicide.

Two studies of the Washington DC handgun ban[42,47] found a decrease in suicide, compared with control regions without a similar ban. These results, however, were inconsistent with the other study of the effect of bans on suicide,[17] which found increases as well as decreases in suicides associated with several types of bans.

One study examined the effects on homicide rates of the 1994 Federal Violent Crime Control Act that banned assault weapons and large-capacity ammunition magazines. Comparing states with bans similar to but enacted before the federal ban with states with no such ban, the study found a relative decline in homicide rates in states without a prior ban, suggesting a benefit associated with the new ban.[45] A study of least suitable (i.e., cross-sectional) design[17] assessed the effects of handgun possession, handgun sales, and bans of sales of Saturday night specials on homicide, aggravated assault, robbery, rape, fatal unintentional firearm-related injury, and suicide in the 170 U.S. cities with populations >100,000 in 1980, and found no consistent results.

Two studies evaluated Maryland laws—a 1988 law banning manufacture and sale of Saturday night specials[27] and a 1994 law banning sales of assault pistols.[28] These studies evaluated outcomes not directly related to health, such as proportions of banned firearms among all recovered crime firearms, or counts of recovered banned firearms used in crime. They indicated reductions in banned firearms, either in comparison with firearms used prior to the ban[28] or with other cities without such a ban.[27] Because the decrease in the number of banned firearms exceeded the increase in

the number of additional nonbanned firearms, there was a net reduction in firearm retrievals overall.[27]

Overall, the number of independent studies was small (three) and available evidence on violent outcomes was inconsistent. One study of greatest design suitability found a decrease in homicide,[45] while other nonindependent studies[42,46,47]—also of greatest design suitability—showed inconsistent findings. A study with a least suitable design[17] also found mixed effects for multiple outcomes. Additional evidence suggested that banned firearms are about half as likely to be used in crimes after the ban, compared with before the ban period or with areas where the same firearms are not banned.[27,28]

**Other effects.** In the period immediately preceding initiation of a ban, the production and sales of firearms about to be banned can increase dramatically.[45] Banning cheap firearms has been asserted[48] to decrease the capacity for self-protection among people in economically disadvantaged populations, who are also more likely to reside in high-crime neighborhoods. There is, however, no evidence for or against this hypothesis.

**Conclusion.** According to *Community Guide* criteria,[22] available evidence is insufficient to determine the effectiveness or ineffectiveness on violent outcomes of banning the acquisition and possession of firearms. The number of available studies was small, some available studies were limited in their design and execution, and results were inconsistent. Further research is needed to evaluate the effects of bans of specified weapons or ammunition on violence and related health and social outcomes.

## Acquisition Restrictions

State governments and the federal government have made concerted efforts to deny the purchase of firearms to people with specified characteristics thought to indicate high risk for illegal or other harmful use of firearms. Restriction characteristics include criminal histories (e.g., felony conviction or indictment, domestic violence restraining order, fugitive of justice, or conviction on drug charges); personal histories (e.g., people adjudicated as "mental defective," illegal immigrants, those with a dishonorable military discharge); and other characteristics (e.g., juveniles). (The term "mental defective" is a determination by a lawful authority that a person, as a result of marked subnormal intelligence or mental illness, is a danger to self or others, or lacks the mental capacity to manage his or her own affairs. The term also includes a court finding of insanity in a criminal case, incompetence to stand trial, or not guilty by reason of lack of mental responsibility.[49])

The federal Interim Brady Handgun Violence Prevention Act (P.L. 103-159), hereafter Interim Brady Law, was implemented in March 1994 to strengthen the Gun Control Act of 1968 (P.L. 90-618) and to require the active investigation of the backgrounds of people applying to purchase handguns. Applications can be rejected if the applicant's background is found to include a felony indictment or conviction, domestic violence restraining order, unlawful use of or addiction to drugs, or dishonorable discharge, or if the applicant is a fugitive from justice or an illegal alien or has been adjudicated a "mental defective." The Interim Brady Law required a 5-day waiting period to allow the background investigation. (Evidence about the Interim Brady Law is included in the review of the effects of waiting periods.) The interim law was to be replaced by a permanent law following implementation of the National Instant Background Check System in 1998. The Lautenberg amendment (P.L. 104-208) of 1996 added a restriction that prohibits the sale of firearms to those convicted of a domestic violence misdemeanor. In 1997, in *Printz v. United States* (521 U.S. 98, 117 S.Ct. 2365 (1997)), the U.S. Supreme Court ruled that states could not be required to conduct background checks for the Interim Brady Law; for states that chose not to conduct background checks, the FBI had to conduct the checks.

The Permanent Brady Act (November 1998, P.L. 103-159), subsequently referred to as the Brady Law, required instant background checks for all firearms purchases, not only handguns. It eliminated the 5-day waiting period, but required firearms dealers to wait a maximum of 3 days to allow the location of required records, after which, if no prohibitory information had been identified, the purchase could proceed. Some states have restrictions in addition to the federal ones, and some states had such laws preceding the Interim Brady Law.[50,51]

Studies by the federal government[52,53] indicate difficulties in the instant background check system, primarily because of a lack of records on many restriction categories (e.g., on individuals adjudicated "mental defective," with a history of drug addiction, or with illegal immigrant status) or because criminal records are difficult and sometimes impossible to retrieve. The Bureau of Justice Statistics reports[54] that in 1999, of an estimated 59 million criminal history records available to states, 89.4% were automated. However, only a median of 69% of state records systems had the records of conviction status required to assess firearms restrictions. The investigation of individual applicant criminal histories may thus require the search of paper files—a time-consuming, costly, and not always successful activity, especially within the 3 days allowed.[55] Notable improvements in the background check system have been made,[56] but the system is still incomplete and lacks the records needed to be fully effective.

The Brady Law has prevented some prohibited people from purchasing firearms at the point of applica-

**Table 3.** Legal restrictions on gun acquisition: descriptive information about included studies

| | Studies (n) |
|---|---|
| **Studies meeting inclusion criteria** | 4[17,29,50,59] |
| **Studies excluded, limited design or execution quality** | 0 |
| **Qualifying studies** | 4[17,29,50,59] |
| Independent studies included in body of evidence[a] | 4[17,29,50,59] |
| Nonindependent studies, not in body of evidence[a] | 0 |
| **Designs of included studies** | |
| Prospective with concurrent comparison group | 2[29,50,59] |
| Cross-sectional | 1[17] |
| **Outcomes reported in included studies** | |
| Homicide | 2[17,50] |
| Aggravated assault | 1[17] |
| Robbery | 1[17] |
| Rape | 1[17] |
| Violent crime | 2[29,59] |
| Suicide | 2[17,50] |
| Unintentional firearm-related injury death | 1[17] |

[a]Studies are described as "independent" if they differ by intervention, population, or follow-up period.

tion for purchase. A review conducted in 1999[57] indicated that of 12.7 million handgun purchase applications (approximately 2.8 million per year) made during the period of the Interim Brady Law, 312,000 (2.4%) had been rejected—63.3% of those because of a felony conviction, 13.3% because of a domestic violence misdemeanor conviction or restraining order, 6.6% because of state-specific prohibitions, 6.1% because the applicant was a fugitive from justice, and 8.3% for other reasons. During the first year of the Permanent Brady Law, there were 8.8 million background checks, 2% resulting in denial; 17% of denials were appealed, of which 22% were reversed.[58] During the same period, 2230 fugitives of the law were identified, and 3353 prohibited people were found to have been erroneously permitted to acquire firearms.

**Review of evidence: effectiveness.** Our search identified four studies on the effects of acquisition restrictions on violent outcomes.[17,29,50,59] One additional study[60] examined only the waiting period component of the Brady Law (see review of waiting periods, below). Descriptive information about execution quality, design suitability, and outcomes evaluated in these studies is provided in Table 3. Details of the four independent qualifying studies are available at the website (*www.thecommunityguide.org/violence*).

Two studies[50,59] examined the effects of restrictions based on prior felony conviction; one[59] assessed overall violent crime as an outcome, and the second[50] assessed homicide and suicide. One of these studies[50] examined the effect of the Interim Brady Law as a whole. Because felony convictions constitute the exclusion factor for the largest proportion of those excluded by the law, we assessed this study as evaluating the felony conviction restriction, and note that evaluation studies often assess several intervention components at once. One study[29] examined the effect of restrictions based on misdemeanor convictions on violent crime overall. Another study[17] examined the effect of "mental defective" status, drug abuse, alcohol, and (unspecified) age restrictions against minors on specific violent crimes, suicide, and unintentional injury. The studies of felony conviction restrictions[50,59] were of greatest design suitability and fair execution; the study of misdemeanor restrictions[29] was of greatest design suitability and good execution; and the study of "mental defective" status, drug abuse, alcohol, and age restrictions[17] was of least suitable design and fair execution.

One study[59] evaluated the effect of felony conviction restrictions in California, and concluded that subsequent arrest for violent crime among restricted felons was 19.4% lower (95% confidence interval [CI]=9.9%, 28.1%) than would have been expected had these felons been allowed to purchase firearms. The second study of felony conviction restrictions[50] indicated statistically nonsignificant declines for firearm-related homicide and suicide and total homicide and suicide in the U.S. population aged $\geq$21 years, and a statistically significant decline in firearm-related suicide deaths among people aged $\geq$55 years. However, by comparing outcomes in states that had a waiting period prior to the Brady Law with states that did not previously have a waiting period, this study showed that this reduction was attributable not to the felony restriction per se, but to the waiting period component of the Interim Brady Law.

A single study[29] indicated that a misdemeanor conviction restriction reduces the rate of first arrest for violent crime by 19.4% and arrests over a 3-year period for firearm or violent crime by 10.7%; however, neither result is statistically significant, and the single study is thus not sufficient to draw a conclusion about effectiveness, because it is not clear that either finding differs from no change.

One study[17] examined four personal history restrictions (i.e., "mental defective," drug abuse, alcohol, and minor age) and their associations with homicide, aggravated assault, robbery, rape, suicide, and unintentional injury. This cross-sectional study had 10 effects in the desired direction and 14 in the undesired direction, 2 of them statistically significant. Overall, evidence of consistent effect by restriction or outcome is limited, because of small numbers of studies of each outcome and inconsistent directions of effect.

One study[50] allowed assessment of the substitution effect (i.e., because the restriction or a waiting period makes firearms unavailable, people substitute other means to harm others or commit suicide). The researchers found evidence of a substitution effect for

suicide, but not for homicide; however, the suicide substitution effect is relatively minor: an increase of 3.0% in non-gun suicide, compared with the firearm-specific suicide decline of 8.6%.

**Other effects.** Restrictions may facilitate the identification and capture of wanted persons.[56] Background checks may also act as a deterrent to application by people prohibited from purchasing weapons. However, we found no evidence of this or of whether denied applicants subsequently acquired firearms by other means (e.g., from the secondary market). One potential harm is false positives, that is, people falsely reported as having a restriction, who may subsequently be stigmatized and mistakenly denied a firearm.

**Conclusion.** According to the *Community Guide* criteria,[22] the available evidence is insufficient to determine the effect of firearms acquisition restrictions on public health and criminal violence, because of a small number of available studies, limitations in their design and execution, and variability in the direction and statistical significance of findings. The only restriction for which study design suitability and execution met our criteria was the misdemeanor conviction restriction; in this instance, the effect was in the expected direction, but was not statistically significant, and we were thus unable to draw a conclusion. Further research is needed to evaluate the effects of acquisition restriction laws on violence, other health-related outcomes, and related health and social effects.

## Waiting Periods for Firearms Acquisition

Waiting periods for firearms acquisition require a specified delay between application for and acquisition of a firearm. This requirement is usually imposed to allow time to check the applicant's background or to provide a "cooling-off" period for people at risk of committing an impulsive crime or suicide. In addition to background checks, waiting periods can be combined with other provisions, such as a requirement for safety training.

The Interim Brady Handgun Violence Prevention Act, a federal law that went into effect in 1994, mandated a background check and a 5-day waiting period for handgun purchasers. In 1998, the 5-day waiting period required by the Interim Brady Law expired, and was replaced by a mandatory, computerized National Instant Criminal Background Check System (required not only for handguns, but for all firearms purchases), allowing dealers to sell the firearm if the FBI reported no adverse evidence to the dealer within 3 days of application. However, many states have their own provisions mandating longer waiting periods for handgun or long firearm purchases or both. Reports on the number of states with waiting periods for handgun purchases vary from 10 (National Rifle Association

**Table 4.** Waiting periods for firearm acquisition: descriptive information about included studies

|  | Studies (n) |
|---|---|
| Studies meeting inclusion criteria | 7[17,50,63–67] |
| Studies excluded, limited design or execution quality | 0 |
| Qualifying studies | 7[17,50,63–67] |
| **Designs of included studies** |  |
| Time series with concurrent comparison group | 2[50,64] |
| Before and after, no concurrent comparison group | 1[63] |
| Cross-sectional | 4[17,65–67] |
| **Outcomes reported in included studies** |  |
| Homicide | 6[17,50,64–67] |
| Aggravated assault | 5[17,64–67] |
| Robbery | 5[17,64–67] |
| Rape | 2[17,64] |
| Suicide | 6[17,63–67] |
| Unintentional firearm-related injury death | 3[17,64,66] |

website: *www.nra.org*) to 15[61] to 19[62], with waiting periods ranging from 2 days (in Alabama, Nebraska, South Dakota, and Wisconsin) to 6 months (in New York).[61]

**Review of evidence: effectiveness.** Our search identified seven studies on the effects of waiting periods on violent outcomes.[17,50,63–67] Descriptive information about execution, design suitability, and outcomes evaluated in these studies is provided in Table 4. Details of the seven independent qualifying studies are available at the website (*www.thecommunityguide.org/violence*). One study[63] was conducted in Queensland, Australia; the remaining studies were conducted in the United States.

Among the seven qualifying studies, five[17,63,65–67] were of lowest design suitability, and two[50,64] of greatest design suitability; all seven studies had fair execution. One study[64] presented the effectiveness results as a mathematical function of the length of waiting period; for purposes of this review, we calculated an effect estimate for a 5-day waiting period (as required by the Interim Brady Law).

Of six studies that evaluated the effects of waiting periods on homicide, four[17,65–67] had least suitable designs. Results were mixed: three point estimates showed a reduction in homicide, two showed an increase (one study with results for 2 decades, the 1960s and 1970s), and none of these findings were statistically significant. Two studies[66,67] found that results were not statistically significant without providing either size or direction of the effect.

Six studies evaluated effects of waiting periods on suicide. One study[63] evaluated the effect of waiting periods for long firearm purchase, one[50] for handgun purchase (under the Interim Brady Law 5-day waiting period), and four[17,64,66,67] for both long firearm and handgun purchases. Two[17,63] studies presented data

that allowed the calculation of relative percentage change in suicide rates; one[17] found a small (0.5%) increase and one[63] a small (2.9%) decrease in total suicides. Two[50,64] studies reported only absolute changes in suicide rates without data on baseline rates, which did not allow calculation of relative percent change. One study reported decreases in firearm suicide rates among children (aged 0 to 14 years) and adolescents[64] (aged 15 to 19 years), and the second study reported a decrease in both firearm-related and total suicide rates among adults (aged ≥21 years).[50] However the second study's decrease was statistically significant only in a subsample of people aged ≥55 years, and only for firearm-related suicide.[50] Two studies[66,67] reported that results were not significant, without providing either size or direction of the effect.

Evidence of the law's effects on aggravated assault, robbery, rape, and unintentional firearm-related injury death were inconsistent in direction, with six of the effect estimates indicating an increase, five indicating a decrease, and none being statistically significant.

Comparison of the effect on suicide of a 28-day waiting period for long firearms (in Queensland, Australia)[63] with a 5-day waiting period for handguns (associated with the Interim Brady Law)[50] indicated a greater effect associated with the longer waiting period for firearm-related suicide, but not for total suicide.

Several studies,[17,50,63] for which both firearm and non-firearm effect estimates were available, suggested the presence of a partial substitution effect for suicide, in which decreases in firearm-related suicide are offset, but at substantially lower levels, by increases in non-gun suicide. No such substitution effects were found for homicide, aggravated assault, or robbery.

**Other effects.** It has also been asserted[60] that waiting periods may give criminals (who may be more likely to acquire firearms by illegal means and avoid the waiting period) an advantage in obtaining firearms over law-abiding citizens (who may lack means of self-defense during the waiting period). However, there is no evidence for or against this hypothesis. One study[64] reported inconsistent effects of waiting periods on property crime; it found an increase in burglary and a decrease in larceny and auto theft.

**Conclusion.** According to the *Community Guide* criteria,[22] the evidence is insufficient to determine the effectiveness of waiting periods for the prevention of suicide, homicide, aggravated assault, robbery, rape, and unintentional firearm-related injury death, because of the small number of available studies, limitations in the design and execution of available studies, and effects that are inconsistent in direction or fail to reach statistical significance. Further research is needed to evaluate the effects of waiting period laws on violence, other health-related outcomes, and associated health and social effects.

