# EXHIBIT 55

1

COPY

CITY OF CHICAGO

COMMITTEE ON POLICE AND FIRE

REPORT OF PROCEEDINGS of a
meeting of the City of Chicago, Committee on
Police and Fire, taken on July 1, 2010, 10:00
a.m., City Council Chambers, Chicago, Illinois,
and presided over by ALDERMAN ANTHONY BEALE,
Chairman.

Reported by:  Donna T. Wadlington, C.S.R.

CITY000307

1      ALDERMAN BALCER:  I'd like to call the

2  meeting to order of the Police and Fire

3  Committee.

4              And I'd also like to recess it

5  at this time until the Chairman returns.

6  Recessed until the Chairman gets here.

7              (WHEREUPON, the Committee is

8              in recess.)

9      CHAIRMAN BEALE:  It's 11:25.  The

10  Committee on Police and Fire will continue its

11  recessed meeting.

12              The sole purpose of this

13  meeting is to consider on the agenda an

14  ordinance introduced directly into Committee by

15  Corporation Counsel concerning responsible gun

16  ownership.

17              On June 18th and June 29th,

18  the Committee held a hearing on gun violence and

19  took testimony from experts on possible policies

20  to reduce such violence in our city.  These

21  hearings contemplated the impact of the United

22  States Supreme Court's ruling -- *McDonald*

1    decision on the City's handgun ban and the

2    future policies the City can enact to address

3    gun violence.

4              More than 30 people testified

5    at the hearing.  We heard from numerous experts

6    on gun violence from the Corporation Counsel,

7    other legal experts, from the Superintendent of

8    the Chicago Police Department, and other CPD

9    officers, from business owners, from leaders of

10   our faith-based community, community

11   organizations and others who have lost loved

12   ones to gun violence and even some from the

13   Plaintiffs in the *McDonald* case.

14              Among those experts testified

15   were Robyn Thomas, David Hemenway, Thom Mannard,

16   Tom VandenBerk, Mark Walsh, Dr. Marie Crandall,

17   Claude Robinson, Annette Holt, Juliet Leftwich,

18   and Daniel Webster.

19              I would also like to

20   acknowledge one of the experts we invited.

21   Dr. Jens Ludwig, a Professor of Social Service

22   Administration, Law and Public Policy at the

1    University of Chicago's Crime Lab, was unable to
2    testify but we also distributed -- more
3    testimony from -- his testimony was also
4    submitted to the record.
5              During prior hearings we also
6    distributed and placed on the record testimony
7    from several of our other experts, as well as
8    references from other work of numerous and other
9    studies in case and effect of gun violence and
10   recommend that we -- what we can do to address
11   the problem.
12             From the evidence that we
13   presented at the hearing, the Committee would
14   like to make the following findings:
15             Chicago, like other big
16   cities, have serious problems of gun violence.
17   The total economic and social costs of gun
18   violence in Chicago are substantial.  Gun
19   violence severely impacts Chicago's criminal
20   justice and health care system.  Gun violence
21   foments fears in Chicago's communities, which
22   can harm property value and drive residents from

CITY000310

1 -- and also fleeing our neighborhoods.  It also

2 can increase -- I'm sorry.

3     An increase in the number of

4 guns in circulation can contribute to an

5 increase in the number of incidents of gun

6 violence.  The presence of guns can also make

7 crime more lethal and would be -- also it can be

8 -- I'm sorry.  I need some water.

9     An increase in the number of

10 guns in circulation contribute to an increase in

11 the number of incidents of gun violence.  The

12 presence of guns makes crime more lethal than

13 others when guns are not present.  Handguns are

14 extremely -- to an extreme degree

15 disproportionately contribute to gun violence

16 and death in Chicago.

17     A strong permitting system

18 from firearms owners is vital.  A vigorous

19 firearm registration system is necessary.

20 Registration gives law enforcement essential

21 information about firearm ownership allowing

22 first responders to determine in advance whether

1    individuals may be -- may have firearms.

2                    Shootings -- I'm sorry.

3    Shootings in the home are a major cause of

4    death, particularly in children and minors,

5    requiring owners to secure or store their

6    firearms when minors are present.

7                    Requiring owners to quickly

8    notify law enforcement of the lost, theft or

9    destruction of their firearm aid law enforcement

10   in reducing illegal gun trafficking and

11   identifying the -- and prosecuting gun

12   traffickers.

13                   Limiting the number of guns in

14   circulation is essential to public safety.

15   Limiting registration of handguns to one person

16   per month would help limit handgun injuries and

17   also reduce crime.

18                   The carrying of firearms in

19   public should be prohibited.  In a dense urban

20   environment like Chicago, public carrying

21   presents a high risk that everyday interpersonal

22   conflicts will result in injury.

1           The public safety requires a

2   ban on assault weapons.

3           Okay.  Mara, suggested that I

4   submit the rest of this for the record, and we

5   will get right into testimony.  Thank you.

6           Corporation Counsel, Mara

7   Georges.  And I do apologize.  I'm extremely

8   tired you all.  It's been a long day.

9           CORPORATION COUNSEL GEORGES:  Good

10  morning, Chairman Beale and members of the

11  Police and Fire Committee.  My name is Mara

12  Georges, G-e-o-r-g-e-s.  I'm the Corporation

13  Counsel for the City of Chicago.

14           With me and to my right is

15  Rose Kelly, who is the drafter of the

16  Responsible Gun Ownership Ordinance, which is

17  before you today and on which we urge your

18  support.

19           This was an ordinance drafted

20  in response to the Supreme Court decision

21  earlier this week in the *McDonald* case.  We

22  believe that this ordinance effectively balances

1     the right to possess a gun in the home for the

2     purpose of self-defense, with the substantial

3     risks to public safety that are associated with

4     guns.

5                    The proposed ordinance is

6     comprehensive.  It regulates the sale and

7     possession of firearms, establishes a permit

8     process for gun owners, and includes a

9     registration requirement for guns that allows

10    for the registration of handguns.

11                   First, I think it's easiest to

12    begin by describing what is banned under this

13    ordinance.

14                   Banned are the sale of

15    firearms in the city of Chicago, certain types

16    of ammunition, including metal and armor

17    piercing bullets and 50 caliber bullets, the

18    sale of any ammunition to minors, laser-sight

19    accessories, silencers, and mufflers, certain

20    types of guns including sawed-off shotguns, 50

21    caliber rifles, machine guns, short-barreled

22    rifles and assault weapons, and handguns deemed

CITY000314

1   unsafe by the Police Superintendent.

2              These guns are unregisterable

3   and it is illegal to possess an unregisterable

4   weapon within the city of Chicago.  Also banned

5   are shooting galleries and target ranges, except

6   for law enforcement purposes.

7              Consistent with the Supreme

8   Court's ruling, we are allowing the possession

9   of handguns in a limited circumstance.  That is,

10  within the home for self-defense purposes.

11             So that there is no confusion

12  about the scope of handgun possession within the

13  city of Chicago, home is defined in the

14  ordinance as the inside of a person's dwelling

15  unit which is traditionally used for living

16  purposes.  Not the garage, not porches, not the

17  stairs, not the back, side or front yard space.

18  Dormitories, hotels, and group living homes are

19  excluded from the definition of home within the

20  ordinance.

21             In addition, there is a two

22  step registration requirement for guns.  The

1    first step requires individuals to obtain a

2    Chicago Firearm Permit, a CFP, prior to owning a

3    gun.  And the second step requires gun owners to

4    obtain a registration certificate for each of

5    their firearms.  Both the CFP and the

6    registration certificate are issued by the

7    Chicago Police Department.

8              The ordinance imposes

9    reasonable limitations on who can obtain a CFP.

10   For example, individuals must be at least 21

11   years of age or 18 to 20 years of age with

12   parental permission to be eligible for a CFP.

13   They must possess a valid Illinois FOID card.

14   They must not have been convicted of a violent

15   crime or of two or more offenses for driving

16   under the influence of alcohol or drugs.

17             They must not have been

18   convicted of an unlawful use of weapon charge

19   involving a firearm.  They must not have

20   violated any other Municipal Code provision

21   regarding possession of laser-sight accessories,

22   silencers or mufflers, or unlawful sales of

1  firearms, or otherwise be ineligible to possess

2  a firearm under any law.

3           Individuals must demonstrate

4  that they've undergone firearm safety training

5  both in a classroom and on a firing range.

6           As I previously stated, the

7  CFP must be obtained prior to taking possession

8  of any gun, and it must be renewed every three

9  years.

10          As with our previous

11  ordinance, the responsible gun ownership

12  ordinance includes a registration requirement

13  for guns.  The new ordinance, however, allows

14  for the registration of handguns.  A

15  registration certificate is required for every

16  firearm.  The application for the registration

17  certificate must be submitted no more than five

18  business days after taking possession of the

19  gun.

20          Each applicant will be issued

21  only one registration certificate per month for

22  a handgun which must be used for the home in

1  which the applicant resides. So, in other

2  words, we're limiting the amount of handguns to

3  one per month for use within the home.

4  Individuals have 90 days after

5  the effective date of the ordinance to register

6  weapons, including guns that were not previously

7  registered, like handguns. So we're urging

8  members of the public to come in within this

9  90-day period after the ordinance's effective

10  date, assuming that this body were to approve

11  it, and register their unregistered weapons.

12  The ordinance also contains a

13  procedure for individuals who are denied either

14  a CFP or a firearm registration certificate to

15  appeal such denials.

16  I'd like to briefly discuss

17  the regulations contained in the responsible gun

18  ownership ordinance regarding where guns can be

19  possessed. These regulations are in addition to

20  any applicable state laws.

21  As I previously mentioned,

22  handguns are only allowed in the registrant's

1  home for self-defense purposes.  Long guns are

2  only allowed in the individual's home or fixed

3  place of business.  You cannot possess a gun in

4  your vehicle, unless it's broken down into a

5  non-functioning state.

6          Each person who keeps or

7  possesses a firearm in his or her home must keep

8  no more than one firearm in the home assembled

9  and operable.  All other firearms must be broken

10  down in a non-functioning state or have a

11  trigger lock or other mechanism making the

12  firearm temporarily inoperable.

13          In homes with minors under the

14  age of 18, guns must be kept secured, secured on

15  the person of the registrant, with trigger locks

16  or in locked boxes.

17          This ordinance also

18  establishes a gun offender registry.  Any gun

19  offender, a person convicted of a gun offense,

20  who lives, works or attends school in the city

21  must register with the Police Superintendent.

22  The registry will be posted on the Police

1    Department's website and available for review by
2    the public.
3                   Consequences for violating the
4    responsible gun ownership ordinance are severe.
5    Penalties include fines of $1,000 to $5,000 and
6    incarceration for not less than 20, nor more
7    than 90 days for certain offenses.  Subsequent
8    convictions are punishable by fines of $5,000 to
9    $10,000 and by incarceration of not less than 30
10   days, nor more than six months, the maximum
11   allowable under state law for the City to
12   impose.
13                  Further, the ordinance
14   authorizes the seizure and destruction of any
15   weapons kept in violation of the chapter.  This
16   ordinance was crafted through careful discussion
17   and review.  We have listened to the Council and
18   tried to accommodate the Council's wishes in
19   crafting this ordinance.
20                  Further, we are confident that
21   this ordinance is consistent with the Supreme
22   Court's rulings in the *Heller* and *McDonald*

1  decisions.  We are hopeful that you will support

2  it.  Thank you.

3          CHAIRMAN BEALE:  Thank you.

4                  Any questions from the

5  committee?  Alderman Rugai.

6          ALDERMAN RUGAI:  Thank you,

7  Mr. Chairman.

8                  We heard it discussed this

9  morning that the ages of many that commit crimes

10  of handguns are 13 to 16 year olds, and there is

11  no real punishment for those youths.  As in some

12  of our previous legislation perhaps for curfew,

13  for example, we have the parents responsible and

14  they are fined in that instance.

15                  Have we ever looked at or are

16  we just prohibited from making the parents

17  responsible if those young people are arrested

18  and convicted of possessing a handgun and using

19  it?

20          CORPORATION COUNSEL GEORGES:  It's a

21  good point, Alderman, but the problem is, of

22  course, if we were to prosecute a minor under

1    our ordinance, typically, that goes then to

2    juvenile court where we can't be imposing our

3    ordinance as a mechanism.

4             ALDERMAN RUGAI:  And not this

5    ordinance.  I mean, can we do something

6    separately to make parents responsible -- you

7    know, they are responsible for their children.

8    And if they -- their children were to be found

9    with guns, could they be prosecuted?

10            CORPORATION COUNSEL GEORGES:  I think

11   you raise a very good point and we will look at

12   it.

13            ALDERMAN RUGAI:  I mean, because it's

14   another side of our ordinance that's before us

15   today, but it was something that stuck in my

16   mind from the press conference this morning that

17   I thought we need to be attending to that side

18   of it as well.

19            CORPORATION COUNSEL GEORGES:  Yes.

20   Good point.

21            ALDERMAN RUGAI:  Thank you.

22            CHAIRMAN BEALE:  Alderman Balcer.

CITY000322

1      ALDERMAN BALCER:  Thank you,
2  Mr. Chairman.
3           What is the -- are there
4  provisions in here for retired police officers
5  --
6      CORPORATION COUNSEL GEORGES:  Yes.
7      ALDERMAN BALCER:  -- and their right
8  to carry a -- or have weapons?
9      CORPORATION COUNSEL GEORGES:  We
10  exclude many classes of people from many of the
11  ordinance requirements, and many of those
12  exclusions apply to current police officers,
13  retired police officers, current military
14  personnel and the like.  So we have tried to
15  accommodate what we heard from Chairman Burke
16  and the others in hearings, that many of these
17  provisions should not apply to retired CPD.
18      ALDERMAN BALCER:  So we're not --
19  people can still defend their homes if they're
20  inside of their homes?
21      CORPORATION COUNSEL GEORGES:  The idea
22  is that individuals have a right to a handgun

CITY000323

1    within the home for self-defense purposes, and

2    we're allowing them to register one per month;

3    one of those handguns per month to have within

4    their home to use for self-defense purposes.

5            ALDERMAN BALCER:  For self-defense

6    purposes.  No one's right is being taken away to

7    defend their home?

8            CORPORATION COUNSEL GEORGES:  Correct.

9            ALDERMAN BALCER:  Good.  My next

10   question and I just -- you can have long rifles

11   and shotguns except sawed-off shotguns; am I

12   correct?

13           CORPORATION COUNSEL GEORGES:  That is

14   correct.  We allow rifles and other long guns.

15           ALDERMAN BALCER:  And you can have

16   one, two, three, four -- you can have as many as

17   you want?

18           CORPORATION COUNSEL GEORGES:  Correct.

19           ALDERMAN BALCER:  And you can have a

20   pistol.  You can buy one pistol per month?

21           CORPORATION COUNSEL GEORGES:  Correct.

22           ALDERMAN BALCER:  They can have twelve

1     in a year?

2          CORPORATION COUNSEL GEORGES: Yes.

3     Each qualified applicant.

4          ALDERMAN BALCER: Can have twelve in a

5     year?

6          CORPORATION COUNSEL GEORGES: Can have

7     twelve in a year. Yes.

8          ALDERMAN BALCER: I think that's quite

9     fair. I'll be honest. I think that's quite

10     fair to a person.

11            And right now you can have as

12     many rifles that meet the requirements and

13     shotguns if you -- if you want? And they are

14     registered and so on?

15          CORPORATION COUNSEL GEORGES: Correct.

16     And that continues. That it is an unlimited

17     number.

18          ALDERMAN BALCER: That continues.

19     That -- there's no -- nothing prohibiting that.

20     There's nothing saying you can't have one rifle,

21     one shotgun. You can have --

22            I'll be honest. I think

CITY000325

1    that's quite fair.  And quite honest, if you

2    can't defend your home with umpteen rifles and

3    shotguns and a pistol, I don't see what else a

4    person can ask for in this.  Thank you.

5         CORPORATION COUNSEL GEORGES:  You're

6    welcome.

7         CHAIRMAN BEALE:  Alderman Fioretti.

8         ALDERMAN FIORETTI:  Thank you,

9    Mr. Chairman.

10              When we started the hearing

11   the other day, you described the -- still I want

12   to refer to the decision, that the mandate would

13   probably come down within 30 days give or take,

14   correct?

15        CORPORATION COUNSEL GEORGES:  Correct.

16        ALDERMAN FIORETTI:  And then you said

17   at that time that we can go into court to ask

18   for some kind of advisory assistance here in the

19   drafting of this -- of this ordinance.  Wasn't

20   that correct?

21        CORPORATION COUNSEL GEORGES:  I don't

22   believe that's what I said.  No.

CITY000326

1          I said when the mandate came

2    back to the Court of Appeals, the Court of

3    Appeals may ask us for briefs, position papers,

4    kind of on where we stand, saying to us, all

5    right, now in light of the decision from the

6    Supreme Court in *McDonald*, saying you have a

7    right to a handgun in your home for

8    self-defense, City, how do you defend your

9    handgun ban?  And at that point it really

10   becomes impossible to defend it.

11          ALDERMAN FIORETTI:  Okay.  And so what

12   was legal or what is illegal out of the

13   ordinance as it existed the day before the

14   decision was handed down?

15          CORPORATION COUNSEL GEORGES:  What the

16   Supreme Court has said is that the Second

17   Amendment applies to the City, and the Second

18   Amendment guarantees a right to a handgun in the

19   home for self-defense.

20          So in other words, a ban by

21   the City on handguns will not withstand the

22   *McDonald* decision.

1     ALDERMAN FIORETTI:  And then where did

2  it go, as you say "a handgun" -- and I thought

3  it was quite clear because I think -- even

4  though you were telling us that there were maybe

5  some movement in terms of a number, that it goes

6  from a handgun to one a month for the rest of

7  one's life.

8     How was that determination

9  reached?

10     CORPORATION COUNSEL GEORGES:  Through

11  briefings with the Aldermen actually, Alderman.

12     Because what happened was

13  various Aldermen wanted us to account for

14  various scenarios.  For instance, a group of

15  Aldermen wanted me to ensure that we had a

16  grandfather provision within the ordinance, so

17  that anyone who was able in 1982 to register

18  multiple handguns would be allowed to register

19  multiple handguns now.

20     Then there was another group

21  who wanted to ensure that people coming to this

22  jurisdiction from a jurisdiction which allowed

1    multiple handguns would have a mechanism either

2    through the Superintendent's discretion or

3    otherwise to register multiple handguns.

4              And what was happening in the

5    drafting was that we were getting so many

6    different classes of individuals who were being

7    authorized to possess different numbers of

8    handguns, that it became un-uniform.  And in my

9    opinion, it became very amenable to a uniformity

10   challenge that we could not support based on

11   creating these different classes.

12             So it was much easier just to

13   have an across the board limitation, and that's

14   why we actually mimic the Springfield agenda and

15   the language in that Springfield agenda, as well

16   as looking at Washington, DC.  And what

17   Washington, DC did, which withstood scrutiny,

18   was allow one handgun every 30 days.

19        ALDERMAN FIORETTI:  And then does the

20   license to have a handgun, this card, does it

21   apply to each and every gun then?

22        CORPORATION COUNSEL GEORGES:  No.  The

1    idea would be you as the individual before you

2    have a gun come in and get qualified, and you

3    get issued a permit, the Chicago Firearms

4    Permit.  So you show you are qualified to

5    possess a gun, and you do that through a number

6    of steps.  By an age qualification, by showing

7    you have a valid FOID card, by submitting to a

8    background check that demonstrates you haven't

9    been convicted since getting that FOID card of

10   these various offenses I listed before, and that

11   you have undergone training.

12                    And then once you demonstrate

13   that, the Police Department will issue you this

14   permit.  So this permit says you are eligible to

15   have a firearm.  Then when you go out and

16   procure your firearms, each of those firearms

17   has to be registered.

18                    ALDERMAN FIORETTI:  Okay.  With the

19   Department then?

20                    CORPORATION COUNSEL GEORGES:  Correct.

21                    ALDERMAN FIORETTI:  Thank you.

22                    But the provisions on

1    insurance are out?

2            CORPORATION COUNSEL GEORGES:  Yes.  We

3    could not find a vehicle available in the market

4    that was not cost prohibitive to provide for an

5    overall insurance requirement.  It would be

6    covered under a homeowner's insurance or a

7    renter's insurance.

8                    But the problem is, of the

9    rental market most people don't maintain

10   renter's insurance.  So if you're asking people

11   to go ahead and try to procure that kind of

12   insurance, it would cost between 600 and $1,000

13   annually.  And we thought that would be seen as

14   a cost prohibitive barrier to exercising the

15   Second Amendment right recognized by the Supreme

16   Court.

17           ALDERMAN FIORETTI:  Thank you.

18           CHAIRMAN BEALE:  Alderman Pope.

19           ALDERMAN POPE:  Thank you,

20   Mr. Chairman.

21                    Good morning, Corporation

22   Counsel.  Again, I would like to thank you and

CITY000331

1    congratulate you and your staff for doing a fine

2    job.  In the last week, I know you have been

3    very busy and you've incorporated a lot of our

4    suggestions.  I think you've done a great job.

5    Just a few questions.

6              One, can you speak to the

7    unregistered guns.  If individuals in the city

8    currently have guns that have not been

9    registered in the past, what is the availability

10   of registering them legally?  I don't know if

11   you mentioned this.  What time period or any

12   repercussions, penalties, etc.?

13             CORPORATION COUNSEL GEORGES:  We're

14   asking those individuals to come in within 90

15   days of the effective date of the ordinance to

16   register those weapons, including handguns that

17   have previously not been registered.  There's an

18   interest that the Police Department has in

19   knowing what guns are out there.  So we want an

20   accurate and as thorough a registry as possible.

21   So we're encouraging people to come in and get

22   those weapons registered.

1    ALDERMAN POPE:  Okay.  And with

2  respect to the police, I know I mentioned this

3  earlier in the week, but I want to ensure that

4  this information gets into the OEMC system so

5  that as the police and first responders go out

6  to a call, they know immediately that John Doe

7  who's making a call for service possesses a

8  handgun at 123 Main Street.

9          Do you foresee -- and maybe

10  you're not the appropriate person to ask.  Do

11  you foresee any problems getting that data into

12  the 911 system so that the dispatchers and

13  police and firefighters can have that

14  information available to them?

15          CORPORATION COUNSEL GEORGES:  I see no

16  problem with that.  We have talked about putting

17  that technological improvement in place so that

18  all first responders have that kind of

19  information when they respond to a call at a

20  home.

21          ALDERMAN POPE:  Okay.  And then as far

22  as the registration, there's a $100 fee for a

CITY000333

1    three-year period; that's correct?

2             CORPORATION COUNSEL GEORGES:  That's

3    for the permit.  So to get the CFP, it's a $100

4    fee and you've got to renew it every three

5    years.

6             ALDERMAN POPE:  Okay.  And the

7    registration for a gun is $15 initially per

8    year?

9             CORPORATION COUNSEL GEORGES:  It is

10   $15 when you first register it.  You have to

11   annually keep that updated, like an online

12   update.  But there is no additional cost if it

13   is the same weapon.  Every new weapon though has

14   to be registered with a $15 registration fee.

15            ALDERMAN POPE:  Okay.  And then as far

16   as -- with that CFP for the three-year period,

17   if I become in violation of that, I become

18   convicted of a felony count, is there any check

19   during that three-year period to ensure that I'm

20   still in compliance with the City laws or is it

21   more or less on the -- the gun owner?

22            CORPORATION COUNSEL GEORGES:  Well,

1   the gun owner does have the burden under this

2   ordinance to keep all information current.  But

3   also, we have the authority to revoke a CFP if

4   the eligibility is no longer met.

5           ALDERMAN POPE:  Thank you.

6                 And then finally this

7   information, is it a matter of --

8           CORPORATION COUNSEL GEORGES:  Rose

9   Kelly also wants to add something.

10          ALDERMAN POPE:  Please.

11          MS. KELLY:  And just -- if a person

12  becomes convicted of a felony and they have a

13  FOID card, the State's firearm owner

14  identification card, that card is revoked.  The

15  State revokes that card and then they do inform

16  the Police Department.

17          ALDERMAN POPE:  Oh, the Police

18  Department is informed automatically.  Great.

19                And is this information a

20  matter of public record?  Could John Q. Public

21  look on the computer system or request

22  information on all the registered handguns in

1    the city of Chicago?

2         CORPORATION COUNSEL GEORGES:  We are

3    doing our best to ensure that that is not the

4    case, for instance, to ensure that we would not

5    be subject to a request under the Freedom of

6    Information Act that seeks the names and

7    addresses of people who have registered weapons.

8         We have asked for an advisory

9    opinion from the Attorney General, and we think

10   we are on certainly strong legal ground in not

11   providing the addresses.  The question that is a

12   little grayer of an area is whether or not we'd

13   have to provide the names.

14        ALDERMAN POPE:  Thank you, Corporation

15   Counsel.  Again, great job in incorporating this

16   very complicated ordinance.

17        CORPORATION COUNSEL GEORGES:  Thank

18   you, Alderman.

19        CHAIRMAN BEALE:  Alderman Burke.

20        ALDERMAN BURKE:  Congratulations,

21   Madam Corporation Counsel.  I think you and your

22   staff have done a tremendous job in putting

CITY000336

1    together this new ordinance, which breaks new

2    ground in municipal regulation of firearms and

3    firearm safety.

4            I'm pleased also that you

5    listened to my suggestion about a gun offender

6    registry, just like there is a sex offender

7    registry.  We'll become the first municipality

8    in Illinois, I believe, to have such a proposal.

9            But tell me, how many people

10    in the next 90 days after this becomes effective

11    will be required to register because they have

12    been convicted of a gun offense in Chicago?

13         CORPORATION COUNSEL GEORGES:  I don't

14    have that information.  I don't know if the

15    Police Superintendent does or not, but I do not

16    have that information available.

17         ALDERMAN BURKE:  One would suspect it

18    would be in the hundreds of thousands, but I'll

19    ask him that question.

20         CORPORATION COUNSEL GEORGES:  I would

21    assume so.

22         ALDERMAN BURKE:  I apologize.  I've

1    only just got to Page 14 of your opus, and I'm

2    reminded of the words of Otto Von Bismark, who

3    said "laws are like sausages.  It's better not

4    to see them being made."  So, apparently, you

5    took his advice and prepared your law where we

6    couldn't see it.

7                    But I have a couple of

8    questions as I'm going through this.  Page 5,

9    Duty-Related Firearm.  It provides that duty

10   related firemen -- firearm shall mean any

11   firearm which is authorized by any law

12   enforcement agency or employer to be utilized by

13   their personnel in the performance of their

14   duties.  So that relates to security guards,

15   private detectives, whatever?

