# EXHIBIT 62



**Results from Large Local Agency Reported Crime database**     Query date: April 17, 2012

Spreadsheet of this table (.csv file) | Spreadsheet help     Revise this query | Get a different type of table

**Definitions.** Also see notes at the end of the page.
For caution, see *Caution against ranking*

**Population Selection:** Agency serving cities 1,000,000 or over

## Murder rate*

| Agency | State | 1991 | 1992 | 1993 | 1994 | 1995 | 1996 | 1997 | 1998 | 1999 | 2000 | 2001 | 2002 | 2003 | 2004 | 2005 | 2006 | 2007 | 2008 | 2009 | 2010 |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Phoenix Police Dept | AZ | 12.9 | 13.6 | 15.2 | 21.5 | 19.7 | 16.3 | 14.9 | 15.1 | 17.5 | 11.5 | 15.3 | 12.6 | 17.2 | 14.1 | 15.0 | 15.5 | 13.8 | 10.5 | 7.6 | 8. |
| Los Angeles Police Dept | CA | 28.9 | 30.3 | 30.5 | 23.8 | 24.5 | 20.5 | 16.3 | 11.8 | 11.6 | 14.9 | 15.6 | 17.1 | 13.4 | 13.4 | 12.6 | 12.4 | 10.2 | 10.0 | 8.1 | 7. |
| San Diego Police Dept | CA | 14.7 | 12.7 | 11.5 | 9.7 | 7.9 | 6.8 | 5.7 | 3.5 | 4.6 | 4.4 | 4.0 | 3.7 | 5.1 | 4.8 | 4.0 | 5.4 | 4.7 | 4.3 | 3.1 | 2. |
| Chicago Police Dept | IL | 32.9 | 33.1 | 30.3 | 33.1 | 30.0 | 28.6 | 27.4 | 25.6 | 22.7 | 21.8 | 22.9 | 22.1 | 20.6 | 15.5 | 15.6 | 16.4 | 15.7 | 18.0 | 16.1 | 16. |
| Las Vegas Metropolitan Police Department | NV | | | | | | | | | 8.5 | 11.9 | 11.9 | 11.9 | 10.6 | 11.3 | 11.6 | 8.9 | 8.9 | 8.1 | 7. |
| New York City Police Dept | NY | 29.3 | 27.1 | 26.5 | 21.3 | 16.1 | 13.4 | 10.5 | 8.6 | 8.9 | 8.4 | 8.9 | 7.3 | 7.4 | 6.9 | 6.6 | 7.3 | 6.0 | 6.3 | 5.6 | 6. |
| Philadelphia Police Dept | PA | 27.6 | 26.5 | 28.1 | 25.9 | 28.2 | 27.5 | 27.4 | 23.3 | 20.3 | 21.0 | 20.4 | 18.9 | 23.3 | 22.2 | 25.6 | 27.8 | 27.3 | 23.0 | 19.5 | 20. |
| Dallas Police Dept | TX | 48.6 | 37.0 | 30.4 | 27.8 | 26.5 | 20.5 | 19.4 | 23.2 | 17.5 | 19.4 | 19.7 | 15.8 | 18.4 | 20.2 | 16.4 | 15.0 | 16.1 | 13.3 | 12.9 | 12. |
| Houston Police Dept | TX | 36.5 | 27.4 | 25.9 | 21.3 | 18.2 | 14.7 | 14.1 | 14.1 | 13.3 | 11.8 | 13.4 | 12.5 | 13.6 | 13.3 | 16.3 | 18.2 | 16.2 | 13.1 | 12.6 | 12. |
| San Antonio Police Dept | TX | 21.8 | 22.5 | 22.3 | 19.4 | 14.2 | 11.5 | 9.2 | 8.1 | 8.5 | 7.4 | 8.5 | 8.4 | 7.0 | 7.6 | 6.8 | 9.2 | 9.3 | 8.6 | 7.2 | 6. |

**Notes:** When data are unavailable, the cells are blank or the year is not presented.
Variations in population coverage and reporting practices may cause differences in reporting from year to year. (See **definitions**).
MSA and non-MSA county populations are not available.
Crime rates are not available for agencies that report data for less than 12 months of a year.
* Rates are the number of reported offenses per 100,000 population

- Los Angeles Police Dept California 2005 - Because of changes in the agency's reporting practices, 2005 aggravated assault figures are not comparable to previous years' data.
- Chicago Police Dept Illinois 2010 - The data collection methodology for the offense of forcible rape used by the Chicago, Illinois, does not comply with national Uniform Crime Reporting Program guidelines. Consequently, its figures for forcible rape and violent crime (of which forcible rape is a part) are not included in this Tool.
- Las Vegas Metropolitan Police Department Nevada 2002 - Due to changes in reporting practices, annexations, and/or incomplete data, 2002 figures are not comparable to previous years' data.
- New York City Police Dept New York 2001 - The murder and nonnegligent homicides that occured as a result of the events of September 11, 2001, are not included.
- Philadelphia Police Dept Pennsylvania 1999 - Due to changes in reporting practices, annexations, and/or incomplete data, 1999 figures are not comparable to previous years' data
- Houston Police Dept Texas 1993 - Due to reporting changes, 1993 robbery and aggravated assault figures are not comparable to previous years' data.
- San Antonio Police Dept Texas 1999 - Due to changes in reporting practices, annexations, and/or incomplete data, 1999 figures are not comparable to previous years' data

**Sources:** FBI, Uniform Crime Reports as prepared by the National Archive of Criminal Justice Data

Home page | Top of this page

eRulemaking | Freedom of Information Act/Privacy | Legal Policies and Disclaimers | USA.gov | White House
UCRDATATOOL.gov is an official site of the U.S. Federal Government, U.S. Department of Justice.

Page last revised on *March 29, 2010*

# EXHIBIT 63

# RESISTING CRIME: THE EFFECTS OF VICTIM ACTION ON THE OUTCOMES OF CRIMES

JONGYEON TARK
GARY KLECK
Florida State University

KEYWORDS: self-protection, victim resistance, injury

*This study assessed the impact of sixteen types of victim self protection (SP) actions on three types of outcomes of criminal incidents: first, whether the incident resulted in property loss, second, whether it resulted in injury to the victim, and, third, whether it resulted in serious injury. Data on 27,595 personal contact crime incidents recorded in the National Crime Victimization Survey for the 1992 to 2001 decade were used to estimate multivariate models of crime outcomes with logistic regression. Results indicated that self-protection in general, both forceful and nonforceful, reduced the likelihood of property loss and injury, compared to nonresistance. A variety of mostly forceful tactics, including resistance with a gun, appeared to have the strongest effects in reducing the risk of injury, though some of the findings were unstable due to the small numbers of sample cases. The appearance, in past research, of resistance contributing to injury was found to be largely attributable to confusion concerning the sequence of SP actions and injury. In crimes where both occurred, injury followed SP in only 10 percent of the incidents. Combined with the fact that injuries following resistance are almost always relatively minor, victim resistance appears to be generally a wise course of action.*

Why do crime incidents turn out more favorably for some victims than for others? Why do only some criminal attempts result in injury or property loss to the victim? Crime victims and prospective victims have a vital interest in knowing the best action to take should they find themselves the target of a criminal attempt. Scholars have also become interested in these issues in the past few decades, though primarily in

CRIMINOLOGY VOLUME 42 NUMBER 4 2004         861

relation to sexual assaults. Forceful physical resistance by victims, especially armed resistance, is particularly controversial among scholars, perhaps because to concede any beneficial effects of forceful resistance might seem to promote private violence. In contrast, scholars studying rape, writing primarily from a feminist perspective, have been more willing to see value in women resisting male aggressors, perhaps because it has different ideological implications than other forms of forceful victim resistance.

Unfortunately, research on these questions is generally seriously flawed and has yielded results that appear highly inconsistent. We sought to correct some of the most serious flaws and use information on the largest available sample of crime incidents to assess the impact of a very diverse set of defensive actions on the most important outcomes of crimes.

## THEORY

There is little formal theory in criminology aimed at explaining the outcomes of crime incidents for victims. Nevertheless, the impact of victim self-protection on the outcome of criminal incidents can be indirectly understood from several theoretical perspectives. First, social learning theory asserts that criminal behavior is learned primarily either in social interactions in which criminal (or noncriminal) behavior is or is not reinforced, or by observing the consequences of criminal behavior (or noncriminal behavior) among others (Akers, 1985). Criminals are less likely to repeat criminal behavior to the extent that it resulted in punishment or failed to yield rewards, that is, was not reinforced. From a social learning perspective, both (a) aversive stimuli in the form of physical pain inflicted by resisting victims, fear of pain or injury being inflicted, or legal punishment resulting from victim action, and (b) the absence of reward, such as the failure to gain desired property, sexual gratification or vengeance, would tend to discourage criminal behavior. Whether criminals directly experienced negative consequences associated with victim resistance, or vicariously experienced those suffered by other offenders, the more frequent these negative consequences were, the less likely the offenders should be to maintain criminal behavior. If victims kill or injure criminals, frighten them or cause them to be arrested, these negative consequences could influence the future criminal behavior of offenders who considered the possibility of experiencing such consequences themselves. The present analysis of National Crime Victimization Survey (NCVS) data for 1992 to 2001 indicates that 68 percent of victims of personal contact crimes took some defensive actions, and 32 percent took forceful actions, ranging from physically struggling with offenders to shooting at them. For violent crimes such as assault,

robbery and rape, private sanctions in the form of forceful victim resistance are considerably more likely than official legal punishments.

Some forms of victim self-defense are also quite severe and could therefore strongly discourage (continued) aggression against victims. While most victim response to crimes does not involve force, victims nevertheless use forceful defensive actions frequently. At the most severe end of the spectrum, there were between 1,400 and 3,200 justifiable or excusable homicides committed by crime victims in 1990 (Kleck, 1997). At the less severe end, more than 1.6 million crime victims used forceful but nonlethal self-protective measures (attacking or threatening offenders with physical violence) in personal crimes in 1995 (U.S. Bureau of Justice Statistics, 2000). It therefore seems reasonable to take victim defensive actions seriously as potential determinants of criminal behavior.

The routine activities approach (for example, Cohen and Felson, 1979; Hindelang, Gottfredson and Garofalo, 1978) asserts that crimes occur when motivated offenders intersect in time and space with suitable targets in the absence of effective guardians. This approach implies avoidance behaviors as a tactic for reducing risks of victimization, but says little directly about victim actions taken while a crime incident is going on. The concept of guardianship, however, implies that victim behaviors might not only help avoid an assault in the first place, but also reduce the offender's prospects for success. Thus, burglars searching for suitable targets will avoid occupied homes partly because of the risk, for example, of the occupants calling the police or acting in self-defense.

All crime victims are guardians of their own safety, and to the extent that their actions reduce the probability or seriousness of injury or property loss, their guardianship is effective. Indeed, victims certainly act as direct guardians of their own safety far more often than police officers, security guards, or other professionals do, given that most crimes entail some kind of victim self-protection, and only a very few involve professional intervention (Federal Bureau of Investigation, 2002; Walker, 1998). Thus, the routine activities perspective would predict that crime events, or at least completed crimes, should occur less often when guardianship of individual personal crime targets, in the form of victim self-protective actions, is more effective.

These theoretical traditions, however, offer little guidance as to which victim actions will affect which crime outcomes under what circumstances. Some weak generalizations have emerged inductively from empirical work, as discussed shortly, but nothing resembling propositions deductively derived from broader theoretical notions has been developed. Perhaps this is not surprising given how little theoretical attention has been directed at explaining variation in the outcomes of crime incidents, in contrast to lasting differences in offending behavior across individuals.

Nevertheless, one might predict that victim actions that threaten the most harm to the offender would most strongly deter continued attempts. Based on this speculation, one could specifically hypothesize that because gun use would be the potentially most "severe" victim action, it would have the strongest inhibiting effects, the use of lesser weapons would have the next strongest inhibiting effects on offenders, use of unarmed force the next strongest, and use of nonforceful methods the weakest.

## PRIOR RESEARCH

Some criminologists have concluded that victim resistance to crime, especially forceful resistance, is useless and even dangerous because it provokes offenders to attack (for example, Bachman and Carmody, 1994; Bachman, Saltzman, Thompson and Carmody, 2002; Cohen, 1984; Griffin and Griffin, 1983; Marchbanks, Liu and Mercy, 1990; Zoucha-Jensen and Coyne, 1993). Others have concluded that resistance is generally beneficial, despite the fact that methodological flaws in research have often biased findings against results indicating desirable effects of resistance (Kleck, 1988; Kleck and Delone, 1993; Kleck and Kates, 2001; Kleck and Sayles, 1990; Southwick, 1996; Thompson et al., 1999; Ullman, 1998; Ullman and Knight, 1992, 1993; Ziegenhagen and Brosnan, 1985). Some of the variation in findings may be due to differences in the types of crimes studied. For example, most studies have been confined to sexual assaults (see Ullman, 1997 for a review of twenty-eight pre-1995 rape resistance studies). Others have examined robberies (Block, 1977; Block and Skogan, 1986; Conklin, 1972; Cook, 1986; Cook and Nagin, 1979; Hindelang, 1976; King, 1987; Kleck, 1988; Kleck and Delone, 1993; Kleck and Kates, 2001; McDonald, 1975; Southwick, 1996; Weiner, 1987; Ziegenhagen and Brosnan, 1985), burglary (Cook, 1991), or assault (Bachman et al., 2002; Fritzon and Ridgway, 2001; Kleck, 1991; Kleck and Kates, 2001; Lizotte, 1986; Thompson et al., 1999). Findings across studies could differ if victim resistance had significantly different effects in different types of crimes (Bachman et al., 2002).

More serious is that many studies are based on small nonprobability samples of crimes, typically local convenience samples of incidents known to authorities, such as those reported to a single local law enforcement agency (Amir, 1971; Conklin, 1972; Fritzon and Ridgeway, 2001; McDonald, 1975; Prentky, Burgess and Carter, 1986; Weiner, 1987), those involving college students at a single campus (Levine-MacCombie and Koss, 1986), victims who sought help from particular rape crisis centers (Cohen, 1984; Ruback and Ivie, 1988), offenders incarcerated in a single institution or handled by a single treatment facility (Ullman and Knight,

1992, 1993), or self-selected volunteer subjects (Bart, 1981; Bart and O'Brien, 1984).

There are biases in convenience samples of crimes that come to the attention of the authorities, biases that bear directly on the apparent effectiveness of victim defensive actions. Most critical, victims tend not to report to the police less serious crimes and those in which they suffered no injuries or property loss (U.S. Bureau of Justice Statistics, 1985). Thus, samples of crimes known to the authorities necessarily tend to disproportionately exclude cases in which victim actions were effective in preventing injury or property loss. As Hindelang and Gottfredson (1976) pointed out decades ago, at the very dawn of victim resistance research, this systematic censoring of crimes thus yields samples of crimes that contribute to underestimating the effectiveness of self-protection. Likewise, incidents reported to victim crisis centers or treatment facilities are likely to suffer from similar censoring of crimes with better outcomes for victims, because the consequences of such crimes are likely to be less traumatic for victims, who would therefore be less in need of treatment or counseling.

Most important, apparent conflicts in findings of studies may be attributable to the failure of most researchers to establish the sequence of protective actions and injury. As Sarah Ullman (1998) noted, where one does not have information on the sequence of resistance and injury, one cannot draw conclusions about whether resistance provoked injury, because a positive association may be primarily due to crimes in which injury provoked resistance from previously nonresisting victims. Nearly all researchers who have found positive associations between injury and self-protection actions, and concluded that resistance provoked offenders into attacking victims, failed to establish whether self-protective (SP) actions preceded the offender's inflicting of injury (for example, Bachman and Carmody, 1994; Block, 1977; Block and Skogan, 1986; Griffin and Griffin, 1981; Marchbanks, Lui and Mercy, 1990; Ruback and Ivie 1988; Zoucha-Jensen and Coyne, 1993). In these studies, crimes in which a victim was injured *before* doing something to resist were effectively treated as cases in which resistance provoked injury. In contrast, the few studies that established the injury-SP sequence have generally found that all or most types of resistance either reduce the risk of subsequent injury or have no net effect one way or the other (Bachman et al., 2002; Kleck and DeLone, 1993; Kleck and Kates, 2001; Quinsey and Upfold, 1985; Thompson et al., 1999; Ullman and Knight, 1992).

Some recent researchers had information on the injury-SP sequence but applied it in ways that biased findings against conclusions that victim actions are beneficial or neutral. The problem lay in how the researchers handled cases in which injury was inflicted first, followed by SP actions.

Thompson and her colleagues (1999) and Bachman and her associates (2002) both coded such cases as crimes in which the victim took no protective actions. This is inappropriate first because it is inaccurate—the victims did take protective actions. More important, this procedure biases findings against a conclusion that victim actions are effective. These incidents all involved offenders inflicting injury on initially nonresisting victims, who then took some kind of self-protective action, after which the offenders inflicted no further injury. In the National Crime Victimization Survey, victims who were injured, then took protective action, and then were injured again would be coded as taking protective actions both before and after injury (U.S. Bureau of Justice Statistics, 2003a). Although one cannot be sure that it was resistance that caused the offenders in these crimes to stop their assault, such cases clearly support the idea that protective actions do stop offenders from attacking further. These authors' coding procedure effectively portrayed these incidents as crimes in which self-protection did not occur, and thus could not have exerted any beneficial effects, thereby converting cases favorable to the efficacy position to neutral ones, and artificially reducing support for the position that resistance deters further attacks.

Bachman and her colleagues (2002) also used a second strategy to address this problematic set of crimes, but the second procedure had the same biasing effect as the first. Cases in which victims were injured, then resisted and then were not injured any further were omitted from analyses altogether. This procedure biases the sample by censoring out cases that support the efficacy hypothesis. Consistent with this assertion, results from all analyses of these samples were even less supportive of the efficacy position than those in which these cases were included in the sample but miscoded as involving no protective actions.

Another problem in victim resistance research is the use of needlessly limited two- or three-category typologies of resistance actions. Most researchers simply divide victims into those who resisted or did not resist, or distinguish only forceful ("physical," "direct," "combative") resistance from nonforceful (for example, Bachman et al., 2002; Block and Skogan, 1986; Fritzon and Ridgway, 2001; Marchbank et al., 1990; Ullman, 1998). Although the pre-1986 NCVS distinguished eight types of SP actions, and the post-1986 NCVS provides information on sixteen types, even researchers using this rich source of information have lumped different types of victim actions into a few very broad categories. For example, Bachman and her colleagues (see also Bachman and Carmody, 1994) combined the sixteen relatively specific protective measures provided in the NCVS data into just two categories: "physical response" and "nonphysical response." The category of "physical response" included such diverse measures as the victim attacking the offender with a gun,

threatening the offender with a knife, making unarmed attacks, physically struggling without any weapon, chasing the offender, and running away. Using this typology, they concluded that "the probability of injury was increased for women who physically resisted" offenders (2002:135).

In contrast, Kleck and Delone (1993) separately assessed all eight distinct categories of self-protection coded in the pre-1986 NCVS. They found that some forceful responses appeared to reduce the risk of injury while others did not, and some nonforceful responses appeared to be effective while others, such as attempting to get help, seemed to increase the risk. Different forms of physical resistance can even have effects of opposite sign. Armed physical resistance is associated with lower risks of injury while some forms of unarmed physical resistance are associated with higher risks (Kleck, 1988; Kleck and DeLone, 1993; Kleck and Sayles, 1990; Ziegenhagen and Brosnan, 1985). Something is therefore lost by combining SP categories, because doing so can obscure differences in the effects of specific victim actions.

One final problem with research in this area may never be completely resolved. Victims do not select their responses to offenders randomly, so the choice of protective action may be correlated with characteristics of victims, offenders and crime circumstances that have their own effects on crime outcomes. Some defensive actions may be more common in circumstances already favorable to the victim, in the sense that it was already unlikely that the victim would have been harmed, or it was fairly easy for the victim to avoid harm, even without taking protective action. For example, victims who call the police or go to "get help" during the incident may be able to do so precisely because they were not injured or seriously threatened. In such cases, analysts could mistakenly attribute effectiveness to victims' actions that had little or no impact. On the other hand, victims may be pushed to extreme defensive actions only by extreme circumstances. The more forceful victim responses may be adopted only under the most desperate circumstances, for example, when victims were outnumbered by offenders. In these cases, defensive actions could appear less effective than they really were because the dangerous circumstances associated with the defensive action often caused the victim to be injured.

The standard solution is to measure and statistically control for as many suspected confounders—correlates of protective actions that affect crime outcomes—as possible. But this is difficult if we know little about likely correlates, and is impossible to completely implement if the correlates are not measured, and perhaps cannot be measured. In particular, the intentions and strength of motivation of offenders have never been measured or controlled in any self-protection study (though Cohen [1984] did ask rape victims about their perceptions of offenders' intentions), yet

these variables might well influence not only crime outcomes but also the victim's choice of defensive strategies.

Reiss and Roth (1993) speculated that victims who use guns are likely to have had more warning time to plan a response than other victims, because the ability to get to a weapon might itself be a product of greater lead time (see also Thompson et al., 1999). The greater time to respond might itself produce better outcomes independent of the gun use. Because no researcher has ever measured lead time, this notion remains an unsupported speculation. On the other hand, empirical evidence indicates that victims who use guns are more likely to be outnumbered and to face offenders with guns (Kleck and Kates, 2001), consistent with the general idea that victims who face more desperate circumstances are more likely to adopt more extreme defensive measures. Regardless, defensive actions are correlated with other variables that could influence crime outcomes, so as many such potentially confounding variables as possible should be controlled.

## METHODS

Our goal was to avoid the flaws of past research, and to (a) examine a large national probability sample of crimes, (b) take account of the sequence of victim protective actions and injury in appropriate ways, (c) control for as many confounding correlates of defensive actions as possible, (d) separately assess the full set of sixteen specific victim actions coded in the post-1992 NCVS on crime outcomes, and (e) do so separately for each type of crime in which there was personal contact between the victim and offender.

The sample used was all crime incidents reported in the National Crime Victimization Survey that occurred in the United States from 1992 through 2001 and that involved personal contact between victims and offenders (U.S. Department of Justice, 2003). Only data gathered since 1992 were used because this was when the NCVS began to record the sequence of victim actions and injury. We analyzed five types of crimes: sexual assaults, robberies, assaults (without sexual elements), personal contact larcenies (completed or attempted purse snatchings and pocket pickings), and confrontational burglaries. All but the last were defined according to NCVS Type of Crime (TOC) typology. We wanted to separately assess the effects of protective actions in residential burglaries in which there was some potential for direct confrontation between victim and offender, but the TOC for many of these would be some kind of robbery. Therefore we defined a confrontational burglary as a crime incident in which there was (a) unlawful entry by the offender into the victim's home and (b) the victim saw the offender while the crime was going on. Crimes with these

Case: 1:10-cv-04184 Document #: 180-2 Filed: 04/27/12 Page 12 of 158 PageID #:7625

elements but also those of sexual assaults were left as sexual assaults because there were already so few cases of this crime type.

The NCVS is an ongoing national household survey conducted by the U.S. Census Bureau that questions everyone 12 years old or older in a large national probability sample of housing units. The NCVS uses a rotating panel design in which stratified multistage samples of housing units are randomly selected, and residents of the sampled units are interviewed every 6 months over a 42-month period about their victimization experiences during the 6 months preceding each interview. All respondents are identified to interviewers, that is, the interviews are not anonymous. Most are conducted by telephone but some are face-to-face. The total unweighted sample size used in this study was 27,595 personal contact crime incidents.

Incidents were weighted using a modified version of the NCVS *Incident Weight*, which reflects the differing probabilities of selection into the sample of different cases. If used unmodified, this weight inflates the apparent sample size up to estimated population totals, fooling statistical software into believing that there are millions of crimes in the sample, and distorting significance tests such that even very weak associations appear to be highly significant. To avoid this, in each sample analyzed, the mean value of the original *Incident Weight* variable was computed. A new weight variable was then created that, for a given crime incident, equaled that case's *Incident Weight* divided by the mean of the *Incident Weight* in the sample being analyzed (for example, robbery incidents). Since the average value of this new weight equals one, apparent sample sizes are exactly equal to the actual unweighted sample size, and significance tests are not distorted.

Because weapon possession, especially in public places, is often unlawful, many cases of armed resistance are probably not reported to the NCVS because it would entail confessing to a crime. While there is no evidence bearing directly on the validity of responses to questions about defensive use of guns or gun carrying, there is considerable evidence that survey respondents often conceal gun ownership. First, surveys asking how many guns people own yield far lower estimates of the total civilian gun stock than do data on the numbers of guns manufactured, imported and exported (Kleck, 1991). Second, when Illinois adults who held required gun owner licenses were asked in interviews whether they owned guns, nearly a tenth claimed that neither they nor anyone in their household owned or had owned a gun in the past 5 years (Bordua, Lizotte and Kleck, 1979). Third, a number of researchers have noted discrepancies in married couple households in survey responses to household gun ownership questions, indicating that wives substantially under-report their husbands' gun ownership (Buckner, 1995; Kleck, 1997; Ludwig, Cook and Smith,

1998). Even among the presumably highly "legitimate" gun owners who registered their guns with the authorities, 12.7 percent denied having any guns (Rafferty, Thrush, Smith and McGee, 1995). Because reporting defensive use of a gun necessarily entails acknowledging possession, this documented reluctance to admit gun ownership is likely to lead to an underreporting of gun use.

Further, we cannot be sure that the relatively few incidents reported in the NCVS are representative of all cases of armed resistance. Those defensive uses of weapons reported by victims are probably more "legitimate" than those not reported, but it is unclear whether they would be more effective. On the one hand, victims might be embarrassed by actions that either failed to prevent harm or made things worse. On the other, victims are known to be less likely to report incidents without injury or property loss, which happens to be the set of incidents within which successful defensive actions would be found.

Table 1 lists the variables included in the analysis and their means and standard deviations. Most variables are binary, indicating the presence or absence of an attribute. The dependent variables measure whether the victim suffered (1) any injury during the incident, regardless of when it occurred (ANYINJUR), (2) any injury after taking some self-protective action (POSTINJU), (3) a serious injury after taking self-protective actions (POSEINU), or (4) property loss (LOSTHIN).[1] Because our dependent variables were all binary, we used logistic regression to estimate equations. In addition to doing so for the full set of all personal contact crime incidents in the sample, we estimated separately for the personal contact crime types to determine whether the effects of protective actions differ by crime type. Only robbery, burglary and personal contact larceny were analyzed with respect to property loss. We did not address rape completion as an outcome of sexual assaults because that topic has already been thoroughly addressed in a large body of research that has consistently found that rape completion is less likely with almost any form of resistance (see reviews in Ullman, 1997; Bachman et al., 2002).

Obviously, protective actions taken after the victim was injured could not have affected whether the injury was inflicted. Likewise, because humans are not capable of instantaneous reaction, attacks that began

---

1. The NCVS also has questions concerning victims' perceptions of the impact of their self-protective actions. This is a separate topic worthy of analysis in its own right but is not addressed here. The published NCVS data indicate that about two-thirds of victims think their actions helped the situation, but fewer than one-tenth think that their actions, on net, hurt the situation (for example, Table 72 in U.S. Bureau of Justice Statistics, 2003b).

simultaneously with victim actions could not have been provoked by those actions. In some incidents, victims described the two events as occurring at the same time. While the beginnings of these actions probably were not literally simultaneous, the victims in these incidents presumably were unable to say whether their protective actions came before or after injury. We treated these incidents as missing on the post-SP injury variables because it was impossible to determine whether injury actually occurred slightly before or slightly after the protective actions. We also performed auxiliary analyses in which these cases were arbitrarily coded as post-SP injury or pre-SP injury incidents.

The NCVS does not address the possibility of complex sequences in which multiple different types of defensive actions are taken and injury occurs after one type of victim action but before another. Rather, all victims who were injured and used protective actions are simply coded by interviewers as to whether protective actions (in general) were taken before, during or after suffering injury. Victims can be coded for as many of these sequences as were appropriate, and therefore might be coded as having suffered injury before, during, and after defensive action. For purposes of coding post-protection injury, we treated victims who were injured both before and after victim actions as having suffered post-protection injury, thereby favoring the hypothesis that resistance increases the victim's risk of injury.

The types of injuries recorded in the NCVS are: (1) raped, (2) attempted rape, (3) sexual assault other than rape or attempted rape, (4) knife or stab wounds, (5) gun shot, bullet wounds, (6) broken bones or teeth knocked out, (7) internal injuries, (8) knocked unconscious, (9) bruises, black eyes, cuts, scratches, swelling, chipped teeth and (10) other injuries. The exact cut-off between serious and minor injury is necessarily subjective and somewhat arbitrary, but we used the fairly conventional one in research that uses NCVS data: the last two categories were treated as less serious injuries, the rest as more serious. This coding scheme thus slants the distribution of injury seriousness in favor of the "serious" category because, among specific categories of injury, only the least serious (bruises, cuts and the like) is coded as less than serious.

The independent variables of primary interest were sixteen binary variables denoting whether a given type of protective action was taken by the victim (2=action was taken, 1=action was not taken). Victims could be coded as having used as many or as few of these strategies as they reported, and those who did nothing to resist would simply be coded 1 on all 16 protection variables. Because there was no variable included in the models that explicitly denoted that victims did nothing to protect themselves, "no self-protection" is the omitted protection category in the

## Table 1. Variables in the Analysis*

| Variable | Description | Mean | SD |
|---|---|---|---|
| **Dependent Variables** | | | |
| LOSTHING | Property was taken without permission | 1.092 | 0.288 |
| ANYINJUR | V was injured | 1.240 | 0.427 |
| POSTINJU | V was injured after responding to offender | 1.035 | 0.183 |
| POSEINJU | V was seriously injured after responding to offender | 1.008 | 0.090 |
| ANYINJU2 | V was injured excluding (attempted) rape | 1.228 | 0.420 |
| POSTINJ2 | V was injured after responding to O | 1.032 | 0.176 |
| POSEINJ2 | V was seriously injured after responding to O | 1.000 | 0.000 |
| **Independent Variables** | | | |
| *Victim's Self-Protection* | | | |
| *Used Physical Force toward Offender* | | | |
| GUNATACK | V attacked O with gun; fired gun | 1.002 | 0.040 |
| GUNTHRET | V threatened O with gun | 1.007 | 0.085 |
| NOGUNATK | V attacked O with other weapons (knife, etc.) | 1.008 | 0.091 |
| NOGUNTHR | V threatened O with other weapon (knife, etc.) | 1.008 | 0.091 |
| NOWEPATK | V attacked O without weapon (hit, kicked, etc.) | 1.096 | 0.295 |
| NOWEPTHR | V threatened without weapon | 1.020 | 1.386 |
| *Resisted or Captured Offender* | | | |
| STRUGGLE | V struggled, ducked, blocked blows, held onto property | 1.181 | 0.385 |
| CHASHELD | V chased, tried to catch or hold O | 1.019 | 0.136 |
| *Scared or Warned off Offender* | | | |
| SCAREOFF | V yelled at O, turned on lights, threatened to call police | 1.090 | 0.287 |
| *Persuaded or Appeased Offender* | | | |
| COPRSTAL | V cooperated, or pretended to (stalled, did what they asked) | 1.019 | 0.138 |
| ARGUE | V argued, reasoned, pleaded, bargained, etc. | 1.098 | 0.297 |
| *Escaped or Got Away* | | | |
| RANHIDE | V ran or drove away, or tried; hid, locked door | 1.138 | 0.345 |
| *Got Help or Gave Alarm* | | | |
| CALLPOL | V called police or guard | 1.072 | 0.259 |
| GETHELP | V tried to attract attention or help, warn others (cried out for help, called children inside) | 1.020 | 0.142 |
| *Reacted to Pain or Emotion* | | | |
| SCREAM | V screamed from pain or fear | 1.021 | 0.142 |
| *Other* | | | |
| OTHERS | V took other action | 1.150 | 0.357 |
| **Power Difference between V and O** | | | |
| ADVSEXOF | Male O and female V | 1.326 | 0.468 |
| ADVAGEOF | O age 15-29 and V either under 15 or 30 or older | 1.210 | 0.407 |
| ADVNUM | Number of O – number of V | -0.128 | 2.058 |
| **Offender Weapons and Attack** | | | |
| OHADGUN | O had gun | 1.082 | 0.274 |
| OHADKNIF | O had knife | 1.057 | 0.231 |
| OHADSHAP | O had sharp object | 1.010 | 0.101 |
| GOTINHOM | O (attempted to) entered house/apartment | 1.015 | 0.122 |
| GOTINCAR | O (attempted to) entered car | 1.000 | 0.156 |

* For binary variables, 1= Attribute is not present, 2=Attribute is present

## Table 1. Variables in the Analysis (Continued)

| Variable | Description | Mean | SD |
|---|---|---|---|
| *Victim characteristics* | | | |
| HADCHILD | Child in the victim's household | 1.394 | 0.489 |
| HOUSOWN | V owned the house | 1.507 | 0.500 |
| EMPLOYED | V was employed | 1.644 | 0.479 |
| OLD65 | V was 65 or older | 1.021 | 0.142 |
| MARRIED | V was married | 1.254 | 0.435 |
| EDUCATIN | V education | 15.159 | 6.538 |
| ARMFORCE | V was Armed force | 1.006 | 0.080 |
| BLACK | V was black | 1.146 | 0.353 |
| ASIAN | V was Asian | 1.018 | 0.134 |
| HISPANIC | V was Hispanic origin | 1.099 | 0.299 |
| NUMVICEX | Number of victimization in last six months | 2.640 | 12.070 |
| NUMHOUSE | Number of housing units in structure | 1.353 | 0.478 |
| | | | |
| *Offender characteristics* | | | |
| OFDGANG | 1+ O* was gang member | 1.074 | 0.262 |
| OFDSUBST | 1+ O was on substance (alcohol or drugs) | 1.299 | 0.458 |
| OFDFAMIL | 1+ O was V' family member | 1.048 | 0.213 |
| OSEXINTI | 1+ O was V's sexual intimate | 1.116 | 0.320 |
| OSUPERIOR | 1+ O was V's parents or supervisor | 1.008 | 0.088 |
| OFDACQNT | 1+ O was V's acquaintance (no family, work acquaint.) | 1.206 | 0.404 |
| OWORKACQ | 1+ O was V's work acquaintance | 1.052 | 0.222 |
| OFDBLACK | 1+ O was Black | 1.282 | 0.450 |
| OFDWHITE | 1+ O was White | 1.611 | 0.487 |
| | * One or more offenders | | |
| *Incident circumstances* | | | |
| RURAL | Incident occurred in rural | 1.159 | 0.365 |
| URBAN | Incident occurred in urban | 1.374 | 0.484 |
| ATHOME | Incident occurred at home | 1.176 | 0.380 |
| NEARHOME | Incident occurred near home | 1.202 | 0.402 |
| SECUPUB | Incident occurred in public place which may have security | 1.269 | 0.443 |
| FAMIPRES | Incident occurred with family member present | 1.202 | 0.402 |
| OTHRPRES | Incident occurred with others present (no family) | 1.482 | 0.500 |
| | | | |
| **Other variables eliminated in logistic analysis** | | | |
| ANYSD16 | V respond responded in any of 16 types of action | 1.707 | 0.455 |
| TOTALSD | Total number of victim response | 0.950 | 0.857 |
| OFDWEPON | O had weapon | 1.234 | 0.423 |
| OFDATCK | O attacked V | 1.541 | 0.498 |
| OFDTHRET | O threatened V | 1.487 | 0.499 |
| OFDGUNAT | O attacked with gun | 1.007 | 0.084 |
| OFDKIFAT | O attacked with knife | 1.023 | 0.150 |
| HOMINCOM | Income of the household | 8.406 | 4.203 |
| YOUG1529 | V was 15 to 29 yr old | 1.461 | 0.498 |
| MALE | V was male | 1.554 | 0.497 |
| NUMOFD | Number of O | 1.531 | 2.020 |
| MALEOFDC | O was male | 1.839 | 0.368 |
| YONGOFDC | O was 15 to 29 yr old | 1.549 | 0.498 |
| NIGHT | Incident occurred at night | 1.451 | 0.498 |
| AFTERNON | Incident occurred in the afternoon | 1.200 | 0.400 |
| SOUTH | Incident occurred in SOUTH | 1.244 | 0.430 |
| WEST | Incident occurred in WEST | 1.190 | 0.393 |

ANYINJUR and LOSTHING analyses, and thus serves as a point of comparison for all specific protective actions. Thus the coefficient of each protection variable reflects how much more or less likely a given outcome was for victims who took that action, compared to victims who did nothing to resist, other things being equal.

NCVS respondents reporting victimization are asked: "Did you do anything with the idea of protecting YOURSELF or your PROPERTY while the incident was going on?" (U.S. Bureau of Justice Statistics, 2003a). It should be noted that some "self-protection" actions are protective of property only, not the victim's bodily safety. For example, it is unlikely that victims would chase an offender to prevent injury to themselves. The purpose of such an action is more likely to recover the victim's property, inflict punishment on the offender or hold him for the police than to protect anything or anyone. Victims can also be coded as either cooperating or pretending to cooperate with the offender. Genuine cooperation might seem to be indistinguishable from nonresistance, but because cooperating and pretending to do so are grouped in the NCVS, victims in this category must be coded as having taken some kind of protective action, since some of them "stalled" to protect themselves.

Another problematic category of "self-protective action" coded in the NCVS is "screamed from pain or fear" (this is the verbatim description that appears in the NCVS interview schedule—U.S. Bureau of Justice Statistics, 2003a). Responses coded as fitting this category of victim response were provided in the context of the introductory statement asking about protection, thus these behaviors are treated as self-protection in the NCVS. But they could also be viewed as virtually involuntary responses to threat or injury itself, rather than actions intended to prevent further injury or property loss. Ambiguity arises because after the initial protection question is asked, those who respond "no" are nevertheless asked the more ambiguous follow-up question: "was there anything you did or tried to do about the incident while it was going on?" Thus some victims who described what they did during the incident, after they answered "no" to the first question, then "yes" to the second one, were not necessarily claiming that the action was taken for protective reasons. Nevertheless, because screaming from pain might well influence whether the perpetrator inflicts further injury, and screaming from fear might influence whether any injury is inflicted in the first place, we included this action in the models. Readers should, however, note that any positive associations between this victim behavior and injury may merely reflect the fact that injury often causes victims to scream from pain, and threat of an attack could make them scream from fear. Even with information on SP-injury sequence, one must still consider the possibility that victims may scream from fear just before an injury is inflicted. Such a case could

appear to support the view that screaming provokes offender attack, even if it actually has no effect.

It is not practical to assess the impact of combinations of specific protective measures. There are 57,527 possible combinations of sixteen different measures. Testing just 1 percent of these combinations would inevitably yield many misleadingly "significant" findings due to the huge number of hypothesis tests performed. Further, any subset of those combinations selected for the models would be arbitrary, given the absence of either research on the effects of combinations of victim actions or relevant theory that specifies which combinations would be most likely to affect, for good or ill, the outcomes of crimes. In any case, only 17.7 percent of all victims used more than one type of SP (13.3 percent used two types, 3.0 percent used three and 1.4 percent used more than three), so there usually is no issue of the effects of combinations of SP actions.[2] Further, when we examined the correlations among SP actions, we found no correlations even as large as 0.2, and only three exceeding 0.1, out of 120 total bivariate correlations. Thus, there appears to be no pronounced clustering of SP actions in the minority of cases where multiple actions were taken.

Other independent variables included in our models measure characteristics of the victims, offenders and circumstances that might influence the outcomes of the incidences and be correlated with the willingness or ability of victims to use each defensive action. First, three variables were included to reflect power advantages that offenders had over victims. ADVSEXOF was coded higher when male offender(s) confronted a female victim, that is, there was likely to be a power advantage to the offender based on sex. ADVAGEOF was coded higher when one or more offenders were in their physical prime ages (15 through 29) and the victim(s) was not in this age range, that is, there was likely to be a power advantage to the offender based on age and associated physical fitness. ADVNUM equaled the number of offenders minus the number of victims, measuring any numerical advantage of offenders.

Other variables measured whether offenders possessed weapons during the incident (OHADGUN, OHADKNIF, OHADSHAP) or whether offender(s) entered or attempted to enter the victim's home or car (GOTINHOM and GOTINCAR). Another twelve variables measured attributes of victims that are mostly self-explanatory. They are included because they reflect the willingness and capability of the victim to protect themselves and possibly different levels of risk of injury. For instance,

---

2. The percent of incidents in which victims used multiple types of SP was 17.7 in all confrontational crimes, 19.0 in robbery incidents, 16.5 in assaults, 23.4 in confrontational burglaries and 32.0 in sexual assaults.

victims older than 65 are, on the one hand, easier for the offender to injure because of their physical frailties and inability or disinclination to retaliate. On the other hand, in robberies, it may be precisely because offenders anticipate little resistance from older victims that they do not feel a need to attack them at the outset.

Ten other variables measure attributes of offenders, as perceived by victims, as well as the relationship between victim and offender. Intimate offenders such as family members and sexual intimates may be more inclined to inflict harm on the victim because hostility has had time to intensify in the course of extended emotional interaction. Alternatively, emotional bonds might inhibit the offender's aggression. Emotional intimacy might also influence the willingness and ability of victims to protect themselves—victims might be reluctant to direct forceful actions at intimates. Because there could be multiple offenders, with differing relationships to the victim, we simply coded whether a given relationship existed between the victim and at least one offender. Thus it is perfectly possible for a given incident to receive the higher code on more than one relationship variable. The same procedure was followed for offender race variables.

Other independent variables measure the degree of safety for the victim in terms of their familiarity with the setting and the possibility of gaining assistance from others. ATHOME reflects whether the crime occurred in the victim's home, while NEARHOME reflects whether the incident occurred in the immediate area around the home, such as the yard, garage and very close streets. SECUPUB stands for a secure public place that may have capable guardians, such as banks, other commercial places, offices, factories or school buildings.

Other variables indicating an urban or rural setting (RURAL, URBAN) reflect population density of the setting and thus the likelihood that there would be other people around who could serve as allies to the victim in intervening or summoning police. The presence of bystanders might discourage offender aggression, but it could also provoke it in aggressors who perceived a need to deter the victim from eliciting assistance from those potential allies. Alternatively, the presence of family members (FAMIPRES, OTHEPRES) could either encourage victims to resist for the sake of protecting their loved ones or make them cautious about resisting to avoid provoking offenders into attacking these others. Note that variables were omitted from equations only when it was necessary because they were constants in the subsample being analyzed.

# FINDINGS

## FREQUENCY AND INJURY RATES OF PROTECTIVE ACTIONS

Table 2 shows how often NCVS crime victims reported using the various types of victim protective actions and the share of victims using each method who were injured. Readers should not interpret these figures as measures of the relative effectiveness of the various resistance tactics, because simple differences in injury rates reflect more than just differences in the effects of victim actions. Nevertheless, this table conveys simple descriptive information that is arguably more important than the results of the later complex multivariate analyses. Most important, these figures show that while many crime victims are injured, they are rarely injured after taking protective action and are almost never seriously injured after resisting. For all 27,595 crime incidents, fewer than 2 percent involved a victim being injured after resisting the offender, and fewer than one-half of 1 percent involved a victim being seriously injured after resisting. Of all crimes involving SP actions and injury, only 10 percent involved SP followed by injury. Thus a scholar who implicitly interpreted SP-plus-injury crimes as incidents in which SP provoked offenders into injuring the victim would be wrong in at least 90 percent of the cases.

Once victims resist, the probability that they will suffer any further injury drops almost to zero, regardless of type of crime or resistance. Most offenders in personal larcenies and burglaries probably never had any intention of hurting their victims, and thus there were no violent intentions to thwart. Post-resistance injury is also rare in sexual assaults, robberies and assaults. This does not mean there is no risk to victim resistance, but the chances of resistance provoking offenders to inflict injury is low by any reasonable standard (2.8 percent of crimes with SP) and the risk of serious injury is close to zero (0.7 percent). Independent of victim resistance, violent crime is by definition inherently dangerous. Even among victims who did not resist, about 18.5 percent were injured; the rest were merely threatened. But resistance rarely adds to this "baseline" level of danger, given how infrequently any further injury is inflicted after resistance.

These conclusions can be drawn even before performing complex multivariate tests for a simple enough reason. Even if one were to make the extreme assumption that all cases of post-SP injury were incidents in which resistance alone caused the offender to hurt the victim, it would still be accurate to conclude that resistance rarely causes the victim to suffer further injury. In reality, it is highly unlikely that all crime victims who resisted and were then injured suffered those injuries because they resisted, because some offenders were certainly determined to hurt their victims regardless. Thus, the post-SP injury percentage is properly viewed

878                                    TARK AND KLECK

**Table 2. Frequency and Injury Rates of Self-Protection (SP) Strategies, in Percentages**

| SP Strategy | All Offenses | | | Robberies | | | |
|---|---|---|---|---|---|---|---|
| | Frequency | Injured after SP | Seriously Injured after SP | Frequency | Injured | Injured after SP | Seriously Injured after SP |
| Attacked with Gun | 45 | 33.3 | 2.2 | 0.0 | 6 | 33.3 | 0.0 | 0.0 |
| Threatened with Gun | 202 | 13.9 | 2.5 | 1.5 | 26 | 11.5 | 7.7 | 7.7 |
| Attacked w. Nongun Weapon | 230 | 40.6 | 2.6 | 0.9 | 35 | 45.7 | 2.9 | 2.9 |
| Threatened w. Nongun Weapon | 232 | 18.5 | 0.9 | 0.4 | 14 | 15.4 | 0.0 | 0.0 |
| Attacked without Weapon | 2,661 | 47.4 | 3.8 | 1.2 | 279 | 51.6 | 7.2 | 4.3 |
| Threatened without Weapon | 540 | 20.6 | 2.6 | 0.4 | 35 | 22.9 | 2.9 | 0.0 |
| Struggled | 4,984 | 49.8 | 4.1 | 1.0 | 542 | 50.9 | 6.3 | 1.3 |
| Chased, Held Offender | 517 | 24.6 | 2.3 | 0.4 | 76 | 32.5 | 6.6 | 2.6 |
| Yelled, Turned on Lights | 2,492 | 27.4 | 2.7 | 0.7 | 228 | 38.6 | 5.7 | 1.8 |
| Stalled, Pretended to Cooperate | 535 | 21.5 | 4.5 | 1.5 | 147 | 11.6 | 4.1 | 1.4 |
| Argued, Reasoned, Pleaded | 2,700 | 23.3 | 3.4 | 0.9 | 160 | 26.9 | 6.9 | 2.5 |
| Ran Away, Hid | 3,807 | 20.5 | 1.8 | 0.4 | 335 | 31.4 | 3.6 | 0.6 |
| Called Police or Guard | 1,990 | 17.8 | 0.9 | 0.2 | 100 | 27.0 | 1.0 | 0.0 |
| Tried to Attract Attention | 567 | 38.7 | 1.9 | 0.4 | 83 | 42.2 | 4.8 | 0.0 |
| Screamed from Pain or Fear | 569 | 77.0 | 3.5 | 1.6 | 68 | 70.6 | 5.9 | 4.4 |
| Other SP Strategies | 4,149 | 15.9 | 2.4 | 0.5 | 273 | 28.2 | 8.1 | 4.0 |
| Any SP | 19,519 | 26.4 | 2.8 | 0.7 | 1,697 | 33.8 | 5.4 | 1.6 |
| No SP | 8,077 | 18.5 | n/a | n/a | 943 | 23.1 | n/a | n/a |
| Total Incidents* | 27,595 | 24.1 | 2 | 0.5 | 2,640 | 30.0 | 3.5 | 1.1 |

* Total Incidents are smaller than the sum of SP actions because victims often employed multiple actions.

**Table 2. Frequency and Injury Rates of Self-Protection (SP) Strategies, in Percentages (continued)**

| SP Strategy | Assaults | | | | Confrontational Burglaries | | | |
|---|---|---|---|---|---|---|---|---|
| | Frequency | Injured | Injured after SP | Seriously Injured after SP | Frequency | Injured | Injured after SP | Seriously Injured after SP |
| Attacked with Gun | 28 | 39.3 | 7.1 | 0.0 | 12 | 25 | 0.0 | 0.0 |
| Threatened with Gun | 138 | 15.8 | 2.9 | 0.7 | 38 | 10.5 | 0.0 | 0.0 |
| Attacked w. Nongun Weapon | 161 | 41.9 | 2.5 | 0.6 | 27 | 25.9 | 3.7 | 0.0 |
| Threatened w. Nongun Weapon | 176 | 18.2 | 1.1 | 0.6 | 34 | 17.6 | 0.0 | 0.0 |
| Attacked without Weapon | 2,146 | 46.2 | 3.4 | 0.4 | 106 | 57.5 | 1.9 | 0.0 |
| Threatened without Weapon | 474 | 19.2 | 2.5 | 0.7 | 22 | 22.7 | 0.0 | 0.0 |
| Struggled | 3,842 | 48.8 | 3.6 | 0.0 | 198 | 60.3 | 6.6 | 1.5 |
| Chased, Held Offender | 324 | 28.7 | 2.5 | 0.0 | 77 | 10.4 | 0.0 | 0.0 |
| Yelled, Turned on Lights | 1,642 | 25.4 | 2.4 | 0.4 | 372 | 16.9 | 1.6 | 0.0 |
| Stalled, Pretended to Cooperate | 299 | 15.4 | 4.3 | 0.7 | 29 | 17.2 | 6.9 | 0.0 |
| Argued, Reasoned, Pleaded | 2,146 | 18.0 | 2.9 | 0.2 | 174 | 30.5 | 2.3 | 0.0 |
| Ran Away, Hid | 3,179 | 18.0 | 1.6 | 0.3 | 114 | 36.8 | 3.5 | 0.9 |
| Called Police or Guard | 1,492 | 17.5 | 0.8 | 0.1 | 366 | 14.2 | 1.1 | 0.0 |
| Tried to Attract Attention | 388 | 35.4 | 0.5 | 0.0 | 41 | 31.7 | 4.9 | 0.0 |
| Screamed from Pain or Fear | 353 | 78.8 | 2.5 | 0.0 | 54 | 68.5 | 1.9 | 0.0 |
| Other SP Strategies | 3,441 | 14.5 | 2.0 | 0.2 | 241 | 7.9 | 2.5 | 0.0 |
| Any SP | 15,503 | 24.9 | 2.5 | 0.4 | 1,293 | 20.1 | 2.7 | 0.3 |
| No SP | 6,068 | 17.1 | n/a | n/a | 528 | 12.5 | n/a | n/a |
| Total Incidents* | 21,570 | 22.7 | 1.8 | 0.3 | 1,821 | 17.9 | 1.9 | 0.2 |

* Total incidents are smaller than the sum of SP actions because victims often employed multiple actions

Table 2. Frequency and Injury Rates of Self-Protection (SP) Strategies, in Percentage (continued)

| SP Strategy | Frequency | Sexual Assaults | | | Personal Larcenies** |
| | | Injured | Injured after SP | Seriously Injured after SP | Frequency |
| --- | --- | --- | --- | --- | --- |
| Attacked with Gun | 0 | - | - | - | 0 |
| Threatened with Gun | 1 | 0 | 0.0 | 0.0 | 0 |
| Attacked w. Nongun Weapon | 5 | 60.0 | 0.0 | 0.0 | 2 |
| Threatened w. Nongun Weapon | 10 | 10.0 | 0.0 | 0.0 | 0 |
| Attacked without Weapon | 120 | 35.8 | 5.0 | 0.0 | 6 |
| Threatened without Weapon | 11 | 33.3 | 0.0 | 0.0 | 0 |
| Struggled | 343 | 36.2 | 2.9 | 0.0 | 37 |
| Chased, Held Offender | 4 | 0 | 0.0 | 0.0 | 37 |
| Yelled, Turned on Lights | 219 | 32.0 | 3.2 | 0.0 | 27 |
| Stalled, Pretended to Cooperate | 49 | 40.8 | 4.1 | 0.0 | 4 |
| Argued, Reasoned, Pleaded | 213 | 34.9 | 3.8 | 0.0 | 2 |
| Ran Away, Hid | 161 | 20.5 | 0.6 | 0.0 | 15 |
| Called Police or Guard | 38 | 42.1 | 5.3 | 0.0 | 12 |
| Tried to Attract Attention | 41 | 51.2 | 4.9 | 0.0 | 11 |
| Screamed from Pain or Fear | 83 | 61.4 | 6.0 | 0.0 | 4 |
| Other SP Strategies | 171 | 12.9 | 0.0 | 0.0 | 28 |
| Any SP | 886 | 25.2 | 2.5 | 0.0 | 139 |
| No SP | 233 | 19.0 | n/a | n/a | 306 |
| Total Incidents* | 1,119 | 23.9 | 2.0 | 0.0 | 445 |

*Total Incidents are smaller than the sum of SP actions because victims often employed multiple actions.
**Since there are no injured Vs in personal larceny incidents, injury percentages are not shown.

as an upper limit on the share of crimes in which protective actions might have provoked offenders into attacking.

These simple injury rates, however, cannot tell us whether resistance actually reduces risk of injury. Perhaps victims resist only in situations that were already relatively safe, or resist only offenders who appeared unlikely to hurt them. Nor can these figures tell us which protective actions are relatively more effective, inconsequential or counter-productive. To address these issues, analyses using multivariate controls are needed.

This extremely low rate of post-SP injury is good news for crime victims. It creates, however, statistical problems for assessing the relative effectiveness of different protective strategies for avoiding injury because it means that there is very little variation on dependent variables measuring post-SP injury. It is harder to predict very rare outcomes. Estimates of the impact of a given variable will necessarily be unstable even in fairly large samples because they are based on so few cases with the outcome of interest. This problem is aggravated when analyses are confined to subsamples pertaining to specific crime types, especially the less frequent ones, and is even more severe with regard to estimating effects of the rarer SP actions. Thus, for example, despite the very large NCVS total samples, there are few robberies with post-SP injury, and also few with armed resistance. Estimates of the effects of armed resistance on post-SP injury in robberies will therefore depend on a few cases and be correspondingly unstable.

## PROPERTY LOSS

Middle-class observers might be tempted to dismiss property loss as a minor consequence of robberies, burglaries and larcenies, preferring instead to focus only on injury, fear, invasion of privacy and the loss of a sense of security. This is certainly true of scholars who study victim resistance because they rarely address the effects of resistance on property loss. In contrast, lower income persons, for whom the loss of $100 might make it impossible to buy groceries or pay the rent, might be less inclined to regard the issue as trivial. Thus we begin by assessing the impact of victim actions on whether victims of robbery, confrontational burglary or personal contact larceny lost any property.

The findings in Table 3 indicate that thirteen of the sixteen protective actions were associated with lower rates of property loss compared to nonresistance, eleven significantly so. Based on the size of the coefficients of the corresponding variables, three of the four most effective methods for avoiding property loss in crimes in general were armed resistance, all in robberies were armed resistance, and three of the four in confrontational

burglaries were armed resistance. Note that the crime-specific findings are unstable for the rarer forms of SP, including use of a gun. Distributions are extreme on both these SP variables and the property loss dependent variable, because property loss is extremely rare among victims who used guns.

## Table 3. Property Loss

| | All Types of Crime | | Robbery | | Confrontational Burglary | | Personal Larceny | |
|---|---|---|---|---|---|---|---|---|
| *Victim's Self Protection* | | | | | | | | |
| Attack with Gun | -1.367 | (-1.94) | -1.793** | (-1.97) | -2.556 | (-1.60) | - | |
| Threat with Gun | -1.682* | (-4.35) | -21.795 | (-0.00) | -0.265 | (-0.57) | - | |
| Attack with nongun weapon | -0.884* | (-2.96) | -1.765* | (-4.33) | -1.451** | (-2.06) | -24.004 | (-0.00) |
| Threat withnongun weapon | -2.227* | (-4.27) | -1.562** | (-2.28) | -20.453 | (-0.00) | 13.436 | (0.00) |
| Attack withoutweapon | -0.549* | (-5.80) | -0.727* | (-4.84) | -0.671 | (-2.12) | -5.331* | (-3.30) |
| Threat without weapon | -1.124* | (-3.97) | -1.523* | (-3.42) | 0.670 | (1.15) | - | |
| Struggled | -0.461* | (-6.71) | -0.665* | (-5.80) | -1.053* | (-4.16) | -4.902* | (-6.27) |
| Chased, heldoffender | 1.056* | (8.35) | 0.060 | (0.22) | 0.802* | (2.76) | 0.679 | (0.55) |
| Yelled, turned onlights | -0.319* | (-3.54) | -0.449* | (-2.69) | -0.629* | (-3.33) | -2.071** | (-2.16) |
| Stalled, pretended to cooperate | 0.930* | (7.58) | 0.732* | (2.96) | 1.087** | (2.40) | 17.532 | (0.00) |
| Argued, reasoned, pleaded | -1.016* | (-9.18) | -0.716 | (-3.62) | -0.568** | (-2.08) | -1.848 | (-0.96) |
| Ran away, hid | -1.285* | (-14.34) | -1.332* | (-9.79) | -0.522 | (-1.71) | -3.752* | (-3.04) |
| Called police or guard | -0.482* | (-4.60) | -0.479** | (-1.99) | -0.219 | (-1.24) | 1.485 | (0.58) |
| Tried to attract attention | -0.037 | (-0.22) | -0.794* | (-3.01) | 0.110 | (0.23) | -0.539 | (-0.25) |
| Screamed from pain or fear | 0.371** | (2.34) | 0.779** | (2.48) | 0.632 | (1.52) | 20.801 | (0.00) |
| Other SP strategies | -0.767* | (-9.53) | -0.509* | (-3.34) | -0.807* | (-3.60) | -3.393* | (-3.90) |
| *PowerDifference* | | | | | | | | |
| ADVSEXOF | 0.160* | (2.90) | 0.168 | (1.43) | -0.341** | (-2.27) | -2.104* | (-2.73) |
| ADVAGEOF | 0.373* | (6.90) | -0.260** | (-2.50) | 0.415* | (2.65) | -0.115 | (-0.20) |
| ADVNUM | 0.043* | (4.68) | 0.086* | (3.05) | 0.081 | (1.68) | -0.376 | (-1.75) |
| *Offender weapons and attack* | | | | | | | | |
| OHADGUN | 0.953* | (14.36) | 0.668* | (5.05) | 0.581** | (2.23) | - | |
| OHADKNIF | 0.441* | (4.97) | -0.088 | (-0.62) | 0.312 | (1.04) | - | |
| OHADSHAP | 0.123 | (0.55) | -0.027 | (-0.08) | 0.750 | (0.85) | - | |
| GOTINHOM | -1.057* | (-5.42) | - | | -1.514* | (-7.46) | - | |
| GOTINCAR | 0.778 | (0.81) | - | | 0.398 | (0.44) | - | |
| *Victim Characteristics* | | | | | | | | |
| HADCHILD | -0.153* | (-2.84) | -0.016 | (-0.14) | -0.153 | (-0.96) | 0.502 | (0.72) |
| HOUSOWN | -0.037 | (-0.59) | -0.101 | (-0.81) | 0.438** | (2.50) | -1.176 | (-1.49) |
| EMPLOYED | -0.143* | (-2.55) | -0.120 | (-1.10) | 0.103 | (0.66) | -0.956 | (-1.55) |
| OLD65 | 0.876* | (7.38) | -0.004 | (-0.01) | 0.862* | (3.38) | -0.488 | (-0.60) |
| MARRIED | -0.129** | (-2.06) | 0.182 | (1.42) | 0.109 | (0.66) | -0.742 | (-1.26) |
| EDUCATIN | -0.017* | (-4.12) | -0.015 | (-1.75) | 0.003 | (0.30) | -0.055 | (-1.34) |
| ARMFORCE | -0.834** | (-2.00) | 0.657 | (0.65) | 0.133 | (0.09) | 17.871 | (0.00) |
| BLACK | 0.133 | (1.94) | 0.321** | (2.39) | -0.124 | (-0.54) | 0.433 | (0.46) |
| ASIAN | 0.538* | (3.75) | 0.240 | (0.93) | -0.202 | (-0.44) | -1.686 | (-1.64) |
| HISPANIC | 0.510* | (6.93) | 0.134 | (0.95) | -0.158 | (-0.62) | -0.415 | (-0.55) |
| NUMVICEX | -0.056* | (-4.52) | -0.011 | (-0.92) | -0.049 | (-0.98) | 1.044 | (0.74) |
| NUMHOUSE | 0.164** | (2.59) | 0.076 | (0.60) | 0.196 | (1.10) | -0.366 | (-0.47) |

* p<0.01 (two-tailed) ** 0.01<P<0.05 (two tailed)

**Table 3. Property Loss (continued)**

| | All Type of Crime | | Robbery | | Confrontational Burglary | | Personal Larceny | |
|---|---|---|---|---|---|---|---|---|
| *Offender Characteristics* | | | | | | | | |
| OFDGANG | -0.240* | (-2.66) | -0.263 | (-1.66) | 0.014 | (0.04) | -1.313 | (-0.89) |
| OFDSUBST | -0.057 | (-1.01) | 0.234** | (2.05) | -0.087 | (-0.58) | 0.652 | (0.41) |
| OFDFAMIL | -0.453* | (-3.31) | 0.698** | (2.11) | -0.637 | (-1.93) | 15.344 | (0.00) |
| OSEXINTI | -0.780* | (-7.61) | 0.489** | (2.00) | -0.405 | (-1.93) | 17.959 | (0.00) |
| OSUPERIOR | -0.101 | (-0.33) | 1.716 | (1.59) | 1.660** | (1.97) | - | |
| OFDACQNT | -0.715* | (-9.13) | 0.156 | (0.92) | 0.009 | (0.05) | 19.751 | (0.00) |
| OWORKACQ | -1.617* | (-6.73) | 1.503 | (2.45) | -0.481 | (-0.55) | - | |
| OFDBLACK | 0.543* | (7.61) | 0.234 | (1.83) | -0.182 | (-0.82) | 0.179 | (0.27) |
| OFDWHITE | -0.420* | (-5.95) | 0.110 | (0.81) | -0.528* | (-2.64) | 0.251 | (0.34) |
| *Incident Circumstances* | | | | | | | | |
| RURAL | -0.166** | (-2.01) | 0.060 | (0.34) | -0.322 | (-1.60) | -1.710 | (-1.78) |
| URBAN | 0.150* | (2.82) | 0.051 | (0.48) | -0.018 | (-0.12) | 0.219 | (0.38) |
| ATHOME | 0.613* | (7.50) | 0.335 | (1.41) | - | | 14.935 | (0.00) |
| NEARHOME | -0.410* | (-5.71) | 0.302** | (2.18) | - | | 0.351 | (0.34) |
| SECUPUB | -0.463* | (-6.71) | -0.146 | (-1.06) | - | | 0.809 | (1.31) |
| FAMIPRES | -0.369* | (-5.26) | -0.095 | (-0.57) | -0.105 | (-0.68) | 0.191 | (0.24) |
| OTHRPRES | -0.568 | (-10.14) | -0.286* | (-2.67) | -0.510** | (-2.25) | 0.913 | (1.31) |
| Sample size | 25,858 | | 2,473 | | 1,671 | | 410 | |
| -2 Log-likelihood | 12,679 | | 2,752 | | 1,457 | | 124 | |

\* p<0.01 (two-tailed) \*\* 0.01<P<0.05 (two tailed)

## INJURY REGARDLESS OF INJURY-SP SEQUENCE

It could be hypothesized that this greater ability of resisting victims to avoid property loss comes at the price of increased risk of injury. While some victims might succeed in retaining their property by resisting, their resistance might anger aggressors into attacking them. Table 4 presents findings comparable to those reported in most research, in that they show the association between protective actions and injury to the victim, without respect to whether injury preceded or followed resistance. It should be stressed that the purpose of reporting the Table 4 estimates is to provide results comparable to those in most studies, not to report results that we regard as the most meaningful estimates of SP effects on victim injury.

The results are extremely mixed and reveal no clear patterns. About half of the protection variable coefficients are positive and half negative. Those that are negative are as likely to pertain to forceful as nonforceful actions. Many of these findings are hard to understand if one interprets the SP-injury associations as the effects of victim actions on injury. For example, taken at face value, they seem to suggest that, aside from threatening the offender with a gun or calling the police, the most effective methods for avoiding injury were threatening without a weapon and "yelling or turning on the lights." While some of these apparent

884                                    TARK AND KLECK

interpretations might be valid, the findings are ambiguous because they take no account of SP-injury sequence. One cannot tell if positive associations reflect counterproductive effects of foolish resistance actions or previously nonresisting victims roused into action by the injuries inflicted on them.

**Table 4. Injury (Regardless of Sequence)**

| | All Types of Crime | Robbery | Logit Coefficient (ratio, coef./SE) Assault | Confrontational Burglary | SexAssault |
|---|---|---|---|---|---|
| *Victim's Self-Protection* | | | | | |
| Attack with Gun | 1.068* (2.96) | -0.227 (-0.24) | 1.408* (3.14) | 1.761 (1.92) | - |
| Threat with Gun | -0.726* (-2.94) | -2.118** (-2.16) | -0.347 (-1.24) | -0.967 (-1.26) | -20.032 (-0.00) |
| Attack with Nongun Weapon | 0.672* (4.30) | 0.499 (1.32) | 0.826* (4.40) | 0.711 (1.33) | 1.463 (1.32) |
| Threat with Nongun Weapon | -0.492** (-2.47) | -0.547 (-0.73) | -0.578*** (-2.40) | 0.344 (0.59) | -1.931 (-1.34) |
| Attack without Weapon | 1.068* (22.05) | 0.913* (6.13) | 1.072* (19.60) | 1.682* (6.32) | 0.458 (1.81) |
| Threat without Weapon | -0.381* (-3.01) | -0.745 (-1.63) | -0.382* (-2.77) | -0.756 (-0.95) | -1.242 (-1.38) |
| Struggled | 1.316* (34.81) | 1.011* (8.87) | 1.357* (31.10) | 2.069* (9.90) | 0.871* (4.81) |
| Chased, Held Offender | 0.049 (0.41) | -0.103 (-0.37) | 0.394* (2.72) | -0.809 (-1.58) | -19.320 (-0.00) |
| Yelled, Turned on Lights | -0.236* (-3.91) | 0.101 (0.58) | -0.245* (-3.26) | -0.281 (-1.20) | -0.046 (-0.21) |
| Stalled, Pretended to Cooperate | 0.128 (1.04) | -0.763* (-2.64) | -0.130 (-0.70) | -0.524 (-0.82) | 0.041 (0.11) |
| Argued, Reasoned, Pleaded | -0.162* (-2.79) | -0.380 (-1.66) | -0.335* (-4.76) | 0.563** (2.19) | 0.358 (1.73) |
| Ran Away, Hid | -0.125** (-2.48) | 0.154 (1.08) | -0.126*** (-2.15) | 0.819* (2.99) | -0.197* (-0.76) |
| Called Police or Guard | -0.552* (-7.58) | -0.463 (-1.72) | -0.442* (-5.21) | -0.447 (-2.08) | 0.668 (1.49) |
| Tried to Attract Attention | 0.431* (3.99) | 0.183 (0.68) | 0.501* (3.80) | -0.016 (-0.03) | 0.372 (0.89) |
| Screamed from Pain or Fear | 2.017* (16.89) | 1.482* (4.71) | 2.151* (14.18) | 2.168* (4.56) | 1.460* (4.69) |
| Other SP Strategies | -0.155* (-3.02) | 0.167 (1.04) | -0.169* (-2.86) | -0.727** (-2.38) | -0.521 (-1.78) |
| *Power Difference* | | | | | |
| ADVSEXOF | 0.149* (3.74) | 0.011 (0.09) | 0.076 (1.54) | -0.023 (-0.12) | 0.062 (0.18) |
| ADVAGEOF | 0.049 (1.15) | 0.079 (0.73) | 0.045 (0.88) | 0.117 (0.54) | 0.246 (0.88) |
| ADVNUM | 0.030* (3.99) | 0.110* (4.52) | 0.019* (2.35) | 0.016 (0.28) | -0.188 (-1.33) |
| *Offender Weapons and Attack* | | | | | |
| OHADGUN | -0.521* (-7.33) | -0.867* (-5.98) | -0.718* (-7.40) | 0.089 (0.30) | 0.912** (2.27) |
| OHADKNIF | -0.152** (-2.19) | -0.311** (-2.01) | -0.273* (-3.17) | 0.044 (0.13) | 0.826** (2.05) |
| OHADSHAP | 0.371* (2.56) | 0.186 (0.53) | 0.340** (2.04) | 1.537 (1.75) | 1.781 (1.34) |
| GOTINHOM | -19.974 (-0.01) | - | - | -19.196 (-0.01) | - |
| GOTINCAR | -19.306 (-0.00) | - | - | -18.167 (-0.00) | - |

* p<0.05 (two-tailed)  ** 0.01<P<0.05 (two-tailed)  * p<0.01 (two-tailed)

**Table 4. Injury (continued)**

Logit Coefficient (ratio, coef./SE)

| | All Types of Crime | Robbery | Assault | Confrontational Burglary | SexAssault |
|---|---|---|---|---|---|
| *Victim Characteristics* | | | | | |
| HADCHILD | -0.056 (-1.56) | -0.065 (-0.58) | -0.072 (-1.76) | -0.135 (-0.70) | 0.281 (1.51) |
| HOUSOWN | -0.128* (-3.06) | -0.124 (-0.96) | -0.122** (-2.54) | -0.105 (-0.50) | -0.592* (-2.60) |
| EMPLOYED | -0.261* (-6.67) | -0.060 (-0.54) | -0.236* (-5.10) | -0.605 (-3.39) | 0.197 (0.99) |
| OLD65 | -0.313*** (-2.36) | 0.214 (0.68) | 0.011 (0.06) | -0.823** (-1.97) | 2.203* (2.73) |
| MARRIED | -0.220* (-4.86) | -0.070 (-0.52) | -0.232* (-4.43) | -0.112 (-0.49) | -0.056 (-0.20) |
| EDUCATIN | -0.024* (-7.73) | -0.015 (-1.67) | -0.030* (-8.32) | -0.004 (-0.24) | 0.000 (-0.02) |
| ARMFORCE | -0.570** (-2.35) | -19.807 (-0.00) | -0.545** (-2.13) | -18.386 (-0.00) | -20.094 (-0.00) |
| BLACK | -0.042 (-0.76) | -0.040 (-0.29) | -0.043 (-0.63) | -0.094 (-0.31) | -0.416 (-1.24) |
| ASIAN | 0.104 (0.83) | 0.209 (0.78) | -0.072 (-0.44) | 0.815 (1.48) | -0.662 (-0.95) |
| HISPANIC | -0.023 (-0.41) | -0.233 (-1.58) | 0.027 (0.41) | 0.113 (0.39) | -0.372 (-1.12) |
| NUMVICEX | -0.010* (-3.77) | -0.001 (-0.08) | -0.011* (-3.74) | 0.007 (0.24) | 0.016 (1.09) |
| NUMHOUSE | 0.037 (0.84) | -0.086 (-0.67) | 0.049 (0.95) | 0.058 (0.28) | -0.047 (-0.21) |
| *Offender Characteristics* | | | | | |
| OFDGANG | 0.119 (1.92) | 0.275 (1.72) | 0.017 (0.24) | 0.553 (1.55) | 0.984 (2.47) |
| OFDSUBST | 0.367* (10.28) | 0.439* (3.88) | 0.311* (7.46) | 0.681* (4.11) | 0.592* (3.38) |
| OFDFAMIL | 0.191*** (2.26) | -0.061 (-0.19) | 0.183 (1.87) | 1.160* (3.62) | -19.803 (-0.00) |
| OSEXINTI | 0.951* (15.87) | 0.692* (2.92) | 1.014* (13.73) | 1.108* (4.93) | 0.491** (2.04) |
| OSUPERIOR | 0.550* (3.18) | 1.307 (1.89) | 0.358 (1.83) | 0.082 (0.09) | 20.752 (0.00) |
| OFDACQNT | 0.126* (2.82) | 0.179 (1.04) | 0.085 (1.68) | 0.149 (0.63) | 0.089 (0.40) |
| OWORKACQ | -0.055 (-0.61) | -0.658 (-0.97) | -0.089 (-0.91) | -0.102 (-0.09) | 0.208 (0.54) |
| OFDBLACK | 0.047 (0.84) | 0.030 (0.23) | 0.013 (0.19) | 0.282 (0.84) | 0.136 (0.39) |
| OFDWHITE | -0.103** (-2.04) | 0.030 (0.22) | -0.134** (-2.29) | -0.045 (-0.15) | -0.157 (-0.57) |
| *Incident Circumstances* | | | | | |
| RURAL | 0.047 (0.99) | -0.350 (-1.89) | 0.080 (1.51) | 0.087 (0.37) | 0.080 (0.34) |
| URBAN | 0.013 (0.33) | 0.189 (1.72) | -0.011 (-0.25) | 0.108 (0.58) | -0.083 (-0.42) |
| ATHOME | 0.406* (6.94) | 0.090 (0.39) | 0.515* (6.68) | - | 0.113 (0.45) |
| NEARHOME | 0.055 (1.15) | -0.002 (-0.02) | 0.010** (0.18) | - | 0.099 (0.40) |
| SECUPUB | -0.176* (-3.77) | -0.453* (-2.93) | -0.103** (-2.05) | - | -0.670 (-1.78) |
| FAMIPRES | -0.100** (-2.03) | -0.309 (-1.77) | 0.160* (2.70) | -0.291 (-1.52) | -0.306 (-1.14) |
| OTHRPRES | 0.009 (0.22) | -0.052 (-0.47) | 0.214* (4.36) | -0.044 (-0.18) | -0.470 (-1.74) |
| Sample size | 25,858 | 2,473 | 20,259 | 1,671 | 1,045 |
| -2 Log-likelihood | 23,839 | 2,607 | 18,087 | 1,026 | 922 |

* p<0.01 (two-tailed) ** 0.01<P<0.05 (two-tailed)

## POST-SELF PROTECTION INJURY

This problem is addressed in the analyses whose findings are reported in Table 5. Here the dependent variable denotes whether the victim was injured after taking protective actions. Victims were coded 2 if they took SP actions and were injured after doing so, and 1 if they took SP actions and were not injured after doing so. The second group included those who were injured only before taking SP actions. This method of defining the dependent variable eliminates the SP-injury sequence problem because only post-SP injuries can "count against" an SP action. It permits comparisons of effectiveness among the sixteen SP actions, but not

between a given SP action and taking none. Cases in which victims took no action were not included in the Table 5 and 6 analyses because the concept of post-SP injury does not apply. (We later report results from an alternative approach in which no-SP cases were included and arbitrarily coded as whether there was "post-SP" injury.) Thus, unlike the preceding analyses, the Tables 5 and 6 results describe only victims who took some kind of protective action. They address the question: "among victims who did something for protection, which actions were relatively more effective in averting subsequent injury?"

Because nonresisting victims were excluded, we could not treat no-SP as the excluded category. It is statistically inconsequential which protective action was treated as the excluded category. We nonetheless selected "called the police" as the omitted category because it is often presented as the officially recommended course of action for crime victims, and thus can serve as a useful point of comparison. The signs and absolute sizes of coefficients in Tables 5 and 6 should therefore not be compared with those in Table 4, because the omitted SP category serving as the point of reference is different. Instead, the focus should be on the relative sizes of the coefficients within each model.

The "effectiveness" of a given SP action is meaningful only in a comparative context even if the alternative is doing nothing. Thus the signs of the coefficients for the SP variables are a somewhat arbitrary reflection of which SP category we chose to treat as the omitted category. If we omit the SP type with the lowest rate of injury, the coefficients of all the included SP variables will be positive. Conversely, if we treat the SP with the highest injury risk as the omitted category, all SP coefficients will be negative, perhaps suggesting to the unwary that all SP actions "work" in avoiding injury. In our injury analyses we treat "no-SP" (Table 4) or "call the police" (Tables 5 and 6) as the omitted categories merely because they are well known as the no-resistance courses of action that are sometimes recommended to prospective victims by authorities such as police or victim advocates. Readers should note, however, that these options are often neither either feasible nor safe for some victims. Conversely, when they are adopted, it is sometimes an indication that the circumstances of the crime were already relatively safe for reasons having nothing to do with victim actions. For example, if a victim was able to call the police during the crime incident, it suggests that circumstances were less risky. Consequently, even SP methods effective in averting offender attack may not have significant negative coefficients because they were not capable of driving the risk of injury below the already extremely low risk among those who had the luxury of calling the police while the incident was going on.

The Table 5 estimates are therefore most appropriately viewed with a focus on the rankings and relative sizes of the SP coefficients. Most of the SP actions appear to have effects on post-SP injury that are not significantly different from calling the police. The SP actions with the largest negative coefficients are both types of armed resistance, threat with a nongun weapon and threat with a gun, though neither action's coefficient is significantly different from zero, partly due to the rarity of these actions. The only option with a significant negative coefficient was "ran away, hid." On the other hand, five types of unarmed SP action had significant positive associations, indicating that they were associated with higher post-SP injury than calling the police: attacking without a weapon, struggling with the offender, stalling or pretending to cooperate, arguing or reasoning or pleading, and screaming from pain or fear.

The meaning of the last association is ambiguous, for reasons discussed earlier. Leaving it aside, two of the significantly less effective SP actions were forceful and the other two nonforceful. None of the four forms of armed resistance were associated with significantly higher injury risk compared to calling the police. In sum, once SP-injury sequence is taken into account, there is no evidence indicating that either forceful resistance in general or armed resistance in particular is generally counterproductive or that it is less effective than nonforceful options in avoiding injury. The findings thus contradict earlier ones that nonforceful resistance is more effective than forceful (for example, Cook, 1986; Block and Skogan, 1986; Marchbanks et al., 1990; Zimring and Zuehl, 1986). The earlier conclusions were probably an artifact of the failure to address SP-injury sequence, because the analysts effectively treated injury preceding SP as if it could be a consequence of SP. This flaw makes resistance look less effective than it actually is.

Attending only to the sizes of the coefficients, the SP methods that appeared most effective in averting injury in all types of crimes were both armed resistance—threat with a gun and threat with any other weapon. In robberies, all of the five most effective SP actions were forceful resistance, and the top four were armed resistance. Among assaults, there was no clear pattern regarding types of SP that averted injury. In confrontational burglaries, five of the six most effective SP actions were forceful, and all four forms of armed resistance showed more success in averting injury than calling the police, though these differences were not significant. Finally, in sexual assaults, four of the six most effective SP actions were forceful, though again, post-SP injury in sexual assaults is so rare that even very large coefficients are not significantly different from zero.

Because the analyses reported in Table 5 excluded no-SP cases, which claimed 29 percent of the total sample, the sample sizes on which these analyses are based are substantially smaller than those reported in Table 4.

**Table 5. Injury after SP Action**

| | Logit Coefficient (ratio, coef./SE) | | | | |
|---|---|---|---|---|---|
| | All Types of Crime | Robbery | Assault | Confrontational Burglary | SexAssault |
| **Victim's Self-Protection** | | | | | |
| Attack with Gun | 0.471 (0.55) | -18.550 (-0.00) | 1.248 (1.42) | -16.682 (-0.00) | -14.562 (-0.00) |
| Threat with Gun | -0.517 (-0.85) | -18.061 (-0.00) | 0.132 (0.21) | -16.959 (-0.00) | -10.502 (-0.11) |
| Attack with Nongun Weapon | 0.049 (0.12) | -1.213 (-0.88) | 0.221 (0.44) | -0.147 (-0.11) | -16.871 (-0.00) |
| Threat with Nongun Weapon | -0.993 (-1.51) | -17.771 (-0.00) | -0.766 (-1.15) | -17.418 (-0.00) | -16.871 (-0.00) |
| Attack without Weapon | 0.597* (4.63) | 0.766* (2.37) | 0.464* (2.98) | 0.001 (0.00) | 3.055* (2.86) |
| Threat without Weapon | -0.060 (-0.21) | -1.050 (-0.97) | 0.051 (0.17) | -17.017 (-0.09) | -14.704 (-0.00) |
| Struggled | 0.881* (8.20) | 0.918* (3.27) | 0.784* (5.88) | 1.861* (3.62) | 1.583 (1.86) |
| Chased, Held Offender | -0.126 (-0.41) | 0.174 (0.32) | 0.014 (0.04) | -17.450 (-0.10) | -16.257 (-0.00) |
| Yelled, Turned on Lights | 0.026 (0.18) | 0.458 (1.25) | 0.072 (0.39) | -0.730 (-1.12) | -0.508 (-0.58) |
| Stalled, Pretended to Cooperate | 0.678* (2.89) | -0.702 (-1.34) | 0.931* (3.01) | -0.128 (-0.08) | -4.323 (-0.41) |
| Argued, reasoned, pleaded | 0.365* (2.72) | 0.306 (0.77) | 0.263 (1.58) | 0.451 (0.66) | 1.274 (1.20) |
| Ran away, hid | -0.424* (-2.83) | -0.231 (-0.64) | -0.323 (-1.80) | 0.210 (0.30) | -1.530 (-1.01) |
| Tried to attract attention | -0.267 (-0.82) | 0.154 (0.27) | -1.507** (-2.03) | 1.830* (1.98) | 2.927 (1.77) |
| Screamed from pain or fear | 0.925* (3.42) | 0.645 (0.94) | 0.700 (1.83) | -18.283 (-0.00) | 2.103 (1.57) |
| Other SP strategies | 0.140 (1.03) | 0.824* (2.55) | 0.037 (0.22) | 0.163 (0.26) | -20.499 (-0.01) |
| **Power difference** | | | | | |
| ADVSEXOF | 0.204 (1.83) | -0.360 (-1.15) | 0.145 (1.01) | -0.190 (-0.35) | 16.286 (0.00) |
| ADVAGEOF | 0.116 (0.97) | 0.269 (1.03) | 0.004 (0.03) | 0.608 (1.03) | -0.681 (-0.65) |
| ADVNUM | 0.051* (3.46) | 0.095* (2.25) | 0.045* (2.69) | 0.102 (1.01) | 0.249 (0.34) |
| **Offender weapons and attack** | | | | | |
| OHADGUN | 0.241 (1.44) | 0.680* (2.08) | -0.111 (-0.47) | -0.594 (-0.58) | 6.100* (2.87) |
| OHADKNIF | 0.116 (0.66) | 0.005 (0.01) | 0.125 (0.59) | -0.085 (-0.09) | -28.671 (-0.00) |
| OHADSHAP | 0.598 (1.82) | 1.332* (2.31) | 0.386 (0.89) | -16.776 (-0.00) | -20.090 (-0.00) |
| GOTINHOM | -17.975 (-0.01) | | | -17.078 (-0.01) | |
| GOTINCAR | -17.547 (-0.00) | | | -15.495 (-0.00) | |

* p<0.01 (two-tailed)   ** 0.01<P<0.05 (two-tailed)

**Table 5. Injury after SP action (continued)**

| | All Types of Crime | | Robbery | | Assault | | Confrontational Burglary | | Sex Assault | |
|---|---|---|---|---|---|---|---|---|---|---|
| *Victim Characteristics* | | | | | | | | | | |
| HADCHILD | -0.215** | (-2.10) | -0.502 | (-1.81) | -0.305* | (-2.50) | -0.128 | (-0.25) | 1.614** | (1.98) |
| HOUSOWN | 0.020 | (0.16) | -0.162 | (-0.49) | 0.085 | (0.59) | 0.152 | (0.27) | -1.502 | (-1.52) |
| EMPLOYED | -0.291* | (-2.66) | -0.269 | (-0.96) | -0.280* | (-2.10) | -0.680 | (-1.35) | -0.298 | (-0.30) |
| OLD65 | -1.001 | (-1.72) | -1.163 | (-0.94) | -17.415 | (-0.00) | 0.378 | (0.40) | -14.230 | (-0.00) |
| MARRIED | -0.154 | (-1.19) | 0.486 | (1.57) | -0.270 | (-1.66) | -0.003 | (0.00) | 0.242 | (0.22) |
| EDUCATIN | -0.021** | (-2.45) | 0.006 | (0.30) | -0.041* | (-3.72) | 0.050 | (1.24) | 0.086 | (1.09) |
| ARMFORCE | -17.479 | (-0.00) | -18.252 | (-0.00) | -17.327 | (-0.00) | -15.533 | (-0.00) | -15.848 | (-0.00) |
| BLACK | -0.097 | (-0.64) | 0.205 | (0.63) | 0.002 | (0.01) | -0.880 | (-0.91) | -4.755** | (-2.47) |
| ASIAN | -0.020 | (-0.06) | 0.889 | (1.78) | -0.916 | (-1.29) | -17.176 | (-0.00) | -17.289 | (-0.00) |
| HISPANIC | 0.032 | (0.21) | -0.239 | (-0.59) | 0.080 | (0.44) | -0.115 | (-0.16) | -0.649 | (-0.46) |
| NUMVICEX | -0.056** | (-2.54) | -0.082 | (-0.81) | -0.048* | (-2.12) | -0.002 | (-0.02) | -0.633 | (-0.97) |
| NUMHOUSE | 0.173 | (1.39) | 0.130 | (0.40) | 0.187 | (1.24) | 0.352 | (0.62) | -1.434 | (-1.36) |
| *Offender Characteristics* | | | | | | | | | | |
| OFDGANG | 0.286 | (1.84) | 0.156 | (0.38) | 0.228 | (1.20) | 2.049* | (2.84) | 1.619 | (0.97) |
| OFDSUBST | 0.379* | (3.83) | 0.385 | (1.41) | 0.411* | (3.42) | 0.857 | (1.85) | 0.895 | (1.13) |
| OFDFAMIL | -0.252 | (-0.96) | -1.640 | (-1.57) | -0.056 | (-0.19) | -0.531 | (-0.43) | -16.219 | (-0.00) |
| OSEXINTI | 0.404* | (2.34) | 0.712 | (1.23) | 0.646 | (2.94) | 0.702 | (1.18) | -2.538 | (-1.40) |
| OSUPERIOR | 1.211* | (3.07) | 2.401 | (1.58) | 0.561 | (1.14) | 2.529 | (1.29) | 23.204 | (0.00) |
| OFDACQNT | 0.127 | (1.01) | 0.010 | (0.02) | 0.153 | (1.04) | -0.040 | (-0.07) | -0.113 | (-0.10) |
| OWORKACQ | -0.724* | (-2.03) | -18.547 | (-0.00) | -0.691 | (-1.64) | -16.403 | (-0.00) | 1.170 | (0.94) |
| OFDBLACK | 0.244 | (1.58) | 0.253 | (0.76) | 0.094 | (0.49) | 1.188 | (1.17) | 2.420 | (1.76) |
| OFDWHITE | -0.123 | (-0.86) | -0.181 | (-0.49) | -0.142 | (-0.83) | 1.334 | (1.30) | -0.719 | (-0.70) |
| *Incident Circumstances* | | | | | | | | | | |
| RURAL | -0.079 | (-0.54) | -0.137 | (-0.29) | 0.055 | (0.32) | -1.062 | (-1.45) | -2.038 | (-1.60) |
| URBAN | 0.172 | (1.65) | -0.352 | (-1.36) | 0.365* | (2.86) | -0.224 | (-0.48) | -0.918 | (-1.04) |
| ATHOME | 0.328* | (2.01) | 0.750 | (1.33) | 0.286 | (1.29) | - | | 0.047 | (0.04) |
| NEARHOME | -0.083 | (-0.60) | -0.023 | (-0.06) | -0.155 | (-0.95) | - | | -0.295 | (-0.33) |
| SECUPUB | -0.116 | (-0.87) | 0.398 | (1.17) | -0.093 | (-0.61) | | | -2.783 | (-1.82) |
| FAMIPRES | 0.340* | (2.49) | 0.078 | (0.19) | 0.808* | (4.53) | 0.022 | (0.04) | 0.347 | (0.26) |
| OTHRPRES | 0.176 | (1.47) | -0.026 | (-0.10) | 0.536* | (3.29) | 0.097 | (0.14) | 1.450 | (1.06) |
| Sample size | 15,233 | | 1,251 | | 12,329 | | 1,041 | | 477 | |
| -2 Log-likelihood | 4,104 | | 560 | | 2,908 | | 188 | | 83 | |

* p<0.01 (two-tailed)　** 0.01<P<0.05 (two-tailed)

This inflates standard errors and makes it even harder to achieve statistical significance for coefficients, especially those of the rarer defensive methods, because there is so little variation on these protection variables. As Table 2 indicated, few victims report using weapons for self-protection. This might reflect reality. It might also reflect an understandable reluctance to admit unlawful weapons possession to federal government interviewers in the context of a nonanonymous interview.

We believe that reporting large but nonsignificant coefficients is appropriate, in the spirit of exploratory findings. Just as qualitative research, based on case studies, life histories or informal interviewing of small nonprobability samples of informants, has yielded valuable insights, findings based on small samples of crime victims reporting less common methods of self-protection likewise merit dissemination, as long as readers understand that the estimates could be a product of chance.

Regardless, the effect of limited variation on the armed resistance variables is that standard errors of their coefficients are so large that even the largest coefficients are nonsignificant. For example, the robbery model coefficient for "attack with gun" is enormous, but is based on just six sample cases of robbery victims taking this SP action, none of whom suffered post-SP injury (Table 2). Thus, this coefficient was not statistically significant. Among robberies, all of the four largest negative SP coefficients were linked with armed resistance, yet none were statistically significant. That is, the injury-preventing effects of armed resistance appear to be larger than all other protective actions, yet estimates of these effects are unstable and imprecise.

We estimated variants of the models in Table 5 in which a single variable measured whether victims used any of the four types of armed resistance and was used in place of the four separate armed resistance variables. Coefficients for this variable were still nonsignificant in all models (results not shown in tables). The estimate closest to significance was in the post-SP models for robbery incidents. The coefficient for the armed resistance variable was a larger negative than the coefficient for any other protective measure, and equaled -1.893, implying that victims who used weapons to resist robbery have only 15.1 percent of the risk of subsequent injury prevailing among victims who called the police, other things being equal. But even this coefficient was significant at only the .076 level, 1-tailed.

Several types of unarmed resistance, some forceful and some nonforceful, are associated with significantly higher post-SP injury rates than calling the police: (1) physically attacking the offender, but without a weapon, (2) physically struggling, (3) stalling or pretending to cooperate, (4) arguing/reasoning/pleading and (5) screaming from fear or pain. Once again, there is no pattern regarding the distinction between forceful and

nonforceful actions. All of these actions, however, have in common
something that could provoke offender attack: they all create problems for
the criminal that could be solved by attacking the victim. When dealing
with victims who attack or struggle with them, offenders can stop the
victims by injuring them and might even consider such action "defensive."
Inflicting injury might also be effective in forcing victims who had been
stalling to begin cooperating. It might also be perceived as a way to
silence victims screaming in fear or pain. Alternatively, screaming may
simply anger or panic offenders into thinking that the noise might lead to
bystanders intervening or summoning the police.

It should, however, be stressed that these are assessments of relative
injury-producing effects and that the Table 2 figures indicates that in
absolute terms, post-SP injury is extremely rare for all SP actions. Thus,
even though large relative differences in injury risk generally imply only small
absolute differences.

## SERIOUS POST-SP INJURY

As evident in Table 2, fewer than one-quarter of the injuries inflicted in
crimes are more serious than bruises or cuts. Yet because serious injury is
probably what victims fear most, focusing on injury without respect to its
seriousness fails to address what people care most about. Findings on the
impact of victim actions on injury in general, most of which is no more
serious than bruises and cuts, might not apply to SP effects on serious
injury. For example, some forceful methods might be effective in avoiding
more serious injury but themselves cause minor injury, as when a victim
cuts his hand while striking the offender. Therefore we also assessed the
effects of resistance on more serious injury. In these analyses, victims who
suffered more serious injuries after taking protective actions were coded 2,
and those who suffered exclusively minor injuries or no injuries after
taking protective actions were both coded 1. As in the examination of all
post-SP injury, this analysis was confined to victims who had taken some
kind of protective action, because the concept of post-SP injury is not
applicable to those who took no SP actions. The omitted SP action
category was once again "called the police."

Victim SP actions are followed by serious injury in only 0.7 percent of
confrontational crimes (Table 2, All Offenses column, Any SP row).
Because serious post-SP injury is extremely rare, there is virtually no
variation to explain. Combined with the rarity of some defensive actions,
especially armed resistance, estimates of impact on serious injury are
highly unstable, reflected in the low ratios of coefficients over standard
errors shown in Table 6. These estimates are therefore presented in the

892　　　　　　　　　　　TARK AND KLECK

spirit of exploratory findings and should be read in conjunction with Table 2 information on the frequency of each defensive action.

Even very large coefficients for protection variables were often not significant because of the action's rarity. For example, based on their very large negative coefficients, attacking or threatening the offender with a gun appears to be almost totally effective in avoiding serious injury. The estimates of their effects are not significant, however, because they were based on only forty-five sample cases of attacking with a gun and 202 of threatening with a gun, in a sample where serious injury after defensive

### Table 6. Serious Injury after SP Action

| | Logit Coefficient (ratio, coef./SE) | | | | | | | |
| | All Types of Crime | | Robbery | | Assault | | Confrontational Burglary | |
|---|---|---|---|---|---|---|---|---|
| *Victim's Self-Protection* | | | | | | | | |
| Attack with Gun | -16.543 | (-0.00) | -15.912 | (-0.00) | -16.069 | (-0.00) | -9.716 | (0.00) |
| Threat with Gun | -0.454 | (-0.41) | -15.226 | (-0.00) | 0.580 | (0.52) | -18.139 | (0.00) |
| Attack with nongun weapon | 0.018 | (0.02) | -1.373 | (-0.53) | 0.176 | (0.16) | -106.511 | (-0.02) |
| Threat with nongun weapon | 0.025 | (0.03) | -14.595 | (-0.00) | 0.351 | (0.38) | -29.267 | (0.00) |
| Attack without weapon | 1.168* | (5.00) | 3.836* | (4.76) | 0.691 | (1.90) | -60.528 | (-0.02) |
| Threat without weapon | -0.440 | (-0.65) | -17.795 | (-0.00) | -0.131 | (-0.16) | -61.822 | (-0.01) |
| Struggled | 1.029* | (4.99) | 1.560 | (2.26) | 1.001* | (3.14) | 43.032 | (0.02) |
| Chased, held offender | -0.677 | (-0.87) | 0.651 | (0.60) | -15.680 | (-0.01) | -72.550 | (-0.02) |
| Yelled, turned on lights | -0.110 | (-0.38) | 0.082 | (0.08) | 0.085 | (0.18) | -21.407 | (-0.01) |
| Stalled, pretended to cooperate | 0.883 | (2.13) | 0.751 | (0.73) | 0.802 | (1.00) | -58.006 | (-0.01) |
| Argued, reasoned, pleaded | 0.474 | (1.85) | 0.817 | (0.87) | -0.557 | (-1.06) | -32.790 | (-0.01) |
| Ran away, hid | -0.561 | (-1.82) | -1.044 | (-0.86) | 0.021 | (0.05) | 0.657 | (0.00) |
| Tried to attract attention | -1.335 | (-1.54) | -19.940 | (-0.26) | -15.907 | (-0.01) | 18.300 | (0.00) |
| Screamed from pain or fear | 1.444* | (3.52) | 3.946* | (3.43) | -0.277 | (-0.18) | 31.363 | (0.01) |
| Other SP strategies | 0.101 | (0.36) | 2.351* | (3.24) | -0.380 | (-0.82) | -54.514 | (-0.01) |
| *PowerDifference* | | | | | | | | |
| ADVSEXOF | 0.787* | (3.74) | -0.455 | (-0.58) | 0.017 | (0.05) | 14.560 | (0.01) |
| ADVAGEOF | 0.528** | (2.42) | 0.093 | (0.14) | 0.848* | (2.78) | 32.883 | (0.02) |
| ADVNUM | 0.064** | (2.57) | 0.038 | (0.42) | 0.071 | (2.48) | 1.362 | (0.01) |
| *Offender Weapons and Attack* | | | | | | | | |
| OHADGUN | 0.897* | (3.26) | 2.130* | (2.91) | 0.491 | (1.09) | -150.691 | (-0.02) |
| OHADKNIF | 0.634** | (2.16) | 1.081 | (1.37) | 0.744 | (1.83) | 44.741 | (0.02) |
| OHADSHAP | 1.489* | (3.40) | 3.469* | (3.18) | 1.218 | (1.70) | 41.528 | (0.00) |
| GOTINHOM | -16.530 | (-0.01) | - | | - | | -21.001 | (-0.01) |
| GOTINCAR | -16.022 | (-0.00) | - | | - | | 0.209 | (0.00) |

* p<0.01 (two-tailed) ** 0.01<P<0.05 (two-tailed)

## Table 6. Serious Injury after SP Action (continued)

| Victim Characteristics | All Types of Crime | | Robbery | | Assault | | Confrontational Burglary | |
|---|---|---|---|---|---|---|---|---|
| HADCHILD | 0.133 | (0.65) | -1.297 | (-1.90) | -0.174 | (-0.59) | -12.233 | (0.00) |
| HOUSOWN | -0.427 | (-1.79) | -1.635 | (-1.92) | -0.237 | (-0.72) | 4.107 | (0.00) |
| EMPLOYED | -0.094 | (-0.43) | 0.677 | (0.98) | -0.603 | (-1.90) | 35.804 | (0.02) |
| OLD65 | -0.931 | (-0.78) | -15.244 | (-0.00) | -15.507 | (-0.00) | 27.137 | (0.02) |
| MARRIED | -0.371 | (-1.42) | 0.015 | (0.02) | -0.151 | (-0.41) | -13.433 | (-0.01) |
| EDUCATIN | 0.016 | (0.93) | -0.010 | (-0.19) | -0.003 | (-0.10) | -1.069 | (-0.01) |
| ARMFORCE | -15.891 | (-0.00) | -15.968 | (-0.00) | -15.232 | (-0.00) | 29.608 | (0.00) |
| BLACK | 0.262 | (0.94) | 2.387* | (3.28) | -0.179 | (-0.40) | 6.520 | (0.00) |
| ASIAN | -1.013 | (-0.89) | -15.319 | (-0.00) | -15.464 | (-0.01) | 24.688 | (0.00) |
| HISPANIC | 0.752* | (2.88) | 0.545 | (0.58) | 1.160* | (3.37) | -16.435 | (-0.01) |
| NUMVICEX | -0.207** | (-1.98) | 0.054 | (0.98) | -0.522 | (-2.04) | -7.050 | (0.00) |
| NUMHOUSE | -0.056 | (-0.24) | -0.572 | (-0.85) | -0.133 | (-0.38) | -25.946 | (-0.02) |
| *Offender Characteristics* | | | | | | | | |
| OFDGANG | 0.009 | (0.03) | 0.380 | (0.41) | 0.068 | (0.16) | 32.478 | (0.02) |
| OFDSUBST | 0.262 | (1.32) | 0.396 | (0.65) | 0.455 | (1.57) | -16.105 | (-0.01) |
| OFDFAMIL | 0.115 | (0.26) | -1.490 | (-0.78) | 1.114 | (2.03) | 15.726 | (0.00) |
| OSEXINT1 | -0.421 | (-1.15) | -0.193 | (-0.15) | 1.257 | (2.40) | -11.353 | (0.00) |
| OSUPERIOR | 1.077 | (1.62) | -16.101 | (-0.00) | -0.632 | (-0.39) | -33.955 | (0.00) |
| OFDACQNT | 0.145 | (0.56) | 0.387 | (0.47) | 0.111 | (0.30) | 3.316 | (0.00) |
| OWORKACQ | 0.310 | (0.61) | -15.693 | (-0.00) | 1.094 | (1.85) | 2.288 | (0.00) |
| OFDBLACK | 0.331 | (1.08) | -0.547 | (-0.72) | 0.570 | (1.33) | 82.758 | (0.04) |
| OFDWHITE | -0.174 | (-0.60) | -0.803 | (-0.80) | -0.112 | (-0.28) | 58.376 | (0.03) |
| *Incident Circumstances* | | | | | | | | |
| RURAL | 0.000 | (0.00) | -0.709 | (-0.51) | 0.276 | (0.69) | -27.641 | (-0.01) |
| URBAN | -0.046 | (-0.22) | -0.762 | (-1.26) | 0.231 | (0.73) | -31.547 | (-0.03) |
| ATHOME | 0.675** | (2.12) | 2.035 | (1.67) | -0.005 | (-0.01) | - | |
| NEARHOME | 0.463 | (1.76) | -0.247 | (-0.29) | 0.457 | (1.20) | - | |
| SECUPUB | -0.013 | (-0.04) | 0.322 | (0.37) | 0.209 | (0.53) | - | |
| FAMIPRES | -0.002 | (-0.01) | 0.928 | (0.96) | 0.987** | (2.10) | 36.479 | (0.02) |
| OTHRPRES | -0.087 | (-0.38) | 0.506 | (0.73) | 0.821 | (1.90) | -13.490 | (0.00) |
| Sample size | 15,233 | | 1,251 | | 12,329 | | 1,041 | |
| -2 Log-likelihood | 1,239 | | 138 | | 625 | | 0 | |

* p<0.01 (two-tailed) ** 0.01<P<0.05 (two-tailed)

action was almost nonexistent. Indeed, the coefficients for attacking with a gun were nonsignificant even though not a single victim taking this action was seriously injured after doing so. Similarly, even though none of the thirty-eight victims in the sample who reported threatening the offender with a gun in a confrontational burglary suffered injury of any kind after taking this action, its coefficient in the serious post-SP injury model, though large (-18.139), was still not statistically significant. Estimating effects of victim gun use in sexual assaults was impossible because there were no sample cases of sexual assault victims attacking their offender with a gun and only one case of a victim even threatening with a gun.

With these caveats in mind, the effectiveness of most victim actions was not significantly different in averting serious injury from calling the police.

At least, the NCVS does not provide enough basis to reliably estimate differences in their effects. All victim actions are associated with a near-zero probability of suffering serious post-SP injury, a conclusion foreshadowed by the Table 2 figures indicating that only 0.7 percent of victims using self-protective actions of any kind suffered any serious injury after doing so. Only three defensive actions were associated with significantly different risks of serious injury compared to calling the police: attacking the criminal without a weapon, physically struggling with the offender and screaming from pain or fear. These three actions are associated with fairly large relative differences in the risk of serious injury; for example, victims who screamed were 4.7 times more likely to later suffer serious injury than those who called the police. But even large relative differences in risk do not imply substantial absolute differences in risks, given that the overall risk of serious post-resistance injury among the reference category victims was one-fifth of 1 percent (Table 2).

## COMPARING THE IMPACT OF SP WITH NO SP

An alternative way to perform the post-SP injury analyses is to include no-SP cases, that is, crimes in which the victim did not take any SP actions. We estimated models in which post-SP injury was coded 2 if (a) the victim took some SP action and was injured afterwards, or (b) took no SP and was injured. This variable was coded 1 if (a) the victim took SP action and was not injured, (b) took SP action and was injured, but before SP actions, or (c) took no SP action and was not injured. Cases in which the victim reported that SP actions and injury occurred simultaneously were treated as missing, because it was impossible to establish SP-injury sequence in these incidents.

Thus, in this alternative analysis, victims who took no SP actions but were injured were treated as valid cases and coded the same as those who took action and were injured. It is reasonable to treat these two situations as similar if one takes seriously the possibility that nonresistance can provoke an offender into attacking, just as victim resistance might. Passivity can send the message that the offender is free to attack or steal with little risk or difficulty. All cases were included in the alternative analyses, and no SP was treated as the excluded category. Thus, coefficients for SP variables can be interpreted as a comparison between each SP action and taking none.

Table 7 reports results of these analyses. For convenience, the Model 1 column displays the Table 5 All Offenses estimates obtained when no-SP incidents were excluded from the post-SP injury analysis. Model 2 estimates were those obtained when no-SP cases were included and those involving injury were coded the same as those involving SP action and

subsequent injury. The SP coefficients in the Model 2 column of Table 7 are directly comparable with those in Table 4 because no-SP cases were included in the samples and no SP is the omitted category in both analyses. This comparison directly establishes the effects of taking the sequence of injury and SP actions into account, because this is the only difference between the Table 7 Model 2 analysis and the Table 4 All Types of Crime analysis. Without exception, every SP coefficient moved in a negative direction when sequence was taken into account (Table 7 vs. Table 4). This indicates that past research failing to address SP-injury sequence consistently understated injury-preventing effects of victim resistance, or created a misleading impression of risk-elevating effects.

**Table 7. Effect of Including No-SP Cases**

Logit Coefficient (ratio, coef./SE)
Injury After SP Action

| | Model 1[+]<br>No-SP Cases Out<br>No SP =<br>missing | | Model 2[++]<br>No-SP Cases In<br>No SP & injured =<br>Injured after SP action | | Model 3[+++]<br>No-SP Cases In<br>No SP & injured =<br>Not injured after SP<br>action | |
|---|---|---|---|---|---|---|
| Attack with Gun | 0.471 | (0.55) | -1.051 | (-1.23) | 0.594 | (0.69) |
| Threat with Gun | -0.517 | (-0.85) | -2.055[*] | (-3.43) | -0.055 | (-0.10) |
| Attack with Nongun Weapon | 0.049 | (0.12) | -1.570[*] | (-3.72) | 0.296 | (0.84) |
| Threat with Nongun Weapon | -0.993 | (-1.51) | -2.687[*] | (-4.11) | -1.722[**] | (-2.56) |
| Attack without Weapon | 0.597[*] | (4.63) | -1.024[*] | (-9.31) | 0.869[*] | (8.41) |
| Threat without Weapon | -0.060 | (-0.21) | -1.173[*] | (-4.26) | 0.430 | (1.93) |
| Struggled | 0.881[*] | (8.20) | -0.746[*] | (-8.98) | 1.126[*] | (13.43) |
| Chased, held Offender | -0.126 | (-0.41) | -1.223[*] | (-4.17) | 0.273 | (1.10) |
| Yelled, turned on Lights | 0.026 | (0.18) | -1.196[*] | (-8.95) | 0.444[*] | (3.95) |
| Stalled, Pretended to Cooperate | 0.678[*] | (2.89) | -0.696[*] | (-3.14) | 1.309[*] | (7.31) |
| Argued, Reasoned, Pleaded | 0.365[*] | (2.72) | -1.176[*] | (-9.83) | 0.906[*] | (8.97) |
| Ran away, hid | -0.424[*] | (-2.83) | -2.102[*] | (-16.03) | 0.239 | (2.13) |
| Tried to Attract Attention | -0.267 | (-0.82) | -1.072[*] | (-3.41) | 0.208 | (1.05) |
| Screamed from Pain or Fear | 0.925[*] | (3.42) | 0.670[*] | (2.47) | 0.892[*] | (5.73) |
| Other SP Strategies | 0.140 | (1.03) | -1.713[*] | (-15.47) | 0.628[*] | (5.57) |
| Call the Police | n/a | | -2.692[*] | (-10.77) | -0.697[*] | (-3.84) |
| N | 15,233 | | 22,566 | | 25,528 | |

[*] p<0.01 (two-tailed) [**] 0.01<P<0.05 (two tailed)
[+] In Model 1, omitted (reference) category is "called the police."
[++] In Model 2, omitted (reference) category is "no SP."
[+++] In Model 3, omitted (reference) category is "no SP."

When no-SP cases are included, all but one of the SP actions have negative coefficients in models of both injury and serious injury (the exception is the ambiguous "screamed from pain or fear"). Thus virtually any form of victim resistance is associated with lower rates of post-SP injury than nonresistance, though there is no longer any clear pattern regarding whether forceful or nonforceful actions are more effective. In Table 7, the appearance of support for the view that crime victims should refrain from resisting crime has essentially disappeared.

The Model 2 coding procedure, however, biases results against the no-SP option by effectively treating all cases in which victims did not resist but were injured as incidents in which nonresistance provoked offenders to attack and injure the victim. A final alternative analysis was based on the sample with no-SP cases included, but used an opposite coding scheme. In Model 3, no-SP incidents in which the victim was injured were all coded as not injured after SP, that is, were effectively all treated as if nonresistance never provoked offenders to attack and injure the victim. Not surprisingly, this procedure has the opposite effect on estimates, making most SP methods look more likely to result in injury than nonresistance. Because the Model 2 and Model 3 analyses are both based on extreme assumptions about the effects on injury of nonresistance, we prefer the estimates reported in Table 5, in which no-SP cases were simply excluded.

EXCLUSION OF FATAL INCIDENTS

The NCVS does not include crimes in which the victim was killed. Could including them alter these injury findings? In one sense the answer is "no," because there are so few fatal cases. In 2001, the United States experienced, based on NCVS estimates, at least 5,315,500 nonfatal violent crimes. There were in the same year, based on Uniform Crime Reports data, 15,980 fatal incidents—that is, murders and non-negligent manslaughters (U.S. Bureau of Justice Statistics, 2003b; U.S. Federal Bureau of Investigation, 2002). This implies a ratio of 0.00306 fatal per nonfatal crimes. Thus, if fatal crimes had been included in our sample of 27,595 nonfatal violent crimes, about eighty-three cases of fatal injury would also have been included, in addition to the 6,650 nonfatal ones in our sample (0.00306 x 6,650 = 83). The overall injury rate in our sample might therefore have increased, from the observed 24.1 percent (Table 2, All Offenses, percent Injured column) to no more than 24.3 percent ((6,650+83)/(27,595+83)=.243). It is thus highly unlikely that our estimates of SP effects on injury could have been materially affected.

In another sense, data on fatal incidents might lead to different results if they were analyzed separately and SP effects on fatal injury were found to be significantly different from effects on nonfatal injury. While separate analysis of SP in homicides could be worthwhile, there is currently no empirical evidence that victim SP actions increase the chances of the victim being murdered. Nor do we know of any sound theoretical reason why any SP actions would increase the risk of fatal injury but not the risk of nonfatal injury.

INCLUDING INCIDENTS IN WHICH SP AND INJURY OCCURRED "SIMULTANEOUSLY"

In our analyses of post-SP injury, we excluded cases in which SP actions and injury occurred at the same time, on the grounds that, even if the two events were not truly simultaneous, it could not be determined whether injury followed the SP action. Two options on handling such cases are to include them in the analyses but arbitrarily code them as either (a) cases of SP followed by injury, or (b) cases of injury followed by SP. We repeated the post-SP injury analyses using these two strategies. The results (not shown) were not significantly different from those reported in Tables 5 and 6, except that the coefficient for threat with a gun became significant and negative, indicating that this action is associated with lower rates of injury, other things being equal, than calling the police.

THE CIRCUMSTANCES IN WHICH DIFFERENT SP ACTIONS WERE TAKEN

Although we exploited the rich NCVS dataset by controlling for all available potentially confounding variables, we could not completely avoid the omitted variables problem. It is almost certain that variables are omitted from our models that affect crime outcomes but are also associated with the use of various defensive actions. Even those measured in the NCVS dataset suggest that victims who took some courses of action may have been able to do so only because they faced more favorable circumstances, while other victims may have taken certain actions only because they were compelled to by desperate circumstances.

Table 8 presents descriptive information about the crimes in which various types of protective action were taken. The results indicate that, contrary to the speculations of Reiss and Roth (1993), victims who used weapons, especially guns, faced more dangerous circumstances than other victims. Although weapon users were more likely to be on home territory, they were also more likely to be outnumbered, to face more physically vigorous offenders, to confront offenders with knives, and to face offenders with guns. And, perhaps most important of all, victims who used weapons to attack were more likely to have already suffered an injury: 13.3 percent of victims who attacked with a gun and 19.1 percent of those who attacked with some other weapon were already injured, compared to 7.9 percent of victims using all SP methods combined. Thus victims who used armed resistance experienced lower risks of property loss or serious injury despite facing otherwise more disadvantageous circumstances. If there are still other such adverse circumstances not measured in the NCVS for which we therefore could not control, it suggests that our analyses may understate the injury-reducing effects of armed resistance.

**Table 8. Circumstances of Confrontation by Type of Self-Protection, in Percentage**

| | Frequency | Offender Advantage | | | Offender Had | | Victim Was | | Location | | Multiple Self-Protection* |
|---|---|---|---|---|---|---|---|---|---|---|---|
| | | Age | Sexual | Numeric | Gun | Knife | Male | Injured | Home | Public* | |
| Attacked with Gun | 45 | 31.8 | 20.0 | 28.9 | 28.9 | 20.0 | 80.0 | 13.3 | 29.5 | 35.6 | 37.8 |
| Threatened with Gun | 202 | 36.1 | 25.2 | 24.1 | 21.3 | 17.3 | 71.8 | 5.0 | 25.2 | 42.1 | 36.1 |
| Attacked w Nongun Weapon | 230 | 23.5 | 26.2 | 13.5 | 6.5 | 17.0 | 63.5 | 19.1 | 23.9 | 43.7 | 44.3 |
| Threatened w Nongun Weapon | 232 | 20.2 | 31.0 | 12.1 | 5.2 | 15.9 | 61.6 | 4.7 | 27.5 | 47.0 | 42.2 |
| Attacked without Weapon | 2,661 | 15.4 | 22.9 | 11.4 | 3.3 | 7.9 | 63.5 | 16.0 | 16.3 | 57.3 | 37.7 |
| Threatened without Weapon | 540 | 20.2 | 15.9 | 11.1 | 4.1 | 7.4 | 70.9 | 6.1 | 15.0 | 51.3 | 57.6 |
| Struggled | 4,984 | 17.5 | 30.9 | 12.7 | 3.8 | 6.1 | 57.5 | 11.6 | 20.7 | 51.0 | 44.8 |
| Chased, Held Offender | 517 | 27.1 | 19.1 | 12.2 | 7.0 | 6.8 | 73.7 | 10.8 | 21.5 | 52.4 | 56.2 |
| Yelled, Turned on Lights | 2,492 | 21.1 | 52.8 | 13.6 | 4.2 | 5.2 | 36.3 | 8.0 | 29.8 | 39.4 | 61.7 |
| Stalled, pretended to Cooperate | 535 | 20.7 | 33.6 | 21.8 | 29.2 | 8.8 | 61.7 | 6.5 | 18.1 | 58.5 | 47.1 |
| Argued, Reasoned, Pleaded | 2,700 | 16.8 | 37.7 | 7.4 | 7.2 | 5.0 | 50.3 | 6.0 | 23.9 | 45.7 | 49.0 |
| Ran Away, Hid | 3,807 | 20.3 | 39.7 | 20.2 | 13.1 | 6.7 | 49.8 | 9.2 | 13.5 | 56.2 | 33.5 |
| Called Police or Guard | 1,990 | 23.4 | 50.9 | 11.1 | 8.0 | 5.3 | 37.6 | 9.5 | 37.5 | 30.2 | 53.7 |
| Tried to Attract Attention | 567 | 18.3 | 53.9 | 16.9 | 7.2 | 6.5 | 31.7 | 11.8 | 18.2 | 54.3 | 76.4 |
| Screamed from Pain or Fear | 569 | 15.8 | 75.6 | 11.2 | 6.5 | 7.6 | 13.3 | 19.9 | 45.2 | 30.4 | 84.9 |
| Other SP Strategies | 4,149 | 24.5 | 30.5 | 11.8 | 6.1 | 5.6 | 57.1 | 5.1 | 14.4 | 55.0 | 26.1 |
| Victim used Weapons in Public | 301 | 27.3 | 14.3 | 23.9 | 12.0 | 19.0 | 82.3 | 6.7 | 0 | 100 | 34.1 |
| Victim used Single SP | 14,636 | 21.0 | 30.5 | 13.3 | 7.1 | 6.0 | 57.7 | 6.7 | 15.8 | 54.5 | 0 |
| Victim used Multiple SP | 4,882 | 19.4 | 41.8 | 13.6 | 7.2 | 6.8 | 47.3 | 11.7 | 25.6 | 45.1 | 100 |
| Victim used Any SP | 19,519 | 20.6 | 33.3 | 13.4 | 7.1 | 6.2 | 55.1 | 7.9 | 18.3 | 52.1 | 25.0 |
| Victim used No SP | 8,077 | 21.8 | 30.7 | 13.9 | 10.8 | 4.5 | 56.1 | – | 15.8 | 57.1 | 0.0 |
| Total Incidents | 27,595 | 21.0 | 32.5 | 13.5 | 8.2 | 5.7 | 55.4 | 5.6 | 17.6 | 53.6 | 17.7 |

* "Near victims own home" or "at, in, or near a friend's or relative's or neighbor's home" were not included.

On the other hand, victims also often resorted to the least forceful protective measures (cooperate or run) when circumstances were very adverse (offenders had guns). One interpretation is that victims in the most adverse situations may be forced to choose either extremely forceful responses or submission because they believe that less forceful actions would be inadequate.

## ARE EFFECTS OF PROTECTIVE ACTIONS CONTINGENT ON OTHER CONDITIONS?

It has been suggested that the effectiveness of different defensive actions may depend on a variety of conditions under which they are used. Researchers have explored whether effectiveness depends on the victim's sex, whether the offender is an intimate of the victim (Ruback and Ivie, 1988; Bachman et al., 2002), offense location (home/nonhome, indoor/outdoor), offender intoxication and offender weapon possession (Ullman and Knight, 1993; Bachman and Carmody, 1994), with highly inconsistent results (Bachman et al., 2002). Although there was no strong a priori rationale for testing any one interaction, we tested each of these possibilities by forming multiplicative interaction terms between each of the sixteen protection variables and each of the aforementioned variables on which protective effects supposedly depend, and including each set of sixteen multiplicative terms (involving a single conditioning variable) in the property loss, post-SP injury and serious post-SP injury models. Thus, for example, when we tested whether SP actions interact with whether the crime occurred in the victim's home (ATHOME), the model included ATHOME x GUNATACK, ATHOME x GUNTHREAT, and so on, in addition to the rest of the variables shown in Tables 3-6. Or, when we tested for whether SP actions interact with whether the offender was armed (OFDWEAPON), the model included OFDWEAPON x GUNATACK, OFDWEAPON x GUNTHREAT, and so on, in addition to the rest of the variables shown in Tables 3 through 6.

In the post-SP injury models, the coefficients of these interaction terms were rarely significantly different from zero. No more than one out sixteen interaction variables had a significant coefficient in any one model, and one would expect one coefficient to be "significant" at the .05 level solely as a result of chance, due to the large number of hypothesis tests. Further, the signs of the coefficients were as likely to be contrary to theoretical expectations as consistent with them. In particular, we found no support for the notion that forceful resistance increased injury risks for women when they faced adversaries who were intimates, as Bachman and her colleagues asserted (2002). On the whole, the effects of victim actions on injury do not appear to significantly vary with victim or offender sex,

victim-offender relationship, crime location, victim's age, offender intoxication, number of offenders or offender weapons.[3]

The only mildly distinct indications of meaningful interactions all pertained to property loss. Defensive actions appeared to be more effective in preventing property loss when the crime occurred in the victim's home or indoors, and less effective when the offender was armed, under the influence of alcohol or other drugs, or was an intimate of the victim. We could, of course, have dredged the data for evidence of three-way and even four-way interactions (for example, SP action by victim-offender relationship by sex by crime type) as well, but there is no strong theoretical rationale for examining any particular interactions of this order. And examining tens of thousands of possible interactions could serve no useful purpose since large numbers of seemingly "significant" associations would inevitably be generated by chance, due to the enormous number of hypothesis tests (see Selvin and Stuart, 1966 for a classic critique of data dredging and ex post facto hypothesis testing).

## DISCUSSION

Both past and present evidence has consistently supported the view that a wide variety of defensive actions reduce the risk of a rape attempt being completed (see the extensive review by Ullman, 1997), of a robbery attempt being completed, that is, the robber escaping with the victim's property (Table 3 and the review of earlier robbery studies in Kleck and DeLone, 1993), or of a burglary attempt being completed (Table 3 and Cook, 1991). Skepticism about the wisdom of victim resistance, then, has largely revolved around whether resistance increases the risks of injury to the victim. But based on close analysis of the largest nationally representative sample of crime incidents available, few forms of self-protection and no forms of armed resistance provoke criminals into attacking and injuring resisting victims in substantial numbers of crimes. Impressions to the contrary in past research rely almost entirely on analyses that failed to distinguish between resistance preceding and following injury, or used samples biased by the exclusion of crimes in which victims resisted successfully. Both problems have been reduced in this research, the first because recent versions of the NCVS record the SP-injury sequence, and the second because the NCVS covers a large

---

3. Incidents with victims who used weapons in public places would seem to be especially interesting because these victims may carry weapons in public habitually. We found, however, that these incidents looked pretty much the same as other incidents involving armed self-protection, except, of course, that they all occurred in public places (see Table 8).

probability sample of crimes, at least among those victims who are willing to report them to government interviewers.

Once these sources of distortion are reduced or eliminated, little evidence remains for the claim that resistance angers offenders into attacking victims. When victims who resist are hurt, it was almost always injury that came first. Post-resistance injury occurs in fewer than 3 percent of personal contact crimes in which victims resist. The few injuries that are inflicted are usually no more serious than cuts and bruises. These conclusions apply across all crime types and do not depend on the victim-offender relationship, crime location, victim or offender sex, victim's age, offender intoxication or offender weapon possession.

The NCVS does have some important limitations. Cases of successful victim resistance are probably underrepresented in NCVS samples because respondents tend not to report incidents in which they suffered no harm. This is probably especially true when their protective actions involved the use of unlawfully possessed weapons. Victim resistance may therefore be even more effective than it appears in NCVS samples. Also, because victims are interviewed as long as 6 months after the crime, they may forget or misrecall more information than victims speaking to police ·or victim counselors immediately after the event. We are, however, not aware of any evidence that such recall failure would distort estimates of the relative effectiveness of SP actions.

# CONCLUSION

All evidence is flawed, and there will always be more evidence developed by later research. Thus one can always cite these facts to justify refraining from drawing any firm conclusions from research, and issue the standard call for more research. While more research is always good, from the standpoint of those who need information to make real-world choices in the near term, this is not a helpful position for scholars to adopt. We believe that as long as some sound research has been conducted, scholars should draw conclusions, accompanied by appropriate caveats about the limits of the data, based on the best evidence available at the time. This seems reasonable if for no other reason than that this is the only course scholars will ever be able to follow, regardless of how much more research is done or how high its quality. Evidence will never be either perfect or complete, so conclusions based on imperfect and incomplete information are the only kinds of conclusions that can ever be drawn.

One might take the position that offering advice to prospective victims is risky because the advice might prove ill-founded, and that refraining from offering advice is therefore more prudent. Refraining, however, has its own consequences. Failing to provide advice that, if followed, would

have helped save a life can cost a life. Likewise, failing to offer advice that would have blocked a rape, prevented crippling injury or otherwise averted harm can passively contribute to those harms coming to pass. Declining to make recommendations may seem like a course that entails less responsibility, but this impression is illusory, because choosing to not act can have consequences as serious as choosing to act. A wealth of evidence indicates that nonresistance is not always the safest course of action for crime victims, implying that some prospective victims who continue believing that nonresistance is the safest course will be hurt because no one did anything to correct their misapprehensions.

It is in this light that we offer tentative advice to potential victims. While there are exceptional situations, victim resistance is usually either successful or inconsequential, and on the rare occasions that it is harmful, it is rarely seriously so. Therefore, unless there are circumstances that clearly indicate resistance will lead to significant harm, the evidence reported in this paper indicates that some form of resistance should be the path generally taken. This does not mean resistance always works, or that it can, by itself, make victims completely safe, since violent crime is dangerous for reasons having nothing to do with victim actions. Rather, it means that resistance will generally either make things better for the victim (for example, less chance of rape completion or property loss) than they would have been without resistance, or do no harm.

Which victim actions produce the best results will depend on the resources and options available. Many actions are impossible in certain circumstances, which undoubtedly explains why victims sometimes do not act. Nearly all forms of resistance help avert property loss. Research indicates that most also help rape victims avoid rape completion. Regarding impact on injury, some research appeared to indicate a pattern in which nonforceful resistance was more effective than forceful, and the latter was even counterproductive. Once one takes account of the sequence of injury and SP, however, no such pattern is evident. Various kinds of forceful victim protective behavior, such as threatening the offender with a gun or other weapon, show the strongest negative coefficients, though none are significant. A conservative interpretation would be that armed and other forceful resistance does not appear to increase the victim's risk of injury. Most of the SP tactics that appear to have higher risks than calling the police are nonforceful: stalling, arguing and screaming from pain or fear (though this may reflect an effect of injury rather than a cause). Resistance with a gun appears to be most effective in preventing serious injury, though this finding is not statistically significant due to the small number of reported gun uses.

Although the data strongly indicate that armed resistance is the most effective tactic for preventing property loss, it is not as clear which SP

strategy is most effective in averting injury. This is partly because injury following resistance actions is so rare that there is little room for injury rates to vary much across types of victim action. But there is also ambiguity because the circumstances under which victims adopt SP actions differ substantially across types of resistance. Armed resistance, for example, tends to be adopted under circumstances that were more perilous for the victim to begin with, which could obscure some of the injury-preventing effects of these SP actions. While NCVS data allow us to control for some of these circumstances, they do not permit control for all of them. It is reasonable to expect that unmeasured circumstances would tend to show the same patterns as NCVS-measured ones, with the same effects on estimates of injury-preventing effects. Future research should more completely account for crime circumstances that advantage or disadvantage victims in avoiding injury.

While some forms of resistance, mostly nonforceful, appear to increase the risk of injury, the injuries that result are almost always no more serious than bruises and cuts. And still other victim actions have no significant effect on injury. These relative differences, however, are less important than the more general fact that serious injury almost never follows resistance, of any kind, in any type of crime. That is, because resistance appears to be effective in averting further significant harm, or is at worst inconsquential, the question of which particular types of resistance are more effective becomes arguably secondary.

For some, to say that resistance almost never leads to victim injury is not a good enough assurance. The NCVS cannot detect incidents in which victim actions lead to their death. It could be argued that if resistance leads to death in even a few crimes, then resistance is tragically foolish behavior even if it often prevents rape completion, nonfatal injury or property loss. This argument, however, is strictly conjectural. There is no sound empirical evidence that resistance does provoke fatal attacks. The evidence we do have indicates that resistance almost never provokes attacks resulting in serious (nonfatal) injury. The argument is also unrealistically one-sided, because it ignores the possibility that resistance can save lives. Invoking the value of human lives does not necessarily favor those who counsel nonresistance or decline to offer advice any more than it favors those who counsel resistance.

It also seems unlikely that a given form of victim resistance, such as with a gun, would have no impact on serious injury (as found in this research) yet increase the risk of fatal injury. One might nevertheless speculate that offenders confronted with gun-wielding victims might believe that only killing the victim would ensure their own safety, resulting in killings of such victims but few nonfatal injuries. There should be at least a few offenders in this situation who would be satisfied with inflicting

incapacitating yet nonfatal injury, in which case we should have found an effect of victim gun use on serious nonfatal injury. We did not. In any case, we know of no empirical evidence that any significant number of victims have been killed after using weapons in self-defense.

It is possible that a given form of victim resistance is already being used by crime victims in all the circumstances in which it is effective and safe to do so, and that if those SP actions were taken in different circumstances they might produce more harmful outcomes for the victim. Our tests of interactions suggest that various modes of resistance do not vary significantly in their effectiveness across crime circumstances, insofar as we are able to measure circumstances using NCVS data. Although this tends to undercut the hypothesis that SP actions would be less effective were they adopted in different circumstances, such evidence cannot definitively rule out any hypothesis concerning SP actions taken under conditions substantially different from those of the past.

Future research might bring better evidence that contradicts these conclusions. At present, however, the best available evidence indicates that victim resistance to crimes is generally wise.

# REFERENCES

Akers, Ronald L.
  1985   *Deviant Behavior: A Social Learning Approach.* Belmont, CA: Wadsworth.

Amir, Menchim.
  1971   *Patterns in Forcible Rape.* Chicago: University of Chicago Press.

Bachman, Ronet, Linda E. Saltzman, Martie P. Thompson and Dianne C. Carmody
  2002   Disentangling the effects of self-protective behaviors on the risk of injury in assaults against women. *Journal of Quantitative Criminology.* 18:135–57.

Bachman Ronet and Dianne C. Carmody
  1994   Fighting fire with fire: The effects of victim resistance in intimate versus stranger perpetrated assaults against females. *Journal of Family Violence.* 9:317–31.

Bart, Pauline B.
  1981   A study of women who both were raped and avoided rape. *Journal of Social Issues* 37(4):123–137.

Bart, Pauline and Patricia O'Brien
  1984   Stopping rape: Effective avoidance strategies. *Signs: Journal of Women in Culture and Society* 10:83–101.

Block, Richard
   1977    *Violent Crime*. Lexington, MA: Lexington Books.
   1981    Victim-offender dynamics in violent crime. *Journal of Criminal Law and Criminology* 72:743–762.

Block, Richard and Wesley G. Skogan
   1986    Resistance and nonfatal outcomes in stranger-to-stranger predatory crime. *Violence and Victims* 1(4):241–253.

Bordua, David, Alan J. Lizotte and Gary Kleck
   1979    *Patterns of Legal Firearms Ownership, Regulation, and Use in Illinois*. Springfield: Illinois Law Enforcement Commission.

Buckner, H. Taylor
   1995    Personal letter to Gary Kleck, February 9, 1995.

Cohen, Lawrence E. and Marcus Felson
   1979    Social change and crime rate trends: a routine activity approach. *American Sociological Review*. 44:588–608.

Cohen, Pearl B.
   1984    Resistance during sexual assaults: avoiding rape and injury. *Victimology* 9:120–129.

Conklin, John E.
   1972    *Robbery and the Criminal Justice System*. Philadelphia: Lippincott.

Cook, Phillip J.
   1986    The relationship between victim resistance and injury in noncommercial robbery. *Journal of Legal Studies*. 15:405–16.

Cook, Phillip J. and Daniel Nagin
   1979    *Does the Weapon Matter?* Washington, DC: INSLAW.

Fritzon, Katarina and Julie Ridgway
   2001    Near-death experience: the role of victim reaction in attempted homicide. *Journal of Interpersonal Violence*. 16:679–96.

Griffin, Brenda S. and Charles T. Griffin
   1983    Victims in rape confrontation. *Victimology* 6:59–75.

Hindelang, Michael J. and Michael Gottfredson
   1976    The victim's decision not to invoke the criminal justice process. In William F. McDonald (ed.), *Criminal Justice and the Victim*. Beverly Hills, CA: Sage Publications.

Hindelang, Michael J., Michael R. Gottfredson, and James Garofalo
   1978    *Victims of Personal Crime*. Cambridge, MA: Ballinger.

Hirsch, Travis
  1969    *Causes of Delinquencies.* Berkeley: University of California Press.

King, John W.
  1987    *Situational factors and the escalation of criminal violence.* Paper presented at the annual meetings of the American Society of Criminology, Montreal, Canada.

Kleck, Gary
  1988    Crime control through the private use of armed force. *Social Problems* 35:1–21.
  1991    *Point Blank: Guns and Violence in America.* Hawthorne, NY: Aldine de Gruyter.
  1997    *Targeting Guns.* Hawthorne, NY: Aldine de Gruyter.

Kleck, Gary and Marc Gertz
  1998    Carrying guns for protection: results from the National Self-Defense Survey. *Journal of Research in Crime and Delinquency.* 35:193–224.

Kleck, Gary and Miriam A. Delone
  1993    Victim resistance and offender weapon effects in robbery. *Journal of Quantitative Criminology.* 9:55–81.

Kleck, Gary and Don B. Kates
  2001    *Armed.* Amherst, NY: Prometheus Books

Kleck, Gary and Susan Sayles
  1990    Rape and resistance. *Social Problems* 37:149–162.

Koss, Mary P.
  1987    The hidden rape victim. *Psychology of Women Quarterly* 9:193–212.

Levine-MacCombie, J. and Mary P. Koss
  1987    Acquaintance rape: effective avoidance strategies. *Psychology of Women Quarterly* 10:311–320.

Lizotte, Alan J.
  1988    Determinants of completing rape and assault. *Journal of Quantitative Criminology* 2:203–217.

Ludwig, Jens, Philip J. Cook and Tom W. Smith
  1998    The gender gap in reporting household gun ownership. *American Journal of Public Health* 88:1715–1718.

Case: 1:10-cv-04184 Document #: 180-2 Filed: 04/27/12 Page 50 of 158 PageID #:7663

Marchbanks, Polly A., Kung-Jong Lui and James A. Mercy
    1990    Risk of injury from resisting rape. *American Journal of Epidemiology* 132:540–549.

McDonald, John
    1975    *Armed Robbery: Offenders and their Victims.* Springfield, IL: Charles Thomas.

Prentky, Robert Alan, Ann Wolpert Burgess and Daniel Lee Carter
    1989    Victim response by rapist type. *Journal of Interpersonal Violence* 1:73–98.

Quinsey, Vernon L. and Douglas Upfold
    1985    Rape completion and victim injury as a function of female resistance strategy. *Canadian Journal of Behavior Science* 17:40–50.

Rafferty, Ann P., John C. Thrush, Patricia K. Smith and Harry B. McGee
    1996    Validity of a household gun question in a telephone survey. *Public Health Reports* 110:282–288.

Reiss, Albert and Jeffrey A. Roth
    1993    Firearms and violence. In *Understanding and Preventing Violence*, ed. by Albert J. Reiss and Jeffrey A. Roth. Washington, DC: National Academy Press.

Ruback, R. Barry and Deborah L. Ivie
    1988    Prior relationship, resistance, and injury in rapes: an analysis of crisis center records. *Violence and Victims* 3(2):99–111.

Selvin, Hanan C. and Alan Stuart
    1966    Data-dredging procedures in survey analysis. *American Statistician* 20:20–23.

Siegel, Judith M., Susan B. Sorenson, Jacqueline M. Golding, Audrey Burnam and Judith A. Stein
    1989    Resistance to sexual assault: who resists and what happens? *American Journal of Public Health* 79:27–31.

Southwick, Lawrence
    2000    Self-defense with guns. *Journal of Criminal Justice* 28(5): 351–370.

Thompson, Martie P., T.R. Simon, Linda E. Saltzman and James A. Mercy
    1999    Epidemiology of injuries among women after physical assaults: the role of self-protective behaviors. *American Journal of Epidemiology* 150(3):235–244.

Turner, Anthony
   1981    The San Jose Recall Study. In Robert G. Lehnen and Wesley G. Skogan (eds.), *National Crime Survey: Working Papers. Volume I: Current and Historical Perspective*. Washington, DC: U.S. Department of Justice, Bureau of Justice Statistics.

Ullman, Sarah E.
   1997    Review and critique of empirical studies of rape avoidance. *Criminal Justice Behavior* 24:177–204.
   1998    Does offender violence escalate when rape victims fight back? *Journal of Interpersonal Violence* 13:179–192.

Ullman, Sarah E. and Raymond A. Knight
   1991    A multivariate model for predicting rape and physical injury outcomes during sexual assaults. *Journal of Consulting and Clinical Psychology* 59:724–731.
   1992    Fighting back. *Journal of Interpersonal Violence* 7:31–43.
   1993    The efficacy of women's resistance strategies in rape situations. *Psychology of Women Quarterly* 17:23–38.
   1995    Women's resistance strategies to different rapist types. *Criminal Justice and Behavior* 22:263–283.

U.S. Bureau of Justice Statistics
   1985    *Reporting Crimes to the Police. BJS Special Report*. Washington, DC: U.S. Government Printing Office.
   2000    *Criminal Victimization in the United States, 1995*. Washington, DC: U.S. Government Printing Office.
   2003a   National Crime Victimization Survey Incident Report interview schedule. Online at www.ojp.usdoj.gov/bjs/pub/pdf/ncvs2.pdf.
   2003b   2002 National Crime Victimization Survey. Online at www.ojp.usdoj.gov/bjs/pub/cvus02.pdf

U.S. Department of Justice
   2003    *National Crime Victimization Survey, 1992–2001* [Computer file]. Conducted by U.S. Dept. of Commerce, Bureau of the Census. 2nd ICPSR ed. Ann Arbor, MI: Inter-university Consortium for Political and Social Research [producer and distributor].

U.S. Federal Bureau of Investigation
   2002    *Crime in the United States 2001*. Washington, DC: U.S. Government Printing Office.

Walker, Samuel
    1998   *Sense and Nonsense about Crime and Drugs.* Belmont, CA: Wadsworth.

Weiner, Neil Alan
    1987   *Situational dynamics and juvenile interpersonal violence.* Paper presented at the annual meetings of the American Society of Criminology, Montreal.

Ziegenhagen, Eduard A. and Dolores Brosnan
    1985   Victim responses to robbery and crime control policy. *Criminology* 23: 675–695.

Zoucha-Jensen, Janice M. and Ann Coyne
    1993   The effects of resistance strategies on rape. *American Journal of Public Health* 83:1633–1634.

Jongyeon Tark is a Ph.D. candidate at Florida State University and a lieutenant of the Korea National Police. His research focuses on victimization, criminological theory, and law enforcement. He is currently examining the effect of crime victimization on marital disruption using the longitudinal features of the NCVS. He is also studying whether and why racial and ethnic group membership affects victimization reporting decisions.

Gary Kleck is professor of criminology and criminal justice at Florida State University. He received his doctorate in sociology from the University of Illinois in 1979, where he received the University of Illinois Foundation Fellowship in Sociology. He has been at Florida State since 1978. His research has focused on the topics of the impact of firearms and gun control on violence, deterrence, crime control, and violence. He is the author of *Point Blank: Guns and Violence in America*, which won the 1993 Michael J. Hindelang Award of the American Society of Criminology. More recently, he is the author of *Targeting Guns* (1997) and, with Don B. Kates, Jr., *The Great American Gun Debate* (1997) and *Armed* (2001). His articles have appeared in the *American Sociological Review, American Journal of Sociology, Social Forces, Social Problems, Criminology, Journal of Criminal Law and Criminology, Law & Society Review*, the *Journal of the American Medical Association* and other journals.

\*\*\*

# EXHIBIT 64

# Journal of Research in Crime and Delinquency

http://jrc.sagepub.com/

**Carrying Guns for Protection: Results from the National Self-Defense Survey**

GARY KLECK and MARC GERTZ

Journal of Research in Crime and Delinquency 1998 35: 193
DOI: 10.1177/0022427898035002004

The online version of this article can be found at:

http://jrc.sagepub.com/content/35/2/193

Published by:

**$SAGE**

http://www.sagepublications.com

On behalf of:

School of Criminal Justice, Rutgers - Newark

**Additional services and information for *Journal of Research in Crime and Delinquency* can be found at:**

**Email Alerts:** http://jrc.sagepub.com/cgi/alerts

**Subscriptions:** http://jrc.sagepub.com/subscriptions

**Reprints:** http://www.sagepub.com/journalsReprints.nav

**Permissions:** http://www.sagepub.com/journalsPermissions.nav

**Citations:** http://jrc.sagepub.com/content/35/2/193.refs.html

Downloaded from jrc.sagepub.com at GEORGE WASHINGTON UNIVERSITY on February 24, 2011

# CARRYING GUNS FOR PROTECTION: RESULTS FROM THE NATIONAL SELF-DEFENSE SURVEY

## GARY KLECK
## MARC GERTZ

*The article reviews research on gun carrying and reports new findings from the National Self-Defense Survey on the prevalence, incidence, and patterns of adult gun carrying for protection. About 8.8 percent of adults carried guns in the preceding year, 3.7 percent carried guns on their person, and 6.5 percent carried guns in a vehicle. Within a given year, about 16.8 million U.S. adults carry a gun, 7.1 million who carry do so on the person and 12.4 million do so in a vehicle. On an average day, 2.7 million U.S. adults carry a gun for protection on their person and 5.0 million carry one in a vehicle. Less than one in a thousand instances of gun carrying involves a violent gun crime. Carrying was more common among males, Blacks, people in the South and West, people with a job requiring a gun, those who know someone who was recently the victim of a crime, believe that crime is above average in their neighborhood, have been a robbery victim, or believe people must depend on themselves for protection.*

Millions of Americans carry firearms in public places, both on their person and in their vehicles. Most of this carrying violates gun carry laws, yet it is not necessarily done by people intending, or even likely, to commit some other crime with the gun. By 1995, at least 31 states had passed laws making it easy for adult residents without a criminal conviction to get a license to carry a concealed firearm (U.S. Bureau of Justice Statistics 1996b:120-1). Yet, because of a narrow research focus on carrying by juveniles, virtually nothing is known about gun carrying by adults. This article reviews research on gun carrying and reports findings from a national survey on the prevalence and incidence of carrying among adults and on the kinds of people who carry.

JOURNAL OF RESEARCH IN CRIME AND DELINQUENCY, Vol. 35 No. 2, May 1998 193-224
© 1998 Sage Publications, Inc.

Downloaded from jrc.sagepub.com at GEORGE WASHINGTON UNIVERSITY on February 24, 2011

from the SAGE Social Science Collections. All Rights Reserved.

## WHY GUN CARRYING MATTERS

### Criminogenic Effects of Gun Carrying

Carrying guns in public places, as distinct from merely keeping them in private homes, can have significant implications for both legal and illegal activities associated with crime. The frequency of carrying will affect how often criminals have guns available for criminal uses. Occasional carrying may be a part of planned crimes, whereas routine daily carrying may facilitate the commission, or influence the outcomes, of unplanned crimes, such as spontaneous fights or opportunistic robberies committed impulsively in response to contact with vulnerable or lucrative victims. In 1993, there were about 1.02 million crime incidents committed by offenders who possessed guns (but only some of whom actually used the guns) (U.S. Bureau of Justice Statistics 1996a:72). About 77 percent of all violent crimes in 1993 were committed in public places (p. 67) where the offender would have had to carry a gun to use it in the crime.

When guns are used in violent crimes, it increases the likelihood the crime will be completed (e.g., property is taken in a robbery or burglary), reduces the likelihood that the offender will attack and injure the victim, but increases the likelihood that any injury inflicted will be fatal (Cook 1991; Kleck 1991, chap. 5; Kleck and McElrath 1991). Thus, increased gun carrying by those with criminal propensities could contribute to increases in robberies and other violent crimes, such as assaults, committed in public places, and to higher fatality rates in those crimes.

## DEFENSIVE USES OF GUNS CARRIED IN PUBLIC PLACES

On the other hand, the frequency of carrying also affects how often prospective crime victims, both criminal and noncriminal, will have guns available for self-defense. It is a mistake to think of gun carrying as something done largely for criminal purposes, except in the definitional sense that most concealed carrying without a permit is itself a crime. As will be documented, most nonrecreational carrying is done for noncriminal purposes of self-defense. Self-defense gun carrying is worth taking seriously for two reasons. First, the empirical literature is unanimous in portraying defensive gun use as effective, in the sense that gun-wielding victims are less likely to be injured, lose property, or otherwise have crimes completed against them than victims who either do nothing to resist or who resist without weapons (for reviews, see Kleck 1997, chap. 5; Kleck and DeLone 1993).

Downloaded from jrc.sagepub.com at GEORGE WASHINGTON UNIVERSITY on February 24, 2011

Second, the literature is nearly unanimous (with a single dissenting source of survey information) in indicating that defensive gun use (DGU) is commonplace, though largely invisible to governments.[1] At least 15 surveys have yielded results implying anywhere from 760,000 to 3.6 million DGUs per year, with evidence from the first survey specifically designed to estimate DGU frequency, the National Self-Defense Survey (NSDS), indicating about 2.5 million instances of DGU per year (Kleck and Gertz 1995; for a recent confirming estimate, see Cook and Ludwig 1997:61-3).[2]

More specifically relevant to current concerns, the NSDS indicated that 26.8 percent of those 2.5 million DGUs occurred in some location away from the user's home, and another 35.9 percent occurred in places near the defender's home (yard, carport, street adjacent to home, etc.) where possession of the gun could be regarded in legal terms as carrying. Thus, anywhere from 670,000 to 1,570,000 DGUs a year occur in connection with gun carrying in a public place. To put this in perspective, in 1993 there were about 1.02 million crime incidents committed by offenders who appeared to possess guns (U.S. Bureau of Justice Statistics 1996a). Because some of these crimes, such as cases of domestic violence, were committed in the offender's home and thus did not entail gun carrying, the estimated number of crimes involving gun carrying would be less than 1 million. Thus, there appear to be about as many defensive uses of guns connected with carrying by victims as there are criminal uses by gun carrying offenders.

## DETERRENT EFFECTS OF GUN CARRYING BY PROSPECTIVE VICTIMS

Widespread gun carrying by potential victims may also exert a deterrent effect on rates of criminal behavior, especially for types of crimes commonly committed in public places, such as robberies. That is, quite apart from their effects in disrupting crimes that have already been initiated, gun carrying among prospective victims may discourage some crimes from being attempted in the first place, due to criminals anticipating greater risks of injury to themselves and lower rates of success completing the crimes. Consistent with this hypothesis, Kleck and Patterson (1993:269) found that cities with higher gun prevalence (and presumably higher gun-carrying rates) had lower rates of robbery, a crime typically committed in public places. This association was not significant for total and gun robberies but was significant for nongun robberies. This fits closely with the expectation that robbers lacking guns themselves would be the ones most likely to be deterred by the prospect of victims with guns. Deterring these robbers is especially important in light

Downloaded from jrc.sagepub.com at GEORGE WASHINGTON UNIVERSITY on February 24, 2011

of the fact that prior research has consistently indicated that unarmed robbers are more likely to injure victims than are armed robbers (see findings of Kleck and DeLone 1993, and 16 earlier studies summarized on p. 62 of that article).

Likewise, in a comprehensive pooled cross-sections time series analysis of virtually all 3,141 U.S. counties, Lott and Mustard (1997) found that robbery rates, as well as homicide (both with and without guns), rape, and aggravated assaults, declined after states passed laws making it easier for noncriminals to obtain carry permits. They interpreted the results as indicating that allowing more citizens to legally carry guns reduced rates of crimes involving direct offender-victim contact by raising robbers' perception of risk from armed victims. Although it is debatable how much of this pattern reflected causal effects of new laws (Kleck 1997, chap. 6), the results strongly undercut the conclusions of McDowall, Loftin, and Wiersema (1995), based on univariate (or bivariate) analyses of homicide trends in just seven nonrandomly selected counties (clustered into five areas), that such laws increase gun homicides, supposedly because they indirectly stimulate offender gun carrying (see Britt, Kleck, and Bordua 1996 for a critique of interrupted time series evaluations of legal interventions).

## PURPOSES AND MOTIVES FOR CARRYING GUNS

Most of the nonrecreational carrying of guns by civilians, whether resulting in a DGU or not, is very likely illegal. Although national surveys of the general population (to be reviewed later) indicate that perhaps 5-11 percent of U.S. adults admit to carrying guns on their person for self-protection, only about 1 percent of the population has a permit to carry a concealed weapon, and only about 2 percent even in states like Florida where it is relatively easy to get one. All but one of the states either prohibit civilians altogether from concealed carrying on the person or require a permit to do so (Cramer and Kopel 1994; National Rifle Association 1996). Therefore, probably about 80-90 percent of those who report carrying guns on their person away from their homes do so illegally. This suggests that there are probably still more carriers who are unwilling to report their illegal activity to surveyors. We assume that this defensive carrying is nearly all concealed, in the absence of any reports of widespread open carrying of guns.

On the other hand, very little of this enormous amount of generally unlawful gun carrying is done for purposes of committing a crime (apart from violations of gun laws themselves). Only a tiny fraction of gun carrying results in a crime committed with a gun. We later present an estimate of 975 million

Downloaded from jrc.sagepub.com at GEORGE WASHINGTON UNIVERSITY on February 24, 2011

instances (person-days) of adult gun carrying on the person per year. There are less than a million violent crimes committed with guns (based on victim surveys, and counting both crimes reported to the police and those unreported), and 81 percent of persons arrested for violent crimes in 1994 were aged 18 or older (U.S. Federal Bureau of Investigation 1995:227), implying about 800,000 gun crimes committed by adults. Even if we assumed, somewhat implausibly, that all of these gun crimes involved gun carrying (i.e., occurred in places requiring carrying for a gun to be present), it is still clear that less than one in one thousand instances of gun carrying on the person result in a crime committed with a gun.

If carrying guns is rarely done for the purpose of committing a crime, this suggests that self-protection is a more common motive for any one instance of carrying, among criminals and noncriminals alike. Prior research has found either that most of both illegal carriers and legally permitted carriers express protection-related motives for carrying or that the carrying is associated with crime-related variables such as anticipation of future victimization, prior victimization, fear of crime, or exposure to risk factors for victimization, such as drug-selling or gang membership. These patterns are evident among adults in the general population (Bryant and Shoemaker 1988; Hassinger 1985), juveniles in the general population (Arria, Wood, and Anthony 1995; Bjerregaard and Lizotte 1995; Callahan and Rivara 1992; Fagan 1990; Sheley and Brewer 1995; Sheley, McGee, and Wright 1992; Smith and Sheley 1995; Webster, Gainer, and Champion 1993), adult offenders (Schultz 1962; Wright and Rossi 1986), and juvenile offenders (Ash et al. 1996; Callahan, Rivara, and Farrow 1993; Knox et al. 1994; Sheley 1994; Sheley and Wright 1993, 1995).

None of this implies that gun carrying cannot contribute to crime increases. Some gun crimes are committed in public places by offenders who did not plan the crime but who possessed a gun at the time of the offense only because they were carrying for self-protection. Criminals have a far higher-than-average risk of victimization themselves, and thus should be especially likely to carry guns for defensive reasons (Wright and Rossi 1986). Some of this defensively motivated carrying could increase the number or seriousness of unplanned crimes committed in public places. Gun carrying among criminals could, however, also deter victimization attempts by other criminals just as carrying among noncriminals may do.

The fact that most gun carrying, even by criminals, is done without a concomitant violent crime also does not mean that criminals do not carry guns for criminal purposes. When criminals commit crimes, they often find guns useful for intimidating and controlling their victims, and even for avoiding hurting them (Sheley and Wright 1995:67-9; Wright and Rossi 1986:127-31).

Downloaded from jrc.sagepub.com at GEORGE WASHINGTON UNIVERSITY on February 24, 2011

Thus, two perfectly consistent assertions are supported by the evidence: (a) Only a small share of incidents of gun carrying, even by criminals, is done for the purpose of committing violent crimes and (b) on those less frequent occasions when offenders *do* commit violent crimes, they often commit them with guns that were carried to the scene, either because the offenders believed that weapons would be useful in controlling victims and otherwise ensuring a successful outcome of the crime or because the offenders were initially carrying guns for self-protection (or "just in case") but became involved in an unplanned crime.

## SOME CONCEPTUAL DISTINCTIONS

Gun carrying can be divided up into categories according to the carrier's dominant motivation. Thus, carrying is sometimes done by criminals specifically for the purpose of ensuring that a gun will be available to help carry out a crime. Far more common, even among criminals, is carrying for reasons of self-protection (Sheley and Wright 1995; Wright and Rossi 1986). There is also "carrying" of guns for purely recreational reasons or other reasons unrelated to crime, such as hunting or target shooting. Although this is probably not the sort of carrying that interests most researchers or policymakers, it may well be the kind of carrying that some survey respondents (Rs) have in mind when they report, in response to imprecisely worded questions, that they "carry" guns. This problem will be discussed later at greater length.

Among juveniles, there may also be another common motive that can, for lack of a better term, be labeled "showing off." A typical scenario might be something like the following: A noncriminal adolescent boy sneaks a parent's handgun out of the home and takes it to school or to a friend's house, where he shows it off to his friends. The gun is then returned home without incident. Although this sort of thing is unlikely to be a reason for routine or frequently repeated carrying, or an important or common motive for carrying among adults, it could be a common motive for isolated instances of relatively inconsequential carrying by noncriminal adolescents.

Carrying guns may also be categorized according to the manner in which it is done. Very likely the gun carrying that most researchers are primarily concerned with is concealed carrying of handguns (and primarily loaded handguns), rather than carrying of long guns or the open carrying of handguns. Although some might automatically assume that concealed handgun carrying refers only to carrying on the person, a Gallup survey of adults in 1993 indicated that carrying guns for protection in motor vehicles, which would often include carrying in a glove compartment or similar hidden

Downloaded from jrc.sagepub.com at GEORGE WASHINGTON UNIVERSITY on February 24, 2011

location, is even more common than carrying on the person (Table 1). This may be partly due to the fact that the criminal law in many states is less restrictive concerning gun possession in vehicles, in effect treating citizens' vehicles as extensions of their homes (National Rifle Association 1996; Wright, Rossi, and Daly 1983:252-3). Previous surveys usually do not distinguish between carrying in vehicles and carrying on the person, despite the fact that the former is often legal whereas the latter usually is not.

### PRIOR RESEARCH

Gun carrying received very little scholarly or public attention before the 1990s. This changed after 1987, when Florida's legislature passed a law making it easier for adult residents without a criminal conviction to get a carry permit, followed by a wave of similar "shall issue" or nondiscretionary carry permit laws enacted elsewhere. By 1996, 31 states had "shall issue" carry laws (U.S. Bureau of Justice Statistics 1996b:120-1). A wave of studies, many funded by the federal Centers for Disease Control and Prevention (CDC) or the Justice Department, soon appeared, beginning around 1992.

Almost all of the resulting publications, however, concerned juveniles (Arria et al. 1995; Ash et al. 1996; Callahan and Rivara 1992; Callahan et al. 1993; Knox et al. 1994; Lizotte et al. 1994; Sheley 1994; Sheley and Brewer 1995; Sheley et al. 1992; Sheley and Wright 1993, 1995; Smith and Sheley 1995; Webster et al. 1993). This was an unfortunately narrow focus, given that the vast majority of carrying is done by adults and the vast majority of gun crimes, presumably including the bulk of those involving gun carrying, are committed by adults—77 percent of persons arrested for weapons violations and 81 percent of persons arrested for violent crimes in 1995 were aged 18 or older (U.S. Federal Bureau of Investigation 1996:224).

Furthermore, with respect to law-making, there is very little at stake in connection with juvenile gun carrying. All concealed carrying of handguns in public places by minors has long been completely illegal virtually everywhere in the United States (excepting Vermont), in that such carrying is, depending on the state, either prohibited for civilians of any age or requires a carry permit that minors are not eligible to receive (National Rifle Association 1996; Sheley and Wright 1995:150). Although there is certainly room for improvement in the enforcement of existing carry laws (Kleck 1991:347-53, 441-2), laws permitting the confiscation of guns from juveniles are already "almost universal" (Blumstein 1995:32-3). This did not, however, prevent at least 18 state legislatures in the early 1990s from passing largely redundant bans on juvenile gun carrying anyway (Toch 1993).

Downloaded from jrc.sagepub.com at GEORGE WASHINGTON UNIVERSITY on February 24, 2011

**TABLE 1: Prevalence of Gun Carrying in Recent National Surveys**

*A. Adults*

| Date Fielded | Survey Firm | On Person or in Vehicle? | Protection?[a] | Question Asked of: | Percentage Carry[b] |
|---|---|---|---|---|---|
| February 7-10, 1991 | Princeton | Any | No | All Rs | 10 |
| May 16-19, 1991 | Gallup | Vehicle | No | Personal handgun owners | 8.2 |
| August 18-22, 1991 | CBS/NY Times | Any | No | All Rs | 5 |
| April 3-12, 1993 | LH Research | Person | No | Rs in gun households | 10.5 |
| December 17-19, 1993 | Gallup | Vehicle | Yes | Personal gun owners | 7.75 |
|  |  | Person | Yes | Personal gun owners | 5.27 |
| April 16-19, 1994 | L.A. Times | Any | Yes | All Rs | 11 |
| November 12, 1994 | Chilton | Any | Yes | Personal gun owners | 7.5 |

*B. Youth*

| Year Fielded | Survey | Sample[c] | Recall Period | Protection?[a] | Weapon | Gun | Percentage Carried | |
|---|---|---|---|---|---|---|---|---|
|  |  |  |  |  |  |  | Weapon on School Property | Gun to School |
| 1989 | NCVS | A 12-19 | 6 months |  |  |  | 2 | .05 |
| 1990 | YRBS | G 9-12 | Past 30 days | Yes | 19.6 | 4.1[d] |  |  |
| 1991 | YRBS | G 9-12 | Past 30 days | No | 26.1 | 2.9[e] |  |  |

Downloaded from jrc.sagepub.com at GEORGE WASHINGTON UNIVERSITY on February 24, 2011

| Year | Source | Age/Grade | Time period | Protection? | | | | | |
|------|--------|-----------|-------------|-------------|---|---|---|---|---|
| 1992 | YRBS | A 14-17 | Past 30 days | No | 17.1 | | | | |
|      |      | A 12-19 | Past 30 days | No | 15.7 | | | | |
| 1993 | NCES | G 6-12 | School year | Yes | | | | | |
| 1993 | LHRI | G 6-12 | c. 8 months | No | | | 3.2 | | .19 |
|      |      |         | Past 30 days | No | 15 | | 15-22 | | 4 |
| 1993[f] | YRBS | G 9-12 | Past 30 days | No | 22.1 | 7.9 | 11.8 | | |
| 1995[f] | YRBS | G 9-12 | Past 30 days | No | 20.0 | 7.6 | 9.8 | | |

SOURCES: DIALOG (1995), Bastian and Taylor (1991), U.S. Centers for Disease Control and Prevention (1991, 1992, 1994a, 1994b, 1995, 1996), LH Research (1993a, 1993b), Cook and Ludwig (1997), U.S. National Center for Education Statistics (1996).

NOTE: NCVS = National Crime Victimization Survey, YRBS = Youth Risk Behavior Surveillance, NCES = U.S. National Center for Education Statistics, LHRI = LH Research, Inc.

a. Did question specify carrying for protection against crime?
b. Percentage of entire sample reporting carrying.
c. A = ages, G = grades.
d. Students were counted as gun carriers only if a gun was the weapon they "usually" carried.
e. Students were counted as gun carriers only if they carried guns more often than any other weapon.
f. The 1993 and 1995 YRBS surveys were the first pair of YRBS surveys whose carry results are directly comparable.

**201**

Downloaded from jrc.sagepub.com at GEORGE WASHINGTON UNIVERSITY on February 24, 2011

One would expect adult carrying to look very different from juvenile carrying. Some of the former is legally authorized, whereas very little of the latter is. Much adult carrying is done in vehicles, whereas low driving rates among juveniles younger than age 16 would imply less juvenile carrying in vehicles. Whereas some carrying of guns by juveniles might be done in schools, very little by adults is done there. A significant minority of adult carrying might be linked to jobs requiring a gun (police officer, security guard), whereas virtually none of juvenile carrying would be so linked. Conversely, a good deal of juvenile carrying would be linked to membership in street gangs (Bjerregaard and Lizotte 1995; Callahan and Rivara 1992; Decker and Pennell 1995), whereas among adults such links are likely to be limited to a few younger adults. Consequently, one might expect the correlates of adult gun carrying to differ from the correlates of juvenile carrying. Broadly speaking, adult carrying is likely to look more legitimate.

The few studies of adult carrying have typically relied on less satisfactory types of samples. Some confined their analyses to small nonprobability samples of carry permit holders or applicants (Hassinger 1985; Northwood, Westgard, and Barb 1978). Because no noncarriers were studied, these studies could shed little light on how carriers differ from noncarriers. Further, permit holders are likely to be especially legitimate gun carriers, unrepresentative of all carriers. For example, Hassinger (1985) found, contrary to the typical profiles of either criminals or crime victims, that permit holders typically were married, well-educated, middle-aged, upper-middle-class Whites.

On the other hand, another study used a sample of 50 persons arrested for weapons carrying (Schultz 1962), cases confined to the opposite end of the legitimacy continuum, resulting in the opposite sample bias. Nevertheless, what permit holders and arrestees had in common is that both were likely to carry weapons because of concerns about future victimization. Among Hassinger's permit holders, the most frequently endorsed reason for carrying a pistol was, "I understand the police cannot be everywhere; the pistol is a prudent precaution" (1985:192). Likewise, 70 percent of Schultz's arrestees carried weapons mainly because they were "anticipating attack," by far the most commonly endorsed reason (1962:477). Note that concerns about future victimization do not necessarily imply either past victimization or fear. Northwood and his colleagues found that only 18.5 percent of their permit applicants claimed prior victimization as a reason for carrying. Likewise, research on handgun ownership indicates an association with residence in high-crime areas and anticipation of future victimization but little consistent relationship with fear or prior victimization (see studies reviewed in Kleck 1997, chap. 3).

Three studies of adult gun carrying used probability samples of state populations. Bryant and Shoemaker (1988) found no association between

Downloaded from jrc.sagepub.com at GEORGE WASHINGTON UNIVERSITY on February 24, 2011

gun carrying and prior victimization or fear of crime in a 1984 mail survey of Virginia motor vehicle registrants. The only two significant correlates found were sex and community size: Males and persons from smaller communities were more likely to carry. With a return rate of only 33 percent, it is questionable whether the survey's sample was representative. A mail survey of Louisiana driver's licensees (c. 1985) had the same problem (Bankston and Thompson 1989; Bankston et al. 1990). Although national surveys indicate that only 5-11 percent of adults carry guns for protection (and, according to the present survey, 20 percent of households in the West South Central region of Louisiana, Texas, Oklahoma, Arkansas), 34 percent of the households in this sample reported carrying for protection, suggesting pronounced sample bias. Paralleling the Virginia findings, Bankston and Thompson (1989) found gun carrying to be significantly more common among males, younger persons, and those who perceived guns as effective in reducing crime. Carrying was only weakly and indirectly related to fear or a perception of being at greater risk of future victimization, and was unrelated to prior victimization (see also Bankston et al. 1990).

Finally, Nelson and his colleagues (1996) surveyed Oregon adults by telephone in 1992 to 1993 and found, like Bryant and Shoemaker, carrying a loaded gun to be significantly more common among males in less densely populated areas. They did not measure fear, prior victimization, or similar crime-related variables.

### THE MEANING OF GUN "CARRYING" IN SURVEYS

Table 1 summarizes estimates of gun and weapon carrying prevalence in recent national surveys using probability samples. Perhaps even more than with other phenomena, estimates of the frequency of gun carrying appear to be radically affected by seemingly minor variations in question wording. For many survey Rs, imprecisely worded questions about "carrying" guns can be interpreted literally, as referring to any and all physical conveying of guns. Thus, moving a gun from one room of the owner's home to another room, from a drawer to a gun cabinet, or from the cabinet to the owner's vehicle would all entail physically carrying the gun. Even a question confined to locations away from the owner's home could still encompass carrying guns from a gun store to the owner's home, or carrying for recreational purposes such as target shooting or licensed hunting during appropriate hunting seasons. It is unlikely that either the authors of the survey questions or the consumers of research results had these kinds of gun carrying in mind. Whereas

Downloaded from jrc.sagepub.com at GEORGE WASHINGTON UNIVERSITY on February 24, 2011

some Rs might guess the surveyors' intended meaning, one would not be jus-
tified in assuming that all of them do.

In surveys where the question wordings do not specify the more problem-
atic and often unlawful types of carrying, that is, carrying for criminal or de-
fensive purposes, it is quite possible that the *majority* of Rs reporting carrying
may be referring only to recreational or other innocuous types of carrying.
Consider, for example, a large-scale national survey of high school students.
The 1995 Youth Risk Behavior Surveillance (YRBS) survey, fielded by
CDC, found that 7.6 percent of the students reported carrying a gun (any-
where, not just in school) in the preceding 30 days. The carry question did not
specify carrying for protection, and thus a student who had done some target
shooting or hunting in the previous 30 days could accurately answer "yes." A
1991 national survey indicated that 10 percent of persons aged 16 to 17 had
hunted in the previous year (U.S. Fish and Wildlife Service 1993:75), and a
1989 national survey indicated that 12.9 percent of persons aged 12 to 17 had
engaged in target shooting in the previous year (American Sports Data Inc.
1989:237). Similarly, among adults, about 8.5 percent hunted with firearms
in 1993 (U.S. Bureau of the Census 1995:260) and 7.2 percent engaged in tar-
get shooting (American Sports Data Inc. 1989:237). Thus, there are easily
enough recreational shooters to potentially account for *all* of those reporting
gun carrying in surveys not excluding carrying for recreation (Table 1).

Even a question specifying "for protection" is ambiguous if it does not fur-
ther specify "against crime or criminals," or words to that effect, because peo-
ple in rural areas carry guns for protection against poisonous snakes and other
dangerous animals. The 1990 YRBS, for example, asked about protection but
did not limit the question to protection against human threats. Due to crucial
variations in question wordings, none of the carry estimates in Table 1 up
through 1993 are strictly comparable with any of the others; even the earlier
YRBS surveys each used different question wordings concerning gun carry-
ing. Thus, people who used the YRBS results to judge trends in youth gun
carrying are mistaken. For example, Ash et al. (1996:1754) interpreted the
1990 and 1993 YRBS surveys to indicate huge increases in youth gun carry-
ing. Actually, the difference in self-reported carry rates may have been due to
nothing more than the fact that the 1990 question was limited to protection-
related carrying whereas the 1993 question was not. Further, the 1990 survey
only counted gun carriers who carried guns more often than other weapons,
whereas the 1993 survey counted all gun carriers (based on unpublished cop-
ies of YRBS survey instruments). The first pair of surveys whose results
could be directly compared, the 1993 and 1995 YRBS surveys, indicated that
weapon and gun carrying among youths was declining slightly (Table 1).

Downloaded from jrc.sagepub.com at GEORGE WASHINGTON UNIVERSITY on February 24, 2011

## PREVALENCE OF GUN CARRYING
## IN PREVIOUS NATIONAL STUDIES

The focus here is on national surveys of probability samples of the U.S. population. None of the national surveys of adults (Table 1, panel A) is satisfactory for estimating the prevalence of gun carrying. Some of the surveys did not specify carrying for protection against crime, so they could include a good deal of carrying linked with recreational uses of guns. Two of the surveys that did specifically ask about carrying for protection asked the question only of Rs reporting that they personally owned guns. This procedure excludes people who carry guns belonging to other members of their household, a practice likely to be more common among women. The estimates indicate that between 5 and 11 percent of U.S. adults at least occasionally carry guns in public places. None of the surveys asking carry questions of all adults asked how often carriers carried their guns, so it is not possible to estimate the incidence of carrying or what fraction of the population is carrying on any given day.

One survey fielded after ours yielded national carry prevalence estimates, but they are flawed in important ways. Due to errors in the questionnaire, a Police Foundation (PF) survey fielded in November-December 1994 asked the gun carrying questions only of Rs who reported personally owning a gun (Chilton Research Services 1994). Because our survey indicated that nearly a quarter of carriers claimed (accurately or not) to not personally own a gun, that flaw alone could have caused the PF survey to miss about a quarter of gun carriers. Furthermore, the PF questions pertaining to whether guns were carried on the person or in a vehicle were not asked of persons who carried guns while commuting to and from their jobs or for other work-related reasons (about 28 percent of carrying was for "work-related" reasons in the PF survey—Cook and Ludwig 1997:54-5). Thus, that survey did not yield estimates of all gun carrying on the person or in vehicles and cannot be compared with ours. The PF survey was also afflicted by an unacceptably low interview completion rate of 42 percent (completions divided by completions plus refusals—see Cook and Ludwig 1997:7), compared to, for example, 61 percent (computed the same way) in the present survey.

## THE NATIONAL SELF-DEFENSE SURVEY

### Methods

The data presented here are drawn from the National Self-Defense Survey, the first national survey ever devoted to the subject of armed self-defense. We

Downloaded from jrc.sagepub.com at GEORGE WASHINGTON UNIVERSITY on February 24, 2011

used the most anonymous possible national survey format, that of the anonymous random digit dialed telephone survey. We did not know the identities of those who were interviewed and made this fact clear to the Rs. We interviewed a large, nationally representative sample covering all adults (aged 18 and over) in the lower 48 states and living in households with telephones. The quality of sampling procedures was well above the level common in national surveys. Our sample was not only large and nationally representative, but it was also stratified by state. That is, 48 independent samples of residential telephone numbers were drawn, one from each of the lower 48 states, providing 48 independent, albeit often small, state samples. To gain a larger raw number of sample DGU cases, we oversampled in the South and West regions, where previous surveys have indicated gun ownership is higher. We also oversampled within contacted households for males, who are more likely to own and carry guns, by initially asking to speak to the male head of household. Finally, because the survey was designed to yield information on defensive use of guns, we oversampled for persons who reported, early in the interview, a DGU by interviewing all of them whereas interviewing only a randomly selected one in three of all other Rs. Data were later weighted to adjust for oversampling by region, sex, and involvement in a DGU. The results reported here are based on responses of all 1,832 persons who were given the full interview.

A professional telephone polling firm, Research Network, of Tallahassee, Florida, did the sampling and interviewing. Interviews were conducted from February through April of 1993. Only the firm's most experienced interviewers were used on the project. Interviews were monitored at random by survey supervisors. Up to 10 calls were made in an attempt to contact initial sample members. Of all eligible residential telephone numbers called where a person (rather than an answering machine) answered, 61 percent resulted in a completed interview (i.e., a 39 percent refusal rate among persons contacted). A 20 percent random sample of interviews was validated by supervisors with call-backs. Our sample's demographic distribution (weighted) closely resembled that of the U.S. adult (18+) population: 47 percent male (48 percent in the U.S. population), 84 percent White and 9 percent Black (85 percent and 11 percent, respectively, in the population), and 14 percent aged 18-24 (14 percent), 23 percent aged 25-34 (23 percent), 25 percent aged 35-44 (21 percent), 27 percent aged 45-64 (26 percent), and 12 percent aged 65 and older (17 percent). A fuller description of the methods is in Kleck and Gertz (1995), and a full copy of the questionnaire and the data can be obtained from the senior author.

Following directly after questions about gun ownership, the questions on gun carrying were phrased as follows: "*In the last 12 months*, have you ever

Downloaded from jrc.sagepub.com at GEORGE WASHINGTON UNIVERSITY on February 24, 2011

*carried* a gun away from home, either on your person or in a vehicle, for protection against crime? Do not count carrying for recreation or in connection with duties in law enforcement, work as a security guard, or in the armed forces" (emphases in original survey instrument). Those who replied "yes" were then asked, "Was this carrying done on your person—for example, in a pocket, holster, or bag—or was it only in a motor vehicle?" Those responding "on person" or "both" were then asked, "About how many days in the past 12 months did you carry a gun on your person for protection against crime?" Those responding "in vehicle" or "both" were asked, "About how many days in the past year did you carry a gun in a motor vehicle for protection against crime?" The frequency questions were open-ended—interviewers recorded the number of days Rs reported, from 0 to 365.

Because this was a survey of the general population of adults, it is unlikely to include many Rs who carry guns for criminal purposes. Thus, this study contributes information primarily about the largest, but least studied, segment of the carrying population, largely noncriminal adults. In this way, it adds to, but is distinct from, the substantial body of knowledge concerning carrying among adolescents and criminal adults.

### Results—Prevalence and Incidence of Protective Gun Carrying among U.S. Adults

Table 2 presents the data pertaining to the frequency of gun carrying among U.S. adults. There were 1,832 total Rs, and 1,799 who answered the initial question about carrying, of whom 159 (8.8 percent) reported gun carrying and 1,640 did not. Of the 159 carriers, 29 carried on the person but not in a vehicle, 39 carried both ways (for a total of 68 who carried on the person), 80 carried only in a vehicle (for a total of 119 who carried in a vehicle), and 11 carried a gun but would not say whether they carried on their person or in a vehicle (weighted frequencies). The weighted prevalence results indicate that 8.8 percent of U.S. adults carry a gun in some way for protection each year (95 percent confidence interval: 7.5-10.1 percent), 3.8 percent carry on their person (2.9-4.7 percent), 6.6 percent do so in a vehicle (5.5-7.8 percent), and 2.1 percent carry in both ways (these last are a subset of the previous two segments, not an additional segment). Applying these percentages to the estimated 1993 U.S. resident adult (age 18+) population of 190,673,523 (U.S. Bureau of the Census 1995:13) indicates that about 16.8 million adults carried guns for protection that year, 7.1 million adults carried on their person, 12.4 million carried guns in a vehicle, and 4.0 million did both. In comparison, applying the 1993 YRBS estimate of high school–aged gun carrying prevalence (7.9 percent) to the estimated U.S. population aged 13-17 of

Downloaded from jrc.sagepub.com at GEORGE WASHINGTON UNIVERSITY on February 24, 2011

**TABLE 2:    Prevalence and Incidence of Adult Gun Carrying in the United States, 1993—Results from the National Self-Defense Survey**

| | Type of Carrying | | | |
| | On Person | In Vehicle | Both | Any |
|---|---|---|---|---|
| Prevalence—<br>percentage who carry | 3.8 | 6.6 | 2.1 | 8.8[a] |
| Estimated number of<br>carriers in population | 7,054,920 | 12,393,779 | 4,004,144 | 16,779,270 |
| Mean number of days<br>per carrier per year | 138.18 | 145.92 | | |
| Annual person-days<br>of carrying | 974,848,894 | 1,808,500,232 | | |
| Estimated number<br>carrying on average day | 2,670,819 | 4,954,795 | | |

a. Includes persons who carry but would not say whether it was on the person or in a vehicle.

17,746,048 (pp. 12-13) implies only about 1.4 million adolescent carriers in the past month, only a fraction of whom carry for protection. Even taking account of the difference in recall periods, adults almost certainly account for the vast majority of defensive gun carrying.

As with most surveys, Rs can fail to report events that did occur or report events that occurred prior to the recall period, that is, "telescope" events into the recall period. Based on technical studies of the National Crime Victimization Survey (NCVS), Kleck and Gertz reported that reports of crime victimization experiences could be no more than 21 percent too high due to telescoping. This problem, however, is balanced out by a roughly equal amount of failure to recall events that did occur (1995:171-2). Assuming reports of gun carrying are the same as reporting of crime incidents in this respect, there is no reason to believe that telescoping was common enough to make carry estimates too high.

It is worth stressing that we told Rs not to include carrying done as part of their work duties as police officers, security guards, or in the military. However, even if one speculated that some Rs ignored this instruction and reported such carrying anyway (and we have no reason to believe that any Rs did this), it could inflate our prevalence estimates by no more than a factor of 1.07, in that only 7 percent of the gun carriers ($n = 11$) had such an occupation (Table 3).

The data on frequency of carrying, among those who carry guns, indicate that those who carry on the person do so an average of about 138 days a year,

Downloaded from jrc.sagepub.com at GEORGE WASHINGTON UNIVERSITY on February 24, 2011

TABLE 3:   Comparison of Gun Carriers with Other People (weighted percentages)

| | Sample | | | | | |
|---|---|---|---|---|---|---|
| | All Gun Carriers | Carry on Person | Carry in Vehicle | Own Gun, No Carry | No Carry | All Persons |
| Personally owns gun | 76.1 | 82.4 | 79.0 | 100.0 | 19.6 | 24.6 |
| Gun in household | 81.1 | 86.8 | 84.9 | 100.0 | 32.6 | 36.9 |
| Burglary victim, past year | 11.4 | 7.4 | 10.2 | 4.0 | 4.9 | 5.5 |
| Robbery victim, past year | 5.1 | 6.5 | 4.2 | 1.6 | 2.3 | 2.6 |
| Assault victim as adult | 31.0 | 41.2 | 30.5 | 31.0 | 21.5 | 22.4 |
| Know crime victim? | 50.0 | 54.4 | 47.5 | 33.6 | 28.1 | 30.1 |
| Nights away from home, monthly average | | | | | | |
| 0 | 8.4 | 7.5 | 6.8 | 5.6 | 8.2 | 8.2 |
| 1-6 | 27.9 | 25.4 | 31.4 | 24.7 | 31.5 | 31.2 |
| 7-13 | 24.7 | 19.4 | 27.1 | 27.5 | 23.7 | 23.8 |
| 14+ | 39.0 | 47.8 | 34.7 | 42.2 | 36.6 | 36.8 |
| Must depend on self rather than cops | 85.4 | 88.2 | 84.0 | 64.7 | 52.8 | 55.7 |
| Supports death penalty | 82.9 | 83.8 | 85.7 | 82.2 | 69.3 | 70.5 |
| Courts not harsh enough | 82.8 | 91.2 | 84.7 | 76.4 | 73.2 | 74.0 |
| Gender (percentage male) | 62.9 | 70.6 | 63.9 | 76.1 | 44.9 | 46.7 |
| Age | | | | | | |
| 18-24 | 11.3 | 11.8 | 10.1 | 11.8 | 14.0 | 13.7 |
| 25-34 | 27.7 | 25.0 | 30.3 | 22.0 | 22.3 | 22.8 |
| 35-44 | 27.0 | 32.4 | 26.9 | 23.9 | 25.1 | 25.3 |
| 45-64 | 28.3 | 29.4 | 26.9 | 30.1 | 26.4 | 26.5 |
| 65+ | 5.7 | 1.5 | 5.9 | 12.1 | 12.2 | 11.6 |
| Race | | | | | | |
| White | 79.9 | 79.1 | 83.9 | 90.6 | 84.4 | 84.0 |
| Black | 11.9 | 11.9 | 9.3 | 5.0 | 8.8 | 9.1 |
| Hispanic | 4.4 | 4.5 | 4.2 | 3.8 | 4.8 | 4.7 |
| Other | 3.8 | 4.5 | 2.5 | .6 | 2.1 | 2.3 |
| Place of residence | | | | | | |
| Large city (more than 500,000) | 24.7 | 27.9 | 22.0 | 14.0 | 22.4 | 22.6 |
| Small city | 31.6 | 29.4 | 29.7 | 31.5 | 29.1 | 29.4 |
| Suburb of large city | 26.6 | 23.5 | 30.5 | 28.7 | 31.4 | 31.0 |
| Rural area | 17.1 | 19.1 | 17.8 | 25.9 | 17.1 | 17.1 |
| Marital status | | | | | | |
| Married | 65.4 | 64.2 | 66.7 | 67.2 | 59.3 | 59.8 |
| Widowed | 4.5 | 3.0 | 6.8 | 1.9 | 6.1 | 6.0 |
| Divorced/separated | 12.1 | 13.5 | 10.2 | 15.8 | 12.1 | 12.1 |
| Never married | 17.9 | 19.4 | 16.2 | 15.2 | 22.5 | 22.1 |

(continued)

Downloaded from jrc.sagepub.com at GEORGE WASHINGTON UNIVERSITY on February 24, 2011

**TABLE 3:** Continued

| | Sample | | | | | |
|---|---|---|---|---|---|---|
| | All Gun Carriers | Carry on Person | Carry in Vehicle | Own Gun, No Carry | No Carry | All Persons |
| Annual household income | | | | | | |
|   Less than $15,000 | 9.1 | 11.5 | 8.2 | 8.1 | 14.0 | 13.5 |
|   $15,000-29,999 | 23.1 | 14.8 | 22.7 | 25.7 | 27.5 | 27.1 |
|   $30,000-44,999 | 25.2 | 27.9 | 27.3 | 30.6 | 24.4 | 24.4 |
|   $45,000-59,999 | 17.5 | 18.0 | 19.1 | 18.0 | 19.3 | 19.2 |
|   $60,000-79,999 | 11.9 | 11.5 | 11.8 | 10.9 | 8.6 | 8.9 |
|   $80,000 or more | 13.3 | 16.4 | 10.9 | 6.7 | 6.2 | 6.9 |
| Gun-related occupation | 7.0 | 13.2 | 5.9 | 4.1 | 2.8 | 3.2 |

or 38 percent of the days, whereas those who carry in vehicles do so about 146 days a year, or 40 percent of the days. The figures imply that each year in the United States, there are about 980 million person-days of carrying on the person and about 1.8 billion person-days of carrying in vehicles. It was impossible to tell from our results how much overlap there was between these two sets of numbers, though there almost certainly were more than a billion person-days of carrying total. Because the annual number of crimes committed by persons with guns is less than 1 million, there are less than a million person-days of carrying linked with gun crimes, implying that less than one in a thousand instances of gun carrying involve a violent crime committed with a gun.

One might speculate that some instances of carrying were done by persons ready and willing to commit crime but that they just did not come across a provocation or suitable opportunity for doing so. Although this is undoubtedly true for some carrying, the only way it could reasonably be thought to characterize much carrying is if one assumed that persons of this sort came across criminal opportunities or provocations, by plan or by chance, less than one in a thousand times. We think the one-in-a-thousand figure is more compatible with the interpretation that most of this carrying is done without any intention of committing a crime or even any inclination to do so.

Note also that it was estimated that there are about 670,000 to 1,570,000 DGUs connected with instances of gun carrying (Kleck and Gertz 1995:174, 184-5). This implies that there are more than a thousand times as many instances of carrying guns outside the home as would be needed to account for all of the DGUs away from the home, thereby strengthening the plausibility of the DGU estimates.

Downloaded from jrc.sagepub.com at GEORGE WASHINGTON UNIVERSITY on February 24, 2011

*Results—Gun Carriers Compared to Other People*

Table 3 shows how persons who carry guns for protection in various ways differ from those who personally own a gun but who do not carry, from all those who do not carry (regardless of gun ownership), and from the adult population as a whole. Three groups of carriers are distinguished: all who carry guns in any way, those who carry on the person (including some who also carry in a vehicle), and those who carry in a vehicle (including some who also carry on the person).

An example will aid in interpretation. The first row of Table 3 shows that 76.1 percent of gun carriers reported personally owning a gun, compared to 24.6 percent of the entire sample. The fact that considerably less than 100 percent of gun carriers personally own a gun shows why the PF survey, which asked the carry question only of Rs reporting personal gun ownership, missed many gun carriers, and it indicates that some carriers apparently carry guns belonging to other people, such as a spouse. The fact that 19 percent of gun carriers claim there was no gun belonging to anyone in their household could indicate either that some were carrying guns belonging to people outside their household (e.g., guns borrowed from a friend or relative) or that some carriers were falsely denying gun ownership. Some may also have understood the gun ownership question as pertaining only to guns kept inside the home and failed to report guns kept in a vehicle or place of business.

Gun carriers were more likely to have been the victim of a burglary, robbery, or assault than noncarriers, though they were the same as noncarrying gun owners with respect to assaults. Those who carried on their person, but not vehicle carriers, spent more nights away from home than noncarriers, and thus were more at risk of crimes committed in public places. Not surprisingly, carriers are more likely to believe they have to depend on themselves for protection rather than on the police, even compared to gun owners who do not carry.

Two measures of punitiveness toward criminals were included: whether Rs supported the death penalty for murderers and whether they thought the courts were not harsh enough toward criminals. Gun owners are more likely to endorse the punitive views, regardless of whether they carry. Carriers are only slightly more likely to support capital punishment than noncarrying gun owners. On the other hand, carriers were more likely to believe that the courts are not harsh enough, compared to noncarrying gun owners. Whether this association reflects a causal effect will have to await results of the multivariate analysis.

Although gun owners in general are overwhelmingly male, this is much less true for those who carry guns, as 37 percent of carriers are women. This means that given personal ownership of a gun, women are more likely to

Downloaded from jrc.sagepub.com at GEORGE WASHINGTON UNIVERSITY on February 24, 2011

carry it for protection than are men. This is consistent with an observation of Lizotte and Bordua (1980) that women gun owners are especially likely to own primarily for defensive reasons. It also mirrors, and helps explain, the finding from the present survey that women account for a surprisingly large 46 percent of reported DGUs (Kleck and Gertz 1995:178).

The age distribution of gun carriers resembles that of gun owners and the general population, except that the elderly account for much less than their share of carrying, especially carrying on the person. This may reflect a lower level of activity outside the home.

Blacks are less likely than Whites to own guns, but they claim more than their share of carrying. Thus, given gun ownership, Blacks are more likely to carry a gun. Paralleling the findings for women, this reflects the larger share of Black gun ownership that is due to defensive motives (Lizotte and Bordua 1980).

Unlike the distribution of crime, gun ownership is more common in rural areas and small towns. Carrying of guns, however, is much more common in big cities than one would expect based on gun ownership levels. Compared to noncarrying gun owners, carriers are more likely to live in big cities.

Mirroring the findings from studies of carry permit holders, results indicate carriers are disproportionately likely to be married and to have higher incomes, contrary to what one would expect based on the distribution of crime victimization. This may simply reflect the fact that gun ownership is higher among those better able to afford to buy them, an idea that can be tested in the multivariate analysis by controlling for income.

Finally, although persons with gun-related occupations such as police officer, security guard, or member of the military account for only 7.0 percent of the carriers, and 13.2 percent of those who carry on the person, they are much more likely to carry than either noncarrying gun owners or the general population. Given that Rs were instructed not to report job-related carrying, carrying among these Rs should reflect carrying off the job, but it could also reflect either Rs who carry job-related guns to and from work or Rs simply failing to follow instructions.

Table 4 displays carry prevalence rates in subsets of the U.S. adult population. They are interesting and potentially useful in their own right but nonetheless reflect simple bivariate associations and should not be interpreted as necessarily indicating causal effects. Tentative causal interpretations should await the multivariate analysis. Some of the associations survive multivariate controls, whereas others do not. In particular, many of the patterns in this table are likely to primarily reflect patterns of gun ownership, without necessarily revealing anything useful about gun carrying itself.

Carrying guns for protection is more common among gun owners (though not nonexistent among nonowners); men; Blacks; younger adults; separated

Downloaded from jrc.sagepub.com at GEORGE WASHINGTON UNIVERSITY on February 24, 2011

TABLE 4:   Carry Prevalence Rates by Population Subgroups

| | Percentage Who Carry | | |
| --- | --- | --- | --- |
| | Any Way | On Person | In Vehicle |
| Entire population | 8.8 | 3.7 | 6.5 |
| Gun in household? | | | |
|   Yes | 19.5 | 8.8 | 15.1 |
|   No | 2.6 | .8 | 1.5 |
| Personally own gun? | | | |
|   Yes | 27.3 | 12.5 | 21.0 |
|   No | 2.8 | .9 | 1.8 |
| Sex | | | |
|   Male | 12.0 | 5.6 | 8.9 |
|   Female | 6.1 | 2.0 | 4.4 |
| Race | | | |
|   Black | 11.8 | 5.0 | 6.9 |
|   White | 8.5 | 3.5 | 6.5 |
|   Hispanic | 8.3 | 3.5 | 5.8 |
|   Other | 15.4 | 7.7 | 7.3 |
| Age | | | |
|   18-24 | 7.4 | 3.3 | 4.9 |
|   25-34 | 10.8 | 4.2 | 8.8 |
|   35-44 | 9.6 | 4.8 | 7.0 |
|   45-64 | 9.5 | 4.1 | 6.6 |
|   65+ | 4.3 | .5 | 3.3 |
| Marital status | | | |
|   Married | 9.6 | 4.0 | 7.2 |
|   Widowed | 6.5 | 1.8 | 7.3 |
|   Divorced | 8.0 | 3.7 | 4.9 |
|   Separated | 11.3 | 5.6 | 7.4 |
|   Never married | 7.1 | 3.3 | 4.8 |
| Income | | | |
|   $0-15,000 | 6.3 | 3.3 | 4.3 |
|   15,001-30,000 | 8.0 | 2.1 | 6.0 |
|   30,001-45,000 | 9.6 | 4.5 | 8.0 |
|   45,001-60,000 | 8.5 | 3.7 | 7.1 |
|   60,001-80,000 | 12.5 | 5.1 | 9.5 |
|   80,000+ | 18.1 | 9.4 | 11.3 |
| Region | | | |
|   New England | 3.2 | 2.1 | .0 |
|   Middle Atlantic | 5.1 | 3.2 | 2.5 |
|   East North Central | 2.2 | 1.3 | 1.6 |
|   West North Central | 3.0 | .7 | 3.0 |
|   South Atlantic | 11.9 | 4.7 | 8.7 |
|   East South Central | 14.3 | 3.6 | 11.5 |
|   West South Central | 20.0 | 7.1 | 16.2 |

(continued)

Downloaded from jrc.sagepub.com at GEORGE WASHINGTON UNIVERSITY on February 24, 2011

**TABLE 4:   Continued**

| | Percentage Who Carry | | |
|---|---|---|---|
| | Any Way | On Person | In Vehicle |
| Region | | | |
| Mountain | 17.9 | 9.4 | 13.4 |
| Pacific | 8.0 | 3.6 | 6.4 |
| Size of place | | | |
| City of 500,000+ | 9.7 | 4.6 | 6.3 |
| Suburb of large city | 7.6 | 2.8 | 6.4 |
| Small city | 9.5 | 3.7 | 6.6 |
| Rural area, place < 10,000 | 8.8 | 4.2 | 6.8 |
| Gun occupation? | | | |
| Yes | 19.6 | 15.8 | 12.3 |
| No | 8.5 | 3.4 | 6.4 |
| Robbery victim? | | | |
| Yes | 17.4 | 6.5 | 10.9 |
| No | 8.6 | 3.6 | 6.3 |
| Assault victim? | | | |
| Yes | 12.2 | 6.8 | 8.8 |
| No | 7.8 | 2.8 | 5.8 |
| Burglary victim? | | | |
| Yes | 18.4 | 5.0 | 12.0 |
| No | 8.2 | 3.6 | 6.1 |
| Must depend on self? | | | |
| Yes | 13.5 | 5.9 | 9.8 |
| No | 2.9 | 1.8 | 2.3 |
| Favor death penalty? | | | |
| Yes | 10.4 | 4.5 | 8.0 |
| No | 5.1 | 2.1 | 3.2 |
| Courts not harsh enough? | | | |
| Yes | 10.0 | 4.7 | 7.5 |
| No | 5.9 | 1.3 | 3.9 |

persons; wealthier people; those living in the South and West; people with a job requiring a gun (police, security guards, military); people who have been victims of robbery, assault, or burglary; those who believe they must rely on themselves, rather than the police, for protection; supporters of the death penalty for murder; and those who feel the courts are not harsh enough toward criminals.

### Results—Multivariate Analysis of Gun Carrying

A logistic regression analysis was performed to estimate separate causal effects on gun carrying of the attributes discussed in the previous section.

Downloaded from jrc.sagepub.com at GEORGE WASHINGTON UNIVERSITY on February 24, 2011

**TABLE 5:   Variables Used in Logistic Regression Analysis[a]**

| Variable Name | Description[b] | Mean | SD |
|---|---|---|---|
| CARRY | Carries gun for protection | 1.09 | .28 |
| CARYPERS | Carries gun on person | 1.04 | .19 |
| CARYVEH | Carries gun in vehicle | 1.06 | .25 |
| MALE | R is male | 1.47 | .50 |
| BLACK | R is African American | 1.09 | .29 |
| AGE | Age in years | 42.10 | 15.72 |
| MARRIED | R is presently married | 1.60 | .49 |
| INCOME | Household income (six-point scale) | 3.03 | 1.41 |
| SOUTH | R lives in South | 1.34 | .48 |
| WEST | R lives in West | 1.21 | .40 |
| BIGCITY | R lives in city with more than 500,000 population | 1.23 | .42 |
| GUNHSLD | R lives in household with gun(s) | 1.36 | .48 |
| GUNOCC | Employed as police officer, security guard, or in military | 1.03 | .17 |
| ROBVICT | Victim of robbery in past year | 1.03 | .16 |
| ASLTVICT | Victim of assault as adult | 1.22 | .42 |
| BURGVICT | Victim of burglary in past year | 1.05 | .23 |
| KNOWVICT | R knows victim of serious crime | 1.30 | .46 |
| CRIMNBHD | R sees crime higher/lower in neighborhood? (five-point scale) | 2.18 | 1.03 |
| CRIMWORK | R sees crime higher/lower in area where R works? (five-point scale) | 2.52 | 1.12 |
| MUSTDEP | R believes must depend on self for protection rather than police | 1.56 | .50 |
| FAVORDP | R favors death penalty for murder | 1.71 | .46 |
| CRTSNHE | R feels courts not harsh enough | 1.74 | .44 |

a. Descriptive statistics are based on weighted data for all cases with valid data on a given variable.
b. Except where noted, variables were coded 2 for cases with the indicated attribute, 1 for cases without.

Table 5 lists the variables used in the analysis, and Table 6 shows the resulting parameter estimates. Any variables shown in Table 5 but not appearing in Table 6 were found to not be significantly associated at the .20 level with any form of gun carrying, controlling for the other variables in the equations.

It should be stressed that all analyses control for whether there was a gun in the R's household. Failing to do this would result in findings that could reflect patterns of gun ownership rather than carrying. Thus, the findings in Table 6 show how variables are associated with carrying, controlling for gun ownership. All Rs with the requisite data were included in the samples analyzed, regardless of whether they owned guns, because people can carry guns belonging to others.

Downloaded from jrc.sagepub.com at GEORGE WASHINGTON UNIVERSITY on February 24, 2011

There were three analyses: one for all forms of gun carrying combined, one for carrying on the person, and one for carrying in a vehicle. Note that some Rs reported carrying a gun but would not say whether they carried it on their person or in a vehicle. These Rs would be coded as carriers on the variable measuring any kind of carrying but would be missing on the two more specific carry measures.

Gun carriers are, other things being equal, more likely to be male, from the South or West, to hold a job requiring a gun, to be Black, or to believe that people must depend on themselves for protection rather than on the police. Whether a belief in self-reliance for protection encourages gun carrying or is a view strengthened by the experience of carrying, or both, is impossible to tell in a one-time survey.

Carriers are not more likely to have been crime victims than noncarriers. The one minor exception is that prior assault victimization shows a near-significant association with carrying guns on the person. These findings also raise the issue of causal order—it is possible that victimization stimulates gun carrying, but that once initiated, the carrying deters further victimization. The result would be that in a cross-sectional survey conducted at a single point in time, the prior victimization experiences of carriers would look much like those of noncarriers. The same issue has been raised in connection with the link between gun ownership and fear and victimization (Kleck 1991:29; Wright et al. 1983:129).

Once other correlated predictors are controlled, the measures of punitiveness do not show consistent significant associations with gun carrying. Persons who carry guns on the person are significantly more likely to believe that the courts are not harsh enough, whereas persons who carry in a vehicle are not. Support for the death penalty is unrelated to carrying on the person (whether or not the courts' harshness measure was included in the model) while showing a near-significant association with carrying in a vehicle. Thus, a view of gun carriers as vengeful vigilantes set on punishing criminals receives weak, mixed support at best.

Finally, controlling for other determinants of carrying, residents of big cities (a half million or more people) are significantly more likely to carry guns on the person. Given that robbery rates of big cities exceed those of smaller places to an especially pronounced degree, even more than with other crime types (U.S. Federal Bureau of Investigation 1995:196-7), this association may reflect higher rates of robbery and other violent crimes committed in public places. The fact that big city residents are more likely to carry on the person but not in vehicles may reflect the greater amount of walking and lower motor vehicle ownership among people living in densely populated areas.

Downloaded from jrc.sagepub.com at GEORGE WASHINGTON UNIVERSITY on February 24, 2011

TABLE 6:   Multivariate Correlates of Gun Carrying—Logistic Regression Estimates

| Dependent Variable: Independent Variable | Carrying | | | | | |
|---|---|---|---|---|---|---|
| | Any Way | OR[a] | On Person | OR | In Vehicle | OR |
| GUNHSHLD | 1.8976 (.227) | 6.67 | 2.2147 (.378) | 9.16 | 2.0227 (.274) | 7.56 |
| SOUTH | 1.1719 (.244) | 3.23 | .5635 (.337) | 1.76 | 1.6039 (.301) | 4.97 |
| WEST | .9757 (.279) | 2.65 | .8297 (.374) | 2.29 | 1.3825 (.336) | 3.98 |
| MUSTDEP | 1.1775 (.247) | 3.25 | 1.4167 (.414) | 4.12 | .9630 (.269) | 2.62 |
| BLACK | .6903 (.320) | 1.99 | .6483 (.440) | 1.91 | | |
| MALE | .4559 (.193) | 1.58 | .6117 (.288) | 1.84 | .4556 (.216) | 1.58 |
| GUNOCC | .9681 (.407) | 2.63 | 1.7799 (.466) | 5.93 | .6521[b] (.471) | 1.92 |
| KNOWVICT | .6013 (.189) | 1.82 | .7056 (.270) | 2.03 | .4939 (.209) | 1.64 |
| CRIMAREA | .2256 (.087) | 1.25 | | | | |
| FAVORDP | .3988[b] (.251) | 1.49 | | | .4527[b] (.289) | 1.57 |
| CRTSNHE | | | .9332 (.443) | 2.54 | | |
| BIGCITY | | | .5718 (.305) | 1.77 | | |
| Constant | −14.7846 | | −18.1646 | | −14.5416 | |
| −2 log likelihood | 790.873 | | 428.448 | | 660.485 | |
| Model chi-square improvement | 252.715 | | 138.829 | | 202.850 | |
| Sample size | 1,712 | | 1,726 | | 1,772 | |

NOTE: Estimates of coefficients, with standard errors in parentheses. Variables appearing in Table 5 but not appearing in this table were found to have no significant association with any form of gun carrying at even the .20 level (one-tailed).
a. OR = Odds ratio. For example, the odds ratio of 6.67 for GUNHSHLD in the Carrying Any Way equation means that persons in a household with a gun are 6.67 times more likely, other things being equal, to carry a gun than persons in a household without a gun.
b = .05 < $p$ <.20, one-tailed. All other coefficients: $p$ < .05.

As suggested earlier, the higher levels of carrying among higher income persons disappears once gun ownership is controlled, indicating that, whereas having more money increases one's ability to purchase guns, it otherwise has no net effect on gun carrying.

Downloaded from jrc.sagepub.com at GEORGE WASHINGTON UNIVERSITY on February 24, 2011

When the 11 gun carriers with gun carrying occupations were removed from the sample and the multivariate estimations were repeated, the results were almost all substantively identical (i.e., no change in the sign of the coefficient or whether it was significant). The only exceptions were in the equation for carrying on the person, where the marginally significant results for courts' harshness and big city residence became definitely nonsignificant (results available from senior author).

Two limitations should be especially salient in interpreting these results. First, given that most gun carrying, especially on the person, is unlicensed and usually illegal, many Rs probably falsely denied carrying. A large body of research on the validity of self-reports in surveys addressing illegal behavior indicates that it is usually underreported, that is, that false negative responses outnumber false positives (see studies reviewed in Kleck and Gertz 1997). Leaving aside one-sided speculation about false positives (e.g., Hemenway 1997), there is no basis for believing that survey reporting of (mostly illegal) gun carrying or defensive use of guns is any different in this respect. Therefore, on the assumption that illegal gun carrying is like other illegal behaviors in this respect, false reports of carrying should be less common than false denials, and the prevalence and incidence estimates should be regarded as conservative.

Second, all patterns observed in any survey reflect both reality and patterns of response bias. We suspect that underreporting of carrying is not random, but rather is likely to be highest among persons who perceive themselves as especially vulnerable to arrest and punishment for unlawful behavior. Thus, underreporting may be most common among lower income persons, members of racial and ethnic minorities, people in areas where carry laws are more aggressively enforced, and perhaps males in general. If this suspicion is correct, it means that carry rates are higher than reported in these groups and patterns of carrying are accordingly distorted to some degree.

### CONCLUSION

Carrying guns in public places is common in the United States, is primarily done for protection, and is rarely done for purposes of committing a violent crime. About 17 million U.S. adults report carrying a gun for protection in the past year, carrying firearms on more than a billion different person-days, whereas fewer than a million instances of gun carrying result in the carrier committing a violent crime with the gun. There are about as many defensive uses of guns by crime victims carrying guns as there are violent crimes committed by gun-carrying criminals. Nevertheless, most of the carrying is

Downloaded from jrc.sagepub.com at GEORGE WASHINGTON UNIVERSITY on February 24, 2011

probably illegal, done by persons lacking the permit required to carry a concealed weapon.

Controlling for gun ownership, gun carrying for protection is more common among males, Blacks, residents of the South and West regions, and persons who have a gun-related occupation such as police officer or security guard. Carrying on the person is also more common in big cities. There are only weak, inconsistent hints that gun carrying is associated with greater punitiveness toward criminals. Generally, carrying is not associated with prior victimization, though causal order assumptions are clouded by the possibility that past carrying deterred past victimization attempts.

The present survey of the general population reveals at least 17 million adults carrying guns for protection in public, only a small fraction of whom have permits allowing them to do this legally. Almost none of the billion-plus instances of gun carrying are done in connection with committing a violent crime with a gun. This suggests some difficulties in enforcing laws prohibiting unlicensed carrying of guns, in that those violating the laws are almost never carrying the gun on the way to committing a violent crime. Technological developments are making it easier for concealed guns to be detected at a distance (Sherman and Rogan 1994), but these cannot distinguish guns carried for criminal purposes from those carried for genuinely defensive ones. Unless police officers are very good at distinguishing, on the basis of visible cues alone, those suspects who are unlawfully carrying guns for criminal purposes from those who are carrying unlawfully, but solely for purposes of self-protection, this implies that most of those stopped and frisked for weapons will be guilty of a weapons charge, but otherwise innocent of violent intentions. This in turn suggests limits on the value of enforcing carry laws.

Many have advocated increased enforcement of carry laws as a way of reducing violent crime (Blumstein 1995:32-3; Kleck 1991:441-2; Sherman and Rogan 1994; Wilson 1994). One component of such a policy would be seizure of guns carried in the streets, in addition to making arrests for unlawful carrying. Sherman and Rogan (1994) claimed that in a 1992 police experiment, police seizure of just 29 more guns than normal caused a 49 percent drop in gun crimes in a single police beat of Kansas City, allegedly with no displacement to surrounding areas. The results are, however, less impressive than portrayed by the authors, in that the drop of 83 gun crimes in the target area was in fact accompanied by an increase of 52 gun crimes in contiguous beats, with the possibility of other crimes displaced to noncontiguous beats. Furthermore, their detailed trend data suggest that the seemingly impressive drop was little more than a return to the average gun crime level that had prevailed up until about a year before the beginning of the experiment. The year immediately preceding the start of the experiment (June 1991 to June 1992)

Downloaded from jrc.sagepub.com at GEORGE WASHINGTON UNIVERSITY on February 24, 2011

had an unusually high gun crime rate, which exaggerated the postexperiment drop. Excluding this anomalous period, the postintervention gun crime level was no lower than the preintervention level. Whether either increased gun seizures or increased carry arrests can actually reduce gun crime therefore remains to be seen.

Although those recommending improved enforcement have addressed the issue of successfully identifying which potential suspects are carrying weapons, they have not taken full account of the sheer volume of carrying that is unlicensed but done for otherwise noncriminal purposes. If a large share of carry arrests are of generally noncriminal, albeit unlicensed, gun carriers, this is a serious cost that may deter some police departments from pursuing an increased enforcement policy as aggressively as advocates might like. Some hints of what may happen are provided by research on a 1976 Massachusetts law that established a mandatory penalty for unlicensed carrying. Interviews with Boston police officers indicated that 89 percent of them became more selective about whom to frisk for weapons because they did not want to risk having to arrest "otherwise innocent" persons (Carlson 1982:6). At a minimum, this suggests an awareness by police officers that many of those they might arrest for unlawful carrying are otherwise not serious public threats. Nevertheless, even after Boston police became more selective about searches, 33 percent of those charged with carry violations had no prior court record (Beha 1977:133).

One way out of this dilemma is to sharpen the distinction between carriers the police would want to arrest, because they represent a significant threat to public safety, and those they would not want to arrest, by increasing the share of noncriminal carriers that have carry permits. Violence among carry permit holders appears to be extremely low. Nine years after Florida made permits easily available to noncriminal adult residents, after 239,666 persons had been issued permits (excluding renewals), a total of 72 had had their permits revoked for convictions for crimes in which a firearm was used, or about 1 in 3,329 persons ever issued a permit. This was about eight gun crime revocations per year, that is, 1 in 24,294 of the permits valid as of October 31, 1996 (Florida Department of State 1996), or about 4.12 per 100,000.

Likewise, expanding noncriminal access to carry permits is not generally followed by violence increases. Based on a sophisticated multivariate pooled cross-sections time series analysis of virtually all U.S. counties, Lott and Mustard (1997) found that state laws loosening access to carry permits for adult residents without a criminal record were generally followed by *decreases* in violence, including gun violence. These laws did not necessarily increase the total number of carriers but may instead have allowed more noncriminal carriers to legitimate their carrying. The higher the share of

Downloaded from jrc.sagepub.com at GEORGE WASHINGTON UNIVERSITY on February 24, 2011

noncriminal carriers who have licenses to carry, the less cost there will be to increased enforcement of laws forbidding unlicensed carrying and the more enforcement of carry laws can be concentrated on persons likely to use guns to commit violent crimes.

## NOTES

1. The single survey supposedly indicating few defensive uses of guns (DGU) is the National Crime Victimization Survey (NCVS), which does not, however, directly ask about DGUs. For a detailed explanation of why the NCVS estimate is grossly inaccurate, see Kleck and Gertz (1995):

> One assertion made in defense of the NCVS estimates is that they are based on enormous sample sizes. Larger samples have no implications with respect to whether a prevalence estimate will be larger or smaller, but rather is relevant only to the precision of the estimate. For example, Kleck's (1988) analysis of the 1979-1985 NCVSs was based on interviews in about 400,000 households with about 700,000 persons, while the cumulative sample size of the 15 gun use surveys on which Kleck and Gertz based their DGU estimates is slightly more than 20,000. If one estimates the frequency of a behavior with a 1.3% annual prevalence (as was estimated for DGUs) using a sample of 700,000 cases, the 95% confidence interval estimate, assuming simple random sampling, would be $1.3\% \pm 0.03\%$. However, with a sample of 20,000 cases, it is $1.3\% \pm 0.16\%$. In short, the gain in estimation precision from increasing sample size from 20,000 to 700,000 is negligible, especially in comparison with nonsampling errors. (Pp. 153-7)

2. There has been virtually no empirically based challenge to the claim that DGUs are common. Challenges instead have consisted almost entirely of one-sided speculations about possible sources of overestimation (e.g., Cook and Ludwig 1996; Cook, Ludwig, and Hemenway 1997; Hemenway 1997). A detailed rebuttal of these critiques may be found in Kleck and Gertz (1997).

## REFERENCES

American Sports Data Inc. 1989. *American Sports Analysis—Summary Report, 1989*. Unpublished report of 1989 national survey on sports participation, American Sports Data Inc.

Arria, Amelia M., Nollie P. Wood, and James C. Anthony. 1995. *Archives of Pediatric and Adolescent Medicine* 149:1345-50.

Ash, Peter, Arthur L. Kellermann, Dawna Fuqua-Whitley, and Amri Johnson. 1996. "Gun Acquisition and Use by Juvenile Offenders." *Journal of the American Medical Association* 275:1754-8.

Bankston, William B. and Carol Y. Thompson. 1989. "Carrying Firearms for Protection." *Sociological Inquiry* 59:75-87.

Bankston, William B., Carol Y. Thompson, Quentin A. Jenkins, and Craig J. Forsyth. 1990. "The Influence of Fear of Crime, Gender, and Southern Culture on Carrying Firearms for Protection." *Sociological Quarterly* 31:287-305.

Downloaded from jrc.sagepub.com at GEORGE WASHINGTON UNIVERSITY on February 24, 2011

Bastian, Lisa D. and Bruce M. Taylor. 1991. *School Crime*. Washington, DC: Government Printing Office.

Beha, James A., II. 1977. " 'And Nobody Can Get You Out.' " *Boston University Law Review* 57:96-146.

Bjerregaard, Beth and Alan J. Lizotte. 1995. "Gun Ownership and Gang Membership." *Journal of Criminal Law and Criminology* 86:37-58.

Blumstein, Alfred. 1995. "Youth Violence, Guns, and the Illicit-Drug Industry." *Journal of Criminal Law and Criminology* 86:10-36.

Britt, Chester, Gary Kleck, and David J. Bordua. 1996. "A Reassessment of the D.C. Gun Law: Some Cautionary Notes on the Use of Interrupted Time Series Designs for Policy Impact Assessment." *Law & Society Review* 30:361-80.

Bryant, Clifton D. and Donald J. Shoemaker. 1988. "Gun Ownership and Carrying." *Psychological Reports* 62:61-2.

Callahan, Charles M. and Frederick P. Rivara. 1992. "Urban High School Youth and Handguns." *Journal of the American Medical Association* 267:3038-42.

Callahan, Charles M., Frederick P. Rivara, and James A. Farrow. 1993. "Youth in Detention and Handguns." *Journal of Adolescent Health* 14:350-5.

Carlson, Kenneth. 1982. "Mandatory Sentencing: The Experience of Two States." Washington, DC: National Institute of Justice.

Chilton Research Service. 1994. *Questionnaire Used in Study #5384, "National Gun Ownership Survey."* Radnor, PA: Chilton Research Services.

Cook, Philip. 1991. "The Technology of Personal Violence." Pp. 1-71 in *Crime and Justice: A Review of Research*. Vol. 14. Edited by Michael Tonry. Chicago: University of Chicago Press.

Cook, Philip and Jens Ludwig. 1996. "You Got Me: How Many Defensive Gun Uses Per Year?" Paper presented at the annual meeting of the American Society of Criminology, Chicago.

————. 1997. *Guns in America*. A report to the Police Foundation, issued May 1997. Washington, DC: Police Foundation.

Cook, Philip, Jens Ludwig, and David Hemenway. 1997. "The Gun Debate's New Mythical Number." *Journal of Policy Analysis and Management* 16:463-9.

Cramer, Clayton E. and David B. Kopel. 1994. *"Shall Issue": The New Wave of Concealed Handgun Permit Laws*. Golden, CO: Independence Institute.

Decker, Scott and Susan Pennell. 1995. "Arrestees and Guns." National Institute of Justice Research Preview. Washington, DC: Government Printing Office.

DIALOG. 1995. Search of POLL file of public opinion survey results in DIALOG online database. [Available from author.]

Fagan, Jeffrey. 1990. "Social Processes of Delinquency and Drug Use among Urban Gangs." Pp. 183-219 in *Gangs in America*, edited by C. Ronald Huff. Newbury Park, CA: Sage.

Florida Department of State. 1996. *Concealed Weapons/Firearms License Statistical Report for Period 10/01/87—09/30/95*. Tallahassee, FL, Department of State, Division of Licensing.

Hassinger, James. 1985. "Fear of Crime in Public Environments." *Journal of Architectural Planning and Research* 2:289-300.

Hemenway, David. 1997. "Survey Research and Self-Defense Gun Use." *Journal of Criminal Law and Criminology* 87:1430-1445.

Kleck, Gary. 1988. "Crime control through the private use of armed force." *Social Problems* 35:1-21.

————. 1991. *Point Blank: Guns and Violence in America*. New York: de Gruyter.

————. 1997. *Targeting Guns: Firearms and their Control*. New York: de Gruyter.

Downloaded from jrc.sagepub.com at GEORGE WASHINGTON UNIVERSITY on February 24, 2011

Kleck, Gary and Miriam DeLone. 1993. "Victim Resistance and Offender Weapon Effects in Robbery." *Journal of Quantitative Criminology* 9:55-82.

Kleck, Gary and Marc Gertz. 1995. "Armed Resistance to Crime: The Prevalence and Nature of Self-Defense with a Gun." *Journal of Criminal Law and Criminology* 86:150-87.

————. 1997. "The Illegitimacy of One-Sided Speculation: Getting the Defensive Gun Use Estimate Down." *Journal of Criminal Law and Criminology* 87:1446-1461.

Kleck, Gary and Karen McElrath. 1991. "The Effects of Weaponry on Human Violence." *Social Forces* 69:1-21.

Kleck, Gary and E. Britt Patterson. 1993. "The Impact of Gun Control and Gun Ownership Levels on Violence Rates." *Journal of Quantitative Criminology* 9:249-88.

Knox, George, James G. Houston, John A. Laskey, Thomas F. McCurrie, Edward D. Tromanhauser, and David L. Laske. 1994. *Gangs and Guns*. Task Force Report. Chicago: National Gang Crime Research Center.

LH Research, Inc. 1993a. *A Survey of Experiences, Perceptions, and Apprehensions about Guns among Young People in America*. Report prepared for the Harvard School of Public Health under a grant from the Joyce Foundation. New York: LH Research, Inc.

————. 1993b. *A Survey of the American People on Guns as a Children's Health Issue*. Report prepared for the Harvard School of Public Health under a grant from the Joyce Foundation. New York: LH Research, Inc.

Lizotte, Alan J. and David J. Bordua. 1980. "Firearms Ownership for Sport and Protection." *American Sociological Review* 45:229-44.

Lizotte, Alan J., James M. Tesoriero, Terence P. Thornberry, and Marvin D. Krohn. 1994. "Patterns of Adolescent Firearms Ownership and Use." *Justice Quarterly* 11:51-73.

Lott, John R. Jr. and David B. M. Mustard. 1997. "Crime, Deterrence, and Right-to-Carry Handguns." *Journal of Legal Studies* 26:1-68.

McDowall, David, Colin Loftin, and Brian Wiersema. 1995. "Easing Concealed Firearms Laws." *Journal of Criminal Law and Criminology* 86:193-206.

National Rifle Association. 1996. "NRA State Firearms Law Summaries. ILA Research and Information Division Fact Sheet" [On-line]. Available: http://www.nra.org/research/riflaws.html.

Nelson, David E., Joyce A. Grant-Worley, Kenneth Powell, James Mercy, and Deborah Holtzman. 1996. "Population Estimates of Household Firearm Storage Practices and Firearm Carrying in Oregon." *Journal of the American Medical Association* 275:1744-8.

Northwood, Lawrence K., Richard Westgard, and Charles E. Barb Jr. 1978. *Society* 16:69-74.

Schultz, Leroy G. 1962. "Why the Negro Carries Weapons." *Journal of Criminal Law, Criminology, and Police Science* 53:476-83.

Sheley, Joseph F. 1994. "Drug Activity and Firearms Possession and Use by Juveniles." *Journal of Drug Issues* 24:363-82.

Sheley, Joseph F. and Victoria E. Brewer. 1995. "Possession and Carrying of Firearms among Suburban Youth." *Public Health Reports* 110:18-26.

Sheley, Joseph F., Zina T. McGee, and James D. Wright. 1992. *American Journal of Diseases of Children* 146:677-82.

Sheley, Joseph F. and James D. Wright. 1993. "Motivations for Gun Possession and Carrying among Serious Juvenile Offenders." *Behavioral Sciences and the Law* 11:375-88.

————. 1995. *In the Line of Fire: Youth, Guns, and Violence in Urban America*. New York: de Gruyter.

Sherman, Lawrence W. and Dennis P. Rogan. 1994. "The Kansas City Gun Experiment." Presented at the annual meetings of the American Society of Criminology, November 12, Miami, FL.

Downloaded from jrc.sagepub.com at GEORGE WASHINGTON UNIVERSITY on February 24, 2011

Smith, M. Dwayne and Joseph F. Sheley. 1995. "The Possession and Carrying of Firearms among a Sample of Inner-City High School Females." *Journal of Crime and Justice* 18:109-28.

Toch, Thomas. 1993. "Violence in the Schools." *U.S. News and World Report*, November 8, pp. 31-6.

———. 1995. *Statistical Abstract of the United States, 1995*. Washington, DC: Government Printing Office.

U.S. Bureau of Justice Statistics. 1996a. *Criminal Victimization in the United States, 1993*. Washington, DC: Government Printing Office.

———. 1996b. *Sourcebook of Criminal Justice Statistics 1995*. Washington, DC: Government Printing Office.

U.S. Centers for Disease Control and Prevention. 1991. "Weapon-Carrying among High School Students—United States, 1990." *Morbidity and Mortality Weekly Report* 40 (40): 681-4.

———. 1992. "Behaviors Related to Unintentional and Intentional Injuries among High School Students—United States, 1991." *Morbidity and Mortality Weekly Report* 41 (41): 760-72.

———. 1994a. "Health Risk Behaviors among Adolescents Who Do and Do Not Attend School—United States, 1992." *Morbidity and Mortality Weekly Report* 43 (8): 129-32.

———. 1994b. "Health Risk Behaviors among Persons Aged 12-21 Years—United States, 1992." *Morbidity and Mortality Weekly Report* 43 (13): 231-5.

———. 1995. "Youth Risk Behavior Surveillance—United States, 1993." CDC Surveillance Summaries. *Morbidity and Mortality Weekly Report* 44 (SS-1).

———. 1996. "Youth Risk Behavior Surveillance—United States, 1995." CDC Surveillance Summaries. *Morbidity and Mortality Weekly Report* 45 (SS-4).

U.S. Federal Bureau of Investigation. 1995. *Crime in the United States, 1994* (Uniform Crime Reports). Washington, DC: Government Printing Office.

———. 1996. *Crime in the United States, 1995* (Uniform Crime Reports). Washington, DC: Government Printing Office.

U.S. Fish and Wildlife Service. 1993. *1991 National Survey of Fishing, Hunting, and Wildlife-Associated Recreation*. Washington, DC: Government Printing Office.

U.S. National Center for Education Statistics (NCES). 1996. *1991, 1993, and 1995 Surveys—Data Files and Electronic Codebook* [Machine-readable data file]. NCES 96-827. Office of Educational Research and Improvement. Washington, DC: U.S. Department of Education.

Webster, Daniel W., Patricia S. Gainer, and Howard R. Champion. 1993. "Weapon Carrying among Inner-City Junior High School Students: Defensive Behavior vs Aggressive Delinquency." *American Journal of Public Health* 83:1604-8.

Wilson, James Q. 1994. "Just Take Away Their Guns." *New York Times Magazine*, March 20, pp. 46-7.

Wright, James D. and Peter H. Rossi. 1986. *Armed and Considered Dangerous: A Survey of Felons and Their Firearms*. New York: de Gruyter.

Wright, James D., Peter H. Rossi, and Kathleen Daly. 1983. *Under the Gun*. New York: de Gruyter.

Downloaded from jrc.sagepub.com at GEORGE WASHINGTON UNIVERSITY on February 24, 2011

# EXHIBIT 65

# RESISTING CRIME: THE EFFECTS OF VICTIM ACTION ON THE OUTCOMES OF CRIMES

## JONGYEON TARK
## GARY KLECK
Florida State University

KEYWORDS: self-protection, victim resistance, injury

*This study assessed the impact of sixteen types of victim self protection (SP) actions on three types of outcomes of criminal incidents: first, whether the incident resulted in property loss, second, whether it resulted in injury to the victim, and, third, whether it resulted in serious injury. Data on 27,595 personal contact crime incidents recorded in the National Crime Victimization Survey for the 1992 to 2001 decade were used to estimate multivariate models of crime outcomes with logistic regression. Results indicated that self-protection in general, both forceful and nonforceful, reduced the likelihood of property loss and injury, compared to nonresistance. A variety of mostly forceful tactics, including resistance with a gun, appeared to have the strongest effects in reducing the risk of injury, though some of the findings were unstable due to the small numbers of sample cases. The appearance, in past research, of resistance contributing to injury was found to be largely attributable to confusion concerning the sequence of SP actions and injury. In crimes where both occurred, injury followed SP in only 10 percent of the incidents. Combined with the fact that injuries following resistance are almost always relatively minor, victim resistance appears to be generally a wise course of action.*

Why do crime incidents turn out more favorably for some victims than for others? Why do only some criminal attempts result in injury or property loss to the victim? Crime victims and prospective victims have a vital interest in knowing the best action to take should they find themselves the target of a criminal attempt. Scholars have also become interested in these issues in the past few decades, though primarily in

relation to sexual assaults. Forceful physical resistance by victims, especially armed resistance, is particularly controversial among scholars, perhaps because to concede any beneficial effects of forceful resistance might seem to promote private violence. In contrast, scholars studying rape, writing primarily from a feminist perspective, have been more willing to see value in women resisting male aggressors, perhaps because it has different ideological implications than other forms of forceful victim resistance.

Unfortunately, research on these questions is generally seriously flawed and has yielded results that appear highly inconsistent. We sought to correct some of the most serious flaws and use information on the largest available sample of crime incidents to assess the impact of a very diverse set of defensive actions on the most important outcomes of crimes.

## THEORY

There is little formal theory in criminology aimed at explaining the outcomes of crime incidents for victims. Nevertheless, the impact of victim self-protection on the outcome of criminal incidents can be indirectly understood from several theoretical perspectives. First, social learning theory asserts that criminal behavior is learned primarily either in social interactions in which criminal (or noncriminal) behavior is or is not reinforced, or by observing the consequences of criminal behavior (or noncriminal behavior) among others (Akers, 1985). Criminals are less likely to repeat criminal behavior to the extent that it resulted in punishment or failed to yield rewards, that is, was not reinforced. From a social learning perspective, both (a) aversive stimuli in the form of physical pain inflicted by resisting victims, fear of pain or injury being inflicted, or legal punishment resulting from victim action, and (b) the absence of reward, such as the failure to gain desired property, sexual gratification or vengeance, would tend to discourage criminal behavior. Whether criminals directly experienced negative consequences associated with victim resistance, or vicariously experienced those suffered by other offenders, the more frequent these negative consequences were, the less likely the offenders should be to maintain criminal behavior. If victims kill or injure criminals, frighten them or cause them to be arrested, these negative consequences could influence the future criminal behavior of offenders who considered the possibility of experiencing such consequences themselves. The present analysis of National Crime Victimization Survey (NCVS) data for 1992 to 2001 indicates that 68 percent of victims of personal contact crimes took some defensive actions, and 32 percent took forceful actions, ranging from physically struggling with offenders to shooting at them. For violent crimes such as assault,

robbery and rape, private sanctions in the form of forceful victim resistance are considerably more likely than official legal punishments.

Some forms of victim self-defense are also quite severe and could therefore strongly discourage (continued) aggression against victims. While most victim response to crimes does not involve force, victims nevertheless use forceful defensive actions frequently. At the most severe end of the spectrum, there were between 1,400 and 3,200 justifiable or excusable homicides committed by crime victims in 1990 (Kleck, 1997). At the less severe end, more than 1.6 million crime victims used forceful but nonlethal self-protective measures (attacking or threatening offenders with physical violence) in personal crimes in 1995 (U.S. Bureau of Justice Statistics, 2000). It therefore seems reasonable to take victim defensive actions seriously as potential determinants of criminal behavior.

The routine activities approach (for example, Cohen and Felson, 1979; Hindelang, Gottfredson and Garofalo, 1978) asserts that crimes occur when motivated offenders intersect in time and space with suitable targets in the absence of effective guardians. This approach implies avoidance behaviors as a tactic for reducing risks of victimization, but says little directly about victim actions taken while a crime incident is going on. The concept of guardianship, however, implies that victim behaviors might not only help avoid an assault in the first place, but also reduce the offender's prospects for success. Thus, burglars searching for suitable targets will avoid occupied homes partly because of the risk, for example, of the occupants calling the police or acting in self-defense.

All crime victims are guardians of their own safety, and to the extent that their actions reduce the probability or seriousness of injury or property loss, their guardianship is effective. Indeed, victims certainly act as direct guardians of their own safety far more often than police officers, security guards, or other professionals do, given that most crimes entail some kind of victim self-protection, and only a very few involve professional intervention (Federal Bureau of Investigation, 2002; Walker, 1998). Thus, the routine activities perspective would predict that crime events, or at least completed crimes, should occur less often when guardianship of individual personal crime targets, in the form of victim self-protective actions, is more effective.

These theoretical traditions, however, offer little guidance as to which victim actions will affect which crime outcomes under what circumstances. Some weak generalizations have emerged inductively from empirical work, as discussed shortly, but nothing resembling propositions deductively derived from broader theoretical notions has been developed. Perhaps this is not surprising given how little theoretical attention has been directed at explaining variation in the outcomes of crime incidents, in contrast to lasting differences in offending behavior across individuals.

Nevertheless, one might predict that victim actions that threaten the most harm to the offender would most strongly deter continued attempts. Based on this speculation, one could specifically hypothesize that because gun use would be the potentially most "severe" victim action, it would have the strongest inhibiting effects, the use of lesser weapons would have the next strongest inhibiting effects on offenders, use of unarmed force the next strongest, and use of nonforceful methods the weakest.

## PRIOR RESEARCH

Some criminologists have concluded that victim resistance to crime, especially forceful resistance, is useless and even dangerous because it provokes offenders to attack (for example, Bachman and Carmody, 1994; Bachman, Saltzman, Thompson and Carmody, 2002; Cohen, 1984; Griffin and Griffin, 1983; Marchbanks, Liu and Mercy, 1990; Zoucha-Jensen and Coyne, 1993). Others have concluded that resistance is generally beneficial, despite the fact that methodological flaws in research have often biased findings against results indicating desirable effects of resistance (Kleck, 1988; Kleck and Delone, 1993; Kleck and Kates, 2001; Kleck and Sayles, 1990; Southwick, 1996; Thompson et al., 1999; Ullman, 1998; Ullman and Knight, 1992, 1993; Ziegenhagen and Brosnan, 1985). Some of the variation in findings may be due to differences in the types of crimes studied. For example, most studies have been confined to sexual assaults (see Ullman, 1997 for a review of twenty-eight pre-1995 rape resistance studies). Others have examined robberies (Block, 1977; Block and Skogan, 1986; Conklin, 1972; Cook, 1986; Cook and Nagin, 1979; Hindelang, 1976; King, 1987; Kleck, 1988; Kleck and Delone, 1993; Kleck and Kates, 2001; McDonald, 1975; Southwick, 1996; Weiner, 1987; Ziegenhagen and Brosnan, 1985), burglary (Cook, 1991), or assault (Bachman et al., 2002; Fritzon and Ridgway, 2001; Kleck, 1991; Kleck and Kates, 2001; Lizotte, 1986; Thompson et al., 1999). Findings across studies could differ if victim resistance had significantly different effects in different types of crimes (Bachman et al., 2002).

More serious is that many studies are based on small nonprobability samples of crimes, typically local convenience samples of incidents known to authorities, such as those reported to a single local law enforcement agency (Amir, 1971; Conklin, 1972; Fritzon and Ridgeway, 2001; McDonald, 1975; Prentky, Burgess and Carter, 1986; Weiner, 1987), those involving college students at a single campus (Levine-MacCombie and Koss, 1986), victims who sought help from particular rape crisis centers (Cohen, 1984; Ruback and Ivie, 1988), offenders incarcerated in a single institution or handled by a single treatment facility (Ullman and Knight,

1992, 1993), or self-selected volunteer subjects (Bart, 1981; Bart and O'Brien, 1984).

There are biases in convenience samples of crimes that come to the attention of the authorities, biases that bear directly on the apparent effectiveness of victim defensive actions. Most critical, victims tend not to report to the police less serious crimes and those in which they suffered no injuries or property loss (U.S. Bureau of Justice Statistics, 1985). Thus, samples of crimes known to the authorities necessarily tend to disproportionately exclude cases in which victim actions were effective in preventing injury or property loss. As Hindelang and Gottfredson (1976) pointed out decades ago, at the very dawn of victim resistance research, this systematic censoring of crimes thus yields samples of crimes that contribute to underestimating the effectiveness of self-protection. Likewise, incidents reported to victim crisis centers or treatment facilities are likely to suffer from similar censoring of crimes with better outcomes for victims, because the consequences of such crimes are likely to be less traumatic for victims, who would therefore be less in need of treatment or counseling.

Most important, apparent conflicts in findings of studies may be attributable to the failure of most researchers to establish the sequence of protective actions and injury. As Sarah Ullman (1998) noted, where one does not have information on the sequence of resistance and injury, one cannot draw conclusions about whether resistance provoked injury, because a positive association may be primarily due to crimes in which injury provoked resistance from previously nonresisting victims. Nearly all researchers who have found positive associations between injury and self-protection actions, and concluded that resistance provoked offenders into attacking victims, failed to establish whether self-protective (SP) actions preceded the offender's inflicting of injury (for example, Bachman and Carmody, 1994; Block, 1977; Block and Skogan, 1986; Griffin and Griffin, 1981; Marchbanks, Lui and Mercy, 1990; Ruback and Ivie 1988; Zoucha-Jensen and Coyne, 1993). In these studies, crimes in which a victim was injured *before* doing something to resist were effectively treated as cases in which resistance provoked injury. In contrast, the few studies that established the injury-SP sequence have generally found that all or most types of resistance either reduce the risk of subsequent injury or have no net effect one way or the other (Bachman et al., 2002; Kleck and DeLone, 1993; Kleck and Kates, 2001; Quinsey and Upfold, 1985; Thompson et al., 1999; Ullman and Knight, 1992).

Some recent researchers had information on the injury-SP sequence but applied it in ways that biased findings against conclusions that victim actions are beneficial or neutral. The problem lay in how the researchers handled cases in which injury was inflicted first, followed by SP actions.

Thompson and her colleagues (1999) and Bachman and her associates (2002) both coded such cases as crimes in which the victim took no protective actions. This is inappropriate first because it is inaccurate—the victims did take protective actions. More important, this procedure biases findings against a conclusion that victim actions are effective. These incidents all involved offenders inflicting injury on initially nonresisting victims, who then took some kind of self-protective action, after which the offenders inflicted no further injury. In the National Crime Victimization Survey, victims who were injured, then took protective action, and then were injured again would be coded as taking protective actions both before and after injury (U.S. Bureau of Justice Statistics, 2003a). Although one cannot be sure that it was resistance that caused the offenders in these crimes to stop their assault, such cases clearly support the idea that protective actions do stop offenders from attacking further. These authors' coding procedure effectively portrayed these incidents as crimes in which self-protection did not occur, and thus could not have exerted any beneficial effects, thereby converting cases favorable to the efficacy position to neutral ones, and artificially reducing support for the position that resistance deters further attacks.

Bachman and her colleagues (2002) also used a second strategy to address this problematic set of crimes, but the second procedure had the same biasing effect as the first. Cases in which victims were injured, then resisted and then were not injured any further were omitted from analyses altogether. This procedure biases the sample by censoring out cases that support the efficacy hypothesis. Consistent with this assertion, results from all analyses of these samples were even less supportive of the efficacy position than those in which these cases were included in the sample but miscoded as involving no protective actions.

Another problem in victim resistance research is the use of needlessly limited two- or three-category typologies of resistance actions. Most researchers simply divide victims into those who resisted or did not resist, or distinguish only forceful ("physical," "direct," "combative") resistance from nonforceful (for example, Bachman et al., 2002; Block and Skogan, 1986; Fritzon and Ridgway, 2001; Marchbank et al., 1990; Ullman, 1998). Although the pre-1986 NCVS distinguished eight types of SP actions, and the post-1986 NCVS provides information on sixteen types, even researchers using this rich source of information have lumped different types of victim actions into a few very broad categories. For example, Bachman and her colleagues (see also Bachman and Carmody, 1994) combined the sixteen relatively specific protective measures provided in the NCVS data into just two categories: "physical response" and "nonphysical response." The category of "physical response" included such diverse measures as the victim attacking the offender with a gun,

threatening the offender with a knife, making unarmed attacks, physically struggling without any weapon, chasing the offender, and running away. Using this typology, they concluded that "the probability of injury was increased for women who physically resisted" offenders (2002:135).

In contrast, Kleck and Delone (1993) separately assessed all eight distinct categories of self-protection coded in the pre-1986 NCVS. They found that some forceful responses appeared to reduce the risk of injury while others did not, and some nonforceful responses appeared to be effective while others, such as attempting to get help, seemed to increase the risk. Different forms of physical resistance can even have effects of opposite sign. Armed physical resistance is associated with lower risks of injury while some forms of unarmed physical resistance are associated with higher risks (Kleck, 1988; Kleck and DeLone, 1993; Kleck and Sayles, 1990; Ziegenhagen and Brosnan, 1985). Something is therefore lost by combining SP categories, because doing so can obscure differences in the effects of specific victim actions.

One final problem with research in this area may never be completely resolved. Victims do not select their responses to offenders randomly, so the choice of protective action may be correlated with characteristics of victims, offenders and crime circumstances that have their own effects on crime outcomes. Some defensive actions may be more common in circumstances already favorable to the victim, in the sense that it was already unlikely that the victim would have been harmed, or it was fairly easy for the victim to avoid harm, even without taking protective action. For example, victims who call the police or go to "get help" during the incident may be able to do so precisely because they were not injured or seriously threatened. In such cases, analysts could mistakenly attribute effectiveness to victims' actions that had little or no impact. On the other hand, victims may be pushed to extreme defensive actions only by extreme circumstances. The more forceful victim responses may be adopted only under the most desperate circumstances, for example, when victims were outnumbered by offenders. In these cases, defensive actions could appear less effective than they really were because the dangerous circumstances associated with the defensive action often caused the victim to be injured.

The standard solution is to measure and statistically control for as many suspected confounders—correlates of protective actions that affect crime outcomes—as possible. But this is difficult if we know little about likely correlates, and is impossible to completely implement if the correlates are not measured, and perhaps cannot be measured. In particular, the intentions and strength of motivation of offenders have never been measured or controlled in any self-protection study (though Cohen [1984] did ask rape victims about their perceptions of offenders' intentions), yet

these variables might well influence not only crime outcomes but also the victim's choice of defensive strategies.

Reiss and Roth (1993) speculated that victims who use guns are likely to have had more warning time to plan a response than other victims, because the ability to get to a weapon might itself be a product of greater lead time (see also Thompson et al., 1999). The greater time to respond might itself produce better outcomes independent of the gun use. Because no researcher has ever measured lead time, this notion remains an unsupported speculation. On the other hand, empirical evidence indicates that victims who use guns are more likely to be outnumbered and to face offenders with guns (Kleck and Kates, 2001), consistent with the general idea that victims who face more desperate circumstances are more likely to adopt more extreme defensive measures. Regardless, defensive actions are correlated with other variables that could influence crime outcomes, so as many such potentially confounding variables as possible should be controlled.

## METHODS

Our goal was to avoid the flaws of past research, and to (a) examine a large national probability sample of crimes, (b) take account of the sequence of victim protective actions and injury in appropriate ways, (c) control for as many confounding correlates of defensive actions as possible, (d) separately assess the full set of sixteen specific victim actions coded in the post-1992 NCVS on crime outcomes, and (e) do so separately for each type of crime in which there was personal contact between the victim and offender.

The sample used was all crime incidents reported in the National Crime Victimization Survey that occurred in the United States from 1992 through 2001 and that involved personal contact between victims and offenders (U.S. Department of Justice, 2003). Only data gathered since 1992 were used because this was when the NCVS began to record the sequence of victim actions and injury. We analyzed five types of crimes: sexual assaults, robberies, assaults (without sexual elements), personal contact larcenies (completed or attempted purse snatchings and pocket pickings), and confrontational burglaries. All but the last were defined according to NCVS Type of Crime (TOC) typology. We wanted to separately assess the effects of protective actions in residential burglaries in which there was some potential for direct confrontation between victim and offender, but the TOC for many of these would be some kind of robbery. Therefore we defined a confrontational burglary as a crime incident in which there was (a) unlawful entry by the offender into the victim's home and (b) the victim saw the offender while the crime was going on. Crimes with these

elements but also those of sexual assaults were left as sexual assaults because there were already so few cases of this crime type.

The NCVS is an ongoing national household survey conducted by the U.S. Census Bureau that questions everyone 12 years old or older in a large national probability sample of housing units. The NCVS uses a rotating panel design in which stratified multistage samples of housing units are randomly selected, and residents of the sampled units are interviewed every 6 months over a 42-month period about their victimization experiences during the 6 months preceding each interview. All respondents are identified to interviewers, that is, the interviews are not anonymous. Most are conducted by telephone but some are face-to-face. The total unweighted sample size used in this study was 27,595 personal contact crime incidents.

Incidents were weighted using a modified version of the NCVS *Incident Weight*, which reflects the differing probabilities of selection into the sample of different cases. If used unmodified, this weight inflates the apparent sample size up to estimated population totals, fooling statistical software into believing that there were millions of crimes in the sample, and distorting significance tests such that even very weak associations appear to be highly significant. To avoid this, in each sample analyzed, the mean value of the original *Incident Weight* variable was computed. A new weight variable was then created that, for a given crime incident, equaled that case's *Incident Weight* divided by the mean of the *Incident Weight* in the sample being analyzed (for example, robbery incidents). Since the average value of this new weight equals one, apparent sample sizes are exactly equal to the actual unweighted sample size, and significance tests are not distorted.

Because weapon possession, especially in public places, is often unlawful, many cases of armed resistance are probably not reported to the NCVS because it would entail confessing to a crime. While there is no evidence bearing directly on the validity of responses to questions about defensive use of guns or gun carrying, there is considerable evidence that survey respondents often conceal gun ownership. First, surveys asking how many guns people own yield far lower estimates of the total civilian gun stock than do data on the numbers of guns manufactured, imported and exported (Kleck, 1991). Second, when Illinois adults who held required gun owner licenses were asked in interviews whether they owned guns, nearly a tenth claimed that neither they nor anyone in their household owned or had owned a gun in the past 5 years (Bordua, Lizotte and Kleck, 1979). Third, a number of researchers have noted discrepancies in married couple households in survey responses to household gun ownership questions, indicating that wives substantially under-report their husbands' gun ownership (Buckner, 1995; Kleck, 1997; Ludwig, Cook and Smith,

870                                    TARK AND KLECK

1998). Even among the presumably highly "legitimate" gun owners who registered their guns with the authorities, 12.7 percent denied having any guns (Rafferty, Thrush, Smith and McGee, 1995). Because reporting defensive use of a gun necessarily entails acknowledging possession, this documented reluctance to admit gun ownership is likely to lead to an underreporting of gun use.

Further, we cannot be sure that the relatively few incidents reported in the NCVS are representative of all cases of armed resistance. Those defensive uses of weapons reported by victims are probably more "legitimate" than those not reported, but it is unclear whether they would be more effective. On the one hand, victims might be embarrassed by actions that either failed to prevent harm or made things worse. On the other, victims are known to be less likely to report incidents without injury or property loss, which happens to be the set of incidents within which successful defensive actions would be found.

Table 1 lists the variables included in the analysis and their means and standard deviations. Most variables are binary, indicating the presence or absence of an attribute. The dependent variables measure whether the victim suffered (1) any injury during the incident, regardless of when it occurred (ANYINJUR), (2) any injury after taking some self-protective action (POSTINJU), (3) a serious injury after taking self-protective actions (POSEINU), or (4) property loss (LOSTHIN).[1] Because our dependent variables were all binary, we used logistic regression to estimate equations. In addition to doing so for the full set of all personal contact crime incidents in the sample, we estimated separately for the personal contact crime types to determine whether the effects of protective actions differ by crime type. Only robbery, burglary and personal contact larceny were analyzed with respect to property loss. We did not address rape completion as an outcome of sexual assaults because that topic has already been thoroughly addressed in a large body of research that has consistently found that rape completion is less likely with almost any form of resistance (see reviews in Ullman, 1997; Bachman et al., 2002).

Obviously, protective actions taken after the victim was injured could not have affected whether the injury was inflicted. Likewise, because humans are not capable of instantaneous reaction, attacks that began

---

1. The NCVS also has questions concerning victims' perceptions of the impact of their self-protective actions. This is a separate topic worthy of analysis in its own right but is not addressed here. The published NCVS data indicate that about two-thirds of victims think their actions helped the situation, but fewer than one-tenth think that their actions, on net, hurt the situation (for example, Table 72 in U.S. Bureau of Justice Statistics, 2003b).

simultaneously with victim actions could not have been provoked by those actions. In some incidents, victims described the two events as occurring at the same time. While the beginnings of these actions probably were not literally simultaneous, the victims in these incidents presumably were unable to say whether their protective actions came before or after injury. We treated these incidents as missing on the post-SP injury variables because it was impossible to determine whether injury actually occurred slightly before or slightly after the protective actions. We also performed auxiliary analyses in which these cases were arbitrarily coded as post-SP injury or pre-SP injury incidents.

The NCVS does not address the possibility of complex sequences in which multiple different types of defensive actions are taken and injury occurs after one type of victim action but before another. Rather, all victims who were injured and used protective actions are simply coded by interviewers as to whether protective actions (in general) were taken before, during or after suffering injury. Victims can be coded for as many of these sequences as were appropriate, and therefore might be coded as having suffered injury before, during, and after defensive action. For purposes of coding post-protection injury, we treated victims who were injured both before and after victim actions as having suffered post-protection injury, thereby favoring the hypothesis that resistance increases the victim's risk of injury.

The types of injuries recorded in the NCVS are: (1) raped, (2) attempted rape, (3) sexual assault other than rape or attempted rape, (4) knife or stab wounds, (5) gun shot, bullet wounds, (6) broken bones or teeth knocked out, (7) internal injuries, (8) knocked unconscious, (9) bruises, black eyes, cuts, scratches, swelling, chipped teeth and (10) other injuries. The exact cut-off between serious and minor injury is necessarily subjective and somewhat arbitrary, but we used the fairly conventional one in research that uses NCVS data: the last two categories were treated as less serious injuries, the rest as more serious. This coding scheme thus slants the distribution of injury seriousness in favor of the "serious" category because, among specific categories of injury, only the least serious (bruises, cuts and the like) is coded as less than serious.

The independent variables of primary interest were sixteen binary variables denoting whether a given type of protective action was taken by the victim (2=action was taken, 1=action was not taken). Victims could be coded as having used as many or as few of these strategies as they reported, and those who did nothing to resist would simply be coded 1 on all 16 protection variables. Because there was no variable included in the models that explicitly denoted that victims did nothing to protect themselves, "no self-protection" is the omitted protection category in the

## Table 1. Variables in the Analysis*

| Variable | Description | Mean | SD |
|---|---|---|---|
| **Dependent Variables** | | | |
| LOSTHING | Property was taken without permission | 1.092 | 0.288 |
| ANYINJUR | V was injured | 1.240 | 0.427 |
| POSTINJU | V was injured after responding to offender | 1.035 | 0.183 |
| POSEINJU | V was seriously injured after responding to offender | 1.008 | 0.090 |
| ANYINJU2 | V was injured excluding (attempted) rape | 1.228 | 0.420 |
| POSTINJ2 | V was injured after responding to O | 1.032 | 0.176 |
| POSEINJ2 | V was seriously injured after responding to O | 1.000 | 0.000 |
| **Independent Variables** | | | |
| *Victim's Self-Protection* | | | |
| *Used Physical Force toward Offender* | | | |
| GUNATACK | V attacked O with gun; fired gun | 1.002 | 0.040 |
| GUNTHRET | V threatened O with gun | 1.007 | 0.085 |
| NOGUNATK | V attacked O with other weapons (knife, etc.) | 1.008 | 0.091 |
| NOGUNTHR | V threatened O with other weapon (knife, etc.) | 1.008 | 0.091 |
| NOWEPATK | V attacked O without weapon (hit, kicked, etc.) | 1.096 | 0.295 |
| NOWEPTHR | V threatened without weapon | 1.020 | 1.386 |
| *Resisted or Captured Offender* | | | |
| STRUGGLE | V struggled, ducked, blocked blows, held onto property | 1.181 | 0.385 |
| CHASHELD | V chased, tried to catch or hold O | 1.019 | 0.136 |
| *Scared or Warned off Offender* | | | |
| SCAREOFF | V yelled at O, turned on lights, threatened to call police | 1.090 | 0.287 |
| *Persuaded or Appeased Offender* | | | |
| COPRSTAL | V cooperated, or pretended to (stalled, did what they asked) | 1.019 | 0.138 |
| ARGUE | V argued, reasoned, pleaded, bargained, etc. | 1.098 | 0.297 |
| *Escaped or Got Away* | | | |
| RANHIDE | V ran or drove away, or tried; hid, locked door | 1.138 | 0.345 |
| *Got Help or Gave Alarm* | | | |
| CALLPOL | V called police or guard | 1.072 | 0.259 |
| GETHELP | V tried to attract attention or help, warn others (cried out for help, called children inside) | 1.020 | 0.142 |
| *Reacted to Pain or Emotion* | | | |
| SCREAM | V screamed from pain or fear | 1.021 | 0.142 |
| *Other* | | | |
| OTHERS | V took other action | 1.150 | 0.357 |
| **Power Difference between V and O** | | | |
| ADVSEXOF | Male O and female V | 1.326 | 0.468 |
| ADVAGEOF | O age 15-29 and V either under 15 or 30 or older | 1.210 | 0.407 |
| ADVNUM | Number of O – number of V | -0.128 | 2.058 |
| **Offender Weapons and Attack** | | | |
| OHADGUN | O had gun | 1.082 | 0.274 |
| OHADKNIF | O had knife | 1.057 | 0.231 |
| OHADSHAP | O had sharp object | 1.010 | 0.101 |
| GOTINHOM | O (attempted to) entered house/apartment | 1.015 | 0.122 |
| GOTINCAR | O (attempted to) entered car | 1.000 | 0.156 |

\* For binary variables, 1= Attribute is not present, 2=Attribute is present

## Table 1. Variables in the Analysis (Continued)

| Variable | Description | Mean | SD |
|---|---|---|---|
| *Victim characteristics* | | | |
| HADCHILD | Child in the victim's household | 1.394 | 0.489 |
| HOUSOWN | V owned the house | 1.507 | 0.500 |
| EMPLOYED | V was employed | 1.644 | 0.479 |
| OLD65 | V was 65 or older | 1.021 | 0.142 |
| MARRIED | V was married | 1.254 | 0.435 |
| EDUCATIN | V education | 15.159 | 6.538 |
| ARMFORCE | V was Armed force | 1.006 | 0.080 |
| BLACK | V was black | 1.146 | 0.353 |
| ASIAN | V was Asian | 1.018 | 0.134 |
| HISPANIC | V was Hispanic origin | 1.099 | 0.299 |
| NUMVICEX | Number of victimization in last six months | 2.640 | 12.070 |
| NUMHOUSE | Number of housing units in structure | 1.353 | 0.478 |
| | | | |
| *Offender characteristics* | | | |
| OFDGANG | 1+ O* was gang member | 1.074 | 0.262 |
| OFDSUBST | 1+ O was on substance (alcohol or drugs) | 1.299 | 0.458 |
| OFDFAMIL | 1+ O was V' family member | 1.048 | 0.213 |
| OSEXINTI | 1+ O was V's sexual intimate | 1.116 | 0.320 |
| OSUPERIOR | 1+ O was V's parents or supervisor | 1.008 | 0.088 |
| OFDACQNT | 1+ O was V's acquaintance (no family, work acquaint.) | 1.206 | 0.404 |
| OWORKACQ | 1+ O was V's work acquaintance | 1.052 | 0.222 |
| OFDBLACK | 1+ O was Black | 1.282 | 0.450 |
| OFDWHITE | 1+ O was White | 1.611 | 0.487 |
| | * One or more offenders | | |
| *Incident circumstances* | | | |
| RURAL | Incident occurred in rural | 1.159 | 0.365 |
| URBAN | Incident occurred in urban | 1.374 | 0.484 |
| ATHOME | Incident occurred at home | 1.176 | 0.380 |
| NEARHOME | Incident occurred near home | 1.202 | 0.402 |
| SECUPUB | Incident occurred in public place which may have security | 1.269 | 0.443 |
| FAMIPRES | Incident occurred with family member present | 1.202 | 0.402 |
| OTHRPRES | Incident occurred with others present (no family) | 1.482 | 0.500 |
| | | | |
| **Other variables eliminated in logistic analysis** | | | |
| ANYSD16 | V respond responded in any of 16 types of action | 1.707 | 0.455 |
| TOTALSD | Total number of victim response | 0.950 | 0.857 |
| OFDWEPON | O had weapon | 1.234 | 0.423 |
| OFDATCK | O attacked V | 1.541 | 0.498 |
| OFDTHRET | O threatened V | 1.487 | 0.499 |
| OFDGUNAT | O attacked with gun | 1.007 | 0.084 |
| OFDKIFAT | O attacked with knife | 1.023 | 0.150 |
| HOMINCOM | Income of the household | 8.406 | 4.203 |
| YOUG1529 | V was 15 to 29 yr old | 1.461 | 0.498 |
| MALE | V was male | 1.554 | 0.497 |
| NUMOFD | Number of O | 1.531 | 2.020 |
| MALEOFDC | O was male | 1.839 | 0.368 |
| YONGOFDC | O was 15 to 29 yr old | 1.549 | 0.498 |
| NIGHT | Incident occurred at night | 1.451 | 0.498 |
| AFTERNON | Incident occurred in the afternoon | 1.200 | 0.400 |
| SOUTH | Incident occurred in SOUTH | 1.244 | 0.430 |
| WEST | Incident occurred in WEST | 1.190 | 0.393 |

ANYINJUR and LOSTHING analyses, and thus serves as a point of comparison for all specific protective actions. Thus the coefficient of each protection variable reflects how much more or less likely a given outcome was for victims who took that action, compared to victims who did nothing to resist, other things being equal.

NCVS respondents reporting victimization are asked: "Did you do anything with the idea of protecting YOURSELF or your PROPERTY while the incident was going on?" (U.S. Bureau of Justice Statistics, 2003a). It should be noted that some "self-protection" actions are protective of property only, not the victim's bodily safety. For example, it is unlikely that victims would chase an offender to prevent injury to themselves. The purpose of such an action is more likely to recover the victim's property, inflict punishment on the offender or hold him for the police than to protect anything or anyone. Victims can also be coded as either cooperating or pretending to cooperate with the offender. Genuine cooperation might seem to be indistinguishable from nonresistance, but because cooperating and pretending to do so are grouped in the NCVS, victims in this category must be coded as having taken some kind of protective action, since some of them "stalled" to protect themselves.

Another problematic category of "self-protective action" coded in the NCVS is "screamed from pain or fear" (this is the verbatim description that appears in the NCVS interview schedule—U.S. Bureau of Justice Statistics, 2003a). Responses coded as fitting this category of victim response were provided in the context of the introductory statement asking about protection, thus these behaviors are treated as self-protection in the NCVS. But they could also be viewed as virtually involuntary responses to threat or injury itself, rather than actions intended to prevent further injury or property loss. Ambiguity arises because after the initial protection question is asked, those who respond "no" are nevertheless asked the more ambiguous follow-up question: "was there anything you did or tried to do about the incident while it was going on?" Thus some victims who described what they did during the incident, after they answered "no" to the first question, then "yes" to the second one, were not necessarily claiming that the action was taken for protective reasons. Nevertheless, because screaming from pain might well influence whether the perpetrator inflicts further injury, and screaming from fear might influence whether any injury is inflicted in the first place, we included this action in the models. Readers should, however, note that any positive associations between this victim behavior and injury may merely reflect the fact that injury often causes victims to scream from pain, and threat of an attack could make them scream from fear. Even with information on SP-injury sequence, one must still consider the possibility that victims may scream from fear just before an injury is inflicted. Such a case could

appear to support the view that screaming provokes offender attack, even if it actually has no effect.

It is not practical to assess the impact of combinations of specific protective measures. There are 57,527 possible combinations of sixteen different measures. Testing just 1 percent of these combinations would inevitably yield many misleadingly "significant" findings due to the huge number of hypothesis tests performed. Further, any subset of those combinations selected for the models would be arbitrary, given the absence of either research on the effects of combinations of victim actions or relevant theory that specifies which combinations would be most likely to affect, for good or ill, the outcomes of crimes. In any case, only 17.7 percent of all victims used more than one type of SP (13.3 percent used two types, 3.0 percent used three and 1.4 percent used more than three), so there usually is no issue of the effects of combinations of SP actions.[2] Further, when we examined the correlations among SP actions, we found no correlations even as large as 0.2, and only three exceeding 0.1, out of 120 total bivariate correlations. Thus, there appears to be no pronounced clustering of SP actions in the minority of cases where multiple actions were taken.

Other independent variables included in our models measure characteristics of the victims, offenders and circumstances that might influence the outcomes of the incidences and be correlated with the willingness or ability of victims to use each defensive action. First, three variables were included to reflect power advantages that offenders had over victims. ADVSEXOF was coded higher when male offender(s) confronted a female victim, that is, there was likely to be a power advantage to the offender based on sex. ADVAGEOF was coded higher when one or more offenders were in their physical prime ages (15 through 29) and the victim(s) was not in this age range, that is, there was likely to be a power advantage to the offender based on age and associated physical fitness. ADVNUM equaled the number of offenders minus the number of victims, measuring any numerical advantage of offenders.

Other variables measured whether offenders possessed weapons during the incident (OHADGUN, OHADKNIF, OHADSHAP) or whether offender(s) entered or attempted to enter the victim's home or car (GOTINHOM and GOTINCAR). Another twelve variables measured attributes of victims that are mostly self-explanatory. They are included because they reflect the willingness and capability of the victim to protect themselves and possibly different levels of risk of injury. For instance,

---

2. The percent of incidents in which victims used multiple types of SP was 17.7 in all confrontational crimes, 19.0 in robbery incidents, 16.5 in assaults, 23.4 in confrontational burglaries and 32.0 in sexual assaults.

victims older than 65 are, on the one hand, easier for the offender to injure because of their physical frailties and inability or disinclination to retaliate. On the other hand, in robberies, it may be precisely because offenders anticipate little resistance from older victims that they do not feel a need to attack them at the outset.

Ten other variables measure attributes of offenders, as perceived by victims, as well as the relationship between victim and offender. Intimate offenders such as family members and sexual intimates may be more inclined to inflict harm on the victim because hostility has had time to intensify in the course of extended emotional interaction. Alternatively, emotional bonds might inhibit the offender's aggression. Emotional intimacy might also influence the willingness and ability of victims to protect themselves—victims might be reluctant to direct forceful actions at intimates. Because there could be multiple offenders, with differing relationships to the victim, we simply coded whether a given relationship existed between the victim and at least one offender. Thus it is perfectly possible for a given incident to receive the higher code on more than one relationship variable. The same procedure was followed for offender race variables.

Other independent variables measure the degree of safety for the victim in terms of their familiarity with the setting and the possibility of gaining assistance from others. ATHOME reflects whether the crime occurred in the victim's home, while NEARHOME reflects whether the incident occurred in the immediate area around the home, such as the yard, garage and very close streets. SECUPUB stands for a secure public place that may have capable guardians, such as banks, other commercial places, offices, factories or school buildings.

Other variables indicating an urban or rural setting (RURAL, URBAN) reflect population density of the setting and thus the likelihood that there would be other people around who could serve as allies to the victim in intervening or summoning police. The presence of bystanders might discourage offender aggression, but it could also provoke it in aggressors who perceived a need to deter the victim from eliciting assistance from those potential allies. Alternatively, the presence of family members (FAMIPRES, OTHEPRES) could either encourage victims to resist for the sake of protecting their loved ones or make them cautious about resisting to avoid provoking offenders into attacking these others. Note that variables were omitted from equations only when it was necessary because they were constants in the subsample being analyzed.

## FINDINGS

### FREQUENCY AND INJURY RATES OF PROTECTIVE ACTIONS

Table 2 shows how often NCVS crime victims reported using the various types of victim protective actions and the share of victims using each method who were injured. Readers should not interpret these figures as measures of the relative effectiveness of the various resistance tactics, because simple differences in injury rates reflect more than just differences in the effects of victim actions. Nevertheless, this table conveys simple descriptive information that is arguably more important than the results of the later complex multivariate analyses. Most important, these figures show that while many crime victims are injured, they are rarely injured after taking protective action and are almost never seriously injured after resisting. For all 27,595 crime incidents, fewer than 2 percent involved a victim being injured after resisting the offender, and fewer than one-half of 1 percent involved a victim being seriously injured after resisting. Of all crimes involving SP actions and injury, only 10 percent involved SP followed by injury. Thus a scholar who implicitly interpreted SP-plus-injury crimes as incidents in which SP provoked offenders into injuring the victim would be wrong in at least 90 percent of the cases.

Once victims resist, the probability that they will suffer any further injury drops almost to zero, regardless of type of crime or resistance. Most offenders in personal larcenies and burglaries probably never had any intention of hurting their victims, and thus there were no violent intentions to thwart. Post-resistance injury is also rare in sexual assaults, robberies and assaults. This does not mean there is no risk to victim resistance, but the chances of resistance provoking offenders to inflict injury is low by any reasonable standard (2.8 percent of crimes with SP) and the risk of serious injury is close to zero (0.7 percent). Independent of victim resistance, violent crime is by definition inherently dangerous. Even among victims who did not resist, about 18.5 percent were injured; the rest were merely threatened. But resistance rarely adds to this "baseline" level of danger, given how infrequently any further injury is inflicted after resistance.

These conclusions can be drawn even before performing complex multivariate tests for a simple enough reason. Even if one were to make the extreme assumption that all cases of post-SP injury were incidents in which resistance alone caused the offender to hurt the victim, it would still be accurate to conclude that resistance rarely causes the victim to suffer further injury. In reality, it is highly unlikely that all crime victims who resisted and were then injured suffered those injuries because they resisted, because some offenders were certainly determined to hurt their victims regardless. Thus, the post-SP injury percentage is properly viewed

**Table 2. Frequency and Injury Rates of Self-Protection (SP) Strategies, in Percentages**

| SP Strategy | All Offenses | | | | Robberies | | | |
|---|---|---|---|---|---|---|---|---|
| | Frequency | Injured | Injured after SP | Seriously Injured after SP | Frequency | Injured | Injured after SP | Seriously Injured after SP |
| Attacked with Gun | 45 | 33.3 | 2.2 | 0.0 | 6 | 33.3 | 0.0 | 0.0 |
| Threatened with Gun | 202 | 13.9 | 2.5 | 1.5 | 26 | 11.5 | 7.7 | 7.7 |
| Attacked w. Nongun Weapon | 230 | 40.6 | 2.6 | 0.9 | 35 | 45.7 | 2.9 | 2.9 |
| Threatened w. Nongun Weapon | 232 | 18.5 | 0.9 | 0.4 | 14 | 15.4 | 0.0 | 0.0 |
| Attacked without Weapon | 2,661 | 47.4 | 3.8 | 1.2 | 279 | 51.6 | 7.2 | 4.3 |
| Threatened without Weapon | 540 | 20.6 | 2.6 | 0.4 | 35 | 22.9 | 2.9 | 0.0 |
| Struggled | 4,984 | 49.8 | 4.1 | 1.0 | 542 | 50.9 | 6.3 | 1.3 |
| Chased, Held Offender | 517 | 24.6 | 2.3 | 0.4 | 76 | 32.5 | 6.6 | 2.6 |
| Yelled, Turned on Lights | 2,492 | 27.4 | 2.7 | 0.7 | 228 | 38.6 | 5.7 | 1.8 |
| Stalled, Pretended to Cooperate | 535 | 21.5 | 4.5 | 1.5 | 147 | 11.6 | 4.1 | 1.4 |
| Argued, Reasoned, Pleaded | 2,700 | 23.3 | 3.4 | 0.9 | 160 | 26.9 | 6.9 | 2.5 |
| Ran Away, Hid | 3,807 | 20.5 | 1.8 | 0.4 | 335 | 31.4 | 3.6 | 0.6 |
| Called Police or Guard | 1,990 | 17.8 | 0.9 | 0.2 | 100 | 27.0 | 1.0 | 0.0 |
| Tried to Attract Attention | 567 | 38.7 | 1.9 | 0.4 | 83 | 42.2 | 4.8 | 0.0 |
| Screamed from Pain or Fear | 569 | 77.0 | 3.5 | 1.6 | 68 | 70.6 | 5.9 | 4.4 |
| Other SP Strategies | 4,149 | 15.9 | 2.4 | 0.5 | 273 | 28.2 | 8.1 | 4.0 |
| Any SP | 19,519 | 26.4 | 2.8 | 0.7 | 1,697 | 33.8 | 5.4 | 1.6 |
| No SP | 8,077 | 18.5 | n/a | n/a | 943 | 23.1 | n/a | n/a |
| Total Incidents* | 27,595 | 24.1 | 2 | 0.5 | 2,640 | 30.0 | 3.5 | 1.1 |

* Total Incidents are smaller than the sum of SP actions because victims often employed multiple actions.

**Table 2. Frequency and Injury Rates of Self-Protection (SP) Strategies, in Percentages (continued)**

| SP Strategy | Assaults | | | | Confrontational Burglaries | | | |
|---|---|---|---|---|---|---|---|---|
| | Frequency | Injured | Injured after SP | Seriously Injured after SP | Frequency | Injured | Injured after SP | Seriously Injured after SP |
| Attacked with Gun | 28 | 39.3 | 7.1 | 0.0 | 12 | 25 | 0.0 | 0.0 |
| Threatened with Gun | 138 | 15.8 | 2.9 | 0.7 | 38 | 10.5 | 0.0 | 0.0 |
| Attacked w. Nongun Weapon | 161 | 41.9 | 2.5 | 0.6 | 27 | 25.9 | 3.7 | 0.0 |
| Threatened w. Nongun Weapon | 176 | 18.2 | 1.1 | 0.6 | 34 | 17.6 | 0.0 | 0.0 |
| Attacked without Weapon | 2,146 | 46.2 | 3.4 | 0.6 | 106 | 57.5 | 1.9 | 0.0 |
| Threatened without Weapon | 474 | 19.2 | 2.5 | 0.4 | 22 | 22.7 | 0.0 | 0.0 |
| Struggled | 3,842 | 48.8 | 3.6 | 0.7 | 198 | 60.3 | 6.6 | 1.5 |
| Chased, Held Offender | 324 | 28.7 | 2.5 | 0.0 | 77 | 10.4 | 0.0 | 0.0 |
| Yelled, Turned on Lights | 1,642 | 25.4 | 2.4 | 0.4 | 372 | 16.9 | 1.6 | 0.0 |
| Stalled, Pretended to Cooperate | 299 | 15.4 | 4.3 | 0.7 | 29 | 17.2 | 6.9 | 0.0 |
| Argued, Reasoned, Pleaded | 2,146 | 18.0 | 2.9 | 0.2 | 174 | 30.5 | 2.3 | 0.0 |
| Ran Away, Hid | 3,179 | 18.0 | 1.6 | 0.3 | 114 | 36.8 | 3.5 | 0.9 |
| Called Police or Guard | 1,492 | 17.5 | 0.8 | 0.1 | 366 | 14.2 | 1.1 | 0.0 |
| Tried to Attract Attention | 388 | 35.4 | 0.5 | 0.0 | 41 | 31.7 | 4.9 | 0.0 |
| Screamed from Pain or Fear | 353 | 78.8 | 2.5 | 0.0 | 54 | 68.5 | 1.9 | 0.0 |
| Other SP Strategies | 3,441 | 14.5 | 2.0 | 0.2 | 241 | 7.9 | 2.5 | 0.0 |
| Any SP | 15,503 | 24.9 | 2.5 | 0.4 | 1,293 | 20.1 | 2.7 | 0.3 |
| No SP | 6,068 | 17.1 | n/a | n/a | 528 | 12.5 | n/a | n/a |
| Total Incidents* | 21,570 | 22.7 | 1.8 | 0.3 | 1,821 | 17.9 | 1.9 | 0.2 |

* Total incidents are smaller than the sum of SP actions because victims often employed multiple actions

**Table 2. Frequency and Injury Rates of Self-Protection (SP) Strategies, in Percentage (continued)**

| SP Strategy | Sexual Assaults | | | | Personal Larcenies** |
|---|---|---|---|---|---|
| | *Frequency* | *Injured* | *Injured after SP* | *Seriously Injured after SP* | *Frequency* |
| Attacked with Gun | 0 | - | - | - | 0 |
| Threatened with Gun | 1 | 0 | 0.0 | 0.0 | 0 |
| Attacked w. Nongun Weapon | 5 | 60.0 | 0.0 | 0.0 | 2 |
| Threatened w. Nongun Weapon | 10 | 10.0 | 0.0 | 0.0 | 0 |
| Attacked without Weapon | 120 | 35.8 | 5.0 | 0.0 | 6 |
| Threatened without Weapon | 11 | 33.3 | 0.0 | 0.0 | 0 |
| Struggled | 343 | 36.2 | 2.9 | 0.0 | 37 |
| Chased, Held Offender | 4 | 0 | 0.0 | 0.0 | 37 |
| Yelled, Turned on Lights | 219 | 32.0 | 3.2 | 0.0 | 27 |
| Stalled, Pretended to Cooperate | 49 | 40.8 | 4.1 | 0.0 | 4 |
| Argued, Reasoned, Pleaded | 213 | 34.9 | 3.8 | 0.0 | 2 |
| Ran Away, Hid | 161 | 20.5 | 0.6 | 0.0 | 15 |
| Called Police or Guard | 38 | 42.1 | 5.3 | 0.0 | 12 |
| Tried to Attract Attention | 41 | 51.2 | 4.9 | 0.0 | 11 |
| Screamed from Pain or Fear | 83 | 61.4 | 6.0 | 0.0 | 4 |
| Other SP Strategies | 171 | 12.9 | 0.0 | 0.0 | 28 |
| Any SP | 886 | 25.2 | 2.5 | 0.0 | 139 |
| No SP | 233 | 19.0 | n/a | n/a | 306 |
| Total Incidents* | 1,119 | 23.9 | 2.0 | 0.0 | 445 |

* Total Incidents are smaller than the sum of SP actions because victims often employed multiple actions.
** Since there are no injured Vs in personal larceny incidents, injury percentages are not shown.

as an upper limit on the share of crimes in which protective actions might have provoked offenders into attacking.

These simple injury rates, however, cannot tell us whether resistance actually reduces risk of injury. Perhaps victims resist only in situations that were already relatively safe, or resist only offenders who appeared unlikely to hurt them. Nor can these figures tell us which protective actions are relatively more effective, inconsequential or counter-productive. To address these issues, analyses using multivariate controls are needed.

This extremely low rate of post-SP injury is good news for crime victims. It creates, however, statistical problems for assessing the relative effectiveness of different protective strategies for avoiding injury because it means that there is very little variation on dependent variables measuring post-SP injury. It is harder to predict very rare outcomes. Estimates of the impact of a given variable will necessarily be unstable even in fairly large samples because they are based on so few cases with the outcome of interest. This problem is aggravated when analyses are confined to subsamples pertaining to specific crime types, especially the less frequent ones, and is even more severe with regard to estimating effects of the rarer SP actions. Thus, for example, despite the very large NCVS total samples, there are few robberies with post-SP injury, and also few with armed resistance. Estimates of the effects of armed resistance on post-SP injury in robberies will therefore depend on a few cases and be correspondingly unstable.

## PROPERTY LOSS

Middle-class observers might be tempted to dismiss property loss as a minor consequence of robberies, burglaries and larcenies, preferring instead to focus only on injury, fear, invasion of privacy and the loss of a sense of security. This is certainly true of scholars who study victim resistance because they rarely address the effects of resistance on property loss. In contrast, lower income persons, for whom the loss of $100 might make it impossible to buy groceries or pay the rent, might be less inclined to regard the issue as trivial. Thus we begin by assessing the impact of victim actions on whether victims of robbery, confrontational burglary or personal contact larceny lost any property.

The findings in Table 3 indicate that thirteen of the sixteen protective actions were associated with lower rates of property loss compared to nonresistance, eleven significantly so. Based on the size of the coefficients of the corresponding variables, three of the four most effective methods for avoiding property loss in crimes in general were armed resistance, all in robberies were armed resistance, and three of the four in confrontational

882                                    TARK AND KLECK

burglaries were armed resistance. Note that the crime-specific findings are unstable for the rarer forms of SP, including use of a gun. Distributions are extreme on both these SP variables and the property loss dependent variable, because property loss is extremely rare among victims who used guns.

**Table 3. Property Loss**

| | Logit Coefficient (ratio, coef./SE) | | | |
|---|---|---|---|---|
| | All Types of Crime | Robbery | Confrontational Burglary | Personal Larceny |
| *Victim's Self Protection* | | | | |
| Attack with Gun | -1.367 (-1.94) | -1.793** (-1.97) | -2.556 (-1.60) | - |
| Threat with Gun | -1.682* (-4.35) | -21.795 (-0.00) | -0.265 (-0.57) | - |
| Attack with nongun weapon | -0.884* (-2.96) | -1.765* (-4.33) | -1.451** (-2.06) | -24.004 (-0.00) |
| Threat with nongun weapon | -2.227* (-4.27) | -1.562** (-2.28) | -20.453 (-0.00) | 13.436 (0.00) |
| Attack without weapon | -0.549* (-5.80) | -0.727* (-4.84) | -0.671 (-2.12) | -5.331* (-3.30) |
| Threat without weapon | -1.124* (-3.97) | -1.523* (-3.42) | 0.670 (1.15) | - |
| Struggled | -0.461* (-6.71) | -0.665* (-5.80) | -1.053* (-4.16) | -4.902* (-6.27) |
| Chased, held offender | 1.056* (8.35) | 0.060 (0.22) | 0.802* (2.76) | 0.679 (0.55) |
| Yelled, turned on lights | -0.319* (-3.54) | -0.449* (-2.69) | -0.629* (-3.33) | -2.071**(-2.16) |
| Stalled, pretended to cooperate | 0.930* (7.58) | 0.732* (2.96) | 1.087** (2.40) | 17.532 (0.00) |
| Argued, reasoned, pleaded | -1.016* (-9.18) | -0.716 (-3.62) | -0.568** (-2.08) | -1.848 (-0.96) |
| Ran away, hid | -1.285* (-14.34) | -1.332* (-9.79) | -0.522 (-1.71) | -3.752* (-3.04) |
| Called police or guard | -0.482* (-4.60) | -0.479** (-1.99) | -0.219 (-1.24) | 1.485 (0.58) |
| Tried to attract attention | -0.037 (-0.22) | -0.794* (-3.01) | 0.110 (0.23) | -0.539 (-0.25) |
| Screamed from pain or fear | 0.371** (2.34) | 0.779** (2.48) | 0.632 (1.52) | 20.801 (0.00) |
| Other SP strategies | -0.767* (-9.53) | -0.509* (-3.34) | -0.807* (-3.60) | -3.393* (-3.90) |
| *Power Difference* | | | | |
| ADVSEXOF | 0.160* (2.90) | 0.168 (1.43) | -0.341** (-2.27) | -2.104* (-2.73) |
| ADVAGEOF | 0.373* (6.90) | -0.260** (-2.50) | 0.415* (2.65) | -0.115 (-0.20) |
| ADVNUM | 0.043* (4.68) | 0.086* (3.05) | 0.081 (1.68) | -0.376 (-1.75) |
| *Offender weapons and attack* | | | | |
| OHADGUN | 0.953* (14.36) | 0.668* (5.05) | 0.581** (2.23) | - |
| OHADKNIF | 0.441* (4.97) | -0.088 (-0.62) | 0.312 (1.04) | - |
| OHADSHAP | 0.123 (0.55) | -0.027 (-0.08) | 0.750 (0.85) | - |
| GOTINHOM | -1.057* (-5.42) | - | -1.514* (-7.46) | - |
| GOTINCAR | 0.778 (0.81) | - | 0.398 (0.44) | - |
| *Victim Characteristics* | | | | |
| HADCHILD | -0.153* (-2.84) | -0.016 (-0.14) | -0.153 (-0.96) | 0.502 (0.72) |
| HOUSOWN | -0.037 (-0.59) | -0.101 (-0.81) | 0.438** (2.50) | -1.176 (-1.49) |
| EMPLOYED | -0.143** (-2.55) | -0.120 (-1.10) | 0.103 (0.66) | -0.956 (-1.55) |
| OLD65 | 0.876* (7.38) | -0.004 (-0.01) | 0.862* (3.38) | -0.488 (-0.60) |
| MARRIED | -0.129** (-2.06) | 0.182 (1.42) | 0.109 (0.66) | -0.742 (-1.26) |
| EDUCATIN | -0.017* (-4.12) | -0.015 (-1.75) | 0.003 (0.30) | -0.055 (-1.34) |
| ARMFORCE | -0.834** (-2.00) | 0.657 (0.65) | 0.133 (0.09) | 17.871 (0.00) |
| BLACK | 0.133 (1.94) | 0.321** (2.39) | -0.124 (-0.54) | 0.433 (0.46) |
| ASIAN | 0.538* (3.75) | 0.240 (0.93) | -0.202 (-0.44) | -1.686 (-1.64) |
| HISPANIC | 0.510* (6.93) | 0.134 (0.95) | -0.158 (-0.62) | -0.415 (-0.45) |
| NUMVICEX | -0.056* (-4.52) | -0.011 (-0.92) | -0.049 (-0.98) | 1.044 (0.74) |
| NUMHOUSE | 0.164** (2.59) | 0.076 (0.60) | 0.196 (1.10) | -0.366 (-0.47) |

* p<0.01 (two-tailed) ** 0.01<P<0.05 (two tailed)

**Table 3. Property Loss (continued)**

| | All Type of Crime | | Robbery | | Confrontational Burglary | | Personal Larceny | |
|---|---|---|---|---|---|---|---|---|
| *Offender Characteristics* | | | | | | | | |
| OFDGANG | -0.240* | (-2.66) | -0.263 | (-1.66) | 0.014 | (0.04) | -1.313 | (-0.89) |
| OFDSUBST | -0.057 | (-1.01) | 0.234** | (2.05) | -0.087 | (-0.58) | 0.652 | (0.41) |
| OFDFAMIL | -0.453* | (-3.31) | 0.698** | (2.11) | -0.637 | (-1.93) | 15.344 | (0.00) |
| OSEXINTI | -0.780* | (-7.61) | 0.489** | (2.00) | -0.405 | (-1.93) | 17.959 | (0.00) |
| OSUPERIOR | -0.101 | (-0.33) | 1.716 | (1.59) | 1.660** | (1.97) | - | |
| OFDACQNT | -0.715* | (-9.13) | 0.156 | (0.92) | 0.009 | (0.05) | 19.751 | (0.00) |
| OWORKACQ | -1.617* | (-6.73) | 1.503 | (2.45) | -0.481 | (-0.55) | - | |
| OFDBLACK | 0.543* | (7.61) | 0.234 | (1.83) | -0.182 | (-0.82) | 0.179 | (0.27) |
| OFDWHITE | -0.420* | (-5.95) | 0.110 | (0.81) | -0.528* | (-2.64) | 0.251 | (0.34) |
| *Incident Circumstances* | | | | | | | | |
| RURAL | -0.166** | (-2.01) | 0.060 | (0.34) | -0.322 | (-1.60) | -1.710 | (-1.78) |
| URBAN | 0.150* | (2.82) | 0.051 | (0.48) | -0.018 | (-0.12) | 0.219 | (0.38) |
| ATHOME | 0.613* | (7.50) | 0.335 | (1.41) | - | | 14.935 | (0.00) |
| NEARHOME | -0.410* | (-5.71) | 0.302** | (2.18) | - | | 0.351 | (0.34) |
| SECUPUB | -0.463* | (-6.71) | -0.146 | (-1.06) | - | | 0.809 | (1.31) |
| FAMIPRES | -0.369* | (-5.26) | -0.095 | (-0.57) | -0.105 | (-0.68) | 0.191 | (0.24) |
| OTHRPRES | -0.568 | (-10.14) | -0.286* | (-2.67) | -0.510** | (-2.25) | 0.913 | (1.31) |
| Sample size | 25,858 | | 2,473 | | 1,671 | | 410 | |
| -2 Log-likelihood | 12,679 | | 2,752 | | 1,457 | | 124 | |

* $p<0.01$ (two-tailed) ** $0.01<P<0.05$ (two tailed)

## INJURY REGARDLESS OF INJURY-SP SEQUENCE

It could be hypothesized that this greater ability of resisting victims to avoid property loss comes at the price of increased risk of injury. While some victims might succeed in retaining their property by resisting, their resistance might anger aggressors into attacking them. Table 4 presents findings comparable to those reported in most research, in that they show the association between protective actions and injury to the victim, without respect to whether injury preceded or followed resistance. It should be stressed that the purpose of reporting the Table 4 estimates is to provide results comparable to those in most studies, not to report results that we regard as the most meaningful estimates of SP effects on victim injury.

The results are extremely mixed and reveal no clear patterns. About half of the protection variable coefficients are positive and half negative. Those that are negative are as likely to pertain to forceful as nonforceful actions. Many of these findings are hard to understand if one interprets the SP-injury associations as the effects of victim actions on injury. For example, taken at face value, they seem to suggest that, aside from threatening the offender with a gun or calling the police, the most effective methods for avoiding injury were threatening without a weapon and "yelling or turning on the lights." While some of these apparent

884                                    TARK AND KLECK

interpretations might be valid, the findings are ambiguous because they take no account of SP-injury sequence. One cannot tell if positive associations reflect counterproductive effects of foolish resistance actions or previously nonresisting victims roused into action by the injuries inflicted on them.

**Table 4. Injury (Regardless of Sequence)**

| | Logit Coefficient (ratio, coef./SE) | | | | |
| --- | --- | --- | --- | --- | --- |
| | All Types of Crime | Robbery | Assault | Confrontational Burglary | Sex Assault |
| *Victim's Self-Protection* | | | | | |
| Attack with Gun | 1.068* (2.96) | -0.227 (-0.24) | 1.408* (3.14) | 1.761 (1.92) | - |
| Threat with Gun | -0.726* (-2.94) | -2.118** (-2.16) | -0.347 (-1.24) | -0.967 (-1.26) | -20.032 (-0.00) |
| Attack with Nongun Weapon | 0.672* (4.30) | 0.499 (1.32) | 0.826* (4.40) | 0.711 (1.33) | -19.320 (-0.00) |
| Threat with Nongun Weapon | -0.492** (-2.47) | -0.547 (-0.73) | -0.578*** (-2.40) | 0.344 (0.59) | 1.463 (1.32) |
| Attack without Weapon | 1.068* (22.05) | 0.913* (6.13) | 1.072* (19.60) | 1.682* (6.32) | -1.931 (-1.34) |
| Threat without Weapon | -0.381* (-3.01) | -0.745 (-1.63) | -0.382* (-2.77) | -0.756 (-0.95) | 0.458 (1.81) |
| Struggled | 1.316* (34.81) | 1.011* (8.87) | 1.357* (31.10) | 2.069* (9.90) | -1.242 (-1.38) |
| Chased, Held Offender | 0.049 (0.41) | -0.103 (-0.37) | 0.394* (2.72) | -0.809 (-1.58) | 0.871* (4.81) |
| Yelled, Turned on Lights | -0.236* (-3.91) | 0.101 (0.58) | -0.245* (-3.26) | -0.281 (-1.20) | -0.046 (-0.21) |
| Stalled, Pretended to Cooperate | 0.128 (1.04) | -0.763* (-2.64) | -0.130 (-0.70) | -0.524 (-0.82) | 0.041 (0.11) |
| Argued, Reasoned, Pleaded | -0.162* (-2.79) | -0.380 (-1.66) | -0.335** (-4.76) | 0.563** (2.19) | 0.358 (1.73) |
| Ran Away, Hid | -0.125** (-2.48) | 0.154 (1.08) | -0.126*** (-2.15) | 0.819* (2.99) | -0.197** (-0.76) |
| Called Police or Guard | -0.552* (-7.58) | -0.463 (-1.72) | -0.442* (-5.21) | -0.447 (-2.08) | 0.668 (1.49) |
| Tried to Attract Attention | 0.431* (3.99) | 0.183 (0.68) | 0.501* (3.80) | -0.016 (-0.03) | 0.372 (0.89) |
| Screamed from Pain or Fear | 2.017* (16.89) | 1.482* (4.71) | 2.151* (14.18) | 2.168* (4.56) | 1.460* (4.69) |
| Other SP Strategies | -0.155* (-3.02) | 0.167 (1.04) | -0.169* (-2.86) | -0.727** (-2.38) | -0.521 (-1.78) |
| *Power Difference* | | | | | |
| ADVSEXOF | 0.149* (3.74) | 0.011 (0.09) | 0.076 (1.54) | -0.023 (-0.12) | 0.062 (0.18) |
| ADVAGEOF | 0.049 (1.15) | 0.079 (0.73) | 0.045 (0.88) | 0.117 (0.54) | 0.246 (0.88) |
| ADVNUM | 0.030* (3.99) | 0.110* (4.52) | 0.019** (2.35) | 0.016 (0.28) | -0.188 (-1.33) |
| *Offender Weapons and Attack* | | | | | |
| OHADGUN | -0.521* (-7.33) | -0.867* (-5.98) | -0.718* (-7.40) | 0.089 (0.30) | 0.912* (2.27) |
| OHADKNIF | -0.152* (-2.19) | -0.311** (-2.01) | -0.273* (-3.17) | 0.044 (0.13) | 0.826* (2.05) |
| OHADSHAP | 0.371* (2.56) | 0.186 (0.53) | 0.340** (2.04) | 1.537 (1.75) | 1.781 (1.34) |
| GOTINHOM | -19.974 (-0.01) | - | - | -19.196 (-0.01) | - |
| GOTINCAR | -19.306 (-0.00) | - | - | -18.167 (-0.00) | - |

p<0.01 (two-tailed)    * 0.01<P<0.05 (two-tailed)

**Table 4. Injury (continued)**

| | Logit Coefficient (ratio, coef./SE) | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|
| | All Types of Crime | | Robbery | | Assault | | Confrontational Burglary | | SexAssault | |
| *Victim Characteristics* | | | | | | | | | | |
| HADCHILD | -0.056 | (-1.56) | -0.065 | (-0.58) | -0.072 | (-1.76) | -0.135 | (-0.70) | 0.281 | (1.51) |
| HOUSOWN | -0.128* | (-3.06) | -0.124 | (-0.96) | -0.122** | (-2.54) | -0.105 | (-0.50) | -0.592* | (-2.60) |
| EMPLOYED | -0.261* | (-6.67) | -0.060 | (-0.54) | -0.236* | (-5.10) | -0.605 | (-3.39) | 0.197 | (0.99) |
| OLD65 | -0.313*** | (-2.36) | 0.214 | (0.68) | 0.011 | (0.06) | -0.823** | (-1.97) | 2.203* | (2.73) |
| MARRIED | -0.220* | (-4.86) | -0.070 | (-0.52) | -0.232* | (-4.43) | -0.112 | (-0.49) | -0.056 | (-0.20) |
| EDUCATIN | -0.024* | (-7.73) | -0.015 | (-1.67) | -0.030* | (-8.32) | -0.004 | (-0.24) | 0.000 | (-0.02) |
| ARMFORCE | -0.570** | (-2.35) | -19.807 | (-0.00) | -0.545** | (-2.13) | -18.386 | (-0.00) | -20.094 | (-0.00) |
| BLACK | -0.042 | (-0.76) | -0.040 | (-0.29) | -0.043 | (-0.63) | -0.094 | (-0.31) | -0.416 | (-1.24) |
| ASIAN | 0.104 | (0.83) | 0.209 | (0.78) | -0.072 | (-0.44) | 0.815 | (1.48) | -0.662 | (-0.95) |
| HISPANIC | -0.023 | (-0.41) | -0.233 | (-1.58) | 0.027 | (0.41) | 0.113 | (0.39) | -0.372 | (-1.12) |
| NUMVICEX | -0.010* | (-3.77) | -0.001 | (-0.08) | -0.011* | (-3.74) | 0.007 | (0.24) | 0.016 | (1.09) |
| NUMHOUSE | 0.037 | (0.84) | -0.086 | (-0.67) | 0.049 | (0.95) | 0.058 | (0.28) | -0.047 | (-0.21) |
| *Offender Characteristics* | | | | | | | | | | |
| OFDGANG | 0.119 | (1.92) | 0.275 | (1.72) | 0.017 | (0.24) | 0.553 | (1.55) | 0.984 | (2.47) |
| OFDSUBST | 0.367* | (10.28) | 0.439* | (3.88) | 0.311* | (7.46) | 0.681* | (4.11) | 0.592* | (3.38) |
| OFDFAMIL | 0.191*** | (2.26) | -0.061 | (-0.19) | 0.183 | (1.87) | 1.160* | (3.62) | -19.803 | (-0.00) |
| OSEXINTI | 0.951* | (15.87) | 0.692* | (2.92) | 1.014* | (13.73) | 1.108* | (4.93) | 0.491** | (2.04) |
| OSUPERIOR | 0.550* | (3.18) | 1.307 | (1.89) | 0.358 | (1.83) | 0.082 | (0.09) | 20.752 | (0.00) |
| OWORKACQ | -0.055 | (-0.61) | -0.658 | (-0.97) | -0.089 | (-0.91) | -0.102 | (-0.09) | 0.208 | (0.54) |
| OFDBLACK | 0.047 | (0.84) | 0.030 | (0.23) | 0.013 | (0.19) | 0.282 | (0.84) | 0.136 | (0.39) |
| OFDWHITE | -0.103** | (-2.04) | 0.030 | (0.22) | -0.134** | (-2.29) | -0.045 | (-0.15) | -0.157 | (-0.57) |
| *Incident Circumstances* | | | | | | | | | | |
| RURAL | 0.047 | (0.99) | -0.350 | (-1.89) | 0.080 | (1.51) | 0.087 | (0.37) | 0.080 | (0.34) |
| URBAN | 0.013 | (0.33) | 0.189 | (1.72) | -0.011 | (-0.25) | 0.108 | (0.58) | -0.083 | (-0.42) |
| ATHOME | 0.406* | (6.94) | 0.090 | (0.39) | 0.515* | (6.68) | - | | 0.113 | (0.45) |
| NEARHOME | 0.055 | (1.15) | -0.002 | (-0.02) | 0.010** | (0.18) | - | | 0.099 | (0.40) |
| SECUPUB | -0.176* | (-3.87) | -0.453* | (-2.93) | -0.103** | (-2.05) | - | | -0.670 | (-1.78) |
| FAMIPRES | -0.100** | (-2.03) | -0.309 | (-1.77) | 0.160* | (2.70) | -0.291 | (-1.52) | -0.306 | (-1.14) |
| OTHRPRES | 0.009 | (0.22) | -0.052 | (-0.47) | 0.214* | (4.36) | -0.044 | (-0.18) | -0.470 | (-1.74) |
| Sample size | 25,858 | | 2,473 | | 20,259 | | 1,671 | | 1,045 | |
| -2 Log-likelihood | 23,839 | | 2,607 | | 18,087 | | 1,026 | | 922 | |

* $p<0.01$ (two-tailed) ** $0.01<P<0.05$ (two-tailed)

## POST-SELF PROTECTION INJURY

This problem is addressed in the analyses whose findings are reported in Table 5. Here the dependent variable denotes whether the victim was injured after taking protective actions. Victims were coded 2 if they took SP actions and were injured after doing so, and 1 if they took SP actions and were not injured after doing so. The second group included those who were injured only before taking SP actions. This method of defining the dependent variable eliminates the SP-injury sequence problem because only post-SP injuries can "count against" an SP action. It permits comparisons of effectiveness among the sixteen SP actions, but not

between a given SP action and taking none. Cases in which victims took no action were not included in the Table 5 and 6 analyses because the concept of post-SP injury does not apply. (We later report results from an alternative approach in which no-SP cases were included and arbitrarily coded as whether there was "post-SP" injury.) Thus, unlike the preceding analyses, the Tables 5 and 6 results describe only victims who took some kind of protective action. They address the question: "among victims who did something for protection, which actions were relatively more effective in averting subsequent injury?"

Because nonresisting victims were excluded, we could not treat no-SP as the excluded category. It is statistically inconsequential which protective action was treated as the excluded category. We nonetheless selected "called the police" as the omitted category because it is often presented as the officially recommended course of action for crime victims, and thus can serve as a useful point of comparison. The signs and absolute sizes of coefficients in Tables 5 and 6 should therefore not be compared with those in Table 4, because the omitted SP category serving as the point of reference is different. Instead, the focus should be on the relative sizes of the coefficients within each model.

The "effectiveness" of a given SP action is meaningful only in a comparative context even if the alternative is doing nothing. Thus the signs of the coefficients for the SP variables are a somewhat arbitrary reflection of which SP category we chose to treat as the omitted category. If we omit the SP type with the lowest rate of injury, the coefficients of all the included SP variables will be positive. Conversely, if we treat the SP with the highest injury risk as the omitted category, all SP coefficients will be negative, perhaps suggesting to the unwary that all SP actions "work" in avoiding injury. In our injury analyses we treat "no-SP" (Table 4) or "call the police" (Tables 5 and 6) as the omitted categories merely because they are well known as the no-resistance courses of action that are sometimes recommended to prospective victims by authorities such as police or victim advocates. Readers should note, however, that these options are often neither either feasible nor safe for some victims. Conversely, when they are adopted, it is sometimes an indication that the circumstances of the crime were already relatively safe for reasons having nothing to do with victim actions. For example, if a victim was able to call the police during the crime incident, it suggests that circumstances were less risky. Consequently, even SP methods effective in averting offender attack may not have significant negative coefficients because they were not capable of driving the risk of injury below the already extremely low risk among those who had the luxury of calling the police while the incident was going on.

The Table 5 estimates are therefore most appropriately viewed with a focus on the rankings and relative sizes of the SP coefficients. Most of the SP actions appear to have effects on post-SP injury that are not significantly different from calling the police. The SP actions with the largest negative coefficients are both types of armed resistance, threat with a nongun weapon and threat with a gun, though neither action's coefficient is significantly different from zero, partly due to the rarity of these actions. The only option with a significant negative coefficient was "ran away, hid." On the other hand, five types of unarmed SP action had significant positive associations, indicating that they were associated with higher post-SP injury than calling the police: attacking without a weapon, struggling with the offender, stalling or pretending to cooperate, arguing or reasoning or pleading, and screaming from pain or fear.

The meaning of the last association is ambiguous, for reasons discussed earlier. Leaving it aside, two of the significantly less effective SP actions were forceful and the other two nonforceful. None of the four forms of armed resistance were associated with significantly higher injury risk compared to calling the police. In sum, once SP-injury sequence is taken into account, there is no evidence indicating that either forceful resistance in general or armed resistance in particular is generally counterproductive or that it is less effective than nonforceful options in avoiding injury. The findings thus contradict earlier ones that nonforceful resistance is more effective than forceful (for example, Cook, 1986; Block and Skogan, 1986; Marchbanks et al., 1990; Zimring and Zuehl, 1986). The earlier conclusions were probably an artifact of the failure to address SP-injury sequence, because the analysts effectively treated injury preceding SP as if it could be a consequence of SP. This flaw makes resistance look less effective than it actually is.

Attending only to the sizes of the coefficients, the SP methods that appeared most effective in averting injury in all types of crimes were both armed resistance—threat with a gun and threat with any other weapon. In robberies, all of the five most effective SP actions were forceful resistance, and the top four were armed resistance. Among assaults, there was no clear pattern regarding types of SP that averted injury. In confrontational burglaries, five of the six most effective SP actions were forceful, and all four forms of armed resistance showed more success in averting injury than calling the police, though these differences were not significant. Finally, in sexual assaults, four of the six most effective SP actions were forceful, though again, post-SP injury in sexual assaults is so rare that even very large coefficients are not significantly different from zero.

Because the analyses reported in Table 5 excluded no-SP cases, which claimed 29 percent of the total sample, the sample sizes on which these analyses are based are substantially smaller than those reported in Table 4.

**Table 5. Injury after SP Action**

| | All Types of Crime | | Robbery | | Assault | | Confrontational Burglary | | SexAssault | |
|---|---|---|---|---|---|---|---|---|---|---|
| | | | | | Logit Coefficient (ratio, coef./SE) | | | | | |
| *Victim's Self-Protection* | | | | | | | | | | |
| Attack with Gun | 0.471 | (0.55) | -18.550 | (-0.00) | 1.248 | (1.42) | -16.682 | (-0.00) | -14.562 | (-0.00) |
| Threat with Gun | -0.517 | (-0.85) | -18.061 | (-0.00) | 0.132 | (0.21) | -16.959 | (-0.00) | -10.502 | (-0.00) |
| Attack with Nongun Weapon | 0.049 | (0.12) | -1.213 | (-0.88) | 0.221 | (0.44) | -0.147 | (-0.11) | -16.871 | (-0.00) |
| Threat with Nongun Weapon | -0.993 | (-1.51) | -17.771 | (-0.00) | -0.766 | (-1.15) | -17.418 | (-0.00) | 3.055* | (2.86) |
| Attack without Weapon | 0.597* | (4.63) | 0.766* | (2.37) | 0.464* | (2.98) | 0.001 | (0.00) | -14.704 | (-0.00) |
| Threat without Weapon | -0.060 | (-0.21) | -1.050 | (-0.97) | 0.051 | (0.17) | -17.017 | (-0.09) | 1.583 | (1.86) |
| Struggled | 0.881* | (8.20) | 0.918* | (3.27) | 0.784* | (5.88) | 1.861* | (3.62) | -16.257 | (-0.00) |
| Chased, Held Offender | -0.126 | (-0.41) | 0.174 | (0.32) | 0.014 | (0.04) | -17.450 | (-0.10) | -0.508 | (-0.58) |
| Yelled, Turned on Lights | 0.026 | (0.18) | 0.458 | (1.25) | 0.072 | (0.39) | -0.730 | (-1.12) | -4.323 | (-0.41) |
| Stalled, Pretended to Cooperate | 0.678* | (2.89) | -0.702 | (-1.34) | 0.931* | (3.01) | -0.128 | (-0.08) | 1.274 | (1.20) |
| Argued, reasoned, pleaded | 0.365* | (2.72) | 0.306 | (0.77) | 0.263 | (1.58) | 0.451 | (0.66) | -1.530 | (-1.01) |
| Ran away, hid | -0.424* | (-2.83) | -0.231 | (-0.64) | -0.323 | (-1.80) | 0.210 | (0.30) | 2.927 | (1.77) |
| Tried to attract attention | -0.267 | (-0.82) | 0.154 | (0.27) | -1.507** | (-2.03) | 1.830* | (1.98) | 2.103 | (1.57) |
| Screamed from pain or fear | 0.925* | (3.42) | 0.645 | (0.94) | 0.700 | (1.83) | -18.283 | (-0.00) | -20.499 | (-0.01) |
| Other SP strategies | 0.140 | (1.03) | 0.824* | (2.55) | 0.037 | (0.22) | 0.163 | (0.26) | | |
| *Power difference* | | | | | | | | | | |
| ADVSEXOF | 0.204 | (1.83) | -0.360 | (-1.15) | 0.145 | (1.01) | -0.190 | (-0.35) | 16.286 | (0.00) |
| ADVAGEOF | 0.116 | (0.97) | 0.269 | (1.03) | 0.004 | (0.03) | 0.608 | (1.03) | -0.681 | (-0.65) |
| ADVNUM | 0.051* | (3.46) | 0.095* | (2.25) | 0.045* | (2.69) | 0.102 | (1.01) | 0.249 | (0.34) |
| *Offender weapons and attack* | | | | | | | | | | |
| OHADGUN | 0.241 | (1.44) | 0.680** | (2.08) | -0.111 | (-0.47) | -0.594 | (-0.58) | 6.100* | (2.87) |
| OHADKNIF | 0.116 | (0.66) | 0.005 | (0.01) | 0.125 | (0.59) | -0.085 | (-0.09) | -28.671 | (-0.00) |
| OHADSHAP | 0.598 | (1.82) | 1.332** | (2.31) | 0.386 | (0.89) | -16.776 | (-0.00) | -20.090 | (-0.00) |
| GOTINHOM | -17.975 | (-0.01) | | | | | -17.078 | (-0.01) | | |
| GOTINCAR | -17.547 | (-0.00) | | | | | -15.495 | (-0.00) | | |

* p<0.01 (two-tailed)   ** 0.01<P<0.05 (two-tailed)

**Table 5. Injury after SP action (continued)**

| | All Types of Crime | | Robbery | | Assault | | Confrontational Burglary | | Sex Assault | |
|---|---|---|---|---|---|---|---|---|---|---|
| *Victim Characteristics* | | | | | | | | | | |
| HADCHILD | -0.215** | (-2.10) | -0.502 | (-1.81) | -0.305* | (-2.50) | -0.128 | (-0.25) | 1.614** | (1.98) |
| HOUSOWN | 0.020 | (0.16) | -0.162 | (-0.49) | 0.085 | (0.59) | 0.152 | (0.27) | -1.502 | (-1.52) |
| EMPLOYED | -0.291* | (-2.66) | -0.269 | (-0.96) | -0.280* | (-2.10) | -0.680 | (-1.35) | -0.298 | (-0.30) |
| OLD65 | -1.001 | (-1.72) | -1.163 | (-0.94) | -17.415 | (-0.00) | 0.378 | (0.40) | -14.230 | (-0.00) |
| MARRIED | -0.154 | (-1.19) | 0.486 | (1.57) | -0.270 | (-1.66) | -0.003 | (0.00) | 0.242 | (0.22) |
| EDUCATIN | -0.021* | (-2.45) | 0.006 | (0.30) | -0.041* | (-3.72) | 0.050 | (1.24) | 0.086 | (1.09) |
| ARMFORCE | -17.479 | (-0.00) | -18.252 | (-0.00) | -17.327 | (-0.00) | -15.533 | (-0.00) | -15.848 | (-0.00) |
| BLACK | -0.097 | (-0.64) | 0.205 | (0.63) | 0.002 | (0.01) | -0.880 | (-0.91) | -4.755* | (-2.47) |
| ASIAN | -0.020 | (-0.06) | 0.889 | (1.78) | -0.916 | (-1.29) | -17.176 | (-0.00) | -17.289 | (-0.00) |
| HISPANIC | 0.032 | (0.21) | -0.239 | (-0.59) | 0.080 | (0.44) | -0.115 | (-0.16) | -0.649 | (-0.46) |
| NUMVICEX | -0.056* | (-2.54) | -0.082 | (-0.81) | -0.048** | (-2.12) | -0.002 | (-0.02) | -0.633 | (-0.97) |
| NUMHOUSE | 0.173 | (1.39) | 0.130 | (0.40) | 0.187 | (1.24) | 0.352 | (0.62) | -1.434 | (-1.36) |
| *Offender Characteristics* | | | | | | | | | | |
| OFDGANG | 0.286 | (1.84) | 0.156 | (0.38) | 0.228 | (1.20) | 2.049* | (2.84) | 1.619 | (0.97) |
| OFDSUBST | 0.379* | (3.83) | 0.385 | (1.41) | 0.411* | (3.42) | 0.857 | (1.85) | 0.895 | (1.13) |
| OFDFAMIL | -0.252 | (-0.96) | -1.640 | (-1.57) | -0.056 | (-0.19) | -0.531 | (-0.43) | -16.219 | (-1.40) |
| OSEXINTI | 0.404* | (2.34) | 0.712 | (1.23) | 0.646* | (2.94) | 0.702 | (1.18) | -2.538 | (-1.40) |
| OSUPERIOR | 1.211* | (3.07) | 2.401 | (1.58) | 0.561 | (1.14) | 2.529 | (1.29) | 23.204 | (0.00) |
| OFDACQNT | 0.127 | (1.01) | 0.010 | (0.02) | 0.153 | (1.04) | -0.040 | (-0.07) | -0.113 | (-0.10) |
| OWORKACQ | -0.724** | (-2.03) | -18.547 | (-0.00) | -0.691 | (-1.64) | -16.403 | (-0.00) | 1.170 | (0.94) |
| OFDBLACK | 0.244 | (1.58) | 0.253 | (0.76) | 0.094 | (0.49) | 1.188 | (1.17) | 2.420 | (1.76) |
| OFDWHITE | -0.123 | (-0.86) | -0.181 | (-0.49) | -0.142 | (-0.83) | 1.334 | (1.30) | -0.719 | (-0.70) |
| *Incident Circumstances* | | | | | | | | | | |
| RURAL | -0.079 | (-0.54) | -0.137 | (-0.29) | 0.055 | (0.32) | -1.062 | (-1.45) | -2.038 | (-1.60) |
| URBAN | 0.172 | (1.65) | -0.352 | (-1.36) | 0.365* | (2.86) | -0.224 | (-0.48) | -0.918 | (-1.04) |
| ATHOME | 0.328** | (2.01) | 0.750 | (1.33) | 0.286 | (1.29) | - | | 0.047 | (0.04) |
| NEARHOME | -0.083 | (-0.60) | -0.023 | (-0.06) | -0.155 | (-0.95) | - | | -0.295 | (-0.33) |
| SECUPUB | -0.116 | (-0.87) | 0.398 | (1.17) | -0.093 | (-0.61) | | | -2.783* | (-1.82) |
| FAMIPRES | 0.340* | (2.49) | 0.078 | (0.19) | 0.808* | (4.53) | 0.022 | (0.04) | 0.347 | (0.26) |
| OTHRPRES | 0.176 | (1.47) | -0.026 | (-0.10) | 0.536* | (3.29) | 0.097 | (0.14) | 1.450 | (1.06) |
| Sample size | 15,233 | | 1,251 | | 12,329 | | 1,041 | | 477 | |
| -2 Log-likelihood | 4,104 | | 560 | | 2,908 | | 188 | | 83 | |

* p<0.05 (two-tailed)   ** 0.01<P<0.05 (two-tailed)   . p<0.01 (two-tailed)

890                         TARK AND KLECK

This inflates standard errors and makes it even harder to achieve statistical significance for coefficients, especially those of the rarer defensive methods, because there is so little variation on these protection variables. As Table 2 indicated, few victims report using weapons for self-protection. This might reflect reality. It might also reflect an understandable reluctance to admit unlawful weapons possession to federal government interviewers in the context of a nonanonymous interview.

We believe that reporting large but nonsignificant coefficients is appropriate, in the spirit of exploratory findings. Just as qualitative research, based on case studies, life histories or informal interviewing of small nonprobability samples of informants, has yielded valuable insights, findings based on small samples of crime victims reporting less common methods of self-protection likewise merit dissemination, as long as readers understand that the estimates could be a product of chance.

Regardless, the effect of limited variation on the armed resistance variables is that standard errors of their coefficients are so large that even the largest coefficients are nonsignificant. For example, the robbery model coefficient for "attack with gun" is enormous, but is based on just six sample cases of robbery victims taking this SP action, none of whom suffered post-SP injury (Table 2). Thus, this coefficient was not statistically significant. Among robberies, all of the four largest negative SP coefficients were linked with armed resistance, yet none were statistically significant. That is, the injury-preventing effects of armed resistance appear to be larger than all other protective actions, yet estimates of these effects are unstable and imprecise.

We estimated variants of the models in Table 5 in which a single variable measured whether victims used any of the four types of armed resistance and was used in place of the four separate armed resistance variables. Coefficients for this variable were still nonsignificant in all models (results not shown in tables). The estimate closest to significance was in the post-SP models for robbery incidents. The coefficient for the armed resistance variable was a larger negative than the coefficient for any other protective measure, and equaled -1.893, implying that victims who used weapons to resist robbery have only 15.1 percent of the risk of subsequent injury prevailing among victims who called the police, other things being equal. But even this coefficient was significant at only the .076 level, 1-tailed.

Several types of unarmed resistance, some forceful and some nonforceful, are associated with significantly higher post-SP injury rates than calling the police: (1) physically attacking the offender, but without a weapon, (2) physically struggling, (3) stalling or pretending to cooperate, (4) arguing/reasoning/pleading and (5) screaming from fear or pain. Once again, there is no pattern regarding the distinction between forceful and

nonforceful actions. All of these actions, however, have in common something that could provoke offender attack: they all create problems for the criminal that could be solved by attacking the victim. When dealing with victims who attack or struggle with them, offenders can stop the victims by injuring them and might even consider such action "defensive." Inflicting injury might also be effective in forcing victims who had been stalling to begin cooperating. It might also be perceived as a way to silence victims screaming in fear or pain. Alternatively, screaming may simply anger or panic offenders into thinking that the noise might lead to bystanders intervening or summoning the police.

It should, however, be stressed that these are assessments of relative injury-producing effects and that the Table 2 figures indicates that in absolute terms, post-SP injury is extremely rare for all SP actions. Thus, even large relative differences in injury risk generally imply only small absolute differences.

## SERIOUS POST-SP INJURY

As evident in Table 2, fewer than one-quarter of the injuries inflicted in crimes are more serious than bruises or cuts. Yet because serious injury is probably what victims fear most, focusing on injury without respect to its seriousness fails to address what people care most about. Findings on the impact of victim actions on injury in general, most of which is no more serious than bruises and cuts, might not apply to SP effects on serious injury. For example, some forceful methods might be effective in avoiding more serious injury but themselves cause minor injury, as when a victim cuts his hand while striking the offender. Therefore we also assessed the effects of resistance on more serious injury. In these analyses, victims who suffered more serious injuries after taking protective actions were coded 2, and those who suffered exclusively minor injuries or no injuries after taking protective actions were both coded 1. As in the examination of all post-SP injury, this analysis was confined to victims who had taken some kind of protective action, because the concept of post-SP injury is not applicable to those who took no SP actions. The omitted SP action category was once again "called the police."

Victim SP actions are followed by serious injury in only 0.7 percent of confrontational crimes (Table 2, All Offenses column, Any SP row). Because serious post-SP injury is extremely rare, there is virtually no variation to explain. Combined with the rarity of some defensive actions, especially armed resistance, estimates of impact on serious injury are highly unstable, reflected in the low ratios of coefficients over standard errors shown in Table 6. These estimates are therefore presented in the

spirit of exploratory findings and should be read in conjunction with Table 2 information on the frequency of each defensive action.

Even very large coefficients for protection variables were often not significant because of the action's rarity. For example, based on their very large negative coefficients, attacking or threatening the offender with a gun appears to be almost totally effective in avoiding serious injury. The estimates of their effects are not significant, however, because they were based on only forty-five sample cases of attacking with a gun and 202 of threatening with a gun, in a sample where serious injury after defensive

**Table 6. Serious Injury after SP Action**

| | All Types of Crime | | Robbery | | Assault | | Confrontational Burglary | |
|---|---|---|---|---|---|---|---|---|
| *Victim's Self-Protection* | | | | | | | | |
| Attack with Gun | -16.543 | (-0.00) | -15.912 | (-0.00) | -16.069 | (-0.00) | -9.716 | (0.00) |
| Threat with Gun | -0.454 | (-0.41) | -15.226 | (-0.00) | 0.580 | (0.52) | -18.139 | (0.00) |
| Attack with nongun weapon | 0.018 | (0.02) | -1.373 | (-0.53) | 0.176 | (0.16) | -106.511 | (-0.02) |
| Threat with nongun weapon | 0.025 | (0.03) | -14.595 | (-0.00) | 0.351 | (0.38) | -29.267 | (0.00) |
| Attack without weapon | 1.168* | (5.00) | 3.836* | (4.76) | 0.691 | (1.90) | -60.528 | (-0.02) |
| Threat without weapon | -0.440 | (-0.65) | -17.795 | (-0.00) | -0.131 | (-0.16) | -61.822 | (-0.01) |
| Struggled | 1.029* | (4.99) | 1.560 | (2.26) | 1.001* | (3.14) | 43.032 | (0.02) |
| Chased, held offender | -0.677 | (-0.87) | 0.651 | (0.60) | -15.680 | (-0.01) | -72.550 | (-0.02) |
| Yelled, turned on lights | -0.110 | (-0.38) | 0.082 | (0.08) | 0.085 | (0.18) | -21.407 | (-0.01) |
| Stalled, pretended to cooperate | 0.883 | (2.13) | 0.751 | (0.73) | 0.802 | (1.00) | -58.006 | (-0.01) |
| Argued, reasoned, pleaded | 0.474 | (1.85) | 0.817 | (0.87) | -0.557 | (-1.06) | -32.790 | (-0.01) |
| Ran away, hid | -0.561 | (-1.82) | -1.044 | (-0.86) | 0.021 | (0.05) | 0.657 | (0.00) |
| Tried to attract attention | -1.335 | (-1.54) | -19.940 | (-0.26) | -15.907 | (-0.01) | 18.300 | (0.00) |
| Screamed from pain or fear | 1.444* | (3.52) | 3.946* | (3.43) | -0.277 | (-0.18) | 31.363 | (0.01) |
| Other SP strategies | 0.101 | (0.36) | 2.351* | (3.24) | -0.380 | (-0.82) | -54.514 | (-0.01) |
| *PowerDifference* | | | | | | | | |
| ADVSEXOF | 0.787* | (3.74) | -0.455 | (-0.58) | 0.017 | (0.05) | 14.560 | (0.01) |
| ADVAGEOF | 0.528** | (2.42) | 0.093 | (0.14) | 0.848* | (2.78) | 32.883 | (0.02) |
| ADVNUM | 0.064** | (2.57) | 0.038 | (0.42) | 0.071 | (2.48) | 1.362 | (0.01) |
| *Offender Weapons and Attack* | | | | | | | | |
| OHADGUN | 0.897* | (3.26) | 2.130* | (2.91) | 0.491 | (1.09) | -150.691 | (-0.02) |
| OHADKNIF | 0.634** | (2.16) | 1.081 | (1.37) | 0.744 | (1.83) | 44.741 | (0.02) |
| OHADSHAP | 1.489* | (3.40) | 3.469* | (3.18) | 1.218 | (1.70) | 41.528 | (0.00) |
| GOTINHOM | -16.530 | (-0.01) | - | | - | | -21.001 | (-0.01) |
| GOTINCAR | -16.022 | (-0.00) | - | | - | | 0.209 | (0.00) |

*p<0.01 (two-tailed) ** 0.01<P<0.05 (two-tailed)

**Table 6. Serious Injury after SP Action (continued)**

| | All Types of Crime | | Robbery | | Assault | | Confrontational Burglary | |
|---|---|---|---|---|---|---|---|---|
| *Victim Characteristics* | | | | | | | | |
| HADCHILD | 0.133 | (0.65) | -1.297 | (-1.90) | -0.174 | (-0.59) | -12.233 | (0.00) |
| HOUSOWN | -0.427 | (-1.79) | -1.635 | (-1.92) | -0.237 | (-0.72) | 4.107 | (0.00) |
| EMPLOYED | -0.094 | (-0.43) | 0.677 | (0.98) | -0.603 | (-1.90) | 35.804 | (0.02) |
| OLD65 | -0.931 | (-0.78) | -15.244 | (-0.00) | -15.507 | (-0.00) | 27.137 | (0.02) |
| MARRIED | -0.371 | (-1.42) | 0.015 | (0.02) | -0.151 | (-0.41) | -13.433 | (-0.01) |
| EDUCATIN | 0.016 | (0.93) | -0.010 | (-0.19) | -0.003 | (-0.10) | -1.069 | (-0.01) |
| ARMFORCE | -15.891 | (-0.00) | -15.968 | (-0.00) | -15.232 | (-0.00) | 29.608 | (0.00) |
| BLACK | 0.262 | (0.94) | 2.387* | (3.28) | -0.179 | (-0.40) | 6.520 | (0.00) |
| ASIAN | -1.013 | (-0.89) | -15.319 | (-0.00) | -15.464 | (-0.01) | 24.688 | (0.00) |
| HISPANIC | 0.752* | (2.88) | 0.545 | (0.58) | 1.160* | (3.37) | -16.435 | (-0.01) |
| NUMVICEX | -0.207** | (-1.98) | 0.054 | (0.98) | -0.522 | (-2.04) | -7.050 | (0.00) |
| NUMHOUSE | -0.056 | (-0.24) | -0.572 | (-0.85) | -0.133 | (-0.38) | -25.946 | (-0.02) |
| *Offender Characteristics* | | | | | | | | |
| OFDGANG | 0.009 | (0.03) | 0.380 | (0.41) | 0.068 | (0.16) | 32.478 | (0.02) |
| OFDSUBST | 0.262 | (1.32) | 0.396 | (0.65) | 0.455 | (1.57) | -16.105 | (-0.01) |
| OFDFAMIL | 0.115 | (0.26) | -1.490 | (-0.78) | 1.114 | (2.03) | 15.726 | (0.00) |
| OSEXINTI | -0.421 | (-1.15) | -0.193 | (-0.15) | 1.257 | (2.40) | -11.353 | (0.00) |
| OSUPERIOR | 1.077 | (1.62) | -16.101 | (-0.00) | -0.632 | (-0.39) | -33.955 | (0.00) |
| OFDACQNT | 0.145 | (0.56) | 0.387 | (0.47) | 0.111 | (0.30) | 3.316 | (0.00) |
| OWORKACQ | 0.310 | (0.61) | -15.693 | (-0.00) | 1.094 | (1.85) | 2.288 | (0.00) |
| OFDBLACK | 0.331 | (1.08) | -0.547 | (-0.72) | 0.570 | (1.33) | 82.758 | (0.04) |
| OFDWHITE | -0.174 | (-0.60) | -0.803 | (-0.80) | -0.112 | (-0.28) | 58.376 | (0.03) |
| *Incident Circumstances* | | | | | | | | |
| RURAL | 0.000 | (0.00) | -0.709 | (-0.51) | 0.276 | (0.69) | -27.641 | (-0.01) |
| URBAN | -0.046 | (-0.22) | -0.762 | (-1.26) | 0.231 | (0.73) | -31.547 | (-0.03) |
| ATHOME | 0.675** | (2.12) | 2.035 | (1.67) | -0.005 | (-0.01) | - | |
| NEARHOME | 0.463 | (1.76) | -0.247 | (-0.29) | 0.457 | (1.20) | - | |
| SECUPUB | -0.013 | (-0.04) | 0.322 | (0.37) | 0.209 | (0.53) | - | |
| FAMIPRES | -0.002 | (-0.01) | 0.928 | (0.96) | 0.987** | (2.10) | 36.479 | (0.02) |
| OTHRPRES | -0.087 | (-0.38) | 0.506 | (0.73) | 0.821 | (1.90) | -13.490 | (0.00) |
| Sample size | 15,233 | | 1,251 | | 12,329 | | 1,041 | |
| -2 Log-likelihood | 1,239 | | 138 | | 625 | | 0 | |

\* p<0.01 (two-tailed) \*\* 0.01<P<0.05 (two-tailed)

action was almost nonexistent. Indeed, the coefficients for attacking with a gun were nonsignificant even though not a single victim taking this action was seriously injured after doing so. Similarly, even though none of the thirty-eight victims in the sample who reported threatening the offender with a gun in a confrontational burglary suffered injury of any kind after taking this action, its coefficient in the serious post-SP injury model, though large (-18.139), was still not statistically significant. Estimating effects of victim gun use in sexual assaults was impossible because there were no sample cases of sexual assault victims attacking their offender with a gun and only one case of a victim even threatening with a gun.

With these caveats in mind, the effectiveness of most victim actions was not significantly different in averting serious injury from calling the police.

At least, the NCVS does not provide enough basis to reliably estimate differences in their effects. All victim actions are associated with a near-zero probability of suffering serious post-SP injury, a conclusion foreshadowed by the Table 2 figures indicating that only 0.7 percent of victims using self-protective actions of any kind suffered any serious injury after doing so. Only three defensive actions were associated with significantly different risks of serious injury compared to calling the police: attacking the criminal without a weapon, physically struggling with the offender and screaming from pain or fear. These three actions are associated with fairly large relative differences in the risk of serious injury; for example, victims who screamed were 4.7 times more likely to later suffer serious injury than those who called the police. But even large relative differences in risk do not imply substantial absolute differences in risks, given that the overall risk of serious post-resistance injury among the reference category victims was one-fifth of 1 percent (Table 2).

## COMPARING THE IMPACT OF SP WITH NO SP

An alternative way to perform the post-SP injury analyses is to include no-SP cases, that is, crimes in which the victim did not take any SP actions. We estimated models in which post-SP injury was coded 2 if (a) the victim took some SP action and was injured afterwards, or (b) took no SP and was injured. This variable was coded 1 if (a) the victim took SP action and was not injured, (b) took SP action and was injured, but before SP actions, or (c) took no SP action and was not injured. Cases in which the victim reported that SP actions and injury occurred simultaneously were treated as missing, because it was impossible to establish SP-injury sequence in these incidents.

Thus, in this alternative analysis, victims who took no SP actions but were injured were treated as valid cases and coded the same as those who took action and were injured. It is reasonable to treat these two situations as similar if one takes seriously the possibility that nonresistance can provoke an offender into attacking, just as victim resistance might. Passivity can send the message that the offender is free to attack or steal with little risk or difficulty. All cases were included in the alternative analyses, and no SP was treated as the excluded category. Thus, coefficients for SP variables can be interpreted as a comparison between each SP action and taking none.

Table 7 reports results of these analyses. For convenience, the Model 1 column displays the Table 5 All Offenses estimates obtained when no-SP incidents were excluded from the post-SP injury analysis. Model 2 estimates were those obtained when no-SP cases were included and those involving injury were coded the same as those involving SP action and

subsequent injury. The SP coefficients in the Model 2 column of Table 7 are directly comparable with those in Table 4 because no-SP cases were included in the samples and no SP is the omitted category in both analyses. This comparison directly establishes the effects of taking the sequence of injury and SP actions into account, because this is the only difference between the Table 7 Model 2 analysis and the Table 4 All Types of Crime analysis. Without exception, every SP coefficient moved in a negative direction when sequence was taken into account (Table 7 vs. Table 4). This indicates that past research failing to address SP-injury sequence consistently understated injury-preventing effects of victim resistance, or created a misleading impression of risk-elevating effects.

**Table 7. Effect of Including No-SP Cases**

Logit Coefficient (ratio, coef./SE)
Injury After SP Action

| | Model 1[+] | | Model 2[++] | | Model 3[+++] | |
|---|---|---|---|---|---|---|
| | No-SP Cases Out | | No-SP Cases In | | No-SP Cases In | |
| | No SP = missing | | No SP & injured = Injured after SP action | | No SP & injured = Not injured after SP action | |
| Attack with Gun | 0.471 | (0.55) | -1.051 | (-1.23) | 0.594 | (0.69) |
| Threat with Gun | -0.517 | (-0.85) | -2.055[*] | (-3.43) | -0.055 | (-0.10) |
| Attack with Nongun Weapon | 0.049 | (0.12) | -1.570[*] | (-3.72) | 0.296 | (0.84) |
| Threat with Nongun Weapon | -0.993 | (-1.51) | -2.687[*] | (-4.11) | -1.722[**] | (-2.56) |
| Attack without Weapon | 0.597[*] | (4.63) | -1.024[*] | (-9.31) | 0.869[*] | (8.41) |
| Threat without Weapon | -0.060 | (-0.21) | -1.173[*] | (-4.26) | 0.430 | (1.93) |
| Struggled | 0.881[*] | (8.20) | -0.746[*] | (-8.98) | 1.126[*] | (13.43) |
| Chased, held Offender | -0.126 | (-0.41) | -1.223[*] | (-4.17) | 0.273 | (1.10) |
| Yelled, turned on Lights | 0.026 | (0.18) | -1.196[*] | (-8.95) | 0.444[*] | (3.95) |
| Stalled, Pretended to Cooperate | 0.678[*] | (2.89) | -0.696[*] | (-3.14) | 1.309[*] | (7.31) |
| Argued, Reasoned, Pleaded | 0.365[*] | (2.72) | -1.176[*] | (-9.83) | 0.906[*] | (8.97) |
| Ran away, hid | -0.424[*] | (-2.83) | -2.102[*] | (-16.03) | 0.239 | (2.13) |
| Tried to Attract Attention | -0.267 | (-0.82) | -1.072[*] | (-3.41) | 0.208 | (1.05) |
| Screamed from Pain or Fear | 0.925[*] | (3.42) | 0.670[*] | (2.47) | 0.892[*] | (5.73) |
| Other SP Strategies | 0.140 | (1.03) | -1.713[*] | (-15.47) | 0.628[*] | (5.57) |
| Call the Police | n/a | | -2.692[*] | (-10.77) | -0.697[*] | (-3.84) |
| N | 15,233 | | 22,566 | | 25,528 | |

[*] p<0.01 (two-tailed) [**] 0.01<P<0.05 (two tailed)
[+] In Model 1, omitted (reference) category is "called the police."
[**] In Model 2, omitted (reference) category is "no SP."
[+++] In Model 3, omitted (reference) category is "no SP."

When no-SP cases are included, all but one of the SP actions have negative coefficients in models of both injury and serious injury (the exception is the ambiguous "screamed from pain or fear"). Thus virtually any form of victim resistance is associated with lower rates of post-SP injury than nonresistance, though there is no longer any clear pattern regarding whether forceful or nonforceful actions are more effective. In Table 7, the appearance of support for the view that crime victims should refrain from resisting crime has essentially disappeared.

896                              TARK AND KLECK

The Model 2 coding procedure, however, biases results against the no-SP option by effectively treating all cases in which victims did not resist but were injured as incidents in which nonresistance provoked offenders to attack and injure the victim. A final alternative analysis was based on the sample with no-SP cases included, but used an opposite coding scheme. In Model 3, no-SP incidents in which the victim was injured were all coded as not injured after SP, that is, were effectively all treated as if nonresistance never provoked offenders to attack and injure the victim. Not surprisingly, this procedure has the opposite effect on estimates, making most SP methods look more likely to result in injury than nonresistance. Because the Model 2 and Model 3 analyses are both based on extreme assumptions about the effects on injury of nonresistance, we prefer the estimates reported in Table 5, in which no-SP cases were simply excluded.

EXCLUSION OF FATAL INCIDENTS

The NCVS does not include crimes in which the victim was killed. Could including them alter these injury findings? In one sense the answer is "no," because there are so few fatal cases. In 2001, the United States experienced, based on NCVS estimates, at least 5,315,500 nonfatal violent crimes. There were in the same year, based on Uniform Crime Reports data, 15,980 fatal incidents—that is, murders and non-negligent manslaughters (U.S. Bureau of Justice Statistics, 2003b; U.S. Federal Bureau of Investigation, 2002). This implies a ratio of 0.00306 fatal per nonfatal crimes. Thus, if fatal crimes had been included in our sample of 27,595 nonfatal violent crimes, about eighty-three cases of fatal injury would also have been included, in addition to the 6,650 nonfatal ones in our sample (0.00306 x 6,650 = 83). The overall injury rate in our sample might therefore have increased, from the observed 24.1 percent (Table 2, All Offenses, percent Injured column) to no more than 24.3 percent ((6,650+83)/(27,595+83)=.243). It is thus highly unlikely that our estimates of SP effects on injury could have been materially affected.

In another sense, data on fatal incidents might lead to different results if they were analyzed separately and SP effects on fatal injury were found to be significantly different from effects on nonfatal injury. While separate analysis of SP in homicides could be worthwhile, there is currently no empirical evidence that victim SP actions increase the chances of the victim being murdered. Nor do we know of any sound theoretical reason why any SP actions would increase the risk of fatal injury but not the risk of nonfatal injury.

### INCLUDING INCIDENTS IN WHICH SP AND INJURY OCCURRED "SIMULTANEOUSLY"

In our analyses of post-SP injury, we excluded cases in which SP actions and injury occurred at the same time, on the grounds that, even if the two events were not truly simultaneous, it could not be determined whether injury followed the SP action. Two options on handling such cases are to include them in the analyses but arbitrarily code them as either (a) cases of SP followed by injury, or (b) cases of injury followed by SP. We repeated the post-SP injury analyses using these two strategies. The results (not shown) were not significantly different from those reported in Tables 5 and 6, except that the coefficient for threat with a gun became significant and negative, indicating that this action is associated with lower rates of injury, other things being equal, than calling the police.

### THE CIRCUMSTANCES IN WHICH DIFFERENT SP ACTIONS WERE TAKEN

Although we exploited the rich NCVS dataset by controlling for all available potentially confounding variables, we could not completely avoid the omitted variables problem. It is almost certain that variables are omitted from our models that affect crime outcomes but are also associated with the use of various defensive actions. Even those measured in the NCVS dataset suggest that victims who took some courses of action may have been able to do so only because they faced more favorable circumstances, while other victims may have taken certain actions only because they were compelled to by desperate circumstances.

Table 8 presents descriptive information about the crimes in which various types of protective action were taken. The results indicate that, contrary to the speculations of Reiss and Roth (1993), victims who used weapons, especially guns, faced more dangerous circumstances than other victims. Although weapon users were more likely to be on home territory, they were also more likely to be outnumbered, to face more physically vigorous offenders, to confront offenders with knives, and to face offenders with guns. And, perhaps most important of all, victims who used weapons to attack were more likely to have already suffered an injury: 13.3 percent of victims who attacked with a gun and 19.1 percent of those who attacked with some other weapon were already injured, compared to 7.9 percent of victims using all SP methods combined. Thus victims who used armed resistance experienced lower risks of property loss or serious injury despite facing otherwise more disadvantageous circumstances. If there are still other such adverse circumstances not measured in the NCVS for which we therefore could not control, it suggests that our analyses may understate the injury-reducing effects of armed resistance.

**Table 8. Circumstances of Confrontation by Type of Self-Protection, in Percentage**

| | Frequency | Offender Advantage | | | Offender Had | | Victim Was | | Location | | Multiple Self-Protection |
| --- | --- | --- | --- | --- | --- | --- | --- | --- | --- | --- | --- |
| | | Age | Sexual | Numeric | Gun | Knife | Male | Injured | Home | Public* | |
| Attacked with Gun | 45 | 31.8 | 20.0 | 28.9 | 28.9 | 20.0 | 80.0 | 13.3 | 29.5 | 35.6 | 37.8 |
| Threatened with Gun | 202 | 36.1 | 25.2 | 24.1 | 21.3 | 17.3 | 71.8 | 5.0 | 25.2 | 42.1 | 36.1 |
| Attacked w Nongun Weapon | 230 | 23.5 | 26.2 | 13.5 | 6.5 | 17.0 | 63.5 | 19.1 | 23.9 | 43.7 | 44.3 |
| Threatened w Nongun Weapon | 232 | 20.2 | 31.0 | 12.1 | 5.2 | 15.9 | 61.6 | 4.7 | 27.5 | 47.0 | 42.2 |
| Attacked without Weapon | 2,661 | 15.4 | 22.9 | 11.4 | 3.3 | 7.9 | 63.5 | 16.0 | 16.3 | 57.3 | 37.7 |
| Threatened without Weapon | 540 | 20.2 | 15.9 | 11.1 | 4.1 | 7.4 | 70.9 | 6.1 | 15.0 | 51.3 | 57.6 |
| Struggled | 4,984 | 17.5 | 30.9 | 12.7 | 3.8 | 6.1 | 57.5 | 11.6 | 20.7 | 51.0 | 44.8 |
| Chased, Held Offender | 517 | 27.1 | 19.1 | 12.2 | 7.0 | 6.8 | 73.7 | 10.8 | 21.5 | 52.4 | 56.2 |
| Yelled, Turned on Lights | 2,492 | 21.1 | 52.8 | 13.6 | 4.2 | 5.2 | 36.3 | 8.0 | 29.8 | 39.4 | 61.7 |
| Stalled, pretended to Cooperate | 535 | 20.7 | 33.6 | 21.8 | 29.2 | 8.8 | 61.7 | 6.5 | 18.1 | 58.5 | 47.1 |
| Argued, Reasoned, Pleaded | 2,700 | 16.8 | 37.7 | 7.4 | 7.2 | 5.0 | 50.3 | 6.0 | 23.9 | 45.7 | 49.0 |
| Ran Away, Hid | 3,807 | 20.3 | 39.7 | 20.2 | 13.1 | 6.7 | 49.8 | 9.2 | 13.5 | 56.2 | 33.5 |
| Called Police or Guard | 1,990 | 23.4 | 50.9 | 11.1 | 8.0 | 5.3 | 37.6 | 9.5 | 37.5 | 30.2 | 53.7 |
| Tried to Attract Attention | 567 | 18.3 | 53.9 | 16.9 | 7.2 | 6.5 | 31.7 | 11.8 | 18.2 | 54.3 | 76.4 |
| Screamed from Pain or Fear | 569 | 15.8 | 75.6 | 11.2 | 6.5 | 7.6 | 13.3 | 19.9 | 45.2 | 30.4 | 84.9 |
| Other SP Strategies | 4,149 | 24.5 | 30.5 | 11.8 | 6.1 | 5.6 | 57.1 | 5.1 | 14.4 | 55.0 | 26.1 |
| Victim used Weapons in Public | 301 | 27.3 | 14.3 | 23.9 | 12.0 | 19.0 | 82.3 | 6.7 | 0 | 100 | 34.1 |
| Victim used Single SP | 14,636 | 21.0 | 30.5 | 13.3 | 7.1 | 6.0 | 57.7 | 6.7 | 15.8 | 54.5 | 0 |
| Victim used Multiple SP | 4,882 | 19.4 | 41.8 | 13.6 | 7.2 | 6.8 | 47.3 | 11.7 | 25.6 | 45.1 | 100 |
| Victim used Any SP | 19,519 | 20.6 | 33.3 | 13.4 | 7.1 | 6.2 | 55.1 | 7.9 | 18.3 | 52.1 | 25.0 |
| Victim used No SP | 8,077 | 21.8 | 30.7 | 13.9 | 10.8 | 4.5 | 56.1 | – | 15.8 | 57.1 | 0.0 |
| Total Incidents | 27,595 | 21.0 | 32.5 | 13.5 | 8.2 | 5.7 | 55.4 | 5.6 | 17.6 | 53.6 | 17.7 |

* "Near victims own home" or "at, in, or near a friend's or relative's or neighbor's home" were not included.

On the other hand, victims also often resorted to the least forceful protective measures (cooperate or run) when circumstances were very adverse (offenders had guns). One interpretation is that victims in the most adverse situations may be forced to choose either extremely forceful responses or submission because they believe that less forceful actions would be inadequate.

### ARE EFFECTS OF PROTECTIVE ACTIONS CONTINGENT ON OTHER CONDITIONS?

It has been suggested that the effectiveness of different defensive actions may depend on a variety of conditions under which they are used. Researchers have explored whether effectiveness depends on the victim's sex, whether the offender is an intimate of the victim (Ruback and Ivie, 1988; Bachman et al., 2002), offense location (home/nonhome, indoor/outdoor), offender intoxication and offender weapon possession (Ullman and Knight, 1993; Bachman and Carmody, 1994), with highly inconsistent results (Bachman et al., 2002). Although there was no strong a priori rationale for testing any one interaction, we tested each of these possibilities by forming multiplicative interaction terms between each of the sixteen protection variables and each of the aforementioned variables on which protective effects supposedly depend, and including each set of sixteen multiplicative terms (involving a single conditioning variable) in the property loss, post-SP injury and serious post-SP injury models. Thus, for example, when we tested whether SP actions interact with whether the crime occurred in the victim's home (ATHOME), the model included ATHOME x GUNATACK, ATHOME x GUNTHREAT, and so on, in addition to the rest of the variables shown in Tables 3-6. Or, when we tested for whether SP actions interact with whether the offender was armed (OFDWEAPON), the model included OFDWEAPON x GUNATACK, OFDWEAPON x GUNTHREAT, and so on, in addition to the rest of the variables shown in Tables 3 through 6.

In the post-SP injury models, the coefficients of these interaction terms were rarely significantly different from zero. No more than one out sixteen interaction variables had a significant coefficient in any one model, and one would expect one coefficient to be "significant" at the .05 level solely as a result of chance, due to the large number of hypothesis tests. Further, the signs of the coefficients were as likely to be contrary to theoretical expectations as consistent with them. In particular, we found no support for the notion that forceful resistance increased injury risks for women when they faced adversaries who were intimates, as Bachman and her colleagues asserted (2002). On the whole, the effects of victim actions on injury do not appear to significantly vary with victim or offender sex,

victim-offender relationship, crime location, victim's age, offender intoxication, number of offenders or offender weapons.[3]

The only mildly distinct indications of meaningful interactions all pertained to property loss. Defensive actions appeared to be more effective in preventing property loss when the crime occurred in the victim's home or indoors, and less effective when the offender was armed, under the influence of alcohol or other drugs, or was an intimate of the victim. We could, of course, have dredged the data for evidence of three-way and even four-way interactions (for example, SP action by victim-offender relationship by sex by crime type) as well, but there is no strong theoretical rationale for examining any particular interactions of this order. And examining tens of thousands of possible interactions could serve no useful purpose since large numbers of seemingly "significant" associations would inevitably be generated by chance, due to the enormous number of hypothesis tests (see Selvin and Stuart, 1966 for a classic critique of data dredging and ex post facto hypothesis testing).

## DISCUSSION

Both past and present evidence has consistently supported the view that a wide variety of defensive actions reduce the risk of a rape attempt being completed (see the extensive review by Ullman, 1997), of a robbery attempt being completed, that is, the robber escaping with the victim's property (Table 3 and the review of earlier robbery studies in Kleck and DeLone, 1993), or of a burglary attempt being completed (Table 3 and Cook, 1991). Skepticism about the wisdom of victim resistance, then, has largely revolved around whether resistance increases the risks of injury to the victim. But based on close analysis of the largest nationally representative sample of crime incidents available, few forms of self-protection and no forms of armed resistance provoke criminals into attacking and injuring resisting victims in substantial numbers of crimes. Impressions to the contrary in past research rely almost entirely on analyses that failed to distinguish between resistance preceding and following injury, or used samples biased by the exclusion of crimes in which victims resisted successfully. Both problems have been reduced in this research, the first because recent versions of the NCVS record the SP-injury sequence, and the second because the NCVS covers a large

---

3. Incidents with victims who used weapons in public places would seem to be especially interesting because these victims may carry weapons in public habitually. We found, however, that these incidents looked pretty much the same as other incidents involving armed self-protection, except, of course, that they all occurred in public places (see Table 8).

probability sample of crimes, at least among those victims who are willing to report them to government interviewers.

Once these sources of distortion are reduced or eliminated, little evidence remains for the claim that resistance angers offenders into attacking victims. When victims who resist are hurt, it was almost always injury that came first. Post-resistance injury occurs in fewer than 3 percent of personal contact crimes in which victims resist. The few injuries that are inflicted are usually no more serious than cuts and bruises. These conclusions apply across all crime types and do not depend on the victim-offender relationship, crime location, victim or offender sex, victim's age, offender intoxication or offender weapon possession.

The NCVS does have some important limitations. Cases of successful victim resistance are probably underrepresented in NCVS samples because respondents tend not to report incidents in which they suffered no harm. This is probably especially true when their protective actions involved the use of unlawfully possessed weapons. Victim resistance may therefore be even more effective than it appears in NCVS samples. Also, because victims are interviewed as long as 6 months after the crime, they may forget or misrecall more information than victims speaking to police or victim counselors immediately after the event. We are, however, not aware of any evidence that such recall failure would distort estimates of the relative effectiveness of SP actions.

## CONCLUSION

All evidence is flawed, and there will always be more evidence developed by later research. Thus one can always cite these facts to justify refraining from drawing any firm conclusions from research, and issue the standard call for more research. While more research is always good, from the standpoint of those who need information to make real-world choices in the near term, this is not a helpful position for scholars to adopt. We believe that as long as some sound research has been conducted, scholars should draw conclusions, accompanied by appropriate caveats about the limits of the data, based on the best evidence available at the time. This seems reasonable if for no other reason than that this is the only course scholars will ever be able to follow, regardless of how much more research is done or how high its quality. Evidence will never be either perfect or complete, so conclusions based on imperfect and incomplete information are the only kinds of conclusions that can ever be drawn.

One might take the position that offering advice to prospective victims is risky because the advice might prove ill-founded, and that refraining from offering advice is therefore more prudent. Refraining, however, has its own consequences. Failing to provide advice that, if followed, would

have helped save a life can cost a life. Likewise, failing to offer advice that would have blocked a rape, prevented crippling injury or otherwise averted harm can passively contribute to those harms coming to pass. Declining to make recommendations may seem like a course that entails less responsibility, but this impression is illusory, because choosing to not act can have consequences as serious as choosing to act. A wealth of evidence indicates that nonresistance is not always the safest course of action for crime victims, implying that some prospective victims who continue believing that nonresistance is the safest course will be hurt because no one did anything to correct their misapprehensions.

It is in this light that we offer tentative advice to potential victims. While there are exceptional situations, victim resistance is usually either successful or inconsequential, and on the rare occasions that it is harmful, it is rarely seriously so. Therefore, unless there are circumstances that clearly indicate resistance will lead to significant harm, the evidence reported in this paper indicates that some form of resistance should be the path generally taken. This does not mean resistance always works, or that it can, by itself, make victims completely safe, since violent crime is dangerous for reasons having nothing to do with victim actions. Rather, it means that resistance will generally either make things better for the victim (for example, less chance of rape completion or property loss) than they would have been without resistance, or do no harm.

Which victim actions produce the best results will depend on the resources and options available. Many actions are impossible in certain circumstances, which undoubtedly explains why victims sometimes do not act. Nearly all forms of resistance help avert property loss. Research indicates that most also help rape victims avoid rape completion. Regarding impact on injury, some research appeared to indicate a pattern in which nonforceful resistance was more effective than forceful, and the latter was even counterproductive. Once one takes account of the sequence of injury and SP, however, no such pattern is evident. Various kinds of forceful victim protective behavior, such as threatening the offender with a gun or other weapon, show the strongest negative coefficients, though none are significant. A conservative interpretation would be that armed and other forceful resistance does not appear to increase the victim's risk of injury. Most of the SP tactics that appear to have higher risks than calling the police are nonforceful: stalling, arguing and screaming from pain or fear (though this may reflect an effect of injury rather than a cause). Resistance with a gun appears to be most effective in preventing serious injury, though this finding is not statistically significant due to the small number of reported gun uses.

Although the data strongly indicate that armed resistance is the most effective tactic for preventing property loss, it is not as clear which SP

strategy is most effective in averting injury. This is partly because injury following resistance actions is so rare that there is little room for injury rates to vary much across types of victim action. But there is also ambiguity because the circumstances under which victims adopt SP actions differ substantially across types of resistance. Armed resistance, for example, tends to be adopted under circumstances that were more perilous for the victim to begin with, which could obscure some of the injury-preventing effects of these SP actions. While NCVS data allow us to control for some of these circumstances, they do not permit control for all of them. It is reasonable to expect that unmeasured circumstances would tend to show the same patterns as NCVS-measured ones, with the same effects on estimates of injury-preventing effects. Future research should more completely account for crime circumstances that advantage or disadvantage victims in avoiding injury.

While some forms of resistance, mostly nonforceful, appear to increase the risk of injury, the injuries that result are almost always no more serious than bruises and cuts. And still other victim actions have no significant effect on injury. These relative differences, however, are less important than the more general fact that serious injury almost never follows resistance, of any kind, in any type of crime. That is, because resistance appears to be effective in averting further significant harm, or is at worst inconsquential, the question of which particular types of resistance are more effective becomes arguably secondary.

For some, to say that resistance almost never leads to victim injury is not a good enough assurance. The NCVS cannot detect incidents in which victim actions lead to their death. It could be argued that if resistance leads to death in even a few crimes, then resistance is tragically foolish behavior even if it often prevents rape completion, nonfatal injury or property loss. This argument, however, is strictly conjectural. There is no sound empirical evidence that resistance does provoke fatal attacks. The evidence we do have indicates that resistance almost never provokes attacks resulting in serious (nonfatal) injury. The argument is also unrealistically one-sided, because it ignores the possibility that resistance can save lives. Invoking the value of human lives does not necessarily favor those who counsel nonresistance or decline to offer advice any more than it favors those who counsel resistance.

It also seems unlikely that a given form of victim resistance, such as with a gun, would have no impact on serious injury (as found in this research) yet increase the risk of fatal injury. One might nevertheless speculate that offenders confronted with gun-wielding victims might believe that only killing the victim would ensure their own safety, resulting in killings of such victims but few nonfatal injuries. There should be at least a few offenders in this situation who would be satisfied with inflicting

incapacitating yet nonfatal injury, in which case we should have found an effect of victim gun use on serious nonfatal injury. We did not. In any case, we know of no empirical evidence that any significant number of victims have been killed after using weapons in self-defense.

It is possible that a given form of victim resistance is already being used by crime victims in all the circumstances in which it is effective and safe to do so, and that if those SP actions were taken in different circumstances they might produce more harmful outcomes for the victim. Our tests of interactions suggest that various modes of resistance do not vary significantly in their effectiveness across crime circumstances, insofar as we are able to measure circumstances using NCVS data. Although this tends to undercut the hypothesis that SP actions would be less effective were they adopted in different circumstances, such evidence cannot definitively rule out any hypothesis concerning SP actions taken under conditions substantially different from those of the past.

Future research might bring better evidence that contradicts these conclusions. At present, however, the best available evidence indicates that victim resistance to crimes is generally wise.

# REFERENCES

Akers, Ronald L.
    1985    *Deviant Behavior: A Social Learning Approach.* Belmont, CA: Wadsworth.

Amir, Menchim.
    1971    *Patterns in Forcible Rape.* Chicago: University of Chicago Press.

Bachman, Ronet, Linda E. Saltzman, Martie P. Thompson and Dianne C. Carmody
    2002    Disentangling the effects of self-protective behaviors on the risk of injury in assaults against women. *Journal of Quantitative Criminology.* 18:135–57.

Bachman Ronet and Dianne C. Carmody
    1994    Fighting fire with fire: The effects of victim resistance in intimate versus stranger perpetrated assaults against females. *Journal of Family Violence.* 9:317–31.

Bart, Pauline B.
    1981    A study of women who both were raped and avoided rape. *Journal of Social Issues* 37(4):123–137.

Bart, Pauline and Patricia O'Brien
    1984    Stopping rape: Effective avoidance strategies. *Signs: Journal of Women in Culture and Society* 10:83–101.

Block, Richard
　1977　*Violent Crime*. Lexington, MA: Lexington Books.
　1981　Victim-offender dynamics in violent crime. *Journal of Criminal Law and Criminology* 72:743–762.

Block, Richard and Wesley G. Skogan
　1986　Resistance and nonfatal outcomes in stranger-to-stranger predatory crime. *Violence and Victims* 1(4):241–253.

Bordua, David, Alan J. Lizotte and Gary Kleck
　1979　*Patterns of Legal Firearms Ownership, Regulation, and Use in Illinois*. Springfield: Illinois Law Enforcement Commission.

Buckner, H. Taylor
　1995　Personal letter to Gary Kleck, February 9, 1995.

Cohen, Lawrence E. and Marcus Felson
　1979　Social change and crime rate trends: a routine activity approach. *American Sociological Review.* 44:588–608.

Cohen, Pearl B.
　1984　Resistance during sexual assaults: avoiding rape and injury. *Victimology* 9:120–129.

Conklin, John E.
　1972　*Robbery and the Criminal Justice System*. Philadelphia: Lippincott.

Cook, Phillip J.
　1986　The relationship between victim resistance and injury in noncommercial robbery. *Journal of Legal Studies.* 15:405–16.

Cook, Phillip J. and Daniel Nagin
　1979　*Does the Weapon Matter?* Washington, DC: INSLAW.

Fritzon, Katarina and Julie Ridgway
　2001　Near-death experience: the role of victim reaction in attempted homicide. *Journal of Interpersonal Violence.* 16:679–96.

Griffin, Brenda S. and Charles T. Griffin
　1983　Victims in rape confrontation. *Victimology* 6:59–75.

Hindelang, Michael J. and Michael Gottfredson
　1976　The victim's decision not to invoke the criminal justice process. In William F. McDonald (ed.), *Criminal Justice and the Victim*. Beverly Hills, CA: Sage Publications.

Hindelang, Michael J., Michael R. Gottfredson, and James Garofalo
　1978　*Victims of Personal Crime*. Cambridge, MA: Ballinger.

Hirsch, Travis
    1969    *Causes of Delinquencies.* Berkeley: University of California Press.

King, John W.
    1987    *Situational factors and the escalation of criminal violence.* Paper presented at the annual meetings of the American Society of Criminology, Montreal, Canada.

Kleck, Gary
    1988    Crime control through the private use of armed force. *Social Problems* 35:1–21.
    1991    *Point Blank: Guns and Violence in America.* Hawthorne, NY: Aldine de Gruyter.
    1997    *Targeting Guns.* Hawthorne, NY: Aldine de Gruyter.

Kleck, Gary and Marc Gertz
    1998    Carrying guns for protection: results from the National Self-Defense Survey. *Journal of Research in Crime and Delinquency.* 35:193–224.

Kleck, Gary and Miriam A. Delone
    1993    Victim resistance and offender weapon effects in robbery. *Journal of Quantitative Criminology.* 9:55–81.

Kleck, Gary and Don B. Kates
    2001    *Armed.* Amherst, NY: Prometheus Books

Kleck, Gary and Susan Sayles
    1990    Rape and resistance. *Social Problems* 37:149–162.

Koss, Mary P.
    1987    The hidden rape victim. *Psychology of Women Quarterly* 9:193–212.

Levine-MacCombie, J. and Mary P. Koss
    1987    Acquaintance rape: effective avoidance strategies. *Psychology of Women Quarterly* 10:311–320.

Lizotte, Alan J.
    1988    Determinants of completing rape and assault. *Journal of Quantitative Criminology* 2:203–217.

Ludwig, Jens, Philip J. Cook and Tom W. Smith
    1998    The gender gap in reporting household gun ownership. *American Journal of Public Health* 88:1715–1718.

Marchbanks, Polly A., Kung-Jong Lui and James A. Mercy
 1990 Risk of injury from resisting rape. *American Journal of Epidemiology* 132:540–549.

McDonald, John
 1975 *Armed Robbery: Offenders and their Victims.* Springfield, IL: Charles Thomas.

Prentky, Robert Alan, Ann Wolpert Burgess and Daniel Lee Carter
 1989 Victim response by rapist type. *Journal of Interpersonal Violence* 1:73–98.

Quinsey, Vernon L. and Douglas Upfold
 1985 Rape completion and victim injury as a function of female resistance strategy. *Canadian Journal of Behavior Science* 17:40–50.

Rafferty, Ann P., John C. Thrush, Patricia K. Smith and Harry B. McGee
 1996 Validity of a household gun question in a telephone survey. *Public Health Reports* 110:282–288.

Reiss, Albert and Jeffrey A. Roth
 1993 Firearms and violence. In *Understanding and Preventing Violence*, ed. by Albert J. Reiss and Jeffrey A. Roth. Washington, DC: National Academy Press.

Ruback, R. Barry and Deborah L. Ivie
 1988 Prior relationship, resistance, and injury in rapes: an analysis of crisis center records. *Violence and Victims* 3(2):99–111.

Selvin, Hanan C. and Alan Stuart
 1966 Data-dredging procedures in survey analysis. *American Statistician* 20:20–23.

Siegel, Judith M., Susan B. Sorenson, Jacqueline M. Golding, Audrey Burnam and Judith A. Stein
 1989 Resistance to sexual assault: who resists and what happens? *American Journal of Public Health* 79:27–31.

Southwick, Lawrence
 2000 Self-defense with guns. *Journal of Criminal Justice* 28(5): 351–370.

Thompson, Martie P., T.R. Simon, Linda E. Saltzman and James A. Mercy
 1999 Epidemiology of injuries among women after physical assaults: the role of self-protective behaviors. *American Journal of Epidemiology* 150(3):235–244.

Turner, Anthony
  1981   The San Jose Recall Study. In Robert G. Lehnen and Wesley G.
         Skogan (eds.), *National Crime Survey: Working Papers. Volume
         I: Current and Historical Perspective.* Washington, DC: U.S.
         Department of Justice, Bureau of Justice Statistics.

Ullman, Sarah E.
  1997   Review and critique of empirical studies of rape avoidance.
         *Criminal Justice Behavior* 24:177–204.
  1998   Does offender violence escalate when rape victims fight back?
         *Journal of Interpersonal Violence* 13:179–192.

Ullman, Sarah E. and Raymond A. Knight
  1991   A multivariate model for predicting rape and physical injury
         outcomes during sexual assaults. *Journal of Consulting and
         Clinical Psychology* 59:724–731.
  1992   Fighting back. *Journal of Interpersonal Violence* 7:31–43.
  1993   The efficacy of women's resistance strategies in rape situations.
         *Psychology of Women Quarterly* 17:23–38.
  1995   Women's resistance strategies to different rapist types. *Criminal
         Justice and Behavior* 22:263–283.

U.S. Bureau of Justice Statistics
  1985   *Reporting Crimes to the Police. BJS Special Report.* Washington,
         DC: U.S. Government Printing Office.
  2000   *Criminal Victimization in the United States, 1995.* Washington,
         DC: U.S. Government Printing Office.
  2003a  National Crime Victimization Survey Incident Report interview
         schedule. Online at www.ojp.usdoj.gov/bjs/pub/pdf/ncvs2.pdf.
  2003b  2002 National Crime Victimization Survey. Online at
         www.ojp.usdoj.gov/bjs/pub/cvus02.pdf

U.S. Department of Justice
  2003   *National Crime Victimization Survey, 1992–2001* [Computer
         file]. Conducted by U.S. Dept. of Commerce, Bureau of the
         Census. 2nd ICPSR ed. Ann Arbor, MI: Inter-university
         Consortium for Political and Social Research [producer and
         distributor].

U.S. Federal Bureau of Investigation
  2002   *Crime in the United States 2001.* Washington, DC: U.S.
         Government Printing Office.

Walker, Samuel
    1998   *Sense and Nonsense about Crime and Drugs*. Belmont, CA: Wadsworth.

Weiner, Neil Alan
    1987   *Situational dynamics and juvenile interpersonal violence*. Paper presented at the annual meetings of the American Society of Criminology, Montreal.

Ziegenhagen, Eduard A. and Dolores Brosnan
    1985   Victim responses to robbery and crime control policy. *Criminology* 23: 675–695.

Zoucha-Jensen, Janice M. and Ann Coyne
    1993   The effects of resistance strategies on rape. *American Journal of Public Health* 83:1633–1634.

Jongyeon Tark is a Ph.D. candidate at Florida State University and a lieutenant of the Korea National Police. His research focuses on victimization, criminological theory, and law enforcement. He is currently examining the effect of crime victimization on marital disruption using the longitudinal features of the NCVS. He is also studying whether and why racial and ethnic group membership affects victimization reporting decisions.

Gary Kleck is professor of criminology and criminal justice at Florida State University. He received his doctorate in sociology from the University of Illinois in 1979, where he received the University of Illinois Foundation Fellowship in Sociology. He has been at Florida State since 1978. His research has focused on the topics of the impact of firearms and gun control on violence, deterrence, crime control, and violence. He is the author of *Point Blank: Guns and Violence in America*, which won the 1993 Michael J. Hindelang Award of the American Society of Criminology. More recently, he is the author of *Targeting Guns* (1997) and, with Don B. Kates, Jr., *The Great American Gun Debate* (1997) and *Armed* (2001). His articles have appeared in the *American Sociological Review, American Journal of Sociology, Social Forces, Social Problems, Criminology, Journal of Criminal Law and Criminology, Law & Society Review*, the *Journal of the American Medical Association* and other journals.

# EXHIBIT 66



**Pergamon**

Journal of Criminal Justice 28 (2000) 351–370

**JOURNAL OF CRIMINAL JUSTICE**

# Self-defense with guns
## The consequences

### Lawrence Southwick Jr.*

*Jacobs Management Center, Department of Finance and Managerial Economics, School of Management, University at Buffalo, 240 Jacobs Building, Buffalo, NY 14260, USA*

### Abstract

The choices of potential victims and of criminals with respect to weapons were analyzed in an economic game framework. It was found, using *National Crime Victimization Study* data, that victims who have and use guns have both lower losses and lesser injury rates from violent crime. It was also found that the victim's choice of having a gun is not independent of the criminal's choice. Based on these findings, the consequences of having a greater portion of the potential victims being armed were analyzed. It was found that this would reduce both losses and injuries from crime as well as both the criminals' incentives to commit violent crimes and to be armed. © 2000 Elsevier Science Ltd. All rights reserved.

### Introduction

The regulation of ownership and carrying of guns is currently a topic which generates a good deal of debate. Some people propose that the private ownership of firearms be prohibited while others advocate that all law-abiding, sane, adults are allowed to own and carry guns. Since both groups are making their proposals with the stated goal of improving personal safety, it is important to ask the question of how personal safety is affected by gun ownership. That is not as simple a question as it may at first seem. Criminals may use guns in order to better attack their victims. The potential victims may, however, also use guns in self-defense. Complicating the analysis is the fact that criminals may obtain their weapons by stealing them from law-abiding citizens.

Much of the analysis which has been done on each side of this debate has been done by partisans of that side. That analysis typically does not include a

────────
* Tel.: +1-716-645-3218; fax: +1-716-645-2131.
*E-mail address:* ls5@acsu.buffalo.edu
(L. Southwick Jr.).

model of the behavior of any of the participants nor, frequently, has it been empirically sound. As an example, papers published in the medical literature (which are almost uniformly anti-gun) are often analytically weak[1] (and disconnected from the criminological literature).

Some studies, however, have been done in the economics literature of problems related to this. Becker (1968) looked at the choices made by criminals and by society as essentially a game. The criminals make choices about being in that profession and about the crimes to commit while governments make choices about the resources to devote to catching and punishing the criminals. Ehrlich (1975) analyzed the specific choices about punishment probabilities and severities made by governments and the responses by criminals to those choices. The most relevant study was by Ehrlich and Becker (1972) which analyzes the choices made by potential crime victims for insurance, self-insurance, and self-protection. This study asked the question of how effective are individual responses to the problem of crime and whether current governmental regulations are appropriate in light of the game strategies employed.

0047-2352/00/$ – see front matter © 2000 Elsevier Science Ltd. All rights reserved.
PII: S0047-2352(00)00051-9

## Behavioral model

The criminal and the potential victim may be viewed as participating in a game. The criminal wishes to make as much profit relative to his cost and risk as is feasible. At the same time, the potential victim wishes to minimize his or her (in the following, "he" will refer to the offender while "she" will refer to the victim; both players may be of either sex but this will help to keep the players straight in the text) losses resulting from crime and the fear of crime. The criminal benefits directly from the money and goods stolen from the victim as well as from whatever satisfaction may result if he injures the victim. The latter is more likely to be the case if the assailant knows and dislikes the victim, for whatever reason.

It is sometimes difficult to precisely classify crimes. Some may be primarily for commercial purposes so that any injury to the victim is incidental and, in fact, may be either undesired by or neutral for the criminal. In other cases, the attacker desires to harm the victim (as, for example, rape) and may only take goods or money as a further injury or as incidental benefit to himself. The victim, in this case, may be known to the attacker and may be chosen specifically for the attack because of who she is. In a purely commercial crime, the offender chooses the victim for profitability characteristics; whether the crime can be expected to pay is the overriding consideration. In either case, the offender making the attack weighs the costs and benefits expected for himself in deciding whether to make the attack. This implies that:

$$EU \text{ (Value Stolen + Harm to Victim)}$$
$$- \text{Cost (Criminal Activity)}$$
$$> EU \text{ (Penalties)}$$

is necessary to the decision to make the attack, where EU is expected utility to the offender. The offender will only undertake a crime if the expected value to him of the value of goods and cash stolen plus any utility of the expected harm to the victim less the cost of conducting the criminal activity (in whatever terms he measures his costs) exceeds the expected value of penalties which may be visited upon the offender by either the victim or by society. That is, he must expect to gain by his crime.

On the other side, the potential victim wishes to lose as little as possible from crime, including the losses due to the purchase of insurance or to the taking of self-protection actions. This individual weighs the probability of being attacked by some offender along with the costs and potential benefits of taking some action in deciding on a strategy to be

followed. For example, consider having a gun for self-defense purposes:

$$P(\text{Attack}) \cdot P(\text{Able to use Gun|Attack})$$
$$\cdot [EU \text{ (Loss|No Gun)} - EU \text{ (Loss|Gun)}]$$
$$> EU \text{ (Cost of Gun)}$$

would be necessary to induce a potential victim to have a gun. The potential victim looks at the probability of being attacked by some offender, multiplies that by the probability of being able to use the gun given an attack, and further multiplies that by the change in the expected utility of the loss incurred without and with a gun. If that value exceeds the expected utility of the cost of having a gun, the victim will choose to have a gun. Otherwise, she will not.[2]

There have been a number of studies of the probability of an attack for the average person. For robbery, rape, and aggravated assault, the average probability of being attacked in a given year aggregates to about 1.48 percent (from Table 2 in *Criminal Victimization in the United States*, Bureau of Justice Statistics, 1992). Of course, for many age, sex, or ethnic groups, the probabilities differ greatly. The higher the probability, other things being equal, the greater the value of having a gun, assuming it to have defensive value. The second factor is the probability of being able to use the gun if one has it. That may depend on the weapon used by the attacker as well as the competence in gun usage/attack /defense of both the attacker and the victim. A person who had not practiced using her gun would be less able to engage in self-defense but practice involves a cost to the defender,[3] a fixed cost that needs to be incurred before relying on a gun for defense.

The third factor is the difference in expected utility of the losses suffered by the victim who does not or does use a gun in self-defense. This computation has not generally been made by persons other than by potential victims; there has been little research on the outcomes of specific forms of self-defense. An exception is Kleck and DeLone (1993) who found that the use of a gun was effective for the victim in dealing with a robber. The use of a gun in self-defense against various crimes will be the major subject of this study. After all, if there is no difference in the expected losses or the losses are greater for those who have guns, any positive cost of having a gun would induce people not to have self-defense guns. Of course, since some people do in fact have self-defense guns, this implies that they feel that the benefits outweigh the costs. Finally, the expected cost includes the barriers to ownership that may be erected by governments. Since these barriers are mainly for handguns, there may be a move by both potential victims and by criminals to ownership of rifles or shotguns. Of course, for carrying a gun,

there may be a value/cost placed on the inconvenience involved in carrying something that may be bulky or heavy. It appears that relatively few people do carry guns for self-protection.

The decisions by the potential and actual victim are shown in Fig. 1. Initially, she is at choice point 1 and has to decide whether to have a gun or not. Next, she will either be attacked or she will not, at point 2 or point 3. If she is attacked, she is then at either choice point 4 or choice point 5 and has to decide whether to take action. Of course, at choice point 5 it is not possible to use a gun. In either case, the victim will decide either to take some action or not to do so. She then proceeds to outcome 6, 7, 8, or 9, depending on her choices. At each of those outcomes, there is an expected level of losses, $L_j$, and an expected injury, $I_j$. The major object of this study is to investigate how the outcomes are related to the decisions made.

Fig. 2 shows the decision from the point of view of the attacker. His initial decision, at point 1, is whether to have a gun, to have some other weapon, or to have no weapon. Then, depending on his decision, he encounters the victim at point 2, 3, or 4. The victim will choose to use a gun, to take some other action, or to take no action. It is undoubtedly the case that the probabilities differ depending on the attacker's choice. The results will be an expected outcome of *a* through *i*. The injury to the victim which can be expected will be $L_a$ through $I_i$. The attacker may be indifferent to this, may want greater injury, or may want less injury; this depends on his motive for making the attack in the first place. Finally, the expected outcome includes losses to the victim of $L_a$ through $L_i$. The larger the loss, presumably the larger the gain to the attacker so, if the attack is motivated by commercial reasons, he wants larger numbers here. This study is intended to in-



Fig. 2. Choices and outcomes for attackers.

vestigate how these outcomes are related to the choices made.

### Data

Each year since 1973, a survey has been conducted by the Bureau of the Census of about 100,000 people chosen to be representative of the U.S. population and their recent experiences, if any, with crime. The data set changes each year so this is not a longitudinal study. The title of this study is the *National Crime Victimization Study (NCVS)*. This study asked people about all crimes in which they were victimized, therefore crimes that were not reported to the police are included as well as those that were, if they were reported to the interviewer. The object was to gather a representative sample of all criminal activity that occurs in any given year. Homicides and kidnappings were not included because the sample was too small to give significant results.[4]

Data from a number of these surveys have been combined on a compact disk which is available to the public. This was the source of observations for this study. There were two principal data sets on it which were the most useful for the purposes of this study. They were the data on incidents occurring in 1979 to 1987 and the data on incidents occurring in 1991.



Fig. 1. Choices and outcomes for potential victims.

*L. Southwick / Journal of Criminal Justice 28 (2000) 351–370*

Table 1
Weapon choices

| Criminal choice | Victim choice | | | |
|---|---|---|---|---|
| | Gun | Other action | No action | Total |
| *Sample 1979–1987* | | | | |
| Gun | 150 | 2305 | 1734 | 4189 |
| Other weapon | 163 | 6113 | 1656 | 7932 |
| No weapon | 223 | 18,620 | 11,837 | 30,680 |
| Total | 536 | 27,038 | 15,227 | 42,801 |
| *Sample 1991* | | | | |
| Gun | 15 | 267 | 248 | 530 |
| Other weapon | 12 | 446 | 170 | 628 |
| No weapon | 14 | 1912 | 1516 | 3442 |
| Total | 41 | 2625 | 1934 | 4600 |

Since there were some years left out, the two data sets were not merged for this study; instead, each were considered separately. Also, some comparisons were made over time.[5]

This study looked at the criminal activities which involve direct contact between the principals in the case. The result was that larcenies and burglaries were excluded. Instead, this study looked at rapes, assaults, and robberies. Of course, a burglary that occurs when the victim is at home may involve direct contact if the homeowner is alerted and comes into contact with the attacker. That could change the crime to robbery if the police decide to so categorize it.[6] Of course, only personal attacks were included here. The questionnaire does not distinguish among robbery, aggravated assault, and rape except in the outcomes that are experienced by the victim; the survey later categorizes the crimes. This study does not attempt to separate the crimes into categories since the issue is one of self-defense and the victim does not necessarily know the intentions of the attacker. For example, a robbery may also be accompanied by a rape; how should this crime be categorized?

### Choice of gun use

Both the criminal and the potential victim may decide to have a gun available during the crime. Of course, this is simpler for the attacker who only has to be armed at a time of his choosing inasmuch as he picks the time to commit the crime. The potential victim, on the other hand, needs to be armed at any time that she could be victimized since she has no way of knowing when the attacker will act. Thus, unless the potential victim is *always* armed, she cannot be sure of being armed when the criminal acts.

It follows that people who feel themselves to be in greater peril of being attacked by an armed person would be more likely to arm themselves. This can be tested using the actual numbers from the *NCVS* data. Table 1 shows the data for each of the data sets for each case of robbery, rape, and aggravated assault confrontation. As can be seen in Table 1, the very substantial majority of both offenders and victims have apparently chosen not to be armed with guns. At least, they have not used guns during the encounter. This is true for both data sets.[7]

This data set also allows us to ask whether the potential victim's choice of having/using or not having/using a gun is independent of the attacker's choice. This is done by taking appropriate values from Table 1 and treating them as a contingency table. Using the Yates correction for one degree of freedom, the $\chi^2$ value for the 1979–1987 data is 201.50 and for the 1991 data it is 23.07. Since the value for significance at the 1 percent level is 6.64, it is clear that these two categories are not independent. That is, the person who is attacked by an armed person is more likely to be armed with a gun and to use the gun in self-defense than is the person who is attacked by an unarmed person.

There are several possible reasons for this. First, people who are the more lucrative targets because they have more to steal are more likely to be armed in order to protect their possessions. The criminal, realizing this, knows that it is more important to be armed in order to counteract the armed victim. Second, people who are more in harm's way, in that they feel themselves to be more likely to be attacked by armed persons, are more likely to arm themselves.[8] In any case, it is clear that the arming decisions by the attacker and by the victim are *not* independent of each other.

The question can also be asked about the choice of weapon by the attacker since a weapon other than a gun is possible. The data for this, which is a division of the prior data, is again taken from Table 1. As may

be seen, offenders use other weapons about as frequently as they use guns. These other weapons may include knives or other sharp objects as well as clubs or other blunt objects.

By treating this data as a contingency table with two degrees of freedom, $\chi^2$ values of 293.48 and 39.09 are found for the 1979–1987 and 1991 data, respectively. The 1 percent significance level is a $\chi^2$ value of 9.21 so both are highly significant. Thus, again there appears to be a relationship between the criminal's decision to be armed and the victim's decision about having a gun.

It is also feasible to combine the gun category for the attacker with the other weapon category to see if there is a relationship between the attacker's being armed with any weapon and the victim's having a gun. This is not presented as a separate table because it is just a modification of Table 1, but again there is a strong and highly significant correlation. The $\chi^2$ values (with the Yates correction) are 240.37 and 34.19, where 1 percent significance is a value of 6.64. This tends to confirm Cook's proposition (1981, p. 69) that "The economic value of a gun in robbery tends to be greatest against ... well-defended targets." Interestingly, if only the data where the criminal does NOT have a gun is considered, there is still a strong correlation between the attacker's decision to use some other weapon and the victim's decision to be armed.

It is also useful to look at other victim responses to a robber. If the victim does not have a gun, there are still some responses available to her. For example, the criminal may be attacked or threatened either with some other weapon or with no weapon, the victim may attempt to escape, or the victim may verbally engage the attacker. Table 1, in columns 2 and 3, looks at these cases where the victim does not have a gun (or is not able to use it).

It can be seen that the victim who does not have a gun is far more likely to take some form of action if the attacker does not have a gun than if the attacker does have a gun. The $\chi^2$ values for that contingency table are 919.49 and 66.91 as compared to a 1 percent significance figure of 9.21. Again, there is a strong effect. It would seem to follow that the criminal who is seeking to have victims comply with his demands would be well-advised to use a gun. On the other hand, it also appears that victims who are confronted with a weapon other than a gun are more likely to resist in some way than if they are confronted with no weapon. If the cases where the attacker has a gun are compared with those where he has no weapon at all, the $\chi^2$ values are 189.48 and 11.18. They are significant at the 1 percent level, so it can be inferred that unarmed victims are more likely to resist unarmed attackers than they are to resist attackers armed with guns.

The total number of cases where the victim is armed with a gun (and is able to use it) were relatively small compared to the total number of attacks. As seen in the sample in Table 1, there were only 536 armed victims while there were 42,265 victims who were either unarmed or were unable to use their guns in the 1979–1987 sample. That is, 1.25 percent were armed (and able to use their guns). In the 1991 sample, there were 41 armed victims and 4559 who were unarmed, a percent armed of 0.89 percent. These percentages are not significantly different at the 1 percent level, although they do differ at the 5 percent level. It may be that the risk incurred by the attacker that his victim will be armed with a gun is falling over time. If future data show this to be correct, it would follow that a certain increase in the willingness of criminals to commit crimes could be expected since the potential risk to the criminal of harm from the victim would be reduced.[9]

Even if only 1 percent of potential victims can be expected to be armed with guns, that is a real risk to the criminal since he does not generally know *which* people will be armed. According to *Criminal Victimization in the United States* (Bureau of Justice Statistics, 1992, p. 5), there are some 6.6 million crimes of violence each year. That would imply that in from 59,000 to 83,000 cases each year, victims use their guns to fight off attackers. This is lower by a factor of about thirty than the results reported by Kleck and Gertz (1995).[10] It may well be that in numerous cases where a person showed a gun to an apparent attacker, the attacker backed off and the *NCVS* would not show that a crime had been committed. The intended victim might well be unsure that a crime had, in fact, occurred. If the question were asked in a different way, these defensive uses could be more likely to show up. It may be because Kleck and Gertz asked the question differently than the government did that they got the much larger numbers of self-defense uses. They asked specifically whether the respondent had used a gun in self-defense while the *NCVS* asked only what the respondent did without mentioning the possibility of gun use.[11]

The more probable it is that a person will be armed, the greater the likelihood that an attacker will end up being injured or killed by the person he attacks. If it is obvious who is armed as it would be if people openly carried guns, the attacker could simply avoid those who are armed and attack only those who are not. If he does not know who is armed, however, he confronts a risk every time he chooses to make an attack.[12] That risk depends on the proportion of people who carry concealed guns.[13] It can therefore be seen that each person who carries a concealed gun for defensive purposes raises the odds against the

criminal. This confers an external benefit on other potential victims much as a person's vaccination against some communicable disease benefits others who then have reduced exposure to the disease. It follows, if each person only considers her own benefit in carrying a concealed defensive gun, too few people will carry such guns. Of course, this presumes that there are no external costs to carrying a gun.[14]

The odds are generally different in the home of the victim than outside it. This follows from the fact that people are more likely to have a gun available in their homes than they are elsewhere. Some 35.0 percent of rapes, 9.4 percent of robberies, and 11.8 percent of aggravated assaults occur in the home of the victim.[15] Thus, most such crimes take place elsewhere and for guns to be an effective deterrent, it follows that enough potential victims must carry guns with them. Many state and local laws are aimed at deterring just such gun carrying by potential victims.[16]

The above cannot answer the question of whether arming potential victims will deter violent crime. Bayes Theorem implies that the probability of being a victim, given that one has a gun, multiplied by the probability of a potential victim having a gun is equal to the probability of being a victim, multiplied by the probability of having a gun, given that one is a victim. That is;

$$P(\text{Victim}|\text{Gun}) \cdot P(\text{Gun}) = P(\text{Victim}) \cdot P(\text{Gun}|\text{Victim})$$

The probability of being a victim is about 0.0146 (from above) and the probability of having a gun, given that one is a victim (from above), is about 0.0125. Because the attacker should generally not know which potential victims are armed, arming oneself should not affect the probability of being attacked. That would imply that the probability of being attacked, given that one has a gun, would equal the overall probability of being attacked, 0.0146. If that is true, it would follow from Bayes Theorem that the probability of a potential victim having a gun is just 0.0125 (1 in 80). That should not be interpreted as the proportion of the population carrying a gun, however, because the probability of being a victim varies widely.[17] This is somewhat lower than the results given by Cook and Ludwig (1997) who found that about 5 million adults are carrying guns daily (4 million for employment purposes and 1.1 million otherwise). That is about 2.6 percent of all adults. Kleck and Gertz (1998) found about 7.7 million adults carry guns on any given day. That is about 4 percent of all adults. These figures are inconsistent if those who are at greatest risk are more likely to be armed. Some of these people are armed with unconcealed guns such as the

0.6 million police officers; they may be thereby directly made safer since they are obviously more risky to attack. If the percent carrying concealed guns is close to the 1.25 percent computed above, this could be confirming data. On the other hand, the data showing higher percentages of adults carrying guns would seem to imply that the proportion who use guns for self-defense in the *NCVS* is actually too low; there are more self-defense uses than shown there. If 3.3 percent of adults are armed (averaging the two studies cited) and they are armed because they are twice as likely to be attacked, it follows that self-defense uses are more than five times the number estimated by the *NCVS*.

Now look at the number of times the attacker has a gun. In the sample taken in the period from 1979–1987, there were 4,189 attackers with guns, 9.8 percent of all attacks. In the 1991 sample, there were 530 attackers with guns, or 11.5 percent. The $\chi^2$ value is 13.74, which is significant at the 1 percent level; criminals are increasingly using guns in their attacks.

## Cash and property losses

An important question in the game played between criminals and victims is in the amount of losses experienced by the victims. Robbers, of course, want to maximize their net gains while the victims desire the minimization of their losses. It would be expected that the choice of actions by each would be intended to bring about the satisfaction of their goals.

With respect to cash and property losses it was presumed that the loss to the victim was related to the gain to the attacker. In the transfer of cash, the values were precisely equal. On the other hand, property losses to the victim may well exceed the gains to the criminal since the robber typically sells that property to another party for less than its value to the victim.

Table 2 shows the cases where the victim experienced cash losses in each of the circumstances for the defensive uses by the victim of gun, other action, or no action and by the attacker of gun, other weapon, or no weapon. In addition, the average losses for those who had cash losses are given. Thus, for example, in the 1979–1987 data set, there were 1,734 cases where the attacker had a gun and the victim took no action (from Table 1). In 33.10 percent of these, or 574 cases, there was a cash loss. It needs to be kept in mind that, in at least some of the cases, the principal objective of the attacker may not have been to take cash; it may have been desired to commit an assault or a rape, for example. Thus, in some of the cases where a

Table 2
Cash losses

| Attacker choice | Victim choice | | | |
|---|---|---|---|---|
| | Gun | Take action | No action | Total |
| **Sample numbers 1979–1987** | | | | |
| *Percent with cash losses* | | | | |
| Gun | 2.00 | 5.99 | 33.10 | 17.07 |
| Other weapon | 1.23 | 4.94 | 23.61 | 8.76 |
| No weapon | 1.79 | 5.30 | 28.77 | 14.33 |
| Total | 1.68 | 5.28 | 28.70 | 13.57 |
| *Average loss for those with losses* | | | | |
| Gun | 213.0 | 215.4 | 282.0 | 268.9 |
| Other weapon | 675.0 | 146.6 | 134.8 | 141.5 |
| No weapon | 52.0 | 110.0 | 115.2 | 114.0 |
| Total | 244.1 | 127.9 | 138.9 | 136.3 |
| **Sample numbers 1991** | | | | |
| *Percent with cash losses* | | | | |
| Gun | 13.3 | 13.9 | 45.6 | 28.7 |
| Other weapon | 0.0 | 10.5 | 35.3 | 17.0 |
| No weapon | 14.3 | 12.5 | 48.9 | 28.6 |
| Total | 9.8 | 12.3 | 47.3 | 27.0 |
| *Average loss for those with losses* | | | | |
| Gun | 2.5 | 107.0 | 300.2 | 249.3 |
| Other weapon | – | 75.0 | 168.5 | 127.4 |
| No weapon | 225.0 | 59.2 | 44.2 | 48.2 |
| Total | 113.8 | 67.0 | 84.0 | 79.6 |

cash loss was experienced, that may have only been a secondary objective of the attacker.

It is worth testing to see whether there were significant differences in these percentages. That will, presumably, be an important ingredient in both the attacker's choice of weapon and the defender's choice of behavior. One would expect that the prospect of a greater net yield would help to determine the robber's choice of weapon. Of course, the prospect of greater prison time for the use of a weapon would be a disincentive. On the other side, the prospective victim would be interested in minimizing her expected losses. The use of a gun has to be determined beforehand since, if it is not available, it cannot be used. There is a cost to carrying or having a gun available which is larger relative to the cost of a crime since only on rare occasions will a particular victim have occasion and ability to use it. The prospective loss amounts will, however, be a factor on the other side of that decision.

First, consider the possible situations from the attacker's point of view. If the victim has a gun and is able to use it, the probability is very high that the attacker will get no money. This is true for all possible choices by the attacker. The correlations among the three possible attacker choices have been tested by both the normal approximation to the binomial and by the $\chi^2$ contingency table (with Yates Correction) and it has been found in both data sets that there is no significant difference in the outcomes. That is, it does not matter what choices the attacker makes with regard to his own weapon; if the victim has a gun and is able to use it, the probability of actually getting some money from the victim is the same—very low.

Now, do the same thing for the case where the victim does not have a gun, but does take some other action. There are no significant differences among the three outcomes in each data set. It does not matter whether the attacker has a gun, some other weapon, or no weapon; the probability of getting some cash is the same if the victim takes some action even though she does not have a gun. (These could include attacking or threatening the offender, reasoning or arguing with the offender, giving an alarm, or running away.)

The same analysis can be done for the case in which the victim does not resist. There were significant differences at the 1 percent level between the cases for the 1979–1987 data but the only significant difference for the 1991 data was between the non-gun

weapon and no weapon. In both cases, the lowest proportion of victims who actually part with cash do so when the attacker uses a weapon other than a gun. It would follow that the fiscally optimizing attacker would use either a gun or no weapon. Of course, some other factors of interest to the offender in his decision-making have not yet been considered; that will be done later.

Now, turn to the decisions by the victim. The first case to be examined is where the offender has a gun. Generally, the proportion of victims who lose money did not differ significantly between those victims who have a gun and those who do not but take some other action. The results were significantly different for those victims who take no action; they were much more likely to have monetary losses. This was true for both data sets.

Now, suppose that the attacker has some weapon other than a gun. The person who takes no action is more likely to lose money than is the person who either takes action or who has a gun. The difference between the cases of having a gun and taking some other action is either significant at the 1 percent level or close to it, depending on the statistical test chosen. In any event, there was again a clear increase in the probability of having a cash loss if one takes no action against an attacker armed with a weapon other than a gun.

Finally, consider the offender who is unarmed. The results were similar to the previous case. There was a significant difference between the victim who does not take any action and the one who does take action; the former were much more likely to lose cash. The difference between the use of a gun and the taking of some other action was generally not significant at the 1 percent level. Thus, in all cases, no matter what weapon the attacker has or even if he has no weapon at all, the taking of some action will significantly reduce the probability that the victim will lose some money. Having a gun generally does not reduce the probability significantly more than does taking some other action.

Since it does not depend very much on the opponent's actions for either party in terms of probability of a cash loss, the author looked at that decision using aggregated data. The first case was for the offender. From his point of view, there was very little difference in the proportion of successful robberies between having a gun and having no weapon although the difference was significant in the case of the 1979–1987 data. Having some other weapon, however, significantly reduces the proportion of people who actually lose cash. Based solely on this, his choice would be between having a gun and having no weapon. As noted above, other factors may also enter the decision.

What about the victim? In the 1979–1987 data, all of the choices differ significantly with some non-gun action reducing the probability of loss and having a gun reducing it further. In the 1991 data, the probability of suffering a cash loss was significantly reduced by taking action. Having a gun did not significantly further reduce the probability (this was due to the small data set—it did seem to reduce the probability somewhat).

It is also interesting to ask whether the probability of having a cash loss has changed over the years. This can also be tested by a contingency table. The result was highly significant; the proportion of victims who reported losing cash has increased from the 1979–1987 period to the 1991 period. It is unclear why this should be the case unless people are feeling more secure and are carrying more cash. That could well be the case inasmuch as the *NCVS* has reported that the rates of these types of crimes have been decreasing over the survey period.[18]

Next, look at the sizes of the cash losses which occur. For each of the decisions made by offender and victim, only for those cases where there are losses, the results are also shown in Table 2. The average losses are given for each group.

It is feasible to test for the significance of the differences between the groups in terms of their losses since the data computed also have the standard deviations of losses, although this is not shown in the table. It turns out that the sample size (especially for the victims with guns who lose money) was small enough that there was no significant difference (at the 0.01 level) between the losses suffered by victims in terms of their actions. If the victims take action, they reduce the probability of having a cash loss enough that there is little residual difference in the cash lost by those who still lose cash. Their savings come about through not having any cash loss rather than by reducing the amount of the loss.

On the other hand, the robber will get significantly (at the 0.01 level) more money if he uses a gun than if he uses no weapon. This was the case for both samples. It was also the case that in the 1991 sample, there was a significant gain in using a weapon of any kind. There was significance at the 0.02 level in the 1979–1987 data for the use of a gun over other weapons. When these results are combined with the results on the proportion of victims who actually lose cash, it becomes clear that the use of a gun is the most lucrative choice for the attacker.

## Property losses

The next issue is on property losses other than cash. The data, it must be remembered, were self-

*L. Southwick / Journal of Criminal Justice 28 (2000) 351–370*                    359

reported so the values given may well be more inaccurate than the values given for cash losses. In addition, the value to the person who steals the property is likely to be less than the value to the person who loses it since the robber will probably fence it for a fraction of its market value. This also neglects any sentimental value that may be placed on the property by the victim. Again, most of the victims do not lose any property. The results showing the proportion of victims who lost property is shown in Table 3.

From the offender's view, the probability of getting property from the victim is the lowest with a weapon other than a gun. This was significantly lower than either other choice and this was true for both samples. The use of a gun was significantly more effective than using no weapon only in the first sample. Note that this result is very similar to the result on cash.

Now consider the victim's point of view. She is significantly less likely to lose property if she takes some action or has a gun than if she does nothing. She is also significantly less likely to lose property if she uses a gun rather than taking some other action in the first sample, although this difference was not significant in the second sample. This, too, is in keeping with the results from the data on cash losses.

The next step is to look at the value of property losses for those victims who have such property losses. These data are also given in Table 3. Look first at the victim's choices. The only apparent significant effect was that the property losses were greater for victims who take some action other than with a gun in the first sample. Perhaps the reason for the victim taking the action is because the property she is protecting is more valuable. It cannot be known with certainty why this effect occurs.

There is, however, a set of strong results with regard to the criminal's choices. The amount of property loss increases as the instruments used by the attacker increase in effectiveness. The difference was significant at the 1 percent level in every case except in the move from no weapon to a weapon other than a gun in the second sample. This is an effect that should be expected since the cost to the criminal of the instrument used increases and necessitates the choice of more lucrative targets. Since the marginal target chosen was more remunerative, the average result computed here will be higher as well. This gives an incentive for the robber to use other weapons or a gun, but there may be other costs that reduce the utility of doing so. Since the gun or other weapon may not

Table 3
Property losses

| Attacker choice | Victim choice | | | |
| | Gun | Take action | No action | Total |
|---|---|---|---|---|
| **Sample numbers 1979–1987** | | | | |
| *Percent with property losses* | | | | |
| Gun | 4.67 | 8.07 | 23.01 | 14.13 |
| Other weapon | 4.91 | 6.94 | 20.23 | 9.67 |
| No weapon | 7.17 | 10.13 | 40.94 | 21.99 |
| Total | 5.78 | 9.23 | 36.65 | 18.94 |
| | | | | |
| *Average loss for those with losses* | | | | |
| Gun | 162.0 | 1567.0 | 1118.0 | 1247.8 |
| Other weapon | 1539.0 | 558.0 | 1114.0 | 811.1 |
| No weapon | 113.0 | 392.0 | 274.0 | 306.6 |
| Total | 492.1 | 507.8 | 384.8 | 423.1 |
| | | | | |
| **Sample numbers 1991** | | | | |
| *Percent with property losses* | | | | |
| Gun | 13.33 | 9.36 | 26.21 | 17.36 |
| Other weapon | 0.00 | 6.28 | 19.41 | 9.71 |
| No weapon | 7.14 | 9.68 | 34.89 | 20.77 |
| Total | 7.32 | 9.07 | 32.42 | 18.87 |
| | | | | |
| *Average loss for those with losses* | | | | |
| Gun | 504.0 | 464.0 | 1396.7 | 1123.8 |
| Other weapon | – | 618.5 | 321.7 | 457.9 |
| No weapon | 500.0 | 383.3 | 437.0 | 423.2 |
| Total | 502.7 | 419.4 | 530.4 | 499.9 |

increase the probability of getting property, that also has to be taken into consideration. These results are very similar to the results for the cash losses. Again, it has to be kept in mind that, even though the figures for property losses are generally larger than the corresponding figures for the cash losses, the benefits to the attackers may be much smaller than the loss to the victim.

Table 4 gives the average losses including both cash and property for each strategy by attacker and victim. In this table, the average losses are for *all* victims rather than just for those who have losses. The results are, of course, much like the results from the earlier separate analyses. Looking first at the victim, it can be seen that there was a significantly (at the 1 percent level) lower expected loss if one takes action than if one does not. The loss was also reduced from the case of taking no action to having a gun in the earlier sample; the sample was too small to generate a significant result in the later data. There was no significant difference in the expected loss between taking a non-gun action and defending oneself with a gun.

Next, look at the attacker's decision. He will gain significantly more through the use of a gun than by either of the other methods. The use of a weapon other than a gun has an expected gain that was lower

than the other two methods. (The difference was not significant between other weapon and no weapon in the later sample.) Other things being equal, therefore, it would seem that the offender would be more likely to want to use a gun while the victim would want to take some action, either with a gun or in some other way.

**Injuries**

An important consideration for both parties to these transactions is the issue of injuries. The victim wishes to avoid injuries for the obvious reason that she suffers the loss from them. The attacker may, if the attack is motivated by commercial reasons, wish to avoid injuries as well since the penalties, if he is caught, may be increased as the result of injuries to the victim. Further, the police may be more highly motivated to capture the offender if the victim has injuries and therefore increase the probability of capture. Either would increase the expected cost to the offender and thus reduce the expected net value. Of course, since these data include assaults and rapes, those particular injuries may be the actual motivation for the attacker; he gains utility from harming the victim.

Table 4
Total losses property and cash

| Attacker choice | Victim choice | | | |
|---|---|---|---|---|
| | Gun | Take action | No action | Total |
| Sample numbers 1979–1987 | | | | |
| *Percent of category with losses* | | | | |
|   Gun | 5.33 | 10.33 | 39.85 | 22.37 |
|   Other weapon | 4.91 | 9.24 | 31.28 | 13.75 |
|   No weapon | 8.07 | 12.06 | 54.44 | 28.38 |
|   Total | 6.34 | 11.27 | 50.26 | 25.08 |
| *Average total loss for all in category* | | | | |
|   Gun | 11.8 | 139.4 | 350.6 | 222.3 |
|   Other weapon | 84.0 | 45.9 | 120.0 | 62.2 |
|   No weapon | 9.0 | 45.6 | 145.2 | 83.8 |
|   Total | 32.6 | 53.7 | 165.8 | 93.3 |
| Sample numbers 1991 | | | | |
| *Percent of category with losses* | | | | |
|   Gun | 13.33 | 13.86 | 45.56 | 28.68 |
|   Other weapon | 0.00 | 10.54 | 35.29 | 17.04 |
|   No weapon | 14.29 | 12.50 | 49.08 | 28.62 |
|   Total | 9.76 | 12.30 | 47.41 | 27.04 |
| *Average total loss for all in category* | | | | |
|   Gun | 67.5 | 58.3 | 502.9 | 266.6 |
|   Other weapon | – | 46.7 | 121.9 | 66.2 |
|   No weapon | 67.9 | 44.4 | 174.2 | 101.7 |
|   Total | 47.9 | 46.2 | 211.8 | 115.8 |

Table 5
Injuries

| Attacker choice | Victim choice | | | |
|---|---|---|---|---|
| | Gun | Take action | No action | Total |
| Sample numbers 1979–1987 | | | | |
| *Numbers injured*[a] | | | | |
| Gun | 6 | 145 | 116 | 267 |
| Other weapon | 6 | 628 | 241 | 875 |
| No weapon | 5 | 611 | 251 | 867 |
| Total | 17 | 1384 | 608 | 2009 |
| | | | | |
| *Percent injured* | | | | |
| Gun | 4.00 | 6.29 | 6.69 | 6.37 |
| Other weapon | 3.68 | 10.27 | 14.55 | 11.03 |
| No weapon | 2.24 | 3.28 | 2.12 | 2.83 |
| Total | 3.17 | 5.12 | 3.99 | 4.69 |
| Sample numbers 1991 | | | | |
| *Numbers injured*[a] | | | | |
| Gun | 1 | 19 | 21 | 41 |
| Other Weapon | – | 74 | 19 | 93 |
| No Weapon | – | 74 | 27 | 101 |
| Total | 1 | 167 | 67 | 235 |
| | | | | |
| *Percent injured* | | | | |
| Gun | 6.67 | 7.12 | 8.47 | 7.74 |
| Other weapon | 0.00 | 16.59 | 11.18 | 14.81 |
| No weapon | 0.00 | 3.87 | 1.78 | 2.93 |
| Total | 2.44 | 6.36 | 3.46 | 5.11 |

[a] Injuries included here are rape, knife wound, bullet wound, broken bones, internal injuries, and knocked unconscious.

Table 5 presents the data from both samples for certain injuries.[19] These specific injuries include rapes, knife wounds, bullet wounds, broken bones, internal injuries, and being knocked unconscious. While they are not medically defined inasmuch as the survey respondents are not qualified to give such definitions, they do appear to be serious injuries. Both the numbers of injuries and the percent of victims in each category who receive them are given. The results were very similar to those found by Cook (1980) using earlier data, although he did not analyze the defensive use of guns.

First, consider the issue from the point of view of the attacker. There were significant (at the 1 percent level) differences in each of his choices for both data sets. He is least likely to injure the victim if he is unarmed and most likely to injure the victim if he is armed with a weapon other than a gun. Unless his objective is to injure the victim, he would be generally better off using either a gun or no weapon at all. The use of a gun was significantly more likely to result in injury than was an unarmed attack.[20] Kleck and McElrath (1991, p. 685) found, on the other hand, that the use of a

gun by the (stranger) attacker was significantly less likely to result in victim injury than was either an unarmed attack or an attack with some other weapon. Their result, using some variables in a regression framework, takes more factors into consideration than does this study.[21] It turns out, however, there was a cost to using a gun but the financial gain to using a gun may outweigh that cost in the mind of the attacker.

On the side of the victim, the choice most likely to result in injury is to take action without a gun. This probability was significantly higher than the probability of injury when no action is taken. There was not the same significance between using a gun defensively versus taking some other action because the sample size was too small. The use of a gun versus not having a gun also results in no significant difference because of the small sample size.

Each of the choices available to the victim who has been attacked can also be studied. At that point, she knows what choice of weapons has been made by the offender. First, suppose that the attacker has a gun. Based on the data, there is no significant difference in the injury outcomes whether the victim

Table 6
Men and women defensive choices, sample 1979–1987

| | Gun | Take action | No action | Total |
|---|---|---|---|---|
| *Number making choice* | | | | |
| Men | 456 | 15,696 | 7836 | 23,988 |
| Women | 80 | 11,342 | 7391 | 18,813 |
| *Percent making choice* | | | | |
| Men | 1.90 | 65.43 | 32.67 | |
| Women | 0.43 | 60.29 | 39.29 | |
| *Number with injury* | | | | |
| Men | 16 | 816 | 380 | 1212 |
| Women | 1 | 568 | 228 | 797 |
| *Percent with injury* | | | | |
| Men | 3.51 | 5.20 | 4.85 | 5.05 |
| Women | 1.25 | 5.01 | 3.08 | 4.24 |

chooses to use her gun, take some other action, or to take no action.

If, however, the attacker has some other weapon, there were significant differences in the outcomes depending on the victim's response. The use of a gun by the victim significantly reduces her likelihood of being injured. This result was also found by Kleck and DeLone (1993). There was not as significant a difference between taking no action and taking some action other than gun usage. This may be important to the case where the attacker is doing so for the specific purpose of harming the victim as through rape or aggravated assault. Finally, if the attacker has no weapon, there were no significant differences in injury rates between the responses made by the victim.

One question that arises is whether victims who have guns are more likely to be shot during the commission of a crime. In the 1979–1987 sample, 121 victims were shot; of these, five had guns. In the 1991 sample, twenty victims were shot; of these, one had a gun. The difference was significant in the earlier sample only at the 5 percent level, but the greater level of gunshot wounds is more than offset by the reduced number of other injuries. The difference is not significant in the 1991 sample.[22]

It is often argued that the victim who is confronted with potential deadly physical force should cooperate with the attacker (see, for example, Zimring & Zuehl, 1986, p. 30). The use of a gun for self-defense, however, appears to reduce injury. Thus, it may well be that the choice of some potential victims to arm themselves does improve their safety. While Cook (1986, p. 417) points out that resistance may either result in greater or lesser harm to the victim, the results

above show that having a gun (and being able to use it) reduces harm to the victim.

**Male and female victims**

It is interesting to look at the ways in which male and female victims respond to their attackers. Table 6 shows the results for the 1979–1987 sample. Women were significantly less likely to have a gun than were men. They were also significantly less likely to take some positive action against their attackers.

Table 6 also reports the number of serious injuries received by those who choose each set of actions. The only significant difference here is in the likelihood of receiving an injury if one takes no action. Doing nothing, men were more likely to be injured than were women. This may account for some of the lower propensity either to have a gun or to take some other action among women; they may (accurately) view safety as being more achievable through inaction than do men. It may also be conjectured that the attacker, knowing that women are less likely to be a threat to them, will injure a man more readily so as to reduce a potential threat to themselves.[23] Either the use of a gun or taking some other action results in the same probability of injury to both sexes.

Table 7 is created to look at the differences in losses of cash and property suffered by men and women. Defensive gun usage results in a likelihood of loss that was significantly greater for men than for women. (The confidence level for this as well as for following statements was 1 percent). This was also true for taking some other action. Taking no action results in a likelihood of loss that was significantly greater for women

Table 7
Total losses property and cash, sample 1979–1987

| Attacker choice | Victim choice | | | |
| --- | --- | --- | --- | --- |
| | Gun | Take action | No action | Total |
| **Men** | | | | |
| *Percent of category with losses* | | | | |
| Gun | 3.68 | 8.94 | 42.92 | 22.41 |
| Other weapon | 4.14 | 7.90 | 33.55 | 12.85 |
| No weapon | 6.29 | 9.54 | 46.42 | 22.75 |
| Total | 4.82 | 9.03 | 44.10 | 20.41 |
| *Average total loss for all in category* | | | | |
| Gun | 10.6 | 113.4 | 275.0 | 173.7 |
| Other weapon | 84.6 | 39.7 | 120.4 | 56.8 |
| No weapon | 9.1 | 28.4 | 127.6 | 63.8 |
| Total | 33.6 | 39.9 | 148.0 | 75.1 |
| **Women** | | | | |
| *Percent of category with losses* | | | | |
| Gun | 21.43 | 13.12 | 34.00 | 22.29 |
| Other weapon | 11.11 | 12.54 | 26.80 | 15.91 |
| No weapon | 14.58 | 14.86 | 61.64 | 34.19 |
| Total | 15.00 | 14.38 | 56.79 | 31.04 |
| *Average total loss for all in category* | | | | |
| Gun | 23.2 | 192.0 | 494.5 | 321.8 |
| Other weapon | 77.8 | 61.1 | 119.1 | 75.0 |
| No weapon | 8.9 | 64.7 | 160.9 | 104.3 |
| Total | 26.9 | 72.7 | 184.7 | 116.5 |

than for men. It was generally the case that the amounts lost are significantly greater for women than for men.

Next, consider the specific confrontations that may result. When the defender has a gun and the attacker has a gun, has some other weapon, or has no weapon, there was no significant difference between the injury probability or the loss probability between men and women. It would appear that having a gun really does result in equalizing a woman with a man.[24]

When the attacker has a gun and the defender does not, either taking action or not taking action results in women having a significantly lower probability than men of having a loss but no significant difference in the probability of being injured. This may help to account for the fact that fewer women than men have guns available.

When the attacker has some other weapon, taking action results in a significantly greater probability of loss for women than it does for men while taking no action results in a significantly greater probability of loss for men than for women. The probability of injury did not significantly differ by sex.

Finally, when the attacker has no weapon, women are at significantly greater risk of having a loss than are men, whatever they choose to do. Women, however, had a significantly greater probability of injury than men if they take action. This may be due to the

fact that, generally, women are physically less strong than men and would lose more physical confrontations with their attackers.

## The game[25]

It is now useful to recap these results so that it can be seen how the actors are making their choices in this game. Prior to their encounter, the attacker has to decide what weapon to use, if any. Also, the potential victim has to decide whether to have a gun available because, if it is not available when the encounter takes place, it will not be possible to use that response.

The attacker may have either of two objectives, or some combination of them. Either his objective is commercial and he wants to gain as much profit from the encounters as possible or his objective is to harm the victim, perhaps as revenge for some other act or to gain pleasure from that action. Suppose first that his object is personal profit. Then, he will want to choose either to be armed with a gun or to have no weapon at all. The former has some additional costs for him; he may run a risk of greater penalties by using a gun as well as having the direct cost of having the gun in the first place.

*L. Southwick / Journal of Criminal Justice 28 (2000) 351–370*

Table 8
Clearance rates

|  | 1980 (%)[a] | 1991 (%)[b] | 1991/1980 (%) |
|---|---|---|---|
| *Robbery* | | | |
| Gun | 22.80 | 19.90 | 87.28 |
| Other weapon | 24.46 | 26.08 | 106.63 |
| No weapon | 24.60 | 27.40 | 111.38 |
| | | | |
| *Aggravated assault* | | | |
| Gun | 54.30 | 45.40 | 83.61 |
| Other weapon | 57.87 | 57.84 | 99.94 |
| No weapon | 64.30 | 64.60 | 100.47 |

[a] Data from 1980 Uniform Crime Reports, p. 185.
[b] Data from 1991 Uniform Crime Reports, p. 208.

Consider Table 8. This shows the probability of the offender being caught in two specific years; the first is one year after the start of the first data set and the second is the year of the second data set. This table shows that the probability of a robber or assaulter who uses a gun being caught has declined by 12.7 percent and 16.4 percent, respectively. At the same time, the robber or assaulter who uses no weapon now has a greater chance of being caught. This fact, along with the greater yield to robbers who use guns, will tend to induce an increase in the proportion of offenders who use guns. From Table 1, it can be seen that the proportion has increased from 9.8 percent to 11.5 percent over the period covered by the two samples. The difference was significant at the 1 percent level.

Using data from several tables, the ratio of gun-using attackers to those who use no weapons has risen from 13.65 percent in the earlier data to 15.40 percent in the later sample. At the same time, the ratio of the yields in the two cases to the attacker in terms of property and cash lost by the victim was, in the earlier sample, 2.653. That fell modestly in the second sample to 2.621. This result seems to imply that the marginal benefit to the offender of using a gun has remained relatively stable relative to the marginal benefit of using no weapon. This may, in part, be due to the fact that fewer of the victims have guns or take other actions in the later sample.

Now, take a look at the strategy for the potential victim. It is not appropriate to make the assumption that the choice of action or whether to have a gun is independent of the potential loss since that is clearly not the case. As found earlier, those people who are more likely to be attacked by people with guns are themselves more likely to be armed in self-defense. This can be seen to be a reasonable response to a higher probability of attack since (a) the probability of a loss is lower if the victim has a gun, (b) the expected loss is lower if the victim has a gun, and (c)

the probability of serious injury is lower if the victim has a gun. These conclusions are all based on an attack by a person who has a gun.

What about the case where the victim is attacked by a person who does not have a gun but has some other weapon? While having a gun seems to reduce the probability of having a fiscal loss, the average loss is higher for victims who have a gun than for those who take some other action. As noted above, it cannot be known whether this is due to the probable fact that people who have more to be stolen may well be more likely to have guns for defensive purposes. The other consideration is injuries; the victim is less likely to be harmed if she has a gun than if she takes some other action. It would seem, therefore, that having a gun would dominate the choices available to a potential victim in this case.

The final case is where the attacker has no weapon. This is referred to as "strong-arm" in the case of robbery; it may refer to purse snatching or similar type of robbery by threat or strength or it may involve more prolonged contact as in simply beating up the victim by dint of strength or skill in martial arts. The proportion of injuries is significantly lower for victims who have and are able to use guns. Again, it would seem that the best choice for the victim is to have a gun available.

The foregoing does not apply any cost to the victim's having a gun. In this costless situation, it would be expected that most of the victims would be armed. Yet this is not the case; in fact, most victims apparently do not have guns.[26] It should be noted that the having of a gun is self-reported; if it is illegal for the victim to have a gun, she will be less likely to report having had one during the incident. This point is noted as well by Kleck and Gertz (1998) who report that many of the people who actually carry guns are not licensed to do so. Further, if a victim has a gun but is unable to use it, it might be expected that the victim would class this as a case where no self-defense use of a gun was made.

A person is not a victim until she is attacked. The probability of any individual being attacked is fairly low and, according to the *NCVS*, falling. Given the fact that there is at least some nuisance cost to having a gun available, especially when out of one's home, it would be expected that not all people would choose to have a gun available for self-defense. Further, there are legal barriers to having a self-defense firearm available in many jurisdictions.

Another factor of importance in the availability of a gun is whether the victim is at home or not. In most cases it is easier to have a gun available at home both because it does not have to be carried on one's person and because the laws governing possession are generally less restrictive at home. At home, a person is more likely to have a long gun (rifle or shotgun)

available than they would away from home because of the difficulty associated with carrying it. In terms of both ease of use and safety in self-defense use, since the attacker has a more difficult time in taking it from the victim, the handgun is probably more effective, although the long guns are more deadly. State and local laws tend to be much more restrictive in regard both to handgun ownership and to carrying of handguns. The result is that the cost of the handgun to the defender is increased.

Another cost of having a gun available is in its potential for misuse which brings harm on the family which owns it. In 1994, there were 1356 accidental deaths from gunshot (see Table 137 in the 1997 *Statistical Abstract*). At the same time, there were some 95,988,000 households in the U.S. (see Table 73 in the 1997 *Statistical Abstract*). Of these households, some 41 percent had guns (see Table 2.75 in the 1996 *Sourcebook of Criminal Justice Statistics* of the Bureau of Justice Statistics (a)). It follows that the probability of an accidental death from a gun is 0.0000345. According to Kleck (1991, pp. 271–274), some 17.7 percent of these deaths are actually misclassified suicides and homicides. Correcting for these would reduce the probability to 0.0000287. The relationship of total injuries to deaths in shootings may be as high as 7 to 1.[27] That would imply a probability of injury by accident of 0.0002. Compare this with the probability of being a victim of a violent crime, which, as noted earlier, is about 0.0148 or about seventy-four times as high. The probability of reduction in serious injuries from crime can be computed as 0.000228 in the 1979–1987 sample and 0.0004 in the 1991 sample. Thus, there is still a substantial *net* reduction in injury probability for the average person.[28]

Of course, those who are less likely to be attacked than the average will gain less protection and would be less likely to desire to carry guns.

At the same time, the handgun is also more utilitarian to the attacker since he will usually not be in his own home and will need to carry his weapon of choice with him to the encounter. Thus, it might be expected that the legal restrictions would also increase his costs; to the extent that he takes the probability of being caught and punished into account and to the extent that the expected punishment increases with his use of an illegal firearm (it would be foolish to use a licensed handgun which would increase the probability of being caught), this would be a cost he would/should be expected to consider.

Table 9 is created for the purpose of computing the added risks to the offender of having a gun with respect to expected punishments. The data in this table are from around 1990 and show the expected sentences for various crimes. The number of weapons crimes was computed by multiplying the numbers of each crime by the percentage which are done with a gun, resulting in an inferred 1,000,295 gun crimes. The expected maximum sentence for each crime was computed as the arrests per crime times convictions per arrest times percent incarcerated times the average maximum sentence. Then, this was further multiplied by the average percent of the sentence that was served. The result for the gun crime is an expected incarceration of 0.20 month. If it is further presumed that half of the cases have the sentence for the weapons charge served concurrently with another charge, this would reduce the expected sentence to 0.10 month per gun offense, or about three days.

The difference in expected gain to an attacker with a gun compared to one with no weapon is $138.50 in

Table 9
Prison risks to criminal

| Crime | Rape | Robbery | Aggravated assault | Weapons |
|---|---|---|---|---|
| Crimes[a] | 130,260 | 1,149,710 | 1,600,670 | |
| % Guns[b] | 48.3 | 40.6 | 29.4 | 1,000,295 |
| Arrests[c] | 39,160 | 167,990 | 475,330 | 221,200 |
| % Arrest/crimes | 30.1 | 14.6 | 29.7 | 22.1 |
| Convictions[d] | 18,024 | 47,446 | 53,860 | 20,733 |
| % Convictions/arrests | 46.0 | 28.2 | 11.3 | 9.4 |
| % Incarcerated[d] | 86.0 | 90.0 | 72.0 | 62.0 |
| Average maximum sentence[d] | 128 | 97 | 52 | 34 |
| Average % time served[e] | 55.6 | 46.3 | 47.5 | 46.7 |
| Expected sentence | 8.46 | 1.67 | 0.60 | 0.20 |

[a] *Sourcebook of Criminal Justice Statistics 1991* (Bureau of Justice Statistics, p. 266).
[b] *Sourcebook of Criminal Justice Statistics 1991* (Bureau of Justice Statistics, p. 308).
[c] *Crime in the U.S. 1990* (Federal Bureau of Investigation, p. 174).
[d] *Sourcebook of Criminal Justice Statistics 1993* (Bureau of Justice Statistics, pp. 536–537).
[e] *Prison Sentences and Time Served For Violence* (Greenfield, 1995, p. 1, BJS ).

the earlier sample and $164.90 in the later sample. As long as the opportunity cost of time to the offender is under about $46 per day in the earlier time period and $55 per day in the later time period, it makes sense for him to use a gun. Of course, it is necessary to factor in the cost of the gun as well. If a gun has a street price of $100, it can be expected to be used for about four times before the user is caught. Suppose that results in a 60 percent probability of losing the gun. Then the per use cost of the gun is about $15. That will not affect the decision very much. It would in this case reduce the needed opportunity cost of time for the offender to $31 per day in the earlier sample and $40 per day in the later sample.[29] It needs to be stressed that these figures were only approximate and there should be little confidence placed in their precise values; the method, however, is valid and with better data could result in more precise estimates.

## Arming potential victims

Suppose that more of the victims had guns. What would be the effects of this be on crime? In order to answer this question, suppose that 10 percent of the victims who were not armed but took some action and 10 percent of the victims who took no action were all armed with guns and were able to use them in self-defense. (The 10 percent is simply an arbitrary figure). It will be assumed that each of these persons will carry the same amount of valuables that those who were already armed with guns carried. Since people who do not currently carry guns probably carry smaller amounts of cash and property with them as a form of self-insurance, this would imply that they would carry more when they are armed. Consequently, this may result in an over-estimation of the losses that these people would suffer if they were to be armed with guns.[30] The means by which more potential victims would be armed could be due to lower governmentally imposed costs such as registrations, purchase delays, taxes, or regulatory costs passed on to the consumer. Then, those who are next most likely to be attacked after those who are currently armed would be the incremental ones to arm themselves. This would not be a random sample of citizens, of course. It would be necessary to have the proportion of citizens who are armed be substantially less than 10 percent in order to have 10 percent of the victims be armed. It would also be necessary to increase the number of people who carry guns by more than 10 percent, however, to accomplish this result.

Tables 1 and 4 can be used to compute how the losses would be changed under the posited changed circumstances.[31] These results are given in Table

Table 10
Losses and injuries if more victims were armed

| Attacker choice | Actual | More armed | Difference |
|---|---|---|---|
| **Sample 1979–1987** | | | |
| *Average total loss* | | | |
| Gun | 222.26 | 201.21 | (21.04) |
| Other weapon | 62.15 | 64.34 | 2.18 |
| No weapon | 83.76 | 76.29 | (7.48) |
| Total | 93.31 | 86.30 | (7.01) |
| | | | |
| *Percent with injuries* | | | |
| Gun | 6.37 | 6.14 | −3.72 |
| Other weapon | 11.03 | 10.30 | −6.66 |
| No weapon | 2.83 | 2.77 | −2.07 |
| Total | 4.69 | 4.54 | −3.24 |
| | | | |
| **Sample 1991** | | | |
| *Average total loss* | | | |
| Gun | 237.21 | 220.23 | (16.97) |
| Other weapon | 33.00 | 29.70 | (3.30) |
| No weapon | 77.01 | 76.10 | (0.92) |
| Total | 89.46 | 86.37 | (3.09) |
| | | | |
| *Percent with injuries* | | | |
| Gun | 7.74 | 7.63 | −1.38 |
| Other weapon | 14.81 | 13.33 | −10.00 |
| No weapon | 2.93 | 2.64 | −10.00 |
| Total | 5.11 | 4.84 | −5.23 |

10. The ''Actual'' column of Table 10 is the same loss results given in Table 4 for the actual samples. The ''More Armed'' column is what the results for those samples would have been if 10 percent of those victims who did not actually have guns were to have had guns.[32]

First, consider the choice of the individual who is considering committing a criminal act. The average yield in the earlier sample would have dropped from $93.30 to $86.30, a drop of 7.5 percent. In the 1991 sample, the drop is from $115.80 to $110.10, or 4.9 percent. This means that criminal activity generally would be less lucrative so there would be less incentive to commit criminal acts.[33] This should not be strictly compared to the presence/absence of guns among attackers as considered above; rather it is a productivity measure to the attackers. There are other incentives not to be armed among attackers, such as added prison terms. This simply reduces the gain to a gun and thereby reduces the number of criminals who would rationally choose to be armed.

Second, consider the choice of a criminal who is unarmed as to whether or not to have a gun. The current benefit in the 1979–1987 sample is $138.50, the difference between the yield if he has a gun and the yield if he is unarmed. With more of the victims having guns, the net yield falls to $124.90, a drop of 9.8 percent. In the 1991 sample, the actual yield was

$164.90. It would have fallen, had more victims been armed, to $148.40, a drop of 10.0 percent.

The result of this is that, if more victims have guns, the incentive for a criminal to have a gun falls as well. This is contrary to the standard perception that if more victims are armed, more criminals will also be armed. The fact is that it would not be to their financial benefit to do so. The gain of $138.50 did not induce all criminals to have guns in the 1979–1987 sample so there must have been other costs associated with having a gun. The reduced incentive due to the smaller gain assumes that these other costs would not be reduced.

It needs to be noted in this context that there is no data on injuries to the criminal attackers. Of course, any such injuries are generally valued negatively neither by the victims nor by society generally (except in paying any hospitalization costs). The criminal, however, may well be concerned about this and it may affect his decision about having a gun.[34] If it were the case that having more of the potential victims armed had no effect on the probability of injury to the criminal (which seems unlikely), it would then be the case that this factor would have no effect and criminals' incentives to be armed would be reduced if more victims were armed.[35]

Another question relative to the arming of potential victims is how it would affect their injury rates. Using the same set of serious injuries as in Table 5 and the same presumption that 10 percent of the actual unarmed victims were to have guns, this is analyzed and presented in Table 10. The proportion of victims with serious injuries would have fallen in the 1979–1987 data set from 4.69 percent to 4.54 percent, a drop of 3.24 percent. In the 1991 data, the proportion would have fallen from 5.11 percent to 4.84 percent, a drop of 5.23 percent. It may be conjectured that a factor causing the higher actual rate of serious injury in the 1991 data set is that fewer of the victims had guns than in the earlier data set.[36]

It follows that there is a social gain to having more of the potential victims possessing guns. This gain is not fully captured by the individual since the reduced level of crime and the lower likelihood of criminals being armed will also benefit those potential victims who do not choose to have guns. Lott and Mustard (1997) also find that increased arming of potential victims reduces the incentive to commit crimes.

Of course, people are currently making individually optimal choices of whether to be armed or not. Their choice factors include not only their potential injuries and losses but also the costs they face. Since many states impose substantial costs on the possession of guns (for example, it takes over eight months to receive a handgun permit in New York

State as well as requiring the expenditure of over $200), fewer people will choose to be armed. Recently, several states have reduced these barriers (costs) with the result that more potential victims, ceteris paribus, will choose to be armed.

## Conclusion

This study has looked at the decisions by potential victims and by criminal offenders about the use of guns for attack and for defense, as well as the use of other weapons by offenders and the taking of other actions by defenders. It was found that gun usage by defenders is correlated with gun use by offenders. This is to be expected since those with more to lose or a greater risk of being attacked would be more likely to arm themselves and their attackers, knowing this, might similarly be inclined to be armed.

The cash losses and property losses by victims of crime were analyzed and it was found that either the victim's taking other actions or having a gun reduced the probability of actually suffering a loss. This was found to be independent of the choice of weapon for the attacker for the probability of cash losses but the amount of loss suffered by the victim was higher if the attacker used a gun. Similar analyses were done for property losses with similar results. Guns or other actions acted to reduce victim loss probabilities but the amounts of losses were more affected by the choices made by the attacker. Overall, either taking some other action or using a gun worked best for the victim in reducing losses. For the attacker, the optimum commercial choices would be either no weapon or the use of a gun. Other weapons may be preferred if the object is to inflict injury without killing the victim.

The next step was to look at the serious injuries which occurred. Victims received more injuries if they took some other action than if they used a gun or did nothing. Their attackers caused the lowest rate of injury if they did not use a weapon but caused the highest rate of injury if they used a weapon other than a gun. Thus, it followed that the best choice for the victim is to use a gun and for the money-motivated attacker is either to use a gun or to use no weapon.

The differences between men and women in their reactions to being attacked were also analyzed. Women are less likely to have guns but, if they do, will have the same probability of injury or probability of loss that men do. If they do not have guns, women are less likely to take some action than are men and this appears to be a rational choice given the relative likelihoods of injury and financial loss.[37]

The next stage in the analysis was to look at this game with the additional factors of the cost to both

the offender and the potential victim of carrying a gun. Since there is such a cost for both, the choice for the potential victim may be optimally found as any of the three strategies. It may be worthwhile to carry a gun if the probability of being a victim is large enough or the potential loss is sufficiently large. Given that many people will still choose not to carry a gun, the reduction in the expected loss accompanied by the increase in the probability of injury may induce victims to choose either to take some other action or not, depending on their own utility functions. The attacker will, if he is optimi-zing his receipts, choose either to use a gun or no weapon, depending on his weighing of the apparent likelihood of extra prison time for gun usage against the extra payoff for having a gun. The attacker who is interested in harming his victim will tend to choose a weapon other than a gun. It appears that the opportunity costs of the criminal's time are about what would be expected, given the actual choices made.

The final step in the analysis was to look at what the results in terms of both losses and injuries would have been in both data sets if more of the victims had been armed. It was found that potential victims who choose to carry guns provide an external benefit to the class of potential victims. They reduce the probability that the attacker will get anything from a particular crime and therefore reduce the attractiveness of that crime to the criminal. Further, they reduce the amount of gain that can be expected from that crime. Since there are costs to the potential victim in carrying a gun, it follows that too few guns will be carried for a social optimum.

## Acknowledgments

I benefited from the excellent computer analysis done by my R.A., Shao-Chi Chang, and from discussions with my colleagues Isaac Ehrlich, William Hamlen, and Govind Hariharan as well as from comments by Randall Lutter and from very helpful suggestions by an anonymous referee. Neither they nor my employer bear responsibility for the opinions contained herein.

## Notes

1. See, for example, Loftin et al. (1991) and Kellerman et al. (1993). Their statistical procedures are invalid. Kellerman et al. purport to create a control group which, it turns out, differs in many important (and biased) respects from their sample population while Loftin et al. compared results from two states with the District of Columbia while neglecting factors in which they differ in numerous uncontrolled ways. See Kates et al. (1995) for the analysis of numerous such medical studies.

2. Of course, this does not apply to having a gun for recreational purposes. Generally, long guns are for recreation while handguns are for self-protection, although there are overlaps in both directions. The ownership of a gun does not imply that it is for self-defense, although it may sometimes be useful in such a situation.

3. Of course, some people find practice with a gun gives them a positive utility.

4. Also, other sources have substantially accurate data on these crimes. Further, homicide victims cannot be interviewed.

5. There are some minor differences in the format of the questionnaire, as filled out by the interviewer, across the two periods. For our purposes, the only substantive difference is in the question regarding defensive use of a weapon. In the earlier sample, the question was whether a gun was "used or brandished" against the attacker, while in the second sample the question was whether the offender was "attacked or threatened" with a gun. It seems unlikely that this made a difference in how the form was filled out. The actual question asked of the victim was "What did you do?" which did not change. It is possible, however, that differences in results do occur as a result of this interviewer difference, so changes over the two time periods should be interpreted with caution.

6. The choice of how to categorize a crime is highly arbitrary. If an assault is accompanied by a robbery, is it primarily an assault or primarily a robbery? The true answer depends on the motive of the attacker, which can only be inferred by the person doing the categorization. In the attacks studied in this study, it is only the attack and consequences which matter rather than the crime category. The report is made by the victim and the categorization is made by the researcher.

7. The data are the actual sample results. As a result, they may not be a random sample accurately reflecting the overall population; they would have to be weighted to accomplish that. The objective here, however, is to see what happened to a set of people who were attacked and who chose different responses to the attack. It is also the case that interviewees who may have been armed but who did not use their guns in response to the attack are not counted as users of guns in self-defense.

8. This can be thought of as having a rational expectations basis where it is expectations which govern decisions.

9. Kleck (1988, p. 17) argues that gun ownership among potential victims has a substantial inhibiting effect on criminals' willingness to commit crimes.

10. Possibly, people are reluctant to tell a government interviewer about gun use. Kleck (1991, p. 106) earlier had estimated about 1 million defensive uses of guns annually. Cook and Ludwig (1997, p. 9) found as many as 4.7 million defensive uses annually, although they believe there are actually fewer such uses. Mauser (1996) estimates about 750,000 such uses and finds the Canadian rate to be somewhat smaller but in the same range. See Kleck and Gertz (1995) for more extensive discussion of the differences with the NCVS.

11. Even in Kleck's surveys, it is probable that self-defense uses of guns are underreported, especially by people who do not legally carry the guns. It may mean the safety improvement found in this study is understated if there is under-reporting in the data used since the question at issue is the results of such defensive gun uses. Unreported uses are likely to have been even more successful than those reported since they would have less in losses and fewer injuries for the defender.

12. Alternatively, the attacker could exercise more caution in making the attack. Either way, the attack is more costly in his own terms if the victim has a higher probability of being armed.

13. If the attacker knows the potential victim, he may know as well whether the potential victim is armed and therefore may make a decision on his attack based on that information.

14. It is sometimes argued that armed civilians are more likely to attack others in a momentary fit of anger, but the evidence on licensed gun carrying does not support this.

15. Data from *Sourcebook of Criminal Justice Statistics, 1991* (Bureau of Justice Statistics (b), p. 264).

16. While a number of states have laws which allow the concealed carrying of guns, there are others which do not as well as localities even in the former states which restrict it severely.

17. It is also the case that the survey results are subject to bias, given that it may be illegal for some defenders to carry guns.

18. Rape has declined from 1.8 to 1.0 per 1000 population from 1979 to 1990, Robbery declined from 6.3 to 5.7, and Aggravated Assault declined from 9.9 to 8.4, *Criminal Victimization in the U.S.: 1973–90* Trends, (Bureau of Justice Statistics, 1992, pp. 19, 25, 39).

19. Cook (1985, p. 94) argues that the number of bullet wounds is understated in the surveys. This may also be true for other injuries or bullet wounds may be deliberately misclassified as other injuries but there is no reason to believe that there is a systematic bias that will affect the results herein.

20. Cook (1987) notes that gun robberies are also more likely to result in the victim's death than are non-gun robberies. On the other hand, he uses FBI data rather than *NCVS* data and also does not analyze injuries as done here.

21. They also report on a number of other studies that appear to show that the use of weapons by attackers result generally in reduced injury to the victim. These other studies also show, as does this one, that the use of a gun results in lower injury than does the use of some other weapon.

22. It is the case that people who were killed by an attacker are not included in the sample. Generally, the ratio of people injured but not killed by gunshot to the number killed is about 3.3 (see Table 3.144 in the *1995 Sourcebook* (Bureau of Justice Statistics (b)). That would suggest that two people should be added to the injuries list over the two periods. At the same time, about thirty-five other people who did not use guns for defense would also have died. These figures would not change the conclusion.

23. Zimring and Zuehl (1986, p. 17) find, using a different sample, that females are less likely to be killed in a robbery than are males, which may be seen as added confirmation of this point.

24. The sample of women who are attacked and have guns is too small to test for a significant difference in the probability of being raped. The average probability of rape, given an attack on a woman, is about 1 in 80. In the sample only eighty women with guns were attacked and one was raped. If none had been raped, the difference would still not be significant.

25. Taylor (1995) has formally developed a game theoretic model that comes to many of the same conclusions theoretically as are found empirically in this study.

26. Because the defensive gun use is reported only if the victim reports it, those victims who have guns but do not use them either because they are unable to do so or because they are unwilling to do so will not be included as having guns for defensive purposes; they are treated by this study as though they were unarmed.

27. See Wintemute and Wright (1992, p. 556). Mercy and Houk (1988) argue for 5 to 1. The *1995 Sourcebook of Criminal Justice Statistics* (Bureau of Justice Statistics (b)), Table 3.144, gives a ratio of 4.4 to 1, but does not include gunshots which are not treated at a hospital.

28. The effect on the probability of death is less clear. Generally, based on the relative likelihood of serious injury, it also appears that having a gun also reduces the net (average) probability of death.

29. Raising the street price of the gun would also reduce the incentive to use a gun, although that has been unsuccessfully tried already.

30. Note that the population of people who are currently armed differs from the general population in the likelihood of being attacked by an armed robber and, therefore, probably in the amount of expected losses.

31. These results make the assumption that the loss of cash and property to the victim is equal to the gain to the criminal.

32. More than a 10 percent increase in the number armed would be necessary. Further, because the people who are currently armed for self-defense are generally those who have more to lose, the reduction in losses would be greater than is assumed in this analysis. Thus, this section results in an underestimate of the effects to be expected.

33. Kleck (1986, p. 47) argues that increased gun ownership among potential victims reduces the incentive of criminals to commit crimes due to an increased probability of being harmed; this has not been considered in the present study.

34. Cook (1979, p. 755) notes that "the fear of some victims' ability to defend themselves should be considered when analyzing deterrents to robbery."

35. Since it is usually illegal for the victim to use deadly physical force when she is not in imminent danger, it may be optimal for a criminal who faces or expects to face armed victims to be unarmed so as to reduce the threat to himself.

36. Kleck and Sayles (1990) and Kleck and DeLone (1993) also found that victim resistance using guns reduced injuries among victims.

37. It might be possible to look at age and income as other factors affecting outcomes since both are related to gun ownership, although non-linearly. (See *Sourcebook of Criminal Justice Statistics, 1994* (Bureau of Justice Statistics (b)), Table 2.64). It is difficult, however, to determine the age and income of the person to whom the incident happened so this was not done.

## References

Becker, G. S. (1968). Crime and punishment: an economic approach. *J Polit Econ 76*(2), 169–217.

Bureau of Justice Statistics. *Criminal Victimization in the United States*, various years.

Bureau of Justice Statistics. *Sourcebook of Criminal Justice Statistics*, various years.

Bureau of Justice Statistics. (1992). *Criminal Victimization in the United States: 1973–90 Trends*. NCJ-139-564, December.

Cook, P. J. (1979). The effect of gun availability on robbery and robbery murder. In R. H. Haveman & B. B.

Zuehl (Eds.), *Policy Studies Annual Review* ( Vol. 3, pp. 743–781). Sage Publications.

Cook, P. J. (1980). Reducing injury and death rates in robbery. *Policy Anal 6*(1), 21–45.

Cook, P. J. (1981). The effect of gun availability on violent crime patterns. *Ann Am Acad Polit Soc Sci 455*, 63–79.

Cook, P. J. (1985). The case of the missing victims: gunshot woundings in the national crime survey. *J Quant Criminol 1*(1), 91–102.

Cook, P. J. (1986). The relationship between victim resistance and injury in noncommercial robbery. *J Leg Stud XV*(2), 405–416.

Cook, P. J. (1987). Robbery violence. *J Crim Law Criminol 78*(2), 357–376.

Cook, P. J., & Ludwig, J. (1997). *Guns in America: National Survey on Private Ownership and Use of Firearms.* Research in Brief, National Institute of Justice, May.

Ehrlich, I. (1975). The deterrent effect of capital punishment: a question of life and death. *Am Econ Rev LXV* (3), 397–417.

Ehrlich, I., & Becker, G.S. (1972). Market insurance, self-insurance, and self-protection. *J Polit Econ 80* (4), 623–648.

Federal Bureau of Investigation. *Crime in The U.S.,* various years.

Greenfield, L. A. (1995). *Prison Sentences and Time Served For Violence.* Bureau of Justice Statistics. Washington, DC.

Kates, D. B., Schaffer, H. E., Lattimer, J. K., Murray, G. W., & Cassem, E. W. (1995). Guns and public health: epidemic of violence or pandemic of propaganda? *Tenn Law Rev 62*(3), 513–596.

Kellerman, A. L., Rivara, F. P., Rushforth, N. B., Banton, J. G., Reay, D. T., Francisco, J. T., Locci, A. B., Prodzinski, A., Hackman, B.B., & Somes, G. (1993). Gun ownership as a risk factor for homicide in the home. *N Engl J Med 329*(15), 1084–1091.

Kleck, G. (1986). Policy lessons from recent gun control research. *Law Contemp Probl 49*(1), 35–62.

Kleck, G. (1988). Crime control through the private use of armed force. *Soc Probl 35*(1), 1–21.

Kleck, G. (1991). *Point Blank.* New York: Aldine.

Kleck, G., & DeLone, M. A. (1993). Victim resistance and offender weapon effects in robbery. *J Quant Criminol 9*(1), 55–81.

Kleck, G., & Gertz, M. (1995). Armed resistance to crime: the prevalence and nature of self-defense with a gun. *J Crim Law Criminol 86*(1), 150–187.

Kleck, G., & Gertz, M. (1998). Carrying guns for protection: results from the national self-defense survey. *J Res Crime Delinquency 35*(2), 193–224.

Kleck, G., & McElrath, K. (1991). The effects of weaponry on human violence. *Soc Forces 69*(3), 669–692.

Kleck, G., & Sayles, S. (1990). Rape and resistance. *Soc Probl 37*(2), 149–162.

Loftin, C. L., McDowall, D., Wiersma, B., & Cottey, T. J. (1991). Effects of restrictive licensing of handguns on homicide and suicide in the District of Columbia. *N Engl J Med 325*(23), 1615–1620.

Lott J. R. Jr., & Mustard, D. B. M. (1997). Crime, deterrence, and right-to-carry concealed handguns. *J Leg Stud XXVI:* 1–68.

Mauser, G. A. (1996). Armed self-defense: the Canadian case. *J Crim Justice 24*(5), 393–406.

Mercy, J. A., & Houk, V. N. (1988). Firearm injuries: a call for science. *N Engl J Med 319*(19), 1283–1285.

Taylor, R. (1995). A game theoretic model of gun control. *Int Rev Law Econ 15*(3), 269–288.

Wintemute, G. J., & Wright, M. A. (1992). Initial and subsequent hospital costs of firearm injuries. *J Trauma 33*(4), 556–560.

Zimring, F. E., & Zuehl, J. (1986). Victim injury and death in urban robbery: a Chicago study. *J Leg Stud XV*(1), 1–40.