EXHIBIT 74

**Table 1. Annual Estimates of the Resident Population for the United States, Regions, States, and Puerto Rico: April 1, 2000 to July 1, 2009**

| Geographic Area | Population Estimates | | | | | | | | | | April 1, 2000 | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | July 1, 2009 | July 1, 2008 | July 1, 2007 | July 1, 2006 | July 1, 2005 | July 1, 2004 | July 1, 2003 | July 1, 2002 | July 1, 2001 | July 1, 2000 | Estimates Base | Census |
| **United States** | 307,006,550 | 304,374,846 | 301,579,895 | 298,593,212 | 295,753,151 | 293,045,739 | 290,326,418 | 287,803,914 | 285,081,556 | 282,171,957 | 281,424,602 | 281,421,906 |
| **Northeast** | 55,283,679 | 55,060,196 | 54,879,379 | 54,710,026 | 54,598,185 | 54,514,298 | 54,364,452 | 54,167,735 | 53,930,017 | 53,667,506 | 53,594,828 | 53,594,378 |
| **Midwest** | 66,836,911 | 66,595,597 | 66,359,247 | 66,082,058 | 65,806,421 | 65,587,713 | 65,319,024 | 65,074,729 | 64,815,413 | 64,493,956 | 64,395,190 | 64,392,776 |
| **South** | 113,317,879 | 112,021,022 | 110,573,419 | 108,930,843 | 107,411,036 | 105,874,018 | 104,431,612 | 103,185,017 | 101,868,637 | 100,559,939 | 100,235,832 | 100,236,820 |
| **West** | 71,568,081 | 70,698,031 | 69,767,850 | 68,870,285 | 67,937,509 | 67,069,710 | 66,211,330 | 65,376,433 | 64,467,489 | 63,450,556 | 63,198,752 | 63,197,932 |
| Alabama | 4,708,708 | 4,677,464 | 4,637,904 | 4,597,688 | 4,545,049 | 4,512,190 | 4,490,591 | 4,472,420 | 4,464,034 | 4,451,849 | 4,447,589 | 4,447,100 |
| Alaska | 698,473 | 688,125 | 682,297 | 677,325 | 669,488 | 661,569 | 650,884 | 642,691 | 633,316 | 627,499 | 626,931 | 626,932 |
| Arizona | 6,595,778 | 6,499,377 | 6,362,241 | 6,192,100 | 5,974,834 | 5,759,425 | 5,591,206 | 5,452,108 | 5,304,417 | 5,166,697 | 5,130,607 | 5,130,632 |
| Arkansas | 2,889,450 | 2,867,764 | 2,842,194 | 2,815,097 | 2,776,221 | 2,746,161 | 2,722,291 | 2,704,732 | 2,691,068 | 2,678,288 | 2,673,386 | 2,673,400 |
| California | 36,961,664 | 36,580,371 | 36,226,122 | 35,979,208 | 35,795,255 | 35,558,419 | 35,251,107 | 34,876,194 | 34,485,623 | 33,994,571 | 33,871,648 | 33,871,648 |
| Colorado | 5,024,748 | 4,935,213 | 4,842,259 | 4,753,044 | 4,660,780 | 4,599,681 | 4,548,775 | 4,504,265 | 4,433,068 | 4,328,070 | 4,302,015 | 4,301,261 |
| Connecticut | 3,518,288 | 3,502,932 | 3,488,633 | 3,485,162 | 3,477,416 | 3,474,610 | 3,467,673 | 3,448,382 | 3,428,433 | 3,411,726 | 3,405,607 | 3,405,565 |
| Delaware | 885,122 | 876,211 | 864,896 | 853,022 | 839,906 | 826,639 | 814,905 | 804,131 | 794,620 | 786,411 | 783,557 | 783,600 |
| District of Columbia | 599,657 | 590,074 | 586,409 | 583,978 | 582,049 | 579,796 | 577,777 | 579,585 | 578,042 | 571,744 | 572,055 | 572,059 |
| Florida | 18,537,969 | 18,423,878 | 18,277,888 | 18,088,505 | 17,783,868 | 17,375,259 | 16,981,183 | 16,680,309 | 16,353,869 | 16,047,118 | 15,982,639 | 15,982,378 |
| Georgia | 9,829,211 | 9,697,838 | 9,533,761 | 9,330,086 | 9,097,428 | 8,913,676 | 8,735,259 | 8,585,535 | 8,419,594 | 8,230,161 | 8,186,781 | 8,186,453 |
| Hawaii | 1,295,178 | 1,287,481 | 1,276,832 | 1,275,599 | 1,266,117 | 1,252,782 | 1,239,298 | 1,228,069 | 1,218,305 | 1,211,566 | 1,211,538 | 1,211,537 |
| Idaho | 1,545,801 | 1,527,506 | 1,499,245 | 1,464,413 | 1,425,862 | 1,391,718 | 1,364,109 | 1,342,149 | 1,321,170 | 1,299,551 | 1,293,955 | 1,293,953 |
| Illinois | 12,910,409 | 12,842,954 | 12,779,417 | 12,718,011 | 12,674,452 | 12,645,295 | 12,597,981 | 12,558,229 | 12,507,833 | 12,437,645 | 12,419,658 | 12,419,293 |
| Indiana | 6,423,113 | 6,388,309 | 6,346,113 | 6,301,700 | 6,253,120 | 6,214,454 | 6,181,789 | 6,149,007 | 6,124,967 | 6,091,649 | 6,080,520 | 6,080,485 |
| Iowa | 3,007,856 | 2,993,987 | 2,978,719 | 2,964,391 | 2,949,450 | 2,941,358 | 2,932,799 | 2,929,264 | 2,929,424 | 2,928,184 | 2,926,380 | 2,926,324 |
| Kansas | 2,818,747 | 2,797,375 | 2,775,586 | 2,755,700 | 2,741,771 | 2,730,765 | 2,721,955 | 2,712,598 | 2,701,456 | 2,692,810 | 2,688,811 | 2,688,418 |
| Kentucky | 4,314,113 | 4,287,931 | 4,256,278 | 4,219,374 | 4,182,293 | 4,147,970 | 4,118,627 | 4,091,330 | 4,069,191 | 4,048,903 | 4,042,288 | 4,041,769 |
| Louisiana | 4,492,076 | 4,451,513 | 4,376,122 | 4,240,327 | 4,497,691 | 4,489,327 | 4,474,726 | 4,466,068 | 4,460,816 | 4,468,979 | 4,468,972 | 4,468,976 |
| Maine | 1,318,301 | 1,319,691 | 1,317,308 | 1,314,963 | 1,311,631 | 1,308,253 | 1,303,102 | 1,293,938 | 1,284,791 | 1,277,211 | 1,274,915 | 1,274,923 |
| Maryland | 5,699,478 | 5,658,655 | 5,634,242 | 5,612,196 | 5,582,520 | 5,542,693 | 5,496,708 | 5,439,913 | 5,375,035 | 5,310,579 | 5,296,544 | 5,296,486 |
| Massachusetts | 6,593,587 | 6,543,595 | 6,499,275 | 6,466,399 | 6,453,031 | 6,451,279 | 6,451,637 | 6,440,978 | 6,411,730 | 6,363,015 | 6,349,119 | 6,349,097 |
| Michigan | 9,969,727 | 10,002,486 | 10,050,847 | 10,082,438 | 10,090,554 | 10,089,305 | 10,066,351 | 10,038,767 | 10,006,093 | 9,955,308 | 9,938,492 | 9,938,444 |
| Minnesota | 5,266,214 | 5,230,567 | 5,191,206 | 5,148,346 | 5,106,560 | 5,079,344 | 5,047,862 | 5,017,458 | 4,982,813 | 4,933,958 | 4,919,492 | 4,919,479 |
| Mississippi | 2,951,996 | 2,940,212 | 2,921,723 | 2,897,150 | 2,900,116 | 2,886,006 | 2,867,678 | 2,858,643 | 2,853,313 | 2,848,310 | 2,844,666 | 2,844,658 |
| Missouri | 5,987,580 | 5,956,335 | 5,909,824 | 5,861,572 | 5,806,639 | 5,758,444 | 5,714,847 | 5,680,852 | 5,643,986 | 5,606,065 | 5,596,684 | 5,595,211 |
| Montana | 974,989 | 968,035 | 957,225 | 946,230 | 934,801 | 925,887 | 916,750 | 909,868 | 905,873 | 903,293 | 902,190 | 902,195 |
| Nebraska | 1,796,619 | 1,781,949 | 1,769,912 | 1,760,435 | 1,751,721 | 1,742,184 | 1,733,680 | 1,725,083 | 1,717,948 | 1,713,345 | 1,711,265 | 1,711,263 |
| Nevada | 2,643,085 | 2,615,772 | 2,567,752 | 2,493,405 | 2,408,804 | 2,328,703 | 2,236,949 | 2,166,214 | 2,094,509 | 2,018,211 | 1,998,260 | 1,998,257 |
| New Hampshire | 1,324,575 | 1,321,872 | 1,317,343 | 1,311,894 | 1,301,415 | 1,292,766 | 1,281,871 | 1,271,163 | 1,256,879 | 1,240,446 | 1,235,791 | 1,235,786 |
| New Jersey | 8,707,739 | 8,663,398 | 8,636,043 | 8,623,731 | 8,621,837 | 8,611,530 | 8,583,481 | 8,544,115 | 8,489,469 | 8,430,921 | 8,414,378 | 8,414,350 |
| New Mexico | 2,009,671 | 1,986,763 | 1,968,731 | 1,942,608 | 1,916,538 | 1,891,829 | 1,869,683 | 1,850,035 | 1,828,809 | 1,820,813 | 1,819,041 | 1,819,046 |
| New York | 19,541,453 | 19,467,789 | 19,422,777 | 19,356,564 | 19,330,891 | 19,297,933 | 19,231,101 | 19,161,873 | 19,088,978 | 18,998,044 | 18,976,811 | 18,976,457 |
| North Carolina | 9,380,884 | 9,247,134 | 9,064,074 | 8,866,977 | 8,669,452 | 8,531,283 | 8,416,451 | 8,316,617 | 8,203,451 | 8,079,383 | 8,046,406 | 8,049,313 |
| North Dakota | 646,844 | 641,421 | 638,202 | 636,771 | 635,365 | 636,303 | 632,809 | 633,617 | 636,267 | 641,200 | 642,195 | 642,200 |
| Ohio | 11,542,645 | 11,528,072 | 11,520,815 | 11,492,495 | 11,475,262 | 11,464,593 | 11,445,180 | 11,420,981 | 11,396,874 | 11,363,844 | 11,353,150 | 11,353,140 |
| Oklahoma | 3,687,050 | 3,644,025 | 3,612,186 | 3,574,334 | 3,532,769 | 3,514,449 | 3,498,687 | 3,484,754 | 3,464,729 | 3,453,943 | 3,450,638 | 3,450,654 |
| Oregon | 3,825,657 | 3,782,991 | 3,732,957 | 3,677,545 | 3,617,869 | 3,573,505 | 3,550,180 | 3,517,111 | 3,470,382 | 3,430,891 | 3,421,437 | 3,421,399 |
| Pennsylvania | 12,604,767 | 12,566,368 | 12,522,531 | 12,471,142 | 12,418,161 | 12,388,368 | 12,357,519 | 12,326,302 | 12,299,533 | 12,285,504 | 12,281,071 | 12,281,054 |
| Rhode Island | 1,053,209 | 1,053,502 | 1,055,009 | 1,060,196 | 1,064,989 | 1,071,414 | 1,071,504 | 1,066,034 | 1,058,051 | 1,050,736 | 1,048,315 | 1,048,319 |
| South Carolina | 4,561,242 | 4,503,280 | 4,424,232 | 4,339,399 | 4,256,199 | 4,201,306 | 4,146,474 | 4,103,934 | 4,062,701 | 4,023,570 | 4,011,832 | 4,012,012 |
| South Dakota | 812,383 | 804,532 | 797,035 | 788,519 | 780,084 | 774,283 | 766,975 | 762,107 | 758,983 | 755,694 | 754,835 | 754,844 |
| Tennessee | 6,296,254 | 6,240,456 | 6,172,862 | 6,089,453 | 5,995,748 | 5,916,762 | 5,856,522 | 5,803,306 | 5,755,443 | 5,703,243 | 5,689,276 | 5,689,283 |
| Texas | 24,782,302 | 24,304,290 | 23,837,701 | 23,369,024 | 22,801,920 | 22,418,319 | 22,057,801 | 21,710,788 | 21,332,847 | 20,945,963 | 20,851,818 | 20,851,820 |