## Firearms Registration and Licensing of Firearm Owners

Registration requires that a record of the owners of specified firearms be created and retained.[68] Licensing requires an individual to obtain a license or other form of authorization or certification that allows the purchase or possession of a firearm.[68] Licensing and registration requirements are often combined with other firearms regulations, such as safety training or safe storage requirements.

The registration practices of states and the federal government vary widely.[69] Recorded information may be retained by a specified recorder, such as by federal firearms licensees; such records may be accessible under specified circumstances, such as criminal investigations. In some states, recorded information is kept in centralized registries. The Firearm Ownership Protection Act of 1986 specifically precludes the federal government from establishing and maintaining a national registry of firearms and their owners. Likewise, there are no current federal firearms licensing requirements or provisions for individual purchasers. However, several states have laws that require the licensing of firearm owners or registration of firearms, and recorded information is kept in centralized registries. For example, licensing of handgun owners is required in 17 states and the District of Columbia.[6] Statewide handgun registration laws currently exist in four states. Licensing and registration may serve as instruments for the control of illegal firearms ownership, transfer, and use,[56,70] and might also deter illegal acquisition and use.

**Review of evidence: effectiveness.** Our search identified five studies[17,65–67,71] on the effects of licensing on violent outcomes, two[17,71] of which also report on the effects of registration. One study[17] was based on data collected in 1979 to 1981, one[65] on data collected in the 1960s and 1970s, one[66] on data collected in 1978, and one[67] on data collected in 1969–1970; one[71] assessed firearms retrieved from crimes during a 1-year period (1997–1998). All five studies were of least suitable (cross-sectional) design and had fair execution. Descriptive information about execution quality, design suitability, and outcomes evaluated in these studies is provided in Table 5, and at the *Community Guide* website (*www.thecommunityguide.org/violence*). Details of the four independent qualifying studies are also available at the website.

Evidence of the effects of licensing and registration on diverse study outcomes was inconsistent, with eight of the effect estimates showing increases in violence, and eight showing decreases. (One study had data on three outcomes each for 1960 and 1970.) Two studies[66,67] reported that results were statistically nonsignif-

**Table 5.** Firearm registration and owner licensing: descriptive information about included studies

|  | Studies (*n*) |
|---|---|
| Studies meeting inclusion criteria | 5[17,65–67,71] |
| Studies excluded, limited design or execution quality | 0 |
| Qualifying studies | 5[17,65–67,71] |
|   Studies used as secondary evidence[a] | 1[71] |
| Designs of included studies |  |
|   Cross-sectional | 5[17,65–67,71] |
| Outcomes reported in included studies |  |
|   Homicide | 4[17,65–67] |
|   Aggravated assault | 4[17,65–67] |
|   Robbery | 4[17,65–67] |
|   Rape | 1[66] |
|   Suicide | 4[17,65–67] |
|   Unintentional firearm-related injury death | 2[17,66] |
|   Gun counts or proportions | 1[71] |

[a]Secondary evidence does not directly measure a violent outcome, but may be suggestive of an effect.

icant without providing either size or direction of the effect.

One study[71] assessed recovered firearms that had been used in crimes in states with and without licensing and registration laws. We counted this study as secondary evidence because it provided neither a direct measure of violent outcomes or evidence that the use of recovered firearms is a good proxy measure of crime. This study reported that crime firearms purchase in-state was 48.5% lower in cities that had both licensing and registration requirements, compared with cities that had neither.

**Other effects.** Potential benefits that have been associated with the licensing of firearm owners and the registration of firearms include increased ability to enforce firearms laws, tracing sources of illegally possessed or used firearms, and data for research on the etiology of harmful and illegal firearms uses.[70,72] Potential harms that have been associated with licensing and registration are the perceived threat to the privacy and rights of owners.[73]

**Conclusion.** According to the *Community Guide* criteria,[22] the evidence on licensing and registration is insufficient to determine their effectiveness in reducing violence. Only a few studies were available, there were limitations in the studies' design and execution, and results were inconsistent. Further research is needed to evaluate the effects of licensing and registration laws on violence, other health-related outcomes, and associated health and social effects.

## Shall Issue Concealed Weapons Carry Laws

Shall issue concealed-weapons carry laws (shall issue laws) require authorities to issue permits to carry concealed weapons to all applicants who are not found

to have specified characteristics that disqualify them. In contrast, some states have adopted "may issue" laws, in which the issuing authority has the discretion to issue or deny a firearms permit based on criteria such as the perceived need or moral character of the applicant, and other states prohibit all carrying of concealed weapons (as of 2001, six states had such a prohibition).[6] Disqualification criteria in shall issue laws vary by state, but generally include, among others, prior felony conviction, conviction on a drug charge in the past 3 years, commitment to a mental hospital in the past 5 years, fugitive from justice, or age below a specified minimum. States also differ substantially in requirements such as firearms safety training, permit fees, and specifying places where firearms may not be carried.[11]

Before 1977, only eight states had shall issue laws, compared with 31 states as of 2000.[62] Researchers disagree on which states adopted shall issue laws and when.[74–76] For example, several studies consider Virginia to have had a shall issue law in 1988.[74,75,77–80] However, although the Virginia law at that time included the phrase "shall issue," the law also required demonstration of the applicant's need and "good character"—both characteristics of the more discretionary "may issue" laws. Differential classification of the laws may affect analyses of their effects.

Two principal hypotheses, which are not mutually exclusive, have been proposed to predict the consequences of shall issue laws. Some analysts have reasoned that, because the law allows for self-defense, potential criminals may be deterred by fear that a possible victim could be armed.[60] If so, publicity about the law and the perception on the part of potential criminals that individuals could be carrying concealed firearms is likely to be more important in reducing violence than the actual numbers of firearms carried. Others have reasoned that the presence of more firearms increases rates of unintended and intended injury in interpersonal confrontations, and, in addition, leads potential criminals to carry and use more lethal firearms more often.[81] If this is so, the actual number of additional firearms carried is important. In the only available survey on the attitudes of (imprisoned) felons, Wright and Rossi[82,83] report that felons claim to be deterred from committing a crime if they think that potential victims might be armed, but also carry firearms themselves to deter violence by victims. This finding suggests that shall issue laws may have contrary effects on firearms behavior—both deterring and escalating firearms carrying in the criminal population—with unknown net effect.

**Review of evidence: effectiveness.** Our search identified 12 studies[17,30,60,75,77–80,84–87] on the effects of shall issue laws on violent outcomes. Descriptive information about the quality, study design, and outcome measures from these studies is provided in Table 6. Details of all

**Table 6.** "Shall issue" carry laws: descriptive information about included studies

| | Studies (*n*) |
|---|---|
| Studies meeting inclusion criteria | 12[17,30,60,75,77–80,84–87] |
| Studies excluded, limited design and execution quality | 0 |
| Studies excluded, limited data quality[a] | 8[60,75,77–80,84,85] |
| Qualifying papers | 4[17,30,86,87] |
| Studies included in body of evidence | 4[17,30,86,87] |
| **Designs of included studies** | |
| Time series with concurrent comparison group | 2[30,87] |
| Time series, no concurrent comparison group | 1[86] |
| Cross-sectional | 1[17] |
| **Outcomes reported in included studies** | |
| Homicide | 3[17,30,86] |
| Homicide of the police (i.e., police as homicide victims) | 1[87] |
| Aggravated assault | 2[17,30] |
| Robbery | 2[17,30] |
| Rape | 2[17,30] |

[a]Because county-level crime data have been shown to be highly unreliable,[33] and because they have not been consistently used correctly, we excluded studies based on these data regardless of other design or execution qualities.

qualifying studies are available at the website (*www.thecommunityguide.org/violence*).

In 1997, Lott and Mustard[74] published an analysis of the effects of shall issue laws based on a large data set and spanning a 17-year period. They tested multiple hypotheses about the effects of shall issue laws on diverse outcomes, including violent crimes, property crimes, unintentional injury deaths, and suicide.[60,64,88] Because crime rates vary considerably among counties, Lott and Mustard[74] focused their analysis on U.S. county-level rather than state-level data. Five additional studies[75,78–80,85] used Lott and Mustard's data[74] or independently derived county-level data[77] as the basis for their own analyses. However, county-level crime data are highly problematic.

At the county level, missing data and under-reporting are prevalent. Concerns have been raised about the procedures for extrapolating to estimate the extensive missing county-level data.[33] Lott and Mustard[74] and those who used these authors' data did not adjust for missing information by using population denominator data that corresponded to crime numerator data. Thus, Lott and Mustard's denominator numbers were often too high, leading to underestimated crime rates in regions with poor reporting.[33] For example, less populous regions may have lower rates of crime as well as less complete reporting; comparisons by region would then be biased. Finally, these county-level studies may have misclassified as many as three out of ten reviewed states as shall issue jurisdictions.[30] The relationships among

available studies of shall issue laws by data source and unit of analysis (Figure 3)) indicate that most studies of these laws suffer from basic data problems associated with county-level information. Because of these critical concerns about the accuracy of county-level crime data for research purposes,[33] we did not use data from any of the county-level studies in our assessment of the effects of shall issue laws on violence.

The four qualifying studies of shall issue laws include one study[30] that examined national level effects on homicide using Vital Statistics reports (from the CDC's National Center for Health Statistics), one study[17] that used both Vital Statistics and UCR data to examine the effects of shall issue and other firearms laws on multiple violent outcomes, one study[86] that used Vital Statistics to assess the effects of shall issue laws in five selected counties, and one study[87] that used state-level UCR data to assess the effects of shall issue laws on homicides of police (homicides in which police are the victims). Thus, three qualifying studies assessed homicide as an outcome; of these one assessed homicide of police officers, and another multiple violent outcomes. Two of these studies are of greatest design suitability, one each of moderate and least suitable design, and all had fair execution. In contrast to county-level data from the UCR, county-level mortality Vital Statistics data are essentially complete.[89]

Two studies[17,30] suggested a reduction in homicide associated with shall issue laws at the national level, and the third[86] suggested mixed effects in five counties, with an overall increase in homicide associated with the laws. The study of police homicide[87] shows a small, statistically nonsignificant decline in the homicide of police associated with shall issue laws. Homicides of police occur at a rate of <100 per year, accounting for 0.6% of all U.S. homicides.

**Conclusion.** According to *Community Guide* criteria,[22] the small number of qualifying studies that evaluate the effects of shall issue laws on homicide, aggravated assault, robbery, rape, and homicide of police is not sufficient to determine the effectiveness of these laws in reducing the rate of these crimes. We have not included data from studies based on county-level evidence in our assessment, because county-level data have important systematic flaws that preclude reliable conclusions. Further research is needed to assess the effects of shall issue laws on violence.

## Child Access Prevention Laws

Child access prevention (CAP) laws are designed to limit children's access to and use of firearms; states vary in the ages of children covered by the laws, from <14 to <18 years. The laws require firearm owners to store their firearms locked, unloaded, or both. In some states, firearm owners are liable when firearms are improperly stored or when a child uses the owner's



**Figure 3.** Sources of data and designs in studies of "shall issue" laws. NCHS, National Center for Health Statistics; UCR, Uniform Crime Report.

improperly stored firearm to threaten or harm him- or her-self or another person.

Laws aimed at preventing child access are a relatively recent development: Florida passed the first CAP law in 1989, and after the Columbine shootings in April 1999, two more states adopted CAP laws.[90] By 2000, a total of 16 states had adopted CAP laws.[62] In three states (FL, CT, CA), violating a CAP law is a felony; in the other states with CAP laws, it is a misdemeanor.

**Review of evidence: effectiveness.** Our search identified three studies[64,91,92] of the effect of CAP laws; all examined unintentional firearm-related injury deaths as outcomes, and one[92] examined firearm-related and non–firearm-related suicides and homicides. All three studies were of greatest design suitability and fair execution. On the untested assumption that locked and unloaded firearms may hinder rapid access to firearms for self-defense, one study[64] examined multiple outcomes, including violent crimes (i.e., homicide, aggravated assault, robbery, and rape) committed with and without firearms. All studies assessed outcomes among juveniles; one study[64] also examined effects for older age groups. Descriptive information about the quality,

study design, and outcome measures from these studies is provided in Table 7. Details of the three qualifying studies are available at the website (*www.thecommunityguide.org/violence*).

All the studies present a common challenge for purposes of analysis: The law is intended to reduce injuries

**Table 7.** Child access prevention laws: descriptive information about included studies

|  | Studies (*n*) |
|---|---|
| **Studies meeting inclusion criteria** | 3[64,91,92] |
| **Studies excluded, limited design and execution quality** | 0 |
| **Qualifying studies** | 3[64,91,92] |
| **Designs of included studies** |  |
| Time series with concurrent comparison group | 3[64,91,92] |
| **Outcomes reported in included studies** |  |
| Homicide | 2[64,92] |
| Aggravated assault | 1[64] |
| Robbery | 1[64] |
| Rape | 1[64] |
| Suicide | 2[64,92] |
| Unintentional firearm-related injury death | 3[64,91,92] |

caused by juveniles. The studies, however, assess juvenile **victims**, whose injuries (other than suicide) could be caused either by adults or by juveniles. As a result, the assessment of the effects of CAP laws on outcomes other than suicide may be biased. None of the studies assessed levels of publicity, awareness, or enforcement of CAP laws as mediators of their potential effects.

Two studies[64,91] examined effects of the same laws on unintentional firearm-related injury in the same populations in similar time periods. Of these, we chose the study[91] with the greatest suitability of design and execution scores to assess effects of the laws on unintentional firearm-related injury. We used the study with a lower execution score[64] to assess additional outcomes (i.e., homicide, assault, robbery, and rape).

An earlier study[92] indicated a reduction in unintentional firearm-related injury death among juveniles aged <15 years that was statistically significant in states providing a felony prosecution for CAP law violation, and a nonsignificant increase in unintentional firearm-related injury death among juveniles in states providing a misdemeanor prosecution. However, a later study,[91] including data from three additional states that had passed CAP laws and 3 more years of follow-up, confirms the earlier finding on states with misdemeanor prosecution, but shows that, among states with a felony prosecution, the effect of the law on unintentional firearm-related injury death among juveniles aged <15 years is statistically significant only in Florida (a state with a felony sanction) but not in the other two felony states.

One study[92] indicated a reduction associated with CAP laws in firearm-related suicide among juveniles aged <15 years. Data from studies of homicide, assault, robbery, and rape[64,92] indicate mixed results, with two findings indicating reductions (in firearm-related homicide among juveniles aged <15 years, and in assault among all ages), and three indicating increases (in total homicide, robbery, and rape in all ages) associated with CAP laws. Only the findings on robbery and rape are statistically significant. However, too few studies examine each outcome to determine the effect of the law on specific types of violence.

**Other effects.** One study[64] suggests that CAP laws may be associated with an increase of 2% in property crimes; the increase was statistically significant for burglary but not for property crime overall.

**Conclusion.** According to *Community Guide* criteria,[22] the small number of studies of CAP laws, all of limited quality of execution and inconsistent findings, is insufficient to determine the effectiveness of the laws in reducing violence or unintentional firearm-related injury and other violent outcomes. Further research with longer follow-up periods is needed to assess effects of CAP laws on violence, unintentional injury, and other outcomes of interest.

## Zero Tolerance of Firearms in Schools

The Gun-Free Schools Act,[93] which affected 94% of schools in 1996–1997, stipulates that each state receiving federal funds under the Act must have a law requiring local education agencies to expel a student from school for ≥1 year if the student is found in possession of a firearm at school, although this expulsion requirement can be modified on a case-by-case basis. Expulsion may lead to alternative school placement or to "street" placement (full expulsion, with no formal education, for a specified length of time), after which students are generally allowed to return to their regular schools.

In the 1998–1999 school year, 3523 students were expelled for having a firearm in school. Of the total expelled, 44% were referred to alternative schools. (A national survey[94] indicated that, as of 1993, 66% of school districts reported implementing some type of alternative program to address school violence.) In 1996–1997, 4% of public schools reported having random, handheld metal detector checks on students, and in 1% of schools, students were required to pass through metal detectors every day.[95]

A national survey[96] indicates that approximately 3% of the 12th graders in 1997 (an estimated 80,190 students nationwide) reported carrying firearms on school property in the previous 4 weeks. According to these separate estimates, even if only seniors carry firearms, <4.4% of firearms (i.e., 3523/80,190) are being detected in association with the Gun-Free Schools Act. If students in lower grades also carry firearms (statistics are not available to determine this), the proportion of firearms being detected would be even lower.

The Gun-Free Schools Act does not require reporting on possible effects of its requirements on school safety conditions other than numbers of firearm-carrying students detected and expelled; however, reports from other sources indicate changes in some aspects of violence in the school environment. The carrying of weapons appears to have declined steadily during the 1990s, as did involvement in physical fights on school property.[97,98] However, the proportion of high school students who reported being threatened or injured with a weapon on school property in the past 12 months remained steady over this period, at 7% to 9%. The rate of serious violent crimes at or on the way to or from school peaked in 1994, and has declined from then until at least 2000.[98]

**Review of evidence: effectiveness.** No studies were located that attempted to evaluate the effects on school violence of zero tolerance of firearms in schools; nor did any study measure the specific effect of the Gun-Free Schools Act on firearm carrying in schools.