16              CORPORATION COUNSEL GEORGES:  Correct.

17              ALDERMAN BURKE:  Is it the intention

18   of this law to require security guards, private

19   detectives, bank guards, which are apparently

20   excluded from the prohibition against carrying,

21   to come in and get a certificate?

22              MS. KELLY:  There would be certain

1     exceptions from the certificate, including

2     private detectives which were preempted on and

3     those security guards.  There's the *Heyworth*

4     case that we are preempted.  So no, we could not

5     require them to come in and get the registration

6     certificate.

7           ALDERMAN BURKE:  Well, there is.

8     Yeah, there's a -- a case, *City vs. Heyworth,*

9     which is an appellate court case which precludes

10     the City from enforcing the old gun registration

11     ordinance against security guards, private

12     detectives, and whatever.  But I've just got to

13     get this in my own mind now.

14           I know that there's no

15     prohibition against those various categories

16     from carrying or possessing.  Peace officers,

17     investigators for the Illinois Appellate

18     Defender Project, special investigators for the

19     state's attorneys, court security guards, etc.?

20           MS. KELLY:  Correct.

21           ALDERMAN BURKE:  But when we get to

22     the certificate for $100, are those individuals

CITY000339

1    excluded from the requirement to obtain a

2    certificate?

3              MS. KELLY:  Yes.

4              ALDERMAN BURKE:  They are?

5              MS. KELLY:  We are preempted by that.

6              ALDERMAN BURKE:  All right.  What

7    about retired peace officers?

8              MS. KELLY:  They would get the

9    certificate, but any fee would be waived.

10              ALDERMAN BURKE:  I saw that and I was

11    going to ask you.  How in light of the federal

12    law which permits retired peace officers to

13    carry concealed weapons, possess concealed

14    weapons throughout the United States of America,

15    how does that ordinance then sustain a challenge

16    in light of the federal law?

17              MS. KELLY:  We're not saying that you

18    cannot carry your weapon, and if there is a

19    federal preemption, there's a federal

20    preemption.

21                   We're just saying that for

22    those firearms in the city for retired police

1    officers, you would need the registration

2    certificate, and you still would be allowed to

3    carry your concealed weapon outside.  They are

4    not -- they would not be subject to --

5              ALDERMAN BURKE:  But just --

6              MS. KELLY:  -- where you couldn't have

7    a handgun on the outside.

8              ALDERMAN BURKE:  But just as in the

9    *Heyworth* case, don't you find yourself in the

10   same dilemma when the federal law permits

11   retired peace officers, retired federal agents

12   to carry concealed?  Are you not then

13   interfering with that right to carry concealed

14   when you require them to have a certificate?

15             And if you're waiving the fees

16   for retired Chicago peace officers, would you

17   then charge the fee for a certificate for a

18   retired deputy sheriff, retired U.S Marshal,

19   retired FBI agent?

20             For instance, if the

21   Superintendent of Police was not a peace officer

22   under Illinois law, he is a retired federal

1    agent, who under the federal law, which was

2    adopted several years ago, is entitled to

3    possess and carry a concealed weapon throughout

4    the entire United States of America.

5         MS. KELLY:  I think, Alderman, we took

6    a look at that, and I think the federal law does

7    permit us to require the registration.  We could

8    not ban them from carrying though outside, like

9    the concealed carry.  We couldn't ban them.  But

10    I do believe that the law does give us some

11    permission to -- to require the registration.

12         ALDERMAN BURKE:  I'd hope you'd look

13    at that federal law, because I think that there

14    may be -- in my reading of it, and believe me

15    I'm just only on Page 14 of this, so I don't

16    have a deep understanding of --

17         MS. KELLY:  We did take a look at

18    that.

19         ALDERMAN BURKE:  And I'd also think

20    that you should consider if it is permissible to

21    charge this fee -- this hundred dollar fee to

22    retired peace officers, you should think about

1   the possibility of waiving that fee for other

2   retired peace officers, just as you waive it for

3   Chicago peace officers.

4                    I also had a question.  While

5   you define laser in your definitions --

6              MS. KELLY:  Laser-sight accessory as

7   the definition?

8              ALDERMAN BURKE:  Yes.  It appears you

9   do not define muffler or silencer, but in

10  820.060, possession of laser-sight accessory,

11  firearms, silencer or muffler, you refer to

12  firearm, silencer or muffler, but yet I don't

13  see any definition of firearm, silencer or

14  muffler?

15             MS. KELLY:  No.  There's no definition

16  in there and then the courts would look for what

17  is the common meaning --

18             ALDERMAN BURKE:  I'm sorry.  I can't

19  hear you.

20             MS. KELLY:  Oh, I'm sorry.  There is

21  no definition in the ordinance, but the courts

22  would look at to what is the common meaning of

CITY000343

1    it.

2                We thought a silencer and a

3    muffler is a much more common understanding than

4    a laser-sight accessory.  So the courts would

5    just look at to what is meant common law in

6    common uses, which is the silencer and muffler

7    which is --

8                ALDERMAN BURKE:  So you're saying it's

9    not a term of art.  It's a commonly recognized

10   -- well, tell me.  What is a muffler besides

11   what I wear around my neck?

12               MS. KELLY:  Well, I think we would

13   have to have our gun experts tell you that.

14               ALDERMAN BURKE:  So is it the intent

15   then to have a former federal agent, like

16   Superintendent Weis, if he wasn't a peace

17   officer under Illinois law, to come in and get a

18   certificate?

19               CORPORATION COUNSEL GEORGES:  That's

20   the way it is written currently.

21               ALDERMAN BURKE:  And it is the

22   intention to have deputy sheriffs, deputy

1  marshals, DEA agents, special agents of any

2  federal agency residing in the city of Chicago

3  to come in and get a certificate?

4          MS. KELLY:  If they're current agents

5  or if they're retired?

6          ALDERMAN BURKE:  If they're current --

7          MS. KELLY:  No, they would be --

8          ALDERMAN BURKE:  -- they're exempt.

9  If they're retired?

10          CORPORATION COUNSEL GEORGES:  They're

11  not exempted.

12          ALDERMAN BURKE:  They must get a

13  certificate?

14          CORPORATION COUNSEL GEORGES:  Correct.

15          ALDERMAN BURKE:  I'm sure if I had

16  more time to read through this I'd have some

17  other questions.

18          But, obviously, this is a

19  monumental document that you prepared, and

20  you've devoted an awful lot of time and energy

21  to it.  And I think that it's, as I said, a

22  groundbreaking document and other municipalities

CITY000345

1    and governmental agencies around the country

2    will be looking at this for guidance and

3    leadership.  And I think you're to be highly

4    commended.

5            CORPORATION COUNSEL GEORGES:  Thank

6    you, Alderman.  Rose has spent an incredible

7    amount of time in drafting this document and

8    we -- really in speaking with a lot of your

9    colleagues at a lot of the briefings we had,

10   they felt it was imperative that we get

11   something in place immediately because we don't

12   want to add to any confusion that is out there

13   over where our gun laws stand and what is being

14   allowed or not allowed in the city of Chicago.

15           ALDERMAN BURKE:  Well, I'm not asking

16   these questions to try and criticize --

17           CORPORATION COUNSEL GEORGES:  I

18   understand.  Absolutely.

19           ALDERMAN BURKE:  I'm just bringing

20   them up to see if, you know, there should be

21   some fine-tuning of what has already been a

22   splendid effort.

1    CORPORATION COUNSEL GEORGES:  And you
2  certainly raised very valid points.  Thank you
3  for that.
4    CHAIRMAN BEALE:  Any other questions?
5  Alderman Lane.
6    ALDERMAN LANE:  Thank you,
7  Mr. Chairman.
8    I just have one question.
9  Along with the gun registration, will they
10  register within all the districts in Chicago or
11  just at 35th Street?
12    CORPORATION COUNSEL GEORGES:  Well, I
13  think they're just setting up a centralized
14  location for registration.  But I'm sure you can
15  talk with the Police Department if there's a
16  need to have some more satellite locations for
17  that, and we can look at that at a later date if
18  that becomes necessary.
19    ALDERMAN LANE:  Okay.  Thank you.
20    CHAIRMAN BEALE:  There are no other
21  questions?  Thank you.
22    CORPORATION COUNSEL GEORGES:  Thank

1    you.

2               CHAIRMAN BEALE:  Next we have Tom

3    Bosley from Purpose Over Pain.

4               MR. BOSLEY:  First of all, good

5    morning.  And I'd like to thank the members of

6    the Council for allowing me to have the

7    opportunity to come before you.

8                         Again, my name is Tom Bosley.

9    I'm the Vice President of Purpose Over Pain.

10   I'm also the father of Terrell Bosley, gospel

11   musician who was shot and killed while coming

12   out of church on April 4th, 2006.

13                        And although we don't -- many

14   of the parents feel that they don't want to have

15   guns in Chicago, we understand that the Supreme

16   Court has told us we have to accept them.  And

17   since the hand ban is currently invalid as it

18   stands, we think it's important that the City

19   really move quickly to impose the new gun laws

20   and put them in place.

21                        So we do -- we do support the

22   restrictions that people should have in regards

1    to the number of guns that they should have,

2    also requiring the gun owners to get safety

3    training, and the measures that you will see

4    presented in the ordinances.

5              But we also think that

6    although individuals have the right to have the

7    guns in the home, with these rights come

8    tremendous responsibilities, and the

9    responsibilities should be strictly enforced.

10             We need these ordinances which

11   are designed to protect not only the first

12   responders and our precious children but also to

13   protect citizens from citizens.  So it's our

14   hope that the City Council doesn't -- not only

15   stop with passing these ordinances, but keep

16   continued dialogue going to come up with new

17   strategies to combat the problems that we

18   ultimately face.  We're going to face the fact

19   that there will be more guns in Chicago.  And

20   with that being said, we have to continue to

21   dialogue and come up with new strategies to

22   address that point of fact.

1        So, again, I'd just like to

2   thank you guys for allowing me to speak before

3   you on behalf of parents who have indeed lost

4   their kids to senseless acts of gun violence.

5        CHAIRMAN BEALE:  Any questions from

6   the Committee?  Thank you, Tom.

7            Thom Mannard.  Mannard.

8        MR. MANNARD:  Thank you, Mr. Chairman,

9   members of the Committee and the Council.

10           My name is Thom Mannard.  I'm

11  the Executive Director of the Illinois Council

12  Against Handgun Violence.  We are a statewide

13  organization that works to raise awareness about

14  the issue of handgun violence in our State and

15  across our country.

16           Madam Corporation Counsel

17  talked about a couple of the provisions that I

18  will mention, but just to reiterate the

19  importance of the permit and the registration

20  process.

21           The permit process is one that

22  is stronger than we have at the State level,

1   because at the State level a FOID card is good

2   for ten years.  This permit will be renewed

3   every three years, which we believe is important

4   in terms of ensuring that individuals who might

5   fall into prohibited categories won't fall

6   through the cracks.

7              In particular, we think that

8   the training provision is also critical.  Just

9   as somebody needs significant training before

10  they can drive a car, certainly training for

11  firearms, in particular handgun usage, is

12  important.

13             And the District of Columbia

14  had a very reasonable provision for one hour of

15  range training, four hours of classroom

16  training, and that is what we will have in this

17  ordinance.  And I even was -- found it a little

18  bit interesting on Monday when the lead

19  plaintiff, Mr. McDonald, made a comment that,

20  you know, people shouldn't run out to get

21  handguns; that they should properly educate and

22  train themselves before they bring a handgun

1   into their home.  So I think that that certainly

2   is an important component of this.

3                       With the registration

4   component particular -- particularly relative to

5   registering a firearm, the make, model and the

6   serial number, I'm sure the Superintendent can

7   speak to how that can be helpful to law

8   enforcement in having that information.

9                       But also with the registry,

10  it's an additional help to law enforcement.

11  Because if they find somebody who is in

12  possession of a registered firearm, they can of

13  course take appropriate action with that

14  individual.  They can seize an unregistered

15  firearm.  So those are important protections

16  that will help law enforcement as they continue

17  to fight gun violence in the city of Chicago.

18                      The final thing that I would

19  just like to mention is the one handgun a month

20  provision, and that really goes to the black

21  market, illegal gun sales.  Research has shown

22  that a significant number of guns that are

CITY000352

1    traced back to crimes, and this is across our

2    country, are the result of bulk purchases.

3              If I'm an individual and I go

4    somewhere and purchase 20 handguns at one time,

5    it's probably likely I'm not going to be giving

6    those handguns away as Christmas gifts to the

7    family.  It's probably likely that I am going to

8    be selling those guns potentially on the black

9    market.

10             We're coming up on the 11 year

11   anniversary of the slaying of Coach Ricky

12   Birdsong, which was just outside the city of

13   Chicago.  But we also -- that individual who

14   shot Coach Birdsong also shot a couple people in

15   Rogers Park that 4th of July weekend.  That

16   individual received his handgun from an

17   unlicensed seller in Peoria who was buying

18   handguns in bulk and selling them through

19   classified ads and newspapers.

20             Benjamin Smith who shot Coach

21   Birdsong actually received the gun from the

22   seller because he saw a classified ad in the

1   Peoria Journal Star.

2            But this bulk purchase limit,

3   and I think Alderman Balcer you referred to it,

4   certainly one handgun per month seems extremely

5   reasonable.

6          ALDERMAN BALCER:  If I could.

7          CHAIRMAN BEALE:  Alderman Balcer.

8          ALDERMAN BALCER:  Point of

9   clarification, Mr. Chairman.

10         Not only one handgun a month,

11   but as many rifles and shotguns as you need,

12   excluding the sawed-off shotgun, of course.

13         How much more does a person

14   need to arm themselves?  I mean, you only have

15   two arms.  With all that artillery, I don't know

16   how you can't defend yourself, frankly.  Thank

17   you, Mr. Chairman.

18         MR. MANNARD:  Absolutely.  And so we

19   certainly think that that is reasonable.

20         And all of these are

21   provisions that have been tested at the local

22   and State level and have proven to be effective.

1          And so finally, I just would

2   like to thank the Council, the members of this

3   Committee for taking on this issue.  I would

4   hope only that our leaders in Washington will

5   follow your lead.  The issue of handgun bans

6   appears to be off the table.  So knowing that

7   let's hope that we can have a thorough and

8   reasonable discussion in Washington about how we

9   can limit the impact of handgun violence in our

10  communities, whether it be Chicago, in Illinois

11  or across the country.

12          Thank you, Mr. Chairman and

13  members of the Committee.

14          CHAIRMAN BEALE:  Any questions?

15  Alderman Fioretti.

16          ALDERMAN FIORETTI:  Thank you.

17          With your expertise, you know,

18  it seems that these issues get confused.  The

19  legitimate citizen who wants to own a handgun

20  for his own safety in his or her own home can

21  now do so under this ordinance.  But the amount

22  of violence that we have that occurs, and those

1    numbers that we -- that the Supreme Court

2    bantered around, are those -- are crimes that

3    are committed by people that will probably never

4    register their handguns.  Isn't that correct?

5         MR. MANNARD:  Well, certainly, there's

6    always going to be an element that will not obey

7    the law.  But I talked to a lot of legislators

8    about this issue and they come back and say,

9    well, you know, this one law won't stop young

10   people from dying in my community.  But I

11   respond by saying that it is our job or really

12   more your job as elected officials to minimize

13   the risk that handguns pose to our communities.

14        Just as -- I use a comparison

15   to drug laws or drunk driving laws.

16   Unfortunately, we can tighten drug laws but

17   criminals aren't obeying those laws either.  But

18   it doesn't stop us from trying to minimize the

19   risks of drugs in our communities and the impact

20   they have on our families.

21        So I believe that it's

22   imperative that legislative bodies do what they

1    can within their power to minimize the risk of

2    gun violence in our communities, knowing that,

3    unfortunately, we have over -- best estimates

4    from Bureau of Alcohol, Tobacco, and Firearms,

5    over 300 million guns in circulation in our

6    country.  About a third of those are handguns,

7    so about a hundred million handguns in

8    circulation.

9         If we stopped producing guns

10   today in this country, unfortunately, we're

11   still going to lose lives to gun violence on a

12   daily basis.

13        So while I've heard the

14   arguments certainly, Alderman Fioretti, about,

15   you know, the criminals don't obey the laws.  I

16   think it's unfair to say, well, we apply that to

17   just gun laws.  Because criminals aren't obeying

18   laws when it comes to manufacturing crystal meth

19   or, you know, selling drugs or other types of

20   things and that should not prohibit legislative

21   bodies from doing what they can to address this

22   issue and improve the safety of our communities.

52

1         ALDERMAN FIORETTI:  And do you -- do

2    you think though and -- just ten years down the

3    line here, where do you think we will be if what

4    we see with everyone -- with homes being --

5    having handguns, the availability of handguns

6    here.

7         Because as I looked at those

8    numbers I said, you know -- and we're going to

9    try to keep it out of the hands of those that

10    are -- have instability issues, substance abuse

11    issues.  But people in those homes still have

12    those.

13         MR. MANNARD:  Right.

14         ALDERMAN FIORETTI:  And so do you

15    think we are opening up a Pandora's box here by

16    this, or are we at least trying some reasonable

17    restrictions here, and what do you see the

18    outcome?

19         MR. MANNARD:  Well, I think that this

20    body is considering to put in the absolutely

21    right protections to ensure that handguns in the

22    home will not be a risk to people outside of

CITY000358

1   those homes as well as those that live in those

2   homes.

3           One of the things that we do

4   with our organization is try and emphasize to

5   individuals the inherent risks of firearm

6   ownership.  To understand that when you bring a

7   handgun into the home there is an increased risk

8   of an unintentional shooting.  There's an

9   increased risk of suicide.  There's an increased

10  risk of a homicide happening in that home or

11  even somebody simply being wounded by that

12  firearm arm.  That's because the firearm is

13  present in that home.

14          Now, we are not going to be so

15  ignorant to say that people haven't successfully

16  defended themselves with firearms in the home

17  because they certainly have.  But the numbers

18  that we know bear out that there is a greater

19  risk of an unintentional shooting, a suicide or

20  a homicide in the home, particularly with

21  handguns.

22          One of the reasons we focus on

1     handguns is because the recreational guns,

2     shotguns, long guns, aren't used nearly as often

3     in crimes or involved with gun-related death, as

4     opposed to handguns. And I think the safe

5     storage requirements that is included in this

6     ordinance will ensure safety of particularly

7     young people who are in homes with handguns,

8     teenagers.

9                  You think about -- when I

10    stood on the State Suicide Prevention Alliance,

11    it's through the Department of Public Health.

12    I'm not on that alliance because I'm a suicide

13    prevention expert. It's because the State of

14    Illinois recognizes that the means -- the access

15    to firearms oftentimes leads to a completed

16    suicide. So if we have safe storage in this

17    ordinance, it might prevent that teenager who

18    may be at a temporary moment of depression,

19    didn't make the team, a bad breakup, they won't

20    have access to that firearm because it's safely

21    stored by the firearm owner.

22                So I think that this ordinance

CITY000360

1    is, as Alderman Burke said I think, certainly

2    the most comprehensive firearm ordinance in the

3    country.  And I certainly am thrilled and

4    applaud the Council, and Madam Corporation

5    Counsel, and your team for all the work that

6    you've done in putting this together.  Because

7    it certainly, I would hope, would be a model for

8    other municipalities across the nation.

9                    And, once again, if our

10   President would want to consider some of these

11   provisions, I think that would certainly be

12   helpful in reducing gun-related death and

13   violence in our country.

14              ALDERMAN FIORETTI:  Thank you.

15                    One other question and maybe

16   you can educate me regarding the training.  The

17   one-hour training, firearms training and the

18   four hours classroom, I believe, that's under

19   the ordinance, where is the -- if you know and

20   maybe beyond.  But where could one who now wants

21   to apply -- have the card and purchase a gun,

22   where would they go and how far would they have

1   to go out of the city and what would they need
2   to do here?
3           MR. MANNARD:  There are a number of
4   ranges, although I don't know the exact number,
5   that are within 15 miles of the city limits.
6   And, you know, Melrose Park, Franklin Park,
7   Chicago Ridge, so the surrounding suburbs.  Of
8   course, the surrounding suburbs knew that
9   Chicago had a handgun ban, which is why we have
10  gun stores in those -- you know, you can cross
11  Harlem Avenue, and you'll probably find a gun
12  store within a mile of Harlem Avenue.  But
13  ranges are readily available for people to be
14  trained.
15          And in terms of the classroom
16  instruction, I would actually tell somebody that
17  while we're often on opposite sides of the issue
18  that they would want to talk to the Illinois
19  State Rifle Association or even consult with the
20  National Rifle Association about appropriate
21  education.  I'm sure that, perhaps, our Chicago
22  Police Department may have a registry, if I'm

CITY000362

1    not mistaken, of where appropriate places are

2    for range training and classroom training.

3                But it's not the type of

4    provision that is going to require people to

5    head down to Springfield or Sparta to be

6    appropriately trained and fit that requirement.

7                ALDERMAN FIORETTI:  One other

8    question.  And, you know, I believe as the

9    ordinance is drafted, it is a ground-breaking

10   ordinance.  It does offer reasonable

11   restrictions, not unreasonable restrictions upon

12   future court challenges.  But do you see

13   additional court challenges to this ordinance as

14   it stands?

15               MR. MANNARD:  I would not be surprised

16   if there are additional court challenges.  But

17   this has been thoroughly considered in terms of

18   whether it would withstand a court challenge.

19   And I believe that the Council is on solid

20   ground, very solid ground in passing this

21   ordinance because, once again, many of these

22   provisions have already been tested in the

CITY000363

1    courts.

2            ALDERMAN FIORETTI:  Thank you.  Thank

3    you very much.

4            CHAIRMAN BEALE:  Any other questions?

5    Hearing none, thank you.  Sandra Reed.

6            MS. REED:  Good morning.

7            CHAIRMAN BEALE:  State your name.

8            MS. REED:  I'm Sandra Reed, and I'm a

9    board member with Illinois Council Against

10   Handgun Violence.

11                 And I -- you know, this

12   subject is so close to my heart as an educator

13   also because I've had so many students killed by

14   guns.  And it's so important that you put in

15   place an ordinance especially to protect our

16   children.  And Thom Mannard mentioned about

17   child safety with the storage of guns.  But

18   there was another thing that's on this ordinance

19   that's very, very important about the trigger

20   locks or the safety locks.  That has to be in

21   place to protect our children.

22                 Another thing, as a board

CITY000364

1    member for Illinois Council Against Handgun

2    Violence, we have a student voice contest.  And

3    I just want to read you several excerpts from

4    our students.  Because their voices, they're

5    crying out for help, and you need to hear their

6    voices.

7                    These are students that are in

8    the seventh and fourth grade, and I'm just going

9    to read you short excerpts.  I don't want to

10   take up too much of your time.

11                   Here's one student in the

12   seventh grade.

13                   I wish that guns had never

14   been made because many lives could have been

15   saved, especially those who didn't deserve to

16   die and those victims whose families still cry.

17                   It's another city night, and

18   you can hear the shouts of a fight until the

19   bang of a gun silences all.  That is, of course,

20   'til the police come to call.

21                   Here's one other student,

22   seventh grade, and I'm just going to read you

1    his last three lines.

2                    I'm scared, I'm weak and I'm

3    alone.

4                    So I thank you for presenting

5    this ordinance.  And I thank the Council for

6    their hard work.  I read a lot of the ordinance

7    and I think it's great.  And I'm just asking and

8    pleading with you to please, please save our

9    children.  Thank you.

10                   And if you want copies of

11   this, we will send you copies.  Okay.  Thank

12   you.

13              CHAIRMAN BEALE:  Any questions?  All

14   right.  Thank you.

15                   All right.  That's all the

16   testimony we have regarding this ordinance.  If

17   there are no other questions from the

18   Committee -- Alderman Rugai.

19              ALDERMAN RUGAI:  Is the Superintendent

20   available for some -- couple of questions?

21              CHAIRMAN BEALE:  Yes, he is.

22              ALDERMAN RUGAI:  Short.

1     CHAIRMAN BEALE:  Superintendent.

2     Thank you.

3          ALDERMAN RUGAI:  Good afternoon,

4     Superintendent.

5               I have a question of -- we've

6     talked a great deal about the first responders

7     and protecting them and identifying homes that

8     are -- have guns registered.  How though are we

9     going to alert them?

10              Is OEMC going to have some

11    identification when an address comes up that the

12    police are called to -- that a gun is registered

13    at this home or several guns are registered?

14    How can we -- how are we going to alert police

15    and/or fire or paramedics to that?

16         SUPERINTENDENT WEIS:  What we want to

17    do, we'll be expanding our CLEAR system, and we

18    want it to be an automated notification so that

19    if you should get a particular assignment or

20    dispatched to a particular residence, you would

21    immediately be notified that someone in that

22    residence has a registered weapon.

CITY000367

1          We're not there yet.  We have

2     to expand and enhance some of our CLEAR systems,

3     but that's our goal that we're going to get to

4     absolutely as soon as we can.  We want it to be

5     an automated system so that the officer doesn't

6     have to think about querying the system.  We

7     want him to be automatically notified of the

8     fact that there is a weapon registered at that

9     address.

10          ALDERMAN RUGAI:  And is there

11     technology available for that or is it just

12     updating in the system that exists now?

13          SUPERINTENDENT WEIS:  It's expanding

14     upon what we have right now, and it's something

15     that our folks are working on right now.

16          ALDERMAN RUGAI:  I just envisioned a

17     dispatcher saying, you know, call at this

18     address, this is the problem, and it appears

19     there's a gun registered at this home.  You

20     know, over the voice as well as then transmitted

21     electronically.

22          SUPERINTENDENT WEIS:  We would

1    certainly work with OEMC, and we can have that

2    dual notification system so they would get it

3    both orally and verbally on their screen.

4         ALDERMAN RUGAI:  Are you -- and again,

5    just reading the fine details this morning.

6    Someone under 18 can register with written

7    parental consent?

8         SUPERINTENDENT WEIS:  Correct.

9         ALDERMAN RUGAI:  I'm not usually a

10   very skeptical person, but what else is going to

11   be required?  I mean, teens often write notes

12   for one another why they miss school.  I mean I

13   -- how is that going to be validated, I guess?

14   Can the parent come in with them?

15        SUPERINTENDENT WEIS:  We're still

16   drafting the rules and regulations which would

17   capture a lot of those type of specific details.

18   It's -- we included that because that's under

19   the FOID requirements that someone can have a

20   FOID card.

21             So in terms of the rules and

22   regulations and the how to's that we would do

1  that, we would find -- that's one of the reasons

2  we want -- that we'd like to automate as much of

3  this process as we can, but there still will

4  have to be someone come down to police

5  headquarters so we can, you know, fingerprint,

6  so that we can verify the identification.