**Table 1. Annual Estimates of the Resident Population for the United States, Regions, States, and Puerto Rico: April 1, 2000 to July 1, 2009**

| Geographic Area | Population Estimates | | | | | | | | | | April 1, 2000 | |
| --- | --- | --- | --- | --- | --- | --- | --- | --- | --- | --- | --- | --- |
| | July 1, 2009 | July 1, 2008 | July 1, 2007 | July 1, 2006 | July 1, 2005 | July 1, 2004 | July 1, 2003 | July 1, 2002 | July 1, 2001 | July 1, 2000 | Estimates Base | Census |
| Utah | 2,784,572 | 2,727,343 | 2,663,796 | 2,583,724 | 2,499,637 | 2,438,915 | 2,379,938 | 2,334,473 | 2,291,250 | 2,244,314 | 2,233,204 | 2,233,169 |
| Vermont | 621,760 | 621,049 | 620,460 | 619,985 | 618,814 | 618,145 | 616,559 | 614,950 | 612,153 | 609,903 | 608,821 | 608,827 |
| Virginia | 7,882,590 | 7,795,424 | 7,719,749 | 7,646,996 | 7,563,887 | 7,468,914 | 7,373,694 | 7,283,541 | 7,191,304 | 7,104,533 | 7,079,048 | 7,078,515 |
| Washington | 6,664,195 | 6,566,073 | 6,464,979 | 6,372,243 | 6,261,282 | 6,184,289 | 6,113,262 | 6,056,187 | 5,987,785 | 5,911,122 | 5,894,143 | 5,894,121 |
| West Virginia | 1,819,777 | 1,814,873 | 1,811,198 | 1,807,237 | 1,803,920 | 1,803,302 | 1,802,238 | 1,799,411 | 1,798,582 | 1,806,962 | 1,808,344 | 1,808,344 |
| Wisconsin | 5,654,774 | 5,627,610 | 5,601,571 | 5,571,680 | 5,541,443 | 5,511,385 | 5,476,796 | 5,446,766 | 5,408,769 | 5,374,254 | 5,363,708 | 5,363,675 |
| Wyoming | 544,270 | 532,981 | 523,414 | 512,841 | 506,242 | 502,988 | 499,189 | 497,069 | 492,982 | 493,958 | 493,783 | 493,782 |
| | | | | | | | | | | | | |
| **Puerto Rico** | 3,967,288 | 3,954,553 | 3,941,235 | 3,926,744 | 3,910,722 | 3,893,931 | 3,876,637 | 3,858,272 | 3,837,768 | 3,814,413 | 3,808,603 | 3,808,610 |

Note: The April 1, 2000 Population Estimates base reflects changes to the Census 2000 population from the Count Question Resolution program and geographic program revisions.  See Geographic Terms and Definitions at http://www.census.gov/popest/geographic/ for a list of the states that are included in each region.

Suggested Citation:
Table 1. Annual Estimates of the Resident Population for the United States, Regions, States, and Puerto Rico: April 1, 2000 to July 1, 2009 (NST-EST2009-01)
Source: U.S. Census Bureau, Population Division
Release Date: December 2009

# EXHIBIT 75

Table 8.4. Studies of the Association Between Gun Laws and Suicide Rates

| Study | Sample | # Control Variables | Gun Ownership Measured? | # Gun Controls Assessed | Gun Controls Significantly[a] Reduce Rate of | |
|---|---|---|---|---|---|---|
| | | | | | Gun Suicide | Total Suicide |
| Geisel et al. (1969) | 50 states, 1960 | 7 | No | 1(8)[b] | Yes/No[c] | No |
| | 50 states, 1965 | 8 | No | 1(8)[b] | Yes/No[c] | No |
| | 129 cities, 1960 | 8 | No | 1(8)[b] | — | No |
| Murray (1975) | 50 states, 1970 | 9 | No | 7 | No | — |
| Lester and Murrell (1980) | 48 states, 1960, 1970 | 0 | No | 1[b] | Yes | Yes[e] |
| Nicholson and Garner (1980) | Time series, D.C. | 0 | No | 1 | Yes | Yes |
| Lester and Murrell (1982) | 48 states, 1960, 1970 | 0 | No | 3(8)[d] | Yes | Yes |
| Medoff and Magaddino (1983) | 50 states, 1970 | 5 | No | 1(2)[c] | — | — |
| DeZee (1983) | 50 states, 1978 | 7 | No | 7 | No | No |
| Sommers (1984) | 50 states, 1978 | 2 | No | 9 | No[f] | No[f] |
| Lester (1987a) | 48 states, 1970 | 0 | No | 1[b] | — | — |
| Lester (1988a) | 9 regions, 1970 | 2 | Yes | 1[b] | Yes[g] | Yes[h] |
| Boor and Bair (1990) | 50 states, D.C., 1985 | 9 | No | 2(8)[b] | — | Yes[h] |
| Rich et al. (1990) | Time series, 2 cities | 0 | No | 1 | Yes | Yes[i] |
| Kleck and Patterson (1993) | 170 cities | 9 | Yes | 13 | No[i] | No[i] |

[a] Significant at .05 level.
[b] Measured "strictness" of gun control: all control types lumped together.
[c] Overall "strictness" index of gun control was significantly and negatively related to the gun suicide rate but separate gun law dummies yielded no significant results.
[d] Used three factor scores grouping eight gun control types together; individual controls not separately assessed.
[e] Lumped two gun law types together into a single dummy variable.
[f] Only one of nine law coefficients was significant at .05 level.
[g] Only bivariate association reported.
[h] Grouped eight types of gun control into two summary indexes.
[i] Only one of thirteen results was supportive for gun suicide rate, two of thirteen for total suicide rate.

# 9

# Firearms Accidents

The 1225 fatal gun accidents that were reported in 1995 claimed about 3% of the total gun deaths that year. The significance of gun accidents therefore is not due to their dominance in the firearms death statistics. Rather, this category of gun misuse is important because of the pivotal role it plays in the debate over whether keeping a gun in the home for protection entails more risk than benefit for the average household. Many people who misuse guns, whether in accidents, suicides, homicides, or other crimes, originally owned the guns for defensive reasons (Heins, Kahn, and Bjordnal 1974; Browning 1974; Burr 1977; Wright and Rossi 1986). Consequently, disarming a significant share of these persons is likely to entail persuading them either that guns are not very useful for self-defense (an issue addressed in Chapter 5) or that there is some serious compensating risk that outweighs any possible defensive benefits.

Most defensive gun owners do not perceive themselves or members of their immediate family as prone to crime or suicide, so it is difficult to persuade them that such risks apply to them. On the other hand, many people regard accidents as events that can happen to anyone. It is plausible that even the most responsible and law-abiding family can experience a gun accident if they keep a firearm in the home, particularly if it is kept loaded for self-defense. Therefore, the argument is made that because the chances of successfully using a gun for defense against criminals are supposedly extremely small, the risk of a gun accident to the average gun owner will outweigh any reasonable estimate of the defensive value of guns.

As reported in Chapter 5, this argument was made in explicit form by Rushforth and his colleagues (1975:504) and later by Kellermann and Reay (1986), and a variant was made by Newton and Zimring (1969:64). Noting that fatal gun accidents outnumbered justifiable homicides of home burglars and robbers, Rushforth et al. concluded from these facts that "the possession of firearms by civilians appears to be a dangerous and ineffective means of self-protection" (Rushforth et al. 1975:505). Although this conclusion was a non sequitur, it has since been repeatedly

cited in procontrol propaganda tracts (e.g., Yeager et al. 1976:4) and many others have made similar arguments (e.g., Shields 1981:49–53; Kellermann and Reay 1986).

This argument is rhetorically important. Without any counterbalancing risk, even the slightest defensive benefit of guns could tip the scales in favor of ownership. Even if *nearly* all crimes occurred in ways that precluded victims from defending themselves with a gun, there would still remain that small minority of cases in which a gun would be usable. Because crime victims cannot know in advance whether they would be among that small minority, they might well decide they should have a gun just in case they did find themselves in such a rare circumstance. The reasoning would be: "If there's no risk to me or my family, why not give myself the option of using a gun, should appropriate circumstances arise?" Consequently, the risk of gun accidents to ordinary people plays a critical role in the gun control debate, serving as the counterbalancing risk to which all gun owners and their families are theoretically subject.

## THE FREQUENCY OF GUN ACCIDENTS

In 1993, 1521 U.S. deaths were officially classified as being due to the accidental discharge of a firearm (Table 1.2). However, this was probably an overcount, due to the misclassification of some gun suicides and, to a lesser extent, some gun homicides as fatal gun accidents (FGAs). The potential for misclassification of suicides is suggested by the high fraction of alleged FGAs that resulted from self-inflicted wounds. Although one deviant study found that 78% of persons suffering fatal or nonfatal accidental GSWs inflicted the wounds themselves (Kellermann et al. 1996: 1440), most studies indicate that about half of unintentional gunshot woundings are self-inflicted [Metropolitan Life Insurance Company (MLIC) 1953, 1956, 1968; Iskrant and Joliet 1968:95–96; Rushforth et al. 1975:502; Morrow and Hudson 1986:1122; U.S. General Accounting Office 1991:21; Riddick et al. 1993:218].

That a death is self-inflicted does not prove it was suicidal, since people do accidentally wound themselves. However, the circumstances of many allegedly accidental self-inflicted woundings are highly suspicious. For example, one of the most detailed MLIC studies found that of sixty-six fatal self-inflicted home gun "accidents," twenty-four involved the victim allegedly cleaning, oiling, or repairing a gun (MLIC 1968). Vincent DiMaio, an expert on gunshot wounds, has written that in his extensive experience as a medical examiner he had "never seen a case of an individual fatally shooting himself while 'cleaning, repairing or oiling

a weapon.' Careful investigation of these deaths (where such an activity was alleged) . . . revealed all to be suicides" (1973:2). [See Zimring and Hawkins (1987:59); and Sinauer et al. (1996:1742) for examples of scholars who took the statistics at face value and were convinced that "many" accidents occur while cleaning guns.] DiMaio further stated that most deaths alleged to be single-person hunting accidents and many cases of "Russian roulette" are also in fact suicides.