There was one study[99] of the effectiveness of metal detector programs in reducing the carrying of firearms in schools. Although firearms detection is not explicitly required in the Gun-Free Schools Act, the effectiveness of the law may depend on the ability to detect firearms. The study was a cross-sectional survey of New York school administrators and students to assess the association of metal detector programs with student behavior and attitudes. The metal detection program studied consisted of approximately weekly scanning of "randomly selected students" with a handheld device; the likelihood of detection was unclear. The study was of least suitable design and fair execution. Details about the quality, design, and outcome measure from this study are available at the website (*www.thecommunityguide.org/violence*).

The study compared rates or counts of firearms detection at schools with and without metal detection programs. Compared with schools without metal detection programs, schools with such programs had rates of carrying firearms to, from, or in school that were half as great (1.9% to 2.1% vs 4.0% to 4.6%), but did not differ in weapons carrying overall. Moreover, the study reported that schools did not differ in rates of threats or fights outside or inside of school. We could not determine the effectiveness of these programs because only a single study of least suitable design was available, and because the intermediate outcome of firearms carrying is not necessarily a good proxy for violence or injury.

**Other effects.** The effects of firearms detection programs in schools on students, school staff, or community are unknown; it is possible that such programs either reduce fear of harm or increase awareness, concern, and fear about the possibility of firearm-related violence. These effects may vary to the extent that a program is more or less effective in reducing firearms in schools.

A major, albeit unintended, harm of the Gun-Free Schools Act of 1994, particularly if firearms detection becomes more effective, is the "street" expulsion of thousands of students with low school achievement and high risk of violence. One review for the U.S. Department of Education[100] indicates that alternative schools for violent students may be effective as well as cost-effective in reducing violent behavior and enhancing emotional development for youth suspended or expelled from their usual schools; however, the review also notes that attendance at alternative schools may stigmatize students and increase discrimination against them. Even though the specific effect of firearm-related expulsion is not known, expulsion can result in a life course with fewer opportunities for (legal) employment, fewer resources, and a greater likelihood of criminal behavior and imprisonment compared with retention in special school programs.[101] The resulting lower productivity and increased criminal activity are likely to have high societal costs.[101]

**Conclusion.** It was not possible to assess the effectiveness of zero tolerance of firearms in schools because no studies of zero tolerance were identified and only a single study of least suitable design was identified that measured the effect of a school metal detector program on firearm-carrying behavior but not on violence per se. The effectiveness of such widespread policies in reducing violence and related health and social outcomes needs additional evaluation.

## Combinations of Firearms Laws

Government jurisdictions (e.g., states or nations) differ in the degree to which they regulate firearms possession and use as well as in rates at which specific forms of violence occur (as is the case with the United States and Canada).[102] In our review, we considered whether these characteristics—degree of firearms regulation, and firearm-related and other forms of violent behavior—are causally associated. Causality is difficult to assess because levels of firearm-related violence and the degree of firearms regulation may each affect the other: high levels of firearm-related violence may lead to the increased regulation of firearms, and regulation may also lead to the reduction of violence. Moreover, these possibilities are not mutually exclusive. The interpretation of association is thus difficult and depends on temporal sequence, which cannot be determined in simple cross-sectional studies. An additional challenge to establishing a causal link may be the lack of comparable information from nations about laws, violent outcomes, and possible confounders of the association between them.

**Review of evidence: effectiveness.** We reviewed three forms of evidence: studies of the effects of comprehensive national laws within nations; cross-national studies of firearms law systems; and studies in which law types within jurisdictions (i.e., regulation of specific, defined aspects of firearms acquisition and use) are categorized and counted, and the counts correlated with rates of specific forms of violence within the same jurisdictions. We refer to these last as "index studies" because they develop indices of regulation based on the kinds and numbers of firearms laws found in different jurisdictions. We considered the three kinds of evidence together in drawing conclusions. Descriptive information about execution quality, design suitability, and outcomes evaluated in these studies is provided in Tables 8, 9, and 10. Details of the studies that met inclusion criteria are available at the website (*www.thecommunityguide.org/violence*).

We considered available studies of two comprehensive national laws, the Gun Control Act of 1968 (P.L. 90-618) in the United States and the Criminal Law Amendment Act of 1977 in Canada. Our search identified two studies[65,113] of the U.S. law that assessed violent outcomes and ten studies[103–112] of the Canadian

**Table 8.** Combinations of laws: Gun Control Act of 1986 (United States) and Firearms Control Legislation of 1977 (Canada)

| | Studies (n) |
|---|---|
| **Studies meeting inclusion criteria** | 12[65,103–113] |
| **Studies excluded, limited design and execution quality** | 0 |
| **Qualifying papers** | 12[103] |
| Studies included in body of evidence | 2[65,109] |
| Nonindependent studies, not in body of evidence[a] | 10[103–108,110–113] |
| **Designs of included studies** | |
| Before-after, no concurrent comparison group | 1[65] |
| Time series, no concurrent comparison group | 1[109] |
| **Outcomes reported in included studies** | |
| Homicide | 2[65,109] |
| Suicide | 1[109] |
| Unintentional firearm-related injury death | 1[109] |

[a]Nonindependent studies are not included in the body of evidence because they assess the same intervention in the same population for the same (or a shorter) follow-up period, are not as well designed or executed as an included study, or both.

**Table 10.** Combinations of laws: firearm law index studies

| | Studies (n) |
|---|---|
| **Studies meeting inclusion criteria** | 8[17,65–67,117–120] |
| **Studies excluded, limited design and execution quality** | 0 |
| **Qualifying papers** | 8[17,65–67,117–120] |
| Studies included in body of evidence | 6[17,65,66,117,118,120] |
| Papers excluded, nonindependent[a] | 2[67,119] |
| **Study designs** | |
| Cross-sectional | 6[17,65–67,117,118,120] |
| **Outcomes reported** | |
| Homicide | 4[17,65,66,118] |
| Suicide | 5[17,66,117,118,120] |
| Unintentional firearm-related injury death | 3[17,66,118] |
| Aggravated assault | 4[17,65,66,118] |
| Robbery | 4[17,65,66,118] |
| Rape | 1[17] |

[a]Nonindependent studies are not included in the body of evidence because they assess the same intervention in the same population for the same (or a shorter) follow-up period, are not as well designed or executed as an included study, or both.

law that assessed violent outcomes (Table 8). Because the studies of each law were not independent, we chose the study with the greatest design and execution scores to represent the effects of the U.S. law[65] and one Canadian study[109] to represent the effects of the Canadian law (on rates of homicide, suicide, and unintentional firearm-related deaths). The U.S. study was of least suitable design and fair execution; the Canadian study was of moderate design suitability and fair execution. The study of the Gun Control Act of 1968 yielded two nonsignificant results in opposing directions (i.e., an increase in homicide, adjusted for new firearms, and a decrease in homicide, adjusted for the total firearms stock). The study of the comprehensive Canadian firearms law indicated decreased rates of homicide, but increased rates of firearm-related suicide.

In the cross-national studies of comprehensive laws, the effects of more and less comprehensive firearms regulations on violence were assessed by comparing

**Table 9.** Combinations of laws: international comparative studies (United States and Canada)

| | Studies (n) |
|---|---|
| **Studies meeting inclusion criteria** | 3[114–116] |
| **Studies excluded, limited design and execution quality** | 0 |
| **Qualifying papers** | 3[114–116] |
| **Study designs** | |
| Cross-sectional | 3[114–116] |
| **Outcomes reported** | |
| Homicide | 2[114,115] |
| Aggravated assault | 2[114,115] |
| Robbery | 1[115] |
| Suicide | 1[116] |

regions within two nations, the United States and Canada. Our search identified three such studies (Table 9).[114–116] All three studies were of least suitable design and fair execution. Because the two Canadian–U.S. comparisons of homicide assessed largely distinct populations in different time periods—1976 to 1980[114] and 1980 to 1986[115]—these two studies were regarded as independent.

One study[115] comparing Seattle with Vancouver found an inverse association between the degree of firearms regulation in these cities and their rates of firearm-related aggravated assault (relative risk 7.7, 95% CI=6.7, 8.7) and homicide (relative risk 5.1, 95% CI=3.5, 7.3), but not of other forms of interpersonal violence. A second study in the same setting[116] found a similar inverse association of the degree of firearms regulation and firearm-related suicide, counterbalanced by an opposing difference in other forms of suicide; that is, the degree of regulation was associated with lower rates of firearm-related suicide and higher rates of other forms of suicide. The third study[114] compared U.S. and Canadian border states and provinces, respectively, and indicated no association between national levels of firearms regulation and rates of homicide; no summary statistic was reported.

The index studies compared degrees of firearms regulation and violent outcomes among U.S. states and cities. We found eight index studies,[17,65–67,117–120] of which all but two[67,119] qualified for analysis (Table 10). Several qualifying studies include separate analyses of data from different years; thus, separate findings from a single study (e.g., from 1960 and 1979 in the study by Maggadino and Medoff[65]) are included in our analysis, insofar as the study is independent from other studies.

One qualifying study[66] noted only the lack of statistically significant differences between levels of violence associated with the degree of regulation, without indicating the quantity or even the direction of difference. All six qualifying studies were of least suitable design and fair execution.

Index studies yielded heterogeneous results. Of six findings on homicide from three studies,[17,65,118] one indicated a statistically significant increase and five indicated decreases, two of which are statistically significant. One study with rape as an outcome indicated a statistically nonsignificant decrease. Three studies with aggravated assault, robbery, and unintentional firearm-related injury death as outcomes had inconsistent findings, some indicating an increase in the outcome associated with greater regulation, and others a decrease. Only for suicide did all index studies show a reduction associated with a greater amount of regulation; two of five results were statistically significant. Overall, index studies were found to have inconsistent results on violent outcomes.

**Other effects.** High levels of regulation may be seen as an infringement on individual rights.

**Conclusion.** Based on findings from national law assessments, cross-national comparisons, and index studies, evidence is insufficient to determine whether the degree or intensity of firearms regulation is associated with decreased (or increased) violence. Current evidence is inconsistent and, in general, methodologically inadequate, based on Task Force standards, to draw conclusions about causal effects. Moreover, even if findings were clear, the design of index studies conducted to date would not allow us to specify which firearms laws did or did not contribute to the reduction of violence. Additional research is needed to determine the relationship(s) between specific types and degree of firearms regulation and the rates of specified types of violence in given jurisdictions.

## Results: Part II—Research Issues for Firearms Laws

Review of eight firearms laws and law types found insufficient evidence to determine whether the laws reviewed reduce (or increase) violence. Additional high-quality research is required to determine whether a relationship exists between firearms laws and violent outcomes. Areas for further potential study are discussed below.

### General Research Issues

#### 1. Violent outcome data sources

It was noted at the outset of this article and in the assessments of specific laws that multiple problems exist with the available data on outcomes used in studies of firearms laws. Much remains to be done to improve the recording of events and accessibility of the relevant data. Improvements would allow better evaluation of the effects of firearms laws as well as improvements in understanding of other aspects of violence and injury. These include:

Reporting systems for individual criminal and violent events and details of their circumstances

More detailed data on the location and perpetrators of the crime

More detailed data on agents in unintentional firearm-related injuries, linked to information on both the victim and the storage conditions of firearms involved

More detailed information on firearms used in crimes (e.g., type of firearm used, whether the firearm was carried legally, was registered, how it was acquired, and whether the owner was licensed)

More statistics relevant to changes in behaviors that can be attributed to laws (e.g., the numbers of concealed carry permits issued, or changes in safe storage practices).

#### 2. Measurement of exposure: What laws are in place, and where?

**Classification:** There have been disputes about which states have which types of laws. Misclassification of state laws and their dates of implementation hinders firearms law research. Some differences among states in the effects of laws may be attributable to differences among states in provisions of the law, such as their requirements, penalties, or the presence of other laws. A recent analysis of firearms laws[62] may help to resolve some of these issues for researchers by providing a recent, systematic, and detailed analysis of major federal, state, and local firearms laws.

**Implementation and enforcement.** As with any intervention, the degree of implementation may affect the intervention's effectiveness. Data on implementation have typically not been included in the evaluation of firearms laws. How do the intensity and visibility of law enforcement differ among jurisdictions, and how do they affect the law's effectiveness?

**Publicity and awareness of laws.** Knowledge about laws may be one means by which they become effective. If deterrence is a factor in the effectiveness of a law, then public (and criminal) awareness is of particular importance. Awareness can mitigate a law's potential effects, as when firearms are purchased at increased rates prior to the implementation of a ban.

**Duration of exposure and follow-up.** Follow-up periods of <2 years may be inadequate to assess the long-term societal effects of a law. It will be useful to determine whether specific laws have immediate or gradual impact, and how effects change over time.

### 3. Measurement of violent outcomes

**Specific measures.** Studies should measure outcomes directly associated with the law being evaluated (e.g., violence outside the home for laws about firearm carrying outside the home, and child violence perpetration for laws about child access to and use of firearms in the home). Failure to do so may result from a lack of information on direct measures of the outcome of interest.

**Intermediate outcomes.** Even when outcomes of interest are directly assessed, it may be useful to have information on intermediate outcomes in order to understand the way in which the outcome of interest is achieved (e.g., decreasing violence by changing firearm storage or carrying behavior).

**Population-specific effects.** The measurement of the effects of laws (e.g., acquisition restrictions) on violence perpetrated by criminals is important. It is also important to measure or estimate overall population effects of the same laws—for example, whether felony conviction restrictions for firearms purchase affect not only rates of violence among people with felony convictions, but also rates of violence in the general population.

**Substitution of weapons.** If the goal of a firearms law is the reduction of harm, it is essential to determine whether, given that one weapon may become less available because of the law, that weapon is not readily replaced by another that causes the same (or more or less) harm.

**Substitution of place.** Similarly, given that many firearms laws are local, it is important to determine whether enacting a law in one location displaces harm from that setting to another (e.g., affecting crime in neighboring jurisdictions that do not have such a law).

### 4. Measurement of potential confounders and effect modifiers

**Measuring and adjusting for confounders.** In the analysis of firearms laws, important confounders (e.g., gang activity, drug-related issues, crime cycles, law enforcement practices) are often difficult to measure. Better measures should be developed and used.

**Effect modification.** It is critical to assess the conditions under which laws may work, may work best, and may not work (e.g., alone or in combination with other laws, or in some settings but not in others). Many laws have multiple provisions, and it is important to determine which combinations of laws or provisions are the most effective.

### 5. Methods

**Appropriate design and analytic techniques.** Where possible, the data should be collected as prospective time-series measurements; analyses of trends are preferable to analyses of before-and-after changes.

Analytic techniques should include appropriate adjustment for autocorrelation of data in time series and in adjacent geographic locations.

**Assumptions and validation.** Analytic techniques commonly rest on assumptions about the study design or the characteristics of the study data. Assumptions should be validated, and, to the extent that they are violated, the consequences of violation considered and addressed.

## Research Issues Specific to Reviewed Firearms-Related Topics

Several data and research gaps were uncovered in this evaluation that could be potential topics for study.

### Bans

Examine effect of grandfathering and registration of grandfathered banned firearms on ban effectiveness.
Examine effects on purchases of firearms to be banned prior to implementation of the ban.
Examine substitution effects.

### Restrictions

Examine effects of restriction requirements in the secondary market (gun shows, private sales).
Assess the proportion of firearm-related crimes committed by people in each of the prohibited categories.
Examine the effect of specific restrictions on violence by populations to whom the restrictions apply (e.g., felons, drug abusers, or those adjudicated "mental defective").

### Waiting periods

Examine the effect of length of waiting period on violent outcomes.
Examine substitution effects (especially for suicide).
Compare effects of Interim and Permanent Brady laws on firearm-related violence.

### Licensing and registration

Assess substitution effects.
Look for specifics in state laws (e.g., fingerprinting or other requirements) as effect modifiers.
Examine effects of licensing and registration in a recent time period, with before-and-after study design and comparison populations.

### Shall issue carry laws

Focus specifically on crimes outside the home as outcomes.
Examine permit status for firearms used in crimes.
Examine the effects of differences in state laws on the number of permits issued.
Examine the deterrent effects of publicity about the law.

**Child access prevention laws**

Assess effects of laws on juvenile firearms users rather than victims.

Examine the effect of laws on storage practices, stratified by the presence of children in the home.

Assess the storage of firearms involved in unintentional injuries, suicide, and crime.

Assess effects of enforcement, punishment, and conviction on storage violation.

Compare effects of the CAP law in Florida (a state with felony sanction for CAP law violation) with effects in other states where violation is a misdemeanor.