7              I think you raised a good

8  point.  If there is a parent, that parent may

9  have to come down and --

10             ALDERMAN RUGAI:  It's not in the

11  ordinance.  That's the only thing that concerned

12  me.  It says written consent, and I'm sure we

13  could always come back and amend it.  But I do

14  --

15             SUPERINTENDENT WEIS:  Well, I believe

16  the thought process was for those nuances that

17  would actually be kind of the rules and

18  regulations.  Rather than having it in the

19  ordinance, allow the Superintendent of Police to

20  develop those in a very quick mode method, if we

21  had to.  Like if things could change.  Similar

22  to the -- the list of weapons that would be

1    viewed as unsafe. That could change as time

2    progresses. So if we had to make small

3    modifications, it would give a little more

4    flexibility.

5            ALDERMAN RUGAI: It did mention that

6    an affidavit had to be signed. That the parent

7    or guardian did not have any prohibition

8    themselves for an FOID, so --

9            SUPERINTENDENT WEIS: Correct.

10           ALDERMAN RUGAI: -- perhaps that

11   affidavit in the rules and regulations could be

12   done in person.

13           SUPERINTENDENT WEIS: That would be --

14           ALDERMAN RUGAI: Maybe that's an

15   answer to my question.

16           SUPERINTENDENT WEIS: Certainly could

17   be.

18           ALDERMAN RUGAI: The other -- we

19   defined -- as far as safety in the home from

20   children, we say trigger lock or other

21   mechanisms. Is that again something that you

22   can define further?

1    You know, we had previous

2   ordinances we talked about yesterday or the day

3   before.  Should we define it further?  "Other

4   mechanisms" is pretty vague.  And I'm just

5   wondering would it be better for us to define

6   what those other mechanisms are?

7    SUPERINTENDENT WEIS:  I mean there's

8   so many probably different methods and

9   manufacturers you could get.  I think the intent

10   behind that was the trigger lock is one way of

11   securing a weapon.  Another one would be various

12   types of safety locking boxes, some which have

13   biometric readers.

14    When you start going through

15   each one of them, I think as long as we define

16   the need, which is to ensure that a young person

17   cannot gain access to that weapon, how that is

18   done, you know, we can certainly offer

19   suggestions.  We could explore expanding that.

20    But I think trigger locks, of

21   course, is one method.  Other ones are certainly

22   out there.

1          ALDERMAN RUGAI:  I can see someone

2     arguing a case that they put a book on top of it

3     or that -- you know, so that someone couldn't

4     lift up -- the safety box or a box of some sort.

5     And, again, maybe I'm being too skeptical, but I

6     think we probably need to define some of those

7     types of ones that we think are other

8     mechanisms.

9          SUPERINTENDENT WEIS:  Right.  And we

10     can certainly do that.

11          ALDERMAN RUGAI:  Those are all of my

12     questions.  Thank you.

13          CHAIRMAN BEALE:  Any other question?

14     Alderman Burke.

15          ALDERMAN BURKE:  Superintendent,

16     congratulations on this remarkable initiative.

17     But I think it's been said before that the devil

18     is in the details.  And once we get this passed,

19     then there's going to be a period of time we're

20     going to have to work on how it's going to be

21     implemented economically and effectively.

22          I'm pleased that you endorse

1    the concept of a gun offender registry. But

2    tell me, if you can, how many gun offenders are

3    presently living in the city of Chicago?

4            SUPERINTENDENT WEIS: I don't have

5    that information for you at this time.

6            ALDERMAN BURKE: Perhaps we could get

7    a feel for that by you telling me, if you

8    remember, how many guns did you seize last year?

9            SUPERINTENDENT WEIS: Approximately

10   10,000.

11           ALDERMAN BURKE: So in each of those

12   instances there would have been an offender.

13   Obviously, you take out of that, back out of

14   that multiple seizures at one point. But it's

15   probably safe to say that there may well be in

16   excess of a hundred thousand gun offenders

17   living in Chicago?

18           SUPERINTENDENT WEIS: Certainly could

19   be. What I can give you stats on, on 2009 UUW

20   arrests, and these aren't convictions, but

21   arrests were 4,335, and aggravated UUW arrests

22   were 3,537. Again, only arrests not

CITY000374

1    convictions.

2         ALDERMAN BURKE:  You're coming pretty

3    close to 10,000 arrests.  Not convictions.  But

4    most of them are either pled out for a

5    misdemeanor.  Very few of them, with the

6    exception of a motion to suppress, don't result

7    in some kind of a conviction.

8         So our good intention of

9    creating this registration of gun offenders may

10   well be overwhelming and should we consider

11   limiting it to a gun offender offense within 15

12   years or 20 years or should we have a cutoff

13   someplace?

14        Is it likely that somebody can

15   be rehabilitated?  Should we -- and I know this

16   was my idea, but I'm just talking off the top of

17   my head.  Can a teenager be rehabilitated after

18   a number of years, those kinds of things?

19        So I don't want to create a

20   bureaucracy that's going to be impossible to

21   administer.

22        SUPERINTENDENT WEIS:  Yes, sir.

1        ALDERMAN BURKE:  And I would also like

2   you to think about the question I raised with

3   the Corporation Counsel.

4           What about retired federal

5   agents who come to live in Chicago?  Retired

6   deputy sheriffs, deputy coroners, requiring them

7   to get this certificate.

8           I'm not asking you to pose a

9   legal opinion, but given your knowledge of what

10   went on in the long fight to get this federal

11   law adopted, do you think that we can enforce

12   this against the retired agents and peace

13   officers?

14        SUPERINTENDENT WEIS:  Well, I do have

15   some vested interest in that, sir.

16        ALDERMAN BURKE:  Well, my question --

17   You heard my question.

18        SUPERINTENDENT WEIS:  Right.

19        ALDERMAN BURKE:  If you are not a

20   peace officer in Illinois, you're a retired FBI

21   agent.  You can carry a concealed weapon under

22   federal law and you decided to move to Chicago.

1    In order to be a law-abiding citizen, you would

2    have to go to the Superintendent of Police and

3    present an affidavit that you had gotten

4    training and get a CFP so you can register your

5    weapon.

6             SUPERINTENDENT WEIS:  Yes.  I don't

7    think that's unreasonable.  Where I think would

8    be good to explore a little bit more is,

9    perhaps, on the fees involved.  I think it is

10   important that we do actually look at someone

11   when they're registering a weapon.  I know that

12   we've actually held some retired FBI agents

13   shoots, and some of the folks coming to those,

14   you know, they're a little bit older.  And their

15   physical skills have diminished a little bit,

16   and one can make the argument that, perhaps,

17   they should not be carrying a weapon.

18             So I think the registration

19   process to at least look at the individual, make

20   sure they have the ability to handle a weapon,

21   make sure they are certified, as they have to, a

22   level of training and recertify every year, I

1  think those are all fair.  It's something that I

2  think is needed.

3           I think where the expiration

4  could be would be in, perhaps, the fees

5  associated with that.  Because many have served

6  for 20 to 25 years, really very similar to a

7  Chicago police officer, and also other

8  municipalities throughout the State, and I could

9  see a fairness issue raised on that.  And it's

10 something, of course, that we would continue to

11 explore as we, you know, get this thing

12 sharpened up.

13          ALDERMAN BURKE:  Well, you've got to

14 fine-tune it.  There's no doubt about it.

15          SUPERINTENDENT WEIS:  Yes, sir.

16          ALDERMAN BURKE:  But I think it's an

17 overall concept.  And as a document, it's

18 terrific.  It's really a landmark piece of

19 legislation.  But we don't want to create an

20 unenforceable bureaucratic maze either and tie

21 up police officers to do this kind of paperwork.

22          But it seems to be largely

1  self-enforcing.  The applicant has to come in

2  with the affidavit, with the license number,

3  with the photographs, etc.  So one would hope

4  that the process will be minimal.

5             Is there any estimate about

6  whether you're going to need additional

7  personnel to administer this?

8             SUPERINTENDENT WEIS:  We ran the

9  numbers and that's -- the cost of a hundred

10  dollars covered all the costs that we feel we

11  would have to need.

12             I know that personnel was

13  looked at and that's how the hundred dollars was

14  arrived.  And I think it came out to be slightly

15  less than a hundred dollars.  I'll say around

16  like 97.50 or something.

17             But that cost covers the

18  administrative fees to include personnel that we

19  believe it will take to put this into place.

20             ALDERMAN BURKE:  How many personnel do

21  you think?

22             SUPERINTENDENT WEIS:  I don't know.

CITY000379

1    ALDERMAN BURKE:  Is it possible to
2 think about contracting this out to an outside
3 agency?
4    SUPERINTENDENT WEIS:  We can certainly
5 look at that and see if there's a cost benefit
6 to doing that.
7    ALDERMAN BURKE:  As I know, you always
8 want to keep the peace officers out there on the
9 street working.
10    SUPERINTENDENT WEIS:  Right.
11    ALDERMAN BURKE:  And I'd also like to
12 get, if it's possible, an estimate of how many
13 gun offenders in the next 90 days are going to
14 be required to register or they're going to be
15 breaking the law.
16    SUPERINTENDENT WEIS:  We can certainly
17 get that information for you through the Chair.
18    ALDERMAN BURKE:  There was -- when I
19 raised this issue back in '08, you sent a letter
20 to the then Chairman with some statistics on
21 what it would take to implement this
22 registration program, and so it appears that

1    there is somebody over in Planning that's done

2    some research on this.  Thank you.

3              SUPERINTENDENT WEIS:  Yes, sir.

4              CHAIRMAN BEALE:  Is that it,

5    Mr. Chairman?

6              ALDERMAN BURKE:  Yes.  Thank you.

7              CHAIRMAN BEALE:  Any other questions?

8                   Hearing none, Alderman Pope

9    has a motion do pass.  All in favor?

10              RESPONSE:  Aye.

11              CHAIRMAN BEALE:  The ayes have it.

12    All those -- any opposition?

13                   No.  This will be reported out

14    at the next City Council meeting.  Thank you.

15

16

17         (WHICH WERE ALL THE PROCEEDINGS HAD

18          IN THE ABOVE-ENTITLED MATTER.)

19

20

21

22

```
1    STATE OF ILLINOIS   )
                          )
2    COUNTY OF C O O K   )

3

4

5              I, DONNA T. WADLINGTON, a

6    Certified Shorthand Reporter, doing business in

7    the County of Cook and State of Illinois, do

8    hereby certify that I reported in machine

9    shorthand the proceedings in the above entitled

10   cause.

11             I further certify that the

12   foregoing is a true and correct transcript of

13   said proceedings as appears from the

14   stenographic notes so taken and transcribed by

15   me this 30th day of July, 2010.

16

17

18             _____

19             DONNA T. WADLINGTON
               CSR #084-02443
20

21

22
```

WADLINGTON REPORTING SERVICE, INC.
(312) 372-5561

CITY000382

**$**

$1,000 [2] 14/5 25/12
$10,000 [1] 14/9
$100 [3] 27/22 28/3 33/22
$15 [3] 28/7 28/10 28/14
$5,000 [2] 14/5 14/8

**'**

'08 [1] 74/19
'til [1] 59/20

**0**

02443 [1] 76/19
084-02443 [1] 76/19

**1**

10,000 [2] 68/10 69/3
11 [1] 47/10
123 [1] 27/8
13 [1] 15/10
14 [2] 32/1 36/15
15 [1] 69/11
15 miles [1] 56/5
16 [1] 15/10
18 [1] 63/6
1982 [1] 22/17

**2**

20 [4] 14/6 47/4 69/12 72/6
2006 [1] 42/12
2009 [1] 68/19
2010 [1] 76/15
25 [1] 72/6

**3**

3,537 [1] 68/22
30 [3] 14/9 20/13 23/18
300 [1] 51/5
30th [1] 76/15
35th [1] 41/11

**4**

4,335 [1] 68/21
4th [2] 42/12 47/15

**6**

600 [1] 25/12

**8**

820,060 [1] 37/10

**9**

90 [4] 14/7 26/14 31/10 74/13
911 [1] 27/12
97.50 [1] 73/16

**A**

abiding [1] 71/1
ability [1] 71/20
able [1] 22/17
about [23] 27/16 31/5 34/7 36/22 44/13
44/17 49/8 50/8 51/6 51/7 51/14 54/9 56/20
58/16 58/19 61/6 62/6 66/2 70/2 70/4 72/14
73/5 74/2
above [2] 75/18 76/9
ABOVE-ENTITLED [1] 75/18
absolutely [4] 40/18 48/18 52/20 62/4
abuse [1] 52/10
accept [1] 42/16
access [3] 54/14 54/20 66/17
accessory [3] 37/6 37/10 38/4
accommodate [2] 14/18 17/15
account [1] 22/13

accurate [1] 26/20
across [5] 23/13 44/15 47/1 49/11 55/8
Act [1] 30/6
action [1] 46/13
acts [1] 44/12
actually [7] 22/11 23/14 47/21 56/16 64/17
71/10 71/12
ad [1] 47/22
add [2] 29/9 40/12
additional [5] 28/12 46/10 57/13 57/16 73/6
address [4] 43/22 51/21 61/11 62/9 62/18
addresses [2] 30/7 30/11
administer [2] 69/21 73/7
administrative [1] 73/18
adopted [2] 36/2 70/11
ads [1] 47/19
advice [1] 32/5
advisory [2] 20/18 30/8
affidavit [4] 65/6 65/11 71/3 73/2
after [2] 31/10 69/17
afternoon [1] 61/3
again [10] 25/22 30/15 42/8 44/1 55/9 57/21
63/4 65/21 67/5 68/22
against [7] 32/20 33/11 33/15 44/12 58/9
59/1 70/12
age [1] 24/6
agencies [1] 40/1
agency [3] 32/12 39/2 74/3
agenda [2] 23/14 23/15
agent [4] 35/19 36/1 38/15 70/21
agents [7] 35/11 39/1 39/1 39/4 70/5 70/12
71/12
ages [1] 15/9
aggravated [1] 68/21
ago [1] 36/2
ahead [1] 25/11
Alcohol [1] 51/4
Alderman [19] 15/5 15/21 16/22 20/7 22/11
25/18 30/18 30/19 36/5 40/6 41/5 48/3 48/7
49/15 51/14 55/1 60/18 67/14 75/8
Aldermen [3] 22/11 22/13 22/15
alert [2] 61/9 61/14
all [20] 21/4 27/18 29/2 29/22 34/6 41/10
42/4 48/15 48/20 55/5 59/19 60/13 60/15
60/15 67/11 72/1 73/10 75/9 75/12 75/17
alliance [2] 54/10 54/12
allow [3] 18/14 23/18 64/19
allowable [1] 44/3
allowed [5] 22/18 22/22 35/2 40/14 40/14
allowing [1] 18/2 42/6 44/2
alone [1] 60/3
Along [1] 41/9
already [2] 40/21 57/22
also [17] 29/3 29/9 31/4 36/19 37/4 42/10
43/2 43/5 43/12 45/8 46/9 47/13 47/14 58/13
70/1 72/7 74/11
although [3] 42/13 43/6 56/4
always [3] 50/6 64/13 74/7
am [3] 18/11 47/7 55/3
amenable [1] 23/9
amend [1] 64/13
Amendment [3] 21/17 21/18 25/15
America [2] 34/14 36/4
amount [2] 40/7 49/21
and/or [1] 61/15
anniversary [1] 47/11
annually [2] 25/13 28/11
another [7] 16/14 22/20 58/18 58/22 59/17
63/12 66/11
answer [1] 65/15
any [21] 14/14 15/4 26/11 27/11 28/18 32/10
32/11 34/9 37/13 39/1 40/12 41/4 44/5 49/14
58/4 60/13 65/7 67/13 73/5 75/7 75/12

anyone [1] 22/17
apologize [1] 31/22
apparently [2] 32/4 32/19
Appeals [2] 21/2 21/3
appears [5] 37/8 49/6 62/18 74/22 76/13
appellate [2] 33/9 33/17
applaud [1] 55/4
applicant [2] 19/3 73/1
applies [1] 21/17
apply [5] 17/12 17/17 23/21 51/16 55/21
appropriate [4] 27/10 46/13 56/20 57/1
appropriately [1] 57/6
Approximately [1] 68/9
April [1] 42/12
are [66]
area [1] 30/12
aren't [4] 50/17 51/17 54/2 68/20
arguing [1] 67/2
argument [1] 71/16
arguments [1] 51/14
arms [2] 48/14 53/12
arms [1] 48/15
around [4] 38/11 40/1 50/2 73/15
arrested [1] 15/17
arrests [5] 68/20 68/21 68/21 68/22 69/3
arrived [1] 73/14
art [1] 38/9
artillery [1] 48/15
as [59] 15/11 16/3 16/18 18/16 18/16 19/11
21/13 22/2 23/15 23/16 24/1 25/13 26/20
26/20 27/5 27/21 27/22 28/15 28/16 32/8
35/8 37/2 37/6 39/21 42/17 45/9 46/16 47/6
48/11 48/11 50/12 50/14 52/7 53/1 53/1 54/2
54/3 55/1 57/8 57/13 58/12 58/22 62/4 62/4
62/20 62/20 64/2 64/3 65/1 65/1 65/19 65/19
65/15 66/15 71/21 72/11 72/17 74/7 76/13
ask [6] 20/4 20/17 21/3 27/10 31/19 34/11
asked [1] 30/8
asking [5] 25/10 26/14 40/15 60/7 70/8
assignment [1] 61/19
assistance [1] 20/18
associated [1] 72/5
Association [2] 56/19 56/20
assume [1] 31/21
attending [1] 16/17
Attorney [1] 30/9
attorneys [1] 33/19
authority [1] 29/3
authorized [2] 23/7 32/11
authorizes [1] 14/14
automate [1] 64/2
automated [2] 61/18 62/5
automatically [2] 29/18 62/7
availability [2] 26/9 52/5
available [7] 14/1 25/3 27/14 31/16 56/13
60/20 62/17
Avenue [2] 56/11 56/12
awareness [1] 44/13
away [2] 18/6 47/6
awful [1] 39/20
Aye [1] 75/10
aye [1] 75/11

**B**

back [6] 21/2 47/1 50/8 64/13 68/13 74/19
background [2] 24/8
bad [1] 54/19
Baker [3] 16/22 48/3 48/7
ban [2] 21/9 21/20 36/8 36/9 42/17 56/9
bang [1] 59/19
bank [1] 32/19
bans [1] 49/5
bantered [1] 50/2

**B**

barrier [1] 25/14
based [1] 23/10
basis [1] 51/12
be [80]
bear [1] 53/18
became [2] 23/8 23/9
because [24] 16/13 22/3 22/12 31/11 36/13
40/11 45/1 46/11 47/22 51/17 52/7 53/12
53/17 54/1 54/12 54/13 54/20 55/6 57/21
58/13 59/4 59/14 63/18 72/5
become [3] 28/17 28/17 31/7
becomes [4] 21/10 29/12 31/10 41/18
been [13] 24/9 26/2 26/8 26/17 31/12 40/21
48/21 57/17 57/22 59/14 59/17 67/17 68/12
before [10] 16/14 21/13 24/1 24/10 42/7 44/2
45/9 45/22 66/3 67/17
behalf [1] 44/3
behind [1] 66/10
being [8] 18/6 23/6 32/4 40/13 43/20 52/4
53/11 67/5
believe [11] 20/22 31/8 36/10 36/14 45/3
50/21 55/18 57/8 57/19 64/15 73/19
benefit [1] 74/5
Benjamin [1] 47/20
besides [1] 38/10
best [2] 30/3 51/3
better [2] 32/3 66/5
between [1] 25/12
beyond [1] 55/20
biometric [1] 66/13
Birdsong [3] 47/12 47/14 47/21
Bismark [1] 32/2
bit [4] 45/18 71/8 71/14 71/15
black [2] 46/20 47/8
board [3] 23/13 58/9 58/22
bodies [2] 50/22 51/21
body [1] 52/20
book [1] 67/2
Bosley [3] 42/3 42/8 42/10
both [1] 63/3
box [3] 52/15 67/4 67/4
boxes [1] 66/12
breaking [2] 57/9 74/15
breaks [1] 31/1
breakup [1] 54/19
briefings [2] 22/11 40/9
briefs [1] 21/3
bring [2] 45/22 53/6
bringing [1] 40/19
bulk [3] 47/2 47/18 48/2
burden [1] 29/1
Bureau [1] 51/4
bureaucracy [1] 69/20
bureaucratic [1] 72/20
Burke [4] 17/15 30/19 55/1 67/14
business [1] 76/6
busy [1] 26/3
buy [1] 18/20
buying [1] 47/17

**C**

call [5] 27/6 27/7 27/19 59/20 62/17
called [1] 61/12
came [2] 21/1 73/14
can [55] 16/5 17/19 18/10 18/15 18/16 18/19
18/20 18/22 19/4 19/6 19/11 19/21 20/4
20/17 26/6 27/13 41/14 41/17 45/10 46/6
46/7 46/12 46/14 49/7 49/9 49/20 50/16 51/1
51/21 55/16 56/10 59/18 61/14 62/4 63/1
63/6 63/14 63/19 64/3 64/5 64/6 65/22 66/18
67/1 67/10 68/2 68/19 69/14 69/17 70/11

70/21 71/4 71/16 74/4 74/16
can't [5] 16/2 19/20 20/2 37/18 48/16
cannot [2] 34/18 66/17
capture [1] 63/17
car [1] 45/10
card [10] 23/20 24/7 24/9 29/13 29/14 29/14
29/15 45/1 55/21 63/20
careful [1] 14/16
carry [9] 17/8 34/13 34/18 35/3 35/12 35/13
36/3 56/9 70/21
carrying [4] 32/20 33/16 36/8 71/17
case [6] 30/4 33/4 33/8 33/9 35/9 67/2
categories [2] 33/15 45/5
cause [1] 76/10
centralized [1] 41/13
certain [2] 32/4 32/22
certainly [21] 30/10 41/2 45/10 46/1 48/4
48/19 50/5 51/14 53/17 55/1 55/3 55/7 55/11
63/1 65/16 66/18 66/21 67/10 68/18 74/4
74/16
certificate [13] 32/21 33/1 33/6 33/22 34/2
34/9 35/2 35/14 35/17 38/18 39/3 39/13 70/7
certified [2] 71/21 76/6
certify [2] 76/8 76/11
CFP [4] 28/3 28/16 29/3 71/4
Chair [1] 74/17
Chairman [12] 15/7 17/2 17/15 20/9 25/20
41/7 44/8 48/9 48/17 49/12 74/20 75/5
challenge [3] 23/10 34/15 57/18
challenges [3] 57/12 57/13 57/16
change [2] 64/21 65/1
chapter [1] 14/15
charge [2] 35/17 36/21
check [2] 24/8 28/18
Chicago [21] 24/3 30/1 31/12 35/16 37/3
39/2 40/14 41/10 42/15 43/19 46/17 47/13
49/10 56/7 56/9 56/21 68/3 68/7 70/5 70/22
72/7
child [1] 58/17
children [7] 16/7 16/8 43/12 58/16 58/21
60/9 65/20
Christmas [1] 47/6
church [1] 42/12
circulation [2] 51/5 51/8
citizen [2] 49/19 71/1
citizens [2] 43/13 43/13
city [21] 14/11 21/8 21/17 21/21 26/7 28/20
30/1 33/8 33/10 34/22 39/2 40/14 42/18
43/14 46/17 47/12 56/1 56/5 59/17 68/3
75/14
clarification [1] 48/9
classes [3] 17/10 23/6 23/11
classified [1] 47/19 47/22
classroom [4] 45/15 55/18 56/15 57/2
clear [3] 22/3 61/17 62/2
close [2] 58/12 69/3
Coach [4] 17/1 47/14 47/20
colleagues [1] 40/9
Columbia [1] 45/13
combat [1] 43/17
come [20] 20/13 24/2 26/14 26/21 32/21 33/5
38/17 39/3 42/7 43/7 43/16 43/21 50/8 59/20
61/14 64/4 64/9 64/13 70/5 73/1
comes [2] 51/18 61/11
coming [5] 22/21 42/11 47/10 69/2 71/13
commended [1] 40/4
comment [1] 45/19
commit [1] 15/9
committed [1] 50/3
committee [6] 15/5 44/6 44/9 49/3 49/13
60/18
common [5] 37/17 37/22 38/3 38/5 38/6
commonly [1] 38/9

communities [5] 49/10 50/13 50/19 51/2
51/22
community [1] 50/10
comparison [1] 50/14
completed [2] 54/15
compliance [1] 28/20
complicated [1] 30/16
comprehensive [1] 55/2
computer [1] 29/21
concealed [8] 34/13 34/13 35/3 35/12 35/13
36/3 36/9 70/21
concept [2] 68/1 72/17
concerned [1] 64/11
conference [1] 16/16
confident [1] 14/20
confused [1] 49/18
confusion [1] 40/12
congratulate [1] 26/1
congratulations [2] 30/20 67/16
consent [2] 63/7 64/12
Consequences [1] 14/3
consider [3] 36/20 55/10 69/10
considered [1] 57/17
considering [1] 52/20
consistent [1] 14/21
consult [1] 56/19
contest [1] 59/2
continue [3] 43/20 46/16 72/10
continued [1] 43/16
continues [2] 19/16 19/18
contracting [1] 74/2
convicted [5] 15/18 24/9 28/18 29/12 31/12
conviction [1] 29/6
convictions [4] 14/8 68/20 69/1 69/3
Cook [1] 76/7
copies [2] 60/10 60/11
coroners [1] 70/6
Corporation [6] 25/21 30/14 30/21 44/16
55/4 70/3
correct [18] 18/8 18/12 18/14 18/18 18/21
19/15 20/14 20/15 20/20 24/20 24/12 32/16
33/20 39/14 50/4 63/8 65/9 76/12
cost [7] 25/4 25/12 25/14 28/12 73/9 73/17
74/5
costs [1] 73/10
could [20] 16/9 23/10 25/3 29/20 33/4 36/7
48/6 55/20 59/14 64/13 64/21 65/1 65/11
65/16 66/9 66/19 68/6 68/18 72/4 72/8
couldn't [4] 32/6 35/6 36/9 67/3
Council [12] 14/17 42/6 43/14 44/9 44/11
49/2 55/4 57/19 58/9 59/1 60/5 75/14
Council's [1] 14/18
Counsel [6] 25/22 30/15 30/21 44/16 55/5
70/3
count [1] 28/18
country [8] 40/1 44/15 47/2 49/11 51/6 51/10
55/3 55/13
COUNTY [1] 76/2 76/7
couple [4] 32/7 44/17 47/14 60/20
course [12] 15/22 46/13 48/12 56/8 59/19
66/21 72/10
court [15] 16/2 20/17 21/2 21/12 21/16 21/16
25/16 33/9 33/19 42/16 50/1 57/12 57/13
57/16 57/18
Court's [1] 14/22
courts [6] 37/16 37/21 38/4 58/1
covered [2] 25/6 73/10
CPD [1] 17/17
cracks [1] 45/6
crafted [1] 14/16
crafting [1] 14/19