Combining data from three unusually detailed MLIC studies (MLIC49-51, MLIC53-55, and MLIC64-66; *PB*:Tables 7.8, 7.9), of 345 home FGAs in which circumstance was specified, 50 were self-inflicted and allegedly involved cleaning or repairing a gun; another 20 were self-inflicted and involved Russian roulette. If it is assumed that half of the Russian roulette cases and all of the "cleaning, repairing" cases were actually suicides, in line with DiMaio's judgments, at least 60 deaths, or 17.4% of the home FGAs were actually suicides. Since 63.5% of FGAs in 1993 occurred in the home (U.S. NCHS 1995b:38–39), about 11% (0.174 × 0.635 × 100%) or more of FGAs may actually be suicides. This estimate is consistent with more recent statewide evidence provided by Morrow (1987), whose North Carolina data indicated that 11–28% of self-inflicted fatal gun "accidents" were possible or probable suicides. If half of U.S. FGAs are self-inflicted, applying Morrow's figures would yield an estimate that about 5.5–14.0% of all deaths classified as FGAs are actually suicides (*PB*:271). Note that although these misclassified cases are a substantial share of the relatively rare FGAs, they constitute at most 1–2% of the far more numerous gun suicides and are therefore of little significance for suicide analyses.

DiMaio (1973) also reported that "incidents in which a gun 'accidentally' discharges during a 'friendly scuffle' or while 'horsing around' on close examination are usually found to be homicides." If it is assumed that just half of the eighty-one home FGAs in the three most detailed MLIC studies that were other-inflicted and involved "scuffling for possession of weapon" or "playing with weapon" were actually homicides (out of 166 total other-inflicted cases in the home), then another 24.4% of home FGAs, or 15.5% (0.244 × 0.635 × 100%) of all alleged FGAs are actually homicides. Excluding the 26.5% of alleged FGAs that may have actually been suicides or homicides would leave 73.5% of the original total, or about 1117 genuine FGAs in 1993. Nevertheless, as this revised estimate relies on information concerning local samples and informed judgments about the true nature of dubious cases, the official published national FGA figures will be conservatively used in subsequent discussions. The estimate of 1117 may serve as the lower limit, and the official figure of 1521 as the upper limit, of a range in which the true number of FGAs in 1993 fell.

The risk of being a victim of a FGA can be better appreciated if it is compared to a more familiar risk. Table 9.1 shows death rates associated with motor vehicle accidents and gun accidents for the United States in

Case: 1:10-cv-04184 Document #: 180-6 : 04/27/12 Page 7 of 21 PageID #:8146

1993. The rates are based on two measures of exposure to risk: (1) the number of households that own at least one of the devices (a gun or vehicle), and (2) the number of such devices in private hands.

The accidental death rate for motor vehicles is fourteen times as high as for guns when based on the number of owning households, and thirty-three times as high when based on numbers of devices in existence when focusing on all guns, or twenty times higher when focusing just on handguns. The point is not that guns are safe because they cause accidental death less often than motor vehicles. Cars are very dangerous when handled recklessly, and for an object to be less involved in fatal accidents than cars is not to pass a rigorous standard of safety. The comparison is made only to provide a meaningful point of reference with which readers are familiar.

Another point of comparison more narrowly relevant to household risks for small children would be swimming pools. Each year about five hundred children under the age of five accidentally drown in residential swimming pools, compared to about forty killed in gun accidents (National Safety Council 1993:22, 105), despite the fact that there are only about five million households with swimming pools (Wintemute 1990: 665), compared to at least 43 million with guns (analysis of Davis and Smith 1994). Thus, based on owning households, the risk of a fatal accident among small children is over one hundred times higher for swimming pools than for guns.

In addition to the fairly rare fatal gun accidents, however, there are also many more accidents involving nonfatal injuries. Waller and Whorton (1973) found that there were 14.5 nonfatal accidents to every fatal one in Vermont, while Rushforth et al. reported a 13-to-1 ratio in Cleveland (1975:504–5) and Kellermann et al. (1996:1440) reported a 16-to-1 ratio. National data from emergency rooms almost exactly confirmed these ratios, indicating that there were 14.0 nonfatal unintentional gunshot injuries for each fatal one (Annest et al. 1995:1752). These national data strongly disconfirm the extraordinary claim of a 105:1 ratio by the U.S. General Accounting Office (1991:27–28). This anomalous figure seems to have been the product of gross undercounting of fatal accident injuries, since the study's sample of ten cities should have had about twenty-six FGAs, assuming the national FGA rate of 0.614 per 100,000 applied to the cities (population 4,169,720), but the GAO investigators uncovered only five.

## TRENDS IN GUN ACCIDENTS

Table 9.2 shows the number and rate of FGAs for the United States from 1933 to 1995. When linked with Table 3.1, the data seem to present an anomaly: as the size of the private gun stock increased sharply from 1967 to 1994, the number and rate of FGAs sharply declined. To some degree this trend is undoubtedly attributable to the same causes driving down rates of accidental death in general, since the latter have been declining since the 1930s. However, whereas the general rate declined by only 18% from 1977 to 1987, the FGA rate dropped by 33% (National Safety Council 1988:18, 21). Thus, factors specific to gun accidents were also at work. These data count only deaths, rather than total accidents. Although there are no trend data on nonfatal gun accidents, it is possible that total accidents remained the same or even increased over the period in question, but that so much smaller a fraction of them resulted in death that the death rate declined.

The peak in the FGA rate, within the last thirty years, occurred in 1967 and the sharpest increases occurred in the 1965–1967 period. One interpretation of these facts is that increases in defensive gun ownership occurred during this period in response to the unusually large increases in crime and to urban riots of the 1966–1968 period. Because the increases in defensive gun ownership were likely to have been among persons not raised around guns and not socialized into their safe use (Lizotte and Bordua 1980; Lizotte et al. 1981), they were especially likely to contribute to FGA increases (McDowall and Loftin 1986). During the first year or two of such inexperienced ownership, gun owners might be especially accident-prone. Crime increased sharply during the same years that had large increases in FGAs. The 1963–1964 period showed a 14% increase in the reported rate of violent crime and a 10% increase in burglary, 1965–1966 saw 9 and 10% increases, respectively, and 1966–1967 saw 15% increases in both categories. On the other hand, the largest one-year crime increase in recorded U.S. history occurred in 1967–1968, during which time the FGA rate declined sharply. This same pattern was in evidence again in 1973–1974. Thus it is difficult to attribute FGA increases solely to general crime increases and resulting defensive gun purchases. However, what distinguished 1965–1967 from the rest of the past thirty years was the outbreak of riots in many of the nation's large cities. Thus riots in particular may have increased new gun ownership among especially accident-prone people, as well as the keeping of loaded guns in the home.

The decreases in FGAs from 1967 to 1987 may be partly attributable to improvements in medical treatment of gunshot wounds. Certainly, over a long period of the past, there have been dramatic improvements in survival rates of gunshot victims. The mortality rate for abdominal gunshot wounds treated at a midwestern urban hospital was 60% in the 1930–1938 period, 36% in 1938–1946, 16% in 1955–1962, and 12.7% in 1962–1970 (Taylor 1973:175). It should be stressed that these mortality rates apply only to victims reaching the hospital alive and are therefore not useful for approximating the overall mortality rate. They are cited only to

Case: 1:10-cv-04184 Document #: 180-6 ░░d: 04/27/12 Page 8 of 21 PageID #:8147

indicate long-term trends in the effectiveness of medical treatment of gunshot wounds. Note, however, that the medical explanation seems insufficient to explain the dramatic declines in the FGA rate after 1967, since the medical improvements apparently had slowed or perhaps even ceased by the mid-1960s, and were probably not large enough to account for a halving of the FGA rate. Likewise, contrary to Zimring and Hawkins (1967:60), little of the post-1967 decline cannot be attributed either to declines in hunting or to urbanization, since the number of hunting license holders was flat over this period (U.S. Bureau of the Census 1995:257) and the share of the population living in large urban places was declining (ibid.:43).

Post-1967 declines may instead be due to shifts in the types of guns owned and, more importantly, the types routinely kept loaded. FGAs occur only with loaded guns, and most of the guns routinely kept loaded are handguns owned for self-defense (Chapter 5). The fraction of the civilian gun stock claimed by handguns increased in the past several decades (Table 3.1) and it is possible that an increasing fraction of these handguns were the cheap, small-caliber, low-power handguns known as Saturday night specials (SNSs). Since these are less lethal than other guns and are probably mainly owned for self-defense (Chapter 4), an increased share of loaded guns being either handguns in general or specifically SNSs would lower the mortality rate among accidental woundings (Kates 1983:263).

## CHILDREN AND GUN ACCIDENTS

The image of a small child finding his parents' gun and killing himself or a playmate is an emotionally powerful one. Advocates of stricter gun control often lay special stress on the risks of gun accidents to children (e.g., Center to Prevent Handgun Violence 1989, 1996a, 1996b). Accidents of this sort can more easily be blamed on the mere availability of guns per se, rather than to correctable problems with how they are handled, since all small children are assumed to be irresponsible by adult standards and therefore cannot be taught safety precautions with the same assurance of effectiveness as would be the case with adolescents or adults. It can be argued, then, that this sort of risk applies to all households with guns and children, not just those with unusually irresponsible older persons.

Perhaps the most widespread myth about gun accidents is that gun accidents primarily involve children. This is a dangerous misdiagnosis of the problem, which can misdirect control efforts into ineffective or irrelevant paths. One "personal security expert" named Louis R. Mizell, Jr.,

even claimed in a 1995 book, in a section ironically titled "The Harsh Reality," that "firearm accidents kill an average of 1500 people each year in the United State and *most of the victims are children*" (1995:82, emphasis added).

In reality, FGAs rarely involve children, if one defines "child" as a person who has not reached adolescence. Instead, the victims of FGAs, like victims of intentional homicides, are concentrated most heavily among adolescents and young adults. In 1993, 119 children under the age of 13, including 30 under the age of 5 were killed in accidents officially classified as FGAs. If the distribution of child FGAs across gun type categories was roughly the same in 1993 as it was in 1980, when handguns claimed about 40% of FGAs with victims under age 13 (*PB*:309), handguns were involved in about 48 deaths of children under the age of 13, including about 12 under age 5 in 1993. Thus, only about 3% of FGAs (48 of 1521) in 1993 involved preadolescent children killed with handguns. Even if one added in 13–17 year old adolescents, the 0–17-year-old share of FGAs would still be 392, or 26%.

However, even these figures probably overstate the frequency of FGAs involving child victims. It has long been known that abusive parents who seek medical care for their battered children often attribute the injuries to "accidents" (e.g., Kempe, Wilverman, Steele, Droegemueller, and Silver, 1962). When the children in such incidents die, it is all the easier for parents to sustain the deception, since their victims cannot contradict them. It is therefore likely that some of the FGAs involving small children were actually extreme cases of child abuse. A 1976 national survey found that 3% of children had, in the previous year, had guns or knives (the two are combined in the source) actually used on them by their parents, according to the parents' own admissions (Strauss, Gelles, and Steinmetz 1980:61–62). Since this translates into about 46,000 such incidents per year, it would not be surprising if a few dozen resulted in a gun death falsely reported as accidental. Consequently, even fewer than 48 children a year are accidentally killed with handguns.