**Zero firearms tolerance in schools**

Assess effects of zero firearms tolerance policies on school violence, firearm-related violence, and the school environment.

Assess school policies and practices for firearms detection, and their relative effectiveness.

Assess cost and benefit of "street" expulsion.

**Multiple laws and systems of laws**

Assess the effects of combinations of specific laws on specific forms of violence. Studies should allow the determination of which laws are critical to effective combinations and which are not.

## Other Effects

The reviews also identified potential research questions related to outcomes in addition to violence. These include:

**Property crime.** Assess the effects of firearms laws on property crime.

**Self-defense.** Assess the effects of firearms laws on people's capacity to defend themselves legally. Determine whether all demographic population segments are similarly affected.

**Legal rights.** Assess the effects of firearms laws on legal rights. For example, expulsion under the Gun-Free Schools Act to keep schools safe may conflict with the rights of students to an education.

**Justice.** Assess the effects of firearms laws (such as licensing, registration, background checks of applicants) on the apprehension of "wanted persons," such as fugitives from justice.

**Cost.** Assess the costs and benefits associated with implementing and enforcing firearms laws.

## Discussion: Reviewing Firearms Law Effects in the United States

International comparisons indicate that firearm-related violence is considerably higher in the United States than in other developed, industrialized nations.[7] As with other public health problems, efforts have been made to reduce firearm-related violence by means of legal interventions. However, at least based on identified studies of the range of firearms laws reviewed here, the evidence is insufficient to determine whether U.S. firearms laws affect violence. When we conclude that evidence for the effectiveness of a given firearms law on an outcome is insufficient, we do not imply that the law has no effect; rather, we mean that we do not yet know what effect, if any, the law has on that outcome. Other researchers have also noted "the absence of a critical mass of high-quality published studies evaluating the effectiveness of specific gun laws, relative to the magnitude of the problem in the United States."[62]

There are numerous challenges to evaluating the effects of firearms laws on violence in the United States. Information about firearms is collected to regulate, monitor, and investigate firearms transactions, but the collection and use of this information is also limited to protect the privacy of firearms owners. For example, firearms application information used in Brady Law background checks must be destroyed within a given time period. And the Firearms Owners Protection Act of 1986 (P.L. 99-308, 99 Cong., 2d Sess., 100 Stat. 449–461) forbids the federal government from establishing a federal registry of firearms owners. In addition, some of the data sources for violent outcomes (e.g., UCR) that have been most available and most widely used have also been of questionable value because of substantial under-reporting and questionable validity.

However, there are also emerging opportunities to determine whether existing laws are an effective means of reducing violence. The FBI's National Incident-Based Reporting System is designed to replace the UCR and will focus on the detailed circumstances of criminal events. The National Violent Death Reporting System will link multiple sources of information on violent deaths—including death certificates, and medical examiner, police, and crime lab reports—to provide comprehensive information on the circumstances of child abuse deaths, suicides, domestic violence homicides, and other forms of violent death. These reporting systems will greatly enhance the ability to evaluate the effects of firearms laws and other interventions to reduce these forms of violence.

Laws can and have played a prominent role in public health in the United States,[121] and may be one reasonable approach to the problem of firearm-related violence.[14] Further research is needed to understand how laws might affect firearm-related injury and death in the United States.

Members of the coordination team were Robert A. Hahn, PhD, MPH, Oleg O. Bilukha, MD, PhD, and Susan Snyder, PhD, Division of Prevention Research and Analytic Methods, Epidemiology Program Office, Centers for Disease Control

and Prevention (CDC), Atlanta GA; Alex Crosby, MD, Division of Violence Prevention, National Center for Injury Prevention and Control, CDC, Atlanta GA; Mindy T. Fullilove, MD, New York State Psychiatric Institute, Columbia University, and the Task Force on Community Preventive Services; Farris Tuma, ScD, and Eve K. Moscicki, ScD, MPH, National Institute of Mental Health, Bethesda MD; and Akiva Liberman, PhD, National Institute of Justice, Department of Justice, Washington DC.

Members of the consultation team were Laurie M. Anderson, PhD, Epidemiology Program Office, CDC, Olympia WA; Carl Bell, MD, Community Mental Health Council, Chicago IL; Red Crowley, Men Stopping Violence, Atlanta GA; Sujata Desai, PhD, National Center for Injury Prevention and Control, CDC, Atlanta GA; Deborah French, Colorado Department of Public Health and Environment, Denver CO; Darnell F. Hawkins, PhD, JD, University of Illinois at Chicago; Danielle LaRaque, MD, Harlem Hospital Center, New York; Barbara Maciak, PhD, MPH, Epidemiology Program Office, CDC, Detroit MI; James Mercy, PhD, National Center for Injury Prevention and Control, CDC, Atlanta GA; Suzanne Salzinger, PhD, New York State Psychiatric Institute, New York; and Patricia Smith, Michigan Department of Community Health, Lansing.

We received additional useful information from Phillip Cook, PhD, Duke University, Durham NC; Gary Kleck, PhD, School of Criminology and Criminal Justice, Florida State University, Tallahassee; Jon Vernick, PhD, and Daniel Webster, ScD, MPH, Johns Hopkins University, Baltimore MD; James Wright, PhD, University of Central Florida, Orlando; and Frank Zimring, JD, University of California, Berkeley.

Points of view are those of respective affiliated authors and do not necessarily reflect those of the Centers for Disease Control and Prevention; National Institute of Justice, U.S. Department of Justice; or National Institutes of Health.

No financial conflict of interest was reported by the authors of this paper.

## References

1. Hahn RA, Bilukha OO, Crosby A, et al. First reports evaluating the effectiveness of strategies for preventing violence: early childhood home visitation. MMWR Morb Mortal Wkly Rep 2003;52:1–9.
2. Bilukha O, Hahn RA, Crosby A. The effectiveness of early childhood home visitation in preventing violence: a systematic review. Am J Prev Med 2005;28(suppl 1):11–39.
3. Hahn RA, Lowy J, Bilukha O, et al. The effectiveness of therapeutic foster care for the prevention of violence: a systematic review. Am J Prev Med 2005;28(suppl 1):71–89.
4. Arias E, Anderson RN, Hsiang-Ching K, Murphy SL, Kochanek KD, Division of Vital Statistics. Deaths: final data for 2001. Natl Vital Stat Rep 2003;52:1–115.
5. Gotsch KE, Annest JL, Mercy JA, Ryan GW. Surveillance for fatal and nonfatal firearm-related injuries—United States, 1993–1998. MMWR Surveill Summ 2001;50:1–34.
6. Pastore AL, Maguire K. Sourcebook of criminal justice statistics 2001. Washington DC: U.S. Department of Justice, Bureau of Justice Statistics, 2002.
7. Krug EG, Dahlberg LL, Mercy JA, Zwi AB, Lozano R. World report on violence and health. Geneva: World Health Organization, 2002.
8. Cook PJ, Ludwig J. The costs of gun violence against children. Future Child 2002;12:87–99.
9. Bureau of Alcohol Tobacco and Firearms. Commerce in firearms in the United States. Washington DC: U.S. Department of the Treasury, Bureau of Alcohol, Tobacco and Firearms, 2000.
10. Cook PJ, Molliconi S, Cole TB. Regulating gun markets. J Criminal Law Criminol 1995;86:59–92.
11. Bureau of Alcohol Tobacco and Firearms. State laws and published ordinances—firearms. Washington DC: U.S. Department of the Treasury, Bureau of Alcohol, Tobacco and Firearms, 2000.
12. Cook PJ, Ludwig J. Guns in America: results of a comprehensive national survey on firearms ownership and use. Washington DC: Police Foundation, 1996.
13. Schuster MA, Franke TM, Bastian AM, Sor S, Halfon N. Firearm storage patterns in U.S. homes with children. Am J Public Health 2000;90:588–94.
14. Kellermann AL, Lee RK, Mercy JA, Banton JG. The epidemiologic basis for the prevention of firearm injuries. Annu Rev Public Health 1991;12:17–40.
15. Powell EC, Sheehan KM, Christoffel KK. Firearm violence among youth: public health strategies for prevention. Ann Emerg Med 1996;28:204–12.
16. Cook PJ, Moore MH. Guns, gun control, and homicide: a review of research and public policy. In: Smith MD, Zahn MA, eds. Homicide: a sourcebook of social research. Thousand Oaks CA: Sage, 1999:277–96.
17. Kleck G, Patterson EB. The impact of gun control and gun ownership levels on violence rates. J Quantitative Criminol 1993;9:249–87.
18. Ohsfeldt RL, Morrisey MA. Firearms, firearms injury, and gun control: a critical survey of the literature. Adv Health Econ Health Services Res 1992;13:65–82.
19. Teret SP, Wintemute GJ. Policies to prevent firearm injuries. Health Aff 1993;12:96–108.
20. Zimring FE. Firearms, violence and public policy. Sci Am 1991;11:48–54.
21. U.S. Department of Health and Human Services. Healthy people 2010. Washington DC: U.S. Department of Health and Human Services, 2001.
22. Briss PA, Zaza S, Pappaioanou M, et al. Developing an evidence-based Guide to Community Preventive Services—methods. Am J Prev Med 2000;18(suppl 1):35–43.
23. Truman BI, Smith-Akin CK, Hinman AR, et al. Developing the Guide to Community Preventive Services—overview and rationale. Am J Prev Med 2000;18(suppl 1):18–26.
24. Carande-Kulis VG, Maciosek MV, Briss PA, et al. Methods for systematic reviews of economic evaluations for the Guide to Community Preventive Services. Am J Prev Med 2000;18(suppl 1):75–91.
25. Zaza S, Wright-de Aguero L, Briss PA, et al. Data collection instrument and procedure for systematic reviews in the Guide to Community Preventive Services. Am J Prev Med 2000;18(suppl 1):44–74.
26. Cook PJ, Moore MH, Braga AA. Gun control. In: Wilson JQ, Petersilia J, eds. Crime: public policies for crime control. Oakland CA: Institute for Contemporary Studies, 2002:291–329.
27. Vernick JS, Webster DW, Hepburn LM. Effects of Maryland's law banning Saturday night special handguns on crime guns. Inj Prev 1999;5:259–63.
28. Weil DS, Knox RC. The Maryland ban on the sale of assault pistols and high-capacity magazines: estimating the impact in Baltimore. Am J Public Health 1997;87:297–8.
29. Wintemute GJ, Wright MA, Drake C, Beaumont JJ. Subsequent criminal activity among violent misdemeanants who seek to purchase handguns. JAMA 2001;285:1019–26.
30. Ludwig J. Concealed-gun-carrying laws and violent crime: evidence from state panel data. Int Rev Law Econ 1998;18:239–54.
31. Cramer CE, Kopel DB. "Shall issue": the new wave of concealed handgun permit laws. Tennessee Law Rev 1995;62:679–757.
32. Maltz MD. Bridging gaps in police crime data. Washington DC: U.S. Department of Justice, Federal Bureau of Investigation, 1999.
33. Maltz MD, Targonski J. A note on the use of county-level UCR data. J Quantitative Criminol 2002;18:297–318.
34. Maguire K, Pastore AL. Sourcebook of criminal justice statistics 2000. Washington DC: U.S. Department of Justice, Bureau of Justice Statistics, 2001.
35. Federal Bureau of Investigation. Supplementary homicide reports 1980–2000. Washington DC: Federal Bureau of Investigation, 2000 (machine-readable data files).
36. Federal Bureau of Investigation. Developments in the National Incident-Based Reporting System (NIBRS). Washington DC: U.S. Department of Justice, Federal Bureau of Investigation, Criminal Justice Information Services Division, 2000.
37. Azrael D, Barber C, Mercy J. Linking data to save lives: recent progress in establishing a National Violent Death Reporting System. Harvard Health Pol Rev 2001;2:38–42.
38. Gittelsohn A, Royston P. Annotated bibliography of cause-of-death validation studies, 1958–80. Washington DC: National Center for Health Statistics, 1982.

39. Poe GS, Powell-Griner E, McLaughlin JK, Placek PJ, Thompson GB, Robinson K. Comparability of the death certificate and the 1986 National Mortality Followback Survey. Washington DC: National Center for Health Statistics, 1993.

40. Sorlie PD, Rogot E, Johnson N. Validity of demographic characteristics on the death certificate. Epidemiology 1992;3:181–4.

41. Barber C, Hemenway D, Hochstadt J, Azrael D. Underestimates of unintentional firearm fatalities: comparing Supplementary Homicide Report data with the National Vital Statistics System. Inj Prev 2002;8:252–6.

42. Loftin C, McDowall D, Wiersema B, Cottey TJ. Effects of restrictive licensing of handguns on homicide and suicide in the District of Columbia. N Engl J Med 1991;325:1615–20.

43. Jones ED. The District of Columbia's "Firearms Control Regulation Act of 1975": the toughest handgun control law in the United States—or is it? Ann Am Acad Political Social Sci 1981;455:138–49.

44. Nicholson R, Garner A. The analysis of the Firearms Control Act of 1975: handgun control in the District of Columbia. Washington DC: U.S. Conference of Mayors, 1980.

45. Roth JA, Koper CS. Impacts of the 1994 Assault Weapons Ban: 1994–1996. Washington DC: U.S. Department of Justice, 1999.

46. Britt CL, Bordua DJ, Kleck G. A reassessment of the D.C. gun law: some cautionary notes on the use of interrupted time series designs for policy impact assessment. Law Society Rev 1996;30:361–80.

47. McDowall D, Loftin C, Wiersema B. Using quasi-experiments to evaluate firearm laws: comment on Britt et al.'s reassessment of the D.C. gun law. Law Society Rev 1996;30:381–91.

48. Kleck G. Evidence that "Saturday night specials" are not very important for crime. Sociol Social Res 1986;70:303–7.

49. Bureau of Alcohol Tobacco and Firearms. Federal firearms regulations reference guide. Washington DC: U.S. Department of the Treasury, Bureau of Alcohol, Tobacco and Firearms, 2000.

50. Ludwig J, Cook PJ. Homicide and suicide rates associated with implementation of the Brady Handgun Violence Prevention Act. JAMA 2000;284:585–91.

51. U.S. Department of Justice. Survey of state procedures related to firearm sales, 1996. Washington DC: Bureau of Justice Statistics, U.S. Department of Justice, 1996.

52. Government Accounting Office. Gun control: options for improving the National Instant Criminal Background Check System. Washington DC: U.S. General Accounting Office, 2000.

53. Government Accounting Office. Improving the National Instant Criminal Background Check System. Washington DC: U.S. General Accounting Office, 2000 (testimony before Committee on the Judiciary, U.S. Senate).

54. U.S. Department of Justice. Survey of state criminal history information systems, 1999. Washington DC: U.S. Department of Justice, 2000.

55. Government Accounting Office. Opportunities to close loopholes in the National Instant Criminal Background Check System. Washington DC: General Accounting Office, 2002.

56. U.S. Department of Justice. National Instant Criminal Background Check System (NICS). Operations report (November 30, 1998–December 31, 1999). Washington DC: U.S. Department of Justice, 2000.

57. U.S. Department of Justice. Presale handgun checks, the Brady interim period, 1994–1998. Bureau of Justice Statistics Bulletin. Washington DC: U.S. Department of Justice, 1999.

58. Government Accounting Office. Gun control: implementation of the National Instant Criminal Background Check System, GAO/GGD/AIMD-00–64. Washington DC: U.S. General Accounting Office, 2000 (Report to the Honorable Craig Thomas, U.S. Senate).

59. Wright MA, Wintemute GJ, Rivara FP. Effectiveness of denial of handgun purchase to persons believed to be at high risk for firearm violence. Am J Public Health 1999;89:88–90.

60. Lott JR. More guns, less crime: understanding crime and gun-control laws. 2nd ed. Chicago: University of Chicago Press, 2000.

61. Brady Campaign to Prevent Gun Violence. Background checks and waiting periods for firearm purchases. Available at: www.bradycampaign.org/facts/issues/?page=waitxstate. Accessed December 14, 2004.

62. Vernick JS, Hepburn LM. State and federal gun laws: trends for 1970–1999. In: Cook PJ, Ludwig J, eds. Evaluating gun policy. Washington DC: Brookings Institution Press, 2003:345–402.

63. Cantor CH, Slater PJ. The impact of firearm control legislation on suicide in Queensland: preliminary findings. Med J Aust 1995;162:583–5.

64. Lott JR, Whitley JE. Safe-storage gun laws: accidental deaths, suicides, and crime. J Law Econ 2001;44:659–90.

65. Magaddino JP, Medoff MH. An empirical analysis of federal and state firearm control laws. In: Kates DB, ed. Firearms and violence. Cambridge MA: Ballinger, 1984:225–58.

66. DeZee MR. Gun control legislation: impact and ideology. Law Policy Q 1983;5:367–79.

67. Murray D. Handguns, gun control laws and firearm violence. Social Problems 1975;23:81–92.

68. DeFrancesco S, Vernick JS, Weitzel MM, LeBrun EE. Gun policy glossary: policy, legal and health terms. Baltimore MD: Johns Hopkins Center for Gun Policy and Research, 2000.