**C**

create [2] 69/19 72/19
creating [2] 23/11 69/9
crimes [4] 15/9 47/1 50/2 54/3
criminals [3] 50/17 51/15 51/17
critical [1] 45/8
criticize [1] 40/16
cross [1] 56/10
cry [1] 59/16
crying [1] 59/5
crystal [1] 51/18
CSR [1] 76/19
curfew [1] 15/12
current [5] 17/12 17/13 29/2 39/4 39/6
currently [3] 24/8 38/20 42/17
cutoff [1] 69/12

**D**

daily [1] 51/12
data [1] 27/11
date [2] 26/15 41/17
day [4] 28/11 21/13 66/2 76/15
days [7] 14/7 14/10 28/13 23/18 26/15 31/10
74/13
DC [2] 23/16 23/17
DEA [1] 39/1
deal [1] 61/6
death [2] 54/3 55/12
decided [1] 70/22
decision [4] 20/12 21/5 21/14 21/22
decisions [1] 15/1
deep [1] 36/16
defend [6] 17/19 18/7 20/2 21/8 21/10 48/16
defended [1] 53/16
Defender [1] 33/18
defense [5] 18/1 18/4 18/5 21/8 21/19
define [7] 37/5 37/9 65/22 66/3 66/5 66/15
67/6
defined [1] 65/19
definition [4] 37/7 37/13 37/15 37/21
definitions [1] 37/5
demonstrate [1] 24/12
demonstrates [1] 24/8
Department [8] 24/13 24/19 26/18 29/16
29/18 41/15 54/11 56/22
Department's [1] 14/1
depression [1] 54/18
deputy [5] 35/18 38/22 38/22 70/6 70/6
described [1] 20/11
deserve [1] 59/15
designed [1] 43/11
destruction [1] 14/14
details [3] 63/5 63/17 67/18
detectives [4] 32/15 32/19 33/2 33/12
determination [1] 22/8
develop [1] 64/20
devil [1] 67/17
devoted [1] 39/20
dialogue [2] 43/16 43/21
did [6] 22/1 23/17 36/17 65/5 65/7 68/8
didn't [2] 54/19 59/15
die [1] 59/16
different [4] 23/6 23/7 23/11 66/8
dilemma [1] 35/10
diminished [1] 71/15
Director [1] 44/11
discretion [1] 23/2
discussed [1] 15/8
discussion [2] 14/16 49/8
dispatched [1] 61/20
dispatcher [2] 62/17
dispatchers [1] 27/12

District [1] 45/13
districts [1] 41/10
do [32] 16/5 21/8 24/5 27/9 27/10 29/15
31/15 36/10 37/9 42/21 42/21 49/21 50/22
52/1 52/1 52/3 52/14 52/17 53/3 56/2 57/12
61/17 63/22 64/13 67/10 70/11 70/14 71/10
72/21 73/20 75/9 76/7
document [4] 39/19 39/22 40/7 72/17
Doe [1] 27/6
does [9] 23/19 23/20 29/1 31/15 34/15 36/6
36/10 48/13 57/10
doesn't [3] 43/14 50/18 62/5
doing [5] 26/1 30/3 51/21 74/6 76/6
dollar [1] 36/21
dollars [3] 73/10 73/13 73/15
don't [22] 20/3 20/21 25/9 26/10 31/13 31/14
35/9 36/15 37/12 40/11 42/13 42/14 48/15
51/15 56/4 59/8 64/6 69/19 71/6 72/19
73/22
done [6] 26/4 30/22 55/6 65/12 66/18 75/1
DONNA [2] 76/5 76/19
doubt [1] 72/14
down [6] 20/13 21/14 52/2 57/5 64/4 64/9
drafted [1] 57/9
drafting [4] 20/19 23/5 40/7 63/16
drive [1] 45/10
driving [1] 50/15
drug [2] 50/15 50/16
drugs [2] 50/19 51/19
drunk [1] 50/17
dual [1] 63/2
during [1] 28/19
duties [1] 32/14
duty [2] 32/9 32/9
Duty-Related [1] 32/9
dying [1] 50/10

**E**

each [5] 19/3 23/21 24/16 66/15 68/11
earlier [1] 27/3
easier [1] 23/12
economically [1] 67/21
educate [2] 45/21 55/16
education [1] 56/21
educator [1] 58/12
effective [3] 26/15 31/10 48/22
effectively [1] 67/21
effort [1] 40/22
either [4] 23/1 50/17 69/4 72/20
elected [1] 50/12
electronically [1] 62/21
element [1] 50/6
eligibility [1] 29/4
eligible [1] 24/14
else [2] 20/3 63/10
emphasize [1] 53/4
employer [1] 32/12
encouraging [1] 26/21
endorse [1] 67/22
energy [1] 39/20
enforce [1] 70/11
enforced [1] 43/9
enforcement [4] 32/12 46/8 46/10 46/16
enforcing [2] 33/10 73/1
enhance [1] 62/2
ensure [9] 22/15 22/21 27/3 28/19 30/3 30/4
52/21 54/6 66/10
ensuring [1] 45/4
entire [1] 36/4
entitled [3] 36/2 75/18 76/9
envisioned [1] 62/16
especially [2] 58/15 59/15
estimate [2] 73/5 74/12

estimates [1] 51/3
etc [3] 26/12 33/19 73/3
even [4] 22/3 45/17 53/11 56/19
ever [1] 15/15
every [6] 23/18 23/21 28/4 28/13 45/3 71/22
everyone [1] 52/4
exact [1] 56/4
example [1] 15/13
except [2] 18/11
exception [1] 69/6
exceptions [1] 33/1
excerpts [2] 59/3 59/9
excess [1] 68/16
exclude [1] 17/10
excluded [2] 32/20 34/1
excluding [1] 48/12
exclusions [1] 17/12
Executive [1] 44/11
exempt [1] 39/8
exempted [1] 39/11
exercising [1] 25/14
existed [1] 21/13
exists [1] 62/12
expand [1] 62/2
expanding [3] 61/17 62/13 66/19
expert [1] 54/13
expertise [1] 49/17
experts [1] 38/13
expiration [1] 72/3
explore [3] 66/19 71/8 72/11
extremely [1] 48/4

**F**

face [2] 43/18 43/18
fact [3] 43/18 43/22 62/8
fair [4] 19/9 19/10 20/1 72/1
fairness [1] 72/9
fall [2] 45/5 45/5
families [2] 50/20 59/16
family [1] 47/7
far [4] 27/21 28/15 55/22 65/19
father [1] 42/10
favor [1] 75/9
FBI [3] 35/19 70/20 71/12
federal [15] 34/11 34/16 34/19 34/19 35/10
35/11 35/22 36/1 36/6 36/13 38/15 39/2 70/4
70/10 70/22
fee [8] 27/22 28/4 28/14 34/9 35/17 36/21
36/21 37/1
feel [3] 42/14 68/7 73/10
fees [4] 35/15 71/9 72/4 73/18
felony [2] 28/18 29/12
felt [1] 40/10
few [2] 26/5 69/5
fight [3] 46/17 59/18 70/10
final [1] 46/18
finally [2] 29/6 49/1
find [5] 25/3 35/9 46/11 56/11 64/1
fine [4] 26/1 40/21 63/5 72/14
fine-tune [1] 72/14
fine-tuning [1] 40/21
fined [1] 15/14
fines [2] 14/5 14/8
fingerprint [1] 64/5
Fioretti [3] 20/7 49/15 51/14
fire [1] 61/15
firearm [17] 24/15 29/13 31/3 32/9 32/10
32/11 37/12 37/13 46/5 46/12 46/15 53/5
53/12 53/12 54/20 54/15 55/17
firearms [11] 24/3 24/16 24/16 31/2 34/22
37/11 45/11 51/4 53/16 54/15 55/17
firefighters [1] 27/13
firemen [1] 32/10

**F**

first [7]  27/5 27/18 28/10 31/7 42/4 43/11 61/6
fit [1]  57/6
flexibility [1]  65/4
focus [1]  53/22
FOID [7]  24/7 24/9 29/13 45/1 63/19 63/20 65/8
folks [2]  62/15 71/13
follow [1]  49/5
foregoing [1]  76/12
foresee [2]  27/9 27/11
former [1]  38/15
found [2]  16/8 45/17
four [3]  18/16 45/15 55/18
fourth [1]  59/8
Franklin [1]  56/6
frankly [1]  48/16
Freedom [1]  30/5
further [5]  14/13 14/20 65/22 66/3 76/11
future [1]  57/12

**G**

gain [1]  66/17
General [1]  30/9
get [28]  24/2 24/3 26/21 28/3 32/21 33/5 33/13 33/21 34/8 38/17 39/3 39/12 40/10 43/2 45/20 49/18 61/19 62/3 63/2 66/9 67/18 68/6 70/7 70/10 71/4 72/11 74/12 74/17
gets [1]  27/4
getting [3]  23/5 24/9 27/11
gifts [1]  47/6
give [4]  20/13 36/10 65/3 68/19
given [1]  70/9
giving [1]  47/5
go [9]  20/17 22/2 24/15 25/11 27/5 47/3 55/22 56/1 71/2
goal [1]  62/3
goes [3]  16/1 22/5 46/20
going [27]  32/8 34/11 43/16 43/18 47/5 47/7 50/6 51/11 52/8 53/14 57/4 59/8 59/22 61/9 61/10 61/14 62/3 63/10 63/13 66/14 67/19 67/20 67/20 69/20 73/6 74/13 74/14
good [12]  15/21 16/11 16/20 18/9 25/21 42/4 45/1 58/6 61/3 64/7 69/8 71/8
gospel [1]  42/10
got [4]  28/4 32/1 33/12 72/13
gotten [1]  71/3
governmental [1]  40/1
grade [3]  59/8 59/12 59/21
grandfather [1]  22/16
grayer [1]  30/12
great [5]  26/4 29/18 30/15 60/7 61/6
greater [1]  53/18
ground [5]  30/10 31/2 57/9 57/20 57/20
ground-breaking [1]  57/9
groundbreaking [1]  39/22
group [2]  22/14 22/20
guarantee [1]  21/18
guardian [1]  65/7
guards [6]  32/14 32/18 32/19 33/3 33/11 33/19
guess [1]  63/13
guidance [1]  40/2
gun [36]  14/4 23/21 24/2 24/5 28/7 28/21 29/1 31/5 31/12 33/10 38/13 40/13 41/9 42/19 43/2 44/4 46/17 46/21 47/21 51/2 51/11 51/17 54/3 55/12 55/21 56/10 56/11 59/19 61/12 62/19 68/1 68/2 68/16 69/9 69/11 74/13
gun-related [2]  54/3 55/12
guns [21]  16/9 18/14 26/7 26/8 26/19 42/15

43/1 43/7 43/19 46/22 47/8 51/5 51/9 54/1 54/2 58/14 58/17 59/13 61/8 61/13 68/8
guys [1]  44/2

**H**

had [14]  22/15 37/4 39/15 40/9 45/14 56/9 58/13 59/13 64/21 65/2 65/6 66/1 71/3 75/17
hand [1]  42/17
handed [1]  21/14
handgun [26]  15/18 17/22 21/7 21/9 21/18 22/2 22/6 23/18 23/20 27/8 35/7 44/12 44/14 45/11 45/22 46/19 47/16 48/4 48/10 49/5 49/9 49/19 53/7 56/9 58/10 59/1
handguns [25]  15/10 18/3 21/21 22/18 22/19 23/1 23/2 23/8 26/16 29/12 45/21 47/4 47/6 47/18 50/4 50/13 51/6 51/7 52/5 52/5 52/21 53/21 54/1 54/4 54/7
handle [1]  71/20
hands [1]  52/9
happened [1]  72/12
happening [2]  23/4 53/10
hard [1]  60/6
Harlem [2]  56/11 56/12
has [13]  21/16 24/17 26/18 28/13 40/6 40/21 42/16 46/21 57/17 58/20 61/22 73/1 75/9
have [111]
haven't [2]  24/8 53/15
having [4]  42/5 64/18
he [4]  35/22 38/16 47/22 60/21
head [2]  57/5 69/17
headquarters [1]  64/5
Health [1]  54/11
hear [3]  37/19 59/5 59/18
heard [4]  15/8 17/15 51/13 70/17
hearing [2]  20/10 58/5 75/8
bearings [1]  17/16
heart [1]  58/12
held [1]  71/12
Heller [1]  14/22
help [3]  46/10 46/16 59/5
helpful [2]  46/7 55/12
her [1]  49/20
here [7]  17/4 20/18 52/3 52/6 52/15 52/17 56/2
Here's [2]  59/11 59/21
hereby [1]  76/8
Heyworth [3]  33/3 33/8 35/9
highly [1]  40/3
him [2]  31/19 62/7
his [5]  32/5 47/16 49/20 49/20 60/1
home [19]  18/1 18/4 18/7 20/2 21/7 21/19 27/20 43/7 46/1 49/20 52/22 53/7 53/10 53/13 53/16 53/20 61/13 62/19 65/19
homeowner's [1]  25/6
homes [8]  17/9 17/20 52/4 52/11 53/1 53/2 54/7 61/7
homicide [2]  53/10 53/20
honest [3]  19/9 19/22 20/1
hope [6]  36/12 43/14 49/4 49/7 55/7 73/3
hopeful [1]  15/1
hour [2]  45/14 55/17
hours [2]  45/15 55/18
how [22]  21/8 22/8 31/9 34/11 34/15 46/7 48/13 48/16 49/8 55/22 61/8 61/14 61/14 63/13 63/22 66/17 67/20 68/2 68/8 73/13 73/20 74/12
hundred [6]  36/21 51/7 68/16 73/9 73/13 73/15
hundreds [1]  31/18

**I**

I'd [6]  36/12 36/19 39/16 42/5 44/1 74/11
I'll [4]  19/9 19/22 31/18 73/15

I'm [36]  28/19 31/4 32/1 32/8 36/15 37/18 37/20 39/15 40/15 40/19 41/14 42/9 42/10 44/10 46/6 47/3 47/5 54/12 54/12 56/21 56/22 58/8 58/8 59/8 59/22 60/2 60/2 60/2 60/9 63/9 64/12 66/4 67/5 67/22 69/16 70/8
I've [4]  31/22 33/12 51/13 58/13
idea [3]  17/21 24/1 69/16
identification [3]  29/14 61/11 64/6
identifying [1]  21/7
ignorant [1]  53/15
illegal [2]  21/12 46/21
Illinois [13]  31/8 33/17 35/22 38/17 44/11 49/10 54/14 56/18 58/9 59/1 70/20 76/1 76/7
immediately [3]  27/6 40/11 61/21
impact [2]  49/9 50/19
imperative [2]  40/10 50/22
implement [1]  74/21
implemented [1]  67/21
importance [1]  44/19
important [8]  42/18 45/3 45/12 46/2 46/15 58/14 58/19 71/10
impose [2]  14/12 42/19
imposing [1]  16/2
impossible [2]  21/10 69/20
improve [1]  51/22
improvement [1]  27/17
incarceration [2]  14/6 14/9
include [2]  14/5 73/18
included [2]  54/5 63/18
including [2]  26/18 33/1
incorporated [1]  26/3
incorporating [1]  30/15
increased [3]  53/7 53/9 53/9
incredible [1]  40/6
indeed [1]  44/3
individual [6]  24/1 46/14 47/3 47/13 47/16 71/19
individuals [8]  17/22 23/6 26/7 26/14 33/22 43/6 45/4 53/5
inform [1]  29/15
information [13]  27/4 27/14 27/19 29/2 29/7 29/19 29/22 30/6 31/14 31/16 46/8 68/5 74/17
informed [1]  29/18
inherent [1]  53/5
initially [1]  28/7
initiative [1]  67/16
inside [1]  17/20
instability [1]  52/10
instance [4]  15/14 22/14 30/4 35/20
instances [1]  68/12
instruction [1]  56/16
insurance [6]  25/1 25/5 25/6 25/7 25/10 25/12
intent [2]  38/14 66/9
intention [3]  32/17 38/22 69/8
interest [2]  26/18 70/15
interesting [1]  45/18
interfering [1]  35/13
invalid [1]  42/17
investigators [1]  33/17 33/18
involved [2]  54/3 71/9
is [108]
isn't [1]  50/4
issue [9]  24/13 44/14 49/3 49/5 50/8 51/22 56/17 72/9 74/19
issued [1]  24/3
issues [3]  49/18 52/10 52/11
it [80]
it's [34]  15/20 16/13 28/3 32/3 38/8 38/9 39/21 42/18 43/13 46/10 47/5 47/7 50/21 51/16 54/11 54/13 54/20 57/3 58/14 59/17 60/7 62/13 62/14 63/18 64/10 67/17 67/20

CITY000386

**I**

it's... [7] 68/14 72/1 72/9 72/16 72/17 72/18 74/12

**J**

job [6] 26/2 26/4 30/15 30/22 50/11 50/12
John [2] 27/6 29/20
Journal [1] 48/1
July [2] 47/15 76/15
jurisdiction [2] 22/22 22/22
just [36] 5/16 18/10 23/12 26/5 29/11 31/6 32/1 33/12 34/21 35/5 35/8 36/15 37/2 38/5 40/19 41/8 41/11 41/13 44/1 44/18 45/8 46/19 47/12 49/1 50/14 51/17 52/2 59/3 59/8 59/22 60/7 62/11 62/16 63/5 66/4 69/16
juvenile [1] 16/2

**K**

keep [5] 28/11 29/2 43/15 52/9 74/8
Kelly [1] 29/9
kept [1] 14/15
kids [1] 44/4
killed [2] 42/11 58/13
kind [7] 20/18 21/4 25/11 27/18 64/17 69/7 72/21
kinds [1] 69/18
knew [1] 56/8
know [35] 16/7 26/2 26/10 27/2 27/6 31/14 33/14 40/20 45/20 48/15 49/17 50/9 51/15 51/19 52/8 53/18 55/19 56/4 56/6 56/10 57/8 58/11 62/17 62/20 64/5 66/1 66/18 67/3 69/15 71/11 71/14 72/11 73/12 73/22 74/7
knowing [1] 26/19 49/6 51/2
knowledge [1] 70/9

**L**

landmark [1] 72/18
Lane [1] 41/5
language [1] 23/15
largely [1] 72/22
laser [4] 37/5 37/6 37/10 38/4
laser-sight [3] 37/6 37/10 38/4
last [3] 26/2 60/1 68/8
later [1] 41/17
law [23] 14/11 32/5 32/11 32/18 34/12 34/16 35/10 35/22 36/1 36/6 36/10 36/13 38/5 38/17 46/7 46/10 46/16 50/7 50/9 70/11 70/22 71/1 74/15
law-abiding [1] 71/1
laws [11] 28/20 32/3 40/13 42/19 50/15 50/15 50/16 50/17 51/15 51/17 51/18
lead [2] 45/18 49/5
leaders [1] 49/4
leadership [1] 40/3
leads [1] 54/15
least [2] 52/16 71/19
legal [3] 21/12 30/10 70/9
legally [1] 26/10
legislation [2] 15/12 72/19
legislative [2] 50/22 51/20
legislators [1] 50/7
legitimate [1] 49/19
less [4] 14/6 14/9 28/21 73/15
let's [1] 49/7
letter [1] 74/19
level [4] 44/22 45/1 48/22 71/22
license [2] 23/20 73/2
life [1] 22/7
lift [1] 67/4
light [3] 21/5 34/11 34/16
like [16] 17/14 25/22 28/11 31/6 32/3 36/8 38/15 42/5 44/1 46/19 49/2 64/2 64/21 70/1

**M**

machine [1] 76/8
Madam [3] 30/21 44/16 55/4
made [3] 32/4 45/19 59/14
Main [1] 27/8
maintain [1] 25/9
make [7] 16/6 46/5 54/19 65/2 71/16 71/19 71/21
making [2] 15/16 27/7
mandate [2] 28/12 21/1
Mannard [4] 44/7 44/7 44/10 58/16
manufacturers [1] 66/9
manufacturing [1] 51/18
many [20] 15/9 17/10 17/10 17/11 17/16 18/16 19/12 23/5 31/9 42/13 48/11 57/21 58/13 59/14 66/8 68/2 68/8 72/5 73/20 74/12
market [4] 25/3 25/9 46/21 47/9
Marshal [1] 35/18
marshals [1] 31/9
matter [3] 29/7 29/20 75/18
maximum [1] 14/10
may [7] 21/3 36/14 54/18 56/22 64/8 68/15 69/9
maybe [6] 22/4 27/9 55/15 55/20 65/14 67/5
maze [1] 72/20
McDonald [4] 14/22 21/6 21/22 45/19
me [11] 22/15 31/9 36/14 38/10 42/6 44/2 55/16 64/12 68/2 68/7 76/15
mean [7] 16/5 16/13 32/10 48/14 63/11 63/12 66/7
meaning [2] 37/17 37/22
means [1] 54/14
meant [1] 38/5
measures [1] 43/3
mechanism [2] 16/3 23/1
mechanisms [4] 65/21 66/4 66/6 67/8
meet [1] 19/12
meeting [1] 75/14
Melrose [1] 56/6
member [2] 58/9 59/1
members [4] 42/5 44/9 49/2 49/13
mention [3] 44/18 46/19 65/5

**N**

mentioned [3] 26/11 27/2 58/16
met [1] 29/4
meth [1] 51/18
method [2] 64/20 66/21
methods [1] 66/8
might [2] 45/4 54/17
mile [1] 56/12
miles [1] 56/5
military [1] 17/13
million [2] 51/5 51/7
mimic [1] 23/14
mind [2] 16/16 33/13
minimal [1] 73/4
minimize [3] 50/12 50/18 51/1
minor [1] 15/22
misdemeanor [1] 69/5
miss [1] 63/12
mistaken [1] 57/1
mode [1] 64/20
model [2] 46/5 55/7
modifications [1] 65/3
moment [1] 54/18
Monday [1] 45/18
month [7] 18/2 18/3 18/20 22/6 46/19 48/4 48/10
months [1] 14/10
monumental [1] 39/19
more [11] 14/6 14/10 28/21 38/3 39/16 41/16 43/19 48/13 50/12 65/3 71/8
morning [6] 15/9 16/16 25/21 42/5 58/6 63/5
most [2] 25/9 55/2 69/4
motion [2] 69/6 75/9
move [2] 42/19 70/22
movement [1] 29/4
Mr. [11] 15/7 17/2 20/9 25/20 41/7 44/8 45/19 48/9 48/17 49/12 75/5
Mr. Chairman [10] 15/7 17/2 20/9 25/20 41/7 44/8 48/9 48/17 49/12 75/5
Mr. McDonald [1] 45/19
much [6] 23/12 38/3 48/13 58/3 59/10 64/2
muffler [7] 37/9 37/11 37/12 37/14 38/3 38/6 38/10
multiple [5] 22/18 22/19 23/1 23/3 68/14
municipal [1] 31/2
municipalities [3] 39/22 55/8 72/8
municipality [1] 31/2
musician [1] 42/11
must [1] 39/12
my [17] 16/15 18/9 23/8 31/5 33/13 36/14 38/11 42/8 44/10 50/10 58/12 65/15 67/11 69/16 69/17 70/16 70/17

**N**

name [3] 42/8 44/10 58/7
names [2] 30/6 30/13
nation [1] 55/8
National [1] 56/20
nearly [1] 54/2
necessary [1] 41/18
neck [1] 38/11
need [12] 16/17 35/1 41/16 43/10 48/11 48/14 56/1 59/5 66/16 67/6 73/6 73/11
needed [1] 72/2
needs [1] 45/9
never [2] 50/3 59/13
new [6] 28/13 31/1 31/1 42/19 43/16 43/21
newspapers [1] 47/19
next [5] 18/9 31/10 42/2 74/13 75/14
night [1] 59/17
no [18] 15/11 18/6 19/19 20/22 23/22 27/15 28/12 29/4 33/4 33/14 37/15 37/15 37/21 39/7 41/20 60/17 72/14 75/13
none [2] 58/5 75/8

**N**

not [53] 14/6 14/9 16/4 17/17 17/18 21/21 23/10 25/3 25/4 26/8 26/17 27/10 30/3 30/4 30/10 30/12 31/15 31/15 32/3 33/4 34/17 35/4 35/4 35/12 35/21 36/8 37/9 38/9 39/11 40/14 40/15 43/11 43/14 47/5 48/10 50/6 51/20 52/22 53/14 54/12 57/1 57/3 57/11 57/15 62/1 63/9 64/10 65/7 68/22 69/3 70/8 70/19 71/17
notes [2] 63/11 76/14
nothing [2] 19/19 19/20
notification [2] 61/18 63/2
notified [2] 61/21 62/7
now [10] 19/11 21/5 22/19 33/13 49/21 53/14 55/20 62/12 62/14 62/15
nuances [1] 64/16
number [10] 19/17 22/5 24/5 43/1 46/6 46/22 56/3 56/4 69/18 73/2
numbers [5] 23/7 50/1 52/8 53/17 73/9

**O**

obey [2] 50/6 51/15
obeying [2] 50/17 51/17
obtain [1] 34/1
obviously [2] 39/18 68/13
occurs [1] 49/22
OEMC [3] 27/4 61/10 63/1
off [4] 18/11 48/12 49/6 69/16
offender [5] 31/5 31/6 68/1 68/12 69/11
offenders [4] 68/2 68/16 69/9 74/13
offense [2] 31/12 69/11
offenses [2] 14/7 24/10
offer [2] 57/10 66/18
officer [5] 35/21 38/17 62/5 70/20 72/7
officers [15] 17/4 17/12 17/13 33/16 34/7 34/12 35/1 35/11 35/16 36/22 37/2 37/3 70/13 72/21 74/8
officials [1] 50/12
often [3] 54/2 56/17 63/11
oftentimes [1] 54/15
Oh [2] 29/17 37/20
Okay [8] 21/11 24/18 27/1 27/21 28/6 28/15 41/19 60/11
old [1] 33/10
older [1] 71/14
olds [1] 15/10
once [4] 24/12 55/9 57/21 67/18
one [35] 18/2 18/3 18/16 18/20 19/20 19/21 22/6 23/18 26/6 31/17 41/8 44/21 45/14 46/19 47/4 48/4 48/10 50/9 53/3 53/22 55/15 55/17 55/20 57/7 59/11 59/21 63/12 64/1 66/10 66/11 66/15 68/14 71/16 73/3
one's [2] 18/6 22/7
one-hour [1] 55/17
ones [2] 66/21 67/7
online [1] 28/11
only [9] 32/1 36/15 43/11 43/14 48/10 48/14 49/4 64/11 68/22
opening [1] 52/15
opinion [3] 23/9 30/9 70/9
opportunity [1] 42/7
opposed [1] 54/4
opposite [1] 56/17
opposition [1] 75/12
opus [1] 32/1
orally [1] 63/3
order [1] 71/1
ordinance [38] 14/4 14/13 14/16 14/19 14/21 16/1 16/3 16/5 16/14 17/11 20/19 21/13 22/16 26/15 29/2 30/16 31/11 34/15 37/21 45/17 49/21 54/6 54/17 54/22 55/2 55/19 57/9 57/10 57/13 57/21 58/15 58/18