The frequency of FGAs involving children is often inflated by the inclusion of adolescent FGAs in the "child" total. In some extreme cases, authors have even included 18–24-year-old adults in the "children" total. For example, Stephen Teret and Garen Wintemute claimed that "almost 1,000 children die each year from unintentional gunshot wounds" (1983:346), citing the National Safety Council annual compilation *Accident Facts* for 1980 as their source. The latest year covered in this source was 1977. Examination of this source revealed that the claim of "almost 1,000 children" actually pertained to persons age 0–24, an age span that Teret and Wintemute did not share with their readers (National Safety Council 1981:7). Interestingly, Wintemute elsewhere set age 14 as the upper age limit for a study of FGAs among "children" (Wintemute, Teret, Kraus,

Wright, and Bradfield 1987:3107). Even if one defines "children" to include adolescents as old as 14, the national "child" FGA total in 1977 was 392 (Table 3). Teret and Wintemute therefore exaggerated the number of child victims by a factor of three.

Grouping children with adolescents seems to serve no purpose other than the propagandistic one of misleading people into believing that accidental gun deaths are common among children. Among the 800 FGAs among young people aged 0–24 in 1993, only 15% involved preadolescent children (under age 13), and less than 4% involved small children under 5 (National Safety Council 1996:32). This practice is especially common among procontrol propagandists and among physicians and public health authors (e.g., Rivara and Stapleton 1982; Runyan et al. 1985; Patterson and Smith 1987). For example, in a propaganda sheet compiled by the Center to Prevent Handgun Violence (1996a), a claim was made about the number of "children" killed with guns each year, but the statistic pertained to deaths among persons "aged 19 and under," almost all of which in fact involved adolescents. In another sheet, titled "Children and Guns," of thirteen statements of statistical fact, none pertained exclusively to preadolescent children. Four of the statements indicated no particular age range, and all the rest mixed adolescents with children. The upper end of the age ranges covered was 17 in two statements, 18 in one of them, 19 in four of them, and even 34 (!) in two (Center to Prevent Handgun Violence 1996b; see also Zimring and Hawkins 1987:58 for a similar example). The federal Centers for Disease Control (CDC) has also indulged in the practice, defining "children" and "childhood" as encompassing the ages 0 to 19 (U.S. CDC 1989).

The practice is misleading and unhelpful because it mixes a population of preadolescent children who have a near-zero rate of involvement in gun accidents together with a very high-rate population, adolescents and young adults. It is more informative to keep adolescent FGAs separate from those involving other age groups, but even if adolescent FGA victims had to be grouped with victims of other ages it would be more appropriate to group them with young adults than with children, since FGA rates among adolescents are very similar to those prevailing among young adults, but radically different from those among younger children (National Safety Council 1996:32).

The lumping together of children and adolescents, two radically different populations, obscures differences between the groups in the accident-prevention potential of various measures. For example, various mechanical devices for "child-proofing" guns, such as pressure-sensitive grips, might prevent some of the few dozen fatal gun accidents involving very small children, but would rarely prevent accidents among older children or adolescents. The repeated citation of statistics that actually pertain predominantly to adolescents as if they pertained to children encourages an exaggerated notion of the accident-preventing potential of such devices.

More generally, the focus on the accident-reducing importance of how guns are stored, i.e., whether they are stored loaded and/or unlocked (e.g., Hemenway et al. 1995a; Wiktor et al. 1994) is partly a product of an unduly narrow focus on the tiny share (almost certainly less than 7%) of FGAs that have child shooters. In particular, a narrow focus on accidents among urban children who gained unauthorized access to guns ignores the fact that most gun accidents neither occur in urban areas nor involve children. Instead, 60% occur in small towns and rural areas (PB:312) and probably more than 93% of shooters involved in the FGAs are adolescents or adults. In rural areas, it is common for adolescents to personally own guns, as hunting is the most common reason for owning guns in such areas, and hunting is more common among adolescents than in any other age group (Chapter 3; U.S. Fish and Wildlife Service 1993). Therefore, the fact that nearly all shooters in FGAs are adults or adolescents means that nearly all of them are old enough to personally own their own guns, and strongly suggests that the vast majority who had authorized access to the guns. Thus, even if guns and/or ammunition were kept locked, accidental shooters ordinarily would have the requisite keys or lock combinations to gain access. Consequently, while "safe storage" of guns is a prudent practice, and may well be partly responsible for gun accidents being as rare as they are, it has only limited relevance to producing further reductions in gun accidents.

The fact that so few FGAs involve small children firing handguns is partially attributable to mechanical characteristics of revolvers. For children under the age of four or so it may be physically impossible, even using two fingers on the trigger, to fire unmodified revolvers of even minimally adequate manufacturing quality, because small children's hand spans are too small to gain sufficient leverage and their hands too weak to pull the trigger double-action (i.e., from an uncocked position) or to cock the hammer back for single-action firing (Kates 1982:37; Naureckas, Galanter, Naureckas, Donovan, and Christoffel 1995). In contrast, long guns, very cheap handguns, guns modified to have very light trigger pulls, and the rarer derringer-type handguns can be discharged more easily, even by very young children. In one extreme case, it was even alleged that a two-year-old boy had shot himself with a revolver with an abnormally light trigger pull (Wintemute et al. 1987:3108).

A study of newspaper accounts of handgun accidents among children age sixteen or younger found that the accidents disproportionately occurred during summer months and afternoon hours, with 66% occurring when no adult was present (Center to Prevent Handgun Violence 1989). Analysis of a subset of these cases indicated that 50% occurred in the

victim's home and 30% in a friend's home. In 45% of the two hundred cases where the location was known, the child found the gun in the bedroom, presumably his parents' bedroom. This corresponds closely to the 42% of all guns that are kept in the owner's bedroom (Quinley 1990:5). In 47% of the cases, the gun was owned by the victim's parents and in 28% of the cases by parents of a friend of the victim (Center to Prevent Handgun Violence 1988). A study of eighty-eight California FGAs with victims under age fifteen found that in at least 48% of the residential deaths, the gun was kept loaded and unlocked (Wintemute et al. 1987:3109). Thus a typical handgun accident with a child shooter or victim involved the child finding his parents' loaded and unlocked gun in their bedroom during the early afternoon in the summer school vacation period, while without adult supervision.

Although a few such incidents may have occurred, none of the sources reviewed in this chapter have cited even one case of a child who found a locked gun, unlocked it, and shot himself or another person. In practice, keeping a gun locked, whether loaded or not, whether stored away or not, appears to be a near-absolute protection against a child gun accident, if conscientiously used. But since it requires affirmative action to lock the gun each time after it is used or cleaned, accidents can still occur if an owner fails to resecure the gun.

Table 9.3 shows trends in FGAs with young victims during 1974–1993. These sharply declined during this period, especially among children under age ten. FGAs decreased in this group from 227 in 1974 to 68 in 1993, a drop of 70% in just nineteen years, despite an increase of 70% in the size of the civilian gun stock during this same period (Table 3.1). The reasons for this dramatic decline probably parallel those discussed in connection with FGA trends in general, especially the increasing handgun share of guns kept loaded for defense. Because handguns are both less lethal and less prone to accidental discharge, as their share of guns kept for self-defense increased, fatal gun accidents decreased.

## GUN TYPES INVOLVED

In the most recent period for which data are available, 1989–1993, among U.S. FGAs in which the gun type was specified on the death certificate, 50.4% involved handguns and 49.6% involved long guns (Table 9.2). Since about 35% of the guns in the U.S. civilian stock are handguns (Table 3.1), this means they are overrepresented among FGAs. Some analysis have jumped from this fact to the dubious conclusion that efforts to control gun accidents through reduction of gun availability should focus on handguns (e.g., Wintemute et al. 1987:3109).

Only loaded guns, however, kill people in firearms accidents. If one considers loaded guns to be the ones "at risk" of use in a FGA, it is more appropriate to compare handguns' share of FGAs with their share of guns routinely kept loaded. About 80–90% of the guns kept loaded for self-defense are handguns (Chapter 5), yet handguns accounted for only half of FGAs in 1989–1993. Thus handguns were actually *less* likely to be involved in FGAs than would be expected based on their share of guns kept loaded in the home.

The lower rate of accident involvement of handguns per loaded gun, compared with long guns, is partly due to technical differences. On a purely mechanical basis, most modern handguns are harder to accidentally discharge than long guns, given a loaded and unlocked status. Firing a revolver or semiautomatic pistol double-action requires a stronger pull on the trigger than firing most rifles or shotguns. Further, most modern handguns are made in such a way that they will not discharge unless the trigger is pulled, something that is not true for many long guns (Kates 1983:262–63). Cases of guns discharging when they are dropped are more common among hunting accidents, nearly all of which involve long guns, than they are among home gun accidents, most of which involve handguns (*PB*:Chapter 7).

Handguns are more likely than long guns to be owned and used for either defensive or criminal purposes (Chapter 3), and criminals own and use guns mainly for defensive and criminal purposes (Wright and Rossi 1986). Further, a larger share of handgun owners are criminals. Tabulations from seven national surveys done between 1973 and 1984 show that 13% of respondents living in a household with only handguns admitted having a nontraffic arrest record, whereas only 10% of respondents in households with only rifles and shotguns reported an arrest (analysis of data from Davis and Smith 1994). Criminals, in turn, are more likely to be involved in gun accidents (Waller and Whorton 1973). In sum, handguns are disproportionately owned by the kinds of people who are unusually likely to get involved in accidents. Therefore, were this not the case, the share of FGAs that involve handguns would probably be still lower than it is.

The implications for gun control policy of these comparisons by gun type are straightforward. Measures restricting accidents to handguns that did not place equally stringent restrictions on long guns would tend to encourage the substitution of long guns for handguns as loaded home defense weapons, reversing the trends of recent decades. Long guns are more deadly than handguns and more easily discharged accidentally, yet need not be more expensive than handguns (Chapter 4). If the sorts of people who currently own handguns were to substitute long guns as loaded home defense weapons, the rate of accidental discharges would probably increase, and the fraction of accidental woundings that resulted

in death would almost certainly increase. Further, rifles have greater capacity to penetrate walls and injure persons outside a room where an accidental discharge occurred (Kates 1983:261–63). In sum, handgun-only legislation is likely to increase the frequency of home FGAs, to the extent that it is effective in reducing handgun ownership among those likely to get involved in gun accidents, and to the extent that these people substituted long guns. This conclusion parallels the Chapter 4 conclusions regarding homicide and handgun-only controls.

## THE VICTIMS AND SHOOTERS IN GUN ACCIDENTS

### Age, Sex, and Race

Males, persons age fifteen to twenty-four, and blacks all have FGA rates higher than average. Among victims of FGAs in 1991, 90% were male, 54% aged fifteen to thirty-four, and 20% were black, compared to 49, 31, and 12%, respectively, of the 1991 resident U.S. population in those groups (U.S. National Center for Health Statistics 1996a; U.S. Bureau of the Census 1993:21). Even when one controls for gun availability, males, blacks, and persons aged fifteen to twenty-four all are far more likely to be involved in FGAs than other groups. For example, based on household gun ownership levels, black males aged fifteen to twenty-four have FGA rates twenty-three times the national average, and white males of that age group have rates 2.7 times the national average (*PB*:311). Thus something about some persons in these sex, race, and age groups inclines them toward involvement in gun accidents beyond mere gun availability. Indeed, the high involvement of blacks is all the more striking once one takes into account their lower levels of gun ownership. The same is true to a lesser extent for persons aged fifteen to twenty-four, who personally own guns at a rate lower than the general adult population. These are the same groups that show the highest rates of intentional violence such as homicide, both as offenders and as victims, suggesting that there are some common predisposing factors shared by participants in accidents and participants in acts of intentional violence.