69. U.S. Department of Justice. Survey of state procedures related to firearm sales, midyear 2000. Washington DC: Bureau of Justice Statistics, U.S. Department of Justice, 2000.

70. Bureau of Alcohol Tobacco and Firearms. Following the gun: enforcing federal laws against firearms traffickers. Washington DC: U.S. Department of the Treasury, Bureau of Alcohol, Tobacco and Firearms, 2000.

71. Webster DW, Vernick JS, Hepburn LM. Relationship between licensing, registration, and other gun sales laws and the source state of crime guns. Inj Prev 2001;7:184–9.

72. Teret SP. The firearm injury reporting system revisited. JAMA 1996;275:70.

73. National Rifle Association of America Institute for Legislative Action. Fact sheet: licensing and registration. www.nraila.org/FactSheets.asp?FormMode=Detail&ID=28. Accessed February 13, 2003.

74. Lott JR, Mustard DB. Crime, deterrence, and right-to-carry concealed handguns. J Legal Stud 1997;26:1–68.

75. Black DA, Nagin D. Do right-to-carry laws deter violent crime? J Legal Stud 1998;27:209–19.

76. Brady Campaign to Prevent Gun Violence. Concealed weapons, concealed risk. Available at: www.bradycampaign.org/facts/issues/?page=ccw. Accessed December 14, 2004.

77. Duggan M. More guns, more crime. J Political Econ 2001;109:1086–114.

78. Moody CE. Testing for the effects of concealed weapons laws: specification errors and robustness. J Law Econ 2001;44:799–813.

79. Olson DE, Maltz MD. Right-to-carry concealed weapon laws and homicide in large U.S. counties: the effect on weapon types, victim characteristics, and victim-offender relationship. J Law Econ 2001;44:747–70.

80. Plassmann F, Tideman TN. Does the right to carry concealed handguns deter countable crimes? Only a count analysis can say. J Law Econ 2001;44:771–98.

81. Webster DW, Vernick JS, Ludwig J, Lester KJ. Flawed gun policy research could endanger public safety. Am J Public Health 1997;87:918–21.

82. Wright JD, Rossi PH. The armed criminal in America: a survey of incarcerated felons. Washington DC: National Institute of Justice, 1985.

83. Wright JD, Rossi PH. Armed and considered dangerous: a survey of felons and their firearms. Hawthorne NY: Aldine de Gruyter, 1986.

84. Ayres I, Donohue III JJ. Nondiscretionary concealed weapons laws; a case study of statistics, standards of proof, and public policy. Am Law Econ Rev 1999;6:436–70.

85. Dezhbakhsh H, Rubin PH. Lives saved or lives lost? The effects of concealed-handgun laws on crime. AEA Papers Proc 1998;88:468–74.

86. McDowall D, Loftin C, Wiersema B. Easing concealed firearms laws: effects on homicide in three states. J Criminal Law Criminol 1995;86:193–206.

87. Mustard DB. The impact of gun laws on police deaths. J Law Econ 2001;44:635–58.

88. Bronars SG, Lott JR. Criminal deterrence, geographic spillovers, and the right to carry handguns. Am Econ Rev 1998;88:475–9.

89. Centers for Disease Control and Prevention, National Center for Health Statistics. Vital statistics of United States, 1995: mortality. Hyattsville MD: U.S. Department of Health and Human Services, 1999.

90. Peters R. Gun violence prevention update. New York: Funder's Collaborative for Gun Violence Prevention, 2001.

91. Webster DW, Starnes M. Reexamining the association between child access prevention gun laws and unintentional shooting deaths of children. Pediatrics 2000;106:1466–9.

92. Cummings P, Grossman DC, Rivara FP, Koepsell TD. State gun safe storage laws and child mortality due to firearms. JAMA 1997;278:1084–6.

93. Public Law 103-382, October 20, 1994, Gun-Free Schools Act, 20 USC 8921, Sec. 14601 (1994).

94. National School Boards Association. Violence in the schools: how America's school boards are safeguarding our children. Alexandria VA: National School Boards Association, 1993.

95. National Center for Education Statistics, Bureau of Justice Statistics. Indicators of school crime and safety, 1998. Washington DC: U.S. Department of Education/U.S. Department of Justice, 1998.

96. U.S. Department of Education, U.S. Department of Justice. 1999 Annual report on school safety. Washington DC: U.S. Department of Education/U.S. Department of Justice, 1999.

97. Brener ND, Simon TR, Krug EG, Lowry R. Recent trends in violence-related behaviors among high school students in the United States. JAMA 1999;282:440–6.

98. National Center for Education Statistics, Bureau of Justice Statistics. Indicators of school crime and safety, 2001. Washington DC: U.S. Department of Education/U.S. Department of Justice, 2001.

99. Centers for Disease Control and Prevention. Violence-related attitudes and behaviors of high school students—New York City. MMWR Morb Mortal Wkly Rep 1993;42:773–7.

100. U.S. Department of Education. Alternative education programs for violent and chronically disruptive students: best practices. Washington DC: Safe and Drug-Free Schools Program, U.S. Department of Education, 1996.

101. Bagley C, Pritchard C. The billion dollar cost of troubled youth: prospects for cost-effective prevention and treatment. Int J Adolesc Youth 1998;7:211–25.

102. Cukier W. Firearms regulation: Canada in the international context. Chron Dis Can 1998;19:25–34.

103. Carrington PJ, Moyer S. Gun availability and suicide in Canada: testing the displacement hypothesis. Stud Crime Crime Prev 1994;3:168–78.

104. Carrington PJ, Moyer S. Gun control and suicide in Ontario. Am J Psychiatry 1994;151:606–8.

105. Leenaars AA, Lester D. Effects of gun control on homicide in Canada. Psychol Rep 1994;75:81–2.

106. Lester D, Leenaars AA. Suicide rates in Canada before and after tightening firearm control laws. Psychol Rep 1993;72:787–90.

107. Mauser G, Holmes RA. An evaluation of the 1977 Canadian firearms legislation. Evaluation Rev 1992;16:603–17.

108. Mundt RJ. Gun control and rates of firearms violence in Canada and United States. Can J Criminol 1990;32:137–54.

109. Canadian Department of Justice. A statistical analysis of the impacts of the 1977 firearms control legislation. Ottawa: Department of Justice, Programme Evaluation Section, 1996.

110. Rich CL, Young JG, Fowler RC, Wagner J, Black NA. Guns and suicide: possible effects of some specific legislation. Am J Psychiatry 1990; 147:342–6.

111. Scarff E. Evaluation of the Canadian gun control legislation. Ottawa: Minister of Supply and Services, 1983.

112. Sproule CF, Kennett D. The use of firearms in Canadian homicides 1972–1982: the need for gun control. Can J Criminol 1988;30:31–7.

113. Zimring FE. Firearms and federal law: the Gun Control Act of 1968. J Legal Stud 1975;4:133–98.

114. Centerwall BS. Homicide and the prevalence of handguns: Canada and the United States, 1976 to 1980. Am J Epidemiol 1991;134:1245–60.

115. Sloan JH, Kellermann AL, Reay DT, et al. Handgun regulations, crime, assaults, and homicide: a tale of two cities. N Engl J Med 1988; 319:1256–62.

116. Sloan JH, Rivara FP, Reay DT, Ferris JAJ, Path MRC, Kellermann AL. Firearm regulations and rates of suicide: a comparison of two metropolitan areas. N Engl J Med 1990;322:369–73.

117. Boor M, Blair JH. Suicide rates, handgun control laws, and sociodemographic variables. Psychol Rep 1990;66:923–30.

118. Geisel M, Roll R, Wettick R. The effectiveness of state and local regulation of handguns. Duke Law J 1969;43:647–73.

119. Lester D, Murrell ME. The preventive effect of strict gun control laws on suicide and homicide. Suicide Life Threat Behav 1982;12:131–40.

120. Medoff MH, Magaddino JP. Suicides and firearm control laws. Evaluation Rev 1983;7:357–72.

121. Gostin LO. Public health law: power, duty, restraint. Berkeley: University of California Press, 2000.

## Appendix A

**Table A1.** Studies measuring effect of gun acquisition or possession bans on violence

| Author & year<br>Design suitability: design<br>Type of analysis<br>Quality of execution<br>(# of limitations)<br>Specific limitations | Intervention; additional intervention components when used (date) Comparison | Study period<br>Location<br>Unit of analysis<br>Sample size<br>Sample characteristics<br>Follow-up percent and length | Results | | | |
|---|---|---|---|---|---|---|
| | | | Reported effect measure | Reported baseline | Reported effect (*p* value) | Value used in review (*p* value) |
| Britt[a] (1996)[1]<br>Greatest: time=series with comparison ARIMA, examines effect of law and timing of effect<br>Fair (3)<br>Description: minimal population description<br>Outcome: ecological measurement[b]<br>Confounding: no control for some important confounders | Intervention: DC law, Firearm Control Regulations Act—ban on handgun purchases, registration of preowned handguns, and safe gun storage regulations (signed 7/23/76; fully in effect since 2/21/77)<br>Control: Baltimore MD (no comparable law), and before-and-after comparison | 1968–1987/1989<br>Washington, DC and Baltimore, MD<br>DC and Baltimore as units of analysis<br>Sample size: two cities<br>Sample characteristics: comparable sociodemographics and crime rates<br>Follow-up percent: NA; regionwide study<br>Follow-up length: 21 yr | Monthly firearm-related and nonfirearm-related homicide counts | None reported | Change in monthly firearm-related homicide counts (1968–1987, no effect, confirmed by additional years of data, 1987–1989)<br>FBI data:<br>Washington 1.5 (NS)<br>Baltimore −2.6 (*p*<0.05)<br>NCHS data (change in natural logarithm rate):<br>Washington −0.002 (NS)<br>Baltimore −3.8 (*p*<0.01) | Relative percent change in homicide rates: not calculable (no baseline provided) |
| Kleck (1993)[2]<br>Least; cross-sectional<br>Regression<br>Fair (2)<br>Outcome: ecological measurement[b]<br>Confounding: no control for some important confounders | Intervention: ban on handgun possession, ban on handgun sales, ban on Saturday night specials (multiple dates, not specified)<br>Control: cities with no such laws | 1980 (1979–1981)<br>USA, cities with population >100,000<br>Cities with >100,000 residents in 1980 as unit of analysis<br>*n*=170<br>Multiple sample characteristics summarized<br>Follow-up percent and length: NA | Natural logarithm of difference in total and firearm-related-specific crime, suicide, and unintentional injury rate between cities that had specified bans and those that did not | None reported | Effects of ban on handgun possession:<br>Homicide total: 0.087 (NS)<br>Assault total: 0.022 (NS)<br>Robbery total: 0.104 (NS)<br>Rape total: −0.092 (NS)<br>Suicide total: −0.062 (NS)<br>Firearm-related unintentional death: 0.009 (NS)<br>Effects of ban on handgun sales: | Relative percent change<br>Ban on handgun possession:<br>Homicide total: 9.1 (NS)<br>Assault total: 2.2 (NS)<br>Robbery total: 11.0 (NS)<br>Rape total: −8.8 (NS)<br>Suicide total: −6.0 (NS)<br>Firearm-related unintentional death: 0.9 (NS) |

(continued on next page)

**Table A1.** *(continued)*

| Author & year Design suitability: design Type of analysis Quality of execution (# of limitations) Specific limitations | Intervention; additional intervention components when used (date) Comparison | Study period Location Unit of analysis Sample size Sample characteristics Follow-up percent and length | Results | | | |
|---|---|---|---|---|---|---|
| | | | Reported effect measure | Reported baseline | Reported effect (*p* value) | Value used in review (*p* value) |
| | | | | | Homicide total: 0.001 (NS) | Ban on handgun sales: |
| | | | | | Assault total: −0.106 (NS) | Homicide total: 0.1 (NS) |
| | | | | | Robbery total: −0.105 (NS) | Assault total: −10.1 (NS) |
| | | | | | Rape total: −0.112 (NS) | Robbery total: −9.9 (NS) |
| | | | | | Suicide total: −0.066 (NS) | Rape total: −10.6 (NS) |
| | | | | | Firearm-related unintentional death: −0.099 (NS) | Suicide total: −6.4 (NS) |
| | | | | | Effects of Saturday night specials ban: | Firearm-related unintentional death: −9.4 (NS) |
| | | | | | Homicide total: 0.083 (NS) | Saturday night specials ban: |
| | | | | | Assault total: 0.069 (NS) | Homicide total: 8.7 (NS) |
| | | | | | Robbery total: 0.060 (NS) | Assault total: 7.1 (NS) |
| | | | | | Rape total: 0.084 (NS) | Robbery total: 6.2 (NS) |
| | | | | | Suicide total: 0.094 (NS) | Rape total: 8.8 (NS) |
| | | | | | Firearm-related unintentional death: 0.063 (NS) | Suicide total: 9.9 (NS) |
| | | | | | | Firearm-related unintentional death: 6.5 (NS) |

*(continued on next page)*

**Table A1.** *(continued)*

| Author & year Design suitability: design Type of analysis Quality of execution (# of limitations) Specific limitations | Intervention; additional intervention components when used (date) Comparison | Study period Location Unit of analysis Sample size Sample characteristics Follow-up percent and length | Results | | | |
|---|---|---|---|---|---|---|
| | | | Reported effect measure | Reported baseline | Reported effect (*p* value) | Value used in review (*p* value) |
| Loftin (1991)[3] Greatest: time-series with comparison Before-and-after *t*-test and ARIMA Fair (4) Description: no population description Outcome: ecological measurement[b] Confounding: no control for some important confounders Other biases: change in rates before law adoption, population changes not accounted for | Intervention: DC law, Firearm Control Regulations Act—ban on handgun purchases, registration of preowned handguns, and safe gun storage regulations (signed 7/23/76; fully in effect since 2/21/77) Control: neighboring counties with no such law, and before-and-after comparison | 1968–1987 Washington, DC and adjacent comparison counties of MD and VA (combined; DC-MD-VA SMSA) DC and adjacent comparison counties (combined) as unit of analysis Sample size: three regions Sample characteristics not described Follow-up percent: NA; regionwide study Follow-up length: 19 yr | Monthly nomicide and suicide counts: pre-law average levels and change after the law | Firearm-related homicides (deaths/month) DC: 13.0 MD/VA: 5.8 Non-firearm-related homicides DC: 7.3 MD/VA: 3.0 Firearm-related suicides DC: 2.6 MD/VA: 9.2 Non-firearm-related suicides DC: 4.4 MD/VA: 9.9 | Change in firearm-related homicides (deaths/month): DC: −3.3 (*p*<0.001) MD/VA: −0.4 (NS) Change in non-firearm-related homicides: DC: −0.3 (NS) MD/VA: 0.7 (*p*<0.05) Change in firearm-related suicides: DC: −0.6 (*p*<0.05) MD/VA: 1.1 (*p*<0.05) Change in non-firearm-related suicides: DC: −0.4 (NS) MD/VA: −0.2 (NS) | Relative percent change (total estimates calculated from firearm-related and non-firearm-related estimates) Firearm-related homicide: −19.9 (*p*<0.001) Total homicide: −20.4 (NS) Firearm-related suicide: −12.6 (*p*<0.005) Total suicide: −18.1 (NS) |
| McDowall (1996)[4] Greatest: time-series with comparison Before-and-after change *t*-test Fair (4) Description: minimal population description Outcome: ecological measurement[b] Confounding: no control for some important confounders | Intervention: DC law, Firearm Control Regulations Act—ban on handgun purchases, registration of preowned handguns, and safe gun storage regulations (signed 7/23/76; fully in effect since 2/21/77) Control: Boston and Memphis—similar size cities with no such law, and before-and-after change comparison | 1968–1987/1990 Washington, DC and Baltimore, Boston, and Memphis DC and Baltimore, Boston, and Memphis as units of analysis Sample size: four regions Sample characteristics not described Follow-up percent: NA; regionwide study Follow-up length: 19 to 22 yr | Monthly homicide and suicide counts: change in average levels before and after law | None reported | Change in firearm-related homicides (deaths/month): DC: 2.08 (1968–1990) Memphis: 0.74 (1968–1987) Boston: −0.80 (1968–1987) Baltimore: −3.01 (1968–1987) Change in non–firearm-related homicides: DC: 0.61 (1968–1990) Memphis: 0.37 (1968–1987) | Relative percent change not calculable. Baseline rates not provided for comparison cities; data collection periods in this report differ for intervention and comparison cities, but available in earlier study[3] |