60/5 60/6 60/16 64/11 64/19
ordinances [4] 43/4 43/10 43/15 66/2
organization [2] 44/13 53/4
other [24] 18/14 28/11 21/20 37/1 39/17 44/14 41/20 51/19 55/8 55/15 57/7 58/4 59/21 60/17 65/18 65/20 66/3 66/6 66/21 67/7 67/13 72/7 75/7
others [1] 17/16
otherwise [1] 23/3
Otto [1] 32/2
our [35] 15/12 16/1 16/2 16/14 26/3 30/3 38/13 40/13 43/12 43/13 44/14 44/15 47/1 49/4 49/9 50/11 50/13 50/19 50/20 51/2 51/5 51/22 53/4 55/9 55/13 56/21 58/15 58/21 59/4 60/8 61/17 62/2 62/3 62/15 69/8
out [20] 21/12 24/15 25/1 26/19 27/5 40/12 42/12 45/20 52/9 53/18 56/1 59/5 66/22 68/13 68/13 69/4 73/14 74/2 74/8 75/13
outcome [2] 52/18
outside [6] 35/3 35/7 36/8 47/12 52/22 74/2
over [7] 40/13 42/3 42/9 51/3 51/5 62/20 75/1
overall [2] 25/5 72/17
overwhelming [1] 69/10
own [4] 33/13 49/19 49/20 49/20
owner [4] 28/21 29/1 29/13 54/21
owners [1] 43/2
ownership [2] 14/4 53/6

**P**

Page [3] 32/1 32/8 36/15
Pain [2] 42/3 42/9
Pandora's [1] 42/9
papers [1] 21/3
paperwork [1] 72/21
paramedics [1] 61/15
parent [4] 63/14 64/8 64/8 65/6
parental [1] 63/7
parents [5] 15/13 15/16 16/6 42/14 44/3
Park [3] 47/15 56/6 56/6
particular [5] 45/7 45/11 46/4 61/19 61/20
particularly [2] 46/4 53/20 54/6
pass [1] 75/9
passed [1] 67/18
passing [2] 43/15 57/20
past [1] 26/9
peace [13] 33/16 34/7 34/12 35/11 35/16 35/21 36/22 37/2 37/3 38/16 70/12 70/20 74/8
penalties [2] 14/5 26/12
people [20] 15/17 17/10 17/19 22/21 25/9 25/10 26/21 30/7 31/9 42/22 45/20 47/14 50/3 50/10 52/11 52/22 53/15 54/7 56/13 57/4
Peoria [2] 47/17 48/1
per [5] 18/2 18/3 18/20 28/7 48/4
performance [1] 32/13
perhaps [7] 15/12 56/21 65/10 68/6 71/9 71/16 72/4
period [5] 26/11 28/1 28/16 28/19 67/19
permissible [1] 36/20
permission [1] 36/11
permit [9] 24/3 24/4 24/14 24/14 28/3 36/7 44/19 44/21 45/2
permits [2] 34/12 35/10
person [8] 19/10 20/4 27/10 29/11 48/13 63/10 63/12 66/16
personnel [6] 17/14 32/13 73/7 73/12 73/18 73/20
photographs [1] 73/3
physical [1] 71/15
piece [1] 30/11
pistol [3] 18/20 18/20 20/3
place [6] 27/17 40/11 42/20 58/15 58/21

73/19
places [1] 57/1
plaintiff [1] 45/19
Planning [1] 75/1
pleading [1] 60/8
please [3] 29/10 60/8 60/8
pleased [2] 31/4 67/22
pled [1] 69/4
point [8] 15/21 16/11 16/20 21/9 43/22 48/8 64/8 68/14
points [1] 41/2
police [23] 17/4 17/12 17/13 24/13 26/18 27/2 27/5 27/13 29/19 31/9 31/15 34/22 35/21 41/15 56/22 59/20 61/12 61/14 64/4 71/9 71/2 72/7 72/21
Pope [2] 25/18 75/8
pose [2] 50/13 70/8
position [1] 21/3
possess [4] 23/7 24/5 34/13 36/3
possesses [1] 27/7
possessing [2] 15/13 33/16
possession [2] 37/10 46/12
possibility [1] 37/1
possible [3] 26/20 74/1 74/12
potentially [1] 47/8
power [1] 51/1
precious [1] 43/12
precludes [1] 33/9
preempted [3] 33/2 33/4 34/5
preemption [2] 34/19 34/20
prepared [2] 32/5 39/19
present [2] 53/13 71/3
presented [1] 43/4
presenting [1] 60/4
presently [1] 68/3
President [2] 42/9 55/10
press [1] 16/16
pretty [2] 66/4 69/2
prevent [1] 54/17
prevention [2] 54/10 54/13
previous [2] 15/12 66/1
previously [1] 26/17
private [4] 32/15 32/18 33/2 33/11
probably [8] 20/13 47/5 47/7 50/3 56/11 66/8 67/6 68/15
problem [4] 15/21 25/8 27/16 62/18
problems [2] 27/11 43/17
proceedings [3] 75/17 76/9 76/13
process [6] 44/20 44/21 64/3 64/16 71/19 73/4
procure [2] 24/16 25/11
producing [1] 51/9
program [1] 74/22
progresses [1] 65/2
prohibit [1] 51/20
prohibited [2] 15/16 45/5
prohibiting [1] 19/19
prohibition [3] 32/20 33/15 65/7
prohibitive [2] 25/4 25/14
Project [1] 33/18
properly [1] 45/21
proposal [1] 31/8
prosecute [1] 15/22
prosecuted [1] 16/9
protect [4] 43/11 43/13 58/15 58/21
protecting [1] 61/7
protections [2] 46/15 52/21
proven [1] 48/22
provide [2] 25/4 30/13
provides [1] 32/9
providing [1] 30/11
provision [5] 22/16 45/8 45/14 46/20 57/4
provisions [7] 17/4 17/17 24/22 44/17 48/21

CITY000388

**P**

provisions... [2] 55/11 57/22
public [4] 14/2 29/20 29/20 54/11
punishable [1] 14/8
punishment [1] 15/11
purchase [5] 47/4 48/2 55/21
purchases [1] 47/2
Purpose [2] 42/3 42/9
purposes [3] 18/1 18/4 18/6
put [5] 42/20 52/20 58/14 67/2 73/19
putting [3] 27/16 30/22 55/6

**Q**

qualification [1] 24/6
qualified [3] 19/3 24/2 24/4
querying [1] 62/6
question [13] 18/10 30/11 31/19 37/4 41/8
55/15 57/8 61/5 65/15 67/13 70/2 70/16
70/17
questions [15] 15/4 26/5 32/8 39/17 40/16
41/4 41/21 44/5 49/14 58/4 60/13 60/17
60/20 67/12 75/7
quick [1] 64/20
quickly [1] 42/19
quite [5] 19/8 19/9 20/1 20/1 22/3

**R**

raise [2] 16/11 44/13
raised [5] 41/2 64/7 70/2 72/9 74/9
ran [1] 73/8
range [2] 45/15 57/2
ranges [2] 56/4 56/13
Rather [1] 64/18
reached [1] 22/9
read [5] 39/16 59/3 59/9 59/22 60/6
readers [1] 66/13
readily [1] 56/13
reading [2] 36/14 63/5
real [1] 15/11
really [7] 21/9 40/8 42/19 46/20 50/11 72/6
72/18
reasonable [6] 45/14 48/5 48/19 49/8 52/16
57/10
reasons [2] 53/22 64/1
received [2] 47/16 47/21
recertify [1] 71/22
recognized [2] 25/15 38/9
recognizes [1] 54/14
record [1] 29/20
recreational [1] 54/1
reducing [1] 55/12
Reed [2] 58/5 58/8
refer [2] 20/12 37/11
referred [1] 48/3
regarding [2] 55/16 60/16
regards [1] 42/22
register [12] 18/2 22/17 22/18 23/3 26/16
28/10 31/11 41/10 50/4 63/6 71/4 74/14
registered [15] 19/14 24/17 26/9 26/17 26/22
28/14 29/22 30/7 46/12 61/8 61/12 61/13
61/22 62/8 62/19
registering [3] 26/10 46/5 71/11
registration [15] 27/22 28/7 28/14 33/5
33/10 35/1 36/7 36/11 41/9 41/14 44/19 46/3
69/9 71/18 74/22
registry [6] 26/20 31/6 31/7 46/9 56/22 68/1
regulation [1] 31/2
regulations [4] 63/16 63/22 64/18 65/11
rehabilitated [2] 69/15 69/17
reiterate [1] 63/1
related [4] 32/9 32/10 54/3 55/12
relates [1] 32/14

relative [1] 46/4
remarkable [1] 67/16
remember [1] 68/8
reminded [1] 32/2
renew [1] 28/4
renewed [1] 45/2
rental [1] 25/9
renter's [2] 25/7 25/10
repercussions [1] 26/12
reported [2] 75/13 76/8
Reporter [1] 76/6
request [2] 29/21 30/5
require [6] 32/18 33/5 35/14 36/7 36/11 57/4
required [3] 31/12 63/11 74/14
requirement [3] 25/5 34/1 57/6
requirements [4] 17/11 19/12 54/5 63/19
requiring [1] 43/2 70/6
research [2] 46/21 75/2
residence [2] 61/20 61/22
residing [1] 39/2
respect [1] 27/2
respond [2] 17/19 50/11
responders [4] 27/5 27/18 43/12 61/6
responsibilities [2] 43/8 43/9
responsible [5] 14/4 15/13 15/17 16/6 16/7
rest [1] 22/6
restrictions [4] 42/22 52/17 57/11 57/11
result [2] 47/2 69/6
retired [22] 17/4 17/13 17/17 34/7 34/12
34/21 35/11 35/11 35/16 35/18 35/18 35/19
35/22 36/22 37/2 39/5 39/9 70/4 70/5 70/12
70/20 71/12
review [2] 14/1 14/17
revoke [1] 29/3
revoked [1] 29/14
revokes [1] 29/15
Ricky [1] 47/11
Ridge [1] 47/2
rifle [3] 19/20 56/19 56/20
rifles [5] 18/10 18/14 19/12 20/2 48/11
right [20] 17/7 17/22 18/6 19/11 21/5 21/7
21/18 25/15 34/6 35/13 43/6 52/13 52/21
60/14 60/15 62/14 62/15 67/9 70/18 74/10
rights [1] 43/7
risk [7] 50/13 51/1 52/22 53/7 53/9 53/10
53/19
risks [2] 50/19 53/5
Rogers [1] 47/15
Rose [2] 29/8 40/6
Rugai [2] 15/5 60/18
rules [4] 63/16 63/21 64/17 65/11
rulings [1] 14/22
run [1] 45/20

**S**

safe [3] 54/4 54/16 68/15
safely [1] 54/20
safety [10] 31/3 43/2 49/20 51/22 54/6 58/17
58/20 65/19 66/12 67/4
said [11] 20/16 20/22 21/1 21/16 32/3 39/21
43/20 52/8 55/1 67/17 76/13
sales [1] 46/21
same [2] 28/13 35/10
Sandra [2] 58/5 58/8
satellite [1] 41/16
sausages [1] 32/3
save [1] 60/8
saved [1] 59/15
saw [2] 34/10 47/22
sawed [2] 18/11 48/12
sawed-off [2] 18/11 48/12
say [7] 22/2 50/8 51/16 53/15 65/20 68/15
73/15

saying [8] 19/20 21/4 21/6 34/17 34/21 38/8
58/11 62/17
says [2] 24/14 64/12
scared [1] 60/2
scenario [2] 22/14
school [1] 63/12
screen [1] 63/3
scrutiny [1] 23/17
Second [3] 21/16 21/17 25/15
securing [1] 66/11
security [5] 32/14 32/18 33/3 33/11 33/19
see [13] 20/3 27/15 32/4 32/6 37/13 40/20
43/3 52/4 52/17 57/12 67/1 72/9 74/5
seeks [1] 30/6
seems [3] 48/4 49/18 72/22
seen [1] 25/13
seize [2] 46/14 68/8
seizure [1] 14/14
seizures [1] 68/14
self [6] 18/1 18/4 18/5 21/8 21/19 73/1
self-defense [5] 18/1 18/4 18/5 21/8 21/19
self-enforcing [1] 73/1
seller [2] 47/17 47/22
selling [3] 47/8 47/18 51/19
send [1] 60/11
senseless [1] 44/4
sent [1] 74/19
separately [1] 16/6
serial [1] 46/6
served [1] 72/5
service [1] 27/7
setting [1] 41/13
seventh [3] 59/8 59/12 59/22
several [3] 36/2 59/3 61/13
severe [1] 14/4
sex [1] 31/6
shall [1] 32/10
sharpened [1] 72/12
sheriff [1] 35/18
sheriffs [2] 38/22 70/6
shooting [2] 53/8 53/19
shoots [1] 71/13
short [2] 59/9 60/22
shorthand [2] 76/6 76/9
shot [4] 42/11 47/14 47/14 47/20
shotgun [2] 19/21 48/12
shotguns [6] 18/11 18/11 19/13 20/3 48/11
54/2
should [15] 17/17 36/20 36/22 40/20 42/22
43/17 43/9 45/21 51/20 61/19 66/3 69/10
69/12 69/15 71/17
shouldn't [1] 45/20
shouts [1] 59/18
show [1] 24/4
showing [1] 24/6
shown [1] 46/21
side [2] 16/14 16/17
sides [1] 56/17
sight [3] 37/6 37/10 38/4
signed [1] 65/6
significant [2] 45/9 46/22
silencer [6] 37/9 37/11 37/12 37/13 38/2 38/6
silences [1] 59/19
similar [2] 64/21 72/6
simply [1] 53/11
since [2] 24/9 42/17
sir [4] 69/22 70/15 72/15 75/3
six [1] 14/10
skeptical [2] 63/10 67/5
skills [1] 71/15
slaying [1] 47/11
slightly [1] 73/14
small [1] 65/2

**S**

Smith [1]  47/20
so [64]
solid [2]  57/19 57/20
some [21]  15/11 20/18 22/5 36/10 39/16
40/21 41/16 52/16 55/10 60/20 61/10 62/2
66/12 67/4 67/6 69/7 70/15 71/12 71/13
74/20 75/2
somebody [6]  45/9 46/11 53/11 56/16 69/14
75/1
someone [7]  61/21 63/6 63/19 64/4 67/1 67/3
71/10
someplace [1]  69/13
something [9]  16/5 16/15 29/9 40/11 62/14
65/21 72/1 72/10 73/16
somewhere [1]  47/4
soon [1]  62/4
sorry [2]  37/18 37/20
sort [1]  67/4
Sparta [1]  57/5
speak [3]  26/6 44/2 46/7
speaking [1]  40/8
special [2]  33/18 39/1
specific [1]  63/17
spent [1]  40/6
splendid [1]  40/22
Springfield [3]  23/14 23/15 57/5
staff [2]  26/1 30/22
stand [2]  21/4 40/13
stands [2]  42/18 57/14
Star [1]  48/1
start [1]  66/14
started [1]  20/10
state [13]  14/11 29/15 44/14 44/22 45/1
48/22 54/10 54/13 56/19 58/7 72/8 76/1 76/7
state's [2]  29/13 33/19
States [2]  34/14 36/4
statewide [1]  44/12
statistics [1]  74/20
stats [1]  68/19
stenographic [1]  76/14
steps [1]  24/6
still [9]  17/19 20/11 28/20 35/2 51/11 52/11
59/16 63/15 64/3
stood [1]  54/10
stop [3]  43/15 50/9 50/18
stopped [1]  51/9
storage [3]  54/5 54/16 58/17
store [1]  56/12
stored [1]  54/21
stores [1]  56/10
strategies [2]  43/17 43/21
street [3]  27/8 41/11 74/9
strictly [1]  43/9
strong [1]  30/10
stronger [1]  44/22
stuck [1]  16/15
student [3]  59/2 59/11 59/21
students [3]  58/13 59/4 59/7
subject [3]  30/5 35/4 58/12
submitting [1]  24/7
Subsequent [1]  14/7
substance [1]  52/10
suburbs [2]  56/7 56/8
successfully [1]  53/15
such [1]  31/8
suggestion [1]  31/5
suggestions [2]  26/4 66/19
suicide [5]  53/9 53/19 54/10 54/12 54/16
Superintendent [10]  31/15 35/21 38/16 46/6
60/19 61/1 61/4 64/19 67/15 71/2
Superintendent's [1]  23/2

support [3]  15/1 23/10 42/21
suppress [1]  69/6
Supreme [6]  14/21 21/6 21/16 25/15 42/15
50/1
sure [7]  39/15 41/14 46/6 56/21 64/12 71/20
71/21
surprised [1]  57/15
surrounding [2]  56/7 56/8
suspect [1]  31/17
sustain [1]  34/15
system [8]  27/4 27/12 29/21 61/17 62/5 62/6
62/12 63/2
systems [1]  62/2

**T**

table [1]  49/6
take [7]  20/13 36/17 46/13 59/10 68/13 73/19
74/21
taken [2]  18/6 76/14
taking [1]  49/3
talk [2]  41/15 56/18
talked [5]  27/16 44/17 50/7 61/6 66/2
talking [1]  69/16
team [2]  54/19 55/5
technological [1]  27/17
technology [1]  27/12
teenager [2]  54/17 69/17
teenagers [1]  54/8
teens [1]  63/11
tell [5]  31/9 38/10 38/13 56/16 68/2
telling [2]  22/4 68/7
temporary [1]  54/18
ten [2]  45/2 52/2
term [1]  38/9
terms [5]  22/5 45/4 56/15 57/17 63/21
Terrell [1]  42/10
terrific [1]  72/18
tested [2]  48/21 57/22
testimony [1]  60/16
than [8]  14/6 14/7 14/9 14/10 38/3 44/22
64/18 73/15
thank [42]  15/2 15/3 15/6 16/21 17/1 20/4
20/8 24/21 25/17 25/19 25/22 29/5 30/14
30/17 40/5 41/2 41/6 41/19 41/21 41/22 42/5
44/2 44/6 44/8 48/16 49/2 49/12 49/16 55/14
58/2 58/2 58/5 60/4 60/5 60/9 60/11 60/14
61/2 67/12 75/2 75/6 75/14
that [260]
that's [24]  16/14 19/8 19/9 20/1 20/22 23/13
28/1 28/2 38/19 53/12 55/18 58/18 58/19
60/15 62/3 63/18 64/1 64/11 65/14 69/20
71/7 73/9 73/13 75/1
their [18]  16/7 16/8 17/7 17/19 17/20 18/4
18/7 32/13 32/13 44/4 46/1 50/4 51/1 59/4
59/5 60/6 63/3 71/14
them [19]  18/2 26/10 27/14 32/4 33/5 35/14
36/8 36/9 40/20 42/16 42/20 47/18 61/7 61/9
63/14 66/15 69/4 69/5 70/6
themselves [4]  45/22 48/14 53/16 65/8
then [21]  16/1 20/16 22/1 22/20 23/19 23/21
24/12 24/15 24/19 27/21 28/15 29/6 29/15
34/15 35/12 35/17 37/16 38/15 62/20 67/19
74/20
there [36]  15/10 17/3 22/4 22/20 26/19 28/12
28/18 31/6 32/22 33/7 34/18 36/13 37/16
37/20 40/12 40/20 41/20 43/19 53/7 53/18
56/3 57/16 58/18 60/17 62/1 62/8 62/10 64/3
64/8 66/22 68/12 68/15 73/5 74/8 74/18 75/1
there's [18]  19/19 19/20 26/17 27/22 33/3
33/8 33/14 34/19 37/15 41/15 50/5 53/8 53/9
62/19 66/7 67/19 72/14 74/5
these [13]  17/16 23/11 24/10 40/16 43/7
43/10 43/15 48/20 49/18 55/10 57/21 59/7

68/20
they [45]  15/14 16/7 16/8 16/9 18/22 19/13
27/6 27/19 29/12 29/15 31/11 34/4 34/8 35/3
35/4 39/7 39/12 40/10 41/9 42/14 43/1 45/10
42/1 45/22 46/11 46/12 46/14 46/16 50/8
50/20 50/22 51/21 53/17 54/19 55/22 55/22
56/1 56/18 63/2 63/12 67/2 71/17 71/20
71/21 71/21
they're [12]  17/19 39/4 39/5 39/6 39/8 39/9
39/10 41/13 59/4 71/11 71/14 74/14
things [4]  51/20 53/3 64/21 69/18
think [55]  16/10 19/8 19/9 19/22 22/3 26/4
30/9 30/21 36/5 36/6 36/13 36/19 36/22
38/12 39/21 40/3 41/13 42/18 43/5 45/7 46/1
48/3 48/19 51/16 52/2 52/3 52/15 52/19 54/4
54/9 54/22 55/1 55/11 60/7 62/6 64/7 66/9
66/15 66/20 67/6 67/7 67/17 70/2 70/11 71/7
71/7 71/9 71/18 72/1 72/2 72/3 72/16 73/14
73/21 74/2
third [1]  51/6
this [82]
Thom [3]  44/7 44/10 58/16
thorough [2]  26/20 49/7
thoroughly [1]  57/17
those [40]  15/11 15/17 17/11 18/3 24/16
26/14 26/16 26/22 33/3 33/15 33/22 34/22
46/15 47/6 47/8 49/22 50/2 50/17 51/6 52/7
52/9 52/11 52/12 53/1 53/1 53/1 56/10 59/15
59/16 63/17 64/16 64/20 66/6 67/6 67/11
68/11 69/18 71/13 72/1 75/12
though [5]  22/4 28/13 36/8 52/2 61/8
thought [5]  16/17 22/2 25/13 38/2 64/16
thousand [1]  68/16
thousands [1]  31/18
three [7]  18/16 28/1 28/4 28/16 28/19 45/3
60/1
three-year [3]  28/1 28/16 28/19
thrilled [1]  55/3
through [11]  14/16 22/10 23/2 24/5 32/8
39/16 45/6 47/18 54/11 66/14 74/17
throughout [3]  34/14 36/3 72/8
tie [1]  72/20
tightening [1]  50/16
time [10]  20/17 26/11 39/16 39/20 40/7 47/4
59/10 65/1 67/19 68/5
to's [1]  63/22
Tobacco [1]  51/4
today [2]  16/15 51/10
together [2]  31/1 55/6
told [1]  42/16
Tom [3]  42/2 42/8 44/6
too [2]  59/10 67/5
took [2]  32/5 36/5
top [2]  67/2 69/16
traced [1]  47/1
train [1]  45/22
trained [2]  56/14 57/6
training [14]  24/11 43/3 45/8 45/9 45/10
45/15 45/16 55/16 55/17 55/17 57/2 57/2
71/4 71/22
transcribed [1]  76/14
transcript [1]  76/12
transmitted [1]  62/20
tremendous [2]  30/22 43/8
tried [2]  14/18 17/14
trigger [4]  58/19 65/20 66/10 66/20
true [1]  76/12
try [4]  25/11 40/16 52/9 53/4
trying [2]  50/18 52/16
tune [1]  71/4
tuning [1]  40/21
twelve [3]  18/22 19/4 19/7

CITY000390

**T**

two [2] 18/16 48/15
type [1] 57/3 63/17
types [3] 51/19 66/12 67/7
typically [1] 16/1

**U**

U.S [1] 35/18
ultimately [1] 43/18
umpteen [1] 20/2
un [1] 23/8
un-uniform [1] 23/8
under [13] 14/1 15/22 25/6 29/1 30/5 35/22
36/1 38/17 49/21 55/18 63/6 63/18 70/21
undergone [1] 24/11
understand [3] 40/18 42/15 53/6
understanding [1] 36/16 38/3
unenforceable [1] 72/20
unfair [1] 51/16
unfortunately [3] 50/16 51/3 51/10
uniform [1] 23/8
uniformly [1] 23/9
unintentional [2] 53/8 53/19
United [2] 34/14 36/4
unlicensed [1] 47/17
unlimited [1] 19/16
unreasonable [2] 57/11 71/7
unregistered [2] 26/7 46/14
unsafe [1] 65/1
until [1] 59/18
up [11] 40/20 41/13 43/16 43/21 47/10 52/15
59/10 61/11 67/4 72/12 72/21
update [1] 28/12
updated [1] 28/11
updating [1] 62/12
upon [2] 57/11 62/14
us [10] 16/14 21/3 21/4 22/4 22/13 36/7
36/10 42/16 50/18 66/5
usage [1] 45/11
use [2] 18/4 50/14
used [1] 54/2
uses [1] 38/6
using [1] 15/18
usually [1] 63/9
utilized [1] 32/12
UUW [2] 68/19 68/21

**V**

vague [1] 66/4
valid [2] 24/7 41/2
validated [1] 63/13
various [5] 22/13 22/14 24/10 33/15 66/11
vehicle [1] 25/3
verbally [1] 63/3
verify [1] 64/6
very [14] 16/11 23/9 26/3 30/16 41/2 45/14
57/20 58/3 58/19 58/19 63/10 64/20 69/5
72/6
vested [1] 70/15
Vice [1] 42/9
victims [1] 59/16
viewed [1] 65/1
violating [1] 14/3
violation [2] 14/15 28/17
violence [11] 44/4 44/12 44/14 46/17 49/9
49/22 51/2 51/11 55/13 58/10 59/2
voice [2] 59/2 62/20
voices [2] 59/4 59/6
Von [1] 32/2