### Social Class and Gun Accidents

Findings from the National Health Survey for 1971–1972 indicated that persons with a family income under $5000 had a rate of injury from the accidental discharge of a firearm nearly four times as high as that for persons with a family income of $15,000 or more (U.S. NCHS 1976:17). Klein and his colleagues (Klein, Reizen, Van Amburg, and Walker 1977) studied all FGAs of persons under age sixteen for Michigan for the period 1970–1975. They found that between 71 and 90% of child FGA victims in Michigan were of lower socioeconomic status. The gun accident patterns parallel patterns for accidents in general. National data indicate that lower-income people are more likely than middle-income people to suffer home accidental injuries in general, regardless of the activities or objects involved (U.S. NCHS 1985:44).

Heins and her colleagues (1974) studied a largely lower-class sample of urban child gun accident victims treated in a Detroit hospital over the period 1962–1971. The authors remarked that "the lack of safety precautions in households we visited was truly amazing" and noted that both the children and parents involved as victims or as shooters were usually unfamiliar with guns and basic gun safety rules (ibid.:329). The majority of the guns had been acquired for protection and 60% of the guns involved were kept loaded at all times; yet despite the presence of children in all of the households, only 13% of the families usually kept the gun under lock and key. The parents involved were unusually likely to keep their guns loaded and unlocked, in view of a 1989 national survey that indicated that only 24% of all gun owners always kept a gun loaded, and 45% of owners usually kept their guns locked up (Quinley 1990).

Klein and his co-workers stated that it was their "very strong impression" that the guns involved in child gunshot deaths were nearly all kept for self-protection and most of them were kept loaded for use against prowlers. They speculated that "guns used for self-protection are more likely to be involved in accidental shootings because hunting or target guns are much less likely to be stored loaded or to be kept where they are readily accessible" (1977:181). As has been shown, this is true, but is only part of the explanation. Protection guns also seem to be owned by different sorts of people than guns kept for sport, by persons not socialized into safe gun handling as part of a sporting gun subculture (Lizotte and Bordua 1980, Lizotte et al. 1981). Klein et al. (1977) concluded that gun control laws are unlikely to be effective because compliance would be low among people who regard a gun as their only protection against crime. They further asserted that gun safety programs, as currently run, are not likely to be effective because they are misdirected at a largely middle-class audience of hunters and target shooters.

Klein also noted that the predominantly low-income urban families of child gunshot victims "kept loaded guns within ready reach because they had no confidence that the police offered them protection against neighborhood crime" (1980:277). Consequently the guns viewed as a hazard by "the middle class professional" were regarded by their lower-income owners as an essential protection against crime (ibid.:277). He concluded

Case: 1:10-cv-04184 Document #: 180-6 Filed: 04/27/12 Page 12 of 21 PageID #:8151

that most safety programs seem to be devised by, directed at, and likely to be effective only with middle-class persons, and that effective accident reduction must involve improvements in the economic, physical, and social environments of lower-class families.

### Victim Marital Status, Size of Place, and Region

National mortality data indicate that most of the victims of FGAs live in rural areas or small towns, consistent with the fact that gun ownership increases as size of place decreases (Chapter 3). Sixty percent of FGA victims in 1980 lived in places with populations under 10,000 (*PB*:312), compared to only 43% of the general population (U.S. Bureau of the Census 1983:27), indicating that rural residents are more likely to be involved in FGAs than urban residents. These data also serve to caution readers that studies of gun accidents based exclusively on urban samples (e.g., Rushforth et al. 1975; Copeland 1984; U.S. General Accounting Office 1991; Kellermann et al. 1996) are likely to overstate the involvement of handguns and therefore of guns owned for defensive reasons, since handguns account for a much larger share of FGAs in large cities than they do in the smaller places where most gun accidents occur (*PB*:312).

The same data also indicated that single males are far more likely to be involved in FGAs than males of other marital statuses, the same as is true with intentional violence and that half of FGAs in 1980 occurred in the South Atlantic, East South Central, and West South Central census regions, although these regions claimed only one-third of the U.S. population (U.S. Bureau of the Census 1983:10). Thus, southerners are more likely to be involved in FGAs, consistent with higher southern gun ownership.

### Shooter Traits

Shooters and victims in gun accidents tend to resemble each other demographically, being nearly always the same in race and usually similar in age. Within an admittedly select sample of gun accidents—negligent manslaughters, as described in the *Supplementary Homicide Reports* for 1980—race of victim and shooter were the same in 96.5% of the shootings and sex was the same in 74.6% of the cases. The average absolute difference in ages was 6.6 years. Further, in another, nonoverlapping segment of FGAs, the 50% or so that were self-inflicted, shooter and victim were obviously identical in all respects, being the same person. Therefore, it is fair to say that shooters and victims generally resemble

each other in FGAs, allowing us to use characteristics of victims to roughly infer at least some traits of the shooters.

Based on this reasoning, the data on victims indicate that shooters in gun accidents are disproportionately drawn from the same demographic groups that are overrepresented in intentionally violent behavior: males, persons age fifteen to twenty-four, blacks, and lower-income persons. Again, these facts hint at the possibility that accidental and intentional killers may share some underlying personality traits, such as poor aggression control, impulsiveness, alcoholism, willingness to take risks, and sensation seeking.

## GUN ACCIDENTS AND LOW SELF-CONTROL

One can view the reckless behavior that precedes many accidents as deviant behavior, and from that standpoint interpret involvement in gun accidents in light of Gottfredson and Hirschi's (1990) self-control theory of deviant behavior. They argue that a personality trait they label "low self-control" encourages not only criminal behavior but also a wide variety of other analogous imprudent behaviors that involve "the pursuit of immediate, certain, easy benefits" such as the pleasures derived from smoking, drinking, and gambling (ibid.:42). Further, persons with low self-control are likely to prefer, and derive pleasure from, risk-taking (ibid.:89). Thus, they would also be more likely to engage in risky behavior with guns, such as combining drinking with target-shooting, without regard to the dangers to themselves or others. If this is true, one would expect the shooters involved in gun accidents to also be more likely to have histories of criminal behavior, drinking, and involvement in other risky activities.

These expectations are supported by the findings of one of the most important studies of gun accidents. Waller and Whorton (1973) studied a virtually complete population of accidental gun woundings, both fatal and nonfatal, treated by physicians in Vermont, a state in which doctors are required by law to report all persons treated for gunshot wounds, no matter how minor. They searched for the arrest, traffic citation, and highway accident records of the shooters and victims in accidental gun woundings, as well as the records of a comparison sample of licensed drivers. Whereas victims shot by another person were not significantly different from the licensed drivers, accidental shooters were significantly more likely to have been arrested, arrested for a violent act, arrested in connection with alcohol, involved in highway crashes, given traffic citations, and to have had their driver's licenses suspended or revoked. Fifty

Case: 1:10-cv-04184 Document #: 180-6 Filed: 04/27/12 Page 13 of 21 PageID #:8152

percent of the shooters had been involved in a highway crash in the previous three years, compared to 29% for the comparison sample of licensed drivers. After showing that the shooters with nontraffic arrests were also generally the same individuals involved in highway crashes, the authors concluded that a common behavioral model may be applicable to both intentional and unintentional acts of violence, both on the highway and elsewhere, a model that stresses "poor control of aggressive tendencies" (ibid.:355). This hypothesis was consistent with findings from a Minnesota study of negligent shooters in hunting accidents, which found that although hunters in general were mildly introverted, the accident-involved shooters had low inhibitions (Kuluvar 1953, cited in Diener and Kerber 1979). Another way of expressing this would be to say that accidental shooters have the same low self-control that Gottfredson and Hirschi observed in criminals.

## ALCOHOL INVOLVEMENT

Although no studies have measured alcohol in the bloodstream of accidental shooters, Rushforth et al. (1975:502) reported that ethanol was found in the blood of 48% of FGA victims. In cases involving self-inflicted wounds, alcohol in the victim's blood means alcohol in the shooter's blood as well. The various drinking-related incidents that Waller and Whorton found in the backgrounds of accidental shooters strongly hinted that many of the shooters were alcoholics. Perhaps half of the victims and probably at least half of the shooters in FGAs had been drinking prior to the accident. Alcohol may contribute to gun accidents in either of two general ways. It may impair physical coordination, reaction time, judgment, and alertness, and thereby increase the chances of a genuinely unintentional gun accident. However, by reducing control of aggressive tendencies, it may also facilitate less unintentional "accidents" that might be more accurately viewed as acts of sublimated aggression.

## CIRCUMSTANCES AND ACTIVITIES ASSOCIATED WITH GUN ACCIDENTS

Gun accidents may be conveniently divided into two categories: those occurring in the home, which claimed 67.5% of FGAs in 1993 where location was known (U.S. NCHS 1995a:Section 5, p. 38), and those occurring outside the home, as many as half of which are hunting accidents (National Safety Council 1988:7, 84, 93). There are no published police data on the circumstances of gun accidents and only limited unpublished information on negligent manslaughters in the FBI's *Supplementary Homicide Reports*. The national vital statistics data say nothing directly about circumstances of FGAs. Instead, the best, albeit dated, evidence comes from the life insurance claims files of the Metropolitan Life Insurance Company (MLIC), covering fatal firearms accidents occurring in a variety of periods from 1946 to 1966. These samples may be biased somewhat in the direction of including more "suspicious" cases worthy of examination by claims investigators. On the other hand, they also cover only insured people, suggesting an underrepresentation of lower-income people. Still, some rough hints about the circumstances of FGAs can be derived from these studies.

The relevant data from various studies done by MLIC and from a few other local studies were summarized in *Point Blank* (Chapter 7). Cases involving clearly reckless activities were common. By far the most common specific circumstance or activity associated with FGAs was one involving reckless or negligent behavior—"playing with a weapon." This is most clearly true for home accidents, and less true for hunting accidents. A large fraction of the cases involved "unspecified" activities. Shooters and other witnesses are probably more likely to withhold information in connection with the most suspicious deaths, leading to incomplete information in claims records. Therefore, examination of only those cases in which circumstance could be specified may tend to understate the prevalence of reckless behavior or suspicious circumstances.

In the three most detailed MLIC studies, there were a total of 455 FGAs in which the specific circumstance was listed. Of these, the most frequent circumstances were playing with a weapon (122 cases), cleaning, repairing a gun, (68 total, 38 self-inflicted), handling, examining, or demonstrating a weapon (54), walking into line of fire in hunting (27), tripping while carrying in hunting (26), and Russian roulette (21). Cases involving playing with a loaded weapon and Russian roulette clearly were reckless, and many of the self-inflicted deaths occurring while the shooter was allegedly cleaning or repairing a gun were suicides. At minimum, a third of the deaths in these samples of FGAs involved obviously reckless conduct, and it is possible that a large share of the remaining cases were also reckless.