*(continued on next page)*

**Table A1.** *(continued)*

| Author & year Design suitability: design Type of analysis Quality of execution (# of limitations) Specific limitations | Intervention; additional intervention components when used (date) Comparison | Study period Location Unit of analysis Sample size Sample characteristics Follow-up percent and length | Results | | | |
|---|---|---|---|---|---|---|
| | | | Reported effect measure | Reported baseline | Reported effect (*p* value) | Value used in review (*p* value) |
| Other biases: change in rates before law adoption, population changes not accounted for | | | | | Boston: −0.31 (1968–1987) Baltimore: −1.41 (1968–1987) Change in firearm-related suicides: DC: −0.47 (1968–1990) Memphis: 0.65 (1968–1987) Boston: 0.10 (1968–1987) Baltimore: 0.17 (1968–1987) Change in non–firearm-related suicides: DC: −0.33 (1968–1990) Memphis: 0.30 (1968–1987) Boston: −0.26 (1968–1987) Baltimore: −0.62 (1968–1987) | |
| Roth (1999)[5] Greatest: time series with comparison Regression Fair (4) Description: minimal population description Outcome: ecological measurement[b] Follow-up: short follow-up period Confounding: no control for some important confounders | Intervention: Federal Violent Crime Control and Law Enforcement Act banning manufacture, transfer, and possession of certain semiautomatic firearms and large-capacity ammunition magazines, plus restrictions on firearms dealer licensing and age of gun acquisition (1994) | 1980–1995 USA, 42 states State as unit of analysis *n*=42 Sample characteristics: U.S. states, populations not described Follow-up percent: NA, statewide study Follow-up length: 1 yr | Percentage difference between predicted and observed firearm homicide rates | None reported | States (*n*=15) that had no similar assault weapons ban before and had prior ban on juvenile handgun possession; New York State excluded, because of enactment of other firearms laws in same period: −6.7 (NS) | Relative percent change in firearm homicide rates, comparing states with and without similar weapons bans prior to federal ban; intervention and comparison states had prior bans on juvenile handgun possession; NY and CA excluded |

*(continued on next page)*

**Table A1.** (continued)

| Author & year Design suitability: design Type of analysis Quality of execution (# of limitations) Specific limitations | Intervention; additional intervention components when used (date) Comparison | Study period Location Unit of analysis Sample size Sample characteristics Follow-up percent and length | Results | | | |
|---|---|---|---|---|---|---|
| | | | Reported effect measure | Reported baseline | Reported effect (*p* value) | Value used in review (*p* value) |
| | Control: states that had similar laws before 1994 | | | | | from comparison because of enactment of other firearms laws in same period: −6.7 (NS) |
| Vernick (1999)[6] Moderate: retrospective design with comparison Pre–post proportions of requests for traces of crime firearms; proportions of banned guns traced to purchase year pre- and post-ban in ban and non-ban cities Fair (4) Description: minimal population description Sampling: convenience sample of 16 cities in YCGII, excluding Washington, DC Outcome: ecological measurement[b] Confounding: no control for some important confounders | Intervention: MD law banning manufacture and sale of Saturday night specials (passed, 1988, effective 1990) Control: 15 YCGII cities without such a law | 1985–1996/1997 Location: Baltimore and 15 comparison cities City as unit of analysis, *n*=16 Population characteristics not provided Follow-up percent: NA Follow-up length: 12 yr retrospective | Relative percent of banned crime gun trace requests (process by which law enforcement identifies source of weapon) among all gun trace requests in other cities compared with Baltimore, after the law, controlling for confounders | Baltimore, before the law: 13.6% Other cities before the law: 17.6% | Ratio of percent of banned crime gun trace requests among all gun trace requests in other cities compared with Baltimore, after the law, controlling for some confounders: 2.3 (*p* value <0.05) | Relative percent change in proportion of crime guns used between July 1996 and April 1997 that were traced to purchase dates before and after the ban, in Baltimore and comparison cities: −107.6 (*p* value NA) |

*(continued on next page)*

**Table A1.** *(continued)*

| Author & year<br>Design suitability: design<br>Type of analysis<br>Quality of execution<br>(# of limitations)<br>Specific limitations | Intervention; additional intervention components when used (date)<br>Comparison | Study period<br>Location<br>Unit of analysis<br>Sample size<br>Sample characteristics<br>Follow-up percent and length | Results | | | |
|---|---|---|---|---|---|---|
| | | | Reported effect measure | Reported baseline | Reported effect (*p* value) | Value used in review (*p* value) |
| Weil (1997)[7]<br>Moderate: time-series with no comparison<br>Regression<br>Fair (4)<br>Description: population<br>Outcome: ecological measurement[b]<br>Follow-up: short follow-up period<br>Confounding: no control for some important confounders | Intervention: MD law banning sales of assault pistols and high-capacity ammunition magazines (1994)<br>Comparison: no separate control population, before-and-after comparison only | 1989–1995<br>Location: Baltimore, MD<br>Baltimore (data from first 6 months of each year) as unit of analysis<br>Population characteristics not provided<br>Follow-up percent: NA; regionwide study<br>Follow-up length: 6 months | Difference between expected and actual number of assault guns recovered in first 6 months of 1995 | None reported | Expected number of assault guns recovered: 52.5<br>Actual number of assault guns recovered: 24<br>55% reduction (*p*=0.018) | Relative percent change:<br>−55.0<br>(*p*=0.018) |

[a]Publications excluded because they report on the same intervention in the same population were: Jones ED. The District of Columbia's "Firearms Control Regulation Act of 1975": the toughest handgun control law in the United States—or is it? *Ann Am Acad Political Social Sci* 1981;455:138–49; and Nicholson R, Garner A. The Analysis of the Firearms Control Act of 1975: Handgun Control in the District of Columbia. Washington DC: U.S. Conference of Mayors, 1980.

[b]In ecological measurement, exposures and outcomes are measured in the same population, but it cannot be determined whether those in the population who are exposed are also those with the outcome (or whether those in the population who are not exposed are also those without the outcome), and thus, whether exposure and outcome are associated.

ARIMA, autoregressive integrated moving average; DC, Washington DC; FBI, Federal Bureau of Investigation; MD, Maryland; NCHS, National Center for Health Statistics; NA, not applicable or not available; NS, not statistically significant; SMSA, standard metropolitan statistical area; VA, Virginia; yr, year(s); YCGII, Youth Crime Gun Interdiction Initiative.

**References for the Appendix**

1. Britt CL, Kleck G, Bordua DJ. A reassessment of the D.C. gun law: some cautionary notes on the use of interrupted time series designs for policy impact. Law Society Rev 1996;30:361–80.
2. Kleck G, Patterson EB. The impact of gun control and gun ownership levels on violence rates. J Quantitative Criminol 1993;9:249–87.
3. Loftin C, McDowall D, Wiersma B, Cottey TJ. Effects of restrictive licensing of handguns on homicide and suicide in the District of Columbia. N Engl J Med 1991;325: 1615–20.
4. McDowall D, Loftin C, Wiersma B. Using quasi-experiments to evaluate firearm laws: comment on Britt et al.'s reassessment of the D.C. gun law. Law Society Rev 1996;30:381–91.
5. Roth JA, Koper CS. Impacts of the 1994 Assault Weapons Ban: 1994–1996. Washington, DC: U.S. Department of Justice, 1999.
6. Vernick JS, Webster DW, Hepburn LM. Effects of Maryland's law banning Saturday night special handguns on crime guns. Inj Prev 1999;5:259–63.
7. Weil DS, Knox RC. The Maryland ban on the sale of assault pistols and high-capacity magazines: estimating the impact in Baltimore. Am J Public Health 1997;87: 297–8.

# EXHIBIT 52

# Reexamining the Association Between Child Access Prevention Gun Laws and Unintentional Shooting Deaths of Children

Daniel W. Webster, ScD, MPH, and Marc Starnes, MHS

**ABSTRACT.** *Context.* A previous study estimated that child access prevention (CAP) laws, which hold adults criminally liable for unsafe firearm storage in the environment of children, were associated with a 23% decline in unintentional firearm mortality rates among children.

*Objective.* To reassess the effects of CAP laws and more fully examine the consistency of the estimated law effects across states.

*Design.* A pooled time-series study of unintentional firearm mortality among children from 1979 through 1997.

*Setting.* The 50 states and the District of Columbia.

*Participants.* All children <15 years.

*Main Outcome Measures.* Rates of unintentional deaths attributable to firearms.

*Results.* When the effects of all 15 state CAP laws enacted before 1998 were aggregated, the laws were associated with a 17% decline in unintentional firearm death rates among children. The laws' effects were not equal across states. Florida's CAP law was associated with a 51% decline; however, there were no statistically significant aggregate or state-specific law effects in the other 14 states with CAP laws.

*Conclusions.* Florida's CAP law—1 of only 3 such laws allowing felony prosecution of violators—appears to have significantly reduced unintentional firearm deaths to children. However, there is no evidence of effects in the other 14 states with CAP laws. *Pediatrics* 2000;106:1466–1469; *child access prevention laws, unintentional firearms deaths.*

ABBREVIATIONS. CAP, child access prevention laws; IRR, incidence rate ratio; CI, 95% confidence interval; LR, likelihood ratio.

I n the United States in 1997, 142 children between 0 and 14 years old died and many more suffered nonfatal injuries from unintentional shootings.[1] The rate of unintentional firearm deaths to children is 9 times higher in the United States than in 25 other industrialized countries combined.[2] Storing firearms in the home unloaded and securely locked up can potentially prevent many of these incidents and possibly prevent some adolescent suicides as well. Recent surveys indicate that 33% to 40% of US households have a gun in them,[3–5] and 1 in 5 gun owners report keeping at least 1 gun loaded and unlocked.[3,5] The American Academy of Pediatrics recommends pediatricians counsel parents about risks associated with keeping guns in the home and how to store guns safely when they are in the environment of children.[6] But most pediatricians do not routinely counsel parents about firearm risks,[7,8] and the only evaluation of such counseling did not find significant effects on gun ownership or gun storage.[9]

Gun-related deaths and injuries involving children have motivated legislators in 17 US states to pass laws that make a gun owner criminally liable if his or her gun is not stored safely and a child uses it to injure himself or others. These laws are commonly referred to as child access prevention (CAP) laws. The US Congress recently considered legislation that would include penalties of up to 1 year in prison and a fine of up to $10 000 for gun owners who do not take appropriate measures to prevent unsupervised child access to the gun if an injury or death occurs.[10]

Cummings et al[11] estimated the effects of the 12 state CAP laws that went into effect before January 1994, and concluded that these laws were associated with a 23% reduction in unintentional gunshot deaths among children <15 years old. Although often not mentioned when the study is referenced in scientific journals,[12] prevention guidelines,[13] or news stories,[14] data from this study indicated that statistically significant reductions associated with the CAP laws were limited to the subgroup of 3 states in which violation of the law was a felony.

The current study more fully examines the interstate variability in CAP law effects on unintentional firearm deaths and the influence of a single state on the aggregate estimate of the effects of the laws. Compared with the previous study, this study includes 3 additional years of data, 3 additional states that adopted CAP laws, and, consequently, more than twice as many child-years of exposure to CAP laws.

## METHODS

Data on the annual number of unintentional gunshot deaths among children 0 to 14 years old and on population demographics were obtained for each state and the District of Columbia from the Compressed Mortality Files of the National Center for Health Statistics for the years 1979 through 1997.[1] We included in the analyses deaths for which a medical examiner or coroner assigned an external cause of death code within the range of E922.0 to E922.9[15] for accidental injuries caused by a firearm missile.

Our evaluation strategy sought to contrast within-state changes in childhood unintentional firearm death rates between states that adopted CAP laws with changes in states that had not adopted a CAP law. As is common for policy impact studies of this type, we

From the Center for Gun Policy and Research, Johns Hopkins University School of Public Health, Baltimore, Maryland.

Received for publication Mar 20, 2000; accepted Sep 6, 2000.

Reprint requests to (D.W.W.) Center for Gun Policy and Research, Johns Hopkins University School of Public Health, 624 N Broadway, Baltimore, MD 21205-1996. E-mail: dwebster@jhsph.edu

PEDIATRICS (ISSN 0031 4005). Copyright © 2000 by the American Academy of Pediatrics.

estimated the effect of CAP laws using regression models that included an explanatory variable set equal to 0 when there was no law and equal to 1 when the law was in effect in a given state and year. When the effective date of a law was not January 1, the value of the CAP law variable was set equal to the proportion of days of that year in which the law was in effect. Incidence rate ratios (IRRs) were estimated to contrast changes in childhood unintentional firearm death rates from prelaw to postlaw periods between states that adopted a CAP law from those that did not pass such a law. An IRR for the CAP law that is <1.0 indicates rates were lower than would have been expected had the law not been implemented. IRRs that are >1.0 indicate higher than expected rates. For ease of interpretation, IRR estimates were converted to the percentage change in childhood unintentional firearm death rates associated with the CAP laws.

The models also included dichotomous indicator variables for each state. Including these so-called fixed effects for states in the models results in all variables being measured as deviations from the state's average for the study period, and enables the law variable to isolate within-state changes associated with the law. Year dummy variables were also used to control for temporal variation observed across states, irrespective of their CAP law status, attributable to unmeasured factors (eg, prevalence of gun ownership). Changes in state population distributions for age, sex, and race were examined as potential confounders.

Because annual rates of unintentional gunshot deaths among children can vary widely from year to year in states with small populations, we used negative binomial regression models to estimate the effects of CAP laws. This procedure allows for possible overdispersion that could violate the restrictive assumptions of the Poisson distribution.[16]

We examined the consistency in the estimated CAP law effects across states by allowing the effect of the law to vary by state. The likelihood ratio statistic was used to test the equality of the laws' effects across states.[17] In addition, we tested the sensitivity of the aggregate law estimate to the experience in any single state by fitting 15 models, each of which excluded the observations from a different 1 of the 15 states with a CAP law. Autocorrelation coefficients were calculated for the Pearson residuals for lags of 1 to 5 years to determine if there was autocorrelation in the model residuals.

## RESULTS

### Aggregate Effects of CAP Laws

Using the same data and methods used by Cummings et al,[11] we first replicated their findings. As was the case in the previous study, the age, sex, and race distributions did not confound the CAP law estimates; therefore, we did not control for these variables in the final models. When the 3 most recent years (1995–1997) of data and 3 new state CAP laws were added, and a more precise measure of the time period in which the laws were in effect was used, CAP laws were associated with an overall 17% decrease (95% confidence interval [CI]: −29%, −3%) in rates of unintentional shooting deaths among chil-

dren 0 to 14 years old (Table 1). There was statistically significant difference in CAP law effects between states that allowed for felony prosecution of law violators versus states where unlawful gun storage was a misdemeanor offense (likelihood ratio [LR] $x^2 = 6.75; df = 1; P = .01$). In the 3 states in which a CAP law violation can be prosecuted as a felony (Florida, Connecticut, and California), there was a 31% decrease (95% CI: −44%, −15%) associated with the law. However, there was no change in the rate of unintentional gun deaths to children associated with CAP laws with only misdemeanor penalties (95% CI: −19%, +22%).

### Variability of CAP Law Effects Across States

When CAP law effects were allowed to vary across the 15 states, the state-specific law effect estimates were not homogeneous (LR $x^2 = 25.43; df = 14; P = .03$; Table 1). Florida's CAP law was associated with a 51% decline (95% CI: −75%, −31%) in the rate of unintentional firearm deaths to children 0 to 14 years old. No other state CAP law effect was statistically significant at the .10 level. The estimated CAP law effect in Florida translates into 52 fewer children killed by unintentional shootings during the 8.25 years of postlaw follow-up than would have been expected without the law, an average of 6.2 children's lives saved per year the law was in effect.

When data for Florida were excluded from the analyses, there were no statistically significant aggregate law effects in the remaining 14 states that adopted CAP laws (−5%; 95% CI: −20%, +12%) or in the other 2 states with felony penalties (−14%; 95% CI: −33%, +10%). Furthermore, when Florida was excluded from the analyses, there was no statistically significant difference in the state-specific law effects among the 14 other CAP-law states (LR $x^2 = 12.63; df = 13; P = .48$). Excluding the effects of any single CAP law state other than Florida did not have a significant impact on the aggregate estimate of the laws' effect.

## DISCUSSION

The prior evaluation of CAP laws[11] is commonly cited as evidence that these laws have reduced rates of unintentional firearm deaths to children. The caveat that significant reductions were observed only among the group of 3 states that allowed for felony

**TABLE 1.** Estimated Change in the Rate of Unintentional Firearm Deaths Among Children 0 to 14 Years Old Associated With the Adoption of CAP Gun Storage Laws, and Tests for Equality of Law Effects

|  | Estimated Change Associated With CAP Law | 95% CI | Significance Level |
|---|---|---|---|
| All CAP laws | −17% | (−29%, −3%) | .018 |
| Felony CAP law | −31% | (−44%, −15%) | .001 |
| Misdemeanor CAP law | 0% | (−19%, +22%) | .981 |
| Equality of effects test: LR $x^2 = 6.75; df = 1; P = .01$. | | | |
|  | | | |
| Florida CAP law | −51% | (−75%, −31%) | <.001 |
| Other 14 CAP laws | −5% | (−20%, +12%) | .522 |
| Equality of effects test: all 15 CAP laws: LR $x^2 = 25.43; df = 14; P = .03$. | | | |
| 14 CAP laws other than Florida's: LR $x^2 = 12.63; df = 13; P = .48$. | | | |

prosecution of safe CAP law violators is often ignored.[12–14] We found an unusually dramatic law effect in 1 of these 3 states (Florida) that was largely responsible for both the law effects within the subset of states with felony CAP laws, and for the aggregate effect across the 15 states with CAP laws. Our tests of the equality of state-specific effects indicated that the 51% reduction in unintentional firearm deaths to children associated with Florida's CAP law was unique. When Florida was excluded from the analyses, there were no statistically significant aggregate or state-specific CAP law effects on childhood unintentional firearm death rates among the other 14 states that had adopted CAP laws.