**W**

WADLINGTON [2] 76/5 76/19

waive [1] 37/2
waived [1] 34/9
waiving [2] 35/15 37/1
want [20] 18/17 19/13 20/11 26/19 27/3
40/12 42/14 55/16 56/18 59/3 59/9 60/10
61/16 61/18 62/4 62/7 64/2 69/19 72/19 74/8
wanted [3] 22/13 22/15 22/21
wants [3] 29/9 49/19 55/20
was [29] 14/16 16/15 21/12 21/14 22/3 22/8
22/12 22/17 22/20 23/4 23/5 23/12 23/18
25/4 34/10 35/21 36/1 40/10 42/11 45/17
47/12 47/17 58/18 64/16 66/10 69/16 73/12
73/13 74/18
Washington [4] 23/16 23/17 49/4 49/8
wasn't [2] 20/19 38/16
way [2] 38/20 66/10
we [137]
we'd [2] 30/12 64/2
we'll [2] 31/7 61/17
we're [15] 17/18 18/2 26/13 26/21 34/17
34/21 43/18 47/10 51/10 52/8 56/17 62/1
62/3 63/15 67/19
we've [2] 61/5 71/12
weak [1] 60/2
weapon [14] 28/13 28/13 34/18 35/3 36/3
61/22 62/8 66/11 66/17 70/21 71/5 71/11
71/17 71/20
weapons [8] 14/15 17/8 26/16 26/22 30/7
34/13 34/14 64/22
wear [1] 38/11
website [1] 14/1
week [2] 26/2 27/3
weekend [1] 47/15
Weis [1] 38/16
welcome [1] 20/6
well [20] 16/18 23/15 28/22 33/7 38/10 38/12
40/15 41/12 50/5 50/9 51/16 52/19 53/1
62/20 64/15 68/15 69/10 70/14 70/16 72/13
went [1] 70/10
were [10] 15/22 16/8 22/4 22/4 23/5 23/6
33/2 68/21 68/22 75/17
what [35] 17/3 17/15 20/3 20/22 21/11 21/12
21/15 22/12 23/4 23/16 26/9 26/11 26/19
34/6 37/16 37/22 38/5 38/10 38/11 40/13
40/21 45/16 50/22 51/21 52/3 52/17 56/1
61/16 62/14 63/10 66/6 68/19 70/4 70/9
74/21
whatever [2] 32/15 33/12
when [16] 20/10 21/1 24/15 27/19 28/10
33/21 35/10 35/14 45/18 51/18 53/6 54/9
61/11 66/14 71/11 74/18
where [13] 16/2 21/4 22/1 32/5 35/6 40/13
52/3 55/19 55/20 55/22 57/1 71/7 72/3
whether [4] 30/12 49/10 57/18 73/6
which [20] 22/22 23/17 31/1 32/11 32/19
33/2 33/9 33/9 34/12 36/1 38/6 38/7 43/10
45/3 47/12 56/9 63/16 66/12 66/16 75/17
while [4] 37/4 42/11 51/13 56/17
who [19] 22/17 22/21 23/6 30/7 32/2 36/1
42/11 44/3 45/4 46/11 47/13 47/17 47/20
49/19 54/7 54/17 55/20 59/15 70/5
who's [1] 27/7
whose [1] 59/16
why [3] 23/14 56/9 63/12
will [24] 15/1 16/11 21/21 24/13 31/11 40/2
41/9 43/3 43/19 44/18 45/2 45/16 46/16 49/4
50/3 50/6 52/3 52/22 54/6 60/11 64/3 73/4
73/19 75/13
wish [1] 59/13
wishes [1] 14/18
within [10] 18/1 18/3 20/13 22/16 26/14
41/10 51/1 56/5 56/12 69/11
withstand [2] 21/21 57/18

withstood [1] 23/17
won't [3] 45/5 50/9 54/19
wondering [1] 66/5
words [2] 21/20 32/2
work [4] 55/5 60/6 63/1 67/20
working [2] 62/15 74/9
works [1] 44/13
would [59] 20/12 22/18 23/1 24/1 25/5 25/12
25/13 25/22 30/4 31/17 31/18 31/20 32/22
34/8 34/9 35/1 35/2 35/4 35/16 37/16 37/22
38/4 38/12 39/7 46/18 49/1 49/3 55/7 55/7
55/10 55/11 55/22 55/22 56/1 56/16 56/18
57/15 57/18 61/20 62/22 63/2 63/16 63/22
64/1 64/17 64/22 65/3 65/13 66/5 66/11
68/12 70/1 71/1 71/7 72/4 72/10 73/3 73/11
74/21
wounded [1] 53/11
write [1] 63/11
written [3] 38/20 63/6 64/12

**Y**

Yeah [1] 33/8
year [11] 15/10 19/1 19/5 19/7 28/1 28/8
28/16 28/19 47/10 68/8 71/22
years [9] 28/5 36/2 45/2 45/3 52/2 69/12
69/12 69/18 72/6
Yes [13] 16/19 17/6 19/2 19/7 25/2 34/3 37/8
60/21 69/22 71/6 72/15 75/3 75/6
yesterday [1] 66/2
yet [2] 37/12 62/1
you [179]
you'd [1] 36/12
you'll [1] 56/11
you're [9] 20/5 25/10 27/10 35/15 38/8 40/3
69/2 70/20 73/6
you've [6] 26/3 26/4 28/4 39/20 55/6 72/13
young [1] 15/17 50/9 54/7 66/16
your [20] 20/2 21/7 21/8 24/16 26/1 30/21
32/1 32/5 34/18 35/3 37/5 40/8 49/5 49/17
50/12 55/5 58/7 59/10 70/9 71/4
yourself [2] 35/9 48/16
youths [1] 15/11

CITY000391

# EXHIBIT 56

## City Council Committee on Police and Fire
## July 1, 2010

On June 18 and June 29, this Committee held hearings on gun violence and took testimony from experts on possible policies to reduce such violence in our city. These hearings contemplated the impact of the United States Supreme Court's *McDonald* decision on the City's handgun ban, and on future policies the City can enact to address gun violence.

More than 30 people testified at these hearings. We've heard from numerous experts on gun violence, from the Corporation Counsel and other legal experts, from the Superintendent of the Chicago Police Department and other CPD officers, from business owners, from leaders in our faith and community organizations, from those who have lost loved ones to gun violence, and even from some of the plaintiffs in the *McDonald* case.

Among the experts that testified were:

- Robyn Thomas, the Executive Director of Legal Community Against Violence

- David Hemenway, from the Harvard School of Public Health

- Thom Mannard, Executive Director of the Illinois Council Against Handgun Violence

- Tom VandenBerk, President and CEO of the Uhlich Children's Advantage Network

- Mark Walsh, the Executive Director of the Illinois Campaign to Prevent Gun Violence

- Dr. Marie Crandall, from the Trauma Unit at Northwestern Medical Faculty Foundation

- Claude Robinson, the Executive Vice President at the Uhlich Children's Advantage Network

- Annette Holt, from Purpose Over Pain

- Juliet Leftwich, the Legal Director of Legal Community Against Violence, and

- Daniel Webster, Co-Director of the Johns Hopkins Center for Gun Policy and Research

I would also like to acknowledge that one of the experts we invited, Dr. Jens Ludwig, a Professor of Social Service Administration, Law, and Public Policy at the University of Chicago's Crime Lab, was unable to speak but prepared testimony that was distributed to the members of the Committee on June 29. This testimony sets forth Dr. Ludwig's research on the costs of gun violence in Chicago. We've distributed this testimony to the Committee members again today, and I would like to note that it is on the record, and to thank Dr. Ludwig.

During our prior hearings, we also distributed and placed on the record the testimony from several of our other experts, as well as references from their work and numerous other studies on

CITY 000790

1

the causes and effects of gun violence, and recommendations on what we can do to address this problem.

From the evidence that was presented at these hearings, the Committee can make the following findings:

1.  Chicago, like other big cities, has a serious problem of gun violence. The total economic and social costs of gun violence in Chicago are substantial. Gun violence severely impacts Chicago's criminal justice and health care systems. Gun violence foments fear in Chicago communities, which can harm property values and drive residents to flee neighborhoods.

2.  An increase in the number of guns in circulation contributes to an increase in the number of incidents of gun violence. The presence of a gun makes a crime more lethal than it would be if a gun were not present.

3.  Handguns, to an extreme degree, disproportionately contribute to gun violence and death in Chicago.

4.  A strong permitting system for firearm owners is vital. Persons who commit violent crimes or threaten public safety by repeated substance abuse should not be allowed to possess firearms. Fingerprinting is necessary to identify ineligible persons. Public safety requires that firearm owners complete a certified firearms training course that includes both classroom instruction and range training.

5.  A vigorous firearms registration system is necessary. Registration gives law enforcement essential information about firearms ownership, allows first responders to determine in advance whether individuals may have firearms, facilitates the return of lost or stolen firearms to their rightful owners, permits officers to seize unregistered weapons, and permits officers to charge an individual with a crime if he or she is in possession of an unregistered firearm. Requiring owners to confirm registration information annually is necessary to further these ends.

6.  Shootings in the home are a major cause of death, particularly of children and minors. Requiring owners to secure or store their firearms when minors are present, or likely to be present, can reduce the number of accidental and intentional youth firearms injuries, including youth suicides. Further, limiting the number of firearms in the home that may be kept in an operable condition even when no minor is present reduces the risk of firearms injury in the home.

7.  Requiring owners to quickly notify law enforcement of the loss, theft, or destruction of their firearm aides law enforcement in reducing illegal gun trafficking, and in identifying and prosecuting gun traffickers. Requiring owners to report the loss or theft when they know or should have known of the loss or theft enhances these purposes. A notification requirement also assists law enforcement in returning firearms to their lawful owners.

CITY 000791

2

8.   Limiting the number of handguns in circulation is essential to public safety. Limiting registration of handguns to one per person per month will help limit handgun injuries and crimes, as well as illegal handgun trafficking and straw purchasing.

9.   The carrying of firearms in public should be prohibited. In a dense, urban environment like Chicago, public carrying presents a high risk that everyday interpersonal conflicts will result in gun injury. Carrying allows carriers, particularly gang members, to intimidate others. Carrying also increases the threat to law enforcement when responding to calls for assistance.

10.  The public safety requires a ban on assault weapons. Assault weapons are not designed for the purpose of self-defense in the home and are not necessary for that purpose, nor are they designed for sport. They are military-style weapons and pose a particularly dangerous threat to law enforcement, as well as to civilians.

11.  "Junk guns" – cheap, low-quality handguns that are prone to misfire, fire when dropped, or otherwise malfunction, and that are usually easily concealed – are disproportionately associated with criminal misuse, especially by juveniles and young adults. Banning junk guns will reduce accidents and the risk of criminal abuse.

12.  Gun dealers in the City present a risk of firearms flowing quickly into the community and into the hands of criminals, through theft or illegal trafficking, or even through legitimate purchases. Further, there are many federally-licensed gun dealers close to Chicago from which Chicago residents may purchase firearms.

The Committee understands and respects the constitutional rights of Chicago residents. The Committee is mindful of the rulings of the United States Supreme Court, and of the protections conferred by the Second Amendment. The policies that will be recommended by the Committee and contained in the Responsible Gun Ownership Ordinance are in full accord with those rights and protections and are necessary for the ongoing protection of the public welfare and the safety of the residents of Chicago.

CITY 000792

# EXHIBIT 57

# The Washington Times

## Daley introduces strictest handgun ordinance
*Defiant Chicago to act after high court's ownership ruling*

By Don Babwin

-

Associated Press

Thursday, July 1, 2010

CHICAGO | With the city's gun ban certain to be overturned, Mayor Richard Daley on Thursday introduced what city officials say is the strictest handgun ordinance in the United States.

The measure, which draws from ordinances around the country, would ban gun shops in Chicago and prohibit gun owners from stepping outside their homes, even onto their porches or garages, with a handgun.

Mr. Daley announced his ordinance at a park on the city's South Side three days after the U.S. Supreme Court ruled that Americans have a right to own a gun for self-defense anywhere they live. The City Council is expected to vote on it Friday.

"As long as I'm mayor, we will never give up or give in to gun violence that continues to threaten every part of our nation, including Chicago," said Mr. Daley, who was flanked by activists, city officials and the parents of a teenager whose son was fatally shot on a city bus while shielding a friend.

The ordinance, which Mr. Daley urged the City Council to pass, also would :

- Limit the number of handguns residents can register to one per month and prohibit residents from having more than one handgun in operating order at any given time.

- Require residents in homes with children to keep them in lockboxes or equipped with trigger locks.

- Require prospective gun owners to take a four-hour class and one-hour training at a gun range. They would have to leave the city for training because Chicago prohibits new gun ranges and limits the use of existing ranges to police officers. Those restrictions were similar to those in an ordinance passed in Washington, D.C., after the high court struck down its ban two years ago.

- Prohibit people from owning a gun if they were convicted of a violent crime, domestic violence or two or more convictions for driving under the influence of alcohol or drugs. Residents convicted of a gun offense would have to register with the police department.

- Call for the police department to maintain a registry of every handgun owner in the city, with the names and addresses to be made available to police officers, firefighters and other emergency responders.

Those who already have handguns in the city - which has been illegal since the city's ban was approved 28 years ago - would have 90 days to register those weapons, according to the proposed ordinance.

Residents convicted of violating the city's ordinance can face a fine up to $5,000 and be locked up for as long as 90 days for a first offense and a fine of up to $10,000 and as long as six months behind bars for subsequent convictions.

"We've gone farther than anyone else ever has," said Corporation Counsel Mara Georges.

Still, the mayor, whose office is trying to craft an ordinance that will withstand legal challenges, had to back off some provisions he'd hoped to include, including requiring gun owners to insure their weapons and restricting each resident to one handgun.

Miss Georges said it would be expensive for homeowners to include guns on their homeowners' and renters' insurance policies, so such a requirement could be seen as being discriminatory to the city's poorer residents. Limiting the number of handguns could be seen as discriminatory to people who owned weapons before the city's ban went into effect in 1982 or before they moved into the city.

"We can limit the place in which those handguns can be located," she said, before adding a not-so-veiled swipe at the court: "For instance, the Supreme Court does not want them coming into the courthouse."

Still, Mr. Daley indicated that no matter what was included in the ordinance, he expects legal challenges.

"Everybody has a right to sue," he said.

# EXHIBIT 58

## Unofficial Transcription of July 2, 2010 Chicago City Council Meeting

Mayor Daley: [indiscernible] Alderman Beale.

Alderman Beale:

Thank you, Mr. President. So, President, members of the City Council, your committee on police and fire held this meeting on June 28, 2010, which reconvened on June 29th and July 1, 2010, to consider the following ordinances: A direct introduction was an ordinance introduced by the Honorable Richard M. Daley as a request of Corporation Counsel concerning firearm regulation. Having had the same on advisement, your committee on police and fire recommend that your honorable body pass the proposed ordinance transmitted here within. If there are no objections, I move to accept the committee's report by roll-call vote.

Mayor Daley: Does anyone wish to speak on the ordinance? Alderman Rugai.

Alderman Rugai:

Thank you, Mr. President. Just to commend Corporation Counsels and Rose Kelly which are Corporation Counsels [indiscernible] as the person who works tirelessly on this very comprehensive ordinance and just to make note in any ordinance, any comprehensive, one of this magnitude and groundbreaking, we are going to have to be tweaking and coming back, I believe, very quickly to amend the ordinance and heard this morning that in fact we do not have retired peace officers as an exemption in the ordinance, those that are retired and that qualify. So, I just want to make note that we consider that, and I'm sure many other as this is put into action and just to make sure that they have stated on the record so that we clear up any confusion in regards to that. Thank you and congratulations.

Mayor Daley: Alderman Balcer.

Alderman Balcer:

Thank you, Ms. Chairman. I rise and support the resolution or the ordinance and to say this on our country's, our nation's court, it's a great honor to stand here and support this ordinance. People say we're restricting weapons, we are not restricting weapons. I don't know how anyone can say that when as of right now, you can have a number of rifles, a number of shotguns, you can have sawed-off shotguns. You can buy one pistol a month. What is wrong with that? If you can't protect your home with that armament, you shouldn't be here. You shouldn't be here. This is a good ordinance, and it abides by the Constitution. People can defend the inside of their home. No one is seizing your weapons. No one is doing anything. It is a good ordinance, and again as I will say, rifles, shotguns except for sawed-off shotguns, that is enough armament to equip an army. I don't know what else we can do. This is a good ordinance, Mr. Mayor. Thank you.


…the mayor for his hard work in leading the fight to protect our citizens and the City of Chicago. I also want to encourage the residents to make sure that they go out and get the proper training and store

## Unofficial Transcription of July 2, 2010 Chicago City Council Meeting

their weapons properly so that we do not see an increase in accidents – children maiming other children or accidental deaths and the children just finding their parent's handgun.  I pray that our families will go out and get the proper protection then the proper training so that we don't have to see senseless death in our home.  I also would encourage gang bangers who get those guns unlawfully to stop getting them unlawfully.  We're going to increase the penalties to make sure that our communities are safe.  So, I want to thank you, Mr. Mayor, on your effort to keep our communities safe.

Mayor Daley:  Alderman Smith, Eddie.

Alderman Smith:

Thank you, Mr. Mayor.  I appreciate the opportunity to have some comments on this ordinance.  I read with interest the position of Stephen's dissent in this U.S. Supreme Court's decision.  Well, I want to first of all, Mr. Mayor, commend you.  I think you really work hard to try to make this city safe.  You've done a lot of work, but you can't do that by yourself.  The parents have got to get involved in this, and I understand that people want to be safe in their home because the home is the place where you go and just release your sanctuary.  But it's a very dangerous thing to have these guns around because we have kids now who are breaking into homes, just stealing guns, and they are going out in the streets and use a gun that was legally registered and using that gun for illegal purposes.  In some areas of our city, we have these guys who act as if they are [indiscernible], like Doc Holliday and Wyatt Earp, and the shootout guys who are trying to take the town in their own hands.  But we have to do the best we can to make sure that our city is safe.  Now, I understand that the law is a law, but how do you tell people who are afraid, who can't come out of their homes, who are afraid that someone is going to come in and hurt them, how do you tell them that they cannot have a gun?  As dangerous as it is to have a gun, how can you tell them that they can't have it?  We have to do something, and we're going to have to be as close to the law as we possibly can because you cannot legislate criminals.  There're going to be criminals no matter what, and the people who intend to do crime.  They're going to do it in whatever manner they can, they're going to get a gun wherever they can, and they're going to use it, and they are not going to register their gun.  So, we have to do whatever we possibly can to make sure that this city is safe.  So, again, Mr. Mayor, I commend you.  I hope that we can do something that will protect our city and give our people a chance to be safe.  Thank you very much.

Mayor Daley:  Alderman Dowell.

Alderman Dowell:

Yes, thank you, Mr. Mayor.  I, too, want to say that I think this is a great start.  We clearly have a lot of work to do in the city.  I want to thank the Corporation Counsels, the lawyers for putting this ordinance together.  I think it's very well written and very understandable.  I think, however, that there will be some tweaking of this ordinance that will be required after we pass this hopefully today.  A couple of points regarding the requirements for vision; the vision… obviously if you have a driver's license, you have established that you have good vision.  But if you don't have a driver's license and you only have an ID card, I don't think that vision is established in that way, and I think that this was more of a burden on

2

**Unofficial Transcription of July 2, 2010 Chicago City Council Meeting**

people to go out and be able to get vision requirement so that they'll have to pay more money in order to register their firearms. So, that's a comment. I think the $15 application fee should be applied to the $100. We want to encourage people to register if they're going to get a firearm in their home. I assume that the domestic violence is covered under…. I did not attend the…I'm not on the police and fire committee, and I didn't know about the meeting yesterday, so I'm just asking some questions, and I believe domestic violence would be covered under violent crime.

Mayor Daley: Violence, yes.

Dowell: And I just want to question the fingerprinting requirement. I know the argument is probably that, you know, there's ID theft, and this is one way of proving who somebody really is. But I tried to put myself in the shoes of really law-abiding citizens who might fear getting fingerprinted because they just don't trust government. They don't know where those fingerprints are going to go. They don't want to be in any kind of a national database. It may have some impacts on some jobs they're getting in the future, and it might deter people who would register from registering. So, these are just some comments that I have regarding the ordinance, but I think it's a great start, and it's something that we need. Thank you.

Mayor Daley: Alderman Fioretti.

Alderman Fioretti:

Thank you, Mr. President. I, too, want to raise the support of this ordinance. And the question is why are we here today? And obviously—

Mayor Daley: Supreme Court.

Fioretti: You know, those that are law-abiding citizens need to have—

Mayor Daley: We're here because of the Supreme Court.

Fioretti: What?

Mayor Daley: We're here because of the Supreme Court.

Fioretti: We are here because of the Supreme Court. And that's correct. But you know what, the Supreme Court were here because those who are law-abiding citizens, according to what the Supreme Court said, Mr. Mayor—

Mayor Daley: Oh.

Fioretti: Was that they should… well, you know what, you're always making comments on people. And so… you know what, this is a serious—

Mayor Daley: So why are we here?

3

## Unofficial Transcription of July 2, 2010 Chicago City Council Meeting

Fioretti:  This is a serious ordinance.

Mayor Daley:  That's why we're here.

Fioretti:  The reason why we're here—

Mayor Daley:  We're here because of the Supreme Court's decision that we render against the City of Chicago—

Fioretti:  Okay.  Thank you for your clarification, but I will ask the body for the clarification when it's necessary.

Mayor Daley:  Okay.

Fioretti:  And if we read the Supreme Court decision through, it was a 5-4 decision that allowed people to have guns in their homes.  This body, 20 some years ago banned the use of guns in their homes.  But the good people of this city aren't committing the crimes in the streets.  When I asked the people that came up before this body, "What else should we do?"  They said, "Let's get parents involved."  Parental involvement is the necessity.  Parental involvement is what we all need here.  Our schools have to be involved, you know.  I'm glad our Minister who came and gave that opening prayer had his daughter give a piece of that opening prayer because you can see that when our faith face institutions, our parents are involved with our children, we have good communities.  We all know that this ordinance is really looking at how many angels could we put on the head of a pin, how much training is necessary, is it unreasonable, is the ability to have one gun, two guns, some kind of limit on guns in the homes unreasonable.  We all know that this ordinance in these views, in the body of this is clearly a reasonable ordinance.  But people out there had stopped me down the street saying, "Oh no.  We shouldn't have any kind of regulation."  Well, somebody out there will challenge this.  When the law suit was first passed, I thought good intentions, the way the hell is paid by good intentions.  The lead plaintiff in this law suit had serious problems in his community, break-ins in his home, and since then what happen?  Well, he said he is favor of training.  Well, some people don't believe that we should have training.  We have training for security guards, 20 hours.  The State of Illinois says that mere attendance of a safety education training and taking a written test will not guarantee the passing of this course.  We have a lot of work to do.  Since 1993 to 2003, almost a 124,000 guns were confiscated.  We heard yesterday that almost 10,000 guns in the last five years have been confiscated.  We've created a bureaucracy of a handgun registry that we're going to dedicate a lot of resources, but for the good intentions and good reasons.  We need to pass this legislation to conform with the Supreme Court.  But Monday's decision was not a good decision for law-abiding citizens, not only in this city, but in cities across this country.  I am going to pass up a vote in favor of this ordinance, but we know it will be subject to challenges, but those are the challenges we have to take to protect our citizens.  Thank you.

Mayor Daley:  Alderman Solis.

Alderman Solis:

Thank you, Mr. President.  I, too, stand in support of this ordinance because I think that through your leadership, it shows the rest of the country, it shows the citizens of this great city of ours that we don't give up.  That we're going to obey the letter of the law because as Americans, that's where we are about

## Unofficial Transcription of July 2, 2010 Chicago City Council Meeting

here in this country. But at the same time, we realized that the decision that has been made by the Supreme Court is not really in the best interest of our citizens. Today, you know, on the eve of the 4th of July weekend, I've got two events. I've got one at 2 o'clock. It's a peace march that is led by the parents of a young man that was shot last year. Drive-by shooting, he was driving in a van. He's an up and coming young man and artist who was shot by a stupid gangbanger shooting at somebody else. And then at 5 o'clock, I have my annual memorial for Police Officer Brian Strouse, and we do that every year. We do it on the block where he was shot at. There's a little bit memorial, a small memorial that was put there by the residents of that block. And the reason I mentioned these two events is that I know that I'm not unique in doing what I'm doing today. I know that each and everyone of you have similar situations, have peace marches, have families, have members of the police officers, relatives, friends who have been shot in this city. And that should be a strong message to the Supreme Court that what we've go through in this city and other big cities in the country is because there's handguns out there and those handguns are shooting and aiming people. So, Mr. President, I'm here just to thank you and to applaud you on your tenacity because you don't give up. And through your leadership, our council is not going to give up and we're going to continue to figure out ways to protect the citizens of our city. Thank you.

Mayor Daley: Thank you. Alderman Colon.

Alderman Colon:

Thank you, Mr. President. I also want to be associated with this ordinance and I want to thank you for your leadership on this. This is an issue for me that touches deep to the heart because even though I've never served in the military like some of my colleagues here, I did serve on the street, and I did witness young people get shot down by other young people. August 10th 1979, that young person was my brother. And since that time, you know, I understand the rights to bear arms, but I also understand that, you know, parents are crying in their sleep because their loved ones' lives have taken from their homes and where are their rights. And, you know, I know that this is a complicated issue, but we can't give up and I appreciate your leadership in doing everything possible to get the guns off the street. I know that it gets mixed reviews as to whether how effective it is, but we cannot give up on being determine to get rid of the guns, get rid of the bullets, and more importantly as was said earlier today, get rid of the violence. And that's something that starts in the mind and hearts of our citizens. So, thank you very much for leadership on this.

Mayor Daley: Latasha Thomas.

Alderman Latasha Thomas:

Thank you, Mr. President. I should rise and supported this ordinance. This ordinance is responsive. It is responsive to what was dictated to us by the Supreme Court. We don't want people walking around with guns. We don't want people just walking around with guns. Having a massive amount of guns does not work in a large municipality. What do they need all of those guns for? That was our intent back in the '80s when the law was passed. Large municipalities need common sense regulation. That's what we thought we did in the '80s. Okay, but our Supreme Court has now said, "No. That doesn't follow the law, our US Constitution." So, we're following the dictate of our Supreme Court. We are responding to what they have had told us we can and can't do as articulated by our Supreme Court. If the Second Amendment crafted in the 1700, it's still suitable today then we must have regulations and restriction

## Unofficial Transcription of July 2, 2010 Chicago City Council Meeting

on that to keep the massive law-abiding citizen safe, and that's what this ordinance has done. We can keep making exceptions, put points here and points there until we make the law just a massive mash. We can keep doing that. I'm sure they had a similar discussion in the '80s when they put the first law in place. But we need to support this ordinance and follow what our US Supreme Court told us to do, but at the same time, protect our law-abiding citizens, and also for the other restriction penalties on those who've decided [IB] to follow the law. These are the reasons why I am supporting this ordinance.

Mayor Daley: Alderman Maldonado.