One MLIC (1968) study contained interesting material specifically relevant to the risks of keeping and using guns for defensive purposes. It was the only study of a general sample of FGAs that counted separately those occurring in connection with attempts to use guns defensively [the Heins

et al. (1974) study concerned only child cases]. In other studies, this type of incident was evidently too rare to even merit a separate category, even though separate categories were commonly provided for as few as 2% of the total cases. Of 107 home FGAs where the associated activity or circumstance was known, only two involved "searching for prowlers, protection against threats." These are the only two cases of this type identified in the literature, though there undoubtedly have been a few others. Thus fewer than 2% of these FGAs involved such uses of guns. If this figure applied to the 1993 total of 966 home FGAs (63.5% of 1521 total), it would imply a rough annual estimate of about eighteen home FGAs involving attempts to use guns defensively. It should be stressed that this is an upper-limit estimate and that there is no firm evidence that such accidents occur even this often. In Chapter 5 it was reported that the best estimate of the annual number of defensive uses is 2.5 million, many of them life-saving. Thus, accidental deaths occur in connection with less than one in 138,000 defensive gun uses.

## Hunting Accidents

Hunting accidents seem to be a different sort of event from home gun accidents, involving much less clear evidence of reckless behavior. It is known that over 96% of fatal hunting accidents with guns involve long guns [North American Association of Hunter Safety Coordinators (NAAHSC) 1982]. Further, all hunting is done in outdoor locations. Therefore, almost the only FGAs that could plausibly be hunting accidents are those that involved shotguns or rifles and that occurred in an outdoor locale suitable for hunting. For the United States in 1991, of 454 FGAs where gun type and place of the accident were specified, only 75, or 16.5%, involved shotguns or rifles and occurred on a farm, in a "place for recreation and sport," or in "other specified places" that theoretically could have been places suitable for hunting (U.S. NCHS 1995b:Section 5, p. 38). These FGAs could have been hunting accidents, but the true hunting share is almost certainly less, since some long gun accidents in outdoor locations are not connected with hunting. Another estimate supports this conclusion. The NAAHSC compiled data annually on hunting accidents, covering thirty-four of the fifty states in 1980. These thirty-four states accounted for about 62.7% of the paid hunting license holders in the United States (author's tabulation of data in U.S. Fish and Wildlife Service 1982b). The NAAHSC report counted 167 fatal hunting accidents for the thirty-four states (NAAHSC 1982). Extrapolating this to all fifty states, one can divide 167 by 0.627 to get an estimate of 266 fatal hunting accidents for the United States as a whole, or 13.6% of all FGAs that year. A middle estimate would therefore be that about 15% of FGAs are hunting accidents.

Information is available from the NAAHSC surveys on the circumstances of gun accidents in hunting, covering over 5000 fatal and nonfatal accidents occurring in the period 1977–1980. The information is unusually detailed and permits several conclusions. First, rough classifications of circumstances indicate that 28% of fatal hunting accidents and 20% of nonfatal accidents involved a safety or law violation or "careless handling." Again, hunting accidents appear to involve reckless conduct less often than home accidents. Second, those accidents that do involve reckless conduct are more likely to be fatal than nonreckless accidents: 16.9% of reckless incidents were fatal, compared to 12.5% for nonreckless ones. Third, few hunting gun accidents involve a gun going off by itself: only 11% of the cases clearly involved no one pulling the trigger, as when a gun fell from an insecure rest and discharged or when the trigger caught on an object. Finally, when a person pulled the trigger, it was usually pulled intentionally. The incidents were accidents only in the sense that the hunters involved did not intend to shoot another person, rather than in the sense that the gun was accidentally discharged (*PB:*Table 7.11).

Hunting accidents are more genuinely accidental, as opposed to the unsurprising result of reckless conduct, than home gun accidents. At worst, the bulk of hunting accidents may involve poor judgment or momentary lapses in concentration rather than gross negligence. The most common circumstance was a hunter shooting at game, missing, but then hitting, beyond the game, a hunter who was obscured by brush and possibly his own camouflage clothing. In hunting areas with dense growth, this sort of accident would seem difficult to avoid altogether. In the long run, a few such accidents will occur as long as hunting continues, no matter how responsible hunters are. Other types of accidents involve debatable errors in judgment, such as those in which the victim was covered by a shooter swinging on moving game or those in which the victim was mistaken for game. Some of these might have been avoided if hunters had been more careful to ensure that the entire area in front of them was clear and by being absolutely sure of the nature of their target. These incidents seem more avoidable in view of the fact that 60–80% of hunting accidents involve members of the same hunting party, who should be able to keep track of each other (MLIC 1953, 1956; Cole and Patetta 1988:1585).

Target or sport shooting at gun ranges and other formal shooting facilities seems virtually free of FGAs. In 1991, in the entire United States there were only sixteen FGAs, involving any type of gun, that occurred in a "place for recreation and sport" (U.S. NCHS 1995b:Section 5, p. 38), about 1% of the FGA total.

## DEFECTIVE FIREARMS

Defects in the design or manufacture of firearms rarely cause gun accidents. The majority of accidents involve people intentionally pulling a trigger and guns doing precisely what they were designed to do: propelling projectiles at high velocity. Nevertheless, a few accidents do occur without anyone pulling a trigger, intentionally or otherwise. For example, some single-action revolvers and derringers have exposed hammers but no safety device such as a hammer block or rotating firing pin to prevent the hammer from striking a cartridge's primer should the weapon be dropped on its hammer (DiMaio 1972). Although such weapons account for a fairly small fraction of handguns, they can accidentally discharge simply by being dropped on a hard surface, without the trigger being pulled. There is no good reason for a gun to be capable of firing without its trigger being pulled, and inexpensive technologies exist that can prevent such discharges. Therefore, when a dropped-gun accident occurs, it is reasonable to conclude that a correctable defect in the gun's design was instrumental in causing the accident. That is, future models could be designed so as to be free of this sort of defect. In particular, many long guns lack these safety devices and thus are subject to a needlessly high risk of accidental discharge.

## PERSONALITY TRAITS OF THE ACCIDENT-INVOLVED

Findings discussed earlier indicated that the same individuals who cause gun accidents also were commonly involved in other types of accidental and violent events, including motor vehicle accidents (Waller and Whorton 1973). This appears to be true about those who cause a variety of types of accidents. Persons who cause one type of accident are more likely than others to be involved in other types of accidents and to commit intentional criminal acts, especially assaults and alcohol-related offenses (Haviland and Wiseman 1974; Willett 1964; Whitlock 1971). These facts have been interpreted by some scholars as indicating that all of these behaviors share some causes in common, such as a disregard for the welfare of others or a low estimation of the value of human life (e.g., Porterfield 1960) or, as noted herein, low self-control. They also suggest that although information on the sorts of people who cause gun accidents is limited, one might indirectly learn something about them from the very extensive literature on motor vehicle and other accidents.

A long series of personality traits has been found to be associated with drivers with higher-than-average rates of traffic citations and accidents, including aggressiveness and a lower capacity for control of hostility and aggression (Conger, Gaskill, Glad, Hassel, Rainey, and Sawrey 1959; Tillman and Hobbs 1949; Shaw 1965), impulsiveness or the tendency to express impulses (Conger et al. 1959; Schuman, Pelz, Ehrlich, and Selzer 1967), immaturity, foolhardiness, and greater dependency needs (Tillman and Hobbs 1949; Conger et al. 1959), and a lesser ability to tolerate tension without discharging it (Conger et al. 1959). Researchers have also found poor driving records to be associated with a complex of personality traits linked to psychopathy, including overconfidence, self-assertiveness, and an indifference to danger, risk, the consequences of one's actions, or the welfare and rights of others (Conger et al. 1959; Shaw 1965). Finally, alcoholism, frequently linked to criminal and intentional violent behavior, has also been found associated with poor driving records (e.g., Waller 1967; Brenner 1967). That is, alcoholism as a persisting trait of the driver at fault has been linked to accidents, as distinct from the fact that the driver had been drinking before the accident.

Other scholars have looked at the social characteristics of bad drivers, finding that they are generally less well-adjusted and integrated into society. Accident-involved drivers are commonly characterized by family disruption and conflict, both in their adult lives and in their childhood (McGuire 1976), poor employment records, fewer friends, sexual promiscuity, and irresponsibility toward their families (Tillman and Hobbs 1949). Of even greater interest is the finding that such drivers are more likely to have police and court records of delinquency and criminal behavior, especially violent criminal behavior (Tillman and Hobbs 1949; McFarland and Mosely 1954; Willett 1964; Waller 1967; Whitlock 1971; Haviland and Wiseman 1974). Again, these findings point to low self-control as a broad personality syndrome common among those who cause accidents.

## REDUCING GUN ACCIDENTS

One cannot have a gun accident without a gun. The presence of a gun in the vicinity of risk-taking or reckless persons is a significant additional hazard in the environment of persons who need as few hazards around them as possible. At the same time, gun accidents are not an inevitable by-product of routine gun ownership by ordinary people. They appear to most commonly be the result of reckless or aggressive behavior by the

same kind of individuals responsible both for intentional violence and other types of accidents. They are rarely the result of a gun "going off" by itself or someone accidentally pulling a trigger. They rarely involve guns that were defective in design or manufacture nor are they due to wear. Rather, they usually involve someone intentionally pulling the trigger on a gun that performs mechanically exactly as it was designed to do.

The limited information available suggests that many shooters in gun accidents (as well as those responsible for other types of accidents) are "accidents waiting to happen." They are frequently people with histories of prior involvement with other types of accidents, intentional violence, and problem drinking. Gun accidents are but one part of a larger picture of their reckless disregard for their own safety and the safety of others. They frequently place themselves in positions of hazard, exposing themselves to risks of all sorts and defying the odds of being injured. And by doing so, they often place those around them at risk as well. With this background, what measures for reducing gun accidents could be effective?

### Gun Safety Training

Gun safety programs typically involve a few hours of training aimed at informing gun users about general safety principles and rules, such as "Never point a gun at something you do not intend to shoot" or "Always treat every gun as if it were loaded," and about technical matters, such as when a pistol's safety is on and how to safely check to see if a gun is loaded. They do not attempt to alter gun owners' personalities, cure alcoholism, or reduce stressful events in gun owners' lives, nor is it likely they could do so if they tried. Rather, they aim to correct knowledge deficiencies and inculcate safe gun-handling practices and habits.

The claim that such programs can reduce the frequency of gun accidents is based on two premises. First, it assumes that the programs reach those segments of the population in which accidents are likely to occur. Second, it assumes that some nonnegligible number of gun accidents can be attributed to preventable or correctable knowledge deficiencies, to ignorance of safety procedures, rules, or customs that can be remedied in a few hours of training. This in turn implies that significant numbers of persons who would otherwise cause gun accidents would, on exposure to the training program, be able and willing to alter their gun-handling habits in the direction of more cautious, responsible, and prudent conduct.

Concerning the first premise, as noted earlier, Klein (1980) observed that gun safety training programs primarily reach middle-class hunters, whereas most gun accidents involve lower-class persons handling guns in their homes. Perhaps this indicates that the programs have successfully reduced the problem within their traditional target population, since hunting accidents are indeed rare. In any case, it indicates a need to go beyond that population. Concerning the second premise, many gun accidents, perhaps the majority of them, involve chronically reckless people whose impulsiveness, emotional immaturity, or alcoholism cannot be eliminated by a few hours of safety training. Consider the following illustrative case.

Two men and their wives were at a dinner party in rural northern Florida. One of the men, the host, decided to demonstrate his marksmanship to the other guests by shooting beer cans off the other man's head with a .22-caliber pistol. His guest willingly participated, placing a can on top of his head and even backing off further to increase the challenge. Both host and guest had been drinking. The guest was confident because the shooter had already demonstrated the William Tell stunt *twice* earlier in the evening. This time the shooter fired and the bullet struck the victim in the head, killing him. The shooter was later described as having a history of "psychological incidents" (*Tallahassee Democrat*, 22 July 1982:1A).