There are 3 noteworthy limitations about the data used in both this study and in the previous evaluation. First, longitudinal data on gun storage practices, the behavior targeted by the law, are not available. Second, available data on mortality from unintentional shootings do not include data about the person who pulled the trigger, such as the shooter's age. Finally and perhaps most importantly, some medical examiners code deaths in which someone shoots another person as homicides if the shooter intentionally pulls the trigger, regardless of the shooter's intention to harm the victim.[18] Scenarios in which someone apparently does not realize a gun is loaded and shoots himself or herself or someone else are coded as suicides or homicides by some medical examiners and as unintentional firearm deaths by others. Thus, death certificate coding practices for such incidents are likely to vary across place and time. Measurement error introduced by inconsistent death certificate coding or by inadequate specificity of our outcome measure could bias estimates of CAP law effects in an unknown direction and reduce their precision.

With those caveats, there are at least 2 possible interpretations of our findings. One, based on the lack of a statistically significant CAP law effect in 14 of the 15 states that adopted these laws, is that CAP laws are ineffective in reducing unintentional firearm deaths to children. But this interpretation requires one to dismiss the very substantial decline (−51%) associated with the adoption of Florida's CAP law that is measured with 8 years of postlaw data and attribute it to unmeasured confounders or to normal statistical variation in trends. The very high level of statistical significance of Florida's CAP law effect ($P < .001$) and our inability to identify any obvious unmeasured confounder that might explain the dramatic decline in Florida causes us to doubt this interpretation.

Perhaps the most plausible interpretation of our findings is that there was indeed something unique about Florida's experience with their CAP law that was responsible for its sharp decline in childhood unintentional shooting deaths. Necessary data are not available to explore all feasible explanations for our findings; however, at least 3 factors distinguish Florida and its law from the other states with CAP laws. First, Florida was the first state to implement a CAP law. Because groundbreaking events tend to be viewed as being particularly newsworthy,[19] news

coverage of Florida's law may have been substantially greater than was the case in the other states that adopted CAP laws. The amount and intensity of the news coverage may also have been greater in Florida than in the other states because of 8 highly-publicized unintentional child shootings in Florida during the 2 weeks before the law's passage.[20] If this was the case, Florida's law may have led to more public awareness than was the case in other states.

Second, Florida's law allows for the stiffest penalties of any of the state laws that were subsequently passed. Both our study and the previous evaluation found the beneficial effects of CAP laws were limited to states that allow for felony prosecution of violators. One way in which the possibility of felony prosecution may lead to greater law effectiveness is by increasing public awareness of the law. Because most news is event-based,[19] postenactment publicity about a law may be dependent on news coverage of law violators being prosecuted. Indeed, the first case prosecuted under Florida's law received extensive news coverage by local, regional, and national outlets.[21] But prosecutors may be reluctant to prosecute cases in which the most serious violation is only a misdemeanor.[22]

Finally, Florida prelaw rates of unintentional firearm deaths to children 0 to 14 years old were higher than all but 2 of the other states (Texas and Nevada) that passed CAP laws. Many of the states that did not experience statistically significant reductions in childhood unintentional firearm deaths after introducing a CAP law had very low rates before the laws were enacted. The low prelaw rates in these states may create a floor effect that make it more difficult to achieve statistically significant reductions than in states such as Florida with much higher baseline rates of childhood unintentional firearm deaths.[23]

Keeping guns securely locked up and unloaded has the potential to reduce the risk of both intentional and unintentional shootings by children and adolescents, and may also reduce the availability of guns to criminals by reducing firearm thefts. But there are significant barriers to changing unsafe gun storage practices including the perceived need by some gun owners to keep guns firing-ready for potential defensive use,[24,25] unrealistic perceptions about children's and adolescents' ability to always follow safety rules concerning guns,[26,27] and the difficulty in avoiding occasional carelessness. In light of these barriers to safe gun storage, it may be prudent to also require guns to have built-in safety features such as magazine safeties that prevent a pistol from firing when its ammunition magazine is removed[28] and devices that prevent unauthorized users from firing the gun.[29]

## ACKNOWLEDGMENTS

This work was supported by a grant from The Joyce Foundation to the Johns Hopkins Center for Gun Policy and Research.

We thank Stephen Teret for helpful comments on earlier drafts of the manuscript.

## REFERENCES

1. Centers for Disease Control and Prevention. CDC WONDER Website.

Available at: http://wonder.cdc.gov. Accessed March 2000

2. Centers for Disease Control and Prevention. Rates of homicide, suicide, and firearm-related deaths among children—26 industrialized countries. *MMWR Morb Mortal Wkly Rep.* 1997;46:101–105

3. Cook PJ, Ludwig J. *Guns in America. Results of a National Survey on Firearm Ownership and Use.* Washington, DC: Police Foundation; 1997

4. Smith T. *Findings From the 1998 National Gun Policy Survey.* Chicago, IL: University of Chicago, National Opinion Research Center; 1998

5. Stennies G, Ikeda R, Leadbetter S, Houston B, Sachs J. Firearm storage practices and children in the home, United States, 1994. *Arch Pediatr Adolesc Med.* 1999;153:586–590

6. American Academy of Pediatrics, Committee on Practice and Ambulatory Medicine. Recommendations for preventive pediatric health care. *Pediatrics.* 2000;105:645–646

7. Olson LM, Christoffel KK, O'Connor KG. Pediatricians' experience with and attitudes toward firearms. Results of a national survey. *Arch Pediatr Adolesc Med.* 1997;151:352–359

8. Becher EC, Christakis NA. Firearm injury prevention counseling: are we missing the mark? *Pediatrics.* 1999;104:530–535

9. Oatis PJ, Fenn Buderer NM, Cummings P, Fleitz R. Pediatric practice based evaluation of Steps to Prevent Firearm Injury program. *Injury Prevention.* 1999;5:48–52

10. The Children's Gun Violence Prevention Act of 1999. S. 735 and H. R.1342

11. Cummings P, Grossman DC, Rivara FP, Koepsell TD. State gun safe storage laws and child mortality due to firearms. *JAMA.* 1997;278:1084–1086

12. Grossman DC, Reay DT, Baker SA. Self-inflicted and unintentional firearm injuries among children and adolescents. *Arch Pediatr Adolesc Med.* 1999;153:875–878

13. US Department of Health and Human Services. *Healthy People 2010: Understanding and Improving Health (Conference Edition).* Washington DC: US Department of Health and Human Services; 2000:15–17

14. Johnson A. Taft fighting to lock up guns. *The Columbus Dispatch.* March 1, 2000:1B

15. World Health Organization. *International Classification of Diseases, Ninth Revision.* Geneva, Switzerland: World Health Organization; 1977

16. Gardner W, Mulvey EP, Shaw EC. Regression analysis of counts and rates: Poisson, overdispersed Poisson and negative binomial models. *Psychol Bull.* 1995;118:392–404

17. Bickel PJ, Doksum KA. *Mathematical Statistics: Basic Ideas and Selected Topics.* Oakland, CA: Holden-Day; 1977:228–229

18. Hanzlick R, Goodin J. Mind your manners: part III. Individual scenario results and discussion of the National Association of Medical Examiners manner of death questionnaire, 1995. *Am J Forensic Sci.* 1997;18:228–245

19. Wallack L, Woodruff K, Dorfman L, Diaz I. *News for a Change: An Advocates' Guide to Working With the Media.* Thousand Oaks, CA: Sage Publications; 1999

20. Landrey S. Kids access to weapons comes before legislature. *St Petersburg Times.* June 19, 1989:1A

21. Levenson B. Dad found guilty on 1 charge in first test of loaded-gun law. *Orlando Sentinel Tribune.* February 21, 1991

22. Frattaroli S. *The Implementation of the 1996 Maryland Gun Violence Act.* Baltimore, MD: Johns Hopkins University School of Public Health; 1999. Thesis

23. Cook TD, Campbell DT. *Quasi-Experimentation. Design and Analysis Issues for Field Settings.* Boston, MA: Houghton Mifflin Company; 1979:52

24. Weil DS, Hemenway D. Loaded guns in the home: analysis of a national random survey of gun owners. *JAMA.* 1992;267:3033–3037

25. Senturia YD, Christoffel KK, Donovan M. Gun storage patterns in US homes with children: a pediatric practice-based survey. *Arch Pediatr Adolesc Med.* 1996;150:265–269

26. Webster DW, Wilson MEH, Duggan AK, Pakula LC. Parents' beliefs about preventing gun injuries to children. *Pediatrics.* 1992;89:908–914

27. Farah MM, Simon HK, Kellermann AL. Firearms in the home: parental perceptions. *Pediatrics.* 1999;104:1059–1063

28. Vernick JS, Meisel ZF, Teret SP, Milne JS, Hargarten SW. "I didn't know it was loaded": an examination of two safety devices that can reduce the risk of unintentional firearm injuries. *J Public Health Policy.* 1999;20:427–440

29. Teret SP, DeFrancesco S, Hargarten SW, Robinson KD. Making guns safer. *Issues Sci Technol.* 1998;(Summer):37–40

## SEEKING CLIENTS, LAWYERS FIND THEM ON THE NET

Type the keyword "Ritalin" into a personal computer's search engine, and what might you find? Among other things, [you might find] a solicitation to join a potential class-action lawsuit.

It's on a Web site with the no-holds-barred name of ritalinfraud.com, sponsored by a law firm. Its target: Swiss manufacturer, Novartis AG, maker of the drug for hyperactivity and attention-deficit disorder. The site suggests that Web surfers join a suit filed last month ... alleging that Novartis failed to adequately disclose Ritalin's side effects. . .

As Americans flock to the Internet to investigate nearly every problem of modern life, lawyers are greeting them with invitations to sue someone. Skeptics of the plaintiffs' bar might call this development online ambulance chasing.

Orey M. *Wall Street Journal.* June 16, 2000

Noted by JFL, MD

# EXHIBIT 53





5. Finally, wipe all exposed metal surfaces with a light coat of oil.

## STORAGE

Factors such as storage facilities, access by others, personal needs, and security all must be considered when deciding how and where to store guns. However, there is one general rule that *must* be applied under all conditions:

> **Store guns so they are not accessible to untrained or unauthorized persons.**

Answering the following questions will help gun owners evaluate their storage options.

1. What is the gun used for?

A gun stored primarily for personal protection must be ready for immediate use. It may be kept loaded, as long as local laws permit and every precaution is taken to prevent careless or unauthorized individuals from gaining access.

As a general rule, a gun stored for any purpose other than personal protection should never be loaded in the home.

# EXHIBIT 54

IN THE UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF ILLINOIS

EASTERN DIVISION

ILLINOIS ASSOCIATION OF      )

FIREARMS RETAILERS,          )

KENNETH PACHOLSKI,           )

KATHRYN TYLER, and           )

MICHAEL HALL,                )

         Plaintiffs,     )

  vs.                        )      No. 10 CV 04184

CITY OF CHICAGO,             )

         Defendant.      )

      The deposition of MARC LEVISON, called
for examination pursuant to the Rules of Civil
Procedure for the United States District Courts
pertaining to the taking of depositions, taken
before Johnetta Stafford Taylor, a notary public
within and for the County of Cook and State of
Illinois, at 33 North Dearborn Street, Chicago,
Illinois, on May 23, 2011, at the hour of
1:00 o'clock a.m.


Johnetta Stafford Taylor

License No:  084-001583

1

1   have weather problems.  We have ice and snow on

2   the street.  We have road obstructions.  It's

3   going to increase our response time.

4       Q.   And you've mentioned the emphasis on

5   scene safety and securing scene safety.

6            So is it your testimony that the police

7   officers on the scene are responsible for

8   securing the safety of the scene?

9       A.   Yes.

10      Q.   So the fire department or EMS personnel

11  are not responsible for securing scene safety?

12      A.   That's correct.

13      Q.   Are you aware that in July of 2010 the

14  City passed a new firearms ordinance?

15      MR. WORSECK:  Objection.  Vague.

16      THE WITNESS:  I'm not sure.  I'm -- can you

17  be more specific?

18  BY MR. PATTERSON:

19      Q.   Well, are you aware that the subject of

20  the lawsuit, this lawsuit that we're here

21  regarding today, relates to provisions of the

22  City of Chicago's firearms ordinance?

23      A.   Yes.

24      Q.   Okay.  And are you aware that that

22

1    ordinance was passed -- the provisions that are

2    under challenge today were passed in July of

3    2010?

4        A.   Yes.

5        Q.   Did the practices of the EMS responding

6    to emergency situations change at all in

7    response to the passage of these provisions of

8    the firearms ordinance?

9        MR. WORSECK:  Objection.  Vague.  Calls for

10   speculation.

11       THE WITNESS:  Not to my knowledge.

12       MR. PATTERSON:  Okay.

13   BY MR. PATTERSON:

14       Q.   Would you know, given your position,

15   whether those practices changed by virtue of

16   passage of the firearms ordinance?

17       MR. WORSECK:  Same objections.

18       THE WITNESS:  We made no order or any type of

19   memo to the field.

20   BY MR. PATTERSON:

21       Q.   Do you know in responding to a call,

22   does the fire department obtain any information

23   regarding whether there are any firearms

24   registered to the location to which the

23

1    department is responding?

2         MR. WORSECK:  Objection.  Vague.

3         THE WITNESS:  Generally, we don't get that

4    information.

5    BY MR. PATTERSON:

6         Q.    Are there circumstances in which you do

7    get that information?

8         A.    Not to my knowledge.

9         Q.    Okay.  And you're aware that you've

10   been identified as a person who has information

11   about the interests served by some of the

12   provisions of the firearms ordinance?

13        A.    Yes.

14        Q.    And one of those provisions is that

15   there's a limit of -- individuals are limited to

16   one operable firearm within the home.

17             Are you familiar with that limit?

18        A.    Yes.

19        Q.    And do you have any information about

20   the policies that are served by that limit?

21        MR. WORSECK:  Objection.  Vague.

22        THE WITNESS:  No, I don't.

23   BY MR. PATTERSON:

24        Q.    Are you aware of any interests of the

                                                    24

1    City that are served by limiting individuals to

2    one operable firearm in the home?

3        A.    No.

4        Q.    Okay.  Do you have any information at

5    all related to that limit of one operable

6    firearm in the home?

7        MR. WORSECK:  Objection.  Vague.

8        THE WITNESS:  No.

9    BY MR. PATTERSON:

10       Q.    Are you aware that another limitation

11   contained in the firearms ordinance restricts

12   sales of firearms within the City of Chicago?

13       A.    I'm aware of that.

14       Q.    Do you have any information regarding

15   that restriction?

16       A.    No.

17       Q.    Are you aware that another provision of

18   the ordinance restricts the operation of ranges

19   in the City of Chicago, firearms ranges?

20       A.    I'm aware of that.

21       Q.    Do you have any information related to

22   that restriction?

23       A.    No.

24       MR. WORSECK:  Objection.  Vague.

25

1    BY MR. PATTERSON:

2        Q.   Are you aware that the ordinance limits

3    possession of firearm to the home?

4        A.   Yes.

5        Q.   Do you have any information related to

6    that restriction?

7        A.   No.

8        MR. WORSECK:  Objection.  Vague.

9            Chief, if you can just give me a minute

10   to object.

11       THE WITNESS:  Okay.  Sorry.

12   BY MR. PATTERSON:

13       Q.   Are you aware that the ordinance

14   prohibits the carriage of firearms in the City?

15       A.   Yes.

16       Q.   And do you have any information related

17   to that restriction of the ordinance?

18       MR. WORSECK:  Objection.  Vague.

19       THE WITNESS:  No.

20   BY MR. PATTERSON:

21       Q.   Well, let me ask you:  What information

22   do you have about the interests that are served

23   by the City's firearms ordinance?

24       MR. WORSECK:  Objection.  Vague.

26

1    THE WITNESS:  I have very little information

2    on it.  That, you know -- my job is to make sure

3    that the paramedics and the firefighters who

4    respond to emergency medicine have the training

5    and the ability to respond safely.

6    MR. PATTERSON:  Okay.

7    BY MR. PATTERSON:

8    Q.   And is that job to ensure that

9    paramedics and emergency medical service

10   personnel can respond safely affected at all by

11   the City's firearms ordinance to the extent that

12   you know?