Alderman Maldonado:

Thank you, Mr. President. As you said, we're here today because of the decision of the Supreme Court last Monday. We're here today because of their poor judgment in my estimation of their understanding of how life is in large urban settings and cities like the City of Chicago. I don't know how they can assume and say that we would be safer by allowing individuals, even if they are law-abiding citizens by owning and possessing firearms in their homes and in the City of Chicago. We are here because we need now to jump, "Oops, let's try to restrict those who are going to be able to possess a firearm in the City of Chicago by restricting through this ordinance those that we know that should not own a firearm in their homes". So, I hope that we can just pass this ordinance as soon as possible and I hope that we can go back to the days in which we can reenact the ordinance that will expire on July 31st.

Mayor Daley: Alderman Dixon:

Alderman Dixon:

President, while I am not a lawyer, I consider the blatant misreading of what seems to be clear constitutional language that well regulated militia and not individuals have the right to a gun. Under the current Chicago law, nearly 3000 public school students were murdered, over 300 wounded, yet the Supreme Court makes it law that people can just go buy a gun. I want to thank you and Corporation Counsel for requesting this ordinance. Thank you for your effort. I think that without it, it is just unimaginable, but I also would like to end by saying, "No Supreme Court judge can live in my community and have come to same conclusion they did a couple of days ago. Thank you very much for your work."

Mayor Daley: Alderman Smith:

Alderman Smith:

Thank you Mr. Mayor. Cities are where21.05 reality meets theory every day and first of all for surfacing problems and trying to come up with solutions that meets the times and the demands of the times. As I see it, the constitution guaranteed the right to bear arms for militia, but you know they guaranteed the right to carry around musket not Uzis. This really breaks my heart today that the City of Chicago is the being forced into this position. I thank everyone who has worked to try to create as restrictive a tool as possible and to try to create some accountability here, but we all know darn well that anyone who wants a gun is going to get it. My son was held up by two guys with two guns just a couple of months

**Unofficial Transcription of July 2, 2010 Chicago City Council Meeting**

ago in my neighborhood. Yes, it happens, you know, I'm on the Lake Front, and if he had left the house thinking that he was safer carrying a weapon, what would have happened? He didn't carry a weapon. That is not how our household is and so he did what we tell him to do when he was a kid which is anytime anybody approaches you with a weapon, you say, "Take whatever you want, whatever you want." But if he had thought that he needed to carry a gun in order to walk to the [IB], I can only imagine what might have taken place. So, this is very serious. I think that what has been thrust upon us is very costly, unfair, and very dangerous, and again, I thank you all in the City of Chicago for doing your best to try to equip us to deal with this.

Mayor Daly: Alderman Moore.

Alderman Moore:

Thank you, Mr. President and Mr. Mayor. We've disagreed on issues from time to time, but today I stand in full support of your efforts to bring sanity to our gun laws and to speak truth to those who engage in this overheated rhetoric and this thoughtless belief that somehow having more guns in society makes us safer. Now, there has been a lot of discussion about the gang violence and the fact that so much of that is caused by the proliferation of guns in society that less attention has been paid to the violence that occurs in our own homes. Children who pick up a gun that's left carelessly in the home and play with it and shoot their brother or sister, or playmate or themselves. Family members who get in to a passionate argument and during the heat of the argument, they grab a gun and shoot it at the person they're arguing with, maiming or perhaps killing that person and then almost immediately regret what they did and yet you can't take back that bullet. You can't bring that person back to life. These measures are designed to ensure that if we have these dangerous instruments in our homes that the people have them know how to handle them, know how to keep them safe, know to keep safe from harms way. I can't imagine why anyone would oppose these reasonable regulations, these reasonable restrictions, but I know there will be those who believe that this right to bear arms is unrestricted and that anyone could have any weapon anywhere at all. Fact is that for every intruder who was stopped by someone who has a handgun in their home, there are at least 9 or 10 family members who are killed by a handgun because of accidents or because of family disagreements that occur in the heat of passion. So, I support this ordinance. I will stand with you in defending this ordinance against the inevitable attacks from the far right-wing and I hope that wisdom and rationality prevails in our court system and that these laws will be upheld.

Mayor Daley: Alderman Cochran.

Alderman Cochran:

Thank you, Mr. President. I stand in support of all the work and ideas that you have had in this area. There are certain areas that are a real concern to me and some of those areas that I am concerned about is the lethal use of force and people getting guns in their homes and not understanding when and what the use of deadly force means. That is the biggest concern that I have. Because you get a gun in your home, it does not necessarily mean that you are entitled to just use the gun whenever you want to.

## Unofficial Transcription of July 2, 2010 Chicago City Council Meeting

Shooting through a door, shooting at someone who is running away from you because you have a gun in your home does not justify you using that gun. If that gun is used in that type of situation, there we have a family, an individual who thought because they had a gun in their home, who is now subject to criminal prosecution and all kinds of problems and legal expenses that are associated with that. So, the education of people who are going to be gun owners is one of the most important things in this ordinance that I see. It is not designated as to what type of education, what or where it will be done, who will responsible for it, the cost associated with it, and that's another area that I am concerned about is that and that is the cost. The cost associated with the education, the cost associated with the training, the cost associated with the Chicago firearms permit. I'm interested in firearms being registered, Mr. President. I'm interested in those people who are in challenge communities who have the biggest problems associated with criminal activity being able to protect themselves in their home and I think registration of those firearms would be easier to accomplish if we just think about a moratorium on the cost associated with that if we can, and bring it in. And I know that there is a cost associated with all of the administrative costs involved in that, but we want to try and embrace, and in my opinion, embrace those people who want to own gun, who we know will have them and who we know that we can reach out for and try and assist them in making the decisions that they need to. My colleague, Alderman Rugai, more certainly made a comment that I am most interested in and that's related to the retired police officers provisions that are not in here. I think that's real important, you know, one of the things that President Bush allowed us to do with retired police officers was to be able to carry their guns across the country, with the hopes that we would be able to respond and continue to be law enforcement officers, then I think that we have to look at that. And the last thing I would like to comment on as we talk to the public and the public reads this is that this is just the beginning. We will be re-looking at this, hearing what you have to say, but it is important for us to put these provisions in place right now, and those concerns that you might have, let us know. We'll advocate for them. Alderman Bill, chairman Bill, will be convening meetings on a monthly basis and police and fire and we will be advocated on behalf of our community as best as we can, but at this point, our advocation on behalf of our community is about safety. It is about supporting City of Chicago in being a safe place and also providing the protection that those people who think that they should have a firearm should have. Thank you, Mr. President.

Mayor Daley: Alderman Suarez:

Alderman Suarez:

Mr. President, I wasn't going to speak today but I feel that, first of all, I want to congratulate you on your struggle to make Chicago a safer place to live. I read the ordinance and I hear a lot of comments for people who have some concerns and understandable, but remember that when you deal with law, it is not fixed. We could always come back and try to correct something that most people feel is not working in their best behalf. As I listened to the news day in and day out and we talked about making our community safer and we keep counting on the number of young people that lose their lives day in and day out, on senseless killings, because these young people that at time, they think they know how to solve a problem is by using violence. They grab a weapon and it's easy to shoot somebody but they

8

## Unofficial Transcription of July 2, 2010 Chicago City Council Meeting

don't realize what the consequences are in the long term. Is this a perfect ordinance? Probably not but it is a great start and we need to make sure that Chicago is a safe city to live in. Do we have problems? Yes, we do but I also asked people as lot of folks talked about guns. Why don't we get together and start talking about the – breaking the code of silence out in the community, of making sure that people get involved in our communities because everything is left off to the government. Government cannot solve all the problems. We have to work together as a society. This is a great start. As I've said, it's not perfect but we can always come back and make corrections in the long run. I congratulation you chairman, and I think that Chicago is moving forward to making our city still a safe city even though we have had some interesting weekends in the last few weeks, I still believe that our city is a great city and with commitment on the people that our elected at the municipal level, county and state, we are going together to make Chicago a safer place and make sure that gun owners make sense. Thank you.


Alderman Freddrenna M. Lyle:

I think that 40 to 50 years from now, students are going to study United States history just in shock and awe, and they are going to be amazed that in a country that told itself to be of the leader of the free nation that we have such a reckless, love affair with guns that we racked up the number of children that were murdered each and every year. They are going to look at Canada. They are going to look at the United States. They are going to look at Britain and they are going say what was wrong with those people who lived in the United States. Do they really watch TV and believed that John Wayne was real. Was this some sort of cowboy mentality that made them feel they have this envi – enviable and viable right to walk around packed and loaded, that they fit millions of dollars litigating and discussing whether or not people would have the right to carry mini mass weapons of destruction. They are going to wonder how it is that the highest court of the country that was, in fact, "The leader of the free world," would fail to – and could fail and did fail time and time again when the question arose to understand the definition of militia versus individual. They are going to understand because they teach it in law school that you read the intent. You look at the era. You look at the time. You look at the discussion and the debate that surrounds the pending legislation, and they're going to try to figure out how could they apply the principles from that era when people were arming themselves against the oppression of a foreign "government", trying to overthrow a government the right to be armed and militia was to protect themselves from the government and say in the year 2010 that, "People have the right to have 20 and 30 and 40 guns to protect themselves," from who? They are going to wonder what madness overtook this country but that's what we find ourselves, and we have to play the hand that we've been dealt. We have a…. we understand that we are living this even flow of government and political regime from republicans to the democrats and we see the shift in the pendulum that is taking place on the Supreme Court. We see what the people to be serious about what happens every four years in November at the election box just to a country 20 and 30 and 40 years down the line. We see actually some of us see what… for wishing of those things that we warn people about when we are allowing republicans to pack the court with right wing conservative ideologies, who at every opportunity rally against judicial activism and yet, they are rewriting the entire America as we know it and we understand

## Unofficial Transcription of July 2, 2010 Chicago City Council Meeting

that politics regardless of the attempt of imperfect man to create a perfect document, does move into and shipped into the courts and thus become law and that's where we find ourselves. We find ourselves with a court that is – that used to be occupied by just literary legal giants, who now uses this opportunity to write an opinion and take a slap at the leaders of the City of Chicago. My colleague talked about somebody – none of them living in her neighborhood, they wouldn't step foot in your neighborhood. In fact, as one – I was at my family reunion in Denver until 6 o'clock this morning, and last night somebody said to me that, "She is convinced that [IB] didn't even have a voice, 'coz she is just out of it, because she has been on the bench", so, it's like [IB]. And, so that's where we find ourselves and – but we are a government of laws. And so, eventhough we believe many of us, but it's not just in this body, it's across America. There are people who are committed to the proposition that militia does not mean individual and I'm sure they are equally as many on the other side. I don't know if the numbers are equal, because I know that the other side is well funded and our side is not, our side is just individuals who didn't band together and get corporate money by the gun manufacturers to support our cause to limit them. The other side did, so that's the way it worked. But, that's the law and we have to obey it, just as when we wrote the laws and when Alderman Burke introduced the ordinance 20 years ago by gun registration. It was the law and people were supposed to obey that, they didn't. We understand all of those things. We understand that what we do today there are going to be some people out there who won't obey four weeks from now and two years from now. And we also understand that it is ever evolving, that there will be changes, and there would be modifications because that is what we do in this body. It is not a perfect bill. Personally, I still believe that if a young move cross the fence, who may not have enough money to buy runner shorts and has enough money to buy a gun, and her son shoots off the window to my garage, I should be able to sue him on insurance policy that I believe. You know, it could – the gun just cost a couple of hundred dollars. She got money to get what she wants, to have a gun in her house, have insurance that when they do damage my property I can go after them, not just the homeowners because many of our communities, the runners outnumber the homeowners. But that's just me. And so, you know, you take the best you can and work with what you have and that is our job. We believe from an adult, from evidence that was presented to us by experts a couple of weeks ago, and whenever we discussed this and the people bother to read as opposed to getting the news from the tea party time. They would understand and see that there is more harm done by proliferation of handguns than there is benefit, but that's okay. And, so we would – if it is an attempt to crash the document that takes us to the next time when we can further try to work madness. Put madness into some sort of an order, and there are going to be people who don't like it because there are people who don't like anything, there are people who don't like everything, there are people who don't understand, there are people who said we don't even need a City Council, I don't know what's the form of government it is that they would want. You know, but we can't deal with all of those naysayers. We have to do what we can on any given day, to try to do the best we can for the people of the City of Chicago. And, I'm convinced that that's what we are doing here today. I came back because I did not want the people in my community believe that I thought their safety was insignificant. I support the ordinance. I think we can continue to shape it and move it and make it better, but it is important that we continue to send signals to our constituent – that we believe that there is a better way and having 24 handguns is not a part of that better way. That's not self defense of your house.

**Unofficial Transcription of July 2, 2010 Chicago City Council Meeting**

That's right you know. That's insanity and I'm sure that I'm going to get emails. I've already - people are already saying that I'm a part of the tyrannical forces. I'm the overseer trying to protect the poor black people from having guns in their homes. And, go for it, you know, they can, doesn't it matter to me. I know – you don't need 24 guns to protect yourself. And, I have a cousin who lost his life because of his brother, set of twins, in Michigan.   His twin was cleaning the gun, the shotgun, before they went hunting.  I've grew up in a household with guns.  My grandfather was a hunter.  There were shotguns and rifles and things all constantly in the house.  Nobody ever went out and shot some two-year-old in the head with any of them.  They were used for hunting and there is a distinct difference, handguns aren't used for hunting anything other than people.  So, Mr. Mayor, I went to the airport at 4:30 this morning so I could come back here and vote in support this ordinance.

Mayor Daley:  Alderman Mitts.

Alderman Emma Mitts:

Thank you, Mr. President.   I, too, rise to support a resolution that all my life I believe in the Ten Commandments where it says, "Thou shall not kill."  And I believe that even today, thou shall not kill whether it be with a handgun or any type of weapon, no one should take another person life.   But unfortunately, that's not the real world we're living in.  There are peoples who do take lives from one another.   I'm reminded of a little girl in my work whose family left a gun on a mattress ended up shooting herself, and of course there were [IB].  I'm reminded of incident in a war where a young man just got shot by friends over girlfriend and of course, that was a family tragedy.  I'm reminded of all the ones who I hear day in and day out that we see who have lost their lives to senseless gun violence including their whole purpose over pain, all of the families and that is a hurting thing to lose a loved one, and I'm reminded of back some years ago in –and my colleague just gave me the date as well.  There was a judge got killed once and Alderman Allen told me it was back in 1982, a Judge Gentile that got killed – a lawyer and a judge in the courtroom in a divorce case.  And I'm reminded of every time I sit here what could happen if someone were to come in here to shoot and we lose our life.  But that's on another person.  We have to have faith and we have to believe that gun is not the answer.  I don't care who rules it.  It's not the answer but peace and love can be an answer, and the kids need to be taught that, but unfortunate since we have to have a law.  I would rather have a law than no law.  So, I'm here today in support of this ordinance that we continue to move forward and we never give up.  We don't stop the fight.  We still don't need guns in our home.  We don't need guns to protect ourselves.  We have been protected each and everyday our lives.  I've been going on with my life.  Fifty five years old, I don't have a gun, never had one, don't need now, I'm walking by faith but not by sight and hope that I can continually have fifty five more years.  Thank you.

Mayor Daley:  Alderman Hairston.

Alderman Leslie Hairston:

Thank you, Mr. President, members of the City Council.  I, too, rise in support of this ordinance and it's not only very troubling that we have to be here today to do this.  It's very troubling the message that it

## Unofficial Transcription of July 2, 2010 Chicago City Council Meeting

is sending. The trouble, the message that the Supreme Court is sending, and I think that's the same message that the gang bangers are sending is that a life is not valuable, and that truly hurts my soul here. I have to say it. I think the Supreme Court is wrong just like they've been wrong before. They were wrong about segregation. They were wrong about the right to vote, and I think as Alderman Lyle said when we look back years – some years ahead, we will see that they were wrong about this as well. We understand what the Constitution says, but we're talking about human life here. And I'm not really sure what the statistics are, but over the weekends when the newspapers and the media are reporting, 'shooting on the Southside', 'shooting on the Westside', we don't know whether those are self-inflicted gun wound. And maybe if we start keeping those statistics, we will be understand how – be able to understand how dangerous this is because a lot of the injuries are kids playing with guns or somebody getting a hold of a gun and it accidentally going off for, you know, that somebody leaving a gun out then somebody picking it up. We've got that type of shooting, but then we also have the ones where they're sitting out just picking off people on the street where everybody else in the neighborhood has a gun, where parents have to die to cover their child to make sure that they are not hit by the stray bullet. I think that it's a good thing that we try to do training, but I think that we have to be realistic about this, is that the people that need to register their weapons will not. And even though the good law-abiding citizens will get the training, I don't know if that training will be sufficient against someone who is untrained. And so, I think we will still have the innocent people that are going to have blood shed because of this. I think that we've got to find other ways to deal with this. We've got to find ways to deal with our youth and their anger and solving things through violence. We have got to find a way to do that. And I guess other than what we're doing here in this body today, I think I have to look to the media over there and ask you all for all of the things you learned in journalism school and everywhere else. This is not the time to have fun with this. This is a very serious message that is going out and it's up to you all to be the messenger. It is true that you have the ability to shape the message and how this message gets out to the City of Chicago. And I ask you to please do that, to please do that because otherwise nothing good can come from this. So, Mr. President, members of the City Council, I will too will be working to see that we can do the best possible thing that we can to try to keep people safe. Thank you.

Mayor Daley: Alderman Cardenas.

Alderman Cardenas:

Thank you, Mr. President. I fully agree with my colleagues in everything that has been said. The 5-4 decision of the Supreme Court is not unanimous. It is, in fact, we are divided. I guess you can it, "A Tale of Two Worlds" that those who lived perhaps in rural areas where they're mile apart from their neighbors than those in the cities like Chicago that would live right next

**Unofficial Transcription of July 2, 2010 Chicago City Council Meeting**

door, a couple of feet away from each other and some signs right on top of each other. Those that had served in the military and I served from the Navy understand and were trained to respect weapons. Respect the weapons that were given to us. We were told how to secure them. We were trained in order to find the weapon locker in case of an emergency. So, in fact, the army has probably the biggest restriction on guns today, and they are the ones that have the most amount of guns in the world. If the founding fathers were here today, they would see it differently. I'm not sure that they envisioned 50 states, 300 million people. I don't think that they envisioned technology or social breakdown in cities like Chicago and many across the country in the world. And if you look at instability across the world, you will see that it is still the massive weapons on the streets whether it's in Africa, whether it's in South America, or any part of Europe. I think the fact that we restrict in this manner methodically to save lives, to affect a problem that by on the one hand clearly restricts us from bringing any weapons. Our Constitution sets it. We restrict our Constitution. But we're also must, as people that represent our constituents and as leaders of our communities, we must also have and we have an awesome responsibility as you say to protect people as well in general from people that cannot abide by our laws. In essence, our enemy of today is ignorance. It is the senseless as respect for human life. So, that's what we'll deal here today, on how to manage that. And, that's our responsibility. And, Mayor, that's your responsibility in this city to set the tone for the rules that we shall abide by, and our responsibility is to look at and analyze it and see the best way forward. And, I think that for us in the city, we must protect our citizens and I for one agree that this is the great way to do it. If there's going to be problems with it, we'll work through them. We'll make further restrictions. We'll cut back on restrictions. But, at the end of the day, at the end of the day, guns must be off the streets. Thank you.

Mr. President:

Alderman Howard B. Brookins, Jr.

Alderman Brookins:

Thank you, Mr. President. Clearly, by definition, a criminal is going to break the law and there's nothing in here that's going to prevent someone who is hell bent on committing a crime from following what is in this paper. I understand that we have to legislate for the rule and not the exception to the rule, and for that, I want to commend you and your staff for changing and tweaking this ordinance to make it more palatable. I understand that one of the exceptions to the rule is people who have guns just like the late Senator Fred Smith. When I was a young man in college and sent to his home to deliver some papers to Senator Margaret Smith, Senator Fred Smith came at the door with this pistol in his hand. And, I went back and asked by dad and Senator Margaret Smith, "Why? What's going on here?" And, they explained to me that he had been robbed several times. He had bruises, etc. And so, now, he doesn't

## Unofficial Transcription of July 2, 2010 Chicago City Council Meeting

come to the door without his gun in his hand. I understand that that is the exception. I also understand the exception is the 80-year-old man who was reported in the paper who had been robbed one too many times and went out and bought a gun for his personal protection. And, when the robbers came and get him for the final time, he has something for them. I understand that that is the exception and we have to legislate for the rule and not the exception. There are some things that I find in the statute just a little bit unpalatable and that would be registration of gun offenders. And, the reason is that certain discretions are given based on community to community, from police officers to police officer. And, what I mean by that? I have explained and people were like, "Howard, you're crazy! Why would you even say something like that?" Because a UUW or unlawful use of a weapon while it sounds like it is something magical and something big, but the mere possession of a handgun not on your own land or place of abode is an unlawful use of a weapon. And, I have given them the example that if my wife called and says, "Honey, I'm coming home but I saw some guys standing in the alley and could you please come and meet me in the alley." If I step off to apron of my garage, that is now a UUW. Of which if I was arrested, you would have to register and would have a felony background. Now, based on county to county, in DuPage county or back in the old days when they had a gun court at 11th and State, , you would get away with and C&D their weapon, confiscate and destroy, and a fine. Nowadays, in Cook County, the State Attorneys are asking for mandatory jail time. In DuPage County, you may get a slap on the wrist. It just really depends on where you are. And so, with respect to that, I think that the stigma of being adjudicated and having to register with this registry the same effect as convicted sex offenders may be a little much. The second thing is that I've always talked about our city hemorrhaging money. And, I know that there is not probably one of the 50 of us that would volunteer to have a gun store within our board. However, I think that maybe we should also urge Springfield, the way we do with cars, the way we do with big appliances is to: One, pass back the tax to those people who live in the City of Chicago to our city. Seeing that we are going to have the burden of having these guns within our community and that maybe we should also raise the taxes on gun ban and have a Chicago gun tax on guns. Two, pay for this registration and all of these other things that are out there by putting the burden on our communities of having so many guns out there in our society. And, while Springfield may say, "Yeah, we'll raise a tax on guns and keep it ourselves." I think that clearly this has put us in an untenable position. That and understanding that we have to legislate by rule, I think that this ordinance is much better than it was. Thank you.

Alderman Lona Lane:

Thank you, Mr. President. I also rise in support of this ordinance. In my ward and in the City of Chicago, too many innocent children have been killed. I don't feel that any parent should have to bury their child. I feel that we need to work a little harder on the rules that exist especially between the children ages 13 to 17 years that are caught with a weapon. We need to work with our Federal and State Government, and try to give some kind of a new ruling regarding weapon. And also, I feel that the children that are caught with these guns that their parents somehow should be held accountable because they are underaged. I want to thank Corporation Council, Rose Kelly, and I've to thank all of you that work so diligently on adapting this rule. Thank you.

## Unofficial Transcription of July 2, 2010 Chicago City Council Meeting

Alderman Proco Joe Moreno:

Thank you, Mr. President. I also rise in support and thankful to the Corporation Council for your hard work. As the new alderman, being here for three months, I have to go back when I was a community organizer. And as a broader discussion today obviously, and what's confusing to me regarding the gun issue is that in any meeting that I've had with principals in high schools about youth violence and gang violence, we talked about solutions, we have reenact this solutions, I haven't heard from one principal or one teacher saying, "Well, if we lifted the gun ban, we'd a better chance of having less youth violence in my school." When I was in a community organization, the homeless organization, we are trying to bring in folks that didn't want to come in to the shelter. We had some issues about violence and guns and we were discussing how we are going to get rid of those, how we are going to deal with that segment of our population. I don't remember once, any of those organizers both professionals and PhDs talking about that the need to get rid of Chicago's gun ban, so we could have a better chance at helping folks come in and having less violence. So, although I rise in support and admiration of this ordinance, I still feel that when we have discussions about afterschool programs and the funding for those and we have discussions – we had the charter school here the other day, the progress that I had looking at those young men, when we have discussions about having our parks programs well extended and having our students there, that's what's going to curb the violence in Chicago, not taking away a gun ban or putting in a new ordinance. Those are the kinds of measures that I'm going to work hard on with my esteemed colleagues and learn from; to take that's important what we're doing today to those issues so that we genuinely, genuinely curve youth violence and gang violence and gun violence. But, again, I rise in support of this ordinance. I look forward to working on those measures that are asked not more important what we're doing today. Thank you, Mr. President.

Mayor Daley: Thank you. Alderman Preckwinkle?

Alderman Toni Preckwinkle:

Thank you very much, Mr. President. Everybody in this room knows that I'm a teacher. And early in my teaching career, one of my students was killed in what we come to call a drive-by. This is early 1970s. She just happened to be on her front porch when someone drove by and kind of sprayed the vicinity, and she was killed, a junior in high school. I subsequently got involved in the Illinois Council Against Handgun Violence, an organization that is devoted to reducing the number of handguns in our communities and share with you, Mr. President, the concern that the proliferation of guns in our society has contributed to the terrible violence that we see in so many of our community. You know, I find it hard to believe that the Supreme Court justices that voted to strike our handgun laws has spent any time in the communities that many of us represent. There's no way...if they knew the violence particularly our young people face everyday, there's no way that they could decide that this was a reasonable course of action. I commend the Law Department for their good work. And I wish frankly that we weren't in this position, that we were in the position where we're struggling to figure out a way in which we can limit the guns on our streets and still meet the test that the Supreme Court has set for us. It seems to me that no one other than a police officer, an officer of the law of one kind or another,

## Unofficial Transcription of July 2, 2010 Chicago City Council Meeting

really needs a handgun. As my colleague, Alderman Lyle, said, "I grew up in a house where my father was a hunter. There were five guns and rifles in the house." No, not handguns because as she points out, you hunt people with handguns, you don't hunt deer, squirrels, or whatever. And as I said, I deeply regret that we're in a position where we have to struggle to figure out how to devise a law that meets what I think is an unreasonable test set before us by the Supreme Court.

Mayor Daley: [indiscernible] Alderman Burke?