For this accident to occur required an extraordinary lack of prudence on the part of both shooter and victim. It is unlikely that either the shooter or the victim was intellectually unaware of the fact that firing a pistol at a target inches above the head of another human being was dangerous; no detailed knowledge of gun safety was necessary for this to be understood. The event was not in any way due to defects in the gun or to its user's ignorance of how it worked. The shooter knew all too well how it worked, aimed the gun at his intended target, and intentionally pulled the trigger. The event was accidental only in the sense that the shooter did not hit what he aimed at. In all these respects, the event was typical of gun accidents.

This case illustrates the limits of gun safety training in preventing gun accidents. It is unlikely that a few hours of safety training could have prevented this sort of accident. Likewise, safety training is largely irrelevant to gun violence that is inflicted with hostile intent, whether conscious or unconscious. People who want to hurt others (or themselves) with guns cannot be prevented from doing so by safety training.

On the other hand, some gun accidents do involve correctable knowledge deficiencies, especially accidents involving otherwise careful but young or inexperienced shooters. Although safety training cannot change reckless personalities into prudent ones, it can provide knowledge and inculcate habits that encourage safe gun handling among persons motivated to make use of that knowledge and to acquire those habits. Training provided by parents to their children is especially likely to succeed in this

respect because children are still impressionable enough for their habits to be molded, the training can be provided over a long period of time, and children are unusually motivated to please those providing the training.

What sorts of gun accidents *could* be prevented through safety training? Events officially labeled "gun accidents" are distributed across a continuum of shooter intentionality, from those involving shooters with the least intent to harm to those with the most intent. Figure 9.1 illustrates the continuum and gives examples of events at various points along the continuum. Some acts officially classified as gun accidents are actually misclassified intentional homicides or suicides. Others, although not exactly intentional, are "subintentional" or unconsciously intended, as when someone exposes a person they dislike to a high risk of "accidental" injury or when a depressed person does the same to himself. Still other accidents involve individuals such as those in the William Tell incident, who do not intend the outcome, but do intentionally take actions that put themselves or others at high risk. Still lower on the scale of intentionality, some people handle guns in a way that violates safety rules, but without any willful intent to do so: they just forget or are unaware of the rules. Others momentarily fail to concentrate on their actions or are otherwise not sufficiently careful around their guns, without engaging in any obvious violations of safety rules. Finally, there are accidents that are genuinely beyond the control of the shooters, as when a hunter's bullet ricochets off a rock and hits an unseen hunter.

Safety training is most likely to succeed with the events in the intermediate range of this continuum. The most intentional acts are hard to prevent because the shooters involved are motivated to intentionally ignore safety precautions, while the least intentional events are also difficult to control because they are a by-product of prudent, legal, socially acceptable uses of guns and involve little or no correctable misconduct or errors by the shooters. Therefore, one would expect the greatest payoff for safety programs to be in preventing accidents attributable to ordinary carelessness or the inadvertent violation of safety procedures, as distinct from more extreme misconduct by chronically reckless persons. Thus, safety training could prevent hunting accidents that involved a sober hunter transporting a loaded long gun in a motor vehicle or improperly crossing a fence with a loaded gun, but is unlikely to prevent either the William Tell stunt or, at the other extreme, a ricochet hitting an unseen hunter.

Information from the NAAHSC hunting accident data provides some weak evidence that hunter safety programs may produce moderate reductions in accident frequency, since the data indicate that among shooters involved in accidents, hunters who had graduated from a gun safety course were significantly less likely than nongraduates to have contributed to the accidents with their own reckless behavior: 12.9% of accidents involving the safety-trained were reckless vs. 19.7% of accidents involving those without training (*PB*:318). Thus, at least among hunters, safety training programs may have some modest value for reducing the frequency of at least some kinds of gun accidents. On the other hand, it is possible that hunters who start out more responsible are more likely to get safety training and that the training itself had no effect.

Hemenway et al. (1995a) claimed that gun training was ineffective in encouraging safe storage of guns, based on their finding that gun owners who had received training were more likely to store their guns in an "unsafe" manner. It turned out, however, that the authors defined "unsafe" gun storage to be any storing of a gun loaded. Since nearly all gun owners who store guns in this way own them for defensive reasons, the authors' findings actually indicated that persons who own guns for defensive reasons are especially likely to have received safety training. Given the higher risks of ownership for defensive reasons, one would think this is a good thing. Nevertheless, both Hemenway et al. (1995a) and Wiktor et al. (1994) indiscriminately referred to all cases of keeping guns loaded and unlocked as "unsafe" or "improper" even though most of the owners who store guns this way have no children in the household and have the guns for self-defense (Hemenway et al. 1995a:49). In light of the fact that gun accidents among adults almost invariably involve shooters with authorized access to the guns, i.e., persons entitled to unlock and load the guns, it is unclear exactly why keeping defensive guns loaded and/or unlocked would produce a net increase in risk among childless adults. This assessment would seem to make sense only in combination with the unstated (and unsupported) premise that there is no safety-enhancing value to keeping a defensive gun in a state of readiness.

## Technological Modification of Guns

At least a few accidental deaths and injuries could be prevented by the effective redesign of guns that can discharge by being dropped and by prohibiting the further manufacture and importation of guns with this flaw. Even a few gun accident deaths are worth preventing and there seems little to be lost, beyond modest price increases, if all guns made available for sale in future had to pass a hammer drop test before being approved for sale. An objective, workable test of this sort has already been developed and was used in extensive handgun safety tests conducted in 1971 [see U.S. Senate (1971:155–58) for a brief summary of the tests]. Such a requirement would affect only newly manufactured or imported guns, but as the newer drop-proof guns came to claim a larger share of the national gun stock, dropped-gun accidents would gradually

decrease. There would be little motivation to evade laws aimed at bringing this state of affairs about, since the more hazardous varieties of gun offer little advantage for either defensive or criminal purposes—at best they would be slightly cheaper.

Another basically technological measure could effectively prevent accidents among children, especially the accidents with young children as shooters. A trigger lock is a simple, cheap device that is placed behind the trigger of a gun, making discharge of most modern guns impossible until the device is unlocked with a key or otherwise disabled. There is no record of preadolescent children defeating trigger locks and accidentally shooting someone, so placing a trigger lock or equivalent device on each gun kept in homes with children old enough to pull the trigger could be sufficient to virtually eliminate child gun accidents.

Some defensive gun owners would reject this measure since it reduces the gun's readiness for defensive uses. However, it does make it safe to keep a gun loaded, and relatively ready for defensive use, in a household with children. It therefore is a safety measure that many defensive owners could be persuaded to adopt, unlike the suggestion that all guns be kept both unloaded and locked away in a box or cabinet (Center to Prevent Handgun Violence 1989), a practice that would render guns useless in many defensive situations, placing their owners in greater danger from a criminal assailant.

Like many safety suggestions offered by gun control advocacy groups, this advice is premised on the erroneous assumption that guns are ineffective for self-defense and that it is therefore inconceivable that *failing* to have a gun ready to use for self-defense could ever place a crime victim in greater danger. Thus, it is assumed that there can be no significant cost to guns being stored in a way that makes them less ready for defensive use. The evidence summarized in Chapter 5 indicates that this assumption is factually incorrect, but even if one chose to ignore the evidence, it is unrealistic to ignore the fact that people who own guns for self-defense *believe* that guns are effective for self-defense and thus want to have them reasonably ready for such use. As long as the gun safety advice of gun control advocates is based on premises that gun owners clearly do not share, it is unlikely that the advice will be widely adopted or help reduce gun accidents.

### Screening for Proficiency

Testing for gun-handling ability, knowledge of gun safety, and of how guns operate before granting a permit or license to purchase or own a gun has some merit, its principal drawback being the considerable expense

involved. It could conceivably prevent a few deaths and injuries due to a lack of such knowledge and ability. Available evidence does not support the idea that a large fraction of gun accidents are attributable to such deficiencies, but if this kind of testing could reliably identify individuals with a predilection for engaging in high-risk activities, it could have some impact on the rate of gun accidents.

No states require gun training of all persons possessing guns. New York requires it of persons buying guns and Rhode Island requires it for handgun acquisition (*Federal Register*, 26 June 1989, p. 26925). For persons applying for a permit to carry a gun, most states require evidence of completion of a gun safety or training program or other proof of ability to use a gun safely. South Carolina requires that applicants for carry permits pass a proficiency test (Nispel 1981:8–9). These requirements, however, apply only to the very small fraction of the gun-owning population that seeks carry permits, making the administration of the laws far less expensive than if they applied to gun possession or purchase, but also making the requirements far less extensive in their potential effects.

### General Gun Control Measures

As an alternative, there are legal means of removing guns altogether from the households of some high-risk individuals. Where successful, such measures could at least eliminate one source of risk from the environment and reduce their exposure to hazards. Rather than testing for knowledge of gun safety rules, license, purchase permit, and background check laws typically prohibit gun purchase or possession by convicted felons and alcoholics, and can thereby incidentally prohibit gun possession by many of those at highest risk of gun accidents. The main practical obstacle to the laws' effectiveness is the fact that many accidental shooters own guns for defensive reasons rather than just recreational ones. It is hard to dissuade people from owning guns if they believe their lives or those of family members may one day depend on having a gun for protection. Consequently, voluntary compliance with gun laws would probably be lowest among those segments of the population in which the accident risk is highest. Nevertheless, at least some involuntary reduction in gun ownership might be achieved through such gun laws.

At least five published studies have examined the impact of gun control laws on the rate of FGAs. The earlier review of these studies' suicide findings indicated that they suffer from serious methodological flaws (Chapter 8); therefore, little confidence can be placed in their accident findings. Geisel and his colleagues (1969) concluded that gun control reduces the FGA rate, but the dummy variable findings mentioned in an

appendix to their article indicated that gun laws have no effect. Murray (1975) concluded that none of the types of gun laws he studied had any impact on the FGA rate, and DeZee's (1983) replication of Murray using later data confirmed that conclusion. Lester and Murrell (1981a, 1986) calculated simple correlation coefficients between state FGA rates and a Guttman scale of gun control laws (critiqued in Chapter 8). They found a significant negative correlation between the two variables, but also found, for their 1970 data, an even larger negative correlation between their gun control index and the rate of fatal drowning accidents. Since the authors conceded that it was doubtful that gun laws could have any direct effect on drowning accidents, their finding regarding gun accidents cannot reasonably be interpreted as demonstrating an impact of gun laws on gun accidents.

While prior research has thus generated little credible evidence indicating that gun control laws reduce the frequency of gun accidents, this does not necessarily mean that gun laws cannot reduce accidents. Many gun accidents involve alcoholics and/or convicted criminals, and many gun laws prohibit purchase or possession of guns by such persons. If these laws were effective in accomplishing their intended goal and denied guns to a significant number of high-risk individuals, they might reduce the rate of gun accidents.

## CITY-LEVEL ANALYSIS OF THE IMPACT OF GUN LEVELS ON FATAL GUN ACCIDENT RATES

Lester (1993) claimed that FGA rates across nations and across U.S. states were significantly related to gun availability levels. His crossnational conclusions, however, were based on a nonrandom sample of only seventeen nations, ten of which had fewer than twenty annual FGAs, implying extremely unstable relative FGA rates. Further, neither the cross-national nor the state analyses controlled for any possibly confounding factors, making the results uninterpretable.