13   MR. WORSECK:  Objection.  Vague calls for

14   speculation.

15   THE WITNESS:  Our primary purpose is to

16   respond safely to all emergency medical calls.

17   And that's what we stress.

18   MR. PATTERSON:  Okay.

19   BY MR. PATTERSON:

20   Q.   And is your goal of responding safely

21   to all emergency medical calls in any way

22   affected by the City's firearms ordinance, if

23   you know?

24   MR. WORSECK:  Objection.  Vague.

27

1      THE WITNESS:  I don't know.  I'm not sure if

2  it's affected by that.  We stress scene safety

3  on all responses.

4      MR. PATTERSON:  Okay.

5  BY MR. PATTERSON:

6      Q.   And would you consider the presence of

7  a firearm at a location to which EMS was called

8  to respond a threat to scene safety?

9      A.   Yes.

10     Q.   And why so?

11     A.   Because anytime there's a weapon, we

12  are not sure whether the user is going to use it

13  or how it's going to be used, a weapon on the

14  scene is dangerous.

15     Q.   And is there anything in your

16  experience, over 30 years' experience with the

17  fire department, that supports that view?

18     MR. WORSECK:  Objection.  Vague.

19     THE WITNESS:  There's so many responses that

20  we have with psychiatric patients, there's

21  battered patients, there's people that have been

22  shot that we're responding to.  Scene safety is

23  paramount on all responses.  A weapon on the

24  scene makes it very vague to make sure that the

28

1    scene is safe.  And that's what we've got to

2    look out for.

3    BY MR. PATTERSON:

4        Q.   How does a weapon on the scene make it

5    vague to determine whether the scene is safe?

6        A.   If the police aren't there to tell us

7    that it's secure and we've walked into a

8    nontrauma run or a psychiatric patient, we have

9    to be on our guard at all times and make sure

10   that there is no weapons there if the patient is

11   unstable.

12            Cardiac arrest -- we have to be aware

13   of our environment when we walk into everyone's

14   call to make sure that it's safe.  And a weapon

15   would make it unsafe for our responders to go to

16   work.

17       Q.   How would a weapon make it unsafe for a

18   responder to go to work?

19       A.   If one of the people at the scene had a

20   gun in their hand, that would be a very unsafe

21   scene, and we're aware of the gun.

22       Q.   Are there any other ways in which a

23   weapon could make the scene unsafe?

24       A.   Any weapon visually in our -- would

                                              29

1    make it unsafe.  We don't know what the user is

2    going to do.  It's unpredictable.

3         Q.    Okay.  Other than when the weapon is in

4    the hand of someone at the scene, are there any

5    other ways in which a weapon could provide a

6    threat to responders at the scene?

7         A.    If it was locked in the box, it's not

8    going to be a threat.  If it's security in the

9    home, it's not a threat.  But if it's out in the

10   open, it's a threat.

11        Q.    Okay.  And earlier I think you

12   testified that the police were responsible for

13   securing the scene of an emergency; is that

14   correct?

15        A.    Scene safety.

16        Q.    For scene safety.

17             Just now you testified that sometimes

18   the EMS arrives before the police officers have

19   had a chance to ensure scene safety; is that

20   correct?

21        A.    There are certain calls where we don't

22   have the police responding ahead of us.  Medical

23   emergencies sometimes.  They respond sometimes

24   to psych patients, sometimes they don't.  But if

                                                    30

1    we have any sight of scene safety not being

2    safe, we'll wait.  But sometimes it's

3    unpredictable.  And that's what the main thing

4    is.  It's unpredictable.

5           And we wait if there's a sense of scene

6    safety problems.  But sometimes you just walk

7    into a building, it seems safe and we are

8    surprised.

9        Q.    In situations where you arrive ahead of

10   the police department or before the police

11   department can ensure scene safety and yet

12   continue to enter the situation, what is done to

13   ensure the safety of responders?

14       A.    It's incident specific.  It depends on

15   what the call is.  Again, it's observation,

16   listening and seeing and checking the whole

17   scene out.

18          Experience is your best guide for this.

19       Q.    Okay.  And have you in your years of

20   experience -- are you familiar with any

21   situations in which an emergency responder has

22   been harmed by use of a firearm when responding

23   to an emergency?

24       A.    Yes.

31

1    Q.    How many such situations are you aware

2    of?

3    A.    A paramedic was shot and a firefighter

4    was shot within the last 20 years.  And I

5    believe in the 1960s during a disturbance,

6    another firefighter was shot.  But I wasn't on

7    the fire department.

8    Q.    So since you've been with the

9    department you're aware of two incidents in

10   which a paramedic or a firefighter has been shot

11   in responding to a scene?

12   A.    One paramedic and one firefighter.

13   Q.    Was this part of the same incident

14   or --

15   A.    Two separate incidents.

16   Q.    And do you have any more details about

17   the situation in which the paramedic was shot?

18   A.    The paramedic knocked down the door and

19   the offender shot through the door and struck

20   the paramedic.

21   Q.    And what type of injuries did the

22   paramedic sustain?

23   A.    I believe he was shot in the arm.

24   Q.    So did he recover from this?

32

1    A.   Yes.

2    Q.   Do you know whether the firearm was

3  lawfully possessed which was used to shoot the

4  paramedic?

5    MR. WORSECK:  Objection.  Vague.  Calls for

6  speculation.  Calls for a legal conclusion.

7    THE WITNESS:  I don't know.

8  BY MR. PATTERSON:

9    Q.   Do you know what type of weapon was

10  used to shoot the paramedic?

11    A.   I don't know.

12    Q.   Do you know what year that incident

13  occurred?

14    A.   I would -- it was in the '80s is the

15  best I can tell you.

16    Q.   Okay.  You couldn't say early '80s or

17  late '80s?

18    A.   No.

19    Q.   No?  Okay.

20        Do you know the name of the person that

21  was shot?

22    A.   Tim Starr.

23    Q.   And the situation in which the

24  firefighter was shot, do you have any more

33

1    specific information about that?

2         A.    I think it was two summers ago, maybe

3    three.

4         Q.    Okay.

5         A.    Arson investigator at the scene of a

6    post fire was shot in the alley.

7         Q.    Okay.  This is an alley outside of a

8    property which was suspected to be --

9         A.    That had had a fire.

10        Q.    Had had a fire?

11        A.    Right.

12        Q.    Suspected arson?

13        A.    He's the arson investigator for the

14   fire department.

15        Q.    So that would have been the summer of

16   2008 or 2009 that that occurred?

17        A.    Yes.

18        Q.    Okay.  And do you know the name of that

19   officer?

20        A.    I can't recall.

21        Q.    And did the officer recover from being

22   shot?

23        A.    Yes, he did.

24        Q.    What type of injuries did he sustain?

34

1      A.    A substantial gunshot.  I know they

2    couldn't take the bullet out.  It was close to

3    his spinal cord and they left it in.  And he's

4    on a disability from the fire department now.

5      Q.    And do you know what type of firearm

6    was used to shoot that officer?

7      A.    No.

8      Q.    Do you know whether the firearm was

9    lawfully possessed at the time it was used to

10   shoot the firefighter?

11     MR. WORSECK:  Objection.  Vague.  Calls for

12   speculation.  Calls for a legal conclusion.

13     THE WITNESS:  No.

14     MR. PATTERSON:  Okay.

15   BY MR. PATTERSON:

16     Q.    Do you know where the person was

17   located when they shot the firefighter?  Were

18   they within the home?

19     A.    The firefighter was shot outside.

20     Q.    Do you know where the shooter was

21   located?

22     A.    No.

23     Q.    So other than these two incidents, are

24   you aware of any other incident in which a fire

35

1    department official has been injured by the use

2    of a firearm in responding to an emergency?

3        A.    Those are the ones I know where people

4    were injured by a firearm.

5        Q.    Are you aware of any other incidents

6    where members of the fire department were not

7    injured but otherwise shot at or threatened with

8    a firearm?

9        A.    Over 35 years on the fire department,

10   it's been hundreds of times where we've been at

11   scenes where shots were fired, shots were

12   sounded while we're on the scene within close

13   proximity.  We've had ambulances chased to the

14   hospital with shots being fired at the back of

15   the rig.  We've had a lot of occurrences with

16   gunshots.

17       Q.    And in any of those situations, are

18   you -- do you know whether or not the gun that

19   was used was lawfully possessed at the time?

20       MR. WORSECK:  Objection.  Vague.  Calls for

21   speculation.  Calls for a legal conclusion.

22       THE WITNESS:  No.

23       MR. PATTERSON:  Okay.

24

                                              36

1    ordinance in 2010?

2        A.    No.

3        Q.    And in responding to emergency

4    situations, does the fire department sometimes

5    respond to situations in which a person has been

6    injured by virtue of criminal violence?

7        A.    Yes.

8        Q.    And in any of those situations have the

9    injured victims been located in the yard of the

10   home?

11       A.    Yes.

12       Q.    How about on the porch of a home?

13       A.    Yes.

14       Q.    How about in the garage?

15       A.    Yes.

16       MR. PATTERSON:  Drew, if I could just have a

17   few minutes to review my notes.

18       MR. WORSECK:  Sure.

19                    (Short pause.)

20       MR. PATTERSON:  Just a couple more questions.

21   BY MR. PATTERSON:

22       Q.    So if I have your testimony correct,

23   it's your position that any time a firearm is

24   possessed by someone other than a police officer

                                              38

1   at the scene of an emergency to which the fire

2   department is responding, that is a threat to

3   the scene safety and potentially a threat to

4   members of the fire department; is that correct?

5      A.   Yes.

6      Q.   Okay.  And your opinion on that does

7   not -- is not dependent in any way upon whether

8   that firearm is possessed lawfully or

9   unlawfully?

10      A.   No.

11      Q.   Have you ever done any study into the

12   frequency with which people who lawfully possess

13   firearms commit crimes with those firearms?

14      A.   No.

15      Q.   Are you aware of any empirical evidence

16   on that issue?

17      MR. WORSECK:  Objection.  Vague.

18      THE WITNESS:  No.

19      MR. PATTERSON:  I don't have any more

20   questions.

21      MR. WORSECK:  I have a few questions.

22                EXAMINATION

23   BY MR. WORSECK:

24      Q.   Chief Levison, following up on an

39

1    answer you just gave regarding the presence of a

2    firearm at an emergency scene making that scene

3    unsafe.

4         Do you remember that testimony?

5    A.   Yes.

6    Q.   If a weapon -- if a firearm on the

7    scene is locked or broken down, would that

8    enhance scene safety?

9    A.   Yes.

10   Q.   If it were illegal to bring guns into

11   certain spots, certain locations, for instance

12   out in public or onto someone's porch or onto

13   someone's yard, would that -- could that reduce

14   the number of firearms that are present in those

15   locations when fire department personnel respond

16   to emergencies at those locations?

17   A.   Yes.

18   Q.   And by doing that, that would enhance

19   scene safety?

20   A.   Yes.

21   Q.   And you talked about some ways in which

22   scene safety can be compromised by the presence

23   of firearms.  One of those ways you talked about

24   was when fire department first responders get

40

1    follow-up.

2           EXAMINATION (Further)

3    BY MR. PATTERSON:

4        Q.   Chief Levison, you just testified, did

5    you not, that scene safety is enhanced by

6    provisions of law that have the effect of

7    reducing the number of operable firearms at the

8    scene; is that correct?

9        A.   Yes.

10       Q.   Do you know whether any provisions of

11   Chicago's firearms ordinance has the effect of

12   reducing the number of operable firearms at

13   potential scenes of emergencies?

14       MR. WORSECK:   Objection.   Vague.

15       THE WITNESS:   No.

16   BY MR. PATTERSON:

17       Q.   Did you understand my question?

18       MR. WORSECK:   Objection.   Vague.

19       THE WITNESS:   There's a lot of shootings out

20   there right now that we respond to every day.

21   So I really have no -- I don't know.

22       MR. PATTERSON:   Okay.

23   BY MR. PATTERSON:

24       Q.   So you simply do not know whether or

                                                    44

1    not Chicago's handgun ordinance is effective in

2    reducing the number of operable firearms at

3    scenes of emergencies?

4        MR. WORSECK:  Objection.  Vague.

5        THE WITNESS:  I'm not an expert on that, on

6    the number of weapons that are legal and

7    illegal.

8    BY MR. PATTERSON:

9        Q.   So is your answer, then, that you do

10   not know whether the City's current firearms

11   ordinance has the effect of reducing the number

12   of operable firearms at the scene of

13   emergencies?  Is that correct?

14       A.   Yes.

15       Q.   Okay.  And you also testified that the

16   presence of a firearm at the scene of an

17   emergency could be an impediment to the delivery

18   of services; is that correct?

19       A.   Yes.

20       Q.   And are you aware of situations in

21   which the presence of a firearm has prevented

22   the fire department from rendering necessary

23   medical services?

24       MR. WORSECK:  Objection.  Vague.

45

1      THE WITNESS:  We have a procedure at scene

2   safety.  If there's knowledge of a weapon on the

3   scene, we are going to stand back and stage out

4   until it's reasonably safe by the law

5   enforcement that we can proceed to render care.

6   That is our position.  That's our training.  If

7   we know there's a weapon on the scene, it's

8   stage out until it's secured.

9      MR. PATTERSON:  Okay.

10         Just give me a minute here.

11            (Short pause.)

12   BY MR. PATTERSON:

13      Q.   And you had testified that if there

14   aren't any members of the police department at

15   the scene, that members of the fire department

16   cannot do anything to secure firearms or

17   otherwise secure the scene; is that correct?

18      MR. WORSECK:  Objection.  I think it

19   misstates the record.

20      MR. PATTERSON:  If I did misstate the record,

21   would you clarify.

22   BY MR. PATTERSON:

23      Q.   When there's no member of the police

24   department present, can a member of the fire

46

1    dual responses in the city.

2        MR. PATTERSON:  Okay.

3    BY MR. PATTERSON:

4        Q.   And your testimony that sometimes the

5    fire department arrives on the scene before the

6    police department, what component of the fire

7    department did you mean when you gave that

8    testimony?

9        A.   Every fire engine in the city is a BLS

10   or an ALS fire company.  They're all capable of

11   going to EMS calls and providing care.  Either

12   on the basic level or on the ALS level.  So we

13   respond dually on over 80 percent of our calls.

14       Q.   So then that response time would be

15   between -- well, strike that.

16           So you said the average ALS ambulance

17   response time is seven minutes; is that correct?

18       A.   Approximately.

19       Q.   Is there any overall average EMS

20   response time that you're aware of?

21       MR. WORSECK:  Objection.  Vague.  Calls for

22   speculation.

23       THE WITNESS:  I don't have the facts in front

24   of me of the exact number.  But it's in that

                                              49

1    ballpark.

2         MR. PATTERSON:  Okay.

3    BY MR. PATTERSON:

4         Q.   So around seven minutes?

5         A.   Six to seven minutes.

6         Q.   And yet, frequently EMS arrives before

7    the police; is that correct?

8         A.   Yes.

9         Q.   Okay.

10        MR. PATTERSON:  That's all I have.

11        MR. WORSECK:  Nothing further from us.

12             We'll reserve signature.

13             (FURTHER DEPONENT SAITH NOT.)

14

15

16

17

18

19

20

21

22

23

24

                                              50

1    STATE OF ILLINOIS   )

2                        )   SS:

3    COUNTY OF C O O K   )

4      I, JOHNETTA STAFFORD TAYLOR, a notary public

5    within and for the County of Cook County and

6    State of Illinois, do hereby certify that

7    heretofore, to-wit, on May 23, 2011 personally

8    appeared before me, at 33 North Dearborn Street,

9    Chicago, Illinois, MARC LEVISON, in a cause now

10   pending and undetermined in the U.S. District

11   Court, Northern District of Illinois, Eastern

12   Division wherein ILAFR is the Plaintiff, and

13   CITY OF CHICAGO is the Defendant.

14     I further certify that the said witness was

15   first duly sworn to testify the truth, the whole

16   truth and nothing but the truth in the cause

17   aforesaid; that the testimony then given by said

18   witness was reported stenographically by me in

19   the presence of the said witness, and afterwards

20   reduced to typewriting by Computer-Aided

21   Transcription, and the foregoing is a true and

22   correct transcript of the testimony so given by

23   said witness as aforesaid.

24     I further certify that the signature to the

52

1    foregoing deposition was reserved by counsel for

2    the respective parties.

3        I further certify that the taking of this

4    deposition was pursuant to Notice, and that

5    there were present at the deposition the

6    attorneys hereinbefore mentioned.

7        I further certify that I am not counsel for

8    nor in any way related to the parties to this

9    suit, nor am I in any way interested in the

10   outcome thereof.

11       IN TESTIMONY WHEREOF:  I have hereunto set my

12   hand and affixed my notarial seal this 13th day

13   of June, 2011.

14

15

16

17   NOTARY PUBLIC, COOK COUNTY, ILLINOIS

18

19

20

21

22

23

24

                                                    53