Alderman Edward M. Burke:

Well, Mr. President, let me quote from the New York Times editorial that was published after the Supreme Court's decision was rendered. In referring to mayors and lawmakers, the New York Times said, "They should not be intimidated by the theoretical debate that has now concluded at the court or the relentless stream of lawsuits sure to follow from the gun lobby that will undoubtedly keep pressing to overturn any and all restrictions. Officials will have to press back even harder. Too many lives are at stake." And that, Mr. President, and ladies and gentlemen of the council, is what we were doing this morning. We're pressing back even harder. I have to confess that back in 1982 when I was the chair of the Police Committee, that.... This ordinance exhibited too much ardor for the ban, and we, perhaps, should have been more sensitive to weighing the rights of legitimate citizens to have weapons. I agree with most of the arguments that I've heard today. And studies have determined that the single best home defense weapon, if one chooses to have a weapon, is a double-barrel shotgun. It's pretty hard to miss. It's pretty easy to check. Flip it open to see whether or not it's loaded. And when that bad guys come through your door, he's going to look at that twice. I have to respectfully, Mr. President, and ladies and gentlemen, disagree with my good friend from the 21st Ward. I think the provision in this ordinance, which now mandates registration of gun offender, is a step in the right direction. It's done in New York City. It's done in Baltimore. And now for the very first time within 90 days, it's going to be the law of the city of Chicago. If somebody lives two doors away from you, don't you have an interest in knowing whether or not that person was convicted of an aggravated battery with a gun? If somebody wants to come and take your daughter out on a date, don't you have a legitimate interest in knowing whether or not that person who's going to come into your house and take your child out on a date has been convicted of an aggravated battery with a gun? Don't the policemen who are rolling up to that house in your neighborhood have the right to know whether or not the person in that house was convicted of a UUW or an aggravated battery with a gun? Doesn't that cop out there that stopping a car at 2 a.m. in the morning in a dark alley and runs their plate – doesn't that cop have a right to know that the person to whom that license is registered was convicted of a gun offense? Don't those kinds of registrations work for sex offenders? Of course, they do. And now they're going to work for the good law-abiding citizens and the cops that are out there trying to do a good job for gun offenders. There are tens of thousands of these offenders that are now going to have to register with the department of police and the database is going to be available. And if they don't register, they're going to be locked up by the Chicago police. And all the gang-bangers out there that have been convicted of gang offenses who think that they can flaw this law are going to have to pay the price. They're going to be locked up. It's one more tool that the cops are going to have. If you don't register as a gun offender, you're going

**Unofficial Transcription of July 2, 2010 Chicago City Council Meeting**

to the station, you're going to be prosecuted, and each day that you don't register is a separate offense. If you don't register for 365 days, that's 365 offenses. This is more than just window dressing. And do you know, Mr. President, and ladies and gentlemen of the council, that the list of those people who have been arrested for murders in Chicago in the year 2009, 93.3% of them has a record with the Chicago Police Department. And in all likelihood of that 93%, most of them have a record for a gun offense. So, this was going to, I believe the unprecedented, is going to give the police department another tool with which to work. And as far as the provisions in this ordinance, it brings together all of these different elements that we've worked on overall these years…gun locks. Alderman Rugai and I sponsored a gun lock ordinance here in 1997, and this council passed it, and this mayor signed it. Is there anything wrong without out requiring a gun lock out of a weapon in a house to secure it or to require it to be locked in a box or kept away from those who would use it improperly or a child that might get their hands on them, of course not. This is reasonable regulation. If we require somebody to take a test to get a driver's license, is it unreasonable to make them get some kind of basic training and firearm safety before they can qualify to own a gun in Chicago, of course not. This is reasonable regulation. And I suggest, according to the research done by the very able Corporation Counsel and the law department staff, it's a reasonable regulation that the Supreme Court has permitted. Now, we can disagree with the Supreme Court all we want, but since last week when they ruled this is the law and we're going to have to foul it. So, I suggest, Mr. President, this is a very, very comprehensive and intelligent approach to a very emotional issues. As Alderman Lyle points out when social historians look back at the 20th and 21st centuries, they're going to see that the debate in America over abortion, over guns, over gays is hard to understand. But the Republicans led by Karl Rove did a pretty good job, didn't they? Of making these issues so important in the national debate to the extent, Mr. President, that as we stand here today, Illinois and Wisconsin are the only states in the union that do not have a concealed carry license provision. Only two states in the entire nation don't have concealed carry. Maybe we're like dinosaurs here in Illinois and Wisconsin, but maybe we're more intelligent than all of those other states. But the fact is this is a reasonable approach. It's mandated by what the law is right now. It's going to be good for the people of Chicago and we can still regulate and pass laws for the health and wealth for the people of the City of Chicago and that's what we're doing in this ordinance. Thank you, Mr. President.


Mayor Daley: Alderman Beale.

Alderman Beale:

Thank you, Mr. President. If no one else wishes to be heard, I renew my motion for a roll call vote.

Mayor Daley: Clerk, call the roll please.

17

**Unofficial Transcription of July 2, 2010 Chicago City Council Meeting**

Clerk Miguel Del Valle:  Alderman Moreno.

Alderman Moreno:  Aye.

Clerk Miguel Del Valle:  Alderman Fioretti.

Alderman Fioretti:  Aye.

Clerk Miguel Del Valle:  Alderman Dowell.

Alderman Dowell:  Aye.

Clerk Miguel Del Valle:  Alderman Preckwinkle.

Alderman Preckwinkle:  Aye.

Clerk Miguel Del Valle:  Alderman Hairston.

Alderman Hairston:  Aye.

Clerk Miguel Del Valle:  Alderman Lyle.

Alderman Lyle:  Aye.

Clerk Miguel Del Valle:  Alderman Jackson.

Alderman Jackson:  Aye.

Clerk Miguel Del Valle:  Alderman Harris.

Alderman Harris:  Aye.

Clerk Miguel Del Valle:  Alderman Beale.

Alderman Beale:  Aye.

Clerk Miguel Del Valle:  Alderman Pope.

Alderman Pope:  Aye.

Clerk Miguel Del Valle:  Alderman Balcer.

**Unofficial Transcription of July 2, 2010 Chicago City Council Meeting**

Alderman Balcer:  Aye.

Clerk Miguel Del Valle:  Alderman Cardenas.

Alderman Cardenas:  Aye.

Clerk Miguel Del Valle:  Alderman Olivo.

Alderman Olivo:  Aye.

Clerk Miguel Del Valle:  Alderman Burke.

Alderman Burke:  Aye.

Clerk Miguel Del Valle:  Alderman Foulkes.

Alderman Foulkes:  Aye.

Clerk Miguel Del Valle:  Alderman Thompson.

Alderman Thompson:  Aye.

Clerk Miguel Del Valle:  Alderman Thomas.

Alderman Thomas:  Aye.

Clerk Miguel Del Valle:  Alderman Lane.

Alderman Lane:  Aye.

Clerk Miguel Del Valle:  Alderman Rugai.

Alderman Rugai:  Aye.

Clerk Miguel Del Valle:  Alderman Cochran.

Alderman Cochran:  Aye.

Clerk Miguel Del Valle:  Alderman Brookins.

Alderman Brookins:  Aye.

Clerk Miguel Del Valle:  Alderman Muñoz.

**Unofficial Transcription of July 2, 2010 Chicago City Council Meeting**

Alderman Muñoz:  Aye.

Clerk Miguel Del Valle:  Alderman Zalewski.

Alderman Zalewski:  Aye.

Clerk Miguel Del Valle:  Alderman Dixon.

Alderman Dixon:  Aye.

Clerk Miguel Del Valle:  Alderman Solis.

Alderman Solis:  Aye.

Clerk Miguel Del Valle:  Alderman Maldonado.

Alderman Maldonado:  Aye.

Clerk Miguel Del Valle:  Alderman Burnett.

Alderman Burnett:  Aye.

Clerk Miguel Del Valle:  Alderman Ed Smith.

Alderman Ed Smith:  Aye.

Clerk Miguel Del Valle:  Alderman Graham.

Alderman Graham:  Aye.

Clerk Miguel Del Valle:  Alderman Reboyras.

Alderman Reboyras:  Aye.

Clerk Miguel Del Valle:  Alderman Suarez.

Alderman Suarez:  Aye.

Clerk Miguel Del Valle:  Alderman Waguespack.  Alderman Mell.  Alderman Austin.

Alderman Austin:  Aye.

**Unofficial Transcription of July 2, 2010 Chicago City Council Meeting**

Clerk Miguel Del Valle:  Alderman Colon.

Alderman Colon:  Aye.

Clerk Miguel Del Valle:  Alderman Rice.

Alderman Rice:  Aye.

Clerk Miguel Del Valle:  Alderman Mitts.

Alderman Mitts:  Aye.

Clerk Miguel Del Valle:  Alderman Allen.

Alderman Allen:  Aye.

Clerk Miguel Del Valle:  Alderman Laurino.  Alderman O'Connor.

Alderman O'Connor:  Aye.

Clerk Miguel Del Valle:  Alderman Doherty.  Alderman Reilly.

Alderman Reilly:  Aye.

Clerk Miguel Del Valle:  Alderman Daley.

Alderman Daley:  Aye.

Clerk Miguel Del Valle:  Alderman Tunney.

Alderman Tunney:  Aye.

Clerk Miguel Del Valle:  Alderman Levar.

Alderman Levar:  Aye.

Clerk Miguel Del Valle:  Alderman Shiller.

Alderman Shiller:  Aye.

Clerk Miguel Del Valle:  Alderman Schulter.

Alderman Schulter:  Aye.

**Unofficial Transcription of July 2, 2010 Chicago City Council Meeting**

Clerk Miguel Del Valle:  Alderman Mary Ann Smith.

Alderman Mary Ann Smith:  Aye.

Clerk Miguel Del Valle:  Alderman Moore.

Alderman Moore:  Aye.

Clerk Miguel Del Valle:  Alderman Stone.

Mayor Daley:  Before I announce the vote, I'd like to introduce a group of people who are purpose over pain for the lost loved ones; Ron and Annette Holt whose son is a victim of gun violence; Treyonda Towns whose daughter is a victim of gun violence; Deborah Hope whose son, sister, brother and aunt are victims of gun violence; Chalonda McIntosh whose father of her children are victims of gun violence; and Charles Brice whose son is a victim of gun violence. For now, these people go Springfield, Washington, D.C. touring the schools where she can educate other people about gun violence and what affect it has upon their own lives and lives of others.  Let's give them a round of applause before we pass this ordinance.

[People clapping]

Mayor Daley:  They have taken their grief in doing something positive and I thank the City Council for 45 yeas and no nays that the ordinance has passed.  [IB] for a motion to reconsider, all those in favor say "Aye".  All those opposed say "No".  No's have it, motion has lost.  The chair recognizes Alderman Burke.

Alderman Burke:

Mr. President, would you kindly direct that the clerk publish in pamphlet form the ordinance which was just adapted by the City Council.

Mayor Daley:  Clerk…

EXHIBIT 60

IN THE UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF ILLINOIS

EASTERN DIVISION

ILLINOIS ASSOCIATION OF      )

FIREARMS RETAILERS,          )

KENNETH PACHOLSKI,           )

KATHRYN TYLER, and           )

MICHAEL HALL,                )

       Plaintiffs,       )

  vs.                        )   No. 10 CV 04184

THE CITY OF CHICAGO,         )

       Defendant.        )

     The deposition of DANA ALEXANDER, called for examination pursuant to the Rules of Civil Procedure for the United States District Courts pertaining to the taking of depositions, taken before Johnetta Stafford Taylor, a notary public within and for the County of Cook and State of Illinois, at 33 North Dearborn Street, Chicago, Illinois, on May 26, 2011, at the hour of 11:00 o'clock a.m.


Johnetta Stafford Taylor

License No:  084-001583

1

1     Q.    And what at a high level of generality

2   was the subject you were being asked about?

3     A.    Improprieties pertaining to police

4   officers' improprieties.

5   MR. THOMPSON:  And we have a court reporter

6   here today, so let's try and speak one at a

7   time.  If I cut you off at any time today, sir,

8   it's inadvertent.  I want to get your full

9   testimony.  You can just signal to me,

10  'Mr. Thompson, I'm not done yet,' and you can

11  keep going.

12          You can also take a break at any point

13  you would like today.  The only thing I would

14  ask is if you do take a break, that you answer

15  the question that's pending at the time, and we

16  can go from there.

17          And as you may know, you're here today

18  in two capacities.  One is as a 30(b)(6)

19  witness, which is the official representative of

20  the City of Chicago on a particular topic.  I'd

21  like to do that at the end of today's

22  deposition.

23          We're also here today for a deposition

24  of you in your capacity as Deputy Chief of the

5

1    city of -- of the Chicago Police Department.

2           And so we'll start with that.

3    BY MR. THOMPSON:

4        Q.   And if you could state your current

5    position.

6        A.   Currently, I'm Deputy Chief of Patrol,

7    Area 2, Chicago Police Department.

8        Q.   And if you'd briefly state what your

9    educational background is.

10       A.   I have a master's degree in criminal

11   social justice.

12       Q.   And when did you get that degree?

13       A.   2007, if I'm not mistaken.  2007.

14       Q.   And have you taken any classes that

15   relate in any way to firearms in an academic

16   setting?

17       A.   No, I have not.

18       Q.   And if you could state -- walk me

19   through chronologically what your employment

20   history has been.  What your first job was,

21   full-time job, and then up to the present.

22       A.   Let me be clear.

23           My first full-time job?

24       Q.   Yes, sir.

6

1      A.    Ever?

2      Q.    Well, why don't we say your first

3    full-time job in law enforcement.

4      A.    Okay.  The first full-time job in law

5    enforcement would be with the Chicago Police

6    Department.  I began at the Chicago Police

7    Department the 26th of March, 1990.

8      Q.    And what was your job title at that

9    time?

10      A.    Patrolman.

11      Q.    And what does a patrolman do?

12      A.    Basically, we do investigative work to

13    the point of we're first responders answering

14    service calls for the citizens.

15      Q.    Okay.

16      A.    Responding to crimes within the City as

17    they take place or within your particular unit

18    of assignment.

19      Q.    All right.  And do you have a

20    particular geographic area or every day --

21      A.    Sure.

22      Q.    Where was your area?

23      A.    My first assignment was to the

24    11th District, which is the Harrison station,

7

1      MR. AGUIAR:  Objection to the form of the

2   question.

3           You may answer.

4      THE WITNESS:  In this particular instance

5   here, we're talking about, you know, a trained,

6   experienced police officer.  And I personally

7   just would -- you know, citing a case like this

8   in comparison to your average citizen, of course

9   this works out for an experienced police

10  officer.

11          Would the same set of consequences work

12  duly the same for an average citizen who, as

13  counsel says, lawfully possesses a weapon, I

14  can't say.  The officer here is trained for

15  that.

16  BY MR. THOMPSON:

17     Q.   Do you know whether the Chicago Police

18  Department has any data on the extent to which

19  citizens lawfully possessing a firearm in their

20  house have been able to deter criminal activity?

21     A.   No, I do not.

22     Q.   Are you aware of the fact that Chicago

23  has allowed citizens to own long guns in their

24  homes for many years?

                                                   47

1      A.    Yes.

2      Q.    And is it true that prior to this

3  recent ordinance from July of 2010 that citizens

4  could have more than one operable long gun in

5  their home?

6      MR. AGUIAR:  Objection to the form.

7          You may answer.

8      THE WITNESS:  Yes.

9      MR. THOMPSON:  All right.

10 BY MR. THOMPSON:

11     Q.    But now there's a limit that there can

12 only be one operable gun, whether it's a long

13 gun or handgun.

14          Is that your understanding?

15     A.    Yes.

16     Q.    Has the City of Chicago put in place

17 any different policies for its first responders

18 or in any other way that is attributable to this

19 new policy that says there can only be one

20 operable gun as opposed to the prior regime in

21 which there could be multiple operable long

22 guns?

23     MR. AGUIAR:  Objection to foundation.

24          You may answer.

48

1      THE WITNESS:  No, not that I'm aware of.

2  BY MR. THOMPSON:

3      Q.   Has the Chicago Police Department

4  observed any changes in criminal activity --

5  well, let me strike that.

6           Has the City of Chicago Police

7  Department observed any differences in the

8  effectiveness of law enforcement that has

9  resulted from this new imposition of a one

10  operable gun limit?

11     MR. AGUIAR:  Objection to the form.  The

12  witness is here to speak on his behalf, not on

13  behalf of the City, as to this topic.

14          You can answer as to your own

15  knowledge.

16     THE WITNESS:  Would you repeat the question,

17  please.

18  BY MR. THOMPSON:

19     Q.   Yes.

20          Are you aware of any changes in the --

21  well, let me move on from that line of

22  questioning.

23          Are you aware of any differences in the

24  way police officers on the ground are conducting

49

1    themselves now that there's a one operable gun

2    limit as opposed to the prior regime where there

3    could be multiple operable long guns?

4        MR. AGUIAR:  I would object to the extent

5    that we're getting into the 30(b)(6) topic, 7

6    topic.

7            But you may answer.

8        THE WITNESS:  As always, as officers are

9    trained and we have encounters, you know, with

10   citizens in the home, there's going to always be

11   the presumption or the heightened awareness of

12   weapons within the home.  Whether it's one or

13   multiple.

14   BY MR. THOMPSON:

15       Q.   Okay.  And is what you're saying is it

16   doesn't really matter whether it's one or

17   multiple, that if there's a loaded operable

18   firearm in that house, the officer is going to

19   be on maximum alert for his or her safety?

20       A.   Let me clarify.

21           Having one, of course, is always better

22   than multiple.  But just through training,

23   period, for a weapon, period, as officers are

24   trained, that's one of the questions that's

                                          50

1          Is that fair to say?

2      MR. AGUIAR:  Objection to foundation and to

3  form.

4          You may answer.

5      THE WITNESS:  You know, the statement in

6  itself, the statement that's used there, 'our

7  battle against gangs, guns, and drugs,' the

8  statement is more a cliche.  It's a statement

9  that's used --

10             (Interruption.)

11     MR. THOMPSON:  I'm sorry.  Go ahead, sir.

12     THE WITNESS:  It's a statement that's more so

13 used within the Chicago Police Department at

14 that time as far as what our fight is.

15         To say that -- to try to simplify and

16 say that the fight is only and to try to equate

17 that guns are only associated with gangs and

18 with drugs, I think is oversimplifying it.

19         I think the fight itself is with guns,

20 period.

21 BY MR. THOMPSON:

22     Q.   Guns, period?

23     A.   Yes.  I would say the use of guns, the

24 violent use of guns, period.

70

1    Q.    The violent criminal use of guns.

2          In other words, is there an epidemic or

3    a -- let me ask it this way.

4          Is there a problem in the City of

5    Chicago with law abiding citizens defending

6    themselves in their home against criminal

7    intruders with firearms?  Is that a problem in

8    the City of Chicago?

9      MR. AGUIAR:  Objection to foundation and to

10   form.

11         You may answer.

12     THE WITNESS:  I can't say that it's been

13   recognized as a problem.  No.

14     MR. THOMPSON:  Off the record for a minute.

15                    (Whereupon, a discussion was had

16                     off the record.)

17                    (Recess.)

18     MR. THOMPSON:  We're back on the record.

19         Just a couple more questions and we'll

20   switch to the 30(b)(6) and we'll get you out of

21   here.

22     THE WITNESS:  Okay.

23   BY MR. THOMPSON:

24     Q.    In your experience, what are the most

71

1    effective tools in limiting violent crime in the

2    City of Chicago?

3        MR. AGUIAR:  I'll object to the form of the

4    question as to it's relevancy.

5            You may answer.

6        THE WITNESS:  Could you repeat the question,

7    please.

8        MR. THOMPSON:  Sure.

9    BY MR. THOMPSON:

10       Q.   In your experience, what are the most

11   effective tools that the Chicago Police

12   Department has to limit the amount of violent

13   crime in the City?

14       MR. AGUIAR:  Same objections.

15       THE WITNESS:  The most effective tools are

16   intelligence as far as criminal activity is

17   concerned.  Communications.  The flow of

18   information from the general public.

19            That's all I can think of right now off

20   the top of my head.

21   BY MR. THOMPSON:

22       Q.   In one of these newsletters you

23   referenced flooding a high crime area with

24   officers.

72

1      MR. THOMPSON:  So with that, we are concluded

2   with your individual deposition and now we'll

3   turn to the 30(b)(6) topic.  And although

4   Mr. Aguiar was kind enough to say what it is,

5   I'll just repeat it so it's fresh in everyone's

6   mind.  And this is by agreement of the parties.

7          We're going to discuss "the training

8   and assumptions of police officers regarding the

9   presence of firearms at homes or business to

10  which they are called to respond on an emergency

11  basis."

12     MR. AGUIAR:  And that is correct.

13     MR. THOMPSON:  So let's talk training, sir.

14                   EXAMINATION

15  BY MR. THOMPSON:

16     Q.   What training do officers receive when

17  it comes to firearms in the home?

18     A.   There's no written training, per se.

19          The training that's received by police

20  officers is more of a tactical nature, tactical

21  training.  And that basic training is just for

22  officers to always have a heightened awareness

23  of weapons as they enter a home or as they enter

24  a business to have contact with citizens.

                                                    79

1    Q.    Are they trained to try to ascertain

2    whether there's a firearm in the house?

3    A.    That's one of the first questions

4    that's always asked.

5    Q.    Are they trained to access a database

6    that lists, for example, oh, here is everyone

7    who has a firearms registered with the City of

8    Chicago?

9    A.    At this point I'm not privy to the

10   point of such a data base existing, although

11   they may be working on one.  I don't know of one

12   that is actually operable as of this moment.

13   No.

14   Q.    And in terms of their training, if they

15   ascertain that there's, let's say, one firearm

16   in the residence, then are there any rules or

17   suggestions that they're supposed to follow?

18   A.    You know, our training would say if you

19   ascertain the fact that there is a firearm and

20   you know the location of that firearm, of course

21   as we interact, you know, with the citizens, of

22   course you want to keep them away from that

23   firearm.

24   Q.    Let's say, as a hypothetical, you've

80

1    got a criminal suspect in the basement of a

2    house and you have intelligence that there is

3    one gun and it's not in the basement, let's say

4    it's on the top floor.

5         Is the point that the officers should

6    go and try to make sure that that criminal

7    suspect doesn't get up to the top floor as

8    opposed to the officer going to the top floor

9    himself, securing the firearm, and then going to

10   deal with the suspect?  Is there in terms of the

11   training one of those two options that is

12   generally preferred?

13   A.    Given dynamics of a certain particular

14   situation such as that, and as counsel says,

15   we're going to have intelligence that the weapon

16   is upstairs, you know, the training for the

17   police officer would say that the intelligence

18   said it's upstairs, but simply put that there's

19   a weapon in the home.  There's no guarantee that

20   the weapon is upstairs or wherever.

21        The training would be, of course, is to

22   keep a fixed eye on the subject that they're

23   dealing with, and hopefully we're in a situation

24   where we have two officers present or more.

                                                    81

1    situation, volatile, there are multiple suspects

2    inside the location but -- and there are

3    multiple firearms inside the building, but

4    there's only one operable -- there's only

5    supposed to be one operable firearm.

6         Does that change the situation on the

7    ground at all?

8    A.   Could you repeat the question, please.

9    Q.   Sure.

10        I'm just saying it's the same scenario

11   as before.  A volatile situation with multiple

12   suspects, with multiple firearms in a building,

13   but this time there's supposed to be only one

14   operable -- under the law.  I'm not saying that

15   there's intelligence one way or the other.  But

16   under the law, there's only supposed to be one

17   operable gun.

18        In terms of their training and the way

19   they're supposed to assess the situation, is it

20   any different?

21   A.   If they're going into a residence and

22   understanding that there is supposed to be only

23   one operable but we know that there's multiple

24   weapons?  Is that what you're saying?

84

1    Q.   Yes, sir.

2    A.   If we know that there's multiple

3  weapons, once again, the training of the

4  officers would more likely be to wait for

5  additional backup officers.  Not knowing what's

6  supposed to be and what actually is occurring,

7  where it's supposed to be one operable, you may

8  have five operable.

9         If we have excellent intelligence to

10  say that there are multiple weapons in the

11  house, period, operable and inoperable, you

12  would probably want to wait for additional

13  officers.

14    Q.   Is it fair to say, then, that the

15  assumptions that the officer operates under, to

16  be safe, is that if they know that there are

17  multiple firearms in that house, they assume

18  that there are multiple operable firearms in the

19  house when they enter it, if they enter it at

20  all?

21    A.   That would be safe to say.

22    Q.   And do you know whether police officers

23  when they approach a house know -- are trained

24  to ascertain whether this residence has guns

85

1    registered in it?

2        MR. AGUIAR:  Objection to the form.

3            Are you asking him if there's a process

4    or --

5        MR. THOMPSON:  Yes.  Is there a process where

6    they can pick up the phone or tap something into

7    the computer and pick up, 'Oh, yes, this house

8    has 18 guns lawfully registered to it.'

9        THE WITNESS:  Once again, counsel is going

10   back to the question you asked me earlier.  And

11   at this time I don't know if there's such a

12   database that exists.  If the department has

13   come into that, I don't know of such a database

14   at this time that the officers could ascertain

15   that type of information prior to them entering

16   the home.

17   BY MR. THOMPSON:

18       Q.   If an officer has no intelligence about

19   whether there's firearms or not inside a home,

20   what are they trained to -- what assumptions are

21   they trained to make about whether there are

22   firearms in that house?

23       A.   There's no -- I can hardly say that

24   there's no assumptions to be made.  It's just

86

1   STATE OF ILLINOIS   )

2                       )   SS:

3   COUNTY OF C O O K   )

4     I, JOHNETTA STAFFORD TAYLOR, a notary public

5   within and for the County of Cook County and

6   State of Illinois, do hereby certify that

7   heretofore, to-wit, on May 26, 2011 personally

8   appeared before me, at 33 North Dearborn Street,

9   Suite 300, Chicago, Illinois, DANA ALEXANDER, in

10  a cause now pending and undetermined in the U.S.

11  District Court, Northern District of Illinois,

12  Eastern Division wherein ILLINOIS ASSOCIATION OF

13  FIREARMS RETAILERS, KENNETH PACHOLSKI, KATHRYN

14  TYLER, and MICHAEL HALL are the Plaintiffs, and

15  THE CITY OF CHICAGO is the Defendant.

16    I further certify that the said witness was

17  first duly sworn to testify the truth, the whole

18  truth and nothing but the truth in the cause

19  aforesaid; that the testimony then given by said

20  witness was reported stenographically by me in

21  the presence of the said witness, and afterwards

22  reduced to typewriting by Computer-Aided

23  Transcription, and the foregoing is a true and

24  correct transcript of the testimony so given by

94

1    said witness as aforesaid.

2      I further certify that the signature to the

3    foregoing deposition was reserved by counsel for

4    the respective parties.

5        I further certify that the taking of this

6    deposition was pursuant to Notice, and that

7    there were present at the deposition the

8    attorneys hereinbefore mentioned.

9        I further certify that I am not counsel for

10   nor in any way related to the parties to this

11   suit, nor am I in any way interested in the

12   outcome thereof.

13       IN TESTIMONY WHEREOF:  I have hereunto set my

14   hand and affixed my notarial seal this 16th day

15   of June, 2011.

16

17

18

19       NOTARY PUBLIC, COOK COUNTY, ILLINOIS

20

21

22

23

24

                                                    95