To produce a better estimate of the impact of gun ownership levels on FGA rates, the 170-city dataset described in Chapter 7 was analyzed by Kleck and Patterson (1993). No significant impact of gun ownership levels was detected. This result may seem somewhat surprising, since common sense would suggest that where there are more guns, there should surely be more gun accidents. Recall, however, that national trend data also failed to support this expectation: FGAs declined (Table 9.2) as gun ownership increased (Tables 3.1, 3.2). The null finding may be partly explainable by the extreme rarity of FGAs. Although one obviously must have a

gun to have a gun accident, the average city has only one or two FGAs a year, and thus requires only one or two guns to have that many FGAs. Since all cities have far more guns than that, they all have enough guns to account for the small number of FGAs they experience, i.e., a sufficient number of guns is universal. Consequently, it may be that only gun availability among a very tiny fraction of the population is likely to have any impact on the FGA rate and that measures of general gun prevalence are insufficiently precise measures of gun availability within this small subpopulation.

Many of the cities with higher gun ownership, especially smaller cities and those in the South and West, have many gun owners who were, from childhood, thoroughly socialized into safe handling of guns, in contrast to owners who acquired guns only as adults, and who received little or no safety training. Thus, the same cities that have cultures supportive of gun ownership may also have safer-than-average gun owner populations. If so, high aggregate rates of gun ownership would not necessarily be positively related to city FGA rates, even if gun ownership by high-risk segments of the population did increase the rates. If the latter is true, then it remains possible that gun laws might reduce FGAs, an issue addressed in Chapter 11.

## CONCLUSIONS

Fatal gun accidents commonly involve unusually reckless behavior. The typical accident involves a shooter intentionally pulling the trigger, but hitting someone he did not intend to hit. About half of accidental gun deaths are self-inflicted. Most gun accidents occur in the home, many (perhaps most) of them involving guns kept for defense. However, very few accidents occur in connection with actual defensive uses of guns. Gun accidents are generally committed by unusually reckless people with records of heavy drinking, repeated involvement in automobile crashes, many traffic citations, and prior arrests for assault. Gun accidents, then, involve a rare and atypical subset of the population, as both shooters and victims. They rarely involve children, and most commonly involve adolescents and young adults. Accident rates are also higher among males, blacks, lower-income persons, single people, rural people, and southerners, i.e., the same segments of the population that show higher rates of intentional violence.

The risk of a gun accident is extremely low, even among defensive gun owners, except among a very small, identifiably high-risk subset of the

population. Consequently, it is doubtful whether, for the average gun owner, the risk of a gun accident could counterbalance the benefits of keeping a gun in the home for protection: the risk of an accident is quite low overall, and is virtually nonexistent for most gun owners.

Loaded long guns appear to be considerably more likely to become involved in accidents than loaded handguns. Therefore, with regard to accident reduction, it would be bad policy to restrict only handguns, without similarly restrictive controls on long guns, since this would encourage substitution of more lethal and "accident-prone" long guns as home defense weapons, possibly resulting in an increase in fatal home gun accidents. Gun accidents rarely involve defective guns. City rates of fatal gun accidents are not significantly related to gun ownership levels. Finally, there is, as yet, no credible evidence indicating that existing gun laws reduce gun accidents.

## NOTE

1. The General Accounting Office's study of 107 FGAs was flawed by an unrepresentative sample in which 21% of the shooters were under age thirteen (1991:20), a share that could be representative of all U.S. FGAs only if shooters were consistently younger than victims, contrary to all prior research.

Table 9.1.    Risks of Accidental Death from Guns and Motor Vehicles, U.S., 1993

| | Accidental Deaths per 100,000 | | | |
|---|---|---|---|---|
| | Gun-owning Households | Firearms | Vehicle-owning Households | Motor Vehicles |
| All guns | 3.423 | 0.656 | 47.865 | 21.587 |
| Handguns | 3.301 | 1.087 | — | — |

Sources:   Deaths: National Safety Council (1996:16, 17); number of civilian guns, handguns: Table 3.1; gun-owning households: average percentage reporting guns/handguns in Table 3.2, applied to total households (U.S. Bureau of the Census 1995:57); vehicle-owning households (based on percentage with vehicles in 1990): U.S. Bureau of the Census (1995:636); registered motor vehicles: U.S. Bureau of the Census (1995:634).

Table 9.2.    Trends in Fatal Gun Accidents, U.S., 1933–1995[a]

| Year | Total | FGAs per 100,000 Resident Population | Handguns (%) | Estimated Handgun | Handgun FGAs per 100,000 Resident Population |
|---|---|---|---|---|---|
| 1933 | 3014 | 2.40 | | | |
| 1935 | 2799 | 2.20 | | | |
| 1940 | 2390 | 1.80 | | | |
| 1945 | 2454 | 1.84 | | | |
| 1950 | 2174 | 1.43 | | | |
| 1955 | 2120 | 1.28 | | | |
| 1960 | 2334 | 1.30 | | | |
| 1965 | 2344 | 1.21 | | | |
| 1966 | 2558 | 1.30 | | | |
| 1967 | 2896 | 1.47 | | | |
| 1968 | 2394 | 1.20 | | | |
| 1969 | 2309 | 1.15 | | | |
| 1970 | 2406 | 1.18 | | | |
| 1971 | 2360 | 1.14 | | | |
| 1972 | 2442 | 1.17 | | | |
| 1973 | 2618 | 1.24 | | | |
| 1974 | 2513 | 1.18 | | | |
| 1975 | 2380 | 1.10 | | | |
| 1976 | 2059 | 0.95 | | | |
| 1977 | 1982 | 0.90 | | | |
| 1978 | 1806 | 0.81 | | | |
| 1979 | 2004 | 0.89 | 43.1 | 864 | 0.38 |
| 1980 | 1955 | 0.86 | 41.1 | 803 | 0.35 |
| 1981 | 1871 | 0.82 | 35.0 | 655 | 0.29 |
| 1982 | 1757 | 0.76 | 37.2 | 654 | 0.28 |
| 1983 | 1695 | 0.72 | 34.8 | 589 | 0.25 |
| 1984 | 1668 | 0.71 | 40.4 | 674 | 0.29 |
| 1985 | 1649 | 0.69 | 36.7 | 605 | 0.25 |
| 1986 | 1452 | 0.59 | 37.6 | 546 | 0.23 |
| 1987 | 1440 | 0.57 | 42.1 | 607 | 0.25 |

continued

Table 9.2. (Continued)

| Year | Total | FGAs per 100,000 Resident Population | Handguns (%) | Estimated Handgun | Handgun FGAs per 100,000 Resident Population |
|------|-------|------|------|------|------|
| 1988 | 1501 | 0.61 | 42.1 | 632 | 0.26 |
| 1989 | 1489 | 0.60 | 46.9 | 699 | 0.28 |
| 1990 | 1416 | 0.57 | 50.8 | 720 | 0.29 |
| 1991 | 1441 | 0.57 | 49.8 | 718 | 0.28 |
| 1992 | 1409 | 0.55 | 49.1 | 691 | 0.27 |
| 1993 | 1521 | 0.59 | 55.2 | 840 | 0.33 |
| 1994 | 1356 | 0.52 | | | |
| 1995 | 1225 | 0.47 | | | |

*Sources:* Deaths: U.S. National Center for Health Statistics (and predecessor agencies; 1988 and earlier), National Safety Council (1996:17, 42–43 and earlier issues). Population estimates: U.S. Bureau of Census (1995:8).

a 1933 was the first year vital statistics data were available for the entire nation, and 1993 was the most recent year for which data by gun type were available at the time of writing. Data on deaths by gun type were not available before 1978.

Table 9.3. Trends in Fatal Gun Accidents Involving Young Victims, 1974–1994

| | Victim Age | | | | Total | | |
|------|-----|-----|-------|-------|------|------|---------|
| Year | 0–4 | 5–9 | 10–14 | 15–19 | 0–14 | 0–19 | All ages |
| 1974 | 85 | 142 | 305 | 476 | 532 | 1008 | 2513 |
| 1975 | 71 | 120 | 304 | 428 | 495 | 923 | 2380 |
| 1976 | 61 | 104 | 263 | 362 | 428 | 790 | 2059 |
| 1977 | 48 | 104 | 240 | 390 | 392 | 782 | 1982 |
| 1978 | 52 | 87 | 210 | 320 | 349 | 669 | 1806 |
| 1979 | 57 | 87 | 220 | 354 | 372 | 726 | 2004 |
| 1980 | 45 | 77 | 194 | 373 | 316 | 689 | 1955 |
| 1981 | 51 | 64 | 183 | 306 | 298 | 604 | 1871 |
| 1982 | 44 | 81 | 154 | 271 | 279 | 550 | 1756 |
| 1983 | 40 | 45 | 158 | 261 | 243 | 504 | 1695 |
| 1984 | 34 | 66 | 187 | 265 | 287 | 552 | 1668 |
| 1985 | 43 | 58 | 177 | 241 | 278 | 519 | 1459 |
| 1986 | 34 | 57 | 143 | 238 | 234 | 472 | 1452 |
| 1987 | 37 | 66 | 144 | 220 | 247 | 467 | 1440 |
| 1988 | 41 | 51 | 185 | 266 | 277 | 543 | 1501 |
| 1989 | 42 | 59 | 172 | 294 | 273 | 567 | 1489 |
| 1990 | 34 | 56 | 146 | 305 | 236 | 541 | 1416 |
| 1991 | 24 | 41 | 162 | 324 | 227 | 551 | 1441 |
| 1992 | 36 | 48 | 132 | 285 | 216 | 501 | 1409 |
| 1993 | 30 | 38 | 137 | 321 | 205 | 526 | 1521 |
| 1994 | 34 | 151 | | n.a. | 185 | n.a. | 1356 |

*Sources:* U.S. NCHS (1988 and earlier; 1996b); National Safety Council (1996:32, and earlier issues).

# 10

# Public Opinion and the Bases of Support for Gun Control

In a democracy, public opinion matters. For proposed gun controls to have any impact, they must survive the political process and be implemented first, and this is harder in the face of significant public opposition to the controls. Public opinion polls are an important part of the political process and combatants on both sides of the gun control debate use poll results to buttress their positions and persuade policymakers of the popularity of the positions they take. Polls are commissioned by activists and by news outlets such as television networks, news magazines, and newspapers, while other surveys are conducted for their own reasons by pollsters such as Gallup and Harris and by research organizations such as the National Opinion Research Center (NORC). Advocates and opponents regularly cite public opinion polls as indicating that "the public" wants stricter controls or is happy with existing controls, believes the Second Amendment guarantees an individual the right to keep and bear arms or does not, or believes gun controls will or will not be effective in reducing crime. Each side selectively asks questions likely to yield answers favorable to their arguments and imposes interpretations on the answers that stress the "friendly" implications, and ignore the "hostile" implications.

## SOME CAVEATS ABOUT INTERPRETING PUBLIC OPINION POLLS

Survey results do not interpret themselves, and do not always mean what they seem to mean. Caution must be exercised in interpreting results, especially with regard to the exact form and wording of the questions asked. In a *Time*/CNN telephone poll conducted December 2, 1993, 23% of adult Americans favored a handgun ban, as described